```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION   |   MDL No. 2804
                                   |
 4   OPIATE LITIGATION             |   Case No. 17-MD-2804
                                   |
 5   This Document Relates to:     |   Hon. Dan A. Polster
                                   |
 6   The County of Summit, Ohio,   |
     et al., v.                    |
 7   Purdue Pharma L.P., et al.    |
     Case No. 17-op-45004          |
 8                                 |
     The County of Cuyahoga v.     |
 9   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45090          |
10                                 |
     City of Cleveland, Ohio v.    |
11   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45132          |
12                                 |
13
                  TUESDAY, JANUARY 15, 2019
14
                         - - -
15
            HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                  CONFIDENTIALITY REVIEW
17
                         - - -
18
           Videotaped deposition of MICHAEL COCHRANE,
19      held at Foley & Lardner LLP, One Biscayne Tower,
        2 Biscayne Boulevard, Suite 1900, Miami, Florida,
20      commencing at 9:11 a.m., on the above date,
        before Kelly J. Lawton, Registered Professional
21      Reporter, Licensed Court Reporter, Certified
        Court Reporter.
22                       - - -
23            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
24               deps@golkow.com
```

```
 1    APPEARANCES:

 2        WEITZ & LUXENBERG, P.C.
          BY:  PAUL NOVAK, ESQUIRE
 3             TIFFANY ELLIS, ESQUIRE
          3011 West Grand Boulevard, Suite 2150
 4        Detroit, Michigan 48202
          (313) 800-4170
 5        tellis@weitzlux.com
          pnovak@weitzlux.com
 6        Representing the Plaintiffs

 7

 8        FOLEY & LARDNER LLP
          BY:  JAMES W. MATTHEWS, ESQUIRE
 9        111 Huntington Avenue
          Boston, Massachusetts 02199
10        (617) 342-4000
          kkoski@foley.com
11        Representing Anda, Inc., and the witness

12

13        REED SMITH LLP
          BY:  M. CRISTINA CÁRDENAS, ESQUIRE
14        1001 Brickell Bay Drive, Suite 900
          Miami, Florida 33131
15        (786) 747-0207
          ccardenas@reedsmith.com
16        Representing AmerisourceBergen Corporation and
          AmerisourceBergen Drug Corporation
17

18

19

20

21

22

23

24
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2    JONES DAY
      BY:  ABIGAIL G. URQUHART, ESQUIRE
 3    555 South Flower Street
      Fiftieth Floor
 4    Los Angeles, California 90071
      (213) 489-3939
 5    aurquhart@jonesday.com
      Representing Walmart
 6
 7    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  KAREN RIGBERG, ESQUIRE
 8    44th Floor
      777 South Figueroa Street
 9    Los Angeles, California 90017-5844
      (213) 243-4006
10    karen.rigberg@arnoldporter.com
      Representing Endo Health Solutions Inc., Endo
11    Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
      Par Pharmaceutical Companies, Inc.,
12    (f/k/a Par Pharmaceutical Holdings, Inc.)
13
      COVINGTON & BURLING LLP
14    BY:  PAUL F. DOWNS, ESQUIRE
      The New York Times Building
15    620 Eighth Avenue
      New York, NY 10018-1405
16    (212) 841-1083
      pdowns@cov.com
17    Representing McKesson Corporation
18
19
20    ALSO PRESENT:
21    ANTHONY BARBARO, Videographer
22    MICHAEL PIGGINS, Weitz & Luxenberg
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          - - -
 2                      I N D E X
 3                          - - -
 4   Testimony of:  MICHAEL COCHRANE              PAGE
        DIRECT EXAMINATION BY MR. NOVAK...............   5
 5                                                  16
 6    CROSS-EXAMINATION BY MR. MATTHEWS............. 262
 7    REDIRECT EXAMINATION BY MR. NOVAK............. 314
 8
 9
10                    E X H I B I T S
11               (Attached to transcript)
12
13   MICHAEL COCHRANE DEPOSITION EXHIBITS           PAGE
14   Anda -      May 18, 2010 E-mail - Subject: Thing  23
     Cochrane      - Bates Numbered
15   Exhibit 1   Anda_Opioids_MDL_0000110043 to
                 Anda_Opioids_MDL_0000110044
16
     Anda -      Notice of Videotaped Deposition of    29
17   Cochrane    Michael Cochrane
     Exhibit 2
18
     Anda -      September 27, 2006 Letter from the     37
19   Cochrane    U.S. Department of Justice Drug
     Exhibit 3   Enforcement Administration - Bates
20               Numbered Anda_Opioids_MDL_0000540738
                 to Anda_Opioids_MDL_0000540741
21
     Anda -      Defendant Anda, Inc.'s Supplemental   42
22   Cochrane    Response to Plaintiffs' (First)
     Exhibit 4   Combined Discovery Requests to
23               Distributor Defendants
24
```

```
 1              E X H I B I T S
 2          (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS        PAGE
 4  Anda -       Anda, Inc. Standard Operating        43
    Cochrane     Procedure Number 028 - Customer Due
 5  Exhibit 5    Diligence - Bates Numbered
                 Anda_Opioids_MDL_0000144398 to
 6               Anda_Opioids_MDL_0000144401
 7  Anda -       Standard Operating Procedure Number  45
    Cochrane     OPS-028-00 - Information Needed to
 8  Exhibit 6    Set Up a New Account - Bates
                 Numbered Anda_Opioids_MDL_0000271410
 9               to Anda_Opioids_MDL_0000271411
10  Anda -       Anda, Inc. Standard Operating        48
    Cochrane     Procedure Number 040 - Suspicious
11  Exhibit 7    Order Monitoring - Bates Numbered
                 Anda_Opioids_MDL_0000144378 to
12               Anda_Opioids_MDL_0000144380
13  Anda -       Standard Operating Procedure Number  54
    Cochrane     OPS-000-40 - Controlled Substance
14  Exhibit 8    Monthly Override % - Bates Numbered
                 Anda_Opioids_MDL_0000276963 to
15               Anda_Opioids_MDL_0000276964
16  Anda -       E-mail Chain - Subject: Distributor  67
    Cochrane     Notification - Bates Numbered
17  Exhibit 9    Anda_Opioids_MDL_0000038787 to
                 Anda_Opioids_MDL_0000038794
18
    Anda -       E-mail Chain - Subject: Distributor  71
19  Cochrane     Notification - Bates Numbered
    Exhibit 10   Anda_Opioids_MDL_0000274531 to
20               Anda_Opioids_MDL_0000274532
21  Anda -       E-mail Chain - Subject: Distributor  73
    Cochrane     Notification - Bates Numbered
22  Exhibit 11   Anda_Opioids_MDL_0000276197 to
                 Anda_Opioids_MDL_0000276199
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S
 2          (Attached to transcript)
 3   MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -      November 5, 2008 E-mail - Subject:   81
     Cochrane    Doug Towle - Bates Numbered
 5   Exhibit 12  Anda_Opioids_MDL_0000153642
 6   Anda -      December 14, 2011 E-mail - Subject:  83
     Cochrane    DEA Meeting - Bates Numbered
 7   Exhibit 13  Anda_Opioids_MDL_0000133096 to
                 Anda_Opioids_MDL_0000133097
 8
     Anda -      December 7, 2005 E-mail - Subject:   92
 9   Cochrane    Excessive Order Reports November
     Exhibit 14  2005 - Bates Numbered
10               Anda_Opioids_MDL_0000271895 to
                 Anda_Opioids_MDL_0000271896
11
     Anda -      July 2, 2007 E-mail - Subject:       96
12   Cochrane    Excessive Order Report June 2007 -
     Exhibit 15  Bates Numbered
13               Anda_Opioids_MDL_0000013481 to
                 Anda_Opioids_MDL_0000013482
14
     Anda -      October 10, 2005 E-mail - Subject:   97
15   Cochrane    Suspicious Orders Week Ending
     Exhibit 16  10-9-05 - Bates Numbered
16               Anda_Opioids_MDL_0000271912 to
                 Anda_Opioids_MDL_0000271914
17
     Anda -      August 6, 2007 E-mail - Subject:     99
18   Cochrane    Suspicious Orders Week Ending 8-5-07
     Exhibit 17  - Bates Numbered
19               Anda_Opioids_MDL_0000271616 to
                 Anda_Opioids_MDL_0000271618
20
     Anda -      Summary of the DEA-HDMA Meeting on   105
21   Cochrane    Suspicious Orders Meeting Date:
     Exhibit 18  Sept. 7, 2007 - Bates Numbered
22               Anda_Opioids_MDL_0000280939 to
                 Anda_Opioids_MDL_0000280940
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2            (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS           PAGE
 4  Anda -       September 13, 2007 E-mail - Subject:  114
    Cochrane     HDMA Update and RAC Conference Call
 5  Exhibit 19   Cancellation Notice - Bates Numbered
                 Anda_Opioids_MDL_0000194634 to
 6               Anda_Opioids_MDL_0000194636
 7  Anda -       September 26, 2007 E-mail and          115
    Cochrane     DEA/Industry Conference Report -
 8  Exhibit 20   Bates Numbered
                 Anda_Opioids_MDL_0000276207 to
 9               Anda_Opioids_MDL_0000276212
10  Anda -       November 14, 2007 E-mail - Subject:   118
    Cochrane     FMC ACCT 400212 - Bates Numbered
11  Exhibit 21   Anda_Opioids_MDL_0000274287 to
                 Anda_Opioids_MDL_0000274288
12
    Anda -       November 9, 2007 E-mail - Subject:    123
13  Cochrane     Approval - Bates Numbered
    Exhibit 22   Anda_Opioids_MDL_0000258572
14
    Anda -       December 11, 2007 E-mail - Subject:   125
15  Cochrane     Distributor Notification - Bates
    Exhibit 23   Numbered Anda_Opioids_MDL_0000272213
16               to Anda_Opioids_MDL_0000272215
17  Anda -       E-mail Chain - Subject: Daily         128
    Cochrane     Submissions - Bates Numbered
18  Exhibit 24   Anda_Opioids_MDL_0000276122 to
                 Anda_Opioids_MDL_0000276129
19
    Anda -       E-mail Chain - Subject:               141
20  Cochrane     Suspicious/Daily Reports - Bates
    Exhibit 25   Numbered Anda_Opioids_MDL_0000276111
21               to Anda_Opioids_MDL_0000276113
22  Anda -       May 6, 2008 E-mail - Subject: Kyle    147
    Cochrane     Wright - SOMS - Bates Numbered
23  Exhibit 26   Anda_Opioids_MDL_0000276096 to
                 Anda_Opioids_MDL_0000276097
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2               (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -      June 17, 2008 E-mail - Subject: SOMs  149
     Cochrane    to DEA HQ - Bates Numbered -
 5   Exhibit 27  Anda_Opioids_MDL_0000276927
 6   Anda -      February 9, 2010 E-mail - Subject:   151
     Cochrane    Suspicious Orders - Bates Numbered
 7   Exhibit 28  Anda_Opioids_MDL_0000078286 to
                 Anda_Opioids_MDL_0000078288
 8
     Anda -      E-mail Chain - Subject: DEA Meeting  154
 9   Cochrane    - Bates Numbered
     Exhibit 29  Anda_Opioids_MDL_0000281694 to
10               Anda_Opioids_MDL_0000281696
11   Anda -      Standard Operating Procedure Number  158
     Cochrane    OPS-040-00 - Suspicious Order
12   Exhibit 30  Monitoring/Order Monitoring System -
                 Bates Numbered
13               Anda_Opioids_MDL_0000056015 to
                 Anda_Opioids_MDL_0000056016
14
     Anda -      E-mail Chain - Subject: Suspicious   159
15   Cochrane    Hold - Bates Numbered
     Exhibit 31  Anda_Opioids_MDL_0000079269 to
16               Anda_Opioids_MDL_0000079274
17   Anda -      Anda, Inc. - Standard Operating      165
     Cochrane    Procedure  - Suspicious Order
18   Exhibit 32  Monitoring/Order Monitoring System -
                 Bates Numbered
19               Anda_Opioids_MDL_0000082105 to
                 Anda_Opioids_MDL_0000082107
20
     Anda -      E-mail Chain - Subject: Account      173
21   Cochrane    #476453 - Bates Numbered
     Exhibit 33  Anda_Opioids_MDL_0000076476 to
22               Anda_Opioids_MDL_0000076479
23
24
```

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -       October 19, 2011 E-mail - Subject:  177
     Cochrane     798 Total Product Usage 3 Mo - Bates
 5   Exhibit 34   Numbered Anda_Opioids_MDL_0000070701
                  to Anda_Opioids_MDL_0000070702
 6
     Anda -       E-mail Chain - Subject: Customer    179
 7   Cochrane     40008 - Pile Drug Store - Bates
     Exhibit 35   Numbered Anda_Opioids_MDL_0000082857
 8                to Anda_Opioids_MDL_0000082858
 9   Anda -       December 13, 2011 E-mail - Subject:  183
     Cochrane     Acct #206406 - Bates Numbered
10   Exhibit 36   Anda_Opioids_MDL_0000082864
11   Anda -       E-mail Chain - Subject: Customer    185
     Cochrane     40008 - Pile Drug Store - Bates
12   Exhibit 37   Numbered Anda_Opioids_MDL_0000726938
                  to Anda_Opioids_MDL_0000726939
13
     Anda -       E-mail Chain - Subject: Approval -  186
14   Cochrane     Bates Numbered
     Exhibit 38   Anda_Opioids_MDL_0000282942
15
     Anda -       E-mail Chain - Subject: Ltr of      189
16   Cochrane     Admonition Response for DEA - Bates
     Exhibit 39   Numbered Anda_Opioids_MDL_0000276293
17                to Anda_Opioids_MDL_0000276299
18   Anda -       June 17, 2008 E-mail - Subject:     192
     Cochrane     Approval - Bates Numbered
19   Exhibit 40   Anda_Opioids_MDL_0000273585 to
                  Anda_Opioids_MDL_0000273586
20
     Anda -       E-mail Chain - Subject: QCP Business 194
21   Cochrane     Increase and Allocation - Bates
     Exhibit 41   Numbered Anda_Opioids_MDL_0000079605
22                to Anda_Opioids_MDL_0000079606
23   Anda -       April 21, 2010 E-mail - Subject:    196
     Cochrane     Approval - Bates Numbered
24   Exhibit 42   Anda_Opioids_MDL_0000283178
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S
 2           (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4    Anda -        March 29, 2011 E-mail - Bates      197
      Cochrane      Numbered Anda_Opioids_MDL_0000133445
 5    Exhibit 43    to Anda_Opioids_MDL_0000133446
 6    Anda -        E-mail Chain - Subject: FL HB 7905 -  199
      Cochrane      Bates Numbered
 7    Exhibit 44    Anda_Opioids_MDL_0000079594 to
                    Anda_Opioids_MDL_0000079595
 8
      Anda -        February 21, 2006 E-mail - Subject:   204
 9    Cochrane      DEA CSOS Report Request - Bates
      Exhibit 45    Numbered Anda_Opioids_MDL_0000155184
10
      Anda -        Letter to Albert Paonessa III from    211
11    Cochrane      the U.S. Department of Justice Drug
      Exhibit 46    Enforcement Administration - Re: DEA
12                  Registration Number RA0180733 -
                    Bates Numbered
13                  Anda_Opioids_MDL_0000001208 to
                    Anda_Opioids_MDL_0000001209
14
      Anda -        December 6, 2011 Letter to Gayle      217
15    Cochrane      Lane from Albert Paonessa III -
      Exhibit 47    Bates Numbered
16                  Anda_Opioids_MDL_0000001210 to
                    Anda_Opioids_MDL_0000001212
17
      Anda -        E-mail and Letter - Subject: Draft    217
18    Cochrane      Response to DEA LOA - Bates Numbered
      Exhibit 48    Anda_Opioids_MDL_0000082872 to
19                  Anda_Opioids_MDL_0000082874
20    Anda -        E-mail Chain - Subject: Draft         219
      Cochrane      Response to DEA LOA -
21    Exhibit 49    Anda_Opioids_MDL_0000133111 to
                    Anda_Opioids_MDL_0000133113
22
      Anda -        E-mail and The Detroit News Article   223
23    Cochrane      - Bates Numbered
      Exhibit 50    Anda_Opioids_MDL_0000281678 to
24                  Anda_Opioids_MDL_0000281680
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -       June 17, 2010 E-mail - Subject: Mass   225
     Cochrane     Update Customer Master # - Bates
 5   Exhibit 51   Numbered Anda_Opioids_MDL_0000281703
 6   Anda -       July 17, 2007 E-mail - Subject:        228
     Cochrane     Internal and External Communications
 7   Exhibit 52   - Bates Numbered
                  Anda_Opioids_MDL_0000275725 to
 8                Anda_Opioids_MDL_0000275729
 9   Anda -       E-mail Chain - Subject: 2Record        229
     Cochrane     Request - Bates Numbered
10   Exhibit 53   Anda_Opioids_MDL_0000078355 to
                  Anda_Opioids_MDL_0000078363
11
     Anda -       June 14, 2012 E-mail - Subject:        235
12   Cochrane     Actavis Brand CII Launch Review -
     Exhibit 54   MoxDuo - Bates Numbered
13                Anda_Opioids_MDL_0000086469 to
                  Anda_Opioids_MDL_0000086470
14
     Anda -       E-mail Chain - Subject: 210582         237
15   Cochrane     Neighborcare CII Order Snafu - Bates
     Exhibit 55   Numbered Anda_Opioids_MDL_0000109243
16                to Anda_Opioids_MDL_0000109245
17   Anda -       E-mail Chain - Subject: Attached       240
     Cochrane     Controlled Info 2nd Attempt - Bates
18   Exhibit 56   Numbered Anda_Opioids_MDL_0000086482
                  to Anda_Opioids_MDL_0000086487
19
     Anda -       E-mail, Letter and Report - Subject:   246
20   Cochrane     Revised Report - Bates Numbered
     Exhibit 57   Anda_Opioids_MDL_0000539140 to
21                Anda_Opioids_MDL_0000539150
22   Anda -       E-mail Chain - Subject: WH/Freight     249
     Cochrane     Hold ORR890 - Bates Numbered
23   Exhibit 58   Anda_Opioids_MDL_0000084233 to
                  Anda_Opioids_MDL_0000084237
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2               (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -       September 11, 2012 - Subject:      257
     Cochrane     Calculation Example - Bates Numbered
 5   Exhibit 59   Anda_Opioids_MDL_0000085935
 6   Anda -       E-mail Chain - Subject: Actavis    260
     Cochrane     Brand CII Launch Review - MoxDuo -
 7   Exhibit 60   Bates Numbered
                  Anda_Opioids_MDL_0000090905 to
 8                Anda_Opioids_MDL_0000090907
 9   Anda -       March 7, 2012 E-mail - Subject: RA - 260
     Cochrane     Top Products for Top 100 Stores
10   Exhibit 61   Review (Combined with Misc Random
                  Research) - Bates Numbered
11                Anda_Opioids_MDL_0000081549 to
                  Anda_Opioids_MDL_0000081571
12
     Anda -       U.S. Department of Justice Drug    273
13   Cochrane     Enforcement Administration -
     Exhibit 62   Diversion Control Division - Title
14                21 United States Code (USC)
                  Controlled Substances Act
15
     Anda -       U.S. Department of Justice Drug    273
16   Cochrane     Enforcement Administration -
     Exhibit 63   Diversion Control Division - Part
17                1301 - Registration of
                  Manufacturers, Distributors, and
18                Dispensers of Controlled Substances
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    - - -

2            THE VIDEOGRAPHER:  We are now on the record.

3       My name is Anthony Barbaro.  I am a videographer

4       for Golkow Litigation Services.  Today's date is

5       January 15th, 2019, and the time is 9:11 a.m.

6       This video deposition is being held in Miami,

7       Florida, at 2 South Biscayne Boulevard, Suite

8       1900, Miami, Florida 33131 In Re:  The National

9       Prescription Litigation for the United States

10      District Court, Northern District of Ohio,

11      Eastern Division.  The deponent is Michael

12      Cochrane.

13           Counsel, would you please announce your

14      appearances for the record.

15           MR. NOVAK:  Paul Novak of Weitz & Luxenberg

16      on behalf of the plaintiffs.  Also from Weitz &

17      Luxenberg today are Tiffany Ellis and

18      Michael Piggins.

19           MR. MATTHEWS:  James Matthews for the

20      defendant Anda, Inc., and for the witness,

21      Michael Cochrane.

22           MS. CARDENAS:  Cristina Cardenas from Reed

23      Smith on behalf of AmerisourceBergen.

24           MR. NOVAK:  And can we have appearance of
```

```
 1          counsel who are attending telephonically?

 2              Don't all jump in at once.

 3              MS. URQUHART:  Hello.  My name is Abigail

 4       Urquhart, counsel for Walmart.

 5              MR. DOWNS:  This is Paul Downs for

 6       Covington & Burling, counsel for McKesson.

 7              MS. RIGBERG:  Karen Rigberg of Arnold and

 8       Porter appearing on behalf of the Endo & Par

 9       defendants.

10              THE VIDEOGRAPHER:  Okay.  The court reporter

11       is Kelly Lawton, and she will now swear in the

12       witness.

13              THE COURT REPORTER:  Sir, would you please

14       raise your right hand.

15              Do you swear or affirm the testimony you're

16       about to give will be the truth, the whole truth,

17       and nothing but the truth?

18              THE WITNESS:  I do.

19              THE COURT REPORTER:  Thank you.

20              MICHAEL COCHRANE, called as a witness by the

21       Plaintiffs, having been first duly sworn, testified

22       as follows:

23       ///

24       ///
```

```
 1                    DIRECT EXAMINATION

 2   BY MR. NOVAK:

 3       Q.   Mr. Cochrane, can you provide your full name

 4   and address for the record?

 5       A.   Yep.  It is Michael Daniel Cochrane.  Address

 ▮   ████████████████████████████████████████████████

 ▮   ████████████

 8       Q.   Okay.  Have you had your deposition taken

 9   before?

10       A.   No.

11       Q.   Okay.  Let me go through a couple just kind

12   of ground rules.

13            The first is make sure to try to provide your

14   answers orally rather than just through a head nod or

15   other gestures.

16            If you don't understand one of my questions,

17   let me know and I'll try to repeat it or rephrase it

18   so that hopefully it's understandable.

19            And if at any time over the course of the

20   deposition you feel like you need a break, let me

21   know and I'll try to accommodate you as quickly as

22   possible.

23            Can you provide for me what your last title

24   was at Anda?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Executive director of regulatory compliance.

 2      Q.   How long were you with the company?

 3      A.   Just over 19 years.

 4      Q.   Okay.  Before you started with the company,

 5   can you give me just a very brief description of your

 6   education and your prior employment history?

 7      A.   High school diploma.

 8      Q.   Okay.  And employment history after high

 9   school?

10      A.   Was Anda.

11      Q.   Okay.  So Anda was your first job out of high

12   school?

13      A.   Correct.

14      Q.   Okay.  And when did you start with the

15   company?

16      A.   March of 1997.

17      Q.   And was it Anda that you started with or

18   Andrx?

19      A.   Anda.

20      Q.   Okay.  And what was your initial position

21   starting in March of '97 with Anda?

22      A.   Warehouse operator.

23      Q.   Where was that?

24      A.   In Davie, Florida.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    How long did you serve as a warehouse

 2   operator?

 3        A.    Don't really remember.  Several years.

 4        Q.    What position did you hold -- by the way, you

 5   said 19 years at Anda.  Was that continuous

 6   employment?

 7        A.    Yes.

 8        Q.    Okay.  You never stopped and worked somewhere

 9   else?

10        A.    No.

11        Q.    Okay.  After the warehouse operator position,

12   what was the next position you held at the company?

13        A.    I was the team leader of the controlled

14   substance cage.

15        Q.    When you say controlled substance cage, are

16   you talking about a portion of the warehouse facility

17   in Davie, Florida?

18        A.    Yes.

19        Q.    And can you give me a brief description of

20   your responsibilities as a team leader of the

21   controlled substance cage at that facility?

22        A.    Running the pick, pack, and ship operation as

23   well as our inventory control and warehouse

24   management functions.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   Roughly what time did you hold the position

2   of controlled substances cage team leader?

3      A.   Sometime in 1999 probably through 2001.

4      Q.   Okay.  When you described one of your

5   functions in that position as inventory control, can

6   you give me a brief description as to what your

7   duties as it related to inventory control entailed?

8      A.   Counting the products and doing inventory

9   reconciliation in the event there were any variances

10  or any shipping -- potential shipping issues.

11     Q.   Okay.  What position did you hold after the

12  controlled substance cage team leader?

13     A.   I don't remember.  I think it may have been

14  compliance manager.

15     Q.   And during what time did you hold the

16  position of compliance manager at the company?

17     A.   I don't remember the dates.

18     Q.   It would have started sometime after 2001?

19     A.   Yes.

20     Q.   And approximately when did you -- well, let

21  me ask a different question.

22          What position did you hold at the company

23  after compliance manager?

24     A.   Maybe it was DEA compliance manager prior to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    compliance manager.  Then it was compliance manager.

 2        Q.   So from the controlled substance cage team

 3    leader, you became DEA compliance manager and then

 4    compliance manager after that?

 5        A.   I believe so, yes.

 6        Q.   Okay.  And what time did you become

 7    compliance manager?

 8        A.   I don't remember the dates.

 9        Q.   Roughly.

10        A.   2003 potentially.

11        Q.   How long did you hold that position?

12        A.   I don't remember.

13        Q.   What position did you have after compliance

14    manager?

15        A.   Maybe compliance logistics manager.  I can't

16    remember all of my titles dating back that far.

17        Q.   Sure.

18             Do you have the approximate time frame for

19    the compliance logistics manager?

20        A.   I don't.

21        Q.   By the way, for the positions of DEA

22    compliance manager and then compliance manager, were

23    the duties roughly the same or did they change?

24        A.   They changed somewhat.
```

1       Q.   Okay.  Why don't you describe first the DEA

2    compliance manager and what your duties were in that

3    position.

4       A.   It was the pick, pack, and ship operation

5    from a logistical standpoint.  Inventory control,

6    receiving, anything from a warehouse function.

7       Q.   Did you have any duties as it related to

8    reporting to the Drug Enforcement Administration?

9       A.   Eventually, yeah.  I was doing our ARCOS

10    reporting, which was a monthly submission of

11    controlled substances transactions.

12       Q.   Anything other than ARCOS report in terms of

13    duties that entailed communications with the DEA?

14            MR. MATTHEWS:  Can you clarify just the time

15       period?

16            MR. NOVAK:  I think he testified

17       approximately 2001 to 2003.

18            MR. MATTHEWS:  Okay.  So limited to when he

19       was DEA compliance manager?

20            MR. NOVAK:  Yes.

21            MR. MATTHEWS:  Thank you.

22            THE WITNESS:  Not that I recall, no.

23    BY MR. NOVAK:

24       Q.   Okay.  And how about when the position

Highly Confidential - Subject to Further Confidentiality Review

```
 1    switched to just general compliance -- or just the

 2    term "compliance manager"?  Did you have expanded

 3    responsibilities for reporting to the DEA at that

 4    time?

 5        A.   Not that I recall, no.

 6        Q.   Okay.  How did your duties change when you

 7    shifted from DEA compliance manager to compliance

 8    manager?

 9        A.   I also took over the licensing aspect of our

10    facilities and the duties of compliance as far as the

11    Department of Health was concerned.

12        Q.   Is that the Florida Department of Health?

13        A.   Yes.

14        Q.   I may have touched on this, but do you recall

15    approximately when you switched from compliance

16    manager to compliance logistics manager?

17        A.   I do not.

18        Q.   Roughly how long did you serve as a

19    compliance logistics manager?

20        A.   I don't remember.

21        Q.   What were the duties that you had as a

22    compliance logistics manager?

23        A.   I still had -- I still oversaw the pick,

24    pack, and ship operation of the controlled substance
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    area as well as following Florida Department of

 2    Health and the newer pedigree regulations that

 3    started in 2003, I believe, 2004, maybe.

 4        Q.   Is that the sum and substance of your duties

 5    as a compliance logistics manager?

 6        A.   Yes.

 7        Q.   What position did you hold after that?

 8        A.   I don't remember.  Director of compliance,

 9    maybe.

10        Q.   And approximately when did you become

11    director of compliance?

12        A.   I'm not sure.  Sometime between 2005 and

13    2010, I would think.

14        Q.   Is when you started in that position?

15        A.   I believe so.

16        Q.   Okay.  And can you give me a description of

17    your duties in that position?

18        A.   It all encompassed the same thing.  The pick,

19    pack, and ship operation of the controlled substance

20    area as well as prescription drug pedigree

21    regulation.  And at some point through there I also

22    took over the licensure of our facilities, but I

23    can't remember the specific dates.

24        Q.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              (Anda - Cochrane Exhibit 1 was marked for

2       identification.)

3       BY MR. NOVAK:

4          Q.   We've had marked as Anda - Cochrane

5       Deposition Exhibit 1 a two-page document, the first

6       page being an e-mail that appears to be from Al

7       Paonessa to Patrick Cochrane dated May 18, 2010, the

8       second page of which appears to be a -- an

9       announcement of some sort.

10             And I'd like you to look at the second page

11      of Anda - Cochrane Deposition Exhibit 1, particularly

12      the portion of the exhibit that relates to you.

13             MS. RIGBERG:  Excuse me.  This is Karen.  Is

14         there a Bates Number for this document?

15             MR. NOVAK:  Oh, thanks.  The document bears

16         the Bates Number 11 -- 110043 and 44.

17             MS. RIGBERG:  Okay.  Good.  Thanks.

18      BY MR. NOVAK:

19         Q.   Have you had a chance to review the document,

20      Mr. Cochrane?

21         A.   Yeah.

22         Q.   And really what I wanted to focus on is

23      really the characterization of the responsibilities

24      of your position as director of logistics compliance
```

Highly Confidential - Subject to Further Confidentiality Review

1    are accurate from your perspective as of that time in

2    2010?

3         A.    Yeah.

4         Q.    Okay.  Now, one of the duties that is

5    referenced in that page of Anda - Cochrane Deposition

6    Exhibit 1 is "Review and determine the control limits

7    of all accounts."

8              You see that reference?

9         A.    I do.

10        Q.    Can you describe for me what that means?

11        A.    At that point in time, we had a system where

12   we were restricting customers to specific amounts of

13   controlled substances, and if they were in need of

14   more, then what we developed as a threshold, we would

15   do a review of the customer to determine whether or

16   not their limits were where we thought they should

17   be.

18        Q.    And you were the one responsible to review

19   and determine as of this time in 2010 what those

20   limits were for each customer?

21        A.    In 2010, I believe we had a baseline of

22   either 5,000 or 1,000.  I'm not sure.  And then we

23   would adjust accordingly from there.

24        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1       A.   I can't remember at that specific date what

2    the specific numbering or limits were from a starting

3    standpoint.

4       Q.   Right.

5            Did you receive the title of executive

6    director around this time in 2010?

7       A.   I don't remember.  If it wasn't around this

8    time, it was shortly after, I would think.

9       Q.   Okay.  And was your title executive director

10   of compliance?

11      A.   I believe it was executive director of

12   regulatory compliance.

13      Q.   And that is the position that you held at

14   Anda for the remainder of your time there?

15      A.   Yes.

16      Q.   And you received that title in approximately

17   2010?

18      A.   I believe so.

19      Q.   Can you give me a description of what your

20   responsibilities were as the director -- the

21   executive director of regulatory compliance?

22      A.   Yeah.  I was the certified designated

23   representative.  I managed all of our customer

24   licensing, the review and determined the control

Highly Confidential - Subject to Further Confidentiality Review

1    limits, ensuring the company's DEA regulatory state

2    and federal compliance, OSHA, EPA, PDMA, DEA,

3    everything that's listed on this form.

4         Q.   Okay.  Did your duties expand at any time

5    from 2010 until your departure from the company?

6              And when did you leave the company?  2016?

7         A.   '16, yes.

8         Q.   Did your duties expand from the period of

9    2010 to 2016?

10        A.   Yeah.  I took over sales training for a short

11   period of time, and that was it.

12        Q.   Okay.  Who did you work with in performing

13   the sales training function?

14        A.   There was a department that was already

15   assembled prior to me inheriting it after a reorg

16   that was done sometime in 2014, 2015, maybe.  There

17   was already a team of maybe five people or so that

18   were part of that department that I ended up taking

19   over.

20        Q.   Okay.  Who were those individuals back in

21   2014 or '15 that reported to you when you took over

22   the sales training requirements?

23        A.   Specific names?

24        Q.   Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Margaret Haines, Abby Pratter, Chuck

2    Brooks -- he was the -- he was the sales training

3    manager at that point -- Dezzy Perez, Leann Brenham.

4    There might have been two other ones.  I can't

5    remember their names.

6      Q.   Okay.  You also had a regulatory compliance

7    staff that reported to you?

8      A.   I did, yes.

9      Q.   And at this roughly 20 -- well, let's go back

10   to approximately 2005 when you were the director of

11   compliance.

12     A.   Okay.

13     Q.   Who was it that reported to you at that time?

14     A.   In 2005, I had Miguel Palma, a team of

15   warehouse operators under him that ran the actual

16   pick, pack, and ship operation of the controlled

17   substance area.  I had Emily Schultz, Vivian Harvey,

18   maybe one or two others that I can't remember right

19   now.

20     Q.   Okay.  When you began to review and determine

21   control limits of accounts, who was it that assisted

22   you in performing that function?

23     A.   Emily Schultz to start, and then from there

24   we expanded the department sometime after 2010.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  And who else in addition to

2   Emily Schultz when you got into 2010 and later?

3        A.    After 2010, it was Sabrina Solis, then

4   Mary Barber.  For a short period of time, we had

5   someone named Howard Davis.  Latoya Samuels after

6   that.  Before I left, John Kincaide, Robert Brown,

7   and one other I can't remember.

8        Q.    Okay.

9        A.    That's stretching from after 2010 through --

10  through '16.

11       Q.    Okay.  By the way, for purposes of preparing

12  for this deposition, what did you do?

13       A.    What did I do?

14       Q.    Yes.

15       A.    I met with James and Katie.

16       Q.    When was that?

17       A.    Yesterday.

18       Q.    Without telling me the substance of any

19  documents, did you review documents in your meeting

20  with James and Katie?

21       A.    I did.

22       Q.    Okay.  Now, for purposes of all of these

23  different responsibilities and titles that you

24  performed over your 19 years at Anda, did the
```

```
 1    documents that you reviewed yesterday assist in

 2    jogging your memory on some of the details?

 3        A.   For some, yes.

 4        Q.   Okay.  Did they assist in refreshing your

 5    recollection about particular facts or events as it

 6    related to the performance of your responsibilities?

 7        A.   For some of them, yes.

 8        Q.   Okay.  When you say for some of them, you

 9    mean for some of the facts and events?

10        A.   Yes.

11        Q.   Okay.

12            (Anda - Cochrane Exhibit 2 was marked for

13    identification.)

14    BY MR. NOVAK:

15        Q.   We have had marked as Anda - Cochrane

16    Deposition Exhibit 2 a document that is the Notice of

17    Videotaped Deposition of Michael Cochrane for today.

18            Have you seen this document before right now?

19        A.   No, sir.

20        Q.   Okay.  The documents that you mentioned that

21    you reviewed in preparation of your deposition, were

22    those solely documents that you reviewed yesterday?

23        A.   Yes.

24        Q.   Okay.  Quantity-wise, roughly how many
```

```
 1   documents were there?

 2        A.   Oh, I don't remember.

 3        Q.   Is there a stack of them that you reviewed?

 4        A.   No, not specifically a stack.  I'd say

 5   several.

 6        Q.   Were they something that you reviewed on a

 7   conference table here in the office?

 8        A.   Yeah.

 9        Q.   Okay.  About how thick of a pile of documents

10   were they?

11        A.   They were one at a time.  There was no

12   specific pile that we went through.  I couldn't give

13   you a size or a stack or height.

14        Q.   Okay.  Over what period of time or how long

15   did you meet yesterday with counsel to prepare for

16   the deposition?

17        A.   I'd say approximately four to five hours.

18        Q.   Okay.  And it was over that period of time

19   here in this office that you looked at those

20   documents?

21        A.   Yes.

22        Q.   Okay.  Now, the notice of deposition

23   exhibit -- notice of deposition states in the second

24   paragraph:  Pursuant to federal rule, Mr. Cochrane is
```

```
 1    requested to produce on or before January 15, 2019,

 2    copies of all documents, data, or information

 3    reviewed in connection with his preparation for the

 4    deposition.

 5         MR. NOVAK:  I'll ask counsel:  Are you

 6         willing to provide the documents that are

 7         requested as indicated in that paragraph of

 8         Exhibit 2?

 9         MR. MATTHEWS:  No, we're not.

10         MR. NOVAK:  Okay.

11         MR. MATTHEWS:  I don't think you have laid

12         the foundation.

13         MR. NOVAK:  We'll come back to that issue in

14         a little bit.

15    BY MR. NOVAK:

16         Q.   As it relates -- hold on.

17              Mr. Cochrane, I wanted to ask you with

18    respect to the time period that you worked at Anda as

19    to whether you had any compensation package that

20    included a bonus provision?

21         A.   I did.

22         Q.   Okay.  What was the basis upon which the

23    bonus was paid?  Were there factors involved in

24    determining your bonus?
```

```
 1        A.    Sure.

 2        Q.    And were those laid out in performance

 3   objectives that were set forth at the company?

 4        A.    Yes, as well as the company's performance.

 5        Q.    So one of the factors was the company's

 6   financial performance, and an additional factor was

 7   the performance of goals that were specific to your

 8   position?

 9        A.    Yes.

10        Q.    How were those goals set?

11        A.    They were set by our direct managers

12   specifically.  I can't remember what they were.

13        Q.    When you say by direct managers, who was your

14   direct manager during the time period that you were

15   the executive director of regulatory compliance?

16        A.    Albert Paonessa, III.

17        Q.    Did you leave your position at roughly the

18   same time that Mr. Paonessa left his, or was there a

19   period of time when you reported to his successor?

20        A.    I reported to his successor.

21        Q.    Okay.  And that was?

22        A.    Chip Phillips.

23        Q.    So during the time that you performed as the

24   executive director of regulatory compliance, those
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    goals were set either by Mr. Paonessa and then later

 2    by Mr. Phillips?

 3        A.   Yes, sir.

 4        Q.   Did any of those bonuses was a factor -- I'll

 5    start over.

 6             There came a point in time when Anda was

 7    purchased by Watson.  Is that your understanding?

 8        A.   Yes.

 9        Q.   Okay.  And after they were purchased by

10    Watson, was Watson's financial performance a factor

11    in the payment of a bonus to you?

12        A.   I believe it was.

13        Q.   Okay.  And then subsequently, when it

14    became -- or became known as Actavis, was the

15    performance or the payment of a bonus to you based at

16    least in part on Actavis's financial performance?

17        A.   I believe so, yes, and as well as our

18    divisional performance since we were a subsidiary.

19        Q.   Okay.  Was any portion of your bonus based

20    upon meeting particular regulatory compliance goals?

21        A.   I believe there were some, yes.

22        Q.   Okay.  What were they, if you recall?

23        A.   Specifically, prescription drug pedigree

24    compliance, following the DSCSA Act, the federal
```

1    pedigree rule that kind of trumped Florida's pedigree

2    rule.  There may have been some in there from an

3    evaluation of customers.  I don't remember.

4        Q.   Okay.  Anything related to compliance with

5    goals associated with controlled substance

6    regulation?

7        A.   Not that I can remember, no.

8        Q.   During the years that you were paid bonuses,

9    roughly, what was the percentage of the bonus

10   compared to your base compensation?

██      ██      █████████████████████████████

██      ████████████████████

██      ██      ██████████████████████████████

██      ████

██      ██      ███████████████

██      ██      █████

██      ██      ████████████████

18       Q.   Okay.  And at the time you left Anda, what

19   was your base compensation?

20       MR. MATTHEWS:  Objection.  I'm not going to

21       let him answer that question unless you can lay a

22       foundation for the actual amount he was paid is

23       relevant to the claims and issues in this

24       lawsuit.

```
 1            MR. NOVAK:  Okay.  All right.  We've got two

 2       issues now.  One is your instruction of the

 3       witness not to answer with respect to

 4       compensation of the specific amounts and also

 5       the -- the refusal to provide documents that the

 6       witness has testified refreshed his recollection

 7       as to the performance of his responsibilities at

 8       the company.

 9            I think what I would like to do is call the

10       special master with respect to those two discrete

11       items to see if we can get a determination on the

12       production of the documents as well as whether he

13       should be allowed to testify on compensation.

14            MR. MATTHEWS:  It's your prerogative.  If you

15       want to do that, feel free to do it.

16            MR. NOVAK:  And just so you know in advance,

17       the primary basis for my position that the

18       documents should be produced is that the witness

19       has testified that they assisted in refreshing

20       his recollection as to the performance of his

21       responsibilities and some facts and events.

22            MR. MATTHEWS:  Would you like to give me an

23       opportunity to examine the witness on that so we

24       have a record -- a clear record?
```

```
 1          MR. NOVAK:  Well, he's already provided

 2     testimony on that.

 3          MR. MATTHEWS:  He has testified in vague and

 4     ambiguous ways that some issues were had -- his

 5     memory was refreshed as to some issues and not

 6     tied it to any specific document he reviewed.  So

 7     on the record as it exists, it is not clear what

 8     document, if any, he reviewed was a document that

 9     refreshed his recollection, and as to which you

10     might be able to overcome the otherwise

11     rock-solid privilege on attorney work product,

12     okay.

13          Those documents were selected by me as part

14     of my job representing this company to show this

15     witness.  They are subject to the attorney work

16     product doctrine, and it's your burden to

17     overcome that.  And if you think that the record

18     you have now overcomes that, fine, we can go in

19     front of the special master and argue it.

20          But I don't believe it does.  And to the

21     extent it's not clear on the record that you

22     haven't asked about specific documents and that

23     he hasn't testified about specific documents, I

24     would like the opportunity to make it clear on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        the record so that when we are before the special

 2        master I can make representations based on

 3        evidence and record rather than just my

 4        representations of what happened.  That's all.

 5        It's up to you how you want to proceed.

 6             MR. NOVAK:  Okay.  Well, I'm assuming that

 7        the particular content of the documents that you

 8        showed him are something that you will also

 9        instruct him not to answer.  So it's difficult

10        for me to go particularly further in providing a

11        more detailed evidentiary foundation.

12             MR. MATTHEWS:  You know, I'm not -- I'm not

13        your lawyer.  So you have to do it however you

14        want to do it, Mr. Novak.

15             MR. NOVAK:  So I think we'll -- do you have

16        the phone number?

17             THE VIDEOGRAPHER:  Off the record?

18             MR. NOVAK:  Yes.

19             THE VIDEOGRAPHER:  Off the record at 9:49.

20          (Recess from 9:49 until 9:51 a.m.)

21             THE VIDEOGRAPHER:  We're now back on the

22        video record at 9:51 a.m.

23          (Anda - Cochrane Exhibit 3 was marked for

24     identification.)
```

1   BY MR. NOVAK:

2      Q.   Mr. Cochrane, do you recognize the name

3   Joseph Rannazzisi?

4      A.   Yeah, I have heard it.

5      Q.   What is your understanding as to who Joseph

6   Rannazzisi is?

7      A.   I believe at one point he was in charge of

8   the DEA.  I don't remember his specific title.

9      Q.   Okay.  We have had marked a document that was

10  previously marked as Anda Versosky Deposition Exhibit

11  Number 1 and will be marked in this proceeding -- or

12  in this deposition as Anda - Cochrane Deposition

13  Exhibit 3.

14          Mr. Cochrane, is this a document that you

15  would have seen prior to today?

16     A.   I believe so.  I don't remember it

17  specifically, though.

18     Q.   Okay.  Generally, do you recall reference to

19  a Rannazzisi letter or letters that issued in the

20  2006 and 2007 time frame to various wholesalers and

21  distributors around the country?

22     A.   Yes.

23     Q.   And do you understand that Anda - Cochrane

24  Deposition Exhibit 3 was such a letter that would

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have been received by Anda during that time frame?

 2         A.   Yes.

 3              MS. RIGBERG:  Is there a Bates Number for

 4       this?

 5              MR. NOVAK:  Yes.  Anda - Cochrane Deposition

 6       Exhibit Number 3 bears the Bates

 7       Number Anda540738 through 540741.

 8              And I'll note someone probably has a copy

 9       that may have my notes on it.  Maybe not.

10              MR. MATTHEWS:  Not me.

11              MR. NOVAK:  Okay.

12    BY MR. NOVAK:

13         Q.   I would like to direct your attention to the

14    third page of Anda - Cochrane Deposition Exhibit

15    Number 3 that states or sets forth circumstances that

16    might be indicative of diversion.  And there are a

17    series of factors that are set forth in the

18    Rannazzisi letter of 2006.

19              Have you reviewed these different factors

20    before?

21              MR. MATTHEWS:  Objection.

22              THE WITNESS:  Not that I remember, no.

23    BY MR. NOVAK:

24         Q.   Okay.  By the way, for purposes -- and we'll
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    set the letter to the side for the moment.

 2            For the purposes of performing your

 3    responsibilities as executive director of regulatory

 4    compliance or the prior position of director of

 5    regulatory compliance, how did you prepare yourself

 6    for becoming aware of what different regulatory

 7    obligations as it related to controlled substance

 8    were?

 9        A.   We were active HDMA members.  I worked for

10    Jay Spellman for a number of years before moving

11    under Dan Movins, who was also somebody who was in

12    the industry for a substantial amount of time.  I

13    don't know if you would call them my mentors, but I

14    worked with them for long periods of time.

15        Q.   Okay.  You made reference to HDMA membership?

16        A.   Yes.

17        Q.   Were there conferences that you would go to

18    that were sponsored by HDMA or other organizations?

19        A.   There were a couple, yeah.

20        Q.   And those conferences gave you training on

21    what different factors were -- that assisted you in

22    the performance of your responsibilities as it

23    related to controlled substances?

24        A.   Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Do you recall the Rannazzisi letters

2   being identified at those conferences as articulating

3   some of the things that you would evaluate for

4   determining whether particular customers of Anda

5   should be eligible to buy controlled substances?

6      A.    I don't remember them specifically being at

7   conferences dating back that far.

8      Q.    Okay.  Let's go through some of the

9   circumstances that are identified in Anda - Cochrane

10  Deposition Exhibit 3 on the third page.

11         And the heading states:  "Circumstances that

12  might be indicative of diversion."

13         And the first one articulated there is:

14  Ordering excessive quantities of a limited variety of

15  controlled substances (e.g., ordering only

16  phentermine, hydrocodone, and alprazolam) while

17  ordering few, if any, other drugs.

18         Do you see that reference?

19      A.    Yeah.

20      Q.    Is that one of the factors that Anda

21  evaluated in making a determination as to whether a

22  particular controlled substance customer of the

23  company should be authorized to receive controlled

24  substances?

```
 1      A.   Yeah.

 2      Q.   Okay.  When was it that Anda began to

 3   evaluate the quantity of controlled substances as

 4   compared to other drugs?

 5      A.   2005, maybe.

 6      Q.   Okay.  Now, in order to make that evaluation,

 7   Anda would need to review both what they were

 8   ordering in terms of controlled substances and also

 9   what they were ordering for noncontrolled substances,

10   correct?

11      A.   Yeah.  But I don't remember if we were doing

12   a specific comparison back in 2005.

13      Q.   Okay.  That might have come later?

14      A.   I think -- I believe it did.

15      Q.   Okay.  In fact, I think I'll go to a

16   different document and then come back to this one.

17      A.   Okay.

18           (Anda - Cochrane Exhibit 4 was marked for

19   identification.)

20   BY MR. NOVAK:

21      Q.   We've had marked as Anda - Cochrane

22   Deposition Exhibit 4 the supplemental responses to

23   plaintiff's first combined discovery request

24   distributed to defendants.
```

Highly Confidential - Subject to Further Confidentiality Review

1          And I wanted to direct your attention,

2    Mr. Cochrane, specifically to Page 9 of the exhibit

3    that has a chart of standard operating procedures.

4          Do you see that chart?

5    A.    Yup.

6    Q.    Okay.  Now, one of the standard operating

7    procedure numbers is customer due diligence formerly

8    known as information needed to set up a new account,

9    and it's SOP Number 28.

10          Do you see that reference?

11    A.    I do.

12    Q.    Okay.  Were you familiar in how SOP 28 worked

13    during your time at the company?

14    A.    I believe so, yeah.

15    Q.    Okay.

16          (Anda - Cochrane Exhibit 5 was marked for

17    identification.)

18    BY MR. NOVAK:

19    Q.    We have had marked as Anda - Cochrane

20    Deposition Exhibit 5, Deposition Exhibit 5 a document

21    that is entitled "Distribution of Rations," SOP 28,

22    and the title is "Customer Due Diligence."  It bears

23    the Bates Number Anda 144398 through 144401.

24          Mr. Cochrane, have you seen Deposition

```
 1    Exhibit 5 Before?

 2         A.   Yes.

 3         Q.   Now, looking at the last page of Deposition

 4    Exhibit 5, there's a chart that makes reference to

 5    revision history and the date of various times when

 6    the standard operating procedure is either issued or

 7    reviewed or modified.

 8              Is that a fair characterization?

 9         A.   Yeah.

10         Q.   Okay.  Is this particular version of SOP 28

11    the version that existed on February 26th of 2018?

12         A.   I don't -- I wasn't there.

13         Q.   Okay.  So --

14         A.   I left in '16.

15         Q.   So the versions of the document that were

16    effective during the time that you were there were

17    different than Deposition Exhibit 5?

18         A.   I -- I don't know.

19         Q.   Okay.  Well, to the extent that there were

20    modifications to the document added in February of

21    2018 that are contained in this exhibit, you're not

22    aware of what those are, correct?

23         A.   No.  I -- I don't --

24         Q.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    This is the first time I'm seeing this for

 2   several years.

 3        Q.    Let me go back, since Deposition Exhibit 5

 4   makes reference to the original version having an

 5   effective date of August 20th of 2004, to see if we

 6   can identify that one.

 7              (Anda - Cochrane Exhibit 6 was marked for

 8   identification.)

 9   BY MR. NOVAK:

10        Q.    We have had marked for identification

11   purposes Anda - Cochrane Deposition Exhibit 6, which

12   is a document entitled -- or bearing the Bates

13   Number Anda 271410 through 411.

14              On the first page, it is entitled "SOP

15   Number 28," "Information Needed to Set Up a New

16   Account."

17              And then the second page actually describes

18   the standard operating procedure itself.

19              Mr. Cochrane, is this the version of the

20   document that would have been in existence back in

21   August of 2004?

22        A.    I believe so, yes.

23        Q.    Okay.  And you are, on the first page of the

24   document, identified in compliance management, and
```

Highly Confidential - Subject to Further Confidentiality Review

1    then it says signed by Michael Cochrane and

2    identifies you as a reviewer.

3           Would you have reviewed SOP 28 back in August

4    of 2004?

5    A.    Yeah.

6    Q.    Okay.  And do these set out the steps that

7    are necessary, in particular Page 2, the steps that

8    were necessary in order to set up a new account for

9    an Anda customer?

10   A.    Yeah.

11   Q.    Okay.  And those steps are set forth under

12   Section 3 of the SOP?

13   A.    Yes.

14   Q.    So in order to set up a new account, Anda

15   would need to obtain the pharmacy licenses,

16   physicians' licenses, or wholesale distributor

17   licenses in order to ship noncontrolled substances.

18          Is that the first obligation?

19   A.    Yes.

20   Q.    And the second one is if a customer is

21   wishing to purchase controlled substances, that above

22   information is needed as well as a copy of the

23   customer's DEA registration?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    So they have to provide that in order to be

2   eligible to buy controlled substances from Anda?

3        A.    Yes.

4        Q.    Okay.  And that DEA registration has to match

5   exactly with the address that's listed on the

6   license?

7        A.    Yup.

8        Q.    Okay.  The next thing they have to do is

9   update their license and provide proof of the updated

10  license to the regulatory compliance department?

11       A.    Yes.

12       Q.    And, finally, if there's a chain of stores,

13  they can provide a spreadsheet of the different

14  licenses for each store in order to show that each of

15  those different stores within the chain are

16  individually licensed to purchase controlled

17  substances?

18       A.    Yes.

19       Q.    Okay.  As of this time in 2004, were those

20  the steps necessary to have a customer become

21  authorized to purchase controlled substances from

22  Anda?

23       A.    Yes.

24       Q.    Okay.  At a later point in time, Anda added
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    other steps.

 2           MR. MATTHEWS:  Objection.

 3    BY MR. NOVAK:

 4       Q.   Correct?

 5           MR. MATTHEWS:  Objection.

 6           THE WITNESS:  Yes.

 7    BY MR. NOVAK:

 8       Q.   And if we go back to Anda Deposition

 9    Exhibit 5 -- Anda - Cochrane Deposition Exhibit 5,

10    there is a reference to -- in the revision history of

11    Standard Operating Procedure 28 to an addition to

12    SOP 28 that was made in March 9th of 2007.

13           Do you see that reference?

14       A.   Yeah.

15       Q.   Would that reflect an additional step that

16    was required by Anda in the performance of -- or in

17    implementing SOP 28 that it would have been required

18    starting in March of '07?

19           Would it be more helpful if I showed you what

20    I think might be the March of '07 version?

21       A.   Sure.

22       Q.   Okay.

23           (Anda - Cochrane Exhibit 7 was marked for

24    identification.)
```

```
 1              THE WITNESS:  This is a different -- this
 2        isn't 28.  This is 40.
 3              MR. NOVAK:  Oh, sorry, sorry, sorry.
 4              MR. MATTHEWS:  Do you want to take that back?
 5              MR. NOVAK:  Did we already have it marked?
 6              Well, we'll leave it as 7.
 7              MR. MATTHEWS:  Okay.  And let me see if I can
 8        find the --
 9              MR. NOVAK:  Was it 7 or 6?
10              MR. MATTHEWS:  The court reporter is the best
11        official --
12              MR. NOVAK:  The best evidence.
13              MR. MATTHEWS:  -- of where we are.  I will
14        often get it wrong, as you know.
15              MR. NOVAK:  Why don't we take five minutes.
16              THE VIDEOGRAPHER:  Off the record at 10:12.
17              (Recess from 10:12 until 10:34 a.m.)
18              THE VIDEOGRAPHER:  We are now back on the
19        record at 10:34.
20     BY MR. NOVAK:
21        Q.   Mr. Cochrane, there were two documents that I
22     want to walk you through that are kind of -- I think
23     it would be helpful to do them side by side.
24              One is the Rannazzisi letter of
```

1    September 27th of 2006, which is Anda - Cochrane

2    Deposition Exhibit Number 3.  And the other one is

3    Standard Operating Procedure 28, just the first page

4    of it, Anda - Cochrane Deposition Exhibit Number 5.

5         Now, first looking at Deposition Exhibit 5,

6    Standard Operating Procedure 28, there was a point in

7    time when Anda started requiring that customers for

8    controlled substances provide a completed customer

9    questionnaire, correct?

10        A.   Yes.

11        Q.   And also 90 days of prior dispense data?

12        A.   Yes.

13        Q.   And also the procedures that the customer

14   utilizes to review and determine whether to fill

15   controlled substance prescriptions?

16        A.   Yes.

17        Q.   And all of that is material that the

18   regulatory staff that worked under you would review

19   for purposes of deciding whether to sell controlled

20   substances, correct?

21        A.   Yes.

22        Q.   Now, when we look at Anda - Cochrane

23   Deposition Exhibit 3, the third page of it, a number

24   of the different factors that are identified there

Highly Confidential - Subject to Further Confidentiality Review

1    under "Circumstances That Might Be Indicative of

2    Diversion" make reference to an analysis of what is

3    being dispensed from the -- from the retailer.

4              Is that a fair characterization?

5              MR. MATTHEWS:  Objection.

6              THE WITNESS:  Yeah.

7    BY MR. NOVAK:

8        Q.    Okay.  So, for example, you wouldn't be able

9    to determine whether a retailer was ordering

10   excessive quantities of a limited variety of

11   controlled substances while ordering few, if any,

12   other drugs without -- well, actually, I won't ask

13   about that one.

14             But an additional factor, the other Number 1

15   on that page, is the percentage of the pharmacy's

16   business that dispensing controlled substances

17   constitutes.

18             You wouldn't be able to figure that out

19   unless you had the retailer's dispensing data,

20   correct?

21             MR. MATTHEWS:  Objection.

22             THE WITNESS:  Yeah.

23   BY MR. NOVAK:

24       Q.    And some of these other factors -- for

1    example, the disproportionate share of the

2    prescriptions for controlled substances being filled

3    by the pharmacy -- again, you need the dispensing

4    data for that to figure out whether there was a

5    disproportionate share being dispensed by the

6    retailers?

7            THE WITNESS:  Yes.

8            MR. MATTHEWS:  Objection.

9    BY MR. NOVAK:

10       Q.   In fact, a whole array of those different

11   factors that the FDA identifies really require you to

12   have a good set of dispensing data from your customer

13   in order to evaluate them.

14           Is that -- is that a fair characterization?

15           MR. MATTHEWS:  Objection.

16           THE WITNESS:  Yes.  You mean the DEA, not the

17      FDA.

18           MR. NOVAK:  Thank you.

19   BY MR. NOVAK:

20       Q.   With that qualification, it's a fair

21   characterization?

22           MR. MATTHEWS:  Objection.

23   BY MR. NOVAK:

24       Q.   Correct?

```
 1        A.   Yes.

 2        Q.   And at some point, Anda started collecting

 3   the customer or potential customer's dispensed data

 4   to evaluate the different factors that are identified

 5   on Page 3 of Anda - Cochrane Deposition Exhibit 3,

 6   the Rannazzisi letter, correct?

 7        A.   Yes.

 8        Q.   When was it that Anda began collecting

 9   dispensed data from its customers for performing that

10   type of review?

11        A.   Sometime in 2007.

12        Q.   Okay.  What was it --

13        A.   It may have been early 2007, I think.

14        Q.   Okay.

15        A.   Maybe mid.

16        Q.   And what was it that caused Anda to change

17   its policy to begin collecting and reviewing that

18   type of information?

19             MR. MATTHEWS:  I'm going to object to the

20        question and instruct the witness not to answer

21        to the extent answering that question requires

22        you to reveal communications between the company

23        and you and any company attorney, whether inside

24        or outside.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              To the extent you can answer without
 2        revealing any such conversations, you can answer
 3        the question.
 4              THE WITNESS:  I honestly don't remember.
 5   BY MR. NOVAK:
 6        Q.   Okay.  At any rate, you think it was '07 when
 7   the company started, as a matter of policy,
 8   collecting dispensed data --
 9        A.   Yes.
10              MR. MATTHEWS:  Objection.
11   BY MR. NOVAK:
12        Q.   -- to determine whether they were going to
13   sell controlled substances to particular customers?
14              MR. MATTHEWS:  Objection.
15              THE WITNESS:  I don't -- I think we were
16        going after existing customers at that point in
17        time that were already doing business with us and
18        collecting questionnaires and collecting
19        dispensing data as well as for newer customers.
20   BY MR. NOVAK:
21        Q.   Okay.
22              (Anda - Cochrane Exhibit 8 was marked for
23   identification.)
24   ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2       Q.   We've had marked as Anda - Cochrane

 3    Deposition Exhibit Number 8 a two-page document

 4    bearing the Anda Bates Number 276963 and 4.

 5           And it appears to be a version of Standard

 6    Operating Procedure 40 entitled "Controlled Substance

 7    Monthly Override Percentage."

 8           Mr. Cochrane, have you seen Anda Deposition

 9    Exhibit 8 before?

10       A.   Yes.

11       Q.   Are you the author of Anda Deposition

12    Exhibit 8?

13       A.   I am.

14       Q.   Okay.  Now, the date that is contained under

15    the originator box of the document is July 27, '07.

16           Is that the approximate date that you created

17    this standard -- this version of Standard Operating

18    Procedure 40?

19       A.   Yes.

20       Q.   Okay.  Before we get into the actual

21    procedure, can you describe for me what the

22    circumstances were that led you to create Standard

23    Operating Procedure 40 as it is set out in Anda

24    Deposition Exhibit 8?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    This was -- I'm not sure if we had a meeting

2    with DEA, but we set a cap at 5,000 dosage units on

3    controlled substance products.  And that was at the

4    guidance of DEA, I believe in Washington, and we had

5    some instances where we would have accounts that

6    would actually require more than 5,000 dosage units,

7    so we would do a review of those accounts to

8    determine whether or not we wanted to increase them

9    above 5,000.

10       Q.    Okay.  And your testimony is that it was the

11   DEA who made the suggestion to set a 5,000 dosage

12   unit cap?

13       A.    Yes, I believe they did suggest that in 2007.

14       Q.    Okay.  Who at the DEA made that suggestion?

15       A.    Michael Mapes, Kyle Wright.  I'm not sure who

16   else was there for that meeting.

17       Q.    Okay.  And you're talking about a specific

18   meeting that occurred in July of 2007?

19       A.    I don't remember the exact date of the

20   meeting, but I'm pretty sure it was in 2007, yeah.

21       Q.    Who all attended the meeting?

22       A.    It was me, Al Paonessa, Tracey Hernandez,

23   Dianne Miranda, Michael Mapes, Kyle Wright, Barbara

24   McGrath.  Maybe a couple of other folks from DEA.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   don't remember their names.

 2        Q.   Okay.  Ms. McGrath, where was she from?

 3        A.   She was the Florida diversion program

 4   manager.

 5        Q.   At DEA?

 6        A.   Yeah.

 7        Q.   Okay.  Who was Tracey Hernandez?

 8        A.   Tracey Hernandez was a DEA compliance person

 9   for Watson -- Watson Pharma.

10        Q.   Okay.  At the time, Watson owned Anda?

11        A.   Yes.

12        Q.   Okay.  Did Ms. Hernandez sometimes give you

13   instruction about the performance of your

14   responsibilities at Anda?

15        A.   No, not specifically that I can remember.

16        Q.   You don't remember her ever providing

17   guidance on how compliance functions at Anda should

18   be performed?

19        A.   Yeah, I'm sure we discussed it since she was

20   part of the same organization.  I don't remember

21   anything specific, though.

22        Q.   Okay.  What do you remember about this

23   July 2007 meeting with the DEA representatives, the

24   Watson representatives, and the Anda people?
```

```
 1              MR. MATTHEWS:  Objection.
 2              THE WITNESS:  I think Michael Mapes reached
 3         out to Tracey Hernandez inquiring about Anda and
 4         whether or not Watson owned Anda.  From there,
 5         she explained that through an acquisition we were
 6         part of Watson at that point, and he wanted us to
 7         all come up and discuss controlled substance
 8         distribution.
 9    BY MR. NOVAK:
10         Q.   Did Mr. Mapes or any of the other DEA
11    representatives express concern about the manner in
12    which Anda had been distributing controlled
13    substances prior to the time of the meeting?
14              MR. MATTHEWS:  Objection.
15              THE WITNESS:  Yeah.
16    BY MR. NOVAK:
17         Q.   What particularly did he express concern
18    about?
19         A.   Some specific customers that Anda had that we
20    were distributing product to.
21         Q.   Do you recall which customers?
22         A.   I don't.
23         Q.   Okay.  And what was it about your
24    distribution to those customers that DEA was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    concerned about?

 2        A.   Pretty sure it was the quantity of certain

 3    products.

 4        Q.   Okay.  From DEA's perspective, they were

 5    concerned that Anda was providing too large a

 6    quantity of controlled substances to particular

 7    customers?

 8        A.   Yes.

 9             MR. MATTHEWS:  Objection.

10    BY MR. NOVAK:

11        Q.   And what types of quantities was he

12    identifying?

13             MR. MATTHEWS:  Objection.

14             THE WITNESS:  I don't remember the exact

15        numbers.

16    BY MR. NOVAK:

17        Q.   Okay.  Did he identify a particular customer

18    for whom Anda was providing 279,000 units of

19    hydrocodone?

20             MR. MATTHEWS:  Objection.

21             THE WITNESS:  I don't remember that

22        specifically.

23             MR. NOVAK:  Okay.  How about 179,000 units of

24        hydrocodone to a different customer?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. MATTHEWS:  Objection.

 2            THE WITNESS:  I don't remember that number

 3      specifically either.

 4    BY MR. NOVAK:

 5      Q.   Were those -- irrespective of whether you

 6    recall the exact number, were those the rough numbers

 7    that were being communicated by Mr. Mapes to the Anda

 8    representatives at the meeting?

 9            MR. MATTHEWS:  Objection.

10            THE WITNESS:  I -- I don't remember specific

11      numbers.

12    BY MR. NOVAK:

13      Q.   I understand you don't remember specific

14    numbers.  But were they in that ballpark?

15            MR. MATTHEWS:  Objection.

16            THE WITNESS:  I don't remember.

17    BY MR. NOVAK:

18      Q.   Okay.  You don't remember at all the volume

19    or the quantity --

20      A.   I don't remember if it was 50,000 or 300,000.

21      Q.   All right.  At any rate -- well, let me ask a

22    different question.

23            Were you aware of the Southwood Compliance

24    Action that DEA had taken back in the summer of 2007?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I believe I was, yes.

2    Q.    Okay.  And what was your understanding as to

3    what the DEA did as it related to Southwood?

4    A.    I don't remember if they fined Southwood or

5    issued an immediate suspension, but it was something

6    along those lines, I believe.

7    Q.    Okay.  As part of the performance of your

8    responsibilities at Anda, you tried to keep abreast

9    as to what DEA was doing from an enforcement

10   perspective against other distributors, correct?

11   A.    Yeah.  The whole industry did.

12   Q.    And Southwood was a particular action that

13   the DEA took that got the attention of the rest of

14   the industry?

15        MR. MATTHEWS:  Objection.

16        THE WITNESS:  Yeah.

17   BY MR. NOVAK:

18   Q.    Okay.  Why?

19   A.    Because they either fined them or issued an

20   immediate suspension.  I don't remember the exact

21   circumstances for Southwood, given the fact that it

22   was that long ago.

23   Q.    Sure.

24   A.    But it was -- it was an issue that the

1    industry all knew of.

2        Q.    What was it that Southwood was doing that was

3    of concern?

4            MR. MATTHEWS:  Objection.

5            THE WITNESS:  I don't remember.

6    BY MR. NOVAK:

7        Q.    Okay.  Was there also pending enforcement

8    action by DEA against AmerisourceBergen?

9            MR. MATTHEWS:  Objection.

10           THE WITNESS:  I'm not sure.

11   BY MR. NOVAK:

12       Q.    You don't recall whether that was brought up

13   by Mr. Mapes or some of the other DEA representatives

14   at this meeting in July of '07?

15           MR. MATTHEWS:  Objection.

16           THE WITNESS:  Yeah, I don't remember them

17       bringing that up.

18   BY MR. NOVAK:

19       Q.    Okay.  Do you remember them bringing up --

20               (Conferring with co-counsel.)

21           MR. NOVAK:  We're going off the record.

22           THE VIDEOGRAPHER:  Off the record at 10:51.

23           (Recess from 10:51 until 11:18 a.m.)

24           THE VIDEOGRAPHER:  We're now back on the

```
 1        record.  The time is 11:18.

 2   BY MR. NOVAK:

 3        Q.    Mr. Cochrane, you had provided deposition

 4   testimony earlier today that related to your bonuses

 5   that were paid to you during your time as an employee

 6   at Anda, and just so I get an understanding as to

 7   what the amounts that we're talking are, if I recall

 8   ██ ████████████████████████████████████████████████

 9   ██ ████████████████████████████████████

10        A.    Throughout my tenure there, yeah.

11        Q.    Okay.  And what was your base compensation

12   towards the end of your career there?

13        A.    My base was ████████ approximately annually.

14        Q.    Okay.  When you started with the company --

15   or, yeah, actually -- yeah, when you started with the

16   company, what do you recall your base compensation

17   being?

18        A.    My base compensation when I started in 1997

19   was ██████ an hour.

20        Q.    Okay.  And during the time period from 2006

21   forward, do you have a rough number as to what it

22   grew from '06 through 2016?

23             MR. MATTHEWS:  Objection.

24             THE WITNESS:  I'm not sure what it was in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        '06.  I want to say -- '06 was maybe in the -- in

 2        the  ████████  range.

 3   BY MR. NOVAK:

 4        Q.    Okay.  On the -- in the latter years, once

 5   Watson or Actavis or Allergen owned Anda, what were

 6   the amounts of the actual bonus payments in those

 7   years?

 8             MR. MATTHEWS:  Objection.

     ██   ███████████   █████████████████████

     ██    █████████   ████████████████████

11   BY MR. NOVAK:

12        Q.    Okay.  And those were based upon both the

13   financial performance of those companies as well as

14   the financial performance of Anda?

15        A.    Yeah.

16        Q.    Did you receive bonuses every year from '06

17   through '16?

18        A.    Pretty sure I did.

19        Q.    Okay.  Did -- when you -- by the way, are

20   there any documents -- never mind.

21             When you initially started in the 2005 and

22   '06 time frame, in the performance of your regulatory

23   compliance functions at the company, did Anda have a

24   number of physician customers to whom they sold
```

```
 1    controlled substances?

 2         A.   Yes.

 3         Q.   Okay.  How many, if you know?

 4         A.   I don't know.

 5         Q.   Hundreds, thousands?

 6         A.   Probably somewhere in the thousands, I would

 7    think.

 8         Q.   Okay.  How was it that Anda would establish a

 9    relationship directly with physician customers for

10    controlled substances?

11              MR. MATTHEWS:  Objection; foundation.

12              THE WITNESS:  We had a specific group of

13         sales reps that were dedicated to physician

14         accounts.

15    BY MR. NOVAK:

16         Q.   They would actually visit their physician

17    offices?

18         A.   No, no.  It was all over the phone.

19         Q.   Okay.  They'd actually issue cold calls to

20    physicians' offices?

21         A.   I believe they would.

22         Q.   Okay.  And inquire as to whether they were

23    interested in opening account to purchase controlled

24    substances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  I don't think the lead-in was

 3         controlled substances.  The lead-in was to

 4         establish a business relationship.  There are

 5         numerous other products that a physician's office

 6         would have been able to purchase through us.

 7    BY MR. NOVAK:

 8         Q.   And many of them would also purchase

 9    controlled substances?

10              MR. MATTHEWS:  Objection.

11              THE WITNESS:  I'm not sure what the

12         percentage was.

13    BY MR. NOVAK:

14         Q.   Okay.  Was part of your regulatory compliance

15    function an evaluation of the appropriateness of

16    physician purchases of controlled substances?

17              MR. MATTHEWS:  Objection.

18              THE WITNESS:  Eventually, we ended up

19         discontinuing sales to physician customers as far

20         as controlled substances.  I'm not sure what

21         evaluation process there was dating that far back

22         on the -- on the physician side.

23    BY MR. NOVAK:

24         Q.   Okay.  You don't recall doing anything in
```

1    particular to evaluate whether a physician should be

2    able to buy the controlled substances that Anda was

3    selling them?

4        A.    It goes back to one of the SOPs from

5    origination and establishing a new account, DEA

6    license, state license, exact addresses.

7        Q.    The different steps that are set forth in

8    Standard Operating Procedure 28?

9        A.    Yes.

10       Q.    Okay.  Anda wouldn't perform any detailed

11   review of the product mix that the physician was

12   purchasing?

13           MR. MATTHEWS:  Objection.

14           THE WITNESS:  Not that I recall, no.

15   BY MR. NOVAK:

16       Q.    Okay.  And were there instances where Anda

17   would receive notifications from the DEA that other

18   distributors had decided to cut off particular

19   physicians?

20       A.    Yeah.  It wasn't limited to just physicians.

21   It was physicians and pharmacies, I believe.

22       Q.    Okay.

23           (Anda - Cochrane Exhibit 9 was marked for

24   identification.)

```
 1    BY MR. NOVAK:

 2        Q.   We've had marked as Anda - Cochrane

 3    Deposition Exhibit 9 a document, the title page of

 4    which is an e-mail from Lorrie Trotman to Michael

 5    Cochrane dated November 7, 2007, but there's a full

 6    number of e-mail threads that are attached to the

 7    document.  And it bears the Bates Number Anda 38787

 8    through 38794.

 9             And I'll direct you first to the last three

10    pages of the document.  We'll start at the back and

11    go forward.

12             This appears to be an e-mail from Kyle

13    Wright -- if you look at the page that ends in the

14    Bates Numbers 792, an e-mail from Kyle Wright

15    entitled "Distributor Notification."

16             Do you see that?

17        A.   Uh-huh.

18        Q.   And then under that is a list of different

19    entities that the DEA identifies have had their

20    controlled substances privileges discontinued from

21    another distributor.

22             Is that a fair characterization?

23        A.   Yup.

24        Q.   Okay.  So the DEA would send lists of a
```

Highly Confidential - Subject to Further Confidentiality Review

1    number of physicians -- and in this instance also a

2    few retail pharmacies -- and basically tell Anda,

3    just for information purposes, other distributors

4    have discontinued or restricted the business with

5    these customers?

6            MR. MATTHEWS:  Objection.

7            THE WITNESS:  Yes.  This wasn't just limited

8        to Anda.  This was industry-wide, from what I

9        understand.

10   BY MR. NOVAK:

11       Q.   They would send these notifications not only

12   to Anda but all the distributors who were evaluating

13   whether they wanted to do business with particular

14   customers?

15       A.   Correct.

16       Q.   When Anda received this type of information

17   back in the 2007 time frame, what would it do with

18   it?

19       A.   We would restrict sales to them from a

20   controlled substance perspective.

21       Q.   You would do that automatically --

22       A.   Yes.

23       Q.   -- or would you perform some additional

24   evaluation first?

```
 1        A.    Automatically.

 2        Q.    And as we look at the other e-mails going

 3   back and forth up the chain, there were discussions

 4   of the various folks within Anda about implementing

 5   the process to cut these particular physicians and

 6   other pharmacies off.

 7              Is that fair?

 8        A.    Yeah.

 9        Q.    Okay.  And in addition to that, there is some

10   discussion about whether, just from a logistical

11   perspective, you can eliminate them from the

12   cold-call list so that salespeople aren't placing

13   cold calls to physicians who have already had their

14   controlled substances privileges restricted?

15        A.    Yes.

16        Q.    Okay.  You don't want to call and try to sell

17   to somebody who you have already decided you are not

18   going to sell to?

19        A.    Correct.

20        Q.    Now, were there instances where in this 2007

21   time frame Anda, on its own, had made decisions to

22   cut off particular physicians?

23        A.    Not that I remember.

24        Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                (Anda - Cochrane Exhibit 10 was marked for

 2      identification.)

 3      BY MR. NOVAK:

 4          Q.   We've had marked Anda - Cochrane Deposition

 5      Exhibit 10, which is a two-page e-mail exchange

 6      dated -- the top page of which is dated October 16th

 7      of 2007, bearing the Bates page Anda -- or the Bates

 8      stamp number Anda 274531 and 532.

 9                Now, looking at the back of the exhibit,

10      this, again, is a notification from Kyle Wright at

11      the Drug Enforcement Administration notifying Anda

12      that particular customers have been cut off by

13      another distributor.

14                Is that what the document appears to be?

15          A.   Yes.

16          Q.   Okay.  And, again, this is something you

17      would receive and process a similar cutoff in terms

18      of Anda's doing business with these customers?

19          A.   Yes.

20          Q.   Now, in this particular instance, Al Paonessa

21      e-mails you on the 16th of October and says:  Did we

22      have almost all these Florida accounts?  Wow.  They

23      sound familiar.

24                Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    I do.

2        Q.    Okay.  So at least Mr. Paonessa thought,

3    gosh, these folks that are getting cut off are folks

4    that he thinks are familiar because they are Anda

5    customers?

6              MR. MATTHEWS:  Objection.

7              THE WITNESS:  I'm not sure.  I'm assuming he

8         sees something from the city and the state.  They

9         all look local to Anda.  But I'm not really a

10        hundred percent sure why he would have written

11        this.

12             MR. NOVAK:  Okay.

13             THE WITNESS:  Or why they would sound

14        familiar.

15   BY MR. NOVAK:

16        Q.    Did Tracey Hernandez ever inquire as to why

17   Anda's suspicious order monitoring program weren't

18   picking up on these physicians and cutting them off?

19             MR. MATTHEWS:  Objection.

20             THE WITNESS:  Not that I recall, no.

21   BY MR. NOVAK:

22        Q.    Did Ms. Hernandez give direction to you to

23   make sure that these customers were cut off?

24             MR. MATTHEWS:  Objection.
```

```
 1              THE WITNESS:  Not that I remember, no.  We

 2        were already doing it if an e-mail came out from

 3        Kyle like this.  But I don't remember her

 4        specifically saying Anda should do it or telling

 5        us that we need to, but it looks like she was

 6        clearly doing the same thing that we were.

 7              (Anda - Cochrane Exhibit 11 was marked for

 8     identification.)

 9     BY MR. NOVAK:

10        Q.   We've had marked next Anda deposition -- Anda

11     - Cochrane Deposition Exhibit 11, which is a two-page

12     document bearing the Bates Number Anda 276197 and

13     198, which, again, is -- oh, I'm sorry, there's also

14     a third page, 199, which is entitled "Distributor

15     Notification."

16              Now, this one includes an additional

17     instruction in the middle of the -- well, at the top

18     of the -- the bottom of the first page and the top of

19     the second page that appears to be from Tracey

20     Hernandez to various individuals, including you, at

21     Anda where she states:  Larry, Mary and Michael,

22     Please make sure the entities noted below are not

23     authorized to receive controlled products.

24              Do you see that?
```

```
 1        A.    Yes, I do.

 2        Q.    Okay.  So was this an instance where Tracey

 3   was writing different individuals, including you, and

 4   instructing you to make sure that the folks

 5   identified by the DEA were not receiving controlled

 6   substances?

 7        A.    Yes.

 8        Q.    Okay.

 9        A.    We were already doing the same thing, because

10   we were on Kyle's communication as well.

11        Q.    Were there instances that Tracey asked about

12   whether you were finding these folks to begin with?

13             MR. MATTHEWS:  Objection.

14             THE WITNESS:  Not that I remember.  But

15        reading this, apparently so.

16   BY MR. NOVAK:

17        Q.    What part of it are you referring to?

18        A.    The very top of the page.

19        Q.    And that is the top of the front page of

20   Deposition Exhibit 11 where Ms. Hernandez writes to

21   you and says:  Michael, did you guys cut them off as

22   a result of receiving Kyle's e-mail?  If so, what are

23   we missing to not have picked them up prior?

24             And then she states in a parenthetical:  Not
```

1    being critical.  I realize some of this ends up being

2    more of a guess.  Just trying to see if there is

3    anything else that we need to add to our SOM program.

4            End of parenthetical?

5            That's the part that you're referring to?

6       A.   Yes.

7       Q.   Okay.  She makes a reference there to "our

8    SOM program."

9            What do you understand her to mean in writing

10   that to you?

11      A.   She's referring to a suspicious order

12   monitoring program which we had in place.  And based

13   on my e-mail to her, it looks like we actually cut

14   off some of the doctors before Kyle's e-mail came out

15   and had detected them.  But I can't remember what my

16   response to her was back in -- in 2007.

17           If you go back down to the center section of

18   the page, one of my e-mails back to her says that we

19   cut off the ones below yesterday.  The ones that is

20   are not listed below were cut off before Kyle's

21   e-mail.

22      Q.   Okay.  So these are the pharmacies and

23   physicians that were cut off as a result of Kyle's

24   e-mail?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  That, yeah, but it looks --

 3         based on what I'm reading, it looks like we cut

 4         off some of the ones on his list prior to the

 5         e-mail coming out.  I'm not a hundred percent

 6         sure on what detected us to do it, but clearly we

 7         cut some of them off before Kyle sent out his

 8         e-mail.

 9    BY MR. NOVAK:

10         Q.   Okay.  Was there a concern at Anda in the

11    2007 time frame as to whether sales to physicians

12    directly from Anda of opioid products would

13    contribute to the diversion of opioid products?

14              MR. MATTHEWS:  Objection.

15              THE WITNESS:  Al -- Al and I were called up

16         to the Florida Department of Health at one point

17         to specifically discuss controlled substance

18         sales to physicians.  So, yeah, there was a

19         concern.

20              And we met with the Department of Health at

21         their request in Tallahassee to talk about

22         potential drug diversion and physician sales.

23    BY MR. NOVAK:

24         Q.   Okay.  Who was that conversation with?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    It was Al and I, and I'm not a hundred

 2   percent sure who from the Department of Health was

 3   there.  It was the existing compliance manager for --

 4   her name was Rebecca -- I can't remember her last

 5   name -- and then one other gentleman.

 6        Q.    Okay.  Did they express concern about the

 7   volume of Anda's business selling opioids directly to

 8   physicians?

 9             MR. MATTHEWS:  Objection.

10             THE WITNESS:  Yes.

11   BY MR. NOVAK:

12        Q.    What was it that they expressed concern about

13   specifically?

14        A.    I think they identified the fact that

15   dispensing physicians were becoming more of a

16   problem.  I'm not sure if it was an application flow

17   thing for them.  There was a one-page document that a

18   physician could fill out to become a dispensing

19   physician or practitioner, and eventually, after

20   meeting with the Department of Health, we decided to

21   discontinue sales to physicians entirely as far as

22   controlled substances were concerned.

23             I don't remember the exact time frame of us

24   doing that, but it was sometime potentially around
```

Highly Confidential - Subject to Further Confidentiality Review

1    2007 or 2008.

2         Q.    In the course of performing your

3    responsibilities in the regulatory compliance areas

4    of Anda, did you become aware of particular employees

5    within Anda who were a concern to the company as it

6    related to overly aggressive sales of controlled

7    substances?

8              MR. MATTHEWS:  Objection.

9              THE WITNESS:  I believe there were a few

10        sales reps on the -- on the Anda side that

11        targeted specific physicians and groups,

12        specifically pain management clinics.

13   BY MR. NOVAK:

14        Q.    What were the names of the employees that you

15   became aware of that were overly aggressive as it

16   related to those types of sales?

17             MR. MATTHEWS:  Objection.

18             THE WITNESS:  Oh, man.  Maybe some of them --

19        maybe one with a first name of Raphael -- no --

20        last name Schaefer, maybe.  And -- I can't

21        remember.

22   BY MR. NOVAK:

23        Q.    Okay.  How was it that you became aware of

24   Raphael Schaefer being overly aggressive in the

```
 1    promotion of controlled substances to customers?

 2            MR. MATTHEWS:  Objection.

 3            THE WITNESS:  I don't remember.  It could

 4       have been just from 222 forms coming in since

 5       it's a triplicate form that was required to even

 6       be able to order those products.  They're

 7       serialized forms that are issued by the DEA to

 8       registrants specifically for the ordering of

 9       certain classes of product.

10   BY MR. NOVAK:

11       Q.   Okay.  Were there particular classes of

12   product -- or, I'm sorry.  Different question.

13            Were there particular classes of trade --

14   I'll start over again.

15            Are you familiar with the term "classes of

16   trade" as it relates to different types of Anda

17   customers for controlled substances?

18       A.   Yes, somewhat.

19       Q.   Can you tell me what different classes of

20   trade were back in the 2007 time frame for opioids?

21       A.   2007, I would say physicians, retail

22   independents, there could have been some national

23   chains, potentially some repackagers, some

24   distributors.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    How about pain management clinics?

2       A.    I'm not sure if they were under a specific

3    class of trade that was just labeled physician.  I

4    don't remember there being a specific designation.

5       Q.    How about Internet pharmacies?

6       A.    Yeah, we had Internet pharmacies prior to

7    2004 or '05, I believe.  We discontinued sales to

8    anybody that we identified as an Internet pharmacy, I

9    believe, in 2005.

10      Q.    Did you have particular sales employees at

11   Anda who were identified by government regulatory

12   agencies as being part of the problem that was

13   created with Internet pharmacies?

14            MR. MATTHEWS:  Objection.

15            THE WITNESS:  The only one that comes to mind

16       is Doug Towle.  I believe he is -- I believe the

17       Miami DEA office asked about him specifically.

18   BY MR. NOVAK:

19      Q.    Okay.  What did they -- what was -- first of

20   all, who in the Florida DEA office did you converse

21   with on that?

22      A.    I do not remember.  I remember they sent a

23   request that we ended up having to send to HR because

24   they wanted personnel information on him at one
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    point.  I don't remember what year it was or who I

 2    spoke to.  At some point in 2005.

 3            (Anda - Cochrane Exhibit 12 was marked for

 4    identification.)

 5    BY MR. NOVAK:

 6        Q.   We've had marked for identification purposes

 7    Anda - Cochrane Exhibit 12, which is a one-page

 8    e-mail bearing the Bates Number Anda 153642 dated

 9    November 5, 2008.

10            This is an e-mail from Karen Martin to you.

11        A.   This is from me to Karen Martin.

12        Q.   Okay.  So the -- the bottom part of the

13    e-mail is to Karen Martin from you?

14        A.   Yes.

15        Q.   The subject is ██████████?

16        A.   Yes.

17        Q.   Okay.  And you are inquiring as to what the

18    reason on file was for ██████████ being terminated

19    from Anda; is that correct?

20        A.   Yes.

21        Q.   Okay.  Now, you wrote in your e-mail to

22    Ms. Martin:  There is an Internet pharmacy trial

23    going on in New York and the defendant is claiming

24    that they are innocent because Anda sold him the
```

1    product and specific mention of ████████ , "the RX

2    King," was made, and there seems to be personal ties

3    between the two.

4         Do you see that reference?

5    A.   I do.

6    Q.   Okay.  Did you have any understanding, either

7    based on your conversations or in your communication

8    with Ms. Martin, as to whether those were some of the

9    circumstances involved in ██████████ termination

10   from Anda in 2006?

11   A.   No.  I have no knowledge of this.  This must

12   have been based on a phone call I received from an

13   attorney or someone in New York.

14   Q.   Okay.

15   A.   Then when I asked for the -- the actual

16   reason on file, I just wanted to make sure our

17   terminology from an HR perspective was on the same

18   page and I wanted the official reason that was in his

19   file.

20   Q.   Okay.  Had you had conversations with other

21   governmental regulatory individuals who identified

22   ████████  as part of what caused the problem with

23   respect to the opioid epidemic in Florida?

24         MR. MATTHEWS:  Objection.

```
 1              THE WITNESS:  No, not that I remember.

 2   BY MR. NOVAK:

 3      Q.   Who is Emily Schultz?

 4      A.   She was an Anda employee that worked for me

 5   in the compliance department.

 6           (Anda - Cochrane Exhibit 13 was marked for

 7   identification.)

 8   BY MR. NOVAK:

 9      Q.   We've had marked as Anda - Cochrane

10   Deposition Exhibit 13 a two-page document that is an

11   e-mail from Emily Schultz to you bearing the Bates

12   Number Anda 133096 and 7 dated December 4 of 2011

13   regarding a DEA meeting.

14           Would you have received Anda - Cochrane

15   Exhibit 13 back in that December 2011 time frame from

16   Ms. Schultz?

17      A.   Yes.

18      Q.   And she was writing to you her notes from a

19   visit that the DEA's officers, Gayle Lane and

20   Susan Langston, had at your Anda facilities, correct?

21      A.   Yes.

22      Q.   And when they met with you in December of

23   2011, they identified ██████████ as, quote, one of

24   the main reasons Florida is in as big of a mess as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they are.

 2             Do you see that reference?

 3    A.    Yes.  This was the one I was referring to --

 4    Q.    Okay.

 5    A.    -- when you first asked the question.

 6    Q.    So this is when it was brought to your

 7    attention that ███████ sales efforts at Anda,

 8    from the DEA's perspective, had caused a mess in the

 9    state of Florida?

10             MR. MATTHEWS:  Objection.

11             THE WITNESS:  No, not specifically 2011.  He

12        was termed a number of years before that.  But he

13        specifically targeted Internet pharmacies prior

14        to -- to 2005 when we discontinued sales to -- to

15        those types of pharmacies.

16    BY MR. NOVAK:

17    Q.    Okay.  I'd like to go back now to Anda

18    Deposition Exhibit 8 -- Anda - Cochrane Exhibit 8.

19    And specifically I'll direct you to the second page

20    of the exhibit.

21    A.    You said 8, right?

22    Q.    Yes.

23             Now, these are the procedures that you

24    instituted for Anda around the time of -- or after
```

1    that July of 2007 meeting with the DEA where they had

2    expressed concern about Anda providing too large a

3    quantity of controlled substances to particular

4    customers, correct?

5            MR. MATTHEWS:  Objection.

6            THE WITNESS:  I believe so.

7    BY MR. NOVAK:

8        Q.   Okay.  So you set a cap of 5,000 units as

9    kind of the default amount that could be sold to Anda

10   customers at that time?

11           MR. MATTHEWS:  Objection.

12           THE WITNESS:  Yes, based on the

13       recommendation of Michael Mapes.

14           MR. NOVAK:  Okay.

15           THE WITNESS:  From DEA.

16   BY MR. NOVAK:

17       Q.   And did you discuss how the 5,000 dosage unit

18   cap could be exceeded for particular customers?

19       A.   With?

20       Q.   With the DEA.

21       A.   Yes.  They understood there would be

22   instances where there are pharmacies that would

23   require more than 5,000 dosage units.

24       Q.   Okay.  What specifically was said on that

1    topic?

2        A.    I don't remember exactly what was said.    But

3    when we brought up 5,000 as a -- when they brought up

4    5,000 as a number, we did discuss the fact that there

5    would be pharmacies that actually would require and

6    need more than that, more than that specific

7    hard-fast number.

8        Q.    Okay.

9        A.    And they agreed.

10       Q.    And did you discuss at all how you would

11   evaluate a particular pharmacy to make a decision as

12   to whether they should get more than 5,000 units of,

13   say, OxyContin?

14       A.    Yeah.    We specifically -- I want to say every

15   single approval over 5,000 had to be approved by --

16   by Al Paonessa, who was the president and chief

17   operating officer of Anda.

18       Q.    Okay.    So if a particular retail customer

19   wanted to buy more than 5,000 units of OxyContin, in

20   order to get their limit raised above that, you would

21   need to seek approval from Al Paonessa?

22       A.    Correct.    And we would collect information to

23   justify the actual increase.

24       Q.    And the information that is collected is set

Highly Confidential - Subject to Further Confidentiality Review

 1    out in the procedure 3.0 --

 2         A.   Yes.

 3         Q.   -- that is contained on this page of Anda -

 4    Cochrane Deposition Exhibit 8, correct?

 5         A.   Yes.

 6         Q.   So you would need to get a filled out

 7    customer questionnaire from the -- the retailer who

 8    was seeking to buy more than 5,000 units?

 9         A.   Yes.

10         Q.   You would review a year-to-date file that

11    contained their purchase history?

12         A.   Correct.

13         Q.   The third step that is referenced as part of

14    your process to sell more than 5,000 units to a

15    retailer says:  Check percentage of controlled

16    substance sales versus nonsubstance sales.

17              And then there are two capital letter things

18    that -- can you tell me what those are, the FPCUSDA

19    and the AGIDO6LIB?

20         A.   Those are specific files on our warehouse

21    management system that you would use to look up that

22    information.

23         Q.   Okay.  So the controlled substance sales

24    would be the DEA?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes, in the library that's listed after it.

 2        Q.    When you say library --

 3        A.    Just where the specific information resides

 4   in the system.  It's just an identifier.

 5        Q.    Which system are we referring to?

 6        A.    Warehouse management system that we used,

 7   called Turning Point Systems.

 8        Q.    So there is a file in the Turning Point

 9   System that sets forth the amount of controlled

10   substance sales that Anda has to particular

11   customers?

12        A.    There was at one point, yeah.

13        Q.    And also a file that contains the total sales

14   to --

15        A.    This would --

16        Q.    -- to a particular customer?

17        A.    Yeah, it could be total sales.

18        Q.    Now, when it says check percentage of

19   controlled substance sales versus noncontrolled

20   substance sales, what percentage would lead Anda to

21   the conclusion, no, we're not going to raise their

22   cap above 5,000?  Their percent of controls is too

23   high?

24             MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  I don't remember the specific
 2        numbering or percentage that we would have used
 3        back then this long ago.
 4   BY MR. NOVAK:
 5        Q.   Okay.  Was it a hard and fast number that you
 6   set or was it susceptible to judgment based on
 7   Mr. Paonessa's view of the customer?
 8                MR. MATTHEWS:  Objection.
 9                THE WITNESS:  Susceptible to judgment from
10        the review perspective.  It wasn't just
11        specifically number three that gave us a yes or a
12        no or whether or not they were going to increase
13        the customer.
14             There was a multitude of things.  There were
15        different facets of information that we were
16        looking at to make that determination.  And, yes,
17        they were judgmental.
18   BY MR. NOVAK:
19        Q.   Okay.  The fourth one, we haven't talked
20   about that one at all.  Says:  Using Sales Advantage
21   from the Anda Intranet review and print previous
22   three months of sales.
23             What does that mean?
24        A.   It's a specific system tool that we had as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    far as the business is concerned, just a portal of

 2    some sort that we had from a -- it's just one of the

 3    many systems that we used to run our -- to run the

 4    business.

 5        Q.   Okay.  And it would simply be a check of your

 6    last three months of sales data for the customer?

 7        A.   Yeah.  You can plug in specific information,

 8    and it would generate a report that would show you

 9    all of their sales for the previous three months.

10        Q.   Okay.  So for these customers that are

11    getting more than 5,000 units of OxyContin or --

12    well, let me step back.  I'll ask a different

13    question.

14             When it says 5,000 dosage units of a

15    controlled substance family, what does controlled

16    substance family mean as it's being applied by Anda

17    in the standard operating procedure that you created

18    here?

19        A.   It means all SKUs for a specific product name

20    regardless of manufacturer or strength are combined

21    into one single family.  So hydrocodone would have

22    multiple SKUs in that same family.

23        Q.   Okay.  When you say SKUs, you are referring

24    to the term S-K-U?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And that is a specific storekeeper unit?

 3        A.    Yeah.  It's a unit of measure.

 4        Q.    So you are adding up all of the different

 5   sales of -- of different products that are all

 6   related to, say, hydrocodone --

 7        A.    Correct.

 8        Q.    -- as one family?

 9        A.    Yes.

10        Q.    Oxycodone would be a separate family?

11        A.    Yes.

12        Q.    What other opioid families would there be?

13        A.    On the opioid side, I'm not sure.  Every

14   specific chemical from a controlled substance

15   perspective had its own family.  I don't remember

16   specifically which ones were opioids and which ones

17   weren't.

18        Q.    Would morphine be a different family for

19   applying this standard operating procedure?

20        A.    Yes, it would.

21        Q.    How about fentanyl?

22        A.    Yes, it would.

23        Q.    We have identified four separate opioid

24   families.  Is it conceivable that a retail customer
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of Anda would be able to buy 4999 units in each of

 2    those four separate policies before they had to worry

 3    about complying with this standard operating

 4    procedure?

 5           MR. MATTHEWS:  Objection.

 6           PHONE:  Objection.

 7           THE WITNESS:  Yeah, it was a different

 8      family.

 9           THE VIDEOGRAPHER:  The time is 12:04.  We are

10      going off the record.

11           (Recess from 12:04 until 12:10 p.m.)

12           (Anda - Cochrane Exhibit 14 was marked for

13    identification.)

14    BY MR. NOVAK:

15      Q.   Mr. Cochrane, the next topic I'm going to go

16    into a little bit are some of the reports that were

17    provided by Anda to the DEA.

18           And in that regard, we have had marked Anda -

19    Cochrane Deposition Exhibit 14, the front page of

20    which is a -- an e-mail from Jay Spellman to

21    different individuals, and the subject of the e-mail

22    is "Excessive Order Reports November 2005."

23           Are these the type of e-mails that Jay

24    Spellman would send to DEA officials back in 2005
```

Highly Confidential - Subject to Further Confidentiality Review

1    time frame?

2        A.    Yes.

3            MR. MATTHEWS:  Objection.

4    BY MR. NOVAK:

5        Q.    Did you have an understanding as a result of

6    the performance of your responsibilities in

7    regulatory compliance as to what the purpose of an

8    Excessive Order Report was?

9        A.    I don't specifically remember the excessive

10   one in detail.  But, yeah, it looks like it went to

11   Joanne Chiavaro at DOJ, to me, Miguel Palma.  He was

12   the DEA compliance manager after my role expanded.

13   And, yeah, Jay had been doing these reports years

14   prior to that, I believe.

15       Q.    Okay.  Are we able to actually switch to the

16   Excel spreadsheet?

17           MR. MATTHEWS:  So, for the record, I'll note

18       my objection to using an electronic version of

19       the copy what is produced on the record as an

20       exhibit, but I assume that we're going to proceed

21       along the same arrangement we have had with these

22       kind of electronic documents that have been used

23       at depositions previously.

24           MR. NOVAK:  Yes.

 1                MR. MATTHEWS:  Okay.  Thank you.

 2                MR. NOVAK:  And I'll note for the record that

 3        the spreadsheet that we're placing up on the

 4        screen is identified as having been produced

 5        in -- in native form on the second page of Anda -

 6        Cochrane Exhibit 14 by Anda bearing the Bates

 7        page 271896.  The version we're looking at on the

 8        screen is what was produced in native format.

 9   BY MR. NOVAK:

10        Q.   Now, in looking at this Excessive Order

11   Report, is it your understanding that it was

12   communicated to the DEA through these reports when

13   particular Anda customers were buying an excessive

14   amount of controlled substances?

15                MR. MATTHEWS:  Objection.

16                THE WITNESS:  Yeah.

17   BY MR. NOVAK:

18        Q.   Okay.

19        A.   It's a system-generated report.  I'm not sure

20   what the formulas or calculations were to come up

21   with it.

22        Q.   That was going to be my next question is:  Do

23   you know what the basis upon which a determination

24   was made by Anda that the amounts being purchased

Highly Confidential - Subject to Further Confidentiality Review

1    were excessive?

2         A.   For this specific one, I don't.  I don't

3    recall what the calculation or formula was.

4         Q.   Okay.  What system would have generated the

5    reports?

6         A.   Our warehouse management system, Turning

7    Point Systems.

8         Q.   Okay.  So there was an automated function in

9    TPS that, on a monthly basis, would run the excessive

10   reports that were then submitted to the Drug

11   Enforcement Administration?

12           MR. MATTHEWS:  Objection.

13           THE WITNESS:  I don't think it was automated.

14       I think there were -- there was actual user

15       function to create them --

16           MR. NOVAK:  Okay.

17           THE WITNESS:  -- and generate them.  It

18       wasn't just a standing auto-generated report.

19       There was a user interface to a certain extent.

20   BY MR. NOVAK:

21        Q.   So there was someone at Anda who would

22   perform a query in the system that would generate the

23   report?

24        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   And that query would be based upon a

2   particular calculation of the customer's order that

3   would determine that it was excessive?

4     A.   Yes.

5          MR. MATTHEWS:  Objection.

6   BY MR. NOVAK:

7     Q.   But as to how that calculation was performed,

8   you -- you don't know?

9     A.   I don't remember, no.

10    Q.   Okay.  Do you have even a general

11  understanding as to how it was calculated that you

12  could provide?

13    A.   On the Excessive Order Report, I don't -- I

14  don't -- I really don't remember what the calculation

15  was.

16    Q.   Okay.

17         (Anda - Cochrane Exhibit 15 was marked for

18  identification.)

19  BY MR. NOVAK:

20    Q.   We've had marked as Anda - Cochrane

21  Exhibit 15 a similar document sent by Jay Spellman,

22  only this one's dated July 2nd of 2007.

23         Mr. Cochrane, do you know if the manner of

24  gathering the Excessive Order Report changed between

```
 1    November 2005 and June of 2007?

 2         A.   No, not that I -- not that I remember.

 3         Q.   Okay.  So these were reports that were

 4    submitted to the DEA on a -- on a monthly basis, at

 5    least between the times of November of 2005 and June

 6    of 2007?

 7         A.   I believe so, yes.

 8         Q.   Okay.

 9              MS. RIGBERG:  Is there a Bates Number for the

10         document?

11              MR. NOVAK:  Oh, thanks for reminding me when

12         I forget.  It was Anda MDL 13481 and 13482.

13              MS. RIGBERG:  Thanks.

14              (Anda - Cochrane Exhibit 16 was marked for

15         identification.)

16    BY MR. NOVAK:

17         Q.   We've had marked as Anda - Cochrane

18    Exhibit 16 a document, the front page of which is an

19    e-mail from Jay Spellman to various individuals at

20    Anda as well as individuals within the Drug

21    Enforcement Administration of the federal government.

22              The subject of the e-mail is "Suspicious

23    Orders Week Ending October 9th of 2005," and the

24    document is a three-page exhibit, the front page of
```

Highly Confidential - Subject to Further Confidentiality Review

1    which bears the Anda Bates Number 271912.  And then

2    the other two pages referenced documents that were

3    produced in native format bearing the Anda Bates

4    Numbers 271913 and 914.

5         Were you familiar, Mr. Cochrane, in the

6    performance of your responsibilities in regulatory

7    compliance with these types of suspicious orders week

8    reports that were sent to the DEA by Mr. Spellman?

9    A.   Yes.

10   Q.   And he routinely copied you on those reports

11   when he submitted them, correct?

12   A.   Yeah.

13   Q.   What was the purpose of sending a suspicious

14   orders week report to the DEA?

15   A.   This specific report was any customer that

16   ordered 5,000 dosage units or more of a specific

17   product.  He reported them to the local office as

18   suspicious.

19   Q.   Did Anda have in place in 2005 a suspicious

20   order monitoring system?

21        MR. MATTHEWS:  Objection.

22        THE WITNESS:  We had a report that would --

23        that we would generate, and if the customer

24        ordered more than 5,000 dosage units, we reported

Highly Confidential - Subject to Further Confidentiality Review

1        it to the local office as suspicious.

2    BY MR. NOVAK:

3        Q.   Okay.  Was there any analysis of those

4    particular customer's orders as part of the

5    evaluation as to whether it should be submitted to

6    the DEA as a suspicious order?

7             MR. MATTHEWS:  Objection.

8             THE WITNESS:  Not that I recall.

9    BY MR. NOVAK:

10       Q.   Okay.

11            (Anda - Cochrane Exhibit 17 was marked for

12   identification.)

13   BY MR. NOVAK:

14       Q.   We've had marked as Anda - Cochrane

15   Exhibit 17 a document that, again, is from Jay

16   Spellman to various individuals at the Drug

17   Enforcement Administration as well as Mr. Cochrane

18   and other individuals at Anda.  This particular one

19   is dated August 6, 2007, and it bears the Bates

20   Number Anda 271616 through 271618.

21            Similar to Anda - Cochrane Exhibit 16, is

22   this also a Suspicious Order Report submitted by Anda

23   to the DEA?

24       A.   Yes.

1      Q.    Okay.  And this one is for the period ending

2   August 5th of 2007?

3      A.    Yes.

4      Q.    Do you know if suspicious order reports in

5   this format were sent to the DEA after August 5th of

6   2007?

7      A.    I don't remember specifically when we would

8   have stopped sending these.

9      Q.    You did, at some point in time, stop sending

10  suspicious order reports in this format?  And when I

11  say "this format," I mean the one that's set forth in

12  Anda - Cochrane Exhibit 17, correct?

13     A.    Yes.

14     Q.    Okay.

15     A.    We -- we revamped the system and put the

16  5,000 dosage unit maximum from ordering perspective

17  in place at that point after discussions with -- with

18  DEA in 2007.

19     Q.    Okay.  So when --

20     A.    Prior -- the prior reporting criteria was if

21  it exceeded 5,000 dosage units, we would report the

22  order to them.

23     Q.    Okay.  And once you instituted the policy of

24  restricting customers to 5,000 dosage units in July

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of 2007, did that coincide with roughly the time that

 2    you stopped sending the suspicious order reports in

 3    this format?

 4              MR. MATTHEWS:  Objection.

 5              THE WITNESS:  I believe it would.

 6    BY MR. NOVAK:

 7       Q.   Okay.  And I'll represent to you this was the

 8    last one we were able to find --

 9       A.   Okay.

10       Q.   -- in this format.

11            So when the format for reporting suspicious

12    orders in this manner changed, what took its place?

13       A.   The customer review process, the

14    questionnaires going out, the approval process for

15    more than 5,000 dosage units.  We were capturing

16    dispense data at that point from -- from customers.

17            A slew of things, I would say.

18       Q.   Now, after this report was submitted on

19    August 6th of 2007, did Anda continue to report

20    suspicious orders to the DEA?

21       A.   I don't know that we had any suspicious

22    orders after making all of the changes that we did in

23    discussing things with -- with Michael Mapes,

24    Kyle Wright, the discussions they gave us on the
```

1    5,000 dosage unit cap as far as pharmacies were

2    concerned, the review process going forward.

3           We weren't sending them anything as far as an

4    Excel spreadsheet like this, where our criteria

5    before that was if it exceeded 5,000 dosage units we

6    would submit it as a suspicious order.

7        Q.   By the way, for the suspicious order reports

8    that we have been reviewing in Anda Deposition

9    Exhibit -- Cochrane Deposition Exhibits 16 and 17 --

10   the actual orders that were being reported, were

11   those ones that Anda shipped?

12       A.   Yes, they were.

13       Q.   Okay.  At some point in time did the

14   regulatory compliance program at Anda determine that

15   if they were going to report a suspicious order to

16   the DEA, they had better not ship it?

17           MR. MATTHEWS:  Objection.

18           THE WITNESS:  I don't remember exactly when

19       we instituted the no-ship policy.  I want to say

20       it was sometime after 2010, potentially.

21   BY MR. NOVAK:

22       Q.   So what happened with suspicious orders

23   between 2007 and 2010 when the no-ship policy was

24   implemented?

```
 1            MR. MATTHEWS:  Objection.

 2            THE WITNESS:  We were doing a more robust

 3       review based on our communication and advice and

 4       suggestions from the local DEA people, the

 5       Washington DEA people, our meetings with them.

 6            We worked together with them to develop a

 7       more robust review process of customers that we

 8       were selling to.  We took their advice from a

 9       threshold standpoint.  We did a different review

10       process in the event they needed more than 5,000.

11  BY MR. NOVAK:

12       Q.   In that answer, you stated:  We took their

13  advice from a threshold standpoint.

14            When you say their advice, do you mean the

15  DEA?

16       A.   I do.  And the 5,000 dosage units on the

17  families and how we were categorizing products as far

18  as the families were concerned, the limits put in

19  place, these were all things that were discussed with

20  DEA.

21       Q.   Now, in your view during that time period,

22  would it be possible for a suspicious order to be

23  placed by a customer with Anda that was less than

24  5,000 units --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1               MR. MATTHEWS:  Objection.

2    BY MR. NOVAK:

3         Q.   -- of a particular control family?

4               MR. MATTHEWS:  Objection.

5               THE WITNESS:  I guess anything is possible.

6    BY MR. NOVAK:

7         Q.   Did Anda have in place policies to restrict

8    distribution of controlled substances other than what

9    we were looking at in Standard Operating Procedure 28

10   to suspend any orders of less than 5,000 units?

11              MR. MATTHEWS:  Objection.

12              THE WITNESS:  I do not believe we did, no.

13              MR. NOVAK:  Okay.  Why don't we stop there

14      for lunch.

15              THE VIDEOGRAPHER:  Off the record at 12:31.

16              (Recess from 12:31 until 1:39 p.m.)

17              THE VIDEOGRAPHER:  We're now back on the

18      record at 1:39.

19   BY MR. NOVAK:

20        Q.   Mr. Cochrane, before I forget, are you

21   related to the other Mr. Cochrane who's in Anda?

22        A.   I am.

23        Q.   Okay.  Brother?

24        A.   Yup.  He's my older brother.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   Patrick?

2       A.   That's right.

3       Q.   Just so we're clear.

4            Earlier today in testimony, you indicated

5    that one of the ways that you educated yourself on

6    compliance issues was to attend industry seminars.

7            And some of those were HDMA seminars?

8       A.   Yeah.

9       Q.   By the way, did you participate on any HDMA

10   committees?

11      A.   I think I was on the DSCSA committee for

12   federal pedigree and maybe regulatory affairs

13   committee.

14      Q.   Okay.  What is it that the regulatory affairs

15   committee did?

16      A.   They have, I think, quarterly conference

17   calls just regarding industry issues as far as

18   regulation changes.  A lot of it, I think, was really

19   geared toward prescription drug pedigree because of

20   counterfeit products that were potentially out in the

21   marketplace and different states changing different

22   regs as far as that's concerned.

23           (Anda - Cochrane Exhibit 18 was marked for

24   identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2        Q.   We've had a document marked as Anda -

 3    Cochrane Deposition Exhibit 18, which is a two-page

 4    document produced from your custodial files bearing

 5    the Bates Number Anda 280939, and the title of the

 6    document is "Summary of the DEA HDMA meeting on

 7    Suspicious Orders," meeting date September 7, 2007.

 8            Was it the practice of HDMA at this time to

 9    distribute to regulatory affair committee members,

10    such as yourself, minutes -- or documents like this

11    one?

12        A.   Yeah.

13        Q.   Okay.  And would you in the course of your

14    responsibilities in regulatory compliance review them

15    for purposes of keeping yourself apprised of industry

16    developments?

17        A.   Yes.

18        Q.   And in particular, Anda Exhibit 18, I want to

19    refresh you to a couple different places in the

20    document.  And this is in reference to a meeting that

21    took place between HDMA attendees and Drug

22    Enforcement Administration attendees.

23            First of all, can you tell me who these HDMA

24    are:  Scott Melville, Anita Ducca, and David Durkin?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.   I don't remember Scott or David, but Anita

2   was one of the ones that would host conference calls

3   and attend things like this.

4       Q.   Okay.  She would also typically distribute

5   the meeting and conference materials related to these

6   types of events?

7       A.   I believe -- I believe she did.

8       Q.   Okay.  Looking at the middle of the page on

9   the first page of Anda - Cochrane Exhibit 18, it

10  states:  Key "take aways" from the meeting were --

11  and then has a couple bullet points.

12           The first bullet point under that is:  DEA's

13  policy was to expect more than just reporting

14  "suspicious orders."  If there was a suspicious

15  order, the distributor should either stop the

16  delivery or should evaluate the customer further

17  before delivering it.

18           You saw that reference?

19      A.   I do.

20      Q.   Is this one of the things that you understood

21  coming out of the meeting that you had with DEA

22  officials in July of 2007 that the expectation was

23  for suspicious orders, that the distributors should

24  either stop them before they were delivered or

Highly Confidential - Subject to Further Confidentiality Review

1    evaluate the customer further before delivering the

2    order?

3          MR. MATTHEWS:  Objection.

4          THE WITNESS:  Yeah.  But at this same time, I

5       mean, within this same year prior to this, we had

6       already begun the evaluation process from a

7       customer standpoint and we were actually doing it

8       for all of our customers, not just -- not just

9       waiting for an order to start the evaluation

10      process.

11          Our meeting consisted of them wanting us to

12      develop a due diligence process and investigate

13      who we have as customers as well as who we are

14      going to bring on as new customers.

15   BY MR. NOVAK:

16      Q.   And that is -- that due diligence process

17   relates to the portion of this observation that's

18   talking about "should evaluate the customer before --

19   further before delivering it"?

20      A.   For this -- in this instance here and at this

21   specific time, that's right around the same time that

22   we had made our 5,000 dosage unit limit for customers

23   based on some guidance we had received in a meeting

24   prior to this.  We also started the customer

Highly Confidential - Subject to Further Confidentiality Review

```
 1    questionnaire process around this same point in time

 2    as well.

 3           So does that answer the question or --

 4    Q.   If I understand your testimony correctly,

 5    it's that at this point in time Anda's process was to

 6    perform the evaluations of customer orders that

 7    exceeded 5,000 units of any particular controlled

 8    substance family and the processes that you have

 9    testified as it relates to that as Anda's method of

10    addressing potentially suspicious orders.

11           MR. MATTHEWS:  Objection.

12    BY MR. NOVAK:

13    Q.   Is that a fair characterization?

14           MR. MATTHEWS:  Objection.

15           THE WITNESS:  We were going after collecting

16       information from a due diligence perspective on

17       customers across the board, not only -- not

18       only -- not the only ones that were ordering

19       5,000 or more.  If they needed 5,000 or more,

20       it's definitely something that we addressed prior

21       to increasing the limit.

22           But we had sent out questionnaires to our

23       entire controlled substance customer base to

24       gather information on them from a due diligence
```

1        perspective even if they were at 5,000 and not

2        above that.

3    BY MR. NOVAK:

4        Q.   Okay.  Going a little further down in this

5    paragraph, the take-aways from the meeting, it

6    states:  The DEA criteria reflected in their

7    September 2006 letter to registrants was "for

8    background."

9            Do you understand the reference there to be

10   the Rannazzisi order -- or the Rannazzisi letter that

11   we were looking at earlier today from September of

12   2016?

13       A.   September of 2006?

14       Q.   Thank you.

15            September of 2006?

16       A.   Yeah, I can see how that's . . .

17       Q.   Okay.  And then next, looking at the next

18   major heading from the HDMA meeting, "Additional

19   points DEA made included," and the second bullet

20   point there states:  DEA provided examples of what a

21   wholesale distributor should do to know their

22   customers and what to look for.  For example, they

23   mentioned inspecting pharmacies.  They also mentioned

24   such actions as 'doing Google searches' to determine

Highly Confidential - Subject to Further Confidentiality Review

```
 1      if the pharmacy's name was affiliated with an

 2      Internet site and getting information from the State

 3      as to the nature and number of prior legal actions

 4      against the pharmacy.

 5              Do you see these references?

 6         A.   I do.

 7         Q.   Was Anda performing site inspections of

 8      pharmacies at this time?

 9         A.   No.

10         Q.   Had they incorporated into Standard Operating

11      Procedure 28 the Google search as part of the steps

12      that regulatory compliance personnel at Anda were

13      required to perform?

14         A.   I do not believe so.

15         Q.   How about gathering information from the

16      State?

17         A.   We would gather State licensure as far as the

18      customer was concerned that was issued by the State.

19         Q.   Okay.  Going to the second page of Anda

20      Deposition Exhibit 18, the first bullet page -- or

21      bullet point on that page of the exhibit, starting

22      with DEA, states:  DEA also does not want to receive

23      suspicious order reports that merely reflect volumes

24      that went over a threshold.  They wanted reports that
```

```
 1    are true -- quote/unquote, true suspicious orders.

 2              Is that consistent with what you had learned

 3    from your meeting with DEA officials in July of 2017?

 4              MR. MATTHEWS:  Objection.

 5    BY MR. NOVAK:

 6         Q.   I'm sorry.

 7              July of 2007?

 8              MR. MATTHEWS:  Objection.

 9              THE WITNESS:  Yeah.  Our -- our -- our system

10         was a -- a threshold-based system, and we were

11         reporting orders that went over that threshold.

12    BY MR. NOVAK:

13         Q.   The orders that we had looked at earlier

14    today, the suspicious --

15         A.   Correct.

16         Q.   -- orders and the excessive orders that were

17    being submitted by Spellman --

18         A.   Correct.

19         Q.   -- were examples of the types of reporting

20    that DEA no longer wanted?

21         A.   Right, which is why we went on to send out

22    questionnaires to our customers, start the due

23    diligence process.  We made specific limits in our

24    system from a 5,000 dosage unit perspective based on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that meeting as well.

 2            And then when you go back and look at SOP

 3    Number 40, there's a process for us to conduct more

 4    of the review even above and beyond the due diligence

 5    piece as far as the questionnaire was concerned to

 6    decide whether or not they were going to raise them

 7    above that 5,000 dosage unit threshold.

 8       Q.   Now, the next bullet point also states the

 9    DEA also indicated that they were not going to make a

10    decision for the wholesale distributor as to when an

11    order was "suspicious."  They feel this is up to the

12    distributor.

13            Is that consistent with the instruction that

14    you were receiving from DEA during this time frame?

15            MR. MATTHEWS:  Objection.

16            THE WITNESS:  They would never give us a

17       decision or any criteria on what they felt

18       constituted a suspicious order.

19    BY MR. NOVAK:

20       Q.   So for purposes of constructing and operating

21    a suspicious order monitoring system program, how

22    that was ultimately constructed to determine if an

23    order was suspicious was up to you?

24       A.   It was up to us as an organization, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Okay.  That's all I have from that document.

2             (Anda - Cochrane Exhibit 19 was marked for

3    identification.)

4    BY MR. NOVAK:

5        Q.   Next document that we have had marked is Anda

6    - Cochrane Deposition Exhibit 19, which is a blast

7    e-mail sent from Anita Ducca of HDMA to a number of

8    recipients.  The Bates Number is Anda 194634 through

9    6.

10            First, this appears to be an e-mail that

11   Ms. Ducca is sending from HDMA as an update and for a

12   conference call -- well, cancellation notice to all

13   the regulatory affair committee members.

14            Is that your understanding as to what the

15   document is?

16       A.   Uh-huh.  Yup.

17       Q.   And this is the type of document you received

18   back in September of '07 from Ms. Ducca?

19            MR. MATTHEWS:  Objection.

20            THE WITNESS:  I believe so.

21   BY MR. NOVAK:

22       Q.   Okay.  I want to draw your attention

23   specifically to the second page of the document, the

24   first bullet point up at the top, starting with on
```

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious orders, it states:  On suspicious orders,

2    Mike Mapes of DEA gave a brief overview stressing the

3    idea that there was both a responsibility to report

4    suspicious orders but also a responsibility to take

5    steps to guard against diversion.  Mike noted that in

6    the DEA's mind, this means that if an order is

7    suspicious, it shouldn't be shipped.

8            Is that consistent with what Mr. Mapes

9    conveyed to Anda representatives when you met with

10   him back in the July of 2007 meeting?

11           MR. MATTHEWS:  Objection.

12           THE WITNESS:  I don't remember him

13       specifically saying that in our meeting.

14   BY MR. NOVAK:

15       Q.   Okay.  Irrespective of whether he said it at

16   that meeting, are -- is this report something that

17   you would have read in your capacity as a regulatory

18   affairs member for HDMA?

19       A.   Yes.

20           MR. MATTHEWS:  Objection.

21           (Anda - Cochrane Exhibit 20 was marked for

22   identification.)

23   BY MR. NOVAK:

24       Q.   We've had marked Anda Deposition Exhibit 20,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    which is an e-mail sent from Tracey Hernandez to a

 2    number of recipients, which apparently included

 3    Mr. Cochrane.  The subject of the e-mail is

 4    "DEA/Industry Conference Report."  It's dated

 5    September of 2007, and the document bears the Anda

 6    Bates Number 276207 through 212.

 7           Mr. Cochrane, I -- first of all, is this an

 8    e-mail that you would have received in the course of

 9    your responsibilities at Anda back in September of

10    2007?

11           MR. MATTHEWS:  Objection.

12           THE WITNESS:  Yes.

13    BY MR. NOVAK:

14       Q.   Okay.  I'd like to direct your attention to

15    the page of the exhibit with the numbers 11 in the

16    bottom right-hand corner.

17           And specifically the area that I wanted to

18    direct your attention is where it says "DEA warning!"

19           Do you see that reference?

20       A.   Yes.

21       Q.   And it states, quote:  Our next strategy

22    involves pain management clinics.  Many are basically

23    pill mills.  'Take heed, distributors, and look at

24    these places.'
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Were you hearing similar things from

2    government regulatory officials in the fall of 2007?

3              MR. MATTHEWS:  Objection.

4              THE WITNESS:  I can't remember.

5         Department of Health definitely brought it up to

6         us.  I just don't remember when.

7    BY MR. NOVAK:

8         Q.   Okay.  How about industry officials?  Were

9    other folks in the industry warning that the next

10   area that we should be looking at in terms of

11   distribution of opioid products are these Internet

12   distributors?

13        A.    Internet distributors?

14        Q.   I'm sorry.  Pain management clinics?

15        A.   When you -- when you say "other officials" --

16        Q.   Other folks in the industry.  For example,

17   other members of the regulatory affairs committee

18   that you sat on.

19        A.    I don't remember off the top of my head.

20        Q.   Okay.  Was Anda, in this fall of 2007 time

21   frame, evaluating whether it should be more

22   restrictive on its sales of opioid products to pain

23   management clinics?

24              MR. MATTHEWS:  Objection.
```

```
 1              THE WITNESS:  I don't remember specifically

 2       back to 2007.

 3              MR. NOVAK:

 4              (Anda - Cochrane Exhibit 21 was marked for

 5       identification.)

 6    BY MR. NOVAK:

 7       Q.   We have had marked Anda Cochrane Deposition

 8    Exhibit Number 21, which is a two-page e-mail thread

 9    dated November 14 of 2007 bearing the Bates numbers

10    Anda 274287 through 288.

11              And it is comprised of a series of e-mail

12    relating to the modification of control thresholds

13    for a particular customer.

14              I want to direct your attention -- well,

15    before we actually talk about the exhibit, we were

16    now into a time frame for Anda where it was

17    implementing the Standard Operating Procedure 40 that

18    you had devised; is that correct?

19       A.   Yes.

20       Q.   And in particular the version of Standard

21    Operating Procedure 40 set a 5,000 unit limit for

22    each opioid product or other controlled substance

23    product, correct?

24       A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And Al Paonessa, the president of the

2    company, would have to sign off if you were going to

3    distribute more than 5,000 units to a particular

4    customer?

5    A.   Yes.

6    Q.   So on the bottom of the first page of Anda

7    Exhibit 21 -- well, let's, I guess, start at the

8    second page of the exhibit.

9         There is a request from Maria Alonzo to

10   Mr. Paonessa cc'ing both you and your brother,

11   Patrick Cochrane, where she requests that this

12   particular FMC customer receives an increase in the

13   threshold.

14        Is that a fair characterization?

15   A.   Yes.

16   Q.   Okay.  And you reply saying:  "Another one?

17   Thoughts?"  with question marks.

18   A.   That was -- okay.  No.

19   Q.   Is that what you wrote back in November of

20   '07?

21   A.   No.  That's what Al wrote.

22   Q.   Oh.  Okay.

23        So Al wrote that, inquiring as to what the

24   other recipients in the e-mail thought of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    proposal to increase the limits for this particular

 2    customer, correct?

 3         A.   Yes.

 4         Q.   Okay.  And then when you go to the first page

 5    of Exhibit 21, you said -- or, you wrote:  I denied

 6    them previously because of the amounts of

 7    hydrocodone.  That's really all they want.  I figured

 8    based on the numbers it was safer to keep them at
```

▮ ▬▬▬▬▬▬    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

```
11              That was your written response to George

12    Fields, Al Paonessa --

13         A.   Yes.

14         Q.   Okay.  Who is George Fields?

15         A.   George Fields, he was in sales, and I think

16    we ended up moving in sales.  I'm not sure what his

17    capacity was in sales.  Maybe a director of sales.

18         Q.   Okay.  And you asked him as to whether they

19    were a chain or a wholesaler?

20         A.   Yes.

21         Q.   Okay.  And George replied they were a

22    distributor?

23         A.   A wholesale distributor.

24         Q.   Was Anda in the business in 2007 of selling
```

```
1    product to other wholesale distributors?

2         A.   I believe so.  I'm not sure when we cut off

3    wholesalers and distributors.

4         Q.   Okay.

5         A.   It would have happened around the same time

6    we did the physicians, so I just don't have a

7    specific date.  I'm going to assume yes back in 2007,

8    but I don't remember.

9         Q.   Okay.  We can go later into what I think the

10   date for that is.

11        A.   Okay.

12        Q.   But it's still a couple years out yet?

13        A.   What's that?

14        Q.   Well, we'll get there.

15             Now --

16        A.   Well, I guess the answer is, yes, we were

17   selling to distributors in 2007.

18        Q.   Okay.  How is it that you would have known

19   that what they really wanted was hydrocodone?

20        A.   Probably looking at the past purchasing

21   history, but I'm not sure.

23   tabs in two months is the past purchasing history

24   that they had with Anda?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   It would appear so.

 2        Q.   Okay.  And you are suggesting that at this

 3   point they be kept at 5,000 tabs per month?

 4        A.   Yes.

 5        Q.   Okay.  Now, Al subsequently asks George:  Why

 6   would they use a million tabs?  Diverting it?

 7             Do you know if there was ever a response to

 8   that from Mr. Fields?

 9        A.   I do not know.

10        Q.   Okay.  Did that question from Al Paonessa

11   drive any further inquiry that you're aware of to see

12   whether these guys had been diverting?

13        A.    I can't remember if it did or not, but

14   knowing that it was Maria Alonzo and it was a

15   distributor account, they were probably one of our

16   larger Puerto Rico customers that was a distributor

17   on the island.  But I don't remember specifically

18   what else we went after or investigating.

19        Q.   Okay.  So as you have modified the policy

20   coming out of the July 2007 meeting to restrict

21   distribution for 5,000 units for any particular

22   controlled substance, were there a lot of these

23   requested modifications to increase the limits above

24   5,000 by different customers?
```

Highly Confidential - Subject to Further Confidentiality Review

 1      A.    Yeah.  There were quite a few, I would say.

 2      Q.    Particularly at the early onset of that

 3   change?

 4      A.    Correct.  Eventually, it kind of dwindled

 5   down as we reviewed customers on a case by case

 6   basis.

 7           (Anda - Cochrane Exhibit 22 was marked for

 8   identification.)

 9   BY MR. NOVAK:

10      Q.    We have had marked Anda - Cochrane

11   Exhibit 22, which is a one-page e-mail exchange

12   between you and Al Paonessa dated November 9th of

13   2007 bearing the Bates Number Anda 258572.

14           And it starts with an e-mail that you wrote

15   to Al where you wrote, quote:  I need your approval

16   to change the monthly dosage limit percentage on the

17   account listed below to 3,900 percent allowing them

18   to purchase up to 200,000 dosage units per month.

19           Is that what you wrote to Al back in November

20   of 2007?

21      A.    Yes.

22      Q.    Okay.  And the specific customer that was at

23   issue for this e-mail was the Harvard Drug Group?

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    You were proposing that their limit for
 2   controlled substances be raised to 200,000 units per
 3   controlled substance family per month?
 4        A.    Yes.
 5        Q.    So they could purchase, for example, 200,000
 6   units in the OxyContin family, 200,000 units in the
 7   hydrocodone family, 200,000 units in the morphine
 8   family, or 200,000 units in the fentanyl family?
 9        A.    Yes.
10        Q.    And Al wrote back saying "Approved," correct?
11        A.    Yep.
12        Q.    What evaluation did you perform for purposes
13   of proposing that the threshold limits be increased
14   to 200,000 dosage units per month for each of these
15   different opioid classes?
16        A.    I would probably resort back to SOP
17   Number 40.  It's not necessarily going to be dispense
18   data from them since they are a distributor that's
19   always selling to pharmacies and physicians but
20   probably some kind of a sales history as far as what
21   products they were distributing and the quantities.
22        Q.    Okay.  But it would not evaluate who they
23   were selling the product to?
24        A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Okay.  Because they were another distributor?

 2      A.    Correct.

 3      Q.    Okay.  And would that similarly have been the

 4   case in your evaluation of the immediately prior one

 5   that we looked at, FMC?

 6      A.    Yes.

 7            MR. MATTHEWS:  Objection.

 8   BY MR. NOVAK:

 9      Q.    Similarly, you would not have reviewed who

10   FMC was selling to?

11      A.    No.  Other distributors aren't going to share

12   information as far as their customer base is

13   concerned.

14      Q.    Okay.

15            (Anda - Cochrane Exhibit 23 was marked for

16   identification.)

17   BY MR. NOVAK:

18      Q.    We have had marked Anda - Cochrane Deposition

19   Exhibit 23, which is a two-page -- well, more than

20   two-page -- a three-page e-mail thread entitled

21   "Distributor Notification," the top page of which is

22   dated December 11, 2007, bearing Bates Number Anda

23   272213 through 15.

24            Now, this morning we had talked about
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    different notifications that the DEA provided to all

2    of the different distributors in the industry about

3    particular customers who had been restricted by other

4    distributors, correct?

5        A.    Yeah.

6        Q.    And is that what this notification is from

7    the DEA?

8        A.    It is.

9        Q.    So the DEA provided notification to you that

10   the various retail pharmacies and other entities that

11   are listed on the second page of Anda - Cochrane

12   Deposition Exhibit 23 had been cut off by somebody?

13       A.    Yes.

14       Q.    And in reviewing that list, it was your

15   observation that you wrote to Emily Schultz as

16   follows:  Get all the customer information from this

17   below in Excel.  I don't want to cut all of them off.

18   Some are good customers.

19            Is that what you wrote to Emily?

20       A.    It is.

21       Q.    Okay.  So this morning when we were talking

22   about other distributors that would cut off accounts

23   based on their suspicious order monitoring program, I

24   think your testimony is that Anda would process those
```

1    cutoffs as well when they received notification from

2    the DEA, correct?

3        A.    Correct.

4              MR. MATTHEWS:   Objection.

5    BY MR. NOVAK:

6        Q.    But in this particular instance you wanted to

7    do a little more evaluation of at least some of the

8    accounts because you thought some of them might have

9    been good customers?

10       A.    Yes.   And I'm not a hundred percent sure what

11   would have brought me to -- to think that.   It could

12   have been a conversation or a meeting we had

13   regarding this specific list.   And it's not in the

14   e-mail trail, but for some reason, I wanted to dig a

15   little bit further.

16       Q.    Okay.   In looking at the list of customers

17   that is referenced on the second page of the exhibit,

18   are there particular customers that stand out to you

19   as ones that you would have described as good

20   customers for Anda?

21       A.    Not looking at it like this, just based on

22   their name, DEA registration, city, and state.   There

23   could have been something that I did as far as our

24   system is concerned in researching our sales to them

Highly Confidential - Subject to Further Confidentiality Review

1     that led me to believe that some were good customers.

2         Q.    The third customer from the bottom is listed

3     as New Choice Pharmacy in Cuyahoga Falls, Ohio.

4               Does that ring a bell as a customer of Anda?

5         A.    No.

6         Q.    Do you recall ever reporting New Choice

7     Pharmacy as having placed suspicious orders with

8     Anda?

9         A.    No.

10        Q.    Okay.  Now, we had reviewed the last

11    suspicious order and excessive order submissions that

12    Anda made to the Drug Enforcement Administration from

13    Jay Spellman this morning.

14              Those were, I think, in approximately

15    September of 2007, right?

16        A.    I believe so.

17              MR. MATTHEWS:  Objection.

18    BY MR. NOVAK:

19        Q.    And from that point forward, you were trying

20    to create a different form of reporting suspicious

21    orders to replace the notifications that Jay Spellman

22    had been making to the DEA, correct?

23        A.    Yes.

24              (Anda - Cochrane Exhibit 24 was marked for

1    identification.)

2    BY MR. NOVAK:

3        Q.    We've had marked Anda - Cochrane Deposition

4    Exhibit 24, which is a thread of multiple e-mail

5    between various individuals, which is dated -- at

6    least the top one is dated April 10th of 2008, but

7    they go on for a much earlier period.  And it bears

8    the number Anda 276122 through 276129.

9             I think the best way to start is at the back

10   end and kind of go forward.

11            Looking at the page that ends with the Bates

12   Numbers 128, I believe there's an e-mail that you

13   wrote on October 5, 2007, to John Bossert.

14            First of all, who is John Bossert?

15       A.    John Bossert is a DEA representative, I

16   believe, from their IT department whose information

17   we were given at our 2007 meeting with DEA.

18       Q.    Okay.  So you -- you stopped submitting the

19   old reports --

20       A.    Yes.

21       Q.    -- and you were writing Mr. Bossert to figure

22   out the reporting mechanism you were going to use

23   going forward?

24            MR. MATTHEWS:  Objection.

```
 1              THE WITNESS:  Yeah.  Back then, they wanted
 2         us to do daily submissions of all of our
 3         controlled substance sales for all products in
 4         the ARCOS format, and we agreed to do it.  And
 5         John was supposed to be the contact person at DEA
 6         for helping us get it done.
 7    BY MR. NOVAK:
 8         Q.   Okay.  So you were submitting this e-mail to
 9    John, basically asking for the logistics and the form
10    of how that daily data would be submitted?
11         A.   Yeah.  They wanted -- they wanted ARCOS
12    formatted daily sales for all controlled products was
13    one of -- was one of the take-aways from that
14    meeting.
15         Q.   And when you say "that meeting," you are
16    referring to the July 2007 meeting that had Anda
17    representatives, DEA representatives, and a few
18    Watson --
19         A.   Yes.
20         Q.   -- representatives?
21              And then a little higher up the page there is
22    similarly an e-mail that you sent to Mr. Bossert
23    saying:  Can you respond to this e-mail letting me
24    know you have received it?  I am just making sure
```

1    they are not being rejected by your e-mail server.

2        A.    Yes.

3        Q.    And that would have been sent on October 22nd

4    of '07?

5        A.    Yes.

6        Q.    Okay.  And then if we look another page up,

7    ending in 127, there is similarly some e-mail that

8    you send both to Mr. Bossert and to Kyle Wright at

9    the drug administration -- Drug Enforcement

10   Administration asking about these daily submissions

11   as well?

12       A.    Yes.

13       Q.    Now, was it your understanding that these

14   daily submissions were supposed to replace the

15   suspicious order monitoring system reports or that

16   they were an entirely different type of data that was

17   to be submitted to DEA?

18           MR. MATTHEWS:  Objection.

19           THE WITNESS:  They wanted every single

20       transaction that we were doing.

21   BY MR. NOVAK:

22       Q.    Okay.  So these daily/every transaction

23   you're doing submissions were not intended to

24   delineate specifically orders that were deemed by

```
 1    Anda to be suspicious?

 2        A.   I don't believe so.

 3        Q.   Okay.  And then if we look at the page ending

 4    in 126, you send a further e-mail where you write:

 5    Hi.  Are you still interested in having us submit all

 6    of our controlled substance transactions daily?  My

 7    samples and questions from a while back are below.

 8    Let me know.

 9             And that was something you sent to

10    Kyle Wright and John Bossert at the DEA on April 8th

11    of 2008, correct?

12        A.   Yes.

13        Q.   Okay.  So for this multiple-month period, you

14    had been sending DEA e-mail, basically, asking how

15    you submit these daily submissions and not getting

16    much by way of responses.

17             Is that a fair characterization?

18        A.   Yeah.

19        Q.   And then finally on April 8th of 2008, you

20    receive a response from Kyle Wright who writes to

21    you:  Mike, Yes, I am still very interested in

22    getting your data, but we need to discuss this.

23             And then discussing the logistics of setting

24    up a call.
```

1          Is that the first reply you've received from

2    the DEA about the logistics of making these daily

3    submissions?

4         A.    I believe it is.

5         Q.    Okay.  And then if we look at the page ending

6    with the three digits 125, Kyle Wright writes to you

7    on April 10th of 2008 and writes:  Mike, I have

8    attached an MOA for you and your firm to review.

9    This is an agreement between Anda and DEA which

10   protects your firm, particularly for not reporting

11   directly to the field offices.  Please review and

12   send me any questions you may have.

13         Your understanding is that Kyle Wright

14   proposed a memorandum of agreement as it related to

15   your submission of information?

16        A.    Yeah.

17        Q.    Okay.

18        A.    We had never received one before, so . . .

19        Q.    When you say "never received one before," you

20   mean never received a memorandum of agreement before?

21        A.    Yeah, from Kyle or anybody at DEA.  I'm just

22   going up and looking at the next response.

23        Q.    Okay.  So after you receive that response,

24   you e-mail Al Paonessa at Anda, Tracey Hernandez at

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Watson, and Patrick Cochrane at Anda on April 10th of
 2    2008 and write:  I finally got a response regarding
 3    our daily reporting.  We have not developed a SOMS
 4    yet.  Please take a look at the agreement Kyle Wright
 5    sent.  Tracey, as I said before, I think it would be
 6    better if we are on the same page as far as a SOMS if
 7    possible.  End of quote.
 8         You wrote that e-mail on April 10th of 2008
 9    to Al Paonessa, Tracey Hernandez, and Pat Cochrane,
10    correct?
11         A.   Yes.
12         Q.   Now, the e-mail concerns two subjects.  The
13    first is the response on the daily reporting, but the
14    second is your statement regarding an -- I'm sorry --
15    SOMS.
16         What does the term SOMS mean as you wrote it
17    to the president of Anda, Tracey Hernandez, and
18    Patrick Cochrane on April 10th of 2008?
19         A.   Suspicious order monitoring system.
20         Q.   Okay.  So what you reported to Al Paonessa,
21    Tracey Hernandez, and Patrick Cochrane was, quote:
22    We have not yet -- we have not developed an SOMS yet,
23    correct?
24         A.   Yeah.  We needed to figure out formatting, I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    think, to get it in.  And then if you jump ahead to

 2    the previous page -- or the next page, Tracey talks a

 3    little bit there.

 4        Q.   You're talking about the page ending in 124?

 5        A.   Yes.

 6        Q.   Okay.  Why don't we go to that.

 7             So Tracey responds to your e-mail and states:

 8    Okay, Michael, you totally lost me.  I thought they

 9    already.  (I remember a conversation a while back

10    about having it by product SKU but not by class?)

11    All along, I've been under the impression that you

12    had this in place.  We were going to have this

13    meeting to compare the two programs?  What am I

14    missing here?

15             She wrote that to you in -- on April 10th of

16    '08, correct?

17        A.   Yes.

18        Q.   And she cc'd Al Paonessa and Pat Cochrane?

19        A.   Yes.

20        Q.   Okay.  Did you have in this time frame, in

21    addition to the written e-mail that was going back

22    and forth with Tracey, any telephone conversations

23    about the existence of an SOMS report at -- an SOMS

24    program at Anda?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't recall off the top of my head if we

 2   did or not.

 3        Q.    Okay.  But basically you were trying to find

 4   out what type of new system to configure and put in

 5   place for purposes of having a suspicious order

 6   monitoring system at this point in April of 2008,

 7   correct?

 8        A.    If you go to page ending in 123, that

 9   paragraph there talks about how we were implementing

10   the limits per family, the older Excel-style

11   reporting that we were doing back in September of

12   2007, the dosage unit limits.  We talked to the local

13   office.  We let them know we were in the process of

14   developing different reporting criteria.

15             And, again, we used that 5,000 dosage unit

16   limits for the family rather than creating a report

17   that would have sent customers that ordered more than

18   that, that we have approved and deemed worthy of it.

19        Q.    Okay.  Let's go through -- that answer tied

20   in with what you -- what you replied to Tracey

21   with --

22        A.    Yes.

23        Q.    -- in April 10th of 2008.  So let's go

24   through that in a little bit more detail.
```

1           So the first thing you write in the first

2    sentence is:  Correct.  We have all had conversations

3    in the past regarding our suspicious order monitoring

4    program.

5           What do you mean by saying "correct"?

6    A.    I'm not sure.

7    Q.    Okay.  The second sentence, you write:  Based

8    on us implementing the limits per family, our program

9    would only capture customers that we actually think

10   are good customers at this point.

11          What do you mean by that?

12   A.    If you go back to SOP 40 that was written

13   after we developed the 5,000 dosage unit per family

14   and we approved them for more than 5,000, the

15   customers that would have hit the report that Jay

16   used to send would be actually good customers that

17   we've approved for an increase.

18   Q.    Okay.  So you had an old suspicious order

19   monitoring system that would report customers who

20   ordered in excess of 5,000?

21   A.    Correct.

22          MR. MATTHEWS:  Objection.  Just pause so I

23      can get my objection in.

24          THE WITNESS:  Got you.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. NOVAK:

2        Q.   And as you observe here, under the new

3    system -- the new Standard Operating Procedure 40

4    that you have created, if you're complying with that

5    SOP 40, the only customers who would be getting

6    reported are ones that you deemed were good customers

7    because they had been approved for an amount in

8    excess of 5,000 units?

9            MR. MATTHEWS:  Objection.

10           THE WITNESS:  Yes.

11   BY MR. NOVAK:

12       Q.   Okay.  So you are trying to figure out an

13   alternative method of devising reporting limits for a

14   suspicious order monitoring system?

15       A.   I think that we did the 5,000 dosage unit

16   limit total per family and started our due diligence

17   process that was all part of our -- our order

18   monitoring system.

19       Q.   Okay.  And then, further down in the e-mail,

20   you state -- by the way, the Standard Operating

21   Procedure 40 that you made reference to in these

22   answers, that's the procedure that we reviewed

23   earlier this morning as Anda - Cochrane Deposition

24   Exhibit 8, correct?
```

```
 1        A.    Yeah.  Yes.

 2        Q.    Okay.  Now, going back to Anda - Cochrane

 3   Deposition Exhibit 24, as we go further down the

 4   e-mail, you state:  I have only talked to our local

 5   office in Ft. Lauderdale regarding this.  They are

 6   aware of our reporting criteria and know we have

 7   monthly limits in place and understand we are in the

 8   process of developing different reporting criteria.

 9              You see that statement?

10        A.    I do.

11        Q.    Okay.  So explaining to Tracey what you're

12   essentially saying is we had the old suspicious order

13   monitoring reports that were going in from Jay

14   Spellman and were now --

15              THE WITNESS:  The new methodology that we've

16         implemented.

17              MR. MATTHEWS:  Wait for a question.

18   BY MR. NOVAK:

19        Q.    We're now in the process of developing

20   different reporting criteria?

21              MR. MATTHEWS:  Objection.

22              You can answer.

23              THE WITNESS:  Yes.  Because with the

24         implementation of our due diligence program and
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        the 5,000 dosage unit limit as suggestions from

2        our previous meeting, correct.

3   BY MR. NOVAK:

4        Q.   Okay.  So in response to that discussion,

5   Tracey writes back to you on April 10, 2008, and

6   states:  That would be helpful.  How did we end up in

7   conversation with Kyle about a memorandum of

8   understanding?

9             You see that reference?

10       A.   I do.

11       Q.   Okay.  Now, that reference is about having a

12  memorandum of understanding in effect as it related

13  to sending the daily data submissions to the DEA

14  that -- that was the initial topic of this e-mail

15  thread, correct?

16       A.   I'm not sure.

17       Q.   Okay.  All right.  And then you replied to

18  Tracey and stated -- on April 10 of 2008, and stated:

19  That is the first I have seen or heard of an MOA.

20  When we were in DC, they asked if we would report all

21  our controlled substance sales for all schedules

22  daily.  We tried to get them to review our sample

23  reports numerous times, and this is finally the

24  response he sent to my e-mail on 4/8/08.  First he
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     requested a brief conference call, and then he

2     e-mailed the memorandum of agreement.

3              That was your explanation to Tracey?

4        A.   Yes.

5        Q.   Okay.  And then the top e-mail, Tracey's last

6     response to you in this thread, she says:  Would you

7     mind if I followed up with Kyle before you sign

8     anything?

9              And then has additional discussion after

10    that?

11             So was it left, at least at this juncture,

12    with Tracey requesting that she do some follow-up

13    before you actually entered a memorandum of

14    agreement?

15       A.   Yes.

16       Q.   Okay.  By the way, sometimes these e-mail

17    exchanges make reference to a memorandum of agreement

18    and in other instances a memorandum of understanding.

19             Do you mean those two terms -- do you

20    understand those two terms to mean the same thing, at

21    least in the context of these e-mails?

22       A.   Yeah.

23             (Anda - Cochrane Exhibit 25 was marked for

24    identification.)
```

```
 1    BY MR. NOVAK:

 2        Q.   We've had marked as Anda - Cochrane

 3    Exhibit 25 a continuation of the e-mail thread that

 4    we've just been discussing with respect to the

 5    submission of reports to the DEA.  It's dated --

 6    well, there are multiple dates.  The top date is

 7    April 30th of 2008, and it is comprised of several

 8    e-mails between Tracey Hernandez, you, and I think

 9    some DEA officials.  And it is Anda MDL 276111

10    through 113.

11            And like the last time, I'll start with the

12    last one in the chain on Page 3 with the page number

13    113.

14            And there, there is an e-mail from

15    Kyle Wright at the Drug Enforcement Administration

16    who writes to you on April 11, 2008, and says:  Mike,

17    I got off the phone with Ms. Chiavaro pertaining to

18    suspicious orders.  It is believed that you are

19    sending your suspicious orders to me here at DEA.  I

20    checked with our IT folks yesterday, and we have not

21    received any suspicious or daily reports.  I know

22    that you are proposing to send them and therefore I

23    sent you the MOA for your firm to review.

24            You see that statement from Kyle Wright to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you?

2         A.    Yes.

3         Q.    Okay.  And then he asks:  Have you been

4    sending us your daily/suspicious orders?  If so,

5    please let me know so that I can get to the bottom of

6    this immediately.  May have to have your IT folks

7    talk to our IT folks.

8              From the time -- well, first of all, is that

9    what Kyle wrote to you in April of 2008?

10        A.    Yes.

11        Q.    Now, from the time that the old reporting

12   format of sending suspicious order reports to the DEA

13   from Jay Spellman had ended in September of -- in

14   August or September of 2008, there had not been any

15   actual suspicious order reports submitted by Anda to

16   the DEA between then and April of '08, correct?

17        A.    Correct.

18        Q.    That question -- it's been pointed out to me,

19   when I said the Jay Spellman reports, I need to

20   clarify this.  I think I said August or September of

21   '08.  They actually stopped in August or September of

22   '07.

23              Is that what you understood?

24        A.    Yeah.
```

```
 1        Q.    Okay.  So between that time and April of

 2    2008, no suspicious order reports have been submitted

 3    to the DEA?

 4        A.    Correct.

 5        Q.    And it is your view that there were no

 6    suspicious orders that had been placed with Anda

 7    during that time period?

 8        A.    Yes.

 9        Q.    And just so we're on the same wavelength for

10    purposes of that answer, when you say yes, you mean

11    that your view is that no suspicious orders had been

12    placed with Anda between August of 2007 and

13    April 2008?

14        A.    Yes.

15        Q.    Okay.  And then after receiving that e-mail

16    from Kyle Wright, you wrote to Tracey and asked on

17    April 11th of 2008 -- and this is the page of the

18    e-mail ending in 112 -- and you write:  How should I

19    respond to this e-mail?  We've been trying to set up

20    the daily reporting since last year and never got any

21    responses from DEA in Washington.  Can we start the

22    daily, just not the suspicious.  What is suspicious

23    about the great majority of our customers only being

24    allowed to order 5,000 dosage units of a controlled
```

1    substance family?  I sent you the e-mail I sent to

2    Joanne Chiavaro yesterday explaining our current

3    practice.

4            That is what you wrote to Tracey?

5        A.   Yes.

6        Q.   By the way, is Tracey simply providing advice

7    in this process, or does she have some veto power

8    over the decisions that you're attempting to

9    implement at Anda?

10       A.   I would say advice.

11       Q.   Okay.  So you asked her for advice on how to

12   respond to Kyle's e-mail, and then you followed it up

13   on April 15 asking Tracey if she had a chance to read

14   your e-mail; and then again on the 16th; and finally

15   she replied on April 30th and states:  Michael, I

16   spoke with Kyle, and he referred me to their IT guy,

17   John Bossert.  I have a call in to John to see if I

18   can get more details.  Sounds like they've set up

19   some program to receive and interpret SOM information

20   on their end, parens, probably something they

21   mandated for the companies who licenses they

22   suspended/revoked but they are "requesting - not

23   mandating" for us to do it as well.

24           You received that reply from Tracey on

1    April 30 of '08?

2         A.   Yes.

3         Q.   By the way, do you recall this process of

4    going back and forth on trying to figure this out,

5    back from this time period in 2008?

6         A.   Vaguely.

7         Q.   Okay.  And then she continues, quote:  He

8    said we still have the option of supplying to the

9    local office, but they would prefer it to come to HQ

10   in an automated format.  I explained that we

11   certainly shouldn't have very many suspicious orders

12   at this point and an automated process seemed a bit

13   much for a minimum number of suspicious orders.  He

14   stated he didn't feel it would take much to submit

15   electronically and suggested I contact John.  I'll

16   call as soon as I hear back from him.  In the

17   meantime, I would hold off on the MOA.

18             Tracey wrote that to you in April 30 of 2008?

19        A.   Yes.

20        Q.   So at this point, there are still two

21   different things in play:  One is submission of this

22   daily data, and the other is submission of suspicious

23   order monitoring information, correct?

24        A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   You understood those to be two different

2    things?

3      A.   Yes.

4      Q.   Okay.

5           (Anda - Cochrane Exhibit 26 was marked for

6    identification.)

7    BY MR. NOVAK:

8      Q.   We have had Anda - Cochrane Deposition

9    Exhibit 26, which is an e-mail thread between Tracey

10   Hernandez, Michael Cochrane, and also with a portion

11   of it including Kyle Wright at the Drug Enforcement

12   Administration.  It bears the Bates stamps Anda

13   276096 to 97.

14          Are these e-mails that would have been

15   exchanged between you, Tracey, and Kyle Wright at the

16   DEA in May of '08?

17     A.   Yes.

18     Q.   So after the last e-mail that we looked at,

19   Tracey followed up on May 6th with Kyle Wright and

20   wrote:  Kyle, on April 30th, I contacted you

21   regarding the format that you would like to see

22   suspicious orders in for our Anda facilities.  You

23   advised that I contact John Bossert, which I did that

24   same day and left a message on his voicemail.  I have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      not heard back from him to-date.

 2              Kyle, we are happy to supply SOM data

 3      directly to the headquarters office if that makes the

 4      receipt and review easier for your folks.  Our only

 5      concern is this.  We have made drastic improvements

 6      to our suspicious order monitoring system since our

 7      meeting last August.  As a result, the number of

 8      truly suspicious orders that we have to report are

 9      next to nothing.

10              We don't mind supplying data to you via

11      e-mail but really don't want to go through the extra

12      time, expense, and resource to develop a reporting

13      mechanism that is as structured as the ARCOS format

14      when we don't see having much, if anything, to report

15      each month.

16              Are you in agreement with the

17      characterization of the suspicious order monitoring

18      system that Tracey provided in that explanation to

19      Kyle?

20              MR. MATTHEWS:  Objection.

21              THE WITNESS:  Yes.  We started our due

22          diligence process.  We had our thresholds in

23          place from the meeting that we had the prior year

24          to them that was a suggestion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And, yes, I agree.

 2    BY MR. NOVAK:

 3        Q.    Okay.  At this point in time, had Anda

 4    developed the alternative criteria that it would use

 5    to determine what type of suspicious order should be

 6    reported to DEA?

 7                    MR. MATTHEWS:  Objection.

 8                    THE WITNESS:  I don't remember.

 9    BY MR. NOVAK:

10        Q.    Okay.

11             (Anda - Cochrane Exhibit 27 was marked for

12    identification.)

13    BY MR. NOVAK:

14        Q.    We've had marked Anda - Cochrane Deposition

15    Exhibit 27, which is an e-mail exchange of one page

16    between Michael Cochrane and Tracey Hernandez dated

17    June 17 of 2008, bearing the Bates number Anda

18    Opioids MDL 276927.

19             Now, in this e-mail, Tracey writes to you and

20    asks on June 16th of '08:  Michael, did you ever get

21    ahold of John Bossert at DEA HQ to pursue the

22    automated SOMS report?

23             That's what she wrote to you, correct?

24        A.    Yes.
```

```
 1       Q.   And you replied:  No.  You had said last
 2   month you wanted us both to be on the call.  Let me
 3   know when.
 4       Correct?
 5       A.   Yes.
 6       Q.   So you still had not made arrangements with
 7   John Bossert at DEA as it related to the submission
 8   of the daily transactional information that had been
 9   discussed in July of '07?
10       A.   Correct.
11       Q.   And --
12       A.   I think Tracey had multiple calls in to him,
13   though, that were talked about in the previous
14   e-mails.
15       Q.   Right.  Okay.
16            MR. NOVAK:  A quick five-minute break.
17            THE VIDEOGRAPHER:  Off the record at 2:52.
18        (Recess from 2:52 until 3:06 p.m.)
19            THE VIDEOGRAPHER:  The time is 3:06 p.m.  We
20       are now back on the video record.
21   BY MR. NOVAK:
22       Q.   Mr. Cochrane, we had been speaking about
23   development of alternative criteria for a suspicious
24   order monitoring system.
```

```
 1              (Anda - Cochrane Exhibit 28 was marked for

 2      identification.)

 3      BY MR. NOVAK:

 4         Q.    And in that regard, why don't we run through

 5      Anda Deposition Exhibit 28 and the Cochrane

 6      Deposition Exhibit 28, which is comprised of a

 7      single-page e-mail from you to Patrick Cochrane dated

 8      February 9th of 2010, and then attached to that is a

 9      Standard Operating Procedure 40.  And those three

10      pages combined have Anda MDL 78286 through 78288.

11              Now, before I get to the e-mail that you

12      wrote to your brother Patrick, let me ask you some

13      questions about Standard Operating Procedure 40 that

14      is contained in the second two pages.

15              Is this a document that you reviewed -- I

16      mean that you authored?

17         A.    It looks like it.  I don't remember it,

18      though.

19         Q.    Okay.  In the document, there is a procedure

20      that is referenced at the page ending in 88.

21              You see that part of the document?

22         A.    Yes.

23         Q.    Okay.  Now, going through the first portion

24      of the procedure, it states "3.1 System Formula."
```

Highly Confidential - Subject to Further Confidentiality Review

1    And then the first line is line number one, states:

2          Add quantity purchased over last 12 months

3    for all customers.

4          2.  Add the number of months customers

5    purchased that do not equal zero.

6          3.  Divide the quantity purchased by the

7    total customer months.

8          4.  Multiply the quantity by a factor of

9    three.

10         5.  If customer order quantity exceeds this

11   number, order is to be held for review.

12         Is that a process that you drafted?

13   A.    I don't remember.

14   Q.    Okay.  Do you recall attempting to get some

15   alternative method developed to hold suspicious

16   orders?

17         MR. MATTHEWS:  Objection.

18         THE WITNESS:  Yes.

19   BY MR. NOVAK:

20   Q.    Okay.  And when I say "hold suspicious

21   orders," for this purpose, do you understand that to

22   mean to pend an order so it is not filled until it

23   has some form of further review by the company?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  So is it fair to say that what you're

 2   attempting to develop here is an alternative

 3   suspicious order monitoring system that has different

 4   numerical criteria for purposes of holding and

 5   reviewing suspicious orders?

 6        A.    Yes.

 7              MR. MATTHEWS:  Objection.

 8   BY MR. NOVAK:

 9        Q.    Okay.  And if I can paraphrase what is

10   attempted to be done by this system formula, is it to

11   take essentially the average monthly order of a

12   customer over the last 12 months and multiply it by

13   three?

14              MR. MATTHEWS:  Objection.

15              THE WITNESS:  Yes.

16   BY MR. NOVAK:

17        Q.    So if I understand it correctly, what you are

18   trying to do with this new draft suspicious order

19   monitoring system would be to take a customer's

20   monthly average report -- or, I'm sorry, his monthly

21   average purchase based on 12 months of data, and if

22   their current order exceeds three times that monthly

23   average purchase, then the order would be held for

24   further evaluation?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. MATTHEWS:  Objection.

 2            THE WITNESS:  Yes.

 3    BY MR. NOVAK:

 4       Q.   Okay.  And the whole purpose of creating this

 5    is to create some type of system that would detect

 6    orders that require additional review to determine

 7    whether they are suspicious under the applicable

 8    regulatory requirements or whether they can be

 9    shipped?

10       A.   Yes.

11       Q.   And so you developed this alternative

12    approach, looking at the page ending in 87, in

13    December of 2009?

14            MR. MATTHEWS:  Objection.

15            THE WITNESS:  Yes.

16    BY MR. NOVAK:

17       Q.   And then, looking at the first page of the

18    document, you were asking Patrick Cochrane to -- to

19    take a look at it and give you feedback?

20       A.   Yes.

21            (Anda - Cochrane Exhibit 29 was marked for

22    identification.)

23    BY MR. NOVAK:

24       Q.   We've had marked as Anda - Cochrane
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Deposition Exhibit 29, a three-page document, the

 2    first page of which is an e-mail thread between

 3    Michael Cochrane, Al Paonessa, and Patrick Cochrane

 4    dated June 22nd and June 29th of 2010.  And then the

 5    second and third pages are the draft standard

 6    operating procedure.  It bears the Bates Number Anda

 7    281694 through 696.

 8            And, again, Mr. Cochrane, I'll start with the

 9    third page of the exhibit.

10            And as far as I can tell, the only difference

11    between this page and the one that we had just

12    reviewed on Anda - Cochrane Exhibit 28 is that it has

13    the words "addlible dlykins" down at the bottom.

14            Do you know what that means?

15    A.    It's a way to test system functionality in

16    our test system, not our live system.

17    Q.    Okay.  So at this point in 2010, the Standard

18    Operating Procedure 40, as you revised it in December

19    of 2009 and was discussed in February of 2010 in your

20    e-mail with Patrick, has not been implemented,

21    correct?

22            MR. MATTHEWS:  Objection.

23            THE WITNESS:  I do not believe so.

24    ///
```

```
 1    BY MR. NOVAK:

 2        Q.    Okay.  And at the very top of the e-mail on

 3    the first page of Anda - Cochrane Deposition

 4    Exhibit 29, you state to Al Paonessa, the president

 5    of the company, and your brother, Patrick, quote:  I

 6    need to test the program again with someone from

 7    John's group.  I'm not sure how many orders would go

 8    on hold because our testing has only consisted of

 9    remote orders for a day.  Is three times our average

10    sales based on the formula suspicious to warrant a

11    review?  Should it be more or less?

12            Is that what you wrote to the president of

13    the company, Albert Paonessa, and your brother,

14    Patrick Cochrane?

15        A.    Yes.

16        Q.    Is it fair to say that as of this point in

17    June of 2010 you're still evaluating some alternative

18    method for detecting and then evaluating and possibly

19    reporting suspicious orders?

20        A.    Yes.

21        Q.    Okay.  Now, from the period of August of 2007

22    when the old method of reporting suspicious orders to

23    the DEA through the monthly Spellman submissions had

24    ceased, had Anda reported any suspicious orders?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I do not believe so.

 2        Q.    Okay.  And the company was evaluating what

 3   criteria would appropriately be employed to identify

 4   suspicious orders?

 5        A.    From a systematic approach, yes.

 6        Q.    And had been evaluating that issue from

 7   September of '07 through June of 2010?

 8        A.    Yes, in addition to our due diligence,

 9   customer questionnaire, dispense data, correct.

10        Q.    And when you say that due diligence process,

11   you are referring to the Standard Operating

12   Procedure 28 that we reviewed earlier today as well

13   as the Standard Operating Procedure 40 based on the

14   5,000-unit cap?

15        A.    Yes.

16              MR. MATTHEWS:  Objection.

17              I'm going to ask the witness again just to

18        pause between the question and your answer to

19        give me an opportunity to pose an objection.

20              Thank you.

21              MR. NOVAK:  If it assists, I can ask the

22        court reporter to put the objection in before his

23        "yes."

24              MR. MATTHEWS:  Let the record reflect who
```

```
1        made that suggestion.  I was -- it's Mr. Novak,

2        counsel for the plaintiffs and the deposing

3        lawyer at this time, not Mr. Matthews for the

4        defendant.

5             MR. NOVAK:  Just trying to help.

6             I'm also just going to state for the record

7        that -- well, and this is really more for

8        purposes of cross-referencing the depositions.

9             (Anda - Cochrane Exhibit 30 was marked for

10   identification.)

11            MR. NOVAK:  We've had marked Anda Deposition

12       Exhibit 30 a document that was previously marked

13       as Anda - Brown Deposition Exhibit 6, and my sole

14       purpose for doing that was to place into the

15       record that the standard operating procedure

16       draft that we've been reviewing had similarly

17       been identified in a prior deposition.

18   BY MR. NOVAK:

19       Q.   And I suppose I will just ask:  Mr. Cochrane,

20   the procedure that is set forth in the second page of

21   Anda - Brown Deposition Exhibit 6, that is the same

22   procedure that is set forth and about which you have

23   been testifying in Anda - Brown -- I'm sorry, Anda -

24   Cochrane Deposition Exhibits 28 and 29, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Okay.  Can you describe for me what the

 3   process of testing the system functionality of this

 4   revised Standard Operating Procedure 40 that you

 5   created -- how one would do that?

 6        A.   With our IT department, we would take

 7   previous orders from a day on our test system and run

 8   them through the program and the system functionality

 9   to make sure it was working appropriately.

10        Q.   Okay.  And were you involved in interacting

11   with your IT program to perform that type of testing

12   with the revised Standard Operating Procedure 40 that

13   you had been working on?

14        A.   Yes.

15             (Anda - Cochrane Exhibit 31 was marked for

16   identification.)

17   BY MR. NOVAK:

18        Q.   We've had marked as Anda Exhibit 31 a

19   document that is comprised of multiple pages.  The

20   top page is an e-mail between Deanne Lykins and

21   Michael Cochrane dated October 28, 2011, and the

22   remainder of the document is approximately six pages

23   long.  It's a series of e-mails bearing the Bates

24   Number 79269 through 79274.
```

```
 1              Are these e-mails that would have been

 2     exchanged between you, Deanne Lykins, and Emily

 3     Schultz as it relates to the testing of the draft

 4     standard operating procedure that has been the

 5     subject of Deposition Exhibits 29 and 30?

 6              MR. MATTHEWS:  Objection.

 7              THE WITNESS:  I believe so.

 8     BY MR. NOVAK:

 9        Q.   Okay.  And the earlier exhibit made reference

10     to the quantity purchased over the last 12 months.

11     If we look at Anda Exhibit 31, it appears to be

12     reviewing data over six months?

13        A.   Yes.

14        Q.   Okay.  So one of the things that you're

15     evaluating in the testing period for the new method

16     of creating suspicious order monitoring system is

17     whether you should use 12 months of historical data

18     from the customer or six months of historical data

19     from the customer; is that fair?

20        A.   Yes.  I'm not sure why, but these e-mails are

21     a lot --

22        Q.   And then Ms. Lykins' e-mail to you on the

23     front page of Anda Exhibit 31, dated October 28th of

24     2011, makes reference to customer average per month,
```

```
 1    customer average per order, and class of trade

 2    average per order.

 3            Do you see those references?

 4       A.   Yes.

 5       Q.   Now, those would be three different methods

 6    of reviewing a particular order to evaluate the

 7    appropriateness of it, correct?

 8       A.   Yes.

 9       Q.   One method would be to compare the order

10    based upon what that specific customer has averaged

11    on a monthly basis; the second would be comparing the

12    order against what the customer's average order is;

13    and the third would be comparing it to all the

14    different customers in the same class of trade,

15    correct?

16       A.   Yes.

17       Q.   Okay.  Were all of those different methods of

18    evaluating orders things that Anda was evaluating for

19    purposes of trying to create a -- a new suspicious

20    order monitoring system?

21       A.   Yes.

22       Q.   Okay.  And during this time, June -- or, I'm

23    sorry, October of 2011, the existing system that is

24    in place for performing due diligence on any orders
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     that are received by Anda for controlled substances

2     is the 5,000 per unit threshold method that Anda

3     developed back in August of 2007?

4              MR. MATTHEWS:  Objection.

5              THE WITNESS:  I don't think so.  At this

6         point in time, I think we had dropped the limits

7         to 1,000 dosage units.

8     BY MR. NOVAK:

9         Q.   Okay.

10        A.   Since we're in late 2011.

11        Q.   Let me go back to Anda - Cochrane Exhibit 4,

12    if you have that, and direct you back to Page 9.

13             Now, in that discovery answer, Anda

14    identifies the Standard Operating Procedure Number 40

15    as having an effective date of December 2011.

16             MR. MATTHEWS:  Objection.

17    BY MR. NOVAK:

18        Q.   Do you see that reference?

19        A.   I do.

20        Q.   Okay.  Are you aware of a system that had

21    been put in place by Anda that has a 1,000-unit limit

22    that was implemented prior to December of 2011?

23        A.   I -- I believe we dropped the limits to 1,000

24    prior to 2011.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Prior to December of 2011?

2        A.    Yes.

3        Q.    Okay.  Would that be reflected in an actual

4   modification of the written standard operating

5   procedure that we had reviewed that was -- that you

6   created in August of 2007?

7              MR. MATTHEWS:  Objection.

8              THE WITNESS:  I'm not sure.

9   BY MR. NOVAK:

10       Q.    Okay.  And maybe this is a good point to talk

11  about more generally how these different standard

12  operating procedures are modified.

13             Are all of the modifications that are made to

14  procedures during the time that you performed your

15  responsibilities at Anda modifications that are made

16  in writing?

17       A.    I can't recall if we documented the changes

18  to any of the procedures.

19       Q.    Okay.  The review process for modification of

20  standard operating procedures typically will include,

21  as part of the modified procedure, dates for when

22  they are reviewed and dates for when they are

23  revised, correct?

24             MR. MATTHEWS:  Objection.
```

```
 1              THE WITNESS:  Correct.

 2   BY MR. NOVAK:

 3        Q.   Okay.  Now, why don't we go back to Anda -

 4   Cochrane Exhibit 7.

 5              And on the back page of that document, there

 6   are various effective dates of standing -- Standard

 7   Operating Procedure 40 that are referenced at Page 3

 8   of the document, the first of which is December 2011,

 9   and identifies you as the author.  And then there are

10   further versions that are referenced identifying

11   different people as the authors.

12              Are -- are you indicating that there is a

13   version of Standard Operating Procedure 40 that was

14   promulgated by Anda in between the August 1st, 2007,

15   version that is Anda Deposition Exhibit 8 and the

16   December 11th version that is referenced on the third

17   page of Anda - Cochrane Deposition Exhibit 7?

18        A.   I'm not sure.  It looks like this may have

19   replaced the previous Number 40.

20        Q.   Okay.  So the company had -- and when you say

21   the previous Version 40, you are referring to Anda

22   Deposition Exhibit 8?

23        A.   Yes.

24        Q.   Okay.  So Anda Deposition Exhibit 8 sets
```

```
1    forth the 5,000 dosage limit method of implementing a

2    standard operating procedure to -- to deal with

3    controlled substances, and it is replaced by a new

4    method in December of 2011, correct?

5            MR. MATTHEWS:  Objection.

6            THE WITNESS:  I'm not sure, but that's what

7        it looks like.

8    BY MR. NOVAK:

9        Q.   Okay.  Now, that new method uses a different

10   procedure to identify whether a particular order

11   should be held by Anda and investigated further

12   before it's released to the customer, correct?

13       A.   Yes.

14           MR. MATTHEWS:  Are you done with 31?

15           MR. NOVAK:  Yes.

16           (Anda - Cochrane Exhibit 32 was marked for

17   identification.)

18   BY MR. NOVAK:

19       Q.   Mr. Cochrane, I've handed you Anda - Cochrane

20   Exhibit 32, which is an additional draft version of

21   Standard Operating Procedure 40 bearing the Bates

22   Number Anda 82105 through 107.  And just to identify,

23   the third page of the document makes reference to a

24   creation date for the document of November 5, 2010.
```

```
 1            So is this a draft of the standard operating

 2    procedure that would have been in evaluation after

 3    the procedure you created with the 5,000 control

 4    units per month in August of '07 and before we get to

 5    whatever is implemented in December of 2011?

 6        A.   I'm not sure.

 7        Q.   Okay.  If you were attempting to find the

 8    version of standard operating procedure that was

 9    created and in effect in December of 2011, where

10    would you look if you were still at the company?

11        A.   I'm not sure.  I think there was a shared

12    drive that all of us had access to where we would

13    keep up-to-date documents.

14        Q.   And would that shared drive also keep prior

15    iterations of those documents if they had been

16    modified over time?

17        A.   I'm not sure.

18        Q.   Okay.  So, for instance, Standard Operating

19    Procedure 28 that deals with new accounts, that one

20    was modified over time to create additional

21    requirements for due diligence information and

22    dispense data, correct?

23        A.   Yes.

24        Q.   Would you be able to determine when those new
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    obligations were placed into Standard Operating

 2    Procedure 28 by -- by going to the shared drive that

 3    you're referencing and looking at the different

 4    versions?

 5         A.   I'm not sure.

 6         Q.   Okay.  Who would know the answer to that at

 7    Anda as of the time that you had left?

 8         A.   I'm not sure.  I would have to say Robert

 9    Brown, potentially; Emily Schultz.  I really don't

10    know.

11         Q.   Okay.  Going back to Anda - Cochrane

12    Deposition Exhibit Number 31, this reflects some

13    testing of a method for identifying orders that would

14    be held to determine whether they were suspicious or

15    not, correct?

16         A.   Yes.

17         Q.   Okay.  Now, in an e-mail from you to Deanne

18    Lykins on October 27 of 2011 cc'ing Emily Schultz --

19    and this starts on Page 1 of Exhibit 31 and goes over

20    to Exhibit 2 -- you write:  I didn't expect 822 lines

21    and 339 orders.  Can you run the same day of sales

22    and look at 12 months of data to see what changes?

23              Is that a -- and then you proceed to state:

24    We also may look at increasing and decreasing some of
```

1    the multipliers.

2          So you're in essence asking Ms. Lykins to

3    review some of the different variables to see what

4    effect it has on the number of orders that are

5    generated?

6          MR. MATTHEWS:  Objection.

7          THE WITNESS:  I think so.

8    BY MR. NOVAK:

9    Q.   Okay.  And I'm -- I'm going to go back a

10   little bit, because we've been talking about this in

11   theoretical terms that may be difficult to -- to

12   understand.  So I want to go back to some simple

13   concepts to see if we agree on them about this

14   process.

15         Anda, through your efforts, is attempting to

16   create a suspicious order monitoring system that will

17   identify orders that may be suspicious so that

18   regulatory compliance staff can perform additional

19   review of them before they are released?

20         MR. MATTHEWS:  Objection.

21   BY MR. NOVAK:

22   Q.   Is that the purpose of the exercise that

23   you're performing that's discussed in Anda - Cochrane

24   Exhibit 31?

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  I believe so.

 3    BY MR. NOVAK:

 4       Q.   Okay.  And so basically what you are trying

 5    to do is create an automated system that will

 6    identify a subset of the orders for controlled

 7    substances that come into the company and determine

 8    which ones should be reviewed in a little more

 9    detail; is that correct?

10       A.   Yes.

11       Q.   Okay.  And so one of the systems that you are

12    attempting to create to do that takes these different

13    criteria, the customer average per month, the

14    customer average per order, the class of trade

15    average per order, and -- and multiplies those

16    figures by a multiplier to see how many orders would

17    be held under that approach?

18              MR. MATTHEWS:  Objection.

19              THE WITNESS:  I believe that was the -- the

20         rationale, yes.

21    BY MR. NOVAK:

22       Q.   You are looking at different averages and

23    different multipliers and saying, hey, how many

24    orders is this going to hold that the company would
```

1    then review in further detail to determine if they're

2    suspicious?

3         A.   Yes.

4         Q.   Okay.  And at this point you haven't arrived

5    at a conclusion as to how you are going to do this?

6    And when I say "at this point," I mean, October of

7    2011.

8         A.   Yes.

9         Q.   And what you are relying upon while you are

10   performing this evaluation to prevent orders from

11   going out that shouldn't be going out is the method

12   that was created back in August of '07 based on the

13   5,000 units and performing review of some orders that

14   were in excess of that based on all the due diligence

15   materials that the company gathers?

16             MR. MATTHEWS:  Objection.

17             THE WITNESS:  No, I don't think that's the

18        case in 2011.

19   BY MR. NOVAK:

20        Q.   Okay.  You think that the threshold had

21   switched from 5,000 down to 1,000?

22        A.   At some point in time, yes, it did.

23        Q.   And when that switch was made, was there also

24   a multiplier that was selected to evaluate orders

1    that come in?

2              MR. MATTHEWS:  Objection.

3              THE WITNESS:  I don't remember.

4    BY MR. NOVAK:

5        Q.    Okay.  Is the system that was put in place to

6    evaluate orders that replaced the 5,000 unit process

7    that you created in August of 2007 contained anywhere

8    in writing?

9        A.    I'm not sure.

10       Q.    Okay.  Can you describe for me the

11   circumstances that resulted in the initial threshold

12   of 5,000 control units per controlled substance

13   family being lowered to 1,000 units?

14       A.    I believe that was the outcome of an

15   inspection by DEA in our Weston location from some

16   point in 2010 when I was out of the office on a

17   medical leave.

18       Q.    Okay.  So there was a point in time in 2010

19   where DEA officials came in and performed an

20   inspection of Anda's distribution center in Weston?

21       A.    Yes.

22       Q.    And they indicated that they were no longer

23   comfortable with a 5,000 unit per family threshold?

24             MR. MATTHEWS:  Objection.

```
 1              THE WITNESS:  I'm not sure.  I wasn't there
 2         for that.  I was out of the office --
 3              MR. NOVAK:  Okay.
 4              THE WITNESS:  -- for several months at that
 5         point.
 6    BY MR. NOVAK:
 7         Q.   I don't want to get into the personal
 8    details, but there was an issue that had you take
 9    a -- a leave of absence or otherwise not perform your
10    functions for a period of time at the company?
11         A.   Correct.
12         Q.   Okay.  And that was from when to when?
13         A.   I do not remember the exact dates.  It was
14    several months towards the end of 2010 though.
15         Q.   Okay.  And during that time period, who was
16    it who filled in for the performance of your
17    responsibilities at the company?
18         A.   It was a joint effort between Emily Schultz,
19    Patrick Cochrane, Jay Spellman, and Albert
20    Paonessa, III.
21         Q.   Okay.  How many months, roughly, was it?
22         A.   I'm not sure.  I believe it was at least
23    three.
24         Q.   Okay.
```

```
1        A.    I don't remember, though.

2        Q.    And did you work part time during that time

3    period, or were you out altogether?

4        A.    Altogether.

5        Q.    Okay.  Now, at some point in time, a new

6    suspicious order monitoring system was implemented by

7    Anda, correct?

8        A.    Yes.

9        Q.    And the effect of that new system was to

10   identify orders that would be held for additional

11   review to determine whether they were suspicious and

12   should thus be reported to the DEA?

13           MR. MATTHEWS:  Objection.

14           THE WITNESS:  Yes.

15   BY MR. NOVAK:

16       Q.    Let me go through a few documents to develop

17   an understanding as to how they would relate to that

18   system of identifying orders and determining whether

19   they should be reported as suspicious.

20           (Anda - Cochrane Exhibit 33 was marked for

21   identification.)

22   BY MR. NOVAK:

23       Q.    I will start with what's been identified as

24   Anda - Cochrane Deposition Exhibit 33, which is an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    e-mail thread on or around December 8th of 2010 and

 2    bears the Bates Number Anda 76476 through 9.

 3              Now, these e-mails start with a request for a

 4    customer to receive authorization for controlled

 5    products, correct?

 6         A.   Yes.

 7         Q.   And looking at the top of page -- the third

 8    page of Anda Exhibit 33, Wayne Tischler -- I'm sorry,

 9    you write to Wayne Tischler, Richard Strockbine, and

10    Patricia Williams:  Very low volume new account.

11    Have them fax a copy of their DEA, since we do not

12    have one, along with one month of dispense data for

13    all products.

14              As of this time in 2010, it would be typical

15    for you to request that type of dispense data as part

16    of the evaluation of an account?

17              MR. MATTHEWS:  Objection.

18              THE WITNESS:  Yes.

19    BY MR. NOVAK:

20         Q.   Okay.  And then Richard Strockbine e-mails

21    back to you and says:  Attached is the requested

22    one-month dispense data for all products.

23              And then you reply to Mr. Strockbine and

24    state:  Denied.  Their primary products dispensed are
```

Highly Confidential - Subject to Further Confidentiality Review

1    alprazolam, carisoprodol, and hydrocodone 10s.  We

2    will not be sell [sic] this customer controlled

3    substances.

4           Do you see that?

5    A.    Yes.

6    Q.    Why would it be that the primary dispense

7    products of alprazolam, carisoprodol, and hydrocodone

8    could lead you to the conclusion that you should deny

9    sales of controlled substances to this customer?

10   A.    Because that was their top products.  No

11   regular noncontrolled prescription drugs, as far as

12   their data was concerned, were -- were in their -- in

13   their top products.

14   Q.    Okay.

15   A.    They were all controlled substances for the

16   most part, or at least these specific ones.

17   Q.    And the fact that these were the top products

18   was a red flag for you to make a decision that this

19   is a customer that would be a risky one to sell

20   product -- controlled substance products to?

21   A.    Yes.

22   Q.    And then on the first page of Exhibit 33,

23   Richard Strockbine asks:  Does this mean we will

24   never in their existence sell them controls?  Are

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they blacklisted for life?

 2            And you say:  Correct.

 3            Is that accurate?

 4    A.   Yes.

 5    Q.   Okay.  So their dispensing data was so bad

 6    that you concluded we would never sell to this

 7    company?

 8            MR. MATTHEWS:  Objection.

 9            THE WITNESS:  Yes.

10    BY MR. NOVAK:

11    Q.   Okay.  Is this the type of customer that

12    would have been reported by Anda to the DEA in 2010?

13            MR. MATTHEWS:  Objection.

14            THE WITNESS:  I'm not sure if we were

15       reporting customers that we were denying business

16       to.

17            MR. NOVAK:  Okay.

18            THE WITNESS:  I think that started at a later

19       date.

20    BY MR. NOVAK:

21    Q.   So the mere fact that this company was asking

22    for the opportunity to purchase controlled substances

23    would not have resulted in you reporting them to the

24    DEA as suspicious in December of 2010?
```

```
 1        A.    I do not believe so.

 2              (Anda - Cochrane Exhibit 34 was marked for

 3        identification.)

 4        BY MR. NOVAK:

 5        Q.    We next have marked Anda - Cochrane

 6        Deposition Exhibit Number 34, which is an e-mail

 7        exchange between Sabrina Solis, you, and

 8        Rachelle Vance as it relates to a customer who is

 9        requesting the opportunity to increase the amounts of

10        their orders.

11              Is that a fair characterization?

12        A.    Yes.

13        Q.    And after you have reviewed the customer, you

14        write to Sabrina Solis and Emily Schultz on Page 1 of

15        the Exhibit 34:  Take a look at this.  I am thinking

16        we should cut off rather than increase.

17              That's what you wrote to the two of them?

18        A.    Yes.

19        Q.    And that would have been based on the

20        three-month product usage data that you reviewed?

21        A.    I believe so.

22        Q.    Okay.  And Sabrina states:  I agree.  The

23        maintenance aren't close.

24              What does that mean as you interpret it?
```

```
 1        A.    I believe she's referring to maintenance

 2   drugs, very common products that are prescribed and

 3   dispensed by most pharmacies that are noncontrolled

 4   products.  Could be things along the lines of

 5   omeprazole, blood pressure medications.  Things along

 6   those lines that are regular maintenance drugs that

 7   are taken on a very regular basis.

 8        Q.    Okay.  So when we looked early this morning

 9   at that Rannazzisi letter that talked about one of

10   the factors in evaluating the process of diversion

11   being the percentage of controlled substances to the

12   percentage of all drugs and tying that into Sabrina's

13   statement, she's saying the other drugs, the

14   noncontrolled drugs, aren't even close to the numbers

15   that they have for the controlled substances that

16   they're dispensing?

17        A.    I believe so.

18        Q.    Okay.  And as a result --

19             MS. RIGBERG:  Do you have the Bates?  Sorry.

20             MR. NOVAK:  What?

21             MR. MATTHEWS:  She wants the Bates Number.

22             MR. NOVAK:  Oh, I'm sorry.  The Bates

23        Number for Anda Exhibit 34 is 70701 through --

24        and 2.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. RIGBERG:   Thank you.

2   BY MR. NOVAK:

3       Q.   Do you know if this customer was reported as

4   having submitted a suspicious order?

5       A.   I'm not sure.

6            (Anda - Cochrane Exhibit 35 was marked for

7   identification.)

8   BY MR. NOVAK:

9       Q.   We next have marked Anda Deposition Exhibit

10  Number 35, which is a two-page e-mail chain with the

11  Anda Bates Numbers 82857 and 8, and it is an e-mail

12  exchange apparently between Michael Cochrane and

13  Howard Davis concerning Pile Drug Store.

14           And in reviewing the customer, you first

15  e-mail Michael Cochrane [sic] on December 1 of 2011

16  and say:  Take a look at this account and let me know

17  your thoughts.  We have a questionnaire and dispense

18  data in the shared drive.

19           That is what you wrote to Howard Davis?

20      A.   Yes.

21      Q.   Okay.  And Howard Davis at this point in time

22  was the regulatory compliance manager for Anda?

23           MR. MATTHEWS:   Objection.

24           THE WITNESS:   I can't remember what his title
```

```
 1          was.  I think he was a director of compliance.

 2     BY MR. NOVAK:

 3          Q.   Okay.  He reported to you?

 4          A.   Yes.

 5          Q.   And Howard wrote back to you that same day,

 6     December 1 of 2011, and stated:  It looks to me (and

 7     therefore I believe it would to the DEA as well) to

 8     be a pharmacy in Arkansas near the Texas border that

 9     caters to "pain management" individuals.  Of the top

10     ten highest drugs dispensed in the pharmacy

11     (including hydrocodone, alprazolam, and Soma), all

12     are classic narcotic cocktails.

13               Do you see that reference?

14          A.   Yes.

15          Q.   And then he writes:  The pain management

16     doctors noted on the referenced questionnaire are

17     approximately 50 miles away from this pharmacy, which

18     is nothing for a drug-seeking individual.  The mere

19     fact that at least four other distributors won't

20     provide Schedule II drugs to this pharmacy is also

21     telling to me.  If it was up to me, I would close the

22     account and report the pharmacy to the DEA.

23               So he had a pretty clear idea about whether

24     to sell to Pile Drug?
```

1    A.    Yeah.

2    Q.    Okay.

3    A.    He was a retired DEA agent that was a

4    diversion program manager.

5    Q.    Mr. Davis was?

6    A.    He was, yes.

7    Q.    Okay.  And so you asked Mr. Davis:  Can you

8    please call this guy and talk to him?  He reached out

9    to Paul Bisaro.  Let him know we will not be

10   reinstating his DEA and we do not wish to sell him

11   controlled substances.

12        You -- you agreed with him that the company

13   would not sell to Pile Drug, correct?

14   A.    Correct.

15   Q.    Okay.  And he wrote back to you, dated

16   December 19, and stated:  I phoned Ronald Morris,

17   pharmacist in charge, Pile Drug Store in Nashville,

18   Arkansas, to let him know that we were unable to sell

19   controlled substances to him based on a suspicious

20   ordering pattern of various controlled substances.  I

21   did not say which controlled substances and he did

22   not ask.

23        So Mr. Davis had concluded that this

24   particular store had engaged in a suspicious ordering

1    pattern of various controlled substances, correct?

2        A.    Maybe.  It could be based on the products

3    that he was ordering from his other distributors.

4    I'm not sure if this was an existing customer or a

5    new customer of ours, but it looks like we reviewed

6    his dispense data.

7             That doesn't necessarily mean he bought those

8    products from us.  I'm sure he had a primary and

9    possibly other secondaries, potentially, as a

10   pharmacy.

11       Q.    Now, you indicated that Mr. Davis was

12   formerly with the DEA; is that correct?

13       A.    Yes, he was.

14       Q.    And his conclusion was that this particular

15   pharmacy should be reported to the DEA, correct?

16            MR. MATTHEWS:  Objection.

17            THE WITNESS:  Yes.

18   BY MR. NOVAK:

19       Q.    And specifically he provides that conclusion

20   to you when he says:  If it was up to me, I would

21   close the account and report the pharmacy to the DEA.

22            Correct?

23       A.    Yes.  Yes.  And I'm not saying that he didn't

24   do that.

```
 1              Susan Langston and Gayle Lane knew him

 2    personally when he was part of the DEA and knew that

 3    he was working with us.  If it was reported, I don't

 4    know that there's any record of it in writing.

 5    That's not to say that he didn't make a phone call

 6    and reach out to Gayle or someone at the local office

 7    and let them know.  I don't remember.

 8         Q.    Okay.  You don't know, sitting here today,

 9    whether Pile Drug Store was reported by Anda to the

10    DEA, correct?

11         A.    I don't know.

12         Q.    All right.

13              MR. MATTHEWS:  There's somebody on the phone

14         who is rustling papers and making banging noises.

15         Could you please mute your phone so that we can

16         hear here at the deposition?  Thank you.

17              (Anda - Cochrane Exhibit 36 was marked for

18    identification.)

19    BY MR. NOVAK:

20         Q.    We've next had marked Anda - Cochrane

21    Deposition Exhibit Number 36.  That is a one-page

22    e-mail dated December 13, 2011, exchanged between

23    Howard Davis, Michael Cochrane, Emily Schultz, and

24    Sabrina Solis with the Bates Number Anda 82864.
```

1          It involves Trillion Enterprises, retail

2     pharmacy, in Pinellas Park, Florida.

3          And Mr. Davis writes to you in this e-mail:

4     Dr. Heromin recently received heavy media attention

5     from a DEA raid closing his pain management clinic in

6     Tampa.  Pharmacy takes 99 percent cash, 30 percent

7     controlled substances, 30 percent noncontrolled

8     substances.  Pharmacy estimates controlled substance

9     ratio to be 8.6 to 1.  Does not specify which number

10    is controls.  The pharmacy dispense data log reveals

11    heavy narcotic cocktails.  Heaviest is Oxy 30

12    milligram at Number 2670.  Pharmacy max at 2100 Oxy

13    last four months running, including December 11th.

14         These are all factors that Howard Davis

15    believes are important considerations in evaluating

16    this pharmacy, correct?

17    A.   Yes.  I believe we all do.  Howard was

18    trained by our people, so he --

19    Q.   Okay.

20    A.   We were all on the same page as far as these

21    being significant factors.

22    Q.   And in the last sentence of the e-mail, he

23    states to you:  I recommend that the pharmacy not

24    receive increases in controlled substances and be

1    reported to the DEA.

2          Do you know if that was done?

3    A.    I -- I don't.  I'd have to look at past

4    reports and see if it was something that we submitted

5    to them or not.

6    Q.    Okay.  Do you know if there was a submission

7    of a Suspicious Order Report as it relates to

8    Trillion Enterprises in Pinellas Park, Florida?

9    A.    No, I don't.

10         (Anda - Cochrane Exhibit 37 was marked for

11   identification.)

12   BY MR. NOVAK:

13   Q.    Next we've had marked Anda - Cochrane

14   Deposition Exhibit 37, which is a multiple page

15   document, the front of which is an e-mail from

16   Michael Cochrane to Albert Paonessa concerning Pile

17   Drug Store.  And the Bates Number for the document is

18   Anda 726938 and 939.

19         Now, in this e-mail, you brought to Albert

20   Paonessa's attention that the customer had been

21   talked to and that Anda would not be selling them

22   controlled substances, correct?

23   A.    Yes.

24   Q.    And then you said:  Please see e-mail below.

Highly Confidential - Subject to Further Confidentiality Review

1           Correct?

2      A.   Yes.

3      Q.   Okay.  Did you have a discussion with

4    Mr. Paonessa regarding the reference on the second

5    page of Anda - Cochrane Exhibit 37 that Mr. Davis had

6    made that, quote:  If it was up to me, I would close

7    the account and report the pharmacy to the DEA?

8      A.   I -- I don't remember having that discussion.

9      Q.   Okay.

10          MR. NOVAK:  Let's take a break.

11          THE VIDEOGRAPHER:  Off the record at 4:15.

12           (Recess from 4:15 until 4:35 p.m.)

13          THE VIDEOGRAPHER:  The time is 4:35.  We are

14     now back on the record.

15   BY MR. NOVAK:

16     Q.   Mr. Cochrane, are you familiar with a

17   customer of Anda during your time there known as Lake

18   Erie Medical?

19     A.   It sounds familiar.

20          (Anda - Cochrane Exhibit 38 was marked for

21   identification.)

22   BY MR. NOVAK:

23     Q.   I have handed you what's been marked as Anda

24   - Cochrane Exhibit 38, which is a two-page -- I'm

1    sorry, just a one-page document bearing the Anda

2    Bates Number of 282942.  It appears to be an exchange

3    between you and Mr. Paonessa with respect to an

4    increase in the limit for controlled substance sales

5    to Lake Erie Medical.

6         Now, this is back in the October 25, 2007,

7    time frame.  That's the time frame where the Anda

8    standard operating procedure that is set forth in

9    Deposition Exhibit 8 would be applicable, correct?

10       A.   Yes.

11       Q.   Okay.  So this is an increase substantially

12   above the 5,000 units per month standard set out in

13   Anda Deposition Exhibit 8 to 75,000 dosage units per

14   month.

15        Why would you propose that much of an

16   increase for Lake Erie Medical?

17            MR. MATTHEWS:  Objection.

18            THE WITNESS:  I'm not sure.  I would have to

19        have the file in front of me and see.  I'm

20        assuming it was warranted if I were to e-mail Al

21        for an approval.  That volume looks to be

22        probably a distributor or a repackager customer

23        of ours, potentially.  I don't know.  I can't

24        remember back to 2007 for that specific customer,

1      though.

2    BY MR. NOVAK:

3        Q.    Okay.  You mentioned a repackager.  How do

4    you evaluate a repackager customer of Anda's to

5    determine whether they are engaging in appropriate

6    distribution of the product to make you feel

7    comfortable selling opioids to them?

8        A.    At that point in time, we probably had all

9    their policies and procedures on hand as part of the

10   due diligence packet of information that we would

11   have gathered from them since they weren't, you know,

12   our typical pharmacy customer, so to speak.  They

13   were a distributor or a repackager.

14       Q.    You wouldn't have dispensing data for a

15   repackager, correct?

16       A.    No, I don't think we would.

17       Q.    Would you have any identification of who

18   their customers were?

19       A.    I'm not sure if we did or not.

20       Q.    Okay.  Typically, for a repackager, would you

21   obtain that type of information?

22       A.    We may have requested it, but most of the

23   distributor/repackager customers couldn't divulge

24   that information.  It's trade secret and proprietary

Highly Confidential - Subject to Further Confidentiality Review

```
 1   to their business.  If we requested it, I'm not sure
 2   we received it or not.
 3          (Anda - Cochrane Exhibit 39 was marked for
 4   identification.)
 5   BY MR. NOVAK:
 6      Q.   We've had next marked as Anda Deposition
 7   Exhibit 39 a document that is comprised of multiple
 8   pages.  The top page is an e-mail exchange between a
 9   number of individuals but is addressed from Jeannie
10   at Lake Erie Medical to you and is dated June 4,
11   2008, and the Bates Number for the document is Anda
12   276293 through 276299.
13          And in the top e-mail, Jeannie writes to you
14   in June of 2008:  Hi, Michael.  Mike Holmes asked me
15   to send this to you.  This is a copy of our letter
16   from the DEA and our response from the DEA.  We also
17   will forward you our written plan of action.
18          Do you see that reference?
19      A.   Yes.
20      Q.   Okay.  Now, one of the attachments to that
21   e-mail is a two-page correspondence from the
22   Department of Justice dated February 26th of 2008
23   where the Department of Justice Drug Enforcement
24   Administration notifies Michael Holmes, the president
```

1    of Lake Erie Medical and Surgical Supply, that they



24         A.    Yeah.  I don't know -- I don't know how or

1    how it came about or who notified us.

2         Q.    When you say you don't know who notified you,

3    isn't this e-mail from Jeannie at Lake Erie Medical

4    to you on June of 2008 a notification?

5         A.    Yes.  From -- from Lake Erie.  I'm saying I

6    don't know if anybody else other than Lake Erie made

7    us aware of this.

8         Q.    Okay.  And they also sent to you their draft

9    response to the DEA, correct?

10        A.    Yes.

11        Q.    And in that response, at the page ending with

12   Bates Number 296 discussing corrective action for the

13   issue of whether they had a sufficient system to

14   disclose suspicious orders of controlled substances,

15   they replied, quote:  The establishment of a system

16   to disclose suspicious orders is a plan of ours that

17   is a work in progress.

18            Do you see that reference?

19        A.    Yes.

20        Q.    And then in this following page, they state:

21   We are in the process of establishing electronic

22   formulas to aid a compliance officer in the

23   controlled substance -- the controlled substance

24   committee.  These procedures will also be made part

Highly Confidential - Subject to Further Confidentiality Review

```
 1     of standard operating procedures in the near future.

 2            Do you see that?

 3     A.   Yes.

 4     Q.   So as of this time in June of 2008, was your

 5     understanding that they didn't have a controlled

 6     substance suspicious order monitoring system in place

 7     but that they were in the process of establishing

 8     electronic formulas to aid the compliance officer and

 9     the controlled substance committee and those

10     procedures would be part of the standard operating

11     procedure in the near future?

12     A.   Yes.

13     Q.   And that was on approximately June 4th of

14     2008, correct?

15     A.   Yes.

16            (Anda - Cochrane Exhibit 40 was marked for

17     identification.)

18     BY MR. NOVAK:

19     Q.   We've next had marked Anda Deposition

20     Exhibit 40 -- Anda - Cochrane Deposition Exhibit 40,

21     which is a two-page e-mail dated on or about

22     June 17th of 2008 between you and Al Paonessa.

23            And in the first e-mail in the chain dated

24     June 17th of 2008, you wrote to Mr. Paonessa and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    said:  Al, I need your approval to change the monthly

 2    dosage limit percentage on the account listed below

 3    from 14,000 -- 1,400 percent to 2,400 percent,

 4    allowing them to purchase up to 125,000 dosage units

 5    a month.

 6            Do you see that reference?

 7       A.   Yes.

 8       Q.   And that's for Lake Erie Medical, correct?

 9       A.   Yes.

10       Q.   So less than two weeks after you learned that

11    Lake Erie Medical had been cited by the DEA as being

12    in violation of the Controlled Substances Act for

13    failing to have sufficient suspicious order

14    monitoring programs in place, you proposed to

15    Mr. Paonessa that they have an increase in the

16    controlled substance purchases limits that Anda would

17    allow for them?

18       A.   Yes.

19       Q.   To 125,000 dosage units per month?

20       A.   Yes.  We must have had calls and dialogue and

21    also a copy of their corrective action plan.  I can't

22    remember this far back.

23       Q.   Okay.  The document we looked at that was

24    13 days earlier than this indicated that those plans
```

1    were in the works.  Had you seen something in between

2    June 4th and June 17th that indicated that they had

3    been finalized?

4              MR. MATTHEWS:  Objection.  Argumentative.

5              THE WITNESS:  I'm not sure.

6    BY MR. NOVAK:

7         Q.   At any rate, Mr. Paonessa approves the

8    increase to 125,000 dosage units per month for a

9    company that you learned two weeks earlier was in

10   violation of the Controlled Substances Act?

11             MR. MATTHEWS:  Objection.  Argumentative.

12             THE WITNESS:  Yes.

13   BY MR. NOVAK:

14        Q.   Did you continue to increase the limits for

15   Lake Erie after that?

16        A.   I'm not sure.

17             MS. RIGBERG:  What was the Bates Number on

18        that Document 40 -- Exhibit 40?

19             MR. NOVAK:  I'm sorry.  It was Anda 273585.

20        And thanks for catching me on that.

21             MS. RIGBERG:  No problem.

22             (Anda - Cochrane Exhibit 41 was marked for

23        identification.)

24   ///

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. NOVAK:

2        Q.   We've had marked next Anda - Cochrane

3    Deposition Exhibit 41, which is a two-page

4    correspondence regarding Lake Erie Medical in April

5    of 2010.

6             And this correspondence seeks another

7    increase in Lake Erie Medical's controlled substance

8    purchasing limit, correct?

9        A.   Yes.

10       Q.   And specifically, the proposal that is made

11   by Lake Erie, they state in an e-mail to Norman Dodes

12   that:  Currently.  Our hydrocodone allocation is

13   125,000 pills per month, and our allocation for CIIs

14   is currently 125,000 pills per month per chemical.

15            And they request that the hydrocodone limit

16   be doubled to 250,000 pills and that their

17   Schedule II allocation be increased to 375,000 pills

18   per month per chemical.

19            Is that your understanding?

20       A.   Yes.

21       Q.   And who is Norman Dodes, by the way?

22       A.   He is a national account director, sales.

23       Q.   Okay.  So he's the salesperson at Anda.  And

24   he submits this request to you in April 14 of 2010 to
```

Highly Confidential - Subject to Further Confidentiality Review

1    have you take a look at it, saying:  Please read

2    below.  We need to raise their control limits.

3          Is that correct?

4    A.   Yes.

5          Based on this e-mail, too, it looks like one

6    of the things that we had agreed to with them was

7    actually receiving customer info so that we could

8    look at who they were selling to and they were

9    sending us updates on a monthly basis that we were

10   filing -- were reviewing and filing, along with the

11   rest of the due diligence documentation that we had

12   on them.

13         They actually agreed to give us their

14   customer info.

15         (Anda - Cochrane Exhibit 42 was marked for

16   identification.)

17   BY MR. NOVAK:

18   Q.   Now, we've had marked Anda - Cochrane

19   Deposition Exhibit 42, which is a --

20         MS. RIGBERG:  Sorry.  One sec.  We need the

21      Bates for 41.

22         MR. NOVAK:  Oh, did I skip that one, too?

23      I'm sorry.  It was Anda 79605 and 606.

24   ///

Highly Confidential – Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2        Q.   We have next marked Anda - Cochrane

 3    Deposition Exhibit 42, which is an April 21, 2010,

 4    exchange of e-mails between Michael Cochrane, Albert

 5    Paonessa, and Norman Dodes.

 6             And it starts with an e-mail from you to

 7    Al Paonessa saying:  Al, I need your approval to

 8    change the monthly dosage limit on the account listed

 9    below from 2,400 percent to 3,900 percent, allowing

10    them to purchase up to 200,000 dosage units per

11    month.

12             So you increased the limit but not as much as

13    the 250,000 limit per family that they had requested.

14    Is that -- is that a fair characterization of your

15    request to Al Paonessa?

16        A.   Yes.

17        Q.   Okay.  And he approved that request?

18        A.   Yes.

19             MR. NOVAK:  And if I failed to do it, the

20        Bates Number for Anda - Cochrane Exhibit 42 ends

21        with Anda 283178.

22             MS. RIGBERG:  Thank you.

23             (Anda - Cochrane Exhibit 43 was marked for

24        identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2        Q.   The next document we've marked is Anda -

 3    Cochrane Exhibit 43, which is a two-page document

 4    bearing the Bates Number Anda 13345 [sic] and 6,

 5    which is an e-mail exchange between several people,

 6    but including you and Emily Schultz related to

 7    another requested increase for the -- the limit to

 8    sell controlled substances to Lake Erie Medical.

 9             Is that accurate?

10        A.   Yes.

11             MR. NOVAK:  Oh, I'm sorry.  I misstated the

12        Bates Number.  It's 133445.

13    BY MR. NOVAK:

14        Q.   Now, in this particular exchange,

15    Emily Schultz writes to you and says on March 29th of

16    2011:  Looks like you have been approving all of the

17    requests for this account.  Do you want to review or

18    should I increase based on what they requested?

19    150,000 Oxy sounds like a ton.

20             Do you see that reference?

21        A.   Yes.

22        Q.   Did you agree with Emily Schultz's

23    characterization that 150,000 OxyContin units per

24    month sounded like a ton?
```

```
 1        A.   I don't remember.

 2        Q.   Do you know whether that increase was

 3   approved?

 4        A.   I do not.

 5        Q.   Do you know who Jeannie Sierin is?

 6        A.   Say the name again.

 7        Q.   Jeannie, Sierin, S-i-e-r-i-n.

 8        A.   No.  I don't -- not that I remember.

 9             (Anda - Cochrane Exhibit 44 was marked for

10   identification.)

11   BY MR. NOVAK:

12        Q.   We've had marked Deposition Exhibit Anda -

13   Cochrane 44, which is a two-page e-mail exchange that

14   includes Mr. Cochrane, Norman Dodes, and some

15   individuals from Lake Erie Medical.  It is dated

16   June 28th of 2011, at least one of the e-mail is, and

17   it bears the Anda Bates Number 79594 and 79595.

18             In the e-mail that begins the thread on the

19   second page, there is an e-mail to you from Gene

20   Gunderson at Lake Erie Medical, where he asks:  Have

21   you had a chance to review our requests for

22   increasing our allocations?

23             Do you see that?

24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    Okay.  Now, you respond to that e-mail on the

2    first page of Anda Exhibit 44 and state in part,

3    quote:  I reviewed your customer listing and

4    increased your limits.  Please try to understand,

5    with all of the changes we have made, you are one of

6    two distributors/repackagers we even sell to and

7    definitely have our highest allocation.

8              Is that an accurate statement as of June 28th

9    of 2011?

10        A.    I think so.

11        Q.    Okay.  Who was the other

12   distributor/repackager that Anda was selling to in

13   June of 2011?

14        A.    I can't remember that.

15        Q.    Okay.  But this customer was your highest

16   allocation repackager.

17             Is that accurate?

18        A.    It appears so.

19        Q.    What is a repackager?

20        A.    They take finished units of product and

21   repackage them into smaller dosage units.  So they'll

22   take a bottle of a hundred and make, say, a blister

23   pack of ten.

24        Q.    Okay.  During the time that you served in
```

1    your compliance role at Anda, did the company have a

2    change in policy as to selling controlled substances

3    to repackagers?

4         A.   Yes.  At some point we discontinued sales to

5    distributors and repackagers with apparently the

6    exception of two.

7         Q.   Okay.  And why was it you changed your policy

8    as it related to selling controlled substances to

9    repackagers?

10        A.   It coincided with us discontinuing sales to

11   physicians in the years prior and not wanting the

12   distributor or repackager customer base touching

13   physicians that we potentially weren't going to

14   distribute to.

15             But in this instance with Lake Erie, we

16   actually had monthly updates with them as far as who

17   their customer base consisted of and they provided us

18   documentation on all their new accounts.

19        Q.   What was the threshold at this point when you

20   had approved 150,000 units per month of OxyContin to

21   Lake Erie Medical?  What was the threshold that Anda

22   used as its default threshold for accounts that it

23   sold to?

24             MR. MATTHEWS:  Objection.  Asked and

Highly Confidential - Subject to Further Confidentiality Review

```
1        answered.  Clearly argumentative.

2            Go ahead.

3            You've asked all about the thresholds that

4        existed at a variety of periods of time.  You

5        spent hours.  We're at 5:04 p.m. in the

6        afternoon.  The only reason to ask that question

7        at this time is because you want to badger the

8        witness about what he's testified about this

9        morning.

10           MR. NOVAK:  James, that -- it's -- that's in

11       violation of the Court's speaking objection.  If

12       you think the record is clear as to what

13       thresholds exists at different points in time,

14       feel free to enlighten me as to where in the

15       earlier portion of the deposition that statement

16       was made.

17           MR. MATTHEWS:  Thirty minutes ago, he

18       testified as of 2011 the baseline limit was 1,000

19       units per dosage per product family per month.

20       Thirty minutes ago.  He probably testified about

21       seven times over the course of this day.

22           So don't lecture me about whether the record

23       is clear or not.  You know, I'm trying to be

24       patient here.  It is 5:04 p.m.  You -- you know,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        are wearing out the witness, and you are asking

 2        questions that were answered for no other reason

 3        than to create the impression -- you know, to

 4        badger this witness about this particular line of

 5        questions about this particular client.

 6             You don't need to ask it.  We are wasting

 7        time.  Let's move on.

 8   BY MR. NOVAK:

 9        Q.   Is it your testimony, Mr. Cochrane, that as

10   of this time in 2011 that the threshold control limit

11   for Anda customers is 1,000 units per controlled

12   substance family?

13        A.   Yes.  At some point in 2010, we dropped the

14   limits to 1,000 dosage units for new customers that

15   were opening an account with Anda.

16        Q.   Can you give a general description of what

17   the process is to submit an order for a customer of

18   Anda's to the company?

19        A.   There were numerous ways orders could be

20   submitted.  Some used our online ordering system.  We

21   had sales reps that received inbound phone calls.  We

22   had customers that were using the CSOS platform for

23   the electronic ordering of controlled substances in

24   the Schedule II form.  Sales reps could key orders
```

1    based on phone conversations with customers.  They

2    could either be inbound or outbound.

3           I believe we had some orders that came

4    through EDI, depending on the size of the customer

5    and what their business primarily focused on.  I

6    think some of the stuff that was EDI may have been

7    chain-oriented for some of our larger customer

8    groups.

9           That's pretty much all I can think of right

10   now.

11       Q.   Okay.  And which of those different orders

12   does -- did Anda apply its process for or -- or its

13   suspicious order monitoring system to in order to

14   evaluate whether they were suspicious orders?

15           MR. MATTHEWS:  Objection.

16           THE WITNESS:  All of them.  All of the orders

17       funneled into one main warehouse operating

18       system.

19   BY MR. NOVAK:

20       Q.   Is that after the orders were placed into

21   TPS?

22       A.   Correct.

23       Q.   Okay.

24           (Anda - Cochrane Exhibit 45 was marked for

Highly Confidential - Subject to Further Confidentiality Review

1    identification.)

2    BY MR. NOVAK:

3        Q.   We've had marked Anda - Cochrane Exhibit 45,

4    which is a one-page e-mail exchange between Jerry

5    Cazzell and Michael Cochrane dated February 21st of

6    2006.

7             Who is Jerry Cazzell?

8        A.   Jerry Cazzell was the VP of IT.

9             MR. NOVAK:  I misspoke.  This is Anda -

10   Cochrane Exhibit 45?

11            THE COURT REPORTER:  It's 45.

12            MR. NOVAK:  Okay.  45.

13            MS. RIGBERG:  Bates Number, please.

14            MR. NOVAK:  Anda 155184.

15   BY MR. NOVAK:

16       Q.   Is it Mr. Cazzell that you had interactions

17   with in figuring out how to create a suspicious order

18   monitoring system that -- the logistics of filtering

19   orders that would be held for review?

20       A.   No.

21       Q.   Who would that have been?

22       A.   John Jefferson and his IT AS400 development

23   group.  Deanne Lykins, you've seen e-mail exchanges

24   with her.

```
1        Q.    Right.

2        A.    Douglas Liddendal was involved at one point.

3   Potentially Debbie Abelow.  That's all I can think of

4   right now.

5        Q.    Okay.  Now, in the third paragraph of the

6   e-mail that Jerry Cazzell sends to you, he writes:

7   We can document the steps in the process of receiving

8   an order, checking the CRL, opening the order, and

9   placing it in TPS to be processed.  Do you want some

10  type of data flow diagram of this process?

11             You see that reference?

12       A.    Yes.

13       Q.    Okay.  Can you describe for me the different

14  steps that are referenced there -- because I never

15  did find a data flow diagram of it -- as to what each

16  of those different steps entails?

17       A.    He's referring to a CSOS order coming in,

18  which is the electronic method of ordering controlled

19  substances.  Checking the CRL means checking the

20  certificate revocation list that was -- that was

21  monitored and -- it was DEA's certificate revocation

22  list as far as the electronic certificate for signing

23  the actual order.

24             Opening the order that comes in, because
```

1    there is an electronic signature that I believe had a

2    specific encryption and we had software that would, I

3    guess, unencrypt it.  And then the order

4    electronically flowing into TPS, which is the system

5    that we used for all of our warehouse management

6    pick, pack, and ship operation.

7        Q.   Okay.  Is -- are there instances after an

8    order has been received in CSOS where they are not

9    placed into TPS to be processed?

10       A.   Not that I'm aware of.

11       Q.   Okay.  How about orders that come in in the

12   other methods that you referenced an answer or two

13   ago?  Say, for example, a telephonic order that comes

14   in to one of the sales representatives.  Are all of

15   those orders placed into TPS?

16            MR. MATTHEWS:  Objection.

17            THE WITNESS:  I'm not sure.  I would assume.

18   BY MR. NOVAK:

19       Q.   Okay.  Are there instances where orders are

20   not placed into TPS because they exceed a control

21   limit?

22       A.   There's a -- I believe there's a hard stop on

23   the limit where it won't let them place the order.

24       Q.   Okay.  So in those instances, an order would

```
 1    be received by a customer but they would be unable to

 2    place it into the TPS system?

 3             MR. MATTHEWS:  Objection.

 4             THE WITNESS:  I'm not sure.  I believe it

 5        would go into the TPS system, but it would zero

 6        the line out or give them whatever allocation

 7        they had left against their monthly limit.

 8    BY MR. NOVAK:

 9        Q.   In those instances where it is zeroed out,

10    what does that mean?

11        A.   It means it just didn't go through the

12    allocation process to relieve inventory, but there's

13    a record of the order coming in is what I believe to

14    have -- is what I believe to happen.

15        Q.   Okay.  At that point, is an order that is

16    zeroed out evaluated by the company's suspicious

17    order monitoring system?

18        A.   I believe they were, because the hold process

19    was prior to inventory allocation.  So whether or not

20    the line item was going to ship, if it came in and

21    was keyed, it should have gone on hold.  And all that

22    happened before the inventory allocation process is

23    what I believe to -- is what I believe -- is what I

24    think how the system worked.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.

2        A.    Since they put -- we were put on hold before

3    allocation, it didn't relieve inventory.  But you

4    would have to ask an IT person.

5        Q.    Okay.  Have you heard the term "the bucket"

6    as it relates to the performance of the

7    responsibilities in the compliance department at

8    Anda?

9        A.    Yeah, I do believe I have heard of that.

10       Q.    Okay.  And what does that mean to you?

11       A.    There were several types of different hold

12   statuses in our system.  Our bucket was just a

13   different type of a hold in the system, meaning

14   orders that were up for review were placed in a

15   bucket, so to speak.

16       Q.    And how does an order get placed in the

17   bucket?

18            MR. MATTHEWS:  I'm sorry, were you finished

19        with your answer?  It was not clear to me you

20        were finished with your answer.

21            THE WITNESS:  The system -- the specific

22        things that we've programmed into the system

23        warrant whether or not it would go on our hold --

24        in our hold bucket.  Our hold bucket was the last
```

1       one before allocation.

2            I believe there was a user hold bucket where

3       a sales rep could have an order that's pending

4       and he's waiting for a response from a customer.

5       There was a credit hold bucket, so to speak,

6       where if customers had specific credit issues,

7       they go into the credit hold bucket.  And so on.

8            I don't remember specifically how many there

9       were, what all their titles were, but we had one,

10      and it was our bucket, so to speak, from a hold

11      standpoint.  The last things that goes through

12      from a checks and blanks thing were -- was our

13      bucket in the hierarchy of the orders being held.

14 BY MR. NOVAK:

15      Q.   Okay.  If I understand that correctly, what

16 you're suggesting is there is almost a sequence --

17      A.   Yes, they have a sequence.

18      Q.   -- of buckets that an order will go through

19 prior to being filled by the company?

20      A.   Yes, I believe that's how it worked.

21      Q.   And the last bucket in the sequence is the

22 allocation bucket where inventory is drawn down to

23 fill the order?

24      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Okay.  The bucket before that is your bucket

2    that relates to whether the order passes under the

3    company's suspicious order monitoring system?

4        A.   I believe so.

5        Q.   Okay.  Before that, there are also buckets

6    related to credit and buckets related to sales?

7        A.   Yeah.  I believe those -- I believe a rep

8    could put an order on hold if he was waiting for a

9    response from a customer.

10       Q.   Okay.  And is it possible that some orders

11   never get to the compliance evaluation process that

12   is in the suspicious order monitoring system because

13   they have been stopped in the sales bucket or in the

14   credit bucket?

15       A.   I guess there's a potential for that.

16       Q.   Okay.  Do you know if those orders are ever

17   evaluated for a determination as to whether they are

18   suspicious?

19            MR. MATTHEWS:  Objection.

20            THE WITNESS:  No, I don't.

21            THE VIDEOGRAPHER:  The time is 5:19 p.m.  We

22       are going off the record.

23         (Recess from 5:18 until 5:32 p.m.)

24         (Anda - Cochrane Exhibit 46 was marked for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    identification.)

 2         THE VIDEOGRAPHER:  Time is 5:32 p.m.  We are

 3      now back on the record.

 4    BY MR. NOVAK:

 5      Q.   We've had marked as Anda Deposition Exhibit

 6    Number 46 a two-page correspondence from the

 7    Department of Justice Drug Enforcement Administration

 8    to Albert Paonessa at Anda dated November 18, 2011,

 9    bearing the Bates Numbers Anda 1208 and 1209.

10         Mr. Cochrane, have you seen Anda Exhibit --

11    Anda - Cochrane Exhibit 46 before?

12      A.   Yes.

13      Q.   Okay.  In it, the Department of Justice's

14    Drug Enforcement Administration issues a letter to

15    Anda and states that an investigation of the Miami

16    Field Division revealed the following violations of

17    Controlled Substance Act of 1970 and the regulations

18    promulgated thereunder.

19         Is that accurate?

20      A.   Yes.

21      Q.   This was based on a Department of Justice

22    Drug Enforcement Administration inspection and

23    investigation of Anda's practices?

24      A.   Yes.
```

```
 1        Q.   Okay.  And look at the first violation that

 2   the Department of Justice Drug Enforcement

 3   Administration cited Anda for.  They noted that Anda

 4   had failed to maintain a complete and accurate record

 5   of all controlled substances on hand the date the

 6   inventory the taken.

 7        Do you see that reference?

 8        A.   Yes.

 9        Q.   And that was based upon an incomplete

10   inventory record at Anda's warehouse facility?

11        A.   Yes.

12        Q.   And then the second violation found by the

13   U.S. Department of Justice's Drug Enforcement

14   Administration as it related to Anda's practices was

15   a failure to report to DEA suspicious orders for

16   controlled substances as required by Title 21 CFR

17   section 1301.74.

18        Do you see that?

19        A.   Yes.

20        Q.   Okay.  And the letter recites after that:

21   Prior to DEA's onsite investigation at Anda during

22   July of 2010, DEA met with the firm during 2005 and

23   2007 to discuss Anda's pattern of distribution of

24   significant quantities of controlled substances to
```

```
 1    its customers.

 2            Do you see that reference?

 3        A.   Yes.

 4        Q.   Were you a participant in the meeting with

 5    the DEA that is referenced here as having occurred in

 6    2005?

 7        A.   Yes.

 8        Q.   And were you a participant in the meeting

 9    that is referenced here as having been held with the

10    DEA and representatives of Anda in 2007?

11        A.   Yes.

12        Q.   The 2007 meeting was the July of '07 meeting

13    that you've testified about earlier today?

14        A.   I believe it was July.

15        Q.   What was the -- what was the subject of the

16    2005 meeting?

17        A.   2005 was a meeting with Michael Mapes

18    regarding Internet pharmacies.

19        Q.   Okay.  So the DEA had expressed concern in

20    the 2005 investigation of Anda that the company

21    wasn't fulfilling its obligations as it related to

22    suspicious order monitoring for controlled substances

23    by Internet pharmacy customers?

24            MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  That meeting was not

 2        necessarily regarding suspicious orders.  That

 3        meeting was specifically regarding high-volume

 4        pharmacies that were doing controlled substance

 5        business over the Internet that were Internet

 6        pharmacies.

 7              We talked with Michael Mapes, Kyle Wright;

 8        took their advice:  Reviewed that specific group

 9        of customers in that trade class; searched our

10        system for any that might not have been

11        categorized that way; and we discontinued

12        controlled substance sales to all of them.

13   BY MR. NOVAK:

14        Q.    When you say "all of them," you mean all of

15   the Internet pharmacies?

16        A.    Correct.

17        Q.    And when you say "sales" to them, you mean

18   direct sales to them?

19        A.    Yes.

20              MR. MATTHEWS:  Objection.

21   BY MR. NOVAK:

22        Q.    And then we've already discussed to some

23   extent the 2007 meeting.

24              The letter continues by stating:  A DEA
```

```
1    report of investigation 2008 documents a statement by

2    an Anda official that customers are limited to

3    purchasing no more than 5,000 dosage units per month

4    in certain chemical families.

5         Do you know who the Anda official that they

6    are referencing there is?

7    A.    No.

8    Q.    Okay.  And then the second page of the U.S.

9    Department of Justice's Drug Enforcement

10   Administration notice of violation letter states

11   that:  Analysis of Anda's distribution of oxycodone

12   during 2009 and 2010 reveal substantially significant

13   sales to numerous customers which consistently met

14   and exceeded 5,000 dosage units per month.

15        You don't disagree with that statement, do

16   you?

17   A.    No.  We had some customers that were ordering

18   more than 5,000 dosage units.  That was discussed

19   with DEA in 2007, like I had previously said, and

20   there was a process to grant customers an approval

21   for more than the 5,000 dosage units.  And DEA

22   recognized the fact that there were going to be

23   customers that needed that.

24   Q.    Okay.  Now, you say they recognized it, but
```

Highly Confidential - Subject to Further Confidentiality Review

1    that was a factor that they cite here for purposes of

2    finding that Anda was in violation of the Controlled

3    Substances Act, correct?

4            MR. MATTHEWS:  Objection.

5            THE WITNESS:  Yes.

6            (Anda - Cochrane Exhibit 47 was marked for

7    identification.)

8    BY MR. NOVAK:

9        Q.   We've had marked Anda - Cochrane Deposition

10   Exhibit 47, which is -- or appears to be Anda's

11   response to the letter finding violations of the

12   Controlled Substance Act.  And this document is dated

13   December 6, 2011, and bears the Bates Numbers Anda

14   1210 through 1212.

15           The document is signed by Albert Paonessa.

16   But were you the one who drafted the document?

17       A.   I think it was a joint effort between

18   internal counsel, myself, Al.

19       Q.   Okay.  And you submitted this correspondence

20   in reaction to the DEA's letter -- or in response to

21   the DEA's letter?

22       A.   Yes.

23           (Anda - Cochrane Exhibit 48 was marked for

24   identification.)

```
 1    BY MR. NOVAK:

 2        Q.   We've had marked as Anda - Cochrane Exhibit

 3    Number 48 a document comprised of three pages.  The

 4    first is an e-mail from Howard Davis to Michael

 5    Cochrane dated November 30th of 2011, and then

 6    attached to that is a two-page draft correspondence

 7    that was drafted for purposes of responding to the

 8    DEA.

 9            Is this one of the drafts that you

10    referenced, Mr. Cochrane, that you participated in as

11    it related to preparing a response to the DEA's

12    finding of a violation of the Controlled Substances

13    Act by Anda?

14        A.   I don't specifically remember this draft, but

15    it looks like it came from Howard Davis, who was the

16    newest member of our group from a compliance

17    perspective.

18        Q.   Okay.  Were you involved in hiring Howard

19    Davis?

20        A.   Yes.

21        Q.   How long was he at Anda?

22        A.   I don't remember.  Approximately three

23    months, maybe.

24        Q.   Okay.  What were the circumstances
```

Highly Confidential - Subject to Further Confidentiality Review

1    surrounding his departure?

2    A.   Howard, even though he had multiple years of

3    experience and was a diversion program manager at one

4    point for four different states, he had zero to add

5    to the program that we had put together from a

6    suspicious orders system as far as due diligence was

7    concerned.  One of his responses to Al and I were --

8    was that he is baffled that DEA is even breathing

9    down our neck I think is the words -- are the words

10   that we used with all that we have in place right now

11   and what we're doing.

12           From a contribution standpoint, there was

13   really no value there.

14   Q.   Was he ultimately terminated by the company?

15   A.   Yes.

16           MR. MATTHEWS:  Can I ask a question?  Is this

17       one exhibit or two exhibits?

18           MR. NOVAK:  One.

19           MS. RIGBERG:  Could we please get that Bates

20       Number?

21           MR. NOVAK:  Yes.  The last one was Anda 82872

22       through 82874.

23           MS. RIGBERG:  Thank you.

24           (Anda - Cochrane Exhibit 49 was marked for

1    identification.)

2    BY MR. NOVAK:

3        Q.    The next document that has been marked for

4    identification purposes is Anda - Cochrane

5    Exhibit 49, which is comprised of three pages of

6    e-mail exchanges between Mr. Cochrane, Emily Schultz,

7    Albert Paonessa, Patrick Cochrane, and others, also

8    apparently relating to the DEA's finding of violation

9    of the Controlled Substances Act.

10            Mr. Cochrane, is this an exchange -- or do

11   these three pages of e-mail constitute an exchange

12   that you had with the different individuals

13   referenced as it relates to developing a draft of the

14   response to the DEA letter?

15       A.    Yes.

16            MR. NOVAK:   I should have noted that it bears

17        the Anda MDL Bates Number 133111 through 113.

18   BY MR. NOVAK:

19       Q.    Now, on the second page of the document,

20   Mr. Davis writes to you and writes in part:  You may

21   want to consider adding a brief compliment to them

22   about their professionalism, et cetera.  They like

23   that, and it keeps the tone nicer throughout the rest

24   of the response.  Better to schmooze early to lower

Highly Confidential - Subject to Further Confidentiality Review

```
1    their guard.

2         Do you see that?

3    A.   No.  Where is that?

4    Q.   At the second page.

5    A.   Yes.

6    Q.   All right.  And your follow on e-mail to

7    Al Paonessa and Patrick Cochrane states:  I added

8    some fluff after preparing our letters and discussing

9    with Howard.  Howard says they love fluff.  Please

10   see attachment and read Howard's e-mail below.

11        Is that what you stated to your brother,

12   Patrick Cochrane, and Mr. Paonessa?

13   A.   Yes.

14   Q.   The other point that Howard addresses in his

15   e-mail of December 1 to you, he states:  By reading

16   between the lines, the DEA is telling us that they

17   view 5,000 d.u. per month in certain chemical

18   families as questionably too high.  I don't know

19   where they came up with the chemical families line,

20   but, again, I certainly wouldn't debate it.

21        Do you see that reference?

22   A.   Yes.

23   Q.   Is that a reference to the 5,000

24   controlled -- dispensable units controlled substance
```

```
1   threshold that you've identified as being part of

2   Anda's system for a period of time?

3        A.   Yes, based on guidance from DEA during that

4   period of time.

5        Q.   Okay.  And was it in response to the DEA's

6   letter of violation to Anda that the -- the 5,000

7   threshold was lowered to 1,000?

8             MR. MATTHEWS:  Objection.

9             THE WITNESS:  I don't know if it was -- it

10       may be in this response, but it was done prior to

11       us receiving this letter that came, I think,

12       approximately 17 months after the inspection.

13  BY MR. NOVAK:

14       Q.   That's all I have on that exhibit.

15            Now, it was a while ago, but do you recall

16  from this morning's testimony you had identified that

17  pain management clinics were one of the next

18  frontiers that the DEA was warning about in 2007 at

19  the HDMA and industry conferences?

20            MR. MATTHEWS:  Objection.

21            THE WITNESS:  I don't specifically remember

22       that from this morning but -- is there an exhibit

23       or -- yeah, the HDMA memo?

24            MR. NOVAK:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Yes.

 2    BY MR. NOVAK:

 3        Q.    When did Anda make a determination to reduce

 4    its sales to pain management clinics?

 5                MR. MATTHEWS:  Objection.

 6                THE WITNESS:  I'm not sure.  I think it was

 7        in 2008, 2009.  I can't remember the exact year.

 8            (Anda - Cochrane Exhibit 50 was marked for

 9    identification.)

10    BY MR. NOVAK:

11        Q.    We've had marked Anda - Cochrane Deposition

12    Exhibit Number 50, which is a June 15, 2010, e-mail

13    from you to Al Paonessa and Patrick Cochrane.

14    Attached to it is a Detroit News article entitled

15    "Feds suspend license of Harvard Drug Group over

16    painkiller sales."  Together, the documents are Anda

17    MDL 281678 through 281680.

18                Now, in the June 15th correspondence from you

19    to Al Paonessa and Patrick Cochrane, you state:  I

20    think we need to cut off all the pain management

21    clinic and docs that purchase controls, the same way

22    we did Internet pharmacies in the past.  Even right

23    after we cut all the Internet pharmacies off, the

24    dispensing docs and pain management clinics were next
```

Highly Confidential - Subject to Further Confidentiality Review

1   at the top.  Did they have more than us?

2          Is that what you wrote to Al Paonessa and

3   Pat Cochrane on June 15 of 2010?

4       A.   Yes.

5       Q.   And this article from The Detroit News about

6   Harvard Drug Group being suspended by the DEA, was

7   that a factor in your decision to submit that article

8   to Al Paonessa and Patrick Cochrane and recommend

9   that Anda cut off all the pain management clinics and

10  docs that purchase controls?

11          MR. MATTHEWS:  Objection.

12          THE WITNESS:  I don't remember, but the

13      article was forwarded to me by some -- by Dennis

14      Poirier, who is part of our purchasing group, and

15      it appears it was in 2010.  I thought it was

16      prior to that.

17  BY MR. NOVAK:

18      Q.   Now, you had identified -- or we had reviewed

19  Harvard Drug Group.  That was a customer of Anda's,

20  correct?

21      A.   Yes, I believe they were.

22      Q.   And, in fact, you had proposed back in 2007 a

23  3,900 percent increase beyond the 5,000 unit per

24  controlled substance limit for all of the drugs that

Highly Confidential - Subject to Further Confidentiality Review

1     you sold to Harvard Drug, correct?

2          A.   Yes.

3          Q.   And Mr. Paonessa approved that?

4          A.   Yes.

5          Q.   When you say "Did they have more than us,"

6     what do you mean?

7          A.   I'm not sure.

8          Q.   Is it a reference to whether Harvard Drug

9     Group had more dispensing doctors and pain management

10    clinics than Anda did?

11         A.   Possibly.

12              (Anda - Cochrane Exhibit 51 was marked for

13    identification.)

14    BY MR. NOVAK:

15         Q.   We've had next marked Anda - Cochrane

16    Exhibit 51, a one-page document that are an exchange

17    of e-mail related to a mass update customer master

18    number.  And the document is dated June 17th of 2010

19    and bears the Anda Bates Number 281703.

20              This document makes reference to a mass

21    update.  Do you have an understanding as to what that

22    means?

23         A.   Yes.  There was a functionality in our system

24    where you didn't have to physically and manually go

Highly Confidential – Subject to Further Confidentiality Review

```
 1    into each account to make a change to it.  You could

 2    do it through uploading a file and having the changes

 3    done so that you weren't tied to going into each and

 4    every individual specific account to make the change.

 5        Q.   And the specific change that was made through

 6    this mass update was the discontinuation of control

 7    sales to physicians and pain management clinics?

 8        A.   And I believe distributors as well.

 9        Q.   And distributors.

10             Was there discussion in the meetings that

11    Anda held with the DEA in or about this June of 2010

12    time frame regarding the discontinuation of those

13    sales?

14        A.   Yes.  We made DEA aware of what we were doing

15    before we did it.

16        Q.   When you say you made DEA aware of it, had

17    DEA representatives expressed their concern about the

18    volume of Anda sales to pain management clinics,

19    physicians, and distributors?

20        A.   At that point in time, I do not believe they

21    did.

22        Q.   Okay.  But they did just shut off your

23    customer, Harvard Drug Group?

24             MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yes.

 2    BY MR. NOVAK:

 3        Q.   Two days before?

 4              MR. MATTHEWS:  Objection.

 5              THE WITNESS:  Yes.

 6    BY MR. NOVAK:

 7        Q.   In your discussions with Al Paonessa and

 8    Patrick Cochrane, is one of the factors that was

 9    discussed -- was one of factors that was discussed

10    that motivated your suggestion that all of these

11    different customers be terminated that you didn't

12    want the DEA to present a similar enforcement action

13    against Anda to the one that they had just brought

14    against Harvard Drug Group?

15              MR. MATTHEWS:  Objection.

16              THE WITNESS:  More than likely, yes.

17    BY MR. NOVAK:

18        Q.   And so you quickly moved, within two days, to

19    cut off all of those customers?

20              MR. MATTHEWS:  Objection.

21              THE WITNESS:  Correct.

22              MR. NOVAK:  I'm going to take a quick break.

23              THE VIDEOGRAPHER:  Off the record at

24        6:00 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Recess from 6:00 until 6:14 p.m.)

 2              (Anda - Cochrane Exhibit 52 was marked for

 3       identification.)

 4              THE VIDEOGRAPHER:  The time is 6:14.  We're

 5          now back on the record.

 6       BY MR. NOVAK:

 7          Q.   We have had marked as Anda - Cochrane Exhibit

 8       Number 52 an e-mail thread between Tracey Hernandez,

 9       Michael Cochrane, and others dated on or around

10       July 17th of 2007 bearing the Anda Bates

11       Number 275725 through 729.

12              Mr. Cochrane, back in July of 2007, when the

13       decision was made to impose the 5,000 pill per month

14       controlled substance threshold on Anda's customers,

15       did you participate in drafting the communication

16       that would go to customers?

17          A.   I believe I did, I along with our sales and

18       marketing group, along with Al, potentially.  I'm not

19       sure who all was involved.

20          Q.   Okay.  And if you look at the second to last

21       page ending in 28, you drafted an e-mail on July 17th

22       to Tracey Hernandez that includes the following as

23       part of the internal script for that process.  You

24       wrote:  Overselling of controlled substances to our
```

```
 1    customer base must immediately cease.

 2              Do you see that?

 3        A.   Yes.

 4        Q.   Those were your words?

 5        A.   Those were our words collectively.

 6        Q.   Okay.  And it was your intent to include that

 7    as part of the script that would be communicated to

 8    customers?

 9        A.   No.  To the sales reps.

10        Q.   Okay.  To the sales representatives at Anda?

11        A.   Yes.  Internal would be sales reps at Anda;

12    external would be customers.

13        Q.   Okay.

14              (Anda - Cochrane Exhibit 53 was marked for

15    identification.)

16    BY MR. NOVAK:

17        Q.   We've next had marked Anda - Cochrane

18    Exhibit 53.

19        A.   Just one second.

20        Q.   Uh-huh.

21        A.   Back to the -- the previous exhibit.

22              I think I misspoke earlier on orders coming

23    in through all of the different mechanisms as far as

24    order entry is concerned, whether they be electronic
```

Highly Confidential - Subject to Further Confidentiality Review

1    or sales reps phoning, you know, taking phone orders.

2    There was a hard stop where the system wouldn't allow

3    you to key something that was going to go over the

4    5,000, and it wouldn't allow you to key the order.

5        Q.    Okay.

6        A.    And just another point of clarity is CII

7    orders were never keyed by sales reps.  Those were

8    either done through CSOS or through a triplicate 222

9    form that the customer would mail in that would then

10   be processed by distribution personnel that had

11   access to the CIIs that were in the vault.  And those

12   orders were specifically keyed by administrative

13   assistants that had access to enter a CII order.  The

14   sales reps don't and never had access to that.

15       Q.    Okay.  What you are providing clarification

16   on is some of your earlier testimony --

17       A.    Yes.

18       Q.    -- as it relates to the submission of orders

19   and the manner in which those orders are placed into

20   TPS?

21       A.    Yes.

22       Q.    Okay.

23       A.    There would be a hard stop on -- before an

24   order could get into the system if it exceeded the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    number of dosage units that were allowed for that

 2    customer.

 3        Q.   Okay.  So in those instances where there is a

 4    hard stop --

 5        A.   Yes.

 6        Q.   -- is the order allowed to be placed into the

 7    TPS system?

 8        A.   No, I don't believe it was.

 9        Q.   Okay.  And if it is not placed into the TPS

10    system, would it be flagged as a -- under the

11    company's operation of its suspicious order

12    monitoring system?

13        A.   No.

14        Q.   Okay.  So to the extent an Anda customer

15    submitted an order that was stopped by virtue of the

16    hard stop --

17        A.   Yes.

18        Q.   -- that you have identified, it would never

19    be flagged for reporting as a suspicious order to the

20    DEA?

21            MR. MATTHEWS:  Objection.

22            THE WITNESS:  I don't think so, no.

23            Sorry.

24    ///
```

```
 1    BY MR. NOVAK:

 2        Q.   Now, we -- before that clarification, we were

 3    looking at Anda Exhibit 53, which is a series of

 4    e-mail exchanges that occurred between various DEA

 5    officials and the company in 2012.  It bears the

 6    Bates Number Anda 78355 through 78363.

 7             Do you recognize this exchange of e-mails,

 8    Mr. Cochrane?

 9        A.   I do not.

10        Q.   Okay.  It starts with an inquiry that Valerie

11    Mitchell submits to the company on a number of

12    issues, if you look at the last two pages of the

13    document.  And specifically, Ms. Mitchell writes to

14    Alberto Esteves and requests a variety of information

15    all related to controlled substance sales by the

16    company.

17             If you look at the last page, Ms. Mitchell,

18    who is a diversion investigator at the Columbus

19    District office of the U.S. Department of Justice's

20    Drug Enforcement Administration, asks:  Has Anda

21    reported any suspicious orders to the DEA Columbus DO

22    this year?

23             You see that reference?

24        A.   Yes.
```

```
 1        Q.    And your understanding is that they had not

 2   reported any suspicious orders to the Columbus

 3   office -- district office, correct?

 4              If it helps, I can direct you to the top

 5   page.

 6        A.    Okay.

 7        Q.    Specifically Ms. Chaney at the Drug

 8   Enforcement Administration writes to you and state:

 9   Can you clarify what you mean by "no individual

10   suspicious orders"?  Do you mean that Anda has had no

11   suspicious orders since 2007?  If, in fact, Anda

12   identified suspicious orders after 2007, were those

13   reported to DEA other than the customer cutoff list?

14   And if so, when and where?

15              Do you see that question posed to you?

16        A.    Yes.

17        Q.    Okay.  And in response, you write to

18   Ms. Chaney on July 24th of 2012 and state:  For

19   clarification purposes, there have not been any

20   instances where we have reported a specific order as

21   being suspicious.

22              Do you see that reference?

23        A.    Yes.

24        Q.    So from the period of 2007 after the Jay
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Spellman suspicious order reports to the DEA were

 2      continued -- were discontinued, from that period

 3      forward to July 24th of 2012, there were no

 4      suspicious order reports submitted by Anda to the

 5      DEA?

 6              MR. MATTHEWS:  Objection.

 7              THE WITNESS:  Not for a specific order, yes.

 8      BY MR. NOVAK:

 9         Q.   Is it your position that there was not a

10      single suspicious order submitted to Anda by one of

11      its customers during that time period that Anda

12      detected?

13              MR. MATTHEWS:  Objection.

14              THE WITNESS:  Yes.

15      BY MR. NOVAK:

16         Q.   Now, you had been working on some alternative

17      methods of identifying suspicious orders still into

18      2012, correct?

19              MR. MATTHEWS:  Objection.

20              THE WITNESS:  We had a system in place prior

21          to 2012 as far as customer due diligence and

22          order monitoring was concerned that was in place.

23          I can't remember the date.  We talked about the

24          testing of a system in 2011, I believe, where
```

Highly Confidential - Subject to Further Confidentiality Review

1      orders were flagged; they would go on hold.  We

2      talked about our bucket.  That was prior to 2012.

3  BY MR. NOVAK:

4      Q.   During the time that Anda was owned by Watson

5  or Actavis, was it involved in the launch of branded

6  products by those companies?

7           MR. MATTHEWS:  Objection.

8           THE WITNESS:  I can't remember the specific

9      branded product launches that we did for Watson

10     or Actavis.

11          (Anda - Cochrane Exhibit 54 was marked for

12     identification.)

13  BY MR. NOVAK:

14     Q.   We've had marked as Anda - Cochrane

15  Exhibit 54 a two-page e-mail related to the branded

16  CII launch of Moxduo.  It is dated June 14th of 2012

17  and bears the Bates Number Anda 86469 to 70.

18          What is Moxduo?

19     A.   I honestly don't remember this product.

20     Q.   Okay.

21     A.   It looks like it's a morphine/oxycodone

22  combination product.

23     Q.   And is there a -- when you say a combination

24  product, you mean that it includes both morphine and

Highly Confidential - Subject to Further Confidentiality Review

```
 1   oxycodone together?

 2        A.   That's what it appears to look like, yes.

 3        Q.   Okay.  And when you are applying a product

 4   like that for purposes of control families, morphine

 5   has one set of limits and oxycodone has another set

 6   of limits, correct?

 7             MR. MATTHEWS:  Objection.

 8             THE WITNESS:  Yes.  I -- I don't remember any

 9        other specific products that would even fall into

10        this category, nor do I remember this specific

11        product, but yes.

12   BY MR. NOVAK:

13        Q.   Okay.  Now, when Anda was preparing to sell

14   the Actavis product, do they take a different role in

15   its distribution than they would for the sale of some

16   opioid product that is by a company that doesn't own

17   them?

18             MR. MATTHEWS:  Objection.

19             THE WITNESS:  No.

20   BY MR. NOVAK:

21        Q.   Okay.  Are there any particular pricing

22   advantages that you are aware of that Anda would be

23   able to extend for products by the company that owns

24   Anda that it wouldn't be able to extend for other
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    companies' opioid products?

 2              MR. MATTHEWS:  Objection.  Foundation.

 3              THE WITNESS:  I was never involved in the

 4         pricing of products or anything of that nature.

 5         I have no idea.

 6    BY MR. NOVAK:

 7         Q.   Okay.  How about the rebates?  Are they any

 8    different from a branded product that is marketed by

 9    Actavis as opposed to some other manufacturer that

10    doesn't own Anda?

11              MR. MATTHEWS:  Objection; foundation.

12              THE WITNESS:  I have no idea.

13              MR. NOVAK:  Okay.  Bear with me for a second.

14              MR. MATTHEWS:  Take your time.

15    BY MR. NOVAK:

16         Q.   Mr. Cochrane, when you perform a review of

17    particular retailers and their orders of controlled

18    substances, does the size of the retailer ever factor

19    into your analysis as to whether the order should be

20    filled?

21              MR. MATTHEWS:  Objection.

22              THE WITNESS:  No, not that I can remember.

23         (Anda - Cochrane Exhibit 55 was marked for

24    identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2         Q.   We've had marked as Anda - Cochrane Exhibit

 3    Number 55 an e-mail exchange between yourself, Jay

 4    Spellman, and Patrick Cochrane.  It's dated

 5    October 4th of 2010 and it bears the Anda Bates

 6    Number 109243 through 245.

 7              Now, this relates to Neighborcare customer

 8    who to send in an order for Control II substances; is

 9    that correct?

10         A.   Yes.

11         Q.   And in your e-mail to Patrick Cochrane and

12    Jay Spellman, you stated at the top of the page:  I

13    rejected this last week.  It looks like they

14    purchased 600 Oxy in 08/10.  They are still a small

15    customer.  I figured it wasn't worth it.  Would

16    either of you given them Oxy?

17              Do you see that reference?

18         A.   Yes.

19         Q.   Was the fact that they were "a small

20    customer" and not "worth it" a factor in your

21    decision to deny OxyContin to that retailer?

22              MR. MATTHEWS:  Objection.

23              THE WITNESS:  The fact that we had just been

24         through a DEA audit where oxycodone was a topic
```

```
 1        and a concern of theirs warranted it not being

 2        worth it given the nature of what had just

 3        happened as far as the DEA inspection was

 4        concerned prior to this.

 5            So I think initially, after that inspection,

 6        one of the things that was instituted from a

 7        policy perspective was not only the 1,000 dosage

 8        units for new customers, but no oxycodone, and

 9        there may have been another product as well that

10        we weren't going to offer to any new customers

11        from a controlled substance perspective until

12        they had an ongoing relationship with us and data

13        that we could review.

14            I can't -- it was either -- I know for sure

15        it was oxycodone, and it might have been -- it

16        may have been hydromorphone.  Those two specific

17        products at some point in 2010, when we reduced

18        the limits to 1,000 dosage units, oxycodone and

19        hydromorphone were automatically zeros.  I don't

20        remember exactly the dates of that, but I think

21        that was part of the outcome from the DEA

22        inspection that took place in 2010.

23            Remember, we didn't get the letter of

24        violation for that inspection until late 2011,
```

Highly Confidential - Subject to Further Confidentiality Review

1      so -- but the inspection was prior to this

2      e-mail.

3      Q.   Okay.

4           (Anda - Cochrane Exhibit 56 was marked for

5      identification.)

6      BY MR. NOVAK:

7      Q.   We've had marked as Anda - Cochrane

8      Exhibit 56 an exchange of e-mail between yourself and

9      Sabrina Solis as it relates to a request for a

10     customer to receive controlled substances.  It is

11     dated June 14th of 2012 and has the Bates

12     Number 86482 through 86487.

13          Now, for this particular customer, there is a

14     request that requires the compliance department's

15     feedback as to whether they would be able to obtain

16     controlled substances through Anda.

17          Is that accurate?

18     A.   Yes.

19     Q.   Okay.  And on the front page of the document,

20     Sabrina Solis writes to you.  She is reporting to you

21     at this time in 2012, correct?

22     A.   Yes.

23     Q.   And she states:  Big customer, so it's a

24     judgment call.

Highly Confidential - Subject to Further Confidentiality Review

1           Do you see that?

2     A.    Yes.

3     Q.    Is Ms. Solis suggesting that since this

4  particular customer is a larger customer that that

5  should be a factor in whether the company authorizes

6  controlled substance sales to them?

7           MR. MATTHEWS:  Objection.

8           THE WITNESS:  I'm not sure exactly what she

9       means, but potentially, yes.

10  BY MR. NOVAK:

11     Q.    Now, looking at the dispensing information

12  for this particular company, it references the top

13  dispensed item as OxyContin 30 milligrams?

14     A.    Yes.

▮       ▮       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

17     A.    More than likely, yes, if it's a month's

18  worth of data.

▮       ▮       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

21     A.    Dosage units per month.

22     Q.    Dosage units per month.

▮               ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▮       ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬



        4      A.   Yes.

        5      Q.   Okay.  So all told, they're well in excess,

        6   just in the OxyContin, of units per month.  They're

        7   in excess not only of the 1,000 unit threshold that

        8   you made reference to in your last answer but also

        9   the older 5,000 unit threshold, correct?

       10           MR. MATTHEWS:  Objection.

       11           THE WITNESS:  Yes.

       12   BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

6     at that point in time, I would have to say no.

7         Q.   Okay.  And so you wrote to Sabrina Solis and

8     said:  I think we should turn them back on since we

9     received the data and it is not too extreme.

10             What do you mean by "not too extreme"?

11        A.   Again, in comparison to things that we have

12    seen based on other pharmacies, the numbers weren't

13    astronomical or outrageous in our opinion.

14        Q.   Okay.  They were over your threshold limits?

15             MR. MATTHEWS:  Objection.

16             THE WITNESS:  The threshold limits were --

17        that I referenced as far as 1,000 dosage units

18        was concerned --

19             MR. NOVAK:  Yes.

20             THE WITNESS:  -- was for new customers moving

21        forward.

22    BY MR. NOVAK:

23        Q.   Okay.  And at this time in 2012, you could

24    authorize a multiple of that initial 1,000 unit

Highly Confidential - Subject to Further Confidentiality Review

1     dosage after they had an established track record?

2          A.   We could, yeah, after we had done a review of

3     them and received dispense data on them on an ongoing

4     basis, yeah.

5          Q.   Okay.  Was there any multiple that the

6     company used of the average monthly purchases by a

7     company in 2012 before it would trigger a hold on the

8     order as a suspicious order?

9               MR. MATTHEWS:  Objection.

10    BY MR. NOVAK:

11         Q.   Or a potentially suspicious order?

12              MR. MATTHEWS:  Objection.

13              THE WITNESS:  I believe there was, yeah.  I

14         don't remember off the top of my head what it

15         was, though.

16    BY MR. NOVAK:

17         Q.   You don't know what the multiple number was?

18         A.   Correct.

19         Q.   Was it a fixed number?

20         A.   Yes.

21         Q.   Okay.  Do you know if it was a multiple of

22    eight?

23         A.   Not sure.

24         Q.   Okay.  Was there a point in time when Anda

Highly Confidential - Subject to Further Confidentiality Review

```
1    applied a multiple of eight to the average monthly

2    order before it would hold an order for a customer?

3             MR. MATTHEWS:  Objection.

4             THE WITNESS:  Possibly.

5    BY MR. NOVAK:

6        Q.   Okay.  Do you know how the eight times

7    multiplier was selected by Anda?

8        A.   No.

9             MR. MATTHEWS:  Objection.

10            THE WITNESS:  Don't remember.

11   BY MR. NOVAK:

12       Q.   Now, we had looked at drafts of Standard

13   Operating Procedure 40 today, and you recall there

█    ████████████████████████████████████████████████

15   contained in it; is that correct?

16       A.   Yes.

17       Q.   Was there ever a document or a standard

18   operating procedure that actually disclosed to

19   whomever was reviewing the standard operating

20   procedure that the company used an eight times

21   multiplier?

22       A.   I'm not sure.

23       Q.   You've not aware of one where an eight times

24   multiplier was contained in the standard operating
```

1    procedure document itself, are you?

2        A.    Correct.  Correct.

3        Q.    Has Anda ever communicated to the DEA that it

4    used an eight times multiplier in its Standard

5    Operating Procedure 40 for purposes of implementing a

6    suspicious order monitoring system?

7             MR. MATTHEWS:  Objection.

8             THE WITNESS:  I'm not sure, but I would

9        assume that it was communicated.

10   BY MR. NOVAK:

11       Q.    Who typically would have communicated those

12   items to the company?

13       A.    Oh, it could have been a number of people.

14   It could have been me; it could have been Robert

15   Brown; it could have been -- depending on when it

16   was, it could have been Howard Davis; Emily Schultz.

17            (Anda - Cochrane Exhibit 57 was marked for

18   identification.)

19   BY MR. NOVAK:

20       Q.    We have had marked as Anda - Cochrane 57 a

21   document that was previously marked as Anda - Brown

22   Exhibit 10 during the deposition of Robert Brown.

23            First let me ask:  Was there a point in time

24   of which you are aware where Anda contracted with

Highly Confidential - Subject to Further Confidentiality Review

1    Buzzeo to perform a suspicious order monitoring

2    system assessment on behalf of the company?

3         A.   Yes.

4              MR. MATTHEWS:  Objection.

5    BY MR. NOVAK:

6         Q.   And were you one of the individuals at Anda

7    who was interviewed by Buzzeo for purposes of their

8    performance of that suspicious order monitoring

9    assessment?

10        A.   Yeah, but I don't know if I was present for

11   the whole -- the whole meeting when they were here.

12        Q.   Okay.  I'd like to direct your attention to

13   Anda - Cochrane 57, the page ending in Bates

14   Number 539142.

15             MR. NOVAK:  And I don't recall if I

16             identified it for the record, but the Bates

17             numbers for the document as a whole is Anda

18             539140 through 150.

19   BY MR. NOVAK:

20        Q.   But looking at the page ending in 142, there

21   is reference, down at the second paragraph, to a

22   statement:  Michael Cochrane, Executive Director,

23   Regulatory Compliance, Anda, provided consultants

24   with corporate SOM background information and was

1    involved with portions of the review.

2           Do you see that reference?

3    A.    Yes.

4    Q.    At Page 5 of the document, if you can turn to

5    that portion of it, the middle paragraph states:

██ ███████████████████████████████████████████████

██ ████████████████████████████████████████

██ ███████████████████████████████████████████████

██ ███████████████████████████████████████████████

██ ███████████████████████████████████████████████

██ ███████████████████████████████████

██ ████████████████████      ████████████████████████

██ ██████████████      ████████████████████

14   SOM attributes is contained in the SOP.

15          Do you see that reference?

16   A.    Yes.

17   Q.    Okay.  And then it continues to state:

18   However, during interviews with staff, consultants

19   learned that eight is the multiplier used to "pend"

20   orders for additional investigation.  Anda could not

21   provide information of how the multiplier of eight

22   was established.

23          Do you see that reference?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   Is there anyone in Anda who can tell us where

2    this multiple of eight came from?

3      A.   I'm not sure.

4      Q.   You were involved in the creation of the

5    standard operating procedure that's being discussed

6    here, correct?

7      A.   Yes.

8      Q.   And you don't know where the eight multiple

9    came from?

10          MR. MATTHEWS:  Objection.

11          THE WITNESS:  No, I don't remember where it

12      came from.

13   BY MR. NOVAK:

14     Q.   Do you know who within Anda, if it's not you

15   as the author of the standard operating procedure,

16   would be the appropriate person to obtain that

17   information from?

18     A.   No.

19     Q.   And to your knowledge, the multiple of eight

20   continued to be used -- well, let me ask a different

21   question because I want to get an understanding of

22   how this multiple is used in practice.

23          (Anda - Cochrane Exhibit 58 was marked for

24      identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. NOVAK:

 2        Q.   We've had marked as Anda - Cochrane

 3   Exhibit 58 a document which is a series of e-mail

 4   dated approximately December 5th of 2014 between

 5   various individuals in the compliance program within

 6   Anda, and it bears the Bates Number Anda 84233

 7   through 84237.

 8             And although the controlled substance at

 9   issue in the discussion at Page 2 is coding, I want

10   to ask you some questions as to how this eight

11   multiplier works.

12             First of all, this particular e-mail

13   contained within Anda Exhibit 58 is from Debra Abelow

14   and addressed to you and Sabrina Solis.

15             Who is Ms. Abelow?

16        A.   One of the ES400 programmers who works on the

17   Turning Points -- the TPS system.

18        Q.   Okay.  So it states in Ms. Abelow's e-mail to

19   you that the pill count for 201887 and 201889 is 100.

20   These two items are on order 28 -- 25961833.  And

21   then the pill count for 20188 --

22        A.   What page are you on?

23        Q.   I'm sorry, Page 2.  The second page of the

24   document.
```

1      A.    Okay.

2      Q.    You see the e-mail from Debra Abelow to you

3   and Sabrina Solis?

4      A.    Yeah.

5      Q.    Okay.  Now, looking down at the different

6   products that are referenced, there are -- is that

7   five different types of coding?

8      A.    No.  That's -- appears to be five different

9   months.

10     Q.    Oh, okay.

11           So the person who would be performing an

12  evaluation of how Anda's suspicious order monitoring

13  system worked in December of 2014, one of the factors

14  they would look at is the average quantity of

15  purchase based upon the last six months of sales

16  data, correct?

17           MR. MATTHEWS:  Objection.

18           THE WITNESS:  I believe so, but I'm not sure.

19  BY MR. NOVAK:

20     Q.    Okay.  And they would basically take the

21  particular pill counts that are within the same

22  control family and calculate what the average

23  quantity purchased is based on six months of data?

24           MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE WITNESS:  I'm not sure.  The person

2         wouldn't do that.  The system would do that.

3    BY MR. NOVAK:

4         Q.   Okay.  The -- when you say the system, you're

5    talking about the features of the suspicious order

6    monitoring system that are built to flag orders that

7    are potentially suspicious?

8         A.   Yes.

9         Q.   Okay.  And the e-mail -- in the e-mail, Debra
```

██  ████████        ██████████████████████████████

██  ████████████████████████████████████████████

██  ████████████████████████████████████████████████

██  █████████████████████████████████████████████

██  ██████████████

██       ████████████████████

██     ███   ████

██     ███   ████  ████████████████████████████

██  ████████████████████████████████████████████

██  ████████████████████████████████████████████

██  ██████████████████████████████████████████

██  ███████████████████

```
22              MR. MATTHEWS:  Objection.

23              THE WITNESS:  I believe so.

24    ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2        Q.   And that's your understanding as to how the

 3    system was designed to work for purposes of

 4    identifying suspicious orders in 2014?

 5             MR. MATTHEWS:  Objection.

 6             THE WITNESS:  I believe so.

 7    BY MR. NOVAK:

 8        Q.   Now, looking at these particular dates for

 9    the period -- well, let me ask first:  That first

10    column that says "period" and then says 11407 through

11    11411, what does that mean?

12        A.   I believe that's a reference to the month and

13    the year.  So drop the 1.  The '14 is the year, and

14    then the 07 is the month.

15        Q.   Okay.  So this particular customer would have

16    purchased 1,800 units of codeine in July of '14?

17        A.   I'm not sure.  I see a ship number and a

18    purchase number.  Those might be dosage units.  I'm

19    not sure.  I haven't seen anything like this for

20    years.

21        Q.   So it's a dosage unit, then, of 1,800 units

22    that are purchased in July of '14?

23             MR. MATTHEWS:  Objection.

24             THE WITNESS:  I'm really not sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2        Q.   Okay.  In -- irrespective of what type of

 3    unit it is, there is a reference to the amount

 4    purchased for July of '14, then August of '14, then

 5    September of '14, October of '14, and November of

 6    '14, correct?

 7        A.   Yes.  This isn't for a specific customer,

 8    though.  This is for a trade class, I believe, in its

 9    entirety.

10        Q.   Okay.  So it's the trade class that is in its

11    entirety increasing the average purchase amounts in

12    the numbers that are reflected in that -- in the

13    "Purchased" column as it's contained in this page of

14    the deposition exhibit; is that correct?

15            MR. MATTHEWS:  Objection.

16            THE WITNESS:  I believe so.

17            MR. NOVAK:  Okay.

18            THE WITNESS:  It's not one specific customer.

19        It's a trade class in its entirety, if I'm not

20        mistaken.

21    BY MR. NOVAK:
```

Highly Confidential - Subject to Further Confidentiality Review

■ ████████████████████████████

■ ██████████████████████████████████

■ ████████████████████████████      ██

■ ██████████████████████████████████

■ ████████████████████████████████

■ ██████

7              MR. MATTHEWS:  Objection.

8              THE WITNESS:  I believe so.

9    BY MR. NOVAK:

10       Q.   Those are pretty significant increases on a

11   month-to-month basis.  Would a suspicious order

12   monitoring system, in your view, appropriately flag

13   increases that are -- are less significant than the

14   ones presented here?

15              MR. MATTHEWS:  Objection.

16              THE WITNESS:  Again, I'm not sure.  But like

17        I said, this is for a trade class.  And I see

18        Walgreens referenced here.  Walgreens would be in

19        the same trade class as Rite Aid and any of our

20        other national chains.  The numbers could be

21        smaller up top because of product availability,

22        for all I know, at that specific given point in

23        time.  And as product became available, customers

24        were ordering it from us, hence the fact the

Highly Confidential - Subject to Further Confidentiality Review

```
 1      number goes up.

 2          I don't know if there was a manufacturing

 3      issue back then.  There's lots of determining

 4      factors.  In looking at these numbers that are

 5      copied and pasted from -- from TPS, I don't know

 6      how many customers are specifically in that

 7      specific trade class.  I know Walgreens has

 8      thousands of stores.  Other national account or

 9      retail chains throughout the country have

10      thousands of stores.  They could potentially be

11      in that same specific class.

12  BY MR. NOVAK:

13      Q.   I think my question has a little different

14  focus.

15          You would agree there is a pretty significant

16  difference between purchases in July of '14 of only

    █  ██████████████████████████████████████████████

    █  ███████████████████████████████

19          MR. MATTHEWS:  Objection.  Argumentative.

20          THE WITNESS:  Yes.

21  BY MR. NOVAK:

22      Q.   Okay.  And a system that uses six months of

23  dispensed data would average out those six months

24  worth of data to create the flag that's going to be
```

1    used to determine whether an order is suspicious or

2    not, correct?

3              MR. MATTHEWS:  Objection.

4              THE WITNESS:  I believe so.

5    BY MR. NOVAK:

6         Q.   Does using six months or a year of data have

7    the effect of potentially masking increases in the

8    amount of dosage units that a company would -- would

9    potentially buy from Anda -- or, for that matter,

10   from any distributor -- as a result of averaging the

11   data?

12             MR. MATTHEWS:  Objection.

13             THE WITNESS:  I don't believe there's any

14        masking going on.

15   BY MR. NOVAK:

16        Q.   Let me have you look for a moment at a

17   different example.

18             (Anda - Cochrane Exhibit 59 was marked for

19   identification.)

20             MR. MATTHEWS:  This is two pages, but it's

21        one exhibit?

22             MR. NOVAK:  Yes.

23   BY MR. NOVAK:

24        Q.   We have had marked Anda Cochrane 59 a

1    two-page document from you to Al Paonessa.  The first

2    page is simply an e-mail dated September 11th of

3    2012, and it's characterized as an example, and then

4    attached to it is a page showing increases in

5    potential units of a product that is ordered.  It

6    bears the Bates Number Anda 85935.

7             Now, in the first e-mail, you write to

8    Al Paonessa:  This is the description of McKesson's

9    controlled substance monitoring program from Rite Aid

10   as well as a spreadsheet calculating what a store

11   could increase to in one calendar year if they

12   started with 1,000 dosage units of a specific

13   controlled substance chemical.

14            You see that reference?

15        A.   Yes.

16        Q.   So this was information you were conveying to

17   Al Paonessa based upon what Rite Aid had communicated

18   to you about McKesson's controlled substance

19   monitoring program; is that correct?

20        A.   It would appear so.

21        Q.   Okay.  And in this example, if we look at the

22   second page of the exhibit, McKesson's controlled

23   monitoring program could allow a customer such as

24   Rite Aid, who started the year in January with 1,000

```
 1    control units, to increase by December to 86,498

 2    units.

 3            Is that accurate?

 4    A.   To -- what was the last number?

 5    Q.   86,498 units.

 6    A.   Yeah, it would appear so.

 7    Q.   So if the controlled substance monitoring

 8    program is constructed with the right variables, you

 9    could have a massive increase in the amount of

10    product that a customer could order simply based on

11    stretching out the averages over the year's time.

12            MR. MATTHEWS:  Objection.

13            THE WITNESS:  Yeah.  I was just --

14            MS. URQUHART:  Objection.

15            THE WITNESS:  -- I was just conveying

16        knowledge of what Rite Aid sent me to Al, just to

17        give him an example.

18            MR. NOVAK:  Okay.

19            THE WITNESS:  But based on -- based on Rite

20        Aid's description, yeah, that's what it looks

21        like.

22            MR. NOVAK:  Okay.  Let me take a quick break.

23            THE VIDEOGRAPHER:  Off the record at 7:09.

24            (Recess from 7:09 until 7:16 p.m.)
```

```
 1            (Anda - Cochrane Exhibit 60 was marked for

 2      identification.)

 3            (Anda - Cochrane Exhibit 61 was marked for

 4      identification.)

 5            THE VIDEOGRAPHER:  The time is 7:16.  We're

 6        now back on the record.

 7      BY MR. NOVAK:

 8        Q.   We've had marked two exhibits, Anda -

 9      Cochrane Exhibit 60 -- Anda - Cochrane 60, which is

10      an e-mail exchange that includes Michael Cochrane

11      related to Rite Aid and the MoxDuo release.  It bears

12      the Bates Number Anda Opioids 90905.

13            Mr. Cochrane, we had reviewed earlier a

14      product that Actavis was releasing that combined both

15      morphine and OxyContin.

16            Do you remember that discussion?

17        A.   Yes.

18        Q.   And in reviewing the launch of that product,

19      you were specifically asked by Mr. Falkin on the

20      first page of Anda - Cochrane Exhibit 60 as

21      Mr. Falkin wrote to you saying:  Mike, after we spoke

22      today, Actavis confirmed to me that they did speak

23      with Rite Aid who is suggesting about 1,200 Rite Aid

24      locations.  You'll confirm with us this is
```

1    acceptable.

2            Do you see that reference?

3    A.    Yes.

4    Q.    And you replied and said:  That is fine.  I

5    don't see the need to exclude any chains.

6            Is that correct?

7    A.    Yes.

8    Q.    Were you making that determination based upon

9    the representation that Actavis had confirmed that

10   they spoke with Rite Aid and was suggesting 1,200

11   Rite Aid locations?

12   A.    Yes.

13   Q.    Okay.  Now, Exhibit Anda - Cochrane 61 is a

14   document or a series of e-mail that were exchanged

15   between you and other individuals at Anda, and the

16   last is -- well, they're dated July 19 of 2012,

17   beginning with the Bates Number 86177 and running

18   through 81571.

19           Hold on.

20           I'm concerned that these documents are not

21   appropriately combined, because looking at the top of

22   it, they appear to be involving different subject

23   matters.

24           Okay.  I apologize.  There's a different

Highly Confidential - Subject to Further Confidentiality Review

1    cover page for the last part of Anda Exhibit 61.

2         MR. MATTHEWS:  What are we doing here?

3         MR. NOVAK:  Could we correct the marking of

4    Anda Exhibit 61?

5         MR. MATTHEWS:  How are you trying to correct

6    it?

7         MR. NOVAK:  The -- and I'll reduce it.  There

8    is an e-mail from Sabrina Solis to Michael

9    Cochrane referencing Rite Aid top 100 products

10   for top 100 stores review, and then attached to

11   that is what I believe to be the appropriate

12   attachment.  I think somehow a different e-mail

13   was attached to that material which should not

14   have been.

15        And as you will note --

16        Could you have that page marked as Anda

17   Exhibit 61.

18        MR. MATTHEWS:  So that the record is

19   complete, the document bearing Bates Numbers Anda

20   Opioids MDL 86177 and 86178 originally marked as

21   the first two pages of Exhibit 61 is being

22   removed from the record and is no longer part of

23   that exhibit.

24        Is that correct?

```
 1              MR. NOVAK:  That is correct.

 2              And in addition to that, the additional pages

 3         up through and including Bates Number 86180 are

 4         being removed.

 5              So the document is now -- that is now Anda

 6         Exhibit 61 bears the Bates page references 81549

 7         and then runs from there through 81571.  There is

 8         an additional page after that that for some

 9         reason does not include a Bates page, and I have

10         no idea why.

11              MR. MATTHEWS:  Okay.  For the record, you are

12         now over your time limit.  I'll give you one

13         question to the witness on this document, and I'm

14         going to cut off any questions after that.

15    BY MR. NOVAK:

16         Q.   Mr. Cochrane, is this an analysis of Rite Aid

17    dispensing data that was provided by Sabrina Solis to

18    you in the March 7, 2012, time frame?

19         A.   I don't have the cover page with the exhibit

20    on it.

21              MR. MATTHEWS:  Just so the record is clear,

22         by "this," you mean what you have marked as

23         Exhibit 61?

24              MR. NOVAK:  Yes.
```

1          THE WITNESS:  There's two that are marked 61,

2     though.  I think maybe this one goes with that

3     letter.

4          MR. MATTHEWS:  So that the record is clear,

5     Mr. Cochrane is holding what's been marked as

6     Deposition Exhibit 61.  It is a document that

7     bears Bate Number Anda Opioids MDL 81549 through

8     81571 with one additional page attached to that

9     that does not bear a Bates Number --

10          MR. NOVAK:  Yes.

11          MR. MATTHEWS:  -- which says at the top "RA

12     Store #4575."

13          Do you agree that that is the exhibit,

14     Mr. Novak?

15          MR. NOVAK:  Yes.

16          MR. MATTHEWS:  One question for the witness.

17          MR. NOVAK:  And I think I already have one

18     pending.

19          MR. MATTHEWS:  Why don't you ask it again.

20     BY MR. NOVAK:

21     Q.   Mr. Cochrane, does Anda Exhibit 61 include an

22     analysis of Rite Aid dispensing data that was

23     provided by Sabrina Solis to you in the March 7,

24     2012, time frame?

```
 1     A.   Yes.

 2          MR. MATTHEWS:  Are you finished?

 3          MR. NOVAK:  I'm out of time.

 4          MR. MATTHEWS:  So you are passing the

 5     witness?

 6          MR. NOVAK:  Yes.

 7          MR. MATTHEWS:  Before we continue, I would

 8     just like to ask on the record if you can tell me

 9     where the last page of Exhibit 61 originated from

10     since it doesn't bear Bates numbers, so I don't

11     know what it is or where it came from.

12          MR. NOVAK:  I -- I don't know what explains

13     that.  I assume it was produced with the

14     remainder of the document but for some reason

15     does not include a Bates Number.

16          MR. MATTHEWS:  Since it doesn't bear any

17     objective indications of its -- where it came

18     from and since the witness didn't identify that

19     page in particular, I object to its use in the

20     deposition because we don't know anything about

21     its authenticity or what it is.

22          MR. NOVAK:  I believe we have a substitute

23     page that -- yeah.  I understand your objection.

24     I'll have to go back to the production at some
```

```
 1        point and see if there's a Bates number that can

 2        be attached to it.  I understand.

 3             MR. MATTHEWS:  That's always -- it's

 4        always -- I'm ready, willing, and able to talk

 5        with you about ways we can solve issues that

 6        arise during the deposition.  So bring it to me

 7        and we will consider it.

 8             MR. NOVAK:  Thanks.

 9             MR. MATTHEWS:  I'm going to have some

10        questions.  I need a few minutes to splash some

11        water on my face and see if the witness is okay,

12        all right?  And then we will be right back.

13             MR. NOVAK:  Thank you.

14             THE VIDEOGRAPHER:  The time is 7:27 p.m.  We

15        are going off the record.

16             (Recess from 7:27 until 7:34 p.m.)

17             THE VIDEOGRAPHER:  The time is 7:34 p.m.  We

18        are now back on the record.

19                      CROSS-EXAMINATION

20   BY MR. MATTHEWS:

21        Q.   Good evening, Mr. Cochrane.  As you know, my

22   name is James Matthews.  I represent Anda in this

23   litigation, and today I have been representing you.

24             I have a few questions for you.  I know it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    late in the day.  I appreciate very much the time

 2    that you have been willing to testify today.

 3            I want to take you way back to the beginning

 4    of the day and just make sure some certain things are

 5    clear on the record.

 6            To begin with, you aren't currently employed

 7    by Anda; is that right?

 8        A.   No, I'm not.

 9        Q.   And you haven't been employed by Anda since

10    sometime in 2016, correct?

11        A.   Correct.

12        Q.   And your appearance here today is voluntary;

13    is that correct?

14        A.   Yes.

15        Q.   I want to focus on a time when you were

16    employed by Anda and responsible for DEA compliance,

17    okay?

18        A.   Okay.

19        Q.   And just so we're sure between us what I mean

20    by DEA compliance, I mean the process of maintaining

21    and being responsible for the system that Anda

22    devised to detect, identify suspicious orders, all

23    right?

24        A.   Okay.
```

```
 1        Q.    But DEA compliance involves a lot more than

 2    that, right?

 3        A.    Correct.

 4        Q.    But today we are going to be limited to that,

 5    all right?

 6        A.    Okay.

 7        Q.    Just for some background, Mr. Cochrane, in

 8    2010, approximately how many customers did Anda

 9    service?

10        A.    Entirely?

11        Q.    Entirely.

12        A.    At least 40- to 50,000.

13        Q.    And what kind of products did Anda sell at

14    that time?

15        A.    All kinds of products:  prescription drugs,

16    controlled substances that were prescription drugs,

17    med surgical supplies, over-the-counter products,

18    vitamins, power bars.

19        Q.    And in what areas of the country did Anda

20    distribute products?

21        A.    All across the United States.

22        Q.    How many of Anda's customers, if you recall,

23    in 2010 were independent retail pharmacies approved

24    for purchasing controlled substances?
```

```
 1      A.   I'm not sure.  I would have to say 10,000.

 2      Q.   Okay.  Did that change at some time?

 3      A.   As to how many customers there were?

 4      Q.   Independent retail pharmacies approved for

 5   purchasing controlled substances.  Did that number

 6   change at some time?

 7      A.   Yes.

 8      Q.   How did it change after 2010?

 9      A.   Drastically.  Fewer customers through our due

10   diligence process and customer review process.

11      Q.   When did that customer review and due

12   diligence process occur?

13      A.   It started back in 2007.

14      Q.   And when did it sort of end, in your view?

15      A.   It's ongoing.

16      Q.   Okay.  About when had the customer

17   independent pharmacy base been reduced from 10,000 to

18   some lower number?

19      A.   Throughout -- from 2007 probably through the

20   present, I would assume.

21      Q.   Okay.  I want to ask you to refer back to --

22      A.   Actually, it would go back to 2005.

23      Q.   I'd like you to refer back to what's

24   previously been marked as Exhibit 57.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Exhibit 57 is a document which is described

 2   on its face as a suspicious order monitoring

 3   assessment prepared by BuzzeoPDMA, right?

 4        A.   Yes.

 5        Q.   And that was -- when was that prepared?

 6        A.   October of 2015.

 7        Q.   All right.  I would like to focus your

 8   attention on the last paragraph of Page 1 of the

 9   report, which bears Bates Number Anda Opioids MDL

10   539142.

11              You see where Buzzeo reports in that

12   paragraph that, according to Director Brown, the firm

13   services approximately 20,000 -- and there's -- I

14   believe it's supposed to be customers, but it doesn't

15   say that -- which are roughly divided equally between

16   retail accounts and chain accounts?

17        A.   Yes.

18        Q.   Is that accurate to the best of your

19   recollection?

20        A.   Yeah.

21        Q.   And then it goes on to say:  Of the retail

22   accounts, only around 1,500 receive controlled

23   substances.

24              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Was that accurate as of 2015 to the best of

 3   your recollection?

 4        A.    I believe it was.

 5        Q.    At the beginning of -- let me ask you another

 6   question -- sort of background question:  At or

 7   around 2010, how many SKUs did Anda distribute?

 8        A.    More than 10,000, potentially 15,000.

 9        Q.    Just so the record is clear, what is an SKU?

10        A.    It's an individual selling unit of product.

11        Q.    Okay.  And there was some testimony about

12   controlled substances and SKUs earlier in the day.

13        Do you remember that?

14        A.    Yes.

15        Q.    Let me ask you this:  At or around the period

16   2005 to 2010, about how many individual SKUs for the

17   product oxycodone did Anda distribute?

18        A.    Twenty-five to 40, maybe more.

19        Q.    Okay.  And so it's clear, why would there be

20   that many SKUs that Anda distributed for oxycodone?

21        A.    Different bottle counts, different

22   milligrams, different manufacturers,

23   different national drug code numbers.  Every national

24   drug code had its own SKU and item number.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Let me ask you the same question for

2   hydrocodone:  During the period 2005 to 2010, about

3   how many SKUs for hydrocodone did Anda distribute if

4   you have a memory?

5        A.   It could have been as many as a hundred.

6        Q.   And how about hydromorphone?

7        A.   Hydromorphone wasn't as popular.  Probably

8   ten, if I had to put a number on it.

9        Q.   Mr. Novak asked you some questions about what

10  you did when you first had -- got the position as

11  head of regulatory compliance to familiarize yourself

12  with the company's obligations.

13       I'm going to ask you:  What was the -- from

14  your perspective as head of the compliance -- DEA

15  compliance during the time that you had the job, what

16  was the source of the legal obligations that you

17  turned to to understand what those legal obligations

18  were?

19       A.   The code of --

20       MR. NOVAK:  Objection.

21  BY MR. MATTHEWS:

22       Q.   You can answer the question.

23       A.   The Code of Federal Regulations, United

24  States Code.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Let me show you what's been marked for

 2    identification as Exhibit 62.

 3            (Anda - Cochrane Exhibit 62 was marked for

 4    identification.)

 5    BY MR. NOVAK:

 6        Q.    Can you take a look at Exhibit 62 and tell me

 7    if you know what that is?

 8        A.    Yes.

 9        Q.    What is it?

10        A.    21 United States Code, the Controlled

11    Substances Act.

12        Q.    When you testified that you looked at the

13    United States Code to -- as the source of your legal

14    obligations with respect to DEA compliance, is that

15    the section of code you were referring to?

16        A.    Yes.

17        Q.    Let me hand you what the court reporter has

18    marked as Exhibit 63.

19            (Anda - Cochrane Exhibit 63 was marked for

20    identification.)

21    BY MR. MATTHEWS:

22        Q.    Look at 63 and tell me if you know what that

23    is.

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    What is it?

2      A.    Title 21, the Code of Federal Regulations.

3      Q.    When you testified earlier that you looked at

4    the regulations as the source of the legal

5    obligations for DEA compliance at Anda, is that what

6    you were referring to?

7      A.    Yes.

8      Q.    You've had a lot of questions today about a

9    lot of different topics, and I'd like to sort of

10   orient them to the United States Code and the Code of

11   Federal Regulations, if I could.

12          So starting first with the code, which is

13   Exhibit 62, could you take a look at it and tell me

14   what, if anything, it says about knowing your

15   customers?

16          MR. NOVAK:  Objection.

17          THE WITNESS:  There is nothing.

18   BY MR. MATTHEWS:

19     Q.    Could you take a look at Exhibit 62 and tell

20   me, what, if anything, it says about dispensing data?

21          MR. NOVAK:  Objection.

22          THE WITNESS:  There is nothing.

23   BY MR. MATTHEWS:

24     Q.    Could you take a look at Exhibit 62 and tell

Highly Confidential - Subject to Further Confidentiality Review

```
 1    me what, if anything, it says about Internet

 2    pharmacies?

 3              MR. NOVAK:  Objection.

 4              THE WITNESS:  There is nothing.

 5    BY MR. MATTHEWS:

 6        Q.   Could you look at Exhibit 62 and tell me

 7    what, if anything, it says about physicians?

 8              MR. NOVAK:  Objection.

 9              THE WITNESS:  There is nothing.

10    BY MR. MATTHEWS:

11        Q.   Could you look at Exhibit 62 and tell me,

12    what, if anything, it says about pain clinics?

13              MR. NOVAK:  Objection.

14              THE WITNESS:  There is nothing.

15    BY MR. MATTHEWS:

16        Q.   Can you look at Exhibit 62 and tell me what,

17    if anything, it says about shipping suspicious

18    orders?

19              MR. NOVAK:  Objection.

20              THE WITNESS:  There is nothing.

21    BY MR. MATTHEWS:

22        Q.   Can you look at Exhibit 62 and tell me what,

23    if anything, it says about cutting off customers?

24              MR. NOVAK:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  There is nothing.

 2    BY MR. MATTHEWS:

 3        Q.    From your perspective as you read the

 4    applicable code -- let me ask you this:  Can you look

 5    at Exhibit 62 and tell me, what, if anything, it says

 6    about site inspections?

 7                  MR. NOVAK:  Objection.

 8                  THE WITNESS:  There is nothing.

 9    BY MR. MATTHEWS:

10        Q.    And can you look at Exhibit 62 and tell me

11    what, if anything, it says about Google searches?

12        A.    There is nothing.

13                  MR. NOVAK:  Objection.

14    BY MR. MATTHEWS:

15        Q.    If you could look at Exhibit 63, please,

16    which is a copy of the Code of Federal Regulations,

17    could you look at Exhibit 63 and tell me what it

18    says, if anything, about knowing your customer?

19                  MR. NOVAK:  Objection.

20                  THE WITNESS:  There is nothing.

21    BY MR. MATTHEWS:

22        Q.    Looking at Exhibit 63, can you tell me what,

23    if anything, it says about dispensing data?

24                  MR. NOVAK:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  There is nothing.

 2    BY MR. MATTHEWS:

 3        Q.   Can you look at Exhibit 63 and tell me, what,

 4    if anything, it says about Internet pharmacies?

 5              MR. NOVAK:  Objection.

 6              THE WITNESS:  There is nothing.

 7    BY MR. MATTHEWS:

 8        Q.   Can you look at Exhibit 63 and tell me what,

 9    if anything, it says about physicians?

10              MR. NOVAK:  Objection.

11              THE WITNESS:  There is nothing.

12    BY MR. MATTHEWS:

13        Q.   Can you look at Exhibit 63 and tell me what,

14    if anything, it says about pain clinics?

15              MR. NOVAK:  Objection.

16              THE WITNESS:  There is nothing.

17    BY MR. MATTHEWS:

18        Q.   Can you look at Exhibit 63 and tell me what,

19    if anything, it says about not shipping suspicious

20    orders?

21              MR. NOVAK:  Objection.

22              THE WITNESS:  There is nothing.

23    BY MR. MATTHEWS:

24        Q.   Can you look at Exhibit 36 and tell me what,
```

Highly Confidential - Subject to Further Confidentiality Review

1    if anything, it says about cutting off customers?

2              MR. NOVAK:  Objection.

3              THE WITNESS:  There is nothing.

4    BY MR. MATTHEWS:

5        Q.   Can you look at Exhibit 63 and tell me what,

6    if anything, it says about site inspections?

7              MR. NOVAK:  Objection.

8              THE WITNESS:  There is nothing.

9    BY MR. MATTHEWS:

10       Q.   Can you look at Exhibit 36 and tell me, what,

11   if anything, it says about Google search?

12             MR. NOVAK:  Objection.

13             THE WITNESS:  There is nothing.

14   BY MR. MATTHEWS:

15       Q.   In fact, would you agree with me that

16   Exhibit 63 doesn't contain any of the words that I

17   just asked you about in any of the previous

18   questions?

19             MR. NOVAK:  Objection.

20             THE WITNESS:  Yes.

21   BY MR. MATTHEWS:

22       Q.   Would you also agree with me that Exhibit 62

23   doesn't contain any of the words that I asked you

24   about in the previous questions about that exhibit?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2              MR. NOVAK:  Objection.

3    BY MR. MATTHEWS:

4        Q.    Besides the statute and the regulation, were

5    there other sources of information that you relied

6    upon in thinking about how to meet your obligations

7    under the statute?

8        A.    Sure.

9              MR. NOVAK:  Objection.

10   BY MR. MATTHEWS:

11       Q.    And what were those sources?

12       A.    Local field investigators, industry groups,

13   Department of Health, DEA, numerous different

14   advisors or regulators.

15       Q.    All right.  So have you heard the term

16   "guidance" in relation to your DEA compliance duties?

17       A.    Yes.

18       Q.    How do you understand that term, "guidance,"

19   in that context?

20       A.    A lot of the things you described are

21   guidance mechanisms.  Not necessarily

22   statute-related, but a lot of the things that you

23   have asked me, we have discussed with our local field

24   offices, DEA in Washington, and things along those
```

1    lines.

2         Q.   All right.  When is the first time anyone

3    gave you guidance about Internet pharmacies?

4              MR. NOVAK:  Objection.

5              THE WITNESS:  2005.

6    BY MR. MATTHEWS:

7         Q.   Can you describe what that guidance was and

8    who you got it from?

9         A.   Yes.  We were called to Washington D.C. to

10   meet with Michael Mapes.  Internet pharmacies were

11   apparently a growing problem that they had seen and

12   were -- were watching.  We had some customers that

13   fit that criteria and they wanted to discuss us

14   distributing controlled substances to them.

15        Q.   Okay.  And what was the guidance you

16   received?

17             MR. NOVAK:  Objection.

18             THE WITNESS:  Not to do it.

19   BY MR. MATTHEWS:

20        Q.   Okay.  What did you do after you received

21   that guidance?

22        A.   Immediately stopped doing it.

23        Q.   And by "stopped doing it," what do you mean?

24        A.   We eliminated all of those customers from

Highly Confidential - Subject to Further Confidentiality Review

```
 1     being able to purchase controlled substances from us.

 2         Q.   When is the first time that you received

 3     guidance from any government agency about

 4     distributing opioids to physicians or pain clinic?

 5             MR. NOVAK:  Objection.

 6             THE WITNESS:  At some point 2008, maybe,

 7         Department of Health.

 8     BY MR. MATTHEWS:

 9         Q.   Okay.  What is the Department of Health you

10     are referring to?

11         A.   Florida Department of Health.

12         Q.   And what were the circumstances under which

13     you received that guidance?

14             MR. NOVAK:  Objection.

15             THE WITNESS:  We were called to Tallahassee

16         to specifically discuss a number of growing

17         dispensing practitioners and physicians within

18         the state of Florida itself.

19     BY MR. MATTHEWS:

20         Q.   Okay.  And what did you understand was their

21     view about Internet -- I'm sorry, physicians and pain

22     clinics at that time?

23             MR. NOVAK:  Objection.

24             THE WITNESS:  That it wasn't something that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        we wanted to be involved in.

2   BY MR. MATTHEWS:

3        Q.   And how did Anda respond to receiving that

4   guidance?

5        A.   We discontinued sales to dispensing

6   physicians.  It may have been after 2008 that we were

7   called up there.  I don't -- I don't remember that

8   specifically but . . .

9        Q.   When you say you ceased sales to dispensing

10  physicians, does that category also include pain

11  clinics?

12       A.   Yes.

13       Q.   I didn't ask you this so I want to go back to

14  it.

15            With respect to 62, the United States Code,

16  is there anything in that document about electronic

17  order monitoring systems?

18            MR. NOVAK:  Objection.

19            THE WITNESS:  Yes.  That you have to develop

20  a system.

21  BY MR. MATTHEWS:

22       Q.   Okay.  Can you look at 62, Exhibit 62, and

23  find for us where it says that you are required to

24  develop an electronic order monitoring system?
```

```
 1              MR. NOVAK:  Objection.

 2              THE WITNESS:  Oh, I misunderstood the

 3         question.  It's not -- it doesn't have to be

 4         electronic.

 5    BY MR. MATTHEWS:

 6         Q.   And if you look at Exhibit 63, which is the

 7    code of regulations -- let me just draw your

 8    attention to -- I have to find it; sorry -- Section

 9    1301.74(b).

10              I'll read this to you:  The registrant shall

11    design and operate a system to disclose to the

12    registrant suspicious orders of controlled

13    substances.

14              Did I read that correctly?

15         A.   Yes.

16         Q.   What, if anything, does the regulation say

17    about an electronic order monitoring system?

18              MR. NOVAK:  Objection.

19              THE WITNESS:  It doesn't.

20    BY MR. MATTHEWS:

21         Q.   I want you, if you could, to look back again

22    at Exhibit 57, which was, for shorthand purposes, the

23    Buzzeo report.

24              Do you have that in front of you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Could you turn to Page 1, which is the page

 3   bearing Bates Number Anda Opioids MDL 539142.

 4        A.    Yes.

 5        Q.    I'd like you to read, if you could, into the

 6   record aloud the paragraph that begins "Anda is

 7   secondary."

 8        A.    Anda is a "secondary" drug wholesaler,

 9   meaning that most of their customers purchase

10   controlled substances from other suppliers and order

11   from Anda when they cannot purchase from

12   their "primary" suppliers.  Secondary suppliers have

13   DEA SOM challenges since they do not have a history

14   of interactions with customers or their interaction

15   is sporadic.  The firm is the primary supplier for

16   Publix and the sole secondary supplier for Walgreens.

17        Q.    Is that paragraph accurate in your view?

18        A.    Yes.

19        Q.    Could you explain the peculiar or the

20   particular circumstances that are unique for

21   secondary suppliers in the marketplace?

22        A.    It's a niche for out of stock products,

23   products that are in short supply, things along those

24   lines, as a backup.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    So in terms of ordering patterns from your

 2    customers, what does that mean?

 3        A.    The majority of their orders are sporadic.

 4    There's -- there's not the same consistency as there

 5    would be with their primary supplier.

 6        Q.    And when you say sporadic, do you mean that

 7    they vary in quantity?

 8        A.    It could vary in quantity, specific products.

 9    It doesn't have to be necessarily controlled,

10    noncontrolled.  It could be over the counter.

11        Q.    Do they vary in terms of timing?

12        A.    Yes.

13        Q.    How -- what do you mean by that?

14        A.    It all depends on the situation with their

15    primary supplier.  That kind of dictates when they're

16    going to order something from us and what they're

17    going to order.  It could be a product availability

18    issue.  There's some different circumstances.

19        Q.    So in terms of timing, was it your experience

20    when you were the head of the DEA compliance that

21    customers ordered at random -- often ordered at

22    random intervals?

23        A.    Yeah.

24        Q.    Now I would like you to turn back to what we
```

Highly Confidential - Subject to Further Confidentiality Review

1    marked as Exhibit 63.  And -- which is the Code of

2    Federal Regulations, and I would like for you to read

3    into record the last sentence of Section 1301.74,

4    subparagraph B, which beginning with "Suspicious

5    orders."

6         A.   Suspicious orders include orders of unusual

7    size, orders deviating substantially from a normal

8    pattern, and orders of unusual frequency.

9         Q.   How does that definition of suspicious orders

10   relate to your experience as a compliance -- head of

11   compliance at a secondary supplier of pharmaceutical

12   products?

13             MR. NOVAK:  Objection.

14             THE WITNESS:  Based on that, you could

15        consider every controlled substance order

16        suspicious to a certain extent.

17   BY MR. MATTHEWS:

18        Q.   Right.

19             Now, a lot of the testimony today -- or a lot

20   of the questions you were asked today focused upon

21   the implementation of Anda's electronic order

22   monitoring system.

23             Do you remember those questions?

24        A.   Yes.

1    Q.   I want to clarify something right up front.

2         From time to time, do you refer to your --

3    first of all, let me ask you this:  What is an

4    electronic order monitoring system?

5    A.   It's a system that encompasses multiple

6    facets of data and information.

7    Q.   Is the purpose of an electronic order

8    monitoring system to analyze orders received in real

9    time as they're received electronically?

10   A.   Yes.

11   Q.   And from time to time did you refer to the

12   electronic order monitoring system that Anda put in

13   place as a SOM system?

14   A.   Yes.

15   Q.   In your view, was the electronic order

16   monitoring system the total sum and substance of

17   Anda's suspicious order monitoring system?

18        MR. NOVAK:  Objection.

19        THE WITNESS:  No.

20   BY MR. MATTHEWS:

21   Q.   Could you describe for the record your view

22   of what Anda's system for detecting suspicious orders

23   was in place during the time that you were there?

24   A.   It included collecting customers' information

1    as far as our customer questionnaire is concerned;

2    their licensing; the fact that we were reviewing

3    dispense data; the fact that we were reviewing

4    products; potential doctors that they were even using

5    from a script-filling perspective.

6        Q.    Was there any period of time during your

7    employment at Anda as head of DEA compliance that

8    Anda didn't have in place a system for detecting

9    suspicious orders?

10       A.    No.

11             MR. NOVAK:  Objection.

12   BY MR. MATTHEWS:

13       Q.    What, if any, time while you were employed as

14   DEA compliance head at Anda did Anda not have a

15   system in place for detecting suspicious orders?

16             MR. NOVAK:  Objection.

17             THE WITNESS:  No.

18   BY MR. MATTHEWS:

19       Q.    By that, you mean none?

20       A.    Yeah, none.

21       Q.    Okay.  So one purpose -- when you -- I'll

22   withdraw that.

23             At some point in time, Anda implemented an

24   electronic order monitoring system; is that correct?

```
 1      A.   Yes.

 2      Q.   When was that, to the best of your

 3   recollection?

 4      A.   2007?

 5      Q.   If I -- well, if I say 2011, does that

 6   refresh your recollection?

 7           MR. NOVAK:  Objection.

 8           THE WITNESS:  20 -- yeah, 2010 to 2011.

 9   BY MR. MATTHEWS:

10      Q.   Having refreshed your recollection, what was

11   the period of time that Anda implemented electronic

12   order monitoring system to the best of your

13   recollection?

14      A.   2011.

15      Q.   Okay.  Was the electronic order monitoring

16   system that was implemented designed to detect

17   changes in patterns of ordering by your customers?

18      A.   Yes.

19      Q.   Would you explain, in light of the problems

20   that secondary suppliers have, what problems you had

21   with respect to electronic order monitoring systems?

22      A.   The problems?  Well, we reviewed hundreds of

23   thousands of orders based on customers' purchasing

24   history from us and the fact that we were a secondary
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    supplier.  It was -- the system could create a lot of

 2    false positives.

 3         Q.   There was some testimony earlier today about

 4    the particular algorithm that the system used to flag

 5    orders.

 6              Do you recall that testimony?

 7         A.   Yes.

 8         Q.   Without regard to whatever the algorithm was,

 9    after you implemented the electronic order monitoring

10    system, how many orders approximately were being

11    flagged by the system on a month-to-month basis?

12         A.   I'm not sure.  I don't remember, but it was

13    thousands.

14         Q.   And were all of those orders reviewed by the

15    compliance department?

16         A.   Yes.

17         Q.   And how many of those orders did you

18    determine could be shipped?

19         A.   The majority of them.

20         Q.   And what was the basis on which you made the

21    decision that, although the orders had been flagged

22    by the electronic order monitoring system, they could

23    be shipped?

24         A.   The data that we have collected from the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    customer as far as our customer questionnaire and

 2    dispensing information.

 3         Q.   What was your view of the accuracy of the

 4    electronic order monitoring system in identifying

 5    orders that ultimately were suspicious?

 6         A.   Not very accurate.

 7         Q.   And why?

 8         A.   Because of the volume and the amount of

 9    orders and the sporadic nature of our secondary

10    business model.

11         Q.   And so was that a problem, in your view, that

12    could be fixed by changing the algorithm?

13         A.   I'm not sure.

14         Q.   Given the problems of applying an electronic

15    order monitoring system to the business that Anda was

16    engaged in, what was it you, as head of compliance at

17    DEA, relied upon to be the best evidence or the best

18    method for detecting, identifying, and preventing

19    shipment of orders that you believed were suspicious?

20              MR. NOVAK:  Objection.

21              THE WITNESS:  Say that one again.

22    BY MR. MATTHEWS:

23         Q.   Given the problems --

24         A.   I'm getting really tired.
```

```
 1      Q.   Yeah, I apologize.

 2           Given the problems that you've described in

 3      using the electronic order monitoring system in

 4      connection with a business such as Anda which has

 5      irregular patterns of ordering from its customers

 6      because it's a secondary supplier, what was it you

 7      believed, as head of DEA compliance at Anda, was the

 8      best method for identifying potentially suspicious

 9      orders?

10           MR. NOVAK:  Objection.

11           THE WITNESS:  Reviewing customers' data that

12        was submitted.

13      BY MR. MATTHEWS:

14      Q.   Okay.  I have you testified earlier that --

15      well, let me ask it this way:  What is your best

16      recollection of when you first received guidance from

17      anyone about knowing your customer?

18           MR. NOVAK:  Objection.

19           THE WITNESS:  Maybe 2007.

20      BY MR. MATTHEWS:

21      Q.   Okay.  And from your perspective, what does

22      it mean to know your customer?

23      A.   Having background information on them from a

24      business perspective.  Basically what was outlined in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    our customer questionnaire.

 2        Q.   Does that include information about the mix

 3    of products they dispensed?

 4        A.   Sure.  Percentage of cash business, you know,

 5    versus credit card or insurance, things along those

 6    lines; having a list of primary physicians that they

 7    would dispense for from a script standpoint.

 8             There's a lot of different things in the

 9    customer questionnaire.  I haven't looked at one for

10    several years but . . .

11        Q.   Okay.  After you received that guidance in

12    2007 about knowing your customer, what did you do?

13    What did Anda do?

14        A.   We -- we sent out the first version of our

15    customer questionnaire to all of the customers that

16    we had in our database that were purchasing

17    controlled substances.  I believe in that first

18    version we also asked for dispense data.

19             It wasn't -- it was an evolving process.  The

20    questionnaire is different now than it was -- well,

21    it was different in '16, you know, based on what it

22    was in 2007, but I'm pretty sure that was in there as

23    well.

24        Q.   All right.  There was some testimony earlier
```

```
 1    today about the reports that were called monthly --

 2    or were called excessive order reports and suspicious

 3    order reports that Anda filed with the DEA in some

 4    period of time.

 5           Do you recall that testimony?

 6    A.    Yes.

 7    Q.    Prior to 2005, what feedback did you receive

 8    from DEA about the suspicious order and excessive

 9    order reports you were submitting on a monthly and

10    weekly basis?

11           MR. NOVAK:  Objection.

12           THE WITNESS:  None that I can recall.

13    BY MR. MATTHEWS:

14    Q.    Was there ever a time that they asked you to

15    submit them in a particular format?

16    A.    Yes.  Originally, we were faxing them

17    documents, and they requested at some point -- I'm

18    not sure of the date -- for us to export them in

19    Excel and e-mail it so there was an electronic

20    version of it rather than a faxed paper copy to their

21    fax number.

22    Q.    There were -- sorry.

23           There were a series of questions about

24    e-mails you received from DEA about customers who
```

1    other distributors had ceased doing business with.

2          Do you remember those questions?

3    A.   Yup.

4    Q.   Could you find in your pile of exhibits

5    Exhibit Number 10, please.

6          Do you have it in front of you, Mr. Cochrane?

7    A.   Yes.

8    Q.   Mr. Novak asked you some questions about

9    this.  This is an e-mail chain between you and

10   Mr. Wright at DEA about customers that were cut off,

11   right?

12   A.   Yes.

13   Q.   And just so that I have it correctly, it was

14   a policy of the company to -- what was the policy of

15   the company after -- when it received these kinds of

16   reports?

17   A.   That at this point in time we would -- we

18   would discontinue sales to them as well.

19   Q.   All right.  Can you look at the second page

20   of Exhibit 10, and after the list of doctors, do you

21   see the paragraph beginning "Your company"?

22   A.   Yes.

23   Q.   Could you read that into the record, that

24   paragraph, that sentence into the record?

```
 1      A.    Your company has the right to continue sales

 2   as deemed appropriate, and this notification of

 3   itself does not infer administrative or criminal

 4   proceedings will be initiated based on this

 5   notification alone.

 6      Q.    Was it your understanding that Anda's

 7   decision to terminate sales was voluntary?

 8      A.    Yes.

 9      Q.    If you look at Exhibit 11, please.  That's

10   another series of e-mails between you and the folks

11   at DEA about customers that were cut off, right?

12      A.    Yes.

13      Q.    Does it contain the same statement about your

14   right to continue sales?

15      A.    Yes.

16      Q.    Thank you.

17            Could you take a look at Exhibit 13, please.

18            MS. RIGBERG:  Excuse me.  This is Karen

19      Rigberg.  The live feed with the text has

20      stopped, so could you get closer to the

21      microphone?

22            MR. MATTHEWS:  Everybody had their microphone

23      on their ties or their blouses.

24            MS. RIGBERG:  Okay.  That's pretty close.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  I'm not sure about the live

 2       feed.

 3              THE VIDEOGRAPHER:  Do you want to go off the

 4       record real quick?

 5              MR. MATTHEWS:  Okay.

 6              THE VIDEOGRAPHER:  Off the record at 8:11.

 7          (Recess from 8:11 until 8:14 p.m.)

 8              THE VIDEOGRAPHER:  Back on the video record

 9       at 8:14.

10  BY MR. MATTHEWS:

11       Q.   All right.  Mr. Cochrane, we were looking at

12  Exhibit 13, which is e-mail from Emily Schultz to you

13  describing a meeting with DEA, correct?

14       A.   Yes.

15       Q.   And there's reference there on the first page

16  to an individual named Doug Towle.

17              Do you see that?

18       A.   Yes.

19       Q.   Just so the record the clear, the e-mail is

20  dated December 14th, 2011, correct?

21       A.   Yes.

22       Q.   When did Mr. Towle leave employment at Anda

23  to the extent you remember?

24       A.   Sometime in 2006.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   All right.  Was it -- did you understand

 2   that -- that DEA, in 2011, said that Mr. Towle, while

 3   he was an employee of Anda, did anything to cause the

 4   opioid crisis?

 5        A.   No.

 6        Q.   And he had been gone from Anda for five years

 7   before DEA made these statements, right?

 8        A.   Yes.

 9             MR. NOVAK:  Objection.

10   BY MR. MATTHEWS:

11        Q.   Do you know what Mr. Towle did after he left

12   Anda?

13             MR. NOVAK:  Objection.

14             THE WITNESS:  I'm not sure.

15   BY MR. MATTHEWS:

16        Q.   Did he continue to be in the industry?

17        A.   Yes.  I just don't know where he ended up.

18        Q.   What was your understanding of what he was

19   doing?

20        A.   Yes, he was still within the pharmaceutical

21   industry.

22             MR. NOVAK:  Objection.

23   BY MR. MATTHEWS:

24        Q.   And what was -- in what capacity?  What
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    was --

2        A.    Sales.

3        Q.    -- his responsibility?

4        A.    Sales.

5        Q.    Thank you.

6              Could you look at Exhibit 23.

7              Exhibit 23 is an e-mail dated December 11 --

8    an e-mail chain with an e-mail dated December 11,

9    2007, from Emily Schultz to you, right?

10       A.    Yes.

11       Q.    And Mr. Novak asked you some questions about

12   some language in Exhibit 23 that I want to follow up

13   on.  Specifically, if you look in the middle of the

14   page, there's a sentence in an e-mail from

15   Ms. Schultz to you which says:  Some are good

16   customers.

17             Do you see that?

18       A.    Yes.

19       Q.    What did you understand was meant by the

20   phrase "good customers"?

21       A.    They didn't need to be immediately cut off.

22   They were still looking into them and there was

23   nothing suspicious about them as far as we were

24   concerned.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   Okay.  What, if anything -- I'll withdraw

2    that.  Never mind.

3            Could you turn to what was marked as

4    Exhibit 25, please.

5            Mr. Cochrane, Mr. Novak asked you a series of

6    questions this afternoon about communications between

7    you and DEA and Tracey Hernandez about electronic

8    reports that DEA had asked Anda to submit directly to

9    DEA offices in Washington sometime in 2007.

10           Do you recall that testimony?

11      A.   Yes.

12      Q.   Okay.  Can you explain briefly what DEA asked

13   Anda to submit in that meeting in 2007?

14           MR. NOVAK:  Objection.

15           THE WITNESS:  ARCOS reports on a daily basis

16       for all of our controlled substance transactions.

17   BY MR. MATTHEWS:

18      Q.   Anything else?

19      A.   And suspicious orders.

20      Q.   Okay.

21      A.   In an ARCOS format.

22      Q.   All right.  What's ARCOS?

23      A.   It's a specific format for reporting

24   transactional data that DEA has outlined that's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    basically just a notepad in their specific format,

 2    and it gets uploaded into whatever system they use.

 3         Q.   And what kind of orders are reported in

 4    ARCOS?

 5         A.   Schedule II and some Schedule III

 6    transactions.

 7         Q.   Is --

 8         A.   Sales, receipts, credits.

 9         Q.   And was there any limitation on the number or

10    the transactions that are reported for Schedule II

11    drugs in ARCOS?

12              MR. NOVAK:  Objection.

13              THE WITNESS:  Limitations, no.

14    BY MR. MATTHEWS:

15         Q.   You report everything?

16         A.   For IIs, yes.

17         Q.   And the -- what was the agreement that you

18    reached with DEA about ARCOS reporting in that

19    meeting of 2008?

20         A.   They wanted us to --

21              MR. NOVAK:  Objection.

22              THE WITNESS:  All transactions for all

23         schedules of drugs.

24    ///
```

```
 1    BY MR. MATTHEWS:

 2         Q.    Including Schedule II?

 3         A.    Yeah, and IV and V.

 4         Q.    And to whom were you going to report that?

 5         A.    To headquarters.

 6         Q.    In what kind of format?

 7         A.    In the ARCOS format.

 8         Q.    So electronically?

 9         A.    Yes.

10         Q.    And the same was true with respect to

11    suspicious orders; is that correct?

12         A.    Yes.

13         Q.    Okay.  Just so it's -- I understand it

14    completely, what ARCOS reporting did Anda do while

15    you were employed as head of DEA compliance there?

16         A.    Monthly.

17         Q.    Okay.  And were -- where were those reports

18    made?

19         A.    At our office.

20         Q.    And what was -- no, I mean to whom were the

21    reports made?

22         A.    To headquarters in Washington.

23         Q.    Headquarters of what?

24         A.    DEA.
```

```
 1        Q.   And what was included in those monthly

 2   reports?

 3        A.   Schedule II transactions and some

 4   Schedule III transactions that were reportable.

 5        Q.   Can you recall offhand today what

 6   Schedule III transactions were reported while you

 7   were head of DEA compliance?

 8        A.   Primarily hydrocodone before it became a

 9   Schedule II.

10        Q.   And during a period of time that you were

11   head of DEA compliance, all transactions for

12   Schedule II sales by Anda and all transactions for

13   sales of hydrocodone were reported in an ARCOS format

14   on a monthly basis to DEA?

15        A.   Yes.

16        Q.   Okay.  The meeting with DEA where you reached

17   this tentative agreement to report suspicious orders

18   in all transactions directly on a daily basis to

19   Washington was sometime in 2007 -- in the summer of

20   2007, right?

21        A.   Yes.

22             MR. NOVAK:  Objection.

23   BY MR. MATTHEWS:

24        Q.   And after that, what kind of reporting of
```

```
 1    suspicious orders did Anda do to the field office in

 2    South Florida or in Ohio?

 3         A.   There were none.

 4         Q.   And if you look at Exhibit 25 -- I'm sorry.

 5              Could you look at Exhibit 24, please,

 6    Mr. Cochrane.

 7              If you turn to the fourth page of the exhibit

 8    which bears the Bates Number Anda Opioids MDL 276125,

 9    there's an e-mail on that page from Mr. Wright at DEA

10    to you, right?

11         A.   Yes.

12         Q.   And he's discussing a proposed MOA, right?

13         A.   Yes.

14         Q.   Which is short for memorandum of agreement,

15    right?

16         A.   Yes.

17         Q.   Right.

18              Could you read what Mr. Wright wrote to you

19    in the first paragraph of his e-mail on April 10,

20    2008?

21         A.   I have attached an MOA for you and your firm

22    to review.  This is an agreement between Anda and DEA

23    which protects your firm, particularly from not

24    reporting directly to the field offices.  Please
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    review and send me any questions that you may have.

 2        Q.   What did you understand he meant about

 3    protecting Anda from not reporting directly to the

 4    field offices?

 5        A.   I wasn't a hundred percent sure.  This is the

 6    first I had seen or -- or even been offered something

 7    like this from DEA.

 8        Q.   At the time, was Anda reporting suspicious

 9    orders directly to the field offices?

10        A.   No.

11        Q.   Was it your understanding that DEA had asked

12    Anda to report suspicious orders directly to

13    Washington in lieu of reporting it to the field

14    offices?

15        A.   I don't remember if that's what he meant

16    or -- or that's what he said.

17        Q.   All right.  If you look above that,

18    throughout this chain of e-mails, there's a reference

19    to a suspicious order monitoring system and

20    discussion about whether Anda had one in place,

21    right?

22        A.   Yes.

23        Q.   Is it your view that you had a suspicious

24    order monitoring system in place in April of 2008?
```

```
1        A.    With our 5,000 dosage unit limits and our --

2   beginning the collection of due diligence data, we

3   had something in place, yes.

4        Q.    What about an electronic order monitoring

5   system?  Did you have that in place at that time?

6        A.    No.

7        Q.    If you put -- could you look at Exhibit 25,

8   please.

9        A.    Is the air shut off in here?

10       Q.    Yeah, it may have, and I apologize for that.

11             Exhibit 25 is an e-mail chain between you and

12   Tracey Hernandez of Watson, right?

13       A.    Yes.

14       Q.    And the top e-mail is -- Mr. Novak asked you

15   some questions about this -- a report that

16   Ms. Hernandez gave you about a conversation she had

17   with Mr. Wright at DEA, right?

18             Very first page, first e-mail.

19       A.    Uh-huh.

20       Q.    And if you look in the middle of that first

21   e-mail, you see about five lines down, a sentence

22   that begins "He said we"?

23       A.    Yes.

24       Q.    Could you read that sentence into the record?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    He said we still have the option of supplying

 2   the local office, but they would prefer it to come to

 3   headquarters in an automated format.

 4        Q.    And from reading the e-mail, do you

 5   understand what information Mr. Wright was referring

 6   to in that sentence?

 7        A.    Yes.

 8        Q.    What is it?

 9        A.    Suspicious orders.

10        Q.    Okay.  So does that refresh your recollection

11   about whether at this time the agency had asked Anda

12   to report suspicious orders directly to it in

13   Washington rather than to the field office?

14        A.    Yes.

15        Q.    In the communications we've seen today,

16   there's back and forth about what kind of suspicious

17   order volumes you would have to report at this time.

18              Could you explain what -- what you were

19   concerned about and why you did not believe -- let me

20   withdraw that.

21              Could you explain why you believed that you

22   did not have -- would not have a high volume of

23   suspicious orders to report in April of 2008?

24        A.    We had implemented the 5,000 dosage unit cap
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    per family at the -- at the suggestion of DEA from a

 2    prior meeting.

 3         Q.   Would you turn to Exhibit 35, please.

 4              Before we talk about Exhibit 35 in

 5    particular, Mr. Cochrane, I want to ask a question

 6    generally about compliance -- or the compliance

 7    function at Anda while you were head of DEA

 8    compliance.

 9              What kind of -- while you were head of DEA

10    compliance -- I'll withdraw that.

11              Let's take a look at Exhibit 35.

12              Exhibit 35 is an e-mail chain between you and

13    Howard Davis concerning a customer called Pile Drug

14    Store, right?

15         A.   Yes.

16         Q.   And was there a request made of compliance

17    about sales to Pile Drug Store at this time?

18         A.   Was there a request?

19         Q.   Did somebody ask you to do something?

20         A.   Yeah.  I don't know who.

21         Q.   All right.  Look at the e-mail -- the second

22    e-mail in the chain on the first page of the exhibit.

23              It's an e-mail from Howard Davis --

24         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    -- to Michael Cochrane, right?

2       A.    Yup.

3       Q.    He writes:  Can you please call this guy and

4    talk to him.

5             Do you see that?

6       A.    That's from me to Howard.

7       Q.    I'm sorry.

8             You wrote that?

9       A.    I wrote that to Howard, yes.

10      Q.    And then could you read the next sentence in

11   that e-mail?

12      A.    He reached out to Paul Bisaro.

13      Q.    Who was Paul Bisaro?

14      A.    Paul Bisaro was the CEO of Watson and

15   Actavis.

16      Q.    And that was your -- Anda's parent company at

17   the time, right?

18      A.    Correct.  I believe Al reported directly to

19   him.

20      Q.    Okay.  So Paul Bisaro from the prospective of

21   the management chain was an important person, right?

22      A.    The top guy, yeah.

23      Q.    And, ultimately, what decision did you make

24   notwithstanding that Mr. Bisaro, the CEO of Actavis,

1    was contacted by this customer?

2        A.   That we weren't going to be reinstating his

3    DEA and selling him controlled substances.

4        Q.   How does this exhibit relate to how

5    compliance did its job in relation to pressure from

6    senior management or salespeople that it received

7    during the period of time that you were head of DEA

8    compliance?

9            MR. NOVAK:  Objection.

10           THE WITNESS:  It wasn't influential.

11   BY MR. MATTHEWS:

12       Q.   By that you mean senior management and sales

13   folks did not influence the decisions compliance

14   made?

15       A.   Correct.

16       Q.   If you look at Exhibit 39 -- if you could

17   look at Exhibit 39.

18           Exhibit 39 is the first of several e-mails

19   and exhibits that you were shown by Mr. Novak about a

20   customer called -- known as Lake Erie -- I

21   apologize --

22       A.   Lake Erie Medical.

23       Q.   Lake Erie Medical Supply, I believe, right?

24       A.   Yes.

1    Q.    Do you remember that testimony?

2    A.    Yes.

3    Q.    Just so it's clear on the record, what kind

4  of customer was Lake Erie?

5    A.    I believe they were a repackager, yes.

6    Q.    All right.

7          And these e-mails were from 2008 but continue

8  on through, I think, as long as -- as late as 2010,

9  right?

10   A.    I think so.

11   Q.    Beginning of 2011, if you look at Exhibit 43.

12   A.    Yes.

13   Q.    So how many repackagers did Anda have a sales

14 relationship with after 2010, if you recall?

15   A.    In one of these e-mails, it referenced two

16 either repackagers or distributors that were active

17 customers.

18   Q.    What was it about Lake Erie that caused

19 Anda -- what information about Lake Erie did you know

20 that caused you to continue to sell controlled

21 substances to Lake Erie into 2011?

22   A.    We -- we had to have had a questionnaire,

23 policies and procedures that they had in place, they

24 were giving us copies -- or they were giving us

```
 1    updated listings of all their new customers, as I

 2    read some of the other e-mails that we talked about

 3    earlier.

 4         Q.   If you look at this Exhibit 39, it includes a

 5    copy of a letter from a special agent in the Detroit

 6    field office of the Drug Enforcement Administration

 7    to Lake Erie, right?

 8         A.   Uh-huh.

 9         Q.   So you were fully informed of this letter,

10    right?

11         A.   Yes.

12         Q.   Are you aware of whether Lake Erie ever had

13    its status as a registrant -- let me ask you this:

14    Do you know whether the DEA instituted an enforcement

15    action against Lake Erie at any time after 2008

16    through 2011?

17         A.   No.

18         Q.   What information about the status of the --

19              (Telephone interruption.)

20              MR. MATTHEWS:  Excuse me a second.  Can we go

21         off the record.

22              THE VIDEOGRAPHER:  Off the record at 8:38.

23              (Recess from 8:38 until 8:39 p.m.)

24              THE VIDEOGRAPHER:  Back on the record at
```

```
 1        8:39.

 2   BY MR. MATTHEWS:

 3        Q.   Could you look at Exhibit 46?

 4             Exhibit 46 is the letter of admonition from

 5   Mark Trouville, special agent in charge of the Drug

 6   Enforcement Administration, to Al Paonessa at Anda.

 7             Do you see that?

 8        A.   Yes.

 9        Q.   And there is a section of that that concerns

10   what DEA characterizes as a "failure to report to DEA

11   suspicious orders."

12             Correct?

13        A.   Yes.

14        Q.   And if you turn to the second page, could you

15   read into the record the paragraph that begins

16   "Analysis"?

17        A.   Analysis of Anda's distributions of oxycodone

18   during 2009 and 2010 reveal substantially significant

19   sales to numerous customers which consistently met

20   and exceeded 5,000 dosage units per month.

21        Q.   What was your understanding from DEA as to

22   the basis for its conclusion that it believed that

23   "Anda had failed to report to DEA suspicious orders"?

24             MR. NOVAK:   Objection.
```

```
1              THE WITNESS:  I don't -- say it again.

2   BY MR. MATTHEWS:

3      Q.   Was the paragraph that you just read into the

4   record, you understood, was the basis for DEA's

5   conclusion in its view that Anda had "failed to

6   report to DEA suspicious orders"?

7              MR. NOVAK:  Objection.

8              THE WITNESS:  Yes.

9   BY MR. MATTHEWS:

10     Q.   Okay.  Just so the record is clear, I'm going

11  to ask the question again.

12             What was your understanding of DEA's basis

13  for concluding that Anda had, in DEA's view, failed

14  to report to DEA suspicious orders?

15             MR. NOVAK:  Objection.

16             THE WITNESS:  That we were selling more than

17      5,000 dosage units per month to some customers.

18  BY MR. MATTHEWS:

19     Q.   Okay.  Was there any other basis that they

20  ever told you of?

21             MR. NOVAK:  Objection.

22             THE WITNESS:  No.

23  BY MR. MATTHEWS:

24     Q.   Was that something you had discussed with
```

1    agents at DEA on multiple occasions between 2007 and

2    2011?

3              MR. NOVAK:  Objection.

4              THE WITNESS:  Yes.

5    BY MR. MATTHEWS:

6         Q.   Was DEA, from your perspective -- what -- was

7    DEA, from your perspective, aware of the fact that

8    you were selling volumes of oxycodone in excess of

9    5,000 dosage units per month to certain customers

10   during this time period?

11        A.   Yes.

12             MR. NOVAK:  Objection.

13   BY MR. MATTHEWS:

14        Q.   When you met with DEA about this letter,

15   did -- or at any time before you received this

16   letter, did any agent of DEA ever actually identify

17   any specific order that DEA believed was a suspicious

18   order?

19        A.   No.

20             MR. NOVAK:  Objection.

21   BY MR. MATTHEWS:

22        Q.   During a period of time between the 2010

23   inspection and this 2011 order, what orders, if any,

24   did DEA identify to you as specific orders which it

Highly Confidential - Subject to Further Confidentiality Review

1   believed were suspicious that Anda had failed to

2   report?

3           MR. NOVAK:  Objection.

4           THE WITNESS:  None.

5   BY MR. MATTHEWS:

6       Q.   Could you look at Exhibit 52, please.

7           Before I move on, while you were head of DEA,

8   what, if any, enforcement actions did DEA bring

9   against Anda in connection with your DEA compliance?

10      A.   None.

11      Q.   While you were head of compliance at Anda,

12  what, if any, suspension orders did DEA issue to Anda

13  in connection with your DEA compliance?

14      A.   None.

15      Q.   While you were head of DEA compliance at

16  Anda, was there any period of time when your license

17  and your registration to distribute controlled

18  substances was withdrawn by DEA or by any enforcement

19  action?

20      A.   No.

21      Q.   Looking at Exhibit 52, Mr. Novak asked you

22  about this.

23          This is a series of e-mails between you and

24  Tracey Hernandez in 2007.  And it includes a draft

```
 1    e-mail that you prepared for the sales force at Anda

 2    about the decrease -- or the changes in limits you

 3    were about to impose --

 4         A.   Yes.

 5         Q.   -- on customers, right?

 6         A.   Yes.

 7         Q.   And you wrote in your draft e-mail to the

 8    salespeople:  Overselling of controlled substances

 9    must stop.

10              Right?

11         A.   Yes.

12         Q.   Is there a difference between filling an

13    order and selling to customers?

14         A.   No.

15         Q.   Let me ask you this:  Do the salespeople have

16    the ability to make decisions about whether an order

17    is filled --

18         A.   No.

19         Q.   -- of controlled substances?

20         A.   No.

21         Q.   In your view, while you were head of DEA

22    compliance at Anda, were -- were the salespeople that

23    you dealt with sometimes aggressive in selling

24    product?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Sure.

 2        Q.    Okay.  When you wrote overselling must cease,

 3   did you mean that Anda had been overfilling

 4   prescriptions at that time?

 5              MR. NOVAK:  Objection.

 6              THE WITNESS:  We weren't filling scripts.  We

 7         were filling orders for pharmacies that were

 8         filling scripts.

 9   BY MR. MATTHEWS:

10        Q.    Well, in 2007 when you wrote that e-mail,

11   were you suggesting that the compliance department

12   was over-approving orders for controlled substances?

13        A.    No.

14        Q.    Would you take a look at Exhibit 56, please.

15              Exhibit 56 is a series of e-mails between you

16   and Sabrina Solis.  And on the first page of

17   Exhibit 56, there's an e-mail from Ms. Solis to you

18   talking about a customer's profile, right?

19        A.    Yes.

20        Q.    And she lists in this e-mail the customer's

21   top ten drug products, right?

22        A.    Yes.

23        Q.    At the time in June 14, 2012, was this

24   customer authorized to receive -- to purchase
```

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances from Anda?

2        A.   Yes, I believe so.

3        Q.   Look about your e-mail to her.

4        A.   Oh.

5        Q.   You wrote:  I think we should turn them back

6    on.

7             Do you see that?

8        A.   Yes, I do.

9        Q.   Does that refresh your recollection as to

10   whether this customer was authorized to receive

11   controlled substances from Anda in June 2012?

12       A.   Yeah, I don't think they were.

13       Q.   Okay.  So the data that's described in that,

14   is that -- does that data represent sales made by

15   Anda to this customer or is it something else?

16       A.   No.  It's --

17            MR. NOVAK:  Objection.

18            THE WITNESS:  No, it's sales by any other

19       distributor.  It's not specific to Anda.

20   BY MR. MATTHEWS:

21       Q.   Okay.  Just to clean up the record, what does

22   the sales data included in the first page of

23   Exhibit 56 refer to?

24       A.   These are the number of dosage units that

1    they dispensed in a specific month.

2        Q.   Do you know from whom those products were

3    obtained by this customer at that time?

4        A.   Could have been Anda.  It could have been

5    someone else.  I don't know.

6        Q.   Were they authorized to purchase products

7    from Anda at this time -- controlled substance

8    products at this time?

9        A.   No.  They were trying to have their license

10   -- they were trying to be reinstated.

11       Q.   So would that data reflect sales made by

12   Anda?

13       A.   Potentially not, no.

14       Q.   All right.  The time is 8:50 p.m.

15            What time did you wake up this morning,

16   Mr. Cochrane?

17       A.   5:15.

18       Q.   I appreciate your willingness to testify at

19   length.  At this time I don't have any further

20   questions for you.  Thank you.

21            THE VIDEOGRAPHER:  The time is 8:49 p.m.  We

22       are going off the record.  This marks the end of

23       the deposition -- sorry.

24            MR. NOVAK:  The protocol in this case gives

Highly Confidential - Subject to Further Confidentiality Review

```
1        me an opportunity to requestion.  I don't think I

2        have much, if anything.  I just want to confer

3        with my colleagues for a minute.

4             (Recess from 8:49 until 8:53 p.m.)

5             THE VIDEOGRAPHER:  The time is 8:53.  We are

6        now back on the record.

7             MR. NOVAK:  I'm going to try to keep this

8        short.

9                    REDIRECT EXAMINATION

10   BY MR. NOVAK:

11       Q.   But, Mr. Cochrane, you were asked some

12   questions by Mr. Matthews regarding Anda's

13   implementation of its monitoring programs during the

14   time period you were a compliance manager.

15            You are aware of instances where Anda did not

16   follow its own procedures as it related to screening

17   of customers for the sale of controlled substances,

18   are you not?

19            MR. MATTHEWS:  Objection.  Outside the scope.

20            THE WITNESS:  Specifically?

21   BY MR. NOVAK:

22       Q.   For example, instances where you approved

23   sales to controlled -- of controlled substances to

24   customers without having dispense data that would be
```

1    called for in your own protocols?

2         A.   We didn't start collecting dispense data

3    until 2007, and we had existing customers that were

4    buying controlled substances from us prior to that

5    and after 2007, yes.

6         Q.   And in addition to not having dispensing data

7    for some of those customers, you did not have

8    customer questionnaires for all the customers that

9    you provided controlled substances to after 2007, did

10   you?

11              MR. MATTHEWS:  Objection.

12              THE WITNESS:  Correct.

13              MR. NOVAK:  Okay.  That's all I have.

14              THE VIDEOGRAPHER:  The time is 8:54 p.m.

15         This marks the end of the deposition.  We are now

16         off the record.

17              (Whereupon, the deposition concluded at

18   8:54 p.m.)

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of MICHAEL COCHRANE was duly

 7    taken on January 15, 2019, at 9:11 a.m. before me.

 8          The said MICHAEL COCHRANE was duly sworn by

 9    me according to law to tell the truth, the whole

10    truth and nothing but the truth and thereupon did

11    testify as set forth in the above transcript of

12    testimony.  The testimony was taken down

13    stenographically by me.  I do further certify that

14    the above deposition is full, complete, and a true

15    record of all the testimony given by the said

16    witness.

17

18          _____

19          KELLY J. LAWTON, RPR, LCR, CCR

20

21          (The foregoing certification of this

22    transcript does not apply to any reproduction of the

23    same by any means, unless under the direct control

24    and/or supervision of the certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5   and make any necessary corrections.  You should state

 6   the reason in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty

14   (30) days of receipt of the deposition transcript by

15   you.  If you fail to do so, the deposition transcript

16   may be deemed to be accurate and may be used in

17   court.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                - - - - - -

 2                E R R A T A

 3                - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON: _____

 7    _____   _____   _____

 8       REASON: _____

 9    _____   _____   _____

10       REASON: _____

11    _____   _____   _____

12       REASON: _____

13    _____   _____   _____

14       REASON: _____

15    _____   _____   _____

16       REASON: _____

17    _____   _____   _____

18       REASON: _____

19    _____   _____   _____

20       REASON: _____

21    _____   _____   _____

22       REASON: _____

23    _____   _____   _____

24       REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, MICHAEL COCHRANE, do hereby acknowledge

 4      that I have read the foregoing pages, 1 to 327, and

 5      that the same is a correct transcription of the

 6      answers given by me to the questions therein

 7      propounded, except for the corrections or changes in

 8      form or substance, if any, noted in the attached

 9      Errata Sheet.

10

11

12     _____     _____

13     MICHAEL COCHRANE                                   DATE

14

15

16

17

18      Subscribed and sworn to before me this

19      ____ day of _____, 20____.

20      My Commission expires: _____

21

22     _____

        Notary Public

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                          LAWYER'S NOTES

2      PAGE    LINE

3      _____   _____   _____

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```