Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3  IN RE NATIONAL PRESCRIPTION   |   MDL No. 2804
                                  |
 4  OPIATE LITIGATION             |   Case No. 17-MD-2804
                                  |
 5  This Document Relates to:     |   Hon. Dan A. Polster
                                  |
 6  The County of Summit, Ohio,   |
    et al., v.                    |
 7  Purdue Pharma L.P., et al.    |
    Case No. 17-op-45004          |
 8                                |
    The County of Cuyahoga v.     |
 9  Purdue Pharma L.P., et al.    |
    Case No. 18-op-45090          |
10                                |
    City of Cleveland, Ohio v.    |
11  Purdue Pharma L.P., et al.    |
    Case No. 18-op-45132          |
12                                |
13
                  THURSDAY, JANUARY 24, 2019
14
                          - - -
15
           HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                  CONFIDENTIALITY REVIEW
17
                          - - -
18
            Videotaped deposition of PATRICK COCHRANE,
19      held at Foley & Lardner LLP, One Biscayne Tower,
        2 Biscayne Boulevard, Suite 1900, Miami, Florida,
20      commencing at 9:13 a.m., on the above date,
        before Kelly J. Lawton, Registered Professional
21      Reporter, Licensed Court Reporter, Certified
        Court Reporter.
22                        - - -
23              GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

```
 1    APPEARANCES:
 2        WEITZ & LUXENBERG, P.C.
          BY:  PAUL NOVAK, ESQUIRE
 3        3011 West Grand Boulevard, Suite 2150
          Detroit, Michigan 48202
 4        (313) 800-4170
          pnovak@weitzlux.com
 5        Representing the Plaintiffs
 6
 7        FOLEY & LARDNER LLP
          BY:  JAMES W. MATTHEWS, ESQUIRE
 8            GRAHAM D. WELCH, ESQUIRE
          111 Huntington Avenue
 9        Boston, Massachusetts 02199
          (617) 342-4000
10        jmatthews@foley.com
          gwelch@foley.com
11        Representing Anda, Inc., and the witness
12
13        REED SMITH LLP
          BY:  M. CRISTINA CÁRDENAS, ESQUIRE
14        1001 Brickell Bay Drive, Suite 900
          Miami, Florida 33131
15        (786) 747-0207
          ccardenas@reedsmith.com
16        Representing AmerisourceBergen Corporation and
          AmerisourceBergen Drug Corporation
17
18        ARNOLD & PORTER KAYE SCHOLER, LLP
          BY:  ELISEO R. PUIG, ESQUIRE
19        370 Seventeenth Street, Suite 4400
          Denver, Colorado 80202
20        (303) 863-2373
          eliseo.puig@arnoldporter.com
21        Representing Endo Health Solutions Inc., Endo
          Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
22        Par Pharmaceutical Companies, Inc.,
          (f/k/a Par Pharmaceutical Holdings, Inc.)
23
24
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2    WEITZ & LUXENBERG, P.C.
      BY:  TIFFANY ELLIS, ESQUIRE
 3    3011 West Grand Boulevard, Suite 2150
      Detroit, Michigan 48202
 4    (313) 800-4170
      tellis@weitzlux.com
 5    Representing the Plaintiffs
 6

      JONES DAY
 7    BY:  PAIGE E. ZIELINSKI, ESQUIRE
      555 California Street, 26th Floor
 8    San Francisco, California 94104
      (415) 875-5788
 9    pzielinski@jonesday.com
      Representing Walmart
10

11    COVINGTON & BURLING LLP
      BY:  RYAN R. ROBERTS, ESQUIRE
12    3000 El Camino Real
      5 Palo Alto Square, 10th Floor
13    Palo Alto, CA 94306-2112
      (650) 632-4700
14    rroberts@cov.com
      Representing McKesson Corporation
15

16    KIRKLAND & ELLIS, LLP
      BY:  TUCKER HUNTER, ESQUIRE
17    300 North LaSalle Drive
      Chicago, Illinois 60654
18    (312) 862-2000
      tucker.hunter@kirkland.com
19    Representing Allergan Finance LLC
20

      TUCKER ELLIS LLP
21    BY:  JAMES R. SHULTZ, ESQUIRE
      233 South Wacker Drive, Suite 6950
22    Chicago, Illinois 60606
      jay.shultz@tuckerellis.com
23    Representing Janssen and Johnson & Johnson
24
```

```
 1    ALSO PRESENT:

 2       ANTHONY BARBARO, Videographer

 3       MICHAEL PIGGINS, Weitz & Luxenberg

 4       CASSANDRA SUDER, Weitz & Luxenberg

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                       - - -
 2                    I N D E X
 3                       - - -
 4   Testimony of:  PATRICK COCHRANE              PAGE
 5       DIRECT EXAMINATION BY MR. NOVAK...............  13
 6       CROSS-EXAMINATION BY MR. MATTHEWS............. 251
 7
 8
 9                   E X H I B I T S
10              (Attached to Transcript)
11    PATRICK COCHRANE DEPOSITION EXHIBITS           PAGE
12   Anda-Cochrane   Notice of Videotaped 30(b)(6)      14
     Exhibit 1       Deposition of Anda
13
     Anda-Cochrane   Defendant Anda, Inc.'s             74
14   Exhibit 2       Supplemental Response to
                     Plaintiffs' (First) Combined
15                   Discovery Requests to Distributor
                     Defendants
16
     Anda-Cochrane   OPS-028-00 - Standard Operating    77
17   Exhibit 3       Procedure - Information Needed to
                     Set Up a New Account - Bates
18                   Numbered
                     Anda_Opioids_MDL_0000271410 to
19                   Anda_Opioids_MDL_0000271411
20   Anda-Cochrane   Anda, Inc. Standard Operating      79
     Exhibit 4       Procedure - SOP #28 - Customer Due
21                   Diligence - Bates Numbered
                     Anda_Opioids_MDL_0000144398 to
22                   Anda_Opioids_MDL_0000144401
23
24
```

```
 1                  E X H I B I T S
 2    PATRICK COCHRANE DEPOSITION EXHIBITS           PAGE
 3   Anda-Cochrane   Anda, Inc. - Standard Operating   81
     Exhibit 5       Procedure - SOP 040- Suspicious
 4                   Order Monitoring - Bates Numbered
                     Anda_Opioids_MDL_0000144378 to
 5                   Anda_Opioids_MDL_0000144380
 6   Anda-Cochrane   E-mail and Attachment from Michael  82
     Exhibit 6       Cochrane to Al Paonessa - Subject:
 7                   Rough Draft - Bates Numbered
                     Anda_Opioids_MDL_0000276962 to
 8                   Anda_Opioids_MDL_0000276964
 9   Anda-Cochrane   June 22, 2010 E-mail and           94
     Exhibit 7       Attachment - Subject:  DEA Meeting
10                   - Bates Numbered
                     Anda_Opioids_MDL_0000281704 to
11                   Anda_Opioids_MDL_0000281706
12   Anda-Cochrane   July 14, 2010 E-mails and          95
     Exhibit 8       Attachments - Subject:  Discussion
13                   Strategy Document - Bates Numbered
                     Anda_Opioids_MDL_0000408116 to
14                   Anda_Opioids_MDL_0000408119
15   Anda-Cochrane   Standard Operating Procedure -    116
     Exhibit 9       OPS-035-01 - Bates Numbered
16                   Anda_Opioids_MDL_0000277385 to
                     Anda_Opioids_MDL_0000277386
17
     Anda-Cochrane   Standard Operating Procedure -    123
18   Exhibit 10      OPS-028-03 - Bates Numbered
                     Anda_Opioids_MDL_0000277387 to
19                   Anda_Opioids_MDL_0000277389
20   Anda-Cochrane   December 13, 2011 E-mail and      126
     Exhibit 11      Attachment - Subject:  Anda's DEA
21                   Inspection - Requested Information
                     - Urgent - Bates Numbered
22                   Anda_Opioids_MDL_0000112251 to
                     Anda_Opioids_MDL_0000112259
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   E X H I B I T S
 2    PATRICK COCHRANE DEPOSITION EXHIBITS          PAGE
 3   Anda-Cochrane   Anda, Inc. Standard Operating   130
     Exhibit 12      Procedure - Information Needed to
 4                   Set-up a New Account - Bates
                     Numbered
 5                   Anda_Opioids_MDL_000084434 to
                     Anda_Opioids_MDL_000084437
 6
     Anda-Cochrane   Anda, Inc. Standard Operating   134
 7   Exhibit 13      Procedure - Information Needed to
                     Set-up a New Account - Bates
 8                   Numbered
                     Anda_Opioids_MDL_000036519 to
 9                   Anda_Opioids_MDL_000036521
10   Anda-Cochrane   Anda, Inc. Standard Operating   135
     Exhibit 14      Procedure - Customer Due Diligence
11                   - Bates Numbered
                     Anda_Opioids_MDL_000398204 to
12                   Anda_Opioids_MDL_000398207
13   Anda-Cochrane   September 9, 2016 E-mail and      136
     Exhibit 15      Attachment - Subject:  Current
14                   Suspicious Order SOPs - Bates
                     Numbered
15                   Anda_Opioids_MDL_000527935 to
                     Anda_Opioids_MDL_000527938
16
     Anda-Cochrane   E-mail Chain - Subject:  Anda,   145
17   Exhibit 16      Inc. (Corporate) - 1st P&P Review
                     Report - Bates Numbered
18                   Anda_Opioids_MDL_000140430 to
                     Anda_Opioids_MDL_000140497
19
     Anda-Cochrane   February 7, 2007 Letter from U.S. 146
20   Exhibit 17      Department of Justice Drug
                     Enforcement Administration - Bates
21                   Numbered
                     Anda_Opioids_MDL_000571720 to
22                   Anda_Opioids_MDL_000571723
23
24
```

```
 1                    E X H I B I T S
 2     PATRICK COCHRANE DEPOSITION EXHIBITS          PAGE
 3   Anda-Cochrane   December 27, 2007 Letter from U.S.  147
     Exhibit 18      Department of Justice Drug
 4                   Enforcement Administration - Bates
                     Numbered
 5                   Anda_Opioids_MDL_000276156 to
                     Anda_Opioids_MDL_000276157
 6
     Anda-Cochrane   May 4, 2012 E-mail and Attachment   150
 7   Exhibit 19      - Mallinckrodt CDA - Bates
                     Numbered
 8                   Anda_Opioids_MDL_001222751 to
                     Anda_Opioids_MDL_001222758
 9
     Anda-Cochrane   E-mail Chain - Subject:  Rite Aid   153
10   Exhibit 20      - Bates Numbered
                     Anda_Opioids_MDL_000086344 to
11                   Anda_Opioids_MDL_000086345
12   Anda-Cochrane   March 7, 2012 E-mail and            165
     Exhibit 21      Attachment - Subject:  RA - Top
13                   100 Products for Top 100 Stores
                     Review (Combined with Misc Random
14                   Research) - Bates Numbered
                     Anda_Opioids_MDL_0000081549 to
15                   Anda_Opioids_MDL_0000081587
16   Anda-Cochrane   Spreadsheet - Bates Numbered        177
     Exhibit 22      Anda_Opioids_MDL_0000993524
17
     Anda-Cochrane   June 15, 2010 E-mails and           185
18   Exhibit 23      Attachment - Subject:  Scanned
                     Image from MX-5500N - Bates
19                   Numbered
                     Anda_Opioids_MDL_0000281678 to
20                   Anda_Opioids_MDL_0000281680
21   Anda-Cochrane   June 17, 2010 E-mail - Subject:     188
     Exhibit 24      Mass Update Customer Master # -
22                   Bates Numbered
                     Anda_Opioids_MDL_0000281703
23
24
```

```
 1                    E X H I B I T S
 2     PATRICK COCHRANE DEPOSITION EXHIBITS              PAGE
 3   Anda-Cochrane    July 13, 2010 E-mail and           191
     Exhibit 25       Attachment - Subject:  Continuing
 4                    Education Documents - Controlled
                      Substances - Bates Numbered
 5                    Anda_Opioids_MDL_0000104946 to
                      Anda_Opioids_MDL_0000104960
 6
     Anda-Cochrane    E-mail Chain - Subject:            203
 7   Exhibit 26       Suspicious Customer's Cut Off -
                      Bates Numbered
 8                    Anda_Opioids_MDL_0000134998
 9   Anda-Cochrane    May 10, 2011 E-mail - Subject:     205
     Exhibit 27       Customer Cut Off - Bates Numbered
10                    Anda_Opioids_MDL_0000286549
11   Anda-Cochrane    E-mail Chain - Subject: 2Record    208
     Exhibit 28       Request - Bates Numbered
12                    Anda_Opioids_MDL_0000105695 to
                      Anda_Opioids_MDL_0000105698
13
     Anda-Cochrane    E-mail Chain and Attachment -      212
14   Exhibit 29       Subject:  2Record Request - Bates
                      Numbered
15                    Anda_Opioids_MDL_0000086181 to
                      Anda_Opioids_MDL_0000086233
16
     Anda-Cochrane    Defendant Anda, Inc.'s Second      216
17   Exhibit 30       Supplemental Response to
                      Plaintiffs' (First) Combined
18                    Discovery Requests to Distributor
                      Defendants
19
     Anda-Cochrane    2007 Standard Operating Procedures 250
20   Exhibit 31       (SOP) for Anda Pharmacy, AndaMeds,
                      and VIP Commissioned Employees
21                    Compensation - Bates Numbered
                      Anda_Temporary_Compensation_001 to
22                    Anda_Temporary_Compensation_072
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1                   E X H I B I T S

  2    PATRICK COCHRANE DEPOSITION EXHIBITS           PAGE

  3   Anda-Cochrane  July 31, 2007 E-mail - Subject:    252
      Exhibit 32     DEA Teleconference Re:  CS
  4                  Distribution/Anda - Bates Numbered
                     Anda_Opioids_MDL_0000275627
  5
      Anda-Cochrane  E-mail Chain and Attachment -      255
  6   Exhibit 33     Subject:  Final Questionnaire and
                     Cover Letter - Bates Numbered
  7                  Anda_Opioids_MDL_0000275445 to
                     Anda_Opioids_MDL_0000275455
  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  - - -

 2           THE VIDEOGRAPHER:  We are now on the record.

 3      My name is Anthony Barbaro.  I'm a videographer

 4      for Golkow Litigation Services.  Today's date is

 5      January 24th, 2019, and the time is 9:13 a.m.

 6           This video deposition is being held at

 7      2 South Biscayne Boulevard, Suite 1900, Miami,

 8      Florida 33131, in Re:  National Prescription

 9      Opioid Litigation for the United States District

10      Court, Northern District of Ohio, Eastern

11      Division.  The deponent is Patrick Cochrane.

12           And, counsel, would you please identify

13      yourselves.

14           MR. NOVAK:  Paul Novak and Michael Piggins,

15      both of Weitz & Luxenberg, on behalf of the

16      plaintiffs.

17           MR. MATTHEWS:  James Matthews for the

18      defendant Anda.

19           MR. WELCH:  Graham Welch for the defendant

20      Anda.

21           MR. PUIG:  Eliseo Puig, Arnold & Porter, for

22      the Endo & Par entities.

23           MS. CARDENAS:  Cristina Cardenas for

24      AmerisourceBergen.
```

```
 1              THE VIDEOGRAPHER:  Counsel on the phone,

 2      please identify.

 3              MR. SHULTZ:  James Shultz at Tucker Ellis for

 4      Johnson & Johnson.

 5              MR. ROBERTS:  Ryan Roberts of Covington &

 6      Burling on behalf of McKesson.

 7              MR. HUNTER:  Tucker Hunter from Kirkland &

 8      Ellis on behalf of Allergan Finance, LLC.

 9              MS. ZIELINSKI:  Paige Zielinski from Jones

10      Day on behalf of Walmart.

11              THE VIDEOGRAPHER:  The court reporter is

12      Kelly Lawton, and she will now swear in the

13      witness.

14              THE COURT REPORTER:  Sir, would you please

15      raise your right hand.

16              Do you swear or affirm the testimony you're

17      about to give will be the truth, the whole truth,

18      and nothing but the truth?

19              THE WITNESS:  I do.

20              THE COURT REPORTER:  Thank you.

21              PATRICK COCHRANE, called as a witness by the

22      Plaintiffs, having been first duly sworn, testified

23      as follows:

24      ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      DIRECT EXAMINATION

 2    BY MR. NOVAK:

 3         Q.   Good morning, Mr. Cochrane.  Can you provide

 4    your full name and address for the record?
```

███    ███    ████████████████    ████████████

███    ███████████████████████

```
 7         Q.   Okay.  Can you briefly describe for me --

 8    well, let's start with your present position at Anda.

 9         A.   My present position at Anda is vice president

10    of operations and logistics.

11         Q.   And can you provide to me a listing of your

12    responsibilities as vice president --

13         A.   Sure.

14         Q.   -- of operations and logistics?

15         A.   So the main responsibilities are distribution

16    and compliance.  I also lead the customer service

17    group, the project management office, and I serve as

18    a liaison for our parent company's activities related

19    to security and facilities management.

20         Q.   Okay.  I'd like to start with your initial

21    employment at Anda and work forward.

22              MR. MATTHEWS:  Can I just interrupt and

23         object.  Can we get on the record that today is

24         the 30(b)(6) deposition of Anda, not the personal
```

Highly Confidential - Subject to Further Confidentiality Review

1          deposition of Mr. Cochrane so it's clear.

2              MR. NOVAK:  Yes.  And that's fine.

3              We have marked for identification Deposition

4          Exhibit 1, which is the Notice of Videotaped

5          30(b)(6) Deposition of Anda.

6              (Anda Exhibit 1 was marked for

7      identification.)

8      BY MR. NOVAK:

9          Q.   Mr. Cochrane, have you seen the notice of

10     videotaped deposition prior to today?

11         A.   No.

12         Q.   Okay.  You understand that there are certain

13     topics that have been designated for which you have

14     been designated by the company to appear and provide

15     testimony?

16         A.   Yes.

17         Q.   And that you're providing that testimony on

18     behalf of Anda?

19         A.   Yes.

20         Q.   Okay.

21         A.   Quick clarification.

22              I had not seen these first two pages.  This

23     first notice, I had seen; and this second notice

24     piece, I had seen.

```
1      Q.   Okay.  What did you do for purposes of

2   preparing to testify today?

3      A.   We reviewed two to three dozen documents in

4   addition to discussions about my 24-year career at

5   Anda.

6      Q.   When you say -- when you say that "we"

7   reviewed, who was the "we" to whom you were

8   referring?

9      A.   James Graham.

10     Q.   Have you had, for purposes of preparing to

11  testify today, discussions with other Anda employees?

12     A.   No.

13     Q.   Okay.  In addition to the two to three dozen

14  documents that you have identified, have you accessed

15  any of the company's computer systems or files?

16     A.   Sure.

17     Q.   And -- and which of those systems did you

18  access for purposes of preparation for the

19  deposition?

20     A.   E-mail and Anda's system of record, which is

21  TPS.

22     Q.   Okay.  As to the e-mail that you are

23  referencing, that's in addition to the two to three

24  dozen documents that you reviewed?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.   Inclusive.

 2        Q.    Okay.  Is that e-mail, to your knowledge,

 3   that has been produced in the litigation?

 4        A.    Yes.

 5        Q.    Okay.  As to the TPS system, what is it that

 6   you reviewed on the TPS -- well, we'll start with a

 7   more fundamental question.

 8              Can you provide for the record an explanation

 9   of what the TPS system at Anda is?

10        A.    TPS is our warehouse management call,

11   resource management, order entry system, purchasing

12   system.  It's the backbone of our company.

13        Q.    Okay.  And what types of information are

14   maintained in Anda's TPS system?

15        A.    Inventory, sales, all transactions.

16        Q.    Okay.  Is there compliance information that

17   is also maintained within that system?

18        A.    Yes, there is.

19        Q.    Okay.  What was it within the TPS system that

20   you reviewed for purposes of preparing for today's

21   deposition?

22        A.    Customer transaction history.

23        Q.    Can you describe for me within the TPS system

24   what customer transaction history is?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   What transaction history is?

 2      Q.   Yes.

 3      A.   Orders, line items, items, quantities, DEA

 4   numbers, registration numbers, customer name,

 5   address.

 6      Q.   Are limits that are placed upon a customer's

 7   ability to order controlled substances also

 8   maintained in the TPS system?

 9      A.   Yes, they are.

10      Q.   And is that part of what you reviewed for

11   purposes of preparing for today's deposition?

12      A.   No, it's not.

13      Q.   Okay.  Are histories with respect to

14   modification of control limits contained within the

15   TPS system?

16           MR. MATTHEWS:  Objection.

17           THE WITNESS:  No.

18   BY MR. NOVAK:

19      Q.   Okay.  Now, just to get a context, can you

20   provide a description of the different positions that

21   you have held with Anda over the time that you have

22   been employed with the company?

23      A.   Sure.  Start at the beginning or the end?

24      Q.   The beginning.
```

```
 1        A.    1995, I was hired as a warehouse operator.

 2   Late '95 or early '96, I was promoted to a warehouse

 3   lead person.  In '98 or '99, I was moved to oversee

 4   the commercial distribution of Andrx Pharmaceuticals

 5   manufactured product in addition to holding onto some

 6   responsibilities related to the native Anda product.

 7        In 1999, I was promoted to shipping --

 8   operating system analyst/shipping supervisor.  In the

 9   2000 time frame, I was promoted to manager --

10   operations manager.  Later in 2000, distribution

11   center manager.

12        In 2001 or early 2002, we began a project

13   related to opening a second distribution center in

14   Groveport, Ohio, in which I participated on that.

15   And after that facility opened, I was promoted to

16   national distribution manager where now both DCs

17   reported to me.

18        After that, there was an inline promotion to

19   director of logistics.  I held that position until

20   late 2005.  In late 2005, I was promoted to vice

21   president of operations.

22        Q.   The 2005 promotion to vice president of

23   operations, is that essentially the same position

24   that you have held ever since?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.  There have been additional

 2   responsibilities flexed in and flexed out, but the

 3   core of that position has been the distribution

 4   activities of our facilities.

 5        Q.    Okay.  Do you have an understanding as to

 6   what the term "suspicious order" means?

 7        A.    Yes, I do.

 8        Q.    What is your understanding of that term?

 9        A.    A suspicious order is something that deviates

10   from what the norm is.

11        Q.    Now, I asked you whether you had an

12   understanding.

13              For purposes of company operations, what

14   is -- does Anda have a working understanding of what

15   the term "suspicious order" is?

16        A.    Anda does.

17        Q.    Okay.  And what is that definition?

18        A.    On order that deviates from the norm.

19        Q.    Okay.  Does Anda, for purposes of its

20   day-to-day working policies, also utilize a

21   functional definition of the term "suspicious order

22   monitoring system"?

23        A.    Yes.

24        Q.    And what is the definition that the company
```

Highly Confidential - Subject to Further Confidentiality Review

1    uses for suspicious order monitoring system?

2        A.   A suspicious ordering monitoring system

3    relates to the entire program of work, policies,

4    procedures, either system or manual, related to

5    handling and distributing controlled substances.

6        Q.   In that answer, you included the term "either

7    system or manual."

8             What did you mean by that?

9        A.   There are system procedures in place and

10   system -- system work that is performed.  And there's

11   manual work, and there are manual procedures.

12       Q.   In the context of Anda's implementation of

13   suspicious order monitoring system work, can you give

14   me an example of both the system procedure and the

15   manual procedure?

16       A.   Sure.

17            The system procedures would be around

18   validating orders, around checking eligibility of a

19   customer, upon checking eligibility of a limit,

20   checking current access and purchases towards that

21   limit.

22            The manual aspects of it would include all

23   aspects of controlled substance handling from

24   receiving to put-away to physical security to

Highly Confidential - Subject to Further Confidentiality Review

1    physical inventories performed on said inventory to

2    the pick, pack, and ship operations.

3         Q.   I'd like to first focus on what you have

4    identified as the manual procedures that Anda

5    utilizes as part of its suspicious order monitoring

6    system.

7              Can you describe for me the manner in which

8    orders for controlled substances are received by

9    Anda?

10        A.   The manner in which they are received?

11        Q.   Yes.

12             MR. MATTHEWS:  Objection.

13             Is there a time period?

14             MR. NOVAK:  I appreciate that, because --

15        let's say 2006 to now.  And to the extent that

16        the answer differs over that part -- that time

17        period, we can talk about those differences.

18             THE WITNESS:  Orders can be received by Anda

19        via telephone, via Internet, via EDI, via paper

20        222 Form.

21   BY MR. NOVAK:

22        Q.   Are all of those ways in which the company

23   received orders for controlled substances?

24        A.   Yes.

1    Q.    Have there been differences between 2006 and

2    the present in the manner in which those orders are

3    recorded by Anda?

4    A.    No.

5    Q.    At some point between 2006 and the present,

6    did Anda implement a CSOS system?

7    A.    2005.

8    Q.    Oh, okay.

9          Let me go through some of those different

10   types of -- of receiving an order.

11   A.    Sure.

12   Q.    When orders are received for controlled

13   substances by telephone, who is it within Anda that

14   receives them?

15   A.    It's either a sales rep or a sales admin.

16   Q.    And what is it that the sales representative

17   or the sales admin does upon receiving an order for a

18   controlled substance?

19   A.    They key it into TPS.

20   Q.    Can you describe for me the process of keying

21   an order into TPS between 2006 and the present?

22   A.    A customer record is accessed.  There's a

23   number of customer attributes on the screen,

24   including the address and where the customer is

1    shipping from, which warehouse, which distribution

2    center at Anda it's shipping from, the carrier

3    method, whether it's FedEx Air or second day or

4    ground, et cetera, is on that first screen.

5         The second order entry screen allows the

6    individual to key in an item number and a quantity or

7    search or a description of a product and enter a --

8    select a line item and a quantity.  If the product is

9    a CII, it will not let the rep proceed.  If the

10   products are CIII through V or noncontrolled or

11   nonRX, it will allow the sales reps to key and accept

12   that order.

13   Q.   Now, you indicated in -- well, let me start

14   with a different question.

15        I think you described two different screens

16   within the Turning Point System that Anda maintains

17   in that answer.

18        Can you describe for me what is the first

19   screen?

20   A.   The first screen is the one that I described

21   a couple seconds ago related to the address

22   information and the customer routing information, the

23   carrier method, the shipping warehouse.

24   Q.   Is the customer's eligibility to purchase

1    controlled substances contained on that first screen?

2        A.    No, it is not.

3        Q.    Any other information with respect to the

4    customer contained on the first screen?

5        A.    Those are the highlights.  I'm not aware of

6    anything else.

7        Q.    And then the second screen that you

8    described -- first of all, how would an individual

9    receiving a controlled substance order get from the

10   first screen to the second screen?

11       A.    Pressing enter.

12       Q.    Okay.  And then describe for me what is

13   contained on the second screen.

14       A.    The second screen has order header

15   information related to that customer on the top of

16   the screen.  The middle of the screen, when you first

17   enter, it will be largely blank.  The bottom of the

18   screen has fields that you are able to search upon:

19   item number, description.

20       Q.    Okay.  What information is contained on the

21   header in that second screen of the TPS system?

22       A.    The customer number, the customer name, maybe

23   the city and state.

24       Q.    Is the DEA number assigned to the customer

Highly Confidential - Subject to Further Confidentiality Review

1     also contained there?

2         A.    I don't believe so.  I'm not familiar with it

3     on that level of detail.

4         Q.    Okay.  Now, you indicated that a sales

5     representative would not be able to input an order

6     for a control -- a Schedule II controlled

7     substance --

8         A.    That's correct.

9         Q.    -- into the TPS system.

10        A.    That's correct.

11        Q.    Has that been the case from 2006 to the

12    present?

13        A.    Yes.

14        Q.    In what manner is an order for a Schedule II

15    controlled substance input into TPS?

16        A.    There's two ways.  There's one way in TPS

17    that is for a manual 222 Form.  There is a select

18    group of sales administrators that have access to key

19    those CII orders in.  The first screen that I

20    described earlier of the order entry requires the

21    222 Form Number to be input within -- within that

22    order header before it allows you to proceed.

23            The other method of taking CII orders

24    unrelated to TPS order entry is CSOS via the web.

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    Okay.  Sticking with TPS for the moment --

2       A.    Sure.

3       Q.    -- you said that it's a select group of sales

4   administrators?

5       A.    That's correct.

6       Q.    Under what group within Anda are those sales

7   administrators housed?

8       A.    Which group?

9       Q.    Yes.  Which division of the company?

10      A.    The pharmacy has, I believe, two, and the

11  national accounts group has at least one.

12      Q.    Do you know who today is the sales

13  administrator with authority to enter a control -- a

14  Schedule II controlled substance order into the TPS

15  system?

16      A.    I know of one.

17      Q.    And who is that?

18      A.    Ms. Gina Quayto.

19      Q.    Over the years, who else had the

20  authorization to submit controls -- controlled

21  substance Schedule II orders into TPS?

22      A.    Her -- her predecessors.  Other people that

23  held that same possession.

24      Q.    And who was Ms. Quayto's predecessor?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   There was Rosalie Rudees, R-u-d-e-e-s.  There

 2   was another woman named Jeanette.  Her last name

 3   escapes me.

 4      Q.   Okay.  How does the information get --

 5   when -- when a -- I'll start with a new question.

 6           When a controlled substance -- a Schedule II

 7   controlled substance is ordered telephonically --

 8      A.   They are not ordered telephonically.

 9      Q.   Okay.  So that is not an available method

10   of --

11      A.   No, sir.

12      Q.   -- entering an order for a controlled -- a

13   Schedule II controlled substance?

14      A.   No, it is not.

15      Q.   Okay.  When we talked about different methods

16   of ordering, I think you identified a paper

17   222 Form --

18      A.   That is correct.

19      Q.   -- that is available for a Schedule II

20   controlled substance.

21      A.   That's correct.

22      Q.   Via the Internet?

23      A.   A paper form?  No.  A paper form comes in

24   either via mail or FedEx.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    No.  But another method --

2        A.    Oh.  Another method.

3        Q.    -- that you identified of submitting an order

4    was via the Internet?

5        A.    Sure.

6        Q.    And is that a method that is accessible if a

7    customer were to enter a -- an order for a

8    Schedule II controlled substance?

9        A.    Yes, via CSOS.

10        Q.    Okay.  Now, other than the paper 222 Form and

11    via the Internet through CSOS, are there other

12    methods of entering a -- an order for a Schedule II

13    controlled substance that are available to Anda

14    customers?

15        A.    No, there is not.

16        Q.    Okay.  And for orders of controlled

17    substances that are Schedule III or lower, may they

18    also enter those orders telephonically?

19        A.    IIIs, IVs, and Vs can be ordered

20    telephonically.  IIIs, IVs, and Vs can be ordered via

21    the Internet.

22        Q.    So let's stick with Schedule II controlled

23    substances for the moment.

24               How are the CSOS orders that are submitted by
```

1    Anda customers placed into TPS?

2       A.   It's an electronic transfer from the CSOS

3    application into the TPS order entry.

4       Q.   Okay.  And the paper 222 Forms that you

5    referenced a moment ago would have to be manually

6    input into the TPS system?

7       A.   After a series of checks by the distribution

8    center employees that received those forms.

9       Q.   Okay.  Can you describe for me what those

10   systems of checks or series of checks from the

11   distribution center employees are?

12      A.   On the paper 222 Forms, there is the initial

13   screening and validation that is an authentic order.

14   There are a series of fields that need to be

15   completed a certain way in order to accept that

16   order.

17           For instance, the line items need to be

18   clear.  The quantities need to be clear.  The

19   descriptions need to be clear.  The NDC is optional,

20   but if it is written in by the customer, it needs to

21   be clear and legible.

22           The last line completed on the form needs to

23   be accurate.  So the order form allows up to ten line

24   items to be ordered.  If the customer fills out three

1    line items, they must indicate that they only ordered

2    three line items in a specific box.

3         The form must be dated.  The supplier must be

4    written in by the -- by the customer.

5    Q.   When you say "the supplier," are you

6    referring to Anda?

7    A.   Correct.

8    Q.   Okay.  In the paper 222 Forms that you are

9    describing, is a specific manufacturer identified for

10   the controlled substance that's being ordered?

11   A.   No.  There's no field for manufacturer.

12   There is a field for description, and then there is

13   optional fields of NDC.  If a specific NDC is written

14   into that line item, we will attempt to fill that

15   specific NDC.

16   Q.   Okay.  And the NDC will relate to a specific

17   manufacturer?

18   A.   That's correct.

19   Q.   Okay.  Now, all of this information is placed

20   for paper 222 Forms into the TPS system by an actual

21   human being.

22         MR. MATTHEWS:  Objection.

23   BY MR. NOVAK:

24   Q.   Correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. MATTHEWS:  Objection.

 2            THE WITNESS:  Which information?

 3   BY MR. NOVAK:

 4      Q.   The different information that -- that you

 5   described in your last answer:  the initial

 6   authenticity screen, the series of fields that need

 7   to be entered --

 8      A.   None of that goes into TPS.

 9      Q.   Oh, I'm sorry.  I --

10      A.   The items and quantities go -- and the form

11   number would go into TPS.

12      Q.   Okay.  When you were describing these various

13   fields, were those simply fields that are contained

14   on the 222 Form itself?

15      A.   That's correct.

16      Q.   Okay.  How is it that the paper 222 Form is

17   received by someone at Anda and input into the TPS

18   system?

19      A.   They normally are received via FedEx or the

20   U.S. Mail.

21      Q.   And who -- and who is it at Anda that

22   actually does the entry of those orders into the TPS

23   system?

24      A.   The sales admins that I described earlier.
```

1     Q.    Okay.  And those are the -- the

2  administrators designated either in pharmacy or in

3  the national accounts group?

4     A.    Correct.

5     Q.    Okay.  Any other individuals that have the

6  authority to submit a paper 222 Form into the TPS

7  system at Anda?

8     A.    No.

9           MR. MATTHEWS:  Objection.

10          Just remind you to give me a moment to object

11     before you answer.

12  BY MR. NOVAK:

13     Q.    We've talked about the manual processes for

14  receiving and entering orders as it relates to

15  222 Forms.

