Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION,              )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES               )   Polster
                              )
 7

 8                    __ __ __
 9          Thursday, December 13, 2018
                      __ __ __
10

          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW
                      __ __ __
12

13

14

15        Videotaped Deposition of JOLYNN
     COLEMAN, held at 4206 South J.B. Hunt Drive,
16   Rogers, Arkansas, commencing at 8:15 a.m., on
     the above date, before Debra A. Dibble,
17   Certified Court Reporter, Registered
     Diplomate Reporter, Certified Realtime
18   Captioner, Certified Realtime Reporter and
     Notary Public.
19

20

21
                      __ __ __
22
            GOLKOW LITIGATION SERVICES
23        877.370.DEPS | fax 917.591.5672
               deps@golkow.com
24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
           & AGNELLO
 3         BY:  DONALD ECKLUND, ESQUIRE
                decklund@carellabyrne.com
 4              MICHAEL A. INNES, ESQUIRE
                minnes@carellabyrne.com
 5         5 Becker Farm Road
           Roseland, New Jersey 07068-1739
 6         (973) 994-1700
           Counsel for Plaintiffs
 7
 8         JONES DAY
           BY:  EDWARD M. CARTER, ESQUIRE
 9              emcarter@jonesday.com
                CHRISTINE D. PROROK, ESQUIRE
10              cbprorok@jonesday.com
           77 West Wacker Drive, Suite 3500
11         Chicago, Illinois 60601-1692
           312-782-1692
12         Counsel for Walmart
13
           MORGAN, LEWIS & BOCKIUS, LLP
14          (appearing telephonically)
           BY:  MATTHEW R. LADD, ESQUIRE
15              matthew.ladd@morganlewis.com
                101 Park Avenue
16              New York, New York 10178-0060
                (212) 309-6141
17         Counsel for Teva Pharmaceuticals USA,
           Inc.; Cephalon, Inc.; Watson
18         Laboratories, Inc.; Actavis, LLC;
           Actavis Pharma, Inc.; f/k/a Watson
19         Pharma, Inc.
20
           MARCUS & SHAPIRA, LLP
21          (appearing telephonically)
           BY:  DARLENE M. NOWAK, ESQUIRE
22              nowak@marcus-shapira.com
                301 Grant Street
23              One Oxford Centre, 35th Floor
                Pittsburgh, Pennsylvania 15219-6401
24              (412) 338-4690
           Counsel for HBC
25
```

```
 1        WRIGHT, LINDSEY & JENNINGS, LLP
          BY:  CALEY B. VO, ESQUIRE
 2            cvo@wlj.com
          3333 Pinnacle Hills Parkway
 3        Suite 510
          Rogers, Arkansas 72758-8498
 4        (479) 986-0888
          Counsel for McKesson
 5
 6        ARNOLD & PORTER KAYE SCHOLER, LLP
           (appearing telephonically)
 7        BY:  RYAN Z. WATTS, ESQUIRE
               ryan.watts@arnoldporter.com
 8             601 Massachusetts Avenue, NW
               Washington, DC 20001-3743
 9             (202) 942-5000
               (202) 942-5999 (Fax)
10        Counsel for Endo Health Solutions Inc.;
          Endo Pharmaceuticals Inc.; Par
11        Pharmaceuticals, Inc.; Par
          Pharmaceutical Companies, Inc. formerly
12        known as Par Pharmaceutical Holdings,
          Inc.
13
14        BARBER LAW FIRM, LLP
           (appearing telephonically)
15        BY:  J. CARTER FAIRLEY, ESQUIRE
               cfairley@barberlawfirm.com
16             425 West Capitol Avenue
               Suite 3400
17             Little Rock, Arkansas 72201
               (501) 707-6175
18        Counsel for Cardinal Health, Inc.
19
          ALSO PRESENT:
20
          Paul D. Morris
21        Senior Associate Counsel
          Commercial & Class Action
22
          THE VIDEOGRAPHER:
23
          James Arndt
24        GOLKOW LITIGATION SERVICES
25                  — — —
```

Highly Confidential - Subject to Further Confidentiality Review

1

## I N D E X

2

JOLYNN COLEMAN                                      PAGE

3

DIRECT EXAMINATION BY MR. ECKLUND              9
4    CROSS EXAMINATION BY MR. CARTER               366
REDIRECT EXAMINATION BY MR. ECKLUND           372

5

6                        E X H I B I T S

7        No.              Description              Page
8    Walmart        NACDS Appointment              25
Coleman        Schedule.
9    Exhibit 1      ENDO_OPIOID_MDL-04920265
through 04920270.

10

Walmart        July 2017 email chain.         30
11   Coleman        Subj: RE: Relay
Exhibit 2      Health/Walmart Top to Top.
12                  MCKMDL00650092-650094.
13   Walmart        8-31-07 letter from            151
Coleman        Mallinckrodt to Jo Lynn
14   Exhibit 3      Coleman, R. Ph.
MNK-T1-0004758254-4758260.

15

Walmart        11-3-06 letter from            168
16   Coleman        Mallinckrodt to David
Exhibit 4      Badeen, R. Ph.
17                  MNK-T1-0000367627-367629.
18   Walmart        5-2-07 letter from             178
Coleman        Mallinckrodt to Jo Lynn
19   Exhibit 5      Coleman, R. Ph.
MNK-T1-0000367674-367675.

20

Walmart        9-17-10 letter from            187
21   Coleman        Mallinckrodt to Jo Lynn
Exhibit 6      Coleman, R. Ph.
22                  MNK-T1-0000367655-376657.
23   Walmart        11-14-07 letter from           196
Coleman        Mallinckrodt to Jo Lynn
24   Exhibit 7      Coleman, R. Ph.
MNK-T1-000036766-376666.

25

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Walmart Coleman Exhibit 8 | 12-4-07 letter from Mallinckrodt to Jo Lynn Coleman, R. Ph. MNK-T1-0000367648-367651. | 204 |
| 2 | Walmart Coleman Exhibit 9 | 12-14-07 letter from Mallinckrodt to Jo Lynn Coleman, R. Ph. MNK-T1-0000367691-367692. | 213 |
| 3 | Walmart Coleman Exhibit 10 | Humana Walmart PowerPoint deck. | 232 |
| 4 | Walmart Coleman Exhibit 11 | 3-31-10 Endo letters. ENDO-OPIOID_MDL-04183970 through 4183972. | 265 |
| 5 | Walmart Coleman Exhibit 12 | 1-27-10 email with attached 1-29-10 ENDO letters. ENDO-OPIOID_MDL-02380063 through 2380065. | 269 |
| 6 | Walmart Coleman Exhibit 13 | 1-7-11 email with attached 1-7-11 ENDO letters. ENDO-OPIOID_MDL-02384297 through 2384299. | 272 |
| 7 | Walmart Coleman Exhibit 14 | 1-3-12 email with attached 1-3-12 ENDO letters. ENDO-OPIOID_MDL-02389777 through 2389779. | 272 |
| 8 | Walmart Coleman Exhibit 15 | 12-28-06 email with 12-27-06 Ethex letter attachment. WMT_MDL_000038419-38420. | 287 |
| 9 | Walmart Coleman Exhibit 16 | 3-2-10 FBI article titled Ethex Corporation, a Subsidiary of KV Pharmaceutical, Pleads Guilty to two Felonies and Agrees to Pay United States $27,568,921 for Fine, Restitution, and Forfeiture. | 288 |

1       Walmart    Removing Costs from the    296
        Coleman   Health Care Supply Chain:
2    Exhibit 17  Lessons from Mass Retail.

6  REPORTER'S CERTIFICATE           376
    ERRATA                    378
7  WITNESS SIGNATURE PAGE       379
    ATTORNEY NOTES            380

Highly Confidential - Subject to Further Confidentiality Review

```
 1            PROCEEDINGS
 2               (December 13, 2018 at 8:17 a.m.)
 3               THE VIDEOGRAPHER:  We are now
 4        on the record.  My name is
 5        James Arndt.  I'm the videographer
 6        from Golkow Litigation Services.
 7        Today's date is December 13, 2018, and
 8        the time is 8:18 a.m.  This video
 9        deposition is being held in Rodgers,
10        Arkansas in the matter of the National
11        Prescription Opiate Litigation for the
12        United States District Court for the
13        Northern District of Ohio, Eastern
14        Division.  The deponent is
15        JoLynn Coleman.  Will counsel please
16        identify themselves.
17               MR. ECKLUND:  Good morning.
18        Don Ecklund from the law firm Carella
19        Byrne on behalf of plaintiffs in the
20        MDL.
21               MR. INNES:  Good morning.
22        Michael Innes on behalf of plaintiffs
23        in the MDL.
24               MR. CARTER:  Edward Carter,
25        Jones Day on behalf of Walmart and the
```

1    witness.  Also with me are

2    Christine Prorok from Jones Day, and

3    Paul Morris from Walmart.

4         MR. FAIRLEY:  Carter Fairley

5    for Cardinal Health.

6         MR. VO:  Caley Vo on behalf of

7    McKesson.

8         THE VIDEOGRAPHER:  Will counsel

9    on the phone please identify

10   themselves?

11        MS. NOWAK:  Darlene Nowak from

12   Marcus & Shapira for HBC Services.

13        MR. LADD:  Matthew Ladd of

14   Morgan Lewis & Bockius on behalf of

15   defendant Rite Aid.

16        MR. WATTS:  Ryan Watts from

17   Arnold & Porter Kaye Scholer, LLP on

18   behalf of Endo Health Solutions Inc.,

19   Endo Pharmaceuticals Inc., Par

20   Pharmaceutical, Inc., and Par

21   Pharmaceutical Companies, Inc.

22        VIDEOGRAPHER:  The court

23   reporter is Debbie Dibble.  She will

24   now swear in the witness.

25             JOLYNN COLEMAN,

Highly Confidential - Subject to Further Confidentiality Review

1    having first been duly sworn, was examined

2    and testified as follows:

3

4              DIRECT EXAMINATION

5    BY MR. ECKLUND:

6         Q.    Good morning, Ms. Coleman.  As

7    I introduced myself this morning, my name is

8    Don Ecklund, and I represent the plaintiffs

9    in this multidistrict litigation which is

10   currently pending in the Northern District of

11   Ohio.  Moments ago you took an oath.  It is

12   the same oath you would take in court.

13             Do you understand that

14   everything you say here today needs to be the

15   truth and you need to testify as completely

16   and fully as you can?

17             Do you understand that?

18        A.    Yes.

19        Q.    Have you ever been deposed

20   before?

21        A.    Yes.

22        Q.    How many times?

23        A.    Twice.

24        Q.    Were those in your professional

25   capacity or were those personal matters?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Professional.

 2          Q.      Can you describe those two

 3    matters?

 4          A.      One was a litigation around a

 5    hire, practice of hiring an associate, and

 6    others was specific to an immunization

 7    program that I oversee, support.

 8          Q.      Did you testify at trial for

 9    the HR matter?

10          A.      No.

11          Q.      Did you testify at trial for

12    the immunization matter?

13          A.      No.

14          Q.      Is the immunization matter

15    still pending?

16          A.      Yes.

17          Q.      Federal court or state court?

18          A.      I'm uncertain.

19          Q.      So you've generally been

20    deposed twice and you've gotten some sense of

21    how the process works.  Today I'll be asking

22    you a series of questions.  You'll be

23    answering those questions.  And we'll try to

24    keep it a fairly swift conversation.

25    Everyone is trying to catch flights today.
```

Highly Confidential - Subject to Further Confidentiality Review

 1    If we can try to maintain some breaks between

 2    my questions and your answers, that will help

 3    the court reporter who is trying to keep up

 4    with us and get a complete and clean

 5    transcript.

 6            Do you understand she's typing

 7    everything you say?

 8        A.    Yes, sir.

 9        Q.    Okay.  Great.

10            Importantly, she can't take

11    down shrugs of the shoulders, utterances,

12    "uh-huh," and "huh-uhs," headshakes.  So

13    please answer verbally.  Even though we do

14    have a video, everyone is going to be relying

15    on the transcript that she's taking today.

16            Do you understand that?

17        A.    Yes.

18        Q.    Your counsel has probably also

19    gone over this as well, but if you can pause

20    between the questions to allow him an

21    opportunity to interpose any objections he

22    may have, that would be, I'm sure,

23    appreciated by him.  And unless he instructs

24    you not to answer a question, you should

25    answer the question after he's interposed the

1    objection  unless you don't understand my

2    question.

3              Do you understand that?

4         A.    Yes.

5         Q.    Okay.  If you don't hear me,

6    let me know.  If you don't understand a

7    question, let me know that.  I'll try to

8    change the question; maybe I'll try to

9    explain myself.  Okay?

10        A.    Okay.

11        Q.    If you answer, I'm going to

12   assume you understood the question.  Is that

13   fair?

14        A.    Yes.

15        Q.    If at any time you need to take

16   a break during the deposition, please let me

17   know.  Now, we may finish the line of

18   questioning, but I'll try to accommodate you

19   as best as I can.

20              If you need to stretch your

21   legs, you need to stand up, feel free.  We

22   don't need to take a break for that.  Okay?

23   If you need a glass of water, please ask

24   someone.  There are several people in the

25   room who would be happy to get you one.

1    Okay?

2         A.    Okay.

3         Q.    If at any point in the

4    deposition you need a document in order to

5    answer a question because you can't recall

6    it, I'd like you to try and tell me about the

7    document, describe the document.  There is a

8    chance we might have it in this box.  There's

9    a chance that someone else might be able to

10   arrange for it to be provided to you during a

11   break.  Okay?

12        A.    Okay.

13        Q.    And as you see, I have a

14   computer in front of me, so if there's an

15   electronic file that you think you may need,

16   chances are I can probably accommodate you on

17   that as well.  We can put it up on the ELMO.

18   We can put it up on the screen.  So if

19   there's an Excel, an Access database or

20   anything else you think you may need, you let

21   us know and we'll try to get it for you.

22   Okay?

23        A.    Okay.

24        Q.    If you don't recall the answer

25   to a question or can't remember the answer,

Highly Confidential - Subject to Further Confidentiality Review

```
1    just say so.  It's important, though, that
2    you remember, you need to try and testify as
3    completely and fully as you can.  Okay?
4                 Will you agree to that?
5    A.      Yes.
6    Q.      Is there anything that would
7    prevent you from thinking clearly today?
8    A.      No.
9    Q.      No medical conditions.
10   Anything that would prevent you from
11   testifying truthfully today?
12   A.      No.
13   Q.      And there's nothing that would
14   prevent you from talking and testifying
15   completely today?
16   A.      No.
17   Q.      What did you do generally to
18   prepare for your deposition today?
19   A.      Met with Walmart legal
20   representatives for roughly about two days.
21   Q.      And when you say "two days," do
22   you mean you met on two separate days for a
23   few hours each day, or do you mean --
24   A.      Yes.
25   Q.      -- you met for two solid days?
```

```
 1            A.     Two days, about six to eight

 2     hours.

 3            Q.     Six to eight hours each day?

 4            A.     Six to eight, yes.

 5            Q.     Okay.  Where did those meetings

 6     take place?

 7            A.     At Walmart.

 8            Q.     Did you have any telephonic

 9     meetings with Walmart's counsel --

10            A.     No.

11            Q.     -- prior to those meetings?

12            Did you receive any video

13     training materials or anything else you

14     needed to review, gave you some ground rules

15     on depositions?

16            A.     No.

17            Q.     Okay.  Aside from materials

18     that your counsel may have provided you, did

19     you review any materials in your files to

20     prepare for your deposition here today?

21            A.     No.

22            Q.     When did you graduate high

23     school?

24            A.     '81.

25            Q.     What did you do after high
```

1    school?

2          A.     Went to college.

3          Q.     Where did you go?

4          A.     First I went to Summit Junior

5    College and played basketball for a year, and

6    then went to the University of Louisiana at

7    Monroe after that first year and started --

8    decided I wanted to go to pharmacy school.

9    So I completed the BS at pharmacy school at

10   Northeast and graduated in '86.

11         Q.     Okay.  So you initially went to

12   Summit Junior College, played basketball for

13   one year.  You then transferred to Louisiana

14   Monroe, and you were there for one year?

15         A.     I was there for the remainder,

16   until I graduated as a pharmacist.

17         Q.     Okay.  So you completed your

18   degree in pharmacy at Louisiana at Monroe?

19         A.     Yes.

20         Q.     And you're a -- what type of

21   pharmaceutical degree do you have?

22         A.     I have a BS.

23         Q.     BS.  Do you have any

24   licensures?

25         A.     I have a licensure in Louisiana

1    and Missouri, and in Texas.

2        Q.      Okay.  You graduated in 1986.

3    Have you gone back to graduate school?

4        A.      I have not.

5        Q.      Any certifications?

6        A.      No.

7        Q.      Additional training?

8        A.      No.

9        Q.      What did you do between 1986

10   and 1987?

11       A.      I worked for K&B, which was a

12   regional chain in New Orleans, Louisiana, for

13   a year as a pharmacist.

14       Q.      And how long did you stay at

15   K&B?

16       A.      Right about a year.

17       Q.      And what did you do then?

18       A.      Moved -- transferred, and an

19   opportunity came up for a Walmart in my

20   hometown where I grew up, and I opened up a

21   pharmacy there for Walmart.

22       Q.      So you joined Walmart in 1987?

23       A.      Yes.

24       Q.      And have you continued to work

25   for Walmart since 1987?

1     A.     Yes, I have.

2     Q.     You said you opened up a

3  pharmacy for Walmart.

4            Were you a dispensing

5  pharmacist?

6     A.     Yes, I was.

7     Q.     And how long were you a

8  dispensing pharmacist for Walmart?

9     A.     Right about ten years.

10    Q.     So approximately 1987 to 1997?

11    A.     Approximately.

12    Q.     What did you do after 1997?

13    A.     Went into a market director

14  role, which was more of an oversight of

15  pharmacies across stores within a market.  It

16  was about 12 to 15 stores in the central

17  Louisiana area.

18    Q.     And how long were you in that

19  market director role?

20    A.     About two years.

21    Q.     Until 1999?

22    A.     Yes.

23    Q.     What position did you take in

24  1999?

25    A.     I went to a general manager

1    position for our mail order pharmacy in

2    Carrollton, Texas.  And I was there for

3    roughly six to seven years.

4         Q.    Okay.  So approximately

5    2005ish, 2006ish?

6         A.    Yes.

7         Q.    That's -- okay.

8               And when you left the position

9    as a general manager for the mail order

10   pharmacy group in Carrollton, Texas, what did

11   you do?

12        A.    I went to the -- took an

13   opportunity to be a buyer for Walmart for Rx.

14   And stayed in that role for about six years.

15        Q.    When you say you were "a buyer

16   for Walmart for Rx," do you mean you were a

17   buyer for the prescription buying group?

18        A.    Yes.

19        Q.    What were your responsibilities

20   as a buyer for Walmart?

21        A.    My responsibilities were to

22   support the stores with inventory, work with

23   suppliers to get the best price possible on

24   the prescriptions, drugs that I purchased.

25   And just leverage relationships with those

1    suppliers to understand new products that are

2    available, and primarily support the stores

3    with the inventory they need.

4        Q.    How would you leverage

5    relationships with the suppliers to

6    understand products?

7        A.    Based -- if they have a new

8    launch of a product, it would be

9    understanding what the launch dates are.

10   It's a big product, what the impact might be

11   to other products in the same category.

12   Primarily to ensure that we understand the

13   volume and can support the stores with

14   inventory.

15       Q.    Did your title change over time

16   from pharmacy buyer?

17       A.    I moved to a senior buyer.  I

18   can't recall exactly the day.

19       Q.    Do you have an approximation?

20       A.    It was probably my last year

21   and a half as a buyer.

22       Q.    Which was when?

23       A.    So I was in the role probably

24   about five years, four years, four and a half

25   years as a buyer, and then moved to a senior

1    buyer.

2        Q.    Did your responsibilities

3    change when you became a senior buyer?

4        A.    I don't recall a significant

5    change in what I did as a senior buyer,

6    compared to a buyer.

7        Q.    Did you have a larger budget to

8    spend?

9        A.    I don't recall that.

10       Q.    Were you responsible for more

11   products?

12       A.    I don't remember exactly what

13   changed when I moved from a buyer to a senior

14   buyer.

15       Q.    Okay.  So fair to say that you

16   don't recall any changes sitting here today

17   between your role and responsibility as a

18   buyer compared to a senior buyer?

19       A.    Correct.

20       Q.    Thank you.  As someone who

21   purchased products from suppliers, what would

22   you look for in a seller?

23             What characteristics and traits

24   would you look for from a seller?

25       A.    From a manufacturer?

1    Q.    Sure.

2    A.    Generally what is their

3  capability to maintain quality -- manufacture

4  quality products to ensure they can support

5  the inventory that we need.  And have the

6  ability to systematically support what we

7  need from an order management, replenishment

8  standpoint.

9    Q.    Anything else?

10    A.    In some cases it would matter

11  if they had, you know, were they vertically

12  integrated on a product?  Did they own the

13  API for a product or did they rely on other

14  suppliers?  That's basically the primary

15  ingredient that makes the medication.

16           How integrated are they with

17  the product?  That's the primary function.

18    Q.    For the record, could you

19  define what you mean by "API"?

20    A.    If it's a medication, a

21  chemical prescription product.  The main core

22  ingredient that makes that product, that API

23  is what I'm referring to.  And in some cases,

24  the manufacturer may not be the owner of that

25  API.  They may have to source it.  They may

1    have to source it.

2         Q.    Reading back at your answer,

3    you didn't mention price.  Was a competitive

4    price an important consideration for finding

5    a good seller?

6         A.    Yes.

7         Q.    Was it the most important

8    concern?

9         A.    It was one of the concerns.

10        Q.    What was the biggest concern?

11             MR. CARTER:  Object to the

12   form.  You can answer.

13             THE WITNESS:  I would say

14        supply and price.

15        Q.    (BY MR. ECKLUND)  In your role

16   as a senior buyer and also as a buyer before

17   that, did you attend any professional

18   associations or meetings with other members

19   of the market?

20        A.    Yes.

21        Q.    Could you identify those

22   professional associations?

23        A.    Primarily as a buyer, we would

24   attend the National Association of Chain Drug

25   Stores annually.  And at times we would

Highly Confidential - Subject to Further Confidentiality Review

1    attend the ECRM conference.  Those were the

2    two ones that we most often attended.

3         Q.     And what does ECRM stand for?

4         A.     I honestly cannot remember.

5         Q.     That's okay.

6                When did you begin attending

7    the NACDS annual meetings?

8         A.     I would say the first one after

9    becoming a buyer.  They generally are the

10   same time yearly.  I haven't attended them --

11   I'm not sure what time of the year they

12   happen, but I would have attended probably

13   the first one after I became a buyer.

14        Q.     What was the purpose of the

15   annual meetings?

16               MR. CARTER:  Object to the

17          form.

18        Q.     (BY MR. ECKLUND)  Why did you

19   attend the annual meetings?

20        A.     As a buyer, we would go along

21   with our leadership to meet with

22   manufacturers.  We would see technology and

23   other vendors just to understand what's out

24   in the market and to meet with our strategic

25   suppliers at those meetings as well.

1    Q.    Did you go to last year's

2  meeting?

3    A.    I did go to last year's

4  meeting.

5    Q.    Do you recall --

6    A.    Not as a buyer.

7    Q.    Okay.  Do you recall when it

8  took place?

9    A.    I believe it was in Julyish.  I

10  can't recall the actual date.

11    Q.    Okay.

12          (Walmart Coleman Deposition

13          Exhibit 1 was marked for

14          identification.)

15    Q.    (BY MR. ECKLUND)  So,

16  Ms. Coleman, I've handed you what's been

17  marked as Exhibit 1.  You can take a moment

18  to peruse it quickly.  You'll see it's an

19  appointment schedule for the National

20  Association of Chain Drug Stores.

21          And on the second page in the

22  afternoon session, you'll see your name.

23    A.    Where -- okay.

24    Q.    Do you see that?

25    A.    Mm-hmm.  (Witness nods.)

1      Q.     You can peruse the entire

2   document.  There may be occasions throughout

3   the deposition where I'll call your attention

4   to a specific passage for a lengthier

5   document, but if you could please focus your

6   attention on those passages, that would be

7   optimal.  Everyone is trying to get out of

8   here as quickly as we can.

9              Have you had a chance?

10      A.     Mm-hmm.

11      Q.     Okay.  So just a few questions.

12              First, do you recall this

13   meeting?

14      A.     I do not.

15      Q.     Okay.  Is the phone number next

16   to the word "Walmart," is that your number or

17   is that Walmart's number?

18      A.     I believe that's Walmart's

19   number.  I use a phone that is a Walmart

20   phone, so the numbers -- I can't remember if

21   that was my desk phone, but generally it

22   would forward to my cell phone, if that were

23   the case.

24      Q.     Okay.  Looking at the other

25   individuals identified on this second page,

1  do you remember meeting with any of these

2  individuals?

3      A.    I don't recall.

4      Q.    Are any of these names familiar

5  to you?

6      A.    I'm familiar with John Bonner.

7  And of course David Badeen was a -- I worked

8  with him.

9           That's the only names I'm

10  familiar with.

11     Q.    Okay.  What's David Badeen's

12  position within Walmart?

13     A.    He was a buyer as well.

14     Q.    Was he a senior buyer at this

15  time, or was he a pharmacy buyer?

16     A.    I really don't know.

17     Q.    Don't know.  Okay.  Who is

18  John Bonner?

19     A.    He was a member of the McKesson

20  team.  That's about all I recall.  I

21  recognize his name.

22     Q.    When you attended this

23  conference, did you sit in any meetings?

24     A.    I would assume that I did.

25     Q.    Okay.  Would they routinely

Highly Confidential - Subject to Further Confidentiality Review

1    hand out materials?

2          A.     In some cases, yes.

3          Q.     Were those materials provided

4    by manufacturers?

5          A.     In some cases, yes.

6          Q.     Wholesalers?

7          A.     Yes.

8          Q.     Dispensing pharmacies?

9          A.     I generally didn't meet with

10   pharmacies.

11         Q.     Did anyone ever hand you

12   anything prepared by a dispensing pharmacy?

13              MR. CARTER:  Object to the

14         form.

15              THE WITNESS:  Not that I

16         recall.

17         Q.     (BY MR. ECKLUND)  You mentioned

18   that you're still actively involved with

19   NACDS.  Is that fair?

20         A.     Not --

21              MR. CARTER:  Sorry.

22              If you can just -- you're doing

23         a good job.  If you can just pause.

24         Every now and then I'll have an

25         objection.

```
 1                    THE WITNESS:  Okay.  Not

 2            actively.  This last year was -- the

 3            last two years were the first time I

 4            had gone back in NACDS since being a

 5            buyer.  So my roles changed after the

 6            buyer role.

 7            Q.    (BY MR. ECKLUND)  So your

 8     current role is -- what's your current title?

 9            A.    My current title is director of

10     clinical services.  So I support the

11     immunizations program and the health

12     screenings program for our pharmacies.  And I

13     have been in that position for five years,

14     almost six years.

15            Q.    So approximately 2013?  Or

16     2012?

17            A.    Since I took this position,

18     about in 2013.

19            Q.    So fair to say you probably did

20     not attend the annual meetings between 2013

21     and 2017.

22            A.    That would -- from my

23     recollection, that would be correct.

24            Q.    Did you begin attending a

25     different professional association in your
```

1    role as director of clinical services?

2         A.    Annually there's an APHA,

3    American Pharmacist Association meeting that

4    I attended several years ago, and then I

5    probably plan to attend this year.

6              (Walmart Coleman Deposition

7         Exhibit 2 was marked for

8         identification.)

9         Q.    (BY MR. ECKLUND) Ms. Coleman, I

10   want to direct your attention to the email

11   string in the middle of this chain, sent on

12   Thursday, July 13th, 2017 at 1:30.

13             Do you see it?

14        A.    Yes.

15        Q.    Okay.  If you go to the "to"

16   section, the fourth line down, do you see

17   your name?

18             Jo Coleman at Walmart?

19        A.    Are you down here?

20             MR. CARTER:  He's got you in

21        the middle of this email chain.

22             THE WITNESS:  Okay.  I see.

23             MR. ECKLUND:  Do you see it?

24             THE WITNESS:  Mm-hmm.

25        Q.    (BY MR. ECKLUND)  Do you recall

1    this email?

2         A.    I do not.

3         Q.    Who is George Riedl?

4         A.    He was our president of

5    Walmart, health and wellness during this

6    time.

7         Q.    Who is Paul Beahm?

8         A.    He was our executive vice

9    president of health and wellness at that

10   time.

11        Q.    At the top of the second page,

12   it reads, "George, et al., We sincerely

13   appreciate Walmart's executive leadership

14   hosting us on-site yesterday to discuss two

15   strategic initiatives, opioids/PDMPs, and"

16   pharmacy -- or "pharmacist provider status/

17   medical billing."

18              Do you see that?

19        A.    I do.

20        Q.    Did you attend this meeting?

21        A.    I do not recall attending this

22   meeting.

23        Q.    Do you keep a calendar?

24        A.    I do.

25        Q.    Do you keep it online or on

```
 1     your computer?

 2          A.      Yes.

 3          Q.      Is there a way you can check

 4     and see if you attended the meeting?

 5          A.      I could check.  I don't recall

 6     attending this meeting, though.

 7          Q.      Okay.  When we take a break, if

 8     you could check on your calendar, that would

 9     be appreciated.

10          A.      Okay.

11          Q.      Thank you.  Now, do you recall

12     any discussions within Walmart about

13     strategic industry initiatives concerning

14     opioids?

15          A.      I do not.

16          Q.      What's a PDMP?

17          A.      Prescription drug monitoring

18     program.

19          Q.      Are those orchestrated or run

20     through states or by the federal government?

21          A.      I really don't know.  In my

22     role, I really did not deal with this area of

23     the business.  I was overseeing the

24     immunization and health screenings segment,

25     which really was not at all close to this
```

1    matter.

2         Q.    Okay.  Direct your attention to

3    the following paragraph.  It says, "As

4    mentioned yesterday, our government affairs

5    team stands ready to collaborate with

6    Walmart's government affairs team so we can

7    jointly unify and lead the industry in an

8    advocacy strategy."

9              Did I read that correctly?

10        A.    Yes.

11        Q.    Are you a member of Walmart's

12   government affairs team?

13        A.    I am not.

14        Q.    Do you know, looking at the

15   list of individuals who received this email

16   from Walmart, if any of them are members of

17   the government affairs team?

18             MR. CARTER:  Now, are you

19        asking currently or as of the time of

20        the email?

21             MR. ECKLUND:  As of the time of

22        the email.  Yes.  Thank you for the

23        clarification.

24             THE WITNESS:  Possibly

25        James Langman.

```
 1                 That's all I recognize.

 2                 MR. ECKLUND:  Okay.

 3         Q.      (BY MR. ECKLUND)  Who is

 4   James Langman?

 5         A.      He was VP over compliance,

 6   health and wellness compliance.

 7         Q.      As director of clinical

 8   services, do you have a lot of dealings with

 9   James Langman?

10         A.      Not a lot, no.

11         Q.      Infrequent dealings?

12         A.      Infrequent, yes.

13         Q.      Would you say once a quarter?

14         A.      Probably, yes.

15         Q.      Once a month?

16         A.      They would have a compliance

17   meeting once a week.  I would be a focus

18   point, maybe once a quarter, specific to

19   immunizations or health screenings.

20         Q.      As a prior member of the NACDS,

21   and -- are you a current member of the APHA?

22         A.      Not a current member.

23                 I have attended their meetings,

24   but not recently.

25         Q.      When did you stop attending?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      About three years ago.  And I
 2     hope to attend this year.
 3            Q.      2015?
 4            A.      Yes.
 5            Q.      Do you have an understanding of
 6     what the government affairs team would
 7     endeavor to do?
 8                    Do you see it in the first?  It
 9     says, "Our government team stands ready to
10     collaborate."  And as a former member of the
11     association, do you have a sense of what the
12     government affairs team would attempt to do?
13            A.      I don't --
14                    MR. CARTER:  Hold on one
15            second.
16                    Object to the form.
17                    THE WITNESS:  I don't.
18            Q.      (BY MR. ECKLUND)  Also fair to
19     say you don't have any understanding of what
20     the advocacy strategy for the industry was,
21     what they're describing in this email?
22                    MR. CARTER:  Object to the
23            form.
24            Q.      (BY MR. ECKLUND)  Do you see in
25     this first sentence of the second paragraph?
```

1            "So we can jointly unify and

2    lead the industry in advocacy strategy."

3         A.    I really wouldn't understand

4    what that would be about.

5         Q.    What's Relay Health?

6         A.    Relay Health is a subsidiary --

7    I guess a subsidiary of McKesson.

8         Q.    Have you ever worked with

9    Patrick Harris?

10         A.    I have.  I can't recall how

11    long it's been.

12         Q.    In what capacity did you work

13    with Patrick Harris?

14         A.    In the buy role, as I recall,

15    we did -- we had some discussions with

16    Relay Health.  I've more communicated with

17    Relay Health in recent business with the

18    immunization program to support reminder,

19    series reminder vaccines and help our

20    pharmacists identify those patients needing

21    the second or third dose.

22         Q.    Who is Darren Townsend?

23         A.    Darren Townsend is a director

24    supporting billing and NCPDP type, you know,

25    standards.

```
 1          Q.      And what is NCPDP?

 2          A.      I could not tell you what the

 3    acronym exactly stands for, but it's

 4    basically the structure by which we would

 5    bill a drug and a standard for pharmacy

 6    billing.

 7          Q.      Would you agree with me that

 8    based on the text of the email, it appears

 9    Darren Townsend was also involved in

10    Walmart's government affairs team?  If you

11    read this sentence, "I look forward to

12    working with Darren to facilitate a joint

13    government affairs meeting."

14               Do you see that?

15               MR. CARTER:  Object to the

16          form.

17               THE WITNESS:  I see that.  I

18          don't know if he would be considered

19          part of government affairs.  I don't

20          recall that being in his title in

21          any -- so I'm not certain.

22               MR. ECKLUND:  Okay.

23          Q.    (BY MR. ECKLUND)  And sitting

24    here today, you don't know whether there were

25    any additional meetings or additional
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     collaboration between the government affairs

2     team referenced in this email and Walmart's

3     government affairs team?

4                 MR. CARTER:  Object to the

5          form.

6                 THE WITNESS:  That's correct, I

7          don't know.

8          Q.    (BY MR. ECKLUND)  Thank you.

9     You spoke briefly this morning about what you

10    look for in a seller, a good seller.

11                And you specifically mentioned

12    manufacturers.  Did you also purchase from

13    wholesalers?

14         A.    Yes.

15         Q.    Which wholesalers did you

16    purchase from --

17         A.    McKesson.

18         Q.    -- in your role as a pharmacy

19    buyer?

20         A.    McKesson.  And we did purchase

21    specialty products for our specialty pharmacy

22    in Orlando from AmerisourceBergen.

23         Q.    Did you ever purchase any

24    pharmacy -- oh, do you know what?  Actually,

25    you used a very particular term, "specialty
```

1    pharmacies."  Why don't we just break this

2    down.

3                In your role as a pharmacy

4    buyer, you would purchase small molecule

5    prescription drugs; correct?

6         A.      Correct.

7         Q.      Tablets and pills?

8         A.      Correct.

9         Q.      Did you also purchase

10   biologics?

11        A.      That would be the specialty

12   side of it.  So specialty pharmacy would

13   dispense those out of our Orlando facility,

14   and send them to patients' homes.  So those

15   products could have potentially been bought

16   through McKesson for our retail stores.  But

17   for our specialty pharmacies, we bought those

18   products from AmerisourceBergen.

19        Q.      None of the specialty products

20   that you purchased were controlled

21   substances; correct?

22        A.      To my knowledge, correct.

23        Q.      And you didn't purchase on

24   behalf of Walmart any biologics, aside from

25   specialty pharmacies, that would be

1   controlled substances; correct?

2        A.     Can you say that one more time?

3        Q.     So when I think of the pharmacy

4   market, I think of three types of drugs.

5        A.     Mm-hmm.

6        Q.     And I also think of two types

7   of markets.  And we'll talk about these

8   today.

9               Small molecule, biologic,

10  biotech products and then specialty pharmacy.

11  Okay?  That's how I break it up.

12              Now, that may not be the way

13  that someone educated as a pharmacist might,

14  but that's what makes sense to me.  Okay?

15       A.     Okay.

16       Q.     So when I'm thinking of

17  biotechnology drugs -- do you understand what

18  I'm talking about when I talk about

19  biotechnology drugs?

20              MR. CARTER:  Object to the

21         form.

22              THE WITNESS:  I may need to

23         clarify that as you speak to it.

24       Q.     (BY MR. ECKLUND)  Okay.

25       A.     Because I -- I kind of see

1    those as one in some cases, specialty and

2    biotech.

3         Q.    Okay.  All right.  So we'll use

4    yours, then.

5              I'll keep them together in my

6    mind today.  Fair?

7         A.    Fair.

8         Q.    Okay.  Thank you.

9              So you purchased specialty

10   products from AmerisourceBergen for a

11   facility in Orlando.

12        A.    Correct.

13        Q.    And that was as a pharmacy

14   buyer?

15        A.    Yes.

16        Q.    As a senior pharmacy buyer, did

17   you purchase any other specialty products

18   from anyone other than AmerisourceBergen?

19        A.    We would have potentially

20   bought those products as well as from

21   McKesson for our retail stores.

22        Q.    Okay.  So when you became a

23   senior pharmacy buyer, you may have also

24   purchased specialty pharmaceutical drugs from

25   McKesson in addition to AmerisourceBergen?

1    A.    Correct.

2    Q.    Did you ever purchase any

3  prescription drugs from Cardinal?

4    A.    No.

5    Q.    Are you familiar with

6  Cardinal Health?

7    A.    I am.

8    Q.    Did you purchase any from

9  HD Smith?

10    A.    No.

11    Q.    Are you familiar with HD Smith?

12    A.    I am.

13    Q.    Same question for Miami-Luken.

14  Have you ever purchased from Miami-Luken?

15    A.    No.

16    Q.    Are you familiar with

17  Miami-Luken?

18    A.    I am not.

19    Q.    Sitting here today, are you

20  aware of any other drug wholesalers that you

21  may have purchased either small prescription

22  drugs from or special pharmaceuticals?

23    A.    I'm trying to think.

24         ANDA was a distributor that we

25  would, in some cases, launch generic products

1    through them and ship to stores.  But they

2    were the only other distributor that I worked

3    with.

4         Q.     In your answer you said in some

5    cases you may have launched generic products

6    through ANDA.  What circumstances would cause

7    you to purchase generic products from ANDA?

8         A.     We wouldn't purchase the

9    products from ANDA.  We would leverage their

10   distribution channel to get it to the stores

11   quicker.

12              So we would purchase from the

13   manufacturer --

14        Q.     Okay.

15        A.     -- and ANDA would distribute it

16   for us.

17        Q.     Okay.  I appreciate that

18   clarification.  In my question I'd asked

19   specifically about purchase, but you were

20   using a different arm of ANDA.  Okay.  That's

21   helpful for me to know.  I appreciate that.

22        A.     Okay.

23        Q.     I believe I asked you this

24   earlier this morning, but just for my

25   benefit, in your role as a senior pharmacy

1    buyer, were you provided a budget to purchase

2    prescription drugs?

3         A.    No.

4         Q.    Were you provided a budget to

5    purchase controlled substances?

6         A.    No.

7         Q.    Was your performance evaluated

8    regularly as a pharmacy buyer?

9         A.    We would have evaluations

10   annually.

11        Q.    Written?

12        A.    Yes.

13        Q.    Did you also have oral

14   evaluations?

15        A.    It was oral, but it's

16   documented.

17        Q.    Okay.  Were you provided goals

18   for the next year?

19        A.    We had goals, yes.

20        Q.    Did you set your own goals in

21   part?

22        A.    No.

23        Q.    Did you have any influence on

24   your own evaluation?

25        A.    Yes.

1    Q.    How would you influence your

2  own evaluation?

3    A.    Just on what my role was and

4  how I could implement new things around the

5  role of a buyer.  Might be working with a

6  supplier on packaging or things like that.

7    Q.    Okay.  In your role as a

8  pharmacy buyer, I'd like to try and

9  understand how you spent your time on an

10  annual basis, approximations.  Okay?

11    A.    Okay.

12    Q.    How much of your time was spent

13  at your home office?  Your -- wherever your

14  physical office is located within Walmart.

15         MR. CARTER:  Object to the

16      form.

17    Q.    (BY MR. ECKLUND)  Do you

18  understand what I mean by "home office"?  I'm

19  saying if you have an office with a door and

20  it's in -- is it in Arkansas?

21    A.    Yes.

22    Q.    Okay.  How often were you at

23  the office for work, and how often were you

24  on the road traveling?

25         MR. CARTER:  Object to the

1    form.

2              THE WITNESS:  Most of the time

3       I was at the office.

4       Q.    (BY MR. ECKLUND)  Greater than

5  80 percent of the time?

6       A.    Probably.

7       Q.    Greater than 90?

8       A.    I can't ...

9       Q.    So somewhere in the 80- to

10  90-percent range makes you feel comfortable?

11      A.    Yeah.

12      Q.    Can we work with that?

13      A.    Yeah.

14      Q.    So I'll just say four to five

15  days you're in the office, and the other day

16  you might be out.

17      A.    Correct.

18      Q.    Okay?

19              When you were on the road

20  traveling, what would you be traveling for?

21      A.    Either to go to a meeting,

22  attend a Walmart meeting, go to an

23  industry -- or tour a manufacturing facility.

24      Q.    What types of industry meetings

25  would you attend?

1          A.     The ones we've spoken of.

2          Q.     How often did you tour

3   manufacturing facilities?

4          A.     Probably once a year.  And it

5   wouldn't be every manufacturer.  I mean, it

6   would just really be depending on what --

7   what we were working on at the time.

8          Q.     Okay.  And that was a question

9   I was going to ask you.

10              So you would not make it a

11   routine habit to go and visit each of the

12   suppliers of prescription drugs and

13   controlled substances on an annual basis at

14   their manufacturing facilities.  You wouldn't

15   take, you know, 30, 40 trips per year to

16   visit facilities?

17          A.     That's correct.

18          Q.     How many would you estimate you

19   would attend in one year?

20              MR. CARTER:  Object to the

21          form.

22              THE WITNESS:  Two to three

23          potentially.

24          Q.     (BY MR. ECKLUND)  Do you recall

25   attending any manufacturing facility tours at

1    any company that provided controlled

2    substances to Walmart?

3         A.    I don't remember if they did or

4    didn't.

5         Q.    Ms. Coleman, do you have

6    children?

7         A.    Yes.

8         Q.    Okay.  How old?

9         A.    Soon to be 28 and 23.

10        Q.    Did they enjoy Halloween when

11   they were children?

12        A.    Yes.

13        Q.    Do you also enjoy Halloween?

14        A.    I do.  With my grandkids.

15        Q.    Do you recall any facility

16   tours taking place on Halloween?

17        A.    I don't.

18        Q.    Just sitting here today, you

19   don't remember visiting a manufacturer for a

20   facility tour on Halloween?

21        A.    I don't recall that, no.

22        Q.    Okay.  Something that would

23   have been unusual, though?

24        A.    I don't know.

25        Q.    Well, we talked about facility

1    tours being rare.  And Halloween is a unique

2    day, one that's memorable.  Fair?

3                MR. CARTER:  Object to the

4         form.

5                THE WITNESS:  Yeah.

6                MR. ECKLUND:  Okay.  All right.

7         Q.    (BY MR. ECKLUND)  Do you recall

8    any facility tours for Endo?

9         A.    I do not.

10        Q.    Do you recall any facility

11   tours for Mallinckrodt?

12        A.    I'm not certain if we did a

13   tour of Mallinckrodt or not.

14        Q.    Is there anything that you

15   could look at that might refresh your

16   recollection?

17        A.    I don't know.

18        Q.    Do you recall where Endo's

19   manufacturing facilities are located?

20        A.    I don't.

21        Q.    Do you recall where

22   Mallinckrodt's manufacturing facilities are

23   located?

24        A.    I don't.

25        Q.    Do you know whether they're

1      located in Arkansas?

2          A.      Do I know that or not?

3          Q.      Yeah, do you know that?

4          A.      I haven't heard of them in

5      Arkansas, but I don't -- I don't know.

6          Q.      Do you know whether they're

7      within driving distance of your offices or

8      home in Arkansas?

9          A.      I don't know that.

10         Q.      Okay.

11                 How much of your time was

12     devoted to generic purchasing?

13         A.      My initial beginning as a buyer

14     was focused on brands, so I primarily

15     bought -- worked with the brand manufacturers

16     probably the first couple of years.  And then

17     once we launched the $4 generic program, I

18     shifted more to generics.

19         Q.      Approximately how much of your

20     time do you spend -- or devote to branded

21     purchasing?

22         A.      The first part of my job as a

23     buyer was brands only.

24         Q.      Did that change over time?

25         A.      Yes.

1    Q.    How did it change?

2    A.    When the $4 program launched,

3    as I had said earlier, I shifted to help with

4    generic purchases.  And then, as we moved

5    into a different structure of the way we

6    bought products, we shifted to categories or

7    disease states.  And then in that instance,

8    you would kind of oversee whatever drugs were

9    in that category; heart health, diabetes.

10    Q.    Do you know whether the $4

11    generic program included controlled

12    substances?

13    A.    It did not.

14    Q.    Do you know whether the $9

15    program included?

16    A.    To my knowledge, it did not.

17    Q.    Okay.  Was there a reason why

18    it wasn't included?

19    A.    Just in general, in my career

20    with the company, we've never promoted

21    controlled substances to the customer or to a

22    physician.

23    Q.    So the $4 generic program was,

24    in your view, equivalent to a promotion for

25    those generic programs available at Walmart?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. CARTER:  Object to the

2     form.

3          THE WITNESS:  It was a way to

4     bring low-cost medications to

5     customers.

6     Q.    (BY MR. ECKLUND)  Put a pin in

7     that.  We're going to continue on, but I just

8     wanted to tie up one loose end.

9          So we were talking about the

10    Halloween meeting.

11         Do you have any recollection of

12    a tour involving fentanyl patches?

13    A.    I do not.

14    Q.    All right.  And that's okay.  I

15    mean, we're talking about years and years and

16    years.  So it's okay.  It's not "got ya."  I

17    just wanted to ask some questions.

18    A.    I understand.

19    Q.    You mentioned the generic

20    program -- and we'll get to that.  As a buyer

21    for Walmart, how has -- how do you use

22    technology?

23    A.    During my days as a buyer,

24    there was a little bit less technology, but

25    we used, you know, emails.  We used reporting

Highly Confidential - Subject to Further Confidentiality Review

```
 1    out of our, you know, Walmart system to

 2    determine how the product movement was so

 3    that we can ensure we have it in stock.

 4                  Phone.

 5        Q.     That's technology.  We'll take

 6    it.  Yes.

 7        A.     That's what I recall.

 8        Q.     Okay.  So PowerPoint?

 9        A.     Yeah.

10        Q.     Okay.  Excel?

11        A.     Yes.

12        Q.     Microsoft Word?

13        A.     Yes.

14        Q.     Kind of the whole Office suite.

15               What about Access databases?

16        A.     I did not use Access databases.

17        Q.     Familiar with Sequel?

18        A.     No.

19        Q.     Often written as SQL?

20        A.     I've heard of it, but not --

21        Q.     That's not something you use?

22        A.     No.

23        Q.     What about Alteryx?

24        A.     No.

25        Q.     Tableau?
```

1          A.     I used that in a view format

2     today in my business, but as a buyer, I did

3     not.

4          Q.     So in connection with your

5     immunizations --

6          A.     Yes.

7          Q.     -- group and clinical services,

8     you use Tableau, but not as a senior pharmacy

9     buyer?

10         A.     Correct.

11         Q.     And certainly not as a pharmacy

12    buyer?

13         A.     Correct.

14         Q.     Do you have access to data

15    maintained by others?  For example, licensed

16    information?

17              MR. CARTER:  Object to the

18         form.

19              THE WITNESS:  I guess I need

20         you to clarify.

21         Q.     (BY MR. ECKLUND)  Okay.  So are

22    you familiar with IMS Health?

23         A.     Yes.

24         Q.     Do you have Access to IMS

25    Health data?

1    A.    I do today, yes.

2    Q.    Did you as a pharmacy buyer?

3    A.    I do not recall having data

4    from IMS Health at that time.

5    Q.    Do you recall having Access to

6    IMS Health data as a senior pharmacy buyer?

7    A.    I'm not certain.

8    Q.    Okay.  Familiar with IQVIA?

9    A.    Yes.

10    Q.    Did you have Access to IQVIA

11    data as a pharmacy buyer?

12    A.    Not to my knowledge, no.

13    Q.    Do you have access to IQVIA

14    today?

15    A.    I do.

16    Q.    What does IQVIA data show you?

17    A.    It shows you market comparison

18    like what is your share.  It shows you total

19    market, and then where -- where your business

20    falls.  It doesn't tell you what others --

21    who those others are, so it buckets chain

22    versus grocery.  Different segments of

23    pharmacy.

24    Q.    Useful information?

25    A.    Yes.

1     Q.     Okay.

2            And what does IMS Health

3    provide you today?

4     A.     IMS, I think, is now IQVIA.  I

5    think that's their new name.

6     Q.     Okay.

7     A.     But today I get a market share

8    report on immunizations.

9     Q.     Does Walmart consider itself a

10   chain or a grocery?

11    A.     I think we're a mass retailer.

12    Q.     Can you identify any other mass

13   retailers?

14    A.     There used to be more, with

15   Target would have been a mass retailer when

16   they had a pharmacy.  But a lot of

17   consolidation.  I'm not sure who else is in

18   the mass retailer bucket today with us.

19    Q.     Would you consider CVS a mass

20   retailer?

21    A.     They're a chain pharmacy.

22    Q.     Okay.  Would you consider

23   Walgreens?

24    A.     I believe they're classified --

25   now, I don't -- I'm not an IQVIA expert, but

Highly Confidential - Subject to Further Confidentiality Review

1    I believe they're classified as a chain

2    pharmacy.

3         Q.    As a pharmacy buyer, did you

4    have any inventory management tools or

5    databases that you were able to look at to

6    anticipate needs to purchase?

7         A.    We primarily used -- we had

8    a -- I don't even remember the name of the

9    system, but that held all of the item

10   maintenance, and you could see the movement

11   of an item by week.  And we would use reports

12   to determine movement of items across all of

13   the prescription drugs that we bought.

14        Q.    Was it important to have

15   transparency on a weekly basis?

16             MR. CARTER:  Object to the

17        form.

18             THE WITNESS:  In some cases.

19        If there was a supply shortage, yes.

20        Q.    (BY MR. ECKLUND)  Did you

21   ordinarily purchase, on -- let me clarify the

22   question.  I'm sorry.

23             When you were purchasing

24   prescription drugs, were you purchasing to

25   satisfy the needs of a -- Walmart's

1    pharmacies for a week?  For a month?  For a

2    quarter?  What increment of time were you

3    trying to purchase for?

4         A.    We would generally keep safety

5    stock; right?  So we had backup.  But

6    generally we would keep in stock based off of

7    what their demand was.

8               I don't -- I don't -- couldn't

9    even recall how many days on hand we tried to

10   maintain for items.

11        Q.    Would you also try to maintain

12   a safety stock for prescription opioids?

13        A.    I mean, we would want to be in

14   stock, so we would keep what we would need to

15   make sure that we could ensure our

16   pharmacists would have the products they

17   need.

18        Q.    And the inventory management

19   database or system that you described, that

20   would include both prescription drugs and

21   prescription opioid drugs; correct?

22        A.    Correct.

23        Q.    We mentioned earlier how you,

24   fortunately, didn't have to spend all that

25   much time traveling to buyers as a pharmacy

1    buyer.  Did suppliers ordinarily visit you at

2    your office in Arkansas for meetings?

3         A.    Yes.

4         Q.    How often?

5         A.    It would depend on the

6    supplier.  Generally quarterly.  There would

7    be a quarterly review.

8         Q.    Was it common for suppliers to

9    visit you on a quarterly basis?

10              MR. CARTER:  Object to the

11         form.

12              MR. ECKLUND:  Let me try it a

13         different way.

14         Q.    (BY MR. ECKLUND)  How many

15   suppliers did you purchase from?

16         A.    I couldn't -- I couldn't tell

17   you at this point.

18         Q.    Just approximately?

19         A.    I don't know.  30.

20         Q.    30.  How many of the 30 would

21   visit you on a quarterly basis?

22         A.    Probably a third of them.

23         Q.    A third.  So that's ten.  Can

24   you identify any of the ten that would visit

25   you on a quarterly basis?

```
1              A.      Teva, Par, Mylan, Lilly, GSK.
2      Merck.
3                      That's what comes to mind.
4              Q.      Okay.  Did Teva supply
5      prescription opioids to Walmart?
6              A.      I would have to -- I don't know
7      for certain.
8              Q.      Do you recall purchasing
9      prescription opioids from Par?
10             A.      From who?
11             Q.      Par.
12             A.      Possibly.  I don't ...
13             Q.      Okay.  Mylan?
14             A.      Possibly.
15             Q.      Lilly?
16             A.      I'm not certain.
17             Q.      GlaxoSmithKline?
18             A.      I mean, we bought all products.
19     I can't recall who.
20             Q.      I understand.  I understand.
21             A.      Yeah.
22             Q.      Merck?
23             A.      Mm-hmm.
24             Q.      Any recollection?
25             A.      I don't recall.
```

1      Q.      Okay.   When these suppliers

2    would arrive for these quarterly meetings,

3    would they bring materials with them?

4      A.      Sometimes, yes.

5      Q.      Written materials?

6      A.      Yes.

7      Q.      PowerPoint presentations?

8      A.      Yes.

9      Q.      Published literature?

10     A.      Yes.

11     Q.      Did they ever bring you any

12   scientific literature?

13     A.      Yes.

14     Q.      Any materials about efficacy?

15     A.      I don't recall efficacy

16   materials per se.  More so in the vaccine

17   business is where I see that more.

18     Q.      What type of literature do you

19   recall them bringing?

20     A.      It might be information about a

21   new product.

22     Q.      Mm-hmm.

23     A.      It might be on the brand side

24   that scientists would explain the way the

25   product works.

```
 1                    It might be a proposal.
 2          Q.       Did they ever provide you any
 3   materials about new risks or new concerns
 4   about a particular drug or class of drugs?
 5          A.       Not that I recall.
 6          Q.       Would that have been important
 7   to you?
 8          A.       Yes.
 9          Q.       Something you would have read
10   if they provided it to you?
11          A.       Yes.
12          Q.       Possibly considered in your
13   decisions to purchase?
14          A.       Yes.
15          Q.       Did suppliers -- beyond
16   in-person meetings, did they also send you
17   letters?  Written correspondence, letters?
18          A.       They would send letters.  We
19   primarily would be probably seeing
20   notifications, would be primarily most of
21   what we would get.
22          Q.       Emails?
23          A.       Yes.
24          Q.       Text messages?
25          A.       I don't believe we had text
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    when I was a buyer.  I guess we did,

2    somewhat -- some of that, but yeah.

3    Possibly.

4         Q.    Okay.

5               Any other means or methods that

6    you can think of sitting here today that

7    suppliers would use to communicate with you?

8         A.    That haven't been mentioned?

9         Q.    Yes.

10        A.    No.

11        Q.    A few more questions and then

12   we'll take a first break.

13              Was there anyone else at

14   Walmart who served the same role as you as a

15   pharmacy buyer during your tenure at the

16   company besides David Badeen?  You mentioned

17   David earlier.  He was identified in that

18   email.  Anyone else who was a pharmacy buyer

19   during your tenure as a pharmacy buyer?

20        A.    Patsy Little.

21        Q.    Anyone else?

22        A.    I can't remember her.

23   Cheryl Knight.  And that's all that I can

24   remember.

25        Q.    Linda Wilson?
```

1       A.      She was not a pharmacy buyer.

2    But she was -- she worked on the team.

3       Q.      Okay.  Did you have access to

4    David Badeen's email account?

5       A.      No.

6       Q.      Did David have access to yours?

7       A.      No.

8       Q.      Did you guys share offices?

9       A.      We didn't have offices.

10      Q.      Do you have cubicles that are

11   adjacent?

12      A.      Cubicles that are adjacent,

13   yes.

14      Q.      Okay.  How long did you work

15   with David?

16      A.      About the whole time I was a

17   buyer, he was in role, I believe.  Yes.

18      Q.      Would it be unusual if David

19   had signed a contract on your behalf?

20      A.      It would totally depend.

21      Q.      Okay.  Would it be unusual if

22   you signed one on his behalf?

23      A.      It could have happened.  I

24   don't know.

25      Q.      I'm just trying to understand

1    how your offices work.

2          A.      Yeah.

3          Q.      So I'm going to hand you a

4    document.  Actually, I don't need to hand

5    this one to you.  I'm just going to put this

6    one up on the ELMO.  It's not that important.

7    Save some time and then we can go into break.

8                 First introduction to ELMO.

9    Okay?

10                I'm not marking it.  I'm just

11   describing it.

12                MR. CARTER:  Will you identify

13          it just for the record purposes, the

14          Bates numbers.

15                MR. ECKLUND:  So this is a

16          Walmart MDL_000038415, and it is a

17          short two-page document that was

18          produced to us in the litigation.

19                And at the top you'll see it

20          was sent on December 4, 2006.  It was

21          marked as confidential.  It was sent

22          by DAVA Pharmaceuticals.  It was sent

23          to David Badeen.  It was sent by email

24          to David Badeen, according to the

25          letter, and it was accepted for

Highly Confidential - Subject to Further Confidentiality Review

1           Walmart stores by you.

2           Q.      (BY MR. ECKLUND)  Do you see

3    that?

4           A.      Accepted by me.  Where do

5    you --

6           Q.      At the bottom?

7           A.      I don't see it.

8           Q.      Accepted?

9                   MR. CARTER:  It's not on the

10          screen, Counsel.

11                  MR. ECKLUND:  Oh, sorry.  Here

12          you go.  Apologies.

13          Q.      (BY MR. ECKLUND)  "Accepted for

14   Walmart stores Inc. by JoLynn Coleman."

15          A.      Yes.

16          Q.      That's your signature?

17          A.      Yes, it is.

18          Q.      Okay.  Was that unusual for you

19   to sign?

20          A.      Not -- I don't think it was.  I

21   mean, it depended.  Suppliers, we had

22   different products with the same suppliers.

23          Q.      Mm-hmm.

24          A.      It could have been that David

25   was out.  I signed on his behalf.  I don't

Highly Confidential - Subject to Further Confidentiality Review

1  remember.

2       Q.    Okay.  Would you have needed

3  someone to print out that email for you, or

4  would you have had direct access to that

5  email if we had --

6       A.    I would have printed it.

7       Q.    Who within Walmart would have

8  printed David's emails for you to review and

9  then sign?

10      A.    He would have to have printed

11 it or emailed it to me.  And I would have

12 printed it.

13      Q.    David didn't have an assistant?

14      A.    I don't know if we had

15 assistants at that time or not.  Possibly.

16      Q.    Okay.

17            Where does Patsy Little live?

18      A.    I think she lives outside of

19 Lafayette now.

20      Q.    Does she still work at Walmart?

21      A.    No.

22      Q.    Okay.  Do you know where she

23 works?

24      A.    I don't know the name of the

25 company she works at.

1        Q.      Okay.  What about

2   Cheryl Knight?

3        A.      I lost track of Cheryl Knight

4   after I moved on from being a buyer.  So I'm

5   not certain if she's still working for

6   Walmart or not.

7        Q.      David Badeen, does he still

8   work at Walmart?

9        A.      He works for Sam's.

10       Q.      For Sam's.

11               When you were a pharmacy buyer

12  for Walmart, did you also purchase for Sam's?

13       A.      We did, during that time, yes.

14       Q.      Okay.  Aside from

15  Cheryl Knight, David Badeen, and Patsy

16  Little, you can't recall any other pharmacy

17  buyers during your tenure as a pharmacy buyer

18  for Walmart?

19       A.      I can't.

20       Q.      And Linda Wilson wasn't a

21  pharmacy buyer?

22       A.      I don't recall her ever having

23  that title.

24       Q.      Okay.

25               Did each of these individuals

1    that we just talked about -- we talked about

2    Cheryl Knight, David Badeen, Patsy Little,

3    and yourself -- did each of you have

4    responsibility for purchasing controlled

5    substances to supply Walmart's pharmacies?

6          A.    Could have.

7          Q.    None of you was excluded or

8    precluded from purchasing controlled

9    substances?

10               MR. CARTER:  Object to the

11         form.

12         Q.    (BY MR. ECKLUND) You each had

13   the same ability to purchase or buy?

14         A.    Correct.

15         Q.    Same responsibility to purchase

16   and supply the pharmacies for Walmart?

17               MR. CARTER:  Object to the

18         form.

19               THE WITNESS:  Yes.

20         Q.    (BY MR. ECKLUND)  Okay.  As

21   part of your evaluations, were your purchases

22   and your contracts and your negotiations

23   compared against Cheryl Knight's, David

24   Badeen's, or Patsy Little's?  By that, I mean

25   was your performance compared up against

1    other people in the same role?

2         A.    That's kind of not -- can you

3    repeat what I'm --

4         Q.    Sure.  So let's imagine that we

5    had a car dealership.  We passed a few of

6    them on the way in.  You have five car

7    dealers all working at the GMC dealership

8    down the road.  And each of the five dealers

9    works the whole year, and one of them sells

10   five times as many pickup trucks as everybody

11   else.  That's the type of performance that

12   the owner of the dealership is going to know

13   about.  They're going to say, "This person

14   sold a lot more trucks."  And it's going to

15   be potentially reflected in their

16   evaluations.  It might be reflected in the

17   form of a bonus.  It might be something that

18   leads to advancement.  Okay?

19              So I'm trying to understand, in

20   your role as a buyer, you described earlier

21   your job was to make sure that you supplied

22   the volume necessary to supply the stores and

23   meet the needs at the stores.

24              Do you recall we had that

25   conversation?

1          A.      That's correct.

2          Q.      And you also mentioned that

3     price was an important component.  Not the

4     only component, but one of them; right?

5          A.      Correct.

6          Q.      And part of securing the best

7     price is the negotiation that you would

8     engage in with the supplier, whether that's a

9     manufacturer or a wholesaler.

10         A.      Correct.

11         Q.      Okay.  Were your contract

12    negotiations or your purchases measured up

13    against others in the same role within

14    Walmart?

15         A.      No.

16         Q.      Okay.  Who was your direct

17    supervisor when you became a pharmacy buyer

18    for Walmart?

19         A.      Initially it was Frank Segrave.

20         Q.      Changed over time?

21         A.      Yes.  Then it was Bruce

22    Painter.  Then it was Sandy Kinsey.

23         Q.      And when you became a senior

24    pharmacy buyer, was Sandy Kinsey still your

25    direct supervisor?

1    A.    Yes.

2    Q.    Anyone else?

3    A.    No.

4    Q.    Okay.

5          MR. ECKLUND:  Let's take our

6    first break.

7          THE VIDEOGRAPHER:  We are going

8    off the record at 9:25 a.m.

9          (Recess taken, 9:25 a.m. to

10   9:44 a.m.)

11         THE VIDEOGRAPHER:  We are back

12   on the record at 9:44 a.m.

13         MR. ECKLUND:  Welcome back,

14   Ms. Coleman.

15         THE WITNESS:  Thank you.

16   Q.    (BY MR. ECKLUND)  Just a few

17   follow-up questions from this morning.  You

18   mentioned in passing a mail pharmacy program.

19   Did you purchase for mail order?

20   A.    Can you define what

21   specifically?

22   Q.    Sure.

23         So did Walmart provide

24   prescriptions for individuals that only

25   arrived at a physical store or did they also

1   ship prescriptions to individuals at their

2   homes via mail?

3          A.    We did have a mail order

4   pharmacy.

5          Q.    When did the mail order

6   pharmacy begin?

7          A.    I don't know the opening.  I

8   was transferred to be the general manager of

9   that facility and was in that role there for

10  right at six years.

11         Q.    Did the mail order pharmacy

12  program dispense controlled substances?

13         A.    Yes.

14         Q.    Do you recall any specific

15  controlled substances that were distributed

16  by the mail order program?

17         A.    I don't recall specifically,

18  but we had controlled substances that were

19  dispensed.

20         Q.    Were there any limitations in

21  the controlled substances that you would

22  dispense via mail?

23              MR. CARTER:  Object to the

24         form.

25         Q.    (BY MR. ECKLUND)  For example,

1    any particular drug product?  Oxymorphone,

2    hydromorphone, hydrocodone?  Were all of

3    those available via mail program?

4         A.    Yes.

5         Q.    Were there limitations on how

6    many pills you might dispense?  If the

7    prescribing physician had said, "You can have

8    50 pills," would you ship 50 pills via the

9    mail program?

10              MR. CARTER:  Object to the

11         form.

12              THE WITNESS:  We would follow

13         whatever the state allows for the

14         controlled substance and what the

15         physician has ordered.

16         Q.    (BY MR. ECKLUND)  All right.

17    You also mentioned that your title changed

18    from pharmacy buyer to senior pharmacy buyer.

19    Was that change prompted by strong

20    evaluations?  Was it based on seniority?  Do

21    you have an understanding of why your title

22    changed?

23         A.    Other than performance, I don't

24    recall.

25         Q.    Okay.  Have you reviewed any of

Highly Confidential - Subject to Further Confidentiality Review

1    the complaints filed in either state or

2    federal court that are included in the

3    multidistrict litigation?

4         A.    No.

5         Q.    And when I say "the

6    multidistrict litigation," I mean all of

7    those cases that are currently consolidated

8    and centralized before Judge Polster in

9    Cleveland, Ohio.  So that's what I'm

10   referring to.

11        A.    I have not.

12        Q.    Are you familiar generally with

13   the defendants that are named in this case,

14   beyond Walmart?

15        A.    No.

16        Q.    Are you familiar with the

17   plaintiffs?

18        A.    No.

19        Q.    Do you know whether they're

20   individuals or public entities?

21        A.    I do not.

22        Q.    Can we agree that there is an

23   opioid epidemic in the United States today?

24        A.    I believe there's a crisis, an

25   opioid crisis.

1    Q.    What's the difference between

2  an opioid epidemic and an opioid crisis?

3    A.    I'm not a -- someone who can

4  define what an epidemic is, but, you know, I

5  will say one way or the other.

6    Q.    When did you become aware of

7  the opioid crisis?

8    A.    Probably in the last five years

9  or so.  Six years.

10    Q.    How did you become aware of the

11  opioid crisis in 2012?  Or 2013?

12    A.    Just what's in the news or what

13  I hear being at the office.

14    Q.    So at the office you have

15  discussions about the opioid crisis between

16  2012 and 2013?

17    A.    I can't recall when.

18    Q.    Do you have a recollection of

19  any of those discussions?

20    A.    I don't recall specific

21  discussions around the opioid crisis.

22    Q.    Would those have been formal

23  meetings or informal watercoolers?

24    A.    Just informal.

25    Q.    Just conversations around the

1   coffee pot or the watercooler around the

2   office?

3           A.      I really don't recall where

4   they were.

5           Q.      Do you recall having any

6   conversations with anyone in particular?

7           A.      No.

8           Q.      You mentioned news.  Are you

9   talking about written news?  Like a

10  newspaper?  Online internet?  Or television

11  news?

12          A.      Either.

13          Q.      Both?

14          A.      Both.

15          Q.      When you watch television news,

16  what channels do you most often watch?

17          A.      I don't really specifically

18  watch any one over the other.

19          Q.      So local news?

20          A.      Yeah.

21          Q.      CNN?

22          A.      Possibly.

23          Q.      Fox News?

24          A.      Possibly.

25          Q.      CNBC?

1        A.      Yes.

2        Q.      MSNBC?

3        A.      I'm not --

4        Q.      You're completely open to

5  whatever newscaster is on.  You're open to

6  listening and paying attention --

7        A.      I don't watch a lot of news

8  personally, but yeah.

9        Q.      So television news is not a big

10 part of your life?

11       A.      Correct.

12       Q.      How about reading the

13 newspaper?  Is it a habit?

14       A.      No.

15       Q.      What about reading online news?

16 Is that a habit?

17       A.      Online news?  No.

18 Occasionally.

19       Q.      Once or twice a week?

20       A.      Yes.

21       Q.      But not daily?

22       A.      Not daily.

23       Q.      Okay.  When you say "crisis,"

24 what do you mean by crisis?

25       A.      Just that -- crisis is that

1    there's a -- just an opportunity with a

2    product, or -- I don't really know the

3    definition of a crisis, but ...

4         Q.    That's okay.  Let's see if we

5    can reach agreement.

6              So I looked up on

7    Merriam-Webster's Dictionary the word

8    "crisis."

9              And there are a few definitions

10   available.  We've got definition of crisis A:

11   "The turning point for better or worse in an

12   acute disease or fever?"

13             And you can see it on the

14   screen now.  Correct?  Ms. Coleman, you can

15   see the Merriam-Webster's website on the

16   large screen in the room?

17        A.    Yes.

18        Q.    Okay.  And you can see it says

19   "Merriam-Webster since 1828," and you can see

20   I looked up the word "crisis"?

21        A.    Yes.

22        Q.    And I'm going to read it.  If I

23   misread it, just stop me.

24             Definition of crisis.

25             "The turning point for better

1   or worse in an acute disease or fever."

2                    B: "a paroxysmal attack of

3   pain, distress, or disordered function."

4                    C: "an emotionally significant

5   event or radical change of status in a

6   person's life."  And then there's -- midlife

7   crisis is an example.

8                    Following below, we have

9   definition 2, "the decisive moment, as in a

10   literary plot."

11                    And 3A and 3B:  "An unstable or

12   crucial time or state of affairs in which a

13   decisive change is impending, especially one

14   with the distinct possibility of a highly

15   undesirable outcome."  Examples being a

16   financial crisis, or the nation's energy

17   crisis.

18                    And then B: "a situation that

19   has reached a critical phase."  The

20   environmental crisis, and the unemployment

21   crisis being examples.

22                    When you used the word

23   "crisis," do any of those definitions fit

24   your understanding of the word "crisis" as

25   you were using it when we talked about the

```
 1    opioid crisis?

 2         A.    Yes.

 3         Q.    Which one?

 4         A.    Several of them.

 5         Q.    Why don't you identify the ones

 6    that do.

 7         A.    "A turning point for better or

 8    worse."

 9         Q.    Okay.  So --

10         A.    "A decisive moment."

11         Q.    1A, 2.  Okay.

12               What about 3A or 3B?

13         A.    I would say both of them.

14         Q.    Okay.  So when you use the word

15    "crisis" today, I'm going to keep your

16    understanding of that word in mind; is that

17    fair?

18         A.    That's fair.

19         Q.    I want to make sure we have an

20    understanding of what each other -- of what

21    I'm saying to you and what you're saying to

22    me.  And if there's a word that I used today

23    and you want me to look it up and you want a

24    dictionary --

25         A.    Okay.
```

1    Q.    -- totally fine.  Okay?

2         Can we agree that over the past

3    year the opioid crisis has gained visibility

4    in our society?

5    A.    Yes.

6    Q.    Are you aware that

7    President Trump has identified the opioid

8    epidemic as he referred to it as a "public

9    health emergency"?

10   A.    Yes.

11   Q.    Do you agree with that

12   characterization by President Trump that the

13   opioid crisis or opioid epidemic is a "public

14   health emergency"?

15   A.    I think it's a public health

16   concern, personally, my personal opinion.

17   Q.    Okay.  That's all right.  You

18   don't have to agree or disagree with the

19   President.  I'm just asking your opinion.

20   A.    Yeah.

21   Q.    Are you aware that a national

22   commission and a commission of state

23   governors have issued recommendations for

24   action to address the opioid epidemic?

25   A.    I'm not aware of that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Are you aware that many of the
 2    concerns that have been raised by elected
 3    officials stem from the fact that in 2016,
 4    more than 11 million Americans misused
 5    prescription opioids?
 6                  MR. CARTER:  Object to the
 7         form.
 8                  MR. WATTS:  Object to the form.
 9                  MR. ECKLUND:  Are you aware?
10                  THE WITNESS:  Can you restate
11         that?
12                  MR. ECKLUND:  Sure.
13            Q.    (BY MR. ECKLUND)  Are you aware
14    that in 2016, more than 11 million Americans
15    misused prescription opioids?
16                  MR. CARTER:  Object to the
17         form.
18                  THE WITNESS:  I don't
19         specifically know that number.
20            Q.    (BY MR. ECKLUND)  Are you aware
21    that the number of opioid-related deaths have
22    more than quadrupled since 1999?
23                  MR. CARTER:  Object to the
24         form.
25                  THE WITNESS:  I don't know the
```

Highly Confidential - Subject to Further Confidentiality Review

1      details on that.

2           Q.    (BY MR. ECKLUND)  It's not

3      something that you're aware of in your role

4      as a purchaser or buyer of pharmaceutical

5      drugs including prescription opioids for

6      Walmart?

7                 MR. CARTER:  Same objection.

8                 THE WITNESS:  I'm not aware of

9           the details of that, no.

10                MR. ECKLUND:  Okay.

11          Q.    (BY MR. ECKLUND)  I'd like to

12     shift to some of the supply and demand

13     concerns for healthcare generally and

14     pharmaceuticals specifically because it's a

15     unique market.  And I'd like to talk about

16     some of those unique elements of prescription

17     drugs.  Okay?  Can we do that?

18          A.    Yes.

19          Q.    Okay.  Can we agree that buying

20     and selling for health and wellness and

21     prescription drugs in particular is different

22     than how other departments within Walmart

23     might operate?  For example, let's use blue

24     jeans or a dozen eggs or a book.

25          A.    I've never bought in other

Highly Confidential - Subject to Further Confidentiality Review

```
 1    areas of Walmart.

 2         Q.     Okay.

 3         A.     So I would --

 4         Q.     That's okay.  We'll get there.

 5                If I wanted to go into a store

 6    today and buy 50 pills, prescription pills,

 7    but I don't have a prescription, I can't do

 8    it.  Is that right?  Without a prescription,

 9    I can't purchase prescription drugs?

10         A.     Correct.

11         Q.     But I can go in and buy a dozen

12    eggs from Walmart if they're available for

13    sale?

14         A.     Correct.

15         Q.     And I could buy blue jeans?

16         A.     Correct.

17         Q.     Or a book?

18         A.     Yes.

19         Q.     Anything else in the store that

20    has restrictions that you're aware of?

21         A.     Probably firearms.

22         Q.     Firearms.

23         A.     Alcohol.

24         Q.     Okay.  Does that make sense to

25    you?  Firearms should be --
```

1          A.    I don't have one way --

2          Q.    No, I'm saying does it make

3    sense that firearms might be something where

4    there would be additional restrictions on

5    purchase and sales?

6          A.    Yes.

7          Q.    Anything besides firearms and

8    prescription drugs come to mind?

9          A.    Alcohol.

10         Q.    Alcohol.  Does that one make

11   sense to you as well?

12         A.    I don't -- I just know there

13   are restrictions as a purchaser.

14         Q.    Okay.

15         A.    That's really all I have to add

16   there.

17         Q.    And tobacco as well?

18         A.    Yes.

19         Q.    Okay.  Now, you mentioned

20   firearms, alcohol, and I mentioned tobacco to

21   you.

22               So let's talk about those, and

23   then we'll talk about prescription drugs.

24               Most individuals who purchase

25   alcohol purchase alcohol to consume the

```
1    alcohol because they enjoy the alcohol.  Is

2    that basically consistent with your

3    understanding of why people might buy

4    alcohol?

5         A.    I don't know why people buy

6    alcohol.  I don't know.  I mean ...

7              MR. CARTER:  I didn't have the

8         time at the break, but I would object

9         to the form of that question.

10             MR. ECKLUND:  That's fine.

11        Q.    (BY MR. ECKLUND)  Tobacco, most

12   people purchase it for personal use.  They

13   enjoy smoking tobacco.  They enjoy chewing

14   tobacco.  Maybe they're addicted, but they

15   use tobacco themselves?

16             MR. CARTER:  Same objection.

17        Q.    (BY MR. ECKLUND)  What's your

18   understanding of why people purchase

19   prescription drugs?  You're a pharmacist.

20   Why do people most often buy prescription

21   drugs?  Is it because they like ingesting

22   pills or is it because they're looking for a

23   health benefit?

24        A.    They likely have a diagnosed

25   health condition and are seeking treatment of
```

1    that condition.

2         Q.    Okay.  So they're looking to

3    treat a health condition.  They're looking to

4    improve their quality of life?

5              MR. CARTER:  Object to the

6         form.

7              THE WITNESS:  Possibly.

8         Q.    (BY MR. ECKLUND)  Possibly?

9    Perhaps a little longer life?  Maintain or

10   manage a condition so that you can live a

11   full and complete life?

12             MR. CARTER:  Form.

13             THE WITNESS:  Possibly.

14        Q.    (BY MR. ECKLUND)  Possibly?

15             So consumers purchase and

16   ingest pharmaceuticals most often because of

17   the role they can play in improving or

18   maintaining their health.  Is that fair?

19        A.    Yes.

20        Q.    Okay.  In your role as a

21   pharmacy buyer for Walmart, did you also

22   purchase over-the-counter drugs?

23        A.    I did purchase a small part of

24   over-the-counter; the dosing spoons and

25   things like that.

1     Q.     Okay.

2     A.     For a small period of time.

3     Q.     Anything beyond dosing spoons?

4     A.     I did have the blood pressure,

5     diabetes -- the section of devices for a

6     short period of time.

7     Q.     You said "blood pressure,

8     diabetes."  Do you mean blood pressure --

9     A.     Blood pressure monitors.

10    Q.     -- monitors.  And then

11    diabetes.  Blood sugar testing devices?

12    A.     Yes.

13          MR. CARTER:  You've done a

14       pretty good job, but try not to talk

15       over each other.

16          THE WITNESS:  Sorry.

17          MR. CARTER:  So let him finish

18       and then you can --

19          THE WITNESS:  Okay.

20    Q.     (BY MR. ECKLUND)  That's okay.

21    We're doing well, and we'll keep trying.

22          So when you're talking about

23    blood sugar testing devices, you're talking

24    about test strips, needles that diabetics may

25    need to use to get a drop of blood so they

1    can monitor their glucose levels so they can

2    monitor and then manage their condition.

3                    Is that what you're talking

4    about?

5         A.    Yes.

6         Q.    Did you purchase on behalf of

7    Walmart any other devices beyond blood

8    pressure testing equipment or blood sugar

9    testing devices?

10        A.    Not that I recall.

11        Q.    We talked about one of the key

12   differences between prescription drugs and

13   other drugs, which is by definition a

14   prescription only.  You need a prescriber to

15   write a prescription in order to obtain that

16   medication; correct?

17        A.    Correct.

18        Q.    Okay.  Let's talk about another

19   difference in prescriptions.

20                    Let's talk about insurance.

21                    Many consumers who purchase

22   prescription drugs, they have insurance

23   coverage; correct?

24        A.    Correct.

25        Q.    And many elderly individuals in

Highly Confidential - Subject to Further Confidentiality Review

1    America today enjoy benefits provided by

2    Medicare.  Is that consistent with your

3    understanding?

4         A.    Yes.

5         Q.    And you're aware of Medicaid

6    programs as well?

7         A.    Yes.

8         Q.    Okay.  Are you familiar with

9    formulary lists?

10        A.    Yes.

11        Q.    What's a formulary list?

12        A.    It's generally a list of

13   products that the insurance plan covers.

14        Q.    Okay.  Are you familiar with

15   tiers for prescription drugs benefits?

16        A.    Brand or generic tiers.

17        Q.    Okay.  One type.  Specialty

18   pharmaceutical might be another tier?

19        A.    I'm not familiar with those

20   types of tiers.

21        Q.    Again, a somewhat unique

22   circumstance for prescription drugs is that

23   the transactions themselves don't just

24   involve the consumer.  They can involve an

25   insurance provider.  They can involve

1    Medicare.  They can involve Medicaid.  They

2    can involve formulary lists.  That all true?

3              MR. CARTER:  Object to the

4         form.

5              THE WITNESS:  They can, yes.

6         Q.    (BY MR. ECKLUND)  And sitting

7    here today, you can't identify any other

8    product that's available for purchase at

9    Walmart that would involve an insurance

10   provider stepping in and providing coverage?

11        A.    Repeat that.  I'm sorry.

12        Q.    Prescription drugs, you can

13   have insurance coverage for those purchases.

14        A.    Mm-hmm.  (Witness nods.)

15        Q.    Insurance will not pay for your

16   blue jeans.

17              Medicare and Medicaid won't

18   cover blue jeans; right?

19        A.    I'm not a -- not that I know

20   of.

21        Q.    Okay.  And formulary lists,

22   while they restrict which drugs you may get

23   or the order in which you may receive them,

24   there's no one in the shoe department at

25   Walmart that says you can't buy the Nikes

Highly Confidential - Subject to Further Confidentiality Review

```
1    until you've tried the Reeboks; right?  You

2    can choose what you want to buy without

3    involvement by another party.

4         A.    Correct.

5         Q.    Okay.  So there are limitations

6    both on what you can get and also on your

7    preferences or your ability to decide that

8    exists in the prescription drug market that

9    don't exist in other departments of Walmart;

10   is that fair?

11        A.    Not to my knowledge.

12              MR. WATTS:  Object to the form.

13        Q.    (BY MR. ECKLUND)  Are there

14   additional differences in the sale of

15   controlled substances versus prescription

16   drugs?

17              MR. CARTER:  Object to the

18        form.

19              THE WITNESS:  Not that I'm

20        aware of.

21        Q.    (BY MR. ECKLUND)  So we've

22   talked about how consumers who need a drug

23   that's a prescription drug, they need a

24   prescription to get that drug first; right?

25   So we can --
```

1    A.    Correct.

2    Q.    When you considered how much

3    volume to purchase for Walmart's pharmacies,

4    beyond the information you received from the

5    pharmacies themselves, what other information

6    did you consider in securing the appropriate

7    amount of volume?

8    A.    I guess the -- it would depend

9    on new products coming to market.  Brand to

10   generic switches, I would consider those.

11         That's what comes to mind.

12   Q.    Okay.  So you might consider

13   the number of prescriptions received and

14   dispensed within Walmart's pharmacies?

15   A.    Yes.

16   Q.    Replenishment requests from

17   Walmart's pharmacies?

18   A.    Yes.

19   Q.    Would you consider any direct

20   requests from any of the pharmacies?

21         Would you receive direct

22   requests from pharmacies?

23   A.    Possibly.

24   Q.    Okay.  Would you look at weekly

25   dispensing data?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      Yes, in some cases.
 2            Q.      Would you look at monthly
 3     dispensing data in other cases?
 4            A.      Yes.
 5            Q.      And perhaps quarterly data?
 6            A.      Possibly, yes.
 7            Q.      Okay.  So you would look at
 8     dispensing data?
 9            A.      Yes.
10            Q.      Okay.  Would you look at trends
11     over time?
12            A.      Yes.
13            Q.      How would you consider trends
14     over time in your decision-making process as
15     a purchaser for Walmart?
16            A.      Just primarily identifying
17     trends and then looking what the store needs
18     and inventory levels are to determine if I
19     need more or I need less.
20            Q.      Would you also consider sales
21     information from suppliers?
22            A.      No.
23            Q.      Do you know if suppliers ever
24     provided you sales information?
25            A.      I'm sure they probably did.
```

1          Q.     But it's not something that you

2     would consider in connection with your

3     decision to purchase a volume of drugs?

4          A.     I can't say specifically.  I'd

5     have to understand the specific case.

6          Q.     I'll try to come back to that.

7          A.     Okay.

8          Q.     We talked in part on your

9     familiarity with controlled substances.

10    Let's get a little more detailed on

11    controlled substances.

12               What is a controlled substance?

13         A.     It is a product that has

14    limitations as far as refills is considered,

15    depending on the state law, what you can

16    dispense, you know, how many refills,

17    et cetera.

18         Q.     A controlled substance is

19    regulated primarily by the FDA?

20         A.     Any product that we sell would

21    be approved by the FDA.

22         Q.     Do you know whether the DEA is

23    also involved in regulating substance

24    controlled substances?

25         A.     I'm sure -- I do know that they

Highly Confidential - Subject to Further Confidentiality Review

1   are.

2          Q.      Do you know whether DEA is

3   involved in regulating any other prescription

4   drugs?

5          A.      Not to my knowledge.

6          Q.      And do you know why DEA is

7   involved in regulating controlled substances?

8                  MR. CARTER:  Object to the

9          form.

10                 THE WITNESS:  I don't know

11         their function as the DEA.  I don't --

12         you know.

13         Q.      (BY MR. ECKLUND)  Do you

14   understand the differences between Class II

15   and Class III controlled substances?

16         A.      As a pharmacist?  Yes.

17         Q.      What's the difference between a

18   Class II and a Class III?

19         A.      In most cases, it's D -- it's

20   classified that limits refills that are

21   allowed.  And what's -- that's generally what

22   I can say about the difference between those.

23         Q.      And what about the dangers?

24                 Is one more likely to be

25   addictive or dangerous to the individual

1    consuming it?

2         A.    I think it just depends.

3    They're FDA-approved products.

4         Q.    It's not your position because

5    controlled substances in Class II or

6    Class III are FDA-approved that they're safe

7    and lack any concerns about abuse or

8    addiction; correct?

9              MR. CARTER:  Object to the

10        form.

11             THE WITNESS:  Can you repeat

12        that?

13        Q.    (BY MR. ECKLUND)  Sure.  So I

14   asked earlier is one more likely to be

15   addictive or dangerous in the context of

16   Class II and Class III prescription opioids.

17   And then you said, "I think it just depends.

18   They're FDA-approved products."

19             And what I'm trying to

20   understand is if you have a sense, sitting

21   here today, whether one is perceived to be

22   more or less concerning to DEA within the

23   classification system as you understand it.

24             MR. CARTER:  Object to the

25        form.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. WATTS:  Object to the form.

2              THE WITNESS:  As I personally

3      understand it?

4       Q.    (BY MR. ECKLUND)  Yeah.

5       A.    As a pharmacist?

6       Q.    Yeah.  I want your testimony

7      today, yes.

8       A.    There could be differences.  It

9      depends on the patient.

10      Q.    Can we agree that the market

11     for controlled substances is materially

12     different than the market for other

13     prescription drugs?

14             MR. WATTS:  Object to the form.

15             THE WITNESS:  I don't know that

16     I can say one way or the other there.

17      Q.    (BY MR. ECKLUND)  Why aren't

18     you certain if you could say one way or the

19     other?

20      A.    Repeat the question.

21      Q.    So the question was, "Can we

22     agree that the market for controlled

23     substances is materially different than the

24     market for other prescription drugs?"

25             There was an objection --

Highly Confidential - Subject to Further Confidentiality Review

 1                    MR. WATTS:  Object to the form.

 2                    MR. ECKLUND:  I understand

 3          that, Mr. Watts, thank you.  I'm just

 4          reading back the question to the

 5          witness.

 6                    There was an objection

 7          interposed.  Your answer was, "I don't

 8          know that I can say one way or the

 9          other there."

10                    My question was, "Why aren't

11          you certain if you could say one way

12          or the other?"

13                    Is there something you could

14          look at that might describe the

15          differences in the classification for

16          DEA's controlled substances?

17                    THE WITNESS:  I don't know that

18          I understand what you're asking me.

19                    MR. ECKLUND:  That's okay.

20          Q.    (BY MR. ECKLUND)  All right.

21   So we'll shift.

22                    You mentioned limitations on

23   the number of pills that could be provided

24   for controlled substances.

25          A.    Refills that can be allowed.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Refills only?

2      A.      I don't know if there's

3  limitations on specific pills.

4      Q.      Are controlled substances

5  tightly controlled?

6              MR. CARTER:  Object to the

7          form.

8              THE WITNESS:  They're

9          controlled.  I can't speak to how

10         tightly controlled.  I can speak to my

11         knowledge as a pharmacist or in my

12         role, but outside of that ...

13     Q.      (BY MR. ECKLUND)  In your role

14  within Walmart, were controlled substances

15  tightly controlled?

16     A.      There were -- there were

17  security built around the products.  There

18  was training and policies and procedures for

19  pharmacy teams to follow.  So yes.

20     Q.      Were those trainings, policies,

21  and procedures unique to controlled

22  substances?

23     A.      Not only controlled substances,

24  in general operation procedures, but there

25  were specific things that had to be done in

Highly Confidential - Subject to Further Confidentiality Review

1     addition for controlled substances.

2          Q.     As a pharmacy buyer and senior

3     pharmacy buyer within Walmart, were you

4     responsible for completing any DEA forms?

5          A.     No.

6          Q.     Are you familiar with DEA

7     forms?

8          A.     I'm familiar with them as a

9     pharmacist.

10         Q.     Okay.

11                Are you familiar with Form 222?

12         A.     I'm familiar with them in my

13    pharmacist role.

14         Q.     You've never had to fill one of

15    them out?

16         A.     As a pharmacist, yes.

17         Q.     Just as a pharmacy buyer?

18    You've never filled them out as a pharmacy

19    buyer?

20         A.     No.

21         Q.     You've never filled them out as

22    a senior pharmacy buyer?

23         A.     Correct.

24         Q.     Okay.  And we talked briefly

25    about purchasing of controlled substances,

1   which is, among other products, something

2   that you would purchase on behalf of Walmart?

3          A.      Possibly, yes.

4          Q.      Possibly?  You don't remember

5   if you purchased controlled substances?

6          A.      Honestly, we bought a myriad of

7   different products.  I likely did, but I

8   don't recall which ones --

9          Q.      Okay.

10         A.      -- I purchased.

11         Q.      We'll go through some of them.

12         A.      Yeah.

13         Q.      You testified earlier "There

14  were security built around the products.

15  There was training and policies and

16  procedures for pharmacy teams to follow, so

17  yes."

18                 And I asked, "Were those

19  trainings, policies, and procedures unique to

20  controlled substances?"

21                 And you answered, "Not only

22  controlled substances, in general operation

23  procedures, but there were specific things

24  that had to be done in addition for

25  controlled substances."

1          Do you recall that testimony?

2     A.     Yes.

3     Q.     Okay.  Specifically to

4  controlled substances, were there any

5  differences that you can identify today

6  between how they were handled and how they

7  were controlled within Walmart that differ

8  from how you would handle other prescription

9  drugs?

10     A.     Yes.

11     Q.     What are those differences?

12     A.     It's primarily with -- you

13  would do a controlled substance audit every

14  year.  So that was unique to that category.

15  Of the controlled substances that were C-IIs,

16  were locked in a cabinet, that could only be

17  accessed via key by a pharmacist.

18          You kept controlled substance

19  inventories, where every time you would

20  dispense a C-II, you would document that in a

21  log.  Those are the differences I'm speaking

22  to.

23     Q.     Okay.  The controlled

24  substances audits were handled annually?

25     A.     Yes.

1        Q.      Okay.

2                Was that at a pharmacy level?

3        A.      Yes.

4        Q.      Or was it --

5                Okay.

6                Did you ever attend any of

7    those audits?

8        A.      In -- as a pharmacist, I did,

9    yes.

10       Q.      Could you describe what occurs

11   during a routine controlled substances audit

12   that might occur at a Walmart?

13       A.      You would go through and count

14   all of the pills that you had for controlled

15   substances in your pharmacy and document

16   those.

17       Q.      And in order to do that, you

18   would go back through your dispensing log?

19       A.      No, you would count the

20   physical pills on the shelf.

21       Q.      Do you mean the physical pills

22   inside the cabinet with the key?

23       A.      Not just C-IIs, but all

24   controlled substances.

25       Q.      Okay.  Were some of the

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances kept on shelves instead

2    of in the cabinet?

3         A.    Yes.

4         Q.    Do you recall which ones?

5         A.    Non-C-II products.

6         Q.    So C-IIIs?

7         A.    During my day on the counter,

8    yes.

9         Q.    What's the purpose of a

10   dispensing log?

11        A.    For C-IIs?

12        Q.    Yes.

13        A.    Is that what you're referring

14   to?

15              There's a requirement that you

16   document every time you dispense the quantity

17   you dispensed and the date.

18        Q.    Were you also responsible for

19   taking down the name of the customer who

20   purchased them?

21        A.    No.

22        Q.    The name of the physician that

23   prescribed them?

24        A.    To my knowledge, no.

25        Q.    Whether it was a cash sale or a

1  person who came in with insurance coverage or

2  a prescription drug benefit?

3       A.    To my knowledge, no.  We would

4  just document.  It was a log, an inventory

5  log more so than anything.

6       Q.    Okay.

7             In connection with the

8  purchasing and sale of controlled substances

9  within Walmart, did you also consider dosage

10  size?

11      A.    "Dosage size," meaning?

12  Strength?

13      Q.    Strength of the pills.

14      A.    Yes.

15      Q.    Morphine milligram equivalents?

16      A.    As a buyer went, I did not, no.

17      Q.    Did you consider -- withdrawn.

18            As a buyer -- would you prefer,

19  as a buyer, to purchase abuse-deterrent

20  formulations when available or would you

21  favor a generic that was not abuse deterrent?

22            MR. CARTER:  Object to the

23            form.

24            Do you understand what I'm

25            saying?

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  Can you repeat it

2       one more time, please?

3            Q.    (BY MR. ECKLUND)  Sure.  So

4   you're familiar with abuse-deterrent

5   formulations for prescription opioids?

6            A.    There were a few when I was a

7   buyer, not many.

8            Q.    Okay.  Can you name some of

9   those?

10            A.    I really -- I really can't.

11            Q.    Okay.

12            A.    I can't.

13            Q.    Okay.  What's your

14   understanding of the purpose for an

15   abuse-deterrent formulation?

16            A.    That it had ingredients that

17   would prevent potential addiction, I think.

18   I can't remember.  Overdose.

19            I haven't practiced in quite a

20   long time.  I cannot remember the details.

21            Q.    I understand.  I understand.

22            Do you recall, during your

23   tenure as a buyer for Walmart, whether you

24   would favor restocking pharmacies within

25   Walmart with abuse-deterrent formulations of

Highly Confidential - Subject to Further Confidentiality Review

1    prescription opioids when those formulations

2    existed?

3         A.    I don't recall doing that.  I

4    recall providing the -- buying the product

5    that our pharmacies needed for prescriptions

6    that were written.

7         Q.    Okay.  Did you ever consider

8    thresholds in connection with your purchasing

9    of prescription opioids as a buyer for --

10        A.    I don't recall any type of

11   thresholds.

12        Q.    Are you familiar with DC 6045?

13        A.    I'm familiar with it, yes.

14        Q.    And what is DC 6045?

15        A.    That is our controlled

16   substance distribution center.

17        Q.    Do you know where it's located?

18        A.    I don't.

19        Q.    Do you know whether you ever

20   visited it?

21        A.    I may have.

22        Q.    Sitting here today, you're not

23   sure?

24        A.    I think I did attend a meeting

25   there.  But it was a long time ago.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     Did you ever receive

2    information from DC 6045 in connection with

3    restocking or resupplying Walmart pharmacies

4    with prescription opioids?

5     A.     No.

6     Q.     Are you familiar with the

7    controlled substances ordering system or

8    CSOS, as I believe it's referred to within

9    Walmart?

10    A.     I'm not.

11    Q.     Is it fair to say you didn't

12   consider it in connection with your role as a

13   pharmacy buyer, then?

14    A.     Couldn't have.

15    Q.     When you received the resupply

16   replenishment request from Walmart

17   pharmacies -- we talked about those earlier

18   today -- you might get a request from a

19   specific pharmacy.

20           Do you remember that testimony?

21    A.     Yes.

22    Q.     Would you also consider the

23   relative size of that order and the pharmacy

24   itself?  For example -- we'll just use two

25   extremes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Los Angeles is a humongous
 2       city.  Right?  We can agree on Los Angeles
 3       has a tremendously large population?
 4            A.    Yes.
 5            Q.    Can we also agree that there
 6       are some smaller towns in states like
 7       North Dakota that are more rural, much, much
 8       smaller populations?
 9            A.    Yes.
10            Q.    Would you consider the size of
11       an order going to a Walmart in the greater
12       Los Angeles area differently than you might
13       consider an order being received in
14       North Dakota in a rural part of the state?
15                    MR. CARTER:  Object to the
16            form.
17                    THE WITNESS:  As a buyer, I
18            didn't see specific store orders or
19            monitor store-specific store orders.
20            Q.    (BY MR. ECKLUND)  Did you know
21       whether anyone else within Walmart did?
22            A.    I don't know who that -- I
23       don't know.
24            Q.    If you wanted to get an answer
25       to that question, who might you ask?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I guess somebody in compliance.

2      Q.      Did you ever consider orders of

3  interest in connection with your role as a

4  buyer of prescription opioids within Walmart?

5      A.      Explain what you mean by that

6  again.

7      Q.      Are you familiar with the term

8  "orders of interest"?

9      A.      I'm not.

10     Q.      Okay.  Did you ever receive a

11  request for more pills directly from a

12  pharmacist?

13     A.      I possibly could have.

14     Q.      But sitting here today, you

15  don't specifically recall any requests for

16  more prescription opioids made directly by a

17  pharmacy in --

18     A.      Not specifically, no.

19     Q.      I didn't ignore your question

20  on orders of interest.  I'm just looking at

21  documents, and it's a term that I found in

22  the documents.  I'm not in a position to

23  define it.  I don't know what it means within

24  Walmart.  So I don't want to --

25     A.      Okay.

1      Q.      -- characterize it.  So I

2   understand that you've asked me to define it.

3              What about Walmart's suspicious

4   order monitoring programs?  Did you consider

5   the Walmart suspicious order monitoring

6   programs in connection with your purchasing

7   and restocking of Walmart pharmacies?

8              MR. CARTER:  Object to the

9         form.

10             THE WITNESS:  I didn't really

11        have any connection with that process

12        or any details around that.

13     Q.      (BY MR. ECKLUND)  Did you ever

14   consider concerns about misuse of

15   prescription opioids as a buyer?

16     A.      As a pharmacist.

17     Q.      So in the '80s and early '90s

18   before you transitioned into pharmacy buying,

19   you may have considered it, but in your role

20   as a pharmacy buyer for Walmart, you did not?

21     A.      I did not what?  Can you tell

22   me that one more time?

23     Q.      You did not take into account

24   concerns about misuse of prescription opioids

25   as a pharmacy buyer when restocking?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I don't know that I was at a
2   level where I knew whether there was a misuse
3   or not.  I'm sure it's something that I would
4   have taken into account.
5        Q.      Okay.  So if it had been
6   brought to your attention, it's something you
7   would have taken into account, but if it
8   wasn't brought to your attention, it wasn't
9   something that you were actively considering
10  in your role as a pharmacy buyer from
11  Walmart?
12              MR. CARTER:  Object to the
13        form.
14              THE WITNESS:  I suppose.
15        Q.      (BY MR. ECKLUND)  How would you
16  have considered concerns about misuse of
17  prescription opioids in your role as a
18  pharmacy buyer for Walmart?
19              MR. CARTER:  Object to the
20        form.
21              THE WITNESS:  Say that again.
22        I'm sorry.
23        Q.      (BY MR. ECKLUND)  How would you
24  have considered concerns about misuse of
25  prescription opioids in your role as a

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy buyer for Walmart?

2              MR. CARTER:  Same objection.

3              THE WITNESS:  As a buyer, I

4         just was disconnected from what

5         patient -- you know.  So my role

6         was -- they were filling legitimate

7         prescriptions for patients.  And I was

8         supplying them with product so that

9         they could fill those prescriptions.

10        And that was really my role as a

11        buyer.

12        Q.    (BY MR. ECKLUND)  Would the

13   same hold for concerns about abuse?

14             MR. CARTER:  Same objection.

15             THE WITNESS:  Yes.

16        Q.    (BY MR. ECKLUND)  Addiction?

17             MR. CARTER:  Same objection.

18             THE WITNESS:  In my role as a

19        buyer, my role was to supply the

20        stores that were filling legitimate

21        prescriptions for patients.

22        Q.    (BY MR. ECKLUND)  Okay.  The

23   same answer for tolerance concerns?

24             MR. CARTER:  Same objection.

25             THE WITNESS:  Yes.

1     Q.    (BY MR. ECKLUND)  What about

2   street value?  Was that something you ever

3   considered as a pharmacy buyer?

4         MR. CARTER:  Same objection.

5         THE WITNESS:  Same answer.

6     Q.    (BY MR. ECKLUND)  And you're

7   aware that prescription opioids have been

8   sold on the street illicitly?

9     A.    I am aware of that.

10     Q.    When did you become aware that

11   prescription opioids were being sold on the

12   street?

13     A.    I can't recall exactly.

14     Q.    More than five years ago?

15     A.    Yes.

16     Q.    More than six years ago?

17     A.    I really can't --

18     Q.    That's okay.

19     A.    I don't -- I don't know.

20     Q.    I'm not trying to like pinpoint

21   you.  Will you agree it's between five and,

22   say, eight years ago?

23     A.    Possibly.

24     Q.    Possibly?  We'll stick with

25   five.  Is that fair?

1          A.     Yes.  That's fair.

2          Q.     Okay.  Were you aware that

3    Walmart sells home opioid testing kits?

4          A.     I am not.

5          Q.     You weren't responsible for

6    purchasing home drug testing kits?  We talked

7    about the two other devices you did purchase,

8    blood pressure monitoring equipment -- sorry,

9    three -- spoons, dosing spoons, and then

10   diabetes --

11         A.     I don't recall.

12         MR. CARTER:  JoLynn, try to let

13      him finish the question.  Even if you

14      think you know where he's headed.

15         Q.     (BY MR. ECKLUND)  Yeah, I'm

16   just trying to create a nice little framed-up

17   box here to --

18         Earlier today you talked about

19   how you purchased prescription drugs, both --

20   I'll call them ordinary prescription drugs

21   and controlled substances that are also sold

22   with a prescription.  Okay?

23         A.     Yes.

24         Q.     Beyond that, we talked about

25   how you also had on occasion purchased

1    certain blood pressure monitoring devices.

2            Do you remember that testimony?

3        A.    Yes.

4        Q.    And we also talked about the

5    blood glucose monitoring devices?

6        A.    Yes.

7        Q.    And you also mentioned dosing

8    spoons.

9        A.    Yes.

10       Q.    Okay.  Beyond dosing spoons,

11   blood pressure monitors, and blood glucose

12   monitoring, you didn't purchase any other

13   items, devices, tools, kits, or anything else

14   in your role as a pharmacy buyer for Walmart,

15   besides prescription drugs and --

16       A.    I don't recall ever buying

17   anything --

18       Q.    Okay.

19       A.    -- outside of that.

20       Q.    Okay.  I'd like to turn your

21   attention to the supply side a little bit

22   more directly.  Okay?

23       A.    Okay.

24       Q.    So we're going to talk about a

25   few different elements.  We're going to talk

```
 1    about manufacturers.  We're also going to

 2    talk about wholesalers.  All right?  Let's

 3    start with manufacturers, because I think it

 4    makes sense.

 5              Can we agree that the market

 6    can be characterized as having two main

 7    groups of companies that manufacture

 8    pharmaceuticals?  You have got your innovator

 9    or brand name of your manufacturers, and then

10    you have your generic manufacturers.

11              Can we agree that those are the

12    two major types of manufacturers in the

13    prescription drug market?

14        A.    Yes.

15        Q.    Okay.  There's no third --

16              MR. WATTS:  Objection to form.

17        Q.    (BY MR. ECKLUND)  There's no

18    third that you can think of sitting here

19    today?

20        A.    Not that I can think of sitting

21    here today.

22        Q.    Have you purchased from both

23    brand-name manufacturers and generic

24    manufacturers?

25        A.    Yes.
```

```
1              Q.      Okay.  And you did so in your

2      role as a pharmacy buyer for Walmart?

3              A.      Correct.

4              Q.      Let's see if we can identify

5      the manufacturers you can recall purchasing

6      from on behalf of Walmart.

7                      Do you recall purchasing from

8      Janssen?

9              A.      Yes.

10             Q.      Johnson & Johnson?

11             A.      Yes.

12             Q.      Purdue?

13             A.      Yes.

14             Q.      Teva?

15             A.      Yes.

16             Q.      Endo?

17             A.      Yes.

18             Q.      Allergan?

19             A.      Yes.

20             Q.      Pfizer?

21             A.      Yes.

22             Q.      QualiTest?

23             A.      Yes.

24             Q.      Merck?

25             A.      Yes.
```

1    Q.    Bayer?

2    A.    Yes.

3    Q.    Roche?

4    A.    Yes.

5    Q.    Actavis?

6    A.    Yes.

7    Q.    Mallinckrodt?

8    A.    Yes.

9    Q.    GlaxoSmithKline?

10   A.    Yes.

11   Q.    Sanofi?

12   A.    Yes.

13   Q.    Novo Nordisk?

14   A.    Yes.

15   Q.    Eli Lilly?

16   A.    Yes.

17   Q.    Watson?

18   A.    Yes.

19   Q.    Anyone else?

20   A.    There may have been other

21   generic suppliers.

22   Q.    Okay.

23   A.    I don't recall all of them.

24   Q.    DAVA Pharmaceutical was a small

25   one you signed a contract for on behalf of

Highly Confidential - Subject to Further Confidentiality Review

1    David Badeen; right?

2         A.     Yes.

3         Q.     So there's probably some

4    others.  It's not intended to be an

5    exhaustive list.  But if there are any others

6    that you remember, feel free to say, "You

7    know what?  Hold up.  I remembered another

8    one."  Okay?  And we'll get this on the

9    record.

10             Now, within the groups of brand

11   name and generic manufacturers, we talked

12   earlier about how there are specialty

13   pharmaceutical products, and then there are

14   what I referred to as small molecule.

15             Do you remember that?

16        A.     Yes.

17        Q.     Within your role as a buyer for

18   Walmart, you had direct dealings with small

19   molecule pharmaceutical manufacturers;

20   correct?

21        A.     Correct.

22        Q.     And can we also agree that

23   small molecule pharmaceuticals represented

24   the majority of the prescription drugs that

25   you were purchasing for Walmart?

1          A.      Yes.

2          Q.      I mean, the specialty

3    pharmaceuticals by name and pretty clearly in

4    how they're priced, that's not going to be

5    the majority of your market; correct?

6          A.      I don't believe it was.

7          Q.      Okay.

8          A.      Correct.

9          Q.      You don't know whether it's

10   5 percent of sales or 50 percent of sales?

11         A.      I really don't.

12         Q.      Okay.  Do you recall purchasing

13   controlled substances from small molecule

14   pharmaceutical manufacturers?

15         A.      Yes.

16         Q.      Okay.

17         A.      Possibly.

18         Q.      We talked earlier about your

19   familiarity with specialty pharmaceutical

20   manufacturers.  And again, as I understand

21   those, those are often biotech companies,

22   biotechnology drugs.  But it can include

23   traditionals typically administered by

24   injection or infusion.

25                 Is that consistent with your

Highly Confidential - Subject to Further Confidentiality Review

1    understanding as a pharmacist?

2            MR. CARTER:  Object to the

3        form.

4            THE WITNESS:  In most cases,

5        yes.

6        Q.    (BY MR. ECKLUND)  In most

7    cases.

8            Okay.  So as an injection or

9    infusion, they're different than pills and

10   tablets?

11       A.    They are.

12       Q.    Okay.  Method of ingestion, how

13   you get the medicine you need differ?

14       A.    Correct.

15       Q.    Okay.  And as the name implies,

16   specialty products are often intended for

17   special therapeutic situations.  I'll run

18   down a list of a few that I'm aware of.

19   We've got oncologics.  Are you aware of

20   specialty pharmaceuticals in the context of

21   oncology?

22       A.    Yes.

23       Q.    Antivirals?

24       A.    Yes.

25       Q.    Immunosuppressants?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      Immunostimulants?

3       A.      Yes.

4       Q.      Autoimmune modulators?

5       A.      Possibly.

6       Q.      Any others sitting here today?

7       A.      It's been a long time since

8   I've --

9       Q.      It's been a long time?

10      A.      -- bought specialties, so I

11  don't know where the business has gone.

12      Q.      I understand.  None of the

13  drugs that I just -- or categories or

14  conditions that I just identified are

15  controlled substance pain pills; correct?

16      A.      Not to my knowledge.

17      Q.      Okay.  And we talked earlier

18  about how you do not recall purchasing any

19  specialty products that were prescription

20  opioids.  Do you recall that testimony?

21      A.      I don't recall that, yeah.

22      Q.      Okay.

23      A.      That's correct.

24      Q.      All right.  Let's shift over to

25  brand names and generics.

 1              So what -- what's your

 2     understanding of a brand-name prescription

 3     drug?  What is a brand name prescription

 4     drug?

 5         A.     It's the innovator drug.  The

 6     manufacturer of the brand product, which

 7     means the first that got FDA approval, gone

 8     through all the steps to be the sole source

 9     of a product for a period of time.

10         Q.     Okay.  So you mentioned "sole

11     source."  I often refer to it as "single

12     source."  Can we use "single source" today?

13         A.     Yes.

14         Q.     When you talked about

15     exclusivity for a period of time, were you

16     talking about patent exclusivity?

17         A.     Yes.

18         Q.     So as a pharmacy buyer, you

19     were aware that brand name prescription

20     drugs, single source, patent exclusivity,

21     when the drug was covered by the patent, only

22     the firm with the patent could produce and

23     market that drug?

24              MR. CARTER:  Object to the

25          form.

1              THE WITNESS:  Yes.

2         Q.     (BY MR. ECKLUND)  Okay.  How

3    would that impact -- the fact that it's a

4    brand name prescription drug, how would that

5    impact pricing for Walmart?

6              MR. WATTS:  Objection to form.

7              THE WITNESS:  I guess, define

8         what you're specifically asking.

9         Q.     (BY MR. ECKLUND)  All right.

10   So you're familiar with just general sense,

11   supply and demand, traditional

12   microeconomics.  Right?  There's lots and

13   lots of people supplying a product.  The

14   price is going to go down because there's a

15   lot of competition.

16              Are you familiar with that?

17        A.     Mm-hmm.

18        Q.     So if you've got lots and lots

19   of people selling something and it's widely

20   available, you're going to compete on price.

21   You're going to compete on service too, but

22   you're going to compete on price.  If there's

23   only one source for a product, you're the

24   only game in town, you can't really compete

25   on price if that's what you need.

Highly Confidential - Subject to Further Confidentiality Review

1          Does that make sense?

2          MR. CARTER:  Object to the

3     form.

4          THE WITNESS:  In most cases,

5     brands, they offer a price and it's

6     the price to everyone.

7     Q.    (BY MR. ECKLUND)  That's what

8  I'm talking about.  Okay.  So the brand name

9  would come in, and they would offer you the

10 price, and you might be able to negotiate on

11 the edges a little bit, but generally

12 speaking it's going to be pretty close to the

13 price that's offered; is that fair?

14      A.    That's fair.

15          MR. WATTS:  Objection to form.

16      Q.    (BY MR. ECKLUND)  Was Walmart

17 able to use its market power, its size, to

18 negotiate better prices with brand name drug

19 manufacturers?

20      A.    Not that I saw.

21      Q.    So negotiations for single

22 source, brand-name prescription opioids would

23 have been fairly limited?

24      A.    To my knowledge, in my course

25 of buying.

```
 1                    MR. WATTS:  Object to the form.
 2          Q.     (BY MR. ECKLUND)  During your
 3    negotiations for brand-name prescription
 4    drugs, broadly, did you ever consult any
 5    price catalogs?
 6          A.     Meaning to look up prices?  I'm
 7    guessing kind of, if I understand what
 8    you're --
 9          Q.     Are you familiar with the
10    Red Book?
11          A.     I didn't really use the
12    Red Book as a buyer, but ...
13          Q.     Okay.  So you -- that's what
14    I'm asking, did you use it?  So you're
15    familiar with it, but you didn't use it?
16          A.     Correct.
17          Q.     Are you familiar with the
18    Blue Book?
19          A.     I'm familiar with it, but we
20    really didn't use that either.
21          Q.     Okay.  Just for purposes of the
22    record, when I talk about the Red Book, I'm
23    talking about the book published by Medi-Span
24    that tracks averages on prices.
25          A.     Our system used it, but as a
```

1   buyer, we didn't.

2       Q.      Okay.  So the data was in the

3   system that you would use when negotiating,

4   but the book wasn't in your hands?

5       A.      Correct.

6       Q.      Okay.  And when we talk about

7   the Blue Book, that tracks a different

8   measure, not ADW, but WAC.

9               Are you familiar with WAC?

10              What does WAC mean?

11      A.      Warehouse allowable cost.

12      Q.      Okay.

13      A.      Wholesale allowable cost.  I

14  can't really --

15      Q.      I always use "wholesale."

16      A.      Okay.

17      Q.      But if you want to use

18  "warehouse," that's fine.

19              So do you know whether the

20  Blue Book's wholesale average cost was

21  included in a database or system that you had

22  access to within Walmart as a pharmacy buyer?

23      A.      If I were to purchase that

24  product, I would have -- I would know what

25  that is about what to -- you know, bring that

1    in and buy it outside of that.  If we bought

2    it from McKesson, I would see what the cost

3    was there.

4        Q.    And that -- the data within

5    that system, you would use that data and

6    information when negotiating prices for the

7    sale of single source or -- strike that.

8    Sorry.

9            You would use that data when

10   negotiating prices for the purchase of single

11   source brand-name prescription opioids?

12           MR. CARTER:  Object to the

13       form.

14           THE WITNESS:  In general, if we

15       were working with the manufacturer,

16       they would be providing us their

17       pricing.

18       Q.    (BY MR. ECKLUND)  So they would

19   provide the pricing on a take-it-or-leave-it

20   basis?

21       A.    They would provide a price at

22   which they would sell it to us.  And it's

23   not -- we might refer to McKesson to see what

24   the cost is in the system, but generally, if

25   I have a need for a product to support our

Highly Confidential - Subject to Further Confidentiality Review

1    stores to fill prescriptions, we would order

2    that -- we would figure out a way to get the

3    product to the store.

4              My role was not to determine

5    what I bought.  I bought what the stores

6    needed.

7       Q.    So the need for the product was

8    more important than the price paid for the

9    product in those occasions?

10      A.    We supplied the stores with

11   what they needed to fill legitimate

12   prescriptions, and that was the role.

13      Q.    And that's how purchasing

14   within Walmart operated between 2005 and

15   2012-ish in your role as a pharmacy buyer?

16              MR. CARTER:  Object to the

17         form.

18              THE WITNESS:  If I recall --

19              MR. ECKLUND:  Okay.

20              THE WITNESS:  -- yes.

21      Q.    (BY MR. ECKLUND)  Did you ever

22   negotiate prices for brand-name prescription

23   opioids using volume as a motivator to reduce

24   the cost?

25      A.    I don't recall ever doing that.

1    Q.    When the patent for a drug

2    expires, additional firms can begin

3    manufacturing a drug; right?  You're familiar

4    with that process?

5    A.    Yes.

6    Q.    Okay.  And at that point it's

7    no longer -- if there are multiple drugs

8    available in the market, it's no longer

9    considered single source?  It's considered a

10   multisource drug.  Are you familiar with that

11   term, "multisource"?

12   A.    Yes.

13   Q.    Off patent?

14   A.    Yes.

15   Q.    Okay.  We talked a little bit

16   about microeconomic theory, supply and

17   demand; right?

18         In a generic market, there's

19   more competition; correct?

20   A.    Correct.

21   Q.    Many suppliers can offer you

22   the same drug so long as they've received FDA

23   approval to sell that bioequivalent drug;

24   correct?

25   A.    Correct.

1     Q.     Okay.  Are you generally

2  familiar with the process for introducing a

3  generic drug to the market?

4     A.     From the time when I was a

5  buyer, generally familiar, yes.

6     Q.     And what's your understanding

7  of the process?

8     A.     It would depend on the product.

9  If there were multiple providers coming in

10  with a generic, or a few.  But the process in

11  general would be that our supplier would let

12  us know if they were offering a generic

13  alternative and provide us pricing.  And we

14  would determine based off of that what -- and

15  the relationship what products we were going

16  to choose as our preferred.

17     Q.     Would a supplier ever let you

18  know that they had intentions of bringing a

19  new generic alternative to the market?

20          So the timeframe I'm talking

21  about is they have not yet received FDA

22  approval.  They contact you and they say,

23  "We're thinking about, evaluating, interested

24  in, considering introducing a generic version

25  of this drug.  Might Walmart be interested if

1    we're able to achieve FDA approval?"

2              Is that a conversation you

3    might have had with a generic manufacturer?

4         A.    We may have, yes.

5         Q.    Do you have any recollection of

6    any of those conversations?

7         A.    I don't.

8         Q.    It's not common?

9         A.    Not in my time as a buyer.

10        Q.    As more generic versions of a

11   drug enter the market, what happens to the

12   price in your experience as a buyer?

13        A.    It usually goes down.

14        Q.    How significantly from the

15   brand-name, single-source price?

16             MR. CARTER:  Object to the

17        form.

18             THE WITNESS:  It really depends

19        on the product.

20        Q.    (BY MR. ECKLUND)  After generic

21   entry into the market, after the patent

22   expiration, what happens to the sales for --

23   or purchases of brand name, single-source

24   drugs by you?

25             MR. CARTER:  Object to the

1        form.

2                MR. ECKLUND:  Actually, you're

3        right.  It's no longer a single-source

4        drug at that point.  So we'll go with

5        the -- I believe it's innovator drug.

6                I believe that's the name of

7        it, innovator multisource drug.

8                So let's imagine that Purdue

9        had a patent for a drug.  Okay?

10               And the patent expires.  And

11       upon the expiration of the patent,

12       Mallinckrodt or Endo or Janssen comes

13       into the market and they have a

14       bioequivalent, FDA-approved equivalent

15       that's introduced into the market.  A

16       generic version of what once was a

17       patent-protected drug.  What happens

18       to the sales -- what happens to the

19       sales of the formerly patent-protected

20       drug?

21               MR. CARTER:  Object to the

22       form.

23               THE WITNESS:  Usually they go

24       down.

25       Q.    (BY MR. ECKLUND)  A lot?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      It really depends.

2      Q.      Okay.  Would you routinely

3  continue purchasing brand-name drugs for

4  Walmart when there were generic equivalents

5  available?

6      A.      If there was demand in the

7  store to support continuing to have brand

8  available, then we would order it based off

9  of what the store needs were.

10     Q.      Was there typically a large

11 difference in the price of the generic

12 version and the drug?

13              MR. WATTS:  Object to the form.

14              THE WITNESS:  It depended on

15         the product, but usually it was lower.

16     Q.      (BY MR. ECKLUND)  Do you recall

17 whether the prices for generic versions of

18 opioid drugs were often lower than the prices

19 for brand-name?

20     A.      I don't recall any specifics.

21     Q.      Within Walmart, do you know

22 whether the majority of dollar sales or

23 brand-name products or generic products were

24 higher or lower?  Do you know which

25 represented to be more of the dollar sales

Highly Confidential – Subject to Further Confidentiality Review

1    within Walmart?

2          A.      I don't.  I don't know.

3          Q.      Do you know which represented

4    the majority of dispensed prescriptions?

5          A.      I don't know that either.

6          Q.      You don't know whether Walmart

7    sells more generic versions of drugs than

8    they do brand-name drugs?

9                  MR. CARTER:  Object to the

10   form.

11                 THE WITNESS:  Today in my role,

12        I don't have visibility to that.

13         Q.      (BY MR. ECKLUND)  What about

14   during your tenure as a pharmacy buyer for

15   Walmart?

16         A.      During the time as a buyer?

17         Q.      Would the majority of the pills

18   be generic or brand name?

19         A.      I really can't remember.

20         Q.      Okay.  In your role as a

21   pharmacy buyer for Walmart, were there

22   characteristics, features or attributes that

23   could distinguish one generic manufacturer

24   from another generic manufacturer who were

25   both offering the same type of generic drug?

Highly Confidential - Subject to Further Confidentiality Review

1    So what I'm saying is there is a -- generics

2    are available.  There's multiple sources for

3    this generic equivalent of a drug.  You can

4    pick a number that you like, two, five,

5    doesn't matter.

6                   Are there characteristic traits

7    that you would value when determining which

8    of those companies to purchase generic

9    versions from on behalf of Walmart?

10    A.      Whether they could meet the

11    supply demands -- were they a large supplier?

12    Are they a new supplier or an existing

13    supplier?  Are they vertically integrated on

14    the product?  -- were some things that I

15    would look at.

16    Q.      Okay.  So again, volume being a

17    very considerate -- very considerable --

18    sorry.  Volume is a very considerable concern

19    for you as a pharmacy buyer for Walmart?

20                   MR. CARTER:  Object to the

21             form.

22    Q.      (BY MR. ECKLUND) The ability to

23    supply the volume you need?

24                   MR. CARTER:  Sorry for speaking

25             over the question.  I object to the

1      form.

2              MR. ECKLUND:  That's okay.

3              THE WITNESS:  I would -- I want

4         to be able to serve the stores and

5         have the products that they need for

6         the prescriptions that they get.  So

7         the supplier that I would choose.  I

8         want to have a reputation of being

9         able to supply consistently.

10         Q.    (BY MR. ECKLUND)  And if you

11    had concerns that a supplier would not be

12    able to meet, consistently meet the capacity

13    needs of Walmart, that might weigh against

14    them getting the business from Walmart?

15         A.    Possibly, yes.

16         Q.    Possibly.  Okay.

17              Why only possibly?

18         A.    It would depend on if there

19    were other manufacturers or other options.

20         Q.    Okay.  So if all other things

21    held constant, if there were two suppliers

22    available and one of them you were confident

23    could consistently meet your capacity needs

24    and the other one you were not confident

25    would be able to do so, you would pick the

Highly Confidential - Subject to Further Confidentiality Review

1    former, not the latter?

2         A.    I would -- if I could, yes.

3         Q.    Okay.  Why might you be

4    prevented from picking the former?

5         A.    Unless there was a

6    relationship, it was a new supplier that we

7    wanted to give a chance to get a product with

8    us, because we did bring in new suppliers.

9              But my goal as a buyer would be

10   can I -- can the supplier meet the demand of

11   what the stores need?

12        Q.    Okay.  You talked earlier about

13   line capacity.  You also talked about new

14   versus established.  Can you explain to me

15   how you would consider a new entrant into the

16   generic market differently than one that is

17   more established in connection with your role

18   as a purchaser for Walmart?

19        A.    Just history of working with

20   Walmart and their reputation of knowing how

21   they've supplied other products compared to a

22   new supplier that is just getting started.

23        Q.    And reputation could be both

24   favorable or negative?

25              If you had had poor experiences

1    with a potential -- a past supplier, if they

2    had performed poorly, if they had failed to

3    meet your needs, that might weigh against

4    them getting continued work -- or sales from

5    Walmart; fair?

6         A.     It might, yes.

7         Q.     And if they had a sterling

8    reputation within the company -- they've

9    always hit supply needs.  They've always

10   delivered on time, no issues, no problems --

11   that might lean towards them getting more

12   work?

13        A.     Possibly.

14        Q.     You mentioned "vertical

15   integration."

16               What is vertical integration?

17        A.     When the manufacturer of a

18   product owns the API, the -- I don't even

19   remember what that stands for, but it's the

20   pharmaceutical ingredient that is -- makes up

21   that molecule.

22               If they are the manufacturer of

23   that, then they're not dependent on someone

24   else to supply.  So in those cases, the

25   supply chain could be a little bit more

1  predictable.

2      Q.     And again, predictability, the

3  ability to deliver the volume necessary for

4  Walmart's pharmacies to dispense is an

5  important concern for Walmart?

6      A.     Yes.

7      Q.     So availability of the product

8  for sale, the ability to deliver on time, the

9  ability to deliver the required volume,

10 relationships.  What about competitive

11 pricing?

12     A.     We would always look at

13 pricing, yes, as one of the components.

14     Q.     How important was pricing in

15 deciding among varying generic suppliers?

16     A.     It was important.

17     Q.     Can we agree that it was the

18 second most important consideration, just

19 behind volume and the ability to supply?

20     A.     I don't know that I can -- I

21 don't know that I could say that

22 specifically.

23     Q.     How would you --

24     A.     I mean, it depends on the

25 supply.  Supply is most important.

1    Reputation and their consistent record as a

2    supplier is important.  Price is also

3    important.

4         Q.     What about rebates?  Were

5    rebates a consideration in your time as a

6    pharmacy buyer for prescription drugs?

7         A.     It's a part of pricing,

8    technically.

9         Q.     Is it important?

10        A.     Yes.

11        Q.     The availability of rebates was

12   important?  Okay.

13               Was the availability of rebates

14   for controlled substances important?

15        A.     I didn't look at anything

16   specifically different about the purchases of

17   products across what I bought.

18        Q.     Okay.  So your analysis for one

19   category of prescription drugs and another

20   category of prescription drugs was largely

21   the same: again looking at volume, the

22   ability to supply the needs, reputation, new

23   versus established, vertical integration, and

24   pricing?

25        A.     Yes.

1    Q.    And that would be for a

2   cholesterol medication, a diabetes

3   medication, prescription painkillers or

4   opioids, any of the panoply of products you

5   purchased on behalf of Walmart?

6    A.    That's the general structure

7   for which I chose a product that we were

8   going to carry or buy.

9          As long as the store needed it,

10   that was my role.

11    Q.    Can you identify any

12   alternatives to the general structure?

13    A.    I don't know.  Maybe I don't

14   understand.

15    Q.    So you said, "That's the

16   general structure for which I chose a product

17   that we would carry or buy."  Is there any

18   other structure besides this general

19   structure you just described?

20    A.    That would -- those were my

21   parameters as a buyer when we made a

22   selection.

23    Q.    Do you recall from whom you

24   purchased generic prescription opioids?

25    A.    I don't.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall whether one

2    particular manufacturer was the primary

3    source of prescription opioids for Walmart in

4    your time as a pharmacy buyer?

5    A.    I don't recall.  I don't recall

6    that.

7    Q.    Do you recall whether Walmart

8    would agree to give one manufacturer primary

9    position or the ability to meet or beat other

10   competitors' prices?

11   A.    In general?

12   Q.    For prescription opioids.

13   A.    Can you repeat that?  I'm

14   sorry.

15   Q.    Sure.  Do you recall whether

16   Walmart would agree to give one manufacturer

17   a primary position or the ability to meet or

18   beat other competitors' prices for

19   prescription opioids?

20   A.    That could happen.

21   Q.    Do you recall whether it did

22   happen?

23   A.    I don't recall the specific

24   details when I was a buyer.

25   Q.    Do you recall agreeing to

```
1    provide any particular provider of generic

2    prescription opioids exclusivity?

3         A.    I don't recall doing that in my

4    role as a buyer.

5         Q.    Okay.

6               MR. CARTER:  No particular

7         urgency, but if you get to a good

8         breaking point, if we could take one

9         more before lunch.

10              MR. ECKLUND:  Sure.  Let's take

11        one right now.

12              THE VIDEOGRAPHER:  We are going

13        off the record.  The time is

14        10:55 a.m.

15              (Recess taken, 10:55 a.m. to

16               11:07 a.m.)

17              THE VIDEOGRAPHER:  We are back

18        on the record at 11:07 a.m.

19         Q.    (BY MR. ECKLUND)  All right.

20    Ms. Coleman, using the ELMO again, which you

21    were introduced to this morning -- and the

22    document I'm using is attached to an email.

23    It bears Bates No. ENDO-OPIOID_MDL-02375516.

24              And at the top it says

25    "Subject, September 4, 2009,
```

```
 1    Opana-Percocet" -- it's either PI or PL.  I

 2    don't know whether it's one or the other.

 3    "Mergedletter.docx."

 4              Do you see that?

 5         A.   Yes.

 6         Q.   So it's a merged letter.  Did

 7    you ever use merged letters in your role?

 8         A.   No.

 9         Q.   It's a tool that enables you to

10    send out a mass mailing to a lot of people.

11    It's the same correspondence.  Okay?  That's

12    my representation for the record.

13              And I'll just pull up the one

14    that's most important to you.  You got a copy

15    of it.  Do you see that?

16         A.   Yes.

17         Q.   "JoLynn Coleman"?

18         A.   Yes.

19         Q.   I'm not asking whether you

20    recall this document, just trying to make

21    sure that I've got everybody's title and

22    position correct.

23              And do you see there's your

24    colleague, David Badeen.  Do you see that?

25         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      It says "Pharmaceutical buyer."

2              Your title is slightly

3      different.  It just said "buyer."

4              Do you see that?

5      A.      Yes.

6      Q.      Because you were in the

7      pharmacy merchandising, so I suppose how they

8      had your contact information within Endo.

9              Direct your attention to this

10     version of the letter that was sent to

11     Ms. Wilson, and you'll see it's

12     "Ms. Linda Wilson, Pharmaceutical Buyer,

13     Walmart, Pharmacy Merchandising, 702

14     Southwest 8th Street, Bentonville, Arkansas."

15             Which is the same address they

16     have for you.

17             Does this in any way adjust,

18     influence your testimony earlier today about

19     Linda Wilson's role within Walmart?

20     A.      Sitting here today, I do not

21     recall her ever being a pharmacy buyer.

22     Q.      Okay.  Thank you.  Who is

23     Mike Gunning?

24     A.      Say that again?

25     Q.      Mike Gunning.  Have you ever

Highly Confidential - Subject to Further Confidentiality Review

```
 1    worked with Mike Gunning?
 2         A.    I don't recall that name.
 3         Q.    Have you ever worked with John
 4    G. Adams?  From Mallinckrodt?
 5         A.    I don't remember that name
 6    either.
 7         Q.    Paul Beahm, senior VP of
 8    pharmacy.  You mentioned him earlier --
 9         A.    Yes.
10         Q.    -- as someone you reported to.
11         A.    Yes.
12         Q.    Sandy Kinsey, someone else that
13    you reported to right before you moved into
14    director of clinical sales?  Services?
15         A.    Services.
16         Q.    Services.  Thank you.
17         A.    Yes.
18         Q.    Okay.  What's a merchandise
19    manager within Walmart pharmaceutical?
20         A.    I really don't know what the
21    definition is, but generally merchandise
22    managers were -- oversaw certain categories
23    within Walmart in the purchasing group.
24         Q.    Okay.
25               Earlier you talked about some
```

Highly Confidential - Subject to Further Confidentiality Review

1    of the factors that you might have considered

2    when deciding between one or more providers

3    of generic prescription opioids.

4              And you mentioned vertical

5    integration as one.  You mentioned supply.

6    You mentioned a few others.  I don't want to

7    repeat them all.

8              Was expertise and controlled

9    substances something that might differentiate

10   one generic supplier from another?

11             MR. CARTER:  Object to the

12        form.

13             THE WITNESS:  I don't recall

14        that being something that we looked at

15        specifically.

16             (Walmart Coleman Deposition

17        Exhibit 3 was marked for

18        identification.)

19        Q.    (BY MR. ECKLUND)  Ms. Coleman,

20   I've handed you a copy of what appears to

21   have been a fax.  At the bottom it bears

22   Bates stamp MNK-T1_0004758254.

23             I'd like to direct your

24   attention to the second page.

25             The second page, do you see

1    where you signed this document?

2         A.    Yes.

3         Q.    Okay.  You signed it in your

4    role as pharmacy buyer.  You signed it on or

5    around September 6th of 2007.

6              Do you see that?

7         A.    Yes.

8         Q.    While you may not recall this

9    particular document, I just want to run

10   through a few key elements of it.

11             Towards the top of the page, do

12   you see it says "Sent to Mr. Badeen"?

13             Addressed to your address,

14   JoLynn Coleman, signed by you, but addressed

15   to Mr. Badeen.  Again, tying back into what I

16   talked about earlier.  You might receive from

17   him.  He might receive from you.  Just trying

18   to make sure that we have a complete

19   collection of your custodial file and what

20   would have been sent to you or received by

21   you, notwithstanding the fact that there

22   seems to be at least some shifting, migration

23   of documents from one of you to the other,

24   both within the company and it seems like

25   outside.

Highly Confidential - Subject to Further Confidentiality Review

1    Do you see what I'm talking

2  about?

3    A.    Yes.

4    MR. ECKLUND:  Okay.  So just,

5    Counsel, if we can just confirm that

6    we have a complete custodial

7    collection for Ms. Coleman,

8    notwithstanding what we've just talked

9    about.

10    MR. CARTER:  Sure.  I'll refer

11    you to Tara.  I can't speak to how --

12    this looks like it's a Mallinckrodt

13    production, so I certainly don't know

14    how Mallinckrodt categorized folks.

15    But I'll check with Tara and make sure

16    on our end.

17    MR. ECKLUND:  I just want to

18    make sure that if there's any overlap

19    between the copies that it's being

20    caught.  And I suspect it probably

21    would be based on key word searches

22    and the like, but just for the record.

23    Q.    (BY MR. ECKLUND) Now,

24  Ms. Coleman, sometimes when you sign a

25  document with your hand, it doesn't get

Highly Confidential - Subject to Further Confidentiality Review

1    picked up by the OCR, optical character

2    recognition, as easily as typed text.  So a

3    letter addressed to Mr. Badeen but signed by

4    you, we might not have received it.

5                    Do you understand how that

6    might have happened?

7           A.      I understand.

8           Q.      And that's just the concern.

9                    I want to direct your attention

10   to the first sentence at the top of this

11   page.

12                   "Mallinckrodt Pharmaceuticals

13   is pleased to offer this contract

14   modification to Walmart to add the

15   below-listed products as, 'A,' products in

16   primary position on Contract No. 0400500123."

17                   Do you see that?

18          A.      Yes.

19          Q.      Are you familiar with Contract

20   No. 0400500123?

21                   For the remainder of the dep,

22   I'm just going to call it the "Mallinckrodt

23   master contract"?

24          A.      No, I'm not.

25                   MR. ECKLUND:  And, Counsel, is

1          that okay if we just call that the

2          master contract to the original

3          contract for purposes of

4          identification so I don't have to keep

5          saying the number?

6               MR. CARTER:  If that's accurate

7          with respect to what the contract is,

8          we'll take it question by question,

9          but I don't have a problem with you

10         trying to streamline.

11         Q.    (BY MR. ECKLUND)  Sitting here

12    today, you're not familiar with that

13    contract?

14         A.    No.

15         Q.    Are you familiar with this

16    process of contract modification through

17    letter?

18         A.    Somewhat, yes.

19               I just -- I don't remember the

20    details.

21         Q.    Okay.

22         A.    But yes.

23         Q.    Were there -- aside from

24    written correspondence, were there any other

25    ways in which Mallinckrodt would have

Highly Confidential - Subject to Further Confidentiality Review

1   modified, would have adjusted a contract with

2   Walmart?

3        A.     Not in my -- not to my

4   knowledge.

5        Q.     They wouldn't pick up the

6   phone, call you and say, "JoLynn, great news.

7   We're going to drop the price by 5 percent.

8   We're not going to put it in writing, just

9   between friends."  They always put it in

10  writing?

11       A.     I've never seen it not be in

12  writing.

13       Q.     And you don't recall any

14  occasion when it wasn't written?

15       A.     Correct.

16       Q.     Do you see there's handwritten

17  notes and there's a "JC" next to it?  Do you

18  see "Generally work with supplier as long as

19  there doesn't" -- and I believe it was

20  "supply issues," but I'm not positive.

21              Do you see there was a flag put

22  over it?

23       A.     Mm-hmm.  Yes.

24       Q.     Okay.  Is that your initial?

25  The "JC" next to it?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     So you crossed out the right of

3  first refusal?

4      A.     Yes.

5      Q.     Did you also insert the 60-day

6  written notice?

7      A.     That looks like my writing.

8      Q.     Okay.

9             Now, this particular contract

10  involved four products.  Do you see those

11  identified in a table towards the top half of

12  the document?

13      A.     Yes.

14      Q.     Oxycodone/hydrochloride

15  extended release?

16             ER stands for extended release

17  in your understanding; correct?

18      A.     Correct.

19      Q.     And there's four dosage sizes:

20  10 milligrams, 20 milligrams, 40 milligrams,

21  and 80 milligrams.  Do you see that?

22      A.     Yes.

23      Q.     Then there's a size.  It says

24  "Hundreds."  What does that mean, "hundreds"

25  for size?

1    A.    The bottle contains 100.

2    Q.    The bottle contains 100 pills.

3          Then there's an invoice price

4    per bottle.

5          Do you see that?

6    A.    Yes.

7    Q.    And then there's a contract

8    price per bottle, which is lower?

9          Do you see that?

10   A.    Yes.

11   Q.    And then there's a net price

12   per bottle.

13         Do you see that?

14   A.    Yes.

15   Q.    And the net price per bottle is

16   lower still than the contract price per

17   bottle.  Do you see that?

18   A.    Yes.

19   Q.    And then there's a case

20   quantity, 12.

21   A.    Correct.

22   Q.    Okay.  The next line it says,

23   "These products will be eligible for the

24   16 percent rebate reflected above as net

25   price per bottle currently in place between

1    Walmart and Mallinckrodt Pharmaceuticals."

2         Do you see that?

3    A.    Yes.

4    Q.    Okay.  So these products were

5    now being added to the existing contract

6    which had -- or at least being added and

7    included as eligible for a 16 percent rebate

8    provided by an existing contract.

9         Do you see that?

10   A.    Yes.

11   Q.    Okay.  How often would new

12   products be added to an existing supply

13   contract?

14   A.    I really can't -- I mean, I

15   don't know how often.  I really couldn't give

16   you an educated -- I mean, I don't know.

17   Q.    Is it frequent?  Infrequent?

18   A.    It depended on the supplier and

19   whether they had new products launching or

20   not.

21   Q.    Okay.  Okay.  At the bottom of

22   the page right above the italicized text, it

23   reads, "Walmart has the sole obligation to

24   timely, fully, and accurately report all

25   product discounts and rebates to Medicaid,

Highly Confidential - Subject to Further Confidentiality Review

1    Medicare, and/or third-party payers in

2    accordance with all applicable federal and

3    state laws and regulations."

4            Do you see that?

5    A.      Yes.

6    Q.      Who would have been responsible

7    for providing the timely, complete or full

8    and accurate report on all product discounts

9    and rebates to Medicaid within Walmart?

10   A.      I don't know.

11   Q.      It wasn't you?

12   A.      It wasn't me.

13   Q.      Was it any other pharmacy

14   buyer?

15   A.      Not to my knowledge.

16   Q.      Do you know whether it was any

17   of your supervisors?

18   A.      I don't know who would have

19   reported it.

20   Q.      Sitting here today, you don't

21   know one way or another?

22   A.      I don't.

23   Q.      Okay.  Would the same carry for

24   Medicare?  You have no idea who would have

25   been responsible for timely, fully, and

```
1    accurately reporting all rebates, discounts?

2         A.    That's correct.

3         Q.    And once again, for third-party

4    payers?

5         A.    That's correct.

6         Q.    Do you know whether it

7    happened?

8         A.    I can't confirm it or ...

9         Q.    It's not something you were

10   concerned with because it wasn't part of your

11   job?

12        A.    That's correct.

13        Q.    Okay.  You can turn to the next

14   page.  At the top it reads, "Walmart shall

15   sell the products it is buying from

16   Mallinckrodt Pharmaceuticals under this

17   agreement to end user retail pharmacy

18   customers only."  Do you see that?

19        A.    Yes.

20        Q.    Does that mean Walmart will

21   sell the products it's buying from

22   Mallinckrodt Pharmaceuticals under this

23   agreement to Walmart pharmacies?

24        A.    That's the only way we sell --

25   we bought product.
```

1       Q.      So there's nobody else that

2   would have received it from Walmart?  Just

3   Walmart's pharmacies?

4       A.      Say that one more time.  I want

5   to make sure I understand it.

6       Q.      So the -- it says "End user,

7   retail pharmacy customers only."  The only

8   end user retail pharmacy customers that

9   Walmart ever had in your tenure as a pharmacy

10  buyer were Walmart's own pharmacies.

11      A.      Walmart and Sam's.

12      Q.      Walmart and Sam's.

13      A.      Yes.

14      Q.      Okay.  Thank you for the

15  clarification.

16              It continues.  It has

17  "Restrictions."  Do you see, "In no event

18  shall Walmart sell Mallinckrodt

19  Pharmaceuticals' products to any other party,

20  including, without limitation,

21  wholesalers/distributors or

22  retailers/warehousing chains."

23              Do you see that?

24      A.      Yes.

25      Q.      So within this sentence,

Highly Confidential - Subject to Further Confidentiality Review

1    they're not talking about Sam's as a

2    warehousing chain.  Sam's is something else.

3    It's a member's only club?  They're talking

4    about something else.  What's a warehousing

5    chain?

6              MR. CARTER:  Object to the

7         form.

8              THE WITNESS:  I would suppose

9         it's another retailer that has a

10        warehouse.

11             MR. ECKLUND:  Okay.

12        Q.    (BY MR. ECKLUND)  But at the

13   time you signed this contract, you understood

14   what it meant and you understood the

15   obligations.  And if you had questions, you

16   could ask somebody within Walmart's legal

17   department for clarification?

18        A.    Yes.

19        Q.    Okay.  It continues:  "Walmart

20   shall purchase all Mallinckrodt

21   Pharmaceuticals products either directly from

22   Mallinckrodt Pharmaceuticals or through a

23   Mallinckrodt Pharmaceuticals authorized

24   distributor/wholesaler and not from any other

25   source."

1       Do you recall who or if there

2    was a Mallinckrodt Pharmaceuticals authorized

3    distributor or wholesaler at the time that

4    you signed this contract?

5       A.    I would probably say McKesson

6    would have been that distributor.

7       Q.    Why do you think it was

8    McKesson?

9       A.    That's where we bought all of

10   our -- that was our primary wholesaler.

11      Q.    Okay.  You can skip the next

12   paragraph, the one in bold.  It's not

13   important for today.  At least not important

14   to me for today.  It's about how you get paid

15   on the claims and disbursements from

16   Mallinckrodt and vice versa.

17      Do you see that?

18      A.    Yes.

19      Q.    "Walmart" -- in the next

20   paragraph:  "Walmart may indicate its

21   acceptance of all of the terms and conditions

22   contained in this proposal by signing and

23   returning it to Mallinckrodt Pharmaceuticals.

24   If Walmart does not sign and return this

25   proposal, then Walmart's order of the

Highly Confidential - Subject to Further Confidentiality Review

1   above-listed Mallinckrodt Pharmaceutical

2   products shall constitute Walmart's

3   acceptance of all of the terms and conditions

4   contained in this proposal.  If there is a

5   conflict between the terms of this proposal

6   and any other document, this proposal shall

7   govern."

8                Do you see that?

9       A.    Yes.

10      Q.    Okay.  So as I read this, you

11  could do one of two things to accept these

12  modified terms.  You could sign and return

13  the contract, which is what you did here, or

14  you could purchase any of the four listed

15  products on the prior page.  Do you see that?

16               MR. CARTER:  Object to the

17          form.

18      Q.    (BY MR. ECKLUND)  It said if

19  you don't sign -- do you see that line?

20      A.    Yes.

21      Q.    If you sign it, you understand

22  you're bound; right?  You've accepted these

23  new terms.  That's now going to govern the

24  relationship between you and Mallinckrodt

25  concerning those four products.  Right?

1          Just those products, just

2     primary position for those four products;

3     right?

4               MR. CARTER:  Object to the

5          form.

6          Q.    (BY MR. ECKLUND)  If we go to

7     the next portion, right, it says, "If Walmart

8     doesn't sign" -- this doesn't become a

9     nullity automatically.  If you don't sign it,

10    you could do something else to accept the

11    terms.  It says, if you don't sign and return

12    this proposal, then Walmart's order or its

13    purchase if you will, of the above-listed

14    Mallinckrodt Pharmaceutical products shall

15    constitute Walmart's acceptance of all of the

16    terms and conditions contained in this

17    proposal."

18               Do you see that?

19         A.    Yes.

20         Q.    What does that mean to you?

21    What does that language mean to you?

22         A.    If we were to order the

23    product, then we would be accepting the

24    terms.

25         Q.    Okay.

1      A.     Under my time as a buyer, we

2   didn't order product without a contract

3   signed, to my knowledge.

4      Q.     Well, the contract is signed

5   because you've got the -- what we referred to

6   earlier as the master contract or the

7   original contract is the 04000500123.  You've

8   got a contract.  This is a modification of

9   the contract.

10          So the question is, did you

11   always sign proposals for modifications from

12   suppliers?

13      A.     That's what I recall, yes.

14      Q.     So if they sent you something

15   saying there's a price decrease, you would

16   always sign it?

17          MR. CARTER:  Object to the

18      form.

19      Q.     (BY MR. ECKLUND)  You wouldn't

20   just buy more and accept the new discount?

21      A.     Sitting here today, that's what

22   I recall.  I -- we generally would sign if

23   there was a change like that.

24      Q.     Generally or always?

25      A.     In my role --

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Yes.

2          A.     -- I would get a signature.

3          Q.     Okay.

4          A.     I would sign.

5          Q.     Okay.

6                 (Walmart Coleman Deposition

7          Exhibit 4 was marked for

8          identification.)

9          Q.     (BY MR. ECKLUND)  Ms. Coleman,

10   you've been handed another document.  It's

11   been marked as Exhibit 4.  It bears two Bates

12   ranges at the bottom.

13                Do you see that?

14         A.     Yes.

15         Q.     We'll go with the one from the

16   multidistrict litigation, which is

17   MNK-T1_0000367627.

18                Do you see that?

19         A.     Yes.

20                MR. ECKLUND:  And that's just

21          for the benefit of the people

22          following along on the phone.

23         Q.     (BY MR. ECKLUND) All right.

24   Now, this document was sent from Mallinckrodt

25   on November 3rd, 2006.
```

Highly Confidential - Subject to Further Confidentiality Review

1            Do you see that?  At the top of

2    the page --

3        A.    Yes.

4        Q.    -- left-hand side.

5            In the middle of the page it

6    says "Revised" in bold and capital letters.

7        A.    Yes.

8        Q.    Sent to both you and Mr. Badeen

9    at the same address and was sent by fax, or

10   at least it appears to be sent by a fax.

11           And it says,

12   "Mallinckrodt Pharmaceuticals is pleased to

13   offer this contract modification to Walmart

14   to add the below-listed products to the

15   existing contract."  And it has a

16   parenthetical, "(July 7, 2000 to December 31,

17   2006.")

18           Do you see that?

19       A.    Yes.

20       Q.    "Between Walmart and

21   Mallinckrodt Pharmaceuticals on Contract

22   0400500123."  That's the same contract

23   number that we described with the prior

24   document.

25           Do you see that the contract

Highly Confidential - Subject to Further Confidentiality Review

1    remains the same?

2              You can compare the two

3    documents.  It's the same number.

4         A.    Okay.

5         Q.    So the existing contract in

6    2007, August 31st, 2007, and the existing

7    contract November 3rd, 2006 is the same

8    contract number.  The document that I've

9    handed you also indicates that that contract

10   has been in effect since July 7, 2000 at the

11   minimum; right?

12             And it continued through at

13   least December 31st, 2006 on the document I

14   just handed you.  But obviously it gets

15   continued on -- and we'll get to a document

16   that shows you that -- well into 2007.

17             I'd like to go through this

18   document now.

19             So like the prior document, it

20   includes a table of products and

21   prescriptions.  Do you see that?

22        A.    Yes.

23        Q.    Now, if you compare the two,

24   there's a difference in how the table

25   references the controlled substances.

1           And I just wanted to make sure

2    that we're clear for our understanding of all

3    of your documents.

4           In the first document, all four

5    of the products described are controlled

6    substances.  You'd agree, right?

7    Oxycodone/hydrochloride extended release.

8    Whether 10 milligrams or 8 milligrams or

9    anywhere in between, that's a controlled

10   substance; correct?

11      A.    Correct.

12      Q.    And if you look at the product

13   description, it does not include the

14   additional language at the end of the second

15   document I just handed you, USP C-II 10/325.

16   Do you see that?

17      A.    Yes.

18      Q.    Does C-II -- C-II indicate

19   controlled substances Class II?

20      A.    I don't recall.  I mean, I --

21   that would be a -- I suppose it -- that's

22   what that means.

23      Q.    Okay.

24      A.    I don't know.

25      Q.    All right.  But you're not sure

Highly Confidential - Subject to Further Confidentiality Review

```
 1     one way or the other?
 2          A.     I mean, I know they're a C-II.
 3          Q.     Okay.
 4          A.     As a pharmacist, I know they
 5     are, but ...
 6          Q.     But as a buyer --
 7          A.     I'm assuming that's what this
 8     is on this document referencing.
 9          Q.     Okay.  But as a buyer who
10     receives this contract modification on behalf
11     of Walmart, you're not sure one way or the
12     other, sitting here today --
13          A.     I would have known this was a
14     controlled substance as a buyer.
15          Q.     No, I --
16          A.     I don't know what you're
17     asking.
18          Q.     That's not --
19          A.     Okay.
20          Q.     I know you know that it's a
21     controlled substance.
22          A.     Okay.
23          Q.     What I'm trying to understand
24     is matters of interpretation; right?
25                 If I have 50 documents like
```

1    this, you're giving me a way to understand

2    them by explaining how the table is set up;

3    right?

4              If we talk about C-II, that

5    means controlled substance categories of a

6    Class II?

7         A.    Mm-hmm.

8         Q.    Whether this document or any

9    other document that's sent out by

10   Mallinckrodt with a revision, a modification

11   or a change of the existing contract entered

12   between Mallinckrodt and Walmart -- that's

13   what I'm trying to understand.  So you're

14   not -- are you sure or not sure that "C-II"

15   means "controlled substances"?

16             MR. CARTER:  Object to the

17        form.

18             THE WITNESS:  I'm not sure.

19        Q.    (BY MR. ECKLUND)  Okay.  Is

20   there anything you could consult that would

21   give you confidence that it is in fact?

22        A.    I'm just making assumptions

23   that it is.  I don't know for a fact.

24        Q.    No assumptions.

25        A.    I know.  That's why -- that's

Highly Confidential - Subject to Further Confidentiality Review

1    my answer.

2         Q.    That's fine.

3               Okay.  Now, if you look at --

4    to the right of the product description.

5    Many ways it tracks the prior document, size,

6    hundreds, so those are bottles with 100

7    pills.  Contract price per bottle given to

8    McKesson.

9               So as you mentioned earlier,

10   you thought that there was a chance that they

11   were the wholesaler for Mallinckrodt.  Here,

12   it actually reflects that they were involved.

13              Do you see that?

14        A.    Yes.

15        Q.    Given to --

16              And then it's bold actual

17   contract price per bottle.  Do you see

18   there's a dramatic drop?  The price for the

19   first product, oxycodone, and acetaminophen

20   tablets.

21              Size, hundreds; right?  And

22   these were marked as 10/325s.

23              Do you see that?

24        A.    Yes.

25        Q.    That's something to do with the

```
 1    unit?

 2            A.      Yeah.

 3            Q.      One of those is the oxycodone

 4    is the other is the acetaminophen?

 5            A.      Yes.

 6            Q.      Okay.  And if you look at the

 7    row below, oxycodone hydrochloride tablets,

 8    5 milligrams?  Do you see that?

 9            A.      Yes.

10            Q.      And do you see each one has

11    prescriptions of the size of the dose?

12            A.      Yes.

13            Q.      And the prices reflect

14    differences in the dosages as well.

15                    Do you see that?

16                    MR. CARTER:  Object to the

17            form.

18                    THE WITNESS:  Yes.

19            Q.      (BY MR. ECKLUND)  Okay.  So

20    let's use -- we'll use the third one.  It

21    doesn't have any asterisks.  It's simpler.

22    Oxycodone hydrochloride tablets,

23    15 milligrams.  Bottle of 100, contract price

24    per bottle given to McKesson was ███████

25                    Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.
 2          Q.     The actual contract price of
 3    the bottle was ████.  Do you see that?
 4          A.     Yes.
 5          Q.     And the net price per bottle,
 6    to Walmart, was ████.
 7                 Do you see that?
 8          A.     Yes.
 9          Q.     Okay.  So Walmart never paid
10    the ████.  And Walmart didn't pay the
11    actual price of ████.  The price they were
12    extended and the price they would have paid
13    when purchasing oxycodone hydrochloride
14    tablets on or around November 3, 2006 under
15    this revision to the existing contract would
16    have been ████
17                 Am I reading this correctly?
18                 MR. CARTER:  Object to the
19          form.
20                 THE WITNESS:  I mean, I
21          don't -- with it not being signed, I
22          don't know if we executed this
23          agreement or not.  So I can't really
24          say that -- what price we paid for it
25          at that time.
```

1    Q.    (BY MR. ECKLUND)  Is there

2    something that exists within Walmart that

3    would indicate what you paid Mallinckrodt at

4    that time?

5            Is there a database?

6    A.    Probably.

7    Q.    Do you keep within Walmart's

8    pharmacy buying department a file cabinet

9    with signed contracts and modifications?

10   A.    I don't know where those --

11   yeah, I don't know where those are kept.

12   Q.    But you're confident that they

13   exist in their store?

14           MR. CARTER:  Object to the

15       form.

16           THE WITNESS:  I don't know.

17   Q.    (BY MR. ECKLUND)  So they might

18   have been signed and then discarded?

19           MR. CARTER:  Form.

20           THE WITNESS:  I really don't

21       know.

22   Q.    (BY MR. ECKLUND)  If you don't

23   keep the contracts, how are people going to

24   know what contract terms govern?

25   A.    I would -- I don't know who

Highly Confidential - Subject to Further Confidentiality Review

1    kept them or where they were kept personally.

2    I don't have knowledge of that.

3         Q.    How would you know how much you

4    were paying for the volume of pills you're

5    purchasing?

6         A.    These would be -- the price

7    would be in the system, as far as how much I

8    agreed to pay per bottle, from my

9    recollection.

10         Q.    When you received a

11    modification to the existing contract, would

12    you go back and look at a prior contract to

13    see whether it was better or worse for

14    Walmart?

15         A.    A modification, I didn't always

16    go back to the original contract, if it was

17    adding additional products to it.

18         Q.    Do you recall ever going as far

19    back to the original contract, the 0400500123

20    contract?

21         A.    I don't recall.

22         Q.    Okay?

23              (Walmart Coleman Deposition

24         Exhibit 5 was marked for

25         identification.)

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. ECKLUND)  Okay.  So

2  I've just handed you another revision -- of

3  what appears to have been a revision sent to

4  you by Mallinckrodt on May 2nd, 2007.

5           In the prior document I

6  mentioned how the existing contract, again,

7  0400500123, was in effect at least since

8  July 7, 2000, and the prior document expired

9  on or around December 31st, 2006.

10           Do you see that?

11           It's in the parenthetical.

12           MR. CARTER:  He's asking about

13     this.

14           THE WITNESS:  Yes.

15    Q.    (BY MR. ECKLUND)  Do you see

16  that?

17           If you look at the document

18  that's just been marked, do you see that

19  that's changed?

20    A.    Yes.

21    Q.    How has it changed?

22    A.    It says July 7, 2000 to

23  December 31st, 2011.

24    Q.    Okay.  So it was extended.

25           That covers the large majority,

1    overwhelming majority of your time as a

2    pharmacy buyer for Walmart; correct?

3              MR. CARTER:  Object to the

4         form.

5         Q.    (BY MR. ECKLUND)  What years

6    were you a pharmacy buyer?

7         A.    Let me think back.

8              MR. CARTER:  I'll help you out

9         on that.  My objection was it covers

10        all of her time.

11             MR. ECKLUND:  I thought she

12        stopped at 2012.

13             MR. CARTER: '10.

14             MR. ECKLUND:  '10?

15             MR. CARTER:  Before '10.

16             MR. ECKLUND:  Completely?

17             MR. CARTER:  Yeah.

18             MR. ECKLUND:  Okay, perfect.

19        That's great.  I appreciate the

20        clarification.

21        Q.    (BY MR. ECKLUND)  So this

22   covers your entire time as a pharmacy buyer

23   for Walmart?

24        A.    (Witness nods.)

25        Q.    Okay.  And this contract, then,

1    would have governed all of the purchases made

2    from Mallinckrodt by you and others within

3    Walmart.

4              Do you see that?  The time

5    period is the entire duration.

6        A.    Yes.

7        Q.    Okay.  Let's go through these

8    particulars.  So again, same basic setup, a

9    table of products.  All four of the drugs

10   identified on this revision are morphine

11   oral.

12             Do you see that?

13       A.    Yes.

14       Q.    And each one of those is a

15   controlled substance; correct?

16       A.    Correct.

17       Q.    Again, it says, "These products

18   will be eligible for the ■ percent rebate

19   (reflected above as net price per bottle)

20   currently in place between Walmart and

21   Mallinckrodt Pharmaceuticals."

22             Do you see that?

23       A.    Yes.

24       Q.    And again, these drugs, the

25   price, contract price per bottle given to

Highly Confidential - Subject to Further Confidentiality Review

1    McKesson is included in the table, and actual

2    contract price per bottle is included along

3    with the net price per bottle which takes

4    into account a rebate.

5              Do you see that?

6         A.    Yes.

7         Q.    Okay.  Well, what's somewhat

8    different about this particular document, for

9    me, was that fourth paragraph down below the

10   table, it says, "Upon acceptance of this

11   agreement, Mallinckrodt Pharmaceuticals will

12   become Walmart's primary incumbent supplier."

13             What is a primary incumbent

14   supplier?

15        A.    I don't know what the actual

16   words meant in this agreement.

17             I don't know if we executed it,

18   but "incumbent" generally means --

19        Q.    That's okay.

20        A.    I don't know.  I don't know

21   what it means in this text.

22        Q.    "I don't know."  "I don't

23   recall."  "I don't remember" --

24        A.    Yeah.

25        Q.    -- "No idea," those are all

1    great answers if they're the truth.

2        A.    Yeah.

3        Q.    So it's not -- not a memory

4    challenge.

5           So sitting here today, you

6    don't remember what "primary incumbent"

7    supplier means, and it's not a term of art

8    that you used routinely in your role as a

9    pharmacy buyer.

10       A.    Correct.

11       Q.    Okay.

12       A.    Correct.

13       Q.    Now, this particular revision

14    appears to have provided primary incumbent

15    supplier status to Mallinckrodt for Walmart

16    for only the four listed products above.

17          Do you see on the above-listed

18    products?  And then it continues.  And will

19    be given -- so Mallinckrodt "will be given

20    the opportunity to 'meet or beat' any

21    written, bona fide competitive bid for any of

22    these products that is received by Walmart."

23          Do you see that?

24       A.    Yes.

25       Q.    Did Walmart provide

Highly Confidential - Subject to Further Confidentiality Review

1    meet-or-beat terms to manufacturers or

2    suppliers of prescription drugs?

3                MR. CARTER:  Can I just --

4          sorry, are you asking --

5                MR. ECKLUND:  Just generally.

6                MR. CARTER:  Just generally,

7          not --

8                MR. ECKLUND:  Just generally --

9          unlimited.  Right.

10         Q.    (BY MR. ECKLUND)  That's

11   something Walmart might do, offer a potential

12   supplier of prescription drugs an opportunity

13   to, quote/unquote, meet or beat another

14   potential supplier's written offer to supply?

15         A.    I've not seen it in that

16   terminology.  I don't recall "meet or beat."

17   Sometimes that's referred to as it is in

18   this, like right of first refusal.

19         Q.    Did Walmart offer rights of

20   first refusal to certain suppliers of

21   prescription drugs?

22         A.    It has been written in certain

23   contracts like it is here, except it's

24   struck.

25         Q.    Right.  So when you struck it

```
 1    out, obviously that didn't become something

 2    that was going to happen at that point in

 3    time.  It may have changed over time.  It

 4    might have changed for other manufacturers,

 5    but for that particular contract, you struck

 6    it out so they did not have a right of first

 7    refusal.

 8              MR. WATTS:  Object to the form.

 9              THE WITNESS:  I would have to

10         go back to the original agreement for

11         those products specific to this

12         document.

13              MR. ECKLUND:  Okay.

14         Q.   (BY MR. ECKLUND)  Did you ever

15    extend Mallinckrodt or any other

16    pharmaceutical supplier an opportunity to

17    meet or beat another provider's competitive

18    bid?

19         A.   In general or specific?

20         Q.   Ever.  Did it ever?

21         A.   For Mallinckrodt?

22         Q.   Mallinckrodt or anybody else,

23    ever.

24              Did you ever say, "I received a

25    competitive bid.  Do you want to meet or beat
```

1    it?"

2         A.    Depending on the language of

3    the contract, if it was right of first

4    refusal.  Not necessarily a controlled

5    substance.  That was in general.  Yes.

6         Q.    Do you recall any occasion

7    where you did in fact do that?  Where you

8    received a competitive bid, a written

9    competitive bid from another supplier and you

10   contacted your current supplier and said,

11   "We've received a competitive bid.  Under the

12   terms of our contract, we're giving you an

13   opportunity to meet or beat this new

14   competitive bid"?

15        A.    It could have occurred.  I

16   can't recall any specifics or if it did.

17        Q.    And I'm not limiting this to

18   prescription opioids.  I'm talking --

19        A.    In general.

20        Q.    You just don't have any

21   specific recollection --

22        A.    I mean, it could have happened.

23   I just don't remember.

24        Q.    So you don't have any specific

25   recollection of any occasion where you would

1   have received a competitive bid, written

2   competitive bid and would have contacted

3   another entity and told them, "We've received

4   this competitive bid.  This is your

5   opportunity under our contract to meet or

6   beat."  You don't have any recollection of

7   that ever occurring?

8          A.     It could have occurred.  I

9   don't recall any details.

10         Q.     Okay.  Is it something you

11  would have done in your role as a pharmacy

12  buyer?

13         A.     Possibly.

14         Q.     Is there anyone else within

15  Walmart who would have been responsible for

16  notifying a current supplier of a competitive

17  bid?

18         A.     I can't speak to anyone else

19  or -- it depends on the language of the

20  contract.

21         Q.     Well, this contract revision

22  appears to only have been sent to you.

23                (Walmart Coleman Deposition

24         Exhibit 6 was marked for

25         identification.)

1    Q.    (BY MR. ECKLUND)  Ms. Coleman,

2  I've just handed you another document.  A few

3  things we're going to point out just for

4  housekeeping, and then we'll start with the

5  document.

6             MR. ECKLUND:  Counsel, at the

7         top of the page you'll note that they

8         hyphenated her first name in this

9         version and in prior versions they had

10        not.

11            We've also had occurrences

12        where they had no space between J-O

13        and L.  So just in connection with the

14        collection of her responsive

15        documents, if you could assure us that

16        both Jo, space, Lynn, JoLynn with no

17        space, and Jo-Lynn were used in the

18        search terms for collection of the --

19            MR. CARTER:  That's my

20        understanding, but I'll confer with

21        Tara and confirm that.

22            MR. ECKLUND:  Appreciate it.

23        Thank you.

24    Q.    (BY MR. ECKLUND)  All right.

25  Ms. Coleman, I've handed you a document.

Highly Confidential - Subject to Further Confidentiality Review

1    It's contract modification, and unlike some

2    of the others, it's bold, underlined, and two

3    words.

4                    Do you see the prior version

5    was revised, and it's just simple ordinary

6    text?  This one is more bold.

7                    And our -- at least in my

8    interpretation of documents, I always

9    consider documents that are capitalized,

10   bold, underscored, there's some more urgency

11   to it than just ordinary revised.  But that's

12   my interpretation.

13                    Do you interpret the top of

14   these two documents in the same way that I do

15   or differently?  Same level of urgency?  One

16   says "Revised."  The other one says "Contract

17   modification," and it's all capitals.

18                    MR. CARTER:  Object to the

19             form.

20                    THE WITNESS:  I don't -- you

21             know, they don't come at the same

22             time.  I don't know that I would call

23             it out as something --

24             Q.    (BY MR. ECKLUND)  All right.

25   Well, they're approximately five months

1    apart -- four months apart.  Do you see that?

2           One was dated May 2, 2007 and

3    this one is dated September 17, 2007?

4        A.    I see that.

5        Q.    So when we looked at it, at

6    least when I looked at it, I was curious

7    about why the variation.

8           But let's go through this

9    document.

10          So again, sent only to you.

11   This appears from the shading to have been a

12   copy -- perhaps a copy of a scan, perhaps a

13   copy of an email, perhaps a copy of a fax.

14   It's hard to tell.  But the portions in the

15   margins, if you look at it, here, the margins

16   are even in this document.

17          Do you see what I'm talking

18   about?

19       A.    Mm-hmm.

20       Q.    When you look at this one, is

21   it even or is it askew?  Do you see how it's

22   not a straight edge on the sides?

23       A.    Yeah.

24       Q.    Do you see what I'm talking

25   about?

1      A.      Yeah.

2      Q.      So not sure if this was

3  something that was scanned or emailed to you.

4  Do you know whether you received scanned or

5  emailed documents from Mallinckrodt?

6      A.      I don't know -- I don't know

7  specifically.  I -- you know, I don't recall

8  that.

9      Q.      Okay.

10              And it's also quite --

11      A.      I don't know --

12      Q.      Sorry.  It's also quite

13  possible that because this was produced in

14  two cases -- you can see there's two Bates

15  stamps -- it may have been scanned again for

16  the most recent production.  Okay?

17              So I just want to make that

18  clear.  I'm not sure one way or the other.

19  Just wanted to ask you.

20      A.      Okay.

21      Q.      Okay.  So it's, again, the same

22  contract number.  Do you see that?

23      A.      Yes.

24      Q.      It breaks out four drugs:

25  codeine phosphate, codeine phosphate, codeine

1    phosphate and codeine phosphate all blended

2    with acetaminophen.  Do you see that?

3         A.    Yes.

4         Q.    And USP C-III.  Is it your

5    understanding that codeine phosphate is a

6    controlled substance?

7         A.    Yes.

8         Q.    Do you know whether it's in one

9    class or another?  Class II?  Class III?

10        A.    I don't.

11        Q.    Okay.  Now, below the table in

12   bold language it says, "This above-listed

13   pricing is contingent upon an award of

14   primary position of all of the above, codeine

15   phosphate and acetaminophen tablets."

16              Do you see that?

17        A.    Yes.

18        Q.    Do you recall whether you

19   ordered and through an order accepted the

20   terms of this contract?

21        A.    I do not.

22        Q.    Okay.  Do you recall purchasing

23   codeine phosphate and acetaminophen tablets

24   from other suppliers on or around

25   September 2007?

```
 1              A.      I don't recall.

 2              Q.      Are there records or systems in

 3      Walmart that would reveal that information to

 4      us?

 5              A.      Possibly.

 6              Q.      At the top of the next page,

 7      it's got a volume rebate opportunity.  It's

 8      very specific to one product.

 9                      Do you see that?  Mallinckrodt

10      Pharmaceuticals is offering Walmart the

11      opportunity to earn an additional volume

12      rebate on its purchase of a specific drug.

13                      Do you see that?

14              A.      Yes.

15              Q.      Now, is that drug a controlled

16      substance?

17              A.      Yes.

18              Q.      It is.  Okay.

19                      And the rebate term was from

20      October 1st, 2007 through September 30th of

21      2008.  Do you see that?

22              A.      Yes.

23              Q.      Okay.  A few questions.

24                      First, do you know whether you

25      accepted the terms of this volume rebate?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     I do not.

 2          Q.     Okay.

 3                 Second, do you track or keep

 4     records that would reflect when you met

 5     certain rebate goals?  For example, if you

 6     look at the yearly dollar volume, if you sold

 7     or -- sorry, not sold -- strike that.

 8                 If you purchased anywhere from

 9     ███████████████, you did not get a rebate.

10                 Do you see that?

11          A.     Yes.

12          Q.     No VIP rebate.

13          A.     Yes.

14          Q.     And I understand "VIP" to mean

15     "very important," but I don't know what it

16     means in the context of this document.

17                 If you look at the next row,

18     ████████████ to just a dollar under ██████████.

19                 Do you see that?

20          A.     Yes.

21          Q.     █ percent rebate.

22                 And then for sales in excess of

23     ████████████, there was a ██ percent rebate.

24                 Do you see that?

25          A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know whether Walmart

2    kept track of rebates it earned in connection

3    with the sale of prescription drugs?

4    A.    Someone within Walmart did.

5    Q.    Do you know who that is?

6    A.    I don't recall.

7    Q.    Do you know what department?

8    A.    I don't remember.

9    Q.    Not confident if it's in health

10    and wellness or some completely different

11    department?

12    A.    Or financial.  I don't know.

13    Q.    Could be finance group?  Okay.

14        Is there someone you could call

15    or ask at Walmart to find the answer to that

16    question?

17    A.    During this time back --

18    Q.    Today.

19    A.    -- in this day.

20        Today?  Yes.

21    Q.    Who would that be?

22    A.    I would just have to ask

23    somebody in finance.  I -- I really don't

24    know.

25    Q.    Okay.  So you would first reach

Highly Confidential – Subject to Further Confidentiality Review

```
 1    out to the finance department to ask the

 2    question?

 3         A.    I guess.  Yeah.

 4         Q.    And they may or may not be able

 5    to help you out, but they might be -- might

 6    be able to point you in the direction of

 7    someone else who could if they can't?

 8         A.    Correct.

 9         Q.    Anyone in particular in finance

10    that you would reach out to?  Do you have a

11    name in mind?

12         A.    I don't.

13         Q.    Okay.

14         A.    I don't -- I mean, I'm not in

15    the merchandising area and haven't been in a

16    long time, so I don't know their structure or

17    anything now.

18         Q.    Okay.

19               (Walmart Coleman Deposition

20         Exhibit 7 was marked for

21         identification.)

22         Q.    (BY MR. ECKLUND)  Ms. Coleman,

23    you've been handed what has been marked as

24    Exhibit 7.

25               It's another piece of
```

Highly Confidential - Subject to Further Confidentiality Review

1    correspondence that appears to have been sent

2    to you, and you alone, at Walmart from

3    Mallinckrodt.  At the top of the page it

4    indicates, in bold, capital letters,

5    underlined, "Price decrease."

6              Do you see that?

7        A.    Yes.

8        Q.    It's dated November 14, 2007.

9    And it concerns three drugs in the table.

10             Hydrocodone bitartrate -- allow

11   you to pronounce that.

12       A.    Bitartrate.

13       Q.    Bitartrate.  Thank you.

14             And it's blended with

15   acetaminophen.  It's a tablet, and again, it

16   has C-III, which may or may not be controlled

17   substances category Class III, but we're not

18   sure sitting here today.  The same basic

19   layout, size, hundreds.

20             Above it says "New," because

21   they're telling you about a price decrease.

22   New contract price per bottle given to

23   McKesson, and there's an actual contract

24   price per bottle and then a new net price per

25   bottle.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see those references?
 2         A.     Yes.
 3         Q.     Okay.  There's -- one
 4    difference was the size.  In the prior
 5    documents, the size was ordinarily 100 bottle
 6    size.  If you look back at the exhibit,
 7    you'll see what I'm talking about.
 8                    In the second row, you've got a
 9    hydrocodone bitartrate with 500.
10                    Do you see that?
11         A.     Yes.
12         Q.     And it's the same product or
13    drug as the row above.  Do you see that?
14    It's the same two ingredients; right?
15                    Same size.  7.5/650, 7.5/650.
16                    Do you see that?
17         A.     Yes.
18         Q.     Is it your understanding that
19    these two products are the same product?
20         A.     Yes.
21         Q.     Is it also your understanding
22    that these two products are, you know, in all
23    other ways equivalent?
24                    MR. CARTER:  Object to the
25         form.
```

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  By the script,

2      they appear to be equivalent.

3          Q.    (BY MR. ECKLUND)  There is

4  nothing from the table that indicates to you

5  that the product in the first row was

6  different than the product in the second row?

7  It's the same drug?

8          A.    The size is different.

9          Q.    Okay.  In the first row you've

10  got contract price for 100 pills, and it's

11  ███████

12          I'm going to try and do math,

13  take a calculator out so you can take my word

14  for it.  Take 1770 and I'm going to divide it

15  by 5.

16          So the price, if you were to

17  apply it across the 500, the effective

18  contract price for 100 units, for 100

19  capsules in a bottle of 500 would be ██████.

20  Okay?  So it's a discount.  Right?

21          And in every other row it's

22  going to be lower.  Do you understand that?

23  Because you're starting from the same

24  discount.

25          So if we take ██████ and you

Highly Confidential - Subject to Further Confidentiality Review

1    divide it by 5, you effectively have ████.

2    You can check my math if you want.

3            A.      Okay.

4            Q.      You're okay with that?

5            A.      Yes.

6            Q.      So it's a discount.

7                    Why would a manufacturer

8    provide Walmart a discount on bottles of 500

9    pills?

10                   MR. CARTER:  Object to the

11           form.

12                   THE WITNESS:  In some cases we

13           may need a 500-count bottle for some

14           stores, and we may need 100-count

15           bottle for some stores.

16           Q.      (BY MR. ECKLUND)  But the

17   bottle doesn't go to -- does the bottle go to

18   the store?  It goes to the prescribing

19   pharmacist?  And what does the pharmacist

20   then do with the bottle?  Does the pharmacist

21   open the bottle and dispense pills to the

22   patients as they come in?

23           A.      Yes.

24           Q.      So the more pills they dispense

25   out of the 500, they'll lower the price for

1    Walmart?

2                    MR. CARTER:  Object to the

3            form.

4                    THE WITNESS:  At store level,

5            they don't -- we -- they can order

6            what they want.  I'm assuming this

7            is --

8                    You know, it's not -- I'm

9            assuming we carry both of them.  I

10           can't even confirm that we'd carry the

11           500 or the 100s.

12                   They're basically offering one

13           or the other here.  Or we did carry

14           both.  But I can't -- you can't speak

15           to that.

16                   If a store had a volume that

17           they were ordering hundreds over and

18           over, where they could have gotten

19           500s, potentially they would have

20           ordered the 500-count bottle.

21           Q.    (BY MR. ECKLUND)  Okay.

22           A.    But I don't know if we had both

23    of those sizes.

24                   Just because it's on this

25    paper, I don't know for sure that we

1  purchased both of them.

2      Q.     Do you recall negotiating

3  volume discounts with drug suppliers?

4              So here there's a discount.  If

5  you get the 500s, you're paying less per

6  pill?  Can we agree to that?

7      A.     Yes.

8      Q.     Is that something you would

9  have negotiated with the supplier or is that

10  something they would have just offered to

11  you?

12              MR. CARTER:  Object to the

13          form.

14              THE WITNESS:  I can't speak --

15          I mean, I don't know.  It could --

16          they could have just offered it to us.

17              Those are the pack sizes that

18          they would have carried.  Outside of

19          that, I really can't say one or the

20          other.

21      Q.     (BY MR. ECKLUND)  And again,

22  you'll see some of the same language carrying

23  through, ██ percent rebate currently in place

24  between Walmart and Mallinckrodt.  So again,

25  continuing that rebate.

 1              Again, the meet-or-beat

 2     opportunity for the competitive bids.

 3              Do you see that?

 4         A.     Yes.

 5         Q.     So they keep sending the same

 6     contract with the same language over and over

 7     again.

 8              And again, you know, "Walmart

 9     again has the sole obligation" -- at the top

10     of the second page -- the sole obligation "to

11     timely, fully, and accurately report all

12     products, discounts and rebates to Medicaid,

13     Medicare, and/or third-party payers, in

14     accordance with all applicable federal and

15     state laws and regulations."  Right?

16              And then at the bottom, "If in

17     all other respects the existing contract

18     remains unchanged."  And again, this "all"

19     circles back to the original contract entered

20     somewhere in the neighborhood of July 7, 2000

21     that continued throughout the entire time you

22     were the pharmacy buyer?

23              MR. CARTER:  Object to the

24          form.

25              THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Walmart Coleman Deposition

 2             Exhibit 8 was marked for

 3             identification.)

 4        Q.    (BY MR. ECKLUND)  Ms. Coleman,

 5   I've just handed you another document that

 6   was provided to us by Mallinckrodt.  Sent --

 7   what appears to have been sent to you, and

 8   you alone, at Walmart.  And it reads,

 9   "Mallinckrodt Pharmaceuticals is pleased to

10   offer this contract modification to Walmart

11   to add the below listed products to the

12   existing contract between Walmart and

13   Mallinckrodt Pharmaceuticals on Contract

14   No. 0400500123."

15             Do you see that?

16        A.    Yes.

17        Q.    Now, this document's different

18   in a few ways.  First, we can all agree that

19   this is the longest list of products included

20   in any of the letters I've shown you so far;

21   right?

22        A.    Correct.

23        Q.    It's much longer than the

24   others.

25        A.    Correct.
```

1      Q.     So let's go through this list.

2  Morphine sulfate, you see the C-II for all

3  the morphine sulfate in the first four rows?

4      A.     Yes.

5      Q.     And then in the next, on the

6  amphetamines, we've got, again, C-II for

7  those five.

8            Do you see that?

9      A.     Yes.

10     Q.     And it's your understanding

11 that amphetamines are controlled substances?

12     A.     Yes.

13     Q.     Okay.  And then if you go

14 below, we've got four types of

15 raspberry-flavored morphine sulfate

16 immediate-release concentrated oral solution.

17            Do you see that?

18     A.     Yes.

19     Q.     Again, C-II.  And is it your

20 understanding that morphine sulfate

21 concentrated oral solution would have been a

22 controlled substance as well?

23     A.     Yes.

24     Q.     Then you've got morphine

25 sulfate, 15-milligram extended release

Highly Confidential - Subject to Further Confidentiality Review

1  tablets, again, C-II.

2            Do you see that?

3       A.    Yes.

4       Q.    Is it your understanding that

5  morphine sulfate extended release tablets are

6  controlled substances?

7       A.    Yes.

8       Q.    And then beyond the morphine

9  sulfates in their various dosage sizes,

10  you've got two variations of oxycodone.

11            Do you see those?

12       A.    Yes.

13       Q.    And again, C-II.

14            Now, again, most bottles are in

15  units of 100 except for the oral solutions

16  where they're measured in milliliters.

17            Do you see that?

18       A.    Yes.

19       Q.    And then, when we get down into

20  the remainder, it's Warfarin sodium tablets.

21            Warfarin is not a controlled

22  substance; correct?

23       A.    Correct.

24       Q.    And none of those rows include

25  that C-II or C-III reference?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Correct.

2        Q.      Okay.  So at this point, all of

3    these products became eligible for the

4    ███percent rebate currently in place between

5    Walmart and Mallinckrodt Pharmaceuticals.  At

6    least that's what was offered to Walmart by

7    Mallinckrodt.

8                Do you recall purchasing any of

9    these products on or around December of 2007

10   from Mallinckrodt?

11       A.      I don't recall.

12       Q.      And again, there's systems in

13   place within Walmart that would tell you that

14   if you wanted to know it?

15       A.      Yes.

16       Q.      Okay.  Direct your attention to

17   the paragraph starting "Wholesale or

18   differential."  Do you see that?  It's in

19   bold, underlined.

20       A.      Yes.

21       Q.      It says, "As indicated above,

22   Mallinckrodt Pharmaceuticals reimbursed

23   Walmart, a wholesale or differential, which

24   consists of the difference between the

25   contract price per bottle given to McKesson

1    and Walmart's new actual contract price per

2    bottle, as listed above multiplied by the

3    number of bottles purchased by Walmart from

4    McKesson, as reported by McKesson to

5    Mallinckrodt Pharmaceuticals."

6            Did I read that correctly?

7    A.    Yes.

8    Q.    Can you explain to me how this

9    would have worked between your company?  So

10   Walmart -- you have a request for restocking

11   from various pharmacies across the country

12   for whom you were responsible for securing

13   the appropriate volume pills or oral

14   solutions.

15           So you would then do what?  You

16   would contact McKesson to get the products

17   you need?  You would contact Mallinckrodt?

18   To whom would you reach out?

19   A.    If we signed this contract and

20   we purchased these products -- I'm not

21   certain.  I'm assuming.  I'm not certain that

22   we would have this in our warehouse or not,

23   but what this generally means is that if the

24   store didn't get it from our warehouse and

25   purchased it through McKesson, that

Highly Confidential - Subject to Further Confidentiality Review

1    Mallinckrodt would honor the contract, direct

2    contract price.

3         Q.    And the warehouse you're

4    referring to, is that a McKesson warehouse or

5    is that a Walmart warehouse?

6         A.    Well, when I say "McKesson,"

7    I'm referring to McKesson, but "warehouse" in

8    general for me is Walmart warehouse.

9         Q.    Okay.  Do you recall purchasing

10   bottles from McKesson on or around this time?

11        A.    You know, we bought product

12   from McKesson.  It wasn't all -- more of it

13   was regular prescription products, but I

14   don't recall specifics.

15        Q.    Well, some of these are also,

16   you know, ordinary prescriptions --

17        A.    Right.

18        Q.    -- like Warfarin.

19        A.    Correct.

20        Q.    I'm just asking, do you recall

21   purchasing from McKesson?  So you do

22   generally remember purchasing from McKesson

23   at or around this time?

24        A.    Generally, yes.

25        Q.    Just not necessarily the

Highly Confidential - Subject to Further Confidentiality Review

1    morphine sulfate 200-milligram extended

2    release tablets identified at the top of this

3    page?

4        A.    Correct.

5        Q.    Okay.  If you turn to the next

6    paragraph, "Mallinckrodt Pharmaceuticals is

7    offering Walmart the opportunity to earn an

8    additional volume rebate on its purchases of

9    all products" -- and that's capitalized and

10   underlined.

11            Do you see that?

12            "All products on contract with

13   Mallinckrodt Pharmaceuticals from

14   January 1st, 2008 through December 31st,

15   2008."

16            Do you see that?

17       A.    Yes.

18       Q.    Do you know whether you

19   accepted the term of that contract?  Did you

20   accept this opportunity?

21       A.    I don't recall.

22       Q.    You don't recall?  But again,

23   there's a way for you to find out whether you

24   did in fact accept that rebate term?

25       A.    I believe there is, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Okay.  And that opportunity.
 2                   And it follows, "The chart
 3     herein represents the rebate percentage,"
 4     that is to say, or "i.e., █ percent,
 5     █ percent and █ percent."  Do you see
 6     that?
 7            A.     Yes.
 8            Q.     "That Walmart may earn based on
 9     its contract purchases of the contracted
10     products, provided that Walmart's contract
11     purchases of all of the contracted products
12     during the volume rebate term equal or exceed
13     the corresponding yearly dollar volume as set
14     forth below.  For example, if Walmart's
15     contract purchases for all contracted
16     products equal █████, Walmart will have
17     earned a ███ percent rebate on those
18     purchases."  Do you see that?
19            A.     Yes.
20            Q.     Okay.  If you'd turn to the top
21     of the next page.  It's a chart, a table, and
22     it again includes no VIP rebate earned if you
23     sold under ████ in volume.
24                   Do you see that?
25            A.     Yes.
```

```
 1          Q.      Okay.  And then from ████████
    to just under ██████████, it's █percent.
 3                  Do you see that?
 4          A.      Yes.
 5          Q.      It went from ████████ to
 6    almost █████████, it's ████████████.
 7          A.      Yes.
 8          Q.      And then, top volume, ████
 9  █    █████████████ over.  Do you see that?
10          A.      Yes.
11          Q.      Do you know whether you sold --
12    or sorry, strike that.
13                  Do you know whether you
14    purchased ███████████ in product from
15    Mallinckrodt in 2008?
16          A.      I do not.
17          Q.      Do you know whether you
18    purchased ███████████ in product?
19          A.      I do not.
20          Q.      Is there a way you could find
21    out how much volume you purchased?
22          A.      I'm sure there is a way to find
23    that information.
24          Q.      And there's also a way for you
25    to find out whether you received any of the
```

1    additional rebate offered by Mallinckrodt in

2    this document?

3         A.    Yes.

4         Q.    Okay.  And again, you would

5    probably reach out to the finance department

6    first to find out about rebates?

7         A.    Or their merchandising.

8         Q.    Merchandising?

9         A.    Whoever they -- however they

10   are structured today.

11              (Walmart Coleman Deposition

12         Exhibit 9 was marked for

13         identification.)

14              MR. WATTS:  If I could please

15         request that we read the Bates numbers

16         of the exhibits in the record.  That

17         would be helpful for us on the phone.

18         We'd appreciate it.

19              MR. ECKLUND:  Okay.

20              Are you hungry?  Are you ready

21         to eat?

22              THE WITNESS:  I wouldn't -- you

23         said around 12:00?  I'm okay right

24         now.

25              MR. ECKLUND:  You waved your

Highly Confidential - Subject to Further Confidentiality Review

 1          hand.
 2                    THE WITNESS:  I don't know when
 3          the food is here.
 4                    MR. ECKLUND:  Just wave your
 5          hand when you want to break for lunch
 6          and we'll break for lunch.  Okay?
 7                    THE WITNESS:  Okay.
 8          Q.    (BY MR. ECKLUND)  All right.
 9   So I just handed you a document.  This
10   document was sent December 14, 2007.  So it
11   was sent --
12                    MR. CARTER:  You gave me a
13          January 16th.
14                    MR. ECKLUND:  Oh, sorry.
15          Sorry.
16                    I guess there are a couple.
17                    Oh, there are a couple.  Sorry
18          about that.
19                    MR. CARTER:  So 9 is the
20          December document.
21                    MR. ECKLUND:  Yeah.  Let me
22          have the other ones back so we don't
23          get them confused.
24                    MR. CARTER:  I wrote "9" on the
25          January 1st.  So I'll just scratch

Highly Confidential - Subject to Further Confidentiality Review

1      that out.

2              MR. ECKLUND:  I'm quite sure

3      it's not going to be 9.  Oh, the joys

4      of copy service.

5              Okay.

6      Q.    (BY MR. ECKLUND)  So do you

7   have a document in front of you, December 14,

8   2007?

9      A.    Yes.

10     Q.    Okay.  Now, again it talks

11  again about this opportunity to earn a volume

12  rebate.  It's the same table, the same yearly

13  dollar volume, the same rebate percentages.

14             Do you see that?

15     A.    Yes.

16     Q.    Okay.

17             MR. CARTER:  Did you want to do

18     the Bates before we get too far?

19             MR. ECKLUND:  Oh, yeah, I

20     apologize.  I'm sorry about that.

21     Again, MDL MNK-T1_0000367691.

22     Q.    (BY MR. ECKLUND)  Again, it's a

23  letter that was sent to JoLynn Coleman.

24  Appears to also have been sent to David

25  Badeen, and starts off "Mallinckrodt

1    Pharmaceuticals is pleased to offer the

2    following rebate opportunity to Walmart

3    Stores, Inc."

4               Now, the volume rebate

5    opportunities are consistent with the prior

6    version.  What I'm interested in is on the

7    second page.

8               The top page, first paragraph.

9    Last couple of lines.

10              "All charge-back submissions

11   not complying with the aforementioned will be

12   denied.  Walmart shall purchase from

13   Mallinckrodt Pharmaceutical products either

14   directly from Mallinckrodt Pharmaceuticals

15   but through a Mallinckrodt Pharmaceuticals

16   authorized distributor wholesaler and not

17   from any other source."

18              Do you see that?

19        A.    Yes.

20        Q.    What is a charge-back?

21        A.    I'm not sure I remember how

22   that -- what that means in this document.

23              I don't know that I can speak

24   to that.

25        Q.    Okay.  So again, my

1    understanding of what a charge-back is may be

2    different from yours, so I want you to give

3    us your best, but I'll tell you what I think

4    it is.

5                My understanding is a

6    charge-back is something that arises because

7    you've got a few brand manufacturers or a few

8    suppliers selling directly.  And they're

9    distributing their products primarily through

10   a wholesaler.

11               And there's a difference

12   between the manufacturer's price charged to

13   the wholesaler and the manufacturer's

14   contract price with the buyer; right?  So

15   you, at Walmart.

16               And it's my understanding that

17   typically, the wholesaler would submit a

18   charge-back request to the manufacturer on a

19   regular basis, and there would be a flow of

20   funds, transfers, invoices, the like, through

21   maybe their electronic data interchange or

22   credits, debits.  You could have whatever

23   system you want to think about.

24               What I'm interested in -- and

25   we're going to talk about this after lunch --

Highly Confidential - Subject to Further Confidentiality Review

1    is how or if Walmart received charge-backs in

2    connection with its sale of prescription

3    opioids or other products.

4              You recall that Walmart

5    uniquely was wholesaling to itself.  So what

6    I'm curious about is, did Walmart ever

7    receive charge-back from Mallinckrodt or any

8    other provider of opioids?

9              Do you understand what I'm

10   asking about?

11             MR. CARTER:  Object to the

12        form.

13             THE WITNESS:  I understand, but

14        I don't know.  I can't confirm or

15        deny.  I don't recall.

16             MR. ECKLUND:  Okay.

17        Q.    (BY MR. ECKLUND)  Do you

18   disagree with my description of charge-back

19   relationships?

20        A.    That sounds what I -- like what

21   I remember.  It's been a -- it's been a

22   while, but ...

23        Q.    Is there anything you want to

24   correct in how I described it?

25        A.    I don't know that I can, you

1    know, make any adjustments to it.

2            Q.    So it's good enough for today?

3                  MR. CARTER:  Object to the

4            form.

5                  THE WITNESS:  From what I

6            recall sitting here today, yes.

7            Q.    (BY MR. ECKLUND)  Okay.  Good.

8                  Were charge-backs something

9    that Walmart would seek out from

10   manufacturers?

11                 MR. CARTER:  Object to the

12           form.

13                 THE WITNESS:  I don't remember

14           seeking out charge-backs.

15           Q.    (BY MR. ECKLUND)  Were

16   charge-backs something that you might have

17   received from manufacturers?

18                 MR. CARTER:  Form.

19                 THE WITNESS:  It may have.  I

20           don't remember.

21           Q.    (BY MR. ECKLUND)  And are there

22   any systems within Walmart that would reveal

23   whether or not you had received a charge-back

24   from any manufacturer?

25           A.    Possibly.

1       Q.      And where might those systems

2   exist?

3       A.      Somewhere within the

4   merchandising organization.

5       Q.      And if you wanted to reach out

6   to somebody to find out more about the

7   history of Mallinckrodt or any other forms of

8   manufacturer, you would reach out to somebody

9   within the merchandising organization?

10      A.      Merchandising or finance.  I

11  really don't know who oversees that today.

12      Q.      Any names come to mind within

13  merchandising?

14      A.      No.

15      Q.      Anyone that you'd reach out to

16  in particular in finance?

17      A.      No.  I mean, I --

18      Q.      Go ahead.

19      A.      I mean, there are buyers in the

20  area, so I would start with a buyer that I

21  know in the Rx merchandising area.  But I

22  don't -- that would be as far as I would be

23  able to take it.

24      Q.      Okay.  All right.

25              We talked earlier about

Highly Confidential - Subject to Further Confidentiality Review

1    wholesale acquisition costs, or you called

2    them warehousing acquisition costs.  Do you

3    remember?  We talked about WAC?

4          A.     Mm-hmm.

5          Q.     The price which the

6    manufacturer sells to the wholesaler.

7    Generally is that a published price or is

8    that confidential?  Wholesale acquisition

9    cost.  It's published or confidential?

10          A.     It's been a while, but I think

11    it's published.

12          Q.     Okay.

13          A.     I'm not sure.

14          Q.     There's books that have it.

15    There's the database that you had?

16          A.     Yes.

17          Q.     You could get it from Red Book.

18    Right?  Or you could get it -- average

19    wholesale price from the Blue Book.  You

20    could put that in your system and you could

21    use that when you're negotiating prices.

22          Do you remember that?

23          A.     Yes.

24          Q.     And we talked a little about

25    average wholesale price.  Do you recall that?

1      A.      Yes.

2      Q.      None of the contracts that I've

3  shown you today show Walmart actually paying

4  an average wholesale price.  That's fair?

5      A.      Yes.

6      Q.      Okay.  And none of them show

7  Walmart actually paying a wholesale

8  acquisition cost.  Is that also fair?

9           MR. CARTER:  Object to the

10       form.

11           THE WITNESS:  From what I've

12       seen.  I haven't seen it in these

13       documents.

14      Q.      (BY MR. ECKLUND)  Now, based on

15  the documents that I've shown you from

16  Mallinckrodt, it -- it seems to me that there

17  are a few factors that would need to be

18  considered by both Walmart and potentially

19  Mallinckrodt as concerns buying and

20  purchasing of prescription drugs, both

21  opioids and others; right?

22           What's the price?  How much

23  volume?  Is there a rebate?  Does the rebate

24  control or govern for that particular product

25  that's purchased or some other product, and

1    potentially a charge-back.  And we've gone

2    through all of those documents today.

3              Have you seen that?

4    A.    I've seen that, yes.

5    Q.    Are there any other factors

6    that would need to be considered in

7    determining how much Walmart would have paid

8    to receive a given volume of product from

9    Mallinckrodt?

10             MR. CARTER:  Object to the

11        form.

12             THE WITNESS:  I'm sorry, but

13        can you repeat that?

14   Q.    (BY MR. ECKLUND)  Sure.  I'm

15   trying to understand in an absolute sense how

16   much was actually paid for a product.  Right?

17             So if you look at just the

18   contract, at any one point in time -- let's

19   assume for purposes of this question that

20   there is a rebate in place, that there's a

21   volume rebate in place and that there's a

22   charge-back in place.  Assume all three.

23   Okay?

24             Let's also assume that you've

25   got the 500-count bottles and the 100-count

1    bottles.  Right?  So you have different pill

2    sizes.  You have different prices for

3    different pill sizes, and you have a litany

4    of products.  Okay?  So you would have to

5    know -- and at the end of an annual basis or

6    if there's a final accounting to figure out

7    who owes what to whom, right? -- how many

8    bottles were bought, at what price they

9    should have been purchased at, whether any

10   rebates have been triggered for those

11   products, whether any volume rebates might

12   apply for the year or for a term, whether any

13   charge-backs were in place.  All right?

14   Those are all things we talked a little bit

15   about today.

16             I'm wondering are there any

17   other factors that might have needed to be

18   considered in determining how much Walmart

19   might have paid or been entitled to receive

20   back in connection with its purchase of

21   prescription drugs.

22             MR. CARTER:  Object to the form

23        of the question.

24             THE WITNESS:  Sitting today,

25        that's all I can think of.

```
 1              MR. ECKLUND:  Okay.

 2         Q.    (BY MR. ECKLUND)  Who would

 3    handle the reconciliation or the true-ups, if

 4    you will, that needed to occur?  So you've

 5    got -- you did all the purchasing along with

 6    David Badeen, possibly Linda Wilson, maybe

 7    Cheryl, maybe Patsy Little.  You're all

 8    buying.  Let's assume all of you are buying

 9    from Mallinckrodt and others.

10              You know what you're buying for

11    certain pharmacies.  They know what they're

12    buying for certain pharmacies, and at the end

13    of the year, Walmart, the company, is going

14    to know whether they hit ▮▮▮▮▮▮  in sales

15    volume or not, collectively.  Right?

16         A.    Yes.

17         Q.    Are you with me?  Okay.

18              You may not have had to deal

19    with that.  They probably didn't have to deal

20    with that.  I'm not sure if Paul Bone -- is

21    that --

22         A.    Paul Beahm.

23         Q.    Beahm?

24         A.    Beahm.

25         Q.    Okay.  Whether Paul Beahm may
```

1  have to deal with that, but someone had to

2  ultimately figure out what's going to get

3  reconciled.  Who owes us what?  Or do we owe

4  anyone else; right?  Because Walmart would

5  want to not pay a supplier, because if they

6  failed to pay suppliers, suppliers are going

7  to be less willing to work with them;

8  correct?

9            MR. CARTER:  Object to the

10       form.

11            THE WITNESS:  Possibly.

12       Q.    (BY MR. ECKLUND)  I mean,

13  definitely.  No?

14            I mean, if you don't pay

15  suppliers, they're not going to want to work

16  with you.

17       A.    Correct.

18       Q.    And in the same vein, if you're

19  trying to buy product and the suppliers don't

20  come through with the product, you're going

21  to be less likely to work with them.

22       A.    Correct.

23       Q.    So what I'm wondering is, who

24  or what department would have had to

25  reconcile or understand all that information?

Highly Confidential - Subject to Further Confidentiality Review

1    The rebates, volume rebates, product rebates,

2    different prices for different pills based on

3    bottle size, charge-backs.

4            MR. CARTER:  Object to the

5        form.

6            THE WITNESS:  I don't remember

7        what department did that in my role as

8        buyer.

9        Q.    (BY MR. ECKLUND)  But it wasn't

10   your department?

11        A.    It wasn't me as a buyer.

12        Q.    It wasn't you.

13            And sitting here today, you

14   don't know the extent to which any of these

15   rebates were enforced, whether any of the

16   targets were obtained or exceeded, whether

17   the rebates were paid, whether the

18   charge-backs were triggered.  You don't have

19   any recollection about that?

20        A.    That's correct.

21        Q.    But if you wanted to find out

22   answers to those questions, there's systems

23   in place within Walmart that might provide

24   you the data?

25            MR. CARTER:  Form.

1           THE WITNESS:  Possibly, yes.

2       Q.     (BY MR. ECKLUND)  In your role

3  as a pharmacy buyer for Walmart, did you ever

4  have to consider what's often referred to as

5  OBRA 90?  The Omnibus Budget Reconciliation

6  Act of 1990?

7       A.     I don't recall that being

8  something that I used in deciding for -- as a

9  buyer.

10      Q.     Okay.  That's -- so I'm going

11  to give you a snippet of what OBRA 90 does,

12  in my understanding.

13           Among other things, OBRA 90

14  specifies that Medicaid programs receive a

15  rebate that's the lower of a best price to a

16  private purchaser or based upon an average

17  manufacturer's price, or AMP.

18           And they do that for each drug,

19  and there's allowances for inflation over and

20  above that of the consumer price index.  So

21  it's a formulaic approach, but it requires

22  information from purchasers and sellers of

23  drugs.  Okay?  Medicaid can't figure out

24  what's the best price available to private

25  purchasers if they don't get that information

Highly Confidential - Subject to Further Confidentiality Review

1    from private purchasers.

2              Does that make sense?

3              MR. WATTS:  Objection to the

4         form.

5              THE WITNESS:  Yes.

6         Q.    (BY MR. ECKLUND)  Is it

7    possible that OBRA 90 concerns, along with

8    other legal requirements, might be why, in

9    every one of the documents I've shown you

10   concerning Mallinckrodt contracts, it says,

11   "Walmart has the sole obligation to timely,

12   fully and accurately report all product

13   discounts and rebates to Medicaid"?

14             MR. CARTER:  Object to the

15        form.

16        Q.    (BY MR. ECKLUND)  Is it

17   possible that OBRA 90 is what they were

18   thinking about?

19        A.    What you just read to me, you

20   could -- it could mean that.  That's -- I

21   don't know that that is anything that I

22   looked at or referred to as a buyer in that

23   role.

24        Q.    Okay.  And it's my

25   understanding that the average manufacturer's

```
1    price is defined to include the average

2    price, including cash discounts and other

3    price reductions paid to drug manufacturers

4    by wholesalers for drugs.

5                Okay?

6                And Walmart has operated as a

7    wholesaler; correct?

8                MR. CARTER:  Object to the

9         form.

10               THE WITNESS:  We had a

11        distribution center of products.  So I

12        guess -- I don't know how you would --

13        would you say that's a wholesaler?

14               I don't know the terminology,

15        but we had a distribution center.

16        Q.    (BY MR. ECKLUND)  Okay.  Did

17   you ever have occasion to work with a company

18   called Humana?

19        A.    It's an insurance plan.  I had

20   worked in specific special projects with

21   Humana, but ...

22        Q.    Which special projects did you

23   work with with Humana?

24        A.    Primarily at -- not in my role

25   as a buyer but after my role as a buyer.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      So in connection with

2    immunizations?

3      A.      In connection with working with

4    them to provide services in a store, in an

5    area, for screening and health risk

6    assessment-type work.

7      Q.      We talked briefly this morning

8    about home delivery or mail order

9    prescription drugs.

10            Do you recall a Humana Walmart

11   preferred prescription plan that was offered

12   towards the tail end of your term as a

13   pharmacy buyer?

14     A.      I know that there was one.

15     Q.      What do you recall of that

16   program?

17     A.      That there was a Humana Walmart

18   plan.  That is pretty much it.

19     Q.      Okay.

20     A.      I don't -- I don't recall the

21   details of that.

22     Q.      Does the name Right Source --

23     A.      I don't remember that.

24     Q.      -- mean anything?  Humana

25   Right Source?  No?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      No.

2              MR. ECKLUND:  Again, please let

3      me know when you want to take lunch.

4              THE WITNESS:  Probably in a few

5      minutes.  I need a break.

6              MR. ECKLUND:  Do you want to do

7      this one and then we'll take a break?

8              THE WITNESS:  Yeah.

9              MR. ECKLUND:  That's fine.

10             (Walmart Coleman Deposition

11     Exhibit 10 was marked for

12     identification.)

13     Q.      (BY MR. ECKLUND)  So,

14     Ms. Coleman, I've handed you a document that

15     I found online.  And it's from a presentation

16     that was -- I'll say it was jointly offered

17     by Walmart and Humana.  And came out in

18     connection with announcements and press

19     releases.

20             And you can peruse the document

21     if you want.  And let me know if you remember

22     listening in to the media teleconference or

23     reading any materials about this particular

24     venture.  And you can see that there are

25     press contacts, and there's a date.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. ECKLUND:  And just for

2        counsel on the record, there is no

3        Bates stamp on this document.

4        Q.    (BY MR. ECKLUND)

5   September 30th, 2010.  Do you see that on the

6   third slide?

7              When you get there, you let me

8   know.

9        A.    Okay.

10       Q.    So you've had a chance to

11  quickly peruse the slide deck?

12       A.    Yes.

13       Q.    If you'd turn to the -- what

14  includes the 3 at the bottom.  Do you see

15  there's a numbering on the slides?

16       A.    Uh-huh.

17       Q.    So it appears that the media

18  teleconference was going to be held on or

19  around September 30th, 2012.

20             Do you see that?

21       A.    Yes.

22       Q.    And if you go to the next

23  slide, you have a picture of a gentleman,

24  William Fleming, vice president, Humana

25  Pharmacy Solutions.

Highly Confidential - Subject to Further Confidentiality Review

1          Have you ever worked with

2    William Fleming?

3          A.     I haven't.

4          Q.     Go to the next slide.  There's

5    an announcement.  Today's announcement.

6    "Beginning with this fall's Medicare

7    enrollment period, November 15th to

8    December 31, 2010, Humana will offer an

9    innovative Medicare Part D plan co-branded

10   with Walmart that provides significant

11   savings on certain prescription medicines for

12   Medicare beneficiaries."

13          Do you see that?

14          A.     Yes.

15          Q.     If you go to the next page.  It

16   talks a little bit about Medicare Part D.

17          Medicare Part D.  Prescription

18   plan supported by the Medicare program.

19   Started in 2006.  18 million people enrolled

20   in a stand-alone Medicare Part D plan.  And

21   that's based on information available to the

22   Henry J. Kaiser Family Foundation as of

23   April 2010.  Do you see that?

24          So --

25          A.     Yes.

1    Q.    The reference number at the

2    bottom of the page?

3    A.    Yes.

4    Q.    And it furthers breaks out the

5    numbers.  14.3 million Americans 65 years old

6    or older, and 3.7 million people with

7    disabilities under the age of 65.

8              So those would be the

9    individuals in our society that are

10   participating in the stand-alone Medicare

11   Part D plan.  Do you see that?

12   A.    Yes.

13   Q.    One-third of all prescriptions

14   filled in the U.S.  Typical senior fills 42

15   prescriptions per year.  So 1/3 of

16   prescriptions filled in the U.S. covered by

17   this new Medicare program.  Do you see that?

18   A.    Yes.

19   Q.    Is that consistent with your

20   understanding?

21   A.    Based off of what's on here,

22   yes.

23   Q.    You don't have any different

24   understanding?

25   A.    I don't have any different

1    understanding.

2         Q.    Okay.  Just in connection with

3    clinical services, immunizations, you don't

4    have any reason to dispute that number?

5    Okay.

6              MR. CARTER:  Object to the

7         form.

8         Q.    (BY MR. ECKLUND)  There's a

9    prediction, 26 million by 2015.  Do you know

10   whether that came about or if it's slightly

11   lower or slightly higher than the actual

12   number?

13        A.    I don't.

14        Q.    You don't?  Okay.

15             I'll direct your attention to

16   the ninth slide.  Top of the page.  "An

17   innovative solution the Humana Walmart

18   Preferred Rx Plan."

19             PDP.

20             And that's -- "PDP" stands for

21   prescription drug plan; correct?

22        A.    I don't know that for certain,

23   but ...

24        Q.    You don't know.  Okay.

25             If you'd look at the bottom of

Highly Confidential – Subject to Further Confidentiality Review

1    the page, you can see references to

2    calculations based in part on industry

3    average, PDP premium.  Spotlight Medicare

4    prescription drug plans 2010.

5              Do you see that?

6    A.    Yes.

7    Q.    Okay.  So fair to assume -- and

8    we don't like assumptions during depositions,

9    but fair to presume for purposes of this

10   slide that they were talking about a

11   prescription drug plan?

12   A.    Yes.

13   Q.    Okay.  References one low

14   national monthly plan premium of $14.80 a

15   month.

16             Do you know whether that

17   monthly plan premium went into effect?

18   A.    I don't.

19   Q.    You don't know whether the

20   Humana Walmart program went into effect?

21   A.    I know the Humana program

22   exists, but I don't know what the premium

23   was.

24   Q.    Okay.  Does it still exist?

25   A.    I believe so.  I'm not even

Highly Confidential - Subject to Further Confidentiality Review

1   totally sure about that.

2       Q.     Okay.  And towards the bottom

3   of the page, it mentions that there's a list

4   of medicines available, Humana.Medicare.com.

5   So that at the time would have included all

6   the medications covered by this preferred

7   prescription plan?

8               MR. CARTER:  Object to the

9       form.

10              THE WITNESS:  Yep.

11      Q.     (BY MR. ECKLUND)  It also

12  references a broad competitive formulary

13  comparable to other plans.  And again, we

14  talked about formulary lists earlier.  That's

15  a list of drugs that might be approved by a

16  particular provider of an insurance benefit.

17      A.     Correct.

18      Q.     Okay.  This document also

19  mentions home delivery mail order co-payments

20  as low as $0 for generic medications and

21  prescriptions filled using the plan's

22  preferred mail order pharmacy.

23              Have you ever had any dealings

24  with this preferred mail order pharmacy that

25  they're describing?

```
 1          A.     I haven't.

 2          Q.     Okay.  Do you know what they're

 3    describing?

 4          A.     I don't.

 5          Q.     Okay.  If you wanted to find

 6    out more about it, is there someone you could

 7    ask at Walmart?

 8          A.     Probably.

 9                 MR. CARTER:  Object to the

10          form.

11          Q.     (BY MR. ECKLUND)  Who would you

12    ask?

13          A.     I don't -- I'd go to payer

14    relations and ask.

15          Q.     Anyone in particular?

16          A.     Probably Jodi Prohofsky or

17    somebody in that area.

18          Q.     Could you spell Jodi's last

19    name?

20          A.     P-R-O --

21          Q.     Best as you can.

22          A.     P-R-O-H-O-F-S-K-Y?

23          Q.     Okay.  Now, if you could shift

24    to what's got an 11 on it.  And there's

25    another picture of a gentleman.  And I
```

Highly Confidential - Subject to Further Confidentiality Review

1  apologize in advance if I mispronounce his

2  last name.  It appears to be John Agwunobi.

3  　　　　A.　　Correct.

4  　　　　Q.　　And he is the, at the time,

5  president of Walmart's health and wellness

6  division.  And that's the division in which

7  you worked?

8  　　　　A.　　Correct.

9  　　　　Q.　　And do you still continue to

10  work in the health and wellness division?

11  　　　　A.　　Yes.

12  　　　　Q.　　And do you know whether

13  Dr. Agwunobi is still president of that

14  division?

15  　　　　A.　　He is not.

16  　　　　Q.　　Do you know if he still works

17  at Walmart?

18  　　　　A.　　He does not.

19  　　　　Q.　　Do you know who replaced

20  Mr. Agwunobi in the role of president of

21  Walmart's health and wellness division?

22  　　　　A.　　There have been a succession of

23  replacements since he left.

24  　　　　Q.　　Okay.  Did you ever have any

25  dealings with Dr. Agwunobi?

1     A.     Not directly.

2     Q.     Do you have a view as to

3 whether he was a capable and intelligent man?

4     A.     From what I experienced.

5     Q.     There's a reason why I'm

6 asking.

7              If you'd go to the slide that

8 has the number 13 at the bottom.  It says,

9 "Why Walmart?  Uniquely positioned to help

10 lower the cost of prescription medications.

11 Hugely successful $4 prescription program

12 sparked new thinking."  And then "Saved

13 Americans $3.4 billion since 2006."

14              Mentions that those on Medicare

15 are often hit hard with rising healthcare

16 costs because again, many of the individuals

17 on Medicare are retirees living on fixed

18 incomes.

19              And you have "High drug costs

20 cause many Medicare Part D beneficiaries to

21 take less medication than prescribed or

22 forego basic needs to pay for medicines."

23              And then there's a reference

24 that no one should have to choose between

25 groceries and buying medications.

1    So it's talking about Walmart

2    and, in particular, the, quote/unquote,

3    hugely successful $4 prescription program.

4    After lunch, we're going to

5    start talking about that.  Okay?

6    A.    Okay.

7    Q.    Do you want to turn your

8    attention to slide 15 at the bottom.

9    It says, "The plan provides

10   other great ways to save."  And you can see

11   there are three columns beyond drug tier.

12   Do you see that's the drug tier

13   again.  That consists of the formulary list

14   or tiering system to control pharmaceutical

15   drug costs.  Right?  Do you see that?

16   A.    Yes.

17   Q.    And it's got preferred

18   generics, generics, non-preferred generics

19   and preferred brands and then non-preferred

20   brands.

21   And the non-preferred brands

22   might include specialty pharmaceuticals.

23   It's also possible that preferred brands and

24   non-preferred generic.  Right?

25   MR. CARTER:  Form.

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  It's possible.

2       Q.     (BY MR. ECKLUND)  Okay.  All

3  right.  So let's go through this list.

4            $310 annual deductible for all

5  tiers.  And it's got what you pay for a $30

6  prescription supply.  If you go to a

7  preferred pharmacy, like Walmart, Sam's Club

8  or your neighborhood market, table suggests

9  that for the preferred generic, you'd add a

10  $2 co-pay.  Do you see that?

11       A.     Yes.

12       Q.     And then for the tier 2

13  generic, you've got a $5 co-pay.

14            Do you see that?

15       A.     Yes.

16       Q.     And then for the third tier

17  you've got 20 percent co-insurance.

18            Do you see that?

19       A.     Yes.

20       Q.     What is co-insurance?

21       A.     I'm not certain I understand

22  that terminology, what that means.

23       Q.     Okay.

24            Do you know whether any of

25  these four tiers, tier 1, tier 2, tier 3 or

1    tier 4, would have included prescription

2    opioids?

3            A.      I do not know that.

4            Q.      Is there another tier where

5    prescription opioids might have fell?

6            A.      I don't know.

7                    MR. WATTS:  Objection, form.

8            Q.      (BY MR. ECKLUND)  You might not

9    have been on the formulary list?

10           A.      I really don't know.

11           Q.      And if you shift your attention

12   to the far right of the page, it's got

13   Right Source Rx mail order.  So it's the mail

14   order program described throughout this press

15   release.  $0 co-pay, for preferred generic, a

16   $0 co-pay for the tier 2 generic, and then

17   the co-insurance, prices are the same.

18                   Do you see that?

19           A.      Yes.

20           Q.      And we talked earlier about

21   mail order for prescription opioids.  That

22   was something that was available from

23   Walmart?

24           A.      Correct.

25           Q.      Do you know whether mail order

1    prescription opioids would have been included

2    within the Right Source Rx mail order

3    program?

4          A.    I do not.

5          Q.    If they weren't, do you have

6    any idea why they might not have been

7    included?

8          A.    I can't really speculate.

9                MR. WATTS:  Objection to form.

10               MR. ECKLUND:  All right.  Let's

11         take a lunch break.

12               THE VIDEOGRAPHER:  We are going

13         off the record.  12:43 p.m.

14               (Recess taken, 12:43 p.m. to

15         1:19 p.m.)

16               THE VIDEOGRAPHER:  We are back

17         on the record at 1:19 p.m.

18         Q.    (BY MR. ECKLUND)  Welcome back

19    from lunch.

20               I hear you clearing your

21    throat.  If you need to get up and get some

22    water, hot tea, coffee the folks that have

23    hosted this deposition have been tremendously

24    gracious throughout.  I'm sure they would

25    accommodate any of the folks who have a

Highly Confidential - Subject to Further Confidentiality Review

1    request for tea or coffee.

2         A.    Okay.

3         Q.    So, I want to turn your

4    attention back to mail order.

5              We talked about it in some

6    detail, but I want to just make sure that

7    there's no additional information you could

8    share with us today.

9              Do you know who was in charge

10   of the mail order program at any time within

11   your tenure as a pharmacy buyer for Walmart?

12        A.    While I was a buyer, who was in

13   charge of the mail order pharmacy?

14        Q.    Yeah.

15        A.    I don't recall.  I think it

16   changed over to a couple of people.  I think

17   Michelle Wise was originally after I left.

18              And then Norm Beck after that.

19        Q.    And were they working out of

20   the Orlando office or were they working in

21   Arkansas?

22        A.    That was the mail order

23   pharmacy that you asked about, and that was

24   in Carrollton, Texas.

25        Q.    Carrollton, Texas.  Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1                    How did the mail order work

2     generally?  There was a prescription from the

3     prescriber.  Was it provided from the

4     prescriber to the mail order program in

5     Carrollton, Texas?  Or was it given to the

6     patient, and the patient then submitted it to

7     the mail order program in Carrollton, Texas?

8                    Do you understand what I'm

9     asking?

10         A.      Could have been either way.

11         Q.      Could have been either?  Okay.

12                  So the -- a request to fill a

13    prescription drug through the mail order

14    program could have been submitted by either

15    the prescriber or the patient who received

16    the prescription from their healthcare

17    provider?

18         A.      Correct.

19         Q.      Okay.

20                  There's no other way they could

21    have submitted a request for a prescription

22    drug through the mail order program?

23         A.      Not that I recall.

24         Q.      Okay.

25                  Hospitals, for example, didn't

1    work with the mail order program?

2         A.      Not when I was -- not that I'm

3    aware of.

4         Q.      Ambulance or other programs

5    wouldn't?

6         A.      Not that I'm aware of.

7         Q.      Okay.

8                 Who fulfilled the mail order

9    program?

10                Who would actually fill the

11   orders?  Was it all handled out of

12   Carrollton, Texas or did they communicate

13   with pharmacy dispensaries in other parts of

14   the company?  Did it all happen out of Texas?

15        A.      There was one mail order

16   facility that -- and it was all in

17   Carrollton, Texas.

18        Q.      Throughout the entire time that

19   it's been in operation?

20        A.      To my knowledge, yes.

21        Q.      Okay.  Were the mail orders

22   received in Carrollton, Texas or were they

23   sent someplace else?

24        A.      Mail orders?  Meaning orders?

25        Q.      Yes.

1          A.      From a patient or from a

2    doctor?

3          Q.      Yeah, the prescription.  Yeah a

4    patient or prescriber.

5          A.      They were received in

6    Carrollton.

7          Q.      Who shipped the mail orders to

8    the patients?

9          A.      The mail order facility.

10         Q.      Did they use FedEx?

11         A.      I think they used FedEx and

12   UPS.  I don't know what they use today.

13         Q.      U.S. mail?

14         A.      Possible, yes.

15         Q.      DHL?

16         A.      I don't recall.

17         Q.      Okay.  When did mail orders

18   become available?

19         A.      For Walmart?

20         Q.      Yes.

21         A.      I'm not certain.

22         Q.      Were they available throughout

23   your entire tenure as a pharmacy buyer?

24         A.      Yes.

25         Q.      Are they still available today?

1    A.  Yes.

2    Q.  Were prescription opioids

3 available for mail order when you began as a

4 pharmacy buyer?

5    A.  Yes.

6    Q.  And were they still available

7 until 2016?

8    A.  Yes.

9    Q.  So approximately 2000 until

10 2016 they would have been available through

11 mail order?

12    A.  Yes.

13    Q.  Are mail order options

14 available in all 50 states?

15    A.  I can't be certain at this

16 point.

17    Q.  Okay.  Are there any states

18 that you are aware of, sitting here today,

19 that do not allow for mail order options?

20    A.  I'm not aware -- I'm not aware

21 either -- one way or the other.

22    Q.  Okay.

23     Do you know whether Walmart

24 keeps track of data on total mail order

25 sales?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      When you were deciding how many

3   pills to purchase on behalf of Walmart, did

4   you take into account mail order dispensing?

5      A.      They were a store number, so

6   yes.

7      Q.      They were a store?  Okay.

8              And the mail order pharmacy in

9   Carrollton, Texas is a -- it's a Walmart

10  facility?  It's owned by Walmart?

11     A.      Yes.

12     Q.      To the best of your knowledge?

13             Before the break, we were

14  talking about sure-ups and trying to keep

15  track of who owes what to whom when.  Do you

16  recall that?  We were talking about rebates

17  and volume rebates, pill prices and discounts

18  and charge-backs.  Do you remember that?

19     A.      Yes.

20     Q.      Do you recall a dispute

21  concerning hydromorphone in or around January

22  of 2012, between Walmart and Covidien?

23     A.      I do not.

24     Q.      Okay.  If there was an

25  outstanding amount due to Walmart of

1    $592,000, would that be important for you to

2    know about?

3              A.    I believe so.

4                    MR. CARTER:  Object to the

5         form.

6                    THE WITNESS:  I believe so.  I

7         would say yes, I believe so.

8              Q.    (BY MR. ECKLUND)  Sitting here

9    today, though, you don't remember being

10   interviewed or asking any questions in

11   connection with a deduction available to

12   Walmart offered by Covidien or Mallinckrodt,

13   if you prefer, concerning hydrocodone?

14             A.    I do not.

15             Q.    And sitting here today, do you

16   recall any disputes about any other

17   prescription opioids and deductions that may

18   be owed to Walmart from any manufacturer?

19             A.    I don't.

20             Q.    If you wanted to find out more

21   about deductions that may have been disputed

22   or owed to Walmart based upon contractual

23   terms reached between Walmart and its

24   suppliers, is there a file or a system in

25   place in Walmart where you could go and look

Highly Confidential - Subject to Further Confidentiality Review

1    for that information?

2         A.     Similar to what I've answered

3    before.

4         Q.     Okay.

5                So merchandising, finance.

6    Anywhere else?

7         A.     Not that I can think of.

8                MR. ECKLUND:  I'm not going to

9         mark this, but I am going to try to

10        put it up on the ELMO.  For the

11        benefit of everyone on the record,

12        this is Walmart MDL-00038421.

13        Q.     (BY MR. ECKLUND) It's -- so

14   this appears to be an email sent by you to

15   you on or around the end of May 2007.  The

16   subject is "Hydrocodone/ibuprofen" and you

17   can see there was an attachment.

18               Is this something you would do

19   to just keep track of materials you had sent

20   out?  Sort of make sure you don't lose track

21   of stuff you've submitted?

22        A.     Possibly.

23        Q.     Keeping it on your email system

24   so you have a copy of whatever you sent to

25   other people, so you sent it to yourself so

Highly Confidential - Subject to Further Confidentiality Review

1    you have a copy?

2         A.      Possibly.

3         Q.      We'll turn to the second page.

4                 MR. ECKLUND:  Now, I'll

5         represent for the record, I don't know

6         whether these three punch holes were

7         in the original or if those were

8         copies from my office.

9                 Either way, it's immaterial.

10        Q.      (BY MR. ECKLUND)  Question's

11   about -- who is Interpharm?

12        A.      A manufacturer.  I don't

13   remember the details about them, but ...

14        Q.      Okay.  Do you see the terms?

15   The proposal?

16                Was this a proposal that you

17   sent to them or that they sent to you?

18        A.      I don't recall.

19        Q.      Does it look like a document

20   that you would have prepared and signed for

21   yourself?

22        A.      I don't generally do documents

23   like this.

24        Q.      Okay.  So is the greater

25   likelihood that this is something that was

Highly Confidential - Subject to Further Confidentiality Review

1    sent to you by them?

2          A.     Yes.

3          Q.     Okay.  They've got a product

4    that's -- it's a generic.  It's a hydrocodone

5    bitartrate and ibuprofen product.

6                 Do you see that?

7          A.     Yes.

8          Q.     And they have the size of the

9    tablets, the package size, and I presume that

10   that's 100 unit bottles?

11         A.     Yes.

12         Q.     That the active ingredient

13   identified?

14         A.     Correct.

15         Q.     Particular product identifying

16   number?

17                Case pack.  And then there's

18   the wholesale acquisition cost, the average

19   wholesale price, and then your contract

20   price.  Do you see ■?

21         A.     Yes.

22         Q.     Do you know whether this

23   particular product was included in Walmart's

24   ■ generic program?

25         A.     We didn't -- to my knowledge,

1    didn't have any controlled substances on our

2    ███ program.

3          Q.    Okay.  So the ███ on the

4    contract is unrelated to the ██ prescription

5    drug program, to the best of your knowledge?

6          A.    Correct.

7          Q.    Who was John Denman?

8          A.    He was with Teva.  And he was

9    part of the Walmart account representation

10   from Teva.

11         Q.    Okay.  How would you

12   characterize your professional relationship

13   with Mr. Denman?

14         A.    We had a good relationship.

15         Q.    Okay.

16               I'm going to show you two

17   emails that don't need to be marked.  Just a

18   couple of questions.

19               MR. ECKLUND:  For those

20         following along on the telephone, it's

21         Walmart MDL 000038423.

22         Q.    (BY MR. ECKLUND) Referring to

23   the back page, you can see this was sent out

24   by you.  Do you see that?

25         A.    Yes.

1    Q.    Jo Coleman at Walmart.

2    Pharmacy merchandising.  That's you.

3          You have various prices.  You

4    have totals.  Quantities.

5          Do you see all that?

6    A.    Yes.

7    Q.    And then at the bottom -- I'm

8    sorry it's cut off.  "Here is the information

9    you were asking for.  Let me know if you need

10   any additional information."

11         What information were you

12   providing Mr. Denman in that chart?

13         Look at these numbers real

14   quick.

15   A.    Item numbers, drugs.  Looks

16   like -- I can't see the header.  It looks

17   like quantities.

18   Q.    That's how it was produced to

19   us.  I apologize for that.

20         Do you see Endo, DAVA, Endo

21   DAVA, Teva DAVA?  Do you see all that?

22   A.    Yes.

23   Q.    Do you see the number to the

24   right of the various generic manufacturers'

25   names?

1          A.      Yes.

2          Q.      Do you know whether those are

3    pricing terms?

4          A.      I don't.

5          Q.      Do you know whether you were

6    providing this to Mr. Denman in the hopes of

7    acquiring product at a better price?

8          A.      I don't.

9          Q.      Okay.

10              If you'd look at Mr. Denman's

11   email, it reads, "JoLynn, due to the nature

12   of this product, the legal issues and the

13   settlement, we will not be providing a price

14   protection on this product.

15              "We will be selling on a

16   first-come-first-serve basis.  I suggest you

17   buy only what you require and rebuy as

18   needed.  This will obviously decrease the

19   amount of safety stock you can carry, but

20   that's a decision Walmart will have to

21   carefully weigh.  Once you redetermine the

22   appropriate quantities, please send the PO to

23   my attention."

24              A couple of questions.  "PO,"

25   that's purchase order?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      Okay.  And do you recall what

3  the legal issues or the settlement was that

4  Mr. Denman was referring to?

5      A.      I do not.

6      Q.      Was it common for suppliers of

7  products to contact you and send you an email

8  telling you that they'll only be able to

9  provide you some portion of a product, they

10 won't be able to provide you price

11 protection, and that they would reference

12 legal issues in a settlement in

13 correspondence?

14          MR. CARTER:  Object to the

15     form.

16          MR. WATTS:  Object to the form.

17          THE WITNESS:  I can't really

18     speak to it.  I don't know one way or

19     the other if it's common.  I don't

20     know how common it was.

21     Q.      (BY MR. ECKLUND)  Was this

22 something that you might see once in a while?

23 Once a month?  Once a week?

24          MR. CARTER:  Form.

25          THE WITNESS:  I really can't

1    speak to it.  I don't know.

2        Q.    (BY MR. ECKLUND)  Ordinary,

3    usual, or uncommon?

4              MR. CARTER:  Form.

5              THE WITNESS:  I would say

6        uncommon, but I don't -- I don't know.

7              MR. ECKLUND:  Okay.

8        Q.    (BY MR. ECKLUND)  Response to

9    the email that you received from Mr. Denman,

10   you forwarded it along to a gentleman named

11   Kevin Head.  Who is Kevin Head?

12       A.    He was in replenishment at the

13   time, I believe.

14       Q.    Replenishment within Walmart?

15       A.    Yes.

16       Q.    Did he also work in health and

17   wellness division?

18       A.    Yes.

19       Q.    Did he report to you or did you

20   report to him?

21       A.    No.  Actually, they had

22   different reporting structure for the

23   replenishment side.

24       Q.    Okay.  You wrote Kevin, "Can

25   you work a time on my calendar with Jessica

1    for us to discuss this?  We need to decide

2    what we need to order."

3                 Who was Jessica?

4         A.     She was my assistant.

5         Q.     So earlier when we were talking

6    about the emails and the correspondence

7    between you and Mr. Badeen and I asked you

8    how you might have come to have a letter or

9    an email sent to Mr. Badeen and why you might

10   have signed it, it could have been an

11   assistant?  This could have been Jessica that

12   might have provided something?

13        A.     Could have been there were

14   times when we had an assistant and there were

15   times when we didn't have an assistant.

16        Q.     Okay.  All right.

17                And if you look at the time

18   this email was sent, it was sent at 4:18 in

19   the afternoon.  Do you see that?  4:18 p.m.?

20        A.     Yes.

21        Q.     Okay.  Here is the same email

22   from Mr. Denman, and you sent a response to

23   him about three minutes later.

24                "John, I shared some info with

25   you yesterday that I feel like was important

1    for you to know.  But see that you are using

2    that against me with this email.  I would

3    like to discuss further."

4             How was he using information

5    against you?

6       A.    I don't recall.  I don't

7    remember this.

8       Q.    You have no recollection of why

9    you would have sent an email to Mr. Denman

10    suggesting that he was using information that

11    you shared with him that you felt was

12    important for him to know, and that you

13    needed to tell him that in your view, he was

14    using that information against you.

15             MR. CARTER:  Object to the

16       form.

17             THE WITNESS:  I don't remember.

18       Q.    (BY MR. ECKLUND)  Is it common

19    for you to send an email like this to a

20    supplier?

21             MR. CARTER:  Form.

22             THE WITNESS:  I don't know.  I

23       would say no.

24       Q.    (BY MR. ECKLUND)  Do you

25    recall?

1          A.      I don't know.

2          Q.      Do you recall any other

3    occasions where you would have sent an email

4    saying that "you were using something against

5    me" to a supplier?

6          A.      I don't recall.

7          Q.      Okay.  So you don't recall the

8    legal issues, you don't recall the

9    settlement, and you don't recall why you

10   might have felt that he was using something

11   against you?

12         A.      Correct.

13         Q.      Okay.  If McKesson was unable

14   to provide Walmart with an appropriate amount

15   of volume, so the contracted amount of volume

16   of a pill, particularly a controlled

17   substance, exclusively controlled substance,

18   okay?

19              We can -- let's just agree it's

20   hydrocodone.  Okay?

21         A.      Okay.

22         Q.      If McKesson was unable to

23   obtain it, were you permitted to substitute

24   controlled substances from other suppliers?

25         A.      If there was a supply sheet

1    where we couldn't get one supplier, we would

2    identify a supplier that could supply it.  So

3    there -- that would -- could be possible.

4         Q.    And when you did that, would

5    you notify the DEA?

6         A.    I didn't have any part of

7    notifying the DEA of anything in my role as a

8    buyer.

9         Q.    Do you know if anyone else

10   within Walmart would notify the DEA of

11   substitution of controlled substances?

12        A.    I do not.

13        Q.    If you wanted to find out the

14   answer to that question, would there be a

15   place you could go in Walmart to find that

16   answer?

17        A.    I suppose.

18        Q.    Maybe a person that you've

19   talked to within Walmart that would --

20        A.    Yes.

21        Q.    -- answer that question?

22             Would that person be in the

23   compliance group?  The finance group?

24        A.    I really don't know.

25        Q.    Okay.

1          Have you ever heard the term

2     "fill or kill" as it concerns prescription

3     opioids?

4          A.    I have not.

5          Q.    No?

6          Have you ever heard the term

7     "fill or kill" as it concerns any other

8     prescription drugs and the ability to supply

9     a volume that's been contracted for?

10         A.    I have not.

11              (Walmart Coleman Deposition

12         Exhibit 11 was marked for

13         identification.)

14         Q.    (BY MR. ECKLUND)  So we're

15    marking a document Bates stamped

16    ENDO-OPIOID_MDL-04183970.

17              This appears to be a mail merge

18    letter that was sent out to Ms. Linda Wilson

19    as a pharmaceutical buyer, Mr. Badeen as a

20    pharmaceutical buyer, and Ms. Coleman as a

21    pharmaceutical buyer.

22              Do you see that, Ms. Coleman?

23         A.    Yes, sir.

24         Q.    And again, your recollection is

25    that Ms. Wilson did not provide that role

1    within Walmart?

2         A.    Correct.

3         Q.    All right.  Let's talk about

4    this document.  It reads, "Endo

5    Pharmaceuticals, Inc. is announcing a price

6    increase to reflect current market conditions

7    for and all" -- I suspect it meant "any and

8    all" -- SKUs of Percocet, with the exception

9    of the hospital unit dose package.

10              "The new prices will be

11   effective April 1st, 2010.  Listed below are

12   the new prices of the affected MDC for your

13   review."  Do you see that?

14        A.    Yes.

15        Q.    Okay.  I'd like to just focus

16   on a few particular differences in this

17   particular document and the ones we went

18   through earlier with Mallinckrodt.

19              First, there's no rebate

20   reflected on this contract, is there?

21        A.    Correct.

22              MR. WATTS:  Object to the form.

23        Q.    (BY MR. ECKLUND)  In fact, it

24   just says "Product, package, NDC and

25   wholesale acquisition cost" with an asterisk.

Highly Confidential - Subject to Further Confidentiality Review

1    And then the asterisk says, "Endo's wholesale

2    acquisition cost for list price for any

3    product of the undiscounted price offered to

4    wholesalers by Endo does not reflect

5    discounts, rebates or other price concessions

6    that may be offered by Endo and does not

7    necessarily represent the actual price paid

8    by wholesalers or direct customers."

9              What I'm wondering is, is that

10   that they did not offer discounts, rebates or

11   price concessions or not?

12             It says it's not reflected in

13   this.

14             MR. CARTER:  Form.

15        Q.    (BY MR. ECKLUND)   Do you see

16   what I'm saying?  Do you recall whether --

17             MR. WATTS:  Object to the form.

18        Q.    (BY MR. ECKLUND)  Do you

19   recall, looking at this document, whether

20   Endo was providing Walmart discounts, rebates

21   or other price concessions off of the

22   wholesale acquisition cost?

23        A.    I don't know.

24        Q.    Is that something that might

25   have been reflected in a contract?

1      A.      Possibly.

2      Q.      Do you recall ever reviewing

3  any contracts for the purchase of controlled

4  substances from Endo in your role as pharmacy

5  buyer for Walmart?

6      A.      Possibly.

7      Q.      Do you possibly recall it or

8  you're not sure?

9      A.      I'm not sure.

10      Q.      Okay.  It continues, "Please

11  note that we will not be offering an

12  allocated buy-in related to this pricing

13  action.

14              "Revised prices will be mailed

15  to you under separate cover."

16              Do you see that?

17      A.      Yes.

18      Q.      What is an "allocated buy-in"?

19      A.      There were times when a

20  brand -- which this is a brand -- would have

21  a price increase, and there are times when

22  you could have purchased it at their price

23  before the price increase.

24      Q.      And you might have been

25  allocated a particular number of those pills

Highly Confidential - Subject to Further Confidentiality Review

1    based upon a formula or prior purchases?  How

2    might they allocate?

3         A.    I'm not certain how they would

4    allocate that.

5              MR. WATTS:  Object to form.

6         Q.    (BY MR. ECKLUND)  It continues,

7    "Our revised prices will be mailed to you

8    under separate cover."

9              Do you recall receiving a

10   revised price list from Endo concerning these

11   drugs?

12        A.    I don't.

13        Q.    Do you recall approximately how

14   often Endo would send you revised price lists

15   in the mail?

16        A.    I don't.

17        Q.    Once a month?

18        A.    There were many manufacturers

19   that we -- you know, we worked with.  So to

20   keep up with who sent what, I mean, I just --

21   I don't recall it.

22        Q.    I understand.  I appreciate

23   that.  Okay.

24              (Walmart Coleman Deposition

25        Exhibit 12 was marked for

1          identification.)

2                  MR. ECKLUND:  And for the folks

3          following on the phone, this is

4          ENDO-OPIOID_MDL 02384254.

5          Q.     (BY MR. ECKLUND) This is a

6     series, again, of merged letters.  It's

7     unclear to us whether it was sent out, but it

8     appears to have been.

9                  And it appears to have been

10    sent to Linda Wilson as a pharmaceutical

11    buyer for Walmart, David Badeen as a

12    pharmaceutical buyer for Walmart, and lastly,

13    Ms. Coleman as a pharmaceutical buyer for

14    Walmart.

15                 Unlike the prior document which

16    concerned Percocet, this particular letter

17    concerned Opana Extended Release and Opana

18    5 milligram and Opana 10 milligram.  It's

19    dated January 7, 2011.

20                 Do you recall receiving this

21    letter from Endo, Ms. Coleman?

22         A.     I do not.

23                 MR. CARTER:  I'm sorry, hold

24         on.  The one that I have is a 2012.  I

25         think I might have a different copy.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ECKLUND:  Use this one.

 2                    MR. CARTER:  Sorry, I wrote on

 3          that one.

 4                    MR. ECKLUND:  That's odd.

 5          Okay.  Just use that one.

 6          Q.    (BY MR. ECKLUND)  Okay.  Do you

 7      recall that document?

 8          A.    I do not.

 9          Q.    If you look at the top of the

10      page, the format of this document is

11      consistent with the prior document.  It's got

12      the same basic table setup?  Four columns

13      with the same headers?

14          A.    Yes.

15          Q.    Okay.

16                Does it reflect any rebates,

17      discounts?

18                    MR. CARTER:  Hold on one

19          second.  I'm sorry.  She's looking at

20          something dated 2010.  What I now have

21          is 2011.

22                    MR. ECKLUND:  Hang on.  I don't

23          know what happened with the copies.

24                    MR. CARTER:  You might have

25          given us all three of your originals.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. ECKLUND:  Let's go off the

 2         record.

 3              THE VIDEOGRAPHER:  We're going

 4         off the record.  The time is 1:48.

 5              (Recess taken, 1:48 p.m. to

 6         1:50 p.m.)

 7              THE VIDEOGRAPHER:  We are back

 8         on the record at 1:50 p.m.

 9              (Walmart Coleman Deposition

10         Exhibit 13 was marked for

11         identification.)

12              (Walmart Coleman Deposition

13         Exhibit 14 was marked for

14         identification.)

15         Q.    (BY MR. ECKLUND)  Ms. Coleman,

16    I have handed to you what have been marked as

17    a series of exhibits.  Importantly, two of

18    them postdated your involvement as a pharmacy

19    buyer for Walmart.  Were not sent to you

20    directly, based upon what we received in the

21    production.  Do you see that?

22         A.    All of these have my name on

23    them.

24              MR. CARTER:  He's asking you

25         about the dates.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Oh, the dates.
 2          Q.     (BY MR. ECKLUND)  Yeah.  So
 3   they were all sent, but you weren't there.
 4          A.     Okay.
 5          Q.     That's what we're getting at.
 6          A.     Okay.
 7          Q.     So they sent it out using their
 8   letter merge distribution system.
 9                 And they may not have realized
10   about your transition over into clinical
11   services and immunizations.
12          A.     Okay.
13          Q.     So they sent it to the three,
14   but it's unlikely that you've ever seen two,
15   because you were in your new role.
16                 Do you see the dates?
17          A.     Yes.
18          Q.     And that's when you were
19   working in immunizations?
20          A.     That's when I was regional
21   director.
22          Q.     Regional director.  But you
23   were not a pharmacy buyer?
24          A.     Correct.
25          Q.     Okay.  What I'd like you to do
```

1    is just to look at the three documents and

2    just confirm that the format and structure of

3    those three documents is consistent.  Four

4    columns, same setup for tables, same

5    language, and none of them references a

6    master contract, an original contract, or any

7    revisions or modifications to some specific

8    contract.  Do you see that?

9              MR. WATTS:  Objection to form.

10             THE WITNESS:  Yes.

11        Q.    (BY MR. ECKLUND)  And turning

12    just to the one document that you would have

13    likely received during your time as a

14    pharmacy buyer, which would be the earliest

15    of the three.  Do you have any specific

16    recollection of that document?

17        A.    I do not.

18        Q.    Okay.

19              Does it include controlled

20    substances?

21        A.    Yes.

22        Q.    Do you know whether that was

23    the agreement that was in place at the time

24    for those particular controlled substances?

25              MR. WATTS:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  I don't know.

2         Q.      (BY MR. ECKLUND)  Who is

3    Kayla Kelnhofer?

4         A.      She was the Walmart account rep

5    for several companies.  Endo was one of them.

6         Q.      Okay.  Do you recall attending

7    any meetings with Ms. Kelnhofer in the spring

8    of 2005 concerning fentanyl or Oxycontin?

9         A.      I don't recall that

10   specifically.

11        Q.      Do you recall any conversations

12   or discussions concerning RFIDs?

13        A.      I don't recall the details.  I

14   don't.

15        Q.      Okay.

16        A.      I don't remember.

17        Q.      And RFID, is that a radio

18   frequency identification?

19        A.      I believe so.

20        Q.      Okay.  And you don't have any

21   specific recollection of that meeting that

22   might have occurred about 12 or so years ago?

23        A.      I don't.

24        Q.      Okay.  Did you ever work with

25   Art Alderson within Walmart?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      Who is Art Alderson?

 3              A.      I don't remember his exact

 4     title.  He was a VP over -- I don't even

 5     remember.  I reported -- I didn't report

 6     directly to him, but when I was at mail

 7     order, he was involved.

 8              Q.      Earlier today we were talking

 9     about certain DEA forms.  In particular I

10     mentioned the Form 222.  Do you remember that

11     portion of the deposition?

12              A.      Yes.

13              Q.      Okay.  You were confident you

14     had not submitted those forms in your role as

15     a pharmacy buyer.

16                      Do you recall that testimony?

17              A.      Yes.

18              Q.      Do you know whether

19     Bruce Painter might have submitted 222 forms?

20              A.      I really don't know.

21              Q.      Do you know whether the

22     pharmacy merchandising managers would have

23     been responsible for submitting the Form 222

24     forms?

25              A.      I really don't know.
```

1    All I can speak to is as a

2    buyer, I was never -- I never submitted DEA

3    222s.

4        Q.    Who is Doug Statler?

5        A.    I don't remember what company

6    he was with, but he was on the Walmart

7    account with a manufacturer.

8        Q.    Okay.  Leon Nevers?

9        A.    I'm not familiar with that

10   name.

11       Q.    J.D. McCall?

12       A.    I'm not familiar with that

13   name.

14       Q.    Dale Kelly?

15       A.    I'm not familiar with that

16   name.

17       Q.    Jesse Talamantez?

18       A.    Not familiar with it.

19       Q.    Rick Mingory?

20       A.    Not familiar with that.

21       Q.    John Bonner?

22       A.    That name sounds familiar.

23       Q.    Who is John Bonner?

24       A.    I don't remember.  I just

25   recognize the name.

1     Q.    All right.  We talked earlier

2  about whether you may have received updates

3  on sales for prescription drugs or controlled

4  substances from suppliers and whether that

5  might be considered by you in connection with

6  your volume orders.

7          Do you recall that testimony?

8     A.    I do.

9          MR. ECKLUND:  Okay.  And I'm

10         looking at this document.  And I'll

11         just -- I'll represent for the record,

12         it's the last page of a document that

13         was produced,

14         ENDO-OPIOID_MDL-01974008.

15         It's an email.  You can have it

16         if you want.  We don't need to mark it

17         into the record.

18    Q.    (BY MR. ECKLUND)  But I only

19  want to give you the third page.  We were

20  talking about confidentiality earlier.  I

21  don't know that you can see the rest of this

22  without me getting permission from everyone

23  else, and I don't want to go through the

24  process and hassle of doing it now.

25    A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You have had a chance to look

2    at the document, and you noted that you

3    believe that some of these individuals worked

4    at different companies.  Some of them you

5    have no idea where they may have worked,

6    making it extraordinarily difficult to

7    impossible for us to request from counsel for

8    the various defendants permission to use the

9    entire document with you, and the entire

10   email string did not include you, so we're

11   not going to do that.

12          Instead I'm just going to call

13   your attention to that one sheet.  It reads,

14   "Subject Opana market information.  The

15   following is an update regarding TRx

16   progress."  What does "TRx" stand for?

17   A.    I'm not sure.

18   Q.    Okay.

19         "Progress on Opana IR."

20         Is that immediate release?

21   A.    Yes.

22   Q.    "And Opana Extended Release"?

23   A.    Yes.

24   Q.    "I just wanted to send this to

25   give you an idea of how many scripts are

1    being generated" -- and I suppose she meant

2    generated -- "and by whom.  This should also

3    help with purchasing to ensure you have

4    adequate inventory of appropriate strengths.

5    Please let me know if you have any questions

6    or concerns."

7              It's got some statistics.

8    Opana ER -- it looks like TRx stands for

9    total prescriptions were up 4.3 percent.

10             Do you see that?

11        A.    Yes.

12        Q.    It says "Opana Immediate

13    Release."  Again, it appears total

14    prescriptions were up 13.6 percent.  Opana ER

15    distribution by specialty.  Pain specialists

16    wrote the majority of Opana ER with

17    58 percent of total prescriptions.

18             PCPs.  Does that stand for

19    primary care practitioners or pain clinic?

20    Do you have any --

21        A.    I'm not sure in this reference.

22        Q.    PCPs with 20 percent of the

23    total prescriptions and all others with

24    14 percent.

25             And then hematologists and

1    oncologists wrote 0.6 percent of

2    prescriptions for the week ending 11/17/2006.

3              What are -- do you know what

4    hematologists treat?

5         A.    Generally that's liver, I

6    guess.

7              I don't know.

8         Q.    Blood disorders?

9         A.    Yeah.  Blood disorders.

10        Q.    Do you know what an oncologist

11   treats?

12        A.    Cancer.

13        Q.    This seems -- so between the

14   two, hematologists and oncologists combined,

15   they're responsible for writing less than

16   1 percent of prescriptions for that week.

17              Is that right?

18        A.    That's what that says, yeah.

19        Q.    Do you have any reason to

20   dispute it?

21        A.    I can't really say either way.

22        Q.    Would Kelly -- would

23   Kayla Kelnhofer have known, in her role as

24   national account executive for Endo

25   Pharmaceuticals, who was writing

1   prescriptions for their drugs in a given

2   week?

3                MR. CARTER:  Object to the

4       form.

5                MR. WATTS:  Objection to form.

6                THE WITNESS:  I don't know

7       whether she would get information with

8       that.  I don't know.

9       Q.    (BY MR. ECKLUND)  It continues,

10  "In the strong opioid extended release

11  market, Opana Extended Release achieved 0.54

12  percent of the total market, 312,771

13  prescriptions.  Opana ER share is up

14  0.02 percent from the previous week."

15               And then she continues, the

16  market includes Opana ER, Avinza, Kadian,

17  oxycodone, brand and generic, MS ER, and

18  fentanyl patches.  Brand and generic.

19               Do you see that?

20      A.    Yes.

21      Q.    Okay.  Do you know what Avinza

22  is?

23      A.    I don't recall.

24      Q.    Do you know whether it's -- or

25  you don't recall.  If it's a controlled

Highly Confidential - Subject to Further Confidentiality Review

1   substance, you don't recall anything about

2   Avinza?

3        A.      I really don't remember.

4        Q.      Kadian?

5        A.      I don't remember that one

6   either.

7        Q.      Oxycodone?

8        A.      Yes.

9        Q.      What's oxycodone?

10       A.      It's a controlled substance.

11       Q.      Okay.  And at the time it was

12   available in both brand and generic?

13       A.      I can't remember.  I'm --

14       Q.      It's likely?

15       A.      That's what it says.

16       Q.      It's likely that was the case?

17       A.      Likely.

18       Q.      Do you know what MS ER stands

19   for?

20       A.      I don't.

21       Q.      Possible it stands for morphine

22   sulfate extended release?

23       A.      Possible.

24       Q.      But sitting here today, you

25   don't know?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yeah.

2      Q.     Okay.  And fentanyl patches.

3  Do you know what those are?

4      A.     I'm familiar with them.

5      Q.     Controlled substance?

6      A.     Yes.

7      Q.     Do you agree or disagree with

8  Kayla Kelnhofer's representation that the

9  opioid extended release market in or around

10  November of 2006 was strong?

11            MR. CARTER:  Object to the

12        form.

13            THE WITNESS:  Sitting here

14        today, I can't really speculate.  I

15        don't recall what the market was.

16      Q.    (BY MR. ECKLUND)  Do you

17  remember whether you were buying more opioids

18  in 2006 than you were in 2005?

19      A.     I don't.

20      Q.     Do you know whether you were

21  buying more in 2000 than you were in 2012?

22            MR. CARTER:  Object to the

23        form.

24            THE WITNESS:  I don't.

25      Q.    (BY MR. ECKLUND)  Do you know

1    whether you bought more in 2010 than 2002?

2         A.    I don't.

3         Q.    Is there any way you could find

4    out whether you were buying more prescription

5    opioids at any point in time between the time

6    you started as a pharmacy buyer and the

7    conclusion of your role as a pharmacy buyer

8    for Walmart?

9         A.    I would have to leverage

10   resources like we've spoken of previously.

11        Q.    Okay.  Earlier this morning we

12   were talking about relationships between

13   Walmart and certain manufacturers, and you

14   mentioned things like consistency, the

15   ability to develop -- to deliver volume.

16   Right?  Do you recall that?  Track records

17   and the like?

18             And you also mentioned that

19   sometimes you'd favor a new entrant into the

20   market to create a relationship.  So just for

21   purposes of complete testimony --

22             MR. WATTS:  Object to the form.

23             MR. ECKLUND:  You're right.

24        That wasn't testimony.  That was a

25        recitation of her testimony.  I

1              apologize for that.

2        Q.    (BY MR. ECKLUND)  Do you recall

3  on or around February 2007 Walmart receiving

4  a number of empty bottles from Endo?

5        A.    I do not.

6              MR. WATTS:  Object to the form.

7        Q.    (BY MR. ECKLUND)  Is that the

8  kind of thing that you would have taken

9  seriously if you were a dispensing pharmacist

10  prior to your time as a pharmacy buyer?

11        A.    Yes.

12        Q.    Receiving empty bottles, it's

13  troublesome?

14        A.    Yes.

15        Q.    If a Walmart pharmacy received

16  a series of empty bottles, was there a plan

17  in place to restock them, get them supplied

18  quickly?

19        A.    We would -- I mean, if they

20  contacted and we needed to supply them, we

21  could order it for them or they could order

22  it themselves.

23        Q.    Okay.  So empty bottles is a

24  problem.  We can agree to that.  Yes?  It's a

25  problem that needs to be addressed.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. CARTER:  Object to the
 2        form.
 3              THE WITNESS:  It's a concern.
 4        Q.    (BY MR. ECKLUND)  It's a
 5   concern.
 6        A.    As a pharmacist, yes.
 7        Q.    Do you remember working with a
 8   company called Ethex?  E-T-H-E-X?
 9        A.    Yes.
10              (Walmart Coleman Deposition
11        Exhibit 15 was marked for
12        identification.)
13        Q.    (BY MR. ECKLUND)  It's Walmart
14   MDL 000038419.  I'm going to show it to
15   everybody.  I'm going to hand it to you, and
16   then we're going to talk about it a little
17   bit.
18              For the purposes of what I'm
19   showing to you, specifically it talks about
20   purchases of morphine sulfate concentrated
21   oral solution in or around the end of the
22   year, December of 2006.
23              Do you see that?  December 27,
24   2006.  This correspondence was sent to
25   Mr. Badeen.
```

1          Is that your signature at the
2    bottom?
3          A.    Yes.
4          Q.    Okay.  So this acknowledges
5    that you were purchasing supply from a
6    company called Ethex.
7                Is Ethex a company that you did
8    a lot of work with?  A little work with?  Or
9    you have no recollection one way or the
10   other?
11         A.    I really don't recall.
12         Q.    Do you know whether Walmart
13   still works with Ethex?
14         A.    I do not.
15         Q.    Do you know whether Ethex still
16   exists?
17         A.    I do not.
18               (Walmart Coleman Deposition
19               Exhibit 16 was marked for
20               identification.)
21               MR. ECKLUND:  For the folks
22               following along on the phone, we're
23               looking at a document that was
24               obtained from the archives of the FBI
25               website from the St. Louis office.  It

1            concerns a press release dated

2            March 2nd, 2010 that was downloaded on

3            December 10th, 2018.

4        Q.    (BY MR. ECKLUND) Title of which

5    is "Ethex Corporation, a subsidiary of KV

6    Pharmaceutical, pleads guilty to two felonies

7    and agrees to pay the United States

8    $27,568,921 for fine, restitution, and

9    forfeiture."

10            Ms. Coleman, I'd like to direct

11    your attention to the paragraph -- second

12    paragraph talking about certain prescription

13    drugs.

14            It says, "According to

15    documents filed with the Court, Ethex and KV

16    were collectively engaged in the development,

17    manufacturing and sale of prescription drugs,

18    including dextroamphetamine sulfate, a drug

19    used to treat attention deficit disorder in

20    children, propafenone, a heart medication.

21    On May 7th and 8th of 2008, KV and Ethex

22    received two complaints reporting the

23    discovery of oversized morphine sulfate

24    tablets.  During this timeframe, KV

25    manufactured numerous types of drugs with BB2

Highly Confidential - Subject to Further Confidentiality Review

1    tablet presses including morphine sulfate,

2    propafenone HCL -- that's a hydrochloride,

3    and dextroamphetamine sulfate.  These tablet

4    presses have been used by the company for a

5    number of years, and by May 2008 these

6    machines lacked some of the safety and

7    automation features that more modern tablet

8    press machines currently have."

9             Sitting here today, do you have

10   any recollection of Walmart receiving or

11   raising complaints about oversized morphine

12   sulfate tablets?

13        A.    I don't recall that.

14        Q.    And if Walmart had received

15   oversized morphine sulfate tablets, would

16   that have been something that you would have

17   been told about?

18        A.    Possibly.

19        Q.    Would it have been important

20   for you to know that one of the suppliers was

21   providing oversized medication tablets in

22   your role as a pharmacy buyer?

23        A.    Yeah.

24        Q.    Is this something that might

25   have precluded you from working with a

Highly Confidential - Subject to Further Confidentiality Review

1  particular supplier?

2       A.     Possibly.

3       Q.     Is there any likelihood at all

4  that you would have continued buying from a

5  company like this that lacked controls on

6  pill size?

7       A.     It would be part of my

8  decision, yes.

9       Q.     So it's possible you would have

10  continued to purchase from Ethex

11  notwithstanding that?

12       A.     It would have been a decision

13  to determine who I purchased from.

14       Q.     Who is James Burnett?

15       A.     I believe he was a Walmart

16  account rep for a company.  I just can't

17  recall the company.

18       Q.     I'll represent that the

19  document I have was produced by Par.  It

20  bears Bates stamp PAR_OPIOID_MDL_0000081537.

21            I'm not going to mark it.  I'll

22  just read it in to you, the portions that you

23  received when you were at Walmart.

24       A.     Okay.

25       Q.     Okay?

```
 1                    MR. ECKLUND:  If counsel wants
 2          to have it, you can have it.
 3                    MR. CARTER:  That would be
 4          great.  Thank you.
 5                    MR. ECKLUND:  Sure.
 6          Q.    (BY MR. ECKLUND)  So it
 7     mentions a few people.  And again, we just
 8     want to be careful.
 9                    James Burnett, and he sent it
10     to you.  And at the time, it looks like he
11     was at a company called QualiTest.  Because
12     the email that you had sent to him says,
13     "James, I have attached a cover letter along
14     with a list of items that could be a new
15     opportunity.  Please review and get back with
16     us by the end of this week."
17                    And you titled the document
18     that you attached to your email as "QualiTest
19     letter..."
20                    Okay?  Does that help refresh
21     your recollection that Mr. Burnett may have
22     worked for QualiTest?
23                    MR. CARTER:  He's just
24          referring to here.
25                    THE WITNESS:  Yes.
```

```
 1            Q.     (BY MR. ECKLUND)  Do you recall
 2    what that new opportunity may have been in
 3    April of 2010?
 4            A.     I did not do the doc.  I think
 5    it was .doc.
 6            Q.     (BY MR. ECKLUND)  Do you know
 7    whether that letter still exists in your
 8    systems?
 9            A.     I do not.
10            Q.     Okay.  Do you know who
11    Laura Minnihan is?
12            A.     I do not.
13            Q.     Charles Trey?
14            A.     I do not.
15            Q.     Mike Reiney?
16            A.     I do not.
17            Q.     Jeremy Tatum?
18            A.     I do not.
19            Q.     Okay.  You can pass that
20    document.
21                   Do you know who Rick Upp is?
22            A.     Say that again?
23            Q.     Do you know who Rick Upp is?
24    U-P-P?
25            A.     I'm not familiar with that.  I
```

1    don't recall that name.

2           Q.      Okay.  Who is Sherry Capehart?

3           A.      I can't remember.

4           Q.      All right.

5                   Sharina Cassidy?

6           A.      She was on, I believe,

7    replenishment at the time.

8           Q.      Replenishment from Walmart?

9           A.      Yes.

10          Q.      She was a pharmacy buyer or

11   a --

12          A.      Replenishment, I believe.  Now,

13   she did move to a pharmacy buyer at some

14   point.  I don't remember when.

15          Q.      Okay.

16                  Steve Cohen?

17          A.      He was a Walmart account rep

18   for -- I can't remember the company.

19          Q.      Actavis?

20          A.      Yes.

21          Q.      Do you know Nancy Baran,

22   B-A-R-A-N?

23          A.      I do not.

24          Q.      Dianna Herbig?

25          A.      No.

1    Q.    What's an EDI transmission?

2    A.    I think it stands for

3    electronic data invoicing.  It's like an

4    electronic invoicing process.

5    Q.    Did you use EDI transmissions

6    to order prescription drugs on behalf of

7    Walmart?

8    A.    EDI is used between the

9    manufacturer and Walmart as a way of

10   invoicing and payment reconciliation.

11   Q.    When you received an EDI

12   transmission, was it sent to you by email?

13   Did you receive it in some joint shared

14   database?  How would you know that the

15   transmission was going to be sent?

16   A.    In my role as a buyer, I did

17   not receive EDI.

18   Q.    You did not?

19   A.    No.

20   Q.    Do you know who would receive

21   EDI transmissions within Walmart?

22   A.    It would have been -- I

23   honestly don't know.

24   Q.    Okay.  Who is Jasen Jerrell?

25   J-A-S-E-N, last name is Jerrell,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    J-E-R-R-E-L-L.

 2         A.      It seems like I remember him

 3    being on replenishment on the Walmart side.

 4         Q.      My understanding is he was

 5    replenishment manager at least as of April of

 6    2010.  And at that time you were still in

 7    pharmacy purchasing?  Or senior buyer?

 8         A.      Yes.

 9         Q.      Do you recall working with

10    Jasen Jerrell?

11         A.      Yes.  A little bit.

12         Q.      Is it possible that he might

13    have been one of the individuals who might

14    have received notification of an EDI

15    transmission from a manufacturer or supplier?

16         A.      Possibly.

17              (Walmart Coleman Deposition

18         Exhibit 17 was marked for

19         identification.)

20         Q.     (BY MR. ECKLUND)  So,

21    Ms. Coleman, I've handed you an article.  It

22    was downloaded from healthaffairs.org on

23    December 10th, 2018.  It was initially

24    published on or about September or October of

25    2009, as evidenced by the footer on the
```

Highly Confidential - Subject to Further Confidentiality Review

1    document which may have been covered by the

2    sticker that indicates the exhibit.

3         A.      It's there.

4         Q.      You'll see at the top it

5    references Dr. Agwunobi, who we talked about

6    earlier today.

7         A.      Correct.

8         Q.      Within the document it

9    describes what the two authors, Mr. --  or

10   Dr. Agwunobi and -- I'm not sure whether it's

11   Dr. or Mr. Paul London, perceived to be

12   "opportunities to remove costs from the

13   healthcare supply chain, and how to apply

14   lessons from mass retail."

15                You're free to read the entire

16   article, if you want.  It's not necessary.

17                I wanted to just talk to you a

18   little bit about what was described within

19   the article.

20                Importantly, in the bottom of

21   the first page they talk about

22   commoditization of products.  The elimination

23   of middlemen, purchasing in bulk,

24   volume-based cost discounts, embracing price

25   competition whenever possible.  Mass

1    retailers price standardized everyday

2    products and services as commodities.

3              It says, "For a mass retailer

4    any item that can be commoditized, that is

5    made into something that is not distinguished

6    by brand is a product that can be purchased

7    in bulk and offered at a reduced price?"

8              Do you see that?

9         A.    Yes.

10        Q.    Okay.  If you'd turn to the

11   next page.

12             "Streamlining the healthcare

13   supply chain.  It describes the health system

14   is beginning to benefit from the application

15   of cost control models from mass retail."

16             And it goes on.  At the bottom

17   you could see, "For example, low cost

18   generics today are offered in some cases for

19   as little as $4 for a 30-day supply, at

20   commonly prescribed doses."  And it's Endo

21   reference 15, and they're talking about

22   Walmart's $4 drug program.

23             If you were to turn to the last

24   page, you'd see that.

25             Towards the top quarter of the

1    page.  Article by Robertson.  Walmart.  $4

2    drug program saves $26.8 million in

3    California, Sacramento Business Times 2008

4    March 14th.

5                   Do you see that?

6         A.    Yes.

7         Q.    So they're describing Walmart's

8    program.

9                   And it continues, "By forgoing

10   high profit margins in exchange for volume

11   growth, mass retailers have created a

12   competitive cascade that has begun to affect

13   overall healthcare costs."

14                  Do you see that?

15        A.    Where are you?

16        Q.    If you were to look at the

17   bottom of the page, it bears the number 1338

18   in the bottom left-hand corner.

19                  MR. CARTER:  He's reading after

20        footnote 16.

21                  THE WITNESS:  Okay.

22                  MR. ECKLUND:  Yep, exactly.

23        Q.    (BY MR. ECKLUND)  Do you see

24   that?

25        A.    Yes.

1    Q.    Okay.  So this article was

2    published in 2009.  We talked very briefly

3    this morning about Medicare Part D benefits,

4    and we also talked a little bit about the $4

5    30-day generic prescription plan announced by

6    Walmart in 2006.  Do you recall when that

7    program began in 2006?

8    A.    I don't.

9    Q.    September 2006 sound about

10   right?

11   A.    Possibly.

12   Q.    Okay.  Looking at some of the

13   contracts and the purchase prices and some of

14   the publicly available information, along

15   with this article and other materials, it

16   suggests to me that Walmart's generic

17   program, the $4 and $9 programs, were

18   low-margin enterprises for Walmart.

19         Do you understand what a

20   low-margin enterprise is?

21   A.    Yes.

22   Q.    Do you agree with that

23   characterization, that they were low-margin

24   enterprise?

25   A.    Specifically to each product on

Highly Confidential - Subject to Further Confidentiality Review

1    that $4 program, I couldn't speak --

2        Q.    How about an overall --

3        A.    -- generally.  I really -- I

4    don't know.

5        Q.    You don't know?  Okay.

6              As a buyer, did the margins for

7    those products factor into your purchasing

8    decisions?

9        A.    In some cases.

10       Q.    How so?

11       A.    If -- I mean, when we could buy

12   a better-cost product, then we would -- as a

13   buyer, that would be one of my decisions as

14   we've discussed, to try to get the best cost

15   we can.

16       Q.    Do you remember any products

17   where the margins factored into your

18   purchasing decision for the $4 generic

19   program?

20       A.    No.

21       Q.    About a year later, in 2007,

22   Walmart expanded the list of available

23   generic drugs.  Do you remember that?

24       A.    Specifically, I don't.

25       Q.    Okay.

1       A.      But I know there were changes

2    made.

3       Q.      At or around the exact same

4    time, Walmart also added a new 90-day

5    prescription plan for a price of $9 per

6    prescription.  Do you remember the $9

7    prescription plan?

8       A.      I remember that.

9       Q.      And one of the implied messages

10   for that one was "a dime a day for your

11   prescription."

12              Do you remember those

13   campaigns?

14       A.     I don't remember that campaign

15   specifically.

16       Q.     You don't?  Okay.

17              Are you aware that between 2006

18   and 2007, Walmart was in fact underpricing

19   the co-payments charged by some traditional

20   retail and chain pharmacies for generic

21   drugs?

22       A.     No, I'm not aware of that.

23       Q.     Did you, as a buyer, see

24   increased demand or an increased need for

25   more volume for generic drugs upon the

1    introduction of these two pricing programs,

2    the $4 program and the $9 program?  Did you

3    need to buy more generic pills to meet the

4    needs of the dispensing pharmacies?

5           A.     In some cases, yes.

6           Q.     Any of those come to mind?

7           A.     Not specifically.

8           Q.     Did the pharmacy buying group

9    also grow when they introduced these

10   programs?

11          A.     I can't recall if they

12   increased in number because there was

13   transition of people in and out.

14          Q.     Okay.

15          A.     I know I was moved over to

16   generics to help with that program.

17          Q.     So when that program was

18   introduced, that's one of the reasons why you

19   started to focus more on generic purchasing?

20          A.     Yes.

21          Q.     Okay.

22                 Do you know whether Walmart's

23   relative share of the prescription drug

24   market increased between 2006 and 2008?

25          A.     I don't.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know whether it

2  increased between 2005 and 2007?

3    A.    I don't.

4    Q.    Do you know whether Walmart

5  still offers the $4 generic program?

6    A.    Yes.

7    Q.    Do you know whether they still

8  offer the $9 generic program?

9    A.    I do not -- I'm not certain.

10    Q.    Okay.  As a buyer, did you have

11  to consider fixed costs for Walmart?

12    A.    What do you mean by "fixed

13  costs"?

14    Q.    Sure.  That's a fair question.

15         Pharmacy licensing,

16  pharmacists' salary, insurance, rented space,

17  everything that goes into being able to

18  provide a pharmacy service.

19    A.    I, as a buyer, didn't really

20  have access to that information.  I generally

21  would purchase based off of the needs of the

22  pharmacies.

23    Q.    So fixed costs didn't factor

24  into your decision-making process as a

25  pharmacy buyer for Walmart?

1    A.    That's correct.

2    Q.    As a pharmacy buyer, did you

3  consider whether lower costs for prescription

4  drugs would encourage more customers to come

5  into Walmart?

6    A.    I don't -- I don't really have

7  a -- one way or the other.  I mean, the goal

8  was to offer affordable products so that

9  customers had access to prescriptions that

10  they could afford.

11    Q.    Fair to say nobody instructed

12  you that you should try to secure more volume

13  of lower-cost prescription drugs to increase

14  foot traffic in the Walmart stores?

15    A.    No.  That was never something

16  that I encountered.

17    Q.    Okay.  And you didn't consider

18  the possibility that increased foot traffic

19  may have a positive impact on other non-drug

20  sales profit?  So, for example, the patient

21  comes in.  They have a prescription in hand.

22  They're going to go get their $4 generic

23  prescription filled.  They're also going to

24  walk past to the grocery section, clothing

25  items, household products, whatever else it

Highly Confidential - Subject to Further Confidentiality Review

1    may be.  Because they're making the trip into

2    Walmart.  They're in the store already, that

3    they might purchase not only their generic

4    drug, but also something else.

5              That's not something that

6    factored into your purchasing more volumes?

7    A.    My role as a buyer was to

8    secure product to support the stores.

9    Q.    Okay.

10              In the article they describe --

11    the one I handed you from Dr. Agwunobi, he

12    described generic drugs as being almost

13    equivalent to a commodity.

14              Did you view, or do you view

15    generic drugs as a type of commodity?

16              MR. CARTER:  Object to the

17         form.

18              THE WITNESS:  Personally, I

19         don't.

20    Q.    (BY MR. ECKLUND)  Okay.  What

21    would make a generic drug unique among other

22    generic drugs?

23    A.    I mean, personally, I mean,

24    maybe the different diseases that they treat.

25    Q.    Okay.  So if there were two

Highly Confidential - Subject to Further Confidentiality Review

1   drugs that were intended to treat the same

2   condition -- they're both generic versions of

3   the same drug -- would you view those as

4   essentially interchangeable or would you view

5   them as in some way unique?

6          A.     I don't know that I'm

7   following.

8          Q.     Okay.

9          A.     I mean, there are substitution

10  rules in what products can be dispensed for

11  what conditions.  And I'm not certain what

12  specifically you mean by "substitution."

13         Q.     Let's use ibuprofen as an

14  example.

15         A.     Okay.

16         Q.     So you've got brand-name

17  ibuprofen.  You're familiar with that; right?

18         A.     Motrin?

19         Q.     Motrin?  Okay.

20                Advil?

21         A.     Mm-hmm.

22         Q.     Other pain relievers are out

23  there.  You've also probably seen a store

24  brand of ibuprofen.

25         A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  I want you to imagine

2   that they have similar coatings, okay?  One

3   doesn't have a gel cap and the other one

4   doesn't have some kind of buffering.  They're

5   equivalent coatings, same dosage size,

6   50 milligrams.  Do you as a pharmacist view

7   the generic and Motrin different --

8   differently?

9      A.    As a pharmacist?

10     Q.    Yeah.

11     A.    It's a generic version of a

12  brand.

13     Q.    Do you view them as different?

14  Are they interchangeable?

15     A.    Yes.

16     Q.    You do?

17     A.    As a pharmacist I do.

18     Q.    Okay.  Why?

19     A.    Because they're AB-rated to one

20  another.  They're substitutable for one

21  another by law, Motrin to ibuprofen.

22     Q.    Okay.

23           MR. ECKLUND:  Okay.  Let's take

24      a break.

25           THE VIDEOGRAPHER:  We are going

1          off the record at 2:32 p.m.

2                  (Recess taken, 2:32 p.m. to

3          2:47 p.m.)

4                  THE VIDEOGRAPHER:  We are back

5          on the record at 2:47 p.m.

6                  MR. ECKLUND:  Welcome back,

7          Ms. Coleman.

8          Q.     (BY MR. ECKLUND)  Welcome back,

9    Ms. Coleman.  In your role as a pharmacy

10   buyer for Walmart, did you look at pharmacy

11   order history as a part of your purchasing

12   decisions?

13         A.     Order history from the stores?

14         Q.     From the stores.

15         A.     Generally we only saw what they

16   were dispensing, so we would use that to

17   build inventory to support them.

18         Q.     Did you notice a trend over

19   time where a particular pharmacy within

20   Walmart were selling more and more of a

21   specific product?

22         A.     When -- as a buyer, I didn't

23   look at it at store level.  I would just look

24   overall.

25         Q.     When you say "overall," do you

1    mean overall for the entire country or did

2    you mean overall within a region?  A state?

3         A.    Overall, in the U.S.

4               So I would order to put the

5    product in the five DCs that we had to

6    support the business across the U.S.

7         Q.    Okay.  So you weren't concerned

8    with or considering, in connection with your

9    purchasing decisions, the number of pills

10   being dispensed within the state of Ohio, for

11   example, versus the nation as a whole?

12        A.    Correct.  We looked at what was

13   being dispensed and ordered into the pharmacy

14   DCs to support what the pharmacies needed.

15        Q.    Do you think if you had looked

16   at the data at a pharmacy or state level, you

17   might have been able to see trends that were

18   troubling about additional or heightened

19   purchases of controlled substances?

20             MR. CARTER:  Object to the

21        form.  You switched from -- maybe that

22        was intentional.

23             MR. ECKLUND:  It was

24        intentional, yeah.

25             MR. CARTER:  Okay.

1    Q.    (BY MR. ECKLUND)  So the

2  original question was, "You weren't concerned

3  with or considering, in connection with your

4  purchasing decisions, the number of pills

5  being dispensed within the state of Ohio, for

6  example, versus the nation as a whole?"

7            You said, "Correct.  We looked

8  at what was being dispensed and ordered into

9  the pharmacies DCs to support what the

10  pharmacies needed."

11            Switching from prescription

12  drugs to controlled substances, do you think,

13  if you had looked at the data at a pharmacy

14  or at a state level, you might have been able

15  to see trends that were troubling about

16  additional purchases of controlled

17  substances --

18            MR. CARTER:  Form.

19    Q.    (BY MR. ECKLUND)  -- within the

20  state of Ohio?

21    A.    As a buyer, in that -- the time

22  that I was a buyer, we did not look down to

23  store level and what they dispensed.

24    Q.    And I appreciate what you did

25  at the time.  I'm asking if you had looked at

Highly Confidential - Subject to Further Confidentiality Review

1    it in a different way, might you have seen

2    more information that could have influenced

3    your purchasing decisions or Walmart

4    purchasing decisions?

5         A.    Sitting here today, I can't

6    speak to what difference that would have

7    made.

8         Q.    Knowing then what you know now

9    about the opioid crisis, do you think you

10   could have done more to appreciate or

11   understand the number of pills being

12   dispensed within the state of Ohio or the

13   state of West Virginia or any other various

14   states, to see how many pills were going into

15   the markets?

16              MR. CARTER:  Object to the

17         form.

18         Q.    (BY MR. ECKLUND)  Rather than

19   looking at it as just the United States?

20              MR. CARTER:  Object to the

21         form.

22              THE WITNESS:  You're going to

23         have to repeat what you're asking me,

24         because I'm -- I'm now confused.

25         Q.    (BY MR. ECKLUND)  Okay.  So are

1    you familiar with the term "Hindsight is

2    20/20"?

3          A.    I'm familiar with that.

4          Q.    Okay.  What I'm asking you is,

5    with the benefit of knowing where we are

6    today as a country, in the midst of an opioid

7    crisis, using your term from earlier today,

8    understanding and appreciating that many

9    communities have been absolutely decimated by

10   the opioid crisis, if you had looked at more

11   granular data, looked at the data more

12   closely, looked at it at a neighborhood by

13   neighborhood, county by county, city by city,

14   state by state, instead of just the entire

15   United States, do you think you could have

16   seen something in the trends that could have

17   prevented Walmart from dispensing as many

18   prescription opioids?

19               MR. CARTER:  Object to the

20          form.

21               THE WITNESS:  Sitting here

22          today, I -- in a buyer role, that was

23          just not what the buyer role was

24          looking at or focused on.  It was

25          looking at, in general, dispensing

Highly Confidential - Subject to Further Confidentiality Review

1          across all products, not just

2          controls, and making sure that we had

3          adequate on hand to support the

4          stores.

5          Q.    (BY MR. ECKLUND)  I understand

6     it wasn't part of your role at the time.

7     What I'm asking is, if had you done your job

8     slightly differently, within Walmart, you had

9     approached it in a different way, when you

10    looked at more information at a more

11    localized level, do you think that the

12    outcomes for Walmart's prescription buying

13    could have been different?  That you might

14    have purchased fewer pills?

15               MR. CARTER:  Object to the

16          form.

17               THE WITNESS:  Just seems like

18          speculation that I can't really speak

19          to.

20               MR. ECKLUND:  Okay.

21          Q.    (BY MR. ECKLUND)  So you don't

22    know one way or the other?

23          A.    I really don't.

24          Q.    Okay.  And if, as a pharmacy

25    buyer, you had seen increases in dispensing

1    in a small county in West Virginia that were

2    two or three orders of magnitude higher than

3    they had been the prior year, is that

4    something that would have caused you concern?

5    Been a red flag?

6         A.    As a buyer, I didn't look down

7    to store level purchases.

8               My role was to provide products

9    in the distribution centers to support the

10   stores.

11        Q.    Okay.

12              Did you see an increase in

13   dispensing nationally for prescription

14   opioids?

15        A.    I didn't.  One way or the

16   other, I didn't.

17        Q.    So you didn't see it or you are

18   unaware that it happened?

19        A.    I didn't watch to that level,

20   down to a product level.

21        Q.    Okay.

22              Did you look at national data

23   on a product-by-product basis for any other

24   class of drugs, aside from prescription

25   opioids?

1          A.      Repeat your question again.

2    You're referring to a prior question, so I

3    don't know that I'm following.

4          Q.      Okay.  So you said that you

5    didn't watch to that level, down to a product

6    level.

7                  And I said, "Okay.  Did you

8    look at national data on a product-by-product

9    basis for any other class of drugs, aside

10   from prescription opioids?"

11                 So what I'm wondering is,

12   putting aside just prescription opioids, were

13   there any drugs that Walmart purchased, any

14   at all, that you were tracking, looking at

15   national data?

16         A.      I would look at our information

17   on the categories that I bought to make

18   decisions of how much product to bring into

19   the distribution centers.

20         Q.      Okay.  Earlier today we went

21   over a document where Mallinckrodt was

22   providing -- or Endo -- I can't recall, so

23   don't hold me to this.

24                 Where there were two prices for

25   the same drug at the same dosage, same

1    strength, sold in 100-unit bottles, sold in

2    500-unit bottles.  Do you recall that?

3         A.    Yes.

4               MR. WATTS:  Object to the form.

5         Q.    (BY MR. ECKLUND)  And it was a

6    discount on the 500 bottles relative to the

7    100-count bottles.  Do you recall that?

8         A.    Yes.

9         Q.    Okay.  If a pharmacy was

10   purchasing, let's say 1,000 units; right?

11   They needed 1,000 pills.  But they ordered

12   ten 100s.  Would you, in the pharmacy buying

13   department, switch it to two 500-unit bottles

14   to save money?

15        A.    I didn't have any control over

16   that.  The store ordered what they ordered,

17   and the distribution centers shipped what

18   they ordered.

19        Q.    So if they were spending money

20   poorly, if they were wasting money, if there

21   was an opportunity to save money, there was

22   no autocorrect, no way to fix that if they

23   were ordering ten pills at 100, swapping it

24   out, switching it to two at 500?

25        A.    When I was a buyer, there was

1    not.

2         Q.    Did you ever access order

3    history when -- in your role as a pharmacy

4    buyer for Walmart?

5         A.    Order history specific to?

6         Q.    Pharmacies.

7         A.    I primarily used dispensing

8    history.

9         Q.    Okay.

10        A.    Not order history.

11        Q.    Do you know how far back in

12   time Walmart's order history systems track

13   purchases?

14        A.    I don't.

15        Q.    Do you know whether it's a few

16   years?  A decade?

17        A.    I don't.

18        Q.    Do you know whether they track

19   or maintain order histories?

20        A.    I know that we had several

21   years that we would look at, but I don't know

22   how far back it went.

23        Q.    Okay.  Earlier today we were

24   talking about the crisis, and I believe you

25   used the term "legitimate medical need."

1   That Walmart would provide products for

2   legitimate medical needs.

3                Do you remember that testimony?

4        A.      Not specifically, but I

5   remember parts of it.

6        Q.      Do you want -- would you like

7   the court reporter to read it back to you, or

8   do you --

9        A.      I guess probably.

10       Q.      Okay.

11               (Whereupon, the following

12       testimony was read by the court

13       reporter.)

14               "QUESTION:  As a buyer, I just

15       was disconnected from what patient --

16       you know.  So my role was -- they were

17       filling legitimate prescriptions for

18       patients.  And I was supplying them

19       with product so that they could fill

20       those prescriptions.  And that was

21       really my role as a buyer."

22               (End of readback.)

23       Q.      (BY MR. ECKLUND)  Do you

24   remember that testimony now?

25               How, in your role as pharmacy

1    buyer, would you know that you were filling

2    legitimate prescriptions, based on the

3    information you were looking at?

4         A.    My role as a buyer was to

5    ensure that I had on hand for stores to buy

6    product and have it for their patients.

7              The pharmacist's role is to

8    determine whether it's legitimate, whether

9    the patient -- is it a legitimate

10   prescription, is it -- you know, has the

11   patient taken it before?  What medical

12   history?  Those types of things.  That's the

13   pharmacist's role.

14        Q.    So in your role as a pharmacy

15   buyer, legitimacy of a prescription was not

16   something you considered?  It was something

17   that was someone else's responsibility to

18   look at, the pharmacist at the dispensing

19   pharmacy within Walmart?

20        A.    In my role as a buyer, I could

21   not oversee that.  It's important, but I --

22   this was not -- their processes and policies,

23   as I stated earlier, to support the stores in

24   what they can do as a pharmacist,

25   requirements for security of controlled

Highly Confidential - Subject to Further Confidentiality Review

```
1    substances and all of those laws that they
2    follow, their role is to do that and make
3    every effort to make sure that they're
4    dispensing products for legitimate medical
5    reasons, as a pharmacist.
6              As a buyer, I supported the
7    pharmacist in the field with products.
8         Q.    Okay.  When you were a
9    pharmacist, prior to your time as a pharmacy
10   buyer, when you were working as a pharmacist
11   out of Walmart, how would you have determined
12   whether there was a legitimate need for a
13   prescription to be filled by a consumer?
14        A.    If they brought in a
15   prescription, I would ensure that it looks to
16   be valid.  It's written correctly.  It's -- I
17   would look at their history.  I would -- if
18   there was a question, I would contact the
19   physician.
20             If they were transferring from
21   another pharmacy, I would contact that
22   pharmacy if I felt that I needed to.
23             And then I would make a
24   pharmacy judgment to dispense the
25   prescription.
```

1          Q.     Okay.  I'll have to go through

2     each one of those.

3                So at the time you were

4     pharmacist, you were able to look at a

5     patient's history within the systems you had

6     in place at that time?

7          A.     Yes.

8          Q.     And do you know whether you

9     could still look at a patient's history

10    today?

11         A.     At that pharmacy, yes.

12         Q.     Okay.

13                And then you talked about that

14    the prescription was filled out correctly.

15    By "filled out correctly," do you mean it was

16    dose, date, signed by a doctor from a

17    prescription pad from a licensed medical

18    provider?

19         A.     Correct.

20         Q.     Anything else?

21         A.     How many -- how many have you

22    listed?

23         Q.     Refills might be an option?

24         A.     Yeah.  Anything that's required

25    to be on that prescription to fill it.

```
 1            Q.     So it was complete?

 2            A.     Yes.

 3            Q.     And would the most important

 4    single thing be that it's from a prescription

 5    pad from a licensed medical provider and

 6    signed by the provider?

 7            A.     That would be important as well

 8    as it's written for a product that's the

 9    right strength or is in a strength that it's

10    written for and a quantity and a dosage that

11    is appropriate.

12            Q.     How would you, in your judgment

13    as a pharmacist, determine whether strength

14    of a prescription was appropriate?

15            A.     I mean, if he wrote it and it's

16    not available in that strength.

17            Q.     So if it simply doesn't exist?

18            A.     If it simply doesn't exist.

19            Q.     So if the prescription said Oxy

20    1000s, those don't exist; hence that's not

21    going to be filled.  You would have picked up

22    the phone call to the pharmacy or some

23    manager or maybe the physician?

24            A.     The physician.

25            Q.     The physician?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      And you would have told him:

3   "Look, I have a prescription for a

4   nonexistent drug.  Can we get clarification

5   from the provider what they intended to

6   prescribe?"

7      A.      Correct.

8      Q.      What do you mean by

9   "appropriate for use"?

10     A.      I suppose an example of that

11  would be, you know, an oral contraceptive,

12  and it's a male.

13             Different -- I mean, is it --

14     Q.      Okay.  You're not thinking of

15  contraindications between two drugs.  You're

16  not thinking of allergies?

17     A.      We would look at all of those

18  things, yes.

19     Q.      Okay.  So contraindications,

20  allergies --

21             MR. CARTER:  Hold on one

22        second.

23             Folks that are on the phone,

24        and not on hold for us, we're going to

25        hang up and just redial back in.  So

1          if you guys can -- if you guys can do

2          the same thing, then we'll get rid of

3          this hold music.

4                  THE VIDEOGRAPHER:  Going off

5          the record at 3:02 p.m.

6                  (Recess taken, 3:02 p.m. to

7          3:04 p.m.)

8                  THE VIDEOGRAPHER:  We are back

9          on the record at 3:04 p.m.

10                 MR. ECKLUND:  So, Ms. Coleman,

11         we went off the record briefly to

12         address some hold music.

13                 We'll probably hear another

14         "beep beep" as that person rejoins us

15         when they realize they got hung up on.

16         Q.     (BY MR. ECKLUND) So we were

17    talking about appropriate dispensing of

18    pharmaceutical drugs in your role as a

19    pharmacist many years ago within Walmart.

20    And you mentioned one example might be a

21    gentleman walks in off the street with a

22    prescription for birth control pills.  And

23    you would say, "Well, that's inappropriate.

24    That doesn't make any sense to me.  We're not

25    going to dispense that."

Highly Confidential - Subject to Further Confidentiality Review

1    We were talking about other

2  potential occasions where you would have used

3  your judgment as a pharmacist to question or

4  call a doctor or prescriber about a

5  particular prescription.

6    The example is -- I believe I

7  was talking about contraindications.  Are you

8  familiar with contraindications?

9    A.    Yes.

10    Q.    What's a contraindications?

11    A.    If they had a health condition

12  that could have been impacted by a therapy,

13  or other drugs that they were taking.

14    Q.    Okay.  Would allergic reactions

15  be something else that might have been shown?

16    A.    Yes.

17    Q.    Okay.  Any other occasions

18  where you might have exercised your judgment

19  as a pharmacist to question whether or not a

20  prescription was appropriate for a patient

21  with a prescription?

22    A.    Sitting here now, that's all

23  that I can think of.  It's been a while.

24    Q.    Okay.  Do you know whether

25  Walmart today follows basically these same

1    steps that you followed way back when?  That

2    they would look at the history of a patient,

3    that they would look at what's being filled

4    out, whether it's available, whether it makes

5    sense, the number of pills, the number of

6    refills, the size of the pills?

7         A.    I've been away from operations,

8    so I really can't speak to the steps and

9    processes that the stores have and used to.

10        Q.    Do you think it would be

11   important for pharmacists today to exercise

12   the same type of judgment to consider whether

13   or not it's appropriate for a patient to

14   receive a medication based on

15   contraindications or, as you pointed out,

16   what might be an inappropriate use, a man

17   receiving a drug for birth control?

18              MR. CARTER:  Form.

19              THE WITNESS:  Yes.

20        Q.    (BY MR. ECKLUND)  We talked

21   about volume pricing and discounts.

22   Corollary to the volume being ordered is also

23   how the pills get dispensed.  Do you know

24   whether, from the pharmacy side, within

25   Walmart, halving of a quantity versus

Highly Confidential - Subject to Further Confidentiality Review

1    doubling of a quantity that it's a lockstep

2    linear relationship on price?

3              For example, if you buy 25

4    pills from the pharmacy at Walmart, that's

5    going to be exactly one-half the price of 50

6    of the exact same pill from Walmart?

7         A.    I really can't say one way or

8    the other.

9         Q.    Okay.  Do you know if there are

10   any other cost-per-unit variations that are

11   considered within Walmart?

12        A.    Not that I can speak to.

13        Q.    Cost per unit was not something

14   that you were concerned with in connection

15   with supplying dispensing pharmacies?

16        A.    As I've stated earlier in my

17   testimony, that cost is one of the

18   determinations of products.  It's important,

19   but I ordered -- I bought what the pharmacies

20   needed to dispense.

21        Q.    I probably asked this

22   inartfully.

23              Once you purchased the volume

24   that you're going to buy, one X, a million X,

25   it doesn't matter what it is, okay?  Once

1    you've purchased that volume and you've

2    provided to the nation of Walmart dispensing

3    pharmacies, whether it's $2.50 for 25 and $5

4    for 50, or if it's $5 for 25 and $4 for 50,

5    it's not something you were concerned with,

6    one way or the other?

7           A.    I didn't -- the stores ordered

8    what they ordered.

9           Q.    Okay.  Do you recall ever

10   receiving any policy changes in your role as

11   a pharmacy buyer for Walmart?

12          A.    Policy changes?

13          Q.    Did they ever provide you any

14   policies, guidelines, how you should do your

15   job?

16          A.    I can't recall specifically.

17          Q.    Okay.  At those annual meetings

18   you would have, there were no discussions

19   about changes in policy?

20          A.    I can't recall.

21          Q.    Okay.  In connection with

22   controlled substances, did you, as a pharmacy

23   buyer, ever request information concerning

24   the suspicious order monitoring program from

25   a wholesaler or a manufacturer concerning

1    drugs that were being purchased by Walmart?

2    Controlled substances?

3          A.     Can you repeat that one more

4    time?

5          Q.     Sure.  In your role as a

6    pharmacy buyer for Walmart, did you ever

7    request information concerning a suspicious

8    order monitoring program from a wholesaler?

9          A.     The only time I really dealt

10   with suspicious order monitoring was with

11   McKesson.

12         Q.     So that's a wholesaler and

13   that's suspicious order monitoring.  So you

14   dealt with McKesson in connection with their

15   suspicious order monitoring?

16         A.     Into the detail that if a store

17   had a question about anything, I was the

18   intermediary between the store and McKesson

19   in my role, too, as a buyer.

20                So if they had a question

21   regarding anything, I was aware of the

22   monitoring that McKesson had.  But that's to

23   the depth of my knowledge on that.

24         Q.     Do you recall when that

25   occurred?  When the questions may have been

1    raised by a pharmacy and you as the

2    intermediary?

3         A.    I don't recall.

4         Q.    Do you recall any of the

5    circumstances surrounding that discussion

6    where you served as an intermediary between

7    one of the pharmacies?

8         A.    I don't recall the details.  I

9    don't.

10        Q.    Beyond McKesson, do you recall

11   any other wholesalers' suspicious order

12   monitoring programs?  Any occasion where you

13   had to become aware about their suspicious

14   order monitoring program?

15        A.    I don't recall that, no.

16        Q.    Any occasion where you

17   requested information about any other

18   wholesalers' suspicious order monitoring

19   programs?

20        A.    I don't recall that either.

21        Q.    Were suspicious order

22   monitoring programs important to you as a

23   pharmacy buyer for Walmart?

24        A.    I really was not connected with

25   suspicious order monitoring as a buyer.

1      Q.     Same question for

2  manufacturers.  Were there any occasions

3  where you needed to become aware or verify

4  that a manufacturer had a suspicious order

5  monitoring program in place?

6      A.     Not to my knowledge.

7      Q.     And it's fair to say that

8  suspicious order monitoring programs at the

9  manufacturing level were not something that

10 were important to you in your role as a buyer

11 for Walmart?

12             MR. CARTER:  Form.

13             THE WITNESS:  I didn't have any

14        relationship that included suspicious

15        order monitoring and my relationship

16        with a supplier.

17      Q.     (BY MR. ECKLUND)  Let me try it

18 a different way.

19             You didn't consider

20 manufacturers' suspicious order monitoring

21 programs?

22      A.     I didn't know if they had them

23 or not.

24      Q.     Okay.  So if you don't know if

25 they had them, you certainly didn't consider

1   them?

2          A.      I didn't know if they had them,

3   so ...

4          Q.      Okay.  Did you ever discuss

5   Walmart's suspicious order monitoring program

6   with anyone within Walmart?

7          A.      Not that I recall.

8          Q.      Did you ever provide any

9   wholesaler information about Walmart's

10  suspicious order monitoring program?

11         A.      Not my knowledge.

12         Q.      Have you ever seen or read

13  Walmart's suspicious order monitoring

14  program?

15         A.      I do not have any detail around

16  our -- the program.

17         Q.      Did you ever provide any

18  manufacturers any information about Walmart's

19  suspicious order monitoring program?

20         A.      No.

21         Q.      Okay.  Do you recall any

22  occasions where any of your orders were

23  rejected by suppliers due to suspicious order

24  monitoring concerns?

25         A.      None to my knowledge.

1    Q.    Are you aware of any occasions

2    where your orders were rejected by a

3    wholesaler due to suspicious order monitoring

4    concerns?

5    A.    The only time I'm aware of that

6    is a store specific to a McKesson order.

7    Q.    Let's talk about that order.

8    What do you remember about that

9    order?

10    A.    It was a correspondence where a

11    store was trying to get a product and asking

12    why -- why they didn't get it from McKesson.

13    Q.    What product?

14    A.    In that situation --

15    I don't remember.

16    In that situation, I'm kind of

17    the conduit between the store and resolving

18    any issues, so in that situation I would have

19    contacted McKesson.

20    I recall that a couple of

21    times.  I don't recall the details of the

22    product.

23    Q.    Do you recall which

24    manufacturer?

25    A.    I do not.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     Do you recall whether it was a

2   C-II or C-III?

3        A.     I do not.

4        Q.     Do you recall the year?

5        A.     I do not.

6        Q.     Do you recall whether it was

7   towards the beginning or towards the end of

8   your role as a pharmacy buyer for Walmart?

9        A.     I don't -- I don't recall.

10       Q.     That's okay.

11              So I've put up on the screen a

12  PDF from the Department of Justice DEA,

13  Diversion Control Division.  And this is from

14  the resources section on their website, from

15  the publications and manuals portion, in a

16  subfolder manual, in a subfolder pharmacist's

17  manual, Sections I through VIII.

18              Do you see that, Ms. Coleman?

19       A.     Yes.

20       Q.     And if you need it to be zoomed

21  in upon, I believe our tech-savvy

22  videographer will be able to help you out

23  with that.

24              The "Section I, Introduction,"

25  it describes pharmacist's manual.  "Intended

1    to summarize and explain the basic

2    requirements with prescribing, administering,

3    and dispensing controlled substances under

4    the Controlled Substances Act and DEA

5    regulations."

6              Do you recall ever reading this

7    pharmacist manual in your role as a pharmacy

8    buyer for Walmart?

9         A.    I don't recall reading that.

10             What is the date on that?

11        Q.    This was available from the

12   DEA's website on December 11, 2018.

13             I will not represent that I

14   know exactly when it was originally

15   published, but I'm sure if it's important for

16   your testimony, we can go off the record and

17   try to ascertain that date for you or at

18   least a rough approximation.

19             Do you think it's important for

20   you to know?

21        A.    I just don't recall ever

22   reviewing this.

23        Q.    Okay.  Now, at the bottom it

24   references a 2010 edition of the pharmacist's

25   manual to assist you in understanding the

1    provisions of the Controlled Substances Act.

2              Do you see that?  "Message from

3    the administrator?"

4              "The Drug Enforcement

5    Administration is pleased to provide you with

6    the 2010 edition of the pharmacist's manual

7    to assist you in understanding the provisions

8    of the Controlled Substances Act."

9              Do you see that?

10   A.     Yes, I see it.

11   Q.     And at that time, in 2010, you

12   were still a pharmacy buyer for Walmart?

13   A.     I think -- during the -- yes.

14   Possibly.

15   Q.     But sitting here today, not a

16   clear recollection of having read the

17   pharmacist's manual published by the DEA?

18   A.     Correct.

19             MR. CARTER:  Object to the

20        form.

21             MR. ECKLUND:  Okay.

22             MR. CARTER:  Sorry.  I didn't

23        mean to speak over you.

24   Q.     (BY MR. ECKLUND)  Earlier today

25   we talked about morphine milligram

1  equivalents.  I asked you whether that was

2  something that was important in your role as

3  a pharmacy buyer for Walmart.

4            Do you remember that portion of

5  your testimony?

6       A.    Yes.

7       Q.    Okay.

8            Are you familiar with

9  calculators -- with calculating the total

10 daily dose of opioids for safety dosage?  Are

11 any of these --

12      A.    I'm familiar with this.  I'm

13 not -- had not planned to practice as a

14 pharmacist when I retire, so I haven't kept

15 up to date on morphine and the equivalents.

16 It's really not in the immunization space.

17      Q.    Okay.

18            Do you see these measures?

19 These measures, whether it's hydrocodone,

20 oxycodone, methadone, whoever made these

21 calculations and the conversion factors,

22 which I'm showing you now, from the -- I

23 believe this is from the Center for Disease

24 Control, these are not calculations or

25 conversions that you endeavored to undertake

1    in your role as a pharmacy buyer for Walmart.

2            MR. CARTER:   Form.

3            Q.    (BY MR. ECKLUND)  If you were

4    to receive a request from dispensing

5    pharmacies to obtain codeine or fentanyl or

6    hydrocodone or hydromorphone or methadone or

7    morphine or oxycodone or oxymorphone, which

8    are the drugs that are listed on this chart,

9    and if there was a need from the dispensing

10   pharmacies, and those drugs were available

11   for purchase from your suppliers, you would

12   obtain the pills and provide them to the

13   dispensing pharmacies.  Is that fair?

14           A.    The pharmacists would order

15   what they need.

16           Q.    Right, okay.  You weren't at

17   the same time also trying to determine the

18   total daily amount that the pharmacies were

19   asking for.  You weren't trying to convert

20   what those requests from the pharmacies were

21   in MME equivalent, and you were certainly not

22   trying to add them all up together and tally

23   them up and look at them at a pharmacy level?

24           A.    I was not able to do that at

25   that time.

1    MR. CARTER:  And I'll belatedly

2    object to the form of that question.

3    Q.    (BY MR. ECKLUND)  You said you

4    weren't able to or it's not something you

5    did?

6    A.    It's not something we did.

7    Q.    Because you would be able to

8    take each one of the prescription drugs or

9    controlled substances that were being

10   requested and in an Excel chart figure out

11   the conversion into MMEs; right?

12   MR. CARTER:  Form.

13   Q.    (BY MR. ECKLUND)  I mean,

14   that's mathematics.

15   MR. CARTER:  Form.

16   THE WITNESS:  It would be

17   possible.

18   MR. ECKLUND:  Okay.

19   THE WITNESS:  It was not

20   something we did as a buyer.

21   Q.    (BY MR. ECKLUND)  Okay.  I just

22   wanted to clarify, because you said it was

23   not able to do that at that time, and I just

24   wanted to make sure that you could have done

25   it.  It was just something that was not done

Highly Confidential - Subject to Further Confidentiality Review

1    at that time as a pharmacy buyer.

2              MR. CARTER:  Object to the

3         form.

4         Q.    (BY MR. ECKLUND)  Do you see at

5    the bottom of the page, "How should providers

6    use the total daily opioid dose in clinical

7    practice?  Use caution when prescribing

8    opioids of any dosage and prescribe the

9    lowest effective dose.  Use extra precautions

10   when increasing to greater than or equal to

11   50 morphine milligram equivalents per day."

12             And then asterisk.  "These

13   dosage thresholds are based on overdose risk

14   when opioids are prescribed for pain and

15   should not be guide dosing of

16   medication-assisted treatment for opioid use

17   disorders."

18             "Three factors:  Monitor and

19   assess pain function more frequently.

20   Discuss reducing dose or tapering and

21   discontinuing opioids if benefits do not

22   outweigh harms.  Consider offering naloxone.

23   Avoid or carefully justify increasing dosage

24   to" less than or greater -- sorry, "greater

25   than or" less -- greater than or "equal to

1    90 milligrams equivalent a day."

2              I apologize.  I have text

3    messages coming across from my wife hounding

4    me to catch my flight.

5              Do you see that?

6        A.    I see that.

7        Q.    Okay.  Good.

8              Did you consider in your role

9    as a pharmacy buyer how you might be able to

10   lower the effective doses that were being

11   dispensed by the pharmacies within Walmart?

12             MR. CARTER:  Form.

13             THE WITNESS:  As a buyer at

14        that time, I did not.

15       Q.    (BY MR. ECKLUND)  Do you know

16   whether that's something that changed after

17   you left pharmacy buying?

18       A.    I do not.

19       Q.    Okay.

20             Do you know whether there were

21   extra precautions taken at the pharmacy level

22   when increasing beyond 50 morphine milligram

23   equivalents per day?

24       A.    I'm not aware of any details

25   specific to that.

1    Q.    Did you as a pharmacy buyer

2  take extra precautions when purchasing larger

3  dosages?

4    A.    My role as a pharmacy buyer was

5  to supply buy-in product to support what the

6  stores needed.

7    Q.    As a pharmacy buyer, was it

8  part of your job to try and reduce the

9  available dosage within a community, state,

10  an area, or to discontinue opioids in an

11  area?

12           MR. CARTER:  Form.

13           THE WITNESS:  That was not in

14      my role as a buyer at the time.

15    Q.    (BY MR. ECKLUND)  As a pharmacy

16  buyer, did you ever suggest to the pharmacies

17  that were obtaining these prescriptions for

18  the larger strength opioids to consider also

19  offering naloxone?

20    A.    In my role at the time, we did

21  not do that.

22           MR. ECKLUND:  So this is a

23      PowerPoint presentation produced in

24      native format.  Walmart MDL 000011411.

25           This is a short slide deck.

1       It's four slides.  It says, "Walmart

2       U.S. ethics and compliance.  HW, know

3       your customer, controlled substance

4       requirement."

5           Q.    (BY MR. ECKLUND) And I don't

6   know whether it was misspelled in the

7   original or something happened in production,

8   but let's assume it was a requirement.  Okay?

9           A.    Okay.

10          Q.    Okay.  "HW," does that stand

11  for health and wellness?

12          A.    I suppose.

13          Q.    Okay.  What does it mean to

14  know your customer in the health and wellness

15  context for controlled substances?

16          A.    I'm not familiar with that.

17          Q.    Okay.  At the top of this page

18  it says, "Walmart is unique."  And continues,

19  "Walmart is unique in that we are not only a

20  dispenser of controlled substances.  We are a

21  shipper as well."

22              Do you see that?

23          A.    I do.

24          Q.    And that's consistent with your

25  testimony throughout the day that Walmart

Highly Confidential - Subject to Further Confidentiality Review

1   would purchase and then also dispense to its

2   own or provide to its own dispensing

3   pharmacies?

4        A.     Correct.

5        Q.     And you would also provide mail

6   order shipping of prescription opioids?

7               MR. CARTER:  Form.

8        Q.     (BY MR. ECKLUND)  "We are a

9   shipper as well."  Do you see that?

10       A.     I do.

11       Q.     Is there anything else that

12  they could be talking about as far as

13  shipping?

14              MR. CARTER:  Form.

15              THE WITNESS:  Not that I'm

16       aware of.

17       Q.     (BY MR. ECKLUND)  Is there

18  anything you could consult that would help

19  clear this up?

20       A.     I really don't understand your

21  question.

22       Q.     Well, I'm trying to understand

23  what "We are a shipper as well" means.

24       A.     I've not seen this.

25       Q.     Okay.

1    A.    Just, I don't know what is

2    meant by "shipper as well."

3    Q.    Okay.

4          If you'd go towards the next

5    portion.  "DEA has increased scrutiny on

6    companies' suspicious order monitoring."

7          Do you see that?

8    A.    I do.

9    Q.    And then it continues,

10   "Healthcare distribution" -- and again, I

11   suspect it was a typo in the original.  I'm

12   not sure.  But "distribution management

13   associate."  I think that's supposed to be

14   "healthcare distribution management

15   association," the HDMA, "has put out guidance

16   regarding meeting regulatory requirements."

17         Are you familiar with the HDMA?

18   A.    I am not.

19   Q.    Okay.  So you're not a member

20   of the HDMA?

21   A.    I am not.

22   Q.    And you don't attend the HDMA

23   meetings?

24   A.    I do not.

25   Q.    At the bottom it says, "We

Highly Confidential - Subject to Further Confidentiality Review

1    already have the facility record which shows

2    all of our incidents, refusal to fill

3    records, and details about the pharmacy."

4              Do you see that?

5    A.    Yes.

6    Q.    Do you know where one would

7    find the facility records which show the

8    incidents, the refusal to fill records, and

9    the details about the pharmacies?

10   A.    I do not.

11   Q.    So it's something that you

12   believe you could obtain if you asked for it

13   within Walmart?

14   A.    I do not.  I don't have

15   knowledge of anything around that.

16   Q.    Okay.  The next slide:

17   "Walmart is unique.  Request to create a

18   questionnaire to house store prescription

19   filling history such as number of controlled

20   substances pills dispensed, comparison of

21   controlled substances to all pills dispensed,

22   breakdown of insurance types."

23             Do you see that?

24   A.    Yes.

25   Q.    And again, I don't know if this

1    is something where there's a presentation

2    that was acted on or not.  So I don't want to

3    represent one way or the other.  This is just

4    a PowerPoint that was provided to us.  And

5    obviously we don't work for Walmart.

6              Do you believe it would be

7    useful in your role as a pharmacy buyer to

8    have a breakdown or a comparison of

9    controlled substance orders relative to all

10   pills dispensed?

11        A.    As a pharmacy buyer, I really

12   didn't separate them.  I supported the stores

13   for what they were dispensing.

14        Q.    Okay.  The same question, at

15   the store level, would it have been helpful

16   for you to know the number of controlled

17   substances dispensed by any one store?

18        A.    I wouldn't -- you know, I

19   wouldn't, as a buyer, in the role I played, I

20   did not differentiate in that way, store

21   level or product differentiation.

22        Q.    Okay.

23              Same question.  Breakdown of

24   insurance types.  Would that be something

25   that would be useful for you to have as a

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy buyer?

2         A.    At the time when I was a buyer,

3    I wouldn't -- I wouldn't know whether that

4    would be valuable or not.

5         Q.    I've put up on the screen

6    "Press Release.  McKesson and Walmart

7    announce sourcing agreement for generic

8    pharmaceuticals."

9               Issued May 16, 2016.

10              Are you familiar with this

11   agreement?

12        A.    I'm not.

13        Q.    Okay.

14              I should clarify this.  This

15   isn't a document.  It's a website.

16              Were you aware that the FDA

17   requested removal of Opana Extended Release

18   for risks related to abuse in June of 2017?

19        A.    I am not.

20        Q.    Okay.

21              MR. WATTS:  Object to the form.

22              MR. ECKLUND:  Let's go off the

23        record.

24              THE VIDEOGRAPHER:  We are going

25        off the record at 3:31 p.m.)

```
 1                    (Recess taken, 3:32 p.m. to

 2          3:42 p.m.)

 3                    THE VIDEOGRAPHER:  We are back

 4          on the record at 3:42 p.m.

 5          Q.    (BY MR. ECKLUND)  So,

 6   Ms. Coleman, earlier this morning we were

 7   talking -- or earlier this afternoon, I

 8   think, we were talking about the Medicare and

 9   the OBRA 90 rebates and best prices for

10   Medicare.  And I asked you whether you had

11   any involvement in communicating best prices

12   to the federal government concerning OBRA 90.

13                    Do you recall that testimony?

14          A.    I do.

15          Q.    Similar line of questioning.

16   Do you recall anything providing any

17   information about the prices being paid by

18   Walmart to the Medicaid program?

19          A.    I do not.

20          Q.    Do you recall providing any

21   information about the prices being paid by

22   Walmart to any state group?

23          A.    I do not.

24          Q.    But you do recall from the

25   content we went through that that was a
```

1    responsibility of Walmart to make sure that

2    federal and state and third-party payers were

3    aware of prices being paid, rebates,

4    discounts and the like?

5              MR. CARTER:  Form.

6              THE WITNESS:  I did see that

7         language in the contract.

8         Q.    (BY MR. ECKLUND)  In your own

9    words, what is the role of a wholesaler?

10             MR. CARTER:  Form.

11             THE WITNESS:  Personally, my

12        definition would be they -- they are a

13        supplier that distributes products to

14        pharmacies, different dispensing

15        facilities.

16             That's a very broad term, but I

17        don't know the actual definition.

18        Q.    (BY MR. ECKLUND)  Middleman?

19   Intermediary?

20        A.    I mean, I'm required to give,

21   in some cases, to get the product to the

22   store or to the dispensing facility.

23        Q.    Do wholesalers have exclusive

24   rights to single-source medications?

25        A.    Exclusive rights?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. WATTS:  Object to the form.

2          THE WITNESS:  I really don't

3     know.

4     Q.    (BY MR. ECKLUND)  Are you aware

5     of any occasion where wholesalers had

6     exclusive rights to a generic?

7     A.    I wouldn't know that.

8     Q.    Are you aware of occasions

9     where competing wholesalers would sell the

10    same products during the same period of time?

11    A.    I really don't know.

12    Q.    Beyond the rebates and

13    charge-backs that were identified in some of

14    the documents we worked through earlier

15    today, there are other opportunities for

16    rebates and discounts that could have been

17    incorporated into a contract.  And I just

18    want to run through and see if any of these

19    spark a recollection or a memory.

20          Are you familiar with any

21    contracts entered into by you on behalf of

22    Walmart in your role as a pharmacy buyer that

23    provided for prompt payment discounts?

24    A.    Yes.  That could have been in

25    some contracts.

1    Q.    Can you remember which

2    wholesalers or manufacturers you might have

3    included?

4    A.    I don't.

5    Q.    Cash discounts?

6    A.    That could have been in some.

7    Q.    Free goods that are contingent

8    on the purchase of a larger requirement?  So

9    buy this large volume, get this for free?

10   A.    I don't recall that

11   specifically.

12   Q.    Rebates to providers, not to

13   the payer.  So to providers.  Are you

14   familiar with any?

15   A.    I'm not familiar with that.

16   Q.    Do you recall the arrangement

17   reached between Walmart and Caterpillar in or

18   around 2009, I believe it was?

19   A.    In general that we had an

20   arrangement.  I don't know any details around

21   that.

22   Q.    And you don't have any

23   recollection of any contracts that would have

24   provided some benefit to Caterpillar based

25   upon Walmart's purchase of a drug?

1        A.      I do not.

2        Q.      So I've put up on the screen --

3   it's an article that I found online.

4   topbusiness.net, and it describes the "drug

5   crisis," using your word, within Arkansas.

6   The title of the article is "Arkansas

7   Prescription Drug Crisis Worsens.

8   President Trump addresses national opioid

9   epidemic."  It's dated August 8, 2017.

10               I just want to ask you a couple

11  of questions.

12               Were you aware at the time that

13  this article was published there was a study

14  that showed that Arkansas prescription drug

15  problem was so serious that there were enough

16  pills in the street for each of Arkansas'

17  almost 3 million citizens to have a full

18  bottle?

19       A.      I was not aware.

20       Q.      Were you aware that the CDC had

21  released a report that shows all but nine of

22  Arkansas' 75 counties have had overall opioid

23  prescribing rates higher than the national

24  average?

25       A.      I was not aware of that either.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Were you aware that as a state,
 2    Arkansas has an opioid prescription rate of
 3    114.6 per 100, which is second only to
 4    Alabama?  In 2016?
 5              A.     I'm not aware of that either.
 6              Q.     Are you familiar with Greene
 7    County?
 8              A.     I am not.
 9              Q.     Okay.  Do you know where Greene
10    County is located in Arkansas?
11              A.     I do not.
12              Q.     Are you familiar with Garland
13    and Sebastian Counties in Arkansas?
14              A.     I am not.
15              Q.     Howard County?
16              A.     No.
17              Q.     Jackson County?
18              A.     I'm not from Arkansas.  I just
19    live here.  I don't know the specific
20    counties, no, I don't.
21              Q.     Okay.  All right.
22                     The article talks about a
23    number of counties within the state of
24    Arkansas which have per capita orders far in
25    excess of the national averages.  177.8 pills
```

1    dispensed per capita, 176, 169, 150, and then

2    some with far, far lower.

3              For example, Newton and

4    Cleveland Counties have rates of opioid

5    prescriptions with an average of 0.8 and 1.1

6    dispensed for every 100 citizens.

7              We talked earlier about how the

8    data you looked at was national data.  And we

9    talked about how perhaps if you had looked at

10   more localized data at a county level, at a

11   state level, a city level, that there may

12   have been opportunities to change the ways in

13   which Walmart purchased pharmaceutical drugs,

14   particularly prescription opioids.

15             Seeing these numbers, do you

16   think that you could have done something

17   differently as a purchaser of prescription

18   opioids if you had county level data in mind

19   when you were purchasing for the dispensing

20   pharmacies within Walmart?

21             MR. CARTER:  Object to the

22        form.

23             THE WITNESS:  I just -- I

24        don't -- I don't know how I would use

25        that data.  And only can speak to the

1          time when I was a buyer, and I

2          wouldn't have had the ability -- I

3          wouldn't have used that data in that

4          role.

5                    MR. ECKLUND:  Okay.

6          Q.    (BY MR. ECKLUND)  As a

7    pharmacist, if you were aware that in

8    Greene County, in northeast Arkansas, 177.8

9    pills were being dispensed per capita, yet at

10   the same time, Newton and Cleveland counties

11   had averages of 0.8 and 1.1, would that have

12   been something that you would have

13   considered?

14                    MR. CARTER:  Form.

15        Q.    (BY MR. ECKLUND)  Would it have

16   raised alarms in your own mind?  As a

17   pharmacist, you're looking at these numbers.

18   You have 100 people in one county, you have

19   100 people in another county, and you have a

20   per capita rate in one county of under one,

21   and in the other county you have a per capita

22   rate of nearly 180 pills dispensed.

23                    MR. CARTER:  Object to the

24        form.

25                    THE WITNESS:  As a pharmacist,

1      I would use my professional judgment

2      and assess the patient, verify the

3      prescription with the physician.  I

4      would do my role as a pharmacist

5      dispensing products.

6           That's what I can speak to.

7      Q.   (BY MR. ECKLUND)  The article

8  follows, "Arkansas Legislative Focus."  And

9  the author wrote, "Some of that sobering data

10  was brought to the attention of Arkansas

11  policymakers nearly a month ago when Arkansas

12  health department director Nate Smith gave a

13  presentation to the Joint Interim Committee

14  on Public Health at the state capitol."

15           "According to Smith's report,

16  'Large amounts of opioids are being sold in

17  Arkansas, enough for every man, woman, and

18  child to take 80 pills each over the course

19  of a year.  All together, 235.9 million pills

20  were sold across Arkansas in 2016,' Smith

21  said, citing the most up-to-date data from

22  the CDC."

23           In your role as a pharmacy

24  buyer, you wouldn't have considered the

25  number of pills sold across the state of

1    Arkansas because you were focused on national

2    sales and national dispensing needs; correct?

3                    MR. CARTER:  Form.

4                    THE WITNESS:  I can speak to

5            the time when I was a buyer, which was

6            many years ago.

7        Q.    (BY MR. ECKLUND)  I understand.

8        A.    And I would support the

9    dispensing of what the pharmacist needed to

10   support the patients they served.

11       Q.    Okay.  But the state level data

12   that's being discussed here, talking about

13   how many pills were sold across a given

14   state, whether in 2016 or 2006, it's not

15   something that would have been considered in

16   your role as a pharmacy buyer for Walmart.

17   You were looking at national data, not

18   state-level data?

19                   MR. CARTER:  Form.

20                   THE WITNESS:  In my time as a

21           buyer, we did not look at it that way.

22       Q.    (BY MR. ECKLUND)  And do you

23   know whether today pharmacy buyers within

24   Walmart use state-level data?

25       A.    I do not.

```
 1              MR. CARTER:  I was late on

 2         that.  Let me put a form objection on

 3         that given the timeframe.

 4         Q.    (BY MR. ECKLUND)  In the

 5    article it talks about quarterly data.  It

 6    says, "New quarterly data released Tuesday by

 7    the CDC's National Center For Health

 8    Statistics shows that drug overdose deaths

 9    reached an all-time high in the first three

10    quarters of 2016 of 57,900."

11              And we talked about those

12    numbers earlier.  I think I remember I talked

13    about 1999, the quadrupling, and I talked

14    about these numbers this morning.

15              If you'd look at those numbers,

16    it also talks about the rise.

17              "Earlier this year, the CDC

18    reported that more than 52,000 people died

19    from a drug overdose in 2015."

20              So you can see, between 2015,

21    you have 52,000, 2016, there's 57,900 being

22    associated with drug overdoses, or --

23              Do you see that?  The two

24    numbers, Ms. Coleman?

25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And it continues, "Of those,

2   33,091 involved a prescription or illicit

3   opioid.  63.1 percent.  And since 2000, more

4   than 300,000 Americans have lost their lives

5   to an opioid overdose."

6           Do you know whether Walmart has

7   ever looked back at any of those statistics

8   to determine whether any of its prescribed or

9   dispensed opioids were associated with any of

10  these lost lives?

11          MR. CARTER:  Object to the

12      form.

13          THE WITNESS:  I do not.

14      Q.   (BY MR. ECKLUND)  Looking at

15  these numbers, do you think there's anything

16  that you could have done in your role as a

17  pharmacy buyer to have potentially prevented

18  some of these pills from being dispensed onto

19  the market?

20      A.     I'll answer the same as I have

21  previously.  As a role as a buyer, I provided

22  the products that the stores needed to

23  dispense.

24      Q.     The article continues, "In

25  Arkansas 1,067 people died from a drug

1    overdose between 2013 to 2015, putting

2    Arkansas in the top 20 percent of states that

3    prescribed the most painkillers per capita.

4              "By definition, legal

5    prescriptions for opioid painkillers can be

6    written by doctors to treat moderate to

7    severe pain but can also have serious risks

8    and side effects.  Common types are oxycodone

9    or Oxycontin, hydrocodone, Vicodin, morphine

10   and methadone."

11             A couple of questions.

12             In your role as a pharmacy

13   buyer for Walmart, you've purchased

14   oxycodone, hydrocodone, morphine and

15   methadone?

16        A.    I'm not sure.  I can't recall

17   what I purchased when I was a buyer --

18        Q.    I showed you --

19        A.    -- specifically.

20        Q.    I showed you a number of

21   documents, including one that was signed by

22   you that mentioned certain controlled

23   substances?

24        A.    Certain.  I don't know if all

25   of those were on that document.

1    Q.    Do you know whether Walmart

2    dispensed those other drugs?  If perhaps you

3    didn't purchase them, but maybe Mr. Badeen or

4    Ms. Wilson or someone else within the

5    pharmacy buyer group purchased them?

6              MR. CARTER:  Form.

7              THE WITNESS:  Could have.

8    Q.    (BY MR. ECKLUND)  But you don't

9    know one way or another?

10    A.    I don't know one way or the

11    other.

12    Q.    Okay.  Do you agree that

13    prescription opioids have serious risks and

14    side effects?

15              MR. WATTS:  Object to the form.

16              THE WITNESS:  To some patients,

17       they can.

18    Q.    (BY MR. ECKLUND)  There is the

19    difference between a risk and a manifestation

20    of a problem.  Right?

21              I mean, cigarettes carry a risk

22    of lung cancer.  Doesn't necessarily mean

23    that every person who smokes a cigarette will

24    develop lung cancer.  Right?

25              I mean, drunk driving is risky

1    behavior.  Drunk driving is dangerous.  You

2    shouldn't drive drunk.  Not every person that

3    drives drunk gets injured.  Not every person

4    that drives drunk hurts somebody else.  Not

5    everyone that drives drunk gets pulled over.

6    Right?  It's risky behavior, but it's not

7    always dangerous.

8              Can we agree that opioid

9    painkillers, opioid painkillers have serious

10   risks?

11             MR. WATTS:  Object to the form.

12             THE WITNESS:  They're

13        FDA-approved products.  And as a

14        pharmacist, I would use professional

15        judgment, follow the law, determine if

16        it's appropriate therapy.  That's how

17        I can answer that.

18        Q.    (BY MR. ECKLUND)  Well, an

19   FDA-approved drug can have risks and

20   benefits, though; correct?

21        A.    Whether it's an opioid or not,

22   there are risks to medications.

23        Q.    Okay.  So can we agree that

24   prescription opioids, while FDA-approved,

25   could also have serious risks?

```
 1                    MR. WATTS:  Objection to form.

 2                    THE WITNESS:  They could.

 3                    MR. ECKLUND:  Okay.

 4          Q.    (BY MR. ECKLUND)  Do you recall

 5     when you attended pharmacy school learning

 6     about morphine as a drug?

 7          A.    I'm sure I did.  I don't

 8     remember the specifics.

 9          Q.    Do you recall studying or

10     learning about heroin?

11          A.    I recall studying and learning

12     about all drugs.

13          Q.    Okay.  So you recall studying

14     all drugs, and that would include morphine,

15     heroin, cold medications, the whole panoply

16     of drugs that are available?

17          A.    In general, yes.

18          Q.    Okay.  Do you recall learning

19     about prior opioid crises in U.S. history?

20          A.    I don't recall.

21          Q.    Those in the early 1900s, those

22     in the 1960s, those that predated the

23     implementation and development of the

24     Controlled Substances Act in the 1970s?

25          A.    I really don't recall
```

1    specifics.

2              MR. ECKLUND:  I have no

3         additional questions for you today.  I

4         really do appreciate you taking the

5         time, and I hope you get home safe.

6              THE WITNESS:  Thank you.

7              MR. CARTER:  I just have a few

8         quick questions.  We can keep our

9         seats and I won't make anyone miss a

10        flight.

11             CROSS EXAMINATION

12   BY MR. CARTER:

13        Q.    So we'll start with where we

14   just left off.  You were asked some questions

15   about an Arkansas online news article.

16             Do you recall that?

17        A.    No.

18             Do I recall seeing it?  Yes.

19        Q.    Okay.  And, yes, had you ever

20   seen that article when it actually came up?

21        A.    I did not.

22        Q.    You were asked if you recalled

23   as a buyer ever purchasing, you know, very --

24   there was a list of specific opioids in that

25   article.  Do you recall that question?

1          A.      Yes.

2          Q.      During the time that you were a

3    buyer, did you make purchases across the

4    pharmacy portfolio generally?

5          A.      Yes.

6                  MR. ECKLUND:  Objection.

7          Q.      (BY MR. CARTER)  Was the

8    purchase of controlled substances a major or

9    minor percentage of the overall pharmacy buys

10   that you made?

11         A.      Minor.

12         Q.      Would your purchases of

13   controlled substances include controlled

14   substances other than opioids?

15         A.      Yes.

16         Q.      Were opioid purchases a -- some

17   subset of your controlled substance

18   purchases?

19         A.      Correct.

20         Q.      Sitting here today, do you

21   remember some of the pharmaceutical products

22   that you purchased most regularly during your

23   time as a buyer?

24         A.      I purchased in the diabetes

25   category, and men's health, women's health,

Highly Confidential - Subject to Further Confidentiality Review

1    like oral contraceptives.  Those are the

2    three larger categories that I purchased.

3         Q.    I want to switch gears.  If I

4    could get Exhibits 15 and 16.

5              So you were shown Exhibit 15,

6    which is a three-page document, and it was an

7    email that you had sent to yourself dated

8    December 28, 2006.  Do you see that?

9         A.    Yes.

10        Q.    And then you were asked

11   specifically about the attachment, which was

12   a signed agreement with Ethex for morphine

13   sulfate.  Do you recall that?

14        A.    Yes.

15        Q.    Being asked about that?

16        A.    Yes.

17        Q.    All right.  Then you were

18   shown, in Exhibit 16, an FBI press release

19   about the Ethex Corporation.  Do you recall

20   being shown that?

21        A.    Yes.

22        Q.    Okay.  Now, I want to ask,

23   the -- what's the date of Exhibit 16?

24        A.    March 2010.

25        Q.    And the -- one of the

Highly Confidential - Subject to Further Confidentiality Review

1    paragraphs that counsel asked you about was

2    the second paragraph.  And is there a date

3    referenced in terms of this manufacturing

4    complaint?

5         A.    May 7th to 8th of 2008.

6         Q.    Now, if you look at the

7    agreement that you had with Ethex, what's the

8    date of that attachment?

9         A.    December 27, 2006.

10        Q.    And do you recall, in the FBI

11   document counsel showed you, there was this

12   discussion of two complaints reporting the

13   discovery of oversized morphine sulfate

14   tablets.

15              Do you recall being asked about

16   that?

17        A.    Yes.

18        Q.    And do you recall being asked

19   whether if there had been a manufacturing

20   problem regarding oversized pills, if that

21   was something that hypothetically would be

22   important to you.

23              Do you remember that question?

24              MR. ECKLUND:  Objection.

25              THE WITNESS:  Yes.

1     Q.     (BY MR. CARTER)  In the

2     agreement that counsel showed, what is the

3     product that that is for?

4     A.     This is morphine sulfate oral

5     solution.

6     Q.     Is an oral solution a tablet?

7     A.     No.

8     Q.     Did counsel show you any

9     document that you ever ordered an oral -- or

10    excuse me, did counsel show you a document

11    reflecting a contract to order morphine

12    sulfate tablets during the time period where

13    there was this complaint of manufacturing

14    defect?

15    A.     No.

16    Q.     Okay.  You can put those aside.

17          You were shown a document on

18    the screen that was a CDC chart that talked

19    about total daily dose.

20          Do you recall being shown that?

21    A.     Yes.

22    Q.     And you were asked if you had

23    considered that data and done that during

24    your time as a buyer.

25          Do you recall those questions?

1          A.      Yes.

2          Q.      Do you know what the date of

3     that CDC document was?

4          A.      I don't remember the date.

5          Q.      Do you know whether that was

6     even available in that form during that time

7     that you were a buyer?

8          A.      I do not.

9          Q.      You were asked some

10    questions -- the last topic I want to cover.

11              You were asked some questions

12    about the $4 generic program that Walmart

13    ran.  Do you recall those?

14         A.      Yes.

15         Q.      Okay.  To the best of your

16    knowledge, did the $4 generic program include

17    controlled substances of any kind?

18         A.      It did not.

19         Q.      Okay.  And so it would not have

20    included opioids?

21         A.      Correct.

22         Q.      Okay.

23              MR. CARTER:  I have no further

24         questions.  Thank you.

25                   *   *   *

```
 1                  REDIRECT EXAMINATION
 2    BY MR. ECKLUND:
 3         Q.    Just a few to clean up.
 4               The morphine milligram
 5    equivalent calculation, whether on the CDC
 6    charts or found anywhere else, that's a
 7    conversion based upon chemistry; correct?
 8         A.    Correct.
 9         Q.    And that conversion has not
10    changed based upon publication or the
11    issuance of the CDC's guidance or any other
12    publication.  It's something that has been
13    and will remain for all days the same.
14    Hydrocodone relative to oxymorphone is so
15    strong.  Oxymorphone is so strong relative to
16    morphine.  These are conversions.  It's based
17    on mathematics.  Is that fair?
18         A.    That's correct.
19         Q.    So there's nothing about that
20    CDC chart that you couldn't have incorporated
21    in an arithmetic row and column on an Excel
22    chart?
23         A.    Could have.  We just didn't do
24    it in the role as a buyer.
25         Q.    Okay.  Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

1    In connection with the Ethex

2    Corporation document that counsel just

3    forwarded back to you, you correctly noted

4    out that this described oral solution and

5    that describes tablets; correct?  Throughout

6    the day we've been talking about a number of

7    contracts.  And you have not been able to say

8    definitively whether you did or did not

9    purchase any one of various drugs from any of

10   the manufacturers for whom I've talked to you

11   about, whether it was Endo, Mallinckrodt or a

12   variety.

13          Do you know, sitting here

14   today, that Walmart never purchased morphine

15   sulphate tablets from Ethex Corporation in or

16   around 2008?

17   A.     I don't know that.

18   Q.     The article that I showed you

19   from the internet from Arkansas, I didn't

20   represent on the record that you had read it.

21   But I did want to show you numbers specific

22   to Arkansas.

23          Do you have any reason to

24   believe that any of the numbers found in that

25   article are inaccurate and incorrect?

 1                    MR. CARTER:  Form.

 2                    THE WITNESS:  I don't have any

 3            reason.  I don't have -- one way or

 4            the other.

 5            Q.    (BY MR. ECKLUND)  Would it make

 6      you feel more comfortable if I went on to

 7      another website and pulled the original

 8      source materials from the CDC to show you the

 9      same numbers?

10            A.    I don't really understand what

11      you're asking.

12                    MR. WATTS:  Object to the form.

13            Q.    (BY MR. ECKLUND)  When the

14      document referenced this many people losing

15      their lives in 2016, or that many number in

16      2015, or this many per capita prescribed

17      pills for a county within a given year, are

18      you in any -- for any reason at all concerned

19      about the numbers as reflected in that

20      article being inaccurate?  Do you need some

21      assurance that they're accurate?

22            A.    There were references, I

23      believe, on where that information came from.

24            Q.    And whether or not the article

25      is the source or the origin, or some other

1    materials were the source or the origin, the

2    purpose of the article was just describing in

3    general that you and others within Walmart

4    weren't looking at the county level.  You

5    weren't looking at the state level.  You were

6    looking at the national level.

7               So whether I got you those

8    numbers from Arkansas, from the county, from

9    a hospital, from the CDC, from the Department

10   of Justice, from the DEA or from any of the

11   suppliers, it wouldn't have changed anything

12   because you weren't looking at those things.

13   You were looking at it at the national level;

14   correct?

15        A.    During the time that I was a

16   buyer, that is correct.

17               MR. ECKLUND:  Thank you.  No

18        further questions.

19               MR. CARTER:  We'll read and

20        sign.

21               THE VIDEOGRAPHER:  We are going

22        off the record at 4:11 p.m.

23               (Proceedings recessed at 4:11

24        p.m.)

25                    --o0o--

Highly Confidential - Subject to Further Confidentiality Review

```
1                        CERTIFICATE
2     STATE OF UTAH         )
                            )  ss
3     COUNTY OF SALT LAKE )
4               THIS IS TO CERTIFY that the
      testimony of JOLYNN COLEMAN, the witness in
5     the foregoing cause named, was taken before
      me, DEBRA A. DIBBLE, a Registered Merit
6     Reporter and Certified Realtime Reporter and
      Notary Public in and for the State of Utah,
7     residing at Woodland, Utah.
8               That the said witness was by me,
      before examination, duly sworn to testify the
9     truth, the whole truth, and nothing but the
      truth in said cause and the testimony of said
10    witness was reported by me in Stenotype, and
      thereafter caused by me to be transcribed
11    into typewriting, and that a full, true and
      correct transcription of said testimony so
12    taken and transcribed is set forth in the
      foregoing pages numbered from 4 to page
13    inclusive, and said witness was examined and
      said as in the foregoing annexed transcript.
14
                I further certify that I am not of
15    kin or otherwise associated with any of the
      parties to said cause of action, and that I
16    am not interested in the event thereof.
17    I further certify review of the transcript
      was requested.
18
                IN WITNESS WHEREOF, I have
19    hereunto set my hand this 18th day of
      December, 2018.
20
21
22
23              Debra A. Dibble; RDR, CRR, CRC
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               INSTRUCTIONS TO WITNESS

 2

 3          Please read your deposition over

 4     carefully and make any necessary corrections.

 5     You should state the reason in the

 6     appropriate space on the errata sheet for any

 7     corrections that are made.

 8          After doing so, please sign the

 9     errata sheet and date it.

10          You are signing same subject to

11     the changes you have noted on the errata

12     sheet, which will be attached to your

13     deposition.

14          It is imperative that you return

15     the original errata sheet to the deposing

16     attorney within thirty (30) days of receipt

17     of the deposition transcript by you.  If you

18     fail to do so, the deposition transcript may

19     be deemed to be accurate and may be used in

20     court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                           ERRATA

2     Page   LINE   CHANGE

3     _____  _____  _____

4            REASON: _____

5     _____  _____  _____

6            REASON: _____

7     _____  _____  _____

8            REASON: _____

9     _____  _____  _____

10           REASON: _____

11    _____  _____  _____

12           REASON: _____

13    _____  _____  _____

14           REASON: _____

15    _____  _____  _____

16           REASON: _____

17    _____  _____  _____

18           REASON: _____

19    _____  _____  _____

20           REASON: _____

21    _____  _____  _____

22           REASON: _____

23    _____  _____  _____

24           REASON: _____

25

Highly Confidential - Subject to Further Confidentiality Review

1     ACKNOWLEDGMENT OF DEPONENT

2

3

4        I, JOLYNN COLEMAN, do hereby

certify that I have read the foregoing pages

5    and that the same is a correct transcription

of the answers given by me to the questions

6    therein propounded, except for the

corrections or changes in form or substance,

7    if any, noted in the attached

Errata Sheet.

8

9

10

11

12    _____

JOLYNN COLEMAN                        DATE

13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    _____

20    Notary Public

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

                          LAWYER'S NOTES

       page      LINE

4      _____     _____      _____

5      _____     _____      _____

6      _____     _____      _____

7      _____     _____      _____

8      _____     _____      _____

9      _____     _____      _____

10     _____     _____      _____

11     _____     _____      _____

12     _____     _____      _____

13     _____     _____      _____

14     _____     _____      _____

15     _____     _____      _____

16     _____     _____      _____

17     _____     _____      _____

18     _____     _____      _____

19     _____     _____      _____

20     _____     _____      _____

21     _____     _____      _____

22     _____     _____      _____

23     _____     _____      _____

24     _____     _____      _____

25