```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3
      ------------------------     )
 4    IN RE: NATIONAL              ) MDL No. 2804
      PRESCRIPTION OPIATE          )
 5    LITIGATION                   ) Case No.
      ------------------------     ) 1:17-MD-2804
 6                                 )
      THIS DOCUMENT RELATES TO     ) Hon. Dan A. Polster
 7    ALL CASES                    )
      ------------------------     )
 8
 9                   HIGHLY CONFIDENTIAL
           SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
11      The videotaped deposition of PATRICIA DAUGHERTY,
12    called by the Plaintiffs for examination, taken
13    pursuant to the Federal Rules of Civil Procedure of
14    the United States District Courts pertaining to the
15    taking of depositions, taken before CORINNE T.
16    MARUT, C.S.R. No. 84-1968, Registered Professional
17    Reporter and a Certified Shorthand Reporter of the
18    State of Illinois, at the offices of Bartlit Beck
19    Herman Palenchar & Scott, Suite 600, 54 West
20    Hubbard Street, Chicago, Illinois, on
21    November 15, 2018, commencing at 9:08 a.m.
22
23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

```
 1    APPEARANCES:
 2      ON BEHALF OF THE PLAINTIFFS:
 3          LEVIN PAPANTONIO THOMAS MITCHELL
            RAFFERTY & PROCTOR P.A.
 4          316 South Baylen Street, Suite 600
            Pensacola, Florida  32502
 5          205-396-3982
            BY:  PETER MOUGEY, ESQ.
 6               pmougey@levinlaw.com
                 PAGE A. POERSCHKE, ESQ.
 7               ppoerschke@levinlaw.com
                 LAURA DUNNING, ESQ.
 8               ldunning@levinlaw.com
 9
10          NAPOLI SHKOLNIK, PLLC
            360 Lexington Avenue, 11th Floor
11          New York, New York  10017
            212-397-1000
12          BY:  HUNTER J. SHKOLNIK, ESQ.
                 hunter@napolilaw.com
13               (via telephonic communication)
14
      ON BEHALF OF McKESSON CORPORATION:
15
            COVINGTON & BURLING LLP
16          3000 El Camino Real
            5 Palo Alto Square, 10th Floor
17          Palo Alto, CA 94306-2112
            BY:  DEVON MOBLEY-RITTER, ESQ.
18               dmobleyritter@cov.com
                  (via telephonic communication)
19
20    ON BEHALF OF CARDINAL HEALTH, INC.:
21          WILLIAMS & CONNOLLY LLP
            725 Twelfth Street, N.W.
22          Washington, DC  20005
            202-434-5013
23          BY:  JOSEPH S. BUSHUR, ESQ.
                 jbushur@wc.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):
 2     ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
       AMERISOURCEBERGEN DRUG CORPORATION:
 3
           REED SMITH LLP
 4         10 South Wacker Drive, 40th Floor
           Chicago, Illinois  60606-7507
 5         312-207-2834
           BY:  M. PATRICK YINGLING, ESQ.
 6              MPYingling@reedsmith.com
 7
     ON BEHALF OF WALMART:
 8
           JONES DAY
 9         77 West Wacker Drive
           Chicago, Illinois  60601-1692
10         312-782-3939
           BY:  JASON Z. ZHOU, ESQ.
11              jzhou@jonesday.com
12
13     ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
       aka WALGREEN CO.:
14
           BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
15         54 West Hubbard Street, Suite 300
           Chicago, Illinois  60654
16         312-494-4475
           BY:  KATHERINE M. SWIFT, ESQ.
17              kswift@bartlit-beck.com
18
19     ON BEHALF OF PRESCRIPTION SUPPLY, INC.:
20         PELINI, CAMPBELL & WILLIAMS LLC
           8040 Cleveland Avenue NW, Suite 400
21         North Canton, Ohio  44720
           330-305-6400
22         BY:  KRISTEN E. CAMPBELL TRAUB, ESQ.
                kec@pelini-law.com
23
24
```

```
 1    APPEARANCES (Continued):
 2      ON BEHALF OF RITE AID:
 3           MORGAN, LEWIS & BOCKIUS LLP
             77 West Wacker Drive
 4           Chicago, Illinois  60601-5094
             312-324-1773
 5           BY:  SCOTT T. SCHUTTE, ESQ.
                  scott.schutte@morganlewis.com
 6
 7      ON BEHALF OF DISCOUNT DRUG MARUT:
 8           CAVITCH, FAMILO & DURKIN, CO., LPA
             1300 East 9th Street, 20th Floor
 9           Cleveland, Ohio  44114
             216-621-7860
10           BY:  L. WILLIAM "CHIP" ERB, ESQ.
                  LWErb@cavitch.com
11               (via telephonic communication)
12
        ON BEHALF OF CVS:
13
             ZUCKERMAN SPAEDER LLP
14           1800 M Street NW, Suite 1000
             Washington, DC  20036-5807
15           202-778-1823
             BY:  ANTHONY M. RUIZ, ESQ.
16               aruiz@zuckerman.com
                  (via telephonic communication)
17
18
19
20
21
22
23
24
```

```
 1    ALSO PRESENT:

 2          MADISON SHELQUIST, Legal Assistant,
                Levin Papantonio Thomas Mitchell
 3              Rafferty & Proctor P.A.

 4          JOSH GAY,
                Levin Papantonio Thomas Mitchell
 5              Rafferty & Proctor P.A.

 6          MICHAEL KAUFFMANN, Trial Technician,
                Golkow Litigation Services

 7

 8

 9    VIDEOTAPED BY:  MICHAEL NEWELL

10

11    REPORTED BY:  CORINNE T. MARUT, CSR No. 84-1968

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    I N D E X
 2   PATRICIA DAUGHERTY                EXAMINATION
 3        BY MR. MOUGEY.................  10
          BY MS. SWIFT.................. 413
 4        BY MR. MOUGEY................. 429
 5
 6
                    E X H I B I T S
 7
     WALGREENS-DAUGHERTY EXHIBIT        MARKED FOR ID
 8
     No. 1      LinkedIn Profile                 11
 9
     No. 2      US DOJ, July 2006 Follow-Up      23
10              Review of the Drug Enforcement
                Administration's Efforts to
11              Control the Diversion of
                Controlled Pharmaceuticals;
12              P1.1088 - P1.1088.95
13   No. 3      3/21/13 e-mail string;           40
                WAGMDL00303029 - 00303031
14
     No. 4      1/10/13 e-mail with              80
15              attachment;
                WAGMDL00049752 - 00049773
16
     No. 5      21 USCA Section 801             110
17
     No. 6      Document, Chapter II - Drug     128
18              Enforcement Administration,
                Department of Justice;
19              P-GEN-0064
20   No. 7      Masters Pharmaceutical v. DEA,  140
                U.S. Court of Appeals,
21              861 F3d 206
22   No. 8      Document, "OxyContin: Its use   214
                and Abuse," etc., 8/28/01
23              hearing; PGEN-0047
24
```

```
 1                    E X H I B I T S
 2   WALGREENS-DAUGHERTY EXHIBIT          MARKED FOR ID
 3     No. 9     GAO Report to Subcommittee on       218
                 Oversight and Investigations;
 4               P1.1076 - P1.1076.27
 5     No. 10    9/27/06 letter from US DOJ          245
                 DEA; MCKMDL00478906 - 00478909
 6
       No. 11    12/27/07 letter from US DOJ         260
 7               DEA to McKesson Corporation;
                 MCKMDL00478910 - 00478911
 8
       No. 12    8/16/17 e-mail with                 271
 9               attachment; WAGMDL00183798 -
                 00208715
10
       No. 13    Settlement and Memorandum of        281
11               Agreement; WAGMDL00490963 -
                 00490978; and P-WAG-0001
12
       No. 14    6/12/13 e-mail string;              287
13               WAGMDL00575931 - 00575944
14     No. 15    Administrative Inspection           370
                 Warrant;
15               WAGMDL00493697 - 00493700
16     No. 16    US DOJ/DEA Subpoena;                374
                 WAGMDL00493694 - 00493718
17
       No. 17    2/15/13 e-mail with                 377
18               attachment;
                 WAGMDL00303243 - 00303245
19
       No. 18    3/20/13 e-mail string;              392
20               WAGMDL00303186 - 0030387
21
22
23
24
```

```
1        THE VIDEOGRAPHER:  We are now on the record.

2   My name is Michael Newell.  I'm a videographer for

3   Golkow Litigation Services.

4            Today's date is November 15, 2018.  The

5   time is 9:08 a.m.

6            This deposition is being held in

7   Chicago, Illinois in the matter of National

8   Prescription Opiate Litigation for the Northern

9   District of Ohio, Eastern Division.

10           The deponent today is Patricia

11  Daugherty.

12           Will counsel please identify themselves.

13       MR. MOUGEY:  Peter Mougey on behalf of the

14  Plaintiffs.

15       MS. POERSCHKE:  Page Poerschke on behalf of

16  the Plaintiffs.

17       MS. DUNNING:  Laura Dunning on behalf of the

18  Plaintiffs.

19       MS. SHELQUIST:  Madison Shelquist on behalf of

20  the Plaintiffs.

21       MS. TRAUB:  Kristen Campbell Traub with

22  Prescription Supply, Inc.

23       MR. YINGLING:  Patrick Yingling for

24  AmerisourceBergen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MR. SCHUTTE:  Scott Schutte for Rite Aid.

 2        MR. ZHOU:  Jason Zhou for Walmart.

 3        MR. BUSHUR:  Joseph Bushur for Cardinal

 4   Health.

 5        MS. SWIFT:  Kate Swift for Walgreens.

 6        THE REPORTER:  People on the phone.

 7        MR. ERB:  Chip Erb for Discount Drug Mart.

 8        MR. MOUGEY:  Can we also get who's on --

 9        MS. MOBLEY-RITTER:  Devon Mobley-Ritter for

10   McKesson.

11        MR. MOUGEY:  -- video stream.

12        MR. RUIZ:  Anthony Ruiz from Zuckerman Spaeder

13   for CVS.

14        MR. MOUGEY:  Is there anybody else on video

15   stream that's not -- that didn't answer

16   telephonically?

17             Thank you.

18        MS. SWIFT:  There is another gentleman in the

19   room that I don't recognize who didn't announce

20   himself.

21        MR. KAUFFMANN:  Michael Kauffmann.  I am the

22   technician.

23        MS. SWIFT:  Thank you.  Appreciate it.

24        THE VIDEOGRAPHER:  The Court Reporter is
```

1    Corinne Marut and will now swear in the witness.

2                    (WHEREUPON, the witness was duly

3                     sworn.)

4                    PATRICIA DAUGHERTY,

5    called as a witness herein, having been first duly

6    sworn, was examined and testified as follows:

7                        EXAMINATION

8    BY MR. MOUGEY:

9        Q.    Good morning, Ms. Daugherty.  My name is

10   Peter Mougey.  Am I pronouncing your last name

11   correctly?

12       A.    Yes.

13       Q.    You've spent your entire career but for

14   about 20 months with Walgreens, correct?

15       A.    Yes, that's correct.

16       Q.    And you have your PharmD, is your basis

17   of your educational training, correct?

18       A.    Yes.

19       Q.    And explain the difference between a

20   pharmacist and a PharmD.

21       A.    So, there is a Doctorate in Pharmacy,

22   which is a PharmD; and then when I was in school,

23   you were able to get your Bachelor's in pharmacy.

24   My understanding is most pharmacy schools don't

1    provide that anymore.  So, it's PharmD.

2         Q.    And you left Walgreens for a brief,

3    about 20 months and started back with Walgreens in

4    January of 2013, correct?

5         A.    Yes, that sounds right.

6         Q.    And you had two different jobs outside

7    of Walgreens during that 20 months, correct?

8         A.    Yes.

9         Q.    And those were both in the PBM space

10   essentially, correct?

11        A.    Yes.

12        Q.    I'm going to hand you what we'll mark as

13   Daugherty 1.

14               (WHEREUPON, a certain document was

15                marked as Walgreens-Daugherty

16                Deposition Exhibit No. 1:  LinkedIn

17                Profile.)

18   BY MR. MOUGEY:

19        Q.    Do you recognize this document,

20   Ms. Daugherty?

21        A.    Yes.

22        Q.    And this is your background or CV off of

23   LinkedIn, correct?

24        A.    Yes, that's correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And you put in the information into

 2   LinkedIn with your background, correct?

 3        A.    Yes.  This looks like what I entered

 4   into LinkedIn.

 5        Q.    Yes, ma'am.  This is an accurate

 6   description of your job or work experience with

 7   Walgreens in the 20-month stint with the two PBMs?

 8        A.    Yes.

 9        Q.    Let's start, if we could, on the second

10   page of Daugherty 1.  Your first role with

11   Walgreens, Walgreens Health Initiatives for nine

12   years six months, you were a network audit and

13   compliance manager, correct?

14        MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16        A.    Yes.

17   BY MR. MOUGEY:

18        Q.    And you were in that role for six years

19   and six months, correct?

20        A.    I believe it says -- yes, six years and

21   six months.

22        Q.    It's a little confusing.  Two dates on

23   there.  It's six years and six months off to the

24   right, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Let me just walk through the different

3  titles you've had, and then I'll go through your --

4  a little bit more detail into your background.

5  Okay?

6          Your next role was network audit and

7  compliance manager, correct?

8    A.    At Catalyst Rx, yes.

9    Q.    Yes, ma'am.  And I'm sorry.  I've

10  screwed this up.

11          So, let's start at the very bottom.

12  Clinical operations pharmacy manager with

13  Walgreens, 2002 to 2005, correct?

14    A.    Yes.  That was with Walgreens Health

15  Initiatives.

16    Q.    Yes, ma'am.  And then your next role

17  with Walgreens was network audit and compliance

18  manager from January '05 to June of '11, correct?

19    A.    Yes, with Walgreens Health Initiatives.

20    Q.    Thank you.  In June of '11 is when you

21  left Walgreens and went to Catalyst Rx as the

22  director of network audit and compliance, correct?

23    A.    Yes.

24    Q.    And you were there from June '11 to

```
 1    May 2012, correct?

 2        A.    That's correct.

 3        Q.    And then after May of 2012, you left and

 4    went to Catamaran, same title, director, network

 5    audit and compliance, correct?

 6        A.    Yes.

 7        Q.    And then you came back to Walgreens in

 8    January of 2013 up and to the present time,

 9    correct?

10              How did you become aware --

11        A.    Yes.

12        Q.    -- of the role at Walgreens in

13    January of 2013 or whenever you started to apply?

14        A.    For the role of the Pharmaceutical

15    Integrity position?

16        Q.    Exactly, yes.

17        A.    I was looking on Walgreens online

18    looking for positions.  I was looking for a job,

19    and I had looked at multiple areas and Walgreens

20    was one of them.

21        Q.    So, Walgreens was actively looking for

22    individuals in their Pharmaceutical Integrity

23    Department in late 2012, early 2013?

24        A.    I just know of the position that I
```

Highly Confidential - Subject to Further Confidentiality Review

1    applied for, yes.

2         Q.    Right.  And the position you applied for

3    was the Pharmaceutical Integrity position, correct?

4         A.    Yes.

5         Q.    And more specifically, the manager in

6    the Pharmaceutical Integrity position, correct?

7         A.    Yes.

8         Q.    And you found that job through Walgreens

9    actively looking for individuals to fill its

10   Pharmaceutical Integrity Department, correct?

11        MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13        A.    Yes, I saw it online and I applied.

14   BY MR. MOUGEY:

15        Q.    Yes, ma'am.  And did you come to

16   understand that the Pharmaceutical Integrity

17   Department was a new department at Walgreens?

18        A.    When I had been interviewed, I

19   understood that, yes.  Interviewed.

20        Q.    How did or did someone at Walgreens

21   explain the scope of the responsibilities of the

22   Pharmaceutical Integrity Department during the

23   interview process?

24        MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    I don't recall the details of the

 3   interview other than I was going to be filling a

 4   position as a manager for this department.

 5   BY MR. MOUGEY:

 6        Q.    Did you have an understanding of what

 7   the scope of the responsibilities of the

 8   Pharmaceutical Integrity Department were when you

 9   were applying for the position?

10        A.    I believe at the time I had a good

11   understanding of what I was applying for, yes.

12        Q.    And at that point in time when you were

13   applying for the managerial role in Pharmaceutical

14   Integrity, what was your understanding of the scope

15   of the responsibilities at Walgreens?

16        A.    When I had been interviewed, I don't

17   believe I had a complete understanding until I

18   actually had started in the role.

19        Q.    Yes, ma'am.  And all I asked was,

20   whether you had a complete or whether it was

21   detailed, what I asked was what was your

22   understanding of the role in the scope of the

23   responsibilities of the Pharmaceutical Integrity

24   Department when you were applying for that
```

1    position?

2        A.    My understanding was that as a manager,

3    I would be leading a team that would manage our

4    controlled substance ordering process.

5        Q.    Now, let's go back to page 2, and walk

6    me through a little more granular detail in your

7    roles at Walgreens.  Let's start with clinical

8    operations pharmacy manager.

9            Now, there is a three-year gap between

10   when I see your PharmD in 1999 and beginning at

11   Walgreens in 2002.  What did you do in between

12   those -- that time that you graduated and your

13   first job at Walgreens?

14       A.    I was a technician, and then I was a

15   pharmacist at Walgreens.

16       Q.    At Walgreens prior to this?  So, you

17   actually started at Walgreens directly out of

18   school?

19       A.    Correct.

20       Q.    So, from -- you have been at Walgreens

21   since 1999 but -- I'm sorry -- not 2002, but 1999?

22       A.    Correct.  So, I was a technician in

23   school and then I became a pharmacist at Walgreens.

24       Q.    Can you describe to me the first several

1    years of experience up till 2005, just generally,

2    what the scope of your responsibilities were?

3         A.    Sure.  It was managing our drug file and

4    drug database to make sure that the -- basically

5    the NDCs were loaded correctly and managing our

6    clinical programs at the PBM to ensure that the

7    drugs on each of the clinical programs was accurate

8    and was processing correctly in our -- in our

9    system.

10        Q.    You mentioned ensuring that the NDCs

11   were loaded correctly.  What is the NDC?

12        A.    So, the identifier of the actual

13   medication or drug, we used a vendor that provided

14   a file and that was part of my team's

15   responsibility, to ensure the file was loaded

16   correctly.

17        Q.    So, the NDC code would actually explain

18   the type of the drug, the strength and the size of

19   the delivery, correct?

20        A.    Correct.

21        Q.    Any experience up until 2005 with

22   controlled substance ordering process?

23        A.    No.

24        Q.    Any experience with ensuring that

Highly Confidential - Subject to Further Confidentiality Review

1  suspicious orders were reported to the DEA up until

2  2005?

3       A.    No.

4       Q.    Any experience regarding monitoring for

5  suspicious orders up until 2005?

6       A.    No.

7       Q.    Any experience interacting with the DEA

8  about what industry standards were reporting

9  suspicious orders to the DEA?

10      A.    No.

11      Q.    Any experience performing due diligence

12 on orders that were flagged as suspicious before

13 they were shipped?

14      MS. SWIFT:  Object to the form.

15 BY THE WITNESS:

16      A.    No.

17 BY MR. MOUGEY:

18      Q.    Any experience performing due diligence

19 on any suspicious orders up until 2005?

20      A.    No.

21      Q.    Are the answers to those questions that

22 I just asked, that series of questions, the same up

23 until the point when you began with Pharmaceutical

24 Integrity in January of 2013?

1      MS. SWIFT:  Object to the form.  Which

2   questions?

3   BY THE WITNESS:

4      A.    So, for the questions related to I have

5   not had any experience that you had just identified

6   prior to 2013, I had not -- no experience.

7   BY MR. MOUGEY:

8      Q.    No experience regarding identifying

9   suspicious orders up until January 2013?

10     A.    No, I did not.

11     Q.    You had no experience performing due

12  diligence on orders that were deemed suspicious up

13  until January of 2013?

14     A.    No.

15     Q.    You had no experience dealing or

16  interacting with the DEA on orders that were deemed

17  suspicious?

18     A.    No.

19     Q.    You had no experience reviewing orders

20  at Walgreens or any other pharmacy to identify

21  suspicious orders?

22     A.    No, not prior to 2013.

23     Q.    And so in 2013, January of 2013, when

24  you accepted the position with Walgreens as a

1    manager in Pharmaceutical Integrity, that was your

2    first time that you were responsible for

3    identifying suspicious orders entered by the

4    pharmacy to determine whether or not they should be

5    shipped?

6        MS. SWIFT:  Object to the form of the

7    question.

8    BY THE WITNESS:

9        A.    Yes.  That was when I started in my

10   position in 2013, part of my job was to identify

11   suspicious orders in our stores.

12   BY MR. MOUGEY:

13       Q.    So, let's go up to the summary portion

14   of your CV.  Okay.  Let's walk through that.

15            Starts off with "Health and wellness

16   professional with broad experience across

17   healthcare management spectrum including extensive

18   PBM experience, community practice pharmacy,

19   specialty pharmacy, and long-term care pharmacy."

20            Did I read that accurately?

21       A.    Yes.

22       Q.    And what you mean by that sentence,

23   then, is that you have broad experience with your

24   pharmaceutical background as a pharmacist, a

```
1   technician, and a clinician in that space, correct?

2       A.    Yes.

3       Q.    You're not referring to any experience

4   you had in the field of diversion?

5       MS. SWIFT:  Object to the form.

6   BY THE WITNESS:

7       A.    I did not, no.

8   BY MR. MOUGEY:

9       Q.    All right.  When I say "diversion," you

10  understand what I mean, correct?

11      MS. SWIFT:  Object to the form.

12  BY THE WITNESS:

13      A.    Can you -- can you explain what you mean

14  by diversion?

15  BY MR. MOUGEY:

16      Q.    Why don't you explain to me what you

17  understand, based on your broad experience across

18  healthcare management spectrum, what you understand

19  diversion to mean?

20      A.    So, I understand diversion to mean

21  different things depending on what we're talking

22  about.  I understand diversion to mean if a person

23  that shouldn't have access to a medication or has

24  access to it illegally is basically selling it or
```

1    diverting it, that's my understanding of diversion.

2              And I also understand diversion in terms

3    of if, for example, the medication -- a medication

4    that's not prescribed to a certain patient has

5    gotten into another person's hands illegally.

6              And I also understand diversion to mean,

7    in our stores, for example, in a pharmacy, if there

8    was an employee diverting the medication or

9    stealing the medication and taking it for their own

10   use.

11        MR. MOUGEY:  I will hand you what we will mark

12   as Daugherty 2.

13                   (WHEREUPON, a certain document was

14                    marked as Walgreens-Daugherty

15                    Deposition Exhibit No. 2:  US DOJ,

16                    July 2006 Follow-Up Review of the

17                    Drug Enforcement Administration's

18                    Efforts to Control the Diversion of

19                    Controlled Pharmaceuticals; P1.1088

20                    - P1.1088.95.)

21   BY MR. MOUGEY:

22        Q.   Let's just start on the front page of

23   this document.  In the upper left-hand corner there

24   is a seal, and it references the U.S. Department of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Justice.  You're familiar with the U.S. Department
 2    of Justice, correct?
 3         A.    Yes.
 4         Q.    And as part of the U.S. Department of
 5    Justice, do you see below that Office of the
 6    Inspector General, correct?
 7         A.    Yes.
 8         Q.    Often referred to as the OIG.  You're
 9    familiar with the Office of the Inspector General,
10    correct?
11         A.    Yes.
12         Q.    And below that, Evaluation and
13    Inspection Division, correct?
14         A.    Yes.
15         Q.    And the title of this document is
16    "Follow-up Review of the Drug Enforcement
17    Administration's Efforts to Control the Diversion
18    of Controlled Pharmaceuticals."
19               Do you see the title?
20         A.    Yes.
21         Q.    And it's July 2006, correct?
22         A.    Correct.
23         Q.    All right.  Now, have you ever seen this
24    document before that you can recall?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        MS. SWIFT:  Take your time to look at it if

2    you need to.

3    BY THE WITNESS:

4        A.    I don't recall seeing this document.

5    BY MR. MOUGEY:

6        Q.    If you would, please, turn to page 4 of

7    this document and you'll see in the left-hand

8    corner "Impact of Diversion."

9        A.    On page 4?

10       Q.    Yes, ma'am.

11       MS. SWIFT:  Do you mean iv or is it like a

12   number 4?

13       MR. MOUGEY:  Number 4.

14   BY MR. MOUGEY:

15       Q.    Page 4 and it's titled "Impact of

16   Diversion."  Do you see the entry?

17       A.    Yes.

18       Q.    Okay.  And just to explain as well, I

19   should have started here.  On the screen in front

20   of you is an electronic version of that document,

21   and we'll try to highlight where we are in that

22   document.  So that might help a couple times.  If

23   you refer to that or see that on the screen, that's

24   what that is.  Okay?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Okay.

 2      Q.    It's the same document you have in front

 3   of you or it's supposed to be.

 4            So you see the title "Impact of

 5   Diversion," correct?

 6      A.    Yes.

 7      Q.    That paragraph starts off with "The DEA

 8   Administrator noted the consequences of non-medical

 9   pharmaceutical use in a 2004 cable to DEA employees

10   stating that the diversion and abuse of legal

11   controlled substances poses a significant threat to

12   the health and safety of Americans."

13            Did I read that right?

14      A.    Yes.

15      Q.    Do you agree with that -- with that

16   statement from the OIG?

17      MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19      A.    Yes.  I would agree.

20   BY MR. MOUGEY:

21      Q.    And I continue, "In 2005 Congressional

22   testimony, the DEA's Acting Deputy Assistant

23   Administrator, Office of Diversion control also

24   stated that," and you see the block quote below,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2         A.    Yes.

 3         Q.    And the block quote says, "The

 4    non-medical use of prescription drugs has become an

 5    increasingly widespread and serious problems" --

 6    "problem in the United States.  A new generation of

 7    high dose, extended release, opiate pain

 8    medications have taken the existing threat to a new

 9    level.  The abuse and diversion statistics are

10    alarming.  These powerful drugs provide strong

11    incentives for diversion through new means such as

12    'rogue' Internet pharmacies as well as older

13    methods, like prescriptions for profits.  Recent

14    drug use and surveys have" -- "Recent drug use

15    surveys have highlighted the gravity of this

16    problem."

17              Did I read that accurately?

18         A.    Yes.

19         Q.    And you agree that the diversion from

20    whatever methods had become an increasing problem

21    through the 2000s, correct?

22         MS. SWIFT:  Object to the form, calls for

23    speculation.

24    BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    I don't know that to be true.

2           MR. MOUGEY:  Kate, this is -- if you have an

3     "Object to the form," and that's it.  Okay.  We

4     have done this like five times, and every

5     deposition we have asked please just stick with

6     "Object to the form" and that's it.

7                 So, the one- or two- or three-word or

8     sentence descriptions afterwards, we've asked

9     repeatedly that that stop.  If you please just

10    "Object to the form," that's plenty to preserve

11    whatever objections you have.  Thank you.

12          MS. SWIFT:  I will make the necessary

13    objections.

14          MR. MOUGEY:  Well, if we need to stop and we

15    need to call, because I've asked repeatedly.  If

16    you want to stop and we can interrupt Special

17    Master Cohen and we can ask him what the right

18    objections are and whether or not you need to give

19    a description every time, then we can do that.  But

20    I really would appreciate if you'd just stick to

21    "Object to the form."  Thank you.

22    BY MR. MOUGEY:

23          Q.    I want you to hold on to that document

24    because I'm going to come back to it.
```

```
 1                  Now, let's go back to January '13.  You

 2       accepted the position.  You start back up at

 3       Walgreens, and you've now been designated the

 4       manager of the Pharmaceutical Integrity Department.

 5       Okay.

 6                  Did you have any training at the

 7       beginning of your job to give you some background

 8       or context about the scope of what your

 9       responsibilities were?

10            A.    Yes.

11            Q.    And would you please just generally

12       describe the scope of that training and how long it

13       lasted.

14            A.    So, I was trained on our suspicious

15       order monitoring process with respect to flagged

16       orders in our pharmacies.  I was trained with

17       respect to another function of our job was to

18       ensure the DEA 106 forms were submitted by our

19       stores, so we assisted our stores in that process

20       as well.

21                  And I was also trained on our Good Faith

22       Dispensing policy, and during the course of that

23       year we also established our Target Good Faith

24       Dispensing policy, which of course I helped put
```

Highly Confidential - Subject to Further Confidentiality Review

1    together.

2            And I would say that I am continuously

3    being trained as our policies are changed or

4    updated based on any specific regulations or as

5    things need to be updated.

6        Q.    Okay.  Let's take those one by one, if

7    we can.

8            The first part was that you were trained

9    with respect to Walgreens' suspicious order

10   monitoring process.  Now, I'm focusing on when you

11   started in January of 2013.

12           Do you have a recollection of what that

13   process was at Walgreens when you took the position

14   in January of 2013?

15       A.    So, when I started, the process did not

16   include our fully automated CSO KPI tool that we

17   had developed during that year.  It was slightly

18   more manual in that we were going back and forth

19   with flagged orders and working with our stores in

20   e-mail versus in the actual tool itself.

21           However, we were identifying any flagged

22   orders and working with stores to basically

23   understand if it was a flagged order and needed to

24   be reported as suspicious.

1    Q.    The first part of that description was

2    that you did not have access to the fully automated

3    CSO KPI tool that we had developed during that

4    year.  Was there any automation available to you in

5    the beginning of 2013 when you began with

6    Pharmaceutical Integrity?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    At the time the orders that were flagged

10   were automated, and those were pushed to us and

11   then we were to review them and again the

12   communication was e-mail.

13   BY MR. MOUGEY:

14       Q.    Okay.  And what was your understanding

15   of the automation process to flag orders that came

16   to your department?

17       MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19       A.    I don't recall at the time when I first

20   started.

21   BY MR. MOUGEY:

22       Q.    You don't have any understanding of what

23   the automation was?

24       MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    I understand what our CSO KPI tool was

 3   basically developed to do as far as identifying

 4   flagged orders.  We had implemented that shortly

 5   thereafter, and so I was there for a very short

 6   time when we had this process.

 7   BY MR. MOUGEY:

 8        Q.    Do you have any understanding what the

 9   criteria was when you started for flagging

10   suspicious orders?

11        MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13        A.    I may have then.  I honestly don't

14   recall now.

15   BY MR. MOUGEY:

16        Q.    You mentioned the 106 form, the DEA 106

17   form, your training initially.  That has to do with

18   theft of suspicious -- of controlled substances,

19   correct?

20        A.    Yes.

21        Q.    And reporting those thefts to the DEA,

22   correct?

23        A.    Yes.

24        Q.    And you also mentioned GFD, which is
```

Highly Confidential - Subject to Further Confidentiality Review

1    Good Faith Dispensing, correct?

2         A.    Yes.

3         Q.    And GFD, or Good Faith Dispensing, is

4    different than flagging orders, whether they be

5    orders of interest or suspicious orders, for

6    further due diligence, correct?

7         MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9         A.    Our Good Faith Dispensing policy is a

10   different policy, yes.

11   BY MR. MOUGEY:

12        Q.    Yes, ma'am.  And it fulfills different

13   statutory obligations, the Good Faith Dispensing

14   policies and the flagging of suspicious orders,

15   correct?

16        MS. SWIFT:  Object to the form.

17   BY THE WITNESS:

18        A.    I can't speculate.

19   BY MR. MOUGEY:

20        Q.    I'm not asking you to speculate.  I'm

21   asking based on your broad experience across

22   healthcare management, do you have an understanding

23   of whether or not Walgreens GFD, Good Faith

24   Dispensing, and whatever system it had in place

```
 1   when you started identifying suspicious orders,

 2   fulfilled different obligations?

 3        MS. SWIFT:  Same objection.

 4   BY THE WITNESS:

 5        A.   Can you repeat that.  Sorry.

 6   BY MR. MOUGEY:

 7        Q.   Do you have an understanding of whether

 8   Good Faith Dispensing policies at Walgreen

 9   fulfilled different statutory obligations than --

10   do you have an understanding of whether Good Faith

11   Dispensing policies at Walgreens fulfilled

12   different statutory obligations than Walgreens'

13   system to flag suspicious orders?

14        MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16        A.   I don't know.

17   BY MR. MOUGEY:

18        Q.   Let's go back to your summary in your CV

19   on LinkedIn.  The second sentence says, "Developer

20   of proven audit and compliance model and strategies

21   for decreasing pharmacy costs for organizations and

22   payers while driving long-term effects in creating

23   a quality pharmacy network."

24             Do you see that?
```

1      A.    Yes.

2      Q.    Does that sentence refer to any part of

3  your background in diversion?

4      MS. SWIFT:  Object to the form.

5  BY THE WITNESS:

6      A.    No.

7  BY MR. MOUGEY:

8      Q.    The next sentence says, "Decade of

9  experience managing teams of healthcare

10  professionals including pharmacists and certified

11  pharmacy technicians in the innovation and

12  successful execution of advanced pharmacy audit and

13  pharmacy compliance programs."

14          Did I read that right?

15      A.    Yes.

16      Q.    Does that sentence reference any of your

17  experience with diversion as you previously defined

18  it?

19      MS. SWIFT:  Object to the form.

20  BY THE WITNESS:

21      A.    No.

22  BY MR. MOUGEY:

23      Q.    "Particular" -- reading the next

24  sentence.

1          "Particular experience in management of

2     pharmacy network processes, Medicare Part D, and

3     Fraud, Waste and Abuse programs, long-term care

4     pharmacy, formulary and prior authorization, and

5     specialty pharmacy."

6          Does that sentence cover any of your

7     background or experience in diversion as you

8     previously defined it?

9     A.     In that time before 2013, my experience

10    was not, no.

11    Q.     Was nothing?

12    MS. SWIFT:  Object to the form.

13    BY MR. MOUGEY:

14    Q.     Was nothing regarding diversion,

15    correct?

16    A.     It was -- it was -- I had no experience

17    in my previous positions prior to '13 in diversion.

18    Q.     The last sentence, "Dedicated to

19    monitoring future professionals as demonstrated by

20    ten years of experience managing, teaching and

21    mentoring healthcare practitioners."

22          Correct?

23    A.     Yes.

24    Q.     So, in your ten years of experience

1   managing, teaching and mentoring healthcare

2   practitioners, you're familiar with what a sound

3   training regimen would be, correct?

4        MS. SWIFT:  Object to the form.

5   BY THE WITNESS:

6        A.    Related to my positions at the time,

7   yes.

8   BY MR. MOUGEY:

9        Q.    Yes, of course.  And, so, when you began

10  your training at Walgreens, do you believe that you

11  had the opportunity to be fully trained on the

12  issues and the responsibilities of your new job?

13       MS. SWIFT:  Object to the form.

14  BY THE WITNESS:

15       A.    Can you repeat the question?

16  BY MR. MOUGEY:

17       Q.    Yes, ma'am.  When you began in 2013, as

18  you started your new role, do you believe you were

19  adequately trained to fulfill your obligations in

20  the -- in your role as manager of Pharmaceutical

21  Integrity at Walgreens?

22       A.    Yes, and as I said before, I've been

23  trained ongoing as things change.

24       Q.    Yes, ma'am.  And you feel like the

1    training that you initially had in the beginning of

2    January 2013 and your ongoing training was

3    sufficient for you to fulfill your obligations as

4    manager in Pharmaceutical Integrity Department,

5    correct?

6        A.    Yes.

7        Q.    Now, Pharmaceutical Integrity Department

8    was a relatively new department when you began in

9    January 2013, correct?

10       A.    Yes.

11       Q.    Are you familiar with the acronym at

12   Walgreens MPD?

13       A.    No.

14       Q.    No.  All right.  And you would agree

15   with me that, at any corporation, when one

16   department is training another department, it's

17   important that that training be thorough and

18   complete so the mission of your department is

19   completely communicated, correct?

20       MS. SWIFT:  Object to the form.

21   BY THE WITNESS:

22       A.    I think it's important for me to

23   understand what my role is in my job, yes.

24   BY MR. MOUGEY:

1    Q.    And it's important for others to

2 understand what your role is in your job and what

3 your scope of responsibility is, correct?

4    MS. SWIFT:  Object to the form.

5 BY THE WITNESS:

6    A.    Can you explain what you mean by

7 "others"?

8 BY MR. MOUGEY:

9    Q.    Others within Walgreen.

10    MS. SWIFT:  Same objection.

11 BY THE WITNESS:

12    A.    I think it's important for me to be

13 trained, and I think it's important for others to

14 know what my role is if I interact with those

15 people.

16 BY MR. MOUGEY:

17    Q.    And you understand who -- you know who

18 Tasha Polster is, correct?

19    A.    Yes, she is my boss.

20    Q.    She is your direct report, correct?

21    A.    Yes.

22    Q.    And she is the director or the person in

23 charge, at least in the beginning of 2013, of

24 Pharmaceutical Integrity when you started, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Yes, she was the director.

2            Q.    I will hand you what I'll mark as

3     Daugherty 3.

4                      (WHEREUPON, a certain document was

5                       marked as Walgreens-Daugherty

6                       Deposition Exhibit No. 3:  3/21/13

7                       e-mail string; WAGMDL00303029 -

8                       00303031.)

9     BY MR. MOUGEY:

10           Q.    If you'd start at the top of this page,

11    this is an e-mail from Ms. Polster dated 3/21/2013.

12    You see where you were copied on that e-mail,

13    correct?

14           A.    Yes.

15           Q.    Let's go below.  Do you know who

16    Sherrise Trotz is?

17           A.    Yes.

18           Q.    And who is Sherrise Trotz?

19           A.    At the time she was one of our pharmacy

20    operations directors.

21           Q.    Yes, ma'am.  She was the executive

22    director of pharmacy operations at Walgreens,

23    correct?

24           A.    Yes.
```

1    Q.    And the initial e-mail dated Monday,

2  March 18 says, "All, we are requesting your

3  participation in onboarding our last two hired MPDs

4  on your areas of expertise.  A formal announcement

5  about the MPDs will be distributed later this

6  week."

7         Do you have any understanding of what

8  MPDs are in this context?

9    A.    Honestly, I don't know.

10   Q.    Okay.  And you see in the e-mail where

11 it says, "Subject:  New MPD corporate orientation."

12 Correct?

13   A.    Yes.

14   Q.    So, it looks like new employees are

15 being trained or oriented into different

16 departments at Walgreens, correct?

17   MS. SWIFT:  Objection; lacks foundation.

18 BY THE WITNESS:

19   A.    My understanding is from this e-mail is

20 that she's asking for additional information on our

21 department, just a higher level description.

22 BY MR. MOUGEY:

23   Q.    You can see where you are referencing

24 the "Please be prepared to provide the following,"

Highly Confidential - Subject to Further Confidentiality Review

1   and she says, "A high level explanation of your

2   area."

3           Correct?

4       A.    Yes.

5       Q.    And then the second is an

6   "Organizational chart," correct?

7       A.    Yes.

8       Q.    Third bullet is "Your goals and

9   objectives and how they align to the divisional and

10  corporate strategies."

11          Correct?

12      A.    Yes.

13      Q.    And the fourth is "A paper copy of the

14  presentation."  Correct?

15      A.    Yes.

16      Q.    Are you familiar with what the term

17  "onboarding" means?

18      A.    My understanding of onboarding is making

19  sure that we're providing the right training to new

20  employees.

21      Q.    You're getting new people up to speed,

22  correct?

23      A.    Yes.

24      Q.    And this is Sherrise Trotz reaching out

Highly Confidential - Subject to Further Confidentiality Review

1    to different departments saying, "Hey, we need to

2    get the new people up to speed," right?

3         A.    I can speculate that that's what she's

4    doing, yeah.

5         Q.    What's your understanding of what she's

6    saying?  She is saying, "We are trying to get new

7    people up to speed."  You are included in this

8    e-mail, correct?

9         A.    Yes.

10        Q.    And she is asking for the folks on this

11   e-mail to get the new people up to speed.  Isn't

12   that what your understanding is?

13        MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15        A.    My understanding is that she's just

16   asking for a description of our department and an

17   org chart.

18   BY MR. MOUGEY:

19        Q.    And the purpose of her asking for the

20   organization and the description of the charts is

21   to onboard new people that are starting at

22   Walgreens, correct?

23        A.    To provide them additional information

24   on what our department does and our org chart, yes.

1       Q.      Yes, ma'am.  And Ms. Polster responds,

2   "Please find the one-pager.  I will reach out the

3   new MPDs of the week of April 8 to schedule a call

4   with them."

5           Correct?

6       A.      Correct.

7       Q.      And the attachment is entitled

8   "Pharmaceutical Integrity Overview One Pager.doc,"

9   correct?

10      A.      Yeah.  Yes.

11      Q.      And you were copied on this e-mail,

12  correct?

13      A.      Yes, if I was copied on the attachment.

14  It looks like I was.

15      Q.      Yes, ma'am.  And others in your new

16  department, Pharmaceutical Integrity, were also

17  copied, correct?

18      A.      Yes, Chris Dymon, Eric Stahmann and

19  Edward Bratton.

20      Q.      And those were all folks that held the

21  same level of the organizational chart in

22  Pharmaceutical Integrity as you, correct?

23      A.      Yes.

24      Q.      So, as of this point in time,

Highly Confidential - Subject to Further Confidentiality Review

1   Ms. Polster, Mr. Dymon, yourself, Eric Stahmann and

2   Edward Bratton were the top two levels of the

3   organizational chart in Pharmaceutical Integrity,

4   correct?

5        A.   Yes, we all held the time title and we

6   all reported directly to Tasha Polster.

7        Q.   And if you turn to Bates number, and the

8   Bates number's in the bottom right-hand corner,

9   it's the attachment, it's -- the last two digits

10  are 31, and the title of the document is

11  "Pharmaceutical Integrity," correct?

12       A.   Correct.

13       Q.   And that's your department, correct?

14       A.   Yes.

15       Q.   Have you had a chance just to look at

16  this or do you want to take a chance to read the

17  content?

18       A.   I'd like to take a minute.

19       Q.   Sure.

20       A.   Okay.

21       Q.   Based on what you just reviewed, are the

22  two paragraphs under "Pharmaceutical Integrity,"

23  are those an accurate description of the

24  responsibilities of your department?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Yes.

2     Q.    Are they a complete description of the

3  responsibilities of your department?

4     MS. SWIFT:  Object to the form.

5  BY THE WITNESS:

6     A.    I would say that it's not detailed and

7  specific.

8  BY MR. MOUGEY:

9     Q.    Right.  But are they the -- are the

10  descriptions in the two paragraphs that Ms. Polster

11  forwarded to Ms. Trotz, are these an accurate

12  description as you understood it in the beginning

13  of 2013 of what the objectives of Walgreens'

14  Pharmaceutical Integrity Department was?

15     A.    Yes.

16     Q.    And you agree with that first sentence

17  that "Rx," which is prescription or pharmaceutical,

18  correct, that's the name of the department?

19     A.    Yeah.

20     Q.    That's what that stands for?

21     A.    Yes.

22     Q.    "Integrity was created to, one, protect

23  and, two, grow Walgreens' controlled substance

24  business while transforming community pharmacy to

```
 1    play a greater role in the opiate narcotic epidemic

 2    and protect our business against high risk

 3    prescribers."

 4              Do you see that?

 5         A.    Yes.

 6         MS. SWIFT:  Object to the form.

 7    BY MR. MOUGEY:

 8         Q.    Did I read that correctly?

 9         A.    Yes.

10         Q.    Was the two primary goals as Ms. Polster

11    indicated in these paragraphs, one, to protect and,

12    two, to grow Walgreens' controlled substance

13    business?

14         MS. SWIFT:  Objection; mischaracterizes the

15    document.

16    BY THE WITNESS:

17         A.    So, my understanding when I started in

18    this position as to the description of our team was

19    to ensure we were monitoring suspicious orders,

20    prescriptions that were flagged and to make sure we

21    were retraining and training our pharmacists on

22    good faith dispensing and our Target Good Faith

23    Dispensing policies.

24    BY MR. MOUGEY:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    So, if you would, please, just answer my

2  question.

3            Was the two primary goals, as

4  Ms. Polster indicated in these paragraphs, one, to

5  protect and, two, to grow Walgreens' controlled

6  substance business?  Is that an accurate statement

7  as Ms. Polster starts these two paragraphs off?

8      MS. SWIFT:  Objection; asked and answered.

9  BY THE WITNESS:

10     A.    Whose goal was -- are you talking about

11 my goal?  I think I already answered that.

12 BY MR. MOUGEY:

13     Q.    That sounds a lot like what Ms. Swift

14 just said, asked and answered, and then you

15 respond, "I already answered that."  It's kind of

16 funny how that works, isn't it?

17           So, let's go back to the very first

18 page where it says, "In order to onboard," the word

19 you used, train, "our last two hired MPDs on your

20 area of expertise."

21           Do you see the word "expertise"?

22     A.    Yes.

23     Q.    Pharmaceutical Integrity was the area of

24 expertise on the folks on the top of this e-mail,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   correct?

 2        MS. SWIFT:  Object to the form of the

 3   question.

 4   BY THE WITNESS:

 5        A.    I'm not really sure I understand your

 6   question.  Can you repeat it.

 7   BY MR. MOUGEY:

 8        Q.    Your area of expertise along with the

 9   Mr. Stahmann, Mr. Dymon, Mr. Bratton and

10   Ms. Polster, the area of expertise of the folks at

11   the top of this e-mail is Pharmaceutical Integrity,

12   correct?

13        MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15        A.    I was in the Pharmaceutical Integrity

16   Department, yes.

17   BY MR. MOUGEY:

18        Q.    Do you not think that people at the top

19   of that e-mail chain --

20        A.    Yes.

21        Q.    -- are experts in the area of

22   Pharmaceutical Integrity?

23        MS. SWIFT:  Object to the form of the

24   question.
```

1    BY THE WITNESS:

2         A.    I think that they were the managers at

3    Rx Integrity and, yes, that was their

4    responsibility, to make sure that we were leading

5    our team and doing what we were supposed to do,

6    which was ensuring our controlled substance orders

7    and reviewing flagged orders and reporting

8    suspicious orders.

9    BY MR. MOUGEY:

10        Q.    That's a little different than the

11   question I asked.

12              I said do you believe that the

13   individuals at the top of this e-mail chain,

14   Ms. Polster, Mr. Dymon, yourself, Mr. Stahmann and

15   Mr. Bratton, were -- their areas of expertise was

16   the scope and responsibilities of the

17   Pharmaceutical Integrity Department?

18        MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20        A.    I think that they were the managers

21   leading the team and, yes, I did think that they

22   had knowledge on how to manage the processes that

23   we needed to do to fulfill our job.

24   BY MR. MOUGEY:

```
 1          Q.    Was Mr. Stahmann an expert in the area

 2    of diversion?

 3          MS. SWIFT:  Objection; lacks foundation.

 4    BY THE WITNESS:

 5          A.    I don't know.

 6    BY MR. MOUGEY:

 7          Q.    Did you sit shoulder to shoulder with

 8    Mr. Stahmann working in Pharmaceutical Integrity to

 9    build that department?

10          A.    Yes.

11          Q.    Did you have daily interactions with

12    Mr. Stahmann?

13          A.    Yeah.

14          Q.    And you did for a long period of time,

15    correct?

16          A.    Yes.

17          Q.    You sat around probably conference room

18    tables like this talking about controlled substance

19    monitoring, correct?

20          A.    Yes.

21          Q.    You talked about identifying suspicious

22    orders, correct?

23          A.    Yes.

24          Q.    You talked about performing due
```

1    diligence on orders that were identified as

2    suspicious, correct?

3         A.    Yes.

4         Q.    You had months and months and months,

5    years of interactions with Mr. Stahmann on those

6    topics, correct?

7         A.    Yes.

8         Q.    Was he an expert in the areas that we

9    just walked through?

10        MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12        A.    Are you talking about now or are you

13   talking about back in January 2013?

14   BY MR. MOUGEY:

15        Q.    Any point in time.  Do you consider him

16   to be a subject matter expert on diversion?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    Today I do consider him to be

20   knowledgeable on diversion, yes.

21   BY MR. MOUGEY:

22        Q.    And that's different than the question I

23   asked you.  I didn't ask you whether he was

24   knowledgeable.  I asked you do you consider him to

1    be a subject matter expert on the issue of

2    diversion?

3         MS. SWIFT:  Object to the form.

4    BY THE WITNESS:

5         A.    I -- I think that he has a lot of

6    knowledge on diversion, yes.

7    BY MR. MOUGEY:

8         Q.    Does that knowledge level about

9    diversion rise to the level of subject matter

10   expertise?

11        MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13        A.    I would not know how to answer that.

14   I'm not sure what you mean by -- how you would

15   define subject matter expert.  I think he has a lot

16   of knowledge in his area.

17   BY MR. MOUGEY:

18        Q.    You understand what the words "subject

19   matter" is, right?

20        MS. SWIFT:  Let her finish her answer before

21   you ask the next question.

22   BY MR. MOUGEY:

23        Q.    You understand what the words "subject

24   matter" is, correct?

1      A.     Yes.

2      Q.     You understand what the word "expertise"

3   is, correct?

4      MS. SWIFT:  Object to the form.

5   BY THE WITNESS:

6      A.     That would be my opinion that he has a

7   lot of knowledge, yes.

8   BY MR. MOUGEY:

9      Q.     And what I'm asking you, in your

10  understanding, does Mr. Stahmann's knowledge about

11  diversion rise to the level of subject matter

12  expertise?

13     MS. SWIFT:  Same objections.

14  BY THE WITNESS:

15     A.     In my opinion I think he is very

16  knowledgeable --

17  BY MR. MOUGEY:

18     Q.     And does that --

19     A.     -- in diversion.

20     Q.     Does that level of knowledge in

21  diversion rise to the level of subject matter

22  expertise?

23     A.     I don't know.

24     MS. SWIFT:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MOUGEY:

 2        Q.     You don't know?

 3        MS. SWIFT:  Same objection.

 4   BY MR. MOUGEY:

 5        Q.     What part of the -- what part of my

 6   question do you not know?  You don't know --

 7        MS. SWIFT:  She's already told you.

 8   BY THE WITNESS:

 9        A.     I don't know.

10   BY MR. MOUGEY:

11        Q.     You don't know what?

12        A.     What you just asked me.

13        Q.     What part of what I asked you do you not

14   know?

15        A.     The entire question.

16        MS. SWIFT:  Object to the form.

17   BY MR. MOUGEY:

18        Q.     You don't know whether or not

19   Mr. Stahmann is a subject matter expert in the area

20   of diversion?

21        A.     I don't know.

22        MS. SWIFT:  Object to the form.

23   BY MR. MOUGEY:

24        Q.     So, after sitting shoulder to shoulder
```

Highly Confidential - Subject to Further Confidentiality Review

 1    with him for years now in meetings, discussing

 2    diversion, you have no earthly idea of whether or

 3    not his knowledge base rises to the level of

 4    subject matter -- subject matter expert?

 5        MS. SWIFT:  Object to the form;

 6    mischaracterizes the testimony.

 7    BY THE WITNESS:

 8        A.    I think he has a lot of knowledge in

 9    diversion.

10    BY MR. MOUGEY:

11        Q.    What's --

12        A.    Very knowledgeable.

13        Q.    But not to the level of subject matter

14    expertise?

15        MS. SWIFT:  Object to the form.  She's asked

16    you to define your term and you haven't done it.

17    BY THE WITNESS:

18        A.    I don't know what that level means.

19    What level --

20    BY MR. MOUGEY:

21        Q.    Sounds a lot like what Ms. Swift said.

22    We can do this all day long.

23        MS. SWIFT:  She said she didn't know what you

24    were talking about.  I was repeating what she had

Highly Confidential - Subject to Further Confidentiality Review

```
 1    just said.  Define your term.

 2    BY MR. MOUGEY:

 3         Q.    Do you understand what SME is within

 4    Walgreens?

 5         A.    Yes.

 6         Q.    What does that stand for?

 7         A.    Someone who is the expert for a

 8    particular area or topic.

 9         Q.    And SME stands -- the acronym stands for

10    subject matter expert, correct?

11         A.    Correct.

12         Q.    Right.  So, you understand what the word

13    "subject matter expert" is, correct?

14         A.    Yes.

15         MS. SWIFT:  Object to the form.

16    BY MR. MOUGEY:

17         Q.    I didn't invent that word, right?

18         A.    No.

19         Q.    That's a term of art within Walgreens,

20    correct?

21         MS. SWIFT:  Object to the form.

22    BY THE WITNESS:

23         A.    No.

24    BY MR. MOUGEY:
```

1    Q.    Do you believe that Mr. Stahmann, as

2    Walgreens defines SME, is a subject matter expert

3    in the areas of diversion?

4    MS. SWIFT:  Object to the form.

5    BY THE WITNESS:

6    A.    I don't know if Walgreens defines Eric

7    Stahmann as a subject matter expert in the area of

8    diversion.

9    BY MR. MOUGEY:

10    Q.    You understand I'm not asking --

11    MS. SWIFT:  Let her finish her answer.

12    BY MR. MOUGEY:

13    Q.    I'm not asking you whether or not you

14    understand what Walgreens --

15    MS. SWIFT:  Were you finished with your

16    answer?

17    THE WITNESS:  Yeah.

18    BY MR. MOUGEY:

19    Q.    I'm not understanding you what -- I'm

20    not asking you what Walgreens defines him as.  I'm

21    asking you what you do.  You understand that,

22    right?

23    A.    You're asking me what I think?

24    Q.    Yes, ma'am.  That's right.

1      A.     In my opinion.

2      Q.     That's right.  What you believe.

3      A.     I don't know what Walgreens defines as a

4  subject matter expert in your question.  Do I think

5  that Eric Stahmann has a good knowledge base on

6  diversion, yes.

7      Q.     I'm not asking you what Walgreens

8  believes.  I'm asking you do you understand

9  Walgreens' definition of SME?

10     A.     Yes.

11     Q.     And you understand what SME is.  What do

12  you understand that SME is?

13     A.     Someone who is an expert on a specific

14  topic or area of their job.

15     Q.     And you've had years of interacting with

16  Mr. Stahmann on his day-to-day duties, including

17  diversion, correct?

18     A.     Yes.

19     Q.     Do you, Ms. Daugherty, believe that

20  Mr. Stahmann is an SME, as you understand it, on

21  diversion?

22     MS. SWIFT:  Object to the form.

23  BY THE WITNESS:

24     A.     I have never heard Eric referred to as

```
 1   an SME on the topic of diversion.

 2   BY MR. MOUGEY:

 3        Q.    I'm not asking you if you have ever

 4   heard him referred to.

 5             Based on your understanding of what SME

 6   is and based on your interactions for years with

 7   Mr. Stahmann on diversion, do you consider him to

 8   be an SME in diversion?

 9        MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11        A.    I don't know that I consider him an

12   expert.

13   BY MR. MOUGEY:

14        Q.    Who did you understand was the subject

15   matter expert when you started at Walgreens in

16   early 2013 on diversion?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    Again, I don't think that anyone that I

20   knew that I worked at with Walgreens was a subject

21   matter expert on diversion.

22             I would say that I worked directly with

23   my boss Tasha Polster on any questions that I had

24   as I was learning the role in my job.
```

1    BY MR. MOUGEY:

2         Q.    Do you agree -- let's go back to

3    Daugherty 3.

4              Do you agree, on Bates No. 31, that

5    Rx Integrity was created to protect and grow

6    Walgreens' controlled substance business?

7         MS. SWIFT:  Objection.

8    BY MR. MOUGEY:

9         Q.    Do you agree with that statement?

10        MS. SWIFT:  Same objections raised previously

11   on the same question.

12   BY THE WITNESS:

13        A.    I would say that my role when I started

14   in Rx Integrity was to ensure that we were

15   reporting suspicious orders, reviewing flagged

16   orders and ensuring that our DEA 106s were

17   submitted.

18   BY MR. MOUGEY:

19        Q.    So, you do not agree with the very first

20   statement, "Rx Integrity was created to protect and

21   grow Walgreens' controlled substance business"?

22        MS. SWIFT:  Same objections.

23   BY THE WITNESS:

24        A.    I would say that my job was created to

1   ensure that we were managing our suspicious orders,

2   reporting them appropriately, and, again, following

3   our process for DEA 106 and supporting our Good

4   Faith Dispensing policies.

5   BY MR. MOUGEY:

6        Q.    Yes, ma'am.  And none of the description

7   you just gave me included that Rx Integrity was

8   created to protect and grow Walgreens' controlled

9   substance business, correct?

10       MS. SWIFT:  Same objections.

11  BY THE WITNESS:

12       A.    I did not write that.  I don't know.

13  BY MR. MOUGEY:

14       Q.    I understand you didn't write it.

15            Did you respond to this e-mail or at any

16  point in time to Ms. Polster that "I'm confused.  I

17  thought I was here to alert DEA of 106 issues.  I'm

18  here to implement GFD and I'm here to identify

19  suspicious orders.  I didn't know I was here to

20  protect and grow Walgreens' controlled substance

21  business"?  Did you ever say anything along those

22  lines?

23       A.    No.

24       Q.    Did this confuse you when you started?

Highly Confidential - Subject to Further Confidentiality Review

```
 1    You had only been here a couple months at this
 2    point in time.  When you get a statement from your
 3    boss saying that Rx Integrity was created to
 4    protect and grow Walgreens' controlled substance
 5    business, did that confuse you at all?
 6         MS. SWIFT:  Object to the form.
 7    BY THE WITNESS:
 8         A.   No, not that I recall.
 9    BY MR. MOUGEY:
10         Q.   If you go to the bottom -- let's do it
11    this way.  If you go to the bottom of that page.
12              The Rx Integrity managers, and it lists
13    you, Mr. Dymon, Mr. Bratton and Mr. Stahmann,
14    correct?
15         A.   Yes.
16         Q.   And you have what appears to be regional
17    divisions, correct?
18         A.   Yes.
19         Q.   And you were the Midwestern Division,
20    correct?
21         A.   At the time, yes.
22         Q.   How long did that last for?
23         A.   I don't remember.  I can only speculate
24    maybe two years.
```

1    Q.    And then where did you go after the

2    Midwestern Division?

3        A.    Eastern Division.

4        Q.    And did you have specific

5    responsibilities outside of geographic areas as a

6    manager of Pharmaceutical Integrity?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    Can you elaborate on that, explain what

10   you mean.

11   BY MR. MOUGEY:

12       Q.    Well, did you and Mr. Bratton and

13   Mr. Stahmann and Mr. Dymon split up specific tasks

14   or roles outside of the geographic

15   responsibilities?

16       A.    At what time?

17       Q.    In -- at the time this e-mail was

18   drafted in early 2013.

19       A.    Outside of the geographic divisions?

20       Q.    Yes, ma'am.

21       A.    Not that I recall, no.

22       Q.    Not that you -- okay.

23           Was there a time after the creation of

24   this e-mail, so later 2013, '14, that you did have

1    specific roles or responsibilities outside of the

2    geographic areas?

3         A.    In 2013 and 2014?

4         Q.    Right.

5         A.    No.  Not that I recall.

6         Q.    So, it wasn't like Mr. Bratton was the

7    computer guy, right?

8         A.    Not that I recall.

9         MS. SWIFT:  Object to the form.

10   BY MR. MOUGEY:

11        Q.    It wasn't that Mr. Stahmann was the kind

12   of detective, loss prevention guy, right?

13        MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15        A.    No.

16   BY MR. MOUGEY:

17        Q.    Your roles, as you understood them,

18   within Pharmaceutical Integrity was -- were

19   geographic in scope, correct?

20        A.    Correct.

21        MS. SWIFT:  Object to the form.

22   BY MR. MOUGEY:

23        Q.    All right.  Now, let's go to the second

24   paragraph of this document.  "The team works with

Highly Confidential - Subject to Further Confidentiality Review

```
 1   various departments, including legal, government

 2   affairs, logistics, loss prevention, IT and others

 3   to ensure company-wide awareness and adhere federal

 4   state and local laws and regulations."

 5         Correct?

 6   A.    Yes.

 7   Q.    And that was -- "the team" reference

 8   that Ms. Polster disseminated to you all is the

 9   Pharmaceutical Integrity team, correct?

10   A.    Yes.

11   Q.    So, it was important for others within

12   Walgreens to understand what the objectives of your

13   department was, correct?

14   MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16   A.     I think I said earlier it's -- it was

17   important in terms of the people within Walgreens

18   that we were working with, yes.

19   BY MR. MOUGEY:

20   Q.     And important because every other team

21   needs to have an understanding of what the scope of

22   responsibilities of the other groups within the

23   organization are, correct?

24   MS. SWIFT:  Object to the form of the
```

Highly Confidential - Subject to Further Confidentiality Review

1    question.

2    BY THE WITNESS:

3        A.    For example, yes, I think government

4    affairs should be aware of Rx Integrity as we

5    worked with them as well as loss prevention.

6    BY MR. MOUGEY:

7        Q.    All right.  So, let's go back up to the

8    top of the -- of this description where it says,

9    "Rx Integrity is responsible for managing, creating

10   and maintaining controlled substance dispensing,

11   monitoring and reporting programs including the

12   Good Faith Dispensing policy and the National Good

13   Faith Dispensing program."

14            Did I get that right?

15       A.    Yes.

16       Q.    All right.  Can you explain to me who at

17   Walgreens was responsible for creating the policy

18   discussed in that sentence?

19       MS. SWIFT:  Object to the form.

20   BY THE WITNESS:

21       A.    I don't know as my understanding is the

22   policy was created before I started in that

23   position.

24   BY MR. MOUGEY:

1    Q.    So, when you started in the position at

2    Pharmaceutical Integrity in early 2013, how long

3    did the training process last?

4    A.    I think that it was ongoing.  Again, I

5    would say that I am still being trained today and

6    learning new things today --

7    Q.    Are you familiar --

8    A.    -- as regulations change.

9    Q.    I'm sorry.  I didn't mean to interrupt

10   you.

11         Are you familiar with the term

12   "war room"?

13   A.    I'm familiar with the term, yes.

14   Q.    Was it used when you first started at

15   Walgreens, a war room?

16   A.    In 2013?

17   Q.    Yes, ma'am.

18   A.    Not that I recall.

19   Q.    Not that I recall.

20         Do you recall that there was a

21   conference room that was set up where documents and

22   policies and procedures within Walgreens had been

23   kind of gathered for review?

24   A.    No.  My understanding of war room is not

1    the same.

2         Q.    All right.  Do you -- that's why I

3    didn't use the word "war room" that time.  I asked

4    did you understand that there was a room or a

5    conference room that -- at Walgreens that the

6    members of the Pharmaceutical Integrity Department

7    gathered policies, procedures and documents for

8    review to assist with the creation of the policies

9    for identifying suspicious orders?

10        MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12        A.    No.

13   BY MR. MOUGEY:

14        Q.    No.  Do you believe that there was a

15   robust system for identifying suspicious orders at

16   Walgreens when you started in January '13?

17        MS. SWIFT:  Object to the form, foundation.

18   BY THE WITNESS:

19        A.    I think that the suspicious order

20   monitoring program and the CSO KPI tool that we

21   developed when I started was an effective tool,

22   yes.

23   BY MR. MOUGEY:

24        Q.    But the CSO KPI tool was -- that was the

1    automated tool you referenced earlier, correct?

2         A.    Correct.

3         MS. SWIFT:  Object to the form.

4    BY MR. MOUGEY:

5         Q.    That came after you started, correct?

6         MS. SWIFT:  Object to the form.

7    BY THE WITNESS:

8         A.    No, it was in place.  There was just

9    some manual components.  Like I said, as opposed to

10   responding in the tool, we were using e-mail

11   alongside it.

12   BY MR. MOUGEY:

13        Q.    So, sitting here today with what you

14   know, is Ms. Polster's e-mail disseminating the

15   description of Pharmaceutical Integrity in front of

16   you on Daugherty 3, is that an accurate description

17   of your department at that point in time?

18        MS. SWIFT:  Same objection as before.

19   BY THE WITNESS:

20        A.    I don't think it's complete, no.

21   BY MR. MOUGEY:

22        Q.    So, the answer is that is not an

23   accurate description of your department?

24        MS. SWIFT:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    I don't think it's complete.

 3   BY MR. MOUGEY:

 4        Q.    So the answer is yes, I do not think

 5   it's an accurate description, correct?

 6        MS. SWIFT:  Same objection.

 7   BY THE WITNESS:

 8        A.    The answer is I don't think it's

 9   complete.

10   BY MR. MOUGEY:

11        Q.    So, the answer -- I'm entitled to a yes

12   or no on my question.  So, when I ask you a

13   question that's capable of a yes or no, I'd

14   appreciate it if you'd give that to me.  Okay?  If

15   you want --

16        MS. SWIFT:  She is going to give you the

17   answer to the question that she believes is the

18   truthful answer.

19   BY MR. MOUGEY:

20        Q.    If you want to explain your answer,

21   that's your prerogative.  But I would appreciate if

22   you could give me a yes or no.

23             So, do you agree with me that the

24   two-paragraph description that Ms. Polster
```

1    disseminated was inaccurate and not complete?

2        MS. SWIFT:  Same objections.

3    BY THE WITNESS:

4        A.    I don't think that the description in

5    front of me is complete.

6    BY MR. MOUGEY:

7        Q.    And, therefore, it is inaccurate,

8    correct?

9        MS. SWIFT:  Same objections.

10   BY THE WITNESS:

11       A.    I don't know that it's inaccurate.  I

12   don't think it's complete.

13   BY MR. MOUGEY:

14       Q.    Do you not think it's important that

15   descriptions and training within Walgreens for

16   folks that are onboarding be complete?

17       MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19       A.    This description was intended for

20   onboarding new employees, and it was not intended

21   for my understanding of my role.  I understood my

22   role in my position.  I understand it today.

23   BY MR. MOUGEY:

24       Q.    Did you prepare for your deposition

```
 1    today?

 2         A.    Yes.

 3         Q.    And you met with lawyers today, correct,

 4    for today?

 5         A.    Yes.

 6         Q.    In preparation for.  Correct?  Sorry.

 7         A.    Yes.

 8         Q.    And those lawyers included outside

 9    counsel?

10         A.    Yes.

11         Q.    And did it include in-house counsel at

12    Walgreens as well?

13         A.    For the preparation of the deposition?

14         Q.    Yes, ma'am.

15         A.    No.

16         Q.    Were there anyone there for the

17    preparation of your deposition that was not with

18    outside counsel?

19         MS. SWIFT:  Object to the form of the

20    question.

21    BY THE WITNESS:

22         A.    No.

23    BY MR. MOUGEY:

24         Q.    When I say "with," I mean employed by
```

```
 1    the outside counsel.  It was all lawyers that were

 2    there during your preparation?

 3         A.    To my knowledge, yes.

 4         Q.    How many times have you met with outside

 5    counsel to prepare for your deposition?

 6         A.    Three times.

 7         Q.    And how many hours each time did you

 8    prepare?

 9         A.    I would say three, three and a half

10    hours.

11         Q.    Each time?

12         A.    Each time.

13         Q.    Were you given documents to review?

14         MS. SWIFT:  It's a yes-or-no question.

15    BY THE WITNESS:

16         A.    Yes.

17    BY MR. MOUGEY:

18         Q.    And were you given documents to take

19    home to review?

20         A.    No.

21         Q.    How many documents were you given to

22    review in order to prepare for your testimony in

23    total from all your meetings?

24         MS. SWIFT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY THE WITNESS:

2         A.    More than three, less than ten maybe.

3    BY MR. MOUGEY:

4         Q.    Did you have --

5         A.    I don't know exactly.

6         Q.    Sorry.  Did you have any telephone

7    conferences outside of those in-person meetings to

8    prepare for your testimony today?

9         A.    No.

10        Q.    So, the total meetings were the three

11   that you mentioned earlier?

12        A.    Correct.

13        Q.    And which lawyers did you meet with to

14   prepare for your testimony today?

15        A.    So, I met with Kate Swift.  I met with

16   Hamilton.  I don't know his last name.  I met with

17   Pete Wilson.  And I met with -- I can't think of

18   her name.  I can't think of the other lady's name

19   right now at this time.

20        Q.    Did part of your training when you began

21   at Walgreens include an update on the status of

22   opiate prescriptions around the country?

23        MS. SWIFT:  Object to the form.

24   BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I think that I have seen updates,

2     whether it be from like online or in the news or

3     updates in general of what was going on around the

4     country, yes.

5     BY MR. MOUGEY:

6          Q.     And when you reference news sources

7     online or TV reports, was that post you starting

8     with Pharmaceutical Integrity or before or both?

9          A.     Related to?

10         Q.     Opiate crisis.

11         A.     Before and after, yes.

12         Q.     And, so, my initial question was was

13    part of your training a review of the opiate crisis

14    in the U.S. prior to 2013?

15         MS. SWIFT:  Objection.  That's a new question.

16    It's not what you asked previously.

17    BY THE WITNESS:

18         A.     Training.  Yes.  I mean, I had

19    definitely had seen maps or information around what

20    was going on in the country related to controlled

21    substance abuse.

22    BY MR. MOUGEY:

23         Q.     Were you advised that in 2013 as part of

24    your training that the opiate crisis was relatively

Highly Confidential - Subject to Further Confidentiality Review

1    new?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    No.

5    BY MR. MOUGEY:

6        Q.    No.  Would that be inaccurate?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    My understanding of the opioid crisis

10   was before I started my position.

11   BY MR. MOUGEY:

12       Q.    But the question I asked was:  If the

13   opiate crisis was described as new in 2013, that

14   would be inaccurate, correct?

15       MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17       A.    If someone described it as new, I -- I

18   would have to say that it wasn't necessarily new

19   other than it was coming to light more in the news

20   and in the press.

21   BY MR. MOUGEY:

22       Q.    So, when you reference the news and in

23   the press articles that you had seen, that was

24   relatively recent before you had started your 2013

```
1    job at Walgreens?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.   At the time there was a lot of news and

5    information around the opioid crisis, yes.

6    BY MR. MOUGEY:

7        Q.   And do you have an understanding of how

8    far back the national press coverage of the opiate

9    crisis went prior to 2013?

10       MS. SWIFT:  Object to the form, foundation.

11   BY THE WITNESS:

12       A.   No, I don't.

13   BY MR. MOUGEY:

14       Q.   Do you have any understanding of whether

15   or not there were any Congressional investigations

16   regarding the opiate crisis prior to 2013?

17       A.   No.

18       Q.   And do you have any understanding of

19   whether or not there were any subcommittees,

20   Congressional subcommittees, that were formed to

21   investigate the opiate crisis prior to 2013?

22       A.   Not that I can recall.

23       Q.   So, you don't recall any of that being

24   part of your training when you started in 2013?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I don't recall being trained on -- that

2   there were Congressional subcommittees --

3      Q.    Or what the --

4      A.    -- prior to 2013, no.

5      Q.    You don't recall being trained about

6   what the scope of the problem was regarding opiate

7   crisis or how far back that problem existed?

8      MS. SWIFT:  Object to the form of the

9   question.

10   BY THE WITNESS:

11      A.    In my training, I was definitely made

12   aware of the prescription drug abuse going on

13   around the country.  Like I said, I saw some maps.

14   I've seen, you know, information around various

15   parts of the country where there was news related

16   to issues around prescription drug abuse and opioid

17   abuse.

18   BY MR. MOUGEY:

19      Q.    Did you have an understanding as part of

20   your training from Walgreens about how far back the

21   opiate abuse existed, timewise?

22      MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24      A.    At the time I honestly don't remember.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  We have been going about an hour.

 2   Are you getting close to a breaking point?

 3        MR. MOUGEY:  I'd like to finish this next

 4   document if I could, but yes is the answer to your

 5   question.

 6             I hand you what I have marked as

 7   Daugherty 4.

 8                  (WHEREUPON, a certain document was

 9                   marked as Walgreens-Daugherty

10                   Deposition Exhibit No. 4:  1/10/13

11                   e-mail with attachment;

12                   WAGMDL00049752 - 00049773.)

13   BY MR. MOUGEY:

14        Q.    The first page of this document is an

15   e-mail from Mr. Dymon who is your equivalent in

16   Pharmaceutical Integrity, correct?

17        A.    Correct.

18        Q.    To yourself and other members of the

19   Pharmaceutical Integrity team, correct?

20        A.    Yes.

21        Q.    Including the individual Tasha Polster

22   who is in charge of Pharmaceutical Integrity,

23   correct?

24        A.    The e-mail is to Tasha.  I can't recall
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   who Lauren O'Sullivan is.

 2        Q.    But Ms. Polster was running

 3   Pharmaceutical Integrity as of January of 2013,

 4   correct?

 5        A.    Yes.

 6        Q.    The subject of this e-mails says, "DEA

 7   Update Presentation for Market Leadership."

 8              Do you see that?

 9        A.    Yes.

10        Q.    And this is while you were being trained

11   at Walgreens in early 2013 regarding the opiate

12   crisis, correct?

13        A.    Yes.

14        Q.    And the attachment as referenced says

15   "DEA Market Leadership Scrubbed Version

16   January 2013."

17              Do you see that?

18        A.    Where do you see that?

19        Q.    The attachment.

20        A.    Oh, yeah, I see that, yes.

21        Q.    Do you have an understanding of what

22   "scrubbed version" meant?

23        A.    My understanding of scrubbed version is

24   usually when it's picked for spelling and errors
```

1    and grammatical.

2        Q.    And it had been reviewed and the content

3    in the presentation was accurate, correct?

4        MS. SWIFT:  Object to the form.

5    BY THE WITNESS:

6        A.    Accurate according to the person that

7    reviewed it I would assume.

8    BY MR. MOUGEY:

9        Q.    And Mr. Dymon was part of the same

10    training you were when Pharmaceutical Integrity

11    started, correct, Ms. Daugherty?

12        A.    Yes, I think this might have been the

13    first couple days that Mr. Dymon started in the

14    position, yes.

15        Q.    Yes, ma'am.  And the first week that you

16    had been there, correct?

17        A.    Absolutely.

18        Q.    You started after the holidays --

19        A.    Right.

20        Q.    -- in January of '13, correct?

21        A.    That's correct.

22        Q.    You had been there about a week,

23    correct?

24        A.    Yes.

1      Q.    And this was part of the material being

2   disseminated for your review in 2013 when you

3   started, correct?

4      A.    Yes.

5      Q.    And if you would turn to the first

6   page of the PowerPoint presentation that's attached

7   on Bates No. 53, "DEA Update, Market Leadership

8   Meeting."

9            Do you see that?

10     A.    What page?

11     Q.    Bates No. 53 in the bottom right-hand

12  corner.

13     A.    53?

14     MS. SWIFT:  He is talking about the Bates

15  number, which is the long number.

16     THE WITNESS:  Oh, got it.  Okay.

17  BY THE WITNESS:

18     A.    Yes.

19  BY MR. MOUGEY:

20     Q.    "DEA Update, Market Leadership Meeting";

21  and it has Tasha Polster's name, the executive

22  director or the director of Pharmaceutical

23  Integrity, correct?

24     A.    Yes.

1    Q.    And if you turn to the second page of

2  the PowerPoint, that's titled "The New Hot Topic."

3         Do you see that?

4    A.    Yes.

5    Q.    You recognize that guy's face there,

6  that's Dr. Sanjay Gupta from CNN, right?

7    A.    Yes.

8    Q.    And you see in the title of this

9  document "The New Hot Document" -- I mean, "The New

10  Hot Topic," correct?

11    A.    Yes.

12    Q.    And you see that there is talking points

13  below the PowerPoint slide, right?

14    A.    Yes.

15    Q.    And it says, "The new hot topic in the

16  news is the epidemic America has:  Prescription

17  pain drug abuse."

18         Correct?

19    A.    Yes.

20    Q.    Is that an accurate statement that

21  the -- that the opiate epidemic is a new hot topic?

22    MS. SWIFT:  Object to the form.

23  BY THE WITNESS:

24    A.    I don't know at the time if that was a

Highly Confidential - Subject to Further Confidentiality Review

```
1    new hot topic or not.  I don't know.

2    BY MR. MOUGEY:

3         Q.    You testified previously that you had

4    seen reports about the opiate epidemic in the press

5    and online.  Was it a new topic across the American

6    press in January of 2013?

7         MS. SWIFT:  Same objections.

8    BY THE WITNESS:

9         A.    I don't know if that was a new hot

10   topic.  I'm not an expert in the news.  I don't

11   know.

12   BY MR. MOUGEY:

13        Q.    I'm not asking you to be an expert in

14   the news.  You're part of now you've been in

15   Pharmaceutical Integrity Department from 2013 and

16   today is November of 2018.

17             How long had the opiate epidemic been

18   raging by the time January 2013 hit?

19        MS. SWIFT:  Same objections.

20   BY THE WITNESS:

21        A.    I don't know.

22   BY MR. MOUGEY:

23        Q.    You have no idea?

24        MS. SWIFT:  Same objections.
```

```
1    BY THE WITNESS:

2         A.    I don't know.

3    BY MR. MOUGEY:

4         Q.    So, as part of your training, you don't

5    recall any review of how long the opiate crisis had

6    existed?

7         MS. SWIFT:  Same objections.

8    BY THE WITNESS:

9         A.    Not that I recall.

10        MS. SWIFT:  Let me get my objections out.

11        THE WITNESS:  Sorry.

12        MS. SWIFT:  It's okay.

13   BY MR. MOUGEY:

14        Q.    So, sitting here today, do you have an

15   understanding of whether or not the opiate crisis

16   in January '13 was new?

17        MS. SWIFT:  Same objections.

18   BY THE WITNESS:

19        A.    No, I do not.  I don't recall.

20   BY MR. MOUGEY:

21        Q.    I'm asking you.  I said sitting here

22   today.  Sitting here today, do you have an

23   understanding of whether the opiate crisis in

24   January '13 was a new topic in the media?
```

```
 1        MS. SWIFT:  Same objections.

 2   BY THE WITNESS:

 3        A.    I don't know.

 4        MS. SWIFT:  Peter, if you're going to spend a

 5   lot of time on this document, I ask that we take a

 6   break.  We have been going for about an hour 10

 7   minutes.

 8        MR. MOUGEY:  I said when I got through it,

 9   I'll be done.

10        MS. SWIFT:  I'm sorry?

11        MR. MOUGEY:  When I get finished with this

12   document, we'll be done.

13   BY MR. MOUGEY:

14        Q.    On Bates No. 53.

15        MS. SWIFT:  I'll ask again if it's another 10,

16   15 minutes, just so you know.

17   BY MR. MOUGEY:

18        Q.    On Bates No. 53.  Do you see the Bates

19   numbers in the bottom corner?

20        A.    Yes.

21        Q.    The long number.  You see the last two

22   digits are 53?

23        A.    Yes.

24        Q.    All right.  I'm on the timeline 2012.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  You're on Bates 53?

 2        MR. MOUGEY:  Yeah.

 3        MS. SWIFT:  Bates 53 is the title slide.

 4        MR. MOUGEY:  It is.

 5   BY MR. MOUGEY:

 6        Q.   And it's -- there is --

 7        MS. SWIFT:  While you guys figure this out, we

 8   are going to take a five-, ten-minute break.

 9        MR. MOUGEY:  We are not taking a break in the

10   middle of a document.  We have been going an hour

11   and 15 minutes.  We're not taking a break.  I said

12   when we finished this document.  It's a few pages.

13   I'd like to finish.

14        MS. SWIFT:  I'm going to respectfully request

15   a bathroom break.

16   BY MR. MOUGEY:

17        Q.   Page 7.  Do you see the 7th page?

18        MS. SWIFT:  I'm going to note for the record

19   an objection that counsel is refusing to stop the

20   deposition for a bathroom break.

21        MR. MOUGEY:  I just said can I get through

22   this document and I'm almost finished.  We have

23   taken more time asking for breaks than we are --

24   let me finish this document.
```

```
 1    BY MR. MOUGEY:

 2         Q.    Page 7.

 3         MS. SWIFT:  Well, we wouldn't have been doing

 4    that if you grant a request for a break.

 5         MR. MOUGEY:  This is the MO.  We take a break

 6    every hour and we run out the clock.

 7    BY MR. MOUGEY:

 8         Q.    Page 7.  Do you see the talking point on

 9    page 7 of this document titled "Timeline 2012"?

10         A.    Yes.

11         Q.    "The key to note is that this isn't just

12    a Florida problem."

13              Do you see that in the PowerPoint from

14    Ms. -- that has Ms. Polster's name on it?

15         A.    Yes.

16         Q.    And that's referring to the opiate

17    epidemic, correct?

18         MS. SWIFT:  Object to the form, foundation.

19    BY THE WITNESS:

20         A.    I can only speculate.

21    BY MR. MOUGEY:

22         Q.    Sounds like what Ms. Swift just said.

23              So, based on your understanding of your

24    review of this PowerPoint, do you agree that the
```

```
 1    opiate epidemic isn't just a Florida problem?

 2         MS. SWIFT:  Objection.  Do you want her to

 3    look at the whole document or are you asking about

 4    just that sentence?

 5    BY MR. MOUGEY:

 6         Q.    Do whatever you need to do to answer the

 7    question.

 8         A.    I can only assume what that means.  I

 9    don't know.  I can only speculate.  I didn't write

10    it.

11         Q.    I didn't ask you if you write it.

12               Based on your six, seven years now

13    experience in Pharmaceutical Integrity, do you

14    agree that the opiate epidemic isn't just a Florida

15    problem?

16         MS. SWIFT:  Same objections; lacks foundation.

17    BY THE WITNESS:

18         A.    Today I agree that there is a

19    prescription drug abuse problem across the country,

20    yes.

21    BY MR. MOUGEY:

22         Q.    But sitting there in January of 2013,

23    you don't recall having an understanding of whether

24    the opiate epidemic was just a Florida problem?
```

1        MS. SWIFT:  Same objections.

2   BY THE WITNESS:

3        A.    I don't recall in January 2013.

4   BY MR. MOUGEY:

5        Q.    Your job included identifying suspicious

6   orders around the country when you began in

7   January 2013, correct?

8        A.    Yes, and primarily the Midwest.

9        Q.    Wouldn't it be important to know where

10  there were hot spots or problems in the opiate

11  epidemic in performing your responsibilities?

12       MS. SWIFT:  Object to the form of the

13  question.

14  BY THE WITNESS:

15       A.    I think over the course of my training

16  in January 2013, like I said, I was aware of areas

17  that were alerted in the news or in the press or

18  maybe had seen maps online that alerted of areas

19  where there was maybe more prescription drug abuse,

20  yes.

21  BY MR. MOUGEY:

22       Q.    Based on the knowledge you brought to

23  the table in January 2013 and your understanding

24  based on your experience in the pharmaceutical

1   industry, do you agree that the opiate epidemic

2   wasn't just a Florida problem as of January of

3   2013?

4        MS. SWIFT:  Same objections; lacks foundation.

5   BY THE WITNESS:

6        A.   Today I agree that it's not just a

7   Florida issue.

8   BY MR. MOUGEY:

9        Q.   What I'm asking you is when you started

10  in January of 2013.

11       MS. SWIFT:  Same objections.

12  BY THE WITNESS:

13       A.   I don't recall what I knew back in

14  January of 2013, whether it was just a Florida

15  problem or not.

16  BY MR. MOUGEY:

17       Q.   Do you have any understanding of when

18  you had this maybe epiphany or this enlightenment

19  that there was -- the opiate epidemic wasn't just a

20  Florida problem?

21       MS. SWIFT:  Same objections.

22  BY THE WITNESS:

23       A.   Again, I would say it was when I had

24  seen other areas of the country being in the news

Highly Confidential - Subject to Further Confidentiality Review

1    or in the press or online and then had seen that

2    there are other areas of the country where there

3    may be issues with prescription drug abuse, yes.

4        Q.    But that was after you started at

5    Walgreens?

6        MS. SWIFT:  Object to the form.

7    BY THE WITNESS:

8        A.    It was -- it was after the first day I

9    started with Walgreens, yes.

10   BY MR. MOUGEY:

11       Q.    So, coming to the table at Walgreens in

12   2013, you did not have an understanding of whether

13   or not the opiate epidemic, where the hot spots

14   were around the country?

15       MS. SWIFT:  Object to the form of the

16   question.

17   BY THE WITNESS:

18       A.    Prior to 2013, no.

19       MR. MOUGEY:  Let's go ahead and take

20   Ms. Swift's break.

21       MS. SWIFT:  Thank you.

22       MR. MOUGEY:  You're welcome.

23       THE VIDEOGRAPHER:  We're going off the record

24   at 10:22.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (WHEREUPON, a recess was had

 2                     from 10:22 to 10:35 a.m.)

 3        THE VIDEOGRAPHER:  We're back on the record at

 4   10:35.

 5        MR. MOUGEY:  Thank you.

 6   BY MR. MOUGEY:

 7        Q.    Let's stay with the same document,

 8   Ms. Daugherty.  If you would please go to page 6

 9   titled "Timeline of Events," and the first entry is

10   "Pre-August 2010."  Are you there?

11        A.    Yes.

12        Q.    Okay.  Next to the "Pre-August 2010"

13   indicates there had been a "steady increase in

14   Florida pill mills."

15             Do you see that?

16        A.    Yes.

17        Q.    And "prescribers dispensing

18   medications," correct?

19        A.    Yes.

20        Q.    And you can flip to the previous pages.

21   Do you see any indication of a description of the

22   events leading up to the opiate crisis prior to

23   2010?

24        MS. SWIFT:  Object to the form.
```

```
 1    BY THE WITNESS:

 2         A.    What previous pages are you referring

 3    to?

 4    BY MR. MOUGEY:

 5         Q.    Any of the previous five pages of

 6    this -- of this PowerPoint presentation that went

 7    out with Ms. Polster's name on it.

 8               Do you see any entries specifically

 9    describing the timeline of events leading up to

10    August of 2010?

11         MS. SWIFT:  Same objection.

12    BY MR. MOUGEY:

13         Q.    It's an easy question.  Do you see

14    anything else in the timeline?  Unless you want me

15    to go through it page by page with you.

16         MS. SWIFT:  Same objection.

17    BY THE WITNESS:

18         A.    I see on page 4 a graph that shows the

19    leading cause of prescription drugs.

20    BY MR. MOUGEY:

21         Q.    Yes.  That that had surpassed motor

22    vehicles in 2011, correct?

23         A.    That's what it looks like.

24         Q.    Leading cause of death, prescription
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    drugs, correct?

2         A.    Based on this graph, yes.

3         Q.    Yes, ma'am.  And that was surpassed,

4    it -- it looks like prescription drugs surpassed

5    motor vehicles sometime close to 2010, correct?

6         A.    That's what it looks like based on this

7    graph.

8         Q.    And the talking points below says, "This

9    particular stat came out of California, but there

10   were multiple examples across the country where the

11   leading cause of accidental death is prescription

12   pain medications (opioid use)."

13          Correct?

14        A.    That's what it says, yes.

15        Q.    Yes, ma'am.  You're not sure whether

16   that's accurate or not?

17        A.    I don't know --

18        Q.    You don't know?

19        A.    -- it to be true.

20        Q.    You don't know then or you don't know

21   now or both?

22        A.    I don't know then and I don't know now.

23        Q.    You don't know whether or not

24   prescription opiates now are the leading cause of
```

Highly Confidential - Subject to Further Confidentiality Review

1    death in specific age groups in the U.S.?

2         A.    I do know that prescription overdose

3    deaths are or have exceeded motor vehicle accidents

4    based on what I've seen in various charts and

5    graphs online, yes.

6         Q.    And when you say "online," you mean

7    outside of Walgreens?

8         A.    Correct.

9         Q.    Let's go back to page 6.  On this

10   timeline of events that starts with a description

11   of "Pre-August 2010:  Steady increase in Florida

12   pill mills."  Right?

13        A.    That's what it says.

14        Q.    And then it continues describing some of

15   the changes of events like October of 2010 where

16   the Florida legislation restricted prescription

17   dispensing to only 72 hours.  Do you see that?

18        A.    Yes.

19        Q.    Does that give any indication of whether

20   or not there was a dramatic problem at least in the

21   State of Florida prior to 2010?

22        MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24        A.    I do know that Florida changed their

1   legislation to not allow prescribers to dispense

2   medications and only prescribe out of their clinics

3   at some point in time around this time.

4   BY MR. MOUGEY:

5       Q.    Yes, ma'am.  The question I asked was

6   does that give you any indication, the change by

7   the Florida legislature, of whether there was a

8   dramatic problem at least in the State of Florida

9   prior to 2010?

10      MS. SWIFT:  Object to the form.

11  BY THE WITNESS:

12      A.    I don't know if there was a dramatic

13  problem.  I would understand that they are making

14  rules as to restricting the supply of pain

15  medications based on what it's says here, but I'm

16  not familiar with that.

17  BY MR. MOUGEY:

18      Q.    Yes, ma'am.  So, you don't have any

19  understanding of whether there was a problem at all

20  in the State of Florida that led the Florida

21  legislature to change the prescription parameters?

22      A.    My understanding is they changed the

23  parameters of prescribers dispensing pain

24  medications as opposed to just writing and

Highly Confidential - Subject to Further Confidentiality Review

1    dispensing, which they were able to do prior, and

2    I --

3         Q.    Not only -- not only did they change --

4         MS. SWIFT:  Were you done with your answer?

5         THE WITNESS:  Yes, yes.

6    BY MR. MOUGEY:

7         Q.    Not only did you change them -- did

8    they -- I'm sorry.

9              Not only did the Florida Legislature

10   change the dispensing or prescription writing

11   parameters, but they were restricted, correct?

12        MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14        A.    I don't know if they were restricted.

15   I'm not familiar with this particular restriction

16   that you're reading.

17   BY MR. MOUGEY:

18        Q.    In July 2011, "Florida law amended to

19   prohibit practitioners from dispensing C-II and

20   C-III except in very limited instances."

21             Correct?

22        A.    That's what it says, yes.

23        Q.    And C-II and III are controlled

24   substance level II and level III, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    And those are highly addictive opiates

3   with some medical use, correct?

4      MS. SWIFT:  Object to the form.

5   BY THE WITNESS:

6      A.    I would say that controlled substance

7   IIs are highly -- higher -- have a higher addiction

8   potential than controlled III, yes.

9   BY MR. MOUGEY:

10     Q.    April 2012, "Administrative Inspection

11  Warrants were served on six stores and the Jupiter

12  DC."

13          Do you see that?

14          Next page, page 7.

15     A.    Yes.

16     Q.    Now, Jupiter DC.  What's DC stand for?

17     A.    Distribution center.

18     Q.    That's Walgreens distribution center,

19  correct?

20     A.    Yes.

21     Q.    And that's one of Walgreens' Schedule II

22  distribution centers, correct?

23     MS. SWIFT:  Object to the form.

24  BY THE WITNESS:

```
 1        A.    I don't -- I don't recall at the time if

 2   that was one of Walgreens' Schedule II distribution

 3   centers.

 4   BY MR. MOUGEY:

 5        Q.    Do you have -- do you recall during your

 6   training of anyone at Walgreens describing to you

 7   the parameters of the inspection warrants on the

 8   six stores in the Jupiter distribution center?

 9        MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11        A.    I don't recall.

12   BY MR. MOUGEY:

13        Q.    Do you recall, even sitting here today,

14   from the time you started back at Walgreens in

15   January '13 until today, the scope of the DEA

16   investigation into the six Florida stores and the

17   Jupiter distribution center?

18        MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20        A.    I don't know the scope of the

21   investigation.

22   BY MR. MOUGEY:

23        Q.    Do you have any understanding from

24   starting at Walgreens until today what the scope of
```

Highly Confidential - Subject to Further Confidentiality Review

1    the problems were with the six Florida retail

2    pharmacies?

3         MS. SWIFT:  Object to the form.

4    BY THE WITNESS:

5         A.    I have some understanding of the six

6    stores, yes.

7    BY MR. MOUGEY:

8         Q.    What was your understanding of what the

9    problems were in the six Walgreens stores that

10   received Administrative Inspection Warrants?

11        MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13        A.    My understanding was that they dispensed

14   high volume of oxycodone.

15   BY MR. MOUGEY:

16        Q.    And oxycodone is a Schedule II opiate,

17   correct?

18        A.    Yes.

19        Q.    And one of the most highly addictive

20   opiates, correct?

21        MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23        A.    It is -- it is an addictive opioid

24   medication, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MOUGEY:

 2        Q.    And one of the most highly abused opiate

 3    medications, correct?

 4        A.    I don't know that to be true.

 5        Q.    You don't know -- you don't have an

 6    understanding of what opiate prescription were some

 7    of the most highly abused in Florida or even across

 8    the country?

 9        MS. SWIFT:  Object to the form.

10    BY THE WITNESS:

11        A.    I think there were other medications as

12    well that were -- had a potential for addiction,

13    yes.

14    BY MR. MOUGEY:

15        Q.    And so the answer is yes, you have an

16    understanding.  And what was your understanding of

17    what some of the most highly abused Schedule II and

18    Schedule III opiate prescriptions were?

19        MS. SWIFT:  Object to the form.

20    BY THE WITNESS:

21        A.    My understanding of highly abused

22    medications are any of the opioid medications in

23    the controlled substance II classification.

24    BY MR. MOUGEY:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Do you believe that hydrocodone before

2  it was reclassified as Schedule II was one of the

3  more frequently abused opiate prescriptions?

4      MS. SWIFT:  Object to the form, foundation.

5  BY THE WITNESS:

6      A.    That I don't know.

7  BY MR. MOUGEY:

8      Q.    I'm confused.  I mean, you start in

9  January of 2013.  Overdose deaths for prescriptions

10  exceed motor vehicles.  You've been brought on to

11  run -- manager in a new department.  And that new

12  department's job was to identify suspicious orders,

13  correct?

14      MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16      A.    Yes.

17  BY MR. MOUGEY:

18      Q.    And sitting here today, you're not sure

19  whether or not hydrocodone was one of the more

20  abused prescription opiates prior to becoming

21  reclassified as Schedule II?

22      A.    I don't know.

23      Q.    You don't know?

24      A.    No.

1      Q.     Wouldn't it be important for you to know

2   what the most highly abused prescription opiates

3   were in your job identifying suspicious orders?

4      A.     Today?

5      Q.     Any point in time.  From January 2013

6   that opiate overdose deaths had now surpassed car

7   accidents as the leading cause of death.

8             Wouldn't it be important for you to know

9   in your job identifying suspicious orders what the

10  most abused opiate prescription medications were?

11     MS. SWIFT:  Object to the extent it

12  mischaracterizes the prior testimony.

13  BY THE WITNESS:

14     A.     I think that my job was to identify

15  suspicious orders.  And, yes, I do know that

16  controlled substance IIs are more addictive, for

17  example, than controlled IIIs and IVs.

18            I believe that in my job as identifying

19  suspicious orders and flagged orders, I believe

20  that my job is to work with our stores to

21  understand if that order should be considered

22  suspicious regardless of which C-II it is.

23  BY MR. MOUGEY:

24     Q.     Let me make sure we're straight here.

Highly Confidential - Subject to Further Confidentiality Review

1    So, when I asked you wouldn't it be important for

2    you in your job identifying suspicious orders what

3    the most abused opiate prescription medications

4    were, is your answer no, that they were all

5    equally?

6         A.    I don't know if I would have liked to

7    know at the time, if that's what you're asking me.

8         Q.    Sitting here today, do you think it's

9    important for you to know what opiate prescriptions

10   were highly problematic -- I'm sorry.

11            Sitting here today, wouldn't it be

12   important for you to know which opiate medications,

13   Schedule II or Schedule III, were the most abused

14   in fulfilling your job responsibilities at

15   Walgreens?

16        A.    I believe that I think that it's

17   important to know which controlled II or III opioid

18   medications are most abused today, yes, in doing my

19   job.

20        Q.    At what point in time did you become

21   aware that it was important to know which

22   controlled II or III opiate medications are most

23   abused?

24        MS. SWIFT:  Object to form.

1    BY MR. MOUGEY:

2        Q.    When did you come to that conclusion

3    that you ought to know that?

4        MS. SWIFT:  Object to the form of the

5    question.

6    BY THE WITNESS:

7        A.    I think that my understanding of what's

8    most abused, when we started in Rx Integrity, was

9    to put together our Target Good Faith Dispensing

10   process; and we identified three medications in

11   that process to make sure that our pharmacists were

12   alerted and following the procedure or the

13   checklist in the Target Good Faith Dispensing

14   checklists.

15   BY MR. MOUGEY:

16       Q.    And what were those three that were --

17   that fell under the rubric of the GFD that were

18   most abused?

19       A.    I would say the drugs that we selected,

20   and, again, I don't know if it was based on that

21   they were the most abused, were oxycodone,

22   Methadone and hydromorphone.

23       Q.    And do you recall when hydro -- strike

24   that.

1            Let's go back to this timeline, May to

2   June of 2012, a "Relaunch of Good Faith Dispensing

3   Policy."

4            Do you know what is being described here

5   as relaunches?

6        MS. SWIFT:  Objection; foundation.

7   BY THE WITNESS:

8        A.    Since I wasn't there, I don't know

9   exactly what that means, no.

10  BY MR. MOUGEY:

11       Q.    But in your job training in early '13,

12  did anyone tell you that GFD had just been

13  relaunched in May, June of 2012?

14       MS. SWIFT:  Same objection.

15  BY THE WITNESS:

16       A.    Not that I recall.

17  BY MR. MOUGEY:

18       Q.    "November 2012, Order to show cause

19  issued to three of the original Florida

20  pharmacies."

21            Do you see that?

22       A.    Yes.

23       Q.    Let's go back to May and June of 2012.

24  Were you aware that eight stores voluntarily

Highly Confidential - Subject to Further Confidentiality Review

1    removed all C-II products, Xanax and Soma?

2         A.    No.

3         Q.    Sitting here today, did you -- that's

4    the first time you've heard that?

5         A.    Can you repeat the exact question.

6         Q.    Yes, ma'am.  Sitting here today, were

7    you aware that eight Walgreen stores had

8    voluntarily removed all C-II products and Xanax and

9    Soma?

10        A.    That I don't recall.

11        Q.    And then where we started, looking at

12   this document, "The key to note is that this isn't

13   just a Florida problem."

14             Do you have any understanding of what

15   that note is describing?

16        MS. SWIFT:  Same objections as before.

17   BY THE WITNESS:

18        A.    No, I really don't know exactly what

19   that means.

20   BY MR. MOUGEY:

21        Q.    I hand you what I'm marking as Daugherty

22   5.

23                  (WHEREUPON, a certain document was

24                   marked as Walgreens-Daugherty

Highly Confidential - Subject to Further Confidentiality Review

```
1              Deposition Exhibit No. 5:  21 USCA
2              Section 801.)
3    BY MR. MOUGEY:
4        Q.    Let's go back to your training
5    January 2013 when you came on board at
6    Pharmaceutical Integrity.
7              All of the managers were new within the
8    last few months into Pharmaceutical Integrity when
9    you arrived, correct?
10       MS. SWIFT:  Object to the form.
11   BY THE WITNESS:
12       A.    When I arrived, I was the first manager.
13   BY MR. MOUGEY:
14       Q.    So, obviously, then the people -- and
15   you were new, obviously, to Pharmaceutical
16   Integrity, correct?
17       A.    Yes.
18       Q.    And the three that followed you,
19   Mr. Dymon, Mr. -- Mr. Bratton and Mr. Stahmann,
20   were all new as well, correct, after you?
21       A.    Yes.
22       Q.    And Ms. Polster was relatively new in
23   her job role, correct?
24       MS. SWIFT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.   That was my understanding when I

 3   started.

 4   BY MR. MOUGEY:

 5       Q.   Did part of your training include a

 6   description of what the applicable U.S. Code and

 7   Code of Federal Regulations required for suspicious

 8   order monitoring?

 9       MS. SWIFT:  I'm going to object to the extent

10   the question calls for privileged information.

11   Instruct you not to answer if it calls for

12   information you learned from counsel.

13   BY THE WITNESS:

14       A.   I think my understanding was we worked

15   with our attorneys to interpret that regulation,

16   yes.

17   BY MR. MOUGEY:

18       Q.   So, who was in charge at Walgreens of

19   training you regarding compliance issues related to

20   the U.S. Code?  Would attorneys come in and train?

21       MS. SWIFT:  Same objection.  I instruct you

22   not to disclose any information you learned from

23   counsel.

24   BY MR. MOUGEY:
```

```
1        Q.    I'm simply asking did they train.  I
2   don't want you to divulge any what Ms. Swift
3   believes is confidential or privileged.
4              But did attorneys train your group on
5   what was required under the applicable U.S. Code
6   regarding suspicious order monitoring?
7        MS. SWIFT:  I'm also going to instruct you
8   that to the extent you learned information that
9   came from counsel, whether directly or otherwise,
10  not to divulge it.  But you can answer the question
11  yes or no if you understand it.
12  BY THE WITNESS:
13       A.    No.
14  BY MR. MOUGEY:
15       Q.    So, let me make sure, after the couple
16  paragraphs of objections there, make sure we are on
17  the same page.
18              What I asked was:  Did attorneys train
19  your group on what was required under the
20  applicable U.S. Code regarding suspicious order
21  monitoring.  Is your answer to that question no?
22       A.    No, I was not trained by attorneys.
23       Q.    Okay.  So, we're not treading on any
24  proprietary ground here about training and attorney
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   input, correct?

 2        MS. SWIFT:  Object to the form of the

 3   question.

 4   BY THE WITNESS:

 5        A.    I don't know what we're -- what you're

 6   asking.  Can you clarify, please.

 7   BY MR. MOUGEY:

 8        Q.    Were attorneys part of your compliance

 9   training in any shape, form or fashion at

10   Walgreens?

11        MS. SWIFT:  Object to the form of the

12   question.  If you know the answer, you can answer

13   it yes or no.

14   BY THE WITNESS:

15        A.    No, I was not trained by attorneys.

16   BY MR. MOUGEY:

17        Q.    But what I asked you, were they part of

18   the training in any shape, form or fashion

19   regarding compliance with suspicious order

20   monitoring?

21        MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23        A.    No.

24   BY MR. MOUGEY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    Are you aware of whether or not
2  attorneys prepared the material that was used for
3  training for compliance functions related to
4  suspicious order monitoring?
5       A.    No.
6       Q.    You're not aware or they weren't?
7       A.    I'm not aware.
8       Q.    Did you have interactions with
9  attorneys, and, again, I'm not asking you the
10 content, but did you have interactions with
11 attorneys about the implementation of Walgreens
12 program regarding suspicious order monitoring when
13 you started in '13?
14      A.    When I started in '13 I did not have
15 that I recall interactions with attorneys in the
16 beginning, no.
17      Q.    Did there become a point in time when
18 you did have interactions with lawyers about
19 Walgreens' suspicious order monitoring policies or
20 procedures?
21      A.    Honestly, I don't recall.  I have had
22 interactions with attorneys over the course of my
23 job in Rx Integrity.  Specifically around
24 suspicious order monitoring, there may have been,
```

1    but I don't know.

2         Q.    Now, when you say "attorneys," let me

3    make sure I'm clear here.  I'm not talking about

4    just outside counsel.  I'm referring to Walgreens'

5    in-house counsel as well.

6         A.    Yes.

7         Q.    Does that change your answer at all?

8         A.    No.

9         Q.    That doesn't change your answer to any

10   of the previous questions about attorneys'

11   involvement regarding training and compliance with

12   suspicious order monitoring policies?

13        A.    No.

14        Q.    Let's start with or continue with

15   Daugherty 5.  This is U.S. Code Section 801.  You

16   have a copy in front of you.  It's "Congressional

17   findings and declarations:  controlled substances."

18            Do you see that?

19        A.    Yes.

20        Q.    And under No. 2, "The illegal

21   importation, manufacture, distribution, and

22   possession and improper use of controlled

23   substances have a substantial and detrimental

24   effect on the health and general welfare of the

1    American people."

2             Did I read that correctly?

3        A.    Yes.

4        Q.    Do you agree with that provision in the

5    U.S. Code?

6        MS. SWIFT:  Object to the form.

7    BY THE WITNESS:

8        A.    I don't know that to be true.  I don't

9    know.

10       MR. MOUGEY:  Does the camera angle include

11   Ms. Swift?  No.  All right.

12            I would like the record to reflect that

13   there is a continued head nodding and head shaking

14   yes and no from Ms. Swift when asking questions,

15   and it has continued over a series of depositions.

16            And I'd ask that opposing counsel please

17   stop yes or no's with shaking of their head when

18   I'm asking questions, which along with the speaking

19   objections clearly indicates what the counsel wants

20   the witness to answer.

21   BY MR. MOUGEY:

22       Q.    So, let's go back to 2.  Do you agree --

23   let's keep going.

24            If you would, turn the page to the

```
 1    section titled "21 U.S. Code Section 812.

 2    Schedule II."

 3             Do you see the "Schedule II" section

 4    below?

 5        A.    Yes.

 6        Q.    Okay.  "The drug or other substance has

 7    a high potential for abuse."

 8             Do you agree with the -- with that

 9    provision of the U.S. Code?

10        MS. SWIFT:  Same objection.

11    BY THE WITNESS:

12        A.    Yes, I agree.

13    BY MR. MOUGEY:

14        Q.    Schedule II (B), "The drug or other

15    substance has a currently accepted medical use in

16    treatment in the United States or a currently

17    accepted medical use with severe restrictions."

18             Do you see that?

19        A.    Yes.

20        Q.    Do you agree with that provision in the

21    U.S. Code?

22        MS. SWIFT:  Same objection.

23    BY THE WITNESS:

24        A.    I don't know that I agree.
```

1    BY MR. MOUGEY:

2        Q.    Schedule II (C), "Abuse of the drug or

3    other substances may lead to severe psychological

4    or physical dependence."

5            Did I read that right?

6        A.    Yes.

7        Q.    Do you agree with that provision of the

8    U.S. Code?

9        MS. SWIFT:  Same objection.

10   BY THE WITNESS:

11       A.    Yes.

12   BY MR. MOUGEY:

13       Q.    And you'd agree with me that it was

14   important for you to understand the rubric or the

15   parameters from the U.S. Code so you could fill

16   your function as a manager in Walgreens'

17   Pharmaceutical Integrity Department?

18       MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20       A.    I would agree that I should be familiar

21   with the regulations, yes.

22   BY MR. MOUGEY:

23       Q.    And if you would, turn to the second

24   page of this document titled "Section 21 U.S. Code

1    Section 821."  It says, "The Attorney General is

2    authorized to promulgate rules and regulations and

3    to charge reasonable fees relating to the

4    registration and control of the manufacture,

5    distribution and dispensing of controlled

6    substances and to listed chemicals."

7              Did I read that correctly?

8        A.    Yes.

9        Q.    And you would agree with me that

10   Walgreens fills two of the functions listed in

11   U.S. Code Section 821, correct?

12       MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14       A.    Can you be specific, the functions.

15   BY MR. MOUGEY:

16       Q.    Sure.  You understand that Walgreens is

17   a distributor, correct?

18       MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20       A.    Walgreens was a distributor.

21   BY MR. MOUGEY:

22       Q.    Yes, ma'am.  Walgreens was a distributor

23   until it got out of the business in 2014, correct?

24       MS. SWIFT:  Object to the form, foundation.

Highly Confidential - Subject to Further Confidentiality Review

1    BY THE WITNESS:

2        A.    I don't know if it was 2014, but we did

3    get out of the business, yes.

4    BY MR. MOUGEY:

5        Q.    You do know that Walgreens got out of

6    the distribution business?

7        A.    Yes.

8        Q.    So, up and to the point when Walgreens

9    got out of the distribution business, Walgreens was

10   a distributor as referenced in Section 821 of the

11   U.S. Code, correct?

12       MS. SWIFT:  Object to the form, foundation.

13   BY THE WITNESS:

14       A.    When I started in my position, I knew

15   that Walgreens had distribution centers that were

16   fulfilling controlled substance orders.

17   BY MR. MOUGEY:

18       Q.    Do you recall when you started at

19   Walgreens in 2013 how many distribution centers at

20   Walgreens were distributing Schedule II opiates?

21       MS. SWIFT:  Object to the form, foundation.

22   BY THE WITNESS:

23       A.    Honestly, I don't know exactly how many.

24   BY MR. MOUGEY:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You don't know.  Walgreens was also a

retail pharmacy, correct?

3    A.    Yes.

4    Q.    And this reference in Section 821 to

dispensing, do you have an understanding of what is

referenced by the word "dispensing"?

7    MS. SWIFT:  Object to the form.

8  BY THE WITNESS:

9    A.    My understanding of dispensing is

filling controlled substances in the pharmacy, yes.

11  BY MR. MOUGEY:

12    Q.    Like a pharmacy, right?  Dispensing?

13    A.    That's my understanding.

14    MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16    A.    But, again, I'm not interpreting rules

and regulations.  I would probably work with our

attorneys to interpret that, yeah.

19  BY MR. MOUGEY:

20    Q.    I hand you what I've marked as --

21    THE VIDEOGRAPHER:  Can we go off the record

for one minute?

23    MR. MOUGEY:  Sure.

24    THE VIDEOGRAPHER:  We are going off the record

1    at 11:00 a.m.

2                (WHEREUPON, a recess was had

3                 from 11:00 to 11:02 a.m.)

4        THE VIDEOGRAPHER:  We're back on the record at

5    11:02.

6    BY MR. MOUGEY:

7        Q.    Before we leave Daugherty 5, if you

8    would please look at the bottom of each one of

9    these sections and there is a date, October 27,

10   1970.  You can go back to the very first page.

11               21 U.S.C. Section 801, the provision

12   that references that "controlled substances have a

13   substantial and detrimental effect on the health

14   and general welfare of the American people."  And

15   that's dated October 27, 1970, correct?

16       A.    Yes.

17       Q.    And in your education and role as a

18   pharmacist, you were aware about the substantial

19   and detrimental effect of opiate prescriptions on

20   the American public, correct?

21       MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23       A.    I was aware that controlled substances

24   as a pharmacist were regulated and that there was

1    specific requirements in writing a prescription for

2    a controlled substance and that pharmacists have to

3    use their corresponding responsibility when

4    deciding to dispense a controlled substance

5    prescription, yes.

6    BY MR. MOUGEY:

7        Q.    And did you have an understanding that

8    they were also highly addictive?

9        MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11       A.    Yes.  I -- I understand that controlled

12   substances can be addictive.

13   BY MR. MOUGEY:

14       Q.    And did you have an understanding that

15   controlled substances have a substantial and

16   detrimental effect on the health and general

17   welfare of the American people if they were abused?

18       A.    If a person was abusing a controlled

19   substance, I can say that yes, there may be a

20   detrimental effect to their health.

21       Q.    And, so, this wasn't new news that there

22   was a substantial and detrimental effect on the

23   health and general welfare of the American people.

24   In fact, it's referenced in the U.S. Code in 1970

1    as indicated herein, correct?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    I see that it's referenced here, yes.

5    BY MR. MOUGEY:

6        Q.    You went to pharmacy school at, is it

7    Mideastern?

8        A.    Midwestern.

9        Q.    Midwestern and you finished your PharmD

10   in 1999, correct?

11       A.    I believe it was 2000, but yes.

12       Q.    '99, 2000?

13       A.    Yeah.

14       Q.    Somewhere.  You had spent -- how many

15   years does it take you in undergrad and pharmacy

16   all the way to finish your PharmD, how many years

17   of education?

18       A.    How many years did it take me?

19       Q.    Yes, ma'am.

20       A.    So, roughly three years undergrad and

21   four years pharmacy school.

22       Q.    So, approximately seven years of

23   education in the field of pharmacy or pharmacist,

24   rather, you had an understanding that, one,

1    controlled substances were potentially highly

2    addictive, correct?

3        A.    Yes.

4        Q.    You had an understanding based on your

5    seven years of education that prescription opiates

6    potentially could have a substantial and

7    detrimental effect on the health and general

8    welfare of the American people?

9        MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11       A.    I would say that I had an understanding

12   that someone who's become addicted to a controlled

13   substance, that it would definitely have a bad

14   effect on their health, yes.

15   BY MR. MOUGEY:

16       Q.    And when you were brought into

17   Pharmaceutical Integrity in 2013, you have an

18   understanding that your department's role was to

19   identify potential suspicious orders, correct?

20       A.    Yes.

21       Q.    In part.  And the goal of identifying

22   potential suspicious orders was to minimize or

23   prevent the diversion of prescription opiates into

24   the American public, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  Object to the form.
 2   BY THE WITNESS:
 3        A.    My understanding was that our role was
 4   to ensure that any flagged orders were reported as
 5   suspicious.
 6        Q.    And the goal or objective of flagging
 7   those orders as suspicious was to try and prevent
 8   or minimize the amount of prescription opiates into
 9   the American public, correct?
10        MS. SWIFT:  Object to the form.
11   BY THE WITNESS:
12        A.    My understanding was that we were to
13   review flagged orders and report suspicious orders
14   because that was part of the law; and in talking to
15   our attorneys, that's what we were --
16        MS. SWIFT:  Object.  I'm just going to
17   interpret you and instruct you not to disclose
18   anything that you learned from attorneys.
19   BY MR. MOUGEY:
20        Q.    In talking to attorneys, that that
21   helped you understand what the compliance functions
22   were?
23        MS. SWIFT:  Same objection.
24   BY THE WITNESS:
```

1      A.     In talking to attorneys, it helped me

2   understand what we were required to do.

3   BY MR. MOUGEY:

4      Q.     And I understand that you were required

5   to identify and spot suspicious orders and report

6   them, but what I'm trying to get to is what's your

7   understanding of what the objective.  What was the

8   goal of identifying or spotting those suspicious

9   orders and reporting them?

10     MS. SWIFT:  Object to the form, foundation.

11  BY THE WITNESS:

12     A.     The goal was to follow the law is my

13  understanding.

14  BY MR. MOUGEY:

15     Q.     But what was the -- what was the goal or

16  objective of the law?  What was -- what were you

17  trying to do in Pharmaceutical Integrity when you

18  started in 2013?

19     MS. SWIFT:  Object to the form.  To the extent

20  it calls for privileged information, I'll instruct

21  you not to answer.  I'm not sure that it does, but

22  if it does, I'll instruct you not to answer.

23  BY THE WITNESS:

24     A.     I don't know the goal of the law.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MOUGEY:

 2         Q.    What was the goal of the department,

 3    just to spot the orders?

 4         MS. SWIFT:  Object to the form.

 5    BY THE WITNESS:

 6         A.    The department was tasked as part of

 7    their job to flag orders and then report them as

 8    suspicious if they were in fact suspicious.

 9    BY MR. MOUGEY:

10         Q.    I hand you what will be marked as

11    Daugherty 6.

12                   (WHEREUPON, a certain document was

13                    marked as Walgreens-Daugherty

14                    Deposition Exhibit No. 6:

15                    Document, Chapter II - Drug

16                    Enforcement Administration,

17                    Department of Justice; P-GEN-0064.)

18    BY MR. MOUGEY:

19         Q.    Very first page of Daugherty 6 is titled

20    "Chapter II - Drug Enforcement Administration,

21    Department of Justice."

22                   Do you see that?

23         A.    Yeah.  Yes.

24         Q.    And I'd like just to direct your
```

1    attention to a couple of pages in this.

2        MS. SWIFT:  Just for the record, because there

3    is no Bates number on -- or is this a Bates number

4    at the top right, Peter, for identification

5    purposes?

6        MR. MOUGEY:  I don't believe so.  Let me just

7    use the -- let me just use the page numbers if it's

8    okay, because there is not a Bates number.  Let's

9    use 29.  If you want to read the upper right-hand.

10       MS. SWIFT:  Just for identification purposes

11   on the first page it says P-GEN-0064.  I don't know

12   if that's "Plaintiff Generic" through -- well,

13   every page appears to have the same identifier.

14   There is no Bates number on the document.

15       MR. MOUGEY:  Or we can just refer to it as

16   Daugherty 6.

17   BY MR. MOUGEY:

18       Q.    So, Daugherty 6.  Section 1301.36.  It's

19   on page 29 of this document.  And it's Section --

20   it's on the right-hand column.  1301.36.

21            Do you see that where I am?

22       A.    Yes.

23       Q.    Okay.  And that section is entitled

24   "Suspension or revocation of registration;

1    suspension of registration pending final order;

2    extension of registration pending final order."

3              Are we in the same place?

4    A.    Yes.

5    Q.    If you would go down, please, to

6    Section (e), begins with "The Administrator."

7    Bottom of the right-hand page.  Right-hand column,

8    rather.

9    A.    Yes.

10   Q.    "The Administrator may suspend any

11   registration simultaneously with or at any time

12   subsequent to the serving upon the registrant of an

13   order to show cause why such registration should

14   not be revoked or suspended, in any case where he

15   or she finds that there is an imminent danger to

16   the public health or safety."

17             Do you see that?

18   A.    Yes.

19   Q.    So, when you began at Walgreens in

20   January '13, did you have an understanding that

21   Walgreens had received any orders to show cause or

22   immediate suspensions from the DEA?

23   MS. SWIFT:  Object to the form, foundation.

24   BY THE WITNESS:

1    A.    When I began at Walgreens, I did not

2    have any understanding.

3    BY MR. MOUGEY:

4    Q.    Let's broaden that up.

5          Did you understand when you began at

6    Walgreens that Walgreens was under investigation by

7    the regulators regarding its dispensing and

8    distribution of controlled substances?

9    MS. SWIFT:  Object to the form, vague.

10   BY THE WITNESS:

11   A.    I had knowledge when I began at

12   Walgreens that the DEA had gone in and visited

13   select stores in Florida in our pharmacies, yes.

14   BY MR. MOUGEY:

15   Q.    And when you say "visited," you mean

16   like had donuts or they were investigating the

17   retail pharmacies where Walgreens dispensed

18   Schedule II and III narcotics?

19   MS. SWIFT:  Object to the form.  Did you say

20   "had donuts"?

21   MR. MOUGEY:  I did.

22   BY MR. MOUGEY:

23   Q.    What do you mean by visited?

24   A.    My understanding was that they were

Highly Confidential - Subject to Further Confidentiality Review

1    audits of our pharmacies.

2         Q.    They were audits.  They were

3    investigating.  Do you agree with that?

4         MS. SWIFT:  Object to the form, foundation.

5    BY THE WITNESS:

6         A.    I don't know if they were investigating,

7    but at the time my understanding was that they were

8    audits.

9    BY MR. MOUGEY:

10        Q.    Do you recall in the first half of 2013

11   anyone from Walgreens showing you documents that

12   had been served upon Walgreens by the Department of

13   Justice?

14        MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16        A.    In 2013?

17   BY MR. MOUGEY:

18        Q.    Yes.

19        A.    I don't recall.

20        Q.    Do you have an understanding in the

21   beginning of 2013 the scope of the investigation

22   into Walgreens?

23        MS. SWIFT:  Object to the form.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    No.
2   BY MR. MOUGEY:
3        Q.    Did you have an understanding in the
4   beginning of 2013 that the Department of Justice
5   and the DEA were moving to suspend Walgreens'
6   registration because it was in imminent danger to
7   the public's health or safety?
8        MS. SWIFT:  Object to the form, assumes facts.
9   BY THE WITNESS:
10       A.    No, I did not know.
11  BY MR. MOUGEY:
12       Q.    Did you have an understanding of what
13  the scope of the audits was into Walgreens from the
14  DEA?
15       MS. SWIFT:  Object to the form.
16  BY THE WITNESS:
17       A.    My understanding of the scope of the
18  audits or visits from the DEA were to investigate
19  the dispensing of oxycodone, as I mentioned before.
20  BY MR. MOUGEY:
21       Q.    Do you have an understanding of whether
22  or not the audits pertained in any way to the
23  distribution of Schedule II or Schedule III
24  narcotics?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MS. SWIFT:  Object to the form, foundation.

2     BY THE WITNESS:

3          A.    Did I understand in 2013?  No.

4     BY MR. MOUGEY:

5          Q.    Let's continue with the next sentence.

6     It says, "If the Administrator so suspends, he or

7     she shall serve with the order to show cause

8     pursuant to Section 1301.37 an order of immediate

9     suspension which shall contain a statement of his

10    findings regarding the danger to public health or

11    safety."

12              Do you see that?

13         A.    Yes.

14         Q.    Do you have an understanding of whether

15    or not Walgreens in late 2012, early 2013 had

16    received an order to show cause because there was a

17    finding regarding the danger to public health or

18    safety?

19         MS. SWIFT:  Object to the form.

20    BY THE WITNESS:

21         A.    In 2013, I did not, no.

22    BY MR. MOUGEY:

23         Q.    When did you become aware that there was

24    an order to show cause or any regulatory orders

1    from the DEA or the Department of Justice regarding

2    Walgreens' conduct?

3         MS. SWIFT:  Object to the form.

4    BY THE WITNESS:

5         A.    I don't recall.

6    BY MR. MOUGEY:

7         Q.    Do you recall if it was in 2013 at all?

8         A.    I don't recall.

9         Q.    Do you -- would you agree with me that

10   if Walgreens received orders from the Department of

11   Justice or the DEA that there be an immediate

12   suspension that contained a statement regarding the

13   danger to public health or safety, that that is a

14   significant issue at Walgreens?

15        MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17        A.    Can you repeat that.

18   BY MR. MOUGEY:

19        Q.    Would you agree that if Walgreens

20   received an order to show cause requiring immediate

21   suspension that contained statements about findings

22   regarding the danger to public health or safety,

23   that that is a significant issue at Walgreens?

24        MS. SWIFT:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

1    BY THE WITNESS:

2         A.    I don't know.  I don't know all -- I

3    don't know all the facts and what the order to show

4    cause entailed.  I don't know.

5    BY MR. MOUGEY:

6         Q.    I mean, as manager of Pharmaceutical

7    Integrity, aren't you kind of in the fact business?

8    I mean, isn't your job to find out facts regarding

9    suspicious orders?

10        MS. SWIFT:  Object to form.

11   BY THE WITNESS:

12        A.    My job is to find out facts regarding

13   suspicious orders and identify them and report

14   them, yes.

15   BY MR. MOUGEY:

16        Q.    This is now the leading cause of death

17   as of 2013 in the United States when you start,

18   correct?

19        MS. SWIFT:  Object to the form, foundation.

20   BY THE WITNESS:

21        A.    I don't recall if it was the leading

22   cause of death when I started.

23   BY MR. MOUGEY:

24        Q.    And if Walgreens is receiving orders

1    from the regulators that contain findings regarding

2    the danger to public health or safety, wouldn't you

3    expect Walgreens to fully update you on what the

4    problems were in those locations?

5         A.    I again became aware of it.  I just

6    don't recall when I became aware of it.  Early in

7    2013, for example, I was not aware of it.

8         Q.    And at any point in time you can't

9    recall in 2013 when anyone from Walgreens came and

10   updated you on the problems with Walgreens

11   distribution centers regarding the danger to public

12   health or safety?

13        MS. SWIFT:  Object to the form of the

14   question.

15   BY THE WITNESS:

16        A.    I may have been aware of any -- some

17   sort of order to show cause in our DCs in 2013.  I

18   just can't recall when it was, in 2013 or 2014.  I

19   don't remember.

20   BY MR. MOUGEY:

21        Q.    Are you aware that the Jupiter

22   distribution center Schedule II facilities were

23   padlocked by the DEA?

24        MS. SWIFT:  Object to the form, assumes facts.

Highly Confidential - Subject to Further Confidentiality Review

1    BY THE WITNESS:

2         A.    No.

3    BY MR. MOUGEY:

4         Q.    Were you -- if I were to use the word

5    "cage" in a distribution center, does that make

6    sense to you?

7         A.    Yes.

8         Q.    Schedule II and Schedule III narcotics

9    along with others are stored in that cage, correct?

10        A.    As far as I know, yes.

11        Q.    Do you -- are you aware that the DEA put

12   a lock on Walgreens' -- one of Walgreens'

13   distribution centers, locking up their Schedule II

14   and Schedule III narcotics?

15        A.    No.

16        Q.    No one ever has told you that?

17        A.    Not that I recall, no.

18        Q.    Wouldn't that be information that would

19   be important for you to know in your job, that one

20   of Walgreens' Schedule II and Schedule III cages

21   had been locked by the DEA shortly before your

22   arrival?

23        MS. SWIFT:  Object to the form of the

24   question.

```
 1   BY THE WITNESS:

 2        A.    When I first started in Rx Integrity, my

 3   role was to again identify flagged orders and

 4   report suspicious orders according to the law as a

 5   variety of other things, reporting 106s, and,

 6   again, maintaining our Good Faith Dispensing

 7   policy.

 8              I don't know if I would have liked to

 9   know at the time as it didn't have direct impact on

10   my job and basically training our team back in

11   2013.

12   BY MR. MOUGEY:

13        Q.    And you would agree with me that the

14   role of Pharmaceutical Integrity was to identify

15   and spot suspicious orders, correct?

16        A.    Yes.

17        Q.    Pardon me?

18        A.    Yes.

19        Q.    Would you agree with me that Walgreens

20   was required to perform due diligence on those

21   suspicious orders?

22        MS. SWIFT:  Object to form.

23   BY THE WITNESS:

24        A.    Can you be more specific?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MOUGEY:

 2       Q.    Do you understand when I use the word

 3   "due diligence" what that means?

 4       A.    Can you explain what you mean by your

 5   question.

 6       Q.    I'm asking you.  Do you understand when

 7   I use the words "due diligence" what's that mean?

 8       A.    My understanding is that in

 9   Rx Integrity, we were tasked to identify flagged

10   orders and report suspicious orders, yes.

11       Q.    I hand you what I'm marking as

12   Exhibit 7, Daugherty Exhibit 7.

13                   (WHEREUPON, a certain document was

14                    marked as Walgreens-Daugherty

15                    Deposition Exhibit No. 7:  Masters

16                    Pharmaceutical v. DEA, U.S. Court

17                    of Appeals, 861 F3d 206.)

18   BY MR. MOUGEY:

19       Q.    Very first page of Daugherty Exhibit 7,

20   Masters Pharmaceutical vs. The DEA.

21             Do you see that?

22       A.    Yeah, yes.

23       Q.    Bear with me one second, Ms. Daugherty,

24   while we catch up with the electronics.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 I'm going to, while we're looking, I'm
 2   going to take your attention to -- the copy is
 3   light.  So, I'm on -- turn to the fourth page in
 4   and it has a number 1 on the right-hand column that
 5   starts with "The Controlled Substance Act."  Let me
 6   know when you're there.  Fourth page in.
 7        A.    Double-sided fourth page?
 8        Q.    No, just the fourth page.
 9        A.    Okay.
10        Q.    It begins with number 1, "The Controlled
11   Substance Act."  Are we on the same page?
12        A.    Yes.
13        Q.    Let's go through this.
14                 In the middle of that paragraph under 1,
15   do you see the sentence that begins with "In
16   evaluating"?
17        A.    Yes.
18        Q.    Here we go.  I'm going to read the
19   sentence in the middle of the paragraph under 1, it
20   says, "In evaluating a distributor's operations,
21   the Administrator considers (1) whether the
22   distributor has maintained 'effective controls
23   against diversions of particular controlled
24   substances into other than legitimate medical,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    scientific and industrial channels.'"

 2            Correct?  Do you see that?

 3       A.   I see it.

 4       Q.   Did I read that correctly?

 5       A.   Yes.

 6       Q.   And then No. 2, "whether the distributor

 7    has complied with the applicable state and local

 8    laws."

 9            Did I read that right?

10       A.   Yes.

11       Q.   And then No. 3, "whether the distributor

12    has previously been convicted under federal or

13    state laws for a crime related to the sale of

14    controlled substances; (4), the distributor's past

15    experience with controlled substances; and, (5)

16    such other factors as may be relevant to and

17    consistent with the public health and safety."

18            Did I read that right?

19       A.   Yes.

20       Q.   Let's continue under Section 2 below.

21            "Where, as here, the Administrator

22    considers the first factor - the maintenance of

23    'effective controls' against the diversion of

24    controlled substances."
```

```
 1              Do you believe when you started in

 2   January of '13 that Walgreens maintained effective

 3   controls against the diversion of controlled

 4   substances?

 5      MS. SWIFT:  Object to the form, calls for a

 6   legal conclusion.

 7   BY THE WITNESS:

 8      A.    I can't interpret that as this is -- I

 9   would defer to our legal counsel to advise.

10   BY MR. MOUGEY:

11      Q.    But you were hired as a manager in

12   Pharmaceutical Integrity, correct?

13      A.    Yes.

14      Q.    And you were in charge of, as one of the

15   four managers, implementing Walgreens' system to

16   identify suspicious orders, correct?

17      A.    Correct.

18      Q.    And do you believe that the system you

19   were charged with implementing was an effective

20   control against the diversion of controlled

21   substances when you started in January of 2013?

22      MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24      A.    My understanding of my role back in 2013
```

Highly Confidential - Subject to Further Confidentiality Review

1    was to review flagged orders, train our team and

2    report suspicious orders.

3    BY MR. MOUGEY:

4         Q.    And do you believe that the controls

5    used to identify suspicious orders was effective --

6         MS. SWIFT:  Object to the form.

7    BY MR. MOUGEY:

8         Q.    -- when you started in 2013?

9         MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11        A.    I don't know.  My understanding of my

12   role was to identify flagged orders.

13   BY MR. MOUGEY:

14        Q.    Do you --

15        A.    And report suspicious orders.

16        Q.    Do you have an understanding in the

17   beginning of 2013 how suspicious orders were

18   flagged?

19        A.    When I first started in 2013, I had an

20   understanding that they were flagged based on

21   specific criteria, but I was not familiar with the

22   criteria when I first started.

23        Q.    When did you become aware of what the

24   specific criteria was of how suspicious orders were

Highly Confidential - Subject to Further Confidentiality Review

1    flagged?

2        A.    Probably within the first two or three

3    months.

4        Q.    First two or three months.  So, were you

5    responsible for reviewing those suspicious orders

6    in the first two or three months?

7        A.    I was being trained.

8        Q.    Were you responsible as manager of the

9    Midwest Division for reviewing suspicious orders

10   those first two or three months?

11       A.    I don't remember.

12       Q.    You don't recall.  You don't recall the

13   first two or three months at your job of whether or

14   not you were getting sent or forwarded suspicious

15   orders?

16       A.    Oh, yes, but I was also being trained at

17   the time with another team member.

18       Q.    Who else was training alongside with

19   you?

20       A.    Steve Mills.

21       Q.    And who was training the two of you?

22       A.    Steve was training me.

23       Q.    Steve was training you.  And how long

24   had Steve been in a role at Walgreens of

1  identifying suspicious orders when he started

2  training you?

3       MS. SWIFT:  Object to the form, foundation.

4  BY THE WITNESS:

5       A.   I don't know.  I think he started at the

6  end of 2012.

7  BY MR. MOUGEY:

8       Q.   So, a month or two before you?

9       MS. SWIFT:  Same objection.

10  BY THE WITNESS:

11       A.   I don't know exactly when he started.

12  BY MR. MOUGEY:

13       Q.   Walk me through your first few months on

14  the job at Walgreens.  Would you get suspicious

15  orders via e-mail?

16       A.   Flagged orders via e-mail.

17       Q.   Flagged orders.  And you're

18  differentiating between a flagged order and a

19  suspicious order?

20       A.   Yes.

21       Q.   So, the flagged orders you received,

22  what were you charged with doing on those flagged

23  orders?

24       A.   I was charged with reviewing them and

1    then working with the store, if needed, to

2    understand if we needed to report that as a

3    suspicious order or if it was a -- it was not

4    considered suspicious.

5         Q.    So, when you say "working with the

6    store," what did that mean?

7         A.    Calling the store at the time.

8         Q.    And who would you speak to when you

9    called the store?

10        A.    Typically the pharmacy manager.

11        Q.    How many Walgreens were in your

12   geographic region, the Midwest region,

13   approximately in the beginning of 2013?

14        A.    Honestly, I don't recall.

15        Q.    Do you have any understanding of how

16   many were in your scope of review for suspicious

17   orders?

18        A.    I don't remember.

19        Q.    Thousands?

20        MS. SWIFT:  Object to the form.

21   BY MR. MOUGEY:

22        Q.    Would you agree there were thousands?

23        MS. SWIFT:  Object to the form.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't remember exactly.

 2   BY MR. MOUGEY:

 3        Q.    Do you recall if there were five or were

 4   there 2,000?

 5        MS. SWIFT:  Object to the form.

 6   BY THE WITNESS:

 7        A.    I think there were more than 1,000, yes.

 8   BY MR. MOUGEY:

 9        Q.    There were more than 1,000?

10        A.    Yes.

11        Q.    That were under your review and

12   responsibility to identify suspicious orders?

13        A.    Correct.

14        Q.    And how would those -- how would the

15   orders that had been flagged come to you via e-mail

16   when you sat down at your desk?

17        A.    My understanding was they were --

18   honestly, I don't remember.

19        Q.    How often did they come to you?

20        A.    All throughout the day.

21        Q.    And as they came in, you'd pick up the

22   phone and call the -- the retail store?

23        A.    Yes, I could call the retail store.

24        Q.    You could, but you didn't --
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    -- necessarily?

3        A.    I don't think I did in every case.

4        Q.    Did you have any metrics to decide when

5    to call and when not to call in the beginning of

6    2013?

7        A.    I don't remember.

8        Q.    Do you have any criteria of what you

9    used to determine what was suspicious and what

10   wasn't suspicious based on the information you were

11   given?

12       A.    At the time I don't remember.

13       Q.    You don't remember.  Do you have any

14   idea of the methodology used of to determine what

15   was suspicious and what wasn't suspicious?

16       A.    No, I don't remember.

17       Q.    Do you recall what you asked the

18   pharmacist in the beginning of 2013 to -- in order

19   to decide whether the order was suspicious or not

20   suspicious?

21       A.    No, I don't remember.

22       Q.    So, you would just call the pharmacist

23   and you don't have any recollection of what type of

24   information you would discuss with the pharmacist?

Highly Confidential - Subject to Further Confidentiality Review

1        MS. SWIFT:  Object to the form,

2    mischaracterizes the testimony.

3    BY THE WITNESS:

4        A.    I don't remember in the beginning when I

5    started and was trained what the process was

6    exactly.

7    BY MR. MOUGEY:

8        Q.    I'm not asking you --

9        A.    No.  I don't remember.

10        Q.    Generally, do you recall what type of

11    information you were trying to gather from the

12    pharmacist to determine whether or not an order was

13    suspicious?

14        A.    Back in the beginning of 2013, I

15    honestly don't recall in that first month or two.

16        Q.    How about the first several months, do

17    you recall what the process was?

18        A.    I recall when we implemented the CSO KPI

19    tool fully and it was automated that I would review

20    flagged orders, and at that time there was an

21    explanation that the pharmacists would need to

22    provide as to why they needed it.

23            So, there was a prescription coming in

24    from a patient they felt was legitimate and needed

Highly Confidential - Subject to Further Confidentiality Review

1  to be filled, then I would not flag that as a

2  suspicious order.

3      Q.    Up and to the automated tool that came

4  from Walgreens, what -- what criteria were you

5  discussing with the pharmacy to determine whether

6  or not an order was suspicious?

7      A.    So, if I had to speak to a pharmacist,

8  and, again, I don't remember an exact incident, but

9  I would call the pharmacy and I would ask them to

10  provide additional information as to why they

11  needed the additional product, whether it was an

12  extra two bottles to explain to me why they needed

13  the product, whether it was a prescription or a

14  couple prescriptions that they needed to fill for

15  their regular patients.  That was the general

16  course of my conversations with the pharmacist.

17      Q.    Did you have a checklist or a manual or

18  some policy that you used to go through to

19  determine what was suspicious and what wasn't?

20      A.    Not that I recall.

21      Q.    You don't recall any criteria that you

22  used, notes, policies, manuals, to determine

23  whether or not an order was suspicious until the

24  automated tool?

1      A.      Like a manual?

2      Q.      Anything.  Smoke signals, anything to

3 determine what was an order was suspicious and what

4 wasn't up until the automated tool?

5      A.      I may have used notes in the course of

6 being trained to identify what would be considered

7 a suspicious order, my notes, yes.

8      Q.      Did you have a training package that you

9 received?

10     MS. SWIFT:  Object to the form.

11 BY THE WITNESS:

12     A.      I received various training and policies

13 to review, yes.  But I don't know that it was all

14 in one package.

15 BY MR. MOUGEY:

16     Q.      Was it online where you would click and

17 review certain policies or procedures?

18     A.      That was part of my training, to receive

19 online policies and procedures, yes.

20     Q.      But you didn't receive a packet of

21 information, whether it be online or

22 electronically, that you could refer to for

23 criteria before the automated system to identify

24 suspicious orders?

```
 1          MS. SWIFT:  Object to the form.

 2   BY THE WITNESS:

 3          A.    Not that I recall.

 4   BY MR. MOUGEY:

 5          Q.    If you had a question regarding whether

 6   an order was suspicious or not, who did you go to?

 7          A.    Probably varied depending on my

 8   question.

 9          Q.    Why don't you give me kind of the scope

10   of people that you would go to with questions and

11   why you would go to them?

12          A.    I would probably work with either Steve

13   or one of the other managers, Eric, Steve -- Eric,

14   Ed or Chris.

15          Q.    And were they able to respond to your

16   inquiries regarding whether or not an order was

17   suspicious?

18          MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20          A.    I don't recall any specific example.  We

21   would work together to determine that.

22   BY MR. MOUGEY:

23          Q.    I'm not asking you to remember

24   specifics.  I'm very general.  I'm not asking you
```

Highly Confidential - Subject to Further Confidentiality Review

 1    about Susie's prescription in Topeka, Kansas.

 2              I'm asking you generally why would you

 3    go to separate people and ask them questions?  Was

 4    it a difference in scope of responsibility?

 5        MS. SWIFT:  Object to the form.

 6    BY THE WITNESS:

 7        A.    I would not go to separate people.  I

 8    think depending on what I was reviewing again, too,

 9    we had different areas.  So, if I was reviewing an

10    area that happened to be Eric's, I would probably

11    go to Eric and talk to him first, if I had a

12    question.

13    BY MR. MOUGEY:

14        Q.    Did you also go to in-house legal

15    department with questions?

16        MS. SWIFT:  Object to the form to the extent

17    it calls for privileged information.

18    BY THE WITNESS:

19        A.    For what?

20    BY MR. MOUGEY:

21        Q.    For any questions regarding the

22    implementation of whether the criteria of whether

23    or not an order was suspicious.

24        MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1    BY THE WITNESS:

2         A.    Not that I recall.

3         MS. SWIFT:  Calls for privileged information.

4    You can answer it yes or no.

5    BY THE WITNESS:

6         A.    No.

7    BY MR. MOUGEY:

8         Q.    You never went to in-house counsel and

9    asked for any interpretation of whether or not an

10   order was suspicious?

11        MS. SWIFT:  I'm going to instruct the witness

12   not to answer the question.  It calls for

13   privileged information.

14   BY MR. MOUGEY:

15        Q.    Did you go to in-house counsel and ask

16   for any interpretations on compliance regarding

17   suspicious orders?

18        MS. SWIFT:  Same instruction.  Please don't

19   answer the question.

20        MR. MOUGEY:  Whether or not she went -- I'm

21   not asking for what was told.  I'm not asking for

22   the specifics of what she's asked.  All I asked was

23   did you go to in-house counsel for advice or input

24   on whether or not an order was suspicious.

Highly Confidential - Subject to Further Confidentiality Review

1      MS. SWIFT:  It's too close, Peter.  I'm

2   instructing her not to answer the question.

3   BY MR. MOUGEY:

4      Q.    Did you go to in-house counsel asking

5   for input on compliance issues?

6      MS. SWIFT:  You've already covered this

7   earlier in a yes-or-no fashion.  I'm going to

8   instruct her not to answer any further questions on

9   this.  It's privileged.

10      MR. MOUGEY:  You're instructing her not to

11   answer whether or not she went to in-house counsel

12   asking for compliance issues.

13      MS. SWIFT:  You've already covered it and she

14   answered yes or no.  Let's move on.

15      MR. MOUGEY:  You're instructing the witness

16   not to answer my question of whether or not she

17   went to in-house counsel asking for input on

18   compliance issues.

19      MS. SWIFT:  You can answer it yes or no.

20   That's it.  If you remember.

21   BY THE WITNESS:

22      A.    I have to ask what you mean by

23   compliance.  I don't know what you mean.  Can you

24   give me an example?

```
 1    BY MR. MOUGEY:

 2         Q.   Go back to your very first -- the very

 3    first exhibit, No. 1.

 4              Do you see the word "compliance" used

 5    repeatedly in your bio?

 6         A.   Yes.

 7         Q.   How many times -- it's used several

 8    times, correct?

 9         A.   Yes.

10         Q.   "Decade of experience in pharmacy

11    compliance programs."

12              Do you see that in the middle of the

13    page?

14         A.   No.  Where are you referring to?

15         MS. SWIFT:  He is looking at a different

16    document, Patty.

17    BY THE WITNESS:

18         A.   I don't know where you're referring to.

19         MS. SWIFT:  He's on your LinkedIn.  It's a

20    totally different document.

21    BY MR. MOUGEY:

22         Q.   Very first.

23         A.   Oh, got it.

24         Q.   Got it?  Right in the middle of the
```

```
 1    page.  It says, "Decade of experience."

 2         A.    I see that.

 3         Q.    Follow me?  It says, "Decade of

 4    experience," very last part of that sentence is

 5    "pharmacy compliance programs."  Correct?

 6         MS. SWIFT:  Read the whole sentence if you

 7    need to.

 8    BY THE WITNESS:

 9         A.    Yes, I see that.

10    BY MR. MOUGEY:

11         Q.    Compliance.  You understand what the

12    word "compliance" means, correct?

13         MS. SWIFT:  Object to the form.

14    BY THE WITNESS:

15         A.    Yes.

16    BY MR. MOUGEY:

17         Q.    So, when I asked if you went to in-house

18    counsel and asked for input regarding compliance

19    issues, do you recall seeking any input from

20    in-house counsel of Walgreens on compliance

21    functions?

22         MS. SWIFT:  Object to the form, vague.  You

23    can answer yes or no.

24    BY THE WITNESS:
```

1      A.    So, my role also involved various

2  compliance with state requirements related to 106.

3  So, yes.

4  BY MR. MOUGEY:

5      Q.    The only time you went to in-house

6  counsel for input on compliance functions was in

7  regard to 106?

8      MS. SWIFT:  Object to the form.  Again, it's a

9  yes-or-no question and I'll instruct you not to

10  divulge privileged information you received from

11  attorneys.

12  BY THE WITNESS:

13      A.    As far as I recall, I don't know.

14  BY MR. MOUGEY:

15      Q.    So, as issues arose with the Walgreens

16  controls against diversion, outside of your group,

17  who would you go and talk to?

18      MS. SWIFT:  Object to the form.

19  BY THE WITNESS:

20      A.    Around my role for my particular job I

21  only spoke to people in my group and my boss

22  primarily, and we worked with other teams depending

23  on the scope of the program.  If we were working on

24  the enhancement and/or an update for our tool, our

1    CSO KPI, I would work with IT in that instance.

2    BY MR. MOUGEY:

3        Q.    Did you go to whoever was running the

4    suspicious order review group -- before

5    Pharmaceutical Integrity, did you ever find out who

6    that person was prior to 2013?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    I don't know who it is or who it was,

10   what area.

11   BY MR. MOUGEY:

12       Q.    Did you go to Ms. Polster and say, "Who

13   was running this before I got here?  Let's go ask

14   them some of these questions"?

15       MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17       A.    No.

18   BY MR. MOUGEY:

19       Q.    It didn't ever -- in your decade of

20   experience at this point in time as a pharmacist, a

21   clinical technician, compliance, it never dawned on

22   you to say, "I've got all these people that are new

23   and a new department.  Where is the department that

24   was running this before me"?  Did you ever go to

Highly Confidential – Subject to Further Confidentiality Review

1    them?

2        A.    Not that I recall.

3        Q.    Did you ever ask for all the old, the

4    previous department's, all of their training

5    materials and what they were doing before you got

6    there?

7        A.    Not that I recall.

8        Q.    Do you recall being given any material

9    regarding identification of suspicious orders prior

10   to the creation of the Pharmaceutical Integrity

11   Department?

12       A.    No, I don't recall.

13       Q.    Do you recall any process when you first

14   got there of Pharmaceutical Integrity Department

15   going around and collecting, you know, documents

16   with policies and procedures regarding

17   identification of suspicious orders?

18       A.    Can you repeat that.

19       Q.    Do you remember any effort from your

20   group going to other departments collecting

21   documents, providing the criteria used to identify

22   suspicious orders prior to the creation of

23   Pharmaceutical Integrity?

24       A.    No.

1      Q.     Did you remember any effort to go review

2   the group before Pharmaceutical Integrity

3   Department, their policies and procedures about

4   identifying suspicious orders or contacting

5   pharmacies about the criteria of whether an order

6   was suspicious?

7      MS. SWIFT:  Object to the form.

8   BY THE WITNESS:

9      A.     Can you repeat the beginning part of

10   your question?

11   BY MR. MOUGEY:

12      Q.     Did you ever -- do you recall reviewing

13   any prior department's material on criteria used to

14   identify suspicious orders?

15      MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17      A.     No.

18   BY MR. MOUGEY:

19      Q.     Do you know if anyone was monitoring

20   suspicious orders before Pharmaceutical Integrity

21   Department?

22      A.     Back in 2013?

23      Q.     Before you got there, yes.

24      A.     No, I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know if there was a -- if there

2  was a group or a specific person that was

3  responsible for reviewing suspicious orders before

4  you got there?

5    MS. SWIFT:  Objection; foundation.

6  BY THE WITNESS:

7    A.    In 2013?

8  BY MR. MOUGEY:

9    Q.    Prior to you getting there.  You started

10  in January '13.  Who was running the effort at

11  Walgreens to identify suspicious orders before you

12  got there in January '13?

13    A.    When I first started in 2013, I did not

14  know who was running our suspicious order

15  monitoring program prior to 2013.

16    Q.    And at any point in time after you

17  starting in January 2013 did you ever say, "Well,

18  let's go ask the folks that were doing this before

19  us"?

20    A.    No, I did not.

21    Q.    Do you have any understanding of why

22  Pharmaceutical Integrity Department was created?

23    A.    I can only speculate.  I don't know.

24    Q.    Do you have any understanding that the

```
 1    Pharmaceutical Integrity Department was created as

 2    a result of the DEA investigations?

 3         MS. SWIFT:  Object to the form.

 4    BY THE WITNESS:

 5         A.    No, I can only speculate.  I don't know.

 6         MR. YINGLING:  I'm sorry to interject for a

 7    moment.  It's my understanding the phone line is

 8    down right now.  If that's the case, could we get

 9    it back up?

10         MR. MOUGEY:  I just would like to get -- 15

11    more minutes till lunch.  If we can get that

12    without taking a break, that would be great.  Can

13    everybody live with that?

14         MS. SWIFT:  Sounds like there is an objection

15    to that.

16              (Clarification by the reporter.)

17         MR. MOUGEY:  Do you mind if we wait 15 minutes

18    until lunch?

19         MR. YINGLING:  I received an e-mail that

20    somebody who is on the line can't hear what's going

21    on right now.  It's not my objection to stop.

22         MR. MOUGEY:  Right, I haven't heard any

23    objection.  Let's just take 15 minutes.

24         MS. SWIFT:  You have heard an objection.  You
```

1    proceed over the objection.  I'm not going to tell

2    you what to do.  But I take from this there is an

3    objection to proceeding because the phone line is

4    down, which is understandable.  Let me just take a

5    minute and see if I can -- do we know which phone

6    like what they are connected to?  I don't know who

7    set up the phone connection this morning.

8        MR. MOUGEY:  I'm assuming your tech guys did.

9    I have no earthly idea.

10            (WHEREUPON, clarification by the

11             reporter - short interruption.)

12        MR. MOUGEY:  Everybody back on the phone?

13        MS. MOBLEY-RITTER:  Yes, thank you.

14    BY MR. MOUGEY:

15        Q.    Let's go back to Daugherty 7.  In the

16    bottom right-hand side of the page we were just on,

17    fourth page in, the sentence that begins with "The

18    'security requirement.'"

19        A.    Okay.

20        Q.    "The 'security requirement' at the heart

21    of this case mandates that distributors design and

22    operate a system to identify 'suspicious orders of

23    controlled substances' and report those orders to

24    DEA (the Reporting Requirement)."

Highly Confidential - Subject to Further Confidentiality Review

```
1              Do you see that?
2         A.   Yes.
3         Q.   Can you describe what the system in
4    place when you arrived at Walgreens was to identify
5    suspicious orders of controlled substances?
6         MS. SWIFT:  Objection; foundation.
7    BY THE WITNESS:
8         A.   My understanding of our CSO KPI tool is
9    that there is an algorithm defined to flag orders
10   for our team to review and determine if they are
11   suspicious.
12              So, our pharmacies cannot place an order
13   on their own above the ceiling limit that's
14   calculated and the tolerance that's calculated on a
15   daily basis.  If they try to place an order outside
16   of the ceiling limit and the tolerance, they have
17   to request an override from our team and approval
18   to receive additional controlled substance product.
19   BY MR. MOUGEY:
20        Q.   And that was in place when you arrived
21   at Walgreens in 2013?
22        MS. SWIFT:  Objection; foundation.
23   BY THE WITNESS:
24        A.   The automated -- the full automated tool
```

1    was in place probably, and I am not 100% sure,

2    maybe a couple, two or three months after I

3    started.  Yes, there was some manual component in

4    the beginning.

5         Q.    There was some manual what?

6         A.    Component in the beginning.

7         Q.    What I'm interested in is not what was

8    created after you got there, but when you arrived.

9    What was in place when you arrived, what was the

10   system used to identify suspicious orders of

11   controlled substances before you got there?

12        MS. SWIFT:  Objection; foundation.

13   BY THE WITNESS:

14        A.    I don't recall.

15   BY MR. MOUGEY:

16        Q.    Let me ask that a little bit better.

17              What was the system used to identify

18   suspicious orders of controlled substances when you

19   arrived at Walgreens?

20        MS. SWIFT:  Objection; foundation.

21   BY THE WITNESS:

22        A.    We had flagged orders to review and then

23   determine whether we were to report them as

24   suspicious.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MOUGEY:

 2         Q.    But you don't have any understanding of

 3    what that system was other than just a flagged

 4    order appearing on your desktop?

 5         MS. SWIFT:  Object to the form.

 6    BY THE WITNESS:

 7         A.    I don't recall back in 2013.

 8    BY MR. MOUGEY:

 9         Q.    During your training you referenced

10    notes earlier that you took during your training.

11    Do you still have those notes?

12         A.    I have notes related to our SIMS sign-on

13    and password, things like that primarily.  Those

14    are the notes I have, yes.

15         Q.    Okay.  So, when you reference that you

16    took notes during your training, it was password

17    and links and things of that nature?

18         A.    Primarily.

19         Q.    Well, are there other notes outside of

20    passwords and links that you -- that you kept?

21         MS. SWIFT:  Objection; form.

22    BY THE WITNESS:

23         A.    I don't think so.  I can't recall.  The

24    notes that I still have are all related to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    primarily logging in, how to look up orders.

 2    BY MR. MOUGEY:

 3         Q.    What concerns me is "primarily."  It

 4    means you're not sure if that's the entire scope,

 5    correct?

 6         A.    I'm pretty sure, yes.

 7         Q.    Has anyone come to you and asked you for

 8    those notes?

 9         MS. SWIFT:  Object to the form.

10    BY THE WITNESS:

11         A.    No, because they're password -- they're

12    just passwords and --

13    BY MR. MOUGEY:

14         Q.    Where are the notes?

15         MS. SWIFT:  Let her finish her answer.

16    BY MR. MOUGEY:

17         Q.    Are you finished?

18         A.    Well, they're just -- they're just

19    passwords and how to get to like certain parts of

20    our SIMS system, our inventory system, to be able

21    to look up orders.  There is nothing in there other

22    than step, press F7 or press F5 so I could remember

23    how to do that since that wasn't always something

24    that I did on a regular basis.
```

1    Q.    And I appreciate your description but

2    the question I asked you was, did anyone come to

3    you and ask you for those notes?

4    A.    No.

5    MS. SWIFT:  Object to the form.

6    BY MR. MOUGEY:

7    Q.    Do you know where those notes are now?

8    A.    Yes.

9    Q.    And where are they?

10    A.    In my drawer locked up --

11    Q.    Are there any --

12    A.    -- in the office.

13    Q.    Are there any other notes that you kept

14    regarding any other functions of your

15    responsibility in Pharmaceutical Integrity?

16    MS. SWIFT:  Object to the form.

17    BY THE WITNESS:

18    A.    No.

19    BY MR. MOUGEY:

20    Q.    How many pages of notes are there locked

21    in your drawer?

22    MS. SWIFT:  Object to the form.

23    BY THE WITNESS:

24    A.    I don't recall.  I can only guess.  It's

Highly Confidential - Subject to Further Confidentiality Review

1    a small little flip with maybe a handful of pages.

2    BY MR. MOUGEY:

3        Q.    So, did you three-hole punch them and

4    put them into a notebook when you reference

5    "a flip"?

6        A.    It was a notebook.  Sorry.  It was just

7    a small notebook.

8        Q.    And do you have other documents in your

9    possession in regard to your training and documents

10   that you kept for you to rely back on?

11       MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13       A.    Yes.  I have documents related to, for

14   example, DEA 106 reporting and requirements state

15   by state, what's considered a C-5 in some states

16   versus what's not considered a C-5.  I mean,

17   DAW 0 through 9 and their descriptions.  Just

18   regular course of.

19   BY MR. MOUGEY:

20       Q.    Just regular notes?

21       A.    Notes, yeah.

22       Q.    And outside of what you just referenced,

23   do you have any other documents that are in your

24   desk or office or drawer or briefcase or home that

1    relate in any way to you fulfilling your functions

2    in Pharmaceutical Integrity?

3        MS. SWIFT:  Object to the form.

4    BY THE WITNESS:

5        A.    No.

6    BY MR. MOUGEY:

7        Q.    Now, in 2013, after reviewing the order

8    that's flagged and contacting the pharmacy or doing

9    whatever work you did, do you ever recall

10   identifying an order as suspicious?

11       MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13       A.    Can you clarify.  You meant back in

14   2013?

15   BY MR. MOUGEY:

16       Q.    Yes, ma'am.

17       A.    Not specifically, but I believe that I

18   may have.

19       Q.    But you don't recall sitting here today

20   identifying any order specifically as suspicious in

21   the Midwest region in 2013?

22       A.    I can't give you a specific example, no.

23       Q.    I'm not asking for a specific example.

24   I'm asking just a general, do you recall

Highly Confidential - Subject to Further Confidentiality Review

1    identifying orders as suspicious in your role as a

2    manager of the Midwest region for Pharmaceutical

3    Integrity at Walgreens in 2013?

4         A.    I don't recall.

5         Q.    So, once you got -- did you often e-mail

6    a pharmacy to ask questions in an order that was

7    flagged?

8         MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10        A.    Actually I often called a pharmacy.

11   BY MR. MOUGEY:

12        Q.    How did you memorialize that

13   conversation?

14        A.    I'm more of a person that likes to call

15   and make sure that the person on the other end is

16   understanding what I'm asking.  So, for the most

17   part, I just would make a call if I needed to to

18   understand the nature of why they were requesting

19   an additional product.

20        Q.    So, is the answer to my question you

21   didn't memorialize the conversations at all?

22        MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24        A.    I did not write down my phone call

1    conversation, no.

2    BY MR. MOUGEY:

3        Q.    Or take any notes on the phone call

4    conversations?

5        A.    Other than what's in my e-mails, no.

6        Q.    There wasn't any central repository for

7    any of these notes like a database or anything?

8        MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10        A.    We do have an area for notes in our

11    CSO KPI tool, so we have the ability to have the

12    pharmacy put in notes as well as us to put in notes

13    and reply to the pharmacy.

14    BY MR. MOUGEY:

15        Q.    Prior to that tool being developed, was

16    there a centralized place for you to keep notes in

17    your communications with pharmacies?

18        A.    Prior to that development I did not

19    record my phone calls with the pharmacies, no.

20        Q.    And my question was a little different,

21    and I appreciate the answer.  But the question was,

22    was there a place for you to keep them if you

23    wanted to?

24        MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    Did someone provide me and say I needed

 3   to put my notes in my phone conversations

 4   somewhere?  No.

 5   BY MR. MOUGEY:

 6       Q.    There was no -- that you understand when

 7   you began at Walgreens prior to the automated app

 8   being deployed, there was not a centralized place

 9   like a database for you to report your due

10   diligence on flagged orders?

11       MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13       A.    Other than my e-mails.  Not that I'm

14   aware of.

15   BY MR. MOUGEY:

16       Q.    So, if you had a conversation months

17   before with a particular -- about a particular

18   pharmacy, how did you refresh your memory about

19   what you were told before?

20       A.    I don't understand your question.

21       Q.    Aren't patterns an important part of

22   your job with identifying what's a suspicious order

23   and what's not?

24       A.    Can you clarify what you mean.
```

1    Q.    Is the word "pattern" confusing?

2    A.    I guess I don't understand what you're

3    trying to ask.

4    Q.    Do you understand what the word

5    "pattern" means?

6    A.    Yes, I do.

7    Q.    A pattern of flagged orders from one

8    particular pharmacy that you would have to follow

9    up with, wouldn't that be important in your

10   day-to-day responsibilities as a manager for the

11   Midwest region Pharmaceutical Integrity?

12   A.    If a pharmacy had requested the same

13   product and a month later.  Is that what you're

14   saying?

15   Q.    Something along those lines, sure.

16   A.    For example, if they requested the same

17   product, I would still need to understand the

18   nature of why they need it and that they are

19   following good faith dispensing and filling the

20   prescription legitimately and they need it for

21   legitimate patients.

22   Q.    I understand.  But the fact that you

23   might have had to contact that pharmacy before,

24   that pharmacist before, wouldn't that be an

Highly Confidential - Subject to Further Confidentiality Review

1  important part of your function for identifying

2  suspicious orders?

3       A.    I think a pharmacy may ask for the same

4  two bottles of a product a month later and as long

5  as I -- my understand is that it's for a legitimate

6  prescription, I would not consider that suspicious.

7       Q.    What I asked you was aren't patterns an

8  important part of fulfilling your responsibility as

9  manager of the Midwest region for Pharmaceutical

10  Integrity.  Is the answer to the question no?

11       A.    I think that my job in fulfilling my

12  role is to ensure that the order is not considered

13  suspicious, and that's what I would do.

14       Q.    In your job as determining whether an

15  order is suspicious or not, are not patterns an

16  important part of that decision-making process?

17       A.    I think my decision-making process in

18  determining whether an order was suspicious was to

19  determine if the product was needed to fulfill

20  legitimate prescriptions and if our pharmacists

21  understood their corresponding responsibilities.

22  So, that would be my understanding of if a store

23  repeated the order a month later.

24       Q.    So, a pattern is not important to you

Highly Confidential - Subject to Further Confidentiality Review

1    whether it happened month after month for you to go

2    back and look at notes that happened in previous

3    months?

4        A.    Again, I think a pattern of an order

5    from a store from one month to the next, if it was

6    for a couple bottles asking for legitimate

7    prescriptions to fill and they wanted two extra

8    bottles or what -- for example, two extra bottles,

9    I think that that as long as the patient -- the

10   patients were coming in and they needed their

11   prescriptions filled and the pharmacist was

12   fulfilling their good faith dispensing, I don't --

13   I think I was doing my job.

14       Q.    And I'm not suggesting otherwise.  I'm

15   just trying to get an answer to a very simple

16   question.

17            You do not believe that patterns were an

18   important part of fulfilling your responsibility as

19   a manager of the Midwest region for Pharmaceutical

20   Integrity, correct?

21       MS. SWIFT:  Objection.

22   BY THE WITNESS:

23       A.    In my experience, I don't think that

24   that factored in into the actual situations when I

1    had to call a pharmacy or work with a pharmacy on a

2    flagged order.

3    BY MR. MOUGEY:

4         Q.    So, the answer to my question is no, I

5    really don't think that patterns are important in

6    part of your job of identifying suspicious orders

7    for Walgreens in Pharmaceutical Integrity, right?

8    The answer is no, I don't think they're important,

9    isn't that the answer?

10        MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12        A.    In my experience it wasn't an issue in

13   identifying a suspicious order when I was reviewing

14   them.

15   BY MR. MOUGEY:

16        Q.    Yes, ma'am.  Patterns were not an issue

17   and were not an important part of your analysis in

18   identifying suspicious orders, correct?

19        MS. SWIFT:  Object to the form.

20   BY THE WITNESS:

21        A.    No.  That's not what I said.

22             In my job, in my experience in working

23   with the stores, identifying a pharmacy that had a

24   repeat order for however many bottles, as long as

Highly Confidential - Subject to Further Confidentiality Review

1    my understanding was that that order was for a

2    legitimate reason, I did not consider that

3    suspicious if they were filling for legitimate

4    prescriptions.

5    BY MR. MOUGEY:

6         Q.    Let's do it this way.  When you've got

7    an order that was flagged as suspicious, did you go

8    back and look to see if you had had similar

9    conversations with that pharmacy in the past?

10        MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12        A.    Back in 2013?

13   BY MR. MOUGEY:

14        Q.    Yes.

15        A.    So, in the CSO KPI tool there is a

16   record of a previous approval or override to allow

17   the store to receive additional product.

18        Q.    That was deployed months after you got

19   there.

20             When you got there, did you go back and

21   pull notes of previous conversations with that

22   pharmacy when performing your due diligence on a

23   flagged order?

24        MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY THE WITNESS:

 2         A.    If there was e-mail, yes, I would go

 3    back and pull my previous conversation.

 4    BY MR. MOUGEY:

 5         Q.    So, prior to CSO KPI, was there a way to

 6    see or identify any particular patterns that you

 7    think may have been useful when identifying a

 8    suspicious order?

 9         MS. SWIFT:  Object to the form, foundation.

10    BY THE WITNESS:

11         A.    I don't recall the way the flagged

12    orders were determined when I first started.  It

13    was in the very beginning of when I first started.

14    BY MR. MOUGEY:

15         Q.    I understand.  My question is a little

16    different, though.

17               What I asked was, prior to CSO KPI was

18    there a way to see or identify any particular

19    patterns you wanted to use when determining whether

20    an order was suspicious?

21         MS. SWIFT:  Objection; foundation.

22    BY THE WITNESS:

23         A.    I don't know.

24    BY MR. MOUGEY:
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    What do you mean you don't know?

2      A.    I don't know.

3      Q.    You don't recall if there was any tool

4   you could use to identify any patterns?

5      A.    No, I don't recall.

6      Q.    Before we leave the system, when you got

7   there, kind of as a recap here, what I think --

8   we've covered ground and you correct me if I'm

9   wrong.

10          I think that what I understand you

11  saying is you don't remember the specifics of the

12  system used to identify suspicious orders, is that

13  accurate?

14     MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16     A.    I don't remember the specifics of the

17  system when I first started in that first month or

18  two.

19  BY MR. MOUGEY:

20     Q.    There was no mechanism when you started

21  in those first couple months for you to collect any

22  of your notes regarding flagged orders, correct?

23     MS. SWIFT:  Objection; mischaracterizes the

24  testimony.

1    BY THE WITNESS:

2        A.    I was able to collect my notes either in

3    e-mail or in anything else that I would have

4    written down or kept at the time.

5    BY MR. MOUGEY:

6        Q.    No database, no way for you or others to

7    see notes, correct?

8        MS. SWIFT:  Objection; foundation.

9    BY THE WITNESS:

10       A.    I just don't recall.

11   BY MR. MOUGEY:

12       Q.    So you don't recall.  You don't recall

13   if you actually identified any suspicious orders

14   for the entire Midwest region when you first got to

15   Walgreens under the system that you don't recall

16   what it is, correct?

17       A.    I just don't remember in the first two

18   months.

19       Q.    But you don't recall whether you marked

20   any suspicious orders the first -- any flagged

21   orders as suspicious the first couple months,

22   correct?

23       A.    I don't remember if I flagged them.

24       Q.    Now, do you recall then if any orders

1    were deemed suspicious were actually reported to

2    the DEA the first few months you were at Walgreens?

3         A.    I don't know in the first few months.  I

4    do know we reported suspicious orders to the DEA to

5    the local offices.

6         Q.    And you don't have -- what do you know

7    about reporting suspicious orders to the DEA local

8    offices?

9         MS. SWIFT:  Objection; foundation.

10        MR. MOUGEY:  I asked you what -- what in the

11   world could be the objection to "What do you know

12   about reporting suspicious orders to the DEA

13   office?"  Tell me what your objection is.

14        MS. SWIFT:  I'll withdraw the objection for

15   you, Peter.

16        MR. MOUGEY:  You've objected -- I know my

17   questioning -- I'm nobody's -- I'm not signing up

18   to teach any classes, but I think every single

19   question I've asked, maybe minus a handful, have

20   been objected to.

21   BY MR. MOUGEY:

22        Q.    So, I just asked, what was your

23   understanding about Walgreens reporting suspicious

24   orders to the DEA in early 2013 when you got there?

1          A.     I remember probably -- my first

2     recollection would probably be a few months later

3     where I know we were reporting suspicious orders,

4     faxing them to the local DEA offices.  That's all I

5     remember.

6          Q.     That's all you know?

7          A.     That's all I remember.

8          Q.     That's all you remember.  You don't

9     remember what the criteria was?

10         MS. SWIFT:  Object to the form.

11    BY THE WITNESS:

12         A.     That was based on the flagged orders and

13    our team identifying them as suspicious.

14    BY MR. MOUGEY:

15         Q.     You don't know which orders went to

16    which -- which suspicious orders went to which DEA

17    offices?

18         A.     Well, they were designated based on the

19    store and the location.

20         Q.     And who was responsible for sending

21    those to the DEA?

22         MS. SWIFT:  Object to the form.

23    BY MR. MOUGEY:

24         Q.     The suspicious order reports.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I -- my -- I think I remember our

2    analysts were responsible and we were responsible.

3    Q.    Who particularly when you say

4    "analysts"?

5    A.    Honestly, I don't think it was any one

6    person that I can recall.

7    Q.    It was just everybody just sending in

8    suspicious orders as they found them?

9    A.    Honestly, I don't remember the exact

10   process.

11   Q.    I'm just asking generally, just

12   generally, who sent the suspicious orders and where

13   were they kept?

14   A.    They were --

15   MS. SWIFT:  Object to the form, compound.

16   Which question do you want her to answer?

17   MR. MOUGEY:  I want her to answer one question

18   without something "I don't know."

19   MS. SWIFT:  I'm sorry.

20   BY MR. MOUGEY:

21   Q.    Where were the orders -- where were the

22   suspicious order reports to the DEA kept if you

23   wanted to go back and look at them in early '13?

24   A.    If I recall correctly, they were faxed

Highly Confidential - Subject to Further Confidentiality Review

1   from our e-mail, our group e-mail, and kept in a

2   folder.

3          Q.    But you --

4          A.    If I remember correctly.

5          Q.    You don't recall specifically?

6          A.    Not 100% specific, no.

7          Q.    What folder?

8          A.    I don't recall what it was called.

9          Q.    So, did you go back and look at previous

10  suspicious orders as part of contacting pharmacies

11  about whether an order was suspicious?

12         MS. SWIFT:  Object to the form.

13  BY THE WITNESS:

14         A.    I don't recall.  I may have.

15  BY MR. MOUGEY:

16         Q.    Let's continue at the bottom of this

17  page.

18             "The Reporting Requirement is a

19  relatively modest one.  It requires only that a

20  distributor provide basic information about certain

21  orders to the DEA, so that DEA 'investigatory in

22  the field' can aggregate reports from every point

23  along the legally regulated supply chain and use

24  that information to ferret out 'potential illegal

1    activity.'"

2            Did I read that right?

3        A.    Yes.

4        Q.    Do you believe when you got to

5    Walgreens, when you arrived in early '13, that

6    Walgreens was providing basic information to the

7    local DEA offices about suspicious orders?

8        A.    When I first started do I believe --

9        Q.    Yes.

10       A.    -- that Walgreens was sending suspicious

11   orders?

12       Q.    To the local DEA office.

13       A.    That would be my understanding.

14       Q.    Do you think it would be important that

15   the local DEA offices would only get suspicious

16   orders for orders within their purview?

17       MS. SWIFT:   Object to the form.

18   BY THE WITNESS:

19       A.    I don't know.  My understanding was that

20   the stores in their area would receive the

21   suspicious orders.

22   BY MR. MOUGEY:

23       Q.    Was -- that would make sense, right,

24   that they only got the suspicious orders for stores

1    in their area, correct?

2        MS. SWIFT:  Object to the form, foundation.

3    BY THE WITNESS:

4        A.    My understanding is that the local

5    office should be receiving suspicious orders from

6    stores in their area.

7    BY MR. MOUGEY:

8        Q.    Right.  You wouldn't expect that

9    Walgreens was sending suspicious orders from Topeka

10   to the San Francisco DEA office, right?

11       MS. SWIFT:  Objection; foundation.

12   BY THE WITNESS:

13       A.    Again, I don't know exactly what the

14   requirements were for reporting to the DEA local

15   offices if the requirement was this area covers

16   this office.  I didn't have specifics on that.

17   BY MR. MOUGEY:

18       Q.    So you don't.  So, if you went to enter

19   a suspicious order, where would you send it?

20       MS. SWIFT:  Object to the form.

21   BY MR. MOUGEY:

22       Q.    Which DEA field office would you send it

23   to?

24       MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. MOUGEY:

2        Q.     Initially in early '13.

3        A.     I would look up the DEA local office and

4   identify the store and if I had a question of

5   whether it should go to that office, I would call

6   that office and ask them.

7   BY MR. MOUGEY:

8        Q.     Were you responsible for sending the

9   individual suspicious orders to the DEA field

10  offices?

11       A.     No.

12       Q.     Who sent them?  What did you do with

13  them after you flagged them as suspicious?

14       MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16       A.     Our analysts sent them, my understanding

17  was, and we would save them again in a folder in

18  our e-mail group box.

19  BY MR. MOUGEY:

20       Q.     In your e-mail group box.  What was the

21  e-mail that you were using as the e-mail group?

██       ██     ████████████████████████

23       Q.     So, when you mentioned earlier sending

24  faxes, is that like an old-school fax machine or
```

1    was that something off of your internal system that

2    was a fax?

3         A.    It was an electronic fax is how I

4    understood.

5         Q.    Were those -- those were stored in the

6    shared file?

7         MS. SWIFT:  Objection; form.

8    BY THE WITNESS:

9         A.    As far as I know.

10   BY MR. MOUGEY:

11        Q.    But you're not sure?

12        A.    That's my understanding, yes.  I did not

13   send the suspicious orders so I can't be 100% sure,

14   but I believe that's where they were stored.

15        MS. SWIFT:  It's about ten after 12:00, if we

16   want to break for lunch.

17        MR. MOUGEY:  Thanks.  Let's finish with this

18   document if we could.

19   BY MR. MOUGEY:

20        Q.    If you could turn the page.

21             Do you have an understanding of whether

22   once an order was reported as suspicious to the

23   DEA, whether that order was shipped?

24        MS. SWIFT:  Object to the form.

1    BY THE WITNESS:

2        A.    I believe that if an order was sent as

3    suspicious to the DEA in our system, that would not

4    be allowed.  Our store could not receive product.

5             Because our system automatically flagged

6    an order and if the store could not provide

7    explanation to substantiate or we felt that it was

8    considered a suspicious order, it would never have

9    gone to the store.

10   BY MR. MOUGEY:

11       Q.    And then that order was modified to

12   bring it below the ceiling, correct?

13       MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15       A.    No, it was completely stopped, actually.

16   The system would stop the order.

17   BY MR. MOUGEY:

18       Q.    What time frame are you referencing that

19   it was completely stopped?

20       A.    My understanding was when we implemented

21   our CSO KPI tool.

22       Q.    Before that, before the automation, do

23   you have an understanding of whether or not a

24   suspicious order that was flagged and sent to the

1    DEA was then shipped?

2         MS. SWIFT:  Objection; foundation.

3    BY THE WITNESS:

4         A.    No, I don't recall.

5    BY MR. MOUGEY:

6         Q.    You don't have an understanding?

7         A.    No.  I don't recall.

8         Q.    Let's flip the page.  Let's go to the

9    "Once a distributor has reported a suspicious

10   order, it must make one or two choices."

11        MS. SWIFT:  What page are you on?

12        MR. MOUGEY:  The next page.

13        MS. SWIFT:  Which one, please?

14        MR. MOUGEY:  The back side of the page we were

15   just on.  I don't have the page number.  Just turn

16   the page.

17   BY MR. MOUGEY:

18        Q.    Do you see --

19        MS. SWIFT:  From which page?

20   BY MR. MOUGEY:

21        Q.    -- "Information" --

22        MR. MOUGEY:  The one we were just on.

23   BY MR. MOUGEY:

24        Q.    "Information to ferret out potential

```
 1      illegal activity."

 2              Do you see at the top of the page if you

 3      turn it?

 4         MS. SWIFT:  We don't know which page you're

 5      on.  She is not on that page.

 6         THE WITNESS:  Oh.  This page.

 7      BY MR. MOUGEY:

 8         Q.    The fourth page in.

 9         MS. SWIFT:  That one.

10      BY MR. MOUGEY:

11         Q.    Fourth page in.

12         MS. SWIFT:  She's there.

13      BY MR. MOUGEY:

14         Q.    Are you there?

15         A.    Yeah.

16         Q.    Okay.  Great.  The language that begins

17      with "Once a distributor has reported a suspicious

18      order, it must make one of two choices:  decline to

19      ship the order or conduct some 'due diligence'

20      and - if it is able to determine that the order is

21      not likely to be diverted into illegal channels -

22      ship the order."

23              Do you see that?

24         A.    Yes.
```

1    Q.    Do you agree based on your training at

2  Walgreens that if an order that's been flagged as

3  suspicious is shipped without due diligence that

4  that is unlawful?

5    MS. SWIFT:  Object to the form of the

6  question.

7  BY THE WITNESS:

8    A.    I don't think that I would interpret

9  it -- I would work with our legal to interpret

10  this.

11  BY MR. MOUGEY:

12    Q.    You would.  You'd work with legal.

13    A.    To understand how we should interpret

14  it, yeah.

15    Q.    Okay.  So, you thought it was important

16  that you would contact legal to help with

17  compliance issues regarding suspicious orders?

18    A.    Yes.

19    MS. SWIFT:  Object to the form.

20  BY THE WITNESS:

21    A.    Compliance issues related to state

22  requirements for DEA 106s.

23  BY MR. MOUGEY:

24    Q.    We're not talking about -- I'm asking

1    about due diligence and whether or not due

2    diligence needs to be performed before an order is

3    shipped.  Okay?

4              So, 106 is relating to thefts, correct?

5         A.    Correct.

6         Q.    And you understand and agree that

7    suspicious orders are broader than 106, right?

8         MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10        A.    Suspicious orders are different than the

11   106 process, yes.

12   BY MR. MOUGEY:

13        Q.    So, what I'm asking about is suspicious

14   orders.  Is it your understanding that due

15   diligence would need to be performed prior to that

16   order being shipped or that order is deemed

17   unlawful?

18        MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20        A.    Again, because our CSO KPI tool flagged

21   the order and stopped the order before it was

22   shipped, I didn't have or didn't have reason to

23   work with legal and didn't ask them about this

24   because the order was stopped.  It was flagged and

1    stopped.  So, the store never received the order.

2    BY MR. MOUGEY:

3        Q.    Prior to the tool being implemented, do

4    you have an understanding of whether or not a

5    suspicious order that was shipped without due

6    diligence, is that unlawful?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    No, I don't recall what happened prior

10   to the CSO KPI tool.

11   BY MR. MOUGEY:

12       Q.    So we can just add that on to the list

13   of things that you don't recall prior to the

14   automation?

15       A.    I don't recall.

16       Q.    Do you recall how long Walgreens

17   distributed Schedule II after you arrived at

18   Walgreens?

19       A.    I recall that our DCs were distributing

20   C-IIs after I arrived at Walgreens.

21       Q.    And how long were your DCs, your

22   distribution centers, distributing Schedule IIs

23   after you arrived?

24       MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    I don't know.  I can only speculate.

 3   BY MR. MOUGEY:

 4        Q.    A matter of a few months?

 5        A.    At some point maybe in 2013 or 2014.

 6        Q.    Would you agree with me that

 7   Pharmaceutical Integrity as to Walgreens' practices

 8   prior to 2013 is not the right department?

 9        MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11        A.    Can you repeat the question.

12   BY MR. MOUGEY:

13        Q.    Walgreens' Pharmaceutical Integrity

14   Department are not the right people to ask what

15   Walgreens' system was to identify suspicious orders

16   and perform due diligence prior to 2013?

17        MS. SWIFT:  Object to the form, foundation.

18   BY THE WITNESS:

19        A.    I would agree that prior to when I

20   started in 2013, I would not be the person to ask

21   what happened before I started in that position.

22   BY MR. MOUGEY:

23        Q.    And that makes sense, right?

24   Pharmaceutical Integrity, everyone that started in
```

1    Pharmaceutical Integrity started within a few

2    months of you, correct?

3         MS. SWIFT:  Object to the form.

4    BY THE WITNESS:

5         A.    With the exception of maybe a couple

6    people, yeah.

7    BY MR. MOUGEY:

8         Q.    Well --

9         A.    Yes.

10        Q.    -- the Pharmaceutical Integrity

11   Department was created in late 2012, early 2013,

12   right?

13        A.    Yes.

14        Q.    So, Pharmaceutical Integrity is not the

15   right department to ask about Walgreens' conduct

16   prior to 2013, correct?

17        MS. SWIFT:  Object to the form, foundation.

18   BY THE WITNESS:

19        A.    I don't know.

20   BY MR. MOUGEY:

21        Q.    You don't know that either.  But you

22   certainly don't know anything about Walgreens'

23   conduct prior to 2013, right?

24        A.    No.

1      Q.    So, the context of your testimony today

2  is whenever you started, January of '13, until when

3  Walgreens stopped distributing Schedule IIs, fits

4  into whatever that period of months is.  That's

5  what you know about, right?

6      MS. SWIFT:  Object to the form.

7  BY THE WITNESS:

8      A.    I know about what happened after I

9  started in my position in January '13.

10  BY MR. MOUGEY:

11      Q.    Let's talk about Schedule IIs.

12  Schedule IIs, distribution from Walgreens.  The

13  only time period that you're knowledgeable about is

14  from the date you started, January '13, until when

15  Walgreens stopped distributing Schedule IIs, right?

16      A.    I don't know --

17      MS. SWIFT:  Object to the form.

18  BY THE WITNESS:

19      A.    I don't know about distribution prior to

20  January of 2013.

21  BY MR. MOUGEY:

22      Q.    Right.  And then sometime in 2013

23  Walgreens stopped distributing Schedule IIs,

24  correct?

```
1        A.    I don't know exactly --

2        MS. SWIFT:  Object to the form.

3   BY THE WITNESS:

4        A.    -- when they stopped.

5   BY MR. MOUGEY:

6        Q.    Right.  I'm not asking you.  Sometime in

7   2013, right?

8        A.    Possibly, yes.  I don't know.

9        Q.    So, you specifically, Pharmaceutical

10  Integrity, your scope of knowledge about

11  Schedule II narcotics and identifying and reporting

12  suspicious orders is a matter is a matter -- for

13  Schedule II, is a matter of months, correct?

14       MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16       A.    I don't -- can you repeat the question.

17  BY MR. MOUGEY:

18       Q.    Schedule II narcotics.  OxyContin.  Your

19  factual knowledge about Walgreens' policies and

20  procedures for identifying and reporting suspicious

21  orders fits into just a matter of months, correct?

22       MS. SWIFT:  Object to the form,

23  mischaracterizes the testimony all day.

24  BY THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't know how long that was that we

2    were reporting suspicious orders from when I

3    started in January 2013 to when we stopped that

4    process.

5    BY MR. MOUGEY:

6    Q.    For Schedule IIs when you stopped

7    distributing, correct?

8    A.    Yeah, I don't know how long that was.

9    Q.    And I understand.  You've said that

10   repeatedly.

11         But you do know that sometime in 2013

12   Walgreens stopped distributing Schedule IIs,

13   correct?

14   MS. SWIFT:  Objection; mischaracterizes the

15   testimony.

16   BY THE WITNESS:

17   A.    Again, maybe 2013 or 2014 is what I --

18   BY MR. MOUGEY:

19   Q.    So now we're into 2014.  But you're not

20   sure?

21   A.    I said that earlier.

22   Q.    Let's do it this way.  Your body of

23   knowledge about identifying and reporting

24   suspicious orders for controlled substances is no

```
 1    longer than a matter of months or a little more

 2    than a year?

 3         MS. SWIFT:  Object to the form.

 4    BY THE WITNESS:

 5         A.    Depending on when we stopped

 6    distributing controlled substances, my knowledge is

 7    from January 2013 to when we stopped distributing.

 8         MS. SWIFT:  We have been going about for an

 9    hour and a half and it is now close to 12:30.  We

10    are going to break for lunch.

11         THE VIDEOGRAPHER:  We're going off the record

12    at 12:20 p.m.

13                   (WHEREUPON, a recess was had

14                    from 12:20 to 1:02 p.m.)

15         THE VIDEOGRAPHER:  We are back on the record

16    at 1:02 p.m.

17    BY MR. MOUGEY:

18         Q.    Ms. Daugherty, if I could please take

19    you back to Exhibit 7 and the language that we left

20    off in Exhibit 7 that "Once a distributor has

21    reported a suspicious order."

22         A.    "It must make one of two choices"?

23         Q.    Yes, ma'am.

24         A.    Yes.
```

1    Q.    Will you read that last sentence for me.

2    A.    "It must make one of two choices:

3    decline to ship the order or conduct some due

4    diligence and - if it is able to determine that the

5    order is not likely to be diverted into illegal

6    channels - ship the order."

7    Q.    And I apologize if I wasn't clear.  Let

8    me just read the whole thing.

9         "Once a distributor has reported a

10   suspicious order, it must make one of two

11   decisions, choices:  decline to ship the order or

12   conduct some due diligence and - if it is able to

13   determine that the order is not likely to be

14   diverted into illegal channels - ship the order."

15        Did I read that right?

16   A.    Yes.

17   Q.    So, once there is a suspicious order,

18   the distributor, which is Walgreens, has two

19   choices, correct?

20   MS. SWIFT:  Object to the form.

21   BY THE WITNESS:

22   A.    Based on this language, which, again, I

23   don't know if this is a legal requirement or what

24   the document, I've never seen this document before.

1    It says -- it says it must make one of two choices.

2    BY MR. MOUGEY:

3        Q.    Do you have an understanding of one of

4    those two choices that once an order is suspicious,

5    if no due diligence is performed and it's shipped

6    anyways, that that's unlawful?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    No, I don't have an understanding of

10   that.  Based on this document, I see that it says

11   it must make one of two choices, decline to ship

12   the order or conduct some due diligence.

13   BY MR. MOUGEY:

14       Q.    And the due diligence is designed to

15   determine whether the order is not likely to be

16   diverted into illegal channels, correct?

17       A.    Can you repeat the question.

18       Q.    And the due diligence is supposed to be

19   designed to determine whether the order is not

20   likely to be diverted into illegal channels.

21           Do you see that?

22       A.    Yes.

23       Q.    So, according to this document, once an

24   order is flagged suspicious, if there is no due

1    diligence and it's shipped anyways, based on your

2    years of experience in Pharmaceutical Integrity,

3    that shipment is unlawful, correct?

4         MS. SWIFT:  Object to the form.

5    BY THE WITNESS:

6         A.    I see that according to what it says

7    here in this document that if they declined to ship

8    the order or conduct some due diligence and if it

9    is able to determine that the order is not likely

10   to be diverted into illegal channels, it says, ship

11   the order.

12   BY MR. MOUGEY:

13        Q.    But if no due diligence is performed and

14   it's shipped anyways, that's an unlawful order,

15   correct?

16        MS. SWIFT:  Object to the form.

17   BY THE WITNESS:

18        A.    I don't know.  This -- I don't know

19   where this document came from.  I see that it says

20   once a distributor reports a suspicious order it

21   must make one of two choices, decline to ship or

22   conduct due diligence.

23   BY MR. MOUGEY:

24        Q.    Based on your 2013 to now, you've been

1    in Pharmaceutical Integrity for years of which you

2    were responsible for identifying suspicious orders.

3              Do you have an understanding of whether

4    or not if due diligence is not performed on a

5    suspicious order and it's shipped anyways, it's

6    unlawful?

7         MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9         A.    I don't know.  I'm not familiar with

10    this document.  This is the first time I'm seeing

11    this document.

12    BY MR. MOUGEY:

13        Q.    I'm not asking you about the document

14    right now.  I'm asking you based on your years of

15    experience at Walgreens, and you've been in

16    Pharmaceutical Integrity group right now since

17    January of '13, correct?

18        A.    Correct.

19        Q.    And your job responsibility was to

20    identify suspicious orders, correct?

21        A.    Yes.

22        Q.    Do you have an understanding that if an

23    order is identified as suspicious and no due

24    diligence is performed and it's shipped anyways,

1    that that is an unlawful order?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    My understanding is our CSO KPI tool

5    that flags an order when an order cannot be

6    substantiated and is considered suspicious is not

7    shipped at all in our process.  That's my

8    understanding and my job.

9    BY MR. MOUGEY:

10       Q.    I understand, and I understand that's

11   the new process after you got to Walgreens.

12       MS. SWIFT:  Object to the form.

13   BY MR. MOUGEY:

14       Q.    But if in fact an order is shipped

15   without due diligence being performed, that is an

16   unlawful shipment, correct, Ms. Daugherty?

17       MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19       A.    I can't speculate as to what this

20   document is or where it's coming from --

21   BY MR. MOUGEY:

22       Q.    Close the document.

23       A.    -- or what this is saying.

24       Q.    Close the document.  Keep it up on the

```
 1   screen.  Close the document.

 2              What I'm asking you is from your start

 3   at January of 2013 in Pharmaceutical Integrity,

 4   correct?

 5        A.    Yes.

 6        Q.    You were responsible for identifying

 7   suspicious orders for Walgreens in the Midwestern

 8   region initially, correct?

 9        A.    Yes.

10        Q.    Do you have an understanding of whether

11   or not a suspicious order is shipped without

12   performing due diligence, it's unlawful?

13        MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15        A.    I don't know.

16   BY MR. MOUGEY:

17        Q.    You don't know?

18        A.    No.

19        Q.    So we can just add that on to the

20   laundry list of things that you don't know?

21        A.    I don't know.

22        MS. SWIFT:  Object to the form.

23   BY MR. MOUGEY:

24        Q.    Who do we ask at Walgreens of whether or
```

1    not its belief that an order -- a suspicious order

2    that was shipped without any due diligence is

3    unlawful?  Who would you think would be the right

4    people to ask?

5        MS. SWIFT:  Objection; foundation.

6    BY THE WITNESS:

7        A.    If the order was shipped but there was

8    no due diligence accomplished?  The interpretation

9    of that.  I would ask our attorneys.

10   BY MR. MOUGEY:

11       Q.    So, the compliance issue about whether

12   or not an order can be shipped without due

13   diligence is something that you would ask the

14   attorneys?

15       A.    If that was part of my role and

16   responsibility at the time, yes, I would have

17   asked.  But I did not.

18       Q.    What do you think happened after you

19   identified an order as suspicious before the

20   automation was in place?  Do you have an

21   understanding of whether somebody performed due

22   diligence and whether or not the order was held

23   until that due diligence was accomplished?

24       MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    I recently learned that there was a

 3   suspicious order monitoring process that was

 4   managed maybe at our DCs, but I don't know that to

 5   be a true fact.  Just what I heard.

 6   BY MR. MOUGEY:

 7        Q.    Who trained you when you got to

 8   Walgreens?

 9        A.    Steve Mills and Tasha Polster.

10        Q.    No one else?

11        A.    Not that I recall.

12        Q.    So, you have no understanding when you

13   got to Walgreens whether or not it was shipping

14   orders that it deemed suspicious without due

15   diligence?

16        A.    I do not have any recollection of that,

17   no.

18        Q.    Was part of your initial training at

19   Walgreens a -- strike that.

20              Did you have an understanding of the

21   sense of urgency or the importance of your job

22   identifying suspicious orders of controlled

23   substances?

24        A.    When I started in 2013, I did understand
```

1    the importance of my job and making sure that we

2    were reporting suspicious orders as appropriate and

3    reviewing flagged orders, yes.

4         Q.    And once you reported a suspicious

5    order, did you have an understanding that the DEA

6    was using that information to ferret out illegal

7    activity?

8         A.    I don't know what the DEA was doing with

9    that information.

10        Q.    Nobody ever told you in your training

11   that what the DEA did or didn't do with the

12   suspicious orders that you -- that you all were

13   working on?

14        A.    I can't say that anyone ever told me

15   what the DEA was doing with our suspicious orders.

16        Q.    Did you have any understanding of

17   whether or not Congress had been investigating

18   opiate crisis for over a decade before you got to

19   Walgreens?

20        A.    Back in 2013, I did not know that.

21        Q.    Did you have an understanding of the

22   sense of urgency with what you were doing at

23   Walgreens to develop an automated system for

24   identifying suspicious orders?

```
 1        MS. SWIFT:  Object to the form.

 2   BY THE WITNESS:

 3        A.    I had an understanding that it was very

 4   important that we develop the system correctly and

 5   that it worked as we intended, yes.

 6   BY MR. MOUGEY:

 7        Q.    What was your understanding of why that

 8   was important?

 9        A.    Just to make sure that we didn't have

10   the system work improperly and that we didn't have

11   to go back and make any changes or major fixes

12   because that always takes time.

13        Q.    But why was it important?  We saw

14   documents earlier referring back to the Controlled

15   Substance Act in 1970 about the substantial impact

16   on the public health from opiates going back almost

17   decades.  Did you have any understanding of how bad

18   it was when you started in January of '13?

19        MS. SWIFT:  Object to the form.

20   BY THE WITNESS:

21        A.    I don't know how bad it was.  That's

22   just what you're saying.  I don't know.

23   BY MR. MOUGEY:

24        Q.    It's what I'm saying, Peter Mougey as
```

Highly Confidential - Subject to Further Confidentiality Review

1  Plaintiff's counsel, what I'm saying.  You didn't

2  have any understanding of that in 2013?

3      MS. SWIFT:  Object to the form.

4  BY THE WITNESS:

5      A.    I would say I had an understanding that

6  there was a prescription drug issue with abuse in

7  the country at that time.

8  BY MR. MOUGEY:

9      Q.    An issue.  Let me hand you what I will

10 mark as Daugherty Exhibit 8.

11              (WHEREUPON, a certain document was

12              marked as Walgreens-Daugherty

13              Deposition Exhibit No. 8:

14              Document, "OxyContin: Its use and

15              Abuse," etc., 8/28/01 hearing;

16              PGEN-0047.)

17     MR. MOUGEY:  I'm going to hand you a series of

18 these documents.

19 BY MR. MOUGEY:

20     Q.    Do you see the title of this document,

21 Daugherty Exhibit 8, "OxyContin:  Its Use and

22 Abuse, Hearing Before the Subcommittee on Oversight

23 and Investigations of the Committee on Energy,

24 Commerce, House of Representatives."

Highly Confidential - Subject to Further Confidentiality Review

```
1              Do you see that?

2       A.    Yes.

3       Q.    Do you see the date below it?

4       A.    Yes.

5       Q.    What date is that?

6       A.    August 28, 2001.

7       Q.    So, the issue as you described it with

8  opiate prescriptions, were you aware that as early

9  as the early 2000s that there were hearings before

10 Congressional subcommittees regarding OxyContin?

11      A.    No.

12      Q.    And OxyContin was one of the drugs that

13 you were responsible for identifying suspicious

14 orders and reporting them to the DEA, correct?

15      A.    Yes.

16      Q.    And Walgreens was making decisions about

17 whether to ship those suspicious orders or not,

18 correct?

19      A.    My team was making decisions whether to

20 flag the order as suspicious, yes, and shipped to

21 the store.

22      Q.    If you would, please turn to -- it's

23 page 1 of the document and it's titled "OxyContin:

24 Its Use and Abuse."  It's three pages into the
```

1    document.

2           If you go all the way to the bottom of

3    that page, and this committee charged with

4    investigating OxyContin said that "Today's hearing

5    is the logical extension of this subcommittee's

6    ongoing investigation into prescription drug abuse

7    throughout the United States.  My staff and I have

8    met on numerous occasions with the DEA, the FDA and

9    Purdue Pharma in order to investigate the trends of

10   OxyContin abuse and diversion and well as to

11   explore potential solutions."

12          Do you see that?

13   A.    Is that at the bottom of the page?

14   Sorry.  I didn't catch that.

15   Q.    Bottom of page 1 and into the beginning

16   of page 2.  Take your time and read it.

17   A.    Yes.  I see that.

18   Q.    So, when you started in the beginning of

19   2013, you weren't aware that going as far back as

20   2001 there were ongoing investigations into

21   OxyContin and its misuse?

22   MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24   A.    No.

```
 1   BY MR. MOUGEY:

 2       Q.    If you go into the next paragraph,

 3   "Sadly, prescription drug abuse is a growing

 4   national problem.  According to the National

 5   Institute of Drug Abuse, as recently as 1999, more

 6   than 9 million Americans, aged 12 and older,

 7   reported that they used prescription drugs at least

 8   once that year for non-medical reasons."

 9             Do you see that?

10       A.    Yes.

11       Q.    Did I read that correctly?

12       A.    Yes.

13       Q.    This was a growing and exploding health

14   epidemic as early as 2001, correct?

15       MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17       A.    That's what this document says, yes.

18   BY MR. MOUGEY:

19       Q.    But you had no understanding of that

20   when you began at Walgreens, correct?

21       A.    No, I was not aware of this document --

22       Q.    Not this document.

23       A.    -- when I started.

24       Q.    Not this document.  The fact that there
```

1    were ongoing Congressional investigations into

2    OxyContin abuse dating 13 years prior to you

3    getting to Walgreens.  Were you aware of that?

4         MS. SWIFT:  Object to the form.

5    BY THE WITNESS:

6         A.    I was not aware of Congressional

7    investigations back to 2001, no.

8    BY MR. MOUGEY:

9         Q.    Let me hand you what I will mark as

10   exhibit -- Daugherty Exhibit 9.

11                   (WHEREUPON, a certain document was

12                    marked as Walgreens-Daugherty

13                    Deposition Exhibit No. 9:  GAO

14                    Report to Subcommittee on Oversight

15                    and Investigations; P1.1076 -

16                    P1.1076.27.)

17   BY MR. MOUGEY:

18        Q.    Do you know what GAO, Government

19   Accountability Office, stands for or do you know

20   what that is?

21        A.    No, I don't.

22        Q.    Do you see this GAO document dated

23   May 2002, "Report to the Subcommittee on Oversight

24   and Investigations, Committee on Energy and

1    Commerce, House of Representatives"?  Do you see

2    that?

3         A.    Yes.

4         Q.    And this is less than a year after

5    Daugherty 7, the reference to ongoing

6    investigations into OxyContin, correct?

7         A.    This is less than a year.  Say that

8    again.

9         Q.    Yes, ma'am.  This GAO report to the same

10   subcommittee is less than a year after the first

11   document in Daugherty 7 that we just looked at,

12   correct?

13        A.    The document that first was in 2001, is

14   that what you're referring to?

15        Q.    Yes, ma'am.  August of 2001.

16        A.    Yes.  It's a year.

17        Q.    May of 2002.

18        A.    Right.

19        Q.    Less than a year, right?

20        A.    Right.

21        Q.    Thank you.

22              And if you would, please, let's continue

23   with the title, "Prescription Drugs, State

24   Monitoring Programs Provide Useful Tool to Reduce

1    Diversion."

2              Do you see that?

3         A.    Yeah.

4         Q.    If you would, please turn to page 4 of

5    this document.  It's in the middle of the bottom.

6    In the "Background" section.

7         A.    Okay.

8         Q.    You understand that when there are

9    Congressional subcommittee ongoing investigations

10   that that usually is a matter of significant import

11   to the American public, correct?

12        MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14        A.    I can't speculate.

15   BY MR. MOUGEY:

16        Q.    Yeah, that's -- under "Background,"

17   "The diversion and abuse of prescription drugs are

18   associated with incalculable costs to society in

19   terms of addiction, overdose, death and related

20   criminal activities."

21              Do you see that first sentence?

22        A.    Yes.

23        Q.    Do you agree with that?

24        A.    Yes.

1      Q.     The next sentence, "DEA has stated that

2   the diversion and abuse of legitimately produced

3   controlled pharmaceuticals constitute a

4   multi-billion dollar illicit market nationwide."

5          Do you see that sentence?

6      A.     Yes.

7      Q.     Did I read it correctly?

8      A.     Yes.

9      Q.     Were you aware when you started at

10  Walgreens in 2013 that the diversion and abuse of

11  the pharmaceuticals, Schedule II and III that

12  Walgreens distributed and dispensed, that the

13  illicit market was multi-billion dollars?

14     MS. SWIFT:  Object to the form of the

15  question.

16  BY THE WITNESS:

17     A.     I was not aware, no, I'm not.

18  BY MR. MOUGEY:

19     Q.     In 2013 you're aware that Walgreens had

20  more than 7,000 stores across the U.S., retail

21  pharmacies, correct?

22     A.     I don't -- I don't know for sure.

23     Q.     Thousands and thousands of retail

24  pharmacies, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. SWIFT:  Object to the form.

2     BY THE WITNESS:

3          A.    It could be, yes.

4     BY MR. MOUGEY:

5          Q.    You don't even know how many pharmacies

6     that Walgreens was distributing to at that point in

7     time?

8          A.    I don't know if we had 7,000, 7,500,

9     8,000.  But, yes, I agree --

10         Q.    But that's not what I asked you.

11         A.    -- it was thousands, yes.

12         Q.    It said thousands and thousands.

13         A.    Yes.

14         Q.    Correct?

15         A.    Yes.

16         Q.    I didn't say 500.  I didn't say 2,500.

17    I said thousands and thousands, right?

18         A.    Yes.

19         Q.    Okay.  And you're comfortable that there

20    were thousands and thousands of Walgreens retail

21    pharmacies that Walgreens was distributing

22    Schedule II and Schedule III narcotics for,

23    correct?

24         MS. SWIFT:  Object to the form.

```
1    BY THE WITNESS:

2         A.    Can you repeat the question.

3    BY MR. MOUGEY:

4         Q.    Walgreens was responsible for

5    distributing Schedule II and Schedule III opiates

6    to thousands and thousands of its own retail

7    pharmacies, correct?

8         MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10        A.    Walgreens was distributing controlled

11   substances, C-IIs and C-IIIs, to our pharmacies,

12   yes.

13   BY MR. MOUGEY:

14        Q.    And there were how many people assigned

15   at Walgreens to take on this important task when

16   you got there in the beginning of '13 to identify

17   suspicious orders, report them to the DEA and

18   perform due diligence on those orders?

19        MS. SWIFT:  Object to the form.

20   BY THE WITNESS:

21        A.    I don't know.

22   BY MR. MOUGEY:

23        Q.    How many people were in your department?

24        A.    When I first started?
```

1    Q.    Yes, ma'am.

2    A.    Two and myself, Tasha and Steven Mills.

3    Q.    Three people.  And then within a matter

4    of months, how much had that department had grown

5    to?

6    A.    I think we maybe had five more people.

7    Five.

8    Q.    So, Walgreens had assigned seven people

9    to take on this multi-billion dollar diversion

10   problem in Schedule II and Schedule III narcotics

11   in its thousands and thousands of retail

12   pharmacies, correct?

13   MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15   A.    No, we -- I don't know what happened

16   prior to when I started.  So, I can't say that, no.

17   BY MR. MOUGEY:

18   Q.    When you got there in 2013, there at the

19   peak was seven people in prescription and

20   Pharmaceutical Integrity that were responsible for

21   identifying suspicious orders, reporting them to

22   the DEA and performing due diligence to combat this

23   multi-billion dollar diversion problem, correct?

24   MS. SWIFT:  Object to the form.

```
 1    BY THE WITNESS:

 2         A.    As far as I knew, Rx Integrity was

 3    started and, yes, there were roughly seven people

 4    in the beginning of 2013 that were assigned to

 5    manage our CSO KPI tool and manage reporting of

 6    suspicious orders, yes.

 7    BY MR. MOUGEY:

 8         Q.    And that CSO KPI tool was designed to

 9    identify suspicious orders, correct?

10         A.    Yes.

11         Q.    Report them as required to the DEA,

12    correct?

13         A.    Yes.

14         Q.    And identify what orders needed to

15    undergo due diligence, correct?

16         A.    Yes.

17         Q.    And Walgreens had seven people assigned

18    to that process, correct?

19         A.    As far as to my knowledge, yes, at that

20    time.

21         Q.    Did you see other people coming in and

22    out that were providing all of these resources or

23    was it pretty much just the seven of you?

24         A.    To my knowledge, it was -- it was my
```

1    group.

2        Q.    Wouldn't you think you would know?  I

3    mean, after all these years, you would know if

4    there were more people, right?

5        A.    I don't know.

6        Q.    Let's go to the next sentence.  It says,

7    "One recent example of this growing diversion

8    problem is the controlled substance oxycodone."

9              You know what oxycodone is, correct?

10       A.    Yes.

11       Q.    And you have an understanding that

12   oxycodone was one of the most abused prescription

13   opiates when you started at Walgreens in 2013?

14       A.    Yes.  I think it was one of the

15   medications or controlled substances that was

16   abused.

17       Q.    Not one of.  One of the highest, one of

18   the most abused Schedule II prescription opiate,

19   correct?

20       MS. SWIFT:  Object to the form.

21   BY THE WITNESS:

22       A.    I don't know that to be a fact.

23   BY MR. MOUGEY:

24       Q.    You don't know that oxycodone in the

Highly Confidential - Subject to Further Confidentiality Review

1    beginning of 2013 or at any time in 2013 that

2    oxycodone was one of the most abused Schedule II

3    prescription opiates?

4         A.    I know that it was one of the most

5    abused, yes.

6         Q.    The sentence goes on, "Oxycodone,

7    Percocet, Percodan.  OxyContin has become the

8    nation's number one prescribed narcotic medication

9    for treating chronic and severe" -- "chronic severe

10   and moderate pain."

11             Did I read that correctly?

12        A.    Yes.

13        Q.    "A single 40 gram" -- "40 milligram

14   OxyContin tablet legally selling for about $4 is

15   worth about $40 on the illicit market."

16             Correct?

17        A.    That's what it says.

18        Q.    You didn't have any understanding when

19   you began in '13 what OxyContin was selling on the

20   illicit market for?

21        A.    No.

22        Q.    Wouldn't that have been an important

23   fact when you were looking for red flags and

24   suspicious orders what the illicit market is

1    bringing for pills that sold for $4?

2        A.    I know that that OxyContin could be sold

3    illicitly and I know that someone could purchase

4    it.  I did not have an understanding that it was

5    sold for $40, no.

6        Q.    Wouldn't that have been an important

7    fact that it could be sold for hundreds of percent

8    higher than what the -- what the cost at the

9    pharmacy was?

10       A.    I knew that it was being sold on the

11   illicit market for more than what it was valued at,

12   yes.

13       Q.    Sure.  But not $5 more, not $6 more.

14   Roughly a thousand percent more, correct?

15       MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17       A.    I don't know that to be a fact.

18   BY MR. MOUGEY:

19       Q.    Did you ever ask anyone?  Did anybody

20   ever tell you what the demand in the illicit market

21   was for OxyContin?

22       A.    I may have heard, but I can't

23   specifically relate to any one person.

24       Q.    You can't point to any point in time

Highly Confidential - Subject to Further Confidentiality Review

1    where anyone from Walgreens training has provided

2    information to you about the multiple that the

3    illicit market was bringing for OxyContin?

4         MS. SWIFT:  Object.

5    BY THE WITNESS:

6         A.    In training, no.

7    BY MR. MOUGEY:

8         Q.    You said your training was ongoing.  It

9    started Day One and it continued to today.

10            You can't sit here today and tell this

11   jury and tell this Court that you can point to one

12   single time that anyone from Walgreens has pointed

13   to how many percent higher the illicit market is

14   bringing for OxyContin?

15        A.    I was aware that OxyContin could be sold

16   in the illicit market for more than what it was

17   valued at, yes.  In our group we were aware of

18   that.

19        Q.    But not how much more?

20        A.    Exactly how much more, no, not

21   specifically.

22        Q.    I didn't say exactly.

23        A.    Not 100 times more.

24        MS. SWIFT:  Let her finish her answer.

```
 1   BY THE WITNESS:

 2        A.   I don't -- I don't know.  I knew it was

 3   more.

 4   BY MR. MOUGEY:

 5        Q.   That's it.  You don't know if it's

 6   50 cents more, a quarter more, a nickel more or a

 7   thousand percent more?  You don't know.  It's just

 8   more.

 9        A.   I knew it was more than a nickel more.

10   I knew it was a higher amount.

11        Q.   It goes on.

12             "As of February 2002, OxyContin has been

13   involved in 464 deaths from prescription drug abuse

14   as reported by DEA on the basis of medical

15   examiners' autopsy findings for 2000 and 2001 from

16   32 states."

17             Do you have any understanding from the

18   point that the GAO study went to the committee of

19   Congress how much the deaths increased attributable

20   to OxyContin?

21        MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23        A.   No.

24   BY MR. MOUGEY:
```

1    Q.    Did anybody when you started at

2    Walgreens, at any point in time from your initial

3    training through your ongoing training, describe to

4    you about how many people were dying every year

5    from OxyContin overdoses?

6    A.    I think, as I mentioned prior, I had

7    seen things in the news, online, maps related to

8    that and in certain areas where people were dying

9    from OxyContin or oxycodone or opioid overdoses,

10   yes.

11   Q.    But you can't point to any specific time

12   at Walgreens that anyone explained to you how many

13   people were dying every year and what the increase

14   was year after year attributable to OxyContin?

15   A.    I think that was ongoing since I started

16   in 2013.

17   Q.    So, the answer to my question is, "Yes,

18   someone told me," or, "No, I saw it online and I

19   saw it in the media but I never saw it at

20   Walgreens."  Which one is it?

21   A.    Yes, we --

22   MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24   A.    We discussed it in our group.  Did

1    someone tell me?  No.  I probably saw it in

2    reports, yes.

3    BY MR. MOUGEY:

4         Q.    When you say "reports," you're talking

5    about news media?

6         A.    Primarily or documents citing studies,

7    yes.

8         Q.    Wouldn't it be important to know year

9    after year what the OxyContin deaths were

10   increasing when you were looking through all of the

11   suspicious orders to determine what was illicit

12   drug use and what wasn't?  Wouldn't that have been

13   important to know?

14        A.    I think in the scope of my job, I

15   understood that people were dying from oxycodone

16   overdoses; and while reviewing the orders, I was

17   doing my due diligence and making sure that the

18   pharmacists were filling prescriptions legitimately

19   and using their corresponding responsibility, yes.

20        Q.    Right.  But you can't point us to any

21   point in time where that due diligence was

22   conducted other than calling the pharmacy and

23   putting them in some e-mails, correct?

24        MS. SWIFT:  Objection; mischaracterizes the

1    testimony.

2    BY THE WITNESS:

3         A.    No.  I did have documentation in e-mails

4    and in our CSO KPI tool and we have documentation

5    today and you can pull notes and see the

6    pharmacists' responses as well as our responses.

7    BY MR. MOUGEY:

8         Q.    Do you have an understanding of the

9    reason why that system was implemented at Walgreens

10   in mid-2013 is because of a settlement agreement it

11   reached with the regulators?

12        MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14        A.    No.

15   BY MR. MOUGEY:

16        Q.    You have no -- no one has ever told you

17   that the reason why Pharmaceutical Integrity was

18   created was because of the investigation by the

19   regulators into Walgreens' distribution and

20   dispensing practices?

21        MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23        A.    No.

24   BY MR. MOUGEY:

1    Q.    I hand you what will be marked as

2    Exhibit Daugherty 9 -- 10.  I'm sorry.

3          Can you go back to Exhibit 2.

4    A.    Which is?

5    Q.    The "Follow-Up Review of the Drug

6    Enforcement Administration's Efforts to Control the

7    Diversion."

8    A.    Okay.

9    Q.    You can see the date of this document is

10   July 2006, and this is Daugherty 2, correct?

11   A.    Yeah, I see that.

12   Q.    So, this is approximately five years

13   after the first subcommittee on the ongoing

14   investigation into OxyContin I showed you, correct?

15   A.    Yes.

16   Q.    And you see again in the upper left-hand

17   corner, this is the U.S. Department of Justice,

18   correct?

19   A.    Yes.

20   Q.    And the document is titled "Follow-up

21   Review of the Drug Enforcement Administration's

22   Efforts to Control the Diversion of Controlled

23   Pharmaceuticals."

24         Correct?

```
 1        A.    Yes.

 2        Q.    If you just turn to the second page of

 3   this document, under "Executive Digest," second

 4   paragraph that begins with "Diversion of controlled

 5   pharmaceuticals."

 6        A.    Okay.

 7        Q.    "Diversion of controlled pharmaceuticals

 8   has dramatically increased in recent years, and

 9   research on drug usage reflects the growth of the

10   problem.  According to a 2005 report from the

11   National Center on Addiction and Substance Abuse,

12   the number of people who admitted abusing

13   controlled prescription drugs increased by

14   94 percent over a ten-year period, from 7.8 million

15   in '92 to 15.1 million in 2003."

16              Do you see that?

17        A.    Yes.

18        Q.    Did I read that correctly?

19        A.    Yes.

20        Q.    As part of your seven years and your

21   pharmacy Doctorate, you took statistics classes,

22   correct?

23        A.    Not that I recall.

24        Q.    You didn't take any math classes,
```

Highly Confidential - Subject to Further Confidentiality Review

1    statistics classes?

2         A.    I took math classes, yes.

3         Q.    You understand what linear regression

4    is?

5         A.    Yes.

6         Q.    And how do you understand what linear

7    regression is?

8         A.    I understand at a very high level what

9    linear regression is.

10        Q.    What's your understanding of what linear

11   regression is?

12        A.    I just understand the graph and how it

13   basically looks if you were to ask me to look at a

14   graph.

15        Q.    Do you understand what the definition of

16   linear regression is?

17        A.    I don't have a good understanding of

18   linear regression.

19        Q.    Linear regression is what Walgreens is

20   using today to identify suspicious orders, correct?

21        MS. SWIFT:   Object to the form.

22   BY THE WITNESS:

23        A.    I understand that our system is based

24   off a mathematical calculation, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. MOUGEY:

2        Q.    You understand that mathematical

3    calculation is based on a linear regression model?

4        A.    Yes.

5        MS. SWIFT:  Object to the form.

6    BY THE WITNESS:

7        A.    I believe it includes linear regression

8    model.

9    BY MR. MOUGEY:

10       Q.    And my question was a little inartful.

11   I said "today."

12             You understand that during your tenure

13   when Walgreens was still distributing Schedule II

14   and Schedule III, that one of the tools used to

15   measure or identify suspicious orders was a model

16   based on linear regression?

17       MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19       A.    I understand our tool today is based off

20   of that linear regression.

21   BY MR. MOUGEY:

22       Q.    But you're not distributing anymore

23   after 2014, correct?

24       MS. SWIFT:  Object to the form.
```

```
 1    BY THE WITNESS:

 2         A.    Not that I know of.

 3    BY MR. MOUGEY:

 4         Q.    You're not even -- I mean all these

 5    years in Pharmaceutical Integrity, you don't even

 6    know whether Walgreens is distributing Schedule II

 7    and Schedule III narcotics?

 8         MS. SWIFT:  Object to the form.

 9    BY THE WITNESS:

10         A.    I'm not aware of.  No, I don't think we

11    are.

12    BY MR. MOUGEY:

13         Q.    And the fact that Walgreens is using a

14    linear regression model, sitting here today, you

15    can't tell the jury what linear regression is just

16    even from a high level?

17         MS. SWIFT:  Object to the form.

18    BY THE WITNESS:

19         A.    The mathematical calculation was

20    developed by someone who had expertise in that

21    area, and they had developed it to identify stores

22    with orders of unusual quantity and size.

23    BY MR. MOUGEY:

24         Q.    Yes, ma'am.  And I appreciate that, but
```

1    the question I asked you was, do you have an

2    understanding, even at a 30,000 foot view, of what

3    linear regression is?

4         A.    I don't have a great understanding of

5    it, no.

6         Q.    Not a great.  30,000.  Can you tell the

7    jury today what linear regression is?

8         A.    I don't have a good understanding of --

9         Q.    Any understanding.

10        A.    -- of linear regression.

11        Q.    Can you tell us any understanding of

12   what linear regression is?

13        A.    I can't today.

14        Q.    So, we've just gone through five, six

15   years of Congressional subcommittee reports, GAO

16   studies of increasing deaths, increasing diversion

17   problems, and Walgreens model is based on linear

18   regression, and no one from Walgreens ever trained

19   you even enough for you to articulate what a

20   definition of a linear regression is?

21        MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23        A.    I don't believe that was my job.  My job

24   was to identify the flagged orders and report the

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious orders and work with our pharmacists and

2    our stores.

3    BY MR. MOUGEY:

4         Q.    And the linear -- in order -- I'm sorry.

5               The tool used to identify suspicious

6    orders, one of the tools, one of the primary tools

7    is linear regression, correct?

8         MS. SWIFT:  Object to the form; foundation.

9    BY THE WITNESS:

10        A.    The tool did use linear regression, yes,

11   in identifying flagged orders.

12   BY MR. MOUGEY:

13        Q.    And sitting here today you can't

14   articulate, just even a 30,000 foot view, Wikipedia

15   definition of what linear regression is?

16        A.    I don't have a good understanding of

17   linear regression.

18        Q.    But you do understand in this report

19   dated July 2006 with the stamp of the Department of

20   Justice that the number of people who admitted

21   abusing controlled prescription drugs had jumped

22   almost 100 percent by 2003.

23               Do you see that?

24        A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    When you began your tenure at Walgreens

2   in 2013, had anyone introduced you or described to

3   you the sense of urgency based on the number of

4   deaths across America attributable to Schedule II

5   and Schedule III?

6      MS. SWIFT:  Object to the form.

7   BY THE WITNESS:

8      A.    Can you repeat the question.

9   BY MR. MOUGEY:

10     Q.    When you began your training at

11  Walgreens in 2013 throughout the course of that

12  year, did anybody explain to you the increasing

13  year-to-year amount of deaths attributable to

14  Schedule II and Schedule III narcotics?

15     A.    I think I saw that in documents over the

16  course of my training, yes.

17     Q.    Did anyone explain to you the

18  year-to-year increasing trends of people who had

19  used prescription opiates, Schedule II and

20  Schedule III, for the first time?

21     MS. SWIFT:  Object to the form.

22  BY THE WITNESS:

23     A.    Can you repeat the question.  At

24  Walgreens?

```
1   BY MR. MOUGEY:

2        Q.    Yes.

3        A.    Did anyone --

4        Q.    That's your employer, right?

5        A.    Yes.

6        Q.    Did anybody explain to you year over

7   year what the increasing trends were of people who

8   had taken prescription opiates, Schedule II and

9   Schedule III, over time?

10       A.    Not that I recall.

11       MS. SWIFT:  Object to the form.

12  BY MR. MOUGEY:

13       Q.    Didn't you use in part of your job at

14  Walgreens trends over periods of times from stores

15  when determining whether stores met certain

16  thresholds?

17       MS. SWIFT:  Object to the form.

18  BY THE WITNESS:

19       A.    Not that I recall.  I don't understand

20  your question.

21  BY MR. MOUGEY:

22       Q.    Trends.  Do you understand what a trend

23  is?

24       A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What's a trend?

2    A.    Can you tell me what you're asking me,

3 because I understand what a trend is.

4    Q.    Isn't a trend, isn't it a term of art

5 used within Prescription Integrity to identify

6 potential suspicious orders?

7    A.    Can you be more specific and give me an

8 example.

9    Q.    I'm asking you.  Do you not recall any

10 time in Prescription -- I'm sorry -- Pharmaceutical

11 Integrity group you all used trends of

12 prescriptions for Schedule II and Schedule III

13 narcotics when identifying suspicious orders?

14    MS. SWIFT:  Objection; vague.

15 BY THE WITNESS:

16    A.    We identified suspicious orders based on

17 the orders that were flagged and we considered each

18 order before we determined whether it was

19 considered suspicious.  So, I'm not sure what

20 you're asking.  I don't understand your question.

21 BY MR. MOUGEY:

22    Q.    That paragraph continues, "This rate of

23 increase was seven times faster than the increase

24 in U.S. population for that same time period."

1          What does that tell you, the increase in

2   first-time users for Schedule II and Schedule III

3   in comparison to population, what does that tell

4   you, if anything, Ms. Daugherty?

5      MS. SWIFT:  Object to the form.

6   BY THE WITNESS:

7      A.    This particular sentence, if it's

8   accurate, is saying that there were 7.8 million in

9   1992 and then 15 million roughly in -- to

10  15 million in 2003.

11  BY MR. MOUGEY:

12     Q.    And what does that --

13     A.    Which is --

14     Q.    In comparison --

15     A.    -- almost double.

16     Q.    In comparison to the U.S. population,

17  seven times faster, correct, the increase in U.S.

18  population?

19     MS. SWIFT:  Object to the form.

20  BY MR. MOUGEY:

21     Q.    It tells you it's a growing problem?

22     A.    It says it's a growing problem from

23  7.8 million in 1992 to 15.1 million in 2003.

24     Q.    So, when you started at Walgreens in the

Highly Confidential - Subject to Further Confidentiality Review

```
1   beginning of 2013, did anybody say this epidemic is

2   growing year to year exponentially and it has not

3   slowed down in over a decade?

4       MS. SWIFT:  Object to the form.

5   BY THE WITNESS:

6       A.    I don't recall if someone said that to

7   me in that detail.

8   BY MR. MOUGEY:

9       Q.    Anything generally in that regard?

10      A.    I don't recall.  It's possible.  I was

11  basically made aware of these kinds of statistics

12  through, again, online studies, documentation,

13  reports, maps.

14      Q.    I'm going to hand you what's marked as

15  Daugherty 11 -- 10.  Thanks.

16              (WHEREUPON, a certain document was

17               marked as Walgreens-Daugherty

18               Deposition Exhibit No. 10:  9/27/06

19               letter from US DOJ DEA;

20               MCKMDL00478906 - 00478909.)

21  BY MR. MOUGEY:

22      Q.    Do you see the U.S. Department of

23  Justice with a date of September 27, 2006, correct?

24      A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And do you see the very first line of

2   this letter from the U.S. Department of Justice,

3   Drug Enforcement Agency, that "This letter is being

4   sent to every commercial entity in the

5   United States registered with the Drug Enforcement

6   Administration (DEA) to distribute controlled

7   substances."

8          Do you see that?

9      A.    Yes.

10      Q.    And that's Walgreens, right?

11      MS. SWIFT:  Object to the form.

12   BY MR. MOUGEY:

13      Q.    Walgreens is a distributor, right?

14      MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16      A.    I don't know if -- I assume Walgreens

17   was a distributor in 2006.  I don't have knowledge

18   of that since I wasn't involved until 2013 did I --

19   in the Rx Integrity group.

20   BY MR. MOUGEY:

21      Q.    The next sentence says, "The purpose of

22   this letter is to reiterate the responsibilities of

23   controlled substance distributors in view of the

24   prescription drug abuse problem our nation

1    currently faces."

2           Do you see that?

3      A.    Yes.

4      Q.    And this is six, seven years before you

5    started, right?

6      A.    Yes.

7      Q.    Have you ever seen this letter?

8      A.    I may have seen it during deposition,

9    but I honestly can't remember.

10     Q.    In another deposition?

11     A.    Deposition prep.  Sorry.  I don't know

12   if I saw this letter.

13     Q.    Outside of deposition prep, have you --

14   do you recall seeing this letter during your tenure

15   at Walgreens?

16     A.    No.

17     Q.    The next paragraph goes on, "As each of

18   you is undoubtedly aware, the abuse (non-medical

19   use) of controlled prescription drugs is a serious

20   and growing health problem in this country."

21          Do you agree that that continued up

22   until the point when you started with Walgreens in

23   2013?

24          MS. SWIFT:  Object to the form.

```
 1   BY MR. MOUGEY:

 2        Q.    Or continued with Walgreens in 2013?

 3        A.    I don't know.

 4        Q.    You don't know if in 2013 when you began

 5   that the abuse or non-medical use of controlled

 6   prescription drugs continued to be a serious and

 7   growing health problem in this country?

 8        A.    I know when I started in January of 2013

 9   that the abuse of controlled prescription drugs was

10   becoming a problem in the country.  That's what I

11   know.

12        Q.    It was a new problem like that document

13   we saw earlier, right?

14        A.    I don't know that it was new.  I don't

15   know how --

16        Q.    You said it was becoming --

17        A.    -- if it was growing.  I don't -- I

18   don't have any context before 2013, so I don't

19   know.

20        Q.    That's perfect.  You have no context

21   before January 2013 when you started?

22        A.    Other than what I saw in the news, which

23   I mentioned earlier.

24        Q.    And all of this ongoing training at
```

Highly Confidential - Subject to Further Confidentiality Review

 1    Walgreens, you don't have any context for what had

 2    happened in years before with the growing and

 3    continuing serious health problem in this country,

 4    no context that you can base off of when you

 5    started in January of '13?

 6         MS. SWIFT:  Objection; mischaracterizes the

 7    testimony.

 8    BY THE WITNESS:

 9         A.    As part of my job was to manage the

10    controlled substance order monitoring process when

11    I started and manage the team and build the team.

12              So, I don't have knowledge of this

13    letter or what was happening in specifics at

14    Walgreens prior to that.

15    BY MR. MOUGEY:

16         Q.    The question I asked you was a little

17    different.  You mentioned context, and what I asked

18    you was that when you began in '13, you didn't have

19    any context for what had happened in years before

20    with the growing and continuing serious health

21    problem in this country attributable to Schedule II

22    and Schedule III opiates, correct?

23         MS. SWIFT:  Object to the form.

24    BY THE WITNESS:

1    A.    I knew that there was a problem in the

2    country.  I don't know when it started, and I don't

3    know how long it had been going on.

4    BY MR. MOUGEY:

5    Q.    But you knew when you started in the

6    beginning of 2013 that it was becoming a problem?

7    MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9    A.    I knew at that point because that was

10   what I was made aware of when I started my job

11   because prior to that, it wasn't my job to know

12   about the growing health problem related to drug

13   abuse.  My job was different.

14   BY MR. MOUGEY:

15   Q.    Now it was your job in 2013.  Deaths are

16   increasing every year.  Prescription abuse is

17   increasing every year.

18        Wouldn't it have been important for you,

19   as the manager for the Midwest region overseeing

20   and identifying suspicious orders for more than a

21   thousand stores, for you to have some context of

22   the increasing problem?

23   MS. SWIFT:  Objection; mischaracterizes the

24   testimony.

1    BY THE WITNESS:

2         A.    I was aware that there was an increasing

3    problem with drug abuse in the country when I

4    started my job as I was being trained.

5    BY MR. MOUGEY:

6         Q.    Increasing, kind of like your testimony

7    earlier about OxyContin.  You didn't know if it was

8    being sold for a dollar more a pill or a thousand

9    more percent a pill.

10             Here you knew that it was a growing

11   problem, just didn't really know how big of a

12   problem it was.  Is that fair?

13        A.    I didn't --

14        MS. SWIFT:  Object to form.

15   BY THE WITNESS:

16        A.    I didn't know the actual numbers.  I

17   knew that it was a growing problem in the country,

18   yes.

19   BY MR. MOUGEY:

20        Q.    But context, whether it was a growing

21   problem of 1% or 2% or year after year it had

22   doubled, you don't really know because that wasn't

23   part of your job?

24        A.    I know it was a serious problem.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    The next paragraph, "The CSA," and you

2  understand what that stands for?

3      A.    I mean, it says Controlled Substance

4  Act.

5      Q.    Yes, ma'am.

6      A.    Yeah.

7      Q.    "The CSA," Controlled Substance Act,

8  "was designed by Congress to combat diversion by

9  providing for a closed system of drug

10  distribution."

11          Do you know what "closed system" means?

12      MS. SWIFT:  Object to the form.

13  BY THE WITNESS:

14      A.    In this document I'm not sure I

15  completely understand that.

16  BY MR. MOUGEY:

17      Q.    How about outside of this document?

18  Just generally.  Do you understand what a closed

19  system is?  In all this training you've gotten at

20  Walgreens, what is a closed system referencing?

21      A.    A closed system is --

22      MS. SWIFT:  Object to the form.

23  BY THE WITNESS:

24      A.    Honestly, I don't know.

```
 1   BY MR. MOUGEY:

 2       Q.    You don't know.  Sentence continues, "In

 3   which all legitimate handlers of controlled

 4   substances must obtain a DEA registration and, as a

 5   condition of maintaining such registration, must

 6   take reasonable steps to insure that their

 7   registration is not being utilized as a source of

 8   diversion."

 9           Did I read that correctly?

10       A.    Yes.

11       Q.    It goes on, "Distributors are, of

12   course, one of the key components of the

13   distribution chain."

14           Do you agree with that sentence from the

15   DEA that distributors are one of the key components

16   of the distribution chain?

17       MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19       A.    I can't speculate.  I don't know.

20   BY MR. MOUGEY:

21       Q.    Do you have any idea what the

22   distributor's role is in the closed distribution

23   system?

24       MS. SWIFT:  Object to the form.
```

1    BY THE WITNESS:

2         A.    I don't know.

3    BY MR. MOUGEY:

4         Q.    Do you have any idea what -- why the

5    distributors are key components of the distribution

6    system?

7         MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9         A.    No, I can't speculate.

10   BY MR. MOUGEY:

11        Q.    The paragraph goes on, "If the closed

12   system is to function properly as Congress

13   envisioned, distributors must be vigilant in

14   deciding whether a prospective customer can be

15   trusted to deliver controlled substances only for

16   lawful purposes."

17             Did I read that accurately?

18        A.    Yes.

19        Q.    It goes on, "This responsibility is

20   critical."

21             Do you agree that Walgreens as a

22   distributor has a responsibility to be vigilant in

23   deciding whether a prospective customer can be

24   treated to deliver controlled substances only for

Highly Confidential - Subject to Further Confidentiality Review

```
 1   lawful purposes?

 2        MS. SWIFT:  Object to the form.

 3   BY THE WITNESS:

 4        A.    The -- I think I would defer to

 5   interpretation of the law and what our attorney

 6   would advise as far as what that is.  I can't -- I

 7   can't assume to know what that is, what that means

 8   exactly.

 9   BY MR. MOUGEY:

10        Q.    You can't assume or you don't know --

11        A.    I don't --

12        Q.    -- whether or not Walgreens -- no one

13   has ever told you that Walgreens' role was

14   critical?

15        MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17        A.    I don't know in this context of this

18   letter.

19   BY MR. MOUGEY:

20        Q.    And outside the context, has anyone at

21   Walgreens ever told you that your role, its role as

22   a distributor was critical?

23        MS. SWIFT:  Your role, its role, whose role

24   are you talking about?
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MOUGEY:

2        Q.    No one from Walgreens ever told you that

3    your role in Pharmaceutical Integrity as part of

4    Walgreens was critical in the distribution system?

5        A.    At Walgreens I was made aware that my

6    role was important, and I needed to make sure that

7    we were monitoring for flagged orders and reporting

8    suspicious orders.  That was the extent of my role.

9        Q.    The last sentence of that paragraph,

10   "Congress has expressly declared that the illegal

11   distribution of controlled substances has a

12   substantial and detrimental effect on the health

13   and general welfare of the American people."

14           Do you agree with that sentence?

15       MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17       A.    I don't know.  This is just a letter

18   from 2006.

19   BY MR. MOUGEY:

20       Q.    It's just a letter?

21       A.    I'm not sure.  I don't know.

22       Q.    That's it.  And that's the message from

23   Walgreens?

24       A.    I have not seen this letter.

1   Q.   "This is just a letter from the DEA.  I

2   don't know."  Right?

3   A.   Well, I have not seen this letter

4   before.

5   MS. SWIFT:  Object to the form.

6   BY THE WITNESS:

7   A.   I don't know.

8   BY MR. MOUGEY:

9   Q.   No one has ever shown you this letter,

10  correct?

11  MS. SWIFT:  Object to the form.

12  BY THE WITNESS:

13  A.   Not until I saw it possibly in

14  deposition prep, no.

15  BY MR. MOUGEY:

16  Q.   You might not have been in deposition

17  prep if somebody would have shown it to you

18  earlier, right?

19  MS. SWIFT:  Objection.  You're harassing the

20  witness.  Do you have a question?

21  BY MR. MOUGEY:

22  Q.   Who at Walgreens would have been

23  responsible, in your understanding from when you

24  started, of taking this letter and making sure that

1   it got in the right hands of the right people?

2       MS. SWIFT:  Objection; foundation.

3   BY THE WITNESS:

4       A.    Are you asking me in 2006?

5   BY MR. MOUGEY:

6       Q.    I'm asking you from your understanding

7   when you were at Walgreens -- and you were at

8   Walgreens in 2006, right?

9       A.    I was at Walgreens Health Initiatives,

10  our PBM division, yes.

11      Q.    Yes, ma'am.  And that's Walgreens,

12  right?  That's under the umbrella of companies,

13  right?

14      A.    Yes, it's part of Walgreens.

15      Q.    And the PBMs were also distributing --

16  I'm sorry -- were also responsible for Schedule II

17  and Schedule III narcotics, correct?

18      MS. SWIFT:  Object to the form.

19  BY THE WITNESS:

20      A.    Not in distribution that I'm aware of.

21  BY MR. MOUGEY:

22      Q.    Not in distribution, but part of the

23  rubric of the PBMs included Schedule II and

24  Schedule III narcotics, correct?

Highly Confidential - Subject to Further Confidentiality Review

1       MS. SWIFT:  Object to the form.

2   BY THE WITNESS:

3       A.    I don't know what you mean by that.

4   BY MR. MOUGEY:

5       Q.    So, in 2006 when you're at Walgreens --

6   you've been at Walgreens for almost 20 years,

7   right?

8       MS. SWIFT:  Object to the form.

9   BY THE WITNESS:

10      A.    Yes.

11  BY MR. MOUGEY:

12      Q.    Who do you think would have been

13  responsible at Walgreens when a letter like this

14  comes in talking about Walgreens' responsibility

15  and that it's critical, who at Walgreens would have

16  been responsible for distributing or disseminating

17  this to the right people?

18      MS. SWIFT:  Objection; foundation.

19  BY THE WITNESS:

20      A.    In 2006 I would not know.  I do not

21  know.

22      MR. MOUGEY:  I will hand you Daugherty 11.

23              (WHEREUPON, a certain document was

24               marked as Walgreens-Daugherty

```
 1                    Deposition Exhibit No. 11:

 2                    12/27/07 letter from US DOJ DEA to

 3                    McKesson Corporation;

 4                    MCKMDL00478910 - 00478911.)

 5   BY MR. MOUGEY:

 6        Q.   Same letterhead as Daugherty 10,

 7   correct?

 8        A.   Yes.

 9        Q.   U.S. Department of Justice, correct?

10        A.   Yes.

11        Q.   Drug Enforcement Administration below

12   that, correct?

13        A.   Yes.

14        Q.   If you compare dates, about 14 months

15   later the next letter comes out, correct?

16        A.   Yes.

17        Q.   "The purpose of this letter is to

18   reiterate the responsibilities of controlled

19   substance manufacturers and distributors to inform

20   DEA of suspicious orders in accordance with 21 CFR

21   1301.74(b)."

22             Do you see that?

23        A.   Yes.

24        Q.   Do you recall ever seeing this letter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   prior to deposition prep?

 2        A.    No.

 3        Q.    Take a second and look at the contents

 4   of this letter and its similarity to the last

 5   letter.  Very close, isn't it?

 6        MS. SWIFT:  Are you asking her to read the

 7   whole letter?

 8        MR. MOUGEY:  Enough to answer the question.

 9        MS. SWIFT:  Read whatever part of it you need.

10        MR. MOUGEY:  Thank you.

11   BY THE WITNESS:

12        A.    I would say that this letter is much

13   shorter than the first letter.  So, not similar.

14   There is much more detail in the first letter.

15   BY MR. MOUGEY:

16        Q.    Let's go through the Daugherty 11, then.

17   Second paragraph.

18             "In addition to, and not in lieu of, the

19   general requirement under 21 USC 823, manufacturers

20   and distributors maintain effective controls

21   against diversion."

22             Do you see that?

23        A.    Yeah, yes.

24        Q.    "DEA regulations require all
```

1  manufacturers and distributors to report suspicious

2  orders of controlled substances."

3          Do you follow me?

4     A.    Yes.

5     Q.    "Title 21 CFR 1301.74(b), specifically

6  requires that a registrant 'design and operate a

7  system to disclose to the registrant suspicious

8  orders of controlled substances.'  The regulation

9  clearly indicates that it is the sole

10 responsibility of the registrant to design and

11 operate such a system."

12         Do you see that?

13    A.    Yes.

14    Q.    So, as of 2007 it's crystal clear that

15 the DEA is requiring Walgreens as a distributor to

16 have designed and implemented a system intended to

17 identify and report suspicious orders, correct?

18    MS. SWIFT:  Object to the form.

19 BY THE WITNESS:

20    A.    I see that this is what this letter

21 says, that they're requiring a registrant to design

22 and operate a system.  I also see that it's

23 addressed to McKesson.

24 BY MR. MOUGEY:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Yes, because your company can't find

2   this letter.  It hasn't been produced in

3   production.

4            Do you have -- doesn't that seem a

5   little odd to you that letters from the DEA

6   elaborating on industry standards and what does and

7   doesn't need to be done, that your company can't

8   find it?

9      A.    I don't know that that's true.

10     Q.    Don't you find that a little weird, that

11  we have to use --

12     MS. SWIFT:  Let her answer your question.

13  BY MR. MOUGEY:

14     Q.    Were you finished?

15     A.    Um-hmm.

16     Q.    Don't you find -- I thought you were.

17           Do you -- do you find it a little odd

18  maybe that letters from the DEA elaborating on

19  what's required and what's not required and the

20  critical responsibility, that nobody at Walgreens

21  can find that letter?

22     MS. SWIFT:  Object to the form.

23  BY THE WITNESS:

24     A.    I don't know.

1    BY MR. MOUGEY:

2        Q.    Do you think maybe this didn't go to

3    Walgreens so it didn't know about the systems that

4    the DEA was requiring?

5        A.    I don't know if Walgreens received this

6    letter.

7        Q.    Did anyone from Walgreens ever elaborate

8    on the contents or similar to the contents of this

9    letter during your training?

10       MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12       A.    I have no knowledge of this letter

13   during my training.

14   BY MR. MOUGEY:

15       Q.    Or the contents of this letter, similar

16   to the contents of this letter.

17           Do you have any knowledge about anything

18   similar to the contents of this letter during your

19   training at Walgreens?

20       MS. SWIFT:  If you need to read the entire

21   letter to determine the answer to that question,

22   you should do that.

23   BY THE WITNESS:

24       A.    I think I might need to read it.

Highly Confidential - Subject to Further Confidentiality Review

1              So, yes.

2    BY MR. MOUGEY:

3        Q.    So, let's go to the last paragraph.

4    Let's talk about patterns.  Last paragraph on the

5    first page begins with, "The regulation

6    specifically states that suspicious orders include

7    orders of unusual size, orders deviating

8    substantially from a normal pattern and orders of

9    an unusual frequency."

10             Do you see that first sentence?

11       A.    Yes.

12       Q.    The DEA goes on in the sentence after

13   next, "For example, if an order deviates

14   substantially from a normal pattern, the size of

15   the order does not matter and the order should be

16   reported as suspicious."

17             Do you see that?

18       A.    Is that lower down somewhere?

19       Q.    It's the sentence after the one I just

20   read.  Begins with, "For example."  It's

21   highlighted on the screen in front of you.

22       A.    Yes.

23       Q.    Okay.  Do you see that?

24       A.    Yes.

1      Q.    So, the DEA believes that patterns are

2   important when determining whether an order is

3   suspicious, correct?

4      MS. SWIFT:  Object to the form.  You're asking

5   her what the DEA believes?

6   BY MR. MOUGEY:

7      Q.    The DEA as elaborated in this letter.

8      A.    That's what the letter.  The letter

9   says, "If the order deviates substantially from the

10  normal pattern."

11     Q.    And you don't recall in any point in

12  time in your training that patterns should be

13  looked at to identify potential suspicious orders,

14  correct?

15     MS. SWIFT:  Object to the form.

16  BY THE WITNESS:

17     A.    My understanding is if a store has never

18  ordered a product before and they are now ordering,

19  for example, a Suboxone, I will make sure that I

20  understand the extent of why they are ordering the

21  Suboxone films that they need.  Usually it's as a

22  result of now they have legitimate prescriptions

23  coming from a Suboxone clinic.

24          So, if that's what you mean by a normal

1    pattern where they never dispensed it before or

2    hadn't seen any volume of it before and now they

3    are dispensing it, yeah.

4    BY MR. MOUGEY:

5         Q.   Can you think of any other patterns that

6    might be important?

7         MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9         A.   Not off the top of my head right now.

10   BY MR. MOUGEY:

11        Q.   So, the only pattern you can think of

12   after six years in Pharmaceutical Integrity

13   responsible for identifying suspicious orders is

14   when a store has never ordered Suboxone and now is

15   ordering it.  That's the only pattern that you can

16   come up with?

17        A.   Off the top of my head right now, yes.

18        Q.   Let's go to the first sentence on the

19   next page, begins with "Registrants."

20             "Registrants that rely on rigid formulas

21   to define whether an order is suspicious may be

22   failing to detect suspicious orders."

23             Do you have an understanding of whether

24   or not Walgreens was using a rigid formula to

```
 1   detect suspicious orders at any point in time?

 2        MS. SWIFT:  Object to the form, foundation.

 3   BY THE WITNESS:

 4        A.    I don't know what "rigid formulas"

 5   means.  I don't know what that means in this

 6   letter.

 7   BY MR. MOUGEY:

 8        Q.    Well, let's just maybe come up with an

 9   example.  So, if an NDC code in the order for a

10   month was averaged over a period of time, say, six

11   months, and then you have an average.  You

12   following me?

13        A.    Yes.

14        Q.    And that was multiplied times 3, the

15   average.  So, anything over the average times 3 was

16   flagged as suspicious.  Does that sound like a

17   formula to you?

18        MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20        A.    That's -- I don't know what rigid or how

21   that's defined.  That's my question.

22   BY MR. MOUGEY:

23        Q.    I didn't use the word "rigid" on

24   purpose --
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    -- so as not to confuse you --

3        A.    Yes.

4        Q.    -- with the word "rigid."  So, let's

5    just use the word "formula."

6              Three times a six-month average for a

7    specific NDC code.  Is that a formula?

8        MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10       A.    I think that could be a formula.

11   BY MR. MOUGEY:

12       Q.    And do you think that would be a rigid

13   formula?

14       MS. SWIFT:  Object to form.

15   BY THE WITNESS:

16       A.    I don't know.

17   BY MR. MOUGEY:

18       Q.    You don't know.  Do you think that's an

19   appropriate formula to use to identify suspicious

20   orders when reporting them to the DEA?

21       MS. SWIFT:  Objection; foundation.

22   BY THE WITNESS:

23       A.    I don't know.

24   BY MR. MOUGEY:

1      Q.    You wouldn't expect that Walgreens was

2  using formulas like 3 times the average over

3  six-month of an NDC code when reporting suspicious

4  orders to the DEA, would you?

5      MS. SWIFT:  Object to the form, foundation.

6  BY THE WITNESS:

7      A.    I don't know what kind of formula

8  Walgreens was using in 2007 or --

9  BY MR. MOUGEY:

10      Q.    But you certainly wouldn't --

11      A.    To report suspicious orders.

12      Q.    You certainly wouldn't expect Walgreens

13  to be using a rigid formula after this 2007 letter,

14  correct?

15      MS. SWIFT:  Object to the form.

16  BY THE WITNESS:

17      A.    I don't know.

18      MS. SWIFT:  Foundation.

19  BY MR. MOUGEY:

20      Q.    Have you ever talked to Mr. Stahmann

21  about what the formula Walgreens was using during

22  his tenure?

23      MS. SWIFT:  Object to the form.

24  BY THE WITNESS:

1      A.    Before he was working with me?

2   BY MR. MOUGEY:

3      Q.    At any point in time.

4      A.    Other than our CSO KPI tool that we talk

5   about, yes.  But no.

6      Q.    No?

7      A.    Not other than that, no.

8      Q.    I will hand you what I'll mark as

9   Daugherty 12.

10              (WHEREUPON, a certain document was

11               marked as Walgreens-Daugherty

12               Deposition Exhibit No. 12:  8/16/17

13               e-mail with attachment;

14               WAGMDL00183798 - 00208715.)

15   BY MR. MOUGEY:

16      Q.    You see Eric Stahmann that e-mailed

17   himself on August 16, 2017, correct?

18      A.    Yes.

19      Q.    And Mr. Stahmann is one of your

20   colleagues in Pharmaceutical Integrity, correct?

21      A.    Yes.

22      Q.    And he's been there for quite some time

23   as well, correct?

24      A.    Probably several months after I started

1    in 2013, yes.

2         Q.    But as of 2017, in August, he had been

3    there about four years, right?

4         A.    That sounds right, yes.

5         Q.    And you understand that he, like you,

6    had been at Walgreens prior to his tenure in

7    Pharmaceutical Integrity, correct?

8         A.    Yes.

9         Q.    Do you know what department or what

10   group he was in within Walgreens prior to

11   Pharmaceutical Integrity?

12        A.    Our asset protection department.

13        Q.    And loss prevention?

14        A.    Loss prevention, yes.

15        Q.    Okay.  And you see here that the subject

16   is "CD orders," right?

17        A.    Yes.

18        Q.    And the attachments are CDCORP 8-2010,

19   and it's a zip file, correct?

20        A.    Yeah, it says zip, yes.

21        Q.    Thanks.  So, if you'd turn the page to

22   Bates No. 99.  It's in the bottom right-hand

23   corner.

24              Do you know what MOBIUS is?  To the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    bottom of the page.

 2         A.    I have heard the term, but no, I don't.

 3         Q.    You don't have any understanding at all

 4    what it is, whether it's a database or anything?

 5         A.    Not really, no.

 6         Q.    Not really or not at all?

 7         A.    No, I really don't know.  I don't know.

 8         Q.    All right.  And in the middle of the

 9    page on the right-hand side do you see "Report

10    Title, Suspicious Drug Orders"?

11         A.    Yes.

12         Q.    Now, if you would turn to two pages in.

13               Let me come back to that.

14               If you would turn to Bates No. 80.

15         A.    Okay.

16         Q.    And you see "Sales District 277" in the

17    upper left-hand side?

18         A.    Yes.

19         Q.    "Walgreen Store No.," and 3226, correct?

20         A.    Yes.

21         Q.    And do you see "DEA No.," and that's --

22    do you have an understanding of what that DEA

23    number is?

24         A.    Where is it?
```

```
 1           Q.     The upper part of Bates No. 80, right in

 2     the middle of the page, it says, "DEA No.,

 3     BW4129842."

 4           A.     I would assume that it's the DEA number

 5     of the store.

 6           Q.     All right.  Of the pharmacy, right?

 7           A.     The pharmacy, yes.

 8           Q.     The next has got a store address and

 9     it's got 6410 Broadway Avenue, Cleveland, Ohio,

10     correct?

11           A.     Yes, 6410 Broadway.

12           Q.     And you ultimately were over the eastern

13     region of Walgreens for identifying suspicious

14     orders, correct?

15           A.     Yes.  At a later date after I had

16     started, yes.

17           Q.     When do you recall that that date was?

18           A.     I don't remember exactly.  Maybe 2015.

19           Q.     Okay.  So, if you continue on this page,

20     it says on the right-hand side below the kind of

21     title section it says, "Walgreen Item No." and it

22     has an NDC number, correct?

23           A.     Yes.

24           Q.     And next to that column is
```

```
 1    "Description," and it has the average order and

 2    then it has a star, "DEA factor = Trigger."

 3              Do you see that?

 4        A.    Average order.  I see "AVE Order."

 5        Q.    What do you think AVE stands for, do you

 6    know?

 7        MS. SWIFT:  Object to the form.

 8    BY THE WITNESS:

 9        A.    I -- I don't know since I usually use

10    AVG, so I'm not sure.

11    BY MR. MOUGEY:

12        Q.    The DEA factor equals trigger.  Do you

13    see that?

14        A.    Yes.

15        Q.    And you have -- why don't you tell me

16    what you see what that is below that,

17    "Oxycodone-APAP 5-325 tab plus 500."  What does

18    that mean?

19        A.    That's the oxycodone acetaminophen

20    5 milligram 325 strength and that's a 500 count

21    bottle.

22        Q.    And below you see 6 and 3.0 and 18,

23    right?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    So, 6 times 3 is 18.  Do you agree with

 2   that?

 3        A.    Yes.

 4        Q.    And you see under the AVE order, 6; and

 5   under the DEA factor, 3; and under the trigger, 18?

 6        A.    I see the numbers, yes.

 7        Q.    Have you ever seen this report before or

 8   anything similar to it?

 9        A.    No.

10        Q.    Look below.  You see the "Date Ordered,"

11   6/29, 7; 6/22, 4; 6/15, 3; 6/08, 5; 6/1, 9.

12              Do you see that, follow me?

13        MS. SWIFT:  Objection to the extent it

14   mischaracterizes the document.

15   BY THE WITNESS:

16        A.    I follow the numbers, yes.

17   BY MR. MOUGEY:

18        Q.    Okay.  And you see the "Total Ordered"

19   below, 28.

20        A.    I see that, yes.

21        Q.    Now, do you have any idea what

22   percentage 18 of 28 is?

23        MS. SWIFT:  Object to the form.

24   BY MR. MOUGEY:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Is that 155%?  Does that look about

2    right?

3         MS. SWIFT:  Same objection.

4    BY THE WITNESS:

5         A.    What percent 18 out of 28 is?  No, I

6    don't think it's 155%.

7    BY MR. MOUGEY:

8         Q.    Did I say that backwards?

9               The trigger factor is 18.

10              Do you see that above?

11         MS. SWIFT:  Object to the form.

12    BY THE WITNESS:

13         A.    I see the number 18, yes.

14    BY MR. MOUGEY:

15         Q.    And you see below the quantity is 28?

16         A.    Yes.

17         Q.    And 28 is 155% of 18?

18         MS. SWIFT:  Do you want her to do the math in

19    her head or?

20    BY THE WITNESS:

21         A.    Okay.

22    BY MR. MOUGEY:

23         Q.    I understand.

24         A.    I use my phone a lot for math, I'll be

Highly Confidential - Subject to Further Confidentiality Review

1    honest with you.

2         Q.    Although your job --

3         A.    Yes.

4         Q.    -- with linear regression --

5         A.    Yes.

6         Q.    -- and looking is a lot of math, isn't

7    it?

8         MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10        A.    I use my calculator quite a bit, yes.  I

11   have three.

12   BY MR. MOUGEY:

13        Q.    Well, if you want to get your phone out

14   and do the 28 times --

15        A.    No, that's fine.

16        Q.    I'm sorry.  28, 155 as compared to 18,

17   does that look about right to you?  Let's do it

18   like this.

19        A.    Sure.

20        Q.    What's half of 18?  9, right?

21        A.    Yes.

22        Q.    So, you'd agree that 27 would be 150% of

23   18, right?

24        MS. SWIFT:  I'm going to object to the

Highly Confidential - Subject to Further Confidentiality Review

1    on-the-record math.  She's testifying under oath.

2    I mean, if you really want her to get her phone

3    out.  If you can do it in your head, fine.

4    BY THE WITNESS:

5        A.    Yes, I agree.

6    BY MR. MOUGEY:

7        Q.    With what?

8        A.    It's close, yes.

9        Q.    It's close.

10       A.    Yes.

11       Q.    Do you have any idea whether or not

12   Walgreens for periods of time before your arrival

13   in Pharmaceutical Integrity was using rigid

14   formulas to identify suspicious orders for the DEA?

15       MS. SWIFT:  Object to the form, foundation.

16   BY THE WITNESS:

17       A.    No.

18   BY MR. MOUGEY:

19       Q.    You don't have any idea whether

20   Walgreens was using a DEA factor of 3 to multiply

21   average orders?

22       MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24       A.    No, I do not.

```
 1   BY MR. MOUGEY:

 2       Q.    You would agree with me that if

 3   Walgreens was using a formula such as 3 times the

 4   average order to identify suspicious orders, that

 5   that would not comply with the correspondence we

 6   just looked at from the DEA?

 7       MS. SWIFT:  Object to the form, foundation.

 8   BY THE WITNESS:

 9       A.    No.

10   BY MR. MOUGEY:

11       Q.    You'd agree with me that it doesn't

12   comply?

13       MS. SWIFT:  No.  Objection.

14   BY THE WITNESS:

15       A.    No.  I don't know where -- this letter

16   is law.  So, I don't -- I don't really understand

17   if that would comply with the law, no.

18   BY MR. MOUGEY:

19       Q.    I'm asking you if the letter from the

20   DEA provides guidance that rigid formulas shouldn't

21   be used and Walgreens was using a DEA factor of 3,

22   that that would not comply with the DEA's guidance,

23   correct?

24       MS. SWIFT:  Same objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY THE WITNESS:

 2         A.    I don't know.  I can't speculate.

 3    BY MR. MOUGEY:

 4         Q.    And you don't know who would know,

 5    right?  Are we going to get to somebody at

 6    Walgreens that knows something outside of a

 7    six-month window?

 8         MS. SWIFT:  Object to the form of the

 9    question.

10    BY MR. MOUGEY:

11         Q.    I will hand you what we'll mark as

12    Daugherty 13.

13                    (WHEREUPON, a certain document was

14                     marked as Walgreens-Daugherty

15                     Deposition Exhibit No. 13:

16                     Settlement and Memorandum of

17                     Agreement; WAGMDL00490963 -

18                     00490978; and P-WAG-0001.)

19    BY MR. MOUGEY:

20         Q.    Let's walk through this document.  If

21    you'll -- the first 13 pages is titled "Settlement

22    and Memorandum of Agreement."  The signatory pages

23    are page 11 and 12 and 13.

24                    Do you see that?
```

```
1       A.    Yes.

2       Q.    Okay.  Now, this -- these are a series

3  of documents, and we got the signatory pages at a

4  different time.  So, I'm going to refer you to

5  after page 13, there is an "Addendum:  Prospective

6  Compliance," one of three pages, and then the

7  document starts over again.

8           Do you see that?

9       A.    Yes.

10      MS. SWIFT:  Are you following his questions

11  while you're looking?

12      THE WITNESS:  Yes.

13  BY MR. MOUGEY:

14      Q.    Page 1 of 13, "Settlement and Memorandum

15  of Agreement."

16      A.    Yes.

17      Q.    It's titled -- it also has page 1 of 343

18  on the bottom right-hand side.  Do you see that?

19      A.    No.

20      Q.    They're numbered --

21      A.    I have 1 of 3, 1 of 13.  Do you want me

22  to go after that?  Then I have 1 of 3 again.

23      Q.    Right.  But do you see the number on the

24  bottom right-hand side?  Get to the one that starts
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with 1 of 343.

 2        A.    Okay.

 3        Q.    To make it easy, I've just numbered them

 4    sequentially 1 out of 343, so when I reference a

 5    page you can find it.  Okay?

 6        A.    Yes.

 7        Q.    And you're there on page 1 of 343 titled

 8    "Settlement and Memorandum of Agreement."

 9              Do you see that?

10        A.    Yes.

11        Q.    Now, I know you've only looked at the

12    first few pages, but just based on the first page,

13    do you recall ever seeing this document before?

14        A.    I don't recall seeing this page, no.

15        Q.    Okay.

16        A.    This part of it.  No.

17        Q.    Let's just go through some of the

18    procedural background so we know what we are

19    looking at.

20              Do you see the paragraphs that are

21    titled 1, 2, 3, 4, 5, 6 and it goes all the way to

22    10 on page 2 of 343?  Do you see that?

23        A.    Yes.

24        Q.    Okay.  And paragraph 3 references, "On
```

1    April 7, 2011, Walgreens entered into a Settlement

2    and Release Agreement and Administrative Memorandum

3    of Agreement with DEA."

4              Do you see that as Appendix A?

5    A.    Yes.

6    Q.    Okay.  4, "Walgreens' Jupiter

7    distribution center is registered with DEA as a

8    distributor of Schedule II to V controlled

9    substances," and it lists its address in Jupiter,

10   Florida.  Are you still following me?

11   A.    Yes.

12   Q.    And then paragraph 5 references

13   Appendix B that pertains to the Jupiter

14   distribution center, correct?

15   A.    Yes.

16   Q.    And then 6, 7, 8, 9 and 10 are all

17   pharmacy -- retail pharmacies of Walgreens that are

18   referenced in Exhibits C to C6?

19   A.    Yes.

20   Q.    Okay.  Let's continue to page 2 of 3,

21   "Stipulation and Agreement."  Do you have an

22   understanding of what the words "Stipulation and

23   Agreement" means?

24   A.    I understand that this is an agreement.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Okay.  And as you can see below, in the

2    second paragraph, "Walgreens acknowledges that

3    suspicious order reporting for distribution to

4    certain pharmacies did not meet the standards

5    identified by DEA in three letters from DEA's

6    Deputy Assistant Administrator, Office of Diversion

7    Control, sent to every registered manufacturer and

8    distributor, including Walgreens, on September 27,

9    2006, February 7, 2007 and December 27, 2007."

10         Do you follow me?

11         A.    Yes.

12         Q.    Did anyone, when you began at Walgreens

13   in that first year, tell you that Walgreens had

14   acknowledged that its suspicious order reporting

15   for distribution centers did not meet standards as

16   identified by the DEA?

17         A.    Not that I recall, no.

18         Q.    Wouldn't -- wouldn't you have recalled

19   that?  We have people dying.  We have exploding

20   populations using Schedule II and Schedule III

21   narcotics.

22         Wouldn't you recall if somebody said,

23   "Hey, our organization didn't follow and comply

24   with DEA guidelines"?  Don't you think you'd
```

1    remember that?

2        MS. SWIFT:   Object to the form.

3    BY THE WITNESS:

4        A.    I don't know if I would.

5    BY MR. MOUGEY:

6        Q.    Wouldn't that be a --

7        A.    I don't remember that.

8        Q.    You don't know if you'd recall?

9        A.    I don't know.

10       Q.    Do you know -- did you know in the first

11   half of 2013 whether or not Walgreens paid

12   $80 million as part of this agreement?

13       A.    I think I learned, yeah, at some point

14   when this settlement agreement was signed that

15   there was an $80 million involvement.  Maybe June.

16   I don't recall when this was exactly signed.

17       Q.    Maybe June is what your recollection is?

18   Did you look at documents getting -- preparing for

19   today that you had been sent this memorandum of

20   agreement in June of 2013?

21       A.    I've seen some of this memorandum of

22   agreement before, yes.  Not this part that you're

23   showing me right now.

24       Q.    Let me hand you what is marked as

1    Daugherty 14.

2                    (WHEREUPON, a certain document was

3                     marked as Walgreens-Daugherty

4                     Deposition Exhibit No. 14:  6/12/13

5                     e-mail string; WAGMDL00575931 -

6                     00575944.)

7    BY MR. MOUGEY:

8         Q.    Don't close 13.  I just want to...

9               Let's just start with the e-mail on top.

10   Do you see that it's from you to the rest of your

11   group?

12        A.    It's from me to Tasha is what I see up

13   top and then from Tasha to us.  Yes.

14        Q.    And you ask, "I can forward this to Ed?"

15   Help me with the pronunciation.

16        A.    Svihra.

17        Q.    Svihra.  What's Ed Svihra do?

18        A.    I believe his job was director in asset

19   protection.

20        Q.    Why did you ask if you could forward it

21   to Ed?

22        A.    Because it was a document, a settlement,

23   and I wanted to make sure I can share that.

24        Q.    Where did you find it?

1        A.     Tasha had sent it, it looks like.

2        MS. SWIFT:  I'm going to object.  I just

3   noticed that the third e-mail on the chain is from

4   Patty Zagami, who is a lawyer at Walgreens.  I

5   don't know if this is a draft of the settlement

6   agreement or not.  But if it is, I'm going to lodge

7   an assertion of privilege over this document and

8   ask that you not ask questions about it.  You've

9   already got the --

10       MS. DUNNING:  Kate, I am going to represent

11  that the title in the metadata is "Final from USAO

12  website.pdf."  You can see that on the screen.  So

13  I don't think it's a draft, and you all produced

14  this in your post privileged --

15       MS. SWIFT:  Based on that representation, I

16  don't have any reason to think that it's a draft

17  either.  But if you don't need ask about this

18  version of it.

19       MR. MOUGEY:  I wasn't planning on going

20  through it.  What I'm trying to...

21  BY MR. MOUGEY:

22       Q.     As of June of 2013, June 12 of 2013, you

23  had the memorandum and agreement on -- the

24  Settlement and Memorandum Agreement, which is the

```
 1    first series of pages of this document in

 2    Exhibit 12, correct?

 3         A.    It appears that I did in an e-mail, yes.

 4         Q.    Okay.  Can we go to the first page of

 5    the Settlement and Memorandum Agreement.

 6               And Exhibit 13 that was e-mailed to you

 7    in June of '13, appears to be the first -- the same

 8    draft as what's in Exhibit 12, correct?

 9         A.    I don't know if it's the same.  I

10    haven't done a comparison.

11         Q.    It's the same subject matter, right?

12         MS. SWIFT:  Do you want her to read both and

13    confirm that, Peter?  I mean, if you want her --

14         MR. MOUGEY:  That's why I broadened it up to

15    just the same subject matter.

16    BY THE WITNESS:

17         A.    It's titled the same, Settlement and

18    Memorandum of Agreement.  I can agree to that.

19    BY MR. MOUGEY:

20         Q.    Yeah.

21         A.    I don't know that -- I can't say that it

22    with 100% certainty that it's the same document

23    unless I do it.

24         Q.    That's not what I asked.  If you go back
```

1    to what I asked, which was the same subject matter,

2    if you look at paragraphs 1, 2, 3, 4, 5, 6, and

3    you'll see pretty quick that the reference matter

4    is the same in the document we just went through.

5        A.    I would agree that it's similar, yes.

6        Q.    Yes.  And if you turn the page,

7    paragraphs 7, 8, 9 and 10 are also similar to

8    Exhibit 12?

9        MS. SWIFT:  Take your time and compare them to

10   the extent you need to be able to answer the

11   question.

12   BY THE WITNESS:

13       A.    Yes.

14   BY MR. MOUGEY:

15       Q.    Thank you.  Just kind of put that to the

16   side, and we'll stick with Daugherty 12 for a

17   minute.  Okay?

18           What I want you to draw your attention

19   on paragraphs 1 through 10 are all the different

20   matters that were open investigations from the DEA

21   into different Walgreens distribution centers and

22   pharmacies.

23           Do you see that?

24       MS. SWIFT:  Object to the form, foundation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY THE WITNESS:
 2         A.    I don't know what each item
 3    specifically --
 4    BY MR. MOUGEY:
 5         Q.    Then we will go through every single
 6    one.
 7         A.    -- is referring to.
 8         Q.    Let's start with paragraph 4.  You see
 9    that's the Jupiter distribution center, correct?
10         A.    Yes.
11         Q.    And if you get to paragraph 6, that
12    references retail pharmacies and you can see the
13    DEA numbers after the -- like on paragraph 6,
14    correct?
15         A.    I can see the DEA numbers, yes.
16         Q.    And if you turn to paragraph 7, there
17    are additional Walgreens retail pharmacies
18    referenced, correct?
19         A.    Yes.  I see another DEA number, other
20    DEA numbers.
21         Q.    And paragraph 8 are additional Walgreens
22    pharmacies, correct?
23         A.    Yes.
24         Q.    Paragraph 9 are additional Walgreens
```

1    pharmacies, correct?

2         A.    Yes.

3         Q.    And in paragraph 10 it says, "On

4    February 22, 2013, the ALJ consolidated the seven

5    cases into one consolidated proceeding that was

6    scheduled for an administrative hearing initially

7    on January 7, 2013, and then continued until

8    February 25, 2013 and again until April 23, 2013."

9              Do you see that?

10        A.    Yes.

11        Q.    So, there were seven different cases

12   consolidated into one, correct?

13        MS. SWIFT:  Object to the form, foundation.

14   BY THE WITNESS:

15        A.    It says the ALJ consolidated the seven

16   cases, yes.

17   BY MR. MOUGEY:

18        Q.    So, let's continue now on page 2 of 13,

19   at the bottom there.  We just went through the

20   first paragraph before we went into the e-mail

21   version.

22              The second sentence, "Furthermore,

23   Walgreens acknowledges that certain Walgreens

24   retail pharmacies did on some occasions dispense

1    certain controlled substances in a manner not fully

2    consistent with its compliance obligations under

3    the CSA," Controlled Substance Act.

4            Did I read that right?

5    A.    Yes.

6    Q.    "And its implementing regulations," and

7    it cites 21 CFR Part 1300.

8            Do you see that?

9    A.    Yes.

10   Q.    And it goes on, "Finally, Walgreens

11   acknowledges that its recordkeeping practices

12   regarding the dispensing of controlled substances

13   from certain retail pharmacies utilizing its CPO

14   facilities as central-fill pharmacies did not

15   require such original prescriptions to be marked

16   'Central Fill.'"

17           Do you see that?

18   A.    Yes.

19   Q.    Okay.  So, when you come on now and

20   you're at Walgreens six months with Pharmaceutical

21   Integrity, was there any sense of urgency in the

22   department to say what were we doing from our

23   distribution center that warranted these cases

24   being brought and what can we do differently going

1    forward?

2        MS. SWIFT:  Object to the form, foundation.

3    BY THE WITNESS:

4        A.    Not that I recall.

5    BY MR. MOUGEY:

6        Q.    Did anyone at Walgreens walk you through

7    the specifics of this significant amount paid by

8    Walgreens and where the problems were?

9        MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11       A.    Can you clarify what you mean by "the

12   specifics," because I did not walk through or get a

13   walk-through for these pages that you're showing me

14   here.

15   BY MR. MOUGEY:

16       Q.    Okay.  Well, then let's walk through

17   them.

18            So, on page 3 of 13, you see at the very

19   bottom of the page, (2), under "Distribution

20   Centers"?

21       A.    Yes.

22       Q.    And it says, "Failure regarding any

23   Distribution Center to maintain effective controls

24   against the diversion of controlled substances into

1  other than legitimate medical, scientific and

2  industrial channels, as required by," it cites to

3  the U.S. Code.

4          Do you see that?

5      A.    Yes.

6      Q.    And that's what's defined under

7  paragraph 2 is "Covered Conduct"?

8      A.    Yes.

9      Q.    And that paragraph underneath paragraph

10  2 continues on page 4 of 13, "The covered conduct

11  includes any failures to conduct adequate due

12  diligence to ensure that controlled substances were

13  not diverted into other than legitimate channels on

14  or before the effective date of this Agreement."

15          Do you see that as part of the

16  definition of covered conduct?

17      A.    Yes.

18      Q.    And paragraph 3, "Failure regarding any

19  distribution center to timely detect and report

20  suspicious orders of controlled substances as

21  required again by the U.S. Code."

22          Do you see that?

23      A.    Yes.

24      Q.    And that's part of the covered conduct

```
 1    of this agreement and the distribution center,

 2    correct?

 3          A.    Yes.

 4          Q.    No. 4, "Distributing controlled

 5    substances to pharmacies by any distribution center

 6    that the distribution center knew or should have

 7    known were engaged in any of the covered conduct

 8    listed in Section 1.2.b of this Agreement on or

 9    before the effective date."

10              That's part of the covered conduct,

11    correct?

12          A.    That's what it says under, yes.

13          Q.    And paragraph 5 is, "Failure regarding

14    any Distribution Center to make complete and

15    accurate ARCOS reports, on or before the effective

16    date."

17              Do you know what an ARCOS report is?

18          A.    I've heard the term.

19          Q.    But you're not familiar with what the

20    acronym stands for?

21          A.    No.

22          Q.    Do you understand what the function of

23    ARCOS is?

24          A.    I can't recall right now.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Does it even ring a bell generally?

2    A.    I have heard the term "ARCOS."

3    Q.    Other than knowing -- just heard the

4    term at some point, you don't know what it stands

5    for?

6    A.    Not right now.

7    Q.    And I asked what it stands for.  Let me

8    broaden that up.

9          You don't even know what ARCOS is other

10   than just heard the term before, right?

11   A.    I can't recall right now.

12   Q.    If you turn the page to 5 of 13, very

13   bottom of the page under "Terms and Conditions,

14   Obligations of Walgreens Distribution Centers."

15   A.    Which number?

16   Q.    1.

17   A.    Got it.

18   Q.    Let's go to C.  Do you see 1.c, it

19   begins with "Walgreens agrees" under the "Terms and

20   Conditions"?

21   A.    Yes.

22   Q.    "Walgreens agrees to the surrender of

23   Walgreens Jupiter's DEA registration," gives a

24   number, "for controlled substances Schedules II

1    through V until September 13, 2014."

2            Were you aware during your training at

3    Walgreens that Walgreens was surrendering its

4    Jupiter DEA registration for controlled substances

5    II through V?

6        MS. SWIFT:  Object to the form.

7    BY THE WITNESS:

8        A.    I can't recall if I was aware at the

9    time or not.

10   BY MR. MOUGEY:

11       Q.    Do you recall at any point in time being

12   informed by Walgreens that it was surrendering its

13   distribution centers registration for controlled

14   substances II through V?

15       A.    I may have been notified.  I just can't

16   recall at what point in time.

17       Q.    Or that you don't even recall being

18   told?

19       A.    I don't remember, no.

20       Q.    Yeah.  Page 6 of 13, "Walgreens agrees

21   to the surrender of DEA registrations to dispense

22   controlled substances II through V," and it lists

23   six facilities and I'm in paragraph E.

24           Do you see that?

1      A.    Yes.

2      Q.    Were you aware during your tenure in

3   2013 that your employer had surrendered six of its

4   pharmacy registrations and its ability to dispense

5   Schedule II through V prescription opiates?

6      A.    Yes.

7      Q.    You were?

8      A.    Yes.

9      Q.    And when did you become aware of that?

10     A.    I don't remember exactly when.

11     Q.    Was there a -- some training mechanism

12  where you and the rest of the Pharmaceutical

13  Integrity group kind of went through about what

14  happened when and how do we not repeat our

15  failures?

16     MS. SWIFT:  Object to the form.

17  BY THE WITNESS:

18     A.    No.

19  BY MR. MOUGEY:

20     Q.    Did you know specifically what the

21  problems were that Walgreens had agreed to suspend

22  its DEA registration for its six retail pharmacies

23  and its ability to distribute Schedule II through

24  V?

Highly Confidential - Subject to Further Confidentiality Review

```
1        MS. SWIFT:  Object to the form.

2   BY THE WITNESS:

3        A.    Not specifically, no.

4        MS. SWIFT:  We have been going for like an

5   hour and a half.  Can we get to a breaking point in

6   a minute?

7        MR. MOUGEY:  Sue.  We can stop there if you

8   want because I have a little ways to go with this

9   document.

10       THE VIDEOGRAPHER:  Going off the record at

11   2:32.

12              (WHEREUPON, a recess was had

13               from 2:32 to 2:45 p.m.)

14       THE VIDEOGRAPHER:  We're back on the record at

15   2:45.

16   BY MR. MOUGEY:

17       Q.    On page 7 of the document, the title at

18   the top of the page, "Walgreens General

19   Obligations."

20              Do you see that?

21       A.    Yes.

22       Q.    And under paragraph C that Walgreens

23   agreed to pay the United States $80 million?

24       A.    I see that.
```

1      Q.    What does that amount, $80 million, tell

2  you about the significance of this agreement?

3      MS. SWIFT:  Object to the form.

4  BY THE WITNESS:

5      A.    I can't speculate.

6  BY MR. MOUGEY:

7      Q.    I'm asking you what it tells you.  I'm

8  not asking you to speculate.  What does it tell

9  you?

10      MS. SWIFT:  Object to the form.

11  BY THE WITNESS:

12      A.    I know $80 million is a lot of money.

13  BY MR. MOUGEY:

14      Q.    And as a Walgreens employee, what does

15  the $80 million, a lot of money, tell you about the

16  significance of Walgreens' conduct covered in this

17  agreement?

18      MS. SWIFT:  Object to the form.

19  BY THE WITNESS:

20      A.    I can't speculate what that $80 million

21  means.

22  BY MR. MOUGEY:

23      Q.    Does it indicate to you, the

24  $80 million, the significant fine, does that

1    indicate the significant violations of Walgreens'

2    conduct in regard to its obligations under the

3    Controlled Substance Act, does it tell you how

4    important, how large those violations were?

5         MS. SWIFT:  Object to the form.

6    BY THE WITNESS:

7         A.    I can't speculate.

8    BY MR. MOUGEY:

9         Q.    When you started at Walgreens in

10   January of 2013, did anyone relay to you that there

11   were several open cases with the DEA regarding

12   dispensing and distribution violations?

13        A.    No, not that I recall.

14        Q.    Don't you think that would have been

15   important in your day-to-day job, identifying

16   suspicious orders, to know that Walgreens had seven

17   significant violations -- I'm sorry -- seven

18   significant investigations ongoing when you

19   started?

20        MS. SWIFT:  Object to the form.

21   BY THE WITNESS:

22        A.    I don't know if it would have been

23   important at the time.  My job was to basically

24   train our team and ensure that we were reporting

1    suspicious orders.

2    BY MR. MOUGEY:

3        Q.    You don't know whether the fact that

4    Walgreens was being investigated by the DEA in

5    seven different cases would have been important to

6    understand where the holes in the system were?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    For my job, to make sure that we were

10   reviewing all our flagged orders and reporting

11   orders suspicious, if they were suspicious, and

12   making sure that our pharmacists understood their

13   responsibility and our Good Faith Dispensing

14   policy, I don't know that that would have been --

15       Q.    That wouldn't have been important --

16       MS. SWIFT:  Let her finish her answer.

17   BY MR. MOUGEY:

18       Q.    That wouldn't have been important to

19   you?

20       MS. SWIFT:  Let her finish her answer.

21   BY THE WITNESS:

22       A.    I don't know if it would have made a

23   difference for my job.

24   BY MR. MOUGEY:

1    Q.    Did you ever take a test in your seven

2   years of college or graduate school and Doctorate

3   program where "I wish I would have done that

4   differently" and then gone back, went back the next

5   time and changed your practices?

6        MS. SWIFT:  Object to the form.

7   BY THE WITNESS:

8        A.    Would I wish I would have answered the

9   question differently on a test in school?  Yes.

10  BY MR. MOUGEY:

11       Q.    Or that you, the way you were studying

12  and the way you were implementing the curriculum

13  for your own day to day was maybe not the best way

14  and you went back later and changed it?

15       A.    Possibly.

16       Q.    You wouldn't think here that when you

17  came on board at Walgreens to know that there had

18  been open investigations for years before you

19  started, some sort of self-evaluation about what we

20  did wrong or what was wrong and what we could do

21  better going forward, that wouldn't have been

22  important to you as part of your job identifying

23  suspicious orders and reporting them to the DEA?

24       MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1    BY THE WITNESS:

2        A.    For my job to train our team and make

3    sure that we were reviewing flagged orders, I don't

4    know that that would have made a difference to the

5    role that I was in or at the time in 2013 and now.

6    BY MR. MOUGEY:

7        Q.    Under paragraph 4, "Obligations of the

8    DEA."  Section b, "Within five business days of the

9    effective date of this agreement, DEA agrees to

10   unlock the controlled substances storage area of

11   Walgreens Jupiter and make its contents available

12   to Walgreens for any lawful transfer or reverse

13   distribution of the inventory contained therein to

14   an appropriate DEA registrant."

15           Did I read that right?

16       A.    Yes.

17       Q.    So, you're telling this jury that the

18   first several months you were at Walgreens before

19   this agreement was reached, you don't think it

20   would be important to know why the DEA locked the

21   controlled substance storage area at the Walgreens

22   Jupiter distribution center?

23       MS. SWIFT:  Object to the form.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     For my job, I was tasked to ensure that

2     we were reporting suspicious orders and reviewing

3     all the flagged orders.

4     BY MR. MOUGEY:

5          Q.     But you --

6          A.     I don't know --

7          MS. SWIFT:  Let her finish her answer.

8     BY THE WITNESS:

9          A.     I don't know that it would have made a

10    difference in my job day to day.

11    BY MR. MOUGEY:

12         Q.     If you go back to the stipulation and

13    agreement on page 2 of 3 that "Walgreens

14    acknowledges that suspicious order reporting per

15    distribution center" --

16         MS. SWIFT:  She is still getting there.

17    BY MR. MOUGEY:

18         Q.     Are you there?

19         A.     Yes.

20         Q.     "Walgreens acknowledges that suspicious

21    order reporting for distribution to certain

22    pharmacies."

23                Now, that's what you were doing, right?

24         MS. SWIFT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.    My team was tasked to report suspicious

 3   orders.

 4   BY MR. MOUGEY:

 5       Q.    That's right.  That's the same conduct

 6   that's covered under the stipulation and agreement.

 7   Correct?

 8       MS. SWIFT:  Object to the form, foundation.

 9   BY THE WITNESS:

10       A.    I don't know that to be true.

11   BY MR. MOUGEY:

12       Q.    Similar scope of responsibility, similar

13   job description.  You were in charge of suspicious

14   order identification and reporting, right?

15       MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17       A.    My job was to report suspicious orders.

18   BY MR. MOUGEY:

19       Q.    And part of the conduct that's part of

20   this stipulation and agreement is suspicious order

21   reporting for distribution centers, correct?

22       MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24       A.    It says, "Walgreens acknowledges that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    suspicious order reporting for distribution to

2    certain pharmacies did not meet standards."

3              Yes, I see that.

4    BY MR. MOUGEY:

5         Q.    Right.  And identifying suspicious

6    orders is what you went to work every day and that

7    was your job, right?

8         A.    Yes.

9         Q.    And Walgreens is agreeing to a

10   significant fine covering very similar conduct that

11   you were charged with fulfilling on a day-to-day

12   basis, right?

13        MS. SWIFT:  Object to the form.

14   BY THE WITNESS:

15        A.    I don't know that to be true.  I haven't

16   read all 343 pages.

17   BY MR. MOUGEY:

18        Q.    Well, just the general description --

19        A.    I don't know.

20        Q.    -- of suspicious orders is your general

21   job responsibility, right?

22        MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24        A.    My responsibility is reporting
```

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious orders, yes.

2    BY MR. MOUGEY:

3        Q.    And you would have absolutely -- you'd

4    place no importance on understanding what the

5    failures were identified in this agreement and

6    incorporating those lessons learned into your

7    day-to-day responsibility at Walgreens going

8    forward?

9        MS. SWIFT:  Objection; mischaracterizes the

10    testimony and assumes facts.

11    BY THE WITNESS:

12        A.    My responsibility was to make sure that

13    we were following the requirements and part of this

14    document related to Pharmaceutical Integrity and

15    our team, yes.  Not on this page.

16    BY MR. MOUGEY:

17        Q.    But the question I asked was a little

18    different.

19            You would place no importance on

20    understanding what the failures that were

21    identified in this agreement and incorporating

22    those lessons learned into your day-to-day

23    responsibility at Walgreens going forward?

24        MS. SWIFT:  Object to the form,

Highly Confidential - Subject to Further Confidentiality Review

 1   mischaracterizes the testimony and assumes facts.

 2   BY THE WITNESS:

 3        A.    I don't know what lessons learned are in

 4   this document.  My responsibility was to report

 5   suspicious orders.

 6   BY MR. MOUGEY:

 7        Q.    I recognize that you don't understand

 8   what lessons learned were in this document because

 9   you've never reviewed it in detail, right?

10        MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12        A.    I have not read this document --

13   BY MR. MOUGEY:

14        Q.    And no one --

15        A.    -- from page to page.

16        MS. SWIFT:  Let her finish her answer.

17        MR. MOUGEY:  I understand and as soon as she

18   starts talking I stop.  I don't understand when

19   she's finished and not.

20   BY MR. MOUGEY:

21        Q.    So, as soon as you're not done, if

22   you're not done, just please tell me and I'll stop.

23   But when you stop, I start talking.  I'm not trying

24   to interrupt you.  So, if you're not finished, just

Highly Confidential - Subject to Further Confidentiality Review

```
 1    let me know.  Okay?

 2         A.    Okay.

 3         Q.    So, you mean to tell me 343 pages of

 4    lessons learned and no one from Walgreens ever sat

 5    down and said, "Hey, here's the document, here's --

 6    here's what we've -- here's the lessons learned

 7    from this document.  Here's what we can do better

 8    going forward."  No one ever sat you down and

 9    walked you through that?

10         MS. SWIFT:  Object to the form,

11    mischaracterizes the document.

12    BY THE WITNESS:

13         A.    I walked through a handful of pages in

14    this document, yes.

15    BY MR. MOUGEY:

16         Q.    And the question that I asked you wasn't

17    whether you walked through a handful.  Let's do it

18    a third time.

19              So, 343 pages of lessons learned and no

20    one from Walgreens ever sat your team down and

21    said, "Here's what we've learned from this

22    document.  Here's what we can do better going

23    forward."  No one ever sat you down and walked you

24    through anything similar to that?
```

```
 1          MS. SWIFT:  Object to the form.

 2   BY THE WITNESS:

 3          A.    We sat down and talked through the

 4   requirements that were in this document related to

 5   Pharmaceutical Integrity.

 6   BY MR. MOUGEY:

 7          Q.    And how were those -- how were those

 8   relayed to you?  In what format?

 9          A.    We sat down and went through each item

10   in the document.

11          Q.    So, did you look through -- I'm sorry.

12   You went through -- your answer before was,

13   "I walked through a handful of pages in this

14   document."

15          So, did you walk through a handful of

16   pages or did you walk through this document in

17   detail and figure out what lessons Walgreen had

18   learned and incorporate those into your day-to-day

19   responsibilities as you got started at Walgreens?

20          MS. SWIFT:  Object to the form.

21   BY THE WITNESS:

22          A.    We at Walgreens and Rx Integrity walked

23   through a few of the pages in this document

24   requiring specific things related to the
```

```
 1    Pharmaceutical Integrity team.

 2    BY MR. MOUGEY:

 3         Q.    Pharmaceutical Integrity is responsible

 4    for good faith dispensing at the pharmacy level,

 5    right?

 6         A.    Yes.

 7         Q.    And the pharmaceutical team is

 8    responsible for identifying suspicious orders from

 9    the distribution centers, right?

10         MS. SWIFT:  Object to the form.

11    BY THE WITNESS:

12         A.    We were responsible, yes.

13    BY MR. MOUGEY:

14         Q.    And nobody thought it was important to

15    go through this document in detail and go through

16    issue by issue and kind of a lessons learned type

17    strategy going forward?

18         MS. SWIFT:  Object to the form.

19    BY THE WITNESS:

20         A.    I don't know if anybody thought it was

21    important.

22    BY MR. MOUGEY:

23         Q.    But in your group no one went through it

24    in that kind of detail?
```

```
 1        MS. SWIFT:  Object to the form.

 2   BY THE WITNESS:

 3        A.    Not every single page in this document,

 4   no.

 5   BY MR. MOUGEY:

 6        Q.    Nothing more than a handful of pages as

 7   you referenced earlier, correct?

 8        A.    The pages related to our team in

 9   Pharmaceutical Integrity and what was required of

10   us, yes.

11        Q.    All 343 pages pertained to one

12   dispensing and, two, distribution centers and

13   suspicious orders, correct?

14        MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16        A.    I don't know.

17        MS. SWIFT:  Do you want her to look at the

18   whole 343 pages?

19   BY THE WITNESS:

20        A.    I haven't read this whole document.  I

21   don't know.

22        MS. SWIFT:  For the record you've already

23   made -- you've already said earlier this is

24   multiple documents.  If you want to talk about
```

Highly Confidential - Subject to Further Confidentiality Review

1   which part of the document you're talking about,

2   but you're misrepresenting the document.

3   BY MR. MOUGEY:

4        Q.    Do you see the "Procedural Background"

5   in 1 through 7?  I mean 1 through 10.  I'm sorry.

6   Right?

7        A.    Yes.

8        Q.    All dispensing and distribution centers,

9   correct?

10       MS. SWIFT:  Object to the form.

11   BY THE WITNESS:

12       A.    I don't know if they're related to all

13   dispensing and distribution centers.  I see Jupiter

14   and I see some DEA numbers in some of these items,

15   yes.

16   BY MR. MOUGEY:

17       Q.    Let's do it like this.  Here we are,

18   2018.  343 pages, significant fine, and you don't

19   know the specifics about what's in this document.

20   Is that a fair way to do it?

21       MS. SWIFT:  Object to the form,

22   mischaracterizes the documents.

23   BY THE WITNESS:

24       A.    I know what was important to my team and

1    what we needed to know for our job functions

2    related to Rx Integrity.

3    BY MR. MOUGEY:

4        Q.    But if you haven't reviewed the entire

5    document, how do you know what pieces are important

6    to your team?

7        A.    It specifically calls out our team and

8    Rx Integrity in the document.

9        Q.    You think that this document covers the

10   conduct of Pharmaceutical Integrity and that's the

11   reason for the significant fine?

12       MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14       A.    No.

15       MS. SWIFT:  Mischaracterizes the testimony.

16   BY MR. MOUGEY:

17       Q.    Your testimony was, "It specifically

18   calls out our team and Rx Integrity in the

19   document."

20           Why don't we go to page 11.  Do you see

21   "Addendum:  Prospective Compliance"?

22       A.    Yes.

23       Q.    "A.  General.  1.  Walgreens will

24   maintain a Department of Pharmaceutical Integrity,

1    composed of personnel with pharmacy-related

2    training and managerial personnel, who shall be

3    trained in relevant diversion-related issues, to

4    coordinate compliance efforts related to controlled

5    substances."

6            That's you, right?

7    A.    Yes.

8    Q.    So, when you said Pharmaceutical

9    Integrity was called out in this document, is that

10   what you're referencing?

11   A.    Yes.

12   Q.    Any other recollection of Pharmaceutical

13   Integrity being referenced in this document?

14   A.    No.

15   Q.    So, when you say that we went through

16   this document in sections that called out

17   Pharmaceutical Integrity, that's what you're

18   referencing on page 11 under "Addendum:

19   Prospective Compliance," correct?

20   A.    Yes.

21   Q.    Who was the dedicated contact person for

22   the DEA as elaborated on in Section A of page 11?

23   MS. SWIFT:  Object to form.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    We created a dedicated e-mail address

2   for the DEA.

3   BY MR. MOUGEY:

4        Q.    And what was that?

5        A.    It was DEArecordsrequest@Walgreens.com.

6        Q.    And who had access to the

7   DEArecordsrequest@Walgreens.com?

8        A.    Our team, Rx Integrity, and Tasha.

9        Q.    Tasha Polster, right?

10       A.    Yes.

11       Q.    So, it's essentially Pharmaceutical

12  Integrity?

13       A.    Yes.

14       Q.    The e-mail that you mentioned earlier,

15  the e-mail address that was a group e-mail that

16  was -- that was RxIntegrity@Walgreens.com, who had

17  access to that e-mail address?

18       A.    Our team, Rx Integrity.

19       Q.    Anybody else outside of your team had

20  access?

21       A.    Not that I know of.

22       Q.    Anybody else outside of your team have

23  access to the DEA e-mail?

24       A.    Not that I know of.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So, when the DEA says, "Within one month

2    of the effective date of this agreement Walgreens

3    will identify a dedicated contact point," and it

4    says, "(including a dedicated e-mail address) for

5    DEA within the Department of Pharmaceutical

6    Integrity to facilitate Walgreens' responses to DEA

7    requests for information and documents,

8    specifically including responses to requests for

9    dispensing log data and" -- I never can pronounce

10    that.

11    A.    Pseudoephedrine.

12    Q.    Thank you.  Data.  That was a dedicated

13    e-mail address that Walgreens decided to comply

14    with that?

15    A.    That was the dedicated e-mail address,

16    DEArecordsrequest.

17    Q.    If you would turn to page 23, "Order to

18    Show Cause and Immediate Suspension of

19    Registration."

20          Are you there?

21    A.    Yes.

22    Q.    Okay.  Do you see the date at the top?

23    A.    Yes.

24    Q.    Why don't you read that date out loud.

```
1        A.      September 13, 2012.

2        Q.      That's within three months of you

3   starting at Walgreens, correct?

4        A.      Yes.

5        Q.      And the title of this page 23, "Order to

6   Show Cause and Immediate Suspension of

7   Registration."

8                Do you see that?

9        A.      Yes.

10       Q.      And we were -- when we were going

11   through the applicable U.S. Code earlier, you

12   recall that the Department of Justice and, more

13   specifically, the DEA had the ability to

14   immediately suspend a distribution center if that

15   registration constituted an imminent danger to the

16   public health and safety.  Do you recall that?

17       MS. SWIFT:  Objection; lacks foundation.

18   BY THE WITNESS:

19       A.      When we were going through earlier, no,

20   I don't.

21   BY MR. MOUGEY:

22       Q.      Do you see in the first paragraph under

23   "Notice"?

24       A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    That "because such registration

2  constitutes an imminent danger to the public health

3  and safety"?

4      A.    Yes.

5      Q.    Wouldn't you have liked to have known

6  that the DEA believed that one of the distribution

7  centers for Schedule II to V opiate prescriptions

8  constituted an imminent danger to the public health

9  and safety when you got started?

10     MS. SWIFT:  Object to the form.

11  BY THE WITNESS:

12     A.    I don't know that I would have liked to

13  know at the time as my role was really to start up

14  the team and make sure that we were training the

15  team.

16  BY MR. MOUGEY:

17     Q.    That wouldn't have been important to you

18  either?

19     A.    I don't know if I would have liked to

20  know if it would have changed --

21     Q.    Do you know of any other --

22     A.    -- my job.

23     Q.    Do you know if any other distribution

24  centers had received subpoenas or under

1    investigation from the DEA when you started or

2    shortly thereafter?

3         MS. SWIFT:  Object to the form.

4    BY THE WITNESS:

5         A.    No.

6    BY MR. MOUGEY:

7         Q.    But you don't even know which

8    distribution centers, sitting here in late 2012,

9    early 2013, were responsible for distributing

10   Schedule II and III opiate prescriptions?

11        A.    I think I know sitting here today that

12   it was Jupiter and seeing this and Perrysburg, and

13   that's what I can recall.

14        Q.    And Woodland, California?

15        A.    Yes, and Woodland.

16        Q.    There's three?

17        A.    Yeah.

18        Q.    So, one of them, according to the DEA,

19   constituted an imminent danger to the public health

20   and safety within a couple months of you starting

21   but no one informed you of that fact, correct?

22        MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24        A.    No, not when I started.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MOUGEY:

2         Q.    And you mentioned Perrysburg.  How are

3    you familiar with Perrysburg?

4         A.    Perrysburg holds our power of attorney.

5    So, they are the ones that actually execute the

6    C-II orders for our stores, for all our stores.

7         Q.    After Jupiter was shut down?

8         MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10        A.    I don't know if Perrysburg was doing it

11   after or before.  I know that they're doing it now.

12   BY MR. MOUGEY:

13        Q.    Are you aware that Perrysburg also

14   received subpoenas from the DEA in early '13?

15        A.    From the deposition prep.

16        Q.    Just from the deposition prep, but not

17   while you were employing your functions as

18   identifying suspicious orders for Walgreens in

19   early 2013?

20        A.    Not that I recall.

21        Q.    Would that have been good to know, that

22   Perrysburg had received subpoenas from the DEA in

23   early '13 when you were identifying suspicious

24   orders?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  Object to the form,

 2   mischaracterizes the testimony.

 3   BY THE WITNESS:

 4        A.    I think at the time what -- I don't know

 5   if I would have liked to know as it wouldn't have

 6   changed the role of me training our team and

 7   ensuring that we are reporting suspicious orders,

 8   reviewing flagged orders and doing the other tasks

 9   that were part of my job.

10   BY MR. MOUGEY:

11        Q.    If the DEA is firing off subpoenas, does

12   that -- does that -- is that an indicia of "I ought

13   to look a little harder at Perrysburg" in your job

14   day to day and what you're doing?

15        MS. SWIFT:  Object to the form.

16   BY THE WITNESS:

17        A.    I don't know what you mean by looking at

18   a little harder.

19   BY MR. MOUGEY:

20        Q.    Well, I mean, you're --

21        A.    We get subpoenas today, every day from

22   the DEA.  I don't know what you mean.

23        Q.    No big deal?

24        A.    They're a big deal in that we have to
```

```
 1   respond to them, yes, absolutely, and within two

 2   business days.

 3        Q.    Similar answer with the $80 million

 4   fine?

 5        MS. SWIFT:  Object to the form.

 6   BY THE WITNESS:

 7        A.    I don't know what the question is.

 8   BY MR. MOUGEY:

 9        Q.    We get them every day.  No big deal.  We

10   didn't have to go through the 343 pages.  It

11   really -- just the one page that referred to us in

12   Pharmaceutical Integrity, that's what we looked at.

13   Is that similar?

14        A.    No.

15        MS. SWIFT:  Object to the form of the

16   question.

17   BY MR. MOUGEY:

18        Q.    If you would, please, turn to page 27.

19   Actually, let me stop.  I'm sorry.  I skipped a

20   section.

21             On page 25.  Do you see at the bottom,

22   under paragraph 7, about four or five lines up that

23   begins with "Walgreens knew or should have known"?

24        A.    Is it under No. 6 or 7?
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    7.

2    A.    Yes, I see that.

3    Q.    "Walgreens knew or should have known

4    about their obligations to report suspicious orders

5    as such obligations were spelled out in detail in

6    three letters from DEA's Deputy Assistant Director,

7    Office of Diversion Control, sent to every

8    registered manufacturer and distributor, including

9    Respondent, on September 27, 2006, February 7,

10   2007, and December 27, 2007.  The purpose and

11   proper implementation of suspicious order reporting

12   programs was further discussed in the industry's

13   own trade organization, the Healthcare Distribution

14   Management Association, in 'Industry Compliance

15   Guidelines:  Reporting Suspicious Orders and

16   Preventing Diversion of Controlled,' published in

17   2008."

18          Did I read that right?

19   A.    Yes.

20   Q.    Were any of those documents that I just

21   referenced provided to you as part of your training

22   for identifying suspicious orders and then

23   reporting them to the DEA?

24   MS. SWIFT:  Object to the form.

```
 1    BY THE WITNESS:

 2         A.    No, I don't recall receiving them.

 3    BY MR. MOUGEY:

 4         Q.    Any of them?

 5         A.    I don't recall receiving them.

 6         Q.    But you'd agree that the DEA letters and

 7    the trade association's material referenced in

 8    page 25 and 26 of this exhibit are or would have

 9    been helpful tools for understanding your role

10    identifying suspicious orders and reporting them to

11    the DEA, correct?

12         A.    No.

13         Q.    No, you don't agree that they would be

14    helpful, or -- or no, you didn't get them?

15         A.    I don't think that it would have changed

16    my job in Rx Integrity.

17         Q.    Isn't it kind of hard to say that

18    without ever seeing them?

19         A.    Well, I've seen them now.

20         Q.    That wouldn't have been helpful.  But

21    you haven't seen the HDMA materials, right?

22         A.    No, I have not.

23         MS. SWIFT:  Object to the form.

24    BY MR. MOUGEY:
```

1      Q.     You haven't seen the Industry Compliance

2  Guidelines, right?

3      A.     No.

4      Q.     But sitting here you can tell this jury

5  you're pretty sure that they wouldn't have been

6  helpful in fulfilling your obligations, identifying

7  suspicious orders and reporting them to the DEA,

8  right?

9      A.     Since I have not seen them, I don't know

10  if they would have been helpful or not.

11      Q.     Right.  So, the answer is not --

12      A.     But the letters in part I have seen.

13      Q.     You have seen?

14      A.     Well, you just showed them to me.

15      Q.     Sure.  But I'm not talking in 2018.  I'm

16  talking about back in 2013 when you started, these

17  would have been good tools to help you understand

18  what your -- what your day-to-day responsibilities

19  were with identifying suspicious orders and

20  reporting those to the DEA, right?

21      A.     I don't know that it would have changed

22  my job and responsibilities --

23      Q.     But you --

24      A.     -- back in 2013.

1    Q.    But you --

2    A.    For those letters.

3    Q.    But you don't know because you never saw

4    them?

5    MS. SWIFT:  Object to the form,

6    mischaracterizes the testimony.

7    BY THE WITNESS:

8    A.    I don't know because I did not see the

9    letters at that time.

10   BY MR. MOUGEY:

11   Q.    You didn't see the letters or you didn't

12   see the industry trade organization material,

13   correct?

14   A.    I did not.

15   Q.    If you would, please, turn to page 27.

16   And you were -- you were a practicing pharmacist at

17   one point in your career, correct?

18   A.    Yes.

19   Q.    And, so, like if I go to Walgreens and

20   pick up a prescription, that's when I'm interacting

21   usually with a technician or someone licensed

22   behind the counter, that would have been you,

23   right?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And Good Faith Dispensing places a

2  significant obligation on the pharmacist to

3  identify specific red flags with individuals trying

4  to fill prescriptions, right?

5      A.    Good Faith Dispensing, our Good Faith

6  Dispensing, Walgreens' Good Faith Dispensing policy

7  does make note of red flags and the pharmacist to

8  be aware of red flags when dispensing a

9  prescription.

10     Q.    And when someone -- if there is a red

11  flag and the kind of front line, so to speak, is

12  the pharmacist and his or her decision of whether

13  or not to fill that prescription, correct?

14     MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16     A.    It's the pharmacist's decision.  They

17  must use their professional responsibility using

18  their best judgment in determining whether the

19  prescription is legitimate to fill using their

20  corresponding responsibility.

21  BY MR. MOUGEY:

22     Q.    During your training at Walgreens have

23  you seen any evidence or indicia that Walgreens

24  pharmacists were concerned about their safety when

1    making the decision to not fill a prescription of

2    Schedule II and III opiates?

3        MS. SWIFT:  Object to the form.

4    BY THE WITNESS:

5        A.    Can you clarify "safety."

6    BY MR. MOUGEY:

7        Q.    They were afraid to walk to the car.

8        MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10       A.    That I don't recall.

11   BY MR. MOUGEY:

12       Q.    That you had individuals that had

13   examples of individuals that had picked up opiate

14   prescriptions at Walgreens pharmacies and were

15   smoking the pills in the bathroom?

16       A.    That --

17       Q.    Never heard of that?

18       A.    I don't recall.

19       Q.    Would that have been a useful tool when

20   helping discern what a suspicious order was and

21   when to report it to the DEA?

22       MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24       A.    It's up to our pharmacists to determine

1  whether each prescription is legitimate.  So, they

2  have to follow our Good Faith Dispensing policy and

3  they have to resolve any red flags that they

4  identify and they have to document it before they

5  fill it.  And if they don't feel that it's in their

6  best professional judgment to fill the

7  prescription, they have the right to refuse the

8  prescription.

9  BY MR. MOUGEY:

10      Q.    And if they refuse that prescription and

11  there is a drug seeker on the opposite end of the

12  counter, you can understand why that might cause

13  the pharmacist pause for concern if he or she was

14  worried about their safety, correct?

15      MS. SWIFT:  Object to the form.

16  BY THE WITNESS:

17      A.    I don't know the nature of that

18  interaction with the pharmacist and the patient and

19  what the patient would do to make that pharmacist

20  feel not safe.  I don't know.

21  BY MR. MOUGEY:

22      Q.    So, you haven't -- you haven't seen any

23  indication that any pharmacist within Walgreens

24  operations were scared to walk to the car after

 1   their shift?

 2        A.    I can only speculate.  I don't know.

 3        Q.    I'm not asking you to speculate.  I'm

 4   saying you're not aware of any examples of

 5   Walgreens pharmacists scared to walk to their car

 6   after their shift?

 7        A.    Not that I can recall.

 8        Q.    You're not aware of any drug deals being

 9   conducted in Walgreens' parking lot after someone

10   filled their prescription of a Schedule II or III

11   opiate?

12        A.    Personally?

13        Q.    Yes.

14        A.    Not that I can recall, no.

15        Q.    When I say "personally," I mean anyone

16   reporting that to you in Pharmaceutical Integrity.

17        A.    Not at this point that I can recall.

18        Q.    Sitting here, do you recall any

19   instances where there was any reports that

20   Walgreens had individuals smoking prescription

21   opiates in the restroom facilities at Walgreens

22   after filling their prescription?

23        A.    Not that I can recall at this time, no.

24        Q.    At any point in time during your tenure

1    at Walgreens did you reduce an order so it would

2    not or no longer be deemed suspicious?

3         A.    No.

4         Q.    Did -- was there a mechanism at

5    Walgreens at any point in time you were familiar

6    with that an incoming order could be reduced to a

7    certain threshold and then Walgreens deem that

8    order not suspicious?

9         MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11        A.    Can you repeat that.

12   BY MR. MOUGEY:

13        Q.    At any point in time when you were at

14   Walgreens were you aware that there were any

15   policies where orders could be reduced below

16   certain thresholds and not deemed suspicious and,

17   as a result, weren't reported to the DEA?

18        MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20        A.    No.

21   BY MR. MOUGEY:

22        Q.    Do you think that the suspicious order

23   reporting requirement under the U.S. Code and the

24   regs thereunder are only for orders or for

1    shipments?

2        MS. SWIFT:  Object to the form, foundation.

3    BY THE WITNESS:

4        A.    I don't know.

5    BY MR. MOUGEY:

6        Q.    Do you understand what the word

7    "systemic" means?

8        A.    Yes.

9        Q.    What does the word "systemic" mean to

10   you?

11       A.    So, I think widespread.

12       Q.    So, if there were systemic shortcomings

13   at Walgreens with its system to identify suspicious

14   reports and reporting those to the DEA, that would

15   mean across the company, correct?

16       MS. SWIFT:  Object to the form, vague,

17   foundation.

18   BY THE WITNESS:

19       A.    I think widespread, that's what systemic

20   means.

21   BY MR. MOUGEY:

22       Q.    All right.  Let's just -- let's turn to

23   page 33, paragraph 23.  That begins with "Voluntary

24   dispensing."

1          Do you see that?

2     A.     Yes.

3     Q.     And do you see the word "systemic" in

4  the third line?

5     A.     Yes.

6     Q.     And I'm going to replace "systemic" with

7  your word of "widespread," and you tell me if that

8  sentence is accurate.

9          "Voluntary dispensing restrictions

10  enacted either in anticipation of, or in reaction

11  to regulatory action, do not indicate to me that

12  Respondent and its parent company have recognized

13  and adequately reformed the widespread shortcomings

14  discussed herein."

15          So, other than the replacement of

16  "widespread" into "systemic," did I read that

17  sentence correctly?

18     MS. SWIFT:  Object to the form.

19  BY THE WITNESS:

20     A.     You read the sentence correctly, yes.

21  BY MR. MOUGEY:

22     Q.     Do you believe it would have been

23  important for you to know that the DEA believed

24  there were widespread shortcomings within

1  Walgreens' suspicious ordering system and the

2  reports, subsequent reports to the DEA?

3      A.    I don't know that it would have changed

4  my job and the responsibilities of my job, which

5  was to report suspicious orders and flagged orders,

6  reviewing flagged orders at the time.

7      Q.    And, again, I'm confused.  If the DEA is

8  saying that there is systemic widespread

9  shortcomings in a system that you're operating in,

10  you wouldn't have wanted to know that when you

11  started at Walgreens in early 2013 through the

12  summer of 2013, that there were potential problems

13  in the system you were operating?

14      MS. SWIFT:  Object to the form.

15  BY THE WITNESS:

16      A.    I don't know what this is -- what time

17  frame this is exactly referring to.  But when I was

18  working in Rx Integrity and when we were managing

19  our processes and reviewing orders and approving or

20  not approving orders through CSO KPI, I don't know

21  that I would have needed to know that.

22  BY MR. MOUGEY:

23      Q.    Can you go down to the sentence in the

24  right-hand side that says, "I gave significant

1    weight."

2            Do you see where I am?

3        A.    Yes.

4        Q.    "I gave significant weight to the fact

5    that Walgreens appears to have deliberately

6    structured certain of its anti-diversion measures

7    to avoid learning about and/or documenting evidence

8    consistent with diversion."

9            Do you see that sentence?

10       A.    Yes.

11       Q.    "At best, I regard this as deliberate

12   indifference on Walgreens' part as its obligations

13   as a DEA registrant."

14           Do you believe the DEA's concerns about

15   Walgreens' indifference would have been important

16   for you to know as you were implementing your job

17   responsibilities identifying suspicious orders and

18   reporting them to the DEA?

19       MS. SWIFT:  Object to the form.

20   BY THE WITNESS:

21       A.    I don't know this to be true.  So, no, I

22   don't know.

23   BY MR. MOUGEY:

24       Q.    But you wouldn't have wanted to know

1    that the DEA had concerns?

2         MS. SWIFT:  Same objection.

3    BY THE WITNESS:

4         A.    Again, I don't know that it would have

5    changed my role and my job responsibilities in

6    reporting suspicious orders.

7    BY MR. MOUGEY:

8         Q.    But that's a little different than the

9    question I'm asking.

10             The question I'm asking, wouldn't it

11   have been important, wouldn't it have been a factor

12   in your decision-making to know that the DEA

13   believed there were widespread shortcomings when

14   you were fulfilling your critical task of

15   identifying suspicious orders and reporting them to

16   the DEA?  That wouldn't have been important to you?

17        MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19        A.    I don't know if I would have wanted to

20   know, if it would have been important to me back in

21   2013.

22   BY MR. MOUGEY:

23        Q.    When you say you don't know, I mean, you

24   are highly educated, seven years, I mean a

Highly Confidential - Subject to Further Confidentiality Review

1    Doctorate degree.  You've spent seven years of your

2    life gathering information, understanding how to

3    incorporate that information in your day-to-day job

4    duties, right?

5         A.    Yes.

6         Q.    I mean, information is critical in what

7    you do on a day-to-day basis, right?

8         A.    Yes.

9         Q.    I mean, go back to when you were

10   operating as a pharmacist.  If you mixed two kinds

11   of pills incorrectly, that could have catastrophic

12   consequences for the patient, correct?

13        A.    Yes.

14        Q.    I mean, if you mixed and matched, all

15   the information is essential to what you do every

16   day, right?

17        A.    Yes.

18        Q.    And there is no way you can sit and tell

19   a jury that information isn't paramount in the

20   pharmaceutical business, right?

21        MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23        A.    Information is important in the role in

24   my job, yes --

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And here --

2      A.    -- in doing my job.

3      Q.    Here I'm asking you repeatedly, wouldn't

4  have this information been important in you filling

5  the function of identifying suspicious orders and

6  reporting them to the DEA and you are repeatedly

7  telling me, "I don't know."  What is the

8  difference?

9      A.    I don't know at the time if this

10 information would have made a difference in my role

11 in doing my job.

12     Q.    But as a pharmacist, you're trained to

13 make sure you gather all of the applicable

14 information and incorporate that into what you do

15 in your job responsibilities, correct?

16     A.    I am trained to gather information, yes.

17     Q.    And as a pharmacist you have access to

18 huge databases that Walgreens puts up that when

19 prescriptions come in that flag and spot and you

20 use as tools in your day-to-day job, right?

21     MS. SWIFT:  Object to the form.

22 BY THE WITNESS:

23     A.    I have access to our CSO KPI tool, yes,

24 that we review flagged orders.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MOUGEY:

 2        Q.    But as a -- and your role as a

 3   pharmacist, in your first career at Walgreens, you

 4   have access to tremendous amount of resources,

 5   spotting red flags with different prescriptions,

 6   correct?

 7        A.    When I first started in my job?  Are you

 8   talking about like back --

 9        Q.    In your role as a pharmacist.

10        A.    In my role as a pharmacist.  I have

11   access to -- can you give me a little, an example?

12        Q.    You tell me.

13        A.    Clarify.

14        Q.    You tell me.  I mean, there is all kinds

15   of tools that Walgreens had available to you in

16   your role as a pharmacist to help spot potential

17   problems with prescriptions to clients, correct?

18        A.    So, yeah, our DUR system, our Drug

19   Utilization Review --

20        Q.    And your job --

21        A.    -- process.

22        Q.    -- was to review all of the information

23   available to make sure there were no problems,

24   right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  Object to the form.

 2   BY THE WITNESS:

 3        A.    To ensure that the prescription didn't

 4   interact with any of the prescriptions the patient

 5   was on.  To that extent, yes.

 6   BY MR. MOUGEY:

 7        Q.    And when you go to the pharmacist and

 8   they give you some warnings and tell you how to use

 9   it and how often and make sure you don't take it

10   with this, that's all part of your job, right?

11        A.    When I was in the pharmacy filling

12   prescriptions.

13        Q.    Thank you.

14        A.    Yes.

15        Q.    Let's go back to the Pharmaceutical

16   Integrity.  I've asked you repeatedly about all

17   kinds of information that was in these 343 pages,

18   and you said, "I don't know if that will help me or

19   not."

20            The information that was available to

21   Walgreens is critical for you in identifying

22   potential problems in the distribution system,

23   correct?

24        MS. SWIFT:  Object to the form.
```

```
 1    BY THE WITNESS:

 2         A.    I don't know what information you're

 3    referring to that was available to Walgreens.

 4    BY MR. MOUGEY:

 5         Q.    If the -- any information that would

 6    have helped you do your job and that the DEA

 7    thought there was problems, for example, that the

 8    Schedule II and III narcotics cage in the Jupiter

 9    center that was padlocked, wouldn't you have wanted

10    to know why it was padlocked?

11         A.    I don't know if I would have wanted to

12    know at the time in the course of doing my job.

13         Q.    The answer is of course --

14         A.    In my role.

15         Q.    -- of course you would want to know?

16         A.    I don't know that it would have made a

17    difference.

18         Q.    Of course you would want to know.  Every

19    day your job is to make sure you are identifying

20    problems in the system that the DEA said was

21    critical, your job is to protect the distribution

22    system and pills being diverted out of that system.

23               Wouldn't you want all the information

24    that you could possibly get your hand around so you
```

1    could make the best decision you could?

2        A.    I don't know if it would have changed --

3        Q.    I'm not asking --

4        A.    -- the course of me doing my job --

5        Q.    I'm not asking --

6        A.    -- knowing that information.

7        Q.    I'm not asking you.  I get that's your

8    drumbeat answer.  I'm confident that's what you all

9    discussed beforehand.

10           But what I'm asking you is not if it

11   would have changed your decision.  What I'm asking

12   you is something different.

13           Isn't it important, with somebody with

14   their Doctorate degree, that you have access to all

15   of the information so you can make intelligent

16   decisions in your critical function, identifying

17   suspicious orders and reporting them to the DEA?

18   Why would you not want all the information you

19   could gather?

20       MS. SWIFT:  Object to the form.  Which

21   question do you want her to answer?

22   BY THE WITNESS:

23       A.    Can you repeat the question.

24   BY MR. MOUGEY:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     Just answer one of them.

2     A.     I don't think that this information -- I

3  don't know if it would have made a difference and

4  if I would have wanted to know at the time, and I

5  don't think that it would have changed what I was

6  doing in my role at Rx Integrity, which was

7  reporting suspicious orders.

8            I don't know if I would have wanted to

9  know at the time, honestly.

10    Q.     Do you believe that there were issues

11 with pills migrating from one area of the country

12 to another area?

13    MS. SWIFT:  Object to the form.

14 BY THE WITNESS:

15    A.     What do you mean by "pills migrating

16 from"?

17 BY MR. MOUGEY:

18    Q.     Do you know what the word "migration"

19 means?

20    A.     Moving, yes.

21    Q.     So, if there were pills being dispensed

22 in, say, Florida that were ending up in other parts

23 of the country, for example, Ohio, would that have

24 been an important fact that you would want to know

1  in your job identifying suspicious orders and

2  reporting them to the DEA?

3      A.   I had --

4      MS. SWIFT:  Object to the form.

5  BY THE WITNESS:

6      A.   I had seen that in the news that there

7  were people going, driving to Florida and from

8  other states and going back home and getting their

9  prescriptions in Florida, yes.  I was aware of

10 that.

11 BY MR. MOUGEY:

12     Q.   And when was that discussed internally

13 at Walgreens in part of the training to make sure

14 that that loophole was closed?

15     MS. SWIFT:  Object to the form.

16 BY THE WITNESS:

17     A.   I don't honestly recall when -- when we

18 talked about it or if we talked about it.

19 BY MR. MOUGEY:

20     Q.   And do you have any understanding at

21 Walgreens if you ever discussed how big of a

22 problem it was?

23     A.   I don't recall discussing specifics.

24     Q.   Do you recall discussing it generally?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes, I just said I do recall discussing

2    that patients were driving from other states to

3    Florida to get their prescriptions.

4      Q.    I'm sorry.  I thought you said that you

5    recalled seeing it on the news?

6      A.    And seeing it on the news and discussing

7    it, yes.

8      Q.    So, did anyone -- was anyone asked to

9    put together a presentation or a PowerPoint to

10   educate all of these new folks in Pharmaceutical

11   Integrity about the scale and scope of the problem?

12     A.    No.

13     Q.    Why don't you turn to page 41.  Let's

14   look at the last sentence on the bottom of page 41

15   that begins with "DEA."  Let me know when you're

16   there.

17     A.    Okay.

18     Q.    "DEA, State and local law enforcement

19   investigations reveal that thousands of drug

20   seekers flock to these Florida-based pain clinics

21   to obtain their supply of oxycodone and other

22   controlled substances such as" -- I never can

23   pronounce this one either.  Help me.

24     A.    Alprazolam.

1    Q.    Thank you.

2          -- "which has been in turn illegally

3    redistributed in states along the entire East Coast

4    and Midwest."

5          Correct?

6    A.    That's what it says, yes.

7    Q.    Do you recall at Walgreens internally

8    that the Pharmaceutical Integrity group discussed

9    that patients traveling a long distance to get

10   prescriptions was a suspicious order or a red flag?

11   MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13   A.    We discussed that our pharmacists need

14   to identify patients with a further geographical

15   proximity from where the pharmacy was to where

16   their doctor was was considered a red flag that the

17   pharmacist needed to resolve and that the

18   pharmacist needed to be aware there are patients

19   that could be traveling to an oncology specialty

20   hospital getting their treatment, getting their

21   medication and flying back to their home state,

22   yes, we discussed that they needed to resolve that

23   before they legitimately filled a prescription if

24   they had concerns of distance.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You know what a database is, right?

2    A.    Yes.

3    Q.    And do you have a database at Walgreens

4    that you all could search the residence of the

5    patient picking up a prescription and where they

6    were picking up the prescription to identify the

7    individuals that were traveling long distances?

8    A.    We had patient information, patient

9    addresses, yes.

10   Q.    So, could you have searched in your

11   databases and identified those patients that had

12   traveled long distances?

13   A.    Assuming those addresses were correct,

14   both on the -- the prescriber addresses as well as

15   the patient addresses, we could search that, yes.

16   Q.    Sure.  But part of the fulfilling the

17   prescription is showing a driver's license, right?

18   A.    Not in every case, no.

19   Q.    In --

20   A.    Only in certain states where it's

21   required.

22   Q.    Let's just do Florida.  Florida required

23   a driver's license, correct?

24   A.    As far as I can recall, yes.

1    Q.    And the prescriber's address is in

2    the -- is in the database, right, or were they --

3    A.    If it's correct, yes.

4    Q.    And the Walgreens address where the

5    prescription was picked up is in the database,

6    right?

7    A.    Yes.

8    Q.    So, Walgreens had the ability to run a

9    query and identify the individuals that were

10    picking up prescriptions long distances from their

11    residents, correct?

12    A.    I don't know.  I could not run that

13    query myself.

14    Q.    And do you know that that was part of

15    the mechanism that your group employed to try to

16    identify suspicious orders, people that were

17    picking them up from long distances away?

18    A.    No, I'm not aware of that.

19    Q.    On page --

20    A.    In my group.

21    Q.    I'm sorry.  On page 41, the sentence

22    that we just went through that references people,

23    "thousands of drug seekers flock to Florida-based

24    pain clinics and in turn illegally redistributed in

1    states along the entire East Coast and Midwest," is

2    that something that you would have wanted to know

3    when asking someone at Walgreens to help design a

4    system to identify pill seekers that were picking

5    up prescriptions in disparate miles, large amount

6    of time from the Walgreens?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    I was not involved in the design of the

10   system you're referring to.  So, I don't know if I

11   would have wanted to know.

12   BY MR. MOUGEY:

13       Q.    Did you ever see a report that

14   indicated, "Hey, here's these hundreds of people at

15   each Walgreens that were flocking to these

16   Walgreens retail pharmacies and their addresses are

17   from foreign states as a mechanism to identify

18   suspicious orders"?

19       A.    No.

20       Q.    Never saw a report to this day that

21   anyone's ever run and shown you?

22       A.    Not that I'm aware of.  I don't know.

23       Q.    You had no input as a manager in

24   Pharmaceutical Integrity about the types of queries

1    or data pulls that you needed to fill your role?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    The main function of our job was to

5    identify flagged orders which our system, our

6    CSO KPI tool, was already developed to do.  I was

7    not involved in the development of that tool.

8    BY MR. MOUGEY:

9        Q.    Right, but the question I asked was a

10   little different.  I said did you have any input as

11   a manager in Pharmaceutical Integrity about the

12   types of queries or data pulls that you need to

13   fill -- fulfill your role identifying suspicious

14   orders?

15       A.    I could request specific queries.

16       Q.    But did you ever ask for a specific

17   query trying to identify patients who had picked up

18   prescriptions a long distance from their home?

19       MS. SWIFT:  Object to the form.

20   BY THE WITNESS:

21       A.    No, I did not.  Our pharmacists were

22   required to review the prescription and determine

23   whether it was legitimate using their corresponding

24   responsibility, each prescription that they filled.

1    BY MR. MOUGEY:

2        Q.    Well, if the pharmacist was on the front

3    line, is charged with implementing and identifying

4    those suspicious orders, what function did your

5    department have?

6        MS. SWIFT:  Object to the form,

7    mischaracterizes the testimony.

8    BY THE WITNESS:

9        A.    Our job was to ensure that anything that

10   our system flagged was either identified as

11   suspicious and reported to the DEA or it was not

12   considered suspicious.  And we did work with the

13   pharmacists in determining whether those flagged

14   orders were suspicious and the pharmacy manager at

15   the store on a daily basis.

16   BY MR. MOUGEY:

17       Q.    Did you work full time in '13, '14, '15?

18       A.    Yes.

19       Q.    Was there any point in time after you

20   came back into Pharmaceutical Integrity that you

21   didn't work full time?

22       A.    Since 2013, no.

23       Q.    So, the system that you've referred to,

24   who was in charge of developing that system?

1    A.    To my understanding, we had Wayne

2    Bancroft, John Maritello (phonetic), I believe

3    Tasha was involved in developing that system and

4    probably to some extent Steve Mills.

5    Q.    Steve Mills was one of the analysts?

6    A.    Yes.

7    Q.    Do you have an understanding of when

8    Wayne Bancroft and John, Mr. Mills and Ms. Polster

9    implemented the system that was currently used --

10   when I say "currently used" -- the automated app

11   that you've referenced?

12   MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14   A.    The CSO KPI tool I think was in the

15   midst of being developed and finalized when I first

16   started in January.  So, it was already -- there

17   was already a tool.  I just don't know completely

18   when it was finished.  Probably early 2013.

19   BY MR. MOUGEY:

20   Q.    But it wasn't finished when you started?

21   MS. SWIFT:  Object to the form.

22   BY THE WITNESS:

23   A.    I think they were still developing it

24   from when I very first started, yes.

1    BY MR. MOUGEY:

2        Q.    You mentioned earlier that parts of it

3    were manual and then it became automated.  What was

4    the difference between the manual and the automated

5    component?

6        MS. SWIFT:  Object to the form.

7    BY THE WITNESS:

8        A.    So, to the best of my recollection, the

9    documentation was in -- within the CSO KPI tool

10   once it was completely automated and the pharmacist

11   could respond within the tool.  Prior to that the

12   pharmacist would respond in an e-mail.

13   BY MR. MOUGEY:

14       Q.    Okay.  So, essentially when you say

15   automated, that it was a measure or a means to

16   capture some of the notes and correspondence back

17   and forth with the pharmacy?

18       MS. SWIFT:  Object to the form.

19   BY THE WITNESS:

20       A.    It was just a different way to capture

21   it, yes.

22   BY MR. MOUGEY:

23       Q.    Okay.  Different meaning it was --

24   before I think you referenced that it was captured

1    in e-mail, correct?

2         A.    Yes.

3         Q.    And now it was one place where you could

4    go and others could see and it was essentially a

5    database, correct?

6         A.    It was a CSO KPI tool, yes.

7         Q.    All right.  So, if now you wanted to go

8    into the -- I'm just going to call it CSI.  It's

9    too many.  What is it again?

10        A.    CSO KPI.

11        Q.    Just give me the first three.  I'm

12   drowning in acronyms.  What is it?

13        A.    CSO.

14        Q.    CSO.  Can you now go to CSO and search

15   notes that you put in in the middle of '13?

16        A.    I don't know if I can go back that far

17   on my own, but I think we can -- we can find that

18   data or get that data.

19        Q.    Say you had a -- you wanted to go back

20   and kind of do a more deep dive due diligence on a

21   specific Walgreens pharmacy.  Who would you go to

22   to find out whether or not how far back you can go?

23        A.    I would probably ask Steve.

24        Q.    Steve.  And if Steve didn't know, who

1    would be the point of contact on the tech side?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    I think there is a manager on the IT

5    side.  I'm trying to recall his name.  Steve

6    Bamberg.  I would ask him.

7    BY MR. MOUGEY:

8        Q.    Do you have any understanding sitting

9    here today how far back you can look today into

10   CSO?

11       A.    No, I don't recall how far back.

12       Q.    Do you recall generally how far back you

13   can look?

14       A.    I -- I don't.

15       Q.    Walk me through what fields or areas of

16   information that are stored in CSO.

17       MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19       A.    So, if someone was approving or

20   reviewing an override, they could see the store

21   ceiling for that particular item and they could see

22   what the store was asking for as far as with

23   respect to how many bottles or boxes they were

24   asking for.  You could also see the store's

```
1   explanation for why they needed the additional

2   product.

3            And then I can see, if I were to look

4   and see their history, I could see that someone

5   maybe had approved an increase in their ceiling,

6   for example, prior to today, for example, if I was

7   looking at an order from today.

8        Q.    So, if you wanted to --

9        A.    A request.

10       Q.    -- run a query on stores and their

11  history of overrides, you could do that depending

12  on how far back you were looking?

13       A.    I could not do that, no.

14       Q.    But you could go to somebody, whether it

15  be Steve or potentially somebody in your technology

16  department, that could help run the query if you

17  needed to?

18       A.    Yes, I think that's true.

19       Q.    What other information other than

20  overrides and the notes you mentioned would be

21  available in CSO?

22       MS. SWIFT:  Object to the form.

23  BY THE WITNESS:

24       A.    Just the drug that the pharmacy is
```

1    requesting.  I think I already mentioned the

2    ceiling, the quantity, the previous history, if

3    there is any history, the store information, where

4    they're located.  I think it includes their general

5    area as well as their address and their store

6    number.

7    BY MR. MOUGEY:

8        Q.    Now, when you say that the drug that the

9    pharmacy is requesting, do you have an

10   understanding of whether or not the transactional

11   data is contained in CSO?

12       MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14       A.    Can you repeat the question.

15   BY MR. MOUGEY:

16       Q.    Yes.  It was awkward.

17            Transactional data meaning the order by

18   order.  Can you pull that out of CSO?

19       MS. SWIFT:  Object to the form.

20   BY THE WITNESS:

21       A.    The order by order from the store, no.

22   BY MR. MOUGEY:

23       Q.    You mentioned the previous history.

24   What do you mean by previous history?

1      A.    So, if there was one of our team members

2   that had approved and increased the ceiling for a

3   store, you can see the previous history for that

4   particular item for that store.

5      Q.    So, that pertains to the ceiling, the

6   previous history --

7      A.    Yes.

8      Q.    -- as far as how many ceiling increases

9   there were.

10          So, it would be -- you think it would be

11   possible to search how many ceiling increases there

12   were over some period of time?

13      A.    Yeah, I think that's possible.

14      Q.    All right.  That would be important when

15   you were looking at suspicious orders and how many

16   times the ceiling had been requested, right?

17      MS. SWIFT:  Object to the form.

18   BY THE WITNESS:

19      A.    I'm not sure I understand your question.

20   BY MR. MOUGEY:

21      Q.    Well, the ceiling had been requested to

22   be increased on a couple of occasions or several

23   occasions.  That pattern would be important to you

24   in making decisions in Pharmaceutical Integrity

1  about whether or not there was a suspicious order,

2  correct?

3      A.    Depending on the situation, it may be

4  important for me to see that.

5      Q.    But it was a factor that you might look

6  at, right?

7      A.    I may look at that, yes.

8      Q.    And if there was a pattern of having

9  requests for ceiling increases, that would be

10  something that you might drill down on?

11      MS. SWIFT:  Object to the form.

12  BY THE WITNESS:

13      A.    I may depending on the situation.

14  BY MR. MOUGEY:

15      Q.    And if you drill down on it and you

16  gathered information, would you then put it into

17  CSO so that would be -- conversation would be

18  memorialized in the notes?

19      MS. SWIFT:  Object to the form.

20  BY THE WITNESS:

21      A.    What do you mean by drill down into it?

22  BY MR. MOUGEY:

23      Q.    Just did further due diligence.  You

24  did -- look for more information.

1          So, if you wanted to go back and look at

2    previous conversations or previous information that

3    you gathered, you could put that into CSO, correct?

4          MS. SWIFT:  Object to the form.

5    BY THE WITNESS:

6          A.    I can enter comments into the CSO tool,

7    yes.

8    BY MR. MOUGEY:

9          Q.    Is that your practice to enter comments

10   into the CSO tool?

11         A.    If I'm reviewing an order, yes.

12         Q.    And if you are -- if there is a ceiling

13   increase and you wanted to find out why, would

14   you -- and you did -- you did find out why, would

15   you put that information into CSO?

16         A.    If there's a prior ceiling increase, the

17   documentation would be in there.  I wouldn't

18   necessarily need to go find out why because it

19   would be documented in the tool already.

20         Q.    Because the pharmacist would --

21         A.    The pharmacist and the person that

22   approved the ceiling increase would have documented

23   that.  So I can see that.

24         Q.    Who is it that approves the ceiling

1    increases?

2        A.    Today primarily our Pharmaceutical

3    Integrity coordinators and then to a certain

4    extent, our senior analysts.

5        Q.    If you wanted to search your e-mail

6    today, how far back does your e-mail system go?

7        A.    So, I know that they've recently

8    archived a portion of it.  I want to say maybe

9    2014, 2013, but I'm not 100% sure on that.

10       Q.    So, if you wanted to go back and search

11   e-mails or whatever, you think you can go back to

12   '13 or '14?

13       A.    I'm not 100% sure that's accurate.

14       Q.    Do you keep e-mails in any other places

15   other than on your work system?

16       A.    Not that I know of.  No.

17       Q.    Do you e-mail about work-related issues

18   from another e-mail address?

19       A.    No.

20       Q.    Do you only use your work system to

21   discuss any issues at work?

22       A.    Yes.  It's against our policies to use

23   any other thing -- anything other than my laptop,

24   for example, my own e-mail address.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And you don't store any e-mails any

2   other places other than on your desktop at work?

3      A.    No.

4      Q.    And do you store e-mails on your

5   desktop?

6      A.    No, not really.  I store them in my

7   e-mail box.

8      Q.    No, not really or no, you don't?

9      A.    Not that I can recall.  I don't have --

10  I have almost nothing on my desktop.  I don't use

11  it.

12     Q.    You don't have any hard drives or

13  anything else that you have kept e-mails on or

14  stored or anything along those lines, thumb drives,

15  anything along those lines?

16     A.    No.

17     MR. MOUGEY:  Could we take a few minutes.  Let

18  me shift gears on documents.

19     THE VIDEOGRAPHER:  We're going off the record

20  at 3:47.

21              (WHEREUPON, a recess was had

22              from 3:47 to 4:01 p.m.)

23     THE VIDEOGRAPHER:  We are back on the record

24  at 4:01.

1    BY MR. MOUGEY:

2         Q.    Ms. Daugherty, do you have any

3    understanding of why the Perrysburg distribution

4    center may have to close?

5         A.    Today?  No.

6         Q.    No, back in -- I'm sorry.

7               Back in 2013, why would the --

8         A.    That's what confused me.

9         Q.    Why would the Perrysburg distribution

10   center have had to close?

11        MS. SWIFT:  Object to the form.

12   BY THE WITNESS:

13        A.    I don't know.

14   BY MR. MOUGEY:

15        Q.    Do you recall having any communications

16   with other Walgreens personnel about whether or if

17   the Perrysburg distribution center would close?

18        A.    No, I don't recall.

19        Q.    Were you aware in early '13 when you

20   first started at Walgreens that the Perrysburg

21   distribution center had received subpoenas from the

22   DEA?

23        A.    I don't recall.

24        Q.    If in fact the Perrysburg distribution

1   center in early '13 did have to close, would it be

2   important for the pharmacist to understand why, the

3   Walgreens pharmacist to understand why?

4        MS. SWIFT:  Object to the form.

5   BY THE WITNESS:

6        A.    In terms of understanding that their

7   prescription drugs would not be coming from that

8   distribution center?  No.  Just to know where else

9   they could be getting the medications from.

10  BY MR. MOUGEY:

11       Q.    If the Perrysburg distribution center

12  shut down and was no longer distributing controlled

13  substances, primarily Schedule II and III opiate

14  prescriptions, and there were issues or flaws with

15  Walgreens' system, would that be important for the

16  pharmacist to know?

17       MS. SWIFT:  Object to the form.

18  BY THE WITNESS:

19       A.    Can you elaborate on "issues or flaws"

20  in what system?

21  BY MR. MOUGEY:

22       Q.    The distribution system, the suspicious

23  order monitoring system, that there were problems

24  with that system, would that be -- in the

Highly Confidential - Subject to Further Confidentiality Review

1    Perrysburg distribution center.  Would that be

2    important for them to know?

3         MS. SWIFT:  Object to the form, compound.

4    Which system?

5    BY MR. MOUGEY:

6         Q.    The number of systems and whether they

7    really exist or not and when is kind of confusing,

8    isn't it?

9              So, the distribution system center at

10   Perrysburg in early 2013, whatever system was in

11   place at that point.

12        MS. SWIFT:  Object to the form.

13   BY THE WITNESS:

14        A.    I'm not familiar with the system.

15   BY MR. MOUGEY:

16        Q.    In early 2013?

17        A.    In Perrysburg, no.

18        Q.    But in early 2013 you were charged with

19   identifying suspicious orders and performing any

20   due diligence, if any, on those orders, correct?

21        A.    Yes.

22        Q.    And would you perform the due diligence

23   on the suspicious orders or would the distribution

24   center perform the due diligence on the orders?

1        A.      When I first started in January of 2013,

2    we had a team that was reviewing flagged orders and

3    identifying them as suspicious or not.

4        Q.      And was there any request that in early

5    '13 that went to the distribution centers for it to

6    perform due diligence?

7        A.      Not that I know of.

8        Q.      So, would it be important for

9    pharmacists to understand if there were issues with

10   Walgreens' suspicious order monitoring system and

11   orders being filled at the Perrysburg distribution

12   center, would it have been important for them to

13   know that?

14       MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16       A.      Our pharmacists would have needed to

17   know if their medications were coming from a

18   different distribution center, yes.

19   BY MR. MOUGEY:

20       Q.      But the question was if there were

21   system failures, not just that they were coming

22   from, would it be important that the pharmacist

23   understand that there were system failures with

24   Walgreens' suspicious order monitoring policies,

Highly Confidential - Subject to Further Confidentiality Review

1    for the pharmacist to know that there were issues?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    I don't know if it would have been

5    important for a pharmacist at Walgreens in a store

6    to know that there was an issue with a system which

7    I'm not familiar with at that time.

8    BY MR. MOUGEY:

9        Q.    I hand you what I've marked as Daugherty

10   13.

11       MS. SWIFT:  I think we have already marked 13.

12       MR. MOUGEY:  14 then.

13       MS. SWIFT:  I think we've already marked 14.

14       MR. MOUGEY:  Daugherty 15.

15               (WHEREUPON, a certain document was

16                marked Walgreens-Daugherty

17                Deposition Exhibit No. 15:

18                Administrative Inspection Warrant;

19                WAGMDL00493697 - 00493700.)

20   BY MR. MOUGEY:

21       Q.    Do you see on the right-hand side that,

22   Bates No. 97, Administrative Inspection Warrant?

23   Do you see that?

24       A.    Yes.

1    Q.    And on the left-hand side it says, "In

2  the Matter of the Administrative Inspection of

3  Walgreens Corporation."

4    A.    Yes.

5    Q.    Perrysburg, Ohio.  Correct?

6    A.    Correct.

7    Q.    And that's one of the Walgreens

8  distribution centers, correct?

9    A.    Yes.

10    Q.    And if you turn to the very last page,

11  it's dated February 5, 2013.

12          Do you see that?

13    A.    Yes.

14    Q.    And if you go to Bates No. 99 of this

15  document, that Walgreens Perrysburg distribution

16  center was "further authorized to remove for

17  copying from the above-described controlled

18  premises the following records, reports, documents,

19  files and inventories, including computerized

20  records as are appropriate and necessary to the

21  effective accomplishment of the inspection."

22          Do you see that?

23    A.    What page are you on?

24    Q.    I'm on page --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    3?

2    Q.    Bates No. 99 or page 3.

3    A.    I see that.

4    Q.    Okay.  And the DEA goes on that "all

5    other records which refer to or relate to

6    distribution of controlled substances."

7          Do you see that?  On page 4, Bates

8    No. 70, under A.

9    A.    Yes.

10   Q.    And you understand that a subpoena or an

11   investigative warrant is asking for material so the

12   DEA could perform its review or process, correct?

13   A.    Yes.

14   Q.    And I think you mentioned earlier that

15   Walgreens gets subpoenas every day, and it's really

16   not a big deal or anything out of the ordinary, is

17   that right?

18   A.    Walgreens --

19   MS. SWIFT:  Objection; mischaracterizes the

20   testimony.

21   BY THE WITNESS:

22   A.    Walgreens gets subpoenas every day.

23   BY MR. MOUGEY:

24   Q.    So, it's not anything --

1    A.    And it is important.  We take it very

2  seriously and make sure we respond to every single

3  one.

4    Q.    But this isn't anything out of the

5  ordinary, to receive this kind of request for

6  information?

7    MS. SWIFT:  Object to the form.

8  BY THE WITNESS:

9    A.    What's "this"?  I'm sorry.

10  BY MR. MOUGEY:

11    Q.    "This" is the document that we're

12  looking at, Daugherty 15, this Administrative

13  Inspection Warrant.  This is -- this is an example

14  of documents that Walgreens receives every day.  It

15  is not anything out of the ordinary, correct?

16    MS. SWIFT:  Objection; mischaracterizes the

17  testimony.

18  BY THE WITNESS:

19    A.    This is a -- not the subpoenas -- we

20  typically get subpoenas for prescription records.

21  BY MR. MOUGEY:

22    Q.    So, do you think this one maybe was a

23  little more important than the ones you were

24  referring to that you receive regularly?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  Objection; foundation.

 2   BY THE WITNESS:

 3        A.    I don't know.

 4   BY MR. MOUGEY:

 5        Q.    You don't know?

 6        A.    I can't speculate.

 7        Q.    Pardon me?

 8        A.    I don't know.

 9        Q.    I hand you what we've marked as

10   Daugherty 16.

11                   (WHEREUPON, a certain document was

12                    marked as Walgreens-Daugherty

13                    Deposition Exhibit No. 16:  US

14                    DOJ/DEA Subpoena; WAGMDL00493694 -

15                    00493718.)

16   BY MR. MOUGEY:

17        Q.    Keep 15 in front of you, please.  And

18   this is also dated February of 2013.

19            Do you see that?  First page, bottom

20   left-hand corner.

21        A.    Yes.

22        Q.    And it is titled "U.S. Department of

23   Justice/Drug Enforcement Administration Subpoena,"

24   correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     And you see directly underneath that at

3  the top of the page, "In the matter of the

4  investigation of Case No. 17-13-2042," correct?

5      A.     Yes.

6      Q.     And on the left-hand side of the

7  page "Walgreens Corporation" and you see

8  "Distributor" in parens, correct?

9      A.     Yes.

10      Q.     "Custodian of records at," and it has

11  the address for the Perrysburg, Ohio distribution

12  center, correct?

13      A.     Yes.

14      Q.     And, again, in the middle of the

15  paragraph beginning with "Pursuant," the DEA is

16  requesting a series of documents regarding the

17  purchases of controlled substances between the

18  dates of beginning of business 2/1/11 and close of

19  business 2/5/13.

20          Do you see that?

21      A.     Yes.

22      Q.     Now, do you have any understanding of

23  whether or not Walgreens internally was discussing

24  closing down the Perrysburg distribution center

1    after receiving these subpoenas?

2         A.    At the time I recall I was involved in

3    communicating to stores, but just working with

4    actually submitting a communication to the stores

5    around Perrysburg, but I don't recall the

6    specifics.

7         Q.    Who's Bob Martin?

8         A.    She is manager in the inventory team.

9         MS. SWIFT:  Did you say Bob or Barb?

10   BY THE WITNESS:

11        A.    Barb.  It's Barbara.

12   BY MR. MOUGEY:

13        Q.    Is it Barb?

14        A.    It's Barbara, yeah.

15        Q.    Thanks.  Barb.  She is a manager in the

16   inventory side?

17        A.    Yes.

18        Q.    Sitting here today, do you have any

19   understanding of whether the closing of the

20   Perrysburg distribution center had anything to do

21   with the fact that Walgreens received a warrant and

22   a subpoena for a records request?

23        A.    No, I don't.

24        Q.    No, you don't know or no, it wasn't?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    No, I don't know.

 2          Q.    Okay.  Do you think it was just a --

 3   let's go to the next.  Let's go to Daugherty 17.

 4                 (WHEREUPON, a certain document was

 5                  marked as Walgreens-Daugherty

 6                  Deposition Exhibit No. 17:  2/15/13

 7                  e-mail with attachment;

 8                  WAGMDL00303243 - 00303245.)

 9   BY MR. MOUGEY:

10          Q.    This is -- purports to be an e-mail

11   between you and Barb Martin, correct?

12          A.    Yes.

13          Q.    And it's dated 2/15/2013, correct?

14          A.    Yes.

15          Q.    And the e-mail is from Ms. Martin to

16   yourself and it's not copied to anyone else,

17   correct?

18          A.    No.

19          Q.    And she's transmitting, "Per my

20   voicemail.  Here are copies of my draft

21   communications to go out to the stores serviced by

22   Perrysburg.  To be sent out if Perrysburg has to

23   close."

24                 Do you have an understanding of what
```

1    Ms. Martin was referring to "if Perrysburg has to

2    close"?

3         A.    Yes.

4         Q.    What was she referring to?

5         A.    If Perrysburg could not distribute

6    controlled substances to our store.

7         Q.    All right.  But why?

8         MS. SWIFT:  Object to the form.

9    BY THE WITNESS:

10        A.    I don't -- I don't know.  At the time I

11   don't know.

12   BY MR. MOUGEY:

13        Q.    You had me for a minute.  I thought -- I

14   thought we had some information.  But you don't

15   know why.  You don't know why Perrysburg had to

16   close?

17        A.    No, I was not --

18        Q.    I go all excited for a second.

19        A.    -- involved.

20        Q.    The sentence there about "to be sent out

21   if Perrysburg has to close," you don't know what

22   she is referring to why it would close?

23        A.    No, I --

24        Q.    The reasons why?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I did not know the reasons why.

2    Q.    Did it think of you to ask why would we

3  be closing our Perrysburg distribution center?

4    A.    At the time I did not.

5    Q.    Because you had only been there at this

6  point a month and a half, right?

7    A.    That's correct.

8    Q.    Do you have any understanding of why

9  Ms. Martin was communicating with you about

10  coordinating with the individual pharmacies

11  regarding Perrysburg and whether or not it had to

12  close?

13    A.    She was asking me to facilitate the

14  communication.

15    Q.    So you were just going to send it out?

16    A.    If she had indicated that I should send

17  it out, yes.  I would work with our communications

18  department.  That's my -- that was my role in this.

19    Q.    So, here you are, six months into your

20  new career at Walgreens in Pharmaceutical

21  Integrity, and there are seven ongoing cases

22  including the Jupiter distribution center and now

23  you are notified that the Perrysburg distribution

24  center might have to close.

1            Did that give you any alarm or concern

2    about why?

3        MS. SWIFT:  Objection; mischaracterizes the

4    document and the facts.

5    BY THE WITNESS:

6        A.    So, just to clarify.  This was one month

7    into my role, one month and maybe a week.

8            At the time I did not know why we were

9    closing Perrysburg or considering closing

10   Perrysburg.  I didn't know if it was related to

11   moving business to Cardinal or -- I had no

12   knowledge of it.

13   BY MR. MOUGEY:

14       Q.    You didn't know about the seven ongoing

15   cases regarding the Jupiter distribution center and

16   the six pharmacies around the country, correct?

17       A.    In -- in February, I don't know if I

18   knew that at the time.

19       Q.    If you would have known about the seven

20   ongoing cases, six retail pharmacies, the Jupiter

21   distribution center, would it have caused you alarm

22   that a second distribution center may have to

23   close?

24       A.    I don't know if it would have caused me

Highly Confidential - Subject to Further Confidentiality Review

1    alarm.

2        Q.    Would you have thought it was important

3    in your day-to-day responsibilities to know that

4    the second, two out of three distribution centers

5    responsible for distributing Schedule II and III

6    opiate prescriptions was about to close?

7        A.    I don't know if it would have changed my

8    duties in my job.

9        Q.    And I'm not asking you again if it

10   changed your duties or changed your job.  Would it

11   have been important for you to know as a factor in

12   your consideration that the second out of three

13   distribution centers that were responsible for

14   distributing Schedule II and III opiate

15   prescriptions might have to close?

16       MS. SWIFT:  Object to the form.

17   BY THE WITNESS:

18       A.    I was focused on doing my job at the

19   time and making sure we were training our team

20   members.  So, I don't know if I would have thought

21   it was important at the time.

22   BY MR. MOUGEY:

23       Q.    Do you recall whether or not you were

24   aware of the subpoenas at the time you received

1   this draft communication from Ms. Martin?

2       A.    I don't believe I was aware of the

3   subpoenas, but I can't recall.

4       Q.    So, let's turn to Ms. Martin's draft

5   communication that she sent to you within a little

6   less than two weeks from the subpoenas being sent

7   to the Perrysburg distribution center.

8           So, Ms. Martin is asking you to help

9   transmit or facilitate this process, correct?

10      A.    She's helping me -- she's asking me to

11  help her facilitate the communication, yes.

12      Q.    All right.  And her draft is, "Select

13  Pharmacy Managers, Beginning the week of

14  February 18, 2013, stores that have been receiving

15  their Schedule II controlled substance orders from

16  the Walgreens distribution center in Perrysburg,

17  Ohio will now have their orders shipped from the

18  local Cardinal center."

19          Do you see that?

20      A.    Yes.

21      Q.    Now, February 18 is three days after

22  this e-mail comes out, right?

23      A.    Yes.

24      Q.    Did you find that as odd that Ms. Martin

Highly Confidential - Subject to Further Confidentiality Review

1    was asking you to facilitate a communication that

2    the Perrysburg distribution center was closing in

3    three days, potentially closing in three days?

4         MS. SWIFT:  Object to the form.

5    BY THE WITNESS:

6         A.    I think the e-mail said that it was

7    potentially closing.  So, no.

8    BY MR. MOUGEY:

9         Q.    Didn't give you any alarm, that we are

10   going to send out an e-mail to the select pharmacy

11   managers and say, "Hey, three days from now we're

12   going to shut down the distribution center in

13   Perrysburg and you have to go to Cardinal"?

14        A.    At the time this was just a proposed

15   communication, so...

16        Q.    So it didn't cause you any alarm?

17        A.    I didn't think that it was necessarily

18   going to go out on February 18.  This is just the

19   way that it was draft written.

20        Q.    So, she continues with "What do I need

21   to know?"  And she says, "Well, the Schedule II

22   controlled substance order day will remain the

23   same."

24             Do you see that in the first bullet

```
 1    point?

 2         A.    Yes.

 3         Q.    And then the second says, "Posting

 4    procedures in SIMS will be the same as all other

 5    receipts from Cardinal."

 6               And Cardinal is another distributor,

 7    right?

 8         A.    Yes.

 9         Q.    And "Upon receipt, please follow the

10    current posting procedures for Schedule II

11    controlled substance order deliveries."

12               Right?

13         A.    Yes.

14         Q.    "Before, Cardinal only filled the

15    Schedule II controlled substance order for items

16    that Perrysburg didn't carry.  Now, all Schedule II

17    controlled substance orders will be fulfilled by

18    the local Cardinal center."

19               Correct?

20         A.    Yes.

21         Q.    So, your job that you've just been hired

22    to do was to identify suspicious orders and report

23    those to the DEA, right?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And that was primarily Schedule II and

2   III prescription medications, correct, prescription

3   opiates, correct?

4    MS. SWIFT:  Object to the form.

5   BY THE WITNESS:

6    A.    It included all controlled substance

7   medications, II through Vs and pseudoephedrine,

8   yes.

9   BY MR. MOUGEY:

10    Q.    So, you didn't question anything

11   regarding your role in your job and the fact that

12   one of the three distribution centers might be

13   closing?

14    A.    I did not know why the distribution

15   center would be closing.  I had no knowledge of

16   why.

17    Q.    Now, how did -- did the Perrysburg

18   distribution center ultimately end up closing?

19    A.    Honestly, I can't recall.

20    Q.    You can't recall sitting here whether

21   the Perrysburg distribution center, one of the

22   three Schedule II distribution centers for

23   Walgreens, closed?

24    A.    Well, technically they're not closed.

1    They still have power of attorney and they still

2    distribute drugs out of Perrysburg as far as I

3    know.

4         Q.    So, when you say you didn't recall, what

5    did you mean?

6         A.    I don't recall when controlled

7    substances stopped being shipped from Perrysburg.

8    If I had to take a guess, it was probably in the

9    spring of 2013, but I don't know exactly.  Maybe

10   later.  I don't know.  I can't say definitively

11   what date.

12        Q.    Can you -- I think the question I asked

13   you was just whether it closed or not.  Do you

14   recall that?

15        A.    I recall --

16        Q.    Let's start there.

17        A.    -- at some point Perrysburg stopped

18   shipping controlled substances to our stores, yes.

19        Q.    So, when it closed, were the Schedule II

20   and Schedule III opiate prescriptions then migrated

21   or transferred to Cardinal?

22        MS. SWIFT:  Object to the form.

23   BY THE WITNESS:

24        A.    Yes.

```
 1    BY MR. MOUGEY:

 2        Q.    And who was responsible for overseeing

 3    the transfer from the Walgreens facility,

 4    Perrysburg, to Cardinal?

 5        MS. SWIFT:  Object to the form.

 6    BY THE WITNESS:

 7        A.    I don't know.  I can only speculate it

 8    was Rx Inventory, but I don't know that to be for a

 9    fact.

10    BY MR. MOUGEY:

11        Q.    So, did Cardinal have a suspicious order

12    monitoring policy that it used?

13        MS. SWIFT:  Object to the form, foundation.

14    BY THE WITNESS:

15        A.    To my recollection, yes.

16    BY MR. MOUGEY:

17        Q.    But you don't have any -- do you have

18    any better understanding of what Cardinal was using

19    to identify suspicious orders than you do

20    Walgreens?

21        A.    Better understanding than I understand

22    the Walgreens system?

23        Q.    Do you have any understanding of what

24    Cardinal's suspicious order monitoring policy was
```

Highly Confidential - Subject to Further Confidentiality Review

1    when the Perrysburg system closed?

2        MS. SWIFT:  Object to the form.

3    BY THE WITNESS:

4        A.    I have recollection of receiving survey

5    questionnaires from Cardinal for specific store

6    locations, our specific store locations, and

7    performing their suspicious order monitoring

8    process or their due diligence.

9    BY MR. MOUGEY:

10       Q.    And when you say -- when you referenced

11   earlier that the Perrysburg store still had POA,

12   what were you referring to?

13       A.    Power of attorney.

14       Q.    Okay.  And what specifically power of

15   attorney?  What were the facts around the power of

16   attorney that you're referencing?

17       A.    So, our specific people in Perrysburg

18   have power of attorney.  They have authorization

19   basically for our stores to order the controlled

20   substances to receive the controlled substances in

21   our stores.  So, they have a power of attorney over

22   all our stores.

23       Q.    When you say "stores," you mean the --

24       A.    Our pharmacies.

1    Q.    -- the retail pharmacies?

2    A.    Yes.

3    Q.    So, Perrysburg, the distribution center

4    got shut down, still has POA to order on behalf of

5    the retail pharmacies?

6    MS. SWIFT:  Object to the form.

7  BY THE WITNESS:

8    A.    Perrysburg is not closed.  I'm not sure

9  what you mean by "shut down."  They're not closed

10  today.

11  BY MR. MOUGEY:

12    Q.    Walgreens shut down Perrysburg and its

13  ability to ship or distribute Schedule II and

14  Schedule III prescription opiates, correct?

15    MS. SWIFT:  Object to the form.

16  BY THE WITNESS:

17    A.    Walgreens stopped shipping controlled

18  substances out of Perrysburg to our stores, yes.

19  BY MR. MOUGEY:

20    Q.    What's the difference between stopped

21  and shut down, the difference in distributing

22  prescription opiates?

23    A.    Shut down means the facility is shut

24  down, and the facility is open and they're

1    distributing medication today.

2        Q.    So, all that was shut down at Perrysburg

3    was Schedule II and Schedule III distribution of

4    prescription opiates, correct?

5        MS. SWIFT:  Object to the form.

6    BY THE WITNESS:

7        A.    I believe that ultimately Walgreens

8    shopped shipping controlled substances out of

9    Perrysburg, yes.

10   BY MR. MOUGEY:

11       Q.    So, by June of 2013 you are -- you were

12   aware that both Jupiter and Perrysburg distribution

13   centers were no longer shipping prescription

14   opiates, correct?

15       MS. SWIFT:  Objection; foundation.

16   BY THE WITNESS:

17       A.    I don't know that I knew in June that

18   Perrysburg or Jupiter had stopped completely

19   shipping controlled substances.  I don't know that

20   to be a fact.

21   BY MR. MOUGEY:

22       Q.    When do you recall Perrysburg shipping

23   its distribution responsibilities to Cardinal?

24       MS. SWIFT:  Object to the form.

1    BY THE WITNESS:

2        A.    My understanding or my -- my

3    recollection was this started at some point in the

4    spring of 2013 where they started transitioning

5    controlled substances, C-II controlled substances

6    to Cardinal and Perrysburg was no longer shipping.

7    BY MR. MOUGEY:

8        Q.    Do you have any understanding, and I'm

9    going back to the settlement and memorandum of

10   understanding -- memorandum of agreement between

11   Walgreens and the United States, that Walgreens

12   represented to the DEA that it was going to be

13   getting out of the distribution business?

14       MS. SWIFT:  Objection; foundation.

15   BY THE WITNESS:

16       A.    No.

17   BY MR. MOUGEY:

18       Q.    No.  When I say "getting out of the

19   distribution business," I should have asked

20   specifically about Schedule II and Schedule III

21   prescription opiates.

22       A.    No.

23       Q.    No.  Okay.  Now, ultimately Perrysburg's

24   distribution responsibilities for Schedule II and

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Schedule III prescription opiates were transferred

 2   to Cardinal, correct?

 3        MS. SWIFT:  Object to the form.

 4   BY THE WITNESS:

 5        A.    I believe that there was a point where

 6   Perrysburg stopped shipping controlled substances

 7   to our stores.

 8   BY MR. MOUGEY:

 9        Q.    I hand you what is marked as Daugherty

10   19 -- 18.

11                  (WHEREUPON, a certain document was

12                   marked as Walgreens-Daugherty

13                   Deposition Exhibit No. 18:  3/20/13

14                   e-mail string; WAGMDL00303186 -

15                   0030387.)

16   BY MR. MOUGEY:

17        Q.    Do you see at the top of this e-mail on

18   Bates No. 86 your name copied in an e-mail from

19   Denman Murray?

20        A.    Denman.

21        Q.    Denman.  So, you do see your name up

22   there?

23        A.    Yes.

24        Q.    Okay.  And who is Denman Murray?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     So, Denny Murray is the director in

2     inventory, the inventory team.

3          Q.     And you see the subject line is

4     "Cardinal Red Store Status."

5          A.     Yes.

6          Q.     That's March 20 of 2013 on this e-mail,

7     correct?

8          A.     Yes.

9          Q.     Does that refresh your recollection

10    about when Perrysburg distribution center had

11    transferred its responsibilities for Schedule II

12    and Schedule III prescription opiates to Cardinal?

13         A.     I think I had said that my recollection

14    was that Perrysburg began the process of not

15    shipping controlled substances around the spring of

16    2013.

17         Q.     So, within, let's just say, a month and

18    a half of receiving the subpoena from the DEA,

19    Perrysburg DC had shifted its responsibility for

20    prescription opiate distribution to Cardinal,

21    correct?

22         A.     I don't know if they had completely

23    shifted their responsibility.  I had no knowledge

24    of when they stopped shipping controlled

Highly Confidential - Subject to Further Confidentiality Review

1    substances.

2        Q.    Now, if I use the term "red store," do

3    you know what that means in the context of

4    Cardinal's red flag system?

5        MR. BUSHUR:  Objection; form.

6    BY THE WITNESS:

7        A.    I think this was stores that Cardinal

8    had flagged and wanted to receive additional

9    information from Walgreens on.

10   BY MR. MOUGEY:

11       Q.    So, let's start at the back of this

12   e-mail which starts at the bottom of page 86.  Rex

13   Swords to Kermit Crawford with the subject

14   "Cardinal Red Store Status."

15            "Just a quick update on red store

16   status.  Remember, these are stores that are still

17   servicing from Perrysburg until Cardinal clears

18   them for shipment of narcotic pain medications."

19            Do you see that?

20       A.    Yes.

21       Q.    What does it mean or what is the

22   reference that Cardinal is clearing for shipment

23   narcotic pain medication?

24       MS. SWIFT:  Objection; form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY THE WITNESS:

 2         A.    I don't know what Rex meant.  My

 3    understanding was that Cardinal had submitted

 4    questionnaires for select stores and had asked us

 5    to provide some documentation and information on

 6    select stores.

 7    BY MR. MOUGEY:

 8         Q.    And, so, some of the stores had not

 9    cleared to be transferred to Cardinal, correct?

10         MS. SWIFT:  Object to the form.

11    BY THE WITNESS:

12         A.    I don't know.  I didn't -- I wasn't

13    involved in that -- I just was involved in

14    providing the documentation and information to the

15    questionnaires to Cardinal.

16    BY MR. MOUGEY:

17         Q.    And the e-mail goes on, "As on Monday,

18    Cardinal has reviewed 169 of the 380 stores, of

19    which 118 are now 'green' and will be serviced by

20    Cardinal."

21              Do you see that?

22         A.    Yes.

23         Q.    "This leaves us with over 250 stores

24    which remain in red status.  As a reminder, we told
```

1    the DEA we were in the process of winding down

2    controlled substance distribution from Perrysburg."

3              Do you see that?

4    A.    Yes.

5    Q.    "We have an April 1st target to

6    discontinue controlled substance distribution from

7    Perrysburg, which means if these stores are not

8    cleared by Cardinal by that date, they will no

9    longer receive any narcotic pain medications."

10             Did I read that correctly?

11   A.    Yes.

12   Q.    "Based on our announcement yesterday, my

13   concern is Cardinal may not be as aggressive at

14   resolving these stores and ultimately servicing

15   them.  Cardinal canceled our scheduled meeting that

16   we use to review stores and have received reports

17   of store review visits now being canceled by

18   Cardinal."

19             Do you see that?

20   A.    Yes.

21   Q.    What was the sense of urgency that

22   Walgreens told the DEA it would be winding down

23   controlled substance distribution from Perrysburg?

24   MS. SWIFT:  Object to the form.

1   BY THE WITNESS:

2        A.    I don't know.

3   BY MR. MOUGEY:

4        Q.    Why would Walgreens push to wind down

5   its distribution center and risk having patients

6   not being able to access controlled substances?

7        MS. SWIFT:  Object to the form.

8   BY THE WITNESS:

9        A.    I don't know.

10  BY MR. MOUGEY:

11       Q.    Did you ever ask?

12       A.    No, I didn't.

13       Q.    Did anybody ever tell you?

14       A.    No.

15       Q.    There is still another distribution

16  center at this point in time in Woodland,

17  California that were distributing Schedule II and

18  Schedule IIIs, correct?

19       A.    Yes.

20       Q.    Did it dawn on you that maybe you'd want

21  to know what had happened in this distribution

22  center and what the sense of urgency was and what,

23  if any, impact it had on the distribution centers?

24       MS. SWIFT:  Object to the form.

1    BY THE WITNESS:

2         A.    I was not involved in the business

3    decision on making this determination for

4    Perrysburg, no.

5    BY MR. MOUGEY:

6         Q.    I didn't ask you if you were involved in

7    making the business decision.  What I asked was did

8    you want to know what happened to the distribution

9    centers and what the sense of urgency was and what

10   impact, if any, it had on the Woodland, California

11   distribution center?

12        MS. SWIFT:  Object to the form, compound.

13   BY THE WITNESS:

14        A.    Did I want to know what happened to the

15   distribution center?

16   BY MR. MOUGEY:

17        Q.    You were the one, you're responsible --

18   you are one of four people looking at suspicious

19   orders at Walgreens, identifying them and reporting

20   them to the DEA.

21             Aren't you wondering what in the world

22   are we doing winding down our distribution center

23   and transferring it over to Cardinal?  What's the

24   deal?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. SWIFT:  Object to the form.

 2   BY THE WITNESS:

 3        A.    Honestly, I did not wonder that, no.

 4   BY MR. MOUGEY:

 5        Q.    Was it because your job was defined as

 6   implementing Walgreens' Good Faith Dispensing

 7   policies at the pharmacy level rather than at the

 8   distributor level?

 9        MS. SWIFT:  Object to form.  Was what because?

10   BY THE WITNESS:

11        A.    I don't understand your question.

12   BY MR. MOUGEY:

13        Q.    It sounds a lot like what Kate said

14   again.

15        MS. SWIFT:  Ask a clear question.

16   BY THE WITNESS:

17        A.    Can you clarify it?

18   BY MR. MOUGEY:

19        Q.    No.

20        MR. MOUGEY:  I'm just so sick and tired of the

21   not understanding what a proper objection is.

22            We have been marking every single one of

23   these, and I'm going -- this is ridiculous.  I

24   mean, this is absolutely ridiculous.  All day long
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you've interjected yourself into this record

2    despite my repeated requests to stop and then the

3    witness repeats your answer.  It's just ridiculous.

4             This is like five depositions.  You've

5    put up all of these people to testify.  None of

6    them know anything about anything.  And then you

7    intersperse your objections on the record and they

8    repeat it.

9             So, let's do it again.

10        MS. SWIFT:  The record will reflect what

11   actually --

12        MR. MOUGEY:  I'm sure it will.

13        MS. SWIFT:  -- has been happening in all of

14   these depositions, Peter.

15        MR. MOUGEY:  Which is no one knows anything

16   about anything.  If I had to count how many times

17   "I don't know" was today, I would need

18   Ms. Daugherty's phone calculators.

19        MS. SWIFT:  Well, if you're done with your

20   speech, you can continue your deposition.

21        MR. MOUGEY:  I am, but we'll definitely

22   address this again because these are people you've

23   put up.  These are people you've identified to

24   understand what went on.
```

Highly Confidential - Subject to Further Confidentiality Review

1            And we're talking about two months after

2    Ms. Daugherty arrives at Walgreens, the -- one of

3    the three Schedule II and Schedule III distribution

4    centers are shut down and within six months of

5    getting there, two of the three are shut down.

6        MS. SWIFT:  Do you have a question?  You have

7    been putting legal opinions in front of her, things

8    she has never seen before all day.  The things

9    you're asking her about right now happened five,

10   six years ago.

11       MR. MOUGEY:  During her four months' worth of

12   relevant knowledge base that we're supposed to be

13   figuring out what Walgreens' policies are.  So,

14   purge documents and witnesses that don't know

15   anything.

16       MS. SWIFT:  Object to the speech and the

17   argumentative nature of the way you are handling

18   this deposition.  We'll mark it too.

19       MR. MOUGEY:  So far you have all done great

20   with your practices.

21       MS. SWIFT:  We'll mark all of it, Peter.

22       MR. MOUGEY:  Mark away.

23       MS. SWIFT:  You, too.

24       MR. MOUGEY:  Produce the documents after depos

Highly Confidential - Subject to Further Confidentiality Review

 1   close, purging, notes in files that we haven't

 2   produced.  You name it, we got it.

 3        MS. SWIFT:  You're misrepresenting the

 4   testimony wildly.

 5        MR. MOUGEY:  Oh, yeah.

 6   BY MR. MOUGEY:

 7        Q.    Your job at Walgreens was to implement

 8   and monitor the Targeted Good Faith Dispensing

 9   policies, correct?

10        A.    That was one of my jobs, yes.

11        Q.    That was your primary role and that's

12   the reason why it didn't even concern you that

13   distribution centers were closing, correct?

14        MS. SWIFT:  Objection, argumentative.

15   BY THE WITNESS:

16        A.    That was one of my roles, to make sure

17   that our pharmacists were aware of good faith

18   dispensing.  My initial role in coming on in the

19   Rx Integrity department was to review flagged

20   orders and determine which ones were suspicious and

21   report them.  I would say that was the majority of

22   what I was trained on when I first started.

23   BY MR. MOUGEY:

24        Q.    So, within six months of starting at

```
1    Walgreens, two of the three distribution centers

2    are closed down, correct, Schedule II and

3    Schedule III?

4         MS. SWIFT:  Objection; foundation.

5    BY THE WITNESS:

6         A.    I don't know that to be true within six

7    months.  I said I don't remember when it actually

8    happened.

9    BY MR. MOUGEY:

10        Q.    Well, we just went through the

11   memorandum of agreement with the DEA that

12   references the Jupiter center closing, correct?

13        A.    I don't recall --

14        MS. SWIFT:  Object to the form.

15   BY THE WITNESS:

16        A.    -- looking at that.  Sorry.

17   BY MR. MOUGEY:

18        Q.    The memorandum of agreement --

19        A.    Yes.

20        Q.    -- that we went just through.  The big

21   thick document --

22        A.    Yes.

23        Q.    -- with the binder in it, right?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And you recall that that discusses the
 2   Jupiter distribution center unwinding its business
 3   or winding down, correct?
 4        MS. SWIFT:  Objection; mischaracterizes the
 5   document.
 6   BY THE WITNESS:
 7        A.    I would need to look at it again.
 8   BY MR. MOUGEY:
 9        Q.    Go ahead.  You want to look at it, fine.
10        MS. SWIFT:  Do you want to point her to what
11   you're talking about?
12   BY THE WITNESS:
13        A.    I see that it's registered with the DEA.
14   I'm not sure what you're referring to.  We went
15   over 1 through 10 on 963 or 63 I should say.
16   BY MR. MOUGEY:
17        Q.    Look on page 6 of 13, paragraph E.
18        A.    E?
19        Q.    E as in Ed.
20        A.    Okay.
21        Q.    Do you see "Walgreens agrees to
22   surrender" -- "to the surrender of the DEA
23   registrations to dispense controlled substances for
24   Schedules II through V at the following
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     facilities," correct?

2         A.    Yes.

3         Q.    On page 5 of 13, under C, "Walgreens

4     agrees to the surrender of Walgreens Jupiter's DEA

5     registration for controlled substances Schedules II

6     through V until September 13, 2014."

7               Do you see that?

8         A.    Yes.

9         Q.    So, as of this document that you

10    e-mailed around, that you were on the e-mail in

11    June of 2013, Walgreens' Jupiter distribution

12    center was surrendering its license to distribute

13    Schedules II through V until September 13 of 2014,

14    correct?

15        MS. SWIFT:  Objection; foundation.

16    BY THE WITNESS:

17        A.    It says that Walgreens agreed to

18    surrender the DEA registration --

19    BY MR. MOUGEY:

20        Q.    And you were --

21        A.    -- for Jupiter.

22        Q.    You were aware of that.  That was in

23    your e-mail in June of 2013, correct?

24        MS. SWIFT:  Object to the form.
```

1  BY THE WITNESS:

2      A.    I don't know that I was aware of that.

3  I think I said that my focus was on a different

4  section of the settlement.  I don't remember

5  reading many of these pages in the settlement at

6  the time.

7  BY MR. MOUGEY:

8      Q.    So, now, an e-mail that you are included

9  on from Denman Murray on 3/20/2013, within a matter

10 of two to three months, two of the three

11 distribution centers for Walgreens were winding

12 down for its distribution of Schedule II and III

13 prescription opiates, correct?

14     MS. SWIFT:  Object to the form.

15 BY THE WITNESS:

16     A.    I don't know that to be true.

17 BY MR. MOUGEY:

18     Q.    SharePoint.  Are you familiar with

19 Walgreens' internal system SharePoint?

20     A.    Yes.

21     Q.    And what did you use SharePoint for?

22     MS. SWIFT:  Object to the form.

23 BY MR. MOUGEY:

24     Q.    Did you use SharePoint?

```
 1        MS. SWIFT:  Object to the form.

 2   BY THE WITNESS:

 3        A.    I don't recall using SharePoint.  I do

 4   use SharePoint today.

 5   BY MR. MOUGEY:

 6        Q.    And when do you recall beginning to use

 7   SharePoint?

 8        A.    I know what I use SharePoint for today.

 9   Honestly, I probably started, that I can recall,

10   using it last year, possibly the year before.

11        Q.    And what have you used it for in the

12   last year or so?

13        A.    We have a communications SharePoint for

14   logging communications for approval to go out on

15   certain dates, for collecting documentation, for

16   our DEA 106 information to put together additional

17   training to our pharmacists, just for collecting

18   documentation as a group and training our

19   pharmacists around the DEA 106 process.

20        Q.    Was anyone in your group using

21   SharePoint, when you say "your group,"

22   Pharmaceutical Integrity, prior to the time you

23   began using it a year or so ago?

24        MS. SWIFT:  Objection; foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    Not that I know of.

 3   BY MR. MOUGEY:

 4        Q.    Was it -- when you say not that you know

 5   of, you've been on it in the last year or so,

 6   correct?

 7        A.    I've been using it.  But SharePoint has

 8   specific access.  So, my understanding is that like

 9   not everyone can access everyone else's SharePoint

10   site.

11              So, I have access to the communications

12   site, but I don't know if everyone in the company

13   has access to that communication site because it's

14   a pharmacy communications primarily geared site.

15        Q.    So, can any other Pharmaceutical

16   Integrity employees or staff, are they able to use

17   or see the documents you have on SharePoint?

18        A.    For which SharePoint site?

19        Q.    Whichever.  All of them.

20        MS. SWIFT:  Object to the form.

21   BY THE WITNESS:

22        A.    I know that two of my employees have

23   access to the SharePoint site.  I don't know of the

24   other employees.  The other employees don't report
```

Highly Confidential - Subject to Further Confidentiality Review

1    directly to me.  So, I don't know firsthand if they

2    can access.

3    BY MR. MOUGEY:

4         Q.    Do you all not talk about where you

5    store documents in your internal meetings?

6         A.    We don't store documents in our internal

7    meetings.  We store -- we log I should say

8    communications for approval, and that's general for

9    pharmacy operations.  So, it's broader than just

10   our team.  It involves a number of other teams.

11             I believe my team can access it.  I

12   don't know firsthand if they all can, though.

13        Q.    Are there any other internal systems

14   that Rx Integrity uses to keep shared resources

15   from 2013 up until the current time?

16        MS. SWIFT:  Object to the form.

17   BY THE WITNESS:

18        A.    No, we primarily keep everything in our

19   e-mail, our Rx Integrity e-mail or our own personal

20   e-mail or the DEArecordsrequest e-mail when the

21   subpoenas come through in that e-mail.

22   BY MR. MOUGEY:

23        Q.    Other than SharePoint, which you just

24   referenced?

1       A.      For communication planning, yes.

2       Q.      And other than CSO, which you identified

3   earlier, correct?

4       A.      Yes, also in the CSO KPI tool.

5       Q.      Anything other than CSO, SharePoint and

6   your e-mail where you've stored or keep documents

7   related to your role in Pharmaceutical Integrity?

8       A.      No, not that I'm aware of.  We may have

9   some paper documentation early on in our files.

10  But, honestly, I can't recall what it entails.

11      Q.      When you say in your files, what do you

12  mean?

13      A.      In our -- in our drawers.

14      Q.      Has anybody come and asked you for your

15  drawers?

16      A.      Yes.

17      Q.      And are there any drawers that you

18  didn't produce in this course of this litigation?

19      A.      Not that I know of.

20      Q.      Okay.  Other than --

21      A.      We had a very small limited amount of

22  paper that I believe we provided already.

23      Q.      Other than the -- your desk drawer with

24  the notes in it you referenced earlier, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      And how about manuals and training

3    material.   Where is all that kept or stored, if you

4    know?

5      A.      So, manuals and training materials for?

6      Q.      For Pharmaceutical Integrity.   Just --

7      MS. SWIFT:   Object to the form.

8    BY THE WITNESS:

9      A.      We store our policies and our procedures

10   on our shared Rx Integrity site in a folder.

11   BY MR. MOUGEY:

12     Q.      So, we have -- what is the shared

13   Rx Integrity site?

14     A.      It's just on a separate drive.   So,

15   where I have my own personal drive and there is

16   also a shared site for our group that can access.

17     Q.      Okay.   So, you have your shared site

18   where you keep documents, correct?

19     A.      Yes, and my personal site as well.

20     Q.      And then your personal site?

21     A.      Yes.

22     Q.      And then there is SharePoint where you

23   also keep documents, correct?

24     A.      Yes, for communication purposes, yeah.

1    Q.    And you also keep some documents in your

2    e-mail, correct?

3    A.    Yes.

4    Q.    And --

5    A.    And in the CSO KPI tool.

6    Q.    In the CSO tool.  And how do you make

7    the distinction about what goes on SharePoint and

8    the Pharmaceutical Integrity site?

9    MS. SWIFT:  Object to the form.

10   BY THE WITNESS:

11   A.    So, the SharePoint site is for pharmacy

12   communications in general for every department, and

13   that's just for logging any communication that we

14   send out to our stores.

15         I also have a SharePoint site again for

16   DEA 106 training to our pharmacists, so specific to

17   DEA 106 training.

18         And then as far as the shared site that

19   our team shares, I -- those are where we place our

20   policies, our procedures, our updated policies,

21   information that everyone can access.

22   BY MR. MOUGEY:

23   Q.    How about organizational charts, do you

24   have access to Walgreens' organizational charts on

1   any of Walgreens' internal sites?

2       A.    Yes.

3       Q.    How far back are those organizational

4   charts available?  How long have they been

5   available?

6       MS. SWIFT:  Object to the form.

7   BY THE WITNESS:

8       A.    I've been able to access an

9   organizational chart, as early as I can remember,

10  2014 where I would be able to look up a director,

11  for example, and see the people that report to that

12  director.

13      MR. MOUGEY:  I don't have anything else.

14  Thank you, Ms. Daugherty.

15      MS. SWIFT:  I have got a few questions.

16      THE WITNESS:  Okay.

17      MS. SWIFT:  If you can stand it.

18                    EXAMINATION

19  BY MS. SWIFT:

20      Q.    Good afternoon, Ms. Daugherty.  How are

21  you doing?

22      A.    Good.  Thank you.

23      Q.    I'll ask you first a few questions about

24  your background, your education.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 I believe you testified you have a

 2    PharmD?

 3          A.    Yes.

 4          Q.    What is a PharmD?

 5          A.    It's a Doctor in Pharmacy.

 6          Q.    When did you get your PharmD?

 7          A.    2000.

 8          Q.    Where did you go to school for your

 9    PharmD?

10          A.    Midwestern University.

11          Q.    Where is Midwestern University?

12          A.    It's in Downers Grove.

13          Q.    Is that a suburb of Chicago?

14          A.    Yes.

15          Q.    Did you get your undergraduate degree at

16    Midwestern as well?

17          A.    Yes.  My Bachelor's in pharmacy.

18          Q.    Do you live here in Chicago?

19          A.    Yes.

20          Q.    Has it always been the case?  Did you

21    grow up here?

22          A.    I wasn't born here, but yes.

23          Q.    I believe you said that your first job

24    at Walgreens was as a pharmacy technician, is that
```

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2         A.    Yes.

3         Q.    When were you first a pharmacy

4    technician at Walgreens?

5         A.    To the best of my recollection, I

6    believe it was 1996.  I started when I was in

7    school.

8         Q.    What does a pharmacy technician do?

9         A.    So, a technician typically types in the

10   prescription in the Intercom Plus system and our

11   adjudication system.  They can fill and count the

12   medication, and then they also can charge the

13   patient or ring up the patient at the register.

14        Q.    Can the pharmacy tech actually dispense

15   medication?

16        A.    No.

17        Q.    Did you also work as a pharmacist at

18   Walgreens?

19        A.    Yes.

20        Q.    What years did you work as a pharmacist

21   at Walgreens?

22        A.    I started in 1999 when I got my

23   Bachelor's in pharmacy, and I want to say --

24   honestly, I think I started at Walgreens Health

1    Initiatives around 2000, 2003, 2000, something like

2    that.

3         Q.    So, from 1999 until you started at

4    Walgreens Health Initiatives in around 2002 you

5    worked as a pharmacist?

6         A.    Yes.

7         Q.    Is that right?

8               Do you have to be licensed to be a

9    pharmacist in Illinois?

10        A.    Yes.

11        Q.    Is that true all over the country?

12        A.    You have to be licensed in the state

13   that you're practicing, yes.

14        Q.    Do you have to take an exam to become a

15   licensed pharmacist?

16        A.    Yes.

17        Q.    What does a pharmacist do, just as a

18   general matter?

19        A.    So, a pharmacist reviews prescriptions,

20   dispenses prescriptions to a patient.

21        Q.    Did you ever work anywhere else as a

22   pharmacist besides Walgreens?

23        A.    No.

24        Q.    You spent a number of years working at

1    various PBMs, is that right?

2          A.    Yes.

3          Q.    What is a PBM, just from your

4    perspective?

5          A.    A PBM is a pharmacy benefits manager.

6    So, we manage prescription insurance essentially.

7          Q.    At a certain point you came back to work

8    at Walgreens after working at a PBM, is that right?

9          A.    Yes.

10         Q.    Was that in January of 2013?

11         A.    Yes.

12         Q.    In your words, what does the group that

13   you work at in Walgreens do, the Pharmaceutical

14   Integrity group?

15         A.    Our team manages flagged orders, reviews

16   orders for approval if a store requests additional

17   product.  We oversee our CSO KPI tool.  We manage

18   our DEA 106 submissions to the DEA and work with

19   our pharmacies.  We also oversee the Naloxone

20   program, the Safe Med Disposal program and we

21   respond to DEA subpoenas.

22         Q.    We'll break that down a little bit, but

23   the first question I have for you about what you

24   just said is:  Since you've been working in

Highly Confidential – Subject to Further Confidentiality Review

```
1    Pharmaceutical Integrity at Walgreens, have you

2    received training on Walgreens' policies and

3    procedures that have helped you do your job?

4         A.    Yes.

5         Q.    Is the training that you receive at

6    Walgreens ongoing today?

7         A.    Yes.

8         Q.    Have you received training on Walgreens'

9    policies with respect to order monitoring?

10        A.    Yes.

11        Q.    Does that include training on Walgreens'

12   policies with respect to suspicious order

13   monitoring?

14        A.    Yes.

15        Q.    You were asked questions today about

16   whether you had a training manual or a training

17   package.  Do you remember those questions?

18        A.    Yes.

19        Q.    Did you receive the information that you

20   needed to do your job when you started in

21   Pharmaceutical Integrity in 2013?

22        A.    Yes.

23        Q.    Do the policies and procedures that you

24   follow at Walgreens in Pharmaceutical Integrity, do
```

1  those policies and procedures change over time for

2  a variety of reasons?

3      A.   Yes.

4      Q.   I want you to turn back, please, to

5  Exhibit 14.  Do you have it?

6      A.   Yes.

7      Q.   Exhibit 14 is the e-mail, it's a chain

8  that ends with an e-mail from you to Tasha Polster

9  and it attaches a document called Settlement and

10  Memorandum of Agreement.  Correct?

11      A.   Yes.

12      Q.   I believe you testified that as part of

13  your job in the time frame of this e-mail, it's

14  dated June 12, 2013, that you reviewed parts of

15  this memorandum and agreement, is that right?

16      A.   Yes.

17      Q.   Which parts did you review as a part of

18  your job in roughly in the 2013 time frame?

19      A.   So, primarily if you flip to after

20  page 13, it's called "Addendum:  Prospective

21  Compliance"; and it relates to Walgreens Integrity

22  Department responding to the DEA within two

23  business days.  It talks about forming an

24  Rx Integrity team, and then it goes on into the

1    rest of the document.

2         Q.    Did you walk through this addendum to

3    the 2013 memorandum and agreement with others on

4    your team at the time?

5         A.    Yes.

6         Q.    Who did you discuss this addendum to the

7    memorandum of agreement with at your job?

8         A.    Eric Stahmann, Ed Bratton and Tasha

9    Polster.

10        Q.    Was Pharmaceutical Integrity, the group

11   that you're in today, was it already up and running

12   at this time in June of 2013 when this settlement

13   was entered?

14        A.    Yes.

15        Q.    As far as you know, did your team in

16   Pharmaceutical Integrity make sure to do all the

17   things that are laid out in the addendum to the

18   memorandum of agreement that's marked as

19   Exhibit 14?

20        A.    Yes.  We reviewed each item and made

21   sure that we were following each item in this

22   "Addendum:  Prospective Compliance."

23        Q.    Briefly, how do Walgreens pharmacies

24   place orders for controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    So, our SIMS system actually suggests

2    orders and places the orders on the store's behalf.

3    Should the store want to place an additional order

4    on top of the suggested order, they have to go

5    through our ceiling to determine whether the item

6    either is over that -- that particular pharmacy's

7    ceiling or over their tolerance on a daily basis

8    and if, for example, it is, they have to request

9    the order directly to our team for approval.

10    Q.    What systems are in place to make sure

11    pharmacies don't order more controlled substances

12    than they need?  You mentioned a ceiling.  Is that

13    something that you have previously referred to

14    today as the CSO KPI tool?

15    A.    Yeah, the CSO KPI tool has a ceiling for

16    each item for each pharmacy as well as a tolerance

17    meaning how much they can order per order, so per

18    instance, and if the store places an order over and

19    above their tolerance or their ceiling, the order

20    is canceled.

21    Q.    What is the difference between a store's

22    tolerance and a store's ceiling limit?

23    A.    So, the ceiling is the most they can

24    order in a rolling six-week period and the

1    tolerance is what the amount they can order per

2    order, per instance.

3         Q.    Am I understanding you correctly, are

4    there limits for both ceiling and tolerance?

5         A.    Yes.

6         Q.    For every store?

7         A.    Yes.  And they're calculated daily for

8    each store for each item.

9         Q.    Are the limits for ceiling and tolerance

10   the same for every Walgreens pharmacy?

11        A.    No, they vary.

12        Q.    Are the limits for ceiling and tolerance

13   the same for an individual pharmacy from one day to

14   the next?

15        A.    They're different every day.

16        Q.    If a pharmacy wants more than the

17   suggested order that they get from the SIMS system,

18   I believe you just touched on this.  Does a store

19   have to go through your team to go above the

20   suggested order?

21        A.    If the -- if the order that they want,

22   if they want more than exceeds their ceiling or

23   their tolerance, they have to go through our team,

24   yes, for approval.

1    Q.    What is good faith dispensing?

2    A.    So, our good faith dispensing defines

3    the pharmacist's responsibility, corresponding

4    responsibility, to determine whether a prescription

5    is legitimate.

6    Q.    Is good faith dispensing, is that a

7    policy that's specific to Walgreens?

8    A.    As far as I know, yes.

9    Q.    Do Walgreens' pharmacists receive

10   training on the Walgreens Good Faith Dispensing

11   policy?

12   A.    Yes.

13   Q.    How often?

14   A.    Every year.

15   Q.    What is Target Drug Good Faith

16   Dispensing?

17   A.    So, Target Drug Good Faith Dispensing

18   includes select drugs where pharmacists have to

19   document and follow a checklist each time they fill

20   a prescription for a target drug.

21   Q.    Do Walgreens pharmacists receive

22   training on the Target Drug Good Faith Dispensing

23   policy as well?

24   A.    Yes.

1      Q.     Have you received training on both of

2    those policies?

3      A.     Yes.

4      Q.     How do you communicate those policies,

5    the Good Faith Dispensing policy and the Target

6    Drug Good Faith Dispensing policy, to the

7    pharmacists at Walgreens?

8      A.     We communicate it through our online

9    learning tool as well as through various

10   communications --

11     Q.     Do those --

12     A.     -- to our pharmacies.

13     Q.     Do those communications come from the

14   Pharmaceutical Integrity group?

15     A.     Yes.

16     Q.     If a pharmacist isn't comfortable

17   filling a prescription, are they required to fill

18   it for any reason?

19     A.     No.

20     Q.     If a pharmacist isn't comfortable

21   filling a prescription, does Walgreens have a

22   policy about what they're supposed to do?

23     A.     They have the right to refuse the

24   prescription if they don't believe the prescription

1    to be legitimate.

2         Q.    Does Walgreens issue blanket refusal to

3    fill orders with respect to doctors?

4         A.    No, we do not.

5         Q.    You got some questions today about DEA

6    subpoenas.  Do you remember those questions?

7         A.    Yes.

8         Q.    You said that part of your job is

9    responding to subpoenas from the DEA.  What kinds

10   of subpoenas did you mean?

11        A.    Primarily prescription subpoenas or

12   subpoenas for hard copy prescriptions

13   documentation.

14        Q.    How do you respond to those requests

15   from the DEA?

16        A.    So, our team pulls the data and

17   typically either e-mails it back encrypted or

18   sometimes if they're paper copies, they will FedEx

19   them.

20        Q.    Does your team take requests from the

21   DEA seriously?

22        A.    Yes.

23        Q.    Does that -- is that true no matter what

24   kind of a request it is?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Yes.

2          Q.     Do you do your best to respond to any

3    requests from the DEA fully and completely?

4          A.     Yes.

5          Q.     Do you do your best to cooperate with

6    the DEA?

7          A.     Yes.

8          Q.     Has it always been the case while you've

9    been at Walgreens?

10         A.     Yes.

11         Q.     I want to ask you some questions about

12   your time as a pharmacist at Walgreens.  I believe

13   you said you were a pharmacist from 1999 to 2002

14   after pharmacy school, is that right?

15         A.     Yes.

16         Q.     When you were a pharmacist at Walgreens

17   in the '99 to 2002 time frame, did you have a

18   professional responsibility to make sure that

19   prescriptions that you filled were only for

20   legitimate medical purposes?

21         A.     Yes.

22         Q.     If you couldn't confirm for yourself

23   that a prescription was legitimate, would you fill

24   it?
```

1     A.     No.

2     Q.     You mentioned when I asked you what

3  Pharmaceutical Integrity does, the group that you

4  work for today, you mentioned something about med

5  take-back or med kiosks.  Did I hear that

6  correctly?

7     A.     Yes.

8     Q.     What is -- what were you referring to?

9     A.     So, in select stores around the country,

10  Walgreens has a drug take-back kiosk, so patients

11  and customers can bring their medications and

12  dispose of them safely in the kiosk.

13     Q.     Can someone come to a Walgreens pharmacy

14  and with expired medication or any kind of

15  medication that they are bringing in that they

16  haven't just received from the pharmacist and hand

17  it over to a pharmacist?

18     A.     No.  They have to actually place it in

19  the kiosk.

20     Q.     Do you know why that is?

21     A.     That's according to law is my

22  understanding.

23     Q.     Do you know how many medication

24  take-back kiosks Walgreens has at its pharmacies

```
 1    around the country?

 2         A.    I think we're about 1,080 right now,

 3    roughly.

 4         Q.    Is that changing over time?

 5         A.    Yes, that's increasing over time.

 6         Q.    You also mentioned something about

 7    Naloxone when I asked you what your group does

 8    today.  What were you referring to?

 9         A.    So, several years ago, as states started

10    allowing our pharmacies to dispense Naloxone

11    without a prescription, based on the state

12    regulations state by state we would implement our

13    Naloxone program to allow our pharmacists to

14    dispense to a customer asking for Naloxone without

15    a physician's prescription.

16              We would dispense it under a standing

17    order or under the pharmacist NPI, so via their

18    pharmacist prescriptive authority per the state.

19         Q.    Do you know how many states allow

20    Walgreens to dispense Naloxone without a

21    prescription?

22         A.    I think we're at 48 today.

23         MS. SWIFT:  I do not have any other questions.

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  FURTHER EXAMINATION
 2   BY MR. MOUGEY:
 3        Q.   Ms. Daugherty, did you or your group
 4   actually respond to the Perrysburg subpoenas,
 5   meaning did you produce documents responsive?
 6        MS. SWIFT:  Objection; foundation.
 7   BY THE WITNESS:
 8        A.   Not that I know of, no.
 9   BY MR. MOUGEY:
10        Q.   Pardon me?  I couldn't hear you over
11   Ms. Swift.
12        A.   Not that I know of.  Sorry.
13        Q.   Who would know the answer to that of
14   whether or not Walgreens responded to the
15   Perrysburg subpoenas?
16             Sorry.  That's kind of a bad question.
17             When I say "responded," I mean produce
18   documents responsive to the subpoenas.
19        A.   I don't know for sure.  I would assume
20   our internal attorneys would know.
21        Q.   When you mentioned earlier that you were
22   responsible for, I think you said, managing or the
23   DEA subpoenas, what did you mean?
24        A.   We respond to DEA subpoenas.  So, if
```

Highly Confidential - Subject to Further Confidentiality Review

1    there is a prescription records request, our team

2    will pull the data that the DEA investigator is

3    asking for.

4         Q.    How come the subpoena to the Perrysburg

5    distribution center wasn't responded to by your

6    group as you would with the pharmacy subpoenas?

7         A.    So, at the time that the -- my

8    understanding when you showed me the document for

9    the Perrysburg subpoena, I don't think we were

10    responding to every single subpoena because we

11    didn't have a dedicated e-mail box at that time.

12         Q.    Okay.  During your tenure with

13    Pharmaceutical Integrity, were pharmacists

14    receiving bonuses for the amount of prescriptions

15    they filled?

16         A.    Yes.

17         Q.    And did you think it was a good practice

18    in your role at Pharmaceutical Integrity for

19    pharmacists to be bonused based on the amount of

20    prescriptions they filled for Schedule II and III

21    narcotics in light of the opiate epidemic?

22         MS. SWIFT:  Object to the form.

23    BY THE WITNESS:

24         A.    I don't know if it was a good practice.

1    BY MR. MOUGEY:

2        Q.    You don't know.  Do you understand how

3    that potentially could be a conflict of interest

4    for a pharmacist to fill a prescription for

5    Schedule II and III prescription opiates when

6    making a decision whether to dispense based on GFD?

7        MS. SWIFT:  Object to the form.

8    BY THE WITNESS:

9        A.    No.  In my position as a pharmacist, I

10   don't know.  We worked for Walgreens the chain and

11   our job was to fill the prescriptions and make sure

12   they were filled legitimately.

13           To the best of my recollection, the

14   bonus was very small and I don't understand it

15   because I don't feel like there was any incentive

16   to fill more controlled substance prescriptions.

17   BY MR. MOUGEY:

18       Q.    So, bonuses wouldn't impact any of the

19   pharmacists when making a decision whether to fill

20   Schedule II and III prescriptions?

21       A.    In my opinion I don't think so.

22       Q.    And you don't see any potential conflict

23   of interest with pharmacists being bonused based on

24   Schedule II and III opiate prescriptions?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    In my role as a pharmacist, our job was

2   to still fill legitimate controlled substance

3   prescriptions.

4        Q.    So, the answer is no, you don't see any

5   potential conflict of interest with pharmacists

6   being bonused based on Schedule II and III opiate

7   prescriptions?

8        A.    In my experience in my role, no.

9        MR. MOUGEY:  I don't have anything further.

10  Thank you.

11       MS. SWIFT:  We're done.

12       THE VIDEOGRAPHER:  We're going off the record

13  at 5:08 p.m.

14              (Time Noted:  5:08 p.m.)

15              FURTHER DEPONENT SAITH NAUGHT.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1
      I, CORINNE T. MARUT, C.S.R. No. 84-1968,

2 Registered Professional Reporter and Certified
Shorthand Reporter, do hereby certify:

3       That previous to the commencement of the
examination of the witness, the witness was duly

4 sworn to testify the whole truth concerning the
matters herein;

5       That the foregoing deposition transcript
was reported stenographically by me, was thereafter

6 reduced to typewriting under my personal direction
and constitutes a true record of the testimony

7 given and the proceedings had;
      That the said deposition was taken

8 before me at the time and place specified;
      That the reading and signing by the

9 witness of the deposition transcript was agreed
upon as stated herein;

10       That I am not a relative or employee or
attorney or counsel, nor a relative or employee of

11 such attorney or counsel for any of the parties
hereto, nor interested directly or indirectly in

12 the outcome of this action.

13

           _____

14       CORINNE T. MARUT, Certified Reporter

15

      (The foregoing certification of this

16 transcript does not apply to any
reproduction of the same by any means, unless under

17 the direct control and/or supervision of the
certifying reporter.)

18

19

20

21

22

23

24

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.  You

 5    should state the reason in the appropriate space on

 6    the errata sheet for any corrections that are made.

 7                  After doing so, please sign the errata

 8    sheet and date it.

 9                  You are signing same subject to the

10    changes you have noted on the errata sheet, which

11    will be attached to your deposition.

12                  It is imperative that you return the

13    original errata sheet to the deposing attorney

14    within thirty (30) days of receipt of the

15    deposition transcript by you.  If you fail to do

16    so, the deposition transcript may be deemed to be

17    accurate and may be used in court.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              -   -   -   -   -   -

                E R R A T A

2              -   -   -   -   -   -

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6                  REASON:  _____

7    _____  _____  _____

8                  REASON:  _____

9    _____  _____  _____

10                 REASON:  _____

11   _____  _____  _____

12                 REASON:  _____

13   _____  _____  _____

14                 REASON:  _____

15   _____  _____  _____

16                 REASON:  _____

17   _____  _____  _____

18                 REASON:  _____

19   _____  _____  _____

20                 REASON:  _____

21   _____  _____  _____

22                 REASON:  _____

23   _____  _____  _____

24                 REASON:  _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2                    ACKNOWLEDGMENT OF DEPONENT

 3

 4              I, PATRICIA DAUGHERTY, do hereby

 5    certify under oath that I have read the foregoing

 6    pages, and that the same is a correct transcription

 7    of the answers given by me to the questions therein

 8    propounded, except for the corrections or changes

 9    in form or substance, if any, noted in the attached

10    Errata Sheet.

11

12

13         _____

14         PATRICIA DAUGHERTY                DATE

15

16

17    Subscribed and sworn
      to before me this
18    _____ day of _____, 20____.
19    My commission expires:_____

20
      _____ Notary Public
21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                           LAWYER'S NOTES

2       PAGE   LINE

3       _____  _____   _____

4       _____  _____   _____

5       _____  _____   _____

6       _____  _____   _____

7       _____  _____   _____

8       _____  _____   _____

9       _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____