1

2        IN THE UNITED STATES DISTRICT COURT

3         FOR THE NORTHERN DISTRICT OF OHIO

4                  EASTERN DIVISION

5                     -  -  -

6    IN RE:  NATIONAL        :   HON. DAN A.
     PRESCRIPTION OPIATE     :   POLSTER
7    LITIGATION              :
                             :
8    APPLIES TO ALL CASES    :   NO.
                             :   1:17-MD-2804
9                            :

10            - HIGHLY CONFIDENTIAL -

11   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12                    -  -  -

13                January 10, 2019

14                    -  -  -

15           Videotaped deposition of
     FRANK DEVLIN, taken pursuant to
16   notice, was held at the offices of
     Zuckerman Spaeder, LLP, 1800 M Street NW,
17   Suite 1000, Washington, D.C., beginning
     at 8:33 a.m., on the above date, before
18   Michelle L. Gray, a Registered
     Professional Reporter, Certified
19   Shorthand Reporter, Certified Realtime
     Reporter, and Notary Public.

20                    -  -  -

21

22        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com

24

Highly Confidential - Subject to Further Confidentiality Review

Page 2

APPEARANCES:

BAKER & BAKER, PLLC
BY: WILLIAM C. BAKER, JR., ESQ.
300 East Government Street
Pensacola, Florida 32502
(850) 433-0888
Wcb850@gmail.com
Smh@bakerlawemail.com
- and -
WEISMAN KENNEDY & BERRIS, LPA
BY: JAMES A. DeROCHE, ESQ.
101 West Prospect Avenue, Suite 1600
Midland Building
Cleveland, Ohio 44115
(216) 696-7009
Jderoche@garson.com
Representing the Plaintiffs

ZUCKERMAN SPAEDER, LLP
BY: ALEXANDRA W. MILLER, ESQ.
1800 M. Street NW, Suite 1000
Washington, D.C. 20036
(202) 778-1845
smiller@zuckerman.com
Representing the Defendant, CVS, and the
Witness

WILLIAMS & CONNOLLY LLP
BY: KATELYN ADAMS, ESQ.
725 12th Street, NW
Washington, D.C. 20005
(202) 434-5148
kadams@wc.com
Representing the Defendant, Cardinal
Health

Page 3

TELEPHONIC APPEARANCES:

MOTLEY RICE, LLC
BY: MICHAEL ELSNER, ESQ.
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9373
melsner@motleyrice.com
Representing the Plaintiffs

JONES DAY
BY: CHRISTINE D. PROROK, ESQ.
77 West Wacker Drive
Chicago, Illinois 60601
(312) 269-4113
Cprorok@jonesday.com
Representing the Defendant, Walmart

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: ZENO HOUSTON, ESQ.
250 West 55th Street
New York, New York 10019
(212) 836-7332
Zeno.houston@arnoldporter.com
Representing the Defendants, Endo Health
Solutions; Endo Pharmaceuticals, Inc.;
Par Pharmaceutical Companies, Inc. f/k/a
Par Pharmaceutical Holdings, Inc.

JACKSON KELLY, PLLC
BY: JONATHAN L. ANDERSON, ESQ.
500 Lee Street East
Suite 1600
Charleston West Virginia 25301
(304) 340-1169
Jlanderson@jacksonkelly.com
Representing the Defendant,
AmerisourceBergen

Page 4

ALSO PRESENT:
Stephanie Heckman, Paralegal
(Baker & Baker, PLLC)

Justin L. Mann, Esq. (Law Clerk)
(Ropes Gray - via telephone)

Amy Kennedy, Paralegal
(Weisman Kennedy - via telephone))

VIDEOTAPE TECHNICIAN:
Dan Lawlor

LITIGATION TECHNICIAN:
James Beall

Page 5

- - -
I N D E X
- - -

Testimony of:

FRANK DEVLIN

By Mr. Baker          14
By Mr. DeRoche         384

- - -

E X H I B I T S

- - -

NO.          DESCRIPTION          PAGE

CVS
Devlin-P-18  E-mail Thread         89
             1/3/08
             Subject, New Rx
             DEA SOP
             CVS-MDLT1-000025204-59

CVS
Devlin-P-48  Controlled Drug       96
             DEA Standard
             Operating Procedures
             Manual
             CVS-MDLT1-000024877-41

Page 6

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| CVS Devlin-P-53 | E-mail, 10/8/12 Subject, Conference Call Notes CVS-MDLT1-000033579-81 | 343 |
| CVS Devlin-P-55 | Business Idea Description CVS-MDLT1-000034175-77 | 321 |
| CVS Devlin-P-56 | Memo, 8/13/10 Subject, Control Drug IRR Update CVS-MDLT1-000034183 | 212 |
| CVS Devlin-P-57 | E-mail Thread 5/19/09 Subject, Updated DEA SOP CVS-MDLT1-000034234-35 | 92 |
| CVS Devlin-P-64 | Drug Fact Sheet Heroin CVS-MDLT1-000055613-36 | 71 |
| CVS Devlin-P-68 | E-mail, 5/16/11 Subject, Control Drug Suspicious Order Monitoring CVS-MDLT1-000057736-37 | 226 |

Page 7

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| CVS Devlin-P-68A | E-mail Thread 1/28/11 Subject, IRR Narratives CVS-MDLT1-000083966-71 | 243 |
| CVS Devlin-P-69 | SOM Due Diligence Guidance Document CVS-MDLT-000057741-43 | 282 |
| CVS Devlin-P-70 | E-mail, 8/25/10 Subject, Control Drug IRR Draft 3 CVS-MDLT1-000057751-54 | 109 |
| CVS Devlin-P-71 | E-mail Thread 3/14/11 Subject, IRR/SOM Retirement BSR_LOG CVS-MDLT1-000057759 CVS-MDLT1-000055834 | 159 |
| CVS Devlin-P-81 | E-mail Thread 9/1/10 Subject, DEA Speaking Points CVS-MDLT1-000075299-12 | 137 |

Page 8

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| CVS Devlin-P-82 | E-mail Thread 10/12/10 Subject, VBDC Question CVS-MDLT1-000075542 | 327 |
| CVS Devlin-P-92 | E-mail Thread 11/29/12 Subject, Privileged And Confidential SOM Process Documentation CVS-MDLT1-000083064-66 | 331 |
| CVS Devlin-P-94 | E-mail Thread 11/5/09 Re: 11/10/09 CVS-MDLT-000087889-90 | 96 |
| CVS Devlin-P-95 | E-mail Thread 7/26/10 Subject, SOM Update CVS-MDLT1-000088522-34 | 212 |
| CVS Devlin-P-97 | E-mail, 8/28/10 Subject, DEA SOP 8/25/10 CVS-MDLT1-000088956-25 | 114 |

Page 9

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| CVS Devlin-P-98 | E-mail Thread 8/23/10 Subject, DEA SOP CVS-MDLT-000089188 | 102 |
| CVS Devlin-P-102 | E-mail, 2/21/08 Subject, DEA Letters SOMs CVS-MDLT1-000091508-18 | 76 |
| CVS Devlin-P-104 | E-mail Thread 1/18/13 Subject, 1/18/13 CVS-MDLT1-000103329 | 59 |
| CVS Devlin-P-106 | E-mail Thread 11/27/12 Subject, SOM Meeting 11/27 CVS-MDLT1-000029867-68 | 356 |
| CVS Devlin-P-130 | LinkedIn Profile Frank Devlin | 26 |
| CVS Devlin-P-131 | CVS Health Web Printout History | 29 |

Page 10

- - -

**E X H I B I T S** (Cont'd.)

- - -

NO.        DESCRIPTION        PAGE

CVS
Devlin-P-132 Distribution Center   38
        ID XREF
        CVS Caremark Suppliers

CVS
Devlin-P-140 Suspicious Order    285
        Monitoring
        For PSE/Control
        Drugs
        8/27/10
        CVS-MDLT1-000061191-03

CVS
Devlin-P-143 E-mail, 10/13/10    148
        Subject, LP Analyst
        CVS-MDLT1-000104894-97

CVS
Devlin-P-146 Letter, 3/22/07    196
        Subject, Regulatory
        Consulting Services
        (Buzzeo PDMA)
        CVS-MDLT1-00109199-06

CVS
Devlin-P-150 E-mail Thread    200
        2/9/11
        Subject, The CVS Retunement
        CVS-MDLT1-000061141-42

CVS
Devlin-P-164 Chart, Native    323
        Document Yes, No, Code
        (No Bates)

Page 11

- - -

**E X H I B I T S** (Cont'd.)

- - -

NO.        DESCRIPTION        PAGE

CVS
Devlin-P-200 Item Review    469
        Reports
        CVS-MDLT1-00001195-04

CVS
Devlin-P-201 Item Review    426
        Reports
        CVS-MDLT1-000100763-74

CVS
Devlin-P-209 E-mail, 1/6/10    315
        Subject, Control Drug
        IRR Issue Recap
        CVS-MDLT1-000110260

CVS
Devlin-P-211 E-mail Thread    270
        2/24/10
        Subject, Adjustment
        To the CVS SOM
        CVS-MDLT1-000110434-36

Page 12

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked

PAGE   LINE
None.

Page 13

1        THE VIDEOGRAPHER:  We are
2    now on the record.
3        My name is Dan Lawlor, I'm a
4    videographer with Golkow
5    Litigation Services.
6        Today's date is January 10,
7    2019, and the time is 8:33 a.m.
8        This video deposition is
9    being held in Washington, DC, in
10    the matter of National
11    Prescription Opiate litigation,
12    MDL Number 2804.
13        The deponent is Frank
14    Devlin.
15        Counsel will be noted on the
16    stenographic record.
17        The court reporter is
18    Michelle Gray and will now swear
19    in the witness.
20        - - -
21        ... FRANK DEVLIN,
22    having been first duly sworn, was
23    examined and testified as follows:
24        - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 14

EXAMINATION

- - -

BY MR. BAKER:

Q.   Please state your name.

A.   Frank Devlin.

Q.   Mr. Devlin, where do you live?

A.   I live in Pocasset, Massachusetts.

Q.   What is your employment right now?

A.   Excuse me?

Q.   Where are you employed right now?

A.   I own my own consulting company.

Q.   What's the name of the company?

A.   Seashore Risk Management.

Q.   And what is the nature of that business?

A.   It's a consulting firm focusing on safety, OSHA compliance, auditing, forklift training.

Page 15

Q.   Are your customers corporate customers?

A.   Yes.

Q.   Is CVS one of your customers?

A.   No.

Q.   Have you courted CVS to be one of your customers?

MS. MILLER:  Object to form.

BY MR. BAKER:

Q.   Have you tried to get CVS to become one of your customers?

MS. MILLER:  Objection.

BY MR. BAKER:

Q.   Go ahead.

A.   No.

Q.   Have you made any contact with CVS since leaving CVS in 2012?

A.   No.

Q.   What was the reason you left CVS in 2012?

A.   A better employment opportunity.

Q.   What was the better

Page 16

employment opportunity?

A.   Amazon.

Q.   Is that where Mr. Burtner also went to work, Aaron Burtner?

A.   Yes.

Q.   Okay.  Did -- did you help Mr. Burtner get employed at Amazon?

MS. MILLER:  Object to form.

BY MR. BAKER:

Q.   Did you?

MS. MILLER:  Object.

BY MR. BAKER:

Q.   Go ahead.

Let me explain.  When the attorney objects, she objects to form. That doesn't mean you can't answer the question.  It's just a technicality in the rules of procedure where she says object to form, so she preserves the right to go to the judge and have the question looked at by the judge to determine if it's a properly phrased question.  And -- but it doesn't mean you don't answer the question.

Page 17

So if she instructs you not to answer, that would be the only time you wouldn't answer the question.  Fair enough?

MS. MILLER:  And just, Frank, that's correct.  I'm noting my objections on the record.  You may respond to the question unless I instruct you not to answer.

THE WITNESS:  Okay. Can you repeat the question?

BY MR. BAKER:

Q.   Yeah, many times during this deposition counsel seated to your left will say object to form.  That's her right to do that.  That doesn't mean that you don't answer the question.  It's just noted on the record that she objected to the question.  It doesn't necessarily mean something's wrong with the question. It's just she's preserving her right to object at a later time.

A.   I understood.

Q.   Is that clear?

Page 18

1     All right.  So what, if any,
2 contact did you have with Mr. Burtner
3 before he came to work for Amazon, after
4 you left --
5     A.   Yes.
6     Q.   -- CVS, you went to Amazon,
7 right?
8     A.   That is correct.
9     Q.   In 2012.
10     A.   That is correct.
11     Q.   Okay.  What contact did you
12 have with Mr. Burtner after you left CVS
13 to go to Amazon?
14     A.   I reached out to Mr. Burtner
15 for possible employment opportunity with
16 Amazon.
17     Q.   When did you do -- okay.
18 When did you do that?
19     MS. MILLER:  Bill, would you
20     just give him a chance to answer?
21     MR. BAKER:  Sure.
22 BY MR. BAKER:
23     Q.   And I didn't mean to
24 overstep your answer, but you're --

Page 19

1 you're kind of soft-spoken so I can't
2 tell when you're finished your answer.
3     THE WITNESS:  Okay.
4     MS. MILLER:  And, Frank,
5     give him time to complete his
6     question, please.
7 BY MR. BAKER:
8     Q.   Are you ready for the
9 question?
10     A.   Can you repeat your
11 question?
12     Q.   Okay.  The question is, when
13 did you reach out to Mr. Burtner for the
14 prospect of employment with Amazon when
15 you were at Amazon?
16     A.   It probably would have been
17 sometime in 2013.  I can't recall the
18 exact date.
19     Q.   All right.  And what was the
20 reason that you reached out to him?
21     MS. MILLER:  Object to form.
22     THE WITNESS:  I knew him and
23     I knew his capabilities.
24 BY MR. BAKER:

Page 20

1     Q.   Do you know whether or not
2 he expressed anything to you about being
3 unhappy at CVS with his employment?
4     MS. MILLER:  Objection.
5     THE WITNESS:  No.
6     MS. MILLER:  Frank, just
7     give me a little time, stepping on
8     my objections.  Go ahead.
9 BY MR. BAKER:
10     Q.   Did Mr. Burtner express to
11 you any problems going on within the
12 morale of employees at CVS while he was
13 there?
14     MS. MILLER:  Object to form.
15 BY MR. BAKER:
16     Q.   Did he express that to you
17 at all?
18     MS. MILLER:  Object to form.
19     THE WITNESS:  No, not that I
20     can recall.
21 BY MR. BAKER:
22     Q.   How long did you work at
23 Amazon while Mr. Burtner was also at
24 Amazon?

Page 21

1     A.   My employment at Amazon was
2 from beginning of November 2012 through
3 March of 2014.
4     Q.   I'm going to go through a
5 list of acronyms which are abbreviations
6 for words.  And I want to make sure
7 before we go into your deposition today
8 that when we use these acronyms, we're --
9 we're on the same page with respect to
10 these acronyms.
11     Okay?  Are you with me?  Do
12 you understand?
13     A.   I do.
14     Q.   Okay.  All right.  The first
15 acronym is SOM, can you tell us what SOM
16 stands for?
17     A.   I believe that's suspicious
18 order monitoring.
19     Q.   The next acronym is SOP, can
20 you tell us what SOP stands for?
21     MS. MILLER:  Object to form.
22     THE WITNESS:  I believe that
23     would be standard operating
24     procedure.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

BY MR. BAKER:

Q.  I'm asking you these questions in reference to how they were used at CVS.  So that's the context of the question.  So at CVS, SOP was standard operating procedure, correct?

MS. MILLER:  Objection.

THE WITNESS:  I believe so. I can't say 100 percent.  There are a lot of -- a lot of abbreviations, whether it was at CVS or Amazon.  So sometimes they tend to blend together.

BY MR. BAKER:

Q.  When we're talking about an SOM SOP, would that be a suspicious order monitoring standard of procedure at CVS when you were there?

MS. MILLER:  Objection.

THE WITNESS:  No.

BY MR. BAKER:

Q.  Sir?  What's the answer?

MS. MILLER:  Go ahead.

THE WITNESS:  No.

Page 23

BY MR. BAKER:

Q.  What would an SOM SOP be?

MS. MILLER:  Objection.

THE WITNESS:  I believe it would be suspicious order monitoring standard operating procedure.

BY MR. BAKER:

Q.  Okay.  When you're talking about a P&P, is that policy and procedure?

MS. MILLER:  Objection.

THE WITNESS:  Can you repeat that?

BY MR. BAKER:

Q.  P&P, is that policy and procedure?

MS. MILLER:  Objection.

THE WITNESS:  I'd have to see the context in how it's being used.

BY MR. BAKER:

Q.  Okay.  DOJ, that's the Department of Justice.  Are you familiar

Page 24

with that?

A.  I've heard the terminology.

Q.  DEA.  Who is the DEA that you know to exist in the context of your employment when you worked there at CVS?

A.  That would be the Drug Enforcement Agency.

Q.  FDA, who would that be in the context of your employment at CVS when you worked in the suspicious order monitoring department?

MS. MILLER:  Objection.

MR. BAKER:  She objected.

BY MR. BAKER:

Q.  What does FDA mean to you? Food and Drug Administration.  Do you understand that?

A.  I've heard that term used, yes.

Q.  Okay.  CVS, what does that stand for?

MS. MILLER:  Objection.

THE WITNESS:  I've heard it stand for a couple different

Page 25

terms.

BY MR. BAKER:

Q.  Tell me.

A.  For Consumer Value Stores.

Q.  Anything else?

A.  Also Convenience Value, and I forget what the other S was.

Q.  C.F.R., Code of Federal Regulation, are you familiar with that?

A.  Which one?

Q.  Are you familiar with the concept of Code of Federal Regulation? Are you familiar with that term?

A.  I've heard the term "C.F.R.," yes.

Q.  CSA, Controlled Substances Act, have you ever heard of that?

MS. MILLER:  Objection.

THE WITNESS:  I believe I may have heard that, yes.

BY MR. BAKER:

Q.  Okay.  When you worked at CVS, that was from May of 25 -- May of 2005 to October of 2012; is that right?

Page 26

1    A.   No.

2    Q.   When did you work there?

3    A.   February 11th, 1991, through

4 the end of October 2012.

5    Q.   Do you have a LinkedIn page?

6    A.   Yes.

7    Q.   Let me show you what's been

8 marked as Plaintiff's Exhibit Number 130.

9        (Document marked for

10    identification as Exhibit

11    CVS-Devlin-P-130.)

12 BY MR. BAKER:

13    Q.   Is this your LinkedIn page

14 that you're looking at?

15    A.   I need to get my glasses.

16    Q.   Is that it?

17    A.   I need to look through it

18 first.  Appears to be, yes.

19    Q.   Okay.  On your LinkedIn

20 page, the second-to-last page, it has CVS

21 Health.

22        MR. BAKER:  Page forward,

23    please.

24 BY MR. BAKER:

Page 27

1    Q.   At the top, it says here

2 that you were employed at CVS Health from

3 May 2005 to October 2012, seven years and

4 six months.  Did you enter that data in

5 your page?

6    A.   Yes.

7    Q.   Okay.  What was the reason

8 that you chose that time frame to tell

9 everybody that you were employed at CVS

10 Health as opposed to 1991 forward?

11        MS. MILLER:  Objection.

12        THE WITNESS:  Just from an

13    age standpoint.

14 BY MR. BAKER:

15    Q.   What do you mean an age

16 standpoint?

17    A.   Just there's no requirement

18 on LinkedIn as far as putting down exact

19 employment dates.

20    Q.   What happened in May of 2005

21 with respect to your employment that

22 causes you to choose that date?

23    A.   I believe at that point, and

24 not 100 percent sure that I probably

Page 28

1 would have been promoted to another level

2 in a director position.

3    Q.   What position were you

4 promoted to in May of 2005 at CVS Health?

5    A.   CVS had various levels of

6 director positions.

7    Q.   What was the position?

8    A.   It was a similar position to

9 what I was already doing.

10    Q.   What was the name of the

11 position?

12    A.   Director of logistics, loss

13 prevention.

14    Q.   Okay.  So at that point you

15 continued to work as director of

16 logistics, loss prevention from May 2005

17 to October 2012; is that right?

18    A.   Can you repeat that?

19    Q.   Did you work as director of

20 logistics, loss prevention from May 2005

21 to October 2012 at CVS Health?

22    A.   Yes.

23    Q.   Okay.  During that time, was

24 CVS known as CVS Health or CVS Caremark?

Page 29

1        MS. MILLER:  Objection.

2        THE WITNESS:  They were

3    probably -- they've had so many

4    different names.  It could have

5    been CVS Caremark.

6 BY MR. BAKER:

7    Q.   Okay.

8        (Document marked for

9    identification as Exhibit

10    CVS-Devlin-P-131.)

11 BY MR. BAKER:

12    Q.   Let me show you Exhibit 131.

13 I'm trying to get an accurate history of

14 the names of the corporations within CVS

15 Health.  And I'd like to spend some time

16 doing that with you.

17        If you could turn -- this

18 comes from CVS Health's website.  And if

19 you turn to the area of 2001 through

20 2006.  Go about eight pages in.

21    A.   What was the date again?

22    Q.   2001 at the top of the page.

23 Do you see it?  Are you there?

24    A.   "CVS introduces ExtraCare

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 card"?

2     Q. Correct. Okay. Go down to
3 2003. It says, "CVS Caremark Rx and
4 AdvancePCS announce strategic
5 combination, creating a $23 billion
6 company." Were you with them at the
7 time?

8       MS. MILLER: Objection.

9 BY MR. BAKER:

10     Q. Were you with CVS Caremark
11 at the time?

12       MS. MILLER: Objection.

13       THE WITNESS: I was employed
14 at CVS from February 11, 1991
15 through the end of October 2012.

16 BY MR. BAKER:

17     Q. Okay. So 2003 you would
18 have been employed by CVS Caremark?

19       MS. MILLER: Objection.

20 BY MR. BAKER:

21     Q. Yes?

22     A. Yes.

23     Q. Okay. All right. Then it
24 talks about in 2007, it says, "CVS" -- go

Page 31

1 to the next page. It says, "CVS
2 Corporation and Caremark Rx, Inc.,
3 complete their transformative merger,
4 creating CVS Caremark, the nation's
5 premier integrated pharmacy services
6 provider."

7     Is that, to your knowledge,
8 when CVS became known as CVS Caremark?

9       MS. MILLER: Objection.

10 BY MR. BAKER:

11     Q. Or not?

12       MS. MILLER: Objection.

13       THE WITNESS: That's what
14 this document says. I wouldn't
15 know that.

16 BY MR. BAKER:

17     Q. Who was your employer in
18 2007 at CVS, which CVS entity?

19       MS. MILLER: Objection.

20       THE WITNESS: I just refer
21 to CVS as CVS.

22 BY MR. BAKER:

23     Q. Okay.

24     A. I didn't get -- I didn't get

Page 32

1 kind of hung up as far as whether it's
2 CVS Pharmacy, CVS Distribution, CVS
3 Logistics, CVS Health, CVS Caremark.
4 It's CVS.

5     Q. Okay. Do you know when the
6 corporation became known as CVS Health?

7       MS. MILLER: Objection.

8       THE WITNESS: No.

9 BY MR. BAKER:

10     Q. Okay. Go to 2014, under the
11 history of the company.

12       MS. MILLER: Mr. Baker, just
13 a question about the document.
14     Where was this obtained
15 from?

16       MR. BAKER: From the
17 website, CVS.com. It says it
18 right there at the top.

19 BY MR. BAKER:

20     Q. You see on the page under
21 2014, do you see that? You're there.
22 2014. Go to the next page.

23     A. It's cut off.

24     Q. Go to the next page. Go

Page 33

1 about a third of the way down the page.
2 It says, "CVS Caremark announces that its
3 corporate name has changed to CVS Health
4 to further reflect its broader commitment
5 to healthcare."

6     Do you see that?

7     A. I do.

8     Q. Okay. Is that, to your
9 knowledge, when CVS Caremark became known
10 as CVS Health?

11       MS. MILLER: Objection.

12       THE WITNESS: I really
13 didn't pay attention to it.

14 BY MR. BAKER:

15     Q. Okay. Well, you list CVS
16 Health as your employer. That's why I'm
17 wondering why you chose that name. Is
18 that the last name that the company was
19 known as at the time that you left, or
20 did it become known as CVS Health after
21 you left?

22       MS. MILLER: Objection.

23       THE WITNESS: The LinkedIn
24 page, it's not -- the LinkedIn

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    page isn't, as far as I know it is
2    not a legal document. And in
3    putting my history down, it's --
4    you try to keep current. So it's
5    not a reflection of -- I didn't
6    get into -- again, I didn't get
7    into whether it's CVS, CVS
8    pharmacy, CVS Health.
9          When you update your
10   LinkedIn page, that comes up, it's
11   now referred to as CVS Health.
12   BY MR. BAKER:
13      Q.   Okay. Let me explain. I'm
14   not criticizing you for putting CVS
15   Health on there. I just want know the
16   name of the company that paid you while
17   you worked there. That's all I'm getting
18   at. Okay.
19         So when you left in 2012,
20   was the company known as CVS Health or
21   CVS Caremark, or do you know?
22         MS. MILLER: Objection --
23         objection. Asked and answered.
24   BY MR. BAKER:

Page 35

1       Q.   Do you know?
2       A.   I believe I already answered
3    that.
4       Q.   Okay. See, here is what I'm
5    asking you. Do you know whether or not
6    the company name was CVS Caremark or CVS
7    Health when you left, do you know?
8    That's all I'm asking.
9          MS. MILLER: Objection.
10         Asked and answered.
11         THE WITNESS: No.
12   BY MR. BAKER:
13      Q.   Okay. You don't know.
14   Okay.
15         So when you worked there as
16   director of logistics loss prevention,
17   how many -- or excuse me. Where
18   physically were you located when you were
19   working as the director of logistics loss
20   prevention in 2005?
21      A.   2005. My office may have
22   been in the Woonsocket distribution
23   center.
24      Q.   Where were you employed in

Page 36

1    2006, where was your physical location?
2       A.   It still may have been in
3    the distribution center. But I --
4       Q.   Okay. How long did that
5    continue?
6       A.   Probably, I don't know, it
7    was 2007, 2008 I moved to the corporate
8    office which was just up the street.
9       Q.   Okay. So -- and from 2008
10   all the way through the time that you
11   left in 2012, were you in the corporate
12   office in Woonsocket, Rhode Island?
13      A.   Yes. Various -- various
14   locations. I was 1 CVS Drive. I was
15   also at the --
16      Q.   Let me show you what's
17   marked as Exhibit 130 --
18      A.   I didn't finish.
19      Q.   Yeah, go ahead. I'm just
20   trying to move through this, because we
21   only have a certain amount of time to do
22   this.
23      A.   Okay.
24      Q.   I appreciate the fact that

Page 37

1    you're trying to be precise in your
2    answers, but if you drag it on beyond
3    what's necessary to answer the question,
4    it just makes us have to stay here that
5    much longer. And I'd really like to move
6    through this for your benefit, to catch
7    your airplane this afternoon and for
8    everybody's benefit. Okay? I'm not
9    trying to be ugly to you. I just want to
10   move through this. Okay?
11      A.   All right.
12      Q.   So if we could do that, I'd
13   appreciate you doing that in the context
14   of your answer.
15      A.   Sure.
16      Q.   I know you're nervous. It's
17   obvious from looking at you, but I'm not
18   trying to do anything other than ask you
19   straight questions and get straight
20   answers. Is that fair?
21      A.   Okay. I just want to make
22   sure I understand the question.
23      Q.   Sure. If you -- if you
24   think I'm being unfair with you, tell me.

Page 38

1 Okay? But I'm trying to be very fair
2 with you in how I treat you --
3    A.   No, I understand --
4    Q.   -- and I want to be very
5 fair with you in terms of letting you
6 look at the documentation that I'm
7 looking at so you understand where I'm
8 coming from. I'm just trying to get the
9 facts. Is that -- is that clear?
10   A.   Yes, sir.
11   Q.   Okay.
12       MS. MILLER: And, Bill, just
13   give him a chance to answer the
14   question.
15       MR. BAKER: Sure. Sure.
16       (Document marked for
17   identification as Exhibit
18   CVS-Devlin-P-132.)
19 BY MR. BAKER:
20   Q.   This is marked as
21 Exhibit 132. This is --
22   A.   If I just can go back, I
23 wanted to just discuss where my office
24 was located.

Page 39

1    Q.   Sure. Go ahead.
2    A.   I was 1 CVS Drive, and then
3 towards the end of my tenure we moved to
4 an office in Highland Drive which was in
5 Cumberland, Rhode Island. But it was
6 part of the same office complex.
7    Q.   Okay. But during the period
8 of time that you were employed at CVS
9 from 2005 to 2012 when you were in the
10 logistics loss prevention department as
11 the director, you were physically located
12 in Rhode Island, correct?
13   A.   Yes. That's -- that's where
14 my mail would come to, but I -- yes.
15   Q.   Okay. And that's where your
16 physical office was located; is that
17 right?
18   A.   Yes, sir.
19   Q.   All right. I've handed you
20 Exhibit 132. This is a distribution
21 center printout for CVS Health. Can you
22 tell me when you worked there, when you
23 last left in 2012, approximately how many
24 distribution centers were there for CVS

Page 40

1 Health across the United States?
2       MS. MILLER: Objection.
3       THE WITNESS: I'm sorry, can
4   you rephrase the question?
5 BY MR. BAKER:
6    Q.   When you last worked at CVS
7 in October of 2012, that's when you last
8 worked there, right?
9    A.   Yes, sir.
10   Q.   Okay. How many distribution
11 centers were there for CVS? And I'm
12 going to say CVS because there's so many
13 different CVS entities.
14   A.   Right.
15   Q.   So when I say CVS, you know
16 who I'm talking about, correct?
17   A.   Yes, sir.
18   Q.   Okay. I'm talking about
19 your employer in 2012.
20       So how many distribution
21 centers were there at that time?
22   A.   I'd say, off the top of my
23 head, maybe about 20.
24   Q.   Okay. And out of that 20,

Page 41

1 how many were licensed for distributing
2 narcotics?
3       MS. MILLER: Objection.
4       THE WITNESS: If you give me
5   a moment I can try to recall.
6       Maybe about eight.
7 BY MR. BAKER:
8    Q.   Okay. Let's go through this
9 list. We'll make sure I get all of them.
10 Okay?
11       Look on this list, and
12 you'll see -- you can see where it's
13 yellowed in on your screen. Do you see
14 it on the screen?
15   A.   Yeah --
16   Q.   Okay.
17   A.   That's difficult for me to
18 read.
19   Q.   Okay. We'll put --
20       MS. MILLER: Mr. Baker, just
21   one moment.
22       MR. BAKER: Sure.
23       MS. MILLER: Can you tell us
24   the -- I notice there's no Bates

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 number on the document.
2 MR. BAKER: This is an --
3 MS. MILLER: Can you tell us
4 where this originated from?
5 MR. BAKER: This is an
6 internet document from CVS.com.
7 And this is where I got it. And I
8 want to make sure that he is able
9 to look at the yellowed-in version
10 on the screen.
11 You can pull the screen to
12 you.
13 MS. MILLER: But, Mr. --
14 Mr. Baker, this is as of June --
15 MR. BAKER: 2014.
16 MS. MILLER: Well, it says
17 June, it's dated June 14, 2018.
18 MR. BAKER: Yeah, I'm going
19 to ask him which ones were in
20 existence when he was there.
21 MS. MILLER: Okay.
22 MR. BAKER: Okay?
23 THE WITNESS: I have
24 distance glasses that I brought

Page 43

1 with me.
2 BY MR. BAKER:
3 Q. Okay. Go ahead. All right.
4 Let's go through it if we could.
5 A. Can --
6 Q. Sure.
7 A. Do you want me to go get my
8 distance glasses?
9 Q. No. Just whatever you --
10 you can pull the screen right --
11 MS. MILLER: Or the document
12 in front of you is the same
13 document on the screen.
14 THE WITNESS: Okay. Just
15 it's difficult for me to see the
16 yellow highlight.
17 BY MR. BAKER:
18 Q. Are you ready?
19 A. If I can pull the screen
20 closer.
21 Q. Yes.
22 MS. MILLER: And again,
23 Bill, your question is as of when
24 he left --

Page 44

1 MR. BAKER: Correct.
2 MS. MILLER: -- in 2012?
3 MR. BAKER: Correct. We're
4 going to go through that.
5 BY MR. BAKER:
6 Q. All right. The first -- you
7 see where it says type Rx? That's the
8 type of distribution center. Do you see
9 that, that would be Rx licensed?
10 A. Yes.
11 Q. Okay. All right. The first
12 one is CR, which is Conroe, Texas; is
13 that correct?
14 A. That was -- that was there,
15 yes.
16 Q. All right. Was that on
17 board in 2012?
18 A. I believe so, yes.
19 Q. All right. The second one
20 is Ennis, Texas. Do you see that?
21 A. Yes, correct?
22 Q. Was that on board as a
23 narcotics distribution center in 2012?
24 A. Yes.

Page 45

1 MS. MILLER: Objection.
2 BY MR. BAKER:
3 Q. What does Rx mean to you?
4 MS. MILLER: Objection.
5 THE WITNESS: Pharmacy.
6 BY MR. BAKER:
7 Q. Okay. All right. So what
8 do you call the type of licensing that
9 these distribution centers have when they
10 are able to distribute narcotics, what do
11 you call that?
12 MS. MILLER: Objection.
13 THE WITNESS: I would call
14 it a DEA registered facility.
15 BY MR. BAKER:
16 Q. Okay. A DEA registered
17 facility is one that distributes -- that
18 has a license to distribute some form of
19 narcotics; is that right?
20 MS. MILLER: Objection.
21 THE WITNESS: It would be
22 Controls III through V, I believe.
23 BY MR. BAKER:
24 Q. Okay. Controlled Substances

Page 46

1 III through V, correct?
2    A.   Right.
3    Q.   All right.  And you know
4 that certain controlled substances under
5 III were narcotics, meaning hydrocodone
6 combination products, correct?
7        MS. MILLER:  Objection.
8 BY MR. BAKER:
9    Q.   You knew that?
10       MS. MILLER:  Objection.
11 BY MR. BAKER:
12   Q.   Right?
13       MS. MILLER:  Objection.
14       THE WITNESS:  Can you repeat
15   the question?
16 BY MR. BAKER:
17   Q.   Did you know that
18 hydrocodone combination products were
19 Schedule III under the FDA?
20       MS. MILLER:  Objection.
21 BY MR. BAKER:
22   Q.   Did you know that?
23       MS. MILLER:  Objection.
24 BY MR. BAKER:

Page 47

1    Q.   Controlled substances.  If
2 they were Schedule III controlled
3 substances under the FDA scheduling, did
4 you know that?
5        MS. MILLER:  Objection.
6 BY MR. BAKER:
7    Q.   When you were there in 2012?
8        MS. MILLER:  Objection.
9        THE WITNESS:  At one point.
10 BY MR. BAKER:
11   Q.   Okay.  I know.  Did you know
12 that, is what I'm asking?
13       MS. MILLER:  Objection.
14       THE WITNESS:  Yes.
15 BY MR. BAKER:
16   Q.   Okay.  So let's move forward
17 in this list.  You have Florida, Vero
18 Beach, Florida.  Was that one of the
19 facilities that distributed narcotics?
20       MS. MILLER:  Objection.
21       THE WITNESS:  I would use
22   the term "controls."
23 BY MR. BAKER:
24   Q.   Okay.  With respect to the

Page 48

1 next one, Indianapolis, Indiana, was that
2 one of the facilities, one of the
3 distribution centers for CVS that
4 distributed controlled substances?
5    A.   Yes.
6    Q.   Okay.  Kansas City, was that
7 on board when you were there or did that
8 open after you left?
9    A.   I'm not aware of Kansas
10 City.
11   Q.   Okay.  Move to the next
12 page.  New Jersey, which was Lumberton,
13 New Jersey.  Was that a controlled
14 substances distribution center for CVS
15 when you were there, in Lumberton, New
16 Jersey?
17   A.   Yes.
18   Q.   Orlando, Florida, was that a
19 controlled substances distribution center
20 when you were at CVS?
21   A.   Yes.
22   Q.   Knoxville, Tennessee, was
23 that a controlled substance distribution
24 center when you were at CVS?

Page 49

1    A.   Yes.
2    Q.   Patterson, California, was
3 that a controlled substance distribution
4 center when you were at CVS?
5    A.   Yes.
6    Q.   North Smithfield, Rhode
7 Island, was that a controlled substance
8 distribution center when you were at CVS?
9        MS. MILLER:  Mr. Baker, I'm
10   sorry, can you tell me where you
11   are in the document?
12       MR. BAKER:  About at the
13   bottom of Page 2.
14       MS. MILLER:  Okay.  Thank
15   you.
16       MR. BAKER:  Okay.
17       THE WITNESS:  Can you repeat
18   that?
19 BY MR. BAKER:
20   Q.   Patterson, California, was
21 that a controlled substances distribution
22 center when you were at CVS?
23   A.   Yeah, I believe so, yes.
24   Q.   Okay.  North Smithfield,

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 Rhode Island, was that a controlled
2 substances distribution center when you
3 were there at CVS?
4      A.   Yes.
5      Q.   Chemung, New York, was that
6 a controlled substance distribution
7 center for CVS when you were there?
8      A.   Yes.
9      Q.   Are you familiar with the
10 scheduling of controlled substances
11 through the Food and Drug Administration?
12         MS. MILLER: Objection.
13         THE WITNESS: I'm aware of
14    the scheduling. I'm not -- I
15    really can't recall as far as what
16    might be a V, what might be a IV,
17    what might be a III, what might be
18    a II.
19 BY MR. BAKER:
20      Q.   Do you know, if you look
21 through that list that I just gave you of
22 the distribution centers, there's
23 different names of corporations that are
24 listed as the owners of those

Page 51

1 distribution centers.
2         Do you see that on that
3 list?
4         MS. MILLER: Objection.
5 BY MR. BAKER:
6      Q.   Let's go through first,
7 okay. If you start with Conroe, Texas.
8 Do you see that?
9      A.   I do see that.
10      Q.   Okay. Do you see it says
11 the DC name is CVS Pharmacy, Inc.? Do
12 you see that?
13      A.   I do.
14      Q.   Now, if you skip down to
15 Florida, the Vero Beach distribution
16 center, it says "CVS Vero, Florida
17 Distribution LLC."
18         Do you see that?
19      A.   Yes, sir.
20      Q.   Do you know why CVS names
21 these different facilities different
22 names instead of the same thing?
23      A.   No idea.
24         MS. MILLER: Objection.

Page 52

1 BY MR. BAKER:
2      Q.   Okay. Look down below
3 there. It says Indiana, CVS Indiana LLC.
4         Do you see that?
5      A.   Yes.
6      Q.   Do you know why that's named
7 CVS Indiana LLC as opposed to, for
8 instance, CVS Pharmacy, Inc., or CVS
9 Healthcare or CVS something else? Do you
10 know why it's named that?
11         MS. MILLER: Objection.
12         THE WITNESS: No.
13 BY MR. BAKER:
14      Q.   Was there any strategy that
15 you're aware of at CVS for naming these
16 facilities different corporate names like
17 that?
18         MS. MILLER: Objection.
19         THE WITNESS: It wasn't my
20    responsibility.
21 BY MR. BAKER:
22      Q.   Okay. If you look at the
23 Lumberton, New Jersey one on the second
24 page. It lists that as owned by CVS

Page 53

1 Pharmacy, Inc.
2         Do you see that?
3      A.   Yes.
4      Q.   Okay. If you look at
5 Chemung, New York. Look at the bottom of
6 Page 2. It says it's owned by CVS Rx
7 Services, Inc. Do you know why that
8 exists like that, as opposed to being
9 owned by CVS Pharmacy, Inc., or another
10 CVS entity?
11         MS. MILLER: Objection.
12         THE WITNESS: No.
13 BY MR. BAKER:
14      Q.   When you were working there
15 last, at CVS, in 2012, which CVS entity
16 issued your paycheck?
17      A.   I can't recall. I had
18 direct deposit.
19      Q.   All right. From the time
20 that you worked at CVS from 2005 to 2012
21 in the department of logistics loss
22 prevention, were you involved with the
23 suspicious order monitoring program of
24 CVS?

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    A.   First off, the department I
2 actually worked in would be the loss
3 prevention department.
4    Q.   I understand that.  My
5 question was, were you involved with the
6 suspicious order monitoring program?
7    A.   During a period of time,
8 Yes, I was.
9    Q.   Okay.  And did that start in
10 2008?
11       MS. MILLER:  Objection.
12       THE WITNESS:  No.  I believe
13    it would have been earlier than
14    that.
15 BY MR. BAKER:
16    Q.   Okay.  When did you first
17 start getting involved in the suspicious
18 order monitoring program at CVS?
19    A.   I believe it may have been
20 around 2007.
21    Q.   Okay.  Was that when you
22 were involved with the initial drafts of
23 the suspicious order monitoring policy
24 and procedure?

Page 55

1       MS. MILLER:  Objection.
2       THE WITNESS:  Can you repeat
3    that, please?
4 BY MR. BAKER:
5    Q.   Was that when you started to
6 get involved with the suspicious order
7 monitoring policy and procedure drafts?
8       MS. MILLER:  Objection.
9       THE WITNESS:  I would have
10    been involved in that.
11 BY MR. BAKER:
12    Q.   Okay.  Before August --
13 excuse me.
14       Before 2007, are you aware
15 of any written suspicious order
16 monitoring policy and procedure in
17 existence at CVS?
18    A.   There may have been some
19 processes in place that I could say would
20 be related to suspicious order
21 monitoring.  I can't -- I cannot -- you
22 know, I can't recall a particular
23 standard operating procedure, but I
24 believe there were some processes in

Page 56

1 place.
2    Q.   But so far as the
3 standard -- a written standard operating
4 procedure, to your knowledge that didn't
5 exist before 2007; is that correct?
6    A.   Again, there may have been
7 some documents that would have touched
8 upon it.  But I can't say.  I can't
9 recall.
10    Q.   Okay.  When did you get
11 involved -- when did you, while you were
12 employed at CVS, get involved with the
13 writing, drafting or implementation of a
14 specific suspicious order monitoring
15 policy and procedure?
16       MS. MILLER:  Objection.
17       THE WITNESS:  I don't know
18    if I can really recall the
19    beginning when that would have
20    happened.
21 BY MR. BAKER:
22    Q.   Okay.  During the time that
23 you were involved in loss prevention at
24 CVS, what sort of losses were you trying

Page 57

1 to prevent?
2       MS. MILLER:  Objection.
3       THE WITNESS:  So job
4    responsibilities or?
5 BY MR. BAKER:
6    Q.   What were you trying to
7 prevent the loss of?
8    A.   The position was to protect
9 the, you know, people, assets --
10    Q.   At the time --
11    A.   -- of the company.
12       MS. MILLER:  If you can just
13    let him finish.  Thank you.
14 BY MR. BAKER:
15    Q.   As it relates to the
16 distribution of narcotics out of the
17 distribution centers, what was your
18 involvement with the suspicious order
19 monitoring process in relation to those
20 narcotics?
21       MS. MILLER:  Objection.
22       THE WITNESS:  I'm not sure I
23    understand your question.
24 BY MR. BAKER:

Page 58

1  Q.  With respect to the
2  distribution of narcotics out of CVS
3  distribution centers, what was your
4  involvement while you were employed from
5  2005 to 2012 with respect to the
6  suspicious order monitoring of those
7  narcotics?
8      MS. MILLER:  Objection.
9      THE WITNESS:  Well, from a
10     loss prevention standpoint, I
11     would have been involved as far as
12     the security, safety of the
13     products from time of receipt at
14     the distribution center to when it
15     was put into the controlled drug
16     cage from when the order would
17     have fulfilled to when it would
18     have been loaded onto a trailer
19     and ultimately delivered to the
20     store and ensuring that there were
21     proper checks and balances in
22     place to prevent any diversion
23     activity of the items.
24 BY MR. BAKER:

Page 59

1  Q.  Such as loss of the pills?
2  Would that be --
3      MS. MILLER:  Objection.
4  BY MR. BAKER:
5  Q.  Would that be an example?
6  A.  Loss of pills, it could be
7  ensuring the proper shipment of the
8  pills.  Also the, you know, proper
9  receipt.
10     MR. BAKER:  Exhibit 104
11     please.
12     (Document marked for
13     identification as Exhibit
14     CVS-Devlin-P-104.)
15 BY MR. BAKER:
16 Q.  This is an e-mail dated
17 1/8/2013 from Craig Schiavo to Tom
18 Bourque at CVS.  This was after you were
19 gone; is that right?
20 A.  I was not employed in 2013.
21 Q.  Okay.  Do you know who Craig
22 Schiavo is and who Tom Bourque are?
23 A.  No.
24 Q.  All right.  Let me ask you

Page 60

1  to look at this.  It says here, "Tom,
2  below are some bullet points on the
3  importance of including OV orders in the
4  SOM algorithm."
5      Do you know what OV means in
6  the context of that?
7      MS. MILLER:  Objection.
8  BY MR. BAKER:
9  Q.  Do you know?
10 A.  I do not.
11 Q.  I'm going to ask you to
12 assume that means outside vendor.  I'm
13 going to ask you to assume that SOM means
14 suspicious order monitoring.  Does that
15 sound accurate as to how that should be
16 used in terms of that sentence?
17     MS. MILLER:  Objection.
18 BY MR. BAKER:
19 Q.  To your knowledge?
20 A.  I don't know.
21 Q.  Okay.  It says, "Why this is
22 needed."  It says, "DEA Know Your
23 Customer requirements."
24     Do you see that?

Page 61

1  A.  I see that on the document,
2  yes.
3  Q.  Do you know what Know Your
4  Customer means in the context of
5  suspicious order monitoring?
6      MS. MILLER:  Objection.
7  BY MR. BAKER:
8  Q.  If you know, just tell me.
9  If you don't, just tell me that you
10 don't.
11 A.  I believe who are you
12 shipping the controls to.
13 Q.  Is that it, just to whom you
14 are shipping?  That's all it means to
15 you?
16 A.  That's -- yes.
17 Q.  Does that mean anything more
18 than that to you?
19     MS. MILLER:  Objection.
20     THE WITNESS:  No.
21 BY MR. BAKER:
22 Q.  Do you know what the DEA
23 definition of Know Your Customer even
24 means?

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    MS. MILLER: Objection.
2    THE WITNESS: No, I don't --
3    I don't recall that.
4    BY MR. BAKER:
5    Q.   When you were employed at
6    CVS in the logistics loss prevention
7    program, did you have responsibilities
8    with respect to the suspicious order
9    monitoring program?
10    A.   I was involved in the
11    process, yes.
12    Q.   Okay.  And getting involved
13    in that process, did you think -- did you
14    take it upon yourself to learn what the
15    definition of Know Your Customer means
16    with respect to DEA expectations?
17    MS. MILLER: Objection.
18    THE WITNESS: I'm not sure I
19    understand your question.
20    BY MR. BAKER:
21    Q.   Did you -- do you -- does
22    that phrase mean anything to you, Know
23    Your Customer, in the context of DEA
24    expectations with respect to suspicious

Page 63

1    order monitoring?
2    MS. MILLER: Objection.
3    Give me a chance to object.  Go
4    ahead, Frank.
5    THE WITNESS: As I
6    mentioned, know who you're
7    shipping the product to.
8    BY MR. BAKER:
9    Q.   Okay.  Now, let me ask to
10    you look down below.  It says, "Potential
11    issues if not account for in realtime."
12    Do you see where the star is
13    where the asterisk is?  It says, "Stores
14    can place phone orders which have no
15    visibility to until a later time.
16    Currently have a store which had a 68,000
17    hydrocodone pill loss and was placing
18    phone orders to outside vendors."
19    Do you see that?
20    A.   I do.
21    Q.   This is an example of loss
22    prevention -- or this is an example of
23    something that would come under loss
24    prevention, would it not, losing 68,000

Page 64

1    hydrocodone pills --
2    MS. MILLER: Objection.
3    BY MR. BAKER:
4    Q.   -- at a CVS facility?
5    A.   After leaving CVS in 2012, I
6    cannot speak to who was responsible for
7    what.
8    Q.   Okay.  I'm just asking, is
9    that the type of thing that, when you
10    were there, if something like this
11    happened, it would come under loss
12    prevention, is that the department it
13    would come under?
14    MS. MILLER: Objection.
15    THE WITNESS: I don't recall
16    a 68,000 loss.
17    BY MR. BAKER:
18    Q.   I didn't say it occurred
19    while you were there.  I said if it
20    happened when you were there, is this the
21    type of thing that would come under loss
22    prevention for loss prevention to
23    investigate?
24    MS. MILLER: Objection.

Page 65

1    THE WITNESS: I believe it
2    would be a -- not only loss
3    prevention involved, but from an
4    operational standpoint involvement
5    also.
6    BY MR. BAKER:
7    Q.   Okay.  Do you know what a
8    Form 106 is with the DEA?
9    A.   I can recall the term.  I
10    believe it's if you have a loss of
11    controlled drugs.
12    Q.   And when something like this
13    happens, if something like this happened
14    when you were there, where 68,000 pills
15    were lost, is that the type of thing that
16    would have caused you to fill out a Form
17    106 and send it to the DEA?
18    MS. MILLER: Objection.
19    THE WITNESS: No.
20    BY MR. BAKER:
21    Q.   Who would have done that, if
22    anybody?
23    MS. MILLER: Objection.
24    THE WITNESS: It would

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  depend on where it was originating
2  from.
3  BY MR. BAKER:
4      Q.   So if 68,000 pills were lost
5  in the CVS chain, are you saying that
6  that's not something that should be
7  reported to the DEA?
8          MS. MILLER: Objection.
9          THE WITNESS: I didn't say
10 that.
11 BY MR. BAKER:
12     Q.   Okay. Why would you not
13 fill out a Form 106 in that instance
14 then?
15         MS. MILLER: Objection.
16 Mischaracterizes testimony.
17         THE WITNESS: Again, when I
18 was there?
19 BY MR. BAKER:
20     Q.   Yes.
21     A.   It wasn't my responsibility.
22     Q.   Who would have been the
23 person when you were there?
24     A.   It would be the entity that

Page 67

1  the possible loss originated from.
2      Q.   Meaning what, meaning like
3  the distribution center?
4      A.   If it -- well, in this
5  instance here, you are mentioning an
6  outside vendor.
7      Q.   The outside vendor orders --
8  go back to the document. Go back to the
9  document. It says, "Below are bullets on
10 the importance of including outside
11 vendor orders in the SOM algorithm."
12         Do you see that, at the top?
13     A.   Yes.
14     Q.   Okay. It says, "Why it is
15 needed. Know your customer
16 requirements."
17         Do you see that?
18     A.   Yes.
19     Q.   Okay. It says, "In order
20 for dispensing data contained in the
21 algorithm be useful, we must account for
22 all controlled substances ordered. To
23 track all NDC numbers ordered by store
24 and have ability to add unknown/first

Page 68

1  time item orders into our SOM system."
2          Do you see that?
3      A.   I do. I would like a moment
4  to read it to myself.
5      Q.   Okay. I'm reading it to you
6  as we go along.
7      A.   I'm a very visual person.
8      Q.   I understand, but I have
9  limited time and I don't have time for
10 you to re-read stuff that I'm reading
11 directly to you. If we could just move
12 through it. I'm not trying to be ugly to
13 you, but I really want to move through
14 this.
15         MS. MILLER: Bill, I know,
16     you've just got to give him a
17     chance to read it himself.
18         THE WITNESS: I respect your
19     time, sir. I really do. And I,
20     you know, certainly want to
21     cooperate as much as possible. I
22     just, from a learning standpoint,
23     I don't do well if people read to
24     me and then I have to comment.

Page 69

1          I literally have to read.
2      So I apologize for that. But
3      that's -- that's just who I am.
4  BY MR. BAKER:
5      Q.   Okay.
6      A.   I'm reading it. I don't
7  know if I still fully understand what
8  it --
9      Q.   Okay. Well, it says here,
10 "Potential issues if not account for in
11 realtime. Store may order a little from
12 both the outside vendor and the DC to
13 stay under the radar."
14         Do you know what that means?
15     A.   No. I didn't write this
16 document.
17     Q.   Okay. When you were there
18 at CVS, were the stores that your
19 distribution centers over which you were
20 loss prevention director, did those
21 include distribution centers that were
22 licensed to distribute narcotics from the
23 distribution center to a CVS pharmacy?
24         MS. MILLER: Objection.

Page 70

BY MR. BAKER:

1 Q. Yes or no?

2 MS. MILLER: Objection.

3 THE WITNESS: Yes.

4 BY MR. BAKER:

5 Q. Okay. And did those

6 narcotics include Schedule III narcotics?

7 MS. MILLER: Objection.

8 THE WITNESS: I believe so.

9 BY MR. BAKER:

10 Q. And did those narcotics

11 include hydrocodone combination products?

12 MS. MILLER: Objection.

13 THE WITNESS: I believe so.

14 BY MR. BAKER:

15 Q. And do you know hydrocodone

16 combination products to be known as

17 opioids?

18 MS. MILLER: Objection.

19 THE WITNESS: Again, I

20 always used the term "controlled

21 substance."

22 BY MR. BAKER:

23 Q. Okay. Do you know what the

Page 71

1 term "opioid" means?

2 MS. MILLER: Objection.

3 MR. BAKER: Pull up

4 Exhibit 64 please.

5 (Document marked for

6 identification as Exhibit

7 CVS-Devlin-P-64.)

8 BY MR. BAKER:

9 Q. I'd like you to pull up

10 hydrocodone, which is the second page.

11 A. Would I be able to take a

12 break?

13 Q. Do you need to go to the

14 bathroom?

15 A. I do.

16 MR. BAKER: Okay. Sure. Go

17 ahead.

18 MS. MILLER: Go off the

19 record.

20 THE VIDEOGRAPHER: Going off

21 the record. The time is 9:20.

22 (Short break.)

23 THE VIDEOGRAPHER: We are

24 going back on record. Beginning

Page 72

1 of Media File Number 2. The time

2 is 9:30.

3 BY MR. BAKER:

4 Q. You have in front of you the

5 DEA drug fact sheet.

6 Do you see that?

7 A. Yes, sir.

8 Q. Okay. It lists hydrocodone.

9 It says, "Hydrocodone is the most

10 frequently prescribed opioid in the

11 United States."

12 Do you see that?

13 A. No.

14 MS. MILLER: Bill, can you

15 direct him to a page?

16 BY MR. BAKER:

17 Q. Okay. Go to the second page

18 of your DEA drug fact sheet. If you look

19 on the monitor, it's right in front of

20 you.

21 Do you see it?

22 A. It's easier for me to look

23 at the paper.

24 Q. Do you see where it says

Page 73

1 "hydrocodone" at the top?

2 A. Yes.

3 Q. Okay. Do you see where it

4 says, "Hydrocodone is the most frequently

5 prescribed opioid in the United States

6 and is associated with more drug abuse

7 and diversion than any other illicit

8 (sic) or illicit opioid."

9 Do you see that?

10 A. Yes.

11 Q. Okay. Did you know this

12 before it was read to you today by

13 looking at this DEA drug fact sheet?

14 MS. MILLER: Objection.

15 BY MR. BAKER:

16 Q. Did you know this?

17 MS. MILLER: Objection.

18 THE WITNESS: Hydrocodone,

19 per se, I'm not sure.

20 BY MR. BAKER:

21 Q. Okay. Did the distribution

22 centers over which you were the logistics

23 director -- director of logistics and

24 loss prevention, distribute hydrocodone

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  combination products?
2      A.   I believe so.
3      Q.   Okay.  Do you know those to
4  be opioids?
5          MS. MILLER:  Objection.
6          THE WITNESS:  Not at the
7      time.
8  BY MR. BAKER:
9      Q.   Okay.  Do you know it now?
10     A.   Now?
11     Q.   Do you know that now?
12     A.   After reading, seeing this,
13 yes.
14     Q.   Okay.  Have you ever heard
15 of the opioid crisis?
16     A.   I have recently heard of it,
17 yes.
18     Q.   Did you know about it to be
19 in existence which you were employed at
20 CVS?
21         MS. MILLER:  Objection.
22         THE WITNESS:  No.
23 BY MR. BAKER:
24     Q.   That was never discussed

Page 75

1  with anybody at CVS, the opioid crisis or
2  the nature of the opioid crisis going on
3  from 2005 to 2012 when you were in loss
4  prevention logistics?
5          MS. MILLER:  Objection.
6  BY MR. BAKER:
7      Q.   That was never discussed?
8          MS. MILLER:  Objection.
9          THE WITNESS:  No, not that I
10     can recall.
11 BY MR. BAKER:
12     Q.   Did you ever attend any DEA
13 meetings of any type, any DEA conferences
14 of any type?
15     A.   Not that I can recall.
16     Q.   Did you ever attend any
17 training on the opioid crisis while you
18 were at CVS in logistics and loss
19 prevention?
20     A.   No, not that I recall.
21         MR. BAKER:  Okay.  Go to
22     Exhibit Number 58.
23         MS. MILLER:  I don't think
24     we have Exhibit 58.

Page 76

1          MR. BAKER:  Don't have 58?
2  Go to exhibit 102.
3          MS. MILLER:  Is that a new
4  exhibit, Bill?
5          MR. BAKER:  Yeah, Exhibit
6  102.
7          MS. MILLER:  Is that a new
8  one?
9          MR. BAKER:  Yes.
10         (Document marked for
11     identification as Exhibit
12     CVS-Devlin-P-102.)
13 BY MR. BAKER:
14     Q.   Here.
15         MS. MILLER:  Thank you.
16 BY MR. BAKER:
17     Q.   I've handed you Exhibit 102,
18 which is an e-mail from Ron Buzzeo to Amy
19 Lynn Brown dated 2/21/2008.  First of
20 all, do you know who Ron Buzzeo is?  Do
21 you know who Ron Buzzeo is?
22     A.   Yes.
23     Q.   He owns a company named
24 Cegedim.  Is that it?  Is that the name

Page 77

1  of it?
2          MS. MILLER:  Objection.
3          THE WITNESS:  Something like
4      that.
5  BY MR. BAKER:
6      Q.   It was a consulting company
7  that you were in touch with while you
8  were at CVS.  You were in touch with him
9  directly; is that correct?
10     A.   On occasion, yes.
11     Q.   Okay.  In the context of
12 developing a suspicious order monitoring
13 system at CVS?
14     A.   Yes.
15     Q.   Okay.  Look at these letters
16 that are attached to this e-mail.  These
17 are DEA letters dated September 27, 2006
18 and February 7, 2007.  Do you see those
19 two letters?  And the last one, third
20 letter, December 27, 2007.
21         Do you see that?
22     A.   Yes.
23     Q.   Okay.  Have you ever read
24 these letters before today?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    A.   Yes.
2    Q.   Okay.  Did you read all
3  three of them before today?
4    A.   Not fully.
5    Q.   Okay.  Pull up the first
6  letter.  We're going to the third page of
7  the exhibit.
8        MS. MILLER:  And just for
9        purposes of the transcript.  Do
10       you -- were you asking him back in
11       his time at CVS if he read these
12       letters, when he was employed at
13       CVS?
14 BY MR. BAKER:
15   Q.   Let's ask it both ways.
16 When you were employed at CVS, did you
17 read these letters?
18   A.   I can recall the concept of
19 one of the letters.
20   Q.   Okay.
21   A.   Not sure of the date.
22   Q.   Okay.  This e-mail is dated
23 2/21/08 from Ron Buzzeo to Amy Brown,
24 correct?

Page 79

1    A.   That's what it states.
2    Q.   And it attaches these three
3  letters, correct?
4    A.   It appears so.
5    Q.   Okay.  Let's go to the first
6  letter, September 27, 2006.  Do you see
7  that one?
8    A.   Yes.
9    Q.   Okay.  Go to Page 2 of that
10 letter.  And you'll see about halfway
11 down where it says, "The DEA regulations
12 require."  If you can bold that.
13       Okay.  I want you to read
14 this with me.
15       "The DEA regulations require
16 all distributors to report suspicious
17 orders of controlled substances.
18 Specifically, the regulations state in 21
19 C.F.R. 1301.74(b):  The registrant shall
20 design and operate a system to disclose
21 to the registrant suspicious orders of
22 controlled substances.  The registrant
23 shall inform the field division office of
24 the administration in his area of

Page 80

1  suspicious orders when discovered by the
2  registrant.  Suspicious orders include
3  orders of unusual size, orders deviating
4  substantially from a normal pattern and
5  orders of unusual frequency.'"
6        Did I quote that letter
7  correctly?
8    A.   I believe so.
9    Q.   Okay.  Is this the letter
10 that -- is this the content of what you
11 read in the letters that you were
12 provided when you were at CVS?
13       MS. MILLER:  Objection.
14 BY MR. BAKER:
15   Q.   The letters from DEA?
16       MS. MILLER:  Objection.
17       THE WITNESS:  I can recall
18       seeing a letter.  I can't recall
19       if that exact language was in the
20       letter.
21 BY MR. BAKER:
22   Q.   Are you familiar with the
23 concept of 21 C.F.R. 1301.74?
24       MS. MILLER:  Objection.

Page 81

1        THE WITNESS:  No.
2  BY MR. BAKER:
3    Q.   Okay.  Were you not familiar
4  with that Code of Federal Regulation when
5  you were director of loss prevention,
6  logistics?
7    A.   I wouldn't be familiar with
8  the number.
9    Q.   How about the text of it,
10 "The registrant shall design and operate
11 a system to disclose to the registrant
12 suspicious orders of controlled
13 substances."  Were you familiar with that
14 text?
15   A.   Conceptually.
16   Q.   Okay.  Move to the next
17 letter, February 2007.  If you look at
18 the bottom of Paragraph 3.  It says,
19 This responsibility is critical."
20       Do you see that?
21   A.   No.  Okay.
22   Q.   Okay.  Start up at the top.
23 Start up at the top under background.  It
24 says --

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    MR. BAKER:  Go back.
2  BY MR. BAKER:
3    Q.   All right.  It says, "As
4  each of you is undoubtedly aware, the
5  abuse of controlled prescription drugs is
6  a serious and growing health problem in
7  the country"; is that correct?
8    A.   That's what it states in the
9  letter, yes.
10    Q.   Okay.  Did you read this
11  while you were at CVS?
12    A.   I can't --
13    MS. MILLER:  Objection.
14  BY MR. BAKER:
15    Q.   Yes or no?
16    MS. MILLER:  Objection.
17  BY MR. BAKER:
18    Q.   Did you read it?
19    MS. MILLER:  Objection.
20    THE WITNESS:  I don't
21    recall.
22  BY MR. BAKER:
23    Q.   Okay.  It talks about the
24  Controlled Substance Act in the next

Page 83

1  paragraph.  Do you see that?  "The CSA
2  was designed by Congress to combat
3  diversion by providing for a closed
4  system of drug distribution."
5    Do you see that?
6    A.   Yes.
7    Q.   Okay.  Do you see at the
8  bottom it talks about, it says,
9  "Distributors are, of course, one of the
10  key components of this distribution
11  chain."
12    Do you see that?
13    A.   No.
14    Q.   Okay.  Look in there where
15  it says that.  Look, look where my finger
16  is.  Do you see this?  "Distributors are,
17  of course, one of the key components of
18  the distribution chain."
19    Do you see that?
20    A.   I do see that.
21    Q.   Okay.  You were the director
22  of loss prevention logistics over a
23  distribution center that distributed
24  these narcotics, correct?

Page 84

1    MS. MILLER:  Objection.
2    THE WITNESS:  I stated that,
3    yes.
4  BY MR. BAKER:
5    Q.   Okay.  You were physically
6  located in Rhode Island, correct?
7    MS. MILLER:  Objection.
8    THE WITNESS:  Yes.
9  BY MR. BAKER:
10    Q.   And the distribution centers
11  that were licensed to distribute these
12  narcotics for CVS were located in various
13  spots across the United States, which
14  we've gone over with you thus far in your
15  deposition, correct?
16    MS. MILLER:  Objection.
17    THE WITNESS:  That is
18    correct.
19  BY MR. BAKER:
20    Q.   Okay.  And you were the
21  director of logistics and loss prevention
22  over all of those distribution centers or
23  just the one in Rhode Island?
24    A.   I had responsibility for the

Page 85

1  safety, security, quality in all the
2  distribution centers.
3    Q.   Okay.  And then it says,
4  "This responsibility is critical as
5  Congress has expressly declared that the
6  illegal distribution of controlled
7  substances has a substantial and
8  detrimental effect on the health and
9  general welfare of the American people."
10    Did I quote that correctly
11  from the letter?
12    A.   It appears so.
13    Q.   Okay.  Did you read that
14  while you were employed at CVS and when
15  you were the director of logistics loss
16  prevention from 2005 to 2012?
17    MS. MILLER:  Objection.
18    THE WITNESS:  I don't recall
19    that language.
20  BY MR. BAKER:
21    Q.   Okay.  All right.  Turn to
22  the February -- February 7, 2007 letter,
23  Page 3 where it talks about circumstances
24  that might be indicative of diversion.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  Do you see that?
2      A.   Yes, sir.
3      Q.   Okay.  One of the
4  circumstances, it says, "Number 1,
5  ordering excessive quantities of a
6  limited variety of controlled substances,
7  e.g., ordering only phentermine,
8  hydrocodone, alprazolam."
9          Do you see that?
10     A.   I do see that.
11     Q.   And hydrocodone is one of
12  those products that was distributed out
13  of the distribution centers by the CVS
14  distribution centers to CVS pharmacies,
15  correct?
16     A.   During the time I was there,
17  yes.
18     Q.   Okay.  And it says at the
19  bottom, "Ordering the same controlled
20  substance from multiple distributors."
21         Do you see that?
22     A.   I do see that.
23     Q.   Okay.  Do you remember the
24  concept of outside vendors that I went

Page 87

1  over with you earlier today, outside
2  vendors?
3      A.   I can recall that term that
4  you used, yes.
5      Q.   Okay.  The hydrocodone
6  combination products that were being
7  distributed out of the CVS distribution
8  centers to the CVS pharmacies, that was
9  not the only source of hydrocodone
10  combination products that were purchased
11  by those CVS pharmacies, am I correct?
12         MS. MILLER:  Objection.
13         THE WITNESS:  I'm not sure.
14  BY MR. BAKER:
15     Q.   Is it true that the CVS
16  pharmacies that CVS distribution centers
17  distributed to also purchased hydrocodone
18  combination products from outside vendors
19  in addition to purchasing them from CVS
20  distribution centers?
21         MS. MILLER:  Objection.
22         THE WITNESS:  I'm not really
23      familiar with the, I guess,
24      purchasing outside of the

Page 88

1  distribution centers at the store
2  level.
3  BY MR. BAKER:
4      Q.   At any time when you were
5  involved with suspicious order
6  monitoring, did you attempt to monitor
7  the purchase by CVS pharmacies of
8  hydrocodone combination products from
9  outside vendors, yes or no?
10     A.   I can't recall.
11     Q.   You can't recall.  Is that
12  something that you say you don't even
13  remember doing, is that what you mean?
14         MS. MILLER:  Objection.
15         THE WITNESS:  I guess I just
16      can't recall.
17  BY MR. BAKER:
18     Q.   Can you say you even did it?
19  If you can't recall it, is it true that
20  you can't say that you actually even did
21  that, that you monitored outside vendor
22  purchases by CVS pharmacies?
23         MS. MILLER:  Objection.
24  BY MR. BAKER:

Page 89

1      Q.   Is that true?
2      A.   Just -- I apologize, I just
3  don't remember.
4      Q.   Okay.  If you don't remember
5  then you can't say you actually did it
6  either, can you?
7          MS. MILLER:  Objection.
8          THE WITNESS:  Just, I don't
9      remember, sir.
10  BY MR. BAKER:
11     Q.   Okay.  Let's move forward.
12         MR. BAKER:  Pull Exhibit
13      Number 18 please.
14         (Document marked for
15      identification as Exhibit
16      CVS-Devlin-P-18.)
17  BY MR. BAKER:
18     Q.   This is an e-mail from Todd
19  Janson to Tom Mortelliti.  And then if
20  you look down below it it says from Amy
21  Brown to various people, November 27,
22  2007.  Do you see that?
23     A.   I do see that.
24     Q.   Okay.  And it says new Rx

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 DEA SOP. What does Rx DEA SOP mean to
2 you?
3    A. Pharmacy standard operating
4 procedures.
5    Q. Okay. So this discusses a
6 pharmacy standard operating procedure and
7 attached to it is a seventh draft updated
8 November 2007. Do you see that?
9    A. You're on the third page?
10    Q. Yes, sir.
11    A. Yes.
12    Q. Okay. Go back to the first
13 page, the e-mail at the bottom. It says,
14 "We are still in the process of writing
15 the suspicious order monitoring section
16 of the SOP."
17    Do you see that?
18    A. I do.
19    Q. Okay. Let me ask you, are
20 you familiar with any written suspicious
21 order monitoring policy and procedure
22 that existed within the SOP at CVS before
23 this draft?
24    MS. MILLER: Objection.

Page 91

1    THE WITNESS: Again, as I
2    testified earlier, not necessarily
3    an SOP, but I believe there were
4    some processes in place that could
5    be related to suspicious order
6    monitoring.
7 BY MR. BAKER:
8    Q. Okay. This draft that we
9 are talking about did not include a
10 suspicious order monitoring standard
11 operating procedure, did it?
12    A. I'd have to look --
13    MS. MILLER: Do you want a
14    chance to look at the document?
15    THE WITNESS: Yeah, I --
16 BY MR. BAKER:
17    Q. That's what the document
18 says, the very first page, correct?
19    A. Right. But I haven't read
20 the document.
21    Q. Okay. I'm going to move
22 forward, because we're -- we have limited
23 time, okay.
24    This next document is

Page 92

1 Number 57.
2    (Document marked for
3    identification as Exhibit
4    CVS-Devlin-P-57.)
5 BY MR. BAKER:
6    Q. All right. This is an
7 e-mail from Amy Propatier. Now, you know
8 her, do you not?
9    A. Yes.
10    Q. Okay. And it's dated
11 April 3, 2009. And it says, "Good
12 morning. Attached is the DEA SOP which
13 was implemented in December 2007."
14    All right. Stop right
15 there. All right. Is it true that to
16 your recollection that DEA SOP that I
17 handed you, which is Exhibit 18, was
18 implemented in December of 2007?
19    A. Again, I would need a chance
20 to read it.
21    Q. Okay. It says, "We have
22 made some recent updates to the SOP.
23 Please note that we have updated the
24 record retention period from five years

Page 93

1 to two years. Also, the SOM section is
2 still not included in the SOP in the
3 event of an audit and the question comes
4 up, please direct them to corporate,
5 Frank or myself for the explanation of
6 the program."
7    Now let me ask you about
8 that.
9    It says, "Also the SOM
10 section is still not included in the
11 SOP."
12    Do you know what that means?
13    A. Just I don't recall this
14 e-mail.
15    Q. Okay. And do you know who
16 she is referring to? Is she referring to
17 you, Frank Devlin? Is that the point of
18 contact if the -- if somebody questioned
19 this SOP in the context of a DEA audit,
20 they should contact you?
21    MS. MILLER: Objection.
22    THE WITNESS: If there was a
23    DEA audit I may be contacted.
24 BY MR. BAKER:

Page 94

1   Q.   Okay.  Are you the Frank
2  that's referred to in this e-mail, do you
3  know?
4   A.   I can't say 100 percent.
5   Q.   Okay.  Would you say more
6  likely than not based upon the context of
7  the e-mail, that you're that Frank?
8   A.   It could be in reference to
9  me, yes.
10   Q.   Okay.  Amy Propatier at the
11  time, what was her title, do you know?
12   A.   I know she worked in the
13  logistics department.
14   Q.   Okay.  Do you know that --
15  that -- are you aware of the term "DEA
16  compliance coordinator"?
17   A.   I've heard the term.
18   Q.   Did you know whether or not
19  that's what she was considered to be at
20  CVS?
21      MS. MILLER:  Objection.
22      THE WITNESS:  I don't recall
23   her exact title.
24  BY MR. BAKER:

Page 95

1   Q.   Okay.  If the DEA had walked
2  in and asked you in 2009 who is the DEA
3  compliance coordinator, who would you
4  have said that would have been?
5   A.   If they walked into where?
6   Q.   To your office in Rhode
7  Island.
8   A.   I'm not sure.
9   Q.   Okay.  Was there a DEA
10  compliance coordinator in 2009 when you
11  were employed there?
12   A.   I'm just -- I mean there are
13  people involved with DEA.  I'm just -- I
14  just don't recall the exact titles.
15   Q.   Okay.  Let me ask you
16  something.  Was there a DEA compliance
17  coordinator?  Was there somebody that had
18  the title DEA compliance coordinator when
19  you were employed there in 2009 at CVS?
20      MS. MILLER:  Objection.
21   Asked and answered.
22  BY MR. BAKER:
23   Q.   Was there such a position?
24   A.   Again, I just -- I don't

Page 96

1  recall the exact positions.
2      MR. BAKER:  Okay.  Let's
3   move forward.  Go to Exhibit 94.
4      (Document marked for
5   identification as Exhibit
6   CVS-Devlin-P-94.)
7  BY MR. BAKER:
8   Q.   Do you recall that with
9  respect to the 2009 SOP in relation to
10  the suspicious order monitoring, was it
11  still not defined at the time -- at the
12  time that it was revised in December of
13  2009?  Do you recall that one way or the
14  other?
15      MS. MILLER:  Objection.
16      THE WITNESS:  Do you have
17   something that I'm supposed to be
18   looking at?
19  BY MR. BAKER:
20   Q.   Sure.  I'll let you look at
21  Exhibit 48.  We'll go back to that.
22      (Document marked for
23   identification as Exhibit
24   CVS-Devlin-P-48.)

Page 97

1      MS. MILLER:  So we're not
2   using 94?
3      MR. BAKER:  No, we're not.
4   We're using 48 again.
5  BY MR. BAKER:
6   Q.   I want you to go to -- look
7  here.  At the bottom, it's Roman Numeral
8  VIII-VI.  The Bates number is 24916.
9      Do you see that?
10   A.   24916?
11   Q.   At the bottom --
12   A.   Yes.
13   Q.   -- where your right hand is.
14      MS. MILLER:  It's flagged
15   also.
16  BY MR. BAKER:
17   Q.   You have it flagged.  Okay.
18      Do you see where it says
19  suspicious order monitoring?
20      Do you see that?
21   A.   Yes.
22   Q.   Okay.  So what it says on
23  the next page, it says, "These parameters
24  are documented in SOP" -- and there's a

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 blank. "Ordering quantity parameters for
2 controlled drugs, being developed and
3 written."
4          Do you see that?
5     A.   I do see that.
6     Q.   Okay.  Does that mean it's
7 incomplete at this point, at least from
8 the standpoint of it's being developed
9 and written?  Is that what that means?
10         MS. MILLER:  Objection.
11         THE WITNESS:  I'm not sure
12     what it means.
13 BY MR. BAKER:
14    Q.   Were you involved in this
15 process at all of drafting?
16    A.   I would have been involved
17 to some extent.
18    Q.   Okay.  Of drafting the
19 suspicious order monitoring policy and
20 procedure, would you have been involved
21 in that?
22    A.   I would have been involved,
23 yes.
24    Q.   Okay.  But this revision

Page 99

1 date is dated 12/11/09.  That's the first
2 page, correct?  Go back, at the top -- up
3 here.  Upper right-hand corner.
4     A.   Yeah, appears to be.
5     Q.   Okay.  And this is a
6 continuation of the one that was first
7 effectively published in the
8 suspicious -- in the SOP 12/1 of '07
9 that's being updated 12/11/09; is that
10 correct?
11    A.   Again, I'm -- you know, as
12 far as the dates go.
13    Q.   Well, just -- I mean, just
14 isn't that what it says?
15    A.   That's what the document
16 says.
17    Q.   Okay.  The document says the
18 effective date of the initial controlled
19 drug DEA standard operating procedure
20 manual was 12/1 of '07, correct?
21    A.   That's what the document
22 says.
23    Q.   All right.  And that's about
24 ten months after that last letter that I

Page 100

1 showed you in that series of three
2 letters was received by CVS from the DEA
3 from Mr. Rannazzisi, correct?
4          MS. MILLER:  Objection.
5 BY MR. BAKER:
6     Q.   Do you remember the
7 February 2007 letters?
8     A.   Again, I don't recall when
9 I -- when I actually saw the letter.
10    Q.   Okay.  So at this point,
11 we're now 12/11 of 2009.  And there's
12 still no written policy and procedure for
13 suspicious order monitoring at CVS
14 because it's still being developed and
15 written; is that correct?
16         MS. MILLER:  Objection.
17         THE WITNESS:  Again, I'd
18     want to read through the document.
19 BY MR. BAKER:
20    Q.   At least that's what the
21 document says; is that right?
22         MS. MILLER:  Objection.
23         THE WITNESS:  I haven't read
24     the document.

Page 101

1 BY MR. BAKER:
2     Q.   Okay.  Let's go back to the
3 document again.  Go back to where I had
4 you tabbed.  And it says, "These
5 parameters are documented in SOP" --
6 blank -- "order quantity parameters for
7 controlled drugs, being developed and
8 written."
9          That's what it says, right?
10    A.   Are you on 24916 Bates
11 number?
12    Q.   Yes, sir.  24917.  Do you
13 see it?
14    A.   I do see it.
15    Q.   Okay.  That's what the
16 document states, correct?
17    A.   That's what the document
18 states.
19    Q.   Let's move on.  Let's go to
20 Exhibit 94.  All right.  This is an
21 e-mail dated 11/5 of 2009.  It says from
22 John Mortelliti to Christopher Knight.
23 It says, "Sounds good.  I'm trying to get
24 a rough draft SOM SOP to you prior to the

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 meeting. This is a big issue with CVS
2 and the DEA."
3        Now, did I read that
4 correctly?
5        A. That's what it states, yes.
6        Q. And you said you were
7 involved somewhat with the drafting of
8 the SOM SOP, correct?
9        A. I was involved in the
10 drafting of the DEA SOPs.
11       Q. Is that a yes?
12       MS. MILLER: Objection.
13       THE WITNESS: I was
14 involved.
15 BY MR. BAKER:
16       Q. Okay. You were. Okay. Was
17 that a big issue with CVS and the DEA?
18 Is that accurate?
19       A. I don't recall that.
20       Q. Okay. Let's move to the
21 next exhibit, Number 98.
22       (Document marked for
23       identification as Exhibit
24       CVS-Devlin-P-98.)

Page 103

1 BY MR. BAKER:
2        Q. This is an e-mail dated 8/23
3 of 2010 from John Mortelliti to Amy
4 Propatier with you -- actually to you,
5 Frank Devlin, correct? John Mortelliti
6 to Frank Devlin?
7        A. That's what it states, yes.
8        Q. 8/23/2010; is that correct?
9        A. That's what it states, yes.
10       Q. Mr. Mortelliti was who at
11 that time in reference to his job at CVS?
12       A. I believe at that time he
13 would have been a director in -- director
14 of logistics, loss prevention.
15       Q. What office was he located
16 within?
17       A. At that time he would have
18 been based out of the Lumberton
19 distribution center.
20       Q. Okay. And this is to Amy
21 Propatier, who copied her. Who was she
22 at that time, to your knowledge, in
23 reference to her job at CVS?
24       A. She worked in the logistics

Page 104

1 department at CVS corporate headquarters.
2        Q. Okay. So it says, "Good
3 morning, Amy. I attached the PSE SOP to
4 this e-mail. The control drug SOP is
5 being reviewed by counsel. I hope to
6 receive it back today."
7        So at this point 8/23/10, is
8 there still no control drug SOP in
9 existence at CVS?
10       MS. MILLER: Objection.
11       THE WITNESS: That's what it
12       states in the e-mail.
13 BY MR. BAKER:
14       Q. Okay. And at the bottom, it
15 says, "From Frank Devlin." This is you
16 who generated this e-mail, August 23,
17 2010, to John Mortelliti copying Amy
18 Propatier. Subject, "DEA SOP."
19       What is the DEA SOP that
20 you're referring to?
21       A. The DEA standard operating
22 procedure.
23       Q. To include that suspicious
24 order monitoring paragraph to finish it

Page 105

1 up?
2        MS. MILLER: Objection.
3 BY MR. BAKER:
4        Q. Is that part of what you
5 were trying to finish up?
6        MS. MILLER: Objection.
7        THE WITNESS: I'm just -- in
8        reading the e-mail, I mean, I can
9        read the e-mail. I don't --
10 BY MR. BAKER:
11       Q. Okay. We'll go through it.
12       A. I don't recall writing this
13 e-mail.
14       Q. Okay. Did you write this
15 e-mail?
16       A. Just I -- it has my name on
17 it. I do not recall writing the e-mail.
18       Q. All right. If it has your
19 name on it as "from," does that generally
20 mean that you wrote it?
21       MS. MILLER: Objection.
22 BY MR. BAKER:
23       Q. Yes?
24       A. It appears that I wrote the

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 e-mail.
2     Q.   Okay.  So it says, "Good
3 morning, John."  And this is to John
4 Mortelliti in Lumberton, New Jersey,
5 correct?
6     A.   Yes.
7     Q.   Okay.  It says, "Can you
8 work with Amy to get the PSE IRR and
9 control drug IRR inserted into our DEA
10 SOP under suspicious order monitoring?
11 We promised this to the DEA by
12 Wednesday."
13        Did I quote that correctly?
14     A.   That's what it states.
15     Q.   Okay.  It says, "Can you get
16 with Amy to get the PSE IRR" --
17        That's a chemical IRR,
18 correct?
19     A.   Pseudoephedrine.
20     Q.   Okay.  IRR is item review
21 report; is that right?
22     A.   I believe so, yes.
23     Q.   Okay.
24        -- "and the control drug

Page 107

1 IRR" -- that's an item review report?
2     A.   For control drugs, yes.
3     Q.   Okay.
4        -- "inserted into our DEA
5 SOP under suspicious order monitoring."
6 Correct?
7     A.   That's what it states.
8     Q.   Okay.  Is it true at this
9 time, August 23, 2010, that you were
10 working with these people to try to get a
11 suspicious order monitoring SOP together?
12        MS. MILLER:  Objection.
13 BY MR. BAKER:
14     Q.   A written one?
15     A.   You know, I just -- again, I
16 can't recall the exact dates, you know,
17 around SOP.  I know there were, you know,
18 drafts being worked on.  But I -- I also
19 know that there was -- there was an
20 ongoing SO -- there was an ongoing SOM
21 process taking place.
22     Q.   Okay.  It says, "We promised
23 this to the DEA by Wednesday."
24        Now, you're talking about

Page 108

1 the same week, that this is Monday,
2 August 23, correct?
3     A.   That's what the date states,
4 yes.
5     Q.   And Wednesday would be
6 August 25, correct?
7     A.   Yes.
8     Q.   And are you aware that the
9 DEA was doing an inspection of the
10 Indianapolis distribution center
11 August 25 of 2010?
12     A.   Yeah, just I -- I just don't
13 recall the exact date of DEA inspections.
14     Q.   Was it your intent to try to
15 get the suspicious order monitoring
16 policy and procedure inserted into the
17 standard operating procedure manual of
18 CVS before the DEA arrived August 25 of
19 2010?
20        MS. MILLER:  Objection.
21        THE WITNESS:  No.
22 BY MR. BAKER:
23     Q.   Was it your intent to do
24 that?

Page 109

1        MS. MILLER:  Give me a
2 chance to object.  Objection.
3        THE WITNESS:  I just -- I
4 don't recall that.
5 BY MR. BAKER:
6     Q.   Was it your intent to try to
7 show it to the DEA as being in existence
8 as a policy and procedure of CVS while
9 they were at the Indiana facility doing
10 an inspection in August 25 of 2010?
11        MS. MILLER:  Objection.
12        THE WITNESS:  I don't -- I
13 don't recall a particular
14 instance.
15        MR. BAKER:  Could you pull
16 Number 70, please.
17        (Document marked for
18 identification as Exhibit
19 CVS-Devlin-P-70.)
20 BY MR. BAKER:
21     Q.   I'm showing you an e-mail
22 dated August 25, 2010, from Henry
23 Mortelliti to Greg Brantley copied to
24 Francis Devlin.  That's you, Frank

Page 110

1 Devlin, correct?
2    A.   Yes.
3    Q.   Okay.  Dated 8/25/2010.
4 It's called, "Controlled drug IRR Draft 3
5 document."
6         Is that what it's called?
7    A.   That's what it states, yes.
8    Q.   And it says, this -- "Greg,
9 this needs to be implemented as soon as
10 possible in your area."  Is that right?
11    A.   That's what the e-mail
12 states, yes.
13    Q.   Okay.  And it's referencing
14 the control drug IRR, which is the item
15 review report, correct?
16         MS. MILLER:  Objection.
17 BY MR. BAKER:
18    Q.   Is that what it's
19 referencing?
20    A.   I'm not seeing -- oh, in the
21 subject line?
22    Q.   Yes.  Attachment, control
23 drug IRR?
24    A.   IRR SOP.  That's what it

Page 111

1 states, yes.
2    Q.   Do you see that?
3    A.   I do see that.
4    Q.   Okay.  Look at the
5 attachment.  It says, "Control drug
6 IRR" -- control drug inventory review
7 report policy, prevention and monitoring
8 of control drug suspicious orders.
9    A.   It's on the second page?
10    Q.   Yes, sir.
11    A.   Yes.
12    Q.   Okay.  Under general.  Bold
13 all that paragraph.  Highlight it.  It
14 says, "DEA regulations require that all
15 distributors must design a system to
16 monitor, detect and report any suspicious
17 control drug orders.  Suspicious orders
18 are those involving an extraordinary
19 quantity, an uncommon method of payment
20 or delivery, or any other circumstances
21 that may indicate that the control drug
22 will be used in violation of the law.
23 All CVS distribution centers, DCs, must
24 follow these procedures to comply with

Page 112

1 this requirement."
2         Is that what it says?
3    A.   That is what it states, yes.
4    Q.   Okay.  And it talks about
5 the item review report under
6 Subparagraph B.  If you go down, it says,
7 "Items reviewed.  CVS has established the
8 control drug order thresholds which will
9 flag on the IRR, item review report, as
10 well as field loss prevention NovaStor
11 loss prevention software reports"; is
12 that correct?
13    A.   Where -- where are you now?
14    Q.   If you look at your screen,
15 it's right --
16    A.   I'm having trouble reading
17 the screen.
18    Q.   Okay.
19         MS. MILLER:  Bill, it's
20         easier for him to work off of the
21         hardcopy --
22 BY MR. BAKER:
23    Q.   I'm under Paragraph B,
24 Paragraph B?

Page 113

1    A.   B as-in-boy?
2    Q.   Yes.
3    A.   Okay.
4    Q.   Do you see it, items
5 reviewed?
6    A.   Yes.
7    Q.   Okay.  Did I quote that
8 correctly?
9         "CVS has established control
10 drug order thresholds which will flag on
11 the IRR."
12    A.   Yes.
13    Q.   "As well as field loss
14 prevention NovaStar reports"; is that
15 correct?
16    A.   Yes.
17    Q.   It says, "These thresholds
18 are the primary tool to prevent stores
19 from purchasing excessive or potentially
20 suspicious control drug orders," correct?
21    A.   That's what it states.
22    Q.   It says, "These thresholds
23 are based on historic trends of sales,"
24 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    A.   That's what it states.
2    Q.   It says, "Stores may order
3  more than the historical average;
4  however, the DC may not ship amounts that
5  exceed these thresholds if it is believed
6  to be suspicious," correct?
7    A.   That's what it states.
8    Q.   All right.  And this was the
9  control drug IRR policy that's being
10 referred to in this e-mail as being in
11 need of being implemented as soon as
12 possible in your area, correct?
13   A.   Yeah, again, I -- before we
14 believed this activity was taking place,
15 it was more of a finalizing an SOP.
16   Q.   Okay.  So let's go to
17 Exhibit Number 97.
18       (Document marked for
19       identification as Exhibit
20       CVS-Devlin-P-97.)
21 BY MR. BAKER:
22   Q.   All right.  Exhibit
23 Number 97 is the DEA SOP 8/25 of 2010 in
24 an e-mail from Amy Propatier on the cover

Page 115

1  of that.  It's dated 8/26/2010; is that
2  correct?
3    A.   Excuse me.  Yes, that's what
4  it states.
5    Q.   Okay.  So it says from Amy
6  Propatier to Annette Lamoureux.  Do you
7  know who Annette Lamoureux was?
8    A.   I believe she worked in the
9  Woonsocket distribution center.
10   Q.   Okay.  And Amy Propatier
11 also worked in the Woonsocket
12 distribution center; is that correct?
13       MS. MILLER:  Objection.
14 BY MR. BAKER:
15   Q.   Corporate office.
16       She worked in the corporate
17 office; is that correct?
18   A.   She worked in the corporate
19 office, yes.
20   Q.   Okay.  So according to this
21 e-mail as a follow-up to the one that was
22 8/23, remember that one?  "I'm trying to
23 get this inserted by Wednesday."
24       Do you remember that?

Page 116

1    A.   I remember reading that,
2  yes.
3    Q.   Okay.  So now, we are on
4  8/26, and it says, "Could you please
5  post?  We added the suspicious order
6  monitoring."
7        Do you see that?
8    A.   I don't see 8/26.
9    Q.   Okay.  Look -- look.
10 Actually do you see -- actually
11 8/25/2010.  Do you see that?
12   A.   I do see 8/25.
13   Q.   All right.  This is sent on
14 8/26/2010.  Do you see that?
15   A.   Okay.  Yes.
16   Q.   Okay.  It says, "Can you
17 please post?  We added the suspicious
18 order monitoring."
19       Do you see that?
20   A.   I do see that.
21   Q.   Okay.  Is this the first
22 time that the suspicious order monitoring
23 was added to the SOP at CVS?
24       MS. MILLER:  Objection.

Page 117

1  BY MR. BAKER:
2    Q.   Is this the first time that
3  the suspicious order monitoring policy
4  and procedure in its completed form was
5  added to the -- the standard operating
6  procedure manual at CVS?
7    A.   Based on the e-mail that
8  appears to be so.  But again, I'm very
9  confident that the -- there was a process
10 that was taking place.
11   Q.   You are confident that there
12 was a process taking place.
13   A.   I know there was.
14   Q.   Okay.  Let me -- let me talk
15 about that.  There was no written policy
16 and procedure with respect to suspicious
17 order monitoring before 8/25 of 2010,
18 according to the documentation that I've
19 shown you today, correct?
20       MS. MILLER:  Objection.
21 BY MR. BAKER:
22   Q.   Correct?
23   A.   Again, I -- I can't recall
24 on the documentation which I have not

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 read through. That's based on the
2 documentation and not having read through
3 it and the dates, again I don't know the
4 exact date that it was actually put in
5 the SOP.
6     Q.   Well, it says it right here,
7 Mr. Devlin. I mean it says, "Could you
8 please post, we added the SOM." It's
9 dated 8/25/2010. And you have Amy
10 Propatier sending the e-mail 8/26/10. Is
11 that not clear as crystal to you?
12     A.   I under --
13         MS. MILLER: Objection.
14         THE WITNESS: I understand
15     that based on the e-mail.
16 BY MR. BAKER:
17     Q.   Okay. Based upon the
18 e-mail, based upon the documentation,
19 based upon the exhibits that I've shown
20 you today, is it true that, to your
21 knowledge, that's the first time that CVS
22 inserted a suspicious order monitoring
23 policy and procedure into their standard
24 operating procedure, yes or no?

Page 119

1         MS. MILLER: Objection.
2     Asked and answered.
3         THE WITNESS: Again, on the
4     e-mails that you're showing me,
5     you could state that. Again, I
6     just -- I can't recall if that is
7     in fact the date.
8         MR. BAKER: Okay. I've been
9     going about an hour and a half
10     myself. And I have not taken a
11     break. So I'm going to take about
12     a five-minute break.
13         THE VIDEOGRAPHER: We're
14     going off the record. The time is
15     10:09.
16         (Short break.)
17         THE VIDEOGRAPHER: We are
18     going back on record. Beginning
19     of Media File 3. The time is
20     10:20.
21 BY MR. BAKER:
22     Q.   Okay. We're back on the
23 record looking at Exhibit Number 87,
24 which was the --

Page 120

1         MS. MILLER: Bill, you mean
2     97?
3 BY MR. BAKER:
4     Q.   Excuse me. We're back on
5 the record and looking at Exhibit 97,
6 which was the 8/25/10 control drug DEA
7 standard operating procedures manual at
8 CVS distribution center, correct?
9     A.   Yes.
10     Q.   I want you to turn to page,
11 Roman Numeral VII-7. And it talks about
12 the item review report, Paragraph Number
13 4. Do you see here? The item review
14 report?
15         MS. MILLER: Do you mean
16     Roman Numeral VIII-7?
17 BY MR. BAKER:
18     Q.   Right. Roman Numeral
19 VIII-7, Numeral 4, item review report?
20         Do you see that?
21     A.   I do.
22     Q.   It says, "Currently the item
23 review report for control drugs is being
24 reviewed at a central location in New

Page 121

1 Jersey." Is that correct?
2     A.   That's what it states.
3     Q.   Okay. That's where Frank
4 Mortelliti was located, correct?
5     A.   No.
6     Q.   Where was -- that's where --
7 who was Mortelliti? What's his first
8 name?
9     A.   His name is John.
10     Q.   John Mortelliti. Okay.
11 You're Frank Devlin. That's where John
12 Mortelliti was located, correct?
13     A.   Correct.
14     Q.   Was he the one doing the
15 item review report review at that time?
16     A.   John was definitely involved
17 in the item review report. As far as
18 exact time frames and whatnot, I -- I
19 can't recall.
20     Q.   Okay. If this says that
21 that's what he was doing, do you have any
22 reason to doubt that this is accurate,
23 8/25 of 2010?
24         MS. MILLER: Objection.

Page 122

BY MR. BAKER:
1 Q. She objected. So let's look
2 at the page. Look at the first page of
3 this. It's 8/25/10. That's the date on
4 this SOP; is that correct?
5 A. That is correct.
6 Q. Okay. And inside this SOP
7 that's dated 8/25/10, did I read this
8 correctly? "Currently the item review
9 report for controlled drugs is being
10 reviewed in a central location in New
11 Jersey."
12 Did I read that correct?
13 A. You read that correctly.
14 Q. Okay. And was
15 Mr. Mortelliti the one that was doing
16 that item review report in New Jersey?
17 A. Based on this document, yes.
18 Q. Okay. And do you have any
19 reason to doubt that this document is
20 accurate?
21 A. No. I'm not doubting the
22 accuracy of the document. Again, I
23 just -- I can't recall the exact time

Page 123

1 frames he was reviewing and not
2 reviewing.
3 Q. Was he doing this by himself
4 in New Jersey, to your knowledge?
5 MS. MILLER: Objection.
6 BY MR. BAKER:
7 Q. Let me restate the question.
8 Who, if anybody, was assisting
9 Mr. Mortelliti in New Jersey with respect
10 to this item review report?
11 A. I know Mr. Mortelliti was
12 involved in the process. And he may have
13 had, you know, one of his supervisors
14 working for him involved. But I just --
15 I can't say for sure.
16 Q. All right. Turn to the next
17 page. Under Paragraph 7, reports to the
18 DEA, it says, "All investigations
19 resulting in a confirmed suspicious order
20 must be reported to the director of
21 logistics, loss prevention, Frank
22 Devlin."
23 That's you, correct?
24 A. Correct.

Page 124

1 Q. It says, "The director of
2 logistics, loss prevention, will be the
3 only representative of CVS contacting the
4 DEA." Correct?
5 A. That's what it states.
6 Q. Okay. Now, you were in a
7 position of authority at CVS with respect
8 to being the liaison or the contact
9 person between CVS and the DEA according
10 to this SOP; is that correct?
11 A. Yes.
12 Q. Okay.
13 A. From an SOP standpoint and
14 I -- I would have other people involved
15 also.
16 Q. Okay. But in terms of
17 having direct contact with the DEA, this
18 SOP lists you as the only representative
19 of CVS that shall contact the DEA -- DEA,
20 correct?
21 A. That's what this version
22 states. I mean, the process did -- did
23 evolve. And again, I can't recall the
24 dates. But I did get other people

Page 125

1 involved in contacting the DEA.
2 Q. Okay.
3 A. But I would -- I would be
4 aware of it.
5 Q. All right. With respect to
6 this item review report that was being
7 reviewed by Mr. Mortelliti in Lumberton,
8 New Jersey, was he reviewing the totality
9 of all item review reports for all CVS
10 distribution centers throughout the
11 United States?
12 A. Again, I can't recall exact
13 times, but there were periods of time,
14 that, yes, that would be the case.
15 Q. Okay. And when he was doing
16 that, was he reviewing the item review
17 reports that pertained to control drugs
18 being supplied out of the distribution
19 centers to CVS pharmacies?
20 A. Yes.
21 Q. Okay. Would that include
22 narcotics that we talked about,
23 hydrocodone combination products?
24 MS. MILLER: Objection.

Page 126

1 THE WITNESS: Yes, I believe
2 at that time hydrocodone products
3 were -- would have been involved,
4 yes.
5 BY MR. BAKER:
6 Q. Okay. You know hydrocodone
7 combination products are narcotics. I
8 showed you the drug fact sheets on that,
9 correct?
10 MS. MILLER: Objection.
11 BY MR. BAKER:
12 Q. You know that, don't you?
13 MS. MILLER: Objection.
14 THE WITNESS: After reading
15 the -- you know, according to that
16 fact sheet, that's what it's
17 classified as.
18 BY MR. BAKER:
19 Q. And you know they're
20 opioids, correct?
21 MS. MILLER: Objection.
22 THE WITNESS: I mean --
23 BY MR. BAKER:
24 Q. I mean, that's what it said.

Page 127

1 You just read it.
2 MS. MILLER: Objection.
3 THE WITNESS: Well, again,
4 according to the sheet you sent
5 me, yes.
6 BY MR. BAKER:
7 Q. Well, listen, what color is
8 that pen right there?
9 MS. MILLER: Objection.
10 BY MR. BAKER:
11 Q. What color is it?
12 MS. MILLER: Objection.
13 THE WITNESS: You're not
14 going to buy this, but I am
15 color-blind.
16 BY MR. BAKER:
17 Q. Okay. Well, what's in this
18 glass right here?
19 MS. MILLER: Objection.
20 BY MR. BAKER:
21 Q. Does it look like water?
22 MS. MILLER: Mr. Baker.
23 BY MR. BAKER:
24 Q. See, I want to ask direct

Page 128

1 questions and get direct answers. But
2 every time I ask you a question, you kind
3 of, well, I don't remember, this, that.
4 I just want to know what the facts are.
5 Okay. And I don't want to dance around
6 with you with questions and answers. I
7 just want to know the facts. Okay. And
8 I'm not trying to ask you trick
9 questions.
10 So if you can answer my
11 questions directly, we can get through
12 this much smoother than what you're
13 allowing. Okay?
14 MS. MILLER: Bill, he's
15 answering your questions.
16 BY MR. BAKER:
17 Q. So let me -- let me repeat
18 the question. Let's go back.
19 A. My -- my intention is to
20 answer your question, sir.
21 Q. Okay. You know, you know
22 that hydrocodone combination products are
23 opioids, correct?
24 MS. MILLER: Objection.

Page 129

1 Asked and answered.
2 THE WITNESS: According to
3 the sheet you provided me, that's
4 what it states.
5 BY MR. BAKER:
6 Q. Okay. Did you know that a
7 hydrocodone combination product was an
8 opioid when you worked at CVS?
9 A. I -- as I previously
10 testified, I would refer to it as a
11 control drug.
12 Q. Okay. Did you know it was
13 an opioid?
14 A. No.
15 Q. Okay. When Mr. Mortelliti
16 was in Lumberton, New Jersey, reviewing
17 these item review reports, how many
18 pharmacies was he reviewing them for?
19 MS. MILLER: Objection.
20 THE WITNESS: It would be
21 based on from when John was
22 reviewing it, based on how many
23 pharmacies were operating at that
24 time.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

BY MR. BAKER:

Q. Approximately how many pharmacies were operating in August of 2010 to the best of your recollection, how many CVS pharmacies were in operation at that time?

A. I think there could have been maybe eight or nine.

Q. That's distribution centers.

A. I'm sorry, can you repeat the question?

Q. Okay. There might have been eight or nine distribution centers; is that right?

A. I'm sorry, I thought that's what you were asking me.

Q. Okay. So let's ask that. How many distribution centers were in operation at that time that distributed control drugs from CVS distribution centers to CVS pharmacies?

A. It may have been around eight or nine distribution centers.

Q. Okay. And those eight or

Page 131

nine distribution centers, to how many total approximate CVS pharmacies did they distribute Schedule III controlled substances?

A. Again, I would have to look at a store count, because, you know, CVS over the years had, you know, acquisitions and mergers, and so maybe in 2010 there was around 4,000. Best guess. I'm not sure on that.

Q. Okay. Based upon your knowledge without guessing, would 4,000 be about an accurate estimate?

MS. MILLER: Objection.

THE WITNESS: I would say it could be in the ballpark.

BY MR. BAKER:

Q. Okay. And that's because you were director of loss prevention logistics and you were involved in the suspicious order monitoring process; is that right?

MS. MILLER: Objection.

THE WITNESS: I was --

Page 132

BY MR. BAKER:

Q. All right. She objected, so I'm going to have to restate the question until that stops. Okay?

A. Sure.

Q. So what was your involvement with suspicious order monitoring with respect to logistics loss prevention in your position at that time?

A. I was involved in -- I was involved in the suspicious order monitoring process, and I'd say, you know, more from an almost program manager standpoint.

Q. Okay.

A. Ensuring that, you know, the -- the process was taking place and we were -- we had an ongoing process in place.

Q. Okay. And over approximately -- using your best estimate in that position, approximately how many CVS pharmacies were these distribution centers distributing to throughout the

Page 133

United States at that time in August of 2010 approximately?

A. Again, I gave a ballpark number of maybe around 4,000.

Q. Okay. And was Mr. Mortelliti doing the reviews for the supply of opioids from those distribution centers to those pharmacies?

MS. MILLER: Objection.

THE WITNESS: You know, again during that time frame, that's not the terminology I -- I would use. I would use control drugs.

BY MR. BAKER:

Q. Okay. Let's use your terminology. Was Mr. Mortelliti doing the item review reports -- was he reviewing the item review reports on behalf of CVS for all of the distribution of controlled substances out of CVS distribution centers to CVS pharmacies nationwide?

A. There were various points in

Page 134

1 times, yes, he was doing that.
2  Q. Okay. And when he was doing
3 it, how many item review reports was he
4 reviewing per day on average?
5  MS. MILLER: Objection.
6  THE WITNESS: I can't
7  recall.
8 BY MR. BAKER:
9  Q. When he was doing that, how
10 much time was he spending reviewing the
11 item review reports per day for all of
12 those distribution centers' transactions
13 with respect to controlled substances
14 from the distribution centers to the CVS
15 pharmacies nationwide?
16  A. I can't recall a specific
17 amount of time. But I -- I know a -- I
18 know there was a significant amount of
19 his day was spent doing that.
20  Q. And do you know how much
21 time he spent reviewing each item review
22 report on each transaction of controlled
23 substances that was generated from a CVS
24 distribution center to a CVS pharmacy?

Page 135

1  A. I do not.
2  Q. At the time of the initial
3 rollout of these -- this policy, was it
4 your intent to do this on a DC,
5 distribution center to distribution
6 center basis, or was it intent -- was it
7 your intent to have it all centralized
8 into one location?
9  MS. MILLER: Objection.
10 BY MR. BAKER:
11  Q. There was an objection.
12  What was your intent with
13 respect to how the suspicious order
14 monitoring IRR review was to be done with
15 respect to whether it, on the one hand,
16 could be done centrally in one location
17 as opposed to, on the other hand, be done
18 in various distribution centers?
19  A. Are you asking a specific
20 time or?
21  Q. Yes. In 2010 when this
22 rolled out.
23  A. You know, I think the -- the
24 program itself, it was an evolving

Page 136

1 program. And again, I can't recall exact
2 dates, but I do recall, you know,
3 initially, from a central standpoint, and
4 I recall looking at having individual
5 distribution centers doing it, and then
6 maybe more going back to a centralized
7 process.
8  Q. Okay. At first it was
9 centralized in Lumberton, New Jersey,
10 according to this document; is that
11 correct?
12  A. That's what the document
13 states, yes.
14  Q. Okay. And when -- when you
15 had -- when you were involved with
16 knowing that this SOM was inserted into
17 this SOP 8/25/10, were there some DEA
18 talking points developed?
19  MS. MILLER: Objection.
20  THE WITNESS: I don't
21  recall.
22 BY MR. BAKER:
23  Q. Do you -- do you recall
24 whether or not you were involved with

Page 137

1 helping develop DEA talking points with
2 respect to this SOM that was inserted
3 into the SOP 8/25/10?
4  A. Yeah, I'm not sure what
5 you're referencing as far as DEA talking
6 points.
7  Q. Okay.
8  MR. BAKER: We'll take just
9  a short break while I pull that.
10  Let's go back on the record.
11  (Document marked for
12  identification as Exhibit
13  CVS-Devlin-P-81.)
14 BY MR. BAKER:
15  Q. Let me show you Exhibit
16 Number 81.
17  Okay. You see this e-mail
18 on Exhibit 81 that's dated September 1,
19 2010, from John Mortelliti to various
20 people within CVS. Do you see that?
21  A. I do see that.
22  Q. All right. Do you see where
23 it talks about DEA talking points as
24 being the subject?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1   A.   DEA speaking points, yes.
2   Q.   Okay.  And it says, "Team,
3  these are the final approved speaking
4  points for the DEA agents if they come to
5  one of your facilities and question
6  suspicious monitoring.  It is okay to
7  share this document.  Please be sure your
8  team understands it before presenting it
9  so it doesn't look like a prop instead of
10  a tool."
11       Is that what that says?
12   A.   That's what the e-mail
13  states, yes.
14   Q.   Okay.  And within the DEA
15  talking points, if you go to, about the
16  sixth or seventh page in at the bottom,
17  it says --
18       MS. MILLER:  What's the
19       Bates number?
20       MR. BAKER:  The Bates is
21       75306.  If you'll rotate that.
22  BY MR. BAKER:
23   Q.   It's on your screen.  Do you
24  see that?

Page 139

1   A.   75306.  I do see that.
2   Q.   It says, "Responsibilities.
3  DC Rx."  What is a DC Rx?
4   A.   I believe that would be DC
5  pharmacy.
6   Q.   Okay.  "Review report, IRR,
7  daily and determine whether variances are
8  within acceptable ranges," correct?
9   A.   That's what it states.
10   Q.   Okay.  And then it says
11  on -- go two pages further, or three
12  pages further, at 75309.  Under FAQ.  It
13  says, "why is the DC responsible to
14  review suspicious orders?"
15       Do you see that?
16   A.   I do.
17   Q.   Okay.  It says, "The DC, as
18  a separate DEA registrant, is responsible
19  for products shipped from the facility.
20  DEA regulations require all distributors
21  to report suspicious orders," correct?
22   A.   That's what it states, yes.
23   Q.   Now, you saw that document
24  that I presented to you that showed the

Page 140

1  different names of the different CVS
2  entities that were listed as owners of
3  these distribution centers, did you see
4  that?
5   A.   Yes, sir.
6   Q.   Okay.  Who and what -- let
7  me -- let me ask you this.
8       Who decided within CVS that
9  this would be a distribution center to
10  distribution center operated system as
11  opposed to a centralized system at the
12  time it was rolled out, this SOM/SOP was
13  rolled out 8/25/2010?
14       MS. MILLER:  Objection.
15       THE WITNESS:  I can't recall
16  particulars, but it -- you know,
17  it -- probably would have been
18  discussions amongst -- I'm sure I
19  was included.  Probably with John
20  Mortelliti.
21       But again, I'm just -- I
22  can't recall exact conversations.
23  You know, probably soliciting some
24  input by them, getting into more

Page 141

1  theorizing.
2       But, you know, as far as
3  actually remembering, I don't.
4       You know, from what I
5  recall, you know, as the process
6  evolved, you know, it's -- you
7  know, we looked at centralization,
8  we looked at individualization.
9  BY MR. BAKER:
10   Q.   Okay.  With respect to that,
11  when it was first rolled out and
12  centralized in Lumberton, New Jersey, at
13  what point was it then transferred to a
14  DC-to-DC basis, if at all?
15   A.   I just -- I know at one
16  point it was.  I just -- I can't recall
17  the date.
18       MR. BAKER:  Hold on.  Let me
19  take a quick break.  I need to
20  pull those documents if you can't
21  recall.  I'll be --
22       THE VIDEOGRAPHER:  We're
23  going off the record.  The time is
24  10:39.

Page 142

1    (Short break.)
2    THE VIDEOGRAPHER:  We are
3  going back on record.  Beginning
4  of Media File Number 4.  The time
5  is 10:44.
6  BY MR. BAKER:
7    Q.   Okay.  Mr. Devlin, when you
8  were at CVS in 2010, August, we talked
9  about Mr. Mortelliti doing the IR reviews
10  out of Lumberton, New Jersey initially,
11  correct?
12    A.   We did discuss that, yes.
13    Q.   Okay.  And at that point
14  this was not a
15  distribution-to-distribution center
16  operation.  It was out of one
17  distribution center in Lumberton, New
18  Jersey.  Is that accurate or not?
19    A.   Yeah.  And again, I didn't
20  recall the dates.  But I know we kind
21  of -- we had central.  We had
22  distribution, central, so...
23    Q.   And we went over the DEA
24  talking points that showed that the

Page 143

1  intent was to make this a distribution
2  center-oriented program, not a
3  centralized one, right?
4    MS. MILLER:  Objection.
5  BY MR. BAKER:
6    Q.   Is that accurate or not?
7    MS. MILLER:  Objection.
8    THE WITNESS:  Well,
9  according to the --
10  BY MR. BAKER:
11    Q.   Wait a minute, because she
12  objected.  So I've got to re-ask the
13  question until that stops.  Okay.
14    According to the document --
15    MS. MILLER:  I have a right
16  to object.
17    MR. BAKER:  No, she does.
18  But I want to make sure we get it
19  right.
20    MS. MILLER:  I want to make
21  sure he's aware that I have a
22  right to object.
23  BY MR. BAKER:
24    Q.   Okay.  So you understand

Page 144

1  from looking at the documentation, what
2  is your understanding as to what the
3  intent was of CVS insofar as this being
4  either a centralized versus a
5  distribution center by distribution
6  center operation?
7    MS. MILLER:  Objection.
8    THE WITNESS:  According --
9    MS. MILLER:  You may answer.
10  Go ahead.
11    MR. BAKER:  Well, she
12  objected so I'm going to keep
13  doing it until I get it clean.
14  Okay.
15  BY MR. BAKER:
16    Q.   So what was the purpose of
17  that being in -- the distribution to
18  distribution center IRR program versus --
19  in the DEA talking points versus it being
20  a centralized location?
21    MS. MILLER:  Objection.
22    MR. BAKER:  She objected
23  again.
24  BY MR. BAKER:

Page 145

1    Q.   What does the -- what does
2  the document that you looked at show as
3  to what the DEA talking points say about
4  the IRR program being a centralized
5  versus a DC-to-DC-operated program?  What
6  does it say?
7    A.   I lost the page.  What page
8  are we on?
9    Q.   We just reviewed it.  Did it
10  say that it was going to be a
11  distribution center-related program or
12  that it was going to be a centralized
13  program?
14    A.   It was referencing a
15  distribution center being involved.
16    Q.   Okay.  What was the thought
17  process behind that so far as your
18  involvement?
19    A.   I think we were just
20  discussing from an efficiency standpoint,
21  operational standpoint, what made the
22  most sense as far as how we had the
23  program in place.
24    Q.   And how many different

Page 146

1 people were going to have to be at the
2 distribution centers to do that if it was
3 a distribution center-related program
4 versus a centralized program?
5      A.   I believe we were looking at
6 the pharmacy manager or supervisor of
7 each distribution center and the loss
8 prevention manager would have some
9 involvement, but the majority of the
10 involvement would be the pharmacy
11 supervisor and the -- you know, I think
12 at the time we were just looking at, you
13 know, again efficiencies, and it's --
14 having the pharmacy supervisor at the DC
15 doing it, it would certainly, for their
16 respective distribution center, it would
17 take a lot less time to review than a
18 centralized process.  I mean it would
19 take more time for a centralized process.
20      Q.   Okay.  And how long was it
21 intended to stay -- how long did you
22 intend for it to stay in a
23 distribution-center-to-distribution
24 center process versus a centralized

Page 147

1 process?
2      A.   I can't recall a time frame.
3      Q.   Okay.  When was it rolled
4 out into a
5 distribution-center-to-distribution-
6 center process?
7         MS. MILLER:  Objection.
8      Asked and answered.
9 BY MR. BAKER:
10      Q.   Well, we have the DEA
11 talking points.  Was it shortly after
12 that?
13      A.   I just -- I can't -- I can't
14 recall the dates.
15      Q.   If documentation showed that
16 it was in September -- late September
17 2010, early October 2010, would that be
18 consistent with your memory?
19      A.   I just can't -- I can't -- I
20 just can't recall.
21      Q.   Okay.  In October 2010, did
22 you start advertising for a loss
23 prevention analyst in Knoxville,
24 Tennessee?

Page 148

1      A.   Yeah, I just can't recall
2 the date.
3         (Document marked for
4      identification as Exhibit
5      CVS-Devlin-P-143.)
6 BY MR. BAKER:
7      Q.   Let me show you Exhibit 143.
8 This shows that it's an e-mail from
9 Rachel Dingus to you, Frank Devlin.  Who
10 is Rachel Dingus?
11      A.   I can't recall.
12      Q.   Okay.  Does this show that
13 there was a loss prevention analyst
14 position being advertised for CVS?
15      A.   Just give me a moment to
16 read through it.  I mean, this is a job
17 description.
18      Q.   And it's a job description
19 that's attached to an e-mail, 10/13/10,
20 correct?
21      A.   Correct.
22      Q.   To you, right?
23      A.   Correct.
24      Q.   All right.  And it says,

Page 149

1 "Summary.  PSE/control drug item review
2 analyst," correct?  Look here.  That's
3 what it says, right there?
4      A.   Yes.
5      Q.   And control drug would
6 include hydrocodone combination products,
7 or not?
8      A.   Control drug, yes.
9      Q.   Okay.  And would these be
10 the control drugs that would be shipped
11 from the distribution centers to the
12 pharmacies?
13      A.   To CVS stores, yes.
14      Q.   Okay.  And it says, "The
15 loss prevention analyst is responsible
16 for maintaining an adherence to the loss
17 prevention procedures, controls, and
18 investigations.  The loss prevention
19 analyst will be responsible for daily
20 reviews of pseudoephedrine control drug
21 inventory review reports for ten
22 full-service Rx distribution centers, as
23 well as reports obtained from" -- "from
24 NovaStor (Viper)."

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    Is that what it says?
2    A.   That's what it states, yes.
3    Q.   Okay.  So were there ten
4 distribution centers at the time, ten
5 pharmacy distribution centers?
6    A.   According to this document,
7 yes.
8    Q.   Okay.  It says, "They will
9 initiate investigations and feedback from
10 loss prevention in the field as well as
11 the distribution centers"; is that
12 correct?
13    A.   That's what it states.
14    Q.   And under job description
15 under bullet Point 4, it says, "This
16 person will keep detailed notes on all
17 inventory review reports as well as open
18 cases," correct?
19    A.   That's what it states.
20    Q.   Okay.  So let me ask, was
21 there an intent in October of 2012 for
22 you to make this a one location procedure
23 versus a distribution center to
24 distribution procedure?

Page 151

1    A.   It appears based on this
2 document, yes.
3    Q.   Okay.  Now what changed by
4 the time those DEA talking points were
5 developed and the time that this -- this
6 advertisement takes place in October of
7 2010?
8    MS. MILLER:  Objection.
9 BY MR. BAKER:
10    Q.   What change did it cause you
11 to change your mind as to whether this
12 should be a distribution to
13 distribution-type operation --
14 distribution center to distribution
15 center-type operation as opposed to a
16 centralized operation?
17    MS. MILLER:  Objection.
18 BY MR. BAKER:
19    Q.   What changed, if anything?
20    MS. MILLER:  Objection.
21    THE WITNESS:  I can't recall
22 any change and I -- certainly I
23 don't recall any correlation to
24 DEA talking points in the creation

Page 152

1 of this document.
2 BY MR. BAKER:
3    Q.   Well, the DEA talking points
4 said that this was going to be a
5 distribution-wide program, correct?
6    A.   It did, yes.
7    Q.   Okay.  But then you, a month
8 later, in October, are advertising for
9 this to be a centralized location process
10 in Knoxville.  Why?
11    MS. MILLER:  Objection.
12    THE WITNESS:  Alls I can
13 recall is I guess from an
14 operational efficiency standpoint,
15 what we felt was the best way to
16 approach it.
17 BY MR. BAKER:
18    Q.   How many positions -- oh, go
19 ahead.  I'm sorry.  Were you finished?
20    A.   No.  So I mean, this, I
21 mean, you know, the whole suspicious
22 order monitoring process, I mean it
23 was -- it was a new process.
24    Q.   Okay.

Page 153

1    A.   And we had gone into -- you
2 know, it just continually evolved --
3    Q.   Right.
4    A.   -- over a period of time.
5    So whether it was
6 centralized or based in a distribution
7 center, I certainly don't recall any,
8 like major issue of wow, we -- we better
9 change this.  That wasn't the case at
10 all.  It was more, you know, my role as a
11 project manager, you know, not just on
12 SOM, but on other items, it's just -- I'm
13 always looking for efficiency, what is --
14 what's the best way to do this.  So...
15    Q.   Okay.  Now, you mentioned --
16 you mentioned it was a new process, this
17 was a new SOM process, correct?
18    A.   Well, the whole -- the whole
19 evolution of suspicious order monitoring.
20 I mean, it was an evolution in the
21 process.
22    Q.   Okay.  But this is a new
23 process, the new process was the one
24 described in the 8/25/10 SOP; is that

Page 154

1 right?
2    A. No. I -- in the -- and
3 according to that document, I -- and I
4 think I've been consistent, the SOM
5 process is up and running. It was up
6 and running. So I wouldn't necessarily
7 say it's a new process.
8    When I use the term "new,"
9 that's conceptually. I mean that may go
10 back to, when you look at that -- you
11 know, the DEA letter that you showed me.
12 You know, they were -- the industry was
13 changing. So we had to change.
14    Q. Okay. So the SOM process
15 that you are talking about, that -- that
16 causes the generation of these item
17 review reports, was this part of a
18 process that developed from a 2008
19 delivery of a software program by the
20 Buzzeo related company?
21    A. Yes. That would have been
22 related to that.
23    Q. Okay.
24    A. But it was an enhancement of

Page 155

1 our existing processes.
2    Q. Right. Before that Buzzeo
3 related software program was delivered to
4 CVS in 2008, was there any
5 software-related program that CVS
6 implemented in its systems for doing
7 suspicious order monitoring?
8    A. I know on the field side
9 there was some software programs that
10 would address suspicious order
11 monitoring. But, you know, as far as the
12 details and how that worked, I'm just --
13 I'm not privy to that. But I know there
14 was a software program, and also even
15 some manual processes -- processes that
16 were in place.
17    Q. Insofar as the details of
18 that, you would not know?
19    A. As far as the fields?
20    Q. Yes.
21    A. Fields, no, I really wasn't
22 involved in that. I believe it was
23 called Prescription Drug Monitoring
24 Report.

Page 156

1    Q. Okay.
2    A. But I don't know any of the
3 details around that at all.
4    Q. Okay. Insofar as any
5 software program, do you know the details
6 of any software program that existed
7 before 2008 that related to suspicious
8 order monitoring?
9    A. Again, I would -- I would
10 reference that prescription drug
11 monitoring report.
12    Q. Okay. Do you know the
13 details of it is what I'm asking.
14    A. I do not know the details.
15    Q. Okay. Do you know the
16 details of what it monitored or how it
17 monitored it?
18    A. I do not know the details.
19    Q. So -- so if we're trying to
20 ask you, Frank Devlin, as to what your
21 knowledge is of suspicious order
22 monitoring in the -- in the nature of a
23 software program before the 2008 Buzzeo
24 program was delivered to CVS, is it true

Page 157

1 that you -- your answer is you don't
2 know?
3    A. I would recommend you speak
4 to someone else.
5    MS. MILLER: Objection.
6 BY MR. BAKER:
7    Q. Okay. Is that because you
8 don't know the details of it?
9    MS. MILLER: Objection.
10    THE WITNESS: Again, I know
11    there was a software program
12    called Prescription Drug
13    Monitoring. I do not know the
14    details of it.
15 BY MR. BAKER:
16    Q. Okay. And you don't know
17 how it operated or what it did to
18 operate; is that accurate?
19    MS. MILLER: Objection.
20    THE WITNESS: I --
21 BY MR. BAKER:
22    Q. She objected, so I need to
23 re-ask the question.
24    Do you know the details of

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  that program?
2      A.  I know there was a
3  prescription drug monitoring program.  I
4  do not know the details of it.
5      Q.  Okay.  Do you know who
6  operated it?
7      A.  It was part of the field
8  section of the loss prevention
9  department.
10     Q.  Okay.  Do you know who in
11 loss prevention operated it?
12     A.  No.
13     Q.  Okay.  Did you ever see it
14 operated?
15         MS. MILLER:  Objection.
16         THE WITNESS:  I don't -- no,
17     I don't recall seeing it
18     operating.
19 BY MR. BAKER:
20     Q.  Okay.  Let me get back to
21 this IRR process.  Let me show you an
22 e-mail that's Exhibit 71.
23         (Document marked for
24     identification as Exhibit

Page 159

1      CVS-Devlin-P-71.)
2  BY MR. BAKER:
3      Q.  And this shows an e-mail
4  from Mr. Mortelliti -- excuse me, from
5  Ellen Demetrius to John Mortelliti.  It's
6  dated March 10, 2011.  And above that is
7  an e-mail dated March 14, 2011, from
8  Mr. Mortelliti to Ms. Demetrius and
9  copied to Ms. Hinkle and a copy to you.
10 Do you see that?
11     A.  I'm reading through it now.
12     Q.  Okay.  On 3/14/11 there's
13 an -- an e-mail that you received that
14 says, "The IRR process has been shifted
15 to the Knoxville DC with the LP analyst
16 position.  I have forwarded the info to
17 Pam Hinkle who will be overseeing the
18 process going forward."
19         Did I read that correctly?
20     A.  Yes, sir.
21     Q.  Okay.
22         MS. MILLER:  Bill, before
23     you move, there's a -- the second
24     page appears to be an e-mail from

Page 160

1  2012.
2          THE WITNESS:  Yes.
3          MS. MILLER:  Did you intend
4      for that to be part of the
5      exhibit?
6          MR. BAKER:  You know, I
7      don't know, but we'll -- we'll let
8      that stay as it is, because that's
9      the way it was submitted.
10         We'll go over that in just a
11     second.
12 BY MR. BAKER:
13     Q.  So go ahead and look at
14 that.  Is that true that's what it says,
15 it says, "The IRR process has been
16 shifted to our Knoxville DC with the LP
17 analyst position," and this is dated
18 March 14, 2011?
19     A.  That's what it states, yes.
20     Q.  Okay.  Would that be
21 consistent with your recollection of when
22 it was moved from a DC to DC basis to a
23 centralized location in Knoxville DC?
24         MS. MILLER:  Objection.

Page 161

1  BY MR. BAKER:
2      Q.  Go ahead.
3          MS. MILLER:  Go ahead and
4      answer.
5          THE WITNESS:  That -- that
6      would be within the ballpark.
7  BY MR. BAKER:
8      Q.  Okay.  And do you know why
9  it was moved from a distribution
10 center-related program to Knoxville at
11 that time?
12         MS. MILLER:  Objection.
13     Asked and answered.
14 BY MR. BAKER:
15     Q.  Do you know?
16     A.  I believe I -- I had
17 mentioned from a -- you know, the
18 continuous evolution of the process and
19 from an operational efficiency
20 standpoint.
21     Q.  Did it -- did it cause less
22 people to have to be employed by CVS to
23 run the program if it was centralized in
24 one location as opposed to run out of the

Page 162

1 11 distribution centers?

2     MS. MILLER: Objection.

3 BY MR. BAKER:

4     Q. There was an objection.

5     Did it -- did it cost less

6 money to employ people to run the program

7 if it was run out of a centralized

8 location as opposed to a distribution

9 center to distribution center location?

10     A. Cost less money?

11     Q. Yes, sir.

12     A. No.

13     Q. Okay. Look at the next page

14 of that e-mail, if you would.

15     A. The next page?

16     Q. Yes. It's dated 11/11/12

17 from Mr. Aaron Burtner to Christopher

18 Tulley. 11/11/12. Do you see that?

19     A. Aaron Burtner to Chris

20 Tulley?

21     Q. Do you see the e-mail right

22 in front of you?

23     A. Yes, sir.

24     Q. Okay. Look right below it.

Page 163

1 Because you read e-mails from bottom to

2 top in terms of time. Okay.

3     The -- the one that's dated

4 November 11, 2012, at 7:15 a.m., it says,

5 "Hi guys, I met with John A. and Ellen on

6 Friday. They advised me when this

7 program was initially designed it was

8 meant for the review that Aaron does to

9 be done in all 11 DCs. Do you know why

10 and when it was consolidated to just one

11 DC doing the review?"

12     Do you see that? Did I read

13 that correctly?

14     A. I do see that.

15     Q. Okay. And do you see where

16 it's answered at the top there,

17 11/11/2012, Aaron Burtner to Christopher

18 Tulley. Do you see that?

19     A. Yes.

20     Q. Okay. And it says, "Chris,

21 Pam will be able to shed more light but

22 two big reasons. Review consistency with

23 having just one person completing the

24 reviews rather than 11 people."

Page 164

1     Do you see that?

2     A. Yes.

3     Q. Okay. Is it true that

4 you -- you would have one person doing

5 the reviews if it's done in a centralized

6 location?

7     Is that true?

8     MS. MILLER: Objection.

9     THE WITNESS: During this

10 time frame?

11 BY MR. BAKER:

12     Q. During the time frame that

13 you had it done at a centralized location

14 while you were at CVS. If you had one

15 person -- if you had it done in one

16 centralized location, was one person

17 doing the reviews?

18     A. Yes. We had, during my

19 tenure, I believe we had one person, and

20 then I believe we may have gone up to two

21 people.

22     Q. Okay. The one person during

23 your tenure was who?

24     A. I just don't recall their

Page 165

1 name.

2     Q. Was it initially John

3 Mortelliti?

4     A. Well, initially John was

5 involved, yes.

6     Q. Was he doing IRR reviews in

7 Lumberton, New Jersey?

8     A. Yes, sir.

9     Q. Okay. And was he doing it

10 by himself, one person?

11     A. At one point in time, yes.

12     Q. Okay. And when it -- the

13 process was shifted out of the

14 distribution centers to Knoxville, who

15 was the one person doing it in Knoxville?

16     A. I don't recall.

17     MS. MILLER: Objection.

18 BY MR. BAKER:

19     Q. Was -- when the process was

20 transferred out of the distribution

21 centers, the SOM IRR review process, when

22 that happened, when it's transferred out

23 of the distribution centers back to a

24 centralized location in Knoxville, that,

Highly Confidential – Subject to Further Confidentiality Review

Page 166

1 according to the documentation, was
2 around March of 2012, correct?
3      MS. MILLER: Objection.
4  March of --
5 BY MR. BAKER:
6      Q.  March of 2011. Is that
7 correct?
8      A.  According to the
9 documentation --
10      Q.  Okay.
11      A.  -- it does appear March of
12 2011, yes.
13      Q.  And when that happened, was
14 Pam Hinkle the one that was doing the IRR
15 reviews?
16      A.  I don't believe so.
17      Q.  Who was doing them?
18      A.  I don't recall their name.
19      Q.  Okay. Was it one person
20 that was doing the IRR reviews in
21 Knoxville?
22      A.  It would have been one
23 person, but I'm sure Pam had some
24 involvement.

Page 167

1      Q.  Who was that one person?
2      A.  I do not recall their name.
3      Q.  Okay. And did this continue
4 to be a one-person-related review process
5 until you left in 2012?
6      A.  No.
7      MS. MILLER: Objection.
8 BY MR. BAKER:
9      Q.  How many people reviewed the
10 IRRs when the program was in Knoxville?
11      A.  I believe it began with one.
12      Q.  Okay. And you don't
13 remember who that was?
14      A.  I do not recall their name.
15      Q.  Okay. Did it evolve into
16 two?
17      A.  It may have.
18      Q.  Do you know one way or the
19 other?
20      A.  I -- I just -- it may have.
21 I just -- I just -- I don't remember.
22      Q.  Okay. Were you involved
23 with supervising any of that?
24      MS. MILLER: Objection.

Page 168

1      THE WITNESS: No.
2 BY MR. BAKER:
3      Q.  You were not involved with
4 supervising any of the reviews of the
5 IRRs?
6      MS. MILLER: Objection.
7 BY MR. BAKER:
8      Q.  Were you involved with
9 supervising the review of the IRRs?
10      A.  I guess the definition of
11 "supervising" --
12      Q.  What was your involvement
13 with respect to the IRRs and the review
14 of the IRRs, if anything, while you were
15 at CVS?
16      A.  I was not involved in the
17 day-to-day review of the IRR.
18      Q.  What was your involvement
19 with respect to management of how many
20 people would review IRRs?
21      A.  I would be involved in the
22 decision as far as how many people would
23 review the IRR.
24      Q.  Okay. And that was from

Page 169

1 what period to what period that you were
2 involved in making that decision?
3      A.  It would probably be from
4 the beginning of the process till I left.
5      Q.  And the process began when?
6      A.  Maybe 2008, 2009 period.
7      Q.  The IRR? That's consistent
8 with when the Buzzeo --
9      A.  Yeah.
10      Q.  -- software program was
11 delivered.
12      A.  Yeah, it would be -- it
13 would correlate to that.
14      Q.  Okay. Let's just make sure
15 I have the history correct. The Buzzeo
16 program was delivered to CVS in 2008; is
17 that right?
18      A.  I think so.
19      Q.  Okay.
20      A.  I think so.
21      Q.  The beginning of the year or
22 the end of the year? Or do you recall?
23      A.  Probably closer to the end
24 of the year.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1   Q.  Okay.  And the Buzzeo
2  program, did it have an algorithm within
3  it?  Do you recall that?
4   A.  I do recall an algorithm.
5   Q.  Okay.  Do you -- do you know
6  what the algorithm was?
7   A.  I know it had an algorithm.
8  And I know there were, you know, it's
9  something that the Buzzeo team put
10  together.  I know it involved the
11  assistance of statisticians.
12   But as far as the
13  particulars of the algorithm and the
14  details of the algorithm, I defer it to
15  the expertise that we had hired.
16   Q.  Okay.  Do you know whether
17  you could even interpret what the
18  algorithm meant if somebody showed it to
19  you?
20   A.  No.
21   MS. MILLER:  Objection.
22   Give me a chance.  Thank you.
23  BY MR. BAKER:
24   Q.  Do you know?

Page 171

1   MS. MILLER:  Objection.
2  BY MR. BAKER:
3   Q.  Did you answer that
4  question?  Could you interpret what the
5  coefficients mean in the algorithm if
6  somebody showed them to you?
7   MS. MILLER:  Objection.
8   THE WITNESS:  No.  You know,
9   I think it was -- there was
10   involvement from statisticians
11   that put the algorithm together.
12   And I certainly don't present
13   myself as a statistician.
14  BY MR. BAKER:
15   Q.  Okay.  Let me go back to
16  Exhibit 97, please.
17   MS. MILLER:  Which document
18   is that?
19   MR. BAKER:  That is the DEA
20   SOP, 8/25/10.
21  BY MR. BAKER:
22   Q.  Go to Page 1 of that
23  document, which is Bates Number 88957.
24   And go down to the

Page 172

1  third-to-last paragraph where it starts
2  with, "CVS is responsible."
3   Do you see that?
4   A.  Yes, sir.
5   Q.  Okay.  Let me read that to
6  you.  I'm reading from the 8/25/2010 DEA
7  SOP that was adopted by CVS that date; is
8  that correct?  Is that what I'm reading
9  from?
10   A.  That's what it appears, yes.
11   Q.  Okay.  And this, according
12  to the documentation, is when the
13  suspicious order monitoring policy and
14  procedure was put into a written form to
15  place inside the standard operating
16  procedure manual; is that correct?
17   A.  Again the process was in
18  place, but this is -- this appears to be
19  a formalized SOP.
20   Q.  All right.  It says, "CVS is
21  responsible for ensuring compliance with
22  DEA regulatory requirements.  And that
23  responsibility cannot be abdicated or
24  transferred to anyone else."

Page 173

1   That's in your manual,
2  correct?
3   A.  That's what it states.
4   Q.  Okay.  So you understand
5  from your own manual that that
6  responsibility cannot be abdicated or
7  transferred to anyone else?  You
8  understand that from your own manual?
9   MS. MILLER:  Objection.
10   MR. BAKER:  There was an
11   objection.
12  BY MR. BAKER:
13   Q.  Do you understand that
14  that's what the manual said at CVS
15  8/25/10?  Do you understand that?
16   A.  I don't quite understand as
17  far as -- I interpret abdicating or
18  transferring would be the entire program.
19   Q.  Now, insofar as what these
20  coefficient measured within the algorithm
21  and that process that was delivered by
22  the Buzzeo company, do you know what they
23  measured?
24   A.  I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  Q.  Okay.  Do you know anything
2  about an algorithm scoring system that
3  was developed within that process?
4  A.  I know there was some
5  scoring terminology, but the details of
6  that, I just -- I do not recall.
7  Q.  Okay.  And with respect to
8  that scoring process, do you know whether
9  or not it was ever changed from what it
10  was originally designed to do, to flag
11  at?
12  MS. MILLER:  Objection.
13  BY MR. BAKER:
14  Q.  Let's go back.  I withdraw
15  the question.
16  Let's go back to the IRR.
17  I want to make sure we have
18  this down because it's very important for
19  me to understand.
20  The IRR process, that is
21  something, according to your testimony,
22  that started with the delivery of the
23  Buzzeo program in 2008.  Is that right or
24  wrong?

Page 175

1  A.  I believe that's correct.
2  Q.  Okay.  And the IRR process
3  from 2008 when that Buzzeo program was
4  delivered up through the time that we saw
5  Mr. Mortelliti as being the person
6  described in the SOM SOP 8/25/10 being in
7  Lumberton, New Jersey reviewing these
8  IRRs, was there any other person that was
9  reviewing them from 2008 to 2010 besides
10  Mr. Mortelliti in Lumberton, New Jersey?
11  A.  I believe there may have
12  been.
13  Q.  Okay.  From 2008 to 2010, is
14  that where the IRRs were being reviewed
15  in Lumberton?
16  MS. MILLER:  Objection.
17  THE WITNESS:  I can't place
18  exact times.
19  BY MR. BAKER:
20  Q.  Okay.  When the program was
21  first delivered, the Buzzeo computer
22  program, the software program that caused
23  the development of this IRR system, where
24  were the IRRs initially being reviewed in

Page 176

1  2008?
2  MS. MILLER:  Objection.
3  BY MR. BAKER:
4  Q.  Go ahead.
5  MS. MILLER:  You may answer.
6  THE WITNESS:  That would be
7  in Lumberton.
8  BY MR. BAKER:
9  Q.  Okay.  And was that with
10  Mr. Mortelliti doing the reviews?
11  A.  Yes.
12  Q.  Okay.  And then from 2008
13  all the way up to 2010, is that where the
14  IRRs were being reviewed, in Lumberton?
15  A.  I can't recall 100 percent.
16  Q.  Okay.  To the best of your
17  knowledge, is that where they were being
18  reviewed?
19  A.  They may have been.  I just
20  don't know, as I testified earlier, that
21  as the program evolved, you know --
22  it's --
23  Q.  I understand.
24  A.  -- from centralization to

Page 177

1  distribution center and --
2  Q.  We're going to try to take
3  it sequentially.
4  A.  Right.
5  Q.  Okay.  2008, you testified
6  that Mr. Mortelliti was reviewing the
7  IRRs in Lumberton, correct?
8  A.  That is correct.
9  MS. MILLER:  Objection.  I
10  don't think he testified that it
11  was necessarily in 2008.
12  BY MR. BAKER:
13  Q.  Okay.  In 2008, who was
14  reviewing the IRRs and where were they
15  being reviewed?
16  A.  Again, it -- I guess it
17  would come down to the -- the initial
18  delivery of the Buzzeo program.
19  Q.  Okay.
20  A.  I'll refer to it as the
21  Buzzeo program.
22  Q.  Were there any IRRs being
23  reviewed in 2008?
24  A.  I can't recall the exact

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 date. I'd have to see when that program
2 was delivered.
3     Q.   Okay.  Were there any IRRs
4 being reviewed in 2009?
5     A.   I believe so.
6     Q.   Who was reviewing the IRRs?
7     A.   Initially, initially when
8 the Buzzeo program was delivered,
9 whenever that was, the initial review
10 would have involved John Mortellini.
11     Q.   In 2009, if that's when the
12 Buzzeo program was put in operation, is
13 that when Mr. Mortelliti would have been
14 doing the IRR reviews in Lumberton?
15     A.   Can you repeat that?
16     Q.   If the IRRs were being
17 reviewed in 2009, then would it have been
18 Mr. Mortelliti, to the best of your
19 recollection, in Lumberton?
20     A.   Again, once the Buzzeo
21 program was delivered and the IRR was
22 produced, the initial review was taking
23 place with Mr. Mortelliti.
24     Q.   Okay.  We saw from the DEA

Page 179

1 SOP -- SOM SOP 8/25/10 that he is the one
2 identified as the person reviewing the
3 IRRs in Lumberton, true?
4     A.   Based on the SOP, that is
5 true.
6     Q.   Okay.  So if that's true,
7 then it shifted at some point from there
8 to the distribution centers, then back to
9 Knoxville, according to what the
10 documentation shows, right?
11     A.   According to the
12 documentation, that is correct.
13     Q.   Okay.  And according to the
14 DEA talking points that were shown in
15 September, to be dated September of 2010
16 that I've showed you, that's when,
17 according to at least the DEA talking
18 points, it was sent to a distribution
19 center-wide basis; is that right or
20 wrong?
21         MS. MILLER:  Objection.
22 BY MR. BAKER:
23     Q.   You don't know?
24     A.   According to the document,

Page 180

1 the document you've shown me, that's what
2 it's dated.
3     Q.   Okay.  And then according to
4 the -- the next set of documents that I
5 showed you, it was sent back into a
6 centralized location in March of 2011; is
7 that right?
8         MS. MILLER:  Objection.
9 BY MR. BAKER:
10     Q.   In Knoxville?
11     A.   I -- we're going through so
12 many documents here.  I would want to go
13 back and look at the documents.
14     Q.   Okay.  We'll let the
15 documents speak for themselves.
16         But in any event, once it
17 got to Knoxville, how long did it stay in
18 Knoxville before it was moved to
19 somewhere else to your knowledge?
20     A.   I believe it was in
21 Knoxville till my last day of employment
22 with CVS.
23     Q.   Okay.  And your last day of
24 employment with CVS was in October of

Page 181

1 2012?
2     A.   Yes.
3     Q.   Okay.  When it was in
4 Knoxville, how many people were reviewing
5 the IRRs to the best of your knowledge?
6         MS. MILLER:  Objection.
7         THE WITNESS:  It was
8     definitely one.  Maybe two.  I
9     just don't recall.
10 BY MR. BAKER:
11     Q.   Okay.  The "definitely one"
12 is a person that you can't recall the
13 name of; is that correct?
14     A.   Correct.
15     Q.   Okay.  And the two, who
16 would -- who would the Number 2 have
17 been?
18     A.   I didn't know --
19     Q.   Again, somebody you can't
20 recall the name of?
21         MS. MILLER:  Objection.
22         THE WITNESS:  I'm not the
23     best with names.
24 BY MR. BAKER:

Page 182

1    Q.   Okay.  And so far as your
2  direct involvement with reviewing IRRs,
3  what was that direct involvement, if any?
4         MS. MILLER:  Objection.
5    Asked and answered.
6  BY MR. BAKER:
7    Q.   What was it?
8    A.   My involvement would be to
9  just ensure that the IRRs were being
10 reviewed.
11   Q.   Okay.  Did you actually
12 review IRRs yourself?
13   A.   I did not.
14   Q.   Do you know how to -- how to
15 even review an IRR?
16        MS. MILLER:  Objection.
17        THE WITNESS:  Not at this
18   time.
19 BY MR. BAKER:
20   Q.   Okay.  Did you know at the
21 time when you were at CVS how to review
22 an IRR?
23        MS. MILLER:  Objection.
24 BY MR. BAKER:

Page 183

1    Q.   IRR being item review
2  report.  Did you even know how to do
3  that?
4         MS. MILLER:  Objection.
5  BY MR. BAKER:
6    Q.   Did you?
7    A.   I think conceptually I would
8  have an idea, but I would never say I was
9  the IRR expert.
10   Q.   Okay.  From reviewing an
11 IRR, could you draw any conclusions to
12 the extent of your knowledge of how to
13 review IRRs when you were at CVS?
14        MS. MILLER:  Objection.
15        THE WITNESS:  I mean I
16   would -- I would rely on the
17   people working for me.
18 BY MR. BAKER:
19   Q.   Okay.  In other words, you
20 wouldn't rely upon your own conclusions
21 that you would reach for -- from
22 reviewing an IRR, you would rely upon the
23 people that work for you, is that what
24 you said?

Page 184

1         MS. MILLER:  Objection.
2         THE WITNESS:  I -- I never
3    had the responsibility of
4    reviewing the IRR.
5  BY MR. BAKER:
6    Q.   I think the question is, did
7  you know how to review an IRR in such a
8  manner that you felt comfortable coming
9  to any conclusions related to that review
10 of the IRR as it relates to the
11 suspicious order monitoring process?
12        MS. MILLER:  Objection.
13        THE WITNESS:  I would -- I
14   would defer it to the people
15   working for me.
16 BY MR. BAKER:
17   Q.   Who are the people working
18 for you that you would defer to?
19   A.   It would be -- regarding
20 what time frame?
21   Q.   Any time frame that the --
22 that you were employed at CVS and the IRR
23 process, review process, was implemented?
24   A.   Certainly John Mortelliti.

Page 185

1    Q.   Okay.
2    A.   Probably Pam Hinkle.
3    Q.   Anybody else?
4    A.   Those would be the two main
5  people.
6    Q.   And Pam Hinkle's job with
7  relation to review of IRRs in that -- in
8  that context was what, what was her job?
9         MS. MILLER:  Objection.
10        THE WITNESS:  I believe she
11   would have been knowledgeable of
12   the process.
13 BY MR. BAKER:
14   Q.   What was her job title?
15   A.   I don't recall the exact job
16 title.
17   Q.   Okay.  Now, during the time
18 that you were, I guess, appointed with
19 respect to the -- the SOM SOP, in the
20 8/25/10 SOM SOP policy and procedure
21 manual, did you see that where you were
22 appointed to be the one to communicate to
23 the DEA and the only person to
24 communicate to the DEA, do you remember

Page 186

1  that?
2       MS. MILLER: Objection.
3       MR. BAKER: There was an
4  objection. Let's go back.
5  BY MR. BAKER:
6       Q.  Exhibit 97. Do you recall
7  in Exhibit 97 where I pointed out to you
8  that it said, "The only person who shall
9  talk to the DEA is the director of loss
10 prevention, Frank Devlin," do you recall
11 that?
12      A.  At what page are you on?
13      Q.  Mr. Devlin, look at
14 Page 88988 Roman numeral VIII-8. Reports
15 to DEA.
16      A.  Okay. I see that.
17      Q.  Okay. Now, it says here
18 that the director of loss -- the director
19 of logistics loss prevention will be the
20 only representative of CVS contacting the
21 DEA. Do you see that?
22      A.  I do see that.
23      Q.  Okay. How long did you
24 remain that person?

Page 187

1       A.  I do not recall the time
2  frame. I do recall that this process did
3  evolve and, you know, from a delegation
4  standpoint and as Pam Hinkle became more
5  involved with day-to-day DEA issues, then
6  I know I -- certainly I felt comfortable
7  with Pam contacting the DEA.
8       Q.  Did -- did Pam work for you?
9       A.  Pam did work for me.
10      Q.  Okay. During the entire
11 time that you were employed at CVS, did
12 you ever contact the DEA to report a
13 suspicious order of controlled
14 substances?
15      A.  I did not.
16      Q.  Okay. During the entire
17 time that you worked at CVS, are you
18 aware if Pam Hinkle ever contacted the
19 DEA to report the suspicious order of
20 controlled substances?
21      A.  I believe there was one time
22 that she did.
23      Q.  Okay. One time over a
24 period of what years that you were there?

Page 188

1       MS. MILLER: Objection.
2       THE WITNESS: I was employed
3  at CVS from 1991 through 2012.
4  BY MR. BAKER:
5       Q.  Okay. Are you aware of when
6  Pam Hinkle reported any suspicious order
7  of controlled substances being
8  distributed out of a CVS distribution
9  center to the -- to the DEA?
10      A.  I do not recall the time
11 frame.
12      Q.  Okay. Do you recall what
13 distribution center it was distributed
14 out of, the one that she allegedly
15 reported, according to your recollection?
16      A.  I do not recall the
17 distribution center and again 100 percent
18 confidence in the store. I can't say
19 100 percent what store it was.
20      Q.  Okay. During the entire
21 time that you were employed at CVS, are
22 you aware of any suspicious order of
23 controlled substances being reported by
24 CVS to the DEA as it relates to any store

Page 189

1  in Ohio?
2       A.  No, I don't recall any.
3       Q.  Same question as it relates
4  to any store in Florida.
5       MS. MILLER: Objection.
6       THE WITNESS: No, I don't
7  recall.
8  BY MR. BAKER:
9       Q.  During the entire time that
10 you were employed at CVS, are you aware
11 of any report by CVS to the DEA of any
12 distribution of controlled substance to
13 any pharmacy in West Virginia?
14      A.  No, I don't recall.
15      Q.  Did anybody ever bring to
16 your attention anything about a
17 suspicious order out of any transaction
18 between a CVS pharmacy and a CVS
19 distribution center during the entire
20 time that you were employed at CVS?
21      MS. MILLER: Objection.
22      MR. BAKER: She objected.
23 BY MR. BAKER:
24      Q.  During the entire time that

Page 190

1 you were employed at CVS, did anybody
2 ever bring to your attention a suspicious
3 order by any pharmacy, by any CVS
4 pharmacy, to any CVS distribution center?
5      A.   Yes.
6      Q.   When?
7      A.   I do not recall a time
8 frame.
9      Q.   What pharmacy and what
10 distribution center?
11      A.   I know it was a situation I
12 discussed with general counsel at CVS.
13      Q.   Okay.
14          MS. MILLER:  Objection.
15 BY MR. BAKER:
16      Q.   I'm not asking what you
17 discussed with your counsel, okay.
18          MS. MILLER:  No.  Objection.
19      I'm going to instruct him not to
20      answer to the extent there's
21      information that may reveal
22      attorney/client communications.
23          And he did just testify
24      about a suspicious order that he

Page 191

1      was aware of that was reported.
2          MR. BAKER:  Yeah, I'm trying
3      to ask him.  Let me --
4 BY MR. BAKER:
5      Q.   I want you to understand
6 that I'm not trying to ask you any
7 questions about your attorneys'
8 conversations with you or your
9 attorney -- or your conversations with
10 CVS' attorneys, okay?  I want you to
11 understand that before I ask you the next
12 set of questions.
13          Are we clear about that?  So
14 when I ask you the question, I don't want
15 you to tell me what your attorneys said
16 to you or what you said to them.  Is that
17 clear?
18      A.   Yes.
19      Q.   The question is this:
20 During the entire time that you were
21 employed at CVS, did anybody bring to
22 your attention the existence of a
23 suspicious order that had been ordered by
24 a CVS pharmacy from a CVS distribution

Page 192

1 center?
2      A.   Yes.
3      Q.   Okay.  When was this?
4      A.   I do not recall.
5      Q.   What -- approximately what
6 year was it?
7      A.   It could be '10, '11, maybe
8 '12.  I just don't recall.
9      Q.   Out of what state was the
10 order made by a pharmacy to a
11 distribution center of CVS?
12          MS. MILLER:  And again, he's
13      asking you whether there was ever
14      a suspicious order.
15          THE WITNESS:  Okay.
16          MS. MILLER:  An order --
17      right?
18 BY MR. BAKER:
19      Q.   I'm asking you, did anybody
20 bring to your attention the existence of
21 a suspicious order by a CVS pharmacy to a
22 CVS distribution center?  That's what I'm
23 asking you?
24      A.   Okay.  Okay.

Page 193

1      Q.   I'm asking you -- you said
2 you thought there was one, right?
3      A.   In -- actually, in -- I
4 guess from a clarification standpoint, I
5 would -- I would deem it as potentially
6 suspicious order.
7      Q.   Okay.  Did that ever get
8 reported to the DEA by you?
9      A.   No.
10      Q.   Do you know what state that
11 occurred in?
12      A.   Again, when it was -- and I
13 apologize as far as the terminology goes,
14 but it was a potentially suspicious
15 order.
16      Q.   Okay.  During the entire
17 time that you were there, are you aware,
18 specifically of any suspicious order that
19 was reported by CVS to the DEA?  Any?
20          MS. MILLER:  Objection.
21      Asked and answered.
22          THE WITNESS:  Yes.
23 BY MR. BAKER:
24      Q.   Okay.  Who did the

Page 194

1 reporting?
2     A.   I believe it was Pam Hinkle.
3     Q.   When was the reporting done?
4     A.   I do not recall.
5     Q.   Was it brought to your
6 attention?
7     A.   It would have been, yes.
8     Q.   Do you know what state the
9 order occurred within?
10    A.   I'm just not 100 percent
11 sure.
12    Q.   Okay.  During the entire
13 time that you were employed at CVS, I
14 think you already testified, you're not
15 aware of any suspicious orders being
16 reported to the DEA for orders that were
17 made by CVS pharmacies to CVS
18 distribution centers as it relates to
19 Ohio, the state of Ohio, correct?
20    A.   That -- that does not sound
21 familiar.
22    Q.   Okay.  Insofar as the IRR
23 process, you told me that you had
24 delegated that to some extent to other

Page 195

1 people.  Is that right?
2     A.   Yes.
3     Q.   Okay.  And you tell me who
4 those other people were, you mentioned
5 John Mortelliti and you mentioned Pam
6 Hinkle, correct?
7     A.   Yes.
8     Q.   Okay.  Who else?  To who
9 else did you delegate that?
10    A.   Well, they were the LP
11 analyst position.
12    Q.   Do you know who those were?
13    A.   I just don't recall their
14 names.
15    Q.   Okay.  During the time that
16 you were there --
17        MR. BAKER:  Let's take a
18 break for just one second.  I've
19 got to --
20        MS. MILLER:  Can we actually
21 take -- I think we've been going
22 for a while.  Can we take a little
23 bit of a break?
24        MR. BAKER:  Okay.  Do you

Page 196

1 want to take a little bit of a
2 break?
3         MS. MILLER:  Yeah.
4         MR. BAKER:  Okay.
5         THE VIDEOGRAPHER:  Off the
6 record.  11:32.
7         (Short break.)
8         THE VIDEOGRAPHER:  Back on
9 record.  Beginning Media File
10 Number 5.  The time is 11:48.
11 BY MR. BAKER:
12    Q.   Mr. Devlin, I'm going to
13 show you Exhibit 146.
14        (Document marked for
15 identification as Exhibit
16 CVS-Devlin-P-146.)
17 BY MR. BAKER:
18    Q.   This is a letter dated
19 March 22, 2007, to you from Buzzeo PDMA.
20 Is that Ron Buzzeo?
21        MS. MILLER:  Bill, this has
22 highlights on it.  Is this your
23 copy?
24        MR. BAKER:  Probably.

Page 197

1 BY MR. BAKER:
2     Q.   Is that Ron Buzzeo, is that
3 who you are talking about?
4     A.   Yes, sir.
5     Q.   Okay.  This is a letter
6 directed to you, Frank Devlin, director
7 of logistics and loss prevention,
8 correct?
9     A.   Yes.
10    Q.   Okay.  And this is the
11 company that you were subcontracting with
12 for CVS to develop that software program
13 that would implement the suspicious order
14 monitoring of controlled substances,
15 correct?
16        MS. MILLER:  Objection.
17        MR. BAKER:  All right.
18 There's an objection.
19 BY MR. BAKER:
20    Q.   What was this company, what
21 were they, in the context of CVS and
22 suspicious order monitoring?
23    A.   I had -- this was our -- I
24 viewed them as our subject matter experts

Highly Confidential – Subject to Further Confidentiality Review

Page 198

1 around DEA-related matters.
2     Q.   Okay.  Is this who you hired
3 on behalf of CVS to write the software
4 program that was implemented into the
5 suspicious order monitoring program at
6 CVS?
7         MS. MILLER:  Objection.
8         MR. BAKER:  There was an
9     objection.  All right.  So here we
10    go.
11 BY MR. BAKER:
12    Q.   And every time it happens, I
13 have to rephrase the question until I get
14 it right and there's no objection.  Okay?
15 So here we go.
16        Was this the company that
17 you hired to write the software program
18 for CVS?
19        MS. MILLER:  Objection.
20 BY MR. BAKER:
21    Q.   Was this the company that
22 wrote the software program for CVS?
23        MS. MILLER:  Objection.
24 BY MR. BAKER:

Page 199

1     Q.   Who wrote the software
2 program for CVS?
3     A.   That would have been Cegedim
4 Dendrite or Buzzeo PDMA.
5     Q.   Okay.  When was that
6 software program written?
7     A.   I believe it's -- it took a
8 period of time.  The exact date that it
9 was written, I don't recall the exact
10 date that it was written.
11    Q.   Okay.  Was the program ever
12 rewritten after the time that it was
13 initially written?
14        MS. MILLER:  Objection.
15 BY MR. BAKER:
16    Q.   Was the program ever retuned
17 after the time that it was originally
18 delivered to CVS?
19    A.   Yes.
20    Q.   When was it retuned?
21    A.   I do not recall.
22    Q.   Were you involved with
23 anything that caused the retunement
24 process to take place?

Page 200

1         MS. MILLER:  Objection.
2 BY MR. BAKER:
3     Q.   What involvement, if any,
4 did you have with respect to the
5 retunement process?
6     A.   I can't recall exact dates
7 or exact calls, you know, exact time
8 frame, but I do, you know, recall
9 participating in conference calls.
10        (Document marked for
11     identification as Exhibit
12     CVS-Devlin-P-150.)
13 BY MR. BAKER:
14    Q.   Let me show you Exhibit 150.
15 Okay.  This is an e-mail dated
16 February 9, 2011, from Mr. Mortelliti to
17 Frank Devlin.  That's you, correct?
18    A.   Yes, sir.
19    Q.   Okay.  And it says,
20 "Thankfully."  And then below that,
21 February 9, 2011, from Robert Williamson
22 at Cegedim.com -- that's the Buzzeo
23 company, is it not?
24    A.   I believe it's Cegedim.

Page 201

1     Q.   Is it correct?
2     A.   Yes.
3     Q.   Okay.  And it's to
4 Mortelliti, Misiaczek, Ellen Demetrius,
5 and it has a CVS retunement attached to
6 it; is that correct?
7     A.   That's what it states, yes.
8     Q.   It says, "Attached is the
9 CVS retunement documentation.  It
10 contains a revised algorithm and
11 additional required information for your
12 suspicious order monitoring system."
13        Do you see that?
14    A.   Yes.
15    Q.   Okay.  Now, if you go to
16 that retunement document.  If you turn to
17 Page 1, it says at the bottom, "In
18 December 2008, CCS delivered an initial
19 SOM model to CVS which was" -- "which CVS
20 integrated into their order management
21 process."
22    A.   I'm sorry.  You said Page 1.
23    Q.   Right here.  The retunement.
24 Page --

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    MS. MILLER: He's moved --
2  he's moved to the attachment.
3  BY MR. BAKER:
4    Q.  Page 1 of the retunement.
5  Right here.
6    A.  Okay.  I just -- I went to
7  the following page.
8    Q.  I'll physically show it to
9  you.
10    All right.  It says, "In
11  December 2008" -- do you see that --
12    A.  Yes, sir.
13    Q.  -- at the bottom?
14    A.  Yes, sir.
15    Q.  -- "CCS delivered an initial
16  SOM model to CVS, which CVS integrated
17  into their order management process."
18    Is that what that says?
19    A.  Yes.
20    Q.  Is that when CVS first
21  implemented that program?
22    A.  You know, according to that
23  document, you know, I'd say around the
24  time frame --

Page 203

1    Q.  Okay.
2    A.  -- that's when the SOM
3  process would have been enhanced to
4  include this program.
5    Q.  Okay.  Did it take a while
6  to get it implemented beyond the date
7  that it was delivered?
8    MS. MILLER: Objection.
9    THE WITNESS: I don't --
10  BY MR. BAKER:
11    Q.  You don't what?  You don't
12  recall?  You don't know?  You don't what?
13  What did you just say?
14    MS. MILLER: You didn't let
15  him finish his response.
16  BY MR. BAKER:
17    Q.  Go ahead.
18    A.  Can you repeat the question?
19    Q.  Did it get implemented in
20  December 2008?  In other words, did CVS
21  put this in operation in December 2008 or
22  did it get put into operation in 2009?
23    MS. MILLER: Objection.
24  BY MR. BAKER:

Page 204

1    Q.  Go ahead.
2    A.  I don't recall the exact
3  time frame it was implemented.
4    Q.  Okay.  And then it says, "In
5  July of 2009, CVS staff advised that the
6  current SOM model was pending a large
7  number of orders that were not suspicious
8  on their face and cleared by CVS staff."
9    Do you see that?
10    A.  Let me read that.  I do see
11  that.
12    Q.  Okay.  Were you involved
13  with the process of reviewing what was
14  being pended by this program to determine
15  whether or not the orders were suspicious
16  or not suspicious on their face.  Were
17  you involved in that process?
18    A.  Not in any great detail.
19    Q.  Okay.  See, I didn't ask if
20  you were involved in any great detail.  I
21  asked you if you were involved.  So were
22  you involved?
23    MS. MILLER: Objection.
24  BY MR. BAKER:

Page 205

1    Q.  Were you involved?
2    MS. MILLER: Objection.
3  BY MR. BAKER:
4    Q.  Answer.
5    A.  To an extent.
6    Q.  Okay.  What extent were you
7  involved?
8    MS. MILLER: Objection.
9  BY MR. BAKER:
10    Q.  Tell me.
11    A.  More from a project manager
12  overview that the program was being
13  evaluated that were identifying, as it
14  states, a large amount of orders pending,
15  that it was being reviewed and to try
16  and -- trying to, I guess, figure out why
17  it was pending so many large orders.
18    I did not personally review
19  the reports.  I mean, that is something
20  that I did delegate.  I did, as I
21  mentioned earlier, I participated in
22  conference calls which would have
23  resulted in some changes.
24    Q.  Did you ever have any

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 involvement with the algorithm scoring
2 process?
3         MS. MILLER:  Objection.
4         THE WITNESS:  No.  I didn't
5     get involved in the scoring
6     process.
7 BY MR. BAKER:
8     Q.   Okay.  Turn to Page 3 of
9 that retunement document.
10         Okay.  Look at the bottom of
11 Paragraph 1 on Page 3 where it says, "The
12 model has been designed so that any order
13 with a score of .15 or higher is
14 identified as suspicious, pended and
15 should be investigated further."
16         Do you see that?  Look.
17     A.   You're on Page 3 of the
18 document?
19     Q.   Right here where it's
20 underlined.  "The model has been designed
21 so that any order with a score of .15 or
22 higher is identified as suspicious,
23 pended, and should be investigated
24 further."

Page 207

1         Do you see that?
2     A.   I do see that.
3     Q.   Okay.  Do you know what that
4 means?
5     A.   Not at this time, no.
6     Q.   Okay.  Did you know what it
7 meant at that time?
8     A.   I really can't recall.
9     Q.   Turn to Page 4 of that
10 document.
11         MR. BAKER:  Highlight
12     everything on that page.
13 BY MR. BAKER:
14     Q.   Okay.  Can you tell us what
15 these formulas mean?
16     A.   No.
17     Q.   Can you tell us if these
18 formulas were implemented into that
19 suspicious order monitoring software?
20     A.   I was told they were.
21     Q.   Go to the next page, Page 5.
22 Do you see these formulas right here?
23 Were these formulas implemented into that
24 software?

Page 208

1     A.   I believe they were.
2     Q.   Do you know what these
3 formulas mean?
4     A.   Not in any great detail.
5     Q.   Did you ever sit down with
6 anybody and ask them that question, what
7 do these formulas mean?
8     A.   I defer you to the expertise
9 of our DEA consultant.
10     Q.   My question is did you ever
11 sit down with anybody and ask them, what
12 do these formulas mean?
13         MS. MILLER:  Objection.
14         THE WITNESS:  I don't
15     recall.
16 BY MR. BAKER:
17     Q.   Go to the next page, Page 6.
18 Highlight that page.
19         Do you know what these
20 formulas are?
21     A.   Same answer as the previous
22 page.
23     Q.   Were they implemented into
24 the software for suspicious order

Page 209

1 monitoring?
2     A.   As I mentioned previously, I
3 believe they may have been.
4     Q.   Who was in charge of dealing
5 with this company, other than you insofar
6 as the retunement of this program?
7         MS. MILLER:  Objection.
8 BY MR. BAKER:
9     Q.   Who?
10     A.   As I can recall, it would
11 have been -- Mr. Mortelliti would have
12 been involved and we also probably had
13 some of our IT people involved also.
14     Q.   Okay.  The suspicious order
15 monitoring program was run out of the
16 department of logistics and loss
17 prevention at some point, was it not?
18     A.   When you say run out of, the
19 actual software?
20     Q.   The suspicious order
21 monitoring program was assigned by CVS to
22 what department within CVS when you were
23 employed there?
24     A.   As far -- I don't know your

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 terminology of "assign." I mean, we --
2 we were involved in implementing this
3 portion of the SOM program.
4     Q.    Okay.  "We were involved,"
5 meaning what?  Your department?
6     A.    Yes.
7     Q.    Okay.  And were you the
8 director of that department?
9     A.    Yes, I was.
10    Q.    Was there anybody over you?
11 Besides being the director, is there any
12 position over you in that department?
13    A.    There are multiple, yes.
14    Q.    Okay.  Who was just above
15 you?
16    A.    Judy Hughes.
17    Q.    And who was just above her?
18    A.    At that time there were some
19 changes in management.  It could have
20 been Ernie Deyle.  It could have been
21 Mike Silveira.
22    Q.    Okay.  And so far as having
23 direct involvement with your department
24 with this company, was there anybody more

Page 211

1 directly involved than you?
2     A.    John Mortelliti was very
3 involved, and given the implementation of
4 the algorithm into our systems, our IT
5 people would have been fairly involved
6 also.
7     Q.    Okay.  Let's go to the last
8 page of this document where it talks
9 about model coefficients.
10          Do you see that?
11          Do you know what model
12 coefficients are?
13    A.    I don't recall.
14    Q.    Okay.  You just know from
15 looking at this program that it was
16 designed to pend an order at a score of
17 .15 according to the document; is that
18 right?
19          MS. MILLER:  Objection.
20 BY MR. BAKER:
21    Q.    Well, look at the document.
22 Let me read the document.  Does this
23 document say this model -- "The model has
24 been designed so that any order with a

Page 212

1 score of .15 or higher is identified as
2 suspicious, pended, and should be
3 investigated further"?
4          Is that what the document
5 says?
6     A.    That is what the document
7 says.  I would not use that terminology.
8     Q.    Is that consistent with the
9 same scoring system that was used for the
10 2008 model before it was retuned in 2011?
11    A.    I have no idea.
12    Q.    Let me show you Exhibit
13 Number 56.
14          (Document marked for
15          identification as Exhibit
16          CVS-Devlin-P-56.)
17 BY MR. BAKER:
18    Q.    All right.  This is a
19 memorandum to Frank Devlin from John
20 Mortelliti dated August 13, 2010.  Do you
21 see that?
22    A.    Yes.
23    Q.    Okay.  It says, "The
24 following information is a breakdown of

Page 213

1 the tested results for the control drug
2 IRR as well as the plan of action to
3 incorporate the control drug IRR into a
4 permanent SOP."
5          Do you see that?
6     A.    Yes.
7     Q.    Okay.  And it says,
8 "Completed as of 8/13/10.  The control
9 drug IRR score of .15 has been tested by
10 John Mortelliti, Lumberton distribution
11 center," correct?
12          MS. MILLER:  Objection.
13          THE WITNESS:  That's what it
14 states.
15          MR. BAKER:  What's the
16 objection?  What -- what did I
17 state wrong?
18          MS. MILLER:  Well, you --
19 you said the control --
20          MR. BAKER:  Okay.
21          MS. MILLER:  -- drug IRR
22 score.  You are reading the
23 document but --
24 BY MR. BAKER:

Highly Confidential – Subject to Further Confidentiality Review

Page 214

1 Q. Complete -- completed as of
2 8/13/2010. The document says, "Control
3 drug IRR of .15 has been tested by John
4 Mortelliti," correct?
5 That's what it says,
6 correct?
7 A. That's what it says.
8 Q. And it has, paren, Lumberton
9 distribution center, correct?
10 A. Correct.
11 Q. And is that when he was
12 reviewing the IRRs by himself?
13 A. It may have been.
14 Q. Okay. And then the next
15 bullet down says, "It was determined that
16 adjustment to the IRR score needed to be
17 made to reduce the number of items
18 falsely pending, flagged."
19 Is that what it says? Is
20 that what it says?
21 A. It appears to be.
22 Q. Okay. It says, "The team
23 determined that there were no items under
24 .65 in need of an investigation,"

Page 215

1 correct?
2 A. That's what it states.
3 Q. And then it says, "The IRR
4 score was eventually adjusted to .65."
5 Is that what it says?
6 A. That's what it states.
7 Q. Okay. Were you involved at
8 all with the adjustment of that score
9 from .15 to .1 -- to .165?
10 A. I may have been on
11 conference call with the Buzzeo team. I
12 would defer to the expertise of the
13 Buzzeo statisticians.
14 Q. Okay.
15 (Document marked for
16 identification as Exhibit
17 CVS-Devlin-P-95.)
18 BY MR. BAKER:
19 Q. Let me show you Exhibit
20 Number 95.
21 This is an e-mail -- a
22 series of e-mails where it's talking
23 about, if you go to the third page. Go
24 to the third page. Do you see 7/26/10,

Page 216

1 Mortelliti to Devlin, do you see that?
2 A. At the top of the page?
3 Q. Yes, sir.
4 A. Yes.
5 Q. It says, "Frank, I want to
6 be sure I am playing by the rules on
7 this. I don't want to waste money doing
8 a retune if we don't need one. I am not
9 even sure if a retune would be needed
10 since the report seems to be working well
11 at the new score."
12 Do you see that?
13 A. I do see that.
14 Q. Okay. The new score was
15 .65, was it not?
16 MS. MILLER: Objection.
17 THE WITNESS: I --
18 BY MR. BAKER:
19 Q. What was the new score?
20 MS. MILLER: Objection.
21 BY MR. BAKER:
22 Q. Sir?
23 A. I have no idea.
24 Q. Okay. At this new score,

Page 217

1 once it reached this new score that's
2 being discussed here, did you report any
3 suspicious orders to the DEA based upon
4 this program, ever?
5 MS. MILLER: Objection.
6 BY MR. BAKER:
7 Q. Did you?
8 A. I don't recall.
9 Q. Do you remember reporting
10 one, ever reporting one yourself?
11 A. I did not.
12 Q. All right. Let's go to the
13 second page. Do you see on June 30,
14 2010, John Mortelliti is writing an
15 e-mail regarding an SOM update, at the
16 bottom?
17 A. Yes.
18 Q. Do you see that?
19 A. I see that.
20 Q. It says from John Mortelliti
21 to Robert Williamson. It says, "Bob, I
22 will review" -- "I will be reviewing the
23 data for the next few weeks and testing
24 some of the pending items with field loss

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  prevention. I'm going to focus on the
2  .15 score for starters."
3        Do you see that?
4     A.  Yes.
5     Q.  Okay. Was that the score
6  that the system was initially delivered
7  and designed to pend orders at, .15?
8        MS. MILLER: Objection.
9     Asked and answered.
10       THE WITNESS: I would have
11    to go back and look at documents
12    to -- if you have the actual
13    document that was delivered.
14  BY MR. BAKER:
15    Q.  To the best of your
16  recollection, is that the score?
17    A.  I can't -- I don't know.
18    Q.  Okay. And then it talks
19  about movement of that score. If you
20  look at the first page. Do you see where
21  it is? First page, John Mortelliti to
22  Robert Williamson?
23    A.  Yes.
24       MS. MILLER: The first page

Page 219

1     of?
2        MR. BAKER: Of this
3     document.
4        MS. MILLER: Can you give me
5     the Bates number?
6        MR. BAKER: 88523.
7  BY MR. BAKER:
8     Q.  July 26, 2010. Do you see
9  it?
10       Do you see it?
11    A.  Yes.
12    Q.  Okay. It says, ".65 is
13  where we are now. .70 looks a bit more
14  realistic, but I want to view data."
15       Do you see that?
16    A.  I do see that.
17    Q.  Was there an attempt to try
18  to move the score above .65 at one point,
19  that you're aware of?
20    A.  I don't recall.
21    Q.  Okay. Now go to the second
22  to the last page of those documents that
23  are in front of you. This is an e-mail,
24  July 26, 2010, at 2:01 p.m. And this is

Page 220

1  after the July 26, 2010, 1:56 p.m. e-mail
2  was sent that says, ".65 is where we are
3  now. .70 looks a bit more realistic but
4  I still want to view data."
5        And this is the response.
6  Do you see it?
7     A.  Which Bates number are you
8  on?
9     Q.  I'm on Bates Number 88735.
10       Do see the response in the
11  middle of the e-mail?
12       MS. MILLER: Give him a
13    minute to -- to navigate these
14    documents, please, sir.
15  BY MR. BAKER:
16    Q.  At the top of the page. Do
17  you see it?
18       MS. MILLER: I don't see
19    where you are either.
20       THE WITNESS: Where are you
21    referencing?
22  BY MR. BAKER:
23    Q.  I'm pointing to it.
24       MS. MILLER: I know, but

Page 221

1  what's the Bates label?
2        MR. BAKER: The Bates label
3     is 88735.
4        MS. MILLER: 735. Okay.
5        THE WITNESS: And what are
6     you asking me to look at?
7  BY MR. BAKER:
8     Q.  Do you see what the response
9  is?
10    A.  At the top of the page, yes,
11  I do.
12    Q.  Okay. It says, "That's
13  quite a departure from the initial
14  threshold."
15       Do you see that?
16    A.  I do.
17    Q.  Okay. So let's read this in
18  context. The e-mail on the front page,
19  go back to the front page. This is an
20  e-mail dated July 26, 2010, at 1:56 p.m.
21  from John Mortelliti to Robert
22  Williamson. Do you see that?
23    A.  Yes, sir.
24    Q.  Okay. Does it say, ".65 is

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  where we are now, .70 looks a bit more
2  realistic but I still want to view data"?
3          Is that what that says?
4      A.   Yes, it is.
5      Q.   Okay.  Now let's look at the
6  response, July 26, 2010, at 2:01 p.m.
7  from Robert Williamson to John
8  Mortelliti.  Do you see that?
9      A.   Yes.
10     Q.   It says, "That's quite a
11 departure from the initial threshold."
12         Is that what it says?
13     A.   That is what the document
14 states, yes.
15     Q.   Okay.  And to the best of
16 your recollection, was .15 the initial
17 threshold score?
18         MS. MILLER:  Objection.
19 Asked and answered.
20 BY MR. BAKER:
21     Q.   Sir, is that what it was?
22     A.   I don't recall.
23         MS. MILLER:  Objection.
24 Asked and answered.

Page 223

1  BY MR. BAKER:
2      Q.   You don't recall.  Okay.
3          Do you even know how the
4  software program worked?
5          MS. MILLER:  Objection.
6  BY MR. BAKER:
7      Q.   Do you?
8          MS. MILLER:  Objection.
9  BY MR. BAKER:
10     Q.   Answer the question.  Do you
11 know how the software program worked?
12         MS. MILLER:  Objection.
13         THE WITNESS:  I'm not an IT
14 person.
15 BY MR. BAKER:
16     Q.   Listen to my question.
17 It's -- it's like a yes or a no answer.
18 If you say, "I'm not an IT person," that
19 does not answer the question.  Here is
20 the question:
21         Do you know how that
22 software program worked?  Do you know?
23         MS. MILLER:  Objection.
24         You can answer the question.

Page 224

1          THE WITNESS:  From a
2  conceptual standpoint I had an
3  idea.  But the inner workings or
4  the statistical formulas, that was
5  not my area of expertise and
6  that's why we deferred to the
7  outside consultants to ensure that
8  we were putting forth a program
9  that -- that met requirements.
10 BY MR. BAKER:
11     Q.   What was the method that you
12 were approving for use to determine
13 whether or not an order from a CVS
14 pharmacy to a CVS distribution center
15 would be considered to be a suspicious
16 order?
17         MS. MILLER:  Objection.
18 BY MR. BAKER:
19     Q.   What was it?
20     A.   At what point in time?
21     Q.   2011.  Let's take 2011 for
22 instance.
23     A.   Well, there would be, I
24 guess from a -- the terminology would be

Page 225

1  potentially suspicious.
2          Certainly the
3  algorithm/software, more of algorithm,
4  developed by the Buzzeo team, was a
5  component of it.
6          We also had, you know,
7  processes within the distribution centers
8  as far as hourly employees that were
9  fulfilling the orders, the pharmacy
10 supervisors in the distribution centers
11 of being aware of any excessive order
12 quantities that were taking place.  Also
13 had the prescription drug monitoring
14 report.  That was also out there.
15         And I believe I was not
16 involved in it at all, but I know there
17 was -- or I believe there was training
18 taking place by individual pharmacists
19 and pharmacy techs within the stores
20 trying to -- you know, just alerting
21 people to be on the lookout for
22 potentially suspicious orders.
23     Q.   And how did you define a
24 suspicious order in 2011?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1      MS. MILLER:  Objection.
2      THE WITNESS:  It was a whole
3   investigative process.
4   BY MR. BAKER:
5      Q.   Was there any set definition
6   that you used or that you knew was being
7   implemented by CVS to be used to identify
8   a suspicious order in 2011?
9      A.   I don't recall a set
10  definition.  I know there are I think
11  even from the DEA standpoint, and again,
12  I can't quote the exact regulation, there
13  are a variety of components that go into
14  a potentially suspicious order.
15     Q.   Let me show you Exhibit 68.
16         (Document marked for
17         identification as Exhibit
18         CVS-Devlin-P-68.)
19  BY MR. BAKER:
20     Q.   Go ahead and grab it, if you
21  will.
22         All right.  This is an
23  e-mail from Frank Devlin.  That's you,
24  right?

Page 227

1      A.   It is.
2      Q.   To Judith Hughes, 5/16/11.
3   And the subject is "Control drug
4   suspicious order monitoring," correct?
5      A.   That appears to be the
6   subject, yes.
7      Q.   Okay.  Turn to the next
8   page.  Now, you see at the bottom of the
9   first page -- let's make sure we are
10  correct.  Go back to the first page.  The
11  e-mail.  All right.  The Bates number at
12  the bottom of that is 57736.
13         Do you see that?
14     A.   I do.
15     Q.   Okay.  Now, go to the next
16  page, look at the Bates number at the
17  bottom.  It's 57737, correct?
18     A.   Correct.
19     Q.   The Bates number of the next
20  page is 57738, correct?
21     A.   Correct.
22     Q.   All right.  Now, go back to
23  57737, this is called, "Components of the
24  control IRR report," correct?

Page 228

1      MS. MILLER:  And, Frank,
2   take a moment to read the document
3   if you'd like.
4   BY MR. BAKER:
5      Q.   That's what this is called,
6   right?
7      A.   That's the heading of Bates
8   number 7737, correct.
9      Q.   Let me direct your attention
10  down to, "Process of identifying
11  suspicious orders."  Please look.
12  Mr. Devlin, please look at this right
13  here.  "Process of identifying suspicious
14  orders."
15         Do you see that?
16     A.   I do.
17     Q.   Okay.  Could you read for us
18  what it says right there, the first
19  sentence.
20     A.   "In order to determine which
21  items on the control IRR report are
22  suspicious, the order quantity field is
23  observed by the DC IRR analyst for a
24  quantity ordered of ten or more."

Page 229

1      Q.   The next sentence.
2      A.   "The month-to-date field is
3   then observed and compared to Lags 1, 2,
4   and 3."
5      Q.   The next sentence?
6      A.   "If the month-to-date
7   quantity is at least three times greater
8   than the quantities in Lags 1, 2, or 3,
9   then that item is labeled as being
10  suspicious."
11     Q.   Okay.  Is that the
12  definition of a suspicious order that you
13  were using in 2011?
14     MS. MILLER:  Objection.
15     THE WITNESS:  I don't -- I
16     can't recall the exact definition
17     of suspicious, and even, you know,
18     from a documentation standpoint, I
19     don't see a date on this document.
20         And I know, as far as the
21     evolution of our process goes, the
22     term "suspicious order," that was
23     not being properly used.
24  BY MR. BAKER:

Highly Confidential – Subject to Further Confidentiality Review

Page 230

1  Q.  Okay.
2  A.  And it should have been
3  "potentially suspicious."  And later on
4  as our program evolved, we deferred to
5  that, so the suspicious term is -- this
6  is -- in this document, that is not being
7  used properly.
8  Q.  This document says that you
9  define a suspicious order as one that
10  meets that criteria that you just read,
11  correct?
12     MS. MILLER:  Objection.
13  BY MR. BAKER:
14  Q.  Let's read it again.  This
15  process of identifying suspicious orders
16  says, "In order to determine which items
17  on the control IRR report are suspicious,
18  the order quantity field is observed by
19  the DC IRR analyst for a quantity ordered
20  of ten or more.  The month-to-date field
21  is then observed and compared to Lags 1,
22  2, and 3.  If the month-to-date quantity
23  is at least three times greater than the
24  quantities in Lags 1, 2, or 3, then that

Page 231

1  item is labeled as being suspicious."
2     Did I read that correctly?
3  A.  You read what's on the
4  document, yes.
5  Q.  Okay.  And this, of course,
6  deals with the components of the control
7  IRR report and the process of identifying
8  suspicious orders, correct?
9     MS. MILLER:  Objection.
10     THE WITNESS:  All I can read
11     is what's on the document.  I
12     mean, when I look at the header of
13     the e-mail on 736 --
14  BY MR. BAKER:
15  Q.  I'm just reading the headers
16  of this document in this e-mail that's
17  attached sequentially in Bates sequence.
18     Do you see that?
19  A.  I do.  But I just -- I also
20  notice that the subject is "Control drug
21  suspicious order monitoring," and then
22  when I look at this document, I don't see
23  that title being used anywhere.
24  Q.  This is part of suspicious

Page 232

1  order monitoring, the IRR report and the
2  process of identifying suspicious orders,
3  is it not?
4  A.  According to the e-mail, but
5  I -- also I don't see any date on Bates
6  Number 737 or 738.
7  Q.  Okay.
8  A.  I'm not sure of time and
9  place this would have been in place.
10  Q.  Okay.  Let's skip up a
11  paragraph.  Okay.  Let's define what lags
12  are, okay.
13     Go down here.  It says,
14  "Component of the control drug" -- "of
15  the control IRR report."
16     It then talks about what
17  lags are.  It says, "The month-to-date
18  order quantity" -- do you see this right
19  here?  "The month to date order
20  quantity."
21     MS. MILLER:  Can you direct
22     him to where you are in the
23     document, Bill?
24     MR. BAKER:  Yeah.  I'm right

Page 233

1  here.
2     THE WITNESS:  Right where?
3     MS. MILLER:  Where in the
4     paragraph?
5     MR. BAKER:  Where my finger
6     is.
7     THE WITNESS:  Month-to-date
8     order quantity.  Okay.
9  BY MR. BAKER:
10  Q.  Do you see that?
11  A.  Yes.
12  Q.  "The month-to-date order
13  quantity states the amount of the item in
14  question ordered during the current
15  month.  Lag 1 is the amount ordered the
16  month before, Lag 2 is the amount ordered
17  two months before, and Lag 3 is the
18  amount ordered three months before."
19     Do you see that?
20  A.  Yes, sir.
21  Q.  Is that what lags meant at
22  CVS?
23  A.  I would just -- I guess I
24  could defer to this document.  I mean I

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 just -- I don't recall.  I don't recall
2 the definition of lags.
3     Q.   Okay.  Let's see if we can
4 take it in context, okay.
5     Lag 1 is the amount ordered
6 the month before.  Would that be the
7 month before the current order?
8         MS. MILLER:  Objection.
9         THE WITNESS:  I can't
10     interpret it.  I mean, I can just
11     go off of what the document says.
12 BY MR. BAKER:
13     Q.   Lag 2 is the amount ordered
14 two months before.  Is that talking about
15 the amount of control drugs ordered two
16 months before the current month's order?
17     A.   That's what the document
18 states.
19     Q.   Okay.  Lag 3 is the amount
20 ordered three months before.  Does that
21 mean the amount of controlled substances
22 that were ordered three months before the
23 current controlled substance order?
24     A.   Again, that's what the

Page 235

1 document states.
2     Q.   Okay.  Then skip down.
3         "In order to determine which
4 items on the control drug IRR report are
5 suspicious, the order quantity field is
6 observed by the DC IRR analyst for a
7 quantity ordered of ten or more.  The
8 month-to-date field is then observed and
9 compared to Lags 1, 2, and 3.  If the
10 month-to-date quantity is at least three
11 times greater than the quantities in Lags
12 1, 2, or 3, then that item is labeled as
13 being suspicious."
14     Is that what it says?
15     A.   That is what it says, but
16 again, I would dispute the language being
17 used in the document.
18     Q.   You would dispute the
19 language.  But the document says what it
20 says?
21     A.   The document says what it
22 says.  But as I mentioned earlier, there
23 was an evolution, and it's the
24 terminology being used, and it should

Page 236

1 have been as "potentially suspicious."
2     Q.   Okay.  Did you ever recall
3 this document?
4         MS. MILLER:  Objection.
5 BY MR. BAKER:
6     Q.   Did you ever recall it and
7 have it edited?
8     A.   I don't -- I didn't even
9 recall seeing this document to begin
10 with.
11     Q.   If you use that formula,
12 then technically what that would mean, if
13 you look at it -- let's see if we can
14 break this down.  And I want you to
15 explain what this means.  If you're
16 talking about Lags 1, 2, and 3.  We're
17 talking about the first, second and third
18 month before the current order.  Is that
19 accurate or not?
20         MS. MILLER:  Objection.
21     Asked and answered.  He's already
22     testified that he doesn't remember
23     the document.
24 BY MR. BAKER:

Page 237

1     Q.   Would that be an accurate
2 interpretation of what that says?
3         MS. MILLER:  Objection.
4     Asked and answered.
5         THE WITNESS:  All I can do
6     in this situation is defer to
7     what's on this document.
8 BY MR. BAKER:
9     Q.   I agree.  You can defer to
10 what's in the document.  I'm trying to
11 break it down.
12     A.   I can't.  I can't.  If
13 you're -- you know, if you're asking me
14 is this in fact what was in place, I do
15 not recall if that is in fact what was in
16 place.
17     Q.   Okay.
18     A.   It's what's written on this
19 document, is what's written on this
20 document.
21     Q.   Okay.  So when you said I
22 don't recall if that's what was in place,
23 does that mean that you can't recall one
24 way or the other if that's what's in

Highly Confidential – Subject to Further Confidentiality Review

Page 238

1 place?
2        MS. MILLER: Objection.
3        THE WITNESS: You know --
4 BY MR. BAKER:
5        Q.   If you don't recall, you
6 don't recall. But tell me, do you recall
7 one way or the other if that's what was
8 in place?
9        MS. MILLER: Objection.
10        THE WITNESS: All I -- I
11 know from my -- my position, you
12 know, and really from a project
13 manager position of having -- you
14 know, ensuring we have a
15 suspicious order monitoring in
16 place, that we had -- you know, we
17 leveraged outside consultants who
18 were DEA experts. They delivered
19 a product to us. We implemented
20 that product. You know, my role
21 to ensure was it implemented, was
22 it in place, was it being
23 reviewed. And I ensured all of
24 that was taking place.

Page 239

1        The details around it,
2 around the lags, and whatnot, I
3 just -- you know, I'm not a
4 subject matter expert on the
5 algorithm that was presented.
6 BY MR. BAKER:
7        Q.   All right. Is that formula
8 consistent or inconsistent with the
9 algorithm or do you know?
10        MS. MILLER: Objection.
11        He's already testified that he
12        doesn't remember the document.
13 BY MR. BAKER:
14        Q.   Okay. Just --
15        A.   I don't -- I don't recall.
16        Q.   You don't know, you don't
17 recall.
18        Was this formula being used
19 instead of the algorithm?
20        MS. MILLER: Objection.
21 BY MR. BAKER:
22        Q.   In the context of reviewing
23 IRR reports, is that -- is that the
24 process of what was being done to review

Page 240

1 IRR reports, is to look at that lag
2 formula, the three times lag formula?
3        MS. MILLER: Objection.
4        Asked and answered. He's already
5        testified he does not recall.
6        MR. BAKER: Okay. See, I
7        don't mind if you say, "Object to
8        form," but that -- that steps over
9        where you are supposed to object.
10        If you'd please not do that, I'd
11        appreciate it.
12 BY MR. BAKER:
13        Q.   So let me ask this. Was
14 this formula used in the context of
15 reviewing IRRs when you were at CVS?
16        MS. MILLER: Objection.
17 BY MR. BAKER:
18        Q.   Was it used?
19        MS. MILLER: Objection.
20        THE WITNESS: There was a
21        formula in place.
22 BY MR. BAKER:
23        Q.   Okay. And this was the
24 formula?

Page 241

1        A.   I do not know if this was
2 the formula.
3        Q.   Okay. Did you ever ask
4 anybody if this was the formula that was
5 being used?
6        MS. MILLER: Objection.
7        THE WITNESS: I don't
8        recall.
9 BY MR. BAKER:
10        Q.   Do you know why that was
11 even typed up in the context of CVS
12 documentation?
13        MS. MILLER: Objection.
14        THE WITNESS: I do not
15        recall.
16 BY MR. BAKER:
17        Q.   Do you know who came up with
18 that formula?
19        MS. MILLER: Objection.
20 BY MR. BAKER:
21        Q.   The lag formula that we just
22 discussed?
23        A.   I do not.
24        MR. BAKER: I think it's

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  time to break for lunch.  Do you
2  want to try to take, what,
3  30 minutes?
4       THE WITNESS:  Ten minutes?
5       MR. BAKER:  For lunch?
6       MS. MILLER:  No.  30 minutes
7  would be great.
8       THE VIDEOGRAPHER:  Off the
9  record.  The time is 12:29.
10      (Lunch break.)
11      THE VIDEOGRAPHER:  We're
12  going back on record.  Beginning
13  of Media File Number 6.  The time
14  is 1:14.
15 BY MR. BAKER:
16      Q.   Mr. Devlin, we just took a
17 lunch break, correct?
18      A.   Yes.
19      Q.   Okay.  I was going over
20 Document Number 68 with you before we
21 left for lunch.  We were going over that
22 formula that we were talking about.
23          Do you remember the lag
24 formula, the Lag 1, 2, 3?

Page 243

1       MS. MILLER:  Objection.
2  BY MR. BAKER:
3       Q.   Do you remember Document
4  Number 68, Exhibit 68, that we were going
5  over?
6       A.   I recall, yes.
7       Q.   Okay.  Let me show you
8  Exhibit Number 68-A.
9       (Document marked for
10 identification as Exhibit
11 CVS-Devlin-P-68-A.)
12      MR. BAKER:  Let me go off
13 record for just a second.
14      THE VIDEOGRAPHER:  We're
15 going off record.  The time is
16 1:15.
17      (Brief pause.)
18      THE VIDEOGRAPHER:  Going
19 back on record.  Beginning of
20 Media File Number 7.  The time is
21 1:17.
22 BY MR. BAKER:
23      Q.   Okay.  Mr. Devlin, would you
24 look at 68-A please.  It starts with an

Page 244

1  e-mail dated 1/28/11.  Do you see that?
2       A.   Yes.
3       Q.   All right.  And this is an
4  e-mail from Steven Cain to Frank Devlin,
5  and then it's talking about IRR
6  narratives.  And then below that, an
7  e-mail dated January 27, 2011, you, Frank
8  Devlin, to Steven Cain regarding the IRR
9  narratives.
10          Do you see that?
11      A.   I do.
12      Q.   Okay.  Would you turn next
13 to the page that talks about those IRR
14 narratives.  It talks about the
15 components of the IRR -- of the control
16 IRR report, correct?
17      A.   That's what it states.
18      Q.   Okay.  Do you remember this
19 document at all?
20      A.   I really don't recall it.
21      Q.   You don't recall it?
22      A.   No.
23      Q.   Okay.  Go to Page 2 of that
24 document.  It talks about the suspicious

Page 245

1  order process.  This is another formula
2  that I'm going to ask you about.  It
3  says, bullet -- "Bullet Number 1, the DC
4  IRR analyst will review IRR for order
5  quantity that is flagged as potentially
6  suspicious."
7          Do you see that?
8       MS. MILLER:  Objection.
9  Formula, you said the word
10 "formula."
11      MR. BAKER:  Okay.
12 BY MR. BAKER:
13      Q.   Let me ask you what this
14 document says.  "Suspicious order
15 process.  Bullet Number 1, DC IRR analyst
16 will review IRRs for order quantity that
17 has flagged as potentially suspicious."
18          Is that what it says?
19      A.   That's what it says.
20      Q.   Okay.  Now let's talk about
21 that.  An IRR is an item review report,
22 correct?
23      A.   Yes.
24      Q.   Flagged means what?

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    A.   That would be something that
2  you would -- you would want to take an
3  initial look at.
4    Q.   Okay.  What causes it to be
5  flagged?
6    A.   I believe it would be
7  something based off of the algorithm.
8    Q.   And would the algorithm be
9  part of the software program?
10       MS. MILLER:  Objection.
11  BY MR. BAKER:
12   Q.   Is the algorithm built into
13  the software program?
14       MS. MILLER:  Objection.
15  BY MR. BAKER:
16   Q.   What is the algorithm?
17   A.   I don't recall the
18  algorithm.
19   Q.   What is that in the context
20  of the software program?
21       MS. MILLER:  Objection.
22       MR. BAKER:  Look, I'm just
23       trying to get through this without
24       a lot of interruption.  And I want

Page 247

1       to make sure that I get this on
2       record what he's talking about
3       with an algorithm.  He's in charge
4       of the doggone program.
5  BY MR. BAKER:
6    Q.   Can you just testify about
7  the program versus "I don't remember," "I
8  don't recall," and let's get through
9  this.
10       Can we just do that?
11       MS. MILLER:  Mr. Baker, he's
12       testifying to the best of his
13       recollection.  And I'm entitled to
14       object on the record.
15       MR. BAKER:  Agreed.
16  BY MR. BAKER:
17   Q.   But -- but this "I don't
18  recall," "I don't know," is ridiculous
19  because you were the man in charge of the
20  department, and you contracted to get
21  this thing done.
22       So let's try to get through
23  the questions and answers without a lot
24  of "I don't know," "I don't recall," and

Page 248

1  all that kind of business.  It's baloney,
2  and you know it.
3       So let's -- let's go
4  through --
5       MS. MILLER:  Mr. Baker,
6       Mr. Baker, respectfully, he
7       doesn't need to be lectured --
8       MR. BAKER:  Well, he does,
9       because he's intentionally
10       avoiding the questions.
11       MS. MILLER:  -- he's
12       testifying to the best of his
13       recollection.
14  BY MR. BAKER:
15   Q.   Okay.  So here we go.  Look
16  at the document.  Suspicious order
17  process.  Do you see it?
18       Do you see it with your
19  eyeballs?
20       MS. MILLER:  Objection.
21  BY MR. BAKER:
22   Q.   Do you see it?
23   A.   Which Bates number are you
24  referencing?

Page 249

1    Q.   Suspicious order process,
2  right in front of your eyeballs, right
3  here.  Do you see that?
4    A.   Which Bates number are you
5  referencing?
6    Q.   I'm looking at 83970.
7    A.   I do see that.
8    Q.   Okay.  It says, "Suspicious
9  order process."
10       Do you see those words?
11   A.   I do.
12   Q.   Okay.  Read that first
13  bullet point, please?
14   A.   "DC IRR analyst will review
15  IRR for order quantity that is flagged as
16  potentially suspicious."
17   Q.   Okay.  What does the word
18  "flagged" mean in the context of that
19  sentence?
20       MS. MILLER:  Objection.
21       Asked and answered.
22  BY MR. BAKER:
23   Q.   What does it mean?
24   A.   I believe it would be

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  something that, based on the algorithm,
2  it would put outside the parameters and
3  something for the IRR analyst to take a
4  look at.
5      Q.   What algorithm?
6      A.   The one provided by Buzzeo's
7  company.
8      Q.   What does that algorithm
9  have to do with the suspicious order
10  monitoring process?
11     A.   It's part of the overall
12  program.
13     Q.   And what is the score at
14  which an item is flagged as one of being
15  potentially suspicious?
16         MS. MILLER:  Objection.
17     Asked and answered.
18  BY MR. BAKER:
19     Q.   You don't know --
20         MS. MILLER:  Give me -- give
21     me a chance to respond.
22  BY MR. BAKER:
23     Q.   Do -- do you know?
24     A.   Do not recall.

Page 251

1      Q.   We just went through several
2  documents that talk about a .15 score.
3  Do you recall that?
4      A.   I recall seeing those
5  documents.
6      Q.   Okay.  Are you saying that
7  you don't recall that .15 was the score
8  at which that program was designed to
9  flag an order?
10         MS. MILLER:  Objection.
11  BY MR. BAKER:
12     Q.   Are you saying that?
13         MS. MILLER:  Asked and
14     answered.
15         THE WITNESS:  I do not
16     recall the components of the
17     algorithm.
18  BY MR. BAKER:
19     Q.   Okay.  I didn't ask you to
20  recall the components of the algorithm.
21  I'm asking do you recall the score at
22  which an order was to be flagged.  Do you
23  understand that?
24         MS. MILLER:  Objection.

Page 252

1  BY MR. BAKER:
2      Q.   Do you understand that?
3      A.   I understand what was in the
4  document earlier.
5      Q.   Do you remember the document
6  that I showed you, Document Number 150?
7         MS. MILLER:  Do you have
8     that in front of you, Frank?
9         THE WITNESS:  I do.
10  BY MR. BAKER:
11     Q.   Okay.  Turn to Page 3 of
12  that document, 114644.  Read that
13  sentence that's highlighted for you.
14  That's underlined.
15     A.   "The model has been designed
16  so that any order with a score of 0.15 or
17  higher is identified as suspicious,
18  pended, and should be investigated
19  further."
20     Q.   What does that mean?
21         MS. MILLER:  Objection.
22         THE WITNESS:  Sir, alls I
23     know is that was a part of the
24     algorithm.  I do not recall the

Page 253

1  details of the algorithm.
2  BY MR. BAKER:
3      Q.   What does a score of .15
4  mean?
5         MS. MILLER:  Objection.
6     Asked and answered.
7         THE WITNESS:  I don't know.
8  BY MR. BAKER:
9      Q.   What does "identified as
10  suspicious, pended" mean?
11     A.   Identified and pended would
12  be to take a look at for further
13  investigation.
14     Q.   Investigation of what?
15     A.   An order.
16     Q.   How is it investigated?
17     A.   A variety of steps.
18     Q.   Tell me those steps.
19     A.   The IRR analyst would take a
20  look at the flagged order and from other,
21  I guess tools at their disposal, would
22  determine if it was something that
23  required further investigation.  So some
24  of those tools to be used would be

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 looking at past, I guess it would be
2 looking at what is actually flagging it
3 in the model.  Then it could take a look
4 at the -- having access to the
5 prescription drug monitoring report.  It
6 could involve phone calls with field loss
7 prevention.  It could involve discussions
8 with the store pharmacist.  It could
9 involve looking at prescriptions coming
10 out of the store.  Are they, I guess,
11 outside normal parameters from perhaps
12 comparable stores.  There's a variety of
13 components and I'm probably not touching
14 upon all of them.
15       Q.   And that's to be done by
16 the -- who?
17       A.   That would be the IRR
18 analyst.
19       Q.   Okay.  And the IRR analyst
20 would be who in 2011?
21       A.   I believe in 2011 it would
22 have been a person based in Knoxville.
23       Q.   And who was that?
24       A.   I didn't recall her name.

Page 255

1       Q.   And was that process that
2 you just talked about, is that called due
3 diligence?
4       A.   I would -- I know I'm not
5 touching upon all of it, but that would
6 be from what I can recall.
7       Q.   Is that called due
8 diligence?
9            MS. MILLER:  Objection.
10           THE WITNESS:  I don't recall
11      using that terminology.
12 BY MR. BAKER:
13      Q.   What is due diligence in the
14 context of suspicious order monitoring?
15           MS. MILLER:  Objection.
16           THE WITNESS:  I didn't use
17      that terminology.
18 BY MR. BAKER:
19      Q.   Would you have any
20 expectation that the person conducting
21 that review used due diligence?
22           MS. MILLER:  Objection.
23           THE WITNESS:  What's the --
24 BY MR. BAKER:

Page 256

1       Q.   Go ahead.
2       A.   What's the definition of due
3 diligence?
4       Q.   I'm asking you.  You're the
5 former CVS director of loss prevention --
6 of logistics and loss prevention.  I'm
7 asking you, what was due diligence in the
8 context of suspicious order monitoring
9 investigations of pended orders?
10      A.   That's not a term that I can
11 recall using.
12      Q.   You never used that term?
13      A.   I don't recall using due
14 diligence.
15      Q.   Fair enough.  Would you have
16 had any expectation that the person
17 conducting that review would use due
18 diligence in the context of their review?
19           MS. MILLER:  Objection.
20 BY MR. BAKER:
21      Q.   Would you?
22      A.   I would expect the person
23 would investigate the situation.
24      Q.   Would you expect the person

Page 257

1 to do that list of things that you just
2 listed?
3       A.   That would probably be a
4 portion of it.
5       Q.   Okay.  And if that person
6 did not do those things, would that be
7 below your expectations of what they
8 should have done, you being the director
9 of the department out of which suspicious
10 order monitoring was assigned at the
11 time?
12           MS. MILLER:  Objection.
13           THE WITNESS:  I would have
14      to have more details around the
15      situation.
16 BY MR. BAKER:
17      Q.   Do you know what percentage
18 of the time the person who was reviewing
19 those pended orders would conduct such an
20 investigation to the extent of what you
21 just described?
22           MS. MILLER:  Objection.
23           THE WITNESS:  I would not be
24      aware of the time involved.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

BY MR. BAKER:
1 BY MR. BAKER:
2    Q.   What percentage of the
3 pended orders would you have an
4 expectation that that person reviewing
5 the orders for investigation would
6 conduct the steps that you outlined to
7 investigate?  What percentage of those
8 orders would you expect them to go
9 through and do that type of
10 investigation?
11        MS. MILLER:  Objection.
12        THE WITNESS:  I can't
13    recall.  I can't recall what time
14    required.
15 BY MR. BAKER:
16    Q.   I didn't ask time required.
17 What percentage of the pended orders that
18 were pended would you have an expectation
19 that the analyst would then go forward
20 and do that type of an investigation?
21 What percentage number?
22    A.   Sitting here, I do not
23 recall a percentage.
24    Q.   Okay.  Would you expect it

Page 259

1 to be close to 100 percent?
2        MS. MILLER:  Objection.
3 BY MR. BAKER:
4    Q.   I mean, you have a pended
5 order.  Would you not expect the person
6 who is the analyst to do that type of
7 investigation?
8        MS. MILLER:  Objection.
9        THE WITNESS:  If --
10 BY MR. BAKER:
11    Q.   Go ahead.
12    A.   If an -- if an order was
13 flagged, they would look into it further,
14 I would expect that to take place.
15    Q.   Okay.  To the extent that
16 you just described, correct?
17        MS. MILLER:  Objection.
18 BY MR. BAKER:
19    Q.   To the extent that you
20 described?
21    A.   A portion of what I
22 described.
23    Q.   Okay.  And if the person did
24 not conduct that type of investigation,

Page 260

1 would that have been a violation of the
2 policy of how you expected them to
3 investigate that order?
4        MS. MILLER:  Objection.
5        THE WITNESS:  I would have
6    to know the circumstances of the
7    order.  Not if -- it's
8    theoretical.  I would need to know
9    the details.
10 BY MR. BAKER:
11    Q.   Did you ever review any IRR
12 investigative report during the whole
13 time that you were employed at CVS?
14        MS. MILLER:  Objection.
15 BY MR. BAKER:
16    Q.   Did you?
17        MS. MILLER:  Objection.
18 BY MR. BAKER:
19    Q.   Let me repeat the question.
20 During the entire time that you were
21 employed at CVS, did you ever once review
22 an item review report investigative
23 report?
24        MS. MILLER:  Objection.

Page 261

1 BY MR. BAKER:
2    Q.   Did you?
3        MS. MILLER:  Objection.
4        THE WITNESS:  I'm not sure
5    what you're referencing.
6 BY MR. BAKER:
7    Q.   Did you ever review any
8 written documentation of an investigation
9 that was done of a pended order?
10    A.   Not that I can recall.
11        MR. BAKER:  Go to 68-A
12    again, please.  Pull it up,
13    please.
14 BY MR. BAKER:
15    Q.   Go to Page 2, 68-A.  All
16 right.  The next bullet point, this says,
17 "The month-to-date field is then observed
18 and compared to Lags 1 through 6.  Do you
19 see that?
20    A.   What Bates?  Actually, I
21 have the wrong document.
22        MS. MILLER:  Was it 68-A and
23    attachment?
24        MR. BAKER:  68 -- 68-A

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1 attachment.
2 BY MR. BAKER:
3     Q.   Yes, sir.  Look under
4 suspicious order process, Page 2.
5     A.   Okay.
6     Q.   Look under Bullet Point
7 Number 2.
8         Do you see that?
9     A.   Yes.
10     Q.   And remember, Bullet Point
11 Number 1, I just finished asking you
12 about, the DC IRR analyst will review IRR
13 for order quantity that has flagged as
14 potentially suspicious.  You recall that,
15 correct?  We just went over that, right?
16     A.   That's what you read, yes.
17     Q.   Okay.  Now we're going over
18 Bullet Point Number 2.  It says, "The
19 month-to-date field is then observed and
20 compared to Lags 1 through 6."
21         Do you see that?
22     A.   I see that on the document,
23 yes.
24     Q.   Okay.  It says, "If a

Page 263

1 month-to-date quantity is out of line
2 compared to the store lag, as well as the
3 ordering patterns of the network, the
4 order will be labeled suspicious."
5         Do you see that?
6     A.   I do.
7     Q.   Okay.  What does the phrase
8 "out of line" mean?
9         MS. MILLER:  Objection.
10         THE WITNESS:  I didn't write
11     this document.  So I'm not sure
12     exactly what he meant.
13 BY MR. BAKER:
14     Q.   Well, did this document ever
15 get brought to your attention when you
16 worked at CVS?
17     A.   It appears that it was sent
18 to me.  But I don't recall the document.
19     Q.   Okay.  And it appears that
20 it was sent to you in February of 2011;
21 is that right?
22     A.   Correct.
23     Q.   Okay.  And you don't sit
24 here and doubt that it was sent to you in

Page 264

1 2011; is that correct?  You're not
2 doubting that today, are you?
3         MS. MILLER:  Objection.
4         THE WITNESS:  It may have
5     been sent, but I don't recall
6     reading it.
7 BY MR. BAKER:
8     Q.   Okay.  And why would this
9 have been sent to you?  What was your
10 position within the company that would
11 have caused something like this to be
12 sent to you?
13         MS. MILLER:  Objection.
14         THE WITNESS:  I was director
15     of logistics, loss prevention.
16 BY MR. BAKER:
17     Q.   And what did you as director
18 of loss prevention -- logistics loss
19 prevention have to do with suspicious
20 order monitoring while you were employed
21 at CVS?  What did you do?
22     A.   I was involved in
23 implementing the program.
24     Q.   Okay.  And if you were

Page 265

1 involved in implementing the program and
2 this is a memo describing suspicious
3 order process, and the memo says, "If a
4 month-to-date quantity is out of line
5 compared to the store lag as well as the
6 ordering patterns of the network, the
7 order will be labeled suspicious," are
8 you telling me that you don't know what
9 the words "out of line" means?
10         MS. MILLER:  Objection.
11         THE WITNESS:  Again, I
12     didn't write the document.  I'm
13     not sure what the terminology
14     means.
15 BY MR. BAKER:
16     Q.   Did you ever ask anybody
17 what that means, "out of line," how
18 that's defined?
19     A.   Sir, I don't recall the
20 document.
21     Q.   Okay.  Did you ever ask
22 anybody what the words "out of line"
23 mean?  That's what I'm asking you.
24     A.   I do not recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    Q.   Okay.  Do you know how far
2  out of line a month-to-date quantity
3  order would have to be in order for it to
4  be considered suspicious?
5       MS. MILLER:  Objection.
6       THE WITNESS:  I don't recall
7    the term "out of line."
8  BY MR. BAKER:
9    Q.   Did you ever review any
10 investigations, any written documentation
11 of investigations of orders that were out
12 of line when you were at CVS in that
13 department, the director of logistics,
14 loss prevention?
15      MS. MILLER:  Objection.
16 BY MR. BAKER:
17   Q.   Did you?
18      MS. MILLER:  Objection.
19      THE WITNESS:  Not that I
20   recall.
21 BY MR. BAKER:
22   Q.   During the entire time that
23 you were director of logistics loss
24 prevention at CVS, did anybody ever

Page 267

1  present to you an order from a CVS
2  pharmacy to a CVS distribution center
3  that had a month-to-date quantity that
4  was out of line compared to the store
5  Lags 1 through 6 as well as the ordering
6  patterns of the network to where that
7  order was labeled as suspicious?
8       MS. MILLER:  Objection.
9       THE WITNESS:  Not that I
10   recall.
11      MR. BAKER:  Let's go to 97.
12      MS. MILLER:  Is that a new
13   exhibit?
14      MR. BAKER:  Yes.
15      It's an existing one.
16      MS. MILLER:  Oh, right.
17 BY MR. BAKER:
18   Q.   All right.  Go to page Bates
19 Number 88996.
20   A.   Excuse me.  What is the
21 Bates number?
22   Q.   88996.  Are you there?
23   A.   88996?
24   Q.   Yes, sir.

Page 268

1    A.   I'm on that page.
2    Q.   Tell me when you're there.
3    A.   I am there.
4    Q.   Okay.  Do you see where
5  that's entitled Prevention and Monitoring
6  of Control Drug and PSE Suspicious
7  Orders.  Do you see that?
8    A.   I do.
9    Q.   Okay.  It talks about
10 prevention and -- prevention and
11 monitoring of control drug suspicious
12 orders.  Do you see that?
13   A.   Yes, sir.
14   Q.   Okay.  Now, go to the -- go
15 to the bottom of that page.  It says,
16 "DEA regulations require that all
17 distributors must design a system to
18 monitor, detect and report any suspicious
19 control drug orders."
20      Do you see that?
21   A.   Yes, sir.
22   Q.   When you were at CVS did you
23 read this document?
24   A.   I just -- I don't recall the

Page 269

1  document.
2    Q.   Okay.  Go to the next page.
3  It talks about items reviewed.  Do you
4  see that?
5    A.   Yes.
6    Q.   It says, "CVS has
7  established control drug order thresholds
8  which will flag on the IRR, item review
9  report, as well as field loss prevention
10 NovaStar reports."
11      Do you see that?
12   A.   Yes.
13   Q.   Is that the flags that we're
14 talking about when we talk about the
15 other flag that we were talking about
16 in -- in Document Number 68-A?
17      MS. MILLER:  Objection.
18 BY MR. BAKER:
19   Q.   Is that the type of flag we
20 are talking about?
21   A.   I don't know if I can quite
22 interpret that, because I also see the
23 field loss prevention software reports.
24   Q.   Let's move to the next

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 document.
2 MR. BAKER: Let's go to 211
3 please.
4 (Document marked for
5 identification as Exhibit
6 CVS-Devlin-P-211.)
7 MR. BAKER: This is marked
8 Devlin 211 for some reason. We'll
9 take it as it is.
10 BY MR. BAKER:
11 Q. All right. This is an
12 e-mail dated 2/24/10. Do you see it?
13 A. Yes.
14 Q. Okay. Now, this is, if you
15 look at the bottom of that page it says
16 from John Mortelliti to Ellen Demetrius
17 and to Frank Devlin, that's you, right?
18 Correct?
19 A. It appears that's what's on
20 the document, yes.
21 Q. All right. And there's two
22 or three other people. Do you see that?
23 A. Yes.
24 Q. Okay. The subject is

Page 271

1 adjustment to the CVS SOM. Do you see
2 that?
3 A. Yes.
4 Q. It says, "Ellen, would it be
5 possible to do this for Friday? Also,
6 with expenses being tight right now,
7 would we be able to turn off the control
8 drug IRR for all the DCs except
9 Lumberton? The report is very thick and
10 costly to run daily."
11 Do you see that?
12 A. I do see that.
13 Q. Explain to me what that
14 means, "the report is very thick and
15 costly to run daily."
16 You are on this e-mail. I
17 want you to tell me what that means.
18 MS. MILLER: Objection.
19 BY MR. BAKER:
20 Q. What does that mean?
21 A. Again, I don't recall this
22 particular e-mail. I could attempt to
23 interpret what it means.
24 Q. Is it a discussion of the

Page 272

1 IRR?
2 A. Yes.
3 Q. All right. The IRR report
4 being very thick and costly to run daily,
5 is that what that says?
6 A. That's what it says.
7 Q. Okay. And is this at a time
8 when we have one person doing the review?
9 MS. MILLER: Objection.
10 THE WITNESS: Again, as I
11 mentioned earlier, I'm not exactly
12 sure of time frames.
13 BY MR. BAKER:
14 Q. Is the IRR a sample of a
15 flagged order?
16 MS. MILLER: Objection.
17 BY MR. BAKER:
18 Q. Is it or not?
19 A. Can you repeat that again?
20 MS. MILLER: Objection.
21 BY MR. BAKER:
22 Q. Is the IRR a flagged order?
23 MS. MILLER: Objection.
24 THE WITNESS: No.

Page 273

1 BY MR. BAKER:
2 Q. What does the IRR represent?
3 A. Item review report.
4 Q. Of what?
5 A. Well, it could have
6 potential -- potential suspicious orders.
7 Q. Correct, a potential
8 suspicious order. Is that one that was
9 flagged under the --
10 A. Yeah, that would be
11 outside --
12 Q. Okay.
13 A. Outside the parameters, yes.
14 Q. Okay. So it would be a
15 flagged order?
16 A. You could use that term.
17 Q. Okay. So let's try to use
18 that term so we are on the same page.
19 If we're talking about a
20 flagged order, you know what we're
21 talking about, correct?
22 MS. MILLER: Objection.
23 BY MR. BAKER:
24 Q. Right?

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  A.   Sure.
2  Q.   Okay.  And tell me what you
3  mean by a flagged order.
4  A.   Be something that you'd want
5  to take a look at.
6  Q.   Okay.  Because -- how did it
7  become flagged under the suspicious order
8  monitoring system within CVS?  At that
9  time in 2010, how would it get flagged?
10  A.   I believe it would be driven
11  by the algorithm that was put in place
12  against the store orders.  And that would
13  flag potential orders to take a look at.
14  Q.   Okay.  And to take a look at
15  them, would that require an
16  investigation?
17  A.   Yes, to varying degrees.
18  Q.   Okay.  And if this was a
19  very thick and costly to run daily
20  report, how many are we talking about?
21  How many flagged orders are we talking
22  about at that point?
23  A.   I wouldn't know.
24  Q.   Did you go check to find

Page 275

1  out?
2  MS. MILLER:  Objection.
3  THE WITNESS:  No.
4  BY MR. BAKER:
5  Q.   Do you know what was being
6  done to investigate those flagged orders,
7  if anything?
8  MS. MILLER:  Objection.
9  THE WITNESS:  I know we
10  had -- the IRR process was in
11  place.  It was being reviewed on a
12  daily basis.  Anything outside
13  those parameters was being --
14  being reviewed.  There were
15  varying degrees of investigation
16  that would take place.
17  BY MR. BAKER:
18  Q.   Do you know what
19  documentation there was of that
20  investigation, if any?
21  MS. MILLER:  Objection.
22  THE WITNESS:  I'm not sure
23  on the documentation.
24  BY MR. BAKER:

Page 276

1  Q.   Was the documentation under
2  the policies and procedures in effect at
3  that time with CVS supposed to be
4  attached to the IRR?
5  MS. MILLER:  Objection.
6  THE WITNESS:  I -- again,
7  you know, I apologize for just not
8  recalling dates.  But this -- you
9  know, as I mentioned before, this
10  has been an evolving process.  And
11  exact dates, and if you're saying
12  at this particular time, I'm not
13  sure where we were in that
14  process.
15  BY MR. BAKER:
16  Q.   Okay.  You see here the next
17  sentence says, "Once we get the formula
18  acceptable, we can turn it back on for
19  the network."
20  Do you see that?
21  A.   I do see that.
22  Q.   Okay.  Go to the next page.
23  This is an e-mail from Ellen Demetrius to
24  Frank Devlin.  It's a pourover from the

Page 277

1  bottom of the -- of the page before.  Go
2  to the page before.
3  Do you see here, this e-mail
4  right here, February 16, 2010, from Ellen
5  Demetrius to you, Frank Devlin, do you
6  see that?
7  MS. MILLER:  You mean at the
8  bottom of the document on the
9  first page?
10  MR. BAKER:  Bottom of the
11  document.
12  BY MR. BAKER:
13  Q.   Do you see that?  And then
14  it goes over to the next page.  It says,
15  "Hi Frank."
16  Do you see that?
17  A.   I see the "hi Frank," yes,
18  okay.
19  Q.   Okay.
20  A.   All right.
21  Q.   And that's the e-mail from
22  Ellen to you, correct?
23  A.   Let me take a look at it.  I
24  do see that.

Page 278

1    Q.   Okay.  Let's read the
2 e-mail.
3        "Hi Frank.  I just spoke to
4 John and Rick about your request.  What
5 we would like to do is have you pick a
6 day that you would like us to work on,
7 then we will run and rerun the different
8 scores, .16, .17, et cetera, until you
9 are satisfied with the results.  Once you
10 are satisfied, we will change production
11 to the new score for controls.  Is that a
12 satisfactory plan?  Thanks, Ellen."
13        Do you see that?
14    A.   I do.
15    Q.   Do you see where you
16 responded to that, Frank Devlin?  Do you
17 see where that -- you responded to it?
18    A.   I'm reading it now.
19        MS. MILLER:  Which portion
20    of the chain are you referring to
21    as a response?
22 BY MR. BAKER:
23    Q.   Did you respond to it?
24    Let's go back up to the

Page 279

1 e-mail.  Let's repeat it.
2        It says, "Hi Frank.  I just
3 spoke to John and Rick about your
4 request.  What we would like to do is
5 have you pick a day that you would like
6 us to work on, then we will run and rerun
7 the different scores, .16, .17, et
8 cetera, until you are satisfied with the
9 results.  Once you are satisfied, we will
10 change production to the new scores for
11 controls.  Is that a satisfactory plan?
12 Thanks, Ellen."
13        Do you see that?
14    A.   I do see that.
15    Q.   Okay.  Were you involved
16 with the process of changing the score on
17 the algorithm from .15 to a number above
18 .15?
19    A.   I -- I don't -- I don't
20 recall the situation, from looking at the
21 e-mail.  I'm sure I was involved in the
22 process to some extent, I just don't
23 recall the particulars around it.
24    Q.   Look down at the bottom,

Page 280

1 February 15, 2010.  Do you see this
2 portion of the e-mail string?
3    A.   "This is a follow-up on our
4 telephone call"?
5    Q.   It says, "Adjustment to the
6 CVS" -- "CVS SOM."
7        Do you see that?
8    A.   I do.
9    Q.   Okay.  This is between you
10 and Robert Williamson, February 15, 2010.
11 Do you see that?
12    A.   I do.
13    Q.   Okay.  Do you see there
14 where it says, "The score used for
15 pending is currently .15"?
16    A.   I do see that.
17    Q.   Is that a -- is that
18 consistent with the -- the score that was
19 used for flagging orders?
20        MS. MILLER:  Objection.
21        THE WITNESS:  That's what it
22    states in this e-mail.  For me to
23    testify that indeed was the score
24    in place at that date, I don't --

Page 281

1    I don't recall a --
2 BY MR. BAKER:
3    Q.   Okay.  But it looks like if
4 you take this e-mail string up at top,
5 that you are directly involved at least
6 with having the score raised above .15.
7 Am I right or wrong?
8        MS. MILLER:  Objection.
9        THE WITNESS:  I'm reading,
10    I'm just reading through the
11    e-mails.  And just from what I
12    recall, I do recall being on some
13    conference calls and discussing
14    the score.
15        As far as particular
16    activities I took, I just -- I
17    don't recall what I did.
18 BY MR. BAKER:
19    Q.   Okay.  But the documentation
20 indicates that you were involved in those
21 activities; is that right?
22    A.   And I -- then I testified
23 that I know that I was involved and
24 participated in conference calls.

Highly Confidential – Subject to Further Confidentiality Review

Page 282

1    Q.   Okay.  You talked briefly
2  about what you had as an expectation of a
3  store -- of -- of an analyst when an
4  investigation would be conducted.  Do you
5  recall that testimony?
6    A.   I recalled discussing some
7  components of it, yes.
8         (Document marked for
9         identification as Exhibit
10        CVS-Devlin-P-69.)
11 BY MR. BAKER:
12   Q.   Let me show you what's
13 marked as Exhibit 69.
14        This is called "SOM due
15 diligence guidance document, questions to
16 consider when calling the pharmacy."
17        Do you see that?
18   A.   I do.
19   Q.   Have you ever seen this --
20        MS. MILLER:  Bill, was this
21        attached to an e-mail?
22        MR. BAKER:  I don't know.  I
23        don't know.
24        MS. MILLER:  There's no --

Page 283

1  it appears to be undated.  Do you
2  have --
3         MR. BAKER:  I'm just going
4  with the CVS documentation.  I'm
5  going to ask him if he knows about
6  this.
7  BY MR. BAKER:
8    Q.   Do you know anything about
9  it, the due diligence questions, the SOM
10 due diligence guidance document?  Are you
11 aware of this document at all?
12   A.   Again, I don't -- I don't
13 recall it.
14   Q.   Okay.  Was there any sort of
15 document in place at CVS when you worked
16 there that discussed what was to be done
17 by analysts who were reviewing IRRs when
18 conducting investigations related to the
19 IRRs?
20   A.   I'm sure there were
21 guidelines provided, yes.
22   Q.   Okay.
23   A.   I don't recall a particular
24 guideline or when it was produced.

Page 284

1    Q.   The guidelines that were
2  provided, did they have guidelines
3  consistent with what you talked about, at
4  least earlier in this deposition about
5  what your expectations were for
6  investigations?
7    A.   I'd have to look at the
8  documents.  I mean, what I testified to,
9  that's all I could recall off the top of
10 my head.
11   Q.   But the documents that you
12 reviewed, were they consistent with what
13 you testified to?
14        MS. MILLER:  Objection.
15        THE WITNESS:  Which?
16 BY MR. BAKER:
17   Q.   The part about contacting
18 the pharmacy, doing the comparison of the
19 prior orders to the current orders, that
20 list of things that you talked about?
21   A.   Where?
22   Q.   Your testimony.
23   A.   Oh, what I spoke about?
24   Q.   Yes.

Page 285

1        MS. MILLER:  Are you --
2  BY MR. BAKER:
3    Q.   Was there a document that
4  had all the stuff listed in it?
5    A.   Oh, I don't know.  I don't
6  know, sir.
7    Q.   You don't know?
8    A.   I don't know.  You had asked
9  me what they would do.  I was just
10 harkening back what I could recall was
11 going on at the time.
12   Q.   Okay.  Let's move to the
13 next document, Number 2 -- Number 140.
14        (Document marked for
15        identification as Exhibit
16        CVS-Devlin-P-140.)
17 BY MR. BAKER:
18   Q.   Take a look at this.  This
19 is a suspicious order monitoring for
20 PSE/control drugs.  Summary of key
21 concepts and procedures dated August 27,
22 2010.
23        Have you ever seen this
24 document?

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    A.   Again, I don't -- I don't I
2  don't recall the particulars of it, no.
3    Q.   Okay.  Go to Page 3 of that
4  document.  It's labeled 61193.  It says,
5  "Purpose of item inventory review
6  report."
7        Do you see that?
8    A.   "Purpose of inventory review
9  report"?
10   Q.   Yes, sir.
11   A.   I see that.
12   Q.   In the CVS policy and
13 procedure, it's called an item review
14 report.  And this calls it an inventory
15 review report.  Is that the same thing or
16 a different thing?
17   A.   I believe so because I
18 mentioned earlier, there's kind of an
19 evolution of terminology being used.
20   Q.   Right.  And it says here
21 that the purpose of the inventory review
22 report, the IRR, is to prevent diversion
23 of PSE/EPH/control drug products,
24 correct?

Page 287

1    A.   That's what it states, yes.
2    Q.   Okay.  What is diversion?
3        MS. MILLER:  Objection.
4  BY MR. BAKER:
5    Q.   Go ahead.  What is
6  diversion?
7    A.   Diversion, I would look at
8  potential theft.
9    Q.   Anything other than theft?
10   A.   I think theft is what comes
11 to the top of my mind.
12   Q.   Okay.  Go back to
13 Exhibit 97.  And go to Bates number
14 88997.  Are you there?
15   A.   Yes.
16   Q.   It says -- at Paragraph
17 Number 2 at the top, do you see that?
18   A.   Items reviewed?
19   Q.   Yes.  It says, "CVS has
20 established control drug order thresholds
21 which will flag on the IRR."
22        Do you see that?
23   A.   I do.
24   Q.   Okay.  "As well as field

Page 288

1  loss prevention NovaStor reports."
2        Do you see that?
3    A.   Yes.
4    Q.   Okay.  It says, "These
5  thresholds are the primary tool to
6  prevent stores from purchasing excessive
7  or potentially suspicious control drug
8  orders."
9        Do you see that?
10   A.   I do.
11   Q.   Okay.  And what would be the
12 reason behind that, that there would be a
13 need to prevent stores from purchasing
14 excessive or potentially suspicious
15 control drug orders?
16   A.   Can you repeat that?
17   Q.   What would be the reasoning
18 behind the need to prevent stores from
19 purchasing excessive or potentially
20 suspicious control drug orders?
21        MS. MILLER:  Objection.
22 BY MR. BAKER:
23   Q.   Do you have an answer to
24 that question, sir?

Page 289

1    A.   Can you repeat it one more
2  time?
3    Q.   What would be the reason for
4  these thresholds to be the primary tool
5  to prevent stores from purchasing
6  excessive or potentially suspicious
7  control drug orders?
8    A.   Well, you'd want to ensure
9  that there's proper inventory management
10 of the product.
11   Q.   Why would there be a need to
12 prevent the store from purchasing an
13 excessive or potentially suspicious
14 control drug order?
15   A.   Again, would come down to --
16       MS. MILLER:  Objection.
17       THE WITNESS:  -- come down
18       to proper inventory management.
19 BY MR. BAKER:
20   Q.   Other than that?
21   A.   That would certainly be a
22 component.  That was --
23   Q.   What's the whole reason that
24 you're doing this suspicious order

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 monitoring system to begin with?
2       MS. MILLER: Objection.
3 BY MR. BAKER:
4       Q.   Tell me.
5       A.   To ensure we're meeting DEA
6 regulations.
7       Q.   Of monitoring of controlled
8 substance to prevent what?
9       MS. MILLER: Objection.
10 BY MR. BAKER:
11       Q.   To prevent what?
12       A.   I would say improper use of
13 control drugs.
14       Q.   Diversion, correct?
15       MS. MILLER: Objection.
16 BY MR. BAKER:
17       Q.   Is that correct?
18       A.   If that's the term you want
19 to use.
20       MS. MILLER: Objection.
21 BY MR. BAKER:
22       Q.   Okay.  Is that the term
23 that's being used in your documentation
24 here.  Go back to the document that I

Page 291

1 previously pulled up.  It's document
2 Number 140.  Look at 61193.  It says,
3 "What is a control drug IRR?"
4       Do you see that?
5       It says, "Purpose of
6 inventory report, the IRR."
7       Do you see that?
8       A.   I'm just getting to it now.
9 I do see that.
10       Q.   "Assist in detection of
11 potential suspicious orders."
12       Do you see that?
13       A.   Yes, sir.
14       Q.   Okay.  And is that to help
15 prevent diversion?
16       A.   That's what's stated here in
17 the document, yes.
18       Q.   Okay.  Let's go to the next
19 numbered document.  Actually, go back to
20 that document if you would, the previous
21 document, Number 140.  And go to Bates
22 Number 61197.  Do you see under
23 responsibilities, what's listed there?
24 Mr. Devlin, do you see that?

Page 292

1       A.   I'm reading it as you speak.
2       Q.   I'm asking, do you see the
3 word responsibilities?  I'll go through
4 them with you.  Do you see the word
5 responsibilities?
6       A.   Yes.
7       Q.   Okay.  It says DC Rx.  What
8 is a DC Rx?  What does that mean?
9       A.   As I mentioned earlier, that
10 would be DC pharmacy.
11       Q.   Okay.  "Review IRR daily and
12 determine whether variances are within
13 acceptable ranges."
14       Do you see that?
15       A.   I do.
16       Q.   Okay.  Is the IRR a daily
17 report?
18       A.   Yes.  I believe so, yes.
19       Q.   Okay.  What is it a daily
20 report of?
21       MS. MILLER: Objection.
22 BY MR. BAKER:
23       Q.   Go ahead.  What is it a
24 daily report of?

Page 293

1       MS. MILLER: Objection.
2 Asked and answered.
3       THE WITNESS: Orders outside
4 the bounds of the algorithm that
5 was established.
6 BY MR. BAKER:
7       Q.   Okay.  And how many of these
8 IRRs were being generated daily amongst
9 all the thousands of stores that were
10 making orders of controlled substances to
11 distribution centers owned by CVS?
12       MS. MILLER: Objection.
13 BY MR. BAKER:
14       Q.   Tell me.
15       MS. MILLER: Objection.
16       THE WITNESS: I don't know.
17 BY MR. BAKER:
18       Q.   You don't know?
19       A.   No.
20       Q.   Was it over 100?
21       MS. MILLER: How many IRR
22 reports?
23 BY MR. BAKER:
24       Q.   How many IRR reports on

Page 294

1 average would be generated daily?
2 A. I have no idea.
3 Q. Was it over 200?
4 A. I have no idea.
5 Q. Was it over 300?
6 A. I have no idea.
7 Q. Was it over a thousand?
8 MS. MILLER: Objection to
9 this whole line.
10 BY MR. BAKER:
11 Q. Go ahead.
12 A. I have no idea.
13 Q. You have no idea how many
14 IRRs were being generated daily, did you?
15 You have no idea, did you?
16 MS. MILLER: Are you asking
17 how many reports?
18 BY MR. BAKER:
19 Q. How many item review reports
20 were generated daily?
21 A. Oh, there would be an item
22 review report generated for each
23 distribution center.
24 Q. Okay. So how many reports

Page 295

1 were there? How many orders were on
2 those reports?
3 A. That, I do not know.
4 Q. How many orders were flagged
5 on those reports?
6 A. That, I do not know.
7 Q. What was the average number
8 of orders that were flagged on those
9 reports at any time during the period
10 that you were there?
11 MS. MILLER: Objection.
12 THE WITNESS: I just -- I
13 don't know.
14 BY MR. BAKER:
15 Q. What were the average number
16 of investigations that took place
17 relative to the flagged orders under
18 those IRRs?
19 A. I guess I -- I don't recall.
20 Q. Was that not part of your
21 job to know that information?
22 MS. MILLER: Objection.
23 THE WITNESS: My job to
24 ensure that we had a process in

Page 296

1 place. And on all the evidence
2 that I had, the process was in
3 place.
4 BY MR. BAKER:
5 Q. Did you monitor the process
6 to make sure that it was doing what it
7 was supposed to be doing? Did you? Or
8 did you just delegate that?
9 A. I mean, there certainly was
10 delegation that took place.
11 Q. Okay. Part of that was that
12 the DC Rx, the DC pharmacist was supposed
13 to review the report, the IRR daily, and
14 determine whether variances were within
15 acceptable ranges, correct?
16 A. No.
17 Q. That's what it says here on
18 the responsibilities.
19 A. It's DC pharmacy. It's not
20 pharmacist.
21 Q. DC pharmacy. The DC
22 pharmacy. So who is the DC pharmacy? Is
23 that a person? Is that a department?
24 Who is that?

Page 297

1 A. It would be referencing a
2 department.
3 Q. Okay. So the department was
4 to review the IRR daily and determine
5 whether variances were within acceptable
6 ranges, correct?
7 A. That's what's stated on this
8 document. Again, I'm not sure as far as
9 timelines go.
10 Q. And who within the
11 department was -- was that, that was
12 supposed to review the daily IRRs?
13 A. It would depend on which
14 pharmacy distribution center we were
15 talking about. There were some pharmacy
16 distribution centers that would have a
17 pharmacy manager. Some would have a
18 pharmacy supervisor.
19 Q. Look at the bottom bullet
20 here. It says, "If there is no
21 suspicious order, then attach
22 documentation to IRR report and file."
23 Do you see that?
24 A. I do see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1 Q. Okay. What documentation
2 should be attached to the IRR report and
3 filed?
4 A. I can't recall a
5 documentation. I believe we did have the
6 IRR reports signed off on, just to show
7 that they were reviewed.
8 Q. Okay. Let's go back up. It
9 says, "DC Rx files information with DC
10 copy of IRR."
11 Do you see that?
12 A. I do see that.
13 Q. All right. And then the
14 next bullet, determination of suspicious
15 order. "Director of logistics loss
16 prevention" -- that's you, right?
17 A. Yes.
18 Q. Okay.
19 -- "notifies DEA and
20 conducts investigation. No further
21 shipments of the products to the store
22 until the matter is resolved."
23 Do you see that?
24 A. I do see that.

Page 299

1 Q. Okay. You never did that
2 though? You never contacted the DEA to
3 do that; is that correct?
4 MS. MILLER: Objection.
5 MR. BAKER: She objected.
6 BY MR. BAKER:
7 Q. Did you ever contact the DEA
8 at all in that context?
9 A. I did not.
10 Q. Okay. The next says, "No
11 suspicious order. If there's no
12 suspicious order, then attach
13 documentation to IRR report and file."
14 Do you see that?
15 A. Yes.
16 Q. Okay. Is the documentation
17 that's referred to there, is that the
18 investigation?
19 A. That's not how I interpret
20 that.
21 Q. How do you interpret that?
22 A. I look at no suspicious
23 order that the IRR report would be filed.
24 Q. I'm sorry?

Page 300

1 A. No suspicious --
2 Q. Attached documentation.
3 What -- what documentation?
4 A. Perhaps it would be phone
5 calls that were made. Contact with field
6 loss prevention. Contact with the
7 pharmacy. Those are a couple of examples
8 I can think of.
9 Q. Okay. That's the
10 documentation I'm asking for.
11 A. I'm sure -- I'm sure there
12 are -- I'm sure there was probably more.
13 That's all I can recall.
14 Q. Okay. All right. But that
15 was -- that was a written policy within
16 your department that that's how it's
17 supposed to be done. This is it, attach
18 documentation to IRR report and file,
19 right?
20 MS. MILLER: Objection.
21 THE WITNESS: Again, not
22 sure of time frames or --
23 BY MR. BAKER:
24 Q. Well, let's go back, let's

Page 301

1 go back. Go back to the beginning here.
2 A. Again, I'm not, you know,
3 once this --
4 Q. Go back to Page 1 of this
5 document right here. It should be Bates
6 Number 61191. August 27, 2010. Do you
7 see it?
8 I want you to be sure of
9 this time frame.
10 A. I see that.
11 Q. Do you see that?
12 A. Yes.
13 Q. All right. Now let's go
14 back to where we were within this
15 document, which is no suspicious order,
16 attach documentation to IRR report and
17 file. Do you see that?
18 A. Yes.
19 Q. Okay. So we are talking --
20 are we talking about something that was a
21 policy in writing, August 27, 2010, that
22 we're reading right now as it relates to
23 how to handle investigation of IRRs?
24 MS. MILLER: Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    THE WITNESS: I can't -- I
2 can't, based on this document, say
3    that this was a policy.
4 BY MR. BAKER:
5    Q.   Well, then how did it make
6 its way into the document, how did that
7 bullet point make its way into the
8 document?
9    MS. MILLER: Objection.
10 BY MR. BAKER:
11    Q.   How did it make its way into
12 there?
13    MS. MILLER: Objection.
14    THE WITNESS: I don't know.
15 BY MR. BAKER:
16    Q.   This is part of that DEA
17 speaking points we talked about earlier,
18 isn't it?
19    MS. MILLER: Objection.
20 BY MR. BAKER:
21    Q.   Isn't that what this is?
22    A.   I'm not sure.
23    Q.   You're not sure? Do you
24 remember that I showed you the August 25,

Page 303

1 2010 e-mail to Ms. Propatier, do you
2 remember that, on Exhibit Number 97, do
3 you remember that?
4    A.   Let me take some time to
5 take a look at it.
6    Q.   Okay. It says, "Could you
7 please post? We added the suspicious
8 order monitoring."
9    Do you remember that?
10    A.   I see that, yes.
11    Q.   Do you remember the e-mail I
12 showed you about DEA speaking points,
13 make sure we use this when the DEA asks,
14 that it's not to be used as a prop, but
15 to be used as a tool, do you remember
16 that?
17    MS. MILLER: Objection.
18    Why don't you show him the
19 e-mail?
20 BY MR. BAKER:
21    Q.   Do you remember that? If
22 you don't remember it, just say you don't
23 remember it.
24    A.   I'd like to refresh my

Page 304

1 memory.
2    Q.   Okay. Let's take a break
3 while we find that.
4    THE VIDEOGRAPHER: Off
5 video, 2:07.
6    (Short break.)
7    THE VIDEOGRAPHER: We are
8 going back on record. Beginning
9 of Media File 8. The time is
10 2:21.
11 BY MR. BAKER:
12    Q.   Pull Exhibit 81, please.
13 You have in front of you --
14    MS. MILLER: Could you give
15 us one minute?
16    MR. BAKER: Sure.
17    MS. MILLER: Okay.
18 BY MR. BAKER:
19    Q.   You have in front of you
20 Exhibit 81. You've seen this exhibit
21 earlier today, correct?
22    A.   Yes.
23    Q.   Okay. This talks about an
24 e-mail between John Mortelliti and a

Page 305

1 whole bunch of people on that e-mail
2 list. It talks about importance high.
3 "Team, these are the final approved
4 DEA" -- "speaking points for the DEA
5 agents" -- do you see that?
6    A.   I do.
7    Q.   Okay.
8    -- "if they come to one of
9 our facilities and question suspicious
10 monitoring. It is okay to share this
11 document. Please be sure your team
12 understands it before presenting it so it
13 doesn't look like a prop instead of a
14 tool."
15    Do you see that?
16    A.   I do.
17    Q.   "I included Marvin because
18 DEA will be there today as well."
19    Do you see that?
20    A.   Yes.
21    Q.   Okay. Now, look at the next
22 page on this document. Do you see this
23 one, August 27, 2010?
24    Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    A.   Yes.
2    Q.   This is the same group of
3  documents that we've just been
4  questioning you about, correct?
5    A.   It appears so, yes.
6    Q.   All right.  This is the DEA
7  speaking points.  Just go back down
8  inside there.  Keep paging down.  All
9  right.  CVS suspicious order monitoring.
10       Do you see that?  Keep going
11 down.  One more page.
12       "The purpose of the IRR
13 report."  Go up one page.
14       Do you see that?  This is
15 the same document that I've been going
16 over with you before we just took a
17 break, correct?
18   A.   Yes.
19   Q.   All right.  So when I say
20 this is the DEA speaking points, do you
21 understand this is what I'm talking
22 about?
23   A.   I see the correlation
24 between this document and the document

Page 307

1  that you've been talking about, yes.
2    Q.   Okay.  Now go down to where
3  it talks about -- keep going down.
4        MS. MILLER:  And which --
5        are you in 81 or 140?
6        MR. BAKER:  Yeah.  I'm still
7        in 81.  Still in 81.  Keep going.
8        Keep going.  Keep going.
9  BY MR. BAKER:
10   Q.   The responsibilities.  Do
11 you see that?
12   A.   What Bates number is that?
13   Q.   Well, it doesn't have a
14 Bates number, because this is an
15 attachment to the document.
16       MS. MILLER:  It has Bates.
17       THE WITNESS:  5306?
18 BY MR. BAKER:
19   Q.   The one that talks about
20 responsibilities.  Do you see that?
21   A.   Yes.
22   Q.   Yes.  53 -- 075306.  Do you
23 see that?
24   A.   Yes.

Page 308

1    Q.   Okay.  Let's go back up to
2  that.
3        Now, you understand that
4  this is what y'all were showing to DEA;
5  is that right?
6        MS. MILLER:  Objection.
7  BY MR. BAKER:
8    Q.   Was this what was put in
9  place to show the DEA according to that
10 e-mail?
11       MS. MILLER:  Objection.
12       THE WITNESS:  I don't know
13       if this was actually shown to the
14       DEA.
15 BY MR. BAKER:
16   Q.   Wasn't that the purpose of
17 it, according to the e-mail, was to show
18 it to the DEA?
19       MS. MILLER:  Objection.
20       THE WITNESS:  I was
21       interpreting it more as speaking
22       points.
23 BY MR. BAKER:
24   Q.   Okay.  Speaking points to

Page 309

1  the DEA because they were going to be at
2  a facility.  You're sending it to Marvin,
3  whoever that is, because the DEA is going
4  to be there today, correct?
5    A.   That's what the e-mail says,
6  yes.
7    Q.   Okay.  So you understand
8  what I'm talking about when I say DEA
9  speaking points from now on, correct?
10 This is what I'm talking about.
11   A.   Yes.
12   Q.   Can you remember that if I
13 ask you to recall that again in this
14 deposition, that the DEA speaking points
15 are these slides right here?
16   A.   Which is Exhibit 140?
17   Q.   It's Exhibit 81.
18   A.   Okay.  I'll maintain.
19   Q.   You'll remember that, right?
20   A.   Yes.
21   Q.   Okay.  Thank you.  Let's go
22 back to 211, if you would.  Do you
23 remember the series of e-mails that I was
24 talking about --

Page 310

1    MS. MILLER: Bill, if you
2 can give him a moment to put that
3 in front of him.
4 BY MR. BAKER:
5    Q.   Number 211.
6    MS. MILLER: How recently
7 was that?
8    MR. BAKER: I don't know.
9    THE WITNESS: I don't recall
10 a 211. Oh, here it is.
11 BY MR. BAKER:
12    Q.   Do you see it?
13    A.   It didn't have a sticker on
14 it.
15    Q.   Now, at the bottom of that
16 page, the front page there, it says,
17 "Ellen, would it be possible to do this
18 Friday?"
19    And this is regarding
20 adjustment to the CVS SOM.
21    "Also with expenses being
22 tight right now, would we be able to turn
23 off the control drug IRR for all the DCs
24 except Lumberton?"

Page 311

1    Do you see that?
2    A.   I do.
3    Q.   Okay.  And then above that,
4 you see just above that, it says, "Could
5 you turn off the printout from BIP006A
6 except for John Mortelliti and Frank
7 Devlin?"
8    Do you see that?
9    A.   I do.
10    Q.   Okay.  What is that
11 printout?
12    A.   I don't recall what that --
13 what that number stands for.
14    Q.   Would those be the IRRs?
15    A.   I'm not sure.
16    Q.   As you sit here today, is it
17 your testimony that you never read an
18 IRR?
19    MS. MILLER: Objection.
20    THE WITNESS: I didn't say
21 that.
22 BY MR. BAKER:
23    Q.   Did you ever review an IRR
24 in the context of suspicious order

Page 312

1 monitoring?
2    A.   I -- I've read an IRR.  I
3 did not perform the IRR full review
4 process.
5    Q.   Okay.  So when you were at
6 CVS in 2010, did you know how to analyze
7 an IRR to determine whether or not it met
8 the -- the standards of suspicious order
9 monitoring set forth by CVS?
10    A.   I had a conceptual
11 understanding of it, but I did delegate
12 those responsibilities as far as the full
13 analysis goes.
14    Q.   Did you ever do any due
15 diligence type of investigation of
16 anything relative to an IRR itself?
17    A.   No.  Any information would
18 have been presented to me.
19    Q.   Okay.
20    A.   But I can't --
21    Q.   The answer is no --
22    A.   I can't recall a specific
23 instance, no.
24    MR. BAKER: Okay.  Next.

Page 313

1    That's the same thing.  Next.
2 BY MR. BAKER:
3    Q.   Were there any problems that
4 you encountered with the suspicious order
5 monitoring software program that was
6 purchased from the Buzzeo related
7 company?
8    MS. MILLER: Objection.
9 BY MR. BAKER:
10    Q.   What's the name of the
11 company that CVS purchased the software
12 program from that was used for suspicious
13 order monitoring?
14    MS. MILLER: Objection.
15    THE WITNESS: Cegedim
16 Dendrite.
17 BY MR. BAKER:
18    Q.   Okay.  Is that CCS?
19    A.   I don't recall the
20 abbreviation.
21    Q.   Okay.  Cegedim Dendrite, is
22 that the name of it?
23    A.   I believe so.  I think his
24 company actually had a couple different

Page 314

1 names, so I'm not sure.
2    Q.  Okay.  But that -- that was
3 the company that Mr. Buzzeo was
4 affiliated with?
5    A.  Yes.
6    Q.  Okay.  Did you know him
7 personally?  Did you meet him personally?
8    A.  I did meet Mr. Buzzeo, yes.
9    Q.  Okay.  Was there ever a
10 problem with the system as it relates to
11 not reporting by active ingredient,
12 talking about the controlled substances,
13 not reporting the controlled substances
14 by active ingredient?
15         MS. MILLER:  Objection.
16 BY MR. BAKER:
17    Q.  Was there?
18         MS. MILLER:  Objection.
19 BY MR. BAKER:
20    Q.  Was there ever a problem in
21 that respect?
22         MS. MILLER:  Objection.
23         THE WITNESS:  I can recall a
24    change from item to active

Page 315

1    ingredient.
2 BY MR. BAKER:
3    Q.  I'm sorry, what now?
4    A.  I can recall a change from
5 item to active ingredient.
6    Q.  Okay.  Before there was a
7 change from item to active ingredient,
8 did that cause a problem with respect to
9 the implementation of that system?
10         MS. MILLER:  Objection.
11         THE WITNESS:  What's the
12    definition of a problem?  I'm not
13    sure.
14 BY MR. BAKER:
15    Q.  Okay.  Let's talk about it.
16         (Document marked for
17    identification as Exhibit
18    CVS-Devlin-P-209.)
19 BY MR. BAKER:
20    Q.  I'm going to show you
21 Exhibit Number 209.  This is an e-mail
22 from Mr. Mortelliti to you, Frank Devlin,
23 10/6 of 2010.
24         Do you see that?

Page 316

1    A.  I do see that.
2    Q.  All right.  It says, "Here
3 is a bullet recap of the IRR issue I
4 communicated to you.  September there
5 were two control drugs containing hydro
6 that appeared to have lost two to
7 four months of history."
8         Do you see that?
9    A.  I do see that.
10    Q.  What is the significance of
11 that, that it lost history?
12         MS. MILLER:  Objection.
13         THE WITNESS:  I know with
14    the algorithm -- and again, I
15    don't recall all the parameters of
16    the algorithm.  There are multiple
17    components on the algorithm.
18    History was a part of it.
19 BY MR. BAKER:
20    Q.  Okay.  In order to be able
21 to compare the current purchase or the
22 current order against prior orders; is
23 that correct?
24         MS. MILLER:  Objection.

Page 317

1 BY MR. BAKER:
2    Q.  Is that right?
3    A.  I believe you would still be
4 able to make a comparison of prior
5 orders.
6    Q.  Okay.  It says, "Ellen
7 determined that the historical data was
8 lost due to manufacturer change in the
9 wording."
10         Do you see that?
11    A.  I do see that.
12    Q.  Okay.  And then it says,
13 "October, all but one item on the network
14 control drug IRR has lost three to
15 four months of historical data.  There
16 are only six months of data for control
17 drugs."
18         Do you see that?
19    A.  I do see that.
20    Q.  Then it says, "10/6/10, sent
21 a request from to Gary M. to have the IRR
22 formula changed to active ingredient
23 instead of item."
24         Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1     A.   Yes.
2     Q.   All right.  Was there a
3 problem with using the system that was in
4 place 10/26/10 due to it not reporting
5 the item by active ingredient?
6        MS. MILLER:  Objection.
7        THE WITNESS:  I don't -- I
8    don't recall this particular
9    issue.  I -- I do recall a change
10    from item to active ingredient.
11 BY MR. BAKER:
12     Q.   Okay.
13     A.   And I know part of that was
14 looked at.  It was just an evolution in
15 the process --
16     Q.   Okay.
17     A.   -- as far as being able to
18 identify someone if they were spreading
19 orders out over different manufacturers.
20 If they started ordering a little bit
21 from each manufacturer, that by going to
22 active ingredient, that would -- that
23 would provide an enhancement in the
24 information.

Page 319

1 BY MR. BAKER:
2     Q.   Okay.
3     A.   That -- that's how I
4 remember this as an issue.
5     Q.   Tell me about spreading
6 orders, what that means.
7     A.   Again, the change, so if you
8 had a controlled substance and you had
9 four or five different manufacturers for
10 the same controlled substance.  So if
11 you'd order, let's say, and I'm just
12 making these numbers up, so if you order
13 five, five, five, five from the four
14 different manufacturers, you know, that
15 could look like even ordering.  So if you
16 went to active ingredient, that would
17 take out that manufacturer, I guess,
18 component of it.  So you would just be
19 looking at the overall ingredient.
20     Q.   Okay.  Spreading orders,
21 what does that mean in the context of a
22 pharmacy and a threshold in terms of how
23 much they purchase per month of say
24 hydrocodone combination product, what

Page 320

1 does that mean?
2     A.   It wouldn't -- it wouldn't
3 necessarily change.
4        MS. MILLER:  Objection.
5    Excuse me.
6        THE WITNESS:  I'm sorry?
7        MS. MILLER:  Go ahead.
8 BY MR. BAKER:
9     Q.   What does it mean?
10     A.   It wouldn't -- it
11 wouldn't -- it wouldn't change what the
12 pharmacy was purchasing.  It would just
13 give some better visibility as far as the
14 active ingredients go.
15     Q.   Okay.  Visibility meaning
16 visibility under the suspicious order
17 monitoring system?
18     A.   Yes.
19     Q.   Okay.  And if they spread
20 orders, how does that prevent visibility
21 under the suspicious order monitoring
22 system?
23        MS. MILLER:  Objection.
24        THE WITNESS:  It could -- it

Page 321

1    could still flag potentially, I
2    believe, because there are
3    multiple components of the
4    algorithm.  This was really just a
5    fine-tuning of it.
6 BY MR. BAKER:
7     Q.   Okay.  But if they were
8 spreading orders, does that flounder the
9 radar at all insofar as suspicious order
10 monitoring?
11        MS. MILLER:  Objection.
12        THE WITNESS:  I don't know.
13    (Document marked for
14    identification as Exhibit
15    CVS-Devlin-P-55.)
16 BY MR. BAKER:
17     Q.   Okay.  Let me show you
18 Exhibit Number 55.  This is a business
19 idea description, and it's requested on
20 behalf of John Mortelliti.  And it's --
21 under the summary description and
22 objectives, it says, "DEA expects CVS to
23 prevent suspicious orders from being
24 filled out of our DCs.  The current IRR

Page 322

1 does not provide the proper information
2 to meet the DEA's needs. We need control
3 drugs to be monitored by active
4 ingredient. Currently the control drugs
5 are monitored by item. The IRR loses all
6 order history when the info on the item
7 changes, causing CVS to be noncompliant
8 with DEA expectations."
9      Is that what this document
10 says?
11      A. That's what the document
12 says.
13      Q. Okay. And that relates to
14 active ingredient; is that correct?
15      MS. MILLER: Objection.
16      THE WITNESS: I see the term
17      "active ingredient" on the
18      document, yes.
19 BY MR. BAKER:
20      Q. Okay. And that's consistent
21 with what we've been discussing in the
22 prior e-mail, correct?
23      A. I don't know if this
24 document, per se, is related to the prior

Page 323

1 e-mail.
2      Q. Okay. Well, let's go to the
3 next document.
4      (Document marked for
5      identification as Exhibit
6      CVS-Devlin-P-164.)
7 BY MR. BAKER:
8      Q. It's Exhibit Number 164.
9 This is within a native document, and
10 your attorney knows what that means.
11      MS. MILLER: What -- Bill,
12      is there any context of where this
13      came from? Was it attached as an
14      attachment, was it a document --
15      MR. BAKER: There was a --
16      it was a native, and we opened it,
17      this is exactly what it looked
18      like. But it's dated 5/3/11, and
19      it says Frank Devlin --
20      MS. MILLER: Well, I see
21      there's a date of 5/3/11, but
22      there's no -- absolutely no
23      context of --
24      MR. BAKER: I wish I could

Page 324

1 tell you, but these are how the
2 documents are presented to us.
3 They don't tell us --
4      MS. MILLER: Well, this is a
5      page from a larger document. Do
6      you have the document?
7      MR. BAKER: I don't have the
8      larger document. I don't. I wish
9      I did, but --
10      MS. MILLER: It doesn't --
11      MR. BAKER: We'll move
12      forward. And if we want to
13      discuss it out of the deposition,
14      we can. I'd be happy to --
15      MS. MILLER: It's just do
16      you have a -- so you have no other
17      context related to this
18      document --
19      MR. BAKER: At this point I
20      don't --
21      MS. MILLER: -- to provide
22      the witness?
23      MR. BAKER: -- as we sit
24      here today. I wish I did, but

Page 325

1 this is all I have. This is the
2 problem with using natives.
3 BY MR. BAKER:
4      Q. So here we go.
5      MS. MILLER: You don't even
6      have a title on the document of
7      when it was generated.
8      MR. BAKER: I understand.
9      It's provided by CVS. If you have
10      a doubt on that, I'll go back and
11      try to show you where we got it.
12      MS. MILLER: No, I
13      understand that. It's just
14      clearly part of a bigger
15      document --
16      MR. BAKER: Sure.
17      MS. MILLER: -- there's
18      actually no context given the page
19      you're showing the witness.
20      MR. BAKER: I understand.
21      All right.
22 BY MR. BAKER:
23      Q. So this says 5/3/11, Devlin,
24 F. Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    A.   Right.  I do.

2    Q.   Okay.  This has that same
3 sort of thing on it.  It says, "DEA
4 expects CVS to prevent suspicious orders
5 from being filled out of our DCs.  The
6 current IRR does not provide the proper
7 information to meet the DEA's needs.  We
8 need control drugs to be monitored by
9 active ingredient.  Currently the control
10 drugs are monitored by item.  The IRR
11 loses all order history when the info on
12 the item changes, causing CVS to be
13 noncompliant with DEA expectations."
14        Is that what the document
15 says?
16        MS. MILLER:  I object to the
17    use of the document for the
18    reasons I stated.
19        MR. BAKER:  Understood.
20        MS. MILLER:  You may go
21    ahead and answer.
22        MR. BAKER:  Understood.
23        THE WITNESS:  That is what
24    the document states.

Page 327

1 BY MR. BAKER:
2    Q.   Did you write that in there?
3        MS. MILLER:  Objection.
4        THE WITNESS:  I do not
5    recall writing that.  And in
6    looking at my -- that's not the
7    type of language I would use.
8 BY MR. BAKER:
9    Q.   Okay.
10        (Document marked for
11    identification as Exhibit
12    CVS-Devlin-P-82.)
13 BY MR. BAKER:
14    Q.   Let's pull exhibit number
15 82.  This is an e-mail dated 10/12/2010
16 from John have Mortelliti to Todd Janson.
17        Who is Todd Janson?
18    A.   I believe he was a loss
19 prevention manager in Vero Beach,
20 Florida.
21    Q.   Okay.  Let's read this.  It
22 says, "Todd, I sent you an e-mail about
23 two weeks ago explaining why I'm handling
24 the control drug IRR for the time being."

Page 328

1        Do you see that?

2    A.   I do.

3    Q.   All right.  Let's talk about
4 that.  This is October 12, 2010.  This is
5 John Mortelliti.  At that point is he in
6 Lumberton to your knowledge?

7    A.   Yes, I believe his -- yes,
8 his office --

9    Q.   Okay.

10    A.   -- was in Lumberton.

11    Q.   Okay.  And this e-mail says,
12 "I" -- I presume that means John
13 Mortelliti -- "am handling the control
14 drug IRR for the time being."

15        Is that what it says?

16    A.   That's what it says, yes.

17    Q.   Okay.  And it says, "You may
18 want to forward it to Dean."  Then it
19 says, "Dean, there is a rewrite we are
20 trying to get approved for the control
21 drug IRR.  The current report shows
22 control drugs by item instead of active
23 ingredient, such as PSE.  We thought this
24 would be a great idea at the time, but

Page 329

1 what we found was that the system cannot
2 match historical data to an item if the
3 manufacturer changes the name of the
4 item.  Todd can forward you the e-mail.
5 Example, hydro five milligrams can be
6 changed to hydro, milligram five.  Same
7 item, just a five in front of milligram.
8 The system cannot match this item because
9 of the change and, therefore, loses
10 historical data.  This is why you're
11 seeing zero for historical ordering,
12 usually in Lag 3 to 6."

13        Do you see that?

14    A.   I do.

15    Q.   Okay.  Was this brought to
16 your attention, this issue with respect
17 to active ingredient and how it was being
18 used and the issues that it was causing
19 with relation to matching historical data
20 to an item?

21        MS. MILLER:  Objection.

22 BY MR. BAKER:

23    Q.   Was this brought to your
24 attention?

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1  MS. MILLER: Objection.
2  THE WITNESS: I just -- I
3  recall -- I recall the change of
4  the item to active ingredient.
5  But my recollection was based more
6  on the manufacturer issue. As far
7  as the loss, I just -- I don't
8  recall that.
9  BY MR. BAKER:
10  Q.  Okay. If there's a loss of
11  historical data, how does that affect the
12  efficacy of the system?
13  MS. MILLER: Objection.
14  THE WITNESS: There would
15  still be other components. You
16  know, and again, I don't know the
17  details of the algorithm. It
18  wasn't just that one piece. So it
19  would still be -- the system would
20  still be up and running.
21  BY MR. BAKER:
22  Q.  Do you know at what point in
23  time this issue was dealt with to where
24  there was a change from active

Page 331

1  ingredient -- I mean a change from item
2  description to active ingredient?
3  A.  Yeah, I don't recall the
4  time frame.
5  Q.  Was it ever changed?
6  A.  I believe at one point it
7  was changed, yes.
8  Q.  Was it ever changed before
9  you left?
10  A.  Yeah, I believe it was.
11  Q.  Do you know when in the
12  context of before you left it was ever
13  changed, if at all?
14  MS. MILLER: Objection.
15  THE WITNESS: I believe it
16  was changed. I just -- I can't
17  recall the exact time it was
18  changed.
19  MR. BAKER: Pull Exhibit 92.
20  (Document marked for
21  identification as Exhibit
22  CVS-Devlin-P-92.)
23  BY MR. BAKER:
24  Q.  Have you ever heard of the

Page 332

1  concept of --
2  MS. MILLER: Oh. Are you
3  asking questions --
4  MR. BAKER: Yes.
5  MS. MILLER: -- outside the
6  document?
7  MR. BAKER: Yes, yes. Let's
8  move on to the next one. I'll
9  give you a document in just a
10  second.
11  BY MR. BAKER:
12  Q.  Have you ever heard of the
13  concept of same store, same month orders?
14  A.  Same store, same --
15  Q.  Same month orders?
16  A.  No, I don't recall that.
17  Q.  Okay. Let me ask you
18  hypothetically to assume this is what it
19  means.
20  If you have a pharmacy that
21  orders in Week 1, and orders, say, 5,000
22  hydrocodone combination products. And
23  then Week 2 orders the same 5,000
24  hydrocodone combination products, then

Page 333

1  Week 3 orders that same 5,000 hydrocodone
2  combination products, and then Week 4
3  orders those same 5,000 hydrocodone
4  combination products.
5  That's same store, same
6  month, making the order of the same
7  product. Do you understand what I'm
8  talking about if, hypothetically, that's
9  what I'm trying to present to you? Do
10  you understand that?
11  MS. MILLER: Objection.
12  BY MR. BAKER:
13  Q.  Do you understand that?
14  MS. MILLER: Objection.
15  THE WITNESS: I understand
16  you saying a store four weeks in a
17  row is ordering 5,000.
18  BY MR. BAKER:
19  Q.  That's an example of same
20  store, same month ordering.
21  A.  Okay.
22  Q.  So now do you understand
23  what I'm saying when I say same store,
24  same month order?

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    A.   Yes.  I don't recall that
2 term before.
3    Q.   Okay.  That's fine.
4    A.   I'll follow along with --
5    Q.   I'm just trying to make sure
6 we are on the same wavelength, that we're
7 talking the same language, so when I say
8 same store, same month, there's not this
9 disconnect, that you actually understand
10 what I'm talking about.  Do you
11 understand what I'm talking about now
12 when I say same store, same month
13 ordering?
14    A.   Consistently the same amount
15 being ordered --
16    Q.   It doesn't have to be the
17 same amount.  Just simply the same store,
18 making an order the same month, in other
19 words more than one order in a month?
20       MS. MILLER:  Objection.
21       THE WITNESS:  So I thought
22       the example you were giving you
23       said Week 1, 5,000, Week 2, 5,000.
24 BY MR. BAKER:

Page 335

1    Q.   No, sir.  It doesn't have to
2 be the exact same amount.  If the same
3 store makes an order in the same month,
4 in other words more than one order per
5 month.
6       Do you understand what I'm
7 talking about?
8       MS. MILLER:  Objection.
9 BY MR. BAKER:
10    Q.   You're acting dumbfounded
11 like you don't know what I'm talking
12 about.  The same store makes an order
13 sequentially during the weeks of the
14 months.  That's the same store making an
15 order in the same month.  Is that not --
16       MS. MILLER:  You're just
17       saying the store is making an
18       order each week in the month?
19       MR. BAKER:  Correct.
20 BY MR. BAKER:
21    Q.   Do you understand that?
22    A.   I understand that.  The
23 example you gave me though, you were
24 saying the same quantity.

Page 336

1    Q.   Well, let's get away from
2 the example.
3    A.   That's what you're giving
4 me.
5    Q.   But every time I talk to
6 you, you act like you don't know what the
7 heck I'm talking about.  So I'm trying to
8 be plain and simple with you.
9    A.   All right.  Okay.  Sir, I'm
10 carefully listening to your question.
11    Q.   I know you are.
12       MS. MILLER:  Let him -- give
13       him a chance to answer it.  Ask
14       the question.
15 BY MR. BAKER:
16    Q.   But if the same store orders
17 in the same month, that's called same
18 store, same month ordering in the context
19 of my questioning.
20    A.   Irregardless of quantity?
21    Q.   Irregardless -- irrespective
22 of quantity.
23    A.   Okay.
24    Q.   Okay.  I want you to look at

Page 337

1 Document Number 92, and go to 83065.
2 Okay.  Now, this is an attachment to an
3 e-mail dated 11/29/2012; is that correct?
4       MS. MILLER:  Bill, I'm
5       sorry, the document that I have
6       is 83855 as the beginning Bates.
7       MR. BAKER:  Correct.
8       MS. MILLER:  Oh, I thought
9       you said 83065.
10       MR. BAKER:  It's a packet.
11       MS. MILLER:  Because I
12       don't --
13       MR. BAKER:  Give me the one
14       that attaches that.
15 BY MR. BAKER:
16    Q.   Okay.  I'm looking at 83064.
17 Do you see that.  Do you have that?
18       MS. MILLER:  I don't have
19       that.  When you referred to
20       packet, I think I just got one
21       e-mail.
22       MR. BAKER:  I'm sorry.  I
23       apologize.
24       MS. MILLER:  No, I want to

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1 make sure we're talking about the
2 same thing.
3         MR. BAKER:  Do you have the
4 e-mail?
5         MS. MILLER:  Do you have --
6 so it's dated November 29, 2012.
7         THE WITNESS:  I see that.
8         MS. MILLER:  Is that the
9 start?
10        MR. BAKER:  I'm looking at
11 83064, 83065, and 83066.  Do y'all
12 have those?
13        MS. MILLER:  We have that.
14 And so is that Exhibit 92?
15        MR. BAKER:  That's what I'm
16 asking him about.  That's what I'm
17 asking him about.
18        MS. MILLER:  Is this --
19        MR. BAKER:  It's probably a
20 couple --
21        MS. MILLER:  The exhibit --
22 I want for the record -- I just to
23 make sure.
24        MR. BAKER:  Have both be the

Page 339

1 exhibit, composite.
2         MS. MILLER:  Okay.
3 Composite exhibit.  So the first
4 e-mail is the November 29, 2012.
5         MR. BAKER:  Correct.
6 Absolutely.
7         MS. MILLER:  I got it now.
8 BY MR. BAKER:
9    Q.   Okay.  All right.  Look at
10 the e-mail now dated 11/29/12.  Do you
11 see that at the bottom?  Do you see it?
12    A.   Yes.
13    Q.   Okay.  Do you see where it
14 says Thursday, November 29, 2012?  Do you
15 see that?
16    A.   Yes.
17    Q.   Okay.  It says, "Team,
18 here's the project plan and process flow
19 that Craig and I will review with you at
20 2:00 p.m. eastern today.  Thank you,
21 Tom."
22        Do you see that?
23    A.   Yes.
24    Q.   Okay.  Now, go to the top of

Page 340

1 the e-mail.  To the top.  Do you see
2 this?
3    A.   Yes.
4    Q.   Okay.  This says,
5 "Opportunities document."
6        Do you see that?
7    A.   Yes.
8    Q.   "SOM plan."
9        Do you see that?
10    A.   Yes.
11    Q.   Okay.  This is 11/29/12.
12 Now, go to the bottom of the document,
13 and look at the Bates number.  Do you see
14 the Bates number here, 83064?  Do you see
15 that?
16    A.   Yes.
17    Q.   Okay.  Go to the next page.
18 At the top it says, "Opportunities,
19 current SOM process."
20        Do you see that?  Do you see
21 it?
22    A.   Yes, sir.
23    Q.   Okay.  Look at the bottom.
24 It's 83065.

Page 341

1        Do you see that?
2    A.   Yes.
3    Q.   Okay.  Now, go to the bottom
4 of the next document.  It's 83066.
5        Do you see that?
6    A.   Yes.
7    Q.   These are the documents that
8 I'm asking you questions about right now.
9 Do you understand that?
10    A.   Yes, sir.
11    Q.   Okay.  So if you go to the
12 second page, 83065.  Do you see that?
13 Under "Opportunities, current SOM
14 process."
15        Do you see that?
16    A.   Yes.
17    Q.   It says, "If order is
18 cleared on first of month and cleared,
19 and store then orders again that month,
20 it won't be looked at."
21        Do you see that?
22    A.   Yes.
23    Q.   Okay.  What does that mean?
24    A.   I do not know.  This

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 document was -- this document was
2 produced after I left the company.
3     Q.   Okay.  It says, "If system
4 flags it, we are required to look at it
5 and document why it was released.
6 Currently, we're simply releasing order
7 based on past due diligence on a
8 different order."
9         Do you see that?
10    A.   I do.
11    Q.   Okay.  Now, what does that
12 mean?  Do you know?
13    A.   I do not know.
14    Q.   Okay.  Was this the same
15 system that was in place when you were
16 there or is this a different system or do
17 you know?
18    A.   I would not know that.
19    Q.   Okay.  Do you know whether
20 or not there was a change in the system
21 between the time that you left in October
22 2012 and the time that this e-mail and
23 this SOM, "Opportunities, current SOM
24 process" memorandum was generated?

Page 343

1     A.   I would have no idea.
2     Q.   Okay.  Who took over your
3 position when you left?
4     A.   It was -- I believe it was
5 an open position.  And I believe they
6 hired someone from the outside.
7     Q.   Okay.  Who is Craig Schiavo?
8     A.   I have no idea.
9     Q.   You never met him?
10    A.   Not that I recall.
11    Q.   Who is Tom Bourque?
12    A.   I have no idea.
13    Q.   Did Aaron Burtner have
14 anything to do with the SOM process after
15 you left to your knowledge?
16    A.   I believe he did, yes.
17    Q.   Okay.
18        (Document marked for
19 identification as Exhibit
20 CVS-Devlin-P-53.)
21 BY MR. BAKER:
22    Q.   Let's look at Exhibit
23 Number 53, please.
24        Do you know whether or not

Page 344

1 any of the orders of Schedule III
2 narcotics that were being made by CVS
3 pharmacies to outside vendors were being
4 monitored by those outside vendors, do
5 you know?
6     A.   Is there an exhibit I'm
7 supposed to be looking at?
8     Q.   Not right this second.  I'm
9 just asking the question, do you know.
10    A.   Can you repeat the question?
11    Q.   If an outside vendor was
12 selling a narcotic, a Schedule III
13 narcotic to a CVS pharmacy while you were
14 employed at CVS, do you know whether or
15 not that outside vendor was monitoring
16 that order that was made by the CVS
17 pharmacy to its company?
18        MS. MILLER:  Object --
19 objection.
20 BY MR. BAKER:
21    Q.   Do you know?
22    A.   I believe I was told they
23 were, but it's not something I ever
24 looked into.

Page 345

1     Q.   Okay.  So the question is do
2 you know one way or the other.
3     A.   I couldn't say.
4     Q.   You could not say.  Okay.
5 So was CVS monitoring the purchase by its
6 pharmacies of outside vendor products
7 that were Schedule III narcotics?
8        MS. MILLER:  Objection.
9        THE WITNESS:  Not as part of
10 my responsibility.
11 BY MR. BAKER:
12    Q.   Okay.  Let me ask you to
13 look at Document Number 53.  Exhibit 53.
14        Now, this document is dated
15 10/8 of 2012.  Do you see that?
16    A.   I do.
17    Q.   Okay.  Were you still there
18 10/8 of 2012?
19    A.   Yes.
20    Q.   Okay.  And when you were
21 there at 10/8 of 2012, what was your
22 position?
23    A.   Director of logistics loss
24 prevention.

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    Q.   And was the suspicious order
2  monitoring run under that department or
3  not?
4         MS. MILLER:  Objection.
5  BY MR. BAKER:
6    Q.   At that time?
7    A.   Yes.
8    Q.   Okay.  I'd like to ask you
9  to look down on this memorandum, this,
10  this memorandum that is attached to --
11  actually, if you look at the front page,
12  it's October 5, 2012, it says, from Pam
13  Hinkle to Frank Devlin, conference call
14  notes, 10/25/12.
15        Do you see that?
16    A.   I do.
17    Q.   Okay.  So you were on a
18  conference call or was this being sent to
19  you from something Pam Hinkle had
20  attended on a conference call.  Which one
21  is it?
22    A.   I -- I don't recall being on
23  this conference call.
24    Q.   But it appears this was sent

Page 347

1  to you on October 5, 2012, does it not?
2    A.   Yes.
3    Q.   Okay.  So go to the next
4  page.  And do you see, up at the top it
5  says AG/CVS discussion -- AGI/CVS
6  discussion.  Do you know who AGI was?
7    A.   I believe they were an
8  analytics company.
9    Q.   Okay.  Was this a different
10  analytics company than the Cegedim
11  company that Mr. Buzzeo ran?
12    A.   Yes.
13    Q.   Okay.  It talks about
14  attendees, and it names all the
15  attendees.  And you are an attendee.  Do
16  you see here?
17    A.   I do see that.
18    Q.   Frank Devlin, that's you.
19  So you -- did you attend this conference
20  call right before you left?
21    A.   I don't recall.
22    Q.   What date did you leave CVS?
23    A.   It may have been mid -- mid
24  October, but I may have already given my

Page 348

1  notice at this point in time.
2    Q.   Okay.  The second bullet
3  point there says, "AGI will develop an
4  algorithm to fix issues with existing
5  algorithm used for SOM program."
6         Do you see that?
7    A.   I do see that.
8    Q.   What were the existing
9  issues that needed to be fixed?
10    A.   I do not know.
11    Q.   Were they the active
12  ingredient for example, was that
13  something that needed to be fixed?
14         MS. MILLER:  Objection.
15         THE WITNESS:  I'm not -- I'm
16    not sure of what the issues would
17    have been.  As I thought the
18    active ingredient, I thought that
19    had already been changed.
20  BY MR. BAKER:
21    Q.   Was there an issue with same
22  store/same month ordering not running
23  through the SOM process that needed to be
24  fixed?

Page 349

1         MS. MILLER:  Objection.
2         THE WITNESS:  I do not know.
3  BY MR. BAKER:
4    Q.   Was there a problem with
5  outside vendor orders that needed to be
6  fixed --
7         MS. MILLER:  Objection.
8  BY MR. BAKER:
9    Q.   -- in terms of them being
10  monitored or not monitored?
11         MS. MILLER:  Objection.
12         THE WITNESS:  I do not know.
13  BY MR. BAKER:
14    Q.   Was there anything that
15  needed to be fixed in terms of the change
16  of a drug name by a manufacturer that
17  causes history to get lost in the
18  suspicious order monitoring program that
19  was already in place that needed to be
20  fixed?
21         MS. MILLER:  Objection.
22  BY MR. BAKER:
23    Q.   Was there?
24         MS. MILLER:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    THE WITNESS:  I believe that
2    issue had been addressed.
3  BY MR. BAKER:
4    Q.   Okay.  What issues needed to
5  be fixed that you attended this
6  conference call concerning?
7    A.   I don't -- I don't recall
8  attending the conference call.
9    Q.   All right.  Let's skip down
10 in the document.  It says, "All orders
11 generated by outside vendors are not
12 pushed through the SOM process."
13   Do you remember that being
14 part of what was discussed in the
15 conference call?
16   MS. MILLER:  Where is that,
17   Bill?  I'm sorry.
18   MR. BAKER:  Right here.
19   THE WITNESS:  I don't recall
20   attending the conference call.
21 BY MR. BAKER:
22   Q.   Okay.  Is that what the
23 document says, that there's a conference
24 call concerning that particular --

Page 351

1  that -- that that particular issue was
2  addressed, that all orders generated from
3  outside vendors are not pushed through
4  the SOM process?  Is that what the
5  document says?
6    MS. MILLER:  Objection.
7    THE WITNESS:  It appears to
8    be what is stated on the document,
9    yes.
10 BY MR. BAKER:
11   Q.   All right.  Let's go back
12 through this series of questions one more
13 time, make sure I get this on record
14 properly.
15   This is an e-mail dated
16 October 5, 2012, and which you are a
17 party to, correct?
18   A.   It was sent, it looks
19 like -- well -- it looks like, yes, this
20 e-mail was sent to me, I don't recall the
21 e-mail.
22   Q.   Okay.  October 5, 2012.  And
23 at that point it attaches what appears to
24 be subject conference call note,

Page 352

1  10/5/2012; is that right?
2    A.   Correct.
3    Q.   Okay.  And it says note --
4  "Notes from call provided by Aaron."
5    Do you know who Aaron was?
6  Is that Aaron Burtner?
7    A.   I'm surmising that may be.
8    Q.   Okay.  Did you know any
9  other Aaron that worked at CVS that would
10 have attended this conference call other
11 than Aaron Burtner?
12   A.   No, not -- not that I can
13 recall.
14   Q.   Okay.  Go to the next page.
15 It says 10/5/2012 AGI/CVS discussion.
16 And it says attendees.  And it lists you,
17 right?
18   A.   My name is there.
19   Q.   Okay.  And then go down to
20 the bottom.  What does that sentence say
21 where it says "begins with all orders,"
22 that's up on your screen?
23   MS. MILLER:  Again, he's
24   looking at the hardcopy.

Page 353

1  BY MR. BAKER:
2    Q.   What does it say?
3    MS. MILLER:  He is --
4    THE WITNESS:  "All orders
5    generated for outside vendors are
6    not pushed through the SOM
7    process."
8  BY MR. BAKER:
9    Q.   I could not hear you when
10 you said -- after you said outside
11 vendors.
12   "All orders generated for
13 outside vendors," now finish the sentence
14 please.
15   A.   "Are not pushed through the
16 SOM process."
17   Q.   Okay.
18   A.   That's what is stated on the
19 document.
20   Q.   Okay.  It's -- is it true
21 that all orders generated for outside
22 vendors were not pushed through the SOM
23 process in the context of CVS pharmacies
24 making orders from outside vendors of

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 narcotics?
2     MS. MILLER: Objection.
3 BY MR. BAKER:
4    Q.  Is that true?
5     MS. MILLER: Objection.
6     THE WITNESS: I don't know.
7 BY MR. BAKER:
8    Q.  When you were there, did you
9 have any knowledge one way or the other
10 whether or not that was true?
11     MS. MILLER: Objection. To
12   the extent you recall.
13     THE WITNESS: Can you repeat
14   the question?
15 BY MR. BAKER:
16    Q.  When you were there at CVS
17 in October 2012 attending that conference
18 call --
19    A.  I don't recall attending the
20 conference call.
21    Q.  Okay.  Do you have any
22 reason to disagree with what this
23 memorandum indicates in terms of whether
24 all orders generated for outside vendors

Page 355

1 not -- or were not pushed through the SOM
2 process, do you have any reason to
3 disagree with that?
4    A.  I don't recall attending the
5 conference call, so I don't feel
6 qualified to comment on it.
7    Q.  Okay.  Do you feel qualified
8 to disagree with that statement in that
9 memo, is what I asked you.
10    A.  What's on the memo is on the
11 memo.
12    Q.  Okay.  Do you feel qualified
13 to disagree with it one way or the other?
14     MS. MILLER: Objection.
15   Asked and answered.
16     THE WITNESS: I don't feel
17   qualified to comment on it.
18 BY MR. BAKER:
19    Q.  Okay.  So then you could not
20 disagree with it; is that correct?
21    A.  I could not agree nor
22 disagree.
23    Q.  Okay.  Next.
24     MS. MILLER: Can we take a

Page 356

1 quick break?  A quick --
2     MR. BAKER:  Somebody need to
3 go to the bathroom or --
4     MS. MILLER: I would like to
5 if we could.
6     MR. BAKER: Okay.  Go ahead.
7     THE VIDEOGRAPHER:  Going off
8 the record.  The time is 3:00 p.m.
9    (Short break.)
10     THE VIDEOGRAPHER:  We are
11 going back on the record.
12 Beginning of Media File 9.  The
13 time is 3:11.
14    (Document marked for
15 identification as Exhibit
16 CVS-Devlin-P-106.)
17 BY MR. BAKER:
18    Q.  Let me show you Exhibit 106,
19 Mr. Devlin.  Exhibit 106 begins with
20 Bates 29867.  It's an e-mail from
21 Mr. Craig Schiavo to Aaron Burtner.  And
22 this is the month after you left.  This
23 is in November of 2012; is that correct?
24    A.  November 27, 2012, yes, I

Page 357

1 had been gone a month.
2    Q.  Okay.  And what day in
3 October did you leave?  Do you remember?
4    A.  I believe it was
5 mid-October.
6    Q.  Okay.  And so I want to ask
7 you if you could address some of the
8 things that are in this SOM end state
9 enhancement solution that is submitted in
10 the context of this e-mail because these
11 things would have been in existence in
12 November, which is just within a month
13 after you left.  Okay.  Are you ready?
14    A.  Sure.
15    Q.  Okay.  Let's go over this.
16 So SOM end state enhancement solution.
17 It says, "What are the requirements?"
18 And it goes through 21 C.F.R. 1301.74(b).
19    You've seen that.  We've
20 gone over this today, correct?  21 C.F.R.
21 1301.74(b)?
22    A.  I believe we did, yes.
23    Q.  Okay.  You remember
24 Mr. Rannazzisi's letters from 2006 and

Page 358

1  2007 --
2      A.   Yes.
3      Q.   -- that were attached to the
4  e-mail in 2008?  Do you remember that?
5      A.   I do.
6      Q.   Okay.  And it says, "Actions
7  to be taken to enhance CVS process."  It
8  says, "Current algorithm, enhancement to
9  algorithm, create new algorithm.  Review
10  our contracts with Buzzeo.  Were they
11  fired?"
12          My question to you is, after
13  reading this, does this refresh your
14  recollection as to whether or not there
15  was discussion about firing Mr. Buzzeo's
16  company and trying to hire another
17  company?
18          MS. MILLER:  Objection and
19      instruct you not to answer to the
20      extent there are any
21      attorney/client communications.
22  BY MR. BAKER:
23      Q.   I'm not asking you what your
24  attorneys discussed with you.  I'm

Page 359

1  asking, do you recall any -- any notion
2  that right before you left there was
3  discussions about firing Mr. Buzzeo's
4  company and hiring another company?
5          MS. MILLER:  Objection.
6      Same.  Instruct you not to answer
7      to the extent that the question
8      implicates any attorney/client --
9          THE WITNESS:  It does.
10          MS. MILLER:  -- information.
11  BY MR. BAKER:
12      Q.   It requires you to tell me
13  what your attorneys said?
14      A.   Yes.
15      Q.   Okay.  So the next thing
16  says, if you go down here to -- go up.
17  Go up.  It says, "Review AGI proposal."
18          Do you see that?
19      A.   I do.
20      Q.   All right.  Was that
21  Analysis Group?  Was that the new company
22  that you were thinking about dealing with
23  before you left?
24          MS. MILLER:  Objection.

Page 360

1  BY MR. BAKER:
2      Q.   Was it?
3          MS. MILLER:  Objection.
4          THE WITNESS:  I believe AGI,
5      that that was the other company we
6      were having discussions with.
7  BY MR. BAKER:
8      Q.   Okay.  And then under bullet
9  Point 3, it says, "We will need" -- "we
10  will need to understand what criteria the
11  algorithm looks at and ensure it complies
12  with DEA regulations by monitoring each
13  store's orders of unusual size, orders
14  deviating substantially from a normal
15  pattern, and orders of unusual
16  frequency," correct?
17      A.   That's what it states, yes.
18      Q.   Okay.  Let me ask, when you
19  were employed by CVS, did you really
20  understand what the algorithm was looking
21  at or not?
22          MS. MILLER:  Objection.
23          THE WITNESS:  I'd say from a
24      high level, I did.

Page 361

1  BY MR. BAKER:
2      Q.   Okay.  What was the
3  algorithm looking at from a high level?
4          MS. MILLER:  Objection.
5          THE WITNESS:  It was looking
6      at order activity going on in the
7      pharmacies, what type of items
8      were being ordered, frequency,
9      quantity.  Those are a few of the
10      components I can remember.  I
11      believe there are a lot more, but
12      that's all I can remember at this
13      time.
14  BY MR. BAKER:
15      Q.   What about in relation to
16  thresholds, what was the algorithm
17  looking at?
18          MS. MILLER:  Objection.
19          THE WITNESS:  I don't recall
20      that.
21  BY MR. BAKER:
22      Q.   You don't recall that?
23      A.   I don't recall.
24      Q.   Was the algorithm look --

Page 362

1 was the algorithm looking at anything in
2 reference to thresholds?
3          MS. MILLER: Objection.
4          THE WITNESS: Yeah, I
5     just -- I don't recall that.
6 BY MR. BAKER:
7     Q.   All right.  Do you -- do you
8 remember when we looked at the 8/25/10
9 SOM SOP document, do you remember that?
10    A.   Yes.
11    Q.   Exhibit Number 97.  It
12 talked about thresholds being the basis
13 of the SOM system.  Do you recall that?
14    A.   Yes.  That was --
15          MS. MILLER: Would you like
16    to look at the document?
17          MR. BAKER: Yes, go ahead.
18    Pull it out.
19    MS. MILLER: Exhibit 97?
20    MR. BAKER: Exhibit 97.
21          THE WITNESS: I looked at a
22    lot of documents today.
23 BY MR. BAKER:
24    Q.   Okay.  Here it is.

Page 363

1     A.   Here we go.  Okay.
2     Q.   Okay.
3     A.   Found it.  Okay.
4     Q.   Go to Bates Number 88997.
5     A.   Okay.
6     Q.   All right.  It says here
7 under the item review report, "These
8 thresholds are the primary tool to
9 prevent stores from purchasing excessive
10 or potentially suspicious control drug
11 orders."
12          Do you see that?
13    A.   I do see that.
14    Q.   Okay.  What did the
15 algorithm that was being implemented
16 during the time that you were at CVS do
17 to measure these thresholds, if anything?
18          MS. MILLER: Objection.
19          THE WITNESS: I'm just -- I
20    just can't recall in particular
21    how the algorithm was evaluating
22    the threshold.
23 BY MR. BAKER:
24    Q.   Okay.  But the thresholds

Page 364

1 were the primary tool, and so what I'm
2 asking, what do these algorithms do to
3 measure the primary tool that CVS was
4 using in the context of suspicious order
5 monitoring?
6          MS. MILLER: Objection.
7          THE WITNESS: You know,
8     again with the algorithm, I mean I
9     defer it to the expertise of the
10    DEA consultants that we hired.
11 BY MR. BAKER:
12    Q.   Okay.  So now, let's go to
13 the -- back to the other document,
14 Number 106, please.  And it talks about
15 end state enhancement solutions.  This is
16 again the November 2012 document, the
17 month after you left.  You understand
18 that, correct?
19    A.   Yes, sir.
20    Q.   All right.  It says here,
21 under the first checkmark, it says, "Each
22 store should have its own purchases
23 monitored separately based upon their
24 purchasing patterns to identify orders

Page 365

1 deviating from its normal buying pattern
2 and to identify orders of unusual
3 frequency," correct?
4     A.   Yeah --
5          MS. MILLER: Bill, can
6     you -- sorry, are you underneath
7     the -- the review AGI proposal?
8     MR. BAKER: Yeah.
9          MS. MILLER: Oh, okay.
10    MR. BAKER: Yeah.
11          MS. MILLER: And it's the --
12    under that section.
13          THE WITNESS: The first
14    checkmark under trade?
15    MR. BAKER: Right.  Right.
16    Right.  Okay.
17 BY MR. BAKER:
18    Q.   So under the algorithm that
19 was being used at CVS while you were
20 there, was -- did it monitor each store,
21 have its own purchasers -- purchases
22 monitored separately based upon their own
23 purchasing patterns to identify orders
24 deviating from its normal buying pattern

Page 366

1 and to identify orders of unusual
2 frequency, or not, or do you know?
3      A.   I believe that was a part of
4 it.
5      Q.   Do you know?
6      A.   I -- you know, again trying
7 to think back to that time and the actual
8 details.  From a high level conceptual, I
9 thought that was a part of it.  But I
10 can't say.
11      Q.   You don't really know?
12      A.   Yeah, I can't say yes or no.
13      Q.   Okay.  It says, "Orders of
14 unusual size can be determined by
15 comparing the order to previous order
16 sizes, as well as comparing the order to
17 other orders of stores in the area."
18      Do you see that?
19      A.   I do.
20      Q.   To what extent did the
21 algorithm, if any, that was being
22 implemented when you were at CVS measure
23 the CVS store's order against other
24 orders of stores in the area, if any?

Page 367

1      A.   That would probably -- that
2 would be getting into the details around
3 it.  I mean, conceptually that sounds
4 accurate or rings a bell, but how this
5 actually worked within the algorithm, I
6 can't explain that.
7      Q.   Do you know if it actually
8 did that or not?
9      MS. MILLER:  Objection.
10      THE WITNESS:  Again, from a
11      conceptual standpoint, I thought
12      that was one of the components.
13      But again, I can't say how that
14      worked.
15 BY MR. BAKER:
16      Q.   All right.  The next
17 checkmark says, "Will the system take
18 into account drug combinations."
19      Do you see that?
20      A.   I do.
21      Q.   Okay.  Do you know what drug
22 combinations were being monitored, if at
23 all, through the algorithm-based system
24 that was being used by CVS while you were

Page 368

1 there?
2      A.   Yeah, I'm not sure if the
3 context as far as what's on the document
4 here exactly what they are referencing,
5 I'm not sure.
6      Q.   What -- okay.  What drug
7 combination should have been monitored in
8 the context of the CVS suspicious order
9 monitoring system while you were there as
10 it relates to monitoring Schedule III
11 hydrocodone combination products?
12      MS. MILLER:  Objection.
13      THE WITNESS:  I can't really
14      comment on that.  I can't -- I
15      can't recall.
16 BY MR. BAKER:
17      Q.   Okay.  CVS, during the
18 period of time that you were there, did
19 not have a license to distribute
20 Schedule II narcotics; is that correct,
21 only Schedule IIIs?
22      A.   During what time frame?
23      Q.   When you were there.
24      A.   Not --

Page 369

1      MS. MILLER:  Objection.
2 BY MR. BAKER:
3      Q.   Go ahead.  During the period
4 of time that you were there, did CVS have
5 a license to distribute Schedule III
6 narcotics?
7      A.   Schedule III narcotics, yes.
8      Q.   Okay.  During the time that
9 you were there, did CVS have a license
10 to distribute Schedule II narcotics?
11      MS. MILLER:  Did CVS?
12      MR. BAKER:  CVS.
13      THE WITNESS:  Being in the
14      name of CVS, I don't believe so.
15 BY MR. BAKER:
16      Q.   Okay.  To your knowledge,
17 did CVS pharmacies during the period of
18 time that you were there, purchase all of
19 these Schedule II products, Schedule II
20 narcotic products from outside vendors?
21      MS. MILLER:  Objection.
22      THE WITNESS:  I believe so,
23      because they wouldn't be getting
24      them from the distribution

Page 370

1  centers.
2  BY MR. BAKER:
3      Q.  Okay.  And were those
4  Schedule II narcotic products ever
5  monitored by CVS in any way through the
6  distribution center or through any system
7  within CVS?
8          MS. MILLER:  Objection.
9  BY MR. BAKER:
10     Q.  To your knowledge?
11     A.  Not knowing the particulars,
12 but I thought the pharmacy operations
13 department would have had a methodology
14 to do that.
15     Q.  Okay.  Do you know that one
16 way or the other?
17     A.  I don't.  I don't.  It's not
18 something that I was responsible for.
19     Q.  Okay.  Was anybody
20 monitoring those products or not?
21         MS. MILLER:  Objection.
22 BY MR. BAKER:
23     Q.  To your knowledge.  Do you
24 know?

Page 371

1          MS. MILLER:  He already
2      testified that CVS did not
3      distribute those products.
4          THE WITNESS:  Again, you
5      know, CVS was not distributing
6      Schedule IIs.
7  BY MR. BAKER:
8      Q.  I understand.  CVS was
9  retail selling Schedule IIs though,
10 correct?
11     A.  I believe so, yes.
12     Q.  Okay.  Was anybody
13 monitoring that at CVS, or do you know?
14     A.  It wasn't my responsibility.
15     Q.  Do you know if anybody was
16 monitoring that?
17         MS. MILLER:  Objection.
18         THE WITNESS:  Alls I know it
19     wasn't my responsibility.
20 BY MR. BAKER:
21     Q.  Okay.  So do you know one
22 way or the other if anybody was
23 monitoring that?
24         MS. MILLER:  Objection.

Page 372

1          THE WITNESS:  Alls I can
2      testify, it's not my
3      responsibility.
4  BY MR. BAKER:
5      Q.  I know it's not your
6  responsibility.  My question is, do you
7  know if anybody was monitoring it.
8          MS. MILLER:  Objection.
9      Asked and answered.
10 BY MR. BAKER:
11     Q.  I know it wasn't your
12 responsibility according to your answer.
13 I'm asking do you know if anybody else,
14 other than you, because I know you said
15 it wasn't your responsibility.
16         So do you know if anybody
17 within CVS other than you was monitoring
18 Schedule II products that were sold by
19 CVS pharmacy?
20         MS. MILLER:  You mean sales
21     of those products --
22         MR. BAKER:  Yes.
23         THE WITNESS:  Again --
24     again, it wasn't my

Page 373

1  responsibility.  But the pharmacy
2  operations department would have
3  been monitoring that.
4          I don't.  I never saw it.  I
5      wasn't aware of their system.
6      That's just off the top of my
7      head.
8  BY MR. BAKER:
9      Q.  Okay.  So you really don't
10 know?
11         MS. MILLER:  Objection.
12         THE WITNESS:  I -- no.  No.
13     Well again, again I am coming
14     back, it wasn't my responsibility.
15 BY MR. BAKER:
16     Q.  Okay.
17     A.  But I thought in
18 recollection that pharmacy operations
19 would have been --
20     Q.  Understand.  You think
21 pharmacy operations might have been, but
22 do you know for sure one way or the
23 other?
24     A.  No, I'm not -- I'm really

Page 374

1 not in a position to answer the question,
2 sir.
3     Q.   Okay.  Fair enough.
4         All right.  Go to Page 2 of
5 the document that we were on.  We're
6 again on the document dated November 27,
7 2012.  And this is the SOM end state
8 enhancement solution document.  Again,
9 this is one month after you left,
10 correct?
11     A.   Yes.
12     Q.   Okay.  If you go down to the
13 bottom --
14     A.   Month and a half probably,
15 yeah, but -- yes.
16     Q.   Yeah.  It says, "If an order
17 is flagged, it should not be cut to a
18 smaller quantity in order to be below a
19 threshold and shipped.  Orders should be
20 all is shipped if cleared or nothing is
21 shipped."
22     A.   I'm sorry, sir, where --
23     Q.   Do you see that?
24     A.   No, I'm sorry.  Where

Page 375

1 exactly?
2     Q.   I'm pointing to it with my
3 finger.  Do you see that?
4     A.   Is that on 9869?
5     Q.   Yes, sir.  Do you see that?
6         "If an order is flagged, it
7 should not be cut to a smaller
8 quantity" --
9     A.   Okay.  I see it now.  Okay.
10     Q.   Okay.  Do you see that?
11     A.   I'm seeing it, yes.
12     Q.   Okay.  Now, do you
13 understand the concept if an order is
14 flagged, what that means?
15         MS. MILLER:  Objection.  In
16     the context of this proposed
17     algorithm?
18 BY MR. BAKER:
19     Q.   In the context of the CVS
20 SOM system while you were there, what it
21 means to be flagged.  Do you know what
22 that means?
23         MS. MILLER:  Objection.
24         THE WITNESS:  I -- I didn't

Page 376

1     create this document.
2 BY MR. BAKER:
3     Q.   I'm not asking for this
4 document.  Do you know what it means for
5 an order to be flagged within the SOM
6 system under the algorithm-based system?
7 Flagged, red flagged?
8     A.   I would have a definition on
9 it.  But I'm not sure.
10     Q.   Tell me what it means.
11     A.   I'm not sure how that would
12 coincide with this document.
13     Q.   I understand.  Tell me what
14 it means.  Tell me what it means.
15     A.   I think as I mentioned
16 before, flagged would be something that
17 would show up on the IRR report,
18 something that we'd want to have some
19 initial review on.
20     Q.   Okay.  All right.  And it
21 says should not be cut to a smaller
22 quantity in order to be below a threshold
23 and shipped.
24         Do you see that?

Page 377

1     A.   I see that.
2     Q.   Okay.  Was that going on
3 while you were there?  In other words,
4 were there orders that were flagged but
5 then somebody would cut the order to a
6 smaller quantity in order to ship it to
7 be below a threshold?
8         MS. MILLER:  Objection.
9         THE WITNESS:  I don't know.
10 BY MR. BAKER:
11     Q.   You don't know?
12     A.   I don't recall that.  I
13 don't recall hearing that.
14     Q.   Okay.  You don't know if
15 that was going on or not?
16         MS. MILLER:  Objection.
17         THE WITNESS:  I can't recall
18     ever hearing that.
19 BY MR. BAKER:
20     Q.   Go to the next page, please,
21 the last page of this document.  It says
22 here, "Testing of new system before we go
23 live."  It talks about, "Do we have the
24 proper resources to handle?"

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    Do you see that?
2    A.  I see "new system before go
3 live."  I see that.
4    Q.   Okay.  When you were at CVS,
5 and the system, the suspicious order
6 monitoring IRR-related system, was
7 centralized into one location, how many
8 people, when you left in 2012 were in
9 charge of reviewing the IRR daily?  How
10 many people?
11    MS. MILLER:  Objection.
12    THE WITNESS:  Towards the
13    end, I believe it was definitely
14    more than one.  It could have been
15    two, three.
16 BY MR. BAKER:
17    Q.   Do you know?
18    A.   No.  I can't -- I can't
19 recall 100 percent.
20    Q.   Okay.  At one time we
21 discussed it was one person.  That was
22 Mr. Mortelliti --
23    A.   Right.
24    Q.   -- in Lumberton.

Page 379

1    A.   Right.
2    Q.   That was back in 2010,
3 right?
4    A.   Yes.  The program evolved.
5    Q.   Right.  And then we talked
6 about it got sent out to the distribution
7 centers sometime in 2010 after the SOM
8 SOP was inserted.  Do you remember that?
9    A.   We did.
10    MS. MILLER:  Objection.
11 BY MR. BAKER:
12    Q.   Okay.  At some time during
13 2010, was it sent out to all the
14 distribution centers to be done?
15    A.   There was -- again, I can't
16 recall exact dates.  But there was a
17 period of time where the distribution
18 centers were involved in the process.
19    Q.   And then you remember I
20 showed you a document where it said that
21 in March of 2011 it was being moved to
22 Knoxville?  Do you remember that?
23    MS. MILLER:  Objection.
24    THE WITNESS:  I do recall

Page 380

1    you showing me a document that
2    said that.
3 BY MR. BAKER:
4    Q.   Okay.  And at that point,
5 was it just one person, two people, or
6 what?
7    MS. MILLER:  Objection.
8    Asked and answered.
9    THE WITNESS:  Yeah, I think
10    at that time I said it may have
11    been a couple of people.
12 BY MR. BAKER:
13    Q.   Do you know who the couple
14 of people were?
15    A.   Their names escape me.
16    Q.   Okay.  And it stayed there
17 until what period of time?
18    A.   Stayed where?
19    Q.   In Knoxville?
20    A.   I believe it was there -- as
21 far as when I left, I believe it was
22 still there.
23    Q.   Okay.  All right.  So when
24 you left do you know whether it was one

Page 381

1 person, two people, or more than two
2 people that were doing the IRR reviews?
3    MS. MILLER:  Objection.
4    Asked and answered.
5 BY MR. BAKER:
6    Q.   Do you know?
7    A.   I thought it was two, three
8 people doing it.
9    Q.   Okay.  Do you know one way
10 or the other?
11    A.   I -- I'm just trying to
12 think back.  I mean, it was --
13    Q.   Who should we ask that would
14 have better knowledge than you that you
15 think might know the answer to that
16 question better than you?
17    MS. MILLER:  Objection.
18    THE WITNESS:  It could be a
19    variety of resources.
20 BY MR. BAKER:
21    Q.   Okay.  Well, give me the --
22 give me the person, if you had to get
23 that answer from, that you think would be
24 the best person to ask that question of,

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1 based upon your knowledge of who worked
2 there at the time.
3        MS. MILLER: Objection.
4     This is Knoxville, Bill?
5        MR. BAKER: Correct.
6        MS. MILLER: Still?
7        MR. BAKER: Correct.
8        THE WITNESS: Probably look
9     at the human resource department
10     and look at job titles.
11 BY MR. BAKER:
12     Q.   How about Pam Hinkle? Would
13 she be somebody to ask that question to,
14 do you think?
15     A.   Yeah, you can probably ask
16 Pam.
17     Q.   Okay. Why would she be a
18 good person to ask? What was her
19 position?
20     A.   Because she would have been
21 overseeing the process.
22     Q.   In Knoxville?
23     A.   Yes.
24     Q.   Okay. Very good.

Page 383

1        All right. So you see down
2 on this list here, it says, "Are OV
3 orders included in the new system?"
4        Do you see that?
5     A.   Yes.
6     Q.   That's outside vendor
7 orders. I want you to assume that's what
8 that means. So that's being asked.
9        So at the time that you left
10 in 2012, October, were outside vendor
11 orders being included within the
12 suspicious order monitoring system at
13 CVS, to your knowledge?
14        MS. MILLER: Objection.
15     Asked and answered.
16        THE WITNESS: I don't
17     believe so.
18        MR. BAKER: Okay. I'm going
19     to take a break. And I may pass
20     it over to my partner here, Jimmy
21     DeRoche. Give me just a second to
22     review my notes.
23        MS. MILLER: Can we --
24        THE WITNESS: Ten minutes or

Page 384

1     so?
2        MR. BAKER: No, I just need,
3     like, two or three. I mean, if
4     y'all need more than that -- I'm
5     just, you know, going to sit here
6     and take a look at my notes.
7        THE WITNESS: If you don't
8     mind, I'm going to take a couple
9     minutes.
10        THE VIDEOGRAPHER: Going off
11     the record. The time is 3:33.
12        (Short break.)
13        THE VIDEOGRAPHER: We are
14     going back on the record.
15     Beginning of Media File 10. The
16     time is 3:43.
17        - - -
18        EXAMINATION
19        - - -
20 BY MR. DeROCHE:
21     Q.   Mr. Devlin, my name is Jim
22 DeRoche. I have some hopefully brief
23 follow-up questions for you.
24        First of all, where do you

Page 385

1 reside now again? I didn't hear that.
2     A.   I live in Pocasset, in
3 Massachusetts.
4     Q.   Okay. Is that a suburb of
5 Boston of some sort?
6     A.   It's actually part of Cape
7 Cod.
8     Q.   A-ha. Okay.
9        When did you come to
10 Washington?
11     A.   When did I come to
12 Washington?
13     Q.   Yeah.
14     A.   I arrived -- let's see,
15 today is Thursday, right?
16     Q.   Correct.
17     A.   Yeah, I arrived on Tuesday.
18     Q.   You arrived on Tuesday?
19     A.   Yes.
20     Q.   Okay. And what were you
21 doing for -- since -- between Tuesday and
22 today?
23     A.   I had some --
24        MS. MILLER: Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1  BY MR. DeROCHE:
2      Q.   Excuse me?  I didn't hear
3  what you said.
4          MS. MILLER:  Go ahead.
5  BY MR. DeROCHE:
6      Q.   You can answer the question,
7  sir.
8      A.   I -- I had some prep time.
9      Q.   So you prepared for this
10 deposition?
11     A.   Yes.
12     Q.   Okay.  You met with lawyers
13 here at the office we're sitting in; is
14 that correct?
15     A.   Yes.
16     Q.   And you met on -- did you
17 meet on Tuesday or did you arrive late
18 Tuesday?
19     A.   Briefly Tuesday.
20     Q.   And then you met on
21 Wednesday as well, spent all day here?
22         MS. MILLER:  Objection.
23 BY MR. DeROCHE:
24     Q.   You can answer.

Page 387

1      A.   Most of the day.
2      Q.   Okay.  You looked at
3  documents?
4      A.   Some documents, yes.
5      Q.   Okay.  You have an
6  understanding of what this case is about,
7  correct?
8          MS. MILLER:  Objection.
9          THE WITNESS:  Not -- not in
10         any great detail.  I mean high
11         level.  High level, but there's a
12         lot more I don't know than I do
13         know.
14 BY MR. DeROCHE:
15     Q.   Sure.  I think that applies
16 to most of us.
17         When did you find out that
18 you were being deposed in connection with
19 this case?
20     A.   Early December maybe.
21     Q.   Okay.  So you've known for
22 approximately a month that your
23 deposition was going to be taken?
24     A.   About that, yeah.

Page 388

1      Q.   Did you talk to any folks
2  from CVS who you used to work with, about
3  this deposition?
4      A.   No.
5      Q.   Other than the lawyers, have
6  you spoken to anybody else?
7      A.   My wife knows I'm here.
8      Q.   Other than her, no one else?
9      A.   My son and daughter know I'm
10 here.
11     Q.   Other than family, no
12 other -- no other individuals?
13     A.   That's about it.
14     Q.   Okay.  So you didn't try to
15 reach out to folks you used to work with,
16 like Ms. Hinkle or --
17     A.   No.
18     Q.   -- anybody else?
19     A.   No.
20     Q.   Judy Hughes?
21     A.   No.  No.
22     Q.   Do you stay in contact with
23 any people from CVS that you used to work
24 with?

Page 389

1      A.   Very few, but just an
2  occasional hello.  But not -- like I
3  really haven't seen people that I worked
4  with from CVS or -- so...
5      Q.   Did you leave on good terms
6  in your view?
7          MS. MILLER:  Objection.
8          THE WITNESS:  I mean I left
9          on my own.
10 BY MR. DeROCHE:
11     Q.   You don't have any animosity
12 towards CVS?
13         MS. MILLER:  Objection.
14         THE WITNESS:  No.  It was an
15         opportunity to be involved in a
16         lot of, you know, a lot of
17         responsibility and a lot of
18         project management work.  And I
19         think professionally it was a good
20         opportunity, and at the time a
21         better opportunity developed.
22 BY MR. DeROCHE:
23     Q.   Sure.  Do you have clients
24 in Washington DC that you came to see or

Highly Confidential – Subject to Further Confidentiality Review

Page 390

1 did you just come for this deposition?
2    A.   I came for the deposition.
3    Q.   So since Tuesday, you
4 focused on this deposition that we're
5 having here today?
6    A.   I've gone and -- getting
7 back to the hotel room, I've done some
8 work for other clients.
9    Q.   Okay.  All right.  I want to
10 try to understand where logistics loss
11 prevention fit in the -- in the hierarchy
12 of CVS.  I don't think I understand that
13 at all.
14       So can you explain logistics
15 loss prevention and where it fit in, in
16 terms of -- of the structure at CVS?
17    A.   Sure.  I was -- so I was a
18 part of the overall loss prevention
19 department.  And there is a field loss
20 prevention department which would focus
21 on stores.  There was logistics loss
22 prevention which focused, supported
23 distribution centers.  There is also some
24 corporate support around loss prevention

Page 391

1 also.  And I believe there also was some
2 loss prevention support for some of the
3 Caremark mail order sites when I was
4 present.
5    Q.   Okay.  And so logistics loss
6 prevention focused primarily on the
7 distribution centers?
8    A.   That was -- that was a --
9 you know, a big component.  I also
10 provided some support to some of the
11 Caremark mail order sites from a safety
12 standpoint.
13    Q.   That was under loss --
14 logistics loss prevention as well?
15    A.   It was.
16    Q.   Other than the safety
17 that -- oversight that you may have
18 provided to the Caremark mail order
19 division, otherwise besides that, you did
20 focus on the distribution centers?
21    A.   That was my primary focus.
22 I mean I had a variety of
23 responsibilities during my career.
24 Some -- some retail, some corporate.  But

Page 392

1 I always had the distribution centers as
2 a main part of what I was doing.
3    Q.   And when you took over as
4 director of logistics loss prevention,
5 were you sort of the top dog in the
6 logistics loss prevention department?
7    A.   I managed the department,
8 so...
9    Q.   And that was at least since
10 2005 you had held that position?
11    A.   Yeah, again as I testified
12 earlier, I mean there's typical --
13 typical corporate America.  I mean --
14    Q.   Sure.
15    A.   -- you can have same title
16 but different levels.
17    Q.   Great.
18    A.   So, you know, I was a
19 director level different in 2005 than say
20 a director level I was in, say, 2003.
21 But it was just a -- you know, it was
22 kind of an evolution as the company
23 continued to grow and even some of my
24 responsibilities grew.

Page 393

1    Q.   So the director level that
2 you attained in 2005 was, was that the
3 highest level -- director level --
4    A.   No.
5    Q.   -- in logistics loss
6 prevention?
7       MS. MILLER:  Give him a
8 chance to finish his question,
9 please.
10      THE WITNESS:  Oh, sorry.
11 BY MR. DeROCHE:
12    Q.   Highest level in logistics
13 loss prevention.
14    A.   There are -- you know, I
15 guess I was the director of logistics,
16 loss prevention.  As far as my position
17 goes on the director level, I was
18 probably in the middle of the levels of
19 directors, like there could have -- you
20 know, there could have been another --
21 there could have been -- like I could
22 have attained another higher level of
23 director and still be in logistics, loss
24 prevention.

Page 394

1    But there wasn't -- you
2  know, I certainly reported in to someone
3  else.  But that individual had, you know,
4  other responsibilities.
5    Q.   You reported to Judy Hughes,
6  I think you said; is that correct?
7    A.   Yes.
8    Q.   And was Ms. Hughes also
9  considered a director of logistics loss
10 prevention or did she have some other
11 title?
12   A.   I believe she was just
13 director of loss prevention.
14   Q.   Okay.  She was -- so
15 logistics loss prevention is a department
16 within loss prevention?
17   A.   It is.  It is.
18   Q.   She was at the loss
19 prevention level, as opposed to the
20 logistics loss prevention level?
21      MS. MILLER:  Frank, just
22   give him a chance --
23      MR. DeROCHE:  Yeah, sure.
24      MS. MILLER:  -- so you're

Page 395

1  not stepping on him.
2  BY MR. DeROCHE:
3    Q.   Trying to get a distinction
4  so I understand.  So in terms of
5  directors of logistics, loss prevention,
6  you were -- you were the top person of
7  logistics, loss prevention as of 2005?
8      MS. MILLER:  Objection.
9  BY MR. DeROCHE:
10   Q.   Is that correct?
11   A.   My title was director of
12 logistics, loss prevention.
13   Q.   You saw the SOP earlier that
14 mentioned that you were the one, the only
15 one, at least according to the SOP, that
16 was going to be reporting to the DEA any
17 suspicious orders identified and that
18 referred to you as the director of
19 logistics loss prevention.  Seems to
20 indicate -- seems to indicate that you
21 are the top dog in logistics loss
22 prevention as of at least when that SOP
23 was prepared in 2011.
24      MS. MILLER:  Objection.

Page 396

1  BY MR. DeROCHE:
2    Q.   You wouldn't disagree with
3  that?  You were -- you were the top guy
4  in logistics loss prevention at that
5  point?
6      MS. MILLER:  Objection.
7      THE WITNESS:  As a -- you
8    know, as a part of, keeping in
9    mind I was still in the overall
10   loss prevention department.
11 BY MR. DeROCHE:
12   Q.   Sure.  I understand.
13 Everyone needs got a boss.
14   A.   Right.  And even -- you
15 know, and --
16   Q.   At least at home, but be
17 that as it may.
18   A.   Even, like, my business card
19 would say director of logistics loss
20 prevention.  You know, from a -- I guess
21 a budgetary payroll standpoint, it may
22 just say director loss prevention.
23 Director 1 or Director 2.  CVS was big --
24 changed, you know, grading systems and

Page 397

1  whatnot so.
2    Q.   I understand it was a
3  multi-billion dollar company at the time
4  that you were there.  Probably even
5  bigger now.
6      MS. MILLER:  Objection.
7  BY MR. DeROCHE:
8    Q.   So there was many levels of
9  corporate structure, I would assume, that
10 you had to answer through?
11      MS. MILLER:  Objection.
12      THE WITNESS:  Can you repeat
13   that?
14 BY MR. DeROCHE:
15   Q.   Did you have -- let's put it
16 this way.  Logistics, loss prevention,
17 did you have a budget?
18   A.   Yes.
19   Q.   And you were ultimately
20 responsible for budget issues, I take it,
21 as the director?
22   A.   For my piece of the pie.
23   Q.   Right.
24   A.   The overall loss prevention

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1 budget, I was tasked with managing that.
2  Q. Okay. You knew that at
3 least with respect to the Rx distribution
4 centers, that they had a license that was
5 issued by the Drug Enforcement Agency,
6 correct?
7  A. Yes.
8  Q. And were you responsible as
9 director of logistics, loss prevention in
10 ensuring that those licenses were
11 maintained?
12  MS. MILLER: Objection.
13  THE WITNESS: I'm not sure
14  quite what you mean by maintained.
15 BY MR. DeROCHE:
16  Q. Excuse me?
17  A. I'm not quite sure what you
18 mean by maintained.
19  Q. That each of the -- each of
20 the Rx distribution centers continued to
21 be licensed by the Drug Enforcement
22 Agency to distribute controlled
23 substances.
24  MS. MILLER: Objection.

Page 399

1  THE WITNESS: There was a --
2  you know, people responsible for
3  licensing and registration within
4  company.
5 BY MR. DeROCHE:
6  Q. Okay. So logistics loss
7 prevention didn't handle that?
8  A. No. Like if you, like to
9 renew a DEA license, I wouldn't be
10 involved in that.
11  Q. Okay. What about complying
12 with the conditions upon which that
13 license is issued?
14  MS. MILLER: Objection.
15  THE WITNESS: It could be
16  maybe certain components, but
17  not -- not full responsibility for
18  all of it.
19 BY MR. DeROCHE:
20  Q. Okay. The component -- one
21 of the components -- one of the
22 conditions, I like to call it, to the
23 license is that the distribution centers
24 design and maintain a system to identify

Page 400

1 suspicious orders?
2  MS. MILLER: Objection.
3 BY MR. DeROCHE:
4  Q. You're aware of that, right?
5  MS. MILLER: Objection.
6  THE WITNESS: As per the --
7  yes.
8 BY MR. DeROCHE:
9  Q. Okay. And you understood
10 that there was, in fact, a division
11 within the DEA that was called the
12 department of diversion that focused on
13 the diversion of controlled drugs from
14 the legal use of those drugs. You're
15 aware that there's a diversion
16 department?
17  A. I wouldn't necessarily use
18 that term. I mean, just -- to me, the
19 DEA was the DEA.
20  Q. Well, they sent diversion
21 investigators at times to inspect --
22  A. Right, right.
23  Q. Right. So you know --
24  A. But we just -- we always

Page 401

1 just said the DEA is here.
2  Q. DEA is showing up, knocking
3 on the door?
4  A. Right. We didn't I guess
5 formally get into the exact title. It
6 was just, the DEA is here.
7  Q. And you understood that the
8 concern of DEA was that controlled
9 substances like hydrocodone combination
10 products not be diverted into street
11 drugs, for lack of a better term, right?
12  MS. MILLER: Objection.
13 BY MR. DeROCHE:
14  Q. You understood that, right?
15  MS. MILLER: Objection.
16  THE WITNESS: I mean, I
17  looked at my role to ensure the
18  safety and security of control
19  drugs, you know, upon receipt into
20  the distribution center, and then
21  to upon delivery to the CVS retail
22  store.
23 BY MR. DeROCHE:
24  Q. Except the retails -- well,

Page 402

1 part of the responsibility as you've been
2 talking about all day today, for a
3 distribution center, was to ensure that
4 orders were legitimate orders that
5 weren't going to lead to diversion.
6 You're aware of that?
7          MS. MILLER: Objection.
8          THE WITNESS: Again, I think
9      I spoke earlier. I was protecting
10     the integrity, you know, from a
11     security, safety standpoint and to
12     ensure that they are, you know,
13     falling into the proper hands.
14 BY MR. DeROCHE:
15     Q.   Correct. Because if they
16 fall into the -- not the proper hands,
17 again you have things like an epidemic of
18 opioid use of prescription drugs.
19          MS. MILLER: Objection.
20 BY MR. DeROCHE:
21     Q.   And obviously you don't want
22 that, right?
23          MS. MILLER: Objection.
24          THE WITNESS: No. I mean,

Page 403

1      my -- my focus really was, you
2      know, during my time there, I
3      mean, it was, you know, preventing
4      theft. I mean, that was, you
5      know -- as far as other terms or
6      whatnot, it was just, you know, we
7      discussed, you know, how to ensure
8      the safety and security of the
9      control drugs.
10 BY MR. DeROCHE:
11     Q.   I understand that, you know,
12 theft can be one component by which drugs
13 are diverted. But you recognize, don't
14 you, and didn't you recognize at the
15 time, that diversion could occur through
16 other means besides theft?
17          MS. MILLER: Objection.
18     Asked and answered.
19          THE WITNESS: Ultimately,
20     it's theft.
21 BY MR. DeROCHE:
22     Q.   Even if the drugs are paid
23 for to CVS?
24          MS. MILLER: Objection.

Page 404

1          THE WITNESS: I guess part
2      of it would be a case-by-case
3      basis. You would have to look at
4      how was it paid for. Was it, you
5      know, a legitimate prescription.
6      I mean, there's a lot -- a lot
7      goes into it. I've always, you
8      know shied away from just blanket
9      statements.
10 BY MR. DeROCHE:
11     Q.   Sure.
12     A.   I mean, just -- each
13 situation, it's separate and, you know,
14 you have to evaluate the facts.
15     Q.   Sure. There could be
16 varying ways through which drugs are
17 diverted besides theft. You just
18 mentioned one, illegitimate prescription.
19 Even if it's brought in, filled, and the
20 full price is paid to CVS, that could be
21 an instance of diversion, just like if
22 someone stole it off the shelf. You
23 agree with that, right?
24          MS. MILLER: Objection.

Page 405

1          THE WITNESS: Again, I come
2      back to, you know, having -- I'm
3      responsible to protect the
4      controls and the safety and
5      security and make sure they fall
6      into the proper hands. I mean,
7      that's -- that's the ultimate
8      goal.
9 BY MR. DeROCHE:
10     Q.   Right. And that was one of
11 the conditions to the distribution
12 centers getting their license from the
13 DEA to distribute these drugs, is that
14 CVS played by the rules and did its part
15 to police and prevent diversion of those
16 drugs?
17          MS. MILLER: Objection.
18 BY MR. DeROCHE:
19     Q.   You would agree, right?
20     A.   You know, I -- you know, I
21 guess when I was involved I was, you
22 know, certainly to ensure we were meeting
23 the requirements of the DEA regulations.
24 I mean that's -- that's what, you know,

Page 406

1 my focus was always on.
2 Q. Okay. In 2006, when you
3 were the director of logistics loss
4 prevention at CVS, what steps were being
5 taken by CVS to prevent the diversion of
6 controlled substances, if you can recall?
7 A. From what I can recall, I
8 know there was certainly instructions to
9 the employees that were fulfilling any
10 control drug order, any, you know, who
11 felt as -- you know, any excessive
12 quantity, in which I can't recall an
13 actual number that would be. But any,
14 you know, what, you know, the employees,
15 after a while you get used to, you know,
16 filling orders. So they would, you know,
17 start to get a feel for, you know, this
18 is a -- this seems to be an average
19 order. Or if they felt that it was an
20 above average order, then they were
21 instructed to notify their supervisor who
22 could be a pharmacy supervisor or
23 pharmacy manager.
24 And then from there, you

Page 407

1 know, to, you know, research, you know,
2 why, you know, why is this order, you
3 know, excessive.
4 Also, I know the -- the
5 field had -- and I think I testified
6 earlier, I don't recall all the details
7 around the Prescription Drug Monitoring
8 Report. That would also play into the --
9 you know, what I would consider overall
10 prevention or integrity of orders.
11 Q. Anything else?
12 A. That -- you know, I'm sure
13 there were probably other measures in
14 place, but that's really what I recall at
15 this time.
16 Q. With respect to the folks in
17 the DC that were picking and filling the
18 orders from the control cage, is that
19 what you're talking about when you say
20 these personnel --
21 A. Yes.
22 Q. -- were expected to report?
23 Yes?
24 A. Yes. The employees.

Page 408

1 Q. How -- how were they
2 expected to make those reports?
3 A. They would verbally
4 communicate to their supervisor.
5 Q. What training did they
6 receive in terms of identifying
7 suspicious orders?
8 A. That's something I was not
9 involved in.
10 Q. Was that part of logistics
11 loss prevention department to provide
12 that training?
13 A. It probably would be more of
14 an operational component.
15 Q. So who was supposed to
16 provide that training?
17 A. I believe it would be up to
18 the pharmacy supervisor or pharmacy
19 manager.
20 Q. Was there any written
21 training material at that time?
22 A. I don't recall.
23 Q. Was there any written
24 procedure instructing the pickers and

Page 409

1 packers how to identify suspicious
2 orders?
3 A. I can't recall.
4 Q. Did they -- did the pickers
5 and packers have access to dispensing
6 data for the pharmacies that they were
7 picking the orders for?
8 A. The dispensing data.
9 Q. Correct.
10 A. Can you -- can you explain
11 that?
12 Q. Dispensing data, you don't
13 know what dispensing data means?
14 A. I'm just -- how are you
15 using it?
16 Q. What's that?
17 A. How are you using it?
18 Q. I'm using it in the sense
19 that CVS has dispensing data, meaning
20 data showing how a pharmacy has dispensed
21 the drugs that it's selling to its
22 customers in terms of who they are, where
23 they came from --
24 A. Yeah.

Page 410

1    Q.  -- what they purchased, how
2  often they purchased it, and so forth.
3  That, that kind of data, pharmacy level
4  data.
5        MS. MILLER:  Give him a
6    chance --
7  BY MR. DeROCHE:
8    Q.   Do you have access to that?
9        MS. MILLER:  -- to finish
10   his question.
11       Objection.
12       THE WITNESS:  I'm not aware
13   of a report, per se.  But I -- I
14   do know the employees that worked
15   in the control drug cage.
16       They were, some of them, you
17   know, better seasoned employees.
18   And they would -- you know,
19   they -- they would get a feel.
20   You know, they would get a feel
21   for, you know, some average --
22   kind of what average history and
23   what would seem outside the
24   average.

Page 411

1        I mean, they would -- they
2    would -- over a period of time
3    they would get a feel for that.
4  BY MR. DeROCHE:
5    Q.   The average meaning, what do
6  you mean by average?
7    A.   As far as what a typical
8  store would order from a control drug
9  standpoint.
10   Q.   So you're saying they'd get
11 a feel for what -- say they have a
12 hundred stores that they are picking
13 control drugs for.
14   A.   Right.
15   Q.   What the average would be?
16       MS. MILLER:  Give him a
17   chance -- just for the
18   transcript -- to finish his
19   question before you speak.
20 BY MR. DeROCHE:
21   Q.   You can answer.
22   A.   It's just they would -- you
23 know, again, they -- they would get a
24 feel for what stores were ordering.  You

Page 412

1  know, it wasn't -- I'm not saying it was
2  a report, per se.  They would just --
3  they would -- they would get a feel.  I
4  mean they were seasoned -- seasoned,
5  well-trained employees.  And it's a -- I
6  know in the distribution center, you
7  know, it was -- you know, that was viewed
8  as a desirable position.  You know, it
9  was, you know, good quality employees
10 that were involved in that.
11   Q.   They are -- they are picking
12 control drugs in the control cage; is
13 that correct?
14   A.   In most instances, yes.
15   Q.   There are not picking
16 noncontrolled drugs?
17   A.   They could be times, but the
18 control drugs would be picked separately.
19   Q.   Okay.  So generally they are
20 not going to know what the volume of
21 noncontrolled drugs were being shipped to
22 a particular store, to compare that to
23 the control drugs for the most part?
24   A.   I mean, again, it would

Page 413

1  depend on the size of the facility.  You
2  know, the volume being produced.  You
3  know, you -- I don't think it's
4  necessarily that, A, an employee in the
5  control drug cage was there all day.  And
6  I -- you know, I'd have to defer to
7  operational people to comment more
8  intelligently on this than me.
9        But, you know, you know,
10 from my observations and what I can
11 recall from years ago, that you could
12 have someone that's assigned to the
13 control drug cage and, you know, they
14 could be in there for one hour and then
15 the rest of the day could be picking in
16 the noncontrol drug area.
17   Q.   When a CVS DC receives its
18 license from the DEA to distribute
19 Schedule III drugs, the requirement was
20 that it design and operate a system to
21 expose suspicious orders and to identify
22 suspicious orders and to act on them.
23       MS. MILLER:  Objection.
24 BY MR. DeROCHE:

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1    Q.   So I guess what I'm saying
2  is, do you know what the word "design"
3  means?
4         MS. MILLER:  Objection.
5         THE WITNESS:  Design, I mean
6      I would look at having processes
7      in place.
8  BY MR. DeROCHE:
9      Q.   So someone has to
10 consciously, in other words, make a
11 decision, we're going to -- we're going
12 to -- we're going to design this system
13 with the goal in mind of identifying
14 suspicious orders?
15        MS. MILLER:  Objection.
16 BY MR. DeROCHE:
17     Q.   And that's been a
18 requirement since 1972?
19        MS. MILLER:  Objection.
20 BY MR. DeROCHE:
21     Q.   So do you know who designed
22 the system you just mentioned of having
23 the pickers and packers develop some sort
24 of idea over time of what an average

Page 415

1  order might look like to compare to the
2  orders they are filling?
3         MS. MILLER:  Objection.
4  BY MR. DeROCHE:
5      Q.   Who designed that system, do
6  you know?
7         MS. MILLER:  Objection.
8         THE WITNESS:  I wouldn't
9      know.
10 BY MR. DeROCHE:
11     Q.   Do you know if anybody
12 designed that system?
13        MS. MILLER:  Objection.
14        THE WITNESS:  I wouldn't
15     know.
16 BY MR. DeROCHE:
17     Q.   Do you understand what
18 quality control means?
19        MS. MILLER:  Objection.
20        THE WITNESS:  Yes, in some
21     context.
22 BY MR. DeROCHE:
23     Q.   Yeah, I understand.  It can
24 mean a lot of different things depending

Page 416

1  on what you're trying to assess.
2      A.   Right.  Like professionally
3  I've learned quality control of, you
4  know, one company is different than
5  quality control at another company.
6      Q.   But in general, it's a
7  method by which you test to see if a
8  system that you put in place is actually
9  doing what it is intended, you'd agree
10 with that, a fair assessment of what
11 quality control might mean?
12        MS. MILLER:  Objection.
13        THE WITNESS:  Can you repeat
14     that?
15 BY MR. DeROCHE:
16     Q.   Yeah.  Quality control means
17 you're looking at a system you've put in
18 place and you're trying to assess whether
19 or not it's fulfilling its -- what you've
20 intended the system to do.
21        MS. MILLER:  Objection.
22        THE WITNESS:  You can also,
23     to have quality control, just
24     built into normal operational

Page 417

1      practices.
2  BY MR. DeROCHE:
3      Q.   Sure.  Do you know if there
4  was any quality control system that was
5  built into the pickers and packers trying
6  to figure out what's suspicious and
7  what's not system?
8         MS. MILLER:  Objection.
9         THE WITNESS:  I know from a
10     quality control standpoint, when
11     they came to --
12 BY MR. DeROCHE:
13     Q.   I'm sorry.  What's that?
14 I -- I missed that.  I apologize.
15     A.   I was giving you time to
16 read.
17     Q.   Go ahead.
18     A.   From a quality control
19 standpoint, and I know there were
20 processes in place to double-check the
21 controls being picked to make sure that
22 they were accurate.
23     Q.   Sure.  Picking accuracy I
24 understand, but --

Page 418

1    A.   So -- but -- so if you
2 had --
3    Q.   They were scored, right, for
4 accuracy in terms of picking and I
5 understand all that.  But I'm not talking
6 about that.
7         I'm talking about whether or
8 not you did any quality control at all to
9 decide -- to determine whether or not
10 leaving it up to the pickers and packers
11 to somehow identify suspicious orders
12 actually was an efficient and appropriate
13 system to actually try to identify
14 suspicious orders.
15        MS. MILLER:  Objection.
16 BY MR. DeROCHE:
17   Q.   Was there any quality
18 control on that score?
19        MS. MILLER:  Objection.
20        THE WITNESS:  You know,
21   again, you know, as I mentioned
22   earlier, there were various
23   components that I say could tie
24   into suspicious order monitoring,

Page 419

1   you know, not only the
2   pickers-packers, but reports on
3   the field level.
4        But I would -- I would say
5   as far as the double-checks that
6   go around the picking of controls
7   and if you had one employee that
8   had an excessive amount of a
9   control item, and yet that's
10   being -- that order is being
11   double-checked by another
12   employee, that could be another
13   opportunity to -- to flag, hey,
14   wait a minute, you know, maybe we
15   better get our supervisor involved
16   before we let this go.
17 BY MR. DeROCHE:
18   Q.   I understand that.  That's
19 picking accuracy again.
20   A.   Yes.
21   Q.   I understand that someone
22 checks that to make sure that what's
23 ordered is what's in the tote.  And I'm
24 asking you -- and again, even with that

Page 420

1 second person saying, "Well, there seems
2 to be a lot of hydrocodone in this tote,
3 maybe we should look at it," do you know
4 if -- first of all, do you know of any
5 instance when that actually happened,
6 that you can recall?  Specific instance,
7 I mean.
8        MS. MILLER:  Objection.
9        THE WITNESS:  That's -- I
10   wouldn't -- I wouldn't be involved
11   in that.
12 BY MR. DeROCHE:
13   Q.   Okay.  And in terms of the
14 use of the PDMR, was there any kind of
15 written policy that incorporated the PDMR
16 into any kind of system to identify
17 suspicious orders?
18   A.   I don't recall the PDMR
19 procedures.  It's not a system that I
20 used or I was familiar with, so I --
21   Q.   Your answer is no?
22   A.   I really couldn't answer
23 that.
24   Q.   Okay.  Are you aware of any

Page 421

1 suspicious orders that were reported to
2 the DEA during the entire time that you
3 were at CVS --
4        MS. MILLER:  Objection.
5        Asked --
6 BY MR. DeROCHE:
7    Q.   -- that emanated from the
8 pickers and packers process that you
9 mentioned?
10   A.   Not that I can recall.
11   Q.   Do you recall any instance
12 when a picker and packer flagged an order
13 that was anything other than an excessive
14 amount?  In other words, an unusual
15 amount.
16   A.   Again, I wouldn't have
17 exposure to that in the position that I
18 was in.
19   Q.   You were aware that, at
20 least from the DEA standpoint, looking
21 solely at large amount, large volume
22 alone wasn't good enough in terms of
23 complying with the regulations requiring
24 a system in place to identify suspicious

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1  orders.  You're aware of that?
2      MS. MILLER:  Objection.
3      THE WITNESS:  There were --
4  from, again, a high level, I know
5  there were multiple components
6  that went into what could be a
7  potentially suspicious situation.
8  BY MR. DeROCHE:
9      Q.  Unusual size is only one of
10 those?
11     A.  That could be one.
12     Q.  Unusual frequency, correct?
13     A.  Sounds accurate.
14     Q.  Unusual pattern, you know,
15 an order that deviates from normal
16 pattern?
17     A.  That could be a component.
18     Q.  In 2008, the Buzzeo firm
19 delivered an algorithm to CVS that was
20 intended to be incorporated into the
21 ordering system to identify suspicious
22 orders, right?
23     A.  I believe around that time
24 frame.

Page 423

1      Q.  And --
2      MS. MILLER:  Objection.
3  Sorry for the late objection.
4  BY MR. DeROCHE:
5      Q.  That suspicious order
6  monitoring algorithm that was delivered
7  looked at essentially a six-month history
8  of what the store had ordered, did a
9  bunch of calculations, spit out a score,
10 that scored the order in terms of the
11 likelihood that it was suspicious.  Is
12 that a fair summary of what that was
13 intended to do?
14     MS. MILLER:  Objection.
15     THE WITNESS:  I think it was
16 a part.  But I'm not 100 percent
17 sure as far as the six-month
18 period goes.
19 BY MR. DeROCHE:
20     Q.  Well, you understood that
21 the initial -- the original algorithm
22 that came looked at six months.  Then it
23 was retuned.  It moved to a 12-month
24 history.  Are you aware of that?

Page 424

1      A.  Yeah.  Again, not -- not
2  aware of dates.  And I think as I've
3  mentioned before I think --
4      Q.  Sure?
5      A.  -- there was an evolution of
6  the process.
7      Q.  Right.  And the evolution
8  was --
9      A.  Changes made.
10     Q.  Right.  It was changed at
11 the time it was retuned.  We looked at
12 the retunement document a little bit
13 earlier.  It was moving from NDC or item,
14 looking then at active ingredient, and
15 moving from six months to 12 months?
16     MS. MILLER:  Objection.
17 BY MR. DeROCHE:
18     Q.  Those were the two major
19 changes when the retunement occurred,
20 right?
21     MS. MILLER:  Objection.
22     THE WITNESS:  I mean, there
23 were changes.  I mean, those are a
24 couple of changes I can, you know,

Page 425

1  recall.  I can't recall the exact
2  time frame.  But that's safe to
3  say.
4  BY MR. DeROCHE:
5      Q.  Safe to say.  Okay.  So if
6  we look at an IRR.  And I know from
7  looking at the e-mail that we saw earlier
8  at one point when the IRR was turned off
9  for the rest of the country, two folks
10 continued to get the IRR, Mr. Mortelliti
11 and yourself.  So I assume at that time,
12 you at least were receiving the IRR and
13 were familiar generally with the format.
14     MS. MILLER:  Objection.
15 BY MR. DeROCHE:
16     Q.  Correct?
17     MS. MILLER:  Objection.
18     THE WITNESS:  I may have
19 been receiving it, but I was -- I
20 was not involved in the day-to-day
21 review of the report.
22 BY MR. DeROCHE:
23     Q.  We have some giant size
24 documents here.  Don't blame me.

Page 426

1       (Document marked for
2  identification as Exhibit
3  CVS-Devlin-P-201.)
4       MR. DeROCHE:  Counsel is
5  going to get hers in a minute.
6  It's poster size.
7       MS. MILLER:  What's the
8  exhibit number?
9       MR. DeROCHE:  201.
10      MS. MILLER:  201?
11      MR. DeROCHE:  Correct.
12 BY MR. DeROCHE:
13      Q.   We've handed you what we've
14 now marked as Exhibit 201.
15      And this bears a CVS
16 production number of 100763.  It appears
17 to be an IRR for 12/14/2010; is that
18 correct?
19      A.   That's what's stated here,
20 yes.
21      Q.   And it appears to be
22 directed to the Indianapolis distribution
23 center, correct?
24      A.   That's what it states, yes.

Page 427

1       Q.   Okay.  Are you familiar with
2  a gentleman named Terrence Dugger?
3       A.   Yes.
4       Q.   Okay.  And what was
5  Mr. Dugger?
6       A.   He was a loss prevention
7  manager.
8       Q.   At the Indianapolis DC?
9       A.   At the time, yes.
10      Q.   Okay.  Now, if you look
11 at -- first of all, what's the report ID
12 number?
13      MS. MILLER:  Objection.
14 BY MR. DeROCHE:
15      Q.   Do you see that, on the
16 second page, 100764?  Report ID.
17      A.   What number?
18      Q.   The report ID number.
19 Report ID designation.  It's not just
20 numbers.
21      A.   BIP006A.  Okay.
22      Q.   Are you familiar with the
23 report that bears that designation?
24      MS. MILLER:  Objection.

Page 428

1       THE WITNESS:  I do not have
2  the report numbers memorized, so I
3  can only take it for what the
4  document states.
5  BY MR. DeROCHE:
6       Q.   Okay.  Let's go to the third
7  page now that's a table on the third page
8  of Exhibit 201, page that bears 10765 as
9  the Bates number.
10      MS. MILLER:  I think it's
11 100765.
12      MR. DeROCHE:  100765,
13 correct, yeah.
14 BY MR. DeROCHE:
15      Q.   Do you know how to interpret
16 this table?
17      A.   I wouldn't.
18      Q.   Do you know what Mr. Dugger
19 was supposed to do with this report when
20 he received it?
21      MS. MILLER:  Objection.
22      THE WITNESS:  I'm not sure,
23 you know, as far as what time
24 frame this was.

Page 429

1  BY MR. DeROCHE:
2       Q.   Well, the date is on it,
3  12/14/2010.
4       A.   Right.  Well, I'm not sure
5  as far as time frame and who, like who
6  was reviewing, who was not reviewing the
7  report.
8       Q.   Well, if you remember
9  correctly the documents you looked at
10 earlier, I don't want to go back over
11 them, trust me.  But I believe we
12 established during that prior testimony
13 that somewhere around September 2010, the
14 process was shifted to the individual DCs
15 from being reviewed centrally in New
16 Jersey.
17      MS. MILLER:  Objection.
18 BY MR. DeROCHE:
19      Q.   Do you recall that testimony
20 and the documents that established that?
21      MS. MILLER:  Objection.
22 BY MR. DeROCHE:
23      Q.   And I guess that would be
24 consistent with the notion that

Page 430

1 Mr. Dugger in Indianapolis is now getting
2 the IRR as of December 2010, correct?
3         MS. MILLER: Objection.
4         THE WITNESS: Again, I know
5 there were some changes and I know
6 even with the documents, I guess,
7 you know, I'm not sure exactly
8 when or -- I also know at this
9 time the pharmacy manager, and I'm
10 theorizing here, probably would
11 have received the report also.
12 The pharmacy manager had a role in
13 this.
14 BY MR. DeROCHE:
15     Q.   Okay. Mr. Dugger may have
16 enlisted the pharmacy manager to do the
17 review for him?
18         MS. MILLER: Objection.
19         THE WITNESS: No. I'm
20 saying the pharmacy manager may
21 have been doing the review.
22 BY MR. DeROCHE:
23     Q.   Okay. So even though it was
24 directed to Mr. Dugger, the pharmacy

Page 431

1 manager was the actual person at the DC
2 who would have handled the review of the
3 IRR?
4         MS. MILLER: Objection.
5         THE WITNESS: There was --
6 and again, I just, I just can't
7 recall the exact dates. There was
8 a period of time where the
9 pharmacy manager would have also
10 received the report.
11         So if -- I know you're
12 showing me a report that is sent
13 to Mr. Dugger. There's probably
14 another report out there, same
15 report, that probably would have
16 gone to the pharmacy manager.
17 BY MR. DeROCHE:
18     Q.   So they would have printed
19 it twice at the DC?
20     A.   They -- they would have.
21     Q.   In terms of the coefficients
22 that are used, that are identified on
23 here, they are called model weight if you
24 look at the table?

Page 432

1         MS. MILLER: What page are
2 you on now?
3         MR. DeROCHE: Again, same
4 page. I haven't changed.
5         MS. MILLER: Oh. Apologies.
6 I changed.
7 BY MR. DeROCHE:
8     Q.   Do you see that?
9     A.   I see where it says model
10 weight, yes.
11     Q.   Okay. And those are the
12 coefficients that were provided to CVS by
13 the outside vendor, the Buzzeo related
14 firm?
15     A.   I believe so.
16     Q.   And when those coefficients
17 were provided, as you mentioned earlier,
18 they were developed through the use of
19 statisticians doing an analysis of data
20 that was provided to Buzzeo by CVS?
21         MS. MILLER: Objection.
22         THE WITNESS: I -- I believe
23 that was a component of their
24 work.

Page 433

1 BY MR. DeROCHE:
2     Q.   And you -- you mentioned
3 earlier, I think a number of times, that
4 you were happy to defer to the experts in
5 the field, referring to Buzzeo, in terms
6 of the development of an algorithm that
7 would appropriately identify a --
8 potential suspicious orders?
9     A.   I think I testified that I
10 did not present myself as a statistician.
11     Q.   Mm-hmm. And you would defer
12 to Buzzeo on that -- on that score?
13         MS. MILLER: Objection.
14         THE WITNESS: I -- I did not
15 put forth an algorithm.
16 BY MR. DeROCHE:
17     Q.   Now, were you familiar with
18 the score, and you'll see a score
19 referenced, the last box on the page,
20 10 -- 100765.
21         MS. MILLER: Objection.
22 BY MR. DeROCHE:
23     Q.   The score is the last -- the
24 last row.

Page 434

1       MS. MILLER: Objection.
2  Asked and answered.
3 BY MR. DeROCHE:
4     Q. Do you see -- do you see
5 that, sir?
6       MS. MILLER: Objection.
7 We've been through this multiple
8 times.
9       MR. DeROCHE: We haven't
10 been through this. Note your
11 continuing objection. We're not
12 going to agree on your
13 interpretation of what the subject
14 matter covered previously was.
15      We're talking about the same
16 lawsuit. That's probably as
17 broadly as you want to interpret
18 it. We'll note a continuing
19 objection to all my questions if
20 you want, but I'm going to
21 continue without interruption.
22       MS. MILLER: I'm just -- I
23 understand. I have a right to
24 object.

Page 435

1       MR. DeROCHE: Good enough.
2 BY MR. DeROCHE:
3     Q. The row is -- last row. You
4 see the score there?
5     A. I see the last row.
6     Q. Okay. And it describes
7 essentially what the score is intended to
8 show. Do you see that?
9     A. Under description?
10     Q. Correct. Why don't you read
11 that into the record so the folks on the
12 jury can understand what we're talking
13 about.
14     A. Okay. So under score, it
15 says, "Score decides if an order is
16 suspicious or not. If it's" -- "if it's
17 greater than a threshold value, currently
18 0.15, the order is flagged as
19 suspicious."
20      As I think I've mentioned
21 before, as part of the evolution of the
22 program, I think the terminology that
23 we're -- we're using which, you know,
24 should have said potentially suspicious,

Page 436

1 but that was a change that was made later
2 on.
3     Q. I'm not going to quibble
4 with you over the language. I can
5 understand that. But it says right in
6 there, currently a score of .15.
7       MS. MILLER: Objection.
8 BY MR. DeROCHE:
9     Q. And that was what was
10 recommended by Buzzeo, correct?
11       MS. MILLER: What -- where
12 are you -- I'm sorry, I'm not
13 saying .15 in the document.
14       MR. DeROCHE: All right.
15 Well, he read it into the record.
16       MS. MILLER: Oh, I see -- I
17 apologize. I see it now.
18 BY MR. DeROCHE:
19     Q. And the problem is on the --
20 in that column it says model weight.
21 What's the score that's indicated there?
22     A. On the last column model
23 weight says 0.65.
24     Q. And at this point in time,

Page 437

1 do you know if CVS was using .65 instead
2 of .15?
3     A. I would not know.
4     Q. Go to Page 100767. And
5 let's look at the last flagged store on
6 that page. Let me know when you're
7 there.
8     A. 767?
9     Q. Correct.
10     A. Okay.
11     Q. Are you there?
12     A. I am here.
13     Q. And first of all, this
14 appears to be a hydrocodone drug that is
15 being flagged here, correct?
16     A. I see the abbreviation of
17 that in the description, yes.
18     Q. Right. It's supposed to be
19 a 7.5-milligram dose of -- of
20 hydrocodone?
21     A. Yes.
22     Q. Okay. And according to the
23 SOP, someone at the DC, you say it may be
24 the pharmacy manager, is going to look at

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1 this, and they are going to decide does
2 this require further review or is it
3 going to be blessed and shipped.
4        MS. MILLER: Objection.
5 BY MR. DeROCHE:
6    Q.   Correct?
7    A.   Yeah, again, just not -- not
8 recalling dates and times, but if there
9 was a concern, then it'd be, certainly,
10 you know --
11   Q.   It would be escalated?
12   A.   -- further -- further review
13 would take place.
14   Q.   Escalated, I think it was
15 called in the SOP, or something like
16 that --
17   A.   Yeah, escalated to involve,
18 perhaps consultation with people in the
19 field.
20   Q.   Correct.  There are a number
21 of things that could be done at that
22 point --
23   A.   Sure.
24   Q.   -- once it's escalated.

Page 439

1        And because it was
2 escalated, there would be documentation
3 of some type that would be retained so if
4 anybody asked later, in particular, maybe
5 the DEA, CVS could show, yes, we did our
6 duty and we looked at this order and we
7 escalated it and we did some due
8 diligence on this order to satisfy
9 ourselves that it's not suspicious,
10 correct?
11        MS. MILLER: Objection.
12        THE WITNESS: You know, I
13    can't recall the exact process,
14    but I -- I know there was -- you
15    know, there was a review process.
16 BY MR. DeROCHE:
17   Q.   Retention of two years, I
18 believe was said?
19   A.   Yes. Yes.
20   Q.   So it'd be somehow attached
21 or noted.  And even it could be even
22 noted by hand on the IRR itself --
23   A.   Yes, yes.
24        MS. MILLER: Just, wait --

Page 440

1 BY MR. DeROCHE:
2    Q.   -- correct?  You've seen
3 that?
4        MS. MILLER: -- and give him
5    a -- give him a chance to finish
6    his question before you answer,
7    please.
8 BY MR. DeROCHE:
9    Q.   I saw hundreds of IRRs, some
10 of them had handwritten notes.  And
11 you've seen that too, I assume --
12        MS. MILLER: Objection.
13 BY MR. DeROCHE:
14   Q.   -- where the analyst who
15 actually did the escalated review wrote
16 down what they -- what they looked at.
17 That's not unusual, right?
18        MS. MILLER: Objection.
19        THE WITNESS: I can't -- I
20    can't recall a particular
21    circumstance, but I know there was
22    a file kept.
23 BY MR. DeROCHE:
24   Q.   Correct.

Page 441

1        MS. MILLER: Jim, can we
2    take a break?
3 BY MR. DeROCHE:
4    Q.   So if they're --
5        MR. DeROCHE: Actually, let
6    me finish with this exhibit, then
7    we can take a break.
8        MS. MILLER: We've been
9    going for -- that would be great.
10        MR. DeROCHE: All right.
11   Let me -- let me finish with this
12    one, then we'll -- we'll --
13    hopefully I'll not have too long.
14 BY MR. DeROCHE:
15   Q.   All right.  So pharmacy
16 manager or someone at the distribution
17 center would have looked at this IRR and
18 selected the flags for escalation, and
19 those flagged and escalated orders would
20 have shown some documentation showing that they
21 were looked at and deemed not
22 suspicious --
23        MS. MILLER: Objection.
24 BY MR. DeROCHE:

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1    Q.  -- correct?
2    A.  I can't recall on the
3 suspicious versus non-suspicious or
4 potentially suspicious.
5    Q.  I understand that all of
6 these, according to the algorithm, have
7 already been flagged as potentially
8 suspicious, correct? Yes?
9    A.  They would be potentially,
10 yes.
11    Q.  Yes. And then some of them
12 continued to be considered potentially
13 suspicious and worthy of an escalated
14 review, correct?
15    MS. MILLER: Objection.
16    THE WITNESS: Yeah, I guess
17    in some circumstances, but, again,
18    each situation -- each situation
19    would sit on its own.
20 BY MR. DeROCHE:
21    Q.  Well, I understand that --
22    A.  Right.
23    Q.  -- but we're talking about
24 what happens with this report right now.

Page 443

1 And what happens with this report is
2 someone looks at it. It's not ignored.
3 And then a certain subset of what is on
4 the report gets chosen, selected, for
5 escalation for additional review,
6 correct?
7    MS. MILLER: Objection.
8    THE WITNESS: Further --
9    further questions asked perhaps.
10 BY MR. DeROCHE:
11    Q.  Yes. Okay. And the ones
12 that aren't selected for additional
13 review are approved and shipped?
14    MS. MILLER: Objection.
15    THE WITNESS: They would --
16    they would all -- you know, to my
17    knowledge, they would all be --
18    they would all be reviewed.
19    I mean, there wouldn't be
20    just some arbitrarily not
21    reviewed. There would be some,
22    you know, initial review process.
23    I'm sure there are varying degrees
24    of that review process.

Page 444

1 BY MR. DeROCHE:
2    Q.  Well, that's what I'm trying
3 to get at because, I mean, the escalated
4 review I understand. Now, beyond simply
5 looking at the IRR report and saying that
6 looks fine, that's what an escalated
7 review is that is documented. When
8 something beyond just the IRR is looked
9 at, that's considered escalated review
10 from the IRR, correct?
11    MS. MILLER: Objection.
12    THE WITNESS: I can't -- you
13    know, trying to look back and
14    think of the particulars, I mean,
15    I just -- I can't fully recall the
16    particulars of the terminology
17    that we were using at the time.
18 BY MR. DeROCHE:
19    Q.  Okay.
20    A.  Now, I know -- I know, you
21 know, the IRR was being reviewed.
22 Whether it was centrally or individual
23 distribution center, and I know there
24 were instructions as far as maintaining

Page 445

1 files, you know, for a period of time. I
2 know that was taking place.
3    Q.  Okay. If there's no
4 documentation for -- for instance, let's
5 stick with 100767, the last entry, right,
6 and there's no indication anywhere on the
7 IRR itself or in any file that there was
8 any further review other than looking at
9 what's on the IRR.
10    So from looking at the IRR
11 itself, how could someone determine
12 whether or not this is a suspicious order
13 that needs to be reported to the DEA in
14 compliance with the DEA regulations?
15    MS. MILLER: Objection.
16    THE WITNESS: Just because
17    it's appearing in this report,
18    that doesn't automatically say
19    that it has reported to the DEA.
20 BY MR. DeROCHE:
21    Q.  Again, you've got to listen
22 to my question, sir. I'm sorry. Maybe I
23 was unclear.
24    From looking at what's on

Page 446

1 this report --
2      A.   Yes.
3      Q.   -- how can someone determine
4 whether or not this is an actual
5 suspicious order as opposed to a
6 potential suspicious order?
7          MS. MILLER:  Objection.
8          THE WITNESS:  It's been --
9      it's been a few years since I've
10     seen this report.  And I just -- I
11     don't recall the process as far as
12     interpreting the numbers and how
13     that would take place, so I
14     can't -- you know, I don't feel
15     confident in commenting on it.
16 BY MR. DeROCHE:
17     Q.   Okay.  The SOP that you
18 looked at earlier, which was issued by
19 your department to guide the use of this
20 report, said, among other things, that
21 the month-to-date number should be
22 observed in relation to the lags that
23 also appeared on the report.
24          Do you recall that?

Page 447

1          MS. MILLER:  Objection.
2 BY MR. DeROCHE:
3      Q.   Reading that earlier?
4          MS. MILLER:  If you want to
5      show him the document --
6          MR. DeROCHE:  No, I don't
7      want to -- I'm just going to ask
8      him -- I'm not --
9          THE WITNESS:  Can I take a
10     break?  I have to go to the
11     bathroom.
12 BY MR. DeROCHE:
13     Q.   Not with a question pending.
14 When we're done with this question, then
15 we can go on to a break.  All right.
16 So --
17     A.   I can't take a break?
18     Q.   Not with a question pending.
19 We'll take a break in a moment.
20     A.   What document am I looking
21 at?
22     Q.   You know what?  I'll
23 withdraw the question, and you can go
24 take a break.

Page 448

1      A.   Thank you.
2          THE VIDEOGRAPHER:  Going off
3 the record.  The time is 4:44.
4          (Short break.)
5          THE VIDEOGRAPHER:  Going
6 back on record.  Beginning of
7 Media File 11.  The time is
8 5:00 p.m.
9 BY MR. DeROCHE:
10     Q.   Okay, sir.  So we were going
11 through Exhibit 201, and we were looking
12 at the IRR, in particular with respect to
13 one of the orders.  And I guess what I'm
14 trying to figure out is, someone needed,
15 on the first pass to the side, whether or
16 not the orders on this IRR were worthy of
17 additional escalated review.  And
18 according to the SOP, they were directed
19 to look at the month to date and then
20 also look at the lags, and see if there
21 was a problem with the amount in relation
22 to the lags and the pattern of ordering
23 and so forth.  So that's where we are on
24 this document.

Page 449

1          Then it looks -- if you look
2 at the -- back at the first page, if you
3 flip back and just keep where you are,
4 first page.  That's fine.  No, the very
5 first page, top page.  You'll see that
6 this actually is one of the signed IRRs,
7 correct, someone signed this thing and
8 dated it?
9          MS. MILLER:  Objection to
10     the preamble of the question.
11 BY MR. DeROCHE:
12     Q.   Correct?
13     A.   There does appear to be a
14 signature on this document.
15     Q.   Can you tell who that is?
16     A.   No.
17     Q.   Okay.  Certainly it doesn't
18 look like Terrence Dugger, so maybe you
19 were correct that the Rx manager was the
20 one who was actually doing this review at
21 this point in time?
22     A.   Yeah, I'm not -- I'm not a
23 handwriting expert.
24     Q.   Sure.

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1    A.   But that's --
2    Q.   It doesn't look like
3 Terrence Dugger to me.  How about to you?
4         MS. MILLER:  Objection.
5         THE WITNESS:  Yeah, I --
6 BY MR. DeROCHE:
7    Q.   In any event someone --
8    A.   Again, I don't -- I don't
9 know.
10   Q.   -- someone signed this as an
11 indication as they were directed to do in
12 the SOP that this had been reviewed.  So
13 if anybody questioned later, there was
14 proof that it actually had been looked
15 at, correct?
16        MS. MILLER:  Objection.  To
17        the extent you're referencing the
18        SOP --
19 BY MR. DeROCHE:
20   Q.   Correct?
21        MS. MILLER:  -- if you want
22        to show it to him so he can review
23        it --
24        MR. DeROCHE:  Noted.

Page 451

1         MS. MILLER:  -- it would be
2    helpful.
3         MR. DeROCHE:  Noted
4    objection.  Just objection to form
5    only, please.
6         THE WITNESS:  And I guess,
7    you know, with the, you know -- I
8    know I'm being repetitive, but the
9    evolution of a process --
10 BY MR. DeROCHE:
11   Q.   I understand.
12   A.   -- the dates of the process,
13 the -- the SOP, the draft version, the
14 evolution --
15   Q.   I understand, sir.
16   A.   -- of the SOP.  I just -- I
17 can't specifically say that at this date,
18 and this time, you know, this version of
19 the SOP was in place.
20   Q.   Fair enough.  And I'm not
21 going to hold you to it.
22   A.   Okay.
23   Q.   I'm just suggesting that
24 someone signed this one appropriately

Page 452

1 indicating it was reviewed, correct?
2         MS. MILLER:  Objection.
3 BY MR. DeROCHE:
4    Q.   You can answer.
5    A.   Yeah, there -- there appears
6 to be a signature dated 12/14/2010 on
7 this IRR document.
8    Q.   Going back to 100767, and
9 again, these are number of flagged orders
10 on this page in relation to the
11 Indianapolis DC that have been reviewed.
12 And there's no indication, at least with
13 any handwriting on this report itself,
14 that there was any escalated review for
15 any of these orders, correct?
16   A.   I just see the report.
17 There are also could have been a separate
18 file that would have had that information
19 in it.  I just don't know.
20   Q.   Okay.  Well, with respect to
21 the reports, at least the ones -- and
22 I've looked at hundreds of them in New
23 York City at one point, when there was
24 some additional documentation, it was

Page 453

1 actually stuck into the IRR, you know,
2 right after the page that it related to,
3 there was actually a report put in there
4 and retained in the accordion file IRR.
5         Are you familiar with that,
6 sir?
7         MS. MILLER:  Objection to --
8 BY MR. DeROCHE:
9    Q.   -- in terms of receiving --
10        MS. MILLER:  -- the
11        testimony by counsel.
12        THE WITNESS:  I can't -- I
13        can't recall the process.  I know
14        we had -- there were separate
15        files.  And each DC would be
16        responsible for having a file
17        around the IRR.
18 BY MR. DeROCHE:
19   Q.   Okay.
20   A.   I don't recall if they
21 included the IRR or the investigation.  I
22 just can't recall.
23   Q.   Got it.  Now, in terms of
24 actually looking at this report in

Page 454

1 deciding whether or not to escalate these
2 orders, how many lags do you see that
3 were available for the hydrocodone order
4 on the last order listed on Page 100767?
5        MS. MILLER: Objection.
6        THE WITNESS: How many lags?
7 BY MR. DeROCHE:
8    Q.   Yeah. How many lags are
9 there?
10    A.   Are you looking at the
11 bottom line?
12    Q.   Correct.
13    A.   Just in reading the report,
14 it states month-to-date 500. Lag 1, 200;
15 Lag 2, 200; Lag 3, zero; 4, zero; 5,
16 zero; 6, zero.
17    Q.   If you go to the next page,
18 which is 100768. You'll see there's a
19 hydrocodone order, third order down.
20        Do you see that, sir?
21    A.   That's Store 3362?
22    Q.   Correct.
23    A.   I see that.
24    Q.   You see their month-to-date

Page 455

1 is 2,000 doses, correct?
2    A.   I see month to date 2,000.
3    Q.   Okay.
4    A.   I don't recall if that means
5 doses or not. I don't recall that.
6    Q.   Well, at this time this
7 relates to a particular drug, correct?
8    A.   It is under hydrocodone,
9 yes.
10    Q.   Right. So it is relating to
11 an item as opposed to an active
12 ingredient, correct?
13        MS. MILLER: Objection.
14        THE WITNESS: It -- I can't
15      recall the IRR report as far as
16      when it was item versus when it
17      was active ingredient.
18 BY MR. DeROCHE:
19    Q.   You can tell by looking at
20 it, can't you?
21    A.   Oh, I can see that it says
22 hydrocodone. But I don't know --
23    Q.   Well, it's listed NDC,
24 correct?

Page 456

1    A.   I don't know when it went to
2 active ingredient if it would still list
3 the items on top of that. I'm just not
4 sure. I just can't recall.
5    Q.   Do you know if this is, as
6 of December 14, 2010, if you were still
7 using active ingredient versus --
8        MS. MILLER: Objection.
9        THE WITNESS: I don't recall
10      the dates. I'd have to -- I don't
11      recall the dates off the top of my
12      head. I know we made a change.
13 BY MR. DeROCHE:
14    Q.   Right.
15    A.   I just don't recall exactly
16 when the change took place.
17    Q.   Well, the change was done
18 were the retunement document, correct,
19 that we looked at earlier?
20        MS. MILLER: Objection.
21 BY MR. DeROCHE:
22    Q.   It was delivered in February
23 of 2011 and then sometime thereafter
24 implemented?

Page 457

1    A.   Which --
2    Q.   So that would indicate --
3 I'll show you what we previously marked
4 as 150. That's an e-mail. And then the
5 retunement document is attached. It was
6 delivered in February of 2011.
7    A.   Okay.
8        MS. MILLER: Objection.
9 BY MR. DeROCHE:
10    Q.   So as of December 2010,
11 we're still on item as opposed to active
12 ingredient?
13        MS. MILLER: Objection.
14 BY MR. DeROCHE:
15    Q.   Right?
16        MS. MILLER: Asked and
17      answered.
18 BY MR. DeROCHE:
19    Q.   Correct?
20    A.   Again, not being able to
21 recall the dates and just going off the
22 report.
23    Q.   Well, you don't -- you have
24 to recall the date when you have it in

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1 your hand right in front of you, sir?  Or
2 are you trying to --
3     A.   No.
4     Q.   -- skate around the
5 question?
6     A.   No.
7         MS. MILLER:  Objection.
8 BY MR. DeROCHE:
9     Q.   So I think we need
10 forthright questions here.
11     A.   I'm not --
12     Q.   So skating --
13     A.   I'm just -- I'm looking at
14 the document that you provided, and I do
15 see that on February 9, 2011, it's titled
16 "Retunement."
17     Q.   Right.
18     A.   I don't recall this
19 document.  And I just can't --
20     Q.   Can you use logic, sir, and
21 determine that if something is delivered
22 to you on February -- in February of
23 2011, that moved from using item to
24 active ingredient, that as of

Page 459

1 December 2010, earlier in time, you were
2 still using item instead of active
3 ingredient?  Can we use logic and come to
4 that conclusion for the jury so that we
5 don't have to dance anymore?
6         MS. MILLER:  Objection.
7         THE WITNESS:  I think from
8     a --
9 BY MR. DeROCHE:
10     Q.   Tell the jury if you can
11 answer that question, sir.
12     A.   From a --
13     Q.   They're looking right now.
14         MS. MILLER:  Objection.
15         THE WITNESS:  From a --
16 BY MR. DeROCHE:
17     Q.   Go ahead.  Can you use logic
18 and come to that conclusion so we can
19 stop dancing and answer questions and
20 move on?
21         MS. MILLER:  Objection.
22         THE WITNESS:  From a logical
23     standpoint, the documents in front
24     of me, I hear what you're saying.

Page 460

1 BY MR. DeROCHE:
2     Q.   All right.
3     A.   I'm just trying to recall
4 the dates, and I don't know, could a
5 change have been made before this
6 document came into place?  I just don't
7 recall that.  That's -- I'm not trying to
8 skate.  I'm just -- that's how I'm
9 looking at it.
10     Q.   Okay.  So you got the
11 retunement document.  You moved from
12 using six months of lag to 12 months of
13 lag as well, correct?  You're looking
14 there.  You've got the retunement
15 document right in front of you.  Go ahead
16 and look through it.
17     A.   Okay.  I do see the line at
18 12 months worth of data.
19     Q.   And going back to using
20 logic for just a moment, the IRR that you
21 have in front of you, 201, has six months
22 of lag, right?
23         MS. MILLER:  Objection.
24         THE WITNESS:  The document

Page 461

1     does have -- indicating six lags,
2     yes.
3 BY MR. DeROCHE:
4     Q.   And we went through this
5 earlier when Mr. Mortelliti was talking
6 about how the data was missing because
7 you were using the item versus the active
8 ingredient.  And, therefore, you started
9 having IRRs with lags that were noted as
10 zero.
11         And confirm for me, sir, how
12 many lags are zero on Page 100768 with
13 respect to the hydrocodone order
14 referenced there?
15         MS. MILLER:  Objection.
16         THE WITNESS:  In regards to
17     Store 3362?
18 BY MR. DeROCHE:
19     Q.   Correct, sir.  It's the only
20 one that's there in hydrocodone.
21     A.   Okay.
22         MS. MILLER:  Objection.
23 BY MR. DeROCHE:
24     Q.   Go ahead.

Highly Confidential - Subject to Further Confidentiality Review

| Page 462 |
| --- |

1    A.   I see, according to this, I
2 have month-to-date at 2,000. Lag 1, 500;
3 Lag 2, 500. And then I see Lag 3, Lag 4,
4 Lag 5, Lag 6 on this report noted as
5 zero.
6    Q.   Right. Now, do you know if
7 that was there were no orders for that
8 drug for that month for that store or
9 because this is a situation where
10 Mr. Mortelliti was crying wolf about
11 that -- where the actual history was
12 missing?
13       MS. MILLER: Objection.
14       THE WITNESS: I wouldn't
15    know on this particular store.
16 BY MR. DeROCHE:
17    Q.   Okay. This store, as of
18 12/14/2010 has a month-to-date of 2,000.
19 And it shows the first lag is 500, and
20 the second lag is 500. And zeros up to
21 that point.
22       Would you consider a 2,000
23 order month-to-date to be unusual for the
24 store or not?

| Page 463 |
| --- |

1       MS. MILLER: Objection.
2       THE WITNESS: I just -- I
3    can't recall the parameters being
4    used as far as interpreting the
5    report.
6 BY MR. DeROCHE:
7    Q.   Someone looking at this
8 report is going to have to make some
9 determinations based on what's on here.
10       Do you know what that
11 determination would have been at that
12 point?
13       MS. MILLER: Objection.
14       THE WITNESS: Again, I
15    just -- I don't recall the
16    interpretation of the report.
17 BY MR. DeROCHE:
18    Q.   The next page, 100769, again
19 there's only one hydrocodone order on
20 here for Store 4636. And it shows a
21 month-to-date of 400, the first three
22 lags are 100 each. And then zeros for 4,
23 5, and 6, correct?
24    A.   That's what the report

| Page 464 |
| --- |

1 states, yes.
2    Q.   Should this have been
3 cleared or should this have been reviewed
4 further?
5       MS. MILLER: Objection.
6       THE WITNESS: Again, I don't
7    recall what parameters in
8    interpreting the report.
9 BY MR. DeROCHE:
10    Q.   It's got a score of .88,
11 correct, on this order?
12    A.   It states .88, yes.
13    Q.   Okay. And the scoring
14 system was between zero and one, correct?
15       MS. MILLER: Objection.
16       THE WITNESS: I'd have to
17    look into that. I don't recall.
18 BY MR. DeROCHE:
19    Q.   Do you know if the scoring
20 system changed in terms of the range
21 between the original algorithm and the
22 retuned algorithm?
23       MS. MILLER: Objection.
24       THE WITNESS: I know during

| Page 465 |
| --- |

1    the period of time I was employed
2    with CVS, I know that the
3    algorithm did change. As far as
4    the particulars on the score and
5    the lags, I just don't recall
6    those details.
7 BY MR. DeROCHE:
8    Q.   You don't know if the
9 potential score was between zero and one
10 for the original algorithm?
11    A.   I don't remember.
12       MS. MILLER: Objection.
13 BY MR. DeROCHE:
14    Q.   Do you know if this order
15 was cleared from looking at this document
16 that we have in front of us, or was there
17 an additional review done?
18    A.   I wouldn't know that.
19    Q.   Okay. We're going to look
20 quickly at Exhibit 56. And I believe you
21 have it over there already.
22       MS. MILLER: Is that one we
23    have?
24 BY MR. DeROCHE:

Highly Confidential – Subject to Further Confidentiality Review

Page 466

1    Q.   If you can find 56.  It's an
2  August 13, 2010 memo from Mr. Mortelliti
3  to yourself.
4        Are you there?  Do you have
5  it in front of you?
6    A.   Yes.
7    Q.   So this is talking about
8  moving the score from .15 to .65.  And it
9  appears that that was -- determination
10  was made based on some testing that was
11  done by Mr. Mortelliti; is that correct?
12        MS. MILLER:  Objection.
13        THE WITNESS:  If you just
14    give me one moment to read through
15    this quickly.
16  BY MR. DeROCHE:
17    Q.   Sure.
18    A.   Yes, it does --
19    Q.   Okay.
20    A.   It does speak to changing
21  the score.
22    Q.   Right.  It wasn't done -- it
23  appears -- it wasn't done in a haphazard
24  manner, but actually was subject to some

Page 467

1  testing?
2        MS. MILLER:  Objection.
3        THE WITNESS:  Based -- again
4    I don't recall the memo.  But in
5    reading the memo, it does state
6    that there was testing done.  Yes,
7    it wasn't just arbitrarily
8    changed.
9  BY MR. DeROCHE:
10    Q.   Sure.  Sure.  I understand
11  that.
12        And that August 13, 2010
13  memo was again consistent with the idea
14  that as of December of 2010, looking at
15  Exhibit 201, the score apparently is now
16  .65 for purposes of flagging orders, 201
17  we just looked at?
18    A.   Looking at the report, when
19  you look at the table it actually says
20  currently .15 on it.
21    Q.   But then under the model
22  weight column it says .65.
23    A.   Right.  So I -- again, I
24  haven't seen this report in quite some

Page 468

1  time.  But, you know, perhaps that
2  language wasn't updated.  I -- I don't
3  know.
4    Q.   Sure.
5    A.   But the model weight does
6  say .65.
7    Q.   Okay.  And then subsequent
8  to this report, again a retunement was
9  done, we looked at that retunement
10  document a moment ago.  And the
11  retunement involved really a brand-new
12  algorithm, for -- for all intents and
13  purposes, in terms of, you know, it
14  was -- it was a substantial change in the
15  algorithm for purposes of flagging
16  orders.
17        MS. MILLER:  Objection.
18  BY MR. DeROCHE:
19    Q.   You would agree with that,
20  correct?
21        MS. MILLER:  Objection.
22        THE WITNESS:  Yeah, I -- I
23    don't know if I would say it was a
24    brand-new algorithm.  I think

Page 469

1    it -- I thought the -- was just
2    what I can recall.  I thought the
3    algorithm itself, you know, stayed
4    somewhat steady, that some of the
5    numbers within the algorithm would
6    have changed.  That's just all I
7    can recall.
8  BY MR. DeROCHE:
9    Q.   One of the coefficients, the
10  types of coefficients, the calculation of
11  coefficients, all were changed
12  substantially when the retunement was
13  done.  Isn't that correct?
14        MS. MILLER:  Objection.
15        THE WITNESS:  I can't -- I
16    can't recall all the things that
17    were changed in it.
18  BY MR. DeROCHE:
19    Q.   Let me show you what we've
20  marked as Exhibit 200.
21        (Document marked for
22    identification as Exhibit
23    CVS-Devlin-P-200.)
24  BY MR. DeROCHE:

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1 Q. This is an IRR, it looks
2 like it was directed to Knoxville on
3 8/31/2012.
4 And if you'd flip open the
5 table, which is on the second page of
6 this document, sir?
7 A. Yes.
8 Q. And if you flip open the
9 table for the Exhibit 201 that you just
10 looked at, and have them side by side, if
11 you would.
12 A. Okay.
13 Q. And if you look at these two
14 tables that kind of reflect the
15 algorithms, what the attributes are,
16 you'll see that there are substantial
17 differences, correct, between the
18 attributes on the old algorithm versus
19 the attributes on the retuned algorithm?
20 MS. MILLER: Objection.
21 BY MR. DeROCHE:
22 Q. Agreed?
23 MS. MILLER: Objection.
24 THE WITNESS: Are you

Page 471

1 looking at the model weight
2 column?
3 BY MR. DeROCHE:
4 Q. Sorry, what's that?
5 A. Is this the model weight
6 column?
7 Q. Oh, we can look -- no, look
8 at the attribute itself. Zscore6range is
9 the top attribute, right, for the retuned
10 model?
11 A. Yes.
12 Q. Then you have PZscorerange.
13 A. Okay.
14 Q. Right? Then you have
15 Zscore12range?
16 A. Yes.
17 Q. And you have a pairing of
18 each of those with, I think an additional
19 coefficient. And then as you go down,
20 there -- it looks like there's very
21 little consistency between the old
22 algorithm and the new algorithm. The new
23 algorithm is really a substantial change
24 from the old algorithm in terms of

Page 472

1 coefficients that are used.
2 MS. MILLER: Objection.
3 BY MR. DeROCHE:
4 Q. Not to mention adding an
5 additional six months of data?
6 MS. MILLER: Objection.
7 Do you need time to read the
8 document?
9 BY MR. DeROCHE:
10 Q. Correct? You can answer.
11 A. Can I just take a little
12 moment here to compare?
13 Again, just in the essence
14 of time, I -- you know, I do notice that
15 there are some, you know, different
16 languages or attributes used. I do see
17 some similarities.
18 Again, I would -- I would
19 defer to the statisticians as far as what
20 the actual differences are, as far as one
21 algorithm versus the other algorithm.
22 Q. Sure. And obviously the
23 coefficients are not the same as well,
24 correct?

Page 473

1 MS. MILLER: Objection.
2 BY MR. DeROCHE:
3 Q. I mean the -- the model
4 weight, excuse me --
5 A. The model weight --
6 Q. Yeah, the model weight
7 coefficients, for the coefficients.
8 MS. MILLER: Objection.
9 THE WITNESS: It's -- yeah,
10 can see it was -- on the score,
11 that's similar. Some slight
12 changes.
13 And again, I'd probably want
14 an hour to go through this
15 properly and identify the exact
16 changes between each but --
17 BY MR. DeROCHE:
18 Q. The coefficients aren't the
19 same, correct?
20 MS. MILLER: Objection.
21 THE WITNESS: Well, I do
22 notice the model, the model as far
23 as when you say coefficient model
24 weight. That's the column you're

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1  looking at?
2  BY MR. DeROCHE:
3      Q.   The score you mean?
4      A.   Right.
5      Q.   Well, I understand, but
6  we'll get to that in a moment.
7      A.   Right.
8      Q.   But leaving aside the .65 at
9  the bottom, the coefficients bear no
10 resemblance to each other?
11     MS. MILLER:  Objection.
12 BY MR. DeROCHE:
13     Q.   Correct?
14     A.   Yeah, they're -- they're
15 different numbers on the document, yes.
16     Q.   Okay.  And again, the
17 retunement document was delivered and
18 then implemented by CVS based on the
19 statisticians' analysis and design of the
20 algorithm, correct?
21     MS. MILLER:  Objection.
22     THE WITNESS:  They -- they
23         certainly played a big role in --
24         in the changes, yes.

Page 475

1  BY MR. DeROCHE:
2      Q.   Okay.  And they delivered a
3  document to you, addressed to you,
4  telling you, this is the new algorithm we
5  recommend, scoring system, and so forth,
6  including giving you these actual
7  coefficients that are being used,
8  correct?
9      MS. MILLER:  Objection.
10     THE WITNESS:  Based on
11         the -- based on the documents I've
12         seen, it's -- it's not a change
13         that I would have implemented, but
14         probably would have worked with
15         the DIT group to --
16 BY MR. DeROCHE:
17     Q.   Right.
18     A.   -- have that, put that in
19 place.
20     Q.   Fair enough.  Go back to the
21 retunement document.
22     MS. MILLER:  What number is
23         that, please?
24 BY MR. DeROCHE:

Page 476

1      Q.   What's that?  Can you hand
2  me that?  It's 150, I believe.
3  Exhibit 150.
4      MS. MILLER:  Do you have
5         that?
6  BY MR. DeROCHE:
7      Q.   Yeah, there we go.  I'm
8  going to hand you Exhibit 150.  And we're
9  going to look at Page 114652.  You'll see
10 at the end, that's the coefficients that
11 were provided with the retunement.
12     Do you see that, sir?
13     A.   I do see that, yes.
14     Q.   If you look at the second
15 coefficient down, labeled B-1.
16     Do you see that, sir?
17     A.   I do see it.
18     Q.   1.0450.  Okay.  And if you
19 look at the top.
20     A.   1.045.
21     Q.   45, right.  Note a zero at
22 the end too.
23     But if you go to the
24 Exhibit 200, the table that we were just

Page 477

1  looking at, the first model weight is
2  consistent with that number, correct?
3      A.   The model weight of 1.045
4  does match up to 1.045.  It's just an
5  extra zero.
6      MR. DeROCHE:  Leave the
7         retunement table up.
8  BY MR. DeROCHE:
9      Q.   If you go to the second
10 number, second coefficient that's
11 referenced in the retunement document,
12 0.4589.  If you go to the IRR, that
13 coefficient matches up, correct?
14     A.   You see the B-2 in this
15 retunement document is .4589.  And in the
16 IRR, I also see .589.
17     Q.   Great.  Next one down,
18 again, consistent.  1.0889.  Recommended
19 by the statisticians, used by CVS, right?
20     MS. MILLER:  Objection.
21     THE WITNESS:  The numbers
22         correlate, yes.
23 BY MR. DeROCHE:
24     Q.   Okay.  Next number down,

Page 478

1  does that correlate as well?
2      A.  Well --
3      Q.  They are out of order.
4      A.  They're out of order.
5      Q.  I understand.  But they're
6  the same --
7      A.  Okay.
8      Q.  -- correct?
9          MS. MILLER:  Objection.
10         THE WITNESS:  I see on one
11     document 1.2615, and I see on the
12     other document 1.2615.
13  BY MR. DeROCHE:
14     Q.  Okay.  And you see 2.51 --
15  54, excuse me 21, correct?
16     A.  I do see that.  Yes.
17     Q.  And then .75 is on the
18  retunement document as well as the IRR,
19  correct?
20     A.  Correct.
21     Q.  And then .5, correct?
22     A.  Yes, sir.
23     Q.  Okay.  These appear to be
24  the retuned coefficients that are

Page 479

1  provided that are now being used in the
2  IRR by CVS, correct?
3          MS. MILLER:  Objection.  You
4      mean in the IRR that is
5      Exhibit 200?
6          MR. DeROCHE:  Correct.
7  BY MR. DeROCHE:
8      Q.  That's what we've been
9  talking about for the last ten minutes.
10  I don't think anybody is confused.
11     A.  I just -- I don't see the --
12  I see a lot of those similarities, but I
13  also see a model coefficient on the
14  retunement document that I do not see on
15  the IRR, for the 5.9745.
16     Q.  On the retuned document
17  table, what does that refer to, B-0?
18     A.  B-0.
19     Q.  Right.  And B-0, you
20  recognize as a constant, right?
21         MS. MILLER:  Objection.
22  BY MR. DeROCHE:
23     Q.  You recognize that.  If you
24  look at the previous page, you'll see it.

Page 480

1          MS. MILLER:  Previous page
2  of Exhibit 150?
3          MR. DeROCHE:  Of
4  Exhibit 150.
5          THE WITNESS:  I mean, I see
6      a B-0 on here.  But as far as
7      interpreting what all this means,
8      I have no idea.
9  BY MR. DeROCHE:
10     Q.  Now, when the retuned
11  document -- retuned algorithm was
12  provided by Buzzeo to CVS, the experts at
13  Buzzeo recommended a .15 score as being
14  the indicator of a potentially suspicious
15  order, correct?
16         MS. MILLER:  Objection.
17         THE WITNESS:  I don't recall
18     that.
19  BY MR. DeROCHE:
20     Q.  If you look at the document
21  sir, go to the -- go to the retuned
22  document.  You'll see it's underlined.
23  So it won't be hard to find.  There is an
24  underlined sentence.  What do they say?

Page 481

1  Read it for us.
2          MS. MILLER:  Objection.
3      It's not clear this refers to the
4      retuned.
5  BY MR. DeROCHE:
6      Q.  Sir?
7      A.  Are you -- you're referring
8  to 4644 Bates number?
9      Q.  Yes.
10     A.  So on this -- on this -- on
11  this document with Bates number 4644, the
12  underlined sentence states, "The model
13  has been designed so that any order with
14  a score of .15 or higher is identified as
15  suspicious, pended, and should be
16  investigated further."
17     Q.  Now --
18     A.  I don't know if -- I see
19  this in the document.  And I just -- you
20  know, I can't recall if there are other
21  documents that would have changed this,
22  or there were conversations that, again,
23  as this process evolved and changes were
24  made -- I can't recall if every single

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1 change, if there's a paper trail document
2 to go with it. I just -- I don't know
3 that.
4     Q.   Well, sir, I understand.
5 We've seen a paper trail of documents
6 related to the old algorithm and
7 Mr. Mortelliti doing some testing to
8 determine that .15 wouldn't be used but
9 .65 would be used instead. And that
10 appears to have been carried forward.
11         What I'm asking you is, have
12 you ever seen a document that shows that
13 any testing was done with the retuned new
14 algorithm to determine whether or not .65
15 was more appropriate than .15?
16         MS. MILLER: Objection.
17 BY MR. DeROCHE:
18     Q.   You can answer.
19     A.   I just -- I don't recall
20 that.
21     Q.   Okay. And you were there in
22 2012, at least as of October, correct?
23     A.   Around mid-October.
24     Q.   Sure.

Page 483

1     A.   I believe I gave my notice
2 probably at the beginning of October.
3     Q.   Again, I wish I had the
4 retunement document in front of me.
5 We're going to waste our last ten minutes
6 going through this. No, the retuned
7 document I'll take a look at.
8     A.   This one.
9     Q.   There we go. It might be
10 faster if I take a look at this.
11         Moving on to 200 again. If
12 you go to the second -- first page,
13 rather, right behind the table we just
14 reviewed. I apologize. My Bates stamp
15 number is cut off on my copy.
16     A.   Looks like 99, maybe.
17     Q.   Page 38. Yeah, it's Page
18 38. If you see Page 38 at the top, right
19 above the big black box.
20     A.   I see Page 39.
21     Q.   38.
22     A.   Store 1431?
23     Q.   Store 1431. Correct. It's
24 a hydrocodone order -- or hydrocodone

Page 484

1 drug, rather?
2     A.   Yeah, it's Page 39 on mine.
3 Okay.
4     Q.   Okay. And if you look at
5 that, what's the score that's associated
6 with that?
7     A.   Score, I see in this
8 document, it looks like it's .99.
9     Q.   Okay. Do you know if the
10 max is one?
11     A.   I don't recall.
12     Q.   With a score of .99, do you
13 know of any reason, looking at this
14 report itself, why this particular order
15 would not have been escalated for further
16 review?
17         MS. MILLER: Objection.
18         THE WITNESS: No, I -- I
19 can't really recall to comment on
20 it.
21         MR. DeROCHE: Let's go off
22 the record for one minute.
23         THE VIDEOGRAPHER: Going off
24 the record. The time is 5:38.

Page 485

1     (Short break.)
2         THE VIDEOGRAPHER: Going
3 back on record. Beginning of
4 Media File Number 12. The time is
5 5:40.
6         MR. DeROCHE: Thank you for
7 your time. We have nothing
8 further.
9         THE VIDEOGRAPHER: No
10 questions?
11         MS. MILLER: No questions.
12 Thank you.
13         THE VIDEOGRAPHER: This
14 concludes today's deposition.
15 We're going off the record. The
16 time is 5:40.
17     (Excused.)
18     (Deposition concluded at
19 approximately 5:40 p.m.)
20
21
22
23
24

Page 486

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, FRANK DEVLIN, have the opportunity to read and sign the deposition transcript.

_____
MICHELLE L. GRAY,
A Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter and Notary Public
Dated: January 15, 2019

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 487

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 488

- - - - - -
E R R A T A
- - - - - -

PAGE LINE CHANGE
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____

Page 489

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 490, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
FRANK DEVLIN                DATE

Subscribed and sworn
to before me this
_____ day of _____, 20_____.
My commission expires:_____

_____
Notary Public

Page 490

1     LAWYER'S NOTES
2  PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____