```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                      -   -   -
 5
     IN RE:  NATIONAL        :   HON. DAN A.
 6   PRESCRIPTION OPIATE      :   POLSTER
     LITIGATION               :
 7                            :
     APPLIES TO ALL CASES     :   NO.
 8                            :   1:17-MD-2804
                              :
 9
              - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                      -   -   -
12
                 February 19, 2019
13
                      -   -   -
14
15            Videotaped deposition of
     MICHAEL DiBELLO, taken pursuant to
16   notice, was held at the offices of Locke
     Lord, LLP, 200 Vesey Street, New York,
17   New York, beginning at 10:29 a.m., on the
     above date, before Michelle L. Gray, a
18   Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
19   Realtime Reporter, and Notary Public.
20                      -   -   -
21
              GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23
24
```

Page 2

1
2 APPEARANCES:

3 MOTLEY RICE, LLC
BY: DONALD A. MIGLIORI, ESQ.
4 28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
5 (843) 216-9000
Dmigliori@motleyrice.com
6 Representing the Plaintiffs

7 LOCKE LORD, LLP
BY: JOHN P. McDONALD, ESQ.
8 C. SCOTT JONES, ESQ.
2200 Ross Avenue
9 Suite 2800
Dallas, Texas 75201
10 (214) 740.8758
jpmcdonald@lockelord.com
11 sjones@lockelord.com
Representing Henry Schein, Inc. and the
12 Witness
13
FARRELL FRITZ, P.C.
14 BY: KEVIN P. MULRY, ESQ.
400 RXR Plaza
15 Uniondale, New York 11556
(516) 227.0620
16 Kmulry@farrellfritz.com
Representing the Defendant, Cardinal
17 Health
18
GIBBONS, P.C.
19 BY: PAUL E. ASFENDIS, ESQ.
One Pennsylvania Plaza
20 37th Floor
New York, New York 10119-3701
21 (212) 613.2067
pasfendis@gibbonslaw.com
22 Representing the Defendant,
AmerisourceBergen
23
24

Page 3

1 APPEARANCES: (Cont'd.)
2
COVINGTON & BURLING, LLP
3 BY: FREDERICK BENSON, ESQ.
850 Tenth Street, NW, Suite 586N
4 Washington, D.C. 20001
(202) 662-5516
5 fbenson@cov.com
Representing the Defendant, McKesson
6 Corporation
7
TELEPHONIC/STREAMING APPEARANCES:
8
JONES DAY
9 BY: SHUBHA HARRIS, ESQ.
90 South Seventh Street, Suite 4950
10 Minneapolis, Minnesota 55402
(612) 217-8800
11 Shubhaharris@jonesday.com
Representing the Defendant, Walmart
12
MARCUS & SHAPIRA, LLP
13 BY: PAUL MANNIX, ESQ.
One Oxford Centre, 35th Floor
14 Pittsburgh, Pennsylvania 15219
(412) 338-4683
15 pmannix@marcus-shapira.com
Representing the Defendant, HBC Service
16 Company
17
18 ARNOLD & PORTER KAYE SCHOLER, LLP
BY: TIFFANY IKEDA, ESQ.
19 BY: KAREN RIGBERG, ESQ.
777 Figueroa Street, 44th Floor
20 Los Angeles, California 90017
(213) 243-4000
21 tiffany.ikeda@arnoldporter.com
karen.rigberg@arnoldporter.com
22 Representing the Defendants, Endo
Health Solutions; Endo
23 Pharmaceuticals, Inc.; Par
Pharmaceutical Companies, Inc. f/k/a
24 Par Pharmaceutical Holdings, Inc.

Page 4

1 APPEARANCES: (Cont'd.)
2
VIDEOTAPE TECHNICIAN:
3 Henry Marte
4
5 ALSO PRESENT:
6 Janine K. Downing, Esq. - (via telephone)
(Henry Schein)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1 - - -
2 I N D E X
3 - - -
4
Testimony of:
5
MICHAEL DiBELLO
6
7 By Mr. Migliori 14
8
9
10
11 - - -
12 E X H I B I T S
13 - - -
14
15 NO. DESCRIPTION PAGE
16 Henry Schein
DiBello-1 Notice of Deposition 17
17
Henry Schein
18 DiBello-2 Bio of Michael 25
DiBello Aceto
19
Henry Schein
20 DiBello-3 Henry Schein, Inc. 39
Export Compliance
21 Program Corporate
Procedural Manual
22 HSI-MDL-00170080-108
23
24

Page 6

E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

Henry Schein
DiBello-4    Custodial File    55
             Of Michael DiBello
             HSI-MDL-00636179-51

Henry Schein
DiBello-5    Current DEA    64
             Challenges from a
             Distributor's Perspective
             7th Annual Controlled
             Substance Conference
             (No Bates)

Henry Schein
DiBello-6    E-mail, 7/19/18    76
             Subject, DEA Slides
             HSI-MDL-00433692
             & Attachment
             DEA Compliance
             Processes: Follow the
             Order

Henry Schein
DiBello-7    Code of Federal    89
             Regulations
             21 C.F.R. 1301.74

Henry Schein
DiBello-8    United States Code    89
             Title 21
             21 USCA 801, 821
             823

Page 8

E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

Henry Schein
DiBello-15    US DOJ DEA Letter,    174
              12/27/07
              HSI-MDL-00404079-80

Henry Schein
DiBello-16    Suspicious Monitoring 175
              System Specifications
              Draft
              HSI-MDL-00374284-85

Henry Schein
DiBello-17    Henry Schein Visit    186
              Overview
              HSI-MDL-00386875-79

Henry Schein
DiBello-18    New Account Issues    191
              Involving Controlled
              Substances
              HSI-MDL-00231217-18

Henry Schein
DiBello-19    E-mail Thread    220
              2/6/08
              Subject, HDMA Meeting
              HSI-MDL-00376363-64

Henry Schein
DiBello-20    Industry Compliance    225
              Guidelines
              Healthcare Distribution
              Guidelines
              HSI-MDL-00063613-27

Page 7

E X H I B I T S (Cont'd.)
- - -

NO.        DESCRIPTION        PAGE

Henry Schein
DiBello-9    E-mail Thread    93
             1/5/07
             Subject, Purging
             Control Drug Files
             HSI-MDL-00092254

Henry Schein
DiBello-10    Suspicious Monitoring 109
              System Meeting
              10/10/07
              HSI-MDL-00386726

Henry Schein
DiBello-11    Draft Summary of    127
              the HDMA Meeting
              October 16 - 17, 2007
              Not for External
              Distribution
              HSI-MDL-00622468-72

Henry Schein
DiBello-12    Executive Summary    137
              HSI-MDL-00404203-09

Henry Schein
DiBello-13    US DOJ DEA Letter,    164
              9/27/06
              HSI-MDL-00387177-80

Henry Schein
DiBello-14    US DOJ DEA Letter,    171
              2/7/07
              HSI-MDL-00093112-15

Page 9

E X H I B I T S (Cont'd)
- - -

NO.        DESCRIPTION        PAGE

Henry Schein
DiBello-21    Interoffice    233
              Memorandum, 5/11/09
              Subject, Pain Management
              Clinics Recommendation
              HSI-MDL-00635472

Henry Schein
DiBello-22    Schein SOM Procedural 239
              Review 21 CFR 1301.74(b)
              HSI-MDL-00404369-73

Henry Schein
DiBello-23    E-mail Thread    249
              2/10/11
              Subject, SOM Procedures
              HSI-MDL-00007353-55

Henry Schein
DiBello-24    Know Your Customer    271
              Proposal
              HSI-MDL-00002682

Henry Schein
DiBello-25    US DOJ DEA Letter    275
              6/12/12
              HSI-MDL-00065789-90

Henry Schein
DiBello-26    E-mail Thread    277
              1/12/12
              Subject, California
              Doctor Linked to Drug
              Deaths Arrested
              HSI-MDL-00233032-35

Page 10

- - -

E X H I B I T S (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

Henry Schein
DiBello-27  E-mail Thread     286
          1/7/12
          Subject, California
          Doctor Linked to Drug
          Deaths Arrested
          HSI-MDL-00115531-34

Henry Schein
DiBello-28  Individual     293
          Opportunity/Issue
          HSI-MDL-00072607

Henry Schein
DiBello-29  E-mail Thread     297
          10/1/08
          Subject, Doctor Faces
          Charges on Improper
          Distribution of Drugs
          HSI-MDL-006224f5-17

Henry Schein
DiBello-30  E-mail, 11/18/11     303
          Subject, Legal Action
          & Attached Notice of
          Hearing
          HSI-MDL-005912178-86

Henry Schein
DiBello-31  E-mail Thread     307
          2/1/12
          Subject, JDE 629100
          Timothy Kowalski
          HSI-MDL-00020069-70

Page 12

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Page 11

- - -

E X H I B I T S (Cont'd.)

- - -

NO.          DESCRIPTION          PAGE

Henry Schein
DiBello-32  Letter 11/9/12     313
          From Tejeda to Droz
          HSI-MDL-00397293-94

Henry Schein
DiBello-33  Interoffice     318
          Memorandum
          12/19/12
          Subject, Regulatory
          Assessment of Verifications
          Computer Systems and
          Procedures 2013
          HSI-MDL-00622252-58

Page 13

THE VIDEOGRAPHER:  We are
now on the record.  My name is
Henry Marte.  I'm a videographer
with Golkow Litigation Services.
      Today's date is February 19,
2019.  And the time is 10:29 a.m.
      This videotaped deposition
is being held at 200 Vesey Street,
New York, New York, in the matter
of National Prescription Opiate
Litigation.
      The deponent today is
Michael DiBello.
      All appearances are noted on
the stenographic record.
      Will the court reporter
please administer the oath to the
witness.
      - - -
      ... MICHAEL DiBELLO, having
been first duly sworn, was
examined and testified as follows:
      - - -
      EXAMINATION

Page 14

1     - - -
2 BY MR. MIGLIORI:
3     Q.   Good morning, sir.
4     A.   Good morning.
5     Q.   My name is Don Migliori.
6 I'm from a firm Motley Rice.  I'm going
7 to be asking you some questions today.
8 Throughout the course of the day, I'm
9 going to be handing papers over to you
10 and your counsel asking you questions.
11 Hopefully they're intelligible.  If they
12 are not, please stop me.  If you don't
13 understand what I'm asking, or if you
14 can't hear me, I'll be glad to rephrase
15 or slow down.
16     I ask that all your answers
17 be verbal so the court reporter can take
18 down your testimony.  I'd also ask that
19 in between my question and your answer,
20 that you give your counsel some time to
21 interpose an objection if necessary.
22     If you answer -- if you
23 answer my question I'm going to assume
24 that you've understood it.  Is that okay

Page 15

1 with you?
2     A.   Yes.
3     Q.   And have you gone through
4 this process before?
5     A.   No.  I've never been
6 deposed.
7     Q.   Okay.  So if at any time you
8 need to take a break, I'm happy to stop,
9 I ask that it be after a full question
10 and answer has been completed, and then
11 we'll take a break.  Otherwise we'll take
12 a break about every hour or so.  It's my
13 intent to not go very long today.
14     And I'm hopeful that I can
15 stick to that.
16     Could you state your full
17 name and your address, please?
18     A.   Michael DiBello, 397 Split
19 Rock Road, Syosset, New York 11791.
20     Q.   Okay.  And what is your
21 current job and job title?
22     A.   My current job title is vice
23 president, deputy general counsel,
24 regulatory, at Aceto Corp.

Page 16

1     Q.   What is Aceto Corp.?
2     A.   Aceto Corp. is a chemical
3 importer distributor of chemicals and
4 pharmaceutical ingredients, nutritional
5 products, industrial chemicals,
6 agricultural protection products.
7     Q.   Does Aceto have any products
8 that are considered controlled
9 substances?
10     A.   Aceto has -- List 1 and
11 controlled substance chemicals.
12     Q.   Do they manufacture control
13 substances or do they just supply
14 chemicals?
15     A.   Aceto does not manufacture
16 any chemicals or ingredients.  They only
17 import and distribute.
18     Q.   Okay.  And does Aceto have
19 any products that would be related to
20 opiates?
21     A.   No opioid products.
22     Q.   Okay.  Before Aceto, what
23 was your employer and your job title?
24     A.   Before Aceto, I worked at

Page 17

1 Henry Schein.  I was the director of
2 regulatory affairs at Henry Schein, Inc.,
3 in Melville, New York.
4     Q.   And what years were you
5 there?
6     A.   I started at Henry Schein in
7 1996 and I left Schein at 2012.
8     (Document marked for
9     identification as Exhibit
10     Schein-DiBello-1.)
11 BY MR. MIGLIORI:
12     Q.   I'm going to show you
13 Exhibit Number 1.  It's a copy for you
14 and for your lawyer.
15     Copy 1 -- Exhibit 1 is
16 simply the notice for today's deposition.
17 You are here pursuant to this deposition.
18     In preparation for this
19 deposition, did you have any meetings
20 with counsel?
21     A.   Yes.
22     Q.   When were you first notified
23 about this deposition?
24     A.   I was notified about this

Page 18

1 deposition about a week or so ago, this
2 particular, yeah.
3      Q.   The day?
4      A.   The day, yeah.
5      Q.   Okay.  When is the first
6 time that you actually sat and
7 substantively talked about your
8 testimony, either by phone or in person
9 with counsel?
10     A.   Yesterday.  We sat and
11 spoke.
12     Q.   Okay.  Was that the first
13 time?
14     A.   We spoke prior to that.
15     Q.   When did you speak prior to
16 that?
17     A.   I would say probably around
18 two or three weeks ago.
19     Q.   Okay.  Was that on the phone
20 or in person?
21     A.   On the phone.
22     Q.   Were any documents sent to
23 you to review for today?
24     A.   No.

Page 19

1      Q.   How long was the phone call
2 a few weeks ago?
3      A.   The phone call was
4 approximately a half hour or so.
5      Q.   And was that with your
6 counsel here today?
7      A.   Yes.
8      Q.   And the next time that you
9 spoke with counsel about this deposition
10 was yesterday?
11     A.   Correct.
12     Q.   And did you meet in person
13 yesterday?
14     A.   Yes.
15     Q.   How long did you meet?
16     A.   We met yesterday, 9:00 a.m.
17 until -- it was around 3:00, maybe
18 3:15-ish.
19     Q.   Okay.  During that time did
20 you review documents?
21     A.   Yes.
22     Q.   Did you review any testimony
23 of other witnesses?
24     A.   No.

Page 20

1      Q.   Do you recall a gentleman by
2 the name of Shaun Abreu?
3      A.   Yeah.  I recall Shaun.
4      Q.   Did you either review
5 testimony that Shaun may have given in
6 this case or did you speak with him about
7 your testimony in this case?
8      A.   No.
9      Q.   How about Mr. Peacock?  Have
10 you either reviewed any testimony of
11 Mr. Peacock or discussed his testimony in
12 this case?
13     A.   I have not reviewed any
14 testimony nor discussed any of his
15 testimony.
16     Q.   And other than the documents
17 that counsel brought to you to review,
18 did you have any documents of your own
19 that you brought to counsel?
20     A.   No.
21     Q.   Did you retain any documents
22 after you left Henry Schein in your
23 position relative to your time at Henry
24 Schein?  And by documents, I mean

Page 21

1 documents that would be dealing with your
2 regulatory responsibilities, particularly
3 in the area of controlled substances.
4      A.   I just want to make sure I
5 understand the question.
6           Did I --
7      Q.   I can rephrase it if you'd
8 like.
9      A.   Yeah, could you?
10     Q.   Do you have in your
11 possession now, still, since leaving
12 Henry Schein any documents from Henry
13 Schein relative to your roles in
14 regulatory affairs as they relate to
15 controlled substances?
16     A.   I may have.  I may have some
17 documents that I --
18     Q.   What kind of documents do
19 you think you have?
20     A.   Documents that I, you know,
21 worked on, were, you know, my documents,
22 work product.
23     Q.   As you know work product is
24 a loaded term.  When you say work

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 product, are you talking about documents
2 related to actual litigation or documents
3 that were maintained in the ordinary
4 course of business?
5      A.   No documents related to
6 litigation.  Documents that were
7 maintained in the order -- you know,
8 normal course of business.
9      Q.   And did counsel ask you to
10 bring those documents with you, to the
11 extent that they were related to your job
12 as director of regulatory affairs?
13      A.   No.
14      Q.   Are they in a place
15 that's -- that you -- strike that.
16           Do you know where the
17 documents are, are you able to gather
18 those documents and produce those, if
19 required by your counsel?
20      A.   I would have to locate them.
21 Yeah.
22      Q.   Okay.  Any -- so all the
23 documents you reviewed yesterday for the
24 six hours or so were documents that

Page 23

1 counsel brought to you?
2      A.   Correct.
3      Q.   I assume they were things
4 like e-mails and PowerPoint presentations
5 and various documents internal to Henry
6 Schein?
7      A.   Correct.
8      Q.   Were there any external
9 documents, documents from outside the
10 company that you were asked to review to
11 your knowledge?
12      A.   I want to make sure I
13 understand the question.  When you say
14 documents outside the company?
15      Q.   Any documents that would be
16 from -- that would have been maintained
17 by somebody other than Henry Schein.
18      A.   Maintained by someone other
19 than Henry Schein or produced by someone
20 other than Henry Schein?
21      Q.   Either.  If that's an
22 important distinction.
23           MR. McDONALD:  I'll shortcut
24      this, Don, and represent to you

Page 24

1 that every document we showed him
2 had a Henry Schein Bates number
3 from this litigation.
4           MR. MIGLIORI:  Okay.  So
5 every -- every document that he
6 saw, you have produced to us?
7           MR. McDONALD:  Correct.  If
8 it was from a third party, it
9 was -- it's not like Buzzeo, for
10 example, maintained in Henry
11 Schein files.
12           MR. MIGLIORI:  Right.  Or
13 Rannazzisi letters.
14 Anything that --
15           Mr. McDONALD:  Correct.
16           MR. MIGLIORI:  Whatever you
17 showed him, showed up in my
18 production.
19           MR. McDONALD:  Correct.
20 BY MR. MIGLIORI:
21      Q.   And that's all I'm trying to
22 get it.
23           Before we get started,
24 whatever it is that you've looked at,

Page 25

1 I've had a chance to look at myself?
2      A.   Correct.  Yeah, I just
3 wanted to make sure I understood the
4 question.
5      Q.   Sure.  And you wouldn't be
6 in a position to answer that, so that was
7 a hard one.
8      A.   Okay.
9      Q.   Okay.  Would you say you've
10 never had a deposition taken of you
11 before?
12      A.   No.
13      Q.   All right.  I don't have --
14 do you maintain a current curriculum
15 vitae?
16      A.   No.
17           (Document marked for
18      identification as Exhibit
19      Schein-DiBello-2.)
20 BY MR. MIGLIORI:
21      Q.   This is just a snapshot of
22 your -- this is Exhibit Number 2 -- of
23 your LinkedIn page.
24      A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1   Q.   From what I can tell.

2   A.   Okay.

3   Q.   It says, "Michael DiBello,
4  vice president and deputy general counsel
5  at Aceto Corp. and Rising Pharma." This
6  is you, correct?

7   A.   Yes.

8   Q.   And with Aceto, those dates
9  are correct, October 12th, 2012, to
10 present?

11   A.   Correct.

12   Q.   And your office is in Port
13 Washington, New York?

14   A.   Correct.

15   Q.   All right.  The period of
16 time that we're going to be talking about
17 today is your time at Henry Schein Inc.
18 It says, "Director of regulatory affairs
19 and regulatory counsel, April 1996 to
20 2012."

21        First of all, those are the
22 correct dates of your employment?

23   A.   Correct.

24   Q.   Were you director the entire

Page 27

1  time?

2   A.   No.

3   Q.   Okay.  What did you hire in
4  as?

5   A.   I hired in as the quality
6  manager.

7   Q.   And what responsibilities
8  did you have as quality manager?

9   A.   My primary responsibility
10 was to develop and implement a quality
11 management system to certify the company
12 to ISO 9000 quality, the international
13 ISO 9000 quality system standard, and to
14 CE Mark their private label products,
15 medical dental products for
16 distribution -- they were already -- you
17 know, selling worldwide.

18        But in 1996 there were new
19 medical device directives that were being
20 implemented that required the CE Mark
21 certification for distribution into
22 Europe.  That was my initial --

23   Q.   Do you recall which -- do
24 you recall which medical devices they

Page 28

1  were?

2   A.   I'm sorry?

3   Q.   Which medical devices were
4  they, that you were working on?

5   A.   They were medical devices
6  which included anything from the medical
7  business -- excuse me.  I have a sore
8  throat.  I apologize.

9        So, the medical devices
10 included everything in the medical
11 business, which ranged from masks,
12 examination gloves, instruments, to
13 dental devices, again, you know, anything
14 that a dentist would use in their
15 practice.  Generally speaking, low risk
16 devices.  They didn't make drug-coated
17 stents.

18        Henry Schein did not make --
19 again, let me be clear.  Henry Schein did
20 not manufacture these devices.  They
21 simply had their private label name on
22 them.

23   Q.   Gotcha.

24        Was that all of your

Page 29

1  responsibilities as a quality manager?

2   A.   At that time, that was
3  the -- that was my primary role.

4   Q.   And that started in April of
5  '96.  How long did that last, that role?

6   A.   Approximately two years.
7  '96, '90 -- probably into three years.

8   Q.   Sometime in 1999?

9   A.   Yeah.  Approximately 1999 my
10 role expanded to include the regulatory
11 function and compliance.

12   Q.   Before we get to that, from
13 1996 to 1999, did you have any
14 responsibilities whatsoever relative to
15 controlled substances?

16   A.   No.

17   Q.   And during that period of
18 time, did you have any responsibilities
19 relative to regulatory compliance in the
20 area of controlled substances?

21   A.   No.

22   Q.   Did you have any regulatory
23 compliance responsibilities at all in the
24 United States?  I know that you had this

Page 30

1 European --
2      A.   Right.  No.
3      Q.   Before we get to 1999, I
4 want to drop really quickly to
5 Underwriters Laboratories.  It lists here
6 from June of 1987 to April of 1996.
7 Almost nine years you were at a company
8 called Underwriters Laboratories?
9      A.   Correct.
10      Q.   And there you were a senior
11 project engineer/lead quality auditor?
12      A.   Correct.
13      Q.   What were your
14 responsibilities there?
15      A.   My responsibilities at UL
16 included quality system audits, to audit
17 and certify manufacturers.  And those
18 audits included military standard quality
19 system audits for the government,
20 including independent third-party audits
21 in accordance with the ISO 9000 quality
22 standard, the international ISO 9000
23 standard.
24      Q.   Same questions, during that

Page 31

1 period of time, from 1987 to 1996, did
2 you have any responsibilities whatsoever
3 relative to controlled substances?
4      A.   No.
5      Q.   In that period of time from
6 1987 to 1996, did you have any
7 responsibilities relative to regulatory
8 compliance, other than the ISO 9000
9 standards?
10      A.   No.
11      Q.   And your educational
12 background is -- you have a BS in
13 electrical engineering from NYU, correct?
14      A.   At the time it was
15 Polytechnic Institute.  They were later
16 merged into -- yeah, it was NYU.
17      Q.   Okay.
18      A.   Now it's all part of NYU,
19 but --
20      Q.   It wasn't NYU at the time?
21      A.   It wasn't NYU at the time.
22 It's now NYU.
23      Q.   Okay.  From there you went
24 to UL?

Page 32

1      A.   Correct.
2      Q.   And then after you left
3 Underwriters Laboratories, there's a
4 two-year gap between 1996 and 1998 that's
5 not accounted for, that I can see on this
6 short bio.
7           What did you do in those two
8 years?
9           MR. McDONALD:  I'm sorry,
10      where -- where are you looking at,
11      Don?  I don't see a gap.
12           MR. MIGLIORI:  I'm sorry.
13 BY MR. MIGLIORI:
14      Q.   I see that you left
15 Underwriters in April of 1996 and you
16 started law school in 1998.  And I'm just
17 asking you what happened between those
18 two years.
19           MR. McDONALD:  Okay.  But
20      his -- he shows that he is at
21      Henry Schein in 1996.
22           MR. MIGLIORI:  Okay.
23           THE WITNESS:  I was working
24      at Henry Schein.

Page 33

1 BY MR. MIGLIORI:
2      Q.   Okay.  So you got your law
3 degree while you were at Henry Schein?
4      A.   Correct.
5      Q.   All right.
6      A.   1998 I went to Touro.
7      Q.   Okay.  So you went right
8 from UL to Henry Schein.  And then after
9 two years, while you were still a quality
10 manager at Henry Schein, that's when you
11 started law school at Touro, correct?
12      A.   Correct.
13      Q.   Was that a part-time law
14 school?
15      A.   Correct.
16      Q.   And you got your law degree
17 in 2002?
18      A.   Correct.
19      Q.   And then it says, "Columbia
20 Business School, Certificate in Business
21 Excellence."  What is that program, in
22 2008 to 2011?
23      A.   That's a mini executive MBA
24 program where you take X number of

Page 34

1 classes and courses. I think it's 24
2 credits over a period of time, two years
3 or so. And you get a certificate from
4 Columbia Business School for their --
5 this mini MBA program.
6 Q. Okay.
7 A. Executive -- they call it
8 executive MBA program.
9 Q. You don't actually receive a
10 masters in business administration, do
11 you?
12 A. No. It's not a masters.
13 It's a mini MBA program.
14 Q. Okay.
15 A. Executive MBA program, they
16 call it, for executives.
17 Q. And is that the one that's
18 actually in the business school, or is
19 that one that's part of the journalism
20 school?
21 A. I'm not familiar with the
22 journalism school.
23 Q. Okay.
24 A. I think it's the business

Page 35

1 school.
2 Q. Okay. And you got a
3 certificate in 2011 there, while you --
4 again you were still at Henry Schein?
5 A. Correct.
6 Q. And that I assume was
7 part-time or evenings or something like
8 that?
9 A. It was not evenings. It
10 was -- they had credits that -- courses
11 that were either two, three, four or
12 week-long courses that you took during
13 that period.
14 Q. Okay. And what did you
15 study in particular in that business
16 school?
17 A. There were courses on
18 negotiation. There were courses on
19 leadership. There were courses on
20 management, communication, strategic
21 leadership.
22 Q. Okay. So either -- in any
23 of your educational experience, did you
24 take any courses specific to regulatory

Page 36

1 affairs? Did you have any training
2 whatsoever in regulatory affairs in
3 your -- in your courses?
4 A. No.
5 Q. At Underwriters
6 Laboratories, you had no experience or
7 background in domestic regulatory
8 affairs, correct?
9 A. Not domestic regulatory
10 affairs.
11 Q. And by domestic, I mean the
12 United States.
13 A. Correct.
14 Q. And for the first three
15 years at Henry Schein from 1996 to 1999,
16 you had no roles relative to regulatory
17 affairs in the United States on any issue
18 including on issues relating to
19 controlled substances, correct?
20 A. Correct.
21 Q. All right. So we'll get
22 back up to Henry Schein. So in 1999 your
23 job title changed from quality manager to
24 what?

Page 37

1 A. I believe it was director of
2 quality or QA.
3 Q. Tell me how your
4 responsibilities changed in that role.
5 A. The change was due to a
6 promotion from manager to director level.
7 And the -- the role basically changed in
8 that it expanded from corporate quality
9 management system certification to
10 rolling out the ISO certification to
11 Henry Schein's distribution centers.
12 Q. The ISO responsibilities up
13 until this point had been for the
14 international market, correct?
15 A. Correct.
16 Q. Did that change to domestic
17 when you got this promotion?
18 A. Well, it -- the
19 international certification relied on the
20 domestic certification of Henry Schein
21 corporate office.
22 What changed was the
23 certification of the distribution
24 centers. So the expansion of ISO 9000

Page 38

1 now became not just a corporate
2 certification for the European market,
3 but implementing a quality management
4 system for Henry Schein's distribution
5 centers.
6 Q. At this point in 1999, are
7 you now -- in dealing with the
8 distribution centers, are you now
9 responsible for any issues relating to
10 controlled substances?
11 A. 1999, no. I don't -- I
12 don't believe so.
13 Q. Did you have any
14 responsibilities relative to suspicious
15 order monitoring systems or standard
16 operating procedures, relative to
17 controlled substances?
18 A. I don't believe so, not in
19 1999.
20 Q. How long did you hold that
21 job as director of quality assurance?
22 A. I don't recall when my --
23 the exact time when -- when I was
24 promoted to director of regulatory

Page 39

1 affairs. But probably within a few years
2 after that.
3 Q. Okay.
4 (Document marked for
5 identification as Exhibit
6 Schein-DiBello-3.)
7 BY MR. MIGLIORI:
8 Q. Let me show you Exhibit
9 Number 3.
10 Exhibit Number 3 is a
11 document produced by Henry Schein. It's
12 called the export compliance program
13 corporate procedural manual.
14 A. Okay.
15 Q. Produced to us by Henry
16 Schein. Did you review this in
17 preparation for today?
18 A. No.
19 Q. It's not apparent -- well,
20 if you look at the third page, there's
21 actually a date on the bottom of a
22 memorandum or even at the top, of
23 June 21, 2006.
24 Do you see that?

Page 40

1 A. Yes.
2 Q. And then there's attached to
3 that is an organizational chart that
4 actually has a revision date of
5 October 7, 2007.
6 Do you see that on the page?
7 A. Yes.
8 Q. Okay. First, before we get
9 to the organizational chart, the Henry
10 Schein Inc. export compliance program
11 corporate procedural manual, what is
12 that? What is the export compliance
13 program?
14 A. The export compliance
15 program was a manual procedural that we
16 put in place to ensure compliance with
17 export controls, regulations.
18 Q. Is it a reasonable
19 assumption -- by export, it's referring
20 to international shipments?
21 A. Yes.
22 Q. So this document primarily
23 relates to international distribution of
24 Henry Schein products?

Page 41

1 A. Yes.
2 Q. Would that include
3 controlled substances?
4 A. I don't recall.
5 Q. Okay. If you go to the
6 third page, there is an organizational
7 chart. It has Henry Schein, Inc., senior
8 advisory regulatory affairs
9 organizational chart, and it says, as of
10 July 10, 2007.
11 And it has you listed under
12 L. David. Who is that?
13 A. Who is L. David?
14 Q. Yes.
15 A. That was my immediate
16 supervisor, Len David.
17 Q. Okay. And was he your
18 supervisor the entire time that you were
19 at Schein?
20 A. No.
21 Q. When did he become your
22 supervisor?
23 A. I don't recall the specific
24 time. I don't remember exactly when.

Page 42

1    Q.   Okay.  So sometime between
2  1999 and 2007 you took on a role with
3  regulatory affairs, correct?
4    A.   Correct.
5    Q.   Whenever that was, between
6  those two dates, is that when Len David
7  became your supervisor?
8    A.   Correct.
9    Q.   All right.  And up until
10  that point, you had no background in
11  regulatory affairs, at least as it
12  related to controlled substances,
13  correct?
14    A.   Correct.
15    Q.   When you became a director
16  of regulatory affairs, did you take on
17  any training relative to issues
18  concerning controlled substances?
19    A.   Yes.
20    Q.   When was that and what was
21  the training?
22    A.   The training was ongoing.
23  We always attended seminars, conferences,
24  regardless of whether it was controlled

Page 43

1  substances, hazardous materials, FDA,
2  DEA.  It was ongoing training all the
3  time throughout my entire tenure.
4        The training consisted of
5  conferences, seminars at trade
6  associations, Food and Drug Law
7  Institute, and general -- general
8  training at, you know, it could be at a
9  law firm, as well, for CLE credits.  So
10  it was all of the above, and again
11  throughout my entire tenure.
12    Q.   Fair to say --
13    A.   There was no formal, you
14  know, if you're looking for a formal
15  college accredited curriculum, there was
16  no formal college accredited program, per
17  se.
18    Q.   Is it fair to say that your
19  training in regulatory affairs was
20  on-the-job training?
21    A.   It also included on-the-job
22  training.
23    Q.   Okay.  In addition to the
24  conferences and the trade association and

Page 44

1  the seminars?
2    A.   Correct.  That's correct.
3    Q.   And by trade associations,
4  did you attend HDMA conferences?
5    A.   That's correct.
6    Q.   All right.  Any other trade
7  associations that you can recall that you
8  learned or were trained in the area of
9  regulatory affairs?
10    A.   Another trade association
11  was the Health Industry Distribution --
12  HIDA, Health Industry Distribution
13  Association.  I was also a member of the
14  Food and Drug Law Institute.  I was also
15  a member of the New York State Bar
16  Association, food and drug law group,
17  which also had conferences and seminars.
18    Q.   Okay.  Any of the documents
19  that you think you have in your own
20  possession, are any of those related to
21  any of these conferences, seminars,
22  didactic training sessions?
23    A.   You mean like --
24    Q.   Manuals, CLE handouts?

