Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4            ~~~~~~~~~~~~~~~~~~~~~
 5

    IN RE: NATIONAL PRESCRIPTION
 6  OPIATE LITIGATION
                              MDL No. 2804
 7                            Case No. 1:17-MD-2804
    THIS DOCUMENT RELATES     Hon. Dan A. Polster
 8  TO ALL CASES
 9

               HIGHLY CONFIDENTIAL
10
      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
12            ~~~~~~~~~~~~~~~~~~~~~
13            Video Deposition of
14             JENNIFER DIEBERT
15
               JANUARY 24, 2019
16                 8:05 a.m.
17                 Location:
           Renaissance Toledo Downtown Hotel
18            444 North Summit Street
                   Toledo, Ohio
19
20        Todd L. Persson, Notary Public
21
22
23
24
25
```

```
 1    APPEARANCES:

 2

 3        On behalf of the MDL Plaintiffs:

 4            JEFF GADDY, ESQ.

 5            Levin Papantonio Thomas Mitchell

 6            Rafferty & Proctor, PA

 7            316 S. Baylen Street

 8            Suite 600

 9            Pensacola, FL 32502

10            (850) 435-7054

11            jgaddy@levinlaw.com

12

13        On behalf of the Walgreens Boots Alliance,

14        Inc., aka Walgreens Co.:

15            KATHERINE M. SWIFT, ESQ.

16            Bartlit Beck LLP

17            54 West Hubbard Street

18            Chicago, IL 60654

19            (312) 494-4405

20            katherine.swift@bartlitbeck.com

21

22

23

24

25
```

```
 1    APPEARANCES, Continued:

 2

 3         On behalf of AmerisourceBergen Corporation:

 4              MARGARET M. SCHUCHARDT, ESQ.

 5              Jaszczuk PC

 6              311 S. Wacker Drive

 7              Suite 3200

 8              Chicago, IL 60606

 9              (312) 442-0302

10              mschuchardt@jaszczuk.com

11

12         On Behalf of Endo Health Solutions, Inc. And

13              Endo Pharmaceuticals, Inc., Par

14              Pharmaceutical, Inc., and Par

15              Pharmaceutical Companies, Inc. (F/k/a

16              Par Pharmaceutical Holdings, Inc.),

17              VIA TELECONFERENCE:

18              MICHAEL BULLERMAN, ESQ.

19              Arnold & Porter Kaye Scholer, LLP

20              70 West Madison Street

21              Suite 4200

22              Chicago, IL 60602

23              (312) 583-2438

24              michael.bullerman@arnoldporter.com

25
```

```
 1    APPEARANCES, Continued:

 2

 3         On Behalf of Walmart, VIA TELECONFERENCE:

 4              MIRIAM LIABO, ESQ.

 5              Jones Day

 6              77 West Wacker Drive

 7              Chicago, IL 60601

 8              (312) 269-1540

 9              mliabo@jonesday.com

10

11         On Behalf of McKesson Corporation, VIA

12         TELECONFERENCE:

13              MADISON ARENT, ESQ.

14              Covington & Burling LLP

15              The New York Times Building

16              620 Eighth Avenue

17              New York, NY 10018

18              (212) 841-1151

19              marent@cov.com

20                   ~ ~ ~ ~ ~

21

22    ALSO PRESENT:

23              Stephan Hoog, Videographer

24              Rick Christian, Trial Technician

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    TRANSCRIPT INDEX

 2

 3   APPEARANCES.............................     2

 4

 5   INDEX OF EXHIBITS ......................     6

 6

 7   EXAMINATION OF JENNIFER DIEBERT:

 8   By Mr. Gaddy............................     8

 9   By Ms. Swift............................   288

10   By Mr. Gaddy............................   295

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   INDEX OF EXHIBITS
 2    EXHIBIT NO        DESCRIPTION           MARKED
 3   Walgreens-    E-mail Chain, P-WAG-02596.....  41
     Diebert 1
 4   Walgreens-    DEA Website Printout ........  56
     Diebert 2     P-GEN-0010
 5
     Walgreens-    E-mail and attachment .......  63
 6   Diebert 3     P-WAG-0011
 7   Walgreens-    Personnel File P-WAG-02670....  76
     Diebert 4
 8   Walgreens-    Suspicious Controlled Drug ...  79
     Diebert 5     Orders for July 2007
 9                 WAGMDL00390362 - 00390363
10   Walgreens-    Handling Suspicious Drug .....  87
     Diebert 6     Orders Policy
11                 WAGFLDEA00001854 - 00001855
12   Walgreens-    December 27, 2007 Letter .....  94
     Diebert 7     WAGMDL00753976 - 00753977
13
     Walgreens-    Perrysburg Distribution ...... 104
14   Diebert 8     Center DEA Review
                   WAGMDL00757148 - 00757163
15
     Walgreens-    E-mail Chain WAGMDL00751806 .. 112
16   Diebert 9     - 00751807
17   Walgreens-    May 11, 2011 E-mail ......... 119
     Diebert 10    WAGMDL00751821 - 00751823
18
     Walgreens-    Authentication of ........... 147
19   Diebert 11    Prescription Order Policy
20   Walgreens-    E-mail Chain WAGMDL00751808 .. 166
     Diebert 12    - 00751810
21
     Walgreens-    Settlement Memorandum of ..... 173
22   Diebert 13    Agreement P-WAG-0001
23   Walgreens-    Center For Disease Control ... 180
     Diebert 14    Maps P-GEN-0061
24
     Walgreens-    Drug Fact Sheet Hydrocodone .. 189
25   Diebert 15    P-GEN-0086
```

 1  Walgreens-    June 19, 2013 E-mail ........ 207
    Diebert 16    WAGMDL00316771 - 00316785
 2
    Walgreens-    Suspicious Order Report ...... 213
 3  Diebert 17    WAGMDL00674562 - 00674575
 4  Walgreens-    Administrative Inspection .... 219
    Diebert 18    Warrant WAGMDL00493697 -
 5                00493700
 6  Walgreens-    February 8, 2013 E-mail ...... 224
    Diebert 19    WAGMDL00698433 - 00698434
 7
    Walgreens-    E-mail WAGMDL00303243 - ...... 229
 8  Diebert 20    00303245
 9  Walgreens-    February 18, 2013 E-mail ..... 232
    Diebert 21    WAGMDL00524429 - 00524429
10
    Walgreens-    March 22, 2013 E-mail ....... 237
11  Diebert 22    WAGMDL00358555 - 00358557
12  Walgreens-    April 11, 2013 E-mail ....... 242
    Diebert 23    WAGMDL00106910 - 00106912
13
    Walgreens-    E-mail WAGMDL00324902 - ...... 246
14  Diebert 24    00324905
15  Walgreens-    May 30, 2012 E-mail ......... 252
    Diebert 25    WAGMDL00429424 - 00429426
16
    Walgreens-    E-mail WAGMDL00308178 - ...... 255
17  Diebert 26    00308181
18  Walgreens-    September 16, 2012 E-Mail .... 261
    Diebert 27    WAGMDL00528179 - 00528180
19
    Walgreens-    E-Mail WAGMDL00278104........ 267
20  Diebert 28
    Walgreens-    Document Request List, ...... 276
21  Diebert 29    Perrysburg Distribution
                  Center, DEA review July 2011
22
    Walgreens-    Perrysburg Distribution ...... 283
23  Diebert 30    Center DEA Review
24  Walgreens-    August 13, 2012 E-Mail ....... 287
    Diebert 31    WAGMDL00757172 - 007571187
25

```
 1              THE VIDEOGRAPHER:  We are now on the
 2   record.  My name is Stephan Hoog.  I'm the
 3   videographer for Golkow Litigation Services.
 4   Today's date is January 24, 2019.  The time is
 5   8:05 a.m., as indicated on the video screen.
 6              This deposition is being held in
 7   Toledo, Ohio, in the matter of National
 8   Prescription Opiate Litigation, MDL 2804.  The
 9   deponent is Jen Diebert.  Counsel will be noted on
10   the stenographic record.
11              The court reporter is Todd Persson,
12   and will swear in the witness.
13        JENNIFER DIEBERT, of lawful age, called for
14   examination, as provided by the Federal Rules of
15   Civil Procedure, being by me first duly sworn, as
16   hereinafter certified, deposed and said as
17   follows:
18            EXAMINATION OF JENNIFER DIEBERT
19   BY MR. GADDY:
20        Q.    State your name, please.
21        A.    Jennifer Diebert.
22        Q.    And, Ms. Diebert, you work at Walgreens?
23        A.    I do.
24        Q.    How long have you been at Walgreens?
25        A.    16 years.
```

1    Q.    You started in 2003?

2    A.    '03, yeah.

3    Q.    Has your entire time with Walgreens been

4    at the Walgreens Distribution Center in

5    Perrysburg, Ohio?

6    A.    Yes.

7    Q.    Does that distribution center in

8    Perrysburg, Ohio distribute prescription drugs to

9    Walgreens stores within Ohio?

10   A.    We distribute PSE drugs, but we don't

11   distribute any other prescription drugs from the

12   DC currently.

13   Q.    Okay.  I'm interested in the geographic

14   region as to which that store --

15   A.    We do distribute products to Ohio.

16   Q.    Okay.  Do you distribute products to

17   Kentucky?

18   A.    I believe we do have a couple of stores

19   in Kentucky that we distribute to.

20   Q.    Okay.  Do you distribute product to West

21   Virginia?

22   A.    We have two or three locations in the tip

23   of West Virginia that we send orders to.

24   Q.    Do you distribute products to Indiana?

25   A.    Yes, we do.

Highly Confidential - Subject to Further Confidentiality Review

```
1     Q.    Do you distribute product to Illinois?

2     A.    We do have some stores in Illinois that

3   we send orders to as well.

4     Q.    Just a minute ago you used the acronym

5   "PSE."  That's referring to pseudoephedrine?

6     A.    Pseudoephedrine items.

7     Q.    Okay.  When you began with Walgreens at

8   the distribution center in Perrysburg, was

9   Walgreens at that time distributing controlled

10  substances?

11         MS. SWIFT:  Object to the form.

12    A.    Yes, we were.  I believe we were

13  distributing C-III through Vs at the time.

14    Q.    And at some point in time while you were

15  at Perrysburg did that distribution center

16  distribute Schedule II controlled substances?

17    A.    I'm sorry, during which time?

18    Q.    Any time.

19    A.    We did distribute while I've been working

20  there Schedule II narcotics, yes.

21    Q.    About when did the Perrysburg

22  distribution center begin distributing Schedule II

23  narcotics?

24         MS. SWIFT:  Object to form.

25    A.    I -- I don't recall the date that we
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    started doing that.

2        Q.    But you did it while you were there?

3        A.    Yes.

4        Q.    And would it be fair to say that the

5    Perrysburg distribution center continued to

6    distribute Schedule II and III narcotics up until

7    approximately 2013?

8        A.    Yes.

9        Q.    Can you tell me what time period, as far

10   as -- you know, and I understand this would be an

11   estimate -- but as far as when to when the

12   Walgreens distribution center in Perrysburg

13   distributed Schedule II controlled substances?

14            MS. SWIFT:  Object to the form.

15       A.    I -- I don't recall the date that we

16   started doing orders for Schedule IIs.  I wasn't

17   in a position at that time that handled them or

18   processed their orders, or anything, so I -- I

19   couldn't tell you.

20       Q.    Okay.  Do you have a best guess?

21            MS. SWIFT:  Object to the form.

22       A.    No.

23       Q.    When's the first time that you can say

24   you know for sure that Perrysburg was distributing

25   Schedule II drugs?
```

```
 1                MS. SWIFT:  Object to the form.

 2        A.    I'm sorry, I don't recall.

 3        Q.    Does the distribution center in

 4   Perrysburg have a vault?

 5                MS. SWIFT:  Object to the form.

 6        A.    We do have a location in the DC that is

 7   locked that we use to house the controlled

 8   substances.

 9        Q.    Okay.  And there's no controlled

10   substances stored there now; is that correct?

11        A.    That is correct.

12        Q.    But during the period of time that

13   Perrysburg did distribute controlled substances,

14   they were -- they were stored there within the

15   vault?

16        A.    That is correct.

17        Q.    And you're aware that there were rules

18   and regulations regarding the storage of

19   controlled substances?

20        A.    I don't know what the rules and

21   regulations were.

22        Q.    And sorry if my question wasn't clear,

23   but I'm not asking you what they were.  I'm just

24   asking you whether or not you knew that they

25   existed?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I do not know.  I don't know what rules

2    and regulations Walgreens may or may not have.  I

3    wasn't in a position to have that knowledge.

4    Q.    You don't know whether or not there are

5    any rules or regulations regarding the storage of

6    controlled substances?

7    A.    I don't know what the rules are.

8    Q.    I'm not asking you if you know what they

9    are.  I'm asking if you know that there are rules?

10    A.    I -- I don't -- I was not in any position

11    to know whether there were or were not rules.  I

12    couldn't answer that question.  I don't know.

13    Q.    Do you have any background as a

14    pharmacist?

15    A.    No, I don't.

16    Q.    Have you ever worked in a Walgreens

17    pharmacy?

18    A.    No.

19    Q.    Do you have any -- or have you received

20    any training or education on the rules or

21    regulations regarding dispensing of controlled

22    substances?

23    A.    No, I have not.

24    Q.    Do you have any understanding regarding

25    the duties of a pharmacist to ensure that

1    prescriptions that they dispense are medically

2    necessary?

3        A.    No, I don't.

4        Q.    Do you have an understanding that there

5    are rules and regulations regarding the

6    distribution of controlled substances?

7        A.    I'm sorry, repeat one more time.

8        Q.    Sure.  Do you have an understanding that

9    there are rules and regulations regarding the

10   distribution of controlled substances?

11       A.    I don't know what rules or regulations

12   there may be regarding that.

13       Q.    Do you have an understanding that there

14   are rules and regulations regarding --

15       A.    Not pertaining to anything that the DC

16   does.  I have no idea what rules or regulations we

17   may have had.

18       Q.    You don't know if there are rules or

19   regulations?

20       A.    I don't know if there are any rules or

21   regulations pertaining to the distribution of

22   C-IIs or C-III through Vs.  I don't know what they

23   are.

24       Q.    So for the 16 years that you've been at

25   Walgreens in the Perrysburg, Ohio distribution

Highly Confidential - Subject to Further Confidentiality Review

1    center, throughout that entire time period and in

2    any regular duties or responsibilities or training

3    or education you've received by Walgreens, you've

4    never come to understand whether or not there are

5    any rules or regulations regarding the

6    distribution of controlled substances?

7           MS. SWIFT:  Object to the form.

8       A.    I have not been in a position during my

9    time there from when I started that I had any

10   control or knowledge over the actual distribution

11   of the drugs, so I don't know what the regulations

12   would have been.

13      Q.    And maybe we're just misunderstanding

14   each other.  I'm not asking you to tell me what

15   the regulations are.  I'm just asking whether or

16   not you have an appreciation that there are

17   regulations?

18      A.    I don't know what the regulations may

19   have been.

20      Q.    Do you know that there were regulations?

21      A.    I don't know what regulations there are

22   for narcotics now or then.

23      Q.    During your entire time at Walgreens,

24   nobody ever gave you any training or education on

25   any regulations that applied to the distribution

Highly Confidential - Subject to Further Confidentiality Review

```
1    of controlled substances?

2              MS. SWIFT:  Object to the form.

3        A.    There was no reason for me to know that,

4    so I don't recall what they may have been.

5        Q.    I'm not asking whether or not you believe

6    there was a reason for you to know it or not.  My

7    question is whether or not during the 16 years

8    that you were at the distribution center in

9    Perrysburg, Ohio, were you ever given any training

10   or education by Walgreens on the regulations that

11   applied to the distribution of controlled

12   substances?

13             MS. SWIFT:  Object to the form.

14       A.    I don't recall if I ever received

15   training on it.  I wasn't in a position to deal

16   with those kind of orders, or have any reason to

17   know if there was regulations.  So if I did

18   receive training, I do not recall having that.

19       Q.    So the answer to the question is you

20   don't remember ever getting any training on any

21   regulations regarding the distribution of

22   controlled substances?

23             MS. SWIFT:  Object to the form.

24       A.    There was no need for me to know if there

25   were regulations for that.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But regardless -- I understand you don't

2    think there was any reason for you to know.  But

3    you don't recall ever getting any training on it?

4    A.    I do not --

5          MS. SWIFT:  Object to the form.

6    A.    -- I do not recall getting training for

7    regulations for narcotics shipping out of the DC.

8    Q.    So, Ms. Diebert, what I want to try to do

9    is get an understanding of what your specific role

10   or title was within the distribution center going

11   back to 2003 up until today, okay?

12   A.    Okay.

13   Q.    So if you would, start in 2003, and

14   explain to me what your role was and how long you

15   were in that role.

16   A.    In 2003 I was an MPB clerk, which simply

17   means that I was responsible for contacting other

18   departments to try and make sure that the orders

19   were as complete as possible, the self-service

20   role orders, or non-pharmacy, and putting out

21   paperwork for the drivers to deliver their routes.

22   That was the main purpose of my position at that

23   time.

24          In 2008, I believe, I was promoted to the

25   SAIL coordinator.

```
 1      Q.    Okay.  Give me one minute.

 2      A.    Sure.

 3      Q.    So from '03 to '08, and again, these

 4   times are approximate, you were MPB, as in "B" as

 5   in "boy"?

 6      A.    Correct.

 7      Q.    Okay.  And what does that stand for?

 8      A.    Modified post-billing.

 9      Q.    And explain to me what your -- what your

10   duties would have been in that role.

11      A.    It would have been to contact the pick

12   departments within the DC to try to make sure that

13   they had as much of the orders that the stores

14   orders as possible complete, and to produce the

15   paperwork that the drivers use to take out and

16   deliver the routes.

17      Q.    The pick department, are those folks that

18   pick the medications off the shelf for the

19   distribution center?

20      A.    No.  They -- they pick the non-pharmacy.

21      Q.    Okay.  So let me back up a little bit,

22   and maybe I can help myself get a little bit

23   better understanding.

24            But describe for us what the distribution

25   center at Perrysburg is and what all is housed in
```

Highly Confidential - Subject to Further Confidentiality Review

 1    it.

 2              MS. SWIFT:  Objection to form.

 3       A.    So the distribution center has most of

 4    the products that the stores sell.  It is

 5    primarily non-pharmacy items, and with a little

 6    bit of pseudoephedrine items that are housed in

 7    the vault, or the cage, that's locked up.  And

 8    every day we have approximately 150 to 200 stores

 9    that we service and fill the orders for.

10       Q.    Okay.  So if I say the front end of the

11    store, do you know what -- do you know what I'd be

12    referring to?

13       A.    I'm -- non-pharmacy --

14       Q.    Okay.

15       A.    -- is my understanding.

16       Q.    So that would be things like paper

17    towels, toilet paper, that type of stuff?

18       A.    Correct.

19       Q.    Okay.  And the Perrysburg distribution

20    center had -- has a lot of front end items that it

21    stores there?

22       A.    That's correct.  Yes.

23       Q.    Has that always been the case going back

24    to '03?

25       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Does the -- and I'm just going to talk --

2    and for the purpose of this question I'm just

3    asking about up until 2013 when Perrysburg stopped

4    distributing controlled substances.  But up until

5    2013, did Perrysburg also store pharmacy items?

6          MS. SWIFT:  Object to the form.

7    A.   I don't recall what dates we began

8    housing the pharmacy items.  We had regular

9    pharmacy items when I started working there.  I

10   don't recall the date that we stopped servicing

11   those, and I don't recall the date that we started

12   or stopped servicing any of the Class II, III, IV

13   or V drugs.

14    Q.   When you say regular pharmacy items, what

15   do you mean by that?

16    A.   Non-controlled.

17    Q.   Blood pressure medication?

18    A.   I don't know what items specifically are

19   prescription required.

20    Q.   Okay.  But that's what you mean when you

21   say -- regular pharmacy would be prescription --

22    A.   Yes.

23    Q.   -- drugs that are not controlled

24   substances?

25    A.   That's true, yes.

1    Q.    Okay.  Does Perrysburg currently

2    distribute regular pharmacy items?

3    A.    We do not.

4          MS. SWIFT:  Object to the form.

5    A.    The only thing that we distribute is

6    pseudoephedrine items.

7    Q.    Okay.  So when you were a PPB clerk from

8    2003 to 2008, you were telling me that your role

9    was to ensure that the pickers were being as

10   complete as possible in filling any orders from

11   any stores?

12   A.    I don't know if it matters, but it's an

13   MPB.  But, yes, that was one of my roles.  That

14   was the main role.

15   Q.    Were you -- while in that role from 2003

16   to 2008, did you have any responsibilities or

17   duties for any pharmacy items?

18   A.    No.

19   Q.    So not even non-controlled substances?

20   A.    The only responsibility I would have had

21   is completing the paperwork for the driver.  I

22   don't have -- I wouldn't have known what items

23   were or were not on there, because we didn't

24   itemize from my department.  So if your question

25   is did I specifically have a responsibility for

Highly Confidential - Subject to Further Confidentiality Review

1    any kind of pharmacy items, no.  There was no

2    specific task for pharmacy items.

3        Q.    Okay.  Would -- would pharmacy items be

4    included on the order form that you're trying to

5    ensure the pickers fill as complete as possible?

6        A.    I don't recall if there were any pharmacy

7    items that we had to inquire about for the

8    paperwork.

9        Q.    Between '03 and '08, approximately how

10   many stores was Perrysburg servicing?

11           MS. SWIFT:  Object to the form.

12   Foundation.

13       A.    I couldn't tell you.  I don't know.

14       Q.    Okay.  What were your other duties in

15   that role?

16       A.    In MPB?

17       Q.    Yes, ma'am.

18       A.    It was what I said.  It was making sure

19   that the pick department got as much of the orders

20   picked, and making sure that the paperwork was out

21   for the drivers on time to make their deliveries.

22       Q.    Are these Walgreens drivers, or are these

23   third parties?

24       A.    It -- we -- it's a third party that

25   operates for Walgreens.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Anything else, other than review the

2    orders that are picked to ensure they're as

3    complete as possible and printout the paperwork

4    for the drivers?

5    A.    There were detailed work, like, we would

6    create spreadsheets for the shipping department so

7    they know what stores were in a what doors that

8    day, and during what wave of lane.  Periods

9    showing the shipping department, you know, the

10   types of non-conveyable items that they were going

11   to get.  Simple tools like that.

12   Q.    Any duties or responsibilities at all

13   from 2003 to 2008 involving controlled substances?

14   A.    Not as an MPB clerk, no.

15   Q.    And I think you said in 2008 you became a

16   SAIL coordinator?

17   A.    Yes, sir.

18   Q.    Are you still a SAIL coordinator today?

19   A.    It's part of my function, yeah.

20   Q.    And I'm presuming that's an acronym that

21   stands for something?

22   A.    Yeah.  Store Action Inquiry Line.

23   Q.    And have your duties in that role been

24   consistent from 2008 until now, or have they

25   changed over time?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.     They've changed.

 2      Q.     Okay.  Starting in 2008, what were those

 3   duties?

 4      A.     Primarily, we check to make sure that all

 5   the stores who had an order that day, or should

 6   have had an order that day, had an order that day.

 7   We would process those orders.  We would try to

 8   correct any issues that the stores had that they

 9   contacted us for.

10      Q.     What else?

11      A.     That's the primary goal of the SAIL

12   coordinator.

13      Q.     How many SAIL coordinators would there be

14   in a distribution center such as Perrysburg?

15      A.     For -- one, plus an assistant.  So two

16   SAIL team members, the coordinator and the

17   assistant.

18      Q.     Okay.  And when you started in 2008,

19   who -- were you the assistant, or were you the

20   head SAIL coordinator?

21      A.     I was the SAIL coordinator.

22      Q.     Who was your assistant?

23      A.     Carol Shimmel.

24      Q.     Is Carol still the assistant?

25      A.     She is.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     How have those duties changed over time?

2             MS. SWIFT:  Object to the form.

3      A.     Some of the duties have stayed the same.

4   Like, our goal is still to check the orders every

5   day, and make sure that we've got them and to

6   process them.  Some of the things that have

7   changed are just the -- well, probably the biggest

8   change would be that we don't distribute

9   pharmaceuticals anymore, so that's a portion that

10  we don't focus on any longer.  That's probably the

11  biggest change that we've had, other than, you

12  know, geography with the stores, and which ones

13  we're servicing.

14     Q.     In 2008, when you became the SAIL

15  coordinator for Perrysburg, did you have duties

16  and responsibilities regarding controlled

17  substances?

18     A.     I don't recall what dates we were sending

19  out C-III through Vs.  I did not have any

20  involvement in the C-II -- the Class II drugs at

21  all.  But I don't recall what dates I did have

22  C-III through V orders coming through the DC.

23     Q.     Have you ever had any involvement for

24  C-II drugs?

25     A.     Not while we were distributing.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So not pre-2013?

2    A.    No.

3    Q.    Who would have had responsibilities for

4    the C-II drugs?

5    A.    Deb Bish.

6    Q.    And what's her title?

7    A.    Deb is now the receiving weekend manager.

8    Q.    Is that -- that was a bad question --

9    what was her title when she had responsibility for

10   the C-II drugs that Perrysburg was distributing?

11         MS. SWIFT:  Object to form.

12   A.    She was a C-II function manager.

13   Q.    And is there anybody else?  Does she have

14   an assistant, like you do, or a staff that would

15   also have been -- or excuse me -- also would have

16   had responsibilities for C-II drugs?

17         MS. SWIFT:  Object to the form.

18   A.    Deb had -- there was a SAIL coordinator

19   for C-II that I know, and there was a staff of --

20   there was a staff that would pick the orders while

21   we were distributing.  I don't know who they would

22   have been.

23   Q.    Okay.  So I thought you told me there was

24   only one SAIL coordinator, but there's -- there

25   was a separate SAIL coordinator for C-IIs?

```
 1      A.      There is.  I have one SAIL coordinator
 2   for the DC, myself and my assistant, but C-II had
 3   a SAIL coordinator.
 4      Q.      And who is the C-II sale coordinator?
 5      A.      To my recollection, she had multiple, and
 6   I do not recall all of them.  There was John
 7   Walsh, Rachel Merzke, and a Chad Roper, that I
 8   remember.
 9      Q.      Tell me Chad's last name one more time.
10      A.      Roper.
11      Q.      R-O-P-E-R?
12      A.      Yes, sir.
13      Q.      And Rachel's last name?
14      A.      Merzke, M-E-R-K-Z-E -- or M-E-R-Z-K-E,
15   Merzke.  Sorry.
16      Q.      No problem.
17              And are those three folks that you recall
18   being the C-II SAIL coordinator during the time
19   that you've been there?
20      A.      Yes.  They -- those three individuals
21   were C-II sale coordinators while I've been at
22   Walgreens.
23      Q.      Anybody else?
24      A.      There may have been.  I don't recall.
25   Those are the only three I recall.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Are they still there since Walgreens

2    doesn't do C-IIs anymore?

3    A.    I believe that Rachel and John are still

4    there.  Chad has left the company a number of

5    years ago.

6    Q.    Okay.  So as far as who would have had

7    responsibilities for C-IIs, it would have been Deb

8    Bish, who was -- was she the C-II function manager

9    the entire time you've been there?

10        MS. SWIFT:  Object to the form.

11   A.    She was the C-II function manager during

12   the entire time that we distributed C-IIs, and she

13   also was the C-II function manager when we

14   switched to electronic processing, and after the

15   C-II distribution went to AmerisourceBergen.

16   Q.    So there hasn't been anybody else in that

17   role?

18   A.    No, there has not.

19   Q.    As far as folks that would be on the C-II

20   team, or responsible for C-IIs, we got Deb Bish,

21   you gave me the three names of the SAIL

22   coordinators that were -- I guess they would have

23   worked underneath Deb; is that correct?

24   A.    Yes.  Deb would have been their manager.

25   Q.    Okay.  Anybody else in the distribution

Highly Confidential – Subject to Further Confidentiality Review

```
 1    center, any other positions that would have had

 2    C-II responsibilities?

 3             MS. SWIFT:  Object to the form.

 4    A.    I don't know.

 5    Q.    You mentioned there were pickers that

 6    worked under -- on C-IIs, correct?

 7    A.    When we distributed the C-IIs, there were

 8    individuals that picked the orders.

 9    Q.    The folks that picked the C-II orders,

10    did they only pick C-II orders?

11    A.    I don't know.

12    Q.    Did the same people that picked your

13    front end products while you were an MPB clerk,

14    were they also picking controlled substances?

15             MS. SWIFT:  Objection to form.

16    A.    No, they were not.

17    Q.    Approximately how many folks are picking

18    front end items?

19             MS. SWIFT:  Object to the form.

20    A.    I have no idea.

21    Q.    Approximately how many folks are picking

22    controlled drugs when you were distributing them?

23             MS. SWIFT:  Object to the form.

24    A.    I don't know that either.

25    Q.    Okay.  Let me try to learn a little bit
```

Highly Confidential - Subject to Further Confidentiality Review

 1    more about the distribution center.

 2            Is there a position at the distribution

 3    center called an administration manager?

 4        A.    Yes, sir.

 5        Q.    What is the administration manager?  What

 6    is their role?  Sorry.

 7            MS. SWIFT:  Object to the form.

 8        A.    I couldn't tell you all the different

 9    functions that she has.

10        Q.    Okay.  Who is the admin manager?

11        A.    Tammy Hensley.

12        Q.    And how long has she been in that

13    position?

14        A.    Since 2008.  Yes.

15        Q.    Was there somebody in that role before

16    her?

17        A.    There was.

18        Q.    Who was that?

19        A.    I don't know.

20        Q.    And Tammy is still there in that role?

21        A.    Yes, she is.

22        Q.    What does -- what is your interaction

23    with Tammy?  How does what she do relate to you?

24            MS. SWIFT:  Object to the form.

25        A.    They're really separate.  We don't share

Highly Confidential - Subject to Further Confidentiality Review

1    any kind of duties.

2        Q.    Okay.  Who do you report to as a SAIL

3    coordinator?

4        A.    My direct boss is Rob Hackala.  He's an

5    inbound/outbound manager.

6        Q.    And is he there in Perrysburg?

7        A.    He is.

8        Q.    Who does he report to?

9        A.    Justin Joseph.

10       Q.    Who is Justin?

11       A.    He's our distribution center manager.

12       Q.    How long has he been in that role?

13             MS. SWIFT:  Object to the form.

14       A.    I'm not sure.

15       Q.    Was there a Rob Varno who was the

16   distribution center manager at one point time in

17   time?

18       A.    No.

19       Q.    Well, do you know who I'm talking about?

20       A.    I don't know who Rob Verner is.

21       Q.    Varno.

22       A.    Varno?  I have heard his name, but he's

23   never worked at the Perrysburg distribution

24   center.

25       Q.    Approximately how long has Justin been

1    the distribution center manager?

2              MS. SWIFT:  Object to the form.

3         A.    I would approximate the last two to three

4    years he's been in that role.

5         Q.    Who was there before him?

6         A.    Steve Kaneller.

7         Q.    And has he left Walgreens?

8         A.    He's still with Walgreens.

9         Q.    Where is he now?

10        A.    At the Waxahachie DC in Texas.

11        Q.    What is the computer room at the

12   distribution center?

13        A.    The computer room processes our orders

14   that we get every day, and prints the labels for

15   the departments to pick against.

16        Q.    Okay.  What do you mean when you say they

17   process the orders?

18        A.    So they're the ones that take whatever

19   orders we have in the system and process them

20   systematically.  I don't know what steps they use

21   to do that.

22        Q.    Describe that group, or that team for me.

23   How many people are involved in that?

24        A.    They have a manager, Matt Nye, and he has

25   a lead or an assistant -- I'm not sure of his

Highly Confidential - Subject to Further Confidentiality Review

 1    title -- his name is Scott Wedel, and he has a few

 2    operators.  I don't know how many it is.

 3        Q.    Is there an asset protection team at the

 4    distribution center?

 5        A.    There is.

 6        Q.    How many folks are involved in that?

 7        A.    I don't know.

 8        Q.    Who's the head of that department?

 9        A.    Victoria Worm.

10        Q.    How long has Victoria been in charge of

11    that?

12        A.    Probably for the last two to three years.

13        Q.    Who was before her?

14        A.    Rick Meyer.

15        Q.    For how long?

16        A.    I don't know.

17        Q.    Who was before Rick?

18        A.    I don't recall.  Jeremy Willis.

19        Q.    Do you remember who was before Jeremy?

20        A.    No.

21        Q.    And what is -- what is your interaction

22    with loss prevention or asset protection?

23        A.    I really don't have much of any

24    interaction with them beyond OSHA safety training

25    that they give us every month to go over with our

1    team members.

2        Q.    And -- okay.  So how many team members do

3    they have?

4        A.    I don't know.

5        Q.    Approximately.

6            MS. SWIFT:  Object to the form.

7        A.    I don't know.

8        Q.    Do you have any idea what they do?

9        A.    My extent of knowledge for what they do

10   is checking trailers coming in and going out for

11   what they're -- they've got, and taking phone

12   calls from drivers.  I don't know what those would

13   pertain to, though.

14       Q.    As far as the admin manager, you

15   mentioned Tammy Hensley; does she have any

16   assistants, or SAIL coordinator type folks, or

17   anybody like that that works with her?

18       A.    She has a group of team members.

19   Approximately 10.

20       Q.    Okay.  And what are their titles; do you

21   know?

22       A.    I don't know.

23       Q.    What are their roles?

24       A.    They each have a different function.  She

25   has somebody that releases distribution items on a

1   daily basis, somebody that handles item issues in

2   the DC.  She has a number of individuals that work

3   damaged product, and broke open cases, items like

4   that.

5       Q.    So from 2008 until -- up until 2013, when

6   Walgreens stops distributing controlled

7   substances, you had responsibilities or duties

8   related to Schedule III to V controlled

9   substances; would that be correct?

10          MS. SWIFT:  Object to the form.

11   Mischaracterizes testimony.

12      A.    I don't know what date we stopped

13   distributing narcotics or C-III through Vs.  My

14   extent with C-III through Vs in SAIL would just

15   have been processing the orders that we received.

16   But that was systematic.

17      Q.    Okay.  When you said you processed the

18   orders, I mean, walk me through that.  What are

19   you doing?  Are you receiving a printout?  Are you

20   getting product off the shelf?  Are you checking

21   the totes to see if it's accurate?  What exactly

22   are you doing?

23      A.    The only thing that we did with C-III

24   through Vs is it would have been running a query

25   to make sure that there were no unusually large

Highly Confidential - Subject to Further Confidentiality Review

1    orders for any store, and then processing the

2    orders after -- after we did that.  But I don't

3    recall ever having any orders that we had to check

4    in on.

5        Q.   Okay.  So you said that you would look

6    for any excessively large orders.  Walk me through

7    that process.  How would you know what orders had

8    come in?

9        A.   So we have a query, or had a query that

10   would look for any orders over a certain number.

11   I don't remember what number it was set at.  And

12   if anything showed up on that, we had another

13   query that we would run to check that order

14   against the store's order history.  And if it was

15   in line with what they usually get, we would --

16   that would be an indication it was a good order.

17       Q.   Okay.  So are you doing this on a

18   computer?  Are you getting a printout?  Walk me

19   through that.

20       A.   It was a query that we ran on the

21   computer, but we also did a printout of those

22   every day.

23       Q.   Okay.  And what would you get on the

24   printout, just any order that was flagged by this

25   query?

```
 1      A.      That's correct.

 2      Q.      And is this something that was -- that

 3   you were in charge of, or the pickers were in

 4   charge of, or who -- who was running this process?

 5      A.      The SAIL department would run the query.

 6      Q.      Did that same query get run for front end

 7   products?

 8      A.      Yes, it did.

 9      Q.      So that same query about looking for

10   excessive orders would be run for paper towels?

11      A.      Yes.

12      Q.      It would be run for toilet paper?

13      A.      Any item that was over that threshold.

14      Q.      It would be run for bubble gum?

15      A.      Yes.

16      Q.      And any item that was over that

17   threshold, you would get a printout of that

18   excessive order?

19      A.      That's correct.

20      Q.      Whether it was for Skittles, or

21   over-the-counter cold medication, or hydrocodone

22   products, which were Schedule III?

23      A.      The front end query would only bring up

24   items that were non-pharmacy.

25      Q.      But the same query that you ran for these
```

Highly Confidential - Subject to Further Confidentiality Review

1   Schedule III to V drugs was also run for the front

2   end products?

