```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5

    IN RE NATIONAL PRESCRIPTION  | Case No. 17-MD-2804
 6                               |
    OPIATE LITIGATION            | Hon. Dan A. Polster
 7                               |
    APPLIES TO ALL CASES         |
 8

 9                        - - -

10             Friday, November 16, 2018

11                        - - -

12

            HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
13
                   CONFIDENTIALITY REVIEW
14
                          - - -
15

16

17

        Videotaped deposition of CHAD DUCOTE, held
18    at the offices of Mitchell Williams,
      4206 South J.B. Hunt Drive, Suite 200, Rogers,
19    Arkansas, commencing at 8:04 a.m., on the above
      date, before Susan D. Wasilewski, Registered
20    Professional Reporter, Certified Realtime
      Reporter and Certified Realtime Captioner.
21

22

23                        - - -

24             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

| Page 2 |
|---|

1  APPEARANCES:
2  CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
   BY:  ZACHARY S. BOWER, ESQUIRE
3    MICHAEL A. INNES, ESQUIRE
   5 Becker Farm Road
4  Roseland, New Jersey 07068
   (973) 994-1700
5  zbower@carellabyrne.com
   minnes@carellabyrne.com
6  Representing Plaintiffs
7
8  JONES DAY
   BY:  TARA A. FUMERTON, ESQUIRE
9    SCOTT B. ELMER, ESQUIRE
   77 West Wacker
10 Chicago, Illinois 60601
   (312) 782-3939
11 tfumerton@jonesday.com
   selmer@jonesday.com
12 Representing Walmart
13
14 PELINI CAMPBELL & WILLIAMS LLC
   BY:  CRAIG M. EOFF, ESQUIRE
15 8040 Cleveland Avenue NW, Suite 400
   North Canton, Ohio 44720
16 (330) 305-6400
   ceoff@pelini-law.com
17 Representing Prescription Supply Inc.
18
19 BARBER LAW FIRM
   BY:  M. EVAN STALLINGS, ESQUIRE
20 425 West Capitol Avenue, Suite 3400
   Little Rock, Arkansas 72201
21 (501) 372-6175
   estallings@barberlawfirm.com
22 Representing Cardinal Health
23
24
25

| Page 3 |
|---|

1  APPEARANCES VIA TELEPHONE AND STREAM:
2  REED SMITH LLP
   BY:  LINDSAY A. DeFRANCESCO, ESQUIRE
3  1301 K Street, N.W., Suite 1000 - East Tower
   Washington, D.C. 20005
4  (202) 414-9200
   ldefrancesco@reedsmith.com
5  Representing AmerisourceBergen Drug Corporation
6
   MARCUS & SHAPIRA LLP
7  BY:  RICHARD HALPERN, ESQUIRE
   One Oxford Centre, 35th Floor
8  Pittsburgh, Pennsylvania 15219
   (412) 471-3490
9  halpern@marcus-shapira.com
   Representing HBC Service Company
10
11 MORGAN, LEWIS & BOCKIUS LLP
   BY:  MATTHEW LADD, II, ESQUIRE
12 101 Park Avenue
   New York, New York 10178-0060
13 (212) 309-6000
   ladd@morganlewis.com
14 Representing Rite Aid
15
   BARTLIT BECK LLP
16 BY:  ALEX HARRIS, ESQUIRE
   1801 Wewatta Street, Suite 1200
17 Denver, Colorado 80202
   (303) 592-3100
18 alex.harris@bartlit-beck.com
   Representing Walgreens
19
20 COVINGTON & BURLING LLP
   BY:  MARINA DALIA-HUNT, ESQUIRE
21 3000 El Camino Real, 5 Palo Alto Square, 10th Floor
   Palo Alto, California 94306-2112
22 (650) 632-4700
   mdaliahunt@cov.com
23 Representing McKesson
24 ALSO PRESENT:
   DAN LAWLOR, Videographer
25 JENNIFER B. BECHET, ESQUIRE, Walmart Legal

| Page 4 |
|---|

1    - - -
2   I N D E X
3    - - -
4  Testimony of:  CHAD DUCOTE    Page
5    DIRECT EXAMINATION BY MR. INNES.............  7
6    CROSS-EXAMINATION BY MS. FUMERTON..............  293
7
8   E X H I B I T S
9   (Attached to transcript)
10  CHAD DUCOTE DEPOSITION EXHIBITS    PAGE

10  Walmart -    LinkedIn Web Page - Chad Ducote    19
    Ducote
11  Exhibit 1
12  Walmart -    E-mail - Subject:  REVIEW -    63
13  Ducote    Interim SOM Processes
    Exhibit 2    WMT_MDL_000022832 through 22835
14
    Walmart -    E-mail - Subject:  Wal-Mart    69
15  Ducote    Stores East, LP, Bentonville, AR
    Exhibit 3    - 1st Corporate P&P Review Report
16    WMT_MDL_000016251 through 16254
17  Walmart -    E-mail - Subject:  Per your call    73
    Ducote    WMT_MDL_000019447 and 19448
18  Exhibit 4
19  Walmart -    E-mail - Subject:  Som position    92
    Ducote    WMT_MDL_000016686 and 16687
20  Exhibit 5
21  Walmart -    E-mail - Subject:  SOM overview    136
    Ducote    WMT_MDL_000009158 through 9160
22  Exhibit 6
23  Walmart -    E-mail - Subject:  SOM Pilot at    145
    Ducote    DC 6045
24  Exhibit 7    WMT_MDL_000008147 through 8148
25

| Page 5 |
|---|

1   E X H I B I T S
2   (Attached to transcript)
3  CHAD DUCOTE DEPOSITION EXHIBITS    PAGE

4  Walmart -    E-mail - Subject:  Updated SOM    151
   Ducote    Overview May 2015.1.pptx
5  Exhibit 8    WMT_MDL_000019339 and 19340
6  Walmart -    E-mail - Subject:  (No subject)    238
   Ducote    WMT_MDL_000020060 and 20061
7  Exhibit 9
8  Walmart -    E-mail - Subject:  SOM Alerts    262
   Ducote    WMT_MDL_000007345
9  Exhibit 10
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
1              ---
2       THE VIDEOGRAPHER:  We are now on the record.
3   My name is Dan Lawlor.  I'm a videographer of
4   Golkow Litigation Services.
5       Today's date is November 16, 2018, and the
6   time is 8:04 a.m.
7       This video deposition is being held in
8   Rogers, Arkansas, in the matter of National
9   Prescription Opiate Litigation, MDL Number 2804.
10  The deponent is Chad Ducote.
11      Counsel will be noted on the stenographic
12  record.
13      The court reporter is Susan Wasilewski and
14  will now swear in the witness.
15      THE COURT REPORTER:  Sir, would you raise
16  your right hand.
17      Do you solemnly swear or affirm the
18  testimony you're about to give will be the truth,
19  the whole truth, and nothing but the truth?
20      THE WITNESS:  Yes.
21      THE COURT REPORTER:  Thank you.
22      CHAD DUCOTE, called as a witness by the
23  Plaintiffs, having been duly sworn, testified as
24  follows:
25
```

Page 7

```
1            DIRECT EXAMINATION
2   BY MR. INNES:
3       Q.  Good morning, Mr. Ducote.  My name is
4   Michael Innes.  I represent the plaintiffs in this
5   case.  Thank you for being here today.  Thank you
6   for starting a little bit earlier than usual.  I do
7   appreciate that.
8       Could you state your full name for the
9   record.
10      A.  Full name is Chad Edward Ducote.
11      Q.  What is your current occupation?
12      A.  Current occupation is Division Vice
13  President for Supply Chain.
14      Q.  And for what company?
15      A.  Walmart.
16      Q.  Thank you.
17      You understand that you're under oath,
18  right?
19      A.  Yes.
20      Q.  And are you taking any medication or is
21  there any other reason that would interfere with
22  your ability to answer my questions fully and
23  truthfully today?
24      A.  No.
25      Q.  Some basic ground rules -- well, let me
```

Page 8

```
1   start here.  Have you ever sat for a deposition
2   before?
3       A.  Years ago.
4       Q.  Years ago.  So you might know the ground
5   rules.  I'll go over some basic ones.  If I ask a
6   question you don't understand, please let me know
7   and I'll try to rephrase it.
8       A.  Okay.
9       Q.  If you do answer my question, I'll assume
10  you understand the question.
11      Your answers must be audible, spoken.  The
12  court reporter can't take down a nod, so we just
13  need to have a spoken answer.
14      You said you -- you testified in a
15  deposition years ago?
16      A.  Yes.
17      Q.  Do you recall what that was?
18      A.  It was an employment issue.
19      Q.  And was that related to your employment at
20  Walmart?
21      A.  Yes.
22      Q.  And what particularly did that apply to?
23      A.  It was a litigation regarding an individual
24  that was terminated.
25      Q.  So were you a plaintiff or a defendant in
```

Page 9

```
1   the case?
2       A.  Walmart was who was being sued.
3       Q.  Walmart was being sued?
4       A.  Yes.
5       Q.  And you were a witness for Walmart?
6       A.  Yes.
7       Q.  Okay.  Did that have anything to do with
8   Schedule II narcotics?
9       A.  No.
10      Q.  Did it have anything to do with dispensing?
11      A.  No.
12      Q.  Who are the people seated with you today?
13      A.  Tara.  I'm sorry, I do not recall --
14      MS. FUMERTON:  He's not going to be
15  offended.
16      A.  Paul?  No.  Sorry.
17      The attorneys that represent me.
18      Q.  Fair question.  And I'm sorry, is the woman
19  at the end of the table --
20      A.  Jennifer.
21      MS. FUMERTON:  I can handle it.  Jennifer
22  Bechet, who was in-house counsel at Walmart.
23  BY MR. INNES:
24      Q.  Mr. Ducote, what did you do to prepare for
25  this deposition today?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    A.  I had three meetings with attorneys.
2    Q.  How long were those meetings?
3    A.  They ranged from four hours to eight to nine
4  hours.
5    Q.  And when were those meetings?
6    A.  One was yesterday, one was the day before
7  and another was last either Thursday or Friday.  I
8  can't recall exactly.
9    Q.  Who was present at those meetings?
10    A.  The one that was last week was via a Zoom
11  videoconference.  I don't remember everyone who was
12  present.  And Tara was present on that one last
13  week.  The meeting this week, Tara was present,
14  Jennifer was present and there were other attorneys
15  who were present.
16    Q.  Were there any non-attorneys who were
17  present?
18    A.  No.
19    Q.  Were the attorneys all from either Walmart
20  in-house counsel or Jones Day?
21    A.  There were a combination of both.
22    Q.  But there were no attorneys from an entity
23  other than Jones Day or Walmart?
24    A.  No.
25    Q.  Did you review any documents?

Page 11

1    A.  Yes.
2    Q.  Did you review documents with counsel in
3  those meetings?
4    A.  Could you restate that.
5    Q.  Did you review documents with counsel in
6  those meetings?
7    A.  You're referring to the attorneys that were
8  present?
9    Q.  Yes.
10    A.  Yes.
11    Q.  Did you review any documents for preparation
12  for the deposition outside of counsel?
13    A.  No.
14    Q.  Did you review any deposition or trial
15  testimony?
16    A.  No.
17    Q.  Did you review any court documents?
18    MS. FUMERTON:  Objection.  I don't think
19  that is going to -- are you asking outside of the
20  questioning of while we were in the meeting or
21  with the attorneys?
22    MR. INNES:  In general.
23  BY MR. INNES:
24    Q.  The question is did you review any court
25  documents in preparation for today's deposition?

Page 12

1  Yes-or-no question.
2    MS. FUMERTON:  Yeah, but how is that not
3  going to be privileged information?
4    MR. INNES:  It's a yes or no.
5    MS. FUMERTON:  I understand.  But I think to
6  the extent you're asking about what documents he
7  reviewed while he was with counsel --
8    MR. INNES:  So you're objecting to the fact
9  there was a court document?
10    MS. FUMERTON:  No, I'm objecting to the fact
11  that you were asking what documents he was
12  reviewing with counsel.
13  BY MR. INNES:
14    Q.  Did you review any documents -- I apologize.
15  I may have asked this already.
16    Did you review any court documents outside
17  the presence of counsel?
18    A.  Just state it one more time to make sure I
19  fully understand.
20    Q.  Did you review any court documents outside
21  the presence of counsel?
22    A.  No, not that I'm aware of, that there were
23  any court documents.
24    Q.  Have you read the complaint in this case?
25    A.  No.

Page 13

1    Q.  Have you looked at your own personal
2  documents or electronic files, that kind of
3  documents, that might be relevant to this litigation
4  or might refresh your recollection?
5    MS. FUMERTON:  And give just a second to
6  object.
7    Again, I'm going to have a standing
8  objection if you're asking to anything that we
9  had reviewed during our meetings with counsel.
10  But if you're asking about what he may have
11  reviewed outside of meetings with counsel or at
12  the direction of counsel, I have no objection
13    A.  Could you restate that question, then.
14    Q.  Have you looked at any of your own personal
15  paper or electronic files to find documents that
16  might be relevant to this litigation or that might
17  refresh your recollection?
18    MS. FUMERTON:  The question is outside of
19  the context of our review.
20    THE WITNESS:  Okay.  So during the context
21  of the question --
22    MR. INNES:  That's not the question.
23    MS. FUMERTON:  I'm objecting to the question
24  if you're not -- if asking him whether he
25  reviewed documents in the presence of counsel.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    MR. INNES: Are you instructing him to not
2 answer the question?
3    MS. FUMERTON: Yes, if that's your question.
4 I thought you were limiting it.
5    I mean, it's a compound -- you asked a
6 compound question, first of all, right. So if
7 you want to break up the question, then I think
8 that there are parts that could potentially --
9 you can ask the question how you want, but that's
10 a compound question and, as asked, it's asking
11 for potentially privileged information. If you
12 want to limit it in another way, there may be a
13 nonobjectionable question you can ask.
14 BY MR. INNES:
15    Q. Outside meetings with counsel, have you
16 reviewed any documents to refresh your recollection
17 relevant to this case?
18    A. I did not take any documents and review
19 outside of the meetings with counsel.
20    Q. Have you found any documents in your own
21 personal files that are relevant to this case?
22    MS. FUMERTON: Objection; form.
23    A. Could you restate it?
24    Q. Have you identified any documents in your
25 possession that are relevant to this case?

Page 15

1    MS. FUMERTON: And again I'm going to object
2 to the question to the extent you're asking about
3 any actions that were taken at the direction of
4 counsel. If you're asking what he independently
5 did, you can answer the question.
6    A. I'm a little confused on what the question
7 is, actually, if you could clarify.
8    Q. That's because multiple people are asking
9 questions.
10    So my question is did you review any -- I'm
11 sorry. Did you -- strike that.
12    Did you identify any documents in your
13 preparation for today's deposition that are relevant
14 to this case?
15    MS. FUMERTON: Objection; form. It has to
16 be outside of meetings with counsel. So outside
17 meetings with counsel -- I'm not trying to be
18 difficult, but we're not going to answer as to
19 what questions -- any question about what he
20 reviewed while in our meetings with counsel.
21    If you're asking outside of that, that's a
22 different situation.
23    MR. INNES: Outside.
24 BY MR. INNES:
25    Q. Outside of your meetings with counsel, have

Page 16

1 you identified any documents that are relevant to
2 this case?
3    A. The answer to that question, the one that
4 you're asking, is no.
5    MR. INNES: Can I short-circuit this? Can I
6 get a representation from you that all documents
7 that he had reviewed and provided to you in this
8 course of this litigation have been produced or
9 have been recorded as privileged?
10    MS. FUMERTON: Well, no. So it would be
11 only all relevant documents subject to our other
12 objections.
13    MR. INNES: Okay.
14 BY MR. INNES:
15    Q. Did you speak with any representative, any
16 other defendant in this case, prior to your
17 deposition?
18    A. Could you repeat it.
19    Q. Sorry, I was going too fast. I'll break it
20 down.
21    A. Okay.
22    Q. Prior to today, did you speak with any
23 representative from any other defendant in this case
24 regarding today's deposition?
25    A. Just for my clarity, a defendant, I would

Page 17

1 be -- who is a defendant, just to make sure I have
2 that clear?
3    Q. Sure. For instance, Purdue.
4    A. Okay. So restate the question now that I'm
5 clear on "defendant."
6    Q. Did you speak with anyone from Purdue Pharma
7 prior to your deposition today --
8    MS. FUMERTON: Objection.
9 BY MR. INNES:
10    Q. -- regarding this case?
11    A. No.
12    Q. Did you speak with anyone from Cardinal
13 Health prior -- same question.
14    Did you speak with anyone from Cardinal
15 Health prior to your deposition today regarding this
16 case?
17    A. No.
18    Q. Are you familiar with who the defendants are
19 in this case?
20    A. No, not completely.
21    Q. We're going -- we'll circle back to this
22 question.
23    A. Okay.
24    Q. Did you speak with anyone other than counsel
25 prior to the deposition today regarding this case?

Page 18

1    A. They had -- yes, but not regarding the case.
2  About the deposition, that I would not be at work
3  during the time period, that I was going to be out.
4      Is that the question you're asking me or am
5  I confused on the question?
6    Q. I can clarify.
7    A. Okay.
8    Q. Did you speak with anyone other than counsel
9  regarding the subject matter of this case prior to
10 today's deposition?
11   A. No.
12   Q. And I'm not --
13   A. No.
14   Q. No?
15   A. I did not. Just that I was going to be in a
16 deposition and unavailable.
17   Q. I understand.
18     MS. FUMERTON: And we're doing okay but
19 let's just -- make sure he gets his whole
20 question out before he answers. We're talking
21 over each other slightly.
22     THE WITNESS: I thought he was finished with
23 his question.
24     MS. FUMERTON: No, that's better. Just give
25 a slight pause.

Page 19

1  BY MR. INNES:
2    Q. Did you speak with Mr. Abernathy at all
3  regarding this case?
4    A. I would say no. I do speak to Jeff every so
5  often, but I don't recall ever speaking to him about
6  this case.
7      THE COURT REPORTER: I'll get you a sheet
8  going here.
9    Q. Mr. Ducote, we're just going to mark an
10 exhibit and then show it to you. The court reporter
11 is just marking my exhibit tabs for me.
12   A. So when you do state it to me, do I have to
13 state anything about the exhibit number?
14   Q. We'll go through that in a minute.
15   A. Okay.
16     MS. FUMERTON: No, you don't need to -- he's
17 asking the question. You don't really have to
18 say anything about anything other than I want a
19 break or I want to talk to Tara, unless he asks
20 you a question. He has to handle the documents.
21 BY MR. INNES:
22   Q. And if you do want a break at any time,
23 please let me know. We'll go off the record.
24     (Ducote Exhibit 1 was marked for
25 identification.)

Page 20

1  BY MR. INNES:
2    Q. So I'm handing you what's been marked as
3  Plaintiff Exhibit 1.
4    Q. Take your time, review the document, and
5  when you're done, I'll ask you some questions.
6    A. I'm done.
7    Q. Thank you.
8      Mr. Ducote, do you recognize this document?
9    A. Yes.
10   Q. Is this -- is this document something that
11 you generated?
12   A. At the --
13     MS. FUMERTON: Objection; form.
14   A. Okay. Could you restate it to make sure
15 I've got the question correct.
16   Q. Do you not understand the question?
17   A. Just restate it just to make sure I heard
18 it.
19   Q. Is this a document that you generated?
20     MS. FUMERTON: Same objection.
21 BY MR. INNES:
22   Q. I'll strike that.
23     Is this your LinkedIn page?
24   A. Yes.
25   Q. When did you last update your LinkedIn page?

Page 21

1    A. I do not recall exactly.
2    Q. Would you say that this is a -- the current
3  version of your LinkedIn page?
4    A. The current version, as I'm aware of it, and
5  LinkedIn does at times update things, I find, that
6  didn't necessarily I did. There may be a word or
7  two change, but the content, the majority of it is.
8    Q. Okay. So you graduated from the University
9  of Louisiana Monroe with a Bachelor of Science in
10 Pharmacy?
11   A. Yes.
12   Q. And what year was that?
13   A. That was 1997.
14   Q. What is a Bachelor of Science in Pharmacy
15 exactly?
16   A. There are two degrees that qualify you to
17 become a pharmacist in most states. It's either a
18 bachelor of science or Docket of Pharmacy. I went
19 to a school that offered a bachelor of science
20 degree.
21   Q. So you obtained a bachelor of science
22 degree, and that would allow you in some states to
23 become a licensed pharmacist?
24   A. Yes, that's correct.
25   Q. And as part of your studies did you take any

Page 22

1 classes on Schedule II narcotics?
2    A.  Not specifically Schedule II.  There are
3 classes about pharmacy law that encompass that, but
4 it wasn't narrowly just Schedule II narcotics.
5    Q.  Did you take pharmacy law classes?
6    A.  Yes.
7    Q.  Did the pharmacy law classes cover the
8 Controlled Substances Act?
9    A.  I don't recall specifically if it -- the
10 Controlled Substances Act covered.
11    Q.  Were -- and do you recall if any other --
12 any federal regulations related to the sale of
13 pharmaceuticals were covered during your classes?
14    A.  Yes.  Yes.
15    Q.  And what were those statutes or regulations
16 in particular?
17    A.  I don't remember the exact regulations, but
18 what was covered were basically what -- how the drug
19 approval process worked, how the FDA worked to get
20 to a legend drug.
21    Q.  Okay.  Did you cover any statutes,
22 regulations, laws, that would cover the sale or
23 distribution -- strike that -- cover the sale of
24 pharmaceuticals?
25       MS. FUMERTON:  Objection to form.

Page 23

1    A.  I thought you were going to reask the
2 question.  I'm sorry.  Could you state it again.
3    Q.  So one of the ground rules I failed to
4 mention is your counsel can interpose an objection
5 at any time.  If she interposes an objection, you
6 can still answer so long as you understand the
7 question.  That's my primary ground rules.  If you
8 understand the question, please answer it.  If you
9 don't, I'll do my best to rephrase it.
10    A.  I was aware of that.  It just seemed as
11 though you were going to reask the question.  I
12 apologize.  The hesitation caught me off guard.
13    Q.  No problem.  We'll feel this out as we go.
14    A.  Okay.  So maybe once again could you just
15 ask that question.
16    Q.  Sure.
17       In your studies at the University of
18 Louisiana at Monroe to obtain your Bachelor of
19 Science in Pharmacy, did you study laws or
20 regulations that would cover the distribution of
21 pharmaceuticals?
22    A.  I do not recall specifically if that was in
23 the class or not.
24    Q.  Okay.  After you graduated in 1997, you went
25 to the University of Florida where you obtained a

Page 24

1 Master's of Science in Pharmacy Administration,
2 Pharmacy Policy and Regulatory Affairs; is that
3 correct?
4    A.  Yes.
5    Q.  During your studies at the University of
6 Florida to obtain that degree, did you take any
7 classes dealing with the Controlled Substances Act?
8    A.  Yes.
9    Q.  And what were those classes?
10    A.  I do not recall the specific classes, but it
11 was a topic that was covered in at least one of the
12 classes.
13    Q.  Was it a pharmacy law class?
14    A.  I wouldn't characterize it as pharmacy law.
15 It was more just general here's a category and
16 here's topics.  I wouldn't say there was a class
17 that was law and that's what was covered.  I was
18 just part of a class.
19    Q.  What was the focus of your master's degree?
20    A.  The focus for myself of why I went into that
21 program was really the drug approval process.
22    Q.  What's the drug approval process?
23    A.  Really, how a drug goes from being
24 developed, the initial clinical trials, how it's
25 tested, how it's marketed, goes through patents and

Page 25

1 things of that nature.  That's what my focus was
2 during that time period.
3    Q.  So is it fair to say your studies were
4 limited to research and development through the
5 patent process?
6       MS. FUMERTON:  Objection; form.
7    A.  That was the main part of the course.  I
8 mean, there are other subcourses in it, but the
9 majority of the coursework was around FDA drug
10 approval.
11    Q.  So it's my understanding of the
12 pharmaceutical industry that a drug is developed,
13 drug goes through regulatory process for approval,
14 and then that drug is manufactured, and then that
15 drug is sold to the public.
16       I'd like to focus on the last piece of that.
17 Did you take classes dealing with the sale of drugs
18 to the general public?
19       MS. FUMERTON:  Objection; form.
20    A.  I really couldn't answer that question
21 because it's such a broad question.  Could you
22 narrow the question potentially?
23    Q.  Sure.
24       So you would agree that a pharmaceutical
25 company develops a drug, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  A.  Yes.
2  Q.  And they're in the business of manufacturing
3  drugs?
4      MS. FUMERTON:  Objection; form.
5  A.  Some do, some don't.
6  Q.  And then you'd agree that those
7  manufacturers oftentimes sell those drugs to the
8  general public?
9      MS. FUMERTON:  Objection; form.
10  A.  The manufacturers -- the way you're asking
11  the question, I would say manufacturers, no, do not
12  sell to the general public, if that's the question
13  you're asking.
14  Q.  Fair point.
15      A manufacturer puts a drug or a pill into
16  the marketplace that can be prescribed to a patient;
17  is that a fair statement?
18  A.  Yes.
19      MS. FUMERTON:  Objection; form.
20  A.  Yes.
21  Q.  During your studies either at the University
22  of Louisiana Monroe for your bachelor of pharmacy or
23  your studies at University of Florida for your
24  master's and --
25      Did you study any of the laws or regulations

Page 27

1  that governed the prescription -- I'm sorry, the
2  dispensing of a drug to a patient?
3  A.  Could you restate the question for me?
4  Q.  Did you ever study laws or regulations
5  pertaining to the dispensing of drugs to
6  individuals?
7      MS. FUMERTON:  Objection; form.
8  A.  The way I understand your question, the
9  answer would be yes.
10  Q.  And what -- and what were those laws or
11  regulations?
12  A.  Most of those -- most of those laws and
13  regulations relate around state -- state
14  requirements such as -- I'm struggling to remember
15  exact details but, you know, basically that the
16  prescription -- that has been a long time ago.
17      Could you -- I'm sorry to ask you to restate
18  that question.  Could you restate it?
19  Q.  Did you ever study laws or regulations
20  pertaining to dispensing drugs to individuals?
21      MS. FUMERTON:  Objection; form.
22  Q.  I'm sorry, that was one question above.
23      You've testified that you did study -- your
24  testimony today is you have studied laws and
25  regulations pertaining to the dispensing of drugs to

Page 28

1  individuals.
2      My question for you is what are those --
3  what were those regulations or laws that you've
4  studied?
5      MS. FUMERTON:  Objection; form.
6  A.  I could not tell you the specific ones.
7  Q.  Okay.  Controlled Substances Act was one of
8  them, perhaps?
9  A.  Earlier, when you asked the question if that
10  was covered in a class, it was covered in a class.
11  Q.  What's your understanding of the Controlled
12  Substances Act generally?
13  A.  It is a very broad question.
14  Q.  What's your understanding of the Controlled
15  Substances Act as it applies to Schedule II or
16  Schedule III narcotics?
17      MS. FUMERTON:  Objection; form.
18  A.  Just restate one more time.  I think I
19  understood what you said but one more time.
20  Q.  What's your understanding of the Controlled
21  Substances Act as it applies to Schedule II
22  narcotics?
23  A.  Okay.  The way I understood your question is
24  the Controlled Substance Act gives some guidelines
25  as far as how a drug is scheduled, and that's the

Page 29

1  basic premise around Schedule II.  It gives a
2  different guidance on how the drug should be
3  scheduled and if a drug meets that criteria, it's
4  scheduled into a Schedule II.
5  Q.  Following the University of Florida, you
6  went on to Stetson University where you obtained
7  your Master's of Business Administration; is that
8  correct?
9  A.  That's correct.
10  Q.  What was the focus of your studies at
11  Stetson University?
12  A.  General business with more a focus on
13  finance.
14  Q.  Finance as it relates to the pharmaceutical
15  industry?
16  A.  They did cover pharmaceutical industry
17  finance, but it was broader.  It was just finance in
18  general, how things such as -- if I recall
19  correctly, Disney, since they are near Disney's main
20  campus in Orlando, and a few other companies.
21  Q.  Orlando would be a fun town to go to school
22  in.
23  A.  Yeah.
24  Q.  Did you study logistics at Stetson?
25  A.  There was a course that did cover supply

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  chain.  It covered it, from what I recall, two
2  sides, technology systems and there were just basic
3  math of supply chain.
4      Q.  And to be clear, you were enrolled in that
5  class?
6      A.  Could you -- say that again.
7      Q.  You enrolled in that class?
8          MS. FUMERTON:  Objection; form.
9      A.  There were specific courses you had to take.
10 It wasn't an option.  It was -- I couldn't tell you
11 the exact title of the course, but the premise of it
12 was basically technology.
13     Q.  Yeah.  To be clear, I'm not asking for the
14 exact title or the level number.
15     A.  Okay.
16     Q.  Those can be long in a course book.  What
17 I'm asking -- and I want to be clear -- is that
18 course offered at Stetson?
19     A.  Yes.
20     Q.  And you sat in a classroom at Stetson?
21     A.  Potentially not.  Some of these courses were
22 online.  So some were actually I had to go to
23 Stetson.  Some were online.  That one could have
24 been online.
25     Q.  Do you recall viewing that class online?

Page 31

1      A.  That, I do not recall exactly.
2      Q.  Do you recall sitting in a classroom for
3  that class?
4      A.  I don't recall.  I do -- if I -- it most
5  likely was online for that course.  I just don't
6  recall exactly.
7      Q.  What grade did you get in that class?
8      A.  An A.  I do recall that.
9      Q.  That's good.  You don't recall going to
10 class, but you got an A.  I wish I could have done
11 that.
12     A.  I just recall.  I think I've made As in all
13 the courses.
14         MS. FUMERTON:  Easy answer, then.
15 BY MR. INNES:
16     Q.  Let's continue right up the page here.
17     A.  Okay.
18     Q.  You were a pharmacy intern, cashier, cart
19 pusher, sales associate, unloader from February '92
20 to December '97.
21         Was that at Walmart?
22     A.  Yes.
23     Q.  You then went to be a pharmacist or pharmacy
24 manager from '97 -- December '97 to June 1999, also
25 at Walmart?

Page 32

1      A.  Yes.
2      Q.  You then rose to the level of manager of
3  pharmacy recruiting June 1999 to August 2002, also
4  at Walmart?
5      A.  Yes.
6      Q.  You then moved to divisional compliance
7  director, also at Walmart, in August 2004?
8      A.  You skipped one role, but yes.
9      Q.  I'm sorry.  I did.
10         You were the director of training and
11 development, also at Walmart, from August 2002 to
12 August 2004?
13     A.  Yes.
14     Q.  Thank you for correcting me on that.
15         Then you became a divisional compliance
16 director from August 2004, for about 18 years, to
17 July 2010; is that right?
18         MS. FUMERTON:  No.  Objection; form and to
19     the math, I guess.
20 BY MR. INNES:
21     Q.  I'm just reading the document.
22         MS. FUMERTON:  I think that this can be
23     easily clarified.
24     A.  Yes, that's -- I was going to clarify.  It
25 was six years.  The LinkedIn profile did some odd

Page 33

1  math on that.
2      Q.  To be clear, divisional compliance officer
3  at Walmart from July 2004 to July 2010?
4      A.  Yes.
5      Q.  And what were your duties as a divisional
6  compliance director?
7      A.  In that role, I was responsible for
8  Louisiana, Mississippi, and Tennessee, that
9  territory, and it was operational compliance, which
10 is really more some auditing functions.
11     Q.  What do you mean by auditing functions?
12     A.  We would look at things such as food safety
13 to make sure that our stores -- we -- our stores
14 have a great deal of -- great deal of different
15 types of products that we prepare, so we would go in
16 to make sure they were properly preparing food
17 products, things of that nature.
18     Q.  So in that role did you deal with
19 pharmaceuticals?
20     A.  There was a time where we did.
21     Q.  And within that time did you deal with
22 Schedule II narcotics?
23         MS. FUMERTON:  Objection; form.
24     A.  Not specifically with Schedule II narcotics.
25     Q.  Did you do -- did you deal with Schedule III

Page 34

1  narcotics?
2      MS. FUMERTON:  Objection; form.
3  BY MR. INNES:
4      Q.  I'll rephrase.
5      Did you have any responsibility or --
6  regarding hydrocodone?
7      MS. FUMERTON:  Objection; form.
8      A.  I maybe misunderstand your question.  Could
9  you narrow it down for me?
10     Q.  We're discussing your time as a divisional
11 compliance director at Walmart between the years
12 2004 and 2010.  I'd like to know what, if any,
13 dealings or responsibilities you had with respect to
14 opioids.
15     MS. FUMERTON:  Objection; form.
16     A.  During that role, that time period, there
17 was never a time where I actually -- I'm having
18 trouble understanding your question when you say
19 "responsibility" or "involvement."  What does that
20 actually mean?  That's where I'm struggling with the
21 question.
22     Q.  As part of your auditing functions within
23 your role as divisional compliance director from
24 August 2004 to July 2010, did those audits involve
25 Schedule II narcotics?

Page 35

1      A.  They involved recordkeeping.
2      Q.  Recordkeeping of Schedule II narcotics?
3      A.  Yes, at times.
4      Q.  Over the course of the entire time period?
5      A.  No, not the entire time period.
6      Q.  What specific time period?
7      A.  I'd be speculating the exact time period.
8  It was more towards the beginning of the 2004 time
9  period, but it ended at some point during that time
10 period.
11     Q.  Did any of your audits or audit functions
12 involve Schedule III narcotics during that time
13 period?
14     A.  Yes.
15     Q.  What were those Schedule III narcotics?
16     A.  That, I do not recall exactly which
17 Schedule III, but there were Schedule III narcotics
18 looking at recordkeeping.
19     Q.  Was hydrocodone one of those?
20     A.  Yes.
21     Q.  And during what time period did your audits
22 address hydrocodone?
23     A.  Again, it would have been that 2004 time
24 period and would have ended at some point, just I
25 don't recall exactly when it would have ended.

Page 36

1      Q.  Are you aware that the country is in the
2  midst of an opioid epidemic?
3      MS. FUMERTON:  Objection; form.
4      A.  I think there is just a general epidemic of
5  drug abuse, not necessarily just specific opioids.
6  But in general, I think there is an issue with
7  abuse.
8      Q.  Do you believe that that general issue of
9  abuse involves opioids?
10     MS. FUMERTON:  Objection; form.
11     A.  I think it involves a lot.  I think it
12 involves alcohol.  I think it involves different
13 types of medications.  It involves OTC products.  I
14 think it's an addiction issue in general that
15 society faces.
16     Q.  Mr. Ducote, simple question:  Yes or no, do
17 you believe that people are abusing opioids?
18     MS. FUMERTON:  Objection; form.
19     A.  My view is that people abuse a lot of
20 different things, and I think it's unfair to
21 characterize it as specifically just opioids.
22     Q.  Are you aware that 100 people a day are
23 dying from opioids?
24     MS. FUMERTON:  Objection; form.
25     A.  Personally, I think one death is too many,

Page 37

1  so if it's more than one, yeah, it is a tragic
2  situation.
3      Q.  And you're aware that 100 people a day are
4  dying?
5      MS. FUMERTON:  Objection; form, misstates
6  testimony.
7      A.  Am I aware that 100 -- I couldn't tell you
8  how many.  I really couldn't.  I can tell you,
9  though, that I do read in papers and things that
10 just abuse across the board is impacting society.
11     Q.  As part of your reading in the papers, did
12 you read any articles about opioids?
13     MS. FUMERTON:  Objection; form.
14     A.  Could you restate it maybe?
15     Q.  Have you read any newspaper articles
16 involving opioids?
17     MS. FUMERTON:  Objection; form.
18     A.  The articles I've read have included
19 opioids, but it was a broader context.
20     Q.  Have you read Dreamland?
21     A.  No, I have not.
22     Q.  You giggled a little bit.
23     Do you know what I mean by Dreamland?
24     A.  No, that just threw me off when you said
25 Dreamland.  It doesn't seem real.

Page 38

1   Q.   Have you read a New Yorker article regarding
2   the Sackler family?
3   A.   Could you state that again.
4   Q.   Are you familiar with the periodical The New
5   Yorker?
6   A.   Yes, I am.
7   Q.   Do you read The New Yorker?
8   A.   No.
9   Q.   Have you ever read The New Yorker?
10  A.   Yes, I have.
11  Q.   Have you read an article in The New Yorker
12  that involved the Sackler family?
