```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3   IN RE:  NATIONAL      :  MDL No. 2804

     PRESCRIPTION OPIATE   :

 4   LITIGATION            :  Case No. 17-md-2804

                           :

 5   APPLIES TO ALL CASES  :  Hon. Dan A. Polster

                           :

 6                         :

 7

 8              HIGHLY CONFIDENTIAL

 9      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                   - - - -

12              JANUARY 22, 2019

13                   - - - -

14      VIDEOTAPED DEPOSITION OF WALTER WAYNE DURR,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Tuesday,

20   January 22, 2019, commencing at 8:57 a.m.

21                   - - - -

22           GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

23              deps@golkow.com

24

25
```

Page 2

```
 1          A P P E A R A N C E S
 2  On behalf of Plaintiffs
 3      WAGSTAFF & CARTMELL, LLP
        BY:  TYLER HUDSON, ESQUIRE
 4      4740 Grand Avenue, Suite 300
        Kansas City, Missouri  64112
 5      816.701.1100
        thudson@wcllp.com
 6
 7  On behalf of Defendant AmerisourceBergen Drug
    Corporation
 8
        (By Phone/Livestream)
 9      JACKSON KELLY, LLP
        BY:  ANDREW N. SCHOCK, ESQUIRE
10      50 South Main Street, Suite 201
        Akron, Ohio  44308
11      330.252.9078
        anschock@jacksonkelly.com
12
13  On behalf of Defendant Cardinal Health, Inc.
14      PIETRAGALLO GORDON ALFANO BOSICK &
        RASPANTI, LLP
15      BY:  JENNIFER BOURIAT, ESQUIRE
        One Oxford Centre, 38th Floor
16      301 Grant Street
        Pittsburgh, Pennsylvania  15219
17      412.263.2000
        jhb@pietragallo.com
18
19  On behalf of Defendants Endo Pharmaceuticals, Endo
    Health Solutions and Par Pharmaceuticals
20
        (By Phone/Livestream)
21      ARNOLD & PORTER KAYE SCHOLER LLP
        BY:  ERICA GUTHRIE, ESQUIRE
22      601 Massachusetts Avenue, NW
        Washington, DC  20001-37453
23      202.942.5743
        erica.guthrie@arnoldporter.com
24
25
```

Page 3

```
 1      A P P E A R A N C E S (Continued)
 2  On behalf of Defendant HBC Service Company
 3      MARCUS & SHAPIRA, LLP
        BY:  ROBERT M. BARNES, ESQUIRE
 4      One Oxford Centre, 35th Floor
        Pittsburgh, Pennsylvania  15219
 5      412.471.3300
        rbarnes@marcus-shapira.com
 6
 7  On behalf of Defendant McKesson Corporation
 8      COVINGTON & BURLING, LLP
        BY:  MEGHAN MONAGHAN, ESQUIRE
 9      One CityCenter
        850 Tenth Street, NW
10      Washington, DC  20001-4956
        202.662.5807
11      mmonaghan@cov.com
         (By Phone/Livestream)
12      COVINGTON & BURLING, LLP
        BY:  MICHAEL J. LANOSA, ESQUIRE
13      1999 Avenue of the Stars
        Los Angeles, CA 90067-4643
14      424.332.4780
        mlanosa@cov.com
15
16
17  On behalf of Defendant Walmart
18      (By phone/Livestream)
        JONES DAY
19      BY:  RICHARD M. BRODSKY, ESQUIRE
        150 West Jefferson Avenue, Suite 2100
20      Detroit, Michigan  48226
        313.230.7699
21      rbrodsky@jonesday.com
22  Also present
23      Tyler Crotty, legal videographer
24
25
```

Page 4

```
 1               * I N D E X *
 2  WALTER WAYNE DURR            PAGE
 3    EXAMINATION BY MR. HUDSON    7, 176, 207
      EXAMINATION BY MR. BARNES    119, 206
 4
 5     * INDEX OF HBC-DURR EXHIBITS *
 6  NO.      DESCRIPTION        PAGE
 7  Exhibit 1  Email, 7/20/09, from J. Hurley    19
               to W. Durr, et al., subject: RE
 8             Pharmacy controllable substance
               location
 9             HBC_MDL00128697
10  Exhibit 2  Email chain, 10/27/09, from A.    21
               Zelaski to W. Durr, subject: FW:
11             Reporting
               HBC_MDL00128698
12  Exhibit 3  HBC Service Company's Responses   36
               to Plaintiffs' (First Set of
13             Combined Discovery Responses
               P-HBC-0011 - 0011.20
14
    Exhibit 4  Giant Eagle Inventory Control -   36
15             Suspicious Order Policies with
               various effective dates
16             HBC_MDL00078638 - 00078639
               HBC_MDL00078636 - 00078637
17             HBC_MDL00045916 - 00078918
               HBC_MDL00051908
18             HBC_MDL00043414
               HBC_MDL00010092 - 00010093
19
    Exhibit 5  Email, 4/9/15, from S. Green to D.  42
20             Stevens, et al., subject: All
               policies for VAWD reflected as of
21             5:00pm today, attaching various
               policies
22             HBC_MDL00078594 - 00078668
23  Exhibit 6  Email, 4/10/15, from G. Carlson    42
               to M. Doerr, subject: FW: HBC
24             VAWD Application and Documents,
               Part 2, attaching various policies
25             HBC_MDL00f33670 - 00133748
```

Page 5

```
 1     * INDEX OF HBC-DURR EXHIBITS *
 2  NO.        DESCRIPTION       PAGE
    Exhibit 7  Meeting invitation for 8/17/15    56
 3             from D. Bertucci to C. Forde,
               et al., subject: VAWD Physical
 4             Inspection Preparation, attaching
               NABP VAWD Survey Process Guide
 5             HBC_MDL00076207 - 00076218
 6  Exhibit 8  Email chain, 9/2/15, from E. Hart  56
               to R. McClune, subject: RE Vault/
 7             Refrigeration
               HBC_MDL00127457 - 00127460
 8
    Exhibit 9  Email, 8/28/15, from J. Millward to  79
 9             E. Hart, et al., subject: 30-010 -
               Inventory Control - Suspicious Order
10             Policy FINAL.docx, attaching 30-010 -
               Inventory Control - Suspicious Order
11             Policy FINAL.docx
               HBC_MDL00169475 - 00169477
12
    Exhibit 10  DEA Drug Fact Sheet for           115
13              Hydrocodone
                P-GEN-0086.1 - 0086.2
14
    Exhibit 11  2009 - 2014 cumulative totals of  116
15              hydrocodone dosage units shipped
                to Cuyahoga and Summit Counties, Ohio
16              and Ohio state
                P-HBC-0017
17
18           - - - -
19
20
21
22
23
24
25
```

Page 6

1           P R O C E E D I N G S
2                - - - -
3       THE VIDEOGRAPHER:  We are now on the
4   record.  My name is Tyler Crotty.  I'm a
5   videographer for Golkow Litigation Services.
6     Today's date is Tuesday, January 22, 2019,
7   and the time is 8:57 a.m.
8     This video deposition is being held at
9   Marcus & Shapira, LLP, One Oxford Centre,
10  Pittsburgh, PA, in the matter of National
11  Prescription Opiate Litigation MDL, for the Court
12  of the Northern District of Ohio.
13    The deponent is Walter Durr.
14    Will counsel please identify themselves and
15  state whom they represent.
16      MR. HUDSON:  Ty Hudson of Wagstaff &
17  Cartmell for plaintiffs.
18      MS. MONAGHAN:  Meghan Monaghan from
19  Covington & Burling for McKesson.
20      MS. BOURIAT:  Jennifer Bouriat from
21  Pietragallo for Cardinal.
22      MR. BARNES:  Robert Barnes, Marcus &
23  Shapira, for HBC Service Company.
24      THE VIDEOGRAPHER:  Is there any counsel
25  on the phone that could identify themselves,

Page 7

1   please?
2       MR. BRODSKY:  This is Richard Brodsky
3   from Jones Day on behalf of Walmart.
4       MS. GUTHRIE:  This is Erica Guthrie from
5   Arnold & Porter on behalf of the Endo and Par
6   defendants.
7       MR. LANOSA:  This is Mike Lanosa from
8   Covington & Burling on behalf of McKesson
9   Corporation.
10      THE VIDEOGRAPHER:  The court reporter is
11  Ann Medis and she will now swear in the witness.
12          WALTER WAYNE DURR,
13    having been first duly sworn, was examined
14          and testified as follows:
15            EXAMINATION
16  BY MR. HUDSON:
17    Q.  Good morning, sir.  Could you please
18  state your name.
19    A.  Walter Wayne Durr, D-U-R-R.
20    Q.  And, Mr. Durr, my name is Ty Hudson.  I
21  represent the plaintiffs in this case.  I'm going
22  to be taking your deposition today.
23    Have you had your deposition taken before?
24    A.  Yes.
25    Q.  How many times?

Page 8

1    A.  Just once.
2    Q.  In what type of case was it?
3    A.  An insurance case.
4    Q.  And were you a party or just a witness?
5    A.  Witness.
6    Q.  Was it related to your job at Giant
7   Eagle --
8    A.  Yes.
9    Q.  -- or HBC?
10    A.  Giant Eagle.
11    Q.  And when was that case and how recent?
12    A.  It was in the late '80s, I believe.
13    Q.  Well, it sounds like it's been a little
14  while since you've had your deposition taken.  So
15  let's make sure that we understand the ground
16  rules.
17    I'm going to be asking the questions today,
18  and then you're going to be providing answers.
19  From time to time counsel might object for the
20  record.  Unless Mr. Barnes instructs you not to
21  answer, though, I would ask that after the
22  objections you'd answer my questions.
23    Is that fair?
24    A.  Okay.
25    Q.  Also, do you understand that you're

Page 9

1   under oath as if you were in a courtroom in front
2   of a judge and a jury?
3    A.  I do.
4    Q.  And the answers need to be audible just
5   for the court reporter.  So head nods and those
6   things like that are more difficult to pick up.
7   Okay?
8    A.  Okay.
9    Q.  If you need to take a break at any time,
10  let me know, and I'm happy to.  We'll just go off
11  the record, and you can do so.
12    All I would ask is that if there's a pending
13  question, you answer the question before we go on
14  the break.
15    Is that fair?
16    A.  That is.
17    Q.  Before we get going into the substance,
18  let me ask you this:  What did you do to prepare
19  for the deposition today?
20    A.  Had time with Bob yesterday.
21    Q.  And approximately how long would you say
22  that meeting lasted?
23    A.  A few hours.
24    Q.  Anything else that you did to prepare
25  for the deposition?

Page 10

1    A.   No.
2    Q.   Did you talk to anyone?
3    A.   No.
4    Q.   Would that be true about this case in
5 general?  Have you talked to anyone at Giant Eagle
6 about this case?
7        MR. BARNES:  I'll just --
8 BY MR. HUDSON:
9    Q.   Other than lawyers.
10       MR. BARNES:  -- caution you.  Anything
11 related to attorneys for Giant Eagle or for you,
12 excluding that.
13       THE WITNESS:  No.
14 BY MR. HUDSON:
15   Q.   When did you first become aware of this
16 lawsuit?
17   A.   I don't have the exact date.  Sometime
18 in 2018.
19   Q.   And I meant to ask you this before.
20 What is your current address?  Where do you live?
21   A.   111 Dehaven Road, Beaver Falls, PA
22 15010.
23   Q.   So you live in Pennsylvania?
24   A.   Yes.
25   Q.   Tell me, if you could, about your

Page 11

1 education.
2    A.   I have a bachelor's degree from a local
3 university, Point Park University.
4    Q.   And when you say local, local to where,
5 sir?
6    A.   Local to Pittsburgh.  Sorry.
7    Q.   I'm from Kansas City.
8    A.   All right.
9    Q.   No.  That's okay.
10 So from here in Pittsburgh.
11   A.   Yes, sir.
12   Q.   And any other advanced degrees after you
13 graduated from college?
14   A.   No.
15   Q.   Did you go straight to work after
16 college, graduating from college?
17   A.   I was working while I was going to
18 college.
19   Q.   Could you just describe for me your
20 employment history from when you graduated from
21 college up until today?
22   A.   I worked for a company called Foxmeyer
23 Drug Corporation, who then went bankrupt, and then
24 Giant Eagle took over those operations in 1996.
25 And I've been with Giant Eagle since that time.

Page 12

1        MR. BARNES:  Ty, I think you may be
2 assuming the traditional "went to college and then
3 began working."  I think it's a little different
4 here.
5 BY MR. HUDSON:
6    Q.   Do you want to just explain that?
7    A.   Out of high school, I went to the -- was
8 in the service.  Spent close to seven years in the
9 service and then got out.  And then went to
10 college, had a family and kids.  And so I was
11 working, going to college, and went from there.
12   Q.   And so you've been at Giant Eagle for
13 close to 30 years?
14   A.   No.
15   Q.   Or 20 years, I mean; right?
16   A.   Yeah.
17   Q.   You had 1996 to 2008, so about 22 years;
18 right?
19   A.   Yes.
20   Q.   And, if you could, just walk me through
21 the roles that you've had at Giant Eagle from 1996
22 to the present.
23   A.   Started out as a selector, rank and
24 file, if you will.  Opportunity -- that was prior
25 to Giant Eagle.

Page 13

1 So I came into Giant Eagle as a supervisor.
2 And within less than a year, I was promoted to a
3 shift manager.  I then took a role as the HR
4 manager.  And then I had an opportunity to become
5 the operations manager.
6    Q.   And is that your current role today?
7    A.   It is.  And there's a time that I had
8 left HBC to fill a different role within Giant
9 Eagle at another facility.
10   Q.   And what was that timeframe?
11   A.   Well, there's two of them.  2003 I was
12 the HR manager for Okay Grocery.
13   Q.   How long did you remain in that role at
14 Okay Grocery?
15   A.   Approximately ten months to a year.  And
16 then that's when I assumed the operations manager
17 role.
18 And then I was asked to go to Fresh Food
19 Manufacturing in 2012.  And I was there until
20 2015.
21   Q.   And then when you came back in 2015, you
22 went back to the operations manager role?
23   A.   For HBC, yes.
24   Q.   For HBC.  And have all of the positions
25 that you've been at when you've been the shift

Page 14

1 manager, the HR manager, and then the operations
2 manager, were those all at the HBC warehouse?
3     A.   No.  As I stated, I started HR at HBC,
4 but then was HR for Okay Grocery Company, which is
5 a subsidiary of Giant Eagle.  And then I was
6 operations manager for Fresh Foods Manufacturing.
7     Q.   Right.  And I'm sorry.  That was a bad
8 question.
9     I meant to -- I meant other than the two
10 times when you left -- I was really more focused
11 on during the time that you were at Giant Eagle or
12 HBC.  During that time period, was it -- were you
13 always located, physically located at the HBC
14 warehouse?
15     A.   Yes.
16     Q.   And were you an employee of HBC or an
17 employee of Giant Eagle, if you know?
18     A.   Technically, it's Giant Eagle.  But HBC
19 is a subsidiary of Giant Eagle.
20     Q.   Did HBC have any employees that you're
21 aware of?  And maybe the legal distinctions don't
22 mean anything to you.  I'm just trying to figure
23 out --
24     A.   Yeah.
25     Q.   -- if there's --

Page 15

1     A.   The distinctions don't mean anything.
2     Q.   Right.  I mean, I don't know if you've
3 ever looked at payroll --
4     A.   No.
5     Q.   -- or W-2s or things --
6     A.   Ours come from Giant Eagle.
7     Q.   So to your knowledge, are there any --
8 yeah -- are there any employees that are on
9 payroll that are receiving payment from HBC
10 Service Company?
11     A.   No.
12     Q.   To your knowledge, all of the employees
13 at the HBC warehouse would all be employees of
14 Giant Eagle?
15     A.   Yes.
16     Q.   So if you could, let's focus first on
17 your shift manager role at the HBC warehouse.  I
18 think you indicated you came into that role around
19 1997.  How long did you stay in that role?
20     A.   Shift manager, up till 2000 and -- 2000.
21     Q.   2000.  And then how about -- and then at
22 that point you became the HR manager?
23     A.   Correct.
24     Q.   And how long did you stay in that role?
25     A.   Till the end of 2003.  And that's

Page 16

1 inclusive of the Okay Grocery piece.
2     Q.   So you were the HR manager at the HBC
3 warehouse from 2000 until some point in 2003.  And
4 then around that time you were shifted over to
5 Okay Grocery, and then were the HR manager there
6 for, I think you said, about ten months?
7     A.   Yes.
8     Q.   So then we're up to roughly 2004
9 timeframe?
10     A.   Yes.
11     Q.   And then at that point you became the
12 operations manager at the HBC warehouse?
13     A.   Yes.
14     Q.   And how long did you remain in that
15 role?
16     A.   I remained in that role at HBC until
17 2012.  And then I assumed responsibilities as the
18 operations manager for Fresh Foods Manufacturing,
19 Freedom Road, and then returned to HBC in that
20 capacity in 2015.
21     Q.   And from 2012 to 2015, who assumed the
22 role of operations manager at the HBC warehouse?
23     A.   There were two persons who assumed that
24 role.  First was Annmarie Dougherty and Matt
25 Rogos.

Page 17

1     Q.   And do you know how long Ms. Dougherty
2 remained in that role?
3     A.   I believe she was right around a year.
4     Q.   And then Mr. Rogos would have been a
5 couple years from '13 to '15, in that timeframe?
6     A.   Yes.
7     Q.   During the time that you were at Fresh
8 Foods Manufacturing, did you maintain any contact
9 with Mr. Rogos or Ms. Dougherty about what was
10 going on at the HBC warehouse?
11     A.   I did have contact primarily with
12 Mr. Rogos for our Get Go distribution.
13     Q.   What is Get Go?
14     A.   Those are convenience stores owned and
15 operated by Giant Eagle.  And we were and are
16 still doing selection, a portion of the selection
17 at HBC and a portion at Fresh Foods.
18     So I did have to have contact with Matt on a
19 regular basis to discuss Get Go.
20     Q.   So in your role at Fresh Foods, a
21 portion of that involved interacting with the HBC
22 warehouse regarding, you know, for lack of a
23 better word, supply or product that was coming
24 from the warehouse to Fresh Foods?
25     A.   For Get Go.

Page 18

1    Q.   Right.  For Get Go.  Got it.
2    Any other connection between yourself and
3  Mr. Rogos regarding the HBC warehouse?  And,
4  again, just during that timeframe in 2013 to 2015.
5    A.   Nothing specific, that I can recall.
6    Q.   For example, are you aware that one of
7  the things that HBC warehouse worked on was
8  getting VAWD certification in 2015?
9    A.   I'm aware of that.
10   Q.   Did you have any direct role in that
11 process prior to, I think it was, May of 2015
12 maybe when you came back to --
13   A.   Not prior to that, no.
14   Q.   Would it have been Mr. Rogos that would
15 have handled that process up through the time
16 where he was the operations manager?
17   A.   Yes.
18   Q.   If you could, I want to focus in on the
19 timeframe in 2009.  At some point in 2009, did the
20 HBC Service Company obtain a DEA license to become
21 a distributor of controlled substances?
22   A.   Yes.
23   Q.   And at some point did the HBC Service
24 warehouse begin acting as a distributor of
25 Schedule III, IV, and V controlled substances?

Page 19

1    A.   Yes.
2    Q.   Was that in or around November of 2009?
3    A.   Yes.
4    Q.   If you could, describe for me your role
5  in the process of HBC Service Company becoming a
6  distributor of controlled substances.
7    A.   My role was working with the
8  pharmaceutical group led by Greg Carlson and
9  assisting to obtain the registration and to set up
10 the facility operationally.
11   Q.   Anything more specific you recall about
12 that process of obtaining a DEA license for
13 controlled substances?
14   A.   No.
15   Q.   I've got a couple documents I want to
16 show you from that 2009 timeframe.
17       MR. HUDSON:  Let me mark the first one
18 as Exhibit 1.  It's got an internal number of
19 1178.
20       (HBC-Durr Exhibit 1 was marked.)
21 BY MR. HUDSON:
22   Q.   I hand you that.
23   So this, what I've marked as Exhibit 1, is an
24 email from Joseph Hurley to you and Andy Zelaski
25 and Greg Carlson, dated July 20, 2009.  And the

Page 20

1  subject is Pharmacy Controllable Substance
2  Location.
3    Was that an email sent to you back in July of
4  2009?
5    A.   Yes.
6    Q.   And was this during the timeframe when
7  you, Mr. Carlson and others were getting prepared
8  for HBC to become a distributor of controlled
9  substances?
10   A.   Yes.
11   Q.   And if you could, just tell me who was
12 Joseph Hurley.
13   A.   Joseph Hurley, at that time, I believe
14 he was the vice president of distribution.  He's
15 currently our senior vice president of
16 distribution and logistics.
17   Q.   How about Andy Zelaski?
18   A.   Andy Zelaski was a manager who reported
19 to me and was the manager that I put in charge of
20 the pharmacy area.
21   Q.   And then I think we know who Mr. Carlson
22 is.
23   How about the -- it looks like there's three
24 individuals who were copied.  If you could, just
25 tell me who those three individuals are.

Page 21

1    A.   I believe Sue Carenbauer was on our
2  supply chain group.  Larry Baldauf was the vice
3  president.  Joe reported to Larry Baldauf at the
4  time.  And Randy Heiser, I believe he was a
5  systems guy.
6    Q.   Let me hand you another email that I'm
7  marking as Exhibit 2.
8        MR. HUDSON:  And this one has got an
9  internal number of 1137.
10       (HBC-Durr Exhibit 2 was marked.)
11 BY MR. HUDSON:
12   Q.   This is another email.  The first one,
13 Exhibit 1, was in July.  And the second exhibit is
14 from October of 2009.  And that's from Andy
15 Zelaski to you.  It looks like he's forwarding to
16 you an email relating to reporting requirements.
17   A.   Yes.
18   Q.   And would this be an example of another
19 email involving communications between yourself
20 and your team preparing the HBC facility to become
21 a distributor of controlled substances?
22   A.   Yes.
23   Q.   Here in Exhibit 2, the bottom email,
24 it's from Mr. Carlson to Mr. Zelaski.  And two
25 other individuals are copied there.  If you could,

Page 22

1 tell me who those two individuals are.
2     A.  I don't recall who Mr. Meshanski is.
3 Dan Beiter was one of the -- either the category
4 manager or buyer reporting to Greg Carlson.
5     Q.  And Mr. Carlson wrote to Mr. Zelaski,
6 "Andy, for the DEA reporting requirements, I think
7 the only thing you will need to worry about is the
8 annual inventory that's required to take place on
9 December 31.
10     "I think you will be doing regular cycle
11 counts anyway, so it probably won't be a big deal.
12 I'm thinking that you cycle count everything on
13 that day and verify on-hands in the system.  If
14 they are right on, we can just send the DEA our
15 on-hand inventory that day."
16     And then it looks like down below Mr. Carlson
17 has copied a section on general reporting
18 requirements.
19     Do you see that?
20     A.  I see it.
21     Q.  Did the HBC Service facility have
22 certain reporting requirements relating to
23 inventory of controlled substances?
24        MR. BARNES:  Object to form.
25        THE WITNESS:  Could you restate that.

