1            IN THE UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF OHIO

2                    EASTERN DIVISION

3

    IN RE:  NATIONAL PRESCRIPTION    ) No. 17-md-2804

4   OPIATE LITIGATION NO. 2804       )

                                     )

5   APPLIES TO ALL CASES             ) Hon. Dan A. Polster

                                     )

6

7        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

8                CONFIDENTIALITY REVIEW

9

             VIDEO DEPOSITION OF CHRIS DYMON

10

                   January 25, 2019

11                   9:09 a.m.

12

13

14        Reporter:  Jude Arndt, CSR, RPR

                CSR No. 084-004847

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1    DEPOSITION OF CHRIS DYMON produced, sworn,
and examined on January 25, 2019, at Bartlit Beck
2  Herman Palenchar & Scott LLP, 54 West Hubbard Street,
Suite 300, in the City of Chicago, State of Illinois,
3  before Jude Arndt, a Certified Shorthand Reporter and
Certified Court Reporter.
4
5         APPEARANCES OF COUNSEL
6
On Behalf of Plaintiff:
7    Napoli Shkolnik PLLC
     105 West Vandalia Street, Suite 475
8    Edwardsville, IL 62025
     (844) 230-7676
9    BY:  MR. HUNTER SHKOLNIK
         MS. CHELSEA THOMPSON
10        MR. RODNEY CABRERA
         (present via speakerphone)
11        MS. JODI KLOCKENGA
         (present via speakerphone)
12
On Behalf of Walmart:
13   Jones Day
     77 West Wacker
14   Chicago, Illinois  60601
     (312) 782-3939
15   BY:  MR. PATRICK J. BEISELL
         pbeisell@jonesday.com
16
On Behalf of Cardinal Health:
17   Armstrong Teasdale LLP
     7700 Forsyth Boulevard, Suite 1800
18   St. Louis, MO 63105
     (314) 621-5070
19   BY:  MR. PAUL L. BRUSATI
         pbrusati@armstrongteasdale.com
20
On Behalf of AmerisourceBergen:
21   Jaszczuk, P.C.
     311 South Wacker Drive, Suite 3200
22   Chicago, IL  60606
     (312) 442-0302
23   BY:  MS. MARGARET M. SCHUCHARDT
         mschuchardt@jaszczuk.com
24

Page 3

1    APPEARANCES OF COUNSEL (CONTINUED)
2
On Behalf of Walgreens:
3    Bartlit Beck LLP
     54 West Hubbard Street, Suite 300
4    Chicago, IL  60654
     (312) 494-4400
5    BY:  MS. SHARON DESH
         sharon.desh@bartlit-beck.com
6
On Behalf of Mallinckrodt:
7    Hahn Loeser & Parks LLP
     65 East State Street, Suite 1400
8    Columbus, OH  43215
     (614) 453-7129
9    BY:  MS. TERESA J. HARDYMON
         thardymon@hahnlaw.com
10        (present via speakerphone)
11
Also present:  Ben Stanson, videographer
12             Evan J. Wolfe, trial tech
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1         INDEX OF INTERROGATION
2  Examination by Mr. Shkolnik          Page 8
3
         INDEX OF EXHIBITS
4
5  Exhibit Walgreens-Dymon-001          Page 110
   (E-mail, "Walgreens University Information")
6  (PPLPC014000362724 - PPLPC014000362773)
7  Exhibit Walgreens-Dymon-002          Page 153
   (E-mail chain)
8  (WAGMDL00659270 - WAGMDL00659274)
9  Exhibit Walgreens-Dymon-003          Page 180
   (E-mail chain)
10 (WAGMDL00102645 - WAGMDL00102648)
11 Exhibit Walgreens-Dymon-004          Page 185
   (E-mail, "Status Formatt")
12 (WAGMDL00245768 - WAGMDL00245769)
13 Exhibit Walgreens-Dymon-005          Page 194
   (E-mail chain)
14 (WAGMDL00660341 - WAGMDL00660343)
15 Exhibit Walgreens-Dymon-006          Page 195
   (E-mail chain)
16 (WAGMDL00107582 - WAGMDL00107584)
17 Exhibit Walgreens-Dymon-007          Page 198
   (Spreadsheets)
18 (WAGMDL00415363 - WAGMDL00415368)
19 Exhibit Walgreens-Dymon-008          Page 213
   (E-mail chain)
20 (WAGMDL00574927 - WAGMDL00574930)
21 Exhibit Walgreens-Dymon-009          Page 219
   (E-mail chain)
22 (WAGMDL00302946 - WAGMDL00302947)
23 Exhibit Walgreens-Dymon-010          Page 223
   (Authentication of prescription order policy)
24 (WAGMDL00749381 - WAGMDL00749407)

Page 5

1    INDEX OF EXHIBITS (CONTINUED)
2
3  Exhibit Walgreens-Dymon-011          Page 231
   (E-mail chain)
4  (WAGMDL00660331 - WAGMDL00660337)
5  Exhibit Walgreens-Dymon-012          Page 236
   (E-mail chain)
6  (WAGMDL00021425 - WAGMDL00021427)
7  Exhibit Walgreens-Dymon-013          Page 239
   (E-mail chain)
8  (WAGMDL00625218 - WAGMDL00625265)
9  Exhibit Walgreens-Dymon-014          Page 253
   (E-mail chain)
10 (WAGMDL00114602 - WAGMDL00114625)
11 Exhibit Walgreens-Dymon-015          Page 277
   (E-mail chain)
12 (WAGMDL00577118 - WAGMDL00577119)
13 Exhibit Walgreens-Dymon-016          Page 287
   (Status report, January 28, 2013)
14 (WAGMDL00708763)
15 Exhibit Walgreens-Dymon-017          Page 293
   (Status report, February 14, 2013)
16 (WAGMDL00675586)
17 Exhibit Walgreens-Dymon-018          Page 302
   (Status report, December 19, 2013)
18 (WAGMDL00708764)
19 Exhibit Walgreens-Dymon-019          Page 303
   (Status report, April 17, 2014)
20 (WAGMDL00708766)
21 Exhibit Walgreens-Dymon-020          Page 306
   (WAGMDL00316771 - WAGMDL00316785)
22
23 Exhibit Walgreens-Dymon-021          Page 312
   (E-mail chain)
24 (PPLPC004000365800 - PPLPC004000365802)

Page 6

INDEX OF EXHIBITS (CONTINUED)

Exhibit Walgreens-Dymon-022          Page 324
(PowerPoint, "Pharmaceutical Integrity")
(WAGMDL00707955 - WAGMDL00707973)

Exhibit Walgreens-Dymon-023          Page 337
(Annual Performance Review)
(P-WAG-02681)

        (Exhibits are attached.)

---

Page 7

1    THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Ben Stanson.  I am a videographer
3  for Golkow Litigation Services.  Today's date is
4  January 25th, 2019, and the time is 9:09 AM.
5       This video deposition is being held in
6  Chicago, Illinois, in the matter of the national
7  prescription opiate litigation, MDL Number 2804,
8  pending in the U.S. District Court, Northern District
9  of Ohio, Eastern Division.  The deponent is Chris
10  Dymon.
11       Will counsel please identify yourselves
12  for the record?
13    MR. SHKOLNIK:  Hunter Shkolnik, Napoli
14  Shkolnik, on behalf of the MDL plaintiffs and Cuyahoga
15  County.  You can --
16    MS. THOMPSON:  Chelsea Thompson with
17  Napoli Shkolnik for plaintiff.
18    MR. WOLFE:  Evan Wolfe, technology
19  support.
20    MS. SCHUCHARDT:  Margaret Schuchardt,
21  Jaszczuk P.C., on behalf of Amerisource Bergen
22  Corporation.
23    MR. BEISELL:  Patrick Beisell on behalf of
24  Walmart.

---

Page 8

1    MR. BRUSATI:  Paul Brusati, Armstrong
2  Teasdale, on behalf of Cardinal Health.
3    MS. DESH:  Sharon Desh, Bartlit Beck, on
4  behalf of Walgreens.
5    THE VIDEOGRAPHER:  Will counsel on the
6  phone please identify yourselves?
7    MR. CABRERA:  This is Rodney Cabrera again
8  with Napoli Shkolnik for the plaintiff.
9    MS. KLOCKENGA:  Jodi Klockenga with Napoli
10  Shkolnik for plaintiff.
11    THE VIDEOGRAPHER:  Thank you.  The court
12  reporter today is Jude Arndt.  Will you please swear in
13  the witness?
14
15    The witness, CHRIS DYMON, first having been duly
16  sworn, testified as follows:
17    QUESTIONS BY MR. SHKOLNIK:
18    Q.   Good morning, Mr. Dymon.  My name's Hunter
19  Shkolnik.  I'm going to be asking you a series of
20  questions today about your work at Walgreens over the
21  years that you've been there.
22       If you don't understand any of my
23  questions, please let me know.  Sometimes I have a
24  tendency to pick up my pace, and usually the court

---

Page 9

1  reporter shuts me down, but if they don't and you want
2  me to slow down, just say so; okay?
3    A.   Yes, sir.
4    Q.   And you just did the perfect answer.
5  There's no head nodding.  Just -- if there's an answer,
6  just say yes, no, whatever your answer is.  We may know
7  what we're talking about, but a head nod or a shrug or
8  something like that may get picked up on the camera,
9  but the official report is actually the court reporter,
10  so we need verbal; okay?
11    A.   Understood.
12    Q.   And if you answer a question without
13  asking me to rephrase it or to change it, I'm going to
14  assume you understood it.  Do you understand that?
15    A.   Yes, sir.
16    Q.   Are you currently employed by Walgreens?
17    A.   Yes.
18    Q.   How long have you been employed by the
19  company?
20    A.   Since 2003.
21    Q.   And if I'm not mistaken, you hold a Pharm
22  D degree?
23    A.   Correct.
24    Q.   And you also hold a master's in business.

---

Page 10

1  Am I correct?

2      A.   Yes.

3      Q.   And you obtained your master's in business

4  administration while you were working at Walgreens?

5      A.   Yes, sir.

6      Q.   And that was around the time of 2012-2013

7  time frame?

8      A.   Yes, sir.

9      Q.   And at the same time you were also working

10  in the -- working as part of the RX Integrity team that

11  was developing a new SOM process for the company?

12      A.   I was working on the RX Integrity team at

13  that time.

14      Q.   And they were developing a new suspicious

15  order monitoring program for the company at that time,

16  were they not?

17      A.   Can you please clarify by new?

18      Q.   What part of new don't you understand?

19      A.   Are you referring to new as something did

20  not exist or new as continuing to evolve a current

21  process?

22      Q.   Well, how about we pose it this way?

23  There was a new group established in the latter part of

24  2012 to deal with SOM; correct?

Page 11

1      A.   Correct.

2      Q.   So when I say to you were you involved in

3  a new program, is that a fair statement?  You were

4  involved in a new program being established by the

5  company on the handling of suspicious order monitoring

6  by Walgreens in 2012?

7          MS. DESH:  Objection.  Vague.

8      A.   I refer to it as a new team to work on --

9      Q.   (By Mr. Shkolnik)  Oh, so -- I'm sorry.

10  So --

11      A.   The team --

12      Q.   So the word program is the problem?

13      A.   Correct.

14      Q.   When you said program, that would be --

15  you're talking about like a computer program?

16      A.   Something specific, yes.

17      Q.   Okay.  I stand corrected then.  So at the

18  time you were going for your MBA, you were part of a

19  new team that was responsible for handling suspicious

20  order monitoring at Walgreens?

21      A.   Correct.

22      Q.   Had you been part of any team that was

23  responsible for suspicious order monitoring prior to

24  joining this new team?

Page 12

1      A.   No.

2      Q.   What did you do for Walgreens before you

3  joined this new developing RX Integrity team?

4      A.   I was a pharmacy manager.

5      Q.   And a pharmacy manager, meaning you were

6  at the store level managing a specific pharmacy or

7  series of pharmacies?

8      A.   Correct.

9      Q.   What was your region?

10      A.   The Chicagoland area.

11      Q.   And how many stores did you oversee as a

12  pharmacy manager prior to joining RX Integrity, the new

13  team?

14      A.   Just one.

15      Q.   Which store was that?

16      A.   The last store was in Buffalo Grove,

17  Illinois.

18      Q.   I'm sorry.  I couldn't hear that.

19      A.   Buffalo Grove, Illinois.

20      Q.   And how long had you been at Buffalo --

21  I'm going to say it wrong -- Buffalo Grove, Illinois?

22      A.   Probably about a year-and-a-half.

23      Q.   Had you worked through a number of stores

24  prior to that?

Page 13

1      A.   Yes.

2      Q.   Why don't you take us back to when you

3  first joined Walgreens in any capacity, whether it was

4  an intern, pharmacy tech, cash register work, or

5  whatever it is?  Let's start at the beginning, work

6  your way up to when you became part of this

7  newly-developing RX Integrity team?

8      A.   Started with Walgreens in 2003 as a

9  pharmacy intern.  Upon graduation from University of

10  Illinois college of pharmacy with my Pharm D in 2014, I

11  then became a licensed pharmacist in the state of

12  Illinois.

13          I worked numerous stores in the

14  Chicagoland area.  In 2006 I became a pharmacy manager,

15  and over -- between 2006 to the end of 2012 managed

16  pharmacies across the Chicagoland area.

17      Q.   And you mentioned that you have a Pharm D.

18  Is there any other degree that you obtain when you're

19  in pharmacy school?

20      A.   Some pharmacists have just a bachelor's of

21  science in pharmacy.

22      Q.   And what is the difference between Pharm D

23  and bachelor of science?

24      A.   Doctorate versus a bachelor's.

Page 14

1    Q.   I understand the name, but in terms of
2  your training?
3       A.   Additional clinical training.
4       Q.   And is there additional years of schooling
5  for Pharm D versus the bachelor of pharmacy?
6       A.   Yes.  Depending on what state and how the
7  programs are structured.
8       Q.   Let's talk about your program -- what, if
9  any, difference there is in terms of formal in-school
10  training between the bachelor of science and the Pharm
11  D?
12      A.   My university did not offer any other
13  options.  Just a doctorate.
14      Q.   And how many years was that program?
15      A.   Four years.
16      Q.   And the bachelor of science program that's
17  often offered at other schools -- is that also a
18  four-year degree or something less?
19      A.   It could be something less.
20      Q.   And in order to -- you mentioned that you
21  had additional training -- I'm assuming that's outside
22  of the school area -- in order to reach the Pharm D
23  level.  Is that a fair statement?
24      A.   You do as part of your academic

Page 15

1  curriculum.
2       Q.   So is it you work part, you study part?
3  It's like all integrated?
4       A.   It's all integrated.  Yes, sir.
5       Q.   And as a Pharm D -- I mean, I'm not in any
6  way suggesting it's not important degree -- the
7  doctorate.  In what way is a Pharm D different than a
8  BS in pharmacy?  Just -- I never really asked anyone
9  that question.  You're probably the best person for me
10  to ask that.
11      A.   Additional clinical training via rotations
12  during your academic curriculum.
13      Q.   And would that be in stores, hospitals, or
14  some other type of facility, or both?
15      A.   All types of environments.
16      Q.   Was there a certain area that you focused
17  on when you were doing your clinical rotations during
18  your Pharm D training?
19      A.   No.
20      Q.   Did you do stores?
21      A.   Yes.
22      Q.   Did you do any hospital setting?
23      A.   Yes.
24      Q.   Did you do any hospice-type settings?

Page 16

1       A.   No.
2       Q.   Did you do any type of outpatient clinic
3  settings?
4       A.   Yes.
5       Q.   What type of outpatient clinic settings
6  did you work in this part of your training?
7       A.   Ambulatory care.
8       Q.   So would that be an ambulatory care --
9  sort of a surgery center, or some other type of
10  ambulatory care facility?
11      A.   This -- the one I did was dermatology.
12      Q.   And they would do surgical procedures
13  there and --
14      A.   Yes.
15      Q.   Would you be responsible for issuing --
16  I'm sorry.  Would you have -- withdraw that.  Were you
17  responsible when you were doing your internship in the
18  ambulatory care setting with responsibilities of
19  filling prescriptions that patients would take out of
20  the facility?
21      A.   Yes.
22      Q.   Were you also responsible for filling any
23  pharmaceutical requests for utilization within the
24  ambulatory facility while the patients were receiving

Page 17

1  care?
2       A.   Yes.
3       Q.   How long did you do that?
4       A.   I believe it was approximately four- or
5  six-week rotation.  I can't exactly recall.
6       Q.   As part of that rotation did you become
7  experienced in the distribution of any controlled
8  substances?
9       A.   No.
10      Q.   Did that ambulatory clinic fill
11  prescriptions for any C-II to C-V prescriptions?
12      A.   Not that I'm aware of.
13      Q.   So it would be fair to say that you
14  weren't involved in any distributions or prescription
15  filling of C-II to C-V while there?
16      A.   Correct.
17      Q.   In addition to the ambulatory center, what
18  other -- what hospitals did you rotate through, and how
19  long?
20      A.   University of Illinois-Chicago hospital.
21      Q.   And how long was that rotation?
22      A.   Same time length.
23      Q.   Just so I'm clear, the rotations are
24  generally a month to month-and-a-half into different

Page 18

1 settings?

2     A. Correct.

3     Q. And it would give you experience in
4 different types of pharmacy settings, whether it's
5 store, medical facility, hospital, et cetera?

6     A. Correct.

7     Q. And in addition to -- well, when you were
8 at the hospital setting, were you responsible for
9 filling prescriptions for patients that were leaving
10 the hospital to take with them?

11     A. No.

12     Q. When you were at the University of
13 Illinois doing your internship, were you responsible
14 for filling prescriptions for use within the hospital
15 facility?

16     A. Yes.

17     Q. Would that include filling prescriptions
18 for pills, parenteral, any other types of
19 pharmaceuticals?

20     A. Yes.

21     Q. Did -- in that capacity, were you
22 responsible for filling any prescriptions related to
23 C-II to C-V controlled substances?

24     A. Yes.

Page 19

1     Q. And were those generally for use in
2 patients within the hospital setting?

3     A. Yes.

4     Q. Just so I'm clear, were any of the
5 prescriptions you filled for C-II to C-V controlled
6 substances while you were at that rotation to be taken
7 by the patient when they left the hospital setting?

8     A. No.

9     Q. Were you in any way involved with giving
10 instructions to patients that were leaving the hospital
11 with prescriptions for C-II to C-V medications on how
12 they should utilize those medications?

13     A. Not that I can recall, no.

14     Q. Were you responsible with giving any
15 instructions to releasing patient -- patients being
16 released on where they should fill prescriptions?

17     A. No.

18     Q. Were you in any way responsible for
19 telling patients any of the risks and benefits of C-II
20 to C-V medications?

21     A. No.

22     Q. In addition to the hospital, the
23 dermatology clinic, were there any other facilities
24 that you did rotations through while you were at --

Page 20

1 while you were doing your Pharm D?

2     A. Yes.

3     Q. What is -- tell me -- let's go start from
4 the beginning and work our way through, if you could.

5     A. Pharmacy benefit consulting.

6     Q. Pharmacy benefit consulting. What is
7 that?

8     A. Working with consultant groups who work
9 with PBMs and employers, talking about benefit design
10 for programs.

11     Q. And in what capacity did you work at those
12 facilities? Was this one -- withdraw that. Was this
13 one PBC?

14     A. It's a consulting group.

15     Q. And how long did you rotate with them?

16     A. Same as the other rotations.

17     Q. Four to six weeks?

18     A. Correct.

19     Q. What was your responsibility as a student
20 Pharm D intern at the prescription benefit consulting
21 firm?

22     A. Working on benefit design for employer
23 groups.

24     Q. Were you re -- were you working on

Page 21

1 formularies?

2     A. Yes.

3     Q. As part of your work in developing
4 formularies -- just so the jury understands, what does
5 it mean to be -- what is a formulary in the setting of
6 a pharmacy benefit consultant or plan?

7     MS. DESH: And objection. Compound. You
8 can answer.

9     Q. (By Mr. Shkolnik) I'll rephrase it. What
10 do you mean by -- withdraw that. What is meant by a
11 formulary?

12     A. A list of drugs that a PBM covers or a
13 payor covers.

14     Q. In what capacity did you work on
15 formularies as a student intern at that time?

16     A. Just presenting them to the employer
17 groups so they could understand which payor they would
18 choose to pick their benefit with.

19     Q. When you say to the -- did you say payor
20 that they would pick?

21     A. Correct.

22     Q. So help me understand that. As a --
23 working for the consultants, would you have various
24 plans that you would present to employers?

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1     A.   Correct.

2     Q.   And part of your job was to be part of the

3 team to present the different plans, the strengths and

4 weaknesses, cost-benefits for those -- each of those

5 plans?

6     A.   Correct.

7     Q.   And each plan has a formulary associated

8 with it. Am I correct?

9     A.   Correct.

10     Q.   And were you responsible in any way with

11 developing the drugs that were included on the

12 formulary?

13     A.   No.

14     Q.   Those were prepackaged as part of the

15 plans when they were given to you to discuss with the

16 company that was seeking benefits?

17     A.   Correct.

18     Q.   Have you ever been involved with

19 developing a formulary for a prescription benefit plan?

20     A.   No.

21     Q.   After doing the four-to-six-week rotation

22 in the PBC, what did you do next?

23     A.   I did a rotation with Walgreens and --

24 with a field leader.

Page 23

1     Q.   Did you say you were at Walgreens and a

2 field leader, or is that one and the same?

3     A.   It's a Walgreens rotation. You work with

4 a field leader in the pharmacies.

5     Q.   And could you explain for us what that

6 means, please?

7     A.   I would work with either the pharmacy

8 supervisor, the district manager, and shadow that

9 individual as they would go store to store and see

10 operationally how they would manage and interact with

11 their pharmacy team members.

12     Q.   And what time frame was this?

13     A.   All back in 2003.

14     Q.   In 2003 when you were shadowing either

15 Walgreens supervisors or store managers, had you

16 been -- withdraw that. In 2003 when you were shadowing

17 either the Walgreens supervisors or store managers, had

18 you ever heard of the phrase good faith dispensing as

19 it relates to C-II to C-V medications?

20     A.   Not that I can recall at that time.

21     Q.   Did there come a time when you learned --

22 learned of a phrase good faith dispensing?

23     A.   Yes.

24     Q.   In fact, at some point in time that became

Page 24

1 a big portion of the work you did at Walgreens? Am I

2 correct?

3     A.   Correct.

4     Q.   And would I be correct that that was

5 around the 2012 into 2013 time frame, during this

6 development of the new team?

7     A.   In 2013, once I joined the team.

8     Q.   Before 2013 and joining that team -- when

9 I say that team, the RX Integrity team -- had you done

10 any work with good faith dispensing policies and

11 education?

12     A.   Education, yes.

13     Q.   What type of work in education of good

14 faith dispensing did you do prior to 2013?

15     A.   Just the training I received from

16 Walgreens when those policies were released to the

17 stores.

18     Q.   And when was that? Around 2012?

19     A.   I can't exactly recall. It was in the

20 mid-to-late 2000s.

21     Q.   So it was before 2010?

22     A.   I believe so. I cannot recall at the

23 exact date of when it was released.

24     Q.   Going back to when you were shadowing the

Page 25

1 pharmacy supervisors and managers. Was that also a

2 four-to-six-week program?

3     A.   Correct.

4     Q.   Back at that time in 2003, was one of your

5 plans to go work for Walgreens?

6     A.   Yes, one of many.

7     Q.   It was big employer in the area where you

8 were going to school? Am I correct?

9     A.   Correct.

10     Q.   And for graduates of your school that was

11 one of the -- one of the employers that was sought

12 after? Is that a fair statement?

13     A.   It's a fair statement.

14     Q.   Back then did you have intentions of going

15 into the corporate area of pharmaceutical, or was it

16 your plan to just be at the -- not that there's

17 anything wrong with it, but being at a store level?

18     A.   Long-term plan was to get into a

19 corporate- or business-type environment.

20     Q.   And while you were shadowing the

21 supervisor or store manager, did you have -- did you

22 get experience in utilizing the ordering system that

23 was in place in Walgreens during that time frame?

24     A.   No.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.    Did you do any work at the store level
2  while you were shadowing them?
3    A.    No.
4    Q.    What type of work did you do when you were
5  shadowing either supervisors or managers at that time,
6  if you recall?
7    A.    It was more just listening, engaging,
8  sitting in on presentations, understanding, again, how
9  they interacted with team members just to gain an
10 experience of how to work with people.
11   Q.    And back then did you have any involvement
12 in terms of education or training while you were doing
13 that -- that four-to-six-week program at Walgreens?
14 Any experience with the methods and procedures at
15 Walgreens for dispensing C-II to C-V medications?
16   A.    No.
17   Q.    After Walgreens, what did you do?  After
18 that four-to-six-week program?
19   A.    Another rotation went out to the next one.
20   Q.    Was it another Walgreens store, or did you
21 go to CVS, or somebody else?
22   A.    I believe it was another hospital setting.
23 I think Highland Park Hospital was one of my next
24 rotations.

Page 27

1    Q.    And Highland Park Hospital, once again, a
2  four-to-six-week rotation?
3    A.    Correct.
4    Q.    And in the pharmacy at Highland?
5    A.    Correct.
6    Q.    And were you responsible for dispensing
7  medications while you were doing your rotation?
8    A.    Correct.
9    Q.    Was that primarily a hands-on, get a
10 prescription, fill a prescription, type of a training
11 program?
12   A.    That's inpatient hospital pharmacy, so
13 yes, you receive an order from a physician, but it's
14 not outpatient setting; it's inpatient.
15   Q.    So I'll try to clarify my question.
16 Irrespective of how you got the prescription, whether
17 it was electronic through the hospital system or paper
18 or something else -- was it primarily get prescription
19 from somewhere in the hospital setting, fill it for use
20 in patients within the hospital?
21   A.    Correct.
22   Q.    Was any aspect of it get a prescription,
23 fill it, so patients have either bottles or -- bottles
24 of prescriptions to take home with them?

Page 28

1    A.    No.
2    Q.    Was any aspect of it education of patients
3  on the use and risks of opioids?
4    A.    No.
5    Q.    Do you have recollection of doing any --
6  or filling any prescriptions for C-II to C-V opioids
7  while you were there?
8    A.    Not that I can recall.
9    Q.    Certainly in the hospital setting you must
10 have been -- some must have come across the table.  Is
11 that a fair statement?
12   A.    That's a fair statement, but again, I
13 can't recall.  It's over a decade ago.
14   Q.    I understand.
15   A.    Yeah.
16   Q.    Did you receive any specific training at
17 that facility on what, if any, steps you had to do if
18 you were filling a C-II to C-V controlled substance, in
19 particular opioids?
20   A.    Not that I can recall.
21   Q.    Back when you were in your training, did
22 you have any education, either in the school or any of
23 the modules that you did outside, the work modules,
24 that included training on steps that you should follow

Page 29

1  when you're filling prescriptions for C-II to C-V
2  controlled substances such as opioids?
3    A.    Yes.
4    Q.    Was it in-school training?
5    A.    Yes.
6    Q.    Were there any out -- in any of the
7  outside modules, the rotations -- was there training in
8  those as well?
9    A.    Not that I can recall.
10   Q.    Your in-school training, could you tell us
11 as best as you can what that consisted of?
12   A.    Pharmacy law course.
13   Q.    And so that we're talking somewhere in the
14 vicinity of 2000 to 2003, or after 2003?  What time
15 frame?
16   A.    While I was in pharmacy school.
17   Q.    And what year -- we started with 2003
18 as -- when you were doing some rotations, but when in
19 relation to the four years of your education did your
20 training, the law training on C-II to C-V, take place?
21   A.    Somewhere between 2002 and 2003.
22   Q.    So would it have been a course in the more
23 advanced portion of your education?
24   A.    Yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 30

1    Q.   As you sit here today, do you have any
2  recollection of the -- of what the training consisted
3  of regarding the filling of prescriptions for C-II to
4  C-V controlled substances that you learned back then?
5    A.   Yes.
6    Q.   Why don't you tell us about it, please?
7    A.   It's a pharmacy law course, so it was a
8  review of what are the state regulations for dispensing
9  a controlled substance and what are the federal
10  regulations around dispensing a controlled substance.
11    Q.   And did you primarily focus on federal and
12  Illinois, or did you look at other states as well?
13    A.   Just those -- federal and Illinois.
14    Q.   Was there -- as -- sitting here today, do
15  you have any recollection if there were any differences
16  between the two that you were taught?
17    A.   Can you please specify by differences?
18    Q.   Sure.  Was -- well, let's start with the
19  Illinois.  As best as you can recall, what was -- what
20  were the requirements that you were taught back in the
21  2002, 2003 time frame for filling of prescriptions as
22  controlled by the state of Illinois?
23    A.   What would you like me to specify?  I'm
24  not going to go through the entire pharmacy practice

Page 31

1  act.
2    Q.   I mean, as you're sitting here today, do
3  you know the whole pharmacy?
4    A.   I do not, and I'm not an attorney.
5    Q.   And are there any highlights that you took
6  away from the training in that course on how a
7  pharmacist goes about following the law in Illinois for
8  filling a controlled substance C-II to C-V
9  prescription?
10      MS. DESH:  Objection.  Vague.
11    A.   Basic elements is what the board proposes,
12  and that's what we reviewed in the course, what are the
13  elements of a prescription.  That's what the law folks
14  designed.
15    Q.   (By Mr. Shkolnik)  When you say the
16  elements of a prescription, what does that mean?
17    A.   Your name, doctor's name, prescriber's DEA
18  number, drug name, drug strength, quantity, directions,
19  any refills, the date the prescription's written.
20  Those are standard elements of a prescription.
21    Q.   Anything specific to C-II to C-V back then
22  in addition to those basic elements for a prescription?
23    A.   Difference in refills that are allowed on
24  those types of prescriptions.

Page 32

1    Q.   Back at that time were there limitations
2  on refills for C-II to C-Vs?
3    A.   For Schedule II.
4    Q.   In what way were there difference in
5  refills in Illinois?
6    A.   Not allowed on a Schedule II.
7    Q.   No refills at all?
8    A.   Correct.
9    Q.   And the C-III to C-Vs -- were refills
10  allowed?
11    A.   Yes.
12    Q.   Were there any limitations on refills for
13  those?
14    A.   Yes.
15    Q.   What were the limitations on refills for
16  those?
17    A.   Up to a six-month window.
18    Q.   Just so the jury can understand what we're
19  talking about, when you say -- when we talk about
20  C-IIs, what is your understanding of C-II controlled
21  substances as they relate to opioids?  What were
22  those -- what drugs would fall within that category?
23    A.   At what time frame are you referencing?
24    Q.   Let's -- the time frame when you had your

Page 33

1  education.
2    A.   A Schedule II is a substance of
3  potentially addictive, high addictive potential and/or
4  potential could be misused.
5    Q.   And C-III, what would the definition be
6  back then?
7    A.   Lower potential.
8    Q.   But there was still a potential for
9  addiction?
10    A.   Correct.
11    Q.   Would C-IIIs include combined -- like
12  compound medications, or would they just be opioids?
13    A.   Could you please clarify by compound
14  medication?
15    Q.   Let me just go on.  C-III.  What was the
16  difference with C-IIIs?
17    A.   Can you please clarify difference in
18  relation to --
19    Q.   Well, you just told me what C-IIs were and
20  you told me what -- I'm sorry.  C-IVs.  You already
21  said C-III.  I apologize.  What would be the difference
22  between C-IV from the C-IIIs and C-IIs that you were
23  taught back then?
24    A.   Just lower addictive potential.

Page 34

1    Q.   Did -- and then the same for C-Vs?
2    A.   Correct.
3    Q.   Back when you received your education,
4  were any specific brand names identified that would
5  fall within the C-II category for opioids?
6    A.   Can you please clarify identified by --
7    Q.   In your training.  We're still talking
8  about your training, just so it's clear.  So you had
9  your training in school on the differences between C-II
10  to C-V.  Did part of that training include providing
11  you names of drugs that would fall within each
12  category?
13    A.   Yes.
14    Q.   Talking about the C-IIs in particular.
15  What names were you taught back then?
16    A.   I do not recall every name, but common
17  drugs in the C-II or Schedule II class are oxycodone,
18  hydromorphone, methadone, amphetamines.  Those are all
19  common drug types.
20    Q.   And was OxyContin one of the drugs that
21  was mentioned in particular?
22    A.   Yes.
23    Q.   Back when you were doing your training in
24  2002, 2003 time frame when this course was going on,

Page 35

1  had there been any publicity surrounding increasing use
2  of OxyContin inappropriately?
3        MS. DESH:  Objection to the form of the
4  question.  You can answer.
5    A.   Not that I can recall.
6    Q.   (By Mr. Shkolnik)  So it would -- so when
7  you were in your training in 2002 to 2003, you were not
8  aware of any problems being reported associated with
9  excessive use of OxyContin out in the community?
10        MS. DESH:  Same objection.
11    A.   No.
12    Q.   (By Mr. Shkolnik)  Was that anything that
13  was taught in your school at that time?
14    A.   Not that I can recall.
15    Q.   Did you ever become aware that OxyContin
16  was associated with abuse and diversion?
17        MS. DESH:  Objection to the form of the
18  question.
19    A.   Can you please clarify in regards to what
20  time frame?
21    Q.   (By Mr. Shkolnik)  I'm asking you -- I
22  said ever.  Did you ever become aware?
23    A.   Yes.
24    Q.   When did you, Mr. Dymon, first become

Page 36

1  aware that OxyContin had become associated with abuse
2  and diversion?
3        MS. DESH:  Objection to the form of the
4  question.
5    A.   2011, 2012.
6    Q.   (By Mr. Shkolnik)  So just so the jury
7  understands, you're in working for Walgreens by this
8  point in time, 2011 or 2012, in a pharmacy setting here
9  in the Chicagoland area, and you have a Pharm D, and
10  you've been a manager at stores -- by the various
11  stores by then -- and you only became aware that
12  OxyContin had become known to be associated with abuse
13  and diversion in 2011 or 2012?
14        MS. DESH:  Objection.  Assumes facts not
15  in evidence.  You can answer.
16    A.   Can you rephrase your question?  Known to
17  abuse as, i.e., when this became more aware of a
18  national concern?  Because that's what I'm referring to
19  by the date of 2011, 2012.
20    Q.   (By Mr. Shkolnik)  Just so I'm clear, sir,
21  you have a Pharm D, you worked for Walgreens for in
22  excess of nine years, or eight years, by 2011, 2012,
23  you had been a pharmacy manager at various stores.  Is
24  it your testimony that you only became aware of

Page 37

1  problems associated with OxyContin and abuse and
2  diversion in 2011?
3        MS. DESH:  Objection.  Vague.
4    Q.   (By Mr. Shkolnik)  Or 2012?
5    A.   Based on my personal experience and
6  knowledge, yes.
7    Q.   So the stores that you had worked in up
8  through 2011 and 2012, no one ever discussed the fact
9  that Purdue and its drug OxyContin were being abused
10  and related to diversion across the United States up
11  until then?
12        MS. DESH:  Objection.  Assumes facts not
13  in evidence.
14    A.   Not that I can recall.
15    Q.   (By Mr. Shkolnik)  Did you have any
16  understanding that there was a opioid epidemic prior to
17  2011?
18        MS. DESH:  Same objection.
19    A.   No.
20    Q.   (By Mr. Shkolnik)  Were you aware that
21  there was -- withdraw that.  How did you become aware
22  that there had become an opioid epidemic, sir?
23        MS. DESH:  Objection to the form.
24    A.   Media.

Page 38

1    Q.   (By Mr. Shkolnik) So you worked in the
2   pharmacy for upwards of eight or nine years as a
3   manager here in the Chicagoland area, you have a Pharm
4   D, and you did not hear a single word through your
5   company up through -- up until 2011 or 2012 that there
6   was an epidemic related to the abuse of OxyContin and
7   similar medications?  Is that a fair statement?
8        MS. DESH:  Objection.  Assumes facts not
9   in evidence.
10    A.   Not that I can recall.
11    Q.   (By Mr. Shkolnik) Did anyone ever tell
12   you in 2010 that there was -- withdraw that.  I'm going
13   to take OxyContin out of it.  Did anyone at your
14   company, Walgreens, issue any notification to you or
15   any of the other pharmacy managers that you're aware of
16   prior to 2011 or 2012, where the company said we're
17   seeing trends of abuse associated with C-II controlled
18   substance opioids; watch out for it?
19        MS. DESH:  Objection.  Vague.  Calls for
20   speculation.
21    A.   Not that I can recall.
22    Q.   (By Mr. Shkolnik) Did you, Mr. Dymon,
23   have any personal knowledge while you were working at
24   Walgreens pharmacies as a manager up through 2011 or

Page 39

1   2012, that contro -- C-II controlled substance opioids
2   were becoming a national crisis, the abuse of them?
3        MS. DESH:  Objection.  Assumes facts not
4   in evidence.
5    A.   Not that I was aware of, no.
6    Q.   (By Mr. Shkolnik) Did you notice that a
7   lot of pills were being distributed at your stores, a
8   lot of these opioids were being distributed at your
9   stores?
10        MS. DESH:  Objection.  Vague.
11    A.   I managed a single store, so I can't speak
12   to stores.
13    Q.   (By Mr. Shkolnik) Did you know that there
14   was increasing numbers of investigations by the DEA
15   into pharmacies related to the distribution of C-II to
16   C-V controlled substances, specifically opioids, in the
17   time frame from 2008 to 2011?  Did you know that?
18        MS. DESH:  Objection.  Assumes facts not
19   in evidence.
20    A.   Not that I was aware of.
21    Q.   (By Mr. Shkolnik) Did you know that your
22   company signed an agreement with the DEA in 2011 for
23   violating the Controlled Substances Act in its
24   distribution at the store level of C-II to C-V opioids,

Page 40

1   and promised that they would take action so it didn't
2   happen again?  Did you know that?
3        MS. DESH:  Objection.  Misrepresents the
4   record.  Assumes facts not in evidence.
5        MR. SHKOLNIK:  This is becoming a speech
6   in every one.  Is there some type of -- is there a code
7   that you make that same objection so that the witness
8   knows not to answer something?  I really don't
9   appreciate it.  Every question is not objection, vague,
10   assumes facts not in evidence.  Please, stop it.
11        Could you read my question back?
12        [The pending question was read by the
13        reporter.]
14        MS. DESH:  Same objection.
15    A.   Not during the time I was a pharmacy
16   manager, no.
17    Q.   (By Mr. Shkolnik) So no one in the
18   company -- no notice went out to all the pharmacy
19   managers in the country, saying we just signed an
20   agreement with the DEA that we violated the Controlled
21   Substances Act in the way we distribute pills at the
22   store level?  You as a pharmacy manager did not get
23   notification from your company about that?
24        MS. DESH:  Objection.  Compound.

Page 41

1    A.   Not that I can recall.
2    Q.   (By Mr. Shkolnik) Would you have liked to
3   have known about that when you were working as a
4   pharmacy manager, that your company had engaged in
5   actions that required them to enter into an agreement
6   with the DEA related to their violations of the
7   Controlled Substances Act as it related to the
8   distribution, sales of opioids at the store level?
9        MS. DESH:  Objection to the form.
10    A.   Again, I can't speak to it because I
11   didn't know of it at the time, so I don't know if that
12   would change my practice or doing anything different as
13   a pharmacist at that time.
14    Q.   (By Mr. Shkolnik) That's a very good
15   point.  There's probably an assumption that the stores
16   that got in trouble thought they were doing everything
17   right as well, wouldn't you think?
18        MS. DESH:  Objection.  Calls for
19   speculation.
20    A.   I can't assume what stores or what was
21   involved at that time.
22    Q.   (By Mr. Shkolnik) Were you working at
23   Walgreens here -- were you working -- in 2006 were you
24   working for Walgreens?

Page 42

1    A.  Yes, sir.

2    Q.  Did you know that the DEA came into the

3 Walgreens Perrysburg distribution facility and issued

4 an order to show cause letter related to the

5 distribution of the C-II to C-V medications?

6        MS. DESH:  Objection, vague.

7    A.  You mean at that time of 2006, sir?

8    Q.  (By Mr. Shkolnik)  Yes.

9    A.  No.

10    Q.  Did any notification get issued by the

11 company to all of the managers that were having a

12 problem at one of our facilities the DEA has issued

13 warning letters to us -- no warning -- none of that

14 information was imparted to you as a manager of a

15 Walgreens store?

16        MS. DESH:  Objection to the form.

17    A.  Not that I can recall.

18    Q.  (By Mr. Shkolnik)  Did anyone in the

19 company back then say we are being investigated by the

20 DEA and we've got to be careful on how we fill

21 prescriptions and how we order the medications, the

22 C-IIs, C-Vs, from distribution centers because we're

23 under investigation by the DEA?

24        MS. DESH:  Objection.  Calls for

Page 43

1 speculation.

2    A.  Again, not that I can recall.

3    Q.  (By Mr. Shkolnik)  Would you as a

4 manager -- withdraw that.  Did your stores in 2006

5 receive your distribution from the Perrysburg, Ohio,

6 facility as it relates to C-II to C-V medications,

7 opioids?

8    A.  Yes.

9    Q.  Would you have liked to have known that

10 the distribution center that was servicing your stores,

11 not only was under investigation, but was found to be

12 in violation of the Controlled Substances Act while

13 they were distributing to your stores?

14        MS. DESH:  Objection.

15    Q.  (By Mr. Shkolnik)  Would you like to know

16 that?

17        MS. DESH:  Assumes facts not in evidence.

18 You can answer.

19    A.  Wouldn't have changed how I was practicing

20 pharmacy at my store.

21    Q.  (By Mr. Shkolnik)  Is it possible it would

22 have changed how you were ordering from the

23 distribution center to fill your store?

24    A.  No.

Page 44

1    Q.  If you found out the ordering practices

2 were in violation of the Controlled Substances Act, is

3 it your testimony, sir, that you would not have changed

4 your practices?

5        MS. DESH:  Objection to the form.

6    A.  I can't speculate as to what that

7 violation was.

8    Q.  (By Mr. Shkolnik)  Do you know what

9 diversion is, sir?

10    A.  Yes.

11    Q.  What is diversion?

12    A.  Diversion, theft of a controlled

13 substance -- i.e., typically a robbery is a very common

14 form of diversion.  Internal pilferage by a team

15 member.  That's diversion.

16    Q.  How about filling prescriptions that were

17 not appropriate?  Is that also within the definition of

18 diversion?

19    A.  Not my view of diversion, no.

20    Q.  Is that something that Walgreens -- is

21 that your personal view or from your understanding from

22 the training of Walgreens?

23    A.  Personal opinion.

24    Q.  Has Walgreens ever given any education

Page 45

1 surrounding whether or not inappropriate filling of

2 prescriptions is defined as diversion under the

3 Controlled Substances Act?

4        MS. DESH:  Objection.  Calls for

5 speculation.

6    A.  In what time frame physical, sir?

7    Q.  (By Mr. Shkolnik)  At any time frame, sir.

8    A.  I can speak to -- from 2013 and on, yes.

9    Q.  But before 2013, you have no recollection

10 as you're sitting here that that was part of the

11 training from Walgreens; correct?

12    A.  We had a good faith dispensing policy

13 training, so yes.

14    Q.  What was the difference between good faith

15 dispensing policy before 2013 and after 2013 that

16 somehow makes after 2013 education related to improper

17 filling of prescriptions is consistent with diversion?

18    A.  Policies evolved over time, so I mean,

19 that's the only real change to it.

20    Q.  When you say policies have evolved over

21 time, what is right and wrong for filling of a C-II to

22 C-V prescription has not changed, according to the

23 Controlled Substances Act, for 20 years, sir?  Isn't

24 that a statement?

Page 46

1    MS. DESH: Objection. Calls for a legal
2 opinion. You can answer.
3    A. I'm not an attorney. I can't speak to the
4 letter of the law to that degree.
5    Q. (By Mr. Shkolnik) How about in Walgreens
6 in the years you worked, is it your testimony that
7 the -- what is right and wrong for filling of a C-II to
8 C-V prescription has not changed?
9    A. Can you please clarify your question?
10    Q. No. What's wrong with it? Tell me --
11    A. Can you kindly repeat your question, sir?
12    MR. SHKOLNIK: Okay. We'll repeat it,
13 please.
14    [The pending question was read by the
15    reporter.]
16    MS. DESH: Objection to the form.
17    A. No, because that's the pharmacist's
18 professional discretion of how to fill a prescription.
19    Q. (By Mr. Shkolnik) So it's still stayed
20 the same? Am I correct?
21    A. Yes. The pharmacist has always had
22 professional discretion.
23    Q. In terms of the training from Walgreens,
24 how has that education changed before 2013 compared to

Page 47

1 after 2013, as you told us just about five minutes ago?
2    A. Increased awareness, post-2013.
3    Q. What happened in 2013 that all of a sudden
4 Walgreens decides, you know, pharmacists, we should
5 have some increased awareness before we fill a C-II or
6 C-V controlled substance prescription for opioids?
7 Tell us that, please.
8    MS. DESH: Objection to the form.
9    A. Creation of the RX Integrity team.
10    Q. (By Mr. Shkolnik) Did it have anything to
11 do with the fact that your company signed a second
12 agreement with the DEA, paid an $80 million fine --
13    MS. DESH: Objection --
14    Q. (By Mr. Shkolnik) -- and got in a lot of
15 trouble with respect to the way in which they
16 distributed and sold C-II to C-V medications?
17    MS. DESH: Objection to the form.
18    A. I can't speak to that. I was not the one
19 who created the team.
20    Q. (By Mr. Shkolnik) You joined this team at
21 the ground level, did you not, sir?
22    A. Correct.
23    Q. 2013 was the beginning -- withdraw that.
24 The end of 2012 into the beginning of 2013 was the

Page 48

1 beginning of RX Integrity; correct, sir?
2    A. To my understanding, it started in 2013.
3    Q. You were one of the first employees in it?
4    A. Yes.
5    Q. And you worked under Tasha Polster?
6    A. Correct.
7    Q. How many of you were in that initial
8 group?
9    A. When I joined the team, there were three
10 individuals.
11    Q. So it was you, Tasha, it was the other
12 person, Mr. Mills?
13    A. Yes, sir.
14    Q. And when the three of you got into the --
15 became part of this new team, what were you told was
16 different about 2013 that made you adopt a plan for
17 greater vigilance to be taught to the pharmacists at
18 Walgreens?
19    MS. DESH: Objection to the form.
20    A. Again, we wanted to raise education and
21 awareness of our pharmacists surrounding the dispensing
22 of controlled substances.
23    Q. (By Mr. Shkolnik) Did anyone tell you
24 that by that point in time the DEA had shut down the

Page 49

1 Jupiter facility as it relates to controlled substances
2 distribution?
3    MS. DESH: Objection to the form.
4    MR. SHKOLNIK: What is wrong -- you know,
5 come on, stop it, Kate. Every single question is not
6 bad form. What is the -- what's wrong with the form?
7 Your obligation now is to tell me what's wrong with the
8 form.
9    MS. DESH: So first of all, my name is
10 Sharon.
11    MR. SHKOLNIK: I'm sorry, Sharon.
12    MS. DESH: And if you want me to --
13    MR. SHKOLNIK: You seem to act the same
14 way. I'm sorry.
15    MS. DESH: If you want me to expand on my
16 objections, I'm happy to.
17    MR. SHKOLNIK: What is the basis of the
18 form objection to that question?
19    MS. DESH: I'm going to say assumes facts
20 not in evidence.
21    MR. SHKOLNIK: That is not a form
22 objection. Try again.
23    MS. DESH: Hunter, you can continue with
24 your questioning. My objections are proper.

Page 50

1     MR. SHKOLNIK:  Your objections are wrong.
2  Assuming facts not in evidence is not a form objection.
3  Can you tell me what is wrong with the form so me as
4  the lawyer questioning has the ability to rephrase it?
5  And you have not done that yet.  If you're going to use
6  this at trial, tell me the basis.
7     MS. DESH:  Okay.  Can we read the question
8  back, please?
9     [The pending question was read by the
10  reporter.]
11     MS. DESH:  I'm going to object, vague.
12     MR. SHKOLNIK:  That's a form?
13     MS. DESH:  Hunter, you can continue with
14  your questioning.  If you'd like me to expand on my
15  objections, I'm happy to.  You're saying --
16     MR. SHKOLNIK:  No, I want to know the
17  basis of your form objection so I as a lawyer can
18  adhere to the federal rules and rephrase it, and you've
19  yet to do it.
20     MS. DESH:  Hunter, if you're saying that
21  objection, vague, and objection, assumes facts not in
22  evidence are not covered by form, then I will make sure
23  to state them explicitly every time.  Those are proper
24  objections.

Page 51

1     MR. SHKOLNIK:  No, you're not giving
2  speeches.
3     MS. DESH:  Those are proper objections and
4  they're proper as a special master rule during
5  Walgreens 30(b)6 deposition.  I'm going to continue to
6  object as I see fit.  You can continue to ask the
7  questions that you want to ask.  That's the way this
8  works.
9     MR. SHKOLNIK:  I know how it works.  I
10  know when someone is very unsure of themselves, they
11  interrupt the lawyer at every question, and that's what
12  you're doing.
13     Q.   (By Mr. Shkolnik) Can you answer that
14  question, sir, even though she objected?
15     A.   Can I ask the question --
16     Q.   Yes.  Can you read --
17     A.   Can I -- repeat it, please?  Thank you.
18     [The pending question was read by the
19  reporter.]
20     MS. DESH:  Same objection.
21     A.   Yes, I was made aware.
22     Q.   (By Mr. Shkolnik) Was that an important
23  fact to you, sir?
24     MR. SHKOLNIK:  Oh, you're not going to

Page 52

1  object for once.
2     Q.   (By Mr. Shkolnik) Is that an important
3  fact to you?
4     MS. DESH:  Hunter, you're -- this is
5  unnecessary.
6     MR. SHKOLNIK:  No, it is necessary.
7     A.   It was a fact piece of information.
8     Q.   (By Mr. Shkolnik) No.  No.  Is it an
9  important factor to you that the DEA shut down the
10  distribution center as it relates to C-II, C-Vs in
11  Jupiter, Florida, when you joined RX Integrity?  Is it
12  an important fact?
13     MS. DESH:  Objection.  Asked and answered.
14     A.   Yes.
15     MR. SHKOLNIK:  Is that a form objection,
16  too?
17     MS. DESH:  Please proceed.
18     Q.   (By Mr. Shkolnik) Why was it important to
19  you, sir?
20     A.   As a pharmacist my goal is to always help
21  patients, and by not having a facility active, we
22  cannot help patients who need medications.
23     Q.   (By Mr. Shkolnik) So the fact that it was
24  shut down for the manner in which it was improperly

Page 53

1  filling orders to the pharmacies in Florida was not the
2  important factor to you?
3     MS. DESH:  Objection.  Vague.  Assumes
4  facts not in evidence.
5     A.   As a pharmacist, I'm focused on patient,
6  care and treatment of the patient, and that
7  unfortunately hurts patients.
8     Q.   (By Mr. Shkolnik) It hurt your company,
9  too, did it not, sir?
10     MS. DESH:  Same objection.
11     A.   I don't know exactly how it would hurt the
12  company.  It hurts the patient.
13     Q.   (By Mr. Shkolnik) Why did they shut down
14  the C-II to C-V distribution in Jupiter?
15     A.   I do not know the details of the why
16  behind the shutdown, outside of general DEA statements.
17     Q.   What were the general DEA statements that
18  you heard?
19     A.   DEA had some thought that they felt we
20  were not meeting whatever the requirements set forth,
21  so that's why they shut it down -- the facility.
22     Q.   Did you also hear that you had pharmacies
23  that were inappropriately filling prescriptions in
24  Florida?

Page 54

1    MS. DESH: Objection.

2    A.   Just per DEA statements. That's the DEA

3 statement.

4    Q.   (By Mr. Shkolnik) So it wasn't just the

5 way you distributed; it was also the manner in which

6 your pharmacists filled prescriptions; correct?

7    MS. DESH: Same objection.

8    A.   Per the DEA as the DEA addressed it.

9    Q.   (By Mr. Shkolnik) Did your new team at RX

10 Integrity -- did you all sit down and say what did we

11 do wrong in Florida in Jupiter, and how could we take

12 steps to avoid that from happening?

13    A.   Not specific to Jupiter, just globally as

14 a whole, what can we do to help educate our pharmacy

15 team members on controlled substances and ensure we can

16 take care of patients?

17    Q.   Did you become aware that the DEA was also

18 taking action against Perrysburg around that time?

19    A.   Not that I can recall.

20    Q.   Did you ever become aware that the DEA was

21 taking action against Perrysburg as well?

22    A.   Not that I can recall at that time.

23    Q.   I didn't say at that time. You said that.

24    A.   I just can't recall. I don't remember.

Page 55

1    Q.   Did you ever find out the DEA was taking

2 action against your Woodland distribution center?

3    A.   Not that I can recall.

4    Q.   How many distribution centers did

5 Walgreens have for C-II pharmaceuticals at the time you

6 joined RX Integrity?

7    A.   I believe it was just three.

8    Q.   And that would have been Jupiter, which

9 was shut down, Perrysburg, and Woodland; correct?

10    A.   To my recollection, I remember three, yes.

11    Q.   Now, when you got into that newly-formed

12 team, did anyone -- the three of you sit down and say

13 the problem we're trying to fix is three of our

14 distribution centers are going to be shut by the DEA,

15 and what steps can we do to prevent that kind of

16 conduct going forward?

17    MS. DESH: Objection. Assumes facts not

18 in evidence.

19    A.   Again, that's a part of trying to figure

20 out how do we train and educate and develop a program.

21    Q.   (By Mr. Shkolnik) Did you participate in

22 developing the program to fix the problems at the

23 distribution center?

24    A.   Can you please clarify by fix problems at

Page 56

1 distribution center, please?

2    Q.   Well, do you -- sir, do you, Mr. Dymon,

3 believe there were any problems at the distribution

4 centers for C-II pharmaceuticals when you joined the RX

5 Integrity team?

6    A.   No, not when I joined, no.

7    Q.   There was no problems in Perrysburg, there

8 was no problems in Jupiter, and there was no problems

9 in Woodland in early 2013? Is that your testimony?

10    MS. DESH: Objection. Vague.

11    A.   No, that is not my testimony.

12    Q.   (By Mr. Shkolnik) Well, my question to

13 you was, were there any problems at the distribution

14 centers for C-II pharmaceuticals when you joined RX

15 Integrity, and you said, no, not when I joined. Is

16 that your answer?

17    A.   Because I did not know until I joined the

18 team. That's what I'm referring to.

19    Q.   You joined the team. Did you think there

20 was problems that needed to be fixed at the

21 distribution centers that Walgreens ran in Perrysburg,

22 Woodland, and Jupiter as it relates to C-II

23 distribution?

24    MS. DESH: Objection. Vague.

Page 57

1    A.   Again, from my personal opinion, it's not

2 a problem. It's a DEA statement, that the DEA said

3 there was a problem or the DEA felt there was a

4 problem.

5    Q.   (By Mr. Shkolnik) Did you disagree with

6 the DEA statements when they shut down Jupiter, they

7 were shutting down Perrysburg, and they were about to

8 shut down Woodland as well? Did you agree with them or

9 disagree with them, sir?

10    MS. DESH: Objection. Assumes facts not

11 in evidence.

12    A.   Again, as a pharmacist we're harming

13 patients by not providing medications that they need.

14    Q.   (By Mr. Shkolnik) Sir, you were more than

15 a pharmacist when you joined the Integrity team; you

16 were a member of corporate management responsible for

17 overseeing Pharmaceutical Integrity, were you not?

18    A.   I had just started, yes.

19    Q.   When you joined that team in the corporate

20 level, did you, sir, agree or disagree with the DEA

21 when they determined to shut Jupiter C-II, shutting

22 down Perrysburg C-II, and shutting down Woodland Hills?

23 Did you, sir, at that time agree with the DEA or not?

24    MS. DESH: Same objection.

Page 58

1　A.　No.

2　Q.　(By Mr. Shkolnik)  Is that because
3　everything was being done right in Walgreens at that
4　time in those distribution centers?

5　A.　No.  Again, it's the basis of patient
6　care.

7　Q.　Was anything being done wrong in Jupiter
8　when it led to the shutdown of that distribution of
9　C-IIs?  Your opinion, sir, when you joined Integrity.

10　A.　Not -- personal opinion, no.

11　Q.　Did they do anything wrong in Perrysburg
12　when the DEA was about to shut down its distribution
13　center for C-IIs while you were in Integrity?

14　A.　Not that I'm aware of, no.

15　Q.　Did Woodland engage in any inappropriate
16　conduct as it relates to the distribution of C-IIs when
17　the DEA was about to shut that one down in 2013, while
18　you were in the Pharmaceutical Integrity group?

19　MS. DESH:  Same objection.

20　A.　No.

21　Q.　(By Mr. Shkolnik)  So it's your opinion,
22　sir, as a member -- the founding member of the RX
23　Integrity group in 2013, that the DEA was wrong with
24　respect to its actions in Jupiter; correct?

Page 59

1　A.　Can you please rephrase your question?  I
2　apologize.

3　Q.　So it's your opinion, sir, as a member
4　of -- a founding member, one of the first members of
5　the RX Integrity group in 2013, that the DEA was wrong
6　with respect to its decision to shut down the Jupiter
7　distribution center?  That's your opinion, sir?

8　A.　Yes, personal opinion because it harmed
9　patient care, and that's the DEA's prerogative or
10　perspective on what they chose to do.

11　Q.　Is it possible it actually saved people's
12　lives, sir, because your pharmacies were dumping
13　opioids in Florida more than any other company in the
14　United States?  Is that a possibility?

15　MS. DESH:  Objection.  Assumes facts not
16　in evidence.

17　A.　Again, I can't speak for the DEA and the
18　why to what the DEA chose to do at that time.

19　Q.　(By Mr. Shkolnik)  Was the DEA wrong when
20　it was shutting down the C-II distribution at the
21　Perrysburg facility in 2013?  Were they wrong?

22　MS. DESH:  Same objection.

23　A.　I don't work for the DEA.  I can't speak
24　to the DEA.

Page 60

1　Q.　(By Mr. Shkolnik)  As a member of the
2　Walgreens Pharmaceutical Integrity group in 2013, sir,
3　was the DEA wrong for shutting down the Perrysburg
4　distribution center?

5　MS. DESH:  Same objection.

6　Q.　(By Mr. Shkolnik)  Yes or no?

7　A.　Again, harming patient care.

8　Q.　Couldn't possibly be that they were
9　actually saving patients' lives when they stopped
10　inappropriate distribution of opioids?  Is that your
11　opinion, sir?

12　MS. DESH:  Objection.  Assumes facts not
13　in evidence.

14　A.　That's the DEA's take on it.  Then as a
15　pharmacist, again, that's impeding patient care.

16　Q.　(By Mr. Shkolnik)  So as long as the
17　company could pump pills out of a distribution center,
18　that's a good thing even if it's in violation of the
19　Controlled Substances Act -- your opinion, sir, in
20　2013?

21　MS. DESH:  Objection.

22　A.　Again, no, that was in direct conflict of
23　taking care of patients.

24　Q.　(By Mr. Shkolnik)  So if the DEA

Page 61

1　determined that your distribution center in Perrysburg,
2　Ohio, was in violation of the Controlled Substances Act
3　in the manner in which it distributed the opioids, the
4　C-II opioids to pharmacies, do you believe they were
5　wrong in 2013, as it relates to Perrysburg?

6　MS. DESH:  Objection.  Vague.

7　A.　Again, DEA chose to do what they chose to
8　do, and again, that's impacting patient care.

9　Q.　(By Mr. Shkolnik)  It's possibly saving
10　patients' lives, is it, sir?

11　A.　I can't speculate as whether it saved or
12　harmed, but by not having medications we can't even
13　help patients at all.

14　Q.　So just so I understand your analysis
15　here, as long as some patients get the pills that they
16　need, the inappropriate distribution is allowable?  Is
17　that your opinion here, sir, today?

18　MS. DESH:  Objection.  Vague.

19　A.　Again, I'm not -- there's no inappropriate
20　distribution.  That's the DEA's opinion of what
21　occurred.

22　Q.　(By Mr. Shkolnik)  Did Walgreens violate
23　the Controlled Substances Act in 2000 -- in the 2000
24　time frame when the DEA shut down the Jupiter facility?

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  Yes or no?
2          MS. DESH: Objection. Calls for a legal
3  conclusion.
4      A.  Again, I'm not an attorney. I can't speak
5  to the DEA regulations and -- with Walgreens and where
6  that ended.
7      Q.  (By Mr. Shkolnik) You were in the RX
8  Integrity group with the job charged with coming up
9  with a system that would prevent diversion? Fair
10  statement?
11      A.  No.
12      Q.  You didn't have that responsibility at
13  all?
14      A.  Not to come up with a system. Systems
15  were already in place.
16      Q.  To ensure that someone actually followed
17  them -- was that part of your job?
18      A.  To train and educate team members is part
19  of my job, yes.
20      Q.  Is it possible that people in the team
21  were not following the systems that were in place and
22  were allowing pills to be distributed inappropriately
23  in violation of the Controlled Substances Act?
24          MS. DESH: Objection. Calls for

Page 63

1  speculation.
2      A.  Not that I'm aware of.
3      Q.  (By Mr. Shkolnik) Let's talk about the
4  Woodland Hills facility in 2013, sir. Was the DEA
5  wrong when they were shutting it down as it relates to
6  the distribution of C-II opioids, sir? Yes or no?
7          MS. DESH: Objection. Calls for facts not
8  in evidence.
9      A.  Again, that's the DEA's approach, and
10  again, I'm coming from a pharmacist's perspective of
11  patient care, and that's, again, impeding patient care.
12      Q.  (By Mr. Shkolnik) So any time the DEA
13  takes action to stop a company for improperly
14  distributing opioids, you as a pharmacist, sir, take
15  the position that that is wrong?
16          MS. DESH: Objection. Vague.
17      A.  Again, as a pharmacist, my job is to take
18  care of patients and help patients with their health
19  conditions and to help make sure they get the
20  medications they need that are for legitimate purpose
21  and for legitimate need.
22      Q.  (By Mr. Shkolnik) Did you know that one
23  of the problems associated with the Perrysburg, the
24  Jupiter, and the Woodland facilities is that some of

Page 64

1  those pills were actually going to people that
2  shouldn't have gotten them? Did you know that?
3          MS. DESH: Objection. Assumes facts not
4  in evidence.
5      A.  Only per what the DEA has written in their
6  statements.
7      Q.  (By Mr. Shkolnik) Do you disagree with
8  what the DEA has written in their statements, sir, when
9  they say that the distribution from those facilities
10  led to pills being diverted to places other than
11  patients who needed them?
12          MS. DESH: Same objection.
13      A.  Again, that's a statement of DEA. I was
14  not there to witness any of the proposed activity the
15  DEA was citing. I can't speak to it, honestly.
16      Q.  (By Mr. Shkolnik) So unless you, sir, as
17  a member of the Pharmaceutical Integrity group of
18  Walgreens doesn't see the conduct that results in
19  diversion of the pills in violation of the Controlled
20  Substances Act, you would not support the action of DEA
21  shutting down a distribution center? Fair statement?
22          MS. DESH: Objection. Vague.
23      A.  Again, I would need to understand all the
24  facts to understand what occurred and to actually see

Page 65

1  or experience that, sir.
2      Q.  (By Mr. Shkolnik) As a member of the RX
3  Integrity group in 2013, you were provided a lot of
4  facts about what was going on at Walgreens before you
5  came into the team; correct?
6      A.  Can you please clarify by a lot of facts?
7      Q.  Were you given any of the facts of the bad
8  conduct exhibited by Walgreens that led to the
9  development of the RX Integrity team?
10          MS. DESH: Objection. Assumes facts not
11  in evidence.
12      A.  Again, not bad facts. Just, again,
13  history of what led to the creation of the team.
14      Q.  (By Mr. Shkolnik) What was the history
15  that led to the creation of the team, sir? Let's hear
16  them one-by-one.
17      A.  Again, DEA activities at our facilities.
18      Q.  Let me break them down.
19      A.  Uh-huh.
20      Q.  So that would be Jupiter shutdown, stores
21  being shut down, and a prior settlement with the DEA --
22  three things; correct?
23      A.  I cannot recall if that's exactly all
24  three or there was less, but again, I can't recall

Page 66

1 exactly every event.

2  Q. Well, let me start with one. We can agree
3 Jupiter being shut down was one of those things that
4 you were -- let me use your words -- activities at your
5 facilities -- one of the activities were shutting down
6 Jupiter stores -- I'm sorry -- the Jupiter distribution
7 center as it relates to controlled substances? That's
8 one we can agree on?

9  A. I was made aware of that, yes.

10  Q. Number 2. Were you made aware of the fact
11 that multiple stores in Florida were shut down because
12 of the manner in which they were selling those pills
13 and requesting the pills through the distribution
14 facility?

15  A. I was aware stores were being investigated
16 and had to surrender their licenses. Stores were not
17 shut down.

18  Q. They -- thank you for clarifying that.
19 They surrendered their licenses so they couldn't sell
20 controlled substances; correct?

21  A. Correct.

22  Q. And you knew that some of those stores
23 were in communities as small as 3,000 residents and
24 your stores were selling 1.2 million pills, mostly to

Page 67

1 people from outside of the State of Florida? Did you
2 know that?

3  A. Again, only from what the DEA put in their
4 statements.

5  Q. But that's what they said; correct?

6  A. That's the DEA's statement. That's their
7 words, yes.

8  Q. That's not good faith dispensing, is it,
9 sir?

10  A. I can't speak to that. I was not in those
11 stores or in that area at that time.

12  Q. Do you think from a good faith dispensing
13 practicing a community that serves 3,000 people,
14 dispenses 1.2 million pills a year, mostly to people
15 from out of state -- would that ring any bells to you
16 from good faith dispensing practices, sir?

17  A. Yes.

18  Q. That's bad conduct under GFD, is it not?

19  A. No.

20  MS. DESH: Objection.

21  Q. (By Mr. Shkolnik) It's good conduct?

22  A. It's not good nor bad.

23  Q. It's a flag; correct?

24  A. Can you define what you mean by a flag?

Page 68

1  Q. Why don't you define what you mean by a
2 flag under good faith dispensing, sir?

3  A. Under good faith dispensing, that's a
4 factor or point we call to make pharmacists aware -- is
5 the patient traveling long distances to your pharmacy?

6  Q. Paying cash? Is that another one?

7  A. Cash, yes, sir.

8  MR. SHKOLNIK: Let's take a break, please.

9  THE VIDEOGRAPHER: We are off the record
10 at 10:16 AM.

11  [A brief recess was taken.]

12  THE VIDEOGRAPHER: We are back on the
13 record at 10:29 AM.

14  Q. (By Mr. Shkolnik) Mr. Dymon, what's
15 third-party operations of finance?

16  A. That is my role after RX Integrity. I was
17 the manager of third-party operations and finance.

18  Q. What is that?

19  A. Overlooks how we bill prescription claims,
20 how we provide support to our stores around the billing
21 of prescription claims.

22  Q. Would this be working with PBMs?

23  A. No.

24  Q. Could you explain in greater detail what

Page 69

1 it means by how -- withdraw that. Can you explain in
2 greater detail what you mean by overseeing how your
3 pharmacies handle prescription claims?

4  A. How we enter a plan into our system, how a
5 user can find the plan, ensuring the plan is set up
6 appropriately based on the payor.

7  Q. Would this include any type of rebate
8 programs?

9  A. No.

10  Q. When you are referring to plans, what type
11 of plan are you talking about?

12  A. Insurance plans.

13  Q. So it could be like an Express Scripts or
14 something of that nature?

15  A. Correct.

16  Q. Are you responsible for negotiating of
17 contracts between plans and Walgreens?

18  A. No.

19  Q. Is your position related to more of the
20 operational aspect of integrating third-party plans
21 into the Walgreens system?

22  A. Yes.

23  Q. Does your position as manager in the
24 third-party operations in finance in any way deal with

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  contracts with individual manufacturers of
2  pharmaceuticals?
3      A.   No.
4      Q.   Would it include any aspect of preferred
5  pricing plans with manufacturers of pharmaceuticals?
6      A.   No.
7      Q.   Would that be a separate department?
8  Separate individuals would be doing that for Walgreens?
9      A.   Yes, separate department.
10     Q.   What department would handle that?
11     A.   Managed care contracting and sales.
12     Q.   How about 340B programs?  Is that in any
13  way related to the third-party operations aspect of
14  your job?
15     A.   No.
16     Q.   Do you know what a 340B is?
17     A.   Yes.
18     Q.   What is a 340B?
19     A.   A federal program around drug purchasing
20  between an entity such as a hospital and a pharmacy.
21     Q.   It also would include any type of -- it
22  doesn't have to be a hospital to be a 340B; correct?
23     A.   It can be any clinic setting.  It can be
24  various different settings.

Page 71

1      Q.   Black lung clinics in rural communities?
2      A.   I am not an expert on 340B.  I can't speak
3  to that.
4      Q.   They're basically facilities that provide
5  medical care to an indigent population?  Is that a fair
6  statement?
7      A.   That is fair, sir.
8      Q.   And there are contracts that are entered
9  into -- between the 340B entity and distribution
10  facilities for pharmaceuticals, are there not?
11     A.   Correct.
12     Q.   And Walgreens for stores -- Walgreens
13  stores could fill a prescription for a 340B recipient
14  patient and your replacement product would come through
15  the 340B distributor even if it's not your own
16  distributor; correct?
17     A.   Correct.
18     Q.   And there is such a thing -- withdraw
19  that.  There used to be stores that were designated as
20  depots in various regions to be the 340B depots for the
21  return of product?
22     A.   Yes.
23     Q.   Did you ever work in a pharmacy that was a
24  340B depot?

Page 72

1      A.   No.
2      Q.   Were you aware of any of the procedures in
3  place regarding suspicious order monitoring for the
4  replacement C-II to C-V prescriptions that were filled
5  through the 340B program?
6      A.   Not that I can recall.
7      Q.   While you were in RX Integrity, were you
8  overseeing any aspect of capturing 340B replacement
9  distributions so that they would run through the SOM
10  process?  I'll rephrase it.
11     A.   Thank you.
12     Q.   While you were at RX Integrity, did you
13  have any involvement with the capturing of 340B
14  distributions for the purposes of suspicious order
15  monitoring?
16     A.   The team was looking into that for 340B
17  distribution.
18     Q.   There was a period of time where the 340B
19  distributions fell outside of the system that was in
20  place; correct?
21     A.   I believe so.
22     Q.   Do you know if 340B represents large
23  distributions of controlled substances?
24     A.   I do not know.

Page 73

1      Q.   From your experience as a pharmacy
2  manager, did you -- were you able to determine whether
3  or not the number of 340B customers for controlled
4  substances represented a large quantity of purchasers?
5      A.   I wouldn't know that.  I never worked at a
6  340B location.
7      Q.   But couldn't a pharmacy -- did a pharmacy
8  have to be a 340B location in order to fill a script
9  for a 340B patient?
10     A.   Yes.
11     Q.   So all -- a patient couldn't just go to
12  any Walgreens and show their 340B card to fill a
13  prescription?
14     A.   Correct.
15     Q.   They would have to go to a specific
16  Walgreens pharmacy that was designated?
17     A.   Correct.
18     Q.   Was that always the case while you were a
19  pharmacy manager?
20     A.   To the best of my recollection, yes.
21     Q.   Did you participate with the group in RX
22  Integrity that was working on capturing the 340B
23  distribution of controlled substances?
24     A.   Not that I can recall.  No.

Page 74

1    Q.   Do you know when it was for the first time
2    the RX Integrity group implemented changes that would
3    capture 340B distributions for the purposes of
4    controlled substances?
5        A.   I do not know.
6        Q.   Would it be fair to say in earl --
7    withdraw that.  Earlier you mentioned there were
8    programs in place regarding suspicious order
9    monitoring.  Do you know how long after RX Integrity
10   came into play that steps were taken to alter the
11   program that would capture 340B distributions?
12       A.   I do not know.
13       Q.   But you can confirm, can you not, sir,
14   that when you joined RX Integrity in the early part of
15   2013 as one of the original team members, 340B
16   distributions were not being captured by the SOM
17   program that was in place; correct?
18       A.   From what I recall, yes.
19       Q.   Could that potentially lead to diversion,
20   failing to capture distributions for 340B controlled
21   substances?
22       A.   I can't speculate.  I don't know if it
23   would or wouldn't.
24       Q.   Well, if it's not being monitored for

Page 75

1    suspicious order monitoring, isn't that one way in
2    which diversion could occur under the Controlled
3    Substances Act?
4        A.   Again, I can't speculate or interpret the
5    law here and apply it to this, but again, 340B are
6    institutions, health care systems -- they're closed
7    systems practically -- so I wouldn't see any diversion
8    here.
9        Q.   When you say they're a closed system, what
10   do you mean?
11       A.   The patient has to go to the pharmacy
12   that's contracted with that entity and the patient see
13   the prescribers at that entity.
14       Q.   But the pharma -- the patient, the 340B,
15   can fill the prescription outside of the institution
16   under 340B, couldn't they?
17       A.   To the entity that's contracted with the
18   pharmacy.  That's where they would have to go.
19       Q.   So if there's a Walgreens facility in
20   rural Ohio -- withdraw that.  If a health facility
21   which is a 340B facility has patients throughout Ohio
22   or West Virginia, that patient could go to any pharmacy
23   in the Walgreens chain that was authorized to accept
24   340B prescriptions; correct?

Page 76

1        A.   That are authorized for that entity.
2        Q.   So it would be one within the region in
3    which the entity is?
4        A.   I would assume.  Again, I never ran a
5    340B.  I do not administer this program, so --
6        Q.   But failure to capture distribution of
7    340B controlled substances would not be in accordance
8    with the obligations of Walgreens to monitor for
9    suspicious orders if you fail to include those?  Fair
10   statement?
11           MS. DESH:  Objection.  Calls for a legal
12   conclusion.
13       A.   Again, I'm not an attorney.  I'm not
14   well-versed in 340B, so I don't know.
15       Q.   (By Mr. Shkolnik)  I'm not asking if
16   you're an attorney.  I'm asking you as a person -- one
17   of the three people that was brought in to work in RX
18   Integrity, to implement the education and processes
19   necessary going forward in 2013.
20           I'm asking you, Mr. Dymon, if RX Integrity
21   was not running the 340B pre -- I mean, orders through
22   its suspicious order monitoring program -- that was not
23   in accordance with the policies and procedures that
24   were required of Walgreens; correct?

Page 77

1            MS. DESH:  Objection to the form.
2        A.   Again, 340B is an entity's inventory.
3    It's not Walgreens's inventory.  So again, when we
4    created this team, we just, again, educate and develop
5    and this is, again, all about exploring about how we
6    ensure -- go beyond anything that's required for
7    compliance.
8        Q.   (By Mr. Shkolnik)  So not monitoring 340B
9    was not a requirement for Walgreens?  Is that your
10   testimony?
11       A.   A requirement based on who?
12       Q.   Well, sir, who were the requirements of
13   for controlled substance monitoring, suspicious order
14   monitoring?  Let's start there, since you seem to not
15   be sure.
16       A.   Well, I'm just asking to clarify your
17   question.  Are you referencing to the DEA, sir?
18       Q.   I'm asking you.  Who -- let me rephrase
19   this.  You're part of a team that's purpose is to
20   oversee suspicious order monitoring for Walgreens's
21   8,000 stores in 2013.  What guidelines were you
22   supposed to be implementing?
23       A.   We were following, again, the DEA
24   guidelines.

Page 78

1    Q.   So when I'm asking you about complying
2  with the guidelines, I'm going to take your definition,
3  the DEA guidelines; okay?
4    A.   Yes, sir.
5    Q.   Was Walgreens complying with the DEA
6  guidelines when it was not running 340B distributions
7  through its suspicious order monitoring program?  Yes
8  or no?
9        MS. DESH:  Objection to the form.
10    A.   Again, at that time we were developing
11  systems for suspicious order monitoring, and again, I
12  can't speculate as to how that would be viewed, but
13  again, that was identified as an area that needs to be
14  I believe included into our overall order monitoring at
15  that time.
16    Q.   (By Mr. Shkolnik)  And it would be fair to
17  say it was not included in the program before you
18  started?
19    A.   To the best of my knowledge, I do not
20  recall or do not know.  It probably was not.
21    Q.   And sir, that was not in accord with the
22  DEA's guidelines; correct?
23        MS. DESH:  Objection.  Calls for a legal
24  conclusion.

Page 79

1    A.   Again, I can't speculate on that.
2    Q.   (By Mr. Shkolnik)  Well, why were you
3  doing it?  Why were you adding 340B to the program when
4  you guys joined and developed this RX Integrity group?
5  Why would you just add them?
6    A.   Again, I was not the one working on this
7  340B piece of the team, so I can't assume why.  I know
8  as Walgreens we wanted to ensure we went above and
9  beyond any requirements of the company that were
10  needed, and that was the purpose of our team, is to
11  help develop and ensure and to identify -- we work
12  through all those pieces at that time.
13    Q.   Who said 340B should be added to
14  suspicious order monitoring?
15    A.   I can't recall.
16    Q.   You said you were not working on that
17  piece.  Who was?
18    A.   I can only -- potentially maybe Mr. Mills
19  was working on it at the time.
20    Q.   Was it one of the first things that you
21  looked at, or did it come down the road?
22    A.   I can't recall when we would have looked
23  at that.
24    Q.   So just so I understand it, that you as

Page 80

1  one of the three original members of RX Integrity did
2  not believe that Walgreens was in violation of any DEA
3  guideline by not including 340B distributions in its
4  suspicious order monitoring program when you started RX
5  Integrity?  I just want your answer, sir.
6    A.   No.  Because, again, we have to understand
7  what 340B was and what does it mean and how does it all
8  work.  I mean, again, it's something that we were
9  developing at that time.
10    Q.   So the fact that you didn't understand it
11  or no one understood it would be a basis for not
12  complying with the DEA guideline if it was required?
13        MS. DESH:  Objection.  Calls for
14  speculation.
15    A.   Again, if something is unknown, how do you
16  know if you're in compliance or not?
17    Q.   (By Mr. Shkolnik)  Well, Walgreens didn't
18  just have you and Tasha Polster and Mr. Mills to
19  determine what their obligations were under the
20  suspicious order monitoring guidelines?  Am I correct?
21    A.   Correct.
22    Q.   They had lawyers, did they not?
23    A.   Yes.
24    Q.   They had Mr. Pinon, did they not?

Page 81

1    A.   Correct.
2    Q.   He had been there for quite a while before
3  you joined this team; correct?
4    A.   He was present before I joined, yes.
5    Q.   Did he tell the team 340B did not have to
6  be included in the suspicious order monitoring program?
7        MS. DESH:  I'm going to object and
8  instruct the witness not to answer based on
9  conversations with counsel.
10    Q.   (By Mr. Shkolnik)  Was anyone directed by
11  any person at Walgreens when you joined the RX
12  Integrity team who advised that 340B should not be
13  included in suspicious order monitoring?
14        MS. DESH:  Same objection to the extent it
15  requires divulging conversations with counsel.
16  Otherwise, you can answer.
17    A.   I do not know of any conversations.
18    Q.   (By Mr. Shkolnik)  At some point did a
19  light bulb go up over someone's head and say wait a
20  second, we have a large number of C-II to C-V pills
21  being distributed into Walgreens facilities that were
22  not being run through our suspicious order monitoring
23  program?  Did that just -- one day something popped up?
24        MS. DESH:  Objection.  Calls for

Page 82

1 speculation.
2      A.   Again, I do not know if that popped into
3 someone's mind, as you're stating, sir.  Just -- again,
4 I know -- the team was developed and we looked to
5 ensure that we were -- we met and exceeded any
6 compliance requirements.
7      Q.   (By Mr. Shkolnik)  After you implemented a
8 340B program into the SOM; correct?
9      A.   At the formulation of the team when we
10 started in 2013, sir.
11      Q.   Well, when you formulated the team in
12 2013, you were not running the 340B distributions
13 through any SOM program?
14      A.   That is to my understanding, yes.
15      Q.   At some point you implemented a program
16 that ran 340B distributions through the suspicious
17 order monitoring program so you would be in compliance
18 with the Controlled Substances Act; correct?
19           MS. DESH:  Objection.  Calls for
20 speculation.
21      A.   Again, to ensure we met or exceeded any
22 compliance requirements.
23      Q.   (By Mr. Shkolnik)  Was it met or exceeded?
24 There's a big difference there, sir.  Walgreens must

Page 83

1 meet its guidelines; correct?
2      A.   Correct.
3      Q.   Walgreens can certainly exceed guidelines
4 and even be super vigilant; correct?
5      A.   Correct.
6      Q.   Was including 340B in SOM distributions
7 meeting guidelines or exceeding guidelines?
8           MS. DESH:  Objection.  Calls for a legal
9 conclusion.
10      A.   Again, I don't know.  All I know is we had
11 developed -- that was part of our development process
12 or roadmap for the team working on projects.
13      Q.   (By Mr. Shkolnik)  If it was required to
14 include three -- if guidelines required 340B
15 distributions to be included in suspicious order
16 monitoring and Walgreens did not do it until after your
17 team implemented a program to do that, that would be a
18 violation of the DEA guidelines; correct?
19           MS. DESH:  Objection.  Calls for
20 speculation.
21      A.   Again, I'm not versed in 340B regulations,
22 and I don't know how that would fit with overall DEA
23 regulations, sir.
24      Q.   (By Mr. Shkolnik)  I'm not asking you that

Page 84

1 question.  Very simple.  If the DEA guidelines required
2 distributions that came through the 340B program to be
3 included in its suspicious order monitoring for
4 Walgreens, if that was a requirement and you didn't do
5 it until after your team came into place and instituted
6 a change to the program, by definition that would be a
7 violation of the regulations?  Fair statement?
8           MS. DESH:  Objection.  Calls for
9 speculation.
10      A.   Again, I'm -- that's on regulatory law and
11 I'm not an expert on regulatory law, so it could
12 potentially be considered that, but I can't say yes or
13 no to answer that.
14      Q.   (By Mr. Shkolnik)  Well, if I was -- if
15 you had a policy in place that said any distributions
16 of controlled substances had to be monitored as -- for
17 suspicious orders -- that's the guideline -- if that is
18 the requirement -- do you agree that that was what is
19 in place here before you got into Integrity?
20           MS. DESH:  Objection.  Calls for a legal
21 conclusion.
22           MR. SHKOLNIK:  It really doesn't, but --
23      A.   Again, I am aware that the company did
24 have order monitoring prior to me joining in 2013.

Page 85

1      Q.   (By Mr. Shkolnik)  Suspicious order
2 monitoring; correct?
3      A.   To the best of my understanding, yes.
4      Q.   And what was the suspicious order
5 monitoring program in place before you came in to join
6 the team?
7      A.   I just know there was a program in place
8 and it was evolving over the time periods.
9      Q.   What was the program in place on the day
10 you joined the team, sir?
11      A.   I don't know the specific name.  I just
12 know they had a suspicious order monitoring program.
13      Q.   Which one was it?  What did it do?  What
14 did they monitor?
15      A.   All I know is it monitored orders and our
16 RX inventory team and IT teams were the groups that
17 developed that order monitoring system.
18      Q.   So your team didn't develop a new program?
19 Is that a fair statement?
20      A.   Correct.
21      Q.   You took a system that was there and just
22 taught everyone you should follow it?
23      A.   Education around the system and continued
24 evolution of that system.

Page 86

1    Q.   What evolution of the system were
2    implemented by your team after 2013?
3    A.   We worked on a portion of it which is
4    called a CSO or controlled substance order override
5    form.
6    Q.   Other than the override form, what other
7    upgrades did you include in that program?
8    A.   That's what I worked on with the team on
9    that.  I wouldn't know, but there's probably other
10   things IT teams were working on as well with RX
11   inventory.
12   Q.   340B was also included into the system;
13   correct?
14   A.   I believe at some point down the road, but
15   I don't -- do not believe during my time on the team, I
16   don't know.
17   Q.   When did you leave the team?
18   A.   2014.
19   Q.   Early or late?
20   A.   Later in the year in 2014.
21   Q.   Was a change in the program made that
22   would capture orders that were placed through vendors?
23       MS. DESH:  Objection.  Vague.
24   Q.   (By Mr. Shkolnik)  Or was that already in

Page 87

1    place?
2    A.   Can -- I'm sorry.  Can you please
3    clarify -- order from vendor?
4    Q.   (By Mr. Shkolnik)  Yeah.  There was a
5    period of time where a pharmacy could supplement their
6    orders by going to outside vendors if they were either
7    reduced or rejected through the suspicious order
8    monitoring program; correct?
9    A.   Prior to 2013, I believe so.
10   Q.   So by the time you got there, that was
11   fixed?
12   A.   In 2013 I believe that was all addressed.
13   Q.   Was it fixed?
14   A.   To the best of my knowledge, it was
15   addressed, yes.
16   Q.   You're saying addressed.  I'm saying
17   fixed.  Addressing is one thing, fixing a problem is
18   another.  Which one was it?
19   A.   They were blocked from ordering via
20   contacting a vendor.
21   Q.   Why would you -- from your standpoint, why
22   would you want to block a pharmacy from contacting a
23   vendor?
24   A.   To ensure everything went through our

Page 88

1    order monitoring system.
2    Q.   I mean, there was actually a period of
3    time where if the monitoring system either reduced or
4    killed an order, the pharmacist could actually go to
5    Cardinal Health and place that same order and get the
6    medications?  There was a period of time?
7    A.   I believe so, prior to 2013, yes.
8    Q.   I mean, it was through 2009 up until 2013;
9    correct?
10   A.   I do not know the years.
11   Q.   Well, certainly until that fix was
12   implemented, a pharmacist could end-run your suspicious
13   order monitoring program and fill an order from an
14   outside vendor if the company's system shut them down?
15       MS. DESH:  Objection.  Vague.
16   A.   Again, they could potentially order
17   something directly through the vendor prior to that
18   time.
19   Q.   (By Mr. Shkolnik)  Do you know if that was
20   happening down in Florida during the 2010 to 2013 time
21   frame?
22   A.   I do not know.
23   Q.   What was -- you have told me that there's
24   been -- there was the CSO -- the override form was

Page 89

1    implemented as part of when you got onto the team in
2    2013.  At some point 340B was added to the program.
3    Some time in 2013 the direct order to distributors were
4    blocked.
5        Any other changes that were made to the
6    program under your watch when you were part of the
7    team?
8    A.   Just development of educational materials
9    for our stores.
10   Q.   And the educational materials, much of
11   that dealt with the GFD, did it not?
12   A.   Yes.
13   Q.   And that was a big part of your place on
14   the team for a period, was it not?
15   A.   Yes, sir.
16   Q.   You do not only just develop training, but
17   you also went out and did road shows?  Is that a fair
18   statement?
19   A.   I -- from -- like a call or
20   videoconference, yes.
21   Q.   Didn't even think about that.  So you were
22   able to actually do the programs remotely through video
23   conferencing?
24   A.   Yes, sir.

Page 90

1     Q.    Were they done by regions, by store?  How
2 was that done?
3     A.    Regions.
4     Q.    Did you -- were you also a manager of a
5 region?
6     A.    Yes, sir.
7     Q.    What was your region?
8     A.    The eastern operation.
9     Q.    And would that be Maine, Massachusetts,
10 Vermont, New York, down to maybe Jersey, out to Ohio,
11 but not including Ohio?
12     A.    Yes and no.  Ohio was part of the eastern
13 operation at the time, so yes to all of those states.
14     Q.    Oh.  Yours included Ohio, too?
15     A.    Yes.
16     Q.    So Cleveland would have been within your
17 area?
18     A.    Yes.
19     Q.    What years were you a manager for that
20 region?
21     A.    2013 into 2014.
22     Q.    Was there a period of time when Ohio was
23 not included in eastern, or is it -- it remained in
24 eastern?

Page 91

1     A.    I know it's changed over time, but I
2 believe during that time frame it was always a part of
3 eastern.
4     Q.    Who did you replace for that region?
5     A.    Nobody.
6     Q.    Was this developed as part of --
7     A.    Correct.
8     Q.    Let me rephrase the question.  I'm sorry.
9 Was the regions developed as part of the RX Integrity
10 program?
11     A.    Yes.
12     Q.    RX Integrity team, I think is --
13     A.    Apologies.
14         MS. DESH:  You can let him finish his
15 question.
16     Q.    (By Mr. Shkolnik)  What was the purpose of
17 breaking down the country into these regions and having
18 managers for each region?
19     A.    To align the way our field was structured,
20 to provide support to the field leadership of those
21 operations.
22     Q.    And when you're saying provide support to
23 the leadership, what does that mean?
24     A.    Developing education materials, training

Page 92

1 materials.  The CSO override process was
2 operational-based, so all those pieces were tied to
3 their operations.
4     Q.    When was the CSO override process
5 implemented?
6     A.    I believe some time in the first half of
7 2013, maybe middle of 2013.
8     Q.    And during that time, the company was
9 still engaged in distribution activities, was it not,
10 of controlled substances?
11     A.    At that time, in 2013, we began
12 transitioning our distribution centers.
13     Q.    At some point after Jupiter was shut,
14 Perrysburg was shut, and Woodland was being shut down,
15 was distribution being transferred to Cardinal Health?
16         MS. DESH:  Objection.  Assumes facts not
17 in evidence.  You can answer.
18     A.    Cardinal Health was already a distributor
19 for Walgreens at the time.
20     Q.    (By Mr. Shkolnik)  They were a backup
21 distributor, were they not?
22     A.    A secondary, yes, and primary on certain
23 products as well.
24     Q.    But as to the C-II distribution, Cardinal

Page 93

1 Health would have been the secondary for the most part,
2 were they not?
3     A.    Correct.
4     Q.    So as -- initially when Jupiter was shut
5 down, that distribution was picked up by Perrysburg and
6 Woodland?  Am I correct?
7     A.    From what I recall, yes.
8     Q.    And then there was an issue of Perrysburg
9 being shut down and being padlocked by the DEA, and
10 Woodland was picking up a larger portion of the
11 distribution -- isn't that correct -- right around that
12 time?
13         MS. DESH:  Objection.  Assumes facts not
14 in evidence.
15     A.    I don't recall how much or what Woodland
16 picked up from Perrysburg.  I just can't recall.
17     Q.    (By Mr. Shkolnik)  But there was a period
18 Jupiter is shut for C-II -- actually, for all
19 controls -- Perrysburg was shut as well, and then the
20 company was utilizing either Woodland or outside
21 vendors to fill the C-IIs; correct?
22         MS. DESH:  Same objection.
23     A.    To the best of my recollection, I believe
24 so.

Page 94

1    Q.   (By Mr. Shkolnik)  And right around that
2   time was when Walgreens entered into the contract with
3   Amerisource Bergen to become the exclusive distributor
4   once the Cardinal Health contract ended in August of
5   2013; correct?
6    A.   I don't know the exact specific month, but
7   I know towards the end of 2013 we agreed with
8   Amerisource Bergen to become our wholesaler.
9    Q.   And during that period from we'll say
10  around March of 2013 when the announcement of ABC deal
11  through the beginning of 2014, Walgreens was relying
12  for the most part on either Cardinal Health or
13  Amerisource Bergen to do the actual distribution of the
14  C-IIs until it was completely shut off in 2014;
15  correct?
16   A.   To the best of my recollection, yes.
17   Q.   After two thousand -- do you know when in
18  2014 the company said we are not distributing
19  controlled substances going forward?
20   A.   I do not remember the exact month.
21   Q.   You were still on the team, though, when
22  that happened; is that correct?
23   A.   Yes, sir.
24   Q.   When that happened, when the final

Page 95

1   transition happened in 2014, would I be correct in
2   stating that Walgreens was from that point on handling
3   the C-IIs to C-V controlled substances as a pharmacy
4   dis -- as a pharmacy distribution, not as a
5   distributor; correct?
6       MS. DESH:  Objection.  Vague.
7    A.   You mean as in no longer involving in the
8   distribution of C-II through C-V at our own facilities?
9    Q.   (By Mr. Shkolnik)  Yes.  Yes.
10   A.   Yes.
11   Q.   But the company chose to continue running
12  its controlled substance order monitoring program that
13  was in place, even after they were no longer a
14  distributor; correct?
15   A.   Yes.
16   Q.   And as you understand it, it's still
17  running till today; am I correct?
18   A.   Yes.
19   Q.   From when it was the transition out of
20  C -- out of distribution to primarily being focused on
21  the pharmacy sale of opioids, did the GFD become of
22  greater import in terms of the responsibilities of
23  Walgreens because that is where the license was?
24       MS. DESH:  Objection to the form.

Page 96

1    A.   I wouldn't say change to wholesaler
2   changed the viewpoint of the policy or development of
3   policy, no.
4    Q.   (By Mr. Shkolnik)  What happened --
5   withdraw that.  One of the -- would you agree one of
6   the important aspects of -- withdraw that.  One of the
7   changes that occurred as part of the new RX Integrity
8   team was to implement the good faith dispensing
9   educational program; correct?
10   A.   Yes, sir.
11   Q.   Before that, pharmacists did not have to
12  go to a web portal and go through a training program
13  and sign off that they actually completed GFD, before
14  the Integrity program came into place; correct?
15   A.   To the best of my recollection, I believe
16  there was a policy review or policy signoff prior to
17  the additional education by RX Integrity.
18   Q.   But there was a different type of program
19  in place, was there not?
20   A.   Was like the first versions of GFD, yes.
21   Q.   Well, how did it change?  How did GFD
22  Phase 1 compare to GFD Phase 2?
23   A.   Overall, as we learn more about what is
24  going on in the whole nation around opioids, the policy

Page 97

1   continued to evolve over time.
2    Q.   But 2013, there was an enhancement to the
3   training program for GFD, was there not?
4    A.   Yes, I believe so.
5    Q.   And in fact, it was called a relaunch of
6   GFD, was it not?
7    A.   Relaunch.  Yes, sir.  Correct.
8    Q.   And there was a greater focus on GFD from
9   a corporate policy standpoint; correct?
10       MS. DESH:  Objection.  Calls for
11  speculation.
12   A.   Correct.
13   Q.   (By Mr. Shkolnik)  And there was a
14  requirement that all pharmacists undertake GFD training
15  under the procedures that were then in place from 2013
16  forward; correct?
17   A.   Yes, to the best of my recollection.
18   Q.   And there were actually training materials
19  prepared on good practices that should be followed by a
20  pharmacist when filling prescriptions going forward;
21  correct?
22   A.   Yes.
23   Q.   And there was training modules that were
24  put out so that pharmacists in the field could actually

Page 98

1  go online and look at them; correct?
2      A.  Yes.
3      Q.  Were there live programs where you were
4  doing it remotely from the office and walking people
5  through PowerPoints, or was it just click on a link and
6  look at a predone program?
7      A.  I can speak for myself as in my role --
8  yes, with field leadership.
9      Q.  So us would do it live on a link with
10  field leadership?
11      A.  Yes, sir.
12      Q.  As to the pharmacists themselves, would
13  they then go to a web portal and click and watch?
14      A.  We didn't have that technology at that
15  time, but the PowerPoints and materials were on an
16  internet portal that these team members at store level
17  could access.
18      Q.  Would they receive any type of audio or
19  video presentation on GFD?
20      A.  Not that I can recall from that time.
21      Q.  And we're talking -- the time we're
22  talking is 2013 into 2014; correct?
23      A.  Correct.
24      Q.  Did you leave any aspect of GFD training

Page 99

1  after 2014?
2      A.  I apologize.  Can you clarify --
3      Q.  Did you leave any -- all your
4  responsibilities with respect to GFD training after
5  2014?
6      A.  Yes.
7      Q.  Do you know if it's been updated over the
8  years to have live like video/audio-type presentations
9  for the pharmacists?
10      A.  I'm not sure.  I don't know what the team
11  carried on after I left.
12      Q.  I'm going to just bounce back to where I
13  was before.  So you told us you went to Walgreens.  You
14  were out in the field.  You were shadowing.  What did
15  you do next with respect to your education and
16  training?
17      A.  In regards to additional rotations that I
18  did, or --
19      Q.  Yeah.  Additional rotations.
20      A.  To the best of my recollection, I had a
21  medicine rotation back at UIC Hospital.
22      Q.  What does that mean, a medicine rotation?
23      A.  That means rounding with physicians on the
24  floors and working side-by-side with the physicians.

Page 100

1      Q.  And did that include any training with
2  respect to opioids and how they should be prescribed
3  and what types of discussions you would have with the
4  patient?
5      A.  No.
6      Q.  After the medicine rotation, any other
7  rotations before you graduated?
8      A.  There were more.  I just can't recall.  I
9  think we had six or seven we had to do.  It's been a
10  while.  Sorry.
11      Q.  After you graduated, what did you do?
12      A.  I became a licensed pharmacist for
13  Walgreens.
14      Q.  And did you start like at a store here in
15  the Chicagoland area?
16      A.  Yes, I floated through any store in the
17  Chicagoland area.
18      Q.  Is that the way it would work that when
19  you're a new pharmacist, you would sort of work
20  whatever was needed during -- in the region that you're
21  living?
22      A.  Yes, sir.
23      Q.  And how long did you act as a -- and I'm
24  not saying it in a -- trying to be in a negative way --

Page 101

1  as a floater type of a pharmacy?  I don't know what
2  it's called, the technical word.
3      A.  As a floater pharmacist until I became a
4  pharmacy manager in 2006.
5      Q.  So there was never a time when you were
6  like designated you're at the Walgreens on the corner
7  of Clark and whatever?  You would -- you went from
8  floater directly to manager?
9      A.  Yes.  Correct.
10      Q.  And how long did that take between your
11  starting and promotion?
12      A.  Almost two years.
13      Q.  And then you were assigned a specific
14  store as a manager, or would that include stores?
15      A.  Just a specific store.
16      Q.  And now we're talking somewhere around
17  2006, 2007?
18      A.  2006.
19      Q.  And between 2006 and 2013, could you just
20  take us briefly through your -- the stores that you
21  were responsible for -- like what you did?
22      A.  My store, I oversaw payroll, pharmacy
23  scheduling, training my team, working with doctors in
24  the community, working on community education, managing

Page 102

1  the inventory in the pharmacy.
2      Q.   Were you doing pharmacy -- were you doing
3  inventory for the whole store or primarily in the
4  pharmacy side of it?
5      A.   Just the pharmacy side.
6      Q.   During the years between 2006 and 2013,
7  were programs being implemented where ordering and
8  stocking had become automated by computer systems?
9      A.   It was already automated at the time when
10  I started with the company.
11     Q.   So you didn't -- as a pharmacist did you
12  have to go rack-by-back and have a little handheld
13  device and say I have X number of bottles of this and
14  please order X bottles or something like that?  Or was
15  it for the most part being done on an automated
16  generated system through Walgreens?
17     A.   An automated system.
18     Q.   And would those -- with respect to C-IIs
19  or controlled substances in general, was there a
20  ordering pattern that was in place while you were
21  manager in the stores between 2006 and 2013?
22     A.   The system, whatever patterns or
23  algorithms they had for ordering would determine what
24  to order.

Page 103

1      Q.   But would C-IIs come once a week and C-II
2  to C-Vs come twice a week or anything like that?
3      A.   Schedule IIs my stores received once a
4  week.
5      Q.   And what happened if you needed more C-II
6  than once a week?  What was the process that --
7      A.   You could place a manual order for a
8  product.
9      Q.   Would manual go directly to Walgreens
10  distribution, or would you go to a vendor, or both?
11     A.   Directly to Walgreens.
12     Q.   Could you go to a vendor if you wanted to?
13     A.   Not that I recall on a Schedule II.
14     Q.   Was there the ability if Walgreens did not
15  fill an order you could then go to a vendor?
16     A.   The distribution center would manage that
17  part, yes.
18     Q.   So distribution would actually -- the
19  distribution center, if they say no -- withdraw that.
20  During the years 2006 to 2013, if your store placed an
21  order -- you -- withdraw that.  If you had been
22  expecting an order in your store and it didn't come or
23  a reduced amount came, could you as the pharmacist
24  place another order for additional C-IIs before the

Page 104

1  next scheduled order?
2      MS. DESH:  Objection.  Vague.
3      A.   I could always order an item if I needed
4  that item.
5      Q.   (By Mr. Shkolnik)  And were there
6  abilities to direct-order from vendors for C-IIs?
7      A.   Not that I'm aware of at that time.
8      Q.   Did there come a time when you could
9  direct-order C-IIs?
10     A.   Not that I can recall.
11     Q.   When you came into RX Integrity, was there
12  an ability to order C-IIs from vendors directly, manual
13  orders?
14     A.   Not that I can recall.  No.
15     Q.   If an order was placed -- was there a
16  period of time when there was a system in place that if
17  you placed an order and it exceeded a tolerance, that
18  it would be reduced?
19     A.   I don't know how it worked when I was in
20  the field, so I don't know.
21     Q.   If you didn't get enough -- if you were
22  expecting an order of, say, a thousand pills and you
23  only got 500, and you as a store manager felt you
24  needed another additional 500, what would you do?

Page 105

1      A.   You could place another order for
2  additional product, or you could contact the inventory
3  team and have them research or give you more
4  information --
5      Q.   And there was no way to get it ordered
6  from a vendor directly?
7      A.   Not that I can recall from a store level
8  at that time, no.
9      Q.   Did there come a time when -- withdraw
10  that.  At some point in time there was a change to the
11  SOM procedure where vendor orders was run through the
12  SOM program; correct?
13     A.   I can't recall at the time when that would
14  have been implemented.  I don't remember.
15     Q.   No, but you're aware that that occurred?
16  That was something we talked about before?
17     A.   Correct.  There was some kind of order
18  monitoring process at that time, yes.
19     Q.   Who was placing the orders to the vendor
20  during that time frame?  Would it have been the
21  pharmacist or the distribution center?
22     A.   In regards to what kind of medications,
23  sir?
24     Q.   C-IIs.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    A.  All our orders went to our Walgreens
2  distribution center, and then the distribution center
3  based on the product type determines if it goes to the
4  vendor or not, to the best of my recollection of how it
5  worked.
6    Q.  If the suspicious order monitoring system
7  cut -- I'm going to focus on the time frame when you
8  joined Pharmaceutical Integrity.  Would it be correct
9  in stating that as part of your job as well as the rest
10  of your team members, you looked at the system that was
11  in place when you started -- correct -- the SOM system?
12    A.  Correct.
13    Q.  And as I understand your testimony, at
14  that time they had implemented -- there was a program
15  in place that there was such a thing as a tolerance,
16  was there not?
17    A.  I believe so, yes.
18    Q.  Stores had tolerances?
19    A.  I believe so, yes.
20    Q.  Do you know what the algorithm was for
21  setting a tolerance?
22    A.  I do not know.
23    Q.  But you were aware that there was
24  something going on in the computer system that each

Page 107

1  store would have a tolerance on what it could order
2  before it would trigger some event in this SOM system;
3  correct?
4    MS. DESH:  Objection.  Calls for
5  speculation.
6    A.  To the best of my knowledge, yes.
7    Q.  (By Mr. Shkolnik)  And then another change
8  that was implemented by RX Integrity was something
9  called the ceiling as well; correct?
10    A.  Yes.
11    Q.  And that was one of the changes that
12  occurred right around the time when you joined this new
13  team, RX Integrity?
14    A.  Yes.
15    Q.  So irrespective of what the tolerance was,
16  a store would have a hard-stop ceiling in place on how
17  much C-IIs or controlled substances they could order;
18  correct?
19    A.  Yes.
20    Q.  When you looked at the system that was in
21  place, when you became part of Integrity, you became
22  aware that a store's order could exceed a tolerance and
23  the system would automatically reduce the order to the
24  tolerance if there was some tolerance left, some space

Page 108

1  between what they had last ordered and its tolerance;
2  correct?
3    MS. DESH:  Objection.  Vague.
4    A.  I believe so, to the best of my
5  recollection.
6    Q.  (By Mr. Shkolnik)  And then the store
7  could -- once a ceiling was put in place, the store
8  could actually hit tolerance and get more controlled
9  substances as long as it didn't exceed the ceiling;
10  correct?
11    MS. DESH:  Same objection.
12    A.  Potentially.  I can't recall the technical
13  nature of how that all worked.
14    Q.  (By Mr. Shkolnik)  When an order was
15  placed -- and I'll use an example -- probably the
16  easiest way.  If the tolerance was 1,000 pills --
17  however it was calculated for store X, it was 1,000
18  pills, and the order was placed for 2,000 pills.
19    The system, the SOM system that was in
20  place when you became part of the team, would allow it
21  to knock the order down to this tolerance of 1,000 and
22  prevent the additional 1,000 from being distributed to
23  the store; correct?
24    A.  To the best of my recollection, I believe

Page 109

1  that's how it worked.
2    Q.  And until the system was amended, that
3  pharmacy could then place an order for that additional
4  1,000 to a distributor, a manual order to the
5  distributor, until the system closed that hole;
6  correct?
7    MS. DESH:  Objection.  Vague.
8    A.  I'm not sure on the technical, how it
9  would work --
10    Q.  (By Mr. Shkolnik)  I'm not asking you the
11  technical, but there was the ability to order the
12  additional 1,000 pills from a vendor, whether it was
13  the pharmacist, manually, or a distribution center
14  doing it -- someone was able to order those additional
15  1,000 pills through a vendor until the program was
16  amended or upgraded to fix that, to stop that from
17  happening; correct?
18    MS. DESH:  Same objection.
19    A.  Again, I do not recall.  I don't know how
20  it all worked.
21    Q.  (By Mr. Shkolnik)  If -- but were you
22  aware of a period of time where a pharmacy's orders
23  could be reduced to tolerance, yet a pharmacy could
24  still order over tolerance for a vendor?

Page 110

1     A.   I don't recall, because I don't know how
2  it worked.
3     Q.   Is that because it was going on before you
4  joined the team?
5     A.   Correct.
6     Q.   But you were aware at the time you joined
7  the team that the ability to go to a vendor for
8  additional pills over tolerance could no longer occur
9  because it was running through the same suspicious
10  order monitoring program -- correct -- by the time you
11  got there?
12     A.   I'm sorry.  Can you please rephrase?
13     Q.   By the time you became part of the team,
14  any order, including an order that went to the vendor,
15  went through the SOM program, and it would all be
16  evaluated under the same tolerance and ceiling;
17  correct?
18     A.    I believe so, yes.
19          MR. SHKOLNIK:  Can you -- that would be
20  43.  Thank you.
21          [Discussion off the record.]
22          [Exhibit Walgreens-Dymon-001
23          marked for identification.]
24     Q.    (By Mr. Shkolnik)  I'm going to hand you

Page 111

1  what's been marked as Walgreens-Dymon Exhibit 1 for
2  today, and it has a Bates number of PPLPC014000362724.
3          I've just handed you a document that we
4  obtained in discovery in this case, and it's an e-mail
5  from -- it was an internal e-mail at Purdue Pharm from
6  November 6th, 2017, and the subject is Walgreens
7  University information.
8          Have you ever heard of Walgreens
9  University?
10          MS. DESH:  Hunter, can I ask if you have
11  permission to show the witness this document since he's
12  not on it?
13          MR. SHKOLNIK:  Do I have permission?  No,
14  I don't have permission.  No one said no, I couldn't,
15  and we gave notice this week.
16          MS. DESH:  You've given notice on this
17  document?
18          MR. SHKOLNIK:  Yeah.  Yeah.  Yeah.
19     Q.   (By Mr. Shkolnik)  My question was, have
20  you ever heard of Walgreens University?
21     A.   Yes.
22     Q.   What is Walgreens University?
23     A.   It's our onsite version of overall
24  education, and they schedule meetings, work on

Page 112

1  educational training.
2     Q.   This e-mail refers to 11-6-2007, and it's
3  a meeting for November 8, 2017, between Walgreens and
4  Purdue.  Did you attend this meeting, sir?
5     A.   No, I did not.
6     Q.   Turn your attention to Bates numbered --
7  when I Bates numbered, it's on the bottom.  Ending in
8  729.  And it has a attendee list, and it indicates that
9  you and Ms. Martin were attending for Walgreens this
10  meeting with Purdue.
11          Does that refresh your recollection?
12     A.   I did not attend this meeting.
13     Q.   Were you scheduled to attend this meeting?
14     A.   I was, but I had conflicts and I had to
15  not attend the meeting.
16     Q.   But you were aware of this meeting;
17  correct?
18     A.   Yes.
19     Q.   And you received information about this
20  meeting; is that a fair statement?
21     A.   Yes.
22     Q.   And you received the materials that were
23  prepared for the meeting, even though you could not go;
24  correct?

Page 113

1     A.   Yes.
2     Q.   And did you have any meetings within
3  Walgreens in preparation for this meetings --
4     A.   No.
5     Q.    -- this meeting?  Did you have any
6  discussions with any of the people in-house at
7  Walgreens regarding this meeting that occurred on
8  November 8, 2017?
9     A.   Yes.
10     Q.   Tell us about those conversations with
11  people at Walgreens, what they entailed.
12     A.   It was just one conversation about that
13  Purdue was coming onsite for this meeting, and if we
14  would be able to be at the meeting and/or present
15  topics at the meeting.
16     Q.   And you were asked to present on
17  third-party operations?
18     A.   Yes.
19     Q.   Did someone do that in your place?
20     A.   Yes.
21     Q.   Was that Ms. Schneider or Ms. Holden?
22     A.   Yes.
23     Q.   And did they attend this meeting on your
24  behalf?

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    A.   They did.

2    Q.   What was the purpose of this meeting with

3 Purdue in 2017?

4    A.   Educational seminar for them.

5    Q.   To your knowledge, had Walgreens and

6 Purdue engaged in any prior educational programs

7 between them, between the companies at all?

8    A.   I do not know.

9    Q.   Do you know if there was any continuing

10 medical or pharmaceutical education programs that were

11 provided to Walgreens by Purdue related to opioids?

12   A.   Not that I can recall I'm aware of.

13   Q.   When you were in the pharmacy level, not

14 when you got up into corporate, were you aware of any

15 manufacturers providing continuing -- I say medical or

16 pharmaceutical education.  I don't know what the proper

17 word is.

18        But were you aware of any of the

19 manufacturers of opioids providing any educational

20 programs for Walgreens employees?

21   A.   Not that I'm aware of.

22   Q.   Were you aware of Walgreens providing any

23 data to manufacturers related to the sales at the store

24 levels?

Page 115

1    A.   Not that I'm aware of.

2    Q.   If I'm not mistaken, sir, you received a

3 copy of the PowerPoint presentation.

4    A.   I believe so, yes.

5    Q.   Do you know where that is, sir?

6    A.   It would have been in my e-mail if I would

7 have received a copy.

8    Q.   How about if you received a hard copy?

9 Where would that be?

10   A.   I did not receive a hard copy.  I did not

11 attend the meeting.

12   Q.   Do you know if any of the people other

13 than Ms. Schneider or Ms. Holden attended the meeting

14 with Walgreens?

15   A.   I cannot --

16   Q.   With Purdue, I'm sorry.

17   A.   From my team those were the only two

18 individuals.

19   Q.   Would you expect more than just your team

20 to have been in attendance at this meeting if all of

21 these people were listed as attendees?

22   A.   Yes.

23        MR. SHKOLNIK:  Just for the record, we

24 have searched the productions to date, and we could not

Page 116

1 locate any version of this PowerPoint or any e-mails or

2 any other documents related to this program, and we

3 would ask that they be produced, and ask why they

4 weren't produced.

5    Q.   (By Mr. Shkolnik)  Do you know what the

6 purpose of the meeting was?

7    A.   At a high level, just an onsite so they

8 could understand how pharmacy operates.

9    Q.   And did it relate to any type of drugs

10 that Purdue may be trying to sell at the pharmacy

11 level?

12   A.   I do not know if that was in relation to

13 another product line or not.

14   Q.   Do you know what pharmaceuticals Purdue is

15 most known for selling?

16   A.   To my understanding and recollection, it's

17 OxyContin.

18   Q.   Did they -- do you know if this meeting

19 had anything to do with sales of OxyContin?

20   A.   I do not know.

21   Q.   It said there was -- if we go to Bates

22 numbered 2726, the meeting objective.  The name was

23 meeting -- pharmacy insights, Walgreens University.

24 Walgreens University is a customized program

Page 117

1 specifically designed and developed for Purdue which

2 provides a foundational overview of Walgreens Pharmacy

3 operations and workflow.

4        A unique opportunity to engage with

5 Walgreens -- various Walgreens executives, and gain

6 insight into business practices and optimization of

7 pharmacy channel strategy.

8        What is meant by pharmacy channel

9 strategy?

10   A.   I do not know.  I didn't write this

11 document.

12   Q.   Would I be correct in stating in 2017 the

13 distribution of Purdue Pharmaceuticals was going

14 through AmerisourceBergen, as it relates to the

15 controlled substances?  Correct?

16   A.   To the best --

17        MS. DESH:  Objection.  Calls for

18 speculation.

19   A.   I mean, to the best of my knowledge,

20 again, I believe everything goes through

21 AmerisourceBergen.

22   Q.   (By Mr. Shkolnik)  But also in 2017,

23 Walgreens was still operating its suspicious order

24 monitoring program; correct?

Page 118

1    A.   To my understanding, yes.
2    Q.   And RX Integrity is still a active and
3  vibrant team at Walgreens, is it not?
4    A.   Correct.
5    Q.   If we can go Bates number 2734.  There's a
6  slide that was presented at this meeting called the
7  current landscape, and if we go to the bottom it says
8  opioid epidemic, DEA scrutiny and increasing government
9  and media attention.
10       When your team members came back after
11  attending this meeting, did they discuss with you that
12  one of the topics that were focused on in 2017, when
13  people from Purdue were meeting with -- let me use
14  their word so I don't get it wrong -- executives of
15  Walgreens, that there was a discussion of the opioid
16  epidemic, DEA scrutiny and increasing government and
17  media attention?
18    A.   No, my team members only attended their
19  portion of the presentation.
20    Q.   They wouldn't have stayed for the whole
21  thing?
22    A.   No.
23    Q.   To your knowledge did anyone report back
24  that there was a meeting with Purdue in 2017 when

Page 119

1  issues of the opioid epidemic was discussed, as well as
2  DEA scrutiny?
3    A.   I would not be aware of that.
4    Q.   2017, were you aware of the opioid
5  epidemic?
6    A.   Yes.
7    Q.   In 2017, were you aware that DEA
8  scrutiny -- that there was DEA scrutiny and increasing
9  government and media attention related to the opioid
10  epidemic?
11    A.   Nothing different out of the ordinary, no.
12    Q.   Well, what do you mean by out of the
13  ordinary?
14    A.   I -- not aware of any new or any changes
15  on the opioid epidemic.  I mean, I don't know what they
16  mean by this statement.
17    Q.   Well, by then Walgreens had entered its
18  agreement with the DEA, so that was by history;
19  correct?  That's historical?
20    A.   Correct.
21    Q.   By then Amerisource -- I'm sorry.  By then
22  Cardinal Health had had settlements with the DEA over
23  distribution of controlled substances; correct?
24    A.   I cannot speak on what Cardinal Health's

Page 120

1  settlements with the D -- I do not know.
2    Q.   You didn't know that Cardinal Health had
3  been fined as well for the distribution of controlled
4  substances?
5    A.   I do not know.
6    Q.   Did you know -- do you know who Cardinal
7  Health is?
8    A.   Yes, I do.
9    Q.   Do you know that they distributed
10  controlled substances?
11    A.   Yes, they do.  They're a pharmaceutical
12  wholesaler.
13    Q.   Do you know who McKesson is?
14    A.   Yes.
15    Q.   Do you know if they distribute controlled
16  substances, opioids?
17    A.   They are also a pharmaceutical
18  distributor.
19    Q.   Did you know that they were also fined by
20  the DEA and the Department of Justice for their
21  distribution practices related to the controlled
22  substances?
23    A.   I am not aware.
24    Q.   Do you know if AmerisourceBergen was

Page 121

1  fined?
2    A.   I am not aware of anything with
3  AmerisourceBergen.
4    Q.   Do you know if Purdue was ever fined for
5  its conduct in the way in which it marketed and sold
6  OxyContin?
7    A.   I do not know.
8    Q.   Never heard of it?
9    A.   I do not know.  I'm not aware of any
10  settlements, fines.  I -- again, I'm not aware.
11    Q.   As you -- as a pharmacist, which you were
12  for -- which you are till today, but which you were
13  actively for between two thousand -- was it 2003 to
14  2013 -- you never once heard that Purdue was fined for
15  its conduct with relation to OxyContin?
16    A.   Not that I can recall.
17    Q.   You were not aware that some of its
18  executives were found guilty of crimes related to the
19  way in which it marketed OxyContin?
20    A.   Not that I'm aware.
21    Q.   We could turn to Bates numbered 62738.
22  This is a pretty bad photocopy of a page of the
23  PowerPoint slide that was presented at the Purdue
24  meeting on November 8, 2017, and the title is Walgreens

Page 122

1  Purdue business, and it says MATTY, September 2017.
2         Do you know what MATTY means?
3     A.   I do not.
4     Q.   If we look at the top line, it says --
5  there's an arrow pointing to 8,200, so that would be
6  greater than 8,200 Walgreens stores carry Purdue
7  prescription products, or is that less than?
8     A.   No, it's a greater-than symbol.
9     Q.   That's what I thought.  And it says
10  Walgreens distributes approximately 374 million
11  dollars, 16.8 percent of Purdue's prescription
12  products.  Were you aware of that, sir?
13     A.   No.
14     Q.   And it goes on to say Walgreens is the
15  largest of the greater than 200 retail chains that
16  dispense Purdue prescription products.  Were you aware
17  of that, sir?
18     A.   No, and I don't know if that statement is
19  actually accurate based on the date of the document.
20     Q.   Why would you question it?
21     A.   I am not sure if we're the largest
22  pharmacy.  I believe CVS is the largest pharmacy.
23     Q.   Well, it says Walgreens is the largest of
24  the retail chains that dispense Purdue products.

Page 123

1     A.   Again, I don't know if that's accurate or
2  not.
3     Q.   Okay.  So you don't question whether or
4  not Walgreens represents 16.8 percent of Purdue's
5  prescriptions products, do you?
6     A.   I don't know that information personally,
7  so I don't know if that's accurate or not.
8     Q.   If we can go on to the next slide, please.
9  And it's Bates numbers 62739.  Here we have a slide
10  that references Purdue's -- purchases of Purdue
11  prescription drugs, and it's graphed based upon the
12  different pharmaceutic -- sorry, the different
13  pharmacies.  I don't have the color copy of it.
14         Are you aware of what the sales were
15  for -- withdraw that.  Do you know if Butrans was a
16  Purdue product?
17     A.   I can't recall.  I'd have to look it up
18  online to see if that's a product they make.
19     Q.   Let's go to the next -- next page, please.
20  Here we have a slide that was presented that day, and
21  it says Walgreens is the only major retail chain
22  account that has autoshipped every new product
23  launched.
24         While you were at -- first of all in the

Page 124

1  pharmacy level, were you aware that Walgreens was
2  autoshipping every new product launched by Purdue?
3     A.   No.
4     Q.   While you were in the RX Integrity group,
5  were you aware that Walgreens was autoshipping every
6  new Purdue product?
7     A.   No.
8     Q.   Do you know how far back Purdue
9  collaborated with Walgreens?
10     A.   I have no knowledge.  I don't know.
11     Q.   Are you familiar with the drug called
12  Hysingla ER?
13     A.   I have heard of it, yes.
14     Q.   What is it?
15     A.   It's an extended-release form of
16  hydrocodone.
17     Q.   And according to this, Walgreens was the
18  only account of Purdue that autoshipped Hysingla, and
19  here it says to approximately 4,000 stores.  Were you
20  aware of that?
21     A.   I mean, per this document, yes, but prior,
22  no.
23     Q.   What does it mean to autoship?
24     A.   The order is placed automatically on

Page 125

1  behalf for the store.
2     Q.   So even if the pharmacist didn't have
3  someone come in and ask for it, the store would have it
4  stocked automatically by the computer system?
5     A.   Correct, because these are new product
6  launches.
7     Q.   And this way 4,000 stores would be
8  prestocked in case someone came in for a prescription
9  for a extended-release opioid?
10     A.   Yes, in this case, this is a
11  abuse-deterrent opioid.  Yes.
12     Q.   Did it turn out to be abuse-deterrent --
13  Hysingla?  Do you know?
14         MS. DESH:  Objection.  Calls for
15  speculation.
16     A.   To my understanding of the product, it is
17  abuse-deterrent, yes.
18     Q.   And what does it mean to be
19  abuse-deterrent as it relates to Hysingla?
20     A.   Can't be modified out of its form and
21  ingested via other means.
22     Q.   But it also -- it still has its addictive
23  qualities; am I correct?
24     A.   Correct.

Page 126

1    Q.   It's still an extended-release opioid;
2   correct?
3    A.   Correct.
4    Q.   It's the same molecule as OxyContin, is it
5   not?
6    A.   No.
7    Q.   It's a different type of an opioid
8   molecule?
9    A.   Yes.
10    Q.   What is the molecule in Hysingla?
11    A.   Hydrocodone.
12    Q.   What's Symproic?
13    A.   I do not know that drug.
14    Q.   So it goes on, the next sentence down --
15   below -- not that one -- below -- Walgreens allowed
16   district managers to call on their Walgreens health
17   care supervisors who oversee 70 to 100 retail stores.
18        What does that mean, to call on their
19   Walgreens health care supervisors?  What is a health
20   care supervisors?
21    A.   A health care supervisor is a pharmacist
22   who works at a field leadership level to oversee
23   day-to-day operations at retail pharmacies.
24    Q.   Was it common for Walgreens to allow

Page 127

1   Purdue's district managers to call upon Walgreens
2   health supervisors directly?
3    A.   Our own district managers couldn't call
4   our health care supervisors any time.  I really don't
5   know what they mean by this statement here.
6    Q.   So you're thinking that doesn't mean
7   Purdue is able to call upon the health care
8   supervisors?
9    A.   Again, I don't even know -- this
10   statement, it doesn't even make rational sense to me,
11   the way it's written.
12    Q.   If we read the next line two lines down, I
13   think it'll --
14        MS. DESH:  Let him finish his answer.
15        MR. SHKOLNIK:  I'm sorry.
16    Q.   (By Mr. Shkolnik)  If we read the next
17   line down, it says this list is limited to select
18   manufacturers, and a contract is required.
19        Were you aware that Purdue had a contract
20   with Walgreens as one of the select manufacturers so
21   that its district managers can speak directly with
22   Walgreens health care supervisors?  Were you aware of
23   that?
24    A.   I am not aware of that.

Page 128

1    Q.   Is that common, that Walgreens would allow
2   select manufacturers, district managers, to go directly
3   to people in the Walgreens chain to discuss their
4   drugs?
5    A.   Not that I'm aware of.
6    Q.   Was it common to have select district
7   managers being able to go to Walgreens health care
8   supervisors to talk about OxyContin, oxycodone, whether
9   it's extended-release or not extended-release?  Is that
10   common?
11    A.   Not that I'm aware of.
12    Q.   A moment ago you said the sentence above
13   did not make any sense.  Does the next sentence help
14   clarify whether or not the district managers were
15   Purdue's or not?  You could read the next line.
16        Purdue was among the first to be selected
17   and provided access to call on their health care
18   supervisors.  I mean, was that custom and practice at
19   Walgreens, that Purdue could go directly to the
20   pharmacy health care supervisors?
21    A.   Not to my understanding or knowledge.  I
22   don't know.
23    Q.   I mean, as a pharmacist, sir, a Pharm D,
24   worked as a pharmacy manager, cares for patients by

Page 129

1   your own words, do you think it's appropriate to have
2   the manufacturer of opioids coming directly to
3   Walgreens health care supervisors to talk about the
4   sales of their drugs?
5    A.   Again, I don't know if it's -- what they
6   were talking about or what the program is structured to
7   be here.  I have no knowledge of this.
8    Q.   Do you think maybe the Purdue people were
9   just going there to shoot the breeze and they had
10   nothing better to do, these district managers?
11    A.   I can't speculate to that.  I don't know.
12    Q.   Sir, wouldn't you agree with me that the
13   purposes of meeting directly with Walgreens health care
14   supervisors by district managers of Purdue was so that
15   the district managers could sell the Purdue opioids
16   directly to those people?
17        MS. DESH:  Objection.  Calls --
18    Q.   (By Mr. Shkolnik)  Or market.  I'm sorry,
19   not sell.  Market.
20        MS. DESH:  Objection.  Calls for
21   speculation.
22    A.   No.
23    Q.   (By Mr. Shkolnik)  You don't think that's
24   the case?

Page 130

```
 1     A.   No.
 2     Q.   You think they just went there because the
 3  district managers for this pharmacy -- I'm sorry,
 4  Purdue -- just wanted to chat it up with the health
 5  care supervisors?
 6     A.   No, pharmaceutical representatives are
 7  usually in contact to talk about product or product
 8  launches traditionally.
 9     Q.   So it's common to come in and talk to the
10  pharmacists?
11     A.   No, not at store level.
12     Q.   Manager level?
13     A.   Not at store level.
14     Q.   I said managers -- so managers are store
15  level?
16     A.   Yes.
17     Q.   At what level do these salesmen come
18  talking to Walgreens people?
19     A.   It would be at the health care supervisor
20  level.
21     Q.   So even back when you were at the pharmacy
22  level, that was happening, was it not?
23     A.   I don't know.
24     Q.   When you were in Integrity was it
```

Page 131

```
 1  happening?
 2     A.   I don't know.
 3     Q.   And it goes on.  It says Walgreens engages
 4  with manufacturers to provide pharmacist educational
 5  material to their pharmacists through corporate
 6  coordination, including branded and unbranded
 7  resources, to reach 27,000 pharmacists.
 8          When you were a pharmacist working at
 9  Walgreens, were you aware that the educational
10  materials that you were getting about OxyContin,
11  oxycodone manufactured by Purdue was coming directly
12  from that company?
13     A.   I don't recall any materials at that time.
14     Q.   Did you ever see any materials about
15  OxyContin?
16     A.   Not that I can recall.
17     Q.   About oxycodone?
18     A.   Not that I can recall.
19     Q.   Now, the next line.  Walgreens contracted
20  with Purdue through data analytics for a one-year study
21  focused on the journey of the OIC patient.  Do you know
22  what OIC is?
23     A.   I do not know what that acronym means.
24     Q.   Do you think it has anything to do with
```

Page 132

```
 1  opioid?
 2     A.   Again, I can't speculate.  I don't know
 3  what the acronym means.
 4     Q.   Other than opioids, are you aware of any
 5  other products that Purdue was most known for?
 6     A.   To my knowledge, that's their number --
 7  top product that they've always dispensed or created,
 8  distributed.
 9     Q.   Have you ever seen the data analytics
10  study done for Purdue -- I'm sorry, done for Walgreens
11  and contracted with Purdue?  Have you ever seen that
12  study?
13     A.   No.
14     Q.   Neither have I?  That's interesting.
15          MR. SHKOLNIK:  Could you have it produced,
16  please?  It should have been produced in this case.
17     Q.   (By Mr. Shkolnik)  Let's go to the last
18  bullet point.
19          MR. SHKOLNIK:  You know, if you could do
20  me a favor.  If you could add at the end of the
21  transcript that we would like production of all of the
22  material related to the Walgreens Purdue data analytics
23  study, as well as all documents related to the
24  Walgreens collaboration and university meetings.  Thank
```

Page 133

```
 1  you.
 2     Q.   (By Mr. Shkolnik)  If we can go to the
 3  last point.  Purdue contracts for data for Walgreens RX
 4  purchases at the store level.
 5          What does it mean to have Walgreens
 6  purchases at the store-level data?  What would you take
 7  that to mean, sir?
 8     A.   Again, I can't speculate.  I don't know
 9  what this is about or even means.
10     Q.   Sir, you've worked in the pharmacy for at
11  least eight to nine years as a manager, as a floating
12  pharmacist.  What type of data would be available at
13  the store level regarding prescription purchases of
14  OxyContin and oxycodone and Hysingla that Purdue could
15  possibly get from Walgreens that was maintained in the
16  computers?  Tell me.
17     A.   Sales.
18     Q.   Names of the patients?
19     A.   I believe not.  That's not allowable.
20  That's PHI.
21     Q.   Well, how about the prescription, what it
22  was for, how long it was for?
23     A.   Again, I believe not.  I can't speculate.
24  That's all matters of privacy law, and again, I don't
```

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  know what this agreement would entail or would allow
2  them to even access from Walgreens.
3      Q.  Well, it says data is received daily and
4  posted in Phoenix for sales force, as well as added to
5  ValueCentric for executive review and analysis.
6          Whatever the details were, it dealt with
7  all of the prescription purchases at the store level
8  that could be legally produced without violating
9  HIPAA -- was being made available in Phoenix for its
10 sales force and for ValueCentric and executive review
11 and analysis, if we review this presentation that was
12 made at Walgreens University in November of 2017;
13 correct?
14         MS. DESH:  Objection.  Calls for
15 speculation.
16     A.  Again, I don't know what this meeting was.
17 I did not attend it, did not create any content.  I
18 don't know.
19     Q.  (By Mr. Shkolnik)  But you were supposed
20 to be there?  You were invited?
21     A.  Correct.
22     Q.  You didn't go; correct?
23     A.  Correct.
24     Q.  Your direct reports went to the meeting;

Page 135

1  correct?
2      A.  Only for their segment of the meeting.
3      Q.  You don't know if this wasn't discussed at
4  their segment of the meeting, do you, as you sit here?
5      A.  I have no knowledge of it --
6      Q.  So it could have been; correct?
7      A.  I do not know.
8      Q.  Well, you know it was distributed in your
9  company, this PowerPoint from Walgreens University;
10 correct?
11     A.  I don't know if this was distributed to
12 the company.
13     Q.  Well, it was distributed to the people on
14 the -- in the -- who were attendees at the very least;
15 correct?
16         MS. DESH:  Objection.  Calls for
17 speculation.
18     A.  Again, I can't speculate who got it on
19 the --
20     Q.  Good answer.  She says speculate, you say
21 you can't speculate.  Love it.
22         MR. SHKOLNIK:  Could you stop doing that,
23 please?
24     Q.  (By Mr. Shkolnik)  Sir, from your custom

Page 136

1  and practice at Walgreens, if you were a speaker at
2  Walgreens University presentations and you were listed
3  as an attendee, at the very least you would get a copy
4  of the PowerPoint presentations that were going to be
5  utilized?  Fair statement?
6          MS. DESH:  Same --
7      A.  No.
8      Q.  (By Mr. Shkolnik)  So you would just not
9  get them?
10     A.  No, I only had my section when I would
11 present at Walgreens University.
12     Q.  Does this PowerPoint have a section for
13 you even or do you have your own PowerPoint?
14     A.  There's nothing about third party in here.
15     Q.  Well, this last section before we take our
16 break, Purdue contracts for data for Walgreens RX
17 purchases at the store level.  Data is received daily
18 and posted in Phoenix for sales force, as well as added
19 to ValueCentric for executive review and analysis.
20         Sir, would you agree with me that from a
21 manufacturer's standpoint in terms of marketing their
22 opioids to the population that use opioids, whether
23 it's legally or illegally, knowing how many pills are
24 being sold, what the prescriptions are, the length of

Page 137

1  the prescriptions, and whatever else is at the store
2  level that's legally allowed to be shared would be very
3  important information for a manufacturer like Purdue so
4  they could monitor how much of their drugs are going
5  out into the field?  Fair statement?
6          MS. DESH:  Objection to the form.
7      A.  I don't know what Purdue is doing with the
8  data, so again, I don't know what Purdue would do with
9  it.  Maybe they're trying to understand what is going
10 on with their distribution channels.  I don't know.
11     Q.  (By Mr. Shkolnik)  Maybe they're also
12 trying to comply with their obligations for suspicious
13 order monitoring that manufacturers have as well?  Is
14 that a possibility?
15     A.  Again, I don't know.  I don't work for
16 Purdue.  I don't know what they would have done with
17 the data.
18     Q.  Or not done with the data?  Fair
19 statement?
20     A.  I have no -- exactly.  I have no idea what
21 they would do with this information.
22         MR. SHKOLNIK:  Could we take a break,
23 please?
24         THE VIDEOGRAPHER:  We're off the record at

Highly Confidential - Subject to Further Confidentiality Review

Page 138

11:50 AM.

    [A brief recess was taken.]

    THE VIDEOGRAPHER: We are back on the record at 12:00 PM.

    MR. SHKOLNIK: If we could put that doc back up, please.

    Now, just if we could also add to the back that list on the back of the transcript that we're requesting that all the data that's been made available to Purdue by Walgreens regarding purchases at the store level be made available to plaintiffs in this case. We have been unable to identify it in our search of the Walgreens productions to date.

    Q. (By Mr. Shkolnik) We could turn now to Bates numbered 2745, and this document has critical success factors. Success Factor Number 1, product demand and pull-through Walgreens Pharmacy.

    Are you familiar with that type of terminology in the sales of pharmaceuticals when it says product demand and pull-through Walgreens Pharmacy? Do you have any understanding what that would mean?

    A. I do not.

    Q. Is it possible that Purdue was hoping the

Page 139

outcome of the meeting with Walgreens was that its relationship developing and building with Walgreens is that its product would be demanded through the Walgreens stores and sold through the Walgreens stores?

    A. I do not know.

    Q. And the word product is referenced -- we could actually change that word -- that opioid demand and pull-through Walgreens Pharmacy was one of the goals that Purdue had at meeting with your people at Walgreens in November of 2017? Is that another way that that could be said?

    A. Not from my viewpoint. I don't know what they mean by product demand.

    Q. Well, I mean, their product is opioids; correct?

    A. They have various products under their company umbrella. I don't know what they're referring to.

    Q. So maybe this meeting had nothing to do with the opioids that they had been selling for decades, that that's not the product, you think maybe they're not talking about that?

    A. I don't know. I wasn't at the meeting.

    Q. Success Factor 3, continued collaboration

Page 140

with Walgreens key executives, clinical personnel to support MTM/pain management. Do you know what MTM is, as a pharmacist?

    A. Yes.

    Q. What is it?

    A. Medication therapy management.

    Q. And pain management? Do you know what that means?

    A. Yes.

    Q. What's that?

    A. A pharmacist working with practitioners in the treatment of patient pain disorders.

    Q. Do you think it has some relationship with the opioids that Purdue sells?

    A. Potentially their products are used for pain.

    Q. Potentially their products are used for pain? That's a fair statement; correct?

    A. Correct. They're used for cancer, a lot of treatments.

    Q. A lot of treatments. How about abuse?

    A. No.

    Q. As you sit here today, sir, it's your testimony as a Pharm D, employee of Walgreens, that

Page 141

OxyContin produced by Purdue has not been utilized as a drug of abuse leading to this epidemic?

    MS. DESH: Objection to the form.

    Q. (By Mr. Shkolnik) Yes or no?

    A. Their product is not created for abuse. Their product is used for patients to treat pain due to whatever various sources leading to that creation of pain.

    Q. (By Mr. Shkolnik) I don't think I ever said in my question that their product is created for abuse. I didn't say that to you, sir. My question is very straightforward.

    As you sit here today, sir, is it your testimony as a Pharm D, employee of Walgreens, and executive at Walgreens that OxyContin produced by Purdue has not been utilized as a drug of abuse leading to the opioid epidemic?

    MS. DESH: Objection.

    Q. (By Mr. Shkolnik) That was my question. Yes or no?

    MS. DESH: Objection. Form.

    A. I cannot say that has not been abused or misused by an individual.

    Q. (By Mr. Shkolnik) How about by a lot of

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 individuals?

2     MS. DESH: Same objection.

3     A. Again, I cannot say. I mean, an

4 individual can choose to do what they want once they

5 receive a prescription.

6     Q. (By Mr. Shkolnik) So the pharmacies have

7 no -- the pharmacies have absolutely no role in the

8 potential for abuse of opioids, prescription opioids;

9 is that your testimony?

10     A. No potentiation of abuse, no.

11     Q. Pharmacists can never be at fault for the

12 release of opioids that leads to abuse? They cannot

13 be?

14     A. I would never use the word cannot, but

15 again, pharmacists fill prescriptions for patients that

16 have a clinical need and it's a legitimate

17 prescription.

18     Q. Don't pharmacists also fill prescriptions

19 sometimes that -- withdraw that. You're aware that

20 your company was found by the DEA to be filling

21 prescriptions that were clear -- that were -- that were

22 inappropriate out of its stores in Florida. You're

23 aware of that, aren't you?

24     MS. DESH: Objection to the form.

Page 143

1     A. Again, that's the DEA's statement.

2     Q. (By Mr. Shkolnik) So the DEA was wrong

3 when they said the Florida stores that were shut down

4 were distributing pills in violation of law?

5     MS. DESH: Same objection.

6     Q. (By Mr. Shkolnik) Is that your opinion,

7 sir?

8     A. Again, I cannot speak for the DEA if

9 that's right or wrong, but that's just the statement

10 that the DEA made.

11     Q. (By Mr. Shkolnik) Were they right or

12 wrong when they said your pharmacies should be shut

13 down for inappropriate sales of opioids?

14     MS. DESH: Same objection.

15     A. Again, that's their statement and they're

16 impeding patient care.

17     Q. (By Mr. Shkolnik) I'm sorry?

18     A. That's their statement, and it's also

19 impeding patient care when our sites -- our locations

20 are shut down.

21     Q. So as a licensed pharmacist, even if some

22 percentage of the drugs go through -- go out into

23 inappropriate channels, the ends justify the means as

24 long as there's pills available for the people who are

Page 144

1 appropriately prescribed them?

2     MS. DESH: Objection.

3     Q. (By Mr. Shkolnik) Is that your statement?

4     MS. DESH: Objection to the form.

5     A. No, we fill for appropriate legitimate

6 reason prescriptions.

7     Q. (By Mr. Shkolnik) When thousands of

8 patients went into pharmacies in Florida in communities

9 with 3,000 residents and most of those pharmacies --

10 most of those patients had addresses in Tennessee and

11 Ohio and West Virginia and Kentucky, and they came to

12 the stores every 30 days to fill prescriptions for

13 high-dose opioids, that would be appropriate?

14     MS. DESH: Objection, calls for

15 speculation.

16     A. I don't know all the factors leading to

17 what was filled or dispensed at those stores. I was

18 not there.

19     Q. (By Mr. Shkolnik) Apparently the DEA was

20 down there and evaluated them; correct?

21     A. Per the DEA's statements.

22     Q. Is it your opinion the DEA lies when they

23 says stores inappropriately fill prescriptions,

24 whenever they say that?

Page 145

1     A. No.

2     Q. Do you believe the DEA actually tried to

3 help prevent diversion of drugs? Do you believe that?

4     A. That's one of the agency's goals I know

5 that they list on their own website.

6     Q. You've searched that website to find out

7 what the DEA does?

8     A. I use it on occasion, yes.

9     Q. For --

10     A. Just pull out the pharmacist's manual on

11 the DEA website, practitioners, who can prescribe in

12 different states.

13     Q. I guess let me just get your opinion on

14 this one. Was the DEA wrong when it took action

15 against your company in 2011, 2012, and into 2013?

16     MS. DESH: Objection to the form.

17     A. Again, I can't say that the DEA is right

18 or wrong. The DEA chooses to do their actions of what

19 they want to do.

20     Q. (By Mr. Shkolnik) If the DEA action in

21 any way impeded the distribution of opioids, OxyContin,

22 oxycodone, oxymorphone, fentanyl, if the DEA action

23 impeded the distribution of those drugs back in 2011,

24 2012, and 2013, when they took action against

Page 146

1  Walgreens, do you think that was inappropriate?
2        MS. DESH:  Same objection.
3        A.    Again, I can't speak for the DEA's actions
4  and what they choose to do.  That's -- they're a
5  government agency; they chose to do what they wanted to
6  do.
7        Q.    (By Mr. Shkolnik)  My question was by
8  taking action, if it impeded the sale of prescription
9  opioids -- oxycodone, OxyContin, oxymorphone,
10  fentanyl -- would that be inappropriate from your
11  standpoint?
12        MS. DESH:  Same objection.
13        A.    Again, that impacts the patients who need
14  medications and have a legitimate cause and a
15  legitimate need for that medication.  Unfortunately it
16  harms patients as well as potentially makes it
17  challenging to take care of people who really, really
18  need these prescriptions to live day-to-day.
19        Q.    (By Mr. Shkolnik)  And it also helps
20  protect opioids such as OxyContin, oxycodone,
21  oxymorphone, fentanyl from getting in the hands of
22  people who abuse them, if you're inappropriately
23  dispensing and distribute them; correct?
24        A.    Again, I don't know if that would lead

Page 147

1  to -- your statement, sir.
2        Q.    What's the purpose for suspicious order
3  monitoring?
4        A.    Our purpose is to make sure that we are
5  meeting any guidelines, regulatory guidelines that are
6  out there set by DEA, meeting our due diligence.
7        Q.    But why?  Why do you do that?  Why do you
8  have to meet those guidelines and regulatory
9  guidelines, using your words?
10        A.    It's a regulation.
11        Q.    What was the purpose of the regulations?
12        MS. DESH:  Objection.  Calls for
13  speculation.
14        A.    Again, I'm not -- I can't explain why the
15  DEA created those regs or what they're for, but that's,
16  again, they're regulations and we as a pharmacy follow
17  federal and state regulations around dispensing
18  prescriptions.
19        Q.    (By Mr. Shkolnik)  Well, you were actually
20  a distributor, so you had to follow the DEA regulations
21  as a distributor, which had nothing to do with directly
22  handing the pills to the customer; fair statement?
23        A.    We were also a distributor, yes.
24        Q.    And why were you required to follow the

Page 148

1  guidelines as a distributor?
2        A.    I never worked on the distribution side of
3  the Walgreens business, but again, it would be the same
4  as for a pharmacy.  We abide by state and federal
5  regulations.
6        Q.    Well, you actually were on the side of
7  distribution when you were in RX Integrity because you
8  were responsible for either thumbs up, approve, or
9  thumbs down, kill, orders that came across your desk;
10  correct?
11        A.    I don't define our team as a distributor.
12        Q.    RX -- just so it's clear, when RX
13  Integrity came into existence, it was your belief that
14  you were not playing a role of administering suspicious
15  order monitoring compliance at a distributor level?
16        A.    We worked in conjunction with our
17  distributor, our distribution facility.
18        Q.    When you say in conjunction with, did you
19  implement SOM for distribution, or did you implement it
20  for stores?
21        A.    For distribution.
22        Q.    So you were at the distributor level;
23  correct?
24        A.    If that's your interpretation, I --

Page 149

1  distributor to me is a facility and entity that
2  packages, ships, transmits drugs, transfers drugs.
3        Q.    I think you're playing with semantics
4  here, sir.  Was SOM, the Integrity program implemented
5  by RX Integrity, implemented at the distributor level
6  in Walgreens up until you shut down the distribution
7  and gave up the licenses?
8        MS. DESH:  Objection to the form.
9        A.    As part of the distribution process, yes.
10        Q.    (By Mr. Shkolnik)  So RX Integrity was
11  applied to the distribution of opioids while you were
12  there; correct?
13        A.    Yes, of controlled substances.
14        Q.    Was the -- was RX Integrity also
15  applied -- your group's work -- to the store level --
16  I'm not going to say distribution -- sale of opioids,
17  C-II, C-V as well?
18        A.    The ordering of a controlled substance.
19        Q.    So when you say ordering of, that's
20  ordering from distributors; correct?
21        A.    Correct.
22        Q.    So your job was to evaluate both the order
23  from the store and the fulfillment at the distribution
24  side, were you not?

Page 150

1  A.  At the store side is where we intervened,
2  and when we had our own distributors it was based on
3  the actions that we took.  Distributors have their own
4  additional monitoring on top of what we do.
5  Q.  No -- up until 2014, you were your
6  distributor, unless you went to your outside vendor for
7  certain additional or fill-in work; correct?
8  A.  Correct.
9  Q.  When you were a distributor, you were
10  applying the SOM processes at the store level, when
11  they purchased, and at the distribution level when it
12  distributed?  Fair statement?
13  A.  Correct, the ordering, and then the sale
14  from our warehouse to the store, yes.
15  Q.  So it was -- the decision was either to
16  fill or kill an order; correct?
17  MS. DESH:  Objection to the form.
18  Q.  (By Mr. Shkolnik)  You've heard that
19  phrase, haven't you?
20  A.  Not fill or kill, no.
21  Q.  Never heard that?
22  A.  Not in the context of RX Integrity, no.
23  Q.  Was that something that Cardinal Health
24  was -- was that a procedure they were using and they

Page 151

1  told you about?
2  A.  The terminology -- we either fill an order
3  or we cancel an order.
4  Q.  No, you actually filled -- you actually
5  reduced, filled, or canceled, depending upon the time
6  frame; correct?
7  A.  Correct.
8  Q.  Were you aware that the DEA said it was
9  inappropriate to reduce orders that were made?
10  A.  I don't recall.
11  Q.  No one ever told you about it?
12  A.  I'm not saying that.  I just can't recall.
13  Q.  As you sit here today as having been a
14  member of the team established to put the word out and
15  centralize suspicious order monitoring, were you aware
16  that it was inappropriate for the company to take an
17  order that was violating tolerance or violating
18  ceiling, and reduce it and fill that reduced order?
19  Were you ever made aware of that?
20  MS. DESH:  Objection to the form.
21  A.  I can't recall.
22  Q.  (By Mr. Shkolnik)  So the last success
23  factor we have here, continued collaboration with
24  Walgreens key executives, clinical personnel, and to

Page 152

1  support MTM/pain management.
2  If I'm reading that correctly, they want
3  to have a close relationship with the executives of
4  Walgreens to support basically the sale of their pain
5  management medications through the Walgreens
6  distribution -- I'm sorry, pharmacy -- pharmacies;
7  correct?
8  A.  Again, I don't know if the statement --
9  what products they're referring to or what this is
10  about.  I don't know.
11  Q.  What is Walgreens health care supervisors?
12  A.  I -- that term we don't use at Walgreens.
13  I mean, we just -- we call them a health care
14  supervisor.  I think that's the same person that we
15  discussed earlier that's in the field.
16  Q.  Have you had any direct relation -- direct
17  contact with Purdue?
18  A.  Not that I can think of over my years, not
19  that I can recall.
20  Q.  You know, I know it's only been a short
21  period.  Can we just -- let's take our lunch break now.
22  I just want to just move on to something else.  I think
23  it's a good time.
24  THE VIDEOGRAPHER:  We are off the record

Page 153

1  at 12:19 PM.
2  [A recess was taken.]
3  THE VIDEOGRAPHER:  We are back on the
4  record at 1:01 PM.
5  Q.  (By Mr. Shkolnik)  Mr. Dymon, I'm going to
6  hand you a document I've marked as -- or Chelsea has
7  marked as Exhibit 2.
8  [Exhibit Walgreens-Dymon-002
9  marked for identification.]
10  MR. SHKOLNIK:  I'll give it to counsel.
11  Q.  (By Mr. Shkolnik)  Exhibit 2 is Bates
12  number 0065927.  It's a Walgreens document.  It's an
13  e-mail on top, 12-16-2012, Tasha Polster to Dan Doyle.
14  Do you know who Mr. Doyle is?
15  A.  Yes.
16  Q.  Who is Dan Doyle?
17  A.  He is one of the heads of finance at
18  Walgreens.
19  Q.  And when the team was coming together
20  for -- the new RX Integrity team was coming together,
21  was part of the process getting funding for it and
22  coming up with plans for who -- what the team should
23  consist of, what the roles of the people are, and how
24  to fund it?

Page 154

1    A.   Yes.

2    Q.   Were you part of that decision-making

3 process, or had it already gone into place by the time

4 you joined the team?

5    A.   It had already gone into place.

6    Q.   So here we have in this e-mail -- a

7 portion of it is redacted as attorney-client privilege,

8 attorney work product, signed by Tasha Polster.  I

9 think it says thanks and be well, Tasha.

10        Going down below, it appears that she's

11 giving a -- sort of a background into why business --

12 I'm sorry, why RX Integrity group should be

13 established, and to support the request for funding.

14        Do you recall ever seeing a copy of this

15 e-mail?

16    A.   Not that I can recall.

17    Q.   Well, in the first part, DEA has alleged

18 that Walgreens's suspicious order monitoring program

19 for controlled substances is inadequate and has taken

20 aggressive enforcement actions against three Florida

21 pharmacies and the Jupiter distribution center.  Were

22 you aware of that?

23    A.   When I joined the team, yes.

24    Q.   So you beca -- at that point you became

Page 155

1 aware DEA alleged that the suspicious order monitoring

2 program that was in place at the time -- DEA was

3 claiming that it was inadequate; correct?

4    A.   From what I recall, yes.

5    Q.   What was the SOM monitoring program that

6 was in effect at the time that was actually being

7 reported to the DEA when this occurred?

8    A.   I do not know.

9    Q.   Were you aware of a system that was based

10 upon the Chemical Handler's Manual where three times a

11 certain amount of store sales would trigger a report

12 that was then reported on a monthly basis to the DEA?

13    A.   I do not know.

14    Q.   Did anyone ever tell you that there was a

15 system in place, the SOM, suspicious order monitoring

16 procedure in place before RX Integrity took over -- up

17 until the end of 2012, was based upon a multiplier of

18 three drawn from the Chemical Handler's Manual?

19    A.   I do not know.

20    Q.   Do you know when you joined the team what

21 system was in place for reporting to the DEA suspicious

22 orders?

23    A.   I do not know.

24    Q.   Did you take any steps to try to determine

Page 156

1 what were we doing in Walgreens to comply with

2 suspicious order monitoring that the DEA was now

3 claiming was inadequate?

4    A.   Not that I can recall.

5    Q.   Did anyone tell you this is the system we

6 had in place, whatever it was, and we don't believe it

7 was inadequate?

8    A.   Not that I can recall.

9    Q.   Did you yourself say maybe I should learn

10 what the system was that we're trying to change or

11 enhance before we embark upon our work?

12    A.   A basic understanding of what the system

13 was.

14    Q.   Well, the basic understanding of what was

15 being utilized -- withdraw that.  As you sit here

16 today, what system was being relied upon?  I mean, tell

17 us.  I mean, I'm a little confused.

18    A.   The order monitoring system that was in

19 place at that time.

20    Q.   Was that the system based upon Mr.

21 Bancroft's (ph) algorithm?

22    A.   I don't know who worked on creating the

23 system.

24    Q.   Were you aware of any system that was in

Page 157

1 use from 2006 till 2012, the end of 2012, that was the

2 suspicious order monitoring program?

3    A.   I'm aware of a system that they had in

4 place for that, but that's the extent of my knowledge.

5 I don't know anything beyond that.

6    Q.   Did you know they were running two systems

7 at that time?

8    A.   I have no knowledge of that.  I don't

9 know.

10    Q.   Did you ever hear of the Chemical

11 Handler's Manual?

12    A.   Not that I can recall.

13    Q.   Did you ever hear of the DEA three times

14 factor from the Chemical Handler's Manual -- that

15 phrase ever utilized in any fashion when you were doing

16 your kind of due diligence, learning what you're doing,

17 part of your job when you entered RX Integrity?

18    A.   I can't recall.

19    Q.   In addition to the actions against their

20 registrations, DEA is demanding civil penalties,

21 potentially totaling hundreds of millions of dollars.

22 The DEA has confirmed that additional regulatory

23 actions are pending against other Walgreens facilities

24 due to the issues uncovered in the current

Page 158

1  investigation.
2        Were you told when you joined the team not
3  only would DEA allege that the suspicious order
4  monitoring for controlled substances was inadequate and
5  they they had taken actions against three pharmacies
6  and Jupiter distribution center, but that the DEA
7  had -- also had pending actions against the other
8  distribution facilities?
9        MS. DESH:  Objection.  Misstates the
10 document.
11    A.   Not that I can recall.  I mean, there was
12 investigative activity by the DEA at the time, but
13 that's as much as I can recollect.
14    Q.   I mean, if all three of the distribution
15 centers had been shut down by the DEA, would that have
16 been a problem for Walgreens?
17        MS. DESH:  Objection.  Calls for
18 speculation.
19    Q.   (By Mr. Shkolnik)  And when I say shut
20 down, I mean as to controlled substances distribution,
21 just so you're aware.
22        MS. DESH:  Same objection.
23    A.   Again, potentially, maybe.  If we are not
24 able to fill patients' prescriptions, we wouldn't be

Page 159

1  able to serve patients.
2        Q.   Well, patients could go to other
3  pharmacies, couldn't they --
4        A.   Correct.
5        Q.   -- who may have been complying with the
6  law?
7        A.   They can go to other pharmacies.  I can't
8  speak to how those pharmacies run their compliance.
9        Q.   But the mere fact that Walgreens can't
10 sell them their opioids means a patient can't go
11 to CVS or Rite Aid, which may be across the street;
12 correct?
13       A.   Correct.
14       Q.   So when you said earlier this morning that
15 when the DEA took action that that prevented patients
16 from getting pills, that may not be the case if there
17 is a competitor across the street or a block away or
18 two blocks away; correct?
19       A.   Depending.  There's a lot of factors that
20 come into play on that.
21       Q.   Your competitors would be happy to pick up
22 your customers that you lose; fair statement?
23       A.   They may not actually be able to pick up
24 those customers due to insurance coverage.

Page 160

1        Q.   Oh, so some insurance companies could only
2  use Walgreens versus CVS or Rite Aid or Walmart or
3  Kroger's?  Is that the issue, it's depending on your
4  pharmacy -- I mean, your pharmacy benefit plan?
5        A.   Correct.
6        Q.   Oh.  Do you have a lot of -- this is your
7  area, I think.  Do you have a lot of pharmacy benefit
8  plans that only let the customers, the clients use
9  Walgreens versus CVS or Kroger's or Rite Aid?
10       A.   It's not my area, that's on our
11 contracting team, but there are various plans that
12 limit pharmacy access.
13       Q.   One option for many patients would be just
14 going to a competitor if your company is shut down for
15 violating the law; correct?
16       A.   The patient has the right to choose to go
17 where they want to, yes.
18       Q.   And there's many places across the country
19 where you could find a Rite Aid across the street or
20 across the parking lot from a Walgreens; correct?
21       A.   I mean, pharmacies are by each other -- I
22 don't know the exact location, but there are pharmacies
23 all in a similar vicinity.
24       Q.   Now, it goes on to say in response to the

Page 161

1  company -- in response the company has enhanced its
2  suspicious order monitoring program for controlled
3  substances in an effort to convince the DEA that the
4  proposed penalty is excessive and that our new
5  processes will ensure that similar incidents do not
6  occur.
7        When you sat in with Ms. Polster and you
8  joined the team, did she tell you that that was one of
9  the goals of what you were supposed to be doing when
10 you took on the job in RX Integrity?
11       A.   Yes, that we'd be working on a suspicious
12 order monitoring program.
13       Q.   That in an effort to convince the DEA that
14 the proposed penalty is excessive and that your new
15 processes will ensure that the similar incidents do not
16 recur?  Did she tell you that as well?
17       A.   I do not remember.
18       Q.   Isn't it a fair statement that Walgreens
19 recognized they had problems with their suspicious
20 order monitoring processes, and in order to avoid
21 bigger fines and in order to avoid bigger penalties
22 such as shutdowns, they wanted to change the processes
23 so similar incidents do not recur?
24       MS. DESH:  Objection --

Page 162

1    Q.   (By Mr. Shkolnik)  Isn't that a fair
2  statement?
3         MS. DESH:  Objection to the form.
4    A.   I think the system evolves again over
5  time, and this is just the evolution of the order
6  monitoring system.
7    Q.   (By Mr. Shkolnik)  She never said
8  evolution of a suspicious order monitoring program.
9  She said they are doing this to convince the
10  DEA -- they're changing the system, they're enhancing
11  it to convince the DEA that the new processes will
12  ensure that similar incidents do not recur.
13        That's what she said to the -- Mr. Doyle.
14  Was he the head of finance for Walgreens?
15    A.   He's in a finance role, yes.  He was the
16  head; correct.
17    Q.   She wouldn't be lying to the head of
18  finance when she's seeking funding for RX Integrity,
19  would she?
20    A.   No, her integrity would not come into
21  question like that.
22    Q.   I mean, if she's telling him we're
23  changing -- we're putting in new processes to ensure
24  similar incidents do not occur, and I need funding for

Page 163

1  it, she was being honest, straightforward, and telling
2  the truth; correct?
3         MS. DESH:  Objection to the form.
4    A.   Again, I believe anything Ms. Polster says
5  is true and with utmost integrity in her presentations.
6    Q.   (By Mr. Shkolnik)  And if she said that
7  their new processes will ensure that similar incidents
8  do not occur -- if that was her stated goal and that
9  she was trying to convince the DEA of that, you would
10  believe that she was being honest to the DEA as well;
11  correct?
12    A.   Again, yes, she speaks with honesty and
13  integrity in what she does.
14    Q.   And she joined this team and took over
15  this new team with the goal of making sure this does
16  not recur?  Fair statement?
17    A.   That this does not recur, to address any
18  concerns, and to continually develop as we learn more
19  and more throughout the processes in time.
20    Q.   Now she goes on and says -- she goes on in
21  this report -- now, would he be director of finance,
22  chief of finance, treasurer, some -- was there a name
23  back then?
24    A.   I am not sure of his title at the time.  I

Page 164

1  believe currently he's the VP of finance.
2    Q.   Finance.  The updated suspicious order
3  monitoring program is currently being piloted.  Did you
4  know when you joined the team that there was a -- that
5  there was a system that was being, quote, piloted at
6  the time, and that that was not the system that had
7  been in place from 2006 to 2012 for the purposes of
8  reporting to the DEA?
9    A.   Not that I can recall.
10    Q.   Did anyone ever tell you that there was a
11  system in place right up until the time you joined that
12  was being utilized to report to the DEA on a monthly
13  basis orders that were deemed suspicious by burning
14  them onto a CD and mailing them to the DEA offices
15  across the country?  Did they tell you that that was
16  the SOM policy in place at Walgreens before your RX
17  Integrity took over?
18    A.   Not that I can recall.
19    Q.   Did anyone tell you that they were
20  piling -- piloting a second system for SOM compliance
21  while they were still relying upon a different system
22  for reporting to the DEA?
23    A.   Not that I can recollect.
24    Q.   If we can continue on with this.  Once

Page 165

1  turned on for all controlled medications nationwide, it
2  is expected to generate thousands of orders of interest
3  per week.  These orders of interest will require review
4  prior to allowing the drugs to be shipped to our
5  pharmacies.
6         Did -- were you aware that there was a
7  requirement from the Controlled Substances Act and the
8  DEA that prevented Walgreens from shipping an order if
9  it had been deemed suspicious under its algorithm?  Did
10  you know that?
11        MS. DESH:  Objection to the form.
12    A.   Not at that time, I don't think I was
13  aware of it, no.
14    Q.   (By Mr. Shkolnik)  At any time did you
15  ever become aware of it?
16    A.   I can't recall.
17    Q.   Have you ever heard of the do not ship
18  requirement under the Controlled Substances Act?
19    A.   I cannot recall that.
20    Q.   When she says -- when I say -- I
21  apologize -- when Ms. Polster says the orders of
22  interest will all require review prior to allowing
23  drugs to be shipped to our pharmacy, did you have any
24  understanding what was meant by that?

Page 166

1     A.   Not at this time.  I wasn't in the
2  corporate environment when this was written, so I
3  wouldn't have known at this time.
4     Q.   Well, you joined a month later?
5     A.   Correct.
6     Q.   When you got there, I'm sure she gave you
7  some onboarding information, did she not?
8     A.   General high level, yes.
9     Q.   And did she tell you like she told the
10 director of finance once turned on for controlled
11 medications nationwide, it is expected to generate
12 thousands of orders of interest per week.  These orders
13 of interest will all require review prior to allowing
14 drugs to be shipped to pharmacies.
15      Did she tell you in sum or substance that
16 that's one of the things that your job entailed, that
17 you're overseeing this type of a new process?
18     A.   Yes, that we'd be working in orders of
19 interest.
20     Q.   And the orders of interest could not be
21 shipped until someone either gave it the thumbs up or
22 the thumbs down, the yes or no; correct?
23     A.   Correct.
24     Q.   And did she tell you that the system in

Page 167

1  place prior to being taken over by RX Integrity was
2  that orders could be shipped even though they hadn't
3  been -- each one had not been reviewed?  Did she tell
4  you that?
5     A.   I do not recall.
6     Q.   Did anyone ever tell you it would be a
7  violation of the law to ship suspicious orders?
8     MS. DESH:  Objection to the form.
9     A.   Not that I can recall.
10    Q.   Without adequate resources to review these
11 orders the program will not have the necessary impact.
12 The DEA would view this as further failure of our
13 internal processes which could potentially result in
14 additional pharmacies and distribution centers being
15 subjected to regulatory actions and ultimately
16 prohibited from handling controlled substances.
17      Did she ever give you that bit of
18 information when you joined the team approximately less
19 than a month later?
20    A.   I cannot recall.
21    Q.   Did you -- when you joined the team in
22 January of 2013, did you work in a location that was
23 referred to sometimes as the war room?
24    A.   No.

Page 168

1     Q.   Was this -- was there a place called the
2  war room where Mr. Mills worked?
3     A.   I believe that was prior to the RX
4  Integrity team, yes.
5     Q.   So that was in -- it was in December he
6  was working in the war room; correct?
7     A.   I do not know.  I was never involved in
8  that.
9     Q.   Did you ever hear from Mr. Mills or Ms.
10 Polster that there was such high numbers of suspicious
11 orders or orders of interest generated while they were
12 in the war room that they didn't have enough people to
13 review them all and that they were getting shipped
14 anyway?
15    A.   Not that I can recall.
16    Q.   Would that have been appropriate if that
17 was occurring?
18    A.   Again, I don't know what they were doing
19 at that time in the war room.
20    Q.   I'm not asking you what you knew.  If the
21 process in place had generated so many suspicious
22 orders, and that they were unable to review them quick
23 enough, and they were being shipped anyway, from what
24 you learned when you joined the team, would that have

Page 169

1  been good or bad practice?
2     MS. DESH:  Objection to the form.
3     A.   I don't know what they were doing if they
4  weren't able to review them in time.  I don't know.
5     Q.   (By Mr. Shkolnik)  I'm not asking you what
6  you know what they did.  I'm saying assuming that's
7  what they did, assuming so many came in, they didn't
8  have the people and the time and the resources to
9  review every suspicious order that came in before they
10 were shipped, would that have been an appropriate
11 practice based upon the training you received, sir, as
12 being one of the founding members of RX Integrity?
13     MS. DESH:  Objection to the form.
14    A.   I can't speculate as -- make an assumption
15 of what they did or didn't do at that time because I
16 don't know what they did.
17    Q.   (By Mr. Shkolnik)  I'm not asking you --
18    A.   I did not ship the order at all.  I don't
19 know what they did.
20    Q.   I'm not asking you to know what they did.
21 I'm allowed to ask you assumptions based upon testimony
22 of other witnesses that worked with you at that time;
23 okay?  And the assumption is that they were working in
24 the war room -- I want you to assume this -- and they

Page 170

1 were so many suspicious orders coming in, they didn't
2 have the people, time, or resources to review them all
3 before shipping.
4        That -- assuming that as being a fact,
5 based upon what you learned about proper procedures,
6 was that appropriate or not?
7        MS. DESH: Objection to the form.
8 Misstates the record.
9     A.   Again, I do not know what they did at the
10 time and don't know what appropriate actions they did
11 or did not take regarding those orders.
12    Q.   (By Mr. Shkolnik) Are you having a
13 problem understanding my English? Is that -- am I just
14 not speaking the same language here? I'm asking you to
15 assume a set of facts. Assume a fact for me, please,
16 sir, and I'm allowed to do that and you're allowed to
17 answer it.
18        Assume that they were receiving so many
19 suspicious orders in the war room that they didn't have
20 the resources, meaning the people, and time to review
21 them before they were shipped. If they were shipped
22 without review, was that appropriate practice based
23 upon what you knew when you came into the team and you
24 were onboarded?

Page 171

1        MS. DESH: Objection to the form. Asked
2 and answered.
3        MR. SHKOLNIK: It wasn't answered.
4     A.   Again, I don't -- I don't know what they
5 were doing at the time. I don't know if that met
6 regulations at the time. I do not know what they were
7 doing in that war room at that time.
8     Q.   (By Mr. Shkolnik) Would they have met
9 regulations in 2013 when you joined the team?
10        MS. DESH: Objection.
11    Q.   (By Mr. Shkolnik) If they had not
12 reviewed them before they shipped?
13    A.   2013, we were already reviewing orders
14 with our systems. If they weren't, I don't know what
15 that would mean for them.
16    Q.   (By Mr. Shkolnik) I'm not asking you what
17 it means for them. Sir, if anyone in RX Integrity did
18 not review an order before it was shipped, would that
19 have been appropriate?
20        MS. DESH: Same objection. Asked and
21 answered.
22    A.   Again, may or may --
23        MR. SHKOLNIK: It's a different question.
24 It wasn't asked and answered. Completely different

Page 172

1 question.
2     A.   It may or may have not. I don't know the
3 circumstances of what they did.
4     Q.   (By Mr. Shkolnik) If the computer program
5 that was running in 2013 generated a suspicious -- I'm
6 sorry -- a order of interest -- I'll use her words from
7 this -- and for whatever reason, whether they were too
8 busy, overworked, not enough resources, or they were
9 out to lunch -- I don't care -- if it wasn't reviewed
10 before it was shipped to a pharmacy, violation or
11 appropriate, during your time?
12        MS. DESH: Objection to the form.
13    A.   During my time we wouldn't allow that
14 order to proceed.
15    Q.   (By Mr. Shkolnik) Sir, I'm asking you a
16 question, if it was allowed to proceed during the time
17 you were there, was that a violation or not. What
18 problem are you having with with my question?
19    A.   I was not involved in this war room or at
20 this time, so --
21    Q.   In 2013, you were there?
22    A.   Not in the war room, sir.
23    Q.   Who was in the war room?
24    A.   I don't even know what the war room was.

Page 173

1 It's a room. I never partook in any of that activity.
2 I don't know.
3     Q.   Okay. Let's go back to the question I
4 asked. You're the one who threw in the war room this
5 time. I simply said if any order of interest came in
6 into RX Integrity that for whatever reason was not
7 reviewed and it was allowed to be shipped, would it be
8 a violation?
9        MS. DESH: Objection to the form. Asked
10 and answered.
11    A.   Again, under regulatory interpretation,
12 yeah, it might be seen as a violation.
13    Q.   (By Mr. Shkolnik) Thank you.
14    A.   I don't recall ever us doing anything
15 where we would ship without review under my time in RX
16 Integrity.
17        MR. SHKOLNIK: Move to strike the latter
18 part.
19    Q.   (By Mr. Shkolnik) So in addition --
20 without additional resources to timely review the
21 orders of interest, shipments of controlled substances
22 to our pharmacies will be delayed or held, further
23 negatively impacting the business.
24        So what she's saying there is if we don't

Page 174

1  get more money and more people, there's going to be
2  delays in shipments to pharmacies if they're following
3  the rules; correct?
4        MS. DESH:  Objection to the form.
5  Misstates the document.
6     A.  Potentially by reading her statement, yes.
7     Q.  (By Mr. Shkolnik)  The SOM system has been
8  turned on to tracking -- that's in quotes -- for the
9  chain for all controlled substances per the chart
10  below.  For the last week we had 14,000 items that the
11  stores ordered across the chain that would have to be
12  investigated.
13        So what she's saying is that she needs
14  enough resources so the people in your group can review
15  all those orders of interest in a timely fashion before
16  a single order would be shipped; correct?
17     A.  That would be my interpretation; correct.
18     Q.  Who was reviewing them when those 14,000
19  got generated that week?
20     A.  I have no idea.  I was not in RX Integrity
21  at that time.
22     Q.  Were they shipping any during that time
23  when the 14,000 orders were generated across the chain
24  in December -- December 16th, 2012?

Page 175

1     A.  I do not know.
2     Q.  If we can go to the next page, please.
3  Let's just focus on Schedule II.  We'll leave out the
4  Schedule III, IV, and Vs, and we'll leave out
5  pseudoephedrine for the PSEs.  So Schedule II products,
6  there's order items flagged.  That's five -- it says
7  5,606 orders flagged.  Am I correct?
8     A.  Correct.
9     Q.  And it's telling us how they're being
10  flagged.  They're either being flagged because they
11  violate the tolerance; correct?
12     A.  Yes.
13     Q.  And they're being flagged because they're
14  hitting ceiling; correct?
15     A.  Correct.
16     Q.  Or they're being flagged for both?
17     A.  Correct.
18     Q.  And if we look at the next column, it says
19  store manually changing the order.  What does that
20  mean?
21     A.  That would refer to if a store went in and
22  added to their order.
23     Q.  So that would mean a computer-generated
24  order, and then the pharmacist would say I want more,

Page 176

1  and manually goes to the computer interface, the
2  desktop they're using, and they request more of the
3  drug?
4     A.  Correct.
5     Q.  And so here, 38 percent of the C-II -- the
6  C-II drugs were manually ordered, meaning they were
7  increased by the pharmacist at the store, and that
8  caused flagging; correct?
9     A.  Correct.
10     Q.  And then we go to the next segment.  And
11  it says system-reduced order.  And we have 999 orders
12  that were reduced by the system so that it was under a
13  tolerance limit; correct?
14     A.  Correct.
15     Q.  That means a computer by itself, after the
16  pharmacist went to that machine and typed in I want
17  2,000 pills for whatever reason, the machine started
18  thinking about it or -- withdraw that.
19        So at some point the computer is
20  generating an order for the store based upon some
21  algorithm, the computer spits it out at the store
22  level, the computer then says wait a second, it's
23  higher than tolerance, and the computer system then
24  reduces it; correct?

Page 177

1     A.  To my understanding; correct.
2     Q.  And then the order gets sent out to the
3  distribution center?
4        MS. DESH:  Objection to the form.
5     A.  From what I recall, I believe so, yes.
6     Q.  (By Mr. Shkolnik)  And in addition to
7  those 999, there was 479 orders that were generated,
8  whether manually or electronically, that the system
9  reduced because it exceeded the ceiling limit for that
10  store for that controlled substance?
11     A.  Correct.
12     Q.  And if we see that the percentages are
13  about 38 percent are manual, so that would mean
14  seventy -- I'm sorry, 62 percent were electronic in
15  terms of the system reductions as well?
16     A.  You mean of what was transmitted?
17     Q.  Yeah.
18     A.  Correct.
19     Q.  So altogether for the C-IIs for the week
20  prior to December 16th, 2012, we know 1,400 orders from
21  the store for just the C-IIs were reduced to under the
22  suspicious order tolerance and shipped?
23        MS. DESH:  Objection to the form.
24     A.  Again, I'm just reading off this

Page 178

1  dashboard, but I don't know in the end what was shipped
2  or not. I wasn't in this area at this time. I don't
3  know what actually happened then.
4      Q.   (By Mr. Shkolnik)  Well, let's assume it
5  was a month later if you saw this dashboard. Would
6  those reduced 1,476 orders for the prior week had been
7  shipped, what's been reduced under tolerance?
8      A.   I believe they were.
9      Q.   Did you know, sir, that according to the
10 DEA in November of 2012, presentation that included
11 Walgreens and Mr. Swords, they were told that reducing
12 and shipping in that capacity was a violation of the
13 DEA and the controlled substances regulations?
14     MS. DESH:  Objection to the form.
15     A.   I was not aware of that meeting or
16 conversation.
17     Q.   (By Mr. Shkolnik)  Did Ms. Polster ever
18 tell you that she had been advised through e-mailed
19 communications from Mr. Swords that the DEA's diversion
20 director had advised them that reducing in that
21 capacity, in that manner, was a violation of the
22 Controlled Substances Act?
23     A.   I do not recall.
24     Q.   Do you know who in the chain of command

Page 179

1  authorized a procedure where you would reduce an order
2  and ship it?  Who approved of that plan?
3      A.   I would have no idea.
4      Q.   So if we include all of the controlled
5  substances, C-II to C-V, we have orders flagged under
6  the program is twenty four thousand, nine hundred --
7  I'm sorry, am I -- yeah, C-II to C-V -- 22,511.  Of
8  those 2,047 was for exceeding limit, 13,862 of that
9  week exceeded the ceiling.
10         So when we say tolerance and limit, a
11 ceiling is higher than tolerance, is it not?
12     A.   Correct.
13     Q.   So not only did 2,000 violate what the
14 store's ordering pattern considered to be a max, 13,862
15 exceeded the absolute max for that store or similar
16 stores across the chain; correct?
17     A.   Correct.
18     Q.   And an additional 128 violated both, for
19 C-II to C-V?  Correct?
20     A.   Correct.
21     Q.   And if we go all the way to the right,
22 2,907 orders were reduced and shipped because they no
23 longer were deemed suspicious, correct, according to
24 the algorithm?

Page 180

1      A.   According to the information on this
2  sheet, yes, or in the image.
3      Q.   And no one ever told you that that was a
4  violation of the Controlled Substances Act?
5      A.   Not that I can recall.
6      Q.   Do you know who Manuela Chirica was?
7  M-A-N-U-E-L-A, C-H-I-R-I-C-A.
8      A.   She works on the IT team.
9      MR. SHKOLNIK:  Let me hand you what's
10 being marked as Exhibit 3, and give it to counsel.
11     [Exhibit Walgreens-Dymon-003
12     marked for identification.]
13     Q.   (By Mr. Shkolnik)  Bates number is
14 Walgreens 00102645.  This is an e-mail with an
15 attachment of some type of report.  It says controlled
16 substance reporting.  And if we could go to the first
17 page of the e-mail, please.  And it's Ms. Chirica
18 writing to Mr. Mills, Ora Yelvington, and Rajitha
19 Teega.  T-E-E-G-A.  Rajitha is R-A-J-I-T-H-A.
20         It says reports for DEA, and there's
21 attachments.  And it's saying nine report, DEA, PNG,
22 Woodland DEA.  You saw the report that was attached
23 just briefly.  We'll get into it more.  Have you ever
24 seen reports like that?

Page 181

1      A.   In this document?
2      Q.   Yeah.
3      A.   Yes.
4      Q.   Could you tell the court and jury what
5  that report is?
6      A.   This is how we reported quarters to the
7  DEA.
8      Q.   Would this be done on a daily basis,
9  weekly basis, monthly basis?  How would this be done?
10     A.   My team, when I was on the team, we began
11 a process of doing it daily.
12     Q.   And you pointed out when you joined the
13 team, your team, you started the process of doing it
14 daily.  Prior to your team developing, it wasn't being
15 done daily, was it?
16     A.   I believe it was being done weekly, but
17 I'm not sure.
18     Q.   And if we go to the first page of this
19 document -- I'm sorry to keep bouncing on you -- it
20 says I put together the requirements for the report to
21 be sent to the DEA, and then there's a list of items,
22 and it says create a report with the selected orders to
23 be sent to DEA.
24         And it gives us a whole group of data that

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  would be included. It would be a report would be
2  created daily at the end of the business day. Report
3  will contain all orders which the status was changed to
4  denied, report DEA during the day, and it will have the
5  various columns that we see below, basically
6  identifying the drug, the DEA number for the store, the
7  NDC, the package size, and the quantities; correct?
8      A.  Correct.
9      Q.  And then the next section down it says
10 after the report is generated a batch job will create
11 an Excel spreadsheet for each DC to include all orders.
12 Now, was there any process where all of these
13 spreadsheets would be kept in one centralized location?
14     A.  They may be kept on the system that
15 generated them. I'm not sure.
16     Q.  Well, did you know -- like did they -- was
17 there like a folder someone had where they'll say let's
18 throw in today's Excel spreadsheet for today?
19     A.  I believe when we started, yes, they would
20 manually keep some in a folder.
21     Q.  And was that something that you instructed
22 your team that we should do, we got to save the reports
23 that we do on a daily basis?
24     A.  Because we fax them, yes.

Page 183

1      Q.  How long -- for how long a period of time
2  were you faxing them?
3      A.  I don't think long manually, because we
4  went to a automated fax solution for this.
5      Q.  And would that still be a Excel
6  spreadsheet that was generated, and through the
7  computer system, send it out -- a fax system through
8  your computer as opposed to taking the spreadsheet and
9  going to a fax machine? Is that the difference?
10     A.  I think it just went directly, somehow
11 digitally directly into a fax. I don't know via what
12 mechanism or form.
13     Q.  Throughout the time that you were in RX
14 Integrity, was the procedure that an Excel spreadsheet
15 was generated for each day?
16     A.  Yes.
17     Q.  Was there some procedure during the year
18 you were there in 2013 to 2014 -- well, it's almost two
19 years -- I guess it would be January 2013 through most
20 of December 2014 -- where the data generated would be
21 kept somewhere in RX Integrity, the actual spreadsheets
22 for every single day?
23     A.  Ones that were printed when we were
24 manually, yes, they had a folder.

Page 184

1      Q.  And when they were sent electronically,
2  were they kept in an electronic folder?
3      A.  I'm not sure, but I believe some kind of
4  electronic database, maybe. I'm not aware.
5      Q.  And this would be separate than the actual
6  dashboard where it would be sitting inside the actual
7  program. I'm talking the Excel that was generated to
8  be sent to DEA. Those would be kept, the actual
9  document to show this is what we sent DEA on that day?
10     A.  I don't know when we went to an automated
11 solution how that was stored.
12     Q.  Who was in charge of that when you went to
13 automated?
14     A.  The IT team.
15     Q.  Do you know when it went to automated?
16     A.  I can't recall.
17     Q.  Do you ever remember a time when an Excel
18 listing the day's reports were not utilized while you
19 were still in RX Integrity?
20     A.  Not that I can recall.
21     Q.  As you sit here today you just don't know
22 how they were kept after being sent?
23     A.  Not when we did digitally, no, I can't
24 recall.

Page 185

1      Q.  I'm going to hand you -- Bates number
2  00245768, Exhibit Number 4.
3          MR. SHKOLNIK: Give it to counsel.
4          [Exhibit Walgreens-Dymon-004
5          marked for identification.]
6      Q.  (By Mr. Shkolnik) This is an e-mail from
7  Mr. Mills and it's to Jeffrey Tolva, T-O-L-V-A, and
8  Nicholas Leners, L-E-N-E-R-S. Do you know who those
9  two gentlemen are?
10     A.  I do.
11     Q.  Who are they?
12     A.  At that time they were senior business
13 analysts in RX Integrity.
14     Q.  So these were additions to the team after
15 you, Mr. Mills, and Ms. Polster started?
16     A.  Correct.
17     Q.  And here we have Mr. Mills subject is
18 status formatt (sic) and it's dated Feb -- the status
19 is dated February 14, 2013, but the e-mail is 4-19 of
20 2013. And it has an attachment here.
21         MR. SHKOLNIK: If we could turn to that.
22     Q.  (By Mr. Shkolnik) Do you ever recall
23 seeing this attachment that's a document from Ms.
24 Polster to Mr. Mills? Subject is status.

Page 186

1    A.    This template, yes.  This is our status
2  template, but I can't recall if I actually ever saw
3  this status document.
4    Q.    Well, on February 14, 2013, the first
5  topic in there is CSOKPI dashboard.  What is that?
6    A.    That's the dashboard or the system we
7  logged into to do our order monitoring.
8    Q.    And was that part of or attached to the
9  SIMS system in some capacity?
10    A.    To my knowledge it's outside of SIMS but
11  the data from SIMS goes into it.
12    Q.    Which data from SIMS would go into your
13  CSO dashboard system?
14    A.    To my understanding it's receipts and
15  sales data, I believe.
16    Q.    When you say receipts, meaning what the
17  store receives and sales data meaning what sales you
18  made from distribution to the store?
19    A.    Let me clarify.  What we received and what
20  we dispensed from the store location.
21    Q.    So the dashboard would include what we
22  received and what we dispensed from the store location?
23  So basically you could see what the store was doing at
24  the ground level?

Page 187

1    A.    From an ordering perspective, yes.
2    Q.    Just ordering from the DC or from their
3  sales to their customers?
4    A.    Overall both.
5    Q.    Both.  Okay.  And that was an integral
6  part of the SCO, the suspicious order analysis, was it
7  not?
8    A.    Correct, part of the dashboard.
9    Q.    And Manuela was charged with -- to create
10  and implement new changes for the CSOKPI.  What does
11  KPI stand for?
12    A.    Key performance indicator.
13    Q.    And we talked a little bit about this a
14  few minutes ago, the DEA facts template and reporting
15  tool that could be downloaded daily and faxed to the
16  DEA.  So that's what we just discussed in Exhibit 3; am
17  I correct?
18    A.    Correct.
19    Q.    So what we have here based on the status
20  is that there was actually this template, there was a
21  download of the information to a spreadsheet, and then
22  someone would physically fax it to DEA up until a
23  certain point in time; correct?
24    A.    Correct.

Page 188

1    Q.    The next section is talking about lowering
2  oxycodone ceiling limits.  Were you involved in this
3  aspect of the work being done at that time, trying to
4  determine what were the proper oxy limits in terms of
5  ceiling limits, in terms of what values and what
6  analytics were going into that?
7    A.    No.
8    Q.    Did you have any -- were you involved in
9  any of the conversations where they say we're going to
10  be changing the analytics for oxycodone where we'll see
11  dramatic decrease in the amount of oxycodone a store
12  will be able to order, and that they'd be looking into
13  trends?
14        Was that something that was being
15  discussed, that we should kind of change the algorithms
16  here, let's bring our ceilings lower, lower the
17  oxycodone going to the stores?
18    A.    Not that I can recall.
19    Q.    This is an area which I -- this is one of
20  the first times I'm seeing this thing.  It's called
21  Tableau reporting dashboards.  My understanding is
22  Tableau is like kind of a computer program where you
23  could generate reports.  Do you know -- have you ever
24  heard of that before?

Page 189

1    A.    I've heard of the software.
2    Q.    And Tableau was actually being utilized by
3  the team back in 2014 to help you generate reports?
4    A.    We, to my recollection, were not using
5  Tableau to generate reports.  I know we were exploring
6  on how to use it, if it could be a tool that we could
7  use.  That's all I recall.
8    Q.    And according to this it says this week I
9  gained access to the queries Ray uses to create Tableau
10  tables.  Who's Ray?
11    A.    Ray Stukel, I believe at that time he was
12  either asset protection or some kind of analysis role.
13    Q.    And according to this Ray was actually
14  using Tableau in order to run some searches of the data
15  you had.  Does that refresh your recollection?
16    A.    I don't know if he was using our data or
17  not.  I don't know.
18    Q.    It says I just need Tableau and we will be
19  able to create the tables, as-needed basis, without
20  going to Ray.
21        So as I read this, it seems like Tasha is
22  suggesting we, meaning RX Integrity, should get their
23  own Tableau interface so that you could run your own
24  reports rather than rely on Ray to do it for you.  Am I

Page 190

1  reading that correctly?
2      A.  Mr. Mills is informing Ms. Polster that
3  maybe Tableau is a tool that could be used to visualize
4  or create reporting around data.
5      Q.  But isn't he suggesting that -- I'm sorry,
6  I didn't mean to say Tasha was doing it.  I should have
7  said Mr. Mills.  He's saying here that it appears that
8  Ray has been running Tableau tables, and in the second
9  sentence, if we had it ourselves we could run them as
10 we needed them without having to ask Ray for them.
11 Isn't that what she's saying to Tasha?
12     A.  I interpret this as just Steve telling
13 Tasha that Ray uses this tool Tableau to do things.
14 That's the way I read this statement.  I don't know if
15 any of our data ever went through there.  I just don't
16 know.
17     Q.  Then I want to go down to this -- if we go
18 down to Cardinal's SOM.  So as I read this, Cardinal
19 was also running its own suspicious order monitoring
20 with respect to some orders coming out of your stores;
21 is that correct?
22     A.  Based on Steve's statements, it looks like
23 Cardinal was running some form of SOM, yes.
24     Q.  On orders from the stores?

Page 191

1      A.  I don't know, again, where the order is
2  coming from -- from our store, DC.  I just don't know
3  the specifics behind that.
4      Q.  Over the last seven days I have seen a
5  decrease in the amount of Cardinal SOMs.  On average
6  I'm seeing about 10 orders daily that Cardinal has
7  identified to be suspicious, and then it says about 60
8  percent of those orders are legitimate orders that
9  should be canceled.  Those -- these are store who are
10 over the corporate ceiling, and now they are going to
11 Cardinal to request the product.
12     So based upon what Steve is writing there
13 in February of 2013, it appears that their orders, 60
14 percent of the orders, exceeded your Walgreens levels,
15 but then were going on and were being requested at
16 Cardinal.  Am I correct?
17     A.  That's how I would interpret Steve's
18 statement.
19     Q.  How does that happen?  How does someone --
20 how can someone -- or how does Walgreens have an order
21 that says it exceeds our corporate ceiling -- that's
22 it -- and somehow it gets sent over to Cardinal so that
23 that same product can be sent?  How did that happen
24 when you guys were running RX Integrity?

Page 192

1      A.  Again, we're evolving the systems and
2  learning as we go to build the Sprite (ph) systems to
3  address whatever we needed to do.
4      Q.  So apparently somewhere in the corporate
5  system that was allowed to happen and you guys were
6  saying wait a second, we've got to do something to stop
7  it?
8      A.  As we evolved our systems we've developed
9  different solutions over time.
10     Q.  If they were ordering -- when I say they,
11 if stores were ordering in excess of your ceiling and
12 for whatever reason, or however they did it, they were
13 then able to go to the -- to Cardinal and try to fill
14 those orders in excess of your ceiling, that would be
15 in violation of what Walgreens considered proper
16 practices?  Fair statement?
17     MS. DESH:  Objection to the form.
18     A.  That would be outside of our order
19 monitoring system at that time.
20     Q.  (By Mr. Shkolnik)  And it would have
21 violated it; correct?  That's what you mean?
22     MS. DESH:  Same objection.
23     A.  It would have been outside of our system
24 and we wouldn't be aware.

Page 193

1      Q.  (By Mr. Shkolnik)  Whether it's outside of
2  your system or not, it's Walgreens.  It's the company.
3  If your store ordered and went outside of Walgreens's
4  ceiling to fulfill an order, and you're trying to get
5  it anyway, Walgreens didn't approve of that, did they?
6  That wasn't allowed, was it?
7      MS. DESH:  Objection to the form.
8      A.  It was outside order monitoring.  I don't
9  know if the store really did or did not need it,
10 because if they didn't go through our order monitoring,
11 how do I know?
12     Q.  (By Mr. Shkolnik)  And one of the things
13 that you and your team wanted to do was stop that from
14 occurring?  If a store was doing that, they had to go
15 through you so that you could say yes or no and not
16 kind of end run around your suspicious order monitoring
17 system that you had in place; correct?
18     A.  All order monitoring we wanted to go
19 through the system so it's all -- we know of everything
20 that's going on.
21     Q.  I'm going to hand you a document which
22 we're marking as Exhibit 5, Bates numbers WAG00660341,
23 e-mail, Tasha Polster to Barb Martin.
24     MR. SHKOLNIK:  That's Barb, B-A-R-B, not

Page 194

1 Bob.

2     [Exhibit Walgreens-Dymon-005

3     marked for identification.]

4     MR. SHKOLNIK: I'm going to hand that to

5 counsel as Exhibit 5.

6   Q. (By Mr. Shkolnik) There's a lot of

7 redactions here in these e-mails, but I just want to --

8 I want to turn to the attachment, Sheet Number 1 it's

9 called, Bates number 343. There's a list of

10 distribution centers that are here, as well as field

11 offices with addresses and fax numbers.

12     Could you tell me -- the distribution

13 centers that we have listed on the left, we have

14 Jupiter, which we talked about, there was Windsor, and

15 there was Perrysburg. As I understand it, those three

16 were the C-II distribution facilities; correct?

17   A. To my understanding at that time, yes.

18   Q. And the other ones could be distributing

19 C-III to C-V, but not the C-IIs?

20   A. I can't recall, but I believe so. I'm not

21 sure.

22   Q. And when we talked about earlier that --

23 was it Manuela was working on that template for DEA

24 faxing -- this is basically the list of the DEA offices

Page 195

1 that correspond to the distribution center, as well as

2 the address and the fax number where they would send

3 those spreadsheets to; correct?

4   A. Based on this document that -- I mean,

5 again, without looking at these addresses online, I can

6 only assume that's the case, so maybe.

7   Q. I'm going to give you a document we're

8 going to mark as Exhibit 6, and it's Walgreens

9 00415363.

10     [Exhibit Walgreens-Dymon-006

11     marked for identification.]

12     MR. SHKOLNIK: Handing it to counsel.

13   Q. (By Mr. Shkolnik) Attached to Exhibit 6

14 are a series of Excels. They look like Excel

15 spreadsheets. And they are --

16     MS. THOMPSON: Oh --

17     MR. SHKOLNIK: No? Did I do it wrong?

18 There's a bunch of them.

19   Q. (By Mr. Shkolnik) Attached to -- this

20 exhibit is a series of Excel spreadsheets.

21     MS. THOMPSON: We have this one.

22     MR. SHKOLNIK: What's that?

23     MS. THOMPSON: Sorry, this one.

24   Q. (By Mr. Shkolnik) We gave you the wrong

Page 196

1 one. I'm sorry. These -- I'll switch. No, that's

2 fine. I'll just switch mine -- this is 6.

3     MR. SHKOLNIK: So Exhibit 6, so the

4 record's clear and everybody upstairs understands, it's

5 Walgreens 00107582. That's Exhibit 6.

6   Q. (By Mr. Shkolnik) And it is an e-mail

7 from Mr. Mills to Tasha Polster where it says, subject,

8 can I see an example of what you faxed to the DEA? And

9 we have an attachment which is on the last page, Bates

10 number ending in 584. Can you turn to that, please,

11 sir?

12     And the form we have up here, looks like a

13 spreadsheet, and on the top it says Walgreens has

14 identified the following orders of interest that appear

15 to be of unusual size, comma, unusual frequency, or

16 deviate substantially from a normal pattern.

17     That's what was sent to the DEA on a daily

18 basis; correct?

19   A. Correct, this fax template or similar

20 document created from it, yes.

21   Q. And it was important that you were saying

22 that these appear to be unusual size, unusual

23 frequency, or deviate substantially from a normal

24 pattern because that is the regulation under the

Page 197

1 Controlled Substances Act; correct?

2     MS. DESH: Objection to the form.

3   A. I'd have to review the reg to see if

4 that's the wording they used, but probably aligns with

5 the regulation or statement of the DEA.

6   Q. (By Mr. Shkolnik) But that's what your

7 team was looking for? You were looking at orders to

8 determine if they appeared to be unusual size, unusual

9 frequency, or deviated substantially from normal

10 patterns? That was the goal of what RX Integrity was

11 monitoring for, wasn't it?

12   A. Correct.

13   Q. And we had gone through it briefly, and it

14 says -- it tells the date, the store number, address,

15 the DEA numbers, the drug name, the NDC code, package

16 size, and quantity. When they say NDC code on this,

17 the NDC code will tell the DEA exactly which drug it

18 is, manufacturer, as well as the size of the container

19 being ordered, wouldn't it?

20   A. Correct.

21   Q. So this is not comparing all opioids

22 together; this is looking at orders of hydrocodone,

23 APAP 10/650 milligrams, and that order from that

24 pharmacy on that date appeared to be either of unusual

Page 198

1  size, unusual frequency, or deviate substantially from
2  a normal pattern, based upon Walgreens's analysis;
3  correct?
4      A.   Correct, but I don't know if this is an
5  actual example or if this is real data, so I do not
6  know that.
7      Q.   Whether or not it's the real exam -- this
8  is something that happened on that day or not, this is
9  the way the interpretation of the document would be if
10  someone at DEA got it; correct?
11      A.   Correct.
12      Q.   Like you're not -- just so I can clarify,
13  DEA is not being told that this order deviates from all
14  opioids; it's really focusing on hydrocodone, APAP
15  10/650 milligrams, and the ordering pattern and ceiling
16  for that store on a certain date; correct?
17      A.   Correct.
18      Q.   I'm going to hand you what's being marked
19  as Exhibit 7.
20           [Exhibit Walgreens-Dymon-007
21           marked for identification.]
22      Q.   Bates number is 00415363.  And what we've
23  just handed you is a compilation of a series of pages
24  of similar type of DEA report spreadsheets, but from

Page 199

1  different dates.  Am I correct, if you could take a
2  look at it?
3      A.   Correct.
4      Q.   And what we're seeing here is after it's
5  gone through algorithms, order has gone through various
6  algorithms, it was then looked at by RX Integrity, RX
7  Integrity then determined that these various orders
8  appeared to be of unusual size, unusual frequency, or
9  deviated substantially from a normal pattern, and that
10  they were being reported to the DEA at the offices, the
11  appropriate offices for those pharmacies -- I'm sorry
12  for the distribution centers that this was generated
13  at; correct?
14      A.   The dates here are all from 2012, so RX
15  Integrity was not in existence in 2012, so I can't
16  speak to or I don't know who was reviewing or how this
17  was being transmitted at that time.
18      Q.   Do you know which algorithm was being
19  applied to it for these 2012 reports?
20      A.   I do not know.
21      Q.   It appears that the earliest date we have
22  in this compilation was June of 2012.  Do you know what
23  suspicious order monitoring program was being applied
24  to the orders between June of 2012 and December of

Page 200

1  2012?
2      A.   I do not know.
3           MR. SHKOLNIK:  I'm making it difficult for
4  you today.  I'm going to start with 39.
5           MR. SHKOLNIK:  Do you need a break?
6           MS. DESH:  (Shaking head "no.")
7           MR. SHKOLNIK:  Do me a favor.  Just give
8  me 81 first.
9      Q.   (By Mr. Shkolnik)  Are you familiar with
10  the phrase called interstoring?
11      A.   Yes.
12      Q.   What does interstoring mean?
13      A.   The transfer of medication from one store
14  to another store.
15      Q.   And was that approved of by Walgreens
16  while you were in RX Integrity?  Was that an approved
17  practice?
18      A.   Yes, stores are able to just interstore
19  medications between each location.
20      Q.   Was it ever called into question as to
21  whether or not stores were -- should be interstoring
22  controlled substances?
23      A.   Yes.
24      Q.   And was that condoned by RX Integrity

Page 201

1  while you were there?
2      A.   We worked on a solution to block the
3  interstoring of controlled substances in RX Integrity.
4      Q.   So RX Integrity determined that
5  interstoring was not a good thing, correct, as to
6  C-IIs?
7      A.   C-IIs were never allowed to be interstored
8  ever.
9      Q.   But they were doing it?  Stores were doing
10  it, weren't they?
11      A.   No, not C-IIs.
12      Q.   No stores were interstoring C-IIs at
13  Walgreens at any time?
14      A.   Never.
15      Q.   You've never heard of any situations where
16  C-IIs were being interstored in the Walgreens chain
17  when you joined RX Integrity?
18      A.   No.  The system would not allow that.
19      Q.   Would the system stop a pharmacist from
20  calling another store and saying do you have any C-IIs
21  and can I send someone over to pick them up?
22      A.   No.
23      Q.   They couldn't do that?
24      A.   The system can't be on a phone call and

Page 202

1 block sending a patient to another store, sir.
2     Q.   Do you know if there were reports that
3 pharmacists were doing just that, they were contacting
4 other stores and asking if the other stores had C-IIs
5 that they could share with the store which they would
6 interstore?
7     A.   No, C-IIs are are not interstorable.
8     Q.   So that never happened at any time to your
9 knowledge at Walgreens, interstoring of C-IIs at any
10 time?
11     A.   To my knowledge of the system, that's not
12 allowable.  Can't be done.
13     Q.   If someone had been doing that, if stores
14 had been doing that, would -- when I say that, I mean
15 interstoring C-IIs -- would that have been a violation
16 of Walgreens's practices?
17         MS. DESH:  Objection to the form.
18     A.   Again, our system didn't allow it to
19 happen, so I don't even know how they would do it.
20     Q.   (By Mr. Shkolnik)  Well, picking up a
21 phone is a way it could happen; correct?
22     A.   No.
23     Q.   You could not pick up the phone and call
24 another pharmacist that's the manager of the store down

Page 203

1 the road and say do you have any oxies?
2     A.   That's not interstoring.
3     Q.   That's not interstoring?
4     A.   No.
5     Q.   What is that?
6     A.   That's helping the patient get the
7 prescription they need, and that's a common practice
8 that pharmacists do all the time.
9     Q.   Let me get your definition of what
10 interstoring is, sir.
11     A.   Using Walgreens's system to transfer one
12 medication from one store to another store.
13     Q.   So if I understand it correctly, if a
14 pharmacist utilizes the computer terminal to try to get
15 a controlled substance, a C-II like OxyContin, from a
16 neighbor store down the road, the program would not
17 allow that to occur; correct?
18     A.   Correct.
19     Q.   If the same pharmacist had a patient come
20 into the store with a prescription for oxy and the
21 pharmacist didn't have enough and he picked up the
22 phone and he said -- called Joe or Jane at the
23 Walgreens down the store -- down the street, said do
24 you have any oxies there?  I got a patient here that

Page 204

1 needs 180 of these.  I don't have 180.  If I send
2 someone over, can I get them from you so I could fill
3 the order over here?  Were they allowed to do that?
4     A.   No.
5     Q.   That would be a violation if they did
6 that?
7         MS. DESH:  Objection to the form.
8     Q.   (By Mr. Shkolnik)  Correct?
9     A.   Can't even -- you cannot transfer a
10 Schedule II between store locations.
11     Q.   I mean, physically you could?
12     A.   No, you can't.
13     Q.   You mean you couldn't pick up a phone and
14 make a phone call and ask Joe or Jane if you have them?
15 Could you do that?
16     A.   You can call to check stock and send a
17 patient to that location.
18     Q.   Okay.  Okay.  So --
19     A.   You cannot transfer the drug between two
20 locations.
21     Q.   So it would be a violation if Joe or Jane
22 at the other store said yes, I have the oxy and we
23 could send them to your store for you to give it to the
24 patient?  That would be a violation; correct?

Page 205

1         MS. DESH:  Objection to the form.
2     A.   A violation to what?
3     Q.   (By Mr. Shkolnik)  The law.
4         MS. DESH:  Same objection.
5     A.   I can't speak to the law, but there are --
6 if a pharmacist did manual 222s between two locations,
7 they actually can move inventory legally between
8 locations.
9     Q.   (By Mr. Shkolnik)  So now you're telling
10 me if pharmacist in my -- this one store has the
11 patient who needs 180 oxies, I don't have enough -- a
12 hundred and -- I mean, I don't have 180 oxies on hand,
13 I only have 40 or 50, I could actually call Joe or Jane
14 at the other store and say do you have them, and can we
15 get them from you as long as they issue a 222?
16     A.   We cannot do that at Walgreens.
17     Q.   If someone did it at Walgreens, would that
18 be a violation of Walgreens's policies?
19         MS. DESH:  Objection to the form.
20     A.   I don't know how they would even do it to
21 get manual 222s.  It's not a process that Walgreens
22 did.
23     Q.   So let's assume he did it and didn't do
24 the 222s.  Would that be a violation?

Page 206

1    MS. DESH: Same objection.

2    A.   There's federal laws on how to transfer

3 drugs between locations.  If you literally walk in off

4 the street and hand me a bottle, it could be considered

5 a violation, yes.

6    Q.   (By Mr. Shkolnik) So if the pharmacist in

7 the first store who had the patient with a hun -- that

8 needed 180 went to Pharmacy Number 2, Walgreens

9 Pharmacy Number 2, and got them from Joe or Jane so he

10 could have them in his other pharmacy and fill that

11 prescription, that would be a violation of the

12 regulations; correct?

13    MS. DESH: Object --

14    Q.   (By Mr. Shkolnik) You can't do that?

15    MS. DESH: Object to the form.

16    A.   Again, we don't do that practice at

17 Walgreens and that would require proper paperwork to do

18 that kind of a transfer.

19    Q.   (By Mr. Shkolnik) And if one of the

20 pharmacists did that on a regular basis, that would be

21 a violation of law?

22    MS. DESH: Same objection.

23    Q.   (By Mr. Shkolnik) Correct?

24    A.   Again, I don't know, because that

Page 207

1 shouldn't happen, we don't allow it, it can't occur at

2 our stores.

3    Q.   (By Mr. Shkolnik) But sir, you worked in

4 a pharmacy as a pharmacy manager.  You worked in

5 Pharmacy Integrity.  If one of your stores or multiple

6 stores engaged in that practice at Walgreens, that

7 would violate the Controlled Substance Act, as well as

8 Walgreens's own policies and procedures; correct?

9    MS. DESH: Objection to the form.

10    A.   Our policies and procedures do not allow

11 for interstoring of Schedule II.

12    Q.   (By Mr. Shkolnik) But your policies allow

13 Schedule III to Schedule V to be interstored?

14    A.   Correct, at that time.

15    Q.   Did they stop it at some point in time?

16    A.   Yes.

17    Q.   Why?

18    A.   Again, we wanted to ensure that everything

19 went through our order monitoring system, and we did

20 not want any other means of stores to acquire a

21 controlled substance outside of order monitoring.

22    Q.   How were they doing it without going

23 through order monitoring system -- the C-IIs to C --

24 I'm sorry, C-III to C-Vs?  How would a pharmacy

Page 208

1 physically do it?

2    A.   Contact a store, confirm that the store

3 had the product, and within the SIMS system they could

4 do an interstore request, and that would then shift

5 that inventory from one store to another, and then the

6 pharmacist or whomever would get the product and bring

7 it to the other location.

8    Q.   So basically what I described before,

9 someone would physically go there, pick up the bottle,

10 and bring it to the pharmacy, but the transaction would

11 be registered in SIMS?

12    A.   Correct, for III through V.

13    Q.   But it wouldn't go up through SOM?

14    A.   Correct.

15    Q.   And you guys when you implemented RX

16 Integrity changed that?  That was one of the upgrades

17 that you instituted; correct?

18    A.   Correct.

19    Q.   Is that so that -- excuse me -- was the

20 reason for that change in order to decrease the

21 likelihood of diversion?

22    MS. DESH: Objection to the form.

23    A.   Designed to ensure all orders went through

24 order monitoring, and stores could not bring in product

Page 209

1 outside of order monitoring.

2    Q.   (By Mr. Shkolnik) And that's so that you

3 could keep track of whether or not orders were of --

4 that's to ensure --

5    MR. SHKOLNIK: If you could bring back up

6 Exhibit 7, if you would, those spreadsheets.  I'm

7 sorry, not 7.  Make it -- so we don't go through the

8 date issue.  If you could bring up 6.

9    Q.   (By Mr. Shkolnik) That's so you'd be able

10 to ensure that a store was not receiving orders of

11 unusual size, unusual frequency, or deviated

12 substantially from normal patterns?  That's why you

13 made sure it went through the SOM; correct?

14    A.   Correct.

15    Q.   Have you ever heard of a procedure -- I'm

16 sorry, not -- withdraw that.  Have you ever heard of a

17 slogan utilized at Walgreens called focus on profit?

18    A.   No.

19    Q.   Have you ever heard of one called focus on

20 safety?

21    A.   Yes.

22    Q.   Did you ever -- were you ever aware that

23 prior to changing to focus on safety, the slogan was

24 focus on profit?

Page 210

1    A.   I am not aware of that.

2    Q.   You wouldn't condone focus on profit over

3 focus on safety, would you, sir, as a pharmacist?

4    A.   No, safety is a top priority.

5        MR. SHKOLNIK:  Have we been going about an

6 hour?

7        THE VIDEOGRAPHER:  Hour.

8        MR. SHKOLNIK:  Take our break now.  Thank

9 you.

10        THE VIDEOGRAPHER:  We're off the record at

11 2:14 PM.

12        [A brief recess was taken.]

13        THE VIDEOGRAPHER:  We are back on the

14 record at 2:36 PM.

15    Q.   (By Mr. Shkolnik)  Mr. Dymon, I'm going to

16 go back to Exhibit 007 for a second.  This was the

17 spreadsheets that you pointed out were from before you

18 joined the team.  It was pre RX Integrity; am I

19 correct?

20    A.   Correct.

21    Q.   When did Tasha Polster join the team?

22    A.   The team was created in 2013, so whatever

23 her capacity was at this time, I don't remember what

24 role she had.

Page 211

1    Q.   These are spreadsheets that all say at the

2 bottom feel free to contact Tasha Polster if you need

3 additional information.  And we have them going back to

4 June of 2012, as I understand.

5    A.   Correct.  That's what's on these

6 documents.

7    Q.   And in fact, this first spreadsheet, this

8 document is a period that's not a day, it's a period of

9 days over multiple months.  We have June, July,

10 August --

11        TRIAL TECHNICIAN:  Sorry.

12        MR. SHKOLNIK:  That's all right.

13    Q.   (By Mr. Shkolnik)  June, July, August,

14 September, and October.  And they appear to be all

15 pharmacies on the west coast from the same DEA

16 reporting office.  Wouldn't that be correct?

17    A.   I don't know without looking at which

18 reporting office is for those areas.  I can't assume.

19    Q.   But whatever it is, this is not a daily

20 report.  What we're looking at here is a five-month

21 report of a series of transactions that someone

22 submitted to the DEA as a cumulative report; correct?

23    A.   I don't know.  I was not in corporate at

24 that time, so I don't know if this is a mockup, I don't

Page 212

1 know if this is an actual report.  I just don't know

2 the context of it.

3    Q.   But whatever this is, whether it's a

4 mockup or not, this would not be a daily report to DEA;

5 at best, this would be a periodic report that reflects

6 a series of months, whether or not it was used or not

7 used; that's what we're looking at?

8    A.   You're looking at some data on a table.

9 Again, I don't know how this was used, so it could be

10 anything.

11    Q.   I understand that, but if that was a

12 submission -- if the form as we looked at it just like

13 that was submitted to the DEA, or DEA offices, that

14 would represent a cumulative report for a period of

15 time, not a daily report; correct?

16    A.   This looks like some type of cumulative

17 framework, yes.

18    Q.   And if we go to the next page, again, it's

19 Bates numbered 364, we're looking at a cumulative

20 report for stores -- 36 -- yes, stores in Florida for

21 months of June, August, and October, not a daily

22 report; correct?

23    A.   According to the data here, this looks

24 like some type of monthly reporting.

Page 213

1    Q.   Multiple monthly reporting?

2    A.   Correct.

3    Q.   And if we go to the next page, which is

4 Bates numbered 365.  Once again, we're looking at what

5 would be a cumulative report for a period of months

6 from June to -- excuse me -- a cumulative report for

7 the months June, July, August, September, and October,

8 and not a daily report; correct?

9    A.   Correct.

10    Q.   And if we look of the list of drugs

11 involved, these were, by looking at the names, but for

12 a handful these are all opioids; correct?

13    A.   Primarily opioids, yes.

14    Q.   Is hydrocodone a C-II?

15    A.   Not in 2012, no.

16    Q.   In 2013?

17    A.   I believe at the end of 2013 into 2014 it

18 got up-scheduled.

19    Q.   If we could --

20        MR. SHKOLNIK:  Let's go to Exhibit 008,

21 please.  Bates number is 00574927.  Exhibit 008.  I'm

22 going to hand it to counsel.

23        [Exhibit Walgreens-Dymon-008

24        marked for identification.]

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    Q.   (By Mr. Shkolnik) I'm handing you an
2  e-mail from Eric Stahman to Tasha Polster dated March
3  19, 2013. Who is Eric Stahman?
4    A.   He's a manager on RX Integrity.
5    Q.   So you -- did you work with him?
6    A.   Yes.
7    Q.   Was he on -- were you on the same level,
8  you were both managers?
9    A.   Correct.
10   Q.   Did he have a region that was his?
11   A.   Yes.
12   Q.   What was his region?
13   A.   The west.
14   Q.   And Patricia Daugherty, who is she?
15   A.   Also a manager on RX Integrity.
16   Q.   If we look at this what would be the
17 larger font, it says focus on profit, March 2013,
18 vendor receiving and inventory controls for pharmacy.
19       Have you ever seen that slogan contained
20 in any of the Walgreens communications within the
21 company?
22   A.   Not that I can recollect.
23   Q.   Do you ever recollect any discussions that
24 the company was going -- was affirmatively abandoning

Page 215

1  the slogan focus on profit and adopting focus on safety
2  as a slogan?
3    A.   Not that I was aware of.
4    Q.   You are aware that at some point focus on
5  safety became a slogan which the company adopted;
6  correct?
7    A.   Yes.
8    Q.   And that was sometime in 2013, wasn't it?
9    A.   I believe so.
10   Q.   And it was sometime after the agreement
11 was reached with the DEA regarding settlement of all
12 the claims involving the distribution problems;
13 correct?
14       MS. DESH:  Objection to the form.
15   A.   Again, I just recall sometime in 2013. I
16 don't know exact when it went.
17   Q.   (By Mr. Shkolnik) If we could go to the
18 page Bates-numbered 929, up towards the upper portion
19 of the document right there.
20       It says please check with Eric Stahmann on
21 this. We shouldn't have conflicting messages out
22 there. I am okay with your answer once Eric checks
23 with LP and maybe we add something in there that we
24 have resolved discrepancy.

Page 216

1        Then it goes on to say new company policy
2  is to not interstore controlled substances. On
3  monthly, quote, focus on profit, it states if a
4  transfer is made, check for authorization by DM or RXS.
5        What is DM and RXS?
6    A.   DM is a district manager, RXS is a
7  pharmacy supervisor.
8    Q.   Are district leaders allowed to authorize?
9  It is not recommended for any controls to be
10 interstored, district leaders should not authorize
11 these transfers.
12       Does this e-mail refresh your recollection
13 as to the time frame when a decision was made to stop
14 interstoring of all controlled substances?
15   A.   Correct, we were working on that as a
16 team.
17   Q.   Was there a period of time where
18 hydrocodone was authorized to be interstored?
19   A.   It was C-III, so it could be authorized
20 under the current system, the way it was designed.
21   Q.   Do you know the brand names of any
22 hydrocodones?
23   A.   Yes.
24   Q.   What are they?

Page 217

1    A.   Can you specify which ones? There are
2  many.
3    Q.   I'm asking you, are there any brand names
4  of hydrocodone? I'm just asking you.
5    A.   Yes.
6    Q.   Could you tell me any?
7    A.   Vicodin.
8    Q.   Any other?
9    A.   Lortab.
10   Q.   Any other?
11   A.   Those are the two most common ones out
12 there.
13   Q.   Are those considered -- are those utilized
14 as a combined with, say, acetaminophen or anything
15 else, or are those opioid independ -- just single
16 molecule?
17   A.   Those are with acetaminophen.
18   Q.   And those types of opioids could be
19 interstored? If one store needed more, they could just
20 get it from Joe down the block or Jane down the block;
21 correct?
22   A.   Correct.
23   Q.   Did those also have risks associated of
24 addiction?

Page 218

1    A.   Yes.

2    Q.   Were they considered to be less likely to

3 be addictive than, let's say, oxycodone or oxymorphone

4 or any of the others --

5    A.   Yes.

6    Q.   -- that are C-IIs?

7    A.   Yes.

8    Q.   At some point in 2013 is when the policy

9 was put in place to stop even interstoring of those

10 products; correct?

11   A.   Correct.

12   Q.   If we could go to Bates numbers 929.

13        TRIAL TECHNICIAN:  This is 929.

14        MR. SHKOLNIK:  This is?  Oh, sorry.  Could

15 you go to the bottom of the page, please?  No, I'm

16 sorry, 927.  I apologize.

17   Q.   (By Mr. Shkolnik)  Patty -- so this is

18 Tasha to Patty Daugherty, Patricia Daugherty.

19        Patty, check with Eric -- the check with

20 Eric is not for that question, it's for the question

21 right below it.  Sorry I wasn't clear.  It was hard to

22 type it on my iPad to make it clearer to which one I

23 was referring to.  There was a reference to a

24 publication that LP -- that's loss prevention; correct?

Page 219

1    A.   Correct.

2    Q.   Put out, saying it was okay to interstore.

3 Right now the policy allows interstores, until we get

4 the enhancement in place to block it we can't do much

5 about prohibiting it.  My concern was LP put something

6 out saying it's okay with a district leader approval.

7        Was there a period of time where the new

8 procedure to prevent interstoring of controlled

9 substances was getting mixed signals between LP and RX

10 Integrity?

11   A.   Based on Patty's statement it seems like

12 this was some misunderstanding on LP's part.

13   Q.   In none of these e-mails do they reference

14 the fact that it was limited to just C-IIIs -- I'm

15 sorry, that it had already been prohibited for C-IIs

16 and this was only for C-III and C-Vs.  Were there any

17 places where stores were also interstoring the C-II?

18   A.   Not that I'm aware of.

19        MR. SHKOLNIK:  We're going to mark as

20 Exhibit Number 009 Bates numbered 00302946.

21        [Exhibit Walgreens-Dymon-009

22        marked for identification.]

23   Q.   (By Mr. Shkolnik)  This is an e-mail chain

24 from Tasha Polster -- you're included on it -- April 8,

Page 220

1 2013.  And its subject is blocking interstore

2 transfers.  FYI, enhancement to block controlled drugs

3 from being interstored is going live tomorrow night.

4        So as I understand it, based upon the

5 systems that were in place in Walgreens, prior to April

6 8, 2013, interstoring of controlled substances was

7 allowed and not blocked prior to April 8, 2013;

8 correct?

9        MS. DESH:  Objection.  Vague.

10   A.   Three through five, and there may have

11 been some piloting previously to this release date of

12 the system functionality.

13   Q.   (By Mr. Shkolnik)  Well, we had the e-mail

14 that we just went through in Exhibit 008 where there

15 were still mixed signals and some interstoring

16 apparently was going forward with supervisors and

17 supervisors' approval.  But effective April 8, 2013, it

18 was blocked by the computer system, any type of

19 interstoring of controlled substances; correct?

20        MS. DESH:  Objection.  Misstates the

21 record.

22   A.   Chainwide blocking as of that date, yes.

23   Q.   (By Mr. Shkolnik)  And that means as of

24 April 8, 2013, no pharmacy in the chain could

Page 221

1 physically order through a interstoring any controlled

2 substance, whether it's two through five; correct?

3    A.   Twos were blocked prior to this, but three

4 through five.

5    Q.   But at the bottom it's saying -- it says

6 effective immediately, if we go to the bottom of the

7 page, controlled substances, C dash -- I'm sorry, C-II

8 dash C-V will be blocked from interstore claims.  Any

9 controlled substances that are placed on the interstore

10 claim will reject with the below error message,

11 highlighted item restricted from transfer, delete item

12 to continue.

13        That's what someone is going to see on the

14 screen if they try to do it with a C-II to C-V,

15 effective April 8, 2013?

16   A.   Correct.

17   Q.   What -- withdraw that.  Was there anything

18 stopping Walgreens from implementing that very same

19 prohibition in 2012, 2011, 2010, 2009, 2008, anything

20 to prevent that?

21   A.   I don't know.

22        MS. DESH:  Objection.

23   Q.   (By Mr. Shkolnik)  Did you have any

24 discussions that say, Jesus, why didn't we do this a

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 long time ago?

2    A.  No.

3    Q.  I mean, this is a loophole that pharmacies

4 were utilizing to move controlled substances -- I think

5 you're saying it's three through five -- between stores

6 without suspicious order monitoring. And did anyone

7 say why didn't we stop this a long time ago?

8    MS. DESH: Objection. Assumes facts not

9 in evidence.

10    A.  I cannot recall someone saying that.

11    Q.  (By Mr. Shkolnik) I mean, I commend you

12 all for doing this in April of 2013, and I think

13 everyone would commend you for doing it, but is there

14 any excuse why Walgreens allowed their pharmacists to

15 interstore, move controlled substances between stores,

16 without suspicious order monitoring intervention prior

17 to April of 2013?

18    A.  Again, I don't know.

19    Q.  Did you ask any of your supervisors why

20 didn't we do this before?

21    A.  I cannot recall.

22    Q.  As you're sitting here today, would you

23 agree with me it probably would have been a good

24 practice to stop it a long time before 2013?

Page 223

1    MS. DESH: Objection to the form.

2    Q.  (By Mr. Shkolnik) If someone had thought

3 about it?

4    A.  That potentially is a good part of order

5 monitoring.

6    MR. SHKOLNIK: Yeah, I'm going to go with

7 39. Number 010? Thank you.

8    Q.  (By Mr. Shkolnik) I'm going to hand you a

9 document I'm marking as Exhibit 010, Bates numbered

10 00749381.

11    [Exhibit Walgreens-Dymon-010

12    marked for identification.]

13    Q.  I've just handed you a document that was

14 produced by counsel in the last week. And it

15 references authentication of prescription order policy,

16 procedure, Inventory Controls Doc 1, and it references

17 up on top Mount Vernon, Illinois, distribution center.

18 Origination date is December 11, 2006. Revision date

19 10-7-2017 (sic).

20    Have you ever seen this document?

21    A.  No.

22    Q.  According to the scope of the document --

23 I'm sorry -- the purpose is to establish procedures for

24 verifying questionable store order quantities on RX

Page 224

1 items. That would be prescription items; correct?

2    A.  Correct.

3    Q.  And then under scope it says this

4 procedure covers the steps in verifying questionable

5 store order quantities prior to order processing on RX

6 items.

7    So the scope was basically to give

8 instructions to people in this distribution center on

9 how to verify an order if it appeared to be

10 questionable, and that's how they would implement that;

11 correct?

12    MS. DESH: Objection. Calls for

13 speculation.

14    Q.  (By Mr. Shkolnik) If you could answer.

15    A.  I'm not sure how the distribution center

16 used this document or what they did with their team

17 members up there. I don't know.

18    Q.  I'm just going to drop down to where it

19 says responsibilities of Walgreens. And it says

20 Walgreens strategic inventory management system --

21 that's SIMS, is another way of saying it?

22    A.  Correct.

23    Q.  I'm going to use SIMS. SIMS will stop

24 what would be considered suspicious controlled drug

Page 225

1 orders from being released for picking at the DC based

2 on algorithm that looks at past sales and order

3 frequency.

4    So that's the SOM policy that was in

5 effect in October of 2013; correct?

6    MS. DESH: Objection. Calls for

7 speculation.

8    A.  To my understanding, I believe that's how

9 it was working at that time, yes.

10    Q.  (By Mr. Shkolnik) And then it says if we

11 suspect a store order to be suspicious, the order will

12 be canceled and then reported to the FDA, the Board of

13 Pharmacy, and the DEA for controlled substance within

14 three business days.

15    Was it your understanding that that was

16 the procedure in place at that time?

17    A.  I can't speak to the DCs. We reported

18 daily to the DEA.

19    Q.  If we go to the attached protocol, which

20 is Bates numbered 383. Take a look at that with you,

21 sir.

22    And it says up on top -- by the way,

23 you've seen this document before, have you not?

24    A.  I may have at some point.

Page 226

1    Q.   This was actually the policy that was
2  drafted at -- in Integrity as to how Pharmaceutical
3  Integrity was handling suspicious orders, wasn't it?
4    A.   Again, I may have seen parts of this when
5  it was being assembled.
6    Q.   It says this policy and specific
7  procedures govern how controlled substances are
8  processed and what steps are taken by the
9  Pharmaceutical Integrity team to investigate orders of
10 interest in the controlled substance ordering -- order
11 monitoring system, CSOM.
12        That's what we were talking about earlier
13 today -- the CSOM is the system that you guys were
14 working with?
15   A.   Yes.
16   Q.   And -- if we could jump down to how to
17 identify normal and expected transaction.  It says --
18 the following elements allow Pharmaceutical Integrity
19 team to understand and identify normal and expected
20 transactions, which assists in identifying potentially
21 suspicious transactions.
22        And then it says accumulation of receipts
23 over time -- the CSOM accumulates the amount of each
24 controlled substance over a specific limitation period;

Page 227

1  that is, over the last six weeks.
2        And then there's a ceiling limit where
3  data mining is done across Walgreens retail pharmacies
4  to determine the maximum amount that a pharmacy should
5  be allowed to receive in a rolling six-week time
6  period, based upon statistical linear regression.  The
7  analysis compares like pharmacies across the country
8  based on prescription volume, and determines by drug
9  and amount what would represent unusual quantity.
10       That was actually the algorithm that was
11 in place when you started in two thousand -- or the
12 plan in 2013; correct?
13   A.   To the best of my recollection.
14   Q.   So it references both the tolerance as
15 well as the ceiling limits that were being applied to
16 all orders that were placed, either manual or
17 automatic, in the Walgreens system; correct?
18   A.   To my understanding.
19   Q.   Did you ever ask anybody why we didn't
20 have a ceiling in place prior to 2013?
21   A.   Not that I can recall.
22   Q.   Do you think it would have been a good
23 thing for Walgreens to have placed a ceiling on
24 pharmacies going back long before 2013?

Page 228

1    A.   If we understood how systems worked or how
2  to build things, sure, but this is an evolving process
3  over time.  You learn as you go.
4    Q.   Well, I mean, I questioned the guys who
5  built it in your company, and they said they could have
6  done it.  Do you know why it wasn't done sooner?
7    A.   I have no knowledge of that.
8    Q.   From your standpoint, sir, as someone who
9  is a professional in Pharmaceutical Integrity for the
10 period of time you were there, if you would have had
11 your choice, now that you know what you knew, if you
12 knew the company could do it, would you have said we
13 should have had a ceiling in place long before 2013?
14        MS. DESH:  Objection to the form.
15   A.   If potentially it could be developed and
16 done, if it's beneficial.  It's always good to develop
17 something that could be beneficial.
18   Q.   (By Mr. Shkolnik)  And if you knew what
19 you knew today, would you have preferred if the company
20 had been running all suspicious orders against the
21 ceiling prior to 2013?
22        MS. DESH:  Same objection.
23   A.   Again, if we knew that knowledge back then
24 or knew it, it would be great to have that.

Page 229

1    Q.   (By Mr. Shkolnik)  And if technology was
2  there that you could do it, certainly that would be a
3  necessary component; correct?
4    A.   Correct.
5    Q.   And if the technology was there, you would
6  agree that you would want this in place 2011 if it was
7  available, 2010, 2008, or 2009; correct?
8        MS. DESH:  Objection --
9    Q.   (By Mr. Shkolnik)  If they could have done
10 it?
11        MS. DESH:  Objection to the form.
12   A.   Conceptually, if possible, yes.
13   Q.   (By Mr. Shkolnik)  And you would agree
14 with me if both tolerance and ceiling were in place,
15 and the procedures that your team implemented with the
16 upgrades, things such as no interstoring, such as
17 vendor running through your system, all those systems,
18 if they could have been put in place earlier in the
19 computer system, you would agree with me that would
20 have been a better practice; correct?
21        MS. DESH:  Objection to the form.
22   A.   Potentially had a better impact or more
23 beneficial impact.
24   Q.   (By Mr. Shkolnik)  I mean, you would have

Page 230

1 been able to do the good work, the review of individual
2 suspicious orders, potentially suspicious orders, years
3 before and prevented orders from either being placed or
4 shipped; correct?
5      MS. DESH: Objection. Calls for
6 speculation.
7      A.  Potentially.  Hard to say.  It's based on
8 technology and design of all the systems.
9      Q.  (By Mr. Shkolnik)  But assuming that your
10 tech people -- this linear regression model and the
11 interfaces could be built, whatever date that was -- if
12 it could have been pushed back a year, you would
13 support that; correct?
14      MS. DESH: Same objection.
15      A.  Again, if something could be done and it
16 was capable of doing it, it could be a benefit.
17      Q.  (By Mr. Shkolnik)  And if it went back two
18 years, you would have supported that if it was
19 technologically feasible; correct?
20      MS. DESH: Same objection.
21      A.  Again, if something could be developed and
22 work correctly and be beneficial.
23      Q.  (By Mr. Shkolnik)  And you would have the
24 same answer going back to the earliest date that you

Page 231

1 could technologically and feasibly implement ceiling,
2 tolerance, and the order review processes that you put
3 in place with your team as early as possible; correct?
4      MS. DESH: Same objection.
5      A.  Again, if the technology could be
6 beneficial and developed, it may have had an impact.
7      Q.  (By Mr. Shkolnik)  And you would agree
8 with me the system you put in place helped ensure
9 suspicious orders did not get shipped to stores; fair
10 statement?
11      A.  Correct.
12      Q.  I mean, that was your goal, and that's
13 what you did your best to do?
14      A.  Correct.
15      Q.  I'm going to hand you what I'm going to
16 mark as Exhibit 011, Bates numbered 00660331.
17      [Exhibit Walgreens-Dymon-011
18      marked for identification.]
19      Q.  I'm going to hand you a document which is
20 an e-mail from Daniel Coughlin dated August 3, 2010.
21      MR. SHKOLNIK: Just pass that to you.
22      Q.  (By Mr. Shkolnik)  This is an e-mail
23 chain, which I understand you obviously weren't on
24 because it was before you joined suspicious -- I'm

Page 232

1 sorry, Prescription Integrity.  But I just want to go
2 through some of it and just ask you some questions.
3      Up on top it says Daniel Coughlin.  Do you
4 know who that is?
5      A.  I do not.
6      Q.  But Barb Martin, she's the person who's
7 being deposed down the hallway right now.  She still
8 works for the company; right?
9      A.  Yes, Barb Martin works for the company.
10      Q.  And there's also Dwayne Pinon.  He's the
11 lawyer we talked about earlier this morning; correct?
12      A.  Correct.
13      Q.  And we also have Eric Stahmann on this
14 list, as well as Denny Murray.  Those are all people
15 that are still with the company; correct?
16      A.  Correct.
17      Q.  And this refers to suspicious controlled
18 drug orders.  And the attachments are some screenshots,
19 as I understand it, from the computer system.  Have you
20 ever seen screenshots that look like these?
21      A.  Yes.
22      Q.  Let's start with Bates 332.  And there's a
23 document up on top -- there's a wording up on top, I
24 should say.  It says threshold violations, monthly.

Page 233

1 Have you ever seen this type of screenshot?
2      A.  Similar screenshot, but I don't recall
3 with that title on it.
4      Q.  Without the title, what would you
5 understand the screenshot to be?
6      A.  It's just showing a drug on an order that
7 would have -- supposedly looks to have violated some
8 kind of measure.
9      Q.  So we don't know -- by looking at this, we
10 wouldn't know what the algorithm is that they're
11 utilizing; correct?
12      A.  I do not know.
13      Q.  And then we go to the next page.  It's
14 another version for a different drug.  This is Hydromet
15 syrup?
16      A.  Correct.
17      Q.  And again, you recognize the screenshot,
18 but you don't recognize where it says threshold
19 violations, monthly; correct?
20      A.  Correct.  I don't recall seeing something
21 like that.
22      Q.  Did you have monthly reports like this
23 that were generated for the DEA?
24      A.  I do not know.

Page 234

1    Q.   When you -- you've done?

2    A.   Not off of a screen like this, no.

3    Q.   Your team was utilizing that spreadsheet

4 format for the DEA on a daily basis; am I correct?

5    A.   Correct.

6    Q.   Do you know why your team moved from

7 monthly to daily reporting to the local DEA offices?

8    A.   I cannot recall why.

9    Q.   Did anyone tell you that one of the

10 violations that the DEA alleged was that the monthly

11 reporting was inadequate and they wanted specific daily

12 reporting being done?

13       MS. DESH:  Objection to the form.

14    A.   I do not recall.

15    Q.   (By Mr. Shkolnik)  Was it -- did you have

16 an understanding that the regulations required your

17 department to generate daily reports, not monthly

18 reports, for DEA's assessment?

19       MS. DESH:  Objection to the form.  Calls

20 for a legal conclusion.

21    A.   Can I just -- I don't recall what it said.

22    Q.   (By Mr. Shkolnik)  If we could go back to

23 the first page, which is Bates 331.  It says I recall

24 the old paper report as being inches thick.  This was

Page 235

1 replaced by same data on a disc and eventually

2 electronic transmission.  We were instructed in 1985

3 not to review or contact anyone on data.  And it says

4 who from your group has been reviewing the data

5 collected for the past 25 years?

6        Did anyone ever tell you that there was a

7 monthly -- that the procedure in place prior to RX

8 Integrity was that there would be -- first it had been

9 paper, but then electronic -- monthly productions of

10 suspicious order violations reported to the DEA?

11    A.   Not that I can recall.

12    Q.   Did anyone ever tell you that at the time

13 they were releasing the order -- releasing the orders,

14 actually shipping -- while they were collecting monthly

15 reports before they were reported up to the DEA?

16    A.   Not --

17       MS. DESH:  Objection to the form.

18    A.   Not that I was made aware of or can

19 recall.

20    Q.   (By Mr. Shkolnik)  One of the differences

21 in 2013 that your team implemented was that no order,

22 suspicious order, potentially suspicious order, would

23 be shipped -- I mean, as it says here, would stop -- so

24 that it would allow the team to review.

Page 236

1        Was that the procedure you had in place

2 when you guys took over?

3    A.   Correct.  Yes.

4    Q.   Did you know Mr. Bratton?

5    A.   Yes.

6    Q.   Who is Edward Bratton?

7    A.   He's a manager on the Pharmaceutical

8 Integrity team.

9    Q.   Was he part of that team while you were

10 there?

11    A.   Yes.

12    Q.   Was he also a manager that had a region as

13 well like you did?

14    A.   Yes.

15    Q.   Had he been involved in Pharmaceutical

16 Integrity prior to you becoming part of the team?

17    A.   I'm not aware of it.  I'm not sure.

18    Q.   Do you know what group he was with before

19 joining Pharmacy Integrity?

20    A.   I believe he worked with our essential

21 pharmacy operations out of Orlando.

22    Q.   I'm going to hand you a document marked

23 two -- Bates number 21425.  We'll mark it Exhibit 012.

24       [Exhibit Walgreens-Dymon-012

Page 237

1        marked for identification.]

2    Q.   Did Mr. Bratton ever tell you that the

3 system that was in place before your team took over

4 would continue to send additional product to stores

5 without limit or review, which would make possible

6 runaway growth of dispensing of products like oxycodone

7 that played a role in the DEA's investigation of

8 Walgreens?  Did he ever tell you that?

9       MS. DESH:  Objection to the form.

10    A.   Not that I can recall.

11    Q.   (By Mr. Shkolnik)  If we go to the

12 beginning, it says the controlled substance order

13 monitoring system now in place sets limits for each

14 item based on chain average for that item for the

15 stores of similar size.

16        So we're talking 2013, and that's

17 consistent with the policy document we just reviewed,

18 which was Exhibit Number 010; correct?

19    A.   Correct.

20    Q.   It says if a particular store fills more

21 of this item than normal and needs additional product,

22 we would need to document the reason and increase via a

23 CSO override -- here it says which it sounds like that

24 store had done.

Page 238

1 So the process in place was -- in 2013 was
2 it wouldn't ship, someone would -- you would get the
3 screen that would say you're not -- it's over ceiling,
4 you must fill out a override form; correct?
5 A. The store would have to fill out an
6 override form if they needed additional product, yes.
7 Q. And so that was what was implemented in
8 2013; correct?
9 A. Correct.
10 Q. I don't want to beat a dead horse, but if
11 there was a -- if technologically that could have been
12 done in the computer system of Walgreens going back to
13 2010, 2009, 2008, you, sir, you would support that type
14 of change being implemented back then; correct?
15 MS. DESH: Objection to the form.
16 A. Again, if potentially it could be done, it
17 could be a benefit to it.
18 Q. (By Mr. Shkolnik) And the benefit would
19 be it could prevent stores from getting product in
20 violation of ceiling tolerance limits; correct?
21 MS. DESH: Objection to the form.
22 A. It would ensure it went through our order
23 monitoring system appropriately.
24 Q. (By Mr. Shkolnik) And the purpose of

Page 239

1 ensuring it goes through the order monitoring system is
2 to ensure that stores do not get orders which are --
3 sorry for the delay -- which are not -- which are
4 orders of unusual size, unusual frequency, or deviate
5 substantially from a normal pattern; correct?
6 MS. DESH: Objection to the form.
7 A. Correct.
8 Q. (By Mr. Shkolnik) And that would mean it
9 would help ensure that there was not a violation of the
10 Controlled Substances Act in the distribution of
11 products; correct?
12 MS. DESH: Objection. Calls for a legal
13 conclusion.
14 A. Again, potentially, based on how
15 regulations are interpreted.
16 MR. SHKOLNIK: Let's go to 69.
17 Q. (By Mr. Shkolnik) I'm going to hand you
18 what we're marking as Exhibit Number 013. It is Bates
19 numbered 00625218.
20 [Exhibit Walgreens-Dymon-013
21 marked for identification.]
22 Q. Handing you a document that's from -- an
23 e-mail from Steve Bamberg to Mr. Merritello dated
24 January 4th, 2017. But more importantly, I'm going to

Page 240

1 direct your attention to the attachments, the two pages
2 of PowerPoint, that are predated. They're from a prior
3 time frame.
4 Have you ever seen these two pages -- I'm
5 sorry, it's three pages -- of PowerPoints?
6 A. Not that I can recall.
7 Q. If we can just look at Bates numbered 263.
8 And if we look at the bottom under dispensing, and then
9 there's a series of arrows, and it says store level is
10 good faith dispensing, store level is DUR and PDMP.
11 What's DUR?
12 A. Drug utilization review.
13 Q. What does that mean?
14 A. A clinical review that a pharmacist does
15 on a prescription.
16 Q. So they're basically looking to see if
17 there's a history with the patient, with the doctor,
18 with the actual prescription itself?
19 A. With the clinical aspects of the
20 prescription dosing.
21 Q. Then the PDMP means they're actually
22 looking at a computer system to check on the doctor as
23 well as the patient, if they're showing up in the
24 system?

Page 241

1 A. Yes, they're state-level systems, PDMPs.
2 Q. And you're able to see if the patient was
3 a doctor shopper or if the physician had some type of
4 flags associated with him through that -- or him or
5 her -- through that system; correct?
6 MS. DESH: Objection to the form.
7 A. To my understanding, you only see fill
8 history of a prescription in a PDMP.
9 Q. (By Mr. Shkolnik) When you say fill
10 history, what does that mean?
11 A. Where a prescription was filled, and when
12 it was filled last, and what was the drug and the
13 quantity.
14 Q. Is that based on the patient or on the --
15 what is it based on?
16 A. It's patient.
17 Q. So you'd put the patient's name in; that's
18 all that shows up?
19 A. Correct.
20 Q. Is there any way of searching the
21 physician in that database?
22 A. Again, at this time I don't know how --
23 every state mandates their own PDMP structure, so I
24 can't speak to how different states show or not show

Page 242

1 physician type data.

2      Q.   And then the next arrow is corporate
3 monitoring through potential risk indexing, monitoring
4 current done through normal -- manual analysis, will
5 work towards automation and scorecards.

6           Did you participate in some way in trying
7 to develop scorecards or some type of automation
8 process to try to evaluate physicians and how to
9 evaluate patients that were submitting prescriptions to
10 be filled?

11      A.   Not myself individually.  Bratton and our
12 team worked on physician and physician data.

13      Q.   But were you participating at all in
14 something called the top 100 or top 500 physician
15 search tool?

16      A.   That's a tool Mr. Bratton developed.

17      Q.   Did you work with him on that?

18      A.   He did all the work and development.  I
19 just would look at it.

20      Q.   What was top 100 or top 500?

21      A.   I believe he was looking at prescribers
22 and what was being prescribed.

23      Q.   And would that apply to the various store
24 regions or stores, or how was that broken down, do you

Page 243

1 know?

2      A.   I think he would break it down by region
3 and stores.

4      Q.   And did it also include the type of
5 prescribing habits of the individual doctors that were
6 contained in these databases?

7      A.   It would show just what the prescriber
8 prescribed, from what I recall.

9      Q.   And did that help the company -- when it
10 was ultimately put in place, did that help the company
11 in its assessment of its suspicious order monitoring
12 program?  Was that utilized?

13           MS. DESH:  Objection to the form.

14      A.   I don't recall or remember how we utilized
15 it.

16      Q.   (By Mr. Shkolnik)  Do you recall what the
17 purpose of it was?

18      A.   Investigatory.

19      Q.   Meaning?

20      A.   Trying to understand what was going on out
21 there.

22      Q.   What was going on there -- where?

23      A.   Nationwide prescribers, what are
24 prescribers prescribing, where, what.

Page 244

1      Q.   So these were top 500 nation, or top 500
2 market, top 100 nation, top 100 market?  What was it?

3      A.   To my understanding, I think it was
4 chainwide nation.

5      Q.   Mr. Bratton was up in RX Integrity when he
6 was doing that project, was he not?

7      A.   Correct.

8      Q.   And that was part of the RX Integrity
9 program to try to strengthen the whole RX Integrity
10 program, was it not?

11           MS. DESH:  Objection.  Vague.

12      A.   To gain educational insight,
13 understanding, yes.

14      Q.   (By Mr. Shkolnik)  I mean, as you sit here
15 today, you don't know exactly how it was utilized, but
16 it was certainly one of the items that RX Integrity was
17 trying to implement to assist it in doing its job;
18 correct?

19           MS. DESH:  Objection.  Vague.

20      A.   Trying to gain insights or any
21 understanding if it could help us educate the field or
22 to do something differently.

23      Q.   (By Mr. Shkolnik)  In fact, that was the
24 one of the things that you considered yourself to --

Page 245

1 when you went for your yearly assessment in 2013,
2 this -- whatever with work you did to support the top
3 100, top 500 indexing system was one of your
4 achievements that you helped with in 2013; correct?

5      A.   Correct, I assisted on it, yes.

6      Q.   And it was an important part of the
7 overall let's try to make the RX Integrity program more
8 robust; fair statement?

9           MS. DESH:  Objection.  Vague.

10      A.   To learn more, again.  It's just all about
11 learning and learning what could we do.

12      Q.   (By Mr. Shkolnik)  And if we could turn to
13 the next page.  Bates numbered 264.  In 264 we have a
14 breakdown of the various phases of the SOM substance
15 order logic for the program that was implemented prior
16 to you beginning with the group in 2013.

17           Have you ever seen any diagram similar to
18 this that outlined the phases of the SOM system -- the
19 CSOM system?

20      A.   I may have, but I really can't recall.

21      Q.   According to Phase 1, which according to
22 this was implemented 2009 to 2010 -- I'm sorry, August
23 of 2009 through September of 2010, the first phase of
24 the CSOM process would be it would review all

Page 246

1  controlled Walgreens DC orders, and it would flag
2  orders -- and it says up on top, am I correct, flag
3  select orders as suspicious?  That's what the algorithm
4  is saying, the logic; correct?
5      A.   According to the information on this
6  slide.
7      Q.   And in fact, it says that this was
8  actually prepared for litigation at the bottom,
9  anticipation of litigation or at the direction of
10  litigation and regulatory law.  This was in preparation
11  for the trial where they were going to -- where DEA was
12  coming after Walgreens; correct?
13      A.   I do not --
14          MS. DESH:  Objection.  Calls for
15  speculation.
16      A.   I do not know.
17      Q.   (By Mr. Shkolnik)  You knew that they were
18  going -- that they were about to go to trial with the
19  DEA when you started with Integrity; correct?
20          MS. DESH:  Same objection.
21      Q.   (By Mr. Shkolnik)  In February of that
22  year?
23      A.   I know we were in contact with the DEA.  I
24  don't know if it ever went to a trial or anything like

Page 247

1  that.
2      Q.   Well, it didn't go to trial; you guys
3  settled.  But you were aware that the team was gearing
4  up for trial against the DEA over its suspicious order
5  monitoring program?  Were you aware of that?
6          MS. DESH:  Same objection.
7      A.   Again, I don't know if our legal team was
8  preparing for trial or not.  I don't know.
9      Q.   (By Mr. Shkolnik)  It would be a nice
10  exhibit if they were going to trial, but that's a whole
11  'nother issue.
12          And it says that the -- it flags select
13  orders as suspicious, based on a 26-week pattern, and
14  then the key point on what was done in that first year,
15  August of 2009 to September of 2010, orders were not
16  reduced if they were flagged as suspicious.  That's
17  what they're telling us; correct?
18      A.   According to the information on the slide,
19  yes.
20      Q.   Did anyone ever tell you that there was a
21  one-year period where this new SOM logic was being
22  implemented where they were flagging orders as
23  suspicious, were shipping them, and were not reducing
24  them?  Did anyone ever tell you that?

Page 248

1      A.   Not that I can recall.
2      Q.   From your understanding, would it be
3  appropriate if whatever the system in place was -- I'm
4  not going to identify what logic it was or what
5  algorithm.  Was it your understanding that if the
6  company flagged an order as suspicious, they were not
7  supposed to order it -- I'm sorry, ship it?
8          MS. DESH:  Objection to the form.
9      A.   Again, looking at regs, potentially they
10  may have not been able to ship it.
11      Q.   (By Mr. Shkolnik)  So in the first year of
12  this new algorithm or program, they were flagging, and
13  they were not reducing, and they were shipping.
14          So in the second phase, let's start from
15  September 2010, and it says to current -- given the
16  dates in this, some time in 2012 -- it says the orders
17  were reviewed, they were flags based on drug by store,
18  historical patterns of 26 weeks, but they had
19  implemented in this Phase 2 that they would be reducing
20  only WAG DC orders.
21          So this would be saying they had a
22  reduction in place if it exceeded -- if it was found to
23  be suspicious, and if a WAG order -- that means a
24  Walgreens DC order -- would be reduced and shipped;

Page 249

1  correct?
2      A.   Looks so, according to this document, yes.
3      Q.   So then at this point they were saying
4  Phase 3, it was estimated to be implemented some time
5  in mid-2012, that it would check to see if an order was
6  placed with a vendor after -- 48 hours after it was
7  flagged.
8          So here it's saying it was flagged based
9  on drug by store, historical pattern over 26 weeks.  So
10  that stayed the same; correct?
11      A.   I don't know.  I wasn't working on this at
12  the time.
13      Q.   But if we're just reading it, that's what
14  it says?  It's basically the same as the top two?
15      A.   Based on this document, yes.
16      Q.   And there was a discussion during that
17  time frame to shorten the analysis period down to 13
18  weeks.  Irrespective of the wording of discussion, when
19  you got involved in the RX Integrity, would I be
20  correct that it was down to 13 weeks, the algorithm, or
21  was it still 26 weeks?
22      A.   I believe it was 13 or possibly even lower
23  at the time.  I can't exactly recall.
24      Q.   What would be the significance of

Page 250

1  shortening the period that the algorithm applies?  How
2  does that affect your -- the analysis in terms of
3  observing changes and patterns?
4      A.   Again, I didn't design the algorithm.  I
5  would imagine it probably makes it easier to analyze a
6  succinct piece of time easier.
7      Q.   Or it's harder to see a change if you're
8  looking at a shorter period than you're looking at a
9  longer period; isn't that also a possibility?
10     A.   I do not know.  I'm not a statistician.
11     Q.   So here it's -- then it goes on to say
12  what are the takeaways of it after it's been flagged as
13  suspicious?  Review and refinements of tolerance and
14  frequency threshold, confirmed action for each possible
15  scenario using a matrix.
16         Now, then it goes on to say the Phase 4,
17  which was going to be implemented sometime in 2012 --
18  and basically it was saying that the algorithm for
19  suspicious order monitoring would include both DC
20  orders, WAG DC orders, and vendor orders, and flag any
21  as suspicious if they exceed the threshold.
22         When you came into SOM, was that procedure
23  in place?
24     A.   I believe it was.  It's hard to recall

Page 251

1  exactly what changes were occurring, but I believe they
2  were already starting that.
3      Q.   Yeah, that was not a -- that was not a
4  change implemented by the new team; that was already in
5  the works before you guys -- you came in, wasn't it?
6      A.   It probably was in the works, yes.
7      Q.   And here it was saying both WAG DC,
8  Walgreens distribution center, as well as the vendor
9  orders were all reduced if they exceeded a threshold,
10  and when you got on board, that was a process that was
11  occurring in 2013; correct?
12     A.   From what I recall, yes.
13     Q.   When you joined the team, when an order
14  had been reduced, either a WAG or vendor order, was a
15  report being made to the DEA?
16     A.   Yes.
17     Q.   As soon as it was reduced?
18     A.   The same day when I was on the team, yes.
19     Q.   So once a reduction occurs, the daily
20  report would say an order came in, we reduced it, and
21  DEA, you're on notice of this?
22         MS. DESH:  Objection to the form.
23     A.   Same as the templates we looked at
24  earlier.

Page 252

1      Q.   (By Mr. Shkolnik)  Would they -- would it
2  be automatic, or would someone have to look at them
3  first and determine that they're suspicious or not?
4         MS. DESH:  Same objection.  Calls for
5  speculation.
6      A.   I can't really recall.  I know we were
7  just starting to use a new dashboard and automation in
8  various processes.  I just can't remember.
9      Q.   (By Mr. Shkolnik)  I guess maybe my
10  question was kind of vague.  Let me try to phrase it
11  this way.  Was every reduced order automatically
12  reported to the DEA?
13         MS. DESH:  Objection.  Calls for
14  speculation.
15     Q.   (By Mr. Shkolnik)  When you became a
16  member of RX Integrity?
17         MS. DESH:  Same objection.
18     A.   To the best of my recollection, I believe
19  it was.
20     Q.   (By Mr. Shkolnik)  That was not occurring
21  before RX Integrity came into place; correct?
22     A.   I can't speculate to how -- what they were
23  doing before I came into place.
24         MR. SHKOLNIK:  We can go to the next

Page 253

1  exhibit.  That's 68.
2      Q.   (By Mr. Shkolnik)  I'm going to hand you
3  Exhibit Number 014.  Bates numbers is 00114602.
4         [Exhibit Walgreens-Dymon-014
5         marked for identification.]
6      Q.   This is an e-mail that went out to a large
7  group on December 7, 2012.  Based upon your
8  recollection of joining the team, would it be fair to
9  say you would not have been on this distribution?  I
10  know there's a lot of people here.
11     A.   Correct.
12     Q.   At this time where were you, in December
13  of 2012?
14     A.   Pharmacy manager still.
15     Q.   And was the first week of January your
16  first -- was when you began working in Integrity?
17     A.   Yes, about end of first week, start of
18  second week of January.
19     Q.   Did you have to go through an interview
20  process to be added to the team?
21     A.   Yes.
22     Q.   Were they looking for someone who had
23  store-level experience, a Pharm D, to help come onto
24  the team?

Page 254

1   A.   Yes.

2   Q.   Had you worked with Tasha Polster before?

3   A.   Yes.

4   Q.   In what capacity?

5   A.   When I was a pharmacy intern I worked with

6   her.

7   Q.   What was her position at the time when you

8   worked with her?

9   A.   She was a pharmacy supervisor.

10   Q.   When you were saying -- when you did those

11   sort of -- I think you said it was ridealong or

12   something along -- you used a phrase earlier.

13   A.   Correct.

14   Q.   A ridealong --

15   A.   Internship.

16   Q.   Were you working with -- was that with

17   Tasha in that capacity?

18   A.   Yes.

19   Q.   And when this new team was being

20   developed, did she reach out to you and say would you

21   be interested in coming onboard, or did you submit an

22   application?  How did this come about?

23   A.   My field leaders recommended the position,

24   that I look into it, and she also said there's an

Page 255

1   opportunity on my team if you'd like to look at it and

2   apply.

3   Q.   Had you stayed in contact with Ms. Polster

4   during the years in between?

5   A.   Not really.

6   Q.   This is a presentation that occurred on

7   January 31st, 2013.  You were part of -- you were now

8   part of RX Integrity at that point; correct?

9   A.   Correct.

10   Q.   Did you attend this meeting with Mr.

11   Bleser and the large group of people when it occurred

12   in January of 2013?

13   A.   No.

14   Q.   Did you work under Mr. Bleser at any point

15   in time?

16   A.   No, I did not.

17       MR. SHKOLNIK:  If we could jump ahead to

18   Bates numbered 4613, please.

19   Q.   (By Mr. Shkolnik)  We have here a slide

20   that was included in the presentation.  And I believe

21   quite a few members of your, I think, RX Integrity team

22   were on the distribution, if I'm not mistaken.  I think

23   Ms. Polster was there, and Mr. Merritello, and Mr.

24   Murray, and I believe Barb Martin.  They were all on

Page 256

1   this distribution.

2       Did anyone ever tell you about this

3   quarterly report that was being given when you first

4   got onto the team?

5   A.   Not that I can recall.

6   Q.   Now, this slide was included in the

7   presentation, and it refers to -- and the heading is,

8   and it's under a Walgreens PowerPoint background,

9   troubling trend in the United States, leading cause of

10   death is prescription drugs.

11       Were you aware that by 2011 prescription

12   drugs was the leading cause of accidental death in the

13   United States?

14   A.   Just aware of what I heard in the media

15   around that time.

16   Q.   Did you hear anything in the company about

17   that when you were joining RX Integrity?

18   A.   Not that I can recall.

19   Q.   Was anyone talking about the fact that DEA

20   and governmental entities were beginning to look at the

21   fact that prescription drugs were now passing illegal

22   drugs, poisons, and car accidents as a number one cause

23   of death in the United States?

24   A.   Not that I can recall.

Page 257

1   Q.   From a pharmacy perspective, that's a

2   significant fact, isn't it, to all of a sudden for the

3   first time in history prescription drugs are the

4   leading cause of death in the United States, surpassing

5   things like car accidents and illegal drugs and

6   poisonings?  Would you agree with that?

7   A.   It's a health care effect, yes.

8   Q.   And this was an early sign of an epidemic

9   developing in the United States related to prescription

10   drugs and death; correct?

11   A.   To my personal understanding, yes, that

12   would be kind of the start of it, yes.

13       MR. SHKOLNIK:  And if we go to the next

14   slide, 614, please.

15   Q.   (By Mr. Shkolnik)  Now, here the teams

16   were given an outline, which was the evolution of

17   suspicious order monitoring, with a timeline of events.

18   And there was testimony by Mr. Bleser that this was

19   actually prepared by the Pharmacy Integrity group to be

20   included in the quarterly presentation.

21       Did anyone ask you for any input into

22   the -- into a PowerPoint on the timeline of events

23   regarding suspicious order monitoring?

24   A.   I have may have reviewed or edited, but I

Page 258

1  can't recall.
2      Q.   You worked with Ms. Polster and actually
3  worked with her on some of the PowerPoints that were
4  being developed for the team; am I correct?
5      A.   Correct.
6      Q.   I noticed, looking at a lot of your files,
7  you were pretty prolific in the PowerPoint area.  Were
8  you -- did she like rely on you in some way to help her
9  when she was doing her PowerPoint presentations?
10     A.   As a reviewer or to assemble graphics and
11 stuff, yes.
12     Q.   So here one of -- the timeline starts with
13 pre-August of 2010.  Were you aware that there was a
14 steady increase in Florida pill mills and prescribers
15 dispensing medication?  Did you know that that was like
16 a problem going on down in Florida?
17     A.   Not in 2010, no.
18     Q.   Did you ever become aware that one of the
19 problems with respect to the prescription drug deaths
20 increase was related to increase in Florida pill mills?
21         MS. DESH:  Objection to the form.
22     A.   Not at that time, no.
23         MR. SHKOLNIK:  Before I go through this
24 whole -- it's going to be a while on this.  Let's take

Page 259

1  a five-minute; okay?
2          THE VIDEOGRAPHER:  We're off the record at
3  3:39 PM.
4          [A brief recess was taken.]
5          THE VIDEOGRAPHER:  We are back on the
6  record at 3:56 PM.
7      Q.   (By Mr. Shkolnik)  Mr. Dymon, the next
8  milestone on this timeline is October 2010.  It says a
9  change in Florida legislation restricts prescriber
10 dispensing to only 72-hour supply of pain medication.
11         Is that something you became aware of as a
12 practicing pharmacist back in those days, that there
13 were changes being implemented in Florida related to
14 the prescription of pain medications and doctor
15 prescriptions?
16     A.   No, not at that time.
17     Q.   At a later time did you become aware of
18 that?
19     A.   When I was in Integrity.
20     Q.   And was this timeline that we're seeing
21 here something that was discussed ultimately while you
22 were in Integrity, as it relates to Florida?
23     A.   Various timelines where there may have
24 been something around Florida.

Page 260

1      Q.   And the next milestone is October 2010 to
2  March 2010 (sic).  There is a dramatic increase in the
3  number of opioid pain medication prescriptions seen at
4  retail stores.
5          Did you become aware of that first while
6  you were still working in the pharmacy setting?
7      A.   Not that I can recall, no.
8      Q.   When you got into Pharmaceutical
9  Integrity, did you become aware that, as an industry,
10 there had been -- that the big chain pharmacy companies
11 saw a dramatic increase in opioid pain medication
12 prescriptions that were triggered as a result of
13 Florida's change in its law regarding dispensing of
14 pain medication at doctor's offices or pill mills?
15     A.   When I entered into RX Integrity, I became
16 aware of Florida.
17     Q.   And you then became aware that there was a
18 problem with what was known as pill mills; am I
19 correct?
20     A.   Correct, through the media.
21     Q.   And there were pill mills here in the
22 Chicagoland area, weren't there?
23     A.   There may have been.  I'm not aware.
24     Q.   Never heard of any pill mills in this

Page 261

1  area?
2      A.   Not that I can recall.
3      Q.   Never heard of it being any type of a
4  problem that there were pain medication pill mills
5  popping up even here in Illinois?
6      A.   Not that I was aware of.
7      Q.   Did the Walgreens stores where you were
8  working, did they exhibit any increase in opioid sales
9  over the years you were there?
10     A.   Not that I know of.
11     Q.   So when you were -- when you were a
12 floating pharmacist and then you became a manager of
13 pharmacies, you yourself did not see any escalation of
14 opioid prescriptions over the years, like a trending
15 up, between the 2004 time frame and 2011, when you
16 stopped -- I'm sorry, 2012, when you stopped?
17     A.   Not that I can recall.
18     Q.   Wasn't it a fact in the industry that
19 there was a -- in your industry, as a pharmacist,
20 wasn't it common knowledge that opioids, the filling of
21 opioid prescriptions and the prescription numbers, were
22 increasing exponentially over the years from early
23 2000s up through 2013 or 2012?  Wasn't that just
24 well-known in your industry?

Page 262

1   MS. DESH:  Objection to the form.
2     A.   Not to my own personal knowledge or
3   recollection at that time, no.
4     Q.   (By Mr. Shkolnik)  You didn't go to any
5   continuing pharmacy education programs where that was
6   talked about?
7     A.   Not that I can recall.
8     Q.   You didn't go to any task force meetings
9   in your state where this was discussed or anything like
10  that?
11    A.   No, not that I can recall.
12    Q.   Were you a member of any organizations
13  here in your state for pharmacists?
14    A.   Not that I -- not at that time that I
15  remember, no.
16    Q.   Did you receive any communications from
17  any -- from the pharmacy boards of the state of
18  Illinois talking about increasing prescriptions of
19  opioids over the last decade, 2000 to 2010, 2012?
20  Anything from them?
21    A.   No, not that I recall.
22    Q.   Are you still a licensed pharmacist here
23  in the state of Illinois?
24    A.   Yes, I am.

Page 263

1     Q.   Have you always remained a licensed
2   pharmacist from the time you first got your license?
3     A.   Yes.
4     Q.   Do you receive communications from the
5   pharmacy board from your state periodically?
6     A.   Occasionally, yes.
7     Q.   Did -- as you sit here today, is it your
8   testimony you've received no communications from the
9   pharmacy board of Illinois related to opioid
10  prescription and habits of prescriptions?
11    A.   To my recollection, I do not recall
12  receiving any communications around that.
13    Q.   Does the pharmacy board sometimes issue
14  periodic publications to its members?
15    A.   I do not know if they issue publications.
16  They may on their website.  I don't go to it or I'm not
17  a board member or anything like that with the board.
18    Q.   No, I'm just saying as a member do you get
19  communications from the pharmacy board?
20    A.   I may get one e-mail a year about license
21  renewals.  That's about it.
22    Q.   Are you a member of any societies of
23  pharmacies or any other type of organizations for
24  pharmacists?

Page 264

1     A.   No, not at this time.
2     Q.   How about prior to 2012?
3     A.   I may have been a part of the Illinois
4   Pharmacists Association at one point, was a member for
5   a short time, but it may have been around 2014, 2015.
6   I don't remember.
7     Q.   During that time did you receive
8   communications from the Illinois Pharmacists
9   Association related to increasing opioid prescriptions?
10    A.   Not that I can recall.
11    Q.   So in October 2010 to March of 2011 you
12  did become aware that the pharmacies -- the retail
13  pharmacies were seeing dramatic increases of opioid
14  pain medications in the state of Florida?  That's
15  something you did become aware of?
16    A.   Not at that time, no.
17    Q.   But later?
18    A.   Yes.
19    Q.   And then you also became -- later then,
20  July 2011, Florida prohibited practitioners from
21  dispensing C-II and C-IIIs except very limited
22  transactions or instances.  You became aware of that
23  ultimately?
24    A.   Correct.

Page 265

1     Q.   And when you were in the Pharmacy
2   Integrity unit, did this issue come up in terms of
3   explaining the history of why the DEA was taking action
4   against Walgreens as well as other pharmacies and
5   distributors in the United States?
6     A.   Yes, in general.
7     Q.   And then the next page talks about the
8   2012 timeline going into 2013.  And it says there was
9   administrative inspection warrants in the six stores
10  and Jupiter distribution center.  We talked about that
11  earlier, you did become aware of that; correct?
12    A.   Correct.
13    Q.   And then May to June of 2012, eight stores
14  voluntarily removed all C-II products, Xanax and Soma,
15  and in that time period the relaunch of good faith
16  dispensing policy.
17         Does that refresh your recollection as to
18  when the GFD was relaunched in Walgreens?
19    A.   Potentially when I was in the field at
20  that time, probably, yes.
21    Q.   Did you go through the training at that
22  point in time, the GFD training?
23    A.   If it was launched to everyone at the
24  stores, I would have.  I just can't recall or remember

Page 266

1  how it was done.
2      Q.   If you had gone through the GFD training
3  module that was released to all the pharmacists and
4  stores, would that have been something that you would
5  have done online through like your WalNet or some
6  other pharmacy -- Walgreens interface?
7      A.   Yes.
8      Q.   Is that something that would have been
9  kept in your personnel file to show that you actually
10 completed good faith dispensing training?
11     A.   Potentially either at store level, or I
12 don't know if it's stored in a database or something
13 along those lines.  I'm not sure.
14     Q.   As you sit here today, do you recall if
15 you completed any relaunched good faith dispensing
16 policy training program?
17     A.   I may have.  I just can't recall that far
18 back.
19     Q.   Then it says September 2012 an ISO was
20 issued for Jupiter distribution center, and in November
21 an order to show cause was issued for the three Florida
22 pharmacies.
23         Were you aware of that when this was
24 occurring?  Did you hear about that through the

Page 267

1  Walgreens network or through other channels?
2      A.   No.
3      Q.   Was there word being released by the
4  company to all the stores, we're having a problem with
5  our Florida stores and our distribution center, we want
6  you to be aware of it, we want you to be more in tuned
7  into your prescription processing with respect to
8  controlled substances -- anything like that?
9          MS. DESH:  Objection to the form.
10     A.   Not that I can recall.
11     Q.   (By Mr. Shkolnik)  Did you have any
12 understanding as to why the company was relaunching a
13 good faith dispensing policy right around the time when
14 they had just been served with inspections and warrants
15 in Florida?
16     A.   I can't recall why they were launched.
17 They might have evolved the policy over time.
18     Q.   So after you joined -- after you joined
19 Pharmaceutical Integrity, did you reach a conclusion
20 that the relaunch of good faith dispensing was
21 unrelated to DEA action, that this was just Walgreens
22 looking to be a good pharmacy?  Is that your
23 understanding?
24     A.   My understanding is the policy evolved

Page 268

1  over time and they would recommunicate or relaunch
2  changes to policy or procedures.
3      Q.   Because they were under the microscope of
4  the DEA; correct?
5          MS. DESH:  Objection to the form.
6      A.   I don't know if it was due to that.
7      Q.   (By Mr. Shkolnik)  Well, when you were in
8  Pharmacy Integrity, you did know that a big part of the
9  Pharmacy Integrity program was the relaunch of GFD and
10 implementing the processes as a result of the DEA
11 action against Walgreens?  That's something that was
12 made very clear to you, wasn't it?
13     A.   In general, as part of the DEA -- I mean,
14 yes, that would probably be one part of it, but again
15 it's a policy procedural update that would be
16 communicated out.
17     Q.   I agree, and it's a good policy procedure
18 update to be communicated out.  But it was triggered
19 because the DEA had taken action against the company,
20 and one of the steps the company was taking in response
21 to that was let's relaunch GFD, good faith dispensing,
22 policy; correct?
23         MS. DESH:  Objection.  Calls for
24 speculation.

Page 269

1      A.   Again, to my understanding, part of
2  whatever agreement with DEA is part of educating our
3  team members, so I would assume it would be tied to
4  that.
5      Q.   (By Mr. Shkolnik)  And if we go to the
6  next page, I just want to jump down to January of 2013.
7  So now you're part of Integrity, and it says sanction
8  prescriber pilot begins in New Jersey and Pennsylvania.
9          What is a sanction prescriber pilot?  What
10 was that as part of Integrity?
11     A.   A prescriber of interest or concern that
12 we were looking into not filling prescriptions for
13 anymore.
14     Q.   And that was then launched on a wider
15 basis, was it not?
16     A.   It was limited by state or region.  It
17 wasn't like nationwide.
18     Q.   Do you know if it was done in Florida?
19     A.   It may have been, but I can't recall.
20     Q.   Do you know if it was done in Ohio?
21     A.   I can't recall.
22     Q.   Do you know if it was done in Illinois?
23     A.   Not that I can recall.
24     Q.   And was the sanction prescriber program

Page 270

1 tied to the top 100, 500 work that Mr. Bratton was
2 working on and you were supporting?
3     A.   I believe so, yes.
4     Q.   And that was -- the thought behind that
5 was let's look for some -- if we can through our
6 databases and through our systems and whatever we can
7 accumulate determine that some doctors are engaging in
8 questionable practices, you as a company can take some
9 action preemptively with them to prevent C-II to C-V
10 prescriptions from being processed; correct?
11     A.   Correct.
12     Q.   And that was -- I think your team would
13 say that was something you were proud of, is that you
14 came up with this type of a plan to try to preemptively
15 take steps to avoid the potential for filling of
16 improper prescriptions; correct?
17     A.   Correct.  It was one of the first things
18 we worked on, yes.
19     Q.   Then it says February 2013, the DEA
20 administrative hearings began.  Does this refresh your
21 recollection that they were actually starting the
22 processes where the DEA was taking action against the
23 company and the company was taking action back in
24 response against the DEA?

Page 271

1     MS. DESH:  Objection to the form.
2     A.   I'm aware of Walgreens and the DEA
3 communicating and meeting, so yes.
4     Q.   (By Mr. Shkolnik)  Now, if we can go to
5 the next slide.  That's 617.  And it says RX operations
6 taking steps at the store level.  Relaunched Walgreens
7 good faith dispensing policy across the chain.  We
8 talked about that already.
9        Then it says implementing pilots, target
10 drug good faith dispensing, and prescriber sanctioning
11 in New Jersey and Pennsylvania.  That's what we just
12 talked about; correct?
13     A.   Correct.
14     Q.   Then it says invalid prescriber DEA
15 removal from IC and DEA CAP override.  Could you tell
16 us what that is?
17     A.   From what I recall, this was just
18 maintaining our own prescriber database and just
19 removing old prescribers with inactive DEAs from the
20 system.
21     Q.   Was there -- for a period was there -- you
22 identified a problem where pharmacists were having a
23 hard time determining if someone had a valid or invalid
24 DEA license who was issuing prescriptions, and you were

Page 272

1 trying to make the system more robust so you had more
2 accurate information?
3     A.   To make it easier on the staff member --
4 to look it up.
5     Q.   So it would be in the database, and they
6 could look into your database to put in the DEA number,
7 and it would say active, not active; correct?
8     A.   Correct.
9     Q.   Was that part of -- was that another one
10 of the steps of the RX Integrity team in response to
11 trying to make the suspicious order monitoring system
12 more robust?
13     A.   Just another kind of compliance effort by
14 the RX Integrity team around DEA.
15     Q.   And then it says -- what is a DEA CAP
16 override?  That's the part I was not understanding.
17     A.   CAP is a consultation program.
18     Q.   What is that, if you could tell us?
19     A.   It's a program that a pharmacist can use
20 and put notes on a patient after consulting with a
21 patient, and can be used for clinical checks or other
22 information.
23     Q.   And what does it mean to have a DEA CAP
24 override?

Page 273

1     A.   I'm not aware because I didn't work on
2 this or develop it, so I can't speculate to what it was
3 doing.  I don't know.
4     Q.   And then it says top 500, 100 store
5 indexing report.  Can you just briefly tell us what
6 that is?
7     A.   That's Mr. Bratton's prescriber list and
8 store list of top 100 or 500 that he started
9 developing.
10     Q.   And once again, this was all part of what
11 you guys were doing at RX Integrity at that point?
12     A.   To the best of my knowledge, yes.
13     Q.   And now if we could jump ahead to Bates
14 numbered 619.  And here it says SOM Version 5.5 is an
15 industry-leading enhancement to SIMS.
16        Now, when you became part of the team in
17 January of 2013 -- we had gone through the various
18 phases from Exhibit 013, and we had left off at Phase
19 4.  According to this document in 2013, your company
20 was now at Version 5.5, and this appears to be an
21 outline of it.  Do you recall a release of 5.5 at that
22 time?
23     A.   I know the system was still evolving and
24 being developed and we were brought in to work in the

Page 274

1  last part of it.  So --
2      Q.  And here it says -- giving you a -- it's
3  giving a recap of what the program is, and it says the
4  program enhancement to SIMS to impact the ordering
5  process of all controlled substances.  Now, it goes
6  down and it says part of the calculations use an
7  accumulation of receipts of each controlled substances
8  over the last six weeks.
9          So by the time you joined the team, is
10  this -- does this refresh your recollection that the
11  lookback period is receipts going back six weeks, as
12  opposed to the 26 weeks and the 13 weeks which we
13  looked at in earlier documents?
14      A.  Yes, to the best of my recollection.
15      Q.  Now, as you sit here today, do you have
16  any understanding as why they would reduce the lookback
17  period down to six weeks versus 13 or 26 or 52 weeks,
18  in terms of determining what was a suspicious order?
19      A.  Again, my knowledge was just -- I'm not a
20  statistician, but I imagine it's just a more finite
21  period of time where it's easier for us to look through
22  orders and understand what could be going on with that
23  order.
24      Q.  But let's assume there is a progressive

Page 275

1  increase of the ceiling over a year's time.  If you
2  were to look -- take a look back at a year, you'd be
3  able to see the increase over time, whereas if you
4  looked back only say six weeks you may only see a small
5  little bit of what's been happening; correct?
6      A.  Potentially.
7      Q.  I mean, 52 weeks you may be able to see an
8  actual slope, but if you look at six weeks you may see
9  very little change in terms of the overall number of
10  receipts that the store is really seeing over a long
11  period of time; correct?
12      A.  I do not know.
13      Q.  And it goes on to say tolerance and
14  ceiling limits are applied to individual orders at the
15  store level.  Once again, that was the most up-to-date
16  version, they were doing tolerance and ceilings;
17  correct?
18      A.  To the best of my understanding, yes.
19      Q.  Limits can be adjusted to account for
20  unique business needs.  That was something in place at
21  the time?
22      A.  Yes.
23      Q.  And then it goes to say dashboard monitors
24  and flags orders of interests and stores approach

Page 276

1  ceiling thresholds.  And that's what was in place when
2  you joined the team; correct?
3      A.  Correct.
4      Q.  Did you tell stores that they were
5  approaching ceiling thresholds?
6      A.  Not directly that I can recall, no.
7      Q.  If a store -- if a pharmacist went into
8  the SIMS system, or whatever they had at their level,
9  could they determine if they were approaching ceiling
10  limits?
11      A.  No, the store would not, no.
12      Q.  Other than receiving sort of the flash
13  screen that says you need to do an override, is there
14  any other way for the pharmacist to know that their
15  store for that product was either approaching or
16  surpassing either tolerance or ceiling?
17      A.  Not at this time that I can recall.
18      Q.  Would an override form be required if an
19  order exceeded tolerance but was below ceiling?
20      A.  To my recollection, I believe so, yes.
21      Q.  So it required both?
22      A.  I believe so.
23      Q.  And again -- and I don't know if I asked
24  it earlier.  If there was a -- an exceed tolerance and

Page 277

1  a reduction, and you still remained under ceiling,
2  would that automatically be reported to the DEA?
3          MS. DESH:  Objection to the form.  Calls
4  for speculation.
5      A.  I believe over time that all became
6  automatically reported to the DEA.
7      Q.  (By Mr. Shkolnik)  But you don't know at
8  what point that --
9      A.  I can't recall.
10      Q.  But you do know there was a period where
11  it was not automatically reported; correct?
12      A.  Correct.
13      Q.  I'm going to hand you a document which I'm
14  going to mark as 015, Exhibit 015, and it's Bates
15  numbered 00577118.
16          [Exhibit Walgreens-Dymon-015
17          marked for identification.]
18      MR. SHKOLNIK:  Is it easier if I say to
19  you the WAG number?  Is that --
20          TRIAL TECHNICIAN:  She's got it.  We're
21  good.
22          MR. SHKOLNIK:  Okay.  I just realized that
23  this whole -- I'm going to hand you the document.
24      Q.  (By Mr. Shkolnik)  Handing you an e-mail

Page 278

1  dated January 29, 2013. It's from Tasha Polster -- I'm
2  sorry -- yeah, it's from Tasha Polster to a group of
3  people including yourself. And it references some type
4  of meeting, and there's an attachment. And this is
5  a -- this is for a status meeting.
6        When you joined the team, was one of the
7  things that was implemented, one of the processes
8  implemented by Tasha Polster was that the teams would
9  have regular meetings, you'd prepare agendas for
10  discussion at the meetings?
11     A.  Yes.
12     Q.  And I notice there's quite a few of them.
13  Would you attend those as part of that team?
14     A.  Yes.
15     Q.  If we look at the agenda. This one is
16  written to Rex Swords. It's dated November 30, 2012.
17  Rex Swords was Tasha Polster's superior; am I correct?
18     A.  Correct.
19     Q.  And here it's -- so this is before you
20  joined the team, and it seems to be an outline of
21  things that were being considered and implemented. In
22  the first one, it says -- I'm sorry -- the second one,
23  it says SOM meetings, work group has been put together
24  to begin the determination between suspicious order and

Page 279

1  order of interest.
2        Did you participate in any meetings where
3  this topic was discussed? We are going to no longer
4  refer to what the algorithm puts out as suspicious
5  order, but we're going to consider the order of
6  interest, and then implement a review process.
7     A.  I was in meetings they talked about order
8  monitoring, but that was about it.
9     Q.  But there was -- up until November of
10  2012, the company referred to what came out of the
11  computer system as a suspicious order, and for the
12  first time I see in documents in November of 2012 that
13  there is a discussion about whether or not this should
14  be suspicious order and an order of interest.
15        Was that a topic in meetings that you
16  participated in?
17     A.  Not that I can recall, no.
18     Q.  From the time you came on board, were they
19  referred to as orders of interest if the computer
20  generated violations of either the ceiling or the
21  tolerance, or were they called suspicious orders?
22     A.  I believe we were already starting -- I
23  believe we were already calling them order of interest
24  when I started. It's hard to recall, but I think we

Page 280

1  already were doing that.
2     Q.  Now, did you ever ask anybody, hey, why
3  are we changing the wording from in the past being
4  suspicious order to now being orders of interest? Did
5  you ever say that to someone, why was that done?
6     A.  Not that I can recall.
7     Q.  Would you agree with me if something is an
8  order of interest it's not required to be reported to
9  the DEA, but if it's deemed to be a suspicious order it
10  must be reported to the DEA if it shipped?
11        MS. DESH: Objection. Calls for a legal
12  conclusion.
13     A.  I don't know if it would differ between
14  using those two words, to be honest.
15     Q.  (By Mr. Shkolnik) Well, you only reported
16  confirmed suspicious orders when you joined the team;
17  correct?
18     A.  That or orders of interest. I can't -- I
19  think we used orders of interest from when I started on
20  the team. It's just hard to recall that far back.
21     Q.  So just so I understand, was every order
22  that was deemed an order of interest reported to the
23  DEA?
24        MS. DESH: Objection. Calls for

Page 281

1  speculation.
2     A.  To my recollection, we would review an
3  order of interest and understand that order and then
4  make that determination, as you put, thumbs-up,
5  thumbs-down.
6     Q.  And then once you did a thumb-up, you
7  could ship it and it wasn't a reportable event; if you
8  did a thumbs-down, you determined it was suspicious,
9  you didn't ship it, and you reported it as part of that
10  daily spreadsheet to the DEA?
11        MS. DESH: Same objection.
12     Q.  (By Mr. Shkolnik) Correct?
13     A.  To the best of my recollection, yes.
14     Q.  Did you ever ask anybody why they didn't
15  do that previously, why that type of process wasn't in
16  place for all of those flagged orders?
17     A.  Not that I can recall.
18     Q.  The next thing on the list is the American
19  Academy of Pain Management, document prepared and will
20  be sent to AAPM this weekend for review.
21        Did you ever see any documents that were
22  prepared by the RX Integrity group regarding some type
23  of an appearance or submission to the board of the
24  American Academy of Pain Management?

Page 282

1    A.   Yes.
2    Q.   Tell us about that, please, if you would.
3    A.   All I can recall is it was a general
4  document, and I just believe I was just reviewing it
5  for words or word selection.
6    Q.   Do you know what they were asking of the
7  AAPM?
8    A.   I'd have to read the document, but if I
9  recall I believe it was to get their support on how do
10 we work together to address opioids.
11        MR. SHKOLNIK:  If you could add to that
12 list at the end, if you would, I would ask that there
13 be a production of the communications with AAPM,
14 because from what we've seen to date we have not
15 received that, as well as the responses back from the
16 board and any follow-up work.
17   Q.   (By Mr. Shkolnik)  It goes on two sections
18 down, sanctioning of prescribers.  A meeting held with
19 loss prevention, field LP/MPD/EPD.  What is an LP?
20 That's loss prevention; am I correct?
21   A.   Correct.
22   Q.   MPD.  What's that?
23   A.   It's a market pharmacy director.
24   Q.   Where do they come into the level of

Page 283

1  hierarchy with the pharmacies?
2    A.   Pharmacy supervisor would report, I
3  believe, at that time to a market pharmacy director.
4    Q.   And what's an EPD?
5    A.   Executive pharmacy director.
6    Q.   So that's even above MPD?
7    A.   Correct.
8    Q.   And then who does EPD respond to -- report
9  to?
10   A.   I believe, if I recall, it was the vice
11 president for that region or operation.
12   Q.   Then it goes on to say looking to finalize
13 the decision of sanctioning nine out of 13 prescribers
14 for the pilot, will need to finalize all documents for
15 media and internal communications.
16        Did you ever see any of the documents
17 related to the sanctioning of physicians -- I'm
18 sorry -- prescribers, as well as documents for media
19 and the internal communications related to the
20 sanctioning of prescribers?
21   A.   I believe I may have seen the letter used
22 in the sanctioning pilot, but I did not see any media
23 or other communications that I can recall.
24        MR. SHKOLNIK:  Neither did we, and we

Page 284

1  would ask that you would add that to the list, please.
2    Q.   (By Mr. Shkolnik)  And the next thing is
3  target drug good faith dispensing, and it says pilot to
4  launch December 1.  So by the time you got there, it
5  was already launched; correct?
6    A.   To my recollection, yes.
7    Q.   And it says Chuck's group going to Vegas
8  mid-December to see pilot live.  Who's Chuck?
9    A.   I do not know.
10   Q.   And we don't know what was redacted there
11 as it says attorney-client privilege, so we'll skip
12 that.
13        Next section will be IMs.  Do you know
14 what IMs is?
15   A.   IMS.  They're a company that does health
16 care data.
17   Q.   I now have access to the demo tool, have
18 been working with Ray Stukel to learns the ins and outs
19 of using it.
20        Is this the same Ray that we saw in a
21 prior document that was utilizing Tableau --
22   A.   Yes.
23   Q.   -- to run reports?  When you joined RX
24 Integrity, was the IMS data available to RX Integrity?

Page 285

1    A.   Not that I can recall when I first
2  started, not yet.
3    Q.   But at some point it became one of the
4  tools available to RX Integrity, was it not?
5    A.   Yes, over time, yes.
6    Q.   And that helped you in determining --
7  doing your job in terms of approving suspicious order
8  monitoring, was it not?
9        MS. DESH:  Objection to the form.
10   A.   That data was around prescribers, so it
11 helped more with the top 500 prescribers or top 100
12 prescribers.
13   Q.   (By Mr. Shkolnik)  But it was utilized by
14 your RX Integrity team; correct?
15   A.   Correct.
16   Q.   Do you know if they were using a Tableau
17 interface to access the IMS data?
18   A.   I do not know at this time how they were
19 accessing it.
20   Q.   Did you access it yourself?
21   A.   Not at this time, no.
22   Q.   At some other time?
23   A.   When it became available to us, it was a
24 web-based portal.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    Q.   And how did you use it primarily?

2    A.   Just to look up prescriber information.

3    Q.   So if potentially suspicious orders made

4  its way up to you to take a look at, if some of the

5  information was contained from the store level that was

6  available to you, you could actually go into IMS and

7  look at that prescriber and see if there's some history

8  with that prescriber in terms of the medications?

9        MS. DESH:  Objection to the form.

10   A.   From what I recall, the tool was just

11 high-level what drugs the prescriber prescribes and how

12 many approximately.  It was more of just a high-level

13 demographic type of tool.

14   Q.   (By Mr. Shkolnik)  But it would help you

15 if you're looking at potentially -- at an order of

16 interest, and you're being asked to be the thumbs-up or

17 thumbs-down, you had that as a tool you could access

18 between yourself or your team during the year you were

19 there?

20       MS. DESH:  Objection to the form.

21   A.   I could assist in reviewing or answering

22 questions from the field around any prescribers or

23 reason, yes.

24   Q.   (By Mr. Shkolnik)  Thank you.  The last

Page 287

1  thing is decentralization of EPSC audit process.  Do

2  you know what EPSC is?

3    A.   That's electronic prescribing.

4    Q.   And what is in -- what is electronic

5  prescribing?

6    A.   When a prescriber sends a prescription

7  electronically or digitally to a pharmacy.

8    Q.   Actually, that's something that's become

9  more common today, and it helps with avoidance of

10 forging prescriptions, does it not?

11   A.   Ensures prescription integrity from the

12 prescriber to the pharmacy.

13       MR. SHKOLNIK:  We can go to this one.  I

14 have an agenda from -- or status, I should say -- for

15 January 28th, 2013.  We're going to mark as Exhibit

16 016.  Handing it to counsel.  Bates numbered 00708763.

17       [Exhibit Walgreens-Dymon-016

18       marked for identification.]

19   Q.   (By Mr. Shkolnik)  This is now -- the

20 agenda is now being sent from Tasha Polster to you with

21 a status.  Just going to go through some sections of

22 it.  Under that section that says redacted by -- I'm

23 sorry, redacted as attorney-client privilege.  The next

24 one says created TD GFD parameters pilot PowerPoint.

Page 288

1        What does TD mean?

2    A.   Target drug.

3    Q.   And was a target drug GFD -- is that you

4  made PowerPoints directly to certain types of drugs?

5    A.   To the whole principle or concept of

6  target drug good faith dispensing.

7    Q.   And was that something that you worked on

8  personally?

9    A.   Yes.

10   Q.   And then it says -- what's StoreNet via

11 Stellant?

12   A.   StoreNet is our internal website.

13   Q.   So the GFD PowerPoints could be uploaded

14 to this platform so people can utilize it or access it?

15   A.   Any content could be uploaded for stores

16 to utilize, yes.

17   Q.   It goes on to say that there was

18 webinars -- one was hosted in Knoxville, and there was

19 a complete webinar and Q&A for corporate and district

20 teams.

21       Were these the GFD, good faith dispensing,

22 programs that you were hosting and putting together?

23   A.   Yes, good faith and target drug good

24 faith.

Page 289

1    Q.   Now, at the bottom it says created compass

2  communication for CAP block screens.  What is that

3  referencing?

4    A.   That's, again, our clinical CAP block

5  system, and probably we were working on developing some

6  kind of clinical or informative block for stores on

7  prescriptions.

8    Q.   If we could jump down to NACDS.  What is

9  the NACDS?

10   A.   It's the national counselor industry for

11 pharmacy.

12   Q.   Are you personally a member of it?

13   A.   I am not.

14   Q.   Is Walgreens a member of it, to your

15 knowledge?

16   A.   I believe Walgreens and other pharmacies

17 are all members of it.

18   Q.   And it says completed best practices for

19 working NACDS document regarding red flags in

20 controlled substance dispensing with Patty Daugherty.

21       Did you work on that project at all?

22   A.   This was a document that a NACDS worker

23 created, and we were just giving our input and

24 comments.

Page 290

1  Q.  Who else from your group was putting
2  comments into this NACDS document regarding red flags
3  and controlled substance dispensing?
4  A.  From what I recall, Patty and I worked on
5  it. I'm not sure if anyone else worked on it after us.
6  I don't know.
7  Q.  Have you seen the final of that document?
8  A.  I may have, but I can't recall. I can't
9  remember.
10  MR. SHKOLNIK: I haven't seen it either.
11  We'd also add to the list that we be provided with the
12  NACDS documents and any communications related to that.
13  Q.  (By Mr. Shkolnik) Next section.
14  Controlled substance reporting district store level
15  Tableau reports. This is another time that we're
16  seeing that Tableau was being utilized. And here it
17  says goal to visually summarize CSOM data into a useful
18  and usable document on the district and store level.
19  Did you ever see any of those Tableau
20  reports for usable -- which contained usable data from
21  district and store level?
22  A.  We had some mockups. We were trying to
23  see if the tool could work and actually put the data in
24  a nice format for a field leader or a store to see,

Page 291

1  make it useful.
2  Q.  And it says Patty Daugherty set up a
3  meeting with Ray Stukel to discuss application of
4  Tableau. Steve Mills will work on a mockup of a report
5  we would send to RXS. Then it says creating a
6  checklist/guide with Patty Daugherty to explain the
7  Tableau report and what RXS needs to do at the store.
8  When was this all implemented?
9  A.  I don't think it ever was implemented,
10  because the Tableau just wouldn't design the data to
11  make it in a useful, easy way. I don't think we ever
12  utilized it.
13  Q.  But there were some mockups, and there
14  were some --
15  A.  There were some mockups.
16  Q.  And you had a chance to see those;
17  correct?
18  A.  I believe so, from what I recall.
19  Q.  Next section, New York hydrocodone C-II
20  change. So I think we may have mentioned this earlier
21  in our discussions. You were saying at some point
22  hydrocodone class was changed to C-II; am I correct?
23  A.  Correct.
24  Q.  So as of -- at least as of January 2013,

Page 292

1  C-II -- hydrocodone was now deemed to be a C-II in at
2  least one state?
3  A.  I don't remember in 2013 where it was
4  scheduled as a C-II. I just -- I don't recall.
5  Q.  Well, it says here that hydrocodone class
6  change in New York. So there was some work being done
7  in terms of your systems to reflect that; correct?
8  A.  Correct, but I don't know if it was in
9  January of 2013. I don't recall when New York
10  up-scheduled it.
11  Q.  I'm sorry. I think I understand what you
12  mean. So it may have happened before that, but you're
13  getting the system up and running; that's what they're
14  referencing here?
15  A.  To get it ahead of up and running until --
16  before the up-schedule would occur.
17  Q.  There's another section just below that
18  says master prescriber meeting. What is a master --
19  the future master prescriber system?
20  A.  The system of how just we manage
21  prescriber data, addresses, phone numbers, locations.
22  Q.  And that was something that was utilized
23  by RX Integrity in performing its functions?
24  MS. DESH: Objection to the form.

Page 293

1  A.  Again, it's just a demographic database
2  that just -- that's all it would have. It would have
3  no additional information outside of demographics and
4  licensing information.
5  Q.  (By Mr. Shkolnik) I'm going to hand you
6  Bates numbered 00675586, which is Exhibit 017.
7  [Exhibit Walgreens-Dymon-017
8  marked for identification.]
9  Q.  This is another one of the status reports.
10  This one is dated -- now we're in February of 2013.
11  There's an update regarding the GFD. And if we could
12  just go down to the second -- no, the second dot, under
13  GFD. Exception rule, oncology, hospice, and cancer
14  patients. Only 12 CPAP (sic) block were overridden for
15  this.
16  Could you tell us what that means?
17  A.  The clinical blocks that we have in place
18  on a prescription.
19  Q.  What is a clinical block?
20  A.  A clinical reason for dispensing a
21  prescription or if there was a counseling point with
22  the patient.
23  Q.  And if it was -- if the prescription was
24  for cancer, oncology, or hospice, that type of

Page 294

1  counseling wasn't necessary?
2      A.   It just was documented within the CAP
3  block that the team member would enter in.
4      Q.   And that would be one of the parameters
5  that would support the dispensing of the drug, if
6  someone was coming in for -- with a C-II prescription,
7  and the diagnosis is it was for oncology purposes,
8  hospice, or cancer, that would be an important factor
9  in saying this is a good prescription?
10     A.   Correct.  We're trying to start to
11 understand the patients that we serve.
12     Q.   What about if someone came in and this was
13 the third prescription, and it was because they had
14 their wisdom tooth removed?  Was there anything in the
15 GFD to kind of consider that patient?
16     A.   I don't believe -- there's not a specific
17 example like that in GFD, from what I recall.
18     Q.   From a GFD standpoint, if you have a
19 16-year-old kid who's coming in with their third
20 prescription of -- for 30 days of oxycodone, and the
21 prescription basis was a wisdom tooth 90 days earlier,
22 would that be some type of flag on the GFD?
23     A.   No, because that's a clinical
24 determination the pharmacist has to make.  That

Page 295

1  wouldn't be a red flag, not that I recall.
2      Q.   It says need to consider adding other
3  drugs, morphine and oxymorphone.  What does that mean
4  here?
5      A.   This is, again, a pilot.  We're looking at
6  understanding, gain education, and one of the ideas is
7  do we add additional drugs to this checklist.
8      Q.   So in the beginning of the GFD, morphine
9  and oxymorphone were not included in the checklist for
10 GFD?
11     A.   This is target drug good faith dispensing,
12 not GFD.
13     Q.   What does target drug mean?
14     A.   This is TD GFD pilot.
15     Q.   What's the target drug?  What's the
16 difference?
17     A.   Target drug -- it's a checklist based on
18 specific drugs.
19     Q.   So up until this point in time if someone
20 came in with an oxymorphone prescription, that wouldn't
21 trigger this TD, this target drug algorithm of
22 questions?
23     A.   Not at this time.
24     Q.   Was it ultimately included?

Page 296

1      A.   It could be added by district as needed in
2  the future.
3      Q.   Was oxymorphone considered a drug of abuse
4  during the 2013 time frame?
5      A.   I mean, again, not to the degree of oxy,
6  but again, it's in that same class, and I think that
7  was the consideration, do we put it in on there since
8  it's in the same class.
9      Q.   Morphine, on the other hand, was that sort
10 of dispensed on a much less basis than say the
11 oxymorphones, OxyContins, and the like?
12     A.   It might have been similar to oxymorphone,
13 maybe less than some of the others.  I'd have to look
14 at data to tell you a real answer.  I don't know.
15     Q.   If we go into the next section.  DEA
16 reentered project.  Is this what we were talking about
17 earlier, that there was -- one of the steps was to
18 update -- have a system in place where the pharmacist
19 could check the DEA numbers right through your ordering
20 platform?
21     A.   Through our Intercom Plus pharmacy system,
22 yes.
23     Q.   And it says at the bottom, goal, this
24 project is raising awareness as the RxS -- what is RxS?

Page 297

1  That's --
2      A.   The pharmacy supervisor.
3      Q.   And the RxM are concerned about filling
4  rxs with invalid DEA numbers.
5           Once this system went into place, did this
6  now start triggering from the pharmacy level that they
7  started realizing some of these docs may have had
8  expired DEA numbers and there may have been problems
9  with some of the prescriptions?
10     A.   Potentially that the DEA was expired or
11 the renewal was still in progress.
12     Q.   Do you know why the company didn't have
13 this in place long before 2013?
14     A.   I don't know.
15     Q.   I mean, it certainly would have helped if
16 you had questionable doctors out there with invalid DEA
17 numbers?  That would have helped the pharmacy level not
18 to distribute or not to sell or fill those
19 prescriptions; correct?
20          MS. DESH:  Objection to the form.
21     A.   Potentially.  Again, I don't know at the
22 time in the past how the DEA presented data to
23 entities, so it's all speculative on how that
24 information was provided, and the technological

Page 298

1  limitations potentially.
2      Q.   (By Mr. Shkolnik)  Whenever it was
3  technologically feasible to include this in the order
4  and suspicious order monitoring platform, you would
5  agree that that would have been a good time to put it
6  into the system to make it available as part of any
7  good faith dispensing practices; correct?
8          MS. DESH:  Objection to the form.
9      A.   Potentially, again, if we could make the
10  technology work and get the right amount of data.
11     Q.   (By Mr. Shkolnik)  What is HMS data?
12     A.   Healthcare Market Science.  They're a data
13  company.
14     Q.   So it says the white list, black list
15  project.  Work with IT to get the lists up on site.
16  Involved in the testing and functionality of the lists.
17  Goal, to fill the gaps in HMS data until the release of
18  master prescriber.
19          If you could explain to us what that's
20  talking about.
21     A.   HMS is where we received our prescriber
22  data from that feeds into our pharmacy system, so they
23  provide demographics, licensing information.  And at
24  this time data is not as fast as it is today, so there

Page 299

1  would be delays, which in essence we could
2  inadvertently block a prescription that the prescriber
3  actually has a real active DEA, just because the DEA
4  just updated it, but by the time it makes its way to
5  the vendor and then to Walgreens and then to the
6  system, there could be a delay.
7      Q.   And HMS was the vendor you were working
8  with at that time?
9      A.   Correct.
10     Q.   And master prescriber -- was that the
11  Walgreens platform where the HMS data was accessible to
12  the company?
13     A.   Correct.  That's like the database name,
14  yes.
15     Q.   And by the time you left RX Integrity, was
16  the master prescriber HMS data available to the team
17  when they were assessing whether or not an override
18  should be approved or whether or not orders should be
19  deemed suspicious or not?
20          MS. DESH:  Objection to the form.
21     A.   It was available, because it's again just
22  demographic data on a prescriber at this time.
23     Q.   (By Mr. Shkolnik)  And we're seeing again
24  this is an update on the NACDS red flag document.  Here

Page 300

1  it says Mike Umbley and Darem Dughri, D-U-G-H-R-I, are
2  reviewing the document.  Who are those two gentlemen?
3      A.   They're both pharmacists in the corporate
4  environment.
5      Q.   And then it says final factors determined
6  in what should make a red flag.  Did you ever see that
7  final document that was released back to NACDS?
8      A.   I may have, but I just -- I can't recall.
9  I don't remember.
10         MR. SHKOLNIK:  If we could add that to the
11  list, I would like the production of the NACDS red flag
12  document with the final factors.  It's not in what's
13  been produced, at least that we could find.
14     Q.   (By Mr. Shkolnik)  Now, here there's
15  something about compass communications, order cut to
16  zero.  What does order cut to zero mean?
17     A.   That means we canceled the entire order.
18     Q.   Was that something that would happen once
19  RX Integrity reviewed an order and did a full
20  assessment?
21     A.   That, and also the system as it was being
22  evolved would automatically do that as well.
23     Q.   Was it -- by this point in time in
24  February of 2013, was the system doing it

Page 301

1  automatically, the cut to zero, or was this just in the
2  process at this point in time?
3      A.   I believe it was doing it, but I really
4  can't recall.  I don't remember if it was exactly in
5  February or January or maybe started in March.  It was
6  sometimes around this time frame.
7      Q.   Now, it says the PDQ ordering is with
8  Steve Mills.  PDQ is pretty damn quick, pretty darn
9  quick?
10         MS. DESH:  Objection to the form.
11     A.   PDQ stands for pretty darn quick, I
12  believe.
13     Q.   (By Mr. Shkolnik)  And were those for a
14  period of time not running through the SOM system?
15         MS. DESH:  Objection.  Calls for
16  speculation.
17     A.   I can't recall.
18     Q.   (By Mr. Shkolnik)  Was it one of the steps
19  being taken by RX Integrity to stop PDQ ordering and
20  make them all go through the SOM or the CSOM process?
21         MS. DESH:  Same objection.
22     A.   I know we were integrating and working on
23  making sure it was all part of the process right at
24  this time, so it may have already been blocked; I just

Page 302

1  can't recall.

2      Q.    (By Mr. Shkolnik)  But there was a period

3  of time where PDQ was not being blocked; correct?

4          MS. DESH:  Objection.  Calls for

5  speculation.

6      A.    There may have been.  I just can't recall.

7      Q.    (By Mr. Shkolnik)  I'm going to hand you

8  the next exhibit, which is 18.  And it's an agenda from

9  December 19, 2013.  So now you're in the team for

10  almost going on a year, Bates numbered 00708764.

11          MR. SHKOLNIK:  Give it to counsel.

12          [Exhibit Walgreens-Dymon-018

13          marked for identification.]

14      Q.    (By Mr. Shkolnik)  In this report, this

15  is -- okay.  At this point in time the ABC distribution

16  transfer had already begun by the end of December 2013;

17  correct?

18          MS. SCHUCHARDT:  Objection.  Foundation.

19      A.    I believe, yeah, it was prior to this,

20  sometime around the end of 2013, the transition to ABC.

21      Q.    (By Mr. Shkolnik)  And down in projects,

22  it says current, and it says patient sanctioning policy

23  has been reviewed by Mike, is currently with Cheryl for

24  review.

Page 303

1          Can you tell us what that is?

2      A.    We were exploring potentially through data

3  like are there patients that we should just no longer

4  fill prescriptions for at Walgreens.

5      Q.    Was that ever implemented?

6      A.    I can't recall.  I don't know.

7      Q.    And that was something being handled up at

8  the RX Integrity level; correct?

9      A.    Yes.

10      Q.    I'm going to hand you what's been marked

11  as Exhibit 019.  Bates number is 708766.  It's another

12  agenda.  This is now April of 2017 -- sorry, April 17,

13  2014.  Tasha Polster to yourself.

14          [Exhibit Walgreens-Dymon-019

15          marked for identification.]

16      Q.    So now, if I'm not mistaken, you're in the

17  team for over a year and a few months; correct?

18      A.    Correct.

19      Q.    By this time in April 2014, Amerisource

20  Bergen is now handling the distribution of the

21  controlled substances for Walgreens; correct?

22      A.    I believe so, yes.

23      Q.    Under DEA issues, it says for One -- for

24  One Walgreens, we are scrubbing DEAs from HMS for OW

Page 304

1  every week.  What does that mean?

2      A.    That we're just verifying the DEAs with

3  the DEA website due to latency in data.

4      Q.    So you're updating -- you're actually

5  using HMS data to update your database?  Is that what

6  that's saying?

7      A.    Correct.  HMS updates our database, but

8  again there are occasions when the data is delayed, the

9  DEA may have more up-to-date information on their

10  website.

11      Q.    Down at the bottom, it says projects,

12  current, ceiling limits.  And it says cloned ceilings

13  are in place for all oxy IR products and any other

14  products that were on the tracking due to Plano

15  changes.

16          What does that mean?

17      A.    If I recall, I just believe we were

18  looking for a way to, when products came into the drug

19  class, how can we carry over the same data setup for

20  those in the system without having to manually do it

21  over and over.

22      Q.    And it says all hydro and -- hydro/apap

23  products have been set to corporate limits.  What does

24  that mean?

Page 305

1      A.    I believe at that time we were working

2  with ceiling limits and ensuring that all these

3  products -- these products, this class was treated

4  equally, that they're all the same.

5      Q.    So they were already being included in

6  ceiling limits, but there may have been differences

7  depending upon the drug, so they were all then grouped

8  into one same ceiling class?

9      A.    I believe so.  We made it more strict.

10  Yes.

11      Q.    Why was that done in April of 2014 and not

12  when the whole ceiling system was launched?

13      A.    I do not know, but I know probably part of

14  the cloning data helped us do that.  So -- from what I

15  recall.

16      Q.    The cloning data?  Oh, from the -- from up

17  above?

18      A.    Correct.

19      Q.    So there was a technological ability to

20  then compare the different drugs in the class and

21  keeping them all similar?

22      A.    There may have been something along those

23  lines.  I just -- I can't recall.  I know there was

24  probably some technology changes that helped us.

Page 306

1    Q.   But if someone wanted to, they could have
2  said every hydro/apap product should have the corporate
3  ceiling when the SOM ceiling limits was first rolled
4  out?  If someone wanted to, they could have done that?
5    A.   Maybe.  I don't know, again, when it was
6  developed and rolled out if they could do that kind of
7  functionality.
8        MR. SHKOLNIK:  How much longer do we have
9  yet?
10       THE VIDEOGRAPHER:  58 minutes.
11       MR. SHKOLNIK:  Let's take our break now.
12  I just want to tighten up on some of the things I have
13  and see what I'm going to cover.
14       THE VIDEOGRAPHER:  We're off the record at
15  4:55 PM.
16       [A brief recess was taken.]
17       THE VIDEOGRAPHER:  We're back on the
18  record at 5:10 PM.
19    Q.   (By Mr. Shkolnik)  Mr. Dymon, I'm going to
20  hand you what's being marked as Exhibit 020.  It's an
21  e-mail dated 6-19-2013 from Tasha Polster, Bates
22  numbered 316771.
23       MR. SHKOLNIK:  Give it to counsel.
24       [Exhibit Walgreens-Dymon-020

Page 307

1        marked for identification.]
2    Q.   (By Mr. Shkolnik)  Who's Deb Bish -- Debra
3  Bish; do you know?
4    A.   She's a team member who I believe works in
5  our -- worked or still may work at our distribution
6  center.
7    Q.   And this e-mail, I'm not quite sure if
8  you're on this distribution, but it's from Deb Polster
9  (sic) announcing the RX Integrity team and the DEA
10  agreement.
11       Do you recall -- do you recall Ms. Polster
12  issuing notification about the settlement with the DEA
13  or the agreement with DEA, as well as introducing the
14  RX Integrity group?
15    A.   I do recall, I know she made various
16  announcements within corporate to teams about the RX
17  Integrity team.
18    Q.   And you -- at that point in June of 2013,
19  you were certainly part of the Pharmaceutical Integrity
20  team; correct?
21    A.   Correct.
22    Q.   Was it your understanding that once the
23  team came in place, the suspicious order monitoring
24  policies were distributed to the different distribution

Page 308

1  centers and the different regions so that everyone
2  understood what the procedures were going forward with
3  respect to suspicious order monitoring; correct?
4    A.   Yes, from what I recall.
5    Q.   And this says that there should be a
6  contact person at each district distribution center,
7  there would be one person that would be the recipient.
8  It says I need documentation of one person in each DC,
9  some of which I have already gotten back, acknowledging
10  their receipt of the suspicious order monitoring policy
11  and procedures.
12       Were you aware that was one of
13  requirements going forward?
14    A.   Yes, that Tasha was requiring of the DCs,
15  yes.
16    Q.   And at the bottom it says it's been a long
17  year-and-a-half getting this DEA settlement in place.
18  We want to ensure we have proper documentation and
19  accountability for this compliance piece.  Your follow
20  through is critical.
21       By June of 2013, you had become aware that
22  the DEA investigations had been going on for about a
23  year-and-a-half, and right about the day of this
24  notification was when the settlement was reached or

Page 309

1  entered and signed by Walgreens with the DEA; correct?
2    A.   Possibly, based on my recollection.  I
3  don't know the exact date, but somewhere around this
4  time.
5    Q.   And if we go to Bates numbered 773, she's
6  providing an overview of the Pharmaceutical Integrity
7  group.  And it says RX Integrity was created to protect
8  and grow Walgreens controlled substance business while
9  transforming community pharmacy to play a greater role
10  in the opioid narcotic epidemic and protect our
11  business against high risk prescribers.
12       Did you help her in crafting this policy
13  statement to go out to the company?
14    A.   I cannot recall.  I don't know.
15    Q.   But you agree with that, though; correct?
16    A.   With the statements, yes.
17    Q.   RX Integrity is responsible for managing,
18  creating, and maintaining controlled substance
19  dispensing, monitoring, and reporting programs,
20  including the good faith dispensing policy and the
21  national good faith dispensing program.
22       What's the difference between the good
23  faith dispensing policy and the national good faith
24  dispensing program?

Page 310

1    A.  I think the national good faith dispensing
2  program was the name to what became targeted drug good
3  faith dispensing, I believe.  I'm not for certain, but
4  I think that's what it was.
5    Q.  And she goes on to say RX Integrity team
6  identifies and minimizes loss of company assets and
7  ensures the safety, compliance, and security of the
8  ordering and dispensing of controlled substances.
9      You would agree that that was one of the
10  charges that your group had; correct?
11    A.  Correct.
12    Q.  And you were also charged with the
13  obligation, the team, to investigate and report
14  potential violations of laws, regulations, or company
15  policy internally and suspicious orders externally to
16  the DEA, state boards, and other agencies as required;
17  correct?
18    A.  Correct.
19    Q.  Did you ever sit down with Tasha and the
20  other people, whether it was Mr. Swords or anybody
21  else, and say why didn't we implement this type of
22  policy long before June of 2013 as a result of a
23  agreement with the DEA?  Did you ever say that to her?
24    A.  Not that I can recall.

Page 311

1    Q.  I mean, as you're sitting here today, does
2  it make you wonder why didn't your company -- which you
3  spent a lot of years with -- why didn't your company do
4  something like this long before 2013?
5    A.  I think, again, it's an evolving -- it was
6  an evolving problem at this time, and it's hard to
7  understand early on, it sometimes takes time to really
8  understand what's going on.
9    Q.  Once you implemented the good faith
10  dispensing policies, the sales of OxyContin dropped
11  considerably, didn't it?
12    A.  I believe there was a reduction.  I don't
13  know to what degree.  I just can't recall.
14    Q.  If we could go to Bates numbered 776.
15  This is a document we looked at before as an
16  attachment, I think, to Exhibit -- I think it was 10.
17  The -- let me double-check that.  Yes.  Exhibit 010.
18  It was attached to the Mount Vernon, Illinois,
19  distribution center SOM policy.
20      Was this document a -- prepared with your
21  input before it was adopted and distributed throughout
22  the company?
23    A.  It may have -- I can't recall, but I may
24  have been involved in certain sections of it.

Page 312

1    Q.  If we could turn to Bates numbered 6783.
2  At the bottom.  We have a -- this template that we
3  looked at some examples of before.  Ultimately was this
4  template what was officially adopted as the daily
5  report to the DEA?
6    A.  I believe so, to my recollection.  I'd
7  have to go back and look at time -- but I believe it
8  looks like that's what was used.
9      MR. SHKOLNIK:  Catch up.  I think we're at
10  021?
11      MS. THOMPSON:  Yes.
12    Q.  (By Mr. Shkolnik)  I'm going to hand you a
13  document, Exhibit Number 021.  Bates number is
14  PPLPC004003365800.
15      MR. SHKOLNIK:  Give it to counsel.
16      [Exhibit Walgreens-Dymon-021
17      marked for identification.]
18    Q.  (By Mr. Shkolnik)  This is a PowerPoint
19  which was produced by Purdue.
20      MR. SHKOLNIK:  And yes, it was on the list
21  of documents we notified that we would use.
22    Q.  (By Mr. Shkolnik)  Are you familiar with a
23  company called McKinsey?
24    A.  I heard the name.  They might be a

Page 313

1  consulting firm.  I'm not sure.
2    Q.  McKinsey and Company.  This appears to be
3  an analysis done by McKinsey for Purdue, focusing on
4  its OxyContin growth opportunities.
5      First, have you ever seen this McKinsey
6  report?
7    A.  Not that I can recall.
8      MR. SHKOLNIK:  If we could turn to Bates
9  numbered 802, which is Page 6 of the PowerPoint.  Next
10  page, please.
11      TRIAL TECHNICIAN:  They all have the same
12  Bates number.  I just noticed that.
13      MR. SHKOLNIK:  Oh, they do?
14      TRIAL TECHNICIAN:  Yeah.  I just realized
15  that.
16      MR. SHKOLNIK:  Okay.  Wow, that's
17  interesting.
18      MS. DESH:  Produced natively, maybe.
19      MR. SHKOLNIK:  They cheated themselves on
20  pages.
21    Q.  (By Mr. Shkolnik)  If you look at the
22  section where it says by using available store-level
23  inventory and purchasing data, we have attempted to
24  quantify the extent and impact of the access issues,

Page 314

1  some preliminary findings.
2          Were you aware that Walgreens was
3  providing store-level inventory and purchasing data to
4  McKesson -- I'm sorry, to -- I'm sorry to the McKesson
5  lawyer -- to Purdue back in 2013 -- let me start that
6  one all over again. I'm sorry. Just getting tired.
7          Were you aware of Walgreens provided
8  store-level inventory and purchasing data to Purdue
9  regarding its OxyContin?
10     A.   Not that I was aware -- not that I can
11 recall.
12     Q.   I mean, would it surprise you that the
13 company would be sharing its store-level inventory and
14 purchasing data with a manufacturer who's a supplier of
15 drugs you sell?
16     A.   I don't know why they would share the
17 data. I don't know the reason for it or what agreement
18 they would have had.
19     Q.   Are you aware that they actually charged
20 Purdue for the data they provided, that they were
21 actually making money on that exchange of data?
22          MS. DESH: Objection. Calls for
23 speculation.
24     Q.   (By Mr. Shkolnik) I mean, if he knows.

Page 315

1      A.   Not that I was aware of.
2      Q.   Walgreens implemented its good faith
3  dispensing policy around March of 2013. And it goes to
4  say post this policy, Walgreens's estimated monthly
5  dispensing volume of OxyContin declined approximately
6  34 percent from March of 2013 to June of 2013.
7          Does that sound consistent with what your
8  recollection was, that once you got on the road and you
9  started doing the presentations for good faith
10 dispensing and the new relaunch that the sale of
11 OxyContin was dropping rapidly?
12     A.   Not specific to the drug. I just know
13 overall controls went down.
14     Q.   I mean, dropping 34 percent for OxyContin
15 in a three-month period -- if that number is accurate,
16 sir, you would agree with me that is a significant drop
17 in sales of a single product; fair statement?
18     A.   Fair to say that could be a significant
19 drop.
20     Q.   And do you know why your company did not
21 aggressively enforce a good faith dispensing policy as
22 far as back as 2009 or 2010 to try to head off the
23 growth of OxyContin sales at its stores?
24          MS. DESH: Objection. Misrepresents the

Page 316

1  record.
2      A.   No, I would not know.
3      Q.   (By Mr. Shkolnik) Do you know why your
4  company didn't implement an aggressive -- I think you
5  said it was TD or NGFD policy -- prior to 2010 to cause
6  a drop in OxyContin prescriptions back then?
7      A.   I would not know.
8      Q.   Would you agree with me your good faith
9  dispensing initiative and the TD -- what was the TD for
10 again? I just went blank.
11     A.   Target drug.
12     Q.   Target drug dispensing policy -- do you
13 agree with me that it was very effective, very
14 effective, sir, in helping to drop the number of opioid
15 prescriptions that were filled at Walgreens pharmacies?
16     A.   I believe it was one of many tools that we
17 launched that helped pharmacists make an informed
18 decision whether to fill or not fill a prescription.
19     Q.   Was the company supporting the pharmacists
20 in terms of not filling prescriptions that were
21 potentially suspicious prior to relaunching GFD and
22 target -- target drug program?
23          MS. DESH: Objection to the form.
24     A.   Company always let pharmacists use their

Page 317

1  professional discretion, support their choice to
2  dispense or not to dispense a prescription.
3      Q.   (By Mr. Shkolnik) What happened in March
4  of 2013 that all of a sudden caused pharmacists to not
5  fill prescriptions, resulting in a 34 percent decline
6  in the number of OxyContin pills sold? What happened?
7  What did you guys do?
8          MS. DESH: Objection. Calls for
9  speculation.
10     A.   I would like to think that the work RX
11 Integrity was doing in developing education, hosting
12 the webinars and discussions, and raising awareness is
13 what helped to lead to this information that you're
14 saying.
15     Q.   (By Mr. Shkolnik) Basically you guys did
16 a really good job; correct?
17     A.   We did our job. Good or bad, I don't know
18 how you judge that, but I would say we were trying to
19 help solve and help figure out what can we do, how do
20 we educate and inform people.
21     Q.   Ultimately, if you look at it, dropping
22 sales of OxyContin during an epidemic was doing a very
23 good thing, was it not?
24     A.   It can be viewed as that, yes.

Page 318

1    Q.   I mean, you'd view it as that? I'm asking
2    your opinion, sir.
3    A.   I feel -- I feel that we did a good job of
4    educating our pharmacists and helping them make an
5    informed decision.
6    Q.   And possibly helping to save a lot of
7    lives by reducing the number of prescriptions that were
8    filled, potentially unnecessary prescriptions; correct?
9         MS. DESH: Objection to the form.
10   A.   Could impact patient care and patient
11   life, possibly.
12   Q.   (By Mr. Shkolnik) It goes on to say this
13   compares to one percent decrease over the same period
14   for all other pharmacies.
15        So what you're -- what the manufacturer of
16   OxyContin had determined is that at the same time that
17   you were able to get your company sales of OxyContin to
18   drop by 34 percent, the rest of the pharmacies in the
19   United States that hadn't implemented your good faith
20   dispensing policies had only dropped one percent during
21   the same time frame.
22        Am I reading that correctly?
23   A.   According to the information on the
24   document, yes.

Page 319

1    Q.   And it says Walgreens accounted for 90
2    percent of the OxyContin decline, seven percent of the
3    eight percent overall OxyContin decline, over this
4    period.
5         So basically by you implementing your good
6    faith dispensing policies and targeted distribution,
7    targeted drug policies, your company was able to
8    reduce -- well, cause a major decline, 90 percent of
9    the decline of the OxyContin sales of the company that
10   was making OxyContin, Purdue; correct?
11   A.   According to the information on the slide,
12   yes.
13   Q.   Do you know -- were you also having that
14   effect on the generics that were being manufactured and
15   sold, manufactured by Mallinckrodt? Do you know if
16   they were dropping as well at that time?
17   A.   All controlled substances I believe were
18   declining at that time.
19        MS. HARDYMON: Objection. Form.
20        MR. SHKOLNIK: I was waiting for that.
21        THE REPORTER: Who was that on the phone,
22   please?
23        MS. HARDYMON: Teresa Hardymon for
24   Mallinckrodt.

Page 320

1         THE REPORTER: Okay. Very good.
2         MR. SHKOLNIK: Just wanted to keep you
3    awake.
4         MS. HARDYMON: I'm still here.
5    Q.   (By Mr. Shkolnik) Just so it's clear, was
6    it your understanding that by the aggressive
7    implementation of target drug and good faith
8    dispensing, not just OxyContin, the brand drug, but all
9    of the controlled substances dropped, the numbers
10   dropped considerably following the implementation;
11   correct, sir?
12   A.   Correct, to my understanding.
13   Q.   Was that something that the company
14   tracked? Were you able to track that data back then?
15   A.   Yes, we could see dispensing data and
16   declines, yes.
17   Q.   They also go on to say that fewer
18   Walgreens stores are carrying high-dosage, 60 milligram
19   and 80 milligram, OxyContin.
20        Do you know if that was caused by less of
21   the drug being -- less of the prescriptions being
22   filled by the pharmacists as a result of the GFD and
23   the TD process?
24   A.   Potentially. I don't know. Hard to say

Page 321

1    if it was part of the process or prescribing behaviors
2    were changing potentially.
3    Q.   Do you believe -- do you really believe
4    that prescribing habits changed that much between March
5    2013 and June of 2013 to cause a drop in the carrying
6    of high-dosage 60 and 80 milligram OxyContin in your
7    stores, as opposed to implementing your good faith
8    dispensing policies and your targeted drug policies?
9    A.   Just -- it's one factor of it. One part
10   of it.
11   Q.   I mean, if you're not filling -- if you're
12   not willing to fill as many of those prescriptions,
13   based upon your good faith dispensing practices, your
14   computer system is going to take that into
15   consideration and not order more of them; correct?
16   A.   Correct.
17   Q.   I mean, they go hand-in-hand, the
18   processes, in terms of the algorithms of the computer
19   ordering system; correct?
20   A.   Correct.
21        MS. DESH: Objection to the form. Calls
22   for speculation.
23        MR. SHKOLNIK: That was a good one for
24   your client.

Page 322

1    A.   Part of the whole system, it is.

2    Q.   (By Mr. Shkolnik)  Thank you.  If we could

3  turn to Page 11.

4        MR. SHKOLNIK:  I'm not going to tell you

5  the Bates number.

6    Q.   (By Mr. Shkolnik)  Here's a graph of the

7  monthly OxyContin purchasing by the pharmacy chain that

8  was produced to us by Purdue.

9        And it shows, given Walgreens was

10  approximately 21 percent of the total store-level

11  purchase of OxyContin in January of 2013 and

12  Walgreens's purchasing volume fell by 34 percent,

13  Walgreens alone accounted for a seven percent decrease

14  in OxyContin from March to June.

15       You would have no reason to disagree with

16  Purdue's assessment of their own drop in sales;

17  correct?

18   A.   I don't know the exact number, but no, I

19  would not disagree with the drop in sales.

20   Q.   And basically that -- what we're seeing

21  here in terms of the colored graph is that Walgreens in

22  terms of the chains had gone from six, maybe six and

23  three quarter million tablets a month down to looks

24  like four and a quarter million tablets a month just

Page 323

1  between September of 2012 and May of 2013; correct?

2    A.   Correct, according to the graph.

3    Q.   And the launch of the GFD was January

4  13 -- January of 2013; correct?

5    A.   GFD relaunches and TD GFD pilots, yes.

6    Q.   And from that point it pretty much went

7  downhill to that 34 percent decline into June of 2013,

8  according to the Purdue sales document; correct?

9    A.   Correct.

10   Q.   And your competitors, CVS, Rite Aid, other

11  chains, and Walmart, pretty much stayed fairly

12  consistent, very minor drops during that same time

13  frame; correct?

14   A.   Minor to no change in the graph, correct.

15       MR. SHKOLNIK:  Can we go to the next page,

16  Page 12?

17   Q.   (By Mr. Shkolnik)  We look at the right,

18  it says most of the decline in OxyContin units between

19  March 2013 and June of 2013, as well as between

20  September 2012 and June of 2013, is attributable to

21  Walgreens.

22       Would you agree, sir, that there was

23  probably -- a lot of that was dependent upon the

24  successful launch of good faith dispensing and targeted

Page 324

1  drug dispensing habits?

2    A.   Correct, along with all the education to

3  the stores and field leaders.

4    Q.   I mean, don't -- do you think it's kind of

5  amazing that simply training the pharmacists and

6  encouraging the pharmacists to question the

7  prescriptions could generate such an immediate change

8  in the number of OxyContins that were hitting the

9  street --

10       MS. DESH:  Objection --

11   Q.   (By Mr. Shkolnik)   -- in such a short

12  period of time?

13       MS. DESH:  Objection to the form.

14   A.   It's one of the tools we were able to

15  utilize to help our pharmacists gain a better

16  understanding of what was going on.

17   Q.   (By Mr. Shkolnik)  I'm going to show you

18  Exhibit Number 022.  Bates number is 707955.

19       MR. SHKOLNIK:  Give this to counsel.

20       [Exhibit Walgreens-Dymon-022

21       marked for identification.]

22   Q.   (By Mr. Shkolnik)  This appears to be a

23  PowerPoint that was presented by Pharmaceutical

24  Integrity in May of 2013.  We found this in your --

Page 325

1  what we call the custodial file.

2        Do you recall working on this PowerPoint

3  presentation?

4    A.   Yes, I do.

5    Q.   And if I -- if I'm not mistaken --

6  withdraw that.

7        Can we go to Pages 961, 962?  Those are

8  actually the same timeline of events that we went

9  through before under an earlier exhibit, which was Mr.

10  Bleser's January of 2013 quarterly presentation;

11  correct?

12   A.   Correct.

13   Q.   And it basically outlined the history of

14  the problem with respect to opioids, tying it back to

15  the Florida pill mills in pre-August 2010; correct?

16   A.   Correct.

17   Q.   If we can go back to Page Number 959.  You

18  included in there a national prescription drug epidemic

19  slide.

20        And in this one, on the right-hand side,

21  it shows accidental deaths in the United States by type

22  of drug.  And it said -- it showed in red, with bold

23  letters, painkillers were going up from it looks like

24  under around 4,000 deaths up to more than 15,000 deaths

Page 326

1  caused by painkillers, far exceeding cocaine and
2  heroine; correct?
3      A.   Correct.
4      Q.   Why did you include that in a PowerPoint
5  presentation on Pharmaceutical Integrity?
6      A.   I don't know if I made this slide or it
7  may have been made previously by Tasha, but again, when
8  we're educating the field, we want to make them
9  aware -- and CDC, this is data from the CDC, and again,
10 that's a reputable data source -- helps pharmacists
11 understand what is going on, or any leadership, what's
12 going on in the industry.
13     Q.   And I would be correct in stating when you
14 put this as part of a presentation, you were trying to
15 give data so the people that you're talking to
16 understand the significance of the problem that you
17 were dealing with in 2013, once RX Integrity came into
18 existence; correct?
19         MS. DESH:  Objection to the form.
20     A.   Correct.  That's to help them understand,
21 yes.
22         (By Mr. Shkolnik)  And it says issue of
23 drug diversion and abuse has drawn the attention of the
24 public health officials, regulatory agencies, and

Page 327

1  public policy makers on a state and national level.
2         Dramatic increases in the use of and
3  addiction to controlled substance pharmaceuticals have
4  been seen for decades.
5         When did you first become aware that there
6  were dramatic increases in the use of and addiction to
7  controlled substance pharmaceuticals having been seen
8  for decades?  When was the first time you, Mr. Dymon,
9  recognized that?
10     A.   When I was working on this presentation,
11 reading the information from the CDC.
12     Q.   Was that surprising to you?
13     A.   It was, actually, yes.
14     Q.   I mean, that statistic right there,
15 painkillers exceeding cocaine and heroine by two and
16 three times the death numbers -- that's a fairly
17 shocking statistic; correct?
18         MS. DESH:  Objection to the form.
19     A.   It shows the statistical significance, it
20 looks -- yes.
21     Q.   (By Mr. Shkolnik)  And it says
22 prescription drug abuse increases traffic accidents,
23 crime, and overdoses.
24         The DEA is increasing its focus on

Page 328

1  wholesalers and pharmacies in attempt to battle what
2  the Centers for Disease Control and Prevention calls a
3  prescription drug abuse epidemic.
4         Was this the first time that you, Mr.
5  Dymon, became aware that there was now a determination
6  by the CDC that there was a prescription drug abuse
7  epidemic?
8      A.   To the best of my understanding, yes, and
9  recollection.
10     Q.   Up to this time, you, Mr. Dymon, working
11 at Walgreens and having a Pharm D and are working in
12 stores, had not reached that conclusion; fair
13 statement?
14     A.   To the best of my recollection, yeah, not
15 until I saw some things in the media in 2011, 2012
16 starting to occur.
17     Q.   And if we could turn now to 7960.  And it
18 shows that same graph that we looked at in Mr. Bleser's
19 January 2013 PowerPoint.  It shows the leading cause of
20 accidental death was prescription drugs, surpassing
21 motor vehicles and all other drugs; correct?
22     A.   Correct.
23     Q.   And that occurred in between 2010 and
24 2011; correct?

Page 329

1      A.   Correct, according to the graph.
2      Q.   And you're citing a statistic that this
3  came out of California, but you also saw multiple
4  examples across the country where leading cause of
5  accidental death is prescription pain medications, in
6  particular, opioid use; correct?  That was your
7  citation?
8      A.   This was -- I believe Tasha created this,
9  but yes, that would be correct.
10     Q.   When you got this presentation, when you
11 had a chance to see it and you saw that there was
12 multiple examples of this across the country,
13 specifically as it related to prescription pain
14 medication, opioid use, was this a shocking statistic
15 to yourself, sir?
16         MS. DESH:  Objection to the form.
17     A.   I was developing educational materials
18 that -- again, it calls out the concern over the use of
19 prescription drugs.
20     Q.   (By Mr. Shkolnik)  And did you ever
21 question why additional steps weren't taken by your
22 company prior to 2013 to help head this off?
23     A.   Not that I can recall.
24     Q.   Do you agree that if good faith dispensing

Page 330

1 and targeted dispensing had been implemented earlier,
2 that may have had some effect on the epidemic as it was
3 growing?
4         MS. DESH: Objection to the form.
5     A.  Potentially.  It's a multifaceted
6 approach.  There's a lot of things that go into
7 controlling an epidemic, so we're just one part of it.
8     Q.  (By Mr. Shkolnik)  But --
9     A.  But it potentially could have.
10        MR. SHKOLNIK:  If we could just turn to
11 Page 64.  This document up on top, if you could blow
12 that up for us, please.  I hope it doesn't get too
13 fuzzy.  Oh, good job.
14    Q.  (By Mr. Shkolnik)  Could you tell us what
15 we're looking at here in terms of the target drug GFD
16 checklist?
17    A.  This is a checklist that RX Integrity
18 created to help pharmacists in making decisions around
19 the dispensing of a prescription.
20    Q.  So if we're looking at this, a pharmacist
21 has this on a computer; am I correct?
22    A.  They print it off a computer.  It's on a
23 sheet of paper.
24    Q.  Oh, so they actually do this by hand?

Page 331

1 This would be written in by hand by the pharmacist?
2     A.  Correct.
3     Q.  So here they would put the patient's name,
4 the RX number, and the date, so that would be
5 client-specific data that was captured; correct?
6     A.  Correct.  That's the patient's
7 information.
8     Q.  And then at the time this form was
9 utilized, it was -- they had to do it for oxycodone,
10 hydromorphone, and methadone, and then they could --
11 there could have been optional other C-IIs it applied
12 to; correct?
13    A.  Correct.
14    Q.  And the type of things that good faith
15 dispensing suggested was check to see if they have a
16 valid government ID, and actually attach a hard copy,
17 take a photocopy of it some type; correct?
18    A.  Correct.
19    Q.  No GFD refusal for particular prescription
20 in the patient comments on IC profile.  So that's
21 saying look in our system, and let's see if that
22 patient has tried to fill a prescription before, and if
23 it's been rejected on the GFD; correct?
24    A.  Correct.

Page 332

1     Q.  Because sometimes you have pharmacy
2 shoppers, patients that will go to multiple pharmacies;
3 correct?
4     A.  Correct.
5     Q.  And your computer system would actually
6 pick it up if John Smith or Jane Smith was in your
7 system, you could be able to see, wait a second, we got
8 a GFD rejection down the street last month -- it would
9 flag it here as well; correct?
10    A.  Correct.  A team member could see the
11 system, the note.
12    Q.  And if available in your state, PDMP -- so
13 it's telling you if you have that system, because not
14 everybody had that system in 2013, but if you have it,
15 check it?
16    A.  Correct.
17    Q.  The physician -- I'm sorry -- the
18 prescription drug monitoring program; correct?
19    A.  Correct.
20    Q.  And the next thing it says additional
21 checklist requirements, if every no is a red flag, use
22 your professional judgment.
23        So that means if they had no photo ID --
24 what would be the -- which "nos" would be the red flag?

Page 333

1 So if there's no government ID, that would be a red
2 flag; correct?
3     A.  Correct.  Any no would be considered a red
4 flag.
5     Q.  Well, if it was -- oh, so if it was -- if
6 it was a no to no GFD refusal, would that be a yes?
7     A.  Applies to the section going down.
8     Q.  Okay.
9     A.  Yeah.  Sorry.
10        [Discussion off the record.]
11    Q.  So we have under this section, patients
12 have received this prescription from Walgreens before,
13 prescription is from the same prescriber, for the same
14 medication as previous fill, patient and/or prescriber
15 address is within geographical proximity to pharmacy,
16 variances can be explained.
17        So this was -- someone who has a
18 geographical proximity not near the pharmacy, they
19 would have to explain why they're coming to a local
20 pharmacy as opposed to filling where they live;
21 correct?
22    A.  Correct.
23    Q.  I mean, if it's a snowbird and they're
24 filling their prescription in Florida, that may be an

Page 334

1 explanation; correct?
2    A.   Correct.
3    Q.   But if someone is coming from Ohio or
4 Tennessee every three or four weeks and going to a
5 little pharmacy in some small town in Florida, that may
6 be a harder explanation; correct?
7    A.   Correct.
8    Q.   Prescription is being filled on time --
9 that's a good thing, that's a good sign; correct?
10    A.   Correct.
11    Q.   Third-party insurance versus cash;
12 correct?
13    A.   Correct.
14    Q.   Cash is a red flag, is it not?
15    A.   Correct.
16    Q.   What's a cash discount card?
17    A.   A card that acts like an insurance, but
18 it's not, that gives a discount off of a cash price on
19 a prescription.
20    Q.   And I guess it's higher prescription units
21 versus lower prescription units is a flag?
22    A.   Correct.
23    Q.   And then patient has been the same
24 medication, strength, and dose for less than six

Page 335

1 months.  What is the significance of that?
2    A.   Again, has the patient just started this
3 medication, or have they been consistently on it.  It's
4 to understand the clinical state of the patient.
5    Q.   And then if for whatever reason the
6 pharmacist now feels they want to call -- prescriber
7 calls could be necessary, so then these are the type of
8 questions that would be asked of the prescriber;
9 correct?
10    A.   Correct, to help guide that conversation
11 with the prescriber for the pharmacists.
12    Q.   And then at the bottom, it says whether or
13 not it's dispensed or refused, and the person has to
14 sign off on who did it; correct?
15    A.   Correct.
16    Q.   Now, is this ever entered into the system
17 electronically, any of it?
18    A.   No.
19    Q.   So how would someone know if GFD was
20 refused at another store?
21    A.   The team member would enter comments into
22 our Intercom Plus system.
23    Q.   So all of this data would just be kept on
24 paper in the store, not transferred up to the company?

Page 336

1    A.   Correct.
2    Q.   But if -- let's assume an override request
3 is sought from the store to help fill one of these
4 prescriptions.  Would RX Integrity have any access to
5 get some of this information, if needed?
6        MS. DESH:  Objection to the form.
7    A.   We could contact or speak to the field
8 leader, who could then actually go and check on the
9 form for us.
10    Q.   (By Mr. Shkolnik)  And actually, some of
11 the requests from the supervisor, or the manager, the
12 G -- the override forms and the discussion between
13 supervisor and manager would actually include some of
14 this information to explain whether or not an order was
15 appropriate or not; correct?
16        MS. DESH:  Objection to the form.  Calls
17 for speculation.
18    A.   Elements could be included in any -- in an
19 e-mail or any override form to give us information,
20 yes.
21    Q.   (By Mr. Shkolnik)  And that then goes up
22 to your team, who then may either fill or kill that
23 order; correct?
24        MS. DESH:  Same objection.

Page 337

1    A.   Correct, to approve or to cancel, yes.
2        MR. SHKOLNIK:  How am I doing?
3        THE VIDEOGRAPHER:  19 minutes.
4    Q.   (By Mr. Shkolnik)  We're going to hand you
5 a document marked as Exhibit 023, and it's excerpts
6 from your annual reviews in your personnel file.
7        [Exhibit Walgreens-Dymon-023
8        marked for identification.]
9    Q.   We're not really going to go into much of
10 it.  Just --
11        MS. SCHUCHARDT:  Does that have a Bates
12 numbers other than the P-WAG at the top?
13        MR. SHKOLNIK:  It doesn't.  These are
14 all like -- what's been happening, these are late
15 productions, and they haven't made it through Ricoh
16 yet.
17        MS. SCHUCHARDT:  Got it.
18        MR. SHKOLNIK:  If we could go to Page 5 of
19 15 under FY13, so that's the first section.  And at the
20 bottom, one of the -- is that the right one?  Nope.
21        TRIAL TECHNICIAN:  5 of 15, you said?
22        MR. SHKOLNIK:  5 of 15.  You know, let me
23 just skip ahead, make it a lot easier here.  One
24 second.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    A.  Is that towards the back?

2    Q.  (By Mr. Shkolnik)  No -- you can skip

3 that.  I'm not even going to do that.  If we could go

4 towards the back, which is the FY14.  If you look on

5 the bottom, that's the best way of telling, it says

6 FY13, FY14 is on the bottom left.

7        MR. SHKOLNIK:  And if we're going into --

8 I want FY14, Page 3.  I know it's a pain in the neck.

9 I should have numbered them.  I'm sorry, go to Page 7.

10 I'm really making this tough.  I wish I would have

11 numbered this.  Page 7.  That's the one I wanted.  I

12 knew we could do it.

13    Q.  (By Mr. Shkolnik)  Top of the page.  I

14 completed pain management education series via drug

15 topics and made these CEs available for all Walgreens

16 pharmacists.  What is CEs?

17    A.  Continuing education.

18    Q.  And do you know which continuing legal

19 education -- I'm sorry -- continuing education programs

20 that you attended, what series it was regarding drug

21 topics that you attended back in 2014?

22    A.  This -- it was an online module.

23    Q.  And it says that you made them available

24 to Walgreens pharmacists.  So would it be fair to say

Page 339

1 that you took the hard -- the materials, and then you

2 saved it over to the database so that other pharmacists

3 could review those as well?

4    A.  We just linked them out to the website

5 that hosted all the education.

6    Q.  Then it goes on and it says Natasha

7 Polster, manager.  Due to funding restrictions, we were

8 not able to send team members out to drug abuse summits

9 or meetings that would get them exposure outside of

10 Walgreens.

11        Were you aware that the company had

12 limited the funds being made available in 2013 into

13 2014 that prevented your Pharmacy Integrity members

14 from going to summits and meetings to help you get

15 exposure outside of Walgreens, in terms of suspicious

16 order monitoring and pain management and things of that

17 nature?

18    MS. DESH:  Object to the form.

19    A.  There has always been kind of a reduction

20 in funding for just travel and travel expense, so I

21 don't think it's specific to this; I think it's just in

22 general just control of company expenses for travel.

23    Q.  (By Mr. Shkolnik)  But during this time

24 when you were getting RX Integrity up and running,

Page 340

1 wouldn't it have helped all of you if you could have

2 attended either summits or meetings that dealt with

3 this very issue that you were now embarking on?

4    A.  Potentially may be some additional benefit

5 to gain some more information.

6    MR. SHKOLNIK:  I have no further

7 questions.

8    MS. DESH:  Nothing from me.

9    MR. SHKOLNIK:  You want to ask some?

10    TRIAL TECHNICIAN:  Will I make my flight?

11    MR. SHKOLNIK:  Thank you very much, sir.

12    THE WITNESS:  Thank you, sir.

13    MR. SHKOLNIK:  Appreciate it.

14    THE WITNESS:  Thank you.

15    THE VIDEOGRAPHER:  We are off the record

16 at 5:54 PM.

17

18    [SIGNATURE RESERVED.]

19

20

21

22

23

24

Page 341

1        C E R T I F I C A T E

2

3      I, JUDE ARNDT, a Certified Shorthand

4 Reporter and Certified Court Reporter, do hereby

5 certify that prior to the commencement of the

6 examination, CHRIS DYMON was sworn by me to testify the

7 truth, the whole truth and nothing but the truth.

8      I DO FURTHER CERTIFY that the foregoing is a

9 true and accurate transcript of the proceedings as

10 taken stenographically by and before me at the time,

11 place and on the date hereinbefore set forth.

12      I DO FURTHER CERTIFY that I am neither a

13 relative nor employee nor attorney nor counsel of any

14 of the parties to this action, and that I am neither a

15 relative nor employee of such attorney or counsel, and

16 that I am not financially interested in this action.

17

18

19     _____

20     JUDE ARNDT, CSR, RPR

21     CSR No. 084-004847

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

---

Page 342

1        I, CHRIS DYMON, the witness herein, having

2  read the foregoing testimony of the pages of this

3  deposition, do hereby certify it to be a true and

4  correct transcript, subject to the corrections, if any,

5  shown on the attached page.

6

7

8

9        _____

10                CHRIS DYMON

11

12

13  Sworn and subscribed to before me,

14  This _____ day of _____, 201_.

15

16

17  _____

18        Notary Public

19

20

21

22

23

24

---

Page 343

1        DEPOSITION ERRATA SHEET

2

3  Page No._____Line No._____Change to:_____

4  _____

5  Reason for change:_____

6  Page No._____Line No._____Change to:_____

7  _____

8  Reason for change:_____

9  Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21

22  SIGNATURE:_____DATE:_____

23        CHRIS DYMON

24

---