```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION,              )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7

 8                     __ __ __
 9              Thursday, April 25, 2019
                       __ __ __
10
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11               CONFIDENTIALITY REVIEW
                       __ __ __
12

13

14

15         Videotaped Deposition of DAVID S.
      EGILMAN, M.D., MPH,  held at the Providence
16    Marriott Downtown, 1 Orms Street, Providence,
      Rhode Island, commencing at 9:08 a.m., on the
17    above date, before Debra A. Dibble, Certified
      Court Reporter, Registered Diplomate
18    Reporter, Certified Realtime Captioner,
      Certified Realtime Reporter and Notary
19    Public.
20

                       __ __ __
21

22

23            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
24              deps@golkow.com
```

A P P E A R A N C E S:

SPECIAL MASTER: David A. Cohen

SIMMONS HANLY CONROY, LLC
BY: JAYNE CONROY, ESQUIRE
jconroy@simmonsfirm.com
ELLYN HURD, ESQUIRE
ehurd@simmonsfirm.com
RICK KROEGER, ESQUIRE
(appearing telephonically)
rkroeger@simmonsfirm.com
SANFORD SMOKLER, ESQUIRE
(appearing telephonically)
ssmokler@simmonsfirm.com
LAURA FITZPATRICK, ESQUIRE
(appearing telephonically)
lfitzpatrick@simmonsfirm.com
One Court Street
Alton, Illinois 62002
(618) 259-6621
Counsel for MDL Plaintiffs

MOTLEY RICE, LLC
BY: DONALD A. MIGLIORI, ESQUIRE
dmigliori@motleyrice.com
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
(843) 216-9241
Counsel for Summit County and
Plaintiffs

NAPOLI SHKOLNIK, PLLC
BY: SHAYNA E. SACKS, ESQUIRE
shayna@napolilaw.com
360 Lexington Avenue
11th Floor
New York, New York 10017
Counsel for Cuyahoga County and
Plaintiffs

HOLLAND & KNIGHT, LLP
BY: MATTHEW DONOHUE, ESQUIRE
matthew.donohue@hklaw.com
JESSICA FARMER, ESQUIRE
jessica.farmer@hklaw.com
800 17th Street N.W.
Suite 1100
Washington, DC 20006
(202) 469-5222
Counsel for Insys Therapeutics

COVINGTON & BURLING, LLP
BY: JENNIFER L. SAULINO, ESQUIRE
jsaulino@cov.com
GREGORY L. HALPERIN, ESQUIRE
ghalperin@cov.com
CLAYTON L. BAILEY, ESQUIRE
cbailey@cov.com
One CityCenter
850 Tenth Street, NW
Washington DC 20001-4956
(202) 662-5305
Counsel for McKesson

WILLIAMS & CONNOLLY, LLP
BY: JOSEPH S. BUSHUR, ESQUIRE
jbushur@wc.com
(appearing telephonically)
725 Twelfth Street, NW
Washington, D.C. 20005
(202) 434-5092
Counsel for Cardinal Health, Inc.

DECHERT, LLP
BY: TIMOTHY C. BLANK, ESQUIRE
timothy.blank@dechert.com
JENNA NEWMARK, ESQUIRE
jenna.newmark@dechert.com
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
(212) 698-3500
Counsel for Purdue Pharma L.P.,
Purdue Pharma, Inc.

JONES DAY
BY: TARA FUMERTON, ESQUIRE
tfumerton@jonesday.com
77 West Wacker
Chicago, Illinois 60601-1692
(312) 782-1692
Counsel for Walmart

MARCUS & SHAPIRA, LLP
(appearing telephonically)
BY: PAUL MANNIX, ESQUIRE
pmannix@marcus-shapira.com
301 Grant Street
35th Floor
Pittsburgh, Pennsylvania 15219-6401
(412) 338-4690
Counsel for HBC

KIRKLAND & ELLIS, LLP
BY: PRATIK K. GHOSH, ESQUIRE
pratik.ghosh@kirkland.com
DONNA WELCH, ESQUIRE
donna.welch@kirkland.com
300 North LaSalle
Chicago, Illinois 60654
(312) 862-3671
Counsel for Allergan Finance, LLC

MORGAN, LEWIS & BOCKIUS, LLP
BY: BRIAN M. ERCOLE, ESQUIRE
brian.ercole@morganlewis.com
200 S. Biscayne Boulevard, Suite 5300
Miami, Florida 33131-2339
(305) 415-3416
Counsel for Teva Pharmaceuticals USA,
Inc.; Cephalon, Inc.; Watson
Laboratories, Inc.; Actavis, LLC;
Actavis Pharma, Inc.; f/k/a Watson
Pharma, Inc.

ARNOLD & PORTER KAYE SCHOLER, LLP
(appearing telephonically)
BY: ANGEL TANG NAKAMURA, ESQUIRE
Angel.Nakamura@arnoldporter.com
777 South Figueroa Street
44th Floor
Los Angeles, California 90017-5844
(213) 243-4000
Counsel for Endo Health Solutions Inc.;
Endo Pharmaceuticals Inc.; Par
Pharmaceuticals, Inc.; Par
Pharmaceutical Companies, Inc. formerly
known as Par Pharmaceutical Holdings,
Inc.

ROPES & GRAY, LLP
BY: JOSH GOLDSTEIN, ESQUIRE
joshua.goldstein@ropesgray.com
800 Boylston Street
Boston, Massachusetts 02199-3600
(617) 951-7000
Counsel for Mallinckrodt

MORGAN, LEWIS & BOCKIUS, LLP
BY: ELISA P. MCENROE, ESQUIRE
elisa.mcenroe@morganlewis.com
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5917
Counsel for Rite Aid

LOCKE LORD, LLP
BY: ANNA K. FINGER, ESQUIRE
anna.finger@lockelord.com
(appearing telephonically)
2200 Ross Avenue
Suite 2800,
Dallas, Texas 75201
(214) 740-8558
Counsel for Henry Schein, Incorporated
and Henry Schein Medical Facility,
Incorporated

Page 6

```
1        ZUCKERMAN SPAEDER, LLP
2        BY: PAUL B. HYNES, JR., ESQUIRE
            phynes@zuckerman.com
3        1800 M Street, Suite 1000
         Washington, DC 20036
         Counsel for CVS Indiana LLC and CVS Rx
4        Services, Inc.
5
6        BARTLIT BECK LLP
         BY: KATHERINE M. SWIFT, ESQUIRE
7            kate.swift@bartlit-beck.com
         54 West Hubbard Street
8        Suite 300
         Chicago, Illinois 60654
9        Counsel for Walgreens
10
         O'MELVENY & MYERS LLP
11       BY: AMY R. LUCAS, ESQUIRE
            alucas@omm.com
12       1999 Avenue of The Stars, 8th Floor
         Los Angeles, CA 90067
13       (310) 246-6705
         Counsel for Janssen and Johnson &
14       Johnson
15       BARNES & THORNBURG, LLP
         BY: WILLIAM A. HAHN, II, ESQUIRE
16          william.hahn@btlaw.com
         11 South Meridian Street
17       Indianapolis, Indiana 46204
         (317) 231-7501
18       Counsel for H.D. Smith
19
20
21       ALSO PRESENT:
22           Jonathan Jaffe
23
24
```

Page 7

```
1        APPEARING VIA VIDEO STREAM:
2            Kevin Reardon
             kevin.j.reardon@gmail.com
3
             Jay Lichter
4            jlichter@baronbudd.com
5
             Charles Bachmann
6            cbachmann@seegerweiss.com
7
             Scott Siegel
8            ssiegel@seegerweiss.com
9
10       VIDEOGRAPHER:
11           Bill Geigert
12
13               — — —
14          — — — — — — —
15
16
17
18
19
20
21
22
23
24
```

Page 8

```
1
2                I N D E X
3    DAVID S. EGILMAN, M.D., MPH         PAGE
4    EXAMINATION BY MR. DONOHUE            14
     EXAMINATION BY MS. SAULINO           140
5    EXAMINATION BY MR. MCGARRIGLE        423
6
               E X H I B I T S
7
8    No.         Description       Page

     Egilman 1A   Egilman Expert         19
9                 Report and Exhibits,
                  Volume 1 of 3 binder
10
     Egilman 1B   Egilman Expert         19
11                Report and Exhibits,
                  Volume 2 of 3 binder
12
     Egilman 1C   Egilman Expert         19
13                Report and Exhibits,
                  Volume 3 of 3 binder
14
     Egilman 1D   Egilman Opinions       19
15                Received 4-23-2019
                  binder
16
     Egilman 1E   thumb drive,           20
17                (DECHERT1)
18   Egilman 1F   5-25-19 Report of      20
                  David S. Egilman MD,
19                MPH
20   Egilman 1G   thumb drive            20
21
22
23
24
```

Page 9

```
1    Egilman 2   Poster (8.5 x 11        93
                 copy) Deconstructing
2                the myth that
                 prescribed opioids
3                have a low risk of
                 addiction by Daniel
4                K. Cho, Mark
                 Hocevar, Brown
5                University
6    Egilman 3   IMS Data, David        120
                 Egilman
7
     Egilman 4   Green folder marked    141
8                20 - Distribute =
                 Manufacturers
9
     Egilman 5   My Assignment          164
10
     Egilman 6   Folder 26 arrow up     232
11               does = arrow up
                 death
12
     Egilman 7   B.85                   253
13
     Egilman 8   Opinion - McKesson     272
14               blames manufacturers
                 and avoids its own
15               responsibility
16   Egilman 9   Opinion - HDMA was     276
                 responsible for sale
17               of unapproved
                 opioids
18
     Egilman 10  Opinion -              283
19               Distributor
                 marketing drove
20               sales
21
22
23
24
```

Page 10

Egilman 11   Opinion - WAG   287
solution to red
flagged stores was
to find a
distributor who
would sell to them.
All 3 WAG
distributor
facilities failed to
implement SOM
procedures

Egilman 12   Definition -   296
"Venture" refers to
all defendants
(including their
associated
individuals and/or
organizations) and
covers all aspects
of marketing,
distribution, and
supply they engaged
in

Egilman 14   Opinion - these are   306
the members on the
"venture" with two
Redweld folders"

Egilman 15   Opinion B.489   311
Redweld folder

Egilman 16   The "venture" should   329
have known that
higher doses kill
and warned about
this

Page 12

Egilman 23   Compilation of   391
Redweld folders

Egilman 24   Opinion-McKesson had   398
marketing agreements
with Mallinckrodt,
Purdue and Teva

Egilman 25   Opinion - the   404
"Venture" -
McKesson's SOM was
inadequate

Egilman 26   Dr. Egilman's   414
reference folders

Egilman 27   Dr. Egilman's notes   415
Dr. Egilman's   415

Egilman 28   opinion folders with
stickies and
notations

Egilman 29   USA Oxycodone   417
consumption
(mg/capita) 1980 --
2015

Exhibit 30   Opinion-   439
AmerisourceBergen
("ABC") was light on
order monitoring.
The ABC focus is
only on rapid
growth, not steady
sales  Focus on big
accounts only for
suspicious order
monitoring

Page 11

Egilman 17   All for one and one   340
for all - the
"venture" knew
collective marketing
increased the size
of the opioid pie.
Similarly, had any
"venture" member
broken ranks, the
opioid market would
have slowed or if
the complete truth
was told (no
efficacy and high
addiction risk) the
market would have
crashed

Egilman 18   Opinion - When the   347
FDA tried to limit
use in 2001 by
changing the label
from "more than a
few days" to
"extended period of
time," the "venture"
used this language
to increase the
market

Egilman 19   Opinion - the   361
"venture" corrupted
the FDA and Salem --
News.com FDA
Corruption Worsens
as Death Toll Mounts
in Drug Epidemic!
article

Egilman 20   Opinion - "venture"   374
member McKesson
marketed opioids

Egilman 21   Login to McKesson   383
Connect

Egilman 22   Opinion B.385   393

Page 13

Egilman 30A   Opinion-   439
AmerisourceBergen
("ABC") was light on
order monitoring.
The ABC focus is
only on rapid
growth, not steady
sales  Focus on big
accounts only for
suspicious order
monitoring, with
revisions

Egilman 31   Opinion-   440
AmerisourceBergen
("ABC") wanted to
'low key' (HIDE) its
association with
Pain Care Forum
("PCF") with
attachments
PPLP004210521-
42 (0523-
PPLP004279424-
4279425-
PPLP004303453,
PPLP004303456-
4303457
PPLPC018001477198-
1477200,
PPLPC022000926958-
22000926959, was
marked for
identification.)

— — — — — — — —

Page 14

1      PROCEEDINGS
2      (April 25, 2019 at 9:08 a.m.)
3      THE VIDEOGRAPHER:  Good
4  morning.  We are now on the record.
5  My name is Bill Geigert.  I'm a
6  videographer for Golkow Litigation
7  Services.  Today's date is April 25th,
8  2019, and the time is 9:09 a.m.  This
9  video deposition is being held in
10  Providence, Rhode Island, in the
11  matter of National Opioid Litigation.
12      The deponent is Dr. David
13  Egilman.  The court reporter is Debbie
14  Dibble, and she will now swear in the
15  witness.
16      DAVID S. EGILMAN, M.D., MPH,
17  having first been duly sworn, was examined
18  and testified as follows:
19      EXAMINATION
20  BY MR. DONOHUE:
21      Q.    Good morning, Dr. Egilman.  My
22  name is Matt Donohue.  I represent Insys.
23      I apologize, but we do have to
24  do some housekeeping before we start the

Page 15

1  questioning.  So I'm going to ask everybody
2  that's in the room to identify yourself for
3  the court reporter because there are a number
4  of people that she needs to know where you're
5  sitting.  So if you can identify yourself and
6  then endeavor to sit in the same spot
7  throughout the day, that will aid in the
8  accuracy of the transcript.
9      So I'll start.
10      Matt Donohue with Holland &
11  Knight representing Insys.
12      MS. FARMER:  Jessica Farmer
13  with Holland & Knight representing Insys.
14      MS. SAULINO:  Jennifer Saulino
15  from Covington and Burling for McKesson.
16      MR. HALPERIN:  Greg Halperin.
17      MS. SWIFT:  Kate Swift for
18  Walgreens.
19      MS. McENROE:  Elisa McEnroe
20  from Morgan Lewis for RiteAid.
21      MR. HYNES:  Paul Hynes of
22  Zuckerman Spaeder, for CVS.
23      MR. BLANK:  Timothy Blank with
24  Dechert for Purdue.

Page 16

1      MS. NEWMARK:  Jenna Newmark
2  with Dechert for Purdue.
3      MR. ERCOL:  Brian Ercol from
4  Morgan Lewis for the Teva defendants.
5      MS. WELCH:  Donna Welch
6  Kirkland & Ellis for Allergan defendants.
7      MR. JAFFE:  Jonathan Jaffe,
8  plaintiffs consultant.
9      MS. CONROY:  Jayne Conroy,
10  Simmons Hanly Conroy, plaintiffs.
11      MS. LUCAS:  Amy Lucas,
12  O'Melveny and Myers for Janssen and
13  Johnson & Johnson.
14      MS. NAKAMURA:  Angel Nakamura
15  of Arnold and Porter, the Endo and
16  Parr defendants.
17      MS. FULMERTON:  Tara Fulmerton,
18  Jones Day, on behalf of Wal-mart.
19      MR. BAILEY:  Clayton Bailey
20  Covington & Burling for McKesson.
21      MS. SACKS:  Shayna Sacks,
22  Napoli Shkolnik for plaintiffs
23  Cuyahoga County.
24      MR. HAHN:  Bill Hahn, Barnes &

Page 17

1  Thornburg on behalf of H.D. Smith.
2      MS. HURD:  Ellyn Hurd, Simmons
3  Hanly Conroy for the plaintiffs.
4      MR. MIGLIORI:  Donald Migliori,
5  Motley Rice, on behalf of Summit
6  County and plaintiffs.
7      MR. KROEGER:  Rick Kroeger.
8  Simmons Hanly Conroy on behalf of
9  plaintiffs.
10      MR. GOLDSTEIN:  Josh Goldstein,
11  Ropes & Gray on behalf of
12  Mallinckrodt, LLC.
13      MR. GHOSH:  Pratik Ghosh,
14  Kirkland and Ellis, Allergan
15  defendants.
16      SPECIAL MASTER COHEN:  Special
17  Master David Cohen.
18      Hey, there's air conditioning
19  in this room, and I can tell you that
20  Debbie cannot hear you if you're back
21  there, so speak very loudly, please.
22      MR. DONOHUE:  And then we have
23  a number of people on the telephone,
24  but you already have those, right?

Page 18

1    THE REPORTER:  Are you all
2  right if I just indicate those on the
3  transcript appearances?
4    MR. DONOHUE:  I'm fine with
5  that.
6    Next, just housekeeping matter
7  is, I want to explain on the record
8  what we've marked as our first
9  exhibit.
10    So marked as Exhibit 1A, is a
11  binder entitled "Egilman Report and
12  Exhibits Volume 1 of 3."  Marked as
13  Exhibit 1B is a black binder entitled
14  "Egilman Report and Exhibits, Volume 2
15  of 3."
16    Marked as Exhibit 1C is a black
17  binder entitled "Egilman Report and
18  Exhibits, Volume 3 of 3."
19    Marked as Exhibit 1D is a
20  binder entitled "Egilman Opinions
21  Revised."  And that captures the
22  revised material that we got produced
23  by plaintiffs.
24    Marked as Exhibit 1E is a flash

Page 19

1  drive.  It has written on it
2  "Dechert 1," and it contains Excel
3  spreadsheets as part of Dr. Egilman's
4  report.
5    And marked as Exhibit 1G is a
6  black flash drive.  This contains
7  Dr. Egilman's report, exhibits, the
8  notice of deposition, and resource
9  materials.
10    (Whereupon, Deposition Exhibit
11  Egilman 1A, Egilman Expert Report and
12  Exhibits, Volume 1 of 3 binder, was
13  marked for identification.)
14    (Whereupon, Deposition Exhibit
15  Egilman 1B, Egilman Expert Report and
16  Exhibits, Volume 2 of 3 binder, was
17  marked for identification.)
18    (Whereupon, Deposition Exhibit
19  Egilman 1C, Egilman Expert Report and
20  Exhibits, Volume 3 of 3 binder, was
21  marked for identification.)
22    (Whereupon, Deposition Exhibit
23  Egilman 1D, Egilman Opinions Received
24  4-23-2019 binder, was marked for

Page 20

1  identification.)
2    (Whereupon, Deposition Exhibit
3  Egilman 1E, thumb drive, (DECHERT1),
4  was marked for identification.)
5    (Whereupon, Deposition Exhibit
6  Egilman 1F, 5-25-19 Report of David S.
7  Egilman MD, MPH, was marked for
8  identification.)
9    (Whereupon, Deposition Exhibit
10  Egilman 1G, thumb drive, was marked
11  for identification.)
12  Q.   (BY MR. DONOHUE)  So that was
13  all part of Dr. Egilman's report and
14  accompanying materials.
15    This is -- if anyone needs to
16  look at the report or the exhibits
17  electronically, I have that hooked up to my
18  computer right now.  And so that's what we'll
19  be looking at, 1G, if we do that.
20    And then finally, marked as
21  Exhibit 1F is just the report of Dr. Egilman
22  dated March 25, 2019, and it's in a spiral
23  binding for easy access.
24    Sorry about that distraction.

Page 21

1    Dr. Egilman, when were you
2  retained in this litigation?
3  A.   November of last year?
4  Q.   Do you recall --
5    UNIDENTIFIED SPEAKER:  Can you
6  speak up please?  We cannot hear you
7  down here.  To the witness.
8    THE WITNESS:  November of last
9  year.
10  Q.   (BY MR. DONOHUE) Do you recall
11  when in November of 2018 you were retained?
12  A.   Second or third week.
13  Q.   Second or third week.
14    Who retained you?
15  A.   Ms. Conroy.
16    SPECIAL MASTER COHEN:  Let me
17  interrupt and ask if there's any way
18  to mic the witness, because this room
19  has that -- the loud air conditioning.
20  It's hard for me to hear him, so I
21  know those folks can't.
22    MR. BLANK:  We can't hear a
23  word.
24    MR. DONOHUE:  I don't know if

Page 22

1 the videographer has a mic.
2    UNIDENTIFIED SPEAKER: It's
3 very difficult to hear on the phone.
4    MR. DONOHUE: Let's go off the
5 record for a second and see if we can
6 fix this.
7    THE VIDEOGRAPHER: Off the
8 record. The time is 9:16.
9    (Recess taken, 9:15 a.m. to
10 9:24 a.m.)
11    THE VIDEOGRAPHER: We are back
12 on the record at 9:25.
13    Q.   (BY MR. DONOHUE) Dr. Egilman,
14 before the break, you had testified that
15 Ms. Conroy retained you in the second or
16 third week of November 2018 for this
17 engagement. Do I have that right?
18    A.   Yes.
19    Q.   And how did Ms. Conroy retain
20 you?
21    A.   I think it was a phone call.
22    Q.   And what were you retained to
23 do?
24    A.   Somewhere here I have printed

Page 23

1 assignments.
2    There it is.
3    Okay. So I was asked to
4 determine within a reasonable degree of
5 medical and scientific certainty whether or
6 not various defendants working together
7 and/or separately were significant factors of
8 causing the opioid epidemic.
9    Q.   Were you retained to do
10 anything else?
11    A.   That was my assignment.
12    Q.   Did you enter into a written
13 engagement with Ms. Conroy?
14    A.   No.
15    Q.   Do you have an oral agreement
16 with respect to your engagement here?
17    A.   Yes.
18    Q.   What are the terms of the oral
19 agreement that you have with Ms. Conroy with
20 respect to your engagement?
21    A.   I'm not sure I understand the
22 question.
23    Q.   Well, with respect to your
24 engagement in this litigation, first of all,

Page 24

1 what do you understand you are retained to do
2 in the litigation -- strike that.
3    With respect to your engagement
4 in this litigation, what case or cases are
5 you retained as an expert on?
6    A.   In the MDL, Cuyahoga and Summit
7 County case.
8    Q.   Are you retained as an expert
9 by Ms. Conroy in any other case?
10    A.   No.
11    MS. CONROY: Objection.
12    Q.   (BY MR. DONOHUE) Are you
13 currently retained as an expert by any of the
14 plaintiffs' firms in the MDL action in any
15 other case?
16    A.   No.
17    Q.   Have you been providing, with
18 respect to your engagement in this
19 litigation, any consulting advice?
20    MS. CONROY: Objection.
21    THE WITNESS: I'm not sure I
22 understand the -- what you mean by
23 "consulting advice."
24    Q.   (BY MR. DONOHUE) is it your

Page 25

1 understanding that you've been retained in
2 this litigation as a testifying expert?
3    A.   Yes.
4    Q.   Do you understand, if I use the
5 term "consulting expert," what that means?
6    A.   Yes.
7    Q.   Have you been retained as a
8 consulting expert in this litigation?
9    A.   Maybe I understood what it
10 means, because my understanding was that
11 you're either a testifying or a consulting
12 expert. So if I'm a testifying expert, I
13 can't be a consulting expert at the same
14 time. So maybe I didn't understand the
15 difference. But that was my understanding of
16 the difference.
17    Q.   Prior to this engagement, have
18 you done any other engagements with
19 plaintiffs' counsel?
20    MS. CONROY: Objection.
21    THE WITNESS: Please define
22 "engagement."
23    Q.   (BY MR. DONOHUE) In other
24 words, have plaintiffs' counsel retained you

Page 26

1  in the past for expert services in
2  litigation?
3      A.   Do you mean Ms. Conroy?
4      Q.   We can start with Ms. Conroy.
5      A.   Yes.
6      Q.   How many times?
7      A.   I think there were three cases
8  for Federal-Mogul, and there were three
9  opioid cases to 2003, 2005. Those are Purdue
10 cases.
11         I think that's all I've done at
12 her request working with her.
13     Q.   With respect to the three
14 opioid cases that you were retained by
15 Ms. Conroy's firm, what was the nature of
16 your expert testimony in those cases?
17     A.   Well, do you want the short
18 answer or a long answer?
19     Q.   Well --
20     A.   I mean, I have the transcript
21 of the deposition here. I have my -- part of
22 my report is incorporated in this report.
23         That's the short answer. I can
24 give you the long answer that goes through

Page 27

1  the details of what I can recall testifying
2  about.
3      Q.   No, I don't want the long
4  answer, but if you could tell us what your
5  assignment was in those three opioid cases
6  that you were retained in 2003 to 2005, that
7  would be helpful.
8      A.   I don't remember a specific --
9  what the specific assignment was at this
10 time, but the report, the deposition, there
11 were, I think, several reports and
12 depositions would have been my response to
13 the assignment. I don't know if I explicitly
14 was asked for my assignment in a deposition,
15 or whether I included that in the report. I
16 don't recall.
17     Q.   In the past, have you been
18 hired as an expert for litigation services by
19 Motley Rice?
20     A.   I'm not sure who I was retained
21 by, but I was in a case that Motley Rice
22 tried. I was retained by Orrick, I think, in
23 that case. And there was the -- I'm sorry,
24 the asbestos trust case against the tobacco

Page 28

1  companies.
2          I don't think I've testified to
3  any cases or given depositions in any cases
4  at the request of Motley Rice. It's possible
5  that there was an asbestos case.
6      Q.   Have you been retained by the
7  past -- excuse me, in the past for litigation
8  services by the law firm of Spangenberg,
9  Sibley & Lancione?
10     A.   Not that I can recall.
11     Q.   Have you been retained in the
12 past for litigation services as an expert by
13 Skikos Crawford?
14     A.   No.
15     Q.   Have you been retained in the
16 past for litigation services by the law firm
17 Mitchell Rafferty & Proctor?
18     A.   Not that I can remember.
19     Q.   Have you --
20     A.   Let me just frame this a little
21 bit, but it's come to my attention over time
22 that law firms have listed me in a case
23 without my knowledge or permission. So it's
24 possible that that may have happened, but I

Page 29

1  don't know whether it happened or not.
2          I know there are -- I know of
3  some instances where that's happened, but I
4  was never contacted by any of those firms to
5  work on any cases. Whether they listed me on
6  cases without any knowledge or consent, I
7  don't know.
8      Q.   Do you recall specifically what
9  law firm listed you without your permission
10 in their case?
11     A.   There are many. But one of
12 them is Farano. Farano, I think, listed me
13 in 15,000 cases, as I recall, without my
14 knowledge or consent.
15     Q.   Are there any other instances
16 of where you were listed as an expert without
17 your knowledge and consent other than the
18 Farano case that you can remember?
19     A.   There are others. I can't
20 remember all of them.
21     Q.   Do you have any understanding
22 why you were listed as an expert without your
23 consent in those cases?
24     A.   I assume they thought adding my

Page 30

1  name to the list of witnesses would add value
2  to the case for them.
3      But I don't know that. In some
4  way, shape, or form, they saw some advantage
5  to listing me as a witness.
6      Q.   Have you ever been compensated
7  by a plaintiff's law firm for being listed as
8  an expert in any of those cases?
9      MS. CONROY:  Objection.
10     THE WITNESS:  Which cases are
11  you talking?  The Farano cases?
12     Q.   (BY MR. DONOHUE)  Yes, the
13  Farano cases or other cases where you were
14  listed without your permission or consent.
15  Have you ever been compensated by those
16  plaintiffs' law firms for that act?
17     A.   No.
18     Q.   In the past have you been
19  retained as an expert for litigation services
20  by the Napoli Shkolnik firm?
21     A.   No.
22     Q.   So with respect to this
23  engagement that we're here for today, how
24  many hours have you personally spent?

Page 31

1      A.   384.
2      Q.   And what is the hourly rate
3  that you're charging for your services in
4  this litigation?
5      A.   For deposition?  $650 an hour.
6      For everything else, it's $600
7  an hour.
8      (Thomas J. McGarrigle from
9      Reed Smith for AmerisourceBergen
10     joined.)
11     Q.   (BY MR. DONOHUE)  Have you had
12  others assisting you in this engagement?
13     A.   Yes.
14     Q.   Who have you had assist you in
15  the engagement?
16     A.   I have three or four staff, and
17  I hired some students to do -- to assist.
18     Q.   And could you tell us who are
19  the staff that have assisted you in the
20  engagement?
21     A.   Sure.  Donna Barbarita.
22     Q.   Could you spell the last name
23  for the court reporter, please?
24     A.   B-A-R-B-A-R-I-T-A.

Page 32

1      Samson Egilman.
2      Joan Steffen, S-T-E-F-F-E-N.
3      Muna Yiman, Y-I-M-A-N.
4      Q.   Can you do the first name,
5  spell it, please?
6      A.   M-U-N-A.
7      Kevin Reardon.
8      And Alexis Biccirrilo.  And I
9  cannot spell her last name.
10     But I could get it to you at a
11  break, probably.
12     Q.   Okay.  So the list of six
13  people --
14     A.   Oh, and one more.
15     Q.   I'm sorry.
16     A.   Triet Tran.  T-R-I-E-T, Tran.
17  T-R-A-N.
18     Q.   So the seven people that you
19  just listed, does that include both staff and
20  students?
21     A.   No, that's staff.
22     Q.   All right.  Could you please
23  list out students that have assisted you in
24  the engagement?

Page 33

1      A.   Sure.  Emma McMillan, Emma
2  Cavanish, Max Kozlow, Dan Cho.  Lindsay,
3  whose last name I can't remember, but I can
4  get you that at a break.
5      And Mark Hocevar,
6  H-O-E-V-E-N-E-R. (sic)
7      Q.   And I apologize, the first two
8  students that you listed, they were both
9  Emmas?
10     A.   They are both Emmas.
11     Q.   So Emma --
12     A.   It does get confusing.
13     Q.   So with Emma No. 1, what's her
14  last name again?
15     A.   I don't know which order I gave
16  them to you, but one is named McMillan and
17  one is named Cavanish.  Last name.
18     Q.   Now, with respect to the seven
19  staff members that you listed, are those
20  staff that you employ?
21     A.   Yes.
22     Q.   What is Donna Barbarita's
23  position?
24     A.   Office manager.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.    And how did Ms. Barbarita
2 assist you in the engagement?
3    A.    She did copying.  Organizing of
4 documents.
5       She may have helped search for
6 some texts.  She did scanning of documents.
7       That would be, I think, most of
8 the things that she did.
9    Q.    And with respect to Samson
10 Egilman, is that a relation of yours?
11    A.    It is.
12    Q.    And what relation?
13    A.    He is my son.
14    Q.    And what did your son do to
15 assist you with respect to this engagement?
16    A.    Well, he did some of the same
17 things.  He also did some searching on
18 relativity for documents.
19       Helped organize documents.  He
20 did searches for some medical literature, I
21 think.
22    Q.    And what is your son's title?
23    A.    Researcher.
24    Q.    And then with respect to

Page 35

1 Joan Steffen -- do I have that right?
2    A.    You do.
3    Q.    What's Ms. Steffen's title?
4    A.    Researcher.
5    Q.    And how did Ms. Steffen assist
6 you in this engagement?
7    A.    Similarly.  Did searches of the
8 database.  Or helped organize -- she helped
9 organize the report.
10       They all did similar things.
11 So -- but that's what she did.  She didn't
12 work that much on this case.  She did some
13 work.
14    Q.    And with respect to Muna Yiman?
15    A.    Yiman.
16    Q.    Yiman.  I apologize.
17    A.    No problem.
18    Q.    What's her role?
19    A.    Same as Joan's.  She did some
20 searches, some organizing of documents, some
21 preparation, preparation of the organization
22 that you see in the room.  Sometimes I think
23 she -- sometimes I wanted books ordered and
24 she might order the books.  Go to the

Page 36

1 library, get articles.
2    Q.    Okay.  With respect to
3 Kevin Reardon, what's his title?
4    A.    Researcher.
5    Q.    And what was his role in
6 assisting you with the engagement?
7    A.    Same thing.  To do searches of
8 the database, organize documents.  He, I
9 think, reviewed some depositions as well.
10 Certainly he -- he read my deposition.
11       And those are the tasks that he
12 did.  They all pretty much do the same thing.
13    Q.    Okay.  Alexis Biccirrilo?
14    A.    Yes.
15    Q.    What's her title?
16    A.    Researcher.
17    Q.    And same tasks as you listed
18 before?
19    A.    Yes.
20    Q.    And Triet Tran?  Is she also a
21 researcher?
22    A.    It's a he, and, yes.
23    Q.    I apologize.
24    A.    No problem.

Page 37

1    Q.    Same task as you've listed
2 before for the other research?
3    A.    Essentially.  They pretty much
4 all do the same thing.
5    Q.    Are all of the staff that you
6 just listed, those seven people, full-time
7 employees?
8    A.    Yes.
9    Q.    And with respect to their work
10 for you, as your staff, do they only assist
11 in litigation services?  Or do they do other
12 work for you?
13    A.    They do other work for me.
14    Q.    Okay.  What are some of the
15 other things they do if they're not assisting
16 you with your expert work in litigation?
17    A.    They do work on other
18 consulting work for companies, and they also
19 work on writing papers.  Which may not lead
20 to litigation, so they do research on --
21 academic research on various issues.
22       They also help with the
23 non-profit that I run called Global Health
24 Education Training Service.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    So we also have certain public
2 education efforts, and they do that.
3    So, for example, they're --
4 we've been recent -- I met with the FDA on
5 talc issues, and they helped organize the
6 materials for that presentation.
7    They met with Congress people
8 with respect to talc issues on two occasions.
9 Third occasion coming up, so two.
10    We prepared materials for the
11 congressional subcommittee.
12    We provide information to --
13 they help -- they help -- they all teach my
14 course, or help teach my course at Brown.  So
15 they TA the course.  Help prepare materials
16 for the course.
17    When I give talks, they
18 generally help prepare the materials for the
19 talks, PowerPoints and other things like
20 that.
21    That's most of what they do.
22    Q.    How many hours did your staff
23 collectively work on this engagement?
24    A.    That, I don't know.  I don't

Page 39

1 have that number.
2    Q.    Can you estimate?
3    A.    No.
4    Q.    Would you say that in the last
5 four months that you've been engaged for this
6 litigation, your staff has worked full time
7 on it?
8    A.    Oh.  My staff usually works
9 more than 40 hours a week.  Not always.  But
10 my staff has been involved in a variety of
11 issues over this time period, not related to
12 the opioids.  So I don't know.  It's
13 conceivable that they worked an average of 30
14 or 40 hours for six or eight or ten of those
15 weeks.
16    Some of them were taking
17 vacations and other things, so I -- I really
18 don't know that.
19    Q.    Are you billing the hours that
20 your staff works on this engagement --
21    A.    Yes.
22    Q.    -- to the plaintiffs?
23    A.    Yes.
24    Q.    And how do you do that billing?

Page 40

1    Do you prepare monthly bills?
2    A.    No.  We just keep the
3 cumulative hours and usually every three or
4 four months I send the bill.
5    Q.    And how are the cumulative
6 hours kept?
7    A.    Well, I keep them rolling on
8 a -- on a phone.  So when I do hours, I put
9 the total hours of numbers in the day and
10 change the total.
11    Q.    So your staff reports to you on
12 a daily basis the hours they've worked?
13    A.    No.  That's what I do.  I
14 actually don't know how they keep their
15 hours.  I think they do something similar.
16    Q.    How does your staff report to
17 you the hours that they've worked on this
18 engagement?
19    A.    They don't report to me the
20 hours they've worked on the engagement.
21    Q.    How do you know how much to
22 bill your staff out for this occasion?
23    A.    They report to Donna Barbarita,
24 and she generates the bill.

Page 41

1    Q.    And what are you charging with
2 respect to your staff members with respect to
3 this engagement?
4    A.    I don't know.  Usually 50 to
5 $70 an hour.  I don't know what the billing
6 is really.
7    Q.    So that 50 to $75 an hour would
8 be for the seven people that we've identified
9 as your staff?
10    A.    Correct.
11    Q.    Did you rely on information
12 from your staff to develop the opinions in
13 your report?
14    A.    Sure.  The research that they
15 did formed the basis of some of the opinions
16 in my report.
17    Q.    How does your staff know what
18 to do?  How do you instruct them to assist
19 you in the engagement?
20    A.    Well, we meet and discuss the
21 issue generally to start.  Different staff
22 people are given different areas to do
23 research on.
24    And then they talk to each

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  other about the iterative searches they've
2  done and the work they've done.  And then
3  when I find something, generally I yell at
4  them, out my door, because they're all right
5  outside my door, and I say, "Hey, could
6  somebody go get me this?"  Or "Go check
7  that?"
8        And so that's -- a lot of the
9  direction comes in that form.
10        And they interact with each
11  other as well.  Decide amongst themselves
12  what they think are important, sharing
13  documents back and forth.  And they try to
14  co-create -- as we go through, we try to
15  create various outlines which go in a --
16  well, like this thing.  This 3M thing, we
17  have a sticky thing.  It's not a sticky
18  thing, but I have several sticky ones.  So we
19  might write different topics up, and people's
20  names get attached to those topics.  We do a
21  little research on those things.
22        Sometimes -- I may give you an
23  example.  For example, I was interested in
24  the anthropology of pain and sociology of

Page 43

1  pain.  So Alexis was a sociology major.  Joan
2  was an anthropology major.  So I had Alexis
3  put together -- or go get me sociology on the
4  anthropology of pain and organize that.
5        So that's how things happen.
6  It's a fairly non-linear organizational
7  management style, I would say.
8      Q.    Do you provide instructions --
9  written instructions to your staff to assist
10  you in this engagement?
11      A.    No.  I yell at them.
12      Q.    With respect to the flip charts
13  that you mentioned, where their outlines are
14  created, do you have those as part of your
15  file with respect to this engagement?
16      A.    I don't think so.  Because we
17  generally don't keep them up.  I may have one
18  or two.
19      Q.    But you haven't kept the flip
20  charts as part of your expert file?
21      A.    No, not as a -- not on a
22  regular basis.  We may have one in my office
23  now.
24      Q.    Do you ever give your staff

Page 44

1  instructions by e-mail with respect to
2  engagements?
3      A.    Sometimes.
4      Q.    Did you give your staff any
5  instructions to assist in this engagement?
6      A.    Yes.
7      Q.    Do you still have those
8  e-mails?
9      A.    Well, that wasn't done by
10  e-mail.
11      Q.    Maybe I got confused.  Let me
12  ask again.
13        As part of this engagement, did
14  you provide instructions to your staff on how
15  to assist you?
16      A.    From time to time, over the
17  past four months, I'm sure I've sent them
18  e-mails saying "Get me this" or "Get me
19  that."  But most of my communications with
20  them is by yelling.
21      Q.    With respect to the students
22  that you listed, which I think there were six
23  students, are there --
24      A.    There's a couple of others.  We

Page 45

1  did some manual work too, but I don't
2  remember their names.  I can't spell them.
3      Q.    Let's talk about the work
4  that's -- the six students that you mentioned
5  did.
6        How did the students assist you
7  in this engagement?
8      A.    Well, differently.  They had
9  different -- they more or less had research
10  tasks.  So -- because I tried to make the
11  work academic for them in their area of
12  interest.
13        So Emma Cavanish had worked at
14  a marketing company, so she helped put
15  together the marketing literature.  So I have
16  a lot of marketing literature.  One of the
17  things she did was organize all of that
18  marketing literature.  And she did some
19  researches -- oh, one of the searches she
20  did, she did -- she came up with a list of
21  sex terms.  And she did searches to the
22  database for sex terms.  Hookers, tootsies,
23  things like that.
24        So she did a specific search

Page 46

1 for sex terms.
2          And so that was one thing she
3 did.
4          Eva -- Emma McMillan was
5 interested in epidemiology, so I worked with
6 her to look at the whole issue of the
7 pay-for-play, impact in action that generated
8 EERW. And that criticism of the EERW that's
9 in the report came out of that work.
10          Dan Shaw and Mark Hocevar
11 worked on deconstructing the Fishbain paper
12 from 2008. And that work resulted in the
13 poster that's here that they presented at the
14 All Ivy conference on Saturday. And so that
15 was -- that was their work. So they had to
16 do a lot of digging, because a lot of the
17 citations in the Fishbain work in 2008 were
18 unfindable. Because I don't know if they
19 existed or not, but he couldn't find two of
20 the 23 papers that he cited as evidence for
21 the dictionaries, and then they did the
22 reanalysis. So I worked with them on that
23 poster presentation.
24          And they're working on a paper

Page 47

1 now they were -- draft paper they're working
2 on that will also be submitted along with --
3 after the -- sometime now.
4          So -- was that what you wanted
5 to know? Think there was something I left
6 out.
7      Q.    Did you get Max and Lindsay?
8      A.    Oh, yeah. Max. Max -- Max
9 deconstructed the complaint and went through
10 the complaint. Tried to make sure we had all
11 the documents that were cited on the
12 complaint. Tried to organize them by themes.
13          As you know, I -- the
14 complaints had about nine or ten, for want of
15 a better word, bad acts, which I condensed
16 into basically two in my analysis of what was
17 going on.
18          And so he went through the
19 complaint and tried to place those bad -- the
20 way the plaintiffs had done it. And we also
21 did the Massachusetts complaint, in
22 reorganizing in that portion in the way that
23 I conceived of the -- of the cause of the
24 opioid epidemic.

Page 48

1          Max also did some -- we did
2 some cross-checking of language. I think you
3 saw that probably in your report, where
4 duplicate language was taken from Purdue and
5 used in marketing materials produced by some
6 of the front organizations. So he did some
7 searches, looking for where language was
8 copied directly from manufacturers that went
9 into -- directly into the marketing materials
10 by the -- produced by the front
11 organizations.
12          So he did that.
13          There was one other -- there's
14 one other poster that he had a -- that
15 was -- that was his find. So, you know.
16          So that's pretty much what -- I
17 think what Max did.
18          What was the last one?
19      Q.    Before we move to that, Max
20 presented at the All Ivy conference?
21      A.    No. Dan Cho and Mark --
22          Dan Cho presented but the
23 poster was done by he and Mark Hocevar, who
24 are med students at Brown.

Page 49

1      Q.    And what was the nature of the
2 presentation at the All Ivy conference?
3      A.    I'll get it for you.
4          I should have -- we have a
5 poster on that. So it should be here.
6          Oh, here it is. Yeah, here it
7 is.
8          So this is the poster that he
9 did.
10          So this is the -- this is the
11 poster that he just presented. So it starts
12 with a historical description of the hockey
13 stick and the epidemic. And -- can I -- ties
14 the epidemic for addiction. And these are
15 the specific -- this is taken from a
16 published paper.
17          So this ties to the rise of the
18 epidemic for specific marketing acts done by
19 the manufacturers.
20          This is the reconstruction of
21 the Fishbain paper. Fishbain took 23 papers
22 of which -- they're not really papers. He
23 took 23 things, two of which we could never
24 find, including communicating within him. We

Page 50

1  couldn't find him, I think.
2          And so this is a breakdown of
3  those papers. And how many patients came
4  from each of those papers.
5          And this is a -- the -- you can
6  see the one study from Fishbain, the
7  Milligan, Passik, and Taub paper, provides
8  56 percent of the total participants and had
9  a very low addiction rate. But there was
10  another study that was also large and had a
11  stream of zero.
12          So what we did was we tried to
13  use a standard definition for addiction,
14  because the -- where the papers had not
15  really looked for addiction, we threw them
16  out. So an addiction rate, the reason one
17  had an addiction rate of zero was because it
18  didn't really look for addiction.
19          So when you take the -- this is
20  the Fishbain, original Fishbain results.
21  Original Fishbain results has 2,102 patients,
22  97 percent of which are not addicted.
23  Three percent are addicted, and that's where
24  he came up with the 3.87.

Page 51

1          But if you look at studies --
2  if you look at the -- if you throw out the
3  studies that you either can't find or --
4  because they either may or may not exist, or
5  you look at the studies where they actually
6  look for addiction, you get a different rate.
7  And that -- that gives you about 750
8  patients, of which 33 percent are addicted.
9          So that's the gist.
10  Q.    Thank you for that.
11          Did Mr. Cho and Mr. Hocevar
12  rely on any information that they reviewed as
13  part of this engagement to make that
14  presentation?
15  A.    They didn't rely on it, because
16  it's confidential. They couldn't put it in.
17  But they reviewed.
18          Now, there are things in here
19  that -- for example, Fishbain didn't disclose
20  his associations with the litigation and
21  Purdue in particular in the published paper.
22          But what we did get --
23          Now, I probably had this in
24  2006, but at any rate, in relative -- in the

Page 52

1  database with our documents were his reports
2  for Purdue during the time period that he was
3  preparing and publishing this paper. And
4  some of those were cited in federal cases.
5  So we cited those federal cases as evidence
6  that he had misrepresented his
7  non-association with the pharmaceutical
8  companies in the end of this -- in the end
9  here. Okay?
10          But we had more information on
11  his associations with the pharmaceutical
12  manufacturers which we didn't include because
13  it was confidential.
14          It's like we did rely on it in
15  a sense because it supported the construct
16  that he had misrepresented the nature of his
17  relationship with the manufacturers, as in
18  not mentioning it.
19  Q.    How many --
20  A.    Oh, I think one other thing. I
21  think the students -- before we got the
22  cases, the students e-mailed Fishbain and
23  asked him if during this time period he
24  published this, he had any conflicts of

Page 53

1  interest. And he wrote an e-mail back saying
2  no, amongst other things.
3          The other things where he
4  criticized him -- the general anticorporate
5  construct in the -- and cynical views of the
6  medical and scientific views toward
7  corporations.
8  Q.    And do you have that e-mail
9  still?
10  A.    I don't know if I have it, but
11  Dan probably has it.
12  Q.    As part of this engagement,
13  have you kept copies of the e-mails that
14  either the students or staff have sent and
15  received?
16  A.    No, I don't keep any e-mails.
17          You know Jones Day is in the
18  room, right?
19          MR. DONOHUE:  I'll move to
20  strike as nonresponsive.
21  Q.    (BY MR. DONOHUE)  A number of
22  the students that you have had assisting you
23  in the -- in this engagement, how many hours
24  would you estimate that they have worked in

Page 54

1   the last four months?
2       A.    I don't know.  Not much,
3   because they mostly worked in January during
4   inter-session.  But unfortunately, they
5   actually have to go to school.  Now, Brown is
6   pretty easy, okay?  But they still have to
7   show up for class and do some work.  So they
8   haven't done that much in the last couple of
9   months.
10      Q.    And these are all students from
11  Brown?
12      A.    They're all Brown students.
13      Q.    Are the students compensated
14  for the work that they have done to assist
15  you on the engagement?
16      A.    For some.  They didn't get paid
17  to do the academic work, so.
18            But some of this research they
19  did was for me in preparation for the report.
20  So I paid them for that, but I didn't pay
21  them for doing the poster or for writing up
22  the papers.  That's their own.
23      Q.    So what do you pay the students
24  for with respect to this engagement?

Page 55

1       A.    Well, I pay them while they're
2   doing research for me related to the
3   litigation.  I don't pay them for work
4   related to generating medical publications or
5   scientific publications.  It's in the
6   disclosure here, so ...
7             It says "DKC and MH worked as
8   paid student researchers for the -- at the
9   request of plaintiffs in opioid litigation.
10  DKC and MH were not compensated by law firms
11  for work on the paper.  The lawyers for the
12  plaintiffs did not review the paper and had
13  no input into the content of the paper.
14  Dr. Egilman serves as an expert witness at
15  the request of cities and counties suing
16  opioid manufacturers and distributors for
17  money to help pay for the financial costs of
18  the opioid epidemic."
19            The reason I'm in here is I'm
20  not an author of this, but they did
21  acknowledge me as helping them prepare the
22  work.
23      Q.    Do you pay the students with an
24  hourly rate?

Page 56

1       A.    I do.
2       Q.    What's the hourly rate?
3       A.    $20 an hour.
4       Q.    How much have you been paid to
5   date for this engagement?
6       A.    Nothing.
7             Well maybe I got a $10,000
8   retainer, but that's it.
9       Q.    Have you sent any bills to the
10  plaintiffs for your work on this engagement?
11      A.    Just the retainer bill.
12      Q.    How much are you currently owed
13  for the engagement?
14      A.    384 hours times $600.
15      Q.    What about the hours that your
16  staff has worked on the engagement?
17      A.    I don't have that number.
18      Q.    But you'll be asking for
19  compensation with respect to the
20  reimbursement for the hours that your staff
21  has worked; right?
22      A.    Yes.
23      Q.    Can you estimate for us what
24  that would be?

Page 57

1       A.    No.
2       Q.    Is it more than 384 hours?
3       A.    I don't know.
4       Q.    No idea?
5       A.    I do not have any idea whether
6   it is more or less than 384 hours.
7       Q.    Do you have any idea of what
8   ballpark of the hours is that your staff has
9   worked?
10      A.    I do not.  It's probably
11  several hundred hours, I would say.  It's not
12  ten minutes, but I don't know how many hours.
13  And I may be off.  It may not be several
14  hundred hours.
15      Q.    When it comes time to submit a
16  bill for the hours that your staff has paid,
17  how are you going to figure that out?
18      A.    They keep track of their hours.
19  The hours go to Donna Barbarita.  Donna
20  Barbarita will send a bill.
21      Q.    So you believe Donna Barbarita
22  currently has information about the number of
23  hours your staff has worked on this
24  engagement?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    A.   I don't think so.
2         MS. CONROY:  Objection.
3         THE WITNESS:  I don't know if
4    they've given her --
5         I don't think they've given her
6    the hours.  So they each have their
7    own hours.
8    Q.   (BY MR. DONOHUE)  And what
9    would you estimate the number of hours that
10   your students have worked on this engagement?
11   A.   Same thing.  I don't have a
12   good idea about that.  But mostly -- I mean,
13   they work -- they work, you know, around 15
14   to 30 hours for three or four weeks in
15   January, and then after that, you know, five
16   to 15 hours, maybe -- I doubt it -- in the
17   next couple of months.
18   Q.   How much of your income last
19   year was from expert work in the litigation?
20   A.   Probably half.
21   Q.   What were your other sources of
22   income for last year?
23   A.   Consulting for companies.
24   Q.   Is that non-litigation

Page 59

1    consulting?
2    A.   It's confidential consulting.
3    Q.   Any other sources of income for
4    last year?
5    A.   Sure.
6    Q.   What else?
7    A.   Investments.
8         That's about it.
9    Q.   Does Brown pay you anything?
10   A.   A library card.  Discount on
11   that.
12        The library card is probably
13   worth about $50,000 to me, just to give you a
14   number.
15        The year before I got free
16   parking, when I was teaching a course.  They
17   paid for the parking.
18   Q.   Are you currently teaching any
19   courses at Brown?
20   A.   Not this semester.
21   Q.   Do you plan on teaching next
22   semester?
23   A.   I do.  Well, no.  I plan on
24   teaching -- because of this case, I plan on

Page 60

1    teaching the next spring.
2    Q.   Are you still practicing
3    medicine?
4    A.   I still have a license to
5    practice, and I still occasionally see
6    patients.
7    Q.   How many patients would you say
8    you now see?
9    A.   Well, when I'm doing -- I
10   probably see 10 or 15 consulting patients a
11   year and maybe one or two regular patients
12   who call me up or something I've seen them
13   before for.
14   Q.   Do you have an office where you
15   practice medicine?
16   A.   I do.
17   Q.   Is it the same office you use
18   for your expert litigation?  Or different?
19   A.   It's a slightly different
20   suite.
21        I have -- in my office I have
22   about eight rooms.  In one of the rooms I
23   have a medical setup.
24   Q.   Speaking of the protective

Page 61

1    order, were you provided the protective order
2    in this case?
3    A.   Yes.
4    Q.   Did you review it?
5    A.   Yes.
6    Q.   And did you sign it?
7    A.   Yes.
8    Q.   And did you agree to be bound
9    by it?
10   A.   Yes.
11   Q.   What about the staff that
12   you've listed as helping you on the case?
13        Did -- were they provided the
14   protective order?
15   A.   Yes.
16   Q.   Did they sign it?
17   A.   Yes.
18   Q.   Did they agree to be bound by
19   it?
20   A.   Yes.
21   Q.   And the students that you
22   mentioned, the six students, did it -- were
23   they provided the protective order?
24   A.   Yes.

Page 62

1    Q.    Did they sign it?
2    A.    Yes.
3    Q.    And they agreed to be bound by
4  it?
5    A.    Yes.
6    Q.    Do you have a copy of those
7  signed protective orders?
8    A.    Someplace.
9    Q.    Okay.
10   A.    Not on me.
11         I think they were all sent to
12 the plaintiff. I'm not completely sure that
13 I kept copies. The lawyers have copies.
14   Q.    We'll follow up on that
15 separately.
16         Have you in the past violated
17 court orders?
18         MS. CONROY: Objection.
19         THE WITNESS: I need to look at
20 that settlement agreement to answer
21 that question. I'm sure that -- I
22 don't recall the language exactly.
23   Q.    (BY MR. DONOHUE) What
24 settlement agreement are you referring to?

Page 63

1    A.    Between me and Lilly.
2    Q.    I'm sorry, I didn't hear you.
3  Between --
4    A.    Between me and Lilly.
5    Q.    What case was that?
6    A.    Zyprexa.
7    Q.    In the Zyprexa litigation, do
8  you recall whether the Court in that case
9  found that you had violated the Court's
10 protective order?
11   A.    That's in dicta in a case in a
12 ruling on the TRO that I wasn't at, yes.
13 Something like that.
14   Q.    Did you violate the Court's
15 protective order in the Zyprexa case?
16   A.    I need to look at the language
17 that I wrote in the Lilly settlement before I
18 answer that question. I need to refresh my
19 recollection.
20   Q.    Where is that settlement?
21   A.    Where is that settlement? It's
22 in my office.
23   Q.    So you have access to it?
24         You can refresh your

Page 64

1  recollection when you go back to your office?
2    A.    If I went back to my office, I
3  could find the document and I could refresh
4  my recollection.
5    Q.    And what is it that you need to
6  refresh your recollection about with respect
7  to the settlement agreement before answering?
8    A.    Well, that was a finely crafted
9  document. And I need to recall exactly what
10 was in it. And I can't recall exactly what
11 was in it. It's been 9 -- 12 years. So
12 before I answer questions about that, I want
13 to refresh my recollection of what actually
14 was signed and what happened.
15   Q.    All right. Are there any other
16 instances you recall where you have violated
17 a Court's order?
18   A.    No.
19   Q.    Do you recall the Ballinger v.
20 Brush Wellman, Incorporated case?
21   A.    Correct.
22   Q.    Do you recall posting materials
23 in violation of the Court's order in that
24 case?

Page 65

1    A.    That's not what happened.
2    Q.    What did happen?
3    A.    Jones Day hacked my computer,
4  downloaded materials from my computer,
5  illegally, then -- pardon me. Keller and
6  Heckman in Washington, representing the
7  Society for the Plastic Industries, hacked my
8  computer in a case -- in the Staples case,
9  the vinyl chloride case in Texas. They then
10 shared the password with Kelly Stewart at
11 Jones Day. Kelly Stewart of Jones Day then
12 hacked my computer, downloaded materials that
13 were not publicly available because my
14 computer was password-protected.
15         Went to the judge, told the
16 judge I had violated a gag order. He lied to
17 the judge. And the judge believed him.
18 Okay? The judge issued a sanction. The
19 sanction was more or less reversed by the
20 Colorado Appellate Court, cert. denied to the
21 Supreme Court of Colorado.
22         I filed a lawsuit against
23 Keller and Heckman, and it was thrown out on
24 the law. It's the lead case in the

Page 66

1 Millennium hacking statute. It's Egilman
2 versus Keller and Heckman.
3         I then filed a bar complaint
4 against Kelly Stewart in Dallas. Kelly
5 Stewart, at the bar complaint, admitted that
6 he had illegally hacked my computer, a
7 federal felony, 10 years in jail and a
8 $50,000 fine, on videotape. No written
9 record.
10        The bar in Dallas issued a
11 written sanction to him, which was not to be
12 publicly disclosed, for counseling, and found
13 that -- I think the language was that my
14 complaint had merit. The vote was 4 to 1.
15        So that's what happened in that
16 case.
17    Q.    When is the first time that you
18 gave expert testimony in support of
19 litigation? Do you recall your first case?
20    A.    Yeah, my first case is Time
21 versus OCF. It's a Third Circuit case.
22    Q.    What year was that?
23    A.    Third Circuit decision, I think
24 it was '87 or '88. The case was, I think, in

Page 67

1 '86.
2    Q.    Do you recall the area that you
3 were giving expert testimony on --
4    A.    Yes.
5    Q.    -- in that case?
6         What was it?
7    A.    Well, it was the supervisor at
8 the Hess oil refinery in St. Croix who had
9 been exposed to asbestos and developed
10 pleural plaques.
11        He sued Owens Corning and a
12 variety of other asbestos product
13 manufacturers for injuries related for the
14 pleural disease that he got as a result of
15 the exposure.
16        I testified -- there were two
17 trials. There's -- in the first trial, the
18 first trial only went to -- week and a half,
19 and the judge got sick and unfortunately
20 passed away.
21        I hope that doesn't happen to
22 anybody in this case.
23        And then he -- there was a
24 second trial, and in the second trial I

Page 68

1 testified on state of the art warnings, risk
2 communication, asbestos medicine, and a
3 variety of other issues.
4    Q.    How many times in your career
5 have you been retained as an expert witness?
6    A.    I don't know about career, but
7 I've been retained as an expert witness in
8 probably over 4 or 500 cases.
9    Q.    And of the 4 or 500 cases that
10 you've been retained as an expert witness,
11 how many of those would you estimate have
12 been as a testifying expert?
13        MS. CONROY: Object to the
14 form.
15        THE WITNESS: Well, the ones I
16 gave you, that's the ones based on
17 testifying.
18    Q.    (BY MR. DONOHUE) Okay. Would
19 you add to that number if we included
20 retentions as a consulting expert?
21    A.    I've done other consulting
22 expert work, yes.
23    Q.    How many cases would you
24 estimate you'd been retained as a consulting

Page 69

1 expert?
2    A.    That, I don't know.
3    Q.    Would it be about the same
4 number or less?
5    A.    I do not know.
6         For example, I might be
7 consulting with someone and I don't know how
8 many cases there are. Somebody might be
9 sued -- a corporation might be sued for
10 thousands of cases. My consulting might
11 relate to the general issues relating to
12 thousands of cases. I don't know the answer
13 to that question.
14    Q.    I'm not asking about the number
15 of cases. I'm asking about the number of
16 times you've been retained as a consulting
17 expert.
18    A.    Well, okay. I don't know. I
19 don't know that either.
20    Q.    Can we go to your expert
21 report? We've marked one of the copies 1F.
22 Would you like a copy of that? It's got a
23 spiral binding so it's easy to flip through.
24    A.    Sure.

Page 70

1    Q.    And would you mind turning to
2 page 139 of your expert report.
3    A.    Okay.
4    Q.    Okay.  Page 139 is entitled
5 "Prior Expert Testimony."  Is this a complete
6 list of the depositions and trial testimony
7 you've given since 2015?
8    A.    As well as I could put it
9 together.
10    Q.    Do you recall testifying in
11 July of 2015 in a case captioned Montgomery
12 v. Home Depot?  It was in the Southern
13 District of California.
14    A.    No, I don't believe I testified
15 in that case.
16    Q.    Okay.  Looking at page 139 --
17    A.    What year was that case?
18    Q.    2015.
19    A.    I don't recall.
20    Q.    Well, if it -- if you do have a
21 memory of it, we could add it into the list,
22 but.
23    A.    I don't have a memory of it.  I
24 can go look.

Page 71

1    Q.    Turning your attention to
2 page 139 of your expert report.
3         In each of these listed cases,
4 have you testified on behalf of the
5 plaintiffs?
6    A.    No.
7    Q.    So --
8    A.    I don't testify on behalf of
9 anybody.
10    Q.    Let me rephrase the question.
11         With respect to the cases
12 listed on page 139 of your report, were you
13 retained by the plaintiffs in each and every
14 one of those cases?
15    A.    I believe so.
16    Q.    You previously testified that
17 you'd estimate you've been retained 4 to 500
18 times as an expert; do you remember that?
19    A.    Yes.
20    Q.    Out of the 4 to 500 times
21 you've been retained as an expert, in each of
22 those cases have you been retained by the
23 plaintiff?
24    A.    No.

Page 72

1    Q.    How many times have you been
2 retained by the defendant in those 4 to 500
3 cases?
4    A.    Probably 150.  200.
5    Q.    When is the last time you
6 recall being retained by a defendant as an
7 expert in litigation services?
8    A.    Yesterday or the day before.
9    Q.    What case is that?
10    A.    I don't remember the case.
11 It's a Viking Pump case.  I don't know the
12 name.
13    Q.    A Viking Pump?
14    A.    Viking Pump.
15    Q.    And putting aside your
16 retention yesterday, when is the last time
17 you recall being retained by a defendant as
18 an expert?
19    A.    The week before.
20    Q.    In the last four to five years,
21 have you testified on behalf of a defendant?
22    A.    I don't testify on behalf of
23 defendants or plaintiffs.
24    Q.    Have you testified in any case

Page 73

1 in the past four years where you were
2 retained by a defendant?
3    A.    No, because it would be here.
4 But I have in the past.
5    Q.    So when is the last time you
6 recall testifying as an expert when you've
7 been retained by a defendant?
8    A.    Probably about five --
9 actually, no, there's -- there must be a case
10 missing because I think two years ago, I gave
11 a deposition at the request of a plaintiff in
12 a defense case, so there's one case specific.
13 So that's probably about two years ago.
14    Q.    So your answer said you gave a
15 deposition at the request of a plaintiff in a
16 defense case?
17    A.    Well, I was working for
18 Viking Pump, the defendant.  I was deposed by
19 the plaintiff.
20    Q.    Got it.  You mentioned the
21 Viking Pump cases.  Do you recall any other
22 defendants that have retained you as an
23 expert?
24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Q.    What other defendants?
2    A.    Well, the ones that I mentioned
3  when I first met Ms. Conroy.  She retained me
4  at the request of Federal-Mogul.  Turner &
5  Newall was the underlying company, but
6  Federal-Mogul, I think was the owner.  So
7  those three cases were Federal-Mogul cases.
8         Then I've done -- I did an A.E.
9  Smith boiler case.
10         I did a variety of workers'
11  compensation cases when I was running the
12  clinic in Braintree.
13         I did a lead case when I was
14  running the clinic in Braintree.
15         I did some other -- I think
16  it's one or two other boiler manufacturer
17  cases.  I'm sorry, pump manufacturer cases.
18         That's what I can remember.
19    Q.    So your testimony is that out
20  of the 4 to 500 cases where you've been
21  retained, approximately 150 to 200 of those
22  you were retained by the defendant to be an
23  expert?
24    A.    Think you're -- the 4 to 500

Page 75

1  are cases I gave testimony in.  Okay?  The
2  100 to 150, or whatever I gave for a number
3  for the defense cases, the cases I've been
4  retained in, in most of those cases, aside
5  from two or three of those cases, maybe four
6  of them, maybe five, I did not give testimony
7  in those cases.  Those cases settled.  But I
8  was retained and gave reports in all those
9  cases.
10    Q.    Okay.  So let me go back.
11         Out of the 4 to 500 cases where
12  you have testified as an expert, how many of
13  those cases have you testified when you've
14  been retained by a defendant?
15    A.    Probably 10 or so.
16         Well, no, wait.  I gave you
17  some others.  So maybe 10 to 15.
18    Q.    And you mentioned that you
19  believe, putting aside whether you testified
20  as an expert or not, "I've been retained by
21  defendants in 150 to 200 cases"; do I have
22  that right?
23    A.    Correct.  Or more.  I currently
24  have about 50 or 60 cases for Viking Pump.

Page 76

1  And I've been working for them for five or
2  six years, and probably that's my average
3  caseload for them over that time period.  So
4  I may have underestimated the total number of
5  Viking Pump cases that I've done, I've been
6  retained over the last four or five years,
7  but that's my best estimate.
8    Q.    So how many cases have you been
9  retained as an expert by plaintiffs?
10    A.    That, I don't know.  Mostly --
11  mostly the plaintiff cases I'm retained in, I
12  give depositions and they go to trial.  Not
13  all.  I'd say the overwhelming majority go to
14  trial, so most of that number went to trial.
15         I mean, that's just the way it
16  is.
17    Q.    With respect to your retention
18  in this engagement, how many cases have you
19  been retained as an expert by the plaintiff?
20         In other words, how do you
21  count up the number of cases for this
22  engagement since you testified that you have
23  been engaged in the MDL?
24    A.    Again, I do not know what that

Page 77

1  question means.
2    Q.    In your past as a testifying
3  expert, has any court excluded your proposed
4  expert testimony?
5    A.    Yes.
6    Q.    How many times has a court
7  excluded your testimony as an expert witness?
8    A.    Once.
9    Q.    And what case was that?
10    A.    That's the popcorn case in
11  Spokane.
12    Q.    Any other time?
13    A.    No.
14    Q.    Have you ever withdrawn as an
15  expert in litigation after you've been
16  retained?
17    A.    I'm not sure I understand that
18  question.
19    Q.    In any of the 4 to 500 cases --
20  no, strike that.
21         In any of the cases where
22  you've been retained as an expert, have you
23  withdrawn from those cases prior to
24  testifying as an expert?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    A.    Not that I can recall.
2          I mean, I've not -- in cases
3    that I've been retained and given testimony
4    at a deposition, I've not always testified.
5    Q.    Right.  But I'm wondering if
6    you recall ever, after a, for example, a
7    motion to exclude you has been filed, you
8    withdrawing as an expert in that case.
9    A.    Do you mean me?  Me sending a
10   letter saying I withdraw?  Or me telling a
11   lawyer I withdraw?
12   Q.    Have you ever --
13   A.    Is that what you mean?
14   Q.    Well, let's start with that.
15   Do you recall any case --
16   A.    That's never happened.  That I
17   can recall.
18   Q.    Do you recall any case where,
19   after a motion to exclude has been filed
20   against your proposed testimony, where the
21   lawyer that retained you has withdrawn you
22   from the case?
23   A.    I don't know.
24   Q.    Don't recall?

Page 79

1    A.    I don't know.
2    Q.    So if we could go to your
3    report again, and what we've marked as
4    Exhibit 1F, which is in front of you.  Could
5    you confirm that this looks to be a complete
6    copy of your report?  I understand there's
7    not the exhibits, but at least your report?
8          MS. CONROY:  Objection.
9          THE WITNESS:  How am I going to
10   do that?
11   Q.    (BY MR. DONOHUE)  Okay.  We'll
12   do it a different way.  Could you turn to
13   page 141?
14         And this is a page entitled
15   "Signature."
16         Is that your signature?
17   A.    It is.
18   Q.    And the first sentence states
19   that this is a report -- excuse me.  "This
20   report is a statement of opinions I expect to
21   express in this matter and the basis and
22   reason for those opinions."
23         Do you see that?
24   A.    Yes.

Page 80

1    Q.    And is that accurate?
2    A.    You read that correctly, but it
3    should -- understand that these are opinions
4    that I expect to express at this deposition.
5          I don't think I'm going to give
6    these opinions in court.
7    Q.    And why don't you think you're
8    going to give all of the opinions in court?
9    A.    Well, for one thing, I think we
10   don't have five years to try the case.
11         That would be the number one
12   reason.  I know I wouldn't give all of these
13   opinions.
14   Q.    Looking at the opinions in your
15   report, do you know which opinions that you
16   will be testifying at trial about, if
17   allowed?
18         MS. CONROY:  Objection.
19         THE WITNESS:  I -- as you know,
20   I've done some cases with Mr. Lanier,
21   and he always surprises me.
22         So I don't have a clue.
23   Q.    (BY MR. DONOHUE)  So, before we
24   go back to that, let's put on the record what

Page 81

1    your opinions are in this report so we make
2    sure we're all on the same page.
3          Let's start with the
4    definitions that you use which are on page 51
5    of your report.
6    A.    Okay.
7    Q.    Now, with respect to definition
8    4.4, which is the, quote, Venture, capital V,
9    end quote, you write that "The Venture refers
10   to all defendants in the opioid litigation."
11         Do you see that?
12   A.    I do.
13   Q.    What do you mean by "the opioid
14   litigation"?
15   A.    Well, I mean this case.
16   Q.    Now, are you aware of the
17   opioid manufacturers that are named as
18   defendants in this case?
19   A.    Yes.
20   Q.    What about -- are you aware
21   that there are opioid manufacturers that are
22   not named as defendants in this case?
23   A.    Yes.
24   Q.    Are the opioid manufacturers

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 that are not named as defendants in this case
2 part of the venture as you've defined it?
3     A.    I do not know.
4     Q.    How come you don't know?
5     A.    Because I don't have any
6 information on them.  There's no discovery
7 that I've seen.
8     Q.    Is it possible that opioid
9 manufacturers that are not listed as
10 defendants in this case are part of what
11 you've defined as "the venture"?
12     A.    Yes.  Anything is possible.
13     Q.    So you haven't undertaken any
14 analysis of whether manufacturers of opioids
15 not named as defendants in this case are
16 acting in concert with the manufacturer
17 defendants that are named in this case?
18         MS. CONROY:  Objection.
19         THE WITNESS:  No, I searched
20     the database, but there was -- there
21     are no relevant documents on that
22     issue on -- produced by other parties.
23         I can't know what people were
24     doing unless I have depositions and

Page 83

1 documents.
2     Q.    (BY MR. DONOHUE)  Well, in any
3 of the depositions and documents that you
4 reviewed as part of this engagement, did you
5 see references to other entities or
6 individuals that were not named as defendants
7 in the case?
8     A.    I don't recall.
9     Q.    And what is the time period
10 that you have used to describe the venture,
11 as you've defined it on page 51 of your
12 report?
13     A.    I didn't use a time period, but
14 I guess there's kind of two time periods.  So
15 I'll go to the hockey stick.
16         So I would say that the time
17 period for the massive overuse began in 1996,
18 the introduction of Purdue's drug.
19         However, there was some
20 beginning activities, by members of the
21 venture, as early as 1984, when Purdue
22 illegally marketed MS CONTIN.
23         So I would say that that --
24 that was the first act that was part of the

Page 84

1 concerted activity that led eventually do
2 this breakout in 1996.
3     Q.    And what is the date of the
4 first act that you just testified to?
5     A.    It was 9 -- in 1984 Purdue
6 started to market MS CONTIN.  And that was
7 illegally marketed.  It was not an approved
8 drug by the FDA.
9     Q.    And they --
10     A.    And they sold 770,000 pills, I
11 believe, before the FDA caught that.
12         MR. DONOHUE:  I'll move to
13     strike as nonresponsive everything but
14     the date.
15     Q.    (BY MR. DONOHUE)  You said that
16 as part of the first act, members of the
17 venture acted together.  What other members
18 of the venture do you believe acted together
19 in 1984?
20     A.    The only member of the venture
21 in '84 was Purdue.  I believe that was --
22 Purdue was the only member.
23     Q.    If you turn to page 52 of your
24 expert report, marked as Exhibit 1F.

Page 85

1         And we'll go back to some of
2 these areas.  I just want to get a high-level
3 view of your expert report.
4         So page 52 is entitled "Capsule
5 of Opinions."
6         Do you see that?
7     A.    I do.
8     Q.    Is the capsule of opinions
9 intended to be a summary of your overall
10 expert opinion?
11     A.    Oh, it's kind of like the
12 highlights.
13     Q.    So is it the highlights of what
14 is contained in the following opinions in
15 your expert report?
16     A.    It's the highlights of the
17 entire report.
18         So I guess you could call it,
19 in terms of a movie, the -- like the little
20 things they show to encourage you to go to a
21 movie?
22     Q.    The trailer?
23     A.    Yeah, it's like a trailer.
24     Q.    Then if you'd turn to page 53,

Page 86

1 you have as numeral 6, a title "In 2004, I
2 warned about the crisis; I was ignored."
3          Do you see that?
4     A.    Yeah.
5     Q.    Is that an opinion that you
6 intend to offer, if allowed, in this case?
7     A.    It's an opinion I have.
8          I don't have any intention -- I
9 don't get to decide what questions are asked,
10 and I don't get to decide if a question is
11 asked whether I'm allowed to answer it.
12          All I have here, just to maybe
13 speed it up is my opinions.  Okay?
14          I don't know what's going to
15 happen in court.
16     Q.    So with respect to No. 6, "In
17 2004, I warned about the crisis; I was
18 ignored," fair to say that's an opinion
19 that -- an expert opinion that you've
20 expressed in your expert report?
21     A.    Correct.
22     Q.    And when did you form that
23 opinion?
24     A.    Well, 19 -- 2004.

Page 87

1     Q.    Okay.  And then, I just want to
2 make sure I'm reading this right.  So
3 underneath the statement in 2004, I warned
4 about the -- "I warned about the crisis; I
5 was ignored," there's, from page 53 to 61
6 paragraphs.  My question is, are those
7 paragraphs contained in the pages of your
8 report separate opinions?  Or are they
9 supporting material for your opinion about
10 warning of the crisis?
11     A.    I think that's a metaphysical
12 question.  I'm not sure I'm capable of
13 answering it.
14          I would say it certainly
15 supports the opinion in 6, but some of them
16 are separate opinions.  So they're opinions
17 that explain the entire set of what goes into
18 the Opinion 6.
19     Q.    Okay.  And then, with respect
20 to the additional opinions that you have
21 formed since 2004, those start on page 62 of
22 your report.
23          MS. CONROY:  Objection.
24     Q.    (BY MR. DONOHUE)  Do I have

Page 88

1 that right?
2     A.    I don't know how to answer
3 that.  I have to go through some of these.  I
4 may have said -- I may have had some of these
5 opinions -- this is all of the opinions,
6 right?  -- that you're referring to?  All of
7 the opinions for that question?  All of the
8 rest of the -- all of the rest up to 137 or
9 whatever it is?  Is that a question for all
10 of the opinions from page 62 to 137?
11     Q.    I was attempting to ask if this
12 was the -- all of the opinions that you have
13 since 2004 that are contained in your expert
14 report.
15     A.    Yeah, what I'm saying, I may
16 have had some of those opinions before --
17     Q.    Okay.
18     A.    -- 2004.
19     Q.    Okay.  Could you --
20     A.    I don't recall.
21          I don't recall, and I never
22 analyzed them by date.  So in order to answer
23 that question, I need to go through and read
24 them.

Page 89

1     Q.    Okay.
2     A.    I think most of these opinions
3 relate to material that I got in discovery in
4 this litigation.  I may have had some of
5 these opinions in a general way before 2004.
6     Q.    Let me ask you this.  Would you
7 please go through the opinions contained on
8 Section 7 in your report and tell us what
9 opinions, if any, you formed prior to this
10 engagement?
11     A.    Well, 7.3, I was certainly
12 aware of prior to this engagement of the
13 $80 million penalty that Walgreens paid for
14 Jupiter and other things.  And that's --
15 could be part of the basis of 7.3.
16          MR. DONOHUE:  Can we take a
17 break, take our first break?
18          MS. CONROY:  Let's just be --
19 I'm fine with a break, but let's just
20 be clear what he's looking for.  You
21 want to know which of the 137 opinions
22 were formed after his retention in
23 this case in November of 2019 -- of
24 2018?

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1　　　　THE WITNESS: The opposite.
2　Before. He wants to know before.
3　　　　MR. DONOHUE: Before.
4　　　　MS. CONROY: And that's what
5　you want him to determine --
6　　　　MR. DONOHUE: Yes.
7　　　　MS. CONROY: -- during the
8　break?
9　　　　MR. DONOHUE: Yes. If any.
10　　　　THE WITNESS: No, I'm not going
11　to do that during a break.
12　　　　MR. DONOHUE: Well, we can take
13　a longer break.
14　　　　THE WITNESS: I'm not going to
15　do that during a break. When there's
16　a break, there's a break. I'm not
17　working during the break. I have
18　union rules.
19　　　　MR. DONOHUE: All right. We'll
20　wait for Special Master Cohen to get
21　back.
22　　　　SPECIAL MASTER COHEN: I'm
23　right here.
24　　　　You know, if the break is for

Page 91

1　us to break, it's for us to go to the
2　bathroom and take a rest. And he
3　doesn't need to spend 10 or 15 or
4　20 minutes, unless you want to take a
5　long break. But some of that's going
6　to have to take away from your time.
7　　　　MR. DONOHUE: Okay. So, in
8　other words, have him do it on the
9　record?
10　　　　SPECIAL MASTER COHEN: That's
11　probably better.
12　　　　MR. DONOHUE: All right.
13　　　　So I would like you to do that.
14　I'll just restate the question.
15　　　Q.　(BY MR. DONOHUE) Would you
16　please go through your opinions and tell us
17　what opinions, if any, that you formed prior
18　to this engagement?
19　　　A.　Okay.
20　　　　I'm going to have you help me.
21　I have venture members.
22　　　　[Document review.]
23　　　　MR. DONOHUE: Do you want to
24　know what? I will -- Special Master

Page 92

1　Cohen, I will withdraw the question so
2　we can take a break.
3　　　　SPECIAL MASTER COHEN: Okay.
4　　　　MR. DONOHUE: Thank you. Off
5　the record, please.
6　　　　THE VIDEOGRAPHER: Off the
7　record. 10:51.
8　　　　(Recess taken, 10:50 a.m. to
9　11:23 a.m.)
10　　　　THE VIDEOGRAPHER: We are back
11　on the record at 11:24.
12　　　　MR. DONOHUE: For the record,
13　we're going to mark as Deposition
14　Exhibit No. 2, a copy of the poster
15　board that's entitled "Deconstructing
16　the myth that prescribed opioids have
17　a low risk of addiction" that
18　Dr. Egilman pointed to earlier. And
19　so we'll get a copy of that, an 8 by
20　11, hopefully, and just mark it for
21　the record as Exhibit No. 2.
22　　　　MS. CONROY: And for the
23　record, I will state when you reduce
24　that to 8 by 11, it's illegible. So

Page 93

1　if it's -- we can get people an
2　electronic copy or whatever, but just
3　be advised that when you get home and
4　you take a look at it, it can't be
5　read.
6　　　　MR. DONOHUE: All right.
7　Appreciate that.
8　　　　THE WITNESS: So you want me to
9　continue my answer?
10　　　　MR. DONOHUE: No. I withdrew
11　that question.
12　　　　(Whereupon, Deposition Exhibit
13　Egilman 2, Poster (8.5 x 11 copy)
14　Deconstructing the myth that
15　prescribed opioids have a low risk of
16　addiction by Daniel K. Cho, Mark
17　Hocevar, Brown University, was marked
18　for identification.)
19　　　Q.　(BY MR. DONOHUE) With respect
20　to your expert report, did you receive all of
21　the documents that you needed to reach the
22　opinions in your expert report?
23　　　A.　No.
24　　　Q.　Okay. What documents didn't

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 you receive that you needed to reach your
2 opinions?
3    A.    I think I got some -- I think I
4 got an -- okay.  So I got a thing on
5 limitations in my report.  I couldn't review
6 missing or destroyed documents, so they were
7 missing and destroyed documents.
8        I couldn't review documents
9 that were withheld as, quote, nonresponsive.
10 Some of the documents were produced even
11 though confidential with nonresponsive
12 blanks.
13        I couldn't review documents
14 that would help based on a privilege claim.
15        I couldn't review redacted
16 language that was in a lot of the
17 confidential documents.
18        I didn't review correspondence
19 in non-produced personal e-mails.  So there
20 were several participants who had a variety
21 of e-mails that weren't produced.  Something
22 that said text messages.  There were no text
23 messages produced.
24        Purdue had a system of removing

Page 95

1 information from call notes, so I couldn't
2 review things that were removed.
3        I didn't have access to all of
4 the documents produced in all the state
5 litigation.
6        I didn't have the monitoring
7 reports that were part of the corporate
8 integrity agreements.  I didn't have all of
9 the corporate integrity agreements.  I didn't
10 have any -- oh, I'm sorry, I had Cephalon
11 hotline reports related to the CIA, but I did
12 not have any of the other CIA-associated
13 monitoring reports, ethics hotlines, or other
14 related documents.
15    Q.    So the opinions in your expert
16 report are based on incomplete information?
17        MS. CONROY:  Objection.
18        THE WITNESS:  Well, they're
19    based on the information that I had.
20    I can't know if the information that's
21    been destroyed would have impacted on
22    my opinions one way or the other.
23    It's a limitation that you asked me if
24    I -- I answered the question you

Page 96

1 asked.  The implications of things I
2 didn't see, I can't answer.  I don't
3 know how they may or may not have
4 altered an opinion I had.
5    Q.    (BY MR. DONOHUE)  Since
6 March 25th, 2019, which is the date of your
7 report, have you formed any additional
8 opinions as an expert?
9    A.    No, but I have additional bases
10 for opinions.
11    Q.    What's the additional bases you
12 have for opinions since March 25, 2019?
13    A.    Well, I may have some
14 additional -- yeah, additional bases, so.
15        Let's see.  There's an
16 additional bases folder here.
17        Well, let me -- I mean, let me
18 go -- we can look for it.
19        I can start with a -- I read
20 the appendix to Perri's report, where he goes
21 through more of the call notes and other
22 communications that companies made to
23 physicians and other parties.  So that's one
24 category.

Page 97

1        I don't think I listed this,
2 which I call the mushroom document, as part
3 of the basis for my opinion that the
4 physicians were not responsible for the
5 hockey stick.
6        This is an e-mail from Kathe
7 Sackler -- to Kathe Sackler, Wednesday,
8 August 6, 1997.
9        Oh, yes.  Here's the new basis.
10 Do you have that?  She found it.
11        Okay.  So this is J&J Pain
12 Council Meeting, December 6, 2006.
13        And then some additional bases
14 for 135, which is a CVS marketing agreement
15 with Endo.
16        So there's --
17    Q.    Would you do me a favor and
18 just read the Bates numbers of those
19 documents into the record so we'll have a
20 record of what you're referring to?
21    A.    Sure.  JAN-MS-00494367, and
22 then Endo Opioids MDL-06157733.  Then the
23 Insys material that came out during the
24 Boston trial, I haven't seen all of the

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  transcripts of that trial, but I've read
2  reports of that trial, sometimes quotes from
3  testimony from that trial.
4        So that would be additional
5  opinions related to that.
6        And the same thing would be
7  true for the general -- although Rochester is
8  not a defendant in this case, you asked about
9  other people.  I wasn't aware of what
10 Rochester had done until the recent press
11 coverage and pleading against them for
12 various bad acts with respect to the
13 uncontrolled distribution of drugs to their
14 customers.
15       Then I have -- I did bring -- I
16 don't think I brought with me, but I have --
17 as you know, I had the Robert Wood Johnson
18 opinion.  And yesterday I got, probably 4 or
19 5,000 pages of more detail on Robert Wood
20 Johnson Foundation, board of directors, their
21 bios of their contacts with primarily Johnson
22 & Johnson as the corporate entity in terms of
23 the overlapping board of directors of Robert
24 Wood Johnson Foundation.

Page 99

1        I think the Ohio hockey stick.
2  No. 7.  How about this 6, then.  So this is a
3  Summit County PowerPoint.  And it's -- you
4  know, it came in native form, so I don't have
5  the Bates number.
6        I can identify it -- this is
7  the first page.  It's in the production.  So
8  that's the first page of it.  The first page
9  says "Facing the Opioid Epidemic.  How we got
10 here and what we need to do next."  And it
11 was by Christina Delos Reyes.  It's titled
12 "The Role of the Physician, Prescription Drug
13 Abuse.  Akron General Wellness Center,
14 May 31, 2014."
15       And it has an Ohio-specific
16 hockey stick chart in it, along with the
17 specific -- some of the specific marketing
18 activities that trail the hockey stick.
19       So ...
20     Q.   Does the mushroom document have
21 the Bates number?
22     A.   Mushroom.  Yeah, mushroom.
23       It's over here.  Bates number
24 for the mushroom.  PDD_8801118262.

Page 100

1
2        Let's take a quick look.  I
3  think that's it.
4     Q.   Okay.  Could we go --
5     A.   Just let me finish taking a
6  quick look to see if there's anything else --
7     Q.   Oh, I apologize.
8     A.   -- on the table.
9        Yeah, I think 6 is slide deck.
10       So this is another bases.  I
11 have an opinion on slide deck creation, and
12 this is just another company's same
13 activities.  This is Bates numbers
14 acquired_activists_00367447.
15       Let me see this.  What is that?
16 This is the "See no evil" document.  I think
17 this is not in the report.  This is
18 Endo_0064825.
19       I think that's it.
20     Q.   Okay.  Could we go back to your
21 report, which we've marked as Exhibit 1F.
22 And go to page 29, which is your background
23 and qualifications?
24     A.   Okay.

Page 101

1     Q.   Okay.  And so I think you
2  testified earlier you're currently a -- still
3  a medical doctor; right?
4     A.   Correct.
5     Q.   And if we turn to page 31, you
6  have a paragraph about the middle of the page
7  where you talk about warnings.
8        Would you consider yourself an
9  expert in warnings?
10    A.   Yes.
11    Q.   Are you familiar with TIRF
12 REMS?
13    A.   I'm familiar with REMS
14 programs.
15    Q.   Okay.  What do you know about
16 the REMS program?
17    A.   Well, what I'm -- when
18 evaluated -- there's been several recent
19 papers on the REMS programs in the last year.
20 And -- do you really want me to -- ask me
21 what I know about the REMS program?  Because
22 that's a very, very long answer.
23    Q.   No, I appreciate that.
24    A.   I'd be glad to give you that

Page 102

1  answer, okay, but --
2      Q.   Let me withdraw that and ask a
3  different question.
4      A.   Okay.
5      Q.   Did you consider the TIRF REMS
6  program in rendering the expert opinions in
7  your report?
8      A.   I think so.
9      Q.   You testified that you consider
10 yourself an expert in warnings.  What other
11 areas do you believe you have expertise in?
12 If any.
13     A.   Well, do you want to define
14 "expert"?
15     Q.   What other areas do you believe
16 you're qualified to testify as an expert in
17 litigation other than warnings?
18     A.   That's the --
19         MS. CONROY:  Objection.  Legal
20 opinion.
21         THE WITNESS:  -- up to the
22 judge.  If you don't want to define
23 expert, I will.
24         My understanding of the

Page 103

1  definition of expert in this context
2  is that I know more than the layman
3  and can assist the jury in
4  understanding the issues in the case
5  beyond the ability of the normal
6  layman to understand the material that
7  I read, review, consider, and
8  generally summarize.  So that -- if
9  that's the definition of expert, I'll
10 go ahead and answer that question.
11         So an expert in internal
12 medicine.  Occupational environmental
13 medicine and toxicology.  I'm an
14 expert in molecular biology.  I'm an
15 expert in warnings and risk
16 communication.
17         All aspects of public health.
18 Public health includes two, kind of,
19 components.  The first component of
20 public health is trying to figure out
21 what makes people sick, and the second
22 is what makes people healthy.
23         Actually, that's two components
24 of the first question of the public

Page 104

1  health.
2          The second issue with respect
3  to public health is getting people to
4  change their behavior to use the
5  information in part one.
6          I am an expert in the aspects
7  of part one.  Those aspects being,
8  generally, molecular understanding of
9  cause-effect relationships, the
10 epidemiology, toxicology.  The -- then
11 at a higher level, a social and
12 cultural aspects of the causes of
13 disease.
14         So there's -- which is not a
15 lot of academic work in that area.
16         Then the other part of public
17 health is to take the information that
18 we've gathered from part one, and try
19 to get people to change their
20 behavior, to stop doing things that
21 you've determined cause disease, and
22 to get them to do things that promote
23 health and longevity.
24         And at a patient level -- and

Page 105

1  there are two levels for those
2  interventions.  At least two levels.
3          One level is with respect to
4  things that impact on the individual
5  at an individual level.  So that
6  involves -- I'll give you the
7  occupational environmental construct
8  of that in hierarchy.
9          So the first thing to do -- and
10 I'll try to give you some relevant
11 examples as we go along.
12         MR. DONOHUE:  I'm only
13 interested in what you think you're as
14 an expert.  So you seem to be straying
15 into a long explanation about those.
16 Can you do it more briefly, please?
17         MS. CONROY:  Objection.
18         THE WITNESS:  Is that -- is
19 that an objection to the answer -- I
20 don't understand what that was.
21     Q.   (BY MR. DONOHUE)  I'm asking
22 you to summarize instead of giving detailed
23 answers in the areas where you believe you
24 have expertise.  So I understand you have

Page 106

1  expertise, you believe, in public health, and
2  you explained that.
3      A.    I didn't finish explaining
4  that.  There's many aspects of public health,
5  and I've given you the aspects of public
6  health, which --
7      Q.    If you could do it in list
8  form, that would be more helpful and
9  efficient.
10      MS. CONROY:  Objection.
11      THE WITNESS:  Okay.  Well, I'm
12  going to try to give it to you in the
13  form that I understand it.  Okay?  And
14  so they have -- this is how I explain
15  it when I'm in court, for example.
16      So the hierarchy from the --
17  and because this is -- it's an
18  expertise -- the expertise -- I'll
19  start making sense with expertise, to
20  make sure it's exactly relevant.  The
21  expertise is in the first hierarchy of
22  changing what people do is
23  substitution of a safer, for a more
24  dangerous product.

Page 107

1      So in the case of opioids, it
2  would be the study of the various ways
3  that one could treat pain that would
4  not -- that would diminish the risk of
5  addiction.  That's an expertise.
6  That's a way of looking at
7  cost-benefit analyses, looking at all
8  the side effects, et cetera.
9      So if you don't substitute,
10  then the next level down, which I have
11  expertise in, is in trying to avoid
12  the exposures in an administrative
13  fashion.  And so that would be -- in
14  the case of opioids, figuring out how
15  you can control the use of opioids by
16  controlling physician prescriptions,
17  educating the public, et cetera.
18      And I have expertise in that
19  with respect to opioids and general
20  expertise with respect to public
21  health.
22      So that -- pretty much from an
23  opioid perspective, those are the
24  expertises from public health.  That's

Page 108

1  at the micro level as it applies to
2  the patient.
3      Then at the macro level, that's
4  changing policy.  Okay?  And so I have
5  some expertise in social change, how
6  social change occurs at a macro level.
7      And I teach about that.
8      And that means how you create
9  social movement to change ideas in the
10  society.  And those general ideas
11  might change the effect of how people
12  get treated in this case for pain.
13  And that involves legislative
14  interventions, community organizing,
15  et cetera.  I have expertise in that.
16      And it also involves, at a
17  macro level, trying to influence ideas
18  in a society about appropriate care
19  and appropriate achievement.
20      And that's done through a
21  variety of mechanisms, the current era
22  that involves an element of social
23  media and academic publication and
24  some combination thereof.

Page 109

1      So that's roughly the public
2  health expertises that relate to this
3  case.
4      For example, you know, I gave
5  the presentation to the FDA that
6  involves both understanding the
7  mechanism of addiction from a --  the
8  way that -- the relationship of the
9  dosing system to the addiction.  And
10  also I went to the FDA to try to
11  impact on policy.
12      So I'm working on policy issues
13  with respect to talc and other things
14  at a state and local and national
15  level.  So I have expertise in that
16  and I teach about that.
17      I'm an expert in Hill
18  considerations in epistemology,
19  E-P-I-S-T-E-M-O-L-O-G-Y.  And that's
20  how we know what we know.
21      From a scientific perspective.
22  Then this how we know what we believe,
23  that's involves sociology,
24  anthropology aspects and public policy

Page 110

1 issues.
2     I'm an expert in pharmaceutical
3 and other medical products of
4 marketing practices, and I've
5 published on that.
6     Of course I think we went
7 through I'm an expert on warnings.
8     I'm an expert on evaluating the
9 side effects of pain medications, and
10 using secret corporate documents and
11 data.  That, per se, is an expertise,
12 to try to get information out about
13 the health effects and side effects of
14 pain medications.
15     And I've done a little bit with
16 respect to opioids, to the extent that
17 the documents are not confidential,
18 and I've done a lot with respect to
19 other pain medicines, like Vioxx.
20     I'm also an expert in how
21 corporations evaluate the efficacy of
22 their market and control and follow
23 what they and their competitors say
24 about their products.

Page 111

1     So, for example, I've reviewed
2 PMRD and research data, analyzed that
3 data and published on that data.
4     I'm an expert --
5     MR. DONOHUE:  I'm going to
6 object.  Special Master Cohen, I'm
7 going to ask you to direct the witness
8 to answer the question in a summary
9 fashion without -- for using words
10 like, "for example," in an attempt to
11 filibuster a question.  Which,
12 although I recognize, as stated was
13 somewhat broad, I have also made it
14 clear that I'm interested in a summary
15 of the areas he believes he has
16 expertise in, not on a what has now
17 been a 15-minute speech.
18     MS. CONROY:  Your Honor, this
19 was not a speech.  It was an answer to
20 a question that was asked by a
21 defendant, and I would also comment
22 that the defendants have made it very
23 clear there will be Daubert motions
24 filed in this case that will directly

Page 112

1 bear on the expertise of a witness.
2     And so to try to cut down an
3 answer that you asked with respect to
4 expertise is rather alarming, given
5 what's coming in June.
6     SPECIAL MASTER COHEN:  So the
7 defendants are free to ask no
8 questions and get no information.  And
9 if they choose to ask a question and
10 limit it, they're allowed to do that.
11     What I think happened here was
12 that the defendant asked for a list of
13 areas of expertise.  Two examples are
14 social policy and epistemology.  I
15 can't say that.  I just said that in
16 five words.
17     So somewhere between a short
18 list and a long explanation of what
19 each one of those means is how this
20 has to happen.
21     They're entitled to ask you to
22 restrict your answers, Dr. Egilman, in
23 a way that provides only what they're
24 asking.  That's their choice.

Page 113

1 Frankly, maybe it would be better for
2 them to get more information from you,
3 but they're entitled not to do that.
4 So if they want succinct answers,
5 that's what you need to give them.
6 Okay?
7     THE WITNESS:  Okay.
8     MS. CONROY:  Thank you.
9     SPECIAL MASTER COHEN:  Okay.
10   Q.  (BY MR. DONOHUE)  Do you have
11 any other additional areas to list to
12 complete your answer with respect to your
13 expertise?
14   A.  Why don't you go back and
15 re-ask the question.
16   Q.  The question was what areas do
17 you believe that you have expertise in.  And
18 I had asked for a list of those areas.
19   A.  Here, I'm having a little
20 trouble given the ruling.
21     So, you know, I've published on
22 a lot of health effects of a lot of different
23 substances, peer-reviewed papers.  Okay?  So
24 you want me to just say that I've published

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  on the health effects of a lot of substances
2  and the side effects of a lot of things?  Is
3  that all you want?
4      Q.    If that is responsive to the
5  question, if it's true.
6      A.    Well, what's responsive to the
7  question I'm going to give you the detail of
8  each of the substances that I'm an expert in.
9  I'm not an expert in every toxic substance.
10  Okay?  I'm an expert in the ones that I have
11  studied, reviewed, published on.  So
12  that's --
13          I mean, I don't --
14          I mean, I can just -- I mean, I
15  can refer you to my CV.  Why don't I
16  incorporate my CV, and that saves a lot of
17  time?
18      Q.    Okay.
19      A.    In addition to that, I'm an
20  expert on international health and the
21  development of medical schools in developing
22  countries.
23          I'm an expert in minority
24  recruitment to medical schools.

Page 115

1          I'm an expert in the
2  organization of non-profits, the rules and
3  regulations of non-profits.
4          I think that's it for general
5  categories.
6      Q.    Do you consider yourself an
7  expert on the FDA's regulations concerning
8  pharmaceutical marketing?
9      A.    Yes.
10      Q.    Do you consider yourself an
11  expert in pain management?
12          MS. CONROY:  Objection.
13          THE WITNESS:  Well, I consider
14      myself an expert in treating people
15      who have pain for diseases.
16          Certain diseases.  Not all
17      diseases.
18      Q.    (BY MR. DONOHUE)  Do you have
19  any clinical experience in pain management?
20      A.    Well, I have a lot of clinical
21  experience treating people for pain from
22  various diseases, yes.
23      Q.    Have you done any research
24  relating to pain management and the use of

Page 116

1  opioids to treat pain?
2      A.    Yes.
3      Q.    What research have you done?
4      A.    Well, in terms of published
5  research?  I have the work I did -- I think I
6  published -- presented APHA in the FDA
7  presentation.  The rest of the research
8  involves reading literature over time and
9  reading the corporate documents, initially
10  the Purdue documents between 2003, 2005, and
11  then the last several years -- well, the last
12  several months reading all of your documents.
13          In addition, I've read --
14  reviewed opioid literature over time.  That's
15  published literature.
16      Q.    As part of this engagement, did
17  you conduct any quantitative analysis to
18  determine whether defendants' marketing
19  influenced any prescribing decision?
20      A.    Do you mean from a particular
21  prescriber?  Or a particular practitioner?
22      Q.    Yes.
23      A.    Yes.
24      Q.    What quantitative analysis did

Page 117

1  you do?
2      A.    Well, I reviewed the ROI data
3  and the detailed reports from many of the
4  defendants.  And that -- that all -- some of
5  it was specific to specific physicians.
6          I remember it was -- it was one
7  physician whose name came up in the SIG
8  affiliated with impact who was a high user,
9  and somebody saw his name and sent marketing
10  people to that person.  There's the document
11  that talks about no sex, no prostitutes.  So
12  that refers to successful marketing
13  intervention with a particular doctor's name.
14  I don't remember.
15          I don't think that was a
16  formula.  I think it was a particular doctor.
17          So there is a whole slew of --
18  and also some of this is in Perri's report,
19  of indications from detail reps that their
20  work with a rep, with a physician increased
21  that physician's prescribing of opioids.
22      Q.    Are you board certified in
23  internal medicine in preventive occupational
24  medicine?

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  A.  Yes.

2  Q.  And I see from page 30 of your

3  expert report that you say you ran a clinic

4  for 12 to 13 years.

5  A.  Right.

6  Q.  What years were those that you

7  ran the medical clinic?

8  A.  '89 to 2002.

9  Q.  Were you a family medicine

10  doctor during that time in clinic?

11  A.  In part.  I had three general

12  activities.

13  Q.  What were the three general

14  activities?

15  A.  Internal medicine, family

16  medicine, consulting for companies in

17  occupational environmental health issues.

18  Q.  As a doctor, have you treated

19  patients for pain from cancer?

20  A.  Yes.

21  Q.  And as a doctor, have you

22  treated patients for pain for -- or excuse

23  me.  Strike that.

24      Have you treated patients with

Page 119

1  chronic non-malignant pain as a doctor?

2      MS. CONROY:  Objection.

3  Q.  (BY MR. DONOHUE)  Do you

4  believe opioids are addictive?

5  A.  Yes.

6  Q.  When did you first learn that

7  opioids are addictive?

8  A.  I don't recall.

9  Q.  Did you know --

10  A.  Maybe when I read a biography

11  of Charles Dickens.  This would have been in

12  the '70s sometime.

13  Q.  Have you prescribed opioids to

14  your patients?

15  A.  Yes.

16  Q.  What opioids have you

17  prescribed to your patients?

18  A.  Well, if you look, it was

19  produced in this case.  I think it's one of

20  the exhibits.

21      Purdue got my IMS data, and two

22  or three year -- about five years of that

23  data is accurate.  So you'd have to go -- let

24  me get that document out and I'll tell you

Page 120

1  what I prescribed.

2      MR. DONOHUE:  Can you hand that

3  to the court reporter and we'll mark

4  that as Deposition Exhibit 3.

5      (Whereupon, Deposition Exhibit

6  Egilman 3, IMS Data, David Egilman,

7  was marked for identification.)

8      MS. CONROY:  Do you have any

9  copies?

10      MR. DONOHUE:  Sorry, I thought

11  I did, and I'm looking for them right

12  now.

13      THE WITNESS:  Let me just take

14  an aside here.  Do you know using this

15  is illegal based on the contract with

16  IMS.  I just want to make that record.

17  Q.  (BY MR. DONOHUE)  This is a --

18  well, let's identify a document that we've

19  marked as Exhibit 3.

20      Is this the IMS data that

21  you're referring to?

22  A.  It is.

23  Q.  And is this a document that you

24  have attached to your expert report?

Page 121

1  A.  It is.

2  Q.  And you believe this document

3  is illegal?

4  A.  No, its use --

5      MS. CONROY:  Objection.

6      THE WITNESS:  -- in this format

7  is illegal.

8  Q.  (BY MR. DONOHUE)  If you

9  believe the use of it is illegal, why did you

10  attach it to your expert report?

11      MS. CONROY:  Objection.

12      THE WITNESS:  Because it's not

13  illegal for me to use.  There's a

14  contract between Purdue and IMS that

15  says that this cannot be used for any

16  other purpose besides marketing the

17  drug.  And they used it to

18  cross-examine me in a deposition.

19  That's an illegal use, according to

20  their contract.

21  Q.  (BY MR. DONOHUE)  So back to my

22  question, with respect to your treatment of

23  your patients as a medical doctor, what

24  opioids did you prescribe to your patients?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    A.    Okay.  Well, let me -- let's
2  go --
3          So if you look at pages 1 and 2
4  of this, those are -- those are prescriptions
5  that I prescribed.  And those -- not page 3.
6  Just pages 1 and 2.  Pages -- page 3 is some
7  mess-up of IMS data because I was not working
8  at that clinic at that time, and so I did not
9  write those prescriptions.
10         But if you look at page 1 and
11  page 2, you have Lorcet, Percocet generic,
12  Oxycodone tabs, 5 milligrams, Tylenol and
13  codeine, Vicodin line.
14         And the next page, Darvocet
15  generic, Lorcet generic, Oxy slow release 80,
16  two prescriptions for that.  Oxy SR20, and
17  Oxy 40.
18         And then OxyContin tabs.
19  20 milligrams, 40 milligrams, Percocet 2.5
20  325 milligrams.
21         Percocet 7.5, 500 milligrams.
22         Percocet generic, Tylenol and
23  codeine generics, Vicodin generic,
24  Vicoprofen 7.5, 200 milligrams.

Page 123

1    Q.    And the last date that I can
2  read on page 2 of deposition Exhibit 3 is
3  July 2001.
4          Or I assume that the next one
5  is August 2001.  Do you see that?
6    A.    You're talking about those
7  first two pages.  That's not the entire
8  exhibit.
9    Q.    Correct.
10   A.    The last date on the entire
11  exhibit is December 2003.
12   Q.    Right.  But you said that the
13  last page, page No. 3 of the exhibit doesn't
14  apply to you.
15   A.    Well, no, it's got my name on
16  it.  It's not my prescriptions.
17   Q.    Okay.  So I'm asking you about
18  the ones you agree that they're your
19  prescriptions.  The date ending on that
20  information is August of 2001.
21   A.    That's correct.  That was not
22  your question.  That's your question now.  It
23  wasn't your previous question.
24   Q.    Since August 2001, have you

Page 124

1  prescribed opioids to any of your patients?
2    A.    I don't think so.  It's
3  possible that I supervised the prescription
4  of opioids when I was supervising residents
5  of family medicine.  But I wouldn't have
6  written those prescriptions, and I don't have
7  any -- but I would have been responsible for
8  those prescriptions.  I don't have any
9  specific recollection of that actually
10  happening.
11   Q.    For the prescriptions that you
12  wrote for opioids when treating your
13  patients, did you prescribe opioids because
14  it was medically necessary?
15   A.    Yes and no.
16   Q.    When were the times you
17  prescribed opioids to your patients when it
18  wasn't medically necessary?
19   A.    Do you see the OxyContins?
20  Okay?  On the second page of the exhibit?
21         I think most of these relate to
22  one patient, and I was -- he was addicted.
23  And I was trying to get him off.
24         So it was medically necessary

Page 125

1  so he wouldn't go into withdrawal, but that's
2  not a medical necessity in terms of treating
3  the pain.
4          And I tried to get him off, and
5  I failed and therefore I cut him off.
6    Q.    Other than the patient that you
7  just mentioned, are you aware of any other
8  patients that you prescribed opioids to that
9  became addicted?
10   A.    No.
11   Q.    Did you refer to any of your
12  patients' files in reaching the opinions in
13  your expert report that we're here today
14  looking at?
15   A.    I don't have access to my
16  patients' files.
17   Q.    So the answer is no?
18   A.    That's kind of a vague and
19  ambiguous question, but if you're asking just
20  whether I looked in the file, the answer is
21  no.
22         If you're asking whether I
23  relied on information that I gathered while I
24  was treating patients, the answer is yes.

Page 126

1 But I didn't look at the file.
2      Q.    Do you believe chronic pain is
3 a serious medical condition?
4           MS. CONROY:  Objection.
5           THE WITNESS:  May or may not
6      be.
7      Q.    (BY MR. DONOHUE)  Sometimes it
8 is?
9      A.    Sometimes it is.
10     Q.    How do you --
11     A.    Well, sometimes chronic pain is
12 a symptom of a serious medical condition.
13 And probably, rarely, chronic pain is --
14 well, no.  It's -- it's not in and of
15 itself -- it always comes from something.
16 Okay?  So the something that causes the
17 chronic pain can be a serious medical
18 condition.  Part of the seriousness of the
19 medical condition is the fact that the person
20 is in pain.
21     Q.    Do you believe that chronic
22 pain affects people that are in Summit
23 County, Ohio?
24     A.    I'm sure they -- I'm sure there

Page 127

1 are people in pain in Summit County, Ohio.
2      Q.    What about Cuyahoga County,
3 Ohio?  Do you believe there are people that
4 are in chronic pain living there?
5      A.    I'm sure there are.
6      Q.    What about in the
7 United States?  What would you estimate is
8 the number of people in the United States
9 that are affected with chronic pain?
10     A.    I don't think there are good
11 estimates of that number.  I don't know.
12     Q.    Would it be millions of people?
13     A.    I don't think so.
14     Q.    Less than a million?
15     A.    I don't have a number.  There's
16 no good studies.
17     Q.    Do you believe there are any
18 risks, medical risks associated with
19 untreated chronic pain?
20          MS. CONROY:  Objection.
21          THE WITNESS:  There are medical
22     risks of not treating the disease
23     that's causing chronic pain.
24     Q.    (BY MR. DONOHUE)  When you

Page 128

1 treat patients as a medical doctor, do you
2 treat the patients individually?
3      A.    Not always.
4      Q.    What's an example of when you
5 don't treat a patient as an individual?
6      A.    I might treat a family, or a
7 parent and a child.  They might have --
8 particularly with respect to children.
9 There's always someone else who I'm dealing
10 with.
11          In some cases there are issues
12 that I'm treating that relate to the
13 interaction of both parties, both a child and
14 a parent or the parents.
15     Q.    Do you believe there's a single
16 treatment option that would be appropriate
17 for every patient that was suffering from
18 chronic pain?
19     A.    No.
20     Q.    When you treat patients, do you
21 believe it's important to have a variety of
22 treatment options to choose from?
23     A.    Yes and no.
24     Q.    What's the no part?

Page 129

1      A.    Well, if you come in with a cut
2 finger, I don't need five different ways to
3 fix that cut finger.
4           Pretty much there's one way to
5 fix that cut finger, depending on how long
6 the cut or how deep it is.  If it's big
7 enough, it's going to need to be sutured.
8 There's going to be no other alternative.  It
9 doesn't help -- there are no other
10 alternatives.
11          If you come in with an
12 infection and I have an antibiotic that works
13 on that infection, I don't need other
14 options.  I just need the one antibiotic.
15          So those are examples of where
16 I don't need a lot of options.
17     Q.    Could you turn to page 37 of
18 your report, please?
19          Actually, I apologize.
20 Page 36.  So at the end of your background
21 and qualifications which runs from page 29 to
22 page 36 of your report, you write that you've
23 reached the conclusions stated below to a
24 reasonable degree of medical probability

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 based on your review of the medical and
2 scientific literature, corporate documents,
3 deposition, and on your years of training and
4 clinical experience. Do you see that?
5     A.    Yes.
6     Q.    When you are referencing the
7 conclusions stated below, are you referencing
8 the opinions that you give in the remainder
9 of the report?
10    A.    Yes.
11          Reference -- yeah, I'm
12 referencing everything in the report.
13    Q.    Now, with respect to the
14 methodology which starts on page 37 of your
15 report, you write that you base your opinions
16 on the following sources of information.
17          So I want to ask you a couple
18 of questions about that, if that's all right.
19          Review of medical literature.
20 Did you review medical literature in support
21 of your opinions?
22    A.    No.
23    Q.    You did not?
24    A.    I did not do what you just

Page 131

1 asked.
2     Q.    Okay. Let me back up, then.
3     A.    Alone. Okay? It's a -- okay?
4 I did not do what you just asked.
5     Q.    Are you basing your opinions on
6 your report on a review of medical
7 literature?
8     A.    Yes.
9     Q.    And did you review any medical
10 literature?
11    A.    Yes.
12    Q.    And did you review medical
13 journals?
14    A.    Yes.
15    Q.    Did you --
16    A.    I didn't review journals. I
17 reviewed journal articles. Articles that
18 appeared in journals.
19    Q.    Is there anywhere in your
20 report that lists out the medical journal
21 articles that you reviewed that are the bases
22 of your opinions?
23    A.    Well, there's two places there.
24 You have a long list of all of the articles

Page 132

1 that I searched over.
2     Q.    Okay.
3     A.    And then at the -- in some of
4 the opinions I cite specific medical
5 literature.
6          So it appears in aggregate and
7 then attached to some specific opinions.
8     Q.    Did you select all of the
9 medical journal articles that you reviewed
10 that form the basis of your opinion?
11    A.    Yes.
12    Q.    And if we -- let me just go
13 through this and ask these questions.
14          When you write "Review of
15 medical literature," and then underneath it
16 says "Medical meetings," what does that refer
17 to?
18    A.    Well, you know how impact and
19 action have meetings? So I got the minutes
20 of those meetings and I reviewed those. FDA
21 meetings. I reviewed those.
22          There are some memos, corporate
23 memos of meetings. So that kind of business.
24    Q.    And if you took the first

Page 133

1 bullet point, which is your review of medical
2 literature, how many hours would you estimate
3 that you spent reviewing medical literature?
4     A.    No idea.
5     Q.    Can you estimate for us?
6     A.    No.
7     Q.    Well, you spent 384 hours total
8 in the four months that you've been on this
9 engagement; right?
10    A.    Yeah, this isn't limited to the
11 four months I've been involved in this
12 engagement.
13    Q.    What is it comprised of?
14    A.    It's limited to my entire life
15 starting in 1973, probably. So I've been
16 reviewing this kind of work since 1973.
17          So, you know, it's not -- I
18 didn't start looking at this like last month,
19 November.
20    Q.    So if I wanted to know --
21    A.    I mean, for example, you know
22 that I gave a report, including some of the
23 documents, in 2004 and '5, all of the things
24 in that time frame as well. Related to the

Page 134

1  secret documents.
2      Q.   If we wanted to know what
3  medical literature specifically you based
4  your opinions on since you have been engaged,
5  would you be able to answer that?
6      A.   Anything dated since November,
7  I -- is something that I read since I've been
8  engaged.
9      Q.   And are you able to estimate
10 how many hours in the last four months that
11 you have reviewed medical literature?
12     A.   No.
13     Q.   How about review of published
14 books?  Are you able to estimate how many
15 hours in the last four months you've reviewed
16 published books?
17     A.   No.
18     Q.   How about review of corporate
19 documents?  Do you have a list of the
20 productions that you reviewed?  Did you
21 personally review documents from those
22 productions?
23     A.   Yes.
24     Q.   And how many hours in the last

Page 135

1  four months have you spent reviewing
2  corporate documents?
3      A.   I do not know.
4      Q.   Do you have any guess?
5      A.   Less than 384.
6      Q.   And if you'd turn to page 38,
7  you have a category "Review of other produced
8  documents."
9       Do you see that?
10     A.   I do.
11     Q.   Can you estimate how many hours
12 in the last four months you've reviewed other
13 produced documents?
14     A.   No.
15     Q.   And then you have a review of
16 depositions.  Do you see that?
17     A.   I do.
18     Q.   Can you estimate how many hours
19 in the last four months you've spent
20 reviewing depositions?
21     A.   No.
22     Q.   With respect to your staff, do
23 you know how many hours any member of your
24 staff would have spent on any of the

Page 136

1  materials reviewed that we just went through?
2      A.   No.
3      Q.   And what about the students?
4  Would you have any idea of the number of
5  hours the students that are working with you
6  have reviewed on any of the materials we've
7  gone through?
8      A.   No.
9      Q.   As part of your engagement in
10 this litigation, have you conducted
11 interviews of witnesses?
12     A.   No.
13     Q.   As part of your engagement,
14 have you discussed the litigation with any
15 other experts?
16     A.   This litigation?
17     Q.   Yes.
18     A.   No.
19     Q.   As part of this litigation and
20 your engagement, have you reviewed any
21 individual patient's information?
22     A.   Yes.
23     Q.   What individual patient
24 information have you reviewed as part of your

Page 137

1  engagement?
2      A.   Well, if you'll look at the --
3  there's a Butrans ad which involves -- which
4  describes patients.  There's other
5  advertisements and medical information on --
6  in other documents and published papers that
7  relate to individual patient information.
8       There's the Purdue marketing
9  advertisements, and the counter
10 advertisements where patients express their
11 experience using OxyContin initially and then
12 after they became addicted.  So I reviewed
13 those.
14      There's other patient
15 information involved, I think, in some of the
16 call notes.  For example, there's call
17 notes -- oh, there's the death notice of the
18 woman who took half of OxyContin and died of
19 an overdose.
20      So that's a medical report to
21 the FDA by Purdue that includes patient
22 information.
23      So throughout the documents,
24 there's a lot of information about patient

Highly Confidential - Subject to Further Confidentiality Review

Page 138

histories.

Q.   Do you know the volume of medical literature that you considered, read, or reviewed in rendering your opinions in this engagement?

A.   By search I think it's about 35,000 articles that I produced to you.  So I searched over them, for example, for any documents that related to studies of the efficacy of narcotics, opioids for pain, and a variety of other topics.  So I searched over all of those for most of the things I gave opinions on.  And then the ones that came out, I read the abstracts.  If I thought they were relevant, they got into the article.

Q.   And how did you conduct the search through the medical literature?  Is that through a database?

A.   PubMed.

Q.   PubMed?

A.   PubMed.

Q.   And do you have any idea of the volume of documents that you've considered as

Page 139

part of this engagement?

A.   Well, it's 90 million documents of database.  I did similar searches over the database.  And then there's the 35,000 articles in PubMed, and then there's additional documents that I reviewed available.  Some web documents.  Some -- there were other documents I think that were produced in the litigation:  the FDA meetings, the two reports on the FDA, government -- GAO report on the FDA.  And there was another report on the FDA that I read.  So there are other documents I read in addition to the database in the medical literature.

And of course we did a -- we did a deep dive for that -- for that poster presentation.  Trying to find all those citations because they weren't PubMed, and they -- we went to -- we went to like several different libraries to do that -- to do the dive for the Fishbain missing materials.

MR. DONOHUE:  I think now would be a good time to take a lunch break,

Page 140

if that's all right.

MS. CONROY:  Sure.

THE VIDEOGRAPHER:  Off the record at 12:24.

(Recess taken, 12:23 p.m. to 1:15 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 1:16.

THE WITNESS:  Okay.  I just wanted to let you know that exhibit -- well, it's not an exhibit, but folder 20 here was additional bases for opinion that I forgot to mention.

EXAMINATION

BY MS. SAULINO:

Q.   Okay.  Thank you, Dr. Egilman.

So as you may have heard earlier, my name is Jennifer Saulino.  I'm with a law firm called Covington & Burling, and I represent McKesson in this litigation.

So you are just pointing to a folder that you have numbered as 20 that's in front of you, and you're saying now that that is additional bases for the opinions that you

Page 141

issued signed March 25th, 2019; is that right?

A.   Yes.  That was a -- what I did was I added -- I had already given additional bases before.  I omitted this.  I added this to the additional bases.

Q.   And when did you determine that these additional bases existed?

A.   Sometime between when my report was written and today.

Q.   And you didn't feel the need to disclose them to the defendants until this moment?

A.   Correct.

Q.   Okay.  Let's mark folder 20, as Exhibit --

Can I have that, please?

Thank you.

(Whereupon, Deposition Exhibit Egilman 4, Green folder marked 20 - Distribute = Manufacturers, was marked for identification.)

Q.   (BY MS. SAULINO)  So we've identified folder number 20 that was just

Page 142

1 identified by Dr. Egilman as Exhibit 4 to
2 this deposition.
3         That's all we have for that
4 right now, Dr. Egilman.
5         Dr. Egilman, in your report you
6 detailed two methods that you used to form
7 opinions in this case, the grounded theory
8 approach and the evidence-based method. Is
9 that right?
10     A.    Can you tell me where you are
11 in the report.
12     Q.    Sir, you wrote the report. You
13 know what methodology you relied upon?
14     A.    Yes. Can you tell me where in
15 the report you're reading from?
16     Q.    Sir, do you recall relying on
17 the grounded theory approach and the
18 evidence-based method?
19     A.    Yes.
20     Q.    And those are the two
21 methodologies that you detailed in your
22 report. Correct?
23     A.    General methodologies for the
24 report, yes.

Page 143

1     Q.    And those are the only
2 methodologies that you set forth in your
3 report; correct?
4         MS. CONROY:  Objection.
5         THE WITNESS:  No, that's not
6 correct.
7     Q.    (BY MS. SAULINO)  You don't
8 provide any other detail of any methodology
9 anywhere in your report, do you?
10     A.    I don't think that's correct.
11     Q.    Where do you believe that you
12 provide methodology?
13     A.    This whole discussion of EERW
14 methodology, for example.
15         There's other comments on, for
16 example, the quality of the estimates of the
17 number of pain patients. There are a variety
18 of other report -- other opinions that
19 include the methodologic discussions.
20     Q.    Okay. Doctor Egilman, you
21 wrote this report; right?
22     A.    Yes.
23     Q.    Did you write it yourself?
24     A.    Yes.

Page 144

1     Q.    And did the plaintiffs' lawyers
2 help you write it?
3     A.    No.
4     Q.    Not at all?
5     A.    No.
6     Q.    And when you wrote this report,
7 you chose, on pages -- starting at about
8 38 -- do you have your report in front of
9 you?
10     A.    I do. I'm on page 38.
11     Q.    Okay. It looks like I might be
12 off by a page. 37.
13         You start with a section called
14 "Methodology." Am I reading that correctly?
15     A.    Correct.
16     Q.    Okay. And under your section
17 called "Methodology," you start with the
18 grounded theory approach; right? Which is --
19 which starts on page 38.
20         Under "State of the art
21 methods"?
22     A.    Correct.
23     Q.    Okay. And then, if you go to
24 page 40, you explain evidence-based method --

Page 145

1 evidence-based medicine methods; right?
2     A.    Yes.
3     Q.    Okay. In your methodology
4 section, you do not detail any other
5 methodologies, do you?
6     A.    That's correct.
7     Q.    Okay. So your methodology
8 section of your report is incomplete?
9     A.    No.
10     Q.    So you only rely, then, on two
11 methodologies in your report?
12     A.    No.
13         MS. CONROY:  Objection.
14     Q.    (BY MS. SAULINO)  So your
15 methodology section is inaccurate?
16     A.    No.
17     Q.    So where else did you detail
18 your methodologies, Dr. Egilman?
19     A.    Well, I just gave you several
20 other examples.
21     Q.    And why do you not detail them
22 in the methodology section of your report,
23 sir?
24     A.    Excuse me. Your question was

Page 146

1  where else do you --
2      Q.    Sir, are you reading the
3  transcript of your own deposition right now?
4      A.    I'm reading your question.
5      Q.    Okay, sir.  I can ask my
6  question again.  I'll just make it clear.
7      A.    I think you cut my answer off.
8  That's my problem.
9      Q.    Sir, I'll withdraw the question
10  that I asked and I'll ask a new one.  Okay?
11      A.    That was my problem, is that
12  you cut my answer off.
13      Q.    I'll withdraw it and ask a new
14  one, then.
15      A.    Great.
16      Q.    Great.  So in Section 3 of your
17  report that you title "Methodology," you and
18  I have already agreed that you only detailed
19  two methodologies there; correct?
20      A.    In that section that outlines
21  the general methodology for the report,
22  correct.
23      Q.    Okay.  And the other
24  methodologies that you now say you also

Page 147

1  relied on, you did not detail in the
2  methodology section of your report, did you?
3      A.    That's correct.  The specific
4  criticism of some of the epidemiologic
5  studies, approaches and other things were not
6  in the methodology section per se, although
7  they are encompassed by evidence-based
8  medicine methods.
9      Q.    You don't explain that in the
10  methodology section of your report, do you?
11      A.    I'm not sure that's correct.
12      Q.    You don't explain that you're
13  adding other methodologies to your report in
14  the evidence-based medicine methods section
15  of your report, do you?
16      A.    No.  Let me try to help you
17  here.
18          I think in evidence-based
19  medicine, part of this report, the citations
20  certainly, include epidemiology and
21  epidemiologic methods.
22          So some of the opinions later
23  on in the report include more detailed
24  discussion, particular epidemiological

Page 148

1  methodological issues which are encompassed
2  as part of evidence-based medicine.
3      Q.    So the overall methodology,
4  though, that you were using for those
5  opinions is evidence-based medicine method;
6  correct?
7      A.    Correct.  Which is --
8  encompasses many subfields.
9      Q.    And what you're referring to as
10  appearing, quote, later in your report are
11  simply opinions; right?
12      A.    No, they're bases for opinions,
13  when I talk about -- if you're talking about
14  methods.
15      Q.    And you don't have anywhere
16  else in your report where you lay out, "This
17  is the methodology that I used in order to
18  reach this opinion," do you?
19      A.    I don't think I used that form,
20  but that's there in the substance.
21      Q.    Okay.  Well, we'll look at some
22  of that.
23          Now, you have not documented in
24  your report which opinion of your 490

Page 149

1  opinions is based on which of the
2  methodologies you lay out here, have you?
3      A.    Not directly by reference,
4  correct.
5      Q.    There is no way to know, from
6  looking at your report, which opinion is
7  based on which method; correct?
8      A.    No.
9      Q.    Where have you listed that,
10  sir?
11      A.    Well, in some cases if I'm
12  discussing epidemiologic methodological
13  issue, that would come under evidence-based
14  medicine methods.
15      Q.    You don't say --
16      A.    That --
17      Q.    Go ahead, sir.
18      A.    In other parts of the report
19  where I'm not dealing with a scientific issue
20  but rather with an analysis of the ways
21  companies influenced physicians, I'm using
22  grounded methods in general.
23      Q.    Okay.
24      A.    In other words, when I discuss

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  minutes, memos, depositions, and review
2  documents related to the corporate conduct,
3  that would be under the general category of
4  grounds or methodology.
5      Q.   What you just described is not
6  written anywhere in your report, is it?
7      A.   Well, no, that's not correct.
8      Q.   Sir, nowhere in your report do
9  you say this opinion is based on grounded
10 theory approach, or this opinion is based on
11 evidence-based medicine methodology; correct?
12     A.   By opinion, do you mean?
13     Q.   Correct.
14     A.   That's correct.  I do not refer
15 back to a particular -- to grounded theory
16 when I use grounded theory in the report,
17 that's correct.
18     Q.   So there's no way for anyone
19 other than you to look at your report and
20 know which methodology you used for each
21 opinion; correct?
22     A.   Wrong.
23     Q.   Where in your report have you
24 provided those bases?

Page 151

1      A.   Well, the bases for grounded
2  theory method is on page 38 and 39.
3      Q.   Sir, let me clarify my
4  question.
5      A.   And in --
6      Q.   Let me clarify my question.  I
7  obviously was unclear.
8          MS. CONROY:  Let the witness
9      finish the answer before you start
10     another question.
11         MR. DONOHUE:  Then I will
12     withdraw the question and clarify it.
13         MS. CONROY:  And withdraw it by
14     not interrupting the witness.
15     Q.   (BY MS. SAULINO)  Sir, you just
16 answered in response to my question that
17 nowhere in your report do you -- is there any
18 way to know which opinion is based on which
19 method.  You said no.  Correct?
20     A.   I don't think that's correct.
21     Q.   Okay.
22     A.   Certainly -- I don't know
23 which -- you asked about eight related
24 questions.  The previous question was not the

Page 152

1  question that you just asked.  You withdrew
2  the previous question, and the question --
3  two above that -- I can't see.  I don't think
4  it's the question that would relate to the
5  question you just asked.
6      Q.   If another expert were to take
7  your report and pick it up, they cannot, by
8  reading your report, know which methodology
9  you used for each opinion; correct?
10     A.   No.
11     Q.   That's not correct?
12     A.   That is not correct.
13     Q.   Why do you say that's not
14 correct?
15     A.   Because anybody familiar with
16 grounded theory methods -- and I give you
17 some examples of papers -- could recognize
18 the --
19         Let me give you -- try to give
20 you an example.
21     Q.   Sir, I don't want an example.
22 I just want an answer to my question.
23         MS. CONROY:  Let the witness
24     answer the question.

Page 153

1          MS. SAULINO:  I am asking for
2      an answer to my question.  I don't
3      want an example, just an answer to my
4      question.
5          THE WITNESS:  Okay.  That's too
6      bad.  I'm going to give you an
7      example.
8          MS. SAULINO:  Sir, I will
9      object to you -- I will object to the
10     discourse here.  You can provide that
11     information on your own counsel's
12     time.  I would like an answer to my
13     question.
14         THE WITNESS:  I'm giving you an
15     answer to your question.
16         SPECIAL MASTER COHEN:  Why
17     don't you reread the question to the
18     witness and see if he can answer it at
19     least first without an example.
20     Q.   (BY MS. SAULINO)  Sir, I asked
21 you if another expert were to take your
22 report and pick it up, they cannot, by
23 reading your report, know which methodology
24 you used for each opinion, correct?

Page 154

1     And you said no.
2     And I asked you, why do you say
3  that's not correct?
4     A.    I say that's not correct
5  because an expert who is familiar with
6  grounded methods will recognize which
7  opinions in this report were based in
8  grounded methods rather than something else.
9  Like math.
10    Q.    So, sir, what you're saying is
11 that if there is an opinion in this report
12 that's based on math, then it's not based on
13 the grounded theory approach?
14    A.    That was exactly the example I
15 was going to give, yes.
16    Q.    And, sir, nowhere in your
17 report do you lay out which opinion uses
18 which method, do you?
19    A.    Not explicitly.
20    Q.    Now, I want to start with the
21 evidence-based medicine method.  I'd like to
22 ask you some questions about your
23 methodology; okay?
24    You say that the first step in

Page 155

1  the evidence-based medicine method is the
2  development of answerable questions; right?
3     A.    Yes.
4     Q.    And you developed two such
5  questions; right?
6     A.    I'm not sure what you're
7  referring to.
8     Q.    I'm referring to the answerable
9  questions that you developed in your report.
10    A.    Yes.
11    Q.    The top of page 41?
12    A.    Right.
13    Q.    "What are the treatment options
14 for chronic non-cancer pain?"  Is your first.
15 And your second is "In patients with chronic
16 non-cancer pain, how do opioids and NSAIDs
17 compare in terms of efficacy and adverse
18 effects?"
19    I read those correctly; right?
20    A.    Yeah, but you took them out of
21 context.  You took that -- that question is
22 out of context.
23    Q.    Sir, I read those directly from
24 your report, didn't I?

Page 156

1     A.    You read them directly from the
2  report, but your initial framing was
3  incorrect.
4     Q.    Well, sir, I'm looking at the
5  section, if you start on page 40, that is
6  titled "Step 1, translation of uncertainty
7  into" answerable -- into "an answerable
8  question."  Right?
9     A.    Yes.
10    Q.    Okay.  And then you go through
11 your explanation of what generally answerable
12 questions are, and then you say, "I asked the
13 following background questions."  And you
14 list one question.  "What are the treatment
15 options for chronic non-cancer pain"; right?
16    A.    Right.
17    Q.    And you say, "I asked the
18 following foreground questions," and you list
19 one question, and it is, "In patients with
20 chronic non-cancer pain, how do opioids and
21 NSAIDs compare in terms of efficacy and
22 adverse effects?"  Right?
23    A.    Yes.
24    Q.    That's an accurate reading of

Page 157

1  your report; right?
2     A.    Of that section of the report.
3     Q.    Okay.  So those are the two
4  answerable questions that you developed for
5  your report.
6     A.    No.
7     Q.    You developed additional
8  answerable questions that you didn't list in
9  your report?
10    MS. CONROY:  Objection.
11    THE WITNESS:  I had an
12 assignment which I gave you, and that
13 was the -- that was the answerable
14 question that I was addressing in the
15 report.
16    These two questions, as you can
17 see by the framing that I put on them,
18 are background questions.
19    Q.    (BY MS. SAULINO)  So your
20 answerable question was not developed by you.
21 It was an assignment given to you by
22 plaintiff lawyers?
23    A.    Well, it was jointly discussed
24 and developed by me and them together, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1   Q.    As you explain the
2   evidence-based medicine method, you say that
3   it is an evidence that is an approach --
4   A.    Can you tell me where you're
5   reading from so I can follow?
6   Q.    I'm reading your words, sir.
7   A.    I know.  But --
8   Q.    Page 40 at the top.
9         "It is an approach to medical
10  decision-making meant to integrate individual
11  clinical expertise with the best available
12  external clinical evidence from systematic
13  research"; right?
14  A.    I don't think you read that
15  correctly.
16  Q.    What do you think that I was
17  mistaken about?
18  A.    Well, I'm looking at what she
19  transcribed and what I'm reading and it's
20  different.
21        I couldn't catch up to the
22  beginning.  That's why I asked you where you
23  were.  But you kept reading and I couldn't
24  follow the language.

Page 159

1   Q.    Did you hear my question, sir?
2   A.    Yeah, but your question was
3   whether you read it correctly.  In order to
4   know whether you read it correctly, I need to
5   read it.  And I need to listen to what you're
6   saying.
7   Q.    Sir, I actually didn't ask you
8   whether I read it correctly.  I just asked
9   you whether that was the approach that you
10  described in your report.
11  A.    Well, you read it and then said
12  that.  And so in order to know whether it was
13  correctly described, I need to read it.
14  Q.    You don't remember what
15  approach you used in your report, sir?
16  A.    Generally, I do.
17        MS. CONROY:  Objection.
18        THE WITNESS:  But you're asking
19  a specific quote, or attempting to
20  quote it.  I don't know if you're
21  correctly quoting or not.  And I need
22  to read it to see if you're correctly
23  quoting.
24        This is serious business.

Page 160

1   Q.    (BY MS. SAULINO) Yes, it is,
2   sir, and I'm trying to --
3   A.    If you leave a word out or
4   something and I miss it, that's bad.  I
5   want -- so I want to read it.
6   Q.    Right.  Because if I left a
7   word out, then it might be that someone
8   reading it later on wouldn't be able to
9   understand the full basis of your opinions;
10  right?
11  A.    Anything's possible, but, for
12  example, when you left the framing of the
13  background questions out of what you did
14  before, that was completely misleading.
15        So you might leave a word out,
16  it might not make a difference.  I don't
17  know.  But I'd rather not a take a chance.
18  Q.    Sir --
19  A.    That's why if you're going to
20  read something, I'd like to know where you're
21  reading so I can follow it.
22  Q.    Sir, it sounds like you would
23  agree with me that it's very important that
24  we be able to look at your report, read it,

Page 161

1   understand the bases for your opinions and
2   methodology, and then replicate it; right?
3   That's what any good expert would do.
4         MS. CONROY:  Objection.
5         THE WITNESS:  Okay.  Well,
6   there's two questions there.  Which do
7   you want me to answer?
8   Q.    (BY MS. SAULINO)  Why don't you
9   pick, sir?
10  A.    I don't know.
11  Q.    Sir, according to you,
12  "Evidence-Based Medicine" -- I'm at the top
13  of page 40 again -- "is an approach to
14  medical decision-making meant to integrate
15  individual clinical expertise with the best
16  available external clinical evidence from
17  systematic research"; right?
18  A.    Correct.  With quotes between
19  individual and research -- I think it's a
20  David Sackett quote.
21  Q.    Are you agreeing with
22  Mr. Sackett, Dr. Sackett?
23  A.    I am.
24  Q.    Okay.

Page 162

1       And the practice of
2   evidence-based medicine can be outlined in
3   five basic steps; right?
4       A.   Yes.
5       Q.   The translation of uncertainty
6   to an answerable question is the first step;
7   right?
8       A.   That's the one he numbered
9   number one.
10      Q.   Okay.  And that is one of the
11  steps that should be done by the clinical
12  expert; right?
13          MS. CONROY:  Objection.
14          THE WITNESS:  If possible.
15      It's not always possible.
16      Q.   (BY MS. SAULINO)  Are you
17  saying that was not possible in this case?
18      A.   No.  I'm saying it's not always
19  possible.  You asked a general question, you
20  get a general answer.
21      Q.   Okay.  And it was possible in
22  this case for you, as the clinical expert, to
23  translate uncertainty to an answerable
24  question.  Right?

Page 163

1       A.   To the extent that there was
2   uncertainty, yes.
3       Q.   Okay.  But you didn't do that
4   yourself.  The plaintiffs' lawyers handled
5   that for you; right?
6       A.   No.
7       Q.   Well, I'm basing this on your
8   testimony just a couple of minutes ago.  You
9   told me that your answerable question here
10  was the assignment you were given by
11  plaintiffs' lawyers; right?
12      A.   No.
13          MS. CONROY:  Objection.
14          THE WITNESS:  I said it was an
15      assignment that we discussed and
16      talked about and agreed to together.
17      Q.   (BY MS. SAULINO) When was that,
18  sir?
19      A.   That was discussed three months
20  ago.
21      Q.   You don't remember when?
22      A.   No.
23      Q.   Okay.  So it wasn't an
24  assignment; it was an agreed-to research?

Page 164

1       A.   The same difference, to me.
2       Q.   Okay.  And that was the only
3   question that you were trying to answer here?
4       A.   That was the only question I
5   was asked to answer here.  There may have
6   been other questions that came up that were
7   also answered.
8       Q.   Okay.  And precisely what was
9   that question, just so we have it here in
10  your methodology?
11      A.   I was asked to determine within
12  a reasonable degree of medical and scientific
13  certainty whether or not various defendants
14  working together and/or separately were
15  significant factors in causing the opioid
16  epidemic.
17      Q.   Okay.  Let's mark that as an
18  exhibit.
19          (Whereupon, Deposition Exhibit
20      Egilman 5, My Assignment, was marked
21      for identification.)
22      Q.   (BY MS. SAULINO)  And again,
23  the way that you just stated that, it says,
24  "I was asked"; right?

Page 165

1       A.   That's correct.
2       Q.   Okay.  So we've marked as
3   Exhibit 5, what you've titled "My
4   Assignment," which you just read into the
5   record.
6           And just so we're clear, you
7   didn't record that question in your report;
8   right?
9       A.   That's correct.
10      Q.   Why did you not put that in
11  your report?
12      A.   No reason --
13      Q.   You didn't --
14      A.   -- in particular.
15      Q.   You didn't think it was
16  important to put down the answerable question
17  that was step 1 in your evidence-based
18  medicine method?
19      A.   That's correct.
20      Q.   And then you added your
21  background and foreground question; correct?
22      A.   Correct.
23      Q.   Your background question is
24  "What are the treatment options for chronic

Page 166

1  non-cancer pain?" Right?
2      A.    Correct.
3      Q.    Your foreground question is "In
4  patients with chronic non-cancer pain, how do
5  opioids and NSAIDs compare in terms of
6  efficacy and adverse effect?" Right?
7      A.    Correct.
8      Q.    Neither of those answers the
9  question whether or not various defendants
10 working together or separately were
11 significant factors in causing the opioid
12 epidemic; correct?
13     A.    Not by themselves, but they are
14 a part of the answer.
15         MS. CONROY: Objection.
16     Q.    (BY MS. SAULINO) You don't list
17 any other background or foreground questions
18 that you were exploring; correct?
19     A.    That's correct.
20     Q.    So there's no way for us to
21 know what those were?
22     A.    Correct.
23     Q.    Now, your next step is
24 systematic retrieval of best evidence

Page 167

1  available; right?
2      A.    Correct.
3      Q.    You say, "Once an answerable
4  question has been posed, the researcher must
5  select an evidence resource, execute a search
6  strategy, and then evaluate the evidence
7  summary"; right?
8      A.    Correct.
9      Q.    And you say your evidence
10 resource included medical literature and
11 company documents; right?
12     A.    And depositions.
13     Q.    Okay.
14         And you --
15     A.    And other documents. I think I
16 mentioned that already. Institute of
17 Medicine reports, FDA reports, GAO reports.
18 Those are all probably incorporated into
19 company documents as well.
20     Q.    I'm looking at step 2 that
21 you've listed in your report.
22         And here under "Systematic
23 retrieval of the best evidence available,"
24 you first list where you went to review

Page 168

1  medical evidence; right?
2         You say, "I conducted computer
3  searches of several different databases";
4  right?
5      A.    Yes.
6      Q.    And then you say, "I also
7  searched corporate records for unpublished
8  studies"; right?
9      A.    Yes.
10     Q.    And then you identify some
11 search terms that you used; right?
12     A.    Yes.
13     Q.    Those are the only sources that
14 you list under step 2; right?
15     A.    Correct.
16     Q.    Okay. So you're now adding to
17 the sources that you used under step 2?
18     A.    I'm not sure what you mean by
19 "adding to sources."
20     Q.    Well, you said "and
21 depositions, and other documents." Those
22 aren't listed here in step 2; right?
23     A.    No. They're listed elsewhere.
24 Other -- as I said, all of the government

Page 169

1  documents I relied on I believe were also
2  corporate documents, but I wanted to
3  distinguish to be clear. They weren't
4  generated by the companies but the companies
5  had them.
6         So that's a distinction without
7  a difference.
8         Depositions, I didn't include
9  them, but I think I included them in the
10 introductory materials before this section in
11 this report. I think they're on the first or
12 second page.
13     Q.    You did. But here, where you
14 talked about your systematic retrieval of the
15 best evidence available, you didn't list
16 them, did you?
17     A.    Correct. I only listed them at
18 the beginning. It was a mistake. I should
19 have relisted depositions here.
20     Q.    Okay. And let's look at your
21 reference to corporate records here on
22 page 41.
23     A.    Okay.
24     Q.    You say, "In addition to

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  published evidence, I also searched corporate
2  records for unpublished studies"; right?
3      A.    Right.
4      Q.    Not for anything else; right?
5      A.    No.  I searched for all kinds
6  of other things.
7      Q.    Well, you qualify it here by
8  saying you simply searched corporate record
9  for unpublished studies in step 2 of your
10  evidence-based methodology, don't you?
11      A.    Yeah, but if you look at the
12  search terms, it's obvious I was searching
13  for other things.
14      Q.    Sir, there's nothing obvious
15  about that.  Those search terms could easily
16  be found in unpublished studies, couldn't
17  they?
18          MS. CONROY:  Objection.
19          THE WITNESS:  I don't think so.
20      Q.    (BY MS. SAULINO)  So it's your
21  testimony --
22      A.    Not all of them.  I don't think
23  so.
24      Q.    So it's your testimony, sir,

Page 171

1  that while you didn't say that you used more
2  than one -- that you used corporate records
3  for more than unpublished studies, and in
4  fact said exactly the opposite here, we
5  should have known based on the search terms
6  you listed?  That's your testimony?
7      A.    No.  I think elsewhere in the
8  report I explained that I reviewed all of the
9  documents in the repository, and I said that
10  in that section.  It says, "I have accessed
11  the entire repository documents."  Okay?  And
12  so the -- the -- it says, "In addition to
13  published literature, I also searched
14  corporate records for unpublished studies."
15  There's a period.  And then "I also had
16  access to the entire repository documents
17  listed in this litigation."  Another period.
18          So the rest of that paragraph
19  or bullet points in the bullet points of 42,
20  are the other topics for which I searched the
21  entire database.
22      Q.    Sir, with respect --
23      A.    Not respective of whether or
24  not they were an unpublished study.

Page 172

1      Q.    Sir, with respect, that's not
2  what that paragraph says, is it?
3      A.    Well, with respect, it is what
4  it says.
5      Q.    Sir, you say you "searched
6  corporate records for unpublished studies."
7  You then list the corporate records that you
8  searched, and you list the search terms that
9  you used in order to find unpublished
10  studies.  That is what you say in your
11  report; right?
12          MS. CONROY:  Objection.
13          THE WITNESS:  No.  The second
14  sentence says, "I have had access to
15  the entire repository of documents
16  produced in the litigation," and it
17  goes through what documents -- who
18  provided those documents, and then it
19  also has another sentence, okay?
20  Which includes the search terms,
21  without reference or limitation, to
22  published studies.  Unpublished
23  studies.
24      Q.    (BY MS. SAULINO)  You'd agree

Page 173

1  with me all of that is qualified by the
2  paragraph that you start with that
3  specifically identifies unpublished studies
4  as what you were looking for?
5      A.    I do not agree with you,
6  because that is a second -- a different
7  sentence.
8      Q.    Okay.
9      A.    I had a "none" once and I'd
10  have to defer to the "none" as to whether or
11  not the sentence before the definition of
12  search terms is an independent clause rather
13  than the initial paragraph which is separated
14  from that sentence by a list of companies
15  whose documents were produced.
16      Q.    Let's look at your search
17  terms, sir.
18          You would agree with me that
19  it's important to get key terms right,
20  because otherwise you might miss relevant
21  documents in your searches?
22      A.    Well, if you limit it to terms,
23  that would be true.  I didn't limit it to
24  those terms.

Page 174

1    Q.   So there are other terms that
2  you used that you did not list here in your
3  report?
4    A.   Sure.  It's an iterative
5  search.  I mentioned the -- when the lawyer
6  for Insys was asking.  We did all kinds of
7  sex terms.  And I didn't mention that in here
8  either.  This is an iterative process.
9  That's what grounded theory is.  You find
10  something, then you pursue other things
11  related to what you found.  And you do a
12  variety of searches based on what you find in
13  previous searches.
14    Q.   Sir, I'm looking at the
15  evidence-based medicine methodology right
16  now, not the grounded theory methodology.
17    A.   That's fine.  I'm just telling
18  you what -- that that's what I did.  The
19  grounded theory applies to how I reviewed
20  this evidence-based medicine.  Remember,
21  evidence-based medicine is pretty much
22  limited to evidence, not as it's written.  So
23  I'm adopting that method as a basis for using
24  grounded theory method, which allows me to do

Page 175

1  a broader analysis beyond the confines of
2  published medical evidence.
3    Q.   And what you just said is not
4  written anywhere in your report, is it?
5    A.   That's correct.
6    Q.   So there was no way for us to
7  know that until you just told me right now;
8  right?
9    A.   No.  Not at all.
10    Q.   Now, you said that -- you say
11  in your report, "I initially searched the
12  sources above for" --
13    A.   Wait.  Will you tell me where
14  you're reading from?
15    Q.   Page 42, your words, sir.
16    A.   Okay.  Go ahead.
17    Q.   "I initially searched the
18  sources above for key terms identified by me
19  including," and you list them; right?
20    A.   Correct.
21    Q.   You identified these terms
22  yourself?
23    A.   Correct.
24    Q.   No one helped you?

Page 176

1    A.   Well, I discussed them all with
2  the staff, so we had a group discussion.  But
3  I think pretty much these are mine.
4    Q.   Okay.
5          And --
6    A.   It could be that one of my
7  staff suggested one or another one.
8    Q.   And you just told me there are
9  a number of other terms that you used; right?
10    A.   Sure.
11    Q.   But you don't list them here?
12    A.   Correct.
13    Q.   And you don't list them
14  anywhere else in the report?
15    A.   That's correct.
16    Q.   And so there's no way for us to
17  know what other search terms you used; right?
18    A.   That's correct.
19    Q.   Now, is it the case --
20    A.   I got a list of the sex terms,
21  I think.
22    Q.   Sir, I understand that you want
23  to talk about the sex terms, but I'd like to
24  talk about your report.

Page 177

1          MS. CONROY:  Objection.
2    Q.   (BY MS. SAULINO)  So you list
3  here a set of terms; right?
4          Is it fair to say that these
5  are the first terms that you put through the
6  database?
7    A.   Yes.
8    Q.   Okay.  So your initial search
9  was based on these terms; right?
10    A.   Yes.
11    Q.   Okay.  And then from there, you
12  added additional terms after?
13    A.   Sure.
14    Q.   Okay.  So, isn't it true that
15  anything that wouldn't be caught by these
16  initial search terms, you then wouldn't have
17  later reviewed?
18    A.   No.
19    Q.   So you did the initial search
20  over again with additional terms?
21    A.   You can only do an initial
22  search once, so the answer to that is no.
23    Q.   I'm asking you about your
24  process, sir.

Page 178

1   Do you have any way to describe
2 the process that you used with your initial
3 search terms?
4   A.   Sure.  You get -- you do the
5 initial search, you read the documents.
6 Then, for example, if you find -- let's say
7 you find some document with Sade name on it.
8 Okay?  So then you do a search by Sade's
9 name, because you want to know what else Sade
10 is involved in.
11   Or you find Katz's name.  So
12 you put Katz name in.  What else can you find
13 out about Katz.  Or you do a search and
14 you'll find the word "impact."  And then you
15 do a search by impact.
16   So you search by individual
17 names, you search by entities, you -- you
18 know, then you find the American Pain
19 Foundation and the result.  And then you do a
20 search by that.  And then if you find
21 something in those documents, you do
22 subsequent searches.  It's an iterative
23 process.
24   Q.   Okay.  I understand that you're

Page 179

1 saying it is an iterative process, which is
2 the grounded theory approach; right?
3   A.   Yes.
4   Q.   And you used the grounded
5 theory method in combination with the
6 evidence-based medicine approach?  Is that
7 what we're now understanding?
8   MS. CONROY:  Objection.
9   THE WITNESS:  I used the
10 evidence-based medicine approach
11 primarily for evidence, but I
12 incorporated aspects of the
13 evidence-based approach in the
14 grounded theory method.  Because some
15 of what I was doing in evidence-based
16 medicine was looking at evidence.  In
17 order to understand some of the
18 development of evidence, you have to
19 use grounded theory.  Particularly
20 when you're looking at manipulation of
21 study data, or influencing
22 researchers, things that are not
23 within the four corners of what
24 Sackett and others would generally, at

Page 180

1 the time frame, have considered
2 important to evidence.  But which now
3 turns out to be a whole subfield of
4 evidence.  So you have to combine them
5 both.
6   Q.   (BY MS. SAULINO)  What you have
7 just been referring to as evidence in your
8 answer, you mean by that data generated from
9 quantitative studies; right?
10   A.   In part.
11   Q.   I'm trying to understand your
12 previous answer, sir.  And you said you used
13 the evidence-based medicine approach
14 primarily for evidence, but then you
15 explained that you had to incorporate the
16 grounded theory method for things that aren't
17 typically a part of evidence.
18   And so I'm trying to understand
19 what evidence is to you.
20   A.   Well, everything in my report
21 is evidence, if you want a short answer.  The
22 bases of my opinions are evidence, that
23 support my opinions.  But in this particular
24 case, if you want this distinction, mostly in

Page 181

1 medicine, you're looking at, say, a
2 randomized controlled trial.  Let's look at
3 the Roth study.
4   So you look at the Roth study.
5   Q.   Sir, I don't need an example,
6 just an answer to the question.
7   MS. CONROY:  Please don't
8 interrupt the witness when he's in the
9 middle of a --
10   SPECIAL MASTER COHEN:  She's
11 allowed to say that.
12   THE WITNESS:  Okay.  Well, your
13 question was -- and so I'm trying to
14 understand what evidence is to you.
15 Okay?  So --
16   Q.   (BY MS. SAULINO)  And I think
17 you've answered that, sir.  You were about to
18 give an example, but you had answered it;
19 right?
20   MS. CONROY:  Objection.
21   THE WITNESS:  I gave an
22 incomplete answer, but the judge has
23 ruled so you can go on.
24   SPECIAL MASTER COHEN:  So just

Page 182

1  let me just step in there and offer an
2  observation. This is a discovery
3  deposition. It's not de bene esse.
4  You're not testifying in court. If
5  you were testifying in court, you
6  would be allowed to give a complete
7  answer. You would be allowed to
8  finish your answer.
9      But this is a discovery
10 deposition, and they control what it
11 is they want to discover, including,
12 as I said earlier, a decision not to
13 discover some things, for example, the
14 examples you want to give to better
15 explain your answer.
16     That's their choice.
17     So she is allowed to say, all I
18 want is a "yes" or "no" answer, even
19 if it's not really a "yes" or "no"
20 answerable question. Okay?
21     THE WITNESS: Well, Your Honor,
22 if she'd asked the yes-or-no question,
23 I would give a "yes" or "no" answer.
24 Her question was --

Page 183

1      SPECIAL MASTER COHEN: In that
2  case --
3      THE WITNESS: My interpretation
4  of what evidence-based evidence was.
5  She didn't ask a yes-or-no question.
6      SPECIAL MASTER COHEN: I agree
7  with you in that case. There are
8  questions she has asked which are
9  "yes" or "no" answers.
10     THE WITNESS: And I tried to
11 answer them all "yes" or "no."
12     SPECIAL MASTER COHEN: I'm just
13 giving you guidance. I'm not scolding
14 you. I'm trying to make this go more
15 smoothly.
16     THE WITNESS: I understand.
17     SPECIAL MASTER COHEN: I will
18 also add that there are certain
19 courtesies that you can give to the
20 deponent, such as telling him what
21 page you're reading from, and perhaps
22 asking with less vigor some of your
23 questions.
24     MS. SAULINO: Fair enough,

Page 184

1  Your Honor. Thank you.
2      Q.   (BY MS. SAULINO) Let's move on
3  to step 3. "Critical appraisal of evidence
4  for quality clinical relevance and
5  applicability." I'm on page 42 where we just
6  were.
7      A.   Sure.
8      Q.   Okay. You say, "First, the
9  researcher must consider the type of study
10 returned." Right?
11     A.   Yes.
12     Q.   "And different guidelines may
13 be used to critically appraise different
14 types of studies"; right?
15     A.   Yes.
16     Q.   "I used each of these where
17 appropriate to inform my analysis"; right?
18     A.   Yes.
19     Q.   And then you have following for
20 a couple of pages a list of about 32
21 questions; right?
22     A.   I didn't count them, but I'll
23 take your word for it.
24     Q.   Okay. Now, you say, as we just

Page 185

1  read, "I used each of these where appropriate
2  to inform my analysis"; right?
3      A.   Yes.
4      Q.   You don't anywhere in your
5  report provide any indication of which
6  questions were used to inform your analysis
7  for which opinion; right?
8      A.   Not by number. That's correct.
9  But I did refer to certain of these in
10 certain opinions.
11     Q.   So unless we see one of these
12 questions listed as the basis for one of your
13 opinions, there's no way for us to know which
14 questions you used in order to form that
15 opinion; right?
16     MS. CONROY: Objection.
17     THE WITNESS: No.
18     Q.   (BY MS. SAULINO) I'm not
19 right?
20     A.   You are not correct.
21     Q.   Okay. What is not correct
22 about what I just said?
23     A.   In some cases, in some
24 opinions, I have made explicit reference to

Page 186

1  some of the questions in pages 42 to 45.
2       In other cases, if you were
3  well-versed in epidemiology or in analysis of
4  medical literature, you could know when I was
5  using one of these methods, even if I didn't
6  explicitly refer to a particular technique.
7       Q.  All right.  But unless you
8  actually list it as one of -- as a part of
9  the bases for your opinions, there are -- I
10 agree with you, there are some where you do
11 list a question or some questions as part of
12 the bases for your opinion; right?  As you
13 just said.
14      You and I are agreeing, sir.
15      A.  I know.  I'm just trying to
16 understand.  I'm trying to read the --
17      Yes.
18      Q.  Okay.
19      A.  Yes.
20      Q.  So unless you've listed it,
21 there's no way for us to know for sure what
22 questions you were using for your critical
23 appraisal of evidence for validity of
24 clinical relevance and applicability; right?

Page 187

1       MS. CONROY:  Objection.
2       THE WITNESS:  No.
3       Q.  (BY MS. SAULINO)  And you say
4  no because if we are versed in epidemiology,
5  we should be able to figure out precisely
6  which questions you were using; right?
7       MS. CONROY:  Objection.
8       THE WITNESS:  In part.  You
9       also have an opportunity for 14 hours
10      today and tomorrow to ask anything you
11      want about them what relates to what.
12      Q.  (BY MS. SAULINO)  I see.  But
13 you didn't see that it was necessary to spell
14 that out in your report; right?
15      A.  I -- that's correct.  I didn't
16 think I needed to reference a particular
17 question to a particular opinion.
18      Q.  Now, you list more than
19 36,000 pieces of literature in Exhibit C;
20 right?
21      A.  Yes.
22      Q.  You certainly didn't go through
23 this critical analysis for all 36,000-plus
24 pieces of literature there, did you?

Page 188

1       A.  That's correct.
2       Q.  There is no way for us to know
3  which pieces of literature of those 36,000
4  you did use the critical analysis for; right?
5       A.  Not by reading the report,
6  that's correct.
7       Q.  So if an expert, for instance,
8  for the defendants, wanted to take your
9  report and replicate your work in that
10 regard, there's no way to do that; right?
11      MS. CONROY:  Objection.
12      THE WITNESS:  No.
13      Q.  (BY MS. SAULINO)  Not based on
14 your report, is there?
15      A.  Sure there is.  They could go
16 through the literature and see if I missed
17 something as a basis of an opinion for --
18      I mean, most of that literature
19 I was looking at, these questions related to
20 whether or not opioids were effective for
21 chronic pain.  That was a big issue.
22      And the big issues would be
23 easy to check.  We just searched that
24 database for chronic non-malignant pain

Page 189

1  opioids, you won't find much in those
2  searches.  Somebody could do that search and
3  see if I missed it.  That's one example.
4       Q.  Sir, the searching the database
5  for chronic -- I'm sorry, what was --
6       A.  Chronic non-malignant pain.
7       Q.  Non-malignant pain and opioids
8  is not one of the questions that's listed
9  here that you used where appropriate for your
10 critical appraisal; right?
11      A.  That specific question is not
12 there, but it's in the opinions.
13      Q.  Okay.  So you used additional
14 questions to make your critical appraisal?
15      A.  Sure.  Those are just the
16 background questions.
17      Q.  I see.  But you would agree
18 with me that on page 42, under step 3 --
19      A.  Right.
20      Q.  -- you say, "I used each of
21 these where appropriate to inform my
22 analysis," and then you follow that with
23 several pages of questions; right?
24      A.  Are we on the -- you're at

Page 190

1 page 42?
2   Q.   Mm-hmm.
3   A.   333.1?
4   Q.   I was reading the sentence that
5 just precedes 333.1.
6   A.   Right.
7   Q.   Okay.  So when you -- when you
8 indicated here in your report, "I used each
9 of these where appropriate to inform my
10 analysis" and followed that with several
11 pages of the types of questions that you used
12 where appropriate, you didn't think it was
13 necessary -- it was important to put in all
14 of the questions that you were using?
15   A.   Correct.
16   Q.   And nowhere is that written
17 down?  All the questions that you were using?
18   A.   Correct.
19   Q.   Okay.
20        Now, the searches that you ran
21 on the 36,292 pieces of medical literature
22 that you list on Exhibit C, did you run those
23 searches yourself?
24   A.   Yes.

Page 191

1   Q.   All of them?
2   A.   Yes.
3   Q.   So you didn't rely on your
4 students or staff for those searches?
5   A.   No, they checked some of it.
6   Q.   And once the results were
7 returned, you reviewed the abstracts, study
8 descriptions or results to determine whether
9 each study addressed your questions; right?
10   A.   Correct.
11   Q.   And you did that with respect
12 to everything that was returned by your
13 search terms?
14   A.   Correct.
15   Q.   Do you know how many pieces of
16 medical literature were returned by your
17 search terms?
18   A.   No.
19   Q.   But you do know that you
20 reviewed them all yourself?
21   A.   I did iterative searches after
22 the initial search.
23   Q.   Again, which you don't document
24 in your report; right?

Page 192

1   A.   Correct.
2   Q.   Now, earlier you said that
3 you've spent 384 hours on this litigation;
4 right?
5   A.   Correct.
6   Q.   How many of those 384 hours did
7 you use for this running of search terms,
8 iteratively rerunning them and reviewing
9 critically the published literature that
10 resulted?
11   A.   No idea.
12   Q.   Can you give me any kind of
13 estimate?
14   A.   No.
15   Q.   Do you remember doing it at
16 all?
17   A.   Sure.
18   Q.   And about how many hours do you
19 remember doing it?
20   A.   I don't remember how many
21 hours.
22   Q.   Do you know how many pieces of
23 literature you ultimately reviewed
24 critically?

Page 193

1   A.   No.
2   Q.   Can you give me any estimate at
3 all?
4   A.   No.
5   Q.   You would agree with me it
6 would have been tough for you to review
7 36,292 pieces of literature in 384 hours;
8 right?
9   A.   To read them all?  Yes.
10 Impossible.
11   Q.   But you can't give me any
12 estimate as to how many of them you did read?
13   A.   No.  I could tell you that the
14 search for, for example, chronic
15 non-malignant pain and opioids probably comes
16 up with less than 20 papers, I think.
17   Q.   Okay.
18   A.   Those, I read them all.
19        So then others, there were lots
20 of papers that I didn't consider to be
21 relevant.  They didn't come up in the search
22 or there weren't many.
23   Q.   Okay.  But you choose not to
24 identify in Exhibit C or anywhere else which

Page 194

1  papers it was you did actually read; right?
2          MS. CONROY:  Objection.
3          THE WITNESS:  No, it's some
4   cases.  For example, the chronic
5   non-malignant pain, for the number of
6   people who have pain, I think there's
7   specific literature cited for the EERW
8   section.  There's lot of literature
9   mentioned.
10          In other cases there's specific
11  literature mentioned.
12      Q.   (BY MS. SAULINO)  Are you
13  testifying that unless -- that every piece of
14  specific literature that you reviewed and
15  relied on is listed somewhere in your report?
16      A.   No.
17      Q.   So there are some missing?
18          MS. CONROY:  Objection.
19          THE WITNESS:  I'm -- well,
20  first of all, there's 35,000, 36,000
21  articles that were part of the general
22  search.  Aside from giving you the
23  titles, I didn't cite them because
24  most of them I didn't rely on.

Page 195

1  Although, I reviewed them to the
2   extent that searching the abstracts
3   and key words reviews them.
4          There are other sections where
5   there is detail on the number of
6   papers and cites.  For example, the
7   impact of marketing on physician
8   behavior and conduct.  There's a lot
9   of cites there.  Probably not all of
10  them.
11          There's two papers that came
12  out last week -- oh, I should have
13  mentioned those before.  They would be
14  supplemental bases for my opinion, one
15  that came out, I think yesterday.
16  So -- that are relevant.  And those
17  are not in the report for obvious
18  reasons.  They didn't exist.
19      Q.   (BY MS. SAULINO)  So those are
20  additional new bases for your opinions?
21      A.   They're additional new bases
22  for my opinions.
23      Q.   And they're not included in
24  anything you've testified to already; right?

Page 196

1      A.   Correct.  Forgot about those
2   two.
3      Q.   What are the names of those
4   articles?
5      A.   One came out of Yale, was --
6   Ross is one of the authors.  That paper deals
7   with -- correlates the money spent to
8   influence physicians with the dose of opioids
9   used by physicians.
10          And the other one correlates
11  death rates to higher dose.  It's kind of
12  like a matched set.  They're both in JAMA, I
13  think.  Ross is in JAMA.  I think the other
14  one is also in JAMA.
15      Q.   Now, if you look at page 48 of
16  your report, at the top.
17      A.   Okay.
18      Q.   You have a section titled
19  "Evaluation of funding source and conflicts
20  of interest"; right?
21      A.   I do.
22      Q.   And there you say, "In addition
23  to the factor reviewed above" -- I believe
24  you meant to say "factors" there, right?

Page 197

1      A.   Correct.  That's a
2   typographical error.
3      Q.   "Funding source and conflicts
4   of interest should be reviewed and considered
5   for all studies"; right?
6      A.   Yes.
7      Q.   Okay.  And you say that because
8   you believe -- and I'm now quoting from the
9   top of page 49 of your report -- that "There
10  is a high risk of bias when the producers of
11  evidence have an invested interest in the
12  results."
13      A.   Where are you now?
14      Q.   I'm looking at the second line
15  of the top of page 49.
16      A.   Okay.  Halfway through the
17  sentence.  Yes.  That's part of that
18  sentence.
19      Q.   Okay.  I'm just asking whether
20  you believe that to be true?
21      A.   Let me read the whole sentence.
22      Q.   Well, sir, I'm not really
23  asking you whether you believe the sentence
24  to be true.  I'm just asking whether you

Page 198

1  believe that there is a high risk of bias
2  when the producers of evidence have an
3  invested interest in the results.  I actually
4  thought that would be an easy one for you.
5      MS. CONROY:  Objection.
6      THE WITNESS:  That's a more
7  complicated question than you might
8  think.  That's true, but there's
9  evidence that disclosure also induces
10  misrepresentation.  So it goes both
11  ways.
12      Q.    (BY MS. SAULINO)  Okay.  Well,
13  you also believe that whoever funds your
14  organization owns it; right?
15      A.    Are you reading from someplace?
16      Q.    It is something that you
17  included in one of your opinions, but I'm
18  just asking you whether you believe that.
19      A.    Out of context?  No.
20      Q.    So it's not something you
21  generally believe?
22      MS. CONROY:  Objection.
23      THE WITNESS:  Yeah, I don't
24  have a statistic on that.  It's

Page 199

1  certainly not always true.
2      Q.    (BY MS. SAULINO)  In any event,
3  for the reasons of potential bias, you
4  included funding source and industry bias as
5  one of the factors that would decrease your
6  confidence in a particular source of
7  evidence; right?
8      A.    That's generally the direction
9  of the medical literature, correct.
10      Q.    Okay.  And there, I wasn't
11  quoting but I was looking at the very last
12  sentence of 333.5.
13      Just letting you know where I
14  was looking, sir.
15      A.    Okay.
16      Q.    Okay?
17      A.    There's no question.
18      Q.    So you are agreeing that you
19  included funding source and industry bias as
20  one of the factors that would decrease your
21  confidence in a particular source of
22  evidence?
23      A.    Unless it was a statement
24  against interest.

Page 200

1      Q.    Okay.  You didn't say that
2  here, did you?
3      A.    That's correct.  I just
4  modified it.
5      Q.    And have you modified your
6  thinking on that since March 25th?
7      A.    No.  It was incomplete, this
8  sentence.  I didn't incorporate the entire
9  idea.
10      Q.    Now, you testified earlier that
11  while you haven't been paid yet in this case,
12  you are owed $600 times 384 hours to date;
13  right?
14      A.    Correct.
15      Q.    Probably more for today because
16  it would be 650 for today; is that right?
17  650 per hour?
18      A.    Correct.
19      Q.    Okay.  And that, I did it on a
20  calculator and I got $230,400 owed up until
21  this morning.  Does that sound right to you?
22      A.    I didn't do the math.  I'll
23  take your word for it.
24      Q.    And that's just for your hours;

Page 201

1  right?
2      A.    Correct.
3      Q.    So we then need to add to that
4  all of the hours that have been spent by your
5  staff and students; right?
6      A.    Correct.
7      Q.    At their hourly rates; right?
8      A.    Correct.
9      Q.    And do you get some of that
10  money as well?
11      A.    That money is all paid to me
12  and then I pay them.
13      Q.    Is it a complete pass-through
14  or do you keep some of it?
15      A.    There's no way to complete
16  pass-through.  I pay benefits, vacation,
17  things like that.  So I -- there's no way for
18  me to calculate what the overage is.  It's
19  not a complete pyramid scheme like a law firm
20  might run.
21      Q.    So they each make their own
22  hourly rate that's not the same as you're
23  charging the plaintiffs?
24      A.    They make an hourly rate and

Page 202

1  time and a half for overtime that's -- I have
2  a fixed rate for the plaintiffs.
3      Q.    What is your hourly rate for
4  your students?
5      A.    I don't -- the students are $20
6  an hour.
7      Q.    No, I know.  That you pay them.
8      A.    $20 an hour.
9      Q.    And what about for each of your
10  staff members?
11      A.    What their hourly rates are?
12      Q.    Yes.
13      A.    I don't recall.
14      Q.    Less than $70 an hour?
15      A.    Well, I think their rate's
16  generally between 25 and 35 or 40.  But when
17  they're working time and a half or
18  double-time, which happens, then they could
19  get up to 60 or $70 an hour.
20      Q.    Do you charge the plaintiffs
21  overtime?
22      A.    No.  Plaintiffs get a fixed
23  rate.  So that's why I'm saying I -- the
24  overage I get from them is not much, usually,

Page 203

1  because I don't -- they're billed at a fixed
2  rate.
3      Q.    Okay.  In addition to that, you
4  have previously testified that you've made
5  certainly more than 5 million, probably more
6  than $6 million from testimony that you have
7  given for plaintiffs over the years; right?
8      A.    Well, in litigation, I think
9  it's both at the request of plaintiffs and
10  defendants, yes.
11      Q.    Well, earlier you said that of
12  your -- I think you said 4 to 500 times
13  testifying, although previously you've said 6
14  to 700 times testifying -- that the vast
15  majority of that was testimony that the
16  plaintiffs had been retained -- had retained
17  you to do; right?
18      A.    That's correct.
19      Q.    And you've previously testified
20  to that as well; right?
21      A.    Yes.
22      Q.    Now, you've never testified on
23  behalf of a pharmaceutical company in
24  litigation, where a plaintiff is alleging a

Page 204

1  personal injury, have you?
2      A.    I don't testify on behalf of
3  anybody, and I've not been retained by a
4  pharmaceutical company in any cases.
5      Q.    Okay.  And you've not been
6  retained by a pharmaceutical distributor in
7  any cases?
8      A.    Correct.
9      Q.    And you've not been retained by
10  a pharmacy in any cases; right?
11      A.    Correct.
12      Q.    But you have said publicly that
13  you believe that companies deserve full
14  credit for lying, cheating, and endangering
15  people's health; right?
16      A.    Correct.
17      Q.    You've also said that you
18  believe that "Every day executives from
19  corporations spanning the pharmaceutical and
20  medical device industry, preoccupied with
21  increasing profits and maintaining status as
22  viable competitors in the industry, knowingly
23  market unsafe or inadequately tested drugs
24  and medical devices to raise their bottom

Page 205

1  line"; right?
2      A.    I think that's a correct quote.
3  It's from the science article?
4      Q.    It is a quote from an article
5  by you and Dr. Ardolino?
6      A.    Oh.  So that's a published
7  paper.  That's a published book chapter now.
8  Correct.
9      Q.    You do hold that belief,
10  though; right?
11      A.    True.
12      Q.    And you've made a lot of money
13  off of those beliefs that you hold; right?
14          MS. CONROY:  Objection.
15          THE WITNESS:  No.
16      Q.    (BY MS. SAULINO)  Well, you've
17  made certainly more than 5 million, probably
18  more than 6 million up until this litigation,
19  and then another couple hundred thousand so
20  far; right?
21      A.    That's correct.  Those are not
22  related ideas.
23      Q.    So you're saying that your work
24  for the plaintiffs in this case and in other

Page 206

1  cases where you've testified holds no
2  relationship to your beliefs that we just
3  recounted?
4      A.   No.  It doesn't relate to my
5  beliefs.  That's correct.  It relates to the
6  fact that led to my beliefs.
7      Q.   I see.  And so isn't it true,
8  though, sir, based on your own logic that you
9  explain in your report, that all of the
10  hundreds of thousands of dollars you've made
11  in this case and the millions of dollars
12  you've made over the years, testifying for --
13  as having been retained by plaintiffs'
14  lawyers is a factor that should lead jurors
15  to decrease their confidence in the evidence
16  that you present?
17      A.   It's certainly something they
18  should consider in evaluating my testimony.
19      Q.   Okay.
20      A.   There is a difference between
21  this and the other biases discussed in the
22  medical literature.  That difference is this
23  process, and it is not a trivial difference.
24      Q.   When you say "That difference

Page 207

1  is this process," you mean your
2  evidence-based medicine combined with
3  grounded theory approach that you have been
4  discussing today?
5      A.   No.  I mean your
6  cross-examination.  I mean your ability to
7  research and review everything I've written.
8          This room full of lawyers who
9  are looking for any and every mistake I may
10  have made limits my ability to twist, slant,
11  or in any other way deviate from the facts.
12  This process is much more rigorous, not even
13  close, to peer review, to dissertation review
14  or anything else.  So when I prepare reports
15  or testimony for this process, it's in
16  anticipation of being reviewed in immense
17  detail.
18          And not only that.  I
19  understand that everything that I've said in
20  my entire life will be reviewed and will be
21  compared to the opinions that I give in this
22  litigation, as we sit here today.
23          So there's nothing like this
24  process in the other areas or aspects of

Page 208

1  bias.  And so when I know -- when you know
2  you're in this process, and I know I'm in
3  this process, there's a lot of reasons that I
4  want to stick to the truth as much as
5  possible and not spin anything, or take
6  anything out of context.  Because I have
7  great faith that you will be able, with all
8  of your resources and with your great
9  intelligence, to try to catch every minor or
10  major error I make.
11      Q.   So those reasons that you just
12  laid out would also lead you, wouldn't they,
13  sir, to want to detail in your report every
14  step that you took in order to get to each of
15  the conclusions that you made?
16      A.   No.  Can't do that.  I don't
17  have enough time.  I'd be dead by the time
18  the report was written.
19      Q.   So you're agreeing with me,
20  sir, that you choose here not to detail each
21  of the steps that you took to reach each of
22  the conclusions that you made?
23          MS. CONROY:  Objection.
24          THE WITNESS:  Correct.  I

Page 209

1  had -- I detailed what I thought were
2  the bases of my opinions that could be
3  evaluated, as you have been evaluating
4  them, if it was a way that was
5  sufficient for someone to understand
6  what I did and look at what I did and
7  evaluate whether it was compatible
8  with the data that I reviewed.
9          And I am sure that if there was
10  something that I said that was wrong,
11  you will find it and you will correct
12  it.
13          In some ways, I very much value
14  this process because if I made a
15  mistake, I don't want to make a
16  mistake.  And so if you find someplace
17  where I made a mistake, I want to
18  correct it.  I certainly want to say
19  it in a public forum.
20      Q.   Now, sir, you just -- I'm sure
21  you were joking, but you just said "I would
22  be dead if I wrote down each of the steps
23  that I took."  Right?  Meaning that it would
24  take a long time to write that down?

Page 210

1  A.   Hopefully I'm going to live
2  long enough, yes.  That's correct.
3      Q.   Okay.
4      A.   Yes.
5      Q.   But you're saying that they are
6  steps that you did take, right?
7      A.   Well, yes.  I take a lot of
8  steps in my head that I don't write down.
9      Q.   And these are steps that you've
10 taken in less than four months; right?
11     A.   No.
12     Q.   Well, you were retained in
13 November of 2018; right?
14     A.   Yes.
15     Q.   You were presented with your
16 assignment in November of 2018; right?
17     A.   Yes.
18     Q.   And that was the answerable
19 question that you then applied your
20 methodology to; right?
21     A.   Yes.
22     Q.   And that was about four months
23 ago, wasn't it?
24     A.   Those facts individually are

Page 211

1  correct.  But remember, I've been working on
2  this case and had access to some of these
3  documents since 2003.
4      I've been reviewing opioid
5  literature and studying opioids and pain
6  since 1974.
7      So a lot of the information
8  that goes into the report dates from 1974.
9      Q.   And there's no way for us to
10 know what in the report dates from 1974 and
11 what in the report is something that you
12 reviewed in connection with this litigation?
13     A.   Well, you can assume anything
14 that I read after November, okay? -- was at
15 least in part -- that I incorporated into the
16 report -- was in part related to my work in
17 this case.  Although, some of that literature
18 I would have seen and read otherwise.
19     In other words, the Ross paper
20 that I mentioned.  Well, that was e-mailed to
21 me last night by my other kid who's at Yale.
22     So -- because it just came out
23 yesterday.
24     So now that, I would not have

Page 212

1  read that last night had he not sent it to
2  me.
3      Q.   You say we can assume anything
4  that you read after November was a part of
5  the -- or related to your work on the report;
6  right?
7      A.   I think that's fair.
8      Q.   Okay.  Where do you list that?
9      A.   I don't list it.  You go by the
10 dates.
11     Q.   Oh, I see.  So anything written
12 after November?
13     A.   Correct.  Yeah.  Anything
14 written after November after I was retained
15 in the case that was related to the case
16 that's in the report, I read it in relation
17 to the case.
18     Q.   That's not terribly specific
19 guidance, is it?
20     MS. CONROY:  Objection.
21     Q.   (BY MS. SAULINO)  Not much of
22 your opinion is based on things that were
23 written after November of 2018; isn't that
24 right?

Page 213

1  A.   I don't -- I imagine most of
2  what I wrote is based on things written
3  before.
4      Q.   Okay.  So what I'm asking you
5  is, you said it would take a really long time
6  for you to write down all of the steps you
7  took in order to answer the question that you
8  were asked in this litigation and then
9  applied your methodology to; right?
10     We've been talking about you
11 would be dead by then, but we all know you
12 were joking, and we all hope that doesn't
13 happen, so it took a really long time is what
14 I said.
15     A.   Right.  We could take a vote on
16 whether anybody hopes it doesn't happen, but
17 that's correct.  I bet you it won't be
18 unanimous.
19     SPECIAL MASTER COHEN:  I'm
20 neutral, I don't vote.
21     MR. MIGLIORI:  Can some of us
22 vote twice?  I'd like to vote twice.
23     Q.   (BY MS. SAULINO)  But we can
24 agree to what you were saying there.

Page 214

1    A.    And that includes plaintiff
2  lawyers.  I guarantee that.
3    Q.    Fair enough.  We can discuss
4  this at a break.
5          So what you were saying there
6  is it would take you a really long time to
7  write down all of the steps that you took;
8  correct?
9    A.    Correct.
10    Q.    But these are steps that you
11  took in four months; right?  That's what I'm
12  trying to get at.
13    A.    No, No.  A lot of the steps
14  began, as I said in 1974.  I've been reading
15  literature --
16          Look, I did the reports in 2004
17  in the Purdue literatures.  I did the FDA
18  presentation in 2013.  I wasn't involved in
19  any litigation between 2005, 2013 till
20  November; right?  I obviously had been
21  staying up with the literature.  Okay?
22  Because -- and I was staying up with the
23  issue because I, on my own, did the paper and
24  presentation at FDA.

Page 215

1          Also, I brought that story to
2  the L.A. Times.  The L.A. Times story, that
3  was based on my bringing that stuff to them.
4    Q.    Okay.
5    A.    So, I mean, I've been doing
6  things got nothing to do with the litigation.
7  I've been concerned about this issue for a
8  long time.  I've been reading about this
9  issue for a long time, applying this same
10  methodology.
11    Q.    Okay.  So but I'm asking you
12  about your expert work in this case.  Your
13  methodology requires you to start with an
14  answerable question, which you got in
15  November of 2018; right?
16    A.    I got that -- but that question
17  is the question I've been applying --
18          That question came from me,
19  modified slightly by the lawyers.  And that's
20  the question I've been asking all the time.
21  It's a similar question to what I ask -- I
22  develop in every case I do.
23          In other words, it's -- that's
24  the -- the question of -- it's really a

Page 216

1  general -- a more general question is, you
2  know, why did this person get addicted and
3  die?  That's the question.
4          I mean, it's a simple question,
5  really.
6    Q.    Okay.
7    A.    But it's translated into kind
8  of a more bite-sized piece there.  Because
9  when I go to the why question, you -- most
10  people stop at the patient level.  I don't
11  stop at the patient level.
12          Okay?  I ask that question all
13  the way to the generators of the
14  manufacturers of the product, the
15  distributors of the product, et cetera.
16    Q.    Okay.
17    A.    So that's just how I frame the
18  question.
19    Q.    All right, sir.  So --
20    A.    Sorry, go ahead.
21    Q.    It is fair to say that you
22  didn't have access to the database of
23  documents produced by defendants until
24  November 2018; right?

Page 217

1    A.    No.  I had some of them in
2  2003, 2004, and 2005.
3    Q.    And those were Purdue
4  documents?
5    A.    Purdue and others.  Because
6  they produced other documents.  I think they
7  probably had some of the front group
8  documents that were in that mix.
9    Q.    Tell me something, sir.  Did
10  the protective orders that you signed in
11  those cases require you to destroy those
12  documents after the litigation was over?
13    A.    The Purdue documents?
14    Q.    Uh-huh.
15    A.    I don't think so.  I don't
16  recall.
17    Q.    Well, clearly, you didn't.  You
18  kept them; right?
19    A.    Yeah.  There were five CDs of
20  documents that were released by the attorney
21  general of Florida.  I got those CDs.  Those
22  are not confidential.
23    Q.    So nowhere in your report do
24  you give us any idea of which of your

Page 218

1  opinions are based on things that you've
2  known since 1970 and which of your opinions
3  are based on things that you've learned since
4  November of 2018; right?
5      MS. CONROY: Objection.
6      THE WITNESS: Yes, as I
7  modified before.
8      MS. SAULINO: Okay.
9      Q.   (BY MS. SAULINO) Now, you say
10 that step 4 of the evidence-based medicine
11 method, which you list on page 49, you say,
12 "This step speaks for itself.
13      "Once a critical analysis of
14 the evidence has been completed, the findings
15 can be applied to the situation at hand";
16 right?
17     A.   Correct.
18     Q.   And you don't document what the
19 situation at hand is, right?
20     A.   Well, the situation at hand
21 would be the assignment, yeah.
22     Q.   Okay. And you didn't write
23 that down here, did you?
24     A.   I did not write that down.

Page 219

1      Q.   And step 5 is a
2  self-evaluation; right? An evaluation of
3  performance?
4      A.   Correct.
5      Q.   And you say, "Guidelines exist
6  for self-evaluation of each of the previous
7  steps of EBM practice"; right?
8      A.   Right.
9      Q.   And then you said -- you then
10 list seven questions for self-evaluation of
11 finding the best external evidence; right?
12      Or sorry -- for ask -- you
13 start with asking answerable questions.
14 There's a self-evaluation for that; right?
15      I apologize. I skipped ahead.
16     A.   You skipped a section. That's
17 right, yes.
18     Q.   Right. So you start with your
19 self-evaluation for answering answerable
20 questions; right?
21     A.   Right.
22     Q.   You then list a number of
23 questions, but you say, "Not all of these
24 questions applied to my practice of EBM in

Page 220

1  this context. Of those which did apply, I
2  found that my performance was satisfactory";
3  right?
4      A.   Correct.
5      Q.   Which ones applied?
6      A.   Am I asking any clinical
7  questions at all that apply? And am I asking
8  well-formulated questions based on the
9  guidance reviewed above? I think I apply.
10 Am I using a map to locate my knowledge gaps
11 and articulate questions? I didn't do that
12 explicitly. I don't think that's doable in
13 this situation because of the grounded theory
14 method doesn't really apply to that kind of
15 construct.
16      Can I get myself unstuck when
17 asking questions? Doesn't really apply.
18 More clinical -- limited clinical stuff.
19      Am I modeling the asking of
20 answerable questions for my learners? I did
21 not do that. That's really related to
22 teaching.
23      Am I writing any educational
24 prescriptions in my teaching? Are they being

Page 221

1  filled? I didn't do that. It's not part of
2  my role here.
3      Are we incorporating questions
4  asking and answering it to everyday
5  activities? No. Not part of my role here.
6  Well, because I'm blocked from doing that
7  because of the confidentiality orders.
8      How well am I guiding my
9  learners in the questions that -- in their
10 question asking? Well, I did discuss the
11 assignment, and when they got my report, the
12 plaintiff lawyers asked a lot of questions
13 about the report and the -- we discussed the
14 nature of the report.
15      Are my learners writing
16 educational prescriptions for me? No. The
17 plaintiff lawyers didn't write me any
18 educational prescriptions. So those are the
19 ones that didn't.
20     Q.   So of your one, two, three,
21 four, five, six, seven, eight, nine, ten
22 questions here, three of them applied in this
23 context?
24     A.   I guess so, if you counted

Page 222

1  right.
2      Q.    And you chose, however, to list
3  all of these questions and not give us any
4  indication of which ones you were actually
5  using.
6      A.    Correct.  I didn't explicitly
7  state.
8      Q.    Now, you have a -- the next
9  self-evaluation is finding the best external
10 evidence, which I accidently skipped to
11 earlier; right?
12     A.    Correct.
13     Q.    Okay.
14     A.    No demerit points for that.  Go
15 ahead, skip anything you want.
16     Q.    And you list a number of
17 questions here; right?
18     A.    Correct.
19     Q.    Now, here you just say, "I
20 found that my performance was satisfactory";
21 right?
22     A.    Right.
23     Q.    So you didn't skip any of
24 those?

Page 223

1      A.    No, I didn't skip any of those,
2  but the test is yours.
3      Q.    I'm sorry?
4      A.    The test is yours.  Better than
5  the self-evaluation is this two days.
6      Q.    You then -- well, you -- you
7  say here in your report you performed a
8  self-evaluation, sir; right?
9      A.    Correct.
10     Q.    That's what I'm asking you
11 about right now.
12     A.    That's correct.  But what I'm
13 saying is this external evaluation is much
14 better than my own.
15     Q.    You then say, "Self-Evaluation
16 for critically appraising the evidence for
17 its validity and potential usefulness";
18 right?
19     A.    Correct.
20     Q.    Here again, not all of the
21 questions applied, but you chose to write
22 them all down and not give us any indications
23 of which ones you used; right?
24     A.    Correct.

Page 224

1      MS. CONROY:  Objection.
2      Q.    (BY MS. SAULINO)  And then
3  self-evaluation for applying results in
4  practice; right?
5      A.    Right.
6      Q.    And again, not all of them
7  applied.  You wrote them all down and didn't
8  give us any indication of which ones you
9  used; right?
10     A.    None of these apply to practice
11 because there's a confidentiality order in
12 the case.
13     Q.    Well you say here of those
14 which did apply, I found that my performance
15 was satisfactory.
16     A.    Let me just --
17         Well, the second one applies,
18 but it's not really relevant to this process.
19         It does apply, but not relevant
20 to what we're doing here today.
21     Q.    All right.  Well, let me ask
22 you:  Your evaluations, your self-evaluations
23 that you performed here, where are those
24 documented?

Page 225

1      A.    They're not documented.
2      Q.    They're not documented
3  anywhere?
4      A.    Correct.
5      Q.    Okay.  So there's no way for us
6  to replicate them?
7      A.    No.  You can go through this
8  process.  I mean, that's what -- I have no
9  doubt that you have taken great effort over
10 the past four weeks to attempt to replicate
11 and test every opinion I've given and every
12 basis.  So there's plenty -- I imagine that's
13 what we're going to spend most of the day
14 doing.
15         So you can certainly critically
16 evaluate what I've done, based on your access
17 to the database and the literature, the same
18 as I have.
19     Q.    Sir, what you seem to be saying
20 is, I too can look at the database and the
21 literature that you -- the massive database
22 that you've listed and the massive set of
23 literature that you've listed and I can come
24 to the same conclusions you did.  That's what

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 you're saying?
2     A.    No.  You can criticize -- I
3 don't think you want to do that.  That would
4 probably not be in your client's best
5 interest.
6           What I'm saying is you can look
7 at the data.  You can talk to your client.
8 You can talk to lots of experts, and you can
9 evaluate what I've written and criticize me,
10 based on the same data sets I have.
11    Q.    So, sir --
12    A.    And I expect that you've done
13 that, and that we'll see the results.
14    Q.    You understand that you're
15 being offered as an expert in this
16 litigation; right?
17    A.    Right.
18    Q.    That you have some expertise to
19 offer to bring to bear on this methodology
20 that you've laid out and the approaches that
21 you've taken; right?
22    A.    Correct.
23    Q.    That you have something above
24 and beyond what other people have; right?

Page 227

1     A.    I have something beyond --
2 above and beyond what a layman has.
3     Q.    I see.  But anyone else who has
4 a little more knowledge of looking at legal
5 databases could do what you do?
6     A.    I don't know what they could
7 do.
8     Q.    Okay.  What I'm asking you,
9 sir, is --
10    A.    That's not what I referred to
11 before.  I referred to you folks.
12    Q.    Let me be more clear.  What I'm
13 asking you, sir, is I have asked you a number
14 of questions about how to replicate
15 statements you've made in your report as an
16 expert; right?
17    A.    Yes.
18    Q.    And your response has been
19 repeatedly that you're sure I'm doing that
20 already; right?
21        MS. CONROY:  Objection.
22        THE WITNESS:  No, that's not
23    exactly true.  You didn't ask that
24    question explicitly.  If you want to

Page 228

1 know how to replicate what I did, you
2 take an opinion, okay?  Take a sample
3 opinion.  Okay?
4        Here's -- McKesson on page 81.
5 Opinion 129.  Venture member McKesson
6 marketed opioids.  I gave you some
7 examples where McKesson marketed
8 opioids.
9        So you can go to the database.
10 You can talk to your clients.  You can
11 say McKesson never marketed opioids.
12 The documents that I used that will --
13 to substantiate this opinion were
14 false or fraudulent or didn't say what
15 I said it said.  So that's how do you
16 this.  And you can do that because you
17 have access to the database.  You have
18 access to your client more than I
19 have.  And you could critique that
20 opinion.  And say I got it wrong.
21    Q.    (BY MS. SAULINO)  Sir, so what
22 I hear you saying is for each and every one
23 of these opinions, I can look at the document
24 you've cited, document or documents that

Page 229

1 you've cited, and that is the basis for your
2 opinion and nothing more.
3     A.    No.  There's other documents --
4        MS. CONROY:  Objection.
5        THE WITNESS:  -- in the whole
6    report.  You can look at the whole
7    report.
8     Q.    (MS. SAULINO)  No, no, no, sir.
9 I'm trying to understand, based on the
10 explanation you just gave, how to look at one
11 opinion and know what the basis for that
12 opinion is.  And based on what you just said,
13 I look at what you cited and I know.
14    A.    Not true.  What I said was you
15 could see if there are other documents that
16 contradict that document or statement, and
17 then you could look at other documents that
18 I've cited, with similar opinions --
19    Q.    Sir.
20    A.    -- and determine whether or not
21 those are accurate or not.
22    Q.    Sir.
23    A.    Ma'am.
24    Q.    I'm asking a different

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  question. I'm asking how to replicate what
2  you did to come to your opinions.
3      A.   Oh, in order to replicate what
4  I did, you have to do the searches. You have
5  to do iterative searches. You have to look
6  for -- in this particular case, you'd have to
7  look for documents that indicate the case and
8  marketed opioids, you've got to look at
9  contracts. You'll got to look at the coupon
10 program you had, the sampling program you
11 had. And you'd have to look at those things.
12     Q.   And nowhere in your report do
13 you provide us the ability to do that for any
14 particular opinion, do you?
15     A.   No. You have that opinion
16 because you -- ability because you have the
17 same access to the same data I have plus
18 more. You have all of the privileged and
19 confidential documents.
20     Q.   Sir.
21     A.   You have the ability to talk to
22 the -- to your own clients.
23     Q.   I was asking a different
24 question.

Page 231

1          Nowhere in this report do you
2  provide us the ability to replicate what you
3  did in order to come to any particular
4  opinion.
5      A.   Wrong.
6      Q.   Nowhere in this report do you
7  provide us the ability to look at one opinion
8  and know what you looked at, what iterative
9  searches you made, what conclusions you came
10 to, how you challenged them, how you
11 self-appraised them, none of that; right?
12     A.   In detail, that's correct.
13     Q.   Okay. That's all I was asking.
14     A.   All right.
15          THE WITNESS: Can we take a
16 break?
17          MS. SAULINO: Yeah, I think now
18 is a good time for a break.
19          THE VIDEOGRAPHER: Off the
20 record. 2:41.
21          (Recess taken, 2:41 p.m. to
22 3:10 p.m.)
23          THE VIDEOGRAPHER: We are back
24 on the record at 3:11.

Page 232

1          THE WITNESS: Okay. So these
2  are the two articles that I mentioned
3  that came up this week as new bases.
4      Q.   (BY MS. SAULINO) Okay. So
5  thank you, Doctor. You're looking at a
6  folder that you have marked 26, which is a
7  red folder and we're going to mark as
8  Exhibit 6 to your deposition.
9          (Whereupon, Deposition Exhibit
10 Egilman 6, Folder 26 arrow up does =
11 arrow up death, was marked for
12 identification.)
13     Q.   (BY MS. SAULINO) All right.
14 Dr. Egilman, I'd like to turn to the grounded
15 theory approach, which you begin discussing
16 on the bottom of page 38 of your report.
17     A.   Okay.
18     Q.   Now, you say that "Grounded
19 theory is an inductive method which allows
20 analytical categories to emerge from the data
21 presented"; right?
22          Second sentence.
23     A.   38?
24     Q.   Yeah. Second sentence under

Page 233

1  "State of the art methods." The portion
2  where you start talking about the grounded
3  theory approach.
4      A.   Oh, yeah, right. Go ahead.
5      Q.   Okay. And you then two
6  sentences later say, "The grounded theory
7  approach recognizes that data collection and
8  analysis are inherently interrelated
9  processes and calls for analysis to begin at
10 the time of first data collection"; right?
11     A.   Correct.
12     Q.   And the grounded theory
13 approach -- and I'm not reading right now,
14 but based on what I have seen in your report,
15 is it fair that the grounded theory approach
16 entails an initial formulation of hypotheses
17 and then you -- as you've said over and over
18 today, you constantly revise those during the
19 course of research; right?
20     A.   Well, you start with a -- you
21 just start with a question. And then not
22 necessarily a hypothesis.
23     Q.   Well, then let's look at your
24 report. You say towards the bottom of

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1  page 38, "As described by Corbin and Strauss,
2  the hypotheses are constantly revised during
3  the course of the research, until they hold
4  truth of the phenomena under study as
5  evidence in repeated interviews, observations
6  or documents"; right?
7      A.   Right.
8      Q.   Do you agree with that
9  statement?
10     A.   Well, I would say hypotheses
11 are questions.
12     Q.   Okay.  Do you see a distinction
13 between the two?
14     A.   I think you could perhaps --
15 yeah, there's a distinction because
16 hypothesis generally is a -- generally
17 used --
18          Well, in science use a null
19 hypothesis, which implies a non-causal
20 relationship between two items.  And a
21 question is broader than that.
22     Q.   Okay.  With respect to the
23 grounded theory approach, which you discuss
24 here on pages 30 -- starting on 38 and moving

Page 235

1  on to 39, you don't list either initial
2  hypotheses or initial questions, do you?
3      A.   No, not exactly.
4      Q.   And you don't list your initial
5  hypotheses or questions to be used in the
6  grounded theory approach anywhere in your
7  report, do you?
8      A.   No.  Not correct.
9      Q.   Where do you list them?
10     A.   Well, we've gone over some of
11 them.  Some of the background questions were
12 listed.  And then I think in the EERW
13 section, I think there are hypotheses or
14 questions listed there.
15          In the critique of the
16 Rappaport, chicken and egg constructs, I
17 think in the chronic pain analysis with
18 respect to opioid treatment.
19          Off-label promotion.  And the
20 12-hour dosing regimens, I think certainly
21 those incorporate questions.
22     Q.   You're talking about particular
23 opinions that you remember?
24     A.   Correct.

Page 236

1      Q.   Okay.  So with respect to
2  particular opinions, if we see questions --
3  if we see initial questions or initial
4  hypotheses listed there, then you intended
5  those to be an indication of the initial
6  questions or hypotheses that you were using
7  with the grounded theory approach?
8      A.   Or questions, yes.
9      Q.   You said "or questions"?
10 Sorry?
11     A.   Or questions, yes.
12     Q.   And I said "initial hypotheses
13 or questions."  Yes.  So I think we're saying
14 the same thing.  If we see them listed with
15 respect to an opinion, hypotheses or a
16 question, you intended that to be a question
17 of what you used as your initial question or
18 hypothesis for the grounded theory approach?
19     A.   Yes.  Or the evidence-based
20 medicine question, depending on what the
21 issue was.
22     Q.   But again, even for the
23 opinions where you do list questions or
24 hypotheses, you don't tell us which approach

Page 237

1  you're using explicitly in the report.
2      A.   It's not written explicitly,
3  that's correct.
4      Q.   Okay.  And for -- and
5  otherwise, we have no way of knowing what
6  your initial hypotheses or questions were;
7  right?
8          MS. CONROY:  Objection.
9      Q.   (BY MS. SAULINO)  For the
10 grounded theory approach?
11     A.   No.
12     Q.   No, we do not?
13     A.   No, I don't agree with your
14 statement/question.
15     Q.   Will you agree with me that
16 only a few of your opinions list initial
17 questions or hypotheses; right?
18     A.   No, not necessarily.  I gave
19 you the ones I could remember.  I'd have to
20 go through them all to see.
21     Q.   Okay.  Well, is it fair to say
22 that for those that do not list an initial
23 hypothesis or question, there's no way for us
24 to know what it was?

Page 238

1    A.    No.
2    Q.    How would we be able to find
3  that in your report?
4    A.    Well, if you look at
5  Opinion 185, Purdue trained Walgreens'
6  pharmacists.  So that would be the question.
7  Did Purdue train Walgreens' pharmacists?
8  That's the question that I was answering, for
9  example.
10       186.  Did Purdue use friend
11 groups?  I put Purdue use friend groups.  You
12 just put a "did" in front and that's your
13 question.
14   Q.    So for each and every one of
15 your opinions, we should assume, then, that
16 the opinion turned out to be what the initial
17 question was?
18       That's what you're saying?
19   A.    No.
20   Q.    So again I ask you, sir, how do
21 we know for any individual opinion what the
22 initial question or hypothesis was if you
23 didn't list it for us?
24   A.    I gave you two examples.  I can

Page 239

1  go through each opinion.
2    Q.    Well, sir --
3    A.    And give you -- and go through
4  them if you want.  I don't think you want me
5  to do that.
6    Q.    The two examples that you just
7  gave me were 185 and 186.
8         And for each of those examples,
9  you read the opinion and put a did in front
10 of it.  Right?
11   A.    Correct.
12   Q.    Which means, then, that you
13 started with the question that ended up being
14 your opinion; right?
15   A.    No.  It means there was a
16 question and I gave the answer.
17   Q.    I see.  For any of your
18 opinions, was there -- is there a way to see
19 that you started with a question that is
20 different than where you ended up?
21   A.    I think so.
22   Q.    Is there a way to see it in
23 your report?
24   A.    I think so.

Page 240

1    Q.    Okay.  So we would do that by
2  looking at your opinion, looking at the
3  basis, and if we see a question there, we'll
4  know what question you started with; right?
5    A.    That would be correct.
6    Q.    Okay.  If we look at the
7  opinion, look at your report, there is no
8  question there, we don't have any way of
9  knowing whether you started with something
10 different than where you ended up; right?
11   A.    No.
12   Q.    We don't have any way of
13 knowing one way or the other, do we?
14   A.    No, you do.  I gave you some
15 examples.
16   Q.    Well, sir, I -- I see your
17 examples.  Example 185 you said, your opinion
18 is Purdue trained Walgreens pharmacists.  And
19 that we should then assume that your question
20 was, did Purdue train Walgreens pharmacists;
21 correct?
22   A.    Correct.
23   Q.    So what you're telling me is
24 that for each and every one of your opinions,

Page 241

1  unless you otherwise list a question or
2  hypothesis, we should assume, then, that the
3  question you asked was the opinion you ended
4  up with; right?
5    A.    No.
6    Q.    Well then how else will we know
7  how to figure it out?
8    A.    Well, it's going to be
9  different for different opinions.  I'd have
10 to go through each and every one.
11   Q.    And you didn't provide that
12 information in your report; right?
13   A.    It's not explicit.  It's
14 implicit.  You would have to infer that when
15 I wrote "Purdue trained Walgreens'
16 pharmacists," that that was a relevant answer
17 to a question about whether Purdue was
18 involved in the training of Walgreens'
19 pharmacists.
20   Q.    You say that's implicit?
21   A.    Yes.
22   Q.    There's no indication in your
23 report that your question was did Purdue
24 train Walgreens pharmacists, is there?

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    A.    That question is not part of
2  that opinion.
3    Q.    So, again, unless you list an
4  actual question in the bases for your
5  opinion, we have no way of knowing where you
6  started.
7        MS. CONROY:  Objection.
8        THE WITNESS:  No.
9    Q.    (BY MS. SAULINO)  How will we
10 know by looking at your report?
11   A.    It's obvious in the case of
12 many of the answers, if not all of them.
13   Q.    Sir, if it's obvious then why
14 did it require expertise?
15       MS. CONROY:  Objection.
16       THE WITNESS:  The formulation
17   of the question required expertise.
18   The understanding of what the question
19   was may also require expertise.
20   Q.    (BY MS. SAULINO)  If the
21 formulation of the question required
22 expertise, then wouldn't we need to see your
23 expertise in order to know what the question
24 was?

Page 243

1    A.    I'm not sure I understand that
2  question.  The answer, I think, is no, beyond
3  knowing what I've already told you about my
4  expertise.
5    Q.    So you can't give me any other
6  way to figure out what question you began
7  with for any opinion for which you don't list
8  a question.
9    A.    I said I think it's obvious
10 from most of the opinions what the question
11 was.
12   Q.    Okay.
13   A.    Remember that the overriding
14 question is the assignment.  So all of these
15 are subanswers to the assignment question.
16       So the question for all of
17 these is the assignment, and then all of
18 these are answers to the assignment.
19       Now, there are implicit
20 subquestions that require expertise, and
21 that's what all of these opinions are.
22   Q.    Okay.  You didn't say anywhere
23 in Section 3.2, starting on page 38, that
24 your overall question that you were answering

Page 244

1  was the assignment that you've now given us;
2  right?
3    A.    Correct.
4    Q.    And you do say, though, on
5  page 39 at the bottom --
6    A.    Hang on one sec.
7        Go ahead.
8    Q.    On page 39 at the bottom, you
9  do say that after -- so you -- you list some
10 search terms that you used; right?
11   A.    In the middle?
12   Q.    Mm-hmm.
13   A.    Yes.
14   Q.    And then you say, "After the
15 emergent" set of -- I'm sorry -- emergent
16 "subset of documents was reviewed, key themes
17 and concerns were identified, including
18 documents specifically pertaining to
19 evidence-based medicine, third-party interest
20 groups, public/private partnerships, EERW
21 study design, chronic pain treatment, return
22 on investment for marketing techniques,
23 hospital licensing and accreditation, state
24 medical board licensing, off-label promotion,

Page 245

1  diversion, and 12-hour dosing regimens";
2  right?
3    A.    Yes.
4    Q.    You don't list what the key
5  themes and concerns were that you identified;
6  right?
7    A.    You just read them.
8    Q.    So those are the key themes and
9  concerns?
10   A.    Those were some, probably not
11 all of the key themes and concerns.
12   Q.    And there's no way for us to
13 see from your report what all of your key
14 themes and concerns were; right?
15   A.    No.  All of the ones -- they
16 were all in the report.  So anything in the
17 report you can assume is a key theme or
18 concern.
19   Q.    And the only way that we would
20 be able to get there from your report is just
21 by making an assumption?
22       MS. CONROY:  Objection.
23       THE WITNESS:  No.
24   Q.    (BY MS. SAULINO)  Well, if I

Page 246

1 wanted to identify all of the key themes and
2 concerns that you identified when you
3 reviewed the emergent subset of documents
4 that came out of the search terms that you
5 identify on page 39, I would start with the
6 list you provide here. And where else would
7 I find the rest of them?
8     A. If there are others that are
9 not mentioned here, they would be in the
10 opinions.
11     Q. So -- but there is no way for
12 us to know precisely which opinions contain a
13 key theme or concern that you identified
14 after reviewing the documents that emerged
15 from your search using the key terms
16 identified on page 39.
17     A. No.
18     Q. There is a way for us to know?
19     A. Yes.
20     Q. And what is that way?
21     A. They all came out of the
22 searches. It's not that -- they weren't -- I
23 didn't dream them like Kaiko dreamed that,
24 you know, OxyContin was a 12-hour drug. That

Page 247

1 all came out of the searches.
2     Q. Well, you'd agree with me,
3 wouldn't you, sir, that grounded theory
4 approach is an iterative process?
5     A. Yes.
6     Q. So you do one set of searches.
7 You come up with key themes and concerns.
8 You do more searches. You continue to test;
9 right?
10     A. Yes.
11     Q. Testing and repetition is
12 important to the grounded theory approach;
13 right?
14     A. Well, it may or may not be
15 important. There's no real -- in general,
16 yes.
17     Q. You and I just looked on
18 page 38 at a quote you put in your report
19 from Corbin and Strauss that says, "The
20 hypotheses are constantly revised during the
21 course of research until they hold true for
22 the phenomena under a study as evidenced in
23 repeated interviews, observations or
24 documents"; right?

Page 248

1     So repetition is important;
2 right?
3     A. Correct.
4     Q. All right. So what you're
5 telling me now is that in order to figure out
6 what key themes and concerns you started with
7 and then tested with your repeated process,
8 we just look at the opinions and every
9 opinion is a key theme or concern that you
10 started with?
11     A. No. It doesn't say what you
12 start with. It says -- this is an iterative
13 process, and it says -- this sentence that
14 you just didn't read says they're constantly
15 revised.
16     Q. Right.
17     A. So the end revision of whatever
18 the key theme or concern is is what appeared
19 in the report as an opinion.
20     Q. And I'm asking how we figure
21 out where you started, sir.
22     It's not in the report, is it?
23     A. Yes, it is. You start on
24 page 39 in the middle with all those

Page 249

1 searches.
2     Q. Okay.
3     A. And then those searches
4 resulted in a subset of other items, not --
5 this is not a complete list of all the other
6 items but many of these. And then all of
7 these then resulted in opinions.
8     Q. Okay. And what I'm looking for
9 is where you list the subset of other items
10 that you were just talking about. Some of
11 them are listed here, as you just
12 acknowledged, but not all of them.
13     A. I don't think all of them, but
14 I -- you know, it's possible that all of the
15 opinions are subsets of these opinions.
16     Q. You don't know one way or the
17 other sitting here today?
18     A. I haven't evaluated it for that
19 question. That's not something I did.
20     Q. And then you say, "Additional
21 searches were conducted to explore these and
22 other more specific topic areas as they
23 arose." Right?
24     A. Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    Q.    You don't give us any search
2  terms or parameters for those additional
3  searches that you conducted; right?
4    A.    That's correct.
5    Q.    Okay.  So there's no way for us
6  to know what those were?
7    A.    That's correct.
8    Q.    Okay.  And then you say, "This
9  iterative analysis formed the basis for my
10 state-on-the-art opinions in this case."
11   A.    That's correct.
12   Q.    Did you mean "state of the
13 art"?
14   A.    Yes.
15   Q.    Okay.  And you believe that
16 your opinions are state of the art; right?
17   A.    What do you mean by "state of
18 the art"?
19   Q.    I'm using your words, sir.
20   A.    My words are they're state of
21 the art -- there's various definitions of
22 state of the art.  There's a medical state of
23 the art, and then there's this -- this
24 description of state of the art which

Page 251

1  generally is historical analysis of what went
2  on and why.  And that's what this is.
3    Q.    Okay.  But again, you don't
4  provide us a roadmap to your historical
5  analysis of what went on and why; right?
6    MS. CONROY:  Objection.
7    THE WITNESS:  That's not true.
8  I think it's incorporated in the
9  opinions.
10   Q.    (BY MS. SAULINO)  Other than
11 assumptions that one would make by looking at
12 the opinions, you don't provide a roadmap to
13 us about how you've used your process to get
14 there; right?
15   MS. CONROY:  Objection.
16   THE WITNESS:  No.
17   Q.    (BY MS. SAULINO)  You do
18 provide a roadmap?
19   A.    Well, I provide in some cases a
20 specific roadmap.  In other cases, I give you
21 a general idea of where to go.
22   Q.    Why don't we look at
23 Opinion 85.  So that would be on page 75.
24   You actually list it here as

Page 252

1  7.85.  Right?
2    A.    Right.
3    Q.    We're in the same place?
4    A.    Yeah.
5    MS. SAULINO:  What's happening
6  right now?
7    THE WITNESS:  She's getting me
8  the opinion.
9    Q.    (BY MS. SAULINO)  Okay.  Well,
10 I'll give you the documents when we're ready
11 to talk about them.
12   MS. CONROY:  If the doctor
13 would like to refer to the opinion, I
14 don't see any reason why he can't look
15 at it.
16   MS. SAULINO:  I'm happy to give
17 him the opinion.  I really prefer that
18 he not be handed documents.  This is
19 our deposition, so we'll hand him
20 documents that we want to talk with
21 him about.
22   MS. CONROY:  Make sure you give
23 it to Ms. Saulino and she'll hand it
24 over next time.

Page 253

1    Q.    (BY MS. SAULINO)  Can I see
2  what you were just handed?
3    Thank you.
4    I'm marking what you were just
5  handed as Exhibit 7 to your deposition.
6    (Whereupon, Deposition Exhibit
7  Egilman 7, B.85, was marked for
8  identification.)
9    Q.    (BY MS. SAULINO)  And that is
10 Exhibit B.85 to your report; correct?
11   A.    Correct.
12   Q.    Okay.  And if we look back at
13 your report, what we see is you list an
14 opinion in your report, and that is McKesson
15 and Purdue co-marketed Purdue drugs; right?
16   A.    Correct.
17   Q.    I'm looking at your report,
18 page 75.
19   A.    Correct.
20   Q.    Okay.
21   You remember it?
22   A.    It's right here.
23   Q.    I understand that, sir, but I'm
24 looking at your report.

Page 254

1 A. This is part of my report.
2 This is Exhibit B.85.
3 Q. Okay. Well, I just want to
4 confirm that your report -- the only
5 information that your report itself gives us
6 is "See Exhibit B.85 hereto attached"; right?
7 MS. CONROY: Objection.
8 THE WITNESS: I'm holding that
9 B.85 exhibit.
10 MS. SAULINO: We're going to
11 get there. I just want to go step by
12 step.
13 THE WITNESS: That's fine.
14 Q. (BY MS. SAULINO) Could you
15 look at your report, please?
16 A. This is part of my report.
17 Q. Could you look at page 75 of
18 your report, please?
19 A. Sure.
20 Q. Okay. So at 7.85, you say,
21 "Opinion, McKesson and Purdue co-marketed
22 Purdue drugs"; right?
23 A. Correct.
24 Q. And underneath that all you say

Page 255

1 is, "See Exhibit B.85 hereto attached."
2 Right?
3 A. Right.
4 MS. CONROY: Objection.
5 Q. (BY MS. SAULINO) Now let's
6 look at Exhibit B.85, David S. Egilman,
7 Report Opiate Litigation; right?
8 A. Do you know what? Why don't I
9 get my copy of that?
10 Q. No, sir. I'd like to stick
11 here with what we're looking at right now.
12 A. I'm going to get my copy of
13 B.85.
14 Q. Then we will mark that as an
15 exhibit, sir. Is your copy different than
16 what you've given us?
17 A. Could be, because my copy is
18 all marked up. My copies are all marked up.
19 (Discussion off the record.)
20 A. So these are mine.
21 Q. So, just so I'm clear, the box
22 that you've just put in front of you is a set
23 of marked-up exhibits that you brought with
24 you; is that right?

Page 256

1 A. Correct.
2 Q. All right. And these are
3 different than what you've produced to the
4 defendants in this litigation.
5 A. No, they're the same documents,
6 I think, for the -- almost completely.
7 Except for I have notes on them and stickies.
8 Q. And you didn't provide us those
9 notes and stickies?
10 A. I just put the notes and
11 stickies on the last couple of days.
12 Q. So you didn't provide those to
13 us; right?
14 A. That's correct. I didn't
15 provide them to you.
16 Q. Okay. And why is it that --
17 why is it that you need to see your copy in
18 order to answer questions about Opinion 85?
19 A. I don't need to see my copy.
20 My copy -- some of my copies have notes and
21 stickies on them, and they make the answers
22 go faster.
23 Q. Okay. And just for the
24 Special Master's benefit, you would agree

Page 257

1 with me that your notes and stickies have
2 never been produced to the defendants in this
3 litigation?
4 A. That's correct. They were put
5 on in the last two or three days.
6 Q. But you prefer to answer
7 questions about your opinions based on those
8 that have been marked up with your notes and
9 stickies?
10 A. I prefer to use the ones that I
11 just marked up over the last two or three
12 days, that's right.
13 Q. And you wrote these notes and
14 stickies yourself?
15 A. Yes.
16 Q. Did anybody else write them?
17 A. No.
18 I've got other notes too I may
19 refer to too --
20 Q. All right. Can I see --
21 A. -- that relate to opinions.
22 Q. Can I see your version of
23 Opinion 85?
24 Thank you.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    Okay.  There's -- for this
2  particular opinion, there's no difference
3  between what you have and what I have; is
4  that right?
5    A.    That's correct.
6    Q.    Okay.  And the folder that I
7  marked as Exhibit 7, which I think is now
8  under your box --
9    A.    Right.
10   Q.    -- can you -- do you see that
11 folder has a blue dot sticker on it?
12   A.    Right.
13   Q.    What does that mean?
14   A.    I don't know.
15   Q.    You didn't put that there?
16   A.    No.  That set, the plaintiffs'
17 attorneys put together.
18   Q.    Okay.
19   A.    This is my set.
20   Q.    I see.
21   A.    I don't know what their coding
22 was.
23   Q.    Okay.  For purposes of
24 Opinion 85 and Exhibit 85, however, you and I

Page 259

1  are looking at the same document, which is
2  marked as Exhibit 7 to your deposition and is
3  in a green folder; right?
4    A.    Sure.
5    Q.    Okay.  Now, here you have one
6  document cited and a portion of it
7  screenshotted in -- underneath your opinion;
8  right?
9    A.    Correct.
10   Q.    Okay.  You don't list any
11 interviews that supported this opinion;
12 right?
13   A.    Correct.
14   Q.    You don't list any deposition
15 testimony that supported this opinion?
16   A.    Correct.
17   Q.    You don't list any other
18 documents that supported this opinion; right?
19   A.    Not here, that's correct.
20   Q.    You don't list the criteria you
21 used to choose this document to support this
22 opinion; right?
23   A.    Correct.
24   Q.    You don't list the question

Page 260

1  that you began with for this opinion; right?
2    A.    Not explicitly as a question,
3  correct.
4    Q.    Okay.
5    And -- so with respect to
6  Opinion 85, the only information that you
7  have provided is this one portion of this one
8  document; right?
9    A.    No, the only opinion -- the
10 only information I provided in this
11 particular document.  There are other related
12 documents which I think I've already
13 mentioned before, that relate to the McKesson
14 program of marketing drugs for the
15 distributors.
16   Q.    We have no way of knowing which
17 of those you used to form this opinion other
18 than the one that you put here; right?
19   A.    No, that's not true.  They're
20 obvious.  You could read them or you can ask
21 me about them now.
22   Q.    And when you say "they're
23 obvious," you mean that you didn't provide us
24 any guidance in that?  You don't have it

Page 261

1  anywhere in your report?
2    MS. CONROY:  Objection.
3    THE WITNESS:  No, I have it
4    here.
5    One second and I'll get it for
6    you.
7    Do you have the McKesson
8    Redweld?
9    MS. SAULINO:  Okay.  Can I see
10   what you're giving him right now?
11   Q.    (BY MS. SAULINO) So,
12 Dr. Egilman, what you have just asked the
13 plaintiffs' lawyers to provide you is what
14 you called the McKesson Redweld?
15   A.    Correct.
16   Q.    And I only just briefly flipped
17 through what you called the McKesson Redweld,
18 but is the McKesson Redweld a compilation of
19 documents that mention McKesson?
20   A.    Correct.
21   Q.    So what you're saying is that
22 in order to figure out the basis for any one
23 of your opinions that reference McKesson, we
24 need to look at all of your opinions that

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  reference McKesson?
2     A.    Not necessarily.  But --
3     Q.    Okay.
4     A.    Not necessarily, no.
5     Q.    Then how would we know, from
6  looking at your report, sir, anything but
7  other than the one document that you list in
8  Exhibit B.85 which you list as the only
9  support for your Opinion 85?
10    A.    You would ask me here.  Okay?
11 Or you could search the report for all of the
12 McKesson opinions, which are searchable by
13 McKesson.
14          You could pull the documents,
15 as I have done, and put them all in a
16 Redweld, and then you'd have everything that
17 I wrote that might be relevant to all of my
18 McKesson opinions.
19    Q.    Okay.  So what you're saying
20 is, if I took everything in your report that
21 mentioned McKesson, each of the McKesson
22 opinions, and put them together, I would have
23 the basis for any one of your McKesson
24 opinions?

Page 263

1     A.    No, not necessarily.
2          If you wanted to know if there
3  were other opinions that related to this
4  opinion, then you'd look at the other
5  opinions and say, "Oh, I see.  That's related
6  too," because there's a contract between
7  Purdue and McKesson for marketing services,
8  which is obviously related to this Redweld.
9     Q.    You don't provide that roadmap
10 in your report, do you?
11    A.    No.  You'd have to actually
12 search for all of the McKesson opinions and
13 assume and find the contract between McKesson
14 and its distributors showing that they were
15 marketing for them.
16    Q.    Okay.
17          Now, are you willing to agree,
18 sir, that if we take the compilation of each
19 of the opinions that mentions McKesson, then
20 we would have the full set of pieces of
21 evidence that you relied on for -- that you
22 possibly relied on for any one McKesson
23 opinion?
24    A.    No.

Page 264

1     Q.    So there's no way for us to
2  know the full set of evidence that you relied
3  on for any one McKesson opinion?
4     A.    No.  Not true.
5     Q.    You don't believe that's true?
6     A.    Correct.
7     Q.    There is a way for us to know
8  the full set of evidence that you relied on
9  for any one McKesson opinion?
10    A.    True.
11    Q.    In your report you say that
12 somewhere?
13    A.    No.
14          It depends on the opinion.
15          Maybe.  Yes and no.  Probably
16 "yes" and "no" is the answer to that
17 question.
18    Q.    When you say "It depends on the
19 opinion," what do you mean?
20    A.    I mean, some opinions may have
21 all of the documents that I could find
22 relevant to that opinion.
23          Other opinions may -- may be
24 supported by other opinions also in the

Page 265

1  report.
2     Q.    You don't tell us in any of
3  your opinions that this opinion also relies
4  on evidence related to another opinion;
5  right?
6          There's no -- there's no
7  opinion that says that?
8     A.    There's no cross-reference
9  opinion.  I think that's -- I think there are
10 a couple of cross-reference opinions, but in
11 general that's correct.
12    Q.    And there's no way for us to
13 know if we're looking at any one opinion,
14 that this happens to be one of the opinions
15 that lists all of the information that you
16 relied on?
17    A.    Well, that's true.  Absolutely.
18 Because all of the opinions -- all of the
19 information I relied on is all the
20 information that I reviewed, all of the
21 database.  I didn't put that in every
22 opinion.
23    Q.    You relied on the entire
24 database to come to each and every one of

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  your opinions?
2      A.    Sure.  I searched the entire
3  database.  That means I relied and considered
4  the documents in the database.  The same with
5  the medical literature.
6      Q.    And you did all of that in four
7  months?
8      A.    Sure.
9      Q.    You choose only to excerpt one
10 single document for Opinion 85; right?
11     A.    Isn't it 86?
12     Q.    No, it was 85.
13     A.    Okay.  You're right, that's 85.
14 That's correct.
15     Q.    So is it fair to say that
16 that's what you considered to be the best
17 evidence supporting that opinion?
18     A.    Yeah.  It's a piece of evidence
19 that supports the opinion.
20     Q.    There's no way for us to know
21 whether you considered it to be the best of
22 the pieces of evidence that you think support
23 the opinion?
24     A.    I haven't ranked all the

Page 267

1  evidence that support the opinion.  I think
2  this and the contract together support the
3  opinion.  This is a -- this is -- of what I
4  could find, sufficient evidence to support
5  the opinion.
6      Q.    Okay.  So --
7      A.    I'm not trying in each of these
8  opinions to give you every piece of evidence
9  that may support the opinion.  I didn't have
10 enough time to do that.
11     Q.    Well, you had enough time to
12 come to the conclusion; right?
13     A.    I did.
14     Q.    You had enough --
15     A.    With the evidence that I
16 thought I had.
17     Q.    And you had enough time to
18 figure out that you had enough evidence for
19 that conclusion; right?
20     A.    Right.
21     Q.    So surely you had looked at the
22 evidence in order to come to that conclusion;
23 right?
24     A.    Right.

Page 268

1      Q.    But you didn't have time to
2  then simply note the documents?
3          MS. CONROY:  Objection.
4          THE WITNESS:  I couldn't note
5      for every opinion all the evidence
6      that I looked at to -- that related to
7      that particular opinion.  It would
8      take too long and it would be too
9      voluminous.
10     Q.    (BY MS. SAULINO)  We looked
11 earlier today at your steps of your
12 evidence-based medicine method; right?
13     A.    Correct.
14     Q.    Okay.  And on page 41, you list
15 step 2. 3.3.2.
16     A.    Hang on one second.
17          What page?
18     Q.    Page 41.
19     A.    Okay.
20     Q.    Step 2 is "Systematic retrieval
21 of best evidence available"; right?
22     A.    Correct.
23     Q.    So you didn't do that here?
24          MS. CONROY:  Objection.

Page 269

1          THE WITNESS:  Well, I did the
2      best I could with the time I had.
3      Q.    (BY MS. SAULINO)  So you're
4  saying you didn't have enough time to provide
5  an adequate expert report?
6      A.    No.
7          I -- what I'm saying is, I
8  got -- what I gave you, in combination with
9  that last example, is the best evidence that
10 I could find.
11     Q.    Okay.  So Exhibit 7 is the best
12 evidence that you could find for Opinion 85?
13     A.    In combination with the other
14 McKesson documents that I said that are
15 relevant to the same question.
16     Q.    And that combination that
17 you're telling us now is nowhere documented
18 in your report?
19     A.    The fact that it's a
20 combination?  It's obvious in the report.  I
21 think I talked -- there's a contract --
22 there's an opinion that says McKesson had a
23 contract to market for distributors.  And it
24 specifically talks about some of the Purdue

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1  marketing that they did.  And then so to
2  be -- I think it's obvious that those
3  opinions would go together.
4      Q.    You think it's obvious?
5      A.    Correct.
6      Q.    Okay.  But you don't provide
7  that information in your report.
8      A.    Correct.
9      Q.    And you think it's obvious
10 because the word "McKesson" is in the
11 opinion; right?
12     A.    No.
13     Q.    Well, you don't group the
14 McKesson opinions together, do you?
15     A.    Correct.
16     Q.    Okay.  So that wasn't any
17 indicator to us that we should be looking at
18 them together; right?  The way you -- the way
19 you numbered them?
20     A.    Correct.
21     Q.    Okay.
22     A.    The numbering was not a clue.
23     Q.    Okay.
24          All right.  On page 132 of your

Page 271

1  report.
2      A.    Yes.
3      Q.    Second opinion from the bottom,
4  Opinion 7.468 is opinion "McKesson blames
5  manufacturers and avoids its own
6  responsibility"; right?
7      A.    Yes.
8      Q.    And you then say, "See Exhibit
9  B.468" hereto attached; right?
10     A.    Right.
11     Q.    And that's all that's listed in
12 the core of the report.
13         MS. CONROY:  Objection.
14         THE WITNESS:  Correct.
15     Q.    (BY MS. SAULINO)  Then we have
16 to then look at the exhibits; right?
17     A.    Correct.
18     Q.    So then we go to Exhibit B.468;
19 right?
20     A.    Go ahead.
21     Q.    Are you looking for your copy
22 of B.468?
23     A.    I am.
24          Do you have a copy?

Page 272

1      Q.    I do.
2      A.    Okay.  Then I'll take your
3  copy.  What I've got in this box, it doesn't
4  look like I put a sticky or any notes.
5      Q.    I'm handing you what we've
6  marked as Exhibit 8 to your deposition.
7          (Whereupon, Deposition Exhibit
8      Egilman 8, Opinion - McKesson blames
9      manufacturers and avoids its own
10     responsibility, was marked for
11     identification.)
12     Q.    (BY MS. SAULINO)  Okay.  So
13 looking at Exhibit B.468.
14     A.    Okay.  This is airline crash.
15     Q.    The first page.
16         MS. CONROY:  Did you bring
17     copies?
18         MS. SAULINO:  Yep.  You guys
19     have a bunch of them back there, too.
20         MS. CONROY:  I want to make
21     sure you hand them to me.
22     Q.    (BY MS. SAULINO)  B.468.  Are
23 you with me?
24     A.    Yeah.  I do have it here with

Page 273

1  stickies on it and notes, so I do want to get
2  mine.
3      Q.    Well, my question about this is
4  pretty simple, Dr. Egilman.
5      A.    Okay.  Then go ahead.
6      Q.    You only cite one document
7  here; right?
8      A.    Right.
9      Q.    Okay.  You don't provide any
10 questions that you were seeking to answer;
11 right?
12     A.    Correct.
13     Q.    You don't cite to any
14 interviews that supported this opinion?
15     A.    Correct.
16     Q.    You don't cite any deposition
17 testimony that supported this opinion?
18     A.    Correct.
19     Q.    You don't cite any other
20 documents that supported this opinion?
21     A.    Correct.
22     Q.    You don't provide the criteria
23 by which you came to decide that this
24 document was supportive of this opinion?

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    A.    I don't know how I would do
2  that.
3       Q.    Okay.  And what your opinion is
4  is "McKesson blames manufacturers and avoids
5  its own responsibility"; right?
6       A.    Correct.
7       Q.    And so you've chosen one
8  document as the best evidence of that?
9       A.    Correct.
10      Q.    And other than this one
11 document, we have no indication written in
12 your report anywhere or in your exhibit that
13 you used anything else to come to this
14 opinion; right?
15           MS. CONROY:  Objection.
16           THE WITNESS:  Correct.
17      Q.    (BY MS. SAULINO)  You don't
18 provide us any roadmap to how you reevaluated
19 any questions once you looked at other data
20 or documents; right?
21      A.    For this opinion?
22      Q.    Yes.
23      A.    Correct.
24      Q.    And you don't provide us any

Page 275

1  indication of whether you revised your
2  hypotheses to ensure that they held true
3  under repeated study; right?  For this
4  opinion?
5       A.    Not in the report, that's
6  correct.
7       Q.    All right.  Let's look at --
8       A.    Did you want to mark this one
9  or no?
10      Q.    We did mark it.  I gave you the
11 marked copy.
12      A.    Oh, I'm sorry.
13           Do you want to take -- hang on
14 one second while I give this to the court
15 reporter.
16           MS. SAULINO:  Sure.
17      Q.    (BY MS. SAULINO)  Let's look at
18 Exhibit -- let's look at page 77 of your
19 report.
20      A.    Okay.
21      Q.    Do you see Opinion 7.100?
22      A.    I do.
23      Q.    Opinion "Healthcare
24 Distribution Management Association, HDMA,

Page 276

1  now HDA, was responsible for sale of
2  unapproved opioids"; right?
3       A.    Correct.
4       Q.    And you say, "See Exhibit B.100
5  hereto attached"; right?
6       A.    Correct.
7       Q.    And we -- I'm going to hand you
8  Exhibit B.100, unless you have a different
9  version of it.
10      A.    Which number is it?
11      Q.    100.
12      A.    I have a different version.
13      Q.    Okay.  Shall we mark that one?
14      A.    If you like.
15      Q.    Okay.  So I've handed you what
16 we've marked as Exhibit 9 to your deposition,
17 which is your version of Exhibit 100 to your
18 report.
19      A.    Right.
20           (Whereupon, Deposition Exhibit
21      Egilman 9, Opinion - HDMA was
22      responsible for sale of unapproved
23      opioids, was marked for
24      identification.)

Page 277

1       Q.    (BY MS. SAULINO)  And again,
2  here, for Opinion 100, you cite a single
3  exhibit; right?
4       A.    Well, I cite a single exhibit,
5  but it references several FDA documents.
6       Q.    Your opinion does not reference
7  several FDA documents; right?  The exhibit
8  itself does?
9           MS. CONROY:  Objection.
10          THE WITNESS:  The exhibit,
11      which is the basis of the opinion,
12      references several FDA documents.
13      Q.    (BY MS. SAULINO)  And when I
14 say, "The exhibit itself does," I mean not
15 your writing, but in fact the e-mail chain
16 dated Monday April 27, 2009.
17      A.    That's correct.
18      Q.    Okay.  So you're saying that
19 the FDA documents that are referenced in the
20 document that you have screenshotted into
21 Exhibit 100 should also be considered part of
22 the basis of your opinion?
23      A.    Yes.
24      Q.    Okay.  And that's everything

Page 278

1 that is the basis of your Opinion 100?
2 　　A.　Correct.
3 　　Q.　And so there were no other
4 interviews that supported this opinion?
5 　　A.　Correct. I didn't know I could
6 interview your personnel.
7 　　Q.　No deposition testimony?
8 　　A.　Correct. I can't take
9 depositions for sure.
10 　　Q.　Well, you said you read a
11 number of them, sir.
12 　　A.　Right. There's no deposition
13 testimony on this issue.
14 　　Q.　Did you look?
15 　　A.　Yes.
16 　　Q.　And so you don't cite any
17 deposition testimony about the HDMA at all
18 here, right?
19 　　A.　Not on this opinion. That's
20 right.
21 　　Q.　Okay.
22 　　　　There's no other data listed
23 here; right?
24 　　　　MS. CONROY: Objection.

Page 279

1 　　　　THE WITNESS: Correct.
2 　　Q.　(BY MS. SAULINO) No documents
3 other than those we've just talked about;
4 right?
5 　　A.　Correct.
6 　　Q.　There's no way that we can see
7 your original question or hypothesis for this
8 opinion; right?
9 　　A.　Right. You'd have to put a
10 "did" in front of the opinion.
11 　　Q.　But you don't tell us here;
12 right?
13 　　A.　I didn't put the "did" in.
14 　　Q.　You didn't give us any
15 indication that we were supposed to assume a
16 "did"; right?
17 　　A.　Correct.
18 　　Q.　And there's no indication here
19 that you've revised your hypothesis or
20 ensured it held true under repeated study;
21 right?
22 　　A.　Except for checking the
23 underlying of FDA documents, right.
24 　　Q.　So by checking the underlying

Page 280

1 FDA document, we would know that you started
2 with a different original hypothesis and
3 revised it?
4 　　A.　No.
5 　　Q.　Okay. Well, that was my
6 question.
7 　　A.　No, it wasn't.
8 　　Q.　There's no way for us know
9 if you started with a different original
10 hypothesis and revised it; right?
11 　　A.　That's correct.
12 　　Q.　And you say checking the
13 underlying FDA documents. What do you
14 believe that would provide us?
15 　　A.　Well, that was under the
16 question about whether you'd done -- checked
17 other supporting documents or contradictory
18 evidence that indicated that this was not
19 true.
20 　　Q.　And so you're saying you
21 checked the FDA documents that were cited in
22 this e-mail --
23 　　A.　Correct.
24 　　Q.　-- as contradictory evidence?

Page 281

1 　　A.　No. As either confirmatory or
2 contradictory.
3 　　Q.　Which one was it?
4 　　A.　Confirmatory.
5 　　Q.　But you didn't provide those
6 documents here?
7 　　　　MS. CONROY: Objection.
8 　　　　THE WITNESS: No, I just cited
9 　　them in the context of -- they were in
10 　　the document that was the basis of the
11 　　opinion.
12 　　Q.　(BY MS. SAULINO) And you
13 didn't explain how those documents were
14 confirmatory of your opinion. Right?
15 　　A.　No, I didn't explain that, but
16 there's a quote from the documents that's a
17 correct quote in this e-mail.
18 　　Q.　In the e-mail that you're
19 citing, there is a quote from one of the FDA
20 documents? That's what you're saying?
21 　　A.　Correct.
22 　　Q.　Okay. That's not your quote.
23 That's not something you pulled out; right?
24 　　　　MS. CONROY: Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    THE WITNESS:  That's correct.
2    It says it's an FDA quote.
3    Q.    (BY MS. SAULINO)  And you're
4  aware, correct, Dr. Egilman, that the HDMA is
5  a trade association?
6    A.    I am.
7    Q.    And the HDMA doesn't actually
8  sell anything?
9    A.    Do you mean sell any product?
10   Q.    Right.
11   A.    That's correct.
12   Q.    Okay.
13   A.    Are you done with this one?
14   Q.    I am.  Thank you.
15   A.    I've been accused of stealing
16 exhibits before, so I just wanted to make
17 sure I give them to the court reporter.
18   Q.    I'm sure she appreciates it.
19   Let's look at page 82 of your
20 report.
21   A.    Okay.
22   Okay.
23   Q.    And on page 82 you cite
24 Opinion 7.135.  Opinion "Distributor

Page 283

1  marketing drove sales"; right?
2    A.    Right.
3    Q.    And you refer then to Exhibit
4  B.1 -- B.135 as your support; right?
5    A.    Correct.
6    Okay.  Go ahead.
7    Q.    So I'd like to mark whatever
8  version you're planning to use.
9    A.    I'll use whatever you give me
10 because I don't have any notes on this one.
11   Q.    Okay.
12   I'm handing you what we've
13 marked as Exhibit 10 to your deposition,
14 Dr. Egilman.
15   (Whereupon, Deposition Exhibit
16   Egilman 10, Opinion - Distributor
17   marketing drove sales, was marked for
18   identification.)
19   Q.    (BY MS. SAULINO)  And this is
20 Exhibit B.135 to your report; right?
21   A.    Correct.
22   Q.    And here you have a screenshot
23 of a document on page 1; right?
24   A.    Right.

Page 284

1    Q.    And then you have a second
2  document that starts on page 2 and goes
3  through the rest of the exhibit; right?
4    A.    Correct.
5    Q.    Okay.  And those are the only
6  two documents that you provide as a basis for
7  your opinion that distributor marketing drove
8  sales; right?
9    A.    Correct.
10   Q.    You don't provide any
11 deposition testimony; right?
12   A.    Correct.
13   Q.    You don't provide any other
14 documents here on this exhibit; right?
15   A.    Correct.
16   Q.    You don't provide any original
17 questions or hypotheses that you asked;
18 right?
19   A.    Correct.
20   Q.    You don't provide any
21 information that would lead us to believe
22 that you used -- that you revised your
23 hypotheses or ensured that they held true
24 under repeated study; right?

Page 285

1    A.    Correct.
2    Q.    Okay.  So all we have are these
3  two documents; right?
4    A.    Correct.
5    Q.    Okay.  And these two documents
6  are, in fact -- they in fact relate to two
7  different pharmaceutical manufacturers;
8  right?
9    A.    Correct.
10   Q.    So the first document on the
11 first page relates to Purdue Pharma; right?
12   A.    Correct.
13   Q.    And the second document
14 starting on page 2 relates to Cephalon;
15 right?
16   A.    Correct.
17   Q.    And, in fact, the document that
18 starts on page 2 is an unsigned contract;
19 right?
20   If you look at the very last
21 page?
22   A.    Correct.
23   Q.    So based on this document, you
24 have no way of knowing whether it actually

Page 286

1  happened; right?
2      A.    Based on this particular
3  document?  Correct.
4      Q.    Okay.  And if you look at the
5  second page of this document, which is page 3
6  of the exhibit, you see that the objective of
7  this document was "To educate pharmacists
8  regarding new REMS requirements for Actiq and
9  Fentora; right?
10     A.    No, not exactly.
11     Q.    Okay.  Sir, if you'd look with
12 me at the third line of writing on this page.
13         Well, the second line says
14 "Objective," and then the third line says
15 "Educate pharmacists regarding new REMS
16 requirements for Actiq and Fentora."  You'd
17 agree with me that that's what is written
18 there; right?
19     A.    Correct.
20         In the section you read.
21     Q.    All right.  We can put that
22 aside.
23         If I could look at page 65 of
24 your report, please.  The top?

Page 287

1      A.    Okay.
2      Q.    Do you see Opinion 7.21?
3      A.    I do.
4      Q.    And your opinion there is
5  "Walgreens' solution to red flag stores was
6  to find a distributor who would sell to them.
7  All three Walgreens distributor facilities
8  failed to implement SOM procedures"; right?
9      A.    Correct.
10     Q.    Okay.  And then you refer to
11 Exhibit B.21; right?
12     A.    Correct.
13     Q.    Okay.  I have a copy if you
14 would like it.
15     A.    Okay.  I'll use yours.
16     Q.    Okay.  I'm handing you what's
17 been marked as Exhibit 11.
18         (Whereupon, Deposition Exhibit
19     Egilman 11, Opinion - WAG solution to
20     red flagged stores was to find a
21     distributor who would sell to them.
22     All 3 WAG distributor facilities
23     failed to implement SOM procedures,
24     was marked for identification.)

Page 288

1      Q.    (BY MS. SAULINO)  And looking
2  at Exhibit 11 --
3      A.    Okay.
4      Q.    -- it appears that you cite for
5  this opinion one document; right?
6      A.    Correct.
7      Q.    And it is an e-mail that you
8  have screenshotted onto the page; right?
9      A.    Correct.
10     Q.    Okay.  And you provided some
11 red arrows there; right?
12     A.    Correct.
13     Q.    You don't list any other
14 documents; right?
15     A.    Not for this opinion -- not in
16 this -- not in Opinion B.21, but there are a
17 lot of other documents that relate to this
18 issue in the other opinions.
19     Q.    Okay.  You don't provide any
20 cross-referencing of those other opinions;
21 right?
22     A.    Correct.  You'd have to read
23 them.
24     Q.    You don't provide any way --

Page 289

1  any roadmap that would tell us precisely
2  which of your other 490 opinions we should be
3  looking at; right?
4          MS. CONROY:  Objection.
5          THE WITNESS:  No.
6          I think it's pretty clear when
7      you look at the documents that they
8      relate to the -- this situation
9      between Walgreens, Jupiter, Cardinal,
10     and ABC.  You know, there's a whole
11     narrative there.
12     Q.    (BY MS. SAULINO)  You don't
13 write anywhere in this report or its attached
14 exhibits what you believe is obvious about
15 the situation you just described; right?
16     A.    No.
17     Q.    You don't provide any kind of
18 roadmap to your initial hypotheses; right?
19         MS. CONROY:  Objection.
20         THE WITNESS:  That's true.
21     Q.    (BY MS. SAULINO)  You don't
22 provide the question that you were looking to
23 answer; right?
24     A.    That comes under the assignment

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  question generally, so that's -- that's where
2  that question is.
3      Q.   Well, you didn't provide the
4  assignment question in your report either,
5  did you?
6      A.   That's correct.
7      Q.   Okay.
8          You don't show us any
9  re-evaluation from other data or documents in
10 this opinion; right?
11     A.   No.  There are other documents
12 that relate to this situation.
13     Q.   But you don't list them here;
14 right?
15     A.   They're not listed in B.21, but
16 they are otherwise in the report, including
17 reference to Jupiter Walgreens.
18         I cite the Walgreens
19 $80 million payment for violating DEA rules
20 on selling and a variety of other documents.
21     Q.   You don't cite that here?  In
22 Exhibit B.21?
23     A.   I do not cite those other
24 opinions that relate to this opinion in this

Page 291

1  agreement.  That is correct.
2      Q.   Nowhere do you tell us that
3  those other opinions relate to this opinion,
4  explicitly in your report.  Right?
5      A.   That's correct.
6      Q.   You don't cite any deposition
7  testimony here; right?
8      A.   Correct.
9      Q.   Okay.  And this single document
10 that we're looking at right here, that you
11 provide here, as support for your opinion,
12 doesn't even mention anywhere in it SOM
13 procedures; right?
14     A.   By name, correct.
15         MS. SAULINO:  Okay.  We can go
16 off the record.
17         THE VIDEOGRAPHER:  Off the
18 record.  4:13.
19         (Recess taken, 4:12 p.m. to
20 4:25 p.m.)
21         THE VIDEOGRAPHER:  We are back
22 on the record at 4:26.
23     Q.   (BY MS. SAULINO)  Okay.
24 Dr. Egilman, a number of your opinions in

Page 292

1  your report pertain to what you call "the
2  venture."  Correct?
3      A.   Yes.
4      Q.   And on page 51 of your report,
5  you define the venture at 4.4; right?
6      A.   Correct.
7      Q.   And you say, "As referred to
8  herein, 'the venture' refers to all
9  defendants in the opiate litigation,
10 including their associated individuals and/or
11 organizations acting in a concerted fashion
12 separately or together to effect a particular
13 objective"; right?
14     A.   Correct.
15     Q.   That's a definition that you
16 came up with; right?
17     A.   I'm sure I discussed it with
18 the lawyers.
19     Q.   Okay.  Do you remember when
20 that was?
21     A.   Over the last two or three
22 months.
23     Q.   And was that a definition that
24 you came up with or that they gave you?

Page 293

1      A.   It was a discussed definition
2  between the two of us.  I don't know -- I
3  can't tell you which words came from whom.
4      Q.   Okay.  So this definition is
5  not something that was the result of your
6  iterative process of research?
7      A.   Well, that's not necessarily
8  true, no.
9      Q.   Well, you just said that it
10 came from a discussion with the plaintiffs'
11 lawyers; right?
12     A.   Yeah, but it also -- my part of
13 that came from reading the documents and
14 trying to figure out what had gone on.
15     Q.   Are discussions with
16 plaintiffs' lawyers typically a part of your
17 expert process?
18     A.   Certainly they are.  Depends on
19 what the issues are.  For example, I was
20 asking for depositions --
21     Q.   Okay.
22     A.   -- to be taken.  I was asking
23 for further discovery to be taken.
24     Q.   You've answered my question,

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  sir. You said, "Certainly they are."

2      A.    Yeah, but I have to -- it's not

3  everything. It's limited to certain areas.

4      Q.    Okay.

5      A.    So it's just "Certainly they

6  are" is a misleading little snippet. Which I

7  prefer not to leave on the record alone.

8      Q.    Well, sir, I asked you: "Are

9  discussions with plaintiffs' lawyers

10  typically a part of your expert process?"

11          And your answer was, "Certainly

12  they are. Depends on what the issues are,"

13  and then you started giving examples.

14          I don't think we need any

15  further examples. I understand your answer.

16  Okay?

17      A.    No. But go right ahead.

18      Q.    My next question for you,

19  though, is --

20      A.    Just let my put on the record

21  my answer is incomplete. Now go ahead.

22      Q.    My question for you, sir, is

23  your definition for "the venture," do you

24  document anywhere here the iterative process

Page 295

1  that you went through to come up with this

2  definition?

3      A.    No. And there's -- there's, I

4  think there are at least three different

5  times when I discussed the venture in the

6  report, and it's expanded on in at least one

7  of those times.

8      Q.    Okay. So looking at the

9  definitions that you provide on page 51, we

10  can't rely on that definition?

11          MS. CONROY: Objection.

12          THE WITNESS: No, you can rely

13      on that definition. There's an

14      expanded version of this definition --

15      well, first of all, let me see

16      Exhibit 473. Maybe we're talking

17      about the same thing.

18      Q.    (BY MS. SAULINO) We will get

19  to Exhibit 473. I'm just looking at the

20  definition that you put here in your report

21  here, sir, under the section called

22  "Definitions."

23      A.    Okay. Well, hold on one

24  second.

Page 296

1      Q.    I have a copy if you need it.

2      A.    Sure.

3      Q.    I've handed you Exhibit 12 to

4  your deposition, Dr. Egilman.

5          (Whereupon, Deposition Exhibit

6      Egilman 12, Definition - "Venture"

7      refers to all defendants (including

8      their associated individuals and/or

9      organizations) and covers all aspects

10      of marketing, distribution, and supply

11      they engaged in, was marked for

12      identification.)

13          THE WITNESS: Right. So this

14      is exactly what I was referring to.

15      This is -- the opinion's not limited

16      to the definition in 4.4, but there's

17      an expanded basis for the opinion

18      which elaborates more -- elaborates on

19      what that means.

20      Q.    (BY MS. SAULINO) I see that,

21  sir.

22          This does not provide us any

23  information about how you came to the

24  opinion; correct?

Page 297

1      A.    You mean came to the

2  definition? Or the opinion?

3          It's not an opinion; it's a

4  definition.

5      Q.    Okay. Actually, sir, it is

6  both. If you look at page 133 of your report

7  at 7.473?

8      A.    What page?

9          What page?

10      Q.    133.

11      A.    Okay. Where?

12      Q.    I'm looking at 7.473, which

13  also refers to Exhibit B.473, which is the

14  exhibit that we're looking at right now which

15  is Exhibit 12 to your deposition.

16      A.    This is a different issue.

17      Q.    Okay.

18      A.    This is -- this is called

19  "Opinion definitions." It's really a

20  definition. I mean, so you could call that

21  an error or a typo.

22          This should be "Definition."

23      Q.    Well, it's listed in your

24  Opinions section as 473, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    A.    Yeah, it's listed as 473 as an
2  opinion, but if you'll look at the actual
3  opinion, it's listed as a definition.
4    Q.    Okay.  So this is not an
5  opinion?
6    A.    It's a definition.  If you want
7  to call it an opinion, I'm not offended.
8    Q.    Sir, I'm looking at what you
9  put in your report, which says that it was an
10  opinion, and it's in the opinion section, and
11  it cites the very same document that is cited
12  in the "Definitions" section.
13    A.    Well, the same document is --
14  has two different headings to it.  In the
15  summary of opinions, it's listed as an
16  opinion.  But if you look at 473, the word
17  "opinion" doesn't appear.  Okay?  Whereas
18  most of my opinions actually have the word
19  "opinion."  Here, it calls it -- it says
20  "Definition."
21        So I would say that what you
22  see on 133, the word "opinion" -- I mean, it
23  doesn't really matter, to tell you the truth.
24  You can call it an opinion.  You can call it

Page 299

1  a definition.  Because the definition is
2  probably an opinion.  But it's definitely --
3  I meant it to frame what I was referring to
4  when I used the word "venture."
5    Q.    Okay.  Well, as you noted,
6  these two definitions on page 133 and on
7  page 51 actually say different things; right?
8    A.    Not really.  I mean, because
9  one says "Opinion-Definition" and the other
10  says "Definition" without "Opinion."
11    Q.    I'm referring to what happens
12  after the word "Definition."
13    A.    Yeah, there's a modifying
14  sentence in 473 that doesn't appear in --
15  that appears in 473 that was not typed into
16  the same opinion when it was typed that
17  appears on page 133.
18    Q.    Did you do that typing
19  yourself, sir?
20    A.    I don't think I did that
21  typing.
22    Q.    Who did?
23    A.    I don't know.  Probably one of
24  my staff did the typing.

Page 300

1    Q.    Okay.  And so you're saying now
2  that you did not intend 7.473 to be an
3  opinion in your report?
4    A.    No, I intended 473 to be what
5  473 says.
6    Q.    Which is a definition?
7    A.    Which is a definition.
8        I also intended 473, the
9  summary of 473 to be identical to the actual
10  opinion -- the actual definition 473, so
11  what's in this summary of opinions is missing
12  the last sentence.
13    Q.    Okay.
14        And then under -- and then you
15  provide a basis; right?  For the definition?
16    A.    Correct.
17    Q.    Okay.  And the basis for the
18  definition is -- you provide two sentences,
19  and then the second sentence has an A, B, and
20  C; right?
21    A.    Correct.
22    Q.    Okay.  You don't cite any
23  documents; right?
24    A.    Not in this definition,

Page 301

1  correct.
2    Q.    Well, not in -- not on page 51
3  in the "Definitions" sections; right?
4    A.    Correct.
5    Q.    Well, except for Exhibit B.473.
6    A.    Correct.
7    Q.    And not on page 132 under
8  opinion -- I'm sorry, and not on page 133,
9  under Opinion 7.473; right?
10    A.    Correct.
11    Q.    Except for Exhibit B.473;
12  right?
13    A.    Correct.
14    Q.    And then if we look at
15  Exhibit B.473, there are no documents cited
16  here either; right?
17    A.    Correct.
18    Q.    Okay.  You also don't cite to
19  any deposition testimony; right?
20    A.    Correct.
21    Q.    You also don't cite to any
22  literature; right?
23    A.    Not here.
24    Q.    Right.  You don't cite to any

Page 302

1  literature here, right?
2      A.   Not in this opinion, not in
3  473. There's other literature cited to that
4  describes the same activity by Saper.
5  Saper's speech.
6      Q.   Okay.
7      A.   He didn't call it a venture.
8  He called it a narco pharma.
9      Q.   Okay. And you don't link that
10  citation to this definition; right?
11      A.   I didn't use "narco pharma."
12      Q.   So you don't link that citation
13  to this definition in your report; right?
14      A.   Correct. But he describes the
15  same activities in his 2008-2009 talk, where
16  he calls what I call the venture, narco
17  pharma.
18      Q.   So you don't provide anywhere
19  in either of the places where you cite the
20  definition nor in Exhibit B.473, anywhere to
21  look to see how you came to the conclusion
22  that this was the definition for venture;
23  right?
24      A.   No, it's my definition for

Page 303

1  venture.
2      Q.   Well, it's yours and the
3  plaintiffs' lawyers; right?
4      A.   Yeah, they agreed with this
5  definition of venture.
6      Q.   And if they had disagreed, you
7  would have changed it?
8      A.   No. You don't know me very
9  well.
10      Q.   Well, you told me just a couple
11  of minutes ago that this was a definition
12  that was created in combination with them;
13  right?
14      A.   In conversation with them, but
15  if they disagreed with something that I
16  thought should be here, I wouldn't change it.
17      MS. SAULINO: Whoever is on the
18      phone, can you mute, please?
19      Q.   (BY MS. SAULINO) Well, now,
20  let's look at --
21      A.   Are you done with this one?
22      Q.   For now, but don't give it
23  away. Keep it nearby.
24      MS. SAULINO: And, Debbie,

Page 304

1  we're out of stickers.
2      Q.   (BY MS. SAULINO) If you could
3  look at page 135 of your report.
4      A.   Sure.
5      Q.   The very last opinion on that
6  page.
7      A.   Yeah.
8      Q.   Are you there?
9      A.   I just want to -- these --
10  these things are all being named Egilman?
11  All of these exhibits?
12      MS. SAULINO: Oh, I hadn't
13      noticed that.
14      THE WITNESS: Yeah, I did
15      notice that. Is that how you want it
16      to be?
17      MS. SAULINO: We probably
18      should correct it to just Egilman.
19      THE WITNESS: That would be my
20      thought, but I'm not thinking here.
21      MS. SAULINO: Okay. Well,
22      thank you for that.
23      (Discussion off the record.)
24      MS. SAULINO: Thank you. We'll

Page 305

1  discuss it with the court reporter at
2  the next break and we'll work it out.
3  Thank you.
4      THE WITNESS: No problem.
5  Sorry to interrupt.
6      Q.   (BY MS. SAULINO) So last
7  opinion on page 135. 7.488.
8      "Opinion, these are the members
9  of the venture." Do you see that?
10      A.   Correct.
11      Q.   Okay. I have a copy of
12  Exhibit B.488. If you'd like it.
13      A.   Right. You've got to include
14  489, because that also includes additional
15  members of the venture.
16      Q.   Well, you don't cross-reference
17  those two --
18      A.   No, they're just sequential.
19      Q.   Okay. But you told me earlier
20  that they weren't necessarily sequential when
21  they went together; right?
22      A.   They aren't. In this case
23  they're sequential.
24      Q.   And so there was no way for us

Page 306

1 to know that those two were supposed to be
2 read together except that they were
3 sequential?
4 A. No.
5 Q. You don't say anywhere in your
6 report that those two opinions are supposed
7 to be read together; right?
8 A. Explicitly in those words? No.
9 Q. Okay.
10 Well, let's look at 4.88 first.
11 Do you want it or do you have
12 your own copy?
13 A. I don't think it matters. I'll
14 have this one.
15 Q. Okay.
16 MS. SAULINO: It's marked as
17 Exhibit 14.
18 (Whereupon, Deposition Exhibit
19 Egilman 14, Opinion - these are the
20 members on the "venture" with two
21 Redweld folders", was marked for
22 identification.)
23 MS. SAULINO: I think we
24 realized that we were missing a 13.

Page 307

1 THE WITNESS: 13 is always good
2 to be left out.
3 Q. (BY MS. SAULINO) If you look
4 at Exhibit 4.88 under "Basis," you provide a
5 spreadsheet with colors; right?
6 A. Correct.
7 Q. And it is four pages long and
8 then you provide some citations on page 5;
9 right?
10 A. Right.
11 Q. Okay. So these are the members
12 of the venture; is that right?
13 A. Across the top.
14 Q. Across the top of what?
15 A. Across the top. Name, type.
16 The companies across the top are the members
17 of the venture. And they were also in red.
18 Q. And where do you explain that
19 in your report or in this exhibit?
20 A. I don't.
21 Q. So there was --
22 A. Except elsewhere where I name
23 the defendants in the case as the members of
24 the venture.

Page 308

1 So it's -- they're here, by the
2 same name that they're in the case.
3 Q. Do you believe that these are
4 the only defendants in the case?
5 A. No. They're also in 489.
6 Q. Okay. So when you say, in
7 Opinion 4.88, "These are the members of the
8 venture," you don't actually mean that?
9 A. No, I mean it. You've got
10 names across the top, and then you've got in
11 red. And what I said explicitly elsewhere
12 is -- and we've read that already -- that the
13 defendants in the case -- we read that
14 several times during this deposition -- are
15 members of the venture.
16 Q. Well, I understand that you say
17 different things in different places about
18 who makes up the venture, Dr. Egilman, which
19 is why I'm asking you these questions,
20 because it's unclear to me from your report
21 who makes up the venture.
22 A. Okay. Do you want to ask that
23 question?
24 Q. From looking at Document 7.488,

Page 309

1 when you say, "These are the members of the
2 venture," you're now telling me that this is
3 not -- that that opinion is incomplete?
4 A. Well, I said you had to
5 conclude -- you had to include 4.89, for one
6 thing.
7 Q. All right.
8 A. And I've already said elsewhere
9 that the members of the venture were the
10 manufacturers and distributors in the case.
11 Q. But you don't say that in
12 Opinion 7.488; right?
13 A. I don't say that in
14 Opinion 4.88 explicitly, that's right.
15 Q. But you don't say it
16 explicitly, nor do you say it implicitly,
17 sir; right? You say "These are the members
18 of the venture," not "These are some of the
19 members of the venture"; right?
20 A. That's correct.
21 Q. Okay.
22 A. That one should have been
23 clear.
24 This had a different purpose

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1 originally, this document.
2     Q.    All right.  Dr. Egilman, I'm
3 trying to get you Exhibit 489.  We seem not
4 to have it in our little box here.
5     A.    Do you want me to see if I have
6 it in my box?
7     Q.    Oh, it is in the binder that is
8 Exhibit 1.  And there may be other copies
9 your counsel have.  But I won't be able to
10 provide Ms. Conroy a copy from me.
11         MS. SAULINO:  Okay.  Let's go
12 off the record for about a minute.
13         THE VIDEOGRAPHER:  Off the
14 record.  4:46.
15         (Recess taken, 4:45 p.m. to
16 4:47 p.m.)
17         THE VIDEOGRAPHER:  Back on the
18 record at 4:48.
19     Q.    (BY MS. SAULINO)  Okay.
20 Dr. Egilman, I'm going to give you an exhibit
21 sticker, or I can put it on if you'd like.
22         So we're marking as Exhibit 15,
23 Exhibit 4.89 to your report?
24         (Whereupon, Deposition Exhibit

Page 311

1     Egilman 15, Opinion B.489 Redweld
2     folder, was marked for
3     identification.)
4     Q.    (BY MS. SAULINO)  Which is --
5     A.    4.89 is actually this and that.
6     Q.    I'm sorry, when you say "this
7 and that," I have one page that is 4.89.
8 That was what was produced to us.  You have
9 something else?
10     A.    Yeah.  I think you were
11 supplied all these underlying documents.
12         MS. CONROY:  I don't think the
13 notebooks have all of the underlying
14 documents.
15         THE WITNESS:  You don't have
16 the underlying documents.  You weren't
17 given all of this.
18     Q.    (BY MS. SAULINO)  Dr. Egilman,
19 I'm just looking at the one page that we've
20 marked as Exhibit 15.  I want to work through
21 this, so let me figure this out.
22         So Exhibit 15 in front of you
23 is one page; right?
24     A.    Yeah, that's correct.

Page 312

1     Q.    So -- and you'd agree with me
2 that there are no documents cited here;
3 right?
4     A.    That's correct.  They were
5 provided separately as attached to
6 Exhibit 15.
7     Q.    But that's not indicated
8 anywhere here on --
9     A.    They were provided with the
10 opinion, digitally.
11         MS. CONROY:  They're attached
12 electronically to the document.
13     Q.    (BY MS. SAULINO)  So it's your
14 testimony that there were supposed to be
15 documents that went along with opinion 4.89,
16 Exhibit B.489?
17     A.    Yeah.  All of these.
18     Q.    But that they're not cited on
19 the page that is the basis for your opinion?
20     A.    Well, that's the index,
21 basically, to these documents.
22     Q.    I see what you're saying, sir,
23 but I'm trying to figure out what you relied
24 on here.  Because we didn't have those

Page 313

1 documents as being associated with your
2 opinion.
3         MS. CONROY:  Objection.
4         THE WITNESS:  Well, I don't
5 know that that's the case or not.
6     Q.    (BY MS. SAULINO)  Okay.
7     A.    I'm telling you that the way
8 the report was delivered by me, it included
9 the documents in my hands.
10     Q.    All right.  Can I see those
11 documents?
12     A.    Sure.
13     Q.    Can I have the little Redweld
14 so I don't --
15     A.    Sure.
16     Q.    All right.  So let's make
17 Exhibit 15 to your deposition what you are
18 calling Exhibit 4.89, which is the one
19 page -- I think it's in that blue folder.
20     A.    Right.
21     Q.    Okay.  Which is the one page
22 that you're calling an index, plus the
23 Redweld that you're saying is the backup?
24         We'll make that all Exhibit 15

Highly Confidential – Subject to Further Confidentiality Review

Page 314

1  to your deposition.
2      A.    Sure.
3      Q.    Okay.
4      A.    Do you want to put the sticker
5  on the folder?
6      Q.    Yeah.  That's what I'm going to
7  do.
8          Okay.  And your Opinion 4.89 is
9  "Members of the venture entered agreements
10 with the DEA and DOJ for violating the law";
11 right?
12     A.    Correct.
13     Q.    And you say that -- you say now
14 that this opinion was supposed to be read in
15 combination with Opinion 4.88 as comprising
16 all of the members of the venture?
17     A.    Yes.
18     Q.    Okay.  But, again, the Redweld
19 that you just handed me still doesn't tell us
20 that, does it?
21         MS. CONROY:  Objection.
22         THE WITNESS:  This says
23     "Members of the venture entered
24     agreements with the DEA and DOJ for

Page 315

1      violating the law," so I think it does
2      say that.
3      Q.    (BY MS. SAULINO)  Well, I agree
4  that you read what the opinion says, but it
5  doesn't say that it should be read together
6  with 4.88 to comprise the members of the
7  venture; right?
8      A.    That's correct.
9      Q.    Okay.
10         Now, do you still have B.473
11 that I asked you to hang on to?
12         I believe it's Exhibit 12.
13     A.    Yes, I do.
14     Q.    Okay.
15         Exhibit 12 to your deposition?
16     A.    Yes.
17     Q.    So I'm still trying to figure
18 out what the basis is for your determining
19 who made up the venture other than the words
20 that you use here on Exhibit 12.
21         You don't cite any documents in
22 Exhibit 12, as we've already agreed; right?
23     A.    That's correct.
24     Q.    Okay.  We've already agreed you

Page 316

1  don't cite any kind of evidence; right?
2      A.    For the definition.  Correct.
3      Q.    Okay.
4          And so there's no way for us to
5  reconstruct from your written opinion or the
6  exhibits to your written opinion how you came
7  to determine who the members of the venture
8  were; right?
9      A.    No.
10     Q.    There is a way for us to
11 reconstruct that?
12     A.    Yes.
13     Q.    From your written materials?
14     A.    Yes.
15     Q.    And what is that method?
16     A.    Well, first I named them
17 "Members of the venture."  And then if you
18 want to know how they got to be members of
19 the venture, you look at the definition.
20 They relied on each other's lies about
21 addiction and treating mild pain to push the
22 drugs.  They worked together to influence
23 public perceptions of the class of narcotic
24 drugs with respect to drug toxicity, quote

Page 317

1  untreated pain, closed quote, and they
2  encouraged the use of narcotics instead of
3  non-medication treatments or less addictive
4  drugs.
5          So that -- that's the main
6  activities.
7          Now, you know, elsewhere, I --
8      Q.    So I think --
9      A.    I think elsewhere --
10     Q.    I think we're good there, sir.
11         So you started with saying,
12 "First, I named the members of the venture."
13 And as we've just seen, you named them
14 differently in different places; right?
15     A.    I'm just saying my answer is
16 incomplete.  Now go ahead.
17     Q.    You named them differently in
18 different places; right?
19     A.    That's correct.
20     Q.    And here, the basis that you
21 just read to us doesn't have any citation of
22 any kind of support; right?
23     A.    The basis for the definition
24 doesn't have any cites.

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1    Q.    So there are no --
2    A.    But the -- but there are lots
3 of citations, examples, et cetera, for how
4 various members of the venture met the
5 definition I laid out here.
6    Q.    Well, I realize that you are
7 testifying to that, sir, but there's no way
8 for us to see how you came to that conclusion
9 by looking at the definition of the venture
10 presented in B.473; right?
11    A.    Wrong.
12    Q.    And why do you say that's
13 wrong?
14    A.    Well, because we could start
15 with B7.  If you look at B7 --
16    Q.    Sir, my question was about
17 B.473.
18    A.    You asked, "Why do you say
19 that's wrong?"  Okay?  That's a wide
20 question.  That is not a yes-or-no question,
21 as far as I can determine it.
22    Q.    Respectfully --
23    A.    I cannot answer that question
24 "yes" or "no."

Page 319

1    Q.    Respectfully, sir --
2    A.    If I cannot answer the
3 question, then no problem.  So I have no
4 answer that's not -- because it's not a
5 yes-or-no question.  I can't answer the
6 question.  Go ahead.
7    Q.    Respectfully, sir, my question
8 was:  "There's no way for us to see how you
9 came to that conclusion by looking at the
10 definition of venture presented in B.473;
11 right?"
12         And your answer to that was
13 "Wrong."
14         We were looking at B.473 --
15    A.    Well, now you have like four
16 questions above.
17    Q.    Looking at --
18    A.    Go ahead.
19    Q.    Looking at --
20    A.    Start again.
21    Q.    Looking at B.473 --
22    A.    Right.
23    Q.    -- there's no way for us to
24 know how you came to the conclusions listed

Page 320

1 in B.473 by looking at the definition of the
2 venture presented in B.473; right?
3         MS. CONROY:  Objection.
4         THE WITNESS:  There's no
5    conclusions in B.473, so I don't
6    understand the question.
7    Q.    (BY MS. SAULINO)  Okay.  And
8 what you said just prior to that is "There
9 are lots of citations, examples, et cetera
10 for how various members of the venture met
11 the definition I laid out here."
12         But we don't see those
13 citations, examples, et cetera, listed in
14 your definitions for venture where they
15 appear in your report; right?
16    A.    You don't see those examples in
17 4.73?  Correct.
18    Q.    Or 4.88?
19    A.    Or --
20         Well, no, 4.88's got examples.
21 Okay?
22         4.88's got examples.  It has a
23 Redweld folder full of legal violations where
24 the members of the venture paid fines for

Page 321

1 violating the law.
2    Q.    Respectfully, sir, that was
3 4.89, but --
4    A.    Oh, I'm sorry.
5    Q.    -- I take your point.
6    A.    4.89.  Sorry.
7    Q.    Sitting here today, can you
8 name each member of the venture?
9    A.    Not without looking at the
10 notes, without making a mistake, no.
11         Maybe I can.  Let me see.  I
12 had two card stocks.
13    Q.    What are you looking at right
14 now?
15    A.    Looking at the members of the
16 venture.
17    Q.    I'm just asking you whether,
18 without looking at your notes and other lists
19 that you have there, whether you can name the
20 members of the venture.  It's a yes-or-no
21 question.
22    A.    Do you mean as a closed -- as a
23 closed-book test?
24         Maybe I can, maybe I can't.  I

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1 don't know. But I'm not going to guess.
2 Q. All right. So looking back at
3 B.473, which is Exhibit 12, number 1, you
4 say, "They relied on each other's lies about
5 addiction and treating mild pain to push the
6 drugs."
7 A. Correct.
8 Q. That's a conclusion; right?
9 A. No, that's not a conclusion.
10 That's how you qualify for the membership.
11 Q. And you don't provide any way
12 for us to know how you came to that
13 conclusion that that is how you qualify for
14 membership; right?
15 A. I do not explain why that is
16 part of the definition for venture, that's
17 correct. But I do provide examples or
18 evidence that the venture lied about
19 addiction and treating mild pain to push the
20 drugs. That's what the whole report is
21 about, more or less.
22 Q. You don't lay out here any way
23 for the defendants to pick up your report,
24 take your definition, reconstruct the work

Page 323

1 that got you to your conclusion; right?
2 A. Wrong.
3 Q. You don't explicitly in writing
4 provide any way to do that, do you?
5 A. No, that's not exactly true
6 either. I gave you the methodology. If you
7 look at the grounded method, there's the
8 methodology there, there's the beginning of
9 search terms. You could then do the same
10 iterative process I did.
11 Q. Absolutely, sir. You and I
12 have talked at length today about the
13 processes that you used and how you didn't
14 document many steps of those processes;
15 right?
16 A. Right.
17 Q. Okay.
18 So there's no way for us to
19 pick up your report and recreate what brought
20 you to this conclusion.
21 A. Well, it's an iterative
22 process. It's never going to be the same.
23 We do it two or three times,
24 and there will be certainly minor differences

Page 324

1 in what search terms you come up with and
2 what you pursue.
3 So you know, there's -- there's
4 no way to have a -- you can reproduce the
5 method. You can reproduce the search terms,
6 and you can then look at the documents and
7 then do other iterative searches.
8 Q. By my count, more than a third
9 of your 489 or 490 opinions pertain to the
10 venture. Do you have any reason to disagree
11 with that?
12 A. No reason to agree or disagree.
13 Q. Is it your view that each and
14 every one of the opinions that is cited for
15 the venture applies to each and every
16 defendant in the opiate MDL?
17 A. I'm not sure.
18 In the aggregate, yes. I don't
19 know about each --
20 Well, here's a situation.
21 Depends how you define "applied to."
22 I can give you a definition
23 where I think the answer would be yes, and if
24 that's the definition you accept, the answer

Page 325

1 is yes.
2 Q. Why don't we start with my
3 first question. Is it your view that each
4 and every one of the opinions that is cited
5 for the venture applies to each and every
6 defendant in the opiate MDL?
7 A. Based on my understanding of
8 membership in the venture, participation in
9 the venture, yes.
10 Q. So if we look at any one
11 opinion about the venture, we should be able
12 to find support for every defendant in the
13 opiate MDL for that opinion?
14 A. Oh, no. Not necessarily.
15 That's not how it works.
16 Q. Well, so how is there any way
17 for us to understand how you applied that
18 opinion to every member of the venture?
19 A. Works like a bank robbery. One
20 person -- or a series -- a bank robbery
21 network.
22 So you have lots of different
23 people. You have the guy outside watching.
24 You've got the guy inside with the gun.

Page 326

1  You've got the teller who may be complicit.
2  You've got the guys in the car, the getaway
3  car, and you've got some people looking out
4  for the cops. Okay?
5      So they're all 100 percent
6  responsible for robbing that bank. And in
7  this case, that means destroying these
8  communities, costing them misery and some
9  money.
10     And then it goes forward and
11 back. So in other words, that bank -- that
12 group of bank robbers, okay? One of those
13 guys was robbing banks since 1984, okay?
14     But the other bank robbers
15 joined 1996, 1997. Once they agree to the
16 same purpose of continuing to rob banks,
17 they're also responsible for the bank
18 robberies that go back to 1994. And the same
19 thing going forward.
20     So by that definition of
21 concerted action, they're all participants.
22 They all don't have to hold a gun to the
23 teller's head. They didn't all have to be
24 the guard. They're all 100 percent

Page 327

1  responsible.
2      Q.   The definition of concerted
3  action that you just laid out in your
4  testimony is not stated anywhere in your
5  report, is it?
6      A.   Correct.
7      Q.   And you haven't provided
8  anywhere in your report your basis for
9  believing that that definition applies to the
10 defendants in the opiate MDL; right?
11     A.   That's correct.
12     Q.   I'd like to look at some of
13 your venture opinions.
14     Let's look at Opinion 81 which
15 is on page 75 of your report.
16     A.   Why don't you wait a second
17 while he yanks the whole opinion.
18     Q.   Well, I can give you a copy of
19 the whole exhibit.
20     A.   Yeah. But the exhibit books
21 have got --
22     Q.   This is the exhibit. It's one
23 page. Would you like it?
24     A.   I don't think so.

Page 328

1      MS. CONROY:  Objection.
2      THE WITNESS:  But we'll see.
3      Okay.  You're correct.
4      Q.   (BY MS. SAULINO)  What made you
5  think that this exhibit should be more than
6  one page, Dr. Egilman?
7      A.   First, it's two pages.
8      Q.   I was only given one page,
9  Dr. Egilman, so could I see what you have?
10     A.   Sure.
11     Q.   I'm looking at what was
12 produced to us two days ago.
13     A.   Well, I'm looking at my opinion
14 that should have been produced to you.
15     Q.   Right.  Okay.  What you have
16 here, Dr. Egilman, the second page that you
17 have here is what was originally produced to
18 us which was cut off.  And so the first page
19 is what was reproduced to us.  Both were
20 represented to be the same document.
21     Is that your understanding?
22     A.   I don't have any understanding
23 about that.
24     Q.   Okay.  Well, looking at

Page 329

1  Exhibit B.81, is that the basis for your
2  opinion, "The venture should have known that
3  higher doses kill and warned about this"?
4      A.   Correct.
5      Q.   Okay.  And let's mark that as
6  Exhibit 16 to your deposition.
7      (Whereupon, Deposition Exhibit
8      Egilman 16, The "venture" should have
9      known that higher doses kill and
10     warned about this, was marked for
11     identification.)
12     Q.   (BY MS. SAULINO)  You can mark
13 both pages.  And so as I just explained, the
14 first page was what was reproduced to us.
15 The second page is what we originally got,
16 which was cut off.
17     It's my understanding those
18 were supposed to be the same.
19     A.   Yes.  Okay.  I'm not fighting.
20     Q.   Okay.  So what we have here as
21 the basis for Opinion 81, first, let's look
22 at what Opinion 81 is, and that is "The
23 venture should have known that higher doses
24 kill and warned about this"; right?

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    A.    Right.
2    Q.    And here you have a screenshot
3 of the first page of an article; right?
4    A.    Correct.
5    Q.    And that's all you provide as
6 the basis for this opinion.  Right?
7    A.    Correct.
8    Q.    Okay.  You don't actually
9 attach the full article; right?
10    A.    That's apparently correct.
11    Q.    Okay.  And your opinion here,
12 the way that you have phrased it said "The
13 venture should have known that higher doses
14 kill and warned about this"; right?
15    A.    Correct.
16    Q.    You don't give a date at which
17 they should have known; right?
18    A.    No.  This is known for a long
19 period of time.
20    Q.    Okay.
21    A.    This is -- I mean, this is
22 known since, you know, probably 3500 in the
23 Greek scrolls, in the Greek, you know,
24 writing.

Page 331

1    Q.    You would agree with me,
2 Dr. Egilman, that the bottom of the first
3 page of this article is cut off; right?
4    A.    Correct.
5    Q.    Okay.  Would you have any
6 reason to doubt me if I told you that this
7 article that you screenshotted here was
8 published in 2016?
9    A.    No.
10    Q.    And that is the only basis that
11 you provide for Opinion 81?
12    A.    That's the only basis listed in
13 this opinion.
14    Q.    And you don't --
15    A.    This is -- I mean, this is just
16 documenting in numbers what's been known
17 forever.
18    Q.    Well, you don't provide any
19 detail about what you believe has been known
20 forever here in Opinion 81; right?
21    A.    That's correct.
22    Q.    You don't provide any roadmap
23 to where we should look to find what you
24 believe has been known forever; right?

Page 332

1    A.    That's correct.
2    Q.    You don't provide any original
3 hypothesis that you used in order to come to
4 this opinion; right?
5    A.    Correct.
6    Q.    You don't provide us any
7 roadmap of how you tested that hypothesis;
8 right?
9    A.    Correct.
10    Q.    You don't cite to any
11 deposition testimony that discusses this
12 opinion; right?
13    A.    That's correct.
14    Q.    So other than this screenshot
15 of the first page of an article from 2016, we
16 have nothing written in your report that
17 shows us how you came to the opinion in
18 Opinion 81?
19    A.    That's correct.
20    Q.    All right.
21          All right.  So let's look at
22 Opinion No. 8, which is at page 63 of your
23 report.
24          Do you have your report?

Page 333

1    A.    I have the index to the report.
2    Q.    I'm sorry?
3    A.    I have the index to the report.
4    Q.    What do you mean, sir?
5    A.    Well, you keep referring to
6 this as "the report."  I think this is -- the
7 report is 35, 400 pages, I think.  So as
8 we've been going through things, you can see
9 this is not the entire report.
10    Q.    So what you are looking at in
11 front of you -- I just want to make sure on
12 the record we have -- so what's it been
13 marked as for your deposition?
14    A.    It's been marked as "Report of
15 David S. Egilman, M.D. MPH."
16    Q.    For your deposition, sir.
17 Exhibit 1F?
18    A.    Exhibit 1F.
19    Q.    So Exhibit 1F, which you were
20 handed this morning --
21    A.    Right.
22    Q.    -- which is named on the title
23 page "Report of David S. Egilman, M.D. MPH."
24    A.    Right.

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    Q.    You're telling me that that's
2  not a report. That's just an index?
3    A.    This is the -- this is the
4  beginning of a report that's 3,200,
5  3,300 pages; correct. With all the
6  associated documents which have even more
7  pages.
8         That's the whole report. Do
9  you see that? All these boxes? That's the
10 report. That's what was shipped to you.
11   Q.    Actually, sir, nothing was
12 shipped to us.
13   A.    That was what was digitally
14 transmitted to you.
15   Q.    I understand what you're trying
16 to say here. Is there any way that we would
17 know from looking at this document that is
18 titled "Report of David S. Egilman," that
19 this is not actually your report?
20        MS. CONROY: Objection.
21        THE WITNESS: It's part of the
22 report. Do you want the whole report?
23        Well, one way would be to say
24 oh, there's all these exhibits listed.

Page 335

1  Okay? In there.
2         And so those are obviously --
3  I'm sorry.
4         MS. SAULINO: We need to take a
5  time out.
6         THE VIDEOGRAPHER: Off the
7  record. 5:12.
8         (Recess taken, 5:11 p.m. to
9  5:17 p.m.)
10        THE VIDEOGRAPHER: We're back
11 on the record at 5:18.
12        THE WITNESS: Do you want me to
13 keep going with the answer?
14        MS. SAULINO: Do you remember
15 where you were?
16        THE WITNESS: I think so.
17        MS. SAULINO: Okay. Well --
18        THE WITNESS: The question was
19 how would someone know that this was
20 not the entire report?
21        The answer that I gave already
22 was well, there's exhibit numbers
23 attached under -- cited in each of the
24 opinions. So you'd know there'd be

Page 336

1  that. And that's number one reason.
2         Number 2A is, I think that's
3  how it was transmitted digitally,
4  although I didn't do the transmission.
5    Q.    (BY MS. SAULINO) Okay. So I
6  just want to clarify, Dr. Egilman. You've
7  referred to this document that we have marked
8  as Exhibit 1F to your deposition as the index
9  to your report.
10        And I'm trying --
11   A.    It's the introduction and index
12 to the opinions.
13   Q.    And so then we need to add
14 everything in B1 through 4.89, Exhibits B1
15 through 4.89.
16   A.    And the attached documents
17 which were also submitted, that in many cases
18 are supplemental to the few pages that are in
19 the "opinion" opinion.
20   Q.    Okay.
21   A.    Like we went through on that
22 Exhibit 15 that's marked here.
23   Q.    I'm following you.
24        And so if we look at what

Page 337

1  you're now calling the index to your
2  opinions, we see the name of the opinion, and
3  then we go to the exhibit that matches that
4  number, and we see the support for the
5  opinion; right?
6    A.    Well, first, I don't agree with
7  the predicate.
8    Q.    I'm sorry, which predicate?
9    A.    What you're now calling the
10 index to your opinions.
11   Q.    Dr. Egilman, that was something
12 you said just before the break.
13   A.    And I just corrected it and
14 said it's the introductory materials and the
15 index.
16        And so -- next question.
17   Q.    Your report is the opinions
18 that you list in Deposition Exhibit 1F plus
19 all of the exhibits in Exhibit B1 through
20 4.89 and their attached documents. That's
21 your report?
22   A.    No.
23   Q.    What else is a part of your
24 report?

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1      A.    The methodology sections and
2  the other sections in Exhibit 1F.
3      Q.    Right.  Those are already in
4  1F; right?
5      A.    Yeah, but you didn't say it
6  that way.  When you gave your question, you
7  limited it to things called opinions.  And I
8  wanted to make sure that the record was clear
9  that it was everything in 1F.
10     Q.    I appreciate that, Dr. Egilman.
11           Is there anything else that you
12 consider to be part of your report that is
13 not Exhibit 1F or all of the exhibits
14 attached to Exhibit B and their attached
15 documents?
16     A.    No.
17     Q.    Okay.  Let's look at page 63,
18 Opinion 7.8.
19     A.    Okay.
20     Q.    Opinion 7.8 is "All for one and
21 one for all.  The venture knew collective
22 marketing increased the size of the opioid
23 pie.  Similarly, had any venture member
24 broken ranks, the opioid market would have

Page 340

1  marking this as Exhibit 17 to your --
2           MS. SAULINO:  There's a
3  different version?
4           MS. CONROY:  There's an arrow
5  on this one.
6           (Whereupon, Deposition Exhibit
7  Egilman 17, All for one and one for
8  all - the "venture" knew collective
9  marketing increased the size of the
10 opioid pie.  Similarly had any
11 "venture" member broken ranks, the
12 opioid market would have slowed or if
13 the complete truth was told (no
14 efficacy and high addiction risk) the
15 market would have crashed, was marked
16 for identification.)
17     Q.    (BY MS. SAULINO)  Okay.  So
18 I've marked as Exhibit 17 to your deposition,
19 our copy of Exhibit B8.  Your copy that
20 Ms. Conroy just handed you has an arrow
21 pointing at the far left -- the far right,
22 sorry.  I had to reverse myself --
23 description under the far right green box; is
24 that right?

Page 339

1  slowed or if the complete truth was told, no
2  efficacy and high addiction risk, the market
3  would have crashed."
4           Right?
5      A.    Yes.
6      Q.    You wrote that opinion?
7      A.    I did.
8      Q.    Before we even get to
9  Exhibit B8, you hold the opinion that opioids
10 have no efficacy?
11     A.    No efficacy for chronic
12 non-malignant pain.
13     Q.    I see.  You don't say that
14 here, though; right?
15     A.    I left that part out.
16     Q.    All right.  Now let's look at
17 Exhibit B8.  I have a copy here if you need
18 it.
19           Do you want --
20           Okay.  I didn't know if you
21 wanted to use your own copy.
22           THE WITNESS:  Jayne, do you
23 want to see if I've got marks on mine.
24     Q.    (BY MS. SAULINO)  So I'm

Page 341

1      A.    Right.
2      Q.    And otherwise, they're the
3  same?
4      A.    Right.  But the whole document,
5  I think, is provided.  So here's the whole
6  opinion, I think.  Maybe not.  The whole
7  opinion is the whole document.  Apparently,
8  that wasn't sent, but this is enough.
9      Q.    So Dr. Egilman, your basis for
10 this opinion is again one document; right?
11     A.    Correct.
12     Q.    You don't identify any
13 deposition testimony; right?
14     A.    Correct.
15     Q.    You don't identify any other
16 documents that led to this opinion; right?
17     A.    Correct.
18           The basis for my opinion as
19 stated in this opinion is one document.
20 There is other bases elsewhere in the report.
21           But go ahead.
22     Q.    Okay.  But you don't state any
23 of those other bases here under your opinion;
24 right?

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1  A.  Correct.
2  Q.  You don't provide us any kind
3  of cross-reference that would allow us to
4  know where else in your report you provide
5  bases for this opinion; right?
6  MS. CONROY:  Objection.
7  THE WITNESS:  Correct.
8  Q.  (BY MS. SAULINO)  Now, breaking
9  this opinion down, because it seems to have
10 several parts.  Would you agree with me on
11 that?
12 A.  Sure.
13 Q.  Okay.  You first say, "The
14 venture knew collective marketing increased
15 the size of the opioid pie"; right?
16 A.  Correct.
17 Q.  And we've just established you
18 cite one document for that; right?
19 A.  In this opinion, correct.
20 Q.  Okay.  And this document
21 doesn't actually name any members of the
22 venture; right?
23 A.  Well, it's a Janssen document.
24 Q.  Well, it's simply --

Page 343

1  A.  And the name's OxyContin, which
2  is a Purdue product.
3  Q.  Well, sir, when you say it's a
4  Janssen document, all you know is that it was
5  produced by Janssen; right?
6  A.  No, I think it's a Janssen
7  document.  If you look at the document, it's
8  a Janssen document.
9  Q.  Okay.  I'm looking at your
10 Exhibit 8.
11 A.  Yeah.  I say if you look at
12 the -- if you look at the Bates numbered
13 actual document, it's a Janssen document.
14 That's my recollection.
15 Q.  A document that was produced by
16 Janssen?
17 A.  Written -- yeah.  It's not an
18 FDA document produced by Janssen.  It's a
19 Janssen document produced by Janssen.
20 Q.  Do you have any basis for that
21 knowledge?
22 A.  I think it says it on the
23 document.
24 Q.  Did you see any deposition

Page 344

1  testimony to that effect?
2  A.  No.
3  Q.  Did you do any research to that
4  effect?
5  A.  No.
6  Q.  And you say similar -- your
7  next piece of your opinion is "Similarly, had
8  any venture members broken ranks, the"
9  opinion marked -- I'm sorry -- "Had any
10 venture member broken ranks, the opioid
11 market would have slowed or if the complete
12 truth was told, no efficacy and high
13 addiction risk, the market would have
14 crashed."  Right?
15 A.  Right.
16 Q.  And you base that again on this
17 one screenshotted document that you have here
18 on B8?
19 A.  No.  There's other documents
20 that --
21 MS. CONROY:  Objection.
22 THE WITNESS:  There's other
23 documents that support that as well
24 elsewhere in the report.  But the --

Page 345

1  So there's other documents.
2  There's other bases for that opinion.
3  Q.  (BY MS. SAULINO)  Nothing
4  listed here; right?
5  A.  Correct.
6  Not in this opinion.
7  Q.  And there's nothing on this
8  document that talks about breaking ranks, is
9  there?
10 A.  That's correct.
11 Q.  Okay.  And you don't cite to
12 any deposition testimony that leads to that
13 conclusion; right?
14 A.  Correct.
15 Q.  Okay.  Let's look at
16 Opinion 62, which is on page 71.
17 A.  Okay.
18 Q.  In Opinion 62 you say,
19 "Opinion.  When the FDA tried to limit use in
20 2001 by changing the label from more than a
21 few days to extended period of time, the
22 venture used this language to increase the
23 market"; right?
24 A.  Correct.

Page 346

1    Q.    Okay.
2          And if you then look at
3    Exhibit B62 -- I can hand it to you.
4          Oh.  What do you have there?
5    A.    B62.
6    Q.    All right.  Well, let me make
7    sure that your B62 and mine are the same.
8          You have a Redweld as well?
9          MS. CONROY:  Of the Bates
10   documents.
11         THE WITNESS:  This is the
12   online Bates document.
13   Q.    (BY MS. SAULINO)  Okay.  Let
14   me -- I will hand you the exhibit,
15   Dr. Egilman.  I'm just trying to make sure I
16   understand what you have here.
17   A.    I think I've got a mark on
18   mine, so.
19   Q.    I'm sorry?
20   A.    I've got -- this is the one I
21   read and marked.
22   Q.    Okay.
23         Would you like a sticker?
24   A.    Sure.

Page 347

1    Q.    You have it for 18?
2          (Whereupon, Deposition Exhibit
3          Egilman 18, Opinion - When the FDA
4          tried to limit use in 2001 by changing
5          the label from "more than a few days"
6          to "extended period of time," the
7          "venture" used this language to
8          increase the market, was marked for
9          identification.)
10   Q.    (BY MS. SAULINO)  Can you show
11   me what you've marked?
12   A.    Okay.
13   Q.    All right.  So looking at
14   Exhibit 62 --
15         MS. CONROY:  Exhibit 18.  B62.
16         MS. SAULINO:  Sorry,
17   Exhibit 18.  B62.
18   Q.    (BY MS. SAULINO)  On the first
19   page of Exhibit 18, you quote from a CBS News
20   article; right?
21         It's the "60 Minutes."
22   A.    Correct, the "60 Minutes"
23   piece.
24   Q.    Right, a "60 Minutes" piece,

Page 348

1    but it's from cbsnews.com; right?
2    A.    Correct.  It's a transcript of
3    the "60 Minutes" TV show.
4    Q.    Well, it's a portion of a
5    transcript; right?
6    A.    Correct.
7    Q.    There's no Bates number listed
8    there; right?
9    A.    Correct.
10   Q.    Okay.
11         And then, you then attach a --
12   one single e-mail chain; right?
13   A.    Correct.
14   Q.    That's an internal e-mail chain
15   from Purdue; right?
16   A.    Correct.
17   Q.    Those are the two pieces of
18   evidence that you cite for saying that the
19   venture used this language to increase the
20   market.
21   A.    Correct.
22   Q.    You don't cite to any other
23   documents; right?
24   A.    Not in this opinion.

Page 349

1    Q.    And you don't cite to any
2    deposition testimony; right?
3    A.    Correct.
4    Q.    And you don't provide us the
5    question that you were seeking to answer;
6    right?
7    A.    Well, that's again the
8    assignment.
9    Q.    You don't provide us the
10   question that resulted in this opinion;
11   right?
12   A.    Not the specific question that
13   resulted in this opinion.  I gave you the
14   methodology that resulted in this opinion.
15   Q.    Well, sir, you actually haven't
16   given us the methodology that resulted in
17   this opinion.  That's not written here, is
18   it?
19   A.    It's not on the opinion.
20   Q.    And you agreed with me earlier
21   that you used different types of methodology
22   for different opinions; right?
23   A.    No.  It's the same methodology.
24   It's the same search techniques and review of

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1  documents for all of the non, say, medical
2  opinions. The medical opinions are based on
3  evidence-based medicine to the extent
4  possible. That's mostly the efficacy, other
5  things like that.
6      And the non-medical opinions --
7  non-medical drug efficacy opinions are based
8  on grounded method theory.
9      Q.   Well, okay. So that's a bit
10 different than what you told me earlier.
11     So where in your report have
12 you indicated which are the medical opinions
13 based on evidence-based medicine and which
14 are the other opinions that are based on
15 grounded method theory?
16     MS. CONROY: Objection.
17     THE WITNESS: First, I don't
18 think that's different from what I
19 told you before. I think I told you
20 that specifically before. And you
21 need to obviously -- when I'm talking
22 about EERW, I'm talking about medical
23 opinions. If I'm talking about the
24 Roth paper, I'm talking about medical

Page 351

1  evidence.
2      If I'm talking about the
3  efficacy of opioids for chronic
4  non-malignant pain, I'm talking about
5  medical opinions.
6      Q.   (BY MS. SAULINO) Let's just
7  talk --
8      A.   If I'm talking about policy
9  issues of how the companies marketed, took
10 advantage of FDA language, that's a grounded
11 theory opinion.
12     Q.   And this breakdown appears
13 nowhere in your report; correct?
14     A.   I think it's pretty clear if we
15 look at the methodology. Evidence-based
16 medicine deals with medical questions. If
17 you look at the rest of that section, it
18 deals with cause-effect relationships,
19 choice-of-treatment modalities, efficacy,
20 side effects, et cetera.
21     I think it's clear that
22 marketing and other related, over --
23 overselling, things like that, that's not
24 based on a similar kind of evidence base that

Page 352

1  will determine whether or not you use opioids
2  for chronic non-malignant pain.
3      Q.   The explanation you just gave
4  does not appear in your report; correct?
5      MS. CONROY: Objection.
6      THE WITNESS: Those words do
7  not appear, but I think it's clear if
8  you read the introduction to the
9  report, that that's a distinction. It
10 doesn't need an explicit definition
11 since evidence-based medicine is
12 titled evidence-based medicine.
13     And I gave you examples. If
14 you look at the grounded theory of
15 five or six papers that I published on
16 grounded theory, and if you look at
17 just the titles of those papers, you
18 see that they're dealing with other
19 issues, similar ones I deal with here.
20 Off-label marketing. Promotion.
21 Illegal promotion. False and
22 misleading advertising. That kind of
23 activity. That's all grounded
24 theory-based. And there's examples in

Page 353

1  the introduction that -- for both.
2      Q.   (BY MS. SAULINO) So if we
3  wanted to figure out which methodology you
4  used for which opinion, we'd have to guess
5  whether it was a medical opinion or a
6  marketing opinion.
7      A.   If you think that's a guess,
8  then I guess you could call it a guess. I
9  wouldn't call it a guess. I think it's
10 obvious.
11     Q.   Okay. Let's look at the one --
12 let's look at Exhibit 15 to your deposition,
13 the one we were just looking at, No. 8.
14     A.   Right.
15     Q.   You'd agree with me that
16 that --
17     A.   Wait a minute. 15, did you
18 say?
19     MS. CONROY: 17.
20     MS. SAULINO: 17. Sorry.
21 Exhibit 17. It's getting a little
22 late. I apologize.
23     THE WITNESS: You did say 15.
24     MS. SAULINO: I'm sure I did,

Page 354

1  sir. I apologize. I misspoke.
2      THE WITNESS: I'm on 17.
3      Q.  (BY MS. SAULINO) 17, Opinion
4  No. 8.
5      A.   Okay, right.
6          This is obviously a grounded
7  theory-based issue. There's no math modeling
8  here. There's no data that was collected by
9  anybody that I know that shows, quote,
10  business expansion is driven by OxyContin.
11     Q.   Dr. Egilman, I haven't asked my
12  question yet. Could I ask my question?
13     A.   Go ahead.
14     Q.   You would agree with me that
15  this opinion discusses efficacy and high
16  addiction risks; right?
17     A.   Correct.
18     Q.   An opinion that you hold based
19  on your medical experience; right?
20     A.   No. This is dealing with those
21  that -- those efficacy and high addiction
22  risks as it should have been told by the
23  companies. This is a breaking ranks opinion.
24     Q.   But your belief that it should

Page 355

1  have been told that way by the companies is
2  based on your medical opinion; correct?
3      A.   Probably true.
4      Q.   Okay.
5      A.   Okay. But -- but that --
6      Q.   So for this opinion, you would
7  have --
8          MS. CONROY: Let him finish his
9  answer.
10         MS. SAULINO: He did answer.
11         THE WITNESS: Go ahead. My
12  answer is incomplete. Go ahead.
13     Q.   (BY MS. SAULINO) So for this
14  opinion, we would have to guess whether you
15  used the grounded theory approach or the
16  evidence-based medicine opinion; right?
17         MS. CONROY: Objection.
18         THE WITNESS: No. Not at all.
19     Q.   (BY MS. SAULINO) You think
20  it's obvious?
21     A.   I think it's obvious.
22     Q.   But you don't list it anywhere
23  here?
24     A.   Because it's obvious.

Page 356

1      Q.   You don't list, for any
2  opinion, which approach you took; correct?
3      A.   Explicitly, no. But I think
4  it's obvious.
5      Q.   So earlier when you testified
6  that you were actually using a combination of
7  the two, that was inaccurate?
8      A.   No, that was for the whole
9  report.
10     Q.   When I was asking you questions
11  about the evidence-based medicine approach
12  and you were bringing in part of the grounded
13  theory approach, and I asked you why you were
14  doing that, and you said because you used
15  them in combination, that's not actually what
16  happened?
17         MS. CONROY: Objection.
18         THE WITNESS: The only
19  combination would be if -- what you
20  just did with this opinion, right, the
21  evidence-based medicine leads to
22  the -- to the conclusion that the
23  drugs are not efficacious and they're
24  addictive. Right?

Page 357

1          So to the extent that you're --
2  to the extent that you're correct,
3  that that's an evidence-based medical
4  derived opinion, which it probably is,
5  okay? -- that's a component of this
6  grounded theory opinion, but for the
7  most part, this is basically a
8  grounded theory opinion.
9      Q.   (BY MS. SAULINO) Okay. So
10  your testimony earlier when you were
11  explaining to me how you combined the two
12  methodologies was not accurate?
13         MS. CONROY: Objection.
14         THE WITNESS: I don't recall it
15  completely. I just told you an
16  example of where it would be accurate.
17         It doesn't -- I didn't use them
18  in combination all the time. Okay?
19  And I didn't even think about the
20  example you just pointed out so
21  deftly, and where they were used in
22  combination.
23     Q.   (BY MS. SAULINO) Well, about
24  five minutes ago, you told me it was obvious

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1 this was the grounded theory approach. So
2 that's not true either; right?
3    A.   Sure it is. This is obviously
4 a grounded theory approach. The small
5 component of this is that there's a high
6 addiction risk. You don't need to do
7 evidence-based medicine for that. Okay?
8 That -- that's -- that's -- that was obvious,
9 I think, to the -- to the venture members for
10 a long time.
11    Q.   Efficacy is also a medical
12 opinion; right?
13    A.   No efficacy? Yeah, that's
14 true, and that was also known to them.
15 That's an easy one. There's no studies to
16 date that show that these drugs worked for
17 chronic, non-malignant pain.
18    Q.   The fact of the matter is,
19 Dr. Egilman, there is no way for us to look
20 at your report and by reading your report
21 know which theory you used to come to which
22 opinion; right?
23       MS. CONROY: Objection.
24       THE WITNESS: Wrong.

Page 359

1    Q.   (BY MS. SAULINO) We'd have to
2 assume?
3    A.   No.
4       MS. CONROY: Objection.
5       THE WITNESS: It's obvious. If
6    I'm giving an opinion about EERW or
7    technical epidemiologic analysis, or
8    criticizing the methodology used to
9    come up with 100 million untreated
10   pain patients, that's -- that's an
11   epidemiologic evidence-based medical
12   criticism.
13    Q.   (BY MS. SAULINO) You don't say
14 that in your report, do you?
15    A.   If I'm giving an opinion like
16 I -- like this one that -- that the business,
17 that is, the opioid business was driven by
18 OxyContin sales, that's based on grounded
19 theory and these documents.
20       It's not based on any
21 epidemiologic study.
22    Q.   You don't say any of that in
23 your report, do you?
24    A.   Not explicitly. You would have

Page 360

1 to actually read the introduction and apply
2 the correct theory to what's the obvious
3 correct opinion.
4    Q.   All right. Let's look at
5 Opinion 69, which is on page --
6    A.   72.
7    Q.   Thank you. And you have a
8 different 69 than I do for Exhibit B69?
9    A.   I do. And this is also
10 incomplete.
11       But it's one I corrected the
12 opinion on.
13    Q.   Okay. Well, let's just break
14 this down.
15       So can I see what you are
16 looking at right now?
17       Okay. So what you are looking
18 at -- okay -- is Exhibit B69 with your
19 handwriting on it, which is a copy of what we
20 were given as Exhibit B69, which you have
21 changed. Correct?
22    A.   Correct.
23    Q.   So let's mark that.
24    A.   But also the entire article was

Page 361

1 given to you and is in my right hand.
2    Q.   Okay.
3       Sir, I don't know what you
4 think was given to us, but the one page that
5 has just been marked as Exhibit 19 to your
6 deposition is what the defendants received as
7 Exhibit B69.
8       (Whereupon, Deposition Exhibit
9    Egilman 19, Opinion - the "venture"
10   corrupted the FDA and Salem --
11   News.com FDA Corruption Worsens as
12   Death Toll Mounts in Drug Epidemic!
13   article, was marked for
14   identification.)
15       MS. CONROY: Can I see
16   Exhibit 19?
17    Q.   (BY MS. SAULINO) And you've
18 now written over that and changed the
19 opinion; is that right?
20    A.   Right.
21    Q.   Okay. What have you changed
22 the opinion to say?
23    A.   I changed it to the FDA was --
24 in -- in -- over -- it should be overworked,

Page 362

1  understaffed, underpaid, and had a revolving
2  door.
3      Q.    Okay.  And you've not disclosed
4  that new opinion to the defendants until just
5  this moment when I asked about it?
6      A.    Right.  I changed it last
7  night.
8          MS. CONROY:  Objection.
9      Q.    (BY MS. SAULINO)  You changed
10  it last night?
11      A.    Yes.
12      Q.    Did you change any of your
13  other opinions yesterday?
14      A.    Did I change any of them?  I
15  don't think so.  I mean, I wrote notes on a
16  lot of them.
17      Q.    So to your recollection, this
18  is the only opinion that you have changed?
19      A.    Correct.
20      Q.    Okay.  And there's no way for
21  us to know -- if you've changed any others,
22  there's no way for us to know except that you
23  don't currently recall changing any others?
24      A.    No.  I've got them all in this

Page 363

1  box.  You can mark the box.  You've been
2  going through the box during some of the
3  breaks.  I don't think there's any others.
4      Q.    Okay.  And your original
5  opinion here was that the venture corrupted
6  the FDA --
7      A.    Correct.
8      Q.    -- right?
9          And you now don't believe that
10  that opinion holds?
11      A.    Let's say it's -- it depends
12  how you define "revolving door" and what went
13  on in the revolving door.
14      Q.    I --
15      A.    So --
16      Q.    How did we get to a revolving
17  door?  I was looking at your original
18  opinion.
19      A.    Okay.  But you didn't ask that.
20      Q.    Yeah, I did.
21      A.    No, you said -- you just -- you
22  didn't --
23          Your original opinion [sic] was
24  that the venture corrupted the FDA?

Page 364

1          Right.
2          And now you don't believe that
3  opinion holds was your question.
4      Q.    Correct.
5      A.    That was not a reference to
6  this opinion.  That was a general question
7  about what my opinion was now.
8      Q.    Okay.  Well, I apologize if you
9  found that unclear in some way.
10          You no longer --
11      A.    I didn't find it unclear at
12  all.  I was answering it.
13      Q.    Let me change the question,
14  Dr. Egilman.
15          You no longer believe the
16  venture corrupted the FDA?
17      A.    No longer willing to say that
18  this evidence is complete support for that
19  opinion.
20      Q.    Okay.  But the evidence that is
21  cited on B69, you believe is complete support
22  for your new opinion that the FDA was
23  overworked, understaffed, underpaid, and had
24  a revolving door --

Page 365

1      A.    Correct.
2      Q.    -- is that right?
3          Okay.  And your complete
4  support for that is found in Exhibit B69?
5      A.    Correct.
6      Q.    No deposition testimony in
7  addition to this?  Right?
8      A.    No, there's other --
9          Well, no.  I have a lot of
10  other support for this with respect to --
11  this all refers to -- this refers to
12  Rappaport and Curtis Wright.  So there's a
13  lot of other evidence for this.  It's not in
14  the opinion, but there's a lot of other
15  evidence in other opinions, particularly
16  about Rappaport.
17      Q.    When you say "This refers to
18  Rappaport and Curtis" Knight --
19      A.    Curtis Wright, right.
20      Q.    Right.  What do you mean
21  "this"?
22      A.    This opinion.  It cites them.
23      Q.    The opinion cites a single
24  Salem News article, sir; right?

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    A.    The single Salem News article
2  describes what happened with the approval of
3  Zohydro, and it also talks about
4  Curtis Wright.  And the revolving door with
5  Curtis Wright.
6    Q.    Okay.  But you don't cite to
7  anything else besides this single Salem News
8  article; right?
9    A.    Those things are in here.
10 That's correct.
11   Q.    In the news article?
12   A.    That's correct.
13   Q.    Written by someone at the Salem
14 News; right?
15   A.    Correct.
16   Q.    Not written by you?
17   A.    Correct.  I didn't write the
18 article.
19         What do you want me to do with
20 the complete article that was supposed to be
21 attached?
22   Q.    Okay.  When you say "the
23 complete article that was supposed to be
24 attached," what are you handing me right now?

Page 367

1         MS. CONROY:  It's the link.
2  It's the printout of the link that is
3  on the exhibit.
4    Q.    (BY MS. SAULINO)  So rather
5  than a third-page snippet that's on
6  Exhibit B69, you actually meant for the whole
7  page in a third article to be included on
8  B69?
9    A.    That's why I gave you the link.
10   Q.    Okay.  So why don't we attach
11 that to Exhibit 19.
12   A.    I did.
13   Q.    But there's nothing else that
14 you intended to attach to Exhibit 19; right?
15   A.    No.  There's other opinions
16 that relate to that opinion.
17   Q.    And you don't cross-reference
18 other opinions in that opinion; right?
19   A.    Correct.
20   Q.    And when we say "that opinion,"
21 we mean Opinion 69; right?  Which has now
22 been rewritten?
23   A.    Correct.
24   Q.    And you don't provide any

Page 368

1  roadmap in your report that would show us
2  what other opinions support Opinion 69;
3  right?
4         MS. CONROY:  Objection.
5         THE WITNESS:  I don't have a
6  roadmap, but the Zohydro story with
7  Rappaport is in other documents that
8  are in my opinions.
9    Q.    (BY MS. SAULINO)  There's no
10 way for us to look at your opinions and know
11 which other opinions relate to this opinion;
12 right?
13   A.    You'd have to search for
14 Rappaport and Zohydro and then you'd find
15 them.
16   Q.    In all of the 23 boxes that are
17 behind me, that's what we'd have to do?
18   A.    No, you'd do it digitally
19 pretty quickly.
20   Q.    But the digital version of the
21 23 boxes that are behind me --
22   A.    Yes.
23   Q.    -- we'd have to search for
24 those two names in the 23 boxes that are

Page 369

1  behind me, and then we would know the other
2  basis for your opinion?
3    A.    Well, then you'd know other
4  supporting evidence, right.
5    Q.    But not any -- but not all of
6  the other bases for your opinion?
7    A.    No.  Not all of the other bases
8  for my opinion.  I reviewed a lot of other
9  documents.  There's a lot of other support
10 for that opinion.  I mean, I've read
11 Curtis Wright's depositions.  I've read a lot
12 of Purdue documents.
13        Some of them -- some of those
14 are included in the introductory materials on
15 Purdue with respect to Curtis Wright,
16 Curtis Wright's approvals, Curtis Wright's
17 actions at the FDA in approving OxyContin
18 initially.  So that's all -- a lot of that is
19 in there and pretty obvious.
20   Q.    None of what you just said is
21 in your report; right?
22        MS. CONROY:  Objection.
23        THE WITNESS:  No.
24        MS. SAULINO:  I know our

Page 370

1  Special Master needs to leave soon,
2  and wanted to put something on the
3  record.
4      SPECIAL MASTER COHEN:  Do you
5  want to take a moment to do that now?
6      MS. SAULINO:  Yeah.  Why don't
7  we take a moment to do that.
8      SPECIAL MASTER COHEN:  Okay.
9      I'm here just today.  I'm not
10  here tomorrow.  I have very
11  purposefully tried not to insert
12  myself into this deposition unless I
13  was either asked to or it became very
14  clear I needed to because I won't be
15  here tomorrow, and so I won't be in a
16  position to assert myself.
17      What I want to do now is just
18  make a little speech so that hopefully
19  I won't get a lot of phone calls
20  tomorrow because I'm going to be in
21  another deposition doing the same
22  thing in Washington, D.C.  And what I
23  want to remind everybody is, first of
24  all, I'm going to turn to you,

Page 371

1  Dr. Egilman, and ask you to remember
2  tomorrow all the things that I said
3  today.  That your answers can and
4  should be succinct.  If you were to do
5  a review of all of your answers today,
6  the longest one was probably a minute,
7  and most of them were probably about
8  20 seconds or less.
9      That's how it should be
10  tomorrow, the same way.
11      There's no reason to interrupt
12  each other.  I think it will help if
13  everybody just lets everybody answer
14  the question.  And so it's my hope
15  that I don't receive any calls for
16  help tomorrow in settling disputes.
17  It's clear that you can do this
18  without me.
19      Any questions?
20      Okay.  And I'm going to leave
21  in about 15 minutes because I have to
22  get to the airport to go to D.C. That
23  doesn't mean you all have to stop.
24  And thank you for buying me lunch, and

Page 372

1  I'll see you again soon, I'm sure.
2      MS. CONROY:  Thank you.
3      MS. SAULINO:  Thank you.
4      (Discussion off the record.)
5      MS. SAULINO:  There have been a
6  few minutes that were used for
7  plaintiffs.
8      MS. CONROY:  I think two
9  minutes is an exaggeration.
10      THE WITNESS:  You can have an
11  extra two minutes.
12      Q.    (BY MS. SAULINO) Let's look at
13  Opinion 129.
14      A.    Let me just tell you what my
15  desire is, while the Special Master is here,
16  is to go to seven hours today, to take a
17  dinner break, and then come back and do
18  another two or three hours.
19      MS. SAULINO:  Okay.  We can
20  talk about that at the next break.
21      I appreciate you telling me,
22  but I'd like to -- for not to eat up
23  time right now figuring that out.
24      SPECIAL MASTER COHEN:  That's

Page 373

1  not my call.
2      THE WITNESS:  Okay.
3      Q.    (BY MS. SAULINO) Okay.
4  Looking at Opinion 129.
5      It's on page 81.
6      About the middle of the page.
7      A.    Okay.
8      Q.    Your opinion there is "Venture
9  member McKesson marketed opioids"; right?
10      A.    Correct.
11      Q.    And I have a copy of B129 for
12  support.
13      A.    Is this the whole -- do you
14  want the whole McKesson?
15      Q.    What are you asking for,
16  Dr. Egilman?
17      A.    The whole McKesson Redweld.
18      Q.    So let's first look at
19  Exhibit B129, please, which is what you cite
20  here in your report on page 81.
21      A.    Sure.
22      Q.    Okay.  Exhibit B129 is 13-page
23  document; correct?
24      MS. CONROY:  There's no writing

Page 374

1   on this one.
2       THE WITNESS:  Correct.
3       Q.    (BY MS. SAULINO)  I'm going to
4   mark it as Exhibit 20.  Is that -- do you
5   have a different one than I do?
6       A.    No.
7           (Whereupon, Deposition Exhibit
8       Egilman 20, Opinion - "venture" member
9       McKesson marketed opioids, was marked
10      for identification.)
11      Q.    (BY MS. SAULINO)  All right.
12  So in Exhibit B129 -- Exhibit B129, I know
13  that it's small type, but I know that this is
14  something that you relied on for your
15  opinion, so you looked at it; right?
16      A.    Correct.
17      Q.    Okay.  Nowhere in this document
18  does the word "opioid" appear; correct?
19      A.    Correct.
20      Q.    And nowhere in this document
21  does the name of any specific opioid appear;
22  correct?
23      A.    Correct.
24      Q.    Okay.  And as a medical doctor,

Page 375

1   you would agree with me that a physician
2   prescription is required in order to fill a
3   prescription for opioids; right?
4           In order to fill a prescription
5   at a pharmacy for opioids, you need a
6   prescription from a medical doctor; right?
7       A.    Give me the -- under the law?
8       Q.    Yes, Dr. Egilman.
9       A.    Under the law, that's correct
10  but I think, because of the free sampling
11  program, there's reason to believe that that
12  was not required.
13      Q.    Okay.  Dr. Egilman, what you
14  are saying right now, does that have anything
15  to do with your Opinion 129?
16      A.    Oh, yes.
17      Q.    So you believe that
18  Opinion 129, which is supported by a
19  three-page exhibit, somehow supports the
20  statement that the free sampling program
21  changed the fact that a prescription is
22  required to receive opioids from a
23  pharmacist?
24      A.    No, that's not what I said.

Page 376

1       Q.    All right.  Dr. Egilman, you
2   would agree with me, would you not, that a
3   prescription is required for a pharmacist to
4   fill an order for opioids; right?  In order
5   to give opioids to a patient, a pharmacist
6   needs a prescription from a doctor; right?
7       A.    That's what the pharmacist's
8   role is.
9       Q.    Sir, this is a very simple
10  question.
11      A.    I don't think so.
12      Q.    You disagree that a
13  prescription is required in order for a
14  pharmacist to provide opioids to a patient?
15      A.    No.  I said limited to a
16  pharmacist.  That's why I asked for that
17  modifier.  There were pill mills where the
18  pill mills were prescribing -- were filling
19  prescriptions without pharmacist
20  intervention.  So this is not always the
21  case, that pharmacists were required in this
22  hockey stick from 2000 -- 1996 until now.
23      Q.    Under the law, a physician
24  prescription is required in order to fill a

Page 377

1   prescription for opioids; correct?
2       A.    That's correct.
3       Q.    Okay.  There is no discussion
4   of pill mills anywhere in Exhibit B129;
5   correct?
6       A.    Correct.
7       Q.    There is no evidence of pill
8   mills anywhere in Exhibit B129; correct?
9       A.    That's correct.
10      Q.    So pill mills have nothing to
11  do with Exhibit B129; correct?
12      A.    Not correct.
13      Q.    There is nothing in
14  Exhibit B129 that would suggest to us that
15  pill mills have anything to do with it;
16  right?
17      A.    I don't think that's true.
18  When you say -- are you a part of the "us"?
19  I think that's not true.  If you're not part
20  of the "us."
21      Q.    I'm basing my question, sir, on
22  what is written on the pages you have
23  provided as support for your opinion.
24      A.    Well, that wasn't the question

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1  you asked.
2      SPECIAL MASTER COHEN:
3  Dr. Egilman, I think you shouldn't
4  characterize the question she asked
5  and just try your best to answer them.
6      THE WITNESS: I did. But I
7  mean, that's why I asked for -- I
8  asked for --
9      SPECIAL MASTER COHEN: No, you
10 didn't ask for a clarification. You
11 recharacterized her question.
12     So if you think she asked
13 something different, then ask for her
14 to clarify.
15     THE WITNESS: Okay.
16     So --
17     Q.   (BY MS. SAULINO) All right.
18 You and I have already agreed that this
19 document nowhere says the word "opioid" nor
20 the name of any particular opioid; correct?
21     A.   Correct.
22     Q.   You and I have also agreed that
23 this document -- nowhere in it says anything
24 about pill mills; right?

Page 379

1      A.   Correct.
2      Q.   And you and I have also agreed
3  that under the law, a physician prescription
4  is required to fill a prescription for
5  opioids; right?
6      A.   Correct.
7      Q.   Okay. And yet you believe that
8  this document supports your opinion that
9  venture member McKesson marketed opioids;
10 right?
11     A.   Correct.
12     Q.   Okay. And in your clinical
13 practice, you've never had a distributor make
14 a sales call to your office; right?
15     A.   Correct.
16     Q.   You've also never had a
17 pharmacy make a sales call to your office;
18 right?
19     A.   Correct.
20     Q.   In your clinical practice, no
21 distributor has ever sent you a fax blast for
22 a medicine; right? As defined in
23 Exhibit B129?
24     A.   Correct.

Page 380

1      Q.   And no pharmacy has ever sent
2  you a fax blast for a medicine; right?
3      A.   I don't think that's correct.
4      Q.   As defined in Exhibit B129?
5      A.   If you limit it to Health Mart,
6  that's correct. If you include Medco, not
7  correct.
8      Q.   In your clinical practice, no
9  distributor or pharmacy has ever sent an Rx
10 bulletin to your office; right?
11     A.   That's correct.
12     Q.   In your clinical practice, no
13 distributor or pharmacy has ever sent an Rx
14 mail to your office; right?
15     A.   Correct.
16     Q.   In your clinical practice, no
17 distributor or pharmacy has ever sent an Rx
18 update message to your office; right?
19     A.   Correct.
20     Q.   In your clinical practice, no
21 distributor or pharmacy has ever delivered a
22 video presentation to your office; correct?
23     (Special Master leaves.)
24     A.   Correct.

Page 381

1      Q.   In your clinical practice, no
2  distributor or pharmacy has ever autoshipped
3  a medication to your office; correct?
4      A.   Correct.
5      Q.   And in your clinical practice,
6  no distributor or pharmacy has ever sent you
7  an e-mail marketing a medicine; correct?
8      A.   No.
9      Q.   You've received e-mails from
10 distributors or pharmacies marketing a
11 medicine?
12     A.   That's my recollection.
13     Q.   Have you provided them in this
14 litigation?
15     A.   No. You didn't ask if there's
16 been any.
17     Q.   Do you still have that e-mail,
18 sir?
19     A.   It would have been a fax.
20     Q.   Well, my question was about an
21 e-mail, but you recall having received a fax?
22     A.   I think so, yeah.
23     Q.   From who?
24     A.   I think it was Medco.

Page 382

1     Q.    And what is your recollection
2 of what it said?
3     A.    It was to switch patients from
4 Celebrex to Vioxx.
5     Q.    And you recall having received
6 that when?
7     A.    I think so. I don't think I
8 have it, but I think so.
9     Q.    When do you recall having
10 received that?
11     A.    It would have been when I was
12 practicing in clinic.
13     Q.    Okay. You don't recall any
14 such marketing communication with respect to
15 any opioid; right?
16     A.    Correct.
17     Q.    Okay.
18        Now, you don't have any
19 deposition testimony that you cite here to
20 support Opinion B129; right?
21     A.    Correct.
22     Q.    You don't have any other
23 documents that you cite; right?
24     A.    Correct.

Page 383

1     Q.    You've never visited the
2 McKesson Connect web page, have you?
3        It's cited under Rx detail on
4 demand on the second half of the first page?
5        First page.
6        Second column.
7     A.    I think I asked one of my staff
8 to get access to it, but we didn't --
9 couldn't get in it.
10        We looked for it on the Wayback
11 Machine.
12     Q.    So you did look for the
13 McKesson Connect web page?
14     A.    I think so.
15     Q.    Okay.
16        Handing you what's been marked
17 as Exhibit 21 to your deposition.
18        (Whereupon, Deposition Exhibit
19       Egilman 21, Login to McKesson Connect,
20       was marked for identification.)
21     Q.    (BY MS. SAULINO) Which is the
22 log-in page for McKesson Connect.
23     A.    Okay.
24     Q.    Is this what you saw?

Page 384

1     A.    I think so.
2     Q.    Okay. And you couldn't get
3 access; right?
4     A.    Correct. Because I don't have
5 Jones Day's skills.
6     Q.    Because this site is for
7 McKesson partners and customers only; right?
8 As it says here?
9     A.    Correct.
10     Q.    And physicians are not McKesson
11 customers; right?
12        MS. CONROY: Objection.
13        THE WITNESS: Depends how you
14 define "customer."
15     Q.    (BY MS. SAULINO) You as a
16 physician could not get access to this web
17 portal; correct?
18     A.    Correct.
19     Q.    You don't know any physician
20 who could get access to this web portal;
21 correct?
22        MS. CONROY: Objection.
23        THE WITNESS: I don't know any
24       who have tried.

Page 385

1     Q.    (BY MS. SAULINO) And
2 physicians are not McKesson partners;
3 correct?
4        MS. CONROY: Objection.
5        THE WITNESS: Do you mean as
6       defined in your -- on your web portal?
7     Q.    (BY MS. SAULINO) Yes,
8 Dr. Egilman.
9     A.    That's my understanding.
10     Q.    Okay. Dr. Egilman, if you
11 could look at Opinion 385, which is at the
12 bottom of page 119.
13     A.    Okay.
14     Q.    Your opinion here is "Actavis
15 had marketing agreements with some
16 distributors and provided McKesson with
17 talking points to sell oxymorphone to
18 pharmacists"; right?
19     A.    Yes.
20     Q.    All right. And I have
21 Exhibit B385 right here unless you have a
22 different copy of it.
23     A.    No.
24     Q.    Okay. So I'm giving you what's

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1 been marked as Exhibit 2 --
2         Oh, you do have a different
3 copy?
4     A.    I have a whole deposition.
5     Q.    Well, Dr. Egilman, you only
6 cited seven pages here in your Exhibit B385.
7     A.    I think you got provided the
8 whole deposition.
9     Q.    Dr. Egilman, I'm looking at
10 Exhibit B385; right?
11     A.    Right.
12     Q.    And you cite as the basis for
13 your opinion, McCormick depo at 126.  Right?
14 On page 1 of your Exhibit here?
15         MS. CONROY:  Do you have a
16 copy?
17         MS. SAULINO:  Yes.  Sorry.
18         THE WITNESS:  That's obviously
19 a typo, because it's 128.
20     Q.    (BY MS. SAULINO)  Okay.  So
21 page 128 is the page that you're relying on
22 in this deposition for this opinion; right?
23     A.    No.  Also McCormick depo at
24 249.

Page 387

1     Q.    When you say "also McCormick
2 depo at 249," you mean because you see that
3 attached on page 3?
4     A.    No, there's a footnote.
5     Q.    Oh, I see it, on page 2.
6 You're right.  I can see it there.
7         Okay.  Now, Dr. Egilman, you
8 have seen -- so what you're doing here in
9 this opinion is paraphrasing something that
10 you read in a deposition; correct?
11         MS. CONROY:  Objection.
12         THE WITNESS:  No, not exactly.
13     Q.    (BY MS. SAULINO)  Okay.
14 There's no way for us to know what your
15 process was here; right?
16         MS. CONROY:  Objection.
17         THE WITNESS:  I don't think
18 that's correct.
19     Q.    (BY MS. SAULINO)  You don't
20 provide a hypothesis that you answered;
21 right?
22     A.    Well, that -- it's not
23 explicit, but it would be implicit.  The null
24 hypothesis would be Actavis -- McKesson did

Page 388

1 not market for its customers.
2     Q.    And you don't write that
3 anywhere here; right?
4     A.    Correct.
5     Q.    And you don't anywhere here
6 provide -- other than the snippets that you
7 provide in these seven pages, you don't
8 provide additional documents or data; right?
9     A.    No.
10         MS. CONROY:  Objection.
11     Q.    (BY MS. SAULINO)  Other than
12 what you provide in these seven pages, you
13 don't provide additional documents or data
14 that support this opinion; right?
15     A.    No.
16     Q.    Somewhere else we would find
17 additional documents or data that support
18 this opinion?
19     A.    Yes.
20     Q.    And where would we find that?
21     A.    Well, the depositions that I
22 cited were -- should -- were attached, as I
23 understand it.  And were -- and were
24 digitally sent to you.

Page 389

1     Q.    Okay.  Doctor --
2     A.    So the complete depositions,
3 and then, of course, the complete advertising
4 program that was reviewed by McKesson is also
5 attached.
6     Q.    What I have attached,
7 Dr. Egilman, is seven pages of B385; right?
8 And citations to particular pages that you've
9 screenshotted on Exhibit B385; right?
10     A.    It's not my understanding of
11 what was provided.  My understanding of what
12 was provided was the two documents I have in
13 my hand and the depositions I have in the
14 folder.
15     Q.    I'm looking at what you wrote
16 in Exhibit B385 which is a part of your
17 report as you just explained to me a bit ago;
18 right?
19     A.    The report includes the opinion
20 and the attached documents.  You've got them
21 both.
22     Q.    Dr. Egilman, you did not attach
23 those documents, right?  You screenshotted
24 portions of them?

Page 390

1 A. No, it's my understanding the
2 attached documents were provided with the
3 report.
4 Q. Okay. So if we include the
5 documents that you say were attached, there's
6 nothing else; right?
7 A. There's nothing else attached
8 to this opinion, but there are other McKesson
9 marketing for opioid manufacturer documents
10 that are in the McKesson Redweld which we
11 have.
12 Q. Which you don't cite here;
13 right?
14 A. Which I don't cite here, right.
15 Q. Which you don't
16 cross-reference, right?
17 A. Which I don't cross-reference
18 in this opinion, that's right.
19 Q. And the McKesson Redweld that
20 you're talking about is actually a stack of
21 Redwelds; right?
22 A. Right.
23 Q. Okay. And we're going to mark
24 that stack as Exhibit 23.

Page 391

1 A. There was one Redweld for all
2 of these. No?
3 (Whereupon, Deposition Exhibit
4 Egilman 23, compilation of Redweld
5 folders, was marked for
6 identification.)
7 Q. (BY MS. SAULINO) There was?
8 A. I thought so, but maybe I'm
9 wrong. I didn't do this part.
10 Q. Well, we'll mark that stack
11 as --
12 A. The lawyers did this part.
13 Q. We'll mark that stack as
14 Exhibit 23.
15 Now, what are you saying now
16 that that --
17 A. Hang on.
18 Q. Stack represents --
19 A. Other documents indicating
20 marketing agreements between Mallinckrodt and
21 opioid manufactures to market opioids.
22 (Reporter asked for
23 clarification.)
24 THE WITNESS: That McKesson was

Page 392

1 marketing opioids for manufacturers of
2 opioids.
3 Q. (BY MS. SAULINO) Okay. And
4 you don't provide that stack -- that listing
5 of that stack in your report anywhere; right?
6 A. The listing of the stack is not
7 here. Each of the individual documents and
8 opinions is in the report.
9 Q. All right. Let me ask you
10 this, Dr. Egilman.
11 You've not ever seen any
12 talking points that McKesson used to market
13 directly to doctors, have you?
14 A. No.
15 Just an administrative
16 question. Did you want this Exhibit 22 to
17 include the entire Redweld or just this
18 document?
19 Q. Yes. Let's make Exhibit 22
20 include the entire Redweld, which you're now
21 saying is your complete Exhibit 22 -- the
22 complete version of Exhibit 22; right?
23 MS. CONROY: Objection.
24 (Whereupon, Deposition Exhibit

Page 393

1 Egilman 22, Opinion B.385, was marked
2 for identification.)
3 THE WITNESS: No problem. Just
4 asking.
5 Q. (BY MS. SAULINO) Now,
6 Dr. Egilman, do you hold yourself out to be
7 an expert in FDA regulations?
8 A. Based on my definition of
9 "expert," yes.
10 Q. Okay. Have you ever been
11 qualified by a court as an expert in FDA
12 regulations?
13 A. I've testified in court on FDA
14 regulations.
15 Q. Have you ever been qualified by
16 a court as an expert in FDA regulations?
17 A. I assume if I testified, I was
18 qualified.
19 Q. Okay. So you don't know?
20 A. Well, normally -- I don't
21 recall -- I'm not -- not usually there when
22 the motions in limine are made. And so I
23 assume if I come to court and I testify about
24 FDA regulations, that that's all been dealt

Page 394

1 with before, that a judge has approved my
2 testimony about FDA regulations.
3      Q.    You would agree with me that
4 pharmaceutical manufacturers have to follow
5 FDA regulations; right?
6      A.    What do you mean by "have to"?
7      Q.    You find the question
8 ambiguous?
9      A.    I do.
10          You know, there's lots of cases
11 where manufacturers have not followed FDA
12 regulations.  Right?  I've got -- or
13 distributors.  I've got all kinds of examples
14 here.
15          So when you say "have to," I
16 know that there are laws that say they should
17 or shall, and I know that generally when they
18 don't, there's no penalty.
19      Q.    You would agree with me that
20 FDA regulations hold the force of law for
21 pharmaceutical manufacturers; right?
22      A.    Some do.
23      Q.    And since you are holding
24 yourself out as an expert in FDA regulations,

Page 395

1 you would agree with me that the message --
2 the marketing messaging that pharmaceutical
3 manufacturers use is something that has to be
4 approved by the FDA; right?
5          MS. CONROY:  Objection.
6          THE WITNESS:  No, not exactly.
7      Q.    (BY MS. SAULINO)  What is your
8 disagreement with that statement?
9      A.    That's not what happens.
10          Marketing messages get sent to
11 the FDA.  The FDA reviews a small percentage
12 of them, but they never send an approval
13 letter out for the ones they don't look at.
14 So marketing for the most part, the FDA works
15 on a snitch system where one company snitches
16 on another company, and that's how they find
17 out that somebody's violating the off-label
18 rules generally, and then they may clamp
19 down.
20          But the FDA, by itself, has
21 very little staff, and they certainly don't
22 review all of the marketing messages and
23 approve them.  They get them.
24      Q.    What's the basis for what you

Page 396

1 just said?
2      A.    Well, I was at a conference
3 where the FDA people spoke, and I sat at a
4 table with the people from DDMAC who told me
5 what the process was.  That was around 2003,
6 2004.
7      Q.    And the officials from DDMAC
8 told you --
9      A.    Excuse me, I'm not done with
10 that answer.  You said what's the basis for
11 that.  Okay?
12      Q.    I'd like to know what the
13 officials from DDMAC told you.
14      A.    Do you want the incomplete
15 answer, I'm done with the answer.  No
16 problem.  Just it's incomplete.
17          If you want to cut me off, no
18 problem.
19      Q.    The officials from DDMAC told
20 you that the FDA process is based on a snitch
21 system?
22      A.    They said that that was -- that
23 generated most of their actions.
24      Q.    Okay.  And they told you --

Page 397

1      A.    And they told me they had six
2 staff to review all of the marketing messages
3 that were submitted annually at that time,
4 and they didn't -- they didn't review them.
5      Q.    So your --
6      A.    They didn't review nearly all
7 of them.
8      Q.    So you're basing this expertise
9 on one conversation you had at a dinner?
10          MS. CONROY:  Objection.
11          THE WITNESS:  No.  There was a
12 whole conference on this issue.  It
13 was discussed at the conference.
14 Abrams was speaking at the conference,
15 and a lot of people -- because of the
16 lunch, I had a lot of time to have
17 side conversations and more detailed
18 conversations about the process than
19 just what was in the lecture series.
20      Q.    (BY MS. SAULINO)  So you're
21 basing this opinion on one conference that
22 you went to several years ago?
23      A.    No.  I've read other things
24 about this process.  I've read documents

Page 398

1 about this process in the Vioxx litigation,
2 the Actos litigation, in the Zyprexa
3 litigation, in the Purdue litigation.
4        So, I mean, I've seen how the
5 FDA doesn't regulate marketing over time.
6    Q.   Okay.  Your opinion at
7 page 126, 7.430?
8    A.   7 which?
9    Q.   430.  Bottom of page 126.
10    A.   Okay.
11    Q.   All right.  You -- in Exhibit
12 B430, which I have marked here as Exhibit 24.
13        (Whereupon, Deposition Exhibit
14        Egilman 24, Opinion-McKesson had
15        marketing agreements with
16        Mallinckrodt, Purdue and Teva, was
17        marked for identification.)
18        THE WITNESS:  Are these in the
19 full Mallinckrodt?  Have you got that
20 one?  Because there's three documents
21 cited.
22    Q.   (BY MS. SAULINO)  Yes, there
23 are three documents cited and one attached;
24 right?

Page 399

1    A.   Well, they were all attached.
2 One was excerpted.
3    Q.   Dr. Egilman, I'll give you each
4 of the documents that's cited when we get to
5 them.  Okay?
6    A.   Okay.
7    Q.   All right.  So your opinion
8 here is "McKesson had marketing agreements
9 with Mallinckrodt, Purdue, and Teva"; right?
10    A.   Correct.
11    Q.   Okay.  And for that opinion,
12 you cite three documents; right?
13    A.   Correct.
14    Q.   And only three documents;
15 right?
16    A.   Correct.
17    Q.   Okay.  So one of them is
18 actually page 2 of Exhibit B430; right?
19    A.   Correct.
20    Q.   Or an excerpt from one of them;
21 right?
22    A.   Correct.
23    Q.   Okay.  And in that excerpt, we
24 see that this is a McKesson manufacturer

Page 400

1 marketing product promotional agreement;
2 right?
3    A.   Correct.
4    Q.   With Purdue Pharma; right?
5    A.   Correct.
6    Q.   And if you look at the
7 beginning of the last paragraph that appears
8 in your screenshot here.
9    A.   Right.
10    Q.   And you see -- and you've
11 actually highlighted it here.  You see
12 "Supplier will provide MSH with and approve
13 all documents, materials, and/or information
14 in any format, including supplier website
15 links for the services hereunder," and it's
16 then in quotes, "supplier content."
17    A.   Correct.
18    Q.   "It is expressly understood
19 that MSH shall rely upon the supplier content
20 to perform services"; right?
21    A.   You read that part correctly.
22    Q.   Okay.  Let's look at the other
23 two documents that you cite there.
24        Well, I'll give you one of

Page 401

1 them.
2        Here's the other one.  And
3 we're going to make them all a part of
4 Exhibit -- what number are we on there, sir?
5        MS. CONROY:  24.
6        MS. SAULINO:  24.
7    Q.   (BY MS. SAULINO)  Okay.  Now,
8 looking at these other two documents, let's
9 start with the document ending at the bottom
10 in Bates No. 3368.
11    A.   Okay.
12    Q.   Okay?
13        And that's a McKesson
14 manufacturer marketing contract product
15 promotional agreement.  Right?
16    A.   Yes.
17    Q.   And this one is with Teva;
18 right?
19    A.   Yes.
20    Q.   And if you look at the last
21 paragraph on the first page, you see it says
22 "The content of any document, material or
23 information provided by Teva to McKesson for
24 inclusion in the program, supplier content

Page 402

1  under this agreement is the sole
2  responsibility of Teva, and Teva represents
3  and warrants that the supplier content
4  complies with all applicable laws"; right?
5      A.    That's part of what it says.
6      Q.    Well, that's the whole first
7  sentence; right?
8      A.    You read the whole first
9  sentence.
10     Q.    Okay.  And if we look at the
11 third document that you've cited for this
12 opinion, which is Bates ending 3261?
13     A.    Right.
14     Q.    Do you see that that's a
15 McKesson manufacturer marketing product
16 promotional agreement; right?
17     A.    Correct.
18     Q.    And this one is with
19 Mallinckrodt; right?
20     A.    Correct.
21     Q.    And you see the paragraph in
22 the middle of the page, right under what
23 it -- right under the title in the -- that
24 says "Promotional product."  The next

Page 403

1  paragraph?
2      A.    Yes.
3      Q.    It says "The content of any
4  document, material, or information provided
5  or approved by Mallinckrodt to McKesson for
6  inclusion in the program or service supplier
7  content under this agreement is the sole
8  responsibility of Mallinckrodt, and
9  Mallinckrodt represents and warrants that the
10 supplier content complies with all applicable
11 laws"; right?
12     A.    You read that part of this
13 paragraph correctly.
14     Q.    Okay.
15           You have not seen in your
16 investigation nor do you cite any contract
17 between a manufacturer and distributor in
18 which the distributor controls the content of
19 the message, have you?
20     A.    That's not true.  This is a
21 McKesson agreements and contracts where
22 McKesson says that their attorneys have to
23 approve any of the material that goes out.
24     Q.    Dr. Egilman, what you just said

Page 404

1  is said nowhere in the documents we just
2  looked at; right?
3      A.    That's correct.  But you didn't
4  ask that.  It's in other documents.
5           Hang on one second while I try
6  to put 24 together.
7           Okay.  Go ahead.
8      Q.    Okay.  Let's look at
9  Opinion B321.
10          It's on page 110.
11     A.    Okay.
12     Q.    Opinion B321 is "The venture
13 McKesson's suspicious order monitoring SOM
14 was inadequate"; right?
15     A.    Correct.
16     Q.    And I will hand you
17 Exhibit B321 which is Exhibit 25 to your
18 deposition.
19     A.    Hang on one second.
20          (Whereupon, Deposition Exhibit
21          Egilman 25, Opinion - the "Venture" -
22          McKesson's SOM was inadequate, was
23          marked for identification.)
24     Q.    (BY MS. SAULINO) Dr. Egilman,

Page 405

1  can we use the one I gave you?  Or no?
2      A.    I'll let you know after I see
3  if it's complete.
4      Q.    Well, I gave you what was
5  produced to us.
6           MS. CONROY:  Objection.
7           THE WITNESS:  What number are
8  we on, 321?
9      Q.    (BY MS. SAULINO) Yes.
10          Do you have reason to believe
11 that what I gave you as Exhibit B321 which
12 was produced to us is incomplete?
13     A.    I have no idea.
14     Q.    Well, we're short on time,
15 Dr. Egilman, and you're using a lot of it
16 looking around to see whether that is a
17 complete document that I gave you which was
18 what was produced to us.
19          MS. CONROY:  Objection.
20          THE WITNESS:  As you know,
21 we've already had many instances where
22 what you claimed was complete was
23 incomplete.  So I'd like to be able to
24 have the complete situation before I

Page 406

1 testify.
2        But go ahead.
3        Q.   (BY MS. SAULINO)  Exhibit B321,
4 which was produced to us as pages one of 5, 2
5 of 5, 3 of 5, 4 of 5, and 5 of 5, which I
6 have put in front of you as Exhibit 25 to
7 your deposition cites one document; correct?
8        A.   Correct.  I think it's a
9 PowerPoint.
10        Q.   A PowerPoint from 2014; right?
11        A.   Correct.
12        Q.   And from this PowerPoint, you
13 opine that McKesson's SOM was inadequate;
14 correct?
15        A.   Right.
16        Q.   You don't cite any deposition
17 testimony, do you?
18        A.   Correct.
19        Q.   You don't cite any other
20 documents here, do you?
21        A.   Correct.
22        Q.   You don't provide any basis for
23 your hypothesis; right?
24        A.   Not in this opinion.

Page 407

1        Q.   Right.  You don't provide any
2 challenge that you did for that hypothesis;
3 right?
4        Here in this opinion?
5        A.   Correct.  Correct.
6        Q.   Okay.
7        And can you state the year that
8 McKesson implemented the Lifestyle Drug
9 Monitoring Program?
10        A.   I don't recall.
11        Q.   Can you state the year that
12 McKesson implemented its Controlled Substance
13 Monitoring Program?
14        A.   I don't recall.
15        Q.   Can you state the standard
16 threshold that McKesson set under the
17 Lifestyle Drug Monitoring Program?
18        A.   No.
19        Q.   Can you name the controlled
20 substances that McKesson monitored under the
21 Lifestyle Drug Monitoring Program?
22        A.   No.
23        Q.   Can you state how McKesson set
24 thresholds for controlled substances under

Page 408

1 the CSMP?
2        A.   I'd have to look at the
3 PowerPoints.  It's in the PowerPoints.
4        Q.   Other than the PowerPoint, do
5 you have any basis for that knowledge?
6        A.   No.
7        Q.   Can you identify how McKesson
8 set thresholds for various drugs with the
9 same active ingredient?
10        A.   No.
11        Q.   Can you identify when a
12 customer's threshold resets under McKesson's
13 CSMP?
14        A.   No.
15        Q.   Can you state the year that
16 McKesson implemented its Controlled Substance
17 Monitoring Program?
18        A.   No.
19        Q.   You are aware of no evidence
20 that McKesson shipped orders in excess of
21 thresholds at any time to Cuyahoga County
22 under the CSMP; correct?
23        A.   I think that's correct.
24        Q.   You are aware of no evidence

Page 409

1 that McKesson shipped orders in excess of
2 thresholds to Summit County at any time under
3 the CSMP?
4        A.   I think that's correct.
5        Q.   As you sit here today, you
6 cannot identify a single suspicious order
7 McKesson shipped to Summit County; right?
8        A.   As identified by McKesson?  I
9 think that's correct.
10        Q.   To Cuyahoga County?
11        A.   Same answer.
12        Q.   To Akron?
13        A.   Same answer.
14        Q.   To Cleveland?
15        A.   Same answer.
16        Q.   Can you identify the document a
17 customer must submit to McKesson to request
18 an increase to a threshold?
19        A.   No.
20        Q.   As you sit here today, you are
21 aware of no evidence that McKesson changed a
22 customer's threshold without first reviewing
23 a request from the customer; right?
24        A.   No, I don't think that's

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1  correct.
2      Q.    What evidence are you aware of,
3  sir?
4      A.    If you look at the $150 million
5  fine that McKesson paid to DOJ, I think
6  there's evidence in there.
7      Q.    So you're simply basing your
8  opinion on suppositions that you've made
9  based on a government fine?
10         MS. CONROY:  Objection.
11     Q.    (BY MS. SAULINO)  Correct?
12     A.    No.  I'm basing it on the
13  findings of the DOJ with respect to
14  McKesson's overshipping.
15     Q.    So the findings of the DOJ
16  would be the best evidence there; right?  Not
17  your expert opinion?
18     A.    My expert opinions are based in
19  part on those findings.
20     Q.    Can you identify the tool
21  McKesson used to analyze dispensing data
22  under the CSMP?
23     A.    No.
24     Q.    Can you identify any other

Page 411

1  analytic tools McKesson used to analyze
2  customer thresholds under the CSMP?
3      A.    No.  I'd have to look at the
4  document.
5      Q.    Can you identify how McKesson
6  currently sets customer thresholds?
7      A.    No.
8      Q.    Can you identify how McKesson
9  calculated salesperson compensation prior to
10  2012?
11     A.    No.
12     Q.    You are aware of no evidence of
13  any sales compensation incentive tied
14  directly to opioid sales, are you, for
15  McKesson?
16     A.    Do you mean for a salesperson?
17     Q.    Yes.
18     A.    I think that's correct.
19     Q.    Okay.  Dr. Egilman, before we
20  conclude today, I want to make sure to mark a
21  number of things.
22     A.    Are we concluding today?
23     Q.    Well, at least concluding
24  before the break and then we can talk about

Page 412

1  your request for coming back after dinner.
2          So first, you have a number of
3  colored folders that have numbers on them
4  that you have sat in front of you here today;
5  right?
6      A.    I do.  I also have some notes.
7      Q.    Some notes.  Okay.
8          And you brought those intending
9  to use these colored folders and notes during
10  your deposition today?
11         MS. CONROY:  Objection.
12         THE WITNESS:  No.  Not
13     necessarily.
14     Q.    (BY MS. SAULINO)  Well, you've
15  laid them out very carefully, taken up a good
16  amount of our precious space here at the
17  table.  So you brought them for a reason;
18  right?
19     A.    I thought they would be helpful
20  from time to time, yes.
21     Q.    Okay.
22     A.    They have been helpful from
23  time to time.  But I can't predict what the
24  question is, so I brought things that I

Page 413

1  thought you might ask about that might be
2  helpful as answers.
3      Q.    And you've numbered them 1
4  through -- it looks like 32; is that right?
5  Is new bias?
6      A.    I don't know.
7      Q.    Okay.  Can we move your
8  McKesson Redweld?
9      A.    Sure.
10     Q.    Okay.  And I think this is part
11  of your McKesson Redweld.
12         All right.  And I think that
13  was Exhibit B62.
14     A.    Well, it's empty now.
15     Q.    I'm looking at the title of the
16  blue folder.
17         MS. CONROY:  Give it to me.
18     Q.    (BY MS. SAULINO)  Okay.  So
19  these colored folders, you had intended to
20  rely on these in your deposition?
21     A.    I did rely on them.
22     Q.    Okay.  I'd like to mark these
23  as an exhibit to your deposition.
24         And --

Page 414

1    A.    Fine with me.

2    Q.    We can mark them as one

3  exhibit.  I'm guessing you want to leave them

4  laid out here until you're done testifying

5  tomorrow; is that right?

6    A.    That would be my preference.

7    Q.    Okay.  So why don't we mark

8  these colored folders collectively as 26?

9        (Whereupon, Deposition Exhibit

10       Egilman 26, Dr. Egilman's reference

11       folders, was marked for

12       identification.)

13   Q.    (BY MS. SAULINO)  And what is

14  that sort of technicolor folder there?

15   A.    That's the one with five bad

16  acts and limitations.

17   Q.    Okay.

18       So --

19   A.    Here's my notes.  Do you want

20  my notes too?

21   Q.    Yes.  Why don't we mark those

22  as Exhibit 27.  So let's give our court

23  reporter a minute to give us the numbers.

24       I just wanted to mark the notes

Page 415

1  as 27.

2        So the notes are 27.

3        (Whereupon, Deposition Exhibit

4       Egilman 27, Dr. Egilman's notes, was

5       marked for identification.)

6        MS. SAULINO:  And we'll figure

7  out where to put the sticker for 26 at

8  the break.

9        So Exhibit 28, then, I'd like

10  to mark your box of your copies of the

11  exhibits that you have been

12  referencing.

13       MS. CONROY:  I put the folders

14  back in it.

15       (Whereupon, Deposition Exhibit

16       Egilman 28, Dr. Egilman's opinion

17       folders with stickies and notations,

18       was marked for identification.)

19       MS. SAULINO:  Okay.

20       Okay.  Now, the colored folders

21  in front of you we've made Exhibit 26.

22  Your box with your notes on some

23  exhibits is 28.

24       Your notes are Exhibit 27.

Page 416

1        Is there anything else that you

2  have in your vicinity here that you

3  intended to use today to testify?

4        THE WITNESS:  No.

5    Q.    (BY MS. SAULINO)  Okay.  Now,

6  the posters behind you --

7    A.    Oh, yeah, the posters.

8    Q.    You have a number of posters

9  there.

10   A.    Yeah, the posters.

11   Q.    You brought a number of posters

12  here?

13   A.    Yeah.  About 15 posters.

14   Q.    Why did you bring 15 posters?

15   A.    No reason for 15, but you saw

16  we used one that was relevant.

17       These are some of the more

18  important documents in my view.  So.

19   Q.    I see.  So the poster boards

20  behind you are some of the more important

21  documents?

22   A.    And also the poster that was

23  presented on Saturday wasn't given to you.

24  So we can't read it on a small copy.  So I

Page 417

1  brought that.

2    Q.    Are any of the other posters

3  representing something that wasn't given to

4  us?

5    A.    I don't think so.

6    Q.    So we're going to ask at the

7  break or overnight to get paper copies of the

8  posters so that we can mark them.  Okay?

9    A.    They all have Bates numbers on

10  them.

11   Q.    Okay.  Well, then we can mark

12  them.

13       All right.

14       MS. SAULINO:  I think this is a

15  good time for a break.

16       THE WITNESS:  Okay.

17       THE VIDEOGRAPHER:  We're off

18  the record at 6:40.

19       (Recess taken, 6:39 p.m. to

20  7:05 p.m.)

21       THE VIDEOGRAPHER:  We are back

22  on the record at 7:06.

23       (Whereupon, Deposition Exhibit

24  Egilman 29, USA Oxycodone consumption

Page 418

1    (mg/capita) 1980 -- 2015, was marked
2    for identification.)
3    Q.    (BY MS. SAULINO)  Dr. Egilman,
4  we have marked as Exhibit 29 what I
5  understand from your counsel to be a
6  compilation of paper copies of the posters
7  that you brought with you today.
8    A.    She's not my counsel, but
9  that's terrific.  These are copies of the
10  posters.
11    Q.    Those are the copies of the
12  posters, you agree?
13    A.    But Ms. Conroy is not my
14  counsel.
15    Q.    So you agree that's what
16  Exhibit 29 is, though?
17    A.    Right.
18    Q.    Dr. Egilman, you said earlier
19  that there is not anything else that you
20  consider to be a part of your report other
21  than Exhibit 1F and Exhibits B1 through B489,
22  and all of their attached documents; right?
23    A.    Right.  And cited documents.
24    Q.    In B1 to B489; right?

Page 419

1    A.    Correct.
2    Q.    Okay.
3    A.    You've attached all of this
4  material, some of which is included there.
5  Some of which is, as I stated earlier,
6  supplemental bases to opinions and some of
7  which would be -- and that would be a
8  category.  Some of the articles, for example,
9  came out this week.
10    So I don't know whether you
11  were going to call this part of the report or
12  not.  But it's here.  It's marked at the
13  deposition.
14    Q.    So for the record what you are
15  pointing at and saying is "this," is
16  Exhibit 26, which are the colored folders
17  that you brought with you today?
18    A.    Yes.  I would say the material
19  in the folders, yes.
20    Q.    And you previously had
21  testified to additional bases that you had in
22  one of the folders; right?
23    A.    No, I think I went through
24  three or four folders of additional bases.

Page 420

1  There was the -- remember, I -- you took me
2  on -- you put me on plaintiff time, so there
3  were two plaintiff time breaks.  So there
4  were additional bases one, and there was
5  plaintiff time break two.  That was
6  additional bases.  And plaintiff time two
7  which is additional bases.
8    Q.    Okay.
9    Other than those additional
10  bases that we talked about earlier today, do
11  you have more additional bases sitting here
12  in front of us?
13    A.    No.
14    Q.    So your complete report and
15  bases are found in Exhibit 1F, Exhibits B1
16  through B489, the documents cited in
17  Exhibits B1 through B489, and the two
18  additional bases packets that you showed us
19  today; right?
20    A.    Three additional bases packets.
21    MS. CONROY:  That are reflected
22  in the transcript.  They were already
23  gone through the transcript this
24  morning.

Page 421

1    MS. SAULINO:  So we've --
2    Q.    (BY MS. SAULINO)  So
3  Exhibit 1F, Exhibits B1 through B489, the
4  exhibits -- the documents cited in Exhibits
5  B1 through B4.89, and the three additional
6  bases pieces that you cited earlier today
7  constitute your complete report; right?
8    A.    Correct.
9    Q.    Now, does the report,
10  Deposition Exhibit 1F and the attached
11  Exhibits B1 through B14 reflect a complete
12  set of the opinions you will express in this
13  case?
14    A.    Those are a complete set of the
15  opinions that I'm expressing now at this
16  deposition.
17    I don't know what anybody else
18  is going to ask.  For example, I think other
19  opinions have been elicited during this
20  deposition, during questioning.  So I can't
21  predict what any of the defendants might ask
22  that might elicit other opinions.
23    Q.    Dr. Egilman, as an expert in
24  this case, the opinions that you are offering

|  | Page 422 |
| --- | --- |

1  as opinions that you are offering under your
2  expertise are contained in Deposition
3  Exhibit 1F and the attached Exhibits B1
4  through B489; correct?
5      A.    Right.  These are the opinions
6  I'm offering today.
7      Q.    And you intend to offer
8  additional opinions at trial that you are not
9  disclosing today?
10      MS. CONROY:  Objection.
11      THE WITNESS:  No.
12      Q.    (BY MS. SAULINO)  Do the
13  documents and other evidence that you cite in
14  Exhibits B1 through B489 to your report
15  constitute a complete list of all of the
16  bases and reasons for your opinions?
17      A.    And now you left things out.
18  If you go back to the original summary that I
19  agreed to, yes.
20      Q.    Okay.  Fair enough.  Do the
21  documents and other evidence that you cite in
22  Exhibits B1 through B489 plus the three
23  additional bases that we discussed earlier
24  today constitute a complete list of all of

|  | Page 423 |
| --- | --- |

1  the bases and reasons for your opinions?
2      A.    Yes.
3      MS. SAULINO:  Okay.  All right.
4  I'm handing over the mic.
5      EXAMINATION
6  BY MR. MCGARRIGLE:
7      Q.    Good evening, Doctor.
8      A.    How are you doing?
9      Q.    I'm doing fine.  My name is
10  Tom McGarrigle.  I work with Reed Smith, and
11  we represent Amerisource in this deposition.
12  I'm going to have a few questions.  And I'm
13  going to hope that you are succinct in giving
14  us your answers.
15      When you were assigning your
16  office and your staff and your students, were
17  they assigned to any particular defendant?
18  So were there certain students and certain
19  staff members that were designated to focus
20  solely on one particular or group of
21  defendants?
22      A.    Well, do you know what?  I
23  forgot one student.  Lena Milton.  And she
24  worked on a couple of things, but she also

|  | Page 424 |
| --- | --- |

1  particularly worked on, I think, Allergan.
2      Q.    Okay.
3      A.    But otherwise, no.
4      Q.    Was your staff or students
5  assigned to any particular issue?
6      A.    Well, sure over the time,
7  different staff worked on different issues.
8      Q.    Okay.  Did you rely on your
9  staff to review deposition transcripts?
10      A.    I think some, yes.
11      Q.    Did you personally review every
12  deposition transcript in this litigation?
13      A.    Oh, no.
14      Q.    I want to direct your attention
15  to your report, page 110 of your report.  Our
16  7.324.
17      Do you have that in front of
18  you?  Do you have a copy of -- can we get it?
19      A.    It was here.
20      MS. CONROY:  Yeah, where did it
21  go?  With the actual report itself.  We had
22  that.
23      It was 1F.  Is it in the
24  exhibits, then?

|  | Page 425 |
| --- | --- |

1      Q.    (BY MR. MCGARRIGLE)  Doctor,
2  while you're looking at that you might want
3  to look to see if you have a copy of the
4  corresponding exhibit and whether it has been
5  changed or whether it has any notes on it.
6      MS. CONROY:  324?
7      MR. MCGARRIGLE:  Yes.
8      THE WITNESS:  Do you have the
9  324?
10      Okay.
11      Oh, she's looking at that.
12      MS. CONROY:  I'm going to tell
13  you.
14      Yeah.  You've got writing on
15  it.
16      Q.    (BY MR. MCGARRIGLE)  Let's get
17  this on the record.
18      Doctor, in opinion offered on
19  page 110 of your report, 7.3.24, it says
20  "AmerisourceBergen (ABC) was light on order
21  monitoring.  The ABC focuses only on rapid
22  growth, not steady sales, and the focus on
23  big accounts only for suspicious order
24  monitoring."

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1    Did I read that correctly?
2    A.    You did.
3    Q.    And it's a reference to
4  Exhibit D324 hereto attached; right?
5    A.    Correct.
6    Q.    I'm going to have marked as an
7  exhibit, Exhibit No. 30, that report --
8  excuse me, that Exhibit B324.
9    A.    Do you want the one with my
10  handwritten notes?
11    Q.    And did you put some
12  handwriting on it?
13        Let me ask you, first of all,
14  did you -- have you changed your opinion?
15    A.    No.
16    Q.    Okay.  And have you noted --
17  made notes on the exhibit?
18    A.    Yes.
19    Q.    May I see it?
20    A.    Sure.
21    Q.    Can you read for me the notes
22  that you wrote at the bottom?
23    A.    Yeah.  Walgreens --
24    Q.    Of the exhibit?

Page 427

1    A.    "Walgreens had data on all
2  store sales."
3    Q.    Now, in support of the opinion
4  offered in your report, the only support that
5  you cite is this Exhibit B324; is that
6  correct?
7    A.    The only opinion -- the only
8  support for this particular opinion cited in
9  this opinion is the one document.  There are
10  other documents, the Cardinal back-and-forth
11  with Walgreens, and AmerisourceBergen
12  stepping in, for example, that also relates
13  to this.
14    Q.    Well, there's no reference in
15  this to any cross-referencing to any other
16  documents.  Is that fair to say?
17    A.    Correct.
18    Q.    Is it also fair to say that
19  there's no indication that you looked at any
20  deposition testimony to support this opinion;
21  correct?
22    A.    Correct.
23    Q.    There is no indication that you
24  looked at any other documents?

Page 428

1    A.    On this opinion?
2    Q.    On this opinion.
3    A.    Written on the opinion?  That's
4  correct.
5    Q.    So the only thing that you
6  relied upon in coming up with this opinion is
7  this e-mail from Tasha Polster of Walgreens
8  dated October the 31st, 2013; is that
9  correct?
10    A.    No.
11    Q.    In addition to that, what else
12  have you relied upon in reaching this
13  opinion?
14    A.    Do you want give to me the
15  AmerisourceBergen section?
16        There are other documents, but
17  the main narrative here is when Walgreens got
18  hit with the $80 million penalty for
19  overselling, they went to Cardinal to take
20  over the Jupiter and supply and also the
21  other six.  Cardinal basically refused to do
22  that, and they said it's not just six
23  pharmacies that have problems.  It's 374
24  pharmacies that have problems.

Page 429

1        And since Cardinal refused to
2  step in, Walgreens went to AmerisourceBergen,
3  and Bergen stepped in and agreed to supply
4  all of those stores and take over the Jupiter
5  facility for Walgreens.
6        Notwithstanding Cardinal's
7  evaluation of the fact that those orders from
8  those pharmacies were not proper.  And
9  subsequent to that, Walgreens bought
10  26 percent of Amerisource.  So that's the
11  gist of it.  That's in the other documents.
12    Q.    And I note that the
13  Special Master has gone, and ever since he's
14  gone, your answers are getting longer and
15  more nonresponsive, so I'm going to ask you
16  to focus on my questions.
17        This opinion that you're
18  offering is an opinion about the Amerisource
19  Order Monitoring Program; isn't that correct?
20    A.    Correct.
21    Q.    And your opinion about that
22  program is that it was late on order
23  monitoring, that it focused only on rapid
24  growth, not steady sales.  And your only

Page 430

1  basis for those opinions on the Order
2  Monitoring Program is based on this e-mail.
3  This is the only thing that you put in your
4  report that allowed to us figure out what is
5  the doctor relying on.  Is that fair?
6      A.   No.
7      Q.   Is there anything in your
8  report with respect to this opinion that
9  allows us to know what the -- what the
10  hypotheses that you started with?  The
11  question that you asked?  Is there anything
12  that I missed when I read your report and
13  when I read your exhibit that tells me what
14  the beginning hypotheses was?
15     A.   Well, the hypotheses -- is it
16  explicitly stated here?  No.
17     Q.   Okay.  And is there anything in
18  this report that tells me whether or not you
19  revised your hypotheses during the course of
20  your investigation and your study?
21     A.   No.
22     Q.   Okay.
23          Is it fair to say that the
24  basis for the statement that ABC focuses only

Page 431

1  on rapid growth is in -- is based upon the
2  second paragraph of Tasha Polster's e-mail,
3  where it states "Investigators look at rapid
4  growth for a location and whether the order
5  triggers a threshold."
6          Do you see that?
7          The second sentence.
8      A.   I see that.  You asked a
9  question.
10     Q.   Yeah.
11     A.   Do you want me to answer
12  that did you read it correctly or do you want
13  me to answer the question?
14     Q.   You can answer the question.
15     A.   No.
16     Q.   Okay.  The e-mail that you
17  cited as support refers to rapid growth.
18  Your opinion, however, adds the word "only";
19  correct?
20     A.   Correct.
21     Q.   So Walgreens wasn't saying that
22  Amerisource's program only focused on rapid
23  growth.  That's something that you came up
24  with; correct?

Page 432

1      A.   No.
2      Q.   Okay.  Is it fair to say that
3  in the Walgreen e-mail, they do not limit the
4  rapid growth by the word "only"?
5      A.   Yes.
6      Q.   Is it also fair to say that
7  the -- that the basis for your opinion that
8  the focus of the Amerisource Order Monitoring
9  Program is on big accounts only is the
10  statement that is highlighted on your exhibit
11  that they really only focus on heavy hitters?
12     A.   Yes.
13     Q.   Okay.  And is it -- did you
14  write this or did one of your students write
15  this or did one of your staff members write
16  this opinion?
17     A.   I wrote this.
18          MS. CONROY:  Objection.
19     Q.   (BY MR. MCGARRIGLE)  And when
20  you were writing this opinion, did you
21  attempt to be very careful and be very
22  accurate?
23     A.   I tried to be as accurate as
24  possible.

Page 433

1      Q.   Okay.  Is it fair to say that
2  you took the sentence, "They really only
3  focus on heavy hitters" to mean a reference
4  to a customer?
5          Is that how you interpreted
6  this?
7      A.   Yes.
8      Q.   Yeah, because -- I want you to
9  be really careful here, because this opinion
10  is based on double hearsay, isn't it?
11          This is -- this is
12  Tasha Polster writing something based on a
13  discussion that she had with a Joe Tomkiewicz
14  of Amerisource; isn't that right?
15          MS. CONROY:  Objection.
16          THE WITNESS:  No.
17     Q.   (BY MR. MCGARRIGLE)  Okay.
18  This isn't a case where Ms. Polster is
19  talking -- is reporting back of her meeting
20  with Joe Tomkiewicz at Amerisource and
21  talking about the Order Monitoring Program?
22     A.   Not only, no.
23     Q.   With respect to the sentence
24  that you have highlighted in red, right after

Page 434

1 the sentence "They really only focus on the
2 heavy hitters" that you interpreted to mean
3 the customers, the next sentence says "OxyIR
4 30 MK combinations of cocktails with
5 hydrocodone and/or oxycodone advantage of our
6 system that we monitor CS or controlled
7 substance."
8         Are you familiar with opioid
9 cocktails? Are you familiar with opioid
10 cocktails?
11     A.    Mixtures? Yes.
12     Q.    What's a Trinity?
13     A.    That, I don't know.
14     Q.    What's a Las Vegas?
15     A.    That, I don't know.
16     Q.    Did you ever hear that a
17 Trinity opioid cocktail was a combination of
18 a mixture of either hydrocodone or oxycodone
19 and benzodiazepine and a muscle relaxer?
20     A.    No.
21         MS. CONROY:  Objection.
22     Q.    (BY MR. MCGARRIGLE)  You don't
23 know anything about that.  How about a Las
24 Vegas being a mixture of either hydrocodone

Page 435

1 or oxycodone and benzodiazepine?  Did you
2 ever hear that?
3         MS. CONROY:  Objection.
4         THE WITNESS:  No.
5     Q.    (BY MR. MCGARRIGLE)  Do you
6 think there's anything wrong with an order
7 monitoring system that takes opioid cocktails
8 that are used out on the street and looks at
9 combinations when orders are coming in of
10 both an opioid with benzo?  Do you think
11 there's anything wrong with a system that
12 looks at that?
13         MS. CONROY:  Objection.
14         THE WITNESS:  That's certainly
15     something that should be looked at.
16     Q.    (BY MR. MCGARRIGLE)  So you're
17 not being critical of the ABC Order
18 Monitoring Program that is focusing and
19 looking at cocktail combinations, are you?
20     A.    I'm not criticizing that part
21 of the sentence.  Correct.  I'm criticizing
22 the first part of the sentence.
23     Q.    Right.  And that's because you
24 misunderstood what Ms. Polster was talking

Page 436

1 about when she was talking about the heavy
2 hitters.  She's not talking about customers.
3 She's talking about drugs and drug
4 combinations, oxy, hydro, Trinities.
5     A.    No, that's exactly what I
6 interpreted.
7         MS. CONROY:  Objection.
8     Q.    (BY MR. MCGARRIGLE)  Oh.  Okay.
9 So now you agree with me that the heavy
10 hitter reference that's being made is not to
11 heavy hitter customers, not big customers,
12 not major customers, but in fact is a
13 reference to the drugs that are -- that are
14 the more powerful opioids that have been
15 abused; is that your testimony?
16     A.    No.  This reference to heavy
17 hitters is to OxyIR, a combination of
18 cocktails with hydrocodone, and/or oxycodone.
19     Q.    Okay.  So you agree with me
20 that the reference to heavy hitters refers to
21 the drug; correct?
22     A.    In that section, that's
23 correct.
24     Q.    Okay.  And you've inserted the

Page 437

1 word, in your opinion, "only rapid growth."
2 Isn't that correct?
3         MS. CONROY:  Objection, asked
4     and answered.
5     Q.    (BY MR. MCGARRIGLE)  I'm happy
6 with the answer.
7         Let's talk to -- in coming up
8 with this opinion, being critical of ABC's
9 Order Monitoring Program, did you -- can you
10 tell me what the OMP is for ABC?
11     A.    No.
12     Q.    Is that just too many letters
13 to deal with?  Do you want me to break it
14 down?
15     A.    Go ahead.
16     Q.    All right.  Order Monitoring
17 Program.
18     A.    Right.
19     Q.    Do you know Amerisource's Order
20 Monitoring Program?
21     A.    Do I know how --
22     Q.    Do you know -- can you give me
23 the details of it?
24     A.    They do it.

Page 438

1  Q.   Yes.
2  A.   No.
3  Q.   Do you --
4  A.   It's changed over time.  So
5  you've got to give me a time.  But I don't
6  know what -- as I sit here today without
7  reviewing it for any period of time.
8  Q.   For any of the periods of time.
9  Do you know how they -- how the Amerisource
10 Order Monitoring Program calculates
11 thresholds?
12      That's a yes, no?
13 A.   Do you mean at any point in
14 time?
15 Q.   Now.  Can you tell me that?
16 A.   No.
17 Q.   Can you tell me, Doctor, can
18 you tell me if you are aware that under the
19 Order Monitoring Program, the focus is on
20 looking at all sales, whether the sales come
21 from a small, a medium, or a large customer?
22 Do you know that?
23 A.   That's not what this says.
24 Q.   Well, this is coming from

Page 439

1  Walgreens, right?
2  A.   That's a Walgreens memo based
3  on a meeting with Amerisource.
4  Q.   Now, I want you to take a look
5  at another document.
6      This will be -- looking at your
7  report --
8  A.   Did you mark this?
9  Q.   That was -- that was marked and
10 given --
11     MR. MCGARRIGLE:  Let's make
12     that 30 and that 30A.
13     (Whereupon, Deposition Exhibit
14     Egilman 30, Opinion- AmerisourceBergen
15     ("ABC") was light on order monitoring.
16     The ABC focus is only on rapid growth,
17     not steady sales  Focus on big
18     accounts only for suspicious order
19     monitoring, was marked for
20     identification.)
21     (Whereupon, Deposition Exhibit
22     Egilman 30A, Opinion-
23     AmerisourceBergen ("ABC") was light on
24     order monitoring.  The ABC focus is

Page 440

1  only on rapid growth, not steady sales
2  Focus on big accounts only for
3  suspicious order monitoring, with
4  revisions, was marked for
5  identification.)
6  Q.   (BY MR. MCGARRIGLE)  All right.
7  Doctor, look at your report, page 80,
8  paragraph 7121.  "Opinion.  Amerisource
9  Bergen wanted to low key" -- in
10 parenthesis -- "hide its association with
11 pain care forum, PCF."
12      Do you see that?
13 A.   I do.
14 Q.   And in support of that, you
15 cite us to Exhibit B121.  I'll have that
16 marked as Exhibit 31.
17     (Whereupon, Deposition Exhibit
18     Egilman 31, Opinion-AmerisourceBergen
19     ("ABC") wanted to 'low key' (HIDE) its
20     association with Pain Care Forum
21     ("PCF") with attachments
22     PPLP004210521-4210523,
23     PPLP004279424-4279425, PPLP004303453,
24     PPLP004303456-4303457,

Page 441

1  PPLPC018001477198-1477200,
2  PPLPC022000926958-22000926959, was
3  marked for identification.)
4  Q.   (BY MR. MCGARRIGLE)  Did either
5  your student or your staff member write this
6  opinion?
7  A.   No.
8      MS. CONROY:  Objection.
9  Q.   (BY MR. MCGARRIGLE) Do you have
10 a corresponding exhibit and has it changed or
11 does it have any notes or modifications on
12 it?
13     MS. CONROY:  There are no notes
14     or modifications.
15 Q.   (BY MR. MCGARRIGLE)  Okay.  So
16 it's clean, and you haven't changed your
17 opinion; correct?
18 A.   No.
19 Q.   And in this, you're actually --
20 is this one or two opinions?  Is this an
21 opinion, 1, that AmerisourceBergen is
22 associated with a pain care forum, and 2,
23 it's trying to hide that association?
24     MS. CONROY:  Do you have a copy

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1  of the exhibit for me?
2       MR. MCGARRIGLE:  Probably not.
3       There you go.
4       MS. CONROY:  Thank you.
5       THE WITNESS:  Two --
6       I think --
7       Q.    (BY MR. MCGARRIGLE)  The
8  question is --
9       A.    I think it could be either 1 or
10  2.
11      Q.    Okay.
12      And the basis for this opinion,
13  in primary part, your best document is this
14  low key memo exchange between Rita Norton of
15  Amerisource and Burt Rosen; is that correct?
16      MS. CONROY:  Objection.
17      THE WITNESS:  Correct.
18      Q.    (BY MR. MCGARRIGLE)  Do you
19  know if either Mr. Rosen or Ms. Norton were
20  deposed in this litigation?
21      A.    I think Rosen was.
22      Q.    Did you read his deposition?
23      A.    I can't recall.  It's possible.
24      Q.    Do you recall anything about

Page 443

1  his deposition with respect to this
2  January 31st, 2008 e-mail exchange with
3  Ms. Norton?
4       A.    No.
5       Q.    Do you know if Ms. Norton was
6  deposed in that case?
7       A.    That, I don't know.
8       Q.    Were you interested at all in
9  trying to figure out just what the heck this
10  e-mail exchange really meant to see whether
11  or not they were ever deposed on it?
12      MS. CONROY:  Objection.
13      THE WITNESS:  I was pretty sure
14  they weren't deposed on it.
15      Q.    (BY MR. MCGARRIGLE)  Well,
16  whatever, Mr. -- I will tell you, and I'll
17  represent to you that -- I want you to assume
18  that Ms. Norton was in fact deposed.
19      A.    That, I understand.  But
20  whether she was deposed on this topic, I
21  don't think so.
22      Q.    Did you ever ask your students
23  or your staff members to go review
24  Mr. Rosen's deposition testimony or

Page 444

1  Ms. Norton's deposition testimony before you
2  came up with the opinion that ABC was
3  associated with the pain care forum and
4  really wanted to hide that association?
5       Did you do that?
6       A.    Rosen, I think I read.  Not
7  Norton.
8       Q.    Okay.  Not Norton.
9       In fact, a large part of your
10  opinion to hide is based on the fact that
11  Ms. Norton used the word "low key"; correct?
12      A.    Correct.
13      Q.    Among your many specialties and
14  areas of expertise, do you include the
15  English language?
16      It's not meant to be a joke.
17  Do you include the English language as an
18  area where you're an expert.
19      A.    I think I'm fluent in English.
20      Q.    All right.  What definition did
21  you use to equate the word "low key" with the
22  word "hide"?
23      A.    I didn't get a dictionary
24  definition.

Page 445

1       Q.    Why did you use the word
2  "hide"?  "Hide" sounds sinister.  It sounds
3  like you did something wrong and you're
4  trying to hide something.  Is that what you
5  were trying to imply in your opinion?
6       A.    Something sinister?
7       Q.    Yeah.
8       A.    No.  Just stating a fact.
9       Q.    People that hide usually are
10  trying to cover up something, aren't they?
11      A.    Not necessarily.
12      Q.    Do you know the definition of
13  low key means laid back?  It means not
14  elaborate, not showy, not intense,
15  restrained.  Low profile.  Relaxed.
16  Easygoing.  Calm.
17      Do you accept those definitions
18  of the word "laid back"?
19      Do you accept those
20  definitions --
21      A.    Sure.
22      Q.    -- of the word "laid back"?
23      A.    Sure.
24      Q.    What I don't see as the

Page 446

1 definition of laid back, however, is the word
2 "hide."
3     A.    I don't know.  I haven't
4 looked.
5     Q.    Isn't this really, this e-mail
6 exchange that you're basing this whole
7 opinion on, isn't it an e-mail exchange where
8 it's simply they were setting up a meeting
9 and Ms. Norton said -- a meeting to discuss
10 the possibility of being involved with the
11 forum, and Ms. Norton said, "I want to keep
12 this informal?  I want this to be laid back?"
13        Isn't that a fair reading of
14 what was going on there?
15        MS. CONROY:  Objection.
16        THE WITNESS:  No.
17     Q.    (BY MR. MCGARRIGLE)  I want you
18 to assume that Ms. Norton did testify and in
19 fact was questioned about this very document
20 in her testimony, and she said that meeting
21 in fact took place.  And following the
22 meeting with Ms. Norton, they decided that
23 they didn't want to join the forum and in
24 fact have never been a member of the forum.

Page 447

1        Assuming that to be true, that
2 ABC not only didn't hide their association
3 with the forum, but have never been
4 associated with the pain care forum, would
5 that change your opinion expressed in this
6 exhibit?
7     A.    No.
8     Q.    So despite the record testimony
9 that the client -- that ABC has never been
10 associated with the pain care -- the pain
11 care forum, you still maintain and still it's
12 your expert opinion that not only is ABC
13 associated with the pain care forum, but it's
14 hiding it; correct?
15     A.    No.
16     Q.    Okay.  What is your opinion?
17     A.    That they wanted to hide its
18 association with the pain care forum, and
19 they didn't join the pain care forum, if what
20 you said is true.
21     Q.    But you don't know that until
22 today; correct?
23     A.    Correct.
24     Q.    And it doesn't change your

Page 448

1 opinion even though you've now found out new
2 information; correct?
3     A.    Doesn't change the opinion that
4 they didn't want to be associated publicly
5 with the pain care forum.
6     Q.    You also cite six other
7 documents in this exhibit to support your
8 view that back in 2008, ABC was associated
9 with the pain care forum and was trying to
10 hide that.
11        Am I correct?
12     A.    Where are you talking?
13     Q.    There's references to other
14 documents in the exhibit.
15     A.    In this exhibit?
16     Q.    Yes.
17        Were you aware of that?
18     A.    All I have in this --
19     Q.    What about in your folders back
20 there because I'm sure they have this in
21 there.
22     A.    Let's see that.
23     Q.    Could you -- did you have a
24 chance to look at those?

Page 449

1     A.    I've got it.
2     Q.    They should be the exhibits.
3     A.    I've got it.
4     Q.    So in support of this opinion
5 that in 2008, ABDC was associated with the
6 pain care forum and was trying to hide it,
7 you say six documents dated July 2010, two
8 years after this e-mail, 2012, four years
9 after the e-mail, three of them dated 2016,
10 which was eight years after the e-mail, and
11 2017, nine -- almost nine years after the
12 e-mail, how desperate were you to support
13 this opinion by using documents that occurred
14 almost a decade after this supposed event?
15        MS. CONROY:  Objection.
16        THE WITNESS:  Not at all.
17     Q.    (BY MR. MCGARRIGLE)  Do any of
18 those documents, any of those six documents
19 even have the name "Amerisource" on them?
20     A.    Let's see.
21        MS. WELCH:  Counsel, if you're
22 not done, we need to take a break.
23        MS. CONROY:  We're in the
24 middle of an answer here.

Page 450

1     MS. WELCH: Sorry, I thought he
2  had answered it.
3     Q.  (BY MR. MCGARRIGLE) I want you
4  to assume, Doctor -- I'll help you out a
5  little bit because we're pressed for time.
6  There's 110 names on that e-mail, not one
7  from Amerisource.
8     A.   On the cover, you mean?
9     Q.   Yes.
10     A.   Well, I'm looking.
11     [Document review.]
12     THE WITNESS: Well, this is
13  a -- first of all, it's an HDMA.net
14  document.  So it's an HDMA document of
15  which Amerisource was a member.
16     The side e-mail also refers to
17  HDMA testimony, of which
18  AmerisourceBergen was a member.
19     Q.  (BY MR. MCGARRIGLE) Well,
20  that's not your opinion.  Your opinion isn't
21  that HDMA was trying to hide their
22  association with the forum, that Amerisource
23  was.  Correct?
24     A.   Let me just see what the

Page 451

1  question was before you interrupted the
2  answer.
3     [Document review.]
4     THE WITNESS: Well, this says
5  HDMA -- this is referring to McKesson
6  joining the pain care forum.
7     Bert Rosen says, if you're a
8  member of HDMA, you're already a
9  member of the pain care forum.
10  AmerisourceBergen was a member of
11  HDMA, so according to Bert Rosen, they
12  were members of the pain care forum
13  through their membership in HDMA.  And
14  AmerisourceBergen is on the next
15  document in an e-mail; Norton, in
16  fact.
17     Q.  (BY MR. MCGARRIGLE) And that's
18  dated what date?
19     A.   2017.
20     And this is -- I think
21  Bert Rosen acting in his role as the pain
22  care forum lobbyist.
23     [Document review.]
24     That's it.

Page 452

1     MR. MCGARRIGLE: And that's it
2  for me.  Thanks.
3     THE VIDEOGRAPHER: Going off
4  the record.  The time is 7:43 p.m.
5     (Proceedings recessed at
6  7:43 p.m.)
7     --o0o--
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 453

1            CERTIFICATE
2     I, DEBRA A. DIBBLE, Registered
   Diplomate Reporter, Certified Realtime
3  Reporter, Certified Realtime Captioner,
   Certified Court Reporter and Notary Public,
4  do hereby certify that prior to the
   commencement of the examination, DR. DAVID
5  EGILMAN was duly sworn by me to testify to
   the truth, the whole truth and nothing but
6  the truth.
7     I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
      I DO FURTHER CERTIFY that pursuant
11 to FRCP Rule 30, signature of the witness was
   not requested by the witness or other party
12 before the conclusion of the deposition.
13     I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
14 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
15 employee of such attorney or counsel, and
   that I am not financially interested in the
16 action.
17
18
19
   _____
20 DEBRA A. DIBBLE, RDR, CRR, CRC
   NCRA Registered Diplomate Reporter
21 NCRA Certified Realtime Reporter
   Certified Court Reporter
22
23 Dated: 1 May 2019
24

## Page 454

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the
6   appropriate space on the errata sheet for any
7   corrections that are made.
8        After doing so, please sign the
9   errata sheet and date it.
10       You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14       It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of receipt
17  of the deposition transcript by you.  If you
18  fail to do so, the deposition transcript may
19  be deemed to be accurate and may be used in
20  court.
21
22
23
24

## Page 456

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4        I, DAVID S. EGILMAN, M.D., MPH, do
   hereby certify that I have read the foregoing
   pages and that the same is a correct
5   transcription of the answers given by me to
   the questions therein propounded, except for
6   the corrections or changes in form or
   substance, if any, noted in the attached
7   Errata Sheet.
8
9
10
11
12  _____

    DAVID S. EGILMAN, M.D., MPH          DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  _____
20  Notary Public
21
22
23
24

## Page 455

ERRATA

1
2   Page  LINE  CHANGE
3   ____  ____  _____
4         REASON: _____
5   ____  ____  _____
6         REASON: _____
7   ____  ____  _____
8         REASON: _____
9   ____  ____  _____
10        REASON: _____
11  ____  ____  _____
12        REASON: _____
13  ____  ____  _____
14        REASON: _____
15  ____  ____  _____
16        REASON: _____
17  ____  ____  _____
18        REASON: _____
19  ____  ____  _____
20        REASON: _____
21  ____  ____  _____
22        REASON: _____
23  ____  ____  _____
24        REASON: _____

## Page 457

LAWYER'S NOTES

1
2
3   page  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____