1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
2                EASTERN DIVISION

3    IN RE: NATIONAL        )   MDL No. 2804
     PRESCRIPTION OPIATE    )
4    LITIGATION,            )   Case No.
                            )   1:17-MD-2804
5                           )
     THIS DOCUMENT RELATES TO )  Hon. Dan A.
6    ALL CASES              )   Polster
                            )

7

8                   __ __ __
9           Friday, April 26, 2019
                    __ __ __
10

       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11             CONFIDENTIALITY REVIEW
                    __ __ __
12

13

14

15        Videotaped Deposition of DAVID S.
     EGILMAN, M.D., MPH, held at the Providence
16   Marriott Downtown, 1 Orms Street, Providence,
     Rhode Island, commencing at 9:08 a.m., on the
17   above date, before Debra A. Dibble, Certified
     Court Reporter, Registered Diplomate
18   Reporter, Certified Realtime Captioner,
     Certified Realtime Reporter and Notary
19   Public.
20

                    __ __ __
21

22

23         GOLKOW LITIGATION SERVICES
        877.370.3377 ph | fax 917.591.5672
24            deps@golkow.com

Page 459

APPEARANCES:

SIMMONS HANLY CONROY, LLC
BY: JAYNE CONROY, ESQUIRE
    jconroy@simmonsfirm.com
    ELLYN HURD, ESQUIRE
    ehurd@simmonsfirm.com
    RICK KROEGER, ESQUIRE
    (appearing telephonically)
    rkroeger@simmonsfirm.com
    SANFORD SMOKLER, ESQUIRE
    (appearing telephonically)
    ssmokler@simmonsfirm.com
    LAURA FITZPATRICK, ESQUIRE
    (appearing telephonically)
    lfitzpatrick@simmonsfirm.com
One Court Street
Alton, Illinois 62002
(618) 259-6621
Counsel for MDL Plaintiffs

MOTLEY RICE, LLC
BY: JENNA FORSTER, ESQUIRE
    jforster@motleyrice.com
    (appearing telephonically)
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
(843) 216-9241
Counsel for Summit County and
Plaintiffs

NAPOLI SHKOLNIK, PLLC
BY: SHAYNA E. SACKS, ESQUIRE
    shayna@napolilaw.com
360 Lexington Avenue
11th Floor
New York, New York 10017
Counsel for Cuyahoga County and
Plaintiffs

Page 461

JONES DAY
BY: TARA FUMERTON, ESQUIRE
    tfumerton@jonesday.com
77 West Wacker
Chicago, Illinois 60601-1692
(312) 782-1692
Counsel for Walmart

MARCUS & SHAPIRA, LLP
(appearing telephonically)
BY: PAUL MANNIX, ESQUIRE
    pmannix@marcus-shapira.com
301 Grant Street
35th Floor
Pittsburgh, Pennsylvania 15219-6401
(412) 338-4690
Counsel for HBC

KIRKLAND & ELLIS, LLP
BY: PRATIK K. GHOSH, ESQUIRE
    pratik.ghosh@kirkland.com
    DONNA WELCH, ESQUIRE
    donna.welch@kirkland.com
300 North LaSalle
Chicago, Illinois 60654
(312) 862-3671
Counsel for Allergan Finance, LLC

REED SMITH, LLP
BY: THOMAS J. McGARRIGLE, ESQUIRE
    tmcgarrigle@reedsmith.com
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8220
Counsel for AmerisourceBergen Drug
Corporation

Page 460

HOLLAND & KNIGHT, LLP
BY: MATTHEW DONOHUE, ESQUIRE
    matthew.donohue@hklaw.com
    JESSICA FARMER, ESQUIRE
    jessica.farmer@hklaw.com
800 17th Street N.W.
Suite 1100
Washington, DC 20006
(202) 469-5222
Counsel for Insys Therapeutics

COVINGTON & BURLING, LLP
BY: JENNIFER L. SAULINO, ESQUIRE
    jsaulino@cov.com
    GREGORY L. HALPERIN, ESQUIRE
    ghalperin@cov.com
    CLAYTON L. BAILEY, ESQUIRE
    cbailey@cov.com
One CityCenter
850 Tenth Street, NW
Washington DC 20001-4956
(202) 662-5305
Counsel for McKesson

WILLIAMS & CONNOLLY, LLP
BY: A. JOSHUA PODOLL, ESQUIRE
    apodoll@wc.com
    (appearing telephonically)
725 Twelfth Street, NW
Washington D.C. 20005
(202) 434-5092
Counsel for Cardinal Health, Inc.

DECHERT, LLP
BY: TIMOTHY C. BLANK, ESQUIRE
    timothy.blank@dechert.com
    JENNA NEWMARK, ESQUIRE
    jenna.newmark@dechert.com
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
(212) 698-3500
Counsel for Purdue Pharma L.P.,
Purdue Pharma, Inc.

Page 462

MORGAN, LEWIS & BOCKIUS, LLP
BY: BRIAN M. ERCOLE, ESQUIRE
    brian.ercole@morganlewis.com
200 S. Biscayne Boulevard, Suite 5300
Miami, Florida 33131-2339
(305) 415-3416
Counsel for Teva Pharmaceuticals USA,
Inc.; Cephalon, Inc.; Watson
Laboratories, Inc.; Actavis LLC;
Actavis Pharma, Inc.; f/k/a Watson
Pharma, Inc.

ARNOLD & PORTER KAYE SCHOLER, LLP
(appearing telephonically)
BY: ANGEL TANG NAKAMURA, ESQUIRE
    Angel.Nakamura@arnoldporter.com
777 South Figueroa Street
44th Floor
Los Angeles, California 90017-5844
(213) 243-4000
Counsel for Endo Health Solutions
Inc.; Endo Pharmaceuticals Inc.; Par
Pharmaceuticals, Inc.; Par
Pharmaceutical Companies, Inc.
formerly known as Par Pharmaceutical
Holdings, Inc.

ROPES & GRAY, LLP
BY: JOSH GOLDSTEIN, ESQUIRE
    joshua.goldstein@ropesgray.com
800 Boylston Street
Boston, Massachusetts 02199-3600
(617) 951-7000
Counsel for Mallinckrodt

MORGAN, LEWIS & BOCKIUS, LLP
BY: ELISA P. MCENROE, ESQUIRE
    elisa.mcenroe@morganlewis.com
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5917
Counsel for Rite Aid

Page 463

```
1    LOCKE LORD, LLP
2    BY:  ANNA K. FINGER, ESQUIRE
         Anna.K.Finger@lockelord.com
3         (appearing telephonically)
     2200 Ross Avenue
4    Suite 2800
     Dallas, Texas 75201
5    (214) 740-8558
     Counsel for Henry Schein,
6    Incorporated and Henry Schein
     Medical Facility, Incorporated
7
     ZUCKERMAN SPAEDER, LLP
8    BY:  PAUL B. HYNES, ESQUIRE
         phynes@zuckerman.com
9    1800 M Street, Suite 1000
     Washington, DC  20036
10   Counsel for CVS Indiana LLC and CVS
     Rx Services, Inc.
11
12
     BARTLIT BECK LLP
13   BY:  BRIAN SWANSON, ESQUIRE
         brian.swanson@barlit-beck.com
14   54 West Hubbard Street
     Suite 300
15   Chicago, Illinois 60654
     Counsel for Walgreens
16
17   O'MELVENY & MYERS LLP
     BY:  AMY R. LUCAS, ESQUIRE
18       alucas@omm.com
     1999 Avenue of The Stars, 8th Floor
19   Los Angeles, California 90067
     (310) 246-6705
20   Counsel for Janssen and Johnson &
     Johnson
21
22
23
24
```

Page 464

```
1    BARNES & THORNBURG, LLP
     BY:   WILLIAM A. HAHN, II, ESQUIRE
2        william.hahn@btlaw.com
     11 South Meridian Street
3    Indianapolis, Indiana 46204
     (317) 231-7501
4    Counsel for H.D. Smith
5     ALSO PRESENT:
6    Jonathan Jaffe
7
8
9    APPEARING VIA VIDEO STREAM:
10   Kevin Reardon
     kevin.j.reardon@gmail.com
11
12   Jay Lichter
     jlichter@baronbudd.com
13
14   Charles Bachmann
     cbachmann@seegerweiss.com
15
16   Scott Siegel
     ssiegel@seegerweiss.com
17
18   VIDEOGRAPHER:
19   Bill Geigert
20
21        — — — —
22
23
24
```

Page 465

```
1            I N D E X
2    DAVID S. EGILMAN, M.D., MPH        PAGE
3      EXAMINATION BY MS. NEWMARK       544
       EXAMINATION BY MS. LUCAS         608
4      EXAMINATION BY MS. NAKAMURA      641
       EXAMINATION BY MR. ERCOLE        660
5      EXAMINATION BY MS. WELCH         696
       EXAMINATION BY MR. SWANSON       710
6      EXAMINATION BY MR. HYNES         753
       EXAMINATION BY MS. MCENROE       774
7      EXAMINATION BY MS. FUMERTON      785
       EXAMINATION BY MR. PODOLL        796
8      EXAMINATION BY MS. FINGER        811
       EXAMINATION BY MS. SAULINO       812
9
10          E X H I B I T S
11   No.       Description       Page
12   Egilman 32  Transmittal of      558
13       Advertisements and
         Promotional Labeling for
14       Drugs and Biologics for
         Human Use,
15       PPLP000665729-665769
16   Egilman 33  OTHER/OxyContin Tablets NDA  563
         #20-553,
17       PDD1501603661-1501603669
18   Egilman 34  3-8-96 letter to Diane   586
         Schnitzler with
19       attachments,
         PPLP000614833-614856, and
20       Opinion-This is the
         timeline of FDA activity
21       related to opioid
         addiction-it omits
22       regulatory capture
23
24
```

Page 466

```
1    Egilman 35  FDA and Opioids: What's a   607
2        Regulator to Do?  Pain Care
         Forum.  Douglas C.
3        Throckmorton, MD
         PowerPoint,
4        ENDO-OPIOID_MDL-02791998
5    Egilman 36  Opinion-Around 1997,    627
         Venture  members
6        Ortho-McNeil (Johnson &
         Johnson) and Purdue began
7        co-promoting Ultram SR,
         intended for the use of
8        more moderate pain
9    Egilman 37  Non-Malignant Pain    630
         Consensus Guidelines,
10       PKY181320029- 181320030
11   Egilman 38  Purdue Pharma, L.P.,    630
         Proposal, 8-26-98,
12       PKY183033731- 183033736
13   Egilman 39  Exhibit B.77, David S.   633
         Egilman Report Opiate
14       Litigation
15   Egilman 40  Exhibit B.136, David S.   652
         Egilman Report Opiate
16       Litigation
17   Egilman 41  Opinion-ENDO was either too  654
         cheap to add its opioid
18       labels to the 2014 PDR or
         completely irresponsible
19       for this failure to warn
         doctors of any data
20       concerning these dangerous
         drugs
21   Egilman 42  B1, B49, B50, B94, B310,   669
         B398, and B454
22
23   Egilman 43  B.6 Redweld      697
24   Egilman 44  B.123 Redweld     697
     Egilman 45  Tab 22, Exhibit 385   697
```

Page 467

1  Egilman 46  B.426 Redweld          697
2  Egilman 47  B.444 Redweld          697
3  Egilman 48  B.480 Redweld          697
4  Egilman 49  February 2010 e-mail chain.  698
       Subj: RE: Call this
5      Afternoon with attachments,
       Acquired_
6      Actavis_00367447-367452
       plus 3 more pages
7
   Egilman 50  B.487                  777
8
   Egilman 51  Opinion-Walmart helped  789
9      Actavis Market Opioids
10 Egilman 52  Opinion-Ohio Medicaid   810
       depended on the PBMs for
11     formulary drug
       selection/handwritten
12     notations "had its own
       committee"
13
14                  — — — — — —
15
16
17
18
19
20
21
22
23
24

Page 468

1            PROCEEDINGS
2        (April 26, 2019 at 9:08 a.m.)
3        THE VIDEOGRAPHER:  Good
4  morning.  We are back on the record.
5  Today's date is April 26, 2019, and
6  the time is 9:08 a.m.
7        This is the continuation of the
8  deposition of Dr. David Egilman.
9  Counsel will be noted on the
10 stenographic record.
11       Sir, I want to remind you you
12 are still under oath.
13       Counsel, please proceed.
14     DAVID S. EGILMAN, M.D., MPH,
15 having been previously duly sworn, was
16 examined and testified as follows:
17       DIRECT EXAMINATION
18 BY MR. BLANK:
19     Q.   Good morning, Dr. Egilman.  I
20 am Tim Blank with the law firm of Dechert.
21 You recognize that you're still under oath.
22 Yes?
23     A.   Yes.
24     Q.   Dr. Egilman, do you purport to

Page 469

1  be an expert on compliance with suspicious
2  order monitoring?
3      A.   By the definition of expert
4  that I gave yesterday?  Yes.
5      Q.   By any other definition?
6      A.   Give me another definition.
7      Q.   So by your definition, you
8  purport to be an expert in suspicious order
9  monitoring?
10     A.   By the definition that I gave
11 yesterday, I'm an expert in suspicious order
12 monitoring.  I'm not an expert in all aspects
13 of suspicious order monitoring, but I'm
14 familiar with any aspects of suspicious order
15 monitoring.
16     Q.   Are you familiar with any
17 regulations that govern the obligations with
18 respect to suspicious order monitoring?
19     A.   The Controlled Substances Act
20 and --
21     Q.   Which section of the Controlled
22 Substances Act?
23     A.   I don't recall.  The Marino
24 bill which modified the DEA's ability to

Page 470

1  enforce suspicious order monitoring
2  violations.
3        So I'm familiar with some of
4  the enforcement actions with respect to
5  suspicious order monitoring.
6      Q.   And in your expert report, you
7  criticize the performance of various
8  defendants, manufacturers, distributors,
9  others, with respect to their compliance with
10 suspicious monitoring obligations --
11 suspicious order monitoring obligations; is
12 that right?
13     A.   Yes.
14     Q.   What is the regulation that
15 governs suspicious order monitoring?
16     A.   Do you mean under the
17 Controlled Substances Act?
18     Q.   In the Code of federal
19 regulations.
20     A.   I don't know the number.
21     Q.   And do you consider yourself a
22 Drug Enforcement Agency expert?
23     A.   I know more than the layman
24 about that.  I know a lot about the DEA's

Highly Confidential - Subject to Further Confidentiality Review

Page 471

1 actions or inactions in the -- with respect
2 to the defendants in this case.
3     Q.   Do you have any experience with
4 respect to DEA law enforcement?
5     THE WITNESS: Do you have
6 the -- my LiveNote.
7     (Discussion off the record.)
8     A.   Do you mean personal
9 experience?
10     Q.   Yes.
11     A.   No.
12     Q.   Do you know how the DEA applies
13 its regulations concerning suspicious order
14 monitoring?
15     A.   I'm familiar with examples
16 in -- that I've read in its relation to the
17 companies involved in this case.
18     Q.   Do you know what data inputs
19 the DEA looks at and considers in applying
20 the SOMs, suspicious order monitoring
21 regulations?
22     A.   Some of them. They use the
23 ARCOS database to look at sales and
24 distribution. They also control the amount

Page 472

1 of basic raw materials that can come into the
2 country. Control the amount of sales which
3 relates to eventually downstream, the number
4 of narcotics that can be suspiciously
5 ordered.
6     The -- so yes. I can just say
7 yes.
8     Q.   How does the DEA assess the
9 data inputs to determine whether an order is
10 suspicious or not?
11     A.   I think that's changed over
12 time.
13     Q.   How do they do it?
14     A.   Well, they do it a variety of
15 ways. One way is they rely on reports from
16 companies about suspicious order monitoring.
17 Another is they can look at the database that
18 they have of orders over time and location.
19     They also get reports from the
20 field from a variety of law enforcement
21 agencies, press reports, which then can
22 trigger investigations about suspicious order
23 monitoring.
24     Q.   Are you aware of any -- any

Page 473

1 calculations that the DEA performs to
2 determine whether an order is suspicious?
3     MS. CONROY: Objection.
4     THE WITNESS: Well, I think
5 they compare -- yes.
6     Q.   (BY MR. BLANK) And what are
7 you aware of in that respect?
8     A.   Well, they compare orders over
9 time to different -- by different
10 distributors to different locations.
11     Q.   How do they do that?
12     A.   It's different. It's changed
13 over time.
14     Q.   How do they currently do it?
15     A.   That, I don't know.
16     Q.   When did it last change?
17     A.   That, I don't know.
18     Q.   How did they do it the last
19 time you knew how they did it?
20     A.   They set a base and they look
21 for overage over that base by some standard
22 increase over time.
23     Q.   And do you know what that
24 standard increase is?

Page 474

1     A.   No. It's changed over time.
2     Q.   Are you familiar with the
3 algorithm that is used to detect suspicious
4 orders?
5     A.   No.
6     MS. CONROY: Objection.
7     Q.   (BY MR. BLANK) Do you know how
8 any of the defendants in this case implement
9 their suspicious order monitoring practices?
10     A.   Yes.
11     Q.   Have you spoken to any of the
12 defendants in this regard?
13     A.   No. I didn't know I was
14 allowed to. But I would be glad to.
15     Q.   Have you ever consulted for the
16 Drug Enforcement Agency?
17     A.   No.
18     Q.   Have you ever worked for any
19 entity in the capacity of reviewing standard
20 suspicious order monitoring --
21     A.   No.
22     Q.   -- practices?
23     A.   No. Sorry.
24     Q.   Have you ever assisted anybody

Page 475

1　in developing a suspicious order monitoring
2　system?
3　　A.　No.
4　　Q.　Have you ever assisted anybody
5　in interpreting regulations relating to SOMs?
6　　A.　No.
7　　Q.　What are the U.S. Code sections
8　that apply to SOMs?
9　　A.　I do not know.
10　　Q.　What are the specific
11　requirements with respect to manufacturers?
12　　A.　Manufacturers are responsible
13　to report suspicious orders.  There's no
14　specific delineation, as I understand it, for
15　how that's done.
16　　Q.　Have you reviewed DEA guidance
17　on SOM policies?
18　　A.　Yes.
19　　Q.　When?
20　　A.　Over the last several months.
21　　Q.　Which ones?
22　　A.　I don't recall.
23　　Q.　Do you reference them in your
24　report?

Page 476

1　　A.　I don't think so.
2　　Q.　By being --
3　　A.　Well, they are referenced in --
4　　　　In the report, as you know, I
5　summarize the -- and then I thought provided
6　to the Department of Justice, violations of
7　suspicious order monitoring rules by many of
8　the companies, and some of that information
9　was included in the DOJ decisions.
10　　Q.　Yeah, I'm talking about DEA
11　guidance on SOM policies.
12　　A.　Right.
13　　Q.　Okay.  And then tell me once
14　again, because I can't recall if you told me
15　already.  What is the basis for your claim to
16　be an expert on whether any of these
17　defendants are complying with their SOM
18　obligations?
19　　A.　I used the methodology
20　explained in my report to review the
21　documents, to look at that issue.  And I
22　examined, for example, the violations of SOM
23　procedures, e-mails, other documents, and
24　made conclusions about SOM violations based

Page 477

1　on statements made by company officials in
2　e-mails and memos, and in some cases,
3　deposition testimony.  And the compliance
4　enforcement actions of the DEA.
5　　Q.　But just because you did that
6　doesn't make you an expert.  I want to know
7　what makes you an expert.
8　　　MS. CONROY:  Objection.
9　　　THE WITNESS:  Okay.  I'm
10　telling you that what I just said
11　makes me an expert by my definition of
12　an expert.  Very few people,
13　independent of the companies, have
14　been able to review the e-mails,
15　communications, documents, and detail
16　related to the company's lack of
17　adequate enforcement of suspicious
18　order monitoring rules, regulations,
19　procedures.  So that means I know more
20　about it than a layman.  And that
21　means -- and I can explain it to a
22　layman.
23　　　So by my definition of an
24　expert, which may be different than

Page 478

1　your definition of an expert, that is
2　my expertise.
3　　Q.　(BY MR. BLANK)  Did anybody
4　except the plaintiffs in this case ever ask
5　you for your expert opinion on SOM
6　compliance?
7　　　MS. CONROY:  Objection.
8　　　THE WITNESS:  No.
9　　Q.　(BY MR. BLANK)  Doctor Egilman,
10　did you do anything to prepare for your
11　deposition today?
12　　A.　Yes.
13　　Q.　And yesterday?
14　　A.　Yes.
15　　Q.　What did you do?  Specifically
16　to prepare for the deposition.
17　　A.　I reread the report.  Took
18　notes.  Made notes on them.
19　　　I spent a couple days with the
20　plaintiff lawyers two days before the
21　deposition.
22　　Q.　Which -- when did you meet with
23　the plaintiffs' lawyers?
24　　A.　On Tuesday and Wednesday.

Page 479

1 Q. Full days?

2 A. Five, six hours each day.

3 Q. Where?

4 A. Here.

5 Q. Where exactly? In this hotel?

6 A. In this hotel.

7 Q. Who was present?

8 A. Different people different

9 days. Ed Wallace the first day. Jayne

10 Conroy the second day. Ellyn Hurd both days.

11 Erin Dickinson the first day. Dave Buchanan

12 the second day. Jonathan Jaffe.

13 Q. Were they all lawyers?

14 A. Mr. Jaffe is not a lawyer.

15 Q. So you met with five lawyers

16 and Mr. Jaffe?

17 A. Yes.

18 Q. Anybody else?

19 A. That's all I can recall. There

20 may have been other lawyers whose names have

21 escaped.

22 Q. Were lawyers also on the phone

23 from time to time?

24 A. Not that I know of.

Page 480

1 Q. Were any of your staff or

2 student research assistants present?

3 A. They were in and out for some

4 part of the time, yes.

5 Q. They travel from your office to

6 this hotel to meet?

7 A. Right. Well, not -- they

8 schlepped a lot of material here, so yes.

9 Q. Did you make any notes with --

10 in connection with your preparation?

11 A. Yes.

12 Q. Have you shared those with us?

13 A. Yes.

14 Q. Are there any notes that you

15 have not shared with us from your

16 preparation?

17 A. I don't think so.

18 Q. When you were retained by the

19 plaintiffs in November of 2018, what were you

20 told about the litigation?

21 A. I don't recall specifically.

22 Q. How about generally?

23 A. Generally? I was told of the

24 lawsuits by cities and counties from around

Page 481

1 the country. And that they had sued

2 manufacturers and distributors for two

3 claims, the nuisance claim and the RICO

4 claim. And that the suit was based on the

5 harms, the cost of the harms done to the

6 plaintiffs in the case, costs of those harms.

7 And that's basically it. Generally.

8 Q. And who told you that?

9 A. Probably Ms. Conroy.

10 Q. Pardon?

11 A. Ms. Conroy.

12 Q. Anybody else?

13 A. Not in November.

14 Q. Which -- have you read the

15 complaint in the action in which you are

16 purporting to testify as an expert?

17 A. Yes.

18 Q. Which complaint have you read?

19 A. Read the complaint in this

20 case. I read the complaint in the

21 Massachusetts case. I read the complaint in

22 the New York case. I think I read some of

23 the complaint in the Oklahoma case.

24 Q. Did you read the entire

Page 482

1 complaint in this case?

2 A. Yes.

3 Q. Can you recall what it says in

4 that complaint about MS Contin?

5 A. No.

6 Q. Do you recall if it says

7 anything about MS Contin?

8 A. I think MS Contin was not

9 mentioned in the complaint.

10 Q. And I believe yesterday you

11 testified about many of the documents that

12 you reviewed in preparing your expert report.

13 Were you sent any documents specifically

14 relating to Cuyahoga or Summit counties?

15 A. Yes.

16 Q. Which ones?

17 A. Well, I read the depositions

18 through the Summit, Cuyahoga County people

19 responsible for the health plans. And I read

20 the deposition of the Medicaid person for the

21 state of Ohio with respect to the

22 formularies.

23 I gave you a Summit County --

24 or there was a Summit County PowerPoint.

Page 483

1  There were documents in the database that I
2  had that weren't sent to me, but they were in
3  the database. One of those is a Summit
4  County PowerPoint that I mentioned yesterday.
5  So there were other Summit Cuyahoga County
6  documents. For example, there is an ROI
7  squared document that deals with Cleveland
8  Clinic and KOLs in Cuyahoga County.
9        And I've got documents related
10 to physicians who've been accused of and
11 sometimes convicted of overprescribing. So I
12 had those documents.
13   Q.    Were -- those physicians were
14 from Summit or Cuyahoga counties?
15   A.    I think so.
16   Q.    Do you remember the names?
17   A.    No, but they're in the --
18 they're in my report.
19   Q.    Did you --
20   A.    Can I just finish my answer?
21       You asked me for all of the
22 documents that I reviewed.
23   Q.    Okay. You can -- I'm satisfied
24 with what you've said so far. I'd like to

Page 484

1  follow up on some of the things you've said.
2    A.    That's great. So my answer is
3  incomplete.
4    Q.    Well, when was -- have you ever
5  been to Ohio?
6    A.    Yes.
7    Q.    When was the last time you
8  went?
9    A.    To Ohio? Probably 2005, 2006
10 time period.
11   Q.    Have you -- and during that
12 trip to Summit -- or Ohio, did you go to
13 Summit or Cuyahoga County?
14   A.    Not on that trip.
15   Q.    Since you've been retained in
16 this case, which was November of 2018, you
17 have not been to Ohio; correct?
18   A.    That's correct.
19   Q.    Have you interviewed any
20 prescribers from Summit or Cuyahoga counties
21 in Ohio?
22   A.    Not since -- not in the last
23 several years.
24   Q.    Pardon?

Page 485

1    A.    Not in the last several years.
2    Q.    Have you ever interviewed any
3  prescribers from Summit or Cuyahoga counties
4  in Ohio?
5    A.    I believe so.
6    Q.    When?
7    A.    I can't recall the year, but I
8  attended a conference in Cleveland and there
9  were prescribers there and I spoke to them.
10   Q.    Did you -- yeah, do you recall
11 their names?
12   A.    No.
13   Q.    How long did you speak with
14 them for?
15   A.    I think it was a one-day
16 conference, so that day.
17   Q.    You spoke with them all day?
18   A.    Well, I was speaking to lots of
19 people from Cleveland at that time. They
20 were mostly physicians.
21   Q.    How many?
22   A.    I don't recall.
23   Q.    And did you -- did you discuss
24 opioid prescriptions with them?

Page 486

1    A.    I can't recall.
2    Q.    Since you've been retained in
3  this case, have you discussed with any
4  prescriber from Cuyahoga or Summit County
5  whether they saw any marketing messages by
6  any defendants in this case that they say
7  were misleading?
8    A.    No.
9    Q.    Have you ever had such a
10 discussion with any such prescribers for
11 Summit or Cuyahoga counties?
12   A.    No.
13   Q.    So I take it, then, you've
14 never asked any of such prescribers from
15 Cuyahoga or Summit County whether they've
16 relied on any marketing messages by any of
17 the defendants in this case in making
18 prescriptions decisions; correct?
19   A.    No.
20   Q.    That's incorrect?
21   A.    Correct.
22   Q.    Have you ever asked or spoken
23 with any prescribers from Cuyahoga or Summit
24 counties whether they wrote any medically

Highly Confidential - Subject to Further Confidentiality Review

Page 487

1 unnecessary opioid prescriptions for anyone
2 in either of those two counties based on
3 misleading marketing messages?
4     MS. CONROY: Objection.
5     THE WITNESS: Do you mean
6 personally asked?
7 Q. (BY MR. BLANK) Correct.
8 A. No.
9 Q. Have you interviewed any
10 patients who received opioid prescriptions in
11 Cuyahoga or Summit County?
12 A. No.
13 Q. When you were retained in this
14 case, did you receive any summaries of any
15 type from plaintiffs' counsel?
16 A. Aside from the complaints? No.
17 Q. Well, the complaint's not a
18 summary. I meant a summary where a -- the
19 plaintiffs' lawyers have summarized issues or
20 summarized deposition testimony or summarized
21 documents for you.
22 A. Not that I can recall.
23 Q. Did you receive any medical
24 literature from plaintiffs' counsel?

Page 488

1 A. No.
2 Q. Have you received any summaries
3 of testimony from plaintiffs' counsel,
4 whether those summaries are verbal or
5 written?
6 A. We've discussed the testimony
7 given in the case, yes.
8 Q. What's the -- you discussed the
9 testimony you've given so far in this case?
10 A. Discussed the testimony? Have
11 I discussed the testimony that I gave
12 yesterday?
13 Q. No. Have you discussed with
14 plaintiffs' counsel the testimony given by
15 other witnesses in this case?
16 A. Yes.
17 Q. Which witnesses did you
18 discuss?
19 A. I think Rosen, Sade,
20 Kathe Sackler, Richard Sackler.
21     And some other testimony that I
22 think I cited in the report.
23 Q. What were you told --
24 A. We probably discussed that.

Page 489

1 Q. What were you told about
2 Rosen's testimony?
3 A. I don't recall.
4 Q. What were you told about Sade's
5 testimony?
6 A. I don't recall.
7 Q. What were you told about
8 Kathe Sackler's testimony?
9 A. I don't recall.
10 Q. What were you told about
11 Richard Sackler's testimony?
12 A. I don't recall.
13 Q. Just to confirm, you were not
14 given any written summaries of any of the
15 testimonies?
16 A. I got full depositions.
17 Q. Full transcripts but not
18 summaries from counsel?
19 A. Right.
20 Q. Dr. Egilman, are you familiar
21 with 21 CFR -- that's the Code of Federal
22 Procedure, Section 1301.74?
23 A. Not by number.
24 Q. So you don't know what that is?

Page 490

1 A. Not by number.
2 Q. That number doesn't ring a bell
3 with you?
4 A. The number doesn't ring a bell
5 to me.
6 Q. Dr. Egilman, would you agree
7 that chronic pain is a serious medical
8 condition?
9     MS. CONROY: Objection.
10     THE WITNESS: Yes and no.
11 Q. (BY MR. BLANK) Would you agree
12 that chronic pain affects millions of people
13 in the United States?
14 A. Probably, but I'm not sure.
15 Q. Would you agree that chronic
16 pain affects people in Summit County, Ohio?
17 A. Yes.
18 Q. Would you agree that chronic
19 pain affects people in Cuyahoga County, Ohio?
20 A. Yes.
21 Q. Do you agree that there are
22 risks associated with untreated chronic pain?
23 A. From the underlying disease
24 that causes the pain, yes.

Page 491

1    Q.    Do you agree that every patient
2  should be treated individually?
3    A.    No.
4    Q.    Do you agree that there is no
5  single treatment option that is appropriate
6  for every chronic pain patient?
7    A.    Yes.
8    Q.    Do you agree that it is
9  important for physicians to have a variety of
10  treatment options to choose from when
11  treating a medical condition?
12    A.    I answered that one yesterday,
13  and let me accept the same answer.  But I can
14  repeat --
15    Q.    I do recall you did answer that
16  yesterday.  I don't need to hear it again.
17        Do you agree that all
18  treatments for chronic pain have risks?
19    A.    No.
20    Q.    Do you agree that's the role of
21  the prescribing physician, to weigh risks and
22  benefits of any pain medication when treating
23  an individual patient?
24    A.    When they can.

Page 492

1    Q.    Do you agree that a physician
2  should use his or her best judgment when
3  deciding whether to prescribe a medication
4  for pain?
5    A.    I'm not sure.  It's too broad.
6  It includes all physicians.  Physicians have
7  different judgments.
8    Q.    Do you think some physicians
9  should not use their best judgment?
10    A.    I think some physicians don't
11  have good judgment.  I can't evaluate -- I
12  can't answer that question without, you know,
13  some physicians are addicted to opioids, for
14  example.  When you're addicted to opioids,
15  you lose good judgment.
16    Q.    Okay.
17    A.    You may use the best judgment
18  that you have, but because you're addicted to
19  opioids, your best judgment may not be
20  adequate for treating the patient.  So there
21  are -- it's a more complicated question than
22  just that answer would imply.
23    Q.    Sir, would you -- understood.
24  But you agree that a physician should use the

Page 493

1  best judgment that he or she has when
2  deciding whether to prescribe a medication
3  for pain; correct?
4    A.    No.  Same answer.
5    Q.    Whatever the best judgment of
6  that physician is, shouldn't that physician
7  use that best judgment?
8    A.    If you are an -- if you are an
9  opioid addict physician, right, I don't think
10  you should be using any judgment.  I don't
11  think you should be prescribing or
12  practicing.  Okay?
13        So best judgment, medium
14  judgment, low judgment doesn't matter.  Some
15  physicians are not -- because of their
16  vocation, their personal problems, other
17  medical issues, other issues, should not be
18  using any judgment, should not be
19  prescribing.
20    Q.    So for -- let's carve out those
21  physicians that you claim are incapable of
22  having appropriate judgment.  And of the
23  physicians that do have judgment, do you
24  agree they should use their best judgment

Page 494

1  when prescribing medicine for pain?
2        MS. CONROY:  Objection.
3        THE WITNESS:  I think it's too
4    vague a question for me, because I
5    don't know how to assess best judgment
6    for all physicians.
7    Q.    (BY MR. BLANK)  I'm not asking
8  you to.  I'm just asking you whether you
9  agree that the physicians who have judgment
10  should use the best of that judgment when
11  prescribing pain medications for their
12  patients.
13    A.    Sorry.
14        MS. CONROY:  Objection.
15        THE WITNESS:  It's a vague and
16    ambiguous question.
17        I have good judgment, but you
18    don't want me operating on your
19    coronary arteries.  No matter what my
20    judgment is, I shouldn't be doing
21    that.
22    Q.    (BY MR. BLANK)  You said
23  yesterday that you prescribed opioids to one
24  of your patients; correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 495

1    A.    In part.
2    Q.    You said yesterday, I believe,
3  that you prescribed opioids to one of your
4  patients who was an addict.  Correct?
5    A.    That's what I believed at the
6  time, yes.
7    Q.    Okay.  And were you using your
8  best judgment when you did that?
9    A.    Yes.  I was trying to get him
10  off the opioids.  I couldn't just stop them.
11  Put him in withdrawal.
12    Q.    Dr. Egilman, do you agree that
13  students in medical school learn that opioids
14  are addictive?
15    A.    When?
16    Q.    Ever.  In medical school.
17    MS. CONROY:  Objection.
18    THE WITNESS:  Do you mean
19    medical school now?  Or medical school
20    when I went to medical school?  Or
21    medical school when someone else went
22    to medical school in 1960?
23    Q.    (BY MR. BLANK)  Now.
24    A.    I don't think all of them do.

Page 496

1  I don't think it's a uniform part of the
2  curriculum, per se.
3    Q.    Did you?
4    A.    I had no lecture on opioid
5  addiction that I can recall in medical
6  school.
7    Q.    Did you learn it otherwise in
8  medical school?
9    A.    No.  I think I learned it
10  otherwise, not in medical school.
11    Q.    So you did not --
12    A.    I did not in medical school.
13    Q.    So you did not learn in medical
14  school that opioids are addictive?
15    A.    No.  I learned it was -- I knew
16  opioids were addictive before I went to
17  medical school.  I didn't have a lecture on
18  opioid addiction in medical school that I can
19  recall.
20    Q.    Dr. Egilman, are you a pain
21  management specialist?
22    A.    I manage patients with pain.
23  That's what I've done my whole life.
24    Q.    Are you a pain management

Page 497

1  specialist in your view?
2    A.    I manage patients with pain all
3  the time.
4    Q.    Are you a specialist in that
5  field?  "Yes" or "no"?  Or I don't know?
6  Which of those?
7    A.    Do you want a "yes" or "no"?
8  Yes, I manage patients with pain all the
9  time.
10    Q.    Okay.  Listen to my question,
11  then.  Are you a pain management specialist?
12    A.    Yes.  I manage pain all the
13  time in my practice.  When I was practicing.
14    Q.    Are you an addiction expert?
15    A.    Yes.
16    Q.    On what basis?
17    A.    I've taken -- I've learned
18  about addiction in my residency and training.
19  I've treated patients who were addicted.
20  I've developed programs to treat addiction.
21  I've treated a lot of patients with
22  addiction.  I had to get them unaddicted.  On
23  that basis.  And I've studied addiction and
24  addiction issues relatively intensively since

Page 498

1  the late 1990s.
2    Q.    Are you board certified?
3    A.    Yes.
4    Q.    In addiction?
5    A.    No.
6    Q.    Are you board certified in pain
7  management?
8    A.    No.
9    Q.    Are you a toxicologist?
10    A.    I practice toxicology.  I
11  evaluate toxicology as a part of occupational
12  environmental medicine.
13    Q.    Are you board certified?
14    A.    In toxicology?  I don't -- no,
15  I'm not.
16    Q.    What are you board certified
17  in?
18    A.    Internal and occupational
19  medicine.  In preventive occupational
20  medicine, and I'm board eligible in
21  preventive medicine.
22    Q.    Are you a board-certified
23  epidemiologist?
24    A.    There is no board in

Page 499

1 epidemiology.
2     Q.   Do you consider yourself a
3 regulatory expert?
4     A.   Yes.
5     Q.   On what basis?
6     A.   Well, I took two courses at the
7 Harvard Law School on regulations of
8 occupational environmental health.  That was
9 one course taught by Nick Ashford,
10 A-S-H-F-O-R-D.
11     And a second law school course
12 taught by him on environmental law and
13 regulation and all aspects of those.
14     I teach about FDA regulation in
15 my course.  I've published about FDA
16 regulation or lack thereof in published
17 papers.
18     I've testified in front of FDA
19 regulatory bodies.
20     Q.   More than once?
21     A.   Can I finish my answer before
22 you interrupt?
23     You're a lawyer.  You can cut
24 me off anytime you like, so -- according to

Page 500

1 the judge's rule, but you can just say you've
2 heard enough and I'll stop.
3     Q.   Are you close to finishing?
4     A.   I don't know.  Probably not.
5     Q.   Okay.  Did you testify -- then
6 I'll -- you -- I'll take what you've said so
7 far.
8     A.   Okay.  Then let me just put on
9 the record that the answer is incomplete.
10     Q.   How many times did you testify
11 before the FDA?
12     A.   I think two or three times.
13     Q.   When was the last time?
14     A.   The last time was 2013.
15     Q.   How long did you testify for?
16     A.   It was testimony by video, so
17 if I remember all the video and PowerPoints,
18 five or ten minutes.
19     Q.   And you included the transcript
20 in your report; correct?
21     A.   Yes.  And the PowerPoint that
22 went with it.
23     Q.   And it looked to me like your
24 testimony lasted maybe ten minutes?  Does

Page 501

1 that sound about right?
2     A.   Could be.
3     Q.   And I didn't see that you were
4 asked any questions.
5     A.   Well, I was in Grenada teaching
6 an occupational health course.  I wasn't at
7 the DFA meeting.  I sent them the testimony,
8 and it was played on a video, so.
9     Q.   It wasn't live?
10     A.   It was on the video.  I was
11 live in Grenada teaching at a medical school
12 when the testimony went on.
13     Q.   Was your testimony live or was
14 it recorded and then delivered to the FDA?
15     A.   I recorded it and submitted it
16 and it was played at the FDA hearing.
17     Q.   Are you currently employed?
18     A.   Yes.
19     Q.   By whom?
20     A.   Never Again Consulting.
21     Q.   Anybody else?
22     A.   Well, I teach at Brown, so
23 that's kind of -- that's an employment
24 contract, I guess.

Page 502

1     Q.   Who owns Never Again
2 Consulting?
3     A.   I do.
4     Q.   Anybody else own it?
5     A.   No.
6     Q.   Do you have W-2 employees?
7     A.   Do you mean do I issue W-2s to
8 people who work for me?
9     Q.   Yeah.
10     A.   Yes.
11     Q.   How many?
12     A.   10.  12.
13     Q.   And of any of the people that
14 assisted you in the preparation of your
15 report that you named yesterday, are those --
16 any of those W-2 employees?
17     A.   Yeah.  They get paid and we
18 issue W-2s to them.
19     Q.   Okay.  And how about the
20 students who assisted you?  You paid them;
21 correct?
22     A.   Yes.
23     Q.   Did you issue W-2s to them?
24     A.   We haven't -- it's not time to

Highly Confidential - Subject to Further Confidentiality Review

Page 503

1  issue W-2s. They were working in January and
2  late December. I don't think -- maybe -- I
3  don't think they got paid in December, so it
4  would have been next year.
5      Q.    Next year do you expect to
6  issue W-2s to them?
7      A.    I don't know. I assume so.
8      Q.    Do they --
9      A.    If they make less than 6 or
10 $700, we don't have to issue W-2s. But if
11 they make more than that, we do have to issue
12 W-2s. So it will depend how much money they
13 made.
14     Q.    Do you consider them to be your
15 employees?
16     A.    I consider them to be contract
17 workers who are working for they. I'm not
18 sure what the -- I direct what they do. I
19 think they would be considered part-time
20 employees while they're working for me, yes.
21     Q.    Yesterday you testified about
22 the hourly rates that you pay your employees
23 and these -- some of the students that work
24 for you. Is the amount that you pay them the

Page 504

1  same amount that you charge the plaintiffs?
2      A.    No, I charge the plaintiffs
3  much more than what I charge them because I
4  bill for my time.
5      Q.    No, but if you pay an employee
6  $40 an hour, what do you bill the plaintiffs?
7      A.    I don't know. Something more
8  than that.
9      Q.    How much more?
10     A.    I don't know. 60 or $70 an
11 hour, something like that.
12     Q.    So you have a 50 to 75 percent
13 markup on hourly rates?
14         MS. CONROY: Objection.
15         THE WITNESS: No.
16     Q.   (BY MR. BLANK) What's --
17         So you do mark up the hourly
18 rates. That is, you charge the plaintiffs
19 more for every hour that the students work
20 that you pay them; correct?
21         MS. CONROY: Objection.
22         THE WITNESS: No.
23     Q.   (BY MR. BLANK) If you pay a
24 student $40 an hour, what do you charge the

Page 505

1  plaintiffs?
2      A.    Students don't get paid $40 an
3  hour. Students get paid $20 an hour. My
4  full-time employees get paid about $40 an
5  hour sometimes.
6      Q.    Okay. But you mark up both;
7  correct?
8      A.    No. We haven't billed on the
9  students yet, so I don't think --
10        We'll probably --
11        I wouldn't call it a markup.
12 But do we charge exactly what they pay them
13 in a W-2? No because we pay benefits. I
14 give bonuses. When they -- we do a fixed
15 rate. So if they're working time and a half
16 or double time, then they're making 60, 70,
17 $80 an hour, plus benefits, which is another
18 20 percent.
19        Plus, for example, I take my
20 entire staff on vacations. That gets
21 covered. I pay bonuses to the staff. So all
22 in all, it's pretty much a wash. They're not
23 a major profit center for me.
24     Q.    What's your current title at

Page 506

1  Brown?
2      A.    Clinical professor, department
3  of family medicine.
4      Q.    And I can't remember if you
5  testified to this. Do you get paid by Brown?
6      A.    I get a library card, which is
7  probably worth about $50,000 to me. And when
8  I'm teaching a course in the school of public
9  health, they paid my parking.
10     Q.    Do you get tax on that $50,000
11 library card?
12     A.    I do not.
13     Q.    Do you currently have any
14 practicing privileges at any hospitals?
15     A.    No.
16     Q.    Do you have admitting
17 privileges at any hospitals?
18     A.    No.
19     Q.    Are you currently seeing any
20 patients at any hospitals?
21     A.    No.
22     Q.    Are you currently seeing any
23 patients anywhere?
24     A.    Right. We went over that

Highly Confidential - Subject to Further Confidentiality Review

Page 507

1  yesterday.  Do you want me to repeat that
2  testimony?
3      Q.    No.
4          What are the professional
5  organizations in which you are currently a
6  member?
7      A.    AMA, APHA, AHRP, a couple of
8  geological societies.  I have to look at my
9  CV to remember them all.
10     Q.    But that's where they're
11 listed?
12     A.    They're there.
13         I have my CV here someplace.
14     Q.    I have it too.  It's okay.
15 We'll get to that.
16         Do you consider yourself an
17 expert in marketing?
18     A.    Yes.
19     Q.    And do you consider yourself
20 specifically an expert in pharmaceutical
21 marketing?
22     A.    And device.  Medical marketing.
23     Q.    Medical marketing.  That's
24 pharmaceuticals and devices?

Page 508

1      A.    Correct.
2      Q.    And is that because you believe
3  you know more than the layperson in those
4  fields?
5      A.    That would be a beginning.
6  It's also because I've studied marketing
7  practices.  I've published peer-reviewed
8  papers on marketing practices.  I teach on
9  marketing practices.  I give lectures on
10 marketing practice at APHA and other
11 universities.  I've written book chapters on
12 marketing practices in I think two or three
13 books.
14         So there's a lot of different
15 bases for why I think I'm an expert on
16 marketing practices of pharmaceutical
17 companies.
18     Q.    Do you consider yourself an
19 expert in pharmaceutical labeling?
20     A.    Yes.
21     Q.    Do you consider yourself an
22 expert in warnings on such labels?
23     A.    Yes.
24     Q.    On what basis?

Page 509

1      A.    Well, I wrote two chapters in
2  the book "Handbook of Warnings and Risk
3  Communication."  And then all the other
4  things that I just said, which I will be glad
5  to repeat.  I've published in
6  peer-reviewed --
7      Q.    No need.
8      A.    Okay.  My answer is incomplete.
9  Go ahead.
10     Q.    No, I said no need to repeat
11 it, because you've referenced it.  You
12 referenced the two chapters.  Anything else
13 besides what you've already testified about?
14     A.    I've given talks on warnings
15 and risk communication.
16     Q.    Do you consider yourself an
17 expert in the drug approval process?
18     A.    Yes.
19     Q.    Do you know which government
20 agencies regulate drug approvals?
21     A.    Yes.
22     Q.    Which ones?
23     A.    FDA.
24     Q.    Any others?

Page 510

1      A.    Well, for some -- some --
2  depends what you consider drug, but Consumer
3  Product Safety Commission might regulate some
4  over-the -- some cosmetics, which can be
5  advertised as having medical benefits.
6  Generally they'd regulate them to say you
7  can't say that, so they regulate that.
8      Q.    Are you familiar with the new
9  drug application process at the FDA?
10     A.    Yes.
11     Q.    We will refer to that as NDA.
12 Is that all right?
13     A.    Yes.
14     Q.    Have you ever worked on a new
15 drug application with the FDA?
16     A.    No.
17     Q.    Have you ever worked with the
18 FDA on any drug approval?
19     A.    No.
20     Q.    Have you ever reviewed a new
21 drug application?
22     A.    For the FDA?
23     Q.    Yes.
24     A.    No.

Page 511

1    Q.   Have you ever been involved in
2  submitting an NDA?
3    A.   No.
4    Q.   Do you know what an NDA
5  submission entails?
6    A.   Yes.
7    Q.   What is required?
8    A.   Well, NDA submissions are
9  hundreds of boxes of material.  So you -- you
10 first of all, before the NDA process starts,
11 the company has to negotiate with the FDA the
12 kinds and quality and size of the studies
13 that are going to be done to get the drug
14 approved.  And that's a negotiated process.
15        Then there's usually three
16 levels of -- three levels of studies that are
17 done.  Some toxicity studies to start, then
18 level two studies, which would involve small
19 trials that might look for benefit, and then
20 the third level would be randomized
21 controlled trials, then you'd focus on
22 benefits.
23        Generally the organization
24 standards would say that those studies have

Page 512

1  to include at least 2 to 300 patients.  The
2  FDA generally requires two RCTs that are --
3  have a statistically significant result.  And
4  what's not required is that the company
5  doesn't have to turn over all of the studies.
6  The company may do 30 studies.  Of those
7  studies produce two that were positive and
8  just submit those two and not submit the
9  others.
10   Q.   I'm going to stop you here and
11 I'll note for the record that your answer is
12 not complete, because I want to move on to
13 the next question.
14        Do you agree that the FDA has
15 to approve the label for every drug?
16   A.   The label is negotiated, and
17 the approval is agreed to by the company and
18 the FDA.
19   Q.   But if the FDA doesn't approve
20 the label, it does not go on the packaging;
21 correct?
22   A.   If the FDA doesn't finally --
23 they generally -- the letter that --
24   Q.   It's a yes-or-no question.

Page 513

1        MS. CONROY:  Objection.
2    Q.   (BY MR. BLANK) Can you answer
3  it "yes" or "no"?
4    A.   No.
5    Q.   So there are labeled -- drug
6  labels on drug packaging that have not been
7  approved by the FDA in the United States?
8  Prescription drugs?
9    A.   There are prescription drugs
10 that when packaged and given to the patient
11 include information that's not been approved
12 by the FDA.
13        A lot of pharmaceutical
14 company -- a lot of pharmacies put their own
15 short version instructions on the label -- on
16 the packaging in the bag that the patient
17 gets.  That's not, as far as I understand,
18 approved by the FDA.
19   Q.   But the manufacturer's label is
20 approved by the FDA; correct?
21   A.   That is correct.  That wasn't
22 the question you asked.
23   Q.   I just asked it.
24   A.   That's correct.  I'm just

Page 514

1  saying it wasn't the question you asked
2  before.
3    Q.   And you understand that the FDA
4  regulates prescription drug promotion in this
5  country?
6    A.   Yes and no.
7    Q.   Have you communicated with
8  anyone at the FDA about Purdue?
9        MS. CONROY:  Objection.
10       THE WITNESS:  Aside from the
11 FDA presentation I gave?  No.
12   Q.   (BY MR. BLANK)  That was the
13 videotaped recording?
14   A.   Right.
15   Q.   Are you aware whether the FDA
16 has found that any manufacturer of any opioid
17 has committed fraud on the FDA with respect
18 to its labeling?
19   A.   Do you mean a labeling that
20 goes in the package?
21   Q.   Correct.
22   A.   No.
23   Q.   Have you ever done any work for
24 the Federal Trade Commission?

Page 515

1    A.   No.
2    Q.   Do you know what unbranded
3  promotion is?
4    A.   Yes.
5    Q.   Do you know whether the Federal
6  Trade Commission regulates unbranded
7  promotion?
8    A.   Do you mean of drugs?
9    Q.   Yes.
10   A.   Not that I can recall.
11   Q.   Have you ever worked for or
12 consulted with the Federal Trade Commission?
13   A.   No.
14   Q.   Have you ever been employed by
15 a pharmaceutical company?
16   A.   No.
17   Q.   Have you ever consulted for a
18 pharmaceutical company?
19   A.   Kind of, sort of.
20   Q.   Who?
21   A.   Confidential.
22   Q.   You can tell me.  We have a
23 protective order.
24   A.   It doesn't matter.  I don't

Page 516

1  want to disclose it.
2    Q.   Why not?
3    A.   Because it's confidential.
4    Q.   We have a protective order that
5  governs this deposition.
6    A.   Thank you.  Great.  I don't
7  want to disclose it.
8    Q.   What was the nature of the work
9  that you did?
10   A.   I don't want to discuss that
11 either.
12   Q.   Was it related to prescription
13 drugs for pain?
14   A.   No.
15   Q.   Was it related to opioids at
16 all?
17   A.   No.
18   Q.   When was it?
19   A.   Maybe five, six years ago.
20   Q.   How long did you consult for?
21   A.   Not long.
22   Q.   How long?
23   A.   I think two or three
24 conversations.

Page 517

1    Q.   Did you get paid?
2    A.   No.
3    Q.   Did you choose to end the
4  consultancy?
5    A.   I would say that it wasn't a
6  very formal consultancy, so.
7         There was an issue.  We
8  discussed it.  The issue was -- that was it.
9    Q.   Are you familiar with DDMAC?
10   A.   Yes.
11   Q.   What is or was DDMAC?
12   A.   The -- they're in charge of but
13 do not regulate in an effective manner
14 advertising of pharmaceuticals.
15   Q.   It's your opinion that they do
16 not effectively regulate pharmaceutical
17 advertising; is that right?
18       MS. CONROY:  Objection.
19       THE WITNESS:  That's certainly
20   my opinion, yes.
21   Q.   (BY MR. BLANK)  Did DDMAC
22 change its name?
23   A.   Well, the FDA changed its names
24 many times.  I don't know all of the names of

Page 518

1  that organization.
2    Q.   Okay.  So do you know what the
3  new name is?
4    A.   No.
5    Q.   Have you heard of the Office of
6  Prescription Drug Promotion?
7    A.   Yes.
8    Q.   Have you ever worked for DDMAC
9  or OPDP?
10   A.   No.
11   Q.   Have you ever spoken to anybody
12 at DDMAC?
13   A.   Yes.
14   Q.   How many times?
15   A.   That was what I discussed
16 yesterday during the deposition.  I went to a
17 meeting --
18   Q.   You don't need to repeat that.
19 Anything besides what you discussed
20 yesterday?
21   A.   I think that's it.
22   Q.   Have you reviewed any of
23 Purdue's submissions to the FDA regarding
24 pharmaceutical promotion?

Page 519

1    A.    Yes.
2    Q.    Which ones?
3    A.    I can't recall specifically.
4    Q.    Have you ever --
5    A.    Certainly the approval label,
6  and a variety of -- I mean, I have it in my
7  report.
8    Q.    Have you --
9    A.    I have it in the report, the
10 FDA letter sanctioning Purdue's marketing, so
11 those examples.  I've certainly reviewed
12 those.
13   Q.    I was asking about Purdue's
14 submissions.
15   A.    Well, those were submitted, I
16 think.  And then later on, the FDA read them
17 and found them to be in violation of their
18 rules and regulations.
19   Q.    Have you reviewed any other
20 manufacturer's submissions to the FDA
21 regarding pharmaceutical promotion?
22   A.    Yes.
23   Q.    Which defendants?
24        I'm sorry, which manufacturing

Page 520

1  defendants?
2    A.    I think I've seen them for
3  Endo, Insys, probably several others.
4    Q.    Have you done any research into
5  how DDMAC or OPDP reviews promotional
6  materials?
7    A.    Yes.
8    Q.    And what did your research
9  show?
10   A.    That they don't review them.
11 They -- the advertising promotion materials
12 get sent to DDMAC, and DDMAC, you know,
13 doesn't send them -- and we read this and
14 then we okay it.  They just filed it.  And
15 then they occasionally review.
16        But as they see things, for
17 example, at that meeting I had that some of
18 the DDMAC people commented in effect they
19 were just watching TV, and they saw some ads
20 that they thought were wrong and that
21 triggered an investigation.
22   Q.    Who was that?
23   A.    I don't remember the name of
24 the people, but I'm not done with my answer.

Page 521

1  You interrupted my answer.
2        Do you want me to stop the
3  answer?
4    Q.    No.
5    A.    Okay.  You just wanted to
6  interrupt the answer?  No problem.
7        Sometimes I can't tell whether
8  you just want to interrupt or whether you
9  want to stop.
10   Q.    I'll ask you to stop there and
11 your answer is incomplete because you're
12 taking way too long, and we don't have much
13 time for your 489 opinions in this case.
14        MS. CONROY:  Objection.  It was
15 a four-second stop.
16   Q.    (BY MR. BLANK)  Can you
17 describe the --
18   A.    Was that a question?
19        Did you just ask me a question?
20   Q.    I'm about to.
21   A.    Oh, okay.  You were just making
22 a gratuitous comment?  Go right ahead.
23   Q.    Can you just -- are you
24 familiar with the DDMAC review process of

Page 522

1  promotional materials?
2    A.    Yes.
3    Q.    Do you believe that they review
4  the promotional materials?
5    A.    No.  Generally not, maybe
6  occasionally.  They may take maybe a small
7  sample, but they don't look at all the ones
8  that get submitted.
9    Q.    Do you believe that they're
10 supposed to review the promotional materials?
11        MS. CONROY:  Objection.
12        THE WITNESS:  I don't think so.
13 I think they're -- they're authorized
14 to review them, but there's no
15 requirement in the law that they read
16 them all.
17   Q.    (BY MR. BLANK)  So do you know
18 for sure whether they're responsible for
19 reviewing promotional materials?
20   A.    Sure, they're responsible for
21 reviewing them, but that's different from
22 saying that they review them all.
23   Q.    Understood.
24        Have you ever reported any

Page 523

1  OxyContin promotional activities to the FDA
2  through the FDA Bad Ad Program?
3      A.   No.
4      Q.   Have you reported any other
5  opioid promotional activities to the FDA
6  through the FDA's Bad Ad Program?
7      A.   No.
8      Q.   Have you reviewed FDA guidance
9  on pharmaceutical promotion?
10     A.   Yes.
11     Q.   Which guidance?
12     A.   Do you mean by document number?
13     Q.   Yeah.
14     A.   I don't recall.
15     Q.   How about document type?
16     A.   I'm not sure what you mean by
17 that.
18     Q.   When did you last review such
19 guidance?
20     A.   I don't know.  Probably in the
21 last several months.
22     Q.   Have you reviewed any FDA
23 guidance on unbranded promotional materials?
24     A.   Yes.

Page 524

1      Q.   Which ones?
2      A.   I don't recall.  That was
3  longer ago.
4      Q.   Prior to your engagement in
5  this case?
6      A.   Oh, yeah.
7      Q.   What regulations apply to
8  promotion of prescription drugs?
9      A.   Do you mean by Code of Federal
10 Regulations numbers?
11     Q.   Correct.
12     A.   I don't know.
13     Q.   How about by name?
14     A.   By name?
15     Q.   Yeah.
16     A.   I don't know what the current
17 name is of those regulations.
18     Q.   Are you familiar with the
19 regulations that govern the distribution of
20 branded materials?
21     A.   I've read them in the past,
22 yes.
23     Q.   Okay.  Yeah.  Which -- which
24 regulations?

Page 525

1      A.   I don't recall.
2      Q.   You don't --
3      A.   I don't recall the number or
4  the name.
5      Q.   Are you familiar with the
6  regulations governing non-branded materials?
7      A.   Same thing.  I've read them.
8      Q.   Can't --
9      A.   I don't know the -- I don't
10 know the name or the number.
11     Q.   Are you familiar with how the
12 FDA enforces those regulations?
13     A.   Yes.
14     Q.   How do they do it?
15     A.   They generally don't do it.
16     Q.   Pardon?
17     A.   They generally don't do it.
18          Why don't we take a quick
19 break.
20          MR. BLANK:  Okay.
21          THE VIDEOGRAPHER:  Going off
22 the record at 10:21 a.m.
23          (Recess taken, 10:22 a.m. to
24     10:41 a.m.)

Page 526

1          THE VIDEOGRAPHER:  We are back
2     on the record at 10:42.
3      Q.   (BY MR. BLANK)  Thank you.
4  Dr. Egilman, I want to go back to an area we
5  touched on earlier today, because one of the
6  questions I asked I got -- I may have been --
7  misunderstood your answer or you may have
8  misunderstood my question, so I want to ask
9  it again.
10          And it relates to the questions
11 that I asked you about whether you had had
12 any conversations with any prescribers in
13 Cuyahoga or Summit County, Ohio.
14          And the question that I would
15 like to ask you is whether you have ever
16 spoken with any prescribers -- strike that.
17          Whether you ever asked any
18 prescribers in Cuyahoga or Summit counties
19 whether they wrote any medically
20 unnecessary -- strike that.
21          Have you asked any prescribers
22 from Cuyahoga or Summit County, whether
23 they've relied on any marketing messages by
24 any of the defendants in this case in making

Page 527

1  prescription decisions?
2      A.    No.
3      Q.    Now, I looked at your CV, and
4  you did not go to law school; is that
5  correct?
6      A.    I did not apply to law school.
7  I went -- I took two law school courses.
8      Q.    Do you consider yourself a
9  legal expert?
10     A.    Certain areas of the law, yes.
11     Q.    Do you consider yourself a
12  legal expert in spoliation?
13     A.    I know what it is.
14     Q.    Do you know what the legal
15  elements of spoliation are?
16     A.    It's different in different
17  states.
18     Q.    What is it in Ohio?
19     A.    That, I don't know.
20     Q.    What is it in Massachusetts?
21     A.    I do not know.
22     Q.    What is it in Rhode Island?
23     A.    I do not know.
24     Q.    Do you know what it is in any

Page 528

1  state?
2      A.    California.
3      Q.    The legal elements of
4  spoliation?
5      A.    I think so.
6      Q.    What are they?
7      A.    That's destroying documents
8  that should be preserved after you're on
9  notice that there may be a legal action.
10     Q.    So the notice is an important
11  part of any claim of spoliation?
12     A.    Well, in California, in some
13  places if you reasonably anticipate
14  litigation, whether or not there's been
15  specific notice or not, if you destroy
16  documents in anticipation of litigation, you
17  wouldn't need specific notice.
18         But, for example, a lawsuit
19  would be specific notice.
20     Q.    And do you know whether you're
21  being offered as a legal expert in this case?
22     A.    No.
23     Q.    To your knowledge, are you
24  being offered as a legal expert in this case?

Page 529

1      A.    No.
2      Q.    In your report, Dr. Egilman,
3  you accuse Purdue of destroying documents;
4  correct?
5      A.    Correct.
6      Q.    And I noticed several opinions
7  in exhibits.  Do you have access to those
8  exhibits?
9      A.    Yes.
10     Q.    Can I ask -- I don't have all
11  of the copies, but I know you have access.
12         MR. BLANK:  Can we pull
13     Exhibits 88, 162, 278, and 466 and
14     hand them to Dr. Egilman, please?
15     Q.    (BY MR. BLANK) While they're
16  doing that, Dr. Egilman, have you done any
17  forensic analysis to determine whether Purdue
18  has done any spoliation of evidence?
19         MS. CONROY:  Objection.
20         THE WITNESS:  No.
21     Q.    (BY MR. BLANK) Have you done
22  any forensic analysis to determine whether
23  any defendant has spoliated evidence?
24     A.    No.

Page 530

1      Q.    Thank you very much.
2         Dr. Egilman, your assistant --
3  somebody -- has handed you some of the
4  exhibits I identified.  The first one I'd
5  like you to look at is Exhibit B88.
6      A.    I have it.
7      Q.    Which is one of your opinions
8  titled "Purdue destroyed informational
9  materials."  And it consists of two pages.
10         The first page is titled
11  "OxyContin granted promotional materials,"
12  and then it lists a whole bunch of materials.
13         And then the second page is an
14  e-mail or a memorandum to the entire sales
15  force from somebody named Jim Lang.  And
16  you've underlined some language in that
17  memorandum; correct?
18     A.    No.
19     Q.    What was wrong about what I
20  said?
21     A.    I didn't underline anything.
22     Q.    Oh.
23     A.    That's how the document
24  appears.

Highly Confidential - Subject to Further Confidentiality Review

Page 531

1    Q.   Thank you.
2         But the underlined language, is
3    that the basis for your opinion in B88 that
4    Purdue destroyed informational materials?
5    A.   Well, the two documents
6    together.
7    Q.   Do you think there's something
8    wrong about asking sales force to destroy
9    promotional materials that are outdated?
10   A.   If they're not retained, you can,
11   for medical/legal reasons, where you can sue,
12   yes.  Or anticipated litigation.
13   Q.   Do you believe that -- is there
14   any evidence that you are aware of that
15   promotional materials for OxyContin were
16   destroyed?
17        Apart from this memorandum.
18   A.   Well, I think I did some
19   searches for these documents on the first
20   page and couldn't find them in the
21   production.
22   Q.   Do you think it's appropriate
23   practice when promotional materials become
24   outdated that they should be destroyed?

Page 532

1    A.   No.  That's not how I would do
2    it.  Not how I think it should be done.
3    Q.   Do you think there was a
4    sinister intent in destroying outdated
5    promotional materials in August of 2000?
6    A.   I have no basis one way or the
7    other to comment on that.
8    Q.   Would you take a look at
9    Exhibit 162?
10   A.   Did you want to mark this or
11   not?
12   Q.   No.
13   A.   Okay.
14   Q.   Exhibit 162 is from your
15   report, is an opinion titled "Purdue
16   destroyed documents."  And it's a one-page
17   e-mail from a gentleman named Stephen Seid to
18   Russell Gasdia.  And there's a red box around
19   one of the sentences.
20        Do you see that?
21   A.   That's my box.
22   Q.   You put the red box there?
23   Correct?
24   A.   Correct.

Page 533

1    Q.   And it appears that Steve has
2    asked -- sorry, Russ has asked Steve to help
3    him locate some information and Steve
4    replies, in this e-mail, which is Exhibit
5    B162, with the information in the first
6    paragraph.  And then he says in the second
7    paragraph, "I burned all files on my way out
8    the door a la my predecessor.  No.  Should be
9    with the files I left."
10        "White pocket folder with
11   brochures, et cetera.
12        "If Sherl can't locate it, I
13   gave Peter Justison a copy."
14        Do you see that?
15   A.   Mm-hmm.  (Witness nods.)
16   Q.   Okay.  And do you think that
17   the author of this e-mail was serious when he
18   said that he burned all of his files on his
19   way out the door?
20   A.   Do you mean is that what he
21   did?  Burn them?
22   Q.   Do you think he was serious
23   when he said that?
24   A.   Yes.  I don't think he burned

Page 534

1    them.  And I wasn't referring to him in the
2    opinion.  I was referring to "a la my
3    predecessor."
4    Q.   Who was the predecessor?
5    A.   I don't know.
6    Q.   What documents was he talking
7    about?
8    A.   I don't know.
9         He said all that, all files.
10   He says his predecessor destroyed all the
11   files.
12   Q.   Can you turn to Exhibit 278.
13   A.   Okay.
14   Q.   This is your opinion 278?
15   A.   Right.
16   Q.   Titled -- well, it doesn't say
17   "Opinion" on the top of my page.  Does it say
18   "Opinion" on the top of your page?
19   A.   No.
20   Q.   Is this an opinion of yours?
21   A.   Yes.
22   Q.   So it's an opinion, not a fact?
23   A.   I think it's both.
24   Q.   Okay.  But it is your opinion?

Page 535

1   A.   Yes.
2   Q.   There was Purdue spoliation?
3   A.   Yes.
4   Q.   And this is an e-mail with some
5  red arrows on it; correct?
6   A.   Correct.
7   Q.   Are those your red arrows?
8   A.   Yes.
9   Q.   And what are you pointing to?
10   A.   Subject line, "Billing drug
11  substance without training and
12  authorization."
13        Next sentence:  "Although you
14  appear to be right, I don't know how many
15  times I have to tell you what is and is not
16  appropriate material for e-mail.  Can't you
17  talk to people?  No more e-mails on this
18  topic.  And delete the ones you have right
19  now.  Phil."
20   Q.   And do you know whether the
21  recipient of this -- the recipients of this
22  e-mail actually deleted e-mails?
23   A.   I looked for e-mails related to
24  this, and I couldn't find any.

Page 536

1   Q.   And do you know what the
2  e-mails were pertaining to?
3   A.   The manufacturing process.
4   Q.   And have you done any analysis
5  of any of the hard drives of any Purdue
6  employees to determine whether documents were
7  permanently deleted?
8   A.   No.  I asked the plaintiffs to
9  get those hard drives, historically, since
10  1995, and they didn't get them.
11   Q.   And is there any other
12  information produced in this litigation that
13  would lead you to conclude that documents
14  were destroyed?
15   A.   Yes.
16   Q.   What?
17   A.   Well, I'm not sure if it was
18  produced in the litigation, but you see under
19  278, you have the self-destructing document
20  e-mail messaging system patented by
21  Purdue Pharma employees.
22   Q.   Do you think that --
23   A.   It seems like that would be a
24  system that would be set up to routinely

Page 537

1  destroy e-mails and documents.
2   Q.   And do you believe there was
3  sinister intent in deleting e-mails?
4   A.   Well, this patent is in 2007.
5  In 2007, this company had already pled guilty
6  to several crimes and been investigated and
7  been sued in civil litigation.  So I think
8  there is an obligation for a company to
9  preserve e-mails after they've been sued and
10  after they've pled guilty to crimes.
11   Q.   Well, you --
12   A.   And so I would say that
13  planning a system to destroy documents would
14  not be good intent in that context.
15   Q.   Have you ever destroyed a
16  document?
17   A.   Sure.
18   Q.   Have you ever deleted an
19  e-mail?
20   A.   Sure.
21   Q.   Have you broken the law by
22  doing so?
23   A.   No.
24   Q.   I want to go back to your --

Page 538

1  some of the questions we asked about your
2  experience in pain management.
3        Have you ever assessed a
4  patient for pain?
5   A.   Yes.
6   Q.   When was the last time?
7   A.   This week.
8   Q.   Who?
9        Never mind.  Were they a -- I
10  don't want to know their name.
11   A.   That's good.  I'm not going to
12  give you that name.
13   Q.   And how did you assess the
14  pain?
15   A.   I discussed it with them.
16   Q.   Are you familiar with the pain
17  scale?
18   A.   Yes.
19        There are various pain scales,
20  but yes.
21   Q.   Well, the 1 to 10?
22   A.   Yes.  There's also 1 to 4.  The
23  Roth study was a 1 to 4.
24   Q.   Have you treated patients with

Highly Confidential - Subject to Further Confidentiality Review

Page 539

1  cancer-related pain?
2      A.    Yes.
3      Q.    When was the last time?
4      A.    Sometime in the probably 2000,
5  2001 period.
6      Q.    So roughly 18, 19 years ago?
7      A.    Right.  I probably supervised
8  patients who were treated for cancer pain
9  when I was in family medicine as well.
10     Q.    Have you --
11     A.    That would have been in the
12  last ten years -- last five to ten years.
13     Q.    Have you treated patients with
14  chronic non-cancer pain?
15     A.    Yes.
16     Q.    Do you currently?
17     A.    No.
18     Q.    When was the last time?
19     A.    Probably regularly when I was
20  at the clinic, 2001, 2002.
21     Q.    So around 18 or 19 years ago?
22     A.    Yes.
23          I supervised patients --
24  supervised patient care when I was in family

Page 540

1  medicine with chronic non-malignant pain
2  treatments.  But that would have been in the
3  last three years.
4      Q.    Have you treated patients for
5  any sort of addiction?
6      A.    Yes.
7      Q.    How many?
8      A.    Hundreds.  Probably thousands.
9          Certainly hundreds.
10     Q.    Were any of those patients
11  addicted to opioids?
12     A.    Some.
13     Q.    How many?
14     A.    Not many.  Probably less than a
15  dozen.
16     Q.    Sorry, less than a dozen?
17     A.    Probably.
18     Q.    And were those -- were those
19  dozen patients or so addicted to prescription
20  opioids?
21     A.    Yes.
22     Q.    All of them?
23     A.    Yes.
24     Q.    When was the last time you've

Page 541

1  treated such a patient?
2      A.    2001.
3          Aside from supervising some
4  similar patients in family medicine.
5          That's supervising the care of,
6  by supervising residents who were taking care
7  of similar patients.
8      Q.    Earlier I think you testified
9  you had a patient who was addicted to
10  OxyContin; correct?
11     A.    Correct.
12     Q.    Is this the -- was there only
13  one?  Or was there more than one?
14     A.    I can only recall one, but
15  there may have been more.  They were -- it
16  looks like from the IMS data, there may have
17  been two, but I can only recall one.
18     Q.    And was that patient that you
19  can recall, was he or she taking OxyContin as
20  prescribed?
21     A.    I don't know.  I suspected not.
22     Q.    Do you have any records
23  relating to that patient?
24     A.    All the ones I have are the

Page 542

1  ones Purdue gave me.
2      Q.    On the patient record?
3      A.    On the IMS data that Purdue
4  illegally used in my deposition.
5      Q.    And you don't have any
6  professional records of treating that
7  patient?
8      A.    Correct.
9      Q.    Destroyed?
10     A.    I don't know.  I don't work at
11  the -- I sold the clinic 2002, and I don't
12  know what happened to the records.
13          The records were part of the
14  sale.
15     Q.    What is iatrogenic addiction?
16     A.    Caused by medical care.
17     Q.    What is the risk of iatrogenic
18  addiction resulting from prescription opioid
19  use?
20     A.    There's no single answer to
21  that question.
22     Q.    Can you quantify it?
23     A.    Well, it's not quantifiable as
24  asked.  There are a variety of situations and

Highly Confidential - Subject to Further Confidentiality Review

Page 543

1 settings where doctors prescribing drugs can
2 result in addiction.
3     I can quantify it in different
4 settings. There's not good data for most --
5 there's no long -- there's no epidemiologic
6 studies that are of reasonable quality that
7 look at that question under any settings, but
8 there's a variety of reports -- mostly case
9 reports, sometimes clinical series -- that
10 look at that issue in various populations.
11     Q.    Do you currently prescribe
12 opioids to any patients?
13     A.    No.
14     Q.    Have you ever prescribed
15 OxyContin?
16     A.    Yes. In your IMS data that you
17 provided.
18     Q.    And when was the last time?
19     A.    Probably in that IMS data.
20     Q.    From 2001?
21     A.    Correct.
22     Q.    Not since?
23     A.    Not since.
24     And the 2002 data is not mine,

Page 544

1 just to be clear.
2     MR. BLANK: Dr. Egilman, my
3 colleague Jenna Newmark is going to
4 ask you some questions about your
5 specific opinions.
6     EXAMINATION
7 BY MS. NEWMARK:
8     Q.    Hi, Dr. Egilman. I'm
9 Jenna Newmark from Dechert. I am Tim's
10 colleague on behalf of Purdue. I'm going to
11 ask you some questions about -- specifically
12 let's start with your report.
13     Can you please turn to page 53
14 of what's been marked as Exhibit 1F?
15     A.    Okay.
16     Q.    Okay. And it says at the top
17 there, "In 2004, I warned about the crisis; I
18 was ignored."
19     Did I read that correctly?
20     A.    You did.
21     Q.    Is that one of your opinions
22 that you intend to offer in this case?
23     A.    Yes.
24     Well, it's -- excuse me. It's

Page 545

1 an opinion I have offered in this case.
2     Q.    And you testified earlier that
3 these are opinions that you gave in prior
4 cases; right?
5     MS. CONROY: Objection.
6     THE WITNESS: Do you mean the
7 following pages? Yes.
8     Q.    (BY MS. NEWMARK) Yes.
9     A.    That go with No. 6? Yes.
10     Q.    Would that be pages 53 to 61?
11     A.    Right.
12     There's more too, but that's
13 what I put in here.
14     Q.    What do you mean "There's
15 more"?
16     A.    Well, I gave deposition
17 testimony. There were other reports. I
18 retyped this section of one of the early
19 reports and put it in as this opinion,
20 because there were other things that I told
21 Purdue during that case -- during the three
22 cases I consulted on with respect to their
23 marketing practices with respect to
24 OxyContin.

Page 546

1     Q.    So what's on pages 53 to 61
2 were in prior words that you submitted in
3 prior cases involving Purdue; right?
4     A.    Correct.
5     Q.    Did those include the Taylor
6 and the Freund cases?
7     A.    I can't remember the case
8 names.
9     Q.    Okay. But they're from 2004;
10 right?
11     A.    I think so.
12     Q.    And these are all opinions that
13 you formed in or before 2004?
14     A.    Yes.
15     Q.    And these are the exact
16 opinions that you rendered in 2000 -- in or
17 around 2004?
18     MS. CONROY: Objection.
19     THE WITNESS: This is some of
20 the retyped version of the opinions
21 that I'd offered in 2004.
22     I mean, this document actually
23 is -- was produced by Purdue in the
24 production. In addition to this, I

Page 547

1   have PowerPoints that were produced in
2   production.  My deposition, Purdue
3   produced in production.  So all these
4   documents, and there are other reports
5   from other cases that Purdue produced
6   in production so they have them.
7       Q.    (BY MS. NEWMARK)  What
8   materials did you rely upon for the opinions
9   that appear on pages 53 to 61?
10      A.    I think they're all -- all the
11  cites are in.
12      Q.    So is it only what's in the
13  footnotes?
14      A.    No, it's probably more.  I
15  reviewed many, many more things.  But I think
16  I have a cite here for more or less every
17  sentence.  There may have been other
18  supporting documents that also supported
19  those facts that were the bases of my opinion
20  in 2004.
21      Q.    And what do you mean by, quote,
22  in 2004, I warned about the crisis?
23      A.    I mean, in 2000 --
24          Do you want to know what I

Page 548

1   mean?
2       Q.    Yes.
3       A.    Okay.  That's not a yes-or-no
4   question.  You're aware of that?
5       Q.    What do you mean by "In 2004, I
6   warned about the crisis"?
7       A.    Okay.  Do you want the short
8   answer or the long answer?
9       Q.    I'd like you to please give me
10  an answer in accordance with Special Master
11  Cohen's directive yesterday.
12          MS. CONROY:  Objection.  Then
13      you better state what that directive
14      is, because I think we understand it,
15      but I'm not sure you do.
16      Q.    (BY MS. NEWMARK)  Dr. Egilman,
17  what do you mean by "In 2004, I warned about
18  the crisis"?
19      A.    Okay.  My understanding, given
20  your admonition of Special Master Cohen's
21  ruling, was that you can cut me off anytime
22  you want once I start answering a question.
23          So that's -- and that's how
24  I'll answer the question.  But then I'm

Page 549

1   otherwise allowed to answer --
2       Q.    Dr. Egilman, I just asked you a
3   question.  "In 2004, I warned about the
4   crisis."  What do you mean by that?
5       A.    Okay.  I mean that I told
6   Purdue Pharma the following facts and
7   opinions.
8           And the first paragraph, "The
9   drug was originally marketed for managing
10  severe pain; however, Purdue aggressively
11  marketed OxyContin through an advertising
12  campaign" --
13      Q.    Okay, Dr. Egilman, we have the
14  report in front of us, so I'm going to note
15  that your answer is incomplete.
16          Is it fair to say that --
17          MS. CONROY:  I object to the
18      way this questioning is going.  Go
19      right ahead, but that's not the way
20      the Special Master intended
21      interruptions to take place.
22      Q.    (BY MS. NEWMARK)  What do you
23  mean by "crisis"?
24      A.    I mean that there were -- well,

Page 550

1   yeah.  This is what I mean by crisis.
2           So you've got OxyContin
3   prescriptions going up, and you have
4   concomitantly addiction going up, and deaths
5   going up.  And that that started when
6   OxyContin's marketing entered.
7           In addition to that, you have
8   the generation of a variety of pill mills
9   that Purdue promoted and allowed to occur,
10  resulting in the dispersion of OxyContin
11  throughout the population with and without
12  prescriptions.
13          And that as a result of
14  Purdue's actions, OxyContin was overused by
15  the medical community and people got addicted
16  and died.  And that that became a crisis
17  because the number of people who were
18  addicted and died increased dramatically once
19  Purdue began its marketing campaign.
20      Q.    And, Dr. Egilman, you just
21  pulled out a chart.  May I see the chart,
22  please?
23          Is this a chart that you
24  created?

Page 551

1    A.    No.
2    Q.    Is this a chart that you showed
3  Purdue in 2004?
4    A.    No.
5    Q.    All of these opinions on page
6  53 to 61 which you've testified were opinions
7  that you rendered in 2004, did you give those
8  opinions to the FDA?
9    A.    No.  I was not allowed.  There
10 was a confidentiality order in the case.
11   Q.    Did you give those opinions to
12 the DEA?
13   A.    Same answer.  I was not
14 allowed.  There was a confidentiality order
15 in the case.  And I had already gotten in
16 trouble for releasing documents under a
17 confidentiality order at the time I came in
18 possession of these documents.
19   Q.    In 2004, did you have concerns
20 about opioid prescribing generally?
21   A.    Yes.
22   Q.    Apart from things that you
23 learned over the course of the cases that you
24 worked on?

Page 552

1    A.    Yes.
2    Q.    And did you describe those
3  concerns apart from the cases that you worked
4  on to the FDA?
5    A.    No.  Those concerns were based
6  on publicly available information.
7    Q.    Did you tell the FDA at all
8  that you were concerned based on the publicly
9  available information?
10   A.    Not -- no.
11   Q.    So you only expressed those
12 concerns when you were retained by
13 plaintiffs' counsel; correct?
14   A.    No.
15        MS. CONROY:  Objection.
16        THE WITNESS:  I only expressed
17     those concerns when I got the
18     documents that indicated how Purdue
19     was illegally marketing and promoting
20     the use of its drugs and causing
21     overuse of those drugs.
22   Q.    (BY MS. NEWMARK)  Let's look at
23 paragraph 1 on page 53.  The fifth line down
24 begins a sentence almost toward -- after the

Page 553

1  bolded part, reading "However, Purdue Pharma
2  aggressively marketed OxyContin through an
3  advertising campaign that misled health
4  providers and the public about the dangers of
5  OxyContin."
6        Did I read that right?
7    A.    You did.
8    Q.    And when you say "Purdue Pharma
9  aggressively marketed OxyContin," what do you
10 mean by "aggressive"?
11   A.    Well, I think that probably a
12 lot of that is in the next five or six pages
13 here, but some things may not have been
14 included here.
15        They had a very large sales
16 force.  They encouraged the sales force to
17 tell physicians that the addiction rates were
18 low, less than 1%.  They encouraged the sales
19 force to use the drug for chronic
20 non-malignant pain which was not an
21 indication in the label.
22        They encouraged the sales force
23 to increase the dosing so that profits would
24 increase.  So they wanted it as a specific

Page 554

1  program to get people to switch to
2  80 milligrams.
3        They aggressively misled the
4  physician community about Q12 dosing.  And
5  that Q12 dosing by itself was an
6  addiction-generating machine.
7        So those are -- those are some
8  of the things that they did that were
9  aggressive.
10        They also off-label marketed.
11 They were cited for some of that off-label
12 marketing by the FDA, and then pled guilty
13 to -- well, actually, the non-functioning
14 entity subsidiary pled guilty to criminal
15 conduct for the acts of the parents, and that
16 the pleadings indicated a variety of other
17 specific aggressive marketing techniques that
18 were used to mislead information and
19 encourage prescribing.
20        They were aware of pill mills,
21 and they didn't do anything to stop pill
22 mills from prescribing.  They didn't have any
23 suspicious order monitoring program.
24        For example, when Seid found

Highly Confidential - Subject to Further Confidentiality Review

Page 555

1  that ordering increased dramatically, he
2  would review --
3      Q.   Dr. Egilman, I asked you how
4  you defined aggressive.  So I move to strike
5  everything from 88:15 on.
6           And I'll note that your answer
7  is incomplete.
8           How do you define "aggressive"?
9      A.   In this case I defined it by
10 the acts that I just started to try to
11 describe.
12     Q.   And you talked earlier about
13 the size of Purdue's sales force.  How big
14 was Purdue's sales force at the launch of
15 OxyContin?
16     A.   I think I've got a sales force
17 overtime document on that that I've seen.  I
18 think probably 2 or 300 at the beginning,
19 something like that.
20     Q.   Have you ever done any analysis
21 of Purdue's sales force as compared to the
22 sales forces of other manufacturers of
23 Schedule II narcotics at around the same time
24 period?

Page 556

1      A.   No.
2      Q.   Have you ever done any analysis
3  comparing sales practices of OxyContin to
4  sales practices and marketing practices of
5  manufacturers of other opioids at around the
6  same time period?
7      A.   Yes.
8      Q.   And what analysis was that?
9      A.   Well, I reviewed the sales
10 practices of a lot of the other companies
11 involved in litigation.
12           For example, Roxane, which had
13 a similar drug, kind of approved in 1998 but
14 not sold, and then approved again and sold in
15 2000, 2001.  And they didn't have, as I
16 recall, a very aggressive marketing program.
17 They didn't have any advertisements in JAMA
18 that were illegal, for example, or in any
19 other medical magazines I can recall.
20           The only narcotic
21 advertisements that I can recall seeing
22 during that time period were Purdue Pharma
23 advertising in journals.  I don't recall any
24 other pharmaceutical company with opioid

Page 557

1  marketing programs in the general medical
2  journals that I subscribed to.
3      Q.   Have you done any quantitative
4  analysis comparing the sales practices,
5  including the size of the sales force of
6  Purdue, for OxyContin at the launch of
7  OxyContin to other manufacturers of
8  Schedule II narcotics at around the same
9  time?
10     A.   No, but that's difficult to do
11 because Purdue is relatively unique in
12 that --
13     Q.   Dr. Egilman, I asked you a
14 yes-or-no question, and you answered no.  So
15 we'll move on.
16           MS. CONROY:  Objection.
17           THE WITNESS:  Great.  Just note
18     that my answer was incomplete.
19           MS. NEWMARK:  I'll note that
20     your answer was incomplete.
21     Q.   (BY MS. NEWMARK)  You also
22 referred to, on page 53, paragraph 1, a
23 marketing piece that Purdue developed called
24 "Myths About Opioids"; correct?

Page 558

1      A.   Correct.
2      Q.   And you criticized that piece,
3  "Myths About Opioids"; correct?
4      A.   Yes.
5      Q.   And in general, I'm going to
6  sum, in the interest of time, you think that
7  it was misleading; correct?
8      A.   I certainly agree that it was
9  misleading, among other things.
10           (Whereupon, Deposition Exhibit
11     Egilman 32, Transmittal of
12     Advertisements and Promotional
13     Labeling for Drugs and Biologics for
14     Human Use, PPLP000665729-665769, was
15     marked for identification.)
16     Q.   (BY MS. NEWMARK)  I've marked
17 as Exhibit 32, a document which the court
18 reporter is going to show you now.  Have you
19 ever seen this document before?
20           MS. CONROY:  Do you have a copy
21     for me?
22           MS. NEWMARK:  I do.
23           THE WITNESS:  This is the --
24     Q.   (BY MS. NEWMARK)  Have you ever

Highly Confidential - Subject to Further Confidentiality Review

Page 559

1  seen this document before?
2      A.   I don't know.  I'm trying to --
3  I think so, yes.
4      Q.   Do you know what it is?
5      A.   It's the submission of the ad
6  to the FDA under the regulations where you
7  have to submit ads to the FDA.
8      Q.   And is this a -- and that's
9  pursuant to Section 2253; right?
10      A.   Correct.
11      Q.   And is this a submission for
12  the "Myths About Opioids" brochure to the FDA
13  pursuant to 2253?
14      A.   It is.
15      Q.   So through the 2253 process,
16  the FDA is to review these submissions;
17  correct?
18          MS. CONROY:  Objection.
19          THE WITNESS:  No.
20      Q.   (BY MS. NEWMARK)  What is your
21  understanding of the 2253 process?
22      A.   The companies have to submit
23  them to the FDA.  The FDA looks at a
24  teeny-weeny portion of them, and evaluates

Page 560

1  them.
2          Generally they only evaluate
3  for critical review advertisements where one
4  company squeals on another company and
5  complains about its illegal marketing based
6  on the -- based on the marketing campaign
7  that results.
8      Q.   Has the FDA ever issued any
9  sort of official statement saying that it
10  only reviews a small portion, or in your
11  words a teeny-weeny portion, of the 2253
12  submissions it receives?
13      A.   I think Gottlieb said something
14  like that in a public statement when he was
15  talking about opioids.
16          That's all I can recall from
17  the FDA per se.
18      Q.   And that wasn't in -- that
19  wasn't in 1996, was it?
20      A.   No.
21      Q.   And so at the time that Purdue
22  submitted the 2253 form that you have before
23  you to the FDA, would you agree that it would
24  have been reasonable for Purdue to expect the

Page 561

1  FDA to review this document?
2      A.   No.
3          MS. CONROY:  Objection.
4          THE WITNESS:  Everybody in the
5  business knows the FDA doesn't look at
6  them.  It doesn't have the staff to
7  look at them.  In 2004, they had six
8  people to do all the reviews of 30 to
9  50,000 submissions.
10      Q.   (BY MS. NEWMARK)  Well, you
11  don't know what the expectation was of Purdue
12  or any pharmaceutical company with respect to
13  what the FDA would or wouldn't do; right?
14      A.   That's not true.
15      Q.   Are you aware that the FDA can
16  tell a pharmaceutical company not to use
17  certain marketing materials if the FDA
18  believes those marketing materials are
19  misleading?
20      A.   Yes.
21      Q.   And did the FDA do so with the
22  "Myths About Opioids" brochure that's
23  attached to the 2253 form here?
24      A.   No.

Page 562

1      Q.   Let's move on to paragraph
2  of -- on page 53 of Exhibit 1F.
3          You state in this paragraph
4  that you reviewed the Physicians' Desk
5  Reference; correct?
6      A.   Correct.
7      Q.   And that was for OxyContin?
8      A.   Correct.
9      Q.   What's a Physicians' Desk
10  Reference?
11      A.   It's a compilation of
12  FDA-approved labels that are mailed to all
13  practicing physicians in the country for
14  free.
15          But in order to get into the
16  PDR, the company has to pay for the space.
17  So it doesn't include all labels.
18      Q.   And in paragraph 3 you said
19  that you reviewed the product labeling for
20  OxyContin from 1999 to 2001; right?
21      A.   Correct.
22      Q.   Why did you review the labeling
23  only from 1999 to 2001?
24          MS. CONROY:  Objection.

Page 563

1    THE WITNESS: Because that's
2  when I started to consider using the
3  drug.
4    Q.   (BY MS. NEWMARK) Have you ever
5  seen the initial label for OxyContin?
6    A.   In 1996? Yes.
7    Q.   Have you reviewed that label in
8  detail?
9    A.   Yes.
10    MS. NEWMARK: I'm going to mark
11  as Exhibit 33.
12    (Whereupon, Deposition Exhibit
13  Egilman 33, OTHER/OxyContin Tablets
14  NDA #20-553, PDD1501603661-1501603669,
15  was marked for identification.)
16    Q.   (BY MS. NEWMARK) Dr. Egilman,
17  do you recognize this document that's been
18  marked as Exhibit 33?
19    A.   Yes.
20    Q.   And what is it?
21    A.   It's the initial approved
22  label --
23    Q.   And you --
24    A.   -- for OxyContin.

Page 564

1    Q.   And you said that you've
2  reviewed this before; right?
3    A.   Correct.
4    Q.   Are you aware that the FDA must
5  approve all labels for prescription drugs?
6    A.   It's a negotiated process and
7  final approval has to be done by the FDA.
8    Q.   And the negotiated process can
9  sometimes take a long time; right?
10    A.   Yes.
11    Q.   Do you know why the process
12  takes a long time?
13    A.   Yes.
14    Q.   Why is that?
15    A.   Because generally the companies
16  want language that's favorable to them that
17  minimizes side effects and enhances benefits,
18  and the FDA doesn't agree and they have a
19  struggle about that. The company wants to be
20  able to use a label as favorable to them as
21  possible with respect to how much money they
22  can make using the label to sell the
23  products.
24    Q.   And you testified yesterday

Page 565

1  that someone needs a prescription from a
2  doctor to obtain prescription opioids;
3  correct?
4    Legally; correct?
5    A.   Legally, correct.
6    Q.   And would you agree that the
7  doctor serves as the learned intermediary, to
8  use a legal term, between the drug company
9  and the patient receiving the pharmaceutical?
10    MS. CONROY: Objection.
11    THE WITNESS: No. Not in these
12  cases.
13    Q.   (BY MS. NEWMARK) In general,
14  do you agree --
15    MS. CONROY: Objection.
16    Q.   (BY MS. NEWMARK) -- that the
17  doctor serves as the person who's supposed to
18  use their judgment to decide whether a drug
19  is beneficial for the patient receiving it?
20    MS. CONROY: Objection.
21    THE WITNESS: I wouldn't put it
22  exactly that way, no.
23    Q.   (BY MS. NEWMARK) For any drug,
24  would you agree that a doctor is supposed to

Page 566

1  know what is in the label for any drug that
2  they're prescribing?
3    A.   Can't happen. It's not
4  possible. Not -- it's not possible. It may
5  be a supposed to, but it's not possible.
6    Q.   Well, when you -- strike that.
7    You said that you've treated
8  patients in the past; right?
9    A.   Yes.
10    Q.   And you've prescribed them
11  drugs; right?
12    A.   Yes.
13    Q.   And for the drugs that you
14  prescribed, did you know what was in the
15  label for those drugs?
16    A.   For -- in a general way? Yes.
17  Did I --
18    These labels are usually 6-type
19  print and, you know, 15 to 20 pages. So I
20  wouldn't know everything that was in them.
21  When I was writing the prescription, I would
22  generally refer, first, look at the black
23  box. Then you look at the dose. Then you
24  look at the indication. And you look at the

Page 567

1  major -- the contraindications, warnings.
2       You certainly generally
3  wouldn't look at the long list that used to
4  be in the label of adverse events reported
5  during the studies. Most people ignore that
6  section. It's appropriate, probably, to
7  ignore that section.
8       So, you know, you look at some
9  parts of the label.
10      You know, it takes you more
11 than 15 minutes to read this label. Maybe
12 more than a half an hour to read it. And
13 actually, probably take more than a half an
14 hour to read this label. Most physicians
15 have 10 to 15 minutes per patient. Some
16 patients may get -- most patients get more
17 than one drug. So you don't spend three
18 hours with each patient reviewing the label
19 every time you give them a drug.
20      Q.   But you were saying you
21 don't -- just because you don't review the
22 full label doesn't mean doctors shouldn't
23 review the full label; right?
24      A.   I don't know any physician who

Page 568

1  I've ever spoken to who's has read the full
2  label on every drug they've -- on any drug
3  they've written when they write the drug.
4  And you've got to remember, unless you do
5  that, you're not necessarily reading the
6  right label because these labels can change
7  during the year.
8       So if I'm reading a PDR from
9  this year, there may have been an update sent
10 by mail for one or more of the drugs in there
11 that I may be using. There's no way to fit
12 that in.
13      If it's not a drug I use often,
14 I'm not going to read it, if it's a drug that
15 I may use that drug during the year. So
16 that's what the real practice of medicine is.
17      Q.   Have you taken any surveys of
18 any doctors in Cuyahoga or Summit County and
19 asked them how much of a label they review?
20      A.   No.
21      Q.   Let's turn back to Exhibit 1F.
22      Let's turn to pages 53 and 54.
23      Starting on page -- on page 53,
24 paragraph 3, and then continuing on to 54,

Page 569

1  you list a number of omissions and
2  misrepresentations that you think that Purdue
3  either omitted from or misrepresented from
4  the label; right?
5       A.   Correct.
6       Q.   And what's the basis for your
7  opinion -- strike that.
8       Let's start with the omissions,
9  towards the top of page 54.
10      A.   I'm there.
11      Q.   You list four omissions, A, B,
12 C, and D; right?
13      A.   Correct.
14      Q.   What is the basis for your
15 opinion that A, B, C, and D should have been
16 included in the label for OxyContin?
17      A.   Prior drug addiction is a --
18 should be listed as a contraindication. I
19 think there's literature that shows a prior
20 drug addiction is a contraindication to the
21 use of opioids.
22      And so that's my basis for
23 that. I don't think that's very
24 controversial.

Page 570

1       Second one --
2       Did you just ask for the first
3  one?
4       Q.   Well, we --
5       A.   I mean --
6       Q.   Let's do --
7       A.   Oh, you asked for all four. So
8  do you want to go to the next one now?
9       Q.   Let's -- I'll take your answer
10 for A.
11      Let's go to B, "Purdue failed
12 to include the risk of addiction in the
13 label's warning or precautions section."
14      Did I read that right?
15      A.   You did.
16      Q.   Let's turn back to the 1996
17 label for OxyContin that I showed you as
18 Exhibit 33.
19      A.   Okay.
20      Q.   And if you turn to the third
21 page, PDD1501603663. When you flip the page,
22 it will be facing you.
23      A.   Got it.
24      Q.   And can you please read to me

Page 571

1 what it says, third line down from the very
2 top?
3     A.     "Cmax the extent of absorption
4 AUC. See table 1 below"?
5     Q.     From the very, very top.
6 Sorry.
7          Starting underneath the line.
8 Then there's three lines of text?
9     A.     Oh, okay. It says "OxyContin
10 10 milligrams, 20 milligrams, 40 milligrams.
11 Oxycodone hydrochloride controlled release.
12 Warning: May be habit-forming."
13     Q.     But you think there's no risk
14 of addiction in the label itself that should
15 have been in there?
16     A.     Right. I mean, "Warning: May
17 be habit-forming" goes with bubble gum. I
18 have a big tub of bubble gum in my office,
19 it's habit-forming. It's not addicting, but
20 it's habit-forming. A habit is not an
21 addiction.
22     Q.     But that's your opinion?
23     A.     That a habit is not an
24 addiction? I agree. I have a habit of

Page 572

1 getting up in the morning and exercising.
2 I'm not addicted to it, unfortunately.
3     Q.     Let's --
4     A.     I have a lot of other bad
5 habits too. Probably we can leave that one
6 as an opinion not finished.
7     Q.     Let's turn to page
8 PDD1501603667.
9     A.     667?
10     Q.     Yes.
11     A.     Okeydokey.
12     Q.     Let's go to the middle of the
13 page where it says "Drug abuse and
14 dependence."
15     A.     Right.
16     Q.     What does it say in
17 parentheses?
18     A.     "Addiction."
19     Q.     And then can you please read
20 the first sentence?
21     A.     "OxyContin is a mu agonist
22 opioid with an abuse liability similar to
23 morphine and is a Schedule II controlled
24 substance."

Page 573

1     Q.     What's a Schedule II controlled
2 substance?
3     A.     It's a narcotic that's labeled
4 Schedule II which means it has specific
5 requirements for distribution from a
6 manufacturer's standpoint. It's got to be
7 locked vaults, et cetera. And at the
8 patient-physician level, usually there's a --
9 you have to do a specific -- now you'd have
10 limitations on how many pills you can give
11 and triple prescription writing and things
12 like that.
13     Q.     And --
14     A.     But that wasn't true when I was
15 practicing necessarily. So in the initial
16 time when I was practicing, you could write a
17 Schedule II on a regular prescription. But
18 that's because I'm an old person.
19     Q.     Is it one of the features of a
20 Schedule II drug that it does have abuse
21 potential?
22     A.     Sure.
23     Q.     And what you just read, the
24 sentence underneath "Drug abuse and

Page 574

1 dependence," isn't that a warning relating to
2 addiction?
3     A.     Doesn't say warning.
4     Q.     Does it have to say warning to
5 be a warning?
6     A.     It's awful helpful to say
7 warning when it's a warning. And it's also
8 substantively wrong. It's misleading on its
9 face.
10          And intentionally misleading on
11 its face.
12     Q.     Dr. Egilman, I'm going to move
13 to strike that entire answer. I asked you a
14 yes-or-no question.
15          Does it have to say warning to
16 be a warning?
17     A.     What's "it" refer to?
18     Q.     Does what we read -- just read
19 in the label have to be -- have to say
20 warning to be a warning?
21     A.     Yes, a warning has -- is
22 specific language in the context of an FDA
23 label. It has a specific meaning, and it
24 must be there to -- for that purpose. It's a

Highly Confidential - Subject to Further Confidentiality Review

Page 575

1  specific requirement to put a warning in.
2  It's a negotiated process, and it has to be
3  there.
4        In this context, in order to be
5  a warning, it must start with the word
6  "warning."
7     Q.   You -- on page 54, paragraph 3,
8  Section D, you also state "Purdue failed to
9  list any of the symptoms of opioid
10  withdrawal."
11       Did I read that right?
12    A.   Right.
13    Q.   Let's turn to page -- and I'll
14  shorten it -- 3665 in Exhibit 33.
15    A.   Okay.
16    Q.   Can you please read for me
17  the -- starting from the very, very bottom of
18  the second column.  Starting at "Physical
19  dependence."
20    A.   "Tolerance and physical
21  dependence"?
22    Q.   And please read for me the
23  second-to-last line in that column for the
24  record.

Page 576

1     A.   "Tolerance to the analgesic
2  effect of opioid" --
3     Q.   The -- the second-to-last
4  sentence in that column at the bottom.
5     A.   I was reading the -- I was
6  reading second-to-last sentence.
7     Q.   Starting --
8     A.   The last sentence starts
9  "Physical dependence."
10    Q.   I'm sorry, "Physical
11  dependence," the second-to-the-last line?
12    A.   I was reading -- the
13  second-to-the-last line starts with
14  "Tolerance."
15    Q.   Beneath that.
16    A.   That's the last line.
17    Q.   The last line.  "Physical
18  dependence."
19    A.   Okay.  "Physical dependence
20  results" -- remember, I was challenged on my
21  English reading ability.
22    Q.   Okay.
23    A.   "Physical dependence results in
24  withdrawal symptoms in patients who abruptly

Page 577

1  discontinue a drug or may be prescribed
2  through the administration of drugs with
3  opioid antagonist activity, open parenthesis,
4  see overdosage, all caps, closed parenthesis,
5  period."
6     Q.   Please keep reading.
7     A.   "If OxyContin is abruptly
8  discontinued in a physically dependent
9  patient, an abstinence syndrome may occur.
10  This is characterized by some or all of the
11  following:  Restlessness, lacrimation,
12  rhinorrhea, yawning, respiration [sic],
13  chills, myalgia and mydriasis."
14    Q.   Okay.
15    A.   "Other symptoms may also
16  develop including:  Irritability, anxiety,
17  backache, joint pain, weakness, abdominal
18  cramps, insomnia, nausea, anorexia, vomiting,
19  diarrhea, or increased blood pressure,
20  respiratory rate, or heart rate.  If signs
21  and symptoms of withdrawal occur, patients
22  should be treated by reinstitution of opioid
23  therapy followed by a gradual tapered dose
24  reduction of OxyContin combined with

Page 578

1  symptomatic support, open parenthesis, see
2  dosage administration in all caps, cessation
3  of therapy, closed parenthesis."
4     Q.   Okay.  Dr. Egilman, what you
5  just read there, aren't those signs and
6  symptoms of withdrawal?
7     A.   They are.
8     Q.   And yet on page 54, under
9  omissions D, you say failed -- "Purdue failed
10  to list any of the symptoms of opioid
11  withdrawal"; right?
12    A.   Correct.
13    Q.   So is that statement D wrong?
14    A.   Yes.
15       She went to Brown.  Very good.
16  She didn't take my course.  She would have
17  been better.
18    Q.   Move to strike that.
19       Part of that.  The second part.
20       Okay.  On page 54, you also
21  list in the middle of the page -- at page 54
22  of Exhibit 1, you also list in the middle of
23  the page "Misrepresentations"; right?
24    A.   I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 579

1    Q.   And to -- in the interest of
2  time I'm just going to paraphrase.  One of
3  the misrepresentations you claim are in the
4  label relate to delayed absorption; right?
5       MS. CONROY:  Objection.
6       THE WITNESS:  Correct.
7    Q.   (BY MS. NEWMARK)  And the --
8  specifically the line "Delayed absorption as
9  provided by OxyContin tablets is believed to
10 reduce the abuse liability of the drug";
11 right?
12   A.   In combination with the
13 previous question, yes.
14   Q.   This -- this is what -- I'm
15 going to refer to that line as delayed
16 absorption language; is that okay?
17   A.   Sure.
18   Q.   This delayed absorption
19 language within the label, right?
20   A.   It's a quote from the label,
21 and it's cited from the label.
22   Q.   Are you aware that this label
23 was fully considered and vetted by the FDA?
24      MS. CONROY:  Objection.

Page 580

1       THE WITNESS:  No.
2    Q.   (BY MS. NEWMARK)  Have you
3  reviewed the package insert submission to the
4  FDA from 1994?
5    A.   Yes.
6    Q.   And are you aware that there
7  was correspondence between Purdue and the FDA
8  on the delayed absorption language?
9    A.   Yes.
10   Q.   And ultimately this was the
11 language that the FDA approved; correct?
12   A.   They allowed it to go on the
13 label, right.
14   Q.   Do you disagree with the FDA's
15 approval of this language?
16   A.   Yes.
17   Q.   And let's look at exhibit --
18 the exhibit to your report B462.
19      And I can show you my copy.
20      Dr. Egilman, is that your
21 version of Exhibit 462?
22   A.   Yes.
23   Q.   And do you have notes on that
24 version?

Page 581

1    A.   I do.
2    Q.   And what are those notes?
3    A.   Do you want me to read them?
4    Q.   Yes, please.
5    A.   Dash MS Contin, dash Roxane,
6  dash 160-milligram dose, dash EERW, dash
7  Action, dash Impact, and more.
8    Q.   What is Exhibit B462?
9    A.   Do you mean do you want me to
10 read the title?
11   Q.   Sure.
12   A.   "Opinion.  This is the timeline
13 of FDA activity that FDA created of its
14 activities related to opioid addiction.  It
15 omits regulatory capture."  And all those
16 other things I put down in notes.
17   Q.   Can you please turn to page 2
18 of 38 of Exhibit B462?
19   A.   Sure.
20   Q.   And this is a document that you
21 pulled from the website listed here; right?
22   A.   I think so.
23   Q.   On the first page?
24      Okay.  So this is on the FDA's

Page 582

1  website; right?
2    A.   That's my understanding.
3    Q.   Can you --
4    A.   It was when I pulled it off.
5    Q.   I'm going to represent to you
6  that this is still on the FDA's website
7  today.  Or as of when I last checked last
8  week.  Okay?
9    A.   No problem.  I wasn't
10 challenging that.  I'm just trying to answer
11 the questions.
12   Q.   Okay.  Can you please read, on
13 page 2 of 38, towards the bottom.  There are
14 two bullet points.  Can you please read the
15 first bullet point, the first sentence of the
16 first bullet point?
17   A.   "At the time of approval, FDA
18 believed the controlled release formulation
19 of OxyContin would result in less abuse
20 potential since the drug would be absorbed
21 slowly and therefore would not be an
22 immediate, open quote, rush, closed quote, or
23 a high that would promote abuse."
24   Q.   And this is on the FDA's

Page 583

1  website; right?
2      A.    Correct.
3      Q.    And you disagree with what the
4  FDA has as -- currently has on its website?
5      A.    Do you want to limit that to
6  this paragraph and that sentence?  They have
7  a lot of things on their website.  It's a
8  very large website.
9      Q.    I'll re-ask the question.
10         You said earlier that you
11  disagree with the FDA's decision to approve
12  the controlled release formulation part of
13  the label; right?
14     A.    Yes.
15     Q.    And here, the FDA talks about
16  how it believed the controlled release
17  formulation would result in less abuse
18  potential; right?
19     A.    That's what they say they
20  believed.
21     Q.    Do you have any reason to
22  disagree with that?
23     A.    Yes.
24     Q.    But the FDA still has this on

Page 584

1  its website?
2      A.    Yes.
3      Q.    Have you ever told the FDA that
4  you disagree with what's on its website?
5      A.    Not with what is on its
6  website, but this specific item, yes.
7      Q.    And when did you tell the FDA
8  that you disagreed with that specific item?
9      A.    In 2013 when I gave that
10  presentation at the FDA hearing on opioids.
11     Q.    Are you referring to the
12  testimony before the FDA Center for Drug
13  Evaluation and Research in 2013?
14     A.    Yeah.  It's only one testimony
15  made in that year, so if that's --
16         I don't remember what the name
17  of the committee was, but yeah.
18     Q.    And was that titled "Impact of
19  approved drug labeling on chronic opioid
20  therapy"?
21     A.    Do you mean if that was the
22  title of the hearing?  Yes.  I believe.
23         Something like that.  It was on
24  labeling.

Page 585

1      Q.    And did the FDA take any action
2  with respect to the -- with respect to your
3  concerns about that part of the label after
4  you testified before the FDA?
5      A.    Nope.
6      Q.    Let's turn to page 58 of
7  Exhibit 1F.  And look at paragraphs 13 and
8  14.
9      A.    Okay.
10     Q.    And I'm going to paraphrase
11  here and you can tell me if I'm wrong.  I'm
12  just trying to save some time for my
13  colleagues down the table.
14         These paragraphs relate to your
15  disagreement with the use of OxyContin for
16  Q12-hour dosing; right?
17         MS. CONROY:  Objection.
18         THE WITNESS:  Paragraphs 13 and
19  which one?  13 and 14?
20     Q.    (BY MS. NEWMARK)  13 and 14.
21     A.    Correct.
22     Q.    Are you aware that the FDA
23  approved OxyContin for Q12-hour dosing?
24     A.    Yes.

Page 586

1      Q.    And let's turn to Exhibit 33,
2  the page ending in 3668.
3      A.    Okay.
4      Q.    The first paragraph -- the
5  first full paragraph on the left column, can
6  you please read the second sentence?
7      A.    The controlled release nature
8  of the formulation allows it to be
9  effectively administered every 12 hours.
10  Open parenthesis, see clinical pharmacology,
11  semicolon, pharmacokinetics and metabolism,
12  period, closed parenthesis.
13     Q.    And this is in the labeling
14  that was approved by the FDA; right?
15     A.    Yes.
16     Q.    Do you disagree with that
17  language?
18     A.    Yes.
19     Q.    I'm going to hand you what's
20  going to be marked as Exhibit 34.
21         (Whereupon, Deposition Exhibit
22     Egilman 34, 3-8-96 letter to Diane
23     Shnitzler with attachments,
24     PPLP000614833-614856, and Opinion-This

Highly Confidential - Subject to Further Confidentiality Review

Page 587

1  is the timeline of FDA activity
2  related to opioid addiction-it omits
3  regulatory capture, was marked for
4  identification.)
5  Q.  (BY MS. NEWMARK) Dr. Egilman,
6  have you ever seen this document before?
7  A.  The approval letter?
8  Q.  Exhibit 34?
9  A.  Oh, this one?  Oh.  Hang on a
10  second.
11  I've seen the ad before.  I
12  don't think I've seen the cover letter.
13  Q.  And it's from Lee Ann Storey at
14  the Purdue Frederick Company, and addressed
15  to Diane Shnitzler at the Division of Drug
16  Marketing Advertising and Communications,
17  Food and Drug Administration; right?
18  A.  Correct.  It's on Purdue Pharma
19  stationery.
20  Q.  What's the date on this
21  document?
22  A.  March 8, 1996.
23  Q.  And if I represent to you that
24  this was promotional material submitted to

Page 588

1  the FDA at the time OxyContin was launched,
2  would you have any reason to disagree with
3  me?
4  A.  No.
5  Q.  Are you aware that the FDA has
6  to approve promotional materials for a drug
7  when the drug is launched?
8  A.  The FDA has to -- promotional
9  materials --
10  The answer is no.  They don't
11  do that.
12  There's no approval -- there's
13  no letter coming back from the FDA saying "We
14  approve your promotional materials" that I've
15  seen.
16  Q.  You would agree that this
17  promotional material was sent to the FDA;
18  right?
19  A.  I have no reason to dispute
20  that this is the letter that was sent to the
21  FDA.
22  Q.  Can you please turn to the page
23  ending in one -- the page PPLP000614836.
24  A.  Okay.

Page 589

1  Q.  And do you see where it says
2  "The analgesic efficacy"?
3  A.  I do.
4  Q.  Can you please read that
5  sentence, that line and the line below it for
6  the record?
7  A.  "The analgesic efficacy of
8  immediate release oxycodone, the ease of Q12
9  dosing.  12 hours of smooth and reliable pain
10  control.  Less frequent dosing than Percocet,
11  Vicodin, or Tylenol with codeine."
12  Q.  Are you -- withdrawn.
13  You testified earlier that you
14  know the FDA can tell a company not to -- not
15  to use certain marketing materials if they
16  believe them to be false or misleading;
17  right?
18  A.  They can do that.
19  Q.  And the FDA certainly could
20  have done that here; right?
21  A.  They could have done that.
22  Q.  Especially if it found the
23  Q12-hour dosing language misleading; right?
24  A.  They could have done that, if

Page 590

1  they --
2  Q.  Did they --
3  A.  If they read it, they could
4  have done that.
5  Q.  Did they tell Purdue not to use
6  these promotional materials here?
7  A.  They gave no comment on this
8  submission.  They did not write a letter
9  saying this is okay, and they did not write a
10  letter saying this is not okay.
11  Q.  So the FDA never told Purdue
12  not to use these promotional materials?
13  A.  They never told them it was
14  okay, and they never told them it wasn't.
15  Q.  You've made your opinions about
16  12-hour dosing known to the FDA; right?
17  A.  I did.
18  Q.  And that was during the 2013
19  testimony before the Center for Drug
20  Evaluation and Research?
21  A.  Correct.  It was delayed six
22  years.
23  Q.  Did the FDA instruct Purdue to
24  change any of its labeling in light of your

Page 591

1 testimony?
2     A.    No.
3     Q.    Did you ever express any
4 concerns to the FDA about MS Contin?
5     A.    No.  Do you mean the fact that
6 Purdue was selling it unapproved?  Is that
7 what you mean?
8     Q.    I asked you if you expressed
9 any concerns to the FDA about MS Contin?
10    A.    No.
11    Q.    One of your opinions relates
12 to -- and I'm going to paraphrase again in
13 the interest of time. -- you think that the
14 MS Contin label shows that the -- that
15 OxyContin was underwarned; right?
16    A.    I'm not sure what you're
17 referring to.  I don't understand that
18 question.
19    Q.    I'll withdraw that in the
20 interest of time.
21          On page 85 of your report,
22 Exhibit B156.  You express the opinion that
23 "Purdue misled physicians about the potency
24 of OxyContin"; right?

Page 592

1     A.    Oh, you mean the mushroom
2 document?  Yes.
3     Q.    Is it your opinion that doctors
4 were not aware of the potency of OxyContin?
5     A.    Yes.
6     Q.    What is the basis for this
7 statement?
8     A.    This is an e-mail to herself,
9 maybe some blind ccs, from Kathe Sackler.
10 Kathe Sackler, Wednesday, August 6, 1997.
11          "In recent team meetings, we
12 have discussed the issue that OxyContin is
13 perceived by some physicians, particularly
14 oncologists, as not being as strong as
15 MS Contin.  Although this perception has had
16 some effect with physicians switching to
17 MS Contin with more severe" cancer
18 patients -- "cancer pain patients, it has
19 actually had a positive effect of physician's
20 use of non-cancer pain."
21    Q.    Dr. Egilman?
22    A.    "Since OxyContin" --
23    Q.    Dr. Egilman, does that document
24 have a Bates number on it?

Page 593

1     A.    Yeah.  Can I -- do you want
2 to --
3          Here, let me try this.  You can
4 tell me anytime you want you've heard enough
5 of the answer and I'll stop.  Okay?
6          What I do not want you to do is
7 interrupt my answer except to tell me you've
8 heard enough of the answer.
9     Q.    Okay.  Dr. Egilman --
10    A.    I don't want to be interrupted.
11    Q.    Dr. Egilman --
12    A.    You can stop me, no problem,
13 but you can't interrupt me with other
14 questions because I can only answer one
15 question at a time.  Otherwise, the record
16 gets confused.
17    Q.    Dr. Egilman, does that -- I'm
18 going to note that your answer was
19 incomplete.
20          Does that document have a Bates
21 number?
22    A.    It does.
23    Q.    And does that appear in your
24 report?

Page 594

1     A.    It does.
2     Q.    What's the Bates number on that
3 document?
4     A.    PDD8801118262.
5     Q.    May I see it, please?
6     A.    Sure.
7     Q.    Is this document the same
8 document that appears at Exhibit B156 to your
9 report?
10    A.    I don't know.
11          (Witness was handed copies.)
12    Q.    And what is your opinion at
13 B156?
14    A.    "Physicians had the
15 misimpression that OxyContin was less potent
16 than MS Contin.  Instead of correcting this,
17 Purdue took advantage of this ignorance to
18 encourage inappropriate use of opioids.  And
19 I might add in, from the label, Purdue gave
20 the impression that more -- that MS Contin
21 and OxyContin had equal potency."
22    Q.    Is that a new opinion that you
23 have in this case?
24    A.    New basis for that same

Page 595

1  opinion.
2       I missed that before. I just
3  reread it when you gave me the label to read.
4  So that was your contribution, and I
5  appreciate it.
6       Q.    You said that physicians have
7  the misimpression that OxyContin was less
8  potent than MS Contin; right?
9       A.    Yes. When it was actually more
10  potent than MS Contin.
11       Q.    Besides this one e-mail that
12  you cite in Exhibit B156, do you have any
13  other documents that form the basis for this
14  opinion?
15       A.    Yes.
16       Q.    Are those included in your
17  report?
18       A.    I think so, and then some of
19  them will be in this pile to my right.
20       Q.    Are you referring to --
21  withdrawn.
22       Did you do any surveys of any
23  doctors to see if they had an impression that
24  OxyContin and MS Contin had equal potency?

Page 596

1       A.    No.
2       Q.    Did you see any marketing
3  materials that said that OxyContin and
4  MS Contin had equal potency?
5       A.    Yes.
6       Q.    Which marketing materials were
7  those?
8       A.    Let's start with the label.
9  Right here. Exhibit 33.
10       Q.    I asked you about marketing
11  materials.
12       MS. CONROY: Objection.
13       Q.    (BY MS. NEWMARK) So let's
14  start with marketing materials.
15       MS. CONROY: Objection.
16       Q.    (BY MS. NEWMARK) Which
17  marketing materials gave the impression that
18  MS Contin and OxyContin had equal potency?
19       A.    Sorry, the label is marketing
20  materials.
21       Q.    Besides the label, which
22  marketing materials said that OxyContin and
23  MS Contin had equal potency?
24       A.    Oh, none that I'm aware of.

Page 597

1  Besides the label.
2       Q.    Do you know of any physician
3  who wrote a medically inappropriate or
4  unnecessary prescription based on a
5  misperception about the potency of OxyContin?
6       A.    Personally?
7       Q.    Yes.
8       A.    No.
9       Q.    Have you taken any surveys to
10  determine whether any physicians wrote any
11  medically unnecessary prescriptions based on
12  a misperception about the potency of
13  OxyContin?
14       A.    No.
15       Q.    Let's turn to the label. Bates
16  number ending in 3668.
17       A.    How about before your next
18  question, we just take a quick break.
19       Q.    I'm almost done, Dr. Egilman,
20  and then we'll have a lunch break.
21       A.    Well, how much more have you
22  got?
23       Q.    I'm almost done.
24       A.    How much more do you have?

Page 598

1       Q.    I'm almost done.
2       A.    What does that mean? In
3  English?
4       Q.    It depends on --
5       MS. CONROY: How much time do
6  you have left --
7       MS. NEWMARK: -- how long your
8  answers are. I have about five
9  minutes.
10       THE WITNESS: How much?
11       MS. NEWMARK: Five minutes.
12       THE WITNESS: Well, why don't
13  we take a quick break. Because I
14  don't think your five minutes will be
15  good for five minutes.
16       THE VIDEOGRAPHER: Off the
17  record, 12:08.
18       (Recess taken, 12:11 p.m. to
19  12:12 p.m.)
20       THE VIDEOGRAPHER: We're back
21  on the record at 12:13.
22       Q.    (BY MS. NEWMARK) Dr. Egilman,
23  when we -- when we took a break, I asked you
24  to look at the label again, the page ending

Page 599

1  in 3668.
2      A.   Okay.
3      Q.   Can you please look in the
4  middle column about two-thirds of the way
5  down where it says "Table 3"?
6      A.   Right.
7      Q.   Do you know what this table is?
8      A.   Yeah.  It's a conversion table.
9      Q.   What is it a conversion table
10 of?
11     A.   These are rough morphine
12 equivalents for various opioids.
13     Q.   Would you say here that it
14 is -- this table compares the morphine
15 equivalence of OxyContin -- withdrawn.
16     Would you say that this
17 compares different opioids, including
18 oxycodone?
19     A.   In as mis -- yes, in as
20 misleading a fashion as possible.
21     Q.   What is the basis for saying
22 "in as misleading fashion as possible"?
23     A.   Because most people are going
24 to look at this, look at -- do numbers in

Page 600

1  sequence from low to high or high to low.
2      And you see how the numbers
3  here are more or less random?  Based on the
4  alphabetical order of the drug on the left,
5  but the relevant question for a physician in
6  looking at this is to know what's the
7  relative morphine equivalent.  And you want
8  to know that first.  So this should be
9  ordered by morphine equivalent dose.  So I
10 would start with the most potent and end with
11 the least potent.
12     And if you did that, then you
13 could more easily compare OxyContin --
14 oxycodone to morphine sulfate, for example,
15 than the others.
16     Q.   Well, this is in the label that
17 the FDA approved for OxyContin at its launch;
18 right?
19     A.   Correct.
20     Q.   So that means the FDA also
21 approved Table 3; right?
22     A.   Correct.
23     Q.   And do you disagree with the --
24 with the FDA's approval of this table in the

Page 601

1  label?
2      A.   Yes.
3      Q.   But that's your opinion; right?
4      A.   That's my opinion based on --
5  and based on Sackler's e-mail, this one --
6  one could -- one could infer that this was
7  done this way, particularly with the language
8  that I mentioned before, that you definitely
9  pointed out earlier, that this was done on
10 purpose with morphine at the bottom and
11 oxycodone at the top, rather than just --
12 you're talking here about two -- in the
13 label, there's two drugs mentioned:  Morphine
14 and OxyContin.
15     So the relevant information
16 from giving people information about risks
17 and benefits is to compare those two drugs.
18 So in the table, I would have started with a
19 comparison of oxycodone and morphine,
20 comparative potency.  And then it would have
21 been obvious.  Oxycodone would have been a 1
22 and morphine was a .5.
23     Part of the reason that the
24 Purdue team -- not just Kathe Sackler, but

Page 602

1  the Purdue team believed that physicians were
2  in the dark, as it were, is because this
3  table was set up the way it was, making it
4  hard for a physician to juxtapose oxycodone
5  and morphine potency.
6      Q.   Dr. Egilman, as you said
7  earlier, though, that this was -- that the
8  table was done in some misleading way is just
9  an inference; right?
10     A.   No.  We know the results where
11 there was misleading.
12     MS. CONROY:  Objection.
13     THE WITNESS:  It's not an
14 inference.  It's that this label, the
15 text that you deftly pointed out
16 before, and this table that you have
17 now pointed out are part of the reason
18 that physicians were kept in the dark,
19 or entered the dark and kept in the
20 dark with respect to the relative
21 potency of oxycodone and morphine.
22     Q.   (BY MS. NEWMARK) Dr. Egilman,
23 have you done any surveys of physicians about
24 their understanding of Table 3?

Page 603

1    A.    No.
2    Q.    So you don't know what
3  physicians' actual understanding of Table 3
4  was, right?
5    A.    No.  We only know what
6  physicians' actual understanding of the
7  relative potency of morphine and oxycodone
8  was based on Purdue's information garnered
9  from physicians.
10    Q.    But that's just from Kathe
11  Sackler's e-mail; right?
12    MS. CONROY:  Objection.
13    THE WITNESS:  No, it's
14    summarizing Kathe Sackler's e-mail.
15    Kathe Sackler's e-mail refers to a
16    discussion and meetings on that exact
17    issue and an action program on that
18    exact issue.
19    Q.    (BY MS. NEWMARK)  Dr. Egilman,
20  during your testimony today, you've testified
21  about a lot of things that you would change
22  in the label.  Is that fair to say?
23    MS. CONROY:  Objection.
24    THE WITNESS:  I mean, I've

Page 604

1    testified about what I've testified
2    about.  I don't know how to summarize
3    that.
4    Q.    (BY MS. NEWMARK)  You
5  understand that there's a citizen's petition
6  process by which anyone can petition the FDA
7  to change a label for a pharmaceutical?
8    A.    That's correct.
9    Q.    Have you ever done that for
10  OxyContin?
11    A.    No.
12    Q.    Did you ever do that for
13  MS Contin?
14    A.    No.
15    Q.    Did you ever do that for any of
16  the opioids manufactured by any of the
17  defendants in this case?
18    A.    No.
19    Q.    Are you aware that a citizen's
20  petition actually was filed with the FDA for
21  OxyContin?
22    A.    Yes.  Kolodny.
23    Q.    Do you know what happened with
24  that petition?

Page 605

1    A.    Yeah.  The FDA took the
2  opportunity to petition to reinforce all
3  the -- all of the wrong decisions that have
4  been made over the years.
5    Q.    So you think that the FDA has
6  made a series of wrong decisions over the
7  years?
8    A.    Yes.
9    MS. NEWMARK:  Okay.  I have no
10  further questions.
11    MR. BLANK:  Before we break, I
12  would just want to make a statement
13  for the record that Dr. Egilman's
14  opinion and expert report contains 489
15  numbered opinions plus pages of
16  additional opinions, plus I think
17  33,000 related documents in support of
18  that.
19    We are all here to take
20  Dr. Egilman's deposition.  Under the
21  protocol, we have two days.
22  Obviously, given the number of
23  defendants and the number of opinions,
24  it is impossible for any one defendant

Page 606

1  to ask Dr. Egilman about each of the
2  opinions he purports to offer.  We're
3  doing the best that we can.  We've
4  allotted time amongst the defendants
5  to give each defendant some amount of
6  time for Dr. Egilman, but on behalf of
7  Purdue, we think this is inadequate by
8  a long shot.
9    Even if we were the only
10  examiners over the two days, we could
11  not get through the opinions related
12  specifically to Purdue, and I think
13  the other defendants are in the same
14  situation.
15    So with that, we'll take the
16  lunch break now and resume with some
17  of the other defendants.
18    THE WITNESS:  Let me just say
19  I'll be glad to answer any questions
20  that any of the defense have anytime
21  they want to call me up or meet with
22  me.  No problem.  I'm available.  You
23  don't have to pay me for it.
24    MR. BLANK:  Excellent.

Highly Confidential - Subject to Further Confidentiality Review

Page 607

1    THE VIDEOGRAPHER: Off the
2 record at 12:22.
3    (Recess taken, 12:22 p.m. to
4 1:19 p.m.)
5    THE VIDEOGRAPHER: We are back
6 on the record at 1:20.
7    THE WITNESS: Before you start,
8 I have another plaintiff time
9 document. So there's my plaintiff
10 time document.
11    MS. LUCAS: Thanks,
12 Dr. Egilman. Is this a document that
13 we've not seen before?
14    THE WITNESS: This is a
15 document I've not brought before.
16    MS. LUCAS: Can we please mark
17 this document for the record as
18 Exhibit 35.
19    (Whereupon, Deposition Exhibit
20 Egilman 35, FDA and Opioids: What's a
21 Regulator to Do? Pain Care Forum.
22 Douglas C. Throckmorton, MD
23 PowerPoint, ENDO-Opioid_MDL-02791998,
24 was marked for identification.)

Page 608

1    EXAMINATION
2 BY MS. LUCAS:
3    Q.    Dr. Egilman, I have been
4 granted very limited time to ask you
5 questions even though I have a lot of
6 questions for you, so I'm going to ask you a
7 lot of yes-or-no questions and I would like a
8 yes-or-no answer from you whenever possible.
9    Will you do that for me?
10    A.    Sure.
11    Q.    Thank you. Were you asked to
12 make any assumptions in forming your opinions
13 in this case?
14    A.    No.
15    Q.    Did you make any assumptions in
16 forming your opinions in this case?
17    A.    I'm not sure I understand that
18 question.
19    Q.    Well, regardless if anyone
20 asked you to make any assumptions, did you in
21 fact make any assumptions in this case in
22 forming your opinions?
23    A.    Out of context, I'm not sure
24 what that refers to.

Page 609

1    Q.    Did you assume that the
2 plaintiffs will prove any particular facts in
3 forming your opinions in this case?
4    A.    No.
5    Q.    Have you been retained by
6 plaintiffs' counsel in any other opioids
7 litigations other than the MDL?
8    A.    Yes.
9    Q.    How many?
10    A.    The three that we talked about
11 yesterday.
12    Q.    And which three are those?
13    A.    I don't remember the names of
14 the cases. They're 2004 cases.
15    Q.    Have you been retained in any
16 post 2004 opioids litigations? And I'm
17 talking about opioids litigations in the last
18 few years other than the MDL?
19    A.    No.
20    Q.    You've never spoken to any
21 other counsel for any of the other plaintiffs
22 who are not in the MDL; is that correct?
23    MS. CONROY: Objection.
24    MS. LUCAS: Let me rephrase.

Page 610

1    Q.    (BY MS. LUCAS) "Yes" or "no,"
2 have you spoken about any non-MDL opioids
3 litigations going on in the last few years
4 with counsel for any of the opioids
5 plaintiffs other than the MDL counsel?
6    A.    Yes.
7    MS. CONROY: Objection.
8    Q.    (BY MS. LUCAS) How many
9 counsel other than the MDL counsel have you
10 spoken with?
11    MS. CONROY: Objection.
12    Q.    (BY MS. LUCAS) I'll cut this
13 short. Have you spoken with any of the
14 Oklahoma plaintiffs' counsel about the
15 opioids litigation?
16    A.    Yes.
17    Q.    Which ones?
18    A.    Which ones what? What lawyer?
19    Q.    Correct.
20    A.    I don't remember his name.
21    Q.    Have you spoken with Brad
22 Beckworth?
23    A.    No.
24    Q.    Reggie Whitten?

Highly Confidential - Subject to Further Confidentiality Review

Page 611

1    A.    No.
2    Q.    Any other names that you can
3  think of that's --
4    A.    I can't remember the guy's
5  name.
6    Q.    And did they retain you?
7    A.    No.
8    Q.    Did you ever consult for them?
9    A.    Consult.  I sent them material.
10    Q.    What material did you send
11  them?
12    A.    The two boxes of Johnson &
13  Johnson bad acts documents that I brought
14  here.
15    Q.    Oh, the bad acts documents that
16  say "Johnson & Johnson bad acts"?
17    A.    Yes.
18    Q.    I saw those.  You sent that box
19  to the Oklahoma plaintiffs' counsel?
20    A.    It's two boxes.  I sent I think
21  a digital version.
22    Q.    Are any of the documents inside
23  that box subject to a protective order?
24    A.    I don't think so.

Page 612

1    Q.    Did you check?
2    A.    As far as I know, they're not.
3    Q.    You are of the opinion in this
4  litigation, the MDL, that all the defendants
5  in the opioids litigation, including their
6  associated individuals and/or organizations,
7  are in a venture where they're acting in a
8  concerted fashion separately or together to
9  effect a particular result; correct?
10    A.    Correct.
11    Q.    And although Purdue was the
12  only member of that venture in 1984 in your
13  opinion, others joined around 1996 or '97;
14  correct?
15    A.    No.  I left out Duragesic.
16  That was also in the early '80s.  That was a
17  Janssen product.  I forgot them yesterday.
18    Q.    Oh, you forgot them yesterday.
19  The early what?
20    A.    Early '80s.
21    Q.    The early '80s.  And so would
22  you like to amend your testimony from
23  yesterday?
24    A.    I just did.

Page 613

1    Q.    So your contention is that
2  Janssen joined the venture in the early
3  1980s; is that correct?
4    A.    Janssen started to sell an
5  opioid which led to the hockey stick in part
6  beginning in the early '80s.
7    Q.    And by "an opioid," you mean
8  Duragesic; correct?
9    A.    Correct.
10    Q.    Was there an objective to the
11  venture?
12    A.    Yes.
13    Q.    What was the objective of the
14  venture in your opinion?
15    A.    Make as much money as possible.
16    Q.    Is that the only objective to
17  the venture in your opinion?
18    A.    Yes.
19    Q.    Other than Janssen, you're also
20  of the opinion that Johnson & Johnson was in
21  the venture; correct?
22    A.    Correct.
23    Q.    What year did Johnson & Johnson
24  join the venture, in your opinion?

Page 614

1    A.    Well, Johnson & Johnson's
2  responsible for Janssen.  They own Janssen.
3  So whatever Janssen did, Johnson & Johnson is
4  now responsible for.
5    Q.    Is it your opinion that Johnson
6  & Johnson was in the venture in the early
7  '80s as well?
8    A.    Independently?
9    Johnson & Johnson had a joint
10  marketing agreement with Ultram, or Ultram
11  with Purdue, as I recall.  So whenever that
12  dates, that would have been joining with
13  other members of the venture to promote
14  opioid sales.
15    Q.    So you're of the opinion that
16  J&J did not join the venture until there was
17  a joint marketing agreement related to
18  Ultram; is that correct?
19    A.    No.
20    Q.    Well you said, you told me
21  independently Johnson & Johnson had a joint
22  marketing agreement with Ultram.  Or Ultram
23  with Purdue, as I recall.
24    "So whenever that dates, that

Page 615

1 would have been joining with other members of
2 the venture to promote opioid sales."
3     A.    That's correct.
4     Q.    Then what is the date that you
5 contend Johnson & Johnson joined the venture?
6     A.    Well, Duragesic was a Janssen
7 product in the early '80s. It would have
8 been then, because Johnson & Johnson is
9 responsible for Duragesic now.
10     Q.    So you are of the opinion that
11 J&J joined in the early '80s because of
12 Janssen; correct?
13     A.    They own Janssen. Janssen
14 participated in the early '80s. Johnson &
15 Johnson is now Janssen. Or Janssen is now
16 Johnson & Johnson, yes.
17     Q.    Yes. That's a yes?
18     A.    That's a yes.
19     Q.    Thank you.
20     Do you believe that Janssen is
21 still a member of the venture today, "yes" or
22 "no"?
23     MS. CONROY: Objection.
24     THE WITNESS: Yes.

Page 616

1     Q.    (BY MS. LUCAS) Do you believe
2 that J&J is still a member of the venture
3 today, "yes" or "no"?
4     A.    Yes.
5     Q.    Other than Duragesic, do you
6 know what opioid medications Janssen has
7 manufactured?
8     A.    Well, they originally developed
9 fentanyl. That's --
10     Q.    This is a "yes" or a "no"?
11     A.    Oh, I'm sorry.
12     Q.    That's all right.
13     A.    Yes. Some of them.
14     Q.    You're a very experienced
15 expert, Dr. Egilman. And I don't have much
16 time, so unfortunately I have to ask a lot of
17 "yes" or "no" questions.
18     MS. CONROY: Objection, move to
19 strike.
20     Q.    (BY MS. LUCAS) So you do know
21 what opioid medications Janssen has
22 manufactured. I would like a list of the
23 opioid medications that Janssen has
24 manufactured to your knowledge.

Page 617

1     A.    Janssen apart from J&J?
2     Q.    Yes.
3     A.    Let's see what the list says.
4     Q.    I would like you to give me
5 that list without reference to your notes,
6 please.
7     A.    Well, that's good, but let me
8 look at my notes.
9     MS. LUCAS: Then I'm going to
10 put on the record that Dr. Egilman is
11 incapable of telling me what Janssen's
12 medications were without looking at
13 his notes.
14     And for the record,
15 Dr. Egilman's reading a green piece of
16 paper that looks to be a list of some
17 kind.
18     THE WITNESS: It's a list of
19 some kind.
20     So Janssen's got the fentanyl
21 that I mentioned, and then Nucynta and
22 Nucynta SR.
23     And then -- so that's the
24 Janssen participants.

Page 618

1     Q.    (BY MS. LUCAS) What does "SR"
2 stand for?
3     A.    Slow release.
4     Q.    Do you know when the Duragesic
5 transdermal system was first approved for the
6 market in the United States by the FDA?
7     A.    No.
8     Q.    Do you know if Janssen
9 continues to market Duragesic in the
10 United States today?
11     A.    I believe they do.
12     Q.    Do you know when Nucynta IR was
13 first approved for market in the U.S. by the
14 FDA? And by "IR," I mean immediate release.
15     A.    No.
16     Q.    Do you know whether Janssen
17 still markets Nucynta IR?
18     A.    Did I say Nucynta ER? SR?
19     Q.    You said SR?
20     A.    It's ER.
21     Q.    Correct.
22     A.    I'm sorry. I made a mistake.
23     Q.    That's all right.
24     A.    It's extended release.

Page 619

1  Q.  I'll start again.
2     Do you know whether Janssen
3  still continues to market Nucynta IR today in
4  the United States?
5  A.  I think so.
6  Q.  Do you know whether Janssen
7  still continues to market Nucynta ER in the
8  United States today?
9  A.  I think so.
10  Q.  And do you know when Nucynta ER
11  was first approved for market in the
12  United States by the FDA?
13  A.  No.
14  Q.  Do you know Janssen's total
15  market share for all three of those opioids
16  Nucynta IR, Nucynta ER and Duragesic?
17     MS. CONROY:  Objection.
18     THE WITNESS:  No.
19  Q.  (BY MS. LUCAS)  Do you know
20  Janssen's total market share of all opioid
21  prescriptions in Summit County between 1997
22  and 2017?
23  A.  I need to look at the Summit
24  County document to give you that.

Page 620

1  Q.  Well, unfortunately, we don't
2  have time for you to look through your
3  documents.  So without looking at documents,
4  do you know Janssen's total market share of
5  all opioid prescriptions in Summit County
6  between '97 and 2017?
7     MS. CONROY:  Objection.  Like
8  do a memory test?
9     MS. LUCAS:  Do you want to give
10  me more time?
11     MS. CONROY:  The Court has
12  granted the time here.
13     MS. LUCAS:  Then yes.
14  Q.  (BY MS. LUCAS)  So without
15  looking at your documents, do you know
16  Janssen's total market share of all opioid
17  prescriptions in Summit County between '97
18  and 2017?
19  A.  No.
20  Q.  Without looking at your notes,
21  do you know Janssen's total market share of
22  all opioid prescriptions in Cuyahoga County
23  between 1997 and 2017?
24  A.  No.

Page 621

1  Q.  So you offered 800 -- 489
2  separate opinions in Exhibits B1 through B489
3  of your report, give or take; correct?
4  A.  Take.  Correct.  There are a
5  few that have a lot of duplicates in them.
6  Q.  Okay.  So around 480 opinions
7  are in Exhibits B1 through B489; correct?
8  A.  I think there's more dups of
9  that.  It's probably in the 470 range.
10  Q.  I'll go with that.  So you
11  offered around 470 separate opinions in
12  Exhibits B1 through B489 of your report;
13  correct?
14  A.  No, there's -- some of them
15  have more than one opinion.  No.
16  Q.  So how many total opinions do
17  you believe you've offered in those exhibits?
18  A.  I don't know.
19  Q.  Is it around 470, between 470
20  and 480?
21  A.  I don't know.
22  Q.  Is it more than 500?
23  A.  I do not know.
24  Q.  You have no idea?

Page 622

1  A.  No, I don't have -- I have an
2  idea.  It's between 470, probably, and 600, I
3  would say on the high end.  But you're not
4  including all of the opinions that are in the
5  preliminary sections -- some of which we just
6  went over with Purdue.
7  Q.  Correct.
8  A.  Which are not numbered.
9  Q.  Correct.  I'm interested right
10  now in only the exhibits.
11     So in B1 through B489, you've
12  offered between 470 and 600 separate
13  opinions; correct?
14  A.  That's a rough estimate, yes.
15  I could be wrong.
16  Q.  Of those between 470 to 600
17  opinions, around 14 of them specifically
18  mentioned either Janssen or J&J in the title;
19  correct?
20  A.  I don't know.  I haven't
21  counted them by company.
22  Q.  Do you have any reason to
23  dispute that 14 of those opinions mentioned
24  Janssen or Johnson & Johnson?

Page 623

1    A.    I have no reason to agree or
2    disagree because I haven't done that count.
3    Q.    Is that a no?
4    A.    No, that's not a no.
5    Q.    Do you have any reason to
6    dispute that there are 14 Janssen or Johnson
7    & Johnson mentions in the opinions in
8    Exhibits B1 through B489?
9    A.    I have no reason to agree or
10   disagree because I haven't done that count.
11   Q.    Okay.  But you have no reason
12   to say differently; correct?
13   A.    I have no reason to agree or
14   disagree because I have not done that count.
15   Q.    Okay.
16       Now, by our count -- and I
17   understand you haven't done the count --
18   another 42 of those opinions in Exhibits B1
19   through 489 cite Janssen documents.
20       Do you have any reason to
21   disagree with that?
22   A.    I have no reason to agree or
23   disagree because I have not done that count.
24   Q.    All right.  So even though you

Page 624

1    haven't counted, you don't have any reason to
2    agree or disagree that there are 14 opinions
3    that mention Janssen or J&J in the title and
4    another 42 that cite documents from Janssen;
5    correct?
6    A.    No.
7    Q.    Do you have any reason to
8    dispute that a total of 56 of your opinions
9    involve Janssen or Johnson & Johnson either
10   by name or by document?
11   A.    Yes.
12   Q.    Why is that?
13       Strike that.
14       How many opinions in your
15   report do you think mention J&J or Janssen by
16   name, or cite their documents?
17       Your best estimate.
18   A.    I do not know.
19   Q.    You have no idea?
20   A.    I have not done that count.
21   Q.    Would you dispute it if I said
22   56? "Yes" or "no."
23   A.    Same answer.  I have not done
24   the count.  I have no reason to agree or

Page 625

1    disagree.
2    Q.    So you're an expert.  Let's
3    assume that there are 56 opinions that
4    involve Janssen and Johnson & Johnson.
5        Can you do that?
6    A.    Yes.  That's a different
7    assumption from the last question.
8    Q.    Correct.
9    A.    You'll recall.
10   Q.    So that's a yes?
11   A.    That's correct.  I just want to
12   make it clear that that's different from
13   mentioning documents and opinions that
14   mention the name "Janssen."
15   Q.    Understood.
16       Of the 384 hours that you've
17   spent on this case, do you know how much time
18   you've spent reviewing Janssen and Johnson &
19   Johnson evidence?  "Yes" or "no"?
20   A.    No.
21   Q.    Do you know how many Janssen
22   and Johnson & Johnson documents you have read
23   in the 384 hours you've spent on this case,
24   "yes" or "no"?

Page 626

1    A.    No.
2    Q.    Are you able to give an
3    estimate of how many Janssen or J&J documents
4    you've read in the 384 hours you've spent on
5    this case?
6    A.    No.
7    Q.    Do you think you've reviewed
8    over 100 documents?
9    A.    Yes.
10   Q.    Do you think you've reviewed
11   over 100 Janssen and Johnson & Johnson
12   documents?
13   A.    Yes.
14   Q.    Do you think you've reviewed
15   over 1,000 Janssen and Johnson & Johnson
16   documents?
17   A.    Yes.
18   Q.    Do you think you've reviewed
19   over 10,000 Janssen and Johnson & Johnson
20   documents?
21   A.    Not individually, but by
22   search, yes.
23   Q.    So somewhere between 1,000 and
24   10,000 are documents you've actually reviewed

Page 627

1 that were produced by Janssen and Johnson &
2 Johnson; correct?
3         MS. CONROY:  Objection.
4         MS. LUCAS:  You can answer.
5         THE WITNESS:  Yes, as described
6    above.
7    Q.    (BY MS. LUCAS)  So let's talk
8 about a couple of these opinions.  And we do
9 not have time to go through all 56 because my
10 colleagues here would come after me with
11 pitchforks.  So let's turn first to --
12    A.    I'm sure they're not that mean.
13    Q.    I don't know.  They have a lot
14 of questions.
15         Let's turn to what I'm going to
16 mark as Exhibit 36.
17         (Whereupon, Deposition Exhibit
18    Egilman 36, Opinion-Around 1997,
19    "Venture" members Ortho-McNeil
20    (Johnson & Johnson) and Purdue began
21    co-promoting Ultram SR, intended for
22    the use of more moderate pain, was
23    marked for identification.)
24    Q.    (BY MS. LUCAS) This is opinion

Page 628

1 B397.  "Opinion.  Around 1997 Venture members
2 Ortho-McNeil, parenthesis, Johnson & Johnson,
3 and Purdue began co-promoting Ultram SR,
4 intended for the use of more moderate pain."
5         Did I read that correctly?
6    A.    Yes.
7    Q.    And this is your opinion;
8 correct?
9    A.    Yes.
10    Q.    Ultram is the brand name for
11 tramadol; correct?
12    A.    Yes.
13    Q.    This opinion relates to Ultram;
14 is that right?
15    A.    In part.
16    Q.    In part?
17    A.    Yes.
18    Q.    Do you know whether Ultram is
19 at issue in this litigation?
20    A.    I'm not sure I understand that
21 question.  Do you mean is it one of the named
22 drugs in the complaint?  Is that the
23 question?
24    Q.    No.  I want to know, do you

Page 629

1 know today whether the Court has ruled that
2 Ultram is or is not at issue in this
3 litigation?
4    A.    I do not know.
5         MS. CONROY:  Objection.
6    Q.    (BY MS. LUCAS) You do not know.
7 If the Court had ruled that Ultram is not at
8 issue in this litigation, would this change
9 your opinion at all?
10    A.    This opinion?  No.
11    Q.    Not at all?  Even when
12 confronted with evidence that something in
13 your opinion is simply not at issue, you're
14 not going to change the opinion?
15    A.    Correct.
16    Q.    Okay.  Now before we move on --
17 keep that with you real quick.  The two
18 documents that you cite are two Purdue
19 documents; correct?
20    A.    That's correct.
21    Q.    One is PKY181320029?
22    A.    Yes.
23    Q.    And the other is PKY183033731;
24 correct?

Page 630

1    A.    Yes.
2         MS. LUCAS:  Mark those as 37
3    and 38.
4    Q.    (BY MS. LUCAS) Now, I don't
5 want you to take all of your time reading
6 these documents because we don't have time,
7 but have you read these documents in coming
8 to your opinions?
9    A.    Yes.
10         (Whereupon, Deposition Exhibit
11    Egilman 37, Non-Malignant Pain
12    Consensus Guidelines, PKY181320029-
13    181320030, was marked for
14    identification.)
15         (Whereupon, Deposition Exhibit
16    Egilman 38, Purdue Pharma, L.P.,
17    Proposal, 8-26-98, PKY183033731-
18    183033736, was marked for
19    identification.)
20    Q.    (BY MS. LUCAS) Do you know
21 whether either Exhibits 37 or 38 says
22 anything about Ortho-McNeil?
23    A.    Not without reading the
24 documents.

Highly Confidential - Subject to Further Confidentiality Review

Page 631

1    Q.    You would have to read the
2  document to tell me?
3    A.    Yes.
4    Q.    And you can't tell me where in
5  the document Johnson & Johnson is mentioned?
6    A.    Correct -- without reading
7  them?  Correct.
8    Q.    I've read these documents, and
9  I can't find Ortho-McNeil or Johnson &
10 Johnson in either one of them.
11       Did you intend to base your
12 opinion about Johnson & Johnson on a document
13 that didn't mention J&J?  "Yes" or "no."
14   A.    I need to read the documents to
15 answer the question.
16   Q.    Well, did you -- would you
17 intend to base an opinion about J&J on a
18 document that has nothing to do with J&J?
19       MS. CONROY:  Objection.
20       THE WITNESS:  Oh, no.
21   Q.    (BY MS. LUCAS)  And would you
22 intend --
23   A.    Well, actually, nothing to do
24 with J&J?  Correct.  No, I wouldn't do that.

Page 632

1    Q.    And would you intend to base
2  your opinion on documents that don't mention
3  Ultram if your opinion is about Ultram?
4    A.    Depends on the context.
5    Q.    Well, I've read these
6  documents, and I can't find Ultram either.
7        So would you intend to base an
8  opinion about Ultram on documents that don't
9  mention it?
10   A.    Depends on the context.
11 Obviously in this case, yes.
12   Q.    Yes.  Okay.
13       All right.  I want to mark as
14 39, your opinion No. 77.  B77.
15       "Opinion.  Janssen targeted
16 youth and athletes.  Johnson & Johnson was
17 part of pain coalition with Janssen that
18 targeted youth.  Pain is not a disease.
19 Johnson & Johnson and Janssen engaged in
20 actions targeted at directly influencing
21 potential patients and children."
22       Is that your opinion,
23 Dr. Egilman?
24   A.    Yes.

Page 633

1        (Whereupon, Deposition Exhibit
2    Egilman 39, Exhibit B.77, David S.
3    Egilman Report Opiate Litigation, was
4    marked for identification.)
5    Q.    (BY MS. LUCAS)  "Yes" or "no."
6  Do you know what the pain coalition was?
7    A.    Yes.
8    Q.    And your opinion in No. 77,
9  Exhibit 39, is based on this Janssen Bates
10 number that's cited; correct?
11   A.    Yes.
12   Q.    "Yes" or "no," do you know
13 which Janssen employees were involved in the
14 pain coalition?
15   A.    Not without looking at the
16 documents.
17   Q.    Did you read any depositions in
18 forming this opinion?  "Yes" or "no"?
19   A.    No.
20   Q.    Do you know whether any of the
21 programs mentioned in the pain coalition
22 documents were actually launched to the
23 public?
24   A.    Yes.

Page 634

1    Q.    You do?  Do you know if any of
2  the youth programs mentioned in the pain
3  coalition documents were actually launched to
4  the public?
5    A.    Yes.
6    Q.    Do you believe that they were
7  launched?
8    A.    Yes.
9    Q.    What's the basis for that
10 belief?
11   A.    There's e-mails back and forth
12 about a nurse who was conducting the training
13 in elementary schools, getting more
14 wristbands to promote the program with
15 elementary school kids.
16   Q.    Are you sure about that?
17   A.    I think so.
18   Q.    Why isn't that document cited
19 here, Dr. Egilman?
20   A.    I don't know.
21   Q.    Strike that.
22       That document is not cited
23 there, is it?
24   A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 635

1    Q.    Do you know of any other youth
2 programs that Janssen or Johnson & Johnson
3 launched targeting youth?
4    A.    Besides this one?  No.
5    Q.    You're not aware of any other
6 programs targeting youth that actually
7 launched; correct?
8        MS. CONROY:  Objection.
9        THE WITNESS:  With respect to
10 pain, you're talking?
11    Q.    (BY MS. LUCAS)  With respect to
12 prescription medication or opioids.
13        MS. CONROY:  Objection.
14        THE WITNESS:  That's correct.
15    Q.    (BY MS. LUCAS)  Have you ever
16 heard of Smart Moves, Smart Choices?
17    A.    No.
18    Q.    Never heard of it?
19    A.    Correct.
20    Q.    Are you aware that Janssen
21 partnered with the National Association of
22 School Nurses to launch a program called
23 Smart Moves, Smart Choices?  "Yes" or "no"?
24    A.    I know there were nurses giving

Page 636

1 talks.  Paid for by Janssen.  I don't
2 remember the name of the program.
3    Q.    Are you aware that Smart Moves,
4 Smart Choices involved a program with nurses
5 where the point was to warn kids about the
6 dangers of opioids and other prescription
7 drugs, "yes" or "no"?
8    A.    No.
9    Q.    Are you aware that that program
10 was so popular with nurses, parents, and
11 educators, and schools that it continued for
12 six years and the website is still up today?
13 "Yes" or "no"?
14    A.    No.
15    Q.    Now, of all of the opinions
16 that you have that involve Janssen or Johnson
17 & Johnson, we counted up the documents that
18 you cited as the basis for your opinions.  Do
19 you know how many documents you cited as the
20 basis for your opinions against Janssen and
21 J&J?
22    A.    No.
23    Q.    We came up with 274 in
24 Exhibits B1 through B489.

Page 637

1        Does that sound like something
2 you would dispute?
3    A.    Yes.
4    Q.    Do you think there was more?
5 "Yes" or "no"?
6    A.    Yes, I think there's more.
7    Q.    How many more do you think
8 there are?
9    A.    I do not know.
10    Q.    Do you think there's more than
11 300?
12    A.    Yes.
13    Q.    Do you think there's more than
14 a thousand?
15    A.    Probably.
16    Q.    In Exhibits B1 through B489;
17 correct?
18    A.    And the attached materials,
19 yes.
20    Q.    All right.  If I'm right, and
21 there's only 274, you found those documents
22 by running search terms listed in Exhibit D
23 to your report; correct?
24    A.    No.

Page 638

1    Q.    Let me rephrase that.
2        You found documents by running
3 the search terms in Exhibit D and that you
4 talked about yesterday across the documents
5 listed in Exhibit D.
6        Oh, strike that.
7        You found documents by running
8 search terms across the documents located and
9 listed in Exhibit D; correct?
10        Exhibit D are the documents
11 that you searched; right?
12    A.    I don't think -- what's
13 Exhibit D?
14    Q.    The documents that you
15 searched.
16    A.    No, the documents I searched is
17 the entire database.  I don't think that's --
18    Q.    Oh, the entire -- so you
19 searched the entire database.  Everything;
20 right?
21    A.    That's what the searches were
22 run on.
23    Q.    Got it.
24        So if you've searched the

Page 639

1   entire Janssen production, that's over
2   700,000 documents. Do you have any reason to
3   dispute that?
4       A.   No. I didn't do that count
5   either.
6       Q.   You wanted your searches to be
7   accurate; correct?
8            MS. CONROY: Objection.
9            THE WITNESS: Correct.
10      Q.   (BY MS. LUCAS) You wanted your
11  searches to be comprehensive; correct?
12      A.   I wanted them to be relevant
13  more than comprehensive.
14      Q.   You wanted your searches to be
15  relevant; correct?
16      A.   Yes.
17      Q.   You didn't want to cherry-pick
18  anything for your opinions; correct?
19      A.   Correct.
20      Q.   So if you're citing 274
21  documents out of over 700,000, are you aware
22  that that's 0.048 percent of the documents in
23  Janssen's database?
24      A.   No.

Page 640

1       Q.   And are you aware that your
2   opinions do not cite 99.9 percent of
3   Janssen's documents?
4       A.   No.
5       Q.   And if given the chance, are
6   you going to sit down in the witness chair
7   and take an oath to tell the truth and tell
8   the jury that you haven't taken anything out
9   of context as to Janssen or Johnson &
10  Johnson? Is that what you will do?
11      A.   I don't think I'm going to be
12  answering that question unless you ask it.
13           And if you ask it, I had no
14  intent to take anything out of context.
15           MS. LUCAS: Thank you. I have
16  no more questions.
17           THE VIDEOGRAPHER: Off the
18  record at 1:52.
19           (Recess taken, 1:53 p.m. to
20  1:53 p.m.)
21           THE VIDEOGRAPHER: We are back
22  on the record at 1:53 p.m.
23           * * *
24           * * *

Page 641

1            EXAMINATION
2   BY MS. NAKAMURA:
3       Q.   Good afternoon, Dr. Egilman.
4   My name is Angel Nakamura, and I represent
5   the Endo and Parr defendants in this case.
6            In reviewing your opinions in
7   detail, particularly over the last couple of
8   days, I see that your report doesn't include
9   any specific opinions regarding Parr
10  Pharmaceuticals; is that right?
11      A.   I think there's some Endo
12  opinions.
13      Q.   Correct. There are no specific
14  opinions to Parr; correct?
15      A.   Not that I can recall.
16      Q.   You don't cite any documents or
17  refer to documents that are specific to the
18  Parr defendant; correct?
19      A.   Apart from the Endo documents,
20  correct.
21      Q.   And you're not offering any
22  opinions regarding Parr Pharmaceuticals in
23  this action; is that right?
24           MS. CONROY: Objection.

Page 642

1            THE WITNESS: I think any
2   opinions that relate to Endo relate to
3   Parr.
4       Q.   (BY MS. NAKAMURA) You don't
5   see Parr as a separate entity from Endo?
6       A.   I'm not -- to the extent that
7   Endo and --
8            I'm not making any
9   determinations about who the proper defendant
10  is. So my opinions relate to the drug and
11  what was done with the drug. Somebody else
12  is going to have to figure out who was
13  responsible for that activity at different
14  points of time.
15      Q.   Does your opinion refer to any
16  Parr Pharmaceutical documents?
17      A.   Not that I recall.
18      Q.   Your report and supporting
19  documents reference the Endo products
20  Opana ER and Percocet; is that right?
21      A.   Correct.
22      Q.   And your opinions don't relate
23  to any other Endo opioid products?
24      A.   Let's see.

Page 643

1    Q.    Let me just ask.
2    A.    I think that's not correct.
3    Q.    Do you intend to offer any
4  opinions about any other Endo products other
5  than Opana and Percocet?
6    A.    The opinions that I have on --
7  probably by inference, yes.
8    Q.    What does that mean, "probably
9  by inference"?
10   A.    My mic just fell.
11   Q.    Let me ask you a different
12 question, Dr. Egilman.
13        Does your expert report include
14 any opinions on products other than Opana and
15 Percocet with respect to Endo?
16   A.    Yes.  There are opinions with
17 respect to --
18        Yes.  Sorry.
19   Q.    And you were saying which
20 other -- which other Endo opioid products are
21 referenced in your expert report?
22   A.    Well, there are references to
23 hydromorphone, and oxycodone in the report.
24   Q.    And do you have any expert

Page 644

1  opinions regarding hydromorphone and
2  oxycodone?
3    A.    Yes.  I think they're in the
4  report.
5    Q.    Have you ever prescribed
6  Opana ER?
7    A.    No.
8    Q.    Have you ever prescribed
9  Percocet?
10   A.    Percocet?  Yes, I think I've
11 used Percocet.
12   Q.    Do you continue to prescribe
13 Percocet?
14   A.    No.
15   Q.    Do you recall the last time you
16 prescribed Percocet?
17   A.    If you look at the IMS data, I
18 think it's there.
19   Q.    Sitting here today, do you
20 recall the last time you prescribed Percocet?
21   A.    No.  You'd have to go to the
22 IMS sheets.
23   Q.    And did you prescribe Percocet
24 based on any marketing that you received from

Page 645

1  the Endo sales representatives?
2    A.    Not from a representative, no.
3    Q.    Have you ever been detailed by
4  an Endo sales representative?
5    A.    Not that I can recall.
6    Q.    Do you recall ever speaking
7  with any representative of Endo and telling
8  them that their promotion or marketing
9  practices were false and misleading?
10   A.    No.
11   Q.    You have not interviewed or
12 surveyed prescribers to determine whether any
13 doctor received or relied upon marketing
14 materials by Endo regarding its opioid
15 products; correct?
16   A.    Correct.
17   Q.    So you can't identify any
18 specific prescriber who wrote an improper
19 opioid prescription based on Endo's conduct?
20   A.    No, that's not correct.
21   Q.    Can you clarify that answer,
22 please?
23   A.    Sure.
24   Q.    What do you mean?  Can you --

Page 646

1  are you able to identify any specific
2  prescriber who wrote an improper opioid
3  prescription based on Endo's conduct?
4    A.    I think so.
5    Q.    Who is that?
6    A.    I don't have the name.
7    Q.    You don't have a specific
8  reference to a doctor?
9    A.    I don't remember the name.  I'm
10 not sure if I have a name.  I may have a
11 reference to a physician, per se, in these
12 counties.
13   Q.    And what is the reference to
14 the physician?
15   A.    Well, that would be in the call
16 notes.  If they were in call notes that
17 relate to and describe that activity, then
18 I'd have evidence.
19        And I have them somewhere in
20 the call notes in that pile.
21   Q.    Sitting here today, can you
22 think of or recall a call note that gave you
23 any indication that a physician adjusted his
24 prescription practices based on Endo

Page 647

1  marketing?
2      A.    No, I can't remember a
3  particular instance as I sit here today.
4      Q.    And you stated earlier you
5  haven't interviewed or surveyed any patients
6  to determine whether anyone has received a
7  medically unnecessary opioid prescription as
8  a result of Endo's conduct; correct?
9          MS. CONROY:  Objection.
10         THE WITNESS:  That's correct.
11     Q.    (BY MS. NAKAMURA) So you can't
12 identify any specific patient who received an
13 improper prescription based on Endo's
14 conduct; correct?
15     A.    No.  Not necessarily.
16     Q.    And what does that mean?  Can
17 you -- can you identify a specific patient
18 who received an improper prescription based
19 on Endo's conduct?
20     A.    There's two questions there.
21 Which one do you want answered?
22     Q.    Are you able to identify any
23 specific patient sitting here today who
24 received an improper prescription based on

Page 648

1  Endo's conduct?
2      A.    Not by name.
3      Q.    Is that a "no"?
4      A.    No, it's a "not by name."
5          THE VIDEOGRAPHER:  I apologize.
6      Can we go off the record for a second?
7          Going off the record at
8      2 o'clock p.m.
9          (Recess taken, 2:00 p.m. to
10     2:01 p.m.)
11         THE VIDEOGRAPHER:  We are back
12     on the record at 2:01 p.m.
13     Q.    (BY MS. NAKAMURA)  Are you able
14 to identify, Dr. Egilman, any specific
15 patient who received an improper prescription
16 based on Endo's comment?
17     A.    No, not by name.
18     Q.    You can't say that the opioid
19 crisis in Summit and Cuyahoga counties would
20 look any different if Endo had not marketed
21 or sold opioids; correct?
22     A.    No, not necessarily.
23     Q.    What does that mean?
24     A.    Well, that means if Endo had

Page 649

1  come out and said, "We're no longer going to
2  sell oxycodone," for example, "or Opana ER
3  because doctors are overprescribing, the
4  drugs are being diverted, there's an opioid
5  epidemic that our drugs are contributing to
6  and that the whole industry's drugs are
7  contributing to," then that would have
8  impacted on the opioid epidemic in these two
9  counties and in the United States.
10     Q.    You can't say that a patient
11 would not have received a prescription for
12 another opioid medication if Endo had not
13 manufactured or marketed its opioid, could
14 you?
15     A.    If they withdrew it for the
16 reason I said, and said what I said, then
17 some patients would not have gotten these
18 opioids.
19     Q.    And what's your opinion on how
20 the crisis would look different if Endo had
21 not marketed its opioid products?
22     A.    If they had not marketed and
23 explained the reason for not marketing the
24 way I just described it, then that would have

Page 650

1  significantly decreased the number of
2  prescriptions given, the amount of diverted
3  prescriptions, and it would have cut the
4  hockey stick off.
5      Q.    Can you quantify what you mean
6  by "significantly decreased"?
7      A.    Depends how strong that they
8  said what they said.  But if they said what I
9  said and it was a statement against interest
10 by an opioid manufacturer, it would have gone
11 right back to where it was in 1996.
12     Q.    If Endo had stopped marketing
13 its opioid products?
14     A.    Not just stopped marketing.  If
15 they'd given the reason for stop marketing or
16 the reason that I gave, it would have knocked
17 the hockey stick off.
18     Q.    Have you done any analysis to
19 determine what portion of the epidemic was
20 caused by Endo?
21         MS. CONROY:  Objection.
22         THE WITNESS:  Yes.
23     Q.    (BY MS. NAKAMURA) What have
24 you done?

Page 651

1    A.    All of it.  Everybody's
2  responsible for all of it.  Everybody's
3  equally responsible.
4    Q.    Everyone is equally
5  responsible?  Is there any attribution to
6  Endo that you would have -- excuse me, strike
7  that.
8          Are you able to tell me what
9  portion of the opioid crisis was caused by
10 Endo?
11   A.    Everybody is equally
12 responsible.  It's the bank robbery.
13 Somebody's outside watching for the cops.
14 Somebody's inside with the gun.  Everybody is
15 equally responsible for the community being
16 harmed.
17   Q.    Would you mind turning to
18 page 82 of your report and taking a look at
19 opinion 7.136?
20   A.    Got it.
21   Q.    And that opinion states that
22 "Endo sought to influence formulary decisions
23 by finding people to influence"; correct?
24   A.    Correct.

Page 652

1    Q.    And in support of your opinion,
2  you rely on one cited document; is that
3  right?
4    A.    I need to look at 136 to answer
5  that question.
6          (Whereupon, Deposition Exhibit
7     Egilman 40, Exhibit B.136, David S.
8     Egilman Report Opiate Litigation, was
9     marked for identification.)
10   Q.    (BY MS. NAKAMURA)  And in this
11 e-mail -- or in this exhibit, I'm sorry, you
12 pasted an internal Endo e-mail; correct?
13   A.    Correct.
14   Q.    And other than this e-mail, you
15 cite to no other documents in support of this
16 opinion; right?
17   A.    Not in this opinion, that's
18 correct.
19   Q.    Do you cite to --
20         Okay.  Scratch that.
21         You don't list any interviews
22 that support this opinion; right?
23   A.    No.
24   Q.    You don't cite any deposition

Page 653

1  testimony in support of this opinion?
2    A.    Correct.
3    Q.    And you don't set forth the
4  original question that you sought to answer;
5  right?
6          MS. CONROY:  Objection.
7          THE WITNESS:  Well, you can add
8     a "did" to the beginning and that's
9     the question.
10   Q.    (BY MS. NAKAMURA)  Right.  But
11 that isn't in -- anywhere in your expert
12 report; correct?
13   A.    There's no "did" in front of
14 the opinion, that's correct.
15   Q.    Let's take a look at the first
16 sentence of the e-mail which states "Marc, if
17 you have a clinical contact at VA who
18 influences formulary decisions, best if
19 they're a member of the formulary committee.
20 I'd be happy to provide a presentation on the
21 economic value of OP ER versus oxy."
22         Do you see that?
23   A.    I do.
24   Q.    You don't have any information

Page 654

1  on whether Endo ever identified a contact on
2  the VA formulary committee, do you?
3    A.    Correct.
4    Q.    And you don't know whether Endo
5  actually communicated with anyone on the VA
6  formulary committee; correct?
7    A.    Correct.
8    Q.    And you actually haven't
9  reviewed the presentation that's referenced
10 in this e-mail, have you?
11   A.    Couldn't find it.
12   Q.    Okay.  And you don't know
13 whether anyone on the VA formulary committee
14 took any action based on the information
15 received?
16   A.    Correct.
17   Q.    Let's take a look at
18 opinion 7.137, please.
19         It's also still on page 82 of
20 your report.
21         (Whereupon, Deposition Exhibit
22    Egilman 41, Opinion-ENDO was either
23    too cheap to add its opioid labels to
24    the 2014 PDR or completely

Page 655

1   irresponsible for this failure to warn
2   doctors of any data concerning these
3   dangerous drugs, was marked for
4   identification.)
5       Q.   (BY MS. NAKAMURA)  And this
6   opinion states:  "Endo was either too cheap
7   to add its opioid labels to the 2014 PDR or
8   completely irresponsible for this failure to
9   warn doctors of any data concerning these
10  dangerous drugs"; correct?
11      A.   Correct.
12      Q.   And in support of this opinion,
13  you cite the information contained in
14  Exhibit B137; right?
15      A.   Correct.
16      Q.   And again, that's your only
17  citation?
18      A.   Well, I cite the PDR.  It's not
19  in the PDR.
20      Q.   Correct.  But in this opinion,
21  you -- your resource and your source for the
22  opinion is B.137; correct?
23      A.   Well, plus the PDR.  That's in
24  the opinion.

Page 656

1       Q.   Right.
2            You don't list any other
3   documents?
4       A.   Aside from the PDR and what you
5   see, that's correct.
6       Q.   B137 contains two excerpts of
7   Endo's budgets; correct?
8       A.   Correct.
9       Q.   And other than those two budget
10  examples and the PDR, you don't rely on any
11  other documents in support of this opinion?
12      A.   Correct.
13      Q.   You don't list interviews?
14      A.   Correct.
15      Q.   You don't cite deposition
16  testimony?
17      A.   Correct.
18      Q.   And you don't set forth the
19  criteria you used to choose this document?
20      A.   Correct.
21           MS. CONROY:  Objection.
22      Q.   (BY MS. NAKAMURA)  Have you
23  ever reviewed any internal Endo
24  communications discussing whether Opana ER

Page 657

1   would be included in the 2014 PDR?
2       A.   No.
3       Q.   The PDR is a compendium of
4   FDA-approved labels for pharmaceutical
5   products; right?
6       A.   Plus more, but yes.
7       Q.   It contains --
8       A.   It also includes pictures of
9   the drugs and a variety of other information.
10      Q.   Thank you.
11           So it contains copies of
12  FDA-approved product labeling?
13      A.   Correct.
14      Q.   And those labels are actually
15  found on the products themselves; correct?
16      A.   Well, they're passed out to the
17  patient when the patient gets the drug.
18      Q.   Right.  As part of the package
19  insert?
20      A.   Right.  It's usually 4 to
21  6-point type, yes.
22      Q.   And the product labeling and
23  the package insert is also available on the
24  FDA's website; right?

Page 658

1       A.   It is now.  I'm not sure when
2   it first became available on the FDA web
3   site.
4       Q.   And there's no requirement that
5   a manufacturer submit its product label for
6   inclusion in the PDR; correct?
7       A.   A label requirement?
8       Q.   An FDA requirement.
9       A.   I don't think so.
10      Q.   There's no legal requirement
11  either that a manufacturer submit its label
12  for inclusion in the PDR; correct?
13      A.   Do you mean statutory?
14      Q.   Yes.
15      A.   Correct.  There's no statute
16  that says you have to do that.
17      Q.   Other than the PDR, a physician
18  can obtain the product labeling through other
19  sources; right?
20           MS. CONROY:  Objection.
21           THE WITNESS:  Not so easy.
22      Q.   (BY MS. NAKAMURA)  It's
23  available on the FDA website as you
24  previously testified?

Page 659

1    MS. CONROY:  Objection.
2    THE WITNESS:  I don't know when
3  it went on.  They're on the website
4  now.  I don't know if they were on the
5  website in 2014 or not.
6    Q.    (BY MS. NAKAMURA)  It's also on
7  the product itself; correct?
8    A.    Yeah.  The physician doesn't
9  get the product.  The patient gets the
10  product.
11    Q.    It's also available on the
12  manufacturer's website?
13    A.    I don't know.  I didn't check
14  the 2014 Endo website.  May or may not have
15  been.
16    Q.    And if it was on the Endo
17  website, a physician would have access to it
18  if he searched; correct?
19    A.    If he or she searched the Endo
20  website and if it was on there, he or she
21  probably could have found it.
22    MS. NAKAMURA:  Thank you.
23    THE VIDEOGRAPHER:  Going off
24  the record at 2:11.

Page 660

1    (Recess taken, 2:10 p.m. to
2  2:12 p.m.)
3    THE VIDEOGRAPHER:  We are going
4  back on the record at 2:13 p.m.
5    EXAMINATION
6  BY MR. ERCOLE:
7    Q.    Doctor, again, given the
8  shortness of time, I'd ask that you keep your
9  answers to "yes" or "no" unless they call for
10  a different answer.
11    Sir, "yes" or "no," can you
12  identify for me -- strike that.
13    Sir, you are not giving an
14  opinion about any marketing by Watson
15  Laboratories, are you?
16    A.    Correct.
17    MS. CONROY:  Can you identify
18  yourself and who you represent.
19    MR. ERCOLE:  Bryan Ercole from
20  Morgan Lewis.
21    MS. CONROY:  Who do you
22  represent?
23    MR. ERCOLE:  You're taking up
24  time.  Do you want to cut this off?

Page 661

1    MS. CONROY:  I'll give you just
2  a minute if you tell me who you
3  represent.
4    MR. ERCOLE:  I represent the
5  Actavis and Teva defendants.
6    MS. CONROY:  Thank you.
7    Q.    (BY MR. ERCOLE)  Sir, are you
8  giving any opinion about any marketing by
9  Actavis LLC?
10    A.    You know, with respect to both
11  the previous opinion and this opinion, I'm
12  giving opinions about the drugs and how they
13  were marketed and not -- not who owned them
14  at different points in time.
15    Q.    Sir, "yes" or "no."  Are you
16  giving an opinion about any marketing by
17  Actavis LLC?
18    A.    I don't know.
19    Q.    Can you identify for me any
20  marketing statement about opioids made by
21  Actavis LLC in Cuyahoga County or Summit
22  County?
23    A.    I have to look.
24    Q.    Sitting here right now, can you

Page 662

1  identify for me any marketing statement about
2  opioids made by Actavis LLC in Cuyahoga
3  County or Summit County?
4    MS. CONROY:  By memory?
5    THE WITNESS:  Sitting here
6  right now, I have to look at the
7  marketing materials that relate to the
8  products that Teva was selling, Actiq
9  and Fentora, which are ones that are
10  included in the report and see exactly
11  who authored them.  I don't remember
12  who authored them at various points in
13  time.  So to answer that question, I
14  have to go back and look at the
15  documents generally by looking at the
16  Bates numbers.
17    Q.    (BY MR. ERCOLE)  Sir, I was not
18  asking any questions about Teva.  My question
19  was about Actavis LLC.  Do you know what
20  opioid medicines, if any, they market?
21    A.    Yes.
22    Q.    Okay.  What medicines are they?
23  Just a list of them.
24    A.    Norco, which is hydrocodone

Highly Confidential - Subject to Further Confidentiality Review

Page 663

1  bitartrate and Tylenol.
2      Q.    And, sir, you're -- I'll cut
3  you off and say that your answer is
4  incomplete, but you're reading off of a list
5  of drugs that you have; is that correct?
6      A.    That's correct.
7      Q.    Okay.  Thank you.
8      A.    So you don't want any more?
9      Q.    No, I do not want any more than
10 that.
11          Do you have -- sitting here
12 today -- well, do you have a Redweld
13 concerning Actavis?
14     A.    I think so.
15     Q.    Okay.  Can you ask your team to
16 provide that Redweld right now?
17     A.    They're not my team.  They're
18 the lawyers on the case.
19     Q.    Fair enough.  Can you provide
20 that Redweld for me?
21     A.    I'm not in control of them.
22 Okay?  So you can ask them.
23          MR. ERCOLE:  Can you provide
24 the Redweld of Actavis documents?

Page 664

1          MS. CONROY:  What do you
2  actually mean by "Actavis"?  Do you
3  want the opinions --
4          If you would like the opinion
5  numbers, if you list the opinion
6  numbers.
7          MR. ERCOLE:  Sure.  I don't
8  want to object because we're taking up
9  time, but you said you believe you
10 have a Redweld Actavis document, and
11 I'd like to see what that Redweld is.
12 So can you please provide that Redweld
13 to the extent one exists.
14         MS. CONROY:  And each Redweld
15 corresponds to an opinion.  So you
16 need to provide the opinion number so
17 out of these boxes, we can identify it
18 and give you the Redweld.
19         MR. ERCOLE:  Okay.  Well,
20 you've done -- for other defendants
21 you've provided entire boxes of all of
22 the opinions there.
23         MS. CONROY:  When they have
24 identified an opinion number.

Page 665

1          MR. ERCOLE:  Okay.
2          Let me keep moving forward.
3      Q.    (BY MR. ERCOLE)  Sir, sitting
4  here today, can you identify any Summit or --
5  Summit County or Cuyahoga County prescriber
6  who wrote an opioid preparation because of a
7  false or misleading statement by any Actavis
8  entity?
9          MS. CONROY:  Objection.
10         THE WITNESS:  I don't know.
11 I'd have to go check the call notes.
12 I think I have call notes by Actavis.
13 So the answer is probably yes.
14     Q.    (BY MR. ERCOLE)  You believe
15 you have call notes concerning Actavis; is
16 that correct?
17     A.    Correct.
18     Q.    Okay.  Sitting here today, can
19 you identify for me any -- the name of any
20 prescriber?
21     A.    I don't think the names are in
22 there, but I feel I've got an opinion on
23 this.  I think it's B7.  B7's going to list
24 the documents which I think include Actavis

Page 666

1  documents that identify people who could be
2  characterized the way you characterize them.
3  That is, they were misled by Actavis
4  advertising or marketing.  And you need to go
5  through that opinion and find them.  I think
6  I have them broken down by company.
7      Q.    Well, that's exactly what I've
8  asked.  You said you've broken it down by
9  company.
10         Sir, it's a yes-or-no answer.
11 Sitting here right now, can you identify for
12 me any prescriber who was in Cuyahoga or
13 Summit County that was misled by any
14 statement by Actavis?
15     A.    Not without looking at the
16 Actavis exhibits that are cited in B7.
17     Q.    Okay.  Thank you.
18         Sitting here today, can you --
19 sitting here right now, can you identify for
20 me any prescriber in Cuyahoga or Summit
21 County that was misled by any statement from
22 Cephalon?
23     A.    Same answer.  I have to go back
24 to the call notes.  I think there's evidence

Highly Confidential - Subject to Further Confidentiality Review

Page 667

1  of that in the call notes. So I have to look
2  at the call notes by Cephalon.
3      Q.  Fair enough. And would that
4  same answer apply to Teva USA too?
5      A.  Correct.
6      Q.  Okay. Sir, do you -- you are
7  not giving an opinion on the TIRF REMS
8  program; is that correct?
9      A.  Except that they don't work.
10     Q.  Okay. That is not listed in --
11  the TIRF REM -- do you know what a TIRF
12  medicine is?
13     A.  Yes. It's the transdermal
14  fentanyls.
15     Q.  Are you aware, sir, that before
16  a prescription can be written under the TIRF
17  REMS program, a prescriber must sign an
18  agreement with the patient stating that he or
19  she has counseled the patient about the risk,
20  benefits, and appropriate use of TIRF
21  medicines?
22     A.  That's what they're supposed to
23  do, that's right.
24     Q.  And are you aware that under

Page 668

1  the TIRF REMS program, prescribers must be
2  aware of the risks of any TIRF REM -- TIRF
3  medicine before they write a prescription for
4  one of those medicines?
5      A.  That's generally true under any
6  program, yes.
7      Q.  And are you aware under the
8  TIRF REMS program, a doctor must agree to
9  assess his or her patient for signs of misuse
10  or abuse?
11     A.  Yes.
12     Q.  You do not list any specific
13  opinions in your report about the TIRF REMS
14  program, do you?
15     A.  I think that's correct.
16     Q.  Sir, do you have a Redweld for
17  Teva that contains the opinions that you're
18  giving about Teva in this case?
19     A.  Well, I have -- I have Teva
20  opinions, and they have them in Redwelds back
21  there.
22     Q.  Okay. And are they grouped
23  together?
24     A.  I don't know. I didn't do that

Page 669

1  part of the organizing.
2      Q.  Fair enough. I'm going to --
3  why don't I give you a composite exhibit of
4  documents here.
5          I will represent to you that
6  they are documents B1, B49, B50, B94, B310,
7  B398, and B454.
8          And by "documents," I mean the
9  Exhibits B to your report.
10         (Whereupon, Deposition Exhibit
11  Egilman 42, B1, B49, B50, B94, B310,
12  B398, and B454, was marked for
13  identification.)
14     MS. CONROY:  And you want
15  counsel to pull those folders?
16     THE WITNESS:  I don't -- I
17  mean, if they -- I'll represent to you
18  those are the documents that were in a
19  box over there marked "Teva," and
20  these are the opinions that are
21  reflected in that box over there.
22         So if you want to pull them,
23  you can pull them.
24     MS. CONROY:  No, we're only

Page 670

1  going to pull them if you want them.
2      MR. ERCOLE:  I'm just going to
3  move forward with my questions.
4      MS. CONROY:  Don't pull them,
5  then.
6      THE WITNESS:  I'm going to want
7  them.
8      MS. CONROY:  You want them?
9  Then fine, we will pull them.
10     MR. ERCOLE:  If he needs them,
11  I'd like to go off the record so we're
12  not taking up time doing that.
13     MS. CONROY:  No, we're not
14  going off the record. These are
15  opinions that were provided to you
16  with the basis, and we have time -- we
17  have ourselves brought them here, and
18  if the doctor would like to refer to
19  them. You can tell him not to refer
20  to them.
21     MR. ERCOLE:  They're right in
22  front of him.
23     MS. CONROY:  No, that is not
24  the full opinion.

Page 671

1 MR. ERCOLE: Sure. Feel free
2 to pull the exhibits for those.
3 Q. (BY MR. ERCOLE) Sir, these are
4 Exhibits B -- the composite exhibit I showed
5 you reflect Exhibits B1, B49, B50, B94, B310,
6 B398, and B45.
7 Excuse me, B454 of your report.
8 Do you see that?
9 A. You said 398 and 454?
10 Q. Yes, sir.
11 A. That's what I've got.
12 Q. Okay.
13 Looking at those documents --
14 and you refer to Teva in those documents?
15 Do you see that?
16 A. I do.
17 Q. Okay.
18 What Teva entity are you
19 referring to?
20 A. Well, for the first one, it
21 would be the Teva that was subject to the CIA
22 in 2010.
23 Q. Sir, and -- do you know that
24 with respect to each of the exhibits that I

Page 672

1 provided to you, that Teva Pharmaceuticals
2 USA is not referenced in any of these -- any
3 of the documents that you have cut and pasted
4 or quoted from in connection with those
5 opinions?
6 A. Well, I don't think that's
7 correct.
8 Q. Okay. Do you know that all of
9 the documents referenced therein refer to
10 conduct by Cephalon as opposed to Teva
11 Pharmaceuticals?
12 MS. CONROY: Objection.
13 THE WITNESS: No, not exactly.
14 Q. (BY MR. ERCOLE) Do you know
15 the relationship between Cephalon and Teva
16 Pharmaceuticals USA?
17 A. I think Teva bought Cephalon.
18 Q. And that's your understanding?
19 A. They own them in some way.
20 That's my understanding based on the fact
21 that all these documents that we are
22 discussing have Teva Bates numbers on them.
23 They were produced by Teva, not Cephalon.
24 Q. With respect to the opinions

Page 673

1 that I've given you in that composite
2 exhibit, there is no deposition testimony
3 from this case to -- that is cited in those
4 exhibits to support those opinions; correct?
5 A. Correct.
6 Q. And there are no interviews of
7 prescribers or patients that have been
8 provided to support those opinions; correct?
9 A. Do you mean by me?
10 Q. Yes.
11 A. Correct.
12 Q. There is no specific written
13 narrative in connection in -- with these
14 exhibits, the composite exhibit I gave you to
15 support the opinions that you're giving;
16 correct?
17 MS. CONROY: Objection.
18 THE WITNESS: No.
19 Q. (BY MR. ERCOLE) That's
20 incorrect?
21 A. Correct.
22 Q. Okay.
23 You have not provided any
24 independent analysis in connection with the

Page 674

1 opinions that I'm showing you linking any of
2 the conduct that is described in these
3 opinions to any prescriber in Ohio; correct?
4 MS. CONROY: Objection.
5 THE WITNESS: Not necessarily.
6 Q. (BY MR. ERCOLE) Sir, have you
7 provided any written analyses, you
8 independently writing something in connection
9 with these opinions, that links any of the
10 conduct described in these opinions to any
11 opioid prescription in Ohio?
12 MS. CONROY: Objection.
13 Q. (BY MR. ERCOLE) I'm not asking
14 whether or not they quote documents or not.
15 Is there any narrative that you've offered
16 for these opinions linking anything, any of
17 the conduct described therein, to any opioid
18 prescription in Ohio?
19 A. There's no narrative by me.
20 MS. CONROY: Objection.
21 MR. ERCOLE: Okay.
22 Q. (BY MR. ERCOLE) And there's no
23 narrative by you --
24 A. Hang on one second. Are you

Page 675

1  doing all five opinions?
2      Q.   Yes.
3      A.   Okay.  Let's -- let me look at
4  them all, then.
5      Q.   Sir, I'll withdraw the
6  question, because we just -- in all due
7  respect -- with all due respect, we don't
8  have enough time for you to complete that
9  analysis.
10      Any --
11      MS. CONROY:  Objection, move to
12  strike.
13      Q.   (BY MR. ERCOLE)  Any opinion
14  that you are giving -- strike that.
15      Any of these opinions say
16  specifically that Cephalon or Teva USA caused
17  the opioid crisis in Ohio?
18      MS. CONROY:  Objection.
19      THE WITNESS:  Yes.
20      Q.   (BY MR. ERCOLE)  Sir, do any of
21  the opinions I just showed you expressly
22  state that Cephalon or Teva USA caused the
23  opioid epidemic in Ohio?
24      MS. CONROY:  Objection.

Page 676

1      THE WITNESS:  No.
2      Q.   (BY MR. ERCOLE)  Okay.  Do any
3  of the opinions I just showed you expressly
4  state that Cephalon or Teva USA caused any
5  prescriber in Ohio to write an improper
6  opioid prescription?
7      A.   No.
8      Q.   Do any of the opinions I just
9  showed you expressly state that Cephalon or
10  Teva USA caused any patient to be harmed by
11  any opioid prescription in Ohio?
12      A.   Now I have to look at them.
13      Q.   Sir, I'll withdraw the
14  question.
15      The title of your -- none --
16  none of the opinions that are titled say
17  anything about Teva or Cephalon causing any
18  patient to be harmed by any opioid
19  prescription in Ohio; correct?
20      A.   The titles?
21      Q.   Yes.
22      A.   Correct.  Well, let me look at
23  the titles and answer.
24      Q.   Sir, I'll withdraw the

Page 677

1  question.  The titles will speak for
2  themselves.
3      With respect to -- let me ask
4  this.
5      With respect to any of the
6  Teva, Cephalon or Actavis opinions that
7  you're giving in this case, is there anything
8  that would prevent a juror from reading the
9  documents that you cite in your opinions and
10  then reaching the same opinion?
11      MS. CONROY:  Objection.
12      THE WITNESS:  Depends on the
13  juror.
14      Q.   (BY MR. ERCOLE)  There may be
15  some that would be able to certainly reach
16  the same opinion?
17      A.   Certainly if there was someone
18  with my training and expertise, they -- but
19  they wouldn't have time to read them during
20  the course of a short trial.  So they
21  couldn't -- they couldn't -- it would be
22  like -- I mean, what I --
23      They couldn't -- they wouldn't
24  have time to read them all, and so that would

Page 678

1  not be possible during a trial.
2      I mean, if they were board
3  certified in internal medicine with training
4  in epidemiology and public health --
5      Q.   Sir, it was a -- it was a
6  "yes/no" question.
7      A.   Okay.  Well, depends on the
8  juror, then.
9      Q.   Okay.  And --
10      A.   And how much time they have
11  during the trial.
12      Q.   Do you -- sir, are you -- are
13  you aware that with respect to the opinions
14  that you are giving as to Teva, Cephalon, any
15  Actavis entity, that the total number of
16  documents that you've cited in connection
17  with those opinions is less than 30?
18      A.   I don't think that's correct.
19      Q.   Okay.  So you're not aware of
20  that, then?
21      A.   I think it's wrong.
22      MR. ERCOLE:  Okay.  Great.
23      And I'll -- just continue to
24  note on the record that to be honest

Page 679

1  with you, this is absolutely
2  ridiculous that we're forced to have
3  to ask questions in the way that I did
4  concerning multiple entities. So I
5  appreciate your position on that, but
6  I just want to make it clear on the
7  record, we certainly object and
8  believe our due process rights are
9  being infringed upon.
10      Thank you.
11      THE VIDEOGRAPHER: Off the
12  record. 2:33.
13      (Recess taken, 2:32 p.m. to
14  2:51 p.m.)
15      THE VIDEOGRAPHER: We are back
16  on the record at 2:52.
17      EXAMINATION
18  BY MR. GOLDSTEIN:
19      Q.   My name is Josh Goldstein. I
20  represent Mackenrodt LLC in this case.
21      A.   Good afternoon.
22      Q.   Now, you just testified to
23  Mr. Ercole that your opinions relate to
24  particular drugs and how they were marketed

Page 680

1  and not who owned those particular drugs.
2      Is that accurate?
3      A.   No.
4      Q.   Okay. Would you like to
5  correct your prior testimony?
6      A.   I don't think that's my prior
7  testimony.
8      Q.   Does the definition that you
9  provide of venture only apply to companies
10  and not drugs?
11      A.   No, it applies to the companies
12  I mentioned and the opioid drugs that they
13  manufacture.
14      Q.   And if those drugs are
15  manufactured by a non-defendant, they would
16  not apply to the venture?
17      A.   I don't know if they would or
18  wouldn't. I don't have documents on a
19  company that's not in the litigation.
20      Q.   Now, are you offering a legal
21  opinion of whether the defendants in this
22  litigation are engaged in a venture?
23      A.   I don't know -- if I'm offering
24  an opinion, it's not a legal opinion. I'm

Page 681

1  not a lawyer or a judge.
2      Q.   Have you ever been provided
3  with a legal definition of the word
4  "venture"?
5      A.   No.
6      Q.   And what about a conspiracy?
7  Are you offering a legal opinion about
8  whether the defendants are engaged in a
9  conspiracy?
10      A.   No, I don't think -- I don't
11  use the word "conspiracy" at all.
12      Q.   And have you ever been provided
13  in connection with your work in this case a
14  legal definition of the word "conspiracy"?
15      A.   No.
16      Q.   Now, you testified earlier --
17  I'm going to hand you what's been marked as
18  Exhibit 5 to your deposition.
19      And that's your assignment in
20  this case; correct?
21      A.   Correct.
22      Q.   And that assignment refers to,
23  in part, analyzing whether defendants worked
24  together and/or separately; do you see that?

Page 682

1      A.   Yes.
2      Q.   Are there any defendants who
3  worked only separately? Did not work
4  together as part of this venture?
5      A.   No.
6      Q.   So it would be fair to delete
7  the -- where you see it says "together and/or
8  separately," would it be accurate to delete
9  the "or"?
10      A.   No.
11      Q.   Are there any defendants who
12  were part of the venture but did not work in
13  concert with other defendants?
14      A.   At some point in time, no.
15      Q.   Okay.
16      A.   Let me -- I'm not sure if
17  that's a clear answer to that question.
18      All of the members of the
19  venture at one point in time or another were
20  members of the same organization or
21  organizations that met the definition for the
22  venture.
23      Some of them acted
24  independently. That is, they did not -- some

Page 683

of the actions that the individual venture
member did were done independently of the
venture, and I have no evidence that the
venture knew about what they did when they
did it.

Q. Did you distinguish in your
report between when a defendant was acting
together versus when a defendant was acting
separately in furtherance of the venture?

A. In some cases, it's -- I think
it's almost always obvious, because I'm
either talking about acting through
organizations or KOLs, or I'm talking about
specific things that only one company would
know about.

Q. So that's the distinction you
would draw between acting together and
separately?

A. I didn't make a distinction. I
said "and/or." That's not a distinction.

Q. No, your testimony that you
just provided, that's the distinction you
would draw?

Or strike that.

Page 684

That's how you -- your
testimony is that's how you determined or set
forth in your report when a defendant was
acting together and when a defendant was
acting separately?

A. Well, what do you mean by
"That's how"?

Q. I'll strike the question.

You're aware that there are
manufacturers of opioids that are not
defendants in this case?

A. Yes.

Q. Now, putting aside the fact
that they're not defendants, but for that
fact, are they participants in the venture?

A. I do not know.

Q. And why is that?

A. Because I haven't seen their
documents. I haven't seen or reviewed their
materials.

I haven't reviewed their call
notes. I haven't done the things I've been
able to do with participants in the
litigation.

Page 685

Q. So it's possible to be a
manufacturer of prescription opioids and not
be a member of the venture, putting aside the
fact that your term is limited to defendants?

A. Anything is possible.

Q. But it just so happens that all
of the defendants are also all members of the
venture?

Is that right?

MS. CONROY: Objection.

THE WITNESS: No.

Q. (BY MR. GOLDSTEIN) If you
turn -- I'm going to hand you what's
previously been marked as Exhibit 12.

And I want to refer you to
subparagraph (2). You say "They" -- they
being the members of the venture -- is that
right?

A. Yes.

Q. "Worked together to influence
public perceptions of the class of narcotic
drugs," and then you list "drug toxicity,
untreated pain and encouraged use of
narcotics instead of non-medication

Page 686

treatments or less addictive drugs."

Do you see all of that?

A. Yes.

Q. Did all of the members of the
venture work together to influence public
perceptions of the class of narcotic drugs
with respect to the drug toxicity?

A. All of the members of the
venture worked in organizations or separately
to minimize drug toxicity.

Q. That wasn't my question. My
question was whether they all worked together
to influence public perceptions of the class
of narcotic drugs with respect to the drug's
toxicity?

A. All of the members of the
venture worked in organizations or separately
to influence public perceptions of the class
of narcotic drugs with respect to the drug's
toxicity.

Q. And is that true with respect
to untreated pain?

MS. CONROY: Objection.

THE WITNESS: Yes.

Page 687

1    Q.    (BY MR. GOLDSTEIN) And same
2 for subparagraph (c)?
3    A.    Yes.
4    Q.    And is it your testimony that
5 your report sets forth the ways in which each
6 defendant did each of these three things?
7 2(a), (b), and (c) of Exhibit 12?
8    A.    In the way that I described
9 before, yes.
10        And by that, I mean my
11 definition of "together and separately."
12    Q.    Understood.
13        Now, you would agree with me
14 that there's no written explanation in your
15 report for when -- that defines when each
16 manufacturer that's a member of the venture
17 became a member of the venture.
18    A.    It exists for some, probably
19 not for all.
20    Q.    So just by reading your report,
21 each member of the venture could not look at
22 the report and determine when they became a
23 member of the venture?
24    A.    No, they could know when they

Page 688

1 were a member of the venture. But when they
2 first became a member of the venture, that --
3 I didn't have data on that for all the
4 companies.
5    Q.    You --
6    A.    So in other words, when they
7 joined the American Pain Foundation, that
8 would be a joining of the venture. Or when
9 they joined the Pain Care Forum, that would
10 be joining an activity of the venture. Or
11 when they joined an activity --
12    Q.    I think I understand your
13 testimony.
14    A.    -- of JACHO --
15    Q.    I think I understand your
16 testimony.
17    A.    So the answer is incomplete.
18 No problem.
19    Q.    So my question -- so you said
20 you didn't have the data for each company on
21 when they became a member of the venture;
22 right?
23    A.    I didn't include the data for
24 membership.

Page 689

1    Q.    Oh. So --
2    A.    It wasn't like the Communist
3 Party. They didn't give out cards.
4    Q.    So you have the data; you just
5 didn't include it in your report?
6    A.    For some, I may have the data,
7 and for some, I don't have the data.
8    Q.    So for some, even you have no
9 idea when the defendant became a member of
10 the venture?
11        MS. CONROY: Objection.
12        THE WITNESS: I don't know, for
13    example, when -- and I don't know if I
14    have this or not -- when Purdue first
15    became a member of the Pain Care
16    Forum, or when Endo first joined HDMA.
17    Q.    (BY MR. GOLDSTEIN) That's not
18 my question.
19    A.    I don't have that data.
20    Q.    That's not my question. My
21 question is even you do not know when each
22 defendant that's a member of the venture
23 became a member of the venture.
24        MS. CONROY: Objection.

Page 690

1        THE WITNESS: Well, I think I
2    have -- most of that information is in
3    the documents, but I certainly didn't
4    put it in the report by date.
5    Q.    (BY MR. GOLDSTEIN) Okay. Do
6 you have an understanding that manufacturers
7 of prescription opioids manufacture different
8 types of prescription opioids; right?
9    A.    Yes.
10    Q.    And those prescription opioids
11 have different benefits and risks associated
12 with them?
13    A.    No, not necessarily.
14    Q.    Do they have different
15 benefits?
16    A.    Some do, some don't. Some have
17 the same benefits. After all, you have some
18 generics. They all are addictive, so that's
19 the same risk.
20    Q.    So the ones --
21    A.    They all work for short-term
22 pain, for some short-term pain. So there's a
23 wide range of overlap between different
24 opioids.

Page 691

1  Q.   Is it fair to say that
2  manufacturers of prescription opioids found
3  in certain cases compete against each other
4  in manufacturing different products that they
5  bring to the market?
6  A.   Yes.
7  Q.   And if a manufacturer -- strike
8  that.
9       Are you -- you're aware that
10 some prescription opioids are not intended to
11 be used by patients who are not already
12 taking a prescription opioid?
13 A.   Who have not developed
14 tolerance to prescription opioids.  That
15 would be the TIRF REMS thing, for example.
16 Q.   In an instance where a
17 manufacturer manufactures an opioid that's
18 intended to be used by a patient who's
19 already taking a different opioid, would you
20 agree that the -- that that manufacturer is
21 not manufacturing the opioid to be used by a
22 patient who's not already taking an opioid?
23 MS. CONROY:  Objection.
24 THE WITNESS:  No.

Page 692

1  Q.   (BY MR. GOLDSTEIN)  Now,
2  you've --
3  A.   No, look at Insys.
4  Q.   You previously testified that
5  you prescribed opioids.
6       Do you recall that testimony?
7  A.   Yes.
8  Q.   Before prescribing opioids, do
9  you agree that prescribers should always
10 ensure that the benefits outweigh the risks?
11 A.   When possible.
12      It's not possible in all
13 situations.
14 Q.   Is that what you did when you
15 prescribed opioids?  You always evaluated
16 whether the benefits outweighed the risks?
17 A.   No.  I relied on the
18 information available to me to do that.
19      I could not -- I could not
20 evaluate risks and benefits because the
21 companies misrepresented risks and
22 benefits --
23 Q.   I'm saying based on the
24 information --

Page 693

1  A.   Excuse me.  Let me finish my
2  answer.
3  Q.   I'll strike the question.
4       Based on the information that
5  was available to you at the time you
6  prescribed opioids, did you always ensure
7  that the benefits outweighed the risks as you
8  understood them?
9  A.   I tried to do that.
10 Q.   And in trying to do that, you
11 relied on your medical training and
12 experience; correct?
13 A.   In part.
14 Q.   And on medical research and
15 scientific studies?
16 A.   In part.
17 Q.   On CMEs?
18 A.   I don't think I had any CMEs on
19 opioids when I was prescribing.
20 Q.   Are you aware that other
21 prescribers rely on CMEs?
22 MS. CONROY:  Objection.
23 Q.   (BY MR. GOLDSTEIN) I'll strike
24 the question.

Page 694

1       You relied on the contents of
2  the FDA-approved label when you prescribed
3  opioids?
4  A.   Yes.
5  Q.   And when you considered the
6  risks, you considered the patient's medical
7  history?
8  A.   Yes.
9  Q.   And you considered -- strike --
10 and when you considered the risks and
11 benefits, you considered the patient's
12 presentation based on your examination and
13 interview with that patient?
14 A.   Yes.
15 Q.   And you considered whether the
16 patient -- strike that.
17      Are you aware that particular
18 patients have a disproportionate risk of
19 developing an opioid-related substance abuse
20 or dependence?
21      Are some patients more likely
22 to develop a substance abuse dependence than
23 others?
24 MS. CONROY:  Objection.

Page 695

1 THE WITNESS: Certainly those
2 with a previous history of substance
3 abuse, yes.
4 Q. (BY MR. GOLDSTEIN) And is that
5 something you consider when prescribing
6 opioids?
7 MS. CONROY: Objection.
8 THE WITNESS: Well, I tried to
9 consider that. That's something
10 patients often don't tell the truth
11 about.
12 Q. (BY MR. GOLDSTEIN) What are
13 the factors that you would look to to
14 determine whether a patient was a particular
15 risk of developing a substance abuse disorder
16 or dependence?
17 A. Basically whether they said
18 they'd had a substance abuse disorder in the
19 past. You asked that question. You asked
20 about the history of a use of opioids.
21 MR. GOLDSTEIN: We can go off.
22 THE VIDEOGRAPHER: Off the
23 record at 3:09.
24 (Recess taken, 3:08 p.m. to

Page 696

1 3:10 p.m.)
2 THE VIDEOGRAPHER: We are back
3 on the record at 3:11.
4 EXAMINATION
5 BY MS. WELCH:
6 Q. Good afternoon, Dr. Egilman.
7 My name is Donna Welch. I represent the
8 Allergan defendants.
9 A. Good afternoon.
10 Q. Thank you.
11 The first thing I want to try
12 to do is fairly efficiently make sure that I
13 have a record for my client of all of the
14 documents and other material that forms the
15 bases for your opinions as they specifically
16 relate to Actavis or Allergan.
17 I have identified opinions 6,
18 123, 385, 426, 444 and 480, as specifically
19 referring to Actavis and/or Allergan. And
20 I've had counsel pull the support materials
21 for those opinions.
22 Am I correct, Dr. Egilman, that
23 the materials included in those exhibits,
24 which we've marked as Egilman 43 through

Page 697

1 Egilman 48, as well as any documents that are
2 contained in the colored folders that were
3 marked as Group Exhibit 26 yesterday, contain
4 all of the bases for your opinions 6, 123,
5 385, 426, 444, and 480?
6 (Whereupon, Deposition Exhibit
7 Egilman 43, B.6 Redweld, was marked
8 for identification.)
9 (Whereupon, Deposition Exhibit
10 Egilman 44, B.123 Redweld, was marked
11 for identification.)
12 (Whereupon, Deposition Exhibit
13 Egilman 45, Tab 22, Exhibit 385, was
14 marked for identification.)
15 (Whereupon, Deposition Exhibit
16 Egilman 46, B.426 Redweld, was marked
17 for identification.)
18 (Whereupon, Deposition Exhibit
19 Egilman 47, B.444 Redweld, was marked
20 for identification.)
21 (Whereupon, Deposition Exhibit
22 Egilman 48, B.480 Redweld, was marked
23 for identification.)
24 THE WITNESS: Yeah. I think

Page 698

1 that's correct, but I think if you're
2 delineating it by your initial
3 prologue, it would also include B7 and
4 the Perry appendices that I mentioned
5 yesterday that I brought today.
6 Q. (BY MS. WELCH) Thank you for
7 that.
8 Including, then, B7 and the
9 Perry appendices that you referenced, do the
10 materials marked in Egilman 4 through 48 and
11 Egilman 26 together contain all of the bases
12 for the opinions that I just identified?
13 A. I believe so.
14 Q. Thank you.
15 I am also going to hand you
16 what I've marked as Exhibit 49.
17 Jayne, I'm going to read the
18 Bates numbers and then hand you the other
19 copy.
20 (Whereupon, Deposition Exhibit
21 Egilman 49, February 2010 email chain.
22 Subj: RE: Call this Afternoon with
23 attachments, Acquired_
24 Actavis_00367447-367452 plus 3 more

Page 699

pages, was marked for identification.)

Q. (BY MS. WELCH) This is an e-mail dated 2-17-2010 that bears the Bates label 7447, and it has two attachments.

Egilman 49, Dr. Egilman, I will represent was one of the documents that you identified yesterday as being contained in Group Exhibit 26.

These documents reference a Kadian speaker's program; correct?

A. Correct.

Q. Did you do anything, one way or another, to determine if a Kadian speaker's program was ever implemented by Actavis or Allergan?

A. Apart from these documents? No.

Q. So you do not know, one way or another, whether a Kadian speaker's program was implemented; correct?

A. No. I'd have to look at the documents.

My recollection is it was one, but I'd need to look to be sure.

Page 700

Q. I'll represent to you, Dr. Egilman, that these refer to a proposed Kadian speaker's program and a proposed budget. I just want to make sure that I understand correctly that other than these documents, you have no information to support an opinion that a Kadian speaker's program was actually ever implemented; correct? Other than these documents.

A. I don't think that's correct. I have the KOL opinion, with -- which included some funding from Kadian, which -- some of which, I think, went for speakers. Now, whether those speakers were under this program or another program, I don't recall.

Q. I'm going to have you turn to page 129 in your report. And I want to ask you about opinion 444. 7.444.

A. What page?

Q. 129.

A. Okay.

Q. Opinion 444 says "Allergan did many bad things, such as lying about addiction, expanding the opioid market,

Page 701

claimed pain was a disease, and entered into settlements and guilty pleas."

Do you see that?

A. I do.

Q. You used the term "many bad things."

Is that a term of art in your areas of expertise?

A. No.

Q. Is there some technical definition or meaning to "bad things" that you can explain for me?

A. Sure. It would be defined by the specific examples listed in the documents that were listed below.

Q. Would you agree with me that your report that has been marked by -- as an exhibit in a case does not contain any written analysis describing how you came to that opinion?

MS. CONROY: Objection.

THE WITNESS: Do you mean by me?

Q. (BY MS. WELCH) Correct.

Page 702

A. I think that's correct.

Q. Would you agree with me that your report does not contain any written analysis by you explaining how the referenced or cited documents support the opinion that Allergan did many bad things?

A. Correct.

Q. Would you agree with me that your report does not contain any written explanation by you why you believe that those documents constitute the best evidence regarding your opinion 7.444?

A. Correct.

Q. What was the answerable question that was the underpinning for opinion 7.444?

A. The same issue, the general -- my general assignment.

Q. What was the specific uncertainty that you translated to the answerable question for purposes of coming to your expert opinion 7.444?

A. It's my assignment in the case.

Q. The specific uncertainty and

Page 703

1 the answerable question that underpin
2 opinion 7.444 are the assignment in the case
3 that you read yesterday from a piece of paper
4 and which was marked as an exhibit?
5     A.    Correct.
6     Q.    Exhibit -- I'm sorry,
7 opinion 7.444 lists four specific things:
8 "Lying about addiction, expanding the opioid
9 market, claiming pain was a disease, and
10 entering into settlement and guilty pleas."
11     Are there any other specific
12 things that you claim Allergan did that you
13 contend were bad things that you intend to
14 offer an opinion on?
15     A.    Sure.  Because that phrase
16 starts with "such as."  So there are just
17 four examples.
18     Q.    I have a limited amount of
19 time, Dr. Egilman, so I'd like you to list as
20 succinctly as you can the other bad things
21 you claim Allergan did that you intend to
22 offer an opinion on in this case?
23     A.    Well, they're going to be in
24 these documents attached.

Page 704

1     Q.    Can you list for me,
2 Dr. Egilman, the other bad things that you
3 contend Allergan did that you intend to offer
4 as opinions in this case?
5     A.    I can certainly list some of
6 them by going through the documents.
7     Q.    Can you tell me what they are?
8     A.    Sure.
9         Actavis offered a rebate
10 program to Kroger for encouraging the sale --
11     Q.    I don't need more details about
12 the rebate program.
13         Other than the four things
14 identified and offering a rebate program to
15 Kroger, can you list any other allegedly bad
16 things done by Allergan on which you intend
17 to offer an opinion?
18     A.    Sure.  I can go through them.
19     Q.    And, Dr. Egilman, in the very
20 limited time I have available, I don't have
21 time, unfortunately, for you to go through
22 the documents.
23         Without going through the
24 documents, can you identify any other bad

Page 705

1 things that Allergan -- you claim Allergan
2 did on which you intend to offer an opinion?
3     A.    Without looking at the
4 documents?  No, I can't do that.
5     Q.    Okay.
6         You cite to two settlement
7 agreements in your reference materials.  Both
8 are dated 2010, and I will reference and
9 represent to you that neither of them related
10 to opioids.
11         Are you aware of any other
12 Actavis or Allergan settlement agreements
13 that relate to opioids?
14     A.    No.
15     Q.    Are you aware of any Allergan
16 or Actavis guilty pleas?
17     A.    No.
18     Q.    During what specific time
19 period is it your opinion that the opioid
20 market was expanded?
21     A.    That's the hockey stick.  So
22 that goes from 1996 to about 2016, with a
23 drop-off in 2016 because certain Class II
24 drugs were made Class III drugs.

Page 706

1     Q.    So it's your expert opinion
2 that market expansion for opioids continued
3 through 2016; is that correct?
4     A.    Well, they may have continued
5 after, but there's a -- there's a
6 complication in the data because Class III
7 drugs -- Vicodin, Vicodin was changed from a
8 Class III to Class II, so it's hard --
9     Q.    Dr. Egilman, I hate to
10 interrupt, but you've actually answered my
11 question with respect to time period.  I
12 appreciate that.
13     A.    No problem.
14     Q.    Do you intend to offer an
15 opinion on the specific amount by which you
16 believe Allergan expanded the opioids market?
17     A.    Per se, Allergan?
18     Q.    Yes.
19     A.    No.  My opinion is that, again,
20 everybody's 100 percent responsible.
21     Q.    You cite a number of Kadian
22 marketing materials as the basis for your
23 opinions.  Do you know for any those
24 materials whether Actavis or Allergan or its

Page 707

1  outside sales force ever used those marketing
2  materials after they acquired Kadian in
3  December 2008?
4      A.    That would be in the call notes
5  somewhere, so I would have to look at them by
6  date.
7      Q.    Did you review call notes
8  summaries for Actavis or Allergan that
9  included references to specific use of
10  marketing materials?
11      A.    I think so, but I don't recall
12  specifically.
13      Q.    Am I correct that you have not
14  attempted to determine whether any prescriber
15  in Ohio relied on any of the marketing
16  materials you reference in writing a
17  prescription for an opioid?
18      A.    No.
19      Q.    You have attempted to determine
20  whether a prescriber in Ohio relied on any of
21  those marketing materials in writing a
22  prescription for opioids?
23      A.    Yes.
24      Q.    What did you do to determine

Page 708

1  whether a specific prescriber relied on those
2  specific marketing materials in writing a
3  prescription?
4      A.    Read the call notes where there
5  are references to that or if there are some
6  e-mails where sales representatives are
7  congratulated for getting a particular
8  prescriber --
9      Q.    Other than referencing a call
10  note or an e-mail, did you do anything to
11  determine whether a prescriber in Ohio relied
12  on the materials in writing a prescription?
13      A.    A particular prescriber?
14      Q.    Yes.
15      A.    No.
16      Q.    You also cite to a
17  February 2010 warning letter from the FDA to
18  Allergan; correct?
19      A.    Yes.
20      Q.    You don't cite to any of the
21  corrective action plan -- you do not cite to
22  the corrective action plan approved by the
23  FDA and implemented by Allergan; correct?
24      A.    Well, the first part is

Page 709

1  correct.  The second part, I don't know if
2  that happened.
3      Q.    You'll agree with me that you
4  didn't cite to the corrective action plan;
5  correct?
6      A.    Correct.
7      Q.    And you didn't review the
8  corrective action plan?
9      A.    I think I may have reviewed it.
10      Q.    Can you explain how your
11  systematic retrieval of the best evidence
12  available regarding my client didn't include
13  a citation to evidence relating to the
14  corrective action plan?
15      A.    I had no evidence that the
16  corrective action plan was ever implemented.
17          MS. WELCH:  Dr. Egilman, I want
18      to make a statement for the record.
19      There are 220 Allergan documents
20      referenced in your report by my review
21      of the record.  Nowhere in your report
22      do you explain how those documents
23      were retrieved, how they constitute
24      the best evidence, or how they support

Page 710

1  your opinion.
2          I don't have time to question
3      you about any of your other opinions
4      at this time.  I reserve all rights to
5      seek additional time from the Court to
6      question you about the basis for those
7      opinions.
8          MS. CONROY:  Objection, move to
9      strike.
10          THE VIDEOGRAPHER:  Off the
11      record at 3:26.
12          (Recess taken, 3:25 p.m. to
13      3:28 p.m.)
14          THE VIDEOGRAPHER:  We are back
15      on the record at 3:29 p.m.
16          EXAMINATION
17  BY MR. SWANSON:
18      Q.    Good afternoon, Dr. Egilman.
19  My name is Brian Swanson, and I represent
20  Walgreens.
21      A.    Good afternoon.
22      Q.    Good afternoon.
23          As Ms. Welch said, I wanted to
24  just begin with a housekeeping matter, but I

Page 711

1  think, given the scope of your opinions, the
2  Walgreens house is a little bit bigger.  So
3  I'm going to have to do this a little bit
4  differently, I think.
5        By my count, you have roughly
6  50 opinions cited in your report and appendix
7  that relate directly to Walgreens and
8  Walgreens' conduct.  Does that sound
9  generally accurate to you, sir?
10      A.  I haven't done any counts.
11      Q.  No counts.  Okay.  Now, have
12  your team endeavored to put together a
13  Redweld to the opinions that relate
14  specifically to Walgreens?
15      A.  They're not my team.  Those are
16  plaintiff lawyers in the case.
17      Q.  Okay.  Have the plaintiffs'
18  lawyers endeavored to put together a Redweld
19  of the opinions that you have provided that
20  are specific to Walgreens?
21      A.  I don't know.
22      Q.  Am I correct, sir, that all of
23  the evidence that you rely on as the bases
24  for your opinions directed specifically to

Page 712

1  Walgreens are included in Exhibits B1 to B489
2  of your report?
3      A.  I don't know.
4      Q.  Does your report and the
5  attached appendices include all of the bases
6  for your opinions that are directed
7  specifically to Walgreens?
8      A.  That I have in this litigation?
9  Yes.
10      Q.  Yes, sir.
11        Now, in arriving at those
12  opinions that you have directed specifically
13  to Walgreens, can you tell me how many
14  documents you personally reviewed that were
15  produced by Walgreens?
16      A.  No.
17      Q.  Was it more than 100?
18      A.  I don't know.
19      Q.  Was it more than a thousand?
20      A.  I don't know.
21      Q.  What is your best estimate
22  within 500 documents?
23      A.  I don't have one.
24      Q.  Can you tell me how many pages

Page 713

1  of Walgreens materials you reviewed?
2      A.  No.
3      Q.  Did you personally review every
4  Walgreens document that you included in your
5  report as support for your opinions directed
6  to Walgreens?
7      A.  Yes.
8      Q.  Did you personally review the
9  entire document?
10      A.  To the extent that I had the
11  entire document, yes.  I'm not sure I had the
12  entire document in all cases, though.  I
13  think there may have been some documents that
14  were redacted, et cetera.
15      Q.  Okay.  And the reason I ask is
16  that some of your appendices include excerpts
17  from Walgreens documents.  You're aware of
18  that, correct, sir?
19        MS. CONROY:  Objection.
20        THE WITNESS:  That's correct.
21      Q.  (BY MR. SWANSON)  And for those
22  exhibits where you've only included an
23  excerpt from a document, did you review the
24  entire document in arriving at your opinion?

Page 714

1      A.  Yes.
2      Q.  Your report says, at page 38,
3  that you reviewed depositions taken in the
4  case.  Is that a true statement?
5      A.  Yes.
6      Q.  If you relied, sir, on
7  deposition testimony of any Walgreens
8  employee as a basis for any of your opinions
9  on Walgreens' account, you cited that
10  deposition testimony somewhere in your
11  report; correct?
12      A.  Correct.
13      Q.  Can you testify today that you
14  personally read any deposition from any
15  Walgreens employee current or former?
16      A.  I don't have any specific
17  recollection of reading any Walgreens
18  depositions.
19      Q.  Did you have any discussions
20  with any plaintiffs' lawyers about the
21  testimony of any Walgreens employees?
22      A.  I may have.
23      Q.  What do you recall
24  specifically, if anything, about that

Page 715

1  conversation?
2      A.    Nothing.
3      Q.    Do you recall which witness
4  testimony you may have discussed with
5  plaintiffs' lawyers?
6      A.    No.
7      Q.    Did you review any discovery
8  responses that were provided by Walgreens?
9      A.    I've read responses to the
10  complaint.  I can't recall if I read
11  Walgreens' responses or other responses.  I
12  read responses to the complaint.
13      Q.    How about any responses to
14  interrogatories that Walgreens provided?
15      A.    I can't recall, but I --
16  probably.
17          I've gotten some responses,
18  interrogatories but not all.
19      Q.    Sitting here today, you just
20  can't recall one way or the other?
21      A.    Correct.
22      Q.    In your report, there are
23  references to the DEA and the DOJ; correct?
24      A.    Yes.

Page 716

1      Q.    And specifically you refer to a
2  settlement between Walgreens and the DOJ and
3  the DEA; right?
4      A.    Yes.
5      Q.    Did you speak with any current
6  or former members of the DEA or DOJ in the
7  process of forming your opinions in this
8  case?
9      A.    No.
10      Q.    Are you familiar with
11  Dr. Joseph Rannazzisi?
12      A.    Yes.
13      Q.    Have you ever met him?
14      A.    No.
15      Q.    Other than discussions that you
16  may have had with plaintiffs' lawyers and
17  your students and staff, are there any
18  discussions that you had with anyone that
19  form the bases of any of your opinions in
20  this case against Walgreens?
21      A.    No.
22      Q.    Earlier this morning, Mr. Blank
23  went through some general questions with you
24  regarding your experience with suspicious

Page 717

1  order monitoring systems.  You recall that
2  generally; correct?
3      A.    Yes.
4      Q.    What I want to do is not
5  retread those grounds, but I want to ask you
6  specifically about your experience with the
7  Walgreens specific order monitoring systems,
8  okay?
9      A.    Yes.
10      Q.    I think it's true and you
11  testified this morning you've never seen a
12  live version of the Walgreens suspicious
13  order monitoring system; right?
14      A.    Yes.
15      Q.    That's correct?
16      A.    Yes.  I answered it yes.
17      Q.    Yeah.  Okay.
18          And you also didn't evaluate
19  any design documents for the Walgreens
20  suspicious order monitoring system in
21  arriving at your opinions in this case;
22  correct?
23      A.    I'm not sure that's correct.
24  There's a PowerPoint I referred to, I think,

Page 718

1  that Walgreens implemented that effectively
2  reduced OxyContin prescriptions, and that may
3  have referred in part to SOM programs.
4      Q.    Well, I'm not asking about
5  documents that referred to the system.  I'm
6  asking about specific design documents for
7  the system itself.
8          You didn't review any of those
9  in reaching your opinions on the Walgreens --
10      A.    I read something that said
11  design.
12      Q.    Can I finish my question,
13  please?
14      A.    Sure.
15      Q.    I'm asking you about specific
16  design documents for the Walgreens SOM system
17  itself.  You didn't review any of those in
18  reaching your opinions on Walgreens'
19  suspicious order monitoring system; true?
20      A.    I don't know if that's true or
21  not.  I've read documents that review the
22  Walgreens suspicious order monitoring system
23  which included how it was or wasn't operating
24  at different points in time.  That would have

Page 719

1  included elements of design.
2      Q.    In the monitoring orders in the
3  Walgreens suspicious order monitoring system,
4  is that done at the store level or a
5  distribution level?
6      A.    I think it was done at the
7  distribution level.  At least when the
8  Jupiter fiasco occurred, that's what was
9  done.  Whether it's changed now or not, I
10  can't recall.
11      Q.    Have you done any evaluation of
12  whether the Walgreens suspicious order
13  monitoring system has changed or evolved over
14  time?
15      A.    I'm sure it did after they paid
16  the $80 million fine.
17          MR. SWANSON:  I'll move to
18      strike that.
19      Q.    (BY MR. SWANSON)  It's a
20  yes-or-no question.
21          Have you done any evaluation of
22  whether the Walgreens suspicious order
23  monitoring system has changed or evolved over
24  time?  "Yes" or "no."  Have you done that

Page 720

1  analysis?
2      A.    Yes.
3      Q.    Describe for me how the system
4  or technology changed over time.
5      A.    Oh, I don't remember the
6  specific changes.
7      Q.    Well, what evaluation did you
8  do that you can testify about, sir?
9      A.    Well, I think there was
10  specific changes in the SOM system after the
11  $80 million cite that I mentioned as part of
12  the settlement agreement.
13      Q.    What does the Walgreens
14  suspicious order monitoring system track?  Is
15  it the dispensing of pharmaceuticals or
16  orders or something else?
17          MS. CONROY:  Objection.
18          THE WITNESS:  It depends on the
19      point in time.  At one point in time,
20      it looked at shipments from the
21      distribution sites, although it didn't
22      really look at them.  It was designed
23      to look at them.  Walgreens is capable
24      of looking at orders at the pharmacy

Page 721

1  level.  I don't -- at least until the
2  Jupiter citation or payment, they
3  didn't look at things at the pharmacy
4  level.
5          At least to some extent, based
6  on the program they implemented for
7  OxyContin, they did look at the
8  pharmacy level.
9      Q.    (BY MR. SWANSON)  You're
10  saying --
11      A.    After that point in time.
12      Q.    The suspicious order monitoring
13  system did?  That's your testimony?
14      A.    Well, Walgreens did.  I'm not
15  sure if it was technically called part of the
16  suspicious order monitoring system or if it's
17  just something Walgreens was doing as part of
18  its attempt to reduce OxyContin
19  prescriptions.
20      Q.    Okay.  My question is directed
21  specifically to the suspicious order
22  monitoring system.  Does that system track
23  dispensing of pharmaceuticals or orders for
24  pharmaceuticals or something else?  If you

Page 722

1  know.
2          MS. CONROY:  Objection.
3          THE WITNESS:  It used to just
4      track orders from the distribution
5      sites, as I recall.
6          I think now they look at
7      pharmacy works, at least in certain
8      circumstances.  Whether that's
9      included as part of SOM or the
10      particular program that I talked
11      about, I don't know.
12      Q.    (BY MR. SWANSON)  Do you know
13  how the thresholds or limits are set in the
14  Walgreens suspicious order monitoring system?
15          MS. CONROY:  Objection.
16          THE WITNESS:  No.
17      Q.    (BY MR. SWANSON)  Do you know
18  that the plaintiffs' lawyers deposed several
19  Walgreens individuals regarding the Walgreens
20  suspicious order monitoring system?
21      A.    Yes.
22      Q.    Did you review any of that
23  testimony to inform your opinions regarding
24  the suspicious order monitoring system?

Page 723

1    A.   No.
2    Q.   As you sit here today, do you
3 believe that you have a better understanding
4 of the Walgreens suspicious order monitoring
5 system than the architects of that system?
6    A.   No.
7    Q.   Now, I want to ask you about a
8 few of your opinions.  I'm not going to have
9 time to go through all of them.
10    I'd like to begin with
11 opinion 7.3.  Do you have your report in
12 front of you so you can look at it?
13    A.   I do.
14    Q.   Okay.  And -- while we do that,
15 it's on page 62.
16    Are you there?  7.3?
17    A.   Yes.
18    Q.   Okay.  Opinion 7.3 reads
19 "Opinion.  Walgreens' systems could be
20 manipulated to allow stores to circumvent
21 quantity restrictions -- known issue -- this
22 is how the system always worked."
23    Did I read that correctly?
24    A.   No.

Page 724

1    Q.   I did not?
2    A.   That's correct.
3    Q.   Can you tell me what I read
4 incorrectly?
5    A.   You left the quotes off of
6 "This is how the system always works."
7    Q.   Okay.
8    A.   That's a quote from the
9 document.
10    Q.   Okay.  That's fair.  I'll read
11 it again.
12    Exhibit -- or opinion 7.3.
13 "Opinion.  Walgreens systems could be
14 manipulated to allow stores to circumvent
15 quantity restrictions -- known issue -- quote
16 This is how the system always worked, closed
17 quote."
18    Is that your opinion?
19    A.   Yes.
20    Q.   And then you say "See Exhibit
21 B3 hereto attached"; right?
22    A.   Correct.
23    Q.   So can we look at Exhibit B3?
24 I have a copy or you can be provided with

Page 725

1 one.  It makes no difference to me.
2    A.   Do you have a copy for me?
3    Q.   Sure.  Or do you want --
4    Go ahead.
5    In support of your opinion 7.3,
6 you cite a single document.  That's
7 WAGFLDEA1032; correct?
8    A.   Correct.
9    Q.   And then, you excerpt from that
10 document in your Exhibit B3; right?
11    A.   Correct.
12    Q.   Okay.  Now, you call Exhibit 73
13 an opinion.  But what you're really doing is,
14 as you're noted, you're pulling quotes from a
15 Walgreens document; right?
16    MS. CONROY:  Objection.
17    THE WITNESS:  Part of it's a
18    quote; part of it's an opinion.
19    Q.   (BY MR. SWANSON)  Can you tell
20 me what part of it, then, is an opinion?
21    A.   "Walgreens' systems could be
22 manipulated to allow stores to circumvent
23 quantity restrictions."
24    Q.   So that's your opinion in 7.3,

Page 726

1 and then the quote is -- is what, a fact?
2    MS. CONROY:  Objection.
3    THE WITNESS:  Well, the rest --
4    the rest is the -- is the facts.
5    Okay?
6    I mean, the quote -- the quote
7    is a fact, and that's part of the
8    basis of the opinion, but the basis of
9    the opinion is the rest of the
10    document.
11    Q.   (BY MR. SWANSON)  Okay.  So
12 when you refer to Walgreens' systems in your
13 opinion, what systems are you referring to
14 specifically?
15    A.   Well, here the AS400 ordering
16 system.
17    Q.   Is that different from the SOMS
18 system we were just talking about?
19    A.   I don't know.
20    Q.   I take it you've never seen the
21 Walgreens ordering system that you are
22 opining on in 7.3; correct?
23    A.   If it's different from the
24 ordering system, yes.

Page 727

1    Q.    What do you mean "If it's
2 different from the ordering system."  Do you
3 mean if it's different from the SOMS system?
4    A.    No.
5         This document refers to the
6 ordering system.
7    Q.    Correct.
8    A.    Okay?  So if the suspicious
9 order monitoring system is separate from the
10 ordering system and not interact -- it does
11 not interact with the ordering system, then
12 you're correct.
13    Q.    Right.  And I'm asking do you
14 know if it does or does not?
15    A.    Interact with the ordering
16 system?
17    Q.    Yes, sir.
18    A.    I don't know.
19    Q.    And you can't tell me how
20 orders are entered into the Walgreens
21 ordering system at the pharmacy level, that
22 ordering system that's explained or described
23 in 7.3; right?
24    A.    No, this describes how they're

Page 728

1 enter -- or how the ordering system is
2 circumvented.
3    Q.    You personally have never
4 entered orders into the Walgreens' system;
5 right?
6    A.    That's correct.
7    Q.    So when you talk about the
8 ability to manipulate, what you're doing is
9 you're reading a quote from somebody else who
10 has entered orders into that system; true?
11    A.    No.  This is Christine Atwell
12 who's describing how a particular store is
13 manipulating the AS400 ordering system.
14 She's not necessarily the person -- she's not
15 the person manipulating the system or
16 entering orders.
17    Q.    I'm trying to understand what
18 expertise you believe you bring to bear on
19 this opinion.
20         You personally have never
21 entered orders into a Walgreens ordering
22 system; right?
23    A.    That's correct.
24    Q.    Okay.  And in 2011, you didn't

Page 729

1 know how to do it, and you personally didn't
2 know how to quote/unquote manipulate the
3 system; right?
4    A.    That's correct.
5    Q.    What you're doing instead is
6 you're reading a quote from somebody at
7 Walgreens, and you're offering that quote as
8 your opinion.  True?
9         MS. CONROY:  Objection.
10         THE WITNESS:  That's correct.
11    Q.    (BY MR. SWANSON)  Now, do you
12 provide any analysis, expert analysis that
13 would connect your opinion to the quote from
14 the Walgreens employee?
15    A.    The expert --
16         Yes.
17    Q.    I'm sorry, I don't understand
18 your answer.  The expert --
19    A.    The answer was yes.
20    Q.    And --
21    A.    I cut my answer off to give you
22 a yes.
23    Q.    Thank you.  What --
24    A.    No problem.

Page 730

1    Q.    What written analysis do you
2 provide connecting your opinion in 7.3 to the
3 document that you claim supports it?
4    A.    None.
5    Q.    When it comes to describing how
6 the Walgreens ordering system works that's
7 described in Exhibit B3, would you agree that
8 the architects of that system are better able
9 to explain how it works than you are?
10    A.    I don't know.
11    Q.    Do you know who Barb Martin is?
12    A.    No.  She's the manager of
13 inventory for drugstore in this document.
14    Q.    Right.  And do you see that
15 she's -- she is an author of the bottom
16 e-mail in Exhibit B3?
17    A.    Correct.
18    Q.    And she's the one who is
19 talking about how the system has always
20 worked?
21    A.    Yes.
22    Q.    And do you know that Ms. Martin
23 was deposed in this case?
24    A.    No.

Page 731

1    Q.   Do you know who
2  Christine Atwell is other than that she's the
3  recipient of an e-mail?
4    A.   Well, she's controlled
5  substances function manager, apparently.
6    Q.   Do you know what that means?
7    A.   No.
8    Q.   Do you know what her job --
9    A.   I don't know what her job
10  description is.
11    Q.   Let me ask you about a related
12  exhibit.  It's Exhibit 56, if you could,
13  please.
14    A.   Are you done with this one?
15    Q.   I am.
16         So we can begin, I guess, by
17  looking in your report at page -- page 70,
18  you have opinion 7.56; correct?
19    A.   Correct.
20    Q.   "Opinion.  Walgreens knew
21  pharmacists could manipulate quantities with
22  the AS400 software, and they knew this could
23  result in criminal not just civil actions."
24         Is that your opinion?

Page 732

1    A.   Correct.
2    Q.   And then you direct us to
3  Exhibit B56; right?
4    A.   Yes.
5    Q.   Are you ready?
6    A.   I think so.
7    Q.   Okay.  The --
8         MS. CONROY:  No.
9    Q.   (BY MR. SWANSON)  The only
10  document you cite as the basis for your
11  opinion 56 is a Walgreens document Bates
12  stamped WAGMDL658246; correct?
13    A.   Correct.
14    Q.   And is that the document that
15  has been excerpted below the Bates number in
16  the exhibit?
17    A.   Yes.
18    Q.   And you don't cite any
19  deposition testimony or other testimony from
20  any Walgreens employees regarding this
21  opinion; true?
22    A.   Correct.
23    Q.   Do you know who Rex Swords is?
24    A.   I don't know what his job title

Page 733

1  is.
2    Q.   Okay.  Do you know if Rex
3  Swords was deposed?
4    A.   No.
5    Q.   Do you know if Tasha Polster
6  was deposed?
7    A.   No.
8    Q.   Do you know if Dwayne Pinon was
9  deposed?
10    A.   No.
11    Q.   Do you know if Kermit Crawford
12  was deposed?
13    A.   No.
14    Q.   You've never read the testimony
15  of any of those individuals; is that true?
16    A.   Correct.
17    Q.   The -- Mr. Swords in this
18  e-mail describes a meeting that he had with
19  the -- with Mr. Rannazzisi; is that right?
20    A.   Correct.
21    Q.   And what you've done is you say
22  your opinion is that "Walgreens knew this
23  could result in criminal, not just civil
24  actions"; right?

Page 734

1    A.   That's part of what my opinion
2  is.
3    Q.   Okay.  Well, let me ask you.
4  Your initial -- the first part of your
5  opinion is that "Walgreens knew pharmacists
6  could manipulate quantities with the AS400
7  software"; right?
8    A.   Correct.
9    Q.   Is there anything in this
10  document that you cite as the sole basis for
11  this opinion that relates to pharmacists'
12  so-called ability to manipulate quantities?
13    A.   No.  That's in the other
14  document.
15    Q.   The -- all right.  So I want to
16  focus what's on the -- what's on the document
17  that's in front of us.  Okay?
18         Do you see that Mr. Swords
19  provides a bullet list of statements from a
20  meeting that he had with Mr. Rannazzisi.
21    A.   Yes.
22    Q.   Now, you, in your opinion, you
23  quote a -- one of the lines from that bullet
24  point list; right?

Page 735

1  A.  Yes.
2  Q.  And it's the last one.  "If
3 this continues, they won't be accessing [sic]
4 civil penalties.  There may be criminal
5 penalties"; right?
6  A.  Correct.
7  Q.  Who made that statement?
8  A.  Rannazzisi.
9  Q.  And what's your basis for
10 saying that Rannazzisi made that statement?
11  A.  The lead sentence.  "Rannazzisi
12 presented a large PowerPoint deck on
13 prescription drug trafficking and abuse for
14 approximately two hours."  Comments, quote.
15  Q.  Right.  I understand.
16  The -- some of the bullet
17 points have quotation marks around them;
18 right?
19  A.  Yes.
20  Q.  And others don't; right?
21  A.  Correct.
22  Q.  Okay.  What's the difference
23 between those in quotes and those that aren't
24 in quotes?

Page 736

1  A.  That's it.  Some were in
2 quotes.  I assume the ones in quotes were
3 from the presentation, but I don't know.  But
4 they're all -- they were all things that, in
5 my opinion, Rannazzisi presented.
6  Q.  Well, it's not your opinion.
7 It's your speculation; right?
8  MS. CONROY:  Objection.
9  THE WITNESS:  No.
10  Q.  (BY MR. SWANSON)  Okay.  The --
11 why do you not provide any written analysis
12 connecting your opinion to the document that
13 you claim supports it?
14  A.  Because I think it's obvious on
15 its face.  It's a quote from the document.
16 And the other document's also obvious on its
17 face.  It says "Someone's manipulating the
18 system to increase orders appropriately."
19 The document says that.  Okay.  I mean, I
20 could write the document says that the AS400
21 system can be manipulated to increase orders
22 beyond those permissible.  And this document
23 says "Rannazzisi told them that there could
24 be civil and criminal penalties for that kind

Page 737

1 of activity."
2  Q.  So what expertise do you then
3 bring to bear on this document if all one
4 needs to do is read the quote that you
5 believe comes from Rannazzisi but can't
6 confirm?
7  A.  Well, the expertise is finding
8 the document in the first place.  Doing the
9 analysis to find the document.  Putting it in
10 the context of everything else that was going
11 on at the time with respect to Walgreens.
12 Knowing about the Jupiter situation and the
13 other associated e-mails and conduct.
14  So it's -- it's finding
15 material and putting it in some kind of a
16 context and then explaining it.  And
17 explaining the meaning of it.
18  Q.  The -- all right.  So
19 explaining the meaning and the context of the
20 quote you've cited there, you know that
21 Mr. Swords actually attended the meeting that
22 he's writing about; correct?
23  A.  Yes.
24  Q.  So the best evidence of what

Page 738

1 happened at the meeting and what was stated
2 at the meeting would come from Mr. Swords,
3 not from you; right?
4  A.  I don't know.
5  Q.  Let me ask you -- you can put
6 that one aside.
7  There's been a lot of -- you've
8 given a lot of testimony about what you've
9 called or termed "the venture," and I don't
10 want to repeat that testimony.
11  Your opinion is that Walgreens
12 is a member of what you call the venture;
13 right?
14  A.  Correct.
15  Q.  And your report doesn't
16 identify it, when it is that you claim
17 Walgreens became a member of what you called
18 the venture; right?
19  A.  Correct.
20  Q.  Do you know when Walgreens
21 became a member of what you call the venture?
22  A.  No.  There's no date specific.
23  Q.  Do you have a year specific?
24  A.  No.  Because the time goes

Page 739

1  forward and back, in my understanding of a
2  bank robbery collective.
3        In other words, if I join a
4  group of bank robbers today, and they've been
5  robbing banks for 20 years, I'm responsible
6  for the 20 years of bank robberies before I
7  joined, and I'm responsible for anything
8  after I join --
9        Q.   I'm going to interrupt you.
10  You gave your answer to a yes-or-no question
11  as no, and I'll move to strike everything
12  after that.
13        What act do you claim --
14        MS. CONROY:  Objection.
15        Q.   (BY MR. SWANSON) -- was the
16  act that brought Walgreens within what you
17  call the venture?
18        What was the initial act?
19        A.   I don't have an initial act.
20        Q.   Do you claim that Walgreens
21  remains a member of what you call the
22  venture?
23        A.   Yes.
24        Q.   What was the last action that

Page 740

1  Walgreens took to maintain its status as a
2  member of what you call the venture?
3        A.   I don't know.
4        Q.   You don't say anywhere in your
5  report when Walgreens began distributing
6  opioids to its pharmacies in Cuyahoga and
7  Summit counties; right?
8        A.   Correct.
9        Q.   Do you know?
10        A.   No.
11        Q.   Do you know when Walgreens
12  began distributing to any of its pharmacies
13  in Cuyahoga or Summit counties?
14        A.   No.
15        Q.   Do you even know what decade it
16  was?
17        A.   Began?  No, I don't know.
18        Q.   Is that something that you
19  never tried to find out when you were
20  coming -- putting together your opinions?
21        A.   Correct.
22        Q.   Do you know how many pharmacies
23  Walgreens has in Summit County today?
24        A.   No.

Page 741

1  Q.   Do you know how many it has in
2  Cuyahoga County?
3        A.   No.
4        Q.   Okay.  I want to turn back to
5  your opinions, and I want to ask you about
6  opinion 7.155, which is on page 85.
7        A.   Okay.
8        Q.   Okay.  You say, "Opinion.
9  Pharmacies could have reduced the opioid
10  problem" and then you say "See Exhibit B155
11  hereto attached."  Right?
12        A.   Correct.
13        Q.   Okay.  So can we look at
14  Exhibit B155?
15        Okay.  So Exhibit B155 is your
16  opinion that pharmacies could have reduced
17  the opioid problem; right?
18        A.   Correct.
19        Q.   Correct.  And then the only
20  document you cite in support of that opinion
21  is the document WAGMDL655767; true?
22        A.   In this opinion, but they have
23  the whole PowerPoint with Walgreens reducing
24  the sale of OxyContin and describing the

Page 742

1  entire program that they implemented
2  elsewhere --
3        Q.   Okay.
4        A.   -- in the report.
5        Q.   Let's focus on the page that
6  you've excerpted in Exhibit B155.
7        You've put some -- or some of
8  your helpers have put some arrows in the
9  document; right?
10        A.   Right.
11        Q.   And it's a little difficult to
12  read.  I'm going to try and you tell me if I
13  get it right; is that fair?
14        A.   Sure.
15        Q.   This is titled "National
16  Target, Good Faith Dispensing Checklist";
17  right?
18        A.   Correct.
19        Q.   And then the first arrow points
20  to a box that reads "Additional checklist
21  requirements.  Every" --
22        A.   Wait, wait, wait.  Are we
23  looking at the same thing?
24        Q.   I'm looking at B155?

Page 743

1 A. Oh, you gave me 55.

2 Q. Oh.

3 A. Sorry.

4 Q. That's okay. 155, please.

5 A. That's a related document.

6 Q. Okay. Now are we on the same
7 page?

8 A. Now we're on the same page.

9 Q. And you are looking at a
10 PowerPoint slide from WAGMDL655767; right?

11 A. Right.

12 Q. The Powerpoint slide is
13 entitled "Target Drug GFD Checklist"; right?

14 A. Yeah. The --

15 Q. I'm looking at B155.

16 A. The slide that's extracted,
17 yes.

18 Q. This is the one you put in your
19 report; right?

20 A. Well, I have the entire Bates
21 document.

22 Q. I'm talking about what you put
23 in your report. It's the one slide. Right?
24 That's what I want to focus on with you.

Page 744

1 MS. CONROY: Objection. The
2 report contains the entire document.

3 THE WITNESS: The report
4 contains the entire document. The
5 entire Bates document is cited here.

6 Q. (BY MR. SWANSON) Can you look
7 at the slide on the exhibit you attached?
8 That's what I want to ask you about.

9 A. Yeah. I don't want you to --
10 mislead you --

11 Q. I'm not misleading anyone, sir.

12 A. No, I said I didn't want to
13 mislead you.

14 Q. Let's focus on it.

15 A. It says the entire document --

16 Q. We're good.

17 A. -- is the basis of the opinion.

18 Q. Got it.

19 The slide is entitled "Target
20 Drug GFD Checklist"; right?

21 A. Correct.

22 Q. And then either you or your
23 helper has put in a couple of red arrows;
24 right?

Page 745

1 A. Correct.

2 Q. And I want to focus on the red
3 arrow on the right and what it points to.

4 A. Okay.

5 Q. It says "Additional checklist
6 requirements. Every quote/unquote no is a
7 red flag. Use your professional judgment to
8 assess the prescription."

9 A. Correct.

10 Q. Okay. And then underneath it
11 says -- there's a line 4; right?

12 A. Correct.

13 Q. It says "The patient has
14 received the prescription from Walgreens
15 before."

16 A. Correct.

17 Q. And if that's checked no, then
18 it directs the pharmacist to use his or her
19 professional judgment to assess the
20 prescription; right?

21 A. Correct.

22 Q. And then the same goes from the
23 other criteria that are underneath it; right?

24 A. Any no goes to that bolded

Page 746

1 language.

2 Q. Now, I take it you don't take
3 issue with Walgreens for instructing its
4 pharmacists to exercise their professional
5 judgment; right?

6 A. No, I -- I say this is a very
7 good program. That's what I cite it for.

8 Q. Okay. And that was going to be
9 my next question you got there. You've cited
10 this Walgreens document because you believe
11 that Walgreens' good faith dispensing
12 checklist was a valuable program that helped
13 reduce opioid overprescriptions; right?

14 A. Exactly.

15 Q. Okay. And the -- you don't
16 cite any documents that describe or discuss
17 how Walgreens instructed its pharmacists
18 before this document was created; right?

19 A. That's correct.

20 Q. Okay. Do you know what
21 Walgreens policies or procedures were with
22 respect to dispensing prior to the good faith
23 dispensing checklist that you've identified
24 in Exhibit 155?

Page 747

1    A.    No. I only know the results.

2    Q.    But you don't know, for

3 example, if before 2013, it was Walgreens'

4 policy to direct their pharmacists to use

5 their professional judgment in assessing

6 prescriptions that they were asked to fill;

7 right?

8    A.    I'm sure that general language

9 was somewhere in Walgreens' policy book.

10    Q.    Now -- well, and do you know if

11 prior to 2013, pharmacists at Walgreens had

12 different practices when it came to filling

13 prescriptions for opioids? Do you know that

14 just one way or the other?

15    A.    Yes.

16    Q.    There were different practices

17 within Walgreens before 2013; is that your

18 testimony?

19    MS. CONROY: Objection.

20    THE WITNESS: That's my belief.

21    Q.    (BY MR. SWANSON) But I want to

22 know what your testimony -- what you know,

23 not what you believe. Do you know if there

24 were different practices at Walgreens before

Page 748

1 2013?

2    A.    Yes.

3    Q.    What were the policies at

4 Walgreens with regard to dispensing -- good

5 faith dispensing prior to 2013?

6    A.    I don't know what they were. I

7 just know what the effect was.

8    Q.    You're not a pharmacist; right?

9    A.    Correct.

10    Q.    You've never been trained as a

11 pharmacist?

12    A.    Correct.

13    Q.    You haven't offered any

14 opinions and don't intend to offer any

15 opinions on the specific rules and

16 regulations that govern the pharmacy

17 profession; right?

18    A.    Correct.

19    Q.    You've testified a few times in

20 the deposition that you have prescribed

21 opioids to your patients in the past; right?

22    A.    Yes.

23    Q.    And when you prescribe these

24 opioids to your patients, you expect

Page 749

1 pharmacists to review your prescription and

2 fill it; right?

3    A.    Yes.

4    Q.    And in general, it would be a

5 problem for you if your patients -- and for

6 your patients if the pharmacist didn't fill

7 your legitimate prescriptions; right?

8    MS. CONROY: Objection.

9    THE WITNESS: Not necessarily.

10    Q.    (BY MR. SWANSON) Well, as a

11 physician, sir, do you expect a pharmacist to

12 fill a legitimate prescription that you write

13 based on your assessment of patient's need;

14 right?

15    A.    Not by itself, no.

16    Q.    What did you mean "not by

17 itself"?

18    A.    I mean the pharmacy -- there's

19 a physician role and there's a pharmacist

20 role. The pharmacist may have additional

21 information that I don't have about the

22 patient. And that -- you don't even restrict

23 that to opioids. For example, a patient may

24 be on --

Page 750

1    Q.    Let me withdraw the question,

2 then, and restrict it to opioids so we're

3 keeping on focus here.

4    As a physician, you expect a

5 pharmacist to fill a legitimate prescription

6 for opioids that you write based on your

7 assessment of your patient's need; right?

8    A.    No.

9    Q.    Why not?

10    A.    Because they have an

11 independent responsibility to evaluate

12 whether or not that's an appropriate drug for

13 that patient. They have independent

14 information that I don't have access to to

15 evaluate that question.

16    Q.    Let me ask a slightly more

17 nuanced question.

18    As a physician, you expect a

19 pharmacist to exercise his or her

20 professional judgment to evaluate whether to

21 fill a legitimate opioid description that you

22 write based your assessment of a patient's

23 needs; right?

24    A.    That's a beginning, yes. I

Page 751

1  expect more than that.
2      Q.   What more do you expect of a
3  pharmacist than that he or she exercises his
4  or her professional judgment?
5      A.   I expect the pharmacist to
6  check to see what other drugs that person is
7  on.  What other prescriptions they've been
8  getting.  Whether they've been getting
9  similar prescriptions from other
10 practitioners in the current era.
11         I expect the pharmacist to
12 check to see whether that patient has been
13 getting drugs from other pharmacies not
14 related to his or her pharmacy in a way that
15 would lead to abuse or addiction.
16     Q.   And those are the sorts of
17 assessments that Walgreens documented in its
18 target drug good faith dispensing checklist
19 that you recommended; correct?
20     A.   In 2015, correct.
21     Q.   In what year?
22     A.   In 2015, I think.  Wasn't it?
23     Q.   It's your opinion.
24     A.   No, it's a fact.  Can we look

Page 752

1  at a document?
2      Q.   There are facts that aren't
3  opinions.
4      A.   If I got the year wrong, I'll
5  correct the year.
6      Q.   All right.
7      A.   No.  This is 2013.
8          Why don't we take a break.
9      Q.   You know, I might be done, or I
10 might have one or two more questions.
11     A.   Well, if you're done, then we
12 get a break.  No problem.
13         You know, they've called me
14 experienced.  The one thing I'm experienced
15 with --
16     Q.   You know when you're about
17 done?
18     A.   No, I know when a attorney says
19 "One more question," it's usually 25 to 30
20 questions.
21     MR. SWANSON:  I'll pass the
22 witness.
23     THE WITNESS:  Why don't we take
24 a break.

Page 753

1      THE VIDEOGRAPHER:  Going off
2  the record at 4:11.
3          (Recess taken, 4:10 p.m. to
4  4:35 p.m.)
5      THE VIDEOGRAPHER:  We are back
6  on the record at 4:36.
7          EXAMINATION
8  BY MR. HYNES:
9      Q.   Good afternoon again.  My name
10 is Paul Hynes.  I represent CVS Indiana LLC
11 and CS Rx Services, Inc.  Those are the CVS
12 entities who are defendants in this case.
13 And I want to as a preliminary question ask
14 whether your opinions where you state CVS, do
15 they relate to one or both of those entities?
16     A.   That would be my assumption,
17 yes.
18     Q.   That's your assumption.
19         We can refer, throughout my
20 examination, to those entities as CVS, if
21 that's easier.
22     A.   Right.  There may be an
23 exception to that.  I think I make reference
24 to that.  I think I make reference to the CVS

Page 754

1  PBM that did the formularies for Summit and
2  Cuyahoga County.
3      Q.   Can you tell me where you refer
4  to the CVS PBM in your report?
5      A.   I think it's mentioned.
6      Q.   You think it's mentioned?
7      A.   I think so.
8      Q.   Can you point me to a section
9  or a page number or an exhibit?
10     A.   No.  But there's one opinion
11 that's wrong that's titled "EBMs" thanks for
12 reminding me.
13         For the Medicaid, the state
14 Medicaid did not use an external EBM for its
15 formulary.  It used a -- its own formulary
16 committee.
17         The Cuyahoga and Summit County
18 used CVS, and two others.  I think I've got a
19 list of them here.  And there's a deposition
20 testimony of Woods in the case of Cuyahoga
21 County, at least I think referenced in the
22 report.
23     Q.   Okay.
24     MR. HYNES:  Can we go off the

1    record for one minute?
2        THE VIDEOGRAPHER: Sure. Off
3    the record at 4:38.
4        (Recess taken, 4:37 p.m. to
5    4:38 p.m.)
6        THE VIDEOGRAPHER: We are back
7    on the record at 4:39.
8        MR. HYNES: And just for the
9    record, I will reserve some time to
10   address that opinion later in the day,
11   time permitting.
12   Q.    (BY MR. HYNES) Dr. Egilman, can
13   you please turn to page 134 of your report?
14   A.    Okay.
15   Q.    Showing you Section 7.479
16   states that "CVS's suspicious order
17   monitoring program did not monitor suspicious
18   orders."
19       Is that an opinion that you're
20   rendering in this case?
21   A.    Yes.
22   Q.    Did you consult with any
23   plaintiffs' lawyers in arriving at this
24   opinion?

1    A.    No.
2    Q.    Okay. The next sentence states
3    "CVS's SOM policy specified that if multiple
4    orders for the same store are flagged during
5    the same month, all orders after that first
6    order will not be investigated and will be
7    released based on the release of the first
8    order."
9        Did read that correctly?
10   A.    No.
11   Q.    What did I not read correctly?
12   A.    The last phrase where it's got
13   the word "automatically."
14   Q.    Okay. "Will be automatically
15   released based on the release of the first
16   order." Is that what you're referring to?
17   A.    Yes, that's the part that you
18   read incorrectly.
19   Q.    Okay. That statement refers to
20   CVS's SOM policy; correct?
21   A.    Correct.
22   Q.    You don't cite any CVS SOM
23   policies in support of this opinion, do you?
24   A.    Can I see 479?

1    Q.    Sure. Do you have it?
2    A.    Just let me be clear, here,
3    when you say "do I have it," in the notice of
4    this deposition, I was not asked to bring a
5    single piece of paper. But I have it.
6    Q.    Okay. Well, then let's look at
7    it.
8    A.    You're welcome.
9    Q.    Is the document in front of you
10   a CVS SOM policy?
11   A.    I don't have the whole --
12       Do you have the whole document?
13       I don't know. I have to look
14   at the whole document.
15   Q.    Are you aware that CVS has
16   policies governing its suspicious order
17   monitoring system?
18   A.    Yes.
19   Q.    Did you review any of those
20   policies in preparing the report?
21   A.    Yes.
22   Q.    Which policies did you review?
23   A.    I don't recall.
24   Q.    To the best of your

1    recollection, is the document that you
2    excerpted in Exhibit B.479 a CVS SOM policy?
3    A.    I have to look at it. I don't
4    remember.
5    Q.    To the best of your
6    recollection?
7    A.    To the best of my recollection,
8    I need to look at the document.
9    Q.    I will represent to you that
10   document that you've excerpted there is an
11   attachment to a November 2012 e-mail from
12   Craig Schiavo.
13       Do you know who prepared that
14   document?
15   A.    The document that you're not
16   showing me that I don't have? No.
17   Q.    Okay. Do you know who
18   Mr. Schiavo is?
19   A.    No.
20   Q.    Do you know whether he was a
21   member of CVS's suspicious order monitoring
22   team?
23   A.    No.
24   Q.    Do you know what his position

Highly Confidential - Subject to Further Confidentiality Review

Page 759

1   at CVS was?

2       A.    No.

3       Q.    Do you know if he was deposed

4   in this case?

5       A.    No.

6       Q.    Did you attempt to review any

7   deposition testimony about that document that

8   is excerpted in that exhibit?

9       A.    No.

10      Q.    How did you find that document?

11      A.    Through a search.

12      Q.    Who performed the search?

13      A.    I did or my staff did.

14      Q.    What did you do to confirm that

15  the excerpted language from that document

16  accurately reflected how CVS's suspicious

17  order monitoring system operated?

18          MS. CONROY:  Objection.

19          THE WITNESS:  We looked for

20      other documents around that document

21      in the search.

22      Q.    (BY MR. HYNES)  Did you find

23  any?

24      A.    I don't think so.

Page 760

1       Q.    Okay.  Are you familiar with

2   CVS's suspicious order monitoring system?

3       A.    Not specifically, no.

4       Q.    So you're not familiar with the

5   algorithms that were used to flag orders?

6       A.    Correct.  Except to the extent

7   that they're mentioned here.

8       Q.    So is that the only document

9   you recall reviewing related to CVS's

10  suspicious order monitoring system?

11      A.    No.

12      Q.    What documents did you review?

13      A.    I can't recall.

14      Q.    How many documents related to

15  CVS's suspicious order monitoring system did

16  you review?

17      A.    I can't recall.

18      Q.    What's your best guess?

19      A.    No guess.

20      Q.    Less than 100?

21      A.    No guess.

22      Q.    Are you familiar with the

23  report called the "Item Review Report"?

24      A.    No.  Not by name.

Page 761

1       Q.    Are you --

2       A.    If you could show it to me.

3       Q.    Are you familiar --

4       A.    Could I finish?  If you show it

5   to me, I may be familiar with it.

6       Q.    Understood.

7       A.    I can't recall it by name.

8       Q.    Are you familiar with CVS's SOM

9   policies?

10      A.    Not in detail --

11      Q.    Can you tell me --

12      A.    -- without looking at them.

13      Q.    Can you tell me what they said

14  about how to perform due diligence on orders?

15      A.    Not without looking at them.

16      Q.    Are you familiar with what

17  information CVS staff had available to them

18  to do due diligence on flagged orders?

19      A.    Not without looking at the

20  procedures, no.

21      Q.    Are you familiar with the micro

22  strategy database?

23      A.    No.

24      Q.    The infomatic database?

Page 762

1       A.    Not at -- not by memory.

2       Q.    The store metrics report?

3       A.    No.

4       Q.    Did you review any documents

5   relating to training that CVS SOM team

6   members received on SOM?

7       A.    I think so.

8       Q.    What can you tell me about the

9   training they received?

10      A.    Nothing without looking at the

11  documents.

12      Q.    Okay.  Can you identify any

13  suspicious orders of prescription opioids

14  that CVS shipped to Summit or Cuyahoga

15  County?

16      A.    No.

17      Q.    Do you even know what

18  prescription opioids CVS shipped to Cuyahoga

19  and Summit counties?

20      A.    I don't think I have a list of

21  them in my possession, but I could find that

22  out through the ARCOS database that we have

23  access to.

24      Q.    Well, sitting here today,

Page 763

1  what's your best recollection?
2      A.    I don't have a recollection.
3      Q.    Do you know whether CVS shipped
4  oxycodone to CVS retail pharmacies in Summit
5  and Cuyahoga County?
6      A.    I do not have a recollection.
7      Q.    Do you know whether they
8  shipped fentanyl?
9      A.    I do not know.
10     Q.    Do you know whether they
11 shipped hydrocodone combination products?
12     A.    I do not know.
13     Q.    Do you know the names of the
14 people who staffed CVS's SOM team?
15     A.    No.
16     Q.    Do you know who managed the
17 team?
18     A.    No.
19     Q.    Do you know where the team was
20 located?
21     A.    No.
22     Q.    Did you attempt to review
23 depositions of any staff members who worked
24 on CVS's SOM team?

Page 764

1      A.    No.
2      Q.    I want to talk about the
3  venture that's discussed in your report.
4          Your opinion states that -- or
5  is your opinion that CVS joined the venture?
6  Or was a member of the venture?
7      A.    Yes.
8      Q.    Which CVS entities in your
9  opinion were a member of the venture?
10     A.    I didn't distinguish any.  So.
11         I'm talking about -- when I
12 talk about CVS, I'm talking about the
13 corporate parent.  I didn't break it into
14 subsidiaries.
15     Q.    So your opinion is not that CVS
16 Indiana LLC was a member of the venture?
17     A.    My opinion is that CVS and its
18 subsidiaries were a member of the venture.
19     Q.    Your report doesn't state when
20 CVS and its subsidiaries became members of
21 the venture, does it?
22     A.    Correct.
23     Q.    It also doesn't state when
24 Walmart became a member of the venture, does

Page 765

1  it?
2      A.    Correct.
3      Q.    And it doesn't state when
4  Rite Aid became a member of the venture, does
5  it?
6      A.    Correct.
7      Q.    Do you have an opinion on when
8  CVS or its subsidiaries became members of the
9  venture?
10     A.    No.
11     Q.    Do you have an opinion of when
12 Walmart became a member of the venture?
13     A.    No.
14     Q.    Same question for Rite Aid.
15     A.    Same answer.
16     Q.    Your report doesn't cite any
17 evidence indicating that CVS agreed to become
18 a member of the venture, does it?
19     A.    I'm not sure what you mean by
20 that.
21     Q.    You don't cite any evidence or
22 any conduct showing that CVS agreed,
23 voluntarily agreed to become a member of the
24 venture, do you?

Page 766

1      A.    Well, they were members of the
2  HDMA, and the HDMA was one of the
3  organizations that was part of the venture.
4      Q.    Does your report cite any
5  documents or testimony indicating that CVS
6  was a member of HDMA?
7      A.    I think so.  I think I have a
8  list of members of the HDMA.
9      Q.    And that's your only basis for
10 concluding that a CVS entity was a member of
11 the venture?
12         MS. CONROY:  Objection.
13         THE WITNESS:  No.  CVS did --
14         No.
15     Q.    (BY MR. HYNES) Okay.  What
16 other conduct do you believe CVS took -- or
17 undertook as a member of the venture?
18     A.    CVS contributed to the
19 overprescription of opioids in these two
20 counties.
21     Q.    And what did it do to
22 contribute to the overprescription of opioids
23 in these two counties?
24     A.    It filled prescriptions for

Page 767

1 those drugs.
2     Q.    Would you agree that filling
3 prescriptions is part of the normal business
4 activity for CVS?
5     A.    Yes.
6     Q.    Would you agree that it happens
7 every day?
8     A.    Yes.
9     Q.    Would you agree that it may
10 happen even with respect to prescriptions
11 that you have written for your patients?
12     A.    Yes.
13     Q.    Would you agree that there is
14 nothing inherently wrong with filling
15 prescriptions for prescription opioids?
16     A.    Yes.
17     Q.    You testified earlier that you
18 read the complaint in this case; right?
19     A.    Correct.
20     Q.    Are you familiar with
21 plaintiffs' claims against CVS?
22     A.    I don't -- I haven't separated
23 them out, no.
24     Q.    Are you aware that plaintiffs'

Page 768

1 claims against CVS do not relate to its
2 dispensing of prescription opioids?
3     A.    Yes.
4     Q.    So you know that its claims --
5 plaintiffs' claims relate only to CVS's
6 distribution of prescription opioids?
7     A.    Yes.
8     Q.    Is it -- besides joining HDMA
9 and filling prescriptions for prescription
10 opioids, are you aware of any -- or is it
11 your opinion that CVS did anything else or
12 took any other action in furtherance of the
13 so-called venture?
14     A.    Yes.
15     Q.    What else?
16     A.    It remained silent as to the
17 nature of the opioid epidemic, the
18 overprescription of opioids and the addiction
19 epidemic.
20     Q.    So --
21     A.    CVS failed to act on the
22 information available to it about upstream
23 orders, downstream sales, physician -- CVS,
24 unlike some other distributors, had the

Page 769

1 ability to get data all the way down to the
2 patient level.  So CVS had the capability,
3 which they did not use, to determine which
4 physicians were overprescribing and which
5 patients were over -- being overprescribed.
6 CVS failed to take action on it.
7     Q.    And how do you know CVS had
8 access to that data?
9     A.    Because that data is
10 available -- because, first of all, CVS
11 participates in selling that data to IMS and
12 other entities.  So they certainly have data
13 on what they sell.
14         CVS can get data from IMS
15 that's broader than just its own sales, so
16 they can look at IMS data over the entirety
17 of these two counties and determine how many
18 prescriptions for opioids are going out the
19 door.  They can determine from their own data
20 on their own patients how many of those
21 patients are getting prescriptions from
22 multiple pharmacies, multiple physicians.
23 They can see which physicians are
24 overprescribing from their pharmacy data

Page 770

1 downstream.
2         So while all of the
3 distributors could do that and track orders
4 right down to the pharmacy level out the
5 door, CVS, because it was a vertically
6 oriented distributor pharmacy operation, had
7 more access to that data, more easily
8 acquired, and more easily used than some of
9 the distributors would have had to take it an
10 extra step.
11     Q.    But none of those opinions are
12 reflected in your report, are they?
13     A.    No, I think they are.
14     Q.    Where?
15     A.    I think the whole idea that
16 the --
17         Well, first of all, they had
18 that general opinion that we went through
19 before.  That had any of the participants in
20 the venture --
21     Q.    Sir, your opinion you just
22 stated about CVS's failure to act based on
23 information it had at its disposal is not
24 stated in your report; is that right?

Page 771

1    MS. CONROY: Objection.
2    Q.   (BY MR. HYNES) That's a
3 yes-or-no question.
4    A.   I answered it.
5    Q.   You --
6    A.   Your last question was where,
7 okay?
8         I answered that question
9 before. You asked, and I said, "No, I think
10 they are."
11        Your next question was "Where"?
12 I was answering the "where" question which
13 you interrupted, which is perfectly --
14    Q.   Can you point me to the section
15 number?
16    A.   -- which is perfectly fine. I
17 have no problem with you interrupting my
18 answer. That's what the judge ruled. It
19 just means my answer is incomplete.
20    Q.   That's fine. Your answer is
21 incomplete.
22        Can you point me to a section
23 or page number where that opinion is stated
24 in your report?

Page 772

1    A.   The opinion -- I cannot without
2 looking at the report give you the page
3 number and the opinion number. I can tell
4 you generally, for example, the opinion that
5 I discussed --
6    Q.   I don't need to hear --
7         That's fine.
8    A.   Okay. My opinion is
9 incomplete.
10    Q.   That's fine.
11    A.   My answer is incomplete.
12    Q.   Sir, your opinion at
13 Exhibit B.489 cites a DEA settlement CVS
14 entered into on March 28, 2013. Is that
15 correct?
16    A.   What opinion number is it?
17    Q.   Exhibit No. B.489.
18    A.   What page?
19    Q.   I'll just show it to you.
20    A.   That's correct.
21    Q.   Did you review that settlement
22 agreement?
23    A.   Yes.
24    Q.   Are you aware that it relates

Page 773

1 to conduct occurring in Oklahoma?
2    A.   Yes.
3    Q.   So you're aware that it
4 relates -- that it does not relate to conduct
5 occurring in Cuyahoga or Summit County?
6    MS. CONROY: Objection.
7    THE WITNESS: Well, the
8 citation's specific to Oklahoma.
9    Q.   (BY MR. HYNES) Okay.
10    A.   That's correct.
11    Q.   Are you aware the settlement
12 relates to conduct occurring at CVS retail
13 pharmacies?
14    A.   Yeah, let me look at it so I
15 don't make any mistakes.
16    MS. CONROY: What's the number,
17 4.89?
18    MR. HYNES: B.489.
19    Q.   (BY MR. HYNES) Sir, while
20 we're looking for the document, I'll ask some
21 questions. We're short on time.
22        On the course of your --
23    A.   Do you want to withdraw the
24 previous question?

Page 774

1    Q.   Yeah. I'll go back to it.
2    A.   Do you want to withdraw it?
3    Q.   It's withdrawn.
4         In the course of your work on
5 this engagement, did you review any DEA
6 settlements with CVS related to distribution
7 of prescription opioids to Cuyahoga or Summit
8 County?
9    A.   No.
10    MR. HYNES: We're good, then.
11    THE VIDEOGRAPHER: Off the
12 record at 4:57.
13    MR. HYNES: Pass the witness.
14    (Recess taken, 4:56 p.m. to
15 4:58 p.m.)
16    THE VIDEOGRAPHER: We are back
17 on the record at 4:59.
18        EXAMINATION
19 BY MS. MCENROE:
20    Q.   Dr. Egilman, I have very little
21 time with you, so I'm going to try and just
22 do some "yes" or "no" questions like you did
23 with some of my colleagues earlier today.
24        You're a medical doctor;

Page 775

1  correct?

2      A.   Yes.

3      Q.   And you testified earlier today

4  or yesterday about a specific patient you had

5  who was addicted to opioids to whom you

6  prescribed opioids; is that correct?

7          That's a yes-or-no question.

8          MS. CONROY:  While he's

9      answering, could you identify who you

10     represent on the record.

11         MS. MCENROE:  Yes,

12     Elisa McEnroe from Morgan Lewis for

13     Rite Aid.

14         THE WITNESS:  Yes.

15     Q.   (BY MS. MCENROE)  If the

16 pharmacy had refused to fill that

17 prescription for that particular patient,

18 could that have brought that patient harm?

19     A.   Anything is possible.  I don't

20 think so.

21     Q.   You wrote those prescriptions

22 for that addicted patient because you said

23 that he needed them because of his withdrawal

24 symptoms; correct?

Page 776

1      A.   No.

2      Q.   Okay.  The record will stand

3  with what you testified to yesterday.

4          Today you're going to be asked

5  some questions about Rite Aid of Maryland,

6  Inc., doing business as Mid Atlanta Customer

7  Support Center.  I'm going to call that

8  Rite Aid.  Okay?

9      A.   Yes.

10     Q.   You understand that's the

11 Rite Aid entity that's been sued in this

12 litigation?

13     A.   I'll take your word for it.

14     Q.   Okay.

15     A.   I have no independent

16 understanding of that.

17     Q.   Have you read the complaint in

18 this case?

19     A.   Yes.

20     Q.   I'd like to direct your

21 attention to Exhibit 1F.  I think that's your

22 report.  You have it in front of you.

23     A.   I do.

24     Q.   And in particular to opinion

Page 777

1  487.

2      A.   What page?

3      Q.   On page 135.

4      A.   Okay.

5      Q.   You'll see it says "Opinion.

6  Rite Aid provided marketing services to

7  Teva," and then there's a cite to

8  Exhibit B487.  Do you see that?

9      A.   I do.

10     Q.   Did I read that correctly?

11     A.   You did.

12         (Whereupon, Deposition Exhibit

13     Egilman 50, B.487, was marked for

14     identification.)

15     Q.   (BY MS. MCENROE)  We're handing

16 you what's been marked as Exhibit 50 which is

17 also Exhibit B487 from your report.  You've

18 been handed two folders; a green folder and a

19 Redweld.  Can you describe to me what's in

20 front of you?

21         MS. CONROY:  Do you have a copy

22     of the exhibit for me?

23         MS. MCENROE:  Oh, I do.  Two,

24     if you want.

Page 778

1          MS. CONROY:  One is fine.

2          MS. MCENROE:  Great.

3      Q.   (BY MS. MCENROE)  What is in

4  front of you, Dr. Egilman, that was handed to

5  you by plaintiffs' counsel?

6      A.   Same exhibits.

7      Q.   Is there anything different

8  about the documents you were handed in those

9  folders?

10     A.   It doesn't appear to be.

11     Q.   And do you have a copy of that

12 exhibit for which you have handwriting or

13 sticky notes like you described yesterday in

14 the box that you have brought with you?

15         MS. CONROY:  There are no notes

16     or stickers on the document.

17         MS. MCENROE:  Great.  Okay.

18     Q.   (BY MS. MCENROE)  So that's the

19 only exhibit you have with respect to opinion

20 487 regarding Rite Aid; correct?

21     A.   Correct.

22     Q.   Do you have any other opinions

23 naming Rite Aid in your report?

24     A.   I don't recall.

Page 779

1    Q.    If you had, would that have
2  been included in the material plaintiffs just
3  handed you?
4    A.    Not necessarily.
5    Q.    Would you expect that it would
6  have been?
7    A.    No.
8    Q.    Can you identify for me any
9  other single opinion that identifies Rite Aid
10 in your report as we sit here today?
11   A.    No.
12   Q.    Taking a look at the attachment
13 you have or the exhibit that you have for
14 opinion 487, you'll see that the top says
15 "Teva Fentanyl Patches IVR, Statement of
16 Work."  Do you see that?
17   A.    Yes.
18   Q.    Okay.  Did you read this
19 document before?
20   A.    Yes.
21   Q.    Did you pick this document out
22 of the database?
23   A.    Well, I picked it to be in the
24 report.  I don't think I did the search that

Page 780

1  found the document.
2    Q.    Did you actually type the words
3  into your report, "Opinion.  Rite Aid
4  provided marketing services to Teva"?  Did
5  you type those words?
6    A.    I think so, yes.
7    Q.    Did you do that based on this
8  exhibit?
9    A.    Yes.
10   Q.    Did you do it based on anything
11 else?
12   A.    Not that I can recall.
13   Q.    Can you identify anything else
14 as we sit here today that you did that on
15 behalf of?
16   A.    No.
17   Q.    Take a look at the last page of
18 this document.
19   A.    Right.
20   Q.    It's unsigned; correct?
21   A.    Correct.
22   Q.    Have you ever seen a signed
23 copy?
24   A.    No.

Page 781

1    Q.    Do you have any other evidence
2  supporting your opinion that Rite Aid
3  provided marketing services to Teva?
4    A.    No.
5    Q.    You testified a little bit
6  earlier that each defendant in this case is
7  100% responsible for the opioid crisis; is
8  that correct?
9    A.    Yes.
10   Q.    So you're taking the opinion
11 that Rite Aid is 100% responsible for the
12 opioid crisis on the basis of one unsigned
13 contract; is that right?
14   A.    No.
15   Q.    What other evidence have you
16 provided with your report that says that
17 Rite Aid is responsible for 100% of the
18 opioid crisis?
19   A.    All of the evidence that I
20 provided in my report relates to what was
21 known or knowable by Rite Aid with respect to
22 the venture.
23   Q.    And that was true of yourself
24 at the same time; correct, Dr. Egilman?

Page 782

1    A.    Let me just say my answer is
2  incomplete.
3    Q.    Fine.  That's fine.
4    A.    Now you can interrupt and ask
5  the other question.
6    Q.    That's true of yourself as
7  well, right, just as much as it's true of
8  Rite Aid?
9        MS. CONROY:  Objection.
10       THE WITNESS:  Which is true?
11   Q.    (BY MS. MCENROE)  The
12 information that you said was available to
13 Rite Aid was equally available to yourself to
14 make it 100 percent responsible for the
15 opioid crisis.
16   A.    No, it wasn't.
17   Q.    Do you know what, if any,
18 opioids Rite Aid distributed into Cuyahoga or
19 Summit counties?
20   A.    I don't know which ones they
21 distributed, no.
22   Q.    Do you know if they ever did
23 distribute opioids into Cuyahoga or Summit
24 County?  For a fact?

Page 783

1    A.    For a fact?  I assume they did.
2    Q.    You assume so, but do you know
3 that?
4    A.    I haven't seen the data on
5 their sales --
6    Q.    Okay.
7    A.    -- into the county.
8    Q.    Do you know --
9    A.    But if they didn't sell, I
10 would assume you wouldn't be sitting there.
11 It's an easy summary judgment motion.
12    Q.    So you testified earlier that
13 you did not base your opinions on any
14 assumptions; is that correct?
15    A.    Correct.
16    Q.    But you have made some
17 assumptions at the very least; correct?
18    A.    Do you mean that last one?
19    Q.    Question withdrawn.
20    A.    That you -- that you're -- that
21 Rite Aid is still in the case?
22    Q.    Well, I'm just trying --
23    A.    And I don't think that's --
24    Q.    I withdrew my question.

Page 784

1 There's no question pending.
2         I just want to understand your
3 knowledge base for my client Rite Aid, and it
4 seems to extend just as one unsigned
5 contract.  So I'm hoping that you can tell me
6 a little bit more about what you know
7 specifically about Rite Aid, if anything, and
8 I'm not seeing anything else in your report.
9    A.    Well.
10    Q.    Is there anything else in your
11 report --
12    A.    Is that a question?
13    Q.    Yeah.  Is there anything else
14 in your report about Rite Aid?
15    A.    That specifically mentioned
16 Rite Aid?
17    Q.    Correct.
18    A.    I don't think so.
19         MS. MCENROE:  I have no further
20 questions.
21         Can we go off the record?
22         THE VIDEOGRAPHER:  Off the
23 record at 5:06.
24         (Recess taken, 5:06 p.m. to

Page 785

1 5:07 p.m.)
2         THE VIDEOGRAPHER:  We are back
3 on the record at 5:08.
4         EXAMINATION
5 BY MS. FUMERTON:
6    Q.    Good afternoon, Dr. Egilman.
7 My name is Tara Fumerton, and I represent
8 Walmart in this litigation.
9    A.    Good afternoon.
10    Q.    Do you have your report in
11 front of you?
12    A.    I do.
13    Q.    And could you please turn to
14 page 134 of your report, and I'm going to
15 focus you on opinion 7.480.
16    A.    Okay.
17    Q.    And so opinion 7.480 is that,
18 quote, Walmart helped Actavis market opioids.
19 End quote; correct?
20    A.    Correct.
21    Q.    And this is your only
22 Walmart-specific opinion in your report;
23 correct?
24    A.    I don't know.

Page 786

1    Q.    How would you answer that
2 question, then?
3         In other words, you don't know
4 the answer as to whether or not you have
5 other Walmart-specific opinions in your
6 report?
7    A.    For the Walmart specifically
8 mentioned, you could search the report.  I
9 haven't done that by every company.
10    Q.    You haven't.  So you have a
11 folder back there that's specific to Walmart.
12 Should we -- would that help you determine
13 whether or not there are other
14 Walmart-specific opinions?
15         MS. CONROY:  Objection.
16         THE WITNESS:  You know more
17 than I do.  Those are not my
18 documents.  Those are the plaintiff
19 documents that they brought to the
20 deposition.  So I don't know if they
21 have a folder named Walmart or not.
22    Q.    (BY MS. FUMERTON)  Sitting
23 here, can you identify any other
24 Walmart-specific opinions in your report?

Page 787

1    A.    No.
2    Q.    And to conclusively answer my
3 question as to whether or not there were any
4 other Walmart-specific questions -- or
5 specific opinions in your report, you would
6 need time to review your report; is that
7 right?
8    A.    No.  I'd need to do a search in
9 a PDF.
10    Q.    And so if I did a search in the
11 PDF and Walmart did not show up in any of the
12 titles in your report, could we conclude that
13 opinion 7.480 is the only opinion that is
14 Walmart specific in your report?
15    A.    It's the only opinion that
16 names Walmart in the opinion, yes.
17    Q.    So how would you do the search
18 of the PDF to determine whether or not there
19 were any other Walmart-specific opinions in
20 your report?
21    A.    Well, I'd search it for Walmart
22 first, and then there's a Walmart coding
23 because Walmart documents may have been used
24 for other opinions.  And then you could do a

Page 788

1 search, you know, whatever the code is,
2 asterisk, and then find any other Walmart
3 documents that were cited in the report.
4    Q.    So if there's any Walmart
5 documents cited in the report, is it your
6 testimony that that, then, is referring to a
7 Walmart opinion?
8    A.    I don't know.  I'd have to look
9 at them.
10    Q.    So I'll go back to my original
11 question.  In order to determine whether
12 there were any other Walmart-specific
13 opinions in your report, you'd have to review
14 not just the report but all of the documents?
15    A.    Yeah.  The report is the report
16 and the documents, correct.
17    Q.    All right?
18    A.    You'd have to read the whole
19 thing.
20    Q.    Let's look at page 134 of your
21 report.  You cite Exhibit B.480 in support of
22 your opinion that Walmart helped Actavis
23 market opioids; correct?
24    A.    Right.

Page 789

1    Q.    Do you have a copy?  I do have
2 a copy.  I didn't want to mark it as another
3 exhibit, but I can do so if we need to.
4    A.    I've probably got it in this
5 box here.
6    Q.    And I also just wanted to
7 confirm that I think it's worthwhile to get
8 that to make sure that your copy of
9 Exhibit B.480 is the same that I have.
10        So why don't we go ahead and
11 just mark this, then, as an exhibit?
12        (Whereupon, Deposition Exhibit
13        Egilman 51, Opinion-Walmart helped
14        Actavis Market Opioids, was marked for
15        identification.)
16    Q.    (BY MS. FUMERTON)  Dr. Egilman,
17 is what we just marked as Exhibit 51 the same
18 thing as Exhibit B.480 in your report?
19    A.    Yes.
20    Q.    And is Exhibit B.480 the best
21 evidence that you saw to support your opinion
22 that Walmart helped Actavis market opioids?
23    A.    Yes.
24    Q.    In fact, there was no other

Page 790

1 evidence that you relied on as the basis of
2 your opinion 7.480; correct?
3    A.    Correct.
4    Q.    Now, Exhibit B.480 is a
5 PowerPoint slide deck dated May 2014 titled
6 "Joint Business Planning" and was produced by
7 ANDA; correct?
8    A.    Correct.
9    Q.    There are no references to
10 marketing opioids in this document; correct?
11    A.    Not correct.
12    Q.    And where are there references
13 to marketing opioids in this document?
14    A.    Bates No. 1126042.
15        That's one place.
16    Q.    And --
17    A.    And then 1126043.  And then
18 1126049.
19        [Document review.]
20    Q.    (BY MS. FUMERTON)  I'm going
21 to, just because I'm so short on time, stop
22 you with those examples right now and we can
23 discuss them.  If we need to go to more, we
24 can do so.

Page 791

1     A.    Okay. Can I just make a record
2 that the answer is incomplete.
3     Q.    Sure. So let's go back to
4 page 6042, which I think is the first
5 instance that you indicated referenced
6 marketing opioids; is that right?
7     A.    Correct.
8     Q.    And where do you see the words
9 "marketing" on this page?
10     A.    The word "marketing" is not on
11 this page.
12     Q.    And so nowhere in this page
13 does it discuss marketing opioids; correct?
14     MS. CONROY: Objection.
15     THE WITNESS: Not true.
16     Q.    (BY MS. FUMERTON) Is it your
17 opinion that because this page references
18 sales of opioids that that is the same thing
19 as marketing opioids?
20     A.    No, not exactly.
21     Q.    So explain to me how this page
22 refers to marketing of opioids.
23     A.    This says -- it says planned
24 unit growth to translate in sales and gross

Page 792

1 profit, or GP, improvements.
2     And it indicates estimated
3 increases in sales, and it includes
4 specifically hydromorphone and buprenorphine
5 analogs as part of the drugs that are going
6 to increase gross profit.
7     Q.    And whose gross profit is being
8 referred to there, do you know?
9     A.    Well, it's a joint business
10 planning, so it appears to be both companies.
11     Q.    And you're just basing that off
12 of the title of the document; correct?
13     A.    That's true. I'm basing it on
14 the title of the document, and I think
15 there's other --
16     That's not necessarily true.
17     I think there's other documents
18 in here that indicate increases in gross
19 profit that may segregate out who's
20 specifically --
21     Yeah, for example, if you look
22 at page 6 of the document, 1126044.
23     Strategy one, products either
24 launched or have been pushed out to Walmart.

Page 793

1 Fiscal 2015, and that's indicating an
2 increase. So if you're pushing out more
3 sales to Walmart by Actavis, presumably
4 that's being done to increase Actavis'
5 profits.
6     Q.    And so let me ask you --
7     A.    And of course if -- and
8 similarly, if Walmart is -- what goes -- what
9 gets pushed from Actavis to Walmart doesn't
10 get stuck in Walmart. It gets sold by
11 Walmart into the community. Otherwise there
12 would be a big backup of opioids at the
13 Walmart stores.
14     Q.    In that lengthy explanation
15 that you just gave you did not once use the
16 term "market"; correct? Or "marketing";
17 correct?
18     A.    That's true.
19     Q.    And in reaching your opinion,
20 based solely on the single document, that
21 Walmart helped Actavis market opioids, you
22 did not consider the testimony of the Walmart
23 employees who testified that Walmart did not
24 market opioids; correct?

Page 794

1     A.    That's correct.
2     Q.    And you also did not consider
3 in formulating your opinion the testimony of
4 Patsy Little, where she described these joint
5 business planning meetings as a program
6 that was just in place for a couple of years
7 for the purpose of trying to get a lower cost
8 of goods and get supply on items that were
9 hard to supply in the market; correct?
10     A.    Correct.
11     MS. FUMERTON: So I'm going to
12 pass the witness at this time. I
13 think that -- I want to put on the
14 record an objection that I think the
15 time that has been allocated to each
16 defendant has been woefully deficient,
17 given the lengthy opinions and the
18 fact that specifically to Walmart, the
19 witness was unable to answer the
20 question as to whether or not there
21 were any other additional
22 Walmart-specific opinions in his
23 report. But given the amount of time
24 that we've been allocated, I have to

Page 795

1 pass the witness so that other
2 defendants can ask questions as well.
3 Let's go off the record.
4 MS. CONROY: No, I'm not ready
5 to go off the record. Objection, the
6 plaintiffs did not allocate the time
7 among the defendants. You did that
8 yourselves. So we are not responsible
9 for that.
10 MS. FUMERTON: So are you
11 agreeing to expand the deposition
12 beyond 14 hours?
13 MS. CONROY: Absolutely not.
14 You go to the Court and seek an
15 additional -- any additional time.
16 But we did not allocate time among the
17 defendant or determine how much time
18 Walmart would have versus another
19 defendant.
20 MS. FUMERTON: And my objection
21 stands, and let's go off the record.
22 THE VIDEOGRAPHER: Off the
23 record. 5:21.
24 (Recess taken, 5:20 p.m. to

Page 796

1 5:21 p.m.)
2 THE VIDEOGRAPHER: We are back
3 on the record at 5:22.
4 THE WITNESS: I have to start
5 with the plaintiff time.
6 The opinion that I wrote for
7 453 was incorrect. The opinion should
8 be "Ohio Medicaid had its own
9 formulary committee."
10 Off plaintiff time.
11 EXAMINATION
12 BY MR. PODOLL:
13 Q. Good afternoon, Dr. Egilman.
14 Josh Podoll on behalf of Cardinal Health from
15 Williams and Connolly.
16 A. Oh, good afternoon.
17 Q. Sir, could you turn to page 63
18 of your report?
19 A. Sure.
20 Q. You opine in opinion 7.12 that
21 "Cardinal Health failed to take action for
22 suspicious orders"; correct?
23 A. Correct.
24 Q. You don't provide any written

Page 797

1 analysis regarding how you reached that
2 opinion; correct?
3 A. Can I see B12?
4 MS. CONROY: Sure.
5 MR. PODOLL: That's B12 there
6 if you want a copy, here's a copy.
7 MS. CONROY: Thank you.
8 THE WITNESS: Well, I provide
9 the excerpt of a document that
10 basically -- that says that.
11 Q. (BY MR. PODOLL) Beyond the
12 excerpt of the document that you cite in B12,
13 you don't provide any written analysis
14 regarding how you came to that opinion;
15 right?
16 A. Correct.
17 Q. You don't provide any written
18 analysis regarding how the cited document
19 supports your opinion; correct?
20 A. No. I've got all kinds of
21 arrows showing you what new document supports
22 the opinion.
23 Q. That was my next question.
24 Are the arrows in the opinion

Page 798

1 the portions of this document that you
2 believe support your opinion?
3 A. They're the -- the whole
4 document supports the opinion.
5 MS. CONROY: It's the rest of
6 that.
7 THE WITNESS: The whole
8 document supports the opinion, but
9 certainly the arrows point to the most
10 salient parts of the document that
11 support the opinion.
12 Q. (BY MR. PODOLL) Aside from the
13 documents excerpted in B12, you cite no other
14 documents to support your opinion that
15 Cardinal failed to take action for suspicious
16 orders; correct?
17 A. In this opinion, you mean?
18 Q. Correct.
19 A. That's correct. But there are,
20 I think, other documents including Cardinal's
21 fines paid, et cetera, that are cited
22 elsewhere.
23 MR. PODOLL: Move to strike
24 everything after -- oh, our live feed

Page 799

1   is gone.  Move to strike at --
2       Let's go off the record and fix
3   the live feed.
4       THE VIDEOGRAPHER:  Off the
5   record at 5:25.
6       (Recess taken, 5:25 p.m. to
7   5:25 p.m.)
8       THE VIDEOGRAPHER:  We are back
9   on the record at 5:27.
10      MR. PODOLL:  Move to strike
11  everything in the prior answer after
12  "That's correct."
13      Q.    (BY MR. PODOLL)  You cite no
14  deposition testimony to support the opinion
15  that Cardinal failed to take action for
16  suspicious orders; correct?
17      A.    Correct.
18      Q.    You don't say what methodology
19  you used to reach the opinion that Cardinal
20  failed to take action for suspicious orders;
21  correct?
22      A.    No.
23      Q.    In Exhibit B12, you don't say,
24  in writing, what methodology you use to

Page 800

1   support the opinion that Cardinal failed to
2   take action for suspicious orders; correct?
3       A.    Correct.
4       Q.    You created the -- what is
5   Exhibit B12 to your report; correct?
6       A.    Correct.
7       Q.    You did that by copying and
8   pasting from a document?
9       MS. CONROY:  Objection.
10      Q.    (BY MR. PODOLL)  From two
11  documents?
12      A.    And putting the box and arrows
13  on it.
14      Q.    Fair enough.  And putting in
15  boxes and arrows.
16      The first box that I see on the
17  page is around a quotation under the
18  signature block of Kimberly Anna-Soisson; is
19  that right?
20      A.    Correct.
21      Q.    Do you know who Kimberly
22  Anna-Soisson is?
23      A.    At the time she was the manager
24  of regulatory management.

Page 801

1       Q.    Do you know what her
2   responsibilities were with respect to
3   Cardinal's suspicious order monitoring system
4   at the time of this e-mail?
5       A.    I don't know what her job
6   description was at the time of this e-mail,
7   no.
8       Q.    Did you even try and find out?
9       A.    I don't think there were any
10  job descriptions or personnel files in any of
11  the production.
12      Q.    Did you ask to read her
13  deposition?
14      A.    No.
15      Q.    Did you read her deposition?
16      A.    No.
17      Q.    The excerpts cited in
18  Exhibit B12 refer to a K-Mart store.
19      Do you see that?
20      A.    Correct.
21      Q.    Do you know where that K-Mart
22  store is located?
23      A.    No.
24      Q.    Do you know what that K-Mart

Page 802

1   store's thresholds are?
2       A.    No.
3       Q.    Exhibit B12 does not mention
4   any specific order of opioids; correct?
5       I'll withdraw the question.
6       Do you know whether Cardinal
7   today has a suspicious order monitoring
8   system?
9       A.    Yes, they do.
10      Q.    Do you know when that system
11  was put in place?
12      A.    The current system?
13      Q.    Yes.
14      A.    No, I do not.
15      Q.    Do you know when any suspicious
16  order monitoring system was put in place for
17  Cardinal Health?
18      A.    Sometime after 2007, 2008.
19      Q.    Do you know whether Cardinal
20  Health had a suspicious order monitoring
21  system before 2007 or 2008?
22      A.    Not the one that was effective.
23  Maybe a paper program.
24      MR. PODOLL:  Move to strike.

Page 803

1    Q.    (BY MR. PODOLL) Do you know
2  whether Cardinal Health had any system to
3  monitor suspicious orders before 2007 and
4  2008, "yes" or "no"?
5    A.    Not a functioning system.
6    Q.    Is it your testimony that
7  Cardinal Health had no system to monitor
8  suspicious orders before 2007 or 2008?
9    A.    No.
10    Q.    Is it your testimony that
11  Cardinal Health did have a system to monitor
12  suspicious orders before 2007 or 2008?
13    A.    Yes.  Not a functioning system.
14    MR. PODOLL:  Move to strike
15  everything after "Yes."
16    Q.    (BY MR. PODOLL)  Do you know
17  how Cardinal Health flagged suspicious orders
18  at any time?
19    A.    They had a baseline, and if you
20  went over the baseline by a certain amount,
21  they get a flagged order.
22    Q.    Do you know what criteria
23  Cardinal Health used to set that baseline?
24    A.    Well, that's changed over time,

Page 804

1  but the answer is I don't recall it for any
2  particular point in time.
3    Q.    Do you know who was --
4    MS. CONROY:  There are
5  handwritten notes on the exhibit that
6  you -- that are already marked as
7  Exhibit 28.
8    MR. PODOLL:  Thank you,
9  Counsel.  Could I see that?
10    THE WITNESS:  And there's
11  actually new stuff in this one.
12    It's the Brown alumni folder.
13    MR. PODOLL:  All right.  I am
14  going to reserve some time to deal
15  with this, but I'm going to keep going
16  for now.  Thank you, Counsel.
17    MS. CONROY:  Let me put it back
18  in the exhibit, then.
19    MR. PODOLL:  I appreciate it.
20    Q.    (BY MR. PODOLL) Do you know
21  who was responsible for Cardinal Health's
22  suspicious order monitoring system in 2012?
23    A.    The CEO.
24    Q.    Do you know which employee had

Page 805

1  direct supervisory responsibility for
2  Cardinal Health's suspicious order monitoring
3  system in 2012?
4    Strike that.
5    Do you know which Cardinal
6  Health employee had day-to-day responsibility
7  for Cardinal Health's suspicious order
8  monitoring system in 2012?
9    A.    No.
10    Can we stop for a second
11  because mine is not working?
12    Q.    Yes.  Let's go off the record.
13    THE VIDEOGRAPHER:  Off the
14  record at 5:32.
15    (Recess taken, 5:31 p.m. to
16  5:32 p.m.)
17    THE VIDEOGRAPHER:  We are back
18  on the record at 5:33.
19    Q.    (BY MR. PODOLL) Do you know
20  which Cardinal Health employee had day-to-day
21  responsibility for Cardinal Health's
22  suspicious order monitoring system in 2016?
23    A.    No.
24    Q.    Do you know how many employees

Page 806

1  had day-to-day responsibility -- how many
2  Cardinal Health employees had day-to-day
3  responsibility for suspicious order
4  monitoring at any time?
5    A.    No.
6    Q.    Did you review the deposition
7  testimony of Cardinal Health employees who
8  were responsible day to day for suspicious
9  order monitoring?
10    A.    No.
11    Q.    Did you review the deposition
12  testimony of any Cardinal Health employees?
13    A.    No.
14    Q.    I'd like you to turn to
15  page 106 of your report.  And tell me when
16  you're there.
17    A.    I am there.
18    Q.    Your opinion 7.299 is "The
19  wholesale or performance agreement between
20  Purdue and Cardinal was a concerted action to
21  sell and promote opioids."
22    Is that right?
23    A.    Correct.
24    Q.    Your support for that is

Page 807

1  Exhibit B299; right?
2       Opinion B 299; correct? Which
3  I am handing you.
4      A.   Right.
5      Can you hand me the whole Bates
6  number document?
7      Q.   Sure. Here is the entire
8  document.
9      A.   Okay. Great. Thanks.
10     I've got the whole thing.
11     Very good.
12     Brown alumni have good lawyers.
13     Q.   I wish I'd gone to Brown. I
14 went to a rival school.
15     A.   No problem.
16     He's on the Brown board of
17 trustees. President of Cardinal.
18     Q.   You're not a lawyer; correct?
19     A.   Correct.
20     I don't play one on TV.
21     Q.   You're not offering a legal
22 opinion related to the meaning of concerted
23 action; correct?
24     A.   Correct.

Page 808

1      Q.   You've never consulted with
2  respect -- with an industry -- with Cardinal
3  Health, Purdue, or any other distributor or
4  manufacturer with respect to wholesaler
5  performance agreements; correct?
6      A.   Correct.
7      Q.   The excerpt from the document
8  that -- your opinion B99 doesn't mention
9  opioids, does it?
10     Withdrawn.
11     I'd like to point you to the
12 sentence above the key terms that you've
13 boxed in red. Are you there?
14     A.   Correct.
15     Q.   That sentence says: Set forth
16 below are the key proposed financial terms
17 that may form the basis of any future
18 distributor agreements between the parties.
19 Open parenthesis, collectively, quote, term
20 sheet, closed quote, closed parenthesis.
21     Did I read that correctly?
22     A.   Yes.
23     Q.   Do you know whether any such
24 agreements in fact were entered?

Page 809

1      A.   No.
2      Q.   Do you know the terms of any
3  agreements between Purdue and Cardinal Health
4  that were in fact entered?
5      A.   Well, there are other marketing
6  agreement documents, as I recall, that are
7  elsewhere in the report. And I think they're
8  Cardinal-Purdue documents.
9      Q.   Can you point me, sitting here
10 today, to the terms of any -- of any
11 distributor performance agreement between
12 Cardinal Health and Purdue?
13     A.   No.
14     Q.   Do you have any knowledge about
15 this agreement that I couldn't get by
16 performing the searches you performed and
17 reading the documents you read?
18     A.   No.
19     MR. PODOLL: All right. Let's
20 go off the record.
21     THE VIDEOGRAPHER: Off the
22 record at 5:38.
23     (Recess taken, 5:37 p.m. to
24 5:37 p.m.)

Page 810

1      MR. PODOLL: I just want to
2  make the record that we object to the
3  amount of time allotted for this
4  deposition. So we can just note that
5  on the stenographic record.
6      THE WITNESS: I just say,
7  anyone's free to call me up anytime
8  you want. Ask me any questions you
9  want. Chat any time.
10     MR. PODOLL: Appreciate it.
11     THE WITNESS: My pleasure.
12     (Whereupon, Deposition Exhibit
13 Egilman 52, Opinion-Ohio Medicaid
14 depended on the PBMs for formulary
15 drug selection/handwritten notations
16 "had its own committee," was marked
17 for identification.)
18     (Recess taken, 5:39 p.m. to
19 5:40.
20     THE VIDEOGRAPHER: We are back
21 on the record at 5:40:
22     MS. CONROY: This is Jayne
23 Conroy. We're going to be marking as
24 Exhibit 52, opinion B453, which was

Page 811

1  corrected on the record by
2  Dr. Egilman.
3         EXAMINATION
4  BY MS. FINGER:
5      Q.    Dr. Egilman, my name is Anna
6  Finger. I'm at Locke Lord, and I represent
7  Henry Schein, Incorporated and Henry Schein
8  Medical Facility, Incorporated. I'm going to
9  refer to them herein as Henry Schein or the
10  Henry Schein defendants. Is that okay?
11     A.    Sure.
12     Q.    And so you had access to review
13  all documents produced by Henry Schein in
14  this litigation; correct?
15     A.    Right. I think they came in
16  late, though. So I didn't have that much
17  time on those documents.
18     Q.    Okay. But you had access to
19  all of their documents; correct?
20     A.    Right. At some point in time.
21     Q.    Okay. And you do not list any
22  opinions in your report that specifically
23  mention Henry Schein; correct?
24     A.    Correct.

Page 812

1      Q.    And Henry Schein is not
2  specifically identified as a member in what
3  you call "the venture"; correct?
4      A.    Correct.
5         MS. FINGER: That's all I have.
6  I'll pass the witness.
7         THE WITNESS: Great job.
8         EXAMINATION
9  BY MS. SAULINO:
10     Q.    Dr. Egilman, it's Jennifer
11  Saulino for McKesson again. I'm back.
12     A.    Welcome back.
13     Q.    Thank you.
14        So first, because you've kindly
15  made this offer to us several times, I'd like
16  to ask you, on the record, whether you are
17  willing to sit for additional hours of the
18  deposition so that all of the defendants can
19  have sufficient time to explore your numerous
20  opinions.
21     A.    No. Unless ordered by the
22  judge.
23     Q.    Okay. So you are only willing
24  to talk by telephone with us?

Page 813

1      A.    Or in person.
2      Q.    Or in person?
3      A.    If you want to buy me dinner,
4  I'd be glad to go to dinner with you.
5      Q.    Okay.
6      A.    Particularly if it's one of the
7  Italian restaurants in Federal Hill. Or one
8  of my staff seems to like Chicken McNuggets,
9  but I have a more expensive palate than she
10  does.
11     Q.    Okay. And --
12     A.    And yet I would be glad to talk
13  to you without. And I don't drink, so that's
14  a cheap date in terms of alcohol.
15     Q.    Would it be all right if we
16  brought a court reporter to the dinner?
17     A.    I'd prefer not.
18     Q.    Okay. But that's something we
19  could talk about, then?
20     A.    Correct.
21     Q.    So your objection is just to a
22  formal notice of deposition? Is that --
23     A.    My objection is to a formal
24  proceeding that --

Page 814

1         I don't know if you know this
2  or not, but I've been here for about 14 hours
3  straight, and -- well, I've enjoyed myself.
4  It is a little bit tiring and stressful. And
5  so I prefer a more informal setting and
6  conversation and a back-and-forth.
7         This involves a question and an
8  answer, unidirectional and not a discussion.
9         So I think discussions are
10  generally more fruitful in terms of figuring
11  out what really is going on, what my opinions
12  really are, et cetera.
13        But, you know, that's just --
14  that's my view about how things work.
15     Q.    You'd agree with me, Doctor,
16  wouldn't you, that we just haven't had
17  sufficient time to explore what's really
18  going on with your opinions and what your
19  opinions really are?
20     A.    No.
21        MS. CONROY: Objection.
22        THE WITNESS: I think you had
23  plenty of time to do that. I don't
24  think you came quite prepared to do

Page 815

1    it, but you had plenty of time to do
2    it.
3        Q.    (BY MS. SAULINO)  You'd agree
4    with me that we have not discussed every
5    single one of your 490 opinions in the last
6    two days, have we?
7        A.    Not specifically, correct.
8        Q.    You'd also agree with me,
9    Doctor, that unless specifically referenced
10   in an opinion, you have not reviewed
11   deposition testimony for any particular
12   opinion, unless it's specifically referenced
13   in your -- in your report.
14       A.    No.
15           MS. CONROY:  Objection.
16       Q.    (BY MS. SAULINO)  You would
17   agree with me, however, that there's no way
18   for us to know what deposition testimony you
19   may have reviewed for any particular opinion
20   unless you cite it?
21           MS. CONROY:  Objection.
22           THE WITNESS:  No.
23       Q.    (BY MS. SAULINO)  There is a
24   way for us to know?

Page 816

1        A.    Well, there was a way for you
2    to know.  It's called a depo notice.  The
3    depo notice could include a request for me to
4    give you a list of all the depositions I
5    reviewed.  You didn't do that.  So I didn't
6    bring the list of all of the depositions I
7    reviewed because you didn't ask for it.
8        Q.    Well, Doctor --
9        A.    I did bring lot of other
10   things, but I didn't bring that.
11       Q.    Dr. Egilman, in fact, in your
12   report you say that you reviewed all of the
13   depositions.
14       A.    No, I don't.  I say I reviewed
15   depositions.  I didn't say all of the
16   depositions.
17       Q.    Are you now agreeing to provide
18   a list of each deposition that you reviewed
19   with respect to each opinion?
20       A.    No.  I'm not agreeing to
21   anything.
22       Q.    Okay.  And you would agree --
23       A.    You asked a different question.
24   You asked if there was a way you could have

Page 817

1    found out what depositions I reviewed before
2    the deposition.  And there was.  You could do
3    a notice of deposition.  You could make that
4    request, and I would have complied with that
5    request.
6           You didn't do that.
7        Q.    You would agree with me that
8    that is not anywhere listed in your report
9    except for particular opinions that do -- a
10   few particular opinions that do cite
11   depositions; right?
12       A.    The "no" there is depositions I
13   reviewed?  Correct.  The question is
14   ambiguous.  I just cleared it up in my
15   answer.
16       Q.    All right.  Dr. Egilman, just
17   so we're clear, on the record, you would
18   agree with me that there is nowhere in your
19   report where you have listed with respect to
20   any particular opinion that a deposition was
21   something that you reviewed for that opinion
22   except for the few opinions where you do cite
23   to a deposition.  Right?
24       A.    That's correct.

Page 818

1        Q.    Okay.  And you would agree with
2    me, Dr. Egilman, that in none of your
3    individual opinions do you provide specific
4    information for that opinion about how you
5    retrieved the document or documents that you
6    list as support for that opinion; right?
7        A.    That's correct.  I didn't give
8    you the complete trail of iterative searches
9    for each document.
10       Q.    And you would agree with me,
11   that in none of your individual opinions do
12   you provide specific information about how
13   you determined what constituted the best
14   evidence for that particular opinion; right?
15       A.    Correct.  It's the best
16   evidence that I could find that supported the
17   opinion.
18       Q.    Okay.  Just so I make sure I
19   understand what you're saying, the evidence
20   that you provide in support of any particular
21   opinion is your best evidence for that
22   opinion?
23       A.    It's the best evidence --
24           Well, a lot of the opinions

Highly Confidential - Subject to Further Confidentiality Review

Page 819

1  relate to each other.  So the report has to
2  be taken as a -- as a package.  And we've
3  gone through this over the past two days, and
4  I --
5      Q.    I know.
6      A.    -- I've said this many times.
7  So there are opinions that relate to each
8  other that support each other.  So for any
9  particular opinion, there's other --
10  generally other opinions that support that
11  opinion.
12      Q.    And as you and I have discussed
13  previously, you didn't provide us any
14  cross-referencing for those opinions that
15  support each other; right?
16      A.    That's correct.  You'd have to
17  read the whole report.
18      Q.    And figure it out for
19  ourselves; right?
20          MS. CONROY:  Objection.
21          THE WITNESS:  Well, I think --
22          that's correct.  You would have to
23          read and understand the report.
24      Q.    (BY MS. SAULINO)  Okay.  But

Page 820

1  you did not provide us with any documentation
2  about which opinions you believe support one
3  another; right?
4          Would you like me to add the
5  word "specifically"?  Would that help?
6      A.    Yeah, sure.  If you add
7  "specific," I can give you an easier answer.
8      Q.    Okay.
9      A.    That's a yes.
10      Q.    Okay.
11      A.    Can we just take a quick break?
12      Q.    Sure.  We only have a couple of
13  minutes left.
14      A.    How many have you got?
15      Q.    Like five.
16      A.    Go ahead.
17      Q.    Okay.  I mean, if you need a
18  break, Doctor.
19      A.    I understand.  Go ahead.
20          It was a smaller cup of coffee.
21      Q.    Okay.
22      A.    If it was another tall, okay?
23  But I can give you another five with a
24  smaller cup.

Page 821

1      Q.    Okay.  So, Doctor, in -- you
2  recall that in 2013, you presented at an FDA
3  public hearing on chronic opioid therapy?
4      A.    I do.
5      Q.    And that was an opportunity to
6  reach doctors, scientists, FDA officials and
7  even the public?
8      A.    Well, some of them, yes.
9      Q.    At no point during that
10  presentation did you sound the alarm about
11  the role of distributors or pharmacies in the
12  opioid epidemic, did you?
13      A.    That's correct.
14      Q.    You've also served as an expert
15  in litigation involving opioids; right?
16      A.    Correct.
17      Q.    You've written expert reports
18  and you've given depositions; right?
19      A.    Correct.
20      Q.    But until you were retained as
21  an expert in this case, you never offered an
22  opinion that any distributors' or pharmacies'
23  marketing led to the abuse or misuse of any
24  opioid medication; right?

Page 822

1      A.    Until I saw the documents that
2  were produced in this litigation, correct.
3      Q.    In 2006 you published a book
4  chapter about anti-warnings that contained a
5  discussion about opioids; right?
6      A.    Correct.
7      Q.    And you did not place any blame
8  on any distributor or any pharmacy for what
9  you called the opioid public health problem;
10  right?
11      A.    Correct.
12          MS. SAULINO:  So, Doctor, right
13          now I'd like to put on the record a
14          standing objection on behalf of all of
15          the defendants in this litigation,
16          that we were limited to 14 hours total
17          of time.  And while we did allocate
18          that time amongst ourselves, it was
19          not sufficient time for us
20          collectively to each sufficiently
21          explore all of your opinions, all 490
22          of your opinions in your report, plus
23          the additional bases that you've
24          provided to us over the last couple of

Page 823

```
1   days.
2         And so on behalf of all
3   defendants, we object to the time
4   that's been allotted, and we'd like to
5   keep this deposition open in order to
6   have sufficient time to explore your
7   opinions so that we can understand all
8   of the many, many bases and your
9   criteria for your opinions that you
10  yourself have admitted during this
11  deposition is not specifically listed
12  anywhere in your report.
13        THE WITNESS:  Is that a
14  question?
15        Was that a question?
16        MS. SAULINO:  No.  It was not.
17        Further, Dr. Egilman, we will
18  note for the record that you have
19  26 boxes behind you filled with
20  materials.  You came with additional
21  bases that you evidently created the
22  night before the deposition that are
23  stacked in front of us and are now
24  marked as Exhibit 28.  We were given
```

Page 824

```
1   no notice of the additional bases and
2   opinions, unless and until we happened
3   upon them when we were asking
4   questions.
5         And so on behalf of all of the
6   defendants, I will also object to that
7   issue.
8         THE WITNESS:  Is that a
9   question for me?
10        MS. SAULINO:  No, it is not,
11  Dr. Egilman.
12        THE WITNESS:  So are we done,
13  then?
14        MS. SAULINO:  If you can give
15  me one moment, Dr. Egilman.
16        MS. FUMERTON:  Can we just mark
17  those boxes?
18        MS. SAULINO:  The court
19  reporter is going to kill us.
20        I do want to -- sorry, are we
21  back on the record?
22        I do want to confirm,
23  Dr. Egilman, that the box that we
24  marked as Exhibit 26 is the
```

Page 825

```
1   entirety -- plus Exhibit 28, which is
2   the folders in front of you -- is the
3   entirety of things that you have
4   written notes on in order to bring to
5   the deposition?
6         MS. CONROY:  It's the opposite.
7   28, and then 26 are the folders here.
8         MS. SAULINO:  I apologize.
9   Thank you for correcting that.
10        But those two exhibits are all
11  of what you wrote notes on in order to
12  bring to this deposition?
13        THE WITNESS:  No.  They were
14  all I wrote notes on.
15        It had nothing to do with
16  bringing it to the deposition.  I
17  wrote notes on them, and I brought
18  them to the deposition because I
19  thought it would facilitate the
20  deposition.
21  Q.    (BY MS. SAULINO)  Did you bring
22  any --
23  A.    Make it go fast.
24  Q.    Did you bring anything else
```

Page 826

```
1   that you thought would facilitate the
2   deposition that maybe you didn't write notes
3   on that we haven't marked as an exhibit?
4   A.    Yeah, the only thing you didn't
5   mark are the appendices to the Perry report.
6         Oh, and the J&J bad acts boxes.
7         And the books.  I brought
8   books.  You didn't mark the books.
9         MS. SAULINO:  All right.  With
10  all of that said, I have no more
11  questions today.
12        MS. CONROY:  We do --
13  plaintiffs' counsel, we do not agree
14  to keep this deposition open until
15  there is a court order that there
16  would be any additional time with
17  Dr. Egilman.
18        With respect to the boxes, that
19  was my law firm that brought the
20  copies of exhibits, and the documents
21  to Dr. Egilman's report.  And as far
22  as I could tell, counsel here for the
23  most part did not have copies of
24  either the report or the exhibits that
```

Page 827

1  related to them.  They're all here,
2  and they were available for both the
3  doctor and for counsel.
4       MS. SAULINO:  Okay.  Just to
5  correct the record on that, we did
6  mark, actually, at the very beginning
7  of the first day, binders with all of
8  his opinions and the support that we
9  had been given, at least, but those
10 were a little unwieldy.  You had your
11 staff back there, and so we took him
12 up on the offer to hand the exhibits
13 to him.  But we did have them.
14      THE WITNESS:  Excuse me.  Just
15 not to interrupt this, and I know I'm
16 enjoying it, but can we go off the
17 video record?  I think I'm done.
18 Right?
19      MS. CONROY:  I'm just about
20 done.
21      THE WITNESS:  The time is up.
22      MS. CONROY:  It did not have
23 the full documents.  It just had
24 the -- it did not have the full Bates

Page 828

1  documents printed in those notebooks.
2       MS. SAULINO:  And Dr. Egilman
3  did not provide any indication in his
4  report that those were -- those full
5  Bates documents that were simply cited
6  under the opinions were intended to be
7  considered a part of his report as he
8  defined for me later yesterday.
9       MS. CONROY:  I think it's quite
10 clear that that's not true.
11      THE WITNESS:  Okay.  So I --
12 we're done time-wise, right?
13      MS. SAULINO:  Do you have any
14 questions, Ms. Conroy?
15      THE WITNESS:  We're over 14
16 hours.
17      MS. SAULINO:  Ms. Conroy, do
18 you have any questions?
19      MS. CONROY:  I have no
20 questions.
21      MS. SAULINO:  If she has
22 questions, then she's allowed to use
23 more time.
24      THE WITNESS:  I know.  That's

Page 829

1  why I asked.
2       THE VIDEOGRAPHER:  That
3  concludes today's deposition.  The
4  time is 5:56 p.m.
5       (Proceedings recessed at
6  5:56 p.m.)
7           --o0o--

Page 830

1           CERTIFICATE
2       I, DEBRA A. DIBBLE, Registered
   Diplomate Reporter, Certified Realtime
3  Reporter, Certified Realtime Captioner,
   Certified Court Reporter and Notary Public,
4  do hereby certify that prior to the
   commencement of the examination, DAVID S.
5  EGILMAN, M.D., MPH was duly sworn by me to
   testify to the truth, the whole truth and
6  nothing but the truth.
7       I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
        I DO FURTHER CERTIFY that pursuant
11 to FRCP Rule 30, signature of the witness was
   not requested by the witness or other party
12 before the conclusion of the deposition.
13      I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
14 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
15 employee of such attorney or counsel, and
   that I am not financially interested in the
16 action.
17
18
19  _____
20 DEBRA A. DIBBLE, RDR, CRR, CRC
   NCRA Registered Diplomate Reporter
21 NCRA Certified Realtime Reporter
   Certified Court Reporter
22
23 Dated: 1 May 2019
24

Page 831

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 833

## ACKNOWLEDGMENT OF DEPONENT

I, DAVID S. EGILMAN, MD, MPH, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

DAVID S. EGILMAN, M.D., MPH          DATE

Subscribed and sworn to before me this _____ day of _____, 20 _____.
My commission expires: _____

_____

Notary Public

Page 832

## ERRATA

PAGE  LINE  CHANGE

____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____

Page 834

## LAWYER'S NOTES

PAGE   LINE

_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____