Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4

 5   IN RE:  NATIONAL PRESCRIPTION )

 6   OPIATE LITIGATION              ) MDL NO. 2804

 7   -----------------------------) HON. DAN A. POLSTER

 8   THIS DOCUMENT RELATES TO      ) Case No. 1:17-md-2804

 9   ALL CASES                     )

10   -----------------------------)

11

12                 HIGHLY CONFIDENTIAL

13         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

14

15           The videotaped 30(b)(6) deposition of H.D.

16   SMITH by and through GEORGE EUSON, called for

17   examination, taken pursuant to the Federal Rules of

18   Civil Procedure of the United States District Courts

19   pertaining to the taking of depositions, taken before

20   JULIANA F. ZAJICEK, a Registered Professional Reporter

21   and a Certified Shorthand Reporter, at the offices of

22   Brown, Hay & Stephens, LLP, Suite 800, 205 South Fifth

23   Street, Springfield, Illinois, on November 27, 2018,

24   at 9:13 a.m.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1 PRESENT:
2 ON BEHALF OF THE PLAINTIFFS:
3    MORGAN & MORGAN
     76 South Laura Street, Suite 1100
4    Jacksonville, Florida 32202
     904-361-0012
5    BY: JAMES D. YOUNG, ESQ.
     jyoung@forthepeople.com;
6    RENEE COOK, ESQ.
     rcook@forthepeople.com;
7
         -and-
8
     MORGAN & MORGAN
9    201 North Franklin Street
     Tampa Florida 33602
10   813-679-9217
     JUAN MARTINEZ, ESQ.
11   juanmartinez@forthepeople.com
12
     ON BEHALF OF THE H.D. SMITH ENTITIES:
13
     BARNES & THORNBURG LLP
14   11 South Meridian Street
     Indianapolis, Indiana 46204
15   317-231-7501
     BY: WILLIAM E. PADGETT, ESQ.
16   william.padgett@btlaw.com;
     WILLIAM J. LEEDER, III, ESQ.
17   bill.leeder@btlaw.com
18
     ON BEHALF OF AMERISOURCEBERGEN CORPORATION AND
19   AMERISOURCEBERGEN DRUG CORPORATION:
20   REED SMITH LLP
     10 South Wacker Drive, 40th Floor
21   Chicago, Illinois 60606-7502
     312-207-2834
22   BY: M. PATRICK YINGLING, ESQ.
     mpyingling@reedsmith.com
23
24

Page 3

1 PRESENT: (Continued)
2 ON BEHALF OF MALLINCKRODT LLC AND SPECGX LLC:
3    ROPES & GRAY LLP
     1211 Avenue of the Americas
4    New York, NY 10036-8704
     212-596-9451
5    BY: HAYDEN MILLER, ESQ. (Telephonically)
     hayden.miller@ropesgray.com
6
7 ON BEHALF OF CARDINAL HEALTH, INC.:
8    WILLIAMS & CONNOLLY LLP
     725 Twelfth Street, N.W.
9    Washington, D.C. 20005
     202-434-5000
10   BY: ANDREW C. McBRIDE, ESQ.
     amcbride@wc.com
11
12 ON BEHALF OF PRESCRIPTION SUPPLY, INC.:
13   PELINI CAMPBELL & WILLIAMS LLC
     8040 Cleveland Avenue NW, Suite 400
14   North Canton, Ohio 44720
     330-305-6400
15   BY: KRISTEN E. CAMPBELL, ESQ. (Telephonically)
     kec@pelini-law.com
16
17 ON BEHALF OF McKESSON:
18   COVINGTON & BURLING, LLP
     850 Tenth Street, NW
19   Washington, D.C. 20001
     202-662-5531
20   BY: MEGHAN MONAGHAN, ESQ. (Telephonically)
     mmonaghan@cov.com
21
22
23
24

Page 4

1 PRESENT: (Continued)
2 ON BEHALF OF WALMART INC.:
3    JONES DAY
     77 West Wacker Drive
4    Chicago, Illinois 60601-1692
     312-269-4164
5    BY: NICOLE LANGSTON, ESQ. (Telephonically)
     nlangston@jonesday.com
6
7 ON BEHALF OF HBC SERVICES:
8    MARCUS & SHAPIRA LLP
     One Oxford Centre, 35th Floor
9    Pittsburgh, Pennsylvania 15219
     412-471-3490
10   BY: PAUL M. MANNIX, ESQ. (Telephonically)
     pmannix@marcus-shapira.com
11
12
13
14 THE VIDEOGRAPHER:
15   MR. ANTHONY MICHELETTO,
     Golkow Litigation Services.
16
17
18
19
20 REPORTED BY: JULIANA F. ZAJICEK, C.S.R. NO. 84-2604.
21
22
23
24

Page 5

1              I N D E X
2 WITNESS:                          PAGE:
3 GEORGE EUSON
4    EXAM BY MR. YOUNG.................... 13
5
6              *****
7
8        PREVIOUSLY MARKED EXHIBITS
9 EXHIBIT          FIRST TIME REFERRED TO
10 HDS-EUSON-A    Amended First Notice of    17
                 Deposition Pursuant to Rule
11               30(b)(6) and Document
                 Request Pursuant to Rule
12               30(b)(2) and Rule 34 to
                 Defendant Miami-Luken, Inc.
13
                 HDS-EUSON-B    Amended Second Notice of   17
14               Deposition Pursuant to Rule
                 30(b)(6) and Document
15               Request Pursuant to Rule
                 30(b)(2) and Rule 34 to
16               Defendant H.S. Smith, LLC,
                 d/b/a HD Smith
17
                 HDS-EUSON-001  Schedule II Controlled     18
18               Substances Definition;
                 HDS_Euson_00001 - 003
19
                 HDS-EUSON-002  Controlled Substances Act, 28
20               Title 21 USC Section
                 823(b)(1) - (b)(5);
21               HDS_Euson_00004 - 012
22 HDS-EUSON-003  Security Requirements for   39
                 Controlled Substances, Title
23               21 CFR Section 1301.71(a);
                 HDS_Euson_00013 - 014
24

## Page 6

PREVIOUSLY MARKED EXHIBITS (Continued)

EXHIBIT | FIRST TIME REFERRED TO

HDS-EUSON-004  Security Requirements for    45
Controlled Substances, Title
21 CFR Section 1301.74(b);
HDS_Euson_00015 -016

HDS-EUSON-005  Letter from Joseph    64
Rannazzisi dated 9/27/06;
HDS_Euson_00017 - 020

HDS-EUSON-007  Report of Investigation by    106
the DEA for H.D. Smith
excessive purchases by
Paragould Pharmacy, Semo
Drugs of Kennett, SafeScript
Pharmacy, and Max Care
Pharmacy for March 2006;
HDS_Euson_00023 - 025

HDS-EUSON-008  Report of Investigation by    107
the DEA for H.D. Smith
excessive purchases by
Paragould Pharmacy,
SafeScript Pharmacy, Semo
Drugs of Kennett, and Semo
Drugs/Senath for April 2006;
HDS_Euson_00026 - 028

HDS-EUSON-014  October 5, 2005 e-mail from    111
Danny Avila to Angelo
Grande, Dale Smith and Chris
Smith; HDS_Euson_00059

HDS-EUSON-015  Controlled Substance    118
Monitoring policy, signed by
Dale Smith;
HDS_Euson_00060 - 061

HDS-EUSON-017  E-mail from sales    181
representative Brandon
Salyer to P.J. Little dated
4-20-09 - $3 million
account; Hydro 15x;
HDS_Euson_00063 - 066

## Page 7

PREVIOUSLY MARKED EXHIBITS (Continued)

EXHIBIT | FIRST TIME REFERRED TO

HDS-EUSON-018  Draft summary of the HDMA,    192
DEA Meeting held on Oct 16
and 17, 1007;
HDS_Euson_00067 - 071

HDS-EUSON-019  October 22, 2007 letter from    191
George Euson to Kyle Wright
at the DEA;
HDS_MDL_00036303 - 304

HDS-EUSON-020  DEA Chemical Handler's    148
Manual dated June 2002;
HDS_Euson_00078 - 079

HDS-EUSON-022  HDMA Industry Compliance    158
Guidelines for reporting
suspicious orders and
preventing diversion of
controlled substances;
HDS_Euson_00080 - 092

HDS-EUSON-023  AmerisourceBergen e-mail    197
George Euson sent to Scott
Garriott dated 7-9-07;
HDS_Euson_00093 - 095

HDS-EUSON-024  Brief Overview of H.D.    201
Smith's Controlled Substance
Order Monitoring Program or
CSOMP; HDS_Euson_00096 - 101

HDS-EUSON-025  CSOMP Division Procedures    207
dated March 22, 2008,
revised May 7, 2008;
HDS_Euson_00102 - 109

HDS-EUSON-026  CSOMP Divisional Policy    212
dated May 7, 2008;
HDS_Euson_00110 - 118

## Page 8

PREVIOUSLY MARKED EXHIBITS (Continued)

EXHIBIT | FIRST TIME REFERRED TO

HDS-EUSON-027  E-mail chain from Operations    215
Manager, Dan Howard, and
corporate compliance on
April 29, 2010;
HDS_Euson_00119 - 122

HDS-EUSON-028  E-mail from George Euson    218
dated May 7, 2008 re:
Adjustments made to Keller's
URLs based on division
recommendations, Oxy URL 12x
the average;
HDS_Euson_00123 - 124

HDS-EUSON-030  SOP Due Diligence and SOM    229
dated November 2008;
HDS_Euson_00126 - 129

HDS-EUSON-033  H.D. Smith's Compliance    238
Training dated 4/28/11 at
the New Hampshire
Distribution Center;
HDS_Euson_00133 - 137

HDS-EUSON-034  September 6, 2012 -    251
Prescription Drug Fraud and
Abuse - Sales Training by
George Euson and Debbie
Komoroski Regional
Compliance Manager;
HDS_Euson_00138 - 143

HDS-EUSON-035  April 27, 2010 letter from    240
George Euson to the DEA re
their meeting on Friday,
April 23, 2010;
HDS_Euson_00144 - 146

HDS-EUSON-036  Unsigned Memorandum of    256
Understanding between the
DEA and H.D. Smith;
HDS_Euson_00147 - 152

## Page 9

PREVIOUSLY MARKED EXHIBITS (Continued)

EXHIBIT | FIRST TIME REFERRED TO

HDS-EUSON-037  December 5, 2006, scheduled    258
DEA regulatory investigation
at H.D. Smith;
HDS_Euson_00153 - 176

HDS-EUSON-038  Compliance audit dated    263
January 5, 2010;
HDS_Euson_00177 - 182

HDS-EUSON-039  SOM audit - summary report    271
dated March 29, 2012 between
H.D. Smith and Mallinckrodt;
HDS_Euson_00183 - 184

HDS-EUSON-041  Letter to H.D. Smith from    278
DEA dated 11/21/14 - TX;
HDS_Euson_00197 - 198

HDS-EUSON-042  CSOMP improvement Project    287
initiation form request date
5-6-15; HDS_Euson_00199

HDS-EUSON-043  March 23, 2015 e-mail to    293
Tracey Hernandez re: CSOMP
Fixes and Modifications
Required;
HDS_Euson_00200 - 204

HDS-EUSON-046  HDMA's Amicus Brief in    299
support of Cardinal Health
dated May 9, 2012;
HDS_Euson_00214 - 279

HDS-EUSON-054  Mallinckrodt and H.D.    309
Smith - Confidentiality and
Restricted Use Agreement;
HDS_Euson_00306 - 312

| | Page 10 |
|---|---|

PREVIOUSLY MARKED EXHIBITS (Continued)

| EXHIBIT | FIRST TIME REFERRED TO |
|---|---|

1
2
3 HDS-EUSON-055  E-mail dated September 7,     313
                2017, from Teva to H.D.
4               Smith requesting information
                from 3 of H.D. Smith's
5               customers - unable to
                release Oxy;
6               HDS_Euson_00313 - 317
7 HDS-EUSON-057  Profit Sharing of Fentanyl    321
                between Actavis and H.D.
8               Smith; HDS_Euson_00668 - 673
9 HDS-EUSON-058  E-mail dated April 19, 2006   323
                to George Euson from
10              Diversion Investigator Lynda
                Eleazer re: Budget Drug &
11              Wellness Center's Suspended
                DEA Numbers;
12              HDS_Euson_00674 - 675
13 HDS-EUSON-060  US Court of Appeals Opinion   325
                re: Masters vs. DEA, Decided
14              June 30, 2017;
                HDS_Euson_00685 - 722
15
16
17
18
19
20
21
22
23
24

| | Page 11 |
|---|---|

1      THE VIDEOGRAPHER:  We are now on the record.  My
2 name is Anthony Micheletto.  I am a videographer for
3 Golkow Litigation Services.
4      Today's date is November 27th, 2018.  The
5 time is 9:13 a.m. as indicated on the video screen.
6      This video deposition is being held in
7 Springfield, Illinois in the matter of In Re National
8 Prescription Opiate Litigation, MDL 2804, in the
9 United States District Court for the Northern District
10 of Ohio, Eastern Division.
11      Will counsel please identify themselves
12 for the video record.
13      MR. YOUNG:  James Young on behalf of the
14 Plaintiffs.
15      MS. COOK:  Renee Cook on behalf of the
16 Plaintiffs.
17      MR. MARTINEZ:  Juan Martinez on behalf of the
18 Plaintiffs.
19      MR. McBRIDE:  Andrew McBride on behalf of
20 Cardinal.
21      MR. YINGLING:  Patrick Yingling for
22 AmerisourceBergen.
23      MR. LEEDER:  Bill Leeder on behalf of
24 H.D. Smith.

| | Page 12 |
|---|---|

1      MR. PADGETT:  Bill Padgett on behalf of
2 H.D. Smith and George Euson to the extent it wades
3 into individual questions.
4      THE COURT REPORTER:  If there is anyone on the
5 phone, would you please introduce yourselves.
6      MR. MILLER:  Well, yeah, Hayden Miller from
7 Ropes & Gray on behalf of Mallinckrodt and SpecGx.
8      MS. LANGSTON:  Nicole Langston from Jones Day on
9 behalf of Walmart.
10      MR. MANNIX:  Paul Mannix on behalf of HBC
11 Services.
12      MS. MONAGHAN:  Meghan Monaghan from Covington on
13 behalf of McKesson.
14      MS. CAMPBELL:  Kristen Campbell for Prescription
15 Supply, Inc.
16      THE VIDEOGRAPHER:  Our witness today is George
17 Euson.  Our court reporter is Juliana Zajicek.  Please
18 swear in the witness.
19         (WHEREUPON, the witness was duly
20          sworn.)
21          GEORGE EUSON,
22 called as a witness herein, having been first duly
23 sworn, was examined and testified as follows:
24          EXAMINATION

| | Page 13 |
|---|---|

1 BY MR. YOUNG:
2      Q.   Good morning, Mr. Euson.  My name is James
3 Young and I am here on behalf of the Plaintiffs in the
4 national opioid litigation, as the videographer just
5 relayed.
6      Can you state and spell your last name for
7 the record?
8      A.   Yes.  It is Euson, E-u-s-o-n.
9      Q.   And you're appearing here today as the
10 corporate designee for H.D. Smith LLC, is that
11 correct?
12      A.   Correct.
13      Q.   And you're familiar with Rule 30(b)(6)?
14      A.   I am.
15      Q.   You've appeared as a corporate designee
16 under Rule 30(b)(6) for H.D. Smith in previous
17 litigation?
18      A.   I have.
19      Q.   How many occasions did you testify as the
20 30(b)(6) witness for H.D. Smith previously?
21      A.   Twice, I believe.
22      Q.   I'm going to just go through a few basic
23 rules just to -- I -- I know you've been deposed
24 several times.  I just want to make sure that you're

Page 14

1 up to snuff on -- on how this will go. We'll try our
2 to speak over each other. I know from reading your
3 prior transcripts that's not really an issue with you.
4       You want to give your counsel and any
5 other counsel appearing here today a chance to make an
6 objection, though unless they specifically instruct
7 you not to answer, you should proceed with answering
8 the question that's asked.
9       This is videotaped, as you can see by the
10 cameras around. You are certainly welcome to make any
11 facial gestures and nod or shrug your shoulders, but
12 we'd ask that you always give a verbal response to
13 every question. There may come times when I ask a
14 question that doesn't make sense, that my wife reminds
15 me about all of the time. I'll try to rephrase it in
16 a way that makes sense for you, just let me know if you
17 don't understand the question and I'm certainly try to
18 rephrase it in a way that -- that helps you get to an
19 answer.
20       If you don't know the answer to a
21 question, let me know that as well and we'll try to
22 identify through your testimony the correct person who
23 is in a position to answer that for H.D. Smith.
24       And -- and finally, if -- if you need a

Page 15

1 break at any time, you know, bathroom break or water
2 or collect your thoughts or you want to talk to
3 counsel, just let us know and we'll try to facilitate
4 that as quickly as possible.
5       Tomorrow we are scheduled to take your
6 deposition on an individual basis as a fact witness.
7 So today I'd ask you to frame your answers on behalf
8 of H.D. Smith. In essence, you are H.D. Smith today.
9       There may come times in these questions
10 where we are going to seek testimony of George Euson
11 the individual to color some of the background of your
12 answers, so I know that's -- that can be a bit
13 confusing. I'm going to try my best to make it clear
14 that we are seeking H.D. Smith testimony today and
15 tomorrow will be George Euson testimony.
16       Any questions before we dig in?
17 A.   No.
18 Q.   Okay. You have seen, I assume, the
19 Amended First and Amended Second 30(B)(6) Notices of
20 Deposition before today?
21 A.   I have.
22 Q.   And you're prepared today to answer
23 questions, I think all of the questions -- or -- or
24 subjects that were framed in the Amended First Notice

Page 16

1 of Deposition, is that correct?
2 MR. PADGETT: A through N?
3 MR. YOUNG: Yes, A through N.
4 BY THE WITNESS:
5 A.   Yes.
6 BY MR. YOUNG:
7 Q.   And in the Amended Second Notice you are
8 prepared or your -- your -- your counsel has agreed to
9 answer certain of those questions in writing, and
10 you're here today to answer a subset of those
11 questions. And I have those designated as 5, 6, 7,
12 10, 11, 12, 15 through 21.
13       Is that your recollection as well?
14 MR. PADGETT: He'd -- he'd have to see them.
15 THE WITNESS: Yeah.
16 BY MR. YOUNG:
17 Q.   And that was -- that was going to be the
18 next step is I'm going to -- I'm going to hand you a
19 copy of the Amended Second Notice of Deposition, if
20 you can just take a look at that. And see if that
21 refreshes your recollection about what you are
22 prepared to --
23 THE WITNESS: What's the topic?
24 MR. PADGETT: 5, 6, 7, 10, 11, 12.

Page 17

1 THE WITNESS: Is that 15?
2       On this? These here?
3 MR. PADGETT: Um-hum.
4 BY THE WITNESS:
5 A.   Okay.
6 BY MR. YOUNG:
7 Q.   Okay. And I'm going to hand you also just
8 a copy of the Amended -- you can keep that one.
9 A.   Okay.
10 Q.   This is the Amended First Notice. This is
11 the A through N that you are prepared to testify on.
12       And we had premarked -- we are going to go
13 through a number of documents today. We have
14 premarked them and numbered them as exhibits that go
15 in seq -- sequential order and we overlooked these two
16 documents in that numbering, so we've asked the court
17 reporter to number and attach these as an exhibit to
18 this deposition calling these Exhibits A and B, but
19 all other exhibits are going to be referred to in
20 numerical sequence from 1 through 60.
21       So just -- just so you know, when I refer
22 to an exhibit, and I'll -- I'll either hand you a
23 document or -- or refer to one that's in front of you,
24 it will be Euson Exhibit 001, I'll just call it

Page 18

1 Exhibit 1.
2      A.   Okay.
3      Q.   Okay.  So, before we jump into the
4 documents, I just want to touch briefly on your
5 background, just to understand a little bit how you
6 got to H.D. Smith and what puts you in the position to
7 answer as the corporate designee under Rule 30(b)(6).
8           Did you happen to bring a copy of your CV
9 or resume with you today?
10     A.   I did not.
11     Q.   Is that something -- and -- and -- and
12 maybe this is better asked of counsel.
13     MR. YOUNG:  Is that something that has been
14 previously introduced in -- in discovery?  Do we have
15 a copy of his --
16     MR. PADGETT:  I don't think it's been requested.
17     MR. LEEDER:  Yeah, I don't think it's been
18 requested, but the answer is no, we haven't produced
19 it.
20 BY MR. YOUNG:
21     Q.   Okay.
22          So it's my understanding that you actually
23 have a few different time periods where you were with
24 H.D. Smith and then you left and went and did

Page 19

1 something else.
2          Could you just ex -- explain for us how
3 you came to H.D. Smith and when you left, which
4 periods of time?
5      A.   I came to H.D. Smith in -- in November
6 of 2005.  Prior to that I worked about four years as
7 director of security and compliance for a company
8 called D&K Healthcare in St. Louis.  And in '05 they
9 were purchased by McKesson Corporation.
10          I then went to work for H.D. Smith as
11 director of security and compliance.  I was there from
12 November 2005 to end of May 2008.  And then I went
13 into a private business, family business, until
14 April 2009.  I came back to H.D. Smith.
15          Just to clarify, during that time that I
16 was gone, I was under a consulting contract with
17 H.D. Smith.  So I left but I was still involved with
18 H.D. Smith.
19          I worked at H.D. Smith from April of 2009
20 until October of 2013.  I then left for another
21 business within the industry called Pro Compliance.  I
22 worked there for about a year and then I started my
23 own consulting company in the pharmaceutical area.
24          Also during that time when I was -- when I

Page 20

1 was gone from H.D. Smith I was under a consulting
2 contract also.  And then I went back to H.D. Smith in
3 May of 2016 to present.
4      Q.   And you are currently employed by
5 H.D. Smith LLC?
6      A.   I am.
7      Q.   And what is the title that you hold at
8 H.D. Smith?
9      A.   Vice president of corporate compliance and
10 security.
11     Q.   Is that the title that you held prior to
12 your most recent departure?
13     A.   The first time and second time I was
14 director of -- of corporate compliance and security.
15     Q.   Did your job duties change with this new
16 title?
17     A.   Not necessarily.
18     Q.   It was just a promotion?
19     A.   Promotion, yeah.
20     Q.   What are your current duties for
21 H.D. Smith as the vice president of compliance?
22     A.   I oversee all -- all compliance as far as
23 related to due diligence, our order monitoring
24 program.  I also oversee our licensing, which is all

Page 21

1 of our facility licensing, accreditation, such as VAWD
2 accreditations throughout all of our facilities.
3          One of the people that work for me also is
4 in charge of recalls.  We do ARCOS reporting for the
5 company.  And then we also complete all of the -- if
6 we get subpoenas or requests for information in from
7 either industry or government, I have people that work
8 for me that -- that put that information together.
9          And then we also do -- we are also in
10 charge of internal compliance at our facilities.  So
11 we -- we are in charge of doing audits of our
12 facilities to make sure that they are in compliance
13 either with DEA, OSHA, FDA requirements, such as that.
14          So pretty much anything -- and -- and then
15 physical security of all of our facilities.
16     Q.   Is it fair to say that you are the most
17 senior person at H.D. Smith with compliance
18 responsibilities?
19     A.   Yes.
20     Q.   Who do you report to?
21     A.   Right now I report to David May at
22 AmerisourceBergen.  He is the vice president of
23 diversion control.  Previously I had reported to Tom
24 Twitty who was the senior vice president at

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 H.D. Smith.

2   Q.  Is Tom Twitty still with H.D. Smith?

3   A.  Yes.

4   Q.  Is he in a compliance capacity?

5   A.  Not necessarily. He is mostly operations,

6 limited regulatory, compliance responsibilities. I

7 just reported to him.

8   Q.  Okay. And, but you would -- you're --

9 you're of the belief that you have more background

10 information about compliance as it pertains to

11 H.D. Smith than Tom Twitty?

12   A.  Yes.

13   Q.  Okay. You mentioned Pro Compliance.

14     Is Pro Compliance a -- a contractor or a

15 vendor for H.D. Smith?

16   A.  It is.

17   Q.  And at some point you went and worked for

18 Pro Compliance.

19     Did you ever consider that to be a

20 potential conflict --

21   A.  No.

22   Q.  -- between Pro Compliance and H.D. Smith?

23   MR. PADGETT: Object to form.

24     He answered.

Page 23

1 BY MR. YOUNG:

2   Q.  I'm sorry. Was it?

3   A.  No, it was not.

4   Q.  Was the acquisition of H.D. Smith by

5 Amerisource, do you -- and I -- I think you mentioned

6 that you now report to an Amerisource employee.

7     Do you know whether or not you are going

8 to maintain your position as vice president of

9 compliance at H.D. Smith?

10     Has anyone mentioned that -- that to you?

11   A.  Not right now. The -- I'm retained until

12 August 2nd of 2019 in that capacity.

13   Q.  And -- and what will happen after

14 August 2nd?

15   A.  I don't know.

16   Q.  Okay. Okay. Fair enough.

17     So H.D. Smith is in the business of

18 distributing pharmaceutical products. Is that fair

19 and accurate?

20   A.  Pharmaceutical products, OTC, health and

21 beauty, pretty much anything you would find in a

22 pharmacy.

23   Q.  Is H.D. Smith LLC in any other type of

24 businesses beyond the distribution of pharmaceuticals

Page 24

1 and OTC and the other products you just mentioned?

2   A.  No.

3   Q.  And --

4   A.  We -- caveat that. I mean, there --

5 we've -- there are some ancillary businesses. I think

6 they did a little bit of packaging. There was a

7 specialty division that they had, a third-party

8 network that was part of the company that no longer

9 is.

10   Q.  So the current iteration of H.D. Smith LLC

11 is only in the distribution business?

12   A.  Yes, sir.

13   Q.  Okay. What type of pharmaceutical

14 products does H.D. Smith distribute, just -- just

15 generally? I know that there is a vast array of

16 products that are out there. If you could just

17 briefly describe.

18   A.  Pretty much most of the brand or generic

19 pharmaceutical products that are in the market,

20 including controlled substances and non-controlled

21 substances.

22   Q.  Is there --

23   A.  Full line wholesaler, full line.

24   Q.  Sorry.

Page 25

1   A.  I'm sorry. I didn't mean to walk over

2 you.

3   Q.  I think I did it to you. Apologies.

4     Is there any type of regulation over these

5 products, government regulation?

6   A.  Which products are you talking about?

7   Q.  Pharmaceutical products.

8   A.  Yes.

9   Q.  What type of regulations exist for these

10 products?

11   MR. PADGETT: Object to form.

12 BY THE WITNESS:

13   A.  Can you be a little bit more specific,

14 because there is a lot of them?

15 BY MR. YOUNG:

16   Q.  Sure.

17     So, let's begin with schedules of

18 pharmaceutical products.

19     Does H.D. Smith distribute any Schedule II

20 pharmaceutical products?

21   A.  Yes.

22   Q.  Are there particular regulations that

23 apply to Schedule II pharmaceutical products?

24   A.  There is a lot of different regulations as

Page 26

1 far as storage, security, you know, from -- from
2 receiving to -- to distribution.
3     Q.   And -- and which are the entities that
4 regulate Schedule II pharmaceutical products?
5     A.   DEA and FDA.
6     Q.   Are there any state entities that
7 specifically regulate Schedule IIs?
8     A.   There are state regulations that -- that
9 touch on the requirements for -- for scheduled drugs.
10 DEA is the main regula- -- regulatory agency that
11 controls Schedule IIs.
12     Q.   I'm going to show you a document that
13 is -- been premarked as Euson Deposition Exhibit 1,
14 0001.
15         I'm going to give you a little bit of
16 time.
17     A.   Is there something you specifically wanted
18 me to look at?
19     Q.   I was going to give you some time to take
20 a look at it.
21     A.   Oh, okay.
22     Q.   Are you familiar with the information
23 contained in Exhibit 1?
24     A.   Yes.

Page 27

1     Q.   On Page 2 of Exhibit 1, there is a
2 definition of controlled substances that has been
3 pre-highlighted on the copy that you have.
4         Can you read that into the record for us?
5     A.   "Schedule II/IIN Controlled Substances
6 (2/2N): Substances in this schedule have a high
7 potential for abuse which may lead to severe
8 psychological or physical dependence. Examples of
9 Schedule II narcotics include: hydromorphone
10 (Dilaudid), methadone, meperidine, oxycodone
11 (Percocet) and fentanyl. Other Schedule II narcotics
12 include: morphine, opium, codeine and hydrocodone.
13 Examples of IIN stimulants include" -- do you want me
14 to read that or just that?
15     Q.   That's fine. Thank you. Just the
16 highlighted portion.
17     A.   All right.
18     Q.   Does H.D. Smith have any reason to
19 disagree or dispute with the statements that are made
20 on Exhibit 1 about controlled substances?
21     A.   With regards to the highlighted areas?
22     Q.   Yes.
23     A.   No.
24     Q.   So H.D. Smith agrees that controlled

Page 28

1 substances under Schedule II have a high potential for
2 abuse which may lead to severe psychological or
3 physical dependence?
4     A.   Yes.
5     Q.   Okay. I'm next going to show you a
6 document that has been premarked as Exhibit 2, and it
7 is actually a bit hard to --
8     MR. PADGETT: Do you want these back?
9     MR. YOUNG: You -- actually, yeah, I'll take
10 them back. You already have a copy? Yes, I'll take
11 them back.
12 BY MR. YOUNG:
13     Q.   This next one is been premarked as
14 Exhibit 2, and it is a bit longer than the last one,
15 though, again, it has been pre-highlighted. I'm just
16 going to give you a chance just to take a look at the
17 highlighted portions.
18         I should mention, by the way, that the
19 last exhibit that you looked at was actually from the
20 DEA Diversion Control website, and this exhibit is
21 also from the DEA Diversion Control website.
22         Just let me know when you're --
23     A.   Okay.
24         Just that one page?

Page 29

1     Q.   I believe so, yes.
2         Can you tell me -- the highlighted
3 section, which this is from Title 21 USC Section 823
4 sub (b), sub (1) through (5), can you tell me whether
5 or not that section, and we'll read it in a second,
6 whether or not it applies to H.D. Smith?
7     A.   It would.
8     Q.   Is H.D. Smith a -- a registered
9 distributor of Schedule II pharmaceutical products in
10 the United States?
11     A.   We are.
12     Q.   Can you read for us the first paragraph of
13 subsection (b) which is highlighted on Exhibit 2?
14     A.   Subsection (b): Distributors of
15 controlled substances in Schedule I or II. And it
16 says:
17         "The Attorney General shall register an
18 applicant to distribute a controlled substance in
19 Schedule I or II unless he determines that the
20 issuance of such a registration is inconsistent with
21 the public interest. In determining the public
22 interest, the following factors shall be considered:
23         "(1) maintenance of effective controls
24 against diversion of particular controlled substances

Page 30

1  into other than legitimate medical, scientific, and
2  industrial channels;
3  "(2) compliance with applicable State and
4  local law;
5  "(3) prior conviction record of applicant
6  under Federal or State laws relating to the
7  manufacture, distribution, or dispensing of such
8  substances;
9  "(4) past experience in the distribution
10 of controlled substances," excuse me, "and
11 "(5) such other factors as may be relevant
12 to and consistent with the public health and safety."
13 Q.   And, again, H.D. Smith has no reason to
14 dispute or disagree that these are the requirements
15 for distributors like H.D. Smith?
16 A.   Yes.
17 Q.   And we are going to dig into a little bit
18 more throughout the documents and throughout your
19 deposition today whether or not H.D. Smith maintained
20 effective controls against diversion, it's a central
21 tenet of this case, but I'm just curious preliminarily
22 if you have an opinion on behalf of H.D. Smith whether
23 or not H.D. Smith, in fact, maintained effective
24 controls against diversion for Schedule II products

Page 31

1  throughout its tenure?
2  MR. PADGETT:  I'll object to form.  He can
3  answer.
4  BY THE WITNESS:
5  A.   Could you repeat that?
6  BY MR. YOUNG:
7  Q.   Sure.
8  Is it your opinion here today or your --
9  your testimony today that H.D. Smith maintained
10 effective controls against diversion of Schedule II
11 controlled substances throughout its tenure as a
12 pharmaceutical distributor?
13 MR. PADGETT:  Same objection.
14 BY THE WITNESS:
15 A.   We take our responsibility to maintain
16 effective controls against diversion and we have done
17 so.
18 BY MR. YOUNG:
19 Q.   Has there ever been an instance in which
20 H.D. Smith has failed to maintain effective controls
21 against diversion?
22 A.   Not to my knowledge.
23 Q.   Has H.D. Smith ever failed to comply with
24 applicable state or local law with regard to being a

Page 32

1  registered distributor of Schedule II controlled
2  substances?
3  MR. PADGETT:  Object to form, scope.
4  BY THE WITNESS:
5  A.   Could you repeat that again?
6  BY MR. YOUNG:
7  Q.   Sure.
8  Has H.D. Smith ever failed to comply with
9  applicable state and local laws which apply to the
10 distribution of Schedule II controlled substances?  It
11 is Section 2 of that section that I just read.
12 MR. PADGETT:  Same objection.
13 BY THE WITNESS:
14 A.   Could you be a little bit more specific to
15 that?
16 BY MR. YOUNG:
17 Q.   Is H.D. Smith aware of any prior instances
18 where it failed to comply with state laws?
19 MR. PADGETT:  Go ahead.
20 BY THE WITNESS:
21 A.   I'm trying to think.  You know, I don't
22 know how specific you want to get on that, on state
23 laws.  I mean, there has been issues in some states
24 where we have been cited for some violations.

Page 33

1  BY MR. YOUNG:
2  Q.   So H.D. Smith has violated state laws
3  before?
4  MR. PADGETT:  Object to form.
5  He can answer.
6  BY THE WITNESS:
7  A.   We have been cited for that.
8  BY MR. YOUNG:
9  Q.   Is it your testimony today that you
10 resolved those investigations or enforcement actions
11 but did not actually violate the laws?
12 MR. PADGETT:  Same objection.
13 BY THE WITNESS:
14 A.   We received citations.  We did not have
15 any actions against our registration or -- any actions
16 against our registration.
17 BY MR. YOUNG:
18 Q.   Has H.D. Smith ever had its license
19 suspended or revoked in any state?
20 A.   It has not.
21 Q.   Has the DEA or FDA or Department of
22 Justice ever instituted an enforcement action or
23 investigation against H.D. Smith?
24 A.   Can you be more specific?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.   Are you aware of any instance in which the
2  DEA has instituted an enforcement action or
3  investigation against H.D. Smith?
4      MR. PADGETT:  I'll object to form.
5  BY THE WITNESS:
6      A.   DEA in -- instituted an investigation in
7  our Kentucky facility, our Kentucky distribution
8  center back in 2010 with an administrative inspection
9  warrant.
10  BY MR. YOUNG:
11     Q.   And --
12     A.   -- and subpoena.
13     Q.   And what was the result of that action?
14     A.   No action taken.
15     Q.   Is that the only instance in which the DEA
16  has investigated H.D. Smith?
17     A.   We've had cyclical routine inspections.
18  And I don't know how -- what DEA considers those, if
19  they are investigations.  You know, to us they were
20  cyclic inspections.  There was a -- a lawsuit that we
21  were involved with with -- with DEA, SafeScript case.
22  I don't know if I'd consider that an investigation or
23  not.
24     Q.   How about the state enforcement

Page 35

1  authorities, whatever they may be called, in -- in
2  some states I think it's the Board of Pharmacy, in
3  other states I think it may be called something else.
4          Have any state regulators or enforcers
5  instituted an investigation or litigation against
6  H.D. Smith?
7      MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9      A.   We've had citations in California for --
10  for some violations of not getting a pharmacist
11  signature on deliveries, such as that.  Other than
12  that, unless you can be more specific --
13  BY MR. YOUNG:
14     Q.   Sure.
15     A.   -- nothing is really coming to mind.
16     Q.   How about the State of West Virginia, has
17  the State of West Virginia Attorney General's office
18  or Board of Pharmacy or any other regulatory entity
19  instituted an investigation or enforcement action
20  against H.D. Smith?
21     MR. PADGETT:  Object to form.
22  BY THE WITNESS:
23     A.   We were involved in litigation with the
24  State of West Virginia.

Page 36

1  BY MR. YOUNG:
2      Q.   What was the basis of that litigation?
3      MR. PADGETT:  I'll object to form.
4  BY THE WITNESS:
5      A.   I'm not a -- I'm not ex -- exactly sure.
6  BY MR. YOUNG:
7      Q.   Let's go at it a different way.
8      A.   So if you can --
9      Q.   Were you the chief compliance officer of
10  H.D. Smith at the time that that West Virginia
11  enforcement action was instituted?
12     MR. PADGETT:  Object to form.
13  BY THE WITNESS:
14     A.   I can't remember the exact dates that --
15  that that litigation covered and I was at H.D. Smith
16  for part of it and some not.
17  BY MR. YOUNG:
18     Q.   So what was your understanding in your
19  compliance capacity as to why the State of West
20  Virginia Attorney General was bringing an
21  investigation or action against H.D. Smith?
22     MR. PADGETT:  Object to form and scope.
23  BY MR. YOUNG:
24     Q.   Do you not recall?

Page 37

1      A.   I'm just -- I -- it has been a while for
2  that.  It was -- it was regarding controlled
3  substances in the state with the -- concerning the
4  opioid epidemic --
5      Q.   Do you --
6      A.   -- in the state.
7      Q.   Do you know the allegations that the
8  Attorney General made in its Complaint against
9  H.D. Smith?
10     A.   I believe one of them was a -- a failure
11  to report suspicious orders to the state.
12     Q.   And as the -- and I'm going to use the
13  phrase "chief compliance officer."  I understand at
14  the time that you may not have held that title but
15  that's essentially the role that you filled.
16         As the chief compliance officer for
17  H.D. Smith, what, if anything, did you do when you
18  learned of these allegations?
19     A.   Well, as far as the allegation of failure
20  to report suspicious orders to the state, it was our
21  understanding that we were not required to as an
22  out-of-state wholesale distributor.  I know that,
23  yeah, there was a lawsuit filed and went through the
24  same -- same steps as we are doing through here.

Page 38

1    Q.   By "here," you mean the litigation that we
2  are here for?
3    A.   This litigation, yes.
4    Q.   Do you know the result of that litigation,
5  the West Virginia litigation?
6    A.   H.D. Smith paid a -- a fine.  I'm not
7  exactly sure how much it was.
8    Q.   You're familiar with the Controlled
9  Substances Act of 1971?
10   A.   Yes.
11   Q.   And is the Controlled Substances Act of
12  1971 something that H.D. Smith must comply with?
13   A.   It is our responsibility to comply.
14   Q.   Does H.D. Smith recognize that if you
15  don't follow the rules in the Controlled Substances
16  Act that you can be fined by the Federal Government?
17   A.   Yes.
18   Q.   And similar question with regard to the
19  state Controlled Substances Act.  Various states have
20  enacted their own versions of a Controlled Substances
21  Act.
22       Is H.D. Smith of the opinion that it must
23  comply with the state Controlled Substances Acts in
24  the states in which it operates?

Page 39

1    A.   Yes.
2    Q.   And failure to comply with those laws or
3  rules would result in fines or license revocation.
4       Is that accurate?
5    A.   I believe that that can be the -- the
6  result.
7    Q.   I'm going to show you another exhibit,
8  which is Exhibit 3.
9       This exhibit is also from the DEA
10  Diversion Control website and it has a very brief
11  highlighted section at the top.
12       I'd just ask you to read the highlighted
13  portion into the record and we can talk about it.
14   A.   Okay.
15   Q.   Can you read the highlighted portion into
16  the record, please?
17   A.   "All applicants and registrants shall
18  provide effective controls and procedures to guard
19  against theft and diversion of controlled substances."
20   Q.   Are you familiar with this language of
21  this section?
22   A.   I am.
23   Q.   And has H.D. Smith complied with this
24  requirement throughout its tenure as a pharmaceutical

Page 40

1  distributor?
2    A.   Our responsibility is to provide effective
3  controls against theft and diversion.
4    Q.   That wasn't my question.
5       My question is:  Has H.D. Smith complied
6  with this throughout its tenure as a pharmaceutical
7  distributor?
8    MR. PADGETT:  Object to form.
9  BY MR. YOUNG:
10   Q.   In other words, have there been occasions
11  in which H.D. Smith has failed to provide effective
12  controls and procedures to guard against theft and
13  diversion of controlled substances?
14   MR. PADGETT:  Same objection.
15  BY THE WITNESS:
16   A.   To the best of my knowledge, we have
17  complied with this regulation.
18  BY MR. YOUNG:
19   Q.   The highlighted section uses the word
20  "diversion."
21       What is your understanding of the term
22  "diversion," what does that mean?
23   A.   Diversion can -- basically it's illegal,
24  when you are talking about controlled substances, it

Page 41

1  is an illegal -- acts or any -- anything pertaining to
2  the controlled substances that would be illegal.  It
3  could be theft, it could be abuse.
4    Q.   The section uses the -- the phrase "theft
5  and diversion."  So separating out theft from
6  diversion, what's your understanding of diversion?
7    A.   The controlled substances going into
8  illicit channels, illegal use of controlled
9  substances.
10   Q.   You -- you used the phrase "illicit
11  channels."  Can you be more specific what you mean by
12  that?
13   A.   It could be channels in the supply chain
14  that are -- you know, it could be counterfeit, it
15  could be, you know, criminal type, you know, sale --
16  illicit sales, illegal sales of controlled substances,
17  illegal use of controlled substances.
18   Q.   Would diversion include obtaining
19  prescriptions through forged prescriptions?
20   A.   Yes.
21   Q.   Would diversion include -- I think you --
22  you mentioned it, but just to clarify, would diversion
23  include the resale of legally-obtained prescription
24  controlled substances?  So in other words --

Page 42

1    A.    Obtained legally and then illegally sold?
2    Q.    Yes.
3    A.    On the street or what have you, yes.
4    Q.    Have there been occasions in which
5  H.D. Smith has uncovered, using your definition of
6  diversion, the diversion of controlled substances in
7  its tenure as a registrant under the Controlled
8  Substances Act?
9        MR. PADGETT:  Object; form.
10 BY THE WITNESS:
11    A.    I can -- I can say that we may have
12 suspected diversion.  We don't do criminal
13 investigations.  We -- we may suspect diversion, we
14 may report it.  The end result may be down the line
15 that there was illegal diversion, you know, a fact
16 that someone, you know, was criminally prosecuted,
17 but, you know, our responsibility is -- is -- is not
18 to conduct criminal investigations.  So I can't say
19 for -- for a fact that, you know, what you asked.
20 BY MR. YOUNG:
21    Q.    In your role as chief compliance officer,
22 have you had occasion to investigate a pharmacy that
23 you suspected was diverting controlled substances?
24    A.    When you say "investigate," what --

Page 43

1  what -- can you define that a little bit more?
2    Q.    Gather information or inquire.
3    A.    We would gather information, we would
4  conduct our due diligence, and then if we would have a
5  reason to believe that there may be diversion taking
6  place, then that would -- that would be reported, but
7  we wouldn't necessarily go any further in -- into any
8  kind of criminal investigation because that's not
9  our -- our place.
10    Q.    Okay.  But there have been occasions in
11 which H.D. Smith has concluded that diversion is
12 likely at a pharmacy that it supplies?
13        MR. PADGETT:  Object to form.
14 BY THE WITNESS:
15    A.    When we have reason to believe that there
16 may be diversion taking place.
17 BY MR. YOUNG:
18    Q.    Can you say -- and this is a difficult
19 question, can you say approximately how many
20 pharmacies that you identified as reason to believe
21 that diversion was taking place?
22    A.    We've probably -- I'll take a wild guess,
23 2- or 300 pharmacies, maybe more, that we have -- have
24 reason to believe there may be diversion and we've

Page 44

1  either cut off entirely or at least cut off the -- the
2  purchase of controls.
3    Q.    And specifically with regard to what we
4  will call CT-1 jurisdictions, which CT-1 jurisdictions
5  include Cuyahoga County, the City of Cleveland, Summit
6  County and the City of Akron, with regard to those
7  four geographic communities, are you -- is H.D. Smith
8  aware of suspected diversion taking place at
9  pharmacies that it served as a distributor?
10        MR. PADGETT:  Object to form to the extent
11 suggesting we are a defendant in Summit County or
12 Akron.
13        MR. YOUNG:  Yeah, fair enough.
14 BY MR. YOUNG:
15    Q.    So with regard to Cuyahoga and the City of
16 Cleveland, has H.D. Smith ever identified pharmacies
17 that it suspected were diverting controlled
18 substances?
19    A.    No.
20    Q.    Have you undertaken investigations of
21 pharmacies in Cuyahoga County or Cleveland and that
22 you initially suspected were diverting controlled
23 substances and concluded that they, in fact, were not
24 diverting controlled substances?

Page 45

1        MR. PADGETT:  Object to form.
2  BY THE WITNESS:
3    A.    I'd probably like to get a little bit
4  better idea of what you consider an investigation
5  because -- or I can give you what our determinant --
6  or what we believe any -- any of our due diligence we
7  consider part of an investigation.
8        In our due diligence we look at the
9  totality of all circumstances.  And we never suspected
10 or had reason to believe that any pharmacies in
11 Cuyahoga County or Cleveland were diverting.
12 BY MR. YOUNG:
13    Q.    Fair enough.
14        I'm going to show you now what's been
15 premarked as Plaintiff's Exhibit -- or Euson
16 Deposition Exhibit 4.  This is another printout from
17 the DEA Office of Diversion Control.  It has a
18 highlighted portion.
19        I'm going to ask you to take a look at
20 that and then read it into the record.
21    A.    Do you want me to state the code or any --
22 and the part or anything?
23    Q.    Ah, sure.  That would be great.
24    A.    Okay.

Page 46

1    Q.   I failed to do so with the prior exhibit,
2  so that's probably a good idea.
3    A.   Title 21 Code of Federal Regulations,
4  Part 1301, Registration of Manufacturers,
5  Distributors, and Dispensers of Controlled Substances.
6  Security Requirements.  This is 1301.74,
7  subsection (b).
8       "The registrant shall design and operate a
9  system to disclose to the registrant suspicious orders
10 of controlled substances.  The registrant shall inform
11 the Field Office of the Administration in his area of
12 suspicious orders when discovered by the registrant.
13 Suspicious orders include orders of unusual size,
14 orders deviating substantially from a normal pattern,
15 and orders of unusual frequency."
16   Q.   Are you familiar with the language in
17 1301.74(b)?
18   A.   Yes.
19   Q.   And what do you refer to or how -- how do
20 you refer to this language, this requirement?
21   MR. PADGETT:  Object to form.
22 BY MR. YOUNG:
23   Q.   Within H.D. Smith, does it have a certain
24 nomenclature or is this just a known --

Page 47

1    A.   What time period are you talking about?
2    Q.   Currently.
3    A.   Currently, we have -- if this is what you
4  are asking, we have an automate --
5    MR. PADGETT:  Same objection.
6       Go ahead.
7  BY THE WITNESS:
8    A.   We have an automated system called our
9  Controlled Substance Order Monitoring Program, CSOMP
10 for short.
11      Is that what you were referring to?
12 BY MR. YOUNG:
13   Q.   Not -- not exactly.
14   A.   Okay.
15   Q.   This is -- this is part of the Controlled
16 Substances Act requirements for registrants.  And I
17 was just curious if you had some nomenclature or would
18 refer to this particular provision in a certain way?
19 And specifically talking about the "suspicious orders
20 include orders of unusual size, deviating
21 substantially from a normal pattern, and orders of
22 unusual frequency," that requirement.
23      You have no particular nomenclature you
24 use in the industry?

Page 48

1    A.   Not --
2    Q.   Okay.
3    A.   -- not particularly.
4    Q.   In your opinion, did H.D. Smith comply
5  with this requirement throughout your tenure with the
6  company?
7    A.   Yes, we did.
8    Q.   Did H.D. Smith always have in place
9  systems to identify suspicious orders as defined here
10 in subsection (b) which you just read?
11   MR. PADGETT:  Object to scope.
12 BY THE WITNESS:
13   A.   We had a manual system and then we had an
14 automated system.  We had several iterations of that.
15 BY MR. YOUNG:
16   Q.   And we'll dig into the details of those
17 systems shortly, but is it your testimony today that
18 at all times H.D. Smith complied with this
19 requirement?
20   A.   Yes.
21   Q.   That includes during the manual system as
22 well as the automated system?
23   A.   Yes, sir.
24   Q.   Who was responsible for ensuring that

Page 49

1  H.D. Smith complied with this provision, Section B?
2    MR. PADGETT:  Object to form.
3  BY MR. YOUNG:
4    Q.   Is that -- is that your job?
5    A.   What time period?
6    Q.   Throughout your tenure, if there is
7  someone that was more senior than you and was
8  responsible for compliance with this provision, I'd
9  like to know them, but I'd also like to know whether
10 or not this was your job?
11   A.   When I first came to H.D. Smith in
12 November of 2005 until -- when I first came there, it
13 was the -- it was the responsibility of the individual
14 distribution center managers, the operations managers
15 to report suspicious orders to the field office in
16 their area.  That continued on until spring of 2008
17 when we got our -- our automated system running, and
18 then that was brought in -- into the corporate office
19 and under my responsibility.
20   Q.   When you first got to H.D. Smith, was
21 H.D. Smith in compliance with this provision?
22   A.   I believe so.
23   Q.   When you first got to H.D. Smith, was
24 H.D. Smith reporting suspicious orders to the DEA when

Page 50

1 they were discovered?

2     A.   At that --

3     MR. PADGETT:  Object to form.

4 BY THE WITNESS:

5     A.   At that -- at that time the -- the

6 industry standard and the expectation from DEA was

7 that orders were basically reported after the fact.

8 They were -- if -- if we discovered an order

9 beforehand, it would be reported before the sale.

10     Other than that, the operations managers

11 reviewed orders at the end of each month and anything

12 that they thought was unusual they would send that to

13 the DEA.  And that was the industry standard and the

14 expectation at that time, which has changed over time.

15 BY MR. YOUNG:

16     Q.   And -- and we'll get into that a little

17 bit later, but with regard to the requirements as you

18 read them in -- in Section B, is it your testimony

19 that H.D. Smith was in or out of compliance with

20 specifically reporting suspicious orders when they

21 were discovered by the registrant?

22     So not with the DEA, I think your

23 testimony was that the DEA allowed it to be done a

24 certain way, but -- but I want to know with specific

Page 51

1 reference to this provision as it's written and as you

2 read, was H.D. Smith in compliance?

3     MR. PADGETT:  Object to form.

4 BY THE WITNESS:

5     A.   Even if it was after the fact that our

6 operations manager reported it, that was reported when

7 discovered.

8 BY MR. YOUNG:

9     Q.   Okay.  So there were no delays between

10 when an order was discovered and when it was reported

11 to the DEA throughout the tenure of H.D. Smith as a

12 registrant?

13     MR. PADGETT:  Object to form.

14 BY THE WITNESS:

15     A.   What time period are you talking?

16 BY MR. YOUNG:

17     Q.   Throughout H.D. Smith's history, are you

18 aware of any instance in which H.D. Smith failed to

19 report a suspicious order when it was discovered?

20     MR. PADGETT:  Object to form.

21 BY THE WITNESS:

22     A.   No.

23 BY MR. YOUNG:

24     Q.   Okay.  You mentioned a transition from

Page 52

1 when you got there to H.D. Smith and the way that

2 things were done and the changes that were made.

3     Did the senior management or board of

4 directors of H.D. Smith have involvement or input over

5 those changes?

6     A.   Not necessarily.

7     Q.   How were those changes implemented?  In

8 other words, you get there and you noticed things were

9 being done in a certain way and you had

10 recommendations to change them.

11     How is -- how are you able to implement

12 those changes?

13     A.   Shortly after I got there we had a meeting

14 with DEA and I had consistent contact with DEA and

15 headquarters.  We -- any changes to the programs

16 and -- and how we did things as we went along were --

17 there was never any interference from anyone, any

18 management at H.D. Smith.

19     Q.   So was there someone more senior than you

20 that made it clear that whatever George recommends for

21 compliance changes should be followed?

22     A.   I -- I don't know that it was that rigid.

23 They considered me as their compliance expert and they

24 let me put in the -- the processes in place to -- that

Page 53

1 needed to be put in and improvements.

2     Q.   H.D. Smith acknowledges that Section B of

3 Part 1301 is a requirement that it's obligated to

4 comply with, is that correct?

5     A.   It's our responsibility to put -- comply

6 with the law.

7     Q.   And H.D. Smith acknowledges that as a

8 registrant or distributor of controlled substances it

9 must exercise due diligence to avoid filling

10 suspicious orders, is that accurate?

11     A.   Repeat that.

12     Q.   Does H.D. Smith acknowledge that it must

13 exercise due diligence to avoid filling suspicious

14 orders?

15     MR. PADGETT:  Object to form.

16 BY THE WITNESS:

17     A.   It is our responsibility, you know, within

18 our -- our place in the supply chain to maintain

19 effective controls against diversion and report

20 suspicious orders when discovered as -- as to this

21 regulation.

22 BY MR. YOUNG:

23     Q.   And must H.D. Smith exercise due diligence

24 in that regard?

Page 54

1    MR. PADGETT: Object to form.
2    BY THE WITNESS:
3        A.  Can you clarify due diligence?
4    BY MR. YOUNG:
5        Q.  Well, I'm -- I'm trying to understand
6    what's the basis of H.D. Smith's compliance with
7    these, with these laws, and you're the chief
8    compliance officer.  So I want to understand from
9    H.D. Smith's perspective how should it comply with
10   these laws?  Should it do it willy-nilly or should it
11   do it with due diligence?
12       MR. PADGETT: Object to form.
13   BY THE WITNESS:
14       A.  You know, part -- our -- our process and
15   our procedures, you know, include due diligence to
16   know our customers.  You know, we put processes and
17   procedures in place to get -- to understand the
18   totality of circumstances and -- and the -- and to
19   know our customers, their needs, if that is -- if
20   that's what you are looking for.
21   BY MR. YOUNG:
22       Q.  Yeah.  No, that's -- that's fair.
23       A.  Okay.
24       Q.  In these three or four sections of

Page 55

1    regulations and laws that -- that we've discussed,
2    Exhibits 1 through 4, what's the purpose of these,
3    these laws?
4        Does H.D. Smith have an opinion as to the
5    purpose of the Controlled Substances Act and the
6    attendant regulations?
7        MR. PADGETT: I'll object to form.
8    BY THE WITNESS:
9        A.  You know, our responsibility is to comply
10   with the -- with the regulations.
11   BY MR. YOUNG:
12       Q.  Well, why do these laws exist?
13       MR. PADGETT: Same objection.
14   BY THE WITNESS:
15       A.  I wasn't there when they put the laws
16   together.
17   BY MR. YOUNG:
18       Q.  Does H.D. Smith have an opinion as to why
19   these laws exist?
20       MR. PADGETT: Same objection.
21   BY THE WITNESS:
22       A.  We comply with the regulations.
23   BY MR. YOUNG:
24       Q.  Does H.D. Smith acknowledge that if it

Page 56

1    distributes controlled substances in this case,
2    specifically opioids, that result in diversion, that
3    the public could suffer harm?
4        MR. PADGETT: Object to form.
5    BY THE WITNESS:
6        A.  Again, our -- our responsibility within
7    the supply chain is -- is to maintain effective
8    controls against diversion.  Diversion comes in many
9    forms and there is many forms of diversion that we
10   have no control over.
11   BY MR. YOUNG:
12       Q.  Does H.D. Smith acknowledge that if they
13   distribute opioid orders deviating from a normal
14   pattern and fails to report those to the DEA, that
15   that would result in diversion?
16       MR. PADGETT: Object to form.
17   BY MR. YOUNG:
18       Q.  In other words, let me rephrase that, that
19   was an inartful question.
20       There are three types of suspicious orders
21   that are defined or described in the section that you
22   just read, Section B, and they are orders of unusual
23   size, orders deviating substantially from a normal
24   pattern, and orders of unusual frequency, right?  So

Page 57

1    we've got size, pattern and frequency.
2        When there is a suspicious order that
3    deviates from a normal pattern, if H.D. Smith were to
4    fail to report that suspicious order to the DEA, would
5    that result in diversion?
6        MR. PADGETT: Object to form.
7    BY THE WITNESS:
8        A.  I don't believe you can say a blanket
9    statement like that.
10   BY MR. YOUNG:
11       Q.  Is it possible?
12       MR. PADGETT: Same objection.
13   BY THE WITNESS:
14       A.  Diversion is possible throughout the in --
15   throughout the supply chain.
16   BY MR. YOUNG:
17       Q.  Is H.D. Smith aware of the great demand
18   for opioid products through illicit channels like you
19   described earlier?
20       MR. PADGETT: Object to form.
21   BY THE WITNESS:
22       A.  Can you be a little bit more specific?
23   BY MR. YOUNG:
24       Q.  Is H.D. Smith aware that there is a demand

Page 58

1  on the street for opioids?
2      A.   Yeah, through our experience, yes, there
3  is a -- there has been a demand for -- for opioids.
4      Q.   Is H.D. Smith aware that the country is
5  currently undergoing an addiction, an opioid addiction
6  epidemic?
7      MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9      A.   You know, we stay -- stay abreast of -- of
10  issues and I know CDC has called it an epidemic.  I
11  don't know the exact definition of an epidemic.
12  BY MR. YOUNG:
13     Q.   Does H.D. Smith have an opinion on the
14  current state of opioid addiction in the
15  United States?
16     MR. PADGETT:  Object to form.
17  BY THE WITNESS:
18     A.   Can you rephrase that?
19  BY MR. YOUNG:
20     Q.   Does H.D. Smith have an opinion on what's
21  been described as the opioid epidemic?  So I think
22  you -- you didn't want to use the word "epidemic," so
23  how would you define the current state of affairs with
24  regard to opioid addiction in America?

Page 59

1      MR. PADGETT:  Object to form.
2  BY THE WITNESS:
3      A.   I didn't say I didn't want to use the word
4  "epidemic."  I said CDC has claimed it is an epidemic.
5  And I don't know the exact definition of an epidemic.
6          I think that's subjective.  But I do know
7  that there is -- there are issues with opioids, there
8  is issues with illicit fentanyl, there is issues with
9  heroin, so yes.
10  BY MR. YOUNG:
11     Q.   Does H.D. Smith acknowledge that opioids
12  are addictive?
13     A.   I believe they can be addictive.
14     Q.   Does H.D. Smith acknowledge that opioids
15  are dangerous in the wrong hands?
16     MR. PADGETT:  Object to form.
17  BY THE WITNESS:
18     A.   You'd have to define dangerous and be a
19  little bit more specific on that.
20     Q.   Well, H.D. Smith --
21     A.   And what the wrong hands are.
22     Q.   H.D. Smith distributes opioids and we've
23  agreed or you've admitted that opioids are addictive.
24          Is it your testimony that opioids which

Page 60

1  are addictive are not dangerous in the wrong hands or
2  are dangerous in the wrong hands?
3      MR. PADGETT:  Object to form.
4  BY THE WITNESS:
5      A.   Again, clarify that, I -- I said that they
6  can be addictive.
7  BY MR. YOUNG:
8      Q.   Okay.
9      A.   Okay.
10          And can you repeat your question again
11  then?
12     Q.   Sure.
13          These -- these drugs, these controlled
14  substances, in this case opioids, if they were to
15  reach the wrong hands, does their potential to be
16  addictive, is that dangerous?
17     MR. PADGETT:  Object to form.
18  BY THE WITNESS:
19     A.   I'm not really clear on what you are
20  asking.  I mean --
21  BY MR. YOUNG:
22     Q.   Okay.
23     A.   -- what -- where -- you know, dangerous to
24  the person, dangerous to society?

Page 61

1      Q.   No, that's fair.
2      A.   Yeah.
3      Q.   As I mentioned at the outset, I may ask
4  many a question that -- that doesn't make sense to you
5  and I appreciate you letting me know.
6          Does H.D. Smith have an opinion as to
7  whether or not pharmaceutical products, in this
8  instance opioids, the type that it distributes, have
9  caused harm in the State of Ohio?
10     MR. PADGETT:  Object to form.
11  BY THE WITNESS:
12     A.   I -- I can't say for certain that the
13  drugs that we have distributed have caused harm to
14  anyone.
15  BY MR. YOUNG:
16     Q.   And I should have been more clear.
17          I don't mean specifically the drugs that
18  you delivered but the types of drugs that you
19  delivered, the controlled substance opioids have
20  caused harm to the State of Ohio or in the State of
21  Ohio?
22     MR. PADGETT:  Object to form, scope.
23  BY THE WITNESS:
24     A.   I'm still not exactly sure where you are

Page 62

1  going with that, but, I mean, opioids, you know, can
2  be addictive, they can cause overdose deaths if -- if
3  used incorrectly, if that's what you are getting at.
4  BY MR. YOUNG:
5      Q.   Well, I -- I want to understand
6  H.D. Smith, as a distributor of opioids, whether or
7  not it has an opinion as to whether or not opioids
8  have caused harm to, in this case, I'll even limit it
9  further, the City of Cleveland and Cuyahoga County.
10         Have the City of Cleveland or Cuyahoga
11  County residents and the government entities
12  themselves suffered harm as a result of prescription
13  opioids?
14     MR. PADGETT:  Object to form.
15  BY THE WITNESS:
16     A.   I'm still not clear exactly what harm you
17  are asking about.  You know, these -- you know, these
18  drugs that -- that -- these opioid drugs that are
19  distributed, you know, are -- that are used by -- by
20  patients can be, you know, lifesaving, you know, drugs
21  can -- can relieve people of pain, which they are
22  intended to do, you know, for legitimate use and --
23  and legitimate patients.
24  BY MR. YOUNG:

Page 63

1      Q.   Sure.  And that wasn't my question.  My
2  question is the opposite of that.
3         It's have those same drugs caused harm.
4  You've mentioned some of the benefits and I want to
5  know about some of the harmful effects.
6         So does H.D. Smith have an opinion as to
7  whether or not these prescription opioids that we are
8  talking about generally, not the ones that it
9  specifically distributed, but the type, whether or not
10  that has caused harm in Cleveland and Cuyahoga County?
11     MR. PADGETT:  Object to form.
12  BY THE WITNESS:
13     A.   I don't know the specifics you are talking
14  about, but can opioids be abused, can people die of
15  overdoses, yes, if that's the harm you are talking
16  about, my assumption is in Cuyahoga County people have
17  died of -- of drug overdoses.
18  BY MR. YOUNG:
19     Q.   And do you know whether or not Cleveland
20  and Cuyahoga County drug overdoses have been the
21  result of prescription opioids or I think you
22  mentioned heroin and illicit fentanyl?  Have you
23  researched or have you come to a conclusion as to
24  whether or not prescription opioids are part of that

Page 64

1  cause?
2      MR. PADGETT:  Objection; scope.
3  BY THE WITNESS:
4      A.   I don't know specifically.
5  BY MR. YOUNG:
6      Q.   You haven't -- H.D. Smith hasn't done any
7  research to determine whether or not Cleveland or
8  Cuyahoga County has suffered harm as a result of
9  prescription opioids?
10     MR. PADGETT:  Objection; scope.
11  BY THE WITNESS:
12     A.   I'm -- I'm still not sure what you mean by
13  harm, but my assumption would be that there probably
14  have been people that have died of overload -- of
15  prescription drug overdoses in Cuyahoga County.
16  BY MR. YOUNG:
17     Q.   Okay.  I'm going to show you what's been
18  marked as Exhibit 5, and this I'll give you in just a
19  second, I'm sure that you are familiar with it, it has
20  been pre highlighted, it is on DEA letterhead and it
21  is dated September 27th, 2006.
22         Does that exhibit look familiar to you?
23     A.   Yes, sir.
24     Q.   This letter is from Joe Rannazzisi.

Page 65

1         Are you familiar with Mr. Rannazzisi?
2      A.   Yes.
3      Q.   Have you met him before?
4      A.   I have.
5      Q.   On how many occasions?
6      A.   Maybe a couple.
7      Q.   Did you receive this letter on behalf of
8  H.D. Smith in approximately September of 2006?
9      A.   This was sent to our distribution center,
10  it would have been forwarded to me.
11     Q.   So sometime thereafter you would have
12  received it?
13     A.   Yes.
14     Q.   Do you recall receiving this letter
15  specifically?
16     A.   Not specifically.
17     Q.   Can you read Paragraph 1 of that letter?
18     A.   Not highlighted, the very first paragraph?
19     Q.   Yeah.
20     A.   Okay.
21         "This letter is being sent to every
22  commercial entity in the United States registered with
23  the Drug Enforcement Administration (DEA) to
24  distribute controlled substances.  The purpose of this

Page 66

1 letter is to reiterate the responsibilities of
2 controlled substance distributors in view of the
3 prescription drug abuse problem our nation currently
4 faces."
5    Q.  Mr. Rannazzisi references a prescription
6 drug abuse problem the nation currently faces in
7 September of 2006.
8      Did H.D. Smith have reason to disagree
9 that a prescription drug abuse problem existed in
10 2006?
11    A.  No.
12    Q.  Do you know what Mr. Rannazzisi was
13 referring to when he described the prescription drug
14 abuse problem the nation currently faces?
15    MR. PADGETT:  Object to form.
16 BY THE WITNESS:
17    A.  I am assuming that it is controlled
18 substances since it's from -- since he is from DEA.
19 BY MR. YOUNG:
20    Q.  So you were the compliance officer of
21 H.D. Smith, a licensed drug distributor, you've
22 received this letter in 2006, and your testimony today
23 is you're not sure what the prescription drug abuse
24 problem the nation faced was?

Page 67

1    MR. PADGETT:  Object to form.
2 BY MR. YOUNG:
3    Q.  You are un -- are you unclear?
4    A.  I didn't say that. I said that the -- it
5 is a prescription drug abuse problem. Prescription
6 drug abuse can be anything. But I'm assuming it's --
7 what -- what he is referencing is controlled substance
8 abuse.
9    Q.  Yeah, fair enough. The -- and the letter
10 does go on to -- to state that.
11      Can you turn to Page 2, there is a
12 highlighted portion. And I want to circle back to
13 some of your earlier testimony where you talked about
14 the DEA and sort of their understanding of
15 interpretations of the laws and whatnot. And we'll
16 get to that in a second, but first, can you read for
17 us the highlighted portions of Page 2?
18    A.  "Thus, in addition to reporting all
19 suspicious orders, a distributor has a statutory
20 responsibility to exercise due diligence to avoid
21 filling sup" -- "suspicious orders that might be
22 diverted into other than legitimate medical,
23 scientific, and industrial channels."
24    Q.  Okay. So does H.D. Smith agree, disagree,

Page 68

1 or not have an opinion as to the accuracy of that
2 statement?
3    MR. PADGETT:  Object to form.
4 BY MR. YOUNG:
5    Q.  That a distributor has a statutory
6 responsibility to exercise due diligence to avoid
7 filling suspicious orders that might be diverted into
8 other than legitimate medical, scientific and
9 industrial channels?
10    MR. PADGETT:  Same objections.
11 BY THE WITNESS:
12    A.  We do exercise our due diligence.
13 BY MR. YOUNG:
14    Q.  So H.D. Smith agrees that it has a
15 statutory responsibility?
16    MR. PADGETT:  Same objection.
17 BY THE WITNESS:
18    A.  I'm not sure about the statutory
19 responsibility, but we do, as a practice, exercise our
20 due diligence.
21 BY MR. YOUNG:
22    Q.  So what part of the statutory
23 responsibility does H.D. Smith disagree with?
24    MR. PADGETT:  Same objection.

Page 69

1 BY THE WITNESS:
2    A.  I'm saying I'm not sure of a statutory
3 responsibility, but we -- of -- to exercise due
4 diligence, but we do, as a practice, exercise due
5 diligence.
6 BY MR. YOUNG:
7    Q.  So you disagree that there is a statutory
8 responsibility to exercise due diligence when filling
9 suspicious orders?
10    MR. PADGETT:  Object to form.
11 BY THE WITNESS:
12    A.  I don't disagree. I'm saying that we do
13 exercise our due diligence.
14 BY MR. YOUNG:
15    Q.  That wasn't my question.
16      My question is whether or not you agree or
17 disagree that there is a statutory responsibility to
18 do so?
19    MR. PADGETT:  Object to form, asked and
20 answered.
21 BY MR. YOUNG:
22    Q.  You can answer.
23    A.  Oh, okay.
24      What I'm saying is I'm not clear about

Page 70

1 when they say a statutory responsibility for due
2 diligence. We --
3 BY MR. YOUNG:
4  Q. So you are the chief compliance officer of
5 H.D. Smith, I think your testimony has been that you
6 are the senior-most person charged with compliance
7 responsibility for H.D. Smith, and as we sit here
8 today, you are not sure whether or not there is a
9 statutory responsibility to exercise due diligence?
10  A. We exercise due diligence and our
11 responsibility is to maintain effective controls
12 against diversion, which we do, and we abide by the
13 regulations.
14  Q. Okay. And I -- I guess we are in a bit of
15 a echo chamber.
16  What I need to understand is whether or
17 not H.D. Smith is of the opinion that there is a
18 statutory responsibility to do those things? Because
19 I'm still not getting a clear answer from you as to
20 whether or not it is statutory in nature. So I'll ask
21 it as clearly and cleanly as possible.
22  Is there a statutory responsibility, a
23 legal obligation to exercise due diligence to avoid
24 filling suspicious orders?

Page 71

1  MR. PADGETT: Object to form.
2 BY THE WITNESS:
3  A. I -- I don't -- I don't -- the statutory
4 responsibility I'm not sure of. We do exercise due
5 diligence. That's what we do as a practice, a
6 process, a procedure when -- regarding suspicious
7 orders.
8 BY MR. YOUNG:
9  Q. Why -- why do you do that? If there is
10 not a statutory responsibility, why would you do that?
11  MR. PADGETT: Object to form.
12 BY THE WITNESS:
13  A. As part of our effort to maintain controls
14 against diversion.
15 BY MR. YOUNG:
16  Q. Which is based in law or you just decide
17 to do that on your own?
18  A. No. It's our responsibility to comply
19 with the -- with the law and the regulations.
20  Q. So there is law and regulations that
21 require the exercise of due diligence?
22  MR. PADGETT: Same objection.
23 BY THE WITNESS:
24  A. What I'm telling you is I'm not sure what

Page 72

1 the statutory verbiage is regarding due diligence.
2 BY MR. YOUNG:
3  Q. Okay. That's fair enough.
4  The next paragraph that's highlighted
5 there, can you read that for us?
6  A. "In a similar vein" -- "in a similar vein,
7 given the requirement under Section 823(e) that a
8 distributor maintain effective controls against
9 diversion, a distributor may not simply rely on the
10 fact that the person placing the suspicious order is a
11 DEA registrant and turn a blind eye to the suspicious
12 circumstances. Again, to maintain effective controls
13 against diversion as Section 823(e) requires, the
14 distributor should exercise due care in confirming the
15 legitimacy of all orders prior to filling."
16  Q. Is there anything in that section that
17 H.D. Smith disagrees with?
18  A. No.
19  Q. There is another section in here -- where
20 is -- can we come back to Page 1 of this document, and
21 under Background, the second full paragraph, it begins
22 with: "The CSA was designed."
23  A. "The CSA was designed" -- do you want me
24 to read it?

Page 73

1  Q. Yes, can you read it, please. Sorry.
2  A. "The CSA was designed by Congress to
3 combat diversion by providing for a closed system of
4 drug distribution, in which all legitimate handlers of
5 controlled substances must obtain a DEA registration
6 and, as a condition of maintaining such registration,
7 must take reasonable steps to ensure that their
8 registration is not being utilized as a source of
9 diversion. Distributors are, of course, one of the
10 key components in the distribution chain. If the
11 closed system is to function properly as Congress
12 envisioned, distributors must be vigilant in deciding
13 whether a prospective customer can be trusted to
14 deliver controlled substances only for lawful
15 purposes. This responsibility is critical, as
16 Congress has expressly declared that the illegal
17 distribution of controlled substances has a
18 substantial and detrimental effect on the health and
19 general welfare of the American people."
20  Q. So, and I appreciate you reading that. It
21 was lengthy, I know, and -- and there is a lot there,
22 but what I want to know is whether or not there is
23 anything in that paragraph that H.D. Smith disagrees
24 with?

Page 74

1    MR. PADGETT: I'll object to form.
2 BY THE WITNESS:
3    A. I'm rereading it.
4 BY MR. YOUNG:
5    Q. Yeah, and if you want, we can do it -- we
6 can do it sentence by sentence.
7    So the first sentence is --
8    A. Can I -- can I reread it first?
9    Q. Sure.
10    A. Thanks.
11    Okay.
12    Q. Okay. So, just after you read it a second
13 time, is there any part of that that H.D. Smith
14 disagrees with?
15    MR. PADGETT: Object to form.
16 BY MR. YOUNG:
17    Q. We can go sentence by sentence if you'd
18 like?
19    A. It's not necessarily disagree, just, you
20 know, some of the -- you know, when Congress
21 envisioned, you know, I -- I don't know what was going
22 through Congress's mind back then.
23    Q. Okay. Yeah, fair enough.
24    Do you have an understanding or belief as

Page 75

1 to what, other than described in this letter, what
2 Congress may have envisioned distributors doing under
3 the Controlled Substances Act?
4    In other words, do you have some
5 disagreement with the conclusion here or are you just
6 unaware?
7    A. I don't have any specific disagreement.
8    Q. The letter describes the distribution
9 chain as a closed system.
10    Are you familiar with that phrase?
11    A. Yes.
12    Q. Can you explain to us what the closed
13 system means?
14    A. Basically it's a -- closed system is
15 from -- you know, DEA sets quotas for manufacturers of
16 controlled substances on what they can manufacture.
17 The manufacturer then, if -- if you go -- simplify the
18 supply chain, sells product to distributors, all of
19 that's recorded so that -- so that there is no
20 diversion or theft inside that supply chain from
21 manufacturer/distributor.
22    Same way, and you have to be registered
23 with the DEA to handle controlled substances, the
24 manufacturers are registered, the DEA distributor such

Page 76

1 as H.D. Smith are registered with the DEA.
2    Anyone then that we would sell to, whether
3 it be a hospital, pharmacy, doctor, has to be a -- a
4 registered -- registered with DEA also to handle
5 controlled substances.
6    So we can only sell to DEA registrants,
7 and that's all recorded. So it -- it keeps the system
8 so that there is no introduction of other products,
9 there is no -- if -- if -- you know, if there is
10 theft, that would be discovered. And then on down to
11 where we would sell to, again, a DEA registrant.
12    You've got a DE -- DEA registered
13 practitioner that would be writing prescriptions
14 filled at a DEA pharmacy -- or DEA registered pharmacy
15 on until that it is dispensed to a patient, and all of
16 that -- all -- all of that is tracked through the
17 system in a -- what's considered a closed system.
18    Q. Perfect. Thank you.
19    I want to turn back to Page 2 of this
20 document. It's -- Paragraph 2 says -- it -- it begins
21 with "DEA recognizes," and -- and I'm just going to
22 read it briefly to -- to get you acquainted with it.
23 It's the third sentence.
24    "Nonetheless, given the extent of

Page 77

1 prescription drug abuse in the United States."
2    Can you -- can you read that for us?
3    A. "Nonetheless, given the extent of
4 prescription drug abuse in the United States, along
5 with the dangerous and potentially lethal
6 consequences" -- "consequences of such abuse, even
7 just one distributor that uses its DEA registration to
8 facilitate diversion can cause enormous harm."
9    Q. Does H.D. Smith agree or disagree with
10 that statement?
11    MR. PADGETT: Object to form.
12 BY THE WITNESS:
13    A. Based on circumstances, it could.
14 BY MR. YOUNG:
15    Q. Is it your testimony that one distributor
16 that uses its DEA registration to facilitate diversion
17 can cause enorm- -- enormous harm?
18    A. Yes.
19    Q. The sentence also talks about the extent
20 of prescription drug abuse in the United States. I
21 know we've kind of talked about this a little bit, but
22 does H.D. Smith have reason to dispute that at least
23 in 2006 there was a prescription drug abuse problem in
24 the United States?

Page 78

1    A.  I don't dispute that.

2    Q.  There is another section in here I want to

3 draw your attention to, and, again, this is a letter

4 that all distributors received from Joe Rannazzisi and

5 you previously testified that you received this.

6      The third-to-last paragraph -- oh, no.

7 You already read that.  I'm sorry.

8      The -- the third-to-last paragraph which

9 is highlighted on your sheet that you previously read,

10 I think I've asked this, but does H.D. Smith

11 acknowledge that there are additional responsibilities

12 of distributors beyond just reporting suspicious

13 orders?

14    A.  You are referring to where it says:

15 "Thus, in addition"?

16    Q.  Yes.

17    A.  Okay.

18    MR. PADGETT:  Object to form.

19 BY MR. YOUNG:

20    Q.  So, and -- and -- and I'll break it down,

21 this section of the letter actually describes the

22 reporting requirement as well as the duty to exercise

23 due diligence to avoid filling the order.

24      Does H.D. Smith recognize and acknowledge

Page 79

1 that that is a requirement under the rules,

2 regulations and laws which govern drug distribution?

3    MR. PADGETT:  Object to form.

4 BY THE WITNESS:

5    A.  The regulation is -- as written is a

6 regulatory responsibility to report suspicious orders.

7 BY MR. YOUNG:

8    Q.  Okay.  So does H.D. Smith disagree that

9 there is also a responsibility to avoid filling

10 suspicious orders?

11    MR. PADGETT:  Object to form.

12 BY THE WITNESS:

13    A.  My understanding is that the regulation

14 refers to reporting suspicious orders.  We, as a

15 practice, would not fill a suspicious order.

16 BY MR. YOUNG:

17    Q.  So as the chief compliance officer of

18 H.D. Smith, it is your testimony today that H.D. Smith

19 could, if they so chose, fill a suspicious order?

20    MR. PADGETT:  Object to form.

21 BY MR. YOUNG:

22    Q.  And not violate the Controlled Substances

23 Act?

24    MR. PADGETT:  Same objection.

Page 80

1 BY THE WITNESS:

2    A.  The regulation states that you must report

3 suspicious orders.  There is -- there is not a

4 shipping regulation.

5 BY MR. YOUNG:

6    Q.  Okay.  So, and I don't want to testify for

7 you, I just want to make sure that I get some clarity

8 from you on this.

9      It is your testimony that there is no

10 obligation of a drug distributor to halt a suspicious

11 order?

12    MR. PADGETT:  Object to form.

13 BY THE WITNESS:

14    A.  By regulation there is not.  By practice

15 and procedure and process, H.D. Smith does not ship

16 any orders that we have identified as suspicious.

17 BY MR. YOUNG:

18    Q.  Has it ever done so in the past?

19    A.  Which time period?

20    Q.  To your knowledge as a representative of

21 H.D. Smith, has H.D. Smith ever shipped an order that

22 it identified as suspicious?

23    A.  Prior to our automated system when we were

24 on a manual system, as was industry practice, there

Page 81

1 may have been orders that were reported after the fact

2 that had already been shipped.

3    Q.  And what happens to those orders?  So once

4 they are sent to a pharmacy and they are later

5 identified as suspicious, what, if anything, does

6 H.D. Smith do about that?

7    MR. PADGETT:  Object to form.

8 BY THE WITNESS:

9    A.  At that time -- in that time period?

10 BY MR. YOUNG:

11    Q.  At any time period.

12    MR. PADGETT:  Object to form.

13 BY THE WITNESS:

14    A.  It has changed throughout the years.

15 BY MR. YOUNG:

16    Q.  So let's begin with your initial or first

17 understanding of the way things were at H.D. Smith.

18      If H.D. Smith were to ship an order that

19 was subsequently identified as suspicious, what is

20 your first understanding of what they did with that

21 order afterwards or -- or with that pharmacy/customer

22 afterwards?

23    MR. PADGETT:  Object to form.

24 BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A.   You know, our responsibility was to report
2  suspicious orders and by industry practice and -- and
3  at the time and what was expected by DEA, we were
4  complying with what -- what was expected and what was
5  industry practice, which was report the suspicious
6  order and it would have been after the fact at that
7  time prior to the spring of 2008.
8  BY MR. YOUNG:
9    Q.   Okay.  And what I want to know is did
10 H.D. Smith take any action, and they may not have, I
11 don't know, did they take any action once they
12 recognized that a suspicious order went out the door?
13   MR. PADGETT:  Object to form.
14 BY THE WITNESS:
15   A.   I'm not sure prior to me coming there.
16 BY MR. YOUNG:
17   Q.   How about under your tenure?
18   A.   We did investigate those when they were
19 brought to my attention.
20   Q.   Is there any ability to retract an order
21 from a pharmacy that was shipped?
22   A.   Not to my knowledge.
23   Q.   Did you ever make an attempt to contact a
24 pharmacy and explain that you mistakenly shipped an

Page 83

1  order in excess of what they were entitled to receive?
2    A.   At that time, again, we need to talk about
3  time periods, at that time there was no limit or
4  whatever.
5    Q.   Going back to this letter, this Rannazzisi
6  letter from September of 2006, what, if anything, did
7  you do with this letter?  Did you distribute it, did
8  you condense it to a memo, did you share it with
9  anyone?  What did you do with it?
10   A.   Prior to this letter coming out, the --
11 again, I had had a -- this came out in September 2006.
12 I had a meeting with DEA in January of 2006 that
13 discussed much of the information that was in here.
14 This letter is pretty much pertaining to internet-type
15 pharmacies, the same way as the -- the meeting I had
16 with DEA.
17        So we had already acted upon that.  We
18 had -- I had developed a presentation.  I actually
19 used much of the -- the presentation that DEA had
20 provided me and provided that to our -- our
21 distribution centers, our sales reps, our operations
22 people to better inform them of what to look for
23 regarding internet-type pharmacies.
24   Q.   But specifically with regard to this

Page 84

1  letter, did you do anything with it or did you just
2  read it and file it away?
3    A.   We were already addressing the concerns
4  that were in this -- when this letter came.  So it's
5  not like it just got filed away.  We were already, you
6  know, taking this to our people, to our salespeople at
7  all of our divisions, to our operations people to
8  inform them of things to look for, the things that
9  are -- that are listed on -- on Page 3.  We -- we
10 started to put together a -- we started to explore an
11 automated system that we could use to better adhere to
12 our responsibilities.
13   Q.   And we'll get into the automated system
14 and whatnot, but I want to know, you know, practically
15 speaking, when you received this letter, I know it was
16 forwarded to you because it wasn't addressed to the --
17 to you at your -- at your office, after you received
18 this specific letter, what you did with it?  So not
19 the information in it, but the letter itself, did you
20 forward it to anyone?
21   A.   I could have.
22   Q.   You don't recall?
23   A.   (Nodding head.)
24   Q.   Do you know whether or not senior

Page 85

1  management, so management at a -- at a status or
2  hierarchy above yours received a copy of this letter?
3    A.   These letters were -- were shipped to DEA
4  registrants which would have been our -- our
5  warehouses.  Our corporate office is not a
6  registered -- a registrant with DEA.  They would not
7  have received this.  I can't tell you for sure.  My
8  assumption is I would have forwarded it to upper
9  management.  I can't tell you for sure.
10   Q.   Do you recall any specific conversations
11 that you had with senior management about the contents
12 of this letter?
13        And I don't mean your prior meeting with
14 DEA, you mentioned that January meeting, but
15 specifically this letter?
16   A.   No.  I don't recall.
17   Q.   Do you recall whether or not this letter
18 was distilled or condensed in any form for sharing
19 with other people in the compliance department?
20   MR. PADGETT:  Object to -- object to form.
21 BY THE WITNESS:
22   A.   I don't know what you mean by that
23 question.
24 BY MR. YOUNG:

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.    Were there other people in the compliance
2  department at the time you received this letter?
3    A.    I think one.
4    Q.    Who was that?
5    A.    P.J. VanDermeersch, P.J. Little at the
6  time.
7    Q.    Do you know whether P.J. received a copy
8  of this letter either from you or from some other
9  source?
10    A.    I'm sure she did.
11    Q.    Do you recall discussing the contents of
12  this letter with P.J.?
13    A.    I don't.
14    Q.    Okay.
15        MR. YOUNG:    Now is probably a good time to take
16  a break.  I think we've been going a little bit.  I
17  don't know if you need to use the restroom, but we'll
18  go off the record.
19        THE VIDEOGRAPHER:    We are off the record at
20  10:44 a.m.
21            (WHEREUPON, a recess was had
22              from 10:44 to 10:55 a.m.)
23        THE VIDEOGRAPHER:    We are back on the record at
24  10:55 a.m.

Page 87

1  BY MR. YOUNG:
2    Q.    Mr. Euson, we -- we just took a break and
3  I -- I know that you had a chance to communicate with
4  your counsel.  I don't want to know any of the content
5  of what you may have discussed with them, but is there
6  anything that you learned or were instructed that
7  might change your testimony from the prior session
8  that we just had?
9    A.    No.
10    Q.    So when we just left, we were looking at
11  the Rannazzisi -- what I call Rannazzisi 1, the first
12  letter.  And I want to show you what I call
13  Rannazzisi 2, which is another letter from
14  Mr. Rannazzisi.  This one is dated December 27th,
15  2007th -- 2007, and I'd just ask you to take a look at
16  that.
17        Just like with regard to the first letter,
18  I'll ask:  Do you recall receiving a copy of this
19  letter?
20    A.    Yes.
21    Q.    Is it your recollection that you received
22  it around the time that it was dated in December
23  of 2007?
24    A.    I would assume.

Page 88

1    Q.    The other thing I'd ask is:  Do you recall
2  what you did with this letter after you received it?
3  Just like we discussed with the prior letter, did this
4  letter receive the same treatment or different
5  treatment as the prior Rannazzisi letter?
6    A.    I don't recall exactly what I did with it.
7    Q.    There is a highlighted portion of this
8  letter.  It begins in Paragraph 3, if I could ask you
9  to read that into the record, please.
10    A.    Do you want just the highlighted part?
11    Q.    Yes.
12    A.    "Filing a" -- "Filing a monthly report of
13  completed transactions (such as, excessive purchase
14  report or high unit purchases) does not meet the
15  regulatory requirement to report suspicious orders."
16    Q.    Okay.  Does H.D. Smith agree or disagree
17  with that statement?
18        MR. PADGETT:  Object to form.
19  BY THE WITNESS:
20    A.    You know, this was part of the
21  ever-changing guidance and interpretation by DEA and
22  this was -- I do agree with it, and this was right at
23  the time when we were putting together our automated
24  suspicious order monitoring program, our Controlled

Page 89

1  Substance Order Monitoring Program, so...
2  BY MR. YOUNG:
3    Q.    Did the laws or regulations change over
4  time or the -- the changes that you are talking about
5  are interpretations of the law?
6        MR. PADGETT:  Object to form.
7  BY THE WITNESS:
8    A.    The laws them -- the laws themselves, the
9  regulation?
10  BY MR. YOUNG:
11    Q.    Yes.
12    A.    The verbiage did not change.  The
13  interpretation and the -- of -- of how that regulation
14  was complied with did change over time.
15    Q.    And what did H.D. Smith rely upon to
16  change the way it interpreted those laws?  In other
17  words, did you receive something in writing from the
18  DEA which said:  This is how you should conduct your
19  program?
20    A.    There was a series of events that happened
21  and especially in 2007, we -- there was an industry
22  conference in September that year in which a DEA
23  representative gave a presentation on expectations of
24  compliance with the regulation.

Page 90

1    At that meeting I was invited to come up
2  to DEA headquarters in October of 2007 to discuss
3  H.D. Smith developing an automated system and we met
4  with DEA headquarters in October of that year and we
5  began -- we -- we had started to develop an automated
6  system but it wasn't -- we could never get it to work
7  right.
8    We revamped it after that meeting and --
9  and after -- during that presentation and in
10  September, DEA and a -- person with A --
11  AmerisourceBergen put on a -- joint discussion on
12  order monitoring, and so we tried to fashion our order
13  monitoring system to make it similar to
14  AmerisourceBergen's and I had constant contact with
15  DEA headquarters, Kyle Wright with the DEA, as we were
16  developing it.
17    So I'm not sure exactly if this was your
18  question, but this is where I'm going with it, so, you
19  know, by -- from October to -- to April or March we
20  were developing our system to -- to role out our
21  automated system to better comply with the new
22  interpretation or -- of -- of the regulation.
23    Q.   And is it your position today that
24  H.D. Smith was not obligated to comply with the letter

Page 91

1  of the law prior to the rollout of the automated
2  system because of direction -- directives from the
3  DEA?
4    MR. PADGETT:  Object to form.
5  BY THE WITNESS:
6    A.   Our obligation was to comply with the
7  regulation, and based on industry standard and the
8  interpretation and with working with DEA at the time
9  before our automated system, we believed we were
10  complying with the regulation of reporting orders when
11  discovered.
12  BY MR. YOUNG:
13    Q.   So the -- prior to the implementation of
14  your automated system, and that's under the manual
15  system that -- that you described earlier, the manual
16  system did not meet the requirements that are
17  enunciated in the Rannazzisi '07 letter, did they?
18    A.   We reported suspicious --
19    MR. PADGETT:  Object to form.
20    Go ahead.
21  BY THE WITNESS:
22    A.   We reported orders that we -- that our
23  operations managers deemed as potentially suspicious
24  to DEA after the fact, after they had been shipped, as

Page 92

1  was industry standard, and we were in compliance with
2  what we believed was DEA's expectation of complying
3  with that regulation.
4  BY MR. YOUNG:
5    Q.   Okay.  But that was not technically in
6  compliance with the law as it was written, is that
7  true?
8    MR. PADGETT:  Object to form.
9  BY THE WITNESS:
10    A.   We believe we were in compliance with the
11  regulation.
12  BY MR. YOUNG:
13    Q.   And what was the basis for that belief?
14  Did the DEA send you a letter blessing or sanctioning
15  your program?
16    A.   DEA will not do that.
17    Q.   Did you rely upon the advice of outside
18  counsel to lead you to conclude that your system was
19  in compliance with the law?
20    MR. PADGETT:  Ob- -- object to form.
21    I'll instruct you not to answer any
22  attorney/client communications.
23    MR. YOUNG:  On the development of CSOMP?
24    MR. PADGETT:  Excuse me?

Page 93

1    MR. YOUNG:  On the development of the suspicious
2  order monitoring system?
3    MR. PADGETT:  That wasn't your question.
4  BY MR. YOUNG:
5    Q.   Did your system -- the automated system
6  that you developed, were you under the impression that
7  the automated system, which we'll talk about shortly,
8  that that was in compliance with the letter of the law
9  of the Controlled Substances Act?
10    MR. PADGETT:  Object to form.
11  BY THE WITNESS:
12    A.   Regarding the section on -- on reporting
13  suspicious orders?
14  BY MR. YOUNG:
15    Q.   On any and every section of the Controlled
16  Substances Act, was your automated system in
17  compliance with that?
18    MR. PADGETT:  Object to form.
19  BY THE WITNESS:
20    A.   We believed it was.
21  BY MR. YOUNG:
22    Q.   Now, you -- you seemed to hesitate that
23  you believed that it was.  Is it -- is it 100 percent
24  that it was in compliance or are you unclear as to

Page 94

1  whether or not it was in compliance?
2      MR. PADGETT: Object to form.
3  BY THE WITNESS:
4      A.  I'm not unclear.  My -- we believed that
5  we were in compliance.  We developed that automated
6  system to somewhat mirror AmerisourceBergen's system
7  that -- DEA won't bless or -- or say that any
8  system -- there is -- there is no definition of a
9  system that is authorized or -- or blessed by DEA.
10 You know, I knew that DEA was involved with the
11 development of AmerisourceBergen's.  And then when we
12 met with DEA at headquarters in October of 2007, I was
13 in constant communication with DEA headquarters, Kyle
14 Wright specifically at DEA headquarters, letting him
15 know all along the way how we were developing that
16 system.  Would he give a blessing on it and say
17 that's -- that's exactly what they want?  No, they
18 won't do that.  So our belief, my belief is that we
19 were in compliance with the regulation.
20 BY MR. YOUNG:
21     Q.  Did anyone give you an opinion, a
22 regulatory opinion, a -- a government opinion about
23 whether or not your system was in compliance with the
24 CSA entirely?

Page 95

1      A.  No, but we also -- numerous cyclical
2  inspections by DEA at all of our distribution centers
3  and there was never anything brought up that our
4  system was out of compliance.
5      Q.  There is another highlighted section in
6  this letter.  It's a -- just a part of a sentence I'd
7  just like you to read.  It says -- it begins with:
8  "Registrants must conduct."
9          Can you read that into the record?
10     A.  Just the highlighted part --
11     Q.  No, the whole sentence.
12     A.  -- out of context?
13     Q.  That sentence.
14     A.  Pardon me?
15     Q.  That sentence: "Registrants must
16 conduct."
17     A.  "Registrants must conduct an independent
18 analysis of suspicious orders prior to completing a
19 sale to determine whether the controlled substances
20 are likely to be diverted from legitimate channels."
21     Q.  Okay.  So do you agree or disagree that
22 that is a requirement under the Controlled Substances
23 Act?
24     MR. PADGETT: Object to form.

Page 96

1  BY THE WITNESS:
2      A.  The requirement is to report suspicious
3  orders and the requirement is for us to maintain
4  effective controls against diversion.
5  BY MR. YOUNG:
6      Q.  Okay.  That's not my question.
7          My question is:  This sentence that is in
8  the Rannazzisi letter to all registrants, does
9  H.D. Smith agree that this is a requirement or does it
10 disagree that that's a requirement?
11     MR. PADGETT: Same objection.
12 BY MR. YOUNG:
13     Q.  And I would focus your attention on the
14 temporal aspect, the "prior to completing a sale"
15 provision.
16     MR. PADGETT: Object to form.
17 BY THE WITNESS:
18     A.  I -- I think that -- can you reword that
19 question, because I --
20 BY MR. YOUNG:
21     Q.  Sure.
22     A.  This -- you know, there is also, you know,
23 analysis of suspicious orders prior to completion of
24 sales.  You -- I need a little bit more context and a

Page 97

1  little bit more definition of exactly what you are
2  looking for.
3      Q.  So, as the chief compliance officer of
4  H.D. Smith, as the corporate designee of H.D. Smith,
5  what I would like to know is whether or not H.D. Smith
6  views that sentence as a regulatory requirement that
7  it is currently and historically complying with or
8  not?  If it dis -- if you disagree with it, that's
9  fine, but I want to know whether or not you have been
10 and are in compliance with that requirement,
11 conducting an independent analysis of suspicious
12 orders prior to completing a sale?
13     A.  You --
14     MR. PADGETT: Object to -- object to -- object
15 to form and scope.
16 BY THE WITNESS:
17     A.  This -- this letter is not law and it is
18 not regulation.  We comply with the regulation
19 regarding reporting suspicious orders and we comply
20 with the regulation of maintaining effective controls
21 against diversion.
22 BY MR. YOUNG:
23     Q.  And -- and -- and I appreciate your
24 testimony that this letter is not the law.  I just

Page 98

1 want to know whether or not you disagree with the
2 statement.
3          Do you disagree that registrants must
4 conduct an independent analysis of suspicious orders
5 prior to completing a sale?
6      MR. PADGETT:  Object to form.
7 BY THE WITNESS:
8      A.   I -- I don't know what else to tell you,
9 we -- we comply with the law as written and we
10 consider these guidance documents.
11 BY MR. YOUNG:
12     Q.   Okay.  So is this a guidance document that
13 H.D. Smith relies upon in interpreting and executing
14 its responsibilities under the Controlled Substances
15 Act?
16     A.   We do analyze orders and if we discover a
17 suspicious order we report it and we also do
18 independent investigation on those orders.
19     Q.   Okay.  So H.D. Smith then conducts an
20 independent analysis of suspicious orders prior to
21 completing sales?
22     A.   What time period?
23     Q.   Let's start in 2008.  Did it -- did it do
24 that in 2008?

Page 99

1      A.   Once we had our automated system up, yes,
2 it was prior to the sale.
3      Q.   Okay.  So prior to the implementation of
4 the automated system, it did not do this, H.D. Smith
5 did not do an independent analysis of suspicious
6 orders prior to completing sales.
7          Is that your testimony?
8      MR. PADGETT:  Object to form.
9 BY THE WITNESS:
10     A.   With our -- with our manual system, there
11 were times when orders were discovered prior to sale
12 that were considered suspicious and reported and there
13 were times it was after the sale at the end of the
14 month when our operations managers went through prior
15 sales and reported them as potential suspicious
16 orders, but they were shipped out, it was after the
17 fact.
18 BY MR. YOUNG:
19     Q.   So this letter, the part which you
20 initially read, filing a monthly report of completed
21 transactions does not meet the regulatory requirement
22 to report suspicious orders, is that a -- an accurate
23 depiction of what H.D. Smith did prior to
24 implementation of its automated system, the filing a

Page 100

1 monthly report of completed transactions, or was it
2 something different?
3      A.   Yeah, we are -- our operations managers at
4 the time prior to our automated system would go
5 through monthly reports at the end of the month and if
6 they deemed that there was a pos -- a potential
7 suspicious order, they would report that to DEA.  It
8 was after the fact.  And then this letter was a
9 guidance letter saying that we are not doing that
10 anymore, now we are doing it before the sale.
11     Q.   And -- and that's real -- really what I
12 wanted to know is whether or not this letter was the
13 initial indication to H.D. Smith that what it was
14 doing was not sufficient.
15          Is this the first instance when H.D. Smith
16 learned of that?
17     A.   I wouldn't class -- I wouldn't say that it
18 was insufficient.  That was the industry standard and
19 that was the expectation at the time.  When I had the
20 discussion with DEA, with our industry -- the industry
21 meeting in September 2007, it was brought to people's
22 attention at that conference, which is for
23 distributors.
24          My individual meeting with DEA in October

Page 101

1 of 2007, they also brought it up before this letter,
2 and that's when we started working diligently on our
3 automated system so that we could comply with the new
4 interpretation and expectation of DEA.
5      Q.   Okay.  So what was the first instance -- I
6 think you mentioned three different points in time
7 there.
8          What was the first instance in which
9 H.D. Smith became aware that filing monthly reports
10 after the fact does not meet the regulatory
11 requirements?
12     MR. PADGETT:  Object to the form.
13 BY MR. YOUNG:
14     Q.   It might have been a phone call, it may
15 have been an e-mail, it may have been a letter.
16     A.   It was sometime at the end of 2007.
17     Q.   Do you recall what it was, was it a
18 letter?
19     A.   I -- I don't specifically recall.  It
20 was -- you know, we talked about it at our meeting
21 that we had in October and that's when we were going
22 to develop our system.  That's not something you can
23 develop overnight, and DEA was well aware of that and
24 knew that it would be springtime before we were able

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  to get our automated system up and running to comply
2  with the expectations, their expectations and the
3  expectations of this letter, because that was not the
4  industry standard and the expectation up to this
5  point.
6      Q.   The Rannazzisi letter also references on
7  Page 2, I believe -- I think it is Page 2, yes.  On
8  the last paragraph it mentions a case.  And it says:
9      "I refer you to the recent final order
10 issued by the Deputy Administrator, DEA, in the matter
11 of Southwood Pharmaceuticals," and it gives a -- a
12 case citation.
13     Did you ever review the final order issued
14 by the DEA in the Southwood Pharmaceuticals case?
15     A.   Yes.
16     Q.   What did you conclude after reviewing that
17 final order?
18     A.   It has been a while since I read
19 Southwood, but my recollection is that it had to do
20 mainly with they were supplying internet pharmacies
21 with a lot of hydrocodone, if I recall correctly, and
22 they were not reporting those orders to DEA, and
23 consistently sold them even after they had been warned
24 by DEA.  That's my general recollection of it, so...

Page 103

1      Q.   Did -- did you only review the Southwood
2  Pharmaceuticals final order because of this Rannazzisi
3  letter or were you otherwise aware of it?
4      A.   I don't know exactly when I was aware of
5  this.  I think this final ruling, it looks like it was
6  in 2007, so I don't know when that came out.
7      Q.   Did you do anything with the Southwood
8  Pharmaceuticals final order that you reviewed, did you
9  share it with anyone at H.D. Smith?
10     A.   I don't know if I exactly -- I -- I don't
11 recall if I shared the actual ruling, but it was -- it
12 was discussed at -- in compliance meetings and such
13 that we would have had with -- with the divisions.  We
14 did annual compliance trainings with our sales reps
15 and our divisions.  And I know it was part of -- part
16 of a PowerPoint that I would have had that -- that --
17 and I would have explained the gist of the Southwood
18 ruling, that they had their registration revoked due
19 to internet sales.
20     Q.   Did they -- did H.D. Smith senior
21 management express any concerns to you about being in
22 violation of the CSA after learning about the
23 Southwood Pharmaceuticals final order?
24     A.   No.

Page 104

1      Q.   Did you have concerns about being in
2  violation of the CSA after reading the Southwood case?
3      A.   Not that I believe, no.
4      Q.   Was H.D. Smith of the belief that once it
5  implemented its automated system that it would be in
6  compliance with the DEA's expectations and
7  interpretations of the CSA?
8      A.   Yes.
9      Q.   So prior to implementation of that, for
10 the time period between when you first learned that
11 you were not sufficiently complying with the letter of
12 the law until you implemented the automated system,
13 for that period of time isn't it true that you were in
14 violation of the CSA?
15     MR. PADGETT:  Object to form.
16 BY THE WITNESS:
17     A.   I don't believe so.
18 BY MR. YOUNG:
19     Q.   Why not?
20     A.   The DEA knew what we were doing, we had
21 done some beta testing, we were trying to look at
22 orders, we were reporting some when discovered, even
23 though they may have been after the fact, but, you
24 know, until we had our automated system up and

Page 105

1  running, you know, and we -- we did not have the
2  ability to do that as far as the prior to sale.
3      Q.   So am I to understand that H.D. Smith's
4  inability to comply with the law somehow made it okay?
5      A.   That's not what I'm saying.
6      Q.   Okay.
7      A.   I'm saying that we --
8      MR. PADGETT:  I'll object to form.
9      Go ahead.
10 BY THE WITNESS:
11     A.   We believed that we were in compliance
12 with the law and the expectation from DEA in the way
13 we were operating and we were never told anything
14 differently.  We had numerous dealings with DEA, we
15 had numerous inspections by DEA, and nothing was
16 brought up that we were in violation of -- of the --
17 of this regulation.
18     There were many pharmacies that we had
19 reported that we do our due diligence where we can
20 stop selling controlled substances to them and still
21 nothing was ever mentioned that we were in violation
22 of the regulation.  And we did not believe that we
23 were.
24 BY MR. YOUNG:

Page 106

1    Q.   I'm going to show you what's been marked
2  as Euson Deposition Exhibit 7.  This is a DEA report
3  of investigation of July 13th, 2006.  It is of a
4  Paragould Pharmacy, Semo Drugs of Kennett, SafeScript
5  Pharmacy and Max Care Pharmacy.
6         Does that report look familiar to you?
7  Have you seen that before?
8    A.   I have never seen it.
9    Q.   Is this the type of report that you would
10  receive a copy of?
11    A.   It looks like an internal DEA report.  We
12  would not -- I have never seen this, nor have I seen a
13  report similar to this.
14    Q.   This -- this report references -- where is
15  this name -- you have never seen this exhibit before.
16         So have you ever seen this type of report
17  before?
18    A.   I have not.
19    Q.   Do you know who Scott Garriott is?
20    A.   Yes.
21    Q.   How do you know Scott Garriott?
22    A.   He is a diversion investigator that -- out
23  of the Springfield field office, Springfield,
24  Illinois.

Page 107

1    Q.   Are you familiar with the Paragould
2  Pharmacy in Paragould, Arkansas?
3    A.   I am not.
4    Q.   If in 2006 H.D. Smith would have reported
5  a suspicious order of Paragould Pharmacy, would you
6  have been made aware of that, reported a suspicious
7  order to the DEA, would -- is that something that you
8  would have been made aware of?
9    A.   Not necessarily.
10    Q.   Okay.  I'm going to show you an
11  investigative -- you've probably never seen any of
12  these reports, but I'm going to show you the next one
13  which is a similar report.  That is Exhibit 8.  And it
14  is also involving the same entities.
15         In this report it suggests on it that
16  H.D. Smith submitted a suspicious order analysis
17  report for the month of April 2006.
18         Is that something that you would have been
19  made aware of, also Paragould Pharmacy?
20    A.   I am not familiar with the term
21  "suspicious order analysis report."  So I don't know
22  what -- I don't know if that's a DEA report.  I don't
23  believe it's one of ours.
24    Q.   Okay.  That might just be the phrase that

Page 108

1  DEA is referring to.
2    A.   Okay.
3    Q.   Suspicious order report from H.D. Smith.
4         It lists -- this DEA report identifies
5  Paragould Pharmacy.  And it -- it lists, as you can
6  see, purchases of controlled substances.
7         You were in a compliance capacity at
8  H.D. Smith at the time that this report was issued,
9  right?
10    A.   Yes.
11    Q.   You -- you've never -- you are not
12  familiar with Paragould Pharmacy in -- in Arkansas, I
13  believe you testified, right?
14    A.   Yes.
15    Q.   So what was your role in the routing or
16  reporting of suspicious orders to the DEA at the -- at
17  the time that this report was received by the DEA?
18    A.   Our operation managers would report to the
19  field office in -- in their area, so in -- in this
20  case it's -- it's our Springfield, Illinois
21  distribution center.  So our operations manager would
22  have reported to Scott Garriott who is the diversion
23  investigator in the field office.  So looking at this
24  report, I -- I -- I don't know what to tell you about

Page 109

1  it.  I mean --
2    Q.   You have no -- no recollection about this?
3    A.   No.
4    Q.   Okay.
5    A.   You know, as time went on, we had our
6  operations managers send us reports any time they had
7  contact with regulatory agencies, whether it was
8  sending us a suspicious order or not.  I don't know if
9  that was in place at this time.  But I do not recall
10  Paragould Pharmacy.
11    Q.   But earlier you referred to a manual
12  system and then the automated system.
13         This would have been during the manual
14  system at H.D. Smith?
15    A.   Yes, sir.
16    Q.   And at some point in time H.D. Smith
17  changed its reporting of suspicious orders from the
18  operations managers that you just described, is that
19  right?
20    A.   Yes.
21    Q.   When it went to the automated system, who
22  was responsible for reporting the suspicious orders?
23    A.   It would have been me or someone
24  designated on my staff.  At the time when we put the

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 automated system in place in 2008, it was just me and
2 P.J. Little or VanDermeersch.
3     Q.    And were you always reporting to the same
4 person at the DEA or was it -- was it a different
5 person each time or how did that work?
6     A.    We were under instructions -- the CFR, the
7 regulation says to report to the field office where
8 the -- your distribution center is located.  We were
9 under instructions by DEA headquarters after we had
10 gone up there in October of 2007 to report directly to
11 headquarters.  And there were -- there was -- there
12 were several different people that we would have
13 reported to, basic -- you know, based on who was in
14 what position at the time, whoever we were told to
15 send it to, but it was to DEA headquarters for a time.
16     Q.    And how were these submitted, were these
17 faxed, mailed, e-mailed?
18     A.    E-mail.
19     Q.    Was there a time when you were faxing
20 suspicious orders to the DEA?
21     A.    I'm an -- I -- I don't know.
22     Q.    Okay.
23     A.    I'm assuming that before -- before -- in
24 2008 when we had our automated system it was e-mail.

Page 111

1 I don't know how they were submitted by the divisions
2 prior to that.
3     Q.    Was there a protocol under the manual -- a
4 policy, a procedure or protocol under the manual
5 system which required internal copies of those reports
6 to anyone else?  I know you mentioned you didn't
7 receive them, but did anyone else receive them?
8     A.    Not that I'm aware of.
9     Q.    Okay.  I'm going to show you a one-page,
10 Exhibit 14, so skipping over quite a few since -- just
11 take a look at that.
12         Have you seen this e-mail before?
13     A.    This would have been before my time at
14 H.D. Smith, so I have not seen this before.
15     Q.    Okay.  I didn't know if -- if maybe your
16 counsel had provided it to you or if you've seen it
17 just in the course of business.
18         Okay.  Do you recognize the -- the
19 original sender of this e-mail, Danny Avila, Avila?
20     A.    Yes.
21     Q.    Do you recognize an Agent Barnes, it says:
22 "We called Agent Barnes from our local DEA office."
23         Do you know who that is?
24     MR. PADGETT:  I'm going to object to scope based

Page 112

1 on the exhibit's date.
2         You may answer.
3 BY THE WITNESS:
4     A.    Well, Danny Avila was in Florida, so --
5 and I think that's Agent Barnes -- or so it would be a
6 Diversion Investigator Barnes, and I -- if it's the
7 same person, I know her, but I -- I don't -- without a
8 first name, I know Barnes is kind of a common name,
9 so...
10 BY MR. YOUNG:
11     Q.    Okay.  Danny Avila in the -- in the e-mail
12 says in his last sentence:
13         "These orders would not be caught by the
14 suspicious order utility since they were keyed
15 in-house (is my understanding)."
16         Do you understand what Danny is referring
17 to there?  I understand this is before your tenure,
18 but I just want to know whether you are familiar?
19     MR. PADGETT:  Let the record reflect a
20 continuing objection based on scope, date of the
21 exhibit.
22 BY THE WITNESS:
23     A.    I do not know what that is.
24 BY MR. YOUNG:

Page 113

1     Q.    Okay.
2         The phrase "suspicious order utility,"
3 does that mean anything to H.D. Smith?  Does that have
4 a particular meaning?
5     A.    I -- I don't know what that is.  I have
6 never heard that term.
7     Q.    Okay.
8         The top part of the e-mail which is the --
9 I know the -- the headings are, I guess, cut off, this
10 is just how it was produced to us, but it is from an
11 Angelo Grande.
12         Do you know Angelo Grande?
13     A.    Yes.
14     Q.    Who is Angelo Grande?
15     A.    Currently he is in charge of our Valley
16 Wholesale division in Stockton, California.  Prior to
17 that he was vice president division manager of our
18 Carson, California division, which before that was in
19 Inglewood.  And it was a -- an acquisition.  So he
20 came from an acquisition.  I believe it was Barnes
21 Wholesale that was acquired before my time.
22     Q.    Okay.  The second sentence of Angelo's
23 response to Danny is:
24         "You are correct.  It's my understanding

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 also that all keyed items are excluded from the
2 reporting utility and those items are reviewed
3 manually with a report that is generated from the
4 AS400, showing control drugs sales history by item,
5 date, and by customer."
6     Do you know what he is referring to there
7 by the AS400?
8     A.  Let me read this through real quick.
9     Q.  Sure.
10     A.  I -- I don't know what he is talking
11 about.  I mean, I know what the AS400, that was our
12 sys -- that was our, I don't know what you call it,
13 our system, computer system, software companywide at
14 the time.
15     Q.  Who would be the --
16     A.  I can't -- I can only speculate what it
17 is. I don't know what it is.
18     Q.  Okay.  Who would be the person who would
19 have the most knowledge about the AS400's suspicious
20 order utility?
21     MR. PADGETT:  Object to form.
22 BY THE WITNESS:
23     A.  I would have no idea.  I don't think -- we
24 haven't used AS400 since 2013, and I doubt there is

Page 115

1 anyone at H.D. Smith around anymore that would have
2 any expertise in it.
3 BY MR. YOUNG:
4     Q.  Who was in charge of compliance at the
5 time of this e-mail?
6     A.  Each -- each division was in charge of
7 their own compliance.
8     Q.  There was no central compliance function
9 in headquarters?
10     A.  Not that I'm aware of.  I was first.
11     Q.  Did -- I noticed that Dale Smith and Chris
12 Smith are both copied on Danny's original e-mail.
13     Why would they -- I'm sorry.  They are not
14 copied, they are actually direct addressees.
15     Who on -- why would they be included in a
16 compliance e-mail like this?
17     A.  I have no idea.
18     MR. PADGETT:  Object to form.
19 BY MR. YOUNG:
20     Q.  Did Dale Smith, Junior have any -- I
21 assume this is Dale Smith, Junior in this e-mail, is
22 that your opinion?
23     A.  It would be my opinion.
24     Q.  Yeah.  Did Dale Smith, Junior have any

Page 116

1 role in the compliance function of H.D. Smith at the
2 time of this e-mail?
3     A.  I don't know what his function was at this
4 time.
5     Q.  Do you know whether or not Dale Smith,
6 Junior ever authored any compliance-related policies
7 or procedures for H.D. Smith?
8     A.  I believe there is one policy regarding
9 orders.
10     Q.  That was authored by Dale Smith, Junior?
11     A.  Yes.
12     Q.  Do you know whether Chris Smith had any
13 role or involvement in authoring any policies or
14 procedures relating to compliance functions?
15     A.  Not that I'm aware of.
16     Q.  If we were to try to seek through your
17 information technology the either report or data
18 attendant to the report that's referenced here, who
19 would we be best to talk to about that?  And you may
20 not know.  I just --
21     A.  I -- I can only speculate.  Rob Kash- --
22     MR. PADGETT:  Let me reiterate my continued
23 objection.
24 BY THE WITNESS:

Page 117

1     A.  Rob Kashmer was the head of our IT at one
2 time.  I don't know if at this time.
3 BY MR. YOUNG:
4     Q.  Okay.
5     The last sentence, and, again, I realize
6 this is before your -- your tenure with the company,
7 but the last sentence of Angelo's response is, and
8 I'll -- and I'll read it:
9     "It's my understanding that this
10 monitoring requirement is all a matter of alerting and
11 assisting the DEA with abusers even though they are
12 already getting some of that data on a regular basis
13 through ARCOS."
14     What's the -- what is the reference to
15 ARCOS there, what does that mean?
16     A.  We report ARCOS data to DEA on a -- a
17 monthly basis through all of our distribution centers.
18 It is all of our C-IIs and C-III narcotic products
19 that are either purchased -- you know, either we
20 receive in or we distribute out.  It is part of the
21 closed loop system.
22     Q.  And the date of this e-mail is
23 October 5th, 2005.
24     Have there been any changes since the date

Page 118

1 of this e-mail with regard to the way H.D. Smith
2 reports to the DEA on the ARCOS system?
3    A.   We -- we have central reporting now
4 through my office, through the corporate office.
5    Q.   Was that part of the automated system that
6 you've earlier described or is that something
7 different?
8    A.   No.  It's -- it's separate.
9    Q.   Okay.
10        I will now show you Plaintiff's Exhibit 15
11 with three highlighted sections on it.  Take your
12 time.  I think that this is the -- the policy that you
13 just referenced which was authored by Dale Smith,
14 Junior, but I want to -- want to hear from you, so
15 take a minute to familiarize yourself with it.
16    A.   This was the one I was referencing.
17    Q.   Okay.  Was this the policy for controlled
18 substance monitoring that was in place at the time you
19 joined H.D. Smith?
20    A.   Yes.
21    Q.   I understand that this was written before
22 you got there, but have you since getting there
23 learned when this policy was authored?  I think
24 it's -- it's not dated.

Page 119

1    A.   I have no idea.
2    Q.   Do you know how long it was in place when
3 you got there?
4    A.   I do not.
5    Q.   When you were hired at H.D. Smith, was
6 part of your responsibility to take ownership over the
7 policies and procedures relating to controlled
8 substance monitoring?
9    A.   When I was first hired?
10    Q.   Yes.
11    A.   No.
12    Q.   So when you were first hired with
13 H.D. Smith, you had no responsibility relating to
14 controlled substance monitoring policies and
15 procedures?
16    A.   It was -- it was an evolution.
17    Q.   Am I to understand your -- your initial
18 focus was on security more than controlled substance
19 monitoring?
20    A.   Originally my title was director of
21 security.  It morphed into director of security and
22 compliance.  By it was more of, yeah, security-related
23 audits of facilities.
24    Q.   The policy that's contained within

Page 120

1 Exhibit 15 describes an operations manager as the
2 controlled substances coordinator.
3        When did that definition or assignment to
4 the operations manager end, do you know the particular
5 date?
6    A.   It would have been when we rolled out
7 our -- our automated system which was rolled out
8 throughout the spring of 2008 to our various
9 distribution centers.
10    Q.   This policy references what I would call
11 paraphrasing of the regulations, and I'd just -- I'd
12 like you to read that first paragraph that's
13 highlighted there, "The monthly review"?
14    A.   Read it?
15    Q.   Yes.
16    A.   "The monthly review will consist of
17 comparing previous orders to determine frequency of
18 ordering, size of orders on specific products and
19 deviation from typical purchasing patterns.
20 Evaluations will be made from these reports to
21 determine if account should be brought to DEA's
22 attention."
23    Q.   So this was the policy that was in place
24 at the time you began at H.D. Smith, right?

Page 121

1    A.   Yes.
2    Q.   Is H.D. Smith of the opinion that this
3 policy complied or failed to comply with the
4 Controlled Substances Act as of 2005?
5    A.   Ask me that question again.
6    Q.   Did -- did the -- this policy, the
7 controlled substance monitoring policy, did this meet
8 the requirements of the CSA or did it fail to meet
9 those requirements?
10    A.   We be --
11    MR. PADGETT:  Object to form.
12 BY THE WITNESS:
13    A.   We believe that it did.
14 BY MR. YOUNG:
15    Q.   And I just want to reference back to your
16 earlier testimony.
17        Do you mean to say that you believe that
18 it met the requirements as interpreted by the DEA or
19 under the letter of the law?
20    MR. PADGETT:  Object form.
21 BY THE WITNESS:
22    A.   Both.  We were reporting orders when they
23 were discovered.  At this point it was discovered
24 during the monthly reviews.

Page 122

BY MR. YOUNG:

2    Q.   What's a -- a picker?  This policy
references experienced pickers.

4         What's the -- I don't know if that's a
term of art, or what H.D. Smith...?

6    A.   In a -- in a warehouse environment, it is
the actual people that go to get the product for the
order.

9         So in a -- in a work -- in a
pharmaceutical warehouse, Schedule II products are
kept in a vault, III through Vs are kept in a -- in a
DEA-mandated cage.  Only certain people have authority
to go in those vaults and cages.  We put our most
experienced people in there to reduce errors and so we
have consistency of people looking at orders that
could possibly identify something that may be out of
the ordinary.

18        And so the picker actually has -- in the
old days it was paper, these days it is all
electronic, but basically it's just picking the
orders, you know.

22   Q.   How would the picker determine whether or
not an order was out of the ordinary or excessive or
unusual?

Page 123

MR. PADGETT:  Object to form.

2    BY THE WITNESS:

3    A.   You know, our -- our pickers would --
again, they were the most experienced people, they had
been there the longest, they had the -- that are the
best at what they do, they are there every day filling
orders, they see the orders come in every day, they
see the customers, who the orders are for, and it was
the expectation that if they saw something that they
didn't think that was right they would then bring that
to the attention of the operations manager or their
supervisor.

13   Q.   And if they didn't make that observation,
if they -- if they failed to bring a otherwise
suspicious order to the attention of the manager, is
there some other mechanism in place at the time, this
is going back to '05, that would have caught
suspicious orders or unusual orders other than the
pickers?

20   A.   Not to my knowledge.

21   Q.   Do you know how effective this policy was
at H.D. Smith in identifying suspicious orders?

23   MR. PADGETT:  Object to form.

24   BY THE WITNESS:

Page 124

A.   We had orders that -- that pickers had
identified as potentially suspicious that were
reported and then the monthly reviews by the
operations managers that were, again, familiar with
the customers and, you know, we -- you know, and then
they would -- if they saw something that -- that they
thought may be suspicious, they would report it to
DEA.

9    BY MR. YOUNG:

10   Q.   If the DEA never had meetings in D.C. and
Rannazzisi never sent those two letters, would
H.D. Smith have continued this type of policy for
controlled substance monitoring?

14   A.   I can't speculate on that.

15   MR. PADGETT:  Object to form.

16   BY MR. YOUNG:

17   Q.   I just want to make sure I understand
whether or not the DEA is what triggered the change in
the evolution of your system or was it self awareness,
self observation?

21   A.   There is -- there is no regulation that
says you have to have an automated system or a manual
system.  There is still people today, there is
warehouses out there, there's people that have manual

Page 125

systems in place.

2         As evolution of -- of -- over time, you
know, when we had our first meeting, you know, I
started in November of 2005, had a meeting with DEA in
January of 2006, we started to explore a -- an
automated system so that we could constantly, you
know, try to improve our processes to maintain
effective controls against diversion.  You know, the
whole industry has evolved.

10   Q.   This policy was in place until what, what
time period?

12   A.   I don't know that it was -- it would have
been when we put a policy out in 2008 for order
monitoring.

15   Q.   Okay.  And prior to the implementation of
the 2008 policy, who -- who at H.D. Smith was
responsible for monitoring controlled substances?

18        So this policy references operations
managers and pickers.  Was there an -- an -- was there
anyone else that was involved in that process?

21   A.   I -- I -- I can't -- I can't -- I can't
say.  I mean, the operations manager was the
controlled substance coordinator.  He was the one that
was in charge of the warehouse, everything that went

Page 126

1 on in the warehouse, so he would have been, you know,
2 the main person.
3 Q. Was there an internal auditing function
4 that tested compliance with these policies and
5 procedures?
6 A. Not that I'm aware of.
7 Q. When you came onboard, and I understand
8 there is an evolution of your responsibilities, was
9 there a point in time in which you tested or called
10 into question the efficacy of this policy?
11 A. I don't know if it was to call into
12 question. We were just con -- we were just always
13 trying to him prove our processes and our procedures.
14 Q. So did you evaluate this policy from a
15 compliance perspective?
16 A. I wouldn't say I evaluated -- I evaluated
17 this policy.
18 Q. Were there, I'm going to use the word
19 "thresholds," are you familiar with the word
20 "threshold" --
21 A. I am.
22 Q. -- in the context of registrants?
23 Were there thresholds in place for
24 pharmacy customers at the time of this policy?

Page 127

1 A. Not that I'm aware of.
2 Q. So the only -- what was the basis for a
3 picker to determine whether or not an order was
4 excessive? Just their memory of the prior month's
5 order?
6 A. It would have been their knowledge of
7 the -- of the customer, their ordering history, their
8 day-to-day, everyday phone orders.
9 Q. I think you mentioned that this was a -- a
10 very veteran person in the company, there was not
11 much -- much turnover among the pickers?
12 A. Not to my knowledge, no.
13 Q. Was this a highly compensated position?
14 A. I don't know if it would be highly
15 compensated. It was -- you know, there were veteran
16 or, you know, experienced people that had had many
17 years on, so I don't know exactly, you know, how they
18 were compensated, if they got increases in wages when
19 they went into the cage or vault. I can't answer
20 that.
21 Q. How many pharmacy customers did each
22 picker pick for in a given month? Was it -- did they
23 have designated customers they always picked for or
24 was it an order came in and you just handled that

Page 128

1 order?
2 A. They would handle the orders as they came
3 in.
4 Q. How many customers did H.D. Smith have in
5 2005, approximately?
6 A. It would -- well, it would depend on what
7 distribution center you are talking about. The
8 Springfield or -- or --
9 Q. Nationally how many customers?
10 A. In 2005, I -- I don't have any idea. I --
11 we had -- I'm not even sure how many distribution
12 centers we had at that time because there was a period
13 of time where we were opening or making acquisitions
14 or what have you.
15 Q. Okay. But if a picker doesn't have the
16 regular customer that they are picking for each month,
17 how is it that they are going to know whether or not
18 an order on any given month is excessive? In other
19 words, one month they may get Pharmacy X and the next
20 month they may get Pharmacy Y, how can they compare
21 the two?
22 A. Usually our customers order every day.
23 Q. Okay. So how is it that a picker -- is
24 there some reference manual, is there some database,

Page 129

1 is there -- is there someplace for a picker to go when
2 they get an order for a customer they are not familiar
3 with to determine whether or not that order is
4 unusual? And specifically I ask that because of your
5 prior testimony indicating there was no threshold for
6 these customers. So how -- how are they to know,
7 what's the -- what's the basis?
8 A. I can't answer that.
9 Q. Okay. Let's see.
10 Do you know whether or not there was any
11 training provided to operations managers for their
12 role as the controlled substance coordinators?
13 A. What time period?
14 Q. In '05, it's admittedly prior to when you
15 got there?
16 A. I -- I don't know.
17 Q. How about in '06?
18 A. I implemented training in 2006 after
19 our -- our meeting with DEA in January of 2006.
20 Q. What type of training did you undertake
21 for the operations managers?
22 A. It was mainly regarding orders related to
23 internet pharmacies which was the basis of our
24 discussion in 2006, January of 2006 with DEA. I

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  used -- I may have used their whole PowerPoint that
2  they presented to me in addition to other information
3  I would have had to try to educate them on looking
4  at -- at orders that may be suspicious.
5      Q.  That PowerPoint, do you know if it was
6  shared with them via e-mail or was it something that
7  you put on live on the screen?
8      A.  I went to each distribution center.
9      Q.  Do you know what the budget was for
10  compliance in 2006?
11     A.  I don't.  I wasn't in charge of the
12  budget.
13     Q.  In terms of the process of the operations
14  manager making decisions, did the operation managers
15  have access to data, a database or a system that they
16  could use to compare prior months' orders?
17     A.  I believe the way that -- the way that
18  their reports came out at the end of each month they
19  would have access to monthly reports on controlled
20  substances purchased by our customers.  So they could
21  reference previous months if they wanted to.
22     Q.  And was there any type of formula or
23  algorithm used by the company to determine whether or
24  not an order was excessive as compared to prior

Page 131

1  months?
2      A.  Not at that time.
3      Q.  But at some point I guess with the role of
4  the automated system there was a calculation or
5  algorithm?
6      A.  Yes.
7      Q.  And we'll -- we'll talk about that in just
8  a sec.
9          Do you know whether or not there were --
10  other than the -- the typical monthly review that's
11  contemplated by this policy, were there ad hoc reviews
12  done by operation managers of pharmacies?
13     MR. PADGETT:  Object to form.
14  BY MR. YOUNG:
15     Q.  For -- for purposes of the controlled
16  substance monitoring, I should mention.
17     MR. PADGETT:  Same objection.
18  BY THE WITNESS:
19     A.  I -- I don't know.  You know, I was in
20  communication with -- with the operations managers.
21  What we discussed, if I -- we discussed certain
22  accounts, I -- I just -- I'm not -- I can't tell you.
23  I can't remember.
24  BY MR. YOUNG:

Page 132

1      Q.  And at the time of this policy, while this
2  was in place, it was the practice of H.D. Smith to
3  ship orders and later review whether or not they would
4  be reported to the DEA.
5          Is that accurate?
6      A.  It was a policy that if -- if pickers
7  would identify orders beforehand they could be
8  reported to DEA as suspicious, but also, you know, as
9  the policy says, there was a monthly review, as was
10  industry standard and the expectation from DEA.
11     Q.  But the -- the order that the picker
12  identified, was that shipped or was that held?
13     A.  You'd have to be more specific on what --
14  what our -- it would more like -- my understanding, it
15  would be held until we would discuss it with DEA.
16     Q.  Was that in the policy somewhere?
17     A.  I think it's in here somewhere about
18  discussing it with DEA field office.
19     Q.  Yeah, I think the --
20     A.  It is right below your highlighted --
21     Q.  Yeah.
22     A.  -- part on the second page.
23     Q.  Yeah, let's -- let's dig into that a
24  little bit.

Page 133

1          There is a -- a highlighted portion
2  that -- can you read that for us?
3      A.  On Page 2?
4      Q.  Yes.
5      A.  "If while picking, an excessive purchase
6  is discovered it will be brought to the attention of
7  the Controlled Substance Coordinator.  A check with
8  the local DEA office will be made before shipping of
9  the individual order."
10     Q.  So there is a policy in place at the
11  time, this policy, that says if you identify an
12  excessive purchase, check with the operations manager
13  who is the controlled substances coordinator, right?
14     A.  Correct.
15     Q.  And it doesn't really say who.  I assume
16  it's the operations manager.  It says:  "A check with
17  the local DEA office will be made before shipping of
18  the individual order."
19          That's your recollection of what took
20  place in 2005?
21     A.  That's my understanding.  And I think --
22     MR. PADGETT:  Object to form.
23          Go ahead.
24  BY THE WITNESS:

Page 134

1    A.  -- that's what's in the policy.
2  BY MR. YOUNG:
3    Q.  Do you know how long it took to hear back
4  from the DEA when you reported suspicious orders at
5  the time?
6    A.  To my knowledge, we would never hear back
7  from DEA.
8    Q.  Okay.  So if you were to check with the
9  DEA before shipping and you never heard back from the
10 DEA, I take it that, then, the order never shipped?
11    MR. PADGETT:  Object to form.
12 BY MR. YOUNG:
13    Q.  Is that accurate?
14    A.  No, that is not necessarily true.
15    A check with the local DEA, that would --
16 in my mind that means you would call the DEA, check --
17 in this case you would try to talk to Garriott and
18 discuss the order with him.  Now, I wasn't there.  I
19 don't know exactly what happened, but that's -- that
20 would be my assumption.
21    And then it says, you know, in the next --
22 next paragraph:  "If" -- "If the local DEA office
23 cannot be contacted before shipping, it should be
24 brought to their attention as soon as possible."

Page 135

1    So it was still the expect -- the --
2  the -- the expectation of the DEA and the way this
3  policy is written is that, you know, that -- that
4  order, if they could not get ahold of the DEA to
5  discuss it with them, my assumption is it would be
6  shipped and then discussed with DEA at a later time.
7    Q.  And this policy was in place for part of
8  your initial tenure with H.D. Smith, right?
9    A.  It was.
10    Q.  So from the time that you got to
11 H.D. Smith until you implemented the new policy, what
12 you just described is what occurred, right, that the
13 order would -- would be shipped?
14    MR. PADGETT:  Object to form.
15 BY THE WITNESS:
16    A.  It depends on what the circumstance was
17 and if they were able to get ahold of -- of Garriott,
18 and I don't know if the order was -- first of all,
19 you'd have to be specific on what order and I don't
20 know if it was shipped or it wasn't.
21 BY MR. YOUNG:
22    Q.  Yeah.  And I'm --
23    A.  I'm only going by the policy.
24    Q.  And admittedly I'm speaking in

Page 136

1  generalities.  I want to understand what H.D. Smith
2  did generally.
3    So when -- under this policy when a picker
4  identified an excessive purchase and brought it to the
5  attention of the controlled substances coordinator,
6  who was the operations manager, it was the policy to
7  check with the DEA office.  And what I want to know
8  is, prior to the new policy, under this policy,
9  whether or not generally orders shipped or did not
10 ship?  If you can't say, you can't say.
11    A.  I -- I don't know.
12    Q.  Yeah.  Okay.
13    I had previously showed you some -- some
14 DEA investigation reports.  I know you weren't
15 familiar with them, but those order -- those
16 investigation reports indicated that those orders
17 which were reported as suspicious had, in fact, been
18 shipped.
19    Does that surprise you or is that
20 consistent with your recollection of what occurred at
21 H.D. Smith prior to implementation of the automated
22 pol- -- policy?
23    MR. PADGETT:  Object to the form.
24    You can answer.

Page 137

1  BY THE WITNESS:
2    A.  It wouldn't surprise me.  You know, the
3  enclosure down here says DEA purchase report, you
4  know, for a month's time, and -- and this is a period
5  later, so I'm assuming that they were shipped.  I
6  don't know for a fact.
7  BY MR. YOUNG:
8    Q.  Okay.  Do you know whether or not there
9  was consistent implementation and execution of this
10 policy at each of the distribution centers?
11    MR. PADGETT:  Object to form, scope.
12 BY MR. YOUNG:
13    Q.  From -- from '05 to '08?
14    A.  That was the expectation.
15    Q.  But you didn't test or verify whether or
16 not each of the distribution centers was complying
17 with this policy?
18    A.  No.
19    Q.  Was there anyone charged with auditing or
20 testing whether or not there was compliance with this
21 policy?
22    A.  Not to my knowledge.
23    Q.  Do you know whether or not operations
24 managers prior to your PowerPoint training were aware

Page 138

1 of the statutory definition of suspicious orders?

2 MR. PADGETT: Object to form.

3 BY THE WITNESS:

4 A. I would have -- I would have no way of

5 knowing that.

6 BY MR. YOUNG:

7 Q. Really what I'm asking is, other than this

8 policy, was there any other information that was given

9 to operations managers about compliance with the

10 Controlled Substances Act reporting requirements?

11 A. Prior to me arriving there, I do not know.

12 Q. How about after you arrived and except

13 your PowerPoint instruction?

14 A. Well, I conducted an annual compliance

15 meetings at all of our distribution centers.

16 Q. The -- you -- H.D. Smith maintained a

17 Louisville, Kentucky distribution center during this

18 time.

19 Is that accurate?

20 A. Which time period?

21 Q. '06 through '08.

22 A. I don't think the Louisville distribution

23 center opened until 2007.

24 Q. Okay.

Page 139

1 A. I don't know the exact date.

2 Q. Fair enough.

3 Do you know whether or not the Louisville,

4 Kentucky distribution center would have been the

5 center to ship into Ohio, the State of Ohio?

6 A. Again, it would depend on the time period.

7 Prior -- I don't know --

8 Q. Let me rephrase it.

9 A. It would depend on the time period.

10 Q. Let me rephrase it.

11 In 2007, where would Ohio pharmacies who

12 are customers of H.D. Smith have obtained their

13 products from, which center?

14 A. It would probably, and I don't even know

15 if they had Ohio customers in 2006, but it would

16 probably be Illinois or Louisville.

17 Q. And do you know today where Ohio customers

18 get their products from?

19 A. More than likely Louisville. They could

20 be some coming from New York metro and -- and Illinois

21 could have some and we used to have a Smith Medical

22 Partners that's no longer around that would have

23 shipped possibly into Ohio. They were licensed in

24 Ohio.

Page 140

1 Q. After an operations manager made a report

2 to the DEA about a suspicious order, do you know

3 whether or not they would inform the pharmacy customer

4 of that report to the DEA? Was that --

5 A. The practice was to not.

6 Q. But it's possible that they did have those

7 conversations?

8 MR. PADGETT: Object to the form.

9 BY THE WITNESS:

10 A. I highly doubt it.

11 BY MR. YOUNG:

12 Q. Do you know whether or not the sales --

13 I'll refer to them as the sales staff.

14 Does H.D. Smith have sales staff?

15 A. Yes.

16 Q. Do you know whether or not the sales staff

17 enter -- whether or not the sales staff ever

18 intervened on behalf of a pharmacy customer to prevent

19 the reporting of a suspicious order?

20 A. Not to my knowledge.

21 Q. Okay. Moving right along.

22 MR. PADGETT: What time do you want to break for

23 lunch?

24 MR. YOUNG: Oh, what time is it?

Page 141

1 MR. PADGETT: It is 12:05 right now. But if you

2 go to 12:15, that would be another hour,

3 hour-and-a-half block.

4 MR. YOUNG: I'm just trying to see where we can

5 find a nice, natural break here. I guess we can -- I

6 guess let's do it now. How long have we been going

7 since the last break?

8 MR. PADGETT: About an hour.

9 MR. LEEDER: A little over an hour.

10 MR. PADGETT: About an hour and ten.

11 MR. YOUNG: All right. Let's do it. We have to

12 keep the witness fed.

13 THE VIDEOGRAPHER: We are off the record at

14 12:04 p.m.

15 (WHEREUPON, a recess was had

16 from 12:04 to 1:02 p.m.)

17 THE VIDEOGRAPHER: We are back on the record at

18 1:02 p.m.

19 BY MR. YOUNG:

20 Q. Mr. Euson, we just broke for lunch.

21 During lunch did you have occasion to

22 speak with your counsel?

23 A. I did.

24 Q. Did any of the communications between you

Page 142

1  and your counsel affect or impact the testimony that
2  you've already provided?
3      A.  I wanted to make a clarification on a
4  previous testimony.
5      Q.  Okay.  We'll get to that in a second.
6      A.  Okay.
7      Q.  Did any of the communications with your
8  counsel serve to prepare you further for the rest of
9  the deposition for 30(b)(6) purposes?
10     A.  No.
11     Q.  There was no preparatory comments or get
12  ready for this or expect this?
13     A.  No.
14     Q.  So you mentioned you wanted to clarify
15  something.  What is it?
16     A.  You had asked me about West Virginia and I
17  had -- I had misspoke and I wanted to clarify.  I said
18  it was a fine in West Virginia.  It was a settlement
19  with no admission of any wrongdoing.
20     Q.  And that's your recollection or your
21  attorneys informed you of that?
22     A.  Well, I asked them for the clarification.
23     Q.  Were you involved in the, I don't want to
24  say the legal aspect of it, but were you as the chief

Page 143

1  compliance officer personally involved in the
2  settlement that was negotiated between the West
3  Virginia AG and H.D. Smith?
4      A.  I was not.
5      Q.  Okay.
6          Okay.  So, where we left off was sort of
7  the first generation of your compliance process and
8  policies and we called that the manual phase, I think,
9  or the manual program, prior to the automated program,
10  right?
11         And so I want to now veer into the
12  automated program and -- and learn a little bit about
13  that.
14         The -- when was the first instance in
15  which H.D. Smith determined that it needed to create
16  an automated program?
17     A.  When you say "needed," do you -- do you
18  reference that as some type of a requirement?
19     Q.  Let me -- let me rephrase it.
20         When did H.D. Smith decide that it wanted
21  to create an automated compliance program?
22     A.  Probably mid 2006.
23     Q.  And what were the factors that H.D. Smith
24  considered in making that decision?

Page 144

1      A.  To develop a better process and procedure.
2      Q.  Did H.D. Smith determine that it was --
3  its current practices were in violation of the
4  Controlled Substances Act without implementing an
5  automated system?
6      A.  No.
7      Q.  So H.D. Smith could have, if it so chose,
8  have continued with the manual version of its
9  compliance program without violating the CSA?
10     MR. PADGETT:  Object to form.
11  BY THE WITNESS:
12     A.  There is no -- there is no regulation that
13  an -- that an auto monitoring system has to -- or
14  program has to be manual or automated.
15  BY MR. YOUNG:
16     Q.  And -- and I want to be clear in my
17  question.  I'm not just referring to the manual versus
18  automated functionality, but all of the elements of
19  what H.D. Smith did in complying with the CSA prior to
20  implementation of the automated program, when
21  H.D. Smith made the decision to go to the automated
22  program, did it determine whether or not its existing
23  or prior program was in or out of compliance with the
24  CSA?

Page 145

1      MR. PADGETT:  Object to form.
2  BY THE WITNESS:
3      A.  We were -- we were in compliance with CSA.
4  We wanted to improve the process.
5  BY MR. YOUNG:
6      Q.  Okay.  So H.D. Smith has never violated
7  the Controlled Substances Act?
8      MR. PADGETT:  Object to form.
9  BY THE WITNESS:
10     A.  What part of it?
11  BY MR. YOUNG:
12     Q.  Any part of it.
13     A.  Not to my knowledge.
14     Q.  Okay.
15     A.  No.
16     Q.  The -- when did the -- I'm going to call
17  it the CSOMP program, and I don't mean to -- to coin
18  that phrase, but I think that's the phrase that
19  H.D. Smith uses, right?
20     A.  It is for our automated system.
21     Q.  And what does CSOMP stand for?
22     A.  Controlled Substance Order Monitoring
23  Program.
24     Q.  When was that program live, when did it go

Page 146

1  live?
2      A.  It was -- it was rolled out to our
3  different DCs in the spring of 2008, I believe, from
4  beginning of March through the end of May.  I don't
5  have the exact dates, but it was by divi- -- you know,
6  division by division.
7      Q.  Do you -- do you recall which division you
8  rolled out to first?
9      A.  I'm sure it's documented somewhere, but I
10  can't recall off the top of my head.
11      Q.  No worries.  I figured I'd ask.
12          And I want to understand a little bit
13  about how you came to develop the elements of the
14  CSOMP.
15          Are you the principal architect of the
16  CSOMP system?
17      A.  Yeah, I didn't -- I didn't do the actual
18  IT work or anything, but yes.
19      Q.  And what -- what reference materials did
20  you use to develop the CSOMP system?
21      A.  Early on we -- we -- we took a lot of what
22  similarities to what AmerisourceBergen was developing,
23  you know, in conjunction with, you know, guidance from
24  the DEA in 2007.

Page 147

1      Q.  Who was it at AmerisourceBergen that you
2  communicated with regarding the development of CSOMP
3  or what they were doing with their version?
4      A.  I would have talked occasionally with
5  Chris Zimmerman.
6      Q.  And what was his title or role at
7  Amerisource?
8      A.  At the time I think he was vice president
9  of corporate security and regulatory affairs.
10      Q.  Did he share with you the details or the
11  content of what went into their system?
12      A.  More of the concept, not specific details.
13  At the same time I was in communication with -- with
14  Kyle Wright at the DEA.  I believe Kyle Wright and --
15  and head of diversion at the time Mike Mapes, were
16  working with AmerisourceBergen on that also, so it --
17  it was more a conceptual, not the specific details of
18  it.
19      Q.  Are you familiar with a -- a document
20  called the Chemical Handler's Manual?
21      A.  I am.
22      Q.  How -- how do you know the Chemical
23  Handler's Manual?
24      A.  It is a manual concerning List I

Page 148

1  chemicals, and also at the time, again, you have to
2  reference the time period, at the time there was a
3  part of the Chemial -- Chemical Handler's Manual that
4  referred to suspicious orders and a loose template
5  on -- regarding that.
6      Q.  Was the Chemical Handler's Manual
7  something that Amerisource had relied upon in
8  developing its system, if you know?
9      A.  I do not know that.
10      Q.  Is it something that you discussed with
11  Mr. Zimmerman from Amerisource?
12      A.  I don't recall.
13      Q.  I'm going to show you what was premarked
14  as Euson Deposition Exhibit 21.  It's -- frankly, it's
15  an excerpt.  We don't have the full manual.  There is
16  a -- a cover page and then there is an Appendix E-3.
17  I'll show you that.
18          MR. PADGETT:  Sorry.  Which exhibit?
19          MR. YOUNG:  21, I believe.  It should be.
20          Yeah.  Here you go.
21  BY MR. YOUNG:
22      Q.  Does that exhibit look familiar to you?
23      A.  Yes.
24      Q.  The Page 2 of the exhibit, Appendix E-3,

Page 149

1  it -- it's a list of terms and definitions.
2          Do you know whether or not these terms and
3  definitions were considered in H.D. Smith's building
4  of its automated CSOMP program?
5      A.  Can you give me a second to read this?
6      Q.  Sure.
7      A.  We used this formula, for better terms, as
8  a guideline, because it was the only thing out there
9  that was produced by DEA that referenced calculating
10  possible, you know, orders that may be suspicious.  So
11  we used it as a guideline.
12      Q.  Okay.  And when you say "we used it as a
13  guideline," are there particular aspects of it that
14  you used it as a guideline or it -- it lays out in --
15  in Sections 1 through 5, I think, the formula you were
16  referring to, is that -- is that what you mean when
17  you used it as a guideline or is there something
18  different?
19      A.  Well, again, this came out of the Chemical
20  Handler's Man -- Manual which is specifically for list
21  chemicals, not controlled substances.  But there is
22  reference to, excuse me, for, you know, C-II through V
23  controlled substances in -- in the -- in the notes.
24          So we used this, again, as a guideline,

Page 150

1  that's as far as how we originally identified our
2  customers' purchasing, you know, and then we used a
3  three times factor in some of our calculations when we
4  put our system together. So we -- we didn't use this
5  verbatim because it -- it -- it mixed -- it mixed
6  chemicals with -- with controlled substances. We took
7  pieces of it out and used it as a guideline.
8      Q.  I gotcha.
9          But you did adopt the three times multiple
10 for your basis for identifying suspicious orders?
11     A.  For our basis of identifying potential
12 orders.
13     Q.  Okay. Prior to the implementation of your
14 automated system, your CSOMP system, did you have
15 established customer thresholds that they could order?
16     A.  Before CSOMP?
17     Q.  Yes.
18     A.  Yeah, I think it does describe before that
19 we did not.
20     Q.  I just want to make sure.
21         And part of the implementation of CSOMP
22 was creating customer thresholds, is that correct?
23     A.  Yes, that was one of the things that we
24 did with the system.

Page 151

1      Q.  And I'm just sort of taking your prior
2  testimony and your testimony about the adoption of the
3  Chemical Handler's Manual.
4          Am I to understand that H.D. Smith used
5  the historic purchases of its customers for controlled
6  substances, multiplied times three to determine
7  whether or not an order is potentially suspicious?
8      A.  That's a little bit too general.
9      Q.  Okay.
10     A.  Because it was a little bit more specific
11 on how we did it.
12     Q.  Okay. Can you walk us through
13 specifically how H.D. Smith determined whether or not
14 a customer was submitting a potentially suspicious
15 order?
16     MR. PADGETT: I'll object to form.
17 BY THE WITNESS:
18     A.  We, again, had taken the -- taken this as
19 a guideline, taking what we knew of -- of the way
20 AmerisourceBergen was developing their system. First
21 of all, we -- we created families of controlled
22 substances.
23 BY MR. YOUNG:
24     Q.  Okay. Let me -- let me stop you there.

Page 152

1      A.  Okay.
2      Q.  We'll -- we'll just kind of build it as we
3  go.
4          When you say "families," what do you --
5  what do you mean?
6      A.  Different types of controlled substances,
7  such as oxycodone family, hydrocodone family,
8  methadone family, morphine. So we had, I believe, at
9  the time when we first developed this, I think we had
10 something like 28 different families of drugs.
11         And the reason we did this -- well, first
12 of all, it was one of the things that Amerisource was
13 doing -- and any time that we had discussions with
14 DEA, it wasn't all controlled substance, it wasn't all
15 opioids, it was -- it was pretty specific to your
16 oxycodone, your hydrocodone. So we tried to silo
17 those into -- into families of all types products in
18 that family. You know, like oxycodone would include
19 OxyContin, generic oxycodone, Percocet.
20     Q.  Okay. So you break down the drug
21 purchases by family, and then what goes into the
22 process for determining potentially suspicious orders?
23     A.  One of the other things we did was we did
24 not have the ability in our system to differentiate

Page 153

1  between class of -- of DEA business activity, whether
2  pharmacy, hospital, in the sys- -- systematically in
3  our CSOMP system. So we arranged customers by monthly
4  sales volume. And I believe there was -- again, I
5  could look at the documentation, but I think it was 10
6  or 12 different types of monthly sales volume where it
7  would be customer from zero to -- that buys from us
8  from zero to $10,000 in a month, all products, and
9  then 10- to 25,000, and so on, to get basically a --
10 group customers as a particular size of customer
11 and -- and volume of business that we would get from
12 that customer.
13     Q.  And that was also something that was new
14 to H.D. Smith, you hadn't done that in the manual
15 system, right?
16     A.  No.
17     Q.  And you hadn't used families under the
18 manual system either?
19     A.  Not specifically, but I think the -- the
20 reports that the managers went through every month,
21 they were grouped somehow. I got all controlled
22 substances. I don't know if they were grouped
23 alphabetically or by different classes, but there
24 would be a -- it would have been the first time we

Page 154

1 would have defined customers by volume and defined
2 families of drugs.
3    Q.  Okay.  So you got the customer size and
4 type and you've got the families.
5       What are the other factors that went into
6 determining whether an order was potentially
7 suspicious?
8    A.  These are factors on how we designed our
9 system.
10   Q.  Okay.
11   A.  Not factors that pointed to a suspicious
12 order.
13   Q.  Got you.
14   A.  A potentially suspicious order.
15   Q.  Let's -- let's go into building the system
16 first.
17   A.  Okay.
18   Q.  So what else went into building the
19 system?
20   A.  Well, and then we -- we did similar to
21 what they -- again, using this as a guidance,
22 customers within, if I can use just an example, if --
23 if we had a dozen customers within a certain revenue
24 class, whether it be -- I'm getting ahead of myself,

Page 155

1 too.  I've got -- when I say we have 28 drug families,
2 those were also further broken down by dosage form,
3 whether it be a pill, a liquid, a vial, powders, so
4 that we could compare apples to apples, basically.
5    Q.  Okay.
6    A.  Then -- so if we -- if we had a -- make it
7 just easy numbers.  We had ten customers that were
8 within a -- a revenue class of 25 to $50,000 a month,
9 we would take those, those 12 customers -- or ten
10 customers as an example and look at all of their
11 controlled drug purchases for the previous 12 months
12 and come to an average within that -- within that
13 revenue class, we call them.
14       So it may be if -- if that average, say,
15 for hydrocodone was, you know, 5,000 dosage units in a
16 month, the average that those -- then we would add
17 a -- multiply a factor of three onto that and that
18 would be the threshold.
19   Q.  Okay.
20   A.  That moved and changed every month because
21 customers were coming and going out of revenue classes
22 and volumes differed.
23   Q.  Sure.  Under -- understood.
24       But that was the original -- the original

Page 156

1 basis was what you just described and it could change
2 over time with the purchases of the pharmacy customer?
3    A.  Yes.
4    Q.  Okay.  Why did you work with Amerisource
5 as opposed to any other competitor in that space, like
6 a Cardinal or McKesson or others?
7    A.  We knew that -- I knew that Amerisource
8 was working with DEA on their system.  I was at the
9 conference when they did a co, you know, DEA and
10 Amerisource doing a -- a -- a presentation on their
11 potential system that they were building, and so if it
12 was -- you know, again, DEA does not give a blessing
13 to any system and they won't tell you they will, but I
14 knew they were working with DEA, so that was as close
15 as we could get and -- and, again, using the -- the
16 Chemical Handler's Manual, because it was the only
17 document that gave any guidance at all as far as a
18 potential threshold system and an automated sys -- an
19 automated system.
20   Q.  Do you know --
21   A.  And this is no longer in the Chemical
22 Handler's Manual.
23   Q.  Okay.
24       Do you know whether or not Cardinal or

Page 157

1 McKesson similarly adopted CSOMP systems of their own
2 at that time?
3    MR. PADGETT:  Object to form.
4 BY THE WITNESS:
5    A.  I don't know.
6 BY MR. YOUNG:
7    Q.  Were you a member of the Healthcare
8 Distribution Management Association at the time?
9    A.  I was.
10   Q.  Did you serve on any committees or
11 subcommittees or boards or panels for the HDMA?
12   A.  I was on two committees, regulatory
13 affairs committee and the state government affairs
14 committee.
15   Q.  And did your work on those committees
16 touch upon the development of these types of systems,
17 the CSOMP system?
18   A.  It -- it did.  Again, there was -- as I
19 stated before, there was no -- there is no system that
20 DEA endorses.  There is no -- there was no template
21 for it.  And -- and -- and even with a trade
22 association, you've got antitrust issues and such as
23 far as how much you can discuss with competitors.
24   Q.  Were there representatives from

Page 158

1 Amerisource on the committee that you described that
2 touched on this compliance work?
3     A.   I believe Chris Zimmerman was on that.
4     Q.   Were there representatives from McKesson
5 on that committee?
6     A.   I believe so.
7     Q.   Were there representatives from Cardinal?
8     A.   I believe so.
9     Q.   And so did you meet regularly as a
10 committee?
11     A.   There were periodic calls and there was a
12 one-time-a-year face-to-face meeting that sometimes I
13 made, sometimes I didn't, and other members the same
14 way.
15     Q.   Were there other representatives from
16 H.D. Smith who would attend a committee meeting in
17 your absence?
18     A.   Again, it depends on the time period.
19 There were other people in my position when I was not
20 at the company and there were other people that
21 were -- could have gone to those meetings and in lieu
22 of me going.
23     Q.   I'm going to show you what was premarked
24 as Euson Exhibit 22.  It's a longer document than

Page 159

1 we've been handing you.  So it might take you a bit to
2 look at it.
3         Let me know if you are familiar with this
4 document.
5     A.   I'm familiar.
6     Q.   How are you familiar with this document?
7 Where do you know it from?
8     A.   It's from HDMA.
9     Q.   Did you have a hand, through your
10 committee work, in creating this document?
11     A.   I believe that the -- I -- I don't even
12 know which committee.  It may have been the regulatory
13 affairs committee that may have had a hand in -- in --
14 in this.  I know they also worked with some outside
15 consultants.
16     Q.   Do you recall receiving drafts or
17 participating in the drafting yourself of this end
18 product?
19     A.   I probably did.  I can't say specifically.
20     Q.   Do you know whether or not the CSOMP
21 system that H.D. Smith implemented in the spring
22 of 2008 met the guidelines that HDMA developed in this
23 document?
24     MR. PADGETT:  Object to form.

Page 160

1 BY THE WITNESS:
2     A.   I would have to study this again and get
3 into the weeds with it to --
4 BY MR. YOUNG:
5     Q.   All right.  Let's -- let's walk through a
6 little bit of the document.
7     A.   Okay.
8     Q.   So let's turn to page -- I think it's --
9 keep going -- page, what page is that?  6 of 13.
10 There is a Roman numeral section:  Monitoring for
11 Suspicious Orders, System Design.
12     A.   Monitoring for Suspicious Orders?
13     Q.   Yes.
14     A.   Okay.
15     Q.   Okay.  So that section, it looks like it
16 says:  "It is recommended that a distributor develop
17 an electronic system..."
18         H.D. Smith did that, right?
19     A.   Yes.
20     Q.   "...with accompanying written standard
21 operating procedures."
22         Do you know whether there were SOPs at
23 H.D. Smith at the time the CSOMP rolled out?
24     A.   We did develop SOPs at the time.

Page 161

1     Q.   Okay.  The specific elements of the system
2 are described below that, Section (a), and the first
3 one I think is what you earlier described, which is:
4 "Separate, classify or group customers into
5 appropriate different classes of trade."
6         Did the CSOMP program do that?
7     A.   No.  The vast majority of our customers
8 were pharmacies.  We had one division of ours that
9 sold mainly to doctors and clinics.  So I -- I -- I
10 can't -- we -- we did not have it separated by, like,
11 DEA business activity.
12     Q.   Did the system evolve to include this,
13 like does it include it today?
14     A.   No.
15     Q.   Okay.  Because it is such a small part of
16 the business, is that why?
17     A.   I can't tell you why our system doesn't
18 identify it.
19     Q.   Okay.
20         All right.  Let's flip the page.  The next
21 section, let's just pull this down here, it says:
22         "A distributor may use the DEA website to
23 obtain the DEA's designation of a drug's controlled
24 substance code number to aid in developing a drug

Page 162

1  family."
2      I think you previously testified that you
3  did do that, that CSOMP did -- did identify families?
4      A.   Families, yes.  We didn't necessarily use
5  the controlled drug code number.
6      Q.   What did you use to develop the drug
7  families?
8      A.   It was basically the generic ingredients
9  that were within the product, such as if it was a
10  Percocet, which is oxycodone and acetaminophen, we put
11  it in the oxycodone family.
12      Q.   So, but beneath that bulleted point there
13  are some other options to identify families and I -- I
14  didn't know if you had used one of those to develop
15  your -- your system.
16      The second one is using the NTIS system or
17  the NDC number for the active ingredients.
18      Do you recall?
19      A.   We -- we originally, when we beta tested
20  our system in 2006 and '7, we tried to use the NDC
21  code, and there are so many variables of the same drug
22  using the NDC code it became unusable in our --
23      Q.   Okay.
24      A.   -- system.

Page 163

1      Q.   Okay.  Section C is:  "Develop thresholds
2  to identify orders of interest."
3      I think you testified that you did develop
4  thresholds based in part on the Chemical Handler's
5  Manual, is that correct?
6      A.   Yes.
7      Q.   The third paragraph of this section says:
8  "Distributors are encouraged to update these
9  quantities for determining averages by evaluating
10  schedules, products or families of products and other
11  information made available by the agency to determine
12  an appropriate benchmark for identifying controlled
13  substance orders of interest."
14      That's not so much of a system expectation
15  as it is a sort of policy or procedure expectation of
16  H.D. Smith.
17      Do you know whether or not H.D. Smith took
18  that into consideration?
19      A.   Our system was -- was constantly evolving.
20  When we first developed it, it was strictly a three
21  times multiplier on -- on those products.  Based on
22  customers' needs, based on a number of factors, site
23  visits, dispensing reports, things like that.  We --
24  our attempt was to customize thresholds for customers

Page 164

1  based on their individual needs.
2      And so, again, it was an evolution where
3  we went from a -- a strict three times multiplier to
4  where we could add or subtract multipliers, and then,
5  again, as -- as we kept evolving, we were able to add
6  static thresholds to certain customers on -- on drugs
7  based on their legitimate needs.
8      Q.   Can you put some date connection to these
9  changes in the system, if you recall?  So let's --
10  let's start with the first change.
11      The system began with a three times
12  multiplier.  What was the first change to that three
13  times multiplier, when did that occur?
14      A.   It had to have been after I came back,
15  because I left -- after we rolled out CSOMP to our
16  last distribution center, I left about a month after
17  that.
18      Q.   Okay.
19      A.   So it would have been sometime after I
20  came back, so sometime in 2009.
21      Q.   Did the change to CSOMP when you returned,
22  was that because of something that you learned when
23  you were away from H.D. Smith?
24      A.   No.  It was -- it was more trying to

Page 165

1  constantly evolve and -- and make our system better
2  and -- and better meet our -- our customers' needs
3  and -- and their legitimate, you know -- you know,
4  sup- -- supply of drugs.
5      Q.   One of the examples that this HDMA
6  guidance document includes is the geographical area,
7  the uniqueness of the geographical area.
8      Is that something that your CSOMP took
9  into account?
10      A.   It did.  When we -- I told you that we --
11  we rolled out our CSOMP division by division and they
12  were in various regions of the country, and we used
13  the customers' data for the division for our
14  thresholds.
15      So if you -- I can give you an example.
16  The example I was using before of ten customers within
17  a 10- to $25,000 revenue range, if it was a -- if it
18  was the Kentucky division, we used the -- the
19  customers that were serviced by the Kentucky division,
20  if it was in Illinois, we used the customers that was
21  serviced by our Illinois division.  So we were trying
22  to regionally identify the needs of our customers.
23      Q.   At some point did you move away from that
24  approach or is that how it is today?

Page 166

1    A.   We did.  Now we do it on a national basis.
2    Q.   Why is that?
3    A.   We thought it -- it -- it helps us to
4  identify potential orders of interest, more to find --
5  so we don't incorporate, I guess, different areas of
6  the country that may be experiencing issues with
7  certain drugs more than others and we didn't want that
8  to be influenced in our system as a whole.
9    Q.   When was the first time that that change
10  was incorporated into the system?
11    A.   I'm not sure.  It would have been before I
12  left in 2013, but I just don't -- I don't have the
13  specific date.  I could find it, but I just --
14    Q.   Do you -- that's okay.
15        Do you know the geographic area that -- or
16  areas that you considered in -- in making this change?
17  In other words, was it one part of the country that
18  you thought was skewing things or was it multiple
19  parts?
20    A.   It was -- it was different parts of the
21  country and different drugs that were at issue.
22    Q.   Do you recall which parts of the country
23  it was?
24    A.   You know, Florida had a -- an oxycodone

Page 167

1  problem, not a hydrocodone problem.  The Houston area
2  in Texas had a hydrocodone problem.  Middle Tennessee,
3  you know, had an oxycodone problem.  California had a
4  hydo -- a hydrocodone problem and promethazine with
5  codeine problem.
6        So we tried to keep track of the different
7  issues in different areas and tried to -- again, we
8  were always trying to improve our -- our system and
9  the processes that we were using.
10    Q.   Do you recall if Ohio was one of the
11  geographic areas that had a problem that was
12  considered here?
13    A.   Where specifically in Ohio?
14    Q.   Anywhere in Ohio?
15    A.   There is -- down in the southeast portion
16  of the state, Portsmouth area was a problem, Columbus
17  area was a problem.
18    Q.   And how did you determine that the
19  southeast part of Ohio was a problem?  What was the
20  basis for that conclusion?
21    A.   Research --
22    Q.   What --
23    A.   -- news articles.  You know, I -- I get
24  daily feeds from Google alerts, you know, on -- on

Page 168

1  various things.  There is books out about it.  There
2  is a -- there were certain physicians, practitioners
3  that we identified in certain areas of -- of the
4  country.  And where we found those practitioners with
5  what we would consider questionable prescribing
6  habits, that's where there would be issues.
7    Q.   And you said this was in 2013?
8    A.   When we made the change?
9    Q.   Yes.
10    A.   I -- I am getting on that.
11    Q.   Okay.  I won't hold you to it.  I don't --
12  I don't want you to guess.
13        So let's just pull this down here.  Going
14  on to Page 8 of that guideline document from HDMA,
15  it -- it also says that:
16        "Distributors are encouraged to consider
17  the following when developing 'thresholds.'"  And I
18  just want to tick down this bullet list to see if
19  HDA -- if H.D. Smith incorporated these
20  considerations.
21        The first one is:  "Quantities of products
22  the dispenser initially indicated during the 'Know
23  Your Customer' due diligence phase it expected to
24  purchase."

Page 169

1        Was that something that the CSOMP took
2  into consideration?
3    A.   That wasn't necessarily CSOMP, but a part
4  of our overall due diligence process, we had what we
5  call a customer profile that is basically a
6  questionnaire.  We call it a customer profile.  That
7  is, our sales reps were responsible for bringing that
8  to their pharmacy customers, having them fill the
9  questionnaire out, which did include, you know -- you
10  know, what they expected to be purchasing from us,
11  what type percentage of controls, a number of
12  questions.  I mean, there was -- there was a lot of
13  questions that were asked on the -- on the form.
14        And then our sales reps also took various
15  photographs inside and outside the pharmacy so we knew
16  what it looked like, what -- what kind of area it was
17  in, what -- if it was a brick-and-mortar building.
18    Q.   And I -- and I suspect some of these other
19  bullet points may be what you are describing, but the
20  second one is:  "A minimum of six months sales history
21  and a maximum of 24 months sales history are
22  recommended."
23        Was that part of your routine?
24    A.   No.  We -- well, it depends and it

Page 170

1 depended on when you're -- a lot of that, if -- if we
2 were bringing on a customer from another wholesaler,
3 we may not have that information. You know, as -- you
4 know, as, you know, time -- time went on and we
5 evolved our system, we started working more with
6 dispensing records, dispensing information so that we
7 could actually see what a pharmacy was dispensing, not
8 just what they may be buying from us but what they --
9 what their total book of business was.
10    Q.    Was it common for pharmacies to purchase
11 controlled substances from more than one distributor?
12    A.    Yes.
13    Q.    Would -- would it also be common for
14 distributors to discontinue doing business with
15 customers that order too much controlled substances?
16    A.    What do you mean by too much?
17    Q.    Suspicious orders. So if a distributor
18 like H.D. Smith determined that its customers were
19 submitting suspicious orders, would H.D. Smith
20 discontinue doing business with that customer?
21    A.    It was commonly our practice that if we
22 identified orders that were suspicious and we reported
23 them to DEA -- and part of our investigation, again,
24 would be to go to the pharmacy, get dispensing

Page 171

1 information, you know, launch an investigation. And I
2 would say more -- more times the norm would have been
3 that we would discontinue controlled substances to
4 that pharmacy if we had reason to believe there may be
5 diversion going on.
6    Q.    And do you know whether or not that
7 pharmacy would seek to obtain the controlled
8 substances that it sought from H.D. Smith from another
9 distributor? In other words, was there communication
10 among distributors about these suspicious ordering
11 pharmacies?
12    A.    No. There were -- at one time DEA was
13 sending out a list of pharmacies that other
14 wholesalers had either closed or declined to do
15 business with. That practice was discontinued after a
16 short time.
17    Q.    Okay. Turning back to this guideline,
18 Section (d) talks about -- (d) talks about "Cumulative
19 Reviews Or Thresholds." It says:
20        "The system should contain a mechanism for
21 periodic review of cumulative orders from the same
22 customer over time, to evaluate trends in purchasing
23 patterns."
24        Did the CSOMP system or policies and

Page 172

1 procedures of H.D. Smith relating to CSOMP incorporate
2 that?
3    A.    Let me finish reading the rest of this.
4    Q.    Sure.
5    A.    This wasn't a -- a function of our CSOMP
6 program but a function of our continuing due diligence
7 on our customers. We had originally under -- we were
8 under the -- you had mentioned, we had talked about
9 the AS400. We were under that system until September
10 of 2013 and then we went to an SAP system.
11        We also had some business analytic
12 programs available to us. So we were able to run
13 purchase reports and -- and run those and -- to give
14 us that information, percentage of controls to
15 non-controls. We regularly ran those on our
16 customers, you know, who are our top -- top customers
17 on percentage of controls, and then, again, regularly
18 deal with dispensing information because we not --
19 we -- we -- we don't always know -- there is no way
20 for us to know other controlled substances that are
21 being purchased by a pharmacy through another
22 wholesaler. And what gives us insight into it is
23 doing dispensing reviews so we can see what they've
24 actually dispensed. We still don't know what they've

Page 173

1 purchased, but we can see what they've dispensed.
2    Q.    The ratio of controls to non-controls, was
3 that a standard ratio that you looked as a barometer
4 or did that change over time?
5    A.    It depended on the -- on the customer.
6 DEA has published an average controlled substance
7 figure which is -- it is usually around 13 percent,
8 but that's an average pharmacy, average is average.
9 There is always going to be someone below and someone
10 above.
11        So we -- you know, we used that kind of as
12 a -- we knew that's what the average was. In
13 different discussions with DEA and different
14 presentations we kind of -- kind of morphed into a
15 20 percent controlled substance ratio that was more of
16 a -- Hey, if you are over 20 percent, you know, let's
17 take a deeper dive and look at this customer.
18    Q.    Okay. So if someone was over a 20 percent
19 ratio of controlleds to non-controlleds, that would
20 trigger a deeper dive?
21    A.    It could trigger a -- a review. And,
22 again, it depends on the customer, where they are at,
23 what their business is, who they -- you know, who --
24 where they are getting their prescriptions from, are

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  they a -- you know, are they in a hospital campus, are
2  they a mom-and-pop on a -- on a street corner.  So
3  it -- it all depends on -- on the individual pharmacy.
4      Q.   What type of evidence would exist in
5  H.D. Smith's records that would allow us to discern
6  whether or not a pharmacy was subject to a deeper dive
7  for being over the 20 percent?
8      A.   We have due diligence records on all of
9  our customers.
10      Q.   Okay.  So if we were to look at the due
11  diligence documents for a pharmacy that was at some
12  point in time over 20 percent controlleds to
13  non-controlleds, we should see some record in the due
14  diligence file of an evaluation?
15      A.   I -- I can't tell you that there would
16  always be one there.
17      Q.   But there --
18      A.   We did -- we did these, these were --
19  these were manual processes that we went through to
20  identify customers that we could have -- you know,
21  there may be a concern.
22      Q.   There was no automation of this in the new
23  CSOMP system?
24      A.   It was not a part of CSOMP.  It was --

Page 175

1  that was different.
2      Q.   Is there any --
3      A.   The audit was orders.
4      Q.   Sorry.
5          Is there any automation of this process
6  now?
7      A.   No, other than periodic reviews.
8      Q.   Okay.  The next section, Section (e) talks
9  about stopping shipments of orders of interest.  It
10  says:
11          "If an order meets or exceeds a
12  distributor's threshold, as defined in the monitoring
13  system, or otherwise characterized by the distributor
14  as an order of interest, the distributor should not
15  ship to the customer, in fulfillment of that order,
16  any units of the specific drug code product as to
17  which the order met or exceeded a threshold or as to
18  which the order was otherwise characterized as an
19  order of interest."
20          It is a rather long sentence that
21  basically says you shouldn't ship controlleds to
22  people that are over their threshold.
23          Is that true?
24      A.   Not exactly how you just characterized

Page 176

1  that.
2      Q.   Okay.  How would you characterize that?
3      A.   Our system is designed --
4      Q.   Let me -- let me direct your attention.  I
5  just want to understand what the recommendation from
6  HDMA is in this guideline.
7      A.   Yeah, I'm going to get to that.
8      Q.   Okay.
9      A.   Our system is designed any -- any time if
10  an order would hit a threshold, say I can use, for
11  example, oxycodone, our -- a pharmacy exceeds the
12  threshold for oxycodone, then that order would be held
13  in our system and not shipped and any subsequent order
14  of oxycodone would also be held.  And that order will
15  not be released until we either determined that -- you
16  know, we -- we consider that a held order, an order of
17  interest, not a suspicious order until we deem it a
18  suspicious order.
19          If we would deem it a suspicious order,
20  then that order would never be shipped and it would be
21  reported to DEA and we would continue our
22  investigation.  And at that point any -- any
23  controlled -- any of that drug, that particular drug
24  family would be blocked in our system and -- and that

Page 177

1  pharmacy could not get any of that until we complete
2  our investigation.
3          Most times, as I said before, if we have
4  determined that an order is suspicious and we report
5  it to DEA and we conclude our investigation, it
6  usually ends up we block all controls to that customer
7  and then we also report that to DEA.
8      Q.   I'm -- I'm glad you mentioned that last
9  part, that's a question that I had was if a pharmacy
10  ordered an excessive amount of a particular family,
11  like oxycodone, and that was denied because it was
12  caught by the system, could they then also -- or in
13  the alternative order hydrocodone, a different family?
14  And I think your testimony is you would not ship the
15  hydrocodone because it is also a controlled?
16      A.   That's not what I said.
17      Q.   Okay.
18      A.   We hold the order, say if it's oxy -- it's
19  oxycodone, let's just use that for an example, if --
20  if -- if that was held in our system, we would not
21  ship that -- that order or any other subsequent orders
22  of oxycodone.
23      Q.   Okay.
24      A.   And if our investigation took a day or it

Page 178

1  took a month, they're not -- they would not be able to
2  order oxycodone.
3       If we -- if we determined that that order
4  was suspicious and we reported it to DEA, we would
5  continue our investigation into that pharmacy.
6       During that investigation they would not
7  be able to get any more oxycodone but they could
8  possibly get other controlled substances while --
9  while our investigation -- while we are conducting our
10 investigation.
11      Most of the time, and I'm not going to use
12 absolutes, but most of the time the investigation
13 would -- would end where we would block all controls
14 to that customer.
15      If we had ended up having reason --
16 reasonable suspicion that there may be diversion
17 taking place and then we would report that fact to DEA
18 and any state boards of pharmacy that we could.
19      Q.  Were there communications between
20 H.D. Smith and the pharmacy customers that were being
21 investigated about the status of the investigation?
22      In other words, I'll -- I'll give you a
23 more definite example, a pharmacy orders oxycodone, it
24 is denied oxycodone because it's a -- it is an

Page 179

1  excessive order, is there anyone from H.D. Smith that
2  calls that pharmacy and says, You know, we are almost
3  done with your investigation, we hope to be able to
4  release your order next week?
5       A.  No.
6       Q.  Is there anyone from H.D. Smith that calls
7  that customer, from any aspect of H.D. Smith, and
8  says, Sorry, you hit the threshold on oxycodone, you
9  should try ordering hydrocodone?
10      A.  No.
11      Q.  That's never happened?
12      A.  No, not to my knowledge.
13      Q.  Do you know if salespeople would have had
14 such a conversation?
15      A.  I -- I cannot say that for sure.
16      Q.  Do you know the extent of communications
17 that the sales staff has with pharmacies when they are
18 subject to investigations for hitting their
19 thresholds?
20      A.  They have communication with them because
21 we allow them to communicate what we are doing with
22 their account.  You know, they'll communicate to the
23 pharmacy that, Hey, you are blocked from oxycodone and
24 we need to get a dispensing report and we are going to

Page 180

1  schedule -- you know, it could be -- it depends.
2  Our -- you know, there's different phases of our
3  investigation.
4       If we were going to do a site visit, the
5  sales rep would be the -- the person that would
6  communicate that and say that, you know, our
7  compliance staff is going to come out and do a -- a
8  site visit with you and schedule that because we
9  don't -- we don't want to do -- we are not going to
10 fly across the country and the pharmacy owner or pick
11 is not there.  We want the people that are decision
12 makers to be there so we can discuss the concerns we
13 have.
14      Q.  Has H.D. Smith ever considered that the
15 salesperson might be in a conflict with the compliance
16 function in the example that you just discussed?
17      MR. PADGETT:  Object to form.
18 BY MR. YOUNG:
19      Q.  In other words, the salesperson is
20 motivated to have the sale go through and the
21 compliance person is motivated to make sure that the
22 wrong type of sale does not go through and those two
23 things are in conflict with each other?
24      A.  The sales rep's main job is to sell, but

Page 181

1  we want to sell to good customers, good, compliant,
2  legitimate customers.  You know, they have no say-so
3  in compliance decisions.
4       Q.  Okay.
5       A.  All we are using them for is a conduit for
6  the discussion.
7       Q.  I want to show you Euson Deposition
8  Exhibit 17, which is essentially a collection of
9  documents.  It's -- it's two e-mails, a printout
10 and -- a printout of, like, a ledger and then a
11 printout of a spreadsheet, I think.  I'll give you a
12 minute to look at that.
13      A.  I can hardly read that.
14      Q.  You can't read it?  I had -- we can -- I
15 had that same problem.  We can only copy what we
16 receive.
17      Is that better?
18      A.  Yeah.  The focus is -- that -- that's
19 fine.  It's the copy, I think.
20      Q.  Are you able to read that?
21      A.  I -- I can read it.
22      Q.  Okay.
23      A.  It will just take me a second.
24      Q.  Sure.

Page 182

1    A.   Do you want me to read further?  I can see
2  that.
3    Q.   Oh, no.  Just familiarize yourself with
4  the first page.  We'll just focus on that first and
5  then we can talk about the rest of it.
6         Have you seen this document before?
7    A.   I don't recall.  It was just -- I'm sure I
8  have, but I don't recall seeing it lately.
9    Q.   So this purports to be an e-mail from
10  Brandon Sail -- Salyer?
11    A.   Salyer.
12    Q.   Salyer.  You're familiar with Brandon?
13    A.   Yes.
14    Q.   Is he still with the company?
15    A.   No.
16    Q.   And, I mean, obviously the document speaks
17  for itself, but -- but Brandon is a sales
18  representative in the -- in the Louisville
19  distribution center, is that right?
20    A.   Yes, he was.
21    Q.   And this is to P.J. Little who I think you
22  testified earlier was your colleague in the compliance
23  division?
24    A.   Right.

Page 183

1    Q.   And can you read for us, it is a big ask,
2  I know, I'm sorry, the highlighted portions of this
3  e-mail?
4    A.   "This is a big LTC account," which is
5  long-term care.  "This account will purchase more than
6  $3 million a month in Rx between Amerisource and
7  H.D. Smith combined."
8         Is that -- is that it?
9    Q.   And then it says --
10    A.   I can't tell what --
11    Q.   Yeah, I know.
12    A.   -- what's highlighted and what isn't
13  there.
14    Q.   Yeah.
15    A.   Is that it or do you need more?
16    Q.   So then the next highlighted portion which
17  begins with:  "I don't want to rock the ship too
18  much."
19    A.   "I don't want to rock the ship too much.
20  This is why we need to bump up their limits on the
21  benzodiazepines, hydrocodone, oxycodone families, they
22  would potentially give us much more business."
23    Q.   Okay.  And then if you could just read the
24  response from P.J.?  Or I'm sorry.  It is actually a

Page 184

1  forwarding that P.J. sent to you.
2    A.   From Lori Kirbach?
3    Q.   Yes.  Well, it is to Lori, I think cc'd to
4  you.  I can't -- it is difficult to make out, but what
5  she says there?
6    A.   "I would like to go ahead and raise their
7  URLs for the families listed below."
8    Q.   And there is some handwritten notations on
9  this document.  I don't know if these are P.J.'s or
10  Lori's or yours.
11         Do you -- do you have any recollection as
12  to who may have written these amounts?
13    A.   That's not my writing.  Maybe P.J.'s.
14    Q.   Okay.  And can you tell us what the
15  amounts of the increase recommended by P.J. were?
16    A.   Benzo six times, hydro 15 times.
17    Q.   And the date of this e-mail was before or
18  after implementation of the CSOMP?
19    A.   After.
20    Q.   Okay.  Turning to the next page of this
21  collection, this is -- purports to be an e-mail from
22  Brandon -- I'm sorry -- from P.J. to Brandon.
23         Can you read -- I'm not sure if you can or
24  not, it is very difficult to read, but are you able to

Page 185

1  make that out?
2    A.   "I reviewed this account for an increase
3  of their URL in the benzo, hydro and oxy families.  I
4  have increased all of these families to accommodate
5  purchases.  Per our discussion please provide written
6  documentation regarding information about this account
7  as a backup for justification of our changes.  Please
8  include the information about their switching
9  wholesaler on a couple of different occasions and what
10  our role has been.  Please let me know if you have
11  questions."
12    Q.   Okay.
13    A.   I'm not sure what order those e-mails were
14  in.
15    Q.   Yep, and there -- I believe --
16  MR. PADGETT:  Is there a date?
17  MR. YOUNG:  Yes, I believe it is cut off.  These
18  were produced by you all.
19  BY THE WITNESS:
20    A.   It sounds like the first e-mail --
21  BY MR. YOUNG:
22    Q.   Yeah.
23    A.   -- was the history she was asking for.
24    Q.   So the next page is a printout on

Page 186

```
 1  H.D. Smith letterhead.  Do you -- do you recognize
 2  this type of -- and it is obviously just an excerpt
 3  from -- from some printout, but do you recognize this
 4  type of document?
 5      A.   Yes.  We called this our comment sheet.
 6      Q.   Okay.
 7      A.   It is basically a -- a chronological
 8  record of any changes that we would have made with
 9  different accounts.
10      Q.   And what is the date of this entry?
11      A.   April 22nd, 2009.
12      Q.   And LAK, does that signify Lori Kirbach?
13      A.   Yes.
14      Q.   All right.  And what does Lori say in the
15  Note section?
16      A.   "Increased URL for benzo and hydro after
17  P.J. discussed with Brandon Salyer, the sales rep."
18      Q.   Okay.  So, and this is an example of
19  the sort of communication between Brandon from sales
20  and P.J. from compliance, and the result from this
21  note is an increase in the URL or threshold for this
22  particular customer.
23           Is this typical or atypical, or uncommon?
24      A.   It's not uncommon.
```

Page 187

```
 1      Q.   Okay.  Do you know whether or not
 2  Med Associates was investigated prior to this, this
 3  collection of documents here, Exhibit 17, investigated
 4  for exceeding its thresholds, ordering in excess of
 5  its thresholds?
 6      MR. PADGETT:  Object to form.
 7  BY THE WITNESS:
 8      A.   I can't say without seeing the
 9  documentation on it.
10  BY MR. YOUNG:
11      Q.   But there would be some data that would --
12  or some report or due diligence file or something that
13  would reflect whether or not Med Associates had been
14  investigated?
15      A.   We'd have a due diligence file on
16  Med Associates.
17      Q.   Okay.  If -- assume for a second that
18  Med Associates entered an order that exceeded its
19  threshold for these three drug families, benzos,
20  oxycodone and hydrocodone, this is an instance where
21  sales is requesting of compliance to release or
22  increase the -- the URLs or thresholds.
23           Is that accurate?
24      A.   I regard this more of a -- a heads up from
```

Page 188

```
 1  sales to give us information about -- more information
 2  about the customer and the situation therein with
 3  their other wholesalers.
 4           You know, I don't have any problem with --
 5  with sales giving us information on their customers.
 6  It helps us to know the customers more.  You know, it
 7  doesn't necessarily mean we are going to do as they
 8  ask.  We are going to do our due diligence before we
 9  would act on anything that would be requested like
10  that.
11      Q.   And as far as the reports or records of
12  H.D. Smith that would serve as evidence of these
13  examples, other than the due diligence files, is there
14  some type of report or repository or database that we
15  could look to to find instances where sales reached
16  out to compliance and compliance increased URLs?
17      A.   It was communication through e-mails.
18      Q.   It would all be e-mail, okay.
19           Do you know if Med Associates was -- is
20  still a customer of H.D. Smith?
21      A.   With just the name and an account number,
22  I'd need more information.
23      Q.   Sure.  I just figured it was worth a shot,
24  if they were on your radar or not.
```

Page 189

```
 1           On the first page of this -- this exhibit,
 2  the highlighted portion, there were the handwritten
 3  notes that says benzo six times and hydro 16 times.
 4           Is that a typical type of increase of a --
 5  a URL or a threshold?
 6      MR. PADGETT:  Object to form.
 7           Go ahead.
 8  BY THE WITNESS:
 9      A.   Well, at -- as I talked before, when we
10  first developed the system, it was -- we had three
11  times multipliers and then we were able to put
12  multipliers -- we couldn't put a number.  We had to
13  put a multiplier.  That was all our system gave us.
14           So -- but based on the -- the size of this
15  account, I would -- without more information and
16  knowing exactly what they were ordering and what the
17  UR -- URLs are unit reportable level.  Without knowing
18  what the URL was to begin with for this family and
19  where this customer fit in that family, I can't give
20  you a good answer.  All I can speculate is that with
21  the size of this customer they -- these -- these
22  increases are probably not out of the ordinary.
23      Q.   When you say the size of the customer, do
24  you mean the amount that they are purchasing on a
```

Page 190

1 monthly basis or do you mean, like, the --
2     A.  We had -- we -- we -- as I said before, we
3 have our -- we had our customers in revenue classes
4 based on the size of the customer and what we found
5 was that many times the bigger the customer, the less
6 controls they actually bought, because it could
7 include hospital customers that maybe have a very low
8 percentage of controlleds.
9         So the -- the -- the three times
10 multiplier may not be that high to begin with.  I -- I
11 don't know without all of the information to look at
12 to give you an educated comment.
13     Q.  Do you know if -- and this is an example
14 that this Med Associates exhibit that we've -- we've
15 had you talk about, do you know whether or not due
16 diligence is completed on a customer before increasing
17 its URL in controlleds like this?
18     A.  Yes.
19     Q.  Was due diligence done on Med Associates,
20 to your knowledge?
21     A.  Without further information, I can't tell
22 you, but our practice is we would do due diligence
23 before we raise any limits.
24     Q.  Okay.  So this -- it -- it would be

Page 191

1 unusual for an e-mail from sales to trigger an
2 increase in URL without due diligence being done?
3     A.  Yes.
4     Q.  The reference in the last part of the
5 e-mail where I believe P.J. was asking Brandon for
6 documentation to support, if -- if that documentation
7 came in after the URL was raised, what's -- what's the
8 point of it?
9         Is it just a -- a recordkeeping
10 requirement?
11     A.  I -- I don't know all of the -- all of the
12 particulars.  There could have been a phone call that
13 precipitated this.  You know, any time that we, you
14 know, had a discussion on a phone, we would want to
15 memorialize that discussion in an e-mail.  So without
16 knowing all of the facts, I can't -- I can't tell you.
17     Q.  Okay.  That's fair enough.
18         I want to switch to Euson Deposition
19 Exhibit 19, which is actually a letter from you,
20 October 22nd, 2007, to Kyle Wright.  I'll give you a
21 minute to take a look at it.
22     A.  I'm familiar with it.
23     Q.  Okay.
24         You wrote this letter after meeting with

Page 192

1 the DEA and HDMA, is that correct?
2     A.  Not HDMA.  This was the meeting we had
3 with Kyle Wright and Mike Mapes at DEA headquarters in
4 October --
5     Q.  Okay.
6     A.  -- 2007.
7     Q.  Did you attend a HDMA meeting on
8 October 16th and 17th of 2007?
9     A.  I -- I don't know.
10     Q.  Okay.  Let me -- let me go back one -- one
11 exhibit to Exhibit 18.  I will show you what is
12 labeled a Draft Summary of HDMA DEA Meeting October 16
13 and 17.  See if that refreshes your recollection.
14         And I'd -- I'd specifically direct your
15 attention to the last page of this exhibit, that lists
16 the attendees, under "HDMA Members in Person" you are
17 the third name.
18     A.  Then I guess I was.
19     Q.  Okay.  Fair enough.
20         So you attended this meeting of the HDMA
21 and DEA.  You -- you don't recall the meeting
22 specifically?
23     A.  Not specifically.
24     Q.  Okay.

Page 193

1     A.  I do remember a meeting with Kyle Wright
2 there, so it may have been this one.
3     Q.  And subsequent to this, I'll just refer
4 back to Exhibit 19, which is the -- your letter to
5 Kyle Wright, so you sent Kyle Wright a piece of
6 correspondence, a letter, and it begins with:  "Thank
7 you for taking the time to meet with Larry Mackey,
8 Brian Landry and me at DEA headquarters" and you are
9 following up on issues.
10         There is a -- a highlighted portion on
11 this first page.  Can you just read that sentence for
12 us?
13     A.  "In addition, our division management will
14 be instructed to review any orders they deem
15 suspicious and stop shipment until investigated."
16     Q.  And I -- you know, I -- I can't tell from
17 that sentence, in contrast to your prior testimony,
18 was that the practice prior to sending this letter or
19 was this a new development?
20     A.  Rephrase that.
21     Q.  Prior to writing this letter or prior to
22 meeting with Kyle Wright, was division management
23 instructed to review any order they deem suspicious
24 and stop shipment until investigated?

Page 194

1    A.   Well, as we've discussed before, the --
2    the practice was to look at orders at the end of the
3    month.  This was in the transition phase of -- of, you
4    know, when we are going from the manual system to the
5    automated system and it was just a reminder to our
6    division management that, you know, that we are
7    developing this system and that this is -- you know,
8    that -- that basically that's going to be the practice
9    going forward.
10   Q.   Did -- did Kyle Wright tell you during
11   your meetings with him that the way you were doing
12   things prior to CSOMP were insufficient?
13   A.   Not that I recall.
14   Q.   So what was the impetus to make the
15   change?
16   A.   As I said, we were already exploring an
17   automated system in 2006 and 2007 to improve our
18   processes and when we met with DEA in October, they
19   asked us if we would put an automated system together.
20   And I told them that we had been exploring it but that
21   we would make it our priority to put an automated
22   system together and -- and put it in practice by
23   spring of 2008.
24   Q.   Okay.  You also in this letter describe

Page 195

1    new customer due diligence forms and I think you
2    previously talked about this in answering another
3    question.
4         But who developed these forms, was it --
5    was it just you or was there a committee of people?
6    A.   It -- it was just me but it was with
7    reference to other materials, materials that DEA had
8    given me, materials that I had garnered from HDMA.
9    So, you know, all of the wholesalers questionnaires
10   were a little bit different, but basically on the same
11   theme.
12   Q.   You say in this letter that you are going
13   to send these examples of the new forms to Kyle for a
14   review.
15        Does -- was it your expectation that he
16   was going to comment or edit these forms for you?
17   A.   No.  Historically in communications with
18   DEA they give little to no guidance and it had been my
19   practice to, when I had discussed something with DEA,
20   whether it was a diversion investigator, Kyle Wright,
21   I would then put an e-mail together, send it to them
22   saying, This is what I understand our discussion was.
23   Usually I'd hear nothing, and to me nothing was good.
24        There was a practice at one time about

Page 196

1    sending letters to DEA saying this is what you are
2    going to -- this is what we are going to do and if you
3    don't hear -- and if we don't hear different we
4    consider that a yes.  So that was the premise that I
5    operated under.
6         So when I sent these -- these forms to
7    them to take a look at, the same way when I informed
8    them along the way on how we were developing our
9    system, my expectation is if he had an issue with
10   something, he would bring it to my attention, not that
11   he was going to endorse what we were doing, but if
12   there was something that we either misunderstood or
13   there was something we were doing wrong, my
14   expectation is that he would let us know that, Hey,
15   that's not right.
16   Q.   Okay.  You close your letter with a
17   commitment to implement all reasonable controls to
18   prevent diversion of controlled substances for illicit
19   use.
20        Did you have something specific in mind
21   when you -- when you referred to implementing all
22   reasonable controls?  Or are you just talking about
23   CSOMP or something more than that?
24   A.   No.  Just our -- our everyday commitment

Page 197

1    to -- to, you know, implement controls to -- to --
2    against diversion, not only CSOMP.
3    Q.   Did you ever hear back from Kyle about the
4    customer due diligence forms?  Do you know, did he
5    ever, like, say, Hey, good job or --
6    A.   I don't think so, no.
7    Q.   Okay.
8         Okay.  Let's see.  You -- I'm going to
9    turn to Euson Deposition Exhibit 23, which is an
10   e-mail, handwritten like a journal entry and, of
11   course, a redacted handwritten entry, I'm hoping that
12   maybe you'll be able to read.  It is also pretty
13   difficult to -- to read.
14        Once you are ready to talk about that, let
15   me know.
16   A.   Is there something redacted out of that
17   e-mail after "order" and the -- it is a little hard to
18   follow.
19   Q.   Which one?  After "order" there is, like,
20   a space and a period?
21   A.   Yeah, and then it goes into a monitoring
22   program.  I guess we don't know what that says.
23   Q.   Yeah, I don't know.  This is how we
24   received it, so.

Page 198

1    A.    Okay.

2    Q.    So this e-mail is from you dated July 9th,

3  2007, to Scott Garriott.  I think you -- you

4  previously testified that Scott was a DEA employee,

5  right?

6    A.    Diversion investigator in Springfield,

7  Illinois.

8    Q.    And what was your purpose in sending this

9  e-mail to Scott?

10    A.    Can I finish reading it?

11    Q.    Sure.

12    A.    My purpose was just to let him know that

13  we were working on a -- on an automated system.  It

14  did not go as scheduled in this e-mail.  We had -- we

15  had issues in the initial development of the system to

16  make it work the way we wanted it to work.  So that --

17  that highlighted area "beginning Ju-" -- "July 1"

18  never occurred.

19    Q.    So I -- I -- I don't want to testify for

20  you, but I take it from this e-mail that that section

21  is actually part of what Amerisource sent in its

22  e-mail.

23        Is -- is that your recollection as well?

24  Because your e-mail begins with:  "This is a

Page 199

1  communication that Amerisource sent out to their

2  customers.  We are close to implementing our system

3  but may need to tweak it based on the below."

4        And that's what I wanted to understand was

5  whether "all of the below" was the Amerisource

6  content?  I think that -- and that may also explain

7  the cutting and pasting or the redaction you were

8  asking about.

9    MR. YINGLING:  Objection to form.

10  BY THE WITNESS:

11    A.    Yeah, I'm speculating that it is.

12  BY MR. YOUNG:

13    Q.    Okay.

14    A.    Based on the corporate security and

15  regulatory affairs stuff.

16    Q.    What was it about your CSOMP system that

17  you needed to tweak based on this Amerisource notice

18  it sent its customers?

19    A.    I think I told you we originally -- when

20  we originally started ours we were trying to do it by

21  NDC and it was -- it was -- it did not give us the

22  desired results that we needed to identify orders.  So

23  we -- we needed to tweak the system, and that's

24  something we were working on.  And then when -- in --

Page 200

1  later in 2007 when we got a -- a general concept of --

2  of Amerisource's system, that's what we tried to

3  mirror.

4    Q.    Okay.  There is some handwritten notes on

5  the bottom of this e-mail.  It says:  "Verbal

6  response:  Format is not required but Smith should

7  give it serious consideration."

8        Do you know whose handwriting that is?

9    A.    I don't.

10    Q.    I'm going to turn to Page 2 and ask if you

11  can identify, is that your handwriting?

12    A.    No.

13    Q.    Do you recognize that handwriting?  Would

14  you -- have you seen this document before or that

15  entry?

16    A.    I do not know whose handwriting that is.

17    Q.    Okay.

18    A.    I can only make an assumption that it

19  might be Garriott's.

20    Q.    Okay.  I'm not sure how we obtained it

21  from you all.

22        Okay.  That -- that's all from that

23  exhibit.

24        I want to turn to -- and I'm going to give

Page 201

1  you this one, it's -- because it's got the flags on

2  it.

3    MS. COOK:  Okay.

4    MR. YOUNG:  And you look -- we'll give them that

5  one, that version.

6  BY MR. YOUNG:

7    Q.    Turn to Exhibit 24.  Just take a look at

8  that.

9        Is Exhibit 24 something that you authored?

10    A.    Yes.

11    Q.    What was the purpose of authoring that

12  document?

13    A.    The purpose was to outline what we were

14  doing with our order monitoring program.  This would

15  have been sent, I don't know exactly who it was sent

16  to, but I would have sent it to the divisions to

17  disseminate.  It was also -- went to Kyle Wright, I

18  believe, to give him a -- an overview of -- of what

19  our system was going to look like.  I mean, I had had,

20  you know, consistent, you know, constant communication

21  with him in -- over the phone, but this was in

22  writing, kind of what -- what we were planning on

23  doing and how we were going to roll it out.

24    Q.    Do you know the date that this was

Page 202

1 completed? It's -- it's not dated.

2     A. I think it was attached to an e-mail in

3 March.

4     Q. Okay. Around the time that --

5     A. Of '08, I believe. I don't know the exact

6 date.

7     Q. And you mentioned that you're not sure who

8 all it went to, but do you recall whether this went to

9 senior management people above you?

10     A. It would have.

11     Q. Does this accurately depict the background

12 of DEA oversight of drug distributors?

13     MR. PADGETT: Object to form.

14     MR. YOUNG: That was a poor question, but...

15 BY THE WITNESS:

16     A. It would -- it would depict my --

17 BY MR. YOUNG:

18     Q. Interpretation?

19     A. -- opinion -- interpretation.

20     Q. So, I think it's 4 --

21     MR. PADGETT: You should have been a lawyer.

22     THE WITNESS: Before we get into that --

23     MR. YOUNG: Yeah.

24     THE WITNESS: -- can we take a break?

Page 203

1     MR. YOUNG: Oh, sure, by all means. Any time

2 you feel the urge, let us know.

3     MR. PADGETT: It is almost an hour 15.

4     MR. YOUNG: Can we go off the record.

5     THE VIDEOGRAPHER: We are off the record at

6 2:25 p.m.

7     (WHEREUPON, a recess was had

8     from 2:25 to 2:31 p.m.)

9     THE VIDEOGRAPHER: We are back on the record at

10 2:31 p.m.

11 BY MR. YOUNG:

12     Q. When we left off and took a break, we were

13 talking about the brief overview that you had drafted.

14 You've today looked at it a little bit, but you are

15 the author of it.

16     Is -- is there anything in the brief

17 overview that you recall that was a mistake or an

18 error that you would change today, in other words,

19 does it accurately reflect the brief overview of the

20 CSOMP system?

21     A. I'd have to go into every detail of this

22 to -- to determine that, but I authored this at the

23 time.

24     Q. Okay. That's -- that's a better way of

Page 204

1 going about it, frankly.

2     There is reference made in this document

3 and other documents, and I think your testimony today

4 included this phrase "know your customer."

5     Do you know the origin of the "know your

6 customer" phrase?

7     A. I'm not exactly sure. I think it is in

8 the Chemical Handlers book.

9     Q. But --

10     A. There may be other reference to it. It's

11 kind of a, I don't know, it's -- it's a -- it is -- it

12 is something that's kind of the industry DEA expects

13 you to know your customer.

14     Q. You mentioned that the original system,

15 the CSOMP system had the three times multiplier which

16 was off of a moving average of controlled purchases,

17 right?

18     A. Yes, it would have -- it would have

19 readjusted every month.

20     Q. So --

21     A. And it was also on a -- just to clarify,

22 it was on a -- a rolling 30-day system, not a -- when

23 we -- when we first rolled it out, not a calendar

24 month.

Page 205

1     Q. Has H.D. Smith identified instances in

2 which that aspect of the CSOMP system was manipulated

3 by pharmacies?

4     MR. PADGETT: Object to form.

5 BY THE WITNESS:

6     A. Not that I'm aware of.

7 BY MR. YOUNG:

8     Q. Has H.D. Smith identified instances in

9 which pharmacies used vulnerabilities in its CSOMP

10 system to order more controlled substances than they

11 should have?

12     MR. PADGETT: I'll object to form.

13 BY THE WITNESS:

14     A. What do you consider vulnerabilities in

15 the system?

16     Q. Any type of vulnerability, have you as the

17 head of compliance for H.D. Smith identified any

18 instance in which a pharmacy has managed to navigate

19 its way through your CSOMP system and ordered more

20 controlleds than it should have?

21     A. If you are talking about manipulating our

22 system, I don't -- I -- I can't think of an instance

23 where they manipulated our system. Did pharmacies

24 order more than their threshold allowed, yes.

Page 206

1    Q.   And in such an instance did they receive
2  such an order?
3    A.   It would depend on the order.
4    Q.   Is H.D. Smith aware of instances in which
5  a pharmacy ordered and received more controlled
6  substances than it should have been allowed to?
7    MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9    A.   You'd have to define that.
10  BY MR. YOUNG:
11   Q.   Is H.D. Smith aware of instances in which
12  any pharmacy in the country received an order of
13  controlled substances that should -- it should not
14  have shipped?
15   A.   If we identified orders that were
16  suspicious, we would not have shipped them.
17   Q.   And I want to clarify.  This is for the
18  duration of H.D. Smith including before your tenure
19  whether or not any customer received an order from
20  H.D. Smith that should not have shipped?
21   MR. PADGETT:  Objection; form, scope.
22  BY THE WITNESS:
23   A.   You'd have to identify the order and --
24  and give me more -- more details on that order.

Page 207

1  BY MR. YOUNG:
2    Q.   But you as the chief of compliance have
3  not identified any such order?
4    A.   No.
5    Q.   I'm going to show you Exhibit 25.  We
6  won't spend a lot of time on it.  It's --
7    A.   Are we done with that?
8    Q.   Oh, yeah, we are done with that one.
9          That is the -- let me take that one back.
10  That's my copy.
11          Exhibit 25 is the procedures that were
12  related to the CSOMP.  It wasn't clear from this
13  document when this was implemented.
14          Do you -- do you recall when this CSOMP
15  divisional procedures were implemented?
16   A.   It has got a March 22nd date on it, so I'm
17  assuming then.
18   Q.   Yeah, that was my question was whether or
19  not that date was the date of implementation or the --
20   A.   I assume so.
21   Q.   Okay.
22          Did you draft this?
23   A.   Yes.
24   Q.   Did you have any assistance from P.J. or

Page 208

1  anyone else in compliance?
2    A.   I had assistance from P.J.
3    Q.   Did anyone outside of H.D. Smith assist in
4  the drafting of this procedures document?
5    A.   Outside of H.D. Smith?
6    Q.   Yes.
7    A.   No.
8    Q.   So you didn't consult with Amerisource or
9  Kyle Wright at the DEA or some outside consultant?
10   A.   No.
11   Q.   Page 6, Section I.3, it talks about
12  releasing suspended orders.
13          Is H.D. Smith today aware of any
14  violations of this procedure since 2008, this release
15  suspended order with optional quantity change?
16   A.   Give me a second to read it.
17   Q.   Sure.
18   A.   And could you repeat the question then?
19   Q.   Is H.D. Smith aware of any violation of
20  this procedure at any point since implementation of
21  the CSOMP?
22   A.   No.
23   Q.   There is a reference to a "fat fingered"
24  order.

Page 209

1          How -- I -- I guess that's where a finger
2  hits a different key than it's intended to hit, is
3  that right?
4    A.   It's -- it's kind of an industry lingo, I
5  guess.  Someone meant to order five and they ordered
6  55 or something.
7    Q.   How typical is that?
8    A.   It is not very typical.
9    Q.   Okay.
10   A.   It happens.
11   Q.   If an order is suspended because it is
12  hitting a URL, what's the most typical reason to
13  release a suspended order of these four options?
14   A.   Okay, first of all, I just want to
15  clarify, these are -- we had two different procedures.
16  This is divisional procedures.
17   Q.   Okay.
18   A.   This is what we have trained and allowed
19  our divisions to do on releasing orders.  And you have
20  to be aware of the time period of being 2008.
21   Q.   What's the relevance of 2008?
22   A.   There are some of these things that we
23  don't do anymore.
24   Q.   Ah, okay.  So let's talk about the

Page 210

1  evolution of this real quick.
2       What -- what aspects of this procedure
3  does H.D. Smith no longer do?
4       A.   Our -- our divisions don't release any
5  orders anymore.
6       Q.   So all release of orders is done by --
7       A.   Compliance department.
8       Q.   -- headquarters?
9            Oh, compliance department.
10           Was there a point in time where URLs or
11  thresholds was increased by division employees?
12       A.   Never.  They don't have the ability to.
13       Q.   And who has the ability to increase URLs?
14       A.   Only compliance.
15       Q.   Can --
16       A.   Personnel.
17       Q.   -- any senior person within the company
18  outside of compliance, in other words, if the
19  president of the company wanted to, for his friend who
20  owns a pharmacy, could he -- does he have the
21  authority in the system to increase --
22       A.   There would be no capability for him to do
23  it.  There is only authorized users.
24       Q.   Okay.  And the current authorized users to

Page 211

1  do that are who?
2       A.   Currently, I have one compliance
3  coordinator that is still working at H.D. Smith.  Her.
4  Probably P.J.
5       Q.   Is -- is that because of the
6  acquisition --
7       A.   Yes.
8       Q.   -- by Amerisource?
9       A.   Yes.
10       Q.   Okay.
11       A.   There has been -- there has been
12  transitions into other roles.
13       Q.   I should have asked.  Prior to the
14  acquisition by Amerisource, who had the authority to
15  increase URLs at H.D. Smith?
16       A.   It would have been P.J. VanDermeersch,
17  she's the -- she would have been the compliance
18  manager, she was over licensing but she had
19  overreaching duties and responsibilities.  It would
20  have been Kyle Rieger, who was our compliance manager,
21  and then Tyler Walsh, who would have been our
22  compliance analyst, and Christina Wools, who is our
23  compliance coordinator.
24       Q.   That's quite a few people that you've

Page 212

1  described, which is different than when you first
2  started with H.D. Smith.
3       Is that, that assemblage of people, is
4  that the largest the compliance department has been or
5  was it larger?
6       A.   I still at the time had three compliance
7  managers in the field.  I had a licensing coordinator.
8  I had a couple of people at Valley that reported to
9  me.  I think I might have -- there may have been ten
10  or eleven total in the compliance department.
11       Q.   Was there any point in time in which you
12  asked for additional staff in compliance but were not
13  given authority to hire additional staff?
14       A.   No.
15       Q.   During your tenure in the compliance
16  department, is it your opinion that it was adequately
17  staffed at all times?
18       A.   I believe so.
19       Q.   I'm going to show you what was marked as
20  Exhibit 26.  This, I -- I suspect is the policy that
21  goes along with that procedure, but is that an
22  accurate description?
23       A.   This was a revised policy, and I noticed
24  that it's -- it's a -- it was labeled 810-V which

Page 213

1  meant it was part of a -- a VAWD requirement, so we
2  would have relabeled our -- our policies and -- and --
3  to be able to submit to VAWD for their accreditation
4  process.  So -- so they would have been updated and --
5  at the time.
6       Q.   I have a tabbed page on there.  If you
7  could turn to that tabbed page.  It's -- here, I'll
8  show you.
9       MR. YOUNG:  It's, for the rest of you without
10  the tab, it's --
11  BY MR. YOUNG:
12       Q.   What page is that?
13       A.   Five.  Is that it?
14       Q.   Yes, that one.  Page 5.  It has largely
15  got a black box but with a little bit of writing at
16  the top.
17       I -- we obviously can't see what's in the
18  box.  It is a picture of a screen shot of your system,
19  I take it, but it describes differentiated color
20  coding for these entries, blue, yellow and red, and I
21  specifically want to ask you about the yellow.  It
22  defines the yellow as shipped orders over given URL.
23       How typical would yellow orders be shipped
24  orders over given URLs?

Page 214

1    A.  I -- I can't give you a definitive answer.
2 You know, our -- you know, our system was designed
3 to -- to assist us in identifying potential suspicious
4 orders but not everything -- things that hit our
5 system weren't always defined as suspicious. There
6 may be different reasons for them. And, you know, all
7 orders are -- were held, all orders were investigated,
8 and if we -- if we did not deem that order as
9 suspicious, then we would ship it.
10    Q.  That -- that's what I wanted to ask was
11 whether -- the red designation here is a suspended
12 order.
13       Could a suspended order once it is
14 released turn to a yellow order or once it's red in
15 the system, it's red?
16    A.  Red was probably it was suspended and
17 remained suspended while we finished our investigation
18 on it to determine whether it was a suspicious order
19 or was not a suspicious order. So that would have
20 been one that would have been continually -- you know,
21 it -- it could be suspended for a long time --
22    Q.  If --
23    A.  -- while we conduct our investigation.
24    Q.  And if it was determined to not be

Page 215

1 suspicious, would it then be coded yellow?
2    A.  I don't know.
3    Q.  Okay. I was just curious about when we
4 dig into the data how we would be able to identify
5 those, but I'm not sure that's possible.
6       Okay. That's all for that exhibit.
7       The next exhibit is No. 27 which is a -- a
8 thread, I guess, or a collection of e-mails. It is
9 also somewhat small, hard to read. Apologies in
10 advance.
11    A.  This one is easier.
12    Q.  Okay. So this is a thread, it includes
13 you, the -- the -- the top entry is actually to you
14 from Dan Howard. It designates Dan Howard as the
15 manager of operations in Pompano Beach.
16       Is that still the case, is Dan with the
17 company still?
18    A.  He has transitioned to MWI, a division of
19 AmerisourceBergen.
20    Q.  Okay. So I want to just talk a little bit
21 about this thread.
22       On Page 2 of this thread, Dan says, "I --
23 "I just released 1200 for APEX and 2200 for
24 dispensing."

Page 216

1       I understand out of context in a vacuum it
2 is hard to understand what -- what he is talking about
3 there, but if you go back through the thread you have
4 a -- well, I'm sorry, I've got to go all of the way to
5 the original. July 29th.
6       Okay. Let's -- let's start at the very
7 back. And at the back is a CC to you at corporate,
8 and this is from Lori Kirbach who is the compliance
9 coordinator.
10       "Just wanted to let you know that APEX,"
11 and she gives the number, "has ordered 5400 dosage
12 units of oxy today, and Ira's has ordered 9400 dosage
13 units of oxy today. I will leave these orders held in
14 CSOMP until tomorrow since they were placed today.
15 George, do we want to cancel them or mark them
16 suspicious?"
17       At this point in time, this was in 2010,
18 the -- the automation aspect of the system, wouldn't
19 it automatically identify these orders? This seems
20 like a manual process by Lori.
21    A.  It holds the orders for review.
22    Q.  I see.
23       So the system identified them as held,
24 Lori reviewed them, and she wants to know from you

Page 217

1 whether to cancel them or mark them suspicious, is
2 that right?
3    A.  That's what the e-mail says.
4    Q.  Okay. So -- and I'm sorry. That was
5 actually to Doug. You were cc'd on it.
6       And Doug responds: "Lori, The eight
7 accounts below will have a new URL. We will manage
8 that locally and ship them up to the URL below. If
9 they order more than the daily URL we will ship the
10 maximum and suspend the rest."
11       And then it has an image that we cannot
12 see.
13       And then the ne- -- third -- or I guess
14 the second page is the end result, which is Dan Howard
15 saying, "I just released 1200 and 2200 for
16 dispensing."
17       How is Dan Howard in operations able to
18 release these orders?
19       And it may -- I should mention, this may
20 be a function of us not having the complete e-mail on
21 this subject. This is the only thread that we have.
22 But we don't see in this thread compliance approving
23 this.
24    A.  Yeah, I -- and I don't know that I can

Page 218

1  answer the question because I -- without more context
2  I don't know what Doug is saying as far as the eight
3  accounts, so, or have a new URL. They don't have
4  anything to do with setting URLs.
5      Q.  Okay. So would it be -- this be an
6  unusual situation?
7      MR. PADGETT: Object to form.
8  BY THE WITNESS:
9      A.  I -- I don't know. I don't know what this
10  is. I would have to get more information around this.
11  BY MR. YOUNG:
12      Q.  Would it be unusual for an operations
13  manager to be able to release held orders?
14      A.  They could have the ability, but it would
15  either be under the -- the restrictions that we put on
16  them that were in the previous policy or they may have
17  con -- they may have been in contact with Lori or
18  myself. I just don't recall, but they are not going
19  to -- the divisions did not just release orders.
20      Q.  Evidence of that would be found in the due
21  diligence file for these customers?
22      A.  It should be.
23      Q.  Okay. The next one is Exhibit 28. This
24  is -- again, is a little easier to read, a shorter

Page 219

1  e-mail. This is actually dated the same date that the
2  CSOMP divisional policy was created.
3          And I guess it probably makes sense to
4  start with the initial communication in the thread,
5  the -- the actual original -- what's going on here --
6  the original message was not included here. I don't
7  know that we have that. But the first message is from
8  you to a collection of people, Bryce, Steve, P.J.,
9  regarding Keller Apothecary.
10          Can you read that part that begins with "I
11  agree to some extent"? It is the bottom of the first
12  page.
13      A.  From me. "I agree to some extent, but we
14  have to be careful not to coach customers so that they
15  can circumvent the program. We have already raised
16  this account significantly and they still exceed the
17  parameters in place. I also agree that more scrutiny
18  should be placed on the doctor. That would be
19  partially the pharmacy's responsibility, as it is ours
20  to scrutinize the pharmacy. As far as DEA
21  involvement, forget it. They hold the sword over our
22  head but offer little guidance. They will not become
23  involved with our business decisions but can come back
24  around, suspend our registration if we don't make good

Page 220

1  decisions. Based on what I know at this time, I will
2  not be responsible for raising this account any more
3  than we have. If we have to explain our actions to
4  the DEA, how would we justify it?"
5      Q.  Do you recall this particular thread?
6      A.  I don't recall the thread, I recall the
7  pharmacy.
8      Q.  The pharmacy, okay. What -- what do you
9  recall about Keller Apothecary?
10      A.  It was in urban St. Louis and it was a --
11  a pharmacy that catered to a -- or not catered --
12  it -- it was below a -- a doctor, a doctor's clinic
13  that specialized in pain management above the pharmacy
14  and most of his patients had their prescriptions
15  filled at that pharmacy. We have extensive due
16  diligence files on this pharmacy.
17      Q.  Did you ever end up ceasing doing business
18  with this pharmacy?
19      A.  We did.
20      Q.  At what -- do you know at which point in
21  time you ceased doing business with them? This is
22  dated May of '08.
23      A.  I don't know.
24      Q.  But the due diligence files would reveal

Page 221

1  that?
2      A.  Um-hum.
3      Q.  So at the very top -- well -- well, first,
4  there is a -- a response from Bryce to your e-mail
5  where he says: "Can we suggest to the customer to
6  call the DEA diversion for their questions?"
7          And I, you know, we are -- we are at a
8  disadvantage because we don't have the original e-mail
9  that they are referring to here, but your response to
10  that suggestion is at the top. And it's -- can you
11  read that for us? It begins with, "No I wouldn't."
12      A.  Can I read the rest of this first?
13      Q.  Sure.
14      A.  Okay. What's your question?
15      Q.  Okay. So can you just read your response
16  to Bryce's suggestion to call -- have the customer
17  call the DEA?
18      A.  Start with "No I wouldn't"?
19      Q.  Yes.
20      A.  "No I wouldn't. The first thing the
21  customer is going to tell DEA is that H.D. Smith told
22  them to call DEA. And what is the customer going to
23  ask them? We are mandated to develop a system to
24  identify suspicious orders. We have done that and

Page 222

1 Keller's orders have been identified as suspicious.
2 We have reported that to DEA. It is our business
3 decision, not DEA's. Our URLs are based on averages
4 within a revenue class of customer. When we started
5 this, we made adjustments to Keller's URLs based on
6 division recommendations. Right now Keller's URLs
7 are: Four times for benzo, 12 times for
8 hydromorphone, 16 times for methadone, 12 times for
9 morphine, 12 times for oxycodone. Our normal URL is
10 three times the average. How comfortable are you
11 standing in front of DEA and justifying raising these
12 levels even more? If you have strong evidence that we
13 should do so, I'm willing to look into it. I would
14 recommend we find out more about this business and
15 more about the one doctor that is writing 80 percent
16 of the scripts he is filling."
17      Okay.
18    Q.   Okay. So I just want to unpack this a
19 little bit. The URLs at the time of this writing for
20 oxycodone that you wrote was 12 times for oxycodone.
21      Is that your recollection as well?
22    A.   Yes.
23    Q.   The normal URL was three times the
24 average, but this particular pharmacy had 12 times the

Page 223

1 average.
2      Do you know why H.D. Smith increased the
3 URLs here to 12 times?
4    A.   Yeah. We -- this -- this pharmacy was,
5 you know, had pain management customers, you know, from
6 the doctor above the store. You know, we -- and I
7 don't know when in -- in the time of this e-mail, but,
8 you know, it would be in our due diligence file, but I
9 visited this pharmacy several times. I actually had a
10 discussion with the doctor trying to get a better idea
11 of his business. You know, at the time the -- the
12 doctor and his prescriptions appeared legitimate.
13 The -- there was no suspicion of diversion and so we
14 raised the limits to -- to accommodate the
15 prescriptions that the pharmacy was filling.
16    Q.   Do you recall the ratio of controlleds to
17 non-controlleds for Keller's Apothecary at this time?
18    A.   I don't recall, no.
19    Q.   Would the due diligence files contain that
20 information?
21    A.   I would assume it would.
22    Q.   And you mentioned at some point in time
23 you decided to no longer do business with Keller's.
24      What was the difference between this point

Page 224

1 in time and when you ultimately ceased doing business
2 with them, what was the -- the final straw?
3    A.   I would have to review the file to -- to
4 get the final -- why we made the final determination
5 to cease doing business with them. I can't tell you
6 right now. I -- I don't know.
7    Q.   Is Keller's Apothecary a typical or usual
8 example of a pharmacy that has a pain clinic in close
9 proximity to it?
10    A.   It can be.
11    Q.   Is that one of the factors that H.D. Smith
12 used in evaluating the URLs for pharmacies?
13    A.   It is one of the factors. We use a
14 totality of circumstances, but it is one of the
15 factors that we'd look at.
16    Q.   Were there any other factors that played
17 into your decision to no longer do business with
18 Keller's other than the controlleds? Let me rephrase
19 that.
20      Did you ever consider the percentage of
21 cash pay customers at Keller's Apothecary as one of
22 the factors to continue doing business with it?
23    A.   We do, and to the best of my knowledge
24 they were fairly low cash pay. It was in an area with

Page 225

1 a lot of Medicaid patients.
2    Q.   What are the other factors that you used
3 to evaluate pharmacies like Keller's? You mentioned
4 the ratio of controlleds to non-controlleds, the
5 proximity, and I'm trying to think of the others that
6 you mentioned, but can you recall the other factors?
7    A.   We use a -- a number of factors to
8 evaluate pharmacies, and they can be, you know, cash
9 pay, you know, the cash percentage for controlled
10 prescriptions, cash pay for particular family of -- of
11 drugs. It can be percentage of controlleds that are
12 purchased based on what you -- you know, dispensing
13 reports, what's the overall, you know, dispensing,
14 the -- the cash, we look at the doctors that -- that
15 are writing the -- the -- the controlled
16 prescriptions, we look at the top doctors, we see, you
17 know, what their -- you know, have they had
18 discipline, what their board -- you know, are they
19 board certified in pain management and, you know, what
20 is their specialty, does it make sense, you know, with
21 what they are prescribing, is there a monotony of
22 prescribing, are there combinations of drugs that --
23 that are dangerous combinations, are the quantities of
24 prescriptions that are being issued too high, are the

Page 226

1  patients coming from far distances.
2       In this case the -- the doctor is
3  upstairs, but other cases it may be the doctor might
4  be 50 miles away in an urban area.  Does it make
5  sense?  So we look at the totality of different
6  circumstances.
7       Q.   And that seems like a lot of information
8  to compile for each of your pharmacy customers.  So
9  how often do you do that full profile of a pharmacy?
10      A.   As needed.  As someone, you know, maybe,
11 you know, hits our order monitoring system, we read
12 about something that, you know, a pharmacy may have
13 been raided, there is a doctor that may have gotten in
14 trouble.  We keep a list of doctors, you know, that --
15 that are kind of a watch list, an internal watch list.
16 If we find a pharmacy that's filling prescriptions for
17 a -- a particular doctor, we discuss that with the
18 pharmacy.  So there is -- there is a -- a number of
19 different factors that go into our -- our due
20 diligence process.
21      Q.   Do you share your information about
22 pharmacies that you've identified as suspicious with
23 your other distributor companies, with competitors?
24      A.   With DEA.

Page 227

1       Q.   Just with DEA.  Do you know --
2       A.   Any time that we block a -- a pharmacy
3  from controls or we exit the company -- the pharmacy
4  altogether based on compliance concerns or if we've
5  identified doctors in our -- in our research, we
6  notify DEA of that.
7       Q.   When you take on a new customer, are you
8  able to discern whether or not that customer was
9  ordering too many controlleds from its prior
10 distributor?
11      A.   We don't have any way of knowing that.
12      Q.   So if a pharmacy like Keller's is
13 essentially terminated from its relationship with
14 H.D. Smith and it wants to continue buying
15 controlleds, it will turn to another distributor, is
16 that accurate?
17      Is there any other way for them to --
18 MR. PADGETT:  Object to form.
19      Go ahead.
20 BY MR. YOUNG:
21      Q.   Is there any other way for a pharmacy like
22 Keller's to obtain controlled substances other than
23 through a distributor?
24      A.   No.

Page 228

1       Q.   So if distributors don't know when
2  pharmacies are ordering too many controlleds from one
3  distributor, how can they evaluate them as a new
4  customer?
5       A.   You have to --
6  MR. PADGETT:  Object to form.
7       You can go ahead.
8  BY THE WITNESS:
9       A.   You have to evaluate them --
10 BY MR. YOUNG:
11      Q.   I'm sorry.  Go ahead.
12      A.   We -- we have a process in place to
13 evaluate new customers and, you know, there are --
14 recently there are some tools available from DEA where
15 we can identify how many distributors a pharmacy would
16 have ordered controlled -- or opioids from in the last
17 six months, but there is no numbers, we don't know
18 identities.  The information that is received from DEA
19 is limited to nothing at best.
20      Q.   Does HDMA have any type of information
21 sharing between and among distributors about suspect
22 or problem pharmacies?
23      A.   No.
24      Q.   And you've never had -- you in your role

Page 229

1  as a chief of compliance for H.D. Smith have never had
2  communications with any other distributor about
3  problem pharmacies?
4       A.   Now that we've been acquired by
5  AmerisourceBergen, we will share a list of customers
6  that we have discontinued selling controlled
7  substances to.
8       Q.   With Amerisource?
9       A.   Yes.
10      Q.   But not with other distributors?
11      A.   No.
12      Q.   Do you think that's something that -- that
13 distributors should be able to do?
14      A.   I would welcome any additional cooperation
15 from DEA with the distributors to assist us in this.
16      Q.   All right.  I'm going to turn to -- one
17 moment.  This is Euson Deposition Exhibit 30.  I'll
18 give you this one.  That's fine.  Let me give you this
19 one.
20      This is titled "Customer Due Diligence and
21 Suspicious Order Monitoring Programs, Corporate
22 Security Procedures," and it is dated November 2008.
23      Are you familiar with this document?
24      A.   I'm familiar with this.  I did not author

Page 230

1  this. This was -- this was when I was not at the
2  company.
3      Q.  Do you know who authored this?
4      A.  I do not know.
5      Q.  Do you know who --
6      A.  The director of compliance at the time was
7  Robby Robinson. But I -- I don't know if this -- if
8  he authored this or not.
9      Q.  Okay. On Page 3 of this document, there
10 is a -- it should be a highlighted portion on your
11 copy.
12         Do you see that?
13     A.  Yes.
14     Q.  Can you read that for us?
15     A.  "If an order meets or exceeds a threshold
16 or otherwise characterized as an order of interest,
17 the order is automatically blocked to stop the ordered
18 product from being shipped. The order may be
19 evaluated as suspicious and reported immediately to
20 the DEA or it may be investigated and reported at the
21 conclusion of the investigation if but only if it is
22 determined to be suspicious."
23     Q.  Is that consistent with your understanding
24 of the policy prior to your departure from H.D. Smith

Page 231

1  around this time --
2      A.  It would be consistent.
3      Q.  -- or is this a new development?
4      A.  It -- it would be relatively consistent.
5      Q.  If it was determined that a particular
6  pharmacy's controlled substance order was suspicious,
7  would you hold all shipments of controlleds to that
8  pharmacy under this policy or just the family of the
9  suspicious order?
10     A.  By practice we would -- we would block all
11 subsequent orders in that family. There could be
12 times when, depending on the totality of the
13 circumstances, we could -- we could block the whole
14 pharmacy -- the -- all of the controlleds to a
15 pharmacy at that point. It really depends on our
16 investigation.
17     Q.  And I was just trying to figure out
18 whether this policy changed the prior policy that was
19 in place when you were there.
20     A.  This part of the -- there -- this --
21     Q.  Not just this part but the policy in
22 total.
23     A.  I'd have to read the whole thing.
24     Q.  Okay. Let me direct your attention to

Page 232

1  what I think is the -- is there only two pages to
2  this? Oh, I'm sorry. To the second page. Well, the
3  page -- the page that is Bates stamped 129 on the
4  bottom, HDS_Euson_1 -- 00129. It begins with:
5  "Investigation of orders of interest."
6      A.  Okay.
7      Q.  So this describes a Level II
8  investigation.
9          Are you familiar with Level II
10 investigations? Or is this something that your
11 replacement came up with?
12     A.  Where do you see Level II?
13     Q.  In the middle of the paragraph, it says:
14 "In instances when a customer's order meets or exceeds
15 a threshold, or is otherwise characterized as an order
16 of interest on a continuous basis, a Level II
17 investigation will be initiated."
18     A.  I'm not exactly sure what he means there.
19     Q.  Okay. When you returned to H.D. Smith, do
20 you know whether this policy was still in place or had
21 it been revised at that time?
22     A.  I don't know without -- without reading
23 through this whole thing. I -- I can't comment on
24 that.

Page 233

1      Q.  Have you ever conducted or overseen the
2  conduction of a Level II investigation as contemplated
3  by this policy?
4      A.  Well, if it means -- are you referring to
5  the bullet points below that, the initiation of script
6  data from customer, is that what you are referring to?
7      Q.  Yeah. So it describes: "In addition to
8  investigative guidance, the following procedures are
9  required," and then it gives a bullet list of, it
10 looks like seven or eight things to do.
11         Do you recall performing these -- all of
12 these things on an investigation of a pharmacy during
13 your tenure as chief of compliance?
14     A.  We will initiate script data, which would
15 be dispensing data review and analysis. We do
16 practitioner due diligence, we perform usage analysis,
17 and we do document our findings, we do evaluate our
18 business relationships with the customer. You know,
19 these are -- I said our -- our -- our due diligence
20 processes are always evolving, trying to improve upon
21 them, so, yeah, do we do -- we still do those things.
22     Q.  So in the due diligence files for the
23 pharmacy customers, we would see evidence or indicia
24 of this type of investigation being done for customers

Page 234

1 that met that criteria, the continuous violation or,
2 I'm sorry, the continuous --
3    A.   Can I see that --
4    Q.   Yeah.
5    A.   -- again?
6    Q.   The -- "Where the customer's order meets
7 or exceeds the threshold or is otherwise characterized
8 as an order of interest on a continuous basis, this
9 investigation is required."
10       And what I want to know is if we review
11 the due diligence files of H.D. Smith to what extent
12 we are going to see this type of Level II
13 investigation?
14    A.   Any time that -- that a -- an order is
15 held in our system, we do some level of an
16 investigation into the order.  That can be from review
17 of purchase data all of the way to requesting
18 dispensing data, do an onsite review, doing background
19 investigations on doctors.  Those are the things that
20 we do every day on our customers.
21    Q.   Yeah.  That wasn't my question.  My
22 question is:  That policy that was in place in 2008
23 says that those seven or eight criteria are required
24 in a Level II investigation and what I want to know is

Page 235

1 was that policy consistently adhered to during your
2 tenure in the compliance department at H.D. Smith?
3    MR. PADGETT:  Object to form.
4 BY THE WITNESS:
5    A.   I can't answer that in -- in certainty.
6 BY MR. YOUNG:
7    Q.   Okay.
8    A.   When I came back in April 2009 after
9 getting up to speed with policies and -- and
10 procedures, we continued to improve our processes.
11    Q.   Okay.
12    A.   But all of these things that are on these
13 bullet points are things that we do on a regular
14 basis.
15    Q.   But you may not do them -- do all of them
16 in every investigation of a Level II?
17    A.   It may not get to that.  We may -- we may
18 get -- our Level II investigation may be we -- we do a
19 purchase review and decide that -- that this customer
20 is not someone that we want to do business with.  We
21 may go through a -- a usage report, a -- a
22 prescription analysis and determine factors that --
23 that would give us reasonably there may be some
24 diversion and we would con -- that we would -- that

Page 236

1 would stop our investigation and we would cut the
2 pharmacy off from controlleds and report them.
3       So there is -- there is -- there is a lot
4 of different steps in our investigation and -- and we
5 can stop our investigation at any time to make a
6 determination.
7    Q.   You mentioned utilization reports.  The --
8 or -- or maybe dispensing -- I forget what you called
9 them.  Dispensing reports?
10    A.   They are both.
11    Q.   What's a -- describe for us, what is a
12 drug utilization report?
13    A.   There is different forms of those, but
14 a -- a -- just a typical utilization report that you
15 get from a pharmacy software package usually just
16 shows what their top drugs that they dispense and we
17 as a practice try to get all of their drugs, not just
18 controls, because we want to see what their percentage
19 is.  It would list all of their drugs in -- in order
20 of dispensing in a certain time period, how many
21 dosage units, how many prescriptions.  That's
22 something that most pharmacies can give us in a -- in
23 a relatively quick fashion recently.  It depends on
24 your time period you are talking again.  If you go

Page 237

1 back ten years ago, they were very difficult to get
2 from pharmacies.
3    Q.   So in 2008 how would you obtain a -- a
4 DUR?
5    A.   We would ask the -- the pharmacy for a
6 dispensing report and we could get that in a
7 500-page fax, we could get most -- you know, I won't
8 characterize, but it was difficult for a typical
9 pharmacist to work a computer and get the information
10 that we needed.
11       We -- we now employ -- I mentioned that
12 before because I worked for them -- Pro Compliance, we
13 use them as a vendor.  They get the -- the dispensing
14 information for us from the pharmacy and put it in a
15 usable form that we can easily analyze with our
16 analysts to look at all of the factors that -- that I
17 mentioned before in a -- in a snapshot where we can,
18 you know, make -- make easier more educated decisions
19 on pharmacies.
20    Q.   Did H.D. Smith ever determine that a
21 pharmacy was misrepresenting its drug utilization
22 report?  In other words, underreporting controlleds or
23 over-reporting non-controlleds to decrease its ratio?
24    A.   I -- it would depend on the individual

Page 238

1 circumstance because the way we look at data is
2 different than the way a typical pharmacist or owner
3 of a pharmacy looks at data. And, as I said before,
4 most of them are not great with computers.
5     Q.   You are not aware of a pharmacy trying to
6 game a system by underreporting controlleds in its
7 DUR?
8     A.   Not on purpose.
9     Q.   Have you had any communications -- you --
10 you worked for Pro Compliance briefly, right?
11    A.   I did.
12    Q.   Are you aware of Pro Compliance
13 experiencing that deception from any of its pharmacies
14 that it acquires DUR data from?
15    A.   No, because the -- actually, two parts.
16 Not that they would know about. They get the
17 information from the source, from the software and
18 then they bring it in raw and then they run it through
19 an analytical program, but that is not to say that if
20 a -- if a pharmacy was filling fraudulent scripts or
21 counterfeit scripts, that -- that wouldn't be readily
22 identified. There would be no way to know that.
23    Q.   Okay.
24        I want to show you, this is Exhibit 33.

Page 239

1 And this may be something you referred to earlier.
2 This is -- it looks like a PowerPoint. Take a look
3 and see if that looks familiar to you?
4     A.   It is familiar to me. I'm not sure if I
5 was the one that presented this or not.
6     Q.   Okay. Is that somewhat consistent with
7 the compliance training PowerPoint you described
8 earlier?
9     A.   Yeah, it's some of the information
10 that's -- that's usually in our --
11    Q.   Okay. And turn to -- yours is flagged.
12 Let's see. Go to Page 4. It says, "Recent DEA
13 Actions. H.D. Smith response in Florida Division."
14        What is that referring to?
15        Do you recall?
16    A.   In light of the oxycodone issues that were
17 occurring in Florida, and specifically South Florida
18 where we had a facility in Pompano Beach, we had been
19 in contact -- you know, constant contact, actually,
20 with -- with DEA personnel in Florida regarding the --
21 the issues of oxycodone. And in response to some
22 discussions that I had with DEA, Chris Smith made a
23 decision to halt all oxycodone sales into Florida
24 until every single account of ours could be visited.

Page 240

1 And so that's what a lot of this pertains to.
2     Q.   Okay. I want to understand a little bit
3 about that decision.
4        H.D. Smith decided that it should
5 discontinue oxycodone sales into Florida of its own
6 accord?
7     A.   Yes.
8     Q.   Did the DEA have any influence over that
9 decision?
10    A.   No, only through discussions I had with
11 DEA about the issues with -- with oxycodone and with
12 us being in South Florida, which was kind of the
13 epicenter of that issue, that was something that --
14 that Chris Smith decided that H.D. Smith should do and
15 we did it on our own accord.
16    Q.   Okay. I want to show you Euson
17 Exhibit 35. I'm going to come back -- well, we don't
18 need to come back to that one, but this is a letter, I
19 believe, from you to Leonard Levin at the DEA dated
20 April 27th, 2010.
21        So, do you recall this letter?
22    A.   Yes. I'd have to reread it all --
23    Q.   Sure.
24    A.   -- if you want me to answer about it.

Page 241

1     Q.   And we don't need to do that. I'm just
2 going to address some -- some particular points.
3        But this references a meeting. And it
4 says: "This follows our meeting on Friday,
5 April 23rd," which would have been the prior week of
6 the -- of this letter. And it says in the highlighted
7 portion, can you read that for us: "However"?
8     A.   "However, given the tone and rhetoric of
9 your statements during Friday's meeting, we are also
10 concerned that the company is at risk for regulatory
11 action by the DEA if it does not reduce sales of
12 certain drugs to some of its customers in Florida.
13 Accordingly, this letter is to inform you that
14 H.D. Smith will immediately reduce sales of oxycodone
15 and other controlled substances, as appropriate, to
16 the customers you identified during the meeting on
17 Friday."
18    Q.   Okay. So there was a meeting, I take it,
19 between you and Mr. Levin on April 23rd, 2010.
20        Do you recall that?
21    A.   Um-hum, yes.
22    Q.   At that meeting, just based on your letter
23 here, it appears that Mr. Levin identified for you and
24 for H.D. Smith particular pharmacy customers that it

Page 242

1 was asking you to reduce sales of oxycodone to.
2       Is that correct?
3       A.   We had a meeting called by DEA.  Leonard
4 Levin was in headquarters.  Also Susan Langston, who
5 at the time I think was the group supervisor in the
6 Miami district, field office.  And I think Gayle Lane
7 who was a -- a division -- diversion investigator at
8 the time had a meeting and it was -- it was -- there
9 was a discussion about the issues with the oxycodone
10 in -- in Florida.  And, you know, they -- it was a --
11 it was a discussion about customers of ours and
12 customers in general and -- and the oxycodone issues
13 in general.
14       Q.   The -- the sentence that you read before
15 references tone and rhetoric of statements made at the
16 meeting by the DEA.
17       Do you recall specifically either the tone
18 or the rhetoric that the DEA had at that meeting?
19       A.   It -- it wasn't threatening, but it was to
20 the point.
21       Q.   A decision was made after that meeting,
22 which is what this letter is memorializing, to
23 immediately reduce sales of oxycodone and other
24 controlleds to the customers DEA identified.

Page 243

1       You mentioned previously that Chris Smith
2 made a decision to no longer sell oxycodone in Florida
3 at all.
4       Did the April 23rd meeting with the DEA
5 have any influence on that decision?
6       A.   Just they did identify a few accounts of
7 ours that they had issues with and we needed to do
8 more due diligence on.  There were already accounts in
9 Florida that we had been shutting down due to
10 oxycodone sales.  And then after that, not only
11 through this letter with -- with -- with Leonard
12 Levin, I was also in constant contact with Susan
13 Langston in -- in the Miami field office and we had
14 had discussions about the oxycodone issues in general,
15 and it was sometime after this, it wasn't as a direct
16 result of this meeting, but it was sometime after this
17 that -- that Chris Smith decided that we were going to
18 halt all sales of oxycodone until we could get into
19 every single customer and do complete new due
20 diligence on it, on every customer that we had in
21 Florida.
22       Q.   Do you recall whether or not the customers
23 that the DEA identified at that April 23rd meeting
24 which you subsequently reduced their oxycodone supply,

Page 244

1 do you recall whether or not H.D. Smith had conducted
2 a Level II investigations of any of those customers?
3       A.   At the time?
4       Q.   Yes.
5       A.   I -- I don't know.
6       Q.   Do you recall in the aftermath of this
7 meeting evaluating the specifically identified
8 customers identified by the DEA?
9       A.   I can only speculate that we did.  I would
10 have to check our due diligence files.
11       Q.   Do you know if there was a particular
12 report that would have been prepared or a memorandum
13 that would have been prepared reflecting that
14 evaluation of these specifically identified customers
15 in Florida?
16       A.   It would be in our due diligence files.
17       Q.   Just the individual due diligence file of
18 that customer but not a more general document?
19       A.   I don't know about those specific
20 pharmacies.  When we -- when we decided to halt all
21 sales of oxycodone in Florida, we had kept a -- kind
22 of a running spreadsheet on what our due diligence
23 efforts are because we had also brought in some
24 outside consultants to do site visits.  We were, you

Page 245

1 know, trying to get access to dispensing reports.  You
2 know, we were doing our own visits.  So there was a
3 lot of moving parts and so we tried to keep it
4 organized with a -- with a spreadsheet and we had
5 weekly meetings to discuss the accounts with the
6 division and what -- what our actions were.
7       Q.   Do you know whether or not -- or do you
8 recall whether or not the DEA opined that your
9 policies and procedures or systems to identify
10 suspicious drug orders were insufficient at that
11 meeting?
12       A.   They did not, that I recall.
13       Q.   Did they make particular feedback to you
14 about your policies, procedures or systems to identify
15 suspicious orders at that meeting?
16       A.   Not that I recall.
17       Q.   Can you read for me the sentence which
18 immediately follows the highlighted portion that
19 begins with: "In light of"?
20       A.   Wait.  Where are you at?
21       Q.   The first highlighted portion, it sort of
22 ends with "and will continue to review orders of other
23 customers."  The next sentence there, it is not
24 highlighted, it says: "In light of the meeting on

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1 Friday."
2     A.   "In light of the meeting on Friday,
3 H.D. Smith will take and apply the DEA's fade" --
4 "feedback to the company's overall policies and
5 procedures for identifying suspicious drug orders."
6     Q.   So reading that, does that refresh your
7 recollection about any feedback that the DEA may have
8 given you at that meeting about your policies and
9 procedures?
10     A.   I don't recall, but I also -- they would
11 not have -- they wouldn't even know what our policies
12 and procedures were.
13     Q.   Do you know if your policies and
14 procedures and systems, including the CSOMP that were
15 in place in April of 2010, identified any of the
16 pharmacy customers which were named by the DEA at that
17 April 23rd meeting as suspect or suspicious customers
18 in terms of their controlled ordering?  In other
19 words, were they on your radar?
20     A.   I don't know without looking at that.
21     Q.   Okay.  Can you read the -- the next
22 sentence, which is:  "We heard"?
23     A.   "We heard and understood the DEA's concern
24 Friday regarding prescribing issues in Florida."

Page 247

1     Q.   And -- and you can go ahead and finish it?
2     A.   "And we at H.D. Smith hope to work in
3 collaboration with the DEA to help address the
4 issues."
5     Q.   That seems to be a larger reference than
6 just the pharmacy customers the DEA identified
7 prescribing issues in Florida.
8     Do you know whether or not those concerns
9 are what informed Chris Smith's decision to no longer
10 sell oxycodone in Florida?
11     A.   I believe that what they were referencing
12 was the issue with pain clinics, the proliferation of
13 pain clinics in Florida.  We never sold directly to
14 pain clinics, but prescriptions that were written by
15 those pain clinic doctors would have filtered out and
16 been filled by some of our customers.  So -- and the
17 reason why we, you know, were insistent on looking at
18 prescription data, so that we could identify doctors
19 that may have questionable prescribing habits that
20 would be filled at our pharmacies.
21     Q.   You had access to the data to be able to
22 identify the providers that were writing the
23 prescriptions?
24     A.   Sometimes we did, sometimes we didn't.

Page 248

1 We -- we could not go in to a pharmacy and look at
2 prescriptions, that's a HIPAA violation.
3     Q.   Would a DUR report contain the prescriber
4 DEA number?
5     A.   It depended.  At this time -- it depends
6 on the timing.
7     Q.   In -- in 2010?
8     A.   Sometimes a pharmacy could give us that
9 information, sometimes it was not easy to discern the
10 prescriptions or the combinations.  We could get a
11 list of doctors that they were filling for, but not
12 the detail.  Some pharmacies were able to give that to
13 us, some only gave us utilization reports that didn't
14 have any doctor information on it and we had to ask
15 them and hope that they were telling us the truth
16 because we didn't have access to those records.
17     Once we were a -- you know, able to get
18 Pro Compliance reports, that does identify the doctor
19 that prescribes by prescription and that de-identifies
20 any of the HIPAA information so there is no HIPAA
21 violations.
22     Q.   Were these issues isolated in a particular
23 geographic region of Florida or was it just endemic to
24 Florida?

Page 249

1     A.   Population centers.  South Florida mainly,
2 but over in Tampa, Orlando, Jacksonville.
3     MR. PADGETT:  The big cities.
4 BY MR. YOUNG:
5     Q.   Okay.  One more thing on this one.
6     On Page 2, the second -- well, the first
7 full paragraph, it begins with:  "While H.D. Smith was
8 developing and implementing."
9     Could you read two sentences for us?
10     A.   "While H.D. Smith was developing and
11 implementing new and enhanced procedures for SOM,"
12 which would be suspicious order monitoring,
13 "H.D. Smith provided detailed information to DEA about
14 its SOM.  The DEA even requested that H.D. Smith enter
15 into a memorandum of understanding regarding the SOM."
16     Q.   Did H.D. Smith ever enter into that
17 memorandum un -- of understanding or MOU?
18     A.   That would be subject to interpretation.
19 We had a memorandum of -- of understanding as a result
20 of our meeting in October of 2007 where DEA wanted us
21 to report suspicious orders to headquarters as opposed
22 to the field office as per regulation and then also
23 wanted us to report daily sales of all controlled
24 substances to DEA on a daily basis.  So we complied

Page 250

1 with that. We signed the memorandum of understanding.
2 We complied with all aspects of it and DEA never
3 signed it and they lost it.
4    Q.   Okay. But it was your intention to enter
5 into MOUs?
6    A.   Yes, operated under the what we thought we
7 were supposed to do under the memorandum of
8 understanding.
9    Q.   Do you know, was that typical for the DEA
10 to seek MOUs with distributors?
11    A.   I don't know.
12    MR. PADGETT: Object to form.
13 BY MR. YOUNG:
14    Q.   Was it discussed at any of the meetings
15 that -- the larger meetings, not the individual
16 meetings that you had with the DEA, this idea of
17 entering MOUs?
18    A.   I -- I don't know. I believe there are
19 some other wholesalers that -- that do daily
20 controlled sales to DEA, but I -- I -- I don't know
21 that for sure.
22    Q.   Okay. I'm going to show you what I think
23 is 35. I may have just gone out of -- yeah, it is the
24 previous one, that one.

Page 251

1       And, again, I have flagged this for you,
2 one, two, three, four --
3    MR. YOUNG: For the rest of you, Page 5.
4 BY THE WITNESS:
5    A.   The tab there, the green tab?
6 BY MR. YOUNG:
7    Q.   Yeah. The little tab, that's what I
8 should say, Page 5.
9    MR. PADGETT: Which exhibit?
10    MR. YOUNG: 35. Was it 34? No. 35, yeah.
11    MR. LEADER: No, it's not 35.
12    MR. PADGETT: You just had 35.
13    MR. YOUNG: Oh. Is it 36? No. And I did 34.
14 My apologies. I got all out of sequence there.
15 BY THE WITNESS:
16    A.   Do you want that back?
17 BY MR. YOUNG:
18    Q.   No, no, that's the right one.
19       And I just want to talk, you know, just
20 quickly. This -- this document looks like another
21 PowerPoint. Is this something that you prepared, do
22 you know? I mean, it has got your name on it, but...
23    A.   It would have been me or Debbie Komoroski
24 or in conjunction with a combination of both of us.

Page 252

1    Q.   Okay. On Page 5 of that document, it
2 says, "SOM" and then the highlighted portion that
3 we've highlighted, it says: "Excessive orders will be
4 stopped and not shipped!"
5       Is this some type of change or a new
6 policy or is this just a statement that this is how it
7 is? What -- what's the -- what's the basis for this
8 statement?
9    A.   It is not a new policy. I think it is
10 just reiterating what we've -- what we've been doing
11 since we started CSOMP and that we don't -- anything
12 that -- you know, anything that flags our system, if
13 we -- it is held and then if we determine it's
14 suspicious, it is never shipped. At this point in
15 2012, you know, it -- those orders weren't shipped.
16    Q.   Okay. Prior to this training, I think
17 this is called a training, yeah, sales training, prior
18 to this sales training rollout were excessive orders
19 stopped and not shipped?
20    MR. PADGETT: Object to form.
21 BY THE WITNESS:
22    A.   As I stated, once -- once we had CSOMP up
23 and running, any orders that would have hit our
24 system, which would have included something that --

Page 253

1 that went over our threshold, if you want to consider
2 that excessive, that is stopped and not shipped until
3 we determine if it's suspicious or if it's not
4 suspicious. This was for sales and operations
5 training.
6 BY MR. YOUNG:
7    Q.   Okay.
8    A.   It was just a reiteration of what we were
9 already doing.
10    Q.   There is a -- bullet point beneath there
11 which says: "It is extremely important that we know
12 our customers" and then there is a reference to
13 promotion purchases.
14       What is that referring to?
15    A.   Without further reference, I'm not exactly
16 sure.
17    Q.   Are you familiar with, like, a summer
18 sales promotion program?
19    A.   There was promotions that -- that the --
20 that the company would put on, you know, occasionally
21 throughout the year.
22    Q.   Was H.D. Smith concerned from a compliance
23 standpoint that promotional purchases that exceed the
24 URL would artificially inflate the URL based on your

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1  formula?
2      A.   Early on in my tenure there we stopped any
3  controlled substances being offered on promotion.
4      Q.   Okay.  So promotion purchases then
5  wouldn't impact suspicious order monitoring?
6      A.   No, because there were no controlled
7  substances that were on promotion.
8      Q.   Yet under the suspicious order monitoring
9  slide of this training module it is specifically
10  mentioned?
11      A.   Again, it was probably just a reiteration
12  of what we already had in place.
13      Q.   Okay.
14      A.   And that there were no promotion purchases
15  or, you know, there were no promotional -- controlled
16  substances were not included in any promotional-type
17  sales events.
18      Q.   And then finally, it talks about
19  assistance of the sales team and ongoing
20  communication.
21          Do you recall what kind of message you
22  gave during this training about ongoing communication
23  with pharmacies from the sales team for suspicious
24  order monitoring purposes?

Page 255

1      A.   I'm going to assume that it's -- it's --
2  it's an ongoing communication with the sales staff
3  because as I said we used them as our -- to
4  communicate with the -- the pharmacies.  They had
5  the -- the personal relationship with the pharmacies,
6  so any time we needed additional information, whether
7  it was dispensing information or we were going to do
8  an onsite visit, we coordinated that with sales staff.
9  Occasionally sales came with us so they could see what
10  we were doing when we did our site -- our onsite
11  visits, sometimes they didn't, but it was all -- any
12  contact with the customers is coordinated through the
13  sales rep that was responsible for that account.
14      Q.   Did you ever utilize sales staff to
15  conduct inspections of pharmacy customers?  I say
16  inspections.  That may not be the right word.
17  Investigations or site inspections?
18      A.   Not per se.  They were a part of our what
19  I would consider our initial due diligence on a
20  customer.  If they had a prospect that they wanted to
21  bring on as an H.D. Smith customer, they would be
22  required to fill out the -- the customer profile along
23  with all of the other paperwork they do and that
24  customer profile was then required to be sent to us

Page 256

1  along with photos of the pharmacy.
2          So I wouldn't call it a site inspection.
3  I would call it a -- an additional -- an initial "know
4  your customer" due diligence.
5      Q.   Beyond the initial assessment or
6  evaluation of the customer, did compliance ever rely
7  upon or ask sales staff to conduct compliance-related
8  investigations or inspections of pharmacies?
9      A.   We asked them, and, again, going back to
10  the training, to be vigilant and notifying us or
11  identifying -- you know, if they identified anything
12  that -- that we had trained them, you know, to red
13  flag indicators.  If there was lines coming out a door
14  or if they looked like there were drug sales going on
15  in the parking lot, we -- we wanted them to report
16  that back to us.  It wasn't a -- a compliance duty,
17  but it's a -- you know, part of what they were trained
18  to do.
19      Q.   Okay.  I -- I have the memorandum of
20  agreement that we talked about before and I want to
21  share this with you for one lim- -- very limited
22  purpose.  This is Exhibit 36.
23          And is that the document that you recall,
24  the unsigned MOU between H.D. Smith and the DEA?

Page 257

1      A.   I believe this is.
2      Q.   And really I just want to use this
3  document to refresh your recollection about the timing
4  of the implementation of the CSOMP program.
5          On the last page there is a reference to
6  what I think are your divisions or distribution
7  locations.  It is called Exhibit 1.  And it has dates
8  next to them.
9          Is that -- well, let me ask you this way:
10  What do these locations and dates represent to you?
11      A.   Well, it is not all of our distribution
12  centers, so I'm not exactly sure, but I -- if -- if I
13  could compare this with our documents, I would assume
14  that this is when we rolled out CSOMP to our -- these
15  divisions, but there were -- there are more divisions,
16  so I don't know.
17      Q.   Sure.
18          But I guess at the time that this document
19  was created, this was the -- the state of affairs?
20      MR. PADGETT:  Object to form.
21  BY THE WITNESS:
22      A.   I can only assume, because it's not a
23  complete list, that this is the timeline that we
24  reported to DEA that we would roll out our CSOMP

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1 system to the various divisions.
2 BY MR. YOUNG:
3    Q.   Okay.  Okay.  Thank you.
4         We are getting there.  Are you okay as far
5 as -- everyone at the end?
6    A.   I'm fine.
7    Q.   Bladders are nice and dry.
8         This next document, which is Exhibit 37,
9 it is a little lengthier, and let's give him that
10 version.  I want to use this one.
11        So this, again, may be a document that you
12 have never seen, but that nonetheless has been
13 provided to us, which is a report of investigation by
14 the DEA.
15        Have you ever seen that document?
16   A.   I think I've -- it -- I think this -- I've
17 seen this in -- in connection with SafeScript cases.
18   Q.   Okay.  I want to direct your attention to
19 Page 13 of this document regarding ARCOS reporting.
20   A.   I think there were numbers somewhere.  Oh.
21 MR. PADGETT:  Page 13 of 24?
22 MR. YOUNG:  I believe so.  That's what my notes
23 reflect.
24 MS. COOK:  HDS_Euson_00165 -- 166.

Page 259

1 MR. YOUNG:  Ah, there we are, yes.
2 MR. MARTINEZ:  Bates No. 166.
3 BY MR. YOUNG:
4    Q.   So I'm sorry.  It's Page 14 of 24, and
5 it's Section H, ARCOS Reporting.  This report
6 references errors in H.D. Smith's reporting of its
7 ARCOS data to the DEA.
8         Are you familiar with that issue from
9 2006?
10   A.   Yes.
11   Q.   Do you recall the cause of the problem
12 with the ARCOS reporting in 2006?
13   A.   My understanding, it was something to do
14 with an IT glitch in our system that had -- that was
15 corrected, but that was -- I don't know all of the
16 technical parts of it.
17   Q.   Sure.
18        Are you familiar with any other glitches
19 in ARCOS reporting from H.D. Smith to the DEA aside
20 from the -- the one referenced here in 2006?
21   A.   There is -- there is occasional errors
22 in -- in reporting, and it can be a variety of
23 different reasons for it.  It could be, you know, an
24 ND -- a new product that DEA doesn't have a record of

Page 260

1 in their NDC files and we report it and they send it
2 back as an error.  There is a -- it -- it's a -- we
3 report monthly for all of our DCs and there is
4 always -- I don't want to say always, but it is not
5 uncommon to have errors in ARCOS reporting.
6    Q.   But in your role as chief of compliance
7 during your tenure, have you uncovered more than a
8 one-off type ARCOS reporting problem?
9    A.   No.
10   Q.   So the data that the DEA has in its ARCOS
11 database regarding H.D. Smith transactions would be
12 accurate aside from a handful of errors you described?
13   A.   I can't speak to the accuracy of DEA
14 records.
15   Q.   The -- the data that you reported to the
16 DEA in the ARCOS data stream, upstream to the DEA,
17 that would be accurate for the most part?
18   A.   To the best of my knowledge.
19   Q.   The -- this document also references, I
20 think it's -- I'll find it in a sec -- oh, here it is.
21 On Page 4 of this document, it references DEA reg --
22 oh, wait, I'm sorry.  That's not correct.  I'm looking
23 for the section that has the 12 vendors that were no
24 longer -- this right here.

Page 261

1         We'll find this reference in just a
2 second, but the DEA notified H.D. Smith that 12 of its
3 customers' DEA registration numbers were no longer
4 valid.
5         Is that -- is that typical, obviously we
6 are --
7    A.   Can you show me where --
8    Q.   Yeah, we will, but --
9 MS. COOK:  HDS_EUSON_00167 on the top of the
10 page.
11 MR. YOUNG:  Page 15 of 24.
12 BY THE WITNESS:
13   A.   Page what?  I'm sorry.
14 BY MR. YOUNG:
15   Q.   It's in the -- it's in the continuation of
16 that ARCOS section, I believe.  It is the last two
17 sentences:
18        "H.D. Smith had also been notified by
19 ARCOS of approximately 12 vendors and a few customers
20 whose DEA registration were being used to report
21 transactions were no longer valid.  These problems are
22 in violation of 21 CFR 1304.33."
23        Is that the only instance of this that you
24 are aware of or is this fairly common that people lose

Page 262

1 their DEA registration numbers and they don't notify
2 H.D. Smith and so you keep doing business with them?
3 A. I know what the issue with the vendors
4 was. We had, and it was a rela-- relatively new
5 process of manufacturers using third-party logistics
6 companies back in 2006. So if we had a manufacturer
7 that we were purchasing from, at this point we had
8 their DEA -- their DEA registration on file. We were
9 purchasing from them. They, in turn, instead of
10 shipping it from their DEA-registered site would ship,
11 have it shipped from a third-party logistics company,
12 which could be UPS.
13 Q. I see.
14 A. And it would come in from UPS, it would
15 have an -- and according to regulation, you have to
16 buy -- or you -- you have to reflect the DEA
17 registration from who you received the product from.
18 So it was inaccurate reflection of -- that we got the
19 product from, say, UPS instead of from Mallinckrodt.
20 I'm just -- I'm throwing those examples out. That was
21 the issue with these.
22 Q. No, I understand.
23 A. And we did correct it and we made -- we
24 made modifications to our paperwork that our

Page 263

1 purchasing department used to make sure that we knew
2 where the product was coming from, if it wasn't coming
3 from the -- the actual manufacturer's registered
4 facility but it was coming from a third-party
5 logistics or a contract manufacturer, there is a lot
6 of different variables in there, but...
7 And the customers, I don't know the exact
8 issue with that. We do now have a -- a daily feed
9 of -- from a company called NTIS. They work with DEA.
10 And those -- those numbers daily are bounced against
11 our customer lists and if anyone -- if there is an
12 issue, our system automatically stops any sales to
13 that customer.
14 Q. When did that contract with NTIS begin?
15 A. We've had it for a while. I believe at
16 one point it was a weekly feed and then they offered a
17 daily feed and we went to the daily feed and I don't
18 know if that's why there was a -- a issue with a few
19 customers here. I'd -- I'd have to look into it
20 further to -- to give you a better explanation.
21 Q. Okay. I'm going to turn to Exhibit 38.
22 Exhibit 38, why don't you take a look. I think you
23 authored this document.
24 Well, I'm sorry, you didn't author. This

Page 264

1 is actually to you.
2 A. Right.
3 Q. Are you familiar with this document?
4 A. Not particularly. I know it's addressed
5 to me and I'm sure that I got it back in 2010. I know
6 Andrew Burchard was a -- at the time we had an
7 internal audit team.
8 Q. I direct your attention to the second
9 page of the document. It talks about missing customer
10 due diligence profiles and site visit limitations.
11 And let's just kind of walk through these highlighted
12 portions here. The first one is titled "Missing
13 Customer Due Diligence Profiles."
14 Can you read that?
15 A. "None of Division 3 Smith Medical Partner
16 profiles have been completed" -- "completed at this
17 time."
18 Q. What is Division 3?
19 A. Smith Medical Partners was our
20 specialty -- our specialty division that service
21 mainly doctors' offices.
22 Q. And the next highlighted section says:
23 "Profiles have not been completed for the Smartsource
24 customers in the CA," I don't know if that's

Page 265

1 California division?
2 A. Yes.
3 Q. What is Smartsource customers?
4 A. Smartsource is a generic program run by
5 H.D. Smith to increase sales of generics. And I'm not
6 avoiding your question. I'm getting my head around
7 it --
8 Q. Yeah.
9 A. -- Smartsource. It's a -- it's not a --
10 it's not a separate division. It's a program where
11 they have -- market to -- to customers to increase
12 generic sales.
13 Q. Did that include controlled substances
14 like opioids?
15 A. They are not -- they do not sell C-IIs.
16 Q. Okay. So no Smartsource customers receive
17 C-IIs?
18 A. And they weren't allowed to have -- we
19 wouldn't sell them controlled substances unless we had
20 profiles and vetted them out first.
21 Q. Okay.
22 A. So there may not have been profiles done
23 on all of them, but they weren't buying controls.
24 Q. Without the profiles --

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  A.  Yes.

2  Q.  -- they can't get controlleds?

3      Okay.  So I want to skip down to the Site

4  Visit Limitations section just below there.

5      It says -- are you -- go -- can you go

6  ahead and read that paragraph for us?

7  A.  "It was determined through testing that

8  the customer site visit control is effective.

9  However, with current resources the compliance team is

10  unable to complete all needed site visits within the

11  year.  Current high risk customer population was

12  estimated at 200, but is likely substantially larger

13  than that.  Only 37.5 percent of the current high risk

14  customer population can be visited with current

15  resources."

16  Q.  Do you agree with that site visit

17  limitation assessment from Mr. Burchard?  "You"

18  meaning H.D. Smith.  I should clarify.

19  A.  Yeah, I -- I understand.

20  MR. PADGETT:  Object to the form.

21  BY THE WITNESS:

22  A.  I don't -- without more context around

23  this, I don't recall what he was talking about here

24  and what he was considering high risk customers and

Page 267

1  how he estimated it at 200.  I don't know what

2  criteria he was using.  He was an internal auditor

3  with no compliance experience.

4  Q.  How many site visits could the compliance

5  team conduct within one year in the year 2010, as

6  staffed in 2010?

7  A.  I can't recall how many we had.

8      The only way I can answer that is that

9  I -- that's a -- site visits were -- were performed

10  as -- on an as-needed basis for customers that we

11  determined that we needed to go visit to do additional

12  due diligence on and we did those in a timely manner.

13  You know, they were -- I -- I had people in

14  California, I had people in Florida, I had people up

15  in the northeast, myself in the Midwest.  We've used

16  outside sources at times to do due diligence.  So we

17  were adequately staffed --

18  Q.  Okay.  So --

19  A.  -- in my opinion.

20  Q.  -- do you disagree with the audit

21  recommendation about additional staffing for

22  completing customer profiles and visits?

23  A.  That's a loaded question because I thought

24  we were adequately staffed, but if this would provide

Page 268

1  me with more staffing, I'd take it.

2  Q.  Okay.  I think earlier I asked you whether

3  you had ever requested and were denied more staffing

4  and your answer was no, right?

5  A.  No.  We continually through my tenure

6  increased our staff.

7  Q.  At the time that this audit was done and

8  the findings clearly were routed to you, you were

9  identified on the document as management owner and it

10  was addressed to you, there is an audit recommendation

11  of additional staffing to conduct these site visits.

12      Do you recall whether or not any

13  additional staffing was provided to you to achieve

14  these site visits?

15  A.  I would have to have the dates of

16  engagement, but I know that, you know, our -- from

17  2010 our staffing did increase.

18  Q.  Do you know whether or not the high risk

19  customer population shown in this report is estimated

20  at 200, whether or not that customer population was

21  visited within the year?

22  A.  I would not know that without knowing who

23  those customers are and I -- I don't know what his

24  definition of the high risk customer base is.

Page 269

1  Q.  If you received this recommendation about

2  your department compliance that used the term "high

3  risk customer population," would you inquire of the

4  auditor what he means by that?

5  A.  Without seeing my response, I don't know,

6  but I'm assuming I would.

7  Q.  You don't recall sitting here how you

8  handled the receipt of this report?

9  A.  No.

10  Q.  You have not used the term "high risk" to

11  refer to your pharmacy customers, that's not a phrase

12  that compliance uses?

13  A.  I -- I can't be certain that term has

14  never been used.

15  Q.  By you?

16  A.  I may have.

17  Q.  Is there another term of art or euphemism

18  that you might use within the compliance department to

19  refer to customers that someone else may refer to as

20  high risk?

21  A.  If someone referred a customer to me that

22  they thought was high risk, it would be someone that

23  we would do extensive due diligence, again --

24  Q.  What is another --

Page 270

1    A.   -- depending on who it was.

2    Q.   What is another term that you would use to
3    describe such a customer?

4    A.   If I was to use the term "high risk," I
5    would assume that they most likely would not be a
6    customer of ours anymore.  I just -- I can't tell you
7    that that's a normal --

8    Q.   Let me give you a better, more concrete
9    example.

10        The Keller's Apothecary pharmacy that we
11   talked about earlier, at some point you ended up
12   investigating them and made a decision to no longer do
13   business with them.

14        During the course of that investigation,
15   how would you refer to Keller's Apothecary, what term
16   would you use to describe them as a customer?  Were
17   they high risk?

18   A.   I don't know if I used that term or not.

19   Q.   How would you describe them?

20   A.   You know, and -- and it depended on
21   various times of our investigation of them and our --
22   our investigation around the -- the -- the primary
23   prescriber, the pharmacy itself.

24        When we decided to stop doing business

Page 271

1    with a customer or blocked our controls, when we
2    contacted DEA, we didn't use the term "high risk," we
3    used -- we just said that due to our -- basically due
4    to our compliance review, we were no longer going to
5    con- -- provide this pharmacy with controlleds.

6    Q.   So you can't recall a particular term of
7    art or euphemism or descriptor for pharmacies like
8    Keller's Apothecary?

9    A.   I -- no, no.

10   Q.   Okay.

11        Okay.  Moving off of that document on to
12   Exhibit 39 which is a two-page document actually from
13   Mallinckrodt.  And this is on Mallinckrodt letterhead
14   and it is called "H.D. Smith SOM Audit" dated
15   March 29th, 2012, in Hazelwood, Missouri.

16        Do you recall receiving this document?

17   A.   I'm sure I did.

18   Q.   Do you recall attending a meeting with
19   Mallinckrodt about suspicious order monitoring?

20   A.   I attended several meetings with
21   Mallinckrodt to discuss accounts and controlled
22   substances in general.

23   Q.   Was that typical among your manufacturer
24   vendors?

Page 272

1    A.   No.

2    Q.   And --

3    A.   Now I'm thinking that Mallinckrodt
4    instituted it.  I don't know of -- I know -- I see
5    this date, 2012.  I don't know where in the process,
6    if that was the beginning of when they instituted
7    these meetings, but, you know, they reached out to us
8    to meet with them and we met with them on a -- on a
9    regular basis.  We had conversations with them
10   regularly.

11   Q.   So there's two things I want to talk about
12   on this document.  The first is the second sort of
13   paragraph or section that says:  "H.D. Smith refuses
14   to sell oxycodone to a pharmacy that does business
15   with any 'pain doc' in Florida."

16        Is that referencing the Chris Smith policy
17   that you discussed earlier or is this something
18   different?

19   A.   Can I read through this for a minute?

20   Q.   Sure.

21   A.   Yeah, this, I believe, is -- it's not our
22   report.  It's Mallinckrodt's.  So when they say
23   "refuses to sell oxycodone to a pharmacy that does
24   business with any 'pain doc' in Florida," I don't know

Page 273

1    that that's an accurate statement, and I'm -- you
2    know, that's -- that's their words.

3    Q.   Okay.  So you disagree with that statement
4    that H.D. Smith refused to sell oxycodone to
5    pharmacies that do business with pain docs in Flon --
6    Florida?

7    A.   You know, part of our due diligence on
8    pharmacies in Florida was to get, you know, to know
9    them and to see who they were filling prescriptions
10   for.  You know, a typical pharmacy may do -- take --
11   fill prescriptions for 6-, 700 different physicians in
12   a month's time.  We would concentrate on the top
13   prescribers.  We usually found that five or six
14   prescribers in a pharmacy, at most, were responsible
15   for most of the controlled prescribing.

16        And we had a list of doctors that we used
17   that were -- that we thought were pain management
18   doctors with questionable prescribing habits and if we
19   saw those doctors in dispensing information from our
20   pharmacies in Florida, we would discuss that with the
21   pharmacy.  And if they continued to fill those
22   prescriptions, we would not sell controlleds to those
23   pharmacies, but to say that a blanket statement of any
24   pain doctor in Florida, I can't say that.

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    Q.   Okay.  Did you have an agreement, a
2  written agreement with Mallinckrodt to share
3  information with them?
4    A.   Not through compliance and I'm not -- and
5  I'm assuming that it's -- it's written, but there is
6  some sales data that is transmitted to different
7  manufacturers through wholesalers.
8    Q.   Yeah, and I'm specifically referring to,
9  like, a compliance issues?
10   A.   No.
11   Q.   No.
12   A.   We just did this as we agreed to meet with
13  them.
14   Q.   Mallinckrodt approached you about
15  meeting --
16   A.   They did.
17   Q.   -- about suspicious order monitoring?
18   A.   About controls, not about suspicious order
19  monitoring.
20   Q.   Do you know the impetus, why Mallinckrodt
21  decided to start doing that?  Did they share that with
22  you?
23   A.   I do not know.
24   MR. MILLER:  Hayden Miller on behalf of

Page 275

1  Mallinckrodt objecting to the form and scope.
2  BY MR. YOUNG:
3    Q.   I'm sorry.  I didn't hear your answer.
4    A.   I do not know.
5    Q.   Mallinckrodt in this document appears
6  to -- they reviewed your policy, so you shared your
7  corporate policies with them.
8         Do you recall doing that?
9    A.   We may have.
10   Q.   And then the -- the follow-ups, there's a
11  bot- -- at the very bottom it says:  "Requests
12  follow-ups.  H.D. Smith to provide dispensing data on
13  tourist pharmacy to Mallinckrodt."
14        Is that a typical information exchange?
15   A.   When we were doing due diligence,
16  specifically after discussions with Mallinckrodt, we
17  would share our due diligence with them on the
18  pharmacies and if that included a dispensing report,
19  we would -- we would provide that.
20   Q.   This identifies a particular pharmacy.
21        Do you recall whether or not that was the
22  only pharmacy that you shared with Mallinckrodt or was
23  it broader than that?
24   A.   I'd have to know the time period, but

Page 276

1  we -- we shared files with them.
2    Q.   Okay.
3    A.   From time to time.
4    Q.   This also mentions a pharmacy, Deris
5  Pharmacy, and the note on Deris Pharmacy, there is
6  actually two, one says, "Reevaluate... Higher cash
7  sales," but the Note 4 says:  "Concerns.  Pharmacy
8  using four distributors.  Mallinckrodt requesting due
9  diligence from other distributors."
10        Do you recall with regard to Deris
11  pharmacy whether or not you shared due diligence
12  information with Mallinckrodt?
13   A.   I do not know.  I'd have to -- that would
14  be in our due diligence files.
15   Q.   Is it typical for a pharmacy customer to
16  be served by four distributors at the same time?
17   A.   It's typical for pharmacies to use
18  multiple wholesalers and particularly in certain areas
19  of the country.
20   Q.   How about four, would four be typical
21  or --
22   A.   It can be.  There is many -- especially in
23  urban areas where pharmacies are, New York metro,
24  L.A., it is typical for them to price shop.

Page 277

1    Q.   Do you use drug utilization reports on
2  pharmacies that have multiple distributors, is that
3  like a -- if -- if the pharmacy has multiple
4  distributors, then you do a drug utilization report or
5  is there no connection between the two?
6    A.   It would depend on the circumstances.
7  Many times we wouldn't know that information.
8    Q.   Okay.  We'll shift gears to another
9  document.
10   MR. PADGETT:  Maybe a --
11   MR. YOUNG:  Break?
12   MR. PADGETT:  -- heading down the stretch break?
13  We've been going a good --
14   MR. YOUNG:  Do you guys want to take a break?
15   THE WITNESS:  Sure.
16   MR. PADGETT:  Yeah.
17   MR. YOUNG:  Go off the record.
18   THE VIDEOGRAPHER:  We are off the record at
19  4:13 p.m.
20        (WHEREUPON, a recess was had
21         from 4:13 to 4:24 p.m.)
22   THE VIDEOGRAPHER:  We are back on the record at
23  4:24 p.m.
24  BY MR. YOUNG:

Page 278

1    Q.   Mr. Euson, do you recall your Texas
2 facility, I'll call it H.D. Smith Texas division,
3 receiving a -- a DEA, what do we call this, a Formal
4 Notification of Deficiencies in 2014?
5    A.   You'd have to show it to me.
6    Q.   I -- I will certainly do so.  I just
7 wanted to see if you recall before I did.  I'm handing
8 you Exhibit 41, which is a letter to H.D. Smith from
9 the DEA dated November 21, 2014.
10    A.   I don't recall seeing this.  This -- I
11 wasn't at H.D. Smith at the time.
12    Q.   Okay.  When you returned to H.D. Smith
13 most recently, is this something that you would have
14 been made aware of or just it happened while you were
15 gone and you would never learn of it?
16    A.   I'd have to read through this to see
17 exactly what it is detailing.
18    Q.   If you're not familiar with the substance
19 of this violation letter -- let me ask you:  What did
20 you do to prepare for today's deposition?
21    A.   I went through --
22    MR. PADGETT:  Object to form.
23 BY MR. YOUNG:
24    Q.   Well, I'm concerned because this is a

Page 279

1 letter from the DEA indicating violations at a Texas
2 facility and a representative from H.D. Smith needs to
3 be here today to talk about CSOMP and its suspicious
4 order monitoring violations and you're not familiar
5 with this -- this incident in H.D. Smith's history.
6    And I want to understand is that because
7 this was overlooked or because it happened while you
8 were gone, did you fail to prepare for the -- this
9 type of information?  This document was provided to us
10 by your counsel.
11    MR. PADGETT:  Object to form.
12    You can answer.
13 BY THE WITNESS:
14    A.   That wasn't my answer.  My answer was,
15 yeah, I'd have to -- I said I'd have to read through
16 this to see what -- what the -- the violations are.  I
17 may have when I came back seen this, I may not have.
18 I don't recall.  But that doesn't mean that -- if I
19 read through this, I may be able to answer some of
20 your questions.
21 BY MR. YOUNG:
22    Q.   Sure.  Please take the time to read
23 through it.
24    MR. PADGETT:  In light of the -- kind of the

Page 280

1 statement you made, which topic are you aligning with
2 this Exhibit 41?
3    MR. YOUNG:  What do you mean which topic, which
4 30(b)(6)?
5    MR. PADGETT:  Which 30(b)(6) topic that you are
6 suggesting he wasn't adequately prepared for.
7    MR. YOUNG:  Sure.  Relating -- well, hold on a
8 minute here.
9    MR. PADGETT:  It doesn't really seem to fit
10 under administrative actions.
11    MR. YOUNG:  Your interact -- No. 7:  "Your
12 interaction with the DEA related to the scheduling of
13 controlled substances."
14    MR. PADGETT:  Scheduling, that's not even close.
15    MR. YOUNG:  I'm just going through them one by
16 one.
17    MR. PADGETT:  There is nothing to prep on that.
18    MR. YOUNG:  Hold on.  I've got to go to the
19 first one.  While you are reading that.
20    MR. PADGETT:  Sorry.  I'm pretty anal about
21 30(b)(6) reps.
22    MR. YOUNG:  Oh, we'll -- we'll present this
23 tomorrow, too, sorry.  Don't worry.
24    Where is my little guy.  Here we go.  I've

Page 281

1 got it.
2    The First Amended Notice, Letter H, Letter
3 G, Letter A, Letter I, Letter J, specifically
4 Letter M.  That ought to do it.
5 BY MR. YOUNG:
6    Q.   Are you familiar with the document?
7    A.   I know what it is.  I'm not familiar with
8 it.  I -- I may have seen it, I may not have.
9    Do you have any other information as far
10 as like the -- the response that we would have written
11 within 30 days?
12    Q.   I'm really limited to what your counsel
13 provides to me, so I'm not --
14    A.   I mean, this -- I mean, this is not like a
15 formal action.  It's a -- you know, it's a
16 notification, you have time to -- you have 30 days to
17 address what they have noted in here, and I don't know
18 just from this letter, like as with three, with --
19 with the order monitoring, you know, what -- what the
20 reference is.
21    Q.   Yeah, that's -- that's really what I
22 wanted to -- to focus on was No. 3.
23    A.   I don't know if there were specific
24 details that they gave the division that -- that

Page 282

1 brought them to this conclusion. I -- I do not know
2 that based on the information that -- that's here in
3 this letter.
4    Q.   So earlier in the very beginning of this
5 deposition I asked you whether or not H.D. Smith had
6 ever been in violation of the CSA requirements, and I
7 believe your testimony was, no, it had not. Yet in
8 No. 3 of this letter, the DEA says:
9        "The firm did not operate a system to
10 disclose to the registrant suspicious orders of
11 controlled substances in violation of 21 USC 827(d)
12 and 1301.74(b)(2)."
13       So I understand your testimony today is
14 you're not familiar with this and you don't have a
15 background in understanding what happened in Texas,
16 but in light of this letter and what I've just read to
17 you, do you wish to change your testimony with regard
18 to whether or not H.D. Smith has always been in
19 compliance with the CSA?
20    A.   No, because this -- this letter doesn't
21 give us enough information to know where they are
22 going with this. You have -- you have 30 days to
23 respond. I don't recall that there was any official
24 letter of admonition or anything else that would have

Page 283

1 gone with this. So I don't know if this was explained
2 away, if it was, you know, satisfactory to DEA. There
3 is not enough information to answer your question just
4 based on this document.
5    Q.   That's what I was hoping to obtain from
6 your testimony today, but you're not familiar enough
7 to give me testimony.
8    A.   Well, not without knowing what the
9 response was and getting more background into this.
10    Q.   How about with regard to No. 1 of this
11 letter:
12       "A controlled substance accountability
13 audit revealed the firm did not maintain complete and
14 accurate records of controlled substances distributed
15 by the firm. This is a violation of 21 USC 827(a)(3)
16 and 21 CFR 1304.21(a)."
17       Do you have any recollection as to whether
18 or not H.D. Smith responded to this particular aspect
19 of this Texas violation?
20    A.   I'm assuming they did.
21    Q.   Who would it have been at H.D. Smith that
22 would have responded?
23    A.   November 2014, I don't know.
24    Q.   Would this type of letter be a big deal to

Page 284

1 H.D. Smith?
2    A.   Yes.
3    Q.   This is a pretty significant finding by
4 the D -- DEA?
5    A.   Any -- any time --
6    MR. PADGETT: Object to form.
7 BY THE WITNESS:
8    A.   -- if you were to get any type of letter
9 like this we would take it seriously, because we take
10 our responsibility seriously.
11 BY MR. YOUNG:
12    Q.   Do you recall during your tenure, so only
13 the time when you were there, receiving a letter like
14 this from the DEA?
15    A.   Not particularly.
16    Q.   When did you return to H.D. Smith?
17    A.   During this time period?
18    Q.   Yes, sir, after this letter.
19    A.   May 31st, 2016.
20    Q.   And you don't recall in 2016 or any point
21 thereafter discussing issues out of the Fort Worth
22 division relating to this DEA letter?
23    A.   Not specifically, no.
24    Q.   Who -- who held your position at the time

Page 285

1 of this letter, November 21, 2014?
2    A.   There -- prior to my coming back a Tracey
3 Hernandez was the vice president of compliance and
4 security. I do not know her dates of -- of -- of
5 employment. I know after I left in 2013, one of my
6 compliance managers, Bill Stivers, assumed some of the
7 duties that I was doing, but without further
8 information regarding this, I can't answer that
9 question as to who would have responded to this.
10    Q.   Is this type of document something which
11 would have triggered a review by attorneys for
12 H.D. Smith, either internal or external?
13    MR. PADGETT: I'll object to form.
14    Go ahead.
15 BY THE WITNESS:
16    A.   Again, without the proper context on these
17 three items, I can't answer that. I don't know.
18 BY MR. YOUNG:
19    Q.   If you received a letter like this when
20 you were the chief of compliance, what would you do
21 with it?
22    A.   I would have investigated it. I would
23 have gotten with the -- Tim Van Bakel who was the
24 operations manager at that division and discussed what

Page 286

1 the findings were --
2    Q.   Is Mr. Van Bakel --
3    A.   -- and all of the situa- -- you know, the
4 situation surrounding it.
5    Q.   Is he still with the company?
6    A.   He is.
7    Q.   Do you know whether or not he is still in
8 charge of the Texas division?
9    A.   He is.  They have since moved.
10    Q.   If you received a letter like this, would
11 you refer this or forward it to inside or -- or
12 outside counsel for the company?
13    A.   Again, it would have -- it would have
14 depended on the circumstances surrounding this and if
15 there was explanations or remedies, it -- it -- it
16 would all depend.
17    Q.   I want to show you -- I'm going to move
18 off of this document.  You don't have any particular
19 knowledge about it.
20    MR. YOUNG:  I may want to revisit this document.
21 I think we are going to reserve our rights to revisit
22 this particular topic.  It may be isolated to Texas.
23 I don't know.  But obviously we want to talk about the
24 violations in Texas and what was done with them and

Page 287

1 the witness isn't prepared today to talk about that.
2 So we are going to reserve our rights to revisit that
3 particular issue.
4    MR. PADGETT:  I'm going to object to the
5 assumption of violations -- the allegations of
6 violations.
7 BY MR. YOUNG:
8    Q.   Okay.  So, I want to show you now
9 Exhibit 42-ish.  Yes, Exhibit 42, if you will.
10    And that one is particularly small.  I
11 apologize.  You might be better served looking at the
12 screen, although I'm not even sure that's a very good
13 copy.
14    Have you ever seen this document before?
15 I think this is dated while you are not with the
16 company, so that's why I ask.
17    A.   I may have seen this one when I came back.
18    Q.   Okay.  This is called Project Initiation
19 Form, and it's specifically -- the project is the
20 CSOMP improvements, and the dates of this is, it looks
21 like 5/6 of '15.
22    Are you able to read the project
23 objectives, the first bullet point under Project
24 Objectives?

Page 288

1    A.   "Add pattern and frequency."
2    Q.   Do you know prior to this date whether
3 pattern and frequency were elements of the CSOMP
4 program?
5    A.   The original CSOMP program was threshold
6 based.
7    Q.   So it did not take into account pattern
8 and frequency?
9    A.   Not inherently, no.
10    Q.   Okay.  Can you read underneath, it is the
11 next section down, "Impact if project not performed"?
12 You may not be able to read it.  It is very, very
13 fuzzy.
14    Are you able to read that?
15    A.   I'm trying to focus on it.
16    Q.   Let me -- let me see if I can read it and
17 to the extent you think it doesn't reflect the
18 document, let me know.
19    "Significant regulatory risk.  Current
20 program does not meet minimum DEA requirements,
21 especially pattern and frequency."
22    The next bullet point says:  "Civil
23 monetary penalty (McKesson recent fine of
24 150 million)."

Page 289

1    The next one says:  "Suspension or loss of
2 license and ability to sell control products."
3    And the final bullet point is:  "Risk to
4 the company reputation and patients if product is
5 distributed in illegitimate sources."
6    Do you think that those impacts if this
7 project is not implicated -- not performed are
8 accurate or is that overstating the risks of impact?
9    MR. PADGETT:  Object to form.
10    Go ahead.
11 BY THE WITNESS:
12    A.   We have threshold system, we did have
13 other checks on -- on patterns and frequency doing
14 purchase history checks and -- and checks on our -- on
15 our customers.  This was an enhancement to the system
16 to make it more automated because it was originally
17 just a threshold system.  I think the -- I think the
18 impacts are a little bit overstated.
19 BY MR. YOUNG:
20    Q.   Let me focus you on one of them.
21    A.   Okay.
22    Q.   The comment, I'm trying to figure out who
23 the author of this is.  It may be Tracey Hernandez.
24 She is identified as the owner of this project.

Page 290

1 The comment is: "Current program does not
2 meet minimum DEA requirements, especially pattern and
3 frequency."
4 Do you agree or disagree with that
5 conclusion?
6 A. The way our system was designed was on a
7 threshold basis. It did pick up on pattern and
8 frequency, but this was an enhancement to that --
9 Q. Yeah.
10 A. -- system.
11 Q. I understand that. That's not my
12 question.
13 My question is: Do you agree or disagree
14 with Tracey Hernandez's conclusion that the current
15 program does not meet minimum DEA requirements?
16 A. I believe they were meet --
17 MR. PADGETT: Object to form.
18 Go ahead.
19 BY THE WITNESS:
20 A. I believe we were meeting DEA
21 requirements --
22 BY MR. YOUNG:
23 Q. So --
24 A. -- of the order monitoring system.

Page 291

1 Q. So you disagree with Tracey Hernandez's
2 conclusion?
3 A. I believe that we were complying with
4 regulations.
5 Q. Do you know whether or not this Project
6 Initiation Form was implemented?
7 A. It was.
8 Q. Was it implemented prior to your return to
9 the company?
10 A. It was in process.
11 Q. There is another -- it might be better if
12 I see this real quick.
13 There is another section on here, which is
14 the second bullet point, it says: "Assess by DEA
15 number rather than account number."
16 Do you know what that's describing?
17 A. Where does that say that?
18 Q. Of the second bullet point in the very
19 first box. The first one is: "Add pattern and
20 frequency." The -- the bullet below that. It says:
21 "Assess by DEA number rather than account number."
22 A. Occasionally we have accounts that --
23 pharmacy customers that may have different accounts,
24 they may have a retail pharmacy, they may have service

Page 292

1 340B -- or not 340B, I'm on this. I forget the
2 designation for indigent patients.
3 Q. I think it is 340B.
4 A. Oh, okay. I'm getting too many acronyms
5 here.
6 Q. 30(b)(6) is what you were thinking.
7 A. Sorry. Yeah. That was -- yeah.
8 So they may have two separate accounts
9 that they order on and the way the -- the CSOMP was
10 originally designed, it was designed on account
11 number. So we changed that to -- to trigger off the
12 DEA number so we could more accurately reflect any --
13 any issues at a -- at a pharmacy.
14 Q. Do you know whether it was ever uncovered
15 that a single location pharmacy was using more than
16 one account number to obtain multiple threshold
17 amounts?
18 A. No.
19 Q. Did you ever discuss these findings with
20 Tracey Hernandez?
21 A. She was gone when I came back.
22 Q. Did you ever review any reports that she
23 may have written or memoranda that she wrote about
24 that particular bullet point, the DEA number rather

Page 293

1 than account number?
2 A. Not with her. I discussed that with my
3 staff, and we thought that would be a good enhancement
4 to the system as it was.
5 Q. But it wasn't -- it wasn't part of the
6 system prior to your departure?
7 A. No.
8 Q. Okay. The next exhibit is Exhibit 43.
9 Let's see. I think I'm off by one. There we go.
10 Exhibit 43, which is an e-mail from Tracey Hernandez.
11 There you go.
12 So I'll direct your attention to Page 4 of
13 that exhibit, which is a type of report titled "CSOMP
14 Fixes and Modifications Required," and it is dated
15 February 18th, 2015.
16 A. Okay.
17 Q. Have you seen this before?
18 A. I can't recall this specifically, but
19 I'm -- assume I did.
20 Q. Okay. So let's just walk through it
21 quickly. It's -- the first bulleted section, the
22 CSOMP Issues - Broken Functionality. And the first
23 section says:
24 "If a separate controlled drug order comes

Page 294

1 into CSOMP while another is pended for the same
2 family, the system will allow the second order to go
3 through. This order should be pending as well."
4 Are you familiar with that broken --
5 broken functionality of CSOMP?
6 A. I'm not sure what she is talking about
7 here because as -- as --
8 Q. So --
9 A. -- the functionality of CSOMP is that if
10 an order was suspended in a drug family, it blocked
11 all subsequent drug families.
12 Q. So in the middle of that first full
13 paragraph, there is a sentence that begins "System."
14 It says:
15 "System is currently set that if both
16 items are on the same order, it will pend, but if both
17 items are on separate orders, the order coming through
18 after the first order is placed on CSOMP hold will
19 release without going through CSOMP."
20 Now, I understand you weren't there at the
21 time, but do you have any reason to believe that isn't
22 the case of the system at the time?
23 A. Can you give me a second?
24 Q. Sure.

Page 295

1 A. I'm not certain, but I -- I think I know
2 what the -- the issue was here.
3 We have -- a few of our divisions do
4 multiple-day deliveries. Most are set up to where
5 they -- you get orders at night, they deliver in the
6 morning. We have some in the metropolitan areas that
7 someone can order in the morning and then order again
8 in the afternoon. That -- that order that comes in
9 that may -- that may pass the CSOMP test and is staged
10 for shipment and then another order comes in that may
11 for -- for later in the day or the next day comes in,
12 that first order will not get held up, it will go --
13 it will ship.
14 Q. That's not what this is describing.
15 A. Okay.
16 Q. This actually says the system is currently
17 set that if both items are on the same order, it will
18 pend, but if both items are on separate orders, the
19 second order coming through after the first order is
20 placed on hold, it will release.
21 A. I don't believe that's --
22 Q. That's the opposite of what you described?
23 A. I don't believe that's true.
24 Q. Okay.

Page 296

1 A. That's not the way the system is designed.
2 Q. Do you know whether this broken
3 functionality Section 1 was ever fixed after
4 February 18th, 2015, in the CSOMP at H.D. Smith?
5 A. I don't know that it was broken.
6 Q. Do you --
7 A. My -- to my knowledge, if -- if an order
8 was -- if an order in the same drug family was -- was
9 placed after an order was put on hold, it would hold
10 that order.
11 Q. Okay.
12 A. And all order -- all subsequent orders in
13 that drug family.
14 Q. Okay. Move on to Section 3. It is
15 talking about rejection code access and it gives a
16 specific -- a question about who has access to release
17 a Z5 CSOMP hold.
18 Do you know what a Z5 hold is?
19 A. Let me read through this for a second.
20 I -- I don't know what Z5 is.
21 Q. Okay.
22 A. It is a code in -- in our SAP program.
23 Q. So this finding on the broken
24 functionality of CSOMP found that 448 people in the

Page 297

1 company could release a Z5 CSOMP hold. And the
2 conclusion was it needs to be limited to an extremely
3 short list of compliance personnel.
4 You had testified earlier that under your
5 tenure only a small handful of compliance personnel
6 had the ability to increase URLs, right?
7 Do you know whether that is true for
8 rejection codes like the Z5, because this is
9 concluding otherwise?
10 A. Yeah, I don't know what the Z5 CSOMP hold
11 is.
12 Q. Okay. Who would have the most knowledge
13 about what the Z5 CSOMP hold is?
14 A. Probably somebody in IT that works on
15 the -- on the CSOMP program.
16 Q. And when you de -- I think you testified
17 earlier that you were the architect, not the data
18 architect, but the architect of CSOMP.
19 Who in the IT department did you work with
20 to -- to build this system?
21 A. Originally?
22 Q. Yes.
23 A. Rob Kashmer, Don Huckstep, and the other
24 name is escaping me, but there was three people that I

Page 298

1  worked mainly with. They are no longer with -- none
2  of -- none of them are long -- no longer with the
3  company.
4      Q.  Can you identify the person with the most
5  knowledge at H.D. Smith right now that would be able
6  to answer what a Z5 CSOMP hold code is?
7      A.  I can inquire, but I don't know.
8      Q.  Okay.  One more thing on this one, which
9  is, I believe -- where is this one?
10         So this appears to be a -- the document
11  we've been looking at appears to be support for that
12  earlier project improvement form that we were talking
13  about. No. 5 on this says: "Need to enhance CSOMP
14  with tools to detect orders of unusual frequency
15  and/or pattern."
16         I just want to verify you -- you testified
17  that the CSOMP at the time of this writing did not
18  include frequency or pattern tools, right?
19      MR. PADGETT: Object to form.
20  BY THE WITNESS:
21      A.  It did not inherently detect orders of
22  unusual frequency or pattern. It was threshold based.
23  BY MR. YOUNG:
24      Q.  And Item 6 is the multiple account number

Page 299

1  issue that we discussed before. And in this case the
2  author of this, which I assume is Tracey, said:
3  "Because the URL is assigned by account number, this
4  may cause the customer to double or, in some cases,
5  triple the amount of URL they are permitted. Three
6  account numbers equals three times the URL. This can
7  occur if a customer has a 340B, Smartsource and/or
8  standard account."
9         Does this refresh your recollection at all
10  about the dangers of using account numbers versus DEA
11  numbers in the CSOMP system?
12      A.  That's one of the enhancements we did to
13  closing the gap that there may be. It's not --
14  nothing -- to my knowledge, we didn't have any
15  customers that manipulated that part of that where our
16  CSOMP system was based on account numbers.
17      Q.  Okay. That's it for that document.
18         Hold on. We are going to skip ahead a
19  little bit. 46. Okay.
20         I'm going to hand you Exhibit 46. Which
21  is a lengthy document. It is the amicus brief of the
22  HDMA in support of Cardinal Health.
23         Have you seen that amicus brief before?
24      A.  I have.

Page 300

1      Q.  When did you -- when did you first see
2  that?
3      A.  I don't know when I originally first saw
4  it. I had reviewed it.
5      Q.  There is a section in that brief on Page 2
6  which says: "HDMA's members have not only statutory
7  and regulatory responsibilities to detect and prevent
8  diversion of controlled prescription drugs" --
9      A.  Wait. Wait. Where -- where are you --
10     MR. PADGETT: This, Page 2.
11  BY MR. YOUNG:
12     Q.  Yeah, Page 2. It should be highlighted on
13  your -- your copy. That "HDMA's members."
14     A.  Okay.
15     Q.  Okay. Can you go ahead and read that
16  paragraph for us? And then I want to ask you about
17  H.D. Smith's opinions about that paragraph.
18     A.  "HDA's" -- "HDMA's members have not only
19  statutory and regulatory responsibilities to detect
20  and protect diversion of controlled prescription
21  drugs, but undertake such efforts as responsible
22  members of society. The public health dangers
23  associated with the diversion and abuse of controlled
24  prescription drugs have been well recognized over the

Page 301

1  years by Congress, DEA, HDMA and its members, and
2  public health authorities."
3      Q.  Okay. Does H.D. Smith acknowledge a
4  statutory and regulatory responsibility to detect and
5  prevent diversion of controlled prescription drugs in
6  order to protect society?
7      MR. PADGETT: Object to form.
8  BY THE WITNESS:
9      A.  We have a regulatory responsibility to
10  maintain effective controls against diversion.
11  BY MR. YOUNG:
12     Q.  That wasn't my question.
13        The HDMA issued this amicus brief in
14  support of one of its members, Cardinal Health, and I
15  want to know to what extent you agree or disagree with
16  the positions espoused by the HDMA in this brief.
17        The first sentence says "HDMA members,"
18  and so here we are going to say, H.D. Smith has not
19  only a statutory and regulatory responsibility to
20  detect and prevent diversion of controlled
21  prescription drugs, but undertakes such efforts as
22  responsible members of society.
23        Do you agree or disagree with that
24  statement?

Page 302

1  MR. PADGETT: Object to form.
2  BY THE WITNESS:
3  A. Again, in -- in our place in the supply
4  chain, our responsibility and our regulatory
5  responsibility is to maintain effective controls
6  against diversion.
7  BY MR. YOUNG:
8  Q. Do you agree or disagree with the next
9  sentence: "The public health dangers associated with
10  diversion and abuse have been well recognized over the
11  years."
12  A. I agree with that.
13  Q. Let's see. There is another highlighted
14  section.
15  Can you turn to Page 3 with the
16  highlighted section that begins, "With the agency,"
17  and in this case the agency being the DEA.
18  Can you read that for us?
19  A. "The agency has failed to provide
20  meaningful guidance to assist the regulated industry
21  in complying with DEA's interpretation of its
22  implementing regulations. HDMA respectfully submits
23  that, despite the agency's oft-recited refrain that
24  the regulations are 'clear,' the regulated industry

Page 303

1  does not know the rules of the road because DEA has
2  not adequately explained them."
3  Q. Does H.D. Smith agree or disagree with
4  that statement?
5  MR. PADGETT: Object to form.
6  BY THE WITNESS:
7  A. I would agree that DEA has not
8  historically given clear guidance and has given
9  shifting guidance and -- to the regulated industry.
10  BY MR. YOUNG:
11  Q. You testified earlier about receiving the
12  two Joe Rannazzisi letters from the DEA, correct?
13  A. Correct.
14  Q. And I think you testified actually that
15  those were forms of guidance, right?
16  A. Yes.
17  Q. Is there something in the Rannazzisi
18  letters that you received in, is it '08 and '07, that
19  was unclear to H.D. Smith?
20  MR. PADGETT: 'It was '06 and '07.
21  BY MR. YOUNG:
22  Q. '06 and '07. Sorry.
23  MR. PADGETT: Object to form.
24  BY THE WITNESS:

Page 304

1  A. What I'm referring to is -- is guidance
2  that -- that we have asked for and not gotten. You
3  know, there are -- there are different, you know,
4  communications I've had with DEA where we have not
5  gotten clear guidance, there has been a shifting
6  interpretation of the order monitoring regulation
7  that's been in place for decades, and, you know, still
8  today we ask for assistance and get limited assistance
9  and guidance from DEA, who regulates us.
10  BY MR. YOUNG:
11  Q. Was the directive by the DEA to H.D. Smith
12  to create a suspicious order monitoring program to
13  identify and report suspicious orders, was that clear
14  to H.D. Smith, those obligations to create a -- a SOM
15  program, or was that unclear?
16  A. Are you talking about the automated system
17  that we put in place?
18  Q. Yes.
19  A. That was not a mandate. We voluntarily
20  created that system.
21  Q. Okay. Were -- were the laws, the
22  Controlled Substances Act and attendant regulations,
23  were those clear or unclear to H.D. Smith at the time
24  that it implemented its CSOMP program?

Page 305

1  A. It was unclear to the way the DEA was
2  interpreting them and what DEA -- and what industry
3  practice was at the time.
4  Q. Was the requirement to monitor pattern and
5  frequency in a CSOMP program clear or unclear in 2010?
6  MR. PADGETT: Object to form.
7  BY THE WITNESS:
8  A. When we've developed our CSOMP program, it
9  was clear to DEA through numerous communications with
10  DEA that our system was going to be a threshold system
11  to start out with. We never received any guidance for
12  or against that system and -- and it was clearly
13  communicated to DEA as to how our system operated.
14  BY MR. YOUNG:
15  Q. That wasn't my question. My question is:
16  In 2010 after the implementation of your CSOMP
17  program, was it clear or unclear to H.D. Smith that
18  pattern and frequency were required elements of a
19  CSOMP program?
20  MR. PADGETT: Object to form.
21  BY THE WITNESS:
22  A. I can only answer that that our system,
23  DEA knew what our system was, it was a threshold-based
24  system. To my knowledge many of the order monitoring

Page 306

1 systems that were -- that were created in industry
2 were threshold based and then we were in the midst of
3 developing to enhance that to detect more clearly
4 pattern and frequency.
5 BY MR. YOUNG:
6     Q.   So H.D. Smith did not view pattern and
7 frequency as required elements of its CSOMP program in
8 2010?
9     A.   We thought we were compliant with the
10 regulation with the threshold-based system which gave
11 us the ability to monitor our customers' purchases.
12     Q.   Was pattern a required element of the
13 CSOMP program in 2010, the pattern of orders from
14 customers?
15     MR. PADGETT:  I'll object to form.
16 BY THE WITNESS:
17     A.   I'm not clear what you are asking.
18 BY MR. YOUNG:
19     Q.   In 2010, after implementation of your
20 CSOMP program, there were instructions, or -- or I
21 should say communications with the DEA.
22         Is there anything that the DEA shared with
23 H.D. Smith that led H.D. Smith to conclude that it did
24 not have to include pattern or frequency in its CSOMP

Page 307

1 program?
2     A.   There was nothing communicated either way.
3     Q.   On what did H.D. Smith rely in not
4 including pattern and frequency elements in its CSOMP
5 program?  What was the basis for that decision?
6     A.   The basis was communication, consistent
7 communication with DEA in the development of our CSOMP
8 program and they knew exactly what our CSOMP program
9 was going to detect.
10     Q.   But you've got no -- nothing in writing
11 from the DEA saying that that was acceptable?
12     A.   They won't put anything in writing.
13     Q.   Again, you don't have anything in writing
14 from the DEA?
15     A.   I don't.
16     Q.   You don't have anything in writing from
17 Congress that says that that was acceptable, right?
18     A.   I don't.
19     Q.   How about the Department of Justice or
20 state board of pharmacies or state attorneys general,
21 have any of them given you anything in writing which
22 says it is acceptable to not include pattern and
23 frequency in your CSOMP program?
24     A.   No.

Page 308

1     Q.   Okay.  Turning to Page 10 of this brief,
2 there is another highlighted section.  Can you read
3 that for us?
4     A.   "The societal costs of prescription drug
5 abuse are huge, and the development and implementation
6 of practices and procedures to detect and prevent
7 diversion are burdens that HDMA members willingly
8 bear."
9     Q.   Do you agree that the societal costs of
10 prescription drug abuse are huge?
11     MR. PADGETT:  Object to form.
12 BY THE WITNESS:
13     A.   Define what the societal costs are.  Are
14 we talking monetary or --
15 BY MR. YOUNG:
16     Q.   HDMA, an organization that H.D. Smith is a
17 member of and serves on committees for and supports,
18 prepared this brief and this brief made this remark.
19 And I'm asking whether or not you an -- you agree or
20 disagree with this remark:  "The societal costs of
21 prescription drug abuse are huge"?
22     A.   And I'm trying to get more clarification
23 on what the definition of the societal costs are.  I
24 was not there when this was drafted.

Page 309

1     Q.   Okay.  So do you opine that the societal
2 costs of prescription drug abuse are not huge?
3     A.   I'm just trying to get a better
4 clarification of what the societal costs are.  If you
5 mean the societal costs are deaths of overdose, of
6 drug abuse, there is -- you know, statistically there
7 is an increasing number of people that die from
8 prescription drug overdoses and opioid overdoses
9 altogether.
10     Q.   And would you call those societal costs?
11     A.   It would be one of the definitions, yes.
12     Q.   And would you refer to those as huge or
13 not huge?
14     MR. PADGETT:  Object to form.
15 BY THE WITNESS:
16     A.   I -- I do think they are huge.  We -- you
17 know, we have a -- you know, we take our
18 responsibility serious.
19 BY MR. YOUNG:
20     Q.   Okay.  I want to turn your attention to --
21 this is going back to Mallinckrodt for those of you on
22 the phone.  This is Exhibit 54 that I will hand you
23 which is a Confidentiality and Restricted Use
24 Agreement.

Page 310

1    Is this the first time you've seen this
2  agreement?
3    A.  I can't be certain.
4    Q.  Okay.  And you don't need to read the
5  whole thing.  I just really wanted to ask you a couple
6  of -- of questions.  And you may not be familiar, you
7  may not know the answers to these, but there is a
8  highlighted portion at the bottom of Page 1 which
9  begins with: "Whereas, Mallinckrodt."
10    A.  Do you want me to read that?
11    Q.  Can you read that, please?
12    A.  "Whereas, Mallinckrodt, through its
13  chargeback system, can identify some of the pharmacy
14  customers who are purchasing its controlled substances
15  from multiple distributors/wholesalers and the volumes
16  of pharmacy customers are purchasing from each
17  distributor/wholesaler."
18    Q.  And I don't need you to -- to dig into
19  great detail about the chargeback system, but can you
20  just explain how it is that Mallinckrodt through the
21  chargeback system is able to identify pharmacy
22  customers purchasing controlled substances from
23  multiple distributors?
24    MR. MILLER:  Objection to form and scope on

Page 311

1  behalf of Mallinckrodt.
2    MR. PADGETT:  Same objection.
3  BY THE WITNESS:
4    A.  To my knowledge, H.D. Smith shares data
5  with Mallinckrodt on Mallinckrodt products going to
6  their pharmacy customers.
7  BY MR. YOUNG:
8    Q.  Is that a two-way sharing, does H.D. Smith
9  send information to Mallinckrodt only or does it also
10  receive information from Mallinckrodt?
11    A.  I don't know.
12    Q.  Who at H.D. Smith is in charge of the
13  information sharing with Mallinckrodt?
14    A.  I don't know if we have anybody at
15  H.D. Smith anymore that does that.
16    Q.  Historically, who -- is there one
17  person --
18    A.  We had a -- we had a department that was a
19  chargeback department but they are no longer.
20    Q.  And who was the person that headed up the
21  chargeback department, if you recall?
22    A.  I -- I don't know.
23    Q.  Do you know whether or not any pharmacy
24  customers were identified and you ceased doing

Page 312

1  business with them as a result of this information
2  sharing with Mallinckrodt?
3    A.  We had, like, quarterly discussions with
4  Mallinckrodt about customers, we would conduct due
5  diligence on customers they brought to our attention,
6  additional due diligence.  There were also notices
7  that Mallinckrodt would put out on certain customers
8  that they were denying chargebacks to and many times
9  it would not be customers of ours but we would block
10  them in our system to make sure that they did not
11  become customers of ours.
12    Q.  Was Mallinckrodt the only manufacturer
13  or -- or -- or vendor of yours that provided this
14  level of information?
15    A.  We had meetings fairly regular for a time
16  with Purdue Pharma.
17    Q.  Do you know whether or not Purdue Pharma
18  shared information with H.D. Smith that resulted in
19  H.D. Smith discontinuing servicing pharmacies?
20    A.  I can't -- I can't answer that
21  specifically.  We did share information about
22  pharmacies.  They may have resulted, after we did
23  additional due diligence where we would have
24  discontinued selling controlled, but unless we get

Page 313

1  specific, I wouldn't know that answer.
2    Q.  Those are the only two companies,
3  Mallinckrodt and Purdue, that you recall H.D. Smith
4  having this level of communication with?
5    A.  We've had conversations in the past with
6  other -- other manufacturers where orders of ours may
7  have hit their suspicious order monitoring program,
8  the manufacturers, and they would have called us to
9  discuss that.  I remember having discussions with
10  Watson.  I can't recall the others.
11    Q.  I want to see if this may help.  I'm going
12  to give you Exhibit 55 --
13    A.  Okay.
14    Q.  -- which is a -- I think an e-mail thread.
15  It may be a collection of e-mails other than a thread.
16  I'm not entirely sure.
17    Have you seen this e-mail before?
18    A.  I'm sure I have.  It is something that is
19  addressed to me.
20    Q.  Did -- did H.D. Smith have an agreement
21  with Teva or its predecessor entities or related
22  affiliates regarding sort of exchange of -- of
23  information like we previously discussed?
24    A.  I don't know specifically if we had an

Page 314

1  agreement with Teva. We've had conversations with
2  them. There is a industry group that meets
3  occasionally and I think Teva is on that or attends
4  it, but specifically an agreement, I'm not aware.
5      Q.  What is the name of that industry group?
6  You knew I was going to ask.
7      A.  Oh, boy. It's -- it's a New Jersey
8  industry group. I -- I don't know the name of it.
9      Q.  Okay. If you think of it, let us know
10  through counsel.
11      So the -- part of this e-mail thread goes
12  from a Marianne at Teva to a Lynne Soja at H.D. Smith.
13      Who is -- do you know who Lynne is?
14      A.  I believe she is a buyer.
15      Q.  Okay. And the e-mail suggests that Teva
16  has identified three H.D. Smith customers and it's
17  actually refusing to release any oxycodone for
18  H.D. Smith unless they receive the completed forms and
19  analyzed data.
20      Is that unusual for a manufacturer to take
21  that step?
22      A.  No. It's becoming more and more standard,
23  if -- you know, the -- the manufacturers have order
24  monitoring systems and if they -- if -- if a manu- --

Page 315

1  if a distributor hits their system, they are going to
2  want information before they release an order.
3      Q.  So is H.D. Smith making orders specific to
4  customers -- or for customers to manufacturers,
5  like -- like how did Teva know to hold a particular
6  order that it was for these three customers?
7      A.  Let me read this for a second.
8      Q.  Yeah. And I'm not sure if you understand
9  my question because I don't think it was worded that
10  well.
11      A.  Nah, I just want to read it and then have
12  you --
13      Q.  Okay.
14      A.  -- reask that, so...
15      Okay. Can you reask that then?
16      Q.  Does H.D. Smith place orders with Teva for
17  specific customers or does it buy in bulk?
18      A.  No. They buy in bulk.
19      Q.  So how did Teva know whether or not a
20  particular oxycodone order to H.D. Smith was going to
21  these three pharmacies?
22      MR. PADGETT: Object to form.
23  BY THE WITNESS:
24      A.  I -- I -- I don't know.

Page 316

1  BY MR. YOUNG:
2      Q.  Okay.
3      A.  I don't know if these pharmacies were on
4  Teva's radar. I don't know. They wouldn't -- to my
5  knowledge, they wouldn't have that information unless
6  we specifically shipped an order to a pharmacy and
7  they would have that information.
8      Q.  And you mentioned, I think, that this is
9  becoming more typical recently, right, this --
10      A.  We are seeing that, yes.
11      Q.  Okay. We'll -- we'll -- we'll blow
12  through some questions here pretty quickly, I think.
13      Did H.D. Smith ever undertake interaction
14  or communication with the FDA relating to the
15  scheduling of drugs? I assume not, but I have to ask.
16      A.  We don't.
17      Q.  How about with regard to the setting of
18  quotas?
19      A.  We don't have anything to do with that.
20      Q.  Production of quotas.
21      I just had to make sure.
22      Did H.D. Smith ever sell controlled
23  substances in Cuyahoga County or Cleveland without
24  first having them complete a customer profile form?

Page 317

1      A.  Not to my knowledge, but I'd have to check
2  our -- our due diligence files.
3      Q.  Do you recall whether H.D. Smith ever
4  shipped an order into Cuyahoga County or Cleveland
5  which was later reported to the DEA as a suspicious
6  order?
7      A.  No.
8      Q.  Has H.D. Smith conducted any type of
9  retrospective analysis of past orders of controlled
10  substances from Cuyahoga County or Cleveland which
11  identified unreported or undetected suspicious orders?
12      A.  No.
13      Q.  Has H.D. Smith conducted site visits of
14  its pharmacy customers in Cleveland or Cuyahoga County
15  within the last five years?
16      A.  I would have to check our files to know
17  precisely.
18      Q.  Would that be the due diligence files
19  again?
20      A.  Yes.
21      Q.  That's the central?
22      A.  Yes.
23      Q.  Okay. At any point in time has H.D. Smith
24  re -- reviewed, assessed or analyzed the URLs for

Page 318

1 Cleveland or Cuyahoga County pharmacy customers?

2    A.   Yes.

3    Q.   Have you done so within the last

4 18 months?

5    A.   Again, I'm not certain on the dates.

6    Q.   Online pharmacies, does H.D. Smith still

7 do business with online pharmacies?

8    A.   We don't do business with online

9 pharmacies.

10    Q.   Have you ever done business with online

11 pharmacies?

12    A.   Not knowingly.

13    Q.   I think you mentioned before that was

14 something that the DEA was very focused on?

15    A.   Yes.

16    Q.   In the early 2000s.

17         Did the DEA help H.D. Smith to identify

18 online pharmacies that it was unknowingly doing

19 business with?

20    A.   I don't think -- not in particular.

21    Q.   How did H.D. Smith identify online

22 pharmacies that it was unknowingly doing business

23 with?

24    A.   There was various ways.  I mean, we -- we

Page 319

1 got -- if we had any documentation, I told you that we

2 used to get -- Kyle Wright used to send out an e-mail

3 on pharmacies that had been -- where another

4 wholesaler had -- had stopped doing business with a

5 particular pharmacy and we would make sure that we did

6 not do business with those pharmacies.

7         We -- you know, we -- just as -- as I

8 answered, we never did any business with an online

9 pharmacy that I am aware of.

10    Q.   Is H.D. Smith aware that prescription

11 opioids dispensed in one city can end up in other

12 cities?

13    A.   That's a --

14    Q.   You can answer.  That's a terrible

15 question.

16    MR. PADGETT:  I'll object to form.  I join your

17 objection.

18 BY THE WITNESS:

19    A.   Yes.

20 BY MR. YOUNG:

21    Q.   Let me ask it a different way.

22         Are you familiar with the phrase "the oxy

23 express"?

24    A.   Yes.

Page 320

1    Q.   What does that mean?

2    A.   In my mind it refers to prescriptions in,

3 for example, in Florida, in South Florida that may

4 have been -- people from other areas of the country

5 would visit pain clinics in Florida, get

6 prescriptions, get them filled and go back.

7    Q.   Did H.D. Smith ever conduct any

8 investigations about South Florida pharmacies that

9 revealed what you just described, people from out of

10 state coming down to South Florida to buy these pills?

11    A.   Nothing definitive.  You know, even if we

12 had dispensing information and a -- a pharmacy in

13 South Florida was dispensing a prescription for

14 someone that we -- we identified coming from 100 miles

15 away, we don't know if that's in Florida or not.  You

16 know, we have done surveillance at pharmacies, I have

17 done surveillance at pain clinics, I've seen

18 out-of-state plates.

19         Again, we don't conduct criminal

20 investigations, so I will -- to be definitive, I can't

21 give you an answer.  My assumption would be that there

22 was -- that was going on.

23    Q.   Do you recall whether any of the license

24 plates that you observed in Florida pharmacies were

Page 321

1 from Ohio?

2    A.   They could have been.

3    Q.   But you don't recall specifically?

4    A.   Not specifically.

5    Q.   Would there be evidence in the due

6 diligence files of the South Florida pharmacies that

7 you investigated that indicated the state of origin of

8 the license plate?

9    A.   If it would have been specifically

10 identified by the investigator.

11    Q.   Okay.  Just two more, two more items.

12         We are skipping to Exhibit 57, which you

13 may not have seen before.  This is an amendment to an

14 agreement between H.D. Smith and Actavis.  Take a look

15 at that and let me know when you are ready to talk.

16    MR. PADGETT:  Take your time.

17 BY THE WITNESS:

18    A.   I have never seen it before.

19 BY MR. YOUNG:

20    Q.   Have -- are you familiar with a agreement

21 between a manufacturer and H.D. Smith that involves

22 profit sharing?  Have you ever heard that phrase used

23 with regard to manufacturer/distributor agreements?

24    A.   Not that I know.

Page 322

1  MR. PADGETT: I'll object -- I'll -- I'll object
2  to scope.
3  BY MR. YOUNG:
4  Q.  Let me direct your attention in this
5  agreement to -- where is that profit sharing?
6  MR. PADGETT: While you are looking, continuing
7  objection to this exhibit and questions on it on the
8  basis of scope.
9  BY MR. YOUNG:
10  Q.  Who would be the person at H.D. Smith with
11  the most knowledge about agreements between
12  manufacturers and H.D. Smith, purchase agreements?
13  A.  Probably the person on this e-mail, Dena
14  Mando.
15  Q.  Is she still with H.D. Smith?
16  A.  I don't know if she is with H.D. -- I -- I
17  don't know.
18  Q.  From a compliance perspective, do you
19  identify any issue with manufacturers sharing profits
20  with distributors?
21  MR. PADGETT: Same objection.
22  BY THE WITNESS:
23  A.  I'd have to know more about the agreement
24  and more about what the agreement is and what -- what

Page 323

1  it pertains to to give you a definitive answer on
2  that.
3  BY MR. YOUNG:
4  Q.  Is -- is that type of agreement review
5  part of your job duties, does -- does compliance get
6  involved with reviewing agreements with manufacturers?
7  A.  We do not.
8  Q.  Who would be the department within
9  H.D. Smith that would? Is that regulatory, legal?
10  A.  I -- I don't know if we have anybody left.
11  Q.  Okay. Let me just take a look at this
12  one.
13  Let me -- let me hand you Exhibit 58,
14  which is an e-mail to you from Lynda Eleazer. I might
15  not be saying that right.
16  Do you recall -- I know this is a while
17  ago. Do you recall receiving this e-mail?
18  A.  I'm sure I did and that name is familiar
19  to me.
20  Q.  This e-mail seems to be a -- a request by
21  the DEA diversion investigator to provide a purchase
22  history summary of controlled substances by a
23  particular facility called Budget Drug & Wellness
24  Center.

Page 324

1  Do you recall that particular pharmacy
2  customer or -- or customer, I should say?
3  A.  Can you give me a second?
4  Q.  Sure.
5  A.  I don't necessarily remember this specific
6  customer.
7  Q.  If Budget Drug & Wellness had both DEA
8  numbers immediately suspended on September 12th, 2005,
9  and was not authorized to purchase or dispense
10  controlleds from September 12th, '05 to April 13th,
11  '06, is it fair to say that H.D. Smith would not have
12  shipped Budget Drug & Wellness any controlled
13  substances?
14  MR. PADGETT: I'll object to form.
15  BY THE WITNESS:
16  A.  I'd -- I would have to see what was
17  shipped to this customer, whether there was anything
18  at all. I don't know during this time period.
19  BY MR. YOUNG:
20  Q.  Okay. But if you knew that the DEA number
21  was suspended, H.D. Smith has policies and procedures
22  in place that would cause the cessation of shipping to
23  someone without a DEA number, right?
24  A.  Yes.

Page 325

1  Q.  And so if you were aware that this
2  particular pharmacy had its numbers suspended and you
3  continued to ship to them, that would be a violation
4  of the CSA, right?
5  A.  If we knew that.
6  Q.  So yes?
7  A.  If -- if we knew that they were suspended
8  and continued to ship.
9  Q.  Right.
10  So in that scenario, that would be a
11  violation of the Controlled Substances Act?
12  A.  If we knew that the registration was
13  suspended and we continued to ship.
14  Q.  Okay. Okay. I want to direct your
15  attention, final exhibit, final line of questions, get
16  excited everybody, this is regarding the Master
17  Pharmaceutical case or Masters Pharmaceutical case
18  which is a late entry, handwritten, No. 60 for you
19  keeping track.
20  Are you familiar with the Masters case?
21  A.  I am.
22  Q.  How are you familiar, how did you come to
23  know about the Masters case?
24  Do you recall the first instance?

Page 326

1   A. It -- it -- it -- it -- I don't recall the first
2   instance. It was -- it went on for a while. I've
3   read this, I've read the 300-page part of it, so...
4   Q. In preparation for today's deposition, did
5   you specifically go back and read the Masters opinion?
6   A. I did.
7   Q. Oh, you did, okay.
8       Does -- well, let's -- let's start on
9   Page 4 of the opinion. There should be a
10  highlighted --
11      MR. YOUNG: You don't have it? Oh, you don't
12  have yours. Oh.
13      MR. PADGETT: I can look off of with him.
14      MR. YOUNG: Okay.
15      MR. PADGETT: Do you want it on for the Elmo?
16      MR. YOUNG: The Elmo, yeah.
17  BY MR. YOUNG:
18      Q. Sorry. Page 4, last paragraph, it should
19  be highlighted.
20      Can you read that for us?
21      A. "The 'security requirement' at the heart
22  of this case mandates that distributors 'design and
23  operate a system' to identify 'suspicious orders of
24  controlled substances' and report those orders to DEA

Page 327

1   (the Reporting Requirement). 21 CFR 1301.74(b). The
2   Reporting Requirement is a relatively modest one. It
3   requires only that a distributor provide basic
4   information about certain orders to DEA, so that DEA
5   investigators in the field can aggregate reports from
6   every point along the legally-regulated supply chain
7   and use the information to ferret out potential
8   illegal activity. Southwood" --
9   Q. You can skip that.
10  A. Okay.
11      "Once a distributor has reported a
12  suspicious order, it must make one of two choices:
13  decline to ship the order, or conduct 'due diligence'
14  and if it is able to determine that the order is not
15  likely to be diverted into illegal channels, ship the
16  order (the Shipping Requirement)."
17  Q. So does H.D. Smith acknowledge that that
18  provision that you just read is the reporting
19  requirement under federal regulations?
20      MR. PADGETT: I'll object to form.
21  BY THE WITNESS:
22      A. The regulation states that we have to
23  report suspicious order when we discover.
24  BY MR. YOUNG:

Page 328

1   Q. So the provision that you just read, do
2   you agree or disagree that that is the reporting
3   requirement under federal regulations?
4   A. "Design and operate a system and identify
5   suspicious orders of controlled substance," I agree
6   with that.
7   Q. It -- does it also include the shipping
8   requirement under federal regulations?
9   A. There is not a shipping requirement.
10      MR. PADGETT: Object to form.
11  BY MR. YOUNG:
12      Q. Okay. So the -- the parenthetical at the
13  end of the paragraph you just read says "the shipping
14  requirement."
15      Is it your testimony here today that there
16  is no such shipping requirement?
17      MR. PADGETT: Object to form.
18  BY THE WITNESS:
19      A. My understanding is in federal regulation
20  there is no shipping requirement.
21  BY MR. YOUNG:
22      Q. Okay. So the second half of the provision
23  that you just read, which the court has labeled "the
24  shipping requirement," H.D. Smith disagrees with?

Page 329

1   A. It has been our -- you know, our practice
2   that when we discover a suspicious order and we
3   identify a suspicious order and we report that order
4   to DEA, we do not ship that.
5   Q. Yeah. That's not my question.
6       My question is whether or not H.D. Smith
7   disagrees with the court's encapsulation of what it
8   calls "the shipping requirement" under federal
9   regulations?
10      MR. PADGETT: Object to form.
11  BY THE WITNESS:
12      A. To my knowledge in the federal regulations
13  there is no shipping requirement.
14  BY MR. YOUNG:
15      Q. Okay. And what is the basis for the
16  conclusion that there is no shipping requirement? Is
17  it your individual interpretation or has H.D. Smith
18  reached a formal position or opinion on whether or not
19  the shipping requirement exists or doesn't exist?
20      A. It -- there is nothing in the federal
21  regulation that -- that specifies anything about a
22  shipping requirement.
23      Q. If H.D. Smith fails to follow the
24  reporting requirement, is that a violation of the law?

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1   A.   If we fail to follow --
2   Q.   Report -- the reporting requirement?
3   A.   Suspicious order when we identify it?
4   Q.   Um-hum.
5   A.   It would be in violation of the
6   regulation.
7   Q.   And if H.D. Smith reports a suspicious
8   order and ships it, is that a violation of the federal
9   requirements, federal regulations?
10   MR. PADGETT:  Object to form.
11   BY THE WITNESS:
12   A.   Again, what time period are we talking?
13   BY MR. YOUNG:
14   Q.   At any time period.
15   A.   Well, as we discussed, before our order
16   monitoring program went into place, there were orders
17   that were shipped and reported as suspicious after the
18   fact as per the -- the industry standard and according
19   to what we -- we were under the assumption that DEA,
20   that was their interpretation and what we should be
21   doing.  Once we had our order monitoring system in
22   place, we did not ship any orders that we identified
23   as suspicious.
24   BY MR. YOUNG:

Page 331

1   Q.   So the provision of the Masters case,
2   which you disagree with, essentially says what you
3   just described, but you disagree with it and I want to
4   just make sure because this is an important aspect of
5   this case.  It's important for the court and the jury
6   to understand whether or not H.D. Smith recognizes and
7   agrees with the Masters opinion on a shipping
8   requirement or disagrees with it.  So you have to
9   indulge me while we revisit this one more time.
10   What the -- what the opinion says is once
11   a distributor has reported a suspicious order, so the
12   suspicious order has been reported, it must make one
13   of two choices, decline to ship the order or conduct
14   some due diligence and if it is able to determine that
15   the order is not likely to be diverted into illegal
16   channels, ship the order.
17   Do you agree or disagree that that is the
18   law under federal regulations?
19   MR. PADGETT:  Object to form.
20   BY THE WITNESS:
21   A.   As a practice, if we report a suspicious
22   order, we do not ship it.  As far as a -- a shipping
23   requirement in the federal regulations, there isn't
24   one.

Page 332

1   BY MR. YOUNG:
2   Q.   Sir, again, that is not my question.  My
3   question is whether you agree or disagree with the
4   statement I just made, that once an order has been
5   reported as suspicious, you must make one of two
6   choices, decline to ship or conduct due diligence and
7   eventually ship?
8   A.   And we decline to ship.
9   MR. PADGETT:  Objection to form; asked and
10   answered.
11   BY MR. YOUNG:
12   Q.   I'm sorry?
13   A.   And we decline to ship.
14   Q.   Has there ever been an occasion in which
15   H.D. Smith has reported a suspicious order yet shipped
16   the suspicious order?
17   MR. PADGETT:  Objection; asked and answered.
18   BY THE WITNESS:
19   A.   What time period?
20   BY MR. YOUNG:
21   Q.   At any time.
22   A.   As we discussed earlier, before our
23   automated system it was an after-the-fact review by
24   the operations manager and we reported orders as

Page 333

1   suspicious and they had already been shipped.
2   Q.   So your testimony is that H.D. Smith has
3   never identified a suspicious order and shipped a
4   suspicious order?
5   A.   If we identified a suspicious order, we
6   did not ship it.
7   Q.   So any occasion in which we found a
8   suspicious order or an order that met the definition
9   of suspicious and H.D. Smith shipped it, that would be
10   a violation of the CSA?
11   MR. PADGETT:  Object to form.
12   BY THE WITNESS:
13   A.   Who is making the definition -- who is
14   making the determination of whether it is suspicious?
15   BY MR. YOUNG:
16   Q.   Any occasion in which an order meets the
17   criteria identified by the regulations as a suspicious
18   order and was shipped by H.D. Smith, that would be a
19   violation of the CSA?
20   MR. PADGETT:  Object to form.
21   BY THE WITNESS:
22   A.   Our -- our system was designed to -- to
23   identify potential orders that may be suspicious.
24   Because they hit our system did not make them

Page 334

1  suspicious.  It was after we determined whether they
2  were suspicious or not.
3  BY MR. YOUNG:
4     Q.   Is the determination of whether an order
5  is suspicious or not solely within the purview of the
6  distributor or is it an objective evaluation?
7     MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9     A.   There is no definitive definition of what
10  constitutes a suspicious order.
11  BY MR. YOUNG:
12     Q.   And one final question.  For the time
13  period that H.D. Smith's CSOMP program did not include
14  pattern or frequency, so it was only a threshold
15  basis, if there were orders that deviated
16  substantially on pattern or frequency and yet were
17  shipped, would that be a violation of the CSA?
18     MR. PADGETT:  Object to form.
19  BY THE WITNESS:
20     A.   To my knowledge we never shipped an order
21  that we identified as suspicious during the CSOMP
22  program.
23  BY MR. YOUNG:
24     Q.   That wasn't my question.

Page 335

1        The CSOMP program did not have pattern and
2  frequency, at least until 2015, as elements of it.  So
3  did H.D. Smith ship orders that deviated substantially
4  under the regulations, under the CSA on pattern and
5  frequency, not -- not threshold, on pattern and
6  frequency, did it ship those orders?
7     MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9     A.   I can't answer that definitively and/or if
10  they would have been identified as suspicious or not.
11     MR. YOUNG:  Okay.  No further questions.
12     MR. PADGETT:  No questions here.
13     MR. YOUNG:  All right.  Prepare for Day 2.
14     THE VIDEOGRAPHER:  We are off the record at
15  5:42 p.m.
16        (Time Noted:  5:42 p.m.)
17        FURTHER DEPONENT SAITH NOT.
18
19
20
21
22
23
24

Page 336

1        REPORTER'S CERTIFICATE
2
3        I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
4  a Certified Shorthand Reporter, do hereby certify:
5        That previous to the commencement of the
6  examination of the witness herein, the witness was
7  duly sworn to testify the whole truth concerning the
8  matters herein;
9        That the foregoing deposition transcript
10  was reported stenographically by me, was thereafter
11  reduced to typewriting under my personal direction and
12  constitutes a true record of the testimony given and
13  the proceedings had;
14        That the said deposition was taken before
15  me at the time and place specified;
16        That I am not a relative or employee or
17  attorney or counsel, nor a relative or employee of
18  such attorney or counsel for any of the parties
19  hereto, nor interested directly or indirectly in the
20  outcome of this action.
21        IN WITNESS WHEREOF, I do hereunto set my
22  hand on this 29th day of November, 2018.
23
24        JULIANA F. ZAJICEK, Certified Reporter

Page 337

1        DEPOSITION ERRATA SHEET
2
3  Assignment No.  200754
4  Case Caption:  In Re:  Opiate Litigation
5
6        DECLARATION UNDER PENALTY OF PERJURY
7
8        I declare under penalty of perjury that I
9  have read the entire transcript of my Deposition taken
10  in the captioned matter or the same has been read to
11  me, and the same is true and accurate, save and except
12  for changes and/or corrections, if any, as indicated
13  by me on the DEPOSITION ERRATA SHEET hereof, with the
14  understanding that I offer these changes as if still
15  under oath.
16
17        GEORGE EUSON
18
19
20  SUBSCRIBED AND SWORN TO
21  before me this      day
22  of         , A.D. 20__.
23
24        Notary Public

Page 338

1     DEPOSITION ERRATA SHEET

2  Page No._____Line No._____Change to:_____

3  _____

4  Reason for change:_____

5  Page No._____Line No._____Change to:_____

6  _____

7  Reason for change:_____

8  Page No._____Line No._____Change to:_____

9  _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24          GEORGE EUSON

Page 339

1     DEPOSITION ERRATA SHEET

2  Page No._____Line No._____Change to:_____

3  _____

4  Reason for change:_____

5  Page No._____Line No._____Change to:_____

6  _____

7  Reason for change:_____

8  Page No._____Line No._____Change to:_____

9  _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24          GEORGE EUSON