16          Can you describe for me how CSOS orders

17  for --

18     A.    We haven't described all of the process.

19     Q.    Oh, okay.  Can you continue?

20          What else does a -- an administrator, in,

21  say, the national accounts group do --

22     A.    There are steps before the administrator that

23  are still happening in the warehouse.

24     Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    The form is received at the warehouse.  The

 2   DEA employees, the cage employees or vault employees

 3   are the ones fielding those and doing that initial

 4   screen on those orders.  So they are verifying the

 5   actual physical 222 Form.

 6             If it passes all of those checks we described

 7   earlier, they can then go through a series of checks

 8   to check to make sure that the license is available

 9   and accurate and they can check that the address on

10   the form matches the address on the shipping record

11   that we have in TPS.

12        Q.    Is there anything else done for purposes of

13   handling the 222 Forms at the warehouse --

14        A.    At that point --

15        Q.    -- stage?

16        A.    At that point, once those checks are also

17   validated and the addresses match and the form is

18   authentic, the warehouse people can then look up and

19   cross-reference what is actually being ordered by the

20   customer, whether just based on a description or

21   based on an NDC or both.  They can then write up what

22   is going to be keyed against that order.

23        Q.    When you say "write up what is going to be

24   keyed against that order," what do you mean?
```

1    A.    There is an order load form that the

2    warehouse personnel fill out that gets attached to

3    that 222 Form.  It's basically an instruction of what

4    the admin is going to key in.

5    Q.    Are there any specific tasks as part of the

6    order entry process at the warehouse --

7    A.    There's no entry.  They're writing it up on a

8    sheet.

9    Q.    Okay.  A sheet that is separate from the

10   222 Form?

11   A.    That's correct.

12   Q.    Okay.  And that sheet will indicate whether

13   the customer has a valid DEA license number?

14   A.    It does not.

15   Q.    Okay.

16   A.    The form comes in.  The 222 Form is a DEA

17   form.  It's not an Anda form.  It's not a customer

18   form.  It doesn't have Anda's customer record number

19   on it.

20        So one of the -- those checks that they are

21   doing is validating that we actually have that

22   customer set up.  And we check his license expiration

23   date and his license is valid and his address

24   information.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              The customer number is then attached to this

 2      load sheet, and then the quantities and item numbers

 3      in which they ordered are then also attached to that

 4      load sheet.

 5          Q.   Okay.  So there are a initial set of steps to

 6      verify -- that are performed at the warehouse to --

 7      to verify that this is a -- an existing customer of

 8      Anda?

 9          A.   Correct.

10          Q.   And once that is verified and the DEA

11      registration number is verified to match that of the

12      customer, the warehouse employees take the next step

13      of beginning to enter information into a load sheet?

14          A.   Write up the information on a load sheet.

15          Q.   Okay.  This is still a paper process?

16          A.   Yes, it is.

17          Q.   Okay.  And the information that the warehouse

18      employee at Anda will write into the load sheet is

19      what?

20          A.   Customer number, the quantities, and the Anda

21      item numbers associated with the items that were

22      ordered on the paper 222.

23          Q.   Okay.  Once the warehouse employee at Anda

24      completes the initial steps that we've discussed as
```

Highly Confidential - Subject to Further Confidentiality Review

1    it relates to the paper Form 222 and enters the --

2    I'm sorry -- writes the information on a load sheet,

3    what else does the warehouse employee at Anda do for

4    purposes of submitting a paper 222 order?

5        A.   They make a copy of that load sheet with the

6    222 Form visible on the front of it.  And they --

7    there's -- I'm unsure if they e-mail it to the

8    administrator or they use a shared drive to transfer

9    that data to the person who's going to key the order

10   into TPS.

11       Q.   Okay.  So the --

12       A.   The paper 222 Form stays within the

13   warehouse.

14       Q.   The completed 222 Form is then submitted to

15   the national account --

16       A.   The completed load sheet.

17            MR. MATTHEWS:  Objection.

18   BY MR. NOVAK:

19       Q.   The completed load sheet is then submitted to

20   an administrator in national accounts?

21       A.   One of the two sides.  It's either the

22   pharmacy side or --

23       Q.   Or pharmacy.

24            Okay.  Can you describe for me what the

1    individual, either at pharmacy or national accounts,

2    does once they receive the load sheet that has been

3    submitted by the warehouse?

4        A.    They go into TPS, into the customer record

5    that we described earlier, and they enter the

6    quantities and the item numbers associated with the

7    222 Form order.

8        Q.    All right.  At the point in time that the

9    administrator enters that information into TPS, is

10   an -- is an order number assigned to the order?

11       A.    If the order is accepted, an order number

12   would be assigned.

13       Q.    Okay.  And assuming that the order is

14   accepted and an order number is assigned, what

15   happens next for purposes of evaluating the order for

16   a controlled substance?

17            MR. MATTHEWS:  Objection.

18            THE WITNESS:  The order would go through a --

19       a series of system checks related to controlled

20       substance usage and controlled substance orders

21       previously against those products or those

22       product families and that customer.

23            If all of those checks were passed, the order

24       would move on to the next administrative holds,

```
1         which would be related to credit; could be

2         related to weight or size of the order; related

3         to the shipping method that was selected.

4              If all of those are passed, it will be

5         released to the distribution center and a pick

6         ticket and ship label would print.

7    BY MR. NOVAK:

8         Q.   Okay.  I want to focus on the first half of

9    your answer where you state the order would go

10   through a series of system checks related to

11   controlled substance usage and controlled substance

12   orders previously against those products or those

13   product families and that customer.

14             Can you describe in greater detail what the

15   system checks you referred to in that answer are?

16        A.   They're the same things that I described.

17   It's looking at the product families.  It's looking

18   at the customer history.  And if it deems something

19   outside of the norm as we know it at that point, it

20   could put the order on hold.

21        Q.   Okay.  In that answer, you said:  It's

22   looking at the product families.  It's looking at the

23   customer history.

24             What is the "it" to which you are referring
```

```
 1    in that answer?

 2         A.   TPS.

 3         Q.   Okay.  So TPS has embedded within it an

 4    automated evaluation of factors such as the product

 5    family and the customer history?

 6         A.   Yes.

 7              MR. MATTHEWS:  Objection.

 8              Time.

 9    BY MR. NOVAK:

10         Q.   And over -- and -- and --

11              MR. NOVAK:  James, I appreciate you pointing

12         this out from time to time.  I -- I understand

13         that the nature of those checks are going to vary

14         at different points, and we'll try to do what

15         they looked like in 2006 and then go forward.

16    BY MR. NOVAK:

17         Q.   Can you describe for me in 2006 what the

18    nature of the system checks that are embedded within

19    TPS are as it relates to a controlled substance

20    order?

21         A.   There would be checks against the syntax of

22    the DEA registration.  There would be checks against

23    the expiration date of the DEA registration number.

24    There would be checks against the state license
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    expiration date number.  There would be credit

 2    checks.

 3            There's a number of administrative pieces

 4    that we -- the order would look at.

 5       Q.   Are any of -- I'll ask a different question.

 6            In 2006, were there any quantity limits

 7    embedded within TPS that would automatically apply to

 8    a -- an evaluation of a controlled substance order?

 9       A.   Not -- not at the order entry portion.

10       Q.   In 2006, is there any automated evaluation of

11    the controlled substance family that existed within

12    TPS?

13            MR. MATTHEWS:  Objection.

14            THE WITNESS:  No.

15    BY MR. NOVAK:

16       Q.   All right.  Anything else about the automated

17    TPS evaluation of a controlled substance that

18    occurred in 2006 other than the steps that you've

19    already identified?

20       A.   No.

21       Q.   Okay.  In 2006, for a controlled substance

22    order, what would be the next steps in evaluating

23    whether the order should be fulfilled by Anda?

24       A.   There were none.
```

1      Q.   Okay.  Was there anything in 2006 that

2   addressed whether the customer -- that evaluated

3   whether the customer was eligible to purchase

4   controlled substances?

5           MR. MATTHEWS:  Objection.

6           THE WITNESS:  The validation of their

7       license, the validation of their schedules that

8       they were allowed to purchase per that license.

9   BY MR. NOVAK:

10     Q.   If they were eligible to purchase a

11   controlled substance by virtue of holding a -- a

12   current DEA and state registration licenses, those

13   were the only factors that the TPS system used in

14   evaluating whether the order could be filled?

15          MR. MATTHEWS:  Objection.

16          THE WITNESS:  There could also be contractual

17      checks related to product eligibility for a

18      customer for a specific manufacturer.

19   BY MR. NOVAK:

20     Q.   Okay.  Those relate more to commercial

21   considerations about what type of product they -- a

22   particular customer wanted to purchase as opposed to

23   their eligibility to purchase controlled substances?

24          MR. MATTHEWS:  Objection.

```
 1                THE WITNESS:  You said two things there.

 2     BY MR. NOVAK:

 3         Q.   Okay.  Well, let me look at your answer for a

 4     second.

 5              When you say there could be contractual

 6     checks related to a project -- product eligibility

 7     for a customer for a specific manufacturer, what do

 8     you mean?

 9         A.   Certain manufacturers may restrict certain

10     products in their portfolio to only ship to certain

11     classes of trade or types of customers.

12         Q.   This is in 2006?

13         A.   Sure.

14         Q.   And Anda maintains those contractual

15     limitations on particular customers within its TPS

16     system?

17         A.   Yes.

18         Q.   Are any of those contractual limitations

19     restrictions that emanate from a manufacturer's

20     suspicious order monitoring system?

21         A.   No.

22         Q.   Do any of those contractual restrictions that

23     you identified relate to the eligibility of a

24     customer to purchase controlled substances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    Now, you said that in 2006 after the various

 3   system checks that the TPS system performed on an

 4   automated basis were completed, there would be no

 5   other steps in evaluating the eligibility of the

 6   customer to purchase a controlled substance.

 7             Is that correct?

 8        A.    Correct.

 9        Q.    At that point, is there any other step that

10   Anda would take to prevent the -- the sale of a

11   controlled substance, or at that point, would it

12   simply go through?

13             MR. MATTHEWS:  Objection.

14             THE WITNESS:  Yes, there are additional

15        checks.

16             So when the order allocates and is released

17        to the TPS distribution side of the system, the

18        pick ticket and the ship label are printed by DEA

19        cage or vault personnel.  They are then

20        cross-checked against the order form and the load

21        sheet that was written up to check the accuracy.

22   BY MR. NOVAK:

23        Q.    So an order that has been placed and passed

24   the system checks within TPS for a controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1    substance would still go through a pick, pack, and

2    ship accuracy validation at the end of the process?

3         MR. MATTHEWS:  Objection.

4         THE WITNESS:  There's -- there's two

5       processes.  Specific to CII orders from paper

6       form or a CSOS order, those manual checks are

7       cross-referenced against the official order form.

8    BY MR. NOVAK:

9         Q.   Okay.  And those manual checks are performed

10   for all controlled substance orders or only CII?

11        A.   The specific check that I'm referring to is

12   for CIIs.

13        Q.   Okay.  So we have discussed the process as it

14   relates to the processing of an -- of a paper 222

15   order for a controlled substance.

16        In what manner does the receipt of an

17   electronic order through -- well, let -- let me -- is

18   there any -- is there anything else that we haven't

19   covered for purposes of fulfilling a Paper 222 Form

20   Schedule II controlled substance order as that

21   process existed in 2006?

22        A.   The point that I've gotten you to now is

23   right about to pick the order within the vault.

24        Q.   Okay.  And can you describe for me the

1    process of picking the order within the vault?

2        A.   The pick ticket is used to find the location

3    in which the product is held inside the vault.  The

4    items and quantities are picked in accordance with

5    what information is on that pick ticket.  They are

6    placed into a box.  They are taken to an assembly

7    area.

8            The pick ticket, which contains the order

9    information, the TPS order information, as well as

10   the DEA Schedule 222 Form number is then scanned into

11   a TPS script that enters into that order.  The

12   contents of said order are then scanned.  A function

13   key is then pressed to check for errors and request

14   an invoice.

15           If there's no errors, the invoice prints.

16   The invoice documentation is again cross-checked

17   against the shipping label, which has already been

18   cross-checked against the order load sheet, which has

19   been cross-checked to the order form.

20           So now we have a series of checks to make

21   sure this product is going to the correct address.

22       Q.   Okay.

23       A.   The box is sealed, and it's placed in a

24   staging area.

1    Q.   Okay.  The process that we've just

2  painstakingly gone through, as it relates to the

3  submission of an electronic order under CSOS, can you

4  describe for me the manner in which that process

5  differs once the electronic order has been submitted?

6        MR. MATTHEWS:  Objection.

7        THE WITNESS:  So there's obviously no

8        physical receipt of a paper form order from the

9        warehouse side.  There's no write-up onto a load

10       sheet.  There's no transferring of that write-up

11       load sheet to an admin.

12            The order is in the CSOS system, at which

13       point there is an indicator or an -- a queue in

14       which those order amass, in which the DEA vault

15       personnel will enter into those orders and look

16       at them.

17            It brings up, for lack of a better

18       comparison, an electronic 222 Form.  It is a

19       sheet that was designed within the CSOS

20       administration system to very closely resemble

21       the 222 Form.  The data elements contained on a

22       paper form are the data elements contained on

23       this electronic form.

24            That becomes the basis from which that order

1    is worked.

2    BY MR. NOVAK:

3        Q.   Did there come a point in time after 2006

4    when additional steps were embedded into the TPS

5    system for purposes of evaluating the eligibility of

6    a controlled substance order?

7        A.   Yes, there are.

8        Q.   When after 2006 did the first such change

9    occur?

10       A.   Likely in 2007.

11       Q.   Okay.  And what was that change?

12       A.   There was a change to not accept orders over

13   a specific dosage unit number at the item level.

14       Q.   What do you mean by the term "at the item

15   level"?

16       A.   At the item -- at the item product family

17   level.

18       Q.   Okay.  For purposes of that answer, can you

19   describe for me how Anda defined the term "product

20   family level"?

21       A.   Products that rolled up into a common

22   chemical.

23       Q.   In the context of opioid products, what are

24   the product family levels that existed in 2007?

1    A.   There was the alprazolam family, the

2    hydrocodone families, the oxycodone fentanyl, a

3    number of other items.  I'm not familiar with all the

4    names, nor can I pronounce them.

5    Q.   Morphine an additional?

6    A.   Sure.  Hydromorphone.

7    Q.   Was morphine a separate family level from

8    hydromorphone?

9    A.   I believe it was.

10   Q.   So in 2007, there were specific quantity

11   levels embedded within the TPS system as it related

12   to these different product families?

13        MR. MATTHEWS:  Objection.

14        THE WITNESS:  That's correct.

15   BY MR. NOVAK:

16   Q.   And what were those quantity level

17   restrictions?

18   A.   Generally, they were 5,000 dosage units per

19   pharmacist.

20   Q.   When in 2007 was the 5,000 dosage unit limit

21   embedded into the TPS system?

22   A.   It was -- it was probably the back half of

23   the year.

24   Q.   Okay.  If an order was received that exceeded

Highly Confidential - Subject to Further Confidentiality Review

1    the 5,000 dosage unit family limit that was embedded

2    in TPS from a customer, what would happen to that

3    order?

4          MR. MATTHEWS:  Objection.

5          THE WITNESS:  It depends how it was received.

6    BY MR. NOVAK:

7     Q.    An additional question about the family

8    levels:  How are those kept within the TPS system?

9     A.    I don't understand.

10    Q.    Okay.  Are they based on unit codes or NDC

11   codes?  Or how is it that, from a programming

12   perspective, the TPS system knows that an order

13   containing different products is -- is within the

14   same family?

15    A.    The family name is a field in one of the item

16   attribute screens within the item master file.  So an

17   individual item number within TPS would correspond to

18   a description, strength, size, NDC of a specific item

19   or SKU, and it's part of the item setup.

20    Q.    Okay.  Now, we were talking about the 5,000

21   family dosage unit limit that was embedded into the

22   TPS system and what happens to orders that exceed

23   that 5,000 dosage unit limit.

24          What is done with those?

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  Again, it depends on what the

 3         order entry method was.

 4    BY MR. NOVAK:

 5         Q.   Okay.  When you say it depends on the order

 6    entry method, are you referring to whether it was

 7    entered paper-wise in a 222 Form or electronically

 8    through CSOS?

 9              MR. MATTHEWS:  Objection.

10              THE WITNESS:  Or electronically through the

11         Internet.

12    BY MR. NOVAK:

13         Q.   Okay.  Electronically through the Internet,

14    by making reference to that form of order entry, you

15    are talking about entry of an order in a process that

16    differs from CSOS?

17              MR. MATTHEWS:  Objection.

18              THE WITNESS:  Are you speaking specifically

19         about Schedule IIs, or are you speaking about all

20         controlled substances?

21              MR. NOVAK:  Okay.  That's a fair -- and I

22         appreciate it if you're going to address these

23         different points, identifying circumstances where

24         it differs.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2        Q.   I think earlier you testified controlled

 3    Schedule IIs could not be submitted via the Internet,

 4    correct?

 5        A.   That's correct.

 6        Q.   Okay.

 7        A.   That's still correct.

 8        Q.   So let's talk about the entry for

 9    Schedule III opioid products as the process existed

10    in 2007 after the family limits were imposed.

11             What would happen to orders that exceed the

12    5,000 family dosage unit limit?

13             MR. MATTHEWS:  Objection.

14             THE WITNESS:  Via which order entry method?

15             MR. NOVAK:  Internet.

16             THE WITNESS:  Internet --

17             MR. MATTHEWS:  Objection.

18             THE WITNESS:  -- it would not allow the

19        customer to order over that limit.

20    BY MR. NOVAK:

21        Q.   So what would -- what would happen in terms

22    of -- how would the customer become aware that they

23    were not allowed to enter an order?

24        A.   Likely via a message on the screen that says
```

1    you can't order that quantity.

2        Q.    Okay.  There was a portal available to

3    customers for entry of orders via the Internet?

4             MR. MATTHEWS:  Objection.

5             THE WITNESS:  A portal?  I'm not --

6    BY MR. NOVAK:

7        Q.    A customer submitting a -- an order via the

8    Internet would log onto a specific site at Anda?

9        A.    Sure.

10       Q.    Okay.  And that site would instruct them if

11   they exceeded a 5,000 dosage unit for a family with

12   their order?

13            MR. MATTHEWS:  Objection.

14            THE WITNESS:  I'm not sure of the specific

15       messaging.

16   BY MR. NOVAK:

17       Q.    Okay.  At any rate, they would not be able to

18   file an order if it exceeded the 5,000 family unit

19   restriction via the Internet?

20       A.    Correct.

21       Q.    What would happen if the same customer

22   attempted to submit that order via CSOS?

23       A.    It would be the same result.

24       Q.    In either of those two instances --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    It wouldn't be the same order, though.

 2        Q.    The order that similarly exceeded 5,000 --

 3        A.    It would have to be for a different product

 4   to be on the two different systems, though.  You

 5   can't do -- you can't do a Schedule III on CSOS.

 6        Q.    Oh.  Okay.  Thank you.

 7              And then what would happen to the order if it

 8   had been submitted via a paper 222 Form?

 9        A.    It would be --

10              MR. MATTHEWS:  Objection.

11              THE WITNESS:  It would be caught at the order

12        entry method by the sales administrator and a

13        message would flash on the screen that there was

14        exceeding of the limit.

15   BY MR. NOVAK:

16        Q.    Okay.  For Control II orders that exceeded

17   the 5,000 family unit level in 2007 that were

18   submitted via CSOS, would there be any prompt or

19   electronic notification to the customer that they had

20   exceeded a limit?

21        A.    I don't have details of what that prompt

22   would be.

23        Q.    Okay.

24        A.    But it wouldn't accept the order.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Would it assign an order number to the

2    order?

3    A.    No, it would not.

4    Q.    And if the order that is in excess of the

5    5,000 dosage unit family limit in 2007, if it was

6    submitted via paper 222 Form, would an order number

7    be assigned to such an order?

8    A.    No.

9         MR. MATTHEWS:  Objection.

10   BY MR. NOVAK:

11   Q.    And for a Control III -- a Schedule III

12   controlled substance that was submitted via the

13   Internet to Anda in the 2007 time frame, if it

14   exceeded the 5,000 dosage unit family limit, would an

15   order number be assigned to that type of order?

16        MR. MATTHEWS:  Objection.

17        THE WITNESS:  No, it wouldn't.

18   BY MR. NOVAK:

19   Q.    Okay.  When a customer in this 2007 time

20   frame -- and maybe to be more precise, we're talking

21   about the latter half of 2007 for purposes of these

22   questions.

23        Is that what you understood?

24   A.    (Nodding head.)

1    Q.    You have to give verbal answers.

2    A.    Yes.

3    Q.    Okay.  If a customer became aware of their

4    inability to submit an order, either because they

5    were unable to do so on CSOS or via the Internet, but

6    they nonetheless wanted additional product, what

7    steps were available to such a customer to seek a

8    higher volume of a controlled substance in 2007?

9            MR. MATTHEWS:  Objection.  Outside the scope.

10           THE WITNESS:  They could contact their sales

11       rep and initiate a conversation about it.

12           MR. NOVAK:  First break?

13           MR. MATTHEWS:  Sure.

14           THE VIDEOGRAPHER:  The time is 10:23 a.m.

15       We're going off the record.

16           (Recess from 10:23 until 10:35 a.m.)

17           THE VIDEOGRAPHER:  The time is 10:35 a.m.  We

18       are now back on the record.

19    BY MR. NOVAK:

20    Q.    Mr. Cochrane, we have been talking about the

21    institution of a 5,000 dosage unit per family for

22    controlled substances in approximately August of

23    2007.

24           What were the circumstances at Anda that led

Highly Confidential - Subject to Further Confidentiality Review

1    to the institution of that 5,000 unit limit to begin

2    with?

3        A.    Oh, that was post some conversations and a

4    meeting with DEA.

5        Q.    When did that -- well, start with the

6    conversations that you referenced.

7              Who were the participants in the

8    conversations that you identified?

9        A.    DEA personnel at Washington headquarters,

10    along with a compliance director at our parent,

11    Watson Pharmaceuticals.

12       Q.    Was that individual Tracey Hernandez?

13       A.    Yes, it was.

14       Q.    And did Ms. Hernandez convey to

15    representatives of Anda the content of the

16    conversations that she had with representatives of

17    the DEA?

18              MR. MATTHEWS:  Objection.

19              THE WITNESS:  Yes, she did.

20    BY MR. NOVAK:

21       Q.    And what is your understanding of the content

22    of the discussion that they had?

23       A.    The content was based around quantities of

24    controlled substances that Anda was shipping to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   registrants.

 2       Q.   Is it Anda's understanding that DEA officials

 3   had expressed concern to Ms. Hernandez that in some

 4   instances Anda was shipping too large a volume of

 5   controlled substances to particular customers?

 6            MR. MATTHEWS:  Objection.

 7            THE WITNESS:  I don't know that those words

 8       were used, "too large a volume," but there was --

 9       it warranted a discussion from their part to

10       reach out.

11   BY MR. NOVAK:

12       Q.   Did you have an understanding as to whether

13   DEA officials identified particular quantities of

14   controlled substances that were concerning to them?

15            MR. MATTHEWS:  Objection.

16            THE WITNESS:  No, I didn't.

17   BY MR. NOVAK:

18       Q.   Do you know if any suggestions were made by

19   DEA officials in their conversation with

20   Ms. Hernandez regarding modifications to the manner

21   in which Anda should perform its business?

22       A.   I don't know if there were suggestions made

23   with the initial conversation with Tracey.  There

24   were suggestions made from DEA in some later
```

Highly Confidential - Subject to Further Confidentiality Review

 1    conversations that DEA had with Anda representatives.

 2        Q.   Okay.  Even before those later meetings

 3    occurred, as a result of the initial conversations

 4    between the DEA and Ms. Hernandez, did Anda implement

 5    any steps that modified the manner in which it sold

 6    controlled substances?

 7             MR. MATTHEWS:  Objection.

 8             THE WITNESS:  Yes, they did.

 9    BY MR. NOVAK:

10        Q.   And what were those steps?

11        A.   There was an immediate halt on large bottle

12    size formats of products being available so that we

13    could review some data and make appropriate changes

14    in accordance with what the initial conversation was

15    with the DEA representative and Ms. Hernandez.

16        Q.   When you say review some data and make

17    appropriate changes in accordance with what the

18    initial conversation was with the DEA representative

19    and Ms. Hernandez, what do you mean?

20        A.    There was a general conversation that

21    Ms. Hernandez had with representatives from DEA that

22    was talking about concern about quantities of

23    controlled substances that Anda was shipping into the

24    marketplace to DEA registrants.

1           We ceased selling 500- and 1,000-count

2    bottles for a period of time, a couple of days, so

3    that we could begin to look at our own data and what

4    our shipping history was so that we could assess and

5    try to understand where the commentary from DEA was

6    coming from.

7       Q.   I'm not sure I heard the quantity correctly.

8    Was it 500-count bottles were ceased?

9       A.   500- and 1,000-count.  We continued to sell

10   100-count bottles.  There may have been 90s and 30s

11   as well, but the idea was to cease shipping the large

12   quantity bottles.

13      Q.   Were the prospects of an enforcement action

14   by DEA against Anda discussed in the initial

15   telephone communications that Ms. Hernandez had with

16   DEA officials?

17           MR. MATTHEWS:  Objection.

18           THE WITNESS:  I wasn't part of that

19       conversation.  I'm not sure of what was exactly

20       said from DEA.

21   BY MR. NOVAK:

22      Q.   Okay.  In terms of Ms. Hernandez referring

23   the -- or -- or communicating the content of that

24   initial discussion to officials at Anda, did

1    Ms. Hernandez indicate that DEA officials had

2    suggested a potential enforcement action against

3    Anda?

4            MR. MATTHEWS:  Objection.

5            THE WITNESS:  Yes, she did.

6    BY MR. NOVAK:

7        Q.   And what did she say?

8        A.   I wasn't part of that conversation, but she

9    contacted our then-president, Mr. Al Paonessa, and

10   let her -- let him know that she had received a call

11   from Washington headquarters.

12       Q.   Okay.  And she communicated what DEA

13   officials had communicated to her as it relates to

14   potential enforcement actions against Anda?

15           MR. MATTHEWS:  Objection.

16           THE WITNESS:  Yes.

17   BY MR. NOVAK:

18       Q.   Did Mr. Paonessa subsequently have

19   conversations with you regarding these initial

20   communications between Ms. Hernandez and DEA?

21       A.   Yes, he did.

22       Q.   And what did he tell you?

23       A.   He told us that DEA called Tracey Hernandez

24   at Watson and said there's a concern about the

1    quantities of controlled substances that we are

2    shipping to DEA registrants.

3        Q.    Okay.  At that point in time, had the 5,000

4    dosage unit limit been discussed between Mr. Paonessa

5    and Ms. Hernandez?

6        A.    There was talk about the 5,000 unit dosage

7    limit that we had previously in place related to line

8    item level orders, yes.

9        Q.    Okay.  In that answer, you said there was

10   talk about the 5,000 dosage limit that we had

11   previously in place.

12       A.    Yeah.

13       Q.    Is it your understanding that that 5,000

14   dosage limit was instituted prior to the

15   communications that existed between DEA officials and

16   Ms. Hernandez at Watson?

17       A.    Yes, it was.

18       Q.    When was it instituted?

19       A.    2005, perhaps.  Maybe before.

20       Q.    When we discussed earlier this morning the

21   fulfillment of controlled substance orders in 2006,

22   we identified, I think, a few different limitations

23   or screens that TPS engaged -- applied for purposes

24   of determining whether the order should be fulfilled,

```
 1    correct?

 2        A.   That's right.

 3        Q.   Okay.  Was there a screen in 2006 that

 4    applied a 5,000 dosage limit embedded within TPS?

 5        A.   At the line item level, yes, it did.

 6        Q.   Okay.

 7        A.   It wasn't at a family level.  The family

 8    level came later in 2007.

 9        Q.   Okay.  All right.  I now -- now I think I

10    understand.

11             So going back to the discussions between

12    representatives of the DEA and Ms. Hernandez, based

13    upon the recounting of information to you from

14    Mr. Paonessa, did you have an understanding as to

15    whether the 5,000 dosage unit limit on a family level

16    was something that the DEA had requested?

17             MR. MATTHEWS:  Objection.

18             THE WITNESS:  I don't know that they

19         requested it, but that was part of our response

20         to -- to the conversation and to -- the ask of

21         DEA.

22    BY MR. NOVAK:

23        Q.   Okay.  What other steps did Anda take in

24    response to the conversations that Ms. Hernandez had
```

1    with the DEA?

2        A.    It addition to the ceasing of the 500- and

3    1,000-count bottles?

4        Q.    Yes.

5        A.    Over those days, reviewing data, we made some

6    programming changes to institute the family level

7    limits to a DEA registration number, which was a

8    pretty large change from where we had been with the

9    5,000 dosage unit limit at the line-item level.

10            And that was implemented within a few days

11   and was reported back to DEA.

12       Q.    Okay.  Subsequent to the communications

13   between DEA, Ms. Hernandez at Watson, and

14   Mr. Paonessa at Anda, was there a follow-on meeting

15   directly between representatives --

16       A.    There was at least one --

17       Q.    Let me finish the question.

18            -- between representatives of Anda and the

19   DEA?

20       A.    Yes.  There was at least one additional call

21   with representatives from Anda and DEA, and

22   Ms. Hernandez, I believe, was on that call as well.

23   And then there was a face-to-face meeting in

24   Washington.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  When approximately was the additional

 2   call?

 3        A.    Within days.

 4        Q.    Okay.  July of 2007?

 5        A.    That's accurate, yeah.

 6        Q.    Were you a participant on that call?

 7        A.    I was a participant on one of the calls, for

 8   sure.

 9        Q.    Who, in addition to you, participated?

10        A.    Michael Cochrane and Tracey Hernandez.

11        Q.    Did Mr. Paonessa participate?

12        A.    I don't believe he was on that call.

13        Q.    Okay.  And what did you discuss with DEA in

14   this July 2007 call?

15        A.    We revisited the commentary that DEA gave to

16   Ms. Hernandez; we talked about the changes that we

17   took and made in the days following Ms. Hernandez's

18   initial communication; and we talked about a

19   face-to-face meeting to be scheduled in the coming

20   days or weeks.

21        Q.    Okay.  In the 2007 July telephone call, did

22   DEA representatives communicate a concern about the

23   quantity of orders for controlled substances that

24   Anda was fulfilling?
```

```
 1       A.   Yes, they did.

 2       Q.   Did it identify particular drugs that were of

 3   concern to them?

 4       A.   I don't recall specific drugs or customers

 5   mentioned.

 6       Q.   Okay.  Do you recall whether they

 7   specifically referenced orders in excess of 100,000

 8   or 200,000 units of OxyContin?

 9       A.   I don't recall the exact quantities, but

10   there were large -- larger than 5,000 quantities

11   conveyed.

12       Q.   Okay.  And Anda was at that time in 2007

13   fulfilling orders that were orders of magnitude

14   larger than 5,000 dosage units for a family --

15            MR. MATTHEWS:  Objection.

16   BY MR. NOVAK:

17       Q.   -- of controlled substances, weren't they?

18            MR. MATTHEWS:  Objection.

19            THE WITNESS:  At the order level, yes, it was

20       possible to send more than 5,000 dosage units of

21       a family.

22   BY MR. NOVAK:

23       Q.   Okay.

24       A.   The limits were applied to the line-item
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   level at that point.

 2       Q.   After the follow-on telephone call in July of

 3   2007 that you participated in, did you also

 4   participate in the face-to-face meeting?

 5       A.   I did not.

 6       Q.   Okay.  By the way, we've been talking about

 7   Ms. Hernandez and her participation, both in the

 8   initial communication with DEA and then the follow-on

 9   telephone call from -- that you participated in.

10            What is your understanding as to

11   Ms. Hernandez's position at that time at Watson?

12            MR. MATTHEWS:  Objection.  Outside the scope.

13            THE WITNESS:  She -- she was a compliance

14       director for the Watson Manufacturing Company,

15       which was our parent at the time.

16   BY MR. NOVAK:

17       Q.   Okay.  At the time that Watson acquired Anda,

18   were there any changes instituted in the manner that

19   Anda handled its controlled substances?

20            MR. MATTHEWS:  Objection.  Beyond the scope.

21            THE WITNESS:  Operationally?

22            MR. NOVAK:  Yes.

23            THE WITNESS:  No.

24   ///
```

1    BY MR. NOVAK:

2        Q.   In terms of who within Anda had the authority

3    to make determinations about controlled substance

4    handling, did any of those individuals have to report

5    to Ms. Hernandez at Watson?

6            MR. MATTHEWS:  Objection.

7            THE WITNESS:  Controlled substance handling

8        how?

9    BY MR. NOVAK:

10       Q.   For instance, the maintenance or creation of

11   a suspicious order monitoring system.

12           MR. MATTHEWS:  Objection.  Beyond the scope.

13           THE WITNESS:  No.

14   BY MR. NOVAK:

15       Q.   Were you provided instruction from

16   Mr. Paonessa as to what role Ms. Hernandez should

17   play in devising a suspicious order monitoring system

18   at Anda?

19           MR. MATTHEWS:  Objection.

20           THE WITNESS:  No, I was not.

21   BY MR. NOVAK:

22       Q.   How would you describe Ms. Hernandez's role

23   as it relates to the operation of a suspicious order

24   monitoring system at Anda?

1        MR. MATTHEWS:  Objection.  Outside the scope.

2        THE WITNESS:  She had no influence on that.

3    BY MR. NOVAK:

4    Q.    Now, you indicated at the follow-on meeting

5    with DEA officials and Anda in the summer of 2007,

6    you were not present?

7    A.    The face-to-face, I was not present.

8    Q.    Okay.  Is it your understanding that Anda

9    made commitments in that meeting as to limitations

10   that it would place on the sale of controlled

11   substances?

12       MR. MATTHEWS:  Objection.

13       THE WITNESS:  No, I don't believe there were

14       any commitments made to limitations.

15   BY MR. NOVAK:

16   Q.    Okay.  Were any limitations discussed at the

17   face-to-face meeting?

18   A.    Yes.

19   Q.    And what is your understanding as to what was

20   discussed?

21   A.    DEA indicated to Michael and Al that a normal

22   pharmacy doesn't usually need more than 5,000 dosage

23   units of an item on a monthly basis.

24   Q.    Is that dosage units of an item on a monthly

Highly Confidential - Subject to Further Confidentiality Review

1    basis or 5,000 dosage units of a family on a monthly

2    basis?

3        A.   At that point it was understood that it was

4    family.  We had already made the modifications to our

5    systems to allow for limits by family to a specific

6    registrant.

7        Q.   Okay.  Had you implemented the 5,000 dosage

8    unit per family limit prior to the face-to-face

9    meeting with the DEA?

10       A.   Yes, we had.

11       Q.   That was on approximately August 1?

12       A.   I believe it was still in July.

13       Q.   Okay.  Are there other modifications to the

14   sale of controlled substances that Anda made coming

15   out of the face-to-face meeting that was held with

16   DEA representatives?

17       A.   Other than limit checking at the family

18   level?

19       Q.   Correct.

20       A.   I don't believe so.

21       Q.   Okay.  How about of the types of customers

22   that Anda would sell opioids to?

23       A.   Nothing specific.

24       Q.   Any restrictions on the classes of trade that

Highly Confidential - Subject to Further Confidentiality Review

1    Anda would sell opioids to that came out of the 2007

2    meeting?

3         A.   No, I don't believe so.

4         Q.   Okay.  By the way, when we talk about classes

5    of trade, as of this time in 2007, were there

6    particular classes of trade for whom Anda refused to

7    sell controlled substances?

8         A.   For customers that were identified as

9    Internet pharmacy, we were not selling to Internet

10   pharmacies.

11        Q.   Was there a point in time that Anda imposed

12   the limitation of not selling controlled substances

13   to Internet pharmacies?

14        A.   It was years prior to that.  It was probably

15   in 2004 or -5.

16        Q.   Okay.  Did the DEA discuss in the

17   face-to-face meeting with representatives of Anda

18   that there were particular classes of trade that they

19   viewed as problematic as it related to the sale of

20   controlled substances?

21        A.   I -- I wasn't at the meeting.  I don't -- I

22   don't recall specifics.  But I knew they -- I know

23   they had issues with Internet pharmacies, and there

24   was dialogue prior to the 2007 meeting with

1    Washington related to their Internet pharmacies.

2        Q.   Okay.  We have been using the term class of

3    trade without really defining it.  As it relates to

4    the sale of controlled substances, what were the

5    different types of class of trade to which Anda sold

6    in the summer of 2007?

7        A.   Retail pharmacies, doctors, hospitals,

8    wholesalers, warehousing chain customers.

9        Q.   How about repackagers?

10       A.   Repackagers, yes.

11       Q.   Would pain clinics be a separate class of

12   trade?

13       A.   I think those would be together with either

14   the Internet pharmacies and/or the doctors,

15   potentially.

16       Q.   But as of this time in 2007, the only class

17   of trade that Anda would not sell controlled

18   substances to was Internet pharmacies.

19            Is that correct?

20       A.   I believe that.

21            MR. MATTHEWS:  Objection.

22   BY MR. NOVAK:

23       Q.   Okay.  Now, once the 5,000 dosage unit per

24   control family limitation on opioids was instituted

Highly Confidential - Subject to Further Confidentiality Review

1   in the summer of 2007, did Anda devise policies under

2   which a customer could seek to purchase more than

3   5,000 units --

4        MR. MATTHEWS:  Objection.

5   Q.   -- for a particular control family?

6   A.   Yes, we did.

7   Q.   Okay.  What, if you can describe them, was

8   the process of allowing a customer to purchase more

9   than 5,000 units of, say, OxyContin in August of

10  2007?

11  A.   There was a review of that customer's

12  business, a review of that customer's usage of

13  product, the number of prescriptions they served, the

14  demographics of the customer's location.

15  Q.   For purposes of evaluating the customer's

16  usage of product, what information did Anda collect

17  in August of 2007?

18  A.   Dispensing information from their pharmacy

19  and sometimes purchasing information from that

20  pharmacy from . . .

21  Q.   Did there come a point in time where the --

22  I'll ask a different question.

23        At this point in time in 2007, were the

24  limitations placed on the sale of controlled

1    substance -- substances part of what you considered

2    to be Anda's suspicious order monitoring system?

3        A.   It was part of our entire compliance program

4    as it related to controlled substances.

5        Q.   Okay.  Were there -- in addition to the

6    family unit limitations imposed upon the sale of

7    controlled substances, what were the other elements

8    of Anda's suspicious order monitoring system in

9    August of 2007?

10       A.   Our entire compliance program consisted of

11   procedures related to the handling of the controlled

12   substances, the physical security of the controlled

13   substances, the clearances in which we obtained to

14   allow employees to have access to work with

15   controlled substances, the procedures we had in place

16   to pick and pack controlled substances, the inventory

17   and security aspects of the controlled substances,

18   the cycle counts, daily counts, as well as the

19   accreditation of a customer from the licensure to the

20   customer setup to the address checks.  All of those

21   elements.

22       Q.   Okay.  Were there particular policies in

23   place as of this time in August of 2007 that related

24   to an evaluation of the appropriateness of a

Highly Confidential - Subject to Further Confidentiality Review

1    particular customer buying controlled substances?

2            MR. MATTHEWS:  Objection.

3            THE WITNESS:  The appropriateness?

4            MR. NOVAK:  Yes.

5            THE WITNESS:  Yes.

6    BY MR. NOVAK:

7        Q.   And which of the policies in effect related

8    to that evaluation of the customer's appropriateness?

9        A.   There was a policy related to the information

10   needed to set up an account.  There was controlled

11   substance handling.  There were cycle count pieces.

12           (Anda Exhibit 2 was marked for

13   identification.)

14   BY MR. NOVAK:

15       Q.   We have marked for identification purposes

16   Anda Exhibit -- Anda-Cochrane Exhibit 2.

17           MR. NOVAK:  You know, it just --

18           MR. MATTHEWS:  You should call this Anda, and

19       you can call it Pat Cochrane tomorrow.

20           MR. NOVAK:  Right.

21           MR. MATTHEWS:  That's the way I noted it on

22       the top of mine.

23           MR. NOVAK:  Okay.  What did we call Number 1?

24       Did we call it Anda 1?

```
 1              THE WITNESS:  It's got my name on it.

 2              MR. NOVAK:  Okay.  I think the -- for today's

 3         purposes, they will just be labeled as Anda

 4         exhibits without the witness name.  And then when

 5         we do this tomorrow, we'll have to make it

 6         Patrick Cochrane to distinguish between those and

 7         the Michael Cochrane ones.

 8    BY MR. NOVAK:

 9         Q.   So we've had marked Anda-Cochrane Exhibit 2,

10    which also was previously marked as Anda Spellman

11    Deposition Exhibit 6, which are the defendant

12    Anda Inc.'s Supplemental Response to Plaintiff's

13    First Refined Discovery Request to Distributor

14    Defendants.

15              And the particular page of these that I would

16    like to draw your attention to start at, Page 8.

17              And there, a discovery request is stated:

18    Please produce each of your suspicious order

19    monitoring system policies and procedures since

20    January 1, 2006, and identify the Bates stamp range

21    for each.  Please identify the effective date each

22    was in force and effect.

23              And proceeding after that request is an

24    extended response to the request submitted by
```

1    counsel.

2         And then on the page that is Page 9 of Anda

3    Deposition Exhibit 2, there is a chart identifying

4    different standard operating procedure.

5         Do you see that?

6    A.    I do.

7    Q.    Okay.  There are a couple of particular

8    standard operating procedures to which I wanted to

9    draw your attention.

10        First of all, SOP Number 28, is -- is that

11   the one that deals with the information that would be

12   gathered from a customer for Anda to make the initial

13   determination that it was appropriate to sell

14   controlled substances to them as of 2007?

15   A.    Yes, as well as setting up a new customer for

16   any purchases.

17   Q.    Okay.  And as of 2007, under that operating

18   procedure, what would Anda do?

19   A.    In 2007 they would obtain licensure and

20   create a customer record file.  I believe it was

21   still paper at that point when it was going through

22   the setup process.  There were inputs into the system

23   to create a customer number where licenses and

24   expiration dates were input into TPS.

1     Q.    Okay.  The Standard Operating Procedure 28,

2    is that a procedure that you authored at Anda?

3          MR. MATTHEWS:  Objection.

4          THE WITNESS:  I've certainly had versions

5          that we moved into specific formats.  The initial

6          authoring of that document was sometime in either

7          '98 or '99 and was performed likely by Jay

8          Spellman and/or Elliott Schwartz.

9          (Anda Exhibit 3 was marked for

10    identification.)

11          MR. NOVAK:  Are these going on the screen?

12          THE VIDEOGRAPHER:  Yes.  Do you want to see

13          it?

14          MR. NOVAK:  Yeah.

15    BY MR. NOVAK:

16     Q.    We've had marked as Anda-Cochrane 3 a

17    document bearing the Bates Number Anda_Opioid 271410

18    and 271411.  The cover page, which identifies it, is

19    Standard Operating Procedure Number 28, the title,

20    information needed to set up a new account.

21          As to this version of SOP 28 effective

22    August 20, 2004, Mr. Cochrane, were you the author of

23    that original version.

24     A.    I am the one that put it into this format,

1     yes.

2          Q.    Okay.  And looking at the second page of

3     Anda-Cochrane Exhibit 3 -- by the way, is this the

4     form that the operating procedure would have been in

5     as of 2007?

6          A.    I'm not sure.

7          Q.    Okay.  So the second page of Anda-Cochrane 3

8     identifies the steps that the company would take for

9     purposes of opening a new account with a customer.

10            Is that correct?

11         A.    That's correct.

12         Q.    And some of those included information that

13    was specifically gathered for purposes of determining

14    whether the customer would be eligible for the

15    purchase of controlled substances.

16            Is that correct?

17         A.    Correct.

18         Q.    Which ones specifically relate to controlled

19    substances?

20         A.    31B, 31C, 31D.

21         Q.    Okay.  So for purposes of selling controlled

22    substances to a customer under the version of SOP 28

23    that is Anda-Cochrane 3, the information that Anda

24    would gather related to matching the DEA registration

```
 1    number, assuring that the customer had an updated

 2    license and if the customer were a chain receiving

 3    the license -- licensure information in a spreadsheet

 4    form.

 5             MR. MATTHEWS:  Objection.

 6    BY MR. NOVAK:

 7        Q.   Is that correct?

 8             MR. MATTHEWS:  Objection.

 9             THE WITNESS:  For the initial load, we could

10        receive it as a spreadsheet form.  There was a

11        backwards updating step performed by the

12        compliance department to retrieve those

13        individual license and file them in the customer

14        file.

15        (Anda Exhibit 4 was marked for

16    identification.)

17    BY MR. NOVAK:

18        Q.   Okay.  We've had marked as Anda-Cochrane --

19    or Anda Deposition Exhibit 4 a version of the

20    standard operating procedure with Bates Number 144398

21    through 144401.  And let me start by looking at the

22    very last page of Anda Deposition Exhibit 4.

23             Do you see a revision history that is set

24    forth there?
```

1       A.    I do.

2       Q.    Okay.  Based upon your review of that

3    revision history, when did this particular version of

4    Standard Operating Procedure 28 become effective?

5       A.    Exhibit 4?

6       Q.    Yes.

7       A.    This would tell me that it was February

8    of '18.

9       Q.    Okay.  Now, going back to Anda Exhibit 2.

10      A.    2?  Okay.

11      Q.    The identification of procedures that apply

12   to customer due diligence for Standard Operating

13   Procedure 28, the version of that standard operating

14   procedure that is identified is the version that is

15   Anda Exhibit 4, correct?

16      A.    It would be the most current, yes.

17      Q.    All right.  How would you determine what

18   version of Standard Operating Procedure 28 was in

19   effect for a particular time period between 2006 and

20   2018?

21      A.    I'm not sure I can do that from Exhibit 4.

22      Q.    Okay.

23      A.    Exhibit 4 is a current version, and we would

24   have to go through all of the changes and/or reviews

Highly Confidential - Subject to Further Confidentiality Review

1    that were included in those other revision history

2    line items --

3         Q.   Okay.

4         A.   -- to back into what was there.  At a

5    minimum, it would be Version 3.

6         Q.   Okay.  Now I'd like to direct your attention

7    next to Standard Operating Procedure 40.

8              Can you give me a description from your

9    perspective as to what the purpose of Standard

10   Operating Procedure 40 is?

11        A.   40 is orders of interest monitoring systems,

12   suspicious order monitoring.  That is the system in

13   which we currently look at orders and score and grade

14   orders that are traveling through our system.

15             (Anda Exhibit 5 was marked for

16   identification.)

17   BY MR. NOVAK:

18        Q.   Okay.  We've had marked as Anda Exhibit 5 the

19   version of Standard Operating Procedure 40 that is

20   identified by the company in the supplemental

21   responses to discovery requests that is set forth at

22   Page 9.

23             Now, looking at the last page of Anda

24   Exhibit 5, when did this particular version of

Highly Confidential - Subject to Further Confidentiality Review

1    Standard Operating Procedure 40 become effective?

2        A.    March of '17.

3        Q.    Okay.  Do you know where you would go to

4    obtain the prior versions of Standard Operating

5    Procedure 40 that existed prior to March of 2017?

6        A.    I would go to our compliance department.

7        Q.    Okay.  Do you understand that they have the

8    prior versions of the Standard Operating Procedure 40

9    on file?

10        A.    I don't know that.

11        Q.    Prior to December of 2011, were there

12    predecessor written versions of Standard Operating

13    Procedure 40?

14        A.    December '11 is the original issue of

15    Number 40.

16            (Anda Exhibit 6 was marked for

17    identification.)

18    BY MR. NOVAK:

19        Q.    We've had marked as Anda Deposition Exhibit 6

20    a document that is comprised of three pages bearing

21    the Bates Numbers Anda 276962 through 964.

22            The front page is an e-mail from

23    Michael Cochrane to Al Paonessa.

24            By the way, we've made reference to

1    Mr. Paonessa a number of times today.  I'm not sure

2    if we've ever articulated.  At this time in 2007, was

3    Mr. Paonessa the president of Anda?

4         A.   Yes, he was.

5         Q.   Okay.  Now, in the e-mail that is sent from

6    Mr. Cochrane to Mr. Paonessa, he says:  I have a

7    rough draft of the SOP, but there is no substance to

8    it.  It outlines different things we are going to

9    look at, but I'm not sure what to put in as far as

10   how we make a decision on what the appropriate limits

11   would be and what we raise a customer to.

12        Is this a document that you would have

13   received back in that 2007 time frame?

14        A.   I'm on the e-mail distribution, yes.

15        Q.   Okay.  And then attached to the e-mail is a

16   draft Standard Operating Procedure 40.  This would

17   have been drafted by Michael Cochrane, the director

18   of regulatory compliance at Anda in this 2007 time

19   frame?

20        A.   Specifically it says that Michael was the

21   originator, and the date on the document is 7/27/07.

22        Q.   Okay.  And in the revision history down at

23   the bottom, it states an effective date of August 1,

24   2007.  Do you know if this version of the standard

```
 1    operating procedure became effective in August of --

 2         A.   I don't believe it --

 3         Q.   -- 2007?

 4         A.   I don't believe it did.

 5         Q.   Okay.  Looking at the second page of the

 6    exhibit, under "Purpose," it says:  To make sure the

 7    appropriate steps are followed when a customer is

 8    requesting more than 5,000 dosage units of a

 9    controlled substance family in a single calendar

10    month.

11              Do you see that reference?

12         A.   I do.

13         Q.   Okay.  And then there are procedures that are

14    set forth underneath that.  Whether this was

15    officially adopted or not, are the procedures that

16    are set forth under 3.0 the procedures that were in

17    place -- put in place in August of 2007 for purposes

18    of determining when a customer would get more than

19    5,000 units of a controlled substance family?

20              MR. MATTHEWS:  Objection.

21              THE WITNESS:  Those look like accurate

22         elements of what was done.  I don't know that

23         that's all conclusive.

24    ///
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:

2        Q.   Well, let's review them for a moment.

3             It identifies as the first step in the

4    procedure to forward customer questionnaire to be

5    filled out in its entirety.

6             Do you understand that as of this time in

7    2007 Anda customers were able to obtain controlled

8    substances without a filled out customer

9    questionnaire?

10            MR. MATTHEWS:  Objection.

11            THE WITNESS:  Prior to 2007?  During 2007?

12   BY MR. NOVAK:

13       Q.   Prior to the changes that were made in August

14   of 2007.

15       A.   Yes, they were.  Yes, they were.

16       Q.   They were required to fill out a customer

17   questionnaire in -- prior to August of 2007?

18       A.   Let me let you restate your question, because

19   that's not what you asked me.

20       Q.   Okay.  Okay.  I -- thank you, because I

21   misheard your answer.

22            In August of 2007, is that when the

23   limitation was put in place that required the

24   submission of a customer questionnaire if a

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substance customer wanted more than 5,000

2    units of a controlled substance family?

3            MR. MATTHEWS:  Objection.

4            THE WITNESS:  That's when that process was

5        started, yes.

6    BY MR. NOVAK:

7        Q.   Okay.  For customers that purchase less than

8    5,000 units of a controlled substance family, even

9    after August of 2007, there was a period of time

10   where they could do so without submitting a customer

11   questionnaire, correct?

12       A.   That's correct.

13       Q.   The second step in the procedure that is

14   identified in Anda Exhibit 5 -- or, I'm sorry, Anda

15   Exhibit 6 is, quote:  Review a year to date file that

16   contains monthly dosage unit purchases by product

17   family for any overly suspicious quantities in past

18   purchases.

19            You see that reference?

20       A.   I do.

21       Q.   Is that a step that Anda instituted in August

22   of 2007 for purposes of evaluating whether a

23   particular customer should be able to buy more than

24   5,000 dosage units of a controlled substance family?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Well, it's memorialized in this document as

 2   of July 27th, 2007.  I'm not sure if it was being

 3   practiced as a practice in a nonmemorialized way

 4   prior to that.  But these changes took place in the

 5   summer of 2007, largely in result to -- to our

 6   response to the DEA inquiry.

 7      Q.   Okay.  And that step in the procedure would

 8   be something that Anda could perform just by looking

 9   at their sales to the customer, correct?

10      A.   Not necessarily.  It depends if we're looking

11   at that monthly dosage unit purchases product family

12   for our data or the customer's data or consolidated.

13      Q.   Okay.  And neither is specified in this

14   version of the document.

15           Do you know if Anda was collecting data as to

16   what its controlled substance purchasers were buying

17   from other sources --

18      A.   I don't know when that started.

19      Q.   -- as of this time in 2007?

20      A.   I'm not aware of that.

21      Q.   Okay.  And, similarly, for the third step in

22   the procedure, as outlined here, check percentage of

23   controlled substance sales versus noncontrolled

24   substance sales, after that, there are two what look
```

Highly Confidential - Subject to Further Confidentiality Review

1    as though they are maybe TPS file names.

2         Is that what they are?

3    A.   One's a file name.  One's a library name.

4    Q.   Okay.  Can you describe for me what FPC US

5    DEA is?

6    A.   FP represents a physical file.  CUS

7    represents customer.  DEA represents controlled

8    substances.

9    Q.   Okay.  So what is contained in that file?

10   A.   I can't say with a hundred percent certainty.

11   I don't use that file regularly.  But FP CUST DEA as

12   it relates to Number 2 would tell me that it's

13   looking at the products in aggregate that that

14   customer had purchased from us.

15   Q.   Okay.  In other words, all of the stuff that

16   they buy from you --

17   A.   That's right.

18   Q.   -- was controlled or noncontrolled?

19   A.   Was put into that file.

20   Q.   And then the second reference at page -- this

21   page ending in the Bates Number 64 that is Anda

22   Exhibit 6 is a file called AGIDO6LIB.

23   A.   That is a library.

24   Q.   And what is --

Highly Confidential - Subject to Further Confidentiality Review

1      A.    That's the library in which FP CUST DEA is

2      stored.  As the AS400 file structure works, for lack

3      of a better comparison, you could equate it to

4      Windows.

5      Q.    Okay.

6      A.    That is the file folder.

7      Q.    So within that file folder, a -- an employee

8      of Anda could look at the amount of controlled

9      substance sales that a customer purchases, correct?

10     A.    FP CUST DEA and AGIDO6LIB refer to file

11     structure on the mainframe.  It's not a user

12     interface.  Queries and/or custom screens could be

13     created using that file as its background.

14     Q.    Okay.

15     A.    To my knowledge at the point this draft

16     existed, that file was brand new.  This is a file

17     that had been created post the implementation of

18     specific families of product so that this compared,

19     the data could be compared.  I don't believe that a

20     typical user interface existed at the time of this

21     writing.

22     Q.    Okay.  Do you know as of the time of this

23     writing if one of the steps that was instituted for

24     evaluating whether a customer could buy more than

Highly Confidential - Subject to Further Confidentiality Review

1    5,000 dosage units of a family of a controlled

2    substance, whether they would check these

3    percentages?

4         A.   Yes.

5         Q.   Okay.

6         A.   That was the purpose of creating that.

7         Q.   And were there particular numerical

8    thresholds that were evaluated that would indicate

9    that, yes, the customer can get more than 5,000 units

10   of, say, OxyContin; or, no, the customer could not

11   get more than 5,000 units of OxyContin based upon the

12   percentage of controlled substance sales versus

13   noncontrolled substance sales?

14             MR. MATTHEWS:  Objection.

15             THE WITNESS:  No, I don't know what those

16        thresholds would have been.

17   BY MR. NOVAK:

18        Q.   Do you know whether thresholds -- numerical

19   thresholds were created back at that time in '07?

20             MR. MATTHEWS:  Objection.

21             THE WITNESS:  No, I don't.

22   BY MR. NOVAK:

23        Q.   And then the last step in the procedure

24   referenced here states, quote:  Using sales advantage

1    from the Anda intranet review and print previous

2    three months of sales.

3            You see that reference?

4        A.   I do.

5        Q.   Okay.  Is this outlining a step where an

6    individual evaluating whether a customer should get

7    the ability to buy more than 5,000 dosage units of a

8    controlled substance family in a month where they

9    would review this data?

10           MR. MATTHEWS:  Objection.

11           THE WITNESS:  Yes, they would, in conjunction

12       with the data described in Number 3 and Number 2.

13   BY MR. NOVAK:

14       Q.   Okay.  Now, as this procedure was implemented

15   in the fall of 2007, there were customers of Anda's

16   that were allowed to buy more than 5,000 units of

17   OxyContin or fentanyl or other controlled substance

18   families, correct?

19       A.   Adjustments to families could be made at the

20   family level.

21       Q.   When you say -- if I understand you

22   correctly, that means that the individual making

23   adjustments would make them on a family-by-family

24   basis?

```
 1      A.    I don't understand the question.

 2      Q.    Okay.  I'll ask a completely different one.

 3            As we go into the fall of 2007 and these new

 4    procedures are being implemented as it relates to the

 5    sale of opioid families to Anda's customers, who is

 6    it that's making the decision about whether a

 7    customer can buy more than 5,000 units of a family?

 8      A.    The compliance department.

 9      Q.    Okay.  And so when the compliance department

10    employee is making those decisions to adjust a limit

11    for a customer, do they make it on a family-by-family

12    basis?

13      A.    Yes, they can.

14      Q.    Okay.  Do they typically, or do they

15    typically modify it upwards or downwards of -- for

16    every family?

17            MR. MATTHEWS:  Objection.

18            THE WITNESS:  It would depend on the usage

19        and whether the data warranted it.

20    BY MR. NOVAK:

21      Q.    Okay.  So depending on the data, a compliance

22    department employee might modify the limit for

23    OxyContin, allowing a customer to buy more of that,

24    but still maintain them at 5,000 family units for
```

```
 1    fentanyl?

 2            MR. MATTHEWS:  Objection.

 3            THE WITNESS:  That's possible.

 4    BY MR. NOVAK:

 5       Q.   Okay.  Now, I think you've already testified

 6    that Anda Exhibit 6 was not formerly enacted by the

 7    company.

 8            Is that correct?

 9       A.   At that time, no.

10       Q.   Okay.

11       A.   This is not a complete document.

12       Q.   I want to leap ahead a couple of years.

13            In the summer of 2010, do you have an

14    understanding that Anda met with compliance

15    individuals at the Drug Enforcement Administration to

16    discuss their suspicious order monitoring system?

17            MR. MATTHEWS:  Objection.

18            THE WITNESS:  I believe the DEA met at our

19        location.

20    BY MR. NOVAK:

21       Q.   Okay.  Did you participate in those meetings?

22       A.   Yes.  It was a physical inspection.

23       Q.   Okay.  And in addition to the physical

24    inspection, did DEA officials meet with
```

Highly Confidential - Subject to Further Confidentiality Review

 1    representatives of Anda to discuss modifications in

 2    how their controlled substances were being sold?

 3          MR. MATTHEWS:  Objection.

 4          THE WITNESS:  I don't remember discussing

 5       specifics about modifications.

 6          (Anda Exhibit 7 was marked for

 7    identification.)

 8    BY MR. NOVAK:

 9       Q.   We've had marked as Anda Exhibit 7 a

10    three-page document, the first page of which is an

11    e-mail from Michael Cochrane addressed to Al Paonessa

12    and yourself on June 22 of 2010, and the second and

13    third pages of which are a document entitled Standard

14    Operating Procedure 40.

15          I want to direct your attention first to the

16    first page of Anda Exhibit 7 where Michael Cochrane

17    writes both to Al Paonessa and cc'ing you, quote:

18    The DEA would like for us to come to their office for

19    a meeting Thursday at 10 a.m. in person.  In

20    attendance would be Gayle Lane and Jan Hamilton, who

21    are both group supervisors, and possibly one other

22    person from DEA.  Not sure who.

23          Do you know -- irrespective of when the

24    meeting was held, do you know if a meeting was held

```
 1    arising out of this request from the DEA group

 2    supervisors --

 3              MR. MATTHEWS:  Objection.

 4    BY MR. NOVAK:

 5       Q.   -- in 2010?

 6              MR. MATTHEWS:  Objection.

 7              THE WITNESS:  A meeting with Gayle Lane

 8         happened some many weeks, if not a couple months,

 9         after this e-mail request.

10    BY MR. NOVAK:

11       Q.   Okay.  And did you participate in the

12    subsequent meeting that was held with Gayle Lane?

13       A.   Yes, I did.

14       Q.   Did you also participate in the preparation

15    of the different individuals at Anda for that

16    meeting?

17              MR. MATTHEWS:  Objection.

18              THE WITNESS:  I'm not sure what you mean.

19              (Anda Exhibit 8 was marked for

20    identification.)

21    BY MR. NOVAK:

22       Q.   We've had marked as Anda Exhibit 8 a document

23    that is an e-mail first from you to Al Paonessa on

24    July 14 of 2010 and -- and then that was apparently
```

Highly Confidential - Subject to Further Confidentiality Review

 1     forwarded to -- to Jay Spellman.

 2            Looking at the second page of Anda

 3     Exhibit 8 -- and these are Bates numbers 108116 and

 4     17.

 5            I wanted to direct your attention to the

 6     second page of Anda Exhibit 8.  Are these topics that

 7     you prepared to review with Al Paonessa in

 8     preparation for the meeting with Gayle Lane at DEA?

 9        A.   No, they are not.

10        Q.   Okay.  What are these topics?

11        A.   These are topics we were preparing a

12     discussion for for an on-site inspection that was

13     being performed by Jan Hamilton at the time.

14        Q.   Okay.  So these were in preparation for a DEA

15     inspection, and Ms. Hamilton was an employee at the

16     DEA?

17        A.   She was the other group supervisor in

18     Michael's e-mail.

19        Q.   Okay.  Looking at the second page of Anda

20     Exhibit 8, I want to direct your attention to some

21     bullet points that are further down the page.

22            You see the heading Suspicious/Excessive and

23     Limits?

24        A.   I do.

```
 1        Q.    Okay.  Underneath that, there are a few

 2    different bullet points.  I want to direct your

 3    attention -- well, let's start with the first bullet

 4    point.  It says:  We need to hold a firm stance

 5    supporting that we have not had suspicious or

 6    excessive orders since 2007 meeting with DEA in

 7    Washington, DC.

 8            Do you see that reference?

 9        A.    Yes, I do.

10        Q.    That's something that you drafted as part of

11    the topics for discussion in preparation of the

12    on-site DEA meeting?

13        A.    The continuing DEA meeting, yes.

14        Q.    Okay.

15        A.    The DEA meeting started on July 9th.

16        Q.    Okay.  And then, underneath that, you state

17    as a sub bullet point:  We created chemical families

18    of products to ensure that limits could be enforced

19    across multiple strengths of chemicals and multiple

20    bottles/pack sizes.

21            Those are the chemical families that we've

22    been discussing that were instituted in August of

23    2007?

24        A.    Yes, they are.
```

1           MR. MATTHEWS:  Objection.

2           THE WITNESS:  July of 2007.

3    BY MR. NOVAK:

4       Q.   Okay.  And specifically as it relates to

5    opioids, the chemical families of fentanyl,

6    OxyContin, hydromorphone?

7       A.   Hydrocodone, morphine.

8       Q.   Thanks.

9           MR. MATTHEWS:  Wait for a question.

10   BY MR. NOVAK:

11      Q.   The second bullet point under that states:

12   All accounts are granted a baseline of 5,000 dosage

13   units per month per chemical family as long as a

14   valid DEA license and applicable schedule are loaded

15   for the account.

16          That was the limitation put in place in July

17   of 2007?

18          MR. MATTHEWS:  Objection.

19          THE WITNESS:  Correct.

20   BY MR. NOVAK:

21      Q.   And it continued in place as of this time

22   mid-July of 2010?

23          MR. MATTHEWS:  Objection.

24          THE WITNESS:  Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:

2        Q.   Underneath that is an additional bullet

3    point:  Our systems restrict orders from being

4    entered if either a single order or cumulative orders

5    for a given month exceed the customer's dosage usage

6    unit limits.

7            Do you see that reference?

8        A.   I do.

9        Q.   You wrote that in the summer of 2010,

10   correct?

11       A.   Correct.

12       Q.   Okay.  Are those the limits that were put in

13   place -- I'm sorry.

14           We discussed at the very beginning of the day

15   today the manner in which orders are entered at Anda.

16   And this reference to a restriction on orders did

17   not -- this particular restriction did not exist in

18   2006, correct?

19           MR. MATTHEWS:  Objection.

20           THE WITNESS:  Not in the form that it's

21       described there.

22   BY MR. NOVAK:

23       Q.   Okay.  Well, let's go through the

24   restrictions that are referenced here.

Highly Confidential - Subject to Further Confidentiality Review

1            The first one that is stated underneath this

2    bullet point states:  A warning message is displayed

3    to the sales rep stating that the line item

4    attempting to be ordered exceeds the customer's

5    monthly dosage unit limit.

6            Do you see that reference?

7       A.   Yes, I do.

8       Q.   Is that a -- an automated step that was

9    placed into TPS in July of '07?

10      A.   That version of it, yes.

11      Q.   Okay.

12      A.   It existed before looking at a

13   different limit at the line item level.

14      Q.   Okay.  So there was a line item limit before

15   at the unit level, and in 2007, it was switched to a

16   limit at the family level?

17      A.   Correct.

18           MR. MATTHEWS:  Objection.

19   BY MR. NOVAK:

20      Q.   Okay.  And TPS had an automated message that

21   would display to a sales representative if a customer

22   order exceeded the limit?

23           MR. MATTHEWS:  Objection.

24           THE WITNESS:  Correct.

```
 1    BY MR. NOVAK:

 2         Q.   Okay.  Now, we -- we talked earlier about how

 3    back in 2006 customers would learn -- I'll ask a

 4    different question.

 5              Looking to the next bullet point, you wrote:

 6    If the order is attempted to be entered via one of

 7    the electronic methods, the order is rejected and not

 8    processed any further.

 9              That's what you wrote?

10         A.   I wrote that.

11         Q.   And does that reflect the manner in which the

12    system operated following the changes that were

13    instituted in July of 2007?

14         A.   I'm not sure if that was 2007 or before.  The

15    way that is written, it appears to refer to EDI order

16    methods that are -- they are not an active engagement

17    of entering the order.  It's a system ordering.

18    Those orders are rejected before they get to TPS.

19    That's what I'm referring to.

20         Q.   Okay.  You used a term that I don't recall us

21    discussing this morning:  EDI.

22              What is that?

23         A.   Electronic data interchange.

24         Q.   Okay.
```

```
 1        A.    I did refer to that at the order entry

 2   methods at the very beginning.

 3        Q.    Entirely possible.

 4              The Electronic Data Interchange is part of

 5   the Internet system of ordering?

 6        A.    No.

 7        Q.    CSOS?

 8        A.    No.

 9        Q.    In what context would the Electronic Data

10   Interchange arise as it's referenced in your bullet

11   point here?

12        A.    Large warehousing chains, chain stores would

13   transmit orders via EDI.

14        Q.    Okay.

15        A.    It's a way for mainframes to talk to each

16   other.

17        Q.    We discussed the methods by which customers

18   would submit electronic orders for controlled

19   substances this morning.  Is an EDI order from a

20   large warehouse or larger customer be an additional

21   way for a customer to place a controlled substance

22   order with Anda?

23              MR. MATTHEWS:  Objection.

24              THE WITNESS:  For a III through V, yes.  Not
```

```
 1        for a Schedule II.

 2   BY MR. NOVAK:

 3        Q.   Okay.  Now, the next bullet point that you

 4   wrote in 2010 states:  Our systems do not record and

 5   track attempted orders regardless of order entry

 6   method.

 7             Do you see that reference?

 8        A.   Yes, I do.

 9        Q.   Was that accurate in 2006?

10        A.   Yes, it was.

11        Q.   And continued to be accurate from that point

12   through 2010?

13        A.   Yes, it was.

14        Q.   Okay.  Now, I want to go next to the

15   follow-on bullet point which begins with you writing:

16   In regards to increases of limits, we will submit the

17   current SOP (OPS 035 - Anda - SOP - Controlled

18   Substance Monthly Override.)

19             Do you see that reference?

20        A.   I do.

21        Q.   Can you tell me what that SOP is?

22        A.   That's an SOP that documents how a customer

23   and/or a sales rep would obtain a review and possibly

24   an increase of controlled substances for the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    customer.

 2        Q.    Okay.  Now, that was not identified as a

 3    standard operating procedure that related to Anda's

 4    suspicious order monitoring system as it was in

 5    effect from 2006 through the present in Anda's

 6    supplemental discovery response, was it?

 7              MR. MATTHEWS:  Objection.

 8              THE WITNESS:  I'm not sure.

 9    BY MR. NOVAK:

10        Q.    Okay.  Do you consider that -- going back to

11    the discovery response that is Anda Exhibit 2,

12    Page 9, the chart.

13        A.    Yeah.

14        Q.    If you were writing this today, would you

15    have included SOP 35?

16              MR. MATTHEWS:  Objection.

17              THE WITNESS:  Yes, I would.  I'm not sure if

18         it exists in its current -- in that then format

19         at this time, though.  I don't -- I don't -- I'm

20         not aware if it's been incorporated into another

21         SOP.

22    BY MR. NOVAK:

23        Q.    Right.

24              And I'm -- I'm not either.  I'm focusing on
```

Highly Confidential - Subject to Further Confidentiality Review

1    the time period back in -- when you were writing this

2    in 2010.

3         A.    Sure.

4         Q.    At least back in 2010, SOP 35 operated as the

5    method by which increase limits -- or limits on -- on

6    ordering controlled substance families would be

7    overridden.

8              Is that accurate?

9         A.    I would agree.  It's referenced by me as a

10   current SOP.

11        Q.    Okay.

12             MR. MATTHEWS:  Just so the record is clear,

13        the response indicates that the request for

14        production of documents related to the SOPs that

15        were in effect from 2006 to the present were --

16        was that we had already produced all documents

17        related to that.  And that, in addition, we

18        identified those SOPs that are in effect as of

19        the date of the response by Bates Number and SOP.

20             So, in fact, your characterization of the

21        response is inaccurate, and I just wanted to make

22        that clear on the record so that it didn't appear

23        that somehow the response was incomplete and

24        didn't include SOP 35, which obviously had been

```
 1      produced to you as we represented in the document

 2      when we made the response.

 3           MR. NOVAK:  This is something we can talk

 4      about off the record.  You have made your

 5      clarifying comments.

 6           I -- I can tell you, we haven't found SOP 35,

 7      but we -- we can discuss it at a break.

 8  BY MR. NOVAK:

 9      Q.   Now, underneath, we were looking at your

10  document prepared in July of 2010 that is Anda

11  Exhibit 8.  And the next bullet point that we have

12  been reviewing relates to increases of limits.

13           The first bullet point under that states:

14  While brief, it does not outline what is done in

15  regards to reviewing data in order to consider and

16  grant an increase.

17           Do you see that reference?

18      A.   Yes, I do, but it actually says it does

19  outline what is done in regards to reviewing data.

20      Q.   Oh, I'm sorry.  Did I misread it?

21      A.   You said does not.

22      Q.   Okay.  Thank you for -- for correcting.

23           So does -- are you writing there that

24  SOP 35 -- okay.
```

```
 1              So the manner in which data is reviewed for

 2     purposes of determining whether a customer would get

 3     an increase over the 5,000 unit family limit is set

 4     out in SOP 35?

 5         A.    Yes.

 6         Q.    As of this time in 2010?

 7         A.    Yes.  But what's not here, for context, is

 8     the list of questions or asks that the DEA had of me

 9     that led me to draft this document.

10              I don't know what I'm answering.

11         Q.    Okay.  Well, let me ask you:  What is it that

12     DEA was asking that you feel is important to give

13     context to drafting this document?

14         A.    Oh, what I'm saying is I don't know the

15     specific questions that I was addressing here in

16     those bullets.  A DEA audit is sitting at a

17     conference table much like this where we go through

18     the formalities of security, access, inventory

19     accountability, physical security of the product, so

20     on and so forth.

21              And then it moves to a management discussion.

22     The management discussion has a list of asks and

23     usually has a sampling of a list of customers that

24     they wish to look at.
```

1          It's obvious that there were some asks

2     related to these topics, but I don't know what the

3     specific asks were in my notes that led me to draft

4     this document.

5     Q.    Okay.  The next bullet point that I want to

6     direct your attention to in Anda Exhibit 8, Page 2,

7     is where you wrote:  We can speak to the details of

8     information that is looked at while considering an

9     increase in the level of the increase.

10          And then it says:  Need to discuss the ranges

11    below.

12          You wrote that in 2010?

13    A.    Yes.

14    Q.    Okay.  Now, there are three different ranges

15    that are set out below:  One for a customer who's

■      ████████████████████████████████████

■      ████████████████████████████████████

■      ████████████████████████████████████████

■      ██████████████████████████████████████

■      ████████████████████████████████████████

■      ██████████

22          Is that accurate?

23    A.    Yes.

24          MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. NOVAK:

2        Q.   Okay.  For the first one, these are for

3    customers that you would be allowed to increase the

4    ██████████████████████████████████████████

5            MR. MATTHEWS:  Objection.

6            THE WITNESS:  The primary bullet talks about

7        considering an increase.

8    BY MR. NOVAK:
```

██    ████  ██████  ████████████████████████████

██    █████████████████████████████████████████████

██    █████████████████████████████████████████████

██    ██████

██    ████  ████████████████

██    ████  ██████████████████████████████████████

██    ████████████████████████████████████████████

██    ██████████████████████████████████████████

██    ██████████  ████████████████████████████████

██    ████████████████████████████████████████████

██    █████████████████████████████████████████████

██    ███████████████████████████████████████

██    ██████████

```
22       A.   Those are --

23           MR. MATTHEWS:  Objection.

24           THE WITNESS:  Those are factors.  I don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        know if they are all the factors.

2   BY MR. NOVAK:

3        Q.   Okay.  And then, similarly, in addition to

4   those factors, if you -- or if an Anda compliance

5   employee wanted to give a -- an even larger increase

6   in the control limit to a customer, you wrote:  Above

7   plus report from customer detailing products,

8   dispensed products, and customer questionnaire.

9        Do you see that?

10       A.   Yes, I do.

11       Q.   Okay.  Was it your understanding that for

12  customers who were getting increases in their control

13  limits back at this point in 2010 that Anda was

14  collecting dispensing data for those customers that
```



```
21  2010, was it Anda's practice not to typically gather

22  and review dispense data?

23            MR. MATTHEWS:  Objection.

24            THE WITNESS:  Not necessarily.  It was an
```

Highly Confidential - Subject to Further Confidentiality Review

1        individual customer review, and every customer

2        was evaluated individually.

3    BY MR. NOVAK:

4        Q.   Okay.  And then for customers who got more

█    ████████████████████████████████████████████

6    substance, you wrote in the third bullet point:  All

7    above plus site visit.

8            MR. MATTHEWS:  Objection.

9    BY MR. NOVAK:

10       Q.   Correct?

11           MR. MATTHEWS:  Objection.

12           THE WITNESS:  Yes.

13   BY MR. NOVAK:

14       Q.   Were you recording there that customers who

█    ████████████████████████████████████████████

16   substance like OxyContin or fentanyl would not be

17   allowed to do so unless an Anda compliance

18   representative went out and performed a site visit?

19           MR. MATTHEWS:  Objection.

20           THE WITNESS:  This describes a practice.

21       It's not saying emphatically that that happened

22       on every one of them.

23   BY MR. NOVAK:

24       Q.   Okay.  That it was the general practice that

1    for customers who were buying quantities in excess of

2    ███ ████████████████████████████████████████████

3    typically --

4        A.   Yes --

5        Q.   -- receive site visits?

6            MR. MATTHEWS:  Objection.

7            Wait for the answer and give me a moment to

8        object, please -- wait for the question, I mean.

9    BY MR. NOVAK:

10       Q.   And then the next bullet point after that

11   states:  We will submit the Legacy report parameters

12   for suspicious and excessive orders.

13           And underneath that, it states:  These

14   reports were submitted to DEA prior to 2007 meeting

15   in Washington D.C.

16           First of all, the reports that were submitted

17   to DEA prior to the 2007 meeting, is that a reference

18   to the suspicious order and excessive order reports

19   that at one time Jay Spellman would submit to the DEA

20   on a periodic basis?

21       A.   Yes, they are.

22       Q.   Okay.  You understand that Mr. Spellman

23   ceased providing the periodic reports in that fashion

24   after the 2007 meeting?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  Yes, I do.

 3    BY MR. NOVAK:

 4         Q.   Okay.  When you say -- or when you wrote:  We

 5    will submit the Legacy report parameters for

 6    suspicious and excessive orders, what does that mean?

 7         A.   Again, I don't have the context of the

 8    specific asks that the DEA had for the review

 9    meeting.  I could hazard a guess that that was in

10    response to what our procedure was for suspicious and

11    excessive order reporting.

12         Q.   Okay.  We haven't spoken much yet today about

13    Anda's practices of submitting suspicious order

14    reports to the DEA at different points in time.

15              Can you describe for me, starting in 2006,

16    what the practice of -- of submitting suspicious

17    order reports to the DEA entailed?

18         A.   There were weekly suspicious order reports,

19    and I believe there were monthly excessive order

20    reports, both that had mathematical formulas looking

21    at what that customer's purchase history had been in

22    either a rolling 3-month period or a rolling 12-month

23    period respectively to the suspicious and/or

24    excessive reports.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  For the suspicious -- and these were

 2   reports that were submitted to the DEA in 2006 and

 3   -7, correct?

 4        A.    To the local offices, yes.

 5        Q.    Okay.  The -- the trigger for reporting an

 6   order received by Anda as suspicious for -- for

 7   purposes of these weekly reports in '06 and '07, what

 8   was the trigger?

 9        A.    The mathematical formula that I referenced

10   that's incorporated in the report parameters

11   document.

12        Q.    The -- what report parameters document?

13        A.    The suspicious order reporting document.

14        Q.    Okay.  Are you indicating that the multiples

15   used for generating the suspicious order reports are

16   contained in the document itself that was submitted

17   to the DEA?

18        A.    If not in the document, in the programming

19   that's behind it.

20        Q.    Okay.  Do you know what the multiples were

21   that would have flagged an order as suspicious for

22   purposes of reporting it in those documents in the

23   '06/'07 time frame?

24        A.    Not exactly, no, I don't.
```

```
 1        Q.    Okay.  And then reports in that form ceased

 2   in the summer of '07, correct?

 3        A.    They did.  After the discussions that we had

 4   with Washington headquarters and the guideline of

 5   5,000 dosage units per month was given to us by the

 6   DEA, we deemed that we no longer had suspicious

 7   orders so long as we kept them underneath there

 8   and/or we could justify why a customer would get more

 9   based on his business practices and his data.

10        MR. NOVAK:  Why don't we take a break.  And

11        I'm thinking a lunch break.

12        THE VIDEOGRAPHER:  The time is 12:12.  We're

13        going off the record.

14        (Recess from 12:12 until 1:05 p.m.)

15        MR. MATTHEWS:  Before we start, we had a

16        discussion about whether OPS was in the

17        production.

18        Yes, 35 was contained in the production of

19        this case.  I have found and printed for

20        Mr. Novak's use at this deposition documents

21        bearing Bates numbers Anda_Opioids_MDL_000277385

22        through 386.  It is OPS 35, which was produced

23        roughly five months ago, I believe.

24        MR. NOVAK:  Might as well mark it now.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Anda Exhibit 9 was marked for

 2     identification.)

 3     BY MR. NOVAK:

 4        Q.   We've had marked as Anda Exhibit 9 the

 5     document that Mr. Matthews just identified with the

 6     Bates Number, and I'll ask a couple follow-up

 7     questions with respect to it.

 8              Mr. Cochrane, first, is this the Standard

 9     Operating Procedure 35 as it existed back at the time

10     that you made reference to it at Page 2 of Anda

11     Deposition Exhibit 8?

12        A.   Yes, it looks like the document that would

13     have been in place.

14        Q.   Okay.  So in the context of Anda Exhibit 8

15     when you were preparing -- or writing that

16     characterization of how limits are increased for

17     particular customers beyond a 5,000 unit level, the

18     applicable procedure was Standard Operating Procedure

19     35 contained as -- or identified as Anda Exhibit 9?

20              MR. MATTHEWS:  Objection.

21              THE WITNESS:  Yes.  It was -- in part, yes.

22        But that doesn't necessarily mean that there

23        weren't additional practices or procedures in

24        place that were reviewing customers.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. NOVAK:

 2      Q.   Okay.  Just that they weren't reduced to a

 3   standard operating procedure?

 4      A.   They weren't memorialized in this document,

 5   OPS 35.

 6      Q.   Okay.  Now, looking at Standard Operating

 7   Procedure 35, the second page, I'd like to direct

 8   your attention.

 9           First it indicates that the purpose of the

10   operating procedure is to make sure the appropriate

11   steps are followed when a customer is requesting more

12   than 5,000 dosage units of a controlled substance

13   family in a single calendar month.

14           That is your understanding as to when these

15   steps are to be employed -- or were being employed by

16   Anda in 2010?

17      A.   Yes, it is.

18      Q.   Okay.  And I think some of them are

19   sufficiently clear, but I wanted to direct your

20   attention, under Procedure, to the fourth step, which

21   states, quote:  Forward customer questionnaire to be

22   filled out if percentage ratios are too high.

23           Now, there is no numerical threshold stated

24   for when a percentage ratio is too high for purposes
```

1    of that step.  Would that leave it up to the

2    compliance employee to determine when to forward

3    customer questionnaires?

4        A.    Yes.  It would be the compliance personnel.

5        Q.    Okay.  And in the exercise of their

6    discretion, if they thought that a percentage ratio

7    of controlled substance sales to noncontrolled

8    substance sales was too high, then they would send a

9    customer questionnaire to the customer to have them

10   fill it out?

11       A.    Perhaps.  It might not be the only reason

12   they sent a questionnaire.  There may have been a

13   questionnaire already on file.

14       Q.    Okay.  That's all I have for -- for that.

15             Going back to Anda Exhibit 8, however --

16       A.    Okay.

17       Q.    -- the statement that you wrote in Anda

18   Exhibit 8, quote:  Our systems do not record and

19   track attempted orders regardless of order entry

20   method.

21             End of quote.

22             Is that still true today?

23       A.    To my knowledge, except for certain

24   circumstances of EDI orders, it is still true.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  Has it been true the entire time from

 2   2006 through the present?

 3        A.    I'm not sure.

 4        Q.    Okay.  The EDI orders that you referenced,

 5   that is relegated to the context of large orders from

 6   wholesalers or other entities, or can anyone place an

 7   EDI order?

 8             MR. MATTHEWS:  Objection.

 9             THE WITNESS:  No, that is not correct.  It's

10        not in relationship necessarily to large orders.

11        It could be referencing large customers,

12        customers that have large systems.  It's not

13        necessarily just a wholesale order.

14   BY MR. NOVAK:

15        Q.    Okay.

16        A.    For example, Walgreens transmits orders to us

17   from the store level to Anda via EDI.  There are

18   thousands of them per day.

19        Q.    Okay.  How many of Anda's customers typically

20   order their controlled substances through the EDI

21   ordering --

22             MR. MATTHEWS:  Objection.

23   BY MR. NOVAK:

24        Q.    -- process?
```

```
 1        A.   Very few customers.

 2        Q.   Okay.

 3        A.   I mean, aggregate, Walgreens is a customer.

 4   Their individual locations have the ability to order

 5   Schedules III through V via EDI.

 6        Q.   All right.  In addition to Walgreens, who

 7   else orders controlled substances from Anda through

 8   EDI?

 9        A.   There are various other retail customers.

10        Q.   Okay.

11        A.   I can't think of any names specifically.

12        Q.   Okay.

13        A.   There are some chains.  Thrifty White orders

14   via EDI.  It's usually the chain customers that have

15   central purchasing systems.

16        Q.   Just one other question with respect to Anda

17   Exhibit 8.  As it's used -- or as you wrote it in

18   this document, how do you -- how would you describe

19   the circumstances under which a customer places an

20   attempted order with Anda?

21        A.   I don't understand.

22        Q.   Well, in the entry that we were just reading

23   where you wrote our systems does not -- our systems

24   do not record and track attempted orders regardless
```

Highly Confidential - Subject to Further Confidentiality Review

1    of order entry method, what are the circumstances

2    under which Anda would receive an attempted order as

3    you used the term there?

4          MR. MATTHEWS:  Objection.

5          THE WITNESS:  If a customer, let's say for

6       the Internet, was online in their account and

7       they didn't have a license loaded or they didn't

8       have a schedule loaded for a specific item they

9       were trying to order or they ordered in excess of

10      what their limit was, that line item would not be

11      accepted, and they could not go any further.  It

12      would not transmit that order from the Internet

13      to TPS.  It would not create an order.

14   BY MR. NOVAK:

15      Q.   Okay.

16      A.   Same goes for the order entry methods within

17   TPS for the telephonic sales.

18      Q.   Okay.  How about for paper, 222 Forms?  Are

19   there orders that, as you use the term here, would be

20   attempted orders that are never entered into the

21   system --

22      A.   Those would go --

23          MR. MATTHEWS:  Object.

24   ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2        Q.   -- in paper?

 3             MR. MATTHEWS:  Objection.

 4             THE WITNESS:  Those would go through the same

 5        process as the telephonic sales.  As they were

 6        attempting to be ordered in TPS, they would not

 7        proceed.  It would not let them accept an order.

 8    BY MR. NOVAK:

 9        Q.   Okay.  And then switching back to Exhibit 9,

10    the Operating Procedure 35, do you know if between

11    the period of 2007 through 2010 whether any of the

12    procedures set forth in Standard Operating

13    Procedure 35 were embedded into the TPS system in an

14    automated fashion?

15             MR. MATTHEWS:  Objection.

16             THE WITNESS:  An automated fashion as in how?

17    BY MR. NOVAK:

18        Q.   As in reviewing a 5,000 dosage unit limit to

19    make a determination as to whether it should be

20    increased.

21        A.   No.

22             MR. MATTHEWS:  Objection.

23             THE WITNESS:  There was no TPS programming

24        that was doing any determinations.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2         Q.   Okay.

 3              (Anda Exhibit 10 was marked for

 4    identification.)

 5    BY MR. NOVAK:

 6         Q.   We've had marked as Anda Exhibit 10 a

 7    document bearing the Bates pages 277387 and 38 -- I'm

 8    sorry -- through 389.  It's a three-page document

 9    that appears to be a version of Standard Operating

10    Procedure 28.

11              Mr. Cochrane, we had reviewed earlier

12    versions -- and I think later versions -- of SOP 28.

13    Is this the version that became effective in May

14    of -- I'm sorry -- September 26 of 2008?

15         A.   That appears accurate, yes.

16         Q.   Okay.  Now, looking at this particular

17    version of Standard Operating Procedure 28, it

18    includes certain requirements for collection of

19    information from customers that were not in the

20    initial standard operating procedure that issued in

21    2004.

22              Is that accurate?

23         A.   I'm reading it.

24              Would you restate that question?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    Q.   Looking at this -- I'll just reread it.

2         Looking at this particular version of

3    Standard Operating Procedure 28, it includes certain

4    requirements for collection of information from

5    customers that were not in the initial standard

6    operating procedure that was issued in 2004.

7         Is that accurate?

8    A.   I believe it to be.

9         Could you point me to the other exhibit that

10   you're referencing?

11   Q.   So we can do a comparison?

12   A.   Is it Number -- Number 3?  Yes.

13   Q.   Yes.

14   A.   The answer to your question is yes.

15   Q.   Okay.  And in particular is the modification

16   for this version of SOP 28 simply to reflect that

17   chain stores may submit their information in a

18   different manner than nonchain stores, as set out in

19   Procedure 3.0(D)?

20        MR. MATTHEWS:  Objection.

21        THE WITNESS:  Yes.  This would describe

22        additional steps for stores that were -- or

23        chains that were greater than 50 stores.

24   ///
```

1   BY MR. NOVAK:

2       Q.   And then in the third page of the standard

3   operating procedure, there is a system set forth for

4   comparing and matching DEA registration files that's

5   added.

6            Is that correct?

7       A.   That's correct.

8       Q.   Does that relate only to chains or to any

9   store?

10      A.   Which portion?

11      Q.   The registration file collection of

12  information from the Department of Justice via CD.

13      A.   I believe this subpart B is referring to a

14  deliberate action of checking the chain listing

15  against that DEA CD.  The DEA CD information that we

16  were receiving at that time was uploaded to TPS.  So

17  we had access for that -- for all of that.  But this

18  is describing a deliberate action to the chain store

19  listing.

20      Q.   Okay.  Now, as of this point in time in 2010,

21  there is not a requirement that a customer submit a

22  customer questionnaire in order to be eligible to

23  purchase controlled substances from Anda, is there?

24           MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            THE WITNESS:  I don't know that there's a

 2       requirement.  There had been requests for

 3       questionnaires dating back to 2007.

 4            A questionnaire is just one element of what

 5       is used to qualify a customer for controls.

 6  BY MR. NOVAK:

 7       Q.   Okay.  At any rate, a customer questionnaire

 8  obligation had not been placed into Standard

 9  Operating Procedure 28 as of this point in time,

10  correct?

11       A.   Not to my knowledge at this point, no.

12       Q.   Okay.

13            (Anda Exhibit 11 was marked for

14  identification.)

15  BY MR. NOVAK:

16       Q.   We've had marked next Anda Exhibit 11, which

17  is an e-mail dated December 13 of 2011 from

18  Michael Cochrane to multiple individuals at Anda,

19  including yourself.  And attached to the e-mail is a

20  modified -- or what appears to be a modification to

21  the Standard Operating Procedure 28.

22            The document is Bates Number 112251

23  through -- well, it appears to be out of order, at

24  least mine is -- 11251 through 259.
```

1            And it includes two attachments.  The first

2    is on the third page of Anda Exhibit 11 bearing the

3    Bates Number 112253.

4        A.   Okay.

5        Q.   Is that the questionnaire -- or the customer

6    questionnaire that Anda included in its Standard

7    Operating Procedure 28 starting in 2011?

8            MR. MATTHEWS:  Objection.

9            THE WITNESS:  Based on looking at it, it

10           looks like a document that has a revision date of

11           11/16 of '11.  The SOP, the last page of that

12           exhibit, references August 2011.  And the

13           description is:  Include CQ and DD requests,

14           which I assume to be customer questionnaire and

15           due diligence requests.

16   BY MR. NOVAK:

17       Q.   Now, specifically, the -- if we look at the

18   Standard Operating Procedure 28, as you referenced,

19   August of 2011 is when the standard operating

20   procedure was modified to require the customer

21   questionnaire.

22           And I'm not sure if it's due diligence or

23   dispense data.

24           MR. MATTHEWS:  Objection.

```
 1              THE WITNESS:  Was there a question there?

 2              MR. NOVAK:  I'll break it up into two

 3       questions.

 4    BY MR. NOVAK:

 5       Q.   So it was August of 2011 that Anda first

 6    modified its standard operating procedure to include

 7    a customer questionnaire submission obligation?

 8              MR. MATTHEWS:  Objection.

 9              THE WITNESS:  I haven't determined that yet.

10       I would like to read this document.

11              MR. NOVAK:  Okay.

12              MR. MATTHEWS:  By standard operating

13       procedure, you're referring to SOP 28?

14              MR. NOVAK:  Yes.

15              THE WITNESS:  Okay.  Can you reread?

16    BY MR. NOVAK:

17       Q.   My -- my first question relates to simply the

18    revision history.

19       A.   Okay.

20       Q.   Is August of 2011 the time period when Anda

21    first began requiring the submission of customer

22    questionnaires as part of its written standard

23    operating procedures?

24       A.   What I can confirm related to August '11 and
```

Highly Confidential - Subject to Further Confidentiality Review

1    customer questionnaire and due diligence information

2    is that that is when that language in Section 3.1 B

3    was modified, specifically:  All new and reactivated

4    customers that wished to purchase controlled

5    substances are required to complete our due diligence

6    documents which include our customer questionnaire.

7        Q.   Okay.  And that was the first time that was

8    required as part of Anda's written standard operating

9    procedures for customers wishing to purchase

10   controlled substances?

11            MR. MATTHEWS:  Objection.

12            THE WITNESS:  I'm not sure what would have

13       been in the September 26th of '08 change

14       management description of the revision history.

15   BY MR. NOVAK:

16       Q.   Now, we had reviewed the version of standard

17   operating procedure that existed on May 21 of 2010,

18   and the customer questionnaire obligation was not

19   included in that document, correct?

20       A.   You'll have to point me back to it.  It's

21   Exhibit 10?

22       Q.   Yes.

23       A.   Correct, it was not in there.

24       Q.   Okay.  So by reviewing Exhibit 10, is it your

Highly Confidential - Subject to Further Confidentiality Review

```
 1    understanding that the first time these due diligence

 2    and customer questionnaire obligations were

 3    incorporated into Anda's written standard operating

 4    procedures was in August of 2011?

 5        A.    Yes, that appears correct.

 6            (Anda Exhibit 12 was marked for

 7    identification.)

 8    BY MR. NOVAK:

 9        Q.    We've had marked as Anda Exhibit 12 a version

10    of the standard operating procedure entitled

11    "Information to Set Up a New Account," and the Bates

12    pages are 84434 through 84437.  And my questions on

13    this are relatively simple.

14            By looking at the revision history of the

15    document on the last page, can you determine as to

16    whether from the period of August of 2011, the last

17    version of the document that we looked at, through

18    August 26th of 2014, that no changes were made?

19        A.    I can't determine that based on that revision

20    hit.

21        Q.    Okay.  Well, let's talk more generally about

22    the use of revision histories at the end of standard

23    operating procedures at Anda.

24            In instances where modifications to Anda's
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    procedures are made, are those modifications

2    reflected in the change description column of the

3    revision history?

4         A.   I can't say that they always are.

5         Q.   Okay.  So there are instances where there may

6    be a modification to the -- to the standard operating

7    procedure and it is not reflected in the change

8    description column?

9         A.   That could be incorporated into the review

10   description.

11        Q.   Okay.  At any rate, you are not aware of any

12   modifications -- and you can take a moment to review

13   them -- of the standard operating procedure as it

14   related to new customers between August of 2011 and

15   August 26th of 2014, correct?

16             MR. MATTHEWS:  Objection.

17             THE WITNESS:  I'm not aware of -- of any

18        changes.

19   BY MR. NOVAK:

20        Q.   Okay.

21        A.   I see formatting changes when comparing

22   Page 1 to Page 1 of the document.

23        Q.   Now, looking at the standard operating

24   procedure in Anda Exhibit 12, I'd like to draw your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      attention to the top of the second page.

 2              There's a bullet point there that says:  In

 3      most cases, we also require the submission of a

 4      dispensing log of controlled and noncontrolled

 5      substances dispensed by the pharmacy.  The allocation

 6      of all controlled substance chemical families to

 7      1,000 dosage units for newly reactivated customers

 8      and have excluded oxycodone and methadone products

 9      from availability until we can confirm that the

10      customer is acting in accordance with the Controlled

11      Substance Act.

12              Do you see that reference?

13      A.   I do.

14      Q.   Was that first incorporated as an obligation

15      in the standard operating procedures in August

16      of '11?

17              MR. MATTHEWS:  Objection.

18              THE WITNESS:  I'm -- I'm not sure.  I would

19       have to look at the documents.

20      BY MR. NOVAK:

21      Q.   If you want to take a moment to review them

22      for purposes of answering that question, you can.

23              MR. MATTHEWS:  The question is limited to

24       Standard Operating Procedure 28?
```

1          MR. NOVAK:  Yes.

2          THE WITNESS:  Okay.

3     BY MR. NOVAK:

4          Q.   Do you recall my question?

5          A.   Yeah.

6          The August '11 version is the first time I

7     see that appearing in the SOP document.

8          Q.   Okay.  Now, the obligation as it's contained

9     in the standard operating procedure says that:  In

10    most cases, we also require the submission of a

11    dispensing log of controlled and noncontrolled

12    substances dispensed.

13         What are examples where Anda would not

14    require the submission of a dispensing log for

15    purposes of making a determination as to whether a

16    customer can be eligible for the purchase of

17    controlled substances in the August of '11 through

18    August of 2014 time frame?

19         A.   Specific reviews of individual customers are

20    made on a subjective basis based on the compliance

21    analyst and the compliance department reviewing them.

22    If they felt they had sufficient information through

23    the other methods, they may not require that log.

24         Q.   Okay.

```
 1              (Anda Exhibit 13 was marked for

 2       identification.)

 3       BY MR. NOVAK:

 4          Q.   We've had marked as Anda Exhibit 13 a

 5       document bearing the Bates page Anda 36519 through

 6       Anda 36521, which is -- appears to be an additional

 7       version of Standard Operating Procedure 28.

 8              Again, directing your attention to the third

 9       page of the exhibit in the revision history contained

10       there, is the primary purpose of the revision to the

11       Standard Operating Procedure 28 as it is referenced

12       here the additional licensure information?

13              MR. MATTHEWS:  Objection.

14              THE WITNESS:  That's what's written in the

15          change description for January 5th of 2015.  I

16          haven't reviewed the content yet.

17       BY MR. NOVAK:

18          Q.   And looking at Page 2 of this version of

19       Standard Operating Procedure 28, bearing the Bates

20       number 520 on the bottom --

21          A.   Okay.

22          Q.   -- the language with respect to dispensing

23       data appears to be unchanged.  And specifically I'll

24       draw your attention to the bullet point which reads:
```

1    In most cases we also require the submission of a

2    dispensing log of controlled and noncontrolled

3    substances dispensed by the pharmacy.

4         It's still -- at this point in 2015, is it up

5    to the discretion of compliance personnel as to

6    whether a log of dispensing data will be required in

7    order for a customer to purchase controlled

8    substances?

9         A.   Compliance is still reviewing the individual

10   customers.  Whether or not the practice is a hard

11   rule on a requirement or it is practice as it is

12   memorialized in this document, I can't be a hundred

13   percent sure at this point right now.

14        Q.   Is there a period of -- well . . .

15        (Anda Exhibit 14 was marked for

16   identification.)

17   BY MR. NOVAK:

18        Q.   Before we leave Exhibit 13, that is, as far

19   as you can tell, an accurate copy of the standard

20   operating procedure that was in effect as of the time

21   that is referenced in the revision history?

22        A.   Yes.

23        Q.   Okay.  The next document we have had marked

24   is Anda Exhibit 14, which appears to be yet another

Highly Confidential - Subject to Further Confidentiality Review

1    version of Standard Operating Procedure 28.  It

2    appears that the title of the document has changed to

3    "Customer Due Diligence."

4         Looking at the page ending in the Bates page

5    numbers 205 -- and, again, looking at the language

6    with respect to dispensing data, it continues to

7    state:  In most cases, we also require the submission

8    of a dispensing log of controlled and noncontrolled

9    substances dispensed by the pharmacy.

10        At least for purposes of Standard Operating

11   Procedure 28, it was still up to the discretion of

12   compliance personnel at Anda as to whether dispensing

13   data would be required as a prerequisite to the

14   purchasing of controlled substances; is that correct?

15        MR. MATTHEWS:  Objection.

16        THE WITNESS:  Yes.  Correct.

17        MR. NOVAK:  I think that's all I have for

18   SOP 28.

19        Why don't we take a quick break so I can get

20   the next batch of documents.

21        THE VIDEOGRAPHER:  Off the record at 1:51.

22        (Recess from 1:51 until 1:58 p.m.)

23        (Anda Exhibit 15 was marked for

24   identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  The time is 1:58 p.m.  We

 2      are now back on the record.

 3   BY MR. NOVAK:

 4      Q.   We have had marked Anda Deposition

 5   Exhibit 15, which is a multiple page document bearing

 6   the Bates numbers 527935.

 7              The first page is an e-mail from Robert

 8   Williamson to Jay Spellman dated September 9th of

 9   2016, but I'm more interested in the next three pages

10   of the document, which appear to be Standard

11   Operating Procedure 40.  And the version, looking at

12   the revision history is Version 4 -- 40.01.

13              Is that an accurate description as to what

14   this document is?

15      A.   Yes.

16      Q.   Okay.  And was this the version of the

17   standard operating procedure for Anda related to

18   suspicious order monitoring in effect as of April 5

19   of 2012?

20      A.   It appears that this is SOP 40 from April

21   of 2012, yes.

22      Q.   So at this point, Anda had a written standard

23   operating procedure that involved the holding of

24   orders of interest as part of its suspicious order
```

```
 1    monitoring system; is that correct?

 2         A.   Yes.

 3         Q.   And was that, as of April of 2012, an

 4    automated process?

 5              MR. MATTHEWS:  Objection.

 6              THE WITNESS:  The orders going on hold was

 7         automated, yes.

 8              MR. NOVAK:  Yes.

 9    BY MR. NOVAK:

10         Q.   And specifically looking at the scope of the

11    suspicious order monitoring SOP, the page that ends

12    in 936, it states:  Orders of interest are captured

13    using historical sales information with a user

14    defined time frame by looking at past averages of the

15    following using a user defined multiplier.

16              Do you see that reference?

17         A.   I do.

18         Q.   And then there are various metrics that are

19    referenced as bullet points underneath that to which

20    the defined multiplier is multiplied.  Is that your

21    understanding as to how the suspicious order

22    monitoring system at this point in time works?

23         A.   Yes.

24         Q.   Okay.  And specifically, is there a
```

1    particular user defined multiplier that you are aware

2    of for how SOP 40 was implemented in the 2012 time

3    frame?

4        A.   I'm not aware of the exact number that was

5    used when it was implemented.  You would need to

6    refer to the compliance department for that.

7        Q.   Okay.  And is your understanding of how the

8    suspicious order monitoring program worked is that it

9    would take these different four metrics that are

10   referenced in a bullet point and if the user defined

11   multiplier times one of those metrics exceeded a

12   particular threshold, then the order that had been

13   submitted to Anda would be held for review?

14            MR. MATTHEWS:  Objection.

15            THE WITNESS:  Yes, I do.

16   BY MR. NOVAK:

17       Q.   Okay.  By the way, we have been talking about

18   different standard operating procedures.  Up through

19   the time that this version of Standard Operating

20   Procedure 40 went into effect, was there a -- in

21   April of 2012, was there an automated standard

22   operating -- I'm sorry, an automated suspicious order

23   monitoring system embedded into TPS?

24       A.   It's just a portion of it, but, yes, it was

1     in TPS.

2         Q.   Okay.  I'm saying prior to this version that

3     existed in April of 2012, was there an automated

4     version of a suspicious order monitoring system

5     embedded within into TPS?

6         A.   Yes.  I believe it went into effect in

7     December of '11.

8         Q.   Okay.  And is it your understanding that

9     this -- the document that we have as Anda Exhibit 15

10    includes all of the provisions that were in effect

11    when the original issue came out in December of 2011?

12        A.   I'm unsure of the version changes.

13        Q.   Okay.

14        A.   Not from looking at this document.

15        Q.   Okay.  Can you explain for me in your own

16    words how the suspicious order monitoring system

17    embedded within TPS as of April of 2012, when this

18    document was created, how it would suspend or hold

19    orders for review?

20             MR. MATTHEWS:  Objection.

21             THE WITNESS:  The mechanics of how it would

22        do it?

23    BY MR. NOVAK:

24        Q.   Yes.

1      A.    After the order was entered in TPS, it would

2   go against these -- the programming that was put in

3   place to monitor those four bullets.  If one of those

4   or more of those triggers were hit, the order would

5   go on hold.

6      Q.    Okay.  And once it went on hold, what would

7   the process for reviewing the order to make a

8   determination as to whether it could be released to

9   the customer, how was that process performed?

10      A.    It was performed by compliance analysts

11   within the compliance departments, as outlined in

12   this document.

13      Q.    Okay.  What were the steps -- once an order

14   was held as an order of interest, what were the steps

15   that someone in the compliance department would

16   undertake in order to determine whether to ship the

17   order to the customer or suspend it?

18          MR. MATTHEWS:  Objection.

19          THE WITNESS:  Are you asking me to read

20      through the steps that are taken?

21   BY MR. NOVAK:

22      Q.    If you can simply provide your testimony as

23   to how Anda performed that function during 2012,

24   I'd -- I'd like your characterization on it.

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  The compliance department would

 3         follow the SOP and go through the steps that are

 4         outlined in that SOP to review the individual

 5         order and customer information on file.

 6   BY MR. NOVAK:

 7         Q.   Okay.  And when you say "the individual

 8    steps," do you mean the steps that are set forth

 9    under "Procedure" at the page of Anda Exhibit 15 that

10    ends in 36?

11         A.   Yes.  It could be one, some, or all of those.

12         Q.   Okay.  So a compliance employee would

13    determine whether the order had been stopped based

14    on -- or -- or figure out which of the metrics was

15    the basis for holding the order to begin with.

16              MR. MATTHEWS:  You have to say "yes" or "no."

17              THE WITNESS:  Yes.

18   BY MR. NOVAK:

19         Q.   And then the compliance employee would refer

20    to TPS as the next step?

21         A.   Correct.

22         Q.   Okay.  And the information that they were

23    looking at in TPS was first to pay attention to what

24    city or state the request from the customer came
```

```
1    from, and then also to determine if a customer

2    questionnaire was on file?

3        A.    Yes.

4        Q.    Okay.  The next step in the process that is

5    referenced is -- states:  Determine if customer had

6    previously been reviewed or grandfathered into

7    control eligibility.

8              You see that step?

9        A.    I do.

10       Q.    Is it your understanding that Anda had

11   customers as of this time who had been grandfathered

12   into control eligibility?

13             MR. MATTHEWS:  Objection.

14             THE WITNESS:  It is not, but it is certainly

15        possible depending on what their history had been

16        and whether or not we had questionnaire or data

17        on file.

18   BY MR. NOVAK:

19       Q.    Did you have an understanding as to a

20   grandfathering process that existed for old customers

21   of Anda?

22       A.    Generally, a grandfathered customer would be

23   someone who had access to controls prior to one of

24   the events that were outlined as part of our evolving
```

Highly Confidential - Subject to Further Confidentiality Review

1    process of eligibility for customers to have control

2    access.

3        Q.    Now, I'm not going to go through each of the

4    steps that the compliance manager would take in

5    evaluating whether to release the order.  Is it fair

6    to say that those are the steps that are outlined in

7    Roman numerals I through VI in Anda Exhibit

8    Number 15?

9        A.    Yes.  Those are the steps that could be

10   taken --

11       Q.    Okay.

12       A.    -- to review.

13       Q.    Now, once a determination was made by a

14   compliance officer that they could release the

15   order -- in other words, ship it to the customer --

16   did they have to enter the basis upon which the order

17   was released?

18       A.    I'm not aware of a requirement to do that.

19       Q.    Okay.  At any rate, there is referenced at

20   the bottom of Anda Exhibit 15 the page bearing the

21   numbers -- the end numbers 937, a list of reasons why

22   held orders could be released.

23            Is that correct?

24       A.    Yes.

1      Q.    And -- and those follow over onto the -- the

2    next page of Standard Operating Procedure 40,

3    correct?

4      A.    Yes.

5      Q.    Are those the eight reasons that a compliance

6    personnel could rely upon for purposes of determining

7    that a held order could be released and shipped to

8    the customer?

9           MR. MATTHEWS:  Objection.

10          THE WITNESS:  Those are the eight that are

11      listed on this document, yes.

12   BY MR. NOVAK:

13     Q.    Are there instances of which you are aware

14   where held orders were released to customers without

15   the compliance personnel making a determination that

16   the orders could be released for one of the eight

17   reasons that's referenced on these two pages?

18     A.    I'm not aware of any individual transactions

19   in that manner.

20     Q.    That's all I have for 15.

21          (Anda Exhibit 16 was marked for

22   identification.)

23   BY MR. NOVAK:

24     Q.    We've had marked as Anda Exhibit 16 a

1    document bearing the Bates number Anda 140430 and 31.

2    And then one of the attachments to the document is

3    what appears to be Standard Operating Procedure 40

4    bearing the Bates Numbers 140495 through 497.

5           And my questions are primarily addressed to

6    the standard operating procedure that are the last

7    three pages of Anda Exhibit 16.

8           Mr. Cochrane, in reviewing the revision

9    history that is set forth at the last page of this

10   version of Standard Operating Procedure 40, can you

11   make a determination as to when this version of

12   SOP 40 would have been in effect?

13      A.   This tells me February of 2015.

14      Q.   Okay.  Is it your understanding that that's

15   the document that would have been in effect between

16   February of '15 until the next point in which the SOP

17   was revised?

18      A.   Yes.

19      Q.   That's all I have for SOP 40.

20           (Anda Exhibit 17 was marked for

21   identification.)

22   BY MR. NOVAK:

23      Q.   We've had marked next Anda Exhibit 17, which

24   is a document bearing the Bates numbers Anda 571720

```
 1    through 723, and I only have one question, I think,

 2    with respect to Anda Exhibit 17.

 3         Is this a document that Anda received as a

 4    registrant under the Controlled Substances Act on or

 5    about February 7th of 2007?

 6    A.   Yes, I believe everybody received this --

 7    every registrant received it.

 8    Q.   Okay.

 9         (Anda Exhibit 18 was marked for

10    identification.)

11    BY MR. NOVAK:

12    Q.   We have next marked Anda Exhibit 18, which is

13    a document bearing the Bates Number Anda 276156

14    through 276157 and is a two-page document from Joseph

15    Rannazzisi at the Department of Justice Drug

16    Enforcement Administration to -- addressed to Anda.

17         Is this a document that Anda received from

18    the Department of Justice Drug Enforcement

19    Administration on or about December 27th of 2007?

20    A.   Yes.

21    Q.   Do you know if Anda Exhibits 17 and 18 were

22    reviewed by the individuals in Anda's compliance

23    program for purposes of administering their

24    suspicious order monitoring system?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. MATTHEWS:  Objection.

2          THE WITNESS:  Yes, I can confirm that they

3     were reviewed.  I don't know to what end and for

4     what purposes.

5  BY MR. NOVAK:

6     Q.   Mr. Cochrane, do you have a basic

7  understanding of how rebates or chargebacks work at

8  Anda?

9     A.   Yes, I do.

10    Q.   Can you describe for me first what a

11 chargeback is?

12    A.   A chargeback is a transaction between a

13 wholesaler and a manufacturer to adjust cost based on

14 what the sale price was of the said product,

15 depending on the type of customer that the product

16 went to.

17    Q.   Okay.  When you say "a transaction between a

18 wholesaler and a manufacturer to adjust cost," whose

19 cost is being adjusted?

20    A.   The wholesaler's.

21    Q.   Are you aware of instances where

22 manufacturers provide a chargeback payment or a

23 rebate payment to a wholesaler in exchange for

24 receiving certain information from the wholesaler?

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  Yes, but I wouldn't describe

 3         that as a chargeback or a rebate.

 4    BY MR. NOVAK:

 5         Q.   How would you describe that?

 6         A.   There are specific clauses in vendor

 7    manufacturer contracts that allow for payment of

 8    money specific to data.

 9         Q.   Okay.

10         A.   Commonly referred to as DSA fees.

11         Q.   In terms of how those DSA fees are

12    administered, are they sometimes, in terms of the

13    revenue flow, managed in the same manner as a

14    chargeback?

15              MR. MATTHEWS:  Objection.

16              THE WITNESS:  I'm not sure if it's the exact

17         same manner.  There's a separate transaction for

18         it.  I don't believe that they're blended

19         together.

20    BY MR. NOVAK:

21         Q.   Are you aware of whether Anda maintains or

22    receives rebate payments from Mallinckrodt?

23         A.   I couldn't say for sure.  I don't know the

24    structure of our deal with Mallinckrodt at that level
```

Highly Confidential - Subject to Further Confidentiality Review

1    of detail.

2            (Anda Exhibit 19 was marked for

3    identification.)

4    BY MR. NOVAK:

5        Q.   We've had marked as Anda Exhibit 19 a

6    document bearing the Bates page Anda 1222751 through

7    758.

8            The top page is a simple e-mail from

9    Michael Cochrane to Robert Brown dated May 4, 2012,

10   and the attachment to the document is entitled

11   "Confidentiality and Restricted Use Agreement," and

12   it appears to be an agreement entered between -- or

13   proposed for entry between Mallinckrodt and Anda.

14           Have you reviewed this document before?

15       A.   It's not familiar to me.

16       Q.   Okay.  You understand that this is the type

17   of agreement that you made reference to providing for

18   the use of particular information by Mallinckrodt

19   that is in the possession of Anda for purposes of

20   implementing Mallinckrodt's suspicious order

21   monitoring program?

22           MR. MATTHEWS:  Objection.

23           THE WITNESS:  I would say this is

24       directionally similar to what I described.  What

Highly Confidential - Subject to Further Confidentiality Review

```
 1        I was describing earlier did not have specificity

 2        related to suspicious order monitoring or any DEA

 3        references.

 4    BY MR. NOVAK:

 5        Q.   Okay.  Has Anda at different times considered

 6    the use of or requested access to information about

 7    customers from different manufacturers to be utilized

 8    as part of the operation of Anda's suspicious order

 9    monitoring system?

10        A.   I don't have specific knowledge about that.

11    I know that there was a request for data and

12    purchases directly to DEA post the 2007 meetings that

13    we had with them.

14        Q.   Okay.

15        A.   I don't know about specifics to

16    manufacturers.

17        Q.   Are you aware of whether Anda has requested

18    information from the parent companies that have owned

19    it at various times for purposes of implementing

20    Anda's suspicious order monitoring system?

21        A.   I don't believe specifically to implementing

22    a system.  I believe there have been requests for

23    information about customers that we may have had in

24    common with our parent manufacturer.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Where you would obtain information about the

 2   customer you had in common from Watson or Actavis or

 3   Teva?

 4        A.    Correct.

 5        Q.    In those instances, were you able to access

 6   information from Watson or Actavis or Teva for

 7   purposes of assisting the implementation of Anda's

 8   suspicious order monitoring system?

 9             MR. MATTHEWS:  Objection.

10             THE WITNESS:  We have never had access to any

11        system or data at the parent.

12   BY MR. NOVAK:

13        Q.    Have the parent -- I'm sorry.

14             Well, that answers it as to the parent.

15             How about for other manufacturers?

16        A.    We don't have access to other manufacturers'

17   data.

18        Q.    Okay.  Have you provided to other

19   manufacturers any data of Anda with respect to its

20   customers?

21             MR. PUIG:  Objection.

22             MR. MATTHEWS:  Yes, we have.

23   BY MR. NOVAK:

24        Q.    Which manufacturers?
```

1     A.   Any of the manufacturers that we would have

2   set up where there were specific contractual outlines

3   where we would provide sales-out data or transaction

4   data to, we would comply with those.

5     Q.   Okay.

6     A.   Not specific to DEA.  Not specific to

7   controlled drugs.

8     Q.   And do you know which of those manufacturers

9   you provide that type of information to?

10          MR. PUIG:  Objection.

11          THE WITNESS:  Repeat the question.

12   BY MR. NOVAK:

13     Q.   Do you know which manufacturers you provide

14   that type of information to?

15          MR. PUIG:  Objection.

16          THE WITNESS:  I don't have a list of those.

17   BY MR. NOVAK:

18     Q.   Do you know any of them?

19     A.   I couldn't name names.

20          (Anda Exhibit 20 was marked for

21   identification.)

22   BY MR. NOVAK:

23     Q.   We've had marked next Anda Exhibit 20, which

24   is an e-mail thread comprised of two e-mails.  The

Highly Confidential – Subject to Further Confidentiality Review

1   top one is from Michael Cochrane to Patrick Cochrane

2   dated July 13th of 2012, and the underlying one is

3   from Michael Cochrane to Albert Paonessa with

4   Robert Brown cc'd dated July 12th of 2012.

5           There are some particular portions of this

6   e-mail that relate to chargeback or rebate

7   information that I would like to direct your

8   attention.

9           I should, before I do that, I will also

10  mention that the Bates page number is 86344 and 45.

11          And specifically the portion of the exhibit

12  that I wanted to direct your attention to as it

13  relates to rebates is down at the bottom paragraph of

14  the first page of Anda Exhibit 20 where it states,

15  quote:  We have also had numerous productive phone

16  calls with Mallinckrodt regarding due diligence and

17  order monitoring.  I have suggested we work together

18  and keep the lines of communication open.

19          I specifically brought up Rite Aid, but they

20  did not have anything positive or negative to say.

21  They are only analyzing oxycodone 15 and 30 milligram

22  utilizing their chargeback process.  They do not have

23  the same visibility on their small milligram

24  combination products of oxycodone or any other

1    controlled substance products.

2          We recently found out they are starting to

3    work with a smaller regional chain near their

4    corporate location to learn and understand more about

5    the chain business.  They are starting small to

6    develop a process on how they will manage their

7    customer files with regard to direct deals with their

8    larger national chain customers, whether they are a

9    warehousing chain for CIIs or not.

10          Now, in that reference, it states that

11   Mallinckrodt is using their chargeback process to

12   analyze oxycodone 15 and 30.

13          You see that reference?

14   A.    I do.

15   Q.    Okay.  Can you explain to me what information

16   would be available to Mallinckrodt by virtue of their

17   chargeback process with Anda that would assist them

18   in analyzing 15- and 30-milligram oxycodone

19   utilization?

20          MR. MATTHEWS:  So I'm going to object to this

21          as outside the scope of the 30(b)(6) notice.

22          There's nothing in your notice that purports to

23          require us to educate a witness to talk about

24          Mallinckrodt's information.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          I'll also object on the ground that to the

 2     extent you have purported to ask us -- ask him

 3     based on his personal knowledge, there is no

 4     foundation that he has any information about what

 5     was in Mallinckrodt's mind, what Mallinckrodt

 6     understood.

 7          But if you want to go ahead and speculate for

 8     Mr. Novak, please feel free to do so.

 9          MR. NOVAK:  Well, James, that one was a

10     whopper of a speaking objection that violates the

11     protocols that are in place in this proceeding.

12          And there is a category within the 30(b)(6)

13     requests with respect to rebate programs.  It's

14     Number 11.

15          MR. MATTHEWS:  The information that

16     Mallinckrodt obtained from other distributors and

17     wholesalers about chargebacks has nothing to do

18     with any rebate agreement between Anda and

19     Mallinckrodt or anybody else.

20          I understand that you guys are interested in

21     rebates and chargebacks and how they work, but

22     you should ask Mallinckrodt what its knowledge is

23     about what information it obtained from

24     chargebacks and rebates.  You shouldn't be asking
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        my witness what Mallinckrodt got.  It's -- you

 2        want to talk about patently beyond the scope of

 3        the reasonable rules, that is that.

 4   BY MR. NOVAK:

 5        Q.   As part of the 30(b)(6) notice of deposition

 6   today, Mr. Cochrane, did you understand that one of

 7   the topics you were to be prepared to testify about

 8   is the rebate process between -- or chargeback

 9   process, as we've called it, as between manufacturers

10   and Anda?

11             MR. MATTHEWS:  You know, if we are going to

12        get into a lawyer's fight on the record, that's

13        not what your notice says.  It doesn't say the

14        chargeback process generally.  There's one topic

15        that relates to rebate agreements between Anda

16        and any manufacturers.  You want to ask him about

17        rebate agreements between Anda and manufacturers,

18        he is prepared to answer.  Go ahead.

19             But asking him about what Mallinckrodt

20        understood in connection with chargeback

21        information it may or may not have obtained from

22        other wholesalers is, you know, not within that

23        topic and not within his personal knowledge.

24        There is no foundation for him to offer that
```

1      testimony unless you can ask him and he says he

2      talked to Mallinckrodt individuals personally and

3      that's what they told him.

4           MR. NOVAK:  Somewhere in the record I have to

5      find the actual pending question.

6   BY MR. NOVAK:

7      Q.   Okay.  The question -- and I'll rephrase

8   it -- is:  Can you explain to me what information

9   would be available to Mallinckrodt by virtue of

10  their chargeback process with Anda that would assist

11  in analyzing 15- and 30-milligram oxycodone

12  utilization?

13     A.   The process related to chargebacks is not

14  specific to oxycodone.  It's not specific to

15  controlled substances.  It's specific to how the

16  rules of engagement are with the manufacturer and the

17  wholesaler.

18          If the manufacturer sells that product to us

19  at a price and there are indirect contracts or there

20  are different price concessions offered to certain

21  classes of trade and/or customers within certain

22  classes of trade, Anda invoices at that price.

23          Chargeback transaction is created back to the

24  manufacturer to make us whole on what we paid for the

Highly Confidential - Subject to Further Confidentiality Review

1    product versus what we sold it out at.  That would be

2    line item detailed data to the registrant to the

3    location that Anda shipped the product to.

4        Q.   When you say "line item detailed data" as

5    part of that answer, what type of data would that be

6    for purposes of administering the chargebacks?

7        A.   The date of the transaction, a specific order

8    or invoice reference number that was Anda's number,

9    the customer that we shipped it to, the distribution

10   center that we shipped it from, the item number, the

11   item description possibly, and the quantity.

12       Q.   Okay.

13       A.   And of course the price.

14       Q.   Okay.  Now, continuing with Anda Exhibit 20,

15   there are a few other statements made within the

16   exhibit that do not relate to the chargeback

17   arrangement with Mallinckrodt that I wanted to ask

18   you about.

19            The first part of Michael Cochrane's e-mail

20   to Mr. Paonessa states:  We are having a difficult

21   time finding examples of good retail independence to

22   compare to Rite Aid.

23            Did you have an understanding that Rite Aid

24   was a customer that Anda was evaluating back in 2012

Highly Confidential - Subject to Further Confidentiality Review

1    as to their utilization of controlled substances?

2           MR. MATTHEWS:  Objection.

3           THE WITNESS:  Rite Aid was a customer of ours

4      at the time, so yes.

5    BY MR. NOVAK:

6      Q.   In fact, in 2012, wasn't Rite Aid the

7    largest, if not one of the largest, customers of

8    controlled substances of Anda?

9      A.   Yes, they were.  We had a specific program

10   designed to allow them access to products that they

11   otherwise were not receiving appropriate access to

12   via the wholesale model.

13           We were their primary supplier on those

14   products.

15     Q.   Were controlled substances some of the

16   products for which you were a primary supplier to

17   Rite Aid?

18     A.   Yes.

19     Q.   In 2012?

20     A.   Yes.

21     Q.   All of their stores or only some?

22     A.   Many of their stores.  I can't say all of

23   them.

24     Q.   Okay.  And in the versions of the Standard

1    Operating Procedure 28 and 40 that you identified

2    earlier as being applicable in the 2012 time frame,

3    would those have been applied to Rite Aid?

4         A.    Portions of it could be, yes.

5         Q.    Okay.  Was there any type of alternative

6    system that was put in place as it related to Rite

7    Aid?

8              MR. MATTHEWS:  Objection.

9              THE WITNESS:  System how?

10   BY MR. NOVAK:

11        Q.    In terms of evaluating the eligibility of

12   Rite Aid stores for the purchase of controlled

13   substances.

14        A.    There was extensive data review of Rite Aid

15   usage.

16        Q.    More so than -- than other chains?

17             MR. MATTHEWS:  Objection.

18             THE WITNESS:  Rite Aid was -- was a chain.

19   More so than other chains?  Not necessarily.

20   BY MR. NOVAK:

21        Q.    Now, Michael Cochrane writes in his e-mail to

22   Mr. Paonessa, looking at the third paragraph of that

23   e-mail, quote:  There will be some stores that we

24   have questions on.  Specifically one in Tennessee

Highly Confidential - Subject to Further Confidentiality Review

████

████

████

████

████

6          You see that reference?

7     A.   I do.

8     Q.   Do you know whether there were any Rite Aid

9     stores such as this one in Tennessee that Anda

10    determined they would not supply controlled

11    substances to?

12    A.   There were definitely Rite Aid stores that

13    Anda did not supply controlled substances to.

14    Whether or not it was determined based on criteria

15    like that or other, I'm not sure of.

16    Q.   Okay.  When you say you're definitely --

17    there were definitely Rite Aid stores that Anda did

18    not supply controlled substances to, was that based

19    on a determination that they were declined for

20    eligibility to purchase controlled substances, or for

21    some other reasons?

22    A.   Yes, there were stores that were declined.

23    Q.   And the reason they were declined was what?

24         MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Review of their data, review of

 2         individual stores attributes.  It could be

 3         anything else that's in our program of criteria

 4         to vet a customer.  There were also ongoing

 5         discussions with Rite Aid, that this e-mail

 6         alludes to.

 7    BY MR. NOVAK:

 8         Q.   And those discussions related in part to

 9    finding appropriate data benchmarks against which

10    Rite Aid's dispensing data could be compared for

11    analyzing their orders?

12         A.   That's definitely one element of it.

13         Q.   What are the others?

14         A.   I haven't read the entire e-mail.  You are

15    asking me to recall an e-mail from almost seven years

16    ago.

17              It also refers to a data review that I talked

18    about.

19         Q.   Okay.  The second page of the e-mail makes

20    reference to "being hopeful that Anita can come

21    through with IMS data."

22              Do you know what that's in reference to?

23         A.   I would like to read it.

24              Okay.  Anita worked in the sales reporting
```

Highly Confidential - Subject to Further Confidentiality Review

1    department, and she had access to IMS data related to

2    prescriptions, aggregate level data that Michael

3    looks like he's referring to to create a comparison

4    in that ZIP code as compared to the ZIP codes of the

5    Rite Aid stores.

6         Q.   Okay.  So if I understand it correctly, there

7    are a number of different data sources that Michael

8    is evaluating for purposes of determining whether

9    those data sources could be of assistance to review

10   control eligibility for Rite Aid stores.

11             Is that a fair characterization?

12             MR. MATTHEWS:  Objection.

13             THE WITNESS:  Yes.  Based on this, it is.

14   BY MR. NOVAK:

15        Q.   One of those sources of information is IMS

16   data?

17        A.   I would not categorize that as the primary

18   source.

19        Q.   Okay.  Another source of information would be

20   information provided by Mallinckrodt in their

21   chargeback process?

22             MR. MATTHEWS:  Objection.

23             THE WITNESS:  I don't believe that

24        Mallinckrodt ever provided any data to us related

Highly Confidential – Subject to Further Confidentiality Review

```
 1        to their chargebacks data that they had from

 2        other registrants that were distributing

 3        controlled substances.

 4    BY MR. NOVAK:

 5        Q.   Okay.

 6        A.   The primary sources of Rite Aid review would

 7    be the data that Rite Aid provided.

 8        Q.   Their own dispensing data?

 9        A.   These other items of data -- their own

10    dispensing data, correct.

11             These other items that he's referencing are

12    looking to be used as corroborating data to support

13    what Rite Aid is showing.

14             That's what I read here.

15        Q.   Okay.

16             (Anda Exhibit 21 was marked for

17    identification.)

18    BY MR. NOVAK:

19        Q.   We have had marked as Anda Exhibit 21 a

20    document, the cover page of which is an e-mail from

21    Sabrina Solis to Michael Cochrane and Emily Schultz

22    dated March 7 of 2012; and then attached to that

23    document are some thresholds and other evaluative

24    materials as it relates to Rite Aid.
```

```
 1              Mr. Cochrane, first let me ask:  The pages of

 2      the documents starting at the Bates page numbers

 3      81553 through 81587, are those the types of

 4      dispensing report information that you indicated

 5      would be the type of data that Rite Aid would provide

 6      and Anda would review to determine whether Rite Aid

 7      was eligible for controlled substance purchases?

 8              MR. MATTHEWS:  Objection.

 9              THE WITNESS:  Yes, this is consistent with

10          the type of data that would be reviewed at a

11          store level.

12      BY MR. NOVAK:

13          Q.   Okay.  When Anda performed review of

14      dispensed data, what were the factors that they

15      looked to to make a determination as to whether a

16      particular retail store was appropriately eligible

17      for controlled substance purchases in Anda's mind?

18          A.   There were a number of factors.  A lot of it

19      came down to number of prescriptions, number of

20      items, the types of items, the ranking of said items,

21      the number of overall dispensed units, the quantity

22      of dispensed units as a relationship to prescription

23      size.

24          Q.   I'd like to direct your attention to the page
```

1    of Anda Exhibit 21 that bears the Bates range 81568.

2        A.    81568?

3        Q.    Yes.

4             Now, for this particular store, it appears

5    that the third highest dispensed drug is hydrocodone

6    acetaminophen, the fourth highest dispensed drug is

7    hydrocodone acetaminophen, the sixth highest drug

8    dispensed is oxycodone acetaminophen, and the tenth

9    highest drug dispensed is oxycodone acetaminophen.

10            Is that five different opioid products in the

11   top ten drugs that are dispensed from this particular

12   Rite Aid?

13       A.    I see -- I think I see four, but it's really

14   two families.

15            MR. MATTHEWS:  I'm going to object on the

16        record at this point.  And I'm going to give you

17        some leeway here, but as you well know from the

18        responses we filed and the meet and confers we

19        had, we objected to preparing a witness to talk

20        about any specific customers or transactions on

21        the ground that to do so would be unduly

22        burdensome given that it's about 12 years of

23        history.

24            And we told you we weren't going to prepare a

Highly Confidential - Subject to Further Confidentiality Review

```
1        witness to do that, and we have not prepared a

2        witness to do that.

3            I appreciate that you want to put a document

4        in front of Mr. Cochrane to ask him about the

5        document, but to the extent you are purporting to

6        ask him about the transactions, we told you in

7        advance that if you told us which transactions

8        you wanted to ask him about, we would prepare

9        him.  You chose not to do that with the exception

10       of two customers.  This was not one of them.

11           So I'll give you a little leeway, but I'm

12       going to cut you off pursuant to our objections

13       at some point.

14           MR. NOVAK:  Okay.

15           He answered the last question, right?

16           MR. MATTHEWS:  He did.  He did.  I did let

17       him answer the question.

18           MR. NOVAK:  Okay.

19           MR. MATTHEWS:  And then I asserted my

20       objection.

21   BY MR. NOVAK:

22       Q.  Let me just talk or inquire generally.

23           If a particular retailer has four or five

24   different opioid products as the top ten products
```

Highly Confidential - Subject to Further Confidentiality Review

1    that they dispense, does that raise any red flags for

2    the compliance personnel at Anda who are performing

3    the review of whether a particular customer should be

4    eligible for purchasing controlled substances?

5         MR. MATTHEWS:  Objection.

6         THE WITNESS:  Yes, it would.

7    BY MR. NOVAK:

8    Q.    Okay.  And why is that?

9    A.    That is part of the program that we put

10   together is to evaluate their data and see what

11   products they're dispensing.

12   Q.    And the higher the number of opioid products

13   that are in their top ten, so to speak, the greater

14   concern there is for Anda in terms of determining

15   whether they are or should be eligible to purchase

16   controlled substances?

17   A.    Yes.  It's a greater concern, and it's a

18   trigger for receiving more information.

19   Q.    What type of additional information would

20   Anda seek to receive if they already have the

21   customer's dispensing data?

22   A.    Location demographics related to the

23   surrounding areas.  Are they servicing nursing homes?

24   Are they servicing hospitals?  Are they servicing

Highly Confidential - Subject to Further Confidentiality Review

1    outpatient care centers?  What is the proximity to

2    other locations of pharmacies?  And so on.

3         Q.   Okay.  So if a particular retail store had a

4    high number of opioid products in its top ten

5    dispensed products, would you expect Anda to approve

6    the store absent performing the additional type of

7    due diligence that you just described?

8              MR. MATTHEWS:  Objection.

9              THE WITNESS:  I'm not sure.  I'm not sure

10        what other due diligence would be done before

11        that.

12             MR. NOVAK:  Okay.

13   BY MR. NOVAK:

14        Q.   The other forms of due diligence that would

15   be performed by a compliance staff member at Anda in

16   evaluating a -- a retail store that has a large

17   number of opioid products in its top ten dispensing

18   data, would you expect that additional due diligence

19   to be located or recorded somewhere in the compliance

20   department files?

21             MR. MATTHEWS:  Objection.

22             THE WITNESS:  I would.  I'm not sure where it

23        would be memorialized, whether in a combination

24        of the customer file or TPS or both.

Highly Confidential – Subject to Further Confidentiality Review

1    BY MR. NOVAK:

2        Q.   Okay.  So the information or the due

3    diligence would be contained in the TPS files as well

4    as the customer files?

5        A.   Yes.

6            MR. MATTHEWS:  Objection.

7            MR. NOVAK:  Okay.  Let's take a quick break,

8        and then I'm going to move on to another batch of

9        documents.

10           THE VIDEOGRAPHER:  The time is 2:58.  We are

11       off the record.

12           (Recess from 2:58 until 3:15 p.m.)

13           THE VIDEOGRAPHER:  The time is 3:15 p.m.  We

14       are now back on the record.

15   BY MR. NOVAK:

16       Q.   Mr. Cochrane, are you aware of any instances

17   where Anda shipped what it identified as suspicious

18   orders into either Summit or Cuyahoga Counties?

19       A.   Yes, I am.

20       Q.   And what examples are you aware of?

21       A.   Examples prior to 2007 -- to the 2007 DEA

22   meeting when we were submitting suspicious excessive

23   reports to the DEA on a weekly or monthly basis,

24   there were some transactions on some of those

Highly Confidential - Subject to Further Confidentiality Review

```
1    reports.

2         Q.   Okay.  Would one of those transactions have

3    been for New Choice Pharmacy?

4         A.   Yes, it would.

5         Q.   What were the circumstances under which Anda

6    decided to ship a transaction for New Choice Pharmacy

7    that it had identified as suspicious?

8              MR. MATTHEWS:  Objection.

9              THE WITNESS:  It was captured on a report of

10        suspicious orders for -- for a weekly time period

11        related to fentanyl patches.

12   BY MR. NOVAK:

13        Q.   Okay.  The fentanyl patches that were ordered

14   by New Choice exceeded a number that would have

15   identified the order as suspicious under the criteria

16   being utilized by Anda prior to the summer of 2007?

17        A.   Correct.  I believe the threshold for patches

18   was ten patches.

19        Q.   Okay.  Are you aware of -- after the change

20   in handling controlled substances that arose out of

21   Anda's meeting with the DEA in 2007, are you aware of

22   whether New Choice purchased controlled substances in

23   an amount that exceeded the 5,000 unit per family

24   threshold?
```

```
1        A.   No, I'm not.

2        Q.   Do you know if adjustments were made for New

3   Choice that would enable them to purchase controlled

4   substances in an amount greater than 5,000 units per

5   controlled substance family per month after --

6        A.   No, I'm not.

7        Q.   -- after the summer of 2007?

8        A.   No, I'm not.

9        Q.   Are you aware of whether Anda at one point

10  terminated controlled substance authorization to New

11  Choice?

12       A.   Yes, we did.

13       Q.   What was the reason that you terminated them?

14       A.   Their termination was part of a review of

15  customers that was performed in the summer or fall of

16  2007.

17       Q.   And what was the factor associated with --

18  hold on.

19            Well, let me -- let me start with a different

20  question.

21            The review of customers that was performed in

22  the summer or fall of 2007, was that associated with

23  your implementation of the restrictions that Anda had

24  committed to with the DEA?
```

Highly Confidential – Subject to Further Confidentiality Review

```
1              MR. MATTHEWS:  Objection.

2              THE WITNESS:  Yes, it would have been.

3   BY MR. NOVAK:

4       Q.   What was it about New Choice that was -- that

5   would have made them ineligible to purchase controls

6   based upon the restrictions that Anda had committed

7   to with the DEA?

8              MR. MATTHEWS:  Objection.

9              THE WITNESS:  I'm not sure of the specifics

10         or what the final reason was to cut them off, but

11         the compliance department made that decision as

12         part of their evaluation.

13  BY MR. NOVAK:

14      Q.   Okay.  For preparing for this deposition, did

15  you review any of the TPS entries for New Choice?

16      A.   I reviewed their last ship date, and I

17  reviewed their location.

18      Q.   And their last ship date was when?

19      A.   It was in 2007.

20      Q.   December of 2007?

21      A.   It might -- it may have been.  It was the

22  second half of 2007.  It was after the changes were

23  implemented.

24      Q.   The report that was submitted to DEA as it
```

Highly Confidential - Subject to Further Confidentiality Review

1    related to a suspicious order for New Choice, do you

2    know when that was submitted to the DEA?

3         A.   It was early 2007.

4         Q.   In what form would it have been submitted?

5         A.   Excel.

6         Q.   Now, after the New Choice suspicious order

7    report and the termination of -- of the method of

8    reporting that Anda had periodically done in roughly

9    August of 2007, when was the next suspicious order

10   report that was submitted to the DEA?

11             MR. MATTHEWS:  Objection.

12             THE WITNESS:  After the changes in 2007 where

13        we had specific limits of 5,000 dosage units,

14        we -- we did not submit any more of those

15        suspicious reports.

16   BY MR. NOVAK:

17        Q.   Okay.  I'll ask the question a little

18   differently.

19             Do you have an understanding as to the next

20   time Anda actually reported an order as being

21   suspicious to the DEA?

22        A.   There were customers and specific orders that

23   were reported to DEA in August of 2007.

24        Q.   Subsequent to August of 2007, when was the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    next time that Anda reported a suspicious order to

 2    the DEA?

 3         A.   We were continuously reporting customers that

 4    we denied to do business with or customers that we

 5    ceased doing business with as they arose.

 6         Q.   Do you understand -- and let's talk about

 7    terminology for a second.

 8              Does Anda have an understanding that

 9    reporting a suspicious order to the DEA is something

10    different than reporting a suspicious customer?

11         A.   Yes, we do.

12         Q.   Okay.  So my question related not to the

13    reporting of suspicious customers but the reporting

14    of suspicious orders.

15              Do you know after August of 2007 when the

16    next time Anda reported a suspicious order to the

17    DEA?

18         A.   I'm unsure of the specific dates.

19         Q.   Okay.  I think we were looking at a document

20    earlier today from 2010 where you had indicated that

21    there had been no suspicious orders between 2007 and

22    2010.

23              Do you understand that Anda didn't make a

24    report of any suspicious order during that time
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    frame?

 2            MR. MATTHEWS:  Objection.

 3            THE WITNESS:  I'm unsure.

 4            (Anda Exhibit 22 was marked for

 5    identification.)

 6            MR. MATTHEWS:  22?

 7    BY MR. NOVAK:

 8      Q.   We've had marked as Exhibit Anda 22 a

 9    spreadsheet that was produced in native format

10    bearing the Bates number 993524, and I'll -- I want

11    to put it up on the screen for a moment.

12            Mr. Cochrane, we have on the screen the Excel

13    spreadsheet that is -- that bears the Bates

14    number that I referenced earlier and is Anda

15    Exhibit 22.  I think it's actually a little more easy

16    to maneuver or review on the screen than it is on the

17    paper.

18            Once Anda suspended the old format of

19    reporting suspicious orders at the end of August of

20    2007, do you understand that the manner in which Anda

21    reported suspicious orders, as well as other things,

22    to the DEA after that resembled more Anda Exhibit 22?

23            MR. MATTHEWS:  Objection.

24            THE WITNESS:  Yes.  It began as a list of
```

```
1        customers and specific order details of customers

2        or orders we were not going to fill and no longer

3        do business with.  It was -- it was largely based

4        on the guidance and threshold that the DEA had

5        given us in those meetings related to 5,000

6        dosage units.

7   BY MR. NOVAK:

8        Q.   Okay.  Now, this particular spreadsheet has a

9   customer cutoff tab.  Is that the -- well, actually,

10  let me just go through the different tabs --

11       A.   Okay.

12       Q.   -- that are included in these spreadsheets.

13            There is a customer cutoff tab, a controls

14  denied tab, a controls reinstated tab, and a

15  suspicious orders tab.

16            Is that generally the format that Anda's

17  reports to the DEA took after the change in 2007?

18            MR. MATTHEWS:  Objection.

19            THE WITNESS:  Yes.  It started with the

20       customers cut off and the customers denied and

21       has evolved into reinstated and suspicious also

22       being included.

23  BY MR. NOVAK:

24       Q.   Okay.  Can you describe for me what the
```

1    customer cutoff tab indicates?

2       A.   Those are customers that were previously

3    doing business with us that Anda chose no longer to

4    do business with.

5       Q.   And what would be the factors leading to Anda

6    reporting customers that were cut off to the DEA?

7            MR. MATTHEWS:  Objection.

8            THE WITNESS:  Review of their dispensing

9        data, a review of their history with Anda, a

10       review of their questionnaire, whether or not we

11       had a questionnaire, and other item and customer

12       attributes.

13   BY MR. NOVAK:

14      Q.   Okay.  Did -- did the determination to cut

15   off a customer -- how were -- how did Anda compliance

16   staff know that that was not based upon a particular

17   order?

18           MR. MATTHEWS:  Objection.

19           THE WITNESS:  I'm not sure.

20   BY MR. NOVAK:

21      Q.   The next tab that is included in Anda

22   Exhibit 22 is the controls denied tab.  Do you have

23   an understanding as to what was being conveyed to the

24   DEA by Anda through this tab in the spreadsheet?

1     A.    My understanding of the controls denied

2    customers are customers that did not have previous

3    business with us or were dormant for a period of time

4    that looked to us for controlled substance access

5    that we denied and would not provide.

6     Q.    Okay.  By the way, these spreadsheets that

7    were provided to DEA by Anda, did you have an

8    understanding that they were -- an understanding that

9    they were cumulative?  That is to say they included

10    customers that fit within one of these categories,

11    and as new customers were placed into those

12    categories, the spreadsheet was supplemented to

13    include the customers?

14          MR. MATTHEWS:  Objection.

15          THE WITNESS:  Yes, I believe that to be true.

16      I'm not certain that all of them are in this

17      listing, but that was the idea.

18    BY MR. NOVAK:

19     Q.    Okay.  The third tab contained in Anda

20    Exhibit 22 is the "Controls Reinstated" tab.

21          What information was Anda conveying to the

22    DEA in the Controls Reinstated tab?

23     A.    The conveyance to the DEA was this file and

24    these notes that are contained within that listing.

Highly Confidential - Subject to Further Confidentiality Review

1    These would be customers that demonstrated sufficient

2    practices for us to make the determination that we

3    would, again, sell them controlled substances.

4        Q.    When you made reference to the comments or

5    notes that are contained in this tab of Exhibit 22,

6    is that Column "I," the Anda Comments?

7        A.    Yes.

8        Q.    And then the fourth tab contained in Anda

9    Exhibit 2 [sic] is the Suspicious Order tab, and it

10   lists a handful of suspicious order reports that were

11   submitted to the DEA.  The dates of the submission

12   are referenced as May 27th of 2015, September 16th of

13   2015, October 14th of 2015, February 25th of 2016,

14   and July 19th of 2016.

15            Is that an accurate characterization of this

16   part of the spreadsheet?

17       A.    That's what the file shows, yes.

18       Q.    Are you aware of any suspicious orders having

19   been reported by Anda to the DEA between September of

20   2007 and the first one in this submission, which is

21   May 27th of 2015?

22            MR. MATTHEWS:  Objection.

23            THE WITNESS:  There were order line items and

24        data included in a spreadsheet that was the very

```
 1        beginning of this evolving spreadsheet all the

 2        way back in 2010.  The first iteration of this

 3        spreadsheet had specific order attributes on it.

 4   BY MR. NOVAK:

 5        Q.   There were suspicious orders reported to the

 6   DEA in 2010 by Anda?

 7        A.   That's what I said, yes.

 8        Q.   When were those reported?  In 2010?

 9        A.   In 2010.

10        Q.   I wanted to direct your attention back to

11   Anda Exhibit 8, and specifically the second page --

12   and specifically the second page of Exhibit 8.

13             There, you wrote:  We need to hold a firm

14   stance supporting that we have not had suspicious or

15   excessive orders since 2007 meeting with DEA in

16   Washington D.C.

17             Do you see that reference?

18        A.   Yes, I do.

19        Q.   Okay.  Are you saying that Anda -- here, you

20   appear to be writing that Anda did not have

21   suspicious orders from the period of September '07

22   through July of 2010.

23             Is that correct?

24        A.   That's correct.
```

1    Q.   And you did not report any suspicious orders

2    to the DEA from the period of time August --

3    September of 2007 through July of 2010, correct?

4    A.   That's correct.

5    Q.   Okay.  When was the next suspicious order

6    that you reported in 2010 or sometime thereafter?

7    A.   At the conclusion of this DEA inspection, we

8    began open communication with group supervisor

9    Gayle Lane.  I personally had communication with her

10   via e-mail and the first iteration of the report that

11   we were looking at a few minutes ago, and that first

12   report had orders and customers that we refused to

13   fill.

14   Q.   Those orders and customers would have been

15   included on which tab of the type of spreadsheet that

16   we were looking at --

17   A.   Customer --

18        MR. MATTHEWS:  Objection.

19   BY MR. NOVAK:

20   Q.   -- as Anda Exhibit 22?

21        MR. MATTHEWS:  Objection.

22        THE WITNESS:  Customer Cutoff.

23   BY MR. NOVAK:

24   Q.   You also understand that there was to be a

1    tab in that spreadsheet that specifically included

2    orders that were identified as suspicious, correct?

3          MR. MATTHEWS:  Objection.

4          THE WITNESS:  I do not believe that that tab

5       existed at the first iteration of that report.

6    BY MR. NOVAK:

7       Q.   Okay.  So you provided reports to the DEA

8    starting in 2010 that identified suspicious -- or

9    that identified customers who had been cut off?

10      A.   Correct.

11      Q.   When was the first time you identified a

12   suspicious order as such in a report to the DEA?

13         MR. MATTHEWS:  Objection.

14         THE WITNESS:  It was done in conjunction with

15      the first iteration of the report of customers

16      that we cut off.

17   BY MR. NOVAK:

18      Q.   Okay.  Was it characterized in the report

19   that you submitted to DEA as a suspicious order?

20      A.   I'm not sure how they understood it.  The

21   line item detail and the columns and headings that we

22   provided on that first report were clear that there

23   was a 222 Form submitted for these quantities for

24   that customer and we refused to do business with that

Highly Confidential - Subject to Further Confidentiality Review

1    customer.

2         Q.   Okay.  Did Anda, in submitting its report to

3    DEA, use the words "suspicious order," quote/unquote,

4    in their characterization of what was being submitted

5    to the DEA?

6         A.   I don't have the specific e-mail in front of

7    me.  I wouldn't know what the exact writing was.

8         Q.   Okay.  I'd like to switch emphasis now to

9    2010.  Was there a point in 2010 -- well, I will get

10   this marked first.

11        (Anda Exhibit 23 was marked for

12   identification.)

13   BY MR. NOVAK:

14        Q.   We've had marked for identification purposes

15   Anda Exhibit 23, which is a document -- an e-mail

16   from Michael Cochrane dated June 15th of 2010 to

17   Al Paonessa and Patrick Cochrane, and it attaches an

18   article from the Detroit News, dated June 15th of

19   2010, referencing the suspension of license of

20   Harvard Drug Group.

21        Mr. Cochrane, did you recall when Harvard

22   Drug Group was suspended by the DEA in the summer of

23   2010?

24        A.   Yes, I did.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  They were a customer of Anda's?

2      A.   I don't know that Harvard was a customer of

3      Anda's.  Harvard was a competitor of Anda's.

4      Q.   Do you know whether Anda sold OxyContin to

5      Harvard Drug?

6      A.   I'm unaware of any OxyContin being sold to

7      Harvard Drug.

8      Q.   Okay.  Now, after attaching the news report

9      of Harvard Drug Group's suspension, Michael Cochrane

10     writes to you and Mr. Paonessa that he thinks, quote:

11     We need to cut off all the pain management clinics

12     and docs that purchase controls.

13          And then adds:  The same way we did Internet

14     pharmacies in the past.  Even right after we cut

15     off -- even right after we cut all the Internet

16     pharmacies off, the dispensing docs and pain

17     management clinics were next at the top.

18          End of quote?

19          What did you understand -- first of all,

20     Michael Cochrane is your brother, correct?

21     A.   That's correct.

22     Q.   He was the director of regulatory compliance

23     at the time he wrote this at Anda?

24     A.   That's correct.

1     Q.    Okay.  What did you understand him to mean

2     when he wrote to you "the dispensing docs and pain

3     management clinics were next at the top"?

4     A.    I understood that to mean that they were the

5     next highest users of controlled substances that we

6     were shipping.

7     Q.    Okay.  And what was your reaction to

8     Michael Cochrane's suggestion in the wake of Harvard

9     Drug's suspension that Anda cut off pain management

10    clinics and doctors?

11          MR. MATTHEWS:  You are asking him in his

12       personal capacity?

13          MR. NOVAK:  No.

14    BY MR. NOVAK:

15    Q.    What was Anda's reaction to this suggestion?

16          MR. MATTHEWS:  Objection.

17          THE WITNESS:  I believe by the end of June we

18       had ceased selling to pain management clinics and

19       doctors.

20    BY MR. NOVAK:

21    Q.    Was Anda concerned that the same type of

22    enforcement action that had been brought against

23    Harvard Drug would be brought by the DEA against

24    Anda?

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  That was a factor.  There was

 3         also a move for the State of Florida to disallow

 4         doctors from dispensing meds in the office

 5         setting that I believe took effect later that

 6         fall.

 7              So there was already other indicators that

 8         that business was already being looked at for us

 9         to discontinue.

10    BY MR. NOVAK:

11         Q.   Now, the determination to cut off particular

12    accounts that was made in the summer of 2010 included

13    more than just physicians, did it not?

14         A.   It did.

15         Q.   Okay.  What other types of customers did Anda

16    decide should be cut off at that time?

17         A.   We also ceased doing business with

18    wholesalers/distributors and some hospitals as well.

19              (Anda Exhibit 24 was marked for

20    identification.)

21    BY MR. NOVAK:

22         Q.   We have had marked for identification

23    purposes Anda Exhibit 24, which is a one-page e-mail

24    from Michael Cochrane addressed to both
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Patrick Cochrane and Al Paonessa.

 2            Actually, there are two e-mails.  The first

 3    one is from Al Paonessa to John Jefferson cc'ing

 4    Patrick Cochrane, Michael Cochrane, and

 5    Douglas Lindahl dated June 17th of 2010.

 6            And it states:  John, for every customer in

 7    the attached file, change DEA expiration date to

 8    1100617; remove all schedules; and populate a notes

 9    entry that reads:  Anda has discontinued controls

10    sales to this account on June 17, 2010, AP3.

11            Was this the implementation of a mass cutoff

12    to particular customer categories?

13            MR. MATTHEWS:  Objection.

14            THE WITNESS:  Yes, it appears that way.

15    BY MR. NOVAK:

16        Q.   So two days after Michael conveyed the news

17    about Harvard Drug Group's enforcement skirmish with

18    the DEA, Anda decided to go forward and terminate a

19    number of customers to whom it had been selling

20    opioids, correct?

21        A.   Correct.

22        Q.   Okay.

23        A.   But as I discussed previously, we were also

24    looking at those trade classes for other reasons,
```

1    specifically the State of Florida suspending the

2    ability for doctors to dispense in an office setting.

3        Q.    Okay.  You say that you had been looking at

4    it for other reasons.  Did you ever write an e-mail

5    prior to June 15th of 2010 when Michael Cochrane

6    dispersed the Detroit News story about Harvard Drug

7    Group's fate that you thought these classes of trade

8    should be cut off by Anda?

9        A.    As a correction, Michael didn't distribute

10   that e-mail.  George Fields distributed that e-mail.

11   Michael followed on with a note to Al Paonessa about

12   that.

13           As to the first question, I'm unsure whether

14   I crafted any e-mails related to that.  I know it was

15   being discussed.

16       Q.    Had you seen any e-mail in circulation from

17   others at the company suggesting that those

18   particular channels of trade should be cut?

19       A.    Not that I recall.

20       Q.    Was the enforcement action brought against

21   Harvard Drug Group one of the factors that motivated

22   Anda to cut off those particular channels of trade

23   two days later?

24           MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          THE WITNESS:  Yes, it was.

 2          MR. NOVAK:  Bear with me.  I'm looking for a

 3     particular document.

 4          Can we take a quick five-minute break?  I

 5     have to find a document that's escaped me at the

 6     moment.

 7          THE VIDEOGRAPHER:  Off the record at 3:55.

 8          (Recess from 3:55 until 3:58 p.m.)

 9          THE VIDEOGRAPHER:  The time is 3:58.  We are

10     now back on the record.

11          (Anda Exhibit 25 was marked for

12     identification.)

13     BY MR. NOVAK:

14     Q.   We have had marked as Anda Exhibit 25 a

15     document, the front page of which is an e-mail from

16     Megan Tauber addressed to Kimberly Poropat with cc's

17     both to Al Paonessa and yourself.  And attached to

18     the cover e-mail, which is dated July 13th of 2010,

19     there is some updated internal communication

20     materials.

21          The document bears the Bates number 104946

22     through 104960.

23          And I wanted to direct your attention,

24     Mr. Cochrane, to the internal communication change in
```

1    control process that is Page 2 of the exhibit.

2         And, specifically, at the top of that page,

3    there is a reference to updated control process, and

4    it states:  Effective immediately, Anda is no longer

5    selling to the following classes of trade.

6         And then it lists various trade -- classes of

7    trade underneath, including clinics, including diet

8    and pain clinics, distributors, mail order,

9    physicians, repackagers, veterinarians, and

10   wholesalers/distributors, with the exception of DCI.

11        Is that your understanding as to the

12   categories or classes of trade to which Anda was no

13   longer selling opioid products after the customer

14   cutoff that was implemented in June of 2010?

15   A.   Yes.  As of the time of this writing, that's

16   accurate.

17   Q.   And what was Anda's rationale for cutting off

18   each of the classes of trade that are referenced

19   there?

20   A.   Well, as I spoke previously, the products

21   going in to doctors and clinics were already being

22   looked at differently by the State and future

23   legislation was going to eliminate that.  So we were

24   already looking at that.

1          The rationale behind distributors and

2    repackagers, we didn't necessarily have a good

3    understanding of where that product may end up after

4    it left our possession, and it wasn't as secure of a

5    distribution channel as to a dispensing pharmacy,

6    which was, you know, closer to our core business.

7        Q.   Okay.  At the time that you were selling to

8    repackagers, did you have any type of customer

9    questionnaire or know your customer procedures as it

10   related to that channel of trade?

11       A.   Yes.  I believe we did have information

12   related to the repackagers and who they were

13   repackaging product on behalf of.

14       Q.   Did you have anything that was the equivalent

15   of dispensing data for repackagers?

16            MR. MATTHEWS:  Objection.

17            THE WITNESS:  I'm not sure of that.

18   BY MR. NOVAK:

19       Q.   Okay.  How about for wholesalers?

20            MR. MATTHEWS:  Objection.

21            THE WITNESS:  I'm not sure of that either.

22   BY MR. NOVAK:

23       Q.   Now, the exception of DCI that is referenced,

24   who is DCI?

1    A.    DCI was Drogarias and Chral in Puerto Rico.

2    They were a partner of ours that we actually rented

3    space and had licensure within their facility for a

4    period of time after 2010, but there was an ongoing

5    relationship with them previous to 2010 and long

6    after 2010.

7    Q.    Now, turning another two pages in Anda

8    Exhibit 25, there is reference to -- down at the

9    bottom, underneath the -- the portion -- I'll make a

10   specific page reference number.  It's the page ending

11   in 949, the Bates number.

12   A.    Okay.

13   Q.    There is -- in the middle of the page, there

14   is kind of a graphic something.  Can you tell me what

15   that signifies?

16   A.    That is a form DEA 222.

17   Q.    So these are the types of 222 Forms that you

18   had provided testimony about earlier today?

19   A.    That's correct.

20   Q.    Underneath the 222 Form, the document states:

21   The DEA also requires Anda/VIP and other vendors with

22   a similar setup to track the amount of controlled

23   substance that is each customer purchases throughout

24   the month and place reasonable limits to the purchase

1    eligibility.

2            Most customers are given a 5,000 pill count

3    limit per calendar month within each drug family.  In

4    other words, the customer can purchase up to 5,000

5    pills of any Vicodin product throughout the month of

6    February.  On March 1st, the purchase allowance

7    renews and the customer can purchase another 5,000

8    pills.

9            Is that an accurate characterization of how

10   the 5,000 family pill limit worked as of this time in

11   2010?

12       A.   Yes.  That's a general description of how it

13   worked.

14       Q.   Okay.  And then it continues to state:  The

15   customer can utilize their purchase allowance to

16   purchase any Vicodin SKU they choose.  The same

17   concept would apply to all other controlled substance

18   product families as well.

19           So what we have just been reviewing is

20   similarly applicable to OxyContin, fentanyl, and

21   hydrocodone families, correct?

22           MR. MATTHEWS:  Objection.

23           THE WITNESS:  Generally, that is correct.

24       Fentanyl is a little bit different because the

```
 1        dosage units are a little different.  They're not

 2        a tablet; it's a patch.

 3   BY MR. NOVAK:

 4        Q.   The document continues:  Customers can also

 5   apply for an increase in their monthly pill count

 6   limits if their business format requires it.

 7             For example, Hospice facilities and

 8   pharmacies serving Hospice facilities typically

 9   purchase large amounts of pain medication due to the

10   nature of their patient population.  If a customer in

11   this business segment provided sufficient

12   documentation to Anda/VIP proving the need for an

13   increase, it can be accommodated.

14             The manner of accommodation as of this point

15   in 2010 would be through application of the Standard

16   Operating Procedure 35 that we had discussed earlier

17   today?

18             MR. MATTHEWS:  Objection.

19             THE WITNESS:  Through the process that's

20        described in 35 and then incorporated into 40.

21        I'm not sure of the timeline continuity, but yes.

22   BY MR. NOVAK:

23        Q.   And then the document continues.  Quote:  TPS

24   tracks the pill count limits each month and removes
```

Highly Confidential - Subject to Further Confidentiality Review

1    the ability to order additional product once the

2    limit has been reached.

3              End of quote.

4              Do you see that reference?

5         A.   Yes, I do.

6         Q.   And is that an exemplar TPS screen that shows

7    control limits for particular products?

8         A.   At that time, yes.

9         Q.   Okay.  This is solely for illustrative

10   purposes?  Because I see there's a limit on aspirin.

11   There wasn't a limit on aspirin in real life at Anda,

12   was there?

13        A.   No.

14        Q.   Okay.  But the way it would work in TPS is if

15   you were looking at the control limits for a

16   particular product and a particular customer, you

17   would see a column for the product type, and then a

18   limit, and then there month-to-date purchase, and

19   that would give the amount that was still available

20   for them to purchase in the month?

21        A.   Yes, but these screens were not visible to

22   the customer, nor to the rep.

23        Q.   Okay.  In 2010, a sales representative at

24   Anda would not be able to go into TPS and see this

Highly Confidential - Subject to Further Confidentiality Review

```
1    type of screen?

2         A.   That's true.

3         Q.   Did the sales representative at Anda even

4    know what control limit was set for a particular

5    customer for an opiate product at this point in time

6    in 2010?

7         A.   I don't believe they could see it realtime.

8    However, if they knew they started with the 5,000

9    baseline limit and they had interacted with their

10   customer in compliance to deem an increase

11   appropriate, they could possibly know what their

12   customer's limit was.

13        Q.   Okay.  The document next states:  Anda/VIP

14   customers can also order CII products electronically

15   utilizing CSOS or Controlled Substance Ordering

16   System.  While this requires an additional

17   registration from the DEA, it provides a host of

18   benefits to the customers when ordering from

19   Anda/VIP.

20             Is that an accurate characterization as to

21   the ability of customers to order through CSOS for

22   Schedule II controlled substances at this point in

23   2010?

24             MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  So long as they had the digital

 2         certificate and they had a DEA license and

 3         customer record in good standing, yes.

 4    BY MR. NOVAK:

 5         Q.   Okay.  We had been reviewing a few minutes

 6    ago the spreadsheet containing reports to the DEA

 7    from Anda in Exhibit 22 and the four tabs that were

 8    referenced, those tabs being Customer Cutoffs,

 9    Controls Denied, Controls Reinstated, and Suspicious

10    Orders.

11              Do you recall our review of Anda Exhibit 22

12    in that regard?

13         A.   Yes.

14         Q.   Okay.  As of the time after August of 2007

15    and up through the spring of 2011, there was not a

16    suspicious order tab in those reports as they were

17    submitted to DEA, was there?

18         A.   That report didn't exist in 2007.

19         Q.   Okay.  When was it that those types of

20    reports started to be submitted to Anda -- I mean, to

21    the DEA by Anda?

22         A.   After the 2010 inspection and subsequent

23    conversations we had with DEA.

24         Q.   Okay.  From the time period of September of
```

Highly Confidential - Subject to Further Confidentiality Review

1    2007 through those inspections in the summer of 2010,

2    had there been any reports submitted by Anda to the

3    DEA regarding its customers and their eligibility to

4    purchase controlled substances?

5            MR. MATTHEWS:  Objection.

6            THE WITNESS:  Not to my knowledge.

7    BY MR. NOVAK:

8        Q.   Okay.  So in the summer of 2010, when Anda

9    began discussing the prospect of submitting reports

10   to the DEA, were those discussions in the context of

11   the meetings surrounding the inspection of Anda

12   facilities?

13       A.   They were after the meetings for the

14   inspection.

15       Q.   In what time frame approximately?

16       A.   In the days and weeks after.

17       Q.   Okay.  Would this have been approximately

18   August of 2010?

19       A.   Yes.

20       Q.   And at that time, what was communicated by

21   the DEA to Anda as it related to the submission of

22   suspicious order monitoring reports?

23       A.   Group supervisor Gayle Lane reached out to us

24   after the inspection had concluded, and she wanted to

Highly Confidential – Subject to Further Confidentiality Review

1    open the lines of communication with the local office

2    because, previous to that and since 2007, our

3    compliance department had been dealing with

4    Washington headquarters and not reporting to the

5    local office and not communicating as much with the

6    local office.

7           We had frequent phone calls, and we scheduled

8    an on-site at DEA field office visit.

9        Q.   Okay.  And in conjunction with that DEA field

10   office visit, was it communicated by DEA to Anda that

11   they needed to resume the submission of suspicious

12   order monitoring reports?

13       A.   They were --

14          MR. MATTHEWS:  Objection.

15          THE WITNESS:  They were quite pleased with

16       what we were sending them as far as customers

17       being cut off and customers being denied, and

18       they asked that that continue.

19   BY MR. NOVAK:

20       Q.   Now, in that answer, you indicated that the

21   DEA was quite pleased with what Anda was sending them

22   as far as customers being cut off and customers being

23   denied.  This is in the summer of 2010?

24       A.   This is August and September of 2010.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Now, a moment ago, you testified --

 2    and I'm just going to quote your testimony:  Okay.

 3    From the time period -- this is my question to you:

 4    From the time period of September of 2007 through

 5    those inspections in the summer of 2010, had there

 6    been any reports submitted by Anda to the DEA

 7    regarding its customers and eligibility to purchase

 8    controlled substance.

 9             Your counsel objected.

10             And then you said:  Not to my knowledge.

11             If I'm understanding that testimony

12    correctly, there were no reports submitted to the DEA

13    up through the summer of 2010, were there?

14             MR. MATTHEWS:  Objection.

15             THE WITNESS:  There were no reports up until

16        the communication lines reopened after the

17        inspection we had in the summer in 2010.  With

18        specificity, it was July of 2010 that we had the

19        inspection.  It was after that inspection in

20        August and September that we began sending them

21        the detailed spreadsheet of the customers that we

22        cut off and/or denied.

23    BY MR. NOVAK:

24        Q.   Okay.  So the -- the spreadsheets that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were conveying to DEA that you said they were pleased

 2    with were the ones that began after the July of 2010

 3    inspection?

 4        A.   Correct.

 5        Q.   Okay.  Now, at some point, DEA requested that

 6    you add additional information to your submissions,

 7    correct?

 8        A.   I'm not aware of what you are looking at.

 9             (Anda Exhibit 26 was marked for

10    identification.)

11    BY MR. NOVAK:

12        Q.   We've had marked as Anda Exhibit 26 an e-mail

13    exchange between Michael Cochrane and -- at Anda and

14    Gayle Lane at the U.S. Department of Justice's Drug

15    Enforcement Administration.  The first portion of the

16    e-mail, it's dated April 15th of 2011 and cc's you,

17    as well as other individuals at Anda.  It bears the

18    Bates number Anda 1134998.

19             In that top e-mail, Ms. Lane writes to

20    Michael Cochrane:  Please review 21 CFR 1301.74 (B),

21    and then she quotes from that regulation.  Quote:

22    The registrant shall inform of suspicious orders when

23    discovered by the registrant.

24             End of quote.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              She then continues:  You are required to

 2    report to DEA at the time of the order what was

 3    ordered so it's not enough to let us know of

 4    customers you have cut off after you have researched

 5    them.  If you deem an order suspicious, you need to

 6    notify DEA at that time.

 7              Do you recall receiving this in 2011?

 8       A.   I'm refreshed to know that I received it at

 9    this point by reading it.

10       Q.   Okay.  And then Michael Cochrane replies to

11    Ms. Lane and states:  Please see the attached file of

12    suspicious orders and customers.  I changed the

13    format so there is not a separate tab for each month.

14    This is an update from the last file I sent you in

15    November.  Sorry for the delay.

16              MR. MATTHEWS:  Objection.

17    BY MR. NOVAK:

18       Q.   So the format was changed in April of 2011 to

19    make it more contemporaneous?

20              MR. MATTHEWS:  Objection.

21              THE WITNESS:  I'm not sure what the format

22         change was.  It appears that there was separate

23         tabs by month that Michael consolidated.

24              As clarification, you stated that Michael
```

Highly Confidential - Subject to Further Confidentiality Review

1       replied to Gayle.  This looks the other way

2       around to me, based on the dates.

3            MR. NOVAK:  Thank you.  You're correct.

4   BY MR. NOVAK:

5       Q.   So the correspondence was initiated by

6   Michael and Gayle provided her subsequent response.

7            Is that -- is that correct?

8       A.   That's what this shows.

9       Q.   Okay.

10           (Anda Exhibit 27 was marked for

11  identification.)

12  BY MR. NOVAK:

13      Q.   We've had marked Anda Exhibit 27, the cover

14  e-mail of which was written by Emily Schultz at Anda

15  to Gayle Lane at DEA.  And the subject of the e-mail

16  is "Customer Cutoff."

17           Ms. Schultz writes to Ms. Lane -- and this

18  is -- this bears the Bates number Anda 286549, and

19  then there is a spreadsheet that is attached to it,

20  produced in native format, that bears the Bates

21  number 286550.

22           Now, in the cover e-mail Ms. Schultz at Anda

23  addresses Ms. Lane and attaches an updated

24  spreadsheet of customers we have cut off.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Is this the type of communication that we

2    have been discussing that Anda has with the DEA

3    communicating information as to the eligibility of

4    its customers to purchase controlled substances?

5              MR. MATTHEWS:  Objection.

6              THE WITNESS:  Yes, it is one of the ways we

7         were communicating with the DEA.

8    BY MR. NOVAK:

9         Q.   Now, we'll pull up on the screen the actual

10   Excel spreadsheet that was attached to the e-mail.

11             MR. MATTHEWS:  I'll put in place here my

12        standard objection to the use of spreadsheets

13        that are not produced in physical form at the

14        deposition and so can't be marked as exhibits.

15        And subject to our agreement to work this out at

16        a later time for all of these, I will assume you

17        are going to go forward, right?

18             MR. NOVAK:  Yes.  I, also, by the way,

19        checked.  There are picture and picture video

20        that will actually present the portions of the

21        spreadsheet that we are reviewing in realtime

22        during the deposition transcript as it plays.

23             MR. MATTHEWS:  Okay.  That's a start.

24             MR. NOVAK:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. NOVAK:

 2      Q.   We had been discussing the types of

 3   communications that Anda was making to the DEA and

 4   the different sheets that are included with them.

 5           Can you identify what this first sheet of the

 6   spreadsheet -- what information it conveys to the

 7   DEA?

 8      A.   There's column headings of date the DEA

 9   registration that Anda shipped from, the customer's

10   DEA number; their name, address, city, state; then

11   there's other fields related to -- it's a little

12   blurry, sorry, item number, description, size, NDC

13   quantity, whether or not an order was filled, whether

14   or not the customer was cut off, yes or no, and then

15   a comments field.

16      Q.   Okay.  In earlier versions of this

17   spreadsheet that we looked at, they actually named

18   the tabs, Customer Cutoff or -- et cetera.

19           Can you tell if this is a customer cutoff

20   tab?

21      A.   Earlier versions that we looked at today, not

22   necessarily earlier versions of the file, correct?

23      Q.   Yes.

24           Anda Exhibit 22, I think it was.
```

1      A.   This would be a cutoff file based on Column O

2   showing Customer Cutoff, yes.

3      Q.   Okay.  And then the information that you said

4   identified orders, are there actual orders that are

5   identified in -- in this spreadsheet --

6      A.   I don't see all that --

7      Q.   -- or at least in this tab?

8      A.   On that sheet that you are showing those 50

9   or so rows, I don't see any fields in those columns

10  populated, so...

11     Q.   Okay.  So there is no identification in the

12  context of specific customers that were cut off to

13  the DEA of suspicious orders that precipitated the

14  cutoff.

15          Is that accurate?

16     A.   Sure.  A -- an individual order would not be

17  the only reason why a customer was cut off, though.

18     Q.   Okay.  If we go next to sheet two -- well,

19  maybe that is the only sheet that is populated for

20  this one.

21          All right.  That's all I have for 27.

22          (Anda Exhibit 28 was marked for

23  identification.)

24  ///

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. NOVAK:

2        Q.   We've had marked as Anda Exhibit 28 a series

3    of e-mails that include Patrick Cochrane and other

4    individuals at Anda on some portions of it, but the

5    e-mail originates with a July 13, 2012, e-mail from

6    Valerie Mitchell of the Department of Justice's Drug

7    Enforcement Administration to Alberto Esteves.  The

8    document is in the July of 2012 time frame at various

9    dates and is Bates number 105695 through 698.

10            And I'll start with the original e-mail from

11   Ms. Mitchell to Alberto Esteves.  First of all, who

12   is Alberto Esteves?

13       A.   Alberto is the site director -- he was the

14   site director at the time for the Groveport, Ohio,

15   distribution center that Anda owned.  He is currently

16   the site director for the Olive Branch, Mississippi,

17   site that we have.

18       Q.   Was he responsible for communications with

19   the DEA as it related to any controlled substance

20   distribution questions that emanated from the

21   Groveport, Ohio, distribution center?

22            MR. MATTHEWS:  Objection.

23            THE WITNESS:  Ultimately, he was the highest

24       ranking person at the site and literally the
```

```
 1        first office inside the door.  So if the DEA

 2        served them with questions or came in for an

 3        inspection, he fielded the inspections.

 4             There was also a DEA compliance manager there

 5        by the name of Debra Mooney that oversaw the

 6        operations of the cages involved.

 7   BY MR. NOVAK:

 8        Q.   Do you have an understanding as to whether

 9   the questions that surfaced in this July 13th e-mail

10   surfaced in the context of an inspection of the

11   Columbus facility?

12        A.   I'm not sure.

13        Q.   Okay.

14        A.   I don't believe there was an inspection in

15   July of '12.

16        Q.   Okay.  One of the questions that Ms. Mitchell

17   asks of Esteves on the last page of Anda Exhibit 28

18   is:  Has Anda reported any suspicious orders to the

19   DEA Columbus district office this year?

20             Do you have an understanding as to whether

21   Anda had made any suspicious order reports in 2012

22   through July?

23        A.   No, I'm not sure of that.

24        Q.   Now, looking at Esteves's response to
```

```
 1    Ms. Mitchell, on which you are cc'd, on July 18th of

 2    2012, the second page of Anda Exhibit 28, he

 3    states -- and this is the number four paragraph:

 4    Anda has reported numerous suspicious customers to

 5    the DEA Columbus district office this year.  We have

 6    had regular ongoing communications of customers that

 7    we have continued or denied controlled substance

 8    sales to.

 9          Do you understand that to be his response to

10    Ms. Mitchell's question as to whether Anda has

11    reported any suspicious orders to the DEA?

12          MR. MATTHEWS:  Objection; foundation.

13          THE WITNESS:  I can answer?

14          MR. MATTHEWS:  You can answer if you can.

15          THE WITNESS:  As far as that looks, he's

16       saying that they've reported suspicious

17       customers.  He does not state that there's been

18       any specific orders.

19    BY MR. NOVAK:

20       Q.   And then up at the top of the first page of

21    Anda Exhibit 28, you state in an e-mail to

22    Michael Cochrane:  I asked him to keep us copied on

23    the madness between them.

24          What did you mean by that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Her requests and her general demeanor towards

 2   Alberto were not necessarily what we had come to know

 3   as normal from a -- from a DEA request, so I was

 4   describing the way that Alberto was feeling towards

 5   the communications with her.

 6           (Anda Exhibit 29 was marked for

 7   identification.)

 8   BY MR. NOVAK:

 9        Q.    We've had marked for identification purposes

10   Anda Exhibit Number 29, which is a continuation of

11   the thread of e-mail that we have been reviewing in

12   Anda Exhibit 28 with some additional e-mail exchanges

13   between the DEA and different folks at Anda.

14           The document is dated -- or at least the last

15   e-mail in the chain is dated Thursday, July 19th of

16   2012, and the Bates page referenced for the document

17   is 86181 through 86233.

18           Now, I want to direct your attention,

19   Mr. Cochrane, to first that portion of the document

20   where Ms. Chaney at the Drug Enforcement

21   Administration writes to you on July 19 of 2012.  And

22   specifically what she writes on Page 5 ending in 185

23   of Anda Exhibit 29 is as follows:  The question was

24   why the customers were, quote, cut off, quote.  While
```

1    you sent what appears to be partial information,

2    mostly questionnaires and drug utilization reviews, I

3    found nothing in the files that corresponds to

4    documentation as outlined in your SOP 40 dated

5    December 15th -- I'm sorry, dated December 2011 and

6    April 5, 2012.  I also found nothing to explain the

7    circumstances surrounding the decision to drop these

8    registrants as customers.

9         You see you received that inquiry from

10   Ms. Chaney in July of 2012, correct?

11        A.   Yes, that's correct.

12        Q.   Okay.  And you wrote back to Ms. Chaney, and

13   wrote in part:  I have forwarded this e-mail to

14   Mr. Michael Cochrane.  He is Anda's executive

15   director of compliance and our custodian of records.

16   He will reply with explanations regarding the

17   customer's cutoff.

18        And then you continue to write:  Regarding

19   the inquiry about cutoff, and, quote, controls

20   denied, quote, the customers detailed in the, quote,

21   cutoff, quote, list, are customers that previously

22   had controlled substance business with Anda and that

23   we are no longer servicing.

24        The customers detailed in the controls denied

1    list are those that have not previously done business

2    with Anda that requested controlled substances and

3    Anda chose not to service.

4            Is that an accurate characterization of

5    Anda's position as to what the cutoff and controls

6    denied tabs of their spreadsheets sent to the DEA in

7    the 2012 time frame -- what they signified?

8            MR. MATTHEWS:  Objection.

9            THE WITNESS:  Yes, it is.  And it's exactly

10       what I described when we were reviewing that

11       document a little earlier.

12   BY MR. NOVAK:

13       Q.   Okay.  Now, further up on Page 3 of the

14   e-mail exchange, Ms. Chaney writes to

15   Michael Cochrane and states:  If I understand your

16   response, these customers were discontinued for

17   reasons not necessarily related to a suspicious

18   order, question mark.

19            And then Michael Cochrane responds:  That is

20   correct.  Controlled substance sales were not

21   necessarily discontinued because of a suspicious

22   order.

23            Is that an accurate reflection of Anda's

24   position as to what were being communicated in the

1    spreadsheets it was sending to the DEA as of this

2    time?

3        A.    I have not reviewed the individual customers

4    that are there, but following this e-mail trail, that

5    appears correct, that dispensing data and

6    questionnaires were some of the elements used to make

7    a determination on why we discontinued shipping to

8    those customers.

9        Q.    Now, Ms. Chaney replies to Michael Cochrane's

10   e-mail and states:  So the customer, quote, cutoff,

11   quote, list does not reflect suspicious orders,

12   question mark.

13            Do you see that reference?

14       A.    I do.

15       Q.    And, in response, Michael Cochrane replies:

16   On behalf of --

17            Okay.  We'll have to --

18            He doesn't respond directly to Ms. Chaney's

19   question there, does he?

20       A.    I believe it's on the first page.

21       Q.    Oh, thank you.

22            So in replying to her question, which is

23   simply:  So the customer cutoff list does not reflect

24   suspicious orders?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              He writes:  No, it does not.  We have a

 2     system for identifying orders of interest/suspicious

 3     orders based on the document you referenced below,

 4     SOP 40.  However, there have not been any individual

 5     suspicious orders to report to you, period, end of

 6     quote.

 7              Does that reflect Anda's position at the July

 8     of 2012 time frame about the nonexistence of

 9     suspicious orders?

10       A.   As it relates to Michael's response to

11     Catherine, which is a response to numerous e-mails

12     back to Valerie's original request for a list of

13     orders -- suspicious orders reported in 2012, I would

14     say yes.

15              MR. NOVAK:  Why don't we take a break.

16              THE VIDEOGRAPHER:  4:45 p.m.  We are going

17         off the record.

18           (Recess from 4:45 until 5:09 p.m.)

19              THE VIDEOGRAPHER:  The time is 5:09 p.m.  We

20         are now back on the record.

21           (Anda Exhibit 30 was marked for

22     identification.)

23     BY MR. NOVAK:

24       Q.   We've had marked as Anda Exhibit 30 a
```

1    supplemental response to plaintiff's first combined

2    discovery request to distributor defendants which was

3    provided to us on January 17th.

4           There are a number of different components

5    that I am in particular going to walk through.

6           Mr. Cochrane, if you look at Page 3 of the

7    document, there is a portion of it that reads under

8    second supplemental response to discovery request

9    number two, it states that -- the second paragraph

10   down at the bottom:  Further answering, Anda states

11   that as a result of various meet and confer

12   discussions with plaintiffs, Anda is supplementing

13   this response further to provide information

14   regarding the implementation of Anda's suspicious

15   order monitoring system's policies and procedures.

16          In addition to correspondence, customer due

17   diligence files (which include but are not limited to

18   customer questionnaire, historical dispensing data,

19   and geographical information from each customer)

20   which have been produced to plaintiffs as part of

21   Anda's custodial and noncustodial document

22   productions, Anda maintains certain information in

23   electronic databases that Anda has queried to obtain

24   information responsive to plaintiff's discovery

Highly Confidential - Subject to Further Confidentiality Review

1   requests.

2           Accordingly, Anda now supplements this

3   response by producing reports created as a result of

4   these queries.  These reports were attached hereto as

5   Exhibits A through D.

6           Now, we have, in electronic formats the

7   reports that were submitted as Exhibits A through D,

8   and I would like to walk you through them for a

9   moment to see if there is particular information that

10  can be gleaned from the actual spreadsheets.

11          Now, if we can start with Exhibit A, it is

12  characterized in written form in Anda's supplemental

13  response as a report from Anda's TPS database which

14  tracks the status of various data points in Anda's

15  due diligence files, i.e., current customer status,

16  current control approval status, current customer

17  questionnaire, and current dispensing data, parens,

18  for each of Anda's customers located within the

19  geographic area encompassed in the three cases

20  designated by the court as track one cases.

21          Pursuant to case management order number one.

22          The data included in Exhibit A describes only

23  the status within Anda for these various data points

24  as of the date of this response.  It does not reflect

Highly Confidential - Subject to Further Confidentiality Review

1    the status of such data at any other time.

2    Historical information, if any, is collected as part

3    of the customer's due diligence folder, which has

4    been previously produced.

5        Do you have a basic understanding as to what

6    information is contained in Exhibit A in the

7    spreadsheet?

8        A.   I do.

9        MR. MATTHEWS:  Objection.

10       THE WITNESS:  But can you expand it,

11       possibly, enlarge it, and maybe show the column

12       headings?  I think some of those filters are

13       blocking what those field descriptions are.

14   BY MR. NOVAK:

15       Q.   And I'm with you on expanding the size of it.

16   That's why I try to use electronic exhibits to begin

17   with.

18       A.   It's only in the last year, but okay.

19       Q.   I feel your pain.

20       A.   Okay.  So across the top, we have customer

21   number.  We have customer name.  We have additional

22   heading, which would be an additional address field.

23   Customer street, customer town, state, ZIP, county,

24   customer DEA, CQ I assume is customer questionnaire,

Highly Confidential - Subject to Further Confidentiality Review

1    DD is dispensing data, current status of the

2    customer, which would be active or deactivated.

3            Allow controlled substances, yes or no.

4            Yes, I'm familiar with those.

5    BY MR. NOVAK:

6        Q.   Okay.  So this is information that can be

7    drawn from the TPS database for particular customers?

8        A.   Yes, it is.

9        Q.   Okay.  Does the TPS database include not only

10   the customer's current control approval status, but

11   does it include information as to the history of the

12   customer's status in terms of when it has changed

13   from eligible for controls to noneligible?

14       A.   Not within those fields, no.

15       Q.   No, not within these fields.

16            I think what I'm asking is:  Can that

17   information be extracted from the TPS system?

18       A.   I'm not sure if those types of fields are

19   memorialized and time stamped.  There's customer

20   notes fields that could possibly indicate when

21   indications or when changes were made to those

22   fields.

23            But what you are looking at is a snapshot of

24   what -- when that report was run, those were the

1    statuses.

2        Q.   Okay.  And as to whether a query could

3    provide the full control eligibility status over

4    time, do you know one way or another whether it

5    could?

6        A.   I don't know that those fields and the files

7    that those fields relate to have history.

8        Q.   Right.

9             Are -- I'll ask a different question.

10            Are there fields within the TPS system that

11   provide information of historically the different

12   control eligibility statuses that each particular

13   customer has over time?

14       A.   No.  As far as I know, those fields are the

15   current status.

16       Q.   Why don't we go -- okay.

17            Now, Exhibit B is characterized on Anda

18   Exhibit 30 as a report created from the TPS database

19   which contains notes recorded by Anda's compliance

20   team which are specific to track one customers.

21       A.   Okay.

22       Q.   Those are the notes that you made reference

23   to in your last answer?

24       A.   They could be, yes.

1   Q.   Okay.  Now, looking at Column N, is that the

2   notes field?

3   A.   That Column N is labeled notes, yes.

4   Q.   So, for instance, just looking at the top

5   pharmacy, Southside Pharmacy, it indicates in the

6   notes field:  Controls removed.  Pharmacy indicted on

7   drug charges.

8        That would be the reason that the Anda

9   compliance person recorded as to why that particular

10  customer is no longer eligible?

11       MR. MATTHEWS:  Objection.

12       THE WITNESS:  I -- I think the whole context

13       of the notes -- you have multiple notes entries

14       for that customer.  And I believe Columns K and L

15       are dates and times for said notes.

16       So, for instance, N3 and 4 is one note that

17       was entered on June 4th of 2014 at 5:24 in the

18       afternoon.

19  BY MR. NOVAK:

20  Q.   Okay.  Let me -- let me make sure, just so I

21  understand it.

22       Where is it that you are making the

23  observation that notes three and four is one note

24  that was entered on June 4th of 2014 at 5:24?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Columns K shows the note date.

2      Q.    Okay.  So that's the June 14th --

3      A.    June 4th.

4      Q.    -- June 4th of 2014?

5            Okay.

6      A.    Column L is the time, 17:24:03.

7      Q.    Okay.

8      A.    And you see there are sequence numbers in the

9  next field, which are somewhat telling me, you know,

10  that is a continuous note, all with the same date and

11  time stamp.

12     Q.    Okay.  And specifically you are referring now

13  to the -- the Southside Pharmacy that is in Row 5 of

14  the spreadsheet?

15     A.    I read that as Columns -- Column N, cells 3,

16  4, and 5, are one note.

17     Q.    Oh, okay.

18     A.    Controls removed, pharmacy indicted on drug

19  charges, selling opioids illicitly.  Correction,

20  controls were already disabled.

21     Q.    Okay.  So all of those observations were made

22  as one note relating to one customer.  It just took

23  three rows to get it all in?

24     A.    That's how I read that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.

2    A.    And that's based on my knowledge of how you

3    transfer data from the AS 400 database, which is a

4    green screen application that's taking a freeform

5    text field and then pulling it into Excel.

6    Q.    Okay.

7    A.    Then the next one shows controls denied.  See

8    notes below.  No new due diligence provided.

9          That entry was made on 5/30 of '14.

10   Q.    Okay.  That's helpful.

11         Why don't we go to Exhibit C.

12         Now, in the written characterization of

13   Exhibit C that is contained in Anda Exhibit 30,

14   Page 4, Anda states:  Exhibit C is a report created

15   from the TPS database which reflects the activity

16   resulting from operation of Anda's electronic order

17   monitoring system after processing orders for

18   controlled substances placed by Track One Customers

19   from the period December 2011 to May 2018.

20         Let me stop there.

21         Is the operation of Anda's electronic order

22   monitoring system from December of 2011 as the

23   starting point significant in terms of the type of

24   information that was contained in the TPS database as

```
 1    it related to the operation of a suspicious order

 2    monitoring report?

 3            MR. MATTHEWS:  Objection.

 4            THE WITNESS:  I'm not sure what that question

 5      means.

 6    BY MR. NOVAK:

 7      Q.   Okay.  I'll ask a different one.

 8            The implementation of Standard Operating

 9    Procedure 40 as it relates to suspicious order

10    monitoring reports first started in December '11; is

11    that correct -- December of 2011?

12      A.   The implementation of the system aspects of

13    TPS, pending orders to review, was implemented in

14    December '11.

15      Q.   Okay.  So it is from that period forward

16    through May of 2018 that the data is captured for

17    customers in terms of whether the electronic order

18    monitoring system would have held their orders.

19            Is -- is that an accurate characterization?

20            MR. MATTHEWS:  Objection.

21            THE WITNESS:  I believe that's accurate and

22      what is represented on Page 4, Exhibit C.

23    BY MR. NOVAK:

24      Q.   Okay.  And -- and then, looking further, it
```

Highly Confidential - Subject to Further Confidentiality Review

1    states:  All orders flagged by the electronic order

2    monitoring system were manually reviewed by the Anda

3    compliance team.

4         That is a statement as to the manner in which

5    orders that are held are then subsequently reviewed

6    and a determination made as to whether they should be

7    released.

8         Is that correct?

9    A.   That's correct.

10   Q.   Okay.  Have you ever heard of the term of

11   orders being, quote, in the bucket, quote?

12   A.   Yes.

13   Q.   Okay.  And do you understand the phrase "in

14   the bucket" as it is used at Anda in the context of

15   the operation of a suspicious order monitoring system

16   to be that the orders are held and awaiting manual

17   review by the Anda compliance team?

18   A.   Yes.  The bucket is where the orders go to be

19   reviewed.

20   Q.   Okay.  So continuing on Anda Exhibit 30,

21   Page 4, it states:  The results of this manual review

22   are memorialized in the TPS database and reflected in

23   Exhibit C.  This report includes orders reviewed by,

24   one, Anda's own electronic order monitoring system

Highly Confidential - Subject to Further Confidentiality Review

1    from December 2011 through March 2017; and, two, the

2    electronic order monitoring system operated by Buzzeo

3    PDMA on behalf of Anda from March 2017 through May of

4    2018.

5         We have not discussed it at all today, but

6    you understand that there was a transition in March

7    of 2017 from Anda's homegrown electronic suspicious

8    order monitoring system that operated in TPS to a

9    system that was created by Buzzeo?

10    A.   Yes, I do.

11    Q.   Okay.  And what is recorded in Exhibit C are

12    the orders that were held for controlled substance

13    customers in Cuyahoga and Summit Counties, either by

14    Anda's homegrown suspicious order monitoring system

15    or, subsequently, the Buzzeo system?

16    A.   That's correct.

17    Q.   Okay.  And when it says "the results of this

18    manual review are memorialized in the TPS database

19    and reflected in Exhibit C," how are the results of

20    the manual review reflected in Exhibit C?  Or where

21    would they be reflected?

22         MR. MATTHEWS:  Can he see it?

23         THE WITNESS:  The fields across the top are

24         self-explanatory for the most part.  Item

Highly Confidential - Subject to Further Confidentiality Review

```
 1        description NDC, narcotics schedule, that's

 2        Anda's item number, the next one.  The size of

 3        that item number.  I don't -- I can't see the

 4        next one.  Shipped quantity.  Okay, that is the

 5        quantity.  The DEA blank number would be the

 6        222 Form number or the electronic CSOS

 7        certificate order ID.  The hold reason code from

 8        either one of the two systems.  It looks like a

 9        hold reason description, release reason code, and

10        release reason description.

11   BY MR. NOVAK:

12        Q.   So looking at the hold reason code column,

13   there are different reasons that orders are held that

14   we've reviewed in -- in Standard Operating

15   Procedure 40 as it relates to controlled substances,

16   correct?

17        A.   Correct.

18        Q.   And the -- in the column that says "Hold

19   Reason" for the first one there, in Row 2, the reason

20   as provided is "customer average per month."  Is that

21   an indication that the order was originally held for

22   review because the order exceeded some multiple of

23   the average monthly order from that customer?

24        A.   That's what that description is telling me.
```

1    I'm not familiar with the exact hold reason

2    descriptions as I don't use the system

3    transactionally.

4        Q.    Okay.  And then if we look to the release

5    reason code, there are different -- can you scroll

6    down -- there are different numbers provided, at

7    least for some of the transactions, for the reason

8    that they were released.

9            And the top one, for example, is released

10   because, if we look at the description, the -- it is

11   consistent with customer order pattern and/or within

12   controlled substance -- or within controlled

13   substance increase granted.

14           What do you understand that to mean?

15       A.    It looks like exactly what it states,

16   consistent with what the customer's order patterns

17   are as we see them and within their controlled

18   substance increase.

19       Q.    So if I'm interpreting this spreadsheet

20   correctly, there was an order for oxycodone that was

21   initially held in -- this is looking at Row 2 -- and

22   the reason it was initially held is that it exceeded

23   the customer's average monthly order by -- by some

24   multiple.  We don't know the multiple, but that was

1    the reason it was initially held.

2            MR. MATTHEWS:  Objection.

3    BY MR. NOVAK:

4        Q.   And Anda's compliance staff then reviewed

5    that order, determined that the order was consistent

6    with the customer's order pattern, and consequently

7    granted the -- the increase and released the order?

8            MR. MATTHEWS:  Objection.

9            THE WITNESS:  I can't determine that from

10           what's in the release reason code and release

11           reason on Row 2.

12   BY MR. NOVAK:

13       Q.   Okay.

14       A.   I'm not sure what release reason code zero

15   indicates.

16       Q.   Oh, you're right.  That was for Row 2.

17           But for Row 3, there is a -- a release code

18   number three provided and then an explanation of the

19   release reason that I just referenced.

20           Is --

21       A.   Yes.

22       Q.   Okay.  So for Row 3 -- and thank you for

23   characterizing my -- my misstatement earlier --

24   there, there was a hydromorphone order that was

```
 1    originally held because it exceeded the customer

 2    avenue per month but released because compliance

 3    staff reviewed it and made the determination that it

 4    was consistent with the customer order pattern and/or

 5    within the controlled substance increase granted.

 6         Is that an accurate characterization as to

 7    how that transaction was treated?

 8         MR. MATTHEWS:  Objection.

 9         THE WITNESS:  That looks correct, yes.

10         MR. NOVAK:  Okay.  If you can scroll down to

11      find an additional reason as to why an order was

12      held.

13    BY MR. NOVAK:

14      Q.   Now, in Row 478, there is reference to an

15    oxycodone order that was held because the order

16    exceeded the average order for a particular class of

17    trade.

18         Is that another reason for holding an order

19    under Standard Operating Procedure 40?

20      A.   Yes.

21      Q.   And then that order would have been reviewed

22    and determined that it could be released, because if

23    we look in the follow-on column, it was consistent

24    with the customer's order pattern and/or within CS
```

Highly Confidential - Subject to Further Confidentiality Review

1    and the increase was granted.

2          Is that accurate?

3     A.    That's accurate.

4     Q.    Okay.  And these different notations

5    correspond, if we look back at SOP 40, with the

6    reasons that are delineated in that SOP for the

7    holding of an order and then subsequently the

8    releasing of an order, correct?

9     A.    I don't have the document in front of me.

10   What exhibit are you referring to?

11    Q.    Great question.

12          Exhibit 5.

13          Do you have Exhibit 5 in front of you?

14    A.    I do.

15    Q.    Okay.  So I'm trying to look at the reasons

16   an order would be held as set forth in Exhibit 5 and

17   reviewing them in conjunction with the actual

18   characterizations that are contained on the

19   spreadsheet that was produced as Exhibit C in Anda

20   Exhibit 30.

21          And one of the reasons that's given, for

22   example, is -- in Standard Operating Procedure 40 is

23   the average dosage units per order for that class of

24   trade for a specific chemical family.

Highly Confidential - Subject to Further Confidentiality Review

1           Would that correspond to the class of trade

2    average per order reason for holding an order as

3    notated in Row 478 for an oxycodone order?

4         A.   Yes, but I don't know what class of trade

5    we're talking about or what customer.

6         Q.   Right.  Right.  We don't know --

7         A.   It's probably further over to the left on the

8    columns.  I don't know if we have class of trade

9    inside there.

10        Q.   So for this particular customer, Preztells

11   Pharmacy, that would likely be a retail pharmacy

12   class of trade?

13        A.   Yes.

14        Q.   Okay.

15        A.   Maybe retail independent.  I'm not sure of

16   the delineation between a retail independent versus a

17   chain.

18        Q.   Okay.  That is a good question.

19           Do you know if chains are treated as a

20   separate class of trade when an individual pharmacy

21   location is being evaluated on a controlled substance

22   order than an independent retail pharmacy?

23        A.   They could be classified as a different class

24   of trade.  I'm not sure if there are differences in

1    the parameters for which -- one pharmacy versus the

2    other.

3        Q.   Sitting here today, do you know one way or

4    the other whether a chain pharmacy has a different

5    class of trade for purposes of applying the

6    suspicious order monitoring system than an

7    individual -- an independent retail pharmacy?

8        A.   No, I do not.

9        Q.   Okay.  Now, if we can filter Exhibit C for

10   those transactions where an order has been held, if

11   we look solely at the held orders, there appear to be

12   release reasons provided for just about all of them.

13            Is that -- why don't you scroll down a little

14   bit.

15            Is that a fair characterization?

16            MR. MATTHEWS:  Objection.

17            THE WITNESS:  For the handful we've looked

18       at, yes.

19   BY MR. NOVAK:

20       Q.   Okay.  And just to check, how many

21   transactions are referenced as having been held in

22   the -- in the Summit and Cuyahoga County?

23            MR. MATTHEWS:  You want him to count them up?

24            MR. NOVAK:  No, I think we can just scroll to

Highly Confidential - Subject to Further Confidentiality Review

```
 1        the bottom.

 2             MR. MATTHEWS:  It doesn't have a cumulative

 3        line total.  The line number isn't cumulative.

 4   BY MR. NOVAK:

 5        Q.   If I can direct your attention to the very

 6   bottom of the screen, for the transactions from these

 7   two counties, it states:  976 of 5,652 records found.

 8             Do you see that?

 9        A.   I see that.

10        Q.   Okay.  Does that reflect that there have been

11   976 orders in Summit and Cuyahoga County that were

12   held by Anda's suspicious order monitoring system for

13   a review to determine whether they should be released

14   to their customers?

15             MR. MATTHEWS:  Objection.

16             THE WITNESS:  For that time period

17        encapsulated in that report, yes, it does.

18   BY MR. NOVAK:

19        Q.   Okay.  And then going to the released reason,

20   it appears that the reason typically given for

21   release of those orders are that they are consistent

22   with the customer's order pattern and/or within CS

23   increase granted.

24             Is -- is that a fair statement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. MATTHEWS:  Objection.

 2            You want him to look at every one of them?

 3            MR. NOVAK:  I will withdraw it.

 4   BY MR. NOVAK:

 5       Q.   Let me do one other thing, and that is if we

 6   can filter the release reason column on those orders

 7   that have been held for situations where no reason

 8   for a release was provided.

 9            So those would be examples of customer orders

10   that were held by the suspicious order monitoring

11   system -- I think we determined earlier that there

12   was 976 of those -- and for 23 of those transactions,

13   there is no reason provided for the release.

14            Why would that be?

15       A.   I'm not --

16            MR. MATTHEWS:  Objection.

17            THE WITNESS:  I'm not certain that they were

18       released based on looking at this.

19   BY MR. NOVAK:

20       Q.   Okay.  Is there a field in this data -- or a

21   column that would indicate whether the order has been

22   released?

23       A.   You could scroll across the top, and we could

24   look.  I'm not -- I'm not sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  Was the Date Product Shipped column

 2   indicate that the order has been released?

 3        A.    It could, but you could be using a date stamp

 4   from other aspects of that same order.

 5        Q.    Okay.  How about the Shipped column?  Would

 6   that indicate that the order has actually been

 7   shipped?

 8        A.    It could, it could.

 9        Q.    Now, if we scroll over to the far left,

10   looking at the Customer Name column, it appears that

11   virtually -- well, I won't say "virtually all" -- but

12   more than half of the orders that were held but

13   appear to have been released without a release reason

14   relate to Remedy Senior Care of Ohio.

15            Do you know why Remedy Senior Care of Ohio

16   would have its orders released from the suspicious

17   order monitoring system with no reason for the

18   release recorded in TPS?

19            MR. MATTHEWS:  Objection.

20            THE WITNESS:  No, I don't.  But I can tell

21        you that Remedy Senior Care of Ohio -- we have

22        extensive information on them relating to their

23        dispensing practices and the customer channel in

24        which they serve.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. NOVAK:

 2         Q.   Okay.  That's all I have as to that exhibit.

 3              MR. NOVAK:  Take a quick break.

 4              THE VIDEOGRAPHER:  The time is 5:46.  We're

 5         off the record.

 6              (Recess from 5:46 until 5:58 p.m.)

 7              THE VIDEOGRAPHER:  The time is 5:58.  We are

 8         now back on the record.

 9    BY MR. NOVAK:

10         Q.   I had a few additional questions with respect

11    to Exhibit B that was produced in conjunction with

12    Anda Exhibit 30 in Anda Supplemental Response to

13    Plaintiff's Combined Discovery Requests, if we can

14    pull back up that particular tab of the spreadsheet.

15              Now, would Exhibit B identify instances where

16    a customer of Anda in either Cuyahoga or Summit

17    County had applied for eligibility to purchase

18    controlled substances?

19         A.   That data could be entered into the notes,

20    but that's not the only place that it would be.

21         Q.   Where else -- or what other column would it

22    be contained in?

23         A.   I don't know that I'm referring to a column,

24    but the customer file and any of their due diligence
```

1    information, dispensing data information, their

2    questionnaire, that would all be contained in the

3    customer file.

4        Q.   Okay.

5        A.   This is specifically a notes field within the

6    TPS customer record.

7        Q.   Is there a Customer Denied row in Exhibit B?

8        A.   I don't see one.

9        Q.   Okay.  However, there are instances where, in

10   the Customer Notes field, it identifies that controls

11   were denied.

12            For instance, in Row 6 for the Southside

13   Pharmacy, in Lorain, Ohio.

14       A.   Correct.

15            MR. NOVAK:  Is there a way of filtering those

16            instances where Controls Denied are identified in

17            the notes field?

18   BY MR. NOVAK:

19       Q.   All right.  If we look solely for those

20   instances where Anda had recorded the controls had

21   been denied in the Notes field, it appears as though

22   there are six customers for whom controls were denied

23   by Anda.

24            Is that accurate?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I agree, you're showing six customers on that

 2    screen and that filtering of that screen.  I disagree

 3    with the continuity of the notes because the way you

 4    are filtering it and only looking for the "word

 5    denied," you may or may not be including all of the

 6    notes associated with a respective customer.

 7        Q.   Okay.  So this has identified some instances

 8    where controls were denied but -- well, let's just go

 9    through them.  There aren't that many.

10         The first one, Southside Pharmacy, in Lorain,

11    Ohio, based on your reading of the TPS Notes field,

12    is it fair to say that that customer applied for

13    controlled substances and was denied?

14        A.   It's not clear to me whether the customer

15    initiated the review or compliance initiated the

16    review.  Looking at Row 9, to me, that would be the

17    first entry related to Southside that has the word

18    "denied" in the line item.

19         As I previously stated, I would want to look

20    at all of the notes associated with that customer and

21    follow the timeline, because you're sorted descending

22    by date -- or it looks like you are sorted by

23    customer and then descending by date is what I see.

24        Q.   So looking at Southside Pharmacy in Row 9
```

1    where it says in the customer notes field:  Denied

2    controls.  Asked rep for updated DD -- would that be

3    dispensed data?

4         A.    That would be dispense data.

5         Q.    And when would that note have been entered?

6         A.    9:54 a.m. on January 22 at 2014.

7         Q.    So is it fair to say that Southside Pharmacy

8    was denied controls on that date in 2014?

9         A.    At that time on that date in 2014.

10        Q.    Okay.  So you have it down to the minute, a

11   determination as to when they were denied?

12        A.    I have down to the minute the time in which

13   that comment was entered on that customer notes

14   field.

15        Q.    Your precision is appreciated.

16              Now, the next customer that is referenced as

17   having their controls denied in Summit County is

18   Church Square Pharmacy on Euclid Street.  Is it fair

19   to say that that customer had their application for

20   eligibility for controlled substances denied?

21        A.    Yes, it is.  It shows that at least two times

22   based on your current filter of that sheet.

23        Q.    Okay.  And those two times would be what?

24        A.    Row 63 and 64 on 4 /18/2012 and 3/21/2012

Highly Confidential - Subject to Further Confidentiality Review

```
1    respectively.

2         Q.   Okay.  The next customer in Summit County

3    that is referenced in -- in Exhibit B is St. Claire

4    Drug on -- I can't see which street --

5         A.   Do you mind expanding a little bit?

6         Q.   Yeah.

7              So St. Claire Drug on St. Claire Avenue in

8    Cleveland.  Now, there was one instance where the

9    Customer Notes field indicates that oxycodone and

10   methadone were denied.  Still don't have the most

11   recent dispensed data.

12             Is that the reason why they would have been

13   denied at least as to those two controlled

14   substances?

15             MR. MATTHEWS:  Objection.

16             THE WITNESS:  Again, I'm going to point you

17        back to your filter not showing complete and

18        accurate notes.  An example is Lines 72 and 76.

19        Line 76 shows a sequence number of two for the

20        notes associated with that line.  I'm missing the

21        context of the first part of that note.

22   BY MR. NOVAK:

23        Q.   Is that --

24        A.   I mean, again, you have it sorted descending
```

Highly Confidential - Subject to Further Confidentiality Review

1    by date.  So if -- if we want to talk about that

2    customer, I would go to the earliest date in which we

3    had notes and work -- work the timeline.

4        Q.   Okay.  If we filtered these customers using

5    their DEA number, now that we have located them,

6    would that give us a more expanded notes field as to

7    the history for them?

8        A.   I believe so.

9        Q.   So the customer --

10       A.   Or even the customer number.

11       Q.   Yeah.  So let me just write them down before

12   we leave this.

13            309826 is the customer number for Southside

14   Pharmacy.  89334 is the customer number for Church

15   Square Pharmacy.  503203 is the customer number for

16   St. Claire Drug.  89963 is the customer number for

17   Northeast Ohio Health Service.  19758 is the customer

18   number for Parent Pharmacy Services.  And, finally,

19   Jim Edwards' customer number is 361260.

20            Is that correct for all of those?

21       A.   Yes, sir.

22       Q.   Okay.  So for purposes of getting a more

23   fulsome description of the customer notes, if we look

24   to each of those customer numbers, we would be able

Highly Confidential - Subject to Further Confidentiality Review

1    to get a broader description?

2        A.   I think you would be looking at everything

3    that's contained on that spreadsheet.

4        Q.   Okay.  Why don't we start with Customer

5    309826.

6            Now, if we scroll over to the customer notes

7    field, there is a more extensive description.  Would

8    that be all of the notes that were maintained as to

9    that customer for the dates that are referenced in

10   each of those rows?

11       A.   For the selection criteria of that report,

12   yes.

13       Q.   Okay.  And is it still accurate to say that

14   this particular pharmacy had its controls denied by

15   Anda?

16       A.   The first entry, which I see controls being

17   denied or removed for that customer, is on

18   November 30th, 2011.

19       Q.   Okay.  And would they ever have been eligible

20   for controls subsequent to the date you identified in

21   2011?

22           MR. MATTHEWS:  Objection.

23           THE WITNESS:  I'm not sure as to what there

24       was before.  I can tell you that on

1        November 30th, 2011, the note says that controls

2        were removed and that the dispensing data was on

3        file.

4    BY MR. NOVAK:

5        Q.    Okay.  Now, the -- the note above that

6    states:   No controls ever reported to the DEA.

7            Is that an indication that this is a customer

8    who would have been reported to the DEA on one of

9    Anda's submissions?

10       A.    Yes.  Either cut off or denied.

11       Q.    And the date of the entry of the "no controls

12   ever reported to the DEA" is -- is that December 8th

13   of '11?

14       A.    That's correct.

15       Q.    Okay.  Let's go next to Customer 89344.

16           So this is the Church Square Pharmacy in

17   Euclid Avenue, and if we go over to the customer

18   notes field for this customer, it says that "denied

19   controls," and it's got that entry twice, once in

20   March 21st of 2012 and once on April 18th of 2012.

21           Is that correct?

22       A.    Yes.

23       Q.    Okay.  Is there an indication that at any

24   point subsequent to that this customer was ever

1   approved for purchasing controlled substances?

2       A.   That does not indicate to me that they were

3   approved for controlled substances.

4       Q.   All right.  Let's go to Customer Number

5   503203.

6            So this is St. Claire Drug on St. Claire

7   Avenue and the Customer Notes fields are fairly

8   extensive.  There is a reference to various points in

9   time when different actions were entered by a

10  compliance staff member as it relates to actions

11  taken on controlled substances.  Is that an accurate

12  characterization?

13           MR. MATTHEWS:  Objection.

14           THE WITNESS:  Yes.  I see quite a few rows of

15      notes related to this customer on multiple

16      entries.

17  BY MR. NOVAK:

18      Q.   So many of them that I'm not going to go

19  through them in my remaining time.

20           But can you make a decision -- or a

21  determination from a review of those notes as to

22  whether there was ever a time where their eligibility

23  for controls was denied?

24      A.   I see them starting as a new customer number,

1    because they were acquired by a new owner.  Just

2    referencing Rows 87 through 90, those notes told me

3    that somebody bought them which probably resulted in

4    them receiving a new DEA number and they definitely

5    received a new Anda customer number.

6         We opened them with 500 limits, except it

7    shows codeine at 1,000.  No Oxy or methadone at this

8    time.  We can review for increased limits of Oxy or

9    methadone in a few months with new summarized data.

10    Q.    Okay.

11    A.    The next entries talk about increase denied,

12    no specifics given; told rep we just turned them on

13    for controls and we can review in a few months for

14    increases with new dispense data.  See notes below.

15         Increase denied again.  Revisit in three

16    months.

17    Q.    Okay.

18         MR. MATTHEWS:  Are you finished with your

19    answer?

20         THE WITNESS:  Do you need me to continue?

21         MR. MATTHEWS:  I think the question was:  Can

22    you tell from those notes whether there was a

23    denial of controls?

24         MR. NOVAK:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Are you finished with the

 2        answer?

 3              THE WITNESS:  I don't see an all-out denial

 4        for access to all controls.  I see denials for

 5        requested increases and/or access to oxycodone

 6        and methadone.

 7   BY MR. NOVAK:

 8        Q.    Okay.  If we can go to Customer Number 360.

 9              So this is the Jim Edwards pharmacy on Hudson

10   Industrial in Hudson, Ohio.  Looking at the Customer

11   Notes field, can you make a determination as to

12   whether this customer was ever denied eligibility for

13   controlled substances?

14        A.    The first entry shows that controls access

15   was removed, and there's a reference to the customer

16   not actively buying.

17              The next entry approximately ten months later

18   shows that controls were denied and that it was a

19   mail order pharmacy and the products were mainly

20   liquids.  Dispensing data on file.

21              Approximately four months later, controls

22   denied again.

23              Another month later -- my error, it was not

24   four months later.  I misread.  It was December to
```

1    January.  So it was one month later that controls

2    were denied again.

3            Next entry is the end of February.  Discussed

4    with RB, Robert Brown, turning on for diazepam and

5    alprazolam only at 300 each.  See e-mail in account

6    folder.  Dispense data on file.

7            Fast-forward again to the end of March,

8    there's an entry:  Customer requested Suboxone,

9    denied, controls removed after discussing with RB,

10   Robert Brown, new dispensing data on file.

11       Q.   All right.  If we can go back for a moment to

12   the Southside Pharmacy, which is Customer Number

13   309826.

14           In the Notes field of no controls ever

15   reported to the DEA, is that an indication that Anda

16   submitted a report to the DEA listing Southside

17   Pharmacy as a pharmacy for which they would decline

18   selling controlled substances to?

19       A.   That shows two declarative sentences that say

20   "no controls ever reported to the DEA."  So I would

21   suspect that that would have been on one of the

22   reports for the DEA.

23       Q.   Okay.  That 's all I have for that exhibit.

24           (Anda Exhibit 31 was marked for

Highly Confidential - Subject to Further Confidentiality Review

```
 1     identification.)

 2     BY MR. NOVAK:

 3          Q.   We've had marked as Anda Exhibit 31 a

 4     document that was produced to us yesterday entitled

 5     "2007 Standard Operating Procedures for Anda

 6     Pharmacy, AndaMeds, and VIP Commissioned Employees

 7     Compensation."

 8               Are you familiar with this document?

 9          A.   Generally, yes.

10          Q.   Okay.  Are these the compensation policies

11     that were in place for Anda in 2007?

12               MR. MATTHEWS:  Objection.

13               THE WITNESS:  Yes.  For Anda, AndaMeds, and

14          the VIP commissioned employees.

15     BY MR. NOVAK:

16          Q.   Okay.  Do you know what period of time these

17     compensation policies were in place as it related to

18     Anda?

19          A.   I believe there was a specific policy for

20     each year.

21          Q.   Okay.

22               MR. MATTHEWS:  I think that's it.  I think

23          you are over your time.

24               MR. NOVAK:  I just have one last question.
```

```
 1            MR. MATTHEWS:  You are over your time.

 2            MR. NOVAK:  It's not an offensive one.

 3            MR. MATTHEWS:  I'll give you one more

 4      question.

 5    BY MR. NOVAK:

 6      Q.   There are handwritten notes at certain places

 7    throughout the document.  Do you know whose

 8    handwritten notes they are?

 9      A.   Yes, I do.

10      Q.   Whose are they?

11      A.   Dan Shannon, sales director.

12      Q.   Okay.

13            THE VIDEOGRAPHER:  We're going off the

14      record.  The time is 6:23.

15           (Recess from 6:23 until 6:26 p.m.)

16            THE VIDEOGRAPHER:  The time is 6:26.  We're

17      now back on the record.

18                   CROSS-EXAMINATION

19    BY MR. MATTHEWS:

20      Q.   Good evening, Mr. Cochrane.  I know you know

21    me, but I will introduce myself for the record.  I'm

22    James Matthews.  I represent Anda this evening, and I

23    have a few questions to just clarify some of the

24    answers you have given over the course of the day.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Is that okay?

 2       A.   That's fine.

 3       Q.   I know that you have been here for a very

 4  long time.  I believe we began at 9:00 a.m. and it is

 5  now 6:30 -- or 6:26 p.m.

 6       A.   Correct.

 7       Q.   So we'll try to get through this as quickly

 8  as we can, and we appreciate the time you have given

 9  us.

10            Way back at the beginning of the day,

11  Mr. Novak asked you some questions about

12  conversations that you had or that you participated

13  in with Tracey Hernandez of Watson and some

14  individuals at DEA in the summer of 2007.

15            Do you remember that line of questioning?

16       A.   Yes, I do.

17            (Anda Exhibit 32 was marked for

18  identification.)

19  BY MR. MATTHEWS:

20       Q.   I'm going to hand you what's been marked by

21  the court reporter as Exhibit 32 for identification.

22            I will ask you to take a look at that and

23  tell me if you know what that is.

24            ATTORNEY VIA TELEPHONE:  Excuse me, could you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        please provide the Bates numbers for that

 2        document.

 3            MR. MATTHEWS:  Anda_Opiods_MDL 275627.

 4            THE WITNESS:  Yes, I'm familiar with this.

 5   BY MR. MATTHEWS:

 6        Q.    What is this document?

 7        A.    This is a summary document that Tracey

 8   Hernandez sent to Diane Miranda, who was her boss at

 9   Watson; Al Paonessa, which was my boss at Anda; and

10   it's copied to Michael Cochrane and myself.

11        Q.    And what does it describe?

12        A.    It summarizes our conversation that we had

13   with DEA representatives from Washington D.C. related

14   to the inquiry that was made to Tracey about Anda.

15        Q.    Do you recall Mr. Novak asking you questions

16   about that conversation earlier in the day?

17        A.    Yes, I do.

18        Q.    And among other things, you described that

19   one of the topics of the conversation was the limits

20   on distributing controlled substances to pharmacies?

21        A.    Yes, I do.

22        Q.    Can you expand on the scope of that

23   conversation?

24        A.    We talked about specifically the guidance
```

1    that DEA had given us of 5,000 dosage units per month

2    on products, and we, you know, had more conversation

3    around the ability for us to increase that because we

4    had some customers that we felt needed more than that

5    quantity.

6         And Mr. -- Mr. Mike Mapes responded that,

7    yeah, 5,000 was just a -- a guideline, and if there

8    were legitimate needs, that we were entitled to do

9    that if we had sufficient data to support that.

10        We gave an example of one very large customer

11   that we had at the time that was servicing nursing

12   homes that had 63,000 beds and patients that they

13   were servicing in the New York/New Jersey area.  The

14   data and the e-mail shows the 23,000 prescriptions

15   for over 2,000 products that that pharmacy handled,

16   and Mr. Mapes was understanding of that.

17        Q.   Okay.  Was there any discussion about Anda's

18   reporting practices on that phone call?

19        A.   Yes, there was.

20        Q.   What was that discussion about?

21        A.   They were talking about receiving

22   consolidated data in an ARCOS format at a more

23   frequent interval than what was previously being

24   provided.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Was there discussion about where that data

 2   should be provided?

 3        A.    Directly to Washington, directly to the

 4   gentleman that we were working with, Mike Mapes, and

 5   I believe Kyle Wright was involved as well.

 6        Q.    What kind of data was discussed?

 7        A.    Transactional data of Anda shipments.

 8        Q.    Was there anything in addition to simply

 9   transactional data?

10        A.    I don't -- I'm not sure.

11        Q.    Okay.  Do you recall at one point in the

12   morning Mr. Novak asked you a series of questions

13   about how and when customer questionnaires were used

14   by Anda in connection with its suspicious order

15   monitoring system.

16              Do you remember those questions?

17        A.    Yeah.

18        Q.    I'm going to hand you what's been marked for

19   identification as Exhibit 33, which is document

20   bearing Bates numbers Anda_Opioid_MDL_275445 through

21   275455.

22              (Anda Exhibit 33 was marked for

23   identification.)

24        ///
```

```
 1    BY MR. MATTHEWS:

 2        Q.   Let me ask you to take a look at that,

 3    Mr. Cochrane, and tell me if you know what that is.

 4        A.   Yes.

 5             This is an e-mail trail and a couple of

 6    attachments that have our questionnaire and a cover

 7    letter that accompanied the questionnaire written and

 8    signed by Al Paonessa, our leader at the time.

 9             And the e-mail describes some activity around

10    how we communicated and sent the questionnaire and

11    related letter to our customers.

12        Q.   Okay.  Now let's break it down a little.

13             If you look at the pages bearing Bates

14    Numbers Anda_Opioids_MDL 275445 through 448, what are

15    those pages?

16        A.   445 through 448 are specifically the e-mail.

17        Q.   What's being discussed in the e-mails?

18        A.   There's -- the initial e-mail is an approval

19    request from Michael Cochrane to Al Paonessa and

20    myself related to some of the wording in a document

21    that I assume was attached there.

22             The next e-mail is Michael asking for

23    follow-up from Al Paonessa and myself, asking when we

24    have read it so we could send the e-mail to customer
```

```
 1    service so customer service could facilitate mailing

 2    out these documents.

 3          The next is Michael confirming he got an

 4    approved from Al Paonessa to start mailing the

 5    questionnaire and the final versions are referenced

 6    as attached.

 7          The next entry is Becky Gross, who was our

 8    customer service manager at the time, sending back to

 9    Michael confirming that they would get all those out

10    in the mail.  And she asked if -- if there was going

11    to be any communication to the sales floor about the

12    customers that had been sent a questionnaire.

13          Michael suggesting Gavin loading in Remedy --

14    Remedy is a call center management tool, a program

15    that the sales reps use.  It's a workflow system that

16    has the ability to turf tasks from one person to the

17    next.

18          So if Gavin was going to take that listing of

19    customers, he would push that to the Remedy screens

20    that their respective reps would use so they had

21    visibility of what was sent out to them.

22          There's then an entry for Mark Falcon, who

23    was, I believe, in marketing at the time -- sales and

24    marketing.  And he confirms some of what I just
```

Highly Confidential – Subject to Further Confidentiality Review

1    described related to that.

2         The last entries are related to Michael

3    directing some individuals to where the original file

4    was created and the person who did it.

5         And then the final one is a confirmation from

6    Carrie that they had all been sent out.

7    Q.   All right.  What is the date of the final

8    e-mail?

9    A.   August 10th, 2007.

10   Q.   And could you read the text of that e-mail,

11   please?

12   A.   It's to Michael Cochrane, copying Gavin

13   Mulligan, Al Paonessa, Becky Gross, Dominic Floro,

14   Gavin Mulligan again, Kim Bloom, Mark Falkin, Patrick

15   Cochrane, Paul Sciortino, and it's from Carrie

16   Bennett saying all the mailings have been completed

17   and sent out.  The pharmacies will be receiving them

18   on Monday.

19   Q.   All right.  If you could turn to the page

20   bearing -- of Exhibit 33 bearing Bates

21   number Anda_Opioids_MDL 275449.

22        What's that?

23   A.   This is the letter that was sent as a -- in

24   conjunction with the questionnaire to the customers.

1    Q.   All right.  And if you turn to the pages of

2    Exhibit 33 bearing Bates Number Anda_Opioids_MDL

3    275451 through 55, what is that?

4    A.   That is the customer questionnaire that we

5    sent out as -- as part of that complain.

6    Q.   Mr. Cochrane, to whom was this mailing sent

7    on or about August 10th, 2007?

8    A.   Pharmacy customers of Anda.

9    Q.   Okay.  And what kind of pharmacy customers?

10   A.   All of the independent pharmacies and the one

11   serviced by the pharmacy floor.

12   Q.   Did that include everyone whether or not they

13   purchased controls?

14   A.   It did.

15   Q.   So as of August 10th, 2007, is it fair to say

16   that Anda had sent customer questionnaires to all of

17   its -- controlled substance customer questionnaires

18   to all of its independent pharmacy customers?

19   A.   Yes, it did.

20   Q.   And was it the case that from that point

21   forward it was the policy and procedure of the

22   company to send questionnaires to customers who

23   sought to obtain controlled substances from Anda?

24   A.   Yes.  The questionnaire was a vehicle for us

Highly Confidential - Subject to Further Confidentiality Review

```
 1     to get information about the pharmacy.

 2         Q.   I'd like you, if you could, to turn back to

 3     Exhibit 3, which Mr. Novak showed you earlier today.

 4         A.   Okay.

 5         Q.   I'll withdraw that.  I'm sorry.

 6              Can you look at Exhibit 10 which Mr. Novak

 7     showed you earlier today.

 8              You may -- this is -- Exhibit 10 is a version

 9     of Standard Operating Procedure 28, which is

10     captioned "Information Needed to Set Up a New

11     Account," right?

12         A.   Yes.

13         Q.   And you were asked some questions about this

14     particular version of it by Mr. Novak on direct,

15     including that this was the written standard

16     operating procedure for information needed to set up

17     a new account effective as of September 26, 2008,

18     right?

19         A.   Yes.

20         Q.   And Mr. Novak asked some questions about

21     whether there was anything in the standard operating

22     procedure that reflected a requirement of obtaining

23     due diligence information on customers who were

24     seeking to purchase controlled substances.
```

1        Do you remember that?

2    A.   Yes, I do.

3    Q.   At this time in 2008, wasn't it the case that

4  Anda was requiring all customers seeking to purchase

5  controlled substances to submit a customer

6  questionnaire?

7        MR. NOVAK:  Objection.

8        THE WITNESS:  Yes, we were.

9  BY MR. MATTHEWS:

10    Q.   What information -- without regard to what

11  Standard Operating Procedure 28 said in September of

12  2008, what information was Anda requiring all

13  customers who wished to purchase controlled

14  substances from Anda to submit?

15    A.   The data that is shown in 3.1 B, as well as

16  the questionnaire.

17    Q.   And the questionnaire, you mean the

18  questionnaire we attached as to Exhibit 33?

19    A.   Yes, sir.

20    Q.   Okay.  Could you take a look at Exhibit 13.

21        Exhibit 13 is a copy of SOP 25 -- excuse me,

22  -- SOP 28, which was in effect as of January 5, 2015,

23  right?

24    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And Mr. Novak asked you some questions about

 2   the procedures described in Paragraph 3.1.

 3             Do you recall that?

 4        A.    Yes.

 5        Q.    And, in particular, he focused your attention

 6   on the second page of the standard operating

 7   procedure which bears Bates number Anda_Opioids_MDL

 8   36520.

 9             And the passage which provides the bullet

10   which provide, quote:  In most cases, we also require

11   the submission of a dispensing log of controlled and

12   noncontrolled substances dispensed by the pharmacy,

13   period, end quote.

14             Do you remember that questioning?

15        A.    Yes, I do.

16        Q.    And do you remember that Mr. Novak asked you

17   if it was the case that at this time the regulatory

18   compliance analysts reviewing a request had

19   discretion whether to require submission of

20   dispensing data.

21             Do you recall those questions?

22        A.    Yes, I do.

23        Q.    If you turn to the page bearing

24   Anda_Opioids_MDL 36521 of Exhibit 13, which is the
```

Highly Confidential - Subject to Further Confidentiality Review

1    third page of the standard operating procedure in

2    effect at that time, could you read into the record

3    what is provided in Paragraph 2?

4        A.    Paragraph 2 states:   In addition to the

5    regulatory documentation described in the proceeding

6    section, all customers requests the ability to

7    purchase controls must complete a customer

8    questionnaire, a copy of which is attached hereto.

9             Further, all customers desiring to purchase

10   controlled substance must provide a dispensing log

11   that contains a list of all pharmaceutical products

12   dispensed by the customer during the three months

13   immediately preceding the date that the account is

14   established, which includes the quantities and number

15   prescriptions filled for each dispensed product.

16            The dispensing log should be organized by the

17   largest dispensed product in descending order.

18       Q.    Having read that, does that refresh your

19   recollection about whether the analyst reviewing

20   requests to obtain controlled substances had

21   discretion to require submission of a dispensing --

22   of an applicant's dispensing data?

23       A.    It does refresh, and this states that it's

24   required.

1    Q.    Okay.  Could you take a look at Exhibit 14.

2         Exhibit 14 is another version of SOP 28 which

3    Mr. Novak asked you about.  This one is as of

4    February 6, 2016, correct?

5    A.    Yes.

6    Q.    And I believe that Mr. Novak asked the same

7    series of questions about whether the standard

8    operating procedure, as written, vested analysts with

9    discretion to require dispensing data.  And I

10   believe, again, he focused your attention on

11   Paragraph 3.1.

12        I'd like to focus your attention on Paragraph

13   3.2 and ask if that refreshes your recollection about

14   what was required as of the date of this standard

15   operating procedure.

16   A.    Yes, it does.

17   Q.    And how was your recollection refreshed?

18   A.    It refreshes the fact that it was a required

19   document at the time of this version.

20   Q.    All right.  If you could turn to Exhibit 15.

21        Exhibit 15 is a copy of Standard Operating

22   Procedure 40, captioned "Orders of Interest

23   Monitoring System, Suspicious Order Monitoring"

24   effective as of December 2011, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Correct.

2      Q.    And Mr. Novak asked you a question, or some

3    questions, about a particular provision of this which

4    referred if you -- if you refer to the second page of

5    the SOP, Paragraph III, the first bullet point,

6    Mr. Novak asked you some questions about that bullet

7    point which reads:  Determine if customer had

8    previously been reviewed or grandfathered into

9    control eligibility.

10          Do you see that?

11     A.    I do.

12     Q.    And in particular, he asked you about the

13   phrase "grandfathered into control eligibility."

14          Do you recall those questions?

15     A.    Yes, I do.

16     Q.    By 2011, what information about every

17   customer to whom Anda sold controlled substances had

18   Anda obtained without regard to whether a customer

19   had been with it for a long period of time?

20          MR. NOVAK:  Objection.

21          THE WITNESS:  At that point, by 2011, there

22      was a large return of customer questionnaires by

23      our customer base.  And as, you know, some of the

24      notes had shown, there were customers that had

Highly Confidential - Subject to Further Confidentiality Review

1        control eligibility removed and had references to

2        no questionnaire on file or request for DD and

3        CQ.

4    BY MR. MATTHEWS:

5        Q.    Right.

6              And when was it that the first request to all

7    existing customers went out to provide answers to

8    customer questionnaire?

9        A.    August of 2007.

10       Q.    How many years before the standard operating

11   procedure was adopted?

12       A.    Over four.

13       Q.    Thank you.

14             If you could, could you look at Exhibit 23.

15       A.    Okay.

16       Q.    Exhibit 23 is an e-mail chain among and

17   between you and Michael Cochrane and Al Paonessa,

18   among others, describing and attaching a news article

19   about the Harvard Group Drug, right?

20       A.    Correct.

21       Q.    And in the -- Mr. Novak asked you some

22   questions about this information -- this e-mail and

23   the Harvard Drug Group news story and asked you

24   whether Anda was concerned at that time about the

Highly Confidential - Subject to Further Confidentiality Review

1    possibility that the same type of enforcement action

2    that was brought against Harvard might be brought

3    against Anda.

4           And your answer was, as I recall, yes; is

5    that correct?

6       A.   Yes.

7       Q.   Could you explain, what information did you

8    have from DEA at that time, if any, that DEA was

9    considering bringing an enforcement action against

10   Anda?

11      A.   At that time, we did not have any.

12      Q.   So when you told Mr. Novak that there was

13   concern, what did you -- what did you mean by that?

14      A.   We were evaluating the channels in which we

15   were shipping drugs into.

16      Q.   Right.

17           Was there any basis for you to believe at

18   that time that Anda would -- was under investigation

19   for the kind of conduct that Harvard was found to

20   have been subject to an enforcement action for?

21           MR. NOVAK:   Objection.

22           THE WITNESS:   No, there was not.

23   BY MR. MATTHEWS:

24      Q.   I wanted to just ask you a question or two

1    about Remedy Senior Care, the pharmacy in Ohio that

2    Mr. Novak asked you about towards the end of his

3    examination.

4           Do you recall those questions?

5    A.   I do.

6    Q.   And he showed you a spreadsheet that seemed

7    to suggest that orders from Remedy Senior Care were

8    held by the electronic order monitoring system and

9    then released without an explanation provided on that

10   spreadsheet.

11          Do you remember that?

12   A.   I do.

13   Q.   And you told Mr. Novak at that time that you

14   had -- that Anda had quite a lot of information about

15   Remedy Senior Care.

16          Do you recall that?

17   A.   I do.

18   Q.   Could you explain what information Anda had

19   had about Remedy Senior Care at the time that the

20   decisions were made to ship products to Remedy?

21          MR. NOVAK:  Objection.

22          THE WITNESS:  Yes.  So Remedy Senior Care is

23       a large customer of Anda's.  They primarily

24       service the elderly in a closed-door pharmacy

Highly Confidential - Subject to Further Confidentiality Review

```
 1          type network where they service nursing homes and

 2          facilities.

 3               The specific location in Ohio services over

 4          13,000 beds, so they have a very large pharmacy

 5          operation taking care of those elderly patients.

 6    BY MR. MATTHEWS:

 7          Q.   What is a close-door pharmacy?

 8          A.   It's a pharmacy that only dispenses within

 9    the confines of their business.  So they don't

10    service off-the-street patients.

11          Q.   And what's the significance of the fact that

12    it is a 13,000 bed long-term care center for the

13    elderly in terms of evaluating appropriateness for

14    sales of controlled substances?

15          A.   There are certain types of products that are

16    used with great frequency in long-term care assisted

17    live type facilities, mainly due to the age and the

18    nature of the patients that they are serving.

19          Q.   And what -- what kinds of products would you

20    normally expect to see dispensed in those

21    environments?

22          A.   It's -- it's a cornucopia of everything.  You

23    know, you will have all of your heart medications,

24    you'll have your breathing treatment medications, you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    will have your pain meds.  There's a lot of

 2    everything.  High blood pressure medication,

 3    triglycerides reducers, your Crestors.  There's a lot

 4    of drugs.

 5         Q.   What information about the senior -- sorry --

 6    about Remedy Senior Care of Ohio does Anda --

 7    about -- let me withdraw that and try again.

 8              What information about Remedy Senior Care of

 9    Ohio's dispensing practices is maintained by Anda in

10    its files?

11         A.   We have detailed files related to their

12    purchases and dispensed -- dispensed drugs.

13         Q.   Have you reviewed that information?

14         A.   Yes.

15         Q.   What does it show?

16         A.   It shows a --

17              MR. NOVAK:  Objection.

18              THE WITNESS:  It shows a low overall

19         percentage of controlled substances.  It's very

20         highly skewed towards maintenance-type drugs.

21    BY MR. MATTHEWS:

22         Q.   At the beginning of the day, Mr. Novak asked

23    you if Anda had an understanding of the -- what was

24    a, quote, suspicious order.
```

```
 1                  Do you remember that?

 2       A.    Yes, I do.

 3       Q.    Do you recall what your answered?

 4       A.    Yes, I do.

 5       Q.    What did you answer?

 6       A.    I answered orders that deviate from the norm.

 7       Q.    Could you explain that answer a little bit?

 8       A.    It's -- it's orders that we would hold,

 9   review, and otherwise determine were not for

10   legitimate purposes.

11       Q.    Okay.  Now, from time to time, Anda reported

12   suspicious orders to DEA, right?

13       A.    Yes, we did.

14       Q.    How did Anda determine what orders to report?

15       A.    In the beginning or --

16       Q.    From 2011 onward.

17       A.    From 2011 onward, it would be based on the

18   reviews that we did of individual orders that were

19   held or pended within one of our two systems that we

20   were using.  And if a thorough review of that order

21   and customer and any other information that we had

22   deemed it that the possibility for elicit purposes

23   were going to be applied to that order, we would

24   report it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   From time to time, did Anda have

 2   conversations with DEA agents in the field and in

 3   Washington, D.C. about what their expectation was in

 4   terms of suspicious order reporting?

 5        MR. NOVAK:  Objection.

 6        THE WITNESS:  Yes, we did.

 7   BY MR. MATTHEWS:

 8        Q.   What were those conversations?

 9        MR. NOVAK:  Same objection.

10        THE WITNESS:  Chronologically?

11   BY MR. MATTHEWS:

12        Q.   In general, what was the sum and substance of

13   those conversations?

14        MR. NOVAK:  Objection.

15        THE WITNESS:  In general, they didn't want

16        too many orders.  We could go back to a time

17        where the local office was cc'd on every order

18        that had controlled substance -- substances on it

19        back to the earlier years when I became employed

20        at Anda, to them telling us to stop that

21        practice.

22            And then we devised a suspicious and

23        excessive reporting cadence that was happening

24        that was an after-the-fact system.  And then, you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        know, in 2007, we had Washington asking us to

 2        send them all of our transactions again,

 3        directly.

 4    BY MR. MATTHEWS:

 5        Q.   Okay.  Do you recall that Mr. Novak asked you

 6    some questions about interactions between you and DEA

 7    agent Gayle Lane in the 2010/2011 time period?

 8        A.   Yes.

 9        Q.   And those interactions were about the

10    submission of customer cutoff reports.

11             Do you remember that?

12        A.   Among other things, yes.

13        Q.   What is your memory of those -- of the

14    substance of those conversations?

15        A.   The conversations started --

16             MR. NOVAK:  Objection.

17             THE WITNESS:  -- with Gayle wanting to have

18        more frequent communication between her and Anda

19        locally.  She -- she was appreciative of the

20        customers that we were advising her of that we

21        were ceasing to do business with and otherwise

22        cutting off.

23             She -- she was -- was happy with the format

24        of the customer cutoff spreadsheet that we had
```

1       devised and worked with her on a couple of

2       drafts.

3    BY MR. MATTHEWS:

4       Q.   How frequently did you interact with her

5    during this period of time?

6       A.   Immediately after the inspection, it was a

7    couple to three times a week, usually in the

8    evenings.  And as we, you know, developed the

9    spreadsheet and the customer listing of cutoffs, it

10   became a little less frequent as we went into the

11   rest of the year, but it was still very regularly.

12      Q.   I would like you to look at Exhibit 26 if you

13   would.

14      A.   Yes.

15      Q.   In these conversations you are describing, by

16   the way, with Ms. Lane are additional conversations

17   about suspicious order reporting between you and DEA,

18   right?

19      A.   Suspicious customers, trends we were seeing.

20   We were definitely communicating and sharing some of

21   the same opinions related to the risk that was

22   associated with not just Florida cutting off the

23   ability for doctors to dispense, but just overall,

24   where the pain management and where the doctors'

```
 1    demand was going to go.

 2         Q.   And this conversation -- communication with

 3    DEA about suspicious customers and suspicious orders,

 4    that has continued onward between Anda and DEA

 5    through the present today; is that correct?

 6         A.   Yes, that's correct.

 7              MR. NOVAK:  Objection.

 8    BY MR. MATTHEWS:

 9         Q.   Looking at Exhibit 26, Mr. Novak asked you

10    some questions about Exhibit 26.

11              Could you explain the context of this e-mail?

12         A.   Michael's e-mail is sending her the latest

13    file of the suspicious customers.  Ms. Lane responded

14    back with an excerpt of the CFR, talking about

15    suspicious orders, when they are discovered, need to

16    be reported.

17         Q.   And did you have any follow-up conversations

18    with Ms. Lane about this e-mail after it was sent?

19         A.   I did not.  Michael did.

20         Q.   What did you understand was said?

21         A.   Michael -- the understanding that we had from

22    this is that she needed to send this e-mail to us,

23    that -- as it was quoting specifically what the CFR

24    dictated.  It didn't necessarily change her opinion,
```

1    and she definitely didn't want us to stop

2    communicating customers that we had cut off or denied

3    controls to.

4        Q.   And what were the reporting practices that

5    you implemented after you received this e-mail?

6        A.   We continued to -- we continued to report any

7    customer that we denied doing business with either

8    initially or ceased doing business with for existing

9    customers.

10       Q.   And how about separate suspicious -- separate

11   reports of information captioned "suspicious order"?

12   Were you submitting those after this e-mail?

13       A.   Yes, there were some.

14       Q.   When?

15       A.   Through the following years, there were --

16   there were some that, as that report evolved, became

17   multiple tabs.

18       Q.   Were you ever told to stop submitting reports

19   of customer cutoffs?

20            MR. NOVAK:  Objection.

21            THE WITNESS:  No.

22   BY MR. MATTHEWS:

23       Q.   That was your view of how DEA -- I'll

24   withdraw that question.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. MATTHEWS:  I don't have any further

2     questions at this time.  Thank you, Mr. Cochrane.

3          THE VIDEOGRAPHER:  Going off the record.  The

4     time is 7:06.

5          (Recess from 7:06 until 7:06 p.m.)

6          THE VIDEOGRAPHER:  The time is 7:06 p.m.  We

7     are now going off the record.  This marks the end

8     of the deposition.

9          (Whereupon, the deposition concluded at

10    7:06 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1               C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of PATRICK COCHRANE was duly

 7     taken on January 24, 2019, at 9:13 a.m. before me.

 8          The said PATRICK COCHRANE was duly sworn by

 9     me according to law to tell the truth, the whole

10     truth and nothing but the truth and thereupon did

11     testify as set forth in the above transcript of

12     testimony.  The testimony was taken down

13     stenographically by me.  I do further certify that

14     the above deposition is full, complete, and a true

15     record of all the testimony given by the said

16     witness.

17

18          _____

19          KELLY J. LAWTON, RPR, LCR, CCR

20

21          (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means, unless under the direct control

24     and/or supervision of the certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6      REASON: _____

 7    _____   _____   _____

 8      REASON: _____

 9    _____   _____   _____

10      REASON: _____

11    _____   _____   _____

12      REASON: _____

13    _____   _____   _____

14      REASON: _____

15    _____   _____   _____

16      REASON: _____

17    _____   _____   _____

18      REASON: _____

19    _____   _____   _____

20      REASON: _____

21    _____   _____   _____

22      REASON: _____

23    _____   _____   _____

24      REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, PATRICK COCHRANE, do hereby acknowledge

 4     that I have read the foregoing pages, 1 to 282, and

 5     that the same is a correct transcription of the

 6     answers given by me to the questions therein

 7     propounded, except for the corrections or changes in

 8     form or substance, if any, noted in the attached

 9     Errata Sheet.

10

11

12    _____        _____

13    PATRICK COCHRANE                                    DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20____.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                          LAWYER'S NOTES

2    PAGE    LINE

3    _____   _____   _____

4    _____   _____   _____

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____
```