Page 45

1    A.   I probably do not have any
2  of those anymore just by virtue of the
3  fact that they would be outdated.
4    Q.   I don't keep mine either.
5  Just curious.
6        This chart that's in front
7  of you right now.
8    A.   Yes.
9    Q.   Is this, at least as of
10  2007, the regulatory scheme, the
11  regulatory structure within your
12  department?
13    A.   Yes.
14    Q.   So it has you directly under
15  Len David.  And then under you --
16    A.   Excuse me.
17    Q.   -- it has K. Reid,
18  administrative assistant.  Was that your
19  administrative assistant?
20    A.   Yes.  Well, she supported
21  the whole group, but she reported to me.
22    Q.   Okay.  Underneath that,
23  there are five different branches that
24  report to you.  I want to start with

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 Sergio Tejeda.
2    A.   Okay.
3    Q.   What were his
4 responsibilities, and how did he -- what
5 was he responsible to report to you?
6    A.   At that time, Sergio Tejeda
7 was responsible for the regulatory group
8 at GIV, which was general injectables and
9 vaccines, in Virginia, they were based.
10 He was -- he had a group that's
11 responsible for recalls and DEA and
12 HAZMAT.
13    Q.   Which, if it's represented
14 here, which group that reported to him
15 was responsible for DEA?
16    A.   Well, there were individuals
17 in his group that -- that had DEA
18 responsibilities.  And those individuals
19 were Craig Schiavo, Brian Loiacono, Andy
20 Tiller, and Mark Wilburn.
21    Q.   Okay.  The other one that
22 seems to have been left off from the list
23 under him is Schmidt?
24    A.   Correct.

Page 47

1    Q.   All right.  Let's go through
2 that.  What were Tiller's
3 responsibilities with respect to DEA
4 compliance?
5    A.   So Andy Tiller was based at
6 GIV.
7    Q.   What does that stand for?
8    A.   General injectables and
9 vaccines.
10    Q.   Okay.
11    A.   GIV was a distributor that
12 we -- that Henry Schein acquired, so --
13 through one of the acquisitions.  So she
14 was the supervisor, the regulatory
15 supervisor at GIV.
16    Q.   Did GIV have any controlled
17 substances or opiate distribution?
18    A.   I don't recall.
19    Q.   Okay.  What about Wilburn?
20    A.   Mark Wilburn reported to
21 Andy Tiller as a regulatory specialist,
22 assisting Andy basically on her
23 regulatory responsibilities.
24    Q.   So did Mark or Andy have any

Page 48

1 responsibilities to the best of your
2 recollection relative to the Controlled
3 Substances Act or controlled substances?
4    A.   At some point in time, I
5 don't recall the exact time frame, they
6 did have -- I know Mark had some
7 responsibilities with respect to
8 controlled substances.
9    Q.   Okay.  Do you know when and
10 what it was?
11    A.   I don't remember the time
12 period.  But I believe Mark was
13 conducting due diligence audits for
14 Sergio.
15    Q.   Tell me about Loiacono.
16    A.   Brian Loiacono was a
17 regulatory specialist, and he did some
18 DEA audits and DEA functions for Sergio.
19 But he also had other, let's say FDA and
20 other regulatory responsibilities.
21    Q.   The DEA audits that you
22 recall, were they specific to suspicious
23 order monitoring or controlled
24 substances?  I'm still talking about

Page 49

1 Loiacono.
2    A.   Yeah, Brian's role with
3 Sergio was doing -- I believe he was
4 doing the regulatory due diligence audits
5 for the DEA -- you know, DEA due
6 diligence audits.
7    Q.   Including controlled
8 substances?
9    A.   When you say including
10 controlled substances, what do you --
11 what do you mean by that?
12    Q.   The due diligence for
13 compliance with the Controlled Substances
14 Act?
15    A.   Correct.
16    Q.   All right.  Have you seen
17 any of those audits in preparation for
18 today?
19    A.   No.
20    Q.   Tell me about Sadler.
21    A.   Peter Sadler's primary --
22 his focus was on HAZMAT.
23    Q.   Okay.  You did mention him
24 in reference to DEA compliance earlier.

Page 50

1  The only one we left out was Schmidt.  I
2  thought you did anyway.
3      A.   Peter Sadler?
4      Q.   Yeah.  He didn't have any
5  responsibilities relative to DEA
6  compliance?
7      A.   No, I don't recall.
8      Q.   Okay.  As manager, was
9  Sergio Tejeda the primary person
10  responsible for the DEA compliance?
11      A.   Within the regulatory group
12  he was the primary person.
13      Q.   And the distinction I think
14  you're making, I'm asking, is that there
15  were some compliance responsibilities
16  outside of your group in regulatory
17  affairs, correct?
18      A.   There were some compliance
19  activities outside the regulatory
20  department.
21      Q.   And if I'm mischaracterizing
22  this, please correct me, but there were
23  some front line responsibilities within
24  the verifications department that were

Page 51

1  separate and distinct from the roles
2  within regulatory affairs, correct?
3      A.   Correct.
4      Q.   As the orders and the
5  initial pends, and by pends, P-E-N-D-S,
6  I'm -- I'm referring to anything that's
7  triggering a potential for suspicious
8  order.  All of those were handled on the
9  front line by the verifications
10  department, correct?
11      A.   Please restate the question.
12      Q.   Sure.
13          The orders as they came in
14  to Henry Schein for controlled substances
15  particularly, I'm talking about
16  Schedule II opioids, came first through
17  the verifications department for purposes
18  of detection or potential detection of
19  suspicious orders.  Is that a fair
20  statement?
21      A.   That's correct.
22      Q.   Regulatory affairs only got
23  involved with pended or suspicious orders
24  if they escalated through the -- the

Page 52

1  verifications department, correct?
2      A.   Correct.
3      Q.   And during the period of
4  time that we are talking about here in
5  2007, was it Shaun Abreu that was
6  primarily responsible for verifications,
7  do you recall?
8      A.   I don't recall when Shaun
9  became the primary person.  It may have
10  been 2007, but I don't remember that.
11      Q.   But -- but in any event,
12  there was a -- there was a verifications
13  layer for suspicious order monitoring
14  that existed separate and distinct from
15  regulatory affairs?
16      A.   That's correct.
17      Q.   And whether something
18  escalated from verifications to
19  regulatory affairs, was a decision
20  made -- at this time in 2007, was a
21  decision made by the verifications
22  department, correct?
23      A.   Correct.
24      Q.   That is, there was no

Page 53

1  electronic monitoring at this stage of
2  orders such that there would be an
3  automatic report of anything suspicious
4  to your department, correct?
5          MR. McDONALD:  Object to the
6      form.
7          THE WITNESS:  Electronic
8      monitoring that would -- I'm not
9      sure I follow the question.
10  BY MR. MIGLIORI:
11      Q.   That's fine.  If you don't
12  understand, that's fine.
13      A.   Yeah.
14      Q.   So we'll go through sort of
15  the history of -- of the suspicious order
16  monitoring program.
17          But let me ask you more
18  basically.  When did you first get
19  involved yourself with any
20  responsibilities as it related to
21  suspicious order monitoring programs at
22  Henry Schein?
23      A.   I don't recall the time
24  period when I first initially got

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  involved with suspicious order
2  monitoring.
3      Q.   Was it a component part of
4  your responsibility when you became --
5  when you moved into regulatory affairs?
6  Was it immediately part of your
7  responsibility or oversight?
8      A.   When I moved into regulatory
9  affairs it would have become part of my
10 responsibilities.
11     Q.   Okay.
12     A.   That's correct.
13     Q.   But as you sit here today,
14 you don't recall exactly when that was?
15     A.   I don't recall the exact
16 time period.
17     Q.   We know it's some time
18 before this 2007 flowchart, right?
19     A.   Yes.
20     Q.   I'm not going to have you go
21 through this right now.  But I'm going to
22 mark it and I may go through it at a
23 break.
24          (Document marked for

Page 55

1          identification as Exhibit
2          Schein-DiBello-4.)
3  BY MR. MIGLIORI:
4      Q.   Let me show you Exhibit 4.
5  It's what's been produced to us as your
6  personnel file.
7      A.   Okay.
8      Q.   Lots of nice things said
9  about you in there.
10         The only thing I want to ask
11 you about is, it appears that you applied
12 for the job -- this is Exhibit
13 Number 4 -- that you applied for the job
14 in April of 1996, correct?
15     A.   Correct.
16     Q.   At that point your only
17 professional experience was Underwriters
18 Laboratories, correct?
19     A.   Correct.
20     Q.   Your start date was
21 April 1st, 1996?
22     A.   That's correct.
23     Q.   I'll just get this out of
24 the way now.  On September 21st, if you

Page 56

1  go down to the page that ends with the
2  number 203, the little Bates number on
3  the bottom right corner.  There is a --
4          MR. McDONALD:  Hang on.
5  He's not with you.
6          THE WITNESS:  What page did
7  you say?
8          MR. McDONALD:  203.
9  BY MR. MIGLIORI:
10     Q.   203.
11     A.   203.
12         MR. McDONALD:  You got it.
13 It's right here.
14         THE WITNESS:  That says 183.
15         MR. McDONALD:  It looks like
16 203.  There you go.
17         THE WITNESS:  Okay.  Great.
18 Thank you.
19 BY MR. MIGLIORI:
20     Q.   Now, this appears to be the
21 resignation letter, September 21st, 2012.
22     A.   Correct.
23     Q.   And that resignation was
24 effective October 19, 2012, correct?

Page 57

1      A.   Correct.
2      Q.   And what was the reason for
3  your resignation on that date?
4      A.   I had an opportunity
5  presented to me by Aceto Corporation.
6      Q.   So you just sought a
7  different position with a different
8  company?
9      A.   Correct.  For a better
10 opportunity.
11     Q.   And have you looked at your
12 personal file in preparation for today?
13     A.   No.
14     Q.   I may come back to that
15 later.  I may not.
16     A.   Okay.
17     Q.   For now it's part of our
18 little record.
19         All right.  Just quickly, in
20 looking at Exhibit 3 again, the
21 organizational chart, there are other
22 branches of regulatory affairs that
23 reported to you.  Did Clancy have any
24 responsibilities with respect to DEA or

Page 58

1 suspicious order monitoring?
2    A.   No.
3    Q.   Did Manning have any
4 responsibilities with respect to the DEA
5 or suspicious order monitoring?
6    A.   No.
7    Q.   Did Romano have any
8 responsibilities with respect to the DEA
9 or suspicious order monitoring?
10    A.   No.
11    Q.   How about anybody underneath
12 Romano?
13    A.   At this point in time in
14 2007, Tina Steffanie-Oak did not have any
15 DEA responsibility.  She was the FDA
16 person.
17    Q.   As you implemented the
18 Buzzeo system over time, she became part
19 of the DEA team, right?
20    A.   Later on, yes, she became
21 part of Sergio's DEA team.
22    Q.   Okay.  And then finally the
23 Canadian regulatory affairs, B. Thornton,
24 I assume had no responsibilities with

Page 59

1 respect to the DEA?
2    A.   That's correct.
3    Q.   Did this flowchart
4 effectively -- other than people shifting
5 around in different positions, was this
6 essentially the structure of the
7 department through the time of your
8 departure in 2012?
9    A.   No.
10    Q.   What changed over time?
11    A.   Don Manning reported to Len.
12 He was moved over to Len.
13    Q.   So he no longer reported
14 directly to you.  You reported directly
15 to Len?
16    A.   Correct.
17    Q.   Did quality assurance
18 continue to report to you?
19    A.   Yeah.  At some point in
20 time, Maurizio Romano and the quality
21 assurance team reported to Len.  And
22 then -- and then later he was moved back
23 to me.  So that -- that was a move there,
24 too.

Page 60

1        And Al Clancy resigned.  I
2 don't know exactly when.  But he
3 resigned.  And his function -- his direct
4 report, Wesley Milton reported to Don.
5 That changed.
6    Q.   Is it a true statement that
7 from the time that you took on
8 responsibility with regulatory affairs
9 through the time of your resignation,
10 that Sergio Tejeda and the DEA compliance
11 people reported to you?
12    A.   That's correct.
13    Q.   And you reported to Len
14 David?
15    A.   That's correct.
16    Q.   Okay.  In preparation for
17 today, did you do anything to review the
18 activity of Henry Schein relative to the
19 county in which claims have been brought
20 in this litigation; that is, Summit
21 County, Ohio?
22    A.   No.
23    Q.   You're familiar with the
24 obligations of Henry Schein to report to

Page 61

1 the ARCOS data over time, correct?
2    A.   Correct.
3    Q.   And that came under your
4 department; that is, what -- let me
5 restate that.
6        Did ARCOS reporting, was
7 that a responsibility of regulatory
8 affairs or verifications?
9    A.   ARCOS reporting was the
10 responsibility of verifications.
11    Q.   Okay.  So that was not part
12 of your responsibility?
13    A.   Nope.
14    Q.   Suspicious order monitoring,
15 was that regulatory affairs,
16 verifications or both?
17    A.   Suspicious order monitoring
18 was primarily a responsibility of
19 verification.
20    Q.   Okay.  What role, if any,
21 did regulatory affairs play in that
22 suspicious order monitoring program at
23 Henry Schein while you were there?
24    A.   Regulatory was involved in

Page 62

1 the engagement of Buzzeo to develop an
2 enhanced suspicious order monitoring
3 process, and to implement, to help
4 coordinate and implement and facilitate
5 those enhancements to our suspicious
6 order monitoring process.
7     Q.   Okay.  So just briefly, if
8 you will, what is Buzzeo and how did you
9 interact with Buzzeo at the beginning?
10     A.   Buzzeo is a consultant that
11 Henry Schein used prior to my joining the
12 company.
13         He was consulting, I would
14 say, several years prior to joining --
15 prior to my joining the company.
16         Buzzeo was a former DEA
17 agent.  And we retained Buzzeo to help us
18 with the DEA project and on occasion, you
19 know, I mean, he did -- he did a lot.  He
20 did audits for us.  He advised us in
21 several different aspects with respect to
22 DEA.
23     Q.   So when you first got
24 involved with regulatory affairs sometime

Page 63

1 before 2007, Buzzeo had already been
2 consulting with Henry Schein --
3     A.   That's correct.
4     Q.   -- for suspicious order
5 monitoring?
6     A.   He was consulting with Henry
7 Schein way before I took over regulatory.
8     Q.   Okay.
9         MR. McDONALD:  So let me --
10     let me tell you, just be sure he's
11     done with his question before you
12     are answering.  You're doing
13     pretty good.  The last one you
14     answered it halfway through his
15     question.
16         THE WITNESS:  Okay.  Sorry.
17         MR. McDONALD:  Just wait
18     until he's done.  He'll pause
19     occasionally.  He's trying to
20     throw you off.
21         MR. MIGLIORI:  I'll try to
22     talk quicker so we can get to your
23     answer quicker.
24         THE WITNESS:  Okay.  I

Page 64

1 thought you -- I thought you
2 stopped.
3         MR. MIGLIORI:  No, no,
4     that's fine.  That's going to
5     happen.  The more we talk
6     conversationally, the more that
7     happens.
8         THE WITNESS:  Sure.
9         MR. MIGLIORI:  Sometimes it
10     takes somebody outside watching us
11     to point it out to both of us.
12         THE WITNESS:  Sure.
13         (Document marked for
14         identification as Exhibit
15         Schein-DiBello-5.)
16 BY MR. MIGLIORI:
17     Q.   Let me show you Exhibit
18 Number 5.  This is a PowerPoint
19 presentation that bears your name on the
20 cover.
21     A.   Yes.
22     Q.   I'll tell you that from
23 metadata, we're able to decipher that the
24 date of this is November 2, 2009.  Okay?

Page 65

1     A.   Okay.
2     Q.   Let me just show you.  So
3 Cegedim Dendrite you understand to be an
4 iteration of Buzzeo?
5     A.   That's correct.
6     Q.   All right.  So this is a
7 presentation that bears your name.  Do
8 you recall putting this together?
9     A.   Yes.
10     Q.   Did you review this in
11 preparation for today?
12     A.   Yes.
13     Q.   And so, when you're talking
14 about Buzzeo and the consulting, we're
15 talking about the same group here,
16 correct, that you -- that you seem to
17 have presented this presentation with,
18 right?  It's their watermark or their --
19 correct?
20     A.   Correct.
21     Q.   Do you recall giving this
22 presentation, actually presenting it?
23     A.   Yes.
24     Q.   And what -- what was your

Page 66

1 audience? Who was your audience, the
2 annual controlled substances conference?
3     A.   So the audience -- Ron
4 Buzzeo did conferences and seminars, as
5 we discussed earlier. That was one of
6 the training programs that he attended.
7         He gave annual -- at least
8 once a year, sometimes twice, so the
9 audience was distributors, manufacturers.
10     Q.   This would have been your
11 competitors in the market?
12         MR. McDONALD: Object to the
13     form.
14 BY MR. MIGLIORI:
15     Q.   Right? Other distributors?
16     A.   Yes.
17     Q.   So you're presenting at this
18 conference with other distributors Henry
19 Schein's approach to DEA compliance. Is
20 that a fair generalization?
21     A.   Yes.
22     Q.   Okay. These were the
23 topics. You gave a quick overview of the
24 company.

Page 67

1         Is this -- was this accurate
2 at the time, that Henry Schein was the
3 largest distributor of healthcare
4 products and services to office-based
5 practitioners in the combined North
6 American and European markets?
7     A.   Yes.
8     Q.   And that includes,
9 obviously, controlled substances?
10     A.   Yes.
11     Q.   Customers include dental
12 practices and laboratories, physician
13 practices, and animal health clinics, as
14 well as government and other
15 institutions. Those were your clients?
16     A.   Correct.
17     Q.   Over 12,000 employees at the
18 time. Business in 23 countries. And
19 over $6 billion in sales. That was the
20 size of the company?
21     A.   Correct.
22     Q.   The next slide you put here
23 basically sets forth sort of the
24 foundation of DEA compliance as it

Page 68

1 relates to controlled substances,
2 correct?
3     A.   Correct.
4     Q.   This is the excerpt from the
5 Controlled Substances Act that puts on
6 the distributor the responsibility of
7 designing and operating a system to
8 disclose to the registrant suspicious
9 orders of controlled substances, correct?
10     A.   Correct.
11     Q.   You wrote that "the
12 regulation clearly indicates that it is
13 the sole responsibility of the registrant
14 to design and operate such a system." So
15 you were aware of the obligation of
16 DEA -- DEA registrants like Henry Schein
17 in their sole responsibility to design
18 and operate suspicious order monitoring
19 programs for their company?
20     A.   Can you repeat the question?
21     Q.   Sure. That statement,
22 the -- "The regulation clearly indicates
23 that it is the sole responsibility of the
24 registrant to design and operate such

Page 69

1 a" -- "such a system."
2         That statement refers to
3 Henry Schein, correct?
4     A.   Correct.
5     Q.   That is, designing and
6 operating a system for Henry Schein
7 suspicious order monitoring system was
8 non-delegable. It was something that you
9 had to do yourself, right?
10     A.   That's correct.
11     Q.   In reference to the
12 December 2007 letter from DEA, are you
13 familiar with what's referred to as the
14 "dear registrant" letters or the
15 Rannazzisi letters? Do you recall
16 reading those?
17     A.   Vaguely. In 2007.
18     Q.   So the citation here to the
19 December 2007 letter. Do you have a
20 specific recollection of -- of having
21 read that at the time, or been aware of
22 it at the time?
23     A.   I have a general
24 recollection.

Page 70

1    Q.   Okay.  And this excerpt
2  here, this is something that you pulled
3  out from that letter for the purposes of
4  this presentation to the trade
5  association, correct, or you had it
6  pulled?
7    A.   I had it pulled out, yeah.
8  I didn't prepare it.
9    Q.   And then you go through some
10  challenges that you felt.  You thought
11  this was an unclear requirement with
12  respect to knowing your customer.
13        What -- what do you recall,
14  if anything, was unclear about the
15  obligations under the Controlled
16  Substances Act to know your customer, if
17  you can recall?
18    A.   Do I recall what -- can you
19  repeat that question?
20    Q.   Yeah.  Your first bullet
21  point here says, "Unclear requirements
22  with lack of guidance.  Know your
23  customer."
24        Do you recall why you put

Page 71

1  that bullet point, that there was --
2  there were unclear requirements with lack
3  of guidance relative to "know your
4  customer" obligation?
5    A.   Okay.  So the way the
6  statute is written, it was not specific
7  for a particular customer to determine
8  whether an order could be, you know,
9  deemed suspicious.  And that was the --
10  so it was not specific.  It was -- it was
11  a very broad, very general requirement.
12    Q.   Do you recall in any of the
13  letters received in 2007 or 2006 a
14  guidance from the DEA about what are some
15  of the things that are deemed as red
16  flags or anomalies that need to be
17  investigated for the "know your customer"
18  obligations?
19    A.   I recall that they -- there
20  was a -- you know, in the letter there
21  was some guidance offered.
22    Q.   Okay.  And again the date of
23  this is November of 2009.  By this point
24  you said you were a member of the HDMA.

Page 72

1  Do you recall the guidance provided to
2  Henry Schein and other distributors from
3  the HDMA about the "know your customer"
4  obligations, specifically in 2008?
5        MR. McDONALD:  Object to the
6  form.
7  BY MR. MIGLIORI:
8    Q.   Do you recall that, that's
9  my only question.
10    A.   Not specifically, but --
11    Q.   Do you recall that there
12  was, in fact, a guidance that Henry
13  Schein signed off of from the HDMA in
14  2008 relative to the DEA compliance best
15  practices?
16    A.   You said signed off on it?
17    Q.   As a member of the HDMA.
18    A.   I don't recall.
19    Q.   Okay.  We'll get into the
20  specifics of the process.  But I want to
21  direct your attention to Page 11 right
22  now, just for a timeline.
23    A.   Okay.
24    Q.   This is your PowerPoint.  So

Page 73

1  I just want to sort of go through.  Do
2  you recall looking at this timeline in
3  preparation for today?
4    A.   Yes.
5    Q.   All right.  So in this slide
6  that you prepared for this presentation,
7  you have that the suspicious order
8  monitoring project started in September
9  of 2007.  Is that the beginning of the
10  implementation of the Buzzeo
11  recommendations?
12    A.   No.
13    Q.   What is that date?
14    A.   I'm not -- I'm not -- I'm
15  not recalling what that date signifies.
16    Q.   Shaun Abreu testified in
17  this case as the person designated by
18  Henry Schein to speak for the company
19  relative to the suspicious order
20  monitoring program in place.  To the
21  extent that his -- that he has a
22  recollection of this and -- and what it
23  signifies, at least at this stage, given
24  your -- your current memory, would you

Page 74

1 defer to his testimony, his memory?
2        MR. McDONALD:  Object to the
3    form.
4        THE WITNESS:  Would I -- I
5    just want to make sure I
6    understand the question.
7        Would I defer to his
8    recollection?
9 BY MR. MIGLIORI:
10    Q.   He's testified and was
11 designated by Henry Schein as the person
12 who will speak for the company, not just
13 for himself --
14    A.   Okay.
15    Q.   -- on what these dates
16 signify.  You have not reviewed that
17 testimony, have you?
18    A.   No.
19    Q.   All right.  And as you sit
20 here today, you personally don't have any
21 information about what the suspicious
22 order monitoring project start date
23 means, is that fair to say?
24    A.   Correct.  I don't.

Page 75

1    Q.   This is your slide, but you
2 just don't recall as you sit here today?
3    A.   I don't recall what that
4 project start date means.
5    Q.   Okay.  In November of 2007,
6 in your slide, it says, "Restrictions set
7 up to prevent accounts from ordering
8 products not normally used in their
9 practice."
10        Do you recall a
11 recommendation of Buzzeo or Dendrite,
12 whatever the name was at the time, that
13 there be an immediate standard operating
14 procedure to prevent certain accounts
15 from getting products based on practice
16 type?
17    A.   I don't recall that specific
18 recommendation.
19    Q.   Okay.  But you put this in
20 your slide presumably because there was a
21 decision in November of 2007 to put in an
22 immediate restriction on certain
23 accounts, correct?
24    A.   Well, I would -- you said

Page 76

1 immediate.  It was -- it was -- it says
2 here, "Restrictions set up to prevent
3 accounts from ordering products not
4 normally used in their practice."  So
5 that's -- that was implemented.  I
6 would -- I would agree that it was
7 implemented as stated here on the slide.
8        MR. McDONALD:  You okay?
9        THE WITNESS:  It just went
10    down the wrong pipe.
11        (Document marked for
12    identification as Exhibit
13    Schein-DiBello-6.)
14 BY MR. MIGLIORI:
15    Q.   I'm going to show you
16 Exhibit 6.
17        I'm just giving this to you
18 for another historical --
19    A.   Okay.
20    Q.   -- look at it.
21        This is dated July 19, 2018,
22 last year, from Jeff Peacock to Sergio
23 Tejeda.  And it's attaching another
24 PowerPoint.  And it has a little timeline

Page 77

1 there.  It's on Page 2.
2    A.   Okay.
3    Q.   And it says, "History of
4 Henry Schein's SOMs and 'know your
5 customers' due diligence development."
6    A.   Okay.
7    Q.   It says here, "In 2008,
8 Henry Schein suspicious order monitoring
9 system was designed in conjunction with
10 Buzzeo PDMA."
11        Is that consistent with your
12 recollection, that the suspicious order
13 monitoring system that was recommended
14 and implemented in 2008 was that -- that
15 was consulted to, at least, to -- by
16 Buzzeo?
17    A.   I'm sorry.  The question
18 was?
19    Q.   I'll ask you again.
20    A.   In 2008?
21    Q.   In 2008, in this chart --
22    A.   Right.
23    Q.   -- it says, Henry Schein
24 suspicious order monitoring system was

Page 78

1 designed in conjunction with Buzzeo. Is
2 that consistent with your recollection?
3     A.   In 2008, I just don't
4 understand the significance of 2008.
5 What --
6     Q.   These aren't my documents.
7     A.   Yeah, they're --
8     Q.   I understand you --
9     A.   -- not my documents either.
10 That's why I don't understand the
11 question, I guess.
12     Q.   Well --
13        MR. McDONALD:  Hang on.
14 Hang on.  One of you needs to talk
15 at a time.  Let him ask the
16 question.
17        THE WITNESS:  Sure.
18 BY MR. MIGLIORI:
19     Q.   I'm just trying to give you
20 some context.  I am showing you in this
21 first exhibit, Exhibit Number 5 --
22     A.   Right.
23     Q.   -- I'm showing you a chart
24 that you actually presented to a trade

Page 79

1 association.  And it talks about the
2 start of the suspicious order monitoring
3 program in September of 2007.  And you
4 told me that you don't recall that.
5        I asked you about whether
6 you recall restrictions being set up to
7 prevent accounts from ordering products
8 not normally used in their practice in
9 2007, again, in your slide, and you said
10 you don't recall that.
11     A.   That's not what I said.
12     Q.   Okay.  You do recall it?
13     A.   No.  I said in response to
14 your question, you said immediate.
15     Q.   Okay.
16     A.   I said I don't know what you
17 mean by "immediate restrictions were
18 implemented."
19     Q.   Fair enough.  I'll take the
20 word out "immediate."  Do you recall
21 putting in those restrictions?
22     A.   Yes.
23     Q.   All right.  Were those
24 restrictions the recommendation of

Page 80

1 Buzzeo?
2     A.   I don't recall the specific
3 recommendation with Buzzeo.
4     Q.   In December 2007, there is
5 another reference to the DEA letter sent
6 to manufacturers and distributors.  Do
7 you recall our earlier discussion about
8 that letter?
9     A.   Yes.
10     Q.   And that's the letter from
11 Joe Rannazzisi to all DEA registrants,
12 correct?
13     A.   Correct.
14     Q.   We'll get into that a little
15 later.
16     A.   Okay.
17     Q.   Going to this exhibit, which
18 is from last year, and in giving the
19 history of it, it talks about Henry
20 Schein's suspicious order monitoring
21 system being designed in conjunction with
22 Buzzeo in 2008.
23        I'm simply asking, does this
24 refresh your recollection of this start

Page 81

1 date that's in your chart in the earlier
2 exhibit?
3     A.   Yes.
4     Q.   So is it fair to say, going
5 back to your chart, that at the end of
6 2007, is when the Buzzeo system was first
7 being implemented or being designed for
8 Henry Schein?
9        MR. McDONALD:  Object to the
10 form.
11        THE WITNESS:  No, I don't
12 believe 2007 was an accurate
13 reflection of when the Buzzeo
14 system was designed.
15 BY MR. MIGLIORI:
16     Q.   Okay.  So what was the date
17 that you put in your own slide that says,
18 "Suspicious order monitoring project
19 started"?  What does that signify in your
20 chart?
21        MR. McDONALD:  Objection.
22 Asked and answered.
23        THE WITNESS:  I believe that
24 date signifies a point in time

Page 82

1 when some development and
2 implementation activities were
3 underway. But it does not reflect
4 when the SOM enhancement project
5 was initiated.
6 BY MR. MIGLIORI:
7 Q. Okay. So now you are
8 talking about an enhancement project.
9 Again, this is -- these are your -- this
10 is your chart, where you've picked a
11 date, and you call it an SOM project. Is
12 that different from the enhancement
13 project, or were you wrong about the
14 date?
15 MR. McDONALD: Objection.
16 BY MR. MIGLIORI:
17 Q. I'm just trying to
18 understand your chart.
19 MR. McDONALD: Object to
20 form.
21 THE WITNESS: The chart says
22 SOM project started. So that's --
23 that's the SOM project. I refer
24 to it as SOM enhancements, because

Page 83

1 that's what was the goal of the
2 SOM project.
3 BY MR. MIGLIORI:
4 Q. Okay.
5 A. And the date, all I said was
6 that the 2007 date merely reflects the
7 fact that design, development,
8 implementation, programming, was
9 underway. But does not reflect the
10 actual genesis of the -- of the project.
11 Q. Okay. I can't say I
12 understand any more, but at least we can
13 agree that your words are, "Suspicious
14 order monitoring project started
15 September 20, 2007"? Somehow that's what
16 you chose to represent in this chart?
17 A. Correct.
18 Q. And Peacock chose to
19 represent in his chart last year that the
20 Henry Schein suspicious order monitoring
21 system was designed in conjunction with
22 Buzzeo starting in 2008. And you're
23 saying that's inconsistent with your
24 recollection?

Page 84

1 A. No. I didn't say it was
2 inconsistent. I said one talks about the
3 project being designed in conjunction
4 with Buzzeo, PDMA. And that's Peacock's
5 characterization. And my chart has SOM
6 project started in 2007.
7 Q. Okay. And Peacock says that
8 the implementation of the suspicious
9 order monitoring system was completed in
10 2009. That's in Exhibit 6. In your
11 Exhibit 5, it seems that you also say
12 that the, "New item setup process
13 implemented," and you have a box around
14 the October 1st to October 9th dates,
15 "System completion." Do you see that?
16 A. Yes.
17 Q. All right. Okay. So can we
18 agree that whatever project was underway
19 in 2007 and/or 2008 in these two
20 exhibits, you both agree that that
21 project was operational and implemented
22 in October of 2009? Is that a fair
23 timeline?
24 A. Yes.

Page 85

1 Q. In your exhibit you talk
2 about a statistical approach,
3 specifications were finalized and
4 submitted in March of 2009.
5 Do you recall the process of
6 coming up with statistical algorithms
7 that were to be tested for implementation
8 in this new suspicious order monitoring
9 program?
10 A. Yes.
11 Q. Okay. And those were
12 statistical approaches that were designed
13 in conjunction with Buzzeo, correct?
14 A. Correct.
15 Q. And their testing and the
16 standard operating procedures being
17 revised and finalized, that all occurred
18 through October of 2009 when they were --
19 when they were first implemented,
20 correct?
21 A. Correct.
22 MR. McDONALD: Object to the
23 form.
24 BY MR. MIGLIORI:

Page 86

1  Q.  And then in 2012, according
2  to Jim Peacock's chart, the suspicious
3  order monitoring system was audited by
4  Buzzeo in a collaborative effort with
5  Henry Schein verifications, regulatory
6  affairs, legal and internal audits.  Is
7  that another -- is that consistent with
8  your recollection?
9  A.  I don't recall 2012 SOMs
10  audited by -- that statement, "SOMs
11  audited by Buzzeo in collaboration with
12  Henry Schein verifications, regulatory
13  legal, and internal audit."
14  Q.  You don't recall the Buzzeo
15  audit?
16  A.  I don't recall specifically
17  the Buzzeo audit.  I recall Buzzeo
18  working with us throughout the entire
19  process.  If he conducted an audit
20  throughout the process, which probably
21  did, I mean, there was a lot of testing
22  and, you know, validation going on.  But
23  I don't remember -- I don't recall the
24  specific 2012 collaborative effort.

Page 87

1  Q.  Okay.  So it's in 2012 in
2  September, or actually effective
3  October 19th or something, that you left
4  the company, correct?
5  A.  That's correct.
6  Q.  All right.  And before we
7  take a break, just to get this out of the
8  way.
9  You didn't have any
10  responsibilities or interactions with
11  Henry Schein after you left the company,
12  did you?
13  A.  That's correct.
14  Q.  I saw that you offered to
15  help in the transition, but once you left
16  the company, you lost -- or you no longer
17  maintained any communications, contact,
18  or interactions with either Henry Schein
19  or Buzzeo with respect to Henry Schein's
20  suspicious order monitoring program,
21  correct?
22  A.  That's correct.
23  MR. MIGLIORI:  Why don't we
24  take a break.

Page 88

1  THE VIDEOGRAPHER:  All
2  right.  Stand by, please.  Remove
3  your microphones.  Okay.  The time
4  is 11:49 a.m.  Going off the
5  record.
6  (Short break.)
7  THE VIDEOGRAPHER:  Okay.  We
8  are back on the record.  The time
9  is 12:06 p.m.
10  BY MR. MIGLIORI:
11  Q.  I want to try to fill in
12  some of that timeline now with some
13  specifics and some experience directly.
14  Let's start at the
15  beginning.
16  So sometime in early 2000s
17  when you first got to regulatory affairs,
18  did you -- did you get there as director,
19  did you go right into a director
20  position?
21  A.  When I got to regulatory
22  affairs?
23  Q.  Yes.
24  A.  Yeah.  I was director of

Page 89

1  quality.
2  Q.  Right.
3  A.  And then I believe the title
4  was changed to director of regulatory
5  affairs.
6  Q.  Okay.  And that's what
7  happened some time between --
8  A.  1999.
9  Q.  -- 1999 and 2007?
10  A.  Yeah.  Yeah.
11  Q.  And it's when you became
12  director of regulatory affairs that you
13  first started to deal with the Controlled
14  Substances Act and the obligations
15  relative to DEA compliance, correct?
16  A.  Correct.
17  (Document marked for
18  identification as Exhibit
19  Schein-DiBello-7 and
20  Schein-DiBello-8.)
21  BY MR. MIGLIORI:
22  Q.  This is Exhibit 7.  It's
23  just a statement of the Controlled
24  Substances Act.  Do you recognize that as

Page 90

1 the part of the Controlled Substance Act
2 that governs the distributor's
3 responsibility as it relates to designing
4 and operating a system to disclose to the
5 registrant suspicious orders of
6 controlled substances?
7     A.   Correct.
8     Q.   It talks about informing the
9 DEA in the area of suspicious orders when
10 discovered by the registrant.  You
11 understood that to be an obligation
12 under -- an obligation of Henry Schein to
13 report suspicious orders when discovered?
14     A.   Correct.
15     Q.   And you see that this act
16 was enacted in 1971?
17     A.   Correct.
18     Q.   So I assume for all relevant
19 time that you were at Henry Schein, that
20 you understood and appreciated this was
21 the obligation, correct?
22     A.   Correct.
23     Q.   You also understood as the
24 director of regulatory affairs that under

Page 91

1 the Act, "Suspicious orders include
2 orders of unusual size, orders deviating
3 substantially from a normal pattern, and
4 orders of unusual frequency," that that
5 was the definition in part of suspicious
6 orders?
7     A.   Correct.
8     Q.   As director of regulatory
9 affairs at Henry Schein, you also
10 appreciated that under that same act,
11 Congress made certain findings about
12 controlled substances?  Were you aware
13 that there were certain findings,
14 congressional findings about controlled
15 substances?
16     A.   I don't recall the specific
17 findings.
18     Q.   Did you appreciate, while
19 you were director of regulatory affairs
20 at Henry Schein, that, "The illegal
21 importation, manufacture, distribution
22 and possession and improper use of
23 controlled substances have a substantial
24 and detrimental effect on the health and

Page 92

1 general welfare of the American people"?
2 Were you aware of that?
3     A.   Yes.
4     Q.   And were you aware that in
5 the scheduling of drugs, going back to
6 1970, that the Schedule II drugs were
7 defined as, "A, the drug or other
8 substance has a high potential for
9 abuse"?  Did you appreciate that as
10 director of regulatory affairs?
11     A.   Yes.
12     Q.   Did you appreciate as
13 director of regulatory affairs that a
14 Schedule II drug was, "A drug or other
15 substance, has a currently accepted
16 medical use in treatment in the United
17 States or currently accepted medical use
18 with severe restrictions"?
19     A.   Correct.
20     Q.   Did you appreciate as
21 director of regulatory affairs at Henry
22 Schein that Schedule II drugs -- that,
23 "Abuse of the drug or other substance may
24 lead to severe psychological or physical

Page 93

1 dependence"?
2     A.   Yes.
3     Q.   And did you appreciate while
4 you were director of regulatory affairs
5 at Henry Schein that opioids were
6 Schedule II drugs?
7     A.   Yes.
8     Q.   At some period of time,
9 hydrocodone was a Schedule III drug --
10 actually, were you aware of the fact that
11 hydrocodone was a Schedule III drug
12 during the time that you were director of
13 regulatory affairs at Henry Schein?
14     A.   I don't recall.
15     Q.   I was going to go through
16 some documents chronologically that have
17 your name.
18         (Document marked for
19         identification as Exhibit
20         Schein-DiBello-9.)
21         MR. MIGLIORI:  The first one
22     is Exhibit 9.
23 BY MR. MIGLIORI:
24     Q.   Now when you first got to

Page 94

1 regulatory affairs, what did you
2 understand the suspicious order
3 monitoring program to be?
4        MR. McDONALD:  Object to the
5 form.
6 BY MR. MIGLIORI:
7    Q.   Before we get to the
8 document, what was in place at the time
9 that you started for controlled
10 substances?
11    A.   When I started as director
12 of regulatory?
13    Q.   Yeah.
14    A.   My recollection is that
15 there was a suspicious order monitoring
16 system in place to ensure that we
17 detected suspicious orders and reported
18 them accordingly.
19    Q.   That system in place was a
20 system that was day-to-day managed by the
21 verifications department?
22    A.   Verification department had
23 a primary responsibility for that.
24    Q.   Okay.  And when you first

Page 95

1 got there, do you recall who was
2 responsible for verifications at the
3 time?
4    A.   I don't recall who was
5 responsible for verification at that
6 time.
7    Q.   What, if any,
8 responsibilities did your department have
9 relative to the suspicious order
10 monitoring program in place when you
11 became director of regulatory affairs?
12    A.   My team would get involved
13 when they had questions that the
14 verifications group were not sure how to
15 handle.
16    Q.   Did regulatory affairs set
17 any thresholds at that time when you
18 first started as director?
19    A.   No.
20    Q.   Did regulatory affairs
21 establish any definitions of what is a
22 suspicious order?
23    A.   No.
24    Q.   Did regulatory affairs

Page 96

1 establish any definitions of what is a
2 pended order?
3    A.   No.  When I -- when I took
4 over the group --
5    Q.   At the beginning.
6    A.   At the beginning, no.
7    Q.   And did regulatory affairs
8 have any responsibilities with respect to
9 the due diligence performed when
10 onboarding a new customer at the time
11 that you started?
12    A.   At the time that I took
13 over, no.
14    Q.   Did regulatory affairs have
15 any responsibilities with respect to
16 "know your customer" obligations of an
17 existing customer of Henry Schein when
18 you took over as director?
19    A.   I don't recall.
20    Q.   Is it fair to say that
21 relative to the suspicious order
22 monitoring program that existed when you
23 took over as director of regulatory
24 affairs, that your department was there

Page 97

1 as a resource to verifications when they
2 chose to use it?
3    A.   Yes.
4    Q.   Otherwise, the suspicious
5 order monitoring program, to the extent
6 it existed when you started as director,
7 was managed, implemented, audited by the
8 verifications team?
9    A.   There's several parts to
10 that question, all right.  So managed by
11 the verification team, that's -- that was
12 their primary responsibility.
13        Implemented, yeah, I guess
14 they would implement their, you know,
15 procedures and practices.
16        Audited by the verification
17 team, I don't recall.
18    Q.   Okay.  You've had a
19 recollection that Buzzeo was already in
20 place as a consultant for the suspicious
21 order monitoring program at the time that
22 you took over as director, is that -- do
23 I remember that correctly?
24    A.   So Buzzeo was a consultant,

Page 98

1 for all things DEA, when I took over.
2     Q.    Okay.
3     A.    Including the SOM.
4     Q.    Okay.  So were you aware of
5 any audits at the time that you took over
6 as director that were being performed by
7 your department of the suspicious order
8 monitoring program?
9     A.    Audits?  I don't recall
10 audits.
11     Q.    Do you recall whether Buzzeo
12 had already or were in the process of
13 doing any audits of the suspicious order
14 monitoring program when you became
15 director?
16     A.    I don't recall.
17     Q.    As you sit here today, is
18 your first recollection of a change in
19 the existing suspicious order monitoring
20 program that you inherited when you
21 became director, the first change of that
22 was the change that we saw in the
23 timeline, that is, at the end of 2007,
24 beginning of 2008?

Page 99

1     A.    The first change?
2     Q.    The first change in the
3 suspicious order monitoring program, yes.
4     A.    2007 being the first change,
5 is that the question?
6     Q.    No.  Let me repeat it.
7          You became director sometime
8 before 2007.
9     A.    Yes.
10     Q.    I assume we are talking
11 about a matter of two, three, or
12 four years.
13     A.    I would say probably more
14 than that.  I would say closer to 2000,
15 2001, '2.  The early 2000s --
16     Q.    Okay.
17     A.    -- when I became --
18     Q.    From 2002 until 2007 when
19 you first -- the first date you put on
20 the SOM project in the timeline we
21 discussed there --
22     A.    Okay.
23     Q.    -- were there changes made
24 to the suspicious order -- suspicious

Page 100

1 order monitoring program at Henry Schein
2 that you can recall?
3     A.    I can -- I can't recall
4 specific changes.  But I recall that it
5 was a -- it was an ongoing evolutionary
6 process.
7     Q.    Okay.  And was that
8 evolutionary process being managed by
9 regulatory affairs or by the
10 verifications department?
11     A.    It was a collaborative
12 effort --
13     Q.    Okay.
14     A.    -- where both teams worked
15 to continuously, you know, review and
16 monitor the -- the process.
17     Q.    And what role did you play,
18 if any, in that process?
19     A.    My role as the director was
20 to provide the resources and support for
21 the verifications team, to make sure that
22 Sergio and his team, the regulatory team,
23 would be able to support the
24 verifications group.

Page 101

1     Q.    And do you recall any ways
2 in which Sergio and his team supported
3 the verifications group in the time frame
4 from 2002 to 2007 specifically to change
5 the system?  Do you recall anything
6 specifically?
7     A.    I don't recall anything
8 specifically.  But I know that there --
9 there are a lot of meetings, and a lot of
10 interaction and a lot of discussion about
11 the suspicious orders monitoring system.
12     Q.    Did you participate in those
13 discussions?
14     A.    Yes.
15     Q.    Were there regular meetings
16 in that time frame?
17     A.    There were meetings.  There
18 were -- there were lots of meetings with
19 the verifications group and the IT group.
20     Q.    Okay.  And when did -- when
21 did the -- did you -- strike that.
22          In those meetings, was it
23 the verifications department that was --
24 that was relying on Sergio Tejeda's team

Page 102

1 for regulatory support?
2        During that period of time
3 was it the verifications team that was
4 operationally implementing the system?
5        MR. McDONALD:  Object to the
6     form.
7        THE WITNESS:  During that
8     time was the verification team
9     implementing the system, the
10    suspicious order monitoring
11    system?
12 BY MR. MIGLIORI:
13    Q.   Yeah.
14    A.   Yes.  They -- they -- the
15 verifications team implemented the
16 system.  It was -- yeah.
17    Q.   What resources or support
18 would Sergio Tejeda be giving to them in
19 that time frame?
20    A.   The support would be
21 regulatory technical support in the form
22 of helping them to decide, for example,
23 if this order was suspicious or not.
24        If this -- you know, at some

Page 103

1 point in time, there was a lot of
2 activity and support with the consultant,
3 Buzzeo.  So that's another form of
4 support between Sergio and the
5 verification team.
6    Q.   Was it the regulatory
7 affairs department that retained Buzzeo,
8 that chose to retain Buzzeo?
9    A.   The regulatory team was the
10 primary interface with -- with Buzzeo and
11 made the decision to -- to retain Buzzeo.
12    Q.   Other than what we saw
13 today, which referenced 2007-2008 as the
14 suspicious order monitoring program
15 designed in conjunction with Buzzeo, are
16 you aware of any other Buzzeo changes to
17 the suspicious order monitoring program
18 prior to 2007?
19    A.   I'm not aware of specific
20 changes, but I recall that the -- the
21 Buzzeo engagement occurred before 2007.
22 And again, I would -- I would -- you
23 know, I would call Buzzeo, Sergio would
24 call Buzzeo any time there was a

Page 104

1 question.  So there was -- there was --
2 again, you know, we had a constant
3 interaction with him on a regular -- not
4 a regular, you know, daily basis, but on
5 an occasional basis when we had a
6 question about a DEA issue or a
7 suspicious order monitoring -- suspicious
8 order.
9    Q.   Okay.  Let me show you
10 Exhibit 9 that I've already given you.
11 This is an e-mail that was copied to you.
12 When you deal with -- deal with e-mails,
13 you start at the bottom and go up.
14    A.   Okay.
15    Q.   That's the way the chains
16 work.
17        But this is January of 2007.
18 And it's from Donna Remondino to you and
19 others.  At that time what did Donna
20 Remondino do?
21    A.   Donna worked in the
22 verifications group.
23    Q.   She wrote to you and said,
24 "Trib called."

Page 105

1        Who is Trib?
2    A.   Trib is a programmer, he
3 worked in IT.
4    Q.   Okay.
5    A.   He's a IT programmer.
6    Q.   "Trib called to inform me
7 that they will be purging the control
8 drug files and we will only have access
9 to five years of history.  I wanted to
10 make sure prior to this being done that
11 the DEA and state does not require longer
12 history on file.  I know we get requests
13 to pull information longer than five
14 years, but I am not sure what is our
15 requirement.  Trib will wait to do the
16 purge on regulatory findings.  Thank you
17 for your help."
18        Do you recall her reaching
19 out to you for this issue?
20    A.   I don't recall the specific
21 issue.  Again, there were -- there were
22 lots of questions between the
23 verification and -- and the regulatory
24 group.

Page 106

1 Q. Is this one of the ways in
2 which verifications used regulatory
3 affairs as a resource?
4 A. Yes, yes.
5 Q. In response to that, Sergio
6 Tejeda, who at this point in January of
7 '07 was reporting to you, correct?
8 A. Correct.
9 Q. Sergio responded copying
10 you, saying, "Donna, purging drug files
11 older than five years is acceptable and
12 in compliance with DEA regulations and
13 company policy. For future reference on
14 recordkeeping for controlled substances
15 products, I'm attaching a copy of the
16 corporate record retention policy.
17 Please ensure we maintain controlled
18 substances records accordingly."
19 Do you recall that that was
20 the policy at Henry Schein, to keep
21 controlled substance drug files for five
22 years only?
23 A. I don't recall specifically
24 the five-year policy. But I know we had

Page 107

1 a policy.
2 Q. Do you know why -- do you
3 know why Henry Schein maintained a
4 five-year policy, purpose behind it?
5 A. Do I know why Henry Schein
6 maintained a policy?
7 Q. A five-year --
8 A. Five-year --
9 Q. -- record retention policy.
10 A. No, I don't. I don't know
11 why it was five years.
12 Q. We've talked a lot in other
13 depositions about the -- the databases
14 and the computer systems. At this time,
15 is the JD Edwards, is that the name of
16 the system?
17 A. JD Edwards.
18 Q. Was that in place?
19 A. Yeah, I think that was the
20 name of the system. Sounds right.
21 Q. Did regulatory have any
22 responsibilities with respect to setting
23 the record retention policy or decisions
24 to purge records?

Page 108

1 A. The record retention policy
2 was set by legal.
3 Q. That's -- is regulatory part
4 of legal or is that a separate department
5 completely?
6 A. At what point in time are
7 you referring to?
8 Q. Let's start with 2007.
9 A. In 2007, I don't recall the
10 exact date, but I believe at that time
11 period, regulatory was part of legal.
12 There was a point that regulatory was not
13 part of legal. So there -- there was a
14 transition. When -- when David was
15 reporting to legal.
16 Q. We have been advised that
17 transactional records were purged in
18 2009.
19 Do you recall that being the
20 case?
21 A. Transactional records were
22 purged in 2009?
23 Q. Mm-hmm.
24 A. I don't recall that. I

Page 109

1 don't -- I'm not familiar with that.
2 Q. Were you part of any
3 decision to purge any records that might
4 relate to transactions or DEA reporting
5 requirements in 2009 or at any time?
6 A. No. I was not involved.
7 (Document marked for
8 identification as Exhibit
9 Schein-DiBello-10.)
10 BY MR. MIGLIORI:
11 Q. I'll show you Exhibit 10:
12 Exhibit 10 is a document received from
13 Henry Schein called The Suspicious
14 Monitoring System Meeting Confidential.
15 It's October 10, 2007. The
16 attendees include folks from your team,
17 Sergio Tejeda and Craig Schiavo, right?
18 A. Yes.
19 Q. Andy Tiller and Mark
20 Wilburn, they reported to you as well,
21 correct?
22 A. Indirectly through Sergio.
23 Q. Are these all regulatory
24 people?

Page 110

1    A.   Are these all, on the
2  attendees?
3    Q.   Yeah.
4    A.   Maggie was verification.
5  Maggie Wilding was part of the
6  verifications team.  Patrick Hannahoe was
7  the IT team.  Jaysari Pal was also part
8  of the Patrick's team, IT.
9    Q.   It says here that as the
10 October 10, 2007, minutes of a meeting,
11 confidential meeting.  It says, "During
12 this meeting it was decided that the
13 suspicious monitoring system would take
14 top priority with IS over all of the
15 regulatory projects."
16      Is IS information systems?
17   A.   Yes.
18   Q.   IT department?
19   A.   Yeah, yes.  Same, yeah.
20   Q.   "IS agreed to start figuring
21 out how the system should be set up
22 immediately and will supply regulatory
23 with the specialty codes."
24      Do you recall in October

Page 111

1  2007 beginning a suspicious order
2  monitoring system that involved Henry
3  Schein's internal information systems?
4    A.   I don't recall the specific
5  meeting.
6    Q.   Is it -- do you recall that
7  prior to this date, that the suspicious
8  order monitoring program at Henry Schein
9  was not IT based?
10      MR. McDONALD:  Object to the
11   form.
12 BY MR. MIGLIORI:
13   Q.   It wasn't automated.
14   A.   Prior to 2007?
15   Q.   Correct.
16   A.   I don't recall that.
17   Q.   The next line of the minutes
18 of the meeting says, "The system needs to
19 be able to set thresholds and flag all
20 suspicious orders."
21      Does this refresh your
22 recollection that a system was being
23 implemented and designed as of October
24 2007 to create an automated system to set

Page 112

1  thresholds and flag suspicious orders at
2  Henry Schein?
3      MR. McDONALD:  Object to the
4    form.
5      THE WITNESS:  I don't
6    recall.
7  BY MR. MIGLIORI:
8    Q.   So as you sit here, you just
9  don't recall either way.  You don't
10 recall this being true or untrue,
11 correct?
12      MR. McDONALD:  Object to the
13   form.
14      THE WITNESS:  I don't recall
15   it being true or untrue.
16 BY MR. MIGLIORI:
17   Q.   This minute -- the minutes
18 go on to say, "Also during the meeting we
19 ran through Bob Williamson's
20 recommendations and what we discussed in
21 the first meeting on 9/20/07, so that IS
22 and GIV had an understanding of what was
23 discussed in the previous meeting, as
24 well as what we are trying to do, so that

Page 113

1  our systems are in compliance with DEA."
2      Do you recall Bob Williamson
3  at Buzzeo?
4    A.   Let me just correct my
5  previous statement.
6      You asked if I recall this
7  as being true or untrue?
8    Q.   Yes.
9    A.   I don't recall this as being
10 true.
11   Q.   Okay.  Well, let's unpack
12 that.
13      The -- this memo -- you'll
14 agree with me that this -- these minutes
15 of this meeting, of folks that reported
16 to you, suggest that a system needs to be
17 able to be set up to set thresholds and
18 flag suspicious orders.  That's what the
19 document says, correct?
20      MR. McDONALD:  Object to the
21   form.
22      THE WITNESS:  Correct.
23 BY MR. MIGLIORI:
24   Q.   Do you believe that to be an

Page 114

1 untrue statement, that this system needed
2 to be designed in October of 2007?
3          MR. McDONALD:  Object to the
4     form.
5          THE WITNESS:  Can you repeat
6     the question?
7 BY MR. MIGLIORI:
8     Q.   Sure.  These minutes of this
9 meeting of folks that report to you said
10 a few things.  One, that it was decided
11 that a suspicious monitoring system would
12 take top priority with the IS department
13 over all regulatory projects.
14          To the best of your
15 recollection, was that a true statement
16 then?
17     A.   2007.  I don't recall.
18     Q.   Okay.  The -- the minutes of
19 this meeting of your staff says,
20 "Information systems agreed to start
21 figuring out how the system should be set
22 up immediately and will supply regulatory
23 with specialty codes."
24          Do you recall that to be a

Page 115

1 true statement in 2007?
2     A.   I don't recall.
3     Q.   These folks who worked for
4 you also reported in minutes of their
5 meeting in 2007, that the
6 "system would need to be able to set
7 thresholds and flag all suspicious
8 orders."
9          Do you recall that to be
10 true in October of 2007?
11     A.   I don't recall.
12     Q.   The next sentence talks
13 about a man by the name of Bob
14 Williamson.  Do you remember Bob
15 Williamson of Buzzeo?
16     A.   Yes, I remember Bob.
17     Q.   Did you have interactions
18 with him?
19     A.   Yes.
20     Q.   You knew him well, is that
21 what you said?
22     A.   No, I -- I said I knew Bob
23 Williamson.
24     Q.   Okay.  And you understood

Page 116

1 that he was one of the consultants?
2     A.   Yes.
3     Q.   In fact, he was one of the
4 lead consultants of Buzzeo, correct?
5     A.   He was one of the
6 consultants.
7     Q.   Okay.  These minutes of the
8 folks that work for you in October of
9 2007 reference the fact that during the
10 meeting, this group ran through Bob
11 Williamson's recommendations and what we
12 discussed in the first meeting of
13 September 20, 2007, so that the
14 information systems and the GIV
15 department had an understanding of what
16 was discussed in the previous meeting, as
17 well as what we are trying to do so that
18 our systems are in compliance with the
19 DEA.
20          Do you recall that to be a
21 true state of affairs as of July 10, 2007
22 at Henry Schein?
23          MR. McDONALD:  Object to
24     form.

Page 117

1          THE WITNESS:  I don't
2     recall.
3 BY MR. MIGLIORI:
4     Q.   All right.  Consistent with
5 the timeline that we looked at before
6 that you had in your PowerPoint
7 presentation, it was around September 20
8 of 2007 that you reported to the trade
9 association along with Buzzeo that Henry
10 Schein started its SOM project.
11          Do you recall that?
12          MR. McDONALD:  Object to the
13     form.
14          THE WITNESS:  Point of
15     clarification.  This was the Ron
16     Buzzeo annual meeting, not the
17     trade association.
18 BY MR. MIGLIORI:
19     Q.   Okay.  On the front page of
20 that, it -- it said the 7th Annual.  I
21 thought you said it was the trade
22 association.  I thought you said you
23 reported to some of your competitors
24 and -- and other distributors?

Page 118

1    A.   Right.  But this was -- this
2  was a Cegedim Dendrite annual controlled
3  substance conference, not a trade
4  association.
5    Q.   Okay.  So it was Buzzeo's
6  conference --
7    A.   It was Buzzeo's conference.
8    Q.   But -- but a bunch of
9  different distributors were there?
10   A.   There were -- there were
11  distributors.
12   Q.   It was -- it wasn't a trade
13  association apparently.
14   A.   It wasn't a trade
15  association.
16   Q.   But you did present at that
17  conference, that, in fact, in September
18  of 2007, Henry Schein started the SOM
19  project.
20       MR. McDONALD:  Object to the
21     form.  Mischaracterizes the
22     document.
23  BY MR. MIGLIORI:
24   Q.   Right?  Well, you can read

Page 119

1  the timeline --
2       MR. McDONALD:  Correct.  It
3     doesn't say A.
4  BY MR. MIGLIORI:
5    Q.   What does it say?
6    A.   It says, "SOM project
7  started."
8    Q.   Okay.  And you understand
9  that to be the one that Buzzeo was
10  consulting on, correct, in that Buzzeo
11  presentation that you're making?
12   A.   Correct.
13   Q.   Okay.  So if we get back to
14  this exhibit, Number 10 in front of us,
15  does this refresh your recollection that
16  as of the time you started this SOM
17  project in September of 2007, that the
18  suspicious order monitoring program was
19  not implemented through the Henry Schein
20  information system at that time?  That it
21  was not an automated system as of
22  September of 2007.
23       MR. McDONALD:  Object to the
24     form.

Page 120

1       THE WITNESS:  I don't
2  understand what you mean by
3  automated system.  We -- we had a
4  computer system that identified
5  thresholds.
6       So when you say automated
7  system, it doesn't clearly
8  describe the -- the system at
9  2007.  Because there was a system
10  in place, and -- there was a
11  computer system in place with
12  respect to thresholds.
13  BY MR. MIGLIORI:
14   Q.   All right.  Well, I'm
15  definitely not trying to put words in
16  your mouth.  And I'll try my best to
17  stick to what's on this Exhibit Number 10
18  sitting in front of you, okay?
19       But to do that, I'm going to
20  refer you back to -- is it Exhibit 3.
21  Can you just look at the front page of
22  your timeline, the one that's in your
23  hand?  What's the exhibit number?
24   A.   Exhibit 5.

Page 121

1    Q.   All right.  Exhibit 5.  In
2  your PowerPoint that you prepared and you
3  presented to Buzzeo's conference, you
4  actually picked a date of 9/20/2007.  Do
5  you see that?
6    A.   Yes, I didn't -- I didn't
7  pick the date.  I didn't prepare --
8    Q.   You presented the date.
9    A.   I presented it, correct.
10   Q.   And in that it says,
11  "Suspicious order monitoring project
12  started."
13       That's what your
14  presentation said, correct?
15   A.   That's what it says.
16   Q.   All right.  Now, I'm going
17  to bring you to Exhibit Number 10.
18  Exhibit Number 10 talks specifically
19  about a meeting that you had with Bob
20  Williamson, that is you being Henry
21  Schein, on the same date, 9/20/2007.  And
22  the purpose of that meeting, it was
23  discussed that what we were trying to do,
24  that our systems are in compliance with

Page 122

1  the DEA.
2       Will you agree with me at
3  the very least that the meeting
4  referenced in this confidential minutes
5  on October 10, 2007, shares the same date
6  as the date the somebody picked for you
7  as the beginning of the SOM project?
8       A.  That's correct.
9       Q.  All right.  Will you also
10  agree with me that the folks that report
11  to you were -- boil down to a document
12  that reflects the minutes of this
13  meeting, where they say, first, it was
14  decided that the suspicious monitoring
15  system would take top priority with the
16  informations systems department over all
17  other regulatory products -- projects.
18       You'll agree that's what it
19  says?
20       A.  Correct.
21       Q.  All right.  And you have no
22  reason as you sit here to doubt that that
23  was now a priority of your regulatory
24  team with verifications, the folks at

Page 123

1  this meeting, correct?
2       A.  I think that this meeting
3  captured what -- what was already a -- an
4  ongoing evolutionary project.  And this
5  just reflects at that point in time what
6  they documented was already in place.
7  Meaning, a priority and a project.
8       Q.  Okay.  Without putting words
9  in your mouth, you'll agree with me that
10  this group said the suspicious
11  monitoring system would take top priority
12  with IS over all other regulatory
13  projects.
14       That's what they report
15  about?
16       A.  That's what they say.
17       Q.  And you would have received
18  these minutes, correct, as the -- as the
19  supervisor to this group?
20       MR. McDONALD:  Object to the
21  form.
22       THE WITNESS:  I don't
23  recall.
24  BY MR. MIGLIORI:

Page 124

1       Q.  Okay.
2       A.  -- receiving the minutes.
3       Q.  These -- this group,
4  including Sergio Tejeda and others that
5  reported to you, said that the
6  information systems agreed to "start
7  figuring out how the system should be set
8  up immediately and will supply regulatory
9  with the specialty codes."
10       So you agree with me at
11  least that this group believed that this
12  system needed to be set up immediately
13  and figure out how to start figuring out
14  how the system would be set up?
15       A.  Correct.
16       Q.  All right.  And then that
17  this group said that this system that
18  needed to start immediately, that they
19  needed to figure out, "needed to be able
20  to set thresholds and flag all suspicious
21  orders," that that was the priority at
22  the time in October of 2007?
23       MR. McDONALD:  Object to the
24  form.

Page 125

1       THE WITNESS:  That's what
2  the -- that's what it says.
3  BY MR. MIGLIORI:
4       Q.  And by reference to Bob
5  Williamson and the prior meetings on
6  September 20, 2007, this group is
7  reporting out that the whole purpose of
8  starting this project, figuring out how
9  the system should be set up immediately,
10  was in order to try to get the systems in
11  compliance with the DEA.  That was the
12  purpose of creating this priority,
13  correct?
14       MR. McDONALD:  Object to the
15  form.
16       THE WITNESS:  That's what it
17  says.
18  BY MR. MIGLIORI:
19       Q.  Okay.  You were not at this
20  meeting, from what it appears on the face
21  of this document, correct?
22       A.  That's correct.
23       Q.  All right.  And you don't
24  know whether they shared with you the

Page 126

1  minutes of the meeting from this date,
2  correct?
3      A.   Correct.
4      Q.   But Sergio Tejeda, Craig
5  Schiavo, Andy Tiller, Mark Wilburn,
6  reported to you directly, correct?
7      A.   Not directly.  Sergio
8  reported to me directly.  Craig, Andy,
9  and Mark reported to Sergio.
10     Q.   Who then reported to you.
11     A.   Who reported to me.
12     Q.   All right.  And is it a
13 reasonable reading of this memorandum
14 that the information systems, the
15 automation within Henry Schein to date,
16 was not set up to set thresholds and flag
17 all suspicious orders yet?
18         MR. McDONALD:  Object to the
19     form.
20         THE WITNESS:  I don't recall
21     that.
22 BY MR. MIGLIORI:
23     Q.   Okay.  Now, around this same
24 time, there was an HDA meeting with the

Page 127

1  HDMA meeting with the DEA.  This is in
2  Exhibit Number 11.
3         (Document marked for
4      identification as Exhibit
5      Schein-DiBello-11.)
6  BY MR. MIGLIORI:
7      Q.   Do you recall ever attending
8  a meeting with the DEA or the HDMA?
9          MR. McDONALD:  Object to the
10     form.
11         THE WITNESS:  There were
12     several meetings with HDMA.  They
13     would meet regularly with their
14     membership.  So I attended those
15     meetings, not all of the meetings,
16     but I would attend some of the
17     meetings.
18 BY MR. MIGLIORI:
19     Q.   If you look at the last page
20 of this document which is called -- the
21 document is called "The draft summary of
22 HDMA-DEA meeting, October 16th and 17,
23 2007.  Not for external distribution."
24         There is a list of

Page 128

1  attendees.  And as part of the attendees,
2  it lists Mike DiBello for Henry Schein,
3  and Sergio Tejeda.  Do you see that?
4      A.   Yes.
5      Q.   Do you recall attending this
6  meeting?
7      A.   Yes.
8      Q.   Do you recall where it was?
9      A.   No.
10     Q.   All right.  Let's go through
11 it.
12         Suspicious orders.  Do you
13 recall that a subject matter of this
14 meeting included suspicious orders?
15     A.   Yes.
16     Q.   Do you recall the DEA
17 distributor initiative employee Kyle
18 Wright speaking at this meeting?
19     A.   I don't recall.
20     Q.   Do you know who Kyle Wright
21 is?
22     A.   No.
23     Q.   It says under suspicious
24 orders, "Kyle Wright joined the meeting

Page 129

1  and provided DEA's presentation on
2  suspicious orders."
3         Do you recall seeing that
4  presentation?
5      A.   I don't recall.
6      Q.   Mr. Wright highlighted DEA's
7  position that "wholesale distributors
8  should conduct a more aggressive form of
9  customer due diligence in addition to
10 reporting."
11         Do you recall that being a
12 concern in 2007?
13         MR. McDONALD:  Object to the
14     form.
15         THE WITNESS:  I don't
16     recall.
17 BY MR. MIGLIORI:
18     Q.   Your -- you do recall that
19 when you became director of regulatory
20 affairs, that the "know your customer"
21 obligations existed, right?
22         MR. McDONALD:  Object to the
23     form.
24         THE WITNESS:  When I became

Page 130

1    director of regulatory affairs, I
2    don't recall when the "know your
3    customer" standard became
4    effect -- or -- became effective
5    specifically.
6    BY MR. MIGLIORI:
7        Q.   All right.  You know that
8    the HDMA has recognized that the "know
9    your customer" obligations always existed
10   within the Controlled Substances Act
11   obligations, don't you?
12       MR. McDONALD:  Object to the
13   form.
14       THE WITNESS:  I -- you're
15   asking if I know that HDMA always
16   recognized "know your customer"
17   standard?
18   BY MR. MIGLIORI:
19       Q.   Yes.
20       A.   I don't know that.
21       Q.   Okay.  This -- these minutes
22   go on to say, "DEA also wants
23   distributors to assess orders and stop
24   them before they are filled if there is a

Page 131

1    reason to be suspicious, and expects
2    wholesale distributors to thoroughly
3    evaluate orders, the dispensers
4    themselves, the dispensers' customers."
5        Did you appreciate, in
6    October of 2007, that that's what the DEA
7    expected of distributors?
8        MR. McDONALD:  Object to the
9    form.
10       THE WITNESS:  Yes.
11   BY MR. MIGLIORI:
12       Q.   "Kyle went so far as to
13   discuss having a distributor's employee
14   take a look at the dispensing site's
15   physical location and watch for
16   suspicious activity."
17       Were you aware that the DEA
18   in October of 2007 was telling
19   distributors that part of knowing your
20   customer was on-site inspections?
21       MR. McDONALD:  Object to the
22   form.
23       THE WITNESS:  Yes.
24   BY MR. MIGLIORI:

Page 132

1        Q.   "When asked if these
2    customers weren't DEA registrants and
3    what steps did the DEA take to evaluate
4    them before registration, Kyle made it
5    clear that the DEA didn't have the
6    resources to inspect or otherwise follow
7    up on all registrants."
8        Did you understand, at least
9    in October of 2007, that the obligations
10   to inspect and know the customer were
11   those of the distributors, not the DEA?
12       A.   Yes.
13       Q.   "Kyle also offered to act as
14   an" -- "as an information conduit in the
15   event that any distributor terminated a
16   pharmacy or clinic customer based on
17   suspicious orders."
18       Were you aware the DEA was a
19   resource to Henry Schein in the event
20   that it needed further guidance on any
21   particular act or suspension?
22       MR. McDONALD:  Object to the
23   form.
24       THE WITNESS:  Yes.

Page 133

1    BY MR. MIGLIORI:
2        Q.   "He offered to notify all
3    other distributors, than an unnamed
4    distributor" -- I think it's supposed to
5    be that an unnamed distributor -- "had
6    terminated an account.  That is, "he
7    offered to serve as a resource to share
8    information among distributors about
9    terminated accounts because" -- "because
10   of suspicious orders."
11       Were you aware of that?
12       A.   Yes.
13       Q.   And then the response of the
14   members of the HDA, according to these
15   minutes, included the observation that
16   "the view was that the DEA is expecting
17   distributors to perform a significantly
18   enhanced form of customer due diligence."
19       Did you understand in
20   October of 2007 that the DEA expected
21   that the due diligence be conducted in a
22   significantly enhanced way from the way
23   it had been to date?
24       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Q.   Did you understand in
2  October of 2007 that the DEA expected
3  distributors to develop a proactive
4  stop-shipment order monitoring model
5  relative to suspicious orders?
6    A.   Yes.
7    Q.   And did you appreciate that
8  the DEA expected distributors to expand
9  their controlled substances reporting,
10 that is, to be more inclusive if there
11 was a doubt or question?
12    MR. McDONALD:  Object to the
13 form.
14    THE WITNESS:  Can you
15 restate that last question?
16 BY MR. MIGLIORI:
17    Q.   Sure.  Did -- did you
18 appreciate in October of 2007 that the
19 DEA expected distributors to expand their
20 reporting of suspicious orders in the
21 event that there was a question?
22    A.   Yes.
23    Q.   More information is better?
24    MR. McDONALD:  Object to the

Page 135

1  form.
2  BY MR. MIGLIORI:
3    Q.   Correct?
4    A.   More information is better?
5    Q.   In the context of reporting
6  suspicious orders.
7    A.   Yes.  I understood that.
8    Q.   Then it says here,
9  "Attendees expressed a number of
10 concerns, including:  The systems that
11 DEA appears to expect are expensive and
12 require IT and other expertise that is
13 currently invested in other regulatory
14 efforts, electronic pedigree systems."
15    Was that the experience of
16 Henry Schein, that is, in having and
17 attending this meeting with Kyle Wright,
18 that the concern about better due
19 diligence and more reporting and
20 proactive stop-shipment monitoring, that
21 it was going to be a costly IT endeavor
22 for Henry Schein, do you recall if that
23 was one of the concerns of the company?
24    A.   I don't recall that as being

Page 136

1  a concern.
2    Q.   You'll agree with me though
3  that at least based on the minutes that
4  we just saw of the group that reported to
5  you, that at this time, it seemed that
6  Henry Schein decided to, in fact, going
7  back to Exhibit Number 10, decided in
8  fact to get their IT department actively
9  involved in setting up and figuring out
10 how to come up with the suspicious order
11 monitoring system that could set
12 thresholds and flag suspicious orders?
13    MR. McDONALD:  Object to
14 form.
15 BY MR. MIGLIORI:
16    Q.   Whether it was expensive or
17 not, Henry Schein actually proactively
18 engaged its information systems
19 department, at least according to these
20 minutes?
21    MR. McDONALD:  Object to the
22 form.
23    THE WITNESS:  Yes.
24    MR. McDONALD:  Are you

Page 137

1  moving to a new document?
2    MR. MIGLIORI:  What's that?
3    MR. McDONALD:  Are you
4  moving to a new document?
5    MR. MIGLIORI:  I think so.
6    MR. McDONALD:  Why don't we
7  take a lunch break.
8    THE VIDEOGRAPHER:  Remove
9  your microphones.  The time is
10 1:58 p.m.  Off the record.
11        - - -
12    (Lunch break.)
13        - - -
14    THE VIDEOGRAPHER:  We are
15 back on the record.  The time is
16 1:49 p.m.
17        - - -
18 A F T E R N O O N   S E S S I O N
19        - - -
20    EXAMINATION (Cont'd.)
21        - - -
22    (Document marked for
23 identification as Exhibit
24 Schein-DiBello-12.)

Page 138

BY MR. MIGLIORI:

Q. Mr. DiBello, let me show you Exhibit 12. Now, as I understand the way it worked between regulatory affairs and verifications, the relationship with Buzzeo was mostly facilitated through regulatory affairs, is that fair?

A. Correct.

Q. And in 2005, you were the director of regulatory affairs, correct?

A. In 2005, I believe I was the director of regulatory. I don't remember the exact date when it happened. But it's -- 2005 seems correct.

Q. Okay. And so if Buzzeo did a report in 2005, then it's something that you would have at least received, if not been the recipient of?

A. Correct.

Q. In front of you, Exhibit 12, is a Buzzeo report dated September 16, 2005. And it references Henry Schein and an executive summary on the top page from a visit from Kathleen Malone, project

Page 139

manager from Buzzeo. Do you recall Kathleen?

A. Yes.

Q. And what did you understand her role to be?

A. She was the person that was going to be our primary point person that Buzzeo selected for this project.

Q. Okay. So in 2005, you would have interacted directly with her as Buzzeo was reviewing the suspicious order monitoring procedure and process?

A. I don't recall interacting directly with her. I'm sure I had probably a meeting with her, but I wouldn't say I interacted with her on a regular basis.

Q. You'll see that in the executive summary, they talk about how Dr. Schein, in 2002, conducted a study averaging all orders for each product placed over one years time to determine the significant threshold for each product cumulative for six months. Did

Page 140

you understand that to be the then existing methodology for setting a threshold for controlled substances?

A. Yes.

Q. That data -- that the current system was based on that data, modifications having been made, and new products added since the 2002 study, and at the entry of the threshold is a manual process conducted by the verification team. Is that consistent with your recollection that, from 2002 through 2005, thresholds were manually entered, and it was a product or a function of the verification team?

A. Yes.

Q. It goes on to say, that, "The verification team is a dedicated team that monitors on a daily basis those orders that the system flags as a suspicious and places on a pend status."

Did you understand that to be the system during this period from 2002 to 2005?

Page 141

A. Yes.

Q. And did you understand that the system flagging suspicious orders was synonymous with a pend status?

A. Can you repeat that question?

Q. Sure. It says, "Those orders that the system flags as suspicious and places on a pend status."

So in the system, between 2002 and 2005, an order that was labeled or that was placed on a pend status was a suspicious order?

MR. McDONALD: Object to the form.

THE WITNESS: I wouldn't agree with that.

BY MR. MIGLIORI:

Q. Okay. Would you agree with me that suspicious orders were pended?

A. Suspicious orders were pended. That's correct.

Q. Okay. The verification team was also responsible for verifying

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 registration, licensure, et cetera,
2 correct?
3      A.   Correct.
4      Q.   And Kathleen says, "The
5 purpose of this review is to determine if
6 the system is operating in accordance
7 with DEA regulations and whether the
8 thresholds are in line with best industry
9 practices."
10      So you understood in
11 September of 2005, that was the charge of
12 Buzzeo to determine if Henry Schein was
13 in compliance with DEA regulations and
14 best practices?
15      A.   Correct.
16      Q.   Did you review this in
17 preparation for today?
18      A.   Yes.
19      Q.   So we can go through this
20 quickly.  This audit starts out by
21 restating what the Controlled Substances
22 Act requires.  We've already talked about
23 that earlier this morning, correct?
24      A.   Yes.

Page 143

1      Q.   And it defines suspicious
2 orders including orders of unusual size,
3 orders deviating substantially from
4 normal patterns, and orders of unusual
5 frequency.  That is what Buzzeo advised
6 you, correct?
7      A.   Correct.
8      Q.   It says, "Henry Schein uses
9 a computerized monitoring system to
10 highlight suspicious controlled substance
11 orders to identify orders of unusual
12 size, frequency, and deviation from
13 normal patterns.  Thresholds have been
14 set and reviewed by HSI's staff
15 pharmacist."
16      That's what the standard
17 operating procedure document says,
18 correct?
19      A.   That's what was reported.
20      Q.   Okay.  I want to make sure
21 we're clear, that she's quoting the
22 standard operating procedure document
23 R-03.07, which specifies that, "Henry
24 Schein uses a computerized monitoring

Page 144

1 system to highlight suspicious controlled
2 substance orders and to identify orders
3 of unusual size, frequency and deviation
4 from normal patterns.  Thresholds have
5 been set and are reviewed by HSI's staff
6 pharmacist."
7      That is what the SOP says.
8 Do you see that?
9      A.   Yes.
10      Q.   The findings, however,
11 report out differently.  You're aware of
12 that, correct?
13      MR. McDONALD:  Object to
14      form.
15      THE WITNESS:  I'm not aware
16      of that.
17 BY MR. MIGLIORI:
18      Q.   Let's go to the first
19 finding.  The first finding is that, "The
20 Henry Schein system is based solely upon
21 excessive order thresholds.  Orders are
22 not highlighted for frequency or
23 deviation from patterns."
24      Would you agree with me

Page 145

1 that, if true, that is not consistent
2 with the standard operating procedure
3 document referenced above, correct?
4      MR. McDONALD:  Object to the
5      form.
6      THE WITNESS:  I agree that
7      it's not consistent with what it
8      says above.  I'm not sure I agree
9      with that specific statement.
10 BY MR. MIGLIORI:
11      Q.   Okay.  So that's why I said
12 if true.
13      So let's break it down.
14 This first finding of Buzzeo, as reported
15 by Kathleen Malone, is that, "The Henry
16 Schein system is based solely upon
17 excessive order thresholds.  Orders are
18 not highlighted for frequency or
19 deviation from patterns."
20      If Buzzeo is correct, you
21 would agree with me that that is
22 inconsistent with Henry Schein's standard
23 operating procedure document, R-03.07,
24 correct?

Page 146

1    MR. McDONALD:  Object to the
2    form.
3  BY MR. MIGLIORI:
4    Q.   If true?
5    A.   I agree that it's
6  inconsistent with the previous statement.
7    Q.   You don't believe it to be
8  true, based on your recollection?
9    A.   Correct.
10    Q.   All right.  "When an order
11  pends, the investigation conducted by the
12  verification team includes the review of
13  order frequency and patterns; however,
14  this review will only occur if the order
15  reaches a threshold limit."
16    Now, does that refresh your
17  recollection that in 2005, Buzzeo
18  informed you in regulatory affairs that
19  the system didn't highlight deviations in
20  frequency or pattern in and of themselves
21  independently of size?
22    A.   I'm not sure I agree with
23  that statement.
24    Q.   Will you agree with me that

Page 147

1  the independent consultant that you hired
2  is at least in this document reporting to
3  you that your system only flags for
4  deviations in size of orders, not
5  disjunctively for deviations in frequency
6  or pattern?  That's what she at least
7  reports to you?
8    A.   The system?
9    Q.   Correct.
10    A.   Correct.  The system.
11    Q.   Yeah.
12    A.   But --
13    Q.   And that only when the
14  system kicks out a large -- a deviation
15  in size, does the verification team
16  follow up and actually look at frequency
17  of pattern and frequency?
18    MR. McDONALD:  Object to the
19    form.
20  BY MR. MIGLIORI:
21    Q.   Deviation of frequency and
22  pattern?
23    A.   I don't agree with that.
24    Q.   That's what she says though,

Page 148

1  correct?
2    A.   That's what she says, but I
3  think it's possible that you still review
4  orders based on frequency and pattern and
5  deviation, could still be done.  Just
6  because the system at that particular
7  time was not automated such, doesn't mean
8  that they could not do it manually.
9    Q.   As you sit here today, you
10  don't have an independent recollection
11  that manually, they were proactively
12  looking at frequency and pattern unless
13  triggered by a deviation in size, right?
14  You don't know that that was what was
15  going on?
16    A.   I wouldn't say that it's not
17  going on.  I think that there are people
18  in the verifications department that saw
19  orders every day.
20    Q.   Okay.
21    A.   And they -- they had the
22  ability.
23    See patterns and to see
24  deviations from patterns.  Just because

Page 149

1  the system itself at that particular time
2  was not able to do it electronically or
3  in an automated fashion, I don't -- I
4  would not say that the people were not
5  able to do it.  They were reviewing
6  orders every day.  That's what they did
7  in verifications.
8    Q.   Well, based on her own
9  observations, or Buzzeo's observations,
10  you'll agree with me that Buzzeo
11  recommended to you that a review of the
12  program be conducted to ascertain whether
13  orders can be highlighted for not only
14  unusual size but also for frequency.
15    Do you see that at least she
16  recommended that your system be changed
17  to capture frequency deviations?
18    A.   Recommended a review of the
19  program, right, right.  Program.
20    Q.   Second finding, "There is no
21  formal process in place to review
22  threshold data on a periodic basis, nor
23  is there currently a staff pharmacist
24  available to review the system thresholds

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 as stated in the standard operating
2 procedure. The data from the year 2002
3 study was not available for review."
4        Do you agree that at least
5 here Buzzeo is identifying that the
6 threshold data was not consistent with
7 the standard operating procedures at
8 Henry Schein, that that's what she is
9 reporting to you?
10     A.   The threshold data was not
11 consistent with -- sorry, could you
12 repeat the last part?
13     Q.   Sure.  Buzzeo reports as a
14 second finding to you that "there is no
15 formal process in place to review
16 threshold data on a periodic basis, nor
17 is there currently a staff pharmacist
18 available to review the system thresholds
19 as stated in the standard operating
20 procedure."
21        Will you agree with me that
22 right here at least, Buzzeo is reporting
23 to you that your system, in 2005, was not
24 consistent with your standard operating

Page 151

1 procedure for review of thresholds?
2        MR. McDONALD:  Objection.
3 BY MR. MIGLIORI:
4     Q.   That's what she is reporting
5 to you.
6        MR. McDONALD:  Object to the
7 form.
8        THE WITNESS:  No, I disagree
9     with that.  I think the way I
10    interpret that, she is saying
11    there is no formal process.  She
12    didn't say there was no process.
13    She said there's no formal process
14    in place to review the threshold
15    data on a periodic basis.
16       So there is a process, it
17    just was not formalized.
18 BY MR. MIGLIORI:
19    Q.   You would agree with me that
20 standard operating procedures are
21 formalized processes, right?
22       MR. McDONALD:  Object to the
23    form.
24       THE WITNESS:  Standard

Page 152

1 operating procedures are --
2 BY MR. MIGLIORI:
3     Q.   They are formal processes.
4     A.   Right.
5     Q.   And she is reporting here
6 that you don't have a formal process in
7 place that's consistent with your
8 standard operating procedure.  That's
9 what she's reporting.  Whether you agree
10 with it is the second question.
11        She's telling you that,
12 right?
13     A.   No formal process to review
14 the threshold.  Right, there's no formal
15 process to review the thresholds.
16     Q.   As is stated in the standard
17 operating procedure, which is what your
18 standard operating procedure says there
19 to be.
20        MR. McDONALD:  Object to the
21    form.
22        THE WITNESS:  Says there to
23    be a review?
24 BY MR. MIGLIORI:

Page 153

1     Q.   A formal process.
2        MR. McDONALD:  Object to the
3    form.
4        THE WITNESS:  I don't know
5    that.  It could be -- it could be
6    saying that there's a requirement
7    to review --
8 BY MR. MIGLIORI:
9     Q.   So you don't accept --
10    A.   Thresholds.
11    Q.   You don't accept her second
12 finding either?
13    A.   I -- no, I'm saying that I
14 don't categorize it as that there was an
15 inconsistency with the standard operating
16 procedure.
17        I'm answering the question
18 regarding whether there is any
19 inconsistency or there was no process in
20 place you said.
21    Q.   Let me do it a little more
22 differently.  Let me make it more plain
23 for you.
24        Do you agree with the

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1 finding in September of 2005 that at
2 Henry Schein there is no formal process
3 in place to review the threshold data on
4 a periodic basis, nor is there currently
5 a staff pharmacist available to review
6 the system thresholds as stated in the
7 standard operating procedure?
8     A.   There is no formal process
9 on the staff. I agree with that. No
10 formal.
11     Q.   All right. And she
12 recommended at that time that thresholds
13 be reviewed on a periodic basis to ensure
14 they remain current and applicable. That
15 was recommended to you in this audit,
16 correct?
17     A.   Recommended that thresholds
18 be reviewed on a periodic basis. That's
19 what she recommended.
20     Q.   And so during this review,
21 Buzzeo discussed with Schein conducting a
22 statistical analysis of selected products
23 from Henry Schein product list to
24 determine excessive thresholds. They

Page 155

1 raised the concept of now having a
2 statistical model for suspicious order
3 monitoring, correct?
4     A.   Correct.
5     Q.   The third finding that they
6 found in 2005, it was stated that
7 "approximately 97 percent of Henry
8 Schein's customer base are office-based
9 accounts made up of medical doctors,
10 dentists, midlevel practitioners, and
11 veterinary practitioners. The HIS
12 inventory of available controlled and
13 List I containing drug products is
14 extensive. Currently there is no formal
15 process in place to assess the
16 appropriateness of the customer's medical
17 practice in relation to the drug product
18 being ordered."
19         Do you agree with that
20 statement, that at Henry Schein, there
21 was no formal process in place to assess
22 the appropriateness of the customer's
23 medical practice in relation to the drug
24 product being ordered in 2005?

Page 156

1     A.   In 2005, I would agree. I
2 agree that's what she -- that's what she
3 reported. I can't recall if that was the
4 actual practice -- in 2005 this was? I
5 think we -- the process had begun, or was
6 beginning. Okay.
7     Q.   So do you disagree with
8 Finding Number 3 as well?
9     A.   I'm sorry?
10     Q.   Does that mean that you
11 disagree with Finding Number 3 as well?
12     A.   I would agree with that.
13 That's -- I would agree. I would agree
14 with that.
15     Q.   So she recommended that a
16 formal review be conducted of control
17 drug and List I containing products to
18 ascertain whether there may be products
19 that may be appropriate of all categories
20 of practitioners to order and receive new
21 products added to the HSI inventory.
22 This review should be conducted prior to
23 launching the new product for sale.
24         She basically recommended a

Page 157

1 formalized process of understanding the
2 practice to the drug, correct?
3     A.   Correct.
4     Q.   You would agree with me that
5 concept is a "know your customer"
6 concept, correct?
7     A.   It's a way of knowing your
8 customer. It is a way.
9     Q.   Okay. Her fourth finding,
10 "Orders that are highlighted as
11 suspicious are all investigated. Those
12 that are cleared from suspicious status
13 are released. Those that are not are
14 canceled. At the end of each month, two
15 reports are submitted to the appropriate
16 field office of the DEA. The first
17 report includes those pended orders that
18 were cleared from suspicious status. The
19 second report reflects those orders that
20 were deemed suspicious and canceled."
21         Did you understand that that
22 was the practice through 2005 for pended
23 and suspicious orders?
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    Q.   Did you understand though in
2  that practice, that she recommended that
3  suspicious orders be reported immediately
4  and not at the end of the month.  By
5  reporting them on a monthly basis at the
6  end of the month was inconsistent with
7  the Controlled Substances Act
8  requirements.
9          MR. McDONALD:  Object to the
10  form.
11          THE WITNESS:  In 2005, I
12  don't recall if that was
13  inconsistent with the act.
14  BY MR. MIGLIORI:
15    Q.   She finds -- she documents
16  here the requirement, "The registrant
17  shall inform the field division office of
18  the administration in this area of
19  suspicious orders when discovered by the
20  registrant."
21          Her recommendation she
22  writes, "While HSI has been using the
23  current reporting process for several
24  years, it is recommended consideration to

Page 159

1  be given to filing the suspicious order
2  for those orders not released from
3  suspicious status to the DEA
4  immediately."
5          Do you understand that that
6  was the recommendation then, that
7  reporting them at month's end was not
8  consistent with the requirements of the
9  Controlled Substances Act?
10    A.   That was her recommendation.
11    Q.   Okay.  Fifth finding.  "When
12  an order pends as suspicious, the order
13  and the customer patterns are reviewed.
14  If it still remains suspicious, a letter
15  is sent to the customer requiring an
16  explanation of the order.  A pending
17  order will not be released without a
18  return letter from the customer."
19          Will you agree with me that
20  the methodology at Schein through
21  September of 2005, and beyond, was, when
22  an order pended, that a letter was sent
23  by first class mail to the doctor or the
24  customer for further information?

Page 160

1    A.   Up to 2005.  I'm not sure
2  about beyond.
3    Q.   Okay.  We'll -- I'll take
4  the beyond out for now.
5          Do you agree with me through
6  2005, that was the extent of the -- the
7  due diligence for suspicious orders?
8          MR. McDONALD:  Object to the
9  form.  Mischaracterizes the
10  document.
11          THE WITNESS:  The extent of
12  the due diligence?
13  BY MR. MIGLIORI:
14    Q.   That was the first step of
15  the due diligence process, was to send a
16  letter by first class mail --
17    A.   Right.
18    Q.   -- to the customer for
19  further information.
20    A.   That's -- but that wasn't
21  the extent of it, that was --
22    Q.   I changed it.
23    A.   Okay, okay.
24    Q.   I changed it.

Page 161

1          Do you agree with me --
2          MR. McDONALD:  Why don't you
3  ask the question again, Don?
4  BY MR. MIGLIORI:
5    Q.   You agree with me that the
6  first step in due diligence with a
7  suspicious order, was to send a letter to
8  the doctor for clarification by first
9  class mail?
10          MR. McDONALD:  Object to the
11  form.  Lack of foundation.
12          THE WITNESS:  The first
13  step, I would agree.
14  BY MR. MIGLIORI:
15    Q.   "When the letter's received
16  and reviewed, if the explanation is found
17  reasonable, the order is released and the
18  letter is retained on file.  A notation
19  is made in the system that this letter
20  has been received.  This letter is then
21  used to clear additional excessive orders
22  for the same customer."
23          Were you aware that a
24  cleared order based on that letter, would

Page 162

1  then be used as a basis, that same
2  letter, to clear additional excessive
3  orders for the same customer?
4      A.   Was I aware of that
5  practice?
6      Q.   Yes.
7      A.   No, not...
8      Q.   She recommends that "a
9  careful review of existing letters be
10  conducted each time the same customer
11  exceeds the threshold, even if the same
12  product or product type is ordered.
13      "If the letter will be
14  relied upon to clear each future
15  excessive order by the customer, a
16  careful review should be made to ensure
17  that the explanation remains viable."
18      Do you agree that at this
19  point Buzzeo was recommending more
20  follow-up on subsequent or repeat
21  suspensions or pended orders, based on
22  the same letter?
23      MR. McDONALD:  Object to the
24  form.

Page 163

1      THE WITNESS:  I think my
2  interpretation, is the customer,
3  if the letter will be relied upon
4  to clear each future excessive
5  order by the customer, a careful
6  review should be made.
7      That's --
8  BY MR. MIGLIORI:
9      Q.   And to not just rely on the
10  same letter again, correct?
11      A.   Further review should be
12  made, right.
13      Q.   Okay.  Do you recall these
14  recommendations in 2005 from Buzzeo?
15      A.   I don't recall these
16  specific recommendations.  There were --
17  there were -- there were numerous
18  meetings and reviews of the system from
19  this point in 2005 going forward.  So
20  there were it was not a -- it was not
21  a -- it was a very dynamic process, where
22  there were several reviews throughout
23  this time period, mid to late 2000s.
24      Q.   My question was simply, do

Page 164

1  you recall this recommendation?  Do you
2  recall these recommendations?
3      A.   These recommendations?
4      Q.   Yes.
5      A.   I recall -- generally, I
6  recall these recommendations.  Not each
7  individual specific one, but generally,
8  yes, they were recommendations.
9      Q.   And do you recall those
10  findings of inconsistency with standard
11  operating procedures and DEA
12  requirements?
13      MR. McDONALD:  Object to the
14  form.
15      THE WITNESS:  I wouldn't
16  classify it as inconsistent.  I
17  would say that they were not
18  perhaps fully automated to the
19  extent that they could easily
20  demonstrate compliance with the
21  DEA regulations.
22      (Document marked for
23  identification as Exhibit
24  Schein-DiBello-13.)

Page 165

1  BY MR. MIGLIORI:
2      Q.   This is Exhibit 13.  We
3  talked about a 2007 letter from
4  Rannazzisi.  I just want to ask you
5  quickly.  This is a 2000 -- September 27,
6  2006, letter that Henry Schein produced
7  to us in its files from Joe Rannazzisi
8  the deputy assistant administrator,
9  office of diversion control.
10      Would you have received this
11  letter if it came to Henry Schein in your
12  role as director of regulatory affairs?
13      A.   I probably would have -- it
14  would have gotten to me.
15      Q.   And you'll see that the
16  purpose of this letter is to reiterate
17  the responsibilities of controlled
18  substance distributors in view of the
19  prescription drug abuse problem our
20  nation currently faces?
21      A.   Yes.  I see that.
22      Q.   You accept and recall that
23  this is not a new regulation or guidance,
24  but an explanation of the existing

Page 166

1 obligations of distributors?
2        MR. McDONALD:  Object to the
3 form.
4        THE WITNESS:  I wouldn't
5 agree with that.  I would say that
6 this is the DEA's attempt at
7 clarifying the responsibilities of
8 distributors and clearly defining
9 or outlining their guidelines.
10 BY MR. MIGLIORI:
11     Q.   So you agree they use the
12 word "reiterate," correct?
13     A.   They use the word
14 "reiterate."
15     Q.   And you would add
16 "clarifying"?
17     A.   My interpretation, in 2006,
18 reading this now, you know, dated 2006, I
19 don't recall the DEA previously
20 explaining the responsibilities in any
21 communication.
22     Q.   Okay.  Well, whether you
23 recall a previous -- you see that they
24 use reiterate.  That's just on the face

Page 167

1 of the letter, correct?
2     A.   Correct.
3     Q.   And you've added the word
4 "clarifying."  So you would -- you would
5 add the word "clarify" to this, in your
6 interpretation?
7     A.   In my interpretation, based
8 on this document, I don't recall the
9 reiteration process.
10     Q.   I'm just asking about the
11 clarifying part.  You would add the word
12 "clarifying"?
13     A.   I -- that's the way I would
14 interpret this.
15     Q.   And on Page 3, in talking
16 about diversion, you'll see that the DEA
17 clarified concepts that suggest behavior
18 of diversion.  Do you see that?
19     A.   Yeah.
20     Q.   Ordering excessive
21 quantities of a limited variety of
22 controlled substances, that is an
23 indication of potential diversion,
24 correct?

Page 168

1     A.   That's an indication of,
2 okay.
3     Q.   These would be concepts or
4 clarifications or examples of things that
5 distributors should be looking for to
6 know their customer, correct?
7     A.   Correct.
8     Q.   Some of the other things a
9 distributor should seek to look at to see
10 if an order is suspicious is what
11 percentage of the pharmacy's business
12 does dispensing controlled substances
13 constitute.  That's how much control to
14 noncontrolled substances.  That's one of
15 the things a distributor should look at
16 in its obligation to know its customer,
17 correct?
18     A.   Correct.
19     Q.   Is the pharmacy complying
20 with state laws, not just CSA.  That's
21 another "know your customer" inquiry,
22 correct?
23     A.   Correct.
24     Q.   And when the word "pharmacy"

Page 169

1 appears here, in your practice; that is,
2 in the Henry Schein model, that would
3 also apply to doctors, correct,
4 individual customers, not just
5 pharmacies?
6        MR. McDONALD:  Object to the
7 form.
8        THE WITNESS:  I'm not sure I
9 would make that assumption.
10 BY MR. MIGLIORI:
11     Q.   So you don't look at Henry
12 Schein, what percentage of a doctor's
13 ordering from you is controlled versus
14 noncontrolled?
15     A.   I didn't say that.  I said I
16 wouldn't make the assumption that a --
17 you know, is the pharmacy complying with
18 laws of every state as the same as
19 evaluating a doctor's compliance with the
20 laws of every state.
21     Q.   Would the word "doctor" fit
22 in there for Henry Schein's customers?
23 Is the doctor complying with the laws of
24 every state in which it's dispensing

Page 170

1 controlled substances? Is that an
2 important factor to Henry Schein?
3      A.   Yes.  Doctor would be --
4      Q.   I'm sorry.
5      A.   The doctor compliance.  But
6 we would verify a doctor's license.  A
7 doctor's practice is different than a
8 pharmacy's operation and their
9 compliance.  That's my only point.
10      Q.   It doesn't refer to specific
11 laws.  It just says complying with the
12 laws of the state.  You would expect your
13 doctors to be in compliance with the laws
14 of his or her state?
15      A.   Absolutely.
16      Q.   So these are concepts of
17 know your customer that were shared with
18 you that you would have received in 2006
19 from the DEA, correct?
20      A.   Correct.
21      Q.   February of 2007.  The DEA
22 shared with you, with Henry Schein,
23 another letter.
24           (Document marked for

Page 171

1      identification as Exhibit
2      Schein-DiBello-14.)
3 BY MR. MIGLIORI:
4      Q.   This is Exhibit Number 14.
5 February 7, 2007, again signed by Joseph
6 Rannazzisi.  That's the assistant
7 administrator, office of diversion
8 control.  Again he writes, "The purpose
9 of this letter is to reiterate the
10 responsibilities of controlled substance
11 distributors in view of the prescription
12 drug abuse problem our nation currently
13 faces."
14           I assume you would add the
15 word "clarify" there as well?
16      A.   Well, reiterate is
17 appropriate now since they are actually
18 reiterating.
19      Q.   Okay.
20      A.   I have no --
21      Q.   Okay.
22      A.   I have no problem with that.
23      Q.   And did you agree that, as
24 of this time, February 7, 2007, that the

Page 172

1 country faced a drug abuse problem?
2           MR. McDONALD:  Object to the
3      form.
4           THE WITNESS:  In 2007, I
5      don't recall the status of the
6      drug abuse problem.  But that's --
7      that's what the DEA stated, that's
8      what they are stating in the
9      letter.  But I can't attest to,
10      you know, a drug abuse problem in
11      2007.  I don't recall.
12 BY MR. MIGLIORI:
13      Q.   It says here, back on it,
14 "As each of you," talking to each of the
15 distributors, "is undoubtedly aware, the
16 abuse, nonmedical use of controlled
17 prescription drugs, is a serious and
18 growing health problem in this country."
19           Was Henry Schein or were you
20 not aware of that?
21           MR. McDONALD:  Object to the
22      form.  He's not here on behalf of
23      Henry Schein.  He can talk about
24      what he knows.

Page 173

1           MR. MIGLIORI:  That's fine.
2 BY MR. MIGLIORI:
3      Q.   Were you not aware of that?
4      A.   Was I aware of the drug
5 abuse?
6      Q.   "The, abuse nonmedical use
7 of controlled prescription drugs, is a
8 serious and growing health problem in the
9 country."  Were you aware of that?
10      A.   Yes.
11      Q.   And you'll see on the third
12 page that, again, he goes through the
13 different "know your customer" type
14 inquiries that a distributor should
15 consider in satisfying its obligations
16 with respect to detecting suspicious
17 orders and preventing diversion.
18           Do you see that?
19      A.   Yes.
20      Q.   And so you would have
21 received this kind of information in your
22 role as director of regulatory affairs at
23 Henry Schein in February of 2007,
24 correct?

Page 174

1    A.   Yes.
2    Q.   In December of that year,
3  this is the letter that I think you
4  actually referred to in your PowerPoint
5  slide.
6         This is a little cleaner
7  copy, that we received again from Henry
8  Schein.  It says December 27, 2007.
9  Again signed by Joseph Rannazzisi.
10        (Document marked for
11        identification as Exhibit
12        Schein-DiBello-15.)
13  BY MR. MIGLIORI:
14    Q.   It's talking about the
15  purpose of the letter is to reiterate
16  responsibilities of controlled substance
17  manufacturers and distributors, to inform
18  DEA of suspicious orders in accordance
19  with the Controlled Substances Act.
20        And it talks about the
21  obligation to report suspicious orders
22  when discovered by the registrant.  Do
23  you see this is a direct reference to the
24  timing of reporting suspicious orders?

Page 175

1    A.   Yes.
2    Q.   And you'll agree with me
3  that it also goes on to say that "the
4  regulation specifically states that
5  suspicious orders include orders of
6  unusual size, orders deviating
7  substantially from a normal pattern, and
8  orders of unusual frequency.  These
9  criteria are disjunctive and they are not
10  all-inclusive."
11        You'll see that each of
12  those independently is a suspicious order
13  when detected, according to the DEA in
14  December of 2007.
15    A.   I see that.
16    Q.   And you would have received
17  this kind of information as director of
18  regulatory affairs at Henry Schein in
19  December of 2007?
20    A.   It would have been forwarded
21  to me.  Should have been.
22        (Document marked for
23        identification as Exhibit
24        Schein-DiBello-16.)

Page 176

1  BY MR. MIGLIORI:
2    Q.   Exhibit 16.  This is a
3  document produced by Henry Schein to us
4  called Suspicious Monitoring System
5  Specifications Draft.
6         It again recites the
7  obligations under the Controlled
8  Substances Act.  It describes when to
9  investigate.  It says, "The regulation
10  also require the registrant to inform the
11  local DEA division of suspicious orders
12  when discovered by the registrant.  And
13  registrants must conduct an independent
14  analysis of suspicious orders prior to
15  completing a sale to determine whether
16  the controlled substances are likely to
17  be diverted from legitimate channels."
18         Is that something that you
19  appreciated -- this document, by the way,
20  is -- is January 16, 2008.  Is this
21  something that you would have appreciated
22  in January of 2008?
23        MR. McDONALD:  Can I --
24        where are you getting that from?

Page 177

1         MR. MIGLIORI:  Metadata.
2         THE WITNESS:  I would
3         appreciate that, yeah.
4  BY MR. MIGLIORI:
5    Q.   Okay.  And that in your own
6  document, you recite the DEA definition
7  of suspicious orders as being unusual
8  size, orders deviating substantially from
9  a normal pattern, and orders of unusual
10  frequency.  And that these criteria are
11  disjunctive and are not inclusive.
12         You would agree with me that
13  at this point, Schein appreciates that
14  there is a disjunctive relationship
15  between those three different measures of
16  suspicious order?
17        MR. McDONALD:  Object to the
18        form.
19        You say your own document.
20        Are you representing that this is
21        his document?
22        MR. MIGLIORI:  Yeah.
23        MR. McDONALD:  It came from
24        his --

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    THE WITNESS:  No.
2    MR. MIGLIORI:  We'll go
3 through it, I'll show you.  I'll
4 ask the question differently until
5 we get to that part.
6 BY MR. MIGLIORI:
7    Q.   Would you agree with me that
8 it was appreciated at Henry Schein that
9 deviations in size, frequency and
10 pattern, were disjunctive, that is, a
11 suspicious order is triggered by any one
12 of those three things?
13    A.   In 2008?
14    Q.   In January of 2008.
15    A.   Yes.
16    Q.   In discussing the new
17 monitoring system to be employed, it
18 says, "The new monitoring system will
19 review orders based on customer market
20 segment, specialty, purchasing patterns,
21 and product active ingredient."
22    Do you recall that in part
23 of the new SOM project, was to change the
24 monitoring system, and to actually have

Page 179

1 it based on those four different
2 criterion?
3    A.   I wouldn't agree that it's a
4 new monitoring system.  I think the
5 system was already in place at the time.
6 I would say that the -- I don't know who
7 wrote this document.  It's not my
8 document.  I don't recall seeing this
9 document.  But I don't necessarily agree
10 with that new monitoring.
11    Q.   We'll go back to Exhibit
12 Number 5.  Your document sets as
13 September of 2007 the SOM project
14 starting.  Do you remember that?
15    A.   Okay.  Right.  2000.
16    Q.   January of 2008.  This is
17 referring to the new monitoring system
18 will...
19    Does that refresh your
20 recollection that the SOM project that
21 started at the end of 2007 would include
22 in it a new monitoring system, reviewing
23 orders based on customer market segment,
24 specialty, purchasing patterns, and

Page 180

1 products' active ingredients?
2    A.   Well, we can debate whether
3 it's new or enhanced.  My point is that
4 it was a monitoring system already in
5 place.  Whether these changes or
6 enhancements qualified as a new
7 monitoring system, that's, you know --
8    Q.   So I don't mean to use the
9 word quibble.  We're debating whether the
10 word should be new monitoring or the
11 enhanced monitoring system.
12    But you don't deny that the
13 system that's now being referenced in
14 your timeline, in Exhibit 5, and in this
15 memorandum is a system that is monitoring
16 on new criteria, different criteria?
17    MR. McDONALD:  Object to the
18 form.  Mischaracterizes his
19 testimony.
20    THE WITNESS:  I don't -- I
21 don't agree that this is -- you
22 know, I don't agree that this is
23 new criteria.  I agree that the
24 system is being automated to --

Page 181

1 to -- to be able to readily review
2 the orders for each of these
3 criteria.
4    Whereas, again, the system
5 was already in existence many
6 years prior to 2008.  It may not
7 have been computer -- automated,
8 but it's still -- it was able to
9 review and identify suspicious
10 orders.
11 BY MR. MIGLIORI:
12    Q.   Well, we just went
13 through -- I don't want to go through
14 them again.  But we just went through
15 Buzzeo's findings in 2005, and it wasn't
16 picking up that it needed -- there needed
17 to be a new review of how to check orders
18 for patterns and frequency, not just
19 size.  Do you recall that?
20    A.   Yes.
21    Q.   And one of the things this
22 new monitoring system will review is,
23 among other things, purchasing patterns.
24 That is a new way of looking at the

Page 182

1 ordering -- the orders coming into
2 Schein, according to this document.
3     A.   From a systematic approach.
4     Q.   From a systematic approach.
5 And from any approach.  That there was,
6 according to Buzzeo in 2005, no
7 independent review of just pattern in the
8 system prior to this change.
9     A.   In the computer system?
10    Q.   Right.
11    A.   In the computer system.
12    Q.   In the computer system?
13    A.   In the computer system.
14    Q.   The system was not picking
15 up changes in pattern or frequency in the
16 computer system.
17    A.   I would agree with that.
18    Q.   And this new system was
19 going to do that.
20    A.   In the computer system.
21    Q.   In the computer system.
22         And that computer system
23 didn't get implemented in final process
24 until October of 2009, according to your

Page 183

1 chart, correct?
2     A.   Well, there was
3 implementations prior to -- there were
4 steps prior to that.
5     Q.   There were steps.  And then
6 in October of 2009 there was a system
7 testing and training completed.  So
8 whatever steps there may have been, the
9 training was completed in 2009, in
10 October, correct?
11         MR. McDONALD:  Object to the
12     form.
13         THE WITNESS:  There was
14     training conducted in 2009, right.
15 BY MR. MIGLIORI:
16    Q.   And --
17    A.   October.
18    Q.   -- then the system
19 completion, the implementation process in
20 that box that you prepared, happened in
21 October of 2009.
22         It was implemented in
23 October of 2009, this new system we are
24 talking about back here in January of

Page 184

1 2008, correct?
2     A.   Yeah, and there were steps
3 and phases along the way.
4     Q.   You point them all out.
5     A.   Right.
6     Q.   You have the DEA letter we
7 just talked about.  There is a finished
8 product normalization that was put
9 together.
10    A.   Right.
11    Q.   There was a Gantt chart that
12 was completed.
13    A.   Right.  Statistical --
14    Q.   The suspicious order
15 monitoring statistical approach specs
16 were finalized and submitted.
17         The -- the questionnaire
18 that we were just talking about, to know
19 your customer, that was implemented for
20 due diligence purposes in June of 2009,
21 right?
22    A.   Customer questionnaire,
23 okay.  Right.
24    Q.   This letter we've been

Page 185

1 talking about, that was implemented in
2 June of 2009, the suspicious order
3 monitoring standard operating procedures
4 were revised and finalized in July of
5 2009, correct?
6     A.   Correct.
7     Q.   And the whole system was
8 implemented with training completed in
9 the verifications team and the regulatory
10 affairs in October of 2009, correct,
11 according to your chart?
12    A.   The complete system.
13    Q.   Right.
14    A.   Altogether.
15    Q.   Right.  As director of
16 regulatory affairs, you would have
17 received -- you'll agree with me that
18 this Cegedim Dendrite company was
19 formerly Buzzeo, correct?
20    A.   Yes.
21    Q.   And as director of
22 regulatory affairs in January of 2008,
23 which is when this was dated, you would
24 have received this visit overview,

Page 186

1 correct?
2        MR. McDONALD:  For the
3 record, you're talking about
4 Exhibit 19?  17.
5        MR. MIGLIORI:  17.
6        (Document marked for
7 identification as Exhibit
8 Schein-DiBello-17.)
9        MR. MIGLIORI:  Appreciate
10 it.
11 BY MR. MIGLIORI:
12    Q.   You would have received
13 this?
14    A.   I may have received it, I
15 was not involved in all of the meetings.
16 This could have been a meeting overview
17 of a particular --
18    Q.   I'll save you -- I'll save
19 you some time.  Turn to the last page.
20 You're the first person listed as an
21 attendee.
22    A.   Okay.  I was an attendee.
23    Q.   Attendee of the opening
24 session?

Page 187

1    A.   Of the opening session.
2 Okay, I agree with that.
3    Q.   "Morning session was opened
4 up with general comments about the DEA's
5 changing interpretation of its own
6 regulations and an emphasis on reporting
7 suspicious orders to now include a
8 responsibility for registrants to assure
9 that controlled substances are not being
10 used illegally by customers."
11        And it says that, "The DEA's
12 communication of December 27th" -- that
13 letter that we just saw -- "was used as a
14 controlling document.  And as a result
15 the initial findings were:  1, Schein
16 needs to expand upon its standard
17 operating procedures," that as of January
18 of 2008 Schein standard operating
19 procedures were not sufficient to meet
20 with DEA obligations.
21        Do you see that?
22        MR. McDONALD:  Object to
23 form.  Mischaracterizes the
24 document.

Page 188

1        THE WITNESS:  I don't think
2 he said they were insufficient.
3        He said they --
4 BY MR. MIGLIORI:
5    Q.   Needed to expand upon them?
6    A.   To expand.  Expand.
7    Q.   All right.  Expand means to
8 increase?
9    A.   Yes.
10    Q.   They need more?
11    A.   Expand.
12    Q.   All right.  We can parse.
13        "Schein should transition to
14 the new system where only suspicious
15 orders will be reported to the DEA."
16        So you just report
17 suspicious orders going forward, right?
18    A.   Only suspicious orders will
19 be reported.  Okay.  I see that.
20    Q.   That, "The precise language
21 of the regulations which requires
22 registrants to track orders of unusual
23 size, orders deviates substantially from
24 a normal pattern, and orders of unusual

Page 189

1 frequency.  These specific requirements
2 move from comparing customer purchases to
3 reviewing individual purchasing patterns.
4 Schein will be required to expand its
5 technology to address the fundamental
6 regulatory requirements."
7        As of January of 2008, if
8 the system wasn't picking up frequency
9 and deviations in patterns, that the
10 system would have to be expanded to do
11 that, correct?
12        MR. McDONALD:  Object to the
13 form.
14        THE WITNESS:  The computer
15 system --
16 BY MR. MIGLIORI:
17    Q.   Yeah?
18    A.   -- needed to do that, right.
19    Q.   It is the suspicious order
20 monitoring system, correct?
21    A.   Well, they said the
22 technology.  I would refer that -- I
23 would interpret that as the computer
24 automated system to address the deviation

Page 190

1 from normal patterns or unusual
2 frequencies.
3     Q.   It says, "Questionable
4 orders are filled and the customer is
5 furnished with a letter requesting an
6 explanation."
7       So back in January of 2008,
8 questionable orders were filled.  Do you
9 recall that being the practice?
10     A.   No.
11     Q.   "And the customer is
12 furnished with a letter requesting an
13 explanation."
14       Do you recall that through
15 2008, that was what -- that was what
16 Buzzeo was -- or then Cegedim -- was
17 telling you was Schein's practice?
18     A.   I don't recall this
19 document.  And I don't know how they
20 define questionable orders.  I don't know
21 what that means, a questionable order.
22     Q.   Do you see that Cegedim's
23 recommendation to Henry Schein in January
24 of 2008 was, "An immediate adjustment

Page 191

1 will be made in Schein's procedures to
2 stop or pend the orders, then investigate
3 to clear prior to shipment"?
4       Do you see that?
5     A.   I see that.
6     Q.   And do you recall that being
7 put into place immediately in January of
8 2008?
9     A.   I don't recall in 2008 what
10 they put in place.
11       (Document marked for
12      identification as Exhibit
13      Schein-DiBello-18.)
14 BY MR. MIGLIORI:
15     Q.   I'll show you Exhibit 18.
16 Same date, Cegedim issued a report
17 January 28, 2008, issued a report
18 regarding onboarding new customers.  This
19 doesn't have an attendee.  I can tell you
20 from the Bates information that this is
21 January 28, 2008, the same date as the
22 last document.
23       It says, "New account issues
24 involving controlled substances.  As part

Page 192

1 of Henry Schein's revised suspicious
2 order monitoring system, all new accounts
3 which handle controlled substances will
4 be the subject of a due diligence
5 inquiry."
6       Do you recall in January of
7 2008 implementing a due diligence inquiry
8 for all new customers?
9     A.   I don't recall.
10     Q.   The new process includes,
11 "During the diligence inquiry, the new
12 account holder will be interviewed by a
13 Schein staff over the telephone to
14 determine whether the new account appears
15 qualified to handle the controlled
16 substances."
17       Do you recall that
18 recommendation from Cegedim Dendrite --
19       MR. McDONALD:  Objection.
20 BY MR. MIGLIORI:
21     Q.   -- in January of 2008?
22       MR. McDONALD:  Object to the
23    form.  Lack of foundation.
24       THE WITNESS:  Where were you

Page 193

1 reading that?  Can you point that
2 out?
3 BY MR. MIGLIORI:
4     Q.   The second sentence.
5     A.   "During the diligence
6 inquiry, the new account holder..."
7       MR. McDONALD:  Same
8    objection.  Lack of foundation.
9       THE WITNESS:  I don't recall
10    that.
11 BY MR. MIGLIORI:
12     Q.   Do you know whether that was
13 ever implemented?  Do you know that
14 whether new clients were all subject now
15 to due diligence at the intake, beginning
16 with this new suspicious order monitoring
17 program?
18       MR. McDONALD:  Object to the
19    form.  Lack of foundation.
20       THE WITNESS:  I don't
21    recall.
22 BY MR. MIGLIORI:
23     Q.   Do you recall Dendrite
24 saying that in that first interview that

Page 194

1 information to be acquired may include
2 obvious information like licenses and
3 registrations, personal information such
4 as dates of birth and social security
5 numbers, and what controlled substances
6 the customer anticipates ordering and
7 quantities? Do you recall that
8 recommendation from Cegedim?
9         MR. McDONALD: Object to the
10        form. Lack of foundation.
11        THE WITNESS: I don't agree
12        with that. Licenses and
13        registrations were always part of
14        the system, were always required.
15        That's -- that's a no brainer.
16 BY MR. MIGLIORI:
17     Q.   I think they refer to that
18 as obvious information.
19     A.   Information to be acquired
20 during the interview may --
21     Q.   May.
22     A.   -- include.
23     Q.   May include.
24     A.   Right.

Page 195

1     Q.   Then they say obvious
2 information, license and registration.
3 And then they ask for more specific
4 information. Do you recall that?
5     A.   I don't recall this. But I
6 was clarifying that licenses and
7 registrations were always maintained. I
8 don't know why that would have been a
9 recommendation or as -- information to be
10 acquired. That's --
11     Q.   I think what's new here is
12 doing it over the phone in an interview,
13 not the information. Isn't that what it
14 says?
15     A.   Why do it over the phone?
16        MR. McDONALD: Hang on.
17        Hang on.
18        Object to the form.
19 BY MR. MIGLIORI:
20     Q.   I'll read it again. "During
21 the due diligence inquiry, the new
22 account holder will be interviewed by
23 Schein staff over the telephone to
24 determine whether the new account appears

Page 196

1 to be qualified to handle the controlled
2 substances."
3        Do you see that?
4        MR. McDONALD: Are you
5        simply just asking him if that's
6        in the document?
7        MR. MIGLIORI: Well, right
8        now I am, because he just asked
9        why would it be over the phone.
10       So I had to repeat it to him.
11       MR. McDONALD: Well, you
12       also haven't established that
13       regulatory had anything to do with
14       this due diligence inquiry.
15       MR. MIGLIORI: I established
16       that regulatory was the one that
17       facilitated the relationship with
18       this company.
19 BY MR. MIGLIORI:
20    Q.   Do you recall this process
21 being recommended in January of 2008 as
22 part of the onboarding of new clients,
23 that Schein picked up the phone and
24 interview all new clients and ask for

Page 197

1 things, including obvious things, like
2 licenses and registration, but more
3 detailed information, like birth dates,
4 social security numbers, and how they
5 anticipate ordering controlled
6 substances?
7        MR. McDONALD: Object to
8        form.
9 BY MR. MIGLIORI:
10    Q.   Do you recall that?
11       MR. McDONALD: Object to
12       form.
13       THE WITNESS: I don't recall
14       it, and I disagree with it,
15       because licenses and registrations
16       were maintained and verified
17       electronically. That's why I
18       disagreed with this statement,
19       just because there are certain
20       documents that, why would we ask
21       over the phone when we had hard
22       copies.
23 BY MR. MIGLIORI:
24    Q.   Fine.

Page 198

1    A.   So --
2    Q.   What about the rest of it?
3  This is a new customer you're talking
4  about, during an interviewing.  You're
5  saying that you already have the hard
6  copies before you --
7    A.   The verification --
8    Q.   -- took on new customers?
9    A.   The verification group, to
10 set up an account, step one was DEA
11 license, DEA registration, State Board of
12 Pharmacy license.  That was standard
13 operating procedure.
14   Q.   Okay.
15   A.   Customer account
16 information, Dr. John Smith.
17   Q.   Did they do it by phone?
18   A.   Did they do it by phone?
19   Q.   Right.
20   A.   That was a verification
21 function.  I don't know how they did it.
22 But they -- in order to set up an
23 account, they had basic information that
24 they required from the customer.  And

Page 199

1  that basic information is the customer
2  account, which are also publicly
3  available on the board of -- boards of
4  pharmacy's websites as well as DEA.  Why
5  would we -- that makes no sense.
6    Q.   So your consultant makes no
7  sense here?
8         MR. McDONALD:  Object to the
9         form.
10        THE WITNESS:  At this point
11        I disagree with this -- why we
12        have to do that verbally again
13        over the phone when it was
14        standard operating procedure.  I
15        don't know.
16 BY MR. MIGLIORI:
17   Q.   Do -- do you see that they
18 say obvious information and then go on to
19 other bits of information?
20   A.   Yes.  The other bits are
21 also obvious.
22   Q.   It's obvious to look at what
23 the prescribing, anticipated prescribing,
24 or ordering would be?

Page 200

1    A.   That's -- that's not
2  obvious.  I would -- I would agree with
3  that, that's not obvious.
4    Q.   And is that something that
5  you did?
6         MR. McDONALD:  Object to the
7         form.
8  BY MR. MIGLIORI:
9    Q.   In January of 2008.  Is that
10 something that you agreed to take on at
11 the recommendation of the company that
12 you paid to consult on this issue?
13        MR. McDONALD:  Object to the
14        form.  Lack of foundation.
15        THE WITNESS:  I -- I don't
16        recall what they -- what they did
17        in 2008.
18 BY MR. MIGLIORI:
19   Q.   After the interview, they
20 recommend that the customer be provided
21 with a document with information
22 pertaining to controlled substances which
23 addresses basic legal issues such as
24 legitimate medical use.

Page 201

1         Did Henry Schein ever take
2  that recommendation and implement it for
3  new customers?
4         MR. McDONALD:  Object to the
5         form.  Lack of foundation.
6         THE WITNESS:  That was their
7         recommendation and that would have
8         been implemented.
9  BY MR. MIGLIORI:
10   Q.   Did you -- did you implement
11 it?
12   A.   We would not -- regulatory
13 would not have implemented.  That is a
14 verification function.
15   Q.   Do you know if Henry Schein
16 implemented it?
17        MR. McDONALD:  He's not here
18        on behalf of Henry Schein.
19 BY MR. MIGLIORI:
20   Q.   It's okay if you don't know.
21 I'm asking whether you as director of
22 regulatory affairs know whether this was
23 implemented.
24   A.   I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    Q.   Do you know if a signed
2 document from the client acknowledging
3 receipt of that information was required?
4         MR. McDONALD:  Object to the
5    form.  Lack of foundation.
6         THE WITNESS:  I don't
7    recall.
8 BY MR. MIGLIORI:
9    Q.   What about this, "A
10 background investigation should be
11 conducted to determine whether there are
12 convictions or regulatory actions in the
13 clients' past that may affect their
14 suitability for ordering controlled
15 substances."
16        Cegedim recommended that in
17 January of 2008.  Do you know if your
18 company or if regulatory or verifications
19 ever implemented a "know your customer"
20 inquiry about prior convictions that may
21 affect the suitability for ordering
22 controlled substances of a new client?
23    A.   Convictions, I don't recall
24 that.  I don't recall.

Page 203

1    Q.   Is that a good
2 recommendation?
3         MR. McDONALD:  Object to the
4    form.
5         THE WITNESS:  Do I think
6    it's a good recommendation?
7 BY MR. MIGLIORI:
8    Q.   Yeah.  Do you think that's a
9 good "know your customer" practice, as
10 director of regulatory affairs for Henry
11 Schein, to do a criminal background check
12 to see if that may impact whether or not
13 a new doctor would be an appropriate
14 customer for controlled substances?
15    A.   I would have to -- I would
16 have to evaluate that in light of the
17 industry practice and at that time
18 what -- what would be acceptable and not.
19 And I'm not even sure that -- I'm not
20 even sure how we would be able to access
21 a doctor's criminal convictions.  I don't
22 even know how a doctor would still be
23 able to maintain their license to
24 practice medicine if they were convicted

Page 204

1 felons or -- I'm not sure how they would
2 even be able to maintain their -- their
3 basic medical license.
4    Q.   Do you remember in the DEA
5 letter from Joe Rannazzisi, where the DEA
6 tells you that the mere maintenance of a
7 DEA registration is not due diligence?
8         Do you remember hearing that
9 from Joe Rannazzisi or reading that?  Do
10 you recall that?
11    A.   I'm sorry?
12    Q.   Do you recall that?
13    A.   Do I recall reading that?
14    Q.   Yeah.
15    A.   I don't recall.
16    Q.   Okay.  Would you agree with
17 me that as the director of regulatory
18 affairs for Henry Schein, that it would
19 be insufficient if asked by the
20 verifications team to just go and look to
21 see if a doctor had a valid DEA
22 registration for purposes of performing
23 due diligence under the Controlled
24 Substances Act?

Page 205

1         MR. McDONALD:  Object to the
2    form.
3         THE WITNESS:  The DEA -- the
4    verifications group were looking
5    at doctors' licenses, including
6    the DEA registration, so they
7    wouldn't -- they would not just
8    look at the DEA registration.
9    They would look at their other
10   licenses.
11        Their board of pharmacy
12   license, their Department of
13   Health depending on the state that
14   they were in.
15 BY MR. MIGLIORI:
16   Q.   My question is a little more
17 simple.
18        Would you agree with me that
19 it is insufficient to rely merely on the
20 fact that a doctor has a DEA registration
21 as adequate due diligence when
22 investigating a suspicious order?
23        MR. McDONALD:  Object to the
24   form.

Page 206

1    THE WITNESS:  I would agree.
2 BY MR. MIGLIORI:
3    Q.   Would you agree with me that
4 in his February 7, 2007, letter to you
5 that you received, Joe Rannazzisi
6 expressly said to you, that is to Henry
7 Schein --
8    MR. McDONALD:  Why don't you
9    hang on and let him find the
10    letter so he can read along with
11    you?
12    MR. MIGLIORI:  Or you can
13    look on the screen, either way.
14    MR. McDONALD:  Well,
15    that's -- I'll tell you it's
16    difficult to see.
17    Do you know which exhibit it
18    is?
19    MR. MIGLIORI:  I'm guessing
20    it's somewhere around 15 or 17.
21    MR. McDONALD:  Which one --
22    which one?
23    MR. MIGLIORI:  The
24    February 2 letter?

Page 207

1    MR. McDONALD:  February 7
2    letter?
3    MR. MIGLIORI:  Yes.
4    February.  Only one in February.
5    MR. McDONALD:  14.
6    MR. MIGLIORI:  14.
7    MR. McDONALD:  Exhibit 14,
8    you have it.
9    THE WITNESS:  Okay.
10    February 7th.  Okay.  Page 2?
11 BY MR. MIGLIORI:
12    Q.   Yes.  Second to the last
13 paragraph.
14    "In a similar vein, given
15 the requirement under Section 823(E) that
16 a distributor maintain effective controls
17 against diversion, a distributor may not
18 simply rely on the fact that the person
19 placing the suspicious order is a DEA
20 registrant and turn a blind eye to
21 suspicious circumstances."
22    Do you remember that message
23 from the DEA in February of 2007?
24    A.   I recall the -- when you say

Page 208

1 the message, the letter, yeah.  But I
2 just want to clarify something.
3    In the context of suspicious
4 orders, that's a different process as
5 opposed to account setup.  That's the
6 distinction.  So when we are talking
7 about suspicious orders, there is a --
8 there's a review that obviously if the
9 order was suspicious, we're going to
10 examine it carefully.
11    Q.   Which is called due
12 diligence, correct?
13    A.   Well, it's -- it's a review
14 of the order, that particular order,
15 which would include the doctors' status.
16    Q.   The review of the doctors'
17 status, by Henry Schein's own words, is
18 due diligence, correct?
19    A.   You can -- you can -- well,
20 due diligence could also mean when --
21 when an account is set up.
22    Q.   Exactly.
23    A.   And we conduct -- we conduct
24 an assessment, you know, of the -- of the

Page 209

1 doctor's account, an onsite visit, a
2 questionnaire.
3    So due diligence, at what
4 point in the process are you referring
5 to?  There's different levels of due
6 diligence.
7    Q.   I completely agree.
8    A.   Okay.
9    Q.   But my question was way more
10 fundamental.
11    A.   Okay.
12    Q.   Henry Schein, when it
13 investigates whether an order is
14 suspicious, conducts what is called due
15 diligence and the files that they
16 maintain are called due diligence files,
17 correct?
18    A.   I don't recall a particular,
19 you know, file on a doctor.  You know,
20 again, that function was a verification
21 function when an order was deemed
22 suspicious.
23    Due diligence, from my
24 perspective, from the regulatory

¹ perspective, would include an onsite
² assessment.
³     Q.   It doesn't have to include
⁴ an onsite assessment, does it?
⁵     A.   It doesn't have to, but
⁶ it --
⁷     Q.   In fact, 90 percent -- no, I
⁸ shouldn't -- I can't give you a
⁹ percentage.
¹⁰     Of the due diligence files
¹¹ that were produced to us in this case,
¹² the vast majority of them had no site
¹³ visit?
¹⁴     A.   At what point in time are
¹⁵ you referring to?
¹⁶     Q.   Whatever was given to me,
¹⁷ from 2009 through 2016, I think is what I
¹⁸ got.
¹⁹     A.   Okay.  Well, again, the
²⁰ timeline, right, depending on where we
²¹ were on the timeline, is when the onsite
²² assessments were implemented.  So if
²³ we're talking about 2002 to 2007, yeah,
²⁴ you're not going to find --

¹     Q.   Okay.  Let's get back down
² to earth.
³         In front of us is a document
⁴ where a system was implemented or was
⁵ suggested by Cegedim Dendrite for new
⁶ accounts to perform due diligence
⁷ inquiries.  Do you see that?
⁸     A.   Yes.
⁹     Q.   They recommended a phone
¹⁰ call as part of the new due diligence
¹¹ inquiry, correct?
¹²     A.   That's what they
¹³ recommended.
¹⁴     Q.   They also recommended a
¹⁵ follow-up with a document talking about
¹⁶ legal issues related to legitimate
¹⁷ medical use, correct?
¹⁸     A.   Okay.
¹⁹     Q.   And they recommended that
²⁰ there be a receipt so that customers --
²¹ new customers would acknowledge receiving
²² such -- basically, the document, correct?
²³     A.   Okay.
²⁴     Q.   And then they say that, "A

¹ background investigation should be
² conducted to determine whether there are
³ convictions or regulatory actions in the
⁴ client's past that may affect their
⁵ suitability for ordering controlled
⁶ substances."
⁷         Do you see that, first of
⁸ all?
⁹     A.   I see that.
¹⁰     Q.   Do you know if Henry Schein
¹¹ ever implemented that process for new
¹² customers in the new customer due
¹³ diligence inquiry?
¹⁴     A.   I don't know.
¹⁵     Q.   Would you agree with me that
¹⁶ a doctor who had prior convictions for
¹⁷ drug trafficking who wants to become a
¹⁸ new customer of Henry Schein would have
¹⁹ to explain to Henry Schein the prior
²⁰ conviction?  Would you agree that that
²¹ would be an important due diligence
²² inquiry for Henry Schein?
²³         MR. McDONALD:  Object to the
²⁴     form.

¹         THE WITNESS:  I agree that
²     it would be.  But I do not agree
³     that it would ever get to that
⁴     point because the doctor's
⁵     license, his license to practice
⁶     medicine would be revoked or
⁷     should be revoked.
⁸         I mean, I'm not --
⁹ BY MR. MIGLIORI:
¹⁰     Q.   And let's say it wasn't.
¹¹ Based on what we just saw with
¹² Dr. Rannazzisi's -- Joe Rannazzisi's
¹³ letter.
¹⁴     A.   Joe Rannazzisi was talking
¹⁵ about the DEA registration.
¹⁶     Q.   Which a doctor has for
¹⁷ controlled substances?
¹⁸     A.   In addition to -- in
¹⁹ addition to his -- his State Board of
²⁰ Pharmacy license, which, by the way, his
²¹ DEA registration is contingent upon his
²² license, his State Board.
²³     Q.   Right.
²⁴     A.   Okay.  So if -- again, I'm

Page 214

1 not --
2    Q.   I'm going to give you a fact
3 pattern.  Because I think right now we're
4 enjoying going afield of each other, and
5 I want to just focus this, okay.  I take
6 full responsibility for it.
7        MR. McDONALD:  Just listen
8    to his question.  Okay.
9 BY MR. MIGLIORI:
10    Q.   A doctor who has a prior
11 conviction for drug trafficking who has
12 his license revoked and his DEA
13 registration suspended and reinstated
14 seeks to become a new customer of Henry
15 Schein.
16        Does Henry Schein, as of
17 2009, under this new system, do an
18 inquiry of that new customer, of whether
19 or not he or she has had prior
20 convictions for drug-related offenses?
21        MR. McDONALD:  Under your
22    hypothetical, the license has been
23    revoked?  That's what you said?
24        MR. MIGLIORI:  And then I

Page 215

1    said -- and then reinstated.
2        MR. McDONALD:  You said his
3    DEA registration has been
4    suspended and reinstated.  So both
5    have been revoked and both have
6    been reinstated?
7 BY MR. MIGLIORI:
8    Q.   His license revoked and DEA
9 registration suspended and reinstated,
10 referring to both.
11        Let's say a doctor is in
12 fact convicted of drug trafficking.
13    A.   Okay, okay.
14    Q.   And his licenses are
15 revoked --
16    A.   Revoked.
17    Q.   -- and reinstated.
18    A.   And then reinstated.  Okay.
19    Q.   In 2009, does Henry Schein
20 inquire of that doctor of his or her
21 criminal convictions that may be related
22 or informative of whether or not that
23 doctor should be ordering controlled
24 substances?

Page 216

1        MR. McDONALD:  Object to the
2    form.  Lack of foundation.
3        THE WITNESS:  So that would
4    be a verification function.  And
5    when they are setting up the
6    account, and I don't want to
7    guess --
8        MR. McDONALD:  Don't guess.
9    You're not here to guess.
10        THE WITNESS:  I'm not going
11    to guess what their --
12        MR. McDONALD:  If you know,
13    tell him.  If you don't, tell him
14    that you don't know.
15        THE WITNESS:  I don't know
16    what their practice would be in
17    that hypothetical.
18 BY MR. MIGLIORI:
19    Q.   All right.  In this document
20 in front of us, Exhibit Number 19, it
21 says, that background investigations
22 should be conducted in that situation.
23 And I'm asking you whether or not they
24 were, whether or not regulatory and

Page 217

1 verifications implemented this change.
2        MR. McDONALD:  Object to the
3    form.  Mischaracterizes the
4    document.
5        THE WITNESS:  I don't know.
6        MR. McDONALD:  Objection,
7    lack of foundation.
8 BY MR. MIGLIORI:
9    Q.   It says, "A background
10 investigation should be conducted."  Do
11 you know if they ever were, from January
12 of 2008 forward?
13    A.   Well, background
14 investigations were conducted on doctors,
15 on accounts.
16    Q.   For new customers?
17    A.   I don't recall for new
18 customers.
19    Q.   Was it a good idea?
20        MR. McDONALD:  Object to the
21    form.
22        THE WITNESS:  Do I think
23    it's a good idea?
24 BY MR. MIGLIORI:

Page 218

1    Q.    Yeah.
2    A.    Absolutely.
3    Q.    Would you have concern as
4  director of regulatory affairs for a
5  doctor who does have a drug trafficking
6  past wanting to buy an order of
7  controlled substances from Henry Schein?
8    A.    You're asking me would I
9  have a concern if a doctor had a drug
10 trafficking violation?
11   Q.    Conviction.
12   A.    Conviction?
13   Q.    Yes.
14   A.    Wanted to buy
15 pharmaceutical, controlled substances?
16   Q.    Yes.
17   A.    That would be concern.
18   Q.    If verifications escalated
19 that new customer inquiry to you and to
20 Sergio Tejeda, that we have a customer
21 here that wants to buy controlled
22 substances from us, but in fact it turns
23 out that over a decade ago, that doctor
24 was convicted of drug trafficking, that

Page 219

1  would be something concerning to you,
2  correct?
3        MR. McDONALD:  Object to the
4    form.  Improper hypothetical.
5  BY MR. MIGLIORI:
6    Q.    As director of regulatory
7  affairs at the time?
8    A.    I would be concerned.
9    Q.    But whether or not this was
10 actually implemented going forward, you
11 just -- you just don't know as you sit
12 here today, is that a fair statement?
13   A.    I don't know what
14 verification implemented on all these --
15 you know, there are lots of enhancements
16 that were made.
17       MR. McDONALD:  Let's take a
18   break.  We've been going for a
19   while.
20       MR. MIGLIORI:  Sure.
21       THE VIDEOGRAPHER:  All
22   right.  Remove your microphones.
23   The time is 3:10 p.m.  Off the
24   record.

Page 220

1        (Short break.)
2        THE VIDEOGRAPHER:  We are
3  back on the record.  The time is
4  3:29 p.m.
5        (Document marked for
6    identification as Exhibit
7    Schein-DiBello-19.)
8  BY MR. MIGLIORI:
9    Q.    Let me show you Exhibit
10 Number 19.  It's the same time frame.
11 It's now February of 2008.  It's an
12 e-mail exchange between you and Sergio.
13       And again, if we start at
14 the end, there is a reference to Sergio
15 summarizing the HDMA meeting from last
16 week dated February 6, 2008.  And the
17 covering e-mail that I'm going to ask you
18 about is from Sergio to you February 6,
19 2008.
20       It says, "Mike, please take
21 a look at my response to Jim before I
22 send it."
23       So Mike writes:  -- I'm
24 sorry, Sergio writes, "As you know, this

Page 221

1  was a meeting facilitated by the HDMA to
2  discuss a proposal to the DEA on best
3  practices for distribution of controlled
4  drugs which will be accepted and observed
5  industrywide.  The goal is to come up
6  with something that will satisfy DEA
7  officials to get their buying into that
8  industry is addressing their concerns and
9  no additional actions against the
10 wholesalers is necessary.
11       "The main issues that raised
12 a concern and would have a substantial
13 affect on our operations were:"
14       And Number 1, it says, "Due
15 diligence on new accounts.  The proposal
16 was that the companies will need to
17 perform an onsite review of every new
18 account before they could be opened for
19 controlled substances.  Obviously most of
20 the companies represented in the meeting
21 have a different business model than HSI.
22 Most of them service pharmacies and
23 retailers or regionals which do not do
24 much volume.  We argued that the amount

Page 222

1 of new accounts Henry Schein opens daily,
2 it will be virtually impossible to visit
3 all of them and proposed to have
4 different levels of review for different
5 types of customers with office-based
6 practitioners being in the low risk end
7 and, therefore, subject to lesser level
8 of review.
9     "We also discussed other
10 alternatives like self-certification and
11 third-party certification."
12         Do you recall this exchange
13 with Sergio?
14     A.   I don't recall this
15 particular e-mail.
16     Q.   Do you recall Henry Schein's
17 concern about the impracticality of
18 visiting with all new customers based on
19 the number of new accounts Henry Schein
20 opens daily?
21     A.   I recall that it would be a
22 challenge.  It would be a challenge to
23 conduct an onsite.
24     Q.   Do you recall whether or not

Page 223

1 Henry Schein adopted any industrywide
2 recommendation to do onsite visits of new
3 customers?
4     A.   No, I don't recall Henry
5 Schein adopting -- industrywide?  No.
6     Q.   Industrywide
7 recommendations.
8     A.   Recommendations, yeah.
9     Q.   Did -- did Henry Schein
10 visit with each new customer?
11         MR. McDONALD:  Object to the
12     form.
13 BY MR. MIGLIORI:
14     Q.   After in 2008?
15     A.   I don't know.  Every
16 customer, I don't know.
17     Q.   You don't know, or no?
18     A.   I don't know.
19     Q.   Okay.  And you don't know
20 whether they even made phone calls for
21 every customer, correct?
22         MR. McDONALD:  Object to the
23     form.
24 BY MR. MIGLIORI:

Page 224

1     Q.   Based on the last
2 recommendation we reviewed?
3     A.   That was not a regulatory
4 function.
5     Q.   The question was, do you
6 recall if they did do that?
7     A.   I don't recall.
8     Q.   Okay.  Do you know if Henry
9 Schein adopted a self-certification
10 process as an alternative to visiting
11 with new customers?
12     A.   I don't know.
13     Q.   Do you recall if Henry
14 Schein adopted a third-party
15 certification process for new customers?
16     A.   We used Buzzeo and other --
17 you know, we used -- I'm not sure what
18 third-party certification is.  But we --
19 we used consultants to conduct onsite
20 audits.
21     Q.   For new customers?
22     A.   For all customers.
23     Q.   Including new customers?
24     A.   Including new.

Page 225

1     Q.   Do you know when that
2 started?
3     A.   I don't recall the time
4 period, but I know we used Buzzeo and --
5 and others.
6     Q.   Okay.  There's a reference
7 in the third paragraph that these changes
8 will represent additional costs and
9 resources to the distributors.
10         Do you recall having that
11 concern in 2008, that additional new
12 customer due diligence would be expensive
13 or take up a lot of human resources?
14         MR. McDONALD:  Object to the
15     form.
16         THE WITNESS:  I don't -- I
17     don't recall that, being any
18     additional cost.
19         (Document marked for
20     identification as Exhibit
21     Schein-DiBello-20.)
22 BY MR. MIGLIORI:
23     Q.   I'll show you Exhibit 20.
24 I'm not going to go too deeply into this

Page 226

1  one.
2          We made reference to the
3  HDMA and a guidance that they put out in
4  2008.  Do you recall the 2008 HDMA
5  guidance on suspicious orders?
6  Suspicious order monitoring and
7  compliance with DEA?
8      A.    Vaguely recall.
9      Q.    And at this time, Henry
10  Schein is an active member of HDMA,
11  correct?
12      A.    Henry Schein is a member of
13  HDMA.
14      Q.    And you attended HDMA
15  conferences yourself?
16      A.    Yes, I did.
17      Q.    And you, in part, relied on
18  HDMA to learn about DEA compliance,
19  correct?  Isn't that one of the examples
20  you gave me earlier?
21      A.    We attended conferences and
22  we -- we attended other conferences.  Not
23  just HDMA.
24          We -- we relied on some of

Page 227

1  their guidances.  They were guidances.
2      Q.    I'm just simply asking you,
3  was this one of the examples of the trade
4  associations where you got on-the-job
5  training for DEA compliance?
6      A.    This was one example.  Yes.
7      Q.    Okay.  And on the first page
8  of this guidance, Exhibit Number 20, it
9  says that "these industry compliance
10  guidelines are consistent with and
11  further extend the distributors' track
12  record of supporting and implementing
13  initiatives designed to improve safety,
14  security, and integrity of" -- "of
15  medicine supply.  They have been prepared
16  in recognition of a growing problem of
17  misuse and diversion of controlled
18  substances, and the critical role of each
19  member of the supply chain in helping to
20  enhance security."
21          Did you agree with that
22  statement?
23      A.    Did I agree with that
24  statement in 2000 -- when was this

Page 228

1  issued?
2      Q.    2008.  The actual date of it
3  is November 13, 2008.
4      A.    The -- I don't agree with
5  the statement in its entirety.
6          The -- HDMA was comprised of
7  many distribution companies, small,
8  large, regionals, so I think they tried
9  to -- tried to unify the industry best
10  practices.  But I don't know if they --
11  if these guidelines were consistent with
12  all of their membership.
13      Q.    Okay.  Was there something
14  about these guidelines that Henry Schein
15  took particular issue with, that you can
16  recall?
17      A.    Not particularly.  Nothing
18  jumps out at me, but...
19      Q.    Do you agree with the
20  statement that -- that these guidelines
21  were prepared in recognition of a growing
22  problem of misuse and diversion of
23  controlled substances and the critical
24  role of each member of the supply chain

Page 229

1  in helping to enhance security?
2      A.    Yes.
3      Q.    Okay.  The next sentence, it
4  says, "At the center of the sophisticated
5  supply chain, distributors are uniquely
6  situated to perform due diligence in
7  order to help support the security of
8  controlled substances they deliver to
9  their customers."
10          Do you agree that
11  distributors are uniquely situated to
12  perform the due diligence in order to
13  prevent diversion?
14      A.    I wouldn't say -- they're
15  part of the supply chain, but I don't
16  know if I would use the word "uniquely."
17  Uniquely situated.  They are just
18  another -- you know, distributor is a
19  part of the supply chain.
20      Q.    So as director of regulatory
21  affairs at Henry Schein during this
22  period of time through 2012, you didn't
23  feel that Henry Schein had a unique
24  position in order to prevent diversion

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 and misuse and abuse of opioids?
2    A.   We had a position.  We had,
3 as a member of the supply chain, everyone
4 had a role, a very important role.  I'm
5 not sure that I would say one was more
6 important or one was more unique or
7 different -- different situated -- okay.
8    Q.   Do you accept the concept?
9    A.   It's okay.
10   Q.   Do you agree that due
11 diligence can provide a greater level of
12 assurance that those who purchase
13 controlled substances from distributors
14 intend to dispense them for legally
15 acceptable purposes?  That that is the
16 goal of due diligence?
17   A.   Yes.
18   Q.   I'm not going to go through
19 the whole document.  But if you look at
20 the Page 4 of 15.  There's a section
21 titled "Know Your Customer Due
22 Diligence."
23   A.   Okay.
24   Q.   And do you see that whole

Page 231

1 first section talks about opening new
2 accounts?
3    A.   Okay.
4    Q.   The first suggestion of a
5 guidance from the HDMA, the trade
6 association to the distributors, is the
7 distributor should obtain background
8 information on the customer and the
9 customer's business.  Do you accept that
10 as an industry-wide best practice, that
11 the distributor should obtain background
12 information on the customer and the
13 customer's business?
14   A.   Okay.  I accept that.
15   Q.   Yes?
16   A.   Yes.
17   Q.   Review the information
18 carefully and, where appropriate, verify
19 the information, do you agree that that's
20 a best practice for a distributor?
21   A.   Okay.
22   Q.   Is okay yes?
23   A.   Yes.
24   Q.   Okay.  And three, a

Page 232

1 distributor should independently
2 investigate the potential customer.  Do
3 you agree that's the best practice for a
4 distributor to independently investigate
5 the potential customer of controlled
6 substances?
7    A.   In 2008?
8    Q.   Yeah.
9    A.   Yes.  Yes.
10   Q.   "To help ensure that the
11 industry compliance guidelines remain
12 robust and adaptable, the 'know your
13 customer' due diligence phase also
14 describes additional recommendations and
15 documentation containing further
16 suggestions for managing the
17 distributor's procedures."
18        It goes on to specifically
19 reference different types of information
20 to gather.  Do you know if, first of all,
21 you received these guidances in or around
22 November of 2008, you personally in
23 regulatory affairs?
24   A.   In around November of 2008,

Page 233

1 yeah, yes.  I agree somewhat.
2    Q.   Do you recall implementing
3 any of these best practices as
4 recommended by the HDMA into the Henry
5 Schein system?
6    A.   I don't recall specifically
7 which -- you know, which best practices
8 or any that we implemented.
9    Q.   Do you know whether any
10 onboarding of new client standard
11 operating procedures were changed as a
12 result of this guidance?
13   A.   I don't recall.
14   Q.   But this is a guidance that
15 you would have perceived and would have
16 had in your possession --
17   A.   Yes.
18   Q.   -- at or around the time
19 that it was made, correct?
20   A.   Yes.
21        (Document marked for
22 identification as Exhibit
23 Schein-DiBello-21.)
24 BY MR. MIGLIORI:

Page 234

1     Q.   Exhibit 21 is a confidential
2  interoffice memorandum from Brian -- how
3  do you pronounce his last name?
4     A.   Loiacono.
5     Q.   Loiacono and Craig Schiavo,
6  copying you and Sergio.  Did you review
7  this document in preparation for today?
8     A.   No.
9     Q.   This is a confidential
10  interoffice memorandum regarding pain
11  management clinics and recommendations.
12  Do you recall around May of 2009 doing --
13  regulatory affairs conducting due
14  diligence audits on customers of Henry
15  Schein?
16     A.   I don't recall
17  specifically -- May 2009 doesn't stand
18  out, but we conducted many audits
19  throughout that time period.
20     Q.   Do you recall Physician's
21  Choice Dispensing Services, PCDS, the
22  pain management clinic?
23     A.   Not specifically.
24     Q.   The memorandum says, "While

Page 235

1  conducting our assessments of these
2  facilities we found that most met the
3  minimum DEA requirements, i.e., security
4  and recordkeeping; however, compliance
5  with the minimal DEA requirements does
6  not necessarily convey the legitimacy of
7  the pain clinic.  The issues listed below
8  pose serious concerns in regards to
9  shipping controlled substances to pain
10  clinics."
11     Do you recall doing a deeper
12  dive on this particular customer beyond
13  what they're calling here the minimum DEA
14  requirements?
15     A.   I don't recall.
16     Q.   In investigating these
17  clinics, it was found that a lot of these
18  were cash-only businesses.
19     Do you see that?
20     A.   Yes.  Cash only.  I see
21  that.
22     Q.   There was also a finding
23  that treatment of a large percentage of
24  the patients were out of state.

Page 236

1     Do you see that finding?
2     A.   Yes.
3     Q.   Do you see that for this
4  particular group of clinics, there was a
5  large percentage of orders of controlled
6  substances over noncontrolled substances?
7     A.   Yes.
8     Q.   Do you agree with me that's
9  one of your "know your customer"
10  inquiries that had been recommended by
11  Buzzeo and by the HDMA?
12     A.   Yes.
13     Q.   The other inquiry was a
14  quantity of patients that actually see a
15  doctor.  "In some cases, we witnessed
16  lines outside of the facility well before
17  office hours."
18     Do you agree that waiting
19  lines in front of doctors or pharmacies
20  is an indication of potential diversion?
21     A.   Could be.
22     Q.   And that's one of the
23  recommendations for inquiry and due
24  diligence by Buzzeo and HDMA?

Page 237

1     MR. McDONALD:  Object to the
2     form.
3     THE WITNESS:  That's one of
4     the recommendations --
5  BY MR. MIGLIORI:
6     Q.   Due diligence inquiry.
7     A.   To look at the --
8     Q.   Whether or not there are
9  patients in waiting lines and -- before
10  opening.  Do you ever recall that red
11  flag being identified as a point of
12  inquiry?
13     A.   I don't recall that as a red
14  flag, but mm-hmm.
15     Q.   And do you recall that based
16  on those findings that regulatory
17  affairs, your department, and Ron Buzzeo
18  recommended cutting off PCDS as a client?
19     MR. McDONALD:  Object to the
20     form.
21  BY MR. MIGLIORI:
22     Q.   As a customer?
23     A.   I don't recall this specific
24  account.  There were many accounts.  I

Page 238

1  don't recall it.
2      Q.   You would agree with me that
3  at least on the face of this document,
4  these aren't triggered by thresholds,
5  size of an order, frequency of pattern,
6  correct?  That these are principles of
7  know your customer, correct?
8      A.   Correct.
9      Q.   And that a customer could be
10 a customer to whom you should not be
11 selling controlled substances just based
12 on concepts of knowing your customer due
13 diligence, correct?
14      MR. McDONALD:  Object to the
15      form.
16      THE WITNESS:  Can you repeat
17      that question?
18 BY MR. MIGLIORI:
19      Q.   Sure.  You don't need a
20 variation in size, frequency, or pattern
21 of order in order for a customer to be an
22 inappropriate customer for controlled
23 substances after doing or performing due
24 diligence and this kind of inquiry,

Page 239

1  correct?
2      A.   I agree.
3      Q.   And that the obligation to
4  know your customer is an ongoing
5  obligation; that is, it's not only
6  triggered by a deviation of order in
7  size, frequency or pattern, correct?
8      A.   Correct.
9      Q.   It starts with onboarding
10 the customer and then continues through
11 any orders of controlled substances,
12 correct?
13      MR. McDONALD:  Object to the
14      form.
15      THE WITNESS:  Correct.
16      (Document marked for
17      identification as Exhibit
18      Schein-DiBello-22.)
19 BY MR. MIGLIORI:
20      Q.   Let me show you Exhibit
21 Number 22.  This is another Cegedim
22 Dendrite report.  This one is dated
23 11/2/2009.  And based on, again, the
24 timeline that you created, this would be

Page 240

1  right after the implementation -- full
2  implementation of the SOM project,
3  correct?  If we look at the SOM process
4  timeline in Exhibit Number 5, correct?
5      MR. McDONALD:  I'm sorry.
6      You are representing to the
7      witness that this document is
8      dated November 2nd, 2009?
9      MR. MIGLIORI:  Yes.
10      MR. McDONALD:  I don't
11      understand how that's possible.
12      On the second page, it refers to a
13      meeting that's dated December 16,
14      2009.
15      MR. MIGLIORI:  Okay.  I
16      appreciate that.  So it's after
17      that.  I don't know where the
18      metadata came from then.  But we
19      can at least put now, instead of
20      November 2nd, it's after
21      December 16, 2009.
22      Thank you.
23 BY MR. MIGLIORI:
24      Q.   Do you see this report?

Page 241

1      A.   Yes.
2      Q.   By Cegedim?
3      A.   I see it.
4      Q.   Okay.  And again, that is
5  the -- it's still after the
6  implementation of the new SOM procedures,
7  correct, or the implementation of the SOM
8  project started in 2007, correct?
9      A.   It's after 2007?
10      Q.   No.  It's after the
11 implementation of that project in 2009.
12      A.   After the implementation in
13 2009.
14      Q.   And in this particular
15 suspicious order monitoring procedural
16 review, it says, "The guidance provided
17 directly through the regulations was
18 further amplified in correspondence
19 delivered by the DEA in December of
20 2007."
21      We referred specifically to
22 that letter, right?  You remember that?
23      A.   The Rannazzisi letter?
24      Q.   Yes.

Page 242

1    A.   Yes.
2    Q.   "And in correspondence, the
3  DEA established expectations that
4  registrants will actively investigate
5  prospective customers and aggressively
6  investigate orders pending to filling
7  them."
8        Do you see that?
9    A.   Yes.
10   Q.   All right.  If you go to the
11 conclusions on Page 4, in referring to
12 the recommendations of Buzzeo, it says,
13 "Some of the original recommendations are
14 still open, including the development of
15 procedures to govern and control access
16 codes and the validation of a computer
17 system."
18       So as of this date, which
19 is, as counsel points out, after December
20 of 2009, there were still some access
21 codes and validations that had not been
22 completed.  Do you see that?
23   A.   I see that.
24   Q.   The third bullet point says,

Page 243

1  "New accounts are opened without
2  sufficient due diligence
3  investigations/inquiries.  For the most
4  part, new accounts are opened based upon
5  a verification of the customer's DEA
6  number, which is not considered adequate
7  by the DEA."
8        Do you recall being told
9  sometime after December of 2009 that new
10 accounts were not being opened with
11 sufficient due diligence?
12   A.   No.
13   Q.   "Correspondence regarding
14 the prospective customer's previous
15 history of using controlled substances,
16 office practice rules, and general
17 practice expectations should be completed
18 prior to opening the new account."
19       Were you aware that those
20 were not being done before opening a new
21 account?
22   A.   I don't recall.
23   Q.   A compliance agreement form
24 should be developed and included in the

Page 244

1  new account opening process.
2        Will you agree with me that
3  at least as of the end of 2009, there was
4  no compliance agreement as part of the
5  due diligence process for new customers?
6    A.   I don't know what a
7  compliance agreement form is.
8    Q.   Okay.
9    A.   I've never seen this
10 document.  And there were meetings that
11 were ongoing throughout the entire and --
12 and post-implementation process.
13   Q.   Okay.
14   A.   So it was -- again, it was a
15 dynamic evolutionary process that was
16 constantly being enhanced and improved.
17   Q.   You would agree with me that
18 this enhancement and improvement was in
19 coordination with the regulatory affairs
20 department and verifications?
21   A.   It was -- regulatory's role
22 was to work with other departments that
23 would -- that would implement certain
24 enhancements, such as the verifications

Page 245

1  group and the IT group.  And so there
2  were multiple parties working on these
3  enhancements.
4    Q.   Okay.  My question was
5  simply, you'll agree with me that two of
6  those parties were verifications and your
7  department, regulatory affairs, correct?
8    A.   Two of those departments,
9  yes.
10   Q.   All right.  It also says
11 here that "the use of Med Pro inquiry
12 should be expanded for all controlled
13 substance accounts and not just for the
14 limited number of states that require
15 this background check."
16       Were you familiar with the
17 Med Pro inquiry system?
18   A.   No.
19   Q.   All right.  We'll move on.
20       "Henry Schein has conducted
21 some onsite investigations for
22 prospective customers; however, the
23 criteria for level of due diligence has
24 not been documented in any standard

Page 246

1 operating procedure or memorandum."
2      Is it your recollection that
3 as of the end of 2009, Henry Schein had
4 no standard operating procedure for when
5 and how to do onsite investigation for
6 prospective customers?
7      MR. McDONALD:  Object to the
8 form.  Lack of foundation.
9      THE WITNESS:  I don't recall
10 the date of the standard operating
11 procedure.
12 BY MR. MIGLIORI:
13   Q.   Okay.  At least according to
14 this document, as of December of 2009,
15 Henry Schein, according to this Dendrite
16 report, did not have a standard operating
17 procedure for onsite investigations of
18 prospective customers.  That's what the
19 document says, correct?
20   A.   That's what the document
21 says.
22   Q.   Then another observation was
23 that "at the end of 2009, lower level
24 staff is actively involved in clearing

Page 247

1 pended orders.  Pended orders should be
2 cleared by a management official."
3      Was that true that at the
4 end of 2009, low level staff at -- in the
5 verifications department was still
6 actively clearing pended orders without
7 management involvement?
8      MR. McDONALD:  Object to
9 form.  Lack of foundation.
10      THE WITNESS:  I don't -- I
11 don't know what level of
12 management reviewed verification
13 pended orders.  That's
14 verification.
15 BY MR. MIGLIORI:
16   Q.   Cegedim states on the bottom
17 of the conclusions and recommendations
18 that "Henry Schein has clearly invested a
19 great deal of time and energy in
20 developing an adequate SOM system.
21 However, the responsibilities of the
22 customer service department, the
23 verifications department, and the
24 regulatory department appear to be poorly

Page 248

1 defined and reliant to some extent upon
2 the judgment of individual employees
3 regarding what types of situations should
4 be referred to management for approval or
5 forwarded to regulatory for
6 investigation."
7      Was that the state of the
8 interrelationship between those two
9 departments at the end of 2009, that the
10 relationships were poorly defined as
11 stated here?
12   A.   This is the first time I'm
13 seeing this document, and I -- I don't
14 agree with that comment.
15   Q.   Okay.  So you don't recall
16 being told by Cegedim, a consultant that
17 you hired to review your suspicious order
18 monitoring program, that the three
19 departments, customer service,
20 verifications, and regulatory affairs,
21 had poorly defined roles in the
22 suspicious order monitoring system?  You
23 don't recall being told that?
24   A.   No.

Page 249

1   Q.   You'll agree with me that
2 that's what they are representing here in
3 this document?
4   A.   That's what the document
5 says.
6   Q.   Okay.  And you see under
7 qualifications and disclaimers that
8 Cegedim is saying, "Implementation of
9 these recommendations does not guarantee
10 that the DEA would not find any
11 violations.  The recommendations must be
12 considered with this in mind."
13      So, to your knowledge, as
14 you sit here today, do you know if any of
15 these recommendations were, in fact,
16 implemented?
17   A.   I don't recall specific
18 recommendations that were implemented or
19 not.
20      (Document marked for
21      identification as Exhibit
22      Schein-DiBello-23.)
23 BY MR. MIGLIORI:
24   Q.   I'll show you Exhibit

Page 250

1  Number 23.
2        This is an e-mail chain.
3  The top e-mail is from Craig Schiavo
4  dated February 10, 2011, addressed to
5  you, and it refers to the SOM procedures.
6  And then it says, "Here is the PDF of the
7  review and release procedure in case you
8  couldn't open the Visio version."
9        Do you recall new suspicious
10 order monitoring procedures being
11 implemented that had a change in the
12 review and release procedure?
13     A.   Had a change in the review
14 and release procedure?
15     Q.   Yep.
16     A.   I don't recall specifically
17 that.
18     Q.   If you look at the -- the
19 lower e-mail on the first page.
20     A.   Okay.
21     Q.   Craig Schiavo writes to you
22 and copies Sergio and says, "Mike,
23 attached are the new suspicious order
24 monitoring procedures we have

Page 251

1  implemented.  You may not be able to open
2  one of the review and release procedures
3  if you don't have Visio.  If not, please
4  let me know and I will send you a PDF."
5        And then it talks about the
6  controlled substance monitoring and
7  reporting procedure.  Review and release
8  procedure.  New account setup procedure.
9        Do you recall receiving this
10 information in February of 2011 relative
11 to the new SOM procedures being
12 implemented?
13     A.   No.
14     Q.   If you turn to the next
15 page.  There is a diagram of the review
16 and release procedure.  It talks about a
17 pended order at the top of the diagram.
18 Do you see that?
19     A.   Yes.
20     Q.   And then the shipment once
21 pended was placed on hold.  Was that the
22 procedure in 2011?  It was pended, the
23 shipment was held up?
24     A.   I believe that was the

Page 252

1  procedure.
2        Q.   Once pended, the preliminary
3  review happened at the verifications
4  level, correct?
5        A.   Verification, review, right.
6        Q.   And that constituted a
7  website search, a Google search, a DEA
8  website search, a licensure search.
9  Those are some examples of what happened
10 at that first level review, correct?
11        A.   Correct.
12        Q.   That was not necessarily
13 done by management, that was done by
14 staff, correct?
15            MR. McDONALD:  Object to the
16        form.  Lack of foundation.
17            THE WITNESS:  I don't recall
18        who in verification did that.
19 BY MR. MIGLIORI:
20        Q.   Okay.
21        A.   Of what their titles were.
22        Q.   If the order was released,
23 it would be deemed legitimate and sent,
24 if the order was okayed after that

Page 253

1  internet search, correct?
2        A.   That was the decision block
3  there.
4        Q.   If it wasn't cleared there,
5  verification required a justification
6  letter and questionnaire from the
7  customer.  So a letter would be sent out
8  to the customer for justification of the
9  order, correct?
10        A.   That's what it says.
11        Q.   Is that what you recall too?
12        A.   I don't recall the specific
13 verification review process.  But
14 that's -- that's what it says.
15        Q.   According to this, the first
16 step was going on the internet and do a
17 search on the internet.  The second step
18 would be to send a letter first class
19 mail to the customer for a written
20 response.  That's what the blocks --
21 that's the current flowchart, right?
22            MR. McDONALD:  Object to
23        form.  Nowhere on there does it
24        say internet.

Page 254

1      MR. MIGLIORI:  Website.  I'm
2  sorry.
3      MR. McDONALD:  And a lot of
4  other things as well.  And the
5  word -- and "et cetera."  It
6  nowhere says the original one is
7  limited to the internet.  That is
8  your interpretation.
9      MR. MIGLIORI:  That's fine.
10     MR. McDONALD:  That's not
11  what the document says.
12     MR. MIGLIORI:  If it came
13  across that way, I did not mean
14  it.
15     MR. McDONALD:  Okay.
16     MR. MIGLIORI:  I said
17  internet when I meant website.
18     MR. McDONALD:  Among other
19  things.
20     MR. MIGLIORI:  And et
21  cetera.
22  BY MR. MIGLIORI:
23     Q.   Okay.  You had a pended
24  order.  The first thing you would do is

Page 255

1  go to the website, go to Google, go to
2  the DEA website, go to licensure, et
3  cetera.  That would be the first step,
4  correct?
5      A.   That is a verification
6  function.
7      Q.   Right.
8      A.   That -- I can't comment on
9  verification.
10     Q.   Well, this is -- you are
11  receiving directly from Craig Schiavo who
12  reports to you an SOM standard operating
13  procedure.  This is a formal document of
14  the company, right?
15     A.   It's a flowchart.
16     Q.   Right.  But it's a -- it's
17  a -- it's a formal procedure.  This would
18  end up in a standard operating procedure,
19  right?  New SOM procedures, correct?
20     A.   Correct.
21     Q.   This isn't -- this is a
22  formal flowchart for approval, correct?
23     A.   For review and release.
24     Q.   Yeah, okay.

Page 256

1      A.   Okay.
2      Q.   So after the website and
3  licensure, et cetera, review, if it were
4  not clear, it would go to a letter,
5  correct?
6      A.   That's what it says.
7      Q.   So far, nothing here says
8  get a telephone call, correct, in the
9  flowchart?
10     A.   Yeah, I don't -- I don't see
11  telephone call in here.
12     Q.   All right.  If after the
13  letter, it's not acceptable, the next
14  step would be verification would notify
15  your department of the pended order,
16  correct?
17     A.   They would notify --
18  "Verification notifies regulatory of the
19  pended order."
20     Q.   Okay.  There is no reference
21  to on-site visits for verification,
22  correct?
23     A.   No reference at that point.
24     Q.   There is no reference to

Page 257

1  telephone interviews from verifications,
2  correct?
3      A.   At that point, I don't see
4  it.
5      Q.   It's only after the
6  questionnaire comes back and the order
7  cannot be released that it goes to
8  regulatory, where regulatory will review
9  one or all of the following:  Either send
10  an additional questionnaire, or conduct a
11  phone interview, or conduct a site visit,
12  or review agencies, the DEA, the Board of
13  Pharmacy, or the police.
14     Do you see that?
15     A.   I see that.
16     Q.   So the investigation or the
17  due diligence under this new SOM
18  procedure in February of 2011, has all of
19  the direct contact with the customer
20  happening at the regulatory level, not at
21  verifications, correct?
22     A.   I wouldn't say all of the
23  contact.  There's definitely contact
24  between verification and the customer in

Page 258

1 the second box. And you know, before it
2 gets to regulatory, they would have had
3 contact with the customer.
4     Q.   By letter, according to this
5 flowchart?
6     A.   Well, I think they would
7 have -- they would have called, or they
8 could have -- they could have used any
9 means, including a letter.
10     Q.   I understand what they could
11 have done. I'm actually referring to the
12 formal procedure that's being
13 implemented, that's being shared with you
14 by your staff.
15          Under this flowchart, the
16 only references to phone calls or on-site
17 visits or doing an agency review like the
18 police or the Board of Pharmacy or the
19 DEA, is listed within the regulatory
20 function, not the verifications function.
21 That's what the flowchart says, correct?
22     A.   That's what the flowchart
23 says, but --
24     Q.   Did -- did this get

Page 259

1 implemented in 2011?
2     A.   I don't recall.
3     Q.   At least according to this
4 flowchart, your department was
5 responsible for doing a phone interview
6 or site visit or agency review, correct?
7     A.   The regulatory department
8 would be responsible for site visits, and
9 they would start that with a phone
10 interview, calling the customer to
11 schedule and to start the process
12 including a questionnaire.
13     Q.   What about the DEA, the DEA
14 review or calling the police to see if
15 there's a police action or charge or --
16 that's a regulatory function, not a
17 verifications function, under this
18 procedure, correct?
19          MR. McDONALD: Object to the
20 form.
21 BY MR. MIGLIORI:
22     Q.   That's what it says here,
23 correct?
24     A.   That's what it says here.

Page 260

1 But I -- my recollection is that
2 verifications had the licenses, as I
3 mentioned earlier. And they had the
4 Board of Pharmacy's information on any
5 particular account. They maintained
6 those licenses and the registrations,
7 so...
8     Q.   You are talking about a
9 verification of license, though.
10          This says, "Review agencies,
11 DEA, Board of Pharmacy, and police."
12          You agree there's more to
13 due diligence than just verifying a
14 license, correct?
15     A.   Correct.
16     Q.   So the Board of Pharmacy,
17 for example, has its own procedures and
18 censures for pharmacists, correct?
19     A.   Correct.
20     Q.   And that's part of the
21 regulatory function for the regulatory
22 affairs to look into things like
23 investigations initiated by the Board of
24 Pharmacy against the doctor, correct?

Page 261

1     A.   Correct.
2     Q.   And regulatory would have
3 that onus here in 2011, of following up
4 with those agencies, at least according
5 to this chart?
6     A.   According to this chart.
7     Q.   And so DEA, so if the DEA --
8 have you ever had the experience where
9 the DEA would call regulatory and say,
10 "Listen, we've noticed some things in
11 the -- in the ARCOS data that are
12 concerning to us. Can you share with us
13 your transactional history or your supply
14 history with a particular customer?"
15     A.   Yes.
16     Q.   Would that call come into
17 your department?
18          MR. McDONALD: Object to the
19 form. Lack of foundation.
20          THE WITNESS: That call
21 would -- could come into the
22 regulatory department. It could
23 also go into the verifications
24 department.

Page 262

BY MR. MIGLIORI:

Q. If it comes into regulatory, is that something that you would put in the customer's file somewhere, whether it be the due diligence file or some other place in the system, in the JD Edwards system, "DEA contacted us about this doctor"?

MR. McDONALD: Object to the form. Lack of foundation.

THE WITNESS: I don't recall where it was entered. But we would respond to the DEA based on their requests.

BY MR. MIGLIORI:

Q. If the DEA said they had a concern about a doctor and the doctor -- and they provided the DEA with the requested materials, would Schein then somehow note the file that this is a doctor whose ongoing orders should be viewed as potentially suspicious?

MR. McDONALD: Object to form. Lack of foundation.

Page 263

THE WITNESS: If the DEA indicated that this was an account that they had a problem with, they would have told us that.

If the DEA just wanted to see records, which occasionally happened, it was not -- you know, the DEA could have requested any -- any particular account for any reason.

BY MR. MIGLIORI:

Q. If the DEA asked for certain records because they're concerned about an account, and then that doctor put an order into Schein, would that show up in the Schein system?

MR. McDONALD: Object to the form.

BY MR. MIGLIORI:

Q. That the DEA has had an inquiry on this account?

MR. McDONALD: Object to the form. Lack of foundation. Asked and answered.

Page 264

THE WITNESS: I don't recall.

BY MR. MIGLIORI:

Q. Okay. But under this flowchart at least, to the extent the DEA or the police or the Board of Pharmacy were investigating a doctor, it would be the regulatory department's responsibility to do that level of due diligence on a pended order, if it escalated to this level, correct?

A. Correct.

Q. If at that level regulatory could not clear it, it would come to you, correct?

A. Correct.

Q. So if Sergio or Tina Steffanie-Oak? Did I said that right?

A. Tina Steffanie-Oak.

Q. If one of them couldn't clear it, they would bring it to your attention, correct?

A. Correct.

Q. And then if you wouldn't

Page 265

approve it, then it was a suspicious order, and you cancel the order, you probably cancel the customer too, correct?

MR. McDONALD: Object to the form.

BY MR. MIGLIORI:

Q. That's what the flowchart says, correct?

A. The order is deemed suspicious, and verification is notified to cancel the order.

Q. Okay. And then you would report -- this order, this pended order would be reported, though, to the DEA at the moment it triggered, right?

MR. McDONALD: Object to the form.

MR. MIGLIORI: Strike that.

BY MR. MIGLIORI:

Q. Once the shipment is placed on hold and pended, and suspicious orders were pended, would the DEA be notified at the top of this chart on Page 2?

Page 266

1       MR. McDONALD:  I don't know,
2   Don.
3   BY MR. MIGLIORI:
4       Q.   Or further down.
5       MR. McDONALD:  Don, you've
6   got something different than what
7   we're looking at.
8       THE WITNESS:  Are you on
9   Page 1 or --
10      MR. MIGLIORI:  No, I'm on
11  Page 2.  That -- that's Page 3.
12  I'm on Page 2.
13      THE WITNESS:  I only have --
14      MR. McDONALD:  This page.
15      THE WITNESS:  Okay.
16  BY MR. MIGLIORI:
17      Q.   I'm going back to the
18  beginning of the review process just for
19  a second.
20      A.   Okay.  Okay.
21      Q.   When does DEA get, under
22  this procedure, get notified of the
23  order?
24      A.   DEA would be notified, it

Page 267

1   says here, when -- the order is DEA and
2   board of pharmacy are notified by
3   regulatory affairs.
4       Q.   Where?
5       A.   This stuff here.
6       Q.   So under this system, this,
7   on the third page?
8       A.   On this flowchart.
9       Q.   So in 2011, when an order --
10  I'll go back to Page 2 for a second.
11  When an order is pended, because of a
12  deviation in size, frequency or pattern,
13  by this procedure the DEA isn't notified
14  immediately as of February of 2011?
15      A.   The order is -- is pended
16  here.  It's not deemed to be suspicious.
17      Q.   All right.  But what we saw
18  in the early documents that a suspicious
19  order is one that is a deviation in size,
20  frequency, and pattern.
21      A.   Right.
22      Q.   And that once pended, it
23  needs to be reported, as Buzzeo stated in
24  2005, it needs to be reported

Page 268

1   immediately, correct?
2       MR. McDONALD:  Object to the
3   form.  Mischaracterizes the
4   document.
5   BY MR. MIGLIORI:
6       Q.   Not -- not at the end of the
7   month, correct?
8       MR. McDONALD:  Object to the
9   form.  Mischaracterizes the
10  document and the testimony.  That
11  is not what the document said.
12      THE WITNESS:  The order is
13  pended here.  That doesn't mean
14  it's suspicious.  There's a whole
15  review process here, we just went
16  through.
17  BY MR. MIGLIORI:
18      Q.   I'm going to -- let me give
19  you a hypothetical so we're not
20  confusing.
21      If an order is a deviation
22  in size, it is a pended order in Henry
23  Schein's system, correct?
24      A.   If it's a deviation in size.

Page 269

1       Q.   Yes?
2       A.   Yes.
3       Q.   An order that is a deviation
4   in size, by definition under the CSA, is
5   suspicious, correct?
6       MR. McDONALD:  Object to the
7   form.
8       THE WITNESS:  Not
9   necessarily.
10  BY MR. MIGLIORI:
11      Q.   All right.  Well, you
12  actually had a document where you said
13  exactly that, that we just referred to
14  earlier.
15      You're saying that a
16  deviation in size is not a suspicious
17  order?
18      A.   Potential, potentially.
19  Potential.  It could be.  That's the
20  review process that we're doing here.
21      Q.   So in Schein's system, in
22  February of 2011, Schein is not reporting
23  immediately a deviation in size of order
24  from prior purchasing history to the DEA

Page 270

1 upon discovery. Is that true?
2     A.   We were reporting suspicious
3 orders.
4         Our definition of a
5 suspicious order, after the review is
6 conducted and deemed to be suspicious,
7 that's when it was reported immediately.
8     Q.   So this flowchart is
9 accurate, that you would not have told
10 DEA about this until you got to this last
11 step here of it being --
12     A.   Deemed suspicious.
13     Q.   -- deemed suspicious.
14         All right. And then it
15 says, "Notes are placed in the system to
16 prevent future shipments of controlled
17 substances to this customer."
18         Where would that go, where
19 would that go into the system?
20     A.   That's a verification
21 function. I don't know where they'd put
22 that.
23     Q.   Would you know where to find
24 it if you were asked to consult on a

Page 271

1 particular case?
2     A.   No.
3     Q.   Is it in JD Edwards?
4     A.   That's a verification
5 question, where they put it.
6         (Document marked for
7         identification as Exhibit
8         Schein-DiBello-24.)
9 BY MR. MIGLIORI:
10     Q.   I'll show you Exhibit 24.
11 This is dated May 6, 2011.
12         It is a Henry Schein
13 document produced to us. It says, "Know
14 your customer proposal." It's May 6,
15 2011.
16         It says, "The DEA requires
17 that we know your customer prior to
18 shipping controlled drugs."
19         Do you agree at least in
20 2011 that was a requirement, correct?
21     A.   Yes.
22     Q.   That was a requirement when
23 you started as director of regulatory
24 affairs too, correct?

Page 272

1     A.   Correct.
2     Q.   "A questionnaire has been
3 created to get detailed information on
4 all new accounts."
5         Does this refresh your
6 recollection that in the spring of 2011,
7 a questionnaire had been created to get
8 detailed information on new accounts?
9     A.   I don't know what this
10 document is. This is the first time I'm
11 seeing it. And --
12     Q.   If you don't know, just --
13     A.   I don't know.
14         MR. McDONALD: Tell him you
15     don't know, and we'll get out of
16     here a lot quicker than you --
17 BY MR. MIGLIORI:
18     Q.   A new field has been created
19 in Siebel. Is that the name of the
20 system?
21     A.   I don't know.
22     Q.   You never heard of Siebel?
23     A.   No.
24     Q.   "That will prompt the sales

Page 273

1 representative opening an account to ask
2 if the practice intends on ordering
3 control drugs."
4         Are you familiar with that
5 new process on new customers?
6         MR. McDONALD: Object to the
7     form.
8         THE WITNESS: I'm not
9     familiar with that.
10 BY MR. MIGLIORI:
11     Q.   "If so, the rep will send
12 questionnaire via fast fax or e-mail to
13 the customer."
14         Are you familiar with that
15 process?
16     A.   I don't -- no.
17     Q.   "The customer will fill out
18 the document and return to verifications
19 prior to any controlled drugs shipping to
20 the office. The average number of new
21 accounts ordering controlled substances
22 per day is 6 to 12."
23         Is that your recollection,
24 how many new customers were being

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  onboarded daily?
2      A.  I don't recall.
3      Q.  And you don't recall if
4  verifications implementing this new --
5  this new system, correct?
6      A.  I don't recall this --
7      Q.  It's called a proposal?
8      A.  This proposal.
9      Q.  "The process will increase
10  the number of pending orders if the
11  customer does not send the document back
12  prior to the order being placed."
13          Do you recall an increase in
14  pended orders as a result of a new
15  process of sending out due diligence
16  letters for new customers?
17      A.  Order -- there was an
18  increase in pended orders.
19      Q.  Yeah.  Do you recall there
20  being any such process --
21      A.  I recall --
22      Q.  -- put in place where pended
23  orders increased as a result?
24      A.  I vaguely recall that pended

Page 275

1  orders were increasing because of the
2  process changes generally.
3      Q.  As you sit here today, do
4  you recall whether this actually -- this
5  proposal actually got implemented for new
6  customers?
7      A.  I'm not familiar with this
8  proposal.  Sorry about that.
9      Q.  June of 2012, you haven't
10  left -- you haven't left Schein yet,
11  correct?
12      A.  That's correct.
13      Q.  You left in September?
14      A.  October.
15          (Document marked for
16      identification as Exhibit
17      Schein-DiBello-25.)
18  BY MR. MIGLIORI:
19      Q.  Henry Schein produced to us
20  a June 12, 2012, letter from Joe
21  Rannazzisi.  Would this be a letter that
22  you would have received in your role as
23  director of regulatory affairs in June of
24  2012?

Page 276

1      A.  I would have received this.
2      Q.  And the purpose of the
3  letter is to remind controlled substance
4  manufacturers and distributors of their
5  responsibility to inform DEA of
6  suspicious orders in accordance with the
7  Controlled Substances Act.  Do you recall
8  this letter?
9      A.  I don't recall this specific
10  letter.
11      Q.  You'll see that it's Joseph
12  Rannazzisi again, the deputy assistant
13  administrator, office of diversion
14  control.  You don't -- you do not recall
15  this?
16      A.  I don't recall this
17  particular letter.
18      Q.  Okay.  But this is something
19  you would have received --
20      A.  I would have received -- I
21  would have received it.
22      Q.  Were you still there in
23  October 15, 2012?
24      A.  2012, October 15th.  I had

Page 277

1  resigned.  That was my last week,
2  actually.  I think my last -- I'm not
3  sure.  I might have left before the 15th.
4  It was right about that time.  I don't
5  remember the actual resignation date.
6  But it was -- I might have left by then,
7  or it was my last week.  Yeah, I gave
8  three weeks' notice.
9      Q.  Do you recall learning about
10  a doctor in California that was linked to
11  drug-related deaths that was receiving a
12  supply of controlled substances from
13  Henry Schein in January of 2012?
14      A.  Doctor related to controlled
15  substances death in California.
16      Q.  Yeah.  Being forwarded a
17  news article by your staff about
18  doctor-related -- opioid-related deaths
19  of one of your customers.
20          (Document marked for
21      identification as Exhibit
22      Schein-DiBello-26.)
23  BY MR. MIGLIORI:
24      Q.  The article is on the third

Page 278

1 page. It's entitled, "California doctor
2 linked to drug deaths arrested for
3 trafficking commonly abused painkillers."
4 The copyright is 2012. The
5 e-mail is forwarding it, if you go to the
6 second page, start on January 6th of
7 2012. Randy Stader, and eventually it
8 gets sent up to you as it's being
9 forwarded.
10 Do you recall this?
11 A. Not specifically.
12 Q. On the first page, Craig
13 Schiavo is writing to Sergio and to you
14 saying -- well, regarding this article,
15 "FYI, we have a good amount of sales to
16 this doctor," on January 9, 2012. And
17 your response to that, can you read that,
18 Monday, January 9th of 2012, starting
19 with, "Why didn't"?
20 A. "Why didn't a questionnaire
21 go out? Did the orders pend? Who
22 reviewed/released? How far over
23 threshold? Did they get a just letter?
24 Thanks."

Page 279

1 Q. What is a just letter?
2 A. I would say that's a
3 justification letter, short for
4 justification.
5 Q. So that's the due diligence
6 letter?
7 A. We called it a justification
8 letter.
9 Q. But --
10 A. Part of the due diligence
11 process.
12 Q. Okay. And so the response
13 to your e-mail was, "Mike, I followed up
14 with Shaun on this, and he's putting all
15 the information together and will send it
16 to me today. He did tell me, though,
17 that the account did pend four times. We
18 never requested a questionnaire or
19 justification letter. Once I receive
20 everything I will send you the
21 information."
22 Do you recall finding out
23 about this?
24 A. I don't recall what the

Page 280

1 final result of this review was. I don't
2 remember this specific case.
3 Q. As you sit here today, you
4 don't remember this at all?
5 A. I don't remember this
6 particular doctor.
7 Q. You would agree with me that
8 if the account pended four times, that
9 under that flowchart at the very least, a
10 questionnaire, justification letter
11 should have gone out to the doctor?
12 A. I would have to take a look
13 at the policy, the procedure we have in
14 place at that time. And I would have to
15 look at the file that Craig was putting
16 together.
17 Q. If you look at the flowchart
18 that I just went through with you, you
19 would agree with me that if the account
20 pended, short of somebody in
21 verifications unilaterally releasing it,
22 the next step would be to get a
23 justification letter, correct?
24 MR. McDONALD: Object.

Page 281

1 BY MR. MIGLIORI:
2 Q. That's the procedure in
3 place?
4 MR. McDONALD: Object to
5 form. That's an improper
6 hypothetical. That flowchart, are
7 you representing that that
8 flowchart was in place at the time
9 that the orders were made?
10 MR. MIGLIORI: You can read
11 the e-mail. You don't need to
12 testify either. But the e-mail on
13 top talks about the new procedure.
14 It's called the new procedure.
15 MR. McDONALD: Object to the
16 form. Improper hypothetical.
17 Assumes facts not in evidence.
18 BY MR. MIGLIORI:
19 Q. If you look at the procedure
20 that was sent to you from Sergio Tejeda
21 that predates this, you would agree with
22 me that the first step of the pended
23 orders that are referenced here -- and
24 this pended four times. The first step

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1 in the flowchart would be from somebody
2 from verifications looking at the order
3 and going to the website, the Google, the
4 DEA website, licensure, et cetera. That
5 would be the first step of a review for a
6 pended order, correct?
7     MR. McDONALD: Same
8   objections.
9     THE WITNESS: Correct.
10 According to the procedure.
11 BY MR. MIGLIORI:
12   Q. And short of them clearing,
13 somebody in verifications clearing based
14 on that level of review, the next step
15 for the doctor in a pended order would be
16 for the doctor to get a justification
17 letter, correct? You can look at the
18 document if you'd like.
19   A. Can I see the document
20 again?
21   Q. Sure. It's right in front
22 of you. It's the last exhibit, or
23 second-to-last exhibit.
24   A. Okay.

Page 283

1   Q. The next step is a
2 justification letter being sent out to
3 the doctor, correct, from verifications?
4   A. Verification, that's what
5 the procedure says, would send
6 justification letter.
7   Q. Okay. So as Craig is
8 relating to you that this account had
9 four pended orders, but we never
10 requested a questionnaire or
11 justification letter. If that's a true
12 statement, you would agree with me that
13 that's a violation of your own standard
14 operating procedure for due diligence for
15 this customer, correct?
16     MR. McDONALD: Objection to
17   form. Improper hypothetical.
18     THE WITNESS: I don't know
19   what the final analysis in this
20   particular case was.
21     Craig says, "Once I review
22   everything, I will send you the
23   information." So there may have
24   been other communication in this

Page 284

1   particular case between
2   verifications and the doctor.
3 BY MR. MIGLIORI:
4   Q. Okay. But my question to
5 you was, assuming that that statement is
6 correct, that would have been a violation
7 of your standard operating procedure to
8 not send justification letters out to
9 this doctor with four pended orders,
10 correct?
11     MR. McDONALD: Same
12   objections.
13     THE WITNESS: A violation of
14   this procedure?
15 BY MR. MIGLIORI:
16   Q. Yeah. If the next step, as
17 we just went through, was to get a
18 letter, the due diligence of a pended
19 order is go review the licensure and
20 websites, and if not cleared, send out a
21 justification letter for the customer to
22 fill out, correct?
23   A. There could have been
24 another way of clearing it through

Page 285

1 communication --
2   Q. Understood.
3   A. -- with verification. And
4 the doctor -- which I can't -- I can't
5 comment on. That was a verification
6 function.
7   Q. I'm asking you based on the
8 procedure that's in front of you, these
9 pended orders should have received
10 justification letters, correct?
11     MR. McDONALD: Object to the
12   form.
13     THE WITNESS: That's what
14   the procedure says.
15 BY MR. MIGLIORI:
16   Q. Okay. And at least based on
17 the e-mail that's in front of you right
18 now, that didn't happen for the four
19 pended orders, correct?
20   A. I don't recall the final
21 analysis when Craig put everything
22 together. Maybe at that time they didn't
23 have it. But I don't -- I don't remember
24 the final file.

Page 286

1    Q.   All right.  I'll show you
2 another follow-up on it.  It's
3 Exhibit 27.
4         (Document marked for
5    identification as Exhibit
6    Schein-DiBello-27.)
7 BY MR. MIGLIORI:
8    Q.   Here's some more detail.
9 Jim Mullins writes to others.  You're not
10 included in this one.  Jim Mullins says
11 Shaun Abreu -- who is at this point head
12 of verifications, correct.  2012?
13    A.   I'm not sure of his title.
14 He was the head of verifications.  I
15 don't recall when he became the
16 supervisor of that group.  I'm not sure
17 of his title.
18    Q.   He was at one point
19 supervisor of verifications, right?
20    A.   At one point, I believe he
21 or Lisa Madeline, I think, were.  I'm not
22 sure which one is the actual supervisor.
23    Q.   Well, Lisa is also copied
24 here.

Page 287

1    A.   Okay.
2    Q.   And Shaun writes to
3 others -- and you'd agree with me that a
4 justification letter is sent out in the
5 verifications department, not a
6 regulatory, correct?
7    A.   Verifications department
8 sends justification letter.
9    Q.   Right?
10    A.   Right.
11    Q.   And Shaun writes and says,
12 "Jim, of the 14 orders that were placed,
13 four of them pended.  We pended orders on
14 August 25, 2010; November 19, 2010;
15 January 7, 2011; and January 31, 2011.
16        "I agree it does appear to
17 be a high volume, and the account was
18 listed as a family medical clinic, which
19 may have caused more orders to be
20 released."
21        Why would being listed as a
22 family medical clinic override four
23 pended orders?
24    A.   I don't know.

Page 288

1    Q.   Is there anything in your
2 history as director of regulatory affairs
3 that would say that a listing of a family
4 medical clinic is a justified override of
5 a pended order?
6    A.   I don't recall.
7    Q.   "The account is also coded
8 as a multi-special private practice."
9        Is there anything about
10 coding the account as a multi-special
11 private practice that allows for
12 verifications at the first level to
13 release a pended order?
14    A.   Well, accounts were
15 categorized based on their practice
16 types.  That was all part of the -- the
17 review process.
18    Q.   My question is, was there
19 anything about that categorization that
20 should have had somebody at the first
21 level of verifications release four
22 pended orders over a course of six
23 months?
24    A.   I don't --

Page 289

1        MR. McDONALD:  Hang on.
2 Object to -- object to the form.
3 Lack of foundation.
4        THE WITNESS:  I don't know.
5 BY MR. MIGLIORI:
6    Q.   You don't know.
7        If you go a little further
8 down.  Jim writes to Shaun and says,
9 "Shaun, did orders pend?  Looks like a
10 lot in a short period of time?"
11        And then prior to that,
12 Shaun wrote and said, "I ran the ORD881."
13        What does that mean?  Do you
14 know?
15    A.   I think that was a report on
16 the account.
17    Q.   He ran it from January 6th
18 of 2007 to January 6th of 2012.  "And it
19 looks like he only purchased controlled
20 substances from us for a short period
21 starting in July of 2010 to January of
22 2011.  Attached is the report.  We don't
23 have a suspicious order monitoring
24 questionnaire on file for the doctor."

Page 290

1    Would you agree with me that
2  that's not consistent with the new
3  customer recommendations of Cegedim?
4        MR. McDONALD:  Object to the
5    form.
6  BY MR. MIGLIORI:
7    Q.   To have a new customer
8  without a questionnaire on the file?
9        MR. McDONALD:  Object to the
10   form.
11       THE WITNESS:  I can't
12   comment on the verification
13   function without seeing the -- the
14   file.
15 BY MR. MIGLIORI:
16   Q.   Would you agree that by
17 2012, your last year as director of
18 regulatory affairs, that if there is no
19 questionnaire in a customer file, whether
20 it be as a new client questionnaire, or
21 an ongoing questionnaire, that that is
22 not consistent with your standard
23 operation -- operating procedures for due
24 diligence; every customer should have a

Page 291

1  questionnaire in their file, correct?
2        MR. McDONALD:  Object to the
3    form.
4        THE WITNESS:  That's the
5    general rule.  There may have been
6    an exception for this particular
7    account, for this particular
8    situation.  Not everything is
9    black and white.
10       And I can't comment without
11   seeing what else the verification
12   group did to satisfy themselves
13   that they were okay proceeding.
14 BY MR. MIGLIORI:
15   Q.   Just to put in perspective,
16 this news article says, "Diaz, a doctor,
17 hasn't been charged in connection with
18 the deaths which remain under
19 investigation.  He is accused of
20 illegally prescribing large amounts of
21 pain killers to patients who didn't need
22 the drugs and for accepting sexual favors
23 as payment from some women."
24       Now, is there anything about

Page 292

1  that doctor that you think would have
2  exempted him from the due diligence
3  requirements of having a questionnaire in
4  the file?
5        MR. McDONALD:  Object to the
6    form.
7        THE WITNESS:  This was a
8    verification process.  I can't
9    comment on their review of this
10   Dr. Diaz.
11 BY MR. MIGLIORI:
12   Q.   You would agree that if that
13 escalated to you as director of
14 regulatory affairs, you would hope to,
15 and expect to see at least a customer
16 questionnaire in your file, correct?
17       MR. McDONALD:  Object to the
18   form.  Improper hypothetical.
19       THE WITNESS:  I would expect
20   to see documentation that
21   satisfied the verification review
22   process.
23 BY MR. MIGLIORI:
24   Q.   Including the customer

Page 293

1  questionnaire, correct?
2        MR. McDONALD:  Object to the
3    form.
4        Object to the form.
5        THE WITNESS:  That's one way
6    of documenting their review of
7    this account.
8  BY MR. MIGLIORI:
9    Q.   In 2012, the customer
10 questionnaire was required for all
11 customers, correct?
12   A.   I don't recall when it went
13 into place.  And -- and if there were
14 exceptions or other methods of verifying
15 the doctors' status.
16       (Document marked for
17   identification as Exhibit
18   Schein-DiBello-28.)
19 BY MR. MIGLIORI:
20   Q.   Let me show you Exhibit 28.
21       This is a year after you
22 left, but this relates to the "know your
23 customer" requirements.
24       You talked earlier about

Page 294

1  Tina Steffanie-Oak, right?  She worked
2  for you -- or she worked for Sergio
3  Tejeda under you while you were director
4  of regulatory affairs, correct?
5      A.   Correct.
6      Q.   And she has a PowerPoint
7  presentation here that was produced to us
8  entitled, "Individual Opportunity/Issue,"
9  presented by Tina Steffanie-Oak, where
10 she puts on the first line, "Are we in
11 substantial compliance with the DEA's
12 suspicious order monitoring 'know your
13 customer' regulations?"
14          And she puts in the first
15 bullet point, "We do not have 'know your
16 customer' due diligence for approximately
17 60 percent of our customers.  Remaining
18 40 percent has varying degrees of due
19 diligence.  Files are inconsistent."
20          Were you aware that as of
21 the time that you left Henry Schein, that
22 60 percent of the customers that you were
23 servicing did not have due diligence in
24 their files?

Page 295

1      A.   No.
2          MR. McDONALD:  Object to the
3      form.
4  BY MR. MIGLIORI:
5      Q.   Were you aware that of the
6  40 percent that had some due diligence,
7  that it was varying degrees of due
8  diligence, and they were not consistent
9  with any standard operating procedure?
10         MR. McDONALD:  Object to the
11     form.
12 BY MR. MIGLIORI:
13     Q.   Were you aware of that?
14         MR. McDONALD:  Object to the
15     form.
16         THE WITNESS:  No.
17 BY MR. MIGLIORI:
18     Q.   Is that alarming to you,
19 that 60 percent of the customers, as of
20 2013, had no due diligence, "know your
21 customer" due diligence in their files?
22 Is that surprising to you?
23         MR. McDONALD:  Object to the
24     form.

Page 296

1          THE WITNESS:  This is the
2  first time I'm seeing this.  I'm
3  not familiar with this report, so
4  I -- it's a large number.  I
5  agree.
6          MR. MIGLIORI:  Why don't we
7  take a break and I'll look at what
8  I got and we'll wrap up.
9          THE VIDEOGRAPHER:  Stand by
10 please.  The time is 4:44 p.m.
11 Off the record.
12         (Short break.)
13         THE VIDEOGRAPHER:  We are
14 back on the record.  The time is
15 4:54 p.m.
16 BY MR. MIGLIORI:
17     Q.   Who is Stanley Bergman?
18     A.   Who is Stan Bergman?
19     Q.   Yeah.
20     A.   He is the chairman and COO
21 of Henry Schein.
22     Q.   Okay.  And that was his
23 position in 2008?
24     A.   That was his position.

Page 297

1      Q.   Was that his position in
2  2008?
3      A.   Yes.
4          (Document marked for
5      identification as Exhibit
6      Schein-DiBello-29.)
7  BY MR. MIGLIORI:
8      Q.   Exhibit 29.  This is a news
9  article that Stan Bergman forwarded to
10 your supervisor, Len David, about a
11 doctor.  "Forest City Doctor Has Been
12 Charged With Administering Controlled
13 Substances Without Proper Recordkeeping."
14 And it talks about, "The investigation
15 beginning in December of 2007 following
16 receipt of a DEA substance control
17 ordering form that belonged to Cosby.
18 The form showed purchase of narcotics
19 Demerol and Dilaudid, and further
20 investigation determined Cosby had made
21 40 purchases of controlled substances
22 from Darby Dental Supply in Memphis,
23 Tennessee and Henry Schein in
24 Indianapolis."

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  Do you recall this news
2  article?
3  A.  I don't recall this specific
4  news article.
5  Q.  It says, "While Cosby was
6  listed in good standing on the
7  Pennsylvania Department state website,
8  DEA discovered that Cosby was given one
9  year probation in 1976 on 45 counts of
10  issuing a narcotic prescription to drug
11  dependent persons and six counts of
12  dispensing narcotic prescriptions to a
13  drug dependent person, according to the
14  criminal complaint."
15  You'll agree with me that
16  somebody that maintains an active good
17  standing license, does not necessarily in
18  and of itself show that the person should
19  be somebody that should be receiving
20  controlled substances, correct?
21  MR. McDONALD:  Object to the
22  form.
23  THE WITNESS:  It's a broad
24  statement.  In general, I agree.

Page 299

1  BY MR. MIGLIORI:
2  Q.  In a robust due diligence
3  system, would you agree that you would
4  want to at least know at Henry Schein of
5  the 45 counts of narcotic prescription
6  dispensing and the six counts of
7  dispensing narcotic prescriptions to drug
8  dependent people, at least in the due
9  diligence process, you'd want to know
10  about those prior probation convictions?
11  A.  Correct.
12  Q.  And that's something that
13  should be part of a good onboarding of a
14  new customer process?
15  A.  Should be.
16  Q.  This was escalated to you
17  where Len wrote to you, after receiving
18  it from Stan Bergman, and he wrote, "Knew
19  this would trigger SB's inquiry.  Ideas
20  regarding response?"
21  And your response on
22  October 1st, 2008, was, "Regulatory and
23  verifications were both involved with DEA
24  Agent Jackson during investigation of

Page 300

1  Dr. Cosby.  Henry Schein and Darby were
2  not the target of the investigation and
3  the information requested was provided in
4  a complete and timely manner.  Our
5  verifications protocol did confirm that
6  the doctor did indeed have a valid state
7  license and DEA registration and was not
8  ordering excessive quantities.  Doctor's
9  account has been restricted to block
10  pharma and controlled substances
11  shipments."
12  You'll agree with me that
13  just verifying that having a valid state
14  license and DEA registration and not
15  triggering an excessive order is not in
16  and of itself due diligence or complete
17  due diligence with respect to this
18  customer, correct?
19  MR. McDONALD:  Object to the
20  form.
21  THE WITNESS:  Generally
22  speaking, that's correct.
23  BY MR. MIGLIORI:
24  Q.  Okay.  And as a result of --

Page 301

1  even though this doctor had a valid
2  license, even though this doctor had a
3  valid DEA registration, and even though
4  the system did not trip an excessive
5  order in the system, you did go ahead and
6  suspend and cancel this order, this
7  doctor's ability to order controlled
8  substances from Henry Schein as a result
9  of this news article, correct?
10  A.  We restricted the account.
11  The doctor's account has been restricted
12  to block pharmaceuticals and controlled
13  substances.
14  Q.  You say, "Although we have
15  sophisticated and comprehensive
16  suspicious order monitoring
17  systems/procedures, it is extremely
18  difficult, if not impossible, to identify
19  and police practitioners who maintain
20  valid state and federal licenses and
21  decide to dispense controlled substances
22  to drug-dependent patients."
23  And that's an -- that's an
24  understatement of your obligation at

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 Henry Schein to know your customer, isn't
2 it?
3         MR. McDONALD:  Object to the
4     form.
5         THE WITNESS:  I don't
6     remember this particular doctor.
7     Again, I would need to look at the
8     file that would have information
9     regarding the drug-dependent
10    patients and the doctor's
11    interaction with his patients and
12    what we did at the time.  I don't
13    recall.
14 BY MR. MIGLIORI:
15    Q.   Okay.  Certainly it was
16 within regulatory -- at least in the
17 later schematic of the procedure for due
18 diligence, it certainly would have been
19 in regulatory's realm, the regulatory
20 affairs department, to do the kind of due
21 diligence to check with DEA, Boards of
22 Pharmacy and police to see whether or not
23 this kind of doctor had any prior issues
24 relating to controlled substances,

Page 303

1 correct?
2         MR. McDONALD:  Objection.
3 BY MR. MIGLIORI:
4    Q.   That would have been a
5 regulatory inquiry, correct?
6         MR. McDONALD:  Objection to
7     form.
8         THE WITNESS:  It would be
9     once the doctor's orders pended.
10 BY MR. MIGLIORI:
11    Q.   And you can't tell by
12 looking at this document whether or not
13 any such inquiry was ever done at Henry
14 Schein, correct?  You just can't tell
15 without seeing the due diligence file?
16    A.   Correct.  I need to see the
17 complete file.
18         (Document marked for
19     identification as Exhibit
20     Schein-DiBello-30.)
21 BY MR. MIGLIORI:
22    Q.   Let me show you Exhibit 30.
23 It's an e-mail exchange again that you're
24 mentioned on.  The cover e-mail is

Page 304

1 November 18, 2011, and it involves
2 Melodie Steele.  Who is she?
3    A.   Melodie Steele was an
4 operations manager at the Indianapolis
5 facility.
6    Q.   Okay.  She writes to you and
7 to Sergio and says, November 18, 2011,
8 "The Iowa Board of Pharmacy found
9 probable cause to file charges against
10 Henry Schein for supplying C-II morphine
11 to Des Moines University who was without
12 a valid controlled registration.  Notice
13 to appear in January of 2012."
14         Do you recall this
15 happening?
16    A.   I don't recall this
17 specific.
18    Q.   Would you have been the
19 person who appeared before the board of
20 pharmacy if you received this kind of
21 notice?
22    A.   I did not appear.  I
23 don't -- I don't remember appearing.
24    Q.   Attached to it is the Iowa

Page 305

1 Board of Pharmacy's action against Henry
2 Schein, statement of charges.  Do you
3 recall the Attorney General or the board
4 of pharmacy in Iowa finding that Henry
5 Schein had dispensed morphine to the
6 university without a valid license?
7         MR. McDONALD:  Object to the
8     form.
9         THE WITNESS:  I don't
10    recall.
11 BY MR. MIGLIORI:
12    Q.   It says, "This matter may be
13 resolved by settlement agreement."  Do
14 you know whether or not such an agreement
15 was entered into?
16    A.   I don't recall.
17    Q.   So you do not recall, as you
18 sit here today, the -- the outcome of
19 this action, do you?
20    A.   I don't recall the outcome.
21    Q.   Is this something that would
22 have been handled by the department by
23 the -- the Department of Regulatory
24 Affairs?

Page 306

1  A.  This probably would have
2  gone to legal.  I would have forwarded it
3  to legal.
4  Q.  Okay.  And the charge
5  includes, "From December 19, 2008,
6  through August 31st of 2009, respondent
7  supplied a total of 800 milliliters of
8  Schedule II morphine sulfate injection to
9  Des Moines University.  At the time
10  respondent supplied the morphine sulfate
11  injection to Des Moines University, the
12  university did not have a valid
13  controlled substances registration
14  submitted by Des Moines University to
15  possess the morphine sulphate injection."
16  If that is the charge, where
17  would the system have failed?
18  MR. McDONALD:  Objection to
19  form.
20  BY MR. MIGLIORI:
21  Q.  And by system, I mean Henry
22  Schein's system for verification or
23  compliance.
24  A.  That would be a verification

Page 307

1  function.
2  (Document marked for
3  identification as Exhibit
4  Schein-DiBello-31.)
5  BY MR. MIGLIORI:
6  Q.  Exhibit 31.  It's an e-mail
7  exchange just before you are leaving,
8  between Shaun Abreu and Craig Schiavo.
9  Craig Schiavo worked for you
10  at this point, correct?
11  A.  Worked for Sergio.
12  Q.  Okay.  But worked within
13  regulatory affairs?
14  A.  Correct.
15  Q.  On January 31st, the bottom
16  e-mail on the first page says, "Hi Craig,
17  please see the attached file from the
18  "know your customer" proactive process.
19  This doctor was self-medicating, but he
20  did 31,000 in sales for 2011.  I had him
21  send us a justification stating that he
22  will no longer order the product to
23  self-medicate, and that all future
24  controlled substances orders will be for

Page 308

1  patient use.  Are you okay with
2  reinstating?  See attached file."
3  Is that an appropriate use
4  of the "know your customer" system?
5  MR. McDONALD:  Object to the
6  form.
7  THE WITNESS:  An appropriate
8  use of the know your customer?
9  BY MR. MIGLIORI:
10  Q.  Yeah.  We'll break it down
11  for you.
12  Should Shaun Abreu instruct
13  a customer that they should fill out a
14  form saying they'll no longer
15  self-medicate?  Is that consistent with
16  the due diligence "know your customer"
17  obligations of Henry Schein?
18  MR. McDONALD:  Object to the
19  form.  Lack of foundation.
20  THE WITNESS:  I can't speak
21  to what Shaun Abreu told the
22  customer.
23  BY MR. MIGLIORI:
24  Q.  Is self-medicating permitted

Page 309

1  under the Henry Schein controlled
2  substance policies and procedures?
3  A.  Self-medicating is frowned
4  upon.  And it's one of those areas that
5  we reviewed carefully and would not --
6  would not approve.
7  Q.  Would it be appropriate for
8  Shaun Abreu to take a doctor that was
9  self-medicating, but since he did $31,000
10  in sales for 2011, he had him fill out a
11  justification letter stating that he'll
12  no longer self-medicate, is that an
13  appropriate way of using the
14  justification letter process?
15  MR. McDONALD:  Object to the
16  form.
17  THE WITNESS:  I can't
18  comment on Shaun -- what -- you
19  know, I don't know the -- the
20  interaction between Shaun and the
21  doctor just based on, you know,
22  this e-mail.
23  BY MR. MIGLIORI:
24  Q.  Craig wrote to Shaun and

Page 310

1  said, "I am okay with reinstating. Do
2  you think we should send this to the DEA
3  as a follow-up to our reporting letter?"
4          And Shaun wrote back and
5  said, "We never reported to DEA, it was
6  part of the proactive process. I can
7  simply reinstate the customer."
8          Based on what's on this
9  e-mail, is that an appropriate use of
10 Schein's justification, due diligence
11 process, proactive process?
12         MR. McDONALD:  Object to the
13     form.
14         THE WITNESS:  I don't -- I
15     would need to see the -- the rest
16     of the file to -- to comment on
17     it.
18 BY MR. MIGLIORI:
19     Q.   Was it enough at Henry
20 Schein for a doctor to just simply say
21 I'll stop self-medicating, to justify
22 continuing to sell in the order of
23 $31,000 per year --
24         MR. McDONALD:  Object to the

Page 311

1      form.
2  BY MR. MIGLIORI:
3      Q.   -- to the customer?
4          MR. McDONALD:  Object to the
5      form.
6          THE WITNESS:  A customer
7      would have to explain his
8      circumstances in order to proceed
9      with the order.
10 BY MR. MIGLIORI:
11     Q.   If the doctor is found to
12 have been self-medicating, isn't that a
13 reportable event to DEA?
14         MR. McDONALD:  Object to the
15     form.
16         THE WITNESS:  I don't recall
17     DEA's position on self-medicating.
18     I don't believe it's technically
19     illegal.
20 BY MR. MIGLIORI:
21     Q.   Okay.  And would it be up to
22 Shaun Abreu to make the decision not to
23 report within the Henry Schein system in
24 2012?

Page 312

1      A.   It depends on what -- what
2  happened with the account and the -- and
3  the doctor.
4      Q.   Apparently the doctor was
5  cleared to purchase as long as he
6  promised not to self-medicate, based on
7  the e-mail.  Is that an appropriate -- in
8  the decision tree, is that an appropriate
9  decision for Shaun Abreu to be making,
10 not to report that kind of
11 self-medicating event to the DEA?
12     A.   If Shaun was the manager of
13 the verification group at the time, that
14 was his decision.  But again, based on
15 his interaction with this particular
16 doctor.
17     Q.   Does it trouble you that the
18 verification, at least on the face of his
19 e-mail, was that the account was a
20 $31,000-a-year account?
21         MR. McDONALD:  Object to the
22     form.
23         THE WITNESS:  I would not
24     factor in with the $31,000

Page 313

1      account.
2  BY MR. MIGLIORI:
3      Q.   Would you agree with me on
4  the face of the e-mail, he did?
5          MR. McDONALD:  Object to the
6      form.
7          THE WITNESS:  I don't know
8      that.  I can't tell just based on
9      this e-mail what else was there.
10 BY MR. MIGLIORI:
11     Q.   He certainly took the time
12 to bring it to the attention of your
13 department, that it is a $31,000 account,
14 correct?
15     A.   He forwarded it to Craig.
16     Q.   Who worked for you or worked
17 for Sergio?
18     A.   Worked for Sergio.
19         (Document marked for
20     identification as Exhibit
21     Schein-DiBello-32.)
22 BY MR. MIGLIORI:
23     Q.   Let me show you Exhibit
24 Number 32.  Were you aware that for --

Page 314

1 that during the period of time that you
2 were director of regulatory affairs, that
3 Henry Schein had not been reporting sales
4 of controlled substances to the Ohio
5 Board of Pharmacy as required by Ohio
6 law?
7 　　　MR. McDONALD:  Object to the
8 　　form.  Assumes facts not in
9 　　evidence.
10 　　　THE WITNESS:  I was not
11 　　aware.
12 BY MR. MIGLIORI:
13 　　Q.　This is a letter dated
14 November 9, 2012.  You had just left a
15 month earlier, correct?
16 　　A.　Correct.
17 　　Q.　And Sergio Tejeda at this
18 point is listed as director of regulatory
19 operations and compliance.  Is that a
20 promotion from where he was before?
21 　　A.　Correct.
22 　　Q.　And he writes to the Ohio
23 State Board of Pharmacy in November of
24 2012, saying that "the purpose of this

Page 315

1 letter is to notify the Ohio Board of
2 Pharmacy of an issue that we recently
3 discovered while conducting a routine
4 internal review of our operations.
5 During the course of our internal review
6 we realized that Henry Schein has been
7 underreporting sales of controlled
8 substances to the Ohio Board of Pharmacy
9 as required by the state's Prescription
10 Monitoring Program, PMP.  The reports
11 included sales of products containing
12 tramadol and carisoprodol, but do not
13 include sale of other controlled
14 substances.  We believe the
15 underreporting error was due to
16 misinterpretation or miscommunication of
17 the state requirement that happened
18 during the implementation of our computer
19 automated reporting system."
20 　　　Did that ever get brought to
21 your attention while you were director of
22 regulatory affairs?
23 　　A.　No, I don't recall that.  I
24 wasn't paying attention.

Page 316

1 　　Q.　It says that, "To date,
2 Henry Schein has consistently filed
3 reports on a timely basis as required by
4 the PMP, and prior to the discovery of
5 this issue, Henry Schein was not aware
6 the reports were incomplete.  Please be
7 reassured that there was never any intent
8 to avoid or circumvent the customers
9 obligation under Ohio state law, and as
10 an act of good faith, Henry Schein is
11 providing all controlled substance sales
12 information which was mistakenly omitted
13 for the previous two years."
14 　　　So were you -- would that
15 have been a function of regulatory
16 affairs to make sure that Henry Schein
17 was in compliance with Ohio reporting
18 requirements under the prescription
19 monitoring program, the law in the state
20 of Ohio for those two years?
21 　　A.　It sounds like a
22 verification report.
23 　　Q.　So reporting of transactions
24 of sale of controlled substances from

Page 317

1 Henry Schein from 2010 to 2012 was the
2 function of the verifications department
3 and not the regulatory affairs
4 department?
5 　　A.　That's what it sounds like,
6 yeah.
7 　　Q.　And yet this letter is being
8 written from the regulatory affairs
9 department, correct?
10 　　A.　That's correct, because
11 regulatory would interact with the
12 agency.  But the actual reporting, just
13 like the ARCOS and other reports, are
14 verification functions.
15 　　Q.　Okay.  And you agree with me
16 that reporting is an essential part, is
17 an integral report of the effective
18 detection and prevention of diversion,
19 both at the state and federal levels,
20 correct?
21 　　　MR. McDONALD:  Object to
22 　　form.
23 　　　THE WITNESS:  I would agree.
24 BY MR. MIGLIORI:

Page 318

1    Q.  Go ahead.

2    A.  I would agree.

3      MR. MIGLIORI:  Last

4   document.  And we'll get your

5   lawyer out of here.

6      MR. McDONALD:  I actually

7   need to get on a call.  I'll pass

8   it on.

9      MR. MIGLIORI:  I won't ask

10   anything objectionable.

11      This is the last document.

12 BY MR. MIGLIORI:

13    Q.  We got a little late start

14 with the 10:30 time.  I'm trying to get

15 us out of here on time.

16      (Document marked for

17    identification as Exhibit

18    Schein-DiBello-33.)

19 BY MR. MIGLIORI:

20    Q.  Exhibit Number 33.  Jeff

21 Peacock was your successor?

22    A.  Correct.

23    Q.  And this is a December 19,

24 2012, assessment, internal assessment of

Page 319

1 the regulatory affairs/verifications

2 department.  Do you see that?

3    A.  Okay.

4    Q.  And so the assessment team,

5 the DEA assessment team, and it was

6 comprised of -- and this is what Jeff

7 Peacock testified to, Sergio Tejeda, Tina

8 Steffanie-Oak and Ken Romeo.  Is that

9 consistent with your recollection?

10    A.  I'm not familiar with this

11 report.  This is the first time I'm

12 seeing it.  And it's --

13    Q.  I'm not asking about the

14 report.  I'm just asking the team.  Do

15 you remember there being a DEA team that

16 Sergio headed up with Steffanie-Oak and

17 Ken Romeo from your department?

18    A.  Sergio and -- Sergio was the

19 head of the DEA team, yes.

20    Q.  Okay.  And Steffanie and Ken

21 worked for him, correct?

22    A.  Tina worked and Ken worked

23 for Sergio.

24    Q.  I'm sorry, Tina.  And so Ken

Page 320

1 Romeo wrote to the -- from regulatory

2 affairs wrote to Jeff Peacock, the now

3 director of regulatory affairs about two

4 months after you -- I'm sorry, about a

5 year --

6    A.  Over a year.

7    Q.  -- after you left about the

8 state of suspicious order monitoring

9 program, correct?

10    A.  Okay.  That's what it says.

11    Q.  So the date here, although

12 it says December 19, 2012, it's actually

13 the 2013 verification team.  Do you see

14 that, the dates?

15    A.  Okay.

16    Q.  I just want to orient you.

17    A.  Okay.

18    Q.  "The assessment is a result

19 of a cooperative effort of the regulatory

20 and verification teams that looked into

21 the identification of controlled

22 substances and/or a specific combination

23 of controlled substances that might

24 potentially place Schein in a high risk

Page 321

1 category as a distributor of controlled

2 substances for DEA regulatory actions."

3      Did you ever have such

4 assessments reported to you while you

5 were director of regulatory affairs?

6      MR. JONES:  Object to the

7   form.

8      THE WITNESS:  No.

9 BY MR. MIGLIORI:

10    Q.  It says the material -- the

11 other purpose was, "The materiality of

12 controlled substance transactions in

13 dollar thresholds and active product

14 ingredients thresholds, computer system

15 errors inherent or not presently

16 accounted for, unintentional

17 misrepresentations or omissions, risk

18 control statistics as they related to the

19 level of training and potential errors,

20 and known DEA hot buttons, such as

21 current street trends."

22      Were you ever apprised of

23 the effectiveness of the new SOM program

24 that was implemented in October of -- I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  sorry, 2009 from internal audits?
2           MR. JONES:  Object to the
3      form.
4           THE WITNESS:  No.
5  BY MR. MIGLIORI:
6      Q.   All right.  This team, that
7  team of Sergio Tejeda, Tina
8  Steffanie-Oak, and Ken Romeo, they
9  existed as a team before you departed as
10 director of regulatory affairs, correct?
11     A.   Yes.
12     Q.   Okay.  They had certain
13 findings.  One of the findings was that,
14 "The current suspicious order monitoring
15 system" -- again this is December 2013 --
16 "appears to utilize a regression
17 formulated statistical mode as a basis
18 for normalizing prescribing and
19 purchasing patterns for controlled
20 substances and dangerous prescription
21 drugs resulting in product release."  It
22 says here, "The real problem lies in the
23 fact that our suspicious order monitoring
24 system provides us only a mirror image of

Page 323

1  our own business model.  Our system has
2  not been checked against a neutral
3  nationally recognized medical database to
4  crosscheck its validity as truthful and
5  accurate."
6           Had you ever had any
7  observations or findings that said that
8  the suspicious order monitoring system
9  that you had in place was not real world
10 oriented?
11          MR. JONES:  Object to the
12     form.
13          THE WITNESS:  No.
14 BY MR. MIGLIORI:
15     Q.   The Schein regulatory
16 affairs team found that, "Current
17 suspicious order monitoring parameters of
18 market segment, practice type, and
19 practice specialty do not cross-reference
20 normal clinical drug utilization" --
21 "utilization patterns."
22          Was that observation or
23 finding ever presented to you while you
24 were director of regulatory affairs?

Page 324

1      A.   No.  I don't even know what
2  that means.
3      Q.   Okay.  Was it ever told to
4  you that the suspicious order monitoring
5  system as of 2013 was overburdened with
6  human intervention?
7      A.   No.
8           MR. JONES:  Object to the
9      form.
10          THE WITNESS:  No.
11 BY MR. MIGLIORI:
12     Q.   And was it ever told to you
13 that the risk level for DEA enforcement
14 action was high because of the current
15 computerized suspicious order monitoring
16 system being dated?
17          MR. JONES:  Object to the
18     form.
19          THE WITNESS:  No.
20 BY MR. MIGLIORI:
21     Q.   Second finding of Sergio
22 Tejeda and his team was that, "The
23 individual account thresholds for
24 controlled substance purchase may be

Page 325

1  adjusted by verifications without
2  regulatory and/or medical guidance which
3  could result in an inappropriate product
4  release."  The risk level for DEA
5  enforcement level was high.
6           Were you ever told that the
7  verifications adjustments subjected the
8  company to a high risk of DEA
9  involvement?
10          MR. JONES:  Object to the
11     form.
12          THE WITNESS:  No, I was not.
13 BY MR. MIGLIORI:
14     Q.   Were you aware that as of
15 2013 the regulatory affairs department at
16 Henry Schein thought that, "The
17 'decisionmakers' in the verifications
18 department lacked the medical training
19 and qualifications to release controlled
20 substances without regulatory or medical
21 guidance in some instances"?
22          Had that observation ever
23 been made to you?
24     A.   No.

Page 326

1  Q.  It says, "An example, a
2  product release decision can be made
3  solely within the verification team
4  without a secondary check.  Justification
5  letters submitted to Schein by physicians
6  or accounts requesting controlled
7  substances are not reviewed currently by
8  medically trained personnel."
9      Was that true as of the time
10 that you left, that these justification
11 letters were not being reviewed by
12 medically trained personnel?
13     A.  Justification letters were
14 processed by the verifications group.
15 I'm not aware of any medical professional
16 in that group.
17     Q.  Okay.  "In fairness, they
18 are doing the best they can with the
19 limited training that they have received,
20 and many of our verifications colleagues
21 are new to the particular position of
22 decisionmaker.  Also, internal
23 documentation such as account notations
24 performed by suspicious order teams is

Page 327

1  not revealed to regulatory on a regular
2  basis."
3      Did you have any
4  observations or findings shared with you
5  before you left Schein that a lot of
6  these internal decisions were being made
7  by folks underqualified and those
8  decisions were not being shared on a
9  regular basis with your department?
10     MR. JONES:  Object to the
11 form.
12     THE WITNESS:  No.
13 BY MR. MIGLIORI:
14     Q.  It goes on to say that, "The
15 current gut feeling approach, while
16 laudable, leaves Schein exposed.
17 Operating within a closed loop is usually
18 dangerous.  During assessment process,
19 accounts were identified which needed
20 further regulatory scrutiny but were
21 trapped with the closed loop."
22     Did anyone express concerns
23 to you about the current system that we
24 showed in the diagram, the flowchart of

Page 328

1  decisionmakers, that that as a result led
2  to orders that should have gotten
3  regulatory scrutiny that didn't?
4      MR. JONES:  Object to the
5  form.
6      THE WITNESS:  No.
7  BY MR. MIGLIORI:
8      Q.  Sergio Tejeda and his team
9  in regulatory affairs also found that,
10 "The accounting data reported to
11 regulatory and verification underwriters
12 as total sales may be materially
13 misstated."
14     Were you aware of any
15 accounting issues before you left as
16 director of regulatory affairs as to
17 total sales in their reporting?
18     MR. JONES:  Object to the
19 form.
20     THE WITNESS:  No.
21 BY MR. MIGLIORI:
22     Q.  As of the time you left as
23 director of regulatory affairs, were you
24 aware that Henry Schein had a standard

Page 329

1  operating procedure that allowed for a
2  customer to get a courtesy release of
3  controlled substances three times before
4  an account was required to have full
5  documentation for medical need?
6      MR. JONES:  Object to the
7  form.
8      THE WITNESS:  No.
9  BY MR. MIGLIORI:
10     Q.  Were you aware that the
11 suspicious order monitoring system in
12 2013, at that point still failed to
13 account for two potential deviate order
14 patterns?
15     MR. JONES:  Object to the
16 form.
17     THE WITNESS:  I wasn't there
18 in 2013.
19 BY MR. MIGLIORI:
20     Q.  Okay.  As of the time that
21 you left in October of 2012, were you
22 aware that the suspicious order
23 monitoring system that had been put in
24 place and enhanced through the time of

Page 330

1 your departure, still failed to account
2 for two potential deviate order patterns?
3     MR. JONES:  Object to the
4   form.
5     THE WITNESS:  No.
6 BY MR. MIGLIORI:
7     Q.  And as of December 2013, a
8 year after you left as director of
9 regulatory affairs, the internal
10 regulatory affairs DEA compliance team
11 recommended in the short-term that Henry
12 Schein enhance communication with the
13 verifications department, provide
14 additional medical training to
15 verification decisionmakers, and provide
16 additional training relative to account
17 due diligence techniques.
18     Those were still issues that
19 required enhancement and improvement a
20 year after you left as director of
21 regulatory affairs.  Were you ever made
22 aware of that?
23     MR. JONES:  Object to the
24   form.

Page 331

1     THE WITNESS:  No.
2 BY MR. MIGLIORI:
3     Q.  And that the long-term
4 recommendation of the regulatory affairs
5 team was that it was required that a more
6 proactive involvement by regulatory in
7 the API and SOM systems on a continual
8 basis, that at a year after you left as
9 director, Sergio Tejeda was recommending
10 to Henry Schein that regulatory play a
11 more proactive role in the suspicious
12 order monitoring program at Henry Schein.
13     MR. JONES:  Object to form.
14 BY MR. MIGLIORI:
15     Q.  Were you aware of that?
16     MR. JONES:  Object to form.
17     THE WITNESS:  I was not
18   aware of that.
19     MR. MIGLIORI:  Sir, I
20 appreciate your time.  I think
21 that's all I have.  I appreciate
22 it.
23     THE WITNESS:  Thank you.
24     MR. JONES:  We'll reserve

Page 332

1 our questions.
2     THE VIDEOGRAPHER:  Stand by
3 please.  This marks the end of
4 today's deposition.  The time is
5 5:28 p.m.  Off the record.
6   (Excused.)
7   (Deposition concluded at
8 approximately 5:28 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 333

1
2         CERTIFICATE
3
4
5     I HEREBY CERTIFY that the
6 witness was duly sworn by me and that the
  deposition is a true record of the
  testimony given by the witness.
7
8     It was requested before
  completion of the deposition that the
9 witness, MICHAEL DiBELLO, have the
  opportunity to read and sign the
  deposition transcript.
10
11
12     _____
13   MICHELLE L. GRAY,
  A Registered Professional
  Reporter, Certified Shorthand
14   Reporter, Certified Realtime
  Reporter and Notary Public
15   Dated:  February 22, 2019
16
17
18     (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 334

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 335

- - - - - -
E R R A T A
- - - - - -

PAGE LINE CHANGE

____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____

Page 336

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 337, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
MICHAEL DiBELLO            DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.
My commission expires:_____

_____
Notary Public

Page 337

LAWYER'S NOTES
PAGE LINE
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____