3       A.    It was a query that was geared to look at

4   any pharmacy items.  There were two separate

5   queries.  So now, currently, we use a query that

6   looks for any non-pharmacy.  It's the same query

7   that we used to use then.  When we did distribute

8   C-III through Vs, we had a separate query that

9   just looked at C-III through Vs for any.

10      Q.    And it was looking at -- I've seen an

11  acronym S-K-U-S, SKUs?

12      A.    SKUs.

13      Q.    Do you know what I'm talking about?

14      A.    Yeah.  I don't know what the acronym

15  means, but it means individual items.

16      Q.    Okay.  I looked it up, and I think it's

17  store keeping units, but --

18      A.    It could be.

19      Q.    Okay.  So if we're talking about -- if

20  we're talking about paper towels, it would be an

21  individually wrapped unit of paper towels?

22      A.    It would be however the store sells the

23  unit is a unit.  So if the store sells a six-pack

24  of Bounty, that's one unit.

25      Q.    Okay.  Gotcha.  Whatever is wrapped in an

Highly Confidential - Subject to Further Confidentiality Review

```
 1    individual package?

 2        A.    Correct.

 3        Q.    Okay.  And if a store sells a 500-count

 4    bottle of Vicodin, that's a Schedule III drug,

 5    that would be one SKU?

 6        A.    I don't know what the quantity of those

 7    were.  But if the bottle was 500 pills, and they

 8    only ordered one bottle, they would get one bottle

 9    of 500 pills.

10        Q.    And that would be one SKU?

11        A.    Yes.  That is true.

12        Q.    What was the number of SKUs for Schedule

13    III to V drugs that would trigger it to pop on

14    that report?

15        A.    I don't recall.

16        Q.    Was there anything else that you did

17    related to Schedule III to V controlled substances

18    from '08 through whenever Walgreens stopped

19    distributing?

20              MS. SWIFT:  Object to the form.

21        A.    Not that I remember.

22        Q.    Did you actually go and pick the Schedule

23    III to V drugs off the shelves of the distribution

24    center?

25        A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Did you put them in the totes?

 2      A.    No.

 3      Q.    Did you check the totes before they

 4   got -- went on the truck?

 5      A.    No.

 6      Q.    Did you put the totes on the truck?

 7      A.    I had no handling of any controlled

 8   substances at any time in the DC.

 9      Q.    How often would you process these

10   Schedule III to V orders?  Was that a -- was that

11   a daily occurrence?

12      A.    We processed them daily while we were

13   distributing them.

14      Q.    From 2008, when you became a SAIL

15   coordinator, up until Walgreens stopped

16   distributing controlled substances, did you ever

17   have any duties or responsibilities related to

18   C-IIs?

19      A.    I did not.

20      Q.    Did you ever run any excessive order

21   queries, or anything like that for C-IIs?

22      A.    I did not.

23      Q.    Do you know whether or not anybody in the

24   distribution center did?

25      A.    I don't have any knowledge of it, no.
```

1    Q.    Do you know anything that was done within

2    the distribution center related to the processing

3    of C-II orders?

4    A.    I don't have that knowledge, no.

5    Q.    I'll show you what I'll mark as Exhibit

6    Number 1.  This is P-WAG-2596.

7              -  -  -  -  -

8              (Thereupon, Deposition Exhibit

9              Walgreens-Diebert 1, E-mail Chain,

10             P-WAG-02596, was marked for purposes

11             of identification.)

12             -  -  -  -  -

13    Q.    And do you see this is an e-mail chain,

14    and it looks like at the very top it's an e-mail

15    from Tammy Hensley?

16    A.    I see that Tammy sent the e-mail.

17    Q.    Okay.  And Tammy, I think you told us

18    that she was the admin manager at the Perrysburg

19    distribution center?

20    A.    Yes, she is.

21    Q.    And it looks like this is an e-mail that

22    she sent on August 10, 2015, and it went to Wayne

23    Groves, who is a diversion investigator at the

24    DEA.  Do you see that that's who the e-mail went

25    to?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    I see that, yes.

 2      Q.    Okay.  And the subject is "DEA chemical

 3   application more information."  And if you look

 4   below in the body, it says, "hello, Wayne.  I

 5   reviewed the e-mail and attachments below.  You

 6   will see that the blue font attachments were sent

 7   to you previously.  I'll resend that e-mail right

 8   after sending this one you are reading."  Do you

 9   see that?

10      A.    I see where it says that.

11      Q.    Okay.  And if you flip to the second

12   page, it looks like there's -- and, sorry, go back

13   to the first page with me, and go down to the

14   e-mail at the bottom of the page.  And you see

15   Tammy responds there, and she says, "the blue

16   responses below I've previously sent you.  The new

17   information I've put in green font."  Do you see

18   that?

19      A.    I see that.

20      Q.    Okay.  And then if we go to the previous

21   e-mail, we'll see some of the information that

22   Tammy actually added to the previous e-mail.

23            MS. SWIFT:  Object to the form.

24      Q.    Okay?

25      A.    I can't tell based on this what was new
```

```
1    information or what was old information.

2        Q.    Okay.  No, I understand.  It's not in

3    color.

4              Do you see at the top of the page, it's

5    got the date that we have this e-mail from

6    Mr. Groves of May 15, 2015?

7        A.    Yes.  I see that.

8        Q.    It says, "Rick, thank you for all the

9    information that you have forwarded regarding our

10   visit to your facility.  I have questions that I

11   need to have answered regarding Walgreens List 1

12   chemical application.  If you can forward me the

13   information through e-mail or regular mail, it

14   would be appreciated.  Call me if you have any

15   questions."  Do you see that?

16       A.    I see that.

17       Q.    Okay.  Then down -- then there's a big

18   bolded heading that says "background information."

19   Do you see that?

20       A.    Yes, I do.

21       Q.    Okay.  And under there it says, "names,

22   titles, responsibilities of persons contacted and

23   date."  Do you see that?

24       A.    Yes.

25       Q.    Okay.  And then it looks like there was
```

Highly Confidential - Subject to Further Confidentiality Review

1    some information entered in here about some of the

2    folks who worked at the Perrysburg distribution

3    center.  Do you see that?

4        A.    I do.

5        Q.    And first it has Rick Meyer as asset

6    protection manager, and that was one of the

7    individuals you told us who filled that role,

8    correct?

9        A.    That's correct.

10       Q.    Okay.  Is this fairly consistent with

11   your memory that Rick was in that position in

12   approximately August 2015?

13       A.    Yes.

14       Q.    Okay.  And then it has you listed,

15   correct?

16       A.    It does.

17       Q.    And it says that your position is

18   "SAIL/C2 supervisor."  Do you see that?

19       A.    Yes.

20       Q.    Is that accurate?

21       A.    That was accurate at the time.

22       Q.    Okay.  I could have swore you just told

23   me that you've never had any responsibilities or

24   duties at all for C-IIs.  What is -- what does

25   this mean?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Well, this is in 2015, which was later,

2    and I did become the C2 supervisor at that time

3    supervising the team members that sign the

4    electronic orders.  We were not distributing any

5    C-IIs at that time.

6      Q.     Okay.  That makes perfect sense.  So when

7    did you become the C2 supervisor?

8      A.     In late 2014.

9      Q.     Okay.  And let's talk about that for a

10   minute.  What is your -- what are your duties and

11   responsibilities in that role as the C2

12   supervisor?

13     A.     So it's similar to regular SAIL duties.

14   We make sure that we've got all the orders -- our

15   computer room actually does that.  My role

16   primarily is to make sure that the signers are

17   available, and they're to sign the number of

18   orders that we get every night, and that we print

19   any paper 222 orders that we have for sorts that

20   are not electronic.

21     Q.     Okay.  So the first thing I heard you to

22   say is to make sure that there are signers

23   available?

24     A.     Yes.

25     Q.     Explain to me what that means.

1    A.    So most of our stores are electronic

2    ordering, and we will get a number of orders every

3    night, and we have to have a number of team

4    members available to sign the volume of orders

5    that we have.

6    Q.    Sign for what?  I don't -- what are they

7    signing?

8    A.    They're signing the electronic 222s that

9    the stores are processed against -- the orders are

10   processed against.

11   Q.    Okay.  So somebody from the distribution

12   center has to sign the forms in order for the

13   order to go through?

14   A.    Electronically, yes.

15   Q.    And once that happens, where do those

16   orders go?

17   A.    Systematically, it goes through EDI to --

18   I'm sorry -- actually, to ABC to get filled the

19   next -- overnight, and then the next morning they

20   make the deliveries to the stores.

21   Q.    Okay.  So the orders go from the stores

22   to the distribution center where -- where you are,

23   correct?

24   A.    That's correct.

25   Q.    And from the distribution center they go

1    electronically to AmerisourceBergen?

2        A.    That's correct.

3        Q.    And from there, AmerisourceBergen is

4    charged with filling the orders?

5        A.    Yes.

6              MS. SCHUCHARDT:  Object to the form.

7        Q.    Okay.  So what is your process as the C2

8    supervisor starting in 2014, late 2014, when an

9    order for C-IIs comes in from the store?

10       A.    I didn't -- the computer room at

11   Perrysburg is the department that actually checks

12   to see that we got all the orders and processes

13   them.  My duty is primarily to make sure that the

14   orders that we got, there are processed, are

15   signed, and forwarded to ABC.

16       Q.    Okay.  Do you do any evaluation of any of

17   the orders that come in?

18       A.    I do not.

19       Q.    Do you do any analysis of any of the

20   orders that come in?

21       A.    I do not.

22       Q.    Do you do any type of excessive query

23   report, like you told us about, that you did at

24   one point in time with the III through Vs?

25       A.    I do not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Does the computer room do any type of

2    analysis of the orders that come in for C-IIs?

3          MS. SWIFT:  Object to the form.

4    A.    I -- I don't know what steps or process

5    they follow to process the orders.

6    Q.    Do you know whether or not they do any

7    analysis of any of the orders that come in?

8    A.    I don't know what their process is.

9    Q.    So, no, you don't know whether or not

10   they do any analysis?

11         MS. SWIFT:  Object to the form.

12   A.    I don't know if they run that query like

13   we used to, and I don't know what steps they

14   follow to process the orders.

15   Q.    Do you ever -- are there ever occasions

16   where you have orders come in and the computer

17   room tells you we're not going to fill this order,

18   we're not going to fill that order, or anything

19   like that?

20   A.    That would be ABC's responsibility to

21   fill orders.

22   Q.    Okay.  Is there ever a situation where

23   the computer room tells you you don't need to

24   worry about getting this order signed because

25   we're not going to send it to ABC?

1    A.    No.

2    Q.    Does the computer room ever tell you that

3    they're blocking orders, or anything of that

4    nature?

5    A.    The computer room, to my knowledge,

6    simply checks to make sure we got the orders and

7    processes the orders that we get.

8    Q.    How many people are authorized to sign

9    the 222s?

10    MS. SWIFT:  Object to the form.

11    A.    There are two types of 222s, so we have

12    paper 222s and electronic 222s.  We have five

13    regular signers that sign orders every night right

14    now, and then we have myself and Carol Shimmel,

15    the SAIL assistant, who also have certification to

16    do that.

17    Q.    When you say "sign," due mean physically?

18    A.    Electronic.

19    Q.    Okay.  What's the process of completing

20    electronic signatures?

21    A.    Every team member who has authorization

22    to sign who's had a background approval from the

23    DEA has a specific and unique cert for every

24    single store.  And we have a password for our cert

25    that we are the only ones that know that password.

1    So depending on what store the signer is signing,

2    they'll have to put their unique password in there

3    to approve the order and send it to ABC.

4        Q.    How long is the process to sign a single

5    order?

6        A.    Seconds.

7        Q.    How many orders are -- on average, are --

8    is the distribution center processing every night

9    for C-IIs?

10            MS. SWIFT:  Object to the form.

11       A.    I would say on average we probably

12    process around 4,000 -- sign around 4,000

13    electronic orders a night.  That is an estimate.

14       Q.    About how many stores do you process C-II

15    orders for?

16       A.    So right now we have almost 8,000 stores

17    who are on electronic signing, and every store is

18    able to order every day if they have items that

19    they need.  So it is possible to have up to 8,000

20    orders a day, but we average around 4,000.

21       Q.    All orders for C-IIs come through the

22    Perrysburg distribution center?

23       A.    They do.

24       Q.    So 8,000 stores, you process around 4,000

25    C-II orders a day; is that fair?

1    A.    That's fair.

2    Q.    And the process for signing off on those

3    orders is limited to signing the orders; is that

4    fair?

5    A.    The process for signing the orders is

6    signing the orders.

7    Q.    Right.

8    A.    Yes.

9    Q.    Okay.  No, that -- it seems -- I know it

10   seems like a silly question, but there's --

11   there's nothing that goes into it before you sign

12   the order --

13   A.    There's not --

14        MS. SWIFT:  Object to the form.

15   Q.    -- there's no -- no analysis, no

16   investigation, no -- nothing like that?

17        MS. SWIFT:  Object to the form.

18   A.    I don't know what process the computer

19   room goes through before processing the orders.  I

20   don't know what steps they take --

21        UNIDENTIFIED SPEAKER:  This is the court

22   reporter in the deposition of Christine Bader in

23   the opiate litigation.  If you have not already

24   sent your appearance to Golkow, can you please

25   send your appearance to preihl@golkow.com.  And

Highly Confidential - Subject to Further Confidentiality Review

```
1    that is spelled P as in Paul; R as in Robert; E as

2    in Edward; I as in ice cream; H as in Harry, L as

3    in Larry.

4              MS. SWIFT:  You want to take this one?

5              MR. GADDY:  You're on a conference line

6    for a different deposition.

7              UNIDENTIFIED SPEAKER:  Okay.  Thank you

8    very much for speaking up.

9              MR. BULLERMAN:  While we're at a break

10   here in the questioning because of that

11   interruption; is there a problem with the real

12   time?  Because I'm not getting it.

13             MS. SCHUCHARDT:  I'm not getting it

14   either.

15             MS. SWIFT:  Thank you.

16             THE COURT REPORTER:  It's showing on my

17   end, this is the court reporter, that I am sending

18   it out, so I'm not sure what the problem is.

19             MR. BULLERMAN:  So I will need that

20   fixed.  So can you contact Golkow and get that

21   fixed, or what?

22             MS. GADDY:  Yeah, let's go off the

23   record.

24             THE VIDEOGRAPHER:  Going off the record

25   at 8:58 a.m.
```

```
 1                    (Recess had.)

 2            THE VIDEOGRAPHER:  We're back on the

 3     record at 9:25 a.m.

 4      Q.    Okay, Ms. Diebert.  We were talking about

 5     your role as the C2 supervisor, or C2 manager that

 6     you assumed in late 2014.  Do you recall that,

 7     generally?

 8      A.    Yes, I do.  Yes.

 9      Q.    And you said the primary function that

10     you serve in that role is to ensure that orders

11     that come in from the 8,000 stores on a daily

12     basis get signed off on by you and the other folks

13     who have the ability to sign; is that correct?

14            MS. SWIFT:  Object to the form.  Object

15     to the form

16      A.    We get approximately 4,000 orders, and my

17     goal is to -- my role is to make sure that I have

18     signers available to make sure the orders are all

19     signed.

20      Q.    Okay.  And one of the last things I did

21     was ask what sounded like a silly question when I

22     said is there anything to the process of signing

23     the orders other than signing them, and what I

24     meant by that is; is there any -- any review,

25     analysis, or evaluation that's done by you or any
```

1    of the other signers prior to them signing the

2    orders?

3            MS. SWIFT:  Object to the form.

4    A.    The signers and I only sign the orders

5    that are processed.  Our computer room are the

6    ones that check for orders and do any steps that

7    goes along with that.  I don't know what those

8    steps are, though.

9    Q.    Do you have any idea what the computer

10   room folks do --

11           MS. SWIFT:  Object to the form.

12   Q.    -- as far as evaluating orders?

13           MS. SWIFT:  Object to the form.

14   A.    I don't know what they do in the computer

15   room.  I don't have any knowledge of that.

16   Q.    As soon as an order gets to you, your job

17   is to make sure it gets signed?

18   A.    That is correct.  That --

19   Q.    Do you do any analysis of ceilings or

20   thresholds as it relates to the controlled

21   substance orders?

22           MS. SWIFT:  Object to the form.

23   A.    That's not something that my department

24   does.

25   Q.    When I use the term ceiling and

Highly Confidential - Subject to Further Confidentiality Review

1    thresholds, do those mean anything to you as far

2    as evaluating orders of controlled substances?

3         A.    I've heard those terms.  But as far as I

4    know, they're handled from our corporate office.

5    It's not something that we do at the DC.

6         Q.    Okay.  You've never received any training

7    or education on ceilings or thresholds, or how

8    they may or may not be applied to controlled

9    substance orders?

10             MS. SWIFT:  Object to the form.

11        A.    I -- I have not received any training.

12        Q.    Okay.  Now, I think I understood you

13   earlier this morning to tell me that you had never

14   received any training or education from Walgreens

15   on any rules or regulations regarding any

16   controlled substances; would that be fair?

17             MS. SWIFT:  Object to the extent it

18   mischaracterizes the testimony.

19        A.    I don't personally remember having ever

20   received training specifically to orders for

21   controls when we distributed them.

22        Q.    I'll show you what I'll mark as Exhibit

23   Number 2.  This is P-GEN-0010.

24                      -  -  -  -  -

25             (Thereupon, Deposition Exhibit

```
 1                  Walgreens-Diebert 2, DEA Website

 2                  Printout P-GEN-0010, was marked for

 3                  purposes of identification.)

 4                       -  -  -  -  -.

 5      Q.    I'll mark it as number 2, and I'll

 6   represent to you this is a printout from the DEA

 7   website, and it has a -- as you see, kind of a

 8   third of the way down the page, or a quarter of

 9   the way down the page, it's a little bit faded,

10   but it says "Title 21, Code of Federal

11   Regulations," about a quarter of the way down

12   starting at the top.  Ms. Diebert, I think -- I

13   think on this screen right here, maybe?

14      A.    It may be easier to see?

15      Q.    Yeah, he'll be pulling it up, and you

16   kind of -- you can look, obviously, at your

17   document as well.  But just -- just to help you

18   find your place, sometimes it's helpful.

19      A.    Okay.

20      Q.    And so are you with me now where it says

21   "Title 21, Code of Federal Regulations"?

22      A.    Yes.  I see that.

23      Q.    And below that it says, "Part 1301,

24   Registration of Manufacturers, Distributors and

25   Dispensers of Controlled Substances."  Do you see
```

1    that?

2        A.    I see that.

3        Q.    And you agree with me that from at least

4    2008, when -- when you became the SAIL

5    coordinator, up until the time when Walgreens

6    stopped distributing, that Walgreens was a

7    distributor of controlled substances?

8              MS. SWIFT:  Object to the form.

9    Foundation.

10       A.    So we did distribute C-III through Vs and

11   C-IIs while I was in the SAIL coordinator

12   capacity.  I don't recall what dates we started or

13   stopped either one.

14       Q.    You were definitely distributing C-IIs

15   and C-III through Vs in 2008 when you became the

16   SAIL coordinator, correct?

17       A.    I don't recall.  I don't recall what day

18   we started or stopped that.

19       Q.    Do you recall there ever being a period

20   of time when you were the SAIL coordinator where

21   you had to be -- there was any type of

22   announcement that you were going to start having

23   controlled substances be a part of your duty, or

24   was that something that was a part of your duty

25   when you assumed the position?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    So C-III through Vs were a part of my

2   duty when I assumed the SAIL coordinator position

3   in 2008.  I was never in a position of the C-II

4   narcotic distribution.

5     Q.    Okay.  Is there some distinction in your

6   mind that -- for any differences between C-II and

7   C-III through Vs?  I mean, what distinction are

8   you making there?

9         MS. SWIFT:  Object to the form.  Vague.

10    A.    It's just a different class of controlled

11   substances.

12    Q.    Okay.  Do you have any understanding or

13   appreciation that there's different duties or

14   rules or requirements regarding the two?

15        MS. SWIFT:  Object to the form.

16    A.    I don't -- I don't know what the duties

17   are for the two, or -- I couldn't compare them to

18   know if there is a difference.

19    Q.    Okay.  Okay.  So if we look at this

20   particular regulation, below what we just read it

21   says "security requirements."  Do you see that?

22    A.    Yes, I do.

23    Q.    And the specific section that we're going

24   to look at is Section 1301.74.  It's other

25   security controls for non-practitioners.  Do you

Highly Confidential - Subject to Further Confidentiality Review

1    see that?

2        A.    I do see that.

3        Q.    And what I'm going to draw your attention

4    to is paragraph B.  Do you see that?

5        A.    I do.

6        Q.    Okay.  Do you recall whether or not

7    you've ever seen this regulation before?

8        A.    I do not recall seeing this before, no.

9        Q.    And if you'll read along with me in

10   paragraph B, it says, "the registrant," and in

11   this case that would be -- that would be

12   Walgreens, "shall design and operate a system to

13   disclose to the registrant suspicious orders of

14   controlled substances."  Do you see that sentence?

15       A.    I do see that.

16       Q.    Okay.  Are you familiar with that phrase,

17   "suspicious orders"?

18       A.    I'm familiar with the phrase.  I've heard

19   it.  But I've never had any capacity for it in my

20   role.

21       Q.    Okay.  Have you ever been provided any

22   training or education on suspicious orders, or

23   what that means in the context of this regulation?

24       A.    I've never -- I don't recall ever

25   receiving any training on suspicious orders in any

1    capacity.

2        Q.    So it says, "the registrant shall design

3    and operate a system to disclose to the registrant

4    suspicious orders of controlled substances.  The

5    registrant shall inform the Field Division Office

6    of the administration in his area of suspicious

7    orders when discovered by the registrant."  Do you

8    see that?

9        A.    I see that it says that.

10       Q.    And it continues to say, "suspicious

11   orders include orders of unusual size, orders

12   deviating substantially from a normal pattern, and

13   orders of unusual frequency."  Do you see that?

14       A.    I see that.

15       Q.    Do you see anywhere in this regulation

16   where there's a distinction made between Schedule

17   II controlled substances and Schedules III through

18   V controlled substances?

19       A.    I do not see in this paragraph where it

20   makes any distinction.

21       Q.    Okay.  It simply uses the word

22   "controlled substances," correct?

23       A.    That is correct.

24       Q.    Okay.  And Schedule III drugs are

25   controlled substances, right?

1    A.    That is correct.

2    Q.    Now that we've read the paragraph B

3    there, does that refresh your memory, and do you

4    recall receiving any training or education from

5    Walgreens regarding suspicious orders?

6    A.    I do not recall ever receiving any

7    training on suspicious orders at Walgreens.

8    Q.    Okay.  Do you recall ever having as a

9    part of your responsibility or duties the

10    identification of suspicious orders?

11        MS. SWIFT:  Object to the form.

12    A.    That was not part of any of my

13    responsibilities.

14    Q.    Paragraph -- the second sentence talks

15    about notifying the Field Division Office of DEA

16    about suspicious orders; do you see that?

17    A.    I see where it says the registrant shall

18    inform the field office.

19    Q.    Was any part of your duties or

20    responsibilities at Walgreens ever involve the

21    notification of DEA regarding suspicious orders?

22    A.    I -- my particular function did not have

23    anything to do with suspicious orders.

24    Q.    Do you know if anybody at the

25    distribution center had roles or responsibilities

```
 1    related to suspicious orders?

 2             MS. SWIFT:  Object to the form.  Vague,

 3    and foundation.

 4        A.    I don't know.

 5        Q.    You said that you had heard that term

 6    before, "suspicious orders," correct?

 7        A.    I have heard the term.

 8        Q.    In what context?

 9        A.    Just that there are suspicious orders.

10        Q.    Can you tell me more about that?

11        A.    No.  I just heard the term talked about

12    before, that the DEA is looking for, you know, any

13    suspicious order report.  But I've never had

14    anything to do with it personally.

15        Q.    Who would have had something to do with

16    it?

17             MS. SWIFT:  Object to the form.

18    Foundation.

19        A.    I don't know.

20        Q.    Do you know if anybody has anything to do

21    with it at the distribution center?

22             MS. SWIFT:  Object to the form.

23    Foundation.

24        A.    I don't know.

25        Q.    What is a suspicious controlled drug
```

1    order report?

2           MS. SWIFT:  Object to the form.

3    Foundation.

4        A.    I don't know.

5        Q.    Are you aware that for a period of time

6    suspicious controlled drug order reports were

7    being sent to the Walgreens distribution centers?

8        A.    I was not aware of that.

9        Q.    I'll show you what I'll mark as Exhibit

10   Number 3.  This is P-WAG-0011.

11                - - - - -

12           (Thereupon, Deposition Exhibit

13           Walgreens-Diebert 3, E-mail and

14           attachment P-WAG-0011, was marked

15           for purposes of identification.)

16                - - - - -

17       Q.    And do you see the front page of this

18   document is an e-mail, and then we're going to

19   spend most of our time looking at the attachment

20   to that e-mail.  Do you see this looks like it's

21   an e-mail from Eric Stahmann to Eric Stahmann; do

22   you see that?

23       A.    I do see that.

24       Q.    Do you know who Mr. Stahmann is?

25       A.    I have not heard his name before.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And the subject is "CD orders-2,"

2  and then it has an attachment listed there,

3  correct?

4    A.    Yes.

5    Q.    Okay.  And if you would turn with me,

6  please, to -- if you look in the bottom right-hand

7  corner, there's a Bates numbering system?

8    A.    Yes, sir.

9    Q.    If you would turn with me to the Bates

10  numbering that ends 441.  Are you with me?

11    A.    I am.

12    Q.    Okay.  And if you go about --

13         MR. GADDY:  441.

14    Q.    If you go with me about three-quarters of

15  the way down the page, in the center of the page

16  you'll see an entry that says page 11655?

17    A.    Okay.  I see that.

18    Q.    Are you with me?

19    A.    Yes.

20    Q.    And the formatting of this is kind of

21  funky as far as how it prints out on here, so you

22  got pages that start in the middle of the page and

23  things like that.  But I think it -- I think we

24  can make some sense of it if we go through it.

25         First, let me ask you, as you just kind

Highly Confidential - Subject to Further Confidentiality Review

1    of flip through here, is this a report you've ever

2    seen before?

3        A.    No.  This doesn't look familiar to me at

4    all.

5        Q.    You don't recall anybody at the

6    distribution center ever showing you anything like

7    this?

8        A.    I never saw a report like this that I can

9    remember.

10       Q.    And if we look just under the -- about

11   three-quarters of the way down the page it says

12   page 11655.  Are you with me?

13       A.    I am.

14       Q.    And just below that to the left it

15   says -- it has a date, correct?

16       A.    Yes.

17       Q.    And the date is 8/2/2010?

18       A.    That's correct.

19       Q.    And then over to the right it has I guess

20   the title or the heading, and it says "suspicious

21   controlled drug orders for month of July 2010."

22   Do you see that?

23       A.    I see that.

24       Q.    And right below there it says "management

25   report."  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I do.

2    Q.    And then it has a sales district of 277.

3    Do you see that?

4    A.    I do.

5    Q.    Does that mean anything to you?

6    A.    No.  The sales district would be the area

7    for the store or group of stores that this report

8    would be based on.

9    Q.    Okay.  And this particular store, it's

10   got a store number there 12444, a DEA number for

11   that store, and then it's got an address in

12   Cleveland, Ohio.  Do you see that?

13   A.    I see that.

14   Q.    And is Cleveland, Ohio an area that

15   Walgreens distributed controlled substances to

16   during the period of time that it was so

17   distributing?

18         MS. SWIFT:  Object to the form.

19   Foundation.

20   A.    Cleveland, Ohio is in the area that the

21   distribution center services and delivers product

22   to.  I don't know if we were delivering any

23   controlled substances during that time.

24   Q.    Okay.  Well, the other two distribution

25   centers that Walgreens had that did controlled

1    substances was Jupiter, Florida and Woodlands,

2    California, right?

3        A.    Jupiter and Woodland also distributed

4    C-II narcotics.  But I don't know, again, what

5    times or dates that they did theirs.

6        Q.    And those were the only other two that

7    distributed C-II narcotics, correct?

8        A.    To my knowledge, there were only the

9    three DCs that have ever distributed C-II

10   narcotics to the stores.

11       Q.    And it's consistent with your

12   understanding that the Perrysburg, Ohio

13   distribution center was the distribution center

14   that would have distributed C-II or C-III

15   narcotics to the Cleveland, Ohio area; is that

16   fair?

17            MS. SWIFT:  Object to the form.

18   Foundation.

19       A.    We would have distributed to the

20   Cleveland, Ohio store while Perrysburg DC was

21   doing the distributions.

22       Q.    Of controlled substances?

23       A.    Of C-IIs.  Not during that -- not during

24   outside that time, though.  It would have been a

25   different distribution center that did that.

1    Q.    Okay.  I understand.  Okay.

2          And so then below -- below the address

3    for the store you see there's two horizontal

4    lines?

5    A.    Yes, sir.

6    Q.    And then below there, there's a --

7    something that says "description," and a colon; do

8    you see that?

9    A.    I do.

10   Q.    On the -- then below there, it looks like

11   it's got a couple things.  First, on the left it's

12   got an NDC number; do you see that?

13   A.    Yes, I do.

14   Q.    What's an NDC number?

15   A.    An NDC is the item code for that item.

16   It's a unique code for that item.

17   Q.    Okay.  And so we see there an NDC number,

18   and then it looks like to the right there's a

19   description for that item, correct?

20   A.    That's correct.

21   Q.    And what's the description for that

22   particular item?

23   A.    For this particular item, it says the

24   description is hydrocodone A pack 10-660 tabs.

25   Q.    Okay.  Do you know what that is?

1    A.    Just that it's the item description.

2    Hydrocodone.

3    Q.    Okay.  And this was a Schedule III drug?

4          MS. SWIFT:  Object to the form.

5    A.    I -- I don't know what classification it

6    would have had at the time.

7    Q.    Can you tell me some of the Schedule III

8    drugs that you were in charge of as the SAIL

9    coordinator from '08 through the time that

10   Walgreens stop distributing?

11   A.    I don't know what the specific drugs

12   were, no.

13   Q.    Do you know whether or not Vicodin was

14   one of the drugs that was in your purview as the

15   SAIL coordinator in charge of C-IIIs?

16   A.    I don't know.

17   Q.    Do you know whether or not Lortab was a

18   drug that was within your purview as the SAIL

19   coordinator in charge of C-IIIs?

20   A.    I don't know.

21   Q.    Do you know whether or not Norco was a

22   Schedule III drug that you were in charge of

23   during your purview as the SAIL coordinator in

24   charge of C-IIIs?

25   A.    I don't know.

1    Q.    Do you know any Schedule III drugs by

2    name that you were in charge of while you were the

3    SAIL coordinator?

4    A.    I don't know what the individual drug

5    names were.

6    Q.    Did you receive any training or education

7    from Walgreens on the potency or abusiveness, or

8    the potential for abuse of any of the C-III to V

9    drugs?

10   A.    As a person that just processes the

11   orders, that's not something that I recall ever

12   receiving training for.

13   Q.    So as you sit here and see an order for a

14   hydrocodone product on this suspicious control

15   order report, you have no idea whether that's one

16   of your products or not?

17   A.    I don't know if that was one of the

18   products that we were distributing at the time.

19   Q.    Okay.  Just above where it lists the

20   hydrocodone product, it has a formula that says

21   "average order times DEA factor equals trigger."

22   Do you see that?

23   A.    I see that.

24   Q.    Have you ever seen that before?

25   A.    I have not.

1    Q.    Does that mean anything to you?

2    A.    No.

3    Q.    Do you know what an average order is, or

4    how that would have been calculated?

5    A.    I do not.

6    Q.    Do you know what a DEA factor is, or how

7    that would have been calculated?

8    A.    I have not heard that term before.

9    Q.    And if you flip the page, do you see that

10   about the top half of the page it gives -- it's

11   got somewhat of a rudimentarily chart for the

12   columns or date ordered, quantity, and then DC

13   over on the right?

14   A.    I see that.

15   Q.    And the DC for each of these orders is

16   listed as 011?

17   A.    I do see that.

18   Q.    Do you know what that means?

19   A.    That is the Perrysburg distribution

20   center.

21   Q.    Okay.  So this chart seems to be

22   indicating that the Perrysburg distribution center

23   would have been the source of these orders?

24        MS. SWIFT:  Object to the form.

25   Foundation.

```
 1      A.    According to this chart, that's what it

 2    says.

 3      Q.    Okay.  And the chart then -- it reads

 4    bottom up, as far as chronology, and do you see

 5    how the bottom entry there on that chart is an

 6    order from June 2, 2010?

 7      A.    I see that.

 8      Q.    And it indicates that on that date there

 9    were three units?

10      A.    I -- it says that, yes.

11      Q.    And if -- and if we look back at the

12    previous page, a unit would have been that plus

13    100 at the end of the description.  Does that mean

14    100-count bottle?

15      A.    Yes.

16      Q.    So there's -- so those three units on

17    June 2, 2010 would have been three 100-count

18    bottles; is that correct?

19            MS. SWIFT:  Object to the form.

20    Foundation.

21      A.    That's -- that's my understanding.

22      Q.    And if we go up, it looks like two days

23    later on the 4th there was an order for two

24    additional 100-count bottles, correct?

25            MS. SWIFT:  Object to the form.
```

```
 1      A.     That's what it lists.

 2      Q.     Okay.  And we won't go through every one,

 3   but you see as it goes through the month of June

 4   there were -- there were additional orders for

 5   additional 100-count bottles of hydrocodone

 6   product?

 7             MS. SWIFT:  Object to the form.

 8      Q.     Do you see that?

 9      A.     I do see that.

10      Q.     And then just below the June 2nd order,

11   do you see where it totals up the entire number of

12   orders?

13      A.     I do.

14      Q.     And it lists the total orders there as

15   ███; do you see that?

16      A.     I see that.

17      Q.     And then it gives a percentage, ████████

18   percent; do you see that?

19      A.     I see the percentage.

20      Q.     Okay.  And do you know what that's

21   indicating?

22      A.     I do not.

23      Q.     If we go back to the previous page, do

24   you see that it has the trigger amount as ██?

25      A.     I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    Q.   And then if we go back to the total
2    amount, the total actually ordered was █; do you
3    see that?
4    A.   I see that.
5    Q.   And do you -- do you recognize -- and I'm
6    not asking you to do math -- but that generally
7    that █ represents that the amount that the █ is
8    over the █?
9         MS. SWIFT:  Object to the form.
10   Foundation.
11   A.   I imagine that is the percentage.
12   Q.   Okay.  Do you ever recall during your
13   time as a SAIL coordinator who was in charge of
14   Schedule III controlled substances anybody coming
15   to you and giving you information about orders
16   from stores that were exceeding DEA trigger
17   amounts?
18        MS. SWIFT:  Object to the form.
19   A.   I -- I don't recall ever having that
20   happen.
21   Q.   Do you ever recall anybody telling you
22   about -- coming to you with -- indicating that
23   reports were showing excess amounts of controlled
24   substances going to stores?
25        MS. SWIFT:  Object to the form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.     No.  I don't recall that at all.

2       Q.     Now, if we go back to the previous page,

3   do you see -- we looked at this a moment ago, but

4   do you see the date of this particular report is

5   August 2, 2010?

6       A.     I see that.

7       Q.     Okay.  And if we go back to -- if we flip

8   the page and look at these orders that we were

9   looking at, these are all orders from June 2010;

10  do you see that?

11      A.     I see that.

12      Q.     Okay.  At any point in time would --

13  would it be the practice of Walgreens within the

14  distribution center, and specifically as it

15  relates to the Schedule III controlled substances,

16  to hold orders for weeks or months at a time?

17             MS. SWIFT:  Object to the form.

18  Foundation.

19      A.     From a distribution -- from my position

20  at the distribution center, we would not hold

21  anything.  Whatever orders came through to process

22  were processed.

23      Q.     You were never asked to evaluate any --

24  whether or not orders exceeded any thresholds or

25  any DEA limits or any trigger amounts, or anything
```

Highly Confidential - Subject to Further Confidentiality Review

1     like that?

2          MS. SWIFT:  Object to the form.

3     Compound.  Vague.

4     A.     My position only processed the orders

5     that we received.  If there was another department

6     that may have done that, I don't know who it would

7     have been, or what steps they would have taken to

8     do that.  But my department and what I did did not

9     have that as part of our process.

10    Q.     I'll show you what I'll mark as Exhibit

11    Number 4.  This is P-WAG-2670.

12                    -  -  -  -  -

13               (Thereupon, Deposition Exhibit

14               Walgreens-Diebert 4, Personnel File

15               P-WAG-02670, was marked for purposes

16               of identification.)

17                    -  -  -  -  -

18    Q.     Do you recognize this as your personnel

19    file and performance reviews?

20    A.     Yes, I do.

21    Q.     Turn with me, please, to -- it's going to

22    be -- it's going to say 18 of 23.  And, actually,

23    you can start at 17 of 23.  That makes sense.

24               Now, you've been at the distribution

25    center going all the way back to 2003, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    That is correct.
 2      Q.    That's been your full-time job all the
 3  way back to 2003?
 4      A.    That's correct.
 5      Q.    You've worked there for 16 years now?
 6      A.    That's correct.
 7      Q.    And -- and here in this -- it looks like
 8  these are comments that you inserted yourself?
 9      A.    Yes.  On this page, I inserted that
10  comment.
11      Q.    Okay.  And you say here, "I absorbed the
12  responsibilities of the C-II SAIL department,
13  including all C-II order processing and DEA 222
14  form management."  Do you see that?
15      A.    I do.
16      Q.    And is that -- is that the process that
17  you were telling us about just a little bit ago as
18  far as getting orders signed?
19      A.    That's correct.
20      Q.    Okay.  And if you turn the page, there's
21  a list of bullet points, and then below -- there's
22  a list of indented bullet points, and then below
23  that there's another bullet point that says "I'm
24  very knowledgeable."  Do you see that?
25      A.    I do.
```

 1     Q.    It says, "I'm very knowledgeable in the

 2    outbound process in our distribution center.  I

 3    understand how each departments works, and how

 4    their methods affect each other, including the MPB

 5    and SAIL departments."  Do you see that?

 6     A.    I do.

 7     Q.    Okay.  With your 16 years of experience

 8    within the distribution center, and the fact that

 9    you're understandably very knowledgeable in the

10    outbound process, do you have any appreciation

11    whatsoever whether or not anybody in the

12    distribution center was doing any type of

13    suspicious order monitoring?

14          MS. SWIFT:  Object to the form.  Vague.

15     A.    I don't have any knowledge of whether the

16    distribution itself was even doing suspicious

17    order monitoring.  I don't know what party was

18    responsible for that.  It was not something that

19    was ever part of my details.

20     Q.    Did you have any knowledge that there

21    existed such a suspicious order report that we

22    just looked at?

23          MS. SWIFT:  Object to the form.

24     A.    My extent -- the extent of my knowledge

25    of a suspicious order report was that one existed.

```
 1    I didn't know anything beyond that.

 2         Q.    Okay.  In what context did you know that

 3    one existed?

 4         A.    I had heard the term used before.

 5         Q.    By who?

 6         A.    I -- I don't recall.

 7         Q.    I'll show you what I'll mark as Exhibit

 8    Number 5.

 9                     -  -  -  -  -

10               (Thereupon, Deposition Exhibit

11               Walgreens-Diebert 5, Suspicious

12               Controlled Drug Orders for July 2007

13               WAGMDL00390362 - 00390363, was

14               marked for purposes of

15               identification.)

16                     -  -  -  -  -

17         Q.    This is P-WAG-2589.  If you don't mind,

18    keep that -- I think it was number 3, the

19    suspicious order report, right there with it,

20    because I want to ask you some questions, because

21    there's a little bit of differences between these

22    two docs.

23               With 2589, do you see at the top of the

24    page it -- again, it has a date.  This date is

25    August 6, 2007; do you see that?
```

1    A.    Yes.

2    Q.    And, again, it says suspicious controlled

3    drug orders for the month of July 2007; do you see

4    that?

5    A.    I see that.

6    Q.    And this one says for Warehouse 013; do

7    you see that?

8    A.    I do see that.

9    Q.    Okay.  And I think the last time you told

10   me Perrysburg was 11.  Was it 13 at one point in

11   time?

12   A.    No.  13 is the C-II DC at Perrysburg

13   distribution center.

14   Q.    Okay.  So what is -- so what is 11?

15   A.    11 is the main DC itself.

16   Q.    Okay.

17   A.    11 is the distribution center that sends

18   out all the non-pharmacy items.  13 is the DC that

19   handled only Schedule II.

20   Q.    Okay.  Okay.  Well, let's go back to

21   number 3 then for a minute, because I think that

22   helped me a little bit.

23         So, again, go back to where we were

24   before, page 441 at the bottom right.

25   A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So I understand you to be -- to say that

2    DC code 11 would have been the warehouse that you

3    worked in as a SAIL coordinator for III through

4    Vs?

5    A.    That's correct.

6    Q.    So any item that's distributed from that

7    distribution center would have been a -- that's a

8    controlled drug would have been a III through V

9    controlled drug; is that fair?

10    A.    Any controlled drug that was distributed

11    from DC 11 during the dates that we were

12    distributing would have been a C-III through V.

13    Q.    Okay.  So if you flip to the very next

14    page and look at all these orders for these

15    hydrocodone products, you're able to confidently

16    tell me that these were Schedule III drugs,

17    because these are coming from your distribution

18    center, number 11?

19    MS. SWIFT:  Object to the form.

20    Foundation.

21    A.    If these were distributed from DC 11,

22    they would have been a Schedule III, IV or V drug.

23    Q.    Okay.  And so this report that's talking

24    about this hydrocodone product, which is a

25    Schedule III drug, you were never shown or given

Highly Confidential - Subject to Further Confidentiality Review

1    this report as the SAIL coordinator for Schedule

2    III through V?

3             MS. SWIFT:  Object to the form.

4    Foundation.

5        A.    I don't know what class drug that was at

6    the time, but I was also never -- I never saw this

7    document before.  I've never seen a suspicious

8    drug order report before today.

9        Q.    Okay.  So if you go down to the very

10   bottom of that page, do you see that there's a

11   new -- a new entry and a new drug listed there?

12       A.    I see that there's an entry and a drug

13   listed.

14       Q.    Okay.  And it's a new -- a new NDC

15   number, and then the drug that's defined that's

16   listed there under the description is oxycodone;

17   do you see that?

18       A.    I see that.

19       Q.    Do you have an understanding that

20   oxycodone is a Schedule II drug?

21       A.    It is a Schedule II drug currently.

22       Q.    Okay.  And if we look there under the

23   order history for this particular drug that was

24   flagged on the suspicious control drug order

25   report, do you see that it came from distribution

Highly Confidential - Subject to Further Confidentiality Review

1    center code 13?

2       A.    I see that.

3       Q.    Okay.  And does that -- that makes sense,

4    right, because that's the C-II distribution center

5    at Perrysburg, right?

6       A.    DC 13 is the C-II distribution center at

7    Perrysburg.

8       Q.    Okay.  So when we look at these different

9    drugs that were shipped that are listed here on

10   the report, we can look at the code of the

11   distribution center to determine whether or not

12   they were Schedule III or Schedule II drugs,

13   correct?

14          MS. SWIFT:  Object to the form.

15   Foundation.

16       A.    At the time -- I don't know.

17       Q.    Okay.  Well, the Schedule II drugs, like

18   oxycodone, would have come from distribution

19   center code 13, correct?

20       A.    That's -- that's correct.

21       Q.    And Schedule III through V drugs, like

22   the hydrocodone product we just looked at, would

23   come from distribution code 11, correct?

24       A.    Yes.  According to this report, during

25   that time period, those are the DCs those would

Highly Confidential - Subject to Further Confidentiality Review

1    have come out of.

2        Q.    Okay.  And you agree that this report

3    with these suspicious orders listed on it include

4    both Schedule II drugs as well as Schedule III

5    through V drugs?

6            MS. SWIFT:  Object to the form.

7    Foundation.

8        A.    This report shows both C-III through V

9    and C-II drugs on it.

10       Q.    And you would agree that would be

11   consistent with the regulation we looked at a few

12   minutes ago that made no distinction whatsoever

13   between Schedule II drugs and Schedule III through

14   V drugs?

15           MS. SWIFT:  Object to the form.

16   Foundation.  Calls for a legal conclusion.

17       A.    I don't know.

18       Q.    Do you recall looking at the regulation?

19       A.    I recall looking at the paragraph on

20   that.

21       Q.    Do you -- do you recall there being any

22   distinction made whatsoever over what schedule the

23   drug was?

24           MS. SWIFT:  Object to the form.

25       A.    There was no distinction in the paragraph

1    that you read, but I also don't have any

2    correlation between that and this report.

3         Q.    Sure.  But the regulation that we looked

4    at applied to all controlled substances, according

5    to this language, correct?

6              MS. SWIFT:  Object to the form.

7         A.    That's what the paragraph said, yes.

8         Q.    Okay.  So if we look back to Exhibit

9    Number 5 --

10             MR. GADDY:  2589.

11        Q.    Now, this report looks similar, but it's

12   a little bit different.  It's got the heading at

13   the top that says "for warehouse 13."  Do you see

14   that?

15        A.    I do see that.

16        Q.    Okay.  With looking at this page and the

17   next page, I know it looks substantially similar

18   to the last one, but have you ever seen this

19   report before?

20        A.    I have not.

21        Q.    You said that you had heard, and you've

22   been at the distribution center for 16 years, and

23   you've talked about how you have a good

24   understanding or a good knowledge of all the

25   different departments or divisions.  Do you have

1    an understanding of where within the distribution

2    center this suspicious order report was located?

3         A.    I said I have an understanding of the

4    outbound process, and that's in how it affects my

5    office in getting paperwork and orders completed

6    and done.  I have not ever seen a suspicious order

7    at our DC, and I don't know that our DC even is

8    responsible for that.

9         Q.    As far as you know, nobody at the

10   distribution center has any responsibilities for

11   suspicious order monitoring; is that fair?

12         MS. SWIFT:  Object to the form.

13   Mischaracterizes the testimony.

14         A.    I don't know who is responsible for it.

15         Q.    Do you know that somebody is?

16         A.    I don't know who -- who is responsible

17   for it.

18         Q.    When you say you don't know who is

19   responsible for it, you imply that somebody is.

20   So that's why I'm asking.

21         Do you know whether or not anybody at the

22   distribution center has any responsibility

23   whatsoever for suspicious order monitoring?

24         MS. SWIFT:  Object to the form.

25         A.    I don't know if anybody is or is not

1    responsible for suspicious drug order report at

2    the distribution center.

3        Q.    Thank you.

4            Let me show you what I'll mark as Exhibit

5    6.

6                  -  -  -  -  -

7            (Thereupon, Deposition Exhibit

8            Walgreens-Diebert 6, Handling

9            Suspicious Drug Orders Policy

10           WAGFLDEA00001854 - 00001855, was

11           marked for purposes of

12           identification.)

13                 -  -  -  -  -

14       Q.    This is P-WAG-5004.  If you look down at

15    the bottom of the page, do you see what looks like

16    a web address?

17       A.    I do see that.

18       Q.    Okay.  And does Walgreens have an

19    intranet type program to keep policies and

20    procedures, and things of that nature?

21       A.    We have an intranet.

22       Q.    And are there policy and procedure type

23    documents that are stored on there that you can

24    access?

25       A.    I don't know what --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. SWIFT:  Object to the form.  Vague.
 2      A.      -- I don't know what policies are on the
 3   intranet.  We do have policies for the
 4   distribution center, but I don't know if they're
 5   stored on the intranet.
 6      Q.      Okay.  The title of this policy is
 7   "handling suspicious drug orders."  Do you see
 8   that?
 9      A.      I see that.
10      Q.      Okay.  And if you look down at the bottom
11   of the paragraph, it says this policy originated
12   in 1998, and that it was revised, and we're
13   looking at the revised version from February 15,
14   2005; do you see that?
15      A.      I'm sorry, where are you at?
16      Q.      At the bottom of the paragraph.  It's
17   right on the screen, too, highlighted.
18      A.      Okay.  I do see the revised and the
19   originated dates that are on there.
20      Q.      Okay.  Have you ever seen this policy
21   before?
22      A.      I have not.
23      Q.      Is this a policy that you've ever recall
24   being trained or educated on by anybody at
25   Walgreens?
```

1       A.      No.

2       Q.      It says, "the logistics and planning

3   department sends the suspicious controlled drug

4   orders report to all distribution centers.  The

5   report lists controlled drug orders that may be of

6   unusual size for a store in its category, of

7   unusual frequency for a store in its category, or

8   deviating from a normal pattern for a store in its

9   category."  Do you see that?

10      A.      I see that it says that.

11      Q.      Have -- did you have any understanding

12  prior to reading that about what suspicious

13  controlled drug order reports were supposed to

14  contain?

15      A.      I did not.

16      Q.      It goes on to say that the distribution

17  center must -- must file all reports for five

18  years.  Do you see that?

19      A.      I see that it says that, yeah.

20      Q.      Now that we've looked at this, this

21  policy, do you have any memory of who or what

22  department or division at the distribution center

23  would have been in charge of receiving suspicious

24  controlled drug reports?

25      A.      I don't have any knowledge of who would

Highly Confidential - Subject to Further Confidentiality Review

1    have been responsible for that.

2        Q.    And you certainly were never shown any of

3    the suspicious controlled drug reports?

4        A.    No.  This wouldn't have had anything to

5    do with my position.

6        Q.    And you were never asked to hold any

7    orders while -- while orders that had been placed

8    by the stores were evaluated for whether or not

9    they were included on any suspicious controlled

10   drug order report?

11       MS. SWIFT:  Object to the form.

12       A.    I don't recall ever being asked to do

13   that, no.

14       Q.    Okay.  You don't ever recall being asked

15   to do any investigation or follow-up or due

16   diligence into any order that was received by you

17   to be processed; is that fair?

18       MS. SWIFT:  Object to the form.

19       A.    I was never asked to look into any -- any

20   orders of any kind.  We simply processed the

21   orders that we received every day.

22       Q.    If you flip the page, the policy on this

23   page is handling suspicious orders and loss of

24   controlled drugs; do you see that?

25       A.    I see that.

```
1      Q.    And it says, "distribution centers must
2   file all suspicious controlled drug order reports
3   for five years.  The administration manager must
4   complete the report of theft or loss of controlled
5   substances when any of the following circumstances
6   occur."  Do you see this?
7      A.    I do see that.
8      Q.    Before we get to that; did your -- any of
9   your duties or responsibilities revolve around
10  theft or loss or shrinkage of controlled
11  substances?
12     A.    No.  None of my duties were part of that.
13     Q.    Okay.  And so this policy came into play
14  when, then there's three bullets, one; "theft of
15  controlled drugs, no matter how small."  The
16  second is "substantial loss of controlled drugs,"
17  or three, "all in-transit losses or thefts."  Do
18  you see that?
19     A.    I see that it says that.
20     Q.    Okay.  And this is just applying to, or
21  talking about theft or losses of drugs, correct?
22     A.    To my -- yes.  According to what it says.
23     Q.    Other than you, who looked at the orders
24  for Schedule III drugs that came into the
25  distribution center?
```

```
 1              MS. SWIFT:  Object to the form.
 2    Foundation.
 3         A.    I don't know that there was anybody else
 4    that looked at the orders.  I don't know.
 5         Q.    As far as you know, it was just you?
 6              MS. SWIFT:  Object to the form.
 7         A.    As far as I know, it was just the SAIL
 8    department at the DC that looked at it.  There was
 9    no other department at the DC that would have
10    looked at those, that I know of.
11         Q.    And when you got those orders in, your
12    process was to process the orders?
13         A.    Yes, sir.
14         Q.    And because you've never received any
15    training or education or instruction on
16    identifying suspicious orders, I'm presuming that
17    during the course of your time as a SAIL
18    coordinator, you never told anybody that you had
19    identified any type of suspicious order?
20              MS. SWIFT:  Object to the --
21         Q.    Is that -- would that be fair?
22              MS. SWIFT:  -- object to the form of the
23    question.
24         A.    So there would not have been a reason for
25    me to consider the orders that we got suspicious.
```

1    I was never trained on suspicious orders or what

2    to look for.  That wasn't something that we did at

3    the DC that I'm aware of.

4         Q.    Okay.  So the C-III orders would come in

5    to you as a SAIL coordinator, and you would

6    process the orders, correct?

7         A.    That's correct.

8         Q.    And you weren't trying to identify

9    suspicious orders?

10              MS. SWIFT:  Object to the form.  Vague.

11        A.    We would run a report every day to look

12   for any orders that might be higher than usual,

13   above a certain threshold that the report was

14   looking for.  And we would check that against the

15   store's order history to see if it was in line

16   with what they usually get.

17        Q.    Sure.  And we'll look at some of those

18   policies, and I'll ask you about that in just a

19   minute.  But I'm specifically talking about the

20   suspicious order policy that we looked at that

21   identifies orders of unusual size, unusual

22   frequency, orders that deviate from a store's

23   ordering pattern.

24        A.    I was never trained on anything to do

25   with suspicious orders.

1    Q.   Okay.  Let me show you what I'll mark as

2    number 7.  It's going to be P-WAG-2683.

3                    -  -  -  -  -

4                (Thereupon, Deposition Exhibit

5                Walgreens-Diebert 7, December 27,

6                2007 Letter WAGMDL00753976 -

7                00753977, was marked for purposes of

8                identification.)

9                    -  -  -  -  -

10   Q.   And do you see at the top of the page

11   this is -- this particular letter is on US

12   Department of Justice DEA letterhead?

13   A.   I see that.

14   Q.   Okay.  And do you see that the letter is

15   addressed to Walgreens Corporation at Perrysburg,

16   Ohio?

17   A.   I see that.

18   Q.   Okay.  And that the date of this letter

19   is December 27, 2007; do you see that?

20   A.   Yes.

21   Q.   Do you recall if you've ever seen this

22   before?

23   A.   I have not ever seen this before, that I

24   can remember.

25   Q.   Okay.  This is the first time that you're

Highly Confidential - Subject to Further Confidentiality Review

1    ever seeing this letter?

2        A.    I believe so.

3        Q.    Let's look at some of it.  It starts, it

4    says, "Dear registrant.  This letter is being sent

5    to every entity in the United States registered

6    with the DEA to manufacture or distribute

7    controlled substances".  Do you see that?

8        A.    I do see that.

9        Q.    Okay.  And, obviously, this letter was

10   sent to Walgreens at Perrysburg in December of

11   2007, correct?

12           MS. SWIFT:  Object to the form.

13       A.    I see that.

14       Q.    If you go to the next paragraph, it says,

15   "in addition to, and not in lieu of the general

16   requirement under 21 USC 823 that manufacturers

17   and distributors maintain effective controls

18   against diversion, DEA regulations require all

19   manufacturers and distributors to report

20   suspicious orders of controlled substances."  Do

21   you see that?

22       A.    I see that it says that.

23       Q.    Okay.  Now that we're looking at this

24   letter from December of 2007, do you have any

25   recollection now that after this letter was

1    received that somebody from Walgreens came and

2    told you that there was an obligation to report

3    these suspicious orders?

4        A.    No one ever came to tell me that we had

5    an obligation for that.  I wasn't the C2 manager

6    at the time, so I wouldn't have seen this.

7        Q.    Okay.  Well, do you see anywhere in the

8    body of the paragraph that we just read that said

9    report suspicious orders of C-II drugs, or did it

10   say controlled substances?

11       A.    It says controlled substances, but I have

12   not seen this before.

13       Q.    Okay.  And your job as the SAIL

14   coordinator for III through Vs involved controlled

15   substances, correct?

16       A.    It involved processing orders for

17   controlled substances III through V.  But I don't

18   remember the date, so I don't know if this would

19   have been during that time or not.

20       Q.    Okay.  It goes on to say, "Title 21, CFR

21   1301.74B specifically requires that a registrant

22   design and operate a system to disclose to the

23   registrant suspicious orders of controlled

24   substances."  Do you see that?

25       A.    I see that it says that.

1    Q.    And, again, it doesn't say just C-IIs,

2    does it?

3    A.    No, it does not.  It just says controlled

4    substances.

5    Q.    It goes on to say, "the regulation

6    clearly indicates it's the sole responsibility of

7    the registrant to design and operate such a

8    system."  Do you see that?

9    A.    I see that it says that.

10   Q.    Okay.  Did you at your time as a -- as

11   the SAIL coordinator at Walgreens, did you ever

12   receive any training or education on any system

13   that Walgreens had that would disclose suspicious

14   orders?

15          MS. SWIFT:  Object to the form.  Vague.

16   A.    I did -- I don't recall ever receiving

17   any training on suspicious orders at all.

18   Q.    What about any system that was designed

19   to identify suspicious orders?

20   A.    I don't know of any system that we use

21   for that, if -- if we do that at our DC.

22   Q.    In the next paragraph, it says, "the

23   regulation also requires that the registrant

24   inform the local DEA office of suspicious orders

25   when discovered by the registrant."  Do you see

1    that?

2        A.    I see that it says that.

3        Q.    Okay.  And the phrase "when discovered"

4    is emphasized in the letter, correct?

5        A.    I'm sorry, where is that?  Yes.  I see

6    that.  Sorry.

7        Q.    Did you have any understanding or

8    appreciation at any time while you were the SAIL

9    coordinator in charge of C-III to V narcotics at

10   Perrysburg that there was any immediate

11   notification to the DEA of any suspicious orders

12   that came in for those Schedule III to V drugs?

13            MS. SWIFT:  Object to the form.  Vague.

14   Foundation.

15       A.    I don't know who the registrant is, so I

16   don't know who would have been responsible for

17   that.  But it was not my department.

18       Q.    Okay.  And I'll represent to you that in

19   this context the registrant means Walgreens, not

20   any particular person.

21            So with that clarification, do you have

22   any understanding that you or anybody else within

23   the distribution center made any immediate or

24   timely reports of suspicious orders to the DEA for

25   Schedule III to V controlled drugs?

Highly Confidential - Subject to Further Confidentiality Review

1    MS. SWIFT:  Object to the form.

2  Foundation.

3    A.    I don't know who would have been

4  responsible for suspicious orders or reporting

5  them.

6    Q.    Okay.  But when those orders came in to

7  the distribution center, they came in to you, the

8  SAIL coordinator, correct?

9    A.    C-III through V orders while we were

10  distributing came through my queries and reports,

11  orders, yes.

12    Q.    Okay.  And then you processed the orders?

13    A.    Yes.

14    Q.    It goes on to say, "filing a monthly

15  report of completed transactions, such as

16  excessive purchase reports or high unit purchases,

17  does not meet the regulatory requirement to report

18  suspicious orders."  Do you see that?

19    A.    Yes.

20    Q.    Does that seem pretty clear?

21    MS. SWIFT:  Object to the form.

22    A.    I have no idea.  I don't have anything to

23  compare it to.

24    Q.    "Registrants are reminded that their

25  responsibility does not end merely with the filing

Highly Confidential - Subject to Further Confidentiality Review

1    of a suspicious order report.  Registrants must

2    conduct an independent analysis of suspicious

3    orders prior to completing a sale to determine

4    whether the controlled substances are likely to be

5    diverted from legitimate channels."  Do you see

6    that?

7        A.    I see that it says that.

8        Q.    And I think you've already told me that

9    you never conducted any independent analysis of

10   any of the orders that came in as far as

11   determining whether or not they were likely to be

12   diverted?

13           MS. SWIFT:  Objection.  Mischaracterizes

14   the testimony.

15       A.    Well, I'm not sure what diverted means.

16   But we did not -- to my knowledge anywhere in the

17   DC, we did not research any trends with markets

18   and the items that they were ordering for

19   controlled substances.

20       Q.    You didn't look into -- do any research

21   on the population size that a particular Walgreens

22   store might be serving?

23       A.    No.  The distribution center wouldn't

24   have done that.

25       Q.    You didn't look into the number of

Highly Confidential - Subject to Further Confidentiality Review

 1   prescribers that a particular store would have

 2   been filling prescriptions for?

 3       A.    No.  Not from a SAIL coordinator

 4   position.

 5       Q.    You didn't look into the geographical

 6   distance between doctors that were writing

 7   prescriptions for the store that was filling those

 8   prescriptions?

 9       A.    No.  That's not something we would have

10   looked into from my office.

11       Q.    You didn't look into the geographic

12   distance between the location where a patient

13   lived and the location of the Walgreens store that

14   that patient was going to to have the prescription

15   filled?

16       A.    That's nothing I would have done from my

17   position either.

18       Q.    If you'd turn the page and go to the top

19   of the second page, do you see there the top

20   paragraph starts "registrants"?

21       A.    Yes, I do.  I'm sorry.

22       Q.    It says, "registrants that rely on rigid

23   formulas to define whether an order is suspicious

24   may be failing to detect suspicious orders.  For

25   example, a system that identifies only" -- or

1    excuse me -- "that identify orders are suspicious

2    only of a total amount of a controlled substance

3    ordered during one month exceeds the amount

4    ordered the previous month by a certain percentage

5    or more is insufficient."  Do you see that?

6        A.    I see that.

7        Q.    Let's go down to the second paragraph,

8    and the second sentence starts "daily."

9        A.    I see that.

10       Q.    It says, "daily, weekly, or monthly

11   reports submitted by registrant indicating

12   excessive purchases do not comply with the

13   requirements to report suspicious orders, even if

14   the registrant calls such reports suspicious order

15   reports."  Do you see that?

16       A.    I see that it says that.

17       Q.    Now that we've read through a substantial

18   portion of this -- of this letter, does it bring

19   back your memory that you actually have seen this

20   before?

21       A.    I have never seen this before.

22       Q.    If we read the next paragraph, it says,

23   "lastly, registrants that routinely report

24   suspicious orders yet fill these orders without

25   first determining that the order is not being

Highly Confidential - Subject to Further Confidentiality Review

1    diverted into other than legitimate medical,

2    scientific and industrial channels may be failing

3    to maintain effective controls against diversion."

4    Do you see that?

5        A.    I see it says that.

6        Q.    And, again, you as the SAIL coordinator,

7    when orders came in, you did not have as a regular

8    part of your practice to hold and do any

9    investigation into any of those orders; fair?

10            MS. SWIFT:  Object to the form.

11   Mischaracterizes the testimony.

12       A.    No.  When we received the orders, we

13   processed the orders.

14       Q.    Okay.  So the date of that letter is

15   what?

16       A.    2007.

17       Q.    Okay.  And if you go back to -- if you go

18   back to Exhibit Number 3, which was the one-page

19   e-mail with the report attached.

20       A.    Uh-huh.

21       Q.    And flip for me just one more time to

22   page 441, just so we can stay at the same place

23   we've been at the entire time.

24            And, again, the date of this report that

25   we looked at earlier is August 2010, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.      That's correct.

2       Q.      So this is two-and-a-half, almost three

3   years after that letter, correct?

4       A.      Yes.  Correct.

5       Q.      And these are the -- the title is

6   "suspicious controlled drug orders" is the title

7   to the right of the date?

8       A.      Yes.

9       Q.      Who was Dan Coughlin?

10      A.      I believe Dan Coughlin was a vice

11  president of DC and supply chain.  He didn't work

12  at the distribution center.

13      Q.      Would you have any interaction with him?

14      A.      None.

15      Q.      Is he -- did you have any appreciation

16  for whether or not he has purview over the

17  distribution centers, or do you know?

18              MS. SWIFT:  Object to the form.  Vague.

19      A.      I don't know.

20      Q.      I'll show you what I'll mark as Exhibit

21  Number 8.

22                      -  -  -  -  -

23              (Thereupon, Deposition Exhibit

24              Walgreens-Diebert 8, Perrysburg

25              Distribution Center DEA Review
```

1        WAGMDL00757148 - 00757163, was

2        marked for purposes of

3        identification.)

4              - - - - -

5    Q.    Do you see at the top of the first page,

6    the top left-hand corner, it says "Perrysburg

7    distribution center DEA review"?

8    A.    I do see that.

9    Q.    And this is dated December of 2008,

10   correct?

11   A.    Correct.

12   Q.    And so this is approximately one year

13   after we -- after that letter that we just looked

14   at from the DEA, correct?

15   A.    Correct.  Yes.

16   Q.    And -- okay.  And that was after -- and

17   do you recall that letter said that submitting

18   monthly excessive reports did not comply with the

19   regulations; do you recall that?

20        MS. SWIFT:  Object to the form.  Calls

21   for a legal conclusion.

22   A.    I don't know.

23   Q.    Well, go back to the letter.  The second

24   page, second paragraph, the second sentence.  It

25   starts "daily."  Do you see where it says, "daily,

1    weekly, or monthly reports submitted by a

2    registrant indicating excessive purchases do not

3    comply with the requirement to report suspicious

4    orders"?

5         A.    I see that it says that.

6         Q.    Okay.  And down at the bottom, do you see

7    the signatory of this document is a Joe

8    Rannazzisi, and his title was Deputy Assistant

9    Administrator of the Office of Diversion Control;

10   do you see that?

11        A.    I see that.

12        Q.    And you recognize this as being a letter

13   from the DEA?

14        A.    That's the letterhead.

15        Q.    Okay.  And so go with me back to Exhibit

16   Number 8, and then turn with me, please, to Bates

17   number ending 160.  Are you with me?

18        A.    Yes.

19        Q.    Okay.  And you see halfway down the page

20   there's the heading "controlled drug report"?

21        A.    I see that.

22        Q.    And it says, "Walgreens is required to

23   have a process to disclose to the DEA any

24   suspicious orders of controlled drugs that deviate

25   from the normal size, pattern, and frequency."  Do

Highly Confidential - Subject to Further Confidentiality Review

1    you see that?

2        A.    I see that it says that.

3        Q.    It goes on to say, "any orders that are

4    deemed to be suspicious are" reported -- excuse

5    me -- "are required to be reported to the DEA upon

6    discovery."  Do you see that?

7        A.    I see that.

8        Q.    And you agree that's consistent with what

9    we just read in that letter from the DEA?

10       A.    I agree that that is similar to what we

11   read in the letter, yes.

12       Q.    And it continues to say that "Walgreens

13   produces a monthly suspicious controlled drug

14   order report."  Do you see that?

15       A.    I see that.

16       Q.    And then there's portions of this that

17   obviously I'm not able to ask you about.  But

18   that's where it ends, that Walgreens produces a

19   monthly suspicious controlled drug order report,

20   correct?

21       A.    I see that.

22       Q.    And we know from that -- from looking at

23   those other reports that those reports were coming

24   out even in, I think, August of 2010, correct?

25            MS. SWIFT:  Objection.  Lacks foundation.

1    A.    According to the report that you showed

2    me, we were doing those in 2010.

3    Q.    Okay.  Here in this 2008 review, in the

4    recommendation it says, "we recommend discussions

5    continue with the cross-functional team consisting

6    of logistics, corporate, regulatory, law, and loss

7    prevention departments."  Do you see that?

8    A.    I see that.

9    Q.    And, again, this is in December of 2008,

10    correct, up at the top left-hand corner?

11    A.    Correct.

12    Q.    And Dan Coughlin is the individual who --

13    it looks like the far right-hand column is for

14    management response?

15    A.    He's who is listed there, yes.

16    Q.    Okay.  It says, "we will coordinate

17    another meeting during the third quarter to

18    continue discussions on reporting suspicious

19    controlled drug orders.  Estimated date for next

20    cross-functional meeting for the updated

21    suspicious controlled drug order identification

22    methodology is May 31, 2009."  Do you see that?

23    A.    I see that.

24    Q.    Would you agree with me there was not

25    exactly a sense of urgency in getting that meeting

1    set?

2            MS. SWIFT:  Objection.  Lacks foundation.

3        A.    I -- the only thing I can take from this

4    is that they were paying attention to it and

5    trying to make sure that they were staying in

6    compliance by scheduling these meetings and

7    reviews.

8        Q.    Okay.  And they identified an issue, they

9    had a recommendation, and they decided to set a

10   meeting more than five months away, correct?

11           MS. SWIFT:  Objection.  Lacks foundation.

12       A.    I don't see any issue identified.  I just

13   see that they're trying to maintain and keep

14   review of those suspicious orders, according to

15   this document.

16       Q.    Okay.  Well, the far left-hand column is

17   entitled "issue."  That's why I used that term.

18   Do you see what I'm referring to there?

19       A.    The far left-hand?

20       Q.    Sure.  At the top of the page?

21       A.    Oh, I see.  I'm sorry.

22       Q.    So it identified an issue.  It apparently

23   identified some risks that we can't see.  And then

24   they had some recommendations, only some of which

25   we can see, and they set a meeting for over five

Highly Confidential - Subject to Further Confidentiality Review

1    months after this report, correct?

2              MS. SWIFT:  Objection.  Lacks foundation.

3        A.    Looking at this document, I -- there's no

4    reason that I would think that that issue has

5    anything to do with the controlled drug reporting

6    column.  They're separate.

7        Q.    I'm confused now.  Explain to me what

8    you're saying.

9        A.    So just looking at this page, having the

10   issue above doesn't necessarily mean to me that

11   they're related to each other, that the controlled

12   drug reporting column is related to the issue.  I

13   would have to review the document.

14       Q.    Well, if you just flip back through every

15   page, do you see that all of the columns are

16   identical; issue, risk, recommendation, management

17   response?

18       A.    I see that it's that way, yes.

19       Q.    Okay.  And so what's listed under the

20   "issue" column for controlled drug reporting is

21   they're discussing Walgreens' monthly suspicious

22   controlled drug order report, right?

23       A.    They are discussing that they're doing it

24   and going to report -- or have a meeting scheduled

25   to reexamine it.

1    Q.    How long is that meeting set out in the

2    future?

3    A.    Well, according to the date on this

4    document and the date they have for the next

5    meeting, it is approximately five months.

6    Q.    Was Deb Bish the C2 manager when you

7    started at Walgreens in '03?

8    A.    No.  When I started in 2003, Deb Bish was

9    in a different department.  I don't know what

10   department it was.  However, while we were

11   distributing C-IIs, she was the only C2 function

12   manager for that department.

13   Q.    Okay.  There's never been another C2

14   function manager?

15   A.    Not while we were distributing, no.

16   Q.    At any point in time as the SAIL

17   coordinator for C-III through Vs at Perrysburg did

18   you ever get notification that somebody, whether

19   it was corporate or loss prevention or logistics,

20   or whoever, was cutting any of the orders that

21   were coming in?

22        MS. SWIFT:  Object to the form.  Vague.

23   A.    I don't recall ever hearing of any order

24   adjustments for C-III through Vs while I was a

25   SAIL coordinator.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    And you were the SAIL coordinator up

 2   until when you stopped distributing in 2013,

 3   correct?

 4      A.    I was the SAIL coordinator then, yes.  I

 5   don't know what day we stopped just distributing,

 6   though.

 7      Q.    I'll show you what I'll mark as Exhibit

 8   Number 9.  This is P-WAG-250.

 9                  -  -  -  -  -

10              (Thereupon, Deposition Exhibit

11              Walgreens-Diebert 9, E-mail Chain

12              WAGMDL00751806 - 00751807, was

13              marked for purposes of

14              identification.)

15                  -  -  -  -  -

16      Q.    And this is another e-mail chain, and

17   I'll represent to you it's going to deal with a

18   policy chain -- change.  If you flip to the second

19   page and go down to the bottom of the page.  And

20   you see the first e-mail in the chain is from Dan

21   Coughlin?

22      A.    I do see that.

23      Q.    And the subject line of this e-mail is

24   "suspicious drug order report online DEA manual;"

25   do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    I see that.

 2      Q.    It says, "Shaun will be adjusting the

 3   online manual for the DEA under legal, affecting

 4   inspection, security, and DEA communications.  The

 5   changes will reflect the cessation of the

 6   suspicious controlled drug report based on the new

 7   prevention program controlled substance order

 8   monitoring system."  Do you see that?

 9      A.    I see that.

10      Q.    And this e-mail is dated March 30, 2012,

11   correct?

12      A.    I see that, too, yes.

13      Q.    The body of the e-mail goes on to say,

14   "this system prevents the distribution centers

15   from receiving orders that would be considered

16   suspicious."  Do you see that?

17      A.    I see that.

18      Q.    And then if you go -- flip to the first

19   page, in the middle of the page under "handling

20   suspicious drug orders," you'll see the --

21   somebody copy and pasted in there, but what will

22   ultimately become the new policy.  Do you see that

23   heading there?

24      A.    I do see that.

25      Q.    Okay.  It says, "effective calendar year
```

Highly Confidential - Subject to Further Confidentiality Review

1    2012, the controlled substance order monitoring

2    and prevention systems prevent suspicious

3    controlled drugs from being shipped to the stores.

4    In calendar year 2012, because of the program

5    mentioned, suspicious controlled drug order

6    reports are no longer generated as their shipment

7    is prevented by the system."  Do you see that?

8        A.    I see that it says that.

9        Q.    From your perspective as the SAIL

10   coordinator, do you recall there ever being an

11   implementation of this change in policy that

12   impacted anything you did on your end?

13           MS. SWIFT:  Object to the form.

14   Foundation.

15       A.    I don't recall ever receiving any

16   information on this at all, so it would not have

17   affected what I was doing.

18       Q.    Do you ever recall being notified that

19   there was some controlled substance order

20   monitoring system that was cutting or reducing

21   orders?

22       A.    I don't recall ever receiving that

23   information as the SAIL coordinator.

24       Q.    Did the format or the manner in which you

25   received the orders ever -- ever change, that you

Highly Confidential - Subject to Further Confidentiality Review

1    recall?

2            MS. SWIFT:  Object to the form.  Vague.

3    A.    The only change that I can recall is when

4    we stopped distributing, and I didn't get the

5    orders anymore.

6    Q.    When you got the orders, and did those

7    orders come straight in from the store?

8    A.    I -- I don't know.  I don't -- the orders

9    are generated at the store, there's some steps

10   behind the scenes that I'm not familiar with, and

11   then we receive the orders.

12   Q.    Okay.  When you received the orders, did

13   you receive them electronically, or a printout,

14   or --

15   A.    They were all electronic.

16   Q.    And when you received the orders, you

17   processed them?

18   A.    Correct.

19   Q.    When you were processing orders for C-III

20   through V drugs, approximately how many stores

21   were you processing those orders for?

22           MS. SWIFT:  Object to the form.

23   Foundation.

24   A.    I couldn't tell you.  I can tell you that

25   we processed general orders for about 150 stores a

Highly Confidential - Subject to Further Confidentiality Review

1   day on average.  But I don't know if they all had

2   controls, or how much -- how large those orders

3   might have been.

4        Q.    So the universe of stores that you were

5   processing C-III through Vs for was much smaller

6   than what you're currently signing off on C-II

7   orders for; is that fair?

8        A.    Yes.  When we distributed C-III through

9   Vs, we only distributed to stores that our DC

10   serviced within our geographical location.

11        Q.    Do you know how many stores while you

12   were SAIL coordinator from 2008 through 2013,

13   whenever Walgreens stop distributing, do you know

14   how many stores Walgreens serviced C-IIs for?

15        A.    I do not know that.

16             MR. GADDY:  Okay.  I'm going to change

17   subjects.  This might be a good time to take

18   another break.

19             THE VIDEOGRAPHER:  Going off the record

20   at 10:39 a.m.

21                  (Recess had.)

22             THE VIDEOGRAPHER:  We're back on the

23   record at 11:00 a.m.

24        Q.    Ms. Diebert, are you familiar with a

25   manual at -- within the distribution center, the

1    CM-15?

2        A.    I am not.

3        Q.    Are you familiar with any Walgreens

4    procedural -- sorry -- Walgreens procedure manual

5    the distribution center procedures for handling

6    controlled drugs?

7        A.    I am not.

8        Q.    Do you recall ever being educated or

9    trained on any such process?

10       A.    I do not.

11       Q.    So what I think we've established is that

12   when you were the SAIL coordinator for C-III

13   through Vs, when those orders came in, that you

14   would process the orders.  So what I want to make

15   sure I have an understanding of is step-by-step

16   what you would do to process those orders.  Can

17   you explain that to me?

18       A.    While I was the SAIL coordinator when we

19   distributed C-III through Vs, we would check the

20   query that would show any large orders, and we

21   would check those large orders against the store's

22   regular orders.  And when we were done with that,

23   we would process orders.

24       Q.    Okay.  So the second part, that's what

25   I'm interested in, the process orders.  What does

Highly Confidential - Subject to Further Confidentiality Review

1    that mean?

2         A.    That just means that our computer room

3    would electronically process the orders which

4    would generate the pick labels for the pickers to

5    pick.

6         Q.    Okay.  What does that mean?

7         A.    Which part?  So our computer room is who

8    processes the orders.  Once they do that, it feeds

9    into a printer.  Based on where those items are

10   located in the distribution center, it would

11   create labels that the team members will get, and

12   they'll go out into the DC into the mods that

13   those items are in, and they'll pick into the

14   totes or full cases.  They'll put them on a

15   conveyor, which will take it to the truck that it

16   belongs to.

17        Q.    Okay.  So what is the role of the picker?

18        A.    The picker literally picks the items into

19   either a tote or a full case if they work in that

20   department.  They'll take the label, they'll go to

21   the location, they'll put the label on the

22   product, and then they'll put it on the conveyor.

23        Q.    And when you say conveyor, you're talking

24   about a conveyor belt that will take the -- take

25   the totes or the cases to the loading area?

1     A.     That's correct.

2     Q.     What is your role in processing the

3  orders after the excessive query report that we

4  talked about just a second ago?

5     A.     The reports are the last thing that we do

6  before we process the orders.

7     Q.     So after you run any excessive query

8  reports for, whether it's front end items, whether

9  it's pharmacy items, whether it's C-IIIs or C-Vs,

10  the orders get processed, the label is printed for

11  the pickers, and the pickers pick the items, bag

12  the items, and send them to the trucks?

13     A.     That's correct.

14     Q.     We talked a little bit about the phrase

15  "suspicious orders," and I think you told me you

16  heard of it.  But what about the phrase "orders of

17  interest;" does that mean anything to you?

18     A.     I have not heard that term before.

19     Q.     I'll show you what I'll mark as Exhibit

20  Number 10.

21                    -  -  -  -  -

22                 (Thereupon, Deposition Exhibit

23                 Walgreens-Diebert 10, May 11, 2011

24                 E-mail WAGMDL00751821 - 00751823,

25                 was marked for purposes of

Highly Confidential - Subject to Further Confidentiality Review

```
 1              identification.)

 2              - - - - -

 3     Q.    This is going to be P-WAG-233.  Do you

 4  see this is an e-mail dated May 11, 2011?

 5     A.    I see that.

 6     Q.    And this is to Tammy Trumbull?

 7     A.    I see that.

 8     Q.    Do you know who that is?

 9     A.    Yes.

10     Q.    Who is that?

11     A.    That is now Tammy Hensley.  She's our

12  admin manager.

13     Q.    Okay.  And we're going to spend the bulk

14  of our time talking about the attachment to this

15  e-mail.  But you see here where what is written to

16  Tammy is -- at the end there it says, "I'm

17  attaching the policy I use for Rx questionable

18  orders if that will help you."  Do you see that?

19     A.    I see that.

20     Q.    Do you understand what policy is being

21  referred to there?

22     A.    Not until I see the policy.

23     Q.    Okay.  Well, let's look at it.

24           So on the next page, do you see at the

25  top of the page this is a Walgreens document for
```

1    the -- the subject of the document is the Rx

2    questionable order of quantity?

3        A.    I do see that.

4        Q.    And now that you've looked at it, do you

5    recognize what this policy is?

6        A.    I do not recognize this policy.

7        Q.    Okay.  And it says that this particular

8    policy originated in December of 2006; do you see

9    that?

10       A.    I see that.

11       Q.    Okay.  And what we're looking at here is

12   a revised policy from April of 2010; do you see

13   that?

14       A.    I see that.

15       Q.    Okay.  And this was -- it says the

16   department is SAIL?

17       A.    Yes.

18       Q.    And that would have been your department?

19       A.    At the Mt. Vernon distribution center,

20   yes.  That was not our distribution center.

21       Q.    Okay.  Do different distribution centers

22   have different policies?

23       A.    They may have at the time.  I couldn't

24   tell you.

25       Q.    And if you look at the first heading, it

Highly Confidential - Subject to Further Confidentiality Review

1    says "purpose."  Do you see that?

2        A.    I see that.

3        Q.    It says, "to establish procedures for

4    verifying questionable store order quantities on

5    Rx items."  Do you see that?

6        A.    Yes.

7        Q.    And you've been telling me about some

8    type of excessive order query that you would do on

9    the C-III to Vs.  Do you have an understanding of

10   whether or not this is talking about that process?

11   And if you want to read through it for a minute,

12   feel free.

13            MS. SWIFT:  Take your time to read it if

14   you need to.

15       A.    Okay.  It seems similar to what we would

16   have done.

17       Q.    Okay.  This is generally describing the

18   process that you've been telling us about as far

19   as running the excessive order queries?

20       A.    Yes.

21       Q.    Do you know that there's a written policy

22   in place at Perrysburg that applied to the same

23   process?

24       A.    I don't know that.

25       Q.    Okay.  So it says, "the purpose to

1    establish procedures for verifying questionable

2    store order quantities on Rx items."  Do you see

3    that?

4        A.    Yes.

5        Q.    When it says "Rx items," what does that

6    mean to you in the context of the distribution

7    center?

8        A.    Anything that needs a prescription.

9        Q.    So that would apply to diabetes

10   medication, blood pressure medication, as well as

11   controlled substances; is that fair?

12       A.    That's fair.

13       Q.    It says, "the scope of this procedure

14   covers the steps in verifying questionable store

15   order quantities prior to order processing on Rx

16   items."  And the procedure, it says, "the

17   responsibilities of the computer room personnel

18   and the SAIL team prior to order processing."  Do

19   you see that?

20       A.    I see that.

21       Q.    Okay.  And is that consistent with what

22   you've told me, that this is something you go

23   through, and I think you said it's the last thing

24   that you do before the order gets processed?

25       A.    It is similar, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1     Q.    Okay.  I think you've told me that you do

2   this process not only for pharmacy items and

3   controlled substances, but you also do this same

4   process for front end of the store items, correct?

5     A.    That's correct.

6     Q.    So you do the same process for the paper

7   towels, the toilet paper, the bubble gum, all that

8   stuff, too, as well?

9     A.    Yes.

10     Q.    It says for -- under the procedures, it

11   says, "once transmissions have been" -- well,

12   strike me.  Let me ask you this real quick.

13          What's the involvement of the computer

14   room personnel in this process?

15     A.    It depends on which DC.  Some

16   distribution centers the computer room is solely

17   responsible for checking orders and processing

18   them.  Some distributions centers the SAIL will

19   check orders and the computer room will process

20   them.  At our distribution center, on Sundays the

21   computer room is solely responsible for it, and

22   then Monday through Thursday SAIL checks orders

23   and then the computer room does the processing.

24     Q.    Okay.  So you would be in charge of this

25   Monday through Thursday?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Correct.

2      Q.    Okay.  Does the computer room have any

3  involvement whatsoever on Monday through Thursday?

4      A.    Not for our regular orders, no.

5      Q.    Okay.  Do you actually run the query, or

6  run the report that would give you a printout of

7  anything that flagged?

8      A.    Yes.

9      Q.    All right.  So in number 1, it says,

10  "once transmissions have been received from the

11  stores to its fullest, it tells you to run a query

12  that would be printed for the next process cycle

13  date to be reviewed."  It says, "any Rx order

14  greater than 24" -- can we just call that units?

15      A.    Yes.

16      Q.    Okay.  "Any Rx order greater than 24

17  units of one item should print on a query and

18  store numerical order along with SS items."  Do

19  you see that?

20      A.    Yes.

21      Q.    What is "SS items"?

22      A.    Self-serve or front of store,

23  non-pharmacy items.

24      Q.    Gotcha.  Okay.  So self-serve, meaning

25  the consider can grab it off the shelves

Highly Confidential - Subject to Further Confidentiality Review

1    themselves?

2        A.    They can grab it themselves, correct.

3        Q.    Okay.  So does that number -- I think

4    earlier today I asked you what the limit was that

5    would flag any pharmacy item, and I think you

6    didn't remember.  Does that 24 jog your memory?

7        A.    No.  And it could have been different at

8    the DCs.  I don't know what Mt. Vernon would have

9    done compared to Perrysburg.

10       Q.    And you don't remember what Perrysburg

11   did?

12       A.    No, I don't.

13       Q.    Okay.  But, anyway, the number generated

14   across any prescription item, according to this

15   policy, was the same?

16       A.    Yes.

17       Q.    Whether it's blood pressure medication,

18   diabetes medication, or controlled substances?

19       A.    Yes.  Depending on the query.  Perrysburg

20   ran a query for controlled substances, and we ran

21   a separate query for non-pharmacy items.  So in

22   reading this, it sounds like they may have just

23   run one query that would show everything over 24

24   SKUs totally.  We ran a separate query for

25   controls versus non-pharmacy, and they would have

1    been different thresholds.

2        Q.    Did you run different queries for

3    controlled versus regular pharmacy?

4        A.    Regular pharmacy would have shown up on

5    the regular report because they weren't controlled

6    substances.

7        Q.    Okay.  So you ran a query for front end

8    plus regular pharmacy, and you ran a separate

9    query for controlled?

10       A.    Correct.

11       Q.    Okay.  And do you know if that was

12   pursuant to any written policy?

13       A.    I don't know that.

14       Q.    How did you know to do that?

15       A.    Tammy Trumbull, Hensley, who is the admin

16   manager now, was the SAIL coordinator when I took

17   that position over, and that is how she trained

18   me.

19       Q.    Okay.  But, anyway, according to the

20   policy, the report is run, and this one is 24

21   units, correct?

22       A.    Yes.  On this it is.

23       Q.    Okay.  And you don't remember what it was

24   for Perrysburg?

25       A.    No, I don't.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you remember if it was the same or

2    different for front end items and pharmacy

3    items -- excuse me -- front end items and

4    controlled items?

5    A.    Perrysburg versus Mt. Vernon?

6    Q.    No, no.  Within Perrysburg, whether or

7    not the trigger number was the same or different

8    for controlled substances versus the pharmacy

9    items and non-controlled?

10   A.    It was different.

11   Q.    Then it goes on to say in the second

12   paragraph, it says, "the computer room or SAIL

13   personnel working the query will review the

14   listing.  If there is a questionable quantity, the

15   pharmacy is contacted at that store and the order

16   is questioned."  Do you see that?

17   A.    Yes.

18   Q.    It goes on to say, "if the order is

19   incorrect, the original order for the item is

20   deleted and rekeyed correctly."  Do you see that?

21   A.    I do see that.

22   Q.    Is this accurately -- and I know this is

23   a Mt. Vernon document -- but is this accurately

24   describing what -- what your process was at

25   Perrysburg?

1     A.    Not specifically.  For controlled C-III

2     through V, if we did have something that got

3     flagged on the overage report, we would contact

4     the store if it looked like it wasn't in line with

5     their normal orders.  And if it was a wrong order,

6     we would either delete it or decrease it.  But we

7     wouldn't delete it and reenter an order.

8     Q.    Okay.  So would it be fair to say that

9     when you called the pharmacy, you were trying to

10    determine whether or not the order had been

11    entered in error?

12    A.    Yes.

13    Q.    So are you familiar with the phrase "fat

14    finger report"?

15    A.    I'm familiar with fat fingering, but not

16    a specific report.

17    Q.    Okay.  Okay.  So what you're looking for

18    here is fat fingering errors?

19    A.    Yes.

20    Q.    Okay.  So you're looking for places where

21    somebody wanted one unit and asked for 100 units?

22    A.    Exactly.

23    Q.    Okay.  And those are the type of

24    situations that would flag on this report and that

25    you would make a phone call to the pharmacy about?

1    A.    That's correct.

2    Q.    Okay.  Why is that something that was

3    important to the distribution center?

4    A.    We want to make sure that we were sending

5    the orders out the stores needed.

6    Q.    Okay.  If you sent an excessive quantity

7    that the store didn't need, would the store often

8    have to return those items?

9    A.    We did not return items at the DC.  I

10   don't know what processes the stores would have

11   used.  They would have contacted their district

12   office, and then asset protection for their

13   geographical location would have been involved.

14   But they would not have come back to the

15   distribution center.

16   Q.    Okay.  Well, some aspect of your job

17   involved returns, right, or trying to lower

18   returns?

19   A.    Not for Rx.  Not for pharmacy items.

20   Q.    Okay.  So front end items, if you shipped

21   them too many rolls of toilet paper, would those

22   get returned to the distribution center?

23   A.    There's criteria that the products have

24   to meet before we would approve a return.  But

25   they would -- we do do that.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.   And that's something that you want to

2  avoid; is that fair to say?

3  A.   Yes.  Yes.

4  Q.   Okay.  And why is it that you want to

5  avoid those types of returns?

6  A.   Well, it doesn't suit the store or the

7  customers or the distribution center or Walgreens

8  in general to have excess stock sitting on the

9  shelves that's not getting sold.  If we send too

10  much to one store, we could be shorting another

11  store and missing sales on that.

12  Q.   Okay.  So in addition to looking for

13  these fat finger errors, is there anything else

14  that you're looking for when you're reviewing this

15  excessive order report?

16  A.   Not from a sales perspective, no.

17  Q.   At any time -- so let me make sure I

18  understand your process.

19       If you have an order that flags on the

20  excessive order report, that, frankly, is a fat

21  finger report; do you agree with that?

22  A.   Yes.

23       MS. SWIFT:  Object to the form.

24  Q.   And so if you have an order that flags on

25  the fat finger report, you make a phone call to

1    the pharmacy?

2        A.    That's correct.

3        Q.    Okay.  You said that you would maybe look

4    at the past ordering history for a store, but I

5    would assume that a lot of times you can see the

6    orders that come in on those fat finger reports

7    and realize they're clearly in error?

8             MS. SWIFT:  Object to the form,

9    characterization of the report.

10       A.    So it was very infrequent that we ever

11   actually had to -- or had those items show up on

12   the report.  When they did, I don't recall ever

13   actually having to call the store to see if it was

14   correct or not.  That's how infrequent it would

15   have been.  But, yes, we did check their order

16   history to see if it was something that was

17   regular and average for what the store goes

18   through and orders.

19       Q.    Okay.  Give me an example -- or give me

20   an estimate of how often you would have a

21   controlled drug flag on one of these reports.

22            MS. SWIFT:  Objection.  Calls for

23   speculation.

24       A.    Yeah, I have no idea.

25       Q.    Well, you said it happened very

1    infrequently.  What do you mean by that?

2      A.    I mean, it happened -- I don't recall it

3    ever actually happening.  I don't recall ever

4    contacting a store to say, you know, is your C-III

5    through V item, whatever it was, you know, is that

6    a valid order.

7      Q.    Do you recall a C-III through V item ever

8    flagging on this excessive order, fat finger

9    report?

10     A.    I'm --

11           MS. SWIFT:  Object to the

12    characterization of the report.

13     A.    So I'm sure that it would have come up,

14    but I don't recall it at all.  It was a long time

15    ago.

16     Q.    Okay.  Was this -- this process of

17    running this report and looking for these fat

18    finger errors, was that always a part of your

19    duties and responsibilities as a SAIL coordinator?

20           MS. SWIFT:  Object to the form of the

21    question.

22     A.    It -- for the C-III through Vs while we

23    distributed them and I was the SAIL coordinator,

24    yes.  And for the -- I'm sorry, go ahead.

25     Q.    No --

1          MS. SWIFT:  Did you finish your answer?

2     A.    No.  For non-pharmacy, we have always --

3 as the SAIL coordinator, we've always run that

4 report.

5     Q.    Okay.  But for controlled drugs, you've

6 run that all the way back to 2008, when you became

7 the SAIL coordinator?

8     A.    If that is the -- I don't remember what

9 dates we were distributing C-III through V.  But

10 during my time as SAIL coordinator while we were

11 distributing, yes, we ran that report.

12     Q.    And tell me if I'm wrong, but I heard you

13 tell me that you don't ever remember there being a

14 C-III through V drug that flagged on that report?

15          MS. SWIFT:  Object to the form.

16     A.    I don't recall it happening.

17     Q.    Do you recall ever having to review a

18 store's ordering history for Schedule III through

19 V drugs to evaluate any of these orders that would

20 have flagged on a report?

21     A.    I don't specifically remember reviewing

22 C-III through V.  But we regularly check that for

23 all items that we process now and did then.  But I

24 don't remember if it was C-III through V.  I don't

25 have a specific recollection of that.

1    Q.    Okay.  But so you would have reviewed the

2    historical orders for bubble gum if that were to

3    pop up on one of these reports?

4    A.    Yes, we would.

5    Q.    And you would have looked into whether or

6    not the bubble gum order that came in on this

7    particular order that flagged on the report was

8    consistent with what that store had typically been

9    getting?

10    A.    That's true.

11    Q.    And if it wasn't consistent, in that

12    situation you would make a phone call to the

13    store?

14    A.    That's right.

15    Q.    And you would ask the store, you know,

16    you usually only get 10 units of bubble gum, but

17    here you asked for 1,000 units of bubble gum; did

18    you really want 1,000 units?

19    A.    That's what we would do.

20    Q.    Okay.  And they would tell you, no, we

21    just want our normal 10 units of bubble gum, and

22    in that case you would do what?

23    A.    We would decrease the order to the 10

24    units that they asked for, for non-pharmacy.

25    Q.    You took your direction from the store on

Highly Confidential - Subject to Further Confidentiality Review

1    what to change the order to if the order was to be

2    changed?

3        A.    Yes, we did.

4        Q.    You didn't contact anybody at -- in loss

5    prevention or corporate or internal audit, or

6    anything like that, and ask them for any

7    instructions or directions on what to change the

8    order to?

9            MS. SWIFT:  Object to the form of the

10   question.

11       A.    No, we did not.

12       Q.    Whatever the store told you to do, that's

13   what you inputted for that order?

14           MS. SWIFT:  Object to the form.

15       A.    Yes.

16       Q.    Would there ever be an occasion where the

17   store would say, no, we want -- we want 50 units

18   of bubble gum today, and you would say, well, no,

19   we're only going to give you 10?  Would that ever

20   happen?

21       A.    It's possible.  We would base it on what

22   our current DC inventory was.  We don't want to

23   short other stores just to give a bulk of the

24   product to one store.  So it is possible that we

25   would give them a lesser amount than what they

Highly Confidential - Subject to Further Confidentiality Review

1   were requesting.

2       Q.    But the reason for that would be the

3   amount of inventory that you have in the

4   distribution center?

5       A.    That's correct.

6       Q.    Do you ever recall having one of these

7   fat finger reports flagged for a controlled

8   substance and then you reporting that to the DEA?

9           MS. SWIFT:  Object to the form of the

10  question.

11      A.    I never had any contact with the DEA.

12      Q.    Okay.  Would it even have occurred to you

13  if there had been an order that had come in for

14  1,000 bottles of a C-III drug for a store that

15  usually got 10 bottles, would it even have

16  occurred to you to contact the DEA?

17          MS. SWIFT:  Object to the form.  Assumes

18  facts not in evidence.

19      A.    I don't know what I would have done.

20      Q.    Okay.  Well, your normal process would

21  have been to call the store, right?

22      A.    Yes.

23      Q.    And ask the store did you really want

24  these 1,000 bottles of the C-IIIs, correct?

25          MS. SWIFT:  Object to form.  Calls for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    speculation.

 2       A.    Yes.   I would have called the store to

 3    see if it was a legitimate order.

 4       Q.    Okay.   And if they told you that was a

 5    fat finger error, we really only want our 10

 6    bottles, you would have lowered it to 10 and sent

 7    them the 10, correct?

 8       A.    Correct.

 9             MS. SWIFT:   Objection.   Calls for

10    speculation.

11       Q.    If -- in a similar situation, if you had

12    a store and an order for 100 bottles of

13    controlled -- a Schedule III controlled drug, and

14    it flagged on your report, and you looked, and the

15    store typically got 10 bottles, and you called the

16    store and said did you really want these 100

17    bottles or was that an error, and they told you,

18    no, we really want the 100 bottles; if you had

19    sufficient inventory within the store, was there

20    anything that would have prevented you from

21    sending that order?

22             MS. SWIFT:   Objection.   Calls for

23    speculation.   Hypothetical.

24       A.    Well, we can't see the inventory at the

25    store.   Did you mean the DC?
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'm sorry.  That's exactly what I meant.

2    A.    Okay.

3          MS. SWIFT:  Same objections.

4    A.    I still -- I don't know what I would have

5    done at the time.  It did not happen that I can

6    recall, so I'm not sure what my follow-up would

7    have been.

8    Q.    But there was no policy or procedure that

9    was in place to tell you to do anything other than

10   fill the order if you verified with the store that

11   the order was accurate?

12         MS. SWIFT:  Objection.  Calls for

13   speculation.

14   Q.    Is that correct?

15   A.    Since it didn't happen that I can recall,

16   I don't know if there was a policy or procedure in

17   place.

18   Q.    Okay.  So if you read the last sentence

19   of paragraph 2 under 3-A, it says "if the order

20   is."  Do you see where I am?

21   A.    Paragraph 2, under -- where are you at?

22   Q.    Under "procedure."

23   A.    3-A -- so the C2 SAIL personnel working

24   query?  Is that where you are?

25   Q.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
1      A.    Okay.  I got you.  I see.

2      Q.    All right.  I'm looking at the last --

3      A.    Okay.  Sorry.

4      Q.    It says, "if the order is incorrect, the

5   original order for the item is deleted and rekeyed

6   correctly."  Do you see that?

7      A.    I see that it says that.

8      Q.    Okay.  And you agree that that was the

9   procedure?

10          MS. SWIFT:  Object to the form.

11     A.    That was Mt. Vernon's procedure,

12   according to this document.  But we did not delete

13   and rekey an order.  We either deleted the order,

14   or we just decreased the existing order.

15     Q.    Okay.  And the purpose for doing that was

16   to correct any errors and make sure that the store

17   got what they were really asking for?

18          MS. SWIFT:  Objection to form.

19     A.    That's correct.

20     Q.    And then it looks like the next step is

21   once all orders have been reviewed for accuracy,

22   computer personnel is notified to kick off order

23   processing?

24     A.    That is correct.

25     Q.    So once it's been verified that the --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that the order is what the store was actually

 2    asking for, order processing begins?

 3         A.    Yes.

 4         Q.    Is that the extent of this excessive

 5    order program that you would be in charge of as

 6    the SAIL coordinator?

 7              MS. SWIFT:  Object to the form.

 8         A.    Yes, it is.

 9         Q.    If you look under the next heading on

10    paragraph B, it says, "responsibilities of Rx team

11    member personnel, location control and sale team

12    stores picking date."  Do you see that?

13         A.    I do.

14         Q.    And it says, "as Rx team members are

15    picking orders and an order seems questionable,

16    SAIL office will be contacted via phone for order

17    accuracy verification."  Do you see that?

18         A.    I see that.

19         Q.    Are you familiar with what's being

20    discussed there?

21         A.    I understand what they're saying, but I

22    don't recall that ever actually happening.  I

23    don't know if it's part of our process.

24         Q.    Okay.  At any -- at any time from '08

25    when you became the SAIL coordinator until --
```

Highly Confidential - Subject to Further Confidentiality Review

1    until Walgreens stop distributing C-III through

2    Vs, do you recall ever being contacted by a picker

3    asking whether or not what they were picking was

4    accurate?

5              MS. SWIFT:  Objection.  Calls for

6    speculation.

7         A.    I don't recall that ever happening.

8         Q.    If you go under paragraph C, do you see

9    it says "responsibilities of Walgreens Company"?

10        A.    Yes, sir.

11        Q.    And it says, "suspicious store orders and

12   inquiries are handed through the corporate office

13   internal audit department."  Do you see that?

14        A.    I see that.

15        Q.    Prior to reading that, did you have that

16   understanding or knowledge?

17        A.    No.  I just know that my department never

18   did anything with suspicious orders.

19        Q.    Okay.  Did you know that the internal

20   audit department was -- had purview over

21   suspicious orders, according to the policy?

22        A.    I did not.

23        Q.    Did you ever interact with anybody at the

24   internal audit department?

25        A.    No.

1    Q.    How often would the internal audit

2    department come to Perrysburg while you were

3    distributing controlled drugs?

4         MS. SWIFT:  Objection.  Lacks foundation.

5    A.    I don't know that they ever did come to

6    Perrysburg DC.

7    Q.    In 2008 until Walgreens stopped

8    distributing controlled substances sometime in

9    2013, do you recall ever interacting with anybody

10   from internal audit regarding the Schedule III

11   through V controlled substances?

12   A.    I don't recall when we were distributing,

13   but I don't know of any visits that they did.  I

14   never interacted with any internal audit

15   department personally.

16   Q.    Did they -- did you ever get any request

17   for information from anybody regarding order

18   histories, or order patterns, or order frequencies

19   that you understood to be used for evaluation of

20   suspicious orders?

21   A.    I did not.

22   Q.    Did anybody from the internal audit

23   department ever ask you for any information about

24   orders of controlled substances?

25   A.    I didn't even know we had an internal

1    audit department, so no.

2        Q.    It goes on to say in the second sentence

3    that "suspicious orders are then reported by

4    corporate to the FDA and/or DEA for controlled

5    substances within three days."  Do you see that?

6        A.    I do see that.

7        Q.    Do you have any idea whether or not that

8    was actually happening?

9        A.    I -- I don't know.  I don't know what --

10   what they did with that.  I have no idea.

11       Q.    If you go to the next page, it says

12   "training."  It says, "to establish procedures to

13   properly train, evaluate, and guide the team

14   members on the process, the SAIL function manager

15   will be responsible for the training and

16   enforcement of all these procedures."  Do you see

17   that?

18       A.    I see that it says that.

19       Q.    Okay.  Was that the case at Perrysburg?

20       A.    It was a different hierarchy at

21   Perrysburg.  We didn't have a SAIL function

22   manager.  We had a SAIL coordinator, which was a

23   supervisor role, as opposed to a function manager

24   role.  And that SAIL coordinator would have

25   reported to a different manager that was not part

Highly Confidential - Subject to Further Confidentiality Review

1      of SAIL.

2          Q.    I'm sorry, I missed the first part of

3      your answer.  It was my fault, not yours.

4              So who would have been in charge of the

5      training for this policy or procedure?

6              MS. SWIFT:  Object to the form.

7          A.    I don't know.  In 2006 I was an MPB

8      clerk.  I don't know.

9          Q.    This is the 2010 version.

10         A.    In 2010, I -- I would have been the SAIL

11     coordinator reporting to Tammy Hensley, who was

12     the admin manager.

13         Q.    Okay.  Would Tammy have been in charge of

14     any training under this?

15             MS. SWIFT:  Object to the form.

16     Foundation.

17         A.    I don't -- I don't know.

18         Q.    At any of the time while you were the

19     SAIL coordinator from 2008 through when Walgreens

20     stopped distributing controlled substances, did

21     you provide any training to anybody on these

22     procedures?

23             MS. SWIFT:  Object to the form of the

24     question.

25         A.    Not that I can remember.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Other than I guess -- I think you told us

2    earlier you received some guidance from Tammy when

3    you assumed the position about running these

4    reports and these queries; is that --

5    A.    That's correct.

6    Q.    Okay.  Other than that initial guidance

7    you received from Tammy, did you ever receive any

8    training or instructions from anybody on these

9    procedures after that?

10   MS. SWIFT:  Object to the form.

11   A.    Not that I recall.

12   Q.    And, again, the goal of this process as

13   far as looking at those excessive orders was to

14   identify orders that had been entered in error by

15   the stores?

16   A.    Correct.

17   Q.    And your goal in researching those

18   reports that had flagged was to make sure that the

19   stores actually received the quantity of product

20   that they wanted to receive?

21   A.    It was --

22   MS. SWIFT:  Object to the form of the

23   question.

24   A.    It was to make sure that the stores

25   received the product that they needed to receive.

1    Q.    Okay.  The product that they were

2    actually asking for?

3         MS. SWIFT:  Object to the form.

4    A.    Yes.

5    Q.    You were not charged with doing any

6    second-guessing of how much any store should or

7    should not be receiving if you went through your

8    processes, called the store, and they confirmed

9    that the order entered was actually what they

10   wanted?

11        MS. SWIFT:  Object to the form.

12   Q.    Is that correct?

13   A.    That's correct.

14   Q.    I'll show you what I'll mark as Exhibit

15   Number 11.

16             -  -  -  -  -

17             (Thereupon, Deposition Exhibit

18             Walgreens-Diebert 11, Authentication

19             of Prescription Order Policy

20             WAGMDL00749831 - 00749407, was

21             marked for purposes of

22             identification.)

23             -  -  -  -  -

24   Q.    And if you'll keep that one right next to

25   you, I'm going to do a compare and contrast with

```
1    this.  This is P-WAG-210.

2            And if you look at the top of the page,

3    it looks like there's a different subject.  And,

4    again, I'm comparing Exhibits 11 and 10.  So it

5    looks like the subject, instead of being "Rx

6    questionable order quantity" is now

7    "authentication of prescription order policy."  Do

8    you see that?

9        A.    I do.

10       Q.    But the date of the original is the same,

11   but the revision date is different, correct?

12       A.    I see that.

13       Q.    Okay.  So you see this is an October of

14   2013 policy, correct?

15       A.    Yes.

16       Q.    And you would agree with me that this

17   October 2013 -- this date of October 2013, do you

18   have an understanding that that is after Walgreens

19   stopped distributing from Perrysburg -- excuse

20   me -- stopped distributing controlled substances

21   from Perrysburg?

22            MS. SWIFT:  Objection.  Foundation.

23       A.    I don't know what date we stopped

24   distributing.

25       Q.    Do you recall the DEA coming into the
```

1    Perrysburg distribution center?

2          MS. SWIFT:  Object to the form.  Vague.

3    A.    I know that the DEA came in.  I don't

4    remember the date, and I didn't have any part of

5    their visit when they were there.

6    Q.    When the DEA came into the Perrysburg

7    distribution center in 2013, do you recall

8    approximately how long after that it was that

9    Perrysburg stopped distributing controlled

10   substances?

11         MS. SWIFT:  Object to the form.  Assumes

12   facts.  Foundation.

13   A.    I don't know when they came in, and I

14   don't have any idea how long a time there was

15   between their visit and when we may or may not

16   have stopped distributing drugs, controlled drugs.

17   Q.    Is there any event that you would

18   correlate with Perrysburg stopping to distribute

19   controlled substances?

20         MS. SWIFT:  Object to the form.  Vague.

21   A.    I don't know.

22   Q.    Okay.  All right.  Let's look at these

23   two.  So if you look at Exhibit 11, which is the

24   2013 version, it looks like the purpose is the

25   same in both policies, correct, 2010 and 2013?

1    A.    Yes.  Yes.

2    Q.    So it's the 2013 version, but the policy

3    is aimed at accomplishing the same purpose,

4    correct?

5    A.    Yes.

6    Q.    And it looks like the scope of the

7    procedure is the same -- excuse me -- the scope of

8    the policy is the same?

9    A.    Yes.

10   Q.    And it even looks like the procedure is

11   identical?

12         MS. SWIFT:  Objection to the extent it

13   mischaracterizes the document.

14   A.    It looks similar.

15   Q.    Do you see any differences?

16   A.    It looks like there may be differences

17   under the "C" heading for responsibilities.

18   Q.    Exactly.  I'm just under -- sorry.  I

19   should have been more specific.  I'm just under

20   paragraph A.

21   A.    No.  I don't see any noticeable

22   differences.

23   Q.    Okay.  And the same thing with paragraph

24   B, it looks to be identical?

25   A.    Yes, it does.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     So -- and you jumped ahead of me.

2     A.     Sorry.

3     Q.     So where we see the differences is in

4  paragraph C, correct?

5     A.     Yes.

6     Q.     Okay.  It says -- in the 2013 version of

7  this policy, it says, "the Walgreens strategic

8  inventory management system."  Do you know what's

9  being referred to there?

10    A.     No.

11    Q.     Are you familiar with SIMS?

12    A.     Oh, yes.  Sorry.  I guess I do know.

13    Q.     Okay.  What is SIMS?

14    A.     SIMS is a system that we use at the

15  distribution center.

16    Q.     What is it used for?

17    A.     For processing orders and keeping track

18  of our inventory.

19    Q.     Okay.  It says, "SIMS will stop what

20  would be considered suspicious controlled drug

21  orders from being released for picking at the DC

22  based on the algorithm that looks at pass/fails

23  and order frequency."  Do you see that?

24    A.     I see that.

25    Q.     It says, "if we suspect the store to be

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious, the order will be canceled and then

2    reported to the FDA, the Board of Pharmacy, and

3    the DEA for controlled substances within three

4    business days."  Do you see that?

5        A.    I see that.

6        Q.    Do you recall -- is that -- as we just

7    read that, is that new information to you today --

8        A.    Yes.

9        Q.    -- that this was the policy?

10       A.    Yes.  I didn't -- I didn't know that.

11       Q.    Did you have any understanding that in

12   2013 there was a policy implemented that would --

13   that would -- that would stop suspicious orders

14   from being released for picking at the

15   distribution center?

16           MS. SWIFT:  Object to the form.  Vague.

17       A.    No.  I did not have knowledge of that.

18       Q.    And you certainly didn't have any

19   understanding or any appreciation of orders being

20   reported to Boards of Pharmacy or DEA, or anything

21   like that; is that correct?

22       A.    That's correct.  I did not have that.

23       Q.    I've asked you a lot of questions about

24   reporting to the DEA, or dealing with the DEA, but

25   I didn't ask you anything with the Board of

1    Pharmacy.  Do you ever deal with the Board of

2    Pharmacy in any way?

3        A.    I have not, no.

4        Q.    If you'd flip to the Bates number ending

5    394, and do you see at the top of the page here it

6    says "Mt. Vernon stores," it's got a DC, and then

7    it says "order error processed;" do you see that?

8        A.    I do.

9        Q.    Okay.  And it says, "once it's been

10   confirmed that the adjusted transmissions"

11   across -- "are across the SAIL or the computer

12   room, TM" -- does that mean team member?

13       A.    Yes, it does.

14       Q.    "Will start reviewing store's Rx

15   transmissions and see if there are any Rx items

16   that have been ordered greater than 16 units of

17   one" -- and wick is an item?

18       A.    Yes.

19       Q.    "Greater than 16 units of one item by one

20   store."

21            So is this kind of consistent with the

22   excessive order report, or the fat finger type

23   report that we talked about earlier?

24            MS. SWIFT:  Object to the form.  Vague.

25       A.    I've never seen this form before.

1    Q.    Okay.  Do you see the transmission in the

2    middle of the page where it looks like something's

3    been copied and pasted?

4    A.    Yes.

5    Q.    Where it says "transmission query

6    report"?

7    A.    Yes.

8    Q.    Okay.  Are you saying this is not a

9    format that you're familiar with?

10    A.    Yeah, I've not seen that before.

11    Q.    Okay.  Well, let me explain to you how I

12    think I'm reading it, and you tell me if I'm right

13    or wrong, or if you don't know.  But it looks like

14    in the left-hand column there's an item number and

15    an item description listed?

16    A.    Yes.

17    Q.    And then it looks like there's a -- maybe

18    a destination, a store number where it's supposed

19    to be sent to, and there's an entry for the number

20    of SKUs or units that were ordered; do you see

21    that?

22    A.    Yes.

23    Q.    And it looks like in this -- in the first

24    entry, it looks like there was -- there were 30

25    units ordered, that is circled and struck through,

Highly Confidential - Subject to Further Confidentiality Review

1    and the number "3" is written checked there next

2    to it; do you see that?

3        A.    I do.

4        Q.    Okay.  And that would be consistent with

5    this process that we're -- that we saw on this

6    page, where 16 was their trigger amount, and if

7    there were orders over 16, that they would call

8    the pharmacy to see whether or not they really

9    wanted that number of units?

10       A.    Yes.

11             MS. SWIFT:  Objection.

12       Q.    Is that fair?

13             MS. SWIFT:  Foundation.

14       A.    Yes, it is.

15       Q.    And is this the type of process, even if

16   it wasn't this exact form or format, but that's

17   the type of process that you were telling us about

18   earlier with this excessive order report where you

19   would be looking for these errors from the stores,

20   correct?

21       A.    Yes.  It is very similar to that.

22       Q.    And if you look at the next submission

23   down where you see two different item

24   descriptions; do you see where I am?

25       A.    I do.

1    Q.    And it looks like in those two situations

2    there was a store that ordered 300 units of a

3    product, and 400 units of a product, and in each

4    of those situations they actually only meant to

5    order 3 units or 4 units; is that fair?

6    A.    Yes.

7          MS. SWIFT:  Object to the form.

8    Foundation.

9    Q.    And, again, those are the types of errors

10   that you were looking for when you reviewed these

11   types of reports?

12   A.    That's correct.

13   Q.    If you'd turn with me, please, to Bates

14   number ending 383.  And do you see at the top of

15   this page, it says "suspicious order monitoring

16   program policy and procedures for the

17   pharmaceutical integrity team."  Do you see that?

18   A.    Yes.

19   Q.    Do you know if you've ever seen this

20   document before?

21   A.    I don't believe I have.

22   Q.    Do you know who the -- what the

23   pharmaceutical integrity team is?

24   A.    Yes.  They're a group out of corporate

25   that deals with the pharmacy items.  That's about

1    all I know.

2        Q.    Okay.  Without going through and reading

3    this document, do you know what Walgreens'

4    suspicious order monitoring program is?

5        A.    No.

6        Q.    What could -- what, if anything, could

7    you tell me about it?

8             MS. SWIFT:  Object to the form.

9        A.    I don't know.

10        Q.    If I was to ask you what Walgreens does

11    to identify suspicious orders, what would you tell

12    me?

13        A.    I can only tell you what we do for the

14    large orders, that we check on the queries every

15    day.  I couldn't tell you beyond that.  I don't

16    know.

17        Q.    Where you're looking for fat finger

18    errors?

19        A.    Yeah.

20        Q.    Okay.  But beyond that, you don't know

21    anything --

22        A.    I don't --

23        Q.    -- about the suspicious order monitoring?

24             MS. SWIFT:  Object to the form.  Vague.

25        A.    Yes.  I don't -- I don't know what

 1    Walgreens does for suspicious orders.

 2        Q.    Okay.  Let's look at just a little bit of

 3    this -- of this -- of this policy.

 4            Do you see right underneath the heading,

 5    it says, "this policy and specific procedures

 6    govern how controlled substance orders are

 7    processed and what steps are taken by the

 8    pharmaceutical integrity team to investigate

 9    orders of interest in the controlled substance

10    order monitoring system."  Do you see that?

11        A.    I see that.

12        Q.    Over -- under "overview," it says, "the

13    Walgreens distribution centers must take

14    reasonable measures to identify its customers and

15    understand the normal and expected transactions

16    conducted by those customers" in identifying --

17    excuse me -- "and identify transactions involving

18    controlled substances that are suspicious in

19    nature."  Do you see that?

20        A.    I see that it says that.

21        Q.    Okay.  Do you know who at the

22    distribution center, if anybody, has that role?

23        A.    I don't know who would have that role.

24        Q.    Do you see here that this policy says

25    that it's the responsibility of the distribution

```
1    centers, correct?

2        A.    I do see that.

3        Q.    Okay.  And you currently are the C2

4    manager at the Walgreens distribution center,

5    correct?

6        A.    I am.

7        Q.    Okay.  Who else -- is there anybody

8    higher than you that has the responsibilities and

9    duties for C-IIs --

10            MS. SWIFT:  Object to the form of the

11    question.

12        Q.    -- at the distribution center?

13            MS. SWIFT:  Object to the form.  Vague.

14        A.    For -- there's no one other than myself

15    that is responsible for signing the processed C-II

16    orders.  Beyond that, I don't know who else would

17    have any other responsibilities pertaining to

18    C-IIs.

19        Q.    Okay.  But you as the C2 manager at the

20    Perrysburg distribution center, you don't know --

21    well, first of all, you don't do anything to

22    identify customers, understand normal and expected

23    transactions, or identify transactions that are

24    suspicious?

25        A.    No.  We don't do that.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know of anybody at the Perrysburg

2    distribution center that does that?

3    A.    I don't know who does that.

4    Q.    Do you know whether or not anybody does

5    that?

6    A.    I -- I don't know who does that for the

7    DC or, you know, if Rx Integrity does that.  I

8    don't know who's responsible for it.

9    Q.    Okay.  Well, when you say you don't know

10   who does it, that implies that somebody does.  So

11   my question is; do you know whether or not anybody

12   at the distribution center does that?

13         MS. SWIFT:  Objection.  Asked and

14   answered.

15   A.    I don't know who at the DC would do that,

16   if they do.

17   Q.    Okay.  So you don't know whether or not

18   that even happens in the distribution centers,

19   correct?

20         MS. SWIFT:  Objection.  Asked and

21   answered.

22   A.    As a role of the SAIL coordinator, it's

23   not part of my responsibility, so I would have no

24   reason to know -- excuse me -- know who does that.

25   Excuse me.

1    Q.    Well, you're the C2 manager at

2    Perrysburg, correct?

3    A.    I am.

4    Q.    Do you know whether or not there is

5    anybody at the distribution center that has these

6    responsibilities that are listed here, to identify

7    customers, understand normal and expected

8    transactions, and identify transactions that are

9    suspicious?

10    MS. SWIFT:  Object to the form of the

11    question.  Asked and answered.

12    A.    I don't know if there's anybody at the

13    distribution center that does that.

14    Q.    Thank you.

15    It goes on to say, "for the purpose of

16    this document, a DC customer is an individual

17    Walgreens pharmacy."  Do you see that?

18    A.    Yes.

19    Q.    It says, "orders must be assessed to

20    ensure that quantities of controlled substances

21    ordered by a specific location are reasonable.  In

22    making these assessments, the distribution center

23    may consider the pharmacy's clinical business

24    needs, location, and population served."  Do you

25    see that?

1    A.    I see that.

2    Q.    In your role as the C2 manager at the

3  Perrysburg distribution center, do you do any

4  analysis or evaluation of any particular store's

5  clinical business needs, location, and population

6  served?

7    A.    I do not.

8    Q.    Do you know of anybody at the Perrysburg

9  distribution center that does?

10   A.    I don't know if there's anybody that

11  does.

12   Q.    Then it goes on to say, "Walgreens must

13  report to the DEA any orders that is determined to

14  be suspicious," correct?

15   A.    It says that, yes.

16   Q.    And that's certainly not any of your

17  responsibilities, right?

18   A.    It is not.

19   Q.    And you don't know of anybody at the

20  distribution center that does that, correct?

21   A.    I don't know if there's anybody that does

22  it at the DC.

23   Q.    Okay.  This document goes on to talk

24  about ceiling limits and tolerance limits that are

25  implemented for Walgreens pharmacies.  Do you know

1    what that means?

2        A.    Very little.  I know that there's a limit

3    to the amount of items that the pharmacies can

4    order.  And that's about the extent of it.

5        Q.    Okay.  In your role, do you do any

6    evaluation or analysis of any ceiling or threshold

7    that is set?

8        A.    No, I do not.

9        Q.    Do you have any role in setting those

10   ceilings or thresholds?

11       A.    I'm sorry?

12       Q.    Do you have any involvement in setting

13   those ceilings or thresholds?

14       A.    No, I don't.

15       Q.    Do you have any involvement in

16   determining whether or not those ceilings or

17   thresholds should be raised or lowered?

18       A.    No, I don't.

19       Q.    Do you know whether or not there's a

20   process for raising or lowering a ceiling or

21   threshold?

22       A.    I don't know that.

23       Q.    I'll represent to you that there is a

24   clause in here that talks about the option that a

25   pharmacy be contacted as they approach the ceiling

1    or threshold.  Is that anything that falls within

2    your responsibilities or duties?

3        A.    No.

4              MS. SWIFT:  Object to the form of the

5    question.

6        A.    No.

7        Q.    Have you ever contacted a pharmacy or a

8    store to tell them that they were approaching an

9    order threshold or a ceiling as it related to

10   controlled substances?

11       A.    I don't receive that information, so I

12   would have no reason to contact a store about

13   their threshold limits for C-IIs.

14       Q.    So, no, you have not?

15       A.    No, I have not.

16       Q.    Turn with me, please, to the Bates number

17   ending 395.  And do you see that this is --

18   contains the policy and procedure for List 1

19   chemicals?

20       A.    Yes.

21       Q.    And do you agree with me that List 1

22   chemicals are different than controlled

23   substances?

24             MS. SWIFT:  Objection.  Foundation.

25       A.    They are different, but I don't know what

1    the differences are.

2        Q.    Okay.  Do you have an appreciation that

3    there are different rules and regulations for List

4    1 chemicals than there are for controlled

5    substances, or you just don't know?

6        A.    I don't know.

7        Q.    Have you ever been given any training or

8    education on the differences between rules and

9    regulations for controlled substances versus rules

10   and regulations for List 1 chemicals?

11            MS. SWIFT:  Objection to form.

12       A.    Not that I'm aware of.

13       Q.    Who is Matthew Nye?

14       A.    He's our computer room function manager.

15       Q.    And I'm asking about the time period in

16   which Walgreens was distributing controlled

17   substances.  Would those controlled substances

18   have fallen under his purview?

19            MS. SWIFT:  Object to the form.  Vague.

20       A.    So on Sundays when the computer room

21   processed, it would have for C-III through Vs.  I

22   don't know if they ever had anything to do with

23   C-IIs.

24       Q.    Okay.  I'll show you what I've marked as

25   Exhibit Number 12.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   -  -  -  -  -

 2            (Thereupon, Deposition Exhibit

 3            Walgreens-Diebert 12, E-mail Chain

 4            WAGMDL00751808 - 00751810, was

 5            marked for purposes of

 6            identification.)

 7                   -  -  -  -  -

 8      Q.    And if you look at the top of this, you

 9   see this is an e-mail chain?

10      A.    Yes.

11      Q.    And it looks like the top e-mail is from

12   Deb Bish, correct?

13      A.    Yes.

14      Q.    And if you look down to the "to" line, it

15   looks like you're included; do you see that?

16      A.    Yes.  Yes.

17      Q.    And this e-mail is from May 29, 2012?

18      A.    Yes.

19      Q.    And during this period of time, you would

20   have been the SAIL coordinator in charge of C-III

21   through V drugs, correct?

22      A.    I don't recall when we stopped

23   distributing.  If we were distributing at that

24   time, I would have been the SAIL coordinator.

25      Q.    Okay.  And if you flip through the -- to
```

Highly Confidential - Subject to Further Confidentiality Review

1    the second page, and I can't really ask you about

2    the entire chain, because a lot of it is hidden

3    from me.  But you see the first e-mail that we can

4    actually look at is an e-mail from Steve, and --

5    who was the distribution center manager?

6        A.    Yes.

7        Q.    Okay.  And it looks like he sends that

8    e-mail -- first off, it looks like it goes to

9    Matt, you, and Tammy Trumbull, correct?

10       A.    Correct.

11       Q.    And then it also looks like there's a

12   list serve that it goes to.  Do you understand

13   what I'm saying there?

14       A.    Yes.

15       Q.    Okay.  Do you recognize who that's going

16   to?

17       A.    Yes.

18       Q.    Can you explain that for me?

19       A.    Are you talking about the group e-mail?

20       Q.    Yes.

21       A.    That would have been his -- Steve

22   himself, as the DCM; Justin Joseph, as the

23   manager -- outbound manager, and then the IOs at

24   the time.  I couldn't tell you who the IOs were.

25   They've changed over the years.

1    Q.    What's "IO" mean?

2    A.    Inbound/outbound manager.

3    Q.    Okay.  So that's a group e-mail that

4    would go to all the people with those --

5    A.    The senior managers.

6    Q.    Okay.  Is there a group e-mail account

7    within the distribution center that you would be

8    included on?

9    A.    There are a couple.  I would be included

10   on the Perrysburg SAIL coordinators e-mail.

11   Q.    Okay.

12   A.    And C2 -- Perrysburg C2 orders e-mail

13   group, I believe.  That's the signers group

14   e-mail.

15   Q.    Perrysburg C2 orders?

16   A.    I believe that's the name of it.

17   Q.    Okay.  What else?

18   A.    That may be it.

19   Q.    Okay.  Would you have been on the

20   Perrysburg SAIL going back to 2008?

21          MS. SWIFT:  Object to the form.

22   A.    When I became SAIL coordinator, I would

23   have been put on that, yes.

24   Q.    And the Perrysburg C2 would have

25   started --

1      A.    In late 2014, when I became the process

2    manager.

3      Q.    So, anyway, we see this e-mail from

4    Steve.  The subject is the suspicious drug

5    process; do you see that?

6      A.    Yes.

7      Q.    And then if we go to this next e-mail

8    from Matt on the bottom of the first page, it

9    looks like he's going to -- we'll look at this,

10   and we'll read through it -- but it looks like

11   he's going to talk a little bit about some of this

12   excessive order reports that you run.

13          He says, "I have some questions."  He

14   says, "excessive to us for C-II is any item over

15   100 units."  Do you see that?

16     A.    I see that.

17     Q.    And so that would mean 100 bottles,

18   correct?

19     A.    Correct.

20     Q.    He then asks, "is this acceptable?"  Do

21   you see that?

22     A.    Yes.

23     Q.    He says, "do we need to change the

24   threshold in which we call for C-II overages."  Do

25   you see that?

```
 1       A.    Yes.

 2       Q.    Looking at this e-mail from Matt in May

 3    of 2012, does it jog your memory that when you

 4    were running the excessive reports, or the fat

 5    finger reports for this Schedule III through Vs,

 6    that 100 units was your trigger?

 7             MS. SWIFT:  Object to the form.

 8       A.    I don't recall.  I don't know what the

 9    limit was.

10       Q.    Well, do you see here that in May of 2012

11    Matt's indicating that 100 units was what the

12    trigger was for Schedule II drugs, correct?

13       A.    I see that, yeah.

14       Q.    And to be fair to you, you weren't doing

15    C-IIs at this time, right?

16       A.    That is correct.

17       Q.    Matt goes on to say, "if we go much

18    lower, we're going to need significantly more time

19    to run C-II because calling each store takes about

20    five minutes."  Do you see that?

21       A.    Yes.

22       Q.    It says, "oftentimes no one at the

23    pharmacy can make the decision to change the

24    order.  Do we just leave it and e-mail Linda for

25    being suspicious, or make it 100 SKUs and log it?"
```

Highly Confidential - Subject to Further Confidentiality Review

1    Do you see that?

2        A.    Yes.

3        Q.    Do you know what that means?

4              MS. SWIFT:  Objection.  Calls for

5    speculation.

6        A.    I understand that in there he's asking if

7    he should leave it alone or if he should not.  But

8    that's the extent.  I don't know who Linda is, and

9    I don't know what logs they would have used.

10       Q.    Okay.  It says, "currently we drop it

11   down to 100 units if we can't get a real answer

12   from anyone."  Do you see that?

13       A.    Yes.

14       Q.    Does it surprise you that 100 units was

15   the trigger for Control-II drugs?

16             MS. SWIFT:  Objection.  Calls for

17   speculation.

18       A.    Yeah, I wouldn't know what they would

19   have thought usual for a threshold.

20       Q.    We just looked at these two earlier

21   reports, and one talked about the Rx order

22   thresholds should be 24, and then we looked at

23   another page that said the units -- the threshold

24   should be 16, and now we look at this document

25   that they actually practice in the Perrysburg

1    distribution center for C-IIs was 100 units.  Does

2    that -- is that surprising to you at all?

3              MS. SWIFT:  Object to the form.  Asked

4    and answered.

5         A.    I -- I don't know if it would be

6    surprising or not.  None of those processes was I

7    involved in, so I don't know what standards should

8    have been used or would have been used.

9         Q.    Do you recall if 100 units was consistent

10   with what you used in the C-III to V department?

11             MS. SWIFT:  Objection.  Asked and

12   answered.

13        A.    I don't recall.

14        Q.    Now, as far as what you were doing in the

15   distribution center to look out for anything out

16   of the ordinary, we've covered the excessive order

17   issue, we talked about the pickers, but I think

18   you said you don't ever remember the pickers

19   contacting you about anything questionable.  Is

20   there any other reports or programs or processes

21   that you went through as the SAIL coordinator for

22   Schedule III to V drugs that would have been

23   consistent with monitoring or evaluating order

24   sizes?

25             MS. SWIFT:  Objection to form.  Compound.

1    Vague.

2        A.    I don't recall any other processes that

3    we would have done in regards to C-III through V

4    distribution while I was the SAIL coordinator.

5        Q.    Are you aware that in early 2012 the DEA

6    began to investigate the Jupiter distribution

7    center?

8        A.    I am not aware of that.

9        Q.    Are you aware that Walgreens paid a

10   settlement to settle allegations from the DEA that

11   Walgreens at the Jupiter distribution center had

12   violated the Controlled Substance Act?

13       A.    I'm not aware of any settlement that

14   Walgreens would have had.

15       Q.    Prior to me just representing to you in a

16   question that Walgreens had paid a settlement to

17   the DEA, did you know that that had ever happened?

18       A.    I did not know that, no.

19       Q.    I'll show you what I'll mark as Exhibit

20   13.

21                    -  -  -  -  -

22              (Thereupon, Deposition Exhibit

23              Walgreens-Diebert 13, Settlement

24              Memorandum of Agreement P-WAG-0001,

25              was marked for purposes of

```
 1                    identification.)

 2                    -  -  -  -  -

 3     Q.    This is P-WAG-1.

 4           Now, I think you told me earlier that you

 5     are aware that the Jupiter distribution center in

 6     Florida was another Walgreens distribution center

 7     that distributed Schedule II drugs, correct?

 8     A.    Yes.  Yes.  That's correct.

 9     Q.    And at no time while you were at

10     Walgreens do you ever recall being told that the

11     DEA had investigated them, that the DEA had shut

12     them down, that the DEA had padlocked their

13     controlled substances; any of the above?

14           MS. SWIFT:  Object to the form.

15     Compound.

16     A.    I was never informed of it.  I don't even

17     remember what position I was in at the time, and I

18     wouldn't have had any need to know that

19     information.

20     Q.    Okay.  Regardless of whether or not you

21     had any need to know that information, nobody ever

22     told you; is that fair?

23           MS. SWIFT:  Object to the form.

24     A.    I was not aware of when it happened or

25     what happened.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  If you look at the top of the

2    first page, do you see it says "Settlement

3    Memorandum of Agreement"?

4    A.    I do.

5    Q.    Do you see it says this agreement is

6    entered into between DOJ, DEA, and Walgreens?

7    A.    I see that.

8    Q.    And just to kind of put this in some

9    context, if you look at the very bottom of the

10   page, do you see it's 1 of 349?

11   A.    Uh-huh.

12   Q.    That's the numbering system I'm going to

13   use as far as kind of steering you through this

14   document.

15        If you turn to page 11 of 349, do you see

16   that at the top of the page this is signed by a

17   Mr. Sabatino with Walgreens?

18   A.    I do.

19   Q.    And do you know Mr. Sabatino?

20   A.    No, I do not.

21   Q.    And you see that this was signed in June

22   of 2013, correct?

23   A.    Yes.

24   Q.    So if we go back to the first page, and

25   go down with me, please, to paragraph 5.  Are you

1    with me?

2        A.    I'm there.  Yes, I am.

3        Q.    Do you see it says, "on September 13,

4    2012, the DEA by its administrator, Michelle

5    Leonhart, issued an order to show cause and

6    immediate suspension of registration to Walgreens

7    Jupiter," and it says, "see Appendix B."  Do you

8    see that?

9        A.    I see that.

10       Q.    Let's turn and look at that.  That's

11   going to be on page 27.  Do you see there it says

12   "Appendix B"?

13       A.    Yes, sir.

14       Q.    Okay.  So if we turn one more page to

15   page 28, do you see in the top middle of the page,

16   or I guess about in the middle of the page, it

17   says "order to show cause and immediate suspension

18   of registration"?

19       A.    I do.

20       Q.    And the date of that above there is

21   September 13, 2012?

22       A.    Yes.

23       Q.    And to the left, it says "in the matter

24   of Walgreens Corporation."  Do you see that?

25       A.    Yes.

1    Q.    And it has the Jupiter Florida address,

2    correct?

3    A.    Yes.

4    Q.    And at the top of the page, you see this

5    has -- it's on the DEA Department of Justice

6    letterhead?

7    A.    Yes.

8    Q.    And in -- I think we've agreed throughout

9    the course of the day that Perrysburg stopped

10   distributing controlled substances in 2013; is

11   that fair?

12            MS. SWIFT:  Objection.  Mischaracterizes

13   the testimony.

14   A.    I don't remember when we stopped

15   distributing C-IIs.

16   Q.    Do you remember if it was before or after

17   that time when the DEA came into Perrysburg?

18   A.    I don't remember.

19   Q.    Okay.  Well, regardless, this is

20   September 13, 2012, correct?

21   A.    Yes.

22   Q.    And do you see in the second paragraph

23   there, it says, "notice is hereby given to inform

24   Walgreens Corporation," and it says Walgreens to

25   be referred to as either Walgreens or Respondent,

1    it says, "of the immediate suspension of DEA

2    certificate of registration," and it gives a

3    number, "pursuant to 21 USC 824D, because such

4    registration constitutes an imminent danger to

5    public health and safety."  Do you see that?

6        A.    I see that it says that.

7        Q.    At any time while you were with

8    Walgreens, and specifically in the distribution

9    center dealing with Schedule III to V narcotics,

10   did anybody tell you that another one of

11   Walgreens' distribution centers was alleged by the

12   DEA to be operating in a fashion that constituted

13   an imminent danger to the public health and

14   safety?

15       A.    No.

16       Q.    If you go down to the paragraph number 1,

17   it says, "Walgreens' Jupiter, Florida distribution

18   center is registered with DEA as a distributor in

19   Schedules II through V."  Do you see that?

20       A.    I do.

21       Q.    And that's consistent with your

22   understanding that Jupiter could also distribute

23   Schedule II drugs, correct?

24       A.    Yes.

25       Q.    If -- if you go to paragraph 2, it says,

Highly Confidential - Subject to Further Confidentiality Review

 1    "since at least 2009, the State of Florida has

 2    been the epicenter of a notorious, well-documented

 3    epidemic of prescription drug abuse."  Do you see

 4    that?

 5        A.    I see that.

 6        Q.    When this came out in September of 2012,

 7    did you have that understanding?

 8        A.    No, I did not.

 9        Q.    Now, as you sit here today, do you have

10    an appreciation that the country is in the midst

11    of an opioid epidemic?

12        A.    I understand that the country is -- our

13    opioids use has gone up, and nationwide.

14        Q.    Well, do you also have an understanding

15    that -- that it's not referred to as an opioid

16    epidemic just because use has gone up; it's

17    referred to as an epidemic because of the impacts

18    it's having on people, correct?

19             MS. SWIFT:  Object to the form of the

20    question.

21        A.    I don't know.  I -- people will refer to

22    it different ways.

23        Q.    Okay.  Do you have an appreciation that

24    we're in the midst of an opioid epidemic?

25             MS. SWIFT:  Object to the form.  Vague.

```
 1      A.    Opioid use is, according to the media,
 2   increased.  I don't know where it is, you know,
 3   concentrated at.
 4      Q.    Okay.  Let's look at P-GEN-61.
 5                    -  -  -  -  -
 6             (Thereupon, Deposition Exhibit
 7             Walgreens-Diebert 14, Center For
 8             Disease Control Maps P-GEN-0061, was
 9             marked for purposes of
10             identification.)
11                    -  -  -  -  -
12      Q.    I'll mark this as Exhibit Number 14.
13             Are you familiar with the CDC?  You've
14   heard of the Center For Disease Control?
15      A.    Yes.
16      Q.    And if you look here, and I'll represent
17   to you what we're looking at here is a series of
18   maps, and if you look down at the bottom of the
19   first page, you'll see the source for these maps
20   is the Center For Disease Control; do you see
21   that?
22      A.    I do.
23      Q.    And if you go down for the citation,
24   you'll see that this is discussed -- excuse me --
25   under the source, you see that it's mortality
```

1   data, correct?

2        A.    Yes.

3        Q.    Do you know what mortality means?

4        A.    Yes, I do.

5        Q.    What does that mean?

6        A.    That means death.

7        Q.    Okay.  And if you look under the

8   suggested citation, do you see this comes from

9   drug poisoning mortality; do you see that?

10       A.    I do.

11       Q.    Okay.  So do you understand that this map

12  to be, and this first one that we're looking at

13  here has a date of 1999 on it, correct?

14       A.    Yes.

15       Q.    And to the right of the map, do you see

16  that there's a color-coded scale?

17       A.    Yes.

18       Q.    And do you recognize this to be a map

19  that is color-coded illustrating the rate of

20  deaths from drug overdoses across the United

21  States?

22            MS. SWIFT:  Objection.  Lacks foundation.

23       A.    I see that it is color-coordinated for

24  the amount of deaths per 1,000 in the US.

25       Q.    Okay.  If you -- if you look at the map,

1    you would agree with my characterization that here

2    in 1999 there's a lot of blue on the map?

3        A.    Yes.

4        Q.    Okay.  And if you look at the rates of

5    death, on the right-hand side the code, blue is

6    actually a better thing, correct?

7        A.    Yes.

8        Q.    That means less people are dying,

9    correct?

10       A.    Correct.  Yes.

11       Q.    Okay.  And flip through with me to the

12   next page.  Do you see there that what we see is

13   the map from -- go from 1999 to 2000; do you see

14   that?

15       A.    Yes.

16       Q.    Okay.  And flip with me up to 2003.  And

17   this would be the state of the map as far as these

18   statistics go from CDC when you began at

19   Walgreens; is that fair?

20            MS. SWIFT:  Object to the form.

21   Foundation.

22       A.    So, I'm sorry, say it one more time.

23   What was your question?

24       Q.    You started at Walgreens in 2003,

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    That's -- yes.

2    Q.    Okay.  So this would be the map from 2003

3    that -- illustrating statistics that we have from

4    the Center For Disease Control?

5         MS. SWIFT:  Objection.  Foundation.

6    Q.    Do you see that?

7         MS. SWIFT:  Foundation.

8    A.    From when I started at the DC, this is

9    indicative of that map, from what it shows.

10   Q.    Okay.  And I think that you said from

11   2003 until 2008 you were in the MPB role, correct?

12   A.    That's correct.

13   Q.    Okay.  And your primary job there was to

14   make sure that the orders were picked correctly,

15   and that they -- the truck drivers got the

16   paperwork that they needed, correct?

17   A.    Correct.  Yes.

18   Q.    And then it was in 2008 that you took

19   over as the SAIL coordinator where you had a

20   responsibility for Schedule III through V drugs,

21   correct?

22   A.    If we were still distributing at the

23   time.  I don't remember if we were, what dates we

24   were distributing that.

25   Q.    And as you flip from the map from 2003 to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    2004, do you notice that the map starts to

 2    lighten?

 3         A.    Yes.

 4         Q.    And what does that indicate as far as the

 5    number of drug overdose deaths?

 6               MS. SWIFT:  Objection.  Lacks foundation.

 7         A.    According to the graph, that the death

 8    rate is going up.

 9         Q.    When you then look at 2005, do you see

10    again that the map continues to lighten?

11         A.    Yes.

12         Q.    When you flip to 2006, do you see that

13    the map continues to lighten?

14         A.    Yes.

15         Q.    And, again, that indicates that according

16    to these statistics, more people are dying from

17    drug overdoses, correct?

18         A.    According to these rates, yes.

19         Q.    Okay.  And here, as we get into 2006, we

20    are actually starting to see a collection of red

21    in the right side of the country.  Do you see that

22    little cluster of red?

23         A.    I do.

24         Q.    And from looking at this, do you have an

25    understanding of generally where that is in the
```

1    country?

2        A.    I believe so.  Yes.

3        Q.    Where would that be?

4        A.    It looks like maybe Kentucky, West

5    Virginia area, possibly.  Tennessee.

6        Q.    Okay.  And so this area of the country

7    that includes West Virginia, Kentucky, Tennessee,

8    and then Ohio would be just north of that,

9    correct?

10       A.    Yes.

11       Q.    Okay.  And if you go to the next month in

12   2007, do you see that generally the map continues

13   to lighten, that that red cluster continues to

14   grow?

15       A.    It looks about the same to me.

16       Q.    Okay.  Let's go to 2008, when you become

17   the SAIL coordinator at the Walgreens distribution

18   center.

19            Do you see that we continue to see the

20   cluster of red areas within that area of states

21   that you talked about a minute ago?

22       A.    Yes.

23       Q.    Okay.  And red areas are -- according to

24   this graph, that would be bad, correct?

25            MS. SWIFT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    That means higher mortality rates.

2        Q.    That means more people are dying from

3   drug overdoses, correct?

4              MS. SWIFT:  Object to the form.

5   Foundation.

6        A.    According to this form, yes.

7        Q.    Okay.  And if you would just flip through

8   for me from 2009 to 2010, 2011 to 2012, to 2013,

9   2014, would you agree with me that as we flip

10  through the maps and the years as they progressed

11  that there was less and less blue and more and

12  more red?

13       A.    Yes.

14       Q.    If you would look at -- just look at the

15  2014 map, and compare it, if you would, to the

16  2008 map, when you started as the SAIL coordinator

17  with purview over Schedule III to V drugs, do you

18  see a difference between the two maps?

19       A.    I do.

20       Q.    What's the difference?

21       A.    That according to the map, the chart, the

22  mortality rate has gone up significantly in some

23  areas.

24       Q.    So from 2008 all the way through 2014,

25  you agree with me that the drug mortality rate
```

Highly Confidential - Subject to Further Confidentiality Review

1   across the country has greatly increased?

2          MS. SWIFT:  Object to the form.

3   Foundation.

4      A.    Yes.  According to the map, yes.

5      Q.    And one area in particular that the

6   overdose death rate has increased is in this same

7   area, in the Appalachia area of southern Ohio,

8   West Virginia, Kentucky, and Tennessee?

9          MS. SWIFT:  Object to the form.

10  Foundation.

11     Q.    Correct?

12     A.    I see the increase in the west coast as

13  well, drastically.

14     Q.    There's increases all over the country,

15  aren't there?

16     A.    Right.  But I wouldn't state myself

17  looking at this graph that it's concentrated just

18  in that area.

19     Q.    There's certainly a concentration there?

20     A.    There is a concentration there.

21     Q.    And there's certainly concentrations in

22  other places?

23     A.    Yes.

24     Q.    When you look at the rise of mortality

25  from drug overdoses from 2008 to 2014, do you

Highly Confidential - Subject to Further Confidentiality Review

1    understand why people would say that we're in the

2    midst of an opioid crisis, or an opioid epidemic?

3           MS. SWIFT:  Object to the form.

4    A.    Yes.

5    Q.    And why do you think people would say

6    that?

7    A.    Because of the increase in mortality

8    rate.

9    Q.    Do you understand that the drugs that

10   are -- or that a type of drug that is being used

11   and abused at a high level are opioids --

12          MS. SWIFT:  Object --

13   Q.    -- correct?

14          MS. SWIFT:  -- object to the form.

15   Foundation.

16   A.    I know that the media says that.  I don't

17   have any personal knowledge of that.

18   Q.    Would you consider the DEA to be a

19   reliable source on which drugs are abused or

20   misused?

21          MS. SWIFT:  Objection.  Foundation.

22   A.    I don't know.

23   Q.    Let me show you what I will mark as

24   Exhibit Number 15.

25                  -   -   -   -   -

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  (Thereupon, Deposition Exhibit

 2                  Walgreens-Diebert 15, Drug Fact

 3                  Sheet Hydrocodone P-GEN-0086, was

 4                  marked for purposes of

 5                  identification.)

 6                  -   -   -   -   -

 7            MS. SWIFT:  Before we start the next

 8     exhibit, I just noticed it's, like, 12:30.  How

 9     long have we been on the record?

10            THE VIDEOGRAPHER:  Three hours, 27

11     minutes.

12            MS. SWIFT:  I mean, this last chunk.

13            THE VIDEOGRAPHER:  An hour and 20.

14            MS. SWIFT:  Would this be a good time to

15     stop for lunch?

16          MR. GADDY:  That's fine with me.

17            THE VIDEOGRAPHER:  Going off the record

18     at 12:21 p.m.

19                  (Recess had.)

20            THE VIDEOGRAPHER:  We're back on the

21     record at 1:07 p.m.

22       Q.    Ms. Diebert, before we broke, we had

23     looked at the rate of drug mortality on the map

24     using the CDC's data.  Do you recall that?

25       A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then right before the break, I handed

2    you what I've marked as Exhibit 15.  Do you have

3    that document in front of you?

4    A.    I do.

5    Q.    Do you see at the top that says "drug

6    fact sheet hydrocodone"?  Do you see that?

7    A.    Yes.

8    Q.    Do you have an understanding of what a

9    hydrocodone combination product is?

10   A.    No.

11   Q.    I think I asked you earlier about drugs

12   like Lortab or Vicodin.  Have you heard of those

13   drugs?

14   A.    Yes.

15   Q.    Do you have an understanding that those

16   are Schedule III controlled substances, or were at

17   one time?

18   A.    No.

19   Q.    If they were Schedule III controlled

20   substances, they would have fallen within your

21   purview as the SAIL coordinator from 2008 until

22   the time that Walgreens stopped distributing

23   controlled substances, correct?

24   A.    That's correct.

25   Q.    If you'd flip to the second page of this

1    document, do you see the heading that says "legal

2    status in the US"?

3         A.    I do.

4         Q.    Okay.  And do you see it says,

5    "hydrocodone is a Schedule II narcotic that is

6    marketed in multi-ingredient Schedule III

7    products."  Do you see that?

8         A.    I do.

9         Q.    When -- if I was to reference drugs that

10   are combination products, such as part

11   hydrocodone, part acetaminophen, does that mean

12   anything to you?

13            MS. SWIFT:  Object to the form.

14        A.    No.

15        Q.    But you see here where this DEA fact

16   sheet indicates that hydrocodone is marketed in

17   multi-ingredient Schedule III products?

18        A.    Yes.  I see it says that.

19        Q.    And those Schedule III products would

20   have fallen within your purview as the SAIL

21   coordinator for the Perrysburg distribution

22   center, correct?

23            MS. SWIFT:  Object to the form.

24   Foundation.

25        A.    Yes.  While we were distributing, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Sure.  If you turn back to the first

2   page, do you see the very first sentence under

3   "overview"?

4        A.    Yes.

5        Q.    Do you see where I am?

6        A.    Uh-huh.

7        Q.    Do you see that it says -- excuse me --

8   "hydrocodone is the most frequently prescribed

9   opioid in the United States and is associated with

10  more drug abuse and diversion than any other licit

11  or illicit opioid."  Did I read that correctly?

12       A.    Yes.

13       Q.    Did you know that prior to just reading

14  it right now?

15             MS. SWIFT:  Object to the form.  Vague.

16       A.    No.

17       Q.    It continues to say, "it's an orally

18  active agent most frequently prescribed for the

19  treatment of moderate to moderately severe pain.

20  Its analgesic potency is similar to morphine."  Do

21  you see that?

22       A.    I see that.

23       Q.    It continues to say, "hydrocodone is an

24  antitussive," if I pronounced that right, "agent

25  with an efficacy similar to that of codeine."  It
```

1    goes on to say, "there are numerous brand and

2    generic hydrocodone products marketed in the

3    United States."  Do you see it says "all are

4    combination products"?  Do you see that?

5         A.    I see that.

6         Q.    And we looked at the second page where it

7    talked about the combination products are marketed

8    as Schedule III drugs, correct?

9         A.    Yes.

10             MS. SWIFT:  Object to the form.

11        Q.    Okay.  And those would have been drugs

12   that were within your purview as the SAIL

13   coordinator while Walgreens distributed Schedule

14   III drugs out of Perrysburg?

15             MS. SWIFT:  Objection.  Foundation.

16        A.    Yes.

17        Q.    It says, "the most frequently prescribed

18   combination is hydrocodone and acetaminophen.  For

19   example, Vicodin, Lorcet, and Lortab.  Other

20   examples of combination products include those

21   containing aspirin and ibuprofen, such as

22   Vicoprofen or antihistamines such as Hycomine."

23   Do you see that?

24        A.    I see that.

25        Q.    Did you have an understanding prior --

Highly Confidential - Subject to Further Confidentiality Review

1    excuse me -- to just reading this document that

2    the hydrocodone combination products that would

3    have been classified as Schedule III while

4    Walgreens was distributing controlled substances

5    were the most abused opioids?

6              MS. SWIFT:  Objection.  Foundation.

7    Vague.  Assumes facts.

8        A.    No.  I did not know that before you

9    reading this to me.

10       Q.    Did you know that the DEA indicated --

11   was indicating that hydrocodone combination

12   products were the most abused opioid?

13             MS. SWIFT:  Objection.  Foundation.

14   Vague as to time.

15       A.    No.  I'm not aware of that.

16       Q.    At any point in time while you were at

17   Walgreens as the SAIL coordinator with

18   responsibilities for Schedule III drugs did

19   anybody from the business side or the corporate

20   side, or from loss protection, or from the audit

21   department, ever tell you to do anything, to be on

22   the lookout for any suspicious orders of

23   hydrocodone combination products because of the

24   potential for abuse?

25             MS. SWIFT:  Objection.  Vague.  Compound.

1    A.   I was -- it was never a part of our

2    process to refer any type of suspicious orders.  I

3    don't know if there was a department at the DC

4    that did that for suspicious orders, but it was

5    not out of my department.

6    Q.   We looked at the map about -- excuse

7    me -- the increase in mortality over time from

8    drug overdose deaths.  Did anybody from Walgreens

9    ever provide you with any training or education on

10   the rate of overdoses or the rate of deaths

11   associated with controlled substances?

12        MS. SWIFT:  Object to the form.

13   A.   There was no need to educate me on that

14   for job purposes.

15   Q.   And I'm not asking you whether or not

16   there was any need.  I'm asking you whether or not

17   it was ever done?

18   A.   I did not ever see that kind of

19   information while I was at work, no.

20   Q.   Did anybody ever stress to you the

21   importance of maintaining controls over these

22   controlled substances because of the increase in

23   overdoses and increases of deaths that were

24   happening across the country and in the Appalachia

25   region?

1          MS. SWIFT:  Object to the form.

2    Compound.

3        A.    So the increase in deaths or opioid abuse

4    in general didn't affect our daily processing.

5    There wouldn't have been any need for me to be

6    aware of that, and it wouldn't have affected our

7    daily operation.

8        Q.    Well, whether you think there was a need

9    for it or not, it wasn't done, correct?

10         MS. SWIFT:  Object to the form.

11       A.    I was not informed of any information

12   pertaining to that.

13       Q.    Let's go back to the -- I think it's

14   Exhibit 15 -- 13.  Sorry.  Exhibit 13.  The

15   thick one.  Are you with me?

16       A.    Yes.

17       Q.    Okay.  And I think we were on page 29?

18       A.    Yes.

19       Q.    Okay.  And we had been on paragraph 2,

20   and I was asking about whether or not you had an

21   understanding of Florida being the epicenter of an

22   epidemic of prescription drug abuse, and I think

23   you told me you were not; is that correct?

24       A.    That's correct.  I was not.

25       Q.    Okay.  Have you ever become aware of

1    that?

2        A.    No.

3        Q.    It says, "in July of 2011, the Florida

4    Surgeon General declared a public health emergency

5    based on the prescription pill epidemic which

6    results in an average of seven overdose deaths a

7    day in Florida."  Do you see that?

8        A.    I see that.

9        Q.    Were you aware of that?

10       A.    I was not aware of that.

11       Q.    Nobody from Walgreens ever informed you

12   of that?

13       A.    I was never aware of that.

14       Q.    The controls that we talked about, or the

15   processes or procedures that you -- that we talked

16   about earlier as far as looking for these

17   excessive orders, or these fat finger type

18   ordering errors, as far as you know, was that a

19   process that was in place in all the distribution

20   centers?

21            MS. SWIFT:  Objection.  Foundation.

22       A.    I don't know what distribution centers

23   use that process or not.  I'm only aware of what

24   we used at our DC, and that was in place before I

25   became the SAIL coordinator.

1    Q.    Okay.  And so we know that it was in

2    place in Perrysburg, and then I think we looked at

3    some of the policies from Mt. Vernon, right?

4    A.    Yes.

5    Q.    Okay.  So we know that at least the other

6    distribution centers had some type of policy on

7    that, correct?

8    A.    Well, I know that Mt. Vernon did and

9    Perrysburg did.

10    Q.    Okay.  You would expect that all the

11    distribution centers would follow the same general

12    procedures in that regard?

13    A.    I would expect that they would have

14    something similar in place.

15            MS. ARENT:  Object to the form.

16    Q.    If you'd turn to the top of page 30 for

17    me, please.  And do you see at the top of that

18    page there's a chart that shows in the first

19    column store numbers and locations, and then in

20    the next three columns there are oxycodone

21    purchases by dosage unit in 2009, 2010 and 2011;

22    do you see that?

23    A.    I do.

24    Q.    And do you see for the first one there it

25    indicates a store number, and it says that that

1    store is located in Hudson, Florida?

2        A.    I do.

3        Q.    Okay.  And I think we can agree that that

4    would not be a store that Perrysburg would have

5    serviced; is that fair?

6        A.    I don't know if we would have serviced

7    them during those years.  I don't recall when we

8    started shipping the C-IIs.

9        Q.    Okay.  Well, if I was to represent to you

10   at this point in time, 2009, 2010, 2011, that

11   Perrysburg was not shipping C-IIs to Hudson,

12   Florida, you wouldn't have any issue with that,

13   would you?

14            MS. SWIFT:  Object to the form.

15       A.    Yes.  If -- yes.

16       Q.    Okay.  And do you see there in 2009 it

17   indicates that that Hudson, Florida store received

18   approximately 388,000 dosage units of oxycodone?

19            MS. SWIFT:  Object to the form.

20       A.    I do.

21       Q.    And then in 2010 it went up to

22   approximately 913,000 dosage units?

23       A.    Yes.

24       Q.    And that in 2011 it went up to

25   approximately 2.2 million dosage units of

1    oxycodone; do you see that?

2      A.    I do see that.

3      Q.    And you agree with me that over that

4    three-year span from '09 to '11, or from '09 to

5    two years later in 2011, that the amount of

6    oxycodone dosage units going into that particular

7    store increased approximately 500 percent?

8            MS. SWIFT:  Object to the form.

9      A.    That looks about average.

10     Q.    And if you look at the second entry there

11   for Ft. Myers, Florida, do you see that in 2009

12   the DEA is indicating here in this order to show

13   cause that that store received about 95,000 units

14   of oxycodone that year; do you see that?

15     A.    Yes.

16     Q.    And that in 2010 the number of oxycodone

17   units for that store went up to 496,000 units?

18     A.    Yes.

19     Q.    And that in 2011 the number of units to

20   that store went up to approximately 2.1 million

21   dosage units of oxycodone; do you see that?

22     A.    Yes, I do.

23     Q.    Again, rough math, and I'm not going to

24   hold you to it, but you agree it looks like that

25   increased about 2,000 percent?

```
 1              MS. SWIFT:  Object to the form.
 2        A.    It increased a lot.
 3        Q.    And if you look at the next one, Oviedo,
 4   Florida, about from 80,000 to 223,000 to 1.6
 5   million; do you see that?
 6        A.    Yes.
 7        Q.    About over 1,500 percent increase; do you
 8   agree with that?
 9              MS. SWIFT:  Object to the form.
10        A.    Yes.
11        Q.    At any point in time did anybody from
12   Walgreens, whether it's corporate, internal audit,
13   loss prevention, or anywhere else, come to you
14   within your role as the SAIL coordinator at the
15   distribution center and ask you to do anything to
16   be on the lookout for these types of increases in
17   the stores that Perrysburg serviced?
18              MS. SWIFT:  Object to the form.
19        A.    No.
20        Q.    At any point in time did anybody from
21   Walgreens, whether it's from corporate, from loss
22   prevention, internal audit, the Rx Integrity unit
23   that we've seen reference to, did anybody ever
24   come and tell you that, hey, we made some mistakes
25   in Florida, here's what we need to do to change
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and to learn from those mistakes?

 2              MS. SWIFT:  Object to the form.

 3       A.    No.  Nobody ever included me on any

 4   issues that may have existed in those stores.  I

 5   was not aware of them.

 6       Q.    Well, this isn't necessarily an issue in

 7   the stores.  Do you see this was an issue in a

 8   distribution center?

 9              MS. SWIFT:  Object to the form.

10       A.    It doesn't show that it was an issue with

11   the distribution center.  It just shows the

12   quantities that the stores were ordering.

13       Q.    Sure, sure.  That particular chart.  But

14   if you look at the order to show cause, you see

15   that it was given to the Jupiter distribution

16   center?

17              MS. SWIFT:  Object to the form.

18       Q.    Correct?  Do you recall we saw that?

19              MS. SWIFT:  Do you want her to read the

20   whole document, Jeff?  She said she's never seen

21   it before.

22       A.    I'm not familiar with it.

23       Q.    Okay.  Flip back to page 29 for me,

24   please.  Do you see paragraph 4?

25       A.    Yes, sir.
```

1    Q.    It says there, "since 2009, Walgreens'

2    Jupiter, Florida distribution center has been the

3    single largest distributor of oxycodone products

4    in Florida.  About the same time as the abuse of

5    prescription drugs became an epidemic in Florida,

6    Walgreens' Florida retail pharmacies supplied by

7    Respondent, Walgreens, commanded an increasingly

8    large percentage of the state's growing oxycodone

9    business."  Did I read that correctly?

10   A.    Yes.

11   Q.    It says, "in 2010, only three Walgreens

12   retail pharmacies were in the top 100 purchasers

13   of oxycodone within Florida.  In 2011, 38

14   Walgreens pharmacies made the top 100, and six

15   were in the top 10, and through May 2012, 44

16   Walgreens pharmacies are in the top 100 oxycodone

17   purchasers, all of them supplied by Respondent,

18   Walgreens."  Do you see that?

19   A.    Yes.

20   Q.    Okay.  And do you recognize in the first

21   sentence of that paragraph that it says the

22   Jupiter distribution center is the single largest

23   distributor of oxycodone in the State of Florida?

24   Do you see that?

25   A.    It does say that.

1     Q.    Did anybody at any time from any of these

2    Walgreens departments that we've talked about

3    today ever come to you and talk to you about

4    issues that the DEA was alleging existed in the

5    Jupiter distribution center, and talk to you about

6    how you could make sure that those same problems

7    did not happen in Perrysburg?

8          MS. SWIFT:  Object to the form.  Assumes

9    facts.  Compound.

10    A.    No.  No one ever included me on anything

11    that was happening at the Jupiter, Florida DC.

12    Q.    Okay.  Let's go back to the first

13    document, which is the settlement agreement.  And

14    we looked at this before the break, just so we get

15    our bearings back, if you would look at page 11

16    for me, please.

17    A.    I'm there.

18    Q.    Do you see this was signed in June 2013?

19    A.    Yes, sir.

20    Q.    Okay.  And if you'd flip back, I want to

21    look at page 7 of 349.

22    A.    Okay.

23    Q.    Do you see at the top of the page it says

24    "Walgreens obligations"?

25    A.    Yes.

 1    Q.    And do you see paragraph C underneath

 2    there?

 3    A.    Yes, sir.

 4    Q.    And it says, "Walgreens agrees to pay the

 5    United States $80 million within 10 days of the

 6    effective date of this agreement."  Do you see

 7    that?

 8    A.    I do see that.

 9    Q.    Prior to reading that right here today,

10    did you have any understanding that Walgreens paid

11    an $80 million settlement to the DEA?

12    A.    I was not aware of that.

13    Q.    Would you agree with me that $80 million

14    is a substantial sum of money?

15    A.    It sounds like a lot of money to me.

16    Q.    Do you recall receiving any communication

17    from anybody at Walgreens regarding this action?

18    A.    No.  I never received any communication

19    on this.

20    Q.    And Jupiter was only one of two other

21    distribution centers that Walgreens had that dealt

22    with Schedule II drugs, correct?

23    A.    That's correct.

24    Q.    If you'd turn to page 14 of 349 -- page

25    14.  Do you see at the top of the page it says

Highly Confidential - Subject to Further Confidentiality Review

1    that this is the -- an addendum?

2         A.    Yes.

3         Q.    And it says just under that, "the parties

4    agree that Walgreens will maintain the following

5    specific compliance measures for the duration of

6    this agreement."  Do you see that?

7         A.    I see that.

8         Q.    And then under A-1 it says, "Walgreens

9    will maintain a department of pharmaceutical

10   integrity and post a personnel with primary" --

11   excuse me -- "with pharmacy-related training and

12   managerial personnel who shall be trained in

13   relevant diversion-related issues to coordinate

14   compliance efforts related to controlled

15   substances."  Do you see that?

16        A.    I do.

17        Q.    It goes on to say, "within one month of

18   the effective date of this agreement, Walgreens

19   will identify a dedicated contact point for DEA

20   within the department of pharmaceutical integrity

21   to facilitate Walgreens' responses to DEA requests

22   for information and documents."  Do you see that?

23        A.    I do.

24        Q.    Do you know whether or not you were ever

25   provided any education or training under this

1    provision of the addendum of the settlement

2    agreement?

3        A.    I don't recall ever having any training

4    under this.

5        Q.    Do you recall ever receiving any training

6    in diversion-related issues at all?

7             MS. SWIFT:  Object to the form.  Vague.

8        A.    I -- I don't recall ever receiving any

9    training for diversion issues at all either.

10       Q.    I'll show you what I'll mark as Exhibit

11   16.  This is P-WAG-225.

12                    -  -  -  -  -

13             (Thereupon, Deposition Exhibit

14             Walgreens-Diebert 16, June 19, 2013

15             E-mail WAGMDL00316771 - 00316785,

16             was marked for purposes of

17             identification.)

18                    -  -  -  -  -

19       Q.    And do you see at the top of the page

20   this is an e-mail from Tasha Polster sent on June

21   19, 2013?

22       A.    Yes.

23       Q.    And so this is about -- if you need to

24   look back, you can -- but about a week after the

25   settlement agreement was signed.  Do you agree

1    with that?

2         A.    Yes.

3         Q.    And the subject is "Rx Integrity team and

4    DEA agreement action required."  Do you see that?

5         A.    Yes.

6         Q.    And down below there we see the original

7    e-mail from Ms. Polster; do you see that?

8         A.    I do.

9         Q.    Do you know who Ms. Polster is?

10        A.    I do not.

11        Q.    Have you ever had any interaction with

12   her at all?

13        A.    No.  I don't remember her name.

14        Q.    And you're currently the C2 manager at

15   Perrysburg, correct?

16        A.    Yes.

17        Q.    You don't know Ms. Polster, you never had

18   any interaction with her?

19        A.    Not that I recall, no.

20        Q.    Do you have any interaction at all with

21   the Rx Integrity team?

22        A.    I do.

23        Q.    Who do you interact with on that team?

24        A.    Just the group.  If we have -- if stores

25   have questions about any of their orders, or why

```
1   they're not getting them from ABC, we refer them

2   to Rx Integrity, and they assist them.

3       Q.    Is that the extent of your involvement

4   with Rx Integrity?

5       A.    They'll ask us if we can change schedules

6   sometimes, which don't affect orders, just the day

7   of the orders.  That's about the extent of it,

8   though.

9       Q.    Okay.  So would it be fair to say that if

10  stores are having issues with the orders they're

11  receiving, or maybe not receiving from ABC, that

12  you will liaison between the store and Rx

13  Integrity to help them get the issue resolved?

14          MS. SWIFT:  Object to the form.

15          MS. SCHUCHARDT:  Object to the form.

16      A.    I will put them in contact -- I will tell

17  them to contact Rx Integrity or ABC.  I don't

18  actually get involved.

19      Q.    Okay.  If we go down to the e-mail below

20  to the body of that e-mail, she says, "Hello.  For

21  those of you who don't know me, I'd like to

22  introduce myself and my team.  My name is Tasha

23  Polster.  I'm the director of pharmaceutical

24  integrity."  Do you see that?

25      A.    I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Okay.  And I don't believe you're
 2   included on this e-mail, but about in the middle
 3   of the block there, do you see Ms. Bish?
 4       A.    Yes.
 5       Q.    And then also Tammy Trumbull?
 6       A.    Yes.
 7       Q.    Who is also Tammy Hensley?
 8       A.    Yes.
 9       Q.    And those are folks at Perrysburg,
10   correct?
11       A.    That's correct.
12       Q.    Anybody else on this e-mail that's from
13   Perrysburg?
14             MS. SWIFT:  Objection.  Foundation.
15       A.    I don't believe so.
16       Q.    Okay.  She goes on to say -- I'm going to
17   skip the next sentence, but in the one after that,
18   she says, "the overview document provides a brief
19   description of what my team does and the names and
20   contact information for each of my managers by
21   division.  Feel free to reach out to any of us."
22   Do you see that?
23       A.    I do.
24       Q.    She then goes on to say that "the DC
25   controlled substance contact personnel spreadsheet
```

Highly Confidential - Subject to Further Confidentiality Review

1    has names that Sue gave me of who is responsible

2    for reading the DC suspicious order monitoring

3    policy and procedure.  I need documentation of one

4    person in each DC, some of which I've already

5    gotten back."  Do you see that?

6         A.    I see it says that, yes.

7         Q.    Are you aware of any suspicious order

8    monitoring policy and procedure that is available

9    to you within the distribution center?

10             MS. SWIFT:  Object to the form.

11        A.    I am not -- I am not aware of any

12   suspicious order monitoring from the distribution

13   center.

14        Q.    And you certainly haven't reviewed any

15   suspicious order monitoring policy or procedure,

16   correct?

17             MS. SWIFT:  Object to the form.

18   Foundation.  Calls for speculation.

19        A.    I am not aware of what the suspicious

20   ordering process is or who does it.

21        Q.    Then in the last paragraph, do you see

22   she writes, "it's been a long year-and-a-half

23   getting this DEA settlement in place."  Do you see

24   that?

25        A.    I do.

1    Q.    Okay.  So if this was -- e-mail was sent

2    in June of 2013, that would indicate that this has

3    been in the works going back to early 2012; would

4    that be fair?

5             MS. SWIFT:  Objection.  Foundation.

6    A.    Yes.

7    Q.    She says, "we want to ensure we have

8    proper documentation and accountability for this

9    compliance piece."  Do you see that?

10   A.    I do.

11   Q.    If you'd turn with me in this document to

12   Bates ending 776.

13   A.    Okay.

14   Q.    Do you see this -- I think we looked at

15   this shortly before the break.  Do you recognize

16   this suspicious order monitoring program policy

17   and procedure?

18   A.    Not before today.

19   Q.    Okay.  Do you recall we looked at it a

20   little bit earlier?

21   A.    Yes.

22   Q.    Okay.  And so this was attached there

23   also.  I think -- I can't remember if I asked you

24   this or not, so I'm sorry if I did.  But do you

25   see there in the middle of the page there's a

Highly Confidential - Subject to Further Confidentiality Review

1    bolded section that talks about the ceiling limit?

2        A.    Yes.

3        Q.    And I think you told us that that was a

4    term that you had heard of, but you didn't really

5    have any involvement in setting it or manipulating

6    it, correct?

7        A.    That is correct.

8        Q.    And then same thing at the bottom of the

9    page where it talks about tolerance limits, I

10    think you'd heard that phrase but didn't have any

11    involvement with setting it or manipulating it,

12    correct?

13        A.    I have not heard the tolerance limits

14    phrase before, and I don't have any knowledge of

15    it.  Ceiling limits I have heard of.  But, again,

16    I don't have any dealing with that.

17        Q.    Okay.  I'll show you what I'll mark as

18    Exhibit 17.

19                    -  -  -  -  -

20            (Thereupon, Deposition Exhibit

21            Walgreens-Diebert 17, Suspicious

22            Order Report WAGMDL00674562 -

23            00674575, was marked for purposes of

24            identification.)

25                    -  -  -  -  -

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'll ask you if you've ever seen those

2    reports before.  Do you see at the top of the page

3    this says -- the top right-hand corner, it's got a

4    date of August 18, 2010; do you see that?

5    A.    Yes.

6    Q.    And just below that it says "suspicious

7    order."  Do you see that?

8    A.    Yes.

9    Q.    And then it has some information in the

10   top of the page as far as the store number and

11   drug number.  Do you see for the item description

12   it says "hydromorphone"?

13   A.    I do see that.

14   Q.    And then down at the very bottom of the

15   page it gives a reason code for why this was a

16   suspicious order, and it says "T, exceeds

17   tolerance limit."  Do you see that?

18   A.    I do see that.

19   Q.    Okay.  First of all, let me ask you; have

20   you ever seen a report like this before?

21   A.    I have not.

22   Q.    Have you ever heard of suspicious order

23   reports that were generated such as this based on

24   things like tolerance?

25        MS. SWIFT:  Object to the extent it

1    mischaracterizes the document.

2        A.    I have not heard of any documents

3    generated from suspicious order reports.

4        Q.    And if you don't mind flipping through

5    the document a little bit, for the most part the

6    reports are the same, but there's a couple of

7    different reports included in here with different

8    titles at the top.  Some are "order item detail,"

9    some are "loss prevention."  Just tell me whether

10   you recognize any of these.

11       A.    I have not seen any of these forms

12   before.  I'm not familiar with any of them.

13       Q.    Okay.  Flip with me, please, to page 32.

14   Yeah, Exhibit 13.  Thank you.  I'm sorry.

15             MS. SWIFT:  What page did you say, Jeff?

16             MR. GADDY:  32.

17       Q.    And do you see paragraph 12 there?

18       A.    I do.

19       Q.    Okay.  And we're back in the order to

20   show cause that was issued to the Jupiter

21   distribution center.  And it says, "Respondent,"

22   meaning Walgreens, "employee with overall

23   responsibility for C-II drug operations, the C2

24   function manager raised questions within the

25   corporation about what she correctly identified as

1    unusually large orders for Schedule II narcotics

2    placed regularly by several customer pharmacies."

3    Do you see that?

4        A.    I do see that.

5        Q.    Okay.  And when you were at Perrysburg in

6    this time frame, this is, I think, September of

7    2012, I think you told us Deb Bish was the C2

8    function manager at Perrysburg; is that correct?

9        A.    That is correct.

10       Q.    It says, "based on the evidence available

11   to DEA, none of these orders were reported to DEA

12   as suspicious, and all appear to have been shipped

13   without any further due diligence to verify their

14   legitimacy."  Do you see that?

15       A.    I see that it says that.

16       Q.    If you read in paragraph A, it says, "in

17   January of 2011, Jupiter's C2 function manager

18   expressed concern about the enormous volume of 30

19   milligram oxycodone being ordered by three

20   stores," and it gives the stores numbers.  It

21   says, "concluding in an e-mail to the manager of

22   Rx inventory drug stores at Walgreens' corporate

23   headquarters in Deerfield, Illinois, that she felt

24   the stores needed to justify the large quantity."

25   Do you see that?

1    A.    I do see that.

2    Q.    It goes on to say, "with regard to one

3    particular store in Port Ritchie, she noted that

4    Walgreens shipped the store 3,271 bottles of

5    100-count 30 milligram oxycodone in the 40-day

6    period from December 1, 2010 to January 10, 2011,

7    causing her to question how they could even house

8    this many bottles.  She then inquired of the same

9    corporate manager how do we go about checking the

10   validity of those orders."  Do you see that?

11   A.    I do see that.

12   Q.    Prior to looking at this and reading it

13   just now, did you know that some of the questions

14   that had been raised by the C2 manager in the

15   Jupiter distribution center had been included in

16   this order to show cause and the DEA investigation

17   into the -- into the distribution center?

18   A.    I was not aware of that.

19   Q.    And at no time did anybody from Walgreens

20   ever come and tell you that -- particularly now

21   that you're the C2 manager -- that you needed to

22   be on the lookout for things like this?

23        MS. SWIFT:  Object to the form.

24   A.    I became C2 manager after we stopped

25   distributing, so this wouldn't have affected what

1    we do now.

2        Q.    Okay.  Well, regardless of whether or not

3    you think it would or would not affect it; when

4    you became C2 manager, you weren't ever asked to

5    be on the lookout for things like this that this

6    particular C2 manager was raising questions about?

7            MS. SWIFT:  Object to the form.  Vague.

8        A.    I was not approached and asked to keep on

9    the lookout for that, as we don't check for the

10   orders now that we process them electronically.

11       Q.    You just get the orders and sign the

12   4,000 orders on a daily basis and get them to ABC?

13           MS. SWIFT:  Object to the form.

14       A.    That's what the C2 signers do now, and

15   what I manage.

16       Q.    Now, Jupiter was not the only

17   distribution center to be investigated by the DEA,

18   correct?

19           MS. SWIFT:  Object to the form.

20       A.    I don't have any knowledge of who was

21   investigated by the DEA, if or when.

22       Q.    Did the DEA come to the Perrysburg

23   distribution center?

24           MS. SWIFT:  Object to the form.  Vague.

25       A.    I was not included with it.  I know that

Highly Confidential - Subject to Further Confidentiality Review

1    the DEA did come to the Perrysburg distribution

2    center, but I don't know in what capacity.

3        Q.    Okay.  Let me show you what I'll mark as

4    Exhibit 18.

5                     -  -  -  -  -

6              (Thereupon, Deposition Exhibit

7              Walgreens-Diebert 18, Administrative

8              Inspection Warrant WAGMDL00493697 -

9              00493700, was marked for purposes of

10             identification.)

11                    -  -  -  -  -

12       Q.    This is P-WAG-15.

13             Do you see at the top of this document it

14   says, "in the United States District Court for the

15   Northern District of Ohio, Western Division, in

16   the matter of the administrative inspection of

17   Walgreens Corporation;" do you see that?

18       A.    I do see that.

19       Q.    And what address is given there?

20       A.    For Walgreens, it's our address in

21   Perrysburg.

22       Q.    Okay.  That's the Perrysburg distribution

23   center?

24       A.    It is.

25       Q.    And do you see on the right side of the

```
 1   page that it has the name of a magistrate, and

 2   then it says "administrative inspection warrant."

 3   Do you see that?

 4       A.    I do.

 5       Q.    Flip to the last page, if you don't mind,

 6   please.  Do you see it says February 5, 2013 is

 7   the date?

 8       A.    Yes.

 9       Q.    Okay.  So this would be a couple months

10   after that order to show cause was issued to

11   Jupiter, and a couple months before the settlement

12   agreement was signed?

13          MS. SWIFT:  Object to the form.

14       Q.    Do you agree with that?

15          MS. SWIFT:  Foundation.

16       A.    Based on what those forms say, yes.

17       Q.    Okay.  So if you go to the last page, do

18   you see the date is February 5, 2013?  And we

19   agree that's between the time of the order to show

20   cause that was issued to Jupiter and the time in

21   which Walgreens signed the settlement with the

22   DEA, correct, Ms. Diebert?

23          MS. SWIFT:  Object to the form.

24       A.    Yes.

25       Q.    And if we go back to the first page of
```

1    the document, we see that this is the -- the top

2    right-hand side of the page, this is an

3    administrative inspection warrant?

4        A.    Yes.

5        Q.    And it says in the body, it says, "to

6    Wayne Groves, diversion investigator, and any

7    other authorized diversion investigator or special

8    agent of the Drug Enforcement Administration of

9    the US Department of Justice."  It goes on to say,

10   "application having been made and probable cause,

11   as defined in certain statutes and regulations

12   having been shown by the affidavit of Wayne Groves

13   for an inspection of the controlled premises of

14   Walgreens Corporation in Perrysburg, Ohio, it

15   appears that such inspection is appropriate under

16   21 USC Section 880."  Do you see that?

17       A.    I see that.

18       Q.    Have you ever seen this warrant before?

19       A.    I have not.

20       Q.    Then it goes on to say, "therefore," in

21   paragraph 2, "pursuant to the provisions of 21 USC

22   Section 880, you are hereby authorized to enter

23   the above-described premises within business hours

24   for the following purposes."  Do you see that?

25       A.    Yes.

1    Q.    And under paragraph A it says, "to

2    inspect and copy records, reports, files, official

3    order forms, and other documents required to be

4    made, kept, and maintained under the provisions of

5    the Controlled Substance Act."  Do you see that?

6    A.    I see that.

7    Q.    And there's several other items listed

8    there.  But if you turn to the back page with me

9    to page 4, do you see under A at the top of the

10   page it also "authorizes the inspection of all

11   other records which refer to or relate to the

12   distribution of controlled substances, and all

13   records pertaining to the filing of suspicious

14   order reports with the local Field Division Office

15   of DEA."  Do you see that?

16   A.    I do see that.

17   Q.    It says, "as well as a records pertaining

18   to a distributor maintaining effective controls

19   against diversion pursuant to 21 USC Section 823

20   from February 1, '11 through February 5, '13."  Do

21   you see that?

22   A.    I see that.

23   Q.    Were you made aware of what the DEA was

24   there to do and look for when they came to the

25   Perrysburg distribution center in February of

1    2013?

2        A.    I was not made aware of any DEA

3    inspection.

4        Q.    How did you know that it occurred?

5        A.    Rumors from team members.

6        Q.    Did anybody from the business side ever

7    give you any information about why the DEA came to

8    the Perrysburg distribution center with a warrant

9    and the subpoenas?

10            MS. SWIFT:  Object to the form.  Vague.

11       A.    No.  I was never informed of why the DEA

12   may have been there.

13       Q.    Did Deb Bish or anybody else within the

14   distribution center give you any information about

15   why DEA came to Perrysburg?

16            MS. SWIFT:  Objection.  Asked and

17   answered.

18       A.    No.  No one gave me any information as to

19   why the DEA was there, or may have been there.

20       Q.    Did you have any involvement with

21   responding to any of the warrants or the subpoenas

22   that the DEA served?

23            MS. SWIFT:  Object to the form.  Vague.

24       A.    I was not asked for any information for

25   any DEA visits.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'll show you what I'll mark as Exhibit

2    19.  It's P-WAG-2604.

3                      -  -  -  -  -

4                 (Thereupon, Deposition Exhibit

5                 Walgreens-Diebert 19, February 8,

6                 2013 E-mail WAGMDL00698433 -

7                 00698434, was marked for purposes of

8                 identification.)

9                      -  -  -  -  -

10   Q.    Do you see at the top of the page this is

11   an e-mail from a Jamie Whited on February 8, 2013?

12   A.    Yes.  I see that.

13   Q.    And that he is forwarding in an e-mail

14   from below that was sent on February 7, 2013; do

15   you see that?

16   A.    Yes, I do.

17   Q.    And so this looks like this was sent to,

18   again, some group e-mail accounts; do you see

19   that?

20   A.    Yes.

21   Q.    Do you recognize the recipients of those

22   group e-mail accounts?

23   A.    No, I don't.

24   Q.    It says, "District and market leaders.

25   On Wednesday, February 6th, the DEA inspected the

Highly Confidential - Subject to Further Confidentiality Review

1    Perrysburg distribution center in Ohio and

2    requested records pertaining to controlled

3    substances."  Do you see that?

4        A.    I do see that.

5        Q.    And so it looks like -- we saw the

6    warrant was dated on the 5th, this e-mail is on

7    the 7th.  It looks like DEA actually came into the

8    distribution center on February 6th, according to

9    this document; do you see that?

10       A.    I do see that.

11       Q.    Okay.  Were you working when the DEA came

12   into the facility?

13             MS. SWIFT:  Object to the form.

14   Foundation.

15       A.    I don't know what time the DEA came in.

16   I'm not sure if I was working at the time or not.

17       Q.    Do you recall seeing them come in?

18       A.    I did not personally see anybody when the

19   DEA got there.

20       Q.    Do you remember how you found out that

21   the DEA was there?

22       A.    Like I said, rumors from team members.

23       Q.    Did you find out while they were there,

24   or did you find out after the fact?

25       A.    I don't know.

```
1     Q.    Okay.  Then it goes on to say, "for your
2   reference, the following COMPASS communication
3   will be provided to your stores today."  Do you
4   see that?
5     A.    I do see that.
6     Q.    Okay.  And the COMPASS communication
7   starts out with providing the same information,
8   that the day before DEA had inspected the
9   Perrysburg distribution center; do you see that?
10    A.    I do see that.
11    Q.    And then if you skip down, it says, "the
12  procedures below provide a brief overview of steps
13  to take in the event you receive a warrant at your
14  location."  Do you see that?
15    A.    I do.
16    Q.    And it indicated that this was a
17  communication that was going out to the stores and
18  the pharmacy managers, correct?
19    A.    Yes.
20    Q.    And in the first bullet point, it says,
21  "ask DEA agents for identification and the purpose
22  for their visit and allow agents immediate access
23  to the pharmacy department and direct them to the
24  requested records."  Do you see that?
25    A.    I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It goes on to say that "district and

2    pharmacy team members are not required to answer

3    any questions."  Do you see that?

4    A.    I do see that.

5    Q.    And "not required" is underlined,

6    correct?

7    A.    That's correct.

8    Q.    It says, "you're not required to answer

9    any questions, participate in interviews, or

10    provide written statements to the DEA

11    investigators."  Do you see that?

12    A.    I do see that.

13    Q.    It goes on to say, "participating in

14    these requests may potentially expose the company

15    and the individual team member to liability."  Do

16    you see that?

17    A.    I do see that.

18    Q.    Did anyone at Walgreens, whether it's in

19    the distribution center, whether it's the

20    corporate side, the loss prevention folks, audit

21    folks, ever advise you to not speak with any of

22    the DEA investigators?

23    A.    I was never given any instruction at all

24    in regards to the DEA.

25    Q.    Do you know what information that you

1  would have had, or that any of these store or

2  pharmacy managers would have had that would have

3  exposed Walgreens to liability?

4       MS. SWIFT:  Objection.  Foundation.

5  Calls for a legal conclusion.

6    A.    Nobody ever instructed me one way or the

7  other, and I didn't know what kind of

8  communication went out to the stores.

9    Q.    Do you know what information the stores

10  had that Walgreens was concerned might expose them

11  to liability?

12       MS. SWIFT:  Same objections.

13    A.    I am not aware of any information for the

14  stores.

15    Q.    Do you have any understanding as to why

16  Walgreens is telling the store and pharmacy

17  managers that if they talked to the DEA they might

18  be subject to liability?

19       MS. SWIFT:  Objection.  Foundation.

20    A.    I am not aware of that.

21    Q.    Did anybody at Walgreens ever tell you

22  that if you talked to the DEA you might personally

23  be subject to liability that's -- as is indicated

24  here?

25    A.    I don't recall ever being spoken to by

1    anybody about any DEA research or investigation.

2        Q.    But it looks like this communication went

3    out to the -- to the stores the day after the DEA

4    came in, correct?

5            MS. SWIFT:  Objection.  The document

6    speaks for itself.  Foundation.

7        A.    It looks like it may have in a COMPASS

8    message.

9        Q.    I'll show you P-WAG-1361, which I'll mark

10   as Exhibit 20.

11               -   -   -   -   -

12               (Thereupon, Deposition Exhibit

13               Walgreens-Diebert 20, E-mail

14               WAGMDL00303243 - 00303245, was

15               marked for purposes of

16               identification.)

17               -   -   -   -   -

18       Q.    Do you see here at the top of the page

19   this is an e-mail from Barb Martin in February

20   2013?

21       A.    I do see that.

22       Q.    Do you know who Ms. Martin is?

23       A.    She works for Rx Integrity or Inventory

24   at corporate.

25       Q.    Do you have any understanding for what

1    she does in her role?

2        A.    No, I don't.

3        Q.    And it looks like this e-mail was going

4    to Patty Daugherty.  Do you know who that is?

5        A.    I have seen her name, but I don't know

6    what capacity she works for for Walgreens.

7        Q.    And the subject of this was "draft

8    communication."  Do you see that?

9        A.    I do see that.

10       Q.    And, again, this communication in

11   February of 2013, this is going to be

12   approximately five months after the order to show

13   cause was issued to the Jupiter distribution

14   center; do you see that?

15       A.    Yes.

16       Q.    It says, "per my voicemail, here are

17   copies of my draft communication to go to the

18   stores serviced by Perrysburg to be sent out if

19   Perrysburg has to close."  Do you see that?

20       A.    I see that.

21       Q.    Do you recall that after the DEA came in

22   in early February 2013 that there was concern that

23   the Perrysburg distribution center was going to

24   get shut down?

25       A.    I don't recall what the concern was at

1    that time when the DEA came for a visit.

2        Q.    But it looks like there was enough

3    concern that there was a potential communication

4    drafted; do you see that?

5            MS. SWIFT:  Objection.  Foundation.

6        A.    I see that there was a communication that

7    they wanted to draft.  I don't know the extent of

8    the concern.

9        Q.    Okay.  Look at the next page.  Do you see

10   the draft communication?  It says, "beginning the

11   week of February 18, 2013, stores that have been

12   receiving their Schedule II controlled substance

13   orders from the Walgreens distribution center in

14   Perrysburg, Ohio will now have their orders

15   shipped from the local Cardinal center."  Do you

16   see that?

17       A.    I do see that.

18       Q.    And do you know whether or not this is

19   the procedure that actually ended up going in

20   place?

21           MS. SWIFT:  Objection.  Foundation.

22           MS. ARENT:  Objection to form.

23       A.    I'm not aware of any.

24       Q.    Do you recall any communication given to

25   you in your role as the SAIL coordinator, because

Highly Confidential - Subject to Further Confidentiality Review

1    in this time -- and you're still the SAIL

2    coordinator for III to Vs at this time period,

3    correct?

4        A.    I don't recall when we stopped

5    distributing them.  If we were still distributing

6    them, then yes, I was.

7        Q.    Do you recall any communication given to

8    you as the SAIL coordinator for Schedule III to V

9    controlled substances that there was concern that

10   the DEA might shut down the distribution center?

11       A.    No.  I don't remember any such

12   communication.

13       Q.    Okay.  I'll show you what I'll mark as

14   Exhibit Number 21.  It's going to be P-WAG-2055.

15                        -  -  -  -  -

16            (Thereupon, Deposition Exhibit

17            Walgreens-Diebert 21, February 18,

18            2013 E-mail WAGMDL00524429 -

19            00524429, was marked for purposes of

20            identification.)

21                        -  -  -  -  -

22       Q.    Do you see this is an e-mail from

23   February 18, 2013?

24       A.    Yes.

25       Q.    And do you see that the subject line of

1    that e-mail is "Perrysburg plan week of February

2    18th"?

3        A.    Yes.

4        Q.    And there's a couple of headings there,

5    and the first heading is for C2.  Do you see that?

6        A.    I do see that.

7        Q.    And it says there, "Perrysburg will

8    continue to pick what they can until the DEA comes

9    and shuts them down."  Do you see that?

10       A.    I do see that.

11       Q.    And when it says "Perrysburg will

12   continue to pick what they can," in distribution

13   center parlance, what does that mean?

14           MS. SWIFT:  Object to the form.

15   Foundation.

16       A.    To my knowledge, for a distribution

17   center, that means that they will fill the orders

18   that they get and process.

19       Q.    Okay.  So it's indicating that Perrysburg

20   will continue to fill the orders they can until

21   the DEA comes in and shuts them down?

22           MS. SWIFT:  Object to the form.

23   Foundation.

24       A.    To my knowledge, and according to what

25   that says.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  The next heading there is for

2    C-III through C-V.  Do you see that?

3    A.    I do see that.

4    Q.    And in the first bullet point it says,

5    "Perrysburg will make all the quantity

6    unavailable."  Do you see that?

7    A.    I do see that.

8    Q.    And is that consistent with your

9    recollection that at some point in time after the

10   DEA came into Perrysburg, that you stopped --

11   excuse me -- the Perrysburg distribution center

12   stopped distributing C-III through C-V drugs?

13           MS. SWIFT:  Object to the form.

14   Foundation.

15   A.    I don't remember when we stopped filling

16   C-III through V distribution orders.

17   Q.    If you go to the next bullet point, do

18   you see it says, "for orders today, 2/18, through

19   ISE" -- do you know what "ISE" means?

20   A.    No.

21   Q.    It says, "for orders today, 2/18," it

22   says, "ISE and Perrysburg team will follow the

23   same process that we followed over the weekend to

24   manually redirect orders to Mt. Vernon, Lehigh and

25   Windsor."  Do you see that?

```
 1        A.    I do see that.

 2        Q.    Okay.  And those are three other

 3   distribution centers, correct?

 4        A.    That's correct.

 5        Q.    And those three distribution centers do

 6   distribute C-III through C-V drugs, correct?

 7              MS. SWIFT:  Object to the form.  Vague.

 8        A.    I -- I don't know if they were

 9   distributing C-III through Vs at that time or not.

10        Q.    Okay.  Well, regardless, what this bullet

11   point is -- you understand this bullet point to be

12   indicating that C-III through C-V orders that were

13   received by Perrysburg would be manually forwarded

14   to other distribution centers?

15              MS. SWIFT:  Object to the form.

16   Foundation.

17        A.    I do see that it says that.

18        Q.    Okay.  You then see in the next bullet

19   point it says, "ISE is making a program change to

20   redirect C3-5 orders based on the patterns

21   regardless of available quantity in Perrysburg."

22   Do you see that?

23        A.    Yes.  I see it says that.

24        Q.    From looking at this document that's

25   dated February 18, 2013, do you understand it to
```

Highly Confidential - Subject to Further Confidentiality Review

1   be indicating that Perrysburg is in the process of

2   winding down their distribution of C-III to C-V

3   products?

4           MS. SWIFT:  Objection.  Foundation.

5       A.   I see that it says that the orders are

6   going to be redirected until Perrysburg shuts down

7   based on what the DEA says.

8       Q.   So that would indicate to you that up

9   until -- up until this point, Perrysburg was

10  receiving and processing C-III to C-V orders?

11          MS. SWIFT:  Object to the form.

12  Foundation.  The document says what it says.

13      A.   I see that it says that.

14      Q.   Okay.

15      A.   It indicates that we were still shipping

16  those at the time, yes.

17      Q.   I mean, after you shopped shipping those,

18  you didn't get the orders in anymore, did you?

19          MS. SWIFT:  Object to the form.

20      A.   I couldn't verify if we still got orders

21  or not, or if they were redirected to the other

22  DCs.

23      Q.   Okay.  I'll show you what I'll mark as

24  Exhibit 22.

25                  -  -  -  -  -

```
 1                  (Thereupon, Deposition Exhibit

 2                  Walgreens-Diebert 22, March 22, 2013

 3                  E-mail WAGMDL00358555 - 00358557,

 4                  was marked for purposes of

 5                  identification.)

 6                        -  -  -  -  -

 7      Q.      This is P-WAG-2031.

 8              And do you see this as another e-mail

 9      from March 22, 2013, about a month after the last

10      one we looked at?

11      A.      Yes.

12      Q.      And the subject line is "Perrysburg CIII

13      through CV follow-up."  Do you see that?

14      A.      I do see that.

15      Q.      Okay.  And so let's do the C-III through

16      C-V first.  So go to the second page, please.  And

17      if you go down to the bottom of the page, do you

18      see the heading "CIII-CV"?

19      A.      I do.

20      Q.      Okay.  And I think what you'll see here

21      is it's kind of some rolling updates.  So what we

22      have is the original entry that we just looked at

23      in the last e-mail, and then below that you'll see

24      some updates that are made over time.  So we see

25      the same thing we looked at originally in the
```

1    first bullet point saying Perrysburg will make all

2    the quantity unavailable; do you see that?

3         A.    I do see that.

4         Q.    Okay.  Then if you look at the second --

5    just below there, you see it has an update for

6    2/20?

7         A.    Yes.

8         Q.    Okay.  And if you look at those bullet

9    points, do you see the third bullet point under

10   the 2/20 update, it says "all inventory will be

11   send to Mt. Vernon."  Do you see that?

12        A.    I do see that.

13        Q.    And does that indicate to you that the

14   inventory of C-III to C-V drugs is being removed

15   from the Perrysburg distribution center and sent

16   to the Mt. Vernon distribution center?

17             MS. SWIFT:  Object to the form.

18   Foundation.  The documents speaks for itself.

19        A.    That is what it says on the document.

20        Q.    And then if we look at the 2/22 update,

21   do you see that it says in the first bullet point,

22   "all 3 to 5 transfers have been sent to Mt. Vernon

23   as of Thursday, 2/21, with the exception of one to

24   two cases."  Do you see that?

25        A.    I do see that.

1    Q.    It goes on to say, "the transfers will be

2    received by Mt. Vernon by the end of the week."

3    Do you see that?

4    A.    I do see that.

5    Q.    Did you have any involvement in the

6    transferring of the 3 to 5 inventory from

7    Perrysburg to Mt. Vernon?

8    A.    Not that I recall.

9    Q.    Do you know who would have been in charge

10   of that?

11   A.    The only person I could think that may

12   have been at least over the admin part of it would

13   have been Tammy.  I don't know who in the DC would

14   have gathered or picked the product and shipped

15   it.

16   Q.    In what way, if at all, did your

17   responsibilities or duties change after Walgreens

18   no longer distributed C-IIIs to C-Vs?

19   A.    Well, we didn't have to look for the

20   overage orders for C-III through C-Vs anymore, and

21   that was pretty much about it from the SAIL

22   perspective.

23   Q.    Everything stayed the same with the front

24   of the store items?

25   A.    Yes.

1    Q.    Everything stayed the same with the

2    regular pharmacy items?

3    A.    Yes.  For processing orders, yes.

4    Q.    So you simply just -- you essentially

5    just had the one task removed from your job

6    duties?

7    A.    Yes.

8    Q.    Okay.  If you go back to the second page,

9    do you see at the -- near the top of the page

10   there's a heading for C2s?

11   A.    Yes.

12   Q.    And, again, just like the last one, it's

13   going to be an e-mail that builds on itself with

14   updates -- do you see the original update that we

15   looked at before, and it said "Perrysburg will

16   continue to pick what they can until DEA comes and

17   shuts them down"?

18   A.    Yes.

19   Q.    And if you go down to -- excuse me -- do

20   you see the updates 2/27, about halfway down the

21   page?

22   A.    Yes, I do.

23   Q.    It says, "continue to service potentially

24   red flagged stores."  Do you know what that means?

25   A.    I don't.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It says, "Rx purchasing team is working

2  on the stores.  The plan is to send the store list

3  of the 367 stores to the distribution center by

4  end of day."  Do you see that?

5    A.    I do see that.

6    Q.    If you'd go down four or five bullet

7  points, do you see the one that starts 367

8  potentially red flagged stores?

9    A.    I do.

10   Q.    It says, "Denny or Doug to determine what

11 we need to do to process orders for these stores

12 to account for the order redirects properly.

13 Redirects to Cardinal need to be stopped as

14 Cardinal is not fulfilling orders as they are

15 considered suspicious."  Do you see that?

16   A.    I do see that.

17        MS. ARENT:  Objection to form.

18   Q.    Did anybody at any time educate you on

19 the fact that Cardinal considered some of the

20 stores that Walgreens -- strike that.  Let me

21 start over.

22        Did anybody at Walgreens ever inform you

23 that Cardinal Health had determined that some of

24 the orders being requested by some of the

25 Walgreens stores were considered suspicious?

```
 1                MS. SWIFT:  Object to the form.

 2                MS. ARENT:  Object to the form.

 3       A.    I was not aware that we had any stores

 4    that were still red flagged, and I was also not

 5    aware that Cardinal was the body that was filling

 6    those orders and supposed to be getting them.

 7       Q.    Okay.  Have you ever heard the term "red

 8    flag" as it relates to a store?

 9       A.    No.

10                MS. SWIFT:  Object to the form.

11       Q.    And nobody ever told you that Cardinal

12    considered some of your stores to be suspicious?

13                MS. SWIFT:  Object to the form.

14       A.    I wasn't aware that Cardinal was handling

15    our orders, or that we had red flagged stores.

16       Q.    I'll show you what I'll mark as Exhibit

17    23.  It's P-WAG-2574.

18                -  -  -  -  -

19                (Thereupon, Deposition Exhibit

20                Walgreens-Diebert 23, April 11, 2013

21                E-mail WAGMDL00106910 - 00106912,

22                was marked for purposes of

23                identification.)

24                -  -  -  -  -

25       Q.    Do you see at the top of the page this is
```

Highly Confidential - Subject to Further Confidentiality Review

1    an e-mail from April 11, 2013?

2        A.    Yes.

3        Q.    And it's an e-mail from Steven Mills.  Do

4    you recognize who that is?

5        A.    I do recognize Steve Mills.

6        Q.    How do you recognize him?

7        A.    He's just one of our contacts at

8    corporate.

9        Q.    For what purposes do you interact with

10   Mr. Mills?

11       A.    My only contact with Steve is for new

12   stores that we have opening.  He will let us know

13   when we have one that's opening.  That's it.

14       Q.    Okay.  Can you turn with me, please, to

15   page 2, and I'm going to start at the bottom of

16   the page.

17             Do you see there's an e-mail at the

18   bottom of the page on April 10, 2013, and the

19   subject is "controlled substance order quantity

20   override form."  Do you see that?

21       A.    I do see that.

22       Q.    Do you know what an override form is?

23       A.    I know what the form is.  I've not seen

24   the form before.

25       Q.    What is the form?

```
1      A.    To my knowledge, it's a form that the
2    store fills out if they want an item that is above
3    the limit that they're supposed to have set up for
4    their store.
5      Q.    Okay.  And what do you know about the
6    override process?
7      A.    The store fills it out, Rx Integrity
8    reviews it, and they either approve or deny it.
9      Q.    Do you in your role have any interaction
10   whatsoever with -- or excuse me -- any
11   responsibility whatsoever for approving or denying
12   an override request?
13     A.    I do not.
14     Q.    Does anybody at the distribution center
15   have any responsibility for approving or denying
16   an override request?
17     A.    We do not.
18     Q.    Do you know when this override request
19   process went into effect?
20     A.    I don't.
21     Q.    Okay.  Well, anyway, do you see this is a
22   request, and it looks like it -- I think as you
23   mentioned, it looks like it was sent to Rx
24   Integrity.  That would be consistent with your
25   understanding, right?
```

1      A.    Yes.

2      Q.    And it lists on the form the store

3  number, and if you keep going down, it looks like

4  this is a store from Austintown, Ohio.  Do you see

5  that?

6      A.    Yes.

7      Q.    And the particular drug that they're

8  asking about is a hydrocodone product; do you see

9  that?

10     A.    I do see that.

11     Q.    And they need a 100-count bottle, and

12  they are asking for one; do you see that?

13     A.    I do see that.

14     Q.    And then they're asked to provide a

15  detailed explanation of their request, and their

16  explanation is "new customer," correct?

17     A.    Reason for sales -- yes.  New customer.

18     Q.    Okay.  If you go up -- go back to the

19  second page and go up one e-mail in the chain, it

20  looks like somebody on behalf of Rx Integrity

21  sends this to -- this is the group mail -- group

22  e-mail you mentioned earlier, the Perrysburg SAIL

23  coordinators?

24     A.    Yes.

25     Q.    And you would have been on there?

```
1      A.    Yes.

2      Q.    And it says, "please process the

3  following order."  And it says to give them what

4  they ask for, the one bottle of the hydrocodone

5  product, correct?

6      A.    Yes.

7      Q.    And it looks like you responded to that

8  e-mail, correct?

9      A.    Yes.

10     Q.    And you said at that time "the Perrysburg

11 warehouse no longer carrier/ships CIII-V drugs.

12 You will need to contact the Mt. Vernon SAIL

13 office."  Do you see that?

14     A.    I do see that.

15     Q.    Okay.  And so you would certainly agree

16 with me that as of April 2013, Perrysburg was no

17 longer distributing C-III through C-Vs?

18     A.    Yes.

19     Q.    Let me show you P-WAG-2587.

20                 -  -  -  -  -

21           (Thereupon, Deposition Exhibit

22           Walgreens-Diebert 24, E-mail

23           WAGMDL00324902 - 00324905, was

24           marked for purposes of

25           identification.)
```

```
 1                       -  -  -  -  -

 2        Q.    And if you look at the top of the page,

 3    do you see this is an e-mail from Barb Martin, and

 4    it looks like it went to Shelley Crisel, and I

 5    think you told me she's in Perrysburg?

 6        A.    Mt. Vernon.

 7        Q.    I'm sorry, Mt. Vernon.  And then you and

 8    Ms. Bish were copied, correct?

 9        A.    Yes.

10        Q.    Okay.  And it says, "Shelley, below is

11    the COMPASS communication that was sent.  Perhaps

12    the term was confusing to stores."  And, anyway,

13    what I want to focus on is the communication that

14    was sent out to the -- to the pharmacies.

15            Do you see below there it has -- it looks

16    like she's copy and pasted the communication?

17            MS. SWIFT:  Objection.  Mischaracterizes

18    the document.

19        A.    I do see that on the document.

20        Q.    It says, "Select pharmacy managers.

21    Beginning the week of April 16, 2013, stores that

22    have been receiving their Schedule II controlled

23    substance orders from Cardinal will now have" all

24    their products -- have their -- "all products

25    under C-II orders shipped from AmerisourceBergen."
```

1    Do you see that?

2        A.    I do see that.

3        Q.    And is that consistent with your

4    understanding that at some point in time

5    AmerisourceBergen -- excuse me -- became the

6    primary distributor to the Walgreens stores?

7            MS. SCHUCHARDT:  Objection to form.

8        A.    Yes.  At some point ABC became our

9    primary distributor for our controlled substances.

10       Q.    Okay.  And it looks that -- it looks like

11   that's at least beginning to be put in place here

12   in this communication that was sent to you on

13   April 26, 2013, correct?

14           MS. SWIFT:  Objection.  Foundation.

15       A.    That's correct.

16       Q.    Okay.  So if we -- to kind of get a

17   picture of the -- of the general timeline, we know

18   that in early 2012 Walgreens began working with

19   the DEA on the settlement?

20           MS. SWIFT:  Objection.

21       Q.    Is that fair?

22           MS. SWIFT:  Foundation.

23       A.    I don't know when that began, when the

24   DEA started researching that.

25       Q.    Do you recall a few minutes ago we looked

Highly Confidential - Subject to Further Confidentiality Review

1    at the e-mail from Tasha Polster, and she was

2    sending the settlement, and she said, hey, we've

3    been working on this for about a year-and-a-half?

4        A.    Yes.

5        Q.    And that was a June e-mail; do you recall

6    that?

7        A.    I remember that document, yes.

8        Q.    Okay.  Based on that document, would you

9    agree -- or excuse me -- based on that document,

10   would it be fair to say that Walgreens had been

11   working with the DEA on that settlement since

12   approximately early 2012?

13           MS. SWIFT:  Objection.  Foundation.

14       A.    Based on that document, from what Tasha

15   says, yes.

16       Q.    Okay.  And then we saw in September of

17   2012 Jupiter distribution center was served with

18   an order to show cause, correct?

19       A.    Yes.

20           MS. SWIFT:  Object to the form.

21       Q.    And then we saw in February of 2013,

22   Perrysburg is served with a warrant and subpoenas

23   from the DEA, correct?

24           MS. SWIFT:  Object to the form.

25   Foundation.

1    A.    I did see those documents, yes.

2    Q.    And then by that last document that we

3    looked at in March of 2013, all the C-III to C-V

4    inventory has been transferred out of Perrysburg

5    to Mt. Vernon, correct?

6         MS. SWIFT:  Object to the form.

7    Foundation.

8    A.    That's correct.

9    Q.    And here, in April of 2013, Walgreens is

10   now having AmerisourceBergen come in and take over

11   a lot of their drug shipments?

12        MS. SWIFT:  Object to the form.

13        MS. SCHUCHARDT:  Object to the form.

14        MS. SWIFT:  Foundation.

15   A.    Yes.

16   Q.    And as of present, Walgreens no longer

17   distributes any controlled substances to itself,

18   correct?

19   A.    That's correct.  We don't distribute any

20   controlled substances.

21   Q.    And has that been the case since you

22   became C2 manager?

23   A.    That's the case, yes.

24   Q.    And you became the C2 manager when?

25   A.    In late 2014.

 1    Q.    Okay.  So we know that the DEA begins

 2    their investigation in 2012, and that by late

 3    2014, at the earliest, Walgreens is completely out

 4    of the distribution of controlled substance

 5    business?

 6          MS. SWIFT:  Objection --

 7    Q.    Is that fair?

 8          MS. SWIFT:  Objection.  Foundation.

 9    A.    Yes.

10    Q.    Did anybody at Walgreens corporate, from

11    the business side, ever tell you why Walgreens got

12    out of the distribution business?

13    A.    No.  Nobody ever explained to me why we

14    weren't distributing controlled substances

15    anymore.

16    Q.    Did you ever receive any communication

17    from anybody internally in the distribution center

18    about why Walgreens was ceasing to distribute

19    controlled substances?

20    A.    Not that I recall.

21    Q.    So I want to look at a couple of

22    documents now.

23          MR. GADDY:  It looks like we need to go

24    off the record for a minute.  I think we've been

25    going for a while.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE VIDEOGRAPHER:  Going off the record

 2     at 2:21 p.m.

 3                     (Recess had.)

 4                THE VIDEOGRAPHER:  We're back on the

 5     record at 2:39 p.m.

 6        Q.    Okay, Ms. Diebert.  I'm going to ask you

 7     some questions now regarding some changes that

 8     were made in the 2012/2013 time period that would

 9     have been after the DEA investigation had begun,

10     at least in Jupiter, and see which of these you're

11     familiar with or what you know about.

12                I'll show you what I'm going to mark as

13     Exhibit Number 25.  This is P-WAG-2673.

14                     -  -  -  -  -

15                (Thereupon, Deposition Exhibit

16                Walgreens-Diebert 25, May 30, 2012

17                E-mail WAGMDL00429424 - 00429426,

18                was marked for purposes of

19                identification.)

20                     -  -  -  -  -

21        Q.    And do you see that the -- kind of in the

22     middle of the page, there's an e-mail dated May

23     30, 2012 with the subject line of "meeting notes

24     to outline new procedures for distribution

25     centers"?
```

```
 1        A.    I see that.

 2        Q.    Okay.  And it says, "Chris, I believe you

 3   requested a document recapping the meeting.  Would

 4   you like this to go to DCMOs as a reference?"  Do

 5   you see that?

 6        A.    Yes.

 7        Q.    What does "DCMOs" mean?

 8        A.    Distribution center manager of

 9   outbound -- I'm sorry -- manager of operations.

10        Q.    Okay.  And who would that have been in

11   Perrysburg around this time?

12              MS. SWIFT:  Objection.  Foundation.

13        A.    I don't want to presume, but I'm assuming

14   that it is referring to our DC manager, who may

15   have been Steve Caneller at the time.

16        Q.    And the topic of the notes, as far as the

17   new procedures for the distribution center, it

18   says "CII-V ordering."  Do you see that?

19        A.    I do see that.

20        Q.    And the first item that it indicates as

21   far as a change, it says, "distribution centers

22   will no longer accept a phone call or e-mail from

23   a store related to adjusting CIII-CV orders."  Do

24   you see that?

25        A.    I do see that.
```

1    Q.    Okay.  And that was a change that was

2    implemented by Walgreens as far as ordering of

3    controlled substances, correct?

4         MS. SWIFT:  Objection.  Foundation.

5    A.    Yes.

6    Q.    Do you recall receiving a communication

7    from somebody at Walgreens that you were no longer

8    to accept phone calls or e-mails from stores

9    adjusting controlled substance orders?

10   A.    I don't recall receiving any information.

11   But we did, or I wouldn't have instructed them to

12   contact other groups or parties.

13   Q.    Okay.  Item line number 7 on the updates

14   here says, "the PDQ process has not changed.  PDQ

15   orders will filter through the inventory control

16   process."  Do you see that?

17   A.    I see that.

18   Q.    Do you know what "PDQ" means?

19   A.    No.

20   Q.    Have you ever heard of a PDQ order?

21   A.    I have.

22   Q.    And what is your understanding of what

23   that means?

24   A.    The only PDQ orders I'm aware of are

25   those for C-II, and that is any item that a store

Highly Confidential - Subject to Further Confidentiality Review

 1    wants to order that's a Schedule II narcotic that

 2    they haven't reached their ceiling limit for, they

 3    can order up to two of those per day on a PDQ

 4    order.

 5         Q.    Okay.  So is that something you've

 6    learned about in your capacity as the Schedule II

 7    manager?

 8         A.    Yes, it is.

 9         Q.    So that would be late 2014 or later?

10         A.    Yes.  It would have been after this.

11         Q.    Okay.  Did you have any understanding of

12    the PDQ process during the time that you were a

13    SAIL coordinator for C-III to C-V?

14         A.    I did not.

15         Q.    Okay.  But regardless, here in this

16    document we see that they're instituting a policy

17    in May of 2012 to no longer accept phone calls or

18    e-mails to adjust controlled substance orders, but

19    also the PDQ process is staying in place, correct?

20         A.    Yes.  That's on here.

21         Q.    Let me show you what I'll mark as Exhibit

22    26.  It's P-WAG-2584.

23                    -  -  -  -  -

24              (Thereupon, Deposition Exhibit

25              Walgreens-Diebert 26, E-mail

```
 1              WAGMDL00308178 - 00308181, was

 2              marked for purposes of

 3              identification.)

 4                   -  -  -  -  -

 5      Q.    It looks like this is more of the

 6   official communication as opposed to the notes.

 7   And if you look at the top of this page, do you

 8   see that this e-mail came from a woman named Sue

 9   Thoss?

10      A.    Yes.

11      Q.    Do you know who Ms. Thoss is?

12      A.    I -- I knew that she worked in corporate

13   as a president or vice president capacity.  I

14   don't -- I didn't know her specifically, though.

15      Q.    Okay.  Have you ever had any interaction

16   with her?

17      A.    No.

18      Q.    And do you see here that this e-mail was

19   sent looks like about a week after that last one

20   we just looked at with the notes; do you see that?

21      A.    Yes, I do.

22      Q.    And one of the recipients on this line is

23   "DC SAIL coordinators;" do you see that?

24      A.    I do.

25      Q.    And that would be you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.  I would be included.

 2      Q.    And in the body of the e-mail, it says,

 3   "below is the new process that was sent to stores

 4   related to controlled products CII-CV."  Do you

 5   see that?

 6      A.    Yes, I do.

 7      Q.    So then in the -- if we look down to the

 8   communication that was sent, do you see it's

 9   addressed to pharmacy supervisors and district

10   managers?

11      A.    I do see that.

12      Q.    And it says, "effective immediately, a

13   new process to manage the manual ordering of all

14   controlled substance medications will be

15   implemented and a new controlled substance order

16   quantity override form has been created.  See

17   below for a summary of this new" product.  Do you

18   see that?  Or excuse me, "process."

19      A.    I do see that.

20      Q.    Okay.  Were you aware of any override

21   process being in place prior to this?

22            MS. SWIFT:  Objection.  Foundation.

23      A.    I'm not aware if they were using the

24   process or not.

25      Q.    But, regardless, they refer to it here as
```

1    a new controlled substance order override process?

2        A.    I see that they refer to it that way,

3    yes.

4        Q.    It goes down and says, "what do we need

5    to know?"  And it says for distribution centers it

6    says they "will not accept manual orders placed by

7    pharmacies via phone or e-mail."  Do you see that?

8        A.    I do see that.

9        Q.    So this was a change that was being

10   implemented here in -- looks like June 5th of

11   2012?

12            MS. SWIFT:  Objection.  Foundation.  The

13   document speaks for itself.

14       A.    It says that on the document.  My

15   personal experience was that we didn't take manual

16   orders while I was the SAIL coordinator.

17       Q.    Who would manual orders have come into?

18       A.    For C-III through V, while we were

19   distributing and while I was the SAIL coordinator,

20   they would have come through me, and we did not

21   take manual orders.

22       Q.    Okay.  So your process at Perrysburg, if

23   you had somebody try and make a manual order was

24   to reject it?

25       A.    Yes.  However, I don't recall that ever

1    happening.  I don't ever recall the store calling

2    or e-mailing saying can you add some kind of a

3    C-III through V item on my order.

4        Q.    Okay.  If it never happened, how do you

5    recall that you would have rejected it?

6        A.    Because we're not allowed to add orders

7    for controlled substances.  So the only thing that

8    we would have ever done was delete or decrease it.

9        Q.    And that's consistent with what you told

10   us earlier as it related to that excessive report,

11   excessive order report, that you would -- that you

12   would look at to make sure there were no errors,

13   correct?

14       A.    Yes.  We would look at overages, or large

15   orders, and if it didn't line up with what they

16   got, we would call them.  If it was wrong, we

17   would decrease or delete it.

18       Q.    You would call them to find out if they

19   made a mistake when they entered the order?

20       A.    Yes.

21       Q.    Are you familiar with what a line limit

22   is?

23       A.    I am.

24       Q.    What do you understand that to be?

25       A.    For line limit, we use that in the

Highly Confidential - Subject to Further Confidentiality Review

1    non-pharmacy side, and it's -- corporate will put

2    a limit as to how many of one particular item a

3    store can get.

4        Q.    So that relates to products in the front

5    end of the store?

6        A.    Yes.

7        Q.    Can you give me an example of that?

8        A.    Sure.  Every December we have a lot of

9    photo promotions for Walgreens, and to enable all

10   the stores to get an opportunity to get some of

11   those items to process those orders, they put a

12   line limit of -- like, floating frames, they'll

13   only let the store get three cases instead of 50

14   that they want.  That way more stores can get the

15   product in their stores.

16       Q.    Are you ever familiar with line limits

17   being applied to controlled substance orders?

18             MS. SWIFT:  Objection.  Foundation.

19       A.    We didn't check the orders for C-IIs.

20   For C-III through Vs, I'm not aware if there was

21   or was not a line limit.

22       Q.    What do you mean when you say you didn't

23   check them?

24       A.    Well, the computer room is who checks for

25   C-II orders.  And if there's -- I don't know what

Highly Confidential - Subject to Further Confidentiality Review

1   other processes they use up there to check if

2   they're similar to what we did, but we didn't do

3   that.  The only thing I do as a C2 manager is make

4   sure that the orders get signed.  So I didn't

5   check anything on the ordering part for C-IIs.

6   For C-III through V is when we did -- I'm not

7   aware if there was any kind of a line limit set in

8   place in the system or not.

9       Q.    There was never any line limit for C-III

10  through Vs while you were a SAIL coordinator that

11  you were ever aware of; is that fair?

12          MS. SWIFT:  Object to the form.

13      A.    Not that I am aware of.

14      Q.    I'll show you what I'll mark as Exhibit

15  Number 27.  This is P-WAG-1743.

16              -  -  -  -  -

17          (Thereupon, Deposition Exhibit

18          Walgreens-Diebert 27, September 16,

19          2012 E-Mail WAGMDL00528179 -

20          00528180, was marked for purposes of

21          identification.)

22              -  -  -  -  -

23      Q.    Do you see that at the top of the page

24  this is an e-mail -- and we'll primarily look at

25  the e-mail below, but it's an e-mail from

1    September 16, 2012?

2        A.    Yes.  I see that.

3        Q.    And do you recall that's the same time

4    period that the order to show cause was served on

5    the Jupiter distribution center?

6              MS. SWIFT:  Object to the form.

7        A.    It was around that time, yes.

8        Q.    And the subject of this particular e-mail

9    is "update on suspicious order monitoring."  Do

10   you see that?

11       A.    I do see that.

12       Q.    And here, in September 2012, you would

13   have been the SAIL coordinator, right?

14       A.    That's correct.

15       Q.    If you go about halfway down that e-mail,

16   there's a heading that says "here is the current

17   suspicious order monitoring process in place."  Do

18   you see that?

19       A.    I do see that.

20       Q.    It says, "all controlled substances C-II

21   through V and PSE orders generated through SIMS to

22   Walgreens distribution centers and vendors are

23   subject to our SOM tolerance frequency limits."

24   Do you see that?

25       A.    I do see that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    This says, "any order outside of our

2    parameters are automatically reduced by SIMS to be

3    in compliance with our standards."  Do you see

4    that?

5    A.    I do see that.

6    Q.    And even in this time period, September

7    of 2012, did you have any knowledge of orders

8    being reduced in any way, shape, or form?

9    A.    I do not.

10        MS. SWIFT:  Object to the form.

11   Q.    If you'd look down at the bottom of the

12   page, it says, "in addition to SOM, corporate line

13   limits have been placed on 23 C-II, C-III and C-IV

14   products."  Do you see that?

15   A.    I do see that.

16   Q.    Did anybody inform you that that had

17   happened in September 2012?

18   A.    I don't recall getting any communication

19   on it.

20   Q.    Do you recall anything changing with how

21   you did your job as the C-III to V SAIL

22   coordinator?

23        MS. SWIFT:  Object to the form.

24   A.    No.  I don't recall any adjustments to

25   our process.

1    Q.    Do you recall any additional report

2    related to line limits that you received to help

3    you do your job during that time period?

4    A.    I don't know that there were line limits

5    on C-III through V ordering, and I don't remember

6    any reports or communications revolving around

7    that.

8    Q.    Do you see here in this particular

9    document, it says that line limits have been

10   placed on C-III and C-IV products, correct?

11   A.    I see that.

12   Q.    It then it goes on to say, "if a store

13   needs to order product above their tolerance or

14   frequency ceilings or more than the corporate line

15   limit, they must request that their pharmacy

16   supervisor completes a controlled substance order

17   override form."  Do you see that?

18   A.    I do see that.

19   Q.    And we talked a little bit about that

20   already, right?

21   A.    Yes, we did.

22   Q.    And I think you told me that you as the

23   SAIL coordinator didn't have any involvement in

24   approving or denying any of those requests,

25   correct?

1    A.    That's correct.

2    Q.    It says, "this form is electronically

3    sent to the Rx purchasing inventory management

4    team."  Do you see that?

5    A.    I do see that.

6    Q.    Who is that?

7    A.    It's a group at corporate.  I don't know

8    who's in that group.

9    Q.    It says, "they forward the form to the

10   appropriate SAIL coordinator at the distribution

11   center servicing that store."

12         If you go to the last bullet point, it

13   says, "the SAIL coordinator then manually creates

14   an order per the request."  Do you see that?

15   A.    I do see that.

16   Q.    Do -- as your -- as a SAIL coordinator,

17   did you receive some of these override requests?

18   A.    Not as the SAIL coordinator for C-III

19   through V, no.

20   Q.    Did you ever receive any communications

21   from the corporate folks that an override request

22   had been approved, and that you were to fill the

23   order?

24         MS. SWIFT:  Object to the form.

25   Foundation.

1    A.    Since I was a SAIL coordinator for C-III

2    through V, no, because I wasn't a SAIL coordinator

3    for C-II at the time.  So I wouldn't have gotten

4    those, if there were any.

5    Q.    Well, is it your understanding that the

6    overrides only applies to C-II?

7    A.    That's my limited understanding of it,

8    because we didn't have them for C-III through V

9    that I recall.

10   Q.    Okay.  It goes on to say, it says, "note,

11   the Rx purchasing and supply chain inventory

12   management team does not evaluate the validity of

13   the form as it pertains to good faith dispensing,

14   only that it contains the proper information as

15   requested on the form."  Do you see that?

16   A.    I see that it says that.

17   Q.    Did you know that the team at corporate

18   wasn't actually evaluating the validity of the

19   form?

20         MS. SWIFT:  Object to the form.

21   A.    I don't know what they do with the form

22   when they get the requests.

23   Q.    All that you know is that it ultimately

24   comes to the distribution center and says approved

25   or not?

1          MS. SWIFT:  Object to the form.

2     A.    Actually, we only get the ones that are

3     approved.  We don't see the denied ones.

4     Q.    Okay.  That makes sense.

5          I'll show you P-WAG-2013, Exhibit Number

6     28.

7               -  -  -  -  -

8          (Thereupon, Deposition Exhibit

9          Walgreens-Diebert 28, E-Mail

10         WAGMDL00278104, was marked for

11         purposes of identification.)

12              -  -  -  -  -

13    Q.    And do you see this is an e-mail from

14    September 2012?

15    A.    I do.

16    Q.    And, again, it's consistent with the same

17    general time period that the order to show cause

18    is served on the Jupiter distribution center?

19         MS. SWIFT:  Object to the form.

20    A.    Yes, I do.

21    Q.    And just skip down to the section that

22    says "to all."  Do you see that?

23    A.    I do.

24    Q.    It says, "back in June, Rx purchasing and

25    supply chain placed line limits on several C-II

1  and C-III narcotics."  Do you see that?

2      A.    I do see that.

3      Q.    And that's consistent with what we saw in

4  one of the documents a few minutes ago that talked

5  about them putting line limits on the controlled

6  drugs, correct?

7      A.    On 23 of them, yes.

8      Q.    It says, "at that time it was identified

9  that stores would be able to order drugs cut by

10  the line limit through PDQ.  Supply chain and

11  logistics has identified a process in which they

12  can turn off specific items ordered through PDQ at

13  the distribution center level essentially capping

14  stores at the line limit quantity.  This

15  enhancement will impact all stores in the chain."

16  Do you see that?

17      A.    I see that, yes.

18      Q.    Okay.  Were you ever informed that even

19  though corporate had put line limits on controlled

20  substances, that stores were still able to get

21  around those line limits by placing PDQ orders?

22          MS. SWIFT:  Objection.  Assumes facts not

23  in evidence.

24      A.    I was not aware that there was line

25  limits on them, or what the stores or the DCs

Highly Confidential - Subject to Further Confidentiality Review

1    could or couldn't do with them.

2         Q.    Do you recall having PDQ orders come in

3    while you were the SAIL coordinator?

4              MS. SWIFT:  Object to the form.  Vague.

5         A.    Not for C-III through Vs, no.

6         Q.    Do the PDQ orders that come in look

7    different than a regular order?

8              MS. SWIFT:  Object to the form.

9         A.    They're manual.  Rx Integrity will e-mail

10   them to us requesting that we process them, and we

11   manually enter them and process them.

12        Q.    I'm going to go back to Exhibit 4 for

13   just a minute, to the personnel file which should

14   be down towards the bottom there.  If you would

15   turn to page 10 of 23 for me, please.  This is

16   P-WAG-2670.  Are you with me?

17        A.    Yes, I am.

18        Q.    Okay.  Do you see it says C-II at the

19   bottom of the page?

20        A.    Yes, sir.

21        Q.    And it says, "I began managing the C-II

22   SAIL department this year.  I trained multiple

23   days learning the details of the C-II SAIL

24   procedures."  Do you see that?

25        A.    Yes.

1    Q.    You say, "received numerous request from

2    Rx Integrity each day ranging between 10 to 50 or

3    more orders.  These orders are processed in one or

4    two emergency ways each day."  Do you see that?

5    A.    Yes, I do.

6    Q.    What are you referring to there?

7    A.    Those are the orders that they've

8    approved based on the override forms that the

9    stores submit.

10    Q.    Okay.  So -- and those are just for

11    C-IIs, as you understand it?

12    A.    Yes.  That's my understanding.

13    Q.    Okay.  And the process for these

14    emergency waves of orders, is it the same as the

15    process for the normal orders?

16        MS. SWIFT:  Object to the form.  Vague.

17    A.    It's not.  These are manual orders that

18    we actually enter.  They're not received by the DC

19    systematically like the stores' regular orders

20    are.

21    Q.    But these orders that you're talking

22    about here are orders that have been approved for

23    an override?

24    A.    That's correct.

25    Q.    And would that range that you give there

1    of 10 to 50 a day be fairly accurate?

2        A.    At that time it would have been, yes.

3        Q.    What would you say that would be an

4    accurate range now?

5        A.    Well, we've added more stores into the

6    network, so I would say on average we process

7    about between 50 to 75 Rx Integrity orders every

8    day now.

9        Q.    Do you know what a 340-B order is for

10   controlled substances?

11       A.    I know that we have 340-B orders that we

12   process once a week that we receive from the 340-B

13   group at corporate.

14       Q.    Is there anything different that you have

15   to do with those orders than you do with either

16   your normal orders or the emergency orders?

17            MS. SWIFT:  Object to the form.

18       A.    None of those are electronic.  They're --

19   all 340-B orders are printed to paper.  They have

20   to have a cover sheet attached to them with

21   registrant -- the store information, and whoever

22   the supplier is, and then we send those out FedEx

23   overnight to the distribution centers that are

24   going to fill and ship those orders.

25       Q.    But those come in to you as the C2

1    manager?

2        A.    Yes.

3        Q.    And you get them signed and send them out

4    to, I guess, AmerisourceBergen?

5        A.    There are a couple of different

6    suppliers.  ABC is one of them, AmerisourceBergen.

7    We also have some McKesson orders that we get.

8    Wright & Morrison, I think, is a newer one that

9    we've gotten a few for, and then Cardinal as well.

10       Q.    So is there a difference in how you

11   process the PDQ orders now versus how you process

12   the override orders?

13             MS. SWIFT:  Object to the form.

14       A.    I'm sorry, maybe I misspoke.  PDQ orders

15   are systematic.  We receive them every day

16   systematically.  Those aren't manual orders like

17   the Rx Integrity orders.  So the Rx Integrity

18   orders, we manually enter those and process them

19   every day.  PDQ orders are processed at the same

20   time that all the stores' weekly replenishment

21   orders are processed.

22       Q.    Okay.  Let me say it back to you so

23   that -- make sure I understand it.

24             So every day you get approximately 4,000

25   orders in from the Walgreens chains that you

Highly Confidential - Subject to Further Confidentiality Review

1    service, correct?

2        A.    Yes.  That will be replenishment orders

3    and PDQ orders combined.

4        Q.    Okay.  And so when you say replenishment

5    orders, that would be normal ordering process for

6    the stores?

7            MS. SWIFT:  Object to the form.

8        A.    That's correct.

9        Q.    What is a -- the normal replenishment

10   schedule?  Can you explain that for me?

11       A.    Most of our stores have a once a week

12   ordering.  It's replenishment.  Anything that

13   their replenishment level is set at at the store,

14   if it's below that, their system will generate an

15   order to get it up to that replenishment line.  So

16   most stores have that order once a week.  Some

17   stores have twice, they get twice a week

18   replenishment orders.

19       Q.    Okay.  And I guess the different stores

20   receive -- you have it spread out so that orders

21   come in on a daily basis, seven days a week?

22           MS. SWIFT:  Object to the form.

23       A.    Yes.

24       Q.    And so when you get 4,000 orders in,

25   that's going to be comprised of regular

1    replenishment orders, which would be normal

2    orders, and also PDQ orders?

3        A.    That's correct.

4        Q.    Do you have an understanding for how many

5    of those approximately 4,000 orders are going to

6    be replenishment orders versus how many are going

7    to be PDQ orders?

8        A.    Most of the days of our week we have

9    approximately 2,200 to 2,300 replenishment --

10   stores for replenishment orders on the schedule.

11   So out of 4,000, if you did the math, 2,300 would

12   be replenishment orders, the other 1,700 would be

13   PDQ orders.

14       Q.    And when you're giving me these numbers,

15   you're talking about controlled substances,

16   correct?

17       A.    Schedule II orders, yes.

18       Q.    So 1,700 out of 4,000, again, using rough

19   numbers, of orders received on a daily basis are

20   PDQ orders versus replenishment orders?

21       A.    That's correct.

22       Q.    And do you understand PDQ to mean "pretty

23   darn quick"?

24       A.    That's what I call it.  I don't know what

25   the acronym really means.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    But those are orders that are received on
 2   one day and filled the next morning?
 3              MS. SWIFT:  Object to the form.
 4        A.    For all of our stores that are in the
 5   SESAS, all of their orders are filled and
 6   delivered the next morning.  They're filled
 7   overnight and delivered the next morning.
 8        Q.    Okay.  So the replenishment orders are
 9   filled the next morning as well?
10        A.    Yes.
11        Q.    But the PDQ order would be an order that
12   essentially the store is receiving early; is that
13   fair?
14              MS. SWIFT:  Object to the form.
15        A.    I would -- I would say that a PDQ order
16   is an additional customer that they got come --
17   come in out of the normal that they didn't have
18   enough stock to fill that prescription for.  Most
19   of the PDQ orders are for, like, one bottle of one
20   item.
21        Q.    Okay.  But regardless, the PDQ order is
22   when a store needs to receive an order prior to
23   the replenishment day?
24        A.    Yes.  That's correct.
25        Q.    So currently there definitely are PDQ
```

1    orders allowed for scheduled drugs?

2       A.    Yes.

3       Q.    I'm going to show you a couple of these

4    documents that I was provided yesterday, and just

5    ask you some general questions about them and see

6    if you can help me understand what these are or

7    who they may have come from.  The first one I want

8    to mark as Exhibit 29, the Bates range starts

9    757170.

10                  -  -  -  -  -

11              (Thereupon, Deposition Exhibit

12              Walgreens-Diebert 29, Document

13              Request List, Perrysburg

14              Distribution Center, DEA review July

15              2011 WAGMDL00757170 - 00757171, was

16              marked for purposes of

17              identification.)

18                  -  -  -  -  -

19       Q.    And I have a black and white copy here,

20    but there should be a color copy on the screen

21    that may or may not be better.

22              Do you recognize generally what this

23    document is?

24       A.    I don't.  I haven't seen it before.

25       Q.    At the top left-hand corner it says,

Highly Confidential - Subject to Further Confidentiality Review

1    "document request list, Perry distribution center,

2    DEA review July 2011."  Do you see that?

3         A.    I do see that.

4         Q.    At any time while you've been at

5    Walgreens have you had any involvement in audits

6    that occurred at the distribution center?

7         A.    I did not.

8         Q.    Do you know what -- do you know whether

9    or not audits occurred at the distribution center?

10        A.    I do know that we had some audits.  I

11   don't know if they were internal or out-ternal, if

12   we decided to do them on our own or not.

13        Q.    Do you know what a DEA mini audit is?

14        A.    I've heard the term, but I really don't

15   know what it is.

16        Q.    Okay.  Have you ever been involved in

17   one?

18        A.    No, I have not.

19        Q.    Have you ever had any responsibilities or

20   duties related to participating in any of the

21   audits?

22        A.    Not that I recall.

23        Q.    Who do you know at the -- or who at the

24   distribution center would you suggest I talk to

25   about that?

1    A.    Tammy Hensley.

2    Q.    And has Tammy been the admin manager as

3    long as you've been at Walgreens?

4    A.    No.  She was the SAIL coordinator before

5    me, so she moved to admin in 2008.

6    Q.    Okay.  So in -- assuming that Walgreens

7    was distributing C-IIIs through C-Vs prior to you

8    starting as the SAIL coordinator, Tammy would have

9    been the SAIL coordinator then?

10    A.    Yes.  If we were distributing them, then

11    before 2008 she would have been the SAIL

12    coordinator.

13    Q.    Okay.  And in 2008, when you became the

14    SAIL coordinator, she became the admin manager?

15    A.    That's correct.

16    Q.    Okay.  And she would be the person that

17    you understand would have the most knowledge of an

18    audit process?

19    A.    Yes.

20    Q.    Why do you think that?

21    A.    She's been the admin manager, she's the

22    one I've heard terms about DEA mini audits from,

23    just saying we have a mini audit that we're going

24    to do.  She retains all the paperwork from those

25    audits when they do them.

1    Q.    Anybody else at the distribution center

2    that you believe would have had involvement with

3    either internal audits, outside audits, or the DEA

4    mini audits?

5           MS. SWIFT:  Objection.  Foundation.

6    A.    I don't know.

7    Q.    Do you recognize the handwriting on this

8    document?

9    A.    Yes.  That is Tammy's handwriting.

10   Q.    If we wanted to talk to somebody about

11   records that are kept at the distribution center,

12   would Tammy be the person to talk to about that

13   also?

14   A.    She would be one of them, yeah.

15   Q.    Who else?

16   A.    I would be one of them for some of the

17   records, particularly MPB, which are just the

18   driver records that we keep on hand for two or

19   three years.

20   Q.    Did you say "MPV"?

21   A.    MPB.  We do have a system for keeping

22   records, so if there were records that were

23   wanted, we can -- we should be able to find them.

24   Q.    What system is that?

25   A.    It's just our own internal location

1    system.  We have a record showing where certain

2    documents are at from date ranges, and what type

3    of documents they are.

4        Q.    Are you aware of any process within the

5    distribution center to purge or get rid of

6    records?

7        A.    No.

8        Q.    Have you ever been asked to purge or get

9    rid of records that are older or have been sitting

10   around for a long time?

11       A.    Our MPB records that we had since we

12   opened, I believe last year they got rid of some

13   of those documents.

14       Q.    What type of information would be within

15   those documents?

16       A.    That would be the routes that the -- the

17   paperwork that the drivers took out with them,

18   where the stores put down the piece counts they

19   received and signed off on for their regular store

20   orders.

21       Q.    Was that information maintained

22   electronically or in hard copy?

23       A.    I know we kept the hard copies.  I don't

24   know if it was kept electronically as well.

25       Q.    But you know what you got rid of recently

```
 1    was hard copies?

 2        A.    Yes.

 3        Q.    So I think we looked at this, but do you

 4    see the top left-hand corner it says "document

 5    request list"?

 6        A.    Yes.

 7        Q.    And the first item that it asks about is

 8    copies of last DEA report or internal distribution

 9    center reports relating to DEA visits; do you see

10    that?

11        A.    I see that.

12        Q.    Okay.  And are you aware of any DEA

13    reports or internal distribution center reports

14    regarding DEA visits?

15        A.    I am not.

16        Q.    Is that anything that you've ever seen

17    before?

18        A.    No.

19        Q.    If you go down to the very bottom of the

20    page, number 20, one of the documentations it's

21    talking about is a copy of the sale coordinator

22    tracking sheet?

23        A.    I see that.

24        Q.    And it looks like it says Jen and Deb

25    next to it; do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, I do.

2    Q.    I'm presuming that that would be you.  Do

3    you know what's being referred to there?

4    A.    I believe that that is referring to the

5    sheet that the loaders signed off when they loaded

6    a controlled tote or case onto their truck.  They

7    would keep it, they would sign off on it, and file

8    it.

9    Q.    And what type of information would be on

10   that form?

11   A.    It would have the date, the store number

12   that the item belonged to, the unique scan ID that

13   was assigned to that tote so that it could be

14   tracked, and then the loader -- the trailer

15   number, route number, and then the loader's

16   signature on it.

17   Q.    When you were the SAIL coordinator, did

18   you have physical access to the C-III through C-V

19   drugs?

20   A.    I did not.

21   Q.    If you look at the next page, at the item

22   number 21, it lists it looks like eight different

23   items there of records.  Do you see that?

24   A.    I do see that.

25   Q.    And do you see number 7 says "monthly

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious controlled drug order report"?  Do you

2    see that?

3        A.    I see that on there.

4        Q.    And, again, we looked at some of those

5    this morning.  You're not familiar with those,

6    correct?

7        A.    I am not familiar with those.

8        Q.    And in the column to the right where it

9    says who's responsible, it's indicating that would

10   be Tammy?

11       A.    That's correct.

12       Q.    I'm going to show you what I'll mark as

13   Exhibit Number 30.  It starts out at Bates number

14   757188.

15                    -   -   -   -   -

16                (Thereupon, Deposition Exhibit

17                Walgreens-Diebert 30, Perrysburg

18                Distribution Center DEA Review

19                WAGMDL00757188 - 00757192, was

20                marked for purposes of

21                identification.)

22                    -   -   -   -   -

23       Q.    And, again, this is one I just got last

24   night, so I think you'll have a color copy that

25   will pop up on the screen there.

Highly Confidential - Subject to Further Confidentiality Review

1            And the first two pages of this looks

2    pretty much the same.  Do you recognize this to be

3    your document in your handwriting?

4        A.    No.  That's -- I think that's Tammy's

5    handwriting again, too, but there's very little on

6    there.

7        Q.    Okay.

8        A.    That's her handwriting on the second

9    page.

10       Q.    Okay.  And if you flip to the third page,

11   same thing, again, it appears to be Tammy's

12   handwriting?

13       A.    Yes.  That's Tammy's handwriting.

14       Q.    If you go to the last page of the

15   document, it says, "daily agenda Perrysburg

16   distribution center DEA review."  Do you see that?

17       A.    Yes.

18       Q.    Would you have been involved in this

19   process?

20            MS. SWIFT:  Object to the form.

21       A.    No.

22       Q.    And under Monday, in the box with item 2,

23   it has the name Scott Brown.  Do you know who that

24   is?

25       A.    I do.  He's no longer with Walgreens.

1    Q.    What was his role when he was there?

2    A.    He was the shipping function manager.

3    Q.    What does the shipping function manager

4    do?

5    A.    They would make sure they had loaders

6    assigned to the doors that were being loaded into,

7    that all the product was getting put on the

8    trailers.

9    Q.    In the Wednesday box, do you see an item

10   number 2, it says "afternoon"?

11   A.    I do.

12   Q.    And it says "interviews," and it says

13   "ARCOS Rx manager and SAIL."  Do you see that?

14   A.    I do see that.

15   Q.    And at this time you would have been the

16   SAIL, correct?

17         MS. SWIFT:  Object to the form.

18   A.    Yes.  I was the SAIL coordinator in 2012.

19   Q.    Do you recall participating in interviews

20   with the DEA during this time period?

21   A.    No, I do not.

22         MS. SWIFT:  Object to the form.

23   Q.    Do you know that you didn't, or do you

24   just not remember?

25   A.    I don't recall ever talking to a DEA

1    agent.

2       Q.    Do you ever recall DEA being at

3    Perrysburg and at the distribution center in any

4    form or fashion?

5           MS. SWIFT:  Objection.  Asked and

6    answered.

7       A.    I don't recall when the DEA was there.  I

8    know that they were there, but I couldn't tell you

9    dates, or what they were there for.

10      Q.    Sure.  So -- sorry, that was a bad

11   question.  So we looked at documents earlier that

12   talked about exactly when they came in to inspect,

13   correct?

14      A.    Yes.

15      Q.    Okay.  What I meant to ask you is if

16   you've ever -- whether that time or any other time

17   while you've been at Perrysburg, have you ever

18   seen DEA agents within the facility?

19      A.    I have not seen any DEA agents in the DC.

20      Q.    I had asked you earlier about whether or

21   not you had ever been asked to purge or destroy

22   any older documents.  Do you know -- if I was --

23   if I was wanting to know who did that at the

24   Perrysburg distribution center, who would you

25   suggest I talk to?

```
 1              MS. SWIFT:  Object to the form.  Vague.
 2        A.    I'm not sure.  I may even be able to find
 3    that information out.  I would have to look once I
 4    got back to work.  Tammy may also know that, but
 5    our HR department may also know, too.  I really am
 6    not sure.
 7                    - - - - -
 8              (Thereupon, Deposition Exhibit
 9              Walgreens-Diebert 31, August 13,
10              2012 E-Mail WAGMDL00757172 -
11              007571187, was marked for purposes
12              of identification.)
13                    - - - - -
14        Q.    I'll show you what I'll mark as Exhibit
15    Number 31.  This is -- it begins with Bates
16    757172.
17              And, again, this is a document I just got
18    yesterday, so I think you might have a color copy
19    on the screen, but I just have a black and white
20    that I was able to print out downstairs.
21              Do you recognize the handwriting on this
22    document?
23        A.    That's Tammy's handwriting as well.
24        Q.    Do you retain any documents -- it looks
25    like Tammy collected some items that for whatever
```

Highly Confidential - Subject to Further Confidentiality Review

 1    reason she thought were significant to her and her

 2    job duties and kept them where they were

 3    accessible to her.  Do you do anything like that

 4    with any correspondence or documents?

 5              MS. SWIFT:  Object to the form.

 6        A.    I can't think of any correspondence that

 7    I would keep hard copies of, because it's all

 8    electronic already.

 9        Q.    Ms. Diebert, I think that's all I got for

10    you today.  Thank you.

11              MS. SWIFT:  I just have a few questions.

12    Do you want to take a break first, or do you want

13    to go ahead and get it done?

14              THE WITNESS:  I'm okay.

15              EXAMINATION OF JENNIFER DIEBERT

16    BY MS. SWIFT:

17        Q.    Good afternoon, Ms. Diebert.  How are you

18    doing?

19        A.    I'm good.  How are you?

20        Q.    I'm all right, thanks.

21              Have you always lived in the State of

22    Ohio?

23        A.    I have.

24        Q.    Have you always lived in the Perrysburg

25    area?

1    A.    No.  I actually grew up in Norwalk, which

2  is a little bit south of Sandusky.

3    Q.    About how far from Cleveland is that?

4    A.    About an hour.

5    Q.    When did you move to the Perrysburg area?

6    A.    When I was going to college at Bowling

7  Green State University in the late '90s.

8    Q.    Is Bowling Green also in Ohio?

9    A.    It is.

10    Q.    Are you married?

11    A.    I am.

12    Q.    Do you have kids?

13    A.    Yes.  We have four daughters ranging from

14  14 to 21.

15    Q.    And are any other members of your family

16  employees of the Perrysburg distribution center?

17    A.    Yes.  Actually, my oldest daughter just

18  recently started working there, and my husband

19  worked there as a senior maintenance tech.  He's

20  working with Prometica now, but he would like to

21  go back.

22    Q.    How long did your husband work at the

23  Perrysburg distribution center?

24    A.    He was not there long.  About two years.

25    Q.    Am I right that you have worked at

1    Perrysburg since about 2003?

2        A.    Yes.

3        Q.    Have you ever had -- in your employment

4    at Walgreens at the Perrysburg distribution

5    center, have you ever had any distribution-related

6    responsibilities for C-II controlled substances?

7        A.    No, I have not.

8            MR. GADDY:  Objection to form.

9            MS. SWIFT:  What's the basis of the form

10    objection?

11            MR. GADDY:  She testified that she didn't

12    have responsibilities for that, to the extent that

13    it mischaracterizes her testimony.

14            MS. SWIFT:  She's testified that she did

15    or that she didn't?  I'm sorry, I just didn't hear

16    what you said.

17            MR. GADDY:  That she didn't.

18            MS. SWIFT:  Let me ask the question

19    again.

20        Q.    And please tell me if I'm

21    mischaracterizing your testimony at any point,

22    okay?

23        A.    Okay.

24        Q.    Since you've worked for Walgreens at the

25    Perrysburg distribution center, have you ever had

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distribution-related responsibilities for C-II

 2    controlled substances?

 3              MR. GADDY:  Objection to form.

 4         A.    No, I have not.

 5         Q.    At a certain point in time while you

 6    worked for Walgreens at the Perrysburg

 7    distribution center, have you had certain

 8    responsibilities for C-III through V controlled

 9    substances?

10         A.    Yes, I have.

11         Q.    Am I right that you haven't had any

12    distribution-related responsibilities for any

13    controlled substances since around 2013?

14              MR. GADDY:  Objection to form.

15         A.    That's correct.

16         Q.    So it's been a long time since you had

17    any distribution-related responsibilities at the

18    distribution center; is that right?

19              MR. GADDY:  Same objection.

20         A.    That's correct.

21         Q.    Do you recall questions earlier today

22    about whether you were ever asked to look out for

23    large orders of C-II controlled substances once

24    you became a C2 manager?

25         A.    Yes, I do.
```

```
1    Q.    When you became a C2 manager at the
2    Walgreens Perrysburg distribution center, was
3    Walgreens distributing C-IIs at that point in
4    time?
5    A.    No, we were not.
6    Q.    Would there have been any reason for you
7    to look out for large orders of controlled
8    substances once you became a C2 manager?
9         MR. GADDY:  Objection to form.
10   A.    No, there wouldn't.
11   Q.    Is that because Walgreens was no longer
12   distributing controlled substances, or for some
13   other reason?
14        MR. GADDY:  Objection to form.
15   A.    It's because Walgreens was no longer
16   distributing controlled substances, and the orders
17   that came in were not checked by C2.  The computer
18   room checked those orders.
19   Q.    Am I right that the entire time you've
20   been the C2 manager, a third-party distributor has
21   handled the actual distribution of the orders that
22   you handle?
23   A.    Yes.
24   Q.    You became the C2 manager in late 2014;
25   is that right?
```

1    A.    That's correct.

2    Q.    As the C2 manager since late 2014, have

3    you ever had any responsibilities with respect to

4    C-III through V drugs?

5    A.    No, I have not.

6    Q.    Do you recall earlier today, Ms. Diebert,

7    you got a lot of questions about suspicious

8    controlled drug order reports, suspicious order

9    monitoring, and the term "suspicious orders" was

10    used a fair amount; do you recall that

11    questioning?

12    A.    Yes, I do.

13    Q.    Is that terminology around suspicious

14    orders or suspicious order monitoring the kind of

15    terminology that you used ever typically in your

16    day-to-day?

17    A.    No, it was not.

18    Q.    Back when Walgreens was still

19    distributing controlled substances, was it ever

20    part of your job to make sure that Walgreens

21    wasn't processing orders of excessive quantities

22    of controlled substances?

23    A.    It was.

24    Q.    And when I say "excessive quantities,"

25    was it also part of your job to make sure that

Highly Confidential - Subject to Further Confidentiality Review

1    Walgreens wasn't shipping orders of unusual size?

2            MR. GADDY:  Objection to form.

3        A.    Yes.  We would look for any large orders

4    and compare them against their history.

5        Q.    Did you take steps in your job to make

6    sure that at least as part of your job Walgreens

7    wasn't shipping orders of excessive quantities or

8    unusual size?

9            MR. GADDY:  Objection to form.

10       A.    Yes.

11       Q.    Do you have any knowledge of Walgreens

12   ever shipping excessive quantities of any products

13   to a Walgreens store?

14           MR. GADDY:  Objection to form.

15       A.    I don't have any personal knowledge of

16   that happening.

17       Q.    Do you have any knowledge of Walgreens

18   ever shipping controlled substances into

19   illegitimate channels?

20           MR. GADDY:  Objection to form.

21       A.    No, I don't.

22       Q.    To the extent that other departments at

23   Walgreens were evaluating orders, investigating

24   orders, doing diligence on orders, running queries

25   on orders, would you have known about it?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I would not have.

2    Q.    Do you recall earlier today you got a

3    series of questions, I'll call them timeline

4    questions, where counsel referred to a series of

5    documents that you've never seen before to try to

6    put together a timeline, I believe he used the

7    word "timeline" a couple of times.  Do you

8    remember those questions?

9    A.    I do.

10   Q.    Do you have any personal knowledge of the

11   timeline of any of the events in the documents

12   that counsel showed you that you hadn't seen

13   before?

14   A.    I don't.

15        MR. GADDY:  Objection to form.

16        MS. SWIFT:  I don't have any other

17   questions.  Thank you very much.

18        EXAMINATION OF JENNIFER DIEBERT

19   BY MR. GADDY:

20   Q.    Ms. Diebert, I want to make sure I

21   understand.  I thought I did, but I want to make

22   sure I understand your role as it relates to the

23   excessive quantity or the excessive orders that

24   you were -- that you were looking at.  Do you know

25   what I'm talking about?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. SWIFT:  Object to the form.

2     A.    Yes.  The large orders.

3     Q.    And it would be fair to say that your

4  goal in looking at that report was to -- was to

5  catch orders that were entered by the stores in

6  error?

7          MS. SWIFT:  Object to the form.

8     A.    It was.

9          MS. SWIFT:  Outside the scope.

10    A.    Yes.  We wanted to see if there were any

11 large orders that were unusual for the stores.

12    Q.    Well, you were trying to find orders that

13 were -- that were entered in error, correct?

14         MS. SWIFT:  Object to the form.  Asked

15 and answered.

16    A.    We don't know if they were entered in

17 error or if they were system-generated.  We just

18 wanted to check on any large orders that we

19 received.

20    Q.    Okay.  And I think you told us that in

21 the entire time that you worked with -- in C-III

22 to C-V as a SAIL coordinator, you don't recall

23 ever having any drugs pop on that report?

24         MS. SWIFT:  Object to the form.

25    A.    No.  I don't recall that happening.

1   Q.   Okay.  And I think we looked at the one

2   document from -- that had the e-mail from Matt Nye

3   where he said that the limit that they used for

4   the Schedule II drugs was 100 units, and that they

5   would call a pharmacy if they saw anything over

6   100 units flag on a report.  Do you recall that?

7   A.   I remember seeing that document referring

8   to C-IIs that computer room checked orders for.

9   Q.   Okay.  And you don't recall what the

10  number was that would trigger you to do any type

11  of follow-up or investigation, do you?

12  A.   I don't remember what the number -- the

13  threshold was for C-III through Vs when we checked

14  those orders.

15  Q.   And you don't recall that you've ever in

16  the entire time that you were a SAIL coordinator,

17  you don't recall ever once calling a pharmacy and

18  asking them about a C-III through V order, do you?

19  A.   No.  I don't recall having to do that.

20  Q.   And if you were to have called them and

21  asked them about a C-III through V order, the

22  intention of that call, or the purpose of that

23  call would have been to make sure that the order

24  that they entered in the report was entered

25  correctly and that it was not a mistake, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. SWIFT:  Objection.  Hypothetical.

 2      A.     That is correct.  We would want to make

 3   sure that the order was legitimate and not

 4   invalid.

 5      Q.     And I think we looked at the one example

 6   where there was some forms that were copied and

 7   pasted into the document where somebody had really

 8   wanted 3 units and they actually entered 300; do

 9   you recall that?

10      A.     We did see that example.

11      Q.     And those are the types of things that

12   you were looking for, where you had fat finger

13   type errors as far as entry mistakes, correct?

14      A.     They could be fat finger, but they also

15   could be system-generated errors -- or orders.  We

16   don't know how the orders got in the system.  We

17   were just checking the orders that were in there.

18      Q.     Okay.  But regardless, at no time while

19   you were the SAIL coordinator at Perrysburg do you

20   ever recall calling a pharmacy and cutting an

21   order for a controlled substance?

22              MS. SWIFT:  Object to the form.

23      A.     No.  I do not recall ever having to do

24   that.

25      Q.     Okay.  No more questions.
```

Highly Confidential - Subject to Further Confidentiality Review

1            THE VIDEOGRAPHER:  Going off the record

2      at 3:35 p.m.  This concludes the videotaped

3      deposition of Ms. Diebert.

4            (The deposition was concluded at 3:35

5      p.m.)

6                  SIGNATURE:

7      It was agreed by and between counsel and the

8      parties that the Deponent will read and sign the

9      transcript of said deposition.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2   The State of Ohio,    )
 3                                 SS:
 4   County of Cuyahoga.   )
 5            I, Todd L. Persson, a Notary Public
     within and for the State of Ohio, duly
 6   commissioned and qualified, do hereby certify that
     the within named witness, JENNIFER DIEBERT, was by
 7   me first duly sworn to testify the truth, the
     whole truth and nothing but the truth in the cause
 8   aforesaid; that the testimony then given by the
     above-referenced witness was by me reduced to
 9   stenotypy in the presence of said witness;
     afterwards transcribed, and that the foregoing is
10   a true and correct transcription of the testimony
     so given by the above-referenced witness.
11            I do further certify that this deposition
     was taken at the time and place in the foregoing
12   caption specified and was completed without
     adjournment.
13            I do further certify that I am not a
     relative, counsel or attorney for either party, or
14   otherwise interested in the event of this action.
                 IN WITNESS WHEREOF, I have hereunto set
15   my hand and affixed my seal of office at
     Cleveland, Ohio, on this 29th day of
16   January, 2019.
17
18
19
21            Todd L. Persson, Notary Public
              within and for the State of Ohio
22
     My commission expires August 1, 2022.
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -   -   -   -

                       E  R  R  A  T  A

 2                    -   -   -   -   -   -

 3

 4     PAGE   LINE   CHANGE

 5     _____  _____  _____

 6        REASON:    _____

 7     _____  _____  _____

 8        REASON:    _____

 9     _____  _____  _____

10        REASON:    _____

11     _____  _____  _____

12        REASON:    _____

13     _____  _____  _____

14        REASON:    _____

15     _____  _____  _____

16        REASON:    _____

17     _____  _____  _____

18        REASON:    _____

19     _____  _____  _____

20        REASON:    _____

21     _____  _____  _____

22        REASON:    _____

23     _____  _____  _____

24        REASON:    _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2              ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     JENNIFER DIEBERT              DATE

16

17

18    Subscribed and sworn

      to before me this

19    _____ day of _____, 20____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24

25
```