13  A.   No, I have not.
14  Q.   Do you know who the Sackler family is?
15  A.   No.
16  Q.   Do you know who Purdue Pharma is?
17  A.   Yes, I do.
18  Q.   Do you know who owns Purdue Pharma?
19  A.   I don't specifically.
20  Q.   Aside from auditing or conducting audits,
21  what were your other responsibilities as a
22  divisional compliance director from July 2004 to
23  July 2010?
24       MS. FUMERTON:  Objection; form.
25  A.   During that time periods, we were

Page 39

1   responsible for -- we did do some training.  We did
2   some document review, things as far as process
3   improvement, continuous improvement along those
4   lines.  It would involve the entire -- what we would
5   consider the entire box of Walmart, which could
6   include things like TLE, which is our --
7   Q.   I didn't understand that last piece.  TLE?
8   A.   Tire loop, where people go to get our tires
9   changed and things of that nature.
10  Q.   What sort of training -- you just testified
11  that you had training.
12       Did any of that training relate to
13  distribution of Schedule II narcotics?
14  A.   Maybe there was a misunderstanding of what I
15  said.  I talked about us providing in that role.  We
16  provided training to store associates about proper
17  procedures, things of that nature.
18  Q.   Thank you for clarifying that.  So I'll
19  rephrase my question.
20       Did you provide any training regarding
21  Schedule II narcotics to other Walmart employees?
22  A.   We did at one time provide training on
23  proper recordkeeping and security of the premises.
24  Q.   Proper recordkeeping of Schedule II
25  narcotics?

Page 40

1   A.   Yes, that's correct.
2   Q.   And proper security on the premises of
3   Schedule II narcotics?
4       MS. FUMERTON:  Objection; form.
5   A.   It was proper security of all -- the entire
6   pharmacy.
7   Q.   Who are these employees that you were
8   providing training to?
9       MS. FUMERTON:  Objection; form.
10  A.   I could not recall specifically who they
11  were.  It varied at different times.
12  Q.   I'm not asking for specific names.
13  A.   Okay.
14  Q.   But were they -- what role did they have?
15  A.   Typically, there was -- typically you would
16  have market managers, which is over a certain number
17  of stores.  You would have maybe pharmacists in some
18  of the training courses, but I would say the vast
19  majority were more market level personnel or actual
20  store managers in that training.
21  Q.   Can you explain to me what a market manager
22  is?
23  A.   Yes.  A market manager is typically someone
24  that supervises between six to 15 stores.  They are
25  more of a mid level manager.

Page 41

1   Q.   And you provided training to those market
2   managers regarding the security of Schedule II
3   narcotics?
4       MS. FUMERTON:  Objection; form.
5   A.   We provided training of the overall security
6   of the premise.  And so the question you asked, was
7   Schedule II included in that, we did touch on that.
8   But what the pharmacists were responsible for was to
9   ensure our store managers understood the details of
10  what their pharmacists should be accountable for.
11  Q.   So by premises, you're referring to a
12  Walmart store?
13  A.   Yes.
14  Q.   A Walmart store that we'd find here in
15  Rogers?
16  A.   Yes, that's correct.
17  Q.   You also testified that you would provide
18  training regarding -- I believe it was inventory?
19  A.   I don't recall if I said that.  I said
20  recordkeeping earlier.
21  Q.   Thank you.  Recordkeeping.
22  A.   Yeah.
23  Q.   So my question is what training did you
24  provide regarding recordkeeping as it pertains to
25  Schedule II or Schedule III narcotics?

Page 42

1    MS. FUMERTON:  Objection; form.
2    A.   The vast majority of the training that was
3 provided had to do simply -- for example, when you
4 said Schedule III, invoices come in, our product is
5 checked in, verified and how those records are
6 stored.
7    Q.   And during that time frame, hydrocodone was
8 a Schedule III.  Are you aware of that?
9    A.   Yes.
10    Q.   Let me go back a little bit.  Market
11 managers, do they oversee pharmacists?
12    A.   Some did.  There is several different types
13 of market managers.  Some oversee only the stores.
14 Some oversee only the pharmacies or vision centers.
15 So there is a combination of both in some of those
16 trainings.
17    Q.   Do market managers who oversee pharmacists
18 have a particular title?
19    A.   They are typically called market health and
20 wellness directors.
21    Q.   And what are their responsibilities?
22    A.   I could not answer specifically their
23 responsibilities except just in general.  It's broad
24 oversight of the operations of those -- of those
25 pharmacies in their designated market.

Page 43

1    Q.   So as divisional compliance director, your
2 primary responsibilities were training and auditing?
3    A.   Yes.
4    Q.   Did you have any other responsibilities?
5    A.   We did have responsibilities at different
6 times for various projects that you may have been
7 assigned to.
8       For example, one project was with Sam's
9 Club.  Sam's was rolling out some new procedures,
10 and we were assigned to help them with it, things of
11 that nature.
12    Q.   The example you just provided, did that
13 involve Schedule II narcotics?
14    A.   No, it did not.
15    Q.   Did it involve Schedule III narcotics?
16    A.   No, it did not.
17    Q.   Any other responsibilities that you can add
18 to your divisional compliance director title?
19    A.   I mean, your day-to-day responsibilities of
20 supervising individuals, looking for continuous
21 improvement projects, and those were the basic core
22 to any job you would have, but those types of
23 things.
24    Q.   When you were looking at improvement
25 projects --

Page 44

1    A.   Yes.
2    Q.   -- did any of those improvement projects
3 apply to Schedule II narcotics?
4    MS. FUMERTON:  Objection; form.
5    A.   Not that I recall.
6    Q.   Did you work on an improvement project for
7 Schedule III narcotics?
8    MS. FUMERTON:  Same objection.
9    A.   I don't recall if I did or not.  I don't
10 recall.
11    Q.   Do you recall if any of your colleagues at
12 that time were working on an improvement project --
13    MS. FUMERTON:  Objection; form.
14 BY MR. INNES:
15    Q.   -- for Schedule II narcotics?
16    MS. FUMERTON:  Same objection.
17    A.   During that six years, I worked on so many
18 different things.  I just don't remember every
19 single one during that time period.  It seemed like
20 the vast majority of projects always had to do with
21 something that was operational, like food safety,
22 that I worked on.  That seemed to -- it was a hot
23 topic at the time, so it seemed to come up often,
24 over and over.
25    Q.   So your focus was primarily on food safety?

Page 45

1    A.   No, I wouldn't say -- maybe I misstated
2 that.  I wouldn't say my primary focus was food
3 safety.  That's the topic that seemed to come up a
4 great deal.
5    Q.   Schedule II narcotics did not come up as a
6 topic?
7    MS. FUMERTON:  Objection; form.
8    A.   Yes, it did.
9    Q.   In what context?
10    A.   Recordkeeping.
11    Q.   Did Schedule III come up?
12    A.   Yes, recordkeeping again.
13    Q.   Following your divisional compliance
14 director position, you moved to the Walmart --
15 general manager at a Walmart Distribution Center in
16 Opelousas?
17    A.   Opelousas.
18    Q.   Opelousas, Louisiana?
19    A.   Yes.
20    Q.   And you served in that role from July 2010
21 to July 2014?
22    A.   Yes, that's correct.
23    Q.   And what were your duties as the general
24 manager of that distribution center?
25    A.   The primary duties was supervision of

Page 46

1 day-to-day activities, capital improvements of the
2 facility, and just general oversight of the
3 leadership team there.
4 Q.   And did that facility distribute Schedule II
5 narcotics?
6 A.   No, it did not.
7 Q.   Did it distribute Schedule III narcotics?
8 A.   No, it did not.
9 Q.   Did it distribute any pharmaceutical
10 products?
11 A.   OTC products.
12 Q.   By OTC you mean over the counter?
13 A.   Yes, sir.
14 Q.   Did you distribute any products containing
15 pseudoephedrine?
16 A.   No, we did not.
17 Q.   Did you distribute any products that were --
18 any pharmaceutical products that were -- strike
19 that.
20        Did you distribute any highly regulated
21 products from that facility?
22        MS. FUMERTON:  Objection; form.
23 A.   Yes.
24 Q.   What were those products?
25 A.   Ammunition.

Page 47

1 Q.   Ammunition for rifles?
2 A.   Yes.
3 Q.   Guns, generally?
4 A.   Yes.
5 Q.   Those are regulated by the ATF?
6 A.   Yes.
7 Q.   As part of your duties as general manager of
8 that distribution center, did you have dealings with
9 the ATF?
10 A.   No.
11 Q.   Did you have dealings with any federal
12 agency regarding the sale and dis -- sale of
13 firearms?
14 A.   No.
15 Q.   With the distribution of firearms?
16 A.   No.
17 Q.   With the storage of firearms?
18 A.   No.
19 Q.   Did anyone at the facility have interaction
20 with federal agencies regarding the storage of
21 firearms?
22 A.   Not that I'm aware of.
23 Q.   Did anyone at the facility have any contact
24 with federal agencies regarding anything to do with
25 firearms?

Page 48

1        MS. FUMERTON:  Objection; form.
2 A.   Not that I'm aware of.
3 Q.   Do you have any knowledge of any enforcement
4 actions regarding firearms at that distribution
5 facility?
6 A.   No.
7        MS. FUMERTON:  Just give me one second to
8 object.  Just a reminder.
9        THE WITNESS:  Sorry.
10 BY MR. INNES:
11 Q.   Following your general manager position, you
12 moved to Senior Director II, Pharmacy Supply Chain;
13 is that correct?
14 A.   Yes.
15 Q.   And you held that position from August 2014
16 to June 2017; is that correct?
17 A.   Yes.
18 Q.   And that was in -- it's in Bentonville,
19 Arkansas?
20 A.   Yes.
21 Q.   So you relocated from Opelousas, Louisiana,
22 to Bentonville?
23 A.   Yes, I did.
24 Q.   I'm going to pass over that one right now.
25 We're going to spend a lot of time on that

Page 49

1 particular role.
2 A.   Okay.
3 Q.   So we'll get through this and come back.
4 A.   I understand.
5 Q.   Following Senior Director II, Pharmacy
6 Supply Chain, you moved to Vice President Supply
7 Chain; is that correct?
8 A.   Yes.
9 Q.   And you've been in that role since June of
10 2017?
11 A.   June seems correct.  I know it's on my
12 profile.  It just seems like it was a little bit
13 later, but it's directionally correct.
14 Q.   And the areas that you are responsible for
15 is Alaska, Hawaii, Washington, Oregon, Nevada,
16 California?
17 A.   Yes.
18 Q.   Are there any other states that are listed
19 that you are not responsible for?
20 A.   We may ship stuff into Montana, but that
21 changes on a routine basis depending on
22 transportation alignment.
23 Q.   What do you mean by "stuff"?
24 A.   Groceries, things of that -- food.
25 Q.   So is the -- the role you're in now deals

Page 50

1 exclusively with groceries?
2    A.  It deals exclusively with ambient products,
3 such as pet food, paper goods, and also grocery
4 products that require refrigeration.
5    Q.  Walmart no longer distributes Schedule II
6 narcotics; is that correct?
7    A.  That's my understanding.
8    Q.  Walmart no longer distributes Schedule III
9 narcotics; is that correct?
10    A.  That's my understanding.
11    Q.  I want to go back in time a little bit.
12       During your time in pharmacy recruiting, did
13 you have any discussion with pharmacists regarding
14 opioids?
15    A.  Not that I recall.
16    Q.  Were you aware of the growing opioid
17 epidemic at that time period?
18       MS. FUMERTON:  Objection; form.
19    A.  Going back to our -- my earlier comments, it
20 was in general about just abuse and addiction
21 overall.
22    Q.  So you spoke to pharmacists about abuse and
23 addiction during your --
24    A.  No.  Maybe I misunderstood your question.  I
25 thought you just asked in general.  Is that -- did I

Page 51

1 misunderstand your question?
2    Q.  I have a new question.
3    A.  Okay.
4    Q.  When you were a -- when you were working
5 with pharmacists in recruiting, did you speak to
6 them about addiction?
7    A.  Not specifically.  I thought you said if I
8 was aware of it, not speaking, so I answered -- I
9 think I answered that incorrectly based on what you
10 said.
11    Q.  So another ground rule.  If you don't
12 understand the question, tell me you don't
13 understand the question and I'll rephrase it.
14    A.  Okay.
15    Q.  Once I rephrase it, that's the question
16 that's standing; I want you to answer that one.  I
17 want you to answer a compilation of questions.  Just
18 tell me you don't understand it and I'll rephrase
19 it.
20       MS. FUMERTON:  Fair enough.  I agree if you
21 don't understand the question, you shouldn't
22 answer it.
23       Also, if you don't understand his answer,
24 that didn't mean he didn't understand the
25 question.  I just think there's some confusion

Page 52

1 and that back and forth doesn't necessarily mean
2 that he was not appropriately answering your
3 question.
4       So I agree with the ground rule, but I just
5 want to make sure that we're on both sides
6 applying those.
7 BY MR. INNES:
8    Q.  When you were in your role as a pharmacy --
9 manager of pharmacy recruiting, did the topic of
10 addiction generally come up?
11    A.  Not that I recall.
12    Q.  Did the topic of abuse of addictive drugs
13 come up during your time as a manager of pharmacy
14 recruiting?
15       MS. FUMERTON:  Objection; form.
16    A.  Not that I recall.
17    Q.  So at no time during your tenure as a
18 manager of pharmacy recruiting did you discuss
19 addiction with potential pharmacists?
20       MS. FUMERTON:  Objection; form.
21    A.  I don't recall doing so.
22    Q.  You can't remember or you don't know?
23    A.  Aren't they the same?
24    Q.  Are they?
25    A.  My view is -- yes, to a certain degree, they

Page 53

1 are the same.  I don't remember, I don't recall
2 seems the same to me.
3    Q.  Is it a possibility that you spoke about
4 addiction with pharmacists during your role as a
5 recruiting manager?
6       MS. FUMERTON:  Objection; form.
7    A.  It could be possible.
8    Q.  I know I have a slow cadence, but give me
9 time to finish the question.
10       MS. FUMERTON:  Sure.  I apologize.  Should
11 we take -- we've been going an hour.
12       MR. INNES:  I'm trying to think right now.
13 I think we are at a natural breaking point.  So
14 we can just go off the record.
15       THE VIDEOGRAPHER:  Going off the record.
16 The time is 9:01.
17       (Recess from 9:01 a.m. until 9:17 a.m.)
18       THE VIDEOGRAPHER:  Going back on the record.
19 Beginning of Media File Number 2.  The time is
20 9:17.
21 BY MR. INNES:
22    Q.  Mr. Ducote, we're back on the record.
23 The -- what was the title you held immediately
24 before your current position?
25    A.  Senior Director II, Pharmacy Supply Chain.

Page 54

1    Q.   And how did you come to have that role?
2    A.   Walmart has a process of posting open
3  positions.  The position was posted, I applied and
4  was awarded the position.
5    Q.   And is that posted on an internal web page?
6    A.   My understanding is internal and external,
7  depending on the hiring manager.
8    Q.   And do you recall if there was a job
9  description for that title?
10   A.   Yes.
11   Q.   And do you recall what that job description
12 was?
13   A.   I do not recall exactly what the job
14 description title was.
15   Q.   Do you recall what drew you to apply for
16 that position?
17   A.   Yes, I do.
18   Q.   What was that?
19   A.   Partially to return to this area.  I've
20 lived in this area prior, enjoyed the area, liked
21 it, and wanted to get back here.
22   Q.   It's my understanding that Walmart
23 distributes all Schedule II drugs from the 6408
24 facility; is that correct?
25        MS. FUMERTON:  Objection; form.

Page 55

1    A.   During my time period in the role, we did.
2        MS. FUMERTON:  I honestly don't want to
3  nitpick this, but the "distributes," this
4  obviously was a past issue.  I just wanted to be
5  careful going forward.  So I'm not -- I'm just
6  explaining my objection.
7        MR. INNES:  I'm not sure I understand your
8  objection.
9        MS. FUMERTON:  That the Walmart no longer
10 distributes those substances.  So you asked it in
11 the present tense.  That's my point is I'm just
12 trying to make.
13       MR. INNES:  Fair point.  Fair point.
14 BY MR. INNES:
15   Q.   During your time period at -- in that role,
16 Walmart distributed C2 pharmaceuticals from that
17 facility?
18   A.   Yes.
19   Q.   Do you recall if that was specifically
20 mentioned in the job posting?
21   A.   I do not recall if it was specifically
22 mentioned in there.
23   Q.   Can you describe the application process?
24   A.   From what I remember of it, I had to go
25 online and fill out an interest, and I think I had

Page 56

1  to update my résumé in the system.  And then I got a
2  requisition number.  And that was pretty much how
3  the application process -- it was very simple, very
4  quick.
5    Q.   When you say "fill out an interest," what
6  does that mean?
7    A.   I think I had to check a few boxes that --
8  boxes about maybe how long I was in my previous
9  role, because we -- our transfer policy requires you
10 to be in a position for a certain amount of time.
11 Very basic questions.  Nothing really specific.
12   Q.   At the time of the application, did you feel
13 qualified for that position?
14   A.   Yes.
15   Q.   What made you feel qualified for that
16 position?
17   A.   Going back to the previous question on the
18 job description, I don't recall exactly every
19 specific in it, but I read the job description for
20 the role and felt that the qualifications required,
21 I had.
22   Q.   Do you not recall reading the job
23 description?
24        MS. FUMERTON:  Objection; form.
25   A.   I think I may be confused on the question.

Page 57

1  I thought earlier the question related if I
2  remembered the details.
3    Q.   I'm just reading the transcript.  I didn't
4  mean to cut you off, so maybe I asked the wrong
5  question.
6        Do you now recall, sitting here today,
7  reading the job description?
8        MS. FUMERTON:  Objection; form.
9    A.   Could you ask me the earlier question again?
10 Because maybe I answered the question wrong because
11 I misunderstood the question.
12   Q.   I'm trying to ascertain whether or not you
13 remember reading a job application -- a job posting
14 for that role.
15   A.   I thought my answer was yes, but maybe I'm
16 confused now on it.  Where --
17   Q.   So let's clear that up.  Do you recall
18 reading a job posting for that role?
19   A.   When a job is posted, it has the description
20 of the job in it.  I think maybe that's the
21 confusion between how I'm answering the question, or
22 maybe I'm just totally confused.
23       But when a job is posted, it says here's the
24 job and here's a description of the job.  So when I
25 read that job description, I felt I was qualified

Page 58

1 for that job.
2    Q. And do you recall why you felt you were
3 qualified for that job?
4    A. I mean, to say specifically how I felt at
5 that time, that would be conjecture on my part. I
6 mean, I had a -- the job basically entailed supply
7 chain. I had been doing that for four years, and I
8 thought I was pretty successful at it. And so I
9 think intuitively I felt I was qualified for the
10 job.
11    Q. In your prior position, the position that
12 you had before the -- when you were the general
13 manager of the other facility --
14    A. Yes.
15    Q. -- it was your testimony that you didn't --
16 none of your responsibilities dealt with Schedule II
17 narcotics, correct?
18    A. Yes, that is correct.
19    Q. And the 6048 facility for which you were
20 applying to dealt with Schedule II narcotics,
21 correct?
22    A. It wasn't 6048. 6048 was Opelousas.
23    6045 -- I was not hired specifically to
24 manage 6045. It was the entire network.
25    Q. Who did you replace in that role?

Page 59

1    A. In that role, I replaced Tim Harris.
2    Q. What role did Tim take on after you replaced
3 him?
4    A. Tim had already been put into a new role
5 when I -- when I took over his position, Tim had
6 been moved into a similar role then, now divisional
7 vice president of supply chain.
8    Q. What were your expectations when you took
9 the job as to what your responsibilities were going
10 to be?
11    MS. FUMERTON: Objection; form.
12    A. Maybe could you just reask that for me just
13 to make sure I'm going to answer it correctly?
14    Q. You applied for the role, correct?
15    A. Yes, I did.
16    Q. You were offered that position, correct?
17    A. That is correct.
18    Q. You accepted that position, correct?
19    A. Yes.
20    Q. And when you accepted that position, did you
21 have any idea what that role was going to entail?
22    A. I had a broad idea.
23    Q. And what was that?
24    A. That it was managing and supervising the
25 pharmacy distribution centers that we had throughout

Page 60

1 the country, and that there was a home office team
2 that I would be working with. So those were the two
3 broad assumptions I had regarding the role.
4    Q. And what more specifically was your
5 understanding of what that management or
6 supervision -- or supervising role would be?
7    A. Day-to-day activities, but at a higher
8 level, not specifically here's Example A that's
9 happening in the building. But we have specific
10 times of things that we have to do and that I
11 would air traffic control over those, in a broad
12 sense, very general management, nothing -- nothing
13 out of the ordinary.
14    Q. Did you have an understanding of what
15 Walmart's policies were with respect to Schedule II
16 narcotics at the time you took or accepted that
17 position?
18    MS. FUMERTON: Objection; form.
19    A. I thought -- you looked like you were going
20 to ask another question. Were you not going to ask
21 another question?
22    Q. No, I'm going to wait for you to answer the
23 question.
24    A. Could you restate the question.
25    Q. Did you at the time have an understanding of

Page 61

1 Walmart's policies with respect to Schedule II
2 narcotics when you accepted the job?
3    MS. FUMERTON: Objection; form.
4    A. That question is very broad for me to
5 answer. Is there -- could you narrow --
6    Q. When you accepted the position, did you have
7 an understanding of Walmart's policies with respect
8 to Schedule II narcotics?
9    MS. FUMERTON: Objection; form.
10    A. The reason it's difficult for me to answer
11 the question is there is a host of procedures and
12 policies that relate to dispensing to various
13 factors, and that's -- I couldn't answer that I knew
14 every procedure. I could answer a broad sense I
15 understood some, but that's why --
16    Q. Let's focus on those policies related to
17 distribution of Schedule II narcotics.
18    A. Okay.
19    Q. Did you have an understanding of what those
20 policies were prior to taking the position?
21    MS. FUMERTON: Objection; form.
22    A. Not in specific detail.
23    Q. Did you have a general idea?
24    MS. FUMERTON: Objection; form.
25    A. As I was moving into the role -- and maybe I

Page 62

1 should clarify.
2      Is your question once I took the role and
3 they -- there was a transition, or was it before I
4 took the role?
5      Q.  No.  My question is did you have an
6 understanding of what those policies were prior to
7 taking the position?
8      MS. FUMERTON:  Objection; form.
9      A.  The reason that question is tough for me to
10 answer, at some point if you have worked in a
11 Walmart pharmacy, which my background shows I have,
12 you will understand the general just how the
13 distribution system works of Walmart.  And so the
14 answer is yes, I understand the general
15 distribution, but to understand the specific
16 policies that were in place, the answer is no.  So
17 seems like I'm giving a contrary answer, but it is
18 yes and no.
19      Q.  Was it your understandings that you would
20 have some degree of oversight over Walmart's
21 distribution of opioids when you took that position?
22      MS. FUMERTON:  Objection; form.
23      A.  Understanding I would have responsibility
24 for distribution of all pharmaceutical products that
25 were carried in our network.

Page 63

1      Q.  And that would include opioids?
2      A.  Yes.
3      Q.  And when did -- what was your first day on
4 the job?
5      A.  I could not tell you -- I couldn't tell you
6 specifically.
7      Q.  In or about?
8      A.  When I was looking at this, one of the
9 things that -- to clarify, is I was awarded the job
10 in the August time period.
11      From what I recall, I applied for the job
12 around July or -- probably July.  I seem to remember
13 I was awarded the job in August.  I actually didn't
14 start up here until early October.  So in September
15 was a transition time period for me.
16      (Ducote Exhibit 2 was marked for
17 identification.)
18 BY MR. INNES:
19      Q.  I'm handing you what's been marked as
20 Plaintiff's Exhibit 2.  Pardon my reach.
21      MR. INNES:  Copies for you.
22      THE WITNESS:  Do I keep this?
23      MS. FUMERTON:  No.  We want to make sure we
24 don't lose this, because that would be bad.
25 We're going to keep a pile right here.  They

Page 64

1 might ask you to refer to it later, so we'll keep
2 a copy set there.
3 BY MR. INNES:
4      Q.  Take your time, review it, and when you are
5 done, let me know.
6      A.  All right.  I'm done.
7      Q.  Okay.  Mr. Ducote, you're looking at what's
8 been marked as Plaintiff's Exhibit 2.
9      It's an e-mail from Nick Tallman to you,
10 Chad Ducote.  It is dated August 19th, 2014, and it
11 begins -- the Bates number is -- I'm just going to
12 give the last digits of this for the record --
13 22832.
14      MS. FUMERTON:  It's cut off on the front.
15 Do you know what it is?  Maybe we can clean it up
16 during the break, but just so we know what the
17 complete --
18      MR. INNES:  Oh, I'm sorry, that's a bad
19 copy.  So do you want --
20      MS. FUMERTON:  But you have the copy, so
21 that's what you read was the first --
22      MR. INNES:  Yeah.  I'm sorry.  It's a bad
23 copy, so my apologies.
24      MS. FUMERTON:  Okay.  I'm sorry.
25 BY MR. INNES:

Page 65

1      Q.  So for your notes, it's 000022832.
2      A.  I'm sorry.
3      Q.  Do you remember receiving this e-mail?
4      A.  I don't remember specifically receiving it,
5 but it does appear that I did receive it.
6      Q.  Okay.  So it reads:  Chad, here's the SOM
7 procedure as it stands today.  This has not been
8 through the Compliance Advisory Panel.  This also
9 will only be set up as a short-term solution until
10 the systematic solution is in place next year.
11      Is that an accurate reading?
12      A.  Yes.
13      Q.  Did you ask Mr. Tallman to send you this?
14      A.  Not that I recall.
15      Q.  This is about the time that you're
16 transitioning out of your old role into the new
17 role; is that right?
18      A.  Yes.  If you go to the top where you see the
19 "to" line, it has my name and it has the DC number
20 behind it.  I was still in the actual general
21 manager position technically until the end of that
22 time period.
23      So I think I was awarded the position and
24 Nick -- it was announced.  So from what I recall,
25 there was a flood of notes that were sent to me from

Page 66

1 different team members if things they were working
2 on during that time period.
3 Q. Okay. Do you know what Mr. Tallman is
4 referring to in the -- here's the SOM procedure? Do
5 you know what that is?
6 A. Yes, I do today.
7 Q. And what is that?
8 A. Suspicious order monitoring.
9 Q. And what does suspicious order monitoring
10 pertain to?
11 A. That is a very long answer. I will make it
12 as concise as possible.
13 Q. I can rephrase.
14 Does suspicious order monitoring apply to
15 Schedule II narcotics?
16 A. Yes.
17 Q. Does it apply to Schedule III narcotics?
18 A. Yes.
19 Q. And it's your understanding that this was --
20 strike that.
21 Mr. Tallman was saying this will only be set
22 up as a short-term solution. Do you have any idea
23 what the problem was that they were trying to solve
24 at that time?
25 MS. FUMERTON: Objection; form.

Page 67

1 A. At the time, I did not, but as time went on
2 and I matured in that role, I did -- I did begin to
3 understand what that meant.
4 Q. And when did you first begin to understand
5 what that meant?
6 A. That would be difficult to pinpoint exactly,
7 but it would be in the fall of 2014 time period.
8 I think any new job, as one begins, it takes
9 them some time to get acclimated. And a few months
10 into the job, going into the spring of 2015, I began
11 to fully understand.
12 Q. I'm going to ask you to turn to the --
13 before I do that, do you know what the systematic
14 solution refers to?
15 A. At the time I did not, but again, as time
16 went on, I did understand what that was.
17 Q. And was that around fall of 2014 as well?
18 A. The beginnings of the systematic solution
19 were beginning to be put in place in 2014, but it
20 was not fully implemented at that time period.
21 Q. In fact, it says it's likely put in place
22 next year; is that right?
23 A. Yes.
24 Q. Did that occur?
25 A. Yes.

Page 68

1 Q. It did. I'll ask you to turn to the third
2 page of this document. You've had a chance to
3 review that; is that correct?
4 A. Yes.
5 Q. I don't know if we have a bad copy on that
6 as well, but that is document ending in 22384.
7 Are you familiar with this document?
8 A. Yes.
9 Q. You've seen it before?
10 A. Yes.
11 Q. Can you explain to me what this represents?
12 A. What this represents is VAWD, verified
13 accredited wholesale distributor, was doing -- there
14 were certain policies and procedures that they
15 recommended that were put in place based on their
16 review, and this was an output of that process.
17 Q. You referred to the VAWD. Could you --
18 A. Verified accredited wholesale distributor.
19 Q. And it was important -- well, and the VAWD,
20 did they confer accreditations on distributors?
21 A. I'm not sure from the legal sense exactly
22 how that plays out, but they do give accreditation.
23 Q. Did Walmart apply for accreditation?
24 A. Yes.
25 Q. Was it important that Walmart got that

Page 69

1 accreditation?
2 MS. FUMERTON: Objection; form.
3 A. From my view, it was.
4 Q. And why is that?
5 A. My view is that it's gold standard.
6 Q. And isn't it true at this time in August of
7 2014 the policy in place at Walmart would not
8 qualify for accreditation?
9 MS. FUMERTON: Objection: Form.
10 A. Would you restate the question for me?
11 Q. Isn't it true that at this time, August of
12 2014, the policies in place at that time would not
13 meet the criteria for accreditation by VAWD?
14 MS. FUMERTON: Objection; form.
15 A. I wasn't in the -- I just was beginning the
16 role during that time period. I wouldn't be able to
17 answer. I had not sat in on the previous meetings
18 with VAWD.
19 (Ducote Exhibit 3 was marked for
20 identification.)
21 BY MR. INNES:
22 Q. Mr. Ducote, I'm handing you what we've
23 marked as Plaintiff's 3.
24 MR. INNES: Tara, this is a better copy.
25 BY MR. INNES:

Page 70

1    Q.  Mr. Ducote, while you review that document,
2  this is an e-mail from Tim Harris to Theresa Alford
3  and to you, Chad Ducote, at your 6048 e-mail
4  address, copies Kristy Spruell.  It's dated
5  September 4, 2014.  It ends in Bates number 16251 --
6  or begins in Bates number 16251.
7       Let me know when you've had a chance to
8  review the document.
9       MS. FUMERTON:  You can take your time to
10  review it.  I just noticed you went from the
11  first page to the last page, which is fine, but
12  maybe you can start that way if you want to.
13       THE WITNESS:  Yeah.
14    A.  Okay.  I've reviewed it.
15    Q.  All set?
16    A.  Yes.
17    Q.  So this e-mail indicates from Tim Harris
18  that you -- that Walmart had applied for an
19  extension of time to apply for accreditation.  We
20  simply -- it reads:  We simply need to have an
21  interim plan locked down within the next 30 days.
22       Is that correct?
23       MS. FUMERTON:  Objection; form.
24  BY MR. INNES:
25    Q.  I can rephrase.  Do you see the line at the

Page 71

1  top of the page, Mr. Ducote, it says:  We simply
2  need to have an interim plan locked down within the
3  next 30 days.
4       Is that correct?
5    A.  Yes.
6    Q.  You need to have a plan locked down in the
7  next 30 days, because if you didn't have an interim
8  plan -- current plan -- let me rephrase.
9       The current plan, the plan that was in place
10  in September of '14, did not meet the VAWD
11  accreditation; is that correct?
12       MS. FUMERTON:  Objection; form.
13    A.  That goes back to my previous comment.  I
14  was transitioning into the role.  I had actually not
15  sat in with VAWD, talked with VAWD.  So I was copied
16  on the e-mail, but to speak on behalf of VAWD, I
17  really could not.
18    Q.  Why were you copied on the e-mail?
19    A.  Going back to the earlier comment, during
20  that time period, I was just blasted with e-mails
21  that everyone was starting to copy me on.
22    Q.  Was VAWD accreditation part of your role,
23  your new role?
24    A.  Yes -- yes, it was going to be, but that's
25  looking in hindsight.  If you're asking me at the

Page 72

1  time of this e-mail, I wasn't as aware of it.
2    Q.  Okay.  And when did you become involved in
3  the VAWD accreditation process in a more substantive
4  degree?
5    A.  I -- I don't know exactly when.  In this
6  first round here in these documents that you see,
7  yes, I was copied on the e-mails, but to say I was
8  substantively involved in it, that would be a
9  stretch.
10       It was a next level -- it was either the
11  next year or the year after when we were going
12  through reaccreditation and policies and procedures
13  review, that's when I really became involved.  This
14  time period is simply e-mails I was copied on.  I
15  was trying to get my feet under me and understand
16  what was going on.
17    Q.  You said either the next year or year after
18  when we were going through reaccreditation.
19       Do you mean -- what do you mean by that?
20    A.  Yeah, that's confusing, and I will just,
21  quite frankly, struggle to explain it because it is
22  still confusing to this day for me.
23       VAWD has a accreditation for the overall
24  network, but they are also -- each site has site
25  reviews.  And so at the time period, each year, it

Page 73

1  seemed, there was a different site review that came
2  up, but then there was an overall accreditation at
3  certain time periods.
4    Q.  Okay.  The accreditation that, I would say,
5  begins with this e-mail, that you were first
6  notified of this accreditation process, does that
7  pertain to the entire network?
8    A.  Reading this --
9    Q.  Yeah.
10    A.  -- my answer would be yes.
11    Q.  Okay.
12       (Ducote Exhibit 4 was marked for
13  identification.)
14  BY MR. INNES:
15    Q.  Mr. Ducote, this is Plaintiff's 4.
16       Again, take your time reviewing it and let
17  me know when you have finished.
18    A.  Okay.  I've read it.
19       MS. FUMERTON:  Did you read the second page?
20  You started that way.
21       THE WITNESS:  Yes.
22       MS. FUMERTON:  Okay.  I just wanted to make
23  sure.
24  BY MR. INNES:
25    Q.  Okay.  So this is an e-mail from Kristy

Page 74

1 Spruell to Chad Ducote and Tim Harris sent on
2 September 11, 2014.  It ends in 19 -- it begins with
3 19447.
4     A.  Yes.
5     Q.  Mr. Ducote, I noticed in the "to" line your
6 e-mail address no longer bears the 6048 designation.
7        What's the reason for that?
8     A.  They would have changed me to a different
9 server.  Once you are attached to the home office,
10 the server that you're on changes.  So probably
11 around that beginning September time period is when
12 that transition happened.
13     Q.  So at this time were you sitting in the home
14 office?
15     A.  No.  I was still in Louisiana.
16     Q.  Okay.  This is addressed to Chad and Tim.
17        Is that Tim Harris?
18     A.  Yes.
19     Q.  And at this point is this fair to say this
20 is a transition point between when Tim is leaving
21 and you're entering?
22     A.  Yes.  Tim had started the other role, but I
23 would -- he was still -- yes, to answer your
24 question.
25     Q.  You guys were, for more lack of a better

Page 75

1 term, tag-teaming the role at that point?
2     A.  I wouldn't say tag-teaming.  I was still
3 trying to learn all the details of it, so I don't
4 know if -- if you say tag-teaming means equal 50/50
5 at that time, I didn't still have -- still wasn't
6 fully transitioned.
7     Q.  And you say you were still trying to learn
8 the role at this point?
9     A.  Yes.
10     Q.  Is this part of learning that role?  Is this
11 educating you as to what the role is?
12     A.  Yes.
13     Q.  Okay.  And I want to get into the guts of
14 this.
15        The second line of the e-mail says:  The
16 policy with the identification -- begins with the
17 identification with an order of interest and
18 addresses the steps we'll take to evaluate those
19 orders.
20        Do you know what policy is being referred to
21 there?
22     A.  I do not know specifically what Kristy was
23 referring to.
24     Q.  Did you at the time know what an order of
25 interest was?

Page 76

1     A.  I learned at that time period.
2     Q.  And what was your understanding?
3     A.  An order of interest was, at that time
4 period, what I learned, order of maybe unusual size,
5 frequency.  Pretty much those topics.
6     Q.  And is this policy potentially referring to
7 the suspicious order monitoring policy?
8     A.  Yes.
9     Q.  And the second paragraph begins with:  The
10 part we were trying to solve for is the
11 identification of orders of interest and the ability
12 to stop shipment of such orders unless and until the
13 order has been evaluated and approved as an
14 acceptable order.
15        You agree that this was not being done with
16 the current policy, correct?
17        MS. FUMERTON:  Objection; form.
18     A.  No.  No, I don't agree.  I think as time
19 went on, I learned more.  Again, was in transition
20 but learned more.  I think that statement was
21 inaccurate at the time it was written.
22     Q.  Do you believe there was a policy in place
23 in September of 2014 that identified an order of
24 interest?
25        MS. FUMERTON:  Objection to form --

Page 77

1 objection; form.
2     A.  To tell you if there was a policy, I don't
3 specifically know; but to tell you there was a
4 process, there was a process.
5     Q.  That's not my question.  The question is is
6 there a policy?
7        MS. FUMERTON:  Objection; form.
8     A.  I do not know.
9     Q.  There wasn't a policy in place that would
10 permit the ability to stop a shipment of an order of
11 interest unless and until it had been evaluated and
12 approved as an acceptable order?
13        MS. FUMERTON:  Objection; form.
14     A.  Would you one more time ask that for me?
15     Q.  The policy, the Walmart's policy, suspicious
16 order monitoring policy in September of 2014 and
17 before did not include the ability to stop a
18 shipment of an order of interest until that order
19 had been evaluated and approved as an acceptable
20 order; that's correct, right?
21        MS. FUMERTON:  Objection; form.
22     A.  That question is hard for me to answer
23 because I don't think that's correct, but when
24 you're saying "policy," are you referring to a
25 black-and-white piece of paper --

Page 78

1    Q.   Does Walmart have policies that govern its
2    suspicious order monitoring?
3         MS. FUMERTON:  Objection; form.
4    A.  Yes.
5         MR. INNES:  Can you explain your objection
6    on that?
7         MS. FUMERTON:  Yeah, temporal.  You're
8    asking him does Walmart have policies currently
9    stated that govern its suspicious order
10   monitoring.  Are you talking about now?  Are you
11   talking about in 2014?  Are you talking about in
12   2010?  Are you talking --
13        MR. INNES:  We'll cover --
14        MS. FUMERTON:  -- about in 2016?
15        MR. INNES:  Appreciate it.
16        MS. FUMERTON:  That's my objection.
17        MR. INNES:  Got it.  We'll cover it all.
18   BY MR. INNES:
19   Q.   Currently, do you have -- does Walmart have
20   policies and procedures in place for suspicious
21   order monitoring?
22   A.  I haven't been in that role in a year.  I
23   don't know currently if we do or not.
24   Q.   Did they have it a year ago?
25   A.  When I left the role, yes.

Page 79

1    Q.   Do you have reason to believe that they
2    discontinued those policies?
3    A.  I don't know if they've updated the
4    policies, changed the name of it, or anything else,
5    or if it even applies considering.
6    Q.   Do you know if, as we sit here today,
7    Walmart has a suspicious order monitoring policy?
8         MS. FUMERTON:  Objection; form.
9    A.  Earlier you asked me about us
10   distributing --
11   Q.   I'm asking you now.  I'm asking you today.
12   Sitting here today, does Walmart have a suspicious
13   order monitoring policy?
14        MS. FUMERTON:  Okay.  He started to answer
15   and you interrupted him.  So if you're going to
16   ask a question, make sure you give him the
17   ability to answer before you interrupt if you
18   didn't like the direction it was going.  But let
19   him answer the question; and if you need to
20   follow up, you can follow up.
21   BY MR. INNES:
22   Q.   You can answer the question.
23   A.  I forgot what I was going to say.
24        I do not currently know.  I'm not in that
25   role, or in that position or in that area.  I don't

Page 80

1    know what the current policies are.
2    Q.   So you -- do you agree that Walmart has a
3    policy in place today?
4         MS. FUMERTON:  Objection; form.
5    A.  I really, good faith, couldn't tell you.  I
6    didn't look to see if we had policies currently in
7    place.  My assumption would be yes, we do.  I mean,
8    we make extraordinary efforts to comply with the
9    law.  So you're asking me to make a conjecture
10   statement, and that's -- I just don't think that's a
11   fair question.
12        MR. INNES:  And move to strike as
13   nonresponsive.
14   Q.   The question really is "yes" or "no."  Do
15   you know, sitting here today, if Walmart has a
16   suspicious order monitoring policy in place?
17        MS. FUMERTON:  Okay.  He already answered
18   this question, but go ahead and answer again.
19   A.  No.
20   BY MR. INNES:
21   Q.   You do not know.  Okay.
22        In September of 2014, do you know if Walmart
23   had a suspicious order monitoring policy in place?
24   A.  My viewpoint was that we did have a process,
25   policy, whatever you'd like to call it, in place.

Page 81

1    It may not have been titled specifically of that
2    nature, but there was a process in place.
3         That's my view about the time.  And, again,
4    I was in transition; but looking back on it, that's
5    what my view would be.
6    Q.   There was a written process in place at
7    Walmart in September of 2014 that addressed
8    suspicious order monitoring.
9         MS. FUMERTON:  That's a statement, not a
10   question.
11   BY MR. INNES:
12   Q.   Do you agree?
13        MS. FUMERTON:  Objection; form.
14   A.  Earlier when you asked the question, the
15   question was orders of interest and that's why I
16   answered your question on there was a process for
17   orders of interest.
18   Q.   Was there a written -- was there a written
19   process in place at Walmart in September of 2014
20   that addressed suspicious order monitoring?
21   A.  My view is yes.  And maybe my view -- again,
22   I was in transition; but from what I saw when
23   walking into the role and transitioning into it, I
24   felt there was a process in place.
25   Q.   And when you initially stepped into that

---

Page 82

1  role, Walmart was in the process of changing that
2  policy; is that correct?
3      A.  Yes.
4      Q.  And what changes was it making to that
5  policy?
6      A.  That is -- at that time period, in 2014, I'd
7  just have to think, because, again, transitioning is
8  a lot at one time.
9      Q.  What was the process in place in 2014?
10     MS. FUMERTON:  Objection; form.
11     Q.  In September of 2014?
12     MS. FUMERTON:  Objection; form.
13     A.  I don't recall exactly everything that was
14  in place.  I just remember them talking to me about
15  there is a process that we look at orders of
16  interest and there is a protocol and that we're
17  transitioning to a different process based on a
18  recommendation from VAWD, and that's in that time
19  period in general what I remember from it.
20         As time went on, I understood more of where
21  we were going with the program; but during this time
22  period, it's very difficult for me to answer.
23     Q.  So during this time period, it was your
24  understanding that Walmart decided to make changes
25  to its policy or process for identification of

---

Page 83

1  orders of interest because VAWD told it to do so?
2      A.  No, I don't think it's just strictly because
3  of VAWD.  I think my history at Walmart has been
4  that we're always looking for ways to improve
5  things.  We have continuous improvement programs in
6  place and that, you know, as time goes on, we look
7  to make changes.  So VAWD may have recommended some
8  changes, but I can't say VAWD was the only reason
9  that we would have made adjustments.
10     Q.  At this point in time Walmart was
11  continuously improving, it was going to make changes
12  to its policy, right?
13     A.  I was -- that was my view.  I can't speak
14  on -- I was telling you my view is, is that Walmart
15  is always looking to make improvements.
16     Q.  And it's your view at this time Walmart was
17  trying to make improvements to its suspicious --
18  identification of orders of interest; is that right?
19     A.  My --
20     MS. FUMERTON:  Objection; form.
21     A.  My view is yes.
22     Q.  And what improvements were made?
23     MS. FUMERTON:  Objection; form.
24     A.  Say it one more time.
25     Q.  What improvements were being made at the

---

Page 84

1  time?
2      A.  Procedures potentially that were more
3  definitive than what we had in place.  Also, maybe
4  different training tools we were looking at.  There
5  could have been a host of things we were looking at
6  in the time period.
7      Q.  What procedures were not -- were not
8  definitive in 2014, in September of 2014?
9      MS. FUMERTON:  Not -- objection; form,
10  mischaracterizes his testimony.
11     Q.  I'll rephrase.
12         Mr. Ducote, you testified that Walmart was
13  improving procedures potentially that were more --
14  more definitive than what we had in place.
15     A.  Yes.
16     Q.  What do you mean by that?
17     A.  I just think as time goes on on any
18  procedure, as you implement something and you -- a
19  part of a robust continuous improvement process is
20  you continuously go back to refine processes.  You
21  look for -- you look for any -- I look at things
22  from a zero-base mind-set, that ultimately your goal
23  is to get to zero issues with anything you do, and
24  so as we look through processes and procedures, we
25  make sure we fine-tune them over -- as time goes on.

---

Page 85

1         Is that your question?  Or maybe I
2  misunderstood your question.
3      Q.  What's the -- what's the benchmark that
4  you're trying to improve your policies to reach?
5      MS. FUMERTON:  Objection; form.
6      A.  Could you restate that question?  I didn't
7  understand that question.
8      Q.  Did -- in September of 2014, did Walmart
9  believe its suspicious order monitoring policy was
10  in line with the DEA's regulations?
11     MS. FUMERTON:  Objection; form.
12     A.  I can't speak on behalf of Walmart.  Again,
13  I was new into this role.  I really don't know.
14     Q.  Did you believe that Walmart's policies and
15  procedures met the suspicious order monitoring
16  policy requirements as outlined by the DEA at the
17  time?
18     MS. FUMERTON:  Objection; form.
19     A.  At the time, yes; but, again, it was during
20  that transition time period.  I still had a lot to
21  learn about the process.
22     Q.  If you didn't fully understand the process
23  at the time, how can you state that Walmart's
24  policies and procedures met the suspicious order
25  monitoring policy requirements as outlined by the

---

Page 86

1  DEA?
2      MS. FUMERTON: Objection; form, misstates
3  his prior testimony.
4      A. Oh, I'm sorry. I thought you were going to
5  reask something. Could you state --
6      MS. FUMERTON: No, if I object, which
7  clearly I'm going to --
8      THE WITNESS: Just --
9      MS. FUMERTON: -- you can go ahead --
10     THE WITNESS: Okay.
11     MS. FUMERTON: -- and just -- and answer --
12     THE WITNESS: It's just a pause at times, it
13  makes me think that --
14     MS. FUMERTON: No. No. That's okay. It's
15  not a normal conversation.
16  BY MR. INNES:
17     Q. What was the policy in 2014?
18     MS. FUMERTON: Objection; form.
19     Q. What was the suspicious order monitoring
20  policy in 2014 that -- maintained by Walmart, if
21  any?
22     MS. FUMERTON: Objection; form.
23     A. I just don't recall the exact details of it.
24  There -- there is a process to look at orders that
25  were of interest and just -- you know, that's four

Page 87

1  years ago during a transition of jobs. The first
2  two weeks I'm in a job to remember every specific is
3  extremely difficult; but you asked me in general did
4  I think that there was a process in place, and I
5  answered yes, I did. Do I know all the details of
6  it? I can't recall the details of it.
7      Q. At any point in time -- I'm sorry. I didn't
8  mean to cut you off.
9      A. No, I'm finished.
10     Q. At any point in time after you initially
11  started, did you become aware of any deficiencies in
12  Walmart's procedures for identify -- or suspicious
13  order monitoring procedures?
14     MS. FUMERTON: Objection; form.
15     A. When you use the word "deficiencies," I
16  think there can be conjecture on what a deficiency
17  is. I think there is improvements in how things
18  could have been handled, and that's what I focused
19  on, going back to that comment earlier about
20  continuous improvement, you know.
21         Going to a process that was maybe more
22  automated, going to a process that -- I mean,
23  there's a lot of things. So I don't think there was
24  deficiencies. I think there is improvements that
25  can be made, just to make sure I'm clear on that

Page 88

1  if -- earlier I made that comment, but --
2      Q. Tell me everything you know about Walmart's
3  suspicious order monitoring policy as it was stated
4  by Walmart in September of 2014.
5      MS. FUMERTON: Objection; form.
6      A. It's tough to tell you where to start
7  because, I mean, it was a very -- basically, if
8  orders were of a -- going back to -- and just to
9  make sure I'm going back to memory, I've stated
10  previously I don't remember all the details; but if
11  there were orders that were orders of unusual size,
12  there was a process in place to review those orders.
13     Q. What was that process?
14     A. I think in the document that you gave me
15  earlier, there was an outline that discussed that
16  process. I don't know if that was the process when
17  I first transitioned or when I was transitioning,
18  but I know it was during that transition period. I
19  think it was in Exhibit 3 or Exhibit 2.
20     Q. Do you want to look at Exhibit 3?
21     A. Whichever one that it's in. I'm not sure
22  which --
23     Q. Do you want to look at the one with the
24  process charts?
25     A. Yes. Which exhibit is that?

Page 89

1      Q. Do you have it there?
2      A. Yes, it was Exhibit 2.
3      Q. Do you recognize this as a policy or a
4  process, I'm sorry, that was implemented in 2014?
5      A. I think we're out -- I struggle to answer
6  your question somewhat. There were pieces of this
7  that were in place. To say that this was exactly
8  when I stepped into the role was in place, I
9  couldn't say every detail. I was only there for two
10  weeks, but pieces of this were in place.
11     Q. Let's go forward in time.
12     A. Okay.
13     Q. At any time during your tenure at Walmart,
14  was this the process that was in place?
15     A. Yes, this was an interim process that was
16  put in place.
17     Q. When was that?
18     A. I moved here in October, and it would
19  probably have been a month to two months after I
20  moved here that this was put into place. Yeah, I
21  recall -- the reason I recall the time period is
22  because it was two separate systems that the process
23  had to be put in place in, and one of the systems is
24  very unique system that's made in Austria that only
25  has one person that can update the software, and so

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  it took -- it took time to have them update it.
2  Q.  By "system," you mean computer system?
3  A.  Order filling system where -- the actual
4  system that order fills a product.
5  Q.  And there is two of them?
6  A.  Yes, there is two different systems.
7  Q.  And what are their names?
8  A.  Reddwerks and Knapp.
9  Q.  Is Knapp K-n-a-p-p?
10  A.  Yes, that's correct.
11  Q.  Was Reddwerks used in conjunction with
12  opioids?
13      MS. FUMERTON:  Objection; form.
14  A.  Yes.
15  Q.  Was Knapp used in conjunction with opioids?
16      MS. FUMERTON:  Objection; form.
17  A.  Yes.  They are both used with all products.
18  Q.  And what, generally speaking, is -- does
19  Reddwerks do?
20  A.  Reddwerks, in a broad sense, is a warehouse
21  management system; but specifically within this
22  network, it was used for the picking environment,
23  where order fillers pick an order.
24  Q.  And Knapp?
25  A.  Knapp is an automated order filling system,

Page 91

1  it's more robotic.
2  Q.  But both were used to fill opioid orders?
3      MS. FUMERTON:  Objection; form.
4  A.  Yes.
5  Q.  Are both used in the 6048 facility?
6  A.  No.
7  Q.  The 6045 facility?
8  A.  No.
9  Q.  At that time were they?
10  A.  The struggle, one was used in that facility,
11  not both.
12  Q.  Which one was used in 6048?
13  A.  Neither.
14      MS. FUMERTON:  Objection; form.
15  A.  I think -- sorry.  I answered your question.
16      Neither was -- 6045 was Reddwerks was what
17  we --
18      MS. FUMERTON:  That's okay.
19  BY MR. INNES:
20  Q.  Reddwerks was used in 6045?
21  A.  Yes, that's correct.
22  Q.  Knapp was not used in 6045?
23  A.  No.
24  Q.  Okay.  Was Knapp used in connection with
25  Schedule III hydrocodone?

Page 92

1  A.  Yes.
2  Q.  And what facility was that used in?
3  A.  6001.
4  Q.  And that's before the rescheduling?
5  A.  Yes.
6  Q.  And when they rescheduled, they combined
7  hydrocodone with all Schedule IIs; or you put all
8  Schedule IIs in the 6045?
9  A.  That's correct.
10      (Ducote Exhibit 5 was marked for
11  identification.)
12  BY MR. INNES:
13  Q.  We'll mark this as Plaintiffs' 5.  Let me
14  know when you have a chance to review it.
15      This is an e-mail from Chad Ducote to Betty
16  Strout on September 19th, 2014, it begins with Bates
17  Number 16686.
18  A.  Okay.  I've reviewed it.
19  Q.  So, Mr. Ducote, I want to start in the
20  middle of this e-mail string, which is an
21  e-mail sent about three-quarters of the way down the
22  page.
23  A.  Uh-huh.
24  Q.  It's an e-mail from you --
25  A.  Yeah.

Page 93

1  Q.  -- Chad Ducote, sent on April -- sorry,
2  September 18th, 2014.  So right around the time
3  period that you're transitioning into the role; is
4  that right?
5  A.  Yes.
6  Q.  It's sent to Betty Strout.  Who is Betty
7  Strout?
8  A.  Betty Strout was a HR personnel at the home
9  office --
10  Q.  Okay.
11  A.  -- Walmart home office.
12  Q.  And who is Bryan Boudreaux?
13  A.  He was my boss at the time in that role.
14  Q.  What was his title?
15  A.  He was a senior vice president.
16  Q.  Of?
17  A.  Supply chain.
18  Q.  So the subject of this e-mail is "SOM
19  position."  "SOM" refers to suspicious order
20  monitoring; is that correct?
21  A.  That is correct.
22  Q.  Okay.  You write to Betty, again, on
23  September 18th, of 2014:  "Betty:  Thanks for the
24  response.  Long-term I do see a larger structure
25  you're referring to; yet in the short-term, I feel

Page 94

1 more comfortable with a smaller team to get the
2 process going. Then from there, grow it as we
3 fine-tune things (policies, algorithms, et cetera)."
4 What process are you referring to here?
5 A. I feel I was referring to our order
6 monitoring process that we were looking to improve
7 with policies and algorithms, things of that nature.
8 Q. Is the order monitoring policy different
9 than the suspicious order monitoring?
10 A. It encompasses that.
11 Q. You go on to say: "I have 19 years
12 experience in the pharmacy industry and for the
13 specific skill set we will be" -- "we will be need
14 in some" -- "in the SOM manager position, I truly do
15 not believe that we will recruit that talent in an
16 X4. Due to the exposure of this topic, the person
17 in this position has to be world class talent."
18 What position are you talking about?
19 A. So that was a position that Tim and I had
20 talked about that we ended up going a different
21 strategic route on, so that position actually never
22 came to fruition. We went a different route.
23 Q. What position was it exactly?
24 A. What we were looking to do, we were still
25 unsure at the time -- again, this was all during the

Page 95

1 time period where things were being adjusted -- we
2 were unsure -- if you go to the next paragraph, it
3 says there is a pharmacy division X7 level title
4 director of controlled substances.
5 We weren't quite sure what that role was
6 going to do because that was a new role. And so we
7 were, at the time, debating putting someone that was
8 more over the strategy to help drive some of those
9 long-term algorithms that we discussed, and that's
10 the role we were referring to. But that role
11 actually never -- the decision was made to place
12 that strategic component into the director of
13 controlled substances position.
14 Q. So based on your 19 years of experience in
15 the pharmaceutical industry -- in the pharmacy
16 industry, I'm sorry, and do the exposure of
17 suspicious order monitoring, you needed world class
18 talent, rights?
19 MS. FUMERTON: Objection; form, misstates
20 the document.
21 A. Yes, I feel you should always get the most
22 talented individual you can for a role. I mean,
23 that's a core component of something that I focus
24 on.
25 Q. And you didn't have that at the time; is

Page 96

1 that right?
2 A. Well, the position didn't exist at the time,
3 so --
4 Q. And you needed that position, correct?
5 MS. FUMERTON: Objection; form.
6 A. Restate your question.
7 Q. You wanted to fill a position, didn't you?
8 MS. FUMERTON: Objection; form.
9 A. No. That's -- if that's what you took from
10 what I said earlier, that's not what I meant.
11 We felt that there was -- we felt someone
12 needed -- there was a role that was needed but not
13 necessarily that role wasn't being done, it just
14 needed to be defined in a different way.
15 And that's what we had gone back and forth
16 on, that, you know, different individuals were doing
17 these roles or doing these different tasks, but
18 could we consolidate those down into one role, and
19 that's what I was referring to.
20 But, again, we made a decision to
21 consolidate into a role, but the role existed in
22 another place, not within that department.
23 Q. So was the idea to consolidate multiple
24 roles into one person, or was it to create a new
25 station or new slot?

Page 97

1 MS. FUMERTON: Objection; form.
2 A. That's a good question. I have to think
3 about that during that time period. Say that
4 question one more time, please.
5 Q. Let me break it into pieces.
6 Was the idea to consolidate multiple roles
7 into one role?
8 MS. FUMERTON: Objection; form.
9 A. No, that was not the objective.
10 Q. Was it to create a new position?
11 A. That's a tough question to answer because of
12 the fact it wasn't looking to necessarily create a
13 position. I know it sounds maybe contrary. It's
14 to -- it's -- at the time in the discussions with
15 Tim and going into what I felt, as long as with Tim,
16 that the improvements that long-term that he was
17 even looking at at some point, someone needed to
18 drive those, that needed to be their role.
19 Different people were doing it; but in any
20 corporate environment, if one person is more of a
21 driver of things, you can accomplish those faster,
22 and you can -- you can -- it's just a better setup,
23 and that's what we were referring to. But, again,
24 that role was created -- that role was being done.
25 It's -- am I confusing you on my response to

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 that?

2     Q.  So at the time, September of 2014, who was

3 doing what on your team with respect to suspicious

4 order monitoring?

5         MS. FUMERTON:  Objection; form.

6     A.  At that time, Kristy Spruell was doing some

7 components of it, Theresa Alford was doing some

8 components of it, Ramona Sullins was doing some

9 components of it, Nick Tallman was doing some

10 components of it, and that was the immediate of my

11 team.  And beyond that, there were other individuals

12 that weren't on my team that were doing it.

13     Q.  Who were they?

14     A.  I could not list every single person I --

15 that was there.  There is some that stick out in my

16 head.

17     Q.  Who are they?

18     A.  Roxie.  I don't remember Roxie's last name,

19 Miranda Johnson was doing a few pieces of it.

20 Brooke Leverett, which I could be incorrect about

21 Brooke.  Brooke was transitioning during the same

22 time period.  It may have been Donna -- I don't

23 recall Donna's last name.  And there was other

24 individuals.  I just can't remember every single

25 person's name.

Page 99

1     Q.  Specifically what was Ms. Spruell doing?

2     A.  Ms. Spruell was -- and, again, this is four

3 years ago and still trying to understand exactly

4 everyone's roles, not just Ms. Spruell's role; but

5 she was put in place to help -- I don't know exactly

6 her initial intent.

7         I will tell you the intent whenever I took

8 the role.  When I took the role, what Kristy was

9 doing was to go through each of the procedures and

10 policies and just -- I'm sure you saw that flowchart

11 just a minute ago.  She was creating documents such

12 as that for us.

13     Q.  Is the -- the flowchart you're referring to

14 is Exhibit 2?

15     A.  Yes.

16     Q.  So her job -- was her job to create

17 graphics, is that -- I just want -- strike that.

18         You say her job was to go through each of

19 the procedures and policies and create documents for

20 us.  What do you mean by that?

21         MS. FUMERTON:  Objection; form.  It

22 misstates the testimony.

23     A.  Could you restate your question?

24     Q.  Let me see if I can't target it a little bit

25 more.

Page 100

1         Was Ms. Spruell's role to go through

2 policies and procedures and draft policies and

3 procedures?

4     A.  I don't know if that's what her intended

5 role was.  She did draft some policies and

6 procedures while I was there.

7     Q.  Do you know what policies and procedures she

8 drafted?

9     A.  That's four years ago.  And when we say

10 "draft," "draft" doesn't -- just to make sure you

11 and I are on the same page with this -- "draft"

12 doesn't necessarily mean that it didn't exist

13 before.  Policies exist and they are updated; and as

14 they are updated, drafts are created before the

15 final ones are produced.

16         So some of the things that she drafted are

17 the order of interest.  She also did drafts of --

18 she did other drafts.  I do not recall what the

19 other drafts were.  But there were several other

20 things that Kristy did draft.

21         MS. FUMERTON:  Perhaps this is a good time

22 to take a break?  Then we can take our short

23 break now and take another break at lunch.

24         MR. INNES:  One minute.

25         Let's take a quick break, five -- five

Page 101

1 minutes.

2         MS. FUMERTON:  I will keep it as close to

3 five minutes as we can.

4         THE VIDEOGRAPHER:  Going off record, the

5 time is 10:21.

6         (Recess from 10:21 a.m. until 10:31 a.m.)

7         THE VIDEOGRAPHER:  We're going back on the

8 record, beginning of Media File Number 3.  The

9 time is 10:31.

10 BY MR. INNES:

11     Q.  Okay.  We're back on the record, Mr. Ducote.

12         I want to pick up about where we left off.

13 You -- it's your testimony that you don't know

14 exactly what the policy was, the suspicious order

15 monitoring policy was in September of 2014; is that

16 correct?

17     A.  I think the way you're phrasing it is not

18 what I said.

19     Q.  Do you know --

20     A.  I think --

21     Q.  -- exact --

22         MS. FUMERTON:  Oh, you both paused, which is

23 fine.  Just give each other time.

24 BY MR. INNES:

25     Q.  We'll get it right.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1   A.  Okay.  Go ahead.  Maybe I should let you
2   repeat the question to make sure I understand.
3   Q.  Do you know what Walmart's suspicious order
4   monitoring policy was in 2014, in September of 2014?
5   A.  So maybe I was --
6   MS. FUMERTON:  Objection; form.
7   A.  Sorry.  I was maybe unclear earlier.
8   I think the way I took your question
9   earlier, you were -- you were asking me exactly
10  every single detail if I knew, and I -- I can't
11  recall exactly what I said.  But I had a general
12  awareness of what the policy was, and maybe that's
13  how I should have stated it earlier.
14  Q.  And is it your testimony that that policy
15  that you were generally aware of at -- met the DEA's
16  requirements at the time?
17  MS. FUMERTON:  Objection; form.
18  A.  That, I couldn't answer.  I really -- at the
19  time transitioning, I didn't specifically know what
20  the DEA requirements were, I was learning what those
21  were.  So to be able to convey between the two, it
22  would be difficult for me to do.
23  Q.  When did you learn what the DEA's
24  requirements were with respect to suspicious order
25  monitoring?

Page 103

1   A.  As time went on and I grew into the role,
2   transitioned into it and started to feel more
3   comfortable, I became much more aware.  It wasn't
4   exactly in this time period you were asking me
5   about, though.
6   Q.  When was the first time that you learned
7   about the DEA's suspicious order monitoring
8   requirements?
9   MS. FUMERTON:  Objection; form.
10  A.  In a broad sense, is that how you're asking
11  me the question?  Just in general that there were
12  requirements, is that --
13  Q.  Yes.
14  A.  Okay.  It was around this time period when I
15  was first said, "Hey, there are some requirements."
16  Q.  Did you ever receive any training from
17  Walmart on what those requirements are?
18  MS. FUMERTON:  Objection; form.
19  And, obviously, just counsel, nothing that's
20  privileged or that you had conversations with
21  attorneys about, but outside of that context, you
22  can give training.  I don't know that any such
23  exists.  I'm just -- as we're wading into this,
24  wanting to just give the cautionary statement.
25  A.  Could you reask that question?

Page 104

1   BY MR. INNES:
2   Q.  Sure.  Did you receive any training from
3   Walmart regarding the DEA's suspicious order
4   monitoring requirements, either -- in September of
5   2014?
6   MS. FUMERTON:  Objection; form.
7   A.  I don't recall in 2014 receiving any.  At
8   some point, I did.
9   Q.  What point in time was that?
10  A.  The -- can I take a pause or -- because of
11  the comment.  I'm a little bit confused between the
12  two of your comments.
13  Q.  There's a question pending.  Do you have --
14  do you --
15  MS. FUMERTON:  There is a question pending.
16  I think it's about privilege.  Can we have a
17  quick -- unless you want to rephrase it.  I think
18  you might be able to rephrase it in a way that
19  possibly doesn't -- or I'm happy to take a quick
20  break and find out what the concern is.
21  MR. INNES:  Just one second.  The screen has
22  stopped moving.
23  I'm going to -- I'll reask the question.
24  MS. FUMERTON:  Okay.
25  BY MR. INNES:

Page 105

1   Q.  Did you receive any training from Walmart
2   regarding the DEA's suspicious order monitoring
3   requirements?
4   MS. FUMERTON:  Objection; form.
5   A.  Yes.
6   Q.  Who did you receive that training from?
7   A.  That's the part I'm confused on.  So is it
8   privileged, nonprivileged?
9   MS. FUMERTON:  Can we just -- I think --
10  I'll be super quick.  We'll just clear this up.
11  I just -- honestly it's not a big --
12  MR. INNES:  Well, it's a -- it's a yes-or-no
13  question whether or not he had training.
14  MS. FUMERTON:  Well, he answered that.
15  MR. INNES:  He answered that, and now we're
16  asking who he received the training from.
17  MS. FUMERTON:  Yes, but let me just take a
18  quick --
19  MR. BOWER:  Well, let him answer the
20  question first and then you can take a break and
21  you can talk to him.
22  MS. FUMERTON:  Well, he says that he's
23  wondering whether or not the answer would reveal
24  privileged information, so that's why I want to
25  talk --

Page 106

1    MR. BOWER: The name -- the name of a
2 trainer would not reveal privileged information.
3    MS. FUMERTON: I don't know what he's
4 thinking. I don't know what he's thinking of,
5 and so I don't want to have --
6    MR. BOWER: We're just asking for a name.
7    MS. FUMERTON: No. That's not necessarily
8 the case.
9    MR. INNES: I'll ask it that way.
10 BY MR. INNES:
11    Q. What was the name of the person who trained
12 you in DEA suspicious order monitoring?
13    MS. FUMERTON: Objection; form. It assumes
14 a foundation you haven't established.
15    A. So the --
16    Q. You can answer that question.
17    MS. FUMERTON: What --
18    A. The training that was provided, I thought
19 was under privilege. I thought it was in a
20 situation that was by attorney, an attorney present,
21 not necessarily doing an attorney.
22    MS. FUMERTON: So if they're having -- this
23 is my point. This is why we never -- if you're
24 talking about training, you're talking about
25 something where they are getting legal advice as

Page 107

1 to what requirements are, that's legal advice and
2 attorney-client communication. That's why I have
3 the question. Because you guys might be talking
4 about different things of what you mean to be
5 training.
6    If he received training from somebody
7 outside of legal, then that's a different
8 question and, obviously, there is no problem
9 answering that question, but if what he's
10 thinking of, when you ask, "Did I receive
11 training," did he have communications with
12 lawyers which told him what the requirements
13 were, I think that that can be privileged
14 information.
15    That's what -- that's what -- look, I'm not
16 trying to be difficult. That's what I'm trying
17 to make a distinction between.
18    MR. INNES: Let me see if I can navigate it.
19    MS. FUMERTON: Okay.
20 BY MR. INNES:
21    Q. Did you receive training from lawyers
22 regarding the DEA's suspicious order monitoring
23 policies?
24    A. And when you say "training," define to me
25 what you mean by "training" to make sure I answer

Page 108

1 the question correctly.
2    Q. Did anyone -- did any Walmart attorneys
3 instruct you regarding the requirements of the DEA's
4 suspicious order monitoring policies?
5    MS. FUMERTON: Yeah. I -- you can answer
6 the question. I'm objecting to that question.
7    I think you can phrase it another way to get
8 a yes-no answer in which it wouldn't reveal
9 potentially privileged information.
10 BY MR. INNES:
11    Q. Did you receive training regarding the DEA's
12 suspicious order monitoring policies from
13 nonlawyers?
14    MS. FUMERTON: Objection to the form; not a
15 privilege concern.
16    A. From my viewpoint, no.
17    Q. What do you consider to be "training"?
18    A. That's why I was asking that clarification
19 earlier. You're asking me what I consider training?
20    Q. Yeah. Yeah.
21    A. Okay. So the way I understood your question
22 earlier was training was more of a structured
23 environment to where necessarily we were in a room,
24 it could be online. I wasn't sure if you were
25 referring to training as that; or training as,

Page 109

1 "Here's material, read it, and you should understand
2 this"; or training could be in a one-on-one setting,
3 someone going over a document with you. That's why
4 I was confused about the question earlier, because
5 people have different interpretations of "training."
6    Q. As you understand the word "training," did
7 you receive any training regarding the DEA's
8 suspicious order monitoring policies?
9    MS. FUMERTON: Objection; form, and asked
10 and answered.
11    A. Are you -- you're not going to reask the
12 question?
13    Q. No, I'm not.
14    A. Okay. So from a lawyer/nonlawyer, because
15 the questions were different, the first one and
16 second one, so I just want to be clear.
17    MS. FUMERTON: Look, I'm saying I think can
18 we have a two-minute conversation which will make
19 your life a lot more easier right now that off --
20 if we want to take a short break.
21    MR. INNES: I'll give you -- we'll go off
22 the record for two minutes.
23    MS. FUMERTON: Okay.
24    THE VIDEOGRAPHER: Going off the record.
25 The time is 10:40.

Page 110

1    (Recess from 10:40 a.m. until 10:43 a.m.)
2    THE VIDEOGRAPHER: Going back on the record,
3    beginning of Media File Number 4. The time is
4    10:43.
5    BY MR. INNES:
6    Q. Mr. Ducote, back on the record.
7    We took a brief break so you could discuss
8    with your counsel an issue related to privilege.
9    I'm going to start up with that line of questioning
10   again.
11   A. Okay.
12   Q. How -- what is your knowledge of the DEA's
13   requirements with respect to suspicious order
14   monitoring?
15   A. I did have communication on it with
16   different parties.
17   Q. That's not the question. The question is:
18   What is your knowledge of the DEA's requirements
19   regarding suspicious order monitoring?
20   A. Okay. Sorry. I thought I did answer your
21   question.
22   I do have a general knowledge of it.
23   Q. What is that knowledge?
24   A. What type of scale are you looking for? Are
25   you looking for details of it? Can you give me --

Page 111

1    Q. Mr. Ducote --
2    A. -- some guidance.
3    Q. I'm sorry.
4    A. Go -- no, go ahead. I'm sorry.
5    Q. Mr. Ducote, as part of your responsibilities
6    in that -- in the role that you started in September
7    of 2014 was to implement suspicious order monitoring
8    policies; is that correct?
9    A. Policies were already implemented or
10   procedures, going back to the earlier conversation,
11   but it was oversight of it.
12   Q. And were your duties also to execute those
13   policies?
14   A. Yes.
15   Q. And was it your job to oversee other Walmart
16   employees who executed those policies?
17   A. Yes.
18   MS. FUMERTON: Objection; form.
19   Q. And those policies directed at suspicious
20   order monitoring were put in place to meet the DEA's
21   requirements; is that correct?
22   A. Yes.
23   Q. And part of the DEA's requirements are to
24   make sure that opioids, Schedule II, Schedule III
25   narcotics are not diverted into places where they

Page 112

1    should not be dispensed or distributed?
2    MS. FUMERTON: Objection; form.
3    A. I think, in general, it's controlled
4    substances is what -- what the guidelines are
5    looking at.
6    Q. And an opioid is a controlled substance?
7    A. It's one of them. There's also drugs of
8    interest and things of that nature.
9    Q. And this case is focused on opioids. You
10   know that, right?
11   A. I think you stated that earlier, yes.
12   Q. Is that your understanding, that this case
13   involves the distribution of opioids by Walmart?
14   MS. FUMERTON: Objection; form.
15   A. I thought earlier you said this case
16   involved the distribution of multitude, not just
17   Walmart.
18   Q. I'm asking about your understanding of this
19   case that you are sitting in a deposition for.
20   A. Restate it again just to make sure.
21   Q. I'm asking what your understanding is of the
22   complaint and the allegations in the complaint as
23   they relate to Walmart?
24   A. Yes.
25   MS. FUMERTON: Okay. Objection; form. And

Page 113

1    I object to the extent that you're asking a
2    privileged question. He earlier testified he did
3    not read the complaint. And so the extent that
4    he has learned about what any allegations are in
5    this case from counsel, those communications are
6    privileged.
7    MR. INNES: Limit the speaking objections,
8    if you don't mind.
9    MS. FUMERTON: Okay. Fine. I'm objecting
10   to that question as privileged and instructing
11   him not to answer.
12   BY MR. INNES:
13   Q. What is your understanding of what this case
14   is about?
15   A. My understanding is, from earlier what you
16   told me about, it was a case regarding opioids and
17   it was distribution and you mentioned several, and
18   that's what my understanding is.
19   Q. Okay. So as the person in charge for the
20   health and wellness logistics that oversaw the
21   execution of policies regarding the suspicious order
22   monitoring and opioids --
23   A. Yes.
24   Q. You only have a general sense of what the
25   DEA's requirements are?

Page 114

1    MS. FUMERTON: Objection; form.
2    Q. Is that correct?
3    A. Okay. Your question is more definitive this
4 time than the last time.
5    I understood -- that's a tough question to
6 answer because, yes, I understand in general; but I
7 do understand core components of it. But if I -- I
8 think you're pushing towards a question of exactly
9 what level of detail, I couldn't answer that.
10 That's the most impossible question to answer.
11   Q. What core components do you know of?
12   A. That orders of interest should -- unusual
13 size, frequency. The -- the core components of what
14 our program was and what you'll see in some of the
15 documentation I'm sure you will present to me later
16 is those are the things I understand regarding it.
17   Q. Mr. Ducote, are you aware that under federal
18 law, all manufacturers and distributors are required
19 to maintain effective controls against diversion?
20   A. Yes.
21   Q. When did you become aware of that?
22   A. I could not tell you exactly when. I am
23 aware of it. I just couldn't tell you when.
24   Q. 2013?
25   A. I really don't know exactly when.

Page 115

1    Q. Before or after 2013?
2    A. I'd be guessing. I prefer not to guess.
3    Q. Were you aware of it in 2015?
4    A. Yes.
5    Q. Were you aware of it in 2014?
6    A. I don't know if in 2014 -- I don't --
7    Q. So sitting here today, you can say
8 definitively you were aware of that particular
9 requirement as of 2015?
10   A. Yeah, I do know that.
11   Q. Okay.
12   A. Yes.
13   Q. You're aware the DEA regulations require all
14 manufacturers and distributors to report suspicious
15 orders of controlled substances?
16   A. Yes.
17   Q. And when did you first become aware of that?
18   A. It goes back to the earlier comments. I
19 definitively could tell you 2015. 2014, I'm still
20 unsure.
21   Q. You're aware the Code of Federal Regulations
22 requires registrants to design and operate a system
23 to disclose -- disclose to the registrant suspicious
24 orders of controlled substances; is that correct?
25   A. Yes.

Page 116

1    Q. And you became aware of that in 2015?
2    A. It's know definitively yes, during that time
3 period. Again, same answer as before.
4    Q. So not before 2014?
5    A. No. Just unsure if it's before 2014 or
6 2015.
7    Q. Are you aware that registrants are also
8 required to inform local DEA field office of
9 suspicious orders when they are discovered?
10   MS. FUMERTON: Objection; form.
11   A. That one -- what is the date of the document
12 you're reading? Because I think that may have
13 changed over time.
14   Q. I'm asking you a question.
15   A. So reread it, please.
16   Q. When did you become aware that registrants
17 are required to inform a local DEA field office of
18 the suspicious orders when they are discovered?
19   MS. FUMERTON: Objection; form.
20   A. That answer is difficult for me because it
21 could be convoluted. Because I know in my head the
22 assumption is in 2015, about the same time period;
23 but there was some activity in 2017 that I think is
24 causing me to have some confusion if there was
25 something that came out in 2017 that changed that

Page 117

1 premise by the DEA.
2    Q. So you may have become aware of that
3 particular -- that particular statement in 2017?
4    A. No. I mean, well, not necessarily. I --
5 20 -- it seems as though in 2017 something changed.
6 I can't recall which change, if that changed, it
7 went away from that, or if that got clarified in
8 2017. I know something happened in around 2017 or
9 20 -- late 2016 on that particular item. So that's
10 why it's difficult for me to answer.
11   Q. You're aware that suspicious orders are
12 orders of unusual size, orders deviating from --
13 substantially from the normal pattern, and orders of
14 unusual frequency; is that correct?
15   A. Yes.
16   MS. FUMERTON: Objection to form.
17   Q. When did you first learn of that definition
18 of a suspicious order?
19   MS. FUMERTON: Objection; form.
20   A. I know definitively in 2015, but I -- it
21 seem as though in 2014, when I was transitioning
22 into the role, there was some conversation of that
23 particular item.
24   Q. And what was the conversation surrounding
25 that particular item?

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1   A.  I think, going back to -- it seems like one
2  of the earlier exhibits you showed me, that came up
3  in conversations before.
4   Q.  Can you be more specific?
5   A.  Can you give me a second?
6      I think it's in Exhibit 2, I mean pieces of
7  that, not in the full context of what you stated;
8  but there are some pieces at that time I do remember
9  coming up as conversation.
10   Q.  What were -- what was -- what do you
11  remember from those conversations specifically?
12   A.  Just in general about the unusual size.
13   Q.  And what about the unusual size?
14   A.  I don't remember the details.
15   Q.  Was Walmart focused on orders of unusual
16  size at that time period?
17      MS. FUMERTON:  Objection; form.
18   A.  Could you state that one more time?
19   Q.  Did Walmart consider orders of unusual size
20  at that time frame -- in that time frame with
21  respect as to suspicious order monitoring policy?
22      MS. FUMERTON:  Objection; form.
23   A.  Going back to the earlier comments, we had
24  an order monitoring process in place.  I assume that
25  was a key component of it, but I couldn't tell you

Page 119

1  definitively.
2   Q.  You don't know?
3   A.  I don't know if going back to before I
4  started the role and till we transitioned to
5  this process here, the answer would be no, I don't
6  know exactly.
7   Q.  When did -- when do -- to your knowledge,
8  when did Walmart first consider orders of unusual
9  size as part of its suspicious order monitoring
10  program?
11      MS. FUMERTON:  Objection; form.
12   A.  I know definitively during the time period
13  starting around that October/November time period I
14  told you.  It does seem as though later in the role,
15  I came across something that had additional
16  information.  I just don't remember what the dates
17  were on that document.
18   Q.  So as part of your day-to-day job in that --
19  in your position at that time --
20   A.  Uh-huh.
21   Q.  -- the entire four-year time period, was
22  orders of unusual size something that came up on a
23  daily basis?
24      MS. FUMERTON:  Objection; form.
25   A.  I wouldn't say a daily basis.

Page 120

1   Q.  A weekly basis?
2   A.  Yes.
3      MS. FUMERTON:  Objection; form.
4   Q.  On a weekly basis as it pertained to
5  Schedule II narcotics?
6   A.  All controlled substances, again, just to
7  make sure we're clear on that; but, yes, it would
8  include Schedule II narcotics.
9   Q.  And opioids?
10   A.  Yes.
11   Q.  Do you agree that determination of whether
12  an order is suspicious depends not only on the
13  ordering patterns of a particular customer, or
14  pharmacy in your case, but also on the patterns of
15  the registrant's customer base and the patterns
16  throughout the relevant segment of that regulated
17  industry?
18      MS. FUMERTON:  Okay.  Objection; form.
19   A.  I mean, I have to reread your question.
20  That was a long question.
21      And just to be clear, I'm not an attorney.
22  To interpret rules and regulations, that we're on
23  the same page on that, just I think that we are.
24      So your question, the part I'm a little
25  confused on is that latter part.  Are you reading

Page 121

1  straight from the regulations, or is that more --
2   Q.  I'm asking if you agree with that statement.
3   A.  Okay.  So that's what -- just agree or
4  disagree with the statement?
5   Q.  Yes, sir.
6   A.  Sorry.  I was confused on your question
7  earlier.
8      I agree that it was something that was taken
9  into account during the time period I was in the
10  role.
11   Q.  And your prior testimony was that -- well,
12  strike that.
13      Do you agree that a registrant is required
14  to design and operate a system to disclose
15  suspicious orders of controlled substances?
16   A.  Yes.
17   Q.  And you agree Walmart is a registrant; is
18  that correct?
19   A.  Yes.
20   Q.  And "operate" means that you follow those --
21  the system to disclose; is that correct?
22      MS. FUMERTON:  Objection; form.
23   A.  I don't understand that question.
24   Q.  Well, as a registrant, Walmart is required
25  to design and operate a system to disclose

Page 122

1 suspicious orders of controlled substances; is that
2 right?
3 　A.　Yes.
4 　Q.　And by "design," that means develop a
5 suspicious order monitoring program; is that
6 correct?
7 　A.　Yes.
8 　Q.　And by "operate" means to execute that plan,
9 correct?
10 　A.　Yes.
11 　Q.　So if that plan is not executed properly,
12 you would agree that Walmart would not be operating
13 a system to disclose suspicious orders, correct?
14 　　MS. FUMERTON:　Objection; form.
15 　A.　I don't agree with the overall question.
16 　Q.　What don't you agree with?
17 　A.　I think -- reread the question before I add
18 on.
19 　Q.　Walmart -- let me -- let's break it down.
20 　A.　Okay.
21 　Q.　Walmart has a suspicious order monitoring
22 policy in place in September of 2014, correct?
23 　A.　Yes.
24 　Q.　Walmart developed that plan on its own,
25 correct, or in conjunction with other third parties?

Page 123

1 　A.　Yes.
2 　　MS. FUMERTON:　Objection; form.
3 　A.　Sorry.　Yes.
4 　Q.　For Walmart to -- did Walmart execute that
5 plan, correct?　Did it -- Walmart execute the plan
6 that it -- that it developed to identify suspicious
7 order of controlled substances?
8 　　MS. FUMERTON:　Objection; form.
9 　A.　What my experience was, that I saw was yes,
10 we were, we did.
11 　Q.　Why do you say that?
12 　　MS. FUMERTON:　Objection; form.
13 　A.　Going back to our earlier conversations, I
14 saw, when I came into the role, the amount of
15 resources that were put into it, so there was an
16 ample amount of resources.　So you asked what my
17 opinion was.　My opinion was yes, it was being
18 executed because I saw the other resources and
19 processes that were in place.
20 　Q.　You wanted to change those resources when
21 you came on board; is that right?
22 　　MS. FUMERTON:　Objection; form.
23 　A.　I did want to look at some different
24 changes.　I think anyone that goes into a new role
25 does try to look at what the next iteration of that

Page 124

1 role looks like.
2 　Q.　Who was executing the policy when you came
3 on board?
4 　　MS. FUMERTON:　Objection; form.
5 　A.　There's not one person that was executing
6 it.　It's an organizational -- it's a collective
7 body of different individuals because the process
8 has different steps in it.
9 　Q.　And you had a person on each step of the
10 way?
11 　A.　From what I saw, yes, I felt that there was.
12 　Q.　And what did each one of these people do in
13 the process?
14 　　MS. FUMERTON:　Objection; form.
15 　A.　You know, again, you're -- the questions all
16 seem to revolve around the time period when I was
17 transitioning into the role, but --
18 　Q.　Can -- well, I didn't mean to interrupt.
19 　A.　Yeah, go ahead.　I don't know if I can
20 answer that question ample -- amply.　Go ahead.
21 　Q.　So you transitioned from being a general
22 manager of a distribution center, and you came into
23 a department at Walmart that was heavily regulated
24 by the DEA, right?　And it had certain specific
25 requirements that you had to -- that your policies

Page 125

1 and procedures had to meet; isn't that right?
2 　　MS. FUMERTON:　Objection; form.
3 　A.　Yes, generally right.
4 　Q.　And you -- and you learned about those
5 policies -- you learned about those regulatory
6 requirements on the job; is that right?
7 　A.　Yes.
8 　Q.　You didn't have subject matter expertise
9 when you took that job; is that right?
10 　A.　No.
11 　　MS. FUMERTON:　Objection; form.
12 　　Just give me a second to object.
13 　　THE WITNESS:　Sorry.
14 BY MR. INNES:
15 　Q.　Mr. Ducote, are you aware of -- that --
16 excuse me -- in 2007, 2008, Cardinal Health paid $34
17 million in fines for violating the CSA?
18 　　MS. FUMERTON:　Objection; form.
19 　A.　I do recall at some time period, I was made
20 aware of that.　Who made me aware, how, I don't
21 remember; but I do recall someone making me aware of
22 that.
23 　Q.　So I'm going to ask you a series of
24 yes-or-no questions.
25 　A.　Okay.

Page 126

1  Q.  In '08, are you -- were you aware that
2  McKesson paid $13 million for lack of reporting
3  violation of the CSA?
4       MS. FUMERTON:  Objection; form.
5  A.  Yes.
6  Q.  Are you aware that in 2011, Omnicare paid
7  more than -- paid $50 million in a settlement for
8  lack of monitoring under the CSA?
9       MS. FUMERTON:  Objection; form.
10  A.  No, I don't remember that one.
11  Q.  And are you -- are you aware in 2012, the
12  state of West Virginia sued 14 wholesale
13  distributors for lack of monitoring under the CSA?
14       MS. FUMERTON:  Objection; form.
15  A.  You said "yes" or "no," but seemingly I do.
16  I don't know if there's a third option.
17       MS. FUMERTON:  You don't have to answer the
18  question "yes" or "no."  If -- I want you to
19  answer the question carefully.
20  A.  It does seem like I've heard of that one.
21  BY MR. INNES:
22  Q.  Yes or no, do you know that CVS paid $13
23  million for CSA violations from 2005 to 2011?
24       MS. FUMERTON:  Objection; form.
25  A.  Again, I'm generally aware that CVS had some

Page 127

1  issues.  I don't recall the specifics.
2  Q.  Are you aware that in 2012/2013 time frame,
3  the federal government served a subpoena on
4  AmerisourceBergen for lack of monitoring under the
5  CSA?
6  A.  Yes, I am aware.
7  Q.  How did you become aware of that?
8  A.  That one --
9       MS. FUMERTON:  And I just object to the
10  question to the extent that you learned from
11  attorneys.  If you learned otherwise, fair game.
12  A.  I do not know who specifically, but I
13  just -- I know that I was aware of that one.
14  Q.  Is it someone from Walmart?
15  A.  I don't know.  I really don't remember.
16  Q.  Is it someone from AmerisourceBergen?
17  A.  It wouldn't have been from
18  AmerisourceBergen.  It could have been in the lay
19  press.  It could have been a trade journal.  It
20  could have been on the Internet.  It could have been
21  from -- a trade show or something.  I'm really not
22  100 percent sure.
23  Q.  Are you aware that in 2013, Walgreens paid
24  more than $80 million in fines to settle a DA probe
25  for lack of monitoring under the CSA?

Page 128

1       MS. FUMERTON:  Objection; form.
2  A.  Yes, I was aware of that one.
3  Q.  Were you aware it lost a facility in Florida
4  for over one year, along with six other pharmacy
5  locations in Florida under that same settlement?
6       MS. FUMERTON:  Objection; form.
7  A.  No, I wasn't aware of all those details.  I
8  was just aware high level.
9  Q.  Are you aware that in 2013, CVS was being
10  investigated for 37,000 in missing pain pills in
11  three California locations?
12       MS. FUMERTON:  Objection; form.
13  A.  I don't recall California, but I do remember
14  CVS in general.
15  Q.  Are you aware that as of 2013 at that time
16  period, that at that time, CVS had already paid $29
17  million in fines?
18       MS. FUMERTON:  Objection; form.
19  A.  I don't recall that.
20  Q.  Mr. Ducote, you came on board in September
21  of 2014 into the division that was -- I believe your
22  testimony could be summarized as executing the
23  logistical requirements for distribution of
24  Schedule II opioids; is that right?
25       MS. FUMERTON:  Objection; form.

Page 129

1  A.  Again, that was my view when I came into the
2  role, that we were, yes.
3  Q.  Uh-huh.  Right.  That was a big life change,
4  moving from general manager, moving your family from
5  Opelousas up to Bentonville, Rogers?
6  A.  Uh-huh.
7  Q.  You're taking on a lot of responsibility.
8  Did these fines and subpoenas and lawsuits against
9  your -- against folks in the pharmaceutical
10  distribution world, the world that you were
11  operating in, that you were now in charge of, did
12  that make you nervous at the time?
13       MS. FUMERTON:  Objection; form.
14  A.  I wouldn't say it made me nervous.  It made
15  me more astute, cognitive of to making sure that as
16  I transitioned into the role, I spent the time with
17  the different individuals as referred to earlier
18  learning of the different processes and programs we
19  had in place.
20  Q.  I suspect that would be a natural thing to
21  do.  And when you sat -- when you entered the role
22  and you investigated and educated yourself, I assume
23  as to what Walmart was doing at the time with
24  respect to the CSA?
25       MS. FUMERTON:  There's not a question

Page 130

1  pending.
2  Q.  When you entered the role, you investigated
3  and educated yourself regarding what Walmart was
4  doing with respect to the CSA?
5      MS. FUMERTON:  Objection.
6  Q.  When you entered the role, did you educate
7  yourself with respect to Walmart's policies and
8  procedures with respect to suspicious order
9  monitoring?
10  A.  I began to.  Going back to the one exhibit
11  you showed me, yes.
12  Q.  And what else did you do --
13      MS. FUMERTON:  Objection; form.
14  Q.  -- to educate yourself regarding Walmart's
15  suspicious order monitoring policies that were in
16  place in September of '14?
17  A.  Okay.  Okay.  Let's -- so one of the things
18  we talked about earlier, different meetings with
19  different individuals.  I touched bases, sit downs,
20  things of that nature, which is typical, going back
21  to your point earlier.
22      I did go to different websites and reviewed
23  websites and what was out there.
24  Q.  What websites did you go to?
25  A.  I think someone recommended -- there was a

Page 131

1  recommendation of one website.  It's not the DEA's
2  official website.  I think they have a different
3  website.  I've read through some of the information
4  on there that was recommended.  Just really most of
5  it was through meetings and talking with different
6  individuals at the office.
7  Q.  Did you go to the DEA's website?
8  A.  I don't think it's actual -- their DEA.gov
9  or whatever it is.  I think there's a different
10  website they have that someone had recommended I
11  look at in one of the meetings.
12  Q.  And what did you find on that website?
13  A.  Basically what you read earlier in a
14  nutshell, just in general terms.  I mean, everything
15  you read, I don't recall seeing all -- every
16  specific; but, in general, some of the things you
17  read is what was on there.
18  Q.  And you did that around September of '14?
19  A.  I would say probably more in the October
20  time period.  September, going back to your earlier
21  comment, is focused on moving; selling a house,
22  buying a house, moving family, pets, things like
23  that.
24  Q.  So October 2014 is when you -- when you
25  perused the DEA's website?

Page 132

1  A.  I would say in that time period, October,
2  November.  I'm giving you a general time frame, I
3  don't know exactly, but it's in that time frame.
4  Q.  Because earlier you testified you thought
5  maybe January or 2015 is when you originally learned
6  about these requirements.
7      MS. FUMERTON:  Objection; form, misstates
8  his prior testimony.
9  A.  Say your question again.
10  Q.  Yeah.  My recollection of your testimony is
11  that you first learned these -- the requirements
12  that we read off earlier in 2015?
13  A.  Okay.
14  Q.  Now you're telling me you went to the
15  website in 2014?
16      MS. FUMERTON:  Okay; form.
17  A.  The way you were asking me the question
18  earlier --
19  Q.  Yeah.
20  A.  -- it was specific to the regulation to read
21  each regulation.  You know, if that's the impression
22  I'm giving you now, that's not -- I said I went to
23  the website.  It doesn't mean I read every single
24  regulation.
25  Q.  Oh.

Page 133

1  A.  And then, again, I'm giving you a ballpark
2  of the time period.  I don't know exactly the exact
3  dates of it, October, November, December, January,
4  it could be in that time range.  It seems like it's
5  October, November, though.
6  Q.  So in terms of educating yourself regarding
7  the DEA's requirements regarding suspicious order
8  monitoring, you said you went to a website?
9  A.  Yes.  I seemingly recall.
10  Q.  What else did you do?
11  A.  Most of it was meetings, different touch
12  bases around the office.  That first few months was
13  a whirlwind of just in general.  Plus on top of
14  that, I was traveling to each of the facilities to
15  meet the actual managers in them.  So that's why I
16  submit the time periods are a little hard to pin
17  down as specific as you want.
18  Q.  I can appreciate the transition, moving
19  between states and taking a new job would be
20  overwhelming.  Did it feel overwhelming to you?
21      MS. FUMERTON:  Objection; form.
22  A.  Overwhelming in more of getting everything
23  done; but personally overwhelming, I was okay with
24  it.
25  Q.  So getting everything done in terms of your

Page 134

1  job at Walmart, your new position, that was
2  difficult given the travel schedule; is that
3  correct?
4       MS. FUMERTON:  Objection; form.
5    A.  The other thing which can bring up -- I
6  wasn't going to bring up earlier.  You don't just
7  leave a job in supply chain at that time of year.
8  This is the busiest.  This is Christmas season.
9  This is Thanksgiving.
10       So the previous job, it's not like one day I
11  just cut off and said, "Hey, I'm done."  I had to
12  continue to help the new person, because the new
13  person didn't start immediately.
14       So, yes, it was difficult because I was also
15  in transitioning of assisting the other operation.
16    Q.  So your transition with the job that Walmart
17  posted, that you applied for --
18    A.  Yes.
19    Q.  -- that you accepted, that you took, which
20  involved the execution of policies that -- for
21  Walmart to comply with suspicious order monitoring
22  of opioids, you took that role in the busiest
23  season?
24    A.  For --
25       MS. FUMERTON:  Well --

Page 135

1       MR. INNES:  Is that his testimony?
2    A.  Yeah.
3       MS. FUMERTON:  You -- you -- okay.
4  Objection; form.  You keep making statements but
5  not questions, but --
6    A.  It was the busiest season for the previous
7  location.  Maybe I was unclear on that.
8       So in the previous, this next week is "black
9  Friday."  So a product has to be shipped in stores
10  by then.  So in October leading into November is the
11  busiest time period of the previous job I was
12  leaving.  That's what I was referring to.
13  BY MR. INNES:
14    Q.  Did you feel at that time that you couldn't
15  fully commit to this new job?
16    A.  No.
17       MS. FUMERTON:  Objection; form.
18    A.  No, I did -- I didn't.  I just -- you asked
19  the question about being overwhelmed.  I wasn't
20  overwhelmed, but it was extremely busy.
21    Q.  So you -- are you -- were you doing parts of
22  your old job while you were rolling in to your new
23  job?
24       MS. FUMERTON:  Objection; form.
25    A.  Yes, I was.

Page 136

1       (Ducote Exhibit 6 was marked for
2  identification.)
3  BY MR. INNES:
4    Q.  I'm going to hand you what's been marked as
5  Plaintiffs' 6.  Let me know when you've had a chance
6  to review that.
7    A.  Okay.  Okay.  I've had time to review it.
8    Q.  Mr. Ducote, this is an e-mail from Kristy
9  Spruell to Theresa Alford and Chad Ducote on
10  November 23rd, 2014, 5:30 in the morning, "Subject:
11  SOM review."  It begins on Bates 9158.
12       Mr. Ducote, this is -- this is November of
13  2014.  Are you still in what some people refer to as
14  the "on boarding process" into this new role?
15    A.  On boarding, typically our company refers to
16  a time where they go through benefits and stuff, so
17  I wasn't in a per se on boarding; but I would
18  consider transitioning, learning about the role,
19  learning the responsibilities, yes.
20    Q.  Thank you.  Okay.
21       And was this -- did this document help you
22  learn about Walmart's suspicious order monitoring
23  project progress?
24       MS. FUMERTON:  Objection; form.
25    A.  Could you repeat the question for me, make

Page 137

1  sure I have that correct?
2    Q.  Was this one of the documents that you used
3  to educate yourself?
4    A.  I do remember this document.  I wouldn't say
5  I used it to educate.  It helped educate me to a
6  certain degree, but it wasn't -- maybe I -- maybe
7  I'm misstating it -- yes, did I -- did it -- did I
8  learn something from it?
9       Yes, the answer -- I think you learn
10  something from everything that you read, for the
11  most part; but it wasn't the education only
12  document, if that's what you're referring to.  Maybe
13  I -- is that what your question was?
14    Q.  I want to know if this is one of the
15  documents that you used to review to educate
16  yourself when you first took the job, yes or no?
17    A.  This document, during the transition time
18  period, was something that was provided to me, yes.
19    Q.  And did you remember reading it at the time?
20    A.  Yes.
21       MS. FUMERTON:  Just for a clarification for
22  the record, there is writing on this document,
23  and so didn't -- it looks like an e-mail, so
24  would it have been something that would have come
25  out from ours, but maybe it did; do you know?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    Q.  I am not going to say for sure but --
2        MS. FUMERTON:  Are we confident this is not
3    on there?  We're confident this is not on there.
4        MR. INNES:  Yeah.
5        MS. FUMERTON:  Okay.
6        MR. INNES:  I'm going to clean it up.
7        I'm confident that that was not on there,
8    and that's our mistake.  That's a copy of a
9    draft.  That is not part of the original
10   document.  We can get the original document.
11       MS. FUMERTON:  That's fine, or we can just
12   stipulate for the record.  We don't need to be
13   that complicated.  I just wanted to make sure.
14   We'll stipulate for the record that that --
15       MR. INNES:  I will stipulate for the record
16   that that is a mark that I made and it was copied
17   into the witness's exhibit.
18       MS. FUMERTON:  Okay.  And so just to be
19   clear, it's an arrow on Page 9159 of Exhibit 6.
20   BY MR. INNES:
21       Q.  So the top of page -- of the page ending in
22   Bates 9159, which is Page 2 of the exhibit, you will
23   see four column headers, starting at the left:
24   "Beginning of SOM enhancement project"; second
25   column "Today"; third column "Q1 Fiscal Year" --

Page 139

1    "FY16 - End of Phase 1"; Column 4, Future - Phase 2
2    and 3."
3        Was it your understanding, Mr. Ducote, when
4    you took the job, that this was the timeline that
5    you were to follow for the development of the
6    suspicious order monitoring project?
7        MS. FUMERTON:  Objection; form.
8        A.  I think that this was one view of that, not
9    necessarily what was decided upon.  Going back to
10   your question, these were things that were being
11   handed to me as I stepped into the role, so things
12   that changed as time went on.
13       Q.  Looking at the second column that says
14   "Today," do you believe that to be in and around
15   11/23 of 2014, which is the date of this -- the
16   e-mail?
17       A.  I -- there seems like there was something
18   with this document whenever Kristy had sent it to
19   me, having a conversation with her about it, about
20   some of the information.  I don't remember if it was
21   about that.  I've just got to think about that for a
22   second.
23       The assumption I would make, though, looking
24   at the document, that, yes, today of the date that
25   the document was sent to me, so yes.

Page 140

1    Q.  So I'm going to go to -- this is a little
2    difficult, I realize, because it looks like the
3    cells are split across two pages, but I'm referring
4    to -- I want to direct your attention to Column 1,
5    the third or fourth cell down, it says "Policies."
6    A.  Yes.
7    Q.  Do you see that?
8    A.  Uh-huh.
9    Q.  And that continues onto the second page, top
10   of the second page, I believe?
11       MS. FUMERTON:  Where the arrow is.
12       MR. INNES:  Right.
13       MS. FUMERTON:  That's why I -- I just wanted
14   to short-circuit that.
15       MR. INNES:  Tipped my hand on that one.
16   BY MR. INNES:
17       Q.  So reading from left to right:  SOM -- "SOM
18   policy did not include processes for evaluating
19   'Orders of Interest' or reporting 'Suspicious
20   Orders.'"
21       Is that right?
22       A.  That's what's stated on there.
23       Q.  Okay.
24       A.  But that's not what's correct.
25       Q.  I'm sorry?

Page 141

1    A.  That's not -- that's what's stated on there,
2    but that's not what's correct.
3    Q.  How do you know that not to be correct?
4    A.  Going back to talking about the
5    transition, so whenever, going into the role, you
6    have different people who were sending different
7    documents.  And to a certain degree at the time, I
8    may have questioned things, but a lot of things I
9    had to take at face value that were presented.
10       This one was presented.  I remember in
11   general -- I mean every single detail, I don't
12   remember every single detail -- but I do remember
13   some of the stuff on this left column, as I learned
14   more about the role and understood what was going
15   on, I don't think some of Kristy's viewpoint on this
16   information was correct.  Or it was maybe skewed to
17   her version of what things meant.
18       Q.  Do you have any idea what policies she's
19   referring to?
20       MS. FUMERTON:  Objection; form.
21       A.  At the time, no.  Later on, it seemed that
22   she was referring to there was some procedure out
23   there about order limits.  I don't remember what it
24   was titled or what it was, but I think that's what
25   she was referring to.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    Q. So when you say that that's wrong, when you
2 base -- you're basing that on -- on what?
3      MS. FUMERTON: Objection; form.
4    A. Basing on time in the role and experience.
5 I think as time went on, you know, Kristy's view,
6 her use of the word "no" -- I think just in general,
7 as I got to know Kristy and working with her, she
8 used words at times that were very definitive even
9 though the situation wasn't definitive, that it was
10 something that her and I had conversations with in
11 general.
12    So I don't know if I answered your question,
13 though. Maybe you should reask your question. I
14 think --
15    Q. Is it your --
16    A. -- I got off on a tangent there.
17    Q. Is it your under -- is it your testimony
18 that every Walmart SOM policy for the entire time
19 frame that ever had a suspicious order monitoring
20 policy included a process for orders of interest,
21 for evaluating orders of interest?
22      MS. FUMERTON: Objection; form.
23    A. That, I couldn't say. I don't know if every
24 single one ever had.
25    Q. Can you say that every one had a reporting

Page 143

1 for suspicious orders?
2      MS. FUMERTON: Objection; form.
3    A. I can say the ones that I was in the role
4 that came out did. Beyond that, I'm not sure the
5 policy per se had it. I really wouldn't know. I
6 mean --
7    Q. What was the policy in January of 2015
8 for -- strike that.
9    Could I direct your attention to Row 2 --
10    A. Yes.
11    Q. -- Column 3, right under "Q1 FY16"?
12    A. Okay.
13    Q. These -- what does it mean by "People" on
14 that first cell there?
15    A. It's a general term at Walmart, "people,"
16 "process," "behaviors." It's just used to describe
17 personnel in general.
18    Q. So: "Tiered evaluation and review processes
19 for all alerted orders (system driven)," what does
20 that mean?
21    A. Reddwerks is what Kristy was referring to.
22    Q. Okay. And that wasn't in place in -- at the
23 time of this e-mail, correct?
24    A. No. And that's where I go back to earlier.
25 I think as I was in the role and learned more,

Page 144

1 Kristy was incorrect on some of her assessment of
2 this. There was a process in Reddwerks. It wasn't
3 necessarily a tiered process, but there was a
4 process. So I think she jumped to a conclusion on
5 that.
6    Q. The -- when did Reddwerks -- when was
7 Reddwerks implemented for suspicious order
8 monitoring?
9      MS. FUMERTON: Objection; form.
10    A. I can only speak to the time period that I
11 was in the role. But there -- the components that
12 we put in, the testing had been started around the
13 time period I was in role. January, I think we did
14 some additional tests, and I think it rolled out
15 later on.
16    But that's the tiered piece. There were
17 other pieces that were in place prior to that that
18 were in Reddwerks. The parts I'm familiar with were
19 around that time periods, the tiered piece.
20    Q. You're talking about -- what year is this
21 you're speaking about?
22    A. The more -- the tiered piece I'm referring
23 to, the implementation of that one was probably
24 around March to May of 2015, that time period.
25    But there were -- just to be clear, there

Page 145

1 were other pieces in place prior, because FY16 is
2 actually from February of 2015 to January of 2016,
3 so I'm talk -- it refers to what they said.
4    Q. Just keep that document handy. You don't
5 have to stick it back in the pile yet because I
6 might come back to it.
7    (Ducote Exhibit 7 was marked for
8 identification.)
9 BY MR. INNES:
10    Q. What was your understanding of the -- of
11 Walmart's suspicious order monitoring policy in
12 January of 2015?
13    A. That was -- we had a term for what it was.
14 I don't remember the exact term. But it was a more
15 middle -- it was between the tiered process in
16 Reddwerks driving it and the previous process that
17 was in place when I started the role. It was a
18 middle -- middle time period. It lasted from maybe
19 that November/December time period to when Reddwerks
20 with the tiered went full, which was maybe going
21 back to I think I said May, June, that time period.
22    Q. And in January of 2015, did the system flag
23 controlled orders that were over 50 bottles?
24      MS. FUMERTON: Objection; form.
25    A. Yes. I feel that it did. I won't say 100

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 percent. I'm pretty confident it did.
2 Q. Did it flag controls that were 30 percent
3 higher than the last four-week average?
4 A. 30 percent, that was discussed when I was in
5 the role. I just don't remember on it because we
6 were transitioning to that new process. I didn't
7 focus a lot on some of the math that was behind what
8 was going on currently. I do recall them talking
9 about 30 percent.
10 I don't know how it works, though. I know
11 the 50 and there was something about 30 in
12 Reddwerks, 30 percent.
13 Q. And your boss at the time was Bryan
14 Boudreaux?
15 A. Yes.
16 Q. This is Plaintiffs' Exhibit 7. This is an
17 e-mail from Bryan Boudreaux to Chad Ducote on
18 January 16th, 2015, beginning Bates 8147.
19 A. Okay. I've looked over it.
20 Q. What is Bryan asking you for here?
21 A. That's a good question. I didn't read it
22 from that perspective.
23 Q. Let me see if I can direct you. You're
24 responding to Bryan halfway down, or middle of the
25 page. I believe his question is: "Can you give me

Page 147

1 a high level of what this is?"
2 Do you know what he's referring to of "what
3 this is"?
4 A. Yeah. Yes, I do. Typically whenever we do
5 any type of systems change, it's an outage is what
6 it's called. "Outage" can -- can mean the systems
7 aren't operating in that time period, which is --
8 there's always a risk with a system not operating.
9 It may not come back when it is, so we put a high
10 priority whenever there is an outage.
11 So Bryan was copied, it looked like, or
12 someone copied Bryan -- yeah, Bryan was copied by
13 Miranda. But it was just a general question, "Hey,
14 what is this," because I don't know if he was aware
15 of the specific details.
16 He knew of the program, what we were doing.
17 I just don't know if he knew about the outage in
18 detail, and that's what he was asking.
19 Q. So you say: "Right now the system flags
20 controlled orders that are over 50 bottles or 30
21 percent higher than the last four-week average.
22 Oxycodone has a different metric."
23 What was the different metric for oxycodone
24 at the time?
25 A. From what I recall, it was 20 bottles.

Page 148

1 Q. What do you mean by 20 -- what do you mean
2 by 20 bottles?
3 A. I think there was a specific item. They
4 just had the system flagging at 50, which going back
5 to your 30, that's what I seem to remember at the 30
6 percent. The oxycodone was 20 bottles. There was a
7 different limit for oxycodone.
8 Q. Why was there a different limit for
9 oxycodone?
10 A. I do not know that.
11 Q. Who would know that?
12 MS. FUMERTON: Objection; form.
13 Q. Who would know why there was a limit to
14 oxycodone?
15 MS. FUMERTON: Objection; form.
16 A. That would have to be someone that was in
17 role prior to me -- or not necessarily in my role,
18 but in that area prior because that's when it was
19 set.
20 Q. Tim Harris might know that?
21 MS. FUMERTON: Objection; form.
22 A. I couldn't speak on behalf of Tim.
23 Q. Possible?
24 A. Possible, yes.
25 Q. When you say "in the system," what system

Page 149

1 are you referring to?
2 A. Reddwerks, which goes back to my earlier
3 testimony about there was a system in place, so --
4 Q. And when did Reddwerks -- so let me back up.
5 Prior to your entering the role, was
6 Reddwerks in place?
7 A. Yes.
8 Q. When did Reddwerks start, approximately?
9 A. Approximately maybe 2008, 2009, in that time
10 period.
11 Q. Okay. And when did Reddwerks become
12 involved in the suspicious order monitoring problem?
13 MS. FUMERTON: Objection; form.
14 A. Yeah. I don't know specifically when they
15 did. They were involved whenever I was
16 transitioning into the role.
17 Q. Was -- what's the basis for your testimony
18 that Reddwerks was starting -- started to be used in
19 2008, 2009?
20 A. We had to sign new contracts with Reddwerks.
21 I think on an annual basis you had a service
22 contract.
23 Q. Uh-huh.
24 A. And so not in the role just for what we're
25 discussing today, but just in general for warehouse

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  management systems, I seem to recall 2008, 2009 as
2  one of the time periods they mentioned to me.
3     Q.  Was Reddwerks, in 2008, 2009, used for --
4  used by Walmart in context other than Schedule II
5  narcotics?
6     A.  Yes.
7     Q.  Do you know when Reddwerks -- when Walmart
8  used Reddwerks in the context of Schedule II
9  narcotics?
10     MS. FUMERTON:  Objection; form.
11     A.  I don't know exactly when it started.  It
12  was in place, though, when I started the role.
13     Q.  Okay.  Was it in place at the facility that
14  distributed Schedule IIs?
15     A.  Yes.
16     Q.  Was it being used for the distribution of
17  Schedule IIs --
18     MS. FUMERTON:  Objection.
19     Q.  -- at that time?
20     MS. FUMERTON:  Sorry.  Objection; form.
21     A.  Yes, in a broad sense.  It was the order
22  filling system.
23     Q.  Reddwerks was the order filling system at
24  the Schedule II facility in September/October of
25  2014?

Page 151

1     A.  Yes.
2     MR. INNES:  Go off the record for a moment.
3     THE VIDEOGRAPHER:  Going off record.  The
4  time is 11:37.
5     (Recess from 11:37 a.m. until 11:38 a.m.)
6     THE VIDEOGRAPHER:  Going back on record,
7  beginning of Media File 5.  The time is 11:38.
8  BY MR. INNES:
9     Q.  Mr. Ducote, I'm going to hand you what's
10  been marked as Plaintiffs' Exhibit 8.
11     (Ducote Exhibit 8 was marked for
12  identification.)
13     A.  Okay.  I've had time to do a quick glance at
14  it.
15  BY MR. INNES:
16     Q.  So this is an e-mail from Chad Ducote to
17  Kristy Spruell and Ramona Sullins dated 5/14/2015
18  beginning on Bates 19339.  It has an attachment.
19  That attachment is titled "SOM Overview 2015."  I
20  believe it's a PowerPoint file that attached, the
21  native.
22     So it's important for me to nail down the
23  timeline of when Reddwerks was rolled out and the
24  suspicious order monitoring program was rolled
25  out to all the facilities, right?  And if you turn to

Page 152

1  Page 5 of the slide deck, there is a number at the
2  bottom left-hand corner.
3     A.  Okay.
4     Q.  I want to make sure that we're not talking
5  past each other.  So I understand that Reddwerks was
6  in place at 6045, but what I believe that I'm more
7  interested in is the Reddwerks upgrade.
8     A.  Okay.
9     Q.  So at a certain point in time, did Walmart
10  decide to upgrade its Reddwerks system as it applied
11  to suspicious order monitoring?
12     MS. FUMERTON:  Objection; form.
13     A.  We decided to make some improvements to it.
14     Q.  Okay.  And when were those improvements
15  implemented at 6045?
16     A.  I do not know exactly at 6045.  It had to be
17  in the 2015 time period, in the first half of the
18  year.  I just don't know exactly when.
19     Q.  So if you look at the cover e-mail, you
20  write to Kristy:  "I thought we talked about waiting
21  to roll out 45 until after the relocation in order
22  to not add additional burdens to the move."
23     Is that correct or do I have that wrong?
24     A.  Yes, that's what I stated.
25     Q.  Was that correct, was your understanding

Page 153

1  correct at the time, that you were going to wait to
2  roll out 45?
3     A.  No.  That was a question that I posed to
4  Kristy, or maybe I misunderstood your question.
5  Reask that question.
6     Q.  All right.  When did you originally plan to
7  roll out Reddwerks update to 6045?
8     A.  That is really difficult because you
9  never -- you don't roll out directly, you pilot
10  stuff.  As you pilot it then you work out any
11  potential issues in it, then you have a rollout.  It
12  seems as though it was in the spring of 2015.  I
13  just don't recall exactly.
14     Q.  What's the -- what's the relocation that
15  you're referring to?
16     A.  We made a decision to relocate 6045 from
17  Bentonville, Arkansas, to Rogers, Arkansas.
18     Q.  And what additional -- well, you say here:
19  "...in order to not add additional burdens to the
20  move."
21     What additional burdens are you referring
22  to?
23     A.  What I was referring to is to pilot
24  something during a move, I wasn't sure if that would
25  shut the systems down.  Moving a facility and a

Page 154

1  vault is a pretty -- it's a pretty big deal. So I
2  was unsure of all the technicalities behind it and
3  that's what I was referring to.
4     Q. What were the -- I believe you called them
5  enhancements to the Reddwerks system. What were
6  those specifically?
7     A. Specifically, every one I couldn't list out,
8  but in a nutshell the enhancements were to make some
9  of the processes that we were doing more automated,
10  that they were in the system, so it just flowed
11  smoother and there wasn't as many delays or as many
12  potential delays or as many different screens you
13  had to go, it's what we were looking to do.
14     Q. And how did that relate to the distribution
15  of Schedule II narcotics?
16        MS. FUMERTON: Objection; form.
17     A. That -- you would have to narrow that
18  question down then, because initially my answer
19  would be no change per se, but I'm not sure what you
20  mean.
21     Q. So -- so let's start with this premise.
22  This is -- the slide deck is titled, Suspicious
23  Order Monitoring.
24     A. Okay.
25     Q. The first -- the second page of the slide

Page 155

1  deck was regulatory requirements for the suspicious
2  order monitoring program, it says: "Distributors
3  are required to have a process to identify and
4  disclose suspicious orders of controlled substances
5  to the DEA."
6        That's correct?
7     A. Yes.
8     Q. Do you agree with the substance to that
9  statement?
10     A. At this point in time, yes.
11     Q. Was there a point in time when you didn't
12  agree with that?
13     A. No. Just earlier there was some lack of
14  clarity about when I became aware of it.
15     Q. Well, certainly by this time you were aware
16  of it, correct?
17     A. Yeah, uh-huh.
18     Q. And now we're into May of 2015?
19     A. Yes.
20     Q. You agree you have to identify orders of
21  unusual size, frequency that is changed from a
22  normal pattern?
23        MS. FUMERTON: Objection; form.
24     A. Yes.
25     Q. Okay. DEA used this information to identify

Page 156

1  potential diversion, is that correct?
2        MS. FUMERTON: Objection; form.
3     A. I don't know what the DEA uses it for. I
4  mean, I know what is written here and in general,
5  but I'm not sure if they do use it or not.
6     Q. Do you agree DEA guidance indicates that
7  orders of interest must not be shipped in whole or
8  in part unless they are deemed nonsuspicious?
9        MS. FUMERTON: Objection; form.
10     A. What was your question again?
11     Q. Do you agree with that statement as written
12  on this document, fourth bullet from the bottom?
13     A. Yes, I do.
14     Q. If, for instance -- well, strike that.
15        I want you to turn to the third page,
16  please. Last bullet at the bottom says: "DEA has
17  not pursued any additional enforcement to our plans
18  for SOM enhancements."
19        Is that correct?
20     A. Which bullet point were you on?
21     Q. I'm sorry. It's the bottom of the page,
22  just above the bar.
23     A. Okay.
24     Q. It's in bold.
25     A. Yes. I see the statement. What was the

Page 157

1  question again on it?
2     Q. Have the DEA pursued enforcement actions due
3  to your plans for suspicious order monitoring?
4        MS. FUMERTON: Objection; form.
5     A. The answer is no, the DEA has not. Is that
6  the question?
7     Q. Yeah. So what's the import of "pursued any
8  additional enforcement"?
9     A. I am not sure of exactly what that comment
10  means.
11     Q. Sitting here today you're not aware of any
12  enforcement by the DEA regarding the suspicious
13  order monitoring, is that right?
14     A. Yes, that is correct, I'm not.
15     Q. The DEA chose not to pursue any additional
16  enforcement due to the plans for SOM enhancements.
17        What were those enhancements?
18     A. Those enhancements were what I was referring
19  to earlier, about making the process where it flowed
20  through the systems better, which is the next slide,
21  basically, and who was going to do the order
22  reviews, how they were going to do them and things
23  of that nature.
24     Q. Okay. Let's talk about that. The next
25  page, you're already on, page four, suspicious order

Page 158

1  monitoring process flow.
2     A.  Yes.
3     Q.  An order of interest is identify by the
4  Reddwerks system, how is that -- how does the
5  Reddwerks system identify an order of interest at
6  the time of this in May 2015?
7     A.  I don't -- going back to the earlier
8  comment, I don't know if the updated process was in
9  place.  Based on this, this is off of the updated
10  process.  That's how I'm going to answer the
11  question.  So it would identify an order of interest
12  using a store item combo that was some statistics
13  that was put together by Mu Sigma in conjunction
14  with us.
15     Q.  Let's unpack that a little bit.  What's a
16  store item combo?
17     A.  A store item combo is something -- it's a
18  term we use -- most retailers use this term.  It's
19  this is the store and these are the items that are
20  carried in it.  And so for a pharmacy in this
21  situation a store and the items would be the
22  pharmaceuticals, and then the statistics were
23  applied to that, that data.
24     Q.  What statistics are you talking about?
25     A.  Mu Sigma.

Page 159

1     Q.  Could you spell Mu Sigma for me?
2     A.  M-u S-i-g-m-a.
3     Q.  Is Mu Sigma a vendor?
4     A.  They're a consulting firm.
5     Q.  Where are they located at?
6     A.  I do not know where they are located at.
7     Q.  What exactly did Mu Sigma do in this
8  context?
9     A.  So Mu Sigma was when I started in the role,
10  they had already done some analysis and the data
11  that they provided was basically thresholds and
12  ranges for us to use within our Reddwerks system.
13     Q.  What analysis had they done?
14     A.  I'm not aware.  I mean, I'm generally aware
15  of what they did.  I don't know the details.  It was
16  done before I started in the role.  I just saw the
17  after -- the end product.
18     Q.  Does Walmart have a contract with Mu Sigma
19  at that time?
20     A.  I do not know.
21     Q.  Did they have a contract at any time during
22  your role?
23        MS. FUMERTON:  Objection; form.
24     A.  I'm not sure if it was a contract or just an
25  ad hoc basis, but Mu Sigma is used throughout the

Page 160

1  organization, not just specifically -- they are a
2  statistical analysis consulting firm.
3     Q.  Does Walmart ever enter into an agreement
4  with a third party without a contract?
5        MS. FUMERTON:  Objection; form.
6     A.  When you said contract earlier, I was
7  thinking long-term service contracts.  We do ad hoc
8  things where it is just one time.  So yes there is a
9  contract but it's not my definition of a contract
10  that you would have with a vendor that services you
11  over the year.  So my misunderstanding of the use.
12     Q.  So you were assuming there would be a
13  contract between Mu Sigma and Walmart and by
14  contract I mean an assigned written agreement to
15  perform work?
16        MS. FUMERTON:  Objection; form.
17     A.  Let me read that question.
18        That it would -- there would be some type of
19  signed agreement.
20     Q.  Thank you.
21     A.  Typically short-term things like that may
22  not be called contracts, again, so just for
23  clarification.
24     Q.  What data was provided to Mu Sigma to
25  perform their analysis?

Page 161

1        MS. FUMERTON:  Objection; form.
2     A.  I do not know what data was on that front
3  side, I don't know what was supplied to them.
4     Q.  What do you mean by front side?
5     A.  Going back to the earlier testimony, the
6  analysis was done before I started in the role, so I
7  saw the end product.  I don't know exactly what
8  details were provided.
9     Q.  What did the end product tell you?
10        MS. FUMERTON:  Objection; form.
11     A.  Sorry.  The end product provided thresholds
12  and ranges that were used in the Reddwerks
13  enhancement system, enhancement.  Sorry.
14     Q.  So the Reddwerks enhancement took into
15  account this analysis that was provided by Mu Sigma?
16     A.  Yes.
17     Q.  Based on data that was provided by whom?
18        MS. FUMERTON:  Objection; form.
19     A.  Data was -- I'd have to make the assumption
20  it was provided by us to them.  I don't know 100
21  percent.
22     Q.  And you said thresholds and you also said
23  ranges.  Could you define thresholds, please?
24     A.  Probably one in the same.  I probably used
25  the terms interchangeably, but a threshold would be

Page 162

1 a specific number. The ranges, what I'm referring
2 to, there is ranges of thresholds, but a threshold
3 is a specific number.
4   Q. Number of what?
5      MS. FUMERTON: Objection; form.
6   A. In this particular situation, the threshold
7 is number of bottles.
8   Q. Number of bottles of opioids, for instance?
9      MS. FUMERTON: Objection; form.
10   A. Number of bottles of -- of medications,
11 included noncontrols also.
12   Q. What were the thresholds and ranges of
13 thresholds used for in your suspicious order
14 monitoring process flow?
15      MS. FUMERTON: Objection; form.
16   A. The thresholds and ranges were used for the
17 alerts that the system identified.
18   Q. So we're still in Cell Number 1; is that
19 right?
20   A. Oh, I'm sorry. No. I'm not in Cell 1. I'm
21 in -- well, maybe I am in Cell 1. Let me just think
22 for a second. Yes, I'm in Cell 1.
23   Q. Okay. So an order is placed by a pharmacy,
24 that order is -- what happens next in this process?
25      MS. FUMERTON: Objection; form.

Page 163

1   A. After an order is placed, it would go
2 into -- how much detail do you want? Because this
3 is literally a five-hour conversation of how orders
4 are --
5   Q. Unfortunately, we don't have five hours.
6   A. I can talk five hours on this if you want.
7   Q. If Tara would let you, I would. If you're
8 offering.
9      MS. FUMERTON: I don't know what time we
10 have left on the record.
11   A. So basically, they download into a system
12 that orders then get sent to Reddwerks server and
13 then that's where you are seeing this order of
14 interest piece come into play.
15   Q. Okay. And Reddwerks is looking for -- is
16 taking an order and evaluating it against a
17 threshold?
18   A. Yes.
19   Q. Also evaluating against a range of
20 thresholds?
21   A. No, a threshold.
22   Q. Just a threshold?
23   A. A threshold.
24   Q. Is that the only metric that Reddwerks is
25 applying to that order?

Page 164

1      MS. FUMERTON: Objection; form.
2   Q. What other metrics, if any, is Reddwerks
3 applying to that order?
4      MS. FUMERTON: Objection; form.
5   A. There are other metrics. I don't know
6 exactly what those metrics are, but there are other
7 metrics.
8   Q. Is over 50 bottles a metric?
9      MS. FUMERTON: Objection. Form.
10   A. In this time period that we're discussing, I
11 don't remember if that was still one of the metrics
12 or not.
13   Q. How about 20 bottles of OxyContin --
14 oxycodone, for example?
15      MS. FUMERTON: Objection; form.
16   A. I don't remember at this time period exactly
17 if that was still the metric for that particular
18 item.
19   Q. How about 30 percent over a four-week moving
20 average?
21      MS. FUMERTON: Objection; form.
22   A. I think we may be confusing our different
23 time periods here. During this time period I don't
24 recall if that was or not.
25   Q. What time period is this?

Page 165

1   A. This is the time period of the new tiered
2 approach that we discussed earlier.
3   Q. Right. I'm trying to ascertain whether or
4 not in this -- we're talking about 2014 before,
5 right?
6   A. Yes.
7   Q. And then at some point in time before you
8 take on the role, Walmart has decided that it's
9 going to roll out an enhanced suspicious order
10 monitoring process flow; is that correct?
11   A. That's right.
12   Q. Part of that is involving now the Reddwerks
13 system?
14      MS. FUMERTON: Objection; form.
15   Q. Is that correct?
16   A. It's partially correct. It's always
17 involved the Reddwerks system, but yes.
18   Q. But now we are adding -- now Walmart is
19 adding some enhancements to Reddwerks as it relates
20 to suspicious order monitoring; is that right?
21   A. Yes.
22   Q. Okay. And one of those enhancements is the
23 establishment of thresholds by Mu Sigma, right?
24      MS. FUMERTON: Objection; form.
25   A. In partnership with Mu Sigma --

Page 166

1    Q.  In partnership with Mu Sigma.
2    A.  I want to be clear about that.
3    Q.  I'm interested about that clarification.
4  What is important about the partnership here?
5    A.  I think when you stated it to me, it gave
6  the impression that Mu Sigma would have been doing
7  it in isolation and it wasn't.
8    Q.  Walmart provided data to Mu Sigma?
9    A.  Yes.
10      MS. FUMERTON:  Objection to form.
11   Q.  Yes.  On the terms of the contract Mu Sigma
12 did an analysis --
13      MS. FUMERTON:  Object.  I am sorry.  I'm
14  sorry.  Go ahead.  I interrupted you.  I didn't
15  mean to.
16      THE COURT REPORTER:  I didn't get it either.
17      MS. FUMERTON:  You were going fast.
18   Q.  When my blood sugar drops, I start to --
19      I want to focus on Cell 1, before we move to
20  Cell 2?
21   A.  Okay.
22   Q.  I'm trying to figure out what the
23  enhancements were to the Reddwerks system as it
24  relates to suspicious order monitoring.  I believe
25  you've testified that you worked in partnership --

Page 167

1  that Walmart worked in partnership with Mu Sigma to
2  develop thresholds and threshold ranges; is that
3  correct?
4    A.  Yes.
5    Q.  Was there anything else that Mu Sigma
6  provided to Walmart in this context?
7    A.  Not that I'm aware of.
8    Q.  Okay.  So I'm thinking of -- I am thinking
9  of this as, here is the Reddwerks bucket and here is
10  the metrics that Reddwerks is going to use and right
11  now we've listed off a threshold and a threshold
12  range; is that right?
13   A.  Yes.
14   Q.  Any other metrics that would fit within the
15  Reddwerks enhancements?
16      MS. FUMERTON:  Objection; form.
17   Q.  Let me rephrase that.
18      Any other metrics that would be in the
19  Reddwerks in total, not just those metrics that were
20  added as enhancements, but in total what other
21  metrics are being used by Reddwerks at that time?
22      MS. FUMERTON:  Objection; form.
23   A.  I really couldn't answer the details.  I
24  wasn't into that level of the weeds of every metric
25  that they were using in the system.

Page 168

1    Q.  Was that because that was outside of your
2  purview of your job title?
3      MS. FUMERTON:  Objection; form.
4    A.  No, I wouldn't say that.  I think if you're
5  saying every metric, I mean they use metrics all the
6  way down to the cube of a bottle, the centimeters of
7  it.  I wouldn't know that level of detail.  I mean,
8  that's way beyond what's plausible to know.
9    Q.  Okay.  So maybe I can focus this.  I'm
10  sure -- it sounds like Reddwerks does more than just
11  orders, identifying orders of interest.
12      I'm curious to know what metrics was
13  Reddwerks using at that time to identify orders of
14  interest?
15   A.  What you stated earlier is --
16   Q.  Those two?
17   A.  That's my general understanding, yes.
18   Q.  I broke my own rule.
19      Who is the -- the threshold and the
20  threshold range are the two metrics?
21      MS. FUMERTON:  Objection; form.
22   A.  That I'm aware of, yes.
23   Q.  Okay.  Earlier you testified that metrics
24  that were being used prior to these enhancements,
25  included a 50-bottle threshold, right?

Page 169

1    A.  That I was aware of.
2    Q.  That you were aware of.  A over 20 for a
3  particular form of oxycodone, correct?
4    A.  Yes.
5    Q.  And a 30 percent over four-week moving
6  average, correct?
7    A.  I think earlier I was unsure of the 30
8  percent, that was again during the transition, but I
9  saw that in one of the documents.
10   Q.  Okay.  But more importantly for purposes of
11  2015, those metrics were no longer being used?
12   A.  That is the one thing I'm struggling to
13  answer.  I don't remember exactly when that turned
14  off or when that was adjusted.  I don't.
15   Q.  Okay.
16      MS. FUMERTON:  Is this a good time for
17  lunch?
18      MR. INNES:  Yeah, before we get too much
19  further into this I think we can break.
20      MS. FUMERTON:  Okay.
21      THE VIDEOGRAPHER:  Going off record.  The
22  time is 12:02.
23      (Recess from 12:02 p.m. until 12:40 p.m.)
24      THE VIDEOGRAPHER:  We're going back on
25  record, beginning of Media File Number 6, the

Page 170

1 time is 12:40.
2 BY MR. INNES:
3    Q.  Good afternoon, Mr. Ducote.  We're now back
4 from lunch.  Where we left off, we were on Exhibit
5 Number 8 and we were discussing the suspicious order
6 monitoring process flow that's found on page four of
7 the attached PowerPoint.
8       So I want to make sure we've covered
9 everything that would fall into the first cell here,
10 the order of interest identified by the Reddwerks
11 system.  I think we've identified as the metrics for
12 identifying a suspicious order in the Reddwerks
13 system as being thresholds and ranges of thresholds.
14 Is that correct?
15    A.  Yes.
16    Q.  Other than -- well, you testified that Mu
17 Sigma did an analysis of data that set or provided
18 thresholds and ranges of thresholds.  Is that
19 correct?
20    A.  That's my understanding, yes.
21    Q.  How, if at all, can those -- well, were
22 those thresholds and ranges of thresholds accepted
23 by Walmart --
24       MS. FUMERTON:  Objection; form.
25    Q.  -- as accurate?

Page 171

1       MS. FUMERTON:  Objection; form.
2    A.  Again, this was during that late 2014
3 period.  I would answer yes because that's what we
4 were going to use for this tiered process.
5    Q.  Are the thresholds able to be adjusted
6 within Reddwerks manually?
7       MS. FUMERTON:  Objection; form.
8    A.  Yes.
9    Q.  And are the ranges of thresholds also able
10 to be adjusted manually?
11       MS. FUMERTON:  Objection; form.
12    A.  That is a little unclear about the ranges.
13 The ranges are of the different store item combo.
14 So there may be different thresholds, there is a
15 range of thresholds, so a threshold may be adjusted
16 but the range existed.
17    Q.  I'm not sure I follow that.  So are ranges
18 of thresholds, we're only talking about combinations
19 in that context, is that right?
20       MS. FUMERTON:  Objection; form.
21    A.  Could you repeat that again, please?
22    Q.  Do range thresholds apply to a single drug?
23       MS. FUMERTON:  Objection; form.
24    A.  I don't recall exactly.  So your question is
25 when drugs have different ranges, is that your

Page 172

1 question?
2    Q.  I'm trying to understand the difference
3 between thresholds and ranges of thresholds.
4    A.  A range would just be let's say zero to 10,
5 okay?  A threshold would be one of those numbers in
6 that range, five, maybe or six, would be that
7 threshold for that particular item store.
8    Q.  So let's say a bottle of oxycodone, could
9 that have a different threshold for pharmacy one
10 versus pharmacy two?
11       MS. FUMERTON:  Objection; form.
12    A.  Potentially, yes, it could.
13    Q.  Okay.  So Walmart doesn't apply a static
14 threshold for all oxycodone across all stores?
15       MS. FUMERTON:  Objection; form.
16    A.  The reason it's tough for me to answer that
17 question for you is that may have been the option
18 that was chosen, but I don't -- I can't say
19 specifically.  It was based on ranges, thresholds.
20 So your question may be yes, but it may be no.  I
21 really don't know 100 percent.
22    Q.  Okay.  I wanted to be clear.  When we're
23 discussing the suspicious order monitoring process
24 flow, when was this in place, time period?
25    A.  This was developed -- was began development

Page 173

1 before I began the role, as we discussed earlier.
2 It was piloted sometime around that beginning of
3 2015, maybe as late as 2014, late 2014, I think it
4 was 2015, and then it was in place fully, from what
5 I recall, around that summer of 2015, maybe late
6 summer.  It was in that range of time period.
7    Q.  And this would apply to -- well, strike
8 that.
9       When was it piloted to 6045?
10       MS. FUMERTON:  Objection; form.
11    A.  I don't remember the exact date.
12    Q.  When was it fully rolled out to 6045?
13    A.  I do not recall if it was before or after
14 the vault relocation.
15    Q.  When was the vault relocation?
16    A.  It was around the summer of 2015.
17    Q.  And that was the -- the vault relocation
18 from the oxy -- the rescheduling of -- I'm sorry,
19 the rescheduling of hydrocodone?
20       MS. FUMERTON:  Objection to form.
21    A.  That was one of the reasons but there was
22 other reasons also.
23    Q.  But that was the time frame?
24    A.  Yeah.
25    Q.  So you can't say, sitting here today, for

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  sure, when this suspicious order monitoring process
2  flow was in place?
3      MS. FUMERTON: Objection; form.
4      A. I can't say specifically but I can again say
5  the range of time that was.
6      Q. Mr. Ducote, in your role, one of your
7  responsibilities was the execution of the suspicious
8  order monitoring program, was it not?
9      A. Yes.
10     Q. But sitting here today, you can't tell us
11 what suspicious order monitoring process you were
12 executing in a particular point in time?
13     MS. FUMERTON: Objection; form.
14     A. I think I can tell you a range of time, but
15 your questions have been specific times. I think
16 that's very difficult after a three-year time
17 period.
18     Q. I would like to know what suspicious order
19 monitoring process flow was in place in 2015.
20     MS. FUMERTON: Objection; form.
21     A. At the conclusion of 2015, this process was
22 in place.
23     Q. Okay. Was this process in place the day you
24 left your position?
25     A. Let me just double-check it to make sure.

Page 175

1  Yes.
2      Q. So from 2015 until the last day of your
3  tenure in that role, this was the process flow that
4  was in place?
5      MS. FUMERTON: Objection; form.
6      A. Yes.
7      Q. Now, earlier you testified about, generally
8  speaking, optimization and continued improvement.
9  Was it a static process flow from when it was fully
10 implemented in 2015 until the last day of your
11 tenure, or did it change?
12     MS. FUMERTON: Objection; form.
13     A. That question was very broad. Could you
14 restate it or narrow it down?
15     Q. What changes, if any, were made to this
16 progress flow from the first day it was fully
17 implemented in 2015 until the last day of your
18 tenure?
19     A. Okay. Understood now the question. I'll
20 give you an example of one. One change was where
21 some of the information from the order evaluation
22 was captured. We utilized a system called Archer.
23 So it was improvement over more of a manual paper
24 based process. So something as simple as that.
25     Q. When was that change made?

Page 176

1      A. The exact date, I don't know exactly the
2  time period. It was probably in those first few
3  months, a lot of the adjustments we made were in
4  that -- as you pilot it, you roll it out, the
5  continuous improvement cycle was during that time
6  period.
7      Q. Right. The piloting phase was -- they were
8  beta testing that, you were rolling out and figuring
9  out what the flaws are and optimizing those flaws?
10     MS FUMERTON: Objection; form.
11     A. Somewhat one in the same. You do -- a
12 common technique of anything is that you test it
13 before you roll it out, so the actual -- your
14 reference to a beta test would have been done in
15 more of a sterile environment by Reddwerks, some
16 people call it sandbox, you can call it different
17 terms, but once it rolls into the pilot location it
18 doesn't mean there aren't improvements you still
19 make, but it should be pretty close to the final
20 product.
21     Q. In 2015, when did the pilot program start
22 for 6045?
23     A. I do not recall the exact date of it.
24     Q. Sometime between end of 2014 and when it
25 became final in 2015?

Page 177

1      A. It seems that there was something at the end
2  of 2014 discussed about it, I just don't recall when
3  it was or what it was. Seemingly the pilots were
4  done at the beginning of 2015.
5      Q. Okay. So other than -- in order -- an order
6  of interest is identified in the Reddwerks system in
7  Cell 1 when it flags a certain threshold. Is that a
8  fair statement?
9      A. Yes.
10     Q. And that threshold could be different
11 depending on the store; is that correct?
12     A. Potentially, yes.
13     Q. What happens to those orders that are
14 identified as orders of interest by the Reddwerks
15 system at that point?
16     A. At that point, it's where you are in the
17 second box at the first level order evaluation.
18     Q. Okay. And the first level order evaluation,
19 that occurs at the distribution center?
20     A. Yes.
21     Q. And that's the 6045 distribution center?
22     A. In this -- this time period, this context,
23 it potentially would have been in all distribution
24 centers, because each going back to the statement I
25 made earlier, this was for controlled substances

Page 178

1 plus other drugs of interest.
2    Q.  Right. I think -- I think we can sort of
3 make our day easier. I am going to narrow these
4 questions are directed to Schedule II and III
5 opioids.
6    MS. FUMERTON: Okay. I just object. We can
7 do that but some of the questions then are broad,
8 so I think we still might need clarifications to
9 do that.
10    Q.  If you need clarification, you can ask, but
11 for purposes of the suspicious order monitoring
12 process flow, and the context of this case that
13 deals with opioids and distribution of opioids, I
14 think it's easier to speak -- to not have to preface
15 each one of our questions with that.
16    So you can assume my questions are dealing
17 with Schedule II narcotics in the context of this
18 process flow.
19    A.  Okay.
20    Q.  If you have -- but if you -- that does not
21 override my initial instruction, don't understand my
22 questions just ask.
23    MS. FUMERTON: My only statement in that
24 regard is that because the order monitoring --
25 I'm not testifying but to the extent that there

Page 179

1 were other drugs or other medicines that were
2 involved in the process, then it might not be as
3 simple as just making an assumption every time
4 you use that word.
5    MR. INNES: Are you talking about
6 combination drugs?
7    MS. FUMERTON: No, I'm just talking more
8 generally, but we can understand that, you know,
9 in general, when you are talking about this, but
10 I still would expect that to have a clear record
11 that we be careful about the language we're
12 using.
13    Q.  So the first level order evaluation
14 distribution centers, what's happening there as it
15 pertains to Schedule II, Schedule III opioids?
16    A.  So what would happen at that point is orders
17 would come in. If an order was above a threshold,
18 it would not download that order into the order
19 filling system. It would go into a holding
20 repository, if you want to use that term for
21 simplicity.
22    Those orders would then be reviewed by one
23 of the managers at the DC and they had criteria that
24 they could then release the order to order filling,
25 or the order had to be sent to the second level

Page 180

1 review.
2    Q.  Okay. So let's break that down. Who are
3 the managers at the DC? The DC you're referring to
4 is 6045; is that correct?
5    A.  Yes.
6    Q.  Okay. Who are the managers at DC6045 that
7 would evaluate those orders that were held in the
8 repository?
9    MS. FUMERTON: Objection; form.
10    A.  It could have been any of the salaried
11 managers that were on staff at that time. These
12 orders were reviewed early in the morning because of
13 how the cycle times of the orders were placed.
14    Q.  So it was a salaried employee that reviewed?
15    A.  Yes.
16    Q.  It wasn't an hourly employee that reviewed?
17    A.  Not to do the evaluation, no.
18    Q.  What was the criteria that could -- what was
19 the criteria they used to evaluate those orders that
20 were held in the repository?
21    A.  There were -- there was a sheet or there
22 were guidelines that they were given. It escapes me
23 every specific example of it, but one could have
24 been -- it's called a buyer push, that we knew we're
25 switching to a new item, potentially, so I will use

Page 181

1 that as an example.
2    So we, let's say we use supplier A and then
3 there is supplier B. We would let the inventory of
4 supplier A run down in the pharmacies and then ship
5 supplier B. Sending supplier B to replenish what
6 they normally had gotten from supplier A pushes it
7 over a threshold. So in essence it shows, hey, this
8 is an order of interest, but we know the reason for
9 it. It was intentional to be able to get the
10 product into the pharmacy.
11    Q.  When you refer to supplier, what are you
12 referring to?
13    A.  Just a generic any type of supplier of the
14 product. Supplier of the pharmaceutical product.
15    Q.  Would that be a manufacturer?
16    A.  Yes.
17    Q.  Could it be a distributor?
18    A.  Again, I do want to make my answers as
19 concise as possible for you, because these could go
20 on for extended time periods, but you potentially
21 could purchase -- the way the pharmaceutical supply
22 chain works doesn't always mean you're purchasing
23 directly from a manufacturer.
24    Q.  You're not the -- you raise a good point.
25 We are talking about Schedule II opioids here,

Page 182

1  correct?
2      A.  Okay.  That's a fair point, because going
3  back to the earlier, it gets convoluted as we talk
4  through it.
5      Q.  Okay.  So can you discuss a buyer push in
6  the context of opioids exclusively?
7      A.  See, I went off.  That's again why this is a
8  confusing topic with the questions, so --
9          No, I can't recall if there ever was a buyer
10  push for opioid, for a Schedule II opioid.
11     Q.  If there were, how would that work?
12     A.  That's a good question.  I'm not as familiar
13  with the CSOS system regarding those times of
14  orders.  I'm more familiar with the other systems
15  that were used, in pharm, and things, I understand
16  the basics of CSOS, but on that particular one, I'm
17  not as familiar.
18         My general assumption is it would work
19  similar.  I just couldn't answer specifically.
20     Q.  While we're here, can Walmart pharmacy
21  purchase directly from the manufacturer, a Schedule
22  II opioid from a manufacturer?
23         MS. FUMERTON:  Objection; form.
24     A.  No, not my understanding directly from the
25  manufacturer.

Page 183

1      Q.  So we've identified -- I just want to sort
2  of reset.  We do this periodically along this path.
3      A.  Okay.
4      Q.  The order of interest identified by
5  Reddwerks system, it's flagged as -- or it's
6  segregated into that and held in that repository
7  because it's above a threshold, right?
8      A.  Yes.
9      Q.  So for what purpose would you require --
10  does Walmart require another level of review of that
11  flagged order?
12     A.  Going back to the comment that I made
13  earlier, there is a list of items.  It's escaping me
14  right now to be able to tell you what those are.  If
15  they weren't included -- am I saying that correctly.
16         If what they were allowed to approve was
17  not -- make sure I state this right.
18         On the list, if that wasn't one of the
19  categories, it would push it to the next level.
20  They had no option.  It wasn't a decision, it was
21  yea or nay, it was as simple as that.
22     Q.  Buyer push would be one?
23     A.  Well, going back to the Schedule II, I don't
24  recall exactly.
25     Q.  Okay.  How about an over 50, over 50 bottles

Page 184

1  of a particular drug, opioid?
2          MS. FUMERTON:  Objection; form.
3      A.  I know you asked me this question earlier.
4  With this new process, I don't remember when that
5  was changed or modified.  I don't recall exactly.
6      Q.  Right.  My original question, and you're
7  right, we've talked about this, is whether or not
8  those metrics were embedded in Reddwerks, right?
9      A.  Right.
10     Q.  And now I'm wondering if maybe those metrics
11  were pushed down the process flow to another area.
12     A.  Go ahead.
13     Q.  And so -- but you're -- sitting here today
14  you can't -- you're unsure as to whether or not over
15  50 was a metric use by the first level evaluation
16  team at the distribution center?
17         MS. FUMERTON:  Objection; form.
18     A.  My belief is it was not.  I just can't tell
19  you specifically.
20     Q.  How about oxycodone over 20?
21         MS. FUMERTON:  Objection; form.
22     A.  It would be difficult for me to answer that
23  question, it may have been the threshold that was
24  set, so the answer may be yes but it's not yes for
25  my previous context.  It's yes just because that was

Page 185

1  the threshold that was set for it.
2      Q.  That threshold, and perhaps the 50 bottle
3  threshold could have been set in -- I thought your
4  testimony earlier was -- I'm sorry.
5          How about a greater than 30 percent of the
6  four-week moving average, would that be something
7  that would be at the first level order evaluation?
8          MS. FUMERTON:  Objection; form.
9      A.  We discussed it earlier, but I was
10  struggling with that one.  I will agree because I
11  couldn't remember the timing of it.  My assumption
12  is that it would not have been part of this new
13  process.  That would have been something we stopped.
14  I just don't -- I can't tell you exactly when it
15  was.
16     Q.  Are there any other factors sitting here
17  today that you can recall that were considered at
18  this first level order evaluation?
19     A.  Not that I can recall.  There are other
20  factors.  I just can't recall them.
21     Q.  And if an order was determined to not fit
22  one of those criteria?
23     A.  It would be -- then be sent to a logistics
24  team member.
25     Q.  And that's the third cell?

Page 186

1  A.  Yes.
2  Q.  Before we get to the third cell, I want to
3 know, ask you, what happens if it did meet one of
4 those criteria?
5  A.  If it met one, and this is -- this is very
6 difficult because I think at times I'm answering the
7 question opposite of what you're asking me the
8 question.  But if one -- one of these criteria, they
9 could approve the order, they could ship it.  If it
10 didn't meet one of those, then it would
11 automatically get sent to the next level.
12  Q.  Okay.  If it doesn't meet a factor, it
13 ships?
14  A.  Yes.
15  Q.  Meets a factor, we go down the chain?
16    MS. FUMERTON:  Objection; form.
17  A.  Restate the question.
18  Q.  If it's -- if it meets one of these
19 criteria, that you can't recall right now, it is --
20 they can approve the order and ship it?
21  A.  Yes.
22  Q.  If it doesn't meet one of the criteria that
23 you can't recall, it gets escalated to the second
24 level?
25  A.  There seems -- it seems like we're saying

Page 187

1 the opposite.  So here's criteria that -- let's say
2 1, 2, and 3.  If you get an order as a manager, it's
3 one of these three things that cause the order to be
4 above the threshold, it's understood that you have
5 approval to ship it.  Because it's agreement that
6 that's -- that's a specific reason that everyone
7 understands.
8    If it doesn't meet one of those criteria,
9 then you can't do anything but forward it on to the
10 next level.  You have no -- you're not allowed any
11 judgment per se in that.  You have to send it on.
12    Is that what you were stating to me?
13  Q.  Yes.  Thank you for clarifying the record.
14    Of those orders that are approved for
15 shipping, do they go right out the door, or is there
16 another review on top of that that I don't see on
17 this chart?
18  A.  That goes back to the point earlier.  I'm
19 not as familiar with the CSOS of how it interacted
20 with this, I was mentioning.  I understand CSOS, and
21 I understand this program, but actual, the
22 interaction, because the orders still have to be
23 approved through CSOS.
24  Q.  By CSOS you mean?
25  A.  Controlled Substance Ordering System.  The

Page 188

1 way I understand it to work, is that it would go
2 through this evaluation process first, then if it
3 was one of the criteria, they could ship it, it would
4 go to CSOS and at CSOS it was signed as an order and
5 then sent to order filling.
6  Q.  Do you know how those criteria that
7 permitted a ship of a -- permitted a shipment of an
8 order that was flagged -- a threshold order that was
9 flagged, how those were created?
10    MS. FUMERTON:  Objection; form.
11  A.  I have a general understanding of how they
12 were.  They were created, it's a cross functional
13 team at the office.
14  Q.  Cross functional team means what?
15  A.  It's a team that involved legal and others
16 to determine those criteria.
17  Q.  Okay.  So Walmart legal counsel and
18 Walmart -- and others at Walmart?
19  A.  Yes.
20  Q.  Others from your department?
21  A.  No.  Well, that's -- that's -- we were
22 there, but did we have a say in the criteria?  No.
23 It was basically legal and compliance.
24  Q.  Okay.  So logistics had a seat at the table
25 for the discussion?

Page 189

1  A.  We had a seat of the table.  I would debate
2 if it was for the discussion.  We were there as part
3 of it.
4  Q.  Okay.  Did you, during those discussions,
5 did you or any of your team members offer input as
6 to how those criteria were developed?
7    MS. FUMERTON:  And so, again, I just caution
8   the witness.  He mentioned that legal was sitting
9   at the table.  I think there were communications
10   that were with legal.  That's privileged and I
11   will instruct him to not answer.  To the extent
12   the questions were not -- the answer was not with
13   legal, then you can go ahead and answer.
14  Q.  I want to be sure I understand your
15 instruction.  If legal posed a question to
16 Mr. Ducote and anyone else in the room and they
17 responded, you're saying that would be privileged.
18 But if Mr. Ducote, of his own volition, offered
19 information, that would not be privileged?
20    MS. FUMERTON:  I don't know what he's about
21   to testify, some sort of talk in a hypothetical.
22   So just sort of as general guidance, if the
23   discussion or -- with either the attorneys giving
24   legal advice or the folks seeking legal advice
25   from the attorneys, all of that is considered

Page 190

1 privileged, but outside of that context, then I
2 think you can respond to the question.
3     A.  Going back to our seat at the table that you
4 referred to, it was if -- to explain how things
5 would work based on decisions that they would make.
6 So if they said here's what the decision -- how does
7 it actually work, is what my seat on the table would
8 be for the operational aspects of it.
9     Q.  Okay.  Did you ever suggest that there would
10 be another level of review after an order was
11 cleared by the first level?
12         MS. FUMERTON:  Same instruction.
13     Q.  I can give you a hypothetical, if that
14 helps.  Order comes through, it's flagged by
15 Reddwerks as a threshold, makes it to the first
16 level order evaluation, it fits one of these
17 criteria that you can't recall at the moment, but
18 allows for a shipment.  Did you ever or did anyone
19 from your team ever suggest -- did you suggest that
20 those orders should be subject to another review?
21     A.  Not that I recall.
22     Q.  Okay.  Did anyone on your team suggest it
23 should be subject to another review?
24         MS. FUMERTON:  Objection; form.
25     A.  No, I don't recall if anyone did.

Page 191

1     Q.  So now we've -- let's take it to the order
2 that did not meet one of the criteria that you can't
3 remember.  We're at the second level order
4 evaluation logistics, is that the next stop on the
5 process flow?
6     A.  That is correct.
7     Q.  That's your team's wheelhouse, correct?
8     A.  Yes.
9     Q.  What happened there?
10     A.  There, we had a process where one of the
11 pharmacy order monitoring, some refer to them as
12 POMs, there were different abbreviations that were
13 used, they had a set of criteria that they would use
14 to review the order, they would look at different
15 data points, they would look at various reports and
16 then they would also, at times, depending on what
17 those data reports or those criteria determine, make
18 phone calls to pharmacies to discuss, and then they
19 would make a determination based on all those
20 factors should the order be shipped or should it be
21 sent on to another level of review.
22     Q.  Okay.  You said they looked at criteria to
23 determine -- to make their determination.  And then
24 you listed data, reports, phone calls.  Anything
25 else?

Page 192

1     A.  Data -- I feel that encompasses pretty much
2 everything.
3     Q.  Okay.  No gotcha.  I'm just trying to figure
4 out what you looked at.
5         What data specifically did the team look at?
6     A.  Okay.
7         MS. FUMERTON:  Objection; form.
8     A.  Sorry.  I could not tell you every single
9 data point.  Some that just come to mind when you
10 asked the question, the -- their previous four weeks
11 average, so how -- what was their average order
12 history, we could -- we would look at control to
13 noncontrol percentage of their orders, and there
14 were some other factors.  There's a laundry list of
15 different data points that we would look at.
16     Q.  That laundry list, a dozen, would you say?
17     A.  If I had to estimate, a dozen or two dozen,
18 kind of that range.
19     Q.  And how would those be -- how would the
20 members of the POM team go about accessing that
21 data?
22     A.  That's another five-hour conversation.  Just
23 because of all the names of systems that we have,
24 but basically, in a nutshell, they would use
25 different Walmart systems that were in existence.

Page 193

1 One, for example, is Host.  Host is a system that
2 looks at -- that gives us access to order entries
3 and order flows.  So there were typically, short
4 answer, they were Walmart systems that we looked
5 into, for the most part.
6     Q.  Okay.  So other than four-week average, and
7 control versus ratio of control to noncontrol, what
8 other data points did they look at?
9     A.  I can't recall every single one.  One that
10 came to mind also, looking at as simple as who
11 created the order.  Was the order a system order,
12 was it a manual order.
13     Q.  How would that impact -- I'm sorry.
14     A.  No, I was just going to say, or going back
15 to the buyer push, which again, I know we're
16 referring to the Schedule II piece, so that may not
17 have been a factor in that one.
18         What was your question?
19     Q.  If it was manual versus a computer order,
20 how does that factor into the analysis?
21         MS. FUMERTON:  Objection; form.
22     A.  As a team on a regular basis with the
23 compliance division, there would be meetings to talk
24 about different factors to consider.  So one, going
25 to that factor, manual versus system.  So if an

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  order was over the threshold and it was a
2  system-generated order, one of the things we would
3  want to do is check to see if there was an error
4  with the order.  Their systems aren't always 100
5  percent perfect.  There could just be a simple
6  variation that occurred, so we would look at -- I
7  don't know if I'm answering your question.  I think
8  that's your question, but we would just look at
9  details such as that.
10  Q.  Okay.  And if it was a manual entry, would
11  there be a follow-up with the person who entered
12  that entry?
13  A.  We would make efforts to do so, but it could
14  be where Chad made the manual order but he's not
15  working today, it's Sarah that's working, so we
16  would make an effort, if we couldn't talk to Chad,
17  we would talk to Sarah but find out why the manual
18  order was made that pushed it over the threshold.
19  Q.  Was there a -- was there a record of that
20  conversation?
21  A.  Yes, there should be.
22  Q.  Where would -- where were those stored?
23  A.  Those, going back to the process improvement
24  we discussed earlier, at first those were stored
25  just simply paper logs or spreadsheets, but we moved

Page 195

1  into Archer, a system to record that information.
2  THE VIDEOGRAPHER:  Going off record.  The
3  time is 1:14.
4  (Recess from 1:14 p.m. until 1:25 p.m.)
5  THE VIDEOGRAPHER:  We're going back on
6  record, beginning of Media File 7.  The time is
7  1:25.
8  BY MR. INNES:
9  Q.  Okay.  Mr. Ducote, we're back after a
10  hiccup, I have a follow-up question to your last
11  answer.  We were discussing if there was a record of
12  conversations that happened between the second level
13  order logistics team and pharmacies regarding
14  manually placed orders.
15  Would there be a -- and I think your
16  response was there would be a record of those
17  conversations; is that right?
18  A.  Yes, there should be.
19  Q.  And at one point in time they are maintained
20  as paper logs; is that right?
21  A.  They were written out as a conversation
22  occurred, and then they were transposed into
23  spreadsheets, so there would be a paper log, but not
24  necessarily in the future there wasn't.  So I just
25  want to draw a distinction, at the beginning there

Page 196

1  was but as time went on those were electronically
2  kept completely.
3  Q.  Okay and I will try to frame my question so
4  we can get the timeline down.
5  A.  Okay.
6  Q.  In the beginning there was a conversation
7  that would happen, notes would be taken by a POM
8  team member, handwritten notes?
9  A.  Yes.
10  Q.  And those would be transcribed into an
11  electronic form?
12  A.  Yes, they were supposed to.
13  Q.  Okay.  And who would do the transcription?
14  A.  The POM.
15  Q.  The same team member who took the
16  handwritten notes would then transcribe their own
17  notes into an electronic form?
18  A.  Yes.
19  Q.  And what electronic form specifically would
20  that be?
21  A.  Archer is the one that I was referring to.
22  There may have been a time period where we were
23  using Excel.  As I mentioned earlier, but Archer was
24  eventually what it was.  Archer is a database
25  system.

Page 197

1  Q.  Okay.  So the handwritten notes would be
2  transcribed by the POM member into Archer, which is
3  a database, and those notes would be maintained in
4  that database?
5  A.  Yes.
6  Q.  Is that database searchable?
7  MS. FUMERTON:  Objection; form.
8  A.  I do not know the answer to that question.
9  Q.  For instance, if a POM member wanted to look
10  back at their notes for a particular pharmacy, did
11  they have the ability to do that?
12  A.  Yes.
13  Q.  How would they do that?
14  A.  That is the part I didn't know earlier.  I
15  don't -- I don't know exactly how they did it.
16  Q.  Okay.
17  A.  I do know they could go and look at the
18  store's order history.
19  Q.  So we'll go back in time to when they
20  transcribed them into Excel, I think you said?
21  A.  There was a time period -- I just don't know
22  how long that was.  It may have just been -- could
23  have been a week, could have been two weeks.  There
24  was a wait to get Archer access, so we had them
25  enter them some place.  I don't recall exactly how

Page 198

1  long that was.
2  Q.  Okay.  Were those files maintained?
3      MS. FUMERTON:  Objection; form.
4  A.  Yes, to my understanding, those files are
5  maintained.
6  Q.  And they are still available?
7      MS. FUMERTON:  Objection; form.
8  A.  They were available when I left the role.
9  Q.  Okay.  And what date did you leave the role
10 again?
11 A.  June 2017.
12 Q.  Were those Excel notes ever transcribed a
13 second time into Archer?
14 A.  That's the part I'm unclear on.
15 Q.  You also mentioned -- I'll just recap
16 here -- the POMs looked at data, they looked at
17 reports, they looked at phone calls, right, those
18 are the three things?
19 A.  Yes, and whenever, I guess, to clarify,
20 whenever we talk about data, I'm just talking about
21 information in general.  It's not necessarily a
22 database, it's just information.
23 Q.  Okay.  So thank you for that clarification.
24 So they could -- POM team members would have access
25 to information that would help them make their

Page 199

1  determination?
2  A.  Yes.
3  Q.  And some of that information was a four-week
4  moving average, control versus noncontrol.  What
5  other programs could they -- were there other
6  centrally located files that they would look at?
7      MS. FUMERTON:  Objection; form.
8  A.  There may have been a list of everything
9  they looked at.  I don't recall -- I don't recall if
10 there was or not.  There -- I know there was a
11 checklist that we used.  I just don't recall what
12 was on that checklist.
13 Q.  How would that checklist be used by a POM
14 team member in their investigation of the order?
15 A.  That checklist would have been as a guidance
16 to -- as more of a -- just a general script as
17 you're doing your job, here are some key points to
18 look at or to consider or to ask about.
19 Q.  Were there mandatory items that they had to
20 look at?
21     MS. FUMERTON:  Objection; form.
22 A.  I don't recall we ever stated directly, hey,
23 these are mandatory, but they were expected to use
24 whatever was provided to them in the research.
25 Q.  Is it fair to say that a suggestion was made

Page 200

1  that they use this list and -- well, that's my
2  question.  This was a suggested list of items that
3  they should use when investigating the threshold
4  order?
5  A.  Yes.
6  Q.  Were they required to -- were POM team
7  members required to keep a catalog of the factors
8  that they looked at for each investigation?
9      MS. FUMERTON:  Objection; form.
10 A.  When you state catalog, is the answer or the
11 question you asked earlier one in the same?
12 Q.  Let me ask -- let me see if I can't clarify
13 my question.  It was kind of cumbersome.
14     Is there a record -- does Walmart maintain a
15 record of each investigation by the POM team member?
16     MS. FUMERTON:  Objection; form.
17 A.  When I was in the role, as referenced
18 earlier, Archer was that database.
19 Q.  And in Archer, could a POM team member
20 indicate the various data points that they looked at
21 or considered when making the evaluation?
22 A.  Yes.
23 Q.  You also mentioned reports that POM team
24 members would consider.  What reports are you
25 referring to?

Page 201

1  A.  I think that was the question earlier.  I
2  wasn't -- every single report or information they
3  looked at, I don't recall exactly every one, but one
4  report I had mentioned somewhat earlier -- I say
5  report, use it loosely, is a control versus
6  noncontrol.  It's a report of the information.
7  Q.  I just want to make sure we're not talking
8  past each other.  I was talking about three
9  categories that the POM team member would look at,
10 data, reports and phone calls.  Am I confusing that,
11 are data and reports interchangeable in your mind?
12 A.  Yes.  Yeah.
13 Q.  So data/reports and personal phone calls to
14 the pharmacist or pharmacy?
15 A.  Yes.
16 Q.  And would you talk to -- would the POM team
17 member talk to someone specific at the pharmacist --
18 or the pharmacy?
19     MS. FUMERTON:  Objection; form.
20 Q.  Were they asking for a particular person
21 when they called?
22     MS. FUMERTON:  Objection; form.
23 A.  Going back to the discussion earlier, if we
24 knew that Chad placed an order and we could talk to
25 Chad, we did, if not, we talked to another staff

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1  member.
2     Q.  Okay.  So, again, I'm going to do sort of a
3  reset now.
4     A.  Okay.
5     Q.  We've gone through the orders, gone through
6  the orders of interest, I'm going to cabin my
7  question to the items that get through the flow,
8  right?
9        So we've got orders of interest flagged by
10 the Reddwerks system, it hasn't met a clearing
11 factor, it's past the second level review.  Those
12 second level reviews are documented in Archer,
13 right?  So does Archer have a record of every
14 suspicious order?
15       MS. FUMERTON:  Objection; form.
16    A.  I don't -- I couldn't tell you if it has a
17 record of every single suspicious order.
18    Q.  When do you consider an order to be
19 suspicious?
20       MS. FUMERTON:  Objection; form.
21    A.  Were you going to ask a follow-up on that?
22 You kind of paused there, so I want to make sure.
23    Q.  No, I can -- when do you consider an order
24 to be suspicious?
25       MS. FUMERTON:  Objection; form.  Go ahead.

Page 203

1     A.  After the completion of this evaluation
2  process, we would make a determination.
3     Q.  After the completion of this entire process,
4  is that your testimony?
5     A.  Based on how I understand you asking me the
6  question, we would determine if it's suspicious or
7  not after the completion of the third evaluation.
8  Is that not the question I'm being asked?
9     Q.  I appreciate that answer, I appreciate the
10 clarification.  I think you added some testimony to
11 that, so I appreciate that.
12       So the POM team member has reviewed the
13 suggested data, they have made a phone call and they
14 possibly talked to the pharmacy, they may not have.
15 What happens if they -- what happens next?
16    A.  At that point, based on that order review,
17 order evaluation, they would make a determination if
18 the order could be shipped or cleared.  If it was
19 cleared, it would be sent back to the Reddwerks
20 system to be able to be order filled and shipped.
21 If they could not clear it, it would then go to a
22 third level evaluation.
23    Q.  Okay.  For that process to be completed,
24 from when it first comes into your wheelhouse in the
25 third cell, and leaves, is there an average time

Page 204

1  period that it takes to clear an order?
2     A.  There was a procedure about time periods.
3  If -- I don't recall the exact dates, days on it,
4  but if you had a copy of it, I could walk you
5  through it.
6     Q.  So it's your testimony that the evaluation
7  should be completed in a specific number of days?
8        MS. FUMERTON:  Objection; form.
9     Q.  In less than a specific number of days?
10    A.  It should be completed in the time period
11 that we had outlined in the process.
12    Q.  And if it's not completed in that time
13 period, what happens then?
14    A.  I don't recall having -- when the program
15 first rolled out, there may have been a time or two,
16 where -- with the transition, they didn't make the
17 time period.  I do not recall what happened with
18 those orders, if we -- I do not remember.
19    Q.  Would you hold the orders?
20    A.  When you say hold, what do you mean?
21    Q.  Would you ship the orders?
22    A.  We --
23       MS. FUMERTON:  Objection; form.
24    A.  From what I remember, we did not ship the
25 orders.  The review may have been later than what

Page 205

1  designated.  Let's just say, hypothetically, you
2  were supposed to review it in two days, if that was
3  the number, and we didn't do it for three, from what
4  I recall, it's not that we shipped the order without
5  the review, so the review was done in more than two
6  days as we were transitioning to this program.
7     Q.  You can't say for certain that an order that
8  sat for longer than your hypothetical two days, may
9  have shipped or it may not, you can't say with
10 certainty one way or the other?
11       MS. FUMERTON:  Objection; form.
12    A.  Would you restate the question for me?
13    Q.  I'm going to use your hypothetical two days,
14 if that's okay with you.
15    A.  Yes, sir.
16    Q.  If an order was with the logistics team for
17 more than two days, can you say definitively that
18 that order would not ship?
19       MS. FUMERTON:  Objection; form.
20    A.  The process, the procedure was to not ship.
21 To say it didn't, I cannot recall, and again, I
22 can't recall when this exactly happened, because as
23 the program was rolling out, some of the things we
24 had to fine-tune was, what is a day, is it a
25 business day, is it a calendar day, does the day

Page 206

1 start when an order drops? There is a lot of
2 decision points in fine-tuning this process.
3 Q. I think that's slightly different. I think
4 what I'm trying to get at is, regardless of we count
5 calendar days, leap year, what have you, if it
6 passes a certain point in time that you've defined
7 as sufficient time to review it, what happens when
8 that date expires to that order?
9 MS. FUMERTON: Objection; form.
10 A. Again, what I recall is that we may have
11 gone past the time period on a few orders at the
12 initial, but those orders were still reviewed.
13 That's what I recall.
14 Q. Okay. So I think your testimony was,
15 correct me if I'm wrong, the second level order
16 evaluation logistics team, clears the order, it goes
17 back into Reddwerks and it's filled; is that right?
18 A. Yes.
19 Q. Okay. If it's not cleared, what happens
20 next?
21 A. It goes to the third order evaluation.
22 Q. And what happens there?
23 A. Okay. At that one, I'm not as familiar with
24 every detail. That was handled by our pharmacy
25 practice compliance team. Basically they did a

Page 207

1 different type of review. Our review was based more
2 on orders, some of the information, reports that
3 just are reviewed earlier, they would look at a
4 different side of it. They would look more at the
5 prescriber's side, more of the patient's side.
6 Q. Who was in charge of that group?
7 MS. FUMERTON: Objection; form.
8 A. When you say in charge of the group, it's a
9 large group, so which level of in charge?
10 Q. Well, let's back up. So the second level
11 order evaluation team logistics --
12 A. Okay.
13 Q. Did those folks report to you?
14 A. Yes.
15 Q. So now coming down, third order evaluation
16 compliance --
17 A. Okay.
18 Q. Who did those folk report to?
19 A. Those individuals reported to George
20 Chapman.
21 Q. And that was for the entire time period of
22 your tenure?
23 A. I could not answer the entire -- the
24 restructures and reorganizations so, I'm not -- I'm
25 not sure.

Page 208

1 Q. Was your friend, Miranda Johnson, in charge
2 of that unit at all?
3 MS. FUMERTON: Objection; form.
4 A. Miranda reported to George.
5 Q. Reported to George?
6 A. Yes.
7 Q. What -- when you say they would look at the
8 prescriber's side, what do you mean by that?
9 A. I didn't do those reviews with them, but I
10 did get recaps at times of those reviews which I'm
11 sure we'll discuss in just a bit. So they would
12 look at the prescriber to see that prescriber's
13 order patterns at that pharmacy.
14 Q. And how would they have -- how would they
15 access that data?
16 MS. FUMERTON: Objection; form.
17 A. I don't know specifically. My understanding
18 would be it would be through our order filling
19 system in the pharmacies, which is Connexus.
20 Q. Connexus?
21 A. Yes.
22 Q. What other information would they consider
23 other than the prescriber's data?
24 A. I recall Miranda talking about our George at
25 times, or Roxie, also had worked in that area, I

Page 209

1 think, was one of the individuals. Distance of
2 patients. Distance, I said prescribers, distance.
3 I think she would look at things that were how
4 people potentially -- are patients paid for
5 prescriptions. There is a multitude of factors that
6 she looked at that I didn't have direct access to.
7 Q. Okay. Thank you for that. I didn't want to
8 cut you off, but I didn't catch the first line of
9 what you said.
10 A. Distance of patients. It was distance of
11 patients is what I said.
12 Q. I think it was just before distance of
13 patients. It was something --
14 A. I mentioned George, I mentioned Miranda and
15 Roxie had worked. Roxie.
16 Q. Are you saying George?
17 A. George Chapman.
18 Q. Got it.
19 A. Okay.
20 Q. Sorry.
21 A. No, that's okay.
22 Q. Hearing is a little bad today.
23 Was the data that -- let me back up to the
24 data that you were looking at.
25 A. Okay.

Page 210

Q. Okay. Was that run through any analytics software or -- Tableau for instance?
MS. FUMERTON: Objection; form.
A. Tableau was relatively new to Walmart during that time period, or it may have been in existence before but to the logistics space it was relatively new.
Q. So did you use -- did you use Tableau as part of -- I'm sorry. Did the POM team use Tableau as part of its analysis?
MS. FUMERTON: Objection; form.
A. Tableau was used. I don't know exactly what Tableau was used for.
Q. Who used Tableau?
A. I know on the team Justin used Tableau.
Q. Justin, is it Rafiee?
A. Rafiee. I know Justin used it. I looked at Tableau a few times. I didn't really -- I just looked at it to learn more about it. I do not recall if Dena or Jeff or Shawn or Lisa used Tableau.
Q. Did you, in your role, look at any or -- I'm sorry. Strike that.
Did you perform any trend analysis with respect to opioids during your tenure?

Page 211

MS. FUMERTON: Objection; form.
A. Could you define for me what you mean by trend analysis? It's different. Individuals have different meanings.
Q. What's your definition for trend analysis?
A. Mine typically has been to start at point A and go to point B and see what the difference is between those two points.
Q. Okay. Did you do anything of the like with respect to opioids?
MS. FUMERTON: Objection; form.
A. I have to think about that. There was a time towards the beginning of this program when we were getting it off the ground, I felt that that was something that I wanted to look at and that was part of the reason of hiring Justin. Justin's background was computer science and he was brought on board to help do that, but it never -- never really got the initiative off the ground. Justin left the company at some time period and it -- I didn't really push anything on that.
Q. Why did Justin leave the company?
A. Justin -- it was not the right fit. He came from a transportation background and with it being logistics, he felt -- and I felt, it was a good fit

Page 212

-- but it wasn't the type of role he was looking for.
Q. While he was in that role did he perform any analysis regarding Schedule II opioids for Walmart?
MS. FUMERTON: Objection; form.
A. Yes, yes, he did.
Q. What were those analyses?
A. Well, the analysis was the question you asked earlier about the artery evaluation, is that the question you are asking me or is that a different question?
Q. I'm asking you what analysis Justin Rafiee performed on data regarding Schedule II opioids for Walmart?
MS. FUMERTON: Objection; form.
A. Okay. That's three years ago. Let me think. So Justin did our evaluations, because that was a core part of his job. I know that Justin, going back to the comment I made earlier, Justin was going to start looking at data and developing some type of different reports for me. I just don't remember if he ever -- there may have been one or two reports that Justin produced about most frequent or common alerts, like which products were alerting but it wouldn't have just been Schedule II. It

Page 213

would have been across any controlled substance or any drug of interest.
I don't remember Justin really doing much else beyond that. I think that was partially why Justin left the company was, you know, maybe it wasn't -- it wasn't necessarily his skill set as much as what I thought it was to do analysis.
Q. You hired him to do that analysis?
A. No. I hired him to do a multitude of things but analysis was one.
Q. When he left the company, did you backfill his position?
A. Yes.
Q. Did that person or did that person perform analysis of opioids at your direction?
MS. FUMERTON: Objection; form.
A. I do not recall if the person that backfilled him was Shawn or Lisa, but both had a background in data, in reporting.
Q. What's Shawn's last name?
A. Robinson.
Q. What's Lisa's last name?
A. Holland.
Q. So do you recall any specific analysis that you directed Justin to perform?

Page 214

1    MS. FUMERTON: Objection; form.
2    A.   Seems that's the same question as earlier
3  that you asked, and my answer was I do recall
4  talking to -- to tell you specifically, I know I
5  mentioned about orders that would -- or products
6  that would alert more frequently, but beyond that, I
7  don't remember specifics saying, Justin, I need this
8  analysis done.
9    Q.   And did he complete that analysis regarding
10  the more frequent orders?
11    MS. FUMERTON: Objection; form.
12    A.   He completed a version of it, from what I
13  recall, I don't think it was ever -- when you say
14  complete, you're probably -- I would assume you're
15  referring to 100 percent.  I would not say it was
16  100 percent.
17    Q.   Did you see drafts that were not 100
18  percent?
19    A.   I do remember seeing a draft of something
20  produced, and I don't remember -- you mentioned
21  Tableau earlier.  I don't recall if it was in
22  Tableau or Excel or if there was a Visio or VBA
23  function, I don't remember exactly what it was in.
24    Q.   I'm not familiar with the last two, the
25  Visio and VBA function.

Page 215

1    A.   Visio is a product by Microsoft that gives
2  process maps.  And the VBA is -- I don't know a lot
3  about it, but I know some people have provided me
4  reports saying it comes out of VBA and the reports
5  look similar to the reports that come out of Excel
6  or come out of other tools.
7    Q.   And do you recall any of those reports
8  involving opioids?
9    MS. FUMERTON: Objection; form.
10    A.   It seems going back to the previous two
11  times I answered this question, that yes, they did
12  but they involved other things besides opioids.  I
13  just can't recall the exact content of those
14  reports.
15    Q.   Do you know if those reports have been
16  produced in this case?
17    MS. FUMERTON: Objection; form.
18    A.   I do not know if they have, no.
19    Q.   Did you review those reports prior to today?
20    MS. FUMERTON: Objection; form.
21    Q.   In preparation for today?
22    MS. FUMERTON: Again, anything that was
23  looked at with counsel, I will object to and
24  instruct you not to answer, but to the extent it
25  was outside of any meetings we had, you can go

Page 216

1  ahead and answer.
2    A.   I do not, no.
3    Q.   Let me go back to Exhibit 8 and the process
4  flow.  Third level order evaluation compliance,
5  order gets cleared, it goes back to Reddwerks for
6  fulfillment, is that correct?
7    A.   Could you state that again?
8    Q.   Sure.  I'm in the fourth cell, third level,
9  order evaluation compliance.
10    A.   Okay.
11    Q.   If an order is cleared by that team, it goes
12  back to Reddwerks to be filled; is that right?
13    A.   If on the third level order evaluation it's
14  cleared, then, yes, it would go back to Reddwerks.
15  It would go -- let me phrase that -- let me make
16  sure I phrase that succinctly.
17    So a third order level review would be done,
18  the information would then be discussed per our
19  procedure, and if at that time it was determined to
20  be a suspicious order, it was not shipped and
21  reported.  If it was not determined to be a
22  suspicious order, the order was sent back to
23  Reddwerks to be order filled.
24    Q.   You say if it was not shipped and reported.
25  Reported to whom?

Page 217

1    A.   It would have been reported to the
2  appropriate regulatory agency.
3    Q.   The DEA?
4    A.   That would be one of the agencies.
5    Q.   State agencies?
6    A.   Potentially.  I wasn't involved in the
7  reporting.
8    Q.   I'm curious.  If you were to transpose the
9  second level order evaluation with the third level
10  order evaluation, such that the compliance team
11  reviewed it first, would that have the potential to
12  change the outcome of your suspicious order
13  monitoring program?
14    MS. FUMERTON: Objection; form.
15    A.   I've never thought about that.  I would need
16  more time to think through that.
17    Q.   So we've passed through the third level
18  order evaluation.  Now we're into the determinative
19  order.  It's suspicious logistics and compliance.
20  So this order has been reported to the DEA already,
21  and now a logistics team and compliance team is
22  looking at the order again; is that correct?
23    MS. FUMERTON: Objection; form.
24    A.   No.  No.  I don't think what you said was
25  correct.  Could you restate that?

Page 218

1    Q.  We can do it a different way.  What happens
2  when the order passes from the third level to this
3  fifth cell?
4    A.  That is where the determination using all
5  the different data points, evaluations are done to
6  make a determination.
7    Q.  So I want to make sure we're clear here.  I
8  thought your testimony was that after the third
9  level it's determined to be suspicious and it's
10  reported to the DEA.  Is that not correct?
11    A.  No, that's not what I was stating.  It goes
12  from the third level to this box, this second box
13  from the right or second box from the left on the
14  second row.  That is where the determination is
15  made.
16    Q.  Okay.  So now we've got an order that's
17  passed all the way from Reddwerks through the first
18  level, through the second level, through the third
19  level and now we're going to have eyes on it from
20  both the logistics team and the compliance team?
21    A.  Yes.
22    Q.  And the determination is going to be jointly
23  as to whether or not it's a suspicious order?
24    A.  Yes.
25    Q.  And if it's determined to be a suspicious

Page 219

1  order it's reported to the DEA?
2    A.  Yes.
3    Q.  What other criteria does this team, the
4  logistics and compliance team, look at to determine
5  whether or not the order was suspicious?
6    A.  The majority of the information came from
7  the two evaluations.  It was a collective review of
8  all their information.
9    Q.  So explain to me why that's a necessary
10  step?
11    MS. FUMERTON:  Objection; form.
12    A.  Go ahead.  I'm sorry.  Repeat that because
13  I --
14    Q.  Okay.  It sounds redundant to me.  It sounds
15  that you have already looked at it from a logistics
16  point of view, you have looked at it from a
17  compliance point of view and now you are telling me
18  there is no new data that's looked at, you're just
19  looking at the same data again.  Is that a fair
20  statement?
21    MS. FUMERTON:  Objection; form.
22    A.  Yes, I think that's a fair statement.
23    Q.  Okay.  Why is that a necessary step?
24    MS. FUMERTON:  Objection; form.
25    A.  From -- and this is my personal opinion.  I

Page 220

1  think it never hurts to continuously review stuff.
2  It could have been in the evaluation progress, there
3  is a potential someone could have overlooked
4  something, this gave another set of review as a
5  quality check to make sure that nothing was mixed.
6    Q.  So are these folks at this step going back
7  anew, as to say are they looking with fresh eyes and
8  making a phone call to the pharmacy themselves?
9    MS. FUMERTON:  Objection; form.
10    A.  No.
11    Q.  So they are relying on the reports that are
12  generated out of the logistics evaluation at the
13  second level and the third level compliance
14  evaluation, correct?
15    A.  Yes.
16    Q.  There is no new information they are looking
17  at at this level?
18    MS. FUMERTON:  Objection; form.
19    A.  I would disagree with that.
20    Q.  What new information is included in this?
21    A.  The way that you're surmising it is that
22  there is never any new information.  Maybe there was
23  a time where the information was unclear, that a
24  call was made or something else was looked at, but
25  to say every time that was done, the answer would

Page 221

1  have been no, which is what I thought your question
2  was.
3    Q.  So there is information that can make it
4  into the consideration -- the joint consideration
5  between logistics and compliance at step four that
6  was not considered at second level and third level?
7    A.  No, that's not what I'm saying.  It could be
8  information that was provided that's unclear at that
9  point.  That may be the notes of the conversation
10  with the pharmacist.  It's unclear exactly what the
11  context of that was, so hey, let's make another call
12  to make sure we fully understand what the
13  conversations between party A and party B was.
14    Q.  Who is that next call to?
15    A.  Say that again.
16    Q.  You just said let's make another call?
17    A.  Well, we potentially would call back that
18  pharmacy or could call and discuss with them.
19    Q.  I thought you testified earlier that they
20  wouldn't make another call?
21    MS. FUMERTON:  Objection; form.
22    A.  No, I think you're confused.  Either I'm
23  confusing this or you are confusing.  One of us is
24  confused.
25    Q.  I don't think I am confused.

Page 222

1  A.  All right.  I think I would beg to differ on
2  that.  Basically, on this part here, if we reviewed
3  the information and anything was unclear or there
4  was just a question that maybe came up, there could
5  have been another call that was made.  It doesn't
6  necessarily mean there was but there could have
7  been.
8  Q.  Okay.  So is that -- so new information
9  could possibly potentially maybe be considered in
10 Cell 5 is a phone call, a second phone call to the
11 pharmacy; is that correct?
12     MS. FUMERTON:  Objection; form.
13 A.  I'm not sure your intent of your question.
14 Is your intent that it's a call or is your intent
15 additional information, because that's where I'm
16 trying to --
17 Q.  It's very simple, not trying to play gotcha.
18 Not trying to confuse anybody.
19     I'm trying to figure out what data points
20 and information was considered at each step of your
21 suspicious ordering monitoring process flow.
22 A.  Okay.
23 Q.  I have got a very good sense of what's going
24 on, Cell 1, 2, 3 and 4, although I think I need to
25 speak to somebody else about the particulars of

Page 223

1  Cell 4 and now I need to know what's going on in
2  Cell 5.
3  A.  1, 2, 3, 4.
4  Q.  What is Walmart considering in Cell 5?
5     MS. FUMERTON:  Objection; form.
6  A.  Okay.  Cell 5 is a consideration of Cell 3
7  and 4, the information that was garnered during
8  those evaluations.
9  Q.  So does anyone in the team in Cell 5 go out
10 looking for more information?
11     MS. FUMERTON:  Objection; form.
12 A.  Going back to the earlier statements,
13 potentially, yes, there could have been.  Like,
14 sitting here today, to remember back from all the
15 evaluations that were done to tell you X was done, Y
16 was done, Z was done, I would not be able to answer
17 that, but there is a potential that it could have
18 been.
19 Q.  Did you ever go out in your -- strike that.
20     Did you participate in Cell 5 evaluations?
21 A.  One, two, three -- yes.
22 Q.  In any of your evaluations in Cell 5 did you
23 look for information beyond the scope of what was
24 reported to you from the second and third level
25 review?

Page 224

1     MS. FUMERTON:  Objection; form.
2  A.  I don't -- to say that I went out and looked
3  for additional information or was I a party to
4  getting additional information, those are two
5  different things.
6  Q.  I can clarify.
7  A.  Okay.
8  Q.  Did you consider additional information?
9     MS. FUMERTON:  Objection; form.
10 A.  From what I recall, there were times that we
11 did consider additional information.
12 Q.  And what additional information did you
13 consider?
14 A.  There may have been a question that I had on
15 clarity of notes that were read, or if there was a
16 comment that was made about the prescriber review,
17 could you tell me more information about that
18 prescriber.  It could have been something as simple
19 as that.
20 Q.  So do you recall specific instances where
21 you went back and sought clarity on those data
22 points?
23 A.  Whenever we were doing those evaluations, if
24 I had questions about something, I sought clarity at
25 that time period, is when I sought clarity.

Page 225

1  Q.  And that process was fully documented?
2     MS. FUMERTON:  Objection; form.
3  Q.  There is a record of you going and asking
4  for clarity on those otherwise unclear data points?
5     MS. FUMERTON:  That's not a question.  I'm
6  trying not to interrupt.
7  Q.  Is there a record?
8     MS. FUMERTON:  Just restate it again.
9  A.  Just restate it again.
10 Q.  Is there a record of the times that you went
11 and sought clarification regarding information you
12 found to be ambiguous in the second and third level
13 reviews?
14     MS. FUMERTON:  Objection; form.
15 A.  There potentially could be a record of it.
16 Q.  Where would we find that record?
17 A.  During those evaluation reviews, notes were
18 taken by the Compliance Team, and so they may, in
19 those notes, record that.  I'm not sure if they did
20 or not.
21 Q.  Where did they save their notes?
22 A.  That, I do not know.
23 Q.  Did you save them on their hard drive?
24 A.  I really do not know the answer to the
25 question.

Page 226

1    Q.   Did they save them in ReddWerks?
2         MS. FUMERTON:  Objection; form.
3    A.   I would say no in ReddWerks because
4    ReddWerks wasn't a note-taking function.  But to
5    tell you -- the question I think you asked is:  Do I
6    know where they took notes.  The answer is, no, I do
7    not know where they placed the notes.
8    Q.   Were they uploaded to -- or transcribed to
9    the system that the phone calls were transcribed to?
10   A.   Again, I do not know.
11   Q.   You don't know or they were not?
12   A.   I cannot answer either, apparently the way
13   you're asking the questions because you keep asking
14   me the same question.  So are you asking me if they
15   had taken notes or what they're doing with the
16   notes?  Which of the two that you're asking?
17   Q.   I'm asking where they saved their notes, if
18   they did.
19   A.   I do not know where they saved their notes,
20   no.
21   Q.   Were they required to save their notes?
22        MS. FUMERTON:  Objection; form.
23   A.   I would just make an assumption if they were
24   or not.  I don't know specifically if they,
25   themselves, were told they had to save those notes

Page 227

1    in a specific spot.
2    Q.   You were in charge of this team, were you
3    not?
4    A.   No --
5         MS. FUMERTON:  Objection; form.
6    A.   -- I was not.
7    Q.   You're not in charge of the Logistics --
8    Logistics Team?
9    A.   I was, but the Compliance Team was the one
10   taking the notes.
11   Q.   The Logistics Team and the Compliance Team
12   are participating in Cell 5 together, are they not?
13   A.   Yes.
14   Q.   Are there members of the Logistics Team that
15   are part of that consideration about whether or not
16   to determine if an order is suspicious?
17        MS. FUMERTON:  Objection; form.
18   A.   State it one more time.
19   Q.   Are there members of the Logistics Team that
20   are determining if an order is suspicious or not in
21   Cell 5?
22   A.   Yes.
23   Q.   Are those members of the Logistics Team, the
24   team that you're in charge of, required to take
25   notes or record their findings?

Page 228

1         MS. FUMERTON:  Objection; form.
2    A.   In this review, to make sure that we're
3    clear, that -- you're referring to me in this box.
4    Is that clear -- correct or not?
5    Q.   We're both in Cell 5.
6    A.   Yes.
7    Q.   The one in the middle of the page.
8    A.   Yes.
9    Q.   I'm referring to you or your team members.
10   A.   Okay.
11   Q.   And how they participated in that process.
12   Did they document their participation?
13        MS. FUMERTON:  Objection; form.
14   A.   The participation is documented by the
15   Compliance Team, and that was --
16   Q.   Did they take notes regarding the specifics
17   of their participation?
18        MS. FUMERTON:  Objection; form.
19   A.   I feel like I've answered this question at
20   least seven times, so if there's --
21   Q.   I have not -- I have not gotten an answer to
22   this question.
23        MS. FUMERTON:  Well, I disagree, but -- if
24   you can restate your question, but I agree that
25   he's answered this question as much as he can,

Page 229

1    and there appears to be confusion here.
2         MR. INNES:  It's very --
3         MS. FUMERTON:  I can't ask your questions
4    for you, but part of the problem --
5         MR. INNES:  I'm not asking you to --
6         MS. FUMERTON:  Well, I know, but part of the
7    problem is that this is -- I'll just say I'll
8    make any objections to form.
9    Q.   I'll try to break this down a little bit.
10        So you're in charge of the Logistics Team in
11   Health & Wellness for executing the suspicious order
12   monitoring policy as it pertains to opiates; is that
13   correct?
14   A.   Yes.
15        MS. FUMERTON:  Objection; form.
16   Q.   You -- in Cell 5, it says that a
17   determination -- to determine if an order is
18   suspicious, the Logistics Team and Compliance Team
19   participate in that cell; is that correct?
20        MS. FUMERTON:  Objection; form.  Misstates
21   the document.
22   A.   Sorry, say the question again.
23   Q.   Do members of the Logistics and Compliance
24   Team participate together in -- at the fifth step?
25   A.   Yes.

Page 230

1    Q.   Do the members of your team, the Logistics
2  Team, document their participation in writing?
3        MS. FUMERTON:  Objection; form.
4    A.   The answer is no.
5    Q.   They do not?
6    A.   It was -- it was a review conversation
7  amongst the two parties, so, no, to answer your
8  question, it was not.
9    Q.   So describe for me how that happens.
10    A.   Okay.
11    Q.   We've got an order.  It's made it all the
12  way to Step 5.  How does that meeting happen?
13        MS. FUMERTON:  Objection; form.
14    A.   And just to clarify, it says, though --
15  you're saying there's no notes taken.  I have told
16  you that there's notes taken.  Is there --
17    Q.   I want to know where I can find copies of
18  those notes.
19    A.   Which, again, those are taken by the
20  compliance department, and you would have to ask
21  them where those notes are --
22    Q.   Okay.
23    A.   -- so --
24    Q.   Now we're getting somewhere.  So the
25  Compliance Team is the only people taking notes in

Page 231

1  the meeting?
2        MS. FUMERTON:  Objection; form.  Misstates
3    prior testimony.
4    A.   During these meetings I was a part of, I did
5  not take notes, no, sir.
6    Q.   Why didn't you take notes?
7    A.   We -- a determination was made that there
8  would be a note-taker of who took notes, and the
9  compliance department was responsible for taking
10  those notes.
11    Q.   Okay.  So that was a policy?
12        MS. FUMERTON:  Objection; form.
13    A.   It was advice.
14    Q.   Who gave you that advice?
15        MS. FUMERTON:  Objection to the extent it's
16  calling for privileged information.
17        Otherwise, you can answer the question.  If
18  you can't answer the question without revealing
19  privileged information, I instruct you not to
20  answer.
21    Q.   Were you advised by a nonlawyer?
22    A.   No.
23    Q.   Okay.  So to be clear, are you refusing to
24  answer the question because the advice to not take
25  notes -- to have one note-taker was provided to you

Page 232

1  by counsel?
2        MS. FUMERTON:  Objection to the form of that
3    question.
4        To the extent that question is going to --
5    if answering that question will reveal privileged
6    information, I'm instructing you not to answer
7    that.
8        You can ask him if he's going to follow my
9    instruction not to answer the question, but
10    asking him sort of the legal basis for my
11    instruction is improper.
12        So I'm instructing you not to answer that
13    question.
14        MR. INNES:  I was waiting for that.
15        MS. FUMERTON:  Oh, no.  I did.
16  BY MR. INNES:
17    Q.   So you're not -- you're not going to answer
18  the question; is that correct?
19    A.   I'm going to take advice from counsel.
20    Q.   Do you recall who was in the room when you
21  were provided that advice?
22        MS. FUMERTON:  Objection; form.  You haven't
23  established what the advice was.  That's the
24  whole point of --
25        MR. INNES:  I think we did.

Page 233

1        MS. FUMERTON:  Well --
2        MR. INNES:  We definitely --
3        MS. FUMERTON:  -- this is why --
4        MR. INNES:  -- established what the advice
5    was.  The advice was one person from compliance
6    takes notes.
7        MS. FUMERTON:  Fine.
8        MR. INNES:  That's the record.
9        MS. FUMERTON:  We're not going to get into
10  the context in which the advice was given.
11        Look, I'll talk to -- I'll talk -- Michael,
12  here's my suggestion on this.  I will talk -- I
13  will talk during a break -- if we take one now, I
14  think, for the purposes of --
15        MR. INNES:  Not --
16        MS. FUMERTON:  -- making things go forward,
17  then we can take a break and ask if there is a
18  way that this can be answered, but without taking
19  a break, based on what was said, I am instructing
20  him not to answer.
21  BY MR. INNES:
22    Q.   Do you recall who was in the room when you
23  were provided that advice?
24    A.   I don't recall everyone that was in the
25  room.

Page 234

1   Q. Do you recall anyone that was in the room?
2   A. I recall counsel was in the room.
3   Q. Were there other humans in the room?
4      MS. FUMERTON: Objection; form.
5   A. I don't know who else was not counsel in
6 that room. I was new -- new into the role, a year
7 in about this time period, maybe six months time,
8 still meeting new people. I mean, all the way up
9 into a year I was meeting new people.
10     That meeting was during that six- to
11 nine-month time period potentially. I don't know
12 who -- I don't know everyone that was in the room.
13 If I had to estimate the time period, January to
14 May, June, sometime in that range is where I recall
15 this meeting.
16   Q. What year is that?
17   A. I don't -- it had to be in the 2015 time
18 period.
19   Q. Did you ever take notes at one of these
20 meetings, regardless of the advice of counsel?
21     MS. FUMERTON: Objection; form and --
22   A. Not --
23   Q. Did you disregard -- did you disregard the
24 advice not to take notes in the meeting?
25     MS. FUMERTON: Objection; form. That's

Page 235

1 mischaracterizing what his prior testimony was.
2     Well, now, look, because you are -- you are
3 dancing around a privileged issue, and I will
4 protect the privilege --
5     MR. BOWER: You can object to the form and
6 instruct him not to answer. That's how you do
7 it. Okay? Just move along.
8     MS. FUMERTON: I am trying to move along.
9     MR. INNES: Either object --
10     MS. FUMERTON: There's a way to get through
11 this.
12     MR. INNES: -- object to the form --
13     MS. FUMERTON: -- we had a long discussion
14 about this. We can --
15     MR. BOWER: Either object to form or
16 object --
17     MS. FUMERTON: Then I'm instructing him not
18 to answer that question. The -- object to form
19 and I am instructing him not to answer that
20 question.
21   A. I'll take advice of my counsel.
22   Q. So you didn't -- so you testified that there
23 were a lot -- a lot of people in the room that you
24 didn't know, correct?
25     MS. FUMERTON: Objection; form.

Page 236

1   A. There were people in the room. I don't know
2 if they were attorneys or counsel or not.
3   Q. Sitting here today, do you know the names --
4 I'm not asking you to list them, but do you know the
5 names of the people that were in that room?
6   A. I seem to recall a few of the people there.
7 I just don't know, again, exactly --
8   Q. So it's possible not everyone in the room
9 was a lawyer?
10   A. It is possible.
11   Q. Okay. Thank you. So let's go back to
12 Cell 5. You're considering information that's in
13 the second level report. You're considering
14 information that's in the third level report.
15     Explain to me how you're communicating --
16 the communications are between the Logistics Team
17 and the Compliance Team are happening. Is this an
18 e-mail communication?
19   A. Could you restate the question, make sure I
20 understand it?
21   Q. Describe to me the process -- the process of
22 Cell 5.
23   A. Okay. Cell 5, usually there was a meeting
24 that was set up with myself by a member of the
25 Compliance Teams. It was just typically a planner,

Page 237

1 just a normal calendar -- there was an e-mail for a
2 meeting. The individuals were at the office. It
3 was a face-to-face meeting, and then we -- they
4 would review data with me.
5   Q. How long would those meetings go?
6   A. Some could be as short as 30 minutes. There
7 were a few that lasted a few hours.
8   Q. And how many -- how often did you have those
9 meetings?
10   A. It was when necessary based on the
11 procedure, the time periods and the procedure.
12   Q. How long would those meetings last if you
13 would, let's say -- strike that.
14     Was the average time to make a decision on a
15 particular order in that meeting?
16   A. A typical order was between 20 and 30
17 minutes.
18   Q. Back to Cell 3, the team -- the POM Team
19 that was in your purview, how long did it take them
20 to clear an average order?
21     MS. FUMERTON: Objection; form.
22   Q. Or to make -- strike that -- to make a
23 determination as to whether an order was cleared or
24 should pass to the next level?
25   A. I don't recall exactly the time period, but

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 when I had touched bases with them to just get an
2 understanding of their work, they would spend
3 approximately, in a nine-hour day, seven of those
4 nine hours doing order reviews.
5   Q.  And how many orders in a given day?
6     MS. FUMERTON:  Objection; form.
7   A.  I don't remember exactly how many.
8     MS. FUMERTON:  Are you switching topics?  Is
9 this time for a good break?
10     MR. INNES:  No.  I'm going to stay on this
11 topic.
12     (Ducote Exhibit 9 was marked for
13 identification.)
14 BY MR. INNES:
15   Q.  This has been marked as Plaintiffs'
16 Exhibit 9.  Sorry, my arms are getting shorter,
17 apparently.
18   A.  Okay.
19   Q.  So we're looking at an e-mail, Plaintiffs'
20 Exhibit 9.  It's an e-mail from Chad Ducote to
21 Michael Stephenson, May 8th, 2015.  It's Bates
22 Number 20060.
23     Mr. Ducote, about halfway down -- maybe a
24 quarter of the way down the page, there is a bullet
25 that says: "Logistics evaluation takes an average

Page 239

1 of 8 minutes per alert."
2     Is that accurate?
3     MS. FUMERTON:  Objection; form.
4   A.  That was the information from the pilot that
5 we were doing at 6028.
6   Q.  Okay.  Did that information, to the best of
7 your recollection, change after -- over the course
8 of time?
9   A.  I don't recall if we went back and did a
10 time study.  I don't recall if we went back and
11 redid a time study on how long it took.
12   Q.  If you'd done a time study, who would have
13 done that time study?
14   A.  It probably would have been done by the team
15 and myself who probably would have gone back to look
16 at it.
17   Q.  Do you recall ever doing a time study?
18   A.  It seems at one point that I had worked with
19 them to do a time study to make sure that we were --
20 it does seem at one point, yes.
21   Q.  Okay.  And do you have reason to believe
22 that that -- that the later time study you did was
23 different than eight minutes?
24     MS. FUMERTON:  Objection; form.
25   A.  I don't recall specifically.

Page 240

1   Q.  So in eight minutes, we're at the second
2 level of order evaluation; is that correct?
3   A.  Yes.
4   Q.  That cell takes eight minutes to do?
5   A.  No --
6     MS. FUMERTON:  Objection; form.
7     THE WITNESS:  Sorry.
8   A.  No, that's not necessarily what I'm stating.
9   Q.  So Exhibit 9 says logistics review takes an
10 average of eight minutes, something to that effect.
11 Is that correct?
12     MS. FUMERTON:  Objection; form.
13   Q.  What does it say?  You can read it.
14     MS. FUMERTON:  Objection; form.
15   A.  I think what -- the way I understood your
16 question, it could be how I understood it, that
17 every alert takes eight minutes.  The answer would
18 have been no.  Some could take longer, some less,
19 depending on what was -- what the data showed.
20   Q.  So on 5/8/2015, you send an e-mail to
21 Mr. Stephenson and you run some metrics, it appears,
22 on the time it takes to do certain tasks in the
23 suspicious order monitoring program.  Halfway down
24 it says:  Logistics evaluation takes an average of
25 eight minutes per alert.

Page 241

1     I notice farther down, it says:  Current
2 time commitment is 22 alerts times eight minutes
3 equals three hours per day.
4     I'm wondering if at any point in time over
5 your tenure, the logistics evaluation which is
6 represented in Cell 3 took longer than an average of
7 eight minutes.
8     MS. FUMERTON:  Objection; form.
9   A.  It potentially could have.  I couldn't
10 answer specifically.
11   Q.  Did that average significantly rise?
12     MS. FUMERTON:  Objection; form.
13   A.  I could not answer that question.  I don't
14 know if it significantly rose or if it rose for
15 certain orders.  I couldn't answer that.
16   Q.  And for -- for an average evaluation, your
17 team members would consider a laundry list of data
18 points and make phone calls; is that right?
19   A.  Again --
20     MS. FUMERTON:  Objection; form.
21   A.  -- just to be clear, this was on the pilot,
22 is what we're talking about.  As time went on,
23 processes could have been refined.  That's why I
24 don't feel I can answer your question specifically
25 on how much time it took.

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  MS. FUMERTON: I'll just make a statement on
2  the record, because this is why I objected to
3  your assumption earlier. You made a statement
4  earlier that you wanted to assume that your
5  questions only referred to Schedule II opioids.
6  But then you keep asking the witness questions
7  and documents that aren't so limited. So I just
8  want to make it clear that your assumption
9  apparently no longer applies.
10  MR. INNES: I'm talking about the metrics
11  that were provided here and comparing them to the
12  metrics that are here.
13  MS. FUMERTON: Limited to Schedule II
14  opioid, or are you talking about drugs in
15  general? Because this is my problem with your
16  assumption.
17  MR. INNES: His testimony was the process
18  applies equally, and we're talking about apples
19  to apples here. We're talking about a logistics
20  review, and we're talking about --
21  MS. FUMERTON: But you're asking him about
22  the amount of time. That's my -- that's the
23  clarification I'm trying to make. I'm just
24  asking if you're still on the record that that's
25  the assumption that you're asking everybody to

Page 243

1  make when you're talking about -- or as you're
2  talking about --
3  MR. INNES: I can -- I can make this one
4  very clear.
5  MS. FUMERTON: Okay.
6  BY MR. INNES:
7  Q.  Did you ever run an analysis for the amount
8  of time it took to do a logistics review for
9  opioids?
10  MS. FUMERTON: Objection; form.
11  A.  Not that I recall.
12  Q.  So the metrics that we're referring to in
13  Exhibit 9, are those run against all drugs in
14  Logistics Team review that would be part of the
15  suspicious order monitoring program?
16  A.  Could you restate that question?
17  Q.  Do you recall what the -- what drugs were
18  taken into account when determining the average time
19  frame to clear an order at the second level review?
20  A.  I don't -- of that 157 alerts that's listed,
21  I don't know exactly which drugs those were.
22  Q.  Would there be a way to determine which
23  drugs those were?
24  A.  I would assume, yes, out of the Reddwerks
25  system.

Page 244

1  THE COURT REPORTER: Say that again.
2  THE WITNESS: I would assume, yes, out of
3  the Reddwerks system.
4  Q.  How would you go about using the Reddwerks
5  system to determine, of those 157 alerts, what
6  particular drugs they involved?
7  A.  I personally couldn't tell you exactly how
8  to do that. My general assumption is that the data
9  in Reddwerks is archived, and that someone that
10  understood the system better than I did could find
11  that information.
12  Q.  How long is that data archived for?
13  A.  I don't know exactly.
14  Q.  Following the meeting at schedule -- at
15  Cell 5 --
16  A.  Cell 5. Okay.
17  Q.  -- if you determine an order to not be
18  suspicious, are you contravening the findings at the
19  second level and third level?
20  A.  Say that again.
21  Q.  Are you reversing the order of the decision
22  in the second level and third level review at that
23  point?
24  MS. FUMERTON: Objection; form.
25  A.  No, I don't believe that we have.

Page 245

1  Q.  So for an order to get to Cell 5, it has
2  to -- it did not get cleared by the second level,
3  correct?
4  A.  Yes.
5  Q.  It's still an order of interest?
6  A.  Yes.
7  Q.  It gets to the third level, it's still an
8  order of interest. It gets to the fifth level, gets
9  to the fifth box --
10  A.  Uh-huh.
11  Q.  -- if it's shipped, is that a reversal of
12  the order of interest?
13  MS. FUMERTON: Objection; form.
14  A.  No. No, I do not think so.
15  Q.  If it is determined to be suspicious, what
16  happens next?
17  A.  Then the order is not shipped, obviously.
18  We've discussed that. A report is made to the DEA.
19  And then with the pharmacy, the Practice Compliance
20  Team had a protocol that they put in place for
21  additional potential training, various things. I
22  wasn't involved in the day-to-day activities of
23  that.
24  Q.  Is that the remediation plan involved in
25  Cell 7?

Page 246

1  A. Yes.
2  Q. How often were -- well, strike that.
3     How long between when an order was
4  determined to be suspicious and when it was reported
5  to the DEA?
6     MS. FUMERTON: Objection; form.
7  A. I don't know the exact time period. There
8  was a time period that it was done in. I just can't
9  tell you exactly what that time period is. It was
10 reported by the Compliance Team.
11 Q. And that was a stated -- a stated policy at
12 Walmart?
13    MS. FUMERTON: Objection; form.
14 A. Seems, as I recall, it was in a stated
15 policy.
16 Q. So somewhere I could find a Walmart document
17 that said an order has been determined to be
18 suspicious and it must be reported by -- something
19 to that effect?
20 A. In that policy, I cannot recall if it said
21 exactly the words you said, but it does state about
22 reporting it. The time frame, I think, is the part
23 that I'm struggling to remember what it specifically
24 said.
25 Q. Do you remember where you saw that policy?

Page 247

1  A. I do not.
2     MS. FUMERTON: We've been going a little bit
3  over an hour. Can we take a break?
4     MR. INNES: Yeah. Can you --
5     MS. FUMERTON: Make it short? Yeah, will
6  do.
7     THE VIDEOGRAPHER: Going off the record, the
8  time is 2:30.
9     (Recess from 2:30 p.m. until 2:47 p.m.)
10    THE VIDEOGRAPHER: Going back on record,
11 beginning of Media File Number 8. The time is
12 2:47.
13 BY MR. INNES:
14 Q. Okay, Mr. Ducote. I think we can maybe make
15 one final push here.
16 A. Okay.
17 Q. What I'd like to do is go around the horn
18 again on this exhibit.
19 A. Okay. On 9?
20 Q. 9, yes.
21 A. Okay.
22    MS. FUMERTON: Oh, wait. You're not looking
23 at the same one he's looking at, which is 9.
24 Q. Oh, sorry. I'm on the chart. Is that --
25 A. This was 8.

Page 248

1  Q. That's 8. I'm sorry. Thank you.
2     So starting at the top, Cell 1, orders of
3  interest identified by Reddwerks, how many orders
4  for opioids does Walmart receive on a weekly basis,
5  on average?
6     MS. FUMERTON: Objection; form.
7  A. I really do not recall what that weekly
8  average was while I was in the role.
9  Q. Hundreds? Any guess?
10    MS. FUMERTON: Objection; form.
11 A. I don't remember exactly, but any numbers I
12 looked at were just alerts in general. It was
13 noncontrols, controls, which included opioids. I
14 never looked at it specifically to say opioids. If
15 I did, I just don't remember what the numbers were.
16 Q. Okay. So you never recall running a report
17 to determine how many Schedule II opioids Walmart
18 receives on -- in any given time frame?
19    MS. FUMERTON: Objection; form.
20 A. I don't recall, specifically for opioids or
21 C2, a report.
22 Q. At the first level of evaluation, can you
23 say the percentage of orders that were -- that were
24 marked for further review?
25    MS. FUMERTON: Objection; form.

Page 249

1  A. At some point during that role, I did see
2  that number. I don't remember what it was. That
3  would be speculating on the number.
4  Q. Are the numbers available to you?
5     MS. FUMERTON: Objection; form.
6  A. I did see it. I would assume it is at some
7  place.
8  Q. So at some point in time, it was available
9  for -- available to you?
10 A. Yes.
11 Q. And you don't have reason to believe that
12 that number is no longer available; is that correct?
13 A. No, I don't have a reason to believe. I
14 just don't know, since I've been out of the role,
15 what has changed as far as what's available.
16 Q. So of the first level orders that are held
17 for further review at the second level, what
18 percentage of those -- what percentage of the first
19 levels make it through -- are held for second level
20 review?
21    MS. FUMERTON: Objection; form.
22 A. And that would be the same answer as
23 previous.
24 Q. And what percentage of second level holds
25 are held for further -- further level review by

Page 250

1  compliance?
2      A.  I don't remember that number.
3      Q.  And I take it that you won't -- you don't
4  recall the percentage of orders that are determined
5  to be suspicious following a third level review?
6      MS. FUMERTON:  Objection; form.
7      A.  I don't remember a percentage.  I mean, it
8  was a -- I didn't -- it never was a percentage.  It
9  was more just a number.  If the numbers came in --
10  if I said that -- if the number -- how do I -- how
11  am I trying to say?
12      Each week a certain number would come in, is
13  what I'm trying to say.
14      Q.  Okay.  So if we went through this again and
15  I asked you ballpark raw number of orders that come
16  into Walmart for Schedule II opioids, would you know
17  that?
18      A.  No.
19      MS. FUMERTON:  Objection; form.
20      A.  I wouldn't.  I'd be guessing.
21      Q.  Was it not important to you to know how many
22  orders were being flagged suspicious by the
23  pharmacies in Walmart's -- from orders of pharmacies
24  in Walmart's network?
25      MS. FUMERTON:  Objection; form.

Page 251

1      A.  You've gone back to the earlier comments.
2  When we looked at this, this was more of a broader
3  program that involved other drugs besides opioids.
4  So I didn't specifically look at just the opioid
5  piece.
6      Q.  Were there other drugs sold by Walmart that
7  are resulting in the epidemic proportions the same
8  as opioids?
9      MS. FUMERTON:  Objection; form.
10      A.  That's not a question I can really comment
11  on.  I don't have a basis on what to comment on for
12  that.
13      Q.  You'd agree that opioids are highly
14  addictive; is that correct?
15      MS. FUMERTON:  Objection; form.
16      A.  I think that's the DEA's definition.
17      Q.  You have a degree in pharmacology, do you
18  not?
19      A.  Pharmacy.
20      Q.  Pharmacy?
21      A.  Uh-huh.
22      Q.  And you studied the chemical effects of
23  drugs on the human body?
24      A.  Yes.
25      Q.  Do you agree that heroin is highly

Page 252

1  addictive?
2      A.  I think there is a general agreement that it
3  is, yes.
4      Q.  Do you agree with it?
5      A.  Yes.  I don't have any personal experience
6  with it, but I do agree from what I have read, what
7  I've studied.
8      Q.  Do you agree that opioids are highly
9  addictive?
10      MS. FUMERTON:  Objection; form.
11      A.  They potentially can be.
12      Q.  Do you believe that oxy is highly addictive?
13      MS. FUMERTON:  Objection; form.
14      A.  It potentially can be.
15      Q.  Do you believe that hydrocodone is highly
16  addictive?
17      A.  These are all the same drugs basically that
18  you're asking me about.
19      Q.  Can you -- would you agree that opiates --
20  Schedule II opioids are highly addictive?
21      MS. FUMERTON:  Objection; form.
22      A.  Again, to your question, it's very specific.
23  It can be if not properly used.  And so that
24  question is almost impossible to answer with just a
25  singular answer.

Page 253

1      Q.  These highly addictive drugs have resulted
2  in thousands of deaths across the country?
3      MS. FUMERTON:  Objection; form.
4      A.  What --
5      Q.  Do you agree that these pills have resulted
6  in thousands of deaths across the country?
7      MS. FUMERTON:  Objection; form.
8      A.  I don't have direct knowledge if it has.  I
9  just know what I -- earlier when we talked about
10  reading different things, that's the only piece I
11  could say.  I don't specifically know how many
12  people or anything else that have died from this.
13      Q.  You talked earlier about optimizing the
14  processes; is that right?
15      MS. FUMERTON:  Objection; form.
16      A.  Yes.
17      Q.  That's --
18      A.  Continuous improvement.
19      Q.  Continuous improvement.  What metrics did
20  you look at to continuously improve this suspicious
21  order monitoring process for?
22      MS. FUMERTON:  Objection; form.
23      A.  I can't -- you know, when you talk about
24  continuous improvement, you're not just talking
25  about metrics.  You're talking about just the way

Page 254

1 things are handled. So I'll give you a prime
2 example of what I looked at.
3 So phone calls, we discussed as a team how
4 long would phone calls to make to pharmacies, to
5 make sure that -- you know, what I want them doing
6 was spending time talking to the individuals, the
7 pharmacists, or others that could help with order
8 evaluation. What I didn't want them doing was
9 having to repeatedly call and stay on hold.
10 So we talked about process improvements on
11 how to do things like that. That's why I referred
12 to that earlier, those types of process
13 improvements.
14 Q. Process improvements that are aimed at --
15 that's more efficient, right? Less time on the
16 phone is more efficient for your company?
17 A. No. I don't think it's necessarily less
18 time on the phone. It's more value-added time.
19 It's time-adding value that they're discussing what
20 the topic at hand is and not trying to track someone
21 down. When I refer to process improvements, those
22 are the types of things I'm referring to.
23 Q. What are -- what would be another example of
24 a process improvement?
25 A. I know there's others, and I'm pretty

Page 255

1 confident there's probably some notes of others.
2 Just for the life of me, can't remember right now.
3 The phone was one. I can't think of any others
4 right now.
5 Q. Would it be an improvement if -- to your
6 system, if it flagged suspicious orders more
7 accurately?
8 MS. FUMERTON: Objection; form.
9 A. Can you explain what you mean by more
10 accurately?
11 Q. Well, for instance, Reddwerks flags an order
12 of interest, right, or flags on order of interest
13 and it goes through a whole process; is that
14 correct?
15 A. One more time.
16 Q. Reddwerks flags an order of interest,
17 correct?
18 A. Yes.
19 Q. That order of interest can go through a few
20 layers of review, correct?
21 A. Yes.
22 Q. It could go through one layer of review, or
23 it could go all the way to the end, correct?
24 A. Yes.
25 Q. And each time it goes farther along that

Page 256

1 line, more and more people review it; is that
2 correct?
3 A. Yes.
4 Q. And those people are spending their time
5 reviewing orders, correct?
6 A. Yes.
7 Q. And Walmart's paying them for reviewing the
8 time -- for reviewing those orders, correct?
9 MS. FUMERTON: Objection; form.
10 A. Yes.
11 Q. Would it be better to develop a system -- to
12 optimize a system whereby -- let me stop.
13 The -- some of those orders are determined
14 to not be suspicious and are shipped. Some of those
15 orders are determined to be suspicious and
16 presumably held. Correct?
17 MS. FUMERTON: Objection; form.
18 Q. Some orders are shipped, correct?
19 A. After they go through the evaluation
20 process.
21 Q. Correct.
22 A. Yes.
23 Q. And some orders are held after they go
24 through the evaluation process, correct?
25 A. Yes.

Page 257

1 Q. If you had a system in which it was more
2 efficient to tag the most likely to be determined to
3 be suspicious higher up in your process, that would
4 be more efficient, wouldn't it?
5 MS. FUMERTON: Objection; form.
6 A. If the -- this is more of a personal view.
7 So I don't think that -- at least from my focus of
8 this program wasn't the efficiency of the program.
9 It was more of the accuracy of the program.
10 Efficiency -- when we were talking about the
11 phone calls and you referred to time spent, that's
12 not what I was -- I wasn't looking to give them less
13 time to do a review. It was to give them the time
14 to actually spend where they needed to do the review
15 versus, again, picking up the phone and having to
16 call three times to reach someone.
17 Q. Did Reddwerks function on an algorithm?
18 MS. FUMERTON: Objection; form.
19 A. Parts of Reddwerks does.
20 Q. Did you have confidence in that algorithm?
21 MS. FUMERTON: Objection; form.
22 A. The parts of Reddwerks that does, yes.
23 Reddwerks is a well-renowned company.
24 Q. I'm asking about Reddwerks' algorithm as it
25 pertains to suspicious order monitoring process

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1　flow.  The algorithm used in the Reddwerks system,
2　did you have confidence in that algorithm?
3　　　MS. FUMERTON:  Objection; form.
4　　A.  Reddwerks was using the algorithm developed
5　by Mu Sigma.
6　　Q.  By Mu Sigma?
7　　A.  Unless I'm misunderstanding your question.
8　　Q.  No.  That's new information.
9　　A.  Okay.
10　　Q.  So Mu Sigma developed the algorithm that's
11　used by Reddwerks?
12　　　MS. FUMERTON:  Objection; form.
13　　Q.  That's used in Reddwerks?
14　　　MS. FUMERTON:  Objection; form.
15　　A.  Okay.  I misunderstood what you were asking
16　earlier.  The algorithm that I was referring to
17　earlier are algorithms that are for other things in
18　Reddwerks.  What the thresholds are based off
19　algorithms was developed by Mu Sigma.
20　　Q.  Did you -- do you have confidence -- did you
21　have confidence, during your role, in Mu Sigma's
22　threshold algorithm?
23　　　MS. FUMERTON:  Objection; form.
24　　A.  Based on everything while I was in that
25　role, I'd say yes.

Page 259

1　　Q.  After you left that role, did you continue
2　to have confidence in that algorithm?
3　　　MS. FUMERTON:  Objection; form.
4　　A.  State the question again.
5　　Q.  After you left the role, do you continue to
6　have confidence in the algorithm of Mu Sigma?
7　　　MS. FUMERTON:  Objection; form.
8　　A.  Going -- yeah.  If that algorithm was still
9　being used today, then my answer would have been
10　yes.
11　　Q.  Is it flagging the right number of orders,
12　in your opinion?
13　　　MS. FUMERTON:  Objection; form.
14　　A.  Based on the experiences I had in this job
15　in some of these reviews, yeah, I felt so.
16　　Q.  Did you ever question the algorithm while
17　you were in your role?
18　　　MS. FUMERTON:  Objection; form.
19　　A.  I always question if you could improve
20　things.  I mean, I don't think that was your
21　question, though, earlier to me.  I think your
22　question was if I -- unless I misunderstood your
23　question.
24　　Q.  At some point in time, Walmart introduced
25　Buzzeo into the suspicious order monitoring process;

Page 260

1　is that right?
2　　A.  Yes, that's correct.
3　　Q.  When was that?
4　　A.  It was either 2015 or 2016.  I don't recall
5　exactly when.
6　　Q.  And where did -- where does Buzzeo fit on
7　the process flow?
8　　　MS. FUMERTON:  Objection; form.
9　　A.  This is an area I don't have a great deal of
10　detail on because it was being handled by the
11　compliance group.  My general understanding is that
12　Buzzeo would sit on top of everything.  So if you
13　have pharmacies making orders, Buzzeo, and then you
14　have the logistics systems.
15　　Q.  Is the logistics systems the process we've
16　already been talking about?
17　　A.  Yes.
18　　Q.  Okay.  So with the addition of Buzzeo, did
19　anything in the process flow change?
20　　　MS. FUMERTON:  Objection; form.
21　　A.  Process flow change?  Going back to that
22　comment that I made earlier, I know there were a few
23　things that we fine-tuned.  You know, the calendar
24　date, that was the example, the lack of clarity on
25　business day or calendar day.  The 6045 worked

Page 261

1　Monday through Friday.
2　　　The -- so small things like that, yes, we
3　made process improvements.  Just today, if I had to
4　list every one, I don't -- I couldn't do that today.
5　　Q.  Let me ask it differently.  Structurally,
6　the -- when we go from one to two to three and so on
7　and so forth, that stays the same, and Buzzeo is
8　placed as a filter before this process.  Is that a
9　fair statement?
10　　　MS. FUMERTON:  Objection; form.
11　　A.  We had not gotten to that point yet when I
12　was exiting out of the role.  Buzzeo was still being
13　determined on how it was going to be used.  I don't
14　feel we were at that point when I left that role.
15　　Q.  Was it in its pilot phase at that point?
16　　　MS. FUMERTON:  Objection; form.
17　　A.  Was it in the pilot phase?  I know the
18　contract was being signed.  I don't know if anything
19　else was being done.
20　　Q.  Did you ever review suspicious order
21　monitoring alerts after the rollout of Buzzeo?
22　　　MS. FUMERTON:  Objection; form.
23　　A.  I don't know if Buzzeo rolled out.  So are
24　you stating to me that Buzzeo did roll out?
25　　　MR. INNES:  Let's just mark this.  I'm going

Page 262

1  to mark this as Plaintiffs' 10.
2      (Ducote Exhibit 10 was marked for
3  identification.)
4      MR. INNES: It's a quick one-page e-mail.
5  Could I hold one of those? I'm sorry. Tara, I
6  think this is one I didn't make enough copies of.
7      MS. FUMERTON: That's okay.
8      MR. INNES: I'll have to take it back.
9      MS. FUMERTON: That's okay. Yes. I haven't
10 written on mine yet.
11     MR. INNES: Thank you.
12     MS. FUMERTON: Thanks.
13     THE WITNESS: Up until you --
14     MS. FUMERTON: Wait for a question.
15     THE WITNESS: He did ask me a question.
16 Q.  I didn't ask you a question.
17 A.  Oh, I thought the previous one -- okay.
18 Sorry.
19 Q.  So this is Plaintiff 10. It's an e-mail
20 from Dena McClamroch -- I hope I pronounced that
21 correctly -- to Chad Ducote on August 9th, 2017.
22 It's actually an e-mail chain. It begins with Bates
23 Number 7345.
24     Mr. Ducote, on Wednesday August 9th, you
25 wrote to Ms. Hodges. Who is Ms. Hodges?

Page 263

1  A.  Ms. Hodges took my place in that role.
2  Q.  She was -- she was your replacement?
3  A.  Yes.
4  Q.  Okay. So Tim Harris, Chad Ducote, Debbie
5  Hodges?
6  A.  Yes.
7  Q.  You write to Debbie: They had trouble
8  getting me off the SOM alerts due to settings in
9  Archer. Basically in a nutshell, I will get them.
10 I noticed they spiked a lot this week with the
11 rollout of Buzzeo. Ultimately it's your call what
12 to do, yet I would push back on the algorithm. It
13 is off in my opinion and kicking off way too many
14 alerts that are false positives.
15     So why is it your opinion that the Buzzeo
16 algorithm is kicking off way too many alerts that
17 are false positives?
18     MS. FUMERTON: Objection; form.
19 A.  That was -- when you talk about a hectic
20 period, that August 9th, that time period transition
21 to -- so I cannot recall if I talked to Dena or if I
22 talked to someone else in that area, because I was
23 getting all these e-mails about what was going on,
24 because it was like, hey, all the sudden I get all
25 these e-mails. I hadn't been getting these.

Page 264

1      And from what I -- first of all, I don't
2  know if Buzzeo actually rolled out fully. Still,
3  going back to your previous question, I don't
4  remember a lot about the Buzzeo. That was during
5  that transition.
6      But from what I recall about false
7  positives, is that evaluations that were done that
8  showed no issue, but the system kept flagging them.
9  And potentially I had concerns that the algorithms
10 that they were using, there were some issues with
11 it, to double-check it.
12 Q.  So in --
13 A.  And again, that's my opinion, just to be
14 sure.
15 Q.  To be clear, my questions on this particular
16 exhibit are limited to C2 opioids. So are you --
17 you mentioned algorithms just now. You write in
18 your e-mail "that algorithm," singular.
19     Are you aware of other algorithms used by
20 Buzzeo?
21 A.  No.
22     MS. FUMERTON: Objection; form.
23 A.  No.
24     THE WITNESS: Sorry.
25 A.  No.

Page 265

1  Q.  Have you -- have you seen the algorithm used
2  by Buzzeo?
3  A.  No, not that I recall.
4  Q.  Have you been involved in any of the
5  discussions leading up to the development of the
6  algorithm by Buzzeo?
7  A.  As Buzzeo, the contract, was being signed?
8  I do recall being at a meeting where it was
9  discussed about how Buzzeo looked at things. As far
10 as the algorithm specifically being discussed, I
11 wasn't sure -- I'm using algorithm as a generic
12 term, that whatever is driving the alerts, if it's
13 algorithm -- maybe it's not an algorithm, I would
14 assume it is -- that -- does it have the right
15 inputs.
16     Because it could be something as simple as
17 Buzzeo might have been looking -- I don't mean to
18 get off on a tangent here, but since the question
19 was asked, their algorithm may have been set up, but
20 was in quantities of bottles at a certain size that
21 we didn't carry or it was based on pills.
22     I didn't know enough about it, but it just
23 seemed to me that if it was started kicking off all
24 these false positives, something needed to be looked
25 at in it.

Page 266

```
 1   Q.  Is it -- is it possible that these weren't
 2  false positives, and the spikes were -- you've
 3  optimized your suspicious order monitoring process
 4  now, and you're getting a more accurate display of
 5  suspicious orders, orders of interest?
 6       MS. FUMERTON:  Objection; form.
 7   A.  Again, based on the conversation -- I don't
 8  recall exactly who it was -- I would have -- I had
 9  confidence then, I still would have confidence those
10  team members had done a thorough evaluation.  If
11  they were not finding that there was any issues with
12  those orders, I would have confidence in what they
13  were doing.
14   Q.  I'm sorry.  So you mentioned conversations.
15  Did -- who did you have conversations with regarding
16  the Buzzeo -- the results -- suspicious order alerts
17  from the Buzzeo platform?
18       MS. FUMERTON:  Objection; form.
19   A.  This was over a year ago.  I'm guessing.  I
20  think it was Dena.  I don't remember exactly,
21  though.
22   Q.  So Debbie is your replacement.  That's --
23   A.  Yes.
24   Q.  -- what you testified?
25   A.  That's correct.
```

Page 267

```
 1   Q.  And, you know, a critical function of
 2  your -- the role that you -- that Debbie just took
 3  over is the execution of the suspicious order
 4  monitoring process; is that correct?
 5       MS. FUMERTON:  Objection; form.
 6   A.  Yes.
 7   Q.  And the system is set up, as I understand
 8  it, where Buzzeo sits on top, in your words, and
 9  then the suspicious order monitoring process flow is
10  maintained below that; is that correct?
11       MS. FUMERTON:  Objection; form.
12   A.  Just to clarify my comments earlier, that's
13  what I think.  I still don't know enough about
14  Buzzeo.  I know in this -- on this e-mail, it says
15  with the rollout Buzzeo.  If you look at when I left
16  the other job, which is June of 2017, this e-mail is
17  in August.  So Buzzeo was rolled out after I left
18  the role.
19   Q.  A critical function of the suspicious order
20  monitoring process is to identify orders of
21  interest; is that correct?
22       MS. FUMERTON:  Object --
23   A.  Yes.  That was the same question, right, you
24  were asking me?  Or is that a different question,
25  and I'm misunderstanding it?
```

Page 268

```
 1   Q.  A critical function of the suspicious order
 2  monitoring process is to identify orders of
 3  interest; is that correct?
 4       MS. FUMERTON:  Objection; form.
 5   A.  Yes.
 6   Q.  And the suspicious order monitoring
 7  process -- the SOM that's in place August 9th of
 8  2017 is identifying suspicious orders; is that
 9  right?
10       MS. FUMERTON:  Objection; form.
11   A.  I don't think the way you're wording it is
12  correct.  Again, it's --
13   Q.  Well, what's it identifying?
14   A.  Identify orders of interest is what we just
15  talked about.
16   Q.  So Buzzeo and the -- and the SOM,
17  incorporating Buzzeo, is identifying suspicious
18  orders?
19       MS. FUMERTON:  Objection; form.
20   Q.  Orders of interest?
21   A.  Orders of interest --
22   Q.  It's getting late.
23   A.  -- just to be clear.
24   Q.  Orders of interest?
25   A.  Yes.
```

Page 269

```
 1   Q.  And you're pushing back on that algorithm;
 2  is that right?
 3       MS. FUMERTON:  Objection; form.
 4   A.  No, I wouldn't say I'm pushing back.
 5   Q.  Strike that.
 6       You're directing her to push back on it; is
 7  that right?
 8       MS. FUMERTON:  Objection; form.
 9   A.  What I'm telling her, that she does need to
10  have them -- the way I word stuff maybe is not the
11  way you interpret it.  I am telling her that she
12  should have them relook just to make sure the
13  conversions and everything else are correct,
14  because, again, I don't know a lot about it.
15       But I do question, if she's new in the role,
16  that she understood everything with it.  I
17  trained -- I went through and did some training with
18  her, but I'm not sure we went to this level of
19  detail during that time period.
20   Q.  But you don't --
21   A.  Go ahead.
22   Q.  But based on this e-mail, as you sit here
23  today, you didn't think that it was flagging too few
24  orders; is that correct?
25   A.  State the question again.
```

Page 270

1    Q.  Did you think that Buzzeo was flagging too
2  many or too few orders of interest?
3       MS. FUMERTON:  Objection; form.
4    A.  What I noticed was, the week it rolled out,
5  the alerts from Archer became a lot.  And I really
6  felt that if Debbie wasn't involved, she needed to
7  be involved.  And it was a way to prompt her to make
8  sure she was involved.  I can't speak on Debbie's
9  behalf.  I wasn't there.  Maybe she was, and
10  maybe --
11    Q.  Was that --
12    A.  -- she understood it.
13    Q.  Was that your role, to advise Debbie as to
14  how to do her job at that point?
15       MS. FUMERTON:  Objection; form.
16    A.  Probably not my role to advise her how to do
17  it, but I do think -- I would hope that anyone that
18  takes anyone else's role --
19    Q.  Is it a fair statement that you didn't have
20  confidence that the Buzzeo -- that the addition of
21  Buzzeo, the SOM was identifying the correct
22  orders --
23       MS. FUMERTON:  Objection --
24    Q.  -- for further review?
25       MS. FUMERTON:  Objection; form.

Page 271

1    A.  I really didn't know enough about Buzzeo.
2  That's partially part of the e-mail.  I mean, if I
3  probably knew more about Buzzeo, then probably could
4  have answered my own question.  But I really didn't
5  know a lot about it.
6    Q.  Your assumption that the -- there's too many
7  false positives is based on the assumption that the
8  prior suspicious order monitoring process is
9  flagging the right orders; isn't that right?
10       MS. FUMERTON:  Objection; form.
11    A.  I think it was based on more than that.
12    Q.  Well, you're comparing the number of hits by
13  the -- your -- with your experience in your
14  suspicious order monitoring process, with the hits
15  that are being found in the new process; isn't that
16  right?
17    A.  Yes.
18    Q.  Maybe the new process is better.  Is that a
19  possibility?
20       MS. FUMERTON:  Objection; form.
21    A.  It is a possibility, but it's a possibility
22  it could be worse.  And I think both sides need to
23  be thoroughly reviewed and evaluated.
24    Q.  It could be worse meaning there could be
25  more orders that should be flagged?

Page 272

1    A.  No.
2       MS. FUMERTON:  Objection; form.
3    A.  That's not what I meant.
4    Q.  I want to go back to the process and try it
5  one more time.  Again, we're going to go around the
6  horn with another set of questions and then I
7  think --
8       MS. FUMERTON:  (Inaudible.)
9    Q.  The -- when we get to the first level and
10  you determined that -- is it possible to ship part
11  of an order at the first level and hold another part
12  of the order for further review?
13       MS. FUMERTON:  Objection; form.
14    A.  That's a fine distinction on what you mean
15  by order.  Can you define what an order means?
16    Q.  Pharmacy places an order to the home -- to
17  Walmart, right?
18    A.  Yes, they do.  They place an order.
19    Q.  And that order goes through -- at this time,
20  during your tenure in the position, an order of
21  interest for Schedule II opioids is flagged on a --
22  on a threshold basis by Reddwerks; isn't that right?
23    A.  Yes.
24    Q.  That order that has been flagged as an order
25  of interest or identified as an order of interest by

Page 273

1  the Reddwerks system is evaluated at the first level
2  by a distribution center?
3    A.  Yes.
4    Q.  Can a distribution center -- say, for
5  example, it gets an order of 20 -- say we think 10
6  is fine to ship, we're going to hold the other 10
7  back, can they do that?
8    A.  In this process that was rolled out, no.
9    Q.  Yes.
10    A.  The answer is no.
11    Q.  Same question at the second level:  Can the
12  Logistics Team clear a partial order and hold a
13  partial order?
14    A.  Just to make sure I'm stating your question,
15  so of an order of 20, can they say, hey, I'm going
16  to hold 10 back, but I'm going to let you ship 10
17  until I evaluate this other 10?
18    Q.  Yes.
19    A.  No.
20    Q.  Same hypothetical at the third level.
21    A.  The way I understand your question, that
22  would, again, be the same no process during this
23  time period.
24    Q.  You'd either have to hold the -- hold the
25  entire order or ship that entire order?

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    A.   That particular item, yes.
2    Q.   Okay.  Does that hold true at Step 5, where
3  the Logistics and Compliance Teams are evaluating
4  the second and third level reviews?
5    A.   I'm trying to remember about the remediation
6  program.  If an -- could you reask your original
7  question to make sure I'm answering it correctly?
8    Q.   So I'm now -- so we're all at the same
9  place, they've determined the order is suspicious,
10  logistics and compliance.  Let's say there was an
11  order of 20 that made it to that level.
12    A.   Okay.
13    Q.   Could that Logistics/Compliance Team fulfill
14  10 and hold and identify the other 10 as a
15  suspicious order?
16    A.   No.
17    Q.   They'd have to identify the entire order as
18  suspicious or clear the order; is that right?
19    A.   It would have to be identified as suspicious
20  to not -- or clear -- yes.  The remediation plan is
21  I'm trying to remember.  There seems to be something
22  with the remediation plan that I cannot recall right
23  now.
24    Q.   What is a remediation plan?
25    A.   Remediation plan -- and again, this was

Page 275

1  administered by the compliance division.  My
2  understanding was if an order from a pharmacy is
3  identified as suspicious, there was a remediation
4  plan to address that in the pharmacy.  I just can't
5  remember the finer points of it.  I was not very
6  involved in the remediation plans.  That was handled
7  through that department.
8    Q.   Is it fair to say that's outside your
9  purview, and if we wanted to find out information
10  about that, we'd want to talk to someone in the
11  compliance department?
12    A.   For the operations of the remediation plan,
13  yes.
14    Q.   What logistical elements are there to the
15  remediation plan?
16    A.   Well, I see your question.  I'm sorry.  I
17  misanswered that.  There are no logistics components
18  to it.
19    Q.   Okay.  Are you familiar with a cut and ship
20  policy at the distribution center?
21        MS. FUMERTON:  Objection to form.
22    A.   During this time period?
23    Q.   Any time period as it relates to opioids.
24        MS. FUMERTON:  Objection; form.
25    A.   What do you define -- what do you mean by

Page 276

1  cut and ship, to make sure I understand fully?
2    Q.   Are you familiar with a policy whereby if an
3  order came in for a particular opioid that was over
4  20 bottles, that the distribution center could
5  reform that order to 20 and then ship it?
6        MS. FUMERTON:  Objection; form.
7    A.   When I first began the role, I was aware --
8  I did -- I was made aware that that was some
9  previous practices that existed.
10    Q.   And was it your belief that that policy was
11  in alignment with the DEA's policies at the time?
12        MS. FUMERTON:  Objection; form.
13    A.   I know we've already discussed this.  I'm
14  not an attorney.  But anything that we do, we have
15  full confidence that it is what the guidance is of
16  the DEA or whoever else provides that guidance.
17    Q.   And what do you base that confidence on?
18    A.   Just my experience at Walmart.  I mean,
19  I've -- again, I know that we've gone through it
20  20-plus years.  We've gone through 20-plus years
21  where I've seen a relentless focus on complying with
22  the law and resources put into our compliance
23  programs, ethics programs, and everything else.
24    Q.   So your testimony is at every step of the
25  way on this chain during this time period when this

Page 277

1  was implemented, an order was binary.  An order was
2  either shipped or it was held for further review.
3  Is that right?
4        MS. FUMERTON:  Objection; form.
5    A.   An order was either shipped or held for
6  review?  We discussed earlier about absolutes.  Is
7  there an aberration where something happened?  There
8  potentially is.  I can't recall one right now.
9    Q.   Can you recall that aberration?
10    A.   You're asking me to think back through three
11  years of -- if any issue ever came up?
12    Q.   In fact, I'm asking you what the policy was
13  here in each step.
14    A.   From the best of my recollection, yes, what
15  I answered before is what the policy was.
16    Q.   Is your testimony that although this was the
17  policy, someone may have cut and shipped -- cut and
18  shipped a quantity at some point?
19    A.   It possibly could have happened.
20        MS. FUMERTON:  Objection; form.
21    A.   I just can't remember right now if it ever
22  did happen.  Is it possible?  Yes, it's possible,
23  but it would have been a mistake or it would have
24  been something addressed as soon as it was
25  discovered.

Page 278

1 Q. What was the reason for not allowing partial
2 orders to ship?
3 A. Well, what do you mean by that?
4 Q. Well, at some level there is a -- you've
5 described there's a -- at each level here you've
6 described a work flow or a choice, right? It either
7 meets a criteria and can be put back through -- or
8 it doesn't meet that criteria and it goes down --
9 further down the chain.
10 A. Okay.
11 Q. I suppose there's a third option, which
12 could be cut the order to some -- to reform the
13 order to a size that Walmart was comfortable to ship
14 and hold back the rest of the product. Why wasn't
15 that implemented?
16 MS. FUMERTON: Objection; form.
17 A. I wouldn't be able to answer that. I'm not
18 sure. In the meetings I was part of when I joined
19 this role, it was not something we discussed. I
20 mean, the roadmap that you showed me earlier and
21 where the project was going was what the focus was
22 while I was in that role. That topic didn't come
23 up, that I recall, in that context of how you're
24 asking me the question.
25 Q. Are you familiar with any other roadmap than

Page 279

1 the one we're looking at today?
2 Is there -- a better question is: Is there
3 anything on here in terms of the work flow that we
4 haven't covered that you're aware of?
5 MS. FUMERTON: Objection; form.
6 A. Not that I recall, no.
7 MR. INNES: We can go off the record.
8 THE VIDEOGRAPHER: Going off record, the
9 time is 3:26.
10 (Recess from 3:26 p.m. until 3:35 p.m.)
11 THE VIDEOGRAPHER: Going back on record,
12 beginning of Media File 9. The time is 3:35.
13 BY MR. INNES:
14 Q. Okay. Mr. Ducote, we're back. We're going
15 to keep going through the process flowchart one more
16 time. I do not think I have very many questions
17 left, if that helps you at all.
18 The -- at any point on this flow could an
19 evaluation team, either at the first level, second
20 level, third level, or at the joint level, simply
21 deny an order?
22 MS. FUMERTON: Objection; form.
23 A. Let me walk through the steps. The only
24 step would have been at the joint box, from what I
25 recall, and it would have been reported as a

Page 280

1 suspicious order.
2 Q. So at the first, second, and third levels,
3 those folks were not given the discretion to reduce
4 an order to zero; is that correct?
5 A. During this time period, my belief is, no,
6 they were not given -- did I say that right? They
7 did not have the discretion to do that.
8 Q. Any other time period that you're aware of
9 that they did have that discretion?
10 A. Not that --
11 MS. FUMERTON: Objection; form.
12 A. -- not that I'm aware of to do the zero,
13 that I recall.
14 Q. What do you -- what is your definition of a
15 false positive?
16 A. It's a term -- I'm trying to think of a
17 simple definition, not get off on a tangent on that
18 one, but basically something that, after
19 investigation, turns out to be a nonissue. I cannot
20 recall exactly where I first heard that term, but
21 there was something -- I've heard that term before,
22 and that's something I've used.
23 Q. Okay. Let's use -- let's use that
24 definition, after an investigation it turns out to
25 be a nonissue. So a false positive would be

Page 281

1 anything that ships; is that right?
2 MS. FUMERTON: Objection; form.
3 Q. According to your definition?
4 MS. FUMERTON: Objection; form.
5 A. I'm not really sure how to answer that
6 question because I don't -- restate what you said --
7 Q. Sure.
8 A. -- to make sure I fully understand what
9 you're asking.
10 Q. Your definition of a false positive is
11 something that, after investigation, turns out to be
12 a nonissue.
13 My question is if an order is flagged as an
14 order of interest, but ultimately ships, that will
15 be a false positive, according to your definition,
16 would it not?
17 MS. FUMERTON: Objection; form.
18 A. Could be.
19 Q. Who designed the suspicious order monitoring
20 process flow?
21 MS. FUMERTON: Objection; form.
22 A. This process was designed -- going back to
23 that cross-functional team that I talked to you
24 about earlier, it was designed by that group.
25 Q. And help me out. Who was part of that

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  group? Who were the folks in that group?
2  A. Going back to the same thing earlier, that's
3  some of the privilege. There were -- there were --
4  legal that was involved in it, but other
5  co-components.
6  MS. FUMERTON: Yeah. I think you can answer
7  his question to the extent that it's not
8  revealing communications with legal, but you can
9  say that legal was a -- if that's what your
10  testimony is, if legal was a component, you can
11  say legal and the other folks who were involved.
12  THE WITNESS: All right.
13  A. This flow, in general, was designed when I
14  was coming to the role -- the general framework had
15  been designed in what I was -- what I remember being
16  told, it was legal, it was compliance, and legal
17  being internal and external. Logistics did have a
18  part in it. I do recall being told that pharmacy
19  operations -- I don't know what part they had. I
20  just recall being told about pharmacy operations.
21  And there's someone else I'm missing right
22  now. There's someone else. I don't remember who
23  it -- I think it was -- oh, Global Investigations.
24  That's who it was.
25  Q. Carving out the folks from legal for the

Page 283

1  moment --
2  A. Uh-huh.
3  Q. -- who -- do you remember the individuals in
4  each of those categories, compliance, logistics,
5  pharmacy, and global investigations?
6  MS. FUMERTON: Objection; form.
7  A. I'd be speculating. Just because I've
8  worked with those individuals in different time
9  periods, I may be making an assumption that they
10  were part of it, but simply just because I've worked
11  with them for a year or two years.
12  The only one that I know definitively that I
13  remember exactly the name was Greg Beam that was
14  mentioned.
15  Q. And I'm sorry, which of these departments
16  was Mr. Beam?
17  A. Global Investigations. And to the degree he
18  was involved, I mean, again, this is hearsay someone
19  is telling me, or secondhand information. I don't
20  know to what degree he was involved. I just
21  remember the name being discussed.
22  Q. Well, I think we've firmly established that
23  the suspicious order monitoring process -- the
24  suspicious order monitoring in general was a part --
25  a part of your job; is that correct?

Page 284

1  A. Yes.
2  Q. A big part of your job, in fact?
3  MS. FUMERTON: Objection; form.
4  A. It was a -- it was -- yes, it was a part of
5  my job.
6  Q. Did you -- and you continually optimized the
7  program; is that right?
8  MS. FUMERTON: Objection; form.
9  A. Going back to the discussion earlier, yes.
10  Q. And through those efforts to optimize the
11  program, did you have conversations with folks in
12  these different departments that had a hand in
13  designing the original architecture?
14  A. You know, I've been misunderstanding your
15  question about that probably for the past two hours.
16  Finally it's registered on me. When you say about
17  optimize, when I'm talking about optimize, I am
18  discussing the -- more the execution of the program.
19  When you're talking about optimize, I think you're
20  talking more of a strategy behind the program, and I
21  think that's -- it's a miscommunication potentially.
22  Q. Fair point. I don't think we've been
23  talking past each other. I'm talking about
24  optimization from a logistics standpoint of the
25  suspicious order monitoring process. Did you have

Page 285

1  conversations with folks in -- at least stakeholders
2  in the process over the course of your tenure?
3  MS. FUMERTON: Objection; form.
4  A. When you define the logistics portion of it,
5  what specific portions are you talking about?
6  Q. You're in charge of logistics. Explain to
7  me what part of logistics -- what pieces of this
8  lend themselves to logistics and to your expertise.
9  MS. FUMERTON: Objection; form.
10  A. And state the question one more time.
11  Q. Which parts of the suspicious order
12  monitoring process flow fall within the purview of
13  logistics?
14  A. So the first part as far as the Reddwerks
15  system maintaining the overall system, the DC
16  evaluation piece, the order, second level order
17  evaluation, and then a joint of the other one, and
18  again, it's execution of each of those items on
19  there.
20  Q. Execution of each of the items meaning
21  all -- all points on the flow?
22  MS. FUMERTON: Objection; form.
23  A. It means -- let's use the third box, for
24  example. Conducting second level order evaluations,
25  that was a logistics function. Is that the

Page 286

1  question?
2  Q.  So it's your testimony that logistics has a
3  role in the execution of Box 1, correct?
4  A.  Yes.
5  Q.  Same for Box 2?
6  A.  Yes.
7  Q.  Same for Box 3?
8  A.  Yes.
9  Q.  Same for Box 4?
10  A.  Yes.
11  Q.  I'm sorry, 5, Box 5?
12  A.  Well, it's -- I was counting, 1, 2, 3, 4.
13  Okay.
14  MS. FUMERTON:  Could we just --
15  Q.  Box 5 saying determine if order is
16  suspicious, logistics and compliance, correct?
17  A.  Yes.
18  Q.  You did not have a role in third level order
19  evaluation compliance?
20  A.  Yes.
21  Q.  And you had a role in the reporting to the
22  appropriate agencies for -- is that correct?
23  MS. FUMERTON:  Objection; form.
24  A.  We did not report to the agencies.  That was
25  handled by compliance.

Page 287

1  Q.  The actual physical report was handled -- is
2  handled by compliance, correct?
3  A.  Yes.
4  Q.  But you -- your recommendation as to what
5  goes into that report was involved, correct?
6  MS. FUMERTON:  Objection; form.
7  A.  The recommendation to report, yes.
8  Q.  Okay.  So remediation plan, compliance, did
9  logistics play a role in that?
10  A.  The only role that logistics played was if
11  the remediation program had anything to do with
12  changing an order threshold, then potentially, yes,
13  that would impact us, but that -- all that was
14  handled by the compliance department.
15  Q.  Okay.  So by my count, your testimony is
16  that you were involved in -- the Logistics Team was
17  involved in every single box except for third level
18  order evaluation compliance; is that correct?
19  MS. FUMERTON:  Objection; form.
20  A.  I -- I understand what you're saying.  I
21  don't fully agree with what you're saying, because
22  to me, involvement -- does involvement mean
23  decision-making?  Does involvement mean actually
24  doing the work?
25  The pieces that -- maybe ownership is a

Page 288

1  different words.  How -- when you say involvement,
2  define to me what you mean by that, because I want
3  to be clear that if the question is did I own
4  reporting to the agencies, the answer is no.  I feel
5  like I'm not being clear with the answer.
6  Q.  Did you play a role in any -- did logistics
7  play a role in that part of the process?
8  MS. FUMERTON:  Objection; form.
9  A.  The way that that box is written, the answer
10  would be no.
11  Q.  Which box are you referring to?
12  A.  If you're saying specifically to report to
13  appropriate agencies, we did not file the reports to
14  the appropriate agencies.
15  Q.  But the decision to report to those
16  agencies, you were intimately involved; is that
17  correct?
18  MS. FUMERTON:  Objection; form.
19  A.  We were involved in that decision.
20  Q.  Okay.  Which one -- which of these boxes on
21  the process flow did you have control to make a
22  change or -- to make a change?
23  MS. FUMERTON:  Objection; form.
24  A.  And to clarify, a change wasn't just made
25  singularly by a decision that I would make.  It --

Page 289

1  this -- there was a broader work stream that was
2  involved in changes that would be made to this, so
3  just to make sure I'm clear in answering that.  But
4  I could have had some impact on -- could have had
5  impact on the Reddwerks system.
6  Restate your question, because I'm
7  struggling with answering it for the second and
8  first level order evaluation.
9  Q.  Mr. Ducote, I think the question stands.
10  You've begun to answer it, so I take it that you
11  understand my question.
12  A.  I understood it for the first part, when you
13  said -- let me reread it, then.
14  I think the thing I'm struggling with your
15  question, I have control to make.  The control
16  refers to me, is that I can make the change without
17  consulting others.  And that's where I was trying to
18  distinguish in what your question was.  So is
19  control totally I'm the only one that can make that
20  change, or is it a change that others can have input
21  on?
22  Q.  Take it in parts.  Answer the first part,
23  and then answer the second one.
24  A.  Okay.  I would say on here, as far as
25  control that I singularly would have -- would have

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  to just make decisions carte blanche, no. Every
2  decision that's on here would have involved the
3  cross-functional team that I referred to earlier.
4      To a certain degree, maybe they were more
5  input. Maybe their decision piece was just
6  informational. Maybe they were accountable for it.
7  It means different degrees of it, but there could
8  have been a part.
9      Q.  Thank you for that. So it's your testimony
10  that logistics has at least a part or a role to play
11  in each one of these nodes or boxes on this path but
12  for third level order evaluation compliance?
13      MS. FUMERTON: Objection; form.
14      A.  Yes. I -- the remediation one, I'm partial
15  on that one. So I don't think I had input into the
16  remediation plan, per se, but if the remediation
17  plan changed something -- I guess maybe -- that's
18  the one I'm struggling with in answering this
19  question. The confines of the remediation program
20  were determined by the compliance department.
21      Q.  On the last day that you left the job, what
22  improvements needed to be made to the suspicious
23  order monitoring process flow, in your opinion?
24      MS. FUMERTON: Objection; form.
25      A.  In my opinion, I really -- which Buzzeo was

Page 291

1  the decision that was being looked at. I would have
2  wanted to make sure that we did a thorough
3  evaluation of all the different companies out there
4  that offered different products. I'm not sure
5  besides Buzzeo that was looked at, but that would
6  have probably been something that I would suggest to
7  do a pretty thorough review overall of it.
8      Q.  Would it be your desire to do that so that
9  the suspicious order monitoring process would cease
10  to catch false positives?
11      MS. FUMERTON: Objection; form.
12      A.  No, that's not what I stated. Reddwerks --
13  which sounded like earlier where I was familiar with
14  Reddwerks. Reddwerks is a warehouse management
15  system, so Reddwerks is really designed more
16  about -- around supply chain processes. And it does
17  a great job for what we're doing.
18      But could there have been other -- others
19  out there that would have done as well or even
20  better jobs? Buzzeo, again, it was towards the end.
21  I don't know a lot of detail about Buzzeo, but
22  that's something I would have wanted to look at
23  again, because their contract -- Reddwerks' contract
24  comes up for renewal every few years. And before we
25  would automatically carte blanche just renew it, I

Page 292

1  would have wanted to check more. So that would have
2  been one thing I would have wanted to do.
3      Q.  You wanted to check for other vendors? Is
4  that what you mean by check more?
5      A.  Yes.
6      MR. INNES: I have no further questions at
7  the moment. Thank you for your time. I
8  think you have -- it's --
9      MS. FUMERTON: We can just go right now. I
10  mean, this will be five minutes. It won't be
11  that long.
12      MR. INNES: What we did yesterday is we
13  flipped, so you're on camera. It does not matter
14  to me.
15      MS. FUMERTON: I didn't realize that we were
16  on camera.
17      MR. INNES: We are not. I am.
18      MS. FUMERTON: No, well, that's what I
19  meant. I didn't know the questioner was. It's
20  up to you. I'm happy to ask my questions here.
21  I'm happy to flip with you.
22      MR. INNES: It does not matter to me.
23      MS. FUMERTON: I've never been on camera
24  before, actually. Why don't I just stay here.
25  It's going to be five minutes. If we get into a

Page 293

1  longer back and forth, I may be willing to
2  change.
3      THE VIDEOGRAPHER: Are you still on the
4  record?
5      MS. FUMERTON: Yeah, we're still on the
6  record. Sorry. I'm just going to sit here.
7      CROSS-EXAMINATION
8  BY MS. FUMERTON:
9      Q.  Mr. Ducote, can you please take out
10  Exhibit 9 that was shown to you by Mr. Innes
11  earlier. Do you see that document?
12      A.  Yes.
13      Q.  Can you please take a minute to
14  refamiliarize yourself with that?
15      A.  Okay.
16      Q.  And I believe that Mr. Innes had asked you a
17  question earlier today about whether or not or how
18  you could figure out what products were being
19  considered as part of the statistics that are listed
20  here. Do you recall that line of questioning?
21      A.  I do.
22      Q.  Okay. And I just want to point out at the
23  top of the document, it states that: The current
24  state pilot at 6028.
25      Do you see that?

Page 294

1    A.  Yes.
2    Q.  Could that give some information as to what
3  products were being evaluated here?
4    A.  Yes.
5    Q.  And what information does that tell you?
6    A.  That tells me that it was controls, but
7  non-Schedule II drugs.
8    Q.  Okay.  So at the bottom, the line that
9  Mr. Innes was talking about:  Current time
10  commitment, 22 alerts times eight minutes equals
11  three hours per day.
12     Do you see that?
13    A.  Yes.
14    Q.  And I think he was asking you questions
15  about that eight minutes and whether that was the
16  average time it took to clear an order.  Is that
17  correct?
18    A.  Yes.
19    Q.  And so now that we've looked at 6028, what
20  products is that eight minutes referring to?
21    A.  That eight minutes is referring to products
22  that were drugs of interest that were determined by
23  VAWD, such as, like, albuterol or something of that
24  nature and then control drugs that were Schedule III
25  through Vs, things like alprazolam.

Page 295

1    Q.  Okay.  And so in your e-mail, did you write
2  to Mr. Stephenson anything about what the time
3  commitment may be for the Schedule II facility,
4  6045?
5    A.  Yes, I did.
6    Q.  And what did you tell him?
7    A.  I told him the average alert is expected to
8  be higher than 6028 with additional scrutiny of
9  orders, as those are C2 items.
10    Q.  Okay.  And so you listed -- did you tell him
11  anything else about the C2 facility?
12    A.  That it would take five additional hours a
13  day of reviewing those orders, potentially.
14    Q.  Mr. Innes also asked you a question about
15  various reports that you may have asked folks to run
16  or that you may have had available to you.  Do you
17  recall that line of questioning?
18    A.  Yes.
19    Q.  Do you recall ever seeing or asking -- let
20  me break the question up.
21    Do you recall ever receiving a report that
22  addressed specifically Schedule II opioids?
23    MR. INNES:  Objection to the form.
24  A.  No.
25    Q.  Do you recall ever requesting that somebody

Page 296

1  run a report specific to Schedule II opioids?
2    A.  I do not recall.
3    MS. FUMERTON:  I have no further questions.
4    MR. INNES:  Okay.
5    THE VIDEOGRAPHER:  That concludes today's
6  deposition.  Going off the record, the time is
7  3:07.
8    (Whereupon, the deposition concluded at
9  3:07 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 297

1            C E R T I F I C A T E
2    I, SUSAN D. WASILEWSKI, Registered
3  Professional Reporter, Certified Realtime Reporter,
4  Certified Realtime Captioner, do hereby
5  certify that, pursuant to notice, the deposition of
6  CHAD DUCOTE was duly taken on Friday,
7  November 16, 2018, at 8:04 a.m., before me.
8    The said CHAD DUCOTE was duly sworn by me
9  according to law to tell the truth, the whole truth
10  and nothing but the truth and thereupon did testify
11  as set forth in the above transcript of testimony.
12  The testimony was taken down stenographically by me.
13  I do further certify that the above deposition is
14  full, complete, and a true record of all the
15  testimony given by the said witness, and that a
16  review of the transcript was requested.
17
18  _____
19  Susan D. Wasilewski, RPR, CRR, CCP, CMRS, FPR, CCR
20  (The foregoing certification of this transcript does
21  not apply to any reproduction of the same by any
22  means, unless under the direct control and/or
23  supervision of the certifying reporter.)
24
25

Page 298

## INSTRUCTIONS TO WITNESS

1
2
3
4      Please read your deposition over carefully
5  and make any necessary corrections.  You should
6  state the reason in the appropriate space on the
7  errata sheet for any corrections that are made.
8
9      After doing so, please sign the errata sheet
10  and date it.  It will be attached to your
11  deposition.
12
13      It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the deposition
16  transcript by you.  If you fail to do so, the
17  deposition transcript may be deemed to be accurate
18  and may be used in court.
19
20
21
22
23
24
25

Page 300

1          ACKNOWLEDGMENT OF DEPONENT
2
3      I, _____, do hereby
4  acknowledge that I have read the foregoing pages, 1
5  through 300, and that the same is a correct
6  transcription of the answers given by me to the
7  questions therein propounded, except for the
8  corrections or changes in form or substance, if any,
9  noted in the attached Errata Sheet.
10
11
12  _____     _____
13  CHAD DUCOTE                          DATE
14
15
16
17
18  Subscribed and sworn to before me this
19  _____ day of _____, 20____.
20  My Commission expires: _____
21
22  _____
23  Notary Public
24
25

Page 299

1              - - - - - -
2              E R R A T A
3              - - - - - -
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6    REASON: _____
7  ____  ____  _____
8    REASON: _____
9  ____  ____  _____
10   REASON: _____
11  ____  ____  _____
12   REASON: _____
13  ____  ____  _____
14   REASON: _____
15  ____  ____  _____
16   REASON: _____
17  ____  ____  _____
18   REASON: _____
19  ____  ____  _____
20   REASON: _____
21  ____  ____  _____
22   REASON: _____
23  ____  ____  _____
24   REASON: _____
25

Page 301

1
2          LAWYER'S NOTES
3  PAGE  LINE
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____