Page 23

1 BY MR. HUDSON:
2     Q.  Sure.  Once HBC became -- and if I refer
3 to the HBC Service Company as HBC, will you know
4 what I'm talking about?
5     A.  Yes.
6     Q.  So once HBC became a distributor of
7 controlled substances, did the facility or HBC
8 have certain obligations to report annual
9 inventories to the DEA?
10        MR. BARNES:  Object to form.
11     But you can answer.
12        THE WITNESS:  Yes.
13 BY MR. HUDSON:
14     Q.  And is that sometimes referred to as
15 ARCOS data?
16     A.  I can't say that specifically.
17     Q.  In this particular email that got
18 forwarded to you, do you see there that there's a
19 reference to ARCOS?
20     A.  I do see that.
21     Q.  And do you know what that acronym stands
22 for?
23     A.  I can't spell it, but I know it's a
24 database of sorts for...
25     Q.  When HBC became a distributor of

Page 24

1 controlled substances, what was your understanding
2 of the inventory reporting requirements?
3        MR. BARNES:  Do you mean to DEA
4 specifically or to somebody else?
5        MR. HUDSON:  To the DEA specifically.
6        THE WITNESS:  My understanding from
7 recollection was there was an annual report due to
8 the DEA.  And then we monitored and maintained
9 inventory and communicated to Greg Carlson what
10 those inventories would have been.
11 BY MR. HUDSON:
12     Q.  And so then on an annual basis, did you
13 provide inventory counts to the DEA regarding the
14 controlled substances that were being shipped
15 through the HBC facility?
16     A.  I would say yes.
17     Q.  Did you attempt to ensure that the
18 numbers being reported by HBC to the DEA were
19 accurate?
20     A.  Yes.
21     Q.  Do you have any reason to believe that
22 the inventory numbers that were submitted by HBC
23 to the DEA were inaccurate at any time?
24     A.  I do not.
25     Q.  So if we went to the ARCOS -- the DEA's

Page 25

1 ARCOS data, do you believe that that would be an
2 accurate count of the inventory that flowed
3 through the HBC warehouse from 2009 to 2014?
4        MR. BARNES:  Object to form.  I think
5 you're asking him to speculate about what the DEA
6 does with the numbers that are sent in.  I don't
7 think he has any basis to --
8        THE WITNESS:  I do not.
9        MR. BARNES:  Or cannot.
10 BY MR. HUDSON:
11     Q.  You do agree that HBC has the obligation
12 to report the numbers to the DEA; right?
13     A.  Yes.  And I believe we met that
14 obligation and reported numbers.
15     Q.  So if we went and looked at the numbers
16 that HBC reported to the DEA, do you believe that
17 those would be an accurate count of the inventory
18 that flowed through the HBC warehouse between --
19 controlled substances -- between 2009 and 2016?
20        MR. BARNES:  Are you asking him to
21 assume that the DEA just took their numbers and
22 put them on some other sheet?
23     Because once it goes to the DEA, I don't
24 think he has foundational knowledge to testify
25 what the DEA does with it.

Page 26

BY MR. HUDSON:

Q. Do you understand my question?

A. I do. And I would say the -- I have faith in the numbers that we reported. I can't answer as to what the DEA did with those numbers once they received them or how they formatted them.

Q. Well, what's your understanding of how the process works once the DEA receives the numbers?

MR. BARNES: If you know.

THE WITNESS: I don't know that.

BY MR. HUDSON:

Q. Do you have any reason, as you sit here today, to believe that the DEA would change the numbers that are reported by HBC?

A. I can't answer that one way or the other.

Q. So my question is just focused on the numbers that HBC reported to the DEA.

Those reports, if we went and looked at the physical report that HBC submitted to the DEA, do you believe that those would be an accurate indication of the inventory that was flowing through HBC, the inventory of controlled

Page 27

substances that was flowing through HBC from 2009 to 2016?

MR. BARNES: Object to form.

Go ahead.

THE WITNESS: On an HBC report going to the DEA, I would agree on the accuracy.

BY MR. HUDSON:

Q. From a policies and procedures perspective, who would be responsible for making sure that the HBC warehouse was meeting all the requirements of the Controlled Substances Act once HBC became a distributor of controlled substances in 2009?

A. It would have been a joint responsibility between the facility itself and Greg Carlson's group.

Q. And what responsibilities would lie with the facility?

A. The operational responsibilities of setup, selection and shipping.

Q. And what responsibilities would fall in Greg Carlson's group?

A. His group was primarily around the actual registration, purchasing from the vendors, and scheduling delivery into HBC.

Page 28

Q. So if we assume Giant Eagle is on, I guess, what I think of as the buy side, so they're buying controlled substances from certain manufacturers; right?

A. Okay.

Q. And that would be the part that Mr. Carlson and his group would be focused on, would be the purchasing and then the shipping into the HBC warehouse?

A. Yes.

Q. And then the second piece of that would obviously be then the inventory and the handling at the warehouse and then the shipping out from the warehouse to the Giant Eagle retail pharmacies; right?

A. Yes.

Q. And so am I understanding you right that the piece of handling the inventory at the facility and then shipping to the retail pharmacies, those responsibilities would lie more on the facility?

A. Yes.

Q. How about steps taken to make sure that the facility was complying with the requirements of the Controlled Substances Act; who would be

Page 29

responsible for that particular piece?

MR. BARNES: Objection. Asked and answered already. He already said it was a joint responsibility.

BY MR. HUDSON:

Q. You can answer.

A. It was a joint responsibility.

Q. So my question now, because your last answer, I think it would be fair to say, and correct me if I'm wrong, but you were focused more on operationally the flow of the product and who was responsible for it coming in and out of the facility.

I guess what I'm more focused on is the policies and procedures that would be focused on complying with the Controlled Substances Act.

Would you say that that would be -- your answer would be the same, that for purchases of the product coming into the facility, that would be Mr. Carlson's group, but then what happens at the facility and then the shipping to the retail pharmacies would be the responsibility of the facility itself?

A. I would still say --

MR. BARNES: I'm going to object to

Page 30

1  form. That's kind of a really long question.
2      Do you understand the question?
3          THE WITNESS: I believe so, but if you
4  could break it down.
5  BY MR. HUDSON:
6      Q. Sure. Well, you've testified -- and
7  your counsel made the point that it was asked and
8  answered, so you've already apparently answered
9  this, so I was trying to recap what your previous
10 answer was.
11     Is your answer the same from a compliance
12 standpoint?
13     A. Yes. There was joint responsibility.
14     Q. And those joint responsibilities, would
15 they -- would they lie and fall the same way that
16 they would in terms of operationally who was
17 responsible for the product?
18     A. I would say yes, it was.
19     Q. So once the controlled substances, the
20 Schedule III, IV, and V controlled substances were
21 shipped into the facility and they were physically
22 located at the facility, it would be your
23 testimony that the facility, yourself and
24 the people underneath you, were responsible for
25 coming up with policies and procedures at the

Page 31

1  facility to comply with the Controlled Substances
2  Act?
3          MR. BARNES: Object to form.
4          THE WITNESS: I'll say no. We would
5  have a hand in devising or working with Greg and
6  his group on making sure or ensuring that we were
7  following the proper process and procedures.
8  BY MR. HUDSON:
9      Q. Well, that's what I'm trying to
10 understand. You've testified that from a
11 compliance perspective, it was a joint effort
12 between the facility and Mr. Carlson's group.
13     And I guess what I'm trying to figure out is
14 within that joint responsibility, were there
15 certain responsibilities that fell on the facility
16 versus Mr. Carlson's group?
17     How do I figure out who was responsible for
18 what?
19     A. Yes. So an example would be cameras and
20 the loss prevention piece that fell to Andy
21 Zelaski and myself, primarily Andy, and working in
22 connection with the DEA on what are either best
23 practices or what was regulatory and needed.
24     Again, that was just an example.
25     Q. Sure. And if you could, just walk

Page 32

1  through what you believed to be the obligations
2  that arose in 2009 when that facility became a
3  distributor of controlled substances.
4      And just, if you could, describe what you
5  recall about the steps taken by your team or
6  Mr. Carlson's team to put policies, procedures or
7  things in place to comply with the Controlled
8  Substances Act.
9      A. So we had -- we knew to bring in
10 controlled substances, we had to have a specific
11 area. And it had to meet DEA requirements of the
12 gauge of steel in the wire for the cage, whether
13 there was a roof on it or not, or ceiling I guess
14 I should say. It had to be bolted down to the
15 floor. We had to ensure that the seams were
16 tack-welded and not just bolted.
17     And our Sonitrol system, we had to work with
18 our loss prevention to set that up, ensuring that
19 background checks were covered, drug and alcohol
20 screens were covered.
21     Those are all the things that -- again,
22 working jointly with Greg Carlson and the DEA to
23 get that information to know what direction we
24 should go to properly set up this facility.
25     Q. Did you personally have any

Page 33

1  communications or discussions with the DEA at this
2  time in 2009 when the facility was being set up?
3      A. I would have.
4      Q. And who did you speak with at the DEA?
5      A. I don't fully remember his last name.
6  His first name was Lou. I think it started with a
7  C. It's been quite a few years since.
8      Q. Sure. No, I understand. And I'm just
9  trying to get your best testimony on the record.
10     How many times would you say you spoke to
11 Lou C at the DEA or of the DEA?
12     A. I would say leading up to opening or
13 starting the operation, maybe two times, maybe
14 three. I can't speak for how many times he may
15 have spoke with anyone in corporate.
16     Q. Were those discussions focused on the
17 security requirements, making sure that the
18 facility was meeting the DEA security
19 requirements?
20     A. Yes.
21     Q. Do you know if you reached out to him or
22 if he reached out to you?
23     A. I can't. I don't remember.
24     Q. Anything else you can think of that the
25 HBC warehouse did as part of its process of

Page 34

1  becoming a distributor of controlled substances?
2      A.  Not top of mind, no.
3      Q.  Is it fair to say that the measures or
4  the steps or the plan that you implemented for the
5  warehouse were focused on the security
6  requirements of the Controlled Substances Act?
7      A.  It was one of our focuses.
8      Q.  Well, so far you've talked about
9  security cameras being installed; right?
10     A.  Yes.
11     Q.  And then you talked about creating a
12 specific area in the warehouse for controlled
13 substances that was enclosed with steel and bolted
14 down to make sure that it was a secured area;
15 right?
16     A.  Yes.
17     Q.  And then you talked about background
18 checks for employees who would be dealing with the
19 controlled substances; right?
20     A.  Yes.
21     Q.  So can we agree that all of those were
22 steps taken to address either security or theft
23 controls -- I'm sorry -- security or theft
24 concerns?
25     A.  Yes.

Page 35

1      Q.  Anything else you can think of -- I just
2  want to make sure that I've exhausted this
3  topic -- that either your group or Mr. Carlson's
4  group did to prepare the warehouse to become a
5  distributor of controlled substances?
6      A.  One is, as stated in one of the
7  exhibits, was just inventory controls.
8      Q.  And tell me what steps HBC did to
9  address inventory controls.
10     A.  Well, we implemented a more robust
11 counting system than we had out in, I'll say, the
12 general HBC warehouse.
13     Example, and I don't know that I'll get the
14 numbers exactly right, but for the narcotics cage
15 as we refer to it, we would count that prior to
16 anybody selecting every day.  We would count it
17 after -- as the team members were leaving to go to
18 break, the selectors.
19     We would count it before each route left.
20 And then that was for the pick slots.  And then we
21 would count the reserves once a month unless we
22 saw any discrepancies in our pick location.
23     Q.  So the inventory controls that were put
24 in place involved more rigorous and more regular
25 counting of the inventory to make sure that the

Page 36

1  inventory that was supposed to be there was, in
2  fact, there?
3      A.  Yes.
4      Q.  Anything else that you can think of in
5  terms of controls or steps taken at the HBC
6  warehouse to become a distributor of controlled
7  substances?
8      A.  As we talked, our security, we had a fob
9  system around the entire building.  Like we had a
10 specific fob system, Sonitrol system.
11     We regulated who had access to the room
12 itself.  And then we had even more limited access
13 to the narcotics cage itself along with locks, and
14 the cage itself had its own sensors and alarm
15 system specific to the cage.
16     Q.  Anything else you can think of?
17     A.  Not at this time.
18     Q.  I'm going to switch gears a little bit
19 and hand you what I've marked as Exhibits 3 and 4.
20     (HBC-Durr Exhibits 3 - 4 were marked.)
21 BY MR. HUDSON:
22     Q.  Mr. Durr, I'll represent to you that
23 Exhibit 3 is some responses to questions that the
24 plaintiffs asked HBC.
25     And I'm going to turn to page 8 of these

Page 37

1  questions.  And question No. 2 asks, "Please
2  produce each of your suspicious order monitoring
3  system policies and procedures since January 1 of
4  2006, and identify the Bates range for each."
5      And then if you turn to the ninth page, to
6  the next page of this document, about halfway down
7  the page you'll see some dashes with Bates numbers
8  that are HBC's response to this question, where
9  they've provided some documents that they've
10 identified as being policies and procedures
11 related to suspicious order monitoring.
12     Do you see those?  They're sometimes referred
13 to as Bates numbers, but it's the HBC_MDL00078638.
14 Do you see that?
15     A.  I do.
16     Q.  And you'll see there there's five dashes
17 there on that page.
18     And so then if we look to Exhibit 4, which is
19 the other document that I've provided you, I will
20 represent to you what I've tried to do is go and
21 gather the documents that the company identified
22 by Bates numbers and then put those together into
23 one document.
24     So if you look at Exhibit 3 and you look at
25 those Bates numbers, which is an identifying

Page 38

1  number for that document, you'll see on Exhibit 4
2  that that's the first Bates number of those.
3      And then if you go back through that sequence
4  of documents, you'll see that those are the
5  policies or procedures that HBC has identified.
6      A.  Okay.
7      Q.  And can we agree, if you look to
8  Exhibit 4, the first document, in Exhibit 4 do you
9  see that the policies -- as you move back in that,
10  on the pages of Exhibit 4 -- that the policies are
11  later, dated later in time?
12      So the first one is in 2014 or 2015, and then
13  it moves back to 2016 and then into 2017?
14      A.  I do see that.
15      Q.  Are you familiar with those policies
16  that are marked as Exhibit 4?
17      A.  I am.
18      Q.  And if you could, which of those
19  policies did you have a role in creating?
20      A.  I don't believe I had a role in
21  creating.
22      Q.  When HBC -- let me ask it this way.
23      In early 2016, HBC stopped acting as a
24  distributor of controlled substances; correct?
25      A.  Yes.

Page 39

1      Q.  And at that time Giant Eagle opened a
2  new distribution facility; right?
3      A.  Correct.
4      Q.  At that time did you stay as the
5  operations manager of the HBC facility?
6      A.  I did.
7      Q.  So after February of 2016, for the new
8  Giant Eagle distribution facility, would there be
9  somebody else in the Giant Eagle organization that
10  was responsible for that facility?
11      A.  I was responsible for that facility, the
12  new facility, up till about the end of June going
13  into July.  I had a dual role.
14      Q.  June or July of 2016?
15      A.  Yes.
16      Q.  So from February through June or July of
17  2016, you were responsible for both the HBC
18  facility and the Giant Eagle facility?
19      A.  The GERXDC facility, yes.
20      Q.  GERXDC facility.  Okay.
21      So if we could then turn to the -- it's in
22  the top right, I guess.  One way to describe it
23  would just be 12.4 is the internal number there.
24      A.  Okay.
25      MR. HUDSON:  And then if we could zoom

Page 40

1  in.
2  BY MR. HUDSON:
3      Q.  Do you see the revised date for this
4  particular policy was February 26, 2016?
5      A.  I do.
6      Q.  And is this an inventory control policy
7  for suspicious order monitoring that was
8  implemented for the new GERXDC facility?
9      A.  It appears to be.
10      Q.  Have you reviewed this policy
11  previously?  In other words, were you familiar
12  with it before today?
13      A.  I would say I would have reviewed it at
14  some point.
15      Q.  But this policy, this February 2016
16  policy, were you involved in any way in creating
17  the policy?
18      A.  I can't say categorically that I was.
19  Our primary at that time would have been the
20  GERXDC team.  And George Chunderlik would have had
21  the lead role in helping to develop policies.
22      Q.  Would you have been advised at all on
23  the policies?
24      A.  I would say yes.
25      Q.  Did this indicate that as of February 26

Page 41

1  of 2016, this particular policy that we're looking
2  at went into effect?
3      A.  I can't say that it necessarily went
4  into effect.
5      Q.  And why could you not say that?
6      A.  This was something we were doing to try
7  to acquire VAWD certification for, the GERXDC
8  facility.
9      Q.  Was this policy something that
10  operationally was in effect at either the HBC
11  facility or the GERX facility?
12      A.  I can't answer that with any certainty.
13      Q.  Let's step back then to the first page
14  of this document, which is the prior version of
15  this.
16      Do you see there this version of this policy
17  has a revised date of 4/9/2015?
18      A.  I see that.
19      Q.  And is this another policy that was
20  created around the time that HBC was trying to
21  obtain VAWD certification?
22      A.  I don't want to speculate.  Matt Rogos
23  was the author, and Matt would be the one to
24  answer exactly what he was authoring here.
25      Q.  Let me hand you then what I've marked as

Page 42

1 Exhibit 5.
2 I'm going to mark another one and hand that
3 to you as well.
4 MR. HUDSON: So these are Exhibits 5 and
5 6. In Exhibit 5, the internal number is 5003.
6 And in Exhibit 6, the internal number is 1184.
7 (HBC-Durr Exhibits 5 - 6 were marked.)
8 BY MR. HUDSON:
9 Q. Now, these two documents are from April
10 of 2015, Mr. Durr. At that point in time, were
11 you still located at Fresh Foods?
12 A. I was.
13 Q. And so I think you indicated at this
14 point in time, Mr. Rogos was involved with these
15 policies and is identified as the policy owner on
16 what we've marked as Exhibit 4; correct?
17 A. Mr. Rogos was the facility manager at
18 that time of HBC.
19 Q. Now, if you look at Exhibits 5 and 6, do
20 you see there the cover emails indicate that HBC
21 was taking steps to try to obtain VAWD
22 certification?
23 A. I can see that.
24 Q. Is that something -- and am I correct,
25 in May of 2015, you came back to the HBC facility

Page 43

1 and became the operations manager?
2 A. It was more around the June timeframe.
3 Q. So May, June of 2015?
4 A. Correct.
5 Q. So a little less than two months after
6 these emails that are marked as Exhibit 5 and 6
7 were created?
8 A. Yes.
9 Q. When you came back to become the
10 operations manager of the HBC warehouse, do you
11 know whether or not that warehouse had obtained
12 VAWD certification or not?
13 A. It had not.
14 Q. Do you know whether or not the warehouse
15 had applied to obtain VAWD certification?
16 A. I was aware that it had.
17 Q. And if you take a look at Exhibits 5 and
18 6, do these indicate that certain policies and
19 procedures were either created or revised as part
20 of the effort to try to obtain VAWD certification?
21 A. I was reading through it. It appears
22 to.
23 Q. And if you look at Exhibit 6 and the
24 bottom email on the cover -- the cover email from
25 Mr. Rogos down there at the bottom, do you see

Page 44

1 he's sending that email to somebody at NABP or a
2 couple people at NABP?
3 A. I see that.
4 Q. And then one of the email addresses is
5 vawd@nabp.net; right?
6 A. Yes.
7 Q. And does that indicate to you that
8 Mr. Rogos was sending this email and the
9 attachments to VAWD?
10 A. That's the way it reads.
11 Q. And then if you go up to the top email
12 from Mr. Carlson to Mr. Doerr --
13 A. Doerr.
14 Q. Doerr?
15 A. Doerr.
16 Q. Thank you. Sorry.
17 The last -- do you see there there's
18 attachments? So you've got From, Sent to, Subject
19 and then Attachments.
20 A. I do.
21 Q. And then the very last attachment is
22 VAWD PP Assessment_Final.
23 Do you see that?
24 A. I do.
25 Q. So if we turn back to the start of that

Page 45

1 document, which I believe is on Bates ending 732.
2 And so there's -- you've got the Bates numbers on
3 the bottom right-hand corner.
4 A. Thank you.
5 Q. If you would, just take a look. It
6 looks like this is about a 17-page document. And
7 my question for you is just going to be if you've
8 ever seen this document before.
9 A. I have.
10 Q. And when did you see the document?
11 A. Upon my return -- I can't give you an
12 exact date -- to HBC. The VAWD certification as I
13 came in was -- I was made to understand was still
14 something we were looking to pursue.
15 Q. So since you've seen this document, my
16 focus is on the first page towards the bottom. Do
17 you see there the -- the topic heading General
18 Comments?
19 A. Yes.
20 Q. And then underneath that, it says,
21 "Reviewer Comments: The policies and procedures
22 submitted by the applicant lack detail and often
23 do not reference the requirements. VAWD requires
24 that the criteria, as noted in the assessment, be
25 incorporated in the documentation and with

Page 46

1 sufficient definition that would demonstrate that
2 the requirements are part of operational
3 activities."
4    Do you see that?
5    A.  I do see it.
6    Q.  Do you understand what that means?
7    A.  Yes.
8    Q.  What is the reviewer indicating there in
9 the general comments?
10    A.  I can't speak for the reviewer.  I can
11 only speak for my understanding of reading that
12 paragraph.
13    Q.  Sure.  And what is your understanding
14 from reading that paragraph?
15    A.  There were specific requirements that
16 VAWD -- to obtain VAWD certification, and you had
17 to stay within those rigid confines.  And if you
18 didn't either incorporate and/or show that you
19 were going to have a policy or procedure that met
20 the criteria, then you would not get
21 certification.
22    Q.  And this was feedback that was provided
23 by VAWD prior to the submission that occurred on
24 April 9 and April 10 of 2015; right?
25    Because it was obviously attached to the

Page 47

1 email --
2    A.  Yes.
3    Q.  -- at that time.
4    Did HBC take steps to create or revise
5 policies or procedures based on the feedback from
6 VAWD?
7    A.  I can't answer for what Matt Rogos would
8 have done or didn't do or did do at that time in
9 this particular application.
10    Q.  But at some point in June of 2015 or
11 later, when you came back to the HBC warehouse,
12 you became personally involved in this process as
13 well; right?
14    A.  I did.
15    Q.  And as part of your role in this process
16 of obtaining VAWD certification, one of the things
17 you've testified to is that you looked at this
18 policy and procedure assessment that was provided
19 to HBC; right?
20    A.  What I'd say is, to clarify, I was
21 familiar with this form.  I would have to go back
22 in my memory exactly what was presented to me upon
23 my return as to whether that was still something
24 that was outstanding or not.
25    Q.  Did you look at the policies and

Page 48

1 procedures that were in existence at the HBC
2 facility at the time that you assumed -- came back
3 into your role as operations manager in June of
4 2016 -- excuse me -- June of 2015?
5    A.  Yes.  I was working directly with George
6 Chunderlik in an attempt to gain the VAWD
7 certification.
8    Q.  So let's, if we could, if we go back to
9 Exhibit 5 and I think -- Exhibits 5 and 6, the
10 policies are probably exactly the same.
11    But if we just go through the policies and we
12 start at Bates ending 629, that's the security
13 policy; right?
14    A.  Yes.
15    Q.  And that one shows it was created on 8/1
16 and became effective on 8/1, right, of 2014?
17    A.  I see an effective date and a created
18 date of 8/1, yes.
19    Q.  And then you see the revised date and
20 the last reviewed date of 4/9/2015?
21    A.  I see that.
22    Q.  So if you go to the next policy, which
23 is Bates ending 633, that's the inventory control
24 suspected loss policy; right?
25    A.  Yes.

Page 49

1    Q.  And that's got the same effective date,
2 the same created date, the same revision date and
3 the same last reviewed date; correct?
4    A.  Correct.
5    Q.  If we go to the next one, that's
6 Bates 636, that's the damaged and return product
7 policy?
8    A.  Yes.
9    Q.  And if we go up to the table again and
10 take a look at that, again, it's got an effective
11 date of 8/1/14, a created date of 8/1/14 and then
12 a revised date and a last reviewed date of
13 4/9/2015; right?
14    A.  Yes.
15    Q.  If we go to the next one, that's the
16 inventory control suspicious order policy.  That's
17 Bates 638.
18    A.  Yes.
19    Q.  Again, same dates; right?
20    A.  Yes.
21    Q.  If we go to the next one, that's the HBC
22 recall policy.  Again, same dates; right?
23    A.  Yes.
24    Q.  If we go to the next one, which is Bates
25 ending 642, this is customer authentication.  This

Page 50

1 one actually was created the same day, and then
2 revised on the same day; right?
3    So this looks like -- customer authentication
4 looks like a completely new policy created on
5 April 9, 2015; right?
6    A.  Yes.
7    Q.  If we go to the next one, which is
8 Bates 644, for vendor customer authentication,
9 this one is slightly different.  It's created a
10 month later on 9/1/2014, and then was revised a
11 day earlier on 4/8/15; right?
12    A.  Yes.
13    Q.  If we go to the next one, which is 647,
14 on recall, we're back to the same effective date
15 and created date of 8/1/14 and then the revision
16 date and last reviewed date both being 4/9/15;
17 right?
18    A.  Yes.
19    Q.  The next one is the quarantine product
20 procedure.
21    A.  Yes.
22    Q.  And that's back to the same dates;
23 right?  Effective and created date of 8/1/14 and
24 then revision date and last reviewed date of
25 4/9/15; correct?

Page 51

1    A.  That's correct.
2    Q.  The next one is Bates 653.  And it's the
3 temperature and humidity control policy.  And,
4 again, we've got the same dates there.
5    A.  Yes.
6    Q.  The next one is the Bates 656, which is
7 the product authentication outbound policy.  And,
8 again, we've got the same dates there.
9    A.  Yes.
10    Q.  The next one is Bates 658, which is
11 product authentication inbound policy.  And we've
12 got the same dates there; correct?
13    A.  Yes.
14    Q.  The next one is Bates 662, and that's
15 the HBC pharmacy personnel policy.
16    It's got the same effective date and created
17 date of 8/1/14, but it looks like that one was
18 revised on November 25, 2014.
19    A.  Yes.
20    Q.  And then the last two are Bates end --
21 well, the next one is Bates end 665, which is the
22 HBC pharmacy personnel training policy.
23    And, again, we're back to effective date of
24 8/1/14, created date 8/1/14 and then revision date
25 of 4/9/2015 and last reviewed date of 4/9/2015;

Page 52

1 correct?
2    A.  Yes.
3    Q.  And then the last one is the common
4 carrier policy.  And, again, it's got the same
5 dates; right?
6    A.  Yes.
7    Q.  So we've got about 14 or 15 policies
8 here.  And it looks like 12 of them had an
9 effective date and a created date of 8/1/2014 and
10 then a revision date and a last reviewed date of
11 4/9/2015; correct?
12    A.  Correct.
13    Q.  Does that indicate that HBC created 12
14 different policies on August 1, 2014 and then made
15 them effective on August 1, 2014?
16    A.  No.  It doesn't indicate that.  It
17 indicates that they were memorialized on those
18 dates.
19    Q.  It does say, though, created date is
20 8/1/2014; correct?
21    A.  It does say that.
22    Q.  And it says the effective date is also
23 8/1/14.
24    A.  Yes.
25    Q.  And then for the revision date, it's got

Page 53

1 4/9/2015.  What's your understanding of the
2 revision date?
3    A.  It just states there was a revision
4 done.  You'd have to ask Matt Rogos or the author
5 of it.
6    Q.  For a number of these -- and we can flip
7 back through them and look at them.  But I think
8 most of them, actually, the revision date is
9 4/9/2015, but the revision or the -- the version
10 or revision number remains 1.  Do you know why
11 that is?
12    A.  I cannot answer that.
13    Q.  Does that make sense to you?
14    A.  I can't answer the context in which Matt
15 was preparing these documents.  So I can't speak
16 for Matt.
17    And whether it makes sense or not, I don't
18 know what he was doing with it at that time.
19    Q.  When you came back to become the
20 operations manager in June of 2015, were you the
21 most senior person at the HBC facility?
22    A.  Yes.
23    Q.  Were you responsible for implementing
24 any policies and procedures at the facility?
25    A.  I would have been responsible, yes.

Page 54

1    Q.   Were each of these policies that we've
2  gone through, were those in effect as of April 9,
3  2015 at the HBC facility?
4    A.   I would say some of these policies and
5  procedures were in effect from the beginning.
6    Q.   But I guess -- I guess let me move
7  forward then into -- in June of 2015, when you
8  come back and become the operations manager at the
9  HBC facility, is it your understanding that each
10  one of these policies that we just walked through
11  was in force and effect at the HBC facility?
12    A.   I can't say with certainty as to which
13  ones were and were not.  Again, what was happening
14  here was us attempting to get VAWD certification
15  in the format that was given to us to document and
16  attempt to get that certification.
17    Q.   So VAWD has a certain format and certain
18  policies and procedures it expects to see in order
19  to obtain certification?
20    A.   They have an application and I would
21  call it guidelines in filling out the application.
22    Again, I can't speak to why Mr. Rogos put the
23  headers on or how he arrived at those headers or
24  who he was working with at that time to develop
25  those headers that you see on these documents.

Page 55

1    Q.   Sure.  But what we've looked at in
2  Exhibits 5 and 6, these policies and procedures,
3  it's your understanding that certain of these
4  policies and procedures were created for the
5  purpose of trying to meet the VAWD requirements
6  and obtain VAWD certification.
7    A.   I wouldn't say create.  Memorialize to
8  get that certification.
9    Q.   And my question, though, is:  In June of
10  2015 then, were each one of the policies and
11  procedures that we've talked about in effect
12  operationally at the HBC facility?
13    A.   I can't say that with certainty.
14    Q.   If you walk through each one of the
15  policies, would you be able to identify ones that
16  were in force and effect versus others that were
17  not?
18    Or is it just one of those things where
19  operationally, it's not possible to really say
20  which ones were in effect and which ones were not?
21    A.   Some you could, but I don't want to
22  misspeak that with certainty one wasn't in effect
23  at that time.
24    There were some that are, I would say, more
25  easily identifiable to say yes, that those were

Page 56

1  definitely in effect and were some of our standard
2  operating procedures and more easily identified.
3    Q.   And then for others, you wouldn't be
4  able to say one way or the other whether they were
5  in effect and being followed or not?
6    A.   Not with certainty.
7    Q.   Let me then ask you about the VAWD
8  process.
9    I'm going to hand you a couple of documents
10  here that I've marked as Exhibits 7 and 8.
11    (HBC-Durr Exhibits 7 - 8 were marked.)
12    MR. HUDSON:  This is Exhibit 7.  That is
13  Exhibit 8.
14    And Exhibit 7, the internal number is 1252,
15  and Exhibit 8 is 1249.
16  BY MR. HUDSON:
17    Q.   These are a couple of emails that we
18  found from August and September of 2015.  And I
19  believe you're on both of these emails, one or
20  more of the emails in Exhibit 7 and 8.
21    My first question is going to be:  Are these
22  a couple of emails that related to HBC's attempts
23  to obtain VAWD certification?
24    A.   They appear to be.
25    Q.   And at least at this point in time, in

Page 57

1  August and September of 2015, you're involved in
2  this process; correct?
3    A.   Yes.
4    Q.   And if we look to Exhibit 7, it looks
5  like the facility is taking steps to get prepared
6  for a physical inspection.
7    A.   That's the way it appears, yes.
8    Q.   And if we look to the second email, it
9  looks like there's an email to Dominic Bertucci.
10    Do you know who that is?
11    A.   Been a while, but I remember Dominic
12  vaguely.
13    Q.   Who was that?
14    A.   I can't a hundred percent say what his
15  role was at that time.
16    Q.   Do you know if he was working with --
17  was he an employee of Giant Eagle or HBC?
18    A.   Not HBC.  He would have been with Giant
19  Eagle.
20    Q.   And was he working with Mr. Chunderlik
21  and yourself and others to try to obtain the VAWD
22  certification?
23    A.   Yes.
24    Q.   And then here it looks like somebody
25  from IMS Health -- are you familiar with

Page 58

1 IMS Health?
2    A. Not with my -- I don't recall that.
3    Q. If you look to the end of the email,
4 that looks like it's written by somebody named
5 Tina Posey. From her email signature, it says
6 she's a senior FDA regulatory consultant.
7    Do you know if she worked for a company that
8 provided consulting services relating to obtaining
9 VAWD certification?
10    A. I can't say that with certainty.
11    Q. Are these here steps that Tina and
12 others are recommending the facility take to
13 prepare for the physical inspection?
14    A. We're looking at this 76208 on the
15 bottom. I'm not on this particular email that I
16 see, so I can't answer other than to read what is
17 on here.
18    Q. If we go back to the cover email then,
19 at the top it looks like Dominic has sent an email
20 that's a meeting notification to you and others.
21 You're listed as one of the required attendees.
22    Do you see that?
23    A. I do.
24    Q. And it looks like he's setting up a
25 meeting for August 17, 2015. Do you have any

Page 59

1 recollection of that meeting?
2    A. Nothing specific.
3    Q. If we turn to Exhibit 8, this is an
4 email chain that's -- Mr. McClune's email there at
5 the bottom is in late August 2015. Do you see
6 that?
7    A. I do.
8    Q. And he's sending an email to you and
9 others about getting -- taking steps to be
10 prepared for the VAWD inspection; right?
11    A. All right. I see that.
12    Q. And what was Mr. McClune's role at this
13 time in August of 2015?
14    A. It states there he was a senior category
15 manager for the pharmacy group.
16    Q. And what does senior category manager
17 mean?
18    A. I don't know all his responsibility. It
19 would primarily be in the purchasing.
20    Q. Was he taking steps or overseeing the
21 process of getting ready for this VAWD inspection?
22    A. I can't answer that a hundred percent.
23    Q. Here in this email to you, you're part
24 of the team that he's writing to here on
25 August 27, 2015; correct?

Page 60

1    A. Yes.
2    Q. And underneath that, you see that he's
3 got some solid bullet points.
4    It looks like there's six of those, and then
5 it looks like there's some clear bullet points
6 that are, I guess, what I would call sub-bullet
7 points underneath each one of those solid bullet
8 points.
9    A. Yes.
10    Q. And so the first bullet point he has
11 here, solid bullet point, says, "Suspicious order
12 monitoring."
13    Do you know what that meant?
14    A. I'd say, in general, I know what
15 suspicious order monitoring means, but that was
16 not directed towards me. I would have to ask you
17 to talk to Mr. Millward, McClune, as they're the
18 sub-bullet points on that.
19    Q. And that was going to be my question.
20 It looked to me like for suspicious order
21 monitoring in August of 2015, when Mr. McClune was
22 talking about taking steps to get ready for this
23 inspection, his notes for suspicious order
24 monitoring are focused to Mr. Millward or himself;
25 correct?

Page 61

1    A. That's what it appears, yes.
2    Q. And Mr. McClune -- the first clear
3 bullet which is written to Mr. Millward, said,
4 "Work on figuring out what we have in place
5 through our supply chain so we can better
6 understand our gaps."
7    Do you have any knowledge of what HBC or
8 Giant Eagle had in place through its supply chain
9 for suspicious order monitoring?
10    A. As it relates to this, I do not. I
11 would ask -- Mr. Millward would have to answer
12 them.
13    Q. Were there steps taken by Mr. Millward
14 or others that were at the Giant Eagle corporate
15 offices to address suspicious order monitoring?
16    A. I can't answer for Mr. Millward or
17 others.
18    Q. Between 2009 and 2016, are you aware of
19 any efforts taken at Giant Eagle corporate to
20 monitor suspicious orders of controlled
21 substances?
22    A. I can't answer that for the corporate
23 group.
24    Q. And I guess that's what I'm trying to
25 understand though.

Page 62

1    So you were physically located at the
2 warehouse in Washington, Pennsylvania; correct?
3    A.  Yes.
4    Q.  And then Mr. Millward and the compliance
5 group was located at Giant Eagle's corporate
6 offices here in the Pittsburgh area; right?
7    A.  Yes.
8    Q.  And how many miles apart are those?
9    A.  I don't know.  Figure 30 --
10    Q.  Okay.
11    A.  If that.  25.  I don't know.
12    Q.  But there wasn't anyone in the
13 compliance group that was located at the warehouse
14 in Washington, Pennsylvania; correct?
15    A.  Physically located, no.  They have and
16 have always had systems and visibility through the
17 systems.
18    Q.  Okay.
19    A.  And at any time, any one of them could
20 come to the facility.
21    Q.  And that's what I'm getting at.  My
22 question is:  Between 2009 and 2016, are you aware
23 of any initiatives by the Giant Eagle corporate
24 office using its systems to monitor suspicious
25 orders of controlled substances?

Page 63

1    A.  I'm not aware of any from the corporate.
2 That doesn't mean there weren't any.  I'm just not
3 aware of them.
4    Q.  Would it be fair to say then that
5 between 2009 and 2016, there was no coordination
6 between yourself and the Giant Eagle corporate
7 office in terms of using Giant Eagle systems to
8 monitor suspicious orders of controlled
9 substances?
10    A.  That would not be fair.  We -- "we"
11 being my team, Andy Zelaski and Christy Hart --
12 had daily communications with the corporate team
13 via phone and/or through our systems monitoring
14 inventory and communicating inbound/outbound
15 shipments.
16    So we believe we had a system in place.
17    Q.  Yourself, Mr. Zelaski and Erin Hart?
18    A.  Christy Hart.
19    Q.  I'm sorry.  Christy Hart.
20    Was there anyone else at the HBC facility who
21 was involved in communicating with the compliance
22 group?
23    A.  Those were the primaries.  On a day off
24 we had a backup for Christy.  It was typically
25 Dominique McFann.  But Christy and Andy were the

Page 64

1 primaries.
2    Q.  And when did these communications begin?
3    A.  From the moment we opened operations.
4    Q.  From the moment that you began acting as
5 a distributor of controlled substances?
6    A.  Yes.
7    Q.  So from November of 2009 until the
8 present?
9    A.  I would say probably even before that,
10 as you've seen, as we were setting up to go into
11 distribution.
12    Q.  And I guess what I'm focused on is
13 suspicious order monitoring of controlled
14 substances shipments that were going in and out of
15 the warehouse.
16    Is that your understanding of suspicious
17 order monitoring?
18    A.  Yes.
19    Q.  We've looked at -- if we go back to
20 Exhibits 5 and 6 -- well, actually, and Exhibit 4
21 as well, can we agree that HBC did not have any
22 written policies or procedures in effect at least
23 prior to August 1, 2014?
24    A.  No.  We can't agree on that.
25    Q.  Are you aware of written policies or

Page 65

1 procedures that existed prior to August 1, 2014
2 relating to monitoring of suspicious orders of
3 controlled substances?
4    A.  I would say we had a system in place as
5 it related to suspicious order monitoring.
6    Q.  Okay.  And my question though is more
7 specific.  And we'll get there, and I'll ask you
8 more questions about what that program or system
9 looked like.
10    I guess what I'm focused on right now are
11 just written policies or procedures.  Okay?
12    A.  I believe we had those policies.  Where
13 they are or what happened to them through time, I
14 can't answer that.
15    Q.  You believe that the HBC warehouse had
16 suspicious order monitoring policies or procedures
17 that existed prior to August 1, 2014?
18    A.  I can't say that we had a policy
19 specifically as you're stating it, but I believe
20 we had a system in place and processes and
21 procedures.
22    Q.  Did you have those in writing?
23    A.  I would say that we did, but I don't
24 have them.
25    Q.  When were those policies or procedures

Page 66

1  put into writing?
2      A.  I would say in 2009, as we were working
3  to set up the facility.
4      Q.  So I asked you previously questions
5  about all the steps that HBC took to prepare the
6  warehouse to become a distributor of controlled
7  substances.
8      Do you remember that?
9      A.  I do.
10     Q.  And I asked you, I think, three or four
11 times because I wanted to try, as best I could, to
12 get an exhaustive list.
13     You talked about securities and cameras.  You
14 talked about the fob that had limited access.  You
15 talked about controlling the specific area with a
16 cage of steel that's bolted down.  You talked
17 about background checks.  And you talked about
18 inventory controls that were put in place to make
19 the counting more robust and more regular at the
20 facility, specifically for controlled substances.
21     Do you remember that testimony?
22     A.  I do.
23     Q.  And at that time, when I asked you those
24 questions, you didn't identify suspicious order
25 monitoring of controlled substances as one of the

Page 67

1  things that the HBC facility did to prepare
2  itself; correct?
3          MR. BARNES:  Object to form.  I don't
4  think you asked him that question.
5  BY MR. HUDSON:
6      Q.  Correct?
7      A.  Yes.  You didn't ask that.  And I
8  believe I said something to the effect of I didn't
9  have anything else at that time.
10     Q.  So now, as you sit here today, do you
11 believe that suspicious order monitoring was one
12 of the requirements of the Controlled Substances
13 Act that you attempted to take steps to meet when
14 HBC became a distributor of controlled substances?
15     A.  I believe one of the requirements we --
16 the requirement we believe we had was to have a
17 system in place for suspicious order monitoring.
18     Q.  And that's something that you personally
19 were involved in and aware of in 2009?
20     A.  I would have had I would say some
21 involvement.  Again, at that time, my direct
22 report, Andy Zelaski, would have been the primary
23 on putting those policies and procedures together
24 with us.
25     Q.  And did HBC put policies in place in

Page 68

1  2009 for the HBC facility, written policies?
2          MR. BARNES:  Objection.  Asked and
3  answered several times now.
4  BY MR. HUDSON:
5      Q.  I want to make sure.  I want to give you
6  a chance.  I got to get an exhaustive chance.  So
7  I asked you before, and we didn't mention
8  suspicious order monitoring and now we have.
9      So I want to know, for suspicious order
10 monitoring, what exactly was done in 2009 in terms
11 of putting policies or procedures in writing into
12 effect at the facility?
13     A.  I cannot answer exactly what we had in
14 writing from my memory on that in 2009.
15     As typical for our facility, we write
16 policies and procedures for the work that's going
17 to be conducted in each of the areas.  The system
18 that we had in place was our inventory monitoring
19 and communication with our corporate team on all
20 inbound and outbound.
21     Q.  So I heard a couple of things there.  I
22 want to focus on the first one.
23     It's my understanding that what you're saying
24 is that HBC's practice would be to memorialize in
25 writing the steps it's going to take and put in

Page 69

1  place actually written policies and procedures?
2      A.  Yes.
3      Q.  Was it the practice of HBC to then
4  maintain copies of those written policies and
5  procedures and distribute them to the employees
6  that are in the facility that those policies
7  relate to?
8      A.  That is typical.
9      Q.  And would those be distributed by email
10 or handed out physically?  Or how would that work?
11     A.  It could go either way.  2009, I don't
12 know if we were as robust with email across all of
13 our team members.  So there may have been a hard
14 copy.
15     Q.  But as you sit here today, you believe
16 that there were suspicious order policies in place
17 prior to August 1 of 2014?
18     A.  I believe there were.  I don't know that
19 we specifically headed them as suspicious order
20 monitoring policies.  I can't answer that as we
21 sit here today.
22     Q.  If we go back to Exhibit 4, that's an
23 example of a written policy that related to the
24 HBC facility; correct?  The first page of
25 Exhibit 4?

Page 70

1    A.   Yes.
2    Q.   And this is actually the second version
3  of this policy; right?
4    A.   That's what it states on there.
5    Q.   And so this date has an effective date
6  and a created date of August 1, 2014; right?
7    A.   It does.
8    Q.   And so by looking at this written
9  policy, we can figure out that it was created on
10  August 1, 2014; right?
11    A.   That's what it states.
12    Q.   And then we can tell from this that it
13  was revised on April 9, 2015; correct?
14    A.   Again, that's what it states.
15    Q.   But it's your testimony that you believe
16  that there may have been written policies or
17  procedures that existed at the HBC warehouse that
18  were created prior to August 1, 2014?
19        MR. BARNES:  Object to form.  Asked and
20  answered.
21    He said there were suspicious order policies
22  prior to 8/1/14.
23        THE WITNESS:  Yes.
24  BY MR. HUDSON:
25    Q.   And they were specifically focused on

Page 71

1  monitoring of suspicious orders?
2    A.   Again, I can't answer that that was the
3  heading under it, but we did have systems in
4  place.
5    Q.   Right.  And you've said a couple of
6  times you had systems in place.
7    What I'm trying to figure out is:  Did you
8  follow HBC's practice of putting those into
9  writing?
10    A.   We would have at that time.
11    Q.   Is there any reason then why this policy
12  wouldn't be revision No. 3 or 4, or whatever, and
13  have a revised date of April 9, 2015, where it was
14  revising the policy that existed previous to
15  August 1, 2014?
16    A.   I believe you'd have to ask Mr. Rogos
17  that question.
18    Q.   I'll finish this line, then we can take
19  a break.
20    When you left your job in 2012 as the
21  operations manager of the HBC facility, did you
22  make Mr. Rogos aware of all the written policies
23  and procedures that were in effect at the HBC
24  warehouse?
25    A.   I would not have, no.

Page 72

1    Q.   You did not make him aware of all --
2    A.   No.  Because he was not the person
3  taking over in 2012.  It was Annmarie Dougherty.
4    Q.   Did you make Ms. Dougherty aware of all
5  the policies and procedures?
6    A.   I cannot say that emphatically at this
7  time.  Her and I would have spent time reviewing
8  operational information.  And she also worked
9  there for a time prior to assuming that role.
10    So as leaving, I don't know that I would have
11  had that specific of a conversation with her,
12  because she had already been working within the
13  facility.
14    Q.   Well, I guess what I'm trying to figure
15  out is:  As you sit here today, when we look back
16  at suspicious order monitoring, do you have any
17  idea why those written policies don't exist and no
18  emails relate -- there's no emails or documents
19  that we've been provided with that discuss
20  suspicious order monitoring prior to 2013?
21        MR. BARNES:  Objection.  Calls for
22  speculation.
23    To the extent that you might know, you can
24  answer.
25        THE WITNESS:  I do not know.

Page 73

1  BY MR. HUDSON:
2    Q.   As you sit here today, do you have a
3  specific recollection of seeing written policies
4  related to suspicious order monitoring that
5  existed for the HBC facility between 2009 and
6  2012?
7    A.   Not a specific recollection.
8        MR. BARNES:  We're way past the break
9  time, so if you want to wrap this up.
10        MR. HUDSON:  Sure.
11  BY MR. HUDSON:
12    Q.   So just to finish this topic though, I
13  just want to get your best testimony on the
14  record.
15    As you sit here today, can you say for
16  certain that there were written policies that
17  existed relating to suspicious order monitoring of
18  controlled substances at the HBC warehouse prior
19  to August 1, 2014?
20        MR. BARNES:  Object.  Asked and answered
21  about four times now.
22        THE WITNESS:  I don't believe my answer
23  would change.  With absolute certainty, I cannot
24  answer that.
25

Page 74

BY MR. HUDSON:

1 Q. So is it fair to say, as you sit here
2 today, you can't say for certain one way or the
3 other whether or not there were any HBC policies
4 for suspicious order monitoring of controlled
5 substances that existed prior to August 1, 2014?
6 MR. BARNES: Object to form. You're
7 misstating the testimony he just gave several
8 minutes ago.
9 THE WITNESS: I cannot for certain say
10 that I had a written policy that I could produce.
11 We had procedures in place and policies in place.
12 We had a system in place.
13 BY MR. HUDSON:
14 Q. Right. I want to just clear up any
15 ambiguity that's on the record before we leave
16 this topic.
17 So is it fair to say that your best
18 recollection is that you had a system or a program
19 or practices that existed for monitoring
20 suspicious orders of controlled substances at the
21 HBC warehouse, but as you sit here today, you
22 cannot say one way or the other whether or not
23 those policies or procedures were actually
24 memorialized into writing?

Page 75

1 MR. BARNES: Object to form.
2 THE WITNESS: With any certainty, I
3 cannot.
4 MR. HUDSON: Take a break.
5 THE VIDEOGRAPHER: We're going off the
6 record. The time is 10:27 a.m.
7 (Recess from 10:27 a.m. to 10:44 a.m.)
8 THE VIDEOGRAPHER: We're going back on
9 the record. The time is 10:44 a.m.
10 BY MR. HUDSON:
11 Q. Mr. Durr, before the break we were
12 talking about VAWD certification.
13 Am I correct the HBC facility never did
14 obtain VAWD certification?
15 A. That is correct.
16 Q. Do you know whether or not the HBC
17 facility ever addressed or fulfilled VAWD's
18 policies and procedures requirements to VAWD
19 satisfaction?
20 A. We were getting ready to move the
21 facility or that piece of the work out of the
22 facility, so there was no need to finish up or
23 complete anything specific to HBC.
24 Q. But you did apply for VAWD certification
25 in April of 2015 from the documents that we looked

Page 76

1 at; right?
2 A. Yes. There was an application.
3 Q. And you were still working on that. And
4 we saw the other emails where the site inspection
5 you were getting ready for in August of 2015?
6 A. Yes.
7 Q. But ultimately, through those efforts,
8 HBC did not obtain VAWD certification.
9 A. We did not obtain the VAWD certification
10 for HBC.
11 Q. Did the Giant Eagle warehouse at some
12 point obtain certification?
13 A. To my understanding, they did.
14 Q. The Giant Eagle warehouse and the Giant
15 Eagle distribution facility, that also involved
16 acting as a distributor for Schedule II narcotics
17 as well; right?
18 MR. BARNES: I'm going to interpose an
19 objection as to the GERX facility since it's not
20 part of the case. It's not a named defendant.
21 But go ahead, you can answer.
22 THE WITNESS: I believe it did at that
23 time.
24 BY MR. HUDSON:
25 Q. And the setup, so to speak, at the GERX

Page 77

1 facility was different than the setup at the HBC
2 facility; correct?
3 A. In some aspects.
4 Q. And there's additional requirements,
5 like a vault requirement, for acting as a
6 distributor of Schedule II controlled substances;
7 correct?
8 A. Yes.
9 Q. Are you familiar with any of the
10 differences between the requirements for acting as
11 a distributor of Schedule II controlled substances
12 as opposed to Schedule III, IV, and V?
13 A. I'd say at this point I'm pretty rusty
14 on those.
15 Q. Are others in the organization more
16 familiar than you with those distinctions?
17 A. Yes.
18 Q. We talked about a fair amount this
19 morning about written policies or procedures.
20 Other than the documents that we've looked
21 at, that we've marked as Exhibits 4, 5, and 6, are
22 you aware of any other written policies that you
23 know exist or did exist, that we haven't talked
24 about today, that related to monitoring of
25 suspicious orders of controlled substances?

Page 78

1    A.  Not that I'm aware of.
2    Q.  Have you ever heard the phrase daily
3 threshold reports?
4    A.  I can't say I've never heard it, but it
5 doesn't have any significance with me.
6    Q.  Do you know who Kayla Voelker is?
7    A.  Not off the top of my head.
8    Q.  Do you know whether or not HBC corporate
9 took steps in or around October of 2013 to start
10 creating thresholds or quantity limits to monitor
11 controlled substance shipments or orders?
12    A.  I was not aware.
13    Q.  Let's shift gears then.  And I want to
14 focus in on a couple of times this morning you
15 talked about HBC having a system or a program or
16 practices in place to monitor suspicious orders of
17 controlled substances; is that right?
18    A.  Yes.
19    Q.  And I believe it's your testimony that
20 those practices or that system or program existed
21 going clear back to November of 2009 when HBC
22 began acting as a distributor of controlled
23 substances?
24    A.  Yes.
25    Q.  Did that system or program involve --

Page 79

1 well, let me do this.  Let me mark Exhibit 9.  See
2 if this might help us.
3        (HBC-Durr Exhibit 9 was marked.)
4 BY MR. HUDSON:
5    Q.  I don't think you were copied on this.
6 So I'm not as much focused on your personal
7 knowledge of the particular email as much as the
8 actual substance in the email.
9    This is from Mr. Millward in August of 2015.
10 So at this point in time, you are back as the
11 operations manager of the HBC facility; correct?
12    A.  Yes.
13    Q.  And he's writing here to, it looks like,
14 some of the compliance and other people at
15 corporate about inventory control for suspicious
16 order policy.
17    And then in his email he says, "Here is the
18 policy we submitted for VAWD.  The execution
19 occurs as follows."
20    And then he's got here it looks like at least
21 four things I can count that he has identified in
22 terms of the execution.
23    The first one is, "We have threshold
24 monitoring that uses an average company movement
25 for each scheduled chemical entity, but the

Page 80

1 thresholds are not customized to individual store
2 movements."
3    Was that an initiative of tracking the
4 average company movements something that the HBC
5 facility was involved in?
6    A.  I can't answer that.  You'd have to ask
7 Joe Millward.
8    I would believe this may have been a function
9 being done at corporate or at the corporate level.
10 Not that it wouldn't encompass HBC, but...
11    Q.  And that's, I guess, what I'm asking.
12 At the HBC facility, were there any systems that
13 were being used to monitor thresholds using an
14 average company movement for each scheduled
15 chemical entity, to your knowledge?
16    A.  I can't -- I can't answer that
17 specifically, to the physical facility.
18    Q.  Were there any systems, meaning any
19 computer systems or any sort of automated process,
20 that was occurring at the HBC facility to monitor
21 any thresholds for controlled substances?
22    A.  From reading this, it looks like
23 Supplylogix was being used to monitor.
24    Q.  And is Supplylogix a program that exists
25 at HBC or exists at the corporate offices or both?

Page 81

1    A.  I would believe at the corporate
2 offices.  I cannot say that with any
3 definitiveness.
4    Q.  And that's what I'm -- I guess that's
5 what I'm asking.
6    Is Supplylogix a computer program that you,
7 or others at the HBC warehouse, used on a daily
8 basis?
9    A.  I personally would not have used it.  If
10 there were any use, I would say Christy Hart would
11 have been the person on-site at that time that
12 would have been more involved.
13    Q.  And my question is:  Between 2009 and
14 2016, to your knowledge, did Christy Hart or
15 others use Supplylogix on a daily basis to monitor
16 any inventories of controlled substances?
17    A.  I can't answer for her.
18    MR. BARNES:  Give me an opportunity to
19 object.
20    Object to form.  Relevance.
21    As you know, Ty, none of the opioids at issue
22 were distributed by HBC after October of '14.  So
23 if you're going to ask questions about 2015,
24 there's no drugs at issue.
25    MR. HUDSON:  And I appreciate that

Page 82

1 objection. You've noted it for the record.
2 BY MR. HUDSON:
3    Q.  But my question is: Between 2009 to
4 2016, if Christy Hart, or others at the HBC
5 facility, were using Supplylogix or other programs
6 on a daily basis to monitor shipments of
7 controlled substances, is that something that you
8 believe you would have known about?
9       MR. BARNES: Objection to form. Calls
10 for speculation.
11      THE WITNESS: I can't say at this time
12 whether I would or would not have known about it.
13 BY MR. HUDSON:
14    Q.  So you think it's possible that Christy
15 Hart or others at the HBC facility were doing
16 things to monitor shipments of controlled
17 substances on a daily basis, but that was
18 something that you as the operations manager would
19 not know about?
20    A.  I wouldn't say I wouldn't know about it.
21 I don't know that it was something that, daily, I
22 would have been made aware of unless there were an
23 issue specific within the walls of HBC.
24    Q.  And that's what I'm trying to get an
25 understanding of.

Page 83

1    Between 2009 -- and I'll narrow the timeframe
2 from November of 2009 until October of 2014, when
3 HBC was acting as a distributor of hydrocodone
4 combination products, tell me everything you know
5 about systematic practices at the HBC warehouse to
6 monitor those orders.
7    A.  So '13 to '14, I can't comment one way
8 or the other. I wasn't there.
9    '09 to '12, as I stated previously, we had
10 systems in place only for theft, diversion, and
11 suspicious order management through our connection
12 with our corporate offices and pharmacy team and
13 our own inventory practices inbound and outbound.
14    Q.  And what did that -- what did those
15 systems involve? What computer systems were used?
16    A.  There was several systems. And I'm not
17 going to say that I'm the expert on any one of
18 them. But internally we had a system called
19 Vocollect. So --
20    Q.  Can you spell that?
21    A.  I think it's V-O-C-O-L-L-E-C-T,
22 Vocollect.
23    So as orders were being generated to go to
24 the retail pharmacies, it would come through our
25 systems, which was -- the primary was our

Page 84

1 warehouse management system called Manhattan.
2    So if the store would transmit the order, it
3 would go through our routing system into
4 Manhattan. And then a team member using the
5 device called Vocollect, which was a headset, or
6 a wearable device that picked up their order
7 electronically, and then would tell them where to
8 go in the pharmacy room.
9    I don't know how detailed you want me to get
10 into that, but --
11      MR. BARNES: That's enough to answer the
12 question.
13 BY MR. HUDSON:
14    Q.  That's helpful.
15    So Vocollect and Manhattan were the two
16 computer systems that were used to -- for the
17 retail pharmacies to enter orders.
18    So Manhattan was the system that the retail
19 pharmacies would use to enter orders for
20 controlled substances, and then Vocollect was used
21 by the facility, where you've got a headset and an
22 electronic device, to then go and physically pick
23 those orders from the facility and fill them?
24    A.  Well, let me clarify. There was a -- I
25 believe it's called DCOPS or BICEPS. I don't

Page 85

1 recall which one. But the stores that were
2 putting their orders in would come through DCOPS,
3 and then would interface with Manhattan.
4 Manhattan was the warehouse management system.
5    Q.  Got it. Thank you for that
6 clarification.
7    So DCOPS or BICEPS was a computer system that
8 existed at the 200 or so retail pharmacies where
9 they would enter the orders. And then Manhattan
10 was the warehouse system where you had the ability
11 to receive the orders.
12    And then Vocollect would be used with the
13 headset and the electronic device to then go and
14 pick the orders and fill them?
15    A.  Yes.
16    Q.  And --
17    A.  Sorry to belabor this. But it was DCOPS
18 or BICEPS. The pharmacy group had their own
19 software system that sent the orders to my system
20 which was Manhattan.
21    Manhattan is what I can speak clearly on.
22    Q.  Sure. Any other computer systems that
23 were used at the HBC facility between 2009 and
24 2014?
25    A.  There were different components of

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 Manhattan that we would use for cycle counting,
2 inventory reconciliation, entering purchase
3 orders, but they were all housed under the
4 Manhattan.
5 　Q.　Am I correct though that Manhattan did
6 not have any functionality where the warehouse
7 could set thresholds or quantities of suspicious
8 orders of controlled substances using historical
9 ordering patterns or things of that nature?
10 　A.　Not to my knowledge, no.
11 　Q.　So in terms of monitoring suspicious
12 orders of controlled substances, is it fair to say
13 that the HBC warehouse did not have any computer
14 systems that were utilized on a systematic -- in a
15 systematic way to monitor orders?
16 　A.　No.  I don't believe that's fair to say
17 that.  We could monitor orders.  We knew exactly
18 what was coming in from the stores.  We also knew
19 exactly what was coming in from the vendors.  And
20 there were checks and balances in place.
21 　　　In addition, the corporate team had full
22 visibility of our inventory at all times and could
23 see if there was any fluctuation whatsoever.
24 　Q.　So what I'm trying to separate out is
25 corporate, because it's my understanding -- is it

Page 87

1 fair to say other people who actually were in the
2 corporate office using those computer systems
3 would be more knowledgeable about what corporate
4 did than you did?
5 　A.　About what corporate did.
6 　Q.　Yes.
7 　A.　But, again, our team at HBC was very in
8 tuned or attuned to what was supposed to be on the
9 shelf, what was supposed to come into the
10 building, and what was supposed to go out of the
11 building.
12 　　　But none of those team members made decisions
13 on what to bring in and what to ship out, but they
14 had full visibility to see what was coming in and
15 out.  And if something didn't match in real time,
16 they would see it and/or act upon it.
17 　Q.　Right.  And you've discussed -- I mean,
18 those are programs that are used to make sure the
19 inventory count is correct; right?
20 　A.　That's one thing that can be derived
21 from it.
22 　　　The other is if you see that an order is or
23 that a quantity has suddenly spiked or dropped
24 from what should be happening, then there would be
25 communication with the corporate offices to what

Page 88

1 is going on with any particular item.
2 　Q.　That's the piece that I want to focus in
3 on is this.
4 　　　Was there a systematic process that was
5 utilized on a daily basis to try to figure out
6 whether quantities had spiked or dropped?
7 　A.　Yes.
8 　Q.　And what did that process entail?
9 　A.　For us it was, again, understanding and
10 knowing what was inbound/outbound, knowing what
11 was on the shelf and doing those cycle counts,
12 very robust cycle counts in the narcotic cages we
13 talked about earlier, where we were seeing any
14 changes in that inventory immediately as we were
15 selecting or right after selection.
16 　Q.　So if there was a change in inventory,
17 how would that be identified?  What program would
18 be used to identify the change?
19 　A.　Well, in Manhattan, under our cycle
20 counting function, if they saw a -- I'll give you
21 an example.
22 　　　If they were to distribute ten units for the
23 day, ten selling units, and for whatever reason 12
24 were now missing from the shelf, 12 selling units,
25 then immediately, because of how much cycle

Page 89

1 counting we were doing or how frequently we were
2 doing the cycle counts, you would immediately see
3 that you were short two selling units.  Or it
4 could be an overage, but using two shorts in this
5 example.
6 　　　What our process or system at that time was,
7 was we would not ship out of the facility until we
8 reconciled where those two units were.
9 　Q.　In that example that you gave though,
10 that's an inventory count issue; right?  The
11 inventory is off.
12 　A.　Correct.
13 　Q.　Let me, I guess, ask you this.  We've
14 talked a lot about suspicious order monitoring
15 today; right?
16 　A.　Yes.
17 　Q.　What is your understanding of a
18 suspicious order?
19 　A.　Anything that rises to the level of
20 being suspect in count or quantity.
21 　Q.　And how would something qualify as being
22 suspect?
23 　A.　I could only answer for myself
24 personally.
25 　　　You know, for me, the two units may be

Page 90

1  suspect at the time within our walls.  On a
2  grander scale, I don't know that I can put the
3  framework to that.
4      But if we at HBC saw anything I'll say out of
5  the ordinary, our first communication is to the
6  pharmacy group to understand what we're seeing.
7  I'm not saying that we did, but...
8      Q.  And that's, I guess, what I'm trying to
9  get an idea of, is what would be -- what criteria
10  would the warehouse apply under your system or
11  program to try to figure out whether a shipment is
12  out of the ordinary.
13      A.  So we still see it today even outside of
14  the pharmacy area.
15      Our team members in that specific area, the
16  narcotics room, we were very limiting on who went
17  in there.  Typically, no more than two team
18  members a night would be in that room, and most
19  times we tried to keep it to one.
20      They would get attuned to the normalcies, if
21  you will, of orders going in and out of that room,
22  because they're picking the same items over and
23  over again day in and day out.
24      So, for instance, if they see a store
25  typically would get ten selling units of a

Page 91

1  particular item, and now all of a sudden the store
2  has 50 selling units going out, the team members
3  would bring it to our attention, either Christy
4  Hart or whoever the supervisor is.  And our first
5  call would be to the pharmacy, is this truly an
6  order that was placed and are those quantities
7  that you absolutely want?
8      Q.  So tell me then how HBC is able to
9  figure out that that particular store usually
10  orders ten of that item, and now they're ordering
11  50?
12      A.  A lot of that is just -- I'll categorize
13  it as empirical from the team members -- not from
14  the data, but from the team members working so
15  closely with those products and being in that same
16  area on a regular basis.
17      Q.  So there's not -- so the identifying the
18  suspect orders or the orders that are not
19  ordinary -- I think your words were out of the
20  ordinary -- that would fall on the particular
21  pickers that are working at the facility to fill
22  the orders, and they'd be relying on their
23  experience and knowledge from doing that day in
24  and day out filling orders?
25      A.  As a first line.  I can't answer for

Page 92

1  Greg Carlson and his group as to what they may
2  have been monitoring and looking at.
3      Q.  Right.
4      A.  But we would also be in contact with
5  Greg's group at that time to say, Greg, we saw
6  this store put in this order.  We confirmed it
7  with the pharmacy.  Maybe something you will want
8  to look at.
9      Q.  Sure.  And I understand there may be
10  different initiatives at corporate.  I'm focused
11  on just what happens at the HBC facility.
12      So the pickers then are knowledgeable about
13  the stores based on their experience.  And then
14  they -- in the process of going and using
15  Vocollect to go and physically grab orders and
16  place them, if they believe that there's an order
17  that's out of the usual or out of the ordinary,
18  then they would elevate that to you or Christy
19  Hart or someone on your team?
20      A.  Yes.
21      Q.  And then those items would then be
22  flagged?
23      A.  Yes.
24      Q.  And then that would get -- then would
25  you or someone on your team then escalate the

Page 93

1  issue to the GE pharmacy team?
2      A.  Correct.  Additionally, on the inbound
3  side, if Christy Hart -- again, she was the
4  primary there -- would see an influx of any items
5  coming in, again, she would communicate to the
6  corporate pharmacy group as to anything that she
7  may have seen as a quick rise in any particular
8  item.
9      Q.  And how would that be done?  What
10  program would Christy Hart use?
11      A.  Again, it's her knowledge of -- and
12  experience.  But she's using the inbound purchase
13  orders.
14      Again, she was very experienced with what
15  items were coming in and she was in constant
16  contact with the pharmacy group.
17      Q.  So at the HBC facility, both for the
18  inbound and outbound and the handling at the
19  facility, is it fair to say that you and your team
20  were relying on the experience and knowledge of
21  people like Christy Hart or the pickers as opposed
22  to using some sort of algorithm or computerized
23  process to systematically identify unusual orders
24  using data?
25      MR. BARNES:  What timeframe are we

Page 94

1 talking about?
2      MR. HUDSON: 2009 to 2014.
3      THE WITNESS: So, again, I cannot speak
4 to past 2012.
5 BY MR. HUDSON:
6    Q. Sure.
7    A. So from '9 up to '12, we were not using
8 any type of algorithms. We were using our systems
9 in place of knowing our purchase orders, what was
10 ordered and should be coming into the warehouse,
11 and also what was being ordered to ship out of the
12 warehouse.
13      In addition to that, we rely on the
14 experience of the team members knowing I'll call
15 the normalcies or what was typical of an ordinary
16 order for those pharmacies.
17    Q. Right. But just to be clear, to your
18 knowledge, between 2009 and 2014, there wasn't any
19 systematic process in place using data at the
20 facility to flag suspicious orders --
21      MR. BARNES: Object to form.
22 BY MR. HUDSON:
23    Q. -- using algorithms or some, you know,
24 other computerized process, as opposed to just
25 human knowledge and human judgment.

Page 95

1      MR. BARNES: Object to form.
2      THE WITNESS: Again, from 2009 to the
3 end of 2011, I can only speak that we did not have
4 an algorithm in place. We did have a system in
5 place.
6      And we were using and relying on our software
7 programs of what was being properly or legally
8 purchased brought in and distributed out of HBC.
9 BY MR. HUDSON:
10    Q. I'm trying to figure out, you keep
11 referring to the system, using the system. But I
12 want to make sure the record is clear.
13      Your systems, there wasn't any functionality
14 of Vocollect or Manhattan or DCOPS, or any other
15 computer program that existed at HBC, where they
16 could, on a systematic basis, use algorithms or
17 any other program of any kind to identify
18 suspicious orders programmatically, meaning on a
19 regular basis day to day, using some sort of data
20 analysis?
21      MR. BARNES: Object to form. I think it
22 misstates his testimony.
23 BY MR. HUDSON:
24    Q. Is that fair?
25    A. Again, HBC was not using algorithms at

Page 96

1 that time. I can't speak that corporate or Greg
2 Carlson's group may or may not have been using
3 some data. They would have to answer for that.
4    Q. Sure. And my question is just focused
5 specifically on the HBC facility.
6      The HBC facility was not only using
7 algorithms, but it wasn't using any computer
8 program of any kind to systematically identify
9 orders on any sort of regular basis, day to day,
10 using data. Rather, Christy Hart or pickers or
11 others use human intelligence to identify orders
12 that they believed were suspicious.
13      MR. BARNES: Object to form. Misstates
14 his testimony.
15      He already told you about the warehouse
16 management system called Manhattan and the
17 Vocollect system that's used in the warehouse,
18 which are computerized systems.
19      MR. HUDSON: Please just say,
20 "Objection. Form."
21      MR. BARNES: No.
22      MR. HUDSON: He's testified to those
23 things.
24      MR. BARNES: Right. And you're
25 misstating his testimony in your question.

Page 97

1 BY MR. HUDSON:
2    Q. Sir, do you understand the question?
3    A. I believe I do. And I believe I
4 answered it.
5    Q. So what I'm asking is: Did Vocollect or
6 Manhattan or DCOPS or BICEPS, or any other
7 computer program that existed at HBC, to your
8 knowledge, did any of those have the ability to
9 systematically identify orders of unusual
10 quantity, frequency, or patterns using data?
11    A. Not to my knowledge.
12    Q. So to the extent that HBC, the facility,
13 flagged or identified orders as being suspicious,
14 the facility did so based upon the experience and
15 knowledge of Christy Hart, or pickers, or others
16 at the facility, who had experience and knowledge
17 about the orders that were flowing through the
18 facility. Is that fair?
19    A. Not in and of itself. They still used
20 the information that was supplied to them through
21 our systems, meaning the purchase orders, inbound
22 and outbound orders, for the inbound and
23 distribution.
24    Q. Sure. So if Christy Hart or one of the
25 pickers or somebody had reason to believe that

Page 98

1 something was suspicious, they would then have the
2 ability to go and use those systems to look back
3 at previous orders.
4    A.  Yes.
5    Q.  So that was a tool that was available to
6 them if they identified an order, would be to then
7 go to those systems and compare that order to
8 previous orders.
9    A.  They could.
10    Q.  But the system itself would not flag a
11 particular order and say this order is five times
12 more than this customer's previous order at the
13 store over the last 12 months.
14    A.  No, it would not.
15    Q.  Thank you for clarifying that.
16    A.  You're welcome.
17    Q.  So if I asked you, Mr. Durr, how many
18 shipments of -- how many unusual shipments were
19 flagged by the HBC facility in 2009 by Christy
20 Hart or the pickers or others, would you be able
21 to answer that?
22    A.  No.  Not off my memory, I could not.
23    Q.  Did the HBC facility keep a log of
24 unusual shipments that had been flagged by Christy
25 Hart or pickers or others?

Page 99

1    A.  I believe we had.  I can't say that with
2 certainty at this -- this date.
3    Q.  You believe that the facility did have a
4 log of unusual orders?
5    A.  I believe we did or we had something
6 along those lines.
7    Q.  And when, to your knowledge, did the HBC
8 facility begin keeping a log of unusual or
9 suspicious orders?
10    A.  I would think from the beginning.  If
11 there was -- if it were -- I don't know if it were
12 a formal log.  Again, this many years later, I'm
13 not sure that I can speak with complete certainty.
14 But the communications to the corporate group
15 in itself would have logged that there was an
16 issue or there was something that was highlighted
17 and need further investigation.
18    Q.  Do you believe that emails or other
19 documents would capture those communications that
20 occurred between Christy Hart, yourself or others
21 on your team and the corporate offices?
22    A.  They can.
23    Q.  They can or you believe that they do?
24 In other words, do you think the practice was to
25 communicate by email?

Page 100

1    A.  I know the -- well, there was -- again,
2 the practice at that time was either calling
3 and/or emailing.
4    Again, just knowing Christy Hart, she was
5 very good at her documentation and note-taking and
6 communications with the corporate group.
7    Q.  So if Christy Hart had communications
8 with the corporate group, you would expect that
9 we'd be able to find some documentation that would
10 show that?
11    MR. BARNES:  Object to form.
12    THE WITNESS:  At this time I can't say
13 that you could or couldn't.
14 BY MR. HUDSON:
15    Q.  You think at some point, there were
16 communications that existed that now no longer do?
17    A.  Yes.
18    Q.  And just to speed this up, I'm just
19 going to ask all these questions from the
20 timeframe of 2009, when you started acting as a
21 distributor of controlled substances, up through
22 October of 2014, when hydrocodone combination
23 products were reclassified as Schedule II.  Okay?
24 So from November of 2009 to October of 2014.
25    A.  All right.  I won't answer anything from

Page 101

1 '12 to '14.  I wasn't there.
2    Q.  Okay.  Fair enough.
3    So during that timeframe that we've talked
4 about, do you know the number of shipments that
5 were reported by the HBC facility to corporate as
6 being unusual or suspicious?
7    A.  Not at this time, I don't.
8    Q.  Do you know the number of orders or
9 shipments of controlled substances that were
10 flagged by HBC as being unusual in quantity?
11    A.  Again, I don't have a number to give you
12 at this time.
13    Q.  Do you know the number of unusual or
14 suspicious orders of controlled substances that
15 were flagged as being an unusual pattern?
16    A.  I don't.
17    Q.  Do you know the number of orders that
18 were flagged as being unusual frequency?
19    A.  I don't.
20    MR. BARNES:  I just want to inject a
21 cautionary.  As he stated, all these answers are
22 for the time period that you were there.
23    THE WITNESS:  Correct.
24 BY MR. HUDSON:
25    Q.  And how about the number of shipments

Page 102

1  that were blocked by the HBC facility?
2      A.  I do not.
3      Q.  Do you know whether or not there were
4  any shipments of controlled substances that were
5  blocked by the HBC facility as being suspicious
6  orders?
7      A.  I do not.
8      Q.  Do you know whether or not there were
9  any orders of controlled substances that were --
10  the shipment was stopped so that an investigation
11  could be conducted as to whether or not the order
12  was legitimate?
13      A.  Again, as time has passed, I do not.
14      Q.  How many pickers are there?  Is that the
15  right term, pickers?
16      A.  Pickers or selectors.
17      Q.  Selectors.  How many pickers or
18  selectors, ballpark range, were there at the
19  facility between 2009 and 2012?
20      A.  Just in the Rx room?
21      Q.  Yeah, exactly.  Sorry.  Yeah, in the
22  controlled substance area.
23      A.  In the controlled -- in the narcotics
24  cages, we called it, again, we tried to limit that
25  to no more than two in there at a time.

Page 103

1      Q.  Okay.
2      A.  And more times than not, we kept it to
3  one.
4      Q.  So one or two selectors or pickers were
5  actually filling the orders?
6      A.  Yes.
7      Q.  Between 2009 and 2012 though, how many
8  total pickers or selectors were there employed by
9  the HBC, employed at that facility that were
10  filling the controlled substance orders?
11      A.  It's hard to answer.  You know, we've
12  had selectors -- we're a union facility.  Across
13  that entire timeframe I would -- maybe eight,
14  six to eight, just in the narcotics room.
15      Q.  And that's what I'm just trying to get
16  an idea of, how many were employed at any
17  particular point in time.
18      Meaning, you know, in 2009, if we went and
19  looked at a particular month, how many selectors
20  were employed focused on filling orders in the
21  controlled substance room?
22      A.  Again, still for a day, no more than
23  two, typically, in that room.  But --
24      Q.  But for a week, let's say, or for a
25  shift, in other words --

Page 104

1      A.  Well, as I'm saying, for a shift you
2  would -- we tried to keep it to one or two, two
3  being the max unless we -- there were -- flu
4  season may create a time where we put three team
5  members in that area.  But, typically, it's one to
6  two.
7      Q.  And I guess what I'm trying -- and I'm
8  not communicating very well, so I apologize.
9      I'm trying to get an idea of in any month,
10  like how many selectors are there that are
11  employed at that facility who, during that month,
12  are filling orders of controlled substances?
13      A.  Well, the team members are on four tens.
14  So in any given month, it would typically be
15  probably no more than four to six team members
16  that could possibly rotate in and out of there.
17  They -- you know, vacation, sick time, whatever,
18  may cause a team member not to be available to
19  select in that room for that day, then we would go
20  to a different team member.
21      Q.  And that's what I'm trying to get at.
22      You, as the operations manager, to have that
23  control room staffed appropriately, to fill the
24  orders that are coming in and out, you needed four
25  to six pickers or selectors --

Page 105

1      A.  To get through the week, yes.
2      Q.  -- to get through the week.
3      And approximately how much are those pickers
4  and choosers paid, pickers or selectors paid?  Are
5  they paid by the hour?
6      A.  They're hourly employees.
7      Q.  And what do they get paid per hour?
8      A.  I would have to look back at that time.
9  Average wage is probably 16.  Don't quote me on
10  that.
11      Q.  Sure.
12      A.  I haven't seen our contractual binder.
13  But probably at that time around $16 an hour --
14      Q.  And what is --
15      A.  -- on average.
16      Q.  -- the education level of the pickers or
17  selectors?
18      A.  It varies, but I would say the majority
19  are high school, high school graduates.
20      Q.  And were there some that were not high
21  school graduates?
22      A.  At that time -- I won't say this for
23  fact, but I believe you had to have a GED
24  equivalent or above.
25      Q.  And were the pickers, just through

Page 106

1   experience, then memorizing which store was where?
2       A.  I would say yes.  It wouldn't be so much
3   geographically.  They weren't seeing a store
4   address.  They were just seeing a store number.
5       Q.  Right.  So like a particular store would
6   be a high-volume store versus another store would
7   be a lower-volume store?
8       A.  Yeah.  There were definitely high and
9   low-volume stores.
10      Q.  And then there's different kinds of
11  controlled substances; right?
12      A.  Yes.
13      Q.  How many different types of controlled
14  substances would you say were filled in the HBC
15  facility?
16      A.  I didn't commit that to memory.  I'm
17  sure we could pull that information or file
18  information.
19      Q.  Sure.  But is it thousands of different
20  products?
21      A.  No, no.  We were probably in the -- I'm
22  taking a shot here.
23      Q.  Sure.
24      A.  Probably 50 to 60, if that.
25      Q.  So 50 or 60 in that --

Page 107

1       A.  Different --
2       Q.  -- in that steel cage --
3       A.  Different narcotics --
4       Q.  Sure.
5       A.  -- whether they run the gamut of the
6   Schedule III, IVs and Vs.
7       Q.  Right.  Exactly.
8           But in that steel cage that you've got walled
9   off, so to speak, or caged off, you would say
10  there's 50 or 60 different products?
11      A.  Yeah.
12      Q.  During this timeframe from 2009 to 2012,
13  would you say there were between 100 and 200
14  different stores -- different pharmacy stores?
15      A.  Again, somewhere in that range.
16      Q.  And then in terms of just the volume of
17  dosage units, would you agree it was tens of
18  millions of dosage units that flowed through that
19  facility from 2009 to 2014?
20      A.  I don't want to speculate on dosage.  I
21  don't -- dosage wasn't anything that registered
22  for us.  It was units sold.
23      Q.  Sure.  What would you say units
24  sold-wise; how many units flowed through that
25  facility from 2009 to 2014?  Just ballpark.

Page 108

1       A.  I would only be guessing at this time.
2       Q.  No even ballpark idea, if it was
3   thousands, millions, hundreds of thousands.
4           MR. BARNES:  Don't speculate.
5   BY MR. HUDSON:
6       Q.  Yeah, if you don't know, you don't know.
7   I'm just trying --
8       A.  I don't know.
9       Q.  -- to get your best understanding.
10          And then the other person that you've talked
11  about is Christy Hart.  Tell me about Christy
12  Hart's educational background.
13      A.  My understanding, a high school
14  graduate.  No formal education that I'm aware of.
15          MR. BARNES:  You mean after high school?
16          THE WITNESS:  After high school.  Sorry.
17  BY MR. HUDSON:
18      Q.  Is there anywhere where I could go --
19  obviously, I could talk to Christy Hart and we
20  could talk -- and we could ask her what she
21  remembers.
22          But is there anywhere I could go to try to
23  figure out what Christy Hart or these pickers did
24  more specifically, between 2009 and 2012, to
25  monitor suspicious orders of controlled

Page 109

1   substances?
2       A.  I don't know where you would go for
3   that.
4       Q.  Could I get -- is there anywhere I could
5   go to look at a log or any sort of documentation
6   to gain any more knowledge about what happened at
7   the facility from 2009 to 2012 in terms of
8   monitoring and investigating suspicious orders of
9   controlled substances?
10      A.  Not that I know of.
11      Q.  As you sit here today, between 2009 and
12  2012, and I know it's been a long time, but can
13  you remember any specific investigations that
14  occurred of shipments or orders that had been
15  flagged as potentially being suspicious orders?
16      A.  Not to any detail.
17      Q.  Is it your -- do you have any sense of
18  how many orders Giant Eagle or HBC reported to the
19  DEA as being suspicious orders?
20      A.  Again, not specifically, no.
21      Q.  Did the HBC facility, between 2009 and
22  2012, have any systematic way to block or stop
23  orders?
24          MR. BARNES:  Objection.  Asked and
25  answered.

Page 110

1    THE WITNESS:  There is a systemic way to
2 block an order.  It can be done either from the
3 corporate group or internally through our
4 Manhattan system where, for whatever reason we
5 decide that we don't want an order to go out, we
6 can put it on hold.  We can put the entire item on
7 hold or we can just not ship it and then block it
8 from being shipped specific to a store, if need
9 be.
10 BY MR. HUDSON:
11    Q.  That would be something that somebody
12 would manually --
13    A.  Yeah.
14    Q.  -- have to do?
15    A.  It would be a manual intervention, yes.
16    Q.  And between 2009 and 2012, are you aware
17 of anybody manually making the decision to hold or
18 not ship an order of controlled substances because
19 it was believed to be a suspicious order?
20    A.  Not specifically, no.
21    MR. HUDSON:  Let's go off the record.
22 Take a five-minute break.
23    THE VIDEOGRAPHER:  We're going off the
24 record.  The time is 11:28 a.m.
25    (Recess from 11:28 a.m. to 11:43 a.m.)

Page 111

1    THE VIDEOGRAPHER:  We're going back on
2 the record.  The time is 11:43 a.m.
3 BY MR. HUDSON:
4    Q.  Mr. Durr, before the break, we were
5 talking about suspicious order monitoring of
6 controlled substances at the HBC warehouse.
7    My question is:  Between 2009 and 2012, when
8 you left HBC for that time period, was there any
9 formalized training, that you're aware of, of
10 anyone on suspicious order monitoring of
11 controlled substances?
12    A.  Not that I can speak of at this time.
13    Q.  Between 2009 and 2012, when you left, to
14 your knowledge, did anyone from HBC attend any
15 seminars or educational programs on suspicious
16 order monitoring of controlled substances?
17    A.  I don't recall at this time.
18    Q.  Is it fair to say, to the best of your
19 knowledge, you're not aware of anyone from HBC
20 attending seminars or educational programs?
21    A.  Like I say, I don't recall at this time.
22    Q.  And when you say you don't recall --
23    A.  They may have or may not.  I don't
24 recall.
25    Q.  Do you think that if you or others

Page 112

1 attended seminars or educational programs on
2 suspicious order monitoring, that would be
3 something that you would remember or not remember?
4    A.  I don't know that I would remember it.
5    Q.  Was suspicious order monitoring a high
6 priority between 2009 and 2012?
7    MR. BARNES:  Object to form.
8    THE WITNESS:  I can't say that it was
9 not.  The whole operation was of high importance
10 in ensuring that we were being diligent and
11 properly and legally filling the orders as they
12 were coming to us from the pharmacies.
13 BY MR. HUDSON:
14    Q.  We've got just a couple emails here from
15 you.
16    What was your practice in terms of
17 maintaining emails or other electronic documents?
18    A.  Are you citing a specific email or --
19    Q.  No.  I'm just saying, between 2009 and
20 the present, have you -- do you have a practice of
21 maintaining emails that you'd sent or received or
22 were copied on during your time at Giant Eagle or
23 HBC?
24    A.  Yeah.  There were -- there were some
25 that I kept, some that -- I'm not even saying

Page 113

1 there were emails.
2    I don't know how to answer that for you.
3    Q.  I'm trying to get an understanding of --
4 today, you've got a work computer at HBC; right?
5    A.  I do.
6    Q.  And you've got email, Microsoft Word, or
7 some other email program that you've used; right?
8    A.  Yes.
9    Q.  And you've been a user of email from
10 2009 until the present; right?
11    A.  Yes.
12    Q.  What I'm asking you is:  As a user of
13 email, is it your practice to maintain or keep
14 emails --
15    A.  Not all.
16    Q.  -- that get sent or received or you're
17 copied on?
18    A.  Not all, no.
19    Q.  How do you make the decision of whether
20 to retain emails or not retain emails?
21    A.  If it's something I need to reference at
22 a later date or potentially something I've not
23 completed, then I may file it or hold it.
24    If it's something I can work on and get done
25 at that time, then I would just do it and move on.

Page 114

1    Q.   Sure.  And I guess what I'm -- my
2  emails, if you went back, like my sent emails or
3  these emails, there's probably a lot going back
4  years.
5       Are you somebody who had a practice of
6  deleting emails on a regular basis?  Or are you
7  somebody who just let them, you know, pile up over
8  time?  Or did you use folders?
9       How did you use and organize your emails?
10    A.   Use folders.  I would typically have
11 a -- if I was putting something in a folder, I
12 would label a folder.
13    Q.   Okay.
14    A.   And then there are, I'll say, automatic
15 deletions that happen within our company because
16 of our -- due to our document retention policy.
17    Q.   Sure.  And if you put emails in the
18 folders, then did that preserve those emails, if
19 you know?
20    A.   I don't know specifically.  My
21 understanding would be as -- there are document
22 retention policies that would do automatic purges
23 of those documents.
24    Q.   So if we wanted to know emails that you
25 sent or received going back to 2009 relating to

Page 115

1  suspicious order monitoring, would there be any
2  way for us to look into that?
3     A.   I can't say definitively yes or no.
4        (HBC-Durr Exhibit 10 was marked.)
5  BY MR. HUDSON:
6     Q.   I'm going to hand you what's marked as
7  Exhibit 10, and switch to a different topic.
8        Just a couple last questions here and a
9  couple more emails.
10       I'll represent to you this is a drug fact
11 sheet that was pulled from the DEA website
12 sometime when hydrocodone was still a Schedule II,
13 so prior to October of 2014.
14       And it indicates, on the first page,
15 "Hydrocodone is the most frequently prescribed
16 opioid in the United States and is associated with
17 more drug abuse and diversion than any other licit
18 or illicit opioid."
19       Do you have any knowledge or reason to agree
20 or disagree with that statement?
21    A.   I have no knowledge to agree or
22 disagree.
23 BY MR. HUDSON:
24    Q.   Between 2009 and 2014, the HBC facility
25 did act as a distributor of hydrocodone

Page 116

1  combination products; correct?
2     A.   Yes.
3        (HBC-Durr Exhibit 11 was marked.)
4  BY MR. HUDSON:
5     Q.   And let me just hand you -- I'm going to
6  hand you what I've marked as Exhibit 11.
7        And, again, I'll represent to you that this
8  Exhibit 11 is a document that was compiled by our
9  experts trying to determine the dosage units of
10 hydrocodone that were distributed from HBC or
11 McKesson or Anda into Cuyahoga County, is on the
12 first page, and then if you go back to the third
13 page is Summit County there.
14       And so if we go back to the first page, that
15 is dosage units of hydrocodone combination
16 products that were shipped from HBC Service
17 Company to Cuyahoga between 2009 and 2014?
18       MR. BARNES:  Ty, I'm going to interpose
19 an objection.
20       This exhibit appears to go beyond the Case
21 Track One jurisdictions, including counties in
22 Ohio that are not in Case Track One, as well as
23 nationwide information, which are also not at
24 issue in Case Track One.
25       And so to the extent that this exhibit

Page 117

1  contains any information beyond Summit and
2  Cuyahoga County, we object.
3        MR. HUDSON:  Sure.
4        MS. MONAGHAN:  Can you explain where you
5  received these for McKesson and Anda?
6        MR. HUDSON:  From the ARCOS data.
7        MS. MONAGHAN:  Okay.  Thank you.
8  BY MR. HUDSON:
9     Q.   And, again, I'm not asking you,
10 obviously, to verify whether these are -- these
11 particular numbers here are true or not true.  The
12 ARCOS data is what it is.
13       But my question is:  Just independent of
14 this, do you have any knowledge from your role at
15 HBC, as the operations manager, of the volumes of
16 hydrocodone that were being shipped from HBC into
17 Cuyahoga or Summit Counties?
18    A.   Specifically, I do not at this time.
19    Q.   Seeing, for example, this compilation or
20 summary of shipments into Cuyahoga County, just
21 looking at it, do you have any sense of whether
22 this appears in line with the transactional data
23 from HBC or not?
24    A.   I have no way --
25       MR. BARNES:  Object to form.  Calls for

Page 118

1  speculation.
2       THE WITNESS:  Yeah.  I have no way to
3  affirm that.
4  BY MR. HUDSON:
5       Q.  And then if we look back to the third
6  page, which is the one we were looking at before
7  on Summit County, just the same question.
8       Seeing those numbers for shipments of
9  hydrocodone going into Summit County from HBC
10  Service Company, any sense of whether those seem
11  in line with the HBC transactional data or not for
12  those years?
13       MR. BARNES:  Same objection.
14       In addition, this exhibit misstates that
15  hydrocodone was distributed by HBC.  Hydrocodone
16  was never distributed by HBC.  It's a combination
17  product.
18       MR. HUDSON:  Sure.
19  BY MR. HUDSON:
20       Q.  And, Mr. Durr, if you go back to
21  Exhibit 10, Exhibit 10 is the DEA fact sheet that
22  indicated that "Hydrocodone is the most frequently
23  prescribed opioid in the United States and is
24  associated with more drug abuse and diversion than
25  any other licit or illicit opioid."

Page 119

1       Are you there on Exhibit 10?
2       A.  Um-hum.
3       Q.  And down in that same paragraph, it says
4  all hydrocodone are combination products; correct?
5       A.  It does.
6       Q.  So any hydrocodone being sold in the
7  United States is going to be sold as part of a
8  hydrocodone combination product; correct?
9       A.  That's what it states.
10       Q.  So if we look at this, as you sit here
11  today, between 2009 and 2014, are you aware of any
12  orders or shipments from HBC into Cuyahoga or
13  Summit County where you, or others on your team at
14  the HBC warehouse, flagged an order as being
15  suspicious or unusual?
16       A.  No, I do not.
17       Q.  Are you aware of any investigations of
18  any of those orders on suspicion of diversion?
19       A.  No, I'm not.
20       MR. HUDSON:  I don't have any further
21  questions.
22       MR. BARNES:  Okay.  I have some
23  redirect.
24            EXAMINATION
25  BY MR. BARNES:

Page 120

1       Q.  Just going back with the testimony you
2  just gave, this Exhibit 11, you don't, I take it,
3  have any basis to know how this was prepared or
4  who prepared it or whether the numbers are
5  accurate in any way?
6       A.  I do not.
7       Q.  You just testified that you weren't
8  aware of any orders or shipments into Cuyahoga or
9  Summit County that were flagged as suspicious.
10       You just gave that testimony?
11       A.  Yes.
12       Q.  Is that because it wasn't part of your
13  job and was somebody else's job, or because you
14  just don't think it happened?
15       A.  It could be a combination of both.  It
16  would have been at somebody else's level to know
17  and understand that.
18       Q.  Okay.
19       A.  But with us being such a tightknit group
20  and distributing to ourselves, I just don't
21  believe it happened.
22       Q.  All right.  And we'll get into that in a
23  minute.
24       But these so-called dosage units, do you have
25  any understanding what that even means on

Page 121

1  Exhibit 11?
2       A.  To a small degree.
3       Q.  Do you know -- assuming that any of
4  these numbers are correct, and I'm qualifying
5  that, but we're not sure -- what happened to these
6  hydrocodone combination products shipped by HBC to
7  the Giant Eagle pharmacies?
8       A.  They would have gone into our
9  pharmacies.
10       Q.  And what happened to them after they
11  went to the pharmacies?
12       A.  They would have filled legal
13  prescriptions.
14       Q.  So, to your knowledge, were they
15  diverted in any way?
16       A.  Not to my knowledge.
17       Q.  Do you know the difference between -- or
18  do you know what the term diversion means?
19       A.  I do.
20       Q.  What does it mean to you?
21       A.  I believe that something is being pulled
22  in a different direction than its intended purpose
23  or intended sale or use.
24       Q.  You mentioned a couple of times in your
25  testimony that HBC -- it's a single warehouse; is

Page 122

1 that correct?
2    A.  Yes.
3    Q.  Located in Washington, PA?
4    A.  Yes.
5    Q.  Do you know what the size of that
6 warehouse is?
7    A.  305,000 square feet.
8    Q.  And of that 305,000 square feet, how
9 much is dedicated to pharmacy operations?
10    A.  There was 12,000 square feet and an
11 additional 2,000 for a receiving area.  So 14,000
12 total.
13    Q.  14,000 for pharmacy?
14    A.  Yes.
15    Q.  Including all pharmaceutical products,
16 even noncontrolled?
17    A.  Yes.
18    Q.  What portion of that 12,000 square feet
19 were dedicated -- was the narc room, so-called
20 narc room?
21    A.  Maybe 2,000 square feet.
22    Q.  Was the narc room partitioned off in
23 some secure way from even the pharmacy room?
24    A.  Yes.
25    Q.  And was the pharmacy room partitioned

Page 123

1 off from the rest of the warehouse?
2    A.  Yes.
3    Q.  And what was the rest of the warehouse,
4 the other 292,000 square feet, what was that
5 dedicated to?
6    A.  That's health/beauty care items,
7 cigarettes, tobacco, candy, mints.
8    Q.  Okay.
9    A.  General merchandise.
10    Q.  And was all that product shipped to
11 Giant Eagle grocery stores?
12    A.  Yes.
13    Q.  Did the HBC warehouse ship to any
14 entities other than affiliated Giant Eagle grocery
15 stores and Giant Eagle pharmacies?
16    A.  Pharmacies, only Giant Eagle.  For the
17 grocery side, we did have some nonbanners and
18 independent stores.
19    Q.  Independent Giant Eagle stores?
20    A.  Yes.
21    Q.  All right.  But for the pharmacy --
22    A.  Giant Eagle only.
23    Q.  -- was that Giant Eagle only?
24    A.  Yes.
25    Q.  And would that be to pharmacies

Page 124

1 throughout the Giant Eagle regional chain?
2    A.  Yes.
3    Q.  Do you know approximately how many
4 pharmacies are in the Giant Eagle regional chain?
5    A.  I believe 200.
6    Q.  About 200?
7    A.  Yeah.
8    Q.  Did Giant Eagle ever -- did the HBC
9 warehouse ever supply any internet pharmacies?
10    A.  No.
11    Q.  Did the HBC pharmacy ever supply
12 Schedule II opioids to any entity, including Giant
13 Eagle?
14    A.  No.
15    Q.  Did the HBC warehouse -- with respect to
16 the drugs at issue in this case, do you understand
17 those to be Schedule II opioids?
18    A.  Yes.
19    Q.  And when Giant Eagle distributed --
20 well, let me back up.
21 Giant Eagle never or the HBC warehouse never
22 distributed Schedule II opioids; is that correct?
23       MR. HUDSON:  Object to form.
24       THE WITNESS:  No.
25

Page 125

1 BY MR. BARNES:
2    Q.  Did you understand hydrocodone
3 combination products to be a Schedule III for a
4 period of time before it was reclassified as a II?
5    A.  Yes.
6    Q.  And did the HBC warehouse, while it was
7 a Schedule III, distribute hydrocodone combination
8 products to Giant Eagle pharmacies only?
9    A.  Yes.
10    Q.  And when it was reclassified to a
11 Schedule II, did HBC stop distributing that
12 product?
13    A.  Yes.
14    Q.  Was that approximately in October of
15 2014?
16    A.  I believe so.  Again, I was not there at
17 that time.
18    Q.  You talked a lot about the so-called
19 inbound and outbound controls at the HBC
20 warehouse.  And I want to follow up a little bit
21 on that.
22 By inbound, do you mean the purchasing into
23 the warehouse?
24    A.  Yes.
25    Q.  Now, I want you to focus solely on

Page 126

1 controlled substances.
2 Were you there when the cage system was set
3 up at the HBC warehouse in 2009?
4 A. Yes.
5 Q. And did you have responsibilities in
6 that role --
7 A. Yes.
8 Q. -- in getting ready to distribute
9 Schedule III and IV and V controlled substances?
10 A. Yes.
11 Q. And you said that you had some
12 interaction with DEA when doing that?
13 A. Correct.
14 Q. Does the name Lou Colissimo ring a bell
15 to you?
16 A. It does.
17 Q. And who is he?
18 A. I believe he was the DEA inspector at
19 the time.
20 Q. Was he from the regional DEA Pittsburgh
21 office?
22 A. I believe so, yes.
23 Q. And did he come out to the facility to
24 assist with setting up the facility for the
25 distribution of Schedule III, VI, and V controlled

Page 127

1 substances?
2 A. Yes.
3 Q. Did he assist with providing DEA input
4 as to what the DEA wanted the warehouse to do in
5 order to get a registration and license to
6 distribute Schedule III, IV, and Vs?
7 A. Yes.
8 Q. And did that involve -- first, I'll
9 break it down -- the physical plant itself, what
10 the DEA wanted and required to distribute IIIs,
11 IVs, and Vs?
12 A. Yes.
13 Q. And did you meet all those requirements
14 with Agent Colissimo?
15 A. We did.
16 Q. Did he or his team inspect the facility
17 before, during, and after construction?
18 A. Yes.
19 Q. Did they approve the facility in those
20 inspections?
21 A. Yes.
22 Q. Now, beginning in 2009, when HBC first
23 began distributing Schedule III, IV, and V
24 controlled substances, you mentioned the so-called
25 warehouse management system was called Manhattan?

Page 128

1 A. Yes.
2 Q. How long had that -- that was a
3 computerized system?
4 A. It was and is.
5 Q. And how long had that computerized
6 system been in effect at the warehouse in 2009?
7 A. 2005, we brought that onboard.
8 Q. And does that control the inventory at
9 the warehouse from beginning to end?
10 A. Yes.
11 Q. And does it also interface with the
12 Giant Eagle pharmacy ordering system?
13 A. It does.
14 Q. Does the Manhattan system inside the
15 warehouse, does it involve the use of scanners?
16 A. Yes.
17 Q. And is that given to all of the pickers?
18 A. Yes, it is.
19 Q. And, again, I'm just talking about the
20 pharmacy area.
21 The Vocollect system, is that at the
22 warehouse itself?
23 A. Yes.
24 Q. Does that interface with Manhattan?
25 A. Correct.

Page 129

1 Q. And does the Vocollect system provide
2 direction electronically to pickers for each order
3 that has come in from the pharmacies?
4 A. Yes.
5 Q. And can you explain to us a little bit
6 more in detail how the Vocollect system works.
7 A. The orders come from the stores. Again,
8 they come through our system, routing first, and
9 then into the Manhattan system. They interface
10 with Vocollect.
11 The team members are assigned a particular
12 area in the building, pharmacy being one of those
13 areas, and the narcotics cage being a specific
14 area.
15 The team member would state that they were
16 ready to work in a particular region. Once they
17 identify the region, they would also identify what
18 printer they were going to work from.
19 From there, the system -- based on some
20 controls, meaning everything in the building is
21 weighed and measured so that we can properly cue
22 the totes in the trailers, the team members would
23 then be given a set of labels that are specific to
24 what should go in that tote.
25 Q. And what is a tote? Is that a box of

Page 130

1 some sort?
2     A.  You could call that a plastic box, if
3 you will, with a lid that folds in from both
4 sides.
5     Q.  Okay.
6     A.  Once they identified the region, the
7 printer, and get their set of labels, then we
8 would dictate how many labels they would get so
9 that we could maintain balance in selection.  We
10 didn't want a particular selector stuck on one
11 store too long, potentially holding up routes.
12     Once that happened, the team member would
13 then be directed to an aisle, a bay, a shelf, a
14 slot.  And then they would be told to pick the
15 quantity that the pharmacy had ordered.
16     As they're picking the quantities, they had a
17 wrist scanner, and they would pass the individual
18 quantities in front of that wrist scanner.
19     Q.  Do you mean the bar codes --
20     A.  Yes.  The bar code.
21     Q.  -- of what was being picked?
22     A.  The bar code of what's being picked.
23     And as they would do that, they would place
24 it in the tote.
25     And then as they were finished, before they

Page 131

1 would get their next order to pick, they would
2 have to scan or call in a check digit of that slot
3 to confirm they were in the right slot.
4     Once they do that, then they would just -- it
5 was redundant after that of selection process.
6     Q.  So is the picking process through
7 Manhattan and the Vocollect system highly
8 computerized and monitored continually throughout
9 the day?
10     A.  Yes.
11     Q.  And does the system specifically tell
12 each picker where exactly -- you said the aisle,
13 the shelf, and the slot -- they're supposed to go
14 to make the pick?
15     A.  Yes.
16     Q.  And as they physically make the pick, it
17 scans right into the system?
18     A.  Yeah.  The team members pushing --
19 pulling it past a scanner.
20     Q.  They scan the bar code on their scanner?
21     A.  Correct.
22     Q.  So then the system knows that it's in a
23 specific tote at that time?
24     A.  Correct.
25     Q.  And what happens to -- when the picker

Page 132

1 is done picking in the narcotics room, what does
2 he do then?
3     A.  So the team members not in the narcotics
4 room would take their tote -- and there was an
5 opening with a conveyor going into the narcotics
6 cage -- they would put their tote on there.  It
7 would go into the narcotics room.  And then the
8 narcotics selector would pick their portion of
9 that order and place it in the tote.
10     Q.  I see.  So not all the pickers in the
11 warehouse were allowed in the narcotics room?
12     A.  Correct.
13     Q.  And you said only one or two at a time?
14     A.  Yes.
15     Q.  And once that picking was done in the
16 narcotics room, what happened -- and it was put
17 into the tote -- what happened to the tote?
18     A.  So once the selection is done and we
19 believe that we are ready to put that on the
20 trailer for shipment, our system has a process
21 where we have to scan every single individual
22 tote.
23     If you for some reason would miss a tote or
24 something was unaccounted for, the system would
25 not allow you to do what's called close load.  It

Page 133

1 then forces you down to a specific tote ID to
2 answer why or where that tote might be.
3     Q.  So did you need to close the load before
4 you shipped?
5     A.  Yes.
6     Q.  And once it was ready for -- the load
7 was closed and was ready for shipment, what
8 happened to the tote?
9     And I guess it was on a pallet of some sort?
10     A.  There would be pallets -- they were
11 already palletized.  The pallet would be
12 shrinkwrapped and then loaded onto the trailer.
13     Q.  And the trailers, who handled the --
14 whose trailers were they?
15     A.  They were Talon Logistic or Giant Eagle
16 trailers.
17     Q.  Did you ever do any shipping with
18 McKesson?
19     A.  McKesson -- we would deliver to
20 McKesson, and then McKesson would deliver out to
21 the pharmacies from there.
22     Q.  Okay.  So that's outgoing inventory.
23     In the process you described, the so-called
24 Manhattan system, through the use of bar codes and
25 scanners, would know every step of the picking

Page 134

1 process all the way up to the close load and is
2 ready for shipment?
3     A.  Yes.
4     Q.  And if there were any discrepancies in
5 that, you couldn't ship?
6     A.  Yeah.  We wouldn't ship.
7     Q.  Now, how about on the inbound side; who
8 determines what's coming into the warehouse?
9     A.  At that time that would have been Greg
10 Carlson's group.
11     Q.  At corporate?
12     A.  At corporate.
13     Q.  And did they manage incoming inventory?
14     A.  Yes.
15     Q.  Corporate?
16     How would the warehouse know what to expect?
17 Trucks just show up or would you be told by
18 corporate that expect --
19     A.  It would be scheduled through the
20 system.  We would know that a vendor or, excuse
21 me, a carrier was coming, and on that particular
22 carrier would be a specific vendor.
23     Q.  By the way, what type of physical
24 barriers or controls did you have for outgoing or
25 incoming shipments of narcotics?

Page 135

1     A.  We had several.  We have the cage
2 itself.  Outside of the cage, we had numerous
3 cameras.  I believe we had probably 30 or 40
4 cameras within that small confine.
5     Q.  30 or 40 cameras --
6     A.  Yes.
7     Q.  -- for the pharmacy room itself?
8     A.  Yes.
9     Q.  How about inside the narc room?
10     A.  I believe we at least had anywhere from
11 eight to 12 different angles looking at it, or
12 beaming into it, or an overlap.
13     Q.  And was that to guard against theft and
14 diversion?
15     A.  Correct.
16     Q.  All right.  And so once it was
17 palletized and ready for shipment, did it just sit
18 in the warehouse next to a crate of oranges?
19     A.  No.  We had two areas that -- it would
20 remain in the pharmacy room or it would be
21 monitored as it was being loaded.
22     Once it was loaded, the door was shut and
23 sealed, and those sealed numbers would be
24 communicated or written down on the outgoing
25 paperwork.

Page 136

1     Q.  You mean shut and sealed inside the
2 tractor-trailer?
3     A.  Correct.  In the trailer at -- while it
4 was stationed in our door.  And from there, it was
5 leaving.
6     Q.  Were there any precautions taken to
7 avoid people being able to slip in alongside the
8 trailer or under the trailer?
9     A.  Yes.  On a standard trailer in our door
10 50 and 51, they butted up very tightly against the
11 building itself.  And they were at the height
12 where there were no gaps around that.
13     If we had an inbound UPS/Fedex load coming
14 in, those are box trucks that are at a lower
15 level, and they can't use those normal dock.  So
16 what we had there was -- we had bollards, steel
17 bollards that were drilled into the ground.  We
18 had a steel plate welded onto those bollards so
19 that no one could slide up under the truck or
20 right into the building.
21     We also had created a cage where, when the
22 UPS driver or Fedex driver would come, they would
23 pull those cages to the sides of the vehicle.
24 Again, to deter anyone from having quick or easy
25 access into the building.

Page 137

1     If the driver was not delivering something
2 through that door and they had maybe one or two
3 cases and they were delivering them, first they
4 would have to ring a buzzer.
5     We had a camera right there so we could see
6 who was out there and if anybody was around or
7 near them, then make a determination if we were
8 going to let them into the building.
9     If we were going to let them into the
10 building, we then had a secondary cage, if you
11 will, at the door.  That was locked at all times
12 and monitored.  Then we would let them into there,
13 and then decide whether we were just going to
14 transact with them in the cage or let them into
15 the room itself.
16     Q.  This is all related to narcotics
17 transactions?
18     A.  This related to any of the pharmacy
19 items.  Again, the narcotics would have been in
20 the cage separate of that.
21     Q.  Okay.
22     A.  So they weren't coming directly into
23 that narcotics cage.
24     Q.  All of these physical controls, were
25 these something that Agent Colissimo from the DEA

Page 138

1  had asked HBC to install, or did this include some
2  of his recommendations and then --
3         MR. HUDSON: Object to form.
4         THE WITNESS: I would say they included.
5  BY MR. BARNES:
6     Q. And was he aware during his inspections,
7  before you began distributing controlled
8  substances, about all these safety precautions?
9     A. Yes.
10    Q. Would the warehouse get copies of the
11 purchase orders issued by the buyers or the
12 category managers at corporate?
13    A. Yes. We had the ability to print those
14 in-house.
15    Q. And so if a truck pulled up, you would
16 be able to pull the purchase order?
17    A. Yes.
18    Q. And were there controls to match what
19 was being delivered to the purchase order?
20    A. Yes. Absolutely.
21    So we had a confined area where we would do
22 the pharmacy receiving, whether it be narcotic or
23 otherwise.
24    If it was a temperature-sensitive item, then
25 we would bring it all the way into the room. If

Page 139

1  it was a narcotic, we would take it into the
2  narcotics cage and work it in the narcotics cage.
3     Regardless of those items, but we're going to
4  talk specifically to narcotics, from the purchase
5  order, the team member has no previous knowledge
6  of what they're receiving or what quantities they
7  should be receiving. They would tell the system
8  that they were going on the task to receive.
9     From that, they would use an RF hand-held
10 gun, and they would scan the bar code on the case
11 of the item.
12    Once they scan that, the system would come up
13 and say, for this particular item, from the
14 purchase order that was generated from corporate,
15 you should see X amount of units -- selling units.
16    Q. Okay.
17    A. Their job, then, was to count those
18 selling units, and then key in the units they
19 counted.
20    From there, a report would go to what we call
21 our support staff -- typically, Christy Hart or an
22 equivalent -- and they would get a reconciliation
23 report that they would monitor and review at each
24 step of the way to ensure that what we were told
25 we should be getting is what we received and what

Page 140

1  the team member received.
2     Q. What if there was a short; the purchase
3  order said 100 and 95 showed up?
4     A. So, first, we would go to the bill of
5  lading and/or the purchase order, make sure that
6  they -- that's truly what was supposed to ship.
7     If there's a short, first calls would
8  typically go out to the pharmacy group. They had
9  the direct relationship with that vendor and/or
10 manufacturer or carrier to say, you know, did you
11 truly send these? We're seeing a discrepancy.
12    And then we would go work from there to try
13 to solve that discrepancy.
14    Q. The Manhattan system, is it part of this
15 inbound system?
16    A. Absolutely.
17    Q. Is it monitoring the counting and the RF
18 guns as the bar codes are being read?
19    A. Yes.
20    And then the next step to that is each
21 separate pallet or items on the pallet get a
22 license plate number as to where they belong in
23 the warehouse.
24    So you have a quantity of 25 of 100. That
25 first pallet of 25, the system would register that

Page 141

1  you counted 25 for that pallet. You would then
2  scan the license plate next. And that now marries
3  those units to that license plate number.
4     And from there, when the put-away function is
5  done, the team member would scan that license
6  plate number. And from there, it would tell them
7  or direct them where to put it away in the
8  facility.
9     Q. So the put-away function, was that also
10 part of Manhattan?
11    A. Correct.
12    Q. And would Manhattan tell the put-away
13 team members exactly where the narcotics needed to
14 go in terms of slots and shelves and aisles in the
15 narcotics room?
16    A. Yes.
17    Q. And how was that process monitored to
18 make sure that the team members actually put away
19 what had been received?
20    A. Through our cycle count process.
21    Q. Tell us about the cycle count process.
22    A. So as stated earlier -- again, I may not
23 get the exact numbers, but we were really robust
24 on the cycle counts within the narcotics cage.
25    We were counting at the beginning of the

Page 142

1 shift. We were counting when the team members
2 would go on their breaks. We were counting at the
3 end of the selection of each route prior to
4 loading that route.
5     So to answer that question about the
6 put-away, if for some reason there would be a
7 discrepancy on the pick shelf, then your first
8 obvious area to look would be up in your reserves
9 to see if a replenishment was not properly made.
10    Q.  So this cycle counting for narcotics,
11 you said earlier and just now, was done multiple
12 times every day?
13    A.  Yes. Every day during every selection
14 process.
15    Q.  So let's just take an example of an HCP,
16 Vicodin. That would get counted at the beginning
17 of a shift?
18    A.  Yes.
19    Q.  In the narcotics room?
20    A.  Yes.
21    Q.  And then at the end of a shift?
22    A.  All through the shift.
23    Q.  All through the shift.
24    A.  Correct.
25    Q.  How would it get counted through the

Page 143

1 shift?
2     A.  As I stated, when the team members would
3 go on their breaks, the support staff would stay
4 and remain back and do a count.
5     When the selection was done for that route,
6 we'd go in and count the cage again.
7     Q.  Oh, at every break and at every
8 shipment?
9     A.  Yes.
10    Q.  And then at the end of the day?
11    A.  Correct.
12    Q.  So how many times, for example, would
13 Vicodin get counted in the specific slot and shelf
14 that it was on in the warehouse in any given day?
15    A.  In a number of routes, anywhere from
16 like four to six times.
17    Q.  Why were you doing all that cycle
18 counting?
19    A.  We wanted to ensure the integrity of
20 our -- of our inventory. But also it gives you an
21 opportunity to catch anything that may be -- that
22 may be amiss.
23    Q.  Would it give you an opportunity to spot
24 theft and diversion?
25    A.  It would.

Page 144

1     MR. HUDSON:  Object to the form.
2 BY MR. BARNES:
3     Q.  And was the Manhattan system the
4 computerized system that was monitoring every step
5 of this inbound and outbound process at the
6 warehouse?
7     MR. HUDSON:  Object to the form.
8     THE WITNESS:  Yes.
9 BY MR. BARNES:
10    Q.  Did the DEA come in from time to time
11 and look at the warehouse system and check
12 inventory and ask for records?
13    A.  Yes, they did.
14    Q.  How often did that happen?
15    A.  At least annually.
16    Q.  At least annually.
17    And what would they typically ask for when
18 they came in?
19    A.  They almost always -- I would say they
20 always went to the narcotics cage. They would
21 show up unannounced, introduce themselves, state
22 the nature of their business.
23    And they would -- I don't know whether they
24 randomly or how they decided on their list, but
25 they would show us or tell us which items they

Page 145

1 wanted to do counts on. And they would also tell
2 us what dates they want to see our records from.
3     Q.  So would they take, for example -- I'll
4 use Vicodin again. They'll say, we want all your
5 records on Vicodin for, what, a month or two-month
6 or three-month period of time?
7     A.  Each scenario, they would give us a
8 specific -- I believe a specific date or week in
9 the past. Even they'd say, Show me your records
10 from June of 2010.
11    Q.  And would you give them the records?
12    A.  We would.
13    Q.  Did any of these unannounced inspections
14 ever result in the DEA telling you that you're
15 doing something wrong at the warehouse?
16    A.  No, they did not.
17    Q.  Did the DEA ever find any discrepancies
18 with respect to the controlled substances that HBC
19 was distributing?
20    A.  No, they didn't.
21    Q.  Were the pickers in the narc rooms, were
22 they trained on the Manhattan system?
23    A.  Yes.
24    Q.  On how to use the scanners? How to
25 pick? Things of that nature?

Page 146

1    A.  Yes.

2    Q.  The headsets that they were wearing, was

3 Manhattan instructing through the headsets?

4    A.  Vocollect was instructing, yes.

5    Q.  I'm sorry.  Vocollect.

6    I mean, was there like a computerized voice

7 of some sort?

8    A.  Yes.

9    Q.  If I was wearing one, it would say, go

10 to aisle 3, bay 7, shelf 2, slot 7?

11    A.  Yes.

12    Q.  And then as I pick -- I'm a picker -- I

13 go to that slot, and I brush the bar code past my

14 wrist scanner?

15    A.  Correct.

16    Q.  And Manhattan then knows I did what I

17 was just told to do?

18    A.  Correct.

19    Q.  And does Manhattan then track the

20 inventory as it's being loaded into totes and then

21 all the way out the door?

22    A.  Yes.

23    Q.  You talked about the narcotics room

24 pickers.

25    Over time, would they become familiar with

Page 147

1 the stores' orders?

2    A.  Yes.

3    MR. HUDSON:  Object to the form.  Calls

4 for speculation.

5 BY MR. BARNES:

6    Q.  And, over time, do you recall them

7 raising issues with Christy Hart or yourself or

8 corporate that any order seemed unusual?

9    A.  I can't say with any specificity that --

10 on a particular order.  But I know there were

11 times where -- and they -- again, even outside of

12 the pharmacy, to this day, we still have team

13 members that see and catch those.

14    Q.  You talked about what was going on at

15 corporate.

16    The buyers were managing the incoming

17 inventory?

18    A.  Yes.

19    Q.  So if a pharmacy, for example -- let's

20 just take an example -- instead of ordering ten

21 bottles of Vicodin ordered a hundred, and the

22 pharmacist didn't catch it or intentionally put in

23 a hundred, were there any steps throughout the

24 system where that order could be caught?

25    A.  Yes.

Page 148

1    Q.  Were there multiple steps in the system

2 where that order would be spotted?

3    A.  Yes.

4    Q.  Let's just take that example through, a

5 hundred-bottle order of Vicodin.

6    If the pharmacist enters it into the system,

7 Manhattan takes it in, and it's a pending order

8 for the store -- let's just call it store 1.

9    A.  That's correct.

10    Q.  Somebody at corporate -- is anybody at

11 corporate looking at that order in any way?

12    A.  They could -- excuse me -- could.

13    Q.  Does corporate have access to the

14 Manhattan system?

15    A.  Yes.  They have full visibility.

16    Q.  Do the buyers, the category managers, is

17 it their primary duty to manage inventory at the

18 warehouse?

19    A.  Yes.

20    Q.  Would that include managing orders to

21 the manufacturers and shipments out of the

22 warehouse?

23    A.  Yes.

24    Q.  Do you have much familiarity with what

25 goes on at the pharmacies or is that totally out

Page 149

1 of your --

2    A.  That's out of my realm.

3    Q.  Are you aware of any procedures at the

4 pharmacies to take in narcotics orders and handle

5 them and control them?

6    A.  I know there was an inspection process,

7 and they had to double up on all orders, narcotic

8 orders coming in.

9    That's probably the extent of my knowledge.

10    Q.  But you never worked at a pharmacy.

11    A.  No, I did not.

12    Q.  And you never had any responsibility for

13 any of the pharmacies?

14    A.  No.

15    Q.  Do you know anything about the CSOS

16 systems or Supplylogix systems used at the

17 corporate level?

18    A.  To no detail.

19    Q.  That wasn't part of what you did?

20    A.  No.

21    Q.  You talked on direct examination about

22 policies that were written up, you said

23 memorialized --

24    A.  Right.

25    Q.  -- in approximately 2014?

Page 150

1    A.  Correct.
2    Q.  What did you mean by memorialized?
3    A.  These policies, procedures, or practices
4 that we had in place and were using.
5    And as you got into the VAWD certification --
6 again, I can't speak for Mr. Rogos or specifically
7 what he was doing.  But, you know, they had a very
8 finite way that they wanted information, as I
9 learned as I came into it.
10    And, you know, there was a -- a means of
11 getting that certification was to go into that
12 format.
13    Q.  All right.  But the fact that it was put
14 into that format at that time for VAWD, did that
15 mean that's the first time that a policy ever
16 existed or was ever followed?
17    A.  No.
18    Q.  Would you look back at Exhibit 5.
19    Remember you were asked a bunch of questions
20 about Exhibit 5?
21    A.  Yes.
22    Q.  Do those include some of the policies
23 that were memorialized in about 2014 for purposes
24 of VAWD?
25    A.  Yes.

Page 151

1    Q.  Beginning on Bates No. 594, this
2 compilation of policies, many of them relate to
3 the warehouse; is that correct?
4    A.  Yes.
5    Q.  The first policy listed on Bates
6 No. 595, this licensing policy, it says it was
7 effective 8/1 of '14 and then revised on 4/7 of
8 '15.
9    Did you have any specific involvement with
10 this policy?
11    A.  Not as of '14.
12    Q.  Did HBC have a policy of making sure
13 that its licenses were good and effective and
14 properly renewed?
15    A.  Yes.
16    Q.  Would that have been from 2009 forward?
17    A.  Yes.
18    Q.  If you go forward to page 597, there's a
19 so-called Giant Eagle document retention policy.
20    Do you see that?
21    A.  I do.
22    Q.  You referenced that a couple of times in
23 your testimony.
24    Did corporate have policies for when it was
25 going to delete emails and other records?

Page 152

1    A.  Yes.
2    Q.  And did it, from time to time,
3 effectuate those policies and go in and delete
4 emails and other records --
5    A.  Yes.
6    Q.  -- in accordance with the policy?
7    Do you recognize this policy in any way, or
8 one way or the other?
9    A.  I do.
10    Q.  Do you know how often emails were
11 routinely deleted as a matter of corporate policy?
12    A.  Not without reading through it.
13    Q.  Okay.  But you don't have any general
14 idea if it was X number of years or X number of
15 months?
16    A.  It all depended on the documents
17 themselves.  There was specific timeframes for
18 different types of documents.
19    Q.  Do you recall it ever happening to you
20 that as a result of its email deletion policy, it
21 would come in and delete some of your emails?
22    A.  Yes.
23    Q.  This is a long policy.  It goes all the
24 way -- well, it's a compilation of policies.  It
25 goes all the way to page 628.  But I want you to

Page 153

1 go to 629.
2    Do you see the security policy?  It's pretty
3 thick.
4    A.  I see it.
5    Q.  Now, is it your testimony that the
6 security policy was a memorialization of a
7 preexisting HBC policy that was put into writing
8 for VAWD purposes?
9    A.  Yes.
10    Q.  And there's a reference in the middle of
11 the first page of the policy, "All team members
12 with access to the narcotics cage or team members
13 involved in handling the Class III, IV, and V
14 pharmaceuticals at HBC must undergo DEA-required
15 background checks."
16    Was that something that was in effect in
17 November of 2009 going forward?
18    A.  It was.
19    Q.  Did all of the employees in the
20 narcotics room have to go through DEA background
21 checks?
22    A.  Yes.
23    Q.  Was that something that Agent Colissimo
24 recommended or --
25    MR. HUDSON:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    THE WITNESS:  I believe it was a
2  requirement.  And as part of Giant Eagle general
3  policy, we do drug and alcohol screening upon
4  employment --
5  BY MR. BARNES:
6    Q.  All right.
7    A.  -- for HBC.
8    Q.  So is it your understanding that anybody
9  whoever worked in the narcotics room had been
10  cleared through a DEA background check?
11    MR. HUDSON:  Object to the form.
12    THE WITNESS:  Yes.
13  BY MR. BARNES:
14    Q.  In accordance with this policy?
15    A.  Yes.
16    Q.  The policy continues that, "The secured
17  narcotics cage inside the pharmacy room containing
18  Class III, IV, and V pharmaceuticals must remain
19  locked at all times when not in use."
20    Was that a practice and policy in effect from
21  November 2009 going forward?
22    A.  Yes.
23    Q.  Then there's procedures as part of this
24  policy for the HBC pharmacy room, the narcotics
25  cage inside the HBC pharmacy room, the HBC

Page 155

1  pharmacy exterior.
2    And then we have HBC inbound procedures and
3  outbound procedures, HBC narcotics cage alarm
4  system, general security at HBC, and operating
5  hours.
6    Again, does this policy reflect things that
7  were already being done in 2009?
8    A.  Yes.
9    Q.  I just want to skip through a few of
10  these.
11    Go to the second page, page 630.  They're
12  talking about the HBC pharmacy room.
13    The first bullet at the top, "Team members
14  cannot enter the pharmacy room unless they are
15  granted access by the pharmacy room coordinators
16  or a member of the HBC management team."
17    Is that consistent with what you
18  described already?
19    A.  Yes, it is.
20    Q.  The last bullet in that section talks
21  about visitors to the HBC facilities.
22    Are they strictly -- visitors, are they
23  strictly monitored, especially with respect to
24  getting in or near the narcotics room?
25    A.  Yes.

Page 156

1    Q.  Are they even allowed in the narcotics
2  room?
3    A.  Unless there's some purpose or business
4  that we're aware of a need to, there would be no
5  reason to have a visitor in there.
6    Q.  Down below HBC Pharmacy Exterior, it
7  says, "Exterior entrance to the pharmacy room must
8  be controlled through fob access through a main
9  door."
10    Was that something that was in effect in '09?
11    A.  Yes.
12    Q.  What does fob access mean?
13    A.  The fob.  It's a device that team
14  members can get access into a facility.
15    Q.  Was the pharmacy -- the narcotics room,
16  was it only through the fob system?
17    A.  Yes.  We would send to loss prevention
18  specifically whose fob would be activated or not
19  activated.
20    Q.  I see.  So all workers in the warehouse
21  didn't have access?
22    A.  No.
23    Q.  Only those --
24    MR. MILLER:  I'm sorry to interrupt.
25  This is Jake Miller on the phone.  I just dialed

Page 157

1  in.
2    Is this the Fred Bencivenga deposition?
3    MR. BARNES:  No.
4    MR. MILLER:  Okay.  So that hasn't
5  started yet?
6    MR. BARNES:  No.  This is the Walt Durr
7  deposition.
8    MR. MILLER:  Okay.  Thank you.
9  BY MR. BARNES:
10    Q.  We were talking about the fob access.
11    A.  Right.
12    Q.  Only limited employees?
13    A.  Correct.
14    Q.  So if you were a narcotics room picker,
15  you had an fob access?
16    A.  You would have access to get into the
17  room.  And then we did not give any of them access
18  to the narcotics cage itself other than being let
19  in or when we would open it to actually do the
20  selection.
21    Q.  I see.  And when they were off shift,
22  did they have to turn in the fob?
23    A.  No.  The fob goes with them, but they --
24  it would only give them access, I'll say, to the
25  general areas.

Page 158

1    Q.   Oh, I see.  Okay.
2    All right.  Go forward, please, to page 633,
3  Inventory Control Suspected Loss Policy.
4    Do you see that?
5    A.   I do.
6    Q.   That policy says that "The HBC team
7  members monitor the physical drug inventory in
8  order to identify the loss, theft, or diversion of
9  pharmaceutical products, investigate all suspected
10  losses, and report internally to the company and
11  externally to the appropriate regulatory
12  agencies."
13    Was this policy in effect in 2009 going
14  forward?
15    A.   Yes.
16    Q.   Now, down below under the procedures
17  under this policy, it references Inventory Cycle
18  Counting.  Do you see that?
19    A.   I do.
20    Q.   It says, "Generic pharmaceuticals are
21  cycle counted two times a week."
22    A.   Correct.
23    Q.   Was that something done in 2009 going
24  forward?
25    A.   Yes.

Page 159

1    Q.   Were name brand pharmaceuticals counted
2  nightly --
3    A.   Yes.
4    Q.   -- after selection?
5    A.   Yes.
6    Q.   Reserve locations in the HBC pharmacy
7  warehouse, were they counted monthly?
8    A.   Yes.
9    Q.   What is the reserve location?
10    A.   Reserve location is any product in the
11  warehouse that does not physically fit on the
12  selections, or the pick slot, the immediate pick
13  slot.
14    Q.   Was the reserve location inside the
15  12,000-foot pharmacy area?
16    A.   Yes.
17    Q.   The next bullet says, "Narcotics Cage.
18  Pick slots are counted five times per night:
19  Preselection shifts, first selection break, lunch,
20  second selection break, and end of shift."
21    Is that what you described for us earlier?
22    A.   It is.
23    Q.   So any given controlled substance in the
24  narcotics cage would be counted at a minimum of
25  five times during the day?

Page 160

1    A.   Correct.
2    Q.   The second-to-last bullet talks about
3  "The Rx inventory counts are conducted in May and
4  November of each year."
5    What are those referencing?
6    Did you have physical inventories in May and
7  November of every year?
8    A.   Yes.
9    Q.   In addition to the cycle counting?
10    A.   Correct.
11    Q.   And then, finally, "Products are
12  inspected for signs of opening, use, or
13  tampering."
14    Is that something that was done routinely?
15    A.   Yes.
16    Q.   From 2009 forward?
17    A.   Yes.
18    Q.   Now, if a theft or a discrepancy
19  occurred, was there an internal investigation
20  process?
21    A.   Yes.
22    Q.   Who was normally in charge of that?
23    A.   It depends on what the situation was.
24  There were several.
25    We would reach out to the pharmacy group,

Page 161

1  depending if we believed it may have been at HBC
2  or at the pharmacy or in transit.  It could be a
3  host of people.
4    Our loss prevention was notified immediately.
5  The pharmacy group was notified.
6    Q.   Looking back in all your experience at
7  the HBC warehouse, was there ever a loss of
8  controlled substances that was significant?
9    A.   Not that I'm aware of.
10    Q.   You see under the second page of this
11  policy, under "Internal Investigation Process:
12  The criteria for a significant loss can include,
13  but are not limited to, any loss of a controlled
14  substance."
15    Is that considered an important issue if it
16  had ever occurred at HBC?
17    A.   Yes.
18    Q.   Did the HBC loss prevention work with
19  local police, DEA, and State Board of Pharmacy to
20  investigate any losses or thefts?
21    A.   They did.
22    Q.   Were those reported when discovered?
23    A.   If they were, they would have been.
24    Q.   This policy seems to also involve
25  quarantine products, things of that nature,

Page 162

1 outdated products.
2   Were these policies things that were followed
3 by HBC from 2009 going forward?
4   A.  Yes.
5   Q.  The next policy on page 636 is a damaged
6 and return product policy.
7   Was this a memorialization of a preexisting
8 policy that went all the way back to 2009?
9   A.  Yes.
10   Q.  And what is the purpose of this type of
11 policy?  What is its function?
12   A.  To ensure that any damaged or returned
13 products were being handled properly, and if they
14 required a quarantine, that they were properly
15 quarantined off.
16   Q.  Would this damaged or returned product
17 be monitored by the Manhattan system?
18   A.  Yes.  Just the fact that it says, "All
19 damaged product must be removed from active
20 inventory," you would have to go into Manhattan
21 to remove that from active inventory.
22   Q.  Okay.
23   A.  So there would be a record of that.
24   Q.  The next policy is -- on page 638 is the
25 suspicious order policy.  Do you see that?

Page 163

1   A.  I do.
2   Q.  It says, "Identified individuals from
3 Giant Eagle sourcing, pharmacy compliance, and HBC
4 team members must review pharmacy customer orders
5 and order trends on a regular and for-cause basis
6 to identify suspicious drug orders."
7   Do you see that?
8   A.  I do.
9   Q.  Was that something that was in effect in
10 2009 going forward?
11   A.  Yes.
12   Q.  And were suspicious orders blocked and
13 reported to the appropriate regulatory authority
14 within the timeframe set out in the policy?
15     MR. HUDSON:  Object to the form.
16     THE WITNESS:  I can't say that there
17 were any that were specifically blocked.
18 BY MR. BARNES:
19   Q.  But does this memorialize a preexisting
20 policy?
21   A.  Yes.
22   Q.  Do you know, one way or the other, if an
23 order was flagged as suspicious or as an order of
24 interest to a pharmacy, would the order be held or
25 would it be shipped to the pharmacy?

Page 164

1     MR. HUDSON:  Object to the form.
2     THE WITNESS:  If it were flagged, as you
3 said, as suspicious, the first call would be to
4 the pharmacy group --
5 BY MR. BARNES:
6   Q.  To determine what?
7   A.  -- to the store, and find out did they
8 truly make that order or put that order in.
9   If they did, then we would process the order.
10 If they didn't, then it would not be processed.
11   Q.  The next policy on page 640, the recall
12 policy, do you recognize this policy?
13   A.  I do.
14   Q.  And what's its purpose?
15   A.  To make sure that there's proper
16 handling and disposition of any recalled items.
17   Q.  Is that handled also by the Manhattan
18 system?
19   A.  Yes.
20   Q.  Is this a memorialization of a
21 preexisting policy?
22   A.  Yes.
23   Q.  The next policy, 642, customer
24 authentication, it says, "Giant Eagle only sells
25 prescription drug products to customers who can be

Page 165

1 verified as licensed by federal regulations and
2 the state regulatory authorities with jurisdiction
3 over that customer."
4   Under Procedure, it says, "The HBC Servicing
5 Company only services Giant Eagle pharmacies which
6 are owned along with HBC Servicing Company by
7 Giant Eagle, Inc."
8   What was the purpose of this policy?
9   A.  It was just to ensure that there was no
10 shipments or business done with any unlicensed
11 pharmacy, whether it be Giant Eagle or otherwise.
12 But, as it states, we were only servicing Giant
13 Eagle pharmacies.
14   Q.  Are you aware of any instance where a
15 Giant Eagle pharmacy became unlicensed and you
16 couldn't ship to them?
17   A.  No, I'm not.
18   Q.  And, again, was this a preexisting
19 policy memorialized in 2014?
20   A.  Yes.
21   Q.  The vendor customer authentication
22 policy on page 644, do you recognize this policy?
23   A.  Yes.
24   Q.  What's the purpose of this policy?
25   A.  To ensure that vendors that were

Page 166

1  bringing goods in were verified and authenticated
2  to be properly licensed.
3     Q.  Do you know who the prime vendors were
4  from '09 through '12?
5     A.  Not off the top of my head.
6     Q.  Was this the memorialization of a
7  preexisting policy?
8     A.  Yes.
9     Q.  On page 647, there's another recall
10 policy, that I think we already covered the recall
11 policy.
12    A.  We did.
13    Q.  Would your testimony be the same about
14 this policy?
15    A.  Yes.
16    Q.  The next policy on 649 is the quarantine
17 product procedure.  I think you mentioned that a
18 little bit already.
19    Is this the memorialization of a preexisting
20 policy?
21    A.  Yes.
22    Q.  The temperature and humidity policy on
23 653, was this a policy that was in effect prior to
24 2009 or at 2009 going forward?
25    A.  Humidity, no.  Temperature, yes.

Page 167

1     Q.  By the way, do you know the reason why
2  HBC did not finally get the VAWD certification?
3     Did it have to do with anything regarding
4  temperature or humidity?
5     A.  It did.  This is -- again, knowing that
6  we were going to move the operation, there was a
7  significant investment needed to meet the VAWD
8  requirements on temperature and humidity controls,
9  I believe down to the 15-minute increment.  And we
10 were not going to put that investment into HBC
11 knowing that we were going to move it.
12    Q.  Was HBC already able to monitor
13 temperature and humidity in some other way other
14 than 15-minute increments?
15    A.  Temperature, yes.  We, at the time, were
16 not monitoring humidity.  We didn't have a vault
17 at that time.
18    Q.  Was that the only requirement for VAWD
19 that HBC did not meet at the end of the day?
20    A.  To my knowledge --
21    MR. HUDSON:  Object to the form.  Lack
22 of foundation.
23 BY MR. BARNES:
24    Q.  I'm sorry.  What was your answer?
25    A.  To my knowledge, at this time.

Page 168

1     Q.  The next policy at 656, product
2  authentication outbound policy, do you see that?
3     A.  I do.
4     Q.  What is the purpose of this policy?
5     A.  We wanted to ensure that the number of
6  totes that the driver was taking and that we were
7  shipping were accounted for and that there was an
8  exact count for those.
9     Q.  Is that part of the process you
10 described for us concerning outbound shipments?
11    A.  Yes.
12    Q.  Was this policy a memorialization of a
13 preexisting policy that was in effect from '09
14 going forward?
15    A.  Yes.
16    Q.  The next policy on 658, product inbound
17 policy, can you tell us what the purpose of this
18 policy was?
19    A.  We started talking in, I'll say, some
20 details just to ensure that what was supposed to
21 come in was coming in in the right counts, right
22 quantities, and right condition, right lot
23 numbers, right code dating.
24    Q.  Were the policies and procedures set
25 forth in this policy in effect and being followed

Page 169

1  at the HBC warehouse from 2009 going forward?
2     A.  Yes.
3     Q.  The next policy on 662 is the pharmacy
4  personnel policy.
5     What is the purpose of this policy?
6     A.  This was, I'll say, more specific to
7  VAWD in that they wanted to know who the
8  designated representative is and who it would be
9  when the manager was not available.  They
10 wanted --
11    Q.  They wanted to -- I'm sorry.  They
12 wanted?
13    A.  They wanted to know the chain of command
14 through.
15    Q.  Was there a chain of command before this
16 was memorialized?
17    A.  Yes.
18    Q.  Is it the same as what's memorialized?
19    A.  I'll say to a degree.  Only that at that
20 time in 2009 up to '12 we had a pharmacy manager.
21 And then it appears the inventory manager took
22 over that role.
23    Q.  Other than that, there was a preexisting
24 chain of command?
25    A.  Correct.

Page 170

1    Q.   And the next policy on 665 is HBC
2 pharmacy personnel training policy.
3    Can you tell us the purpose of that policy?
4    A.   Just to ensure that the team members
5 were properly trained in the duties and
6 responsibilities for the pharmacy and narcotics
7 cage.
8    Q.   Does this policy memorialize policies
9 and procedures already in effect from 2009 going
10 forward?
11   A.   Yes.
12   Q.   And the last policy is the common
13 carrier policy on page 667.
14   Do you recognize this policy?
15   A.   I do.
16   Q.   And what is its purpose?
17   A.   To ensure that anyone that was carrying
18 for us outbound met the requirements to properly
19 transport the pharmacies -- pharmaceuticals.
20   Q.   Is this something that was already being
21 done from 2009 going forward?
22   A.   Yes.
23   Q.   Are you familiar with the security
24 requirement in the DEA regulations for controlled
25 substances?

Page 171

1    A.   Again, getting rusty, but yes.
2    Q.   What is the main purpose of the security
3 requirement, in your understanding?
4    MR. HUDSON:  Object to the form.  Lack
5 of foundation.
6 BY MR. BARNES:
7    Q.   What does it require?
8    A.   Theft diversion and suspicious order.
9    Q.   And do you know whether or not
10 compliance with that regulation is something that
11 is dependent upon the specific facts of each
12 specific distributor?
13   MR. HUDSON:  Object to the form.
14   THE WITNESS:  I would say yes.
15 BY MR. BARNES:
16   Q.   In working with the DEA and during their
17 multiple inspections before, during, and after the
18 HBC narcotics room was set up or any of their
19 surprise audits, did they at any time ever give
20 you any indication that HBC was not in full
21 compliance with the security requirement?
22   A.   No, they did not.
23   MR. HUDSON:  Object to the form.
24 BY MR. BARNES:
25   Q.   What is your understanding of whether or

Page 172

1 not the HBC facility complied with the security
2 requirements at all times from November of '09
3 through October of '14?
4    MR. HUDSON:  Object to the form.
5    THE WITNESS:  Up to 2012, they complied.
6 I can't speak for '13 and '14.
7 BY MR. BARNES:
8    Q.   Because you weren't there?
9    A.   I wasn't there.
10   Q.   You've testified multiple times about
11 the system that was in effect.  And you've now
12 described many aspects of that system to us in
13 great detail.
14   A.   I did.
15   Q.   That system that was in place -- I'll
16 have to limit it because you weren't there in '13
17 or '14.
18   The system that was in place at the HBC
19 warehouse in conjunction with the corporate
20 monitoring that was occurring in the pharmacy
21 intake procedures, did you believe that system met
22 the security requirements?
23   MR. HUDSON:  Object to the form.  Lack
24 of foundation.  Calls for a legal conclusion.
25

Page 173

1 BY MR. BARNES:
2    Q.   Go ahead.
3    A.   I did.
4    Q.   And did you also believe that that
5 system would be capable of detecting a suspicious
6 order at multiple levels?
7    A.   Yes.
8    MR. HUDSON:  Same objection.
9 BY MR. BARNES:
10   Q.   And would you expect the systems that
11 were in place throughout that time period to
12 detect a suspicious order if entered by any
13 pharmacy?
14   MR. HUDSON:  Same objection.
15   THE WITNESS:  Yes.
16   With us being a small regional group and
17 knowing all of our pharmacies and our customers,
18 our customer base, and the multiple layers we have
19 not only at the pharmacy, at HBC, and at
20 corporate, you know, it's within the closed
21 circuit of our network and it would be picked up
22 if there was such a...
23 BY MR. BARNES:
24   Q.   Would you expect any suspicious orders
25 in that kind of a system?

Page 174

1    A.  Not really.
2    Q.  Do you know whether -- you learned at
3  some point that a threshold system was added to
4  the system of controls at the warehouse?
5    MR. HUDSON:  Object to the form.
6  Misstates his testimony.  He's already testified
7  he wasn't aware of that.
8    MR. BARNES:  Pardon me?
9    THE WITNESS:  I would agree.  At that
10  time I was not aware.
11  BY MR. BARNES:
12    Q.  At what time are we talking about?
13    A.  In '13 and '14.
14    Q.  But when you came back to the HBC
15  facility in 2015, did you learn that there was --
16    A.  At some point I learned that there was
17  something in place.
18    Q.  Involving a threshold system?
19    A.  I wasn't aware of the details of how the
20  system was operating.
21    Q.  Did the DEA get involved when the Giant
22  Eagle Rx distribution center was being
23  constructed?
24    A.  Yes.
25    MR. HUDSON:  Object to the form.

Page 175

1  I thought you were stopping me from asking
2  questions because you said --
3    MR. BARNES:  I was.  But I didn't want
4  to leave the record -- since you opened the door
5  to a little bit of questioning --
6    MR. HUDSON:  Fair enough.  Proceed.
7    MR. BARNES:  -- I can't resist walking
8  through it.
9    MR. HUDSON:  Sure.
10  BY MR. BARNES:
11    Q.  Did they perform a similar function with
12  respect to advising Giant Eagle as to what they
13  wanted at that facility both in terms of physical
14  and other types of controls?
15    A.  Yes, they did.
16    Q.  And did Giant Eagle follow the DEA's
17  advice and recommendations?
18    A.  Yes, they did.
19    Q.  Did the DEA ever advise you or anybody
20  else at HBC that it had to keep every email or
21  every document or record every phone call ever
22  made with respect to any order?
23    A.  No, they did not.
24    Q.  Are you aware of any policy at all that
25  any of that had to ever be retained?

Page 176

1    A.  No, I'm not.
2    Q.  In any of the DEA inspections, did they
3  ever say, wait a minute, you didn't record every
4  phone call.  We want every email saved.  We want
5  every file maintained?
6    Did they ever say that to you?
7    A.  No, they did not.
8    Q.  Did the Manhattan system, based upon all
9  the descriptions you gave us, did it provide
10  information and functionality to HBC and/or
11  corporate and/or the pharmacies to review orders
12  and to detect suspicious orders?
13    A.  There was information available, yes.
14    Q.  But that system didn't, as a matter of
15  automatic computer processing, intervene and stop
16  an order of any particular quantity.
17    Is that your testimony?
18    A.  No, it did not.
19    Q.  But human intervention could do that?
20    A.  Yes.
21    MR. BARNES:  I have nothing further.
22    RE-EXAMINATION
23  BY MR. HUDSON:
24    Q.  Mr. Durr, you were asked questions about
25  the DEA.  So let's start there.

Page 177

1  Did the DEA ever inspect or review HBC's
2  suspicious order monitoring policies or procedures
3  of controlled substances, to your knowledge?
4    A.  Not to my knowledge.
5    Q.  Did the DEA ever tell you, or anyone
6  affiliated with HBC, that HBC had complied with
7  all aspects of the Controlled Substances Act,
8  including the suspicious order monitoring
9  requirements?
10    A.  I would say by the nature of not having
11  any complaints or issues filed with or towards us,
12  that they did say that we were compliant in all
13  aspects.
14    Q.  To your knowledge, did the DEA ever
15  review whether or not HBC's policies, procedures,
16  or practices in monitoring suspicious orders
17  complied with the Controlled Substances Act, to
18  your knowledge?
19    A.  I would just say they did.
20    Q.  You believe that they did?
21    A.  Yes.  I believe they did.
22    Q.  When did they do that review?
23    A.  When they would do their annual audits.
24    Q.  And what questions did they ask you or
25  others on your team that led you to believe that

Page 178

1 they were auditing your compliance with the
2 suspicious order monitoring?
3    A.  Specifically wanting to understand the
4 movement of quantities through the entire
5 operation and through HBC.
6    Q.  Anything more specific that led you to
7 believe that they were investigating your efforts
8 to comply with the suspicious order monitoring
9 requirements of the Controlled Substances Act?
10    A.  Not that I could say at this time.
11    Q.  So what is it about the movement of the
12 product through the system that leads you to
13 believe that they were evaluating whether or not
14 you were monitoring suspicious orders of
15 controlled substances?
16    A.  It's my belief the DEA, one of their
17 purposes and responsibilities is to ensure the
18 safe receipt and distribution of any and all
19 pharmaceuticals.
20    So for them to come in, they're not coming in
21 just to see how we're doing, they're coming in to
22 understand how we are performing our tasks and are
23 we performing our responsibilities within the
24 confines of either the regulation or the law.
25    Q.  Have you ever read the controlled

Page 179

1 substance laws or regulations?
2    A.  I can't say I've read -- have read them
3 all the way through.  I may have read an excerpt
4 here and there.
5    Q.  Can you, as you sit here today, describe
6 for us what the requirements of the Controlled
7 Substances Act are at just a general level?
8    A.  The requirement was to have the ability
9 to look for and ensure there's no theft,
10 diversion, or suspicious ordering.
11    Q.  And are there specific provisions of the
12 federal framework that relate to security and
13 avoiding theft?
14    A.  I believe there is.
15    Q.  And are there specific provisions that
16 relate to monitoring suspicious orders of
17 controlled substances?
18    A.  I believe there is.
19    Q.  And are those separate provisions?
20    A.  I don't know off the top of my head
21 right here.
22    Q.  Well, as you sit here today, under oath,
23 can you say that you're aware of inquiries by the
24 DEA of HBC that related specifically to the
25 suspicious order monitoring requirements of the

Page 180

1 Controlled Substances Act?
2    MR. BARNES:  Objection.  Asked and
3 answered twice.
4    THE WITNESS:  I can't say that.
5 BY MR. HUDSON:
6    Q.  And I believe you testified -- and I
7 want to make sure the record is clear -- that when
8 you were -- when the facility was preparing itself
9 to act as a distributor of controlled substances,
10 you spoke with Agent Colissimo, I think you said
11 two times?
12    A.  I don't know the exact time, but yes.
13    Q.  Or two times that you can recall; is
14 that fair?
15    A.  I think that would be fair.
16    Q.  And how long were those conversations?
17    A.  I couldn't recall.
18    Q.  Anything more specific you can say, as
19 you sit here, about what you and Agent Colissimo
20 discussed?
21    A.  No, not at this time.
22    Q.  How about any of the audits, the annual
23 audits that you talked about; anything
24 specifically that you can recall that you and the
25 DEA agents that were conducting those

Page 181

1 investigations discussed?
2    A.  No.
3    Q.  One of the things you were asked about
4 is your opinion of whether or not there could be
5 suspicious orders in the system that Giant Eagle
6 and HBC had.
7    Do you remember those questions by HBC's
8 counsel?
9    A.  I do.
10    Q.  What is your idea or your understanding
11 of what a suspicious order is?
12    A.  It's my own personal view of it.
13 Anything that's not in the quantities or in the
14 format that it was intended to be.  Meaning a
15 store called for two units and discovered that it
16 only got one.
17    In itself, that becomes suspect and requires
18 investigation.
19    Q.  Any other examples you can come up with
20 of suspicious orders?
21    A.  Not specifically.
22    Q.  So are you aware of any time when, at
23 HBC, the inventory counts were off?
24    A.  Again, not specifically.  But I've got
25 to believe through the course of our operation,

Page 182

1 there would have been a time where the inventory
2 would have been off.
3     Q.  And in that situation, would that be a
4 potential risk for diversion?
5     A.  No.  I don't believe so.  Again, because
6 of the close circuit or the -- how will I say
7 it -- the fact that we were distributing to
8 ourselves, you know, the next stop or step would
9 have been that it would have gone to a pharmacy,
10 and there were checks and balances at the
11 pharmacy.
12     So there's a lot of layers that it would have
13 to go through.
14     Q.  If a picker went and just went in and
15 took an item and then bar-coded it as if it had
16 or -- in other words, found out some way to -- by
17 the way, was there ever any theft, that you're
18 aware of, that ever occurred at the HBC facility?
19     A.  Yes.
20     Q.  Approximately how many times?
21     A.  One.
22     Q.  And when did that happen?
23     A.  I got to believe it was 2012.
24     Q.  Was that a picker or selector?
25     A.  No.

Page 183

1     Q.  Who was that?
2     A.  It was one of the managers.
3     Q.  What was his or her name?
4     A.  Andy Zelaski.
5     Q.  Andy Zelaski was caught stealing?
6     A.  Yes.
7     Q.  Was it controlled substances?
8     A.  I don't know the form that -- of whether
9 it was or not.  I don't believe it was.
10     Q.  But he was caught stealing narcotics?
11     A.  No.  I don't believe it was.
12     Q.  What was he caught stealing?
13     A.  It was Viagra.
14     Q.  Viagra?
15     A.  Yes.
16     Q.  And that was a manager?
17     A.  Yes.
18     Q.  How long had that been going on?
19     A.  It happened one time, and he was
20 immediately caught by our systems.
21     Q.  Okay.
22     A.  Christy caught it through the counts and
23 immediately reported him.
24     Q.  Do you see, in your mind, a connection
25 between the security requirements or the inventory

Page 184

1 count issues and monitoring for suspicious orders
2 of controlled substances?
3     MR. BARNES:  Object to the form.
4     THE WITNESS:  I'm not sure I'm following
5 you on that.
6 BY MR. HUDSON:
7     Q.  Well, making sure the inventory count is
8 right is one of the things you've talked about a
9 lot today; right?
10     A.  Correct.
11     Q.  But the inventory count can still be
12 right, but you could have a suspicious order;
13 correct?
14     MR. BARNES:  Object to form.
15 BY MR. HUDSON:
16     Q.  Let me try it this way.
17     A.  I would say yes, but through our systems
18 it would still be caught.
19     So if my inventory is correct, the checks and
20 balances on the other side of our closed loop at
21 the pharmacies would detect it.  As soon as they
22 would detect it, because they're checking that
23 inbound order specific to each unit, sell unit,
24 they would call back to us and say, Guys, I was
25 supposed to get two.  I got one.

Page 185

1     Immediately, we are going to start
2 researching that.  And what that research would
3 yield, who knows.  But, you know, we would start
4 looking at all of our cameras.  We would start
5 looking at who was in that particular area, who
6 might have been making those selections.
7     You know, the point of Manhattan is we
8 know -- through that bar code on our tote, I can
9 tell you who selected and what they selected down
10 to the seconds of when they were supposed to make
11 that pick.
12     So with that, and the way we had our cameras
13 angled, we could see if a team member were -- even
14 accidentally put it in the wrong tote or tried to
15 slip it into their pocket.
16     Because as soon as that store says, I should
17 have gotten two, we have a time stamp of when
18 those two should have been picked.
19     Q.  And so, in your mind, the inventory
20 counts in the closed-loop system should always be
21 right.
22     A.  Correct.
23     Q.  And as you sit here today, you're not
24 aware of any time when the inventory counts were
25 not right.

Page 186

1  A.  I can't say that I could sit here and
2  say there's any time where they weren't right.  I
3  would tell you that if they weren't, they would
4  have been reconciled and answered for.
5  Q.  So in your mind, though, if the
6  inventory count was right at -- on the inbound
7  orders, it was right with what was happening at
8  the HBC warehouse, and it was right at the retail
9  pharmacies, that would eliminate concern about
10 suspicious orders of controlled substances?
11 A.  Yes.
12 Q.  In terms of your process of monitoring
13 for controlled substances, the focus was on making
14 sure that those inventory counts were right to
15 eliminate the concern about controlled substances.
16 Did I --
17 MR. BARNES:  Object to the form.
18 MR. HUDSON:  Hold on.
19 BY MR. HUDSON:
20 Q.  Did I get that right?
21 MR. BARNES:  Object to form.  Misstates
22 his testimony.
23 THE WITNESS:  I think that would be just
24 one aspect of it.
25

Page 187

1  BY MR. HUDSON:
2  Q.  But as we've talked about, was that the
3  primary or the main thrust --
4  MR. BARNES:  Object to form.
5  BY MR. HUDSON:
6  Q.  -- of your system or program?
7  MR. BARNES:  Object to form.
8  THE WITNESS:  I can't say it was
9  primary.  It was just one part and parcel.
10 BY MR. HUDSON:
11 Q.  If we look at the policies that you were
12 asked about, I want to go specifically to the
13 suspicious order policy, which is on Bates ending
14 638.
15 MR. HUDSON:  So this is -- the internal
16 number is 5003, and the Bates ending 638.
17 BY MR. HUDSON:
18 Q.  Mr. Durr, if I understood your testimony
19 right, you're saying that this policy memorialized
20 in writing practices that had already been
21 followed at the HBC warehouse?
22 A.  That's what I stated.
23 Q.  Now, take a look -- I want to give you
24 an opportunity to read this policy carefully.
25 A.  Okay.

Page 188

1  Q.  My question is going to be:  Is it your
2  testimony that between 2009 and 2014, HBC followed
3  in all respects what's set forth here in this
4  written policy?
5  MR. BARNES:  Object to form.  Timeframe
6  issue again.  But with that qualification...
7  THE WITNESS:  I can't say with absolute
8  certainty, not having the policies and procedures
9  that may have physically been in place in 2009 to
10 2012, and if, or any, enhancements may have been
11 made or added to this document that Matt Rogos put
12 together.
13 BY MR. HUDSON:
14 Q.  So from 2009 to 2012, the practices or
15 procedures or policies that were followed at the
16 HBC facility, you have no ability, as you sit here
17 today, to compare those to what we've got before
18 us in Exhibit 5, the August 1, 2014 suspicious
19 order policy that Matt Rogos put together?
20 A.  I do not.
21 Q.  If you look at page 2 of the policy
22 Mr. Rogos put together, one of the last bullet
23 points on the second page is, "HBC retains the
24 records of the investigation and outcome for six
25 years."

Page 189

1  Do you see that?
2  A.  I do.
3  Q.  At least starting in August 1 of 2014,
4  or even into April of 2015, did HBC maintain
5  records of investigations and outcomes for six
6  years?
7  A.  If there were any, I would have to go
8  back and look.  I can't answer that.
9  Q.  As you sit here today, you don't know,
10 between August 1 2014 and the present, if HBC
11 conducted any investigations of suspicious orders?
12 A.  I do not.
13 Q.  And, therefore, I assume you would not
14 know of any outcomes of any investigations;
15 correct?
16 A.  Correct.
17 Q.  So the idea that these -- all of these
18 written policies that were -- appear to all be --
19 nearly all of them created on the same day, on
20 August 1 of 2014, the idea that those memorialized
21 practices that were already being followed in each
22 and every way at the HBC facility, that's not
23 something that you can testify to today without
24 looking back and trying to figure out what
25 happened at the facility from 2009 to 2012.

Page 190

1    MR. BARNES: Object to form.
2  Misstates his testimony.
3  BY MR. HUDSON:
4    Q. Is that fair?
5    A. I would say what's fair is I can't
6  produce a document at this time to make any
7  word-by-word comparison of practices and
8  procedures that were in place as we reviewed
9  through each one of these.
10    Q. Right. In a general way, there was some
11  sort of practice or some sort of procedure that
12  existed on these topics.
13    A. I wouldn't say in general. Many --
14  there were specific policies and procedures.
15    Q. But at least for the suspicious order
16  policy, you would agree that if we took the 2014
17  policy and we compared it to what practices were
18  existing in 2009 to 2012, that's not something
19  that you can do here today testifying without
20  providing you with more information.
21    A. I would agree. It's not something I can
22  do here today.
23    Q. And so that's all I'm getting at is, is
24  this idea that you're testifying that in all ways
25  these written policies memorialized practices that

Page 191

1  were already existing at HBC is not something you
2  can categorically say, absolutely, that's true, in
3  all ways we were already following these written
4  policies from 2009 to 2012.
5    MR. BARNES: Objection. Lack of
6  foundation. You mean verbatim?
7    MR. HUDSON: You're now saying he lacks
8  foundation to testify about these policies?
9    MR. BARNES: No. I meant to object to
10  form.
11    MR. HUDSON: Okay.
12    MR. BARNES: You're asking him to, in
13  his mind, compare those written policies verbatim,
14  word for word, to prior policies that aren't in
15  front of him?
16  BY MR. HUDSON:
17    Q. Did you understand the question?
18    A. I did.
19    I cannot verbatim.
20    Q. Okay.
21    A. But we did have those policies and
22  procedures in place.
23    Q. When you say policies or procedures,
24  tell me in your mind the difference between a
25  policy or a procedure and a practice.

Page 192

1    A. Policy is written on the expectation of
2  the operation.
3    The procedure is how we're going to go about
4  performing those responsibilities.
5    I'd say the practice is just to suggest how
6  do we practice those procedures, how do we conduct
7  ourselves within the confines of those procedures.
8    Q. So when you're talking about
9  memorializing, does memorialize, in your mind,
10  mean put into writing?
11    A. It does.
12    Q. So as you sit here today -- or I should
13  say, counsel for HBC hasn't shown you or brought
14  to your attention any other written policies other
15  than ones that we looked at today when I was
16  asking you questions; right?
17    A. That's correct.
18    Q. And as you sit here today, in your mind,
19  you can't think of any specific written policies
20  that you're aware of that existed at sometime, but
21  don't exist now.
22    MR. BARNES: Object.
23    THE WITNESS: Well, I can. And we went
24  through every one of those. What I don't and
25  can't do is produce those for you today to make a

Page 193

1  comparison.
2  BY MR. HUDSON:
3    Q. Well, that's why I'm confused, because
4  you testified that they were memorialized, which I
5  thought meant put into writing.
6    Are you testifying that all of these written
7  policies, there was a prior version of them that
8  existed at HBC earlier in time?
9    A. I cannot sit in front of you today and
10  say that emphatically. But that is my belief, we
11  had those in writing at that time.
12    Whether Mr. Rogos was aware of those and used
13  those to make revisions off of or whether he
14  constructed these some other way, I can't answer
15  that. You'd have to ask Matt Rogos that.
16    Q. And can you say which ones you think
17  there were prior written policies on or not?
18    I'm trying to get a sense of the HBC
19  organization, what were the policies, practices,
20  and procedures that were governed between 2009 and
21  2012.
22    A. I believe we did that when we went
23  through that entire list. Those are the ones I
24  believe were --
25    Q. When HBC's counsel was asking you

Page 194

1 questions or when I was asking you questions?
2   A.  Well, they're one and the same as far as
3 the list that we went down through.
4   Q.  So he walked you through a set of these
5 policies.  And it's your testimony, for each one
6 of them that you covered, you believe that there
7 was a prior version of these policies that
8 existed.
9   A.  I do.  And not verbatim, and there's no
10 way for me to know that.
11   Q.  And my question would be, then:  Do you
12 know why, for each one of these policies in
13 Exhibit 5, they all have or nearly all have
14 effective dates and created dates of August 1 of
15 2014?
16   A.  I would ask you to direct that to
17 Mr. Rogos.  I can only speculate.
18   Q.  Sure.  In your mind, do you believe that
19 those were -- that's an error to say that, because
20 there was a previous version of these policies
21 that was created earlier?
22   A.  It's just an opinion.
23   Q.  Sure.  I know.
24   Is that your opinion?
25   A.  I believe Mr. Rogos had to put a format

Page 195

1 together to set up for the VAWD certification.
2   Again, I can't answer as to why he chose this
3 particular header.  And just knowing Matt through
4 the years as I've known him, if he was putting his
5 name to something specifically and he was creating
6 a document, then he was going to attach the date
7 of something he did, not specifically anything
8 that he had prior.
9   So I can't answer that.
10   Q.  If we go back to Exhibit 5, which has
11 got the internal number of 5003, these versions of
12 these policies that we were looking at, they're
13 all revised in that -- or last reviewed, I guess,
14 is April 9 of 2015; right?
15     MR. BARNES:  Object to form.
16     THE WITNESS:  Could you say that again,
17 please.
18 BY MR. HUDSON:
19   Q.  Sure.  This list -- this set of policies
20 that we've got that are put together in Exhibit 5,
21 these all have a revision date of April 9 of 2015;
22 right?  Most of them?
23   A.  Most of them.
24   Q.  And they also have a last reviewed date
25 of April 9 of 2015; right?

Page 196

1   A.  Most of them.
2   Q.  Most of them have an effective date and
3 a created date of August 1 of 2014.
4   A.  That is correct.
5   Q.  Do you have any knowledge about who
6 created the first -- the initial version of these
7 policies on or around August 1 of 2014?
8   A.  On or before --
9   Q.  On or around.
10   A.  -- '14?
11   Q.  Yeah.  In other words --
12   A.  Not in '14.
13   Q.  Were you involved in that process at
14 all?
15   A.  I was not.
16   Q.  Have you talked to anyone who was
17 involved in that process?
18   A.  I did not.
19   Q.  So as you sit here today, do you know if
20 Mr. Rogos was even the one that created the
21 August 1, 2014 policies?
22   A.  I can't answer that.
23   Q.  Do you know if there's even a copy of
24 policies that exist that were created around
25 August 1 of 2014?

Page 197

1   A.  I do not.
2   Q.  How would I try to figure out what
3 policies or procedures existed at HBC between 2009
4 and 2012?
5   Is there any way to do it?
6     MR. BARNES:  You mean besides his
7 testimony?
8     MR. HUDSON:  Well, he's not able to
9 testify about it, but anyway.
10     MR. BARNES:  He did testify to it.
11     MR. HUDSON:  He's not been able to
12 testify, but that's all right.
13 BY MR. HUDSON:
14   Q.  Is there any way I could -- can you
15 say -- can we go through --
16     MR. BARNES:  We did.
17 BY MR. HUDSON:
18   Q.  -- Exhibit 5.
19   You can testify, under oath today, that each
20 and every one of these policies that's contained
21 in Exhibit 5, there was a policy that covered the
22 same subject between 2009 and 2012 for the HBC
23 warehouse?
24   A.  For the subject topic, yes.  To the
25 verbatim, no.

Page 198

1   Q.   And it was a written policy?

2   A.   I believe it was.

3   Q.   So there was a written suspicious order

4 monitoring policy that existed at HBC between 2009

5 and 2012?

6   A.   I believe there was.  I don't have any

7 way to prove or disprove it at this time.

8   Q.   What was the system that was supposed to

9 be followed according to the -- what did that

10 written policy say about how the system was going

11 to operate?

12   A.   I cannot begin to quote that verbatim.

13   Q.   Did it have any reference to the pickers

14 or selectors, and sort of lay out that process

15 that you've described, how they would use their

16 experience and knowledge to try to identify

17 suspicious orders?

18   A.   I would only be speculating again.

19   Q.   Did it have any criteria for those

20 pickers or selectors to use, to try to figure out

21 what an order of unusual size is?

22   A.   Again, I'm only speculating at this

23 time.

24   Q.   What do you mean that you're only

25 speculating?

Page 199

1   A.   I'm going on ten-plus years of memories,

2 in that range, of what was exactly written and not

3 written.  And I don't have it to substantiate or

4 negate it one way or the other at this time.

5   Q.   Between 2009 and 2012, how many written

6 policies do you recall being created at HBC?

7   A.   I can't give you an exact number.

8   Q.   Can you remember the specifics about any

9 particular policy that was created at HBC between

10 2009 and 2012?

11   A.   No.

12   Q.   In terms of diversion at the pharmacy,

13 HBC has got -- well, today they've got about 200

14 pharmacies, right, or stores?

15   A.   I would think I'm not as in touch with

16 it as I was.

17   Q.   But somewhere north, probably, of a

18 hundred stores in that 2009-to-2012 timeframe; is

19 that fair?

20   A.   Yes.

21   Q.   How many of those pharmacies have you

22 visited?

23   A.   During that timeframe, we would make at

24 least annual visits to the stores, and I would

25 stop at the pharmacies.

Page 200

1   Q.   I guess I should have asked the question

2 more specifically.

3   Do you have any knowledge about the policies

4 and procedures that existed at those retail

5 pharmacies for trying to spot diversion?

6   A.   Not the direct knowledge, no.

7   Q.   Do you know what steps pharmacists took

8 to try to identify phoney prescriptions?

9   A.   I can't answer that.

10   Q.   Do you know whether or not pharmacists

11 tried to flag prescriptions that were being

12 brought in by patients from out of state?

13   A.   I can't answer that.

14   Q.   Do you know whether or not pharmacists

15 tried to identify whether there were doctors in

16 the area who were writing prescriptions to

17 patients where the opioids weren't medically

18 necessary?

19   A.   I can't answer that.

20   Q.   So when counsel for HBC asked you what

21 happened to the controlled substances when they

22 went -- after they left the HBC warehouse, I think

23 you testified that they then went to Giant Eagle

24 retail pharmacies, and then were filled with legal

25 prescriptions; right?

Page 201

1   A.   Correct.

2   Q.   But as you sit here today, can you

3 testify under oath that between 2009 and 2014 each

4 and every prescription that was filled at Giant

5 Eagle retail pharmacies was a legal prescription

6 that was valid for a necessary medical purpose?

7       MR. BARNES:  Object to form.

8       THE WITNESS:  No.  I would leave that

9 for the pharmacies -- pharmacists and pharmacies

10 to answer.

11 BY MR. HUDSON:

12   Q.   So in terms of diversion that may or may

13 not have occurred at the pharmacy level, would you

14 say that that's out of your realm of something

15 that you would have the ability to testify about?

16   A.   Yes.

17   Q.   If we go back to potential diversion at

18 the HBC warehouse, one of the things that you

19 testified about was tote counts?

20   A.   Yes.

21   Q.   Are you ever aware of times where the

22 HBC tote counts for controlled substances were

23 wrong?

24   A.   Not off the cuff.

25   Q.   Did anyone from McKesson ever bring to

Page 202

1 your attention concerns that HBC tote counts may
2 be off?
3        MS. MONAGHAN: Object to form.
4        THE WITNESS: I can't say they did or
5 didn't. If they would have, it would have been
6 addressed and an investigation would have been
7 conducted as to why and what happened and where
8 they went.
9        Again, we'd, if needed, get loss prevention
10 involved, either ourselves in, and alert McKesson,
11 and they would follow their own policies,
12 procedures, and protocol.
13       We would start looking at all of our camera
14 views, and again try to understand what the
15 discrepancy may be.
16 BY MR. HUDSON:
17    Q. My question -- sorry. I appreciate you
18 explaining what would happen if somebody brought
19 that to your attention.
20    My question is just: At any point in time
21 between 2009 to 2014, did anyone bring to your
22 attention or, to your knowledge, to the attention
23 of anyone at HBC any concerns by McKesson that the
24 HBC tote counts may not be accurate?
25    A. From 2009 to 2012 I can answer for. And

Page 203

1 not that I recollect at this time.
2    Q. On the VAWD certification, you were
3 asked questions about why the HBC facility did not
4 obtain VAWD certification.
5    Sir, do you know all of the reasons why that
6 HBC facility was not certified by VAWD?
7    A. As I'm sitting here right now, I've not
8 refreshed myself on that. But I know specifically
9 the one item that did keep us from getting the
10 certification was the temperature and humidity
11 controls monitoring.
12    Q. Sure. And I wanted to just make sure
13 I'm understanding your testimony correctly.
14    You've not gone back to look at the VAWD
15 documents to figure out whether there are other
16 reasons, but you do know that at least one reason
17 that existed was the temperature control every
18 15 minutes, that issue?
19    A. That is correct.
20    Q. Are you aware of any issues at the Giant
21 Eagle retail pharmacies with pharmacists stealing
22 or diverting any controlled substances?
23    A. No, I'm not.
24    Q. Is that something that, if that
25 occurred, would be brought to your attention?

Page 204

1    A. No.
2    Q. I think the record is clear on this, so
3 I apologize. Bear with me.
4    But both Manhattan and Vocollect, neither one
5 of -- those two are both inventory management
6 systems; correct?
7    A. It's a warehouse management system that
8 encompasses inventory functions.
9    Q. Sure. But Manhattan and Vocollect, the
10 idea of those two working together is to allow HBC
11 to manage the warehouse and make sure that the --
12 and track the inventory, and then -- through both
13 incoming and outgoing, and then manage the process
14 of filling orders?
15       MR. BARNES: Object to form.
16       THE WITNESS: It's one capability of it.
17 It is a data-rich system that can be used or
18 reviewed for other purposes or multiple purposes.
19 BY MR. HUDSON:
20    Q. And that's what I guess I'm trying to
21 get at, is: Other than from an inventory or
22 filling order perspective, describe for me what
23 other functionality those two programs have, to
24 your knowledge.
25    A. The ability to slot. The ability to

Page 205

1 look at discrepancies.
2    Again, the data is there. You can write SQLs
3 into the system to pull any information you may
4 want. And we are very limited who has the ability
5 to write those SQLs.
6    But you could write a SQL if you wanted to
7 data mine for anything specifically.
8    And I am not the expert on the SQL writing,
9 but you could have someone who is well-versed in
10 the program, the software program, that could
11 pretty much write a SQL to dig any and all
12 information you might want out of it.
13    Q. And as you sit here today, are you aware
14 of any particular instances where anyone at HBC
15 wrote SQLs to mine data between 2009 and 2012?
16    A. I can't say they did or did not.
17    Q. And the same is true for flagging any
18 orders of controlled substances; right?
19    A. Yes.
20    Q. And same for investigations. We've
21 covered it; right?
22    A. Yes.
23       MR. HUDSON: I don't have any further
24 questions.
25       MR. BARNES: Just one or two follow-ups.

Page 206

1 RE-EXAMINATION
2 BY MR. BARNES:
3 Q. You said you visited the pharmacies at
4 least annually?
5 A. During that time period, yes.
6 Q. And would you go to the pharmacies and
7 talk to the pharmacists?
8 A. I would.
9 Q. Were you able to observe what they were
10 doing and how they handled their narcotics?
11 A. I don't know to any great detail, but
12 yes.
13 Q. Do you know approximately how many
14 prescriptions the Giant Eagle pharmacies filled
15 per year?
16 A. I do not.
17 Q. You were asked if you could say that
18 every prescription filled by Giant Eagle was, I
19 think the term, legal.
20 Do you believe that that's where all the
21 products that went from your warehouse, were
22 distributed to Giant Eagle pharmacies, that they
23 were dispensed pursuant to prescriptions presented
24 by patients?
25 MR. HUDSON: Object to the form.

Page 207

1 THE WITNESS: I do.
2 MR. HUDSON: Lack of foundation.
3 BY MR. BARNES:
4 Q. And you don't have every one of those
5 millions of prescription memorized?
6 A. I do not.
7 Q. Are you aware of the Giant Eagle
8 dispensing guidelines?
9 A. I am not.
10 MR. BARNES: Nothing further.
11 RE-EXAMINATION (Continued)
12 BY MR. HUDSON:
13 Q. Sir, you're not aware of the millions of
14 prescriptions being filled because that's
15 impossible to track; right?
16 A. For me personally?
17 Q. Right.
18 A. Yes.
19 Q. And same for orders filled at HBC. It
20 would be very hard for anyone to track in their
21 head all the thousands or hundreds of thousands of
22 orders that were being tracked through the HBC
23 warehouse; right?
24 A. In totality.
25 Q. Right. In totality.

Page 208

1 So that's why companies put in place systems
2 and document things; right?
3 A. I can't speak for all companies.
4 Q. But you'd agree with me, sir, that if
5 you document things you put in writing, then we
6 would know exactly what was done and how things
7 were tracked from that facility from 2009 to 2014;
8 right?
9 MR. BARNES: Object to form.
10 THE WITNESS: I believe things were
11 documented. Whether they were mined to capture
12 that data is different.
13 BY MR. HUDSON:
14 Q. So you think that things were documented
15 in terms of the practices of what was happening at
16 the facility from 2009 to 2012, but now those
17 documents just no longer exist?
18 A. I can't answer the last part of that.
19 But the first part, yes.
20 Q. Did the company, HBC, have a practice of
21 maintaining policies that the company created to
22 comply with the law?
23 A. Yes. I think we answered that. And
24 then there's also a retention policy.
25 MR. BARNES: I also think, Ty --

Page 209

1 MR. HUDSON: No further questions.
2 MR. BARNES: -- it's way beyond.
3 No further questions.
4 THE VIDEOGRAPHER: This marks the end of
5 the testimony given by Walter Durr. We are going
6 off the record. The time is 1:29 p.m.
7 (Whereupon, at 1:29 p.m., the taking of
8 the instant deposition ceased.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 210

1 COMMONWEALTH OF PENNSYLVANIA )
2 COUNTY OF ALLEGHENY        )   SS:
3            C E R T I F I C A T E
4        I, Ann Medis, Registered Professional
5 Reporter, Certified Livenote Reporter and Notary
6 Public within and for the Commonwealth of
7 Pennsylvania, do hereby certify:
8        That WALTER WAYNE DURR, the witness
9 whose deposition is hereinbefore set forth, was
10 duly sworn by me and that such deposition is a
11 true record of the testimony given by such
12 witness.
13        I further certify the inspection,
14 reading and signing of said deposition were not
15 waived by counsel for the respective parties and
16 by the witness.
17        I further certify that I am not related
18 to any of the parties to this action by blood or
19 marriage and that I am in no way interested in the
20 outcome of this matter.
21        IN WITNESS WHEREOF, I have hereunto set
22 my hand this 25th day of January, 2019.
23

       _____
24            Notary Public
25

---

Page 211

1 COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
   COUNTY OF ALLEGHENY        ) S H E E T
2
3    I, WALTER WAYNE DURR, have read the foregoing
   pages of my deposition given on January 22, 2019,
4 and wish to make the following, if any,
   amendments, additions, deletions or corrections:
5
6 Page  Line  Change and reason for change:
7 ____ ____ _____
8 ____ ____ _____
9 ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18
19 In all other respects, the transcript is true and
   correct.
20
21    _____
            WALTER WAYNE DURR
22
23 _____ day of _____, 2019.
24 _____
         Notary Public
25