Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                       -  -  -

 5    IN RE:  NATIONAL              :

      PRESCRIPTION                  :  MDL No. 2804

 6    OPIATE LITIGATION            :

      _____ :  Case No.

 7                                  :  1:17-MD-2804

      THIS DOCUMENT RELATES        :

 8    TO ALL CASES                 :  Hon. Dan A. Polster

 9                       -  -  -

10           Tuesday, January 22, 2019

11       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                CONFIDENTIALITY REVIEW

12

                         -  -  -

13

14        Videotaped deposition of CHRISTOPHER J. FORST,

15    held at the offices of Baker & Hostetler,

16    200 South Civic Drive, Columbus, Ohio  43215,

17    commencing at 9:14 a.m., on the above date, before

18    Carol A. Kirk, Registered Merit Reporter and Notary

19    Public.

20

21                       -  -  -

22

23           GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

24                  deps@golkow.com
```

Page 2

A P P E A R A N C E S:

On behalf of the Plaintiffs:

MCHUGH FULLER LAW GROUP
BY: MICHAEL J. FULLER, JR., ESQUIRE
mike@mchughfuller.com
ALLAN L. ELKINS, ESQUIRE
aj@mchughfuller.com
AMY J. QUEZON, ESQUIRE
amy@mchughfuller.com
(via teleconference)
97 Elias Whiddon Road
Hattiesburg, Mississippi 39402
601-261-2220

On behalf of Cardinal Health, Inc.:

WILLIAMS & CONNOLLY LLP
BY: JENNIFER G. WICHT, ESQUIRE
jwicht@wc.com
SUZANNE SALGADO, ESQUIRE
ssalgado@wc.com
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5000

On behalf of AmerisourceBergen Corporation:

JACKSON KELLY PLLC
BY: GRETCHEN M. CALLAS, ESQUIRE
gcallas@jacksonkelly.com
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
304-340-1169

On behalf of Walmart:

JONES DAY
BY: CASTEEL BORSAY, ESQUIRE
cborsay@jonesday.com
325 John H. McConnell Boulevard, Suite 600
Columbus, Ohio 43215-2673
614-469-3939

Page 3

On behalf of CVS Indiana, LLC and CVS RX Services, Inc.:

ZUCKERMAN SPAEDER LLP
BY: DANIEL P. MOYLAN, ESQUIRE
dmoylan@zuckerman.com
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
410-949-1159

On behalf of Endo Pharmaceuticals, Inc.,
Endo Health Solutions, Inc., and Par Pharmaceutical
Companies, Inc. (via video stream and realtime):

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: DAVID HIBEY, ESQUIRE
david.hibey@arnoldporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001
202-942-5041

On behalf of Johnson & Johnson and
Janssen Pharmaceuticals:

TUCKER ELLIS LLP
BY: GIUSEPPE W. PAPPALARDO, ESQUIRE
gwp@tuckerellis.com
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113
216-592-5000

On behalf of McKesson:

COVINGTON & BURLING LLP
BY: EMILY L. KVESELIS, ESQUIRE
ekveselis@cov.com
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202-662-5110

Page 4

On behalf of Pernix Therapeutics (via video stream and
realtime):

CLARK MICHIE LLP
BY: BRUCE CLARK, ESQUIRE
bruce.clark@clarkmichie.com
220 Alexander Street
Princeton, New Jersey 08540
609-423-2142

On behalf of Rochester Drug Cooperative (via video
stream and realtime):

ALLEGAERT BERGER & VOGEL, LLP
BY: LUCY N. ONYEFORO, ESQUIRE
lonyeforo@abv.com
111 Broadway, 20th Floor
New York, New York 10006
212-616-7060

On behalf of the West Virginia Board of Pharmacy
(via video stream and realtime):

BAILEY & WYANT, PLLC
BY: JUSTIN C. TAYLOR, ESQUIRE
jtaylor@baileywyant.com
500 Virginia Street East
Charleston, West Virginia 25301
304-345-4222

On behalf of Christopher J. Forst:

SYBERT, RHOAD, LACKEY & SWISHER, LLC
BY: ZACHARY M. SWISHER, ESQ.
zach@law153group.com
153 South Liberty Street
Powell, Ohio 43065
614-785-1811

Page 5

On behalf of UCB (via teleconference):

HUGHES HUBBARD & REED, LLP
BY: DIANE E. LIFTON, ESQUIRE
diane.lifton@hugheshubbard.com
One Battery Park Plaza
New York, New York 10004
212-837-6860

On behalf of C&R Pharmacy (via teleconference):

COLLINSON, DAEHNKE, INLOW & GRECO
BY: AMANDA E. ROSENTHAL, ESQUIRE
amanda.rosenthal@cdiglaw.com
2110 East Flamingo Road, Suite 305
Las Vegas, Nevada 89119
702-979-2132

ALSO PRESENT:
Edna Jamison, McHugh Fuller
Mike Newell, Videographer
Gina Veldman, Trial Technician

|  | Page 6 |
|---|---|
| 1 | VIDEOTAPED DEPOSITION OF CHRISTOPHER J. FORST |
| 2 | INDEX TO EXAMINATION |
| 3 | WITNESS                          PAGE |
| 4 | CHRISTOPHER J. FORST |
| 5 | CROSS-EXAMINATION BY MR. FULLER:        13 |
| 6 |  |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

**Page 7**

1  VIDEOTAPED DEPOSITION OF CHRISTOPHER J. FORST
2  INDEX TO EXHIBITS
3  CARDINAL-FORST    DESCRIPTION        PAGE
4  Cardinal-Forst 1  Letter to Mr. Forst from    17
    Mr. Moné, dated February 1,
5    2008, with attachments,
    Bates-stamped CAH_MDL2804_
6    03195258 through 3195309
7  Cardinal-Forst 2  E-mail to Mr. Reardon and    46
    others from Ms. McPherson,
8    dated 1/28/2008, with
    attachments, Bates-stamped
9    CAH_MDL_PRIORPROD_DEA07_008
    63981 through 863982
10
    Cardinal-Forst 3  Document titled "Process to    63
11    Establish SOM Threshold
    Limits," Bates-stamped
12    CAH_MDL_PRIORPROD_AG_000001
    7 through 20
13
    Cardinal-Forst 4  Chemical Handler's Manual    101
14
    Cardinal-Forst 5  Document titled "Report to    104
15    the U.S. Attorney General
    by the Suspicious Orders
16    Task Force (Comprehensive
    Methamphetamine Control Act
17    of 1996)," Bates-stamped
    CAH_MDL_PRIORPROD_HOUSE_000
18    2207 through 2298
19  Cardinal-Forst 6  21 U.S.C.A. 830        109
20  Cardinal-Forst 7  21 C.F.R. 1301.74        127
21  Cardinal-Forst 8  21 U.S.C.A. 801        117
22  Cardinal-Forst 9  Demonstrative prepared by    133
    Attorney Fuller
23
24

**Page 8**

1  INDEX TO EXHIBITS (CONT'D)
2  CARDINAL-FORST    DESCRIPTION        PAGE
3  Cardinal-Forst 10  Document titled "On-Site    133
    Investigations," Bates-
4    stamped CAH_MDL_PRIORPROD_
    AG_0000174 through 188
5
    Cardinal-Forst 11  21 C.F.R. 1310.05        139
6
    Cardinal-Forst 12  Document titled "Detecting    148
7    and Reporting Suspicious
    Orders and Responding to
8    Threshold Events,"
    Bates-stamped CAH_MDL_
9    PRIORPROD_HOUSE_0001004
    through 1010
10
    Cardinal-Forst 13  Document titled "Daily    166
11    Threshold Reporting," Issue
    Date: 1/29/10, Bates-
12    stamped CAH_MDL_PRIORPROD_
    AG_0000007 through 12
13
    Cardinal-Forst 14  Demonstrative prepared by    189
14    Attorney Fuller
15  Cardinal-Forst 15  Corporate Quality    198
    Regulatory Compliance
16    Manual," Bates-stamped
    CAH_MDL_PRIORPROD_DEA07_011
17    88147 through 1188182
18  Cardinal-Forst 16  Document titled "Compliance    205
    Group Ingredient Limit
19    Report," Bates-stamped
    CAH_MDL_2804_00689780
20    through 689780
21  Cardinal-Forst 17  Demonstrative prepared by    245
    Attorney Fuller
22
    Cardinal-Forst 18  Demonstrative prepared by    245
23    Attorney Fuller
24

**Page 9**

1  INDEX TO EXHIBITS (CONT'D)
2  CARDINAL-FORST    DESCRIPTION        PAGE
3  Cardinal-Forst 19  E-mail to Mr. Hartman and    248
    others from Mr. Forst,
4    dated 11/6/2009, Bates-
    stamped CAH_MDL2804_
5    00992982 through 992983
6  Cardinal-Forst 20  E-mail chain ending with an    269
    e-mail to Ms. Todd from
7    Mr. Forst, dated 9/9/2011,
    Bates-stamped CAH_MDL2804_
8    00289420 and 289421
9  Cardinal-Forst 21  Declaration of Michael A.    294
    Moné Pursuant to 28 U.S.C.
10    1746, Bates-stamped
    CAH_MDL_PRIORPROD_DEA12_000
11    14053 through 1408
12  Cardinal-Forst 22  E-mail chain ending with an    297
    e-mail to Ms. Swedyk and
13    Mr. Forst from Ms. Hug,
    dated 2/15/10, Bates-
14    stamped CAH_MDL_PRIORPROD_
    DEA12_00011836 and 11837
15
    Cardinal-Forst 23  E-mail ending with an    300
16    e-mail to GMB-QRA-
    Anti-Diversion from
17    Mr. Forst, dated 9/30/10,
    Bates-stamped CAH_MDL_
18    PRIORPROD_DEA12_00003250
    and 3251
19
    Cardinal-Forst 24  Document titled "Cardinal    312
20    Health - Lakeland Threshold
    Events," Bates-stamped
21    CAH_MDL_PRIORPROD_DEA12_000
    04353 through 4355
22
23
24

Page 10

1  INDEX TO EXHIBITS (CONT'D)
2  CARDINAL-FORST    DESCRIPTION          PAGE
3  Cardinal-Forst 25  E-mail to Mr. Quintero from  322
               Mr. Rausch, dated 10/22/10,
4             with attachment, Bates-
               stamped CAH_MDL2804_
5             01103874 through 1103876
6  Cardinal-Forst 26  Amended Declaration of     336
               Michael A. Moné Pursuant to
7             28 U.S.C. 1746, Bates-
               stamped CAH_MDL_PRIORPROD_
8             DEA12_00014224 through
               14253
9
   Cardinal-Forst 27  Cardinal Health, Inc.'s    376
10            Second Supplemental
               Objections and Responses to
11            Plaintiffs' First Combined
               Discovery Requests
12
   Cardinal-Forst 28  E-mail chain ending with an  369
13            e-mail to Mr. Reardon and
               others from Mr. Lawrence,
14            dated 10/19/2007, Bates-
               stamped CAH_MDL_PRIORPROD_
15            DEA07_00883454 through
               883456
16
17 CERTIFIED QUESTIONS
18 Page 244, line 18
19 Page 342, line 12
20
21
22
23
24

Page 12

1    Walmart.
2       MR. MOYLAN:  Daniel Moylan,
3    Zuckerman Spaeder, for the CVS
4    Defendants.
5       MR. PAPPALARDO:  Giuseppe
6    Pappalardo with Tucker Ellis for
7    Johnson & Johnson and Janssen
8    Pharmaceuticals.
9       MS. KVESELIS:  Emily
10   Kveselis, Covington & Burling, for
11   McKesson.
12      MS. CALLAS:  Gretchen Callas
13   of the law firm of Jackson Kelly
14   for AmerisourceBergen.
15      MR. SWISHER:  Zach Swisher on
16   behalf of Mr. Forst.
17      MS. SALGADO:  Suzanne
18   Salgado, Williams & Connolly, on
19   behalf of Cardinal Health and
20   Mr. Forst.
21      MS. WICHT:  I'm Jennifer
22   Wicht from Williams & Connolly on
23   behalf of Cardinal Health and
24   Mr. Forst.

Page 11

1          - - -
2       P R O C E E D I N G S
3          - - -
4       THE VIDEOGRAPHER:  We are now
5    on the record.  My name is Michael
6    Newell.  I am a videographer for
7    Golkow Litigation Services.
8       Today's date is January 22,
9    2018.  The time is 9:14 a.m.
10   This deposition is being held
11   in Columbus, Ohio in the matter of
12   National Prescription Opiate
13   Litigation for the Northern
14   District of Ohio, Eastern Division.
15      The deponent today is Chris
16   Forst.
17      Will counsel please identify
18   themselves.
19      MR. FULLER:  Mike Fuller on
20   behalf of the Plaintiff.
21      MR. ELKINS:  A.J. Elkins on
22   behalf of the Plaintiff.
23      MS. BORSAY:  Casteel Borsay
24   with Jones Day on behalf of

Page 13

1       MR. FULLER:  Anybody on the
2    phone?
3       MR. HIBEY:  Hello.  This is
4    David Hibey of Arnold & Porter on
5    behalf of Endo Health Solutions,
6    Endo Pharmaceuticals, Par
7    Pharmaceutical.
8       MS. ROSENTHAL:  Amanda
9    Rosenthal from Collinson, Daehnke,
10   Inlow & Greco for C&R Pharmacy.
11      MS. LIFTON:  Diane Lifton,
12   Hughes Hubbard & Reed, UCB.
13      THE VIDEOGRAPHER:  The court
14   reporter today is Carol Kirk and
15   will now swear in the witness.
16          - - -
17      CHRISTOPHER J. FORST
18 being by me first duly sworn, as hereinafter
19 certified, deposes and says as follows:
20         CROSS-EXAMINATION
21 BY MR. FULLER:
22      Q.  Sir, please state your name for
23 the record.
24      A.  It's Christopher John Forst.

Page 14

1  Q.  And, Mr. Forst, where are you
2  currently working?
3  A.  I'm actually not working right
4  now.
5  Q.  When's the last time you did work?
6  A.  June 30th of 2017.
7  Q.  And what position was that?
8  Where?
9  A.  At Cardinal Health, quality and
10  regulatory affairs.
11  Q.  And your employment with Cardinal
12  Health goes back to about 2005; is that correct?
13  A.  Correct.
14  Q.  Do you know when in 2005?
15  A.  I think my start date was
16  December 1st.
17  Q.  And what position did you
18  originally hold?
19  A.  I was director of pharmacy at a
20  small suburban hospital in Lancaster, Texas.
21  Q.  Was that pharmacy owned by
22  Cardinal?
23  A.  The pharmacy was managed by
24  Cardinal.

Page 15

1  Q.  And that lasted till about
2  February of 2008; is that correct?
3  A.  Correct.
4  Q.  And I believe in February 2008,
5  you moved to Columbus area and took a position
6  inside the QRA department; is that right?
7  A.  That's correct.
8  Q.  And what was your position when
9  you started in QRA in February of 2008?
10  A.  Director of quality and
11  regulatory, the caveat of anti-diversion.
12  (Reporter clarification.)
13  A.  Caveat of anti-diversion.  It
14  was -- the title was kind of back and forth.
15  Do I need to speak up?  Okay.
16  Q.  And did you hold that position
17  until the time you left?  I think you said, in
18  June of 2017.
19  A.  Yes.  I was always the director in
20  quality and regulatory affairs.
21  Q.  So being the director of
22  quality/regulatory affairs, you helped to
23  oversee and to address potential diversion
24  issues with controlled substances, correct?

Page 16

1  MS. WICHT:  Objection to the
2  form.
3  You can go ahead and answer
4  the question.  My objection is
5  preserved for the record.
6  A.  Okay.  Yes.
7  Q.  And so you know how it flows
8  and -- I'm sorry.
9  Have you ever been deposed before?
10  A.  No.
11  Q.  Okay.  I'm going to ask most of
12  the questions.
13  Counsel may object.  Let her get
14  her objection out before you start your answer.
15  A.  Okay.
16  Q.  We'll screw this up, trust me,
17  several times, but we'll work to make sure it's
18  clear and that the record is clear.  Okay?
19  A.  Okay.
20  Q.  All right.
21  MS. LIFTON:  Can I just let
22  our court reporter know that the
23  questioner's microphone is very
24  muffled.  We can hear the witness

Page 17

1  very clearly, but it's very
2  difficult to hear the questioner.
3  Sorry about that.
4  MR. FULLER:  Oh, it's because
5  the phone is over there by the
6  witness and not necessarily by me.
7  MS. LIFTON:  Oh, I'm sorry.
8  There's no microphone.  Okay.
9  Thank you.  We'll do our best.
10  (Discussion off the record.)
11  - - -
12  (Cardinal-Forst Deposition Exhibit 1 marked.)
13  - - -
14  BY MR. FULLER:
15  Q.  Let's go to P1.3504.
16  MR. FULLER:  It's only one
17  copy, but there's copies of it on
18  there if you want to pass that down
19  and people want to just download
20  them.
21  MS. WICHT:  Oh, okay.  Sure.
22  MR. FULLER:  Trying to not
23  kill as many trees.
24  MS. WICHT:  Okay.  Oh, so

Page 18

1  this is just one.  Okay.  So I may
2  look on with the witness a little
3  bit.
4  BY MR. FULLER:
5      Q.    Now, Mr. Forst, this has been
6  produced to me.  What you have in front of you
7  is 3504.
8          You should also see it on the
9  screen.  Maybe not.
10         All right.  We'll do the copy you
11  have in front of you.
12         Have you seen this document
13  before, Mr. Forst?
14     A.    Yes.
15     Q.    Okay.  Now, the first letter
16 appears to be your hire letter or at least the
17 date you got hired and transferred into a
18 different position with Cardinal here in
19 Columbus; is that correct?
20     A.    Yes.
21     Q.    Did you have a personnel file
22 before this; meaning for your time frame from
23 '05 until February of '08, did you receive
24 evaluations and have stuff that would be in a

Page 19

1  personnel file, if one existed, or do you know?
2      A.    I had evaluations.  I don't know
3  where it was filed.
4      Q.    Fair enough.
5          And if you'll go to page 3.  And
6  the way this is going to work is I called out
7  the P1. number, which is the number in the upper
8  right-hand corner of the document.
9          Do you see where it says P1.3504?
10     A.    Yes.
11     Q.    And then the point will give us
12 the page number, so third page is .3.
13         Fair enough?
14     A.    Mm-hmm.
15     Q.    Okay.  Now, this is, at least
16 appears to be, a year-end performance evaluation
17 for Christopher J. Forst, right?
18     A.    Yes.
19     Q.    And it says the manager is Michael
20 Moné; is that correct?
21     A.    Yes.
22     Q.    Was he your boss at that period of
23 time?
24     A.    Yes.

Page 20

1      Q.    And it also says a second level
2  manager is Mark Hartman.  Was that accurate?
3      A.    Yes, that's correct.
4      Q.    And explain to the jury who
5  Mr. Moné is.
6      A.    Mr. Moné is -- was the vice
7  president over the anti-diversion group.
8      Q.    Okay.  And you reported directly
9  to the vice president, correct?
10     A.    Correct.
11     Q.    And who was Mr. Hartman at this
12 time?
13     A.    Mr. Hartman was either a senior
14 vice president or executive vice president, and
15 he was Michael's boss.
16     Q.    Okay.  And that's your
17 understanding at this point in 2009, in the
18 fiscal year 2009, correct?
19     A.    Correct.
20     Q.    Okay.  Now, let's go back with a
21 caveat.
22         So now the document is up in front
23 of you.  You should have a screen in front of
24 you that displays what's on the big screen and

Page 21

1  what everybody else down the table and myself
2  are seeing.
3          You'll notice as we go along,
4  Ms. Gina to my right, your left, she'll
5  highlight the different sections we're talking
6  about and blow them up because some of the
7  things may be small and harder to read.  So it
8  will help us as we go along.  Okay?
9      A.    Okay.
10     Q.    And you're more than welcome to
11 use the hard copy or refer to the screen, but if
12 you're wondering where I may be reading from, if
13 you look at the screen, Gina should be following
14 right along.
15     A.    Okay.
16     Q.    All right.  So let's look at this.
17 This is --
18         MR. FULLER:  On page 3, Gina.
19 BY MR. FULLER:
20     Q.    This is dated June 30 of 2009,
21 correct?
22     A.    Correct.
23     Q.    And it's -- part 1 is "Review of
24 performance goals, 50 percent of overall

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 performance rating."
2          Do you see that section?
3     A.   Yes.
4     Q.   And did you normally have
5 performance goals related to your job and your
6 duties?
7     A.   Yes.
8     Q.   And who set those goals; do you
9 know?
10     A.   They were a combination of the
11 employee, which is me, and Michael or Mark.
12     Q.   All right.  So it would be a sort
13 of a collaborative effort between the three of
14 you?
15     A.   Correct.
16     Q.   Okay.  So read the first goal to
17 us, if you don't mind.
18     A.   "Prevent DEA license suspensions
19 at the distribution centers."
20     Q.   Okay.  And this time frame, I'm
21 assuming if it goes back from a year from
22 June 30th of 2009 to June 30th of 2008, do you
23 know if you were successful in that goal during
24 that time frame?

Page 23

1     A.   I don't know.
2     Q.   Do you remember that being one of
3 your goals?
4     A.   I believe that was the goal of
5 everyone in the -- on the team.
6     Q.   Okay.  Fair enough.
7          Let's go to goal number 2.  Strike
8 that.  Let me ask you another question first.
9          How were you supposed to prevent
10 the license suspension of the distribution
11 centers?
12     A.   By reviewing orders for customers,
13 making sure they met the parameters of the
14 federal guidelines.
15     Q.   So you had to know in doing your
16 job what the parameters were for the federal
17 guidelines, correct?
18     A.   Yes.
19     Q.   And you needed tools to assist you
20 in doing that job, correct?
21          MS. WICHT:  Object to the
22     form.
23     A.   Yes.
24     Q.   And mainly those tools would

Page 24

1 include possibly on-site investigations; is that
2 true?
3     A.   Yes.
4     Q.   It would also include having
5 access to information related to the particular
6 customer as well, correct?
7     A.   Yes.
8     Q.   What type of information would you
9 have to utilize in doing that or trying to
10 achieve that goal to review these orders and
11 prevent the suspension of licenses from your
12 distribution centers?
13     A.   That would depend on the customer.
14     Q.   Can you give us some examples,
15 though?
16     A.   Where the customer is located,
17 what the business model of the customer was,
18 meaning were they a retail independent, a chain,
19 a hospital, a specialty pharmacy.
20     Q.   So I think I've seen it referred
21 to as the type of customer, correct?
22     A.   Correct.
23     Q.   Okay.  Keep going.  I'm sorry.
24     A.   If available, purchase history for

Page 25

1 that customer.  If available, purchase histories
2 of a like customer, preferably in the area.
3          Those are, you know, the basics.
4 I mean, that's not -- that's not just the
5 limited set.  That's just some of the basics.
6     Q.   That's not an exhaustive set, but
7 that's some of the core items, correct?
8     A.   Correct.
9     Q.   You might also want to know the
10 number of scripts that they fill on a -- a daily
11 or monthly basis, right?
12     A.   If that was available, yes.  But
13 that doesn't tell you that much.  I mean, just
14 because it's a number, it's just a number.
15     Q.   Now, you mentioned purchase
16 history.  If they're a Cardinal customer, you
17 would certainly have access to that, correct?
18     A.   Yes.
19          MS. WICHT:  Object to the
20     form.
21     A.   Yes.
22     Q.   Now, I'm assuming that you've seen
23 occasions where a customer has purchased from
24 multiple distributors as well, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    A.  We didn't have access to the other
2 distributors' information unless it was given to
3 us by the customer, and then we -- that was just
4 hearsay by what they said. We're not sure if
5 that was always correct or not.
6    Q.  Meaning we don't know if the
7 customer is always giving us accurate
8 information, right?
9    A.  Correct.
10    Q.  So the best we can --
11    A.  Or the form that they give us
12 is -- it's not an accurate representation of
13 what it is.
14    Q.  Say that again. I'm sorry.
15    A.  Well, if the customer doesn't
16 understand exactly what we're asking for, then
17 sometimes they would, you know, not give the
18 correct information or information that was
19 usable.
20     And, again, it was a source from
21 that customer, so ...
22    Q.  Sure. Now, you guys -- I say "you
23 guys."
24     Depending on the customer,

Page 27

1 certainly, you had the ability to ask for drug
2 utilization reports, drug usage logs, right?
3    MS. WICHT: Object to the
4    form.
5    A.  Yes.
6    Q.  And can you explain to the jury
7 what those are?
8    A.  Drug usage forms?
9    Q.  Yes, sir. And you just correct me
10 if I am wrong, but you guys could make requests
11 of the pharmacy to print out what they have
12 dispensed over a certain period of time?
13    A.  Yes. If the pharmacy was -- had
14 the ability and their software was able to do
15 that, yes.
16    Q.  Sure. And, actually, in the
17 standard order -- standard operating procedures
18 for Cardinal, that's one of the key documents
19 that you're told to ask for when approving new
20 customers, correct?
21    MS. WICHT: Object to the
22    form.
23    A.  Correct.
24    Q.  Okay. Now --

Page 28

1    A.  But I wasn't usually the person
2 that was reviewing new customers.
3    Q.  Fair enough.
4     That doesn't necessarily mean the
5 customer has to give had you that information
6 either, does it?
7    A.  No.
8    Q.  They could refuse?
9    A.  They could refuse.
10    Q.  Now, let me ask you, as a
11 pharmacist that was doing these type of reviews,
12 if they refused to give us information for us to
13 help process their orders and determine whether
14 their order is suspicious, that might be an
15 indication that there's something going on,
16 correct?
17    A.  I can't --
18    MS. WICHT: Object to the
19    form.
20    A.  I can't answer that question.
21    Q.  Why not? Let me ask you -- strike
22 that. Let me ask you a different question.
23     Have you ever had customers where
24 you've had a request made for these reports to

Page 29

1 be printed and ran and they refused?
2    A.  I didn't ask for the reports, so
3 I'm not the individual that would be asking for
4 that question, so ...
5    Q.  Yes. But you would make requests,
6 would you not, of your investigators to obtain
7 that type of information?
8    A.  Yes.
9    Q.  Okay. Have they ever came back to
10 you and told you, "Pharmacy says they're not
11 going to give us that information"?
12    A.  There were times that was the
13 correct -- that was correct.
14    Q.  And you wouldn't make an
15 assumption either way as to why they may not be
16 willing to give that information; is that what
17 you're telling the jury?
18    MS. WICHT: Object to the
19    form.
20    A.  I can't answer that question
21 because I don't know the answer. I don't know
22 the rationale of why the customer is not giving
23 it to us. They might -- they might consider
24 proprietary information. They might not know --

Page 30

1 might not know how to redact it and make it
2 HIPAA friendly.
3         So I can't answer that question.
4     Q.   So how did you deal with it when
5 those situations arose -- explain that to the
6 jury -- where you asked an investigator to
7 obtain a drug usage form and the investigator
8 comes back to you and says, "They won't give it
9 to us"?
10     A.   The investigators didn't report to
11 me, so I would ask the investigator's supervisor
12 if there was anything that we could do about it.
13 And it was usually they won't give us the
14 information.  The inspector did an on-site visit
15 because he was there to get the information.
16     Q.   Sure.
17     A.   And there was nothing that looks
18 suspicious to the investigator.  That was the
19 reason we did investigations.
20         It's not just a number.  It's
21 everything surrounding the pharmacy that we
22 could, as Cardinal Health, see.
23     Q.   I understand that.  But my
24 question is, as these items come through you as

Page 31

1 the director of regulatory, would you make any
2 assumption when they refused to provide it?
3         MS. WICHT:  Object to the
4     form.
5     A.   I can't answer that question
6 because I don't know the rationale as to why
7 they were not providing the information.
8     Q.   Well, you've already testified
9 that there were occasions where they would
10 refuse to give it.
11     A.   Yes.
12     Q.   I want to know back in that time,
13 what assumption, if any, did you make?
14     A.   We would try to --
15         MS. WICHT:  Object to the
16     form.
17     A.   We would try during the inspection
18 to get the information.  If they did not supply
19 it with us, the investigator was there to assist
20 the situation without the information.
21     Q.   And you would agree with me, would
22 you not, that the investigator can't tell where
23 they're ordering from another distributor just
24 by doing his on-site investigation, correct?

Page 32

1         MS. WICHT:  Object to the
2     form.
3     A.   I can't answer that question.  I'm
4 not the investigator, so I don't know how they
5 approached that question.
6     Q.   Have you ever done an
7 investigation on a facility?
8     A.   In the form of an investigator,
9 the -- the way they do one, no.
10     Q.   How did you do one?
11     A.   We used basic similar parameters.
12 But as a pharmacist, I could ask questions that
13 were more specific to dealing with -- asking the
14 pharmacist questions as opposed to some of the
15 investigators.
16         And I'm sure the investigators
17 learned over time the different ways to
18 investigate.
19     Q.   And what would have caused you to
20 go an investigation instead of just sending
21 the investigator out?
22     A.   Usually a request by either
23 Michael or Mark Hartman.  My expertise was
24 hospitals, so I did mostly the hospital

Page 33

1 investigations.
2     Q.   Did you do any pharmacy
3 investigations?
4     A.   I did a handful of pharmacy
5 investigations, yes.
6     Q.   When you say "handful," do you
7 remember which ones?
8     A.   Maybe nine or ten in Florida.
9     Q.   Were these -- and when we say
10 "investigations," were these where you went in
11 and interviewed people, or were these just
12 surveillance type?
13     A.   They were a combination of both.
14     Q.   I'm sorry.  Say that again.
15     A.   They were a combination of both.
16 So depending on what the pharmacy was, it was a
17 surveillance or it was a direct interaction with
18 the pharmacist or the owner or the pharmacist in
19 charge.
20     Q.   And when you say "depending on
21 what the pharmacy was," do you mean type of
22 customer?
23     A.   I mean type of customer.
24     Q.   So if it was a retail independent,

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 you would go in and talk with them, correct?

2  A.  Correct.

3  Q.  If it was a chain pharmacy, you

4 would not go in and talk to them, correct?

5  A.  Correct.

6  Q.  Let's go to goal number 2.  Goal

7 number 2, the description given is "Learn all

8 relative aspects of the suspicious order

9 monitoring system and associated software

10 applications."

11  And you got a score of a 4 on

12 this, both from yourself and your manager,

13 right?

14  A.  Yes.  According to what's on the

15 document, yes.

16  Q.  And 4 says, "Above target."

17  Tell us, what type of suspicious

18 order monitoring system was Cardinal using when

19 you came in February of 2008?

20  A.  Our system was -- generated a list

21 of customers that exceeded their threshold

22 values that was generated each night.  Each

23 customer was reviewed, looking at different

24 aspects of the customer, where they were

Page 35

1 located, relevant information like their

2 ordering patterns, et cetera, et cetera, and the

3 orders were either released or cut or cut and

4 reported as suspicious, depending on the

5 circumstance.

6  Q.  Now, at this point in February of

7 2008, Cardinal just had several of its

8 distribution centers' licenses suspended; is

9 that right?

10  A.  That's correct.

11  Q.  So we know out of those

12 distribution centers, they weren't shipping any

13 controlled substances; is that correct?

14  A.  That is correct.

15  Q.  And what they were doing is they

16 were having their other distribution centers

17 services the customers -- let's do it by

18 example.

19  So, for example, the Lakeland

20 distribution center had its license suspended

21 down in Florida; is that right?

22  A.  Correct.

23  Q.  And instead of those customers

24 going elsewhere, what Cardinal tried to do is

Page 36

1 have those customers serviced by Lakeland

2 serviced from another distribution center out of

3 either Mississippi or out of Greensboro,

4 correct?

5  A.  I believe that is correct.

6  Q.  Okay.  And when you came in during

7 this time frame in February of 2008, I think

8 what you were describing is a threshold-type

9 system wasn't fully implemented yet either, was

10 it?

11  MS. WICHT:  Object to the

12  form.

13  A.  The system had been moved from

14 decentralized to a centralized system.  So prior

15 to, I'm guessing, Michael's employment there,

16 the distribution centers were the ones

17 responsible for looking for suspicious orders

18 and monitoring and reporting them.  And that was

19 before my time, so I don't know how that system

20 worked.

21  Q.  Do you know what the policies and

22 procedures were that were in place when you

23 arrived in February of 2008?

24  MS. WICHT:  Object to the

Page 37

1  form.

2  A.  I was -- I was instructed on how

3 we were to do the forms.  There were policies

4 and procedures in place, and there were rough

5 drafts of new ways that we were going to be

6 doing things that were in place.

7  Q.  So --

8  A.  So it's a system in transition.

9  Q.  Sure.

10  A.  So the policy would change daily,

11 weekly, monthly, as we focused on what we needed

12 to be looking for.

13  Q.  When you say "focused on what we

14 needed to be looking for" --

15  A.  To make sure we were more accurate

16 in what we were looking for, for diversion, for

17 suspicious orders, for Internet pharmacies.  I

18 believe that at that time, it was a big Internet

19 pharmacy crackdown.

20  Q.  And, again, let's back up just for

21 one second.

22  The thresholds that you were

23 describing, those were not completely implicated

24 or -- or applied yet to chain pharmacies, for

Page 38

1 example, correct?
2         MS. WICHT:  Object to the
3     form.
4     A.   My understanding is all customers
5 had thresholds.
6     Q.   All of them?
7     A.   My understanding was yes.  Now,
8 some of the thresholds had not been
9 individualized for the pharmacy based on some of
10 the data that we had, but that was in process to
11 make sure we weren't missing anything.
12     Q.   So it's your understanding that
13 you put blanket thresholds out, even if they
14 weren't individualized, to cause triggers to
15 make sure Cardinal wouldn't miss anything
16 related to suspicious order monitoring?
17     A.   Correct.
18         MS. WICHT:  Object to the
19     form of the question.
20     Q.   And it's your understanding that
21 that was already in place?
22     A.   That was my understanding.
23         MS. WICHT:  That's okay,
24     Chris.  Just make sure that you let

Page 39

1     him ask a full question before you
2     start in on your answer and give me
3     a quick beat.
4         THE WITNESS:  Okay.
5         MS. WICHT:  You're doing
6     fine.
7         THE WITNESS:  Sorry.
8         MS. WICHT:  No.  You're fine.
9 BY MR. FULLER:
10     Q.   Like I told you, we'll screw this
11 up a bunch.  And by the time we're done, you'll
12 have it down pat.  Kidding.
13         MS. WICHT:  And that
14     hopefully won't be a skill you'll
15     need for the rest of your life.
16         MR. FULLER:  Yeah.  Right?
17 BY MR. FULLER:
18     Q.   All right.  Let's take a look at
19 goal number 3.  You actually got involved in
20 this process.  "Draft and update standard
21 operating practices for the suspicious order
22 monitoring system," correct?
23     A.   Correct.
24         MS. WICHT:  Object to the

Page 40

1     form.
2     Q.   And when you were doing that, did
3 you -- when you were -- let me see if I
4 understood how you -- strike that.
5         Tell us how you approached it.
6     A.   I approached --
7         MS. WICHT:  Go ahead.
8     A.   I approached it by reviewing the
9 current policies and procedures that were in
10 place, making sure they were translatable to it
11 now being a centralized system.
12     Q.   These were the policies and
13 procedures that were in place when you arrived
14 back in February of 2008, correct?
15     A.   Correct.  And some of those
16 policies and procedures had been updated when I
17 got there.
18     Q.   And you did additional updating to
19 some of these policies and procedures?
20     A.   I reviewed them to see if there
21 was anything from my perspective that could be
22 added to help.
23     Q.   Okay.  And did you make changes to
24 some of the policies and procedures?

Page 41

1     A.   I don't remember.  That was -- I'm
2 sure I did, but that was 12 years ago, so --
3     Q.   Fair enough.
4         You don't --
5     A.   -- I can't answer that.
6     Q.   You don't recollect whether you --
7 what changes were made, but you believe that
8 there probably were changes?
9     A.   I had input in some of -- I had
10 input into some -- the policies to make certain
11 changes.
12     Q.   Okay.
13     A.   But I don't know -- I can't answer
14 that question.
15     Q.   As to which ones, correct?
16     A.   As to which ones, correct.
17     Q.   No?
18         Do you know what the policy and
19 procedure was before your arrival in February of
20 '08?
21         MS. WICHT:  Object to the
22     form.
23     A.   No, I don't.
24     Q.   Do you know about the use of

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 ingredient limit reports --
2      A.   No.
3      Q.   -- or have you ever seen the --
4      A.   No.
5      Q.   Hold on.  Let me finish.
6      A.   Sorry.  Sorry.
7      Q.   Have you ever seen an ingredient
8 limit report?
9      A.   I don't believe I have, no.
10     Q.   Because they were still being
11 produced or -- or ran, at least up until April
12 of 2008, which would have been the time frame
13 that you're in anti-diversion, correct?
14     A.   It would have been probably a
15 month into the time I was in anti-diversion, but
16 I don't know what those reports are.
17     Q.   You don't recollect seeing them?
18     A.   No.
19     Q.   Now, if I show you one, it might
20 jog your memory, correct?
21     A.   Possibly, but ...
22     Q.   Did you review the older policies
23 and procedures that Cardinal had in place?
24     A.   No.

Page 43

1          MS. WICHT:  Object to the
2      form.
3      Q.   Why not?
4      A.   Those were before my time.  I
5 don't even know if I've even seen them.
6      Q.   So the -- your job --
7      A.   I don't what -- I don't know what
8 the process was as -- as it was decentralized
9 prior to my coming there.
10     Q.   So being one of the individuals
11 that was strapped with updating the policies and
12 procedures to try to, I'm assuming, ensure
13 compliance, correct?
14          MS. WICHT:  Object to the
15     form.
16     A.   Correct.
17     Q.   Compliance which had recently
18 failed by the demonstration of four DCs losing
19 their license, right?
20          MS. WICHT:  Object to the
21     form.
22     A.   I can't answer that question.  I'm
23 not -- I don't know the circumstances of why
24 those --

Page 44

1      Q.   Well, let me ask you.  Did you --
2 did no one ever inform you as to what the
3 circumstances of the probably -- the potential
4 problems were or the allegations by the DEA --
5      A.   Yes.
6      Q.   -- that were occurring in four
7 different distribution centers across the
8 country when you were trying to create these new
9 policies and procedures to prevent that from
10 happening again?
11          MS. WICHT:  Object to the
12     form of the question.
13     A.   Yes.  They informed me what the
14 allegations were.
15     Q.   Did you look at any of the
16 allegations?  Did you look at the -- any of the
17 immediate suspension orders that were sent to or
18 delivered to or served upon any of the
19 distribution centers to get an idea of what were
20 these actual problems?
21     A.   I believe --
22          MS. WICHT:  Object to the
23     form of the question.
24     A.   I believe I saw them, but I can't

Page 45

1 recollect what's in those.  That's 12 years ago.
2      Q.   I'm not asking you to recollect
3 necessarily what's in them.  I'm just asking if
4 you were shown them --
5      A.   Yes.
6      Q.   -- because I think it would be
7 significant -- and maybe not just me, maybe for
8 the jury -- to know whether or not the person --
9 one of the persons involved with developing this
10 new system actually looked and seen what may
11 have went wrong in the old system to put them in
12 the situation that you were trying to fix.
13          That seems reasonable, right?
14          MS. WICHT:  Object to the
15     form of the multiple questions.
16     A.   It's reasonable.
17     Q.   Okay.  So you mentioned these
18 thresholds.  Who created the thresholds; do you
19 know?
20     A.   The thresholds, to my
21 understanding, were in place and they were
22 created by the individual that worked with
23 Michael that did analytics.  I'm guessing it
24 would be Nick Rausch.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    Q.   Mr. Rausch.  Good 'ole Nicholas.
2         Let's go to 3823.
3         MR. FULLER:  Oh, I'm sorry.
4    For the record -- where is my
5    copy? -- 3504 is going to be
6    Plaintiffs' Exhibit 1.
7         This is Plaintiffs' Exhibit
8    2, 3823.
9              - - -
10   (Cardinal-Forst Deposition Exhibit 2 marked.)
11             - - -
12   BY MR. FULLER:
13        Q.   Mr. Forst, this is an e-mail that
14   has an attachment with it.
15             And do you see it's from a Carolyn
16   McPherson?
17             Do you know who that is?
18        A.   Yes.
19        Q.   And in all fairness to you, this
20   was sent out from Ms. McPherson a few days
21   before you arrived there, correct, January 28th
22   of 2008?
23        A.   It appears so by the document,
24   yes.

Page 47

1    Q.   Okay.  Had you already been in
2    talks with the main office -- I'm assuming that
3    at the date of your actual hire, you had been
4    having some conversations, maybe you visited the
5    main office.
6         Anything like that?  Or do you
7    recollect?
8         MS. WICHT:  Object to the
9    form.
10   A.   I don't recollect because there
11   was a transition period in the month of
12   February.  So one week I was at Cardinal
13   corporate and then one week I was at the
14   hospital cleaning -- or closing down and
15   transferring my duties at the hospital.  The
16   next week I was back at Cardinal.
17        Q.   Sure.  I guess my question is --
18   your acceptance letter is dated February 1st of
19   2008.
20        A.   Correct.
21        Q.   I'm assuming you were in
22   conversations with them and maybe had come out
23   to the corporate office here in Columbus prior
24   to February 1.

Page 48

1         MS. WICHT:  Object to the
2    form.  Asked and answered.
3         A.   No, I did not visit the corporate
4    office.
5         Q.   So how did that -- how did that
6    transition happen?  How did it go that you're
7    coming from Texas to Columbus, Ohio?  Explain
8    that to us.
9         A.   I'd known Michael for a long time,
10   and he was searching for people to add to his
11   team, which was just coming along.  And he, you
12   know, asked me if I would be interested, and I
13   said, "It depends."  And I was looking for a
14   change, so I agreed to the -- the change.
15        Q.   And those talks, I'm assuming, all
16   happened prior to this February 1st date where
17   they confirmed and you accepted, right?
18        A.   Correct.
19        Q.   Okay.  What else did he tell you
20   about what you would be doing?
21        A.   He told -- he told me that he
22   needed a pharmacist on board that understood the
23   regulations of controlled substances.
24        Q.   Which you did, right?

Page 49

1    A.   Which I did, coming from the
2    hospital.  They're across the board the same for
3    whether your entity is a hospital or retail
4    pharmacy or whatever.
5         Q.   You're still a --
6         A.   There's different -- yeah, right.
7    There's different parameters that you look for
8    depending on your base, but I had those skills.
9         Q.   And you say you had known Michael.
10   How did you know Michael for a long time,
11   Mr. Moné?
12        A.   I met Mr. Moné when I was -- we
13   were in pharmacy school at different schools
14   together, at a pharmacy meeting.
15        Q.   Oh, okay.  So it goes back quite
16   some time, correct?
17        A.   Quite some time.
18        Q.   Not that I'm commenting on your
19   age; I'm just assuming based on your experience.
20        All right.  Let's go back to 3823.
21   Now, tell us, Mr. Forst, who is Ms. McPherson,
22   Carolyn?
23        A.   Carolyn was one of the directors
24   that -- I don't exactly know her role process.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 I believe she was the one that oversaw the
2 policies and procedures and the regulations and
3 some of the stuff at all the distribution
4 centers.
5      Q.   Okay.
6      A.   But I don't know the parameters of
7 her role.
8      Q.   Fair to say that she was in the
9 QRA department, the department you were moving
10 to, correct?
11     A.   Correct.
12     Q.   Okay.  And she sends this e-mail
13 to Mr. Reardon, Mr. Moné, Mr. Rausch, all
14 individuals we've already talked about, correct?
15          MS. WICHT:  Object to the
16      form.
17     A.   Correct.
18     Q.   And the subject is Threshold List.
19          Do you see that?
20     A.   Yes.
21     Q.   And the attachment is "Deloitte
22 threshold values by type, base, size, combo,
23 report."
24          Did I read that right?

Page 51

1      A.   Yes.
2      Q.   And were you aware that Deloitte
3 was doing work for Cardinal when you arrived?
4      A.   Not at the time I arrived, no.
5      Q.   Did you become aware at some point
6 after that that Deloitte was doing work for
7 Cardinal?
8      A.   Probably in 2012 was the first
9 time I knew Deloitte was working for Cardinal,
10 and I thought that was a new process.
11     Q.   So the fact that you're involved
12 with thresholds and Deloitte had created -- was
13 paid by Cardinal, hired by Cardinal, to create
14 thresholds, you had no idea?
15     A.   I--
16          MS. WICHT:  Object to the
17      form of the question.
18     A.   I have not -- I have not seen this
19 document to my recollection.
20     Q.   So, again, that's my question.  In
21 2008, when you came in to help with SOPs -- and
22 one of the SOPs you worked on related to
23 thresholds, right?
24          MS. WICHT:  Object.

Page 52

1          Sorry.  Go ahead.
2      A.   Yes.
3      Q.   Okay. -- you were not told by
4 anyone in QRA that you can recollect that
5 Cardinal already hired Deloitte to set
6 thresholds for all of its customer types?
7      A.   No.
8          MS. WICHT:  Object to the
9      form of the question.
10     Q.   Okay.  So if we read the first
11 sentence, it says "Attached is thresholds by
12 customer group list supplied by Deloitte.  I
13 have included to the right of the thresholds
14 list, the drug base code list and the customer
15 grouping list.
16          So -- and, again, I understand you
17 haven't been shown this before, Mr. Forst, but
18 if you go to page 3 of the document, I think
19 you'll see it's -- looks like some sort of
20 spreadsheet.  And it says, "Threshold Value
21 Pivot Table, Crossing Customer Type and DEA Base
22 Number With Size."
23          Do you see that there?
24     A.   Yes.

Page 53

1      Q.   Okay.  Now, let me stop you there
2 and ask you just a general question.
3          When you set thresholds, you did
4 it by customer type, correct?
5          MS. WICHT:  Object to the
6      form of the question.
7      A.   Correct.
8      Q.   You also did it by base code
9 numbers, so each different base code for
10 whatever the customer is, he would have or she
11 would have a different threshold; is that right?
12          MS. WICHT:  Object to the
13      form of the question.
14     A.   Correct.
15     Q.   Now, some of the threshold numbers
16 may be the same, but it would be a separate
17 threshold for each base code, just to be clear?
18     A.   Correct.
19          MS. WICHT:  Object to the
20      form.
21     Q.   Okay.  And then it also says by
22 size.  And if you look at the spreadsheet, there
23 are small, medium and large columns.
24          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  A.  Yes.
2  Q.  And do you know how Cardinal was
3  determining size at this time, the time that you
4  arrived in the anti-diversion department, the
5  QRA department?
6  A.  No, I don't know the parameters
7  used to arrive at small, medium, and large size.
8  Q.  What is your understanding of the
9  different processes to determine size that were
10 utilized by Cardinal at any point in your tenure
11 there?
12      MS. WICHT:  Object to the
13 form.
14 A.  Could you repeat the question,
15 please.
16 Q.  Sure.  You agree that -- and let
17 me back up.  Maybe you didn't.
18      Thresholds -- thresholds were also
19 distinguished by the size of the customers,
20 right?
21 A.  Correct.
22 Q.  What is your understanding as to
23 how the size was determined at Cardinal
24 during -- and if the criteria changed from one

Page 55

1  point of your tenure to another point of your
2  tenure, that's fine.  Just give me the different
3  variables if you recollect.
4      MS. WICHT:  Object to the
5  form of the question.
6  A.  Well, for this form, I don't know
7  what the --
8  Q.  And I'm not asking you about this
9  form.  I'm asking you generally.
10 A.  Okay.  So it would be historical
11 purchases.  It would be where the customer is
12 located.
13 Q.  And just so I'm clear, these are
14 factors that went into assigning a small,
15 medium, or large size?
16 A.  Okay.  So that would be --
17      MS. WICHT:  Let him --
18 A.  Sorry.
19 Q.  No.  Go ahead.
20 A.  No.  Go ahead.
21 Q.  No, that was it.  I just wanted to
22 make sure that's how you were determining the
23 brackets.
24 A.  Well, initially I believe it was

Page 56

1  by purchase history.  And that's all I know.
2  I'm sorry.  I don't know any more.
3  Q.  No, no.  That's okay.
4      And when you say "purchase
5  history," are you talking about the volume of
6  purchases?
7  A.  I don't know if it was based on
8  volume, if it was a formula.
9  Q.  You're not sure, you just --
10 A.  I'm not sure.  I have absolutely
11 no idea how they came up with these first
12 numbers.
13 Q.  And just so you know, I'm not
14 asking you how they came up with these numbers
15 on the spreadsheet.  I'm asking you generally.
16      And correct me if I am wrong, but
17 even up to the time that you left in 2017 when
18 Cardinal was utilizing thresholds, it
19 differentiated between a small, medium, and
20 large customer type --
21 A.  Right.
22 Q.  -- correct?
23 A.  Correct.
24 Q.  Do you even know -- and this is

Page 57

1  going back over a little over a year now.
2      Do you know, even at that time,
3  how they determined what was a small, medium,
4  and large customer?
5  A.  At the time I left, I wasn't doing
6  the same thing I was doing when I was hired
7  there.  So I wouldn't know the new definition of
8  what small, medium, and large was a year or two
9  years ago.
10 Q.  Other than the definition that
11 you've already given us, which is based on maybe
12 some sort of formula using volume, are you aware
13 of any other way that they determined small,
14 medium, and large at Cardinal?
15      MS. WICHT:  Object to the
16 form.
17 Q.  Relating to thresholds.
18 A.  I'm not aware of that, no.
19 Q.  All right.
20 A.  I don't know the parameters of
21 that.
22 Q.  Now, if you go to page 10 of this
23 document -- so it would be .10 at the top --
24 you'll see this would be the customer type for

Highly Confidential – Subject to Further Confidentiality Review

Page 58

1 retail, correct?
2      A.  Page 10?  Yes.
3      Q.   Okay.  And if you look in the
4 second column, we have the column for DEA base
5 number.
6           Do you see that?
7      A.   Yes.
8      Q.   And if you go down to 9143 --
9 which is what?
10     A.   Page 10?
11     Q.   Yes, sir.  What is 9143 the base
12 code for, Mr. Forst?
13     A.   It's hydrocodone or oxycodone.
14 It's been four or five years since.
15     Q.   I'll help you.  It's oxycodone.
16     A.   It's oxycodone, okay.
17     Q.   9193 is hydrocodone.
18     A.   Correct.  Okay.
19     Q.   So 9143 we have there, and we have
20 the small, medium, and large columns.
21          Do you see that?
22     A.   Yes.
23     Q.    And then we have 12,000 dosage
24 units, 12,000 dosage units, and 20,000 dosage

Page 59

1 units.
2           Do you see that there?
3      A.   Yes.
4      Q.   Okay.  So at least according to
5 this sheet, at least from -- and, again, I
6 understand you haven't seen it before, but the
7 values for thresholds is 12,000 dosage units --
8 and you -- you measure thresholds by month,
9 correct?
10     A.   Correct.
11     Q.   Okay.
12     A.   Purchases per month.
13     Q.    So this would be for a retail
14 pharmacy, 12,000, 12,000, and 20,000 for the
15 small, medium, and large related to oxycodone
16 purchases --
17          MS. WICHT:  Object to the
18      form.
19     Q.   -- correct?
20     A.   According to the document, yes.
21     Q.   Okay.  Now, if we jump down to
22 9193 --
23     A.   Hydrocodone.
24     Q.   -- which -- yes, sir, you're

Page 60

1 absolutely right -- which is hydrocodone, we
2 again have the small, medium, and large, and the
3 volume is 10,000 dosage units a month for small,
4 16,000 for medium, and 27,000 for large.
5           Do you see that there?
6      A.   Yes.
7      Q.   Okay.  Now, because you haven't
8 seen this document before, I'm assuming that you
9 have no familiarity with how these thresholds
10 were determined or came to by Deloitte.
11          MS. WICHT:  Object to the
12      form of the question.
13     A.   No, I don't know the parameters --
14     Q.   You don't even know --
15     A.   -- or the analytics of what they
16 looked at to arrive at these.
17     Q.   You don't even have any idea what
18 information Cardinal provided to Deloitte to
19 allow them to come up with these analytics,
20 right?
21          MS. WICHT:  Object to the
22      form of the question.
23     A.   That was before my time, and no.
24     Q.   Well, it was before your time, but

Page 61

1 it was --
2      A.   But no, I don't know the -- I
3 don't know what information was given to
4 Deloitte.
5      Q.   Okay.  And, again, you're correct.
6 This is just before, what, three days before
7 your start date in this division, and I
8 understand there was a transition period.  But
9 when working with thresholds, might this have
10 been helpful information for you to have in
11 dealing with thresholds and trying to come up
12 with a better system at Cardinal?
13          MS. WICHT:  Object to the
14      form of the question.
15     A.   Again, this was the work of
16 Michael, Deloitte, and Nick.  So I can't answer
17 that question.  These thresholds in the system
18 were either in place for those customers by
19 their DEA numbers.  And some of them probably
20 had been in place, maybe -- I don't know this --
21 and possibly adjusted already -- I don't know --
22 based on the customer.
23     Q.   Well, I'm not asking you whether
24 you knew that or not.  I think you even

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  indicated when we were talking about looking at
2  customers and setting thresholds or evaluating
3  thresholds, what you try to do is you try to
4  gather as much information as you can, right?
5        MS. WICHT: Object to the
6     form.
7     A.   Yes.
8     Q.   And you're sitting there with the
9  task of improving on this threshold standard
10 operating procedure. You'd want to have as much
11 information as you can to do that, right?
12       MS. WICHT: Object to the
13    form.
14    A.   You would want as much pertinent
15 information as you can because too much
16 information is not always helpful.
17    Q.   Sure. But if this was never
18 offered to you, you have no way to determine
19 whether it would be pertinent or not or even how
20 Deloitte did it or what they considered at the
21 time, correct?
22       MS. WICHT: Object to the
23    form.
24    A.   I can't answer that because,

Page 63

1  again, I wasn't part of that process. So -- and
2  the thresholds were already loaded in the
3  system. Those were what I knew as the
4  thresholds for small, medium, and large. And I
5  probably had a piece of paper that had, "This is
6  a retail customer. These are small, medium, and
7  large."
8        I'm not saying I haven't seen
9  these numbers. I just haven't -- I don't know
10 how they arrived at those numbers.
11          - - -
12 (Cardinal-Forst Deposition Exhibit 3 marked.)
13          - - -
14    Q.   All right. Well, let's talk about
15 that some more. Let's go to 4553. This is
16 going to be Plaintiffs' Exhibit 3.
17       MR. FULLER: For the record,
18    it's P1.4553.
19 BY MR. FULLER:
20    Q.   And this is a standard operating
21 procedure by Cardinal, an SOP, correct?
22    A.   That is correct.
23    Q.   And it's actually one that you are
24 the owner of, isn't it, if you look at the last

Page 64

1  page, page 4?
2     A.   Correct.
3     Q.   Now, let me ask you, do you know
4  if the way that Cardinal used thresholds changed
5  significantly during your tenure there?
6        MS. WICHT: Object to the
7     form of the question.
8     A.   Yes.
9     Q.   When did it change significantly?
10 What were those changes, Mr. Forst? Tell the
11 jury.
12       MS. WICHT: Object to the
13    form of the question.
14    A.   Well, the system changed. The
15 more information that we could gather on
16 customers, the more places that we could use to
17 associate a customer with something that would
18 fit, so what is the -- what's around the
19 customer. We had more information on that. We
20 had more information on trends. We had some
21 clinical information that became available that
22 we would look at more closely.
23       So I can't say one specific item.
24 It was just more -- the more -- the longer you

Page 65

1  do something, the more things you find out that
2  you can apply, put formulas to to see if you can
3  do a better job at getting to the conclusion
4  that you want to draw about a customer.
5     Q.   So I'm not necessarily talking
6  about the information that you might consider in
7  setting a threshold. What I'm referring to is
8  the system as a whole.
9     A.   The system as a whole changed.
10    Q.   How did the system as a whole
11 change?
12    A.   It matured.
13       MS. WICHT: Object to the
14    form of the question.
15    A.   It matured. It was basic at the
16 beginning, and it started incorporating more and
17 more analytics and more and more information,
18 statistical analysis, et cetera, et cetera, that
19 you had a better picture of each customer
20 individually.
21    Q.   So let me ask some pointed
22 questions related to this threshold policy and
23 procedure.
24       In order to utilize the policy and

Highly Confidential – Subject to Further Confidentiality Review

Page 66

1  procedure, you have to set a threshold for a
2  customer, correct?
3        MS. WICHT:  Object to the
4        form of the question.
5     Q.  I'm just wondering because you've
6  already testified, Mr. Forst, that all customers
7  had to have thresholds.
8     A.  Yes.
9     Q.  So in order to use this process,
10 you had to have a threshold for the customer,
11 right?
12        MS. WICHT:  Object to the
13        form of the question.
14    A.  Yes.
15    Q.  You hesitate.  Why do you
16 hesitate?
17    A.  Because I would like to read the
18 whole document, because this is --
19    Q.  We can take a break if you want
20 to --
21    A.  Even though it's -- this is in
22 December of 2008, so I would like to read the
23 whole document before I can answer some of the
24 questions.

Page 67

1     Q.  Okay.  We can take a break and you
2  can read the whole document.
3        MS. WICHT:  We're not going
4        to take a break for read -- if you
5        want him to answer questions about
6        a document, he's entitled to read
7        it and --
8        MR. FULLER:  He is not going
9        to use my time to do it.
10       MS. WICHT:  -- we're not
11       going to go off the record for
12       every time he needs to read a
13       document.
14       MR. FULLER:  If he wants to
15       peruse it --
16       MS. WICHT:  This is not a
17       long document.
18 BY MR. FULLER:
19    Q.  Well, Mr. Forst, you go ahead and
20 you start reading.  And if I think it's using up
21 too much of my time, because I have an allotted
22 amount of time, then I'm going to take a break
23 and let you continue to review, and then we'll
24 come back on when you're finished.

Page 68

1        So you just tell me when you're
2  ready to answer questions, Mr. Forst.  I'm ready
3  to ask them any time you are.
4     A.  Okay.
5     Q.  Have you reviewed the entire
6  document, Mr. Forst?
7     A.  Yes.
8     Q.  Okay.  Are you comfortable to
9  answer questions about this document?
10    A.  I am comfortable to answer
11 questions about the document, but I think what
12 needs to be established is just because I'm the
13 owner, does not mean the person that authored
14 the document or necessarily uses the document.
15       This is a document that the
16 analytics team would use, which would be Nick
17 Rausch.
18    Q.  I'm just asking if you reviewed
19 it --
20    A.  Yes.
21    Q.  -- far enough that I can ask you
22 questions about it.
23    A.  Yes.
24    Q.  It lists you as the owner on it,

Page 69

1  doesn't it?
2     A.  Yes.  The system lists me as the
3  owner.
4     Q.  Now, my next question is, when's
5  the last time you've reviewed this document; do
6  you know?
7     A.  I have no idea.
8     Q.  We're talking years ago, right?
9     A.  Right.
10    Q.  Now, this is a standard operating
11 procedure which Cardinal utilized to help
12 prevent the diversion of controlled substances,
13 right?
14       MS. WICHT:  Object to the
15       form of the question.
16    A.  This appears to be how the
17 thresholds were developed and how to apply
18 thresholds to customers.  That's what it appears
19 to be to me --
20    Q.  And the core of --
21    A.  -- in an -- in an analytical form.
22    Q.  And the core of Cardinal's
23 suspicious order monitoring process was the
24 threshold system, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    MS. WICHT:  Object to the
2 form.
3    A.   Correct.
4    Q.   Okay.  And, again, we're talking
5 about the anti-diversion department, so we're
6 talking about people who want to prevent the
7 diversion of controlled substances, right?
8    A.   Correct.
9    MS. WICHT:  Object to the
10 form of the question.
11   Q.   And you already mentioned the
12 issue with regulatory compliance, both with the
13 Controlled Substances Act, I believe, as well as
14 the Code of Federal Regulations that also apply,
15 right?
16   MS. WICHT:  Object to the
17 form of the question.
18   Mischaracterizes.
19   A.   Yes.
20   Q.   Okay.  Read the Purpose to us, if
21 you will, Mr. Forst.
22   A.   The Purpose, "To outline the
23 conceptual framework and methodology to follow
24 when formulating threshold limits for the

Page 71

1 Suspicious Order Monitoring (SOM) program."
2    Q.   Okay.  So it's the framework, the
3 conceptual framework, for this whole threshold
4 system, right?
5    A.   According to the policy, yes.
6    Q.   Well, not only according to the
7 policy.  You know from working there over a
8 decade in this division that it's the core of
9 the system, isn't it?
10   MS. WICHT:  Object to the
11 form.
12   A.   At this time, according to this
13 policy, yes.
14   Q.   Sir, based on your knowledge and
15 expertise in working in this department, was it
16 the core of the system, or was it not?
17   MS. WICHT:  Object to the
18 form.  Vague.
19   A.   I can't answer that.  I mean --
20   Q.   So, Mr. Forst, during your time
21 with the anti-diversion department, and one of
22 your goals being to prevent the loss of license
23 for other distribution centers, what was the
24 core of the system that you guys implemented to

Page 72

1 try to prevent diversion?
2    MS. WICHT:  Object to the
3 form of the question.
4    Q.   Tell the jury, please.
5    A.   Can you define the word "core" for
6 me.
7    Q.   The main issue.  What was the
8 core?  What was the focus of what your
9 department was doing to try to prevent
10 diversion?
11   MS. WICHT:  Object to the
12 form of the question.
13   A.   Analyzing customer purchases to
14 try to figure out whether diversion was
15 occurring at that customer store or that
16 DEA-licensed store.
17   Q.   Now -- and let's be fair.  Your
18 obligation isn't to determine whether diversion
19 is occurring, is it?  It's suspicion?
20   A.   It's suspicion.
21   MS. WICHT:  Object to the
22 form.
23   Q.   It's suspicion of potential
24 diversion.  Very low standard, right?

Page 73

1    MS. WICHT:  Object to the
2 form.
3    A.   I --
4    MS. WICHT:  Calls for a legal
5 conclusion.
6    A.   I can't answer that question.
7    Q.   Well, you evaluated threshold
8 events to determine whether there was potential
9 diversion, right?
10   A.   Correct.
11   Q.   So before you reported someone to
12 the DEA for a suspicious order, did you have
13 that -- did you require hard proof of diversion,
14 or did you report suspicion?
15   A.   We were --
16   MS. WICHT:  Object to the
17 form of the question.
18   A.   Can we take a break?
19   Q.   No.  There's a question pending.
20   MS. WICHT:  Yeah.  We can't
21 take a break when there's a
22 question pending --
23   THE WITNESS:  Okay.
24   MS. WICHT:  -- unless you

Page 74

1  have an issue about privilege.  So
2  you can do your best and then --
3      A.   Please ask the question again.
4      Q.   So you, evaluating suspicious
5  orders or threshold events, did you report
6  someone to the DEA once you had rock solid proof
7  of diversion, or was your job to report someone,
8  and did you just report them, when they were
9  suspicious orders?
10         MS. WICHT:  Object to the
11      form of the question.
12      A.   We reported them when we thought
13  there was a high potential for diversion
14  occurring at those stores.
15      Q.   Where did you get the basis for a
16  high potential of diversion?  Where did that
17  threshold come from?
18         MS. WICHT:  Object to the
19      form of the question.
20      A.   It's not -- it's not a threshold.
21  It's -- it's a combination of what you look at
22  at the store and the information that you have
23  on the store.
24      Q.   You're supposed to report orders

Page 75

1  of normal size, pattern, and frequency, correct?
2         MS. WICHT:  Object to the
3      form of the question.
4      A.   Correct, but that's a very vague
5  statement.  I mean, what's normal for -- what's
6  large for one individual might not be large for
7  another individual.
8      Q.   Fair enough.
9         MR. FULLER:  We can take your
10      break now.
11         THE VIDEOGRAPHER:  We're
12      going off the record at 10:16.
13         (Recess taken.)
14         THE VIDEOGRAPHER:  We're back
15      on the record at 10:32.
16  BY MR. FULLER:
17      Q.   All right, Mr. Forst.  Before the
18  break, we were looking at this standard
19  operating procedure related to threshold limits
20  and establishing them at Cardinal, right?
21      A.   Correct.
22      Q.   The scope of this threshold, it
23  applies to all pharmaceutical operations and
24  customers, QRA, or quality regulatory affairs,

Page 76

1  as well as supply chain integrity, doesn't it?
2      A.   Correct.
3      Q.   All right.  Now, the policy.  Read
4  to us the intent of this policy.  Let's do one
5  sentence at a time.  It's right there on .4 or
6  4.0 right there on the first page.
7      A.   Oh, the policy, okay.
8         "The intent of calculating
9  threshold limits is to establish a baseline
10  purchase pattern for all monitored items."
11      Q.   So this is going to help us
12  calculate the threshold limits for all
13  baseline -- for the baseline for all monitored
14  items, and that would be all of our controlled
15  substances, correct?
16         MS. WICHT:  Object to the
17      form.
18      A.   Controlled substances and List I
19  chemicals.
20      Q.   Now, help me understand.  What's
21  there -- is there a difference between
22  controlled substances and List I chemicals?
23      A.   Yes.
24      Q.   List I chemicals are separate and

Page 77

1  distinct from controlled substances; isn't that
2  true?
3         MS. WICHT:  Object to the
4      form of the question.
5      A.   According to the DEA, yes.
6      Q.   Well, it's the Controlled
7  Substances Act, as well as the regulations that
8  regulate both, correct?
9      A.   Correct.
10      Q.   Now, do you also have to monitor
11  List I chemicals if they are found in controlled
12  substances?
13      A.   No.  The -- I believe the
14  controlled substance takes precedence.
15      Q.   Fair enough.
16         Read the next sentence of the
17  policy related to these thresholds.
18      A.   "The baseline purchase pattern is
19  then adjusted up by a statistically significant
20  factor or variable to formulate the threshold
21  limit."
22      Q.   So in reality, we determine what
23  an average is, and then we -- it says "adjusted
24  up by a statistically significant factor or

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 variable."
2         Did you guys at Cardinal adjust up
3 the average for thresholds by a statistically
4 significant factor or variable?
5         MS. WICHT: Object to the
6     form. Mischaracterizes.
7     A.   I don't know what their formula
8 was or the analytics behind that.
9     Q.   Okay. Let's keep going. Read the
10 next sentence.
11    A.   "The subsequent implementation of
12 threshold limits allows a SOM program to
13 identify customers whose order pattern
14 significantly deviates from the baseline or
15 normalized purchase pattern."
16    Q.   Okay. So this helps to see
17 deviations from normal patterns, basically,
18 right?
19    A.   Correct.
20    Q.   And that's part of what our
21 requirement is under the regulations, which
22 we'll look at later, is making sure we're not
23 seeing unusual size, pattern, and frequency
24 occurring when we're dealing with controlled

Page 79

1 substances and our customers, right?
2         MS. WICHT: Object to the
3     form.
4     A.   Correct.
5     Q.   Okay. So let's go down to the
6 methodology, which is at the bottom of the page,
7 or at least starts on the bottom of the page.
8         Do you see that section?
9     A.   Yes.
10    Q.   It says, "The following
11 methodology outlines the steps to be followed
12 when calculating threshold limits. Any
13 variation or deviation from the below
14 methodology must -- must -- be approved by
15 corporate QRA."
16        MR. FULLER: Underline must,
17    please.
18 BY MR. FULLER:
19    Q.   Did I read that accurately?
20    A.   Correct.
21    Q.   Okay. So if we're going to
22 deviate from this pattern, corporate QRA has to
23 approve; is that correct?
24        MS. WICHT: Object to the

Page 80

1     form.
2     A.   According to this document,
3 correct.
4     Q.   Is that the way it was operated at
5 Cardinal?
6         MS. WICHT: Object to the
7     form.
8     Q.   Or do you know?
9     A.   The methodology?
10    Q.   Yeah, how you guys ran --
11    A.   The way the methodology --
12    Q.   How you ran your department
13 related to thresholds.
14        If there was going to be a
15 different deviation from the standard operating
16 procedure that was set out and approved, did
17 that had to -- have to be approved by corporate
18 QRA?
19    A.   As far as I know, it was.
20    Q.   Okay. Let's go to the next page.
21        So, Mr. Forst, for you and the
22 record, we're on page 2, right?
23    A.   Correct.
24    Q.   All right, 4.2.1 says, "Extract a

Page 81

1 formula list of customers and historical sales
2 data."
3         That's the first step in our
4 process, according to this, right?
5     A.   Correct.
6     Q.   And that, again, goes to what you
7 were talking about earlier, pulling historic
8 sales information if we have it? Fair enough?
9         MS. WICHT: Just to clarify,
10    it says "extract and format." I
11    think you read it as "extract a
12    formula," Mike.
13        MR. FULLER: Sure. Sorry.
14        MS. WICHT: It's okay.
15 BY MR. FULLER:
16    Q.   "Extract and format a list of
17 customers and historical sales data.
18        And if you look down at b, I think
19 it asks us to do it for the period of a -- a
20 year, 12 months; is that right, Mr. Forst?
21    A.   According to the document, yes.
22    Q.   Okay. Is that your recollection
23 as well, or do you remember some other time
24 frame?

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A.   Again, this was the analytics side
2  under Michael.  So if the document says it's
3  12 months, it's probably a 12-month period.
4    Q.   Okay.  You have no reason --
5    A.   As time changed, it might have
6  changed, but at this time, it was a 12-month
7  period, according to this document.
8    Q.   So at least based on your
9  recollection, you have no basis to disagree with
10 that, correct?
11   A.   No.
12   Q.   All right.  Let's go to 4.2.2.
13 "Differentiate customers through segmentation."
14 It says, "The segmentation of customers is
15 preferred, but is an optional step."
16         Do you see that there, Mr. Forst?
17   A.   Yes.
18   Q.   Differentiating customers is what
19 we talked about earlier, the different types --
20   A.   Correct.
21   Q.   -- chains, retail independents,
22 hospitals, so forth and so on, correct?
23   A.   Correct.
24   Q.   Okay.  And it's your understanding

Page 83

1  that that also was done related to thresholds,
2  correct?
3    A.   Correct.
4    Q.   All right.  4.2.3.
5         It says, "Evaluate historical
6  controlled substance sales data per drug family,
7  per month for each customer segment to establish
8  appropriate threshold limits."
9         Did I read that accurately,
10 Mr. Forst?
11   A.   Yes.
12   Q.   And is that part of the process as
13 you understood it at Cardinal?
14   A.   For the methodology, yes.
15   Q.   And if you go down to part b of
16 this section, it says, "Calculate thresholds --
17 threshold limits for each base code for all
18 customers."
19         And then it gives you i through
20 vii on the next page that sets out how to do
21 that; is that right?
22         MS. WICHT:  For all customer
23      segments.
24         MR. FULLER:  Segments.

Page 84

1         MS. WICHT:  Yeah.
2         MR. FULLER:  I'm sorry.
3         MS. WICHT:  No problem.
4         MR. FULLER:  Jennifer likes
5      making fun of the fact I can't read
6      just because I'm from Mississippi.
7    A.   That is correct.
8    Q.   Okay.  And what it basically tells
9  you to do is it tells you to come up with the
10 average of the different base codes for each
11 segment, correct?  And we can walk through it
12 step by step.  Let's go through it step by step.
13 It won't take us long.
14         It says, "The thresholds will be
15 calculated using consistent historical sales
16 data.  The intent is to remove the erratic
17 purchase patterns from the data as to not skew
18 the threshold limit values."
19         Did I read that right?
20   A.   Yes.
21   Q.   And then part -- or ii says,
22 "Determine the total dosage unit quantities
23 purchased per segment per base code over the 12
24 months" -- so what we're doing is we're looking

Page 85

1  at the total quantities or dosage unit, which is
2  number of pills; is that correct?
3    A.   Correct.
4    Q.   -- "for the 12-month period by
5  each segment, by each base code."
6         Is that fair?
7    A.   Correct.
8    Q.   Okay.  So now let's go to iii.
9  "Identify the number of DEA numbers" -- which
10 would be the number of customers presumptively,
11 correct?
12   A.   Correct.  I mean, a DEA number is
13 associated with a -- an entity, yes.
14   Q.   Fair enough.
15         "Identify the number of DEA
16 numbers who purchased each base code over the
17 12 months for each segment."
18         And then we take that number and
19 then we determine the annual quantity per DEA
20 number for the base code for each segment.  So
21 we just divide the total number of dosage units
22 by the number of DEA numbers or customers buying
23 that base code, right?
24   A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.   And then it says -- and that will
2  give us a total per segment per DEA number per
3  base code for the year.
4         Then it says, "Determine the
5  monthly quantity per DEA number."  And we know
6  we've got to divide the annual number by 12
7  because there's 12 months in a year, right?
8    A.   Correct.
9    Q.   Then there -- here's where I want
10 to you a little bit about.
11        Then it says, "Multiply the
12 monthly quantity per DEA number per base code
13 for each segment by a factor of 3, 5, or 8.  The
14 multiplication factor of 3, 5, or 8 is to be
15 implemented in the following manner:  Three:
16 hydrocodone, oxycodone, alprazolam, and
17 phentermine drug families; Five:  All remaining
18 ARCOS-reportable drug families; Eight Factor:
19 All remaining monitored items not multiplied by
20 3" -- "by a factor of 3 or 5."
21        Did I read that correctly?
22   A.   Correct.
23   Q.   So where did Cardinal come up with
24 this 3, 5, and 8?

Page 87

1    A.   I don't know that answer.
2    Q.   Well, if we're trying to look for
3  outliers, does that make sense, to take our
4  average threshold and then multiply it by -- for
5  example, for oxycodone three times?
6    A.   I don't --
7         MS. WICHT:  Object to the
8    form of the question.
9    A.   I don't know --
10        MS. WICHT:  Calls for
11   speculation.
12   A.   I don't know what the analytics
13 were behind those numbers.
14   Q.   Well, you've been in -- you've
15 been looking and dealing with anti-diversion
16 issues for a significant period of time, right?
17   A.   Yes.
18        MS. WICHT:  Object to the
19   form.
20   Q.   Even going back to your time at
21 the hospital in Texas, correct?
22   A.   Correct.
23   Q.   So when you look at thresholds and
24 you come up with an average for a drug family

Page 88

1  and a segment, does it make sense to then
2  multiply it by 3 --
3         MS. WICHT:  Object to the
4    form of the question.
5    Q.   -- for a threshold?
6         Explain to me from a regulatory
7  perspective --
8    A.   An --
9         MS. WICHT:  Let him finish
10   the question.
11   A.   Okay.
12   Q.   Explain to me from a regulatory
13 perspective, if we're looking for potential
14 suspicious orders, how that makes sense.
15 Explain that to the jury.
16        MS. WICHT:  Object to the
17   form of the question.  Vague.
18   Calls for a legal conclusion.
19   A.   There will be fluctuations in
20 ordering patterns, so if you don't -- if you
21 just take an average, there were people that are
22 going to be above the average or below the
23 average --
24   Q.   Sure.

Page 89

1    A.   -- so you need to adjust for
2  factors so that they're not continually hitting
3  thresholds, because the number that you come up
4  with is just an average.  You're going to have
5  to also look at other things to adjust.  So you
6  don't want every order that comes across, just
7  because it's associated with an average, to hit
8  the threshold.  You have to have a little bit of
9  play room in there for fluctuations in number of
10 times they order a month or whatever.
11        So I don't know how they came up
12 with those numbers, but I'm assuming there has
13 to be some factor in there for fluctuations in
14 times you order a month, et cetera, et cetera.
15   Q.   Sure.  And I get that.  And, like
16 you said, it's an average.  So in order to have
17 that as an average, we have to have people above
18 it and people below it, right?
19   A.   Correct.
20   Q.   And that's how you come up with an
21 average, correct?
22   A.   Correct.
23   Q.   Now -- and I understand what
24 you're saying, we need to have some buffer.  But

Page 90

1 why not a 100 percent buffer? Why not just
2 increase it another 100 percent?
3        You're increasing it 300 percent
4 by multiplying it by 3, right?
5        A.   I --
6        MS. WICHT:  Object to the
7        form.
8        A.   I don't know the analytics behind
9 those numbers.
10        Q.   But you're --
11        A.   I mean, it could be a standard
12 deviation.  I don't know what the analytics is
13 behind those numbers, so I can't answer that
14 question.
15        Q.   So as one evaluating thresholds,
16 the owner, at least according to the document,
17 of this policy and procedure related to
18 thresholds and establishing thresholds, you
19 didn't ask anybody, "Hey, where did we get this
20 3, 5, and 8 multiplying factors"?
21        A.   Okay.
22        MS. WICHT:  Object to the
23        form of the question.
24        A.   The owner of the document in the

Page 91

1 document system is not the final approval --
2 approver of the document.  So, yes, I've read
3 that.  I probably discussed it with Nick, "Is
4 this the formulas that we are using"?
5        Q.   I mean, did you ask why?  I mean,
6 listen, it may not be that you are the final
7 approver of the document, but you are the owner,
8 and whatever Cardinal says it means, I guess it
9 means.  But your name's on it?
10        A.   I understand that.
11        Q.   So do you have any basis for
12 allowing a three-time multiplier to an average
13 to be a threshold for any pharmacy?
14        MS. WICHT:  Object to the
15        form of the question.  Vague.
16        Asked and answered.
17        A.   I can't answer that, because I
18 don't know the analytics behind this.
19        Q.   So you just --
20        A.   I'm not a statistician, so I don't
21 know where you should put your limits, whether
22 it's one standard deviation, two standard
23 deviations.
24        Again, a threshold is just

Page 92

1 something that helps you to see what's going on
2 with the customer.
3        Q.   Absolutely.  It's the trigger --
4        A.   You can have a threshold of 1 and
5 everybody hit and you'd review every order.
6 That would not make any sense.
7        Q.   No.  Or you could have a threshold
8 set three times the average so nobody triggers
9 it so you don't have to review anybody, right?
10        A.   But, again, it's an --
11        MS. WICHT:  Object to the
12        form of the question.
13        A.   But, again, it's an average.
14        Q.   But it's -- sir, my question is,
15 or you can multiply the threshold -- the average
16 by some number to make it so large that no one
17 triggers it, correct?
18        MS. WICHT:  Object to the
19        form of the question.  Calls for
20        speculation.  No foundation.
21        A.   Yeah, I could multiply it by
22 10,000, but that's not the purpose of this.
23        Q.   Well, that's what I'm trying to
24 find out, sir, is the purpose, is why Cardinal

Page 93

1 picked to determine a threshold by finding the
2 average and then multiplying it by 3.
3        MS. WICHT:  He's answered
4        that question.
5        MR. FULLER:  No, he hasn't
6        answered the question.
7        MS. WICHT:  He doesn't know.
8        He -- you asked him multiple times.
9        If he --
10        MR. FULLER:  Apparently
11        nobody knows.  And that seems to be
12        the problem in this litigation,
13        because nobody can answer a
14        question and everybody has memory
15        issues.
16        MS. WICHT:  That's --
17 BY MR. FULLER:
18        Q.   So this document --
19        MS. WICHT:  -- a ridiculous
20        statement.
21        Q.   This document went through you, at
22 least according to the document, correct,
23 Mr. Forst?
24        A.   Correct.

Page 94

1    Q.   And you have no recollection of
2  questioning anybody why you would be multiplying
3  an average by 3, 5, or 8 --
4         MS. WICHT:  Object to --
5    Q.   -- or do you remember now?
6         MS. WICHT:  Object to the
7    form of the question.
8    Mischaracterizes his testimony.
9    A.   Again, I'm not the statistician.
10   Q.   Sir --
11   A.   The owner of the document does not
12 mean that I have written the document, the --
13 the information in the document necessarily -- I
14 can't think of the word I want to use.
15        The information in the document is
16 based on the analytics.  So I -- like I said,
17 I'm not someone that does the analytics.  I'm
18 not a statistician.  There is a reason for 3, 5,
19 and 8.  My guess is -- and only my guess is --
20 3, 5, and 8 is a number based on the probability
21 of that drug family being diverted.
22        MS. WICHT:  I'd just caution
23   you that -- and I think even
24   Mr. Fuller would agree with this,

Page 95

1    that he doesn't want you to guess
2    in your answers.
3         THE WITNESS:  Okay.
4  BY MR. FULLER:
5    Q.   As long as you qualify it as a
6  guess, I don't care if you guess.
7    A.   Well, I'm not going to guess, but
8  that's --
9    Q.   Well, it's a little late for that.
10   A.   That's -- but, again, the
11 analytics behind the 3, 5, and 8, I don't know.
12 But you certainly wouldn't want the hydrocodone
13 multiplied by 8, and the oxycodone, and the
14 alprazolam, because those are -- have a higher
15 incidence of diversion.
16   Q.   Would you want to multiply it by
17 4?
18        MS. WICHT:  Object to the
19   form.  Foundation.  Calls for
20   speculation.
21   A.   I don't know the analytics, so I
22 can't answer that question.
23   Q.   Well, I mean, you just said you
24 didn't want to multiply by 8.  How do you know

Page 96

1  that you don't want to multiply by 8?
2         MS. WICHT:  Object to the
3    form.  This is why we shouldn't
4    guess.
5         He's testified he doesn't
6    know the analytics.  I don't -- I
7    don't think it's a fair question.
8         MR. FULLER:  Let the witness
9    answer this question.
10        MS. WICHT:  Go ahead.  You
11   can answer the question if you're
12   able, Chris.
13   A.   I can't answer that.  But
14 logically, the lesser chance of diversion -- you
15 would not want to be looking for something that
16 has an extremely low chance of diversion when
17 you have hydrocodone, oxycodone, alprazolam, and
18 phentermine as your largest drug families that
19 are diverted according to the DEA.
20        I can't answer the analytics --
21 I've said that three or four times -- about the
22 3, 5 or 8.
23   Q.   Now, not only would you multiply
24 it by 3, 5, or 8, but then you, as you've

Page 97

1  already testified, would go in and ramp up the
2  threshold based on additional factors, correct?
3         MS. WICHT:  Object to the
4    form of the question.
5    Mischaracterizes his testimony.
6         MR. FULLER:  "Object to form"
7    is fine, Counsel.
8    A.   Cardinal looked at each customer
9  individually.  So when you have more information
10 about the customer and you're comfortable that
11 the presence of diversion may be happening, then
12 you should be able to adjust the threshold
13 suitable for that customer's business model and
14 factor.
15   Q.   And it should be consistent with
16 other customers of the same business model and
17 the same size, right?
18        MS. WICHT:  Object to the
19   form.
20   A.   Each individual customer is going
21 to be different.  That's --
22   Q.   Sure it is.  But there's only so
23 many business models out there, right?
24   A.   But the business model is just a

Page 98

1 gauge to get you in the parameter of where you
2 need to be.
3     Q.   Absolutely.  All the factors are
4 just gauges, aren't they?  Whether it's type of
5 business, whether it's number of scripts,
6 whether it's location to a hospital, they're
7 just factors to consider, right?
8     A.   They're factors to consider.
9     Q.   And they're factors that apply to
10 all customers, aren't they?
11    A.   Yes.  If you have that information
12 available to you, yes.
13    Q.   Sure.  So wouldn't you want to
14 make sure that a similarly situated customer
15 isn't ten times more than someone of like size
16 business type and shape and location?
17        MS. WICHT:  Object to the
18     form of the question.
19    A.   But, again, individual customers
20 are all different, just like we're all different
21 sitting around the table.  Different parameters
22 would apply to those individuals.  Unless you
23 know information about that, everybody is just
24 average, and we all know that everybody is

Page 99

1 different.
2     Q.   We do.  And that's why you
3 segmented them at Cardinal, correct?
4        MS. WICHT:  Object to the
5     form.
6     A.   But segments are only a way to
7 divide up the customers in a logical way that
8 you can at least look at individual customers
9 once you get more focused on what you're looking
10 for.
11    Q.   Sure.  Sure.  So where did
12 Cardinal -- the next step.
13        I'm actually -- go down to 4.2.4.
14 It talks about adjustments can be made to the
15 threshold.
16        Do you see that section?
17    A.   Yes.
18    Q.   Where did Cardinal get the
19 approach?  What scientific studies?  What --
20 where from did Cardinal get the approach that
21 after multiplying a threshold, an average by
22 three, that it still could then go in and adjust
23 the threshold based on customer specifics?
24    A.   I don't know.

Page 100

1        MS. WICHT:  Object to the
2     form of the question.
3     Q.   Do you know of any study that
4 suggests that?
5     A.   I don't know.
6        MS. WICHT:  Object to the
7     form of the question.
8     A.   I don't know.
9     Q.   Have you ever seen a study that
10 suggests that?
11    A.   Not to my knowledge.
12        MS. WICHT:  Object to the
13     form of the question.
14    A.   No.
15    Q.   Okay.  Have you ever been told --
16 strike that.
17        In all your time at the hospital,
18 did you ever utilize the Chemical Handler's
19 Manual?
20    A.   I'm not sure what that is, or if
21 it had a different name.
22    Q.   Let's go to 3869.
23    A.   It sounds like a distribution
24 manual.

Page 101

1        - - -
2     (Cardinal-Forst Deposition Exhibit 4 marked.)
3        - - -
4     Q.   This will be Plaintiffs' Exhibit
5 Number 4, 3869, Chemical Handler's Manual.
6        Have you ever seen that before?
7 Take a second and look at it.
8        Have you ever seen that document
9 before?
10    A.   No.  Looks like a distributor's
11 document.
12    Q.   And it applies to List I
13 chemicals, correct?
14        MS. WICHT:  Object to the
15     form.  Calls for speculation.
16    A.   Well, on 3869.7, I see that it
17 does have the word "Listed Chemicals," so a
18 List I chemical, a List II chemical.
19        MR. FULLER:  Hey, bring up
20     the Reardon clip, please.
21 BY MR. FULLER:
22    Q.   You mentioned Mr. Reardon was your
23 boss, correct, or your boss's boss; is that
24 right?

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1   A.   Mr. Reardon is --
2   Q.   Hartman.  Hartman.
3   A.   Mr. Hartman was my boss' boss.
4   Q.   Who is Mr. Reardon?
5   A.   Mr. Reardon was over the
6   distribution centers.
7   Q.   And do you know what he held --
8   what position he held prior to that?
9   A.   I don't know his history.
10      MR. FULLER:  Go ahead.  Play
11   it.
12      (Video clip played as
13   follows):
14      "Q.  Turn to page 271 of the same
15   document.  And you can look on the big screen or
16   you can try to find that page, either way,
17   Mr. Reardon.  Is that the document you're
18   referring to?
19      "A.  No.
20      "Q.  What other document are you
21   referring to; do you know?
22      "A.  Again, it was a document that
23   the trade association had.
24      "Q.  The HDMA?

Page 103

1       "A.  Yes, it was NWDA at the time.
2       "Q.  NWDA.  And how do you know --
3   strike that.  All right.  This is in this manual
4   obviously?
5       "A.  Yes.
6       "Q.  It has a suspicious order
7   reporting system of 1998.  Do you see that?
8       "A.  Yes.
9       "Q.  Have you seen this document
10   before?
11      "A.  Yes.
12      "Q.  Is it your understanding --
13   is that how the limit amounts were created in
14   the audit -- or excuse me -- ingredient limit
15   reports?
16      "A.  Not the ingredient limits
17   report.
18      "Q.  What was this used for; do
19   you know?
20      "A.  I believe this was used for
21   List I chemicals.
22      "Q.  So this applies only to
23   List I chemicals, is your understanding?
24      "A.  Yes.

Page 104

1       "Q.  And, therefore, not controlled
2   substances, unless they include List I chemicals,
3   right?
4       "A.  Yes."
5   BY MR. FULLER:
6       Q.   Okay.  Had you ever seen that
7   document before?
8       A.   The document on the screen?
9       Q.   Yes, sir.
10      A.   I couldn't see that.
11      Q.   Okay.
12      MR. FULLER:  And this is
13   going to be Plaintiffs' Exhibit
14   Number 5, 4349.
15             - - -
16   (Cardinal-Forst Deposition Exhibit 5 marked.)
17             - - -
18   BY MR. FULLER:
19      Q.   And that document is going to be
20   on page 41, Mr. Forst.
21      MS. WICHT:  The document that
22   was shown on the screen in the
23   deposition clip?
24      MR. FULLER:  Yes, ma'am.

Page 105

1   BY MR. FULLER:
2       Q.   Did you find that document,
3   Mr. Forst?
4       A.   Yes.
5       Q.   It says, "Exhibit II, Suspicious
6   Order Reporting System of 1998" --
7       A.   Yes.
8       Q.   -- "For Use in Automated Tracking
9   Systems," correct?
10      A.   Yes.
11      Q.   And this appears to be for -- it
12   says, "The Current Calculation Being Used for
13   List I Chemicals and Schedule II through V
14   Controlled Substances."
15          And you can take a minute and look
16   at it.
17          If you go down to the -- right
18   after Number 4, it talks about a multiplier.
19          Do you see that?
20      A.   Yes.
21      Q.   And it has a 3 and an 8 factor,
22   correct?
23      A.   Yes.
24      Q.   It says, "Note:  Factor equals 3

Page 106

1 for controlled -- IIs and IIIs controlled
2 substances containing List I chemicals."
3          Did I read that right?
4      A.   Yes.
5      Q.   Now, that, at least according to
6 that statement, wouldn't apply to OxyContin --
7 or excuse me -- oxycodone products, would it?
8          MS. WICHT:  Object to the
9      form.  Foundation.  Calls for
10     speculation.
11     A.   Repeat the question, please.
12     Q.   Sure.  It says, "The factor equals
13 3 for C-II through -- and C-III controlled
14 substances containing List I chemicals."
15         OxyContin -- excuse me --
16 oxycodone products do not contain List I
17 chemicals, do they?
18         Let me ask a different question.
19 Do you know what the List I chemicals are that
20 you're -- I guess it was during regulatory --
21 supposed to be preventing the diversion of?
22         MS. WICHT:  Object to the
23     form of the question.
24     A.   The ones that we want were

Page 107

1 pseudoephedrine, ephedrine, and -- I can't --
2 there's -- if it was a List I chemical, it
3 had -- I don't remember.  Those are the two that
4 come to my mind.
5      Q.   Okay.  And that was all based on
6 the meth act that was in the late '90s, correct?
7          MS. WICHT:  Object to the
8      form.
9      A.   That sounds correct.
10     Q.   It was all -- it was all due to
11 the meth outbreak that the country --
12     A.   Correct.
13     Q.   -- was experiencing back then.
14 You know that, right?
15         MS. WICHT:  Object to the
16     form.
17     A.   Yes.
18     Q.   Okay.  And you know
19 pseudoephedrine is not in any oxycodone products
20 that you're aware of, correct?
21     A.   Not to my knowledge, no.
22     Q.   Okay.  And we'll come back to
23 this, but I wanted to show you that.
24         So we see a 3 factor there, but

Page 108

1 you would agree with me that based on what we
2 see -- and actually let's, turn to page 5 of
3 that document.
4          MS. WICHT:  Of Exhibit 5?
5          MR. FULLER:  Yes, ma'am.
6      4339.
7      Q.   And do you see the title of it?
8 It says, "Report to the U.S. Attorney General by
9 the Suspicious Order Task Force."
10     A.   Yes.
11     Q.   And it says, "The comprehensive
12 Methamphetamine Control Act of 1996," just like
13 you thought, right?
14     A.   Yes.
15         MS. WICHT:  Object to the
16     form.
17     Q.   Okay.  If you go down to the
18 second paragraph, it says, "The charter required
19 to establish a task force to prepare
20 recommendations concerning additional guidelines
21 to be used by the chemical industry in complying
22 with 21 U.S.C. 830(b)(1)(A)."
23         Do you know what that regulation
24 is?

Page 109

1      A.   Not off the top of my head, no.
2          MR. FULLER:  Gina, can you
3      pop up the demonstrative A.
4      Q.   So there's on the screen 2130- --
5          MR. FULLER:  And, actually, I
6      think I have a hard copy.  I need a
7      sticker, Edna.
8          This will be Plaintiffs'
9      Exhibit Number 6.  It's
10     demonstrative A, and it's part of
11     the 21 U.S.C.A. 830.  There you go.
12                 - - -
13     (Cardinal-Forst Deposition Exhibit 6 marked.)
14                 - - -
15     Q.   And you have that in front of you.
16 It's the 21 U.S.C.A. Section 830, right?
17     A.   Yes.
18     Q.   United States Code.  This is a
19 federal law that was passed by our U.S.
20 Congress.  And it says Reports, (b) -- and if
21 you -- if --
22         MR. FULLER:  Gina, just leave
23     this up.
24

Highly Confidential - Subject to Further Confidentiality Review

Page 110

BY MR. FULLER:

Q.   If you toggle back and forth, Mr. Forst, between that and 4339, which is the document we just pulled out, you can see it cites 21 U.S.C. 830(b)(1)(A), right?

A.   Yes.

Q.   And if we read (b)(1)(A), it's Reports to Attorney General, and then (1) is "Each regulated person shall report to the Attorney General, in such form and manner as the Attorney General shall prescribe by regulation:

(A) any regulated transaction involving the extraordinary quantity of a listed chemical, an uncommon method of payment or delivery, or any other circumstances that the regulated person believes may indicate that the listed chemical will be used in violation of this subchapter."

Hopefully I read that right, because it's pretty long.

Did I get it right, Mr. Forst?

A.   Yes.

Q.   Okay.  So this code section that the report that we were looking at to Janet Reno

Page 111

is referring to is the code section related to List I chemicals, correct?

A.   Correct.

Q.   Not controlled substances, right?

MS. WICHT:  Object to the form of the question.

A.   According to the document, yes.

Q.   Okay.  Now -- and I think you testified earlier there was two sets of rules that you guys had to follow at Cardinal.  One related to List I chemicals and one related to controlled substances; is that true?

MS. WICHT:  Object to the form of the question.

A.   Could you repeat the question.

Q.   Sure.  There was different statutes that Cardinal had to comply with as a registrant: a set related to List I chemicals, and then the Controlled Substances Act that pertained to controlled substances, correct?

MS. WICHT:  Object to the form of the question.

A.   Correct.

Q.   Okay.  Now, the threshold setting

Page 112

process we read earlier used a multiplier of 3, 5, and 8 in the standard operating procedure set out by Cardinal, right?

A.   According to the procedure, yes.

Q.   Okay.  And at least the 3 and 8 may be justified by List I chemicals, at least according to the documents we've seen in the Chemical Handler's, as well as the Janet Reno report, right?

MS. WICHT:  Object to the form of the question.  Foundation.  Calls for speculation.

A.   I don't know if those two are related.  I can't -- I can't -- just because one says 3 and 8 and the policy says 3 and 8 -- and I don't know the analytics or where that information came from -- I can't say if those are truly related to each other.  It could be a coincidence they chose those numbers.  I don't know the answer to that.

Q.   You don't know if Cardinal based the selection of those numbers off of that report?

A.   I do not know that.

Page 113

Q.   Okay.  Maybe they did, maybe they didn't, but you can't testify one way or the other?

A.   I can't testify one way or the other.

Q.   Fair enough.

So back to 4553, which is the SOP, and page 3 of that document, we talked there about coming up with the average.  That's just the simple math of coming up with the average, right?

Are you aware of any particular reason that it was done that way?

A.   No.

Q.   Okay.  Now, we went down to 4.2.4 and we talked ever so briefly.  And I'm assuming -- well, let me ask it.

Was the section related to after setting a threshold, then adjusting thresholds based on what you described as customer specifics, was that in this policy and procedure before you made any additions or subtractions to it, or do you recollect?

MS. WICHT:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 form.
2     A. I don't recollect.
3     Q. Do you know what the basis of that
4 is, what the scientific basis of making those
5 adjustments would be?
6     MS. WICHT: Object to the
7     form. Asked and answered.
8     A. I don't know the answer to that.
9     Q. Do you know who would? Do you
10 know who would know what studies out there were
11 done that support this methodology used by
12 Cardinal?
13     MS. WICHT: Object to the
14     form of the question.
15     A. I can't speculate on who it would
16 be.
17     Q. All right.
18     So, Mr. Forst, we've talked a
19 little bit about the different regulations and
20 regulatory requirements, right?
21     A. Yes.
22     Q. And you said that there were some
23 that apply and some obligations that Cardinal
24 takes on based on them, correct?

Page 115

1     A. Correct.
2     Q. What is your understanding of what
3 the Controlled Substances Act requires of
4 Cardinal? Tell the jury.
5     MS. WICHT: Object to the
6     form. Calls for a legal
7     conclusion.
8     A. To monitor DEA customer purchase
9 orders or acquisitions if -- for some reason,
10 there's not the word "purchase" in there --
11 to --
12     MS. WICHT: Mike, I -- you
13     didn't write down what he said.
14     MR. FULLER: I'm not
15     transcribing it.
16     MS. WICHT: Okay.
17     MR. FULLER: So you let me
18     conduct my depo the way I like --
19     MS. WICHT: Sure.
20     MR. FULLER: -- if you don't
21     mind.
22     MS. WICHT: Sure.
23 BY MR. FULLER:
24     Q. Go ahead.

Page 116

1     A. -- to look for the possibility of
2 suspicious orders that may be diverted for a
3 non-medical purpose.
4     Q. Okay. Any other obligations that
5 the DEA puts on Cardinal, to your understanding?
6     MS. WICHT: Objection.
7     Q. Strike that.
8     MS. WICHT: Sorry.
9     Q. Any other regulatory or statutory
10 obligations that Cardinal has to meet related to
11 suspicious order monitoring?
12     MS. WICHT: Object to the
13     form and calls for a legal
14     conclusion.
15     A. I think that's pretty succinct. I
16 mean, I would include into that the frequency,
17 the quantity, the pattern. So I think that's a
18 pretty decent definition.
19     Q. And I'm not saying it's not. I'm
20 just wanting to give you an opportunity to tell
21 me about anything else that you may believe
22 Cardinal has to do.
23     Now --
24     - - -

Page 117

1 (Cardinal-Forst Deposition Exhibit 8 marked.)
2     - - -
3     Q. All right. So Plaintiffs' Exhibit
4 Number 8 --
5     MS. WICHT: 7?
6     MR. FULLER: No. 8's first.
7     MS. WICHT: Are we skipping?
8     MR. FULLER: Yeah, we --
9 I'm -- I'm just taking the wrong
10 one backwards.
11     MS. WICHT: Okay.
12 BY MR. FULLER:
13     Q. This is P.4916.
14 Okay. Mr. Forst -- and I'm
15 pronouncing that right; it's Forst, right?
16     A. That's correct.
17     Q. Okay. Sorry.
18 You have 4916, which is
19 Plaintiffs' Exhibit Number 8, in front of you?
20     A. Yes.
21     Q. And it's also on the screen.
22 It says, "United States Code
23 Annotated, Title 21, Food and Drugs," right?
24     A. Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  Q. "Drug Abuse Prevention and
2  Control, Subchapter I, Control and Enforcement,
3  Part A, Introductory Provisions."
4  Do you see that?
5  A. Yes.
6  Q. And it talks about the findings
7  and declarations related to controlled
8  substances.
9  Have you ever seen this code
10  before? Do you ever recall reading the
11  Controlled Substances Act?
12  MS. WICHT: Yeah. It's a
13  compilation of different things.
14  Q. And I'll tell you this is -- yeah,
15  this is sections of it. I didn't give you the
16  whole act.
17  A. Okay.
18  Q. Do you ever recall reading the
19  Controlled Substances Act, Mr. Forst?
20  A. From cover to cover, no.
21  Q. But portions of it throughout your
22  career?
23  A. Yes.
24  Q. Okay. So this is the declarations

Page 119

1  by Congress. And if you look at number 2, it
2  says, "The illegal importation, manufacture,
3  distribution and possession and improper use of
4  controlled substances have a substantial and
5  detrimental effect on the health and general
6  welfare of the American people."
7  Did I read that correctly?
8  A. Yes.
9  Q. And one of the factors that we
10  focus on when we're dealing with Cardinal is the
11  distribution, right? That's what Cardinal is in
12  the business of is distributing, amongst other
13  things, controlled substances?
14  MS. WICHT: Object to the
15  form.
16  A. But "distribution" can also mean
17  distributing to a patient or whatever. So
18  distribution is a very large -- it -- it's a
19  word that encompasses a lot of things just
20  besides distribution centers or -- in my
21  opinion.
22  Q. Fair enough.
23  Do you think that that, then,
24  removes the Controlled Substances Act outside

Page 120

1  the realm of having to be complied with by
2  Cardinal?
3  MS. WICHT: Object to the
4  form.
5  Q. I mean, based on what you were
6  explaining as the definition, does Cardinal
7  still have to comply with the Controlled
8  Substances Act or not?
9  A. Cardinal has to comply with the
10  Controlled Substances Act in portions that the
11  distribution of controlled substances, the
12  licensing, et cetera, whatever -- whatever
13  part -- whatever Cardinal has that is affiliated
14  in some form or fashion, even if it was
15  manufacture, then they would have to follow the
16  Controlled Substances Act for those -- those
17  processes that they do.
18  Q. Fair enough.
19  Are you -- let me ask it
20  differently.
21  Are you aware of whether Cardinal
22  has to -- I mean, has to provide for the
23  maintenance of effective control against the
24  diversion of particular controlled substances

Page 121

1  other than -- into other than legitimate
2  medical, scientific, or industrial channels?
3  MS. WICHT: Object to the
4  form and calls for a legal
5  conclusion.
6  A. Could you repeat the question,
7  please.
8  Q. Sure. Turn to page 4. See here
9  Registration requirements? It's part of the
10  Controlled Substances Act --
11  A. Yes.
12  Q. -- 21 U.S.C. Section --
13  A. Yes.
14  Q. -- 823.
15  (b) is one: Distributors of
16  controlled substances of Schedules I and II.
17  And then one of the requirements is "Maintenance
18  of effective control against the diversion of
19  particular controlled substances into other than
20  legitimate medical, scientific, and industrial
21  channels."
22  A. Yes.
23  MS. WICHT: Object to the
24  form.

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  Q.   Are you aware whether Cardinal has
2  to comply with that?
3       MS. WICHT:  Object to the
4  form.
5  A.   I would say Cardinal does comply
6  with that.
7  Q.   And I'm not asking whether they do
8  or don't right now.
9  A.   Yes, they have -- they should
10 follow that, yes.
11 Q.   So if we go back to our -- what
12 Cardinal is required to do, can we add maintain
13 effective controls against diversion?
14      MS. WICHT:  Object to the
15 form.
16 A.   It says "into other than
17 legitimate medical and scientific and industrial
18 channels.
19 Q.   Right.  You want to prevent
20 diversion?
21      MS. WICHT:  Object to the
22 form of the question.
23 A.   Correct, but is not a DE -- a
24 DEA-licensed facility a legitimate medical,

Page 123

1  scientific, or industrial thing if they have a
2  DEA license.
3  Q.   Well, fair enough.
4       So you always distributed to
5  licensed entities, right?
6  A.   Correct.
7  Q.   Well, explain to the jury why
8  Cardinal got their license suspended, four
9  facilities in 2007 and '08 and then another
10 facility during your time in 2012.
11      MS. WICHT:  Object to the
12 form.
13 Q.   If it only distributed to licensed
14 distributors and that's all you have to do,
15 explain to the jury why Cardinal had five
16 different licenses suspended over a four-year
17 period.
18      MS. WICHT:  Object to the
19 form.
20 Q.   Go ahead.
21      MS. WICHT:  Foundation.
22 Calls for a legal conclusion.
23 A.   I can't --
24 Q.   Because you have to do more than

Page 124

1  just distribute to someone that's licensed to
2  receive it, don't you?
3       MS. WICHT:  Object to the
4  form.
5  A.   Yes.  You need to make sure that
6  they are licensed properly, and you also have --
7  so this one is difficult because you also have
8  to understand that the entity that's licensed
9  has also legal obligations.
10      I, as a pharmacist, would not
11 knowingly fill a prescription that would be
12 going out into and used for diversion or abuse.
13 So I have -- as a pharmacist, looking at this, I
14 have to understand there are other professionals
15 out there that have also the responsibility.  So
16 I can't see who they're dispensing to, who their
17 prescriber is, so I'm very limited in that.
18      So effective control is through
19 the whole system.
20 Q.   And Cardinal has to do its part,
21 doesn't it?
22 A.   Cardinal has done its part.
23 Q.   Well --
24 A.   Those were allegations.

Page 125

1  Q.   Well, no, because in 2012,
2  Cardinal admitted to its system failing.  There
3  was an admission by -- do you -- are you not
4  aware of that, that Cardinal in its memorandum
5  of agreement -- of understanding with the DEA --
6  A.   I believe there was --
7  Q.   -- and the DOJ -- hold on, let me
8  finish -- actually admitted to failure related
9  to the Controlled Substances Act?
10      MS. WICHT:  Object to the
11 form of the question.
12 A.   I am not aware of an admission.
13 Q.   No one ever shared that with you
14 before today, right?
15      MS. WICHT:  Object to the
16 form of the question.
17 A.   I am not aware of an admission.
18 Q.   So, again, my question is, no one
19 ever shared that with you before today, right?
20      MS. WICHT:  Object to the
21 form of the question.
22 A.   I am not aware of an admission.
23 Q.   Did you ever see the second
24 memorandum of understanding, what the

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 allegations were against Lakeland for the second
2 time?
3        A.   They were allegations.
4        Q.   Right.  But Cardinal admitted to
5 some of them.
6        A.   I --
7        Q.   Did anybody share with you --
8        A.   I do not -- I do not remember
9 Cardinal admitting.
10       Q.   Fair enough.
11            So does Cardinal -- from
12 Mr. Forst's perspective, does Cardinal need to
13 maintain effective controls against diversion?
14 Yes or no?
15       A.   In (d)(2)?
16            MS. WICHT:  Object to form of
17       the question.
18       A.   Sorry.  What was the question
19 again?
20       Q.   Does Cardinal need to maintain
21 effective controls to prevent diversion?
22            MS. WICHT:  Object to the
23       form of the question.
24       A.   Cardinal does the best to its

Page 127

1 ability to maintain controls to avoid diversion
2 of controlled substances.
3        Q.   All right.
4            Then let's go to Exhibit Number 7,
5 4915.
6            - - -
7 (Cardinal-Forst Deposition Exhibit 7 marked.)
8            - - -
9        Q.   Does Cardinal have an obligation
10 related to suspicious orders that you're aware
11 of, Mr. Forst?
12       A.   I'm sorry.
13       Q.   Does Cardinal have an obligation
14 related to suspicious orders?
15            MS. WICHT:  Object to the
16       form.
17       A.   Yes.
18       Q.   And what is that obligation, to
19 your understanding?
20       A.   The obligation, to my
21 understanding, is to report orders that are
22 deemed suspicious.
23       Q.   All right.  So make sure I've got
24 this right.

Page 128

1            First we talked about they have to
2 monitor DEA customers looking for possible
3 suspicious orders that may be diverted for
4 non-medical purposes, correct?
5        A.   Correct.
6            MS. WICHT:  Object to the
7       form.
8        Q.   Second, we talked about they need
9 to maintain controls against diversion, right?
10       A.   Yes.
11            MS. WICHT:  Object to the
12       form.
13            MR. FULLER:  He even paused
14       and sort of glanced your way.
15            MS. WICHT:  Sorry.  I was
16       slow.
17 BY MR. FULLER:
18       Q.   And lastly, we talked about
19 Cardinal has to, at least according to the
20 regulations, report orders that are deemed
21 suspicious.
22            MS. WICHT:  Object to the
23       form.
24       Q.   Is that correct, Mr. Forst?

Page 129

1        A.   Yes.
2        Q.   Okay.  Now, let's bounce back to
3 thresholds for one second.
4            Actually, let's finish with this
5 document, 4915.
6            Read, if you will, the -- Section
7 (b) there aloud for the jury, Mr. Forst.
8        A.   "The registrant shall design and
9 operate a system to disclose to the registrant
10 suspicious orders of controlled substances.  The
11 registrant shall inform the field office --
12 Field Division Office of the Administration in
13 his area of suspicious orders when discovered by
14 the registrant.  Suspicious orders include
15 orders of unusual size, orders deviating
16 substantially from a normal pattern, and orders
17 of unusual frequency."
18       Q.   So suspicious orders are defined
19 by the DEA as including orders of unusual size,
20 orders deviating substantially from normal
21 pattern, or orders of unusual frequency; is that
22 correct?
23       A.   According to the document, yes.
24       Q.   So Cardinal should be identifying

Page 130

1 and reporting orders of unusual size, deviating
2 substantially from a normal pattern, and orders
3 of unusual frequency; is that right?
4        MS. WICHT:  Object to the
5 form.
6    A.    Well --
7    Q.    Is that how the regulation reads?
8    A.    It's how the regulation reads, but
9 the regulation is vague as opposed to what is
10 unusual, what is truly normal, or what is an
11 unusual frequency.
12    Q.    Okay. Fair enough.
13    A.    That's open to interpretation.
14    Q.    So -- well, all right. Let's --
15 let's talk about those thresholds just for a
16 moment, though.
17        The thresholds, the process that
18 started in 2008 when you were there, those
19 thresholds -- once somebody reached them, the
20 orders were stopped, weren't they?
21    A.    The orders were held for review.
22    Q.    They wouldn't go out until they
23 were cleared; is that correct?
24    A.    That is correct.

Page 131

1    Q.    And that's been the system since
2 2008 up until the time you left, wasn't it?
3    A.    That is correct.
4    Q.    Now, they can be reviewed and then
5 released, right?
6    A.    That is correct.
7    Q.    But no order is going to go out of
8 Cardinal that's hit a threshold without somebody
9 looking at it, reviewing it, and releasing it,
10 correct?
11    A.    That is correct.
12    Q.    Okay. And that's, again, from
13 February of '08 all the way to when you left in
14 June of '17 -- I think you said June, right?
15    A.    Correct.
16    Q.    Okay. Let's talk -- June or July,
17 somewhere around there, isn't that right?
18    A.    Yes.
19    Q.    Okay.
20    A.    Yeah, because we're in '19.
21    Q.    Now, about that same time,
22 Cardinal also started a Know Your Customer
23 policy --
24    A.    And the time you're referring to

Page 132

1 is?
2    Q.    Back in 2008.
3    A.    Okay.
4    Q.    Right?
5        MS. WICHT:  Object to the
6 form of the question.
7    A.    As far as I know, that is correct.
8    Q.    Okay. Now, it may have been, I
9 guess, already started when you arrived, but it
10 was there when you got there; is that fair?
11    A.    Yes.
12    Q.    And it's been in place since that
13 time, maybe with some tweaks and adjustments,
14 all the way up till the time you left, again, in
15 middle of 2017, correct?
16    A.    Correct.
17    Q.    Okay. So those aren't -- those
18 aren't anything new after the 2012 incident?
19 Those have been in place going all the way back
20 to 2008, correct?
21    A.    That --
22        MS. WICHT:  Object to the
23 form.
24    A.    That sounds correct.

Page 133

1    Q.    Okay. We're going to mark -- my
2 handwriting is a -- we'll call it an art --
3 Exhibit Number 9.
4        - - -
5    (Cardinal-Forst Deposition Exhibit 9 marked.)
6        - - -
7    Q.    Exhibit 9 is a demonstrative --
8 I'm just going to throw it there in the middle
9 for now.
10        MS. WICHT:  We can make
11 copies at the break.
12        MR. FULLER:  Sure. Sure.
13        - - -
14    (Cardinal-Forst Deposition Exhibit 10 marked.)
15        - - -
16 BY MR. FULLER:
17    Q.    Let's talk about --
18        MR. FULLER:  Plaintiffs'
19 Exhibit Number 10 is going to be
20 4547.
21 BY MR. FULLER:
22    Q.    Have you ever seen this
23 suspicious -- or excuse me -- standard operating
24 procedure previously?

Page 134

1       And, again, if you look on
2  page 13, I think you're the owner of this
3  document as well, Mr. Forst.
4       A.   And I reiterate, owner does not
5  necessarily mean the person that is the author
6  of the document.
7       Q.   Well, you said that, but Cardinal
8  labeled you as the owner.
9       A.   So this document --
10       MS. WICHT: What's the
11  question that's open?
12       MR. FULLER: I'm just asking
13  if he's seen it before.
14       MS. WICHT: Okay.
15  BY MR. FULLER:
16       Q.   Is it fair to say that you've seen
17  it before, or would they just stick your name on
18  something you've never seen?
19       A.   This document should belong to
20  Steve Morse, because he was the head of
21  investigations.
22       Q.   Now, you worked with Mr. Morse,
23  didn't you?
24       A.   Yes.

Page 135

1       Q.   Okay.
2       A.   And, again, the assignment of
3  these documents --
4       Q.   Look, I can only go by what's on
5  the document.
6       A.   I understand.
7       Q.   I wasn't at Cardinal. I haven't
8  been in Cardinal. I don't -- I'm trying to
9  learn, okay?
10       MS. WICHT: Well, I think
11  he's trying to explain something --
12       MR. FULLER: Well, no.
13       MS. WICHT: -- and you jumped
14  in on him. So --
15       MR. FULLER: He's trying to
16  tell me --
17       MS. WICHT: -- just let
18  him -- you said you're trying to
19  learn. He's trying to explain.
20       MR. FULLER: He's already
21  explained the owner designation.
22       MS. WICHT: Okay.
23  BY MR. FULLER:
24       Q.   All right. Starting at the first

Page 136

1  page, you see it says "On-Site Investigations"?
2       A.   Yes.
3       Q.   Now, it's your position that
4  Mr. Morse should be the owner of this document,
5  right?
6       A.   Correct.
7       Q.   Not you. Although the document
8  says you; is that --
9       A.   Correct.
10       Q.   Okay.
11       A.   He's the one that would be
12  reviewing the document, recommending to his
13  investigators, and then recommending to him what
14  they should cover.
15       Q.   Well, at least he should be,
16  right?
17       A.   Correct.
18       Q.   You don't know sitting here today
19  whether he did or didn't, do you?
20       MS. WICHT: Object to the
21  form.
22       A.   I can't answer that question. I
23  can't evaluate Steve's performance.
24       Q.   I'm not asking you to evaluate his

Page 137

1  perform -- I'm just saying that you don't --
2       A.   I --
3       Q.   -- know sitting here today whether
4  he did or didn't do those things?
5       MS. WICHT: Object to the
6  form.
7       Q.   Do you?
8       A.   I would say he did those things.
9       Q.   But you're guessing, right?
10       A.   I'm not guessing.
11       Q.   So you know he did those things?
12       A.   As a professional, yes. To the
13  best of his ability, yes.
14       Q.   So you're assuming that based on
15  your interactions with him in the past, that he
16  would have taken those steps?
17       A.   Yes.
18       Q.   Fair enough. Okay.
19       So it says the purpose. "The
20  purpose of this policy is to provide guidance to
21  CAH" -- which means Cardinal Health, right?
22       A.   Correct.
23       Q.   -- "CAH employees by outlining the
24  steps involved in the conduct of on-site

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 investigation of Cardinal Health's customers to
2 obtain information regarding their potential
3 risk for diversion of regulated drugs."
4     Did I read that correctly?
5   A.  Yes.
6   Q.  All right.  So let's go down a
7 little bit to 1.2, and then we see 1301.74.
8     Does that look familiar to you,
9 Mr. Forst?  I think if you look at one of the
10 last --
11   A.  Yes.
12   Q.  -- exhibits --
13   A.  Yes.
14   Q.  -- it may.
15   A.  Yes.  It's familiar to me.
16   Q.  That's the Code of Federal
17 Regulation related to suspicious orders
18 promulgated by the DEA, right?
19   A.  That is correct.
20   Q.  Let's go down to the next bullet
21 point, which is 310 -- excuse me -- 1310.05.
22 We're going to mark it as a demonstrative, the
23 regulation.
24     MR. FULLER:  There's copies

Page 139

1 for counsel.
2     - - -
3   (Cardinal-Forst Deposition Exhibit 11 marked.)
4     - - -
5   Q.  And at least according to -- we'll
6 put it up.
7     Do you see that on the screen?  Or
8 maybe it's in front of you.
9   A.  I have it.
10   Q.  Okay.  It's Code of Federal
11 Regulation, Part 1310, Records and Reports of
12 Listed Chemicals in Certain Machines;
13 Importation and Exportation of Certain Machines,
14 right?
15   A.  Yes.
16   Q.  And then 310 [sic] (a)(1) -- which
17 is what you cite to in your policy and
18 procedure, right, standard operating procedure?
19   A.  Yes.
20   Q.  And it seems to track the same
21 language, doesn't it?
22   A.  Yes, it does.
23   Q.  So read subsection (a) from your
24 standard operating procedure used at Cardinal

Page 140

1 Health during this time.
2   A.  Under 1310.05, Reports; is that
3 correct?
4   Q.  Yes, sir.
5   A.  Okay.  "Each regulated person
6 shall report to the special agent in charge of
7 the DEA divisional office for the area in which
8 the regulated person making the report is
9 located as follows:  Any regulated transaction
10 involving an extraordinary quantity of listed
11 chemical, an uncommon method of payment or
12 delivery and any other circumstance that the
13 regulated person believes may indicate that the
14 listed chemical will be used in violation of
15 this part."
16   Q.  So this is another reporting
17 requirement that Cardinal has, correct?
18   A.  Correct.
19   Q.  That pertains to List I chemicals,
20 doesn't it?
21   A.  Correct.
22   Q.  And is actually set out
23 specifically in Cardinal's own policies and
24 procedures; isn't that right?

Page 141

1   A.  According to this document, yes.
2   Q.  Okay.  Now, read point -- excuse
3 me -- 1.3 of the standard operating procedure
4 for the jury.
5   A.  "Notwithstanding the requirements
6 of the C.F.R., any memorandum of understanding
7 with the DE -- Drug Enforcement Administration
8 that modifies the requirements of the C.E.R." --
9 "C.F.R. will take precedence."
10   Q.  So that's -- what that's telling
11 us is any agreements as set out in the MOUs will
12 take precedent over the regulations, correct?
13   A.  According to the document, yes.
14   Q.  Okay.  And how many memorandums of
15 understanding are you aware of that Cardinal has
16 with the DEA?
17   A.  Possibly two in my time there.
18   Q.  So let's turn to page 3.  This is
19 the Definitions section.
20     You see we have a definitions
21 section there for suspicious order?
22   A.  Yes.  Suspicious order monitoring.
23 Suspicious order, yes.
24   Q.  Okay.  And we have three bullet

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 points there, right?
2    A.   Yes.
3    Q.   Okay.  Read the first one for the
4 jury.
5    A.   "Controlled substance which is of
6 an unusual size, deviates substantially from a
7 normal pattern or is ordered with unusual
8 frequency."
9    Q.   Okay.  Now, I think you pointed
10 out earlier that that was your definition of the
11 regulation, right?
12    A.   Yes.
13    Q.   You said it was vague, didn't you?
14    A.   It's vague in that unusual --
15 substantial and unusual frequency can be -- what
16 is unusual for one individual or deviates
17 substantially from a normal pattern is going to
18 be different across the board.  It has to be in
19 a certain context to understand that.
20    Q.   Sure.  Now, do you know if
21 Cardinal provided a clearer definition of
22 suspicious order in this regard?
23        MS. WICHT:  Object to the
24    form.

Page 143

1    A.   I can't -- I can't say if their
2 definition --
3    Q.   I'm just asking if you know if
4 they had any written definition that gives more
5 clarity to this or not.
6    A.   That is the definition that we
7 used.
8    Q.   That's the -- okay.
9        And then read the next bullet
10 point for the jury.
11    A.   "List I or II chemical which is of
12 an extraordinary quantity, involves an uncommon
13 method of payment or delivery, and any other
14 circumstance which may indicate that the listed
15 chemical will be used in violation of the
16 Federal Controlled Substances Act."
17    Q.   Okay.  Now -- so that obviously is
18 suspicious orders relating to List I or II
19 chemicals, correct?
20    A.   Correct.
21    Q.   And it's a different definition
22 for suspicious order than the controlled
23 substance definition, right?
24    A.   According to the document, yes.

Page 144

1    Q.   And it's consistent what we read
2 in the regulations as well, correct?
3        MS. WICHT:  Object to the
4    form.
5    A.   Correct.
6    Q.   Now, bullet point 3, take a look
7 at that real quick.  I'm not going to make you
8 read it, but it's dealing with drugs required to
9 be monitored by individual states; is that
10 right?
11    A.   Yes.
12    Q.   Because some states may have had
13 particular statutes that required certain
14 monitoring for other substances --
15    A.   Correct.
16    Q.   -- above and beyond the Controlled
17 Substances Act or the List I Chemicals Act,
18 correct?
19    A.   That is correct.
20    Q.   Okay.  So -- and you can take a
21 moment and look at this, but this is the -- the
22 on-site investigations.  And I think you
23 testified earlier related to chains.
24        Is there anywhere that you're

Page 145

1 aware of that on-site investigations, the
2 investigative process that Cardinal goes
3 through, is set out in a policy and procedure
4 that is different for retail independents versus
5 chains?
6        MS. WICHT:  Object to the
7    form to the extent it purports to
8    characterize his prior testimony.
9    A.   I'm not aware of a document like
10 that.
11    Q.   Okay.  Now, something that you had
12 to be able to do in your job for you to do your
13 job effectively is to identify what is a
14 suspicious order, correct?
15    A.   My job was to identify orders that
16 may be suspicious.
17    Q.   You reviewed thresholds, correct?
18    A.   Correct.
19    Q.   And you had the authority to
20 release a threshold, right?
21    A.   Correct.  That order was not
22 necessarily suspicious.
23    Q.   Right.  You -- well, let's start
24 with a premise.  You wouldn't want to release

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 one that was suspicious, correct?
2         MS. WICHT:  Object to the
3 form.
4         A.   I would not want to do that, no.
5         Q.   Okay.  Your goal was to identify
6 those that were suspicious and release those
7 that weren't, right?  That was your job?
8         A.   Yes.
9         Q.   Okay.  In order to identify if
10 something is suspicious, you have to know what
11 suspicious is or else you can't do your job; you
12 would agree with that, right?
13         A.   I have to understand what is
14 possibly suspicious.
15         Q.   And those are the ones that get
16 reported, correct?
17         A.   Correct.
18         Q.   Okay.
19         A.   Because I won't know if it's
20 suspicious because what happens to the product
21 once it gets to the pharmacy, I have no control
22 over.
23         Q.   And let me make sure we're on the
24 same page.

Page 147

1         You said you don't know that it's
2 suspicious, meaning you don't have to determine
3 if it's actually being diverted is what you're
4 saying, right?
5         A.   Correct.  I can't.
6         Q.   You can't know where it goes after
7 you deliver it?
8         A.   I can't.
9         Q.   If there's the potential that it
10 could be diverted, Cardinal has a regulatory
11 obligation to report that, correct?
12         MS. WICHT:  Object to the
13 form.  Foundation.  Calls for a
14 legal conclusion.
15         A.   I can't -- again, once it leaves
16 Cardinal Health, I can -- following the guidance
17 of D -- or the DEA, I can say that this looks
18 suspicious.  Whether it is or not, I don't know.
19 So if I identify it as such, then it would be
20 reported.
21         Q.   That's what I wanted to make sure.
22         A.   But just because it's a threshold
23 does not mean it's necessarily suspicious.
24         - - -

Page 148

1 (Cardinal-Forst Deposition Exhibit 12 marked.)
2         - - -
3         Q.   Okay.  4226, Plaintiffs' Exhibit
4 Number 12.
5         All right.  I'm going to tell you
6 again, this is one that you --
7         A.   Yeah.
8         Q.   -- guess what, you are the owner,
9 Mr. Forst.  That's set out on page 7.
10         Did you see that already?
11         A.   Yep.  Yes, I see that.
12         Q.   All right.  This is another
13 standard operating procedure for the
14 pharmaceutical distribution for Cardinal, isn't
15 it?  It says it in the upper right.  You can say
16 no.
17         A.   Yes, it is.
18         Q.   Okay.
19         A.   I'm trying to get ahead a little
20 bit.
21         Q.   Detecting and reporting suspicious
22 orders and responding to threshold events is
23 exactly what you did, isn't it?
24         MS. WICHT:  Object to the

Page 149

1 form of the question.
2         Q.   This was your job at Cardinal,
3 right?
4         A.   Correct.
5         Q.   Okay.  This is what you spent --
6 and this is what you did most of the ten --
7 well, almost ten years that you were there,
8 right, almost a decade?
9         MS. WICHT:  Object to the
10 form.
11         A.   No.  My role changed.
12         Q.   Okay.  From what time frame did
13 you detect and report suspicious orders at
14 Cardinal?
15         A.   Probably seven of the ten years.
16         Q.   So for seven years, this was your
17 job.
18         Did you receive any particularized
19 training related to identifying and reporting
20 suspicious orders and evaluating threshold
21 events?
22         A.   The training was based on my
23 knowledge as a pharmacist.
24         Q.   From being a pharmacist --

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    A.   From being a pharmacist, from
2 reading the policies and procedures, reading the
3 objectives of what Cardinal was trying to do.
4    Q.   From being aware of the
5 regulations as well?
6    A.   Aware of the regulations.
7    Q.   And you've been a pharmacist -- I
8 don't mean to pry about age -- how long?
9    A.   Oh, God.
10   Q.   Just tell me what year you
11 graduated.  That'll help.
12   A.   '81.
13   Q.   Okay.  So you've been a
14 pharmacist --
15   A.   So whatever that is.
16   Q.   Now you'll make me do the math.
17   A.   Mm-hmm.  30-something -- 30 --
18 35-plus years, maybe.
19   Q.   Yes.
20   A.   Yes.
21   Q.   Close to 38 years.
22   A.   Yeah.  Thanks.
23   Q.   You're welcome.  Where did you do
24 your schooling?

Page 151

1    A.   Went to Creighton University in
2 Omaha, Nebraska.
3    Q.   Now, was that for pharmacy school?
4    A.   That was for pharmacy school.
5    Q.   How about undergrad?
6    A.   I went to the University of
7 Arkansas, two different branches.
8    Q.   Go Razorbacks.
9    A.   Yes.
10   Q.   I went to University of Florida
11 and UCF undergrad, so I'm an SEC fan.  Do you
12 still follow the Razorbacks or --
13   A.   Fortunately, Creighton doesn't
14 have a football team.
15   Q.   And right now Arkansas doesn't
16 have much of one either.
17   A.   Can I object to that?
18   Q.   Yes, you can.  Yes, you can.
19 Look, I had completely written Florida off when
20 they went to the bowl game.  I thought Michigan
21 would have destroyed them.  I was shocked that
22 we beat Michigan.
23       So let me ask, were you pulling
24 for Alabama?

Page 152

1    A.   I didn't care.  I'm just tired of
2 both of them.
3    Q.   Well, the problem is I don't think
4 that's going to change anytime soon.  Both of
5 them have tremendous teams.
6       All right.  Sorry I digressed.
7       So you've been a pharmacist coming
8 up on 40 years --
9    A.   Yes.
10   Q.   -- now, and worked in the industry
11 that entire time?
12   A.   I worked in hospital that entire
13 time, and some -- did -- worked some outpatient
14 in the hospital settings.
15   Q.   When you say "outpatient in the
16 hospital settings" --
17   A.   Just being more like retail.  So
18 I've done both.
19   Q.   Okay.  And then for the past
20 almost ten years of your professional career,
21 you were with Cardinal, right?
22   A.   That is correct.
23   Q.   Part of that was, again, in a
24 hospital setting?

Page 153

1    A.   Correct.
2    Q.   And then in corporate with the
3 anti-diversion group?
4    A.   Correct.
5    Q.   And seven of those ten years, your
6 job was specifically detecting and reporting
7 suspicious orders and responding to threshold
8 events?
9    A.   The job was to, as best we could,
10 detect and report orders that would possibly be
11 suspicious, yes.
12   Q.   And evaluating these threshold
13 events, right?
14   A.   That is correct.
15   Q.   Okay.  So let's talk about your
16 policy and procedure.  It says, "The purpose."
17       "The purpose of the standard
18 operating procedure is to provide guidance to
19 Cardinal Health (CAH) employees in the Quality
20 and Regulatory Affairs (QRA) section on
21 responding, detecting, and reporting suspicious
22 orders."
23       Did I read that correctly?
24   A.   Yes, you did.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    Q.   So this is sort of the guidance
2  provided to you and the others similarly like
3  you at Cardinal in doing your job, right?
4    A.   This is the framework, yes.
5    Q.   Okay.  And it says, "and
6  processing, documenting, and making judgments
7  about threshold events, including making
8  decisions about releasing or cutting orders that
9  are suspicious or exceed a threshold."
10       Did I read that correctly?
11    A.   You read that correctly.
12    Q.   All right.  And this is the
13  framework for doing that, this document, 4226,
14  right?
15       Now you're going to go through it
16  and look, huh?
17    A.   Yes, this appears correct.
18    Q.   Okay.  And it says, "Purpose 1.2.
19  The purpose of this procedure is also to comply
20  with or exceed the standards for distributors
21  set forth in the Controlled Substances Act" --
22  excuse me -- "Controlled Substances Act,
23  regulations promulgated pursuant to that Act,
24  and extra regulatory guidance to which DEA holds

Page 155

1  distributors responsible."
2       Did I read that accurately?
3    A.   Yes, you did.
4    Q.   Now, the scope.  The Scope under
5  2.0 says, "This procedure applies when an order
6  is triggered by CAH's Anti-Diversion
7  Centralization (or equivalent) system for review
8  by the QRA Pharmacist Group in order for the QRA
9  Pharmacist to evaluate the order so as to meet
10  the purpose of the procedure mentioned in 1.0
11  above."
12    A.   Yes.
13    Q.   Do you agree that that is the
14  scope of this document?
15    A.   According to the document, yes.
16    Q.   Do you have any basis to disagree
17  with that?  And what I'm trying to find out
18  is -- you said "according to the document."  Did
19  things at Cardinal actually operate differently
20  than the document suggests?
21    A.   No.
22       MS. WICHT:  Object to the
23  form.
24    Q.   Okay.

Page 156

1       MS. WICHT:  And just to
2  clarify, the time --
3       MR. FULLER:  Are you going to
4  tell me I read it wrong again?
5       MS. WICHT:  No, I'm not going
6  to tell you you read it wrong.
7       MR. FULLER:  Okay.
8       MS. WICHT:  I'm just going to
9  point out the -- the date on the
10  document, which doesn't cover the
11  full time period that --
12       THE WITNESS:  Correct.
13       MS. WICHT:  -- Mr. Forst was
14  in the role.
15       MR. FULLER:  Sure.
16  BY MR. FULLER:
17    Q.   And so the effective date says at
18  the bottom -- on the first page, effective date,
19  the 2nd -- or excuse me -- the 6th of June 2012,
20  right?
21    A.   That is correct.
22    Q.   Do you know if there are any other
23  versions of this?
24    A.   I'm -- I'm not aware, but I would

Page 157

1  imagine there would be.
2    Q.   Was this or a similar policy and
3  procedure in place the entire time that you were
4  filling this role of detecting and reporting
5  suspicious orders?
6    A.   As far as I know, yes.
7    Q.   Okay.  Do you recall any of the
8  changes or updates that may have been done to it
9  being significant in substance?
10       MS. WICHT:  Object to the
11  form.
12    Q.   And what I'm trying to determine,
13  Mr. Forst, if there was some significant change
14  with this policy and procedure that you
15  specifically recall during your tenure.
16    A.   There were changes --
17       MS. WICHT:  Object to form.
18       Sorry.  Go ahead.
19    A.   I'm sorry.
20       There were changes in some of the
21  ways that we tried to look for suspicious
22  orders, but the goal is still the same as the
23  scope of this document.
24    Q.   Fair enough.

Page 158

1 If we go to 4.0 on page 2, do you
2 see the section there, Responsibilities?
3 A. Yes.
4 Q. "The responsibilities of the QRA
5 pharmacist team include ..."
6 Now, let me ask you, who else was
7 on the QRA pharmacist team with you?
8 A. At the time -- and this is --
9 Q. And we can go through your tenure.
10 A. -- 2012.
11 So Steve Morse was there.
12 Q. Was he a -- is he a pharmacist?
13 A. He is a pharmacist.
14 Q. Okay.
15 A. I'm trying to think of who came
16 in. We had some analysts, and I can't name all
17 of them because some of them were temporaries.
18 I think we had two or three when I started.
19 Roger McCarter came. Doug Emma came. Who am I
20 missing? Kimberly came later on.
21 Q. Kimberly who?
22 A. Kimberly Anna-Soisson.
23 Q. Okay.
24 A. William Brady came. I'm missing

Page 159

1 someone, or I think I'm missing someone.
2 If I think of it, I'll --
3 Q. You just shout it out, okay?
4 A. Yeah.
5 Q. All right.
6 A. So it grew as we evolved into
7 the -- the central area as opposed to being at
8 the distribution centers.
9 Q. Now, let me ask, when you first
10 started, were there other -- I know Mr. Moné is
11 a pharmacist as well, correct?
12 A. Correct, and Gary Cacciatore is a
13 pharmacist.
14 Q. Okay. Were you -- was he --
15 Mr. Cacciatore was already there when you
16 arrived in '08; is that right?
17 A. Correct. I think him and
18 Michael --
19 Q. Came in together?
20 A. -- came in together or --
21 Q. Or around the same time?
22 A. -- or -- I think he was already
23 there, but he was also involved in this in some
24 form or fashion. So it became more evolved with

Page 160

1 him, too, at the very beginning.
2 Q. Okay. Were there any other
3 pharmacists there in the 2008, '09, '10 time
4 frame?
5 A. Well, Bob Giacalone, he was there.
6 Q. Okay.
7 A. So, yes, there were pharmacists
8 there.
9 Q. Did the department grow over time?
10 A. Yes, the department grew over
11 time.
12 Q. Okay. Now, it says
13 Responsibilities. It says, "The
14 responsibilities of the QRA Pharmacist team
15 includes: A. Evaluating held orders" -- that
16 was part of your job, right?
17 A. Yes.
18 Q. -- "b. Identifying suspicious
19 orders," correct?
20 A. Correct.
21 Q. That's part --
22 A. Potentially -- potentially
23 suspicious orders, correct.
24 Q. Okay. The next, c, is "Reporting

Page 161

1 the suspicious orders to the DEA," right?
2 A. Correct.
3 Q. "D. Performing a review of
4 suspicious orders."
5 Now, this may be a little out of
6 order.
7 A. That's correct. And, yeah, I
8 agree. It's probably out of order.
9 Q. But -- that's all right.
10 Let's go to e, "Releasing
11 suspicious orders when appropriate."
12 A. Well, I don't like that verbiage,
13 but --
14 Q. Because you would never release a
15 suspicious order --
16 A. Correct.
17 Q. -- right?
18 A. Correct.
19 MS. WICHT: Object to the
20 form.
21 Q. Cutting suspicious orders when
22 appropriate, that was another job that you would
23 do; is that correct?
24 A. Correct.

Page 162

1    Q.   When we say "cutting," help the
2  jury understand what you guys mean by "cutting."
3    A.   So the order was held in the
4  system so it wasn't sent to the customer.
5    Q.   So when we say an order is held,
6  it's just sort of in limbo; it's not going
7  out --
8    A.   It's not going out.  The order has
9  been placed.  It's at the distribution center.
10 The system has stopped it so that it can be
11 evaluated based on -- it's stopped because of --
12 it has hit or exceeded the threshold.
13   Q.   And it hasn't been canceled yet,
14 either, right?
15   A.   It has not been canceled.
16   Q.   Okay.  Go ahead.
17   A.   So it's still an active order.
18   Q.   Yes, sir.  So what does the
19 cutting mean?
20   A.   So the cutting means that the
21 order is essentially voided.
22   Q.   So canceled?
23   A.   It is canceled.  It is voided.
24   Q.   So it will no longer exist in the

Page 163

1  system?
2    A.   It's in the system --
3         MS. WICHT:  Object to the
4    form.
5    A.   It's in the system.  But it's not
6  an active order, so it can't be shipped.
7    Q.   So maybe a different way of saying
8  it is it's taken out of active status?
9    A.   It's taken out of active status.
10   Q.   So there's no way --
11   A.   It is still -- it is still being
12 documented that it was --
13   Q.   Placed?
14   A.   Placed, correct.
15   Q.   Okay.  But as far as the potential
16 for shipment, that's gone away when an --
17   A.   It's gone.
18   Q.   -- order becomes inactive?
19   A.   It's gone.  Correct.
20   Q.   Okay.  If we go to page 3,
21 "Definitions.  5.0.  Anti-Diversion
22 Centralization (ADC)."
23        What is your understanding of the
24 ADC system?

Page 164

1    A.   Prior to the ADC system, we had
2  lots of information, but it was housed in
3  different areas.  So we would have to go and
4  look in each of the areas separately.
5         The ADC system brought all those
6  together under one -- into one system.  So you
7  could just be in ADC and you could pull up
8  information that you had previously about the
9  customer, possibly in Content Manager.  You
10 could see --
11   Q.   Can you see investigations that
12 may have been done?
13   A.   You could see investigations in
14 Content Manager.  You would go to that.  It
15 would take you to that area.  So it would open
16 up different screens.
17        So it was more centralized, so it
18 was a lot easier to find documents when you were
19 reviewing orders.
20   Q.   So it sort of did what it's named?
21   A.   Exactly.
22   Q.   Anti-diversion centralization?
23   A.   Correct.
24   Q.   Bringing everything together from

Page 165

1  different -- like you said, stored in different
2  areas?
3    A.   Correct.
4    Q.   Now, not that you wouldn't have
5  had access to the --
6    A.   We had access to all those areas
7  previously.  This just tried to simplify it to
8  streamline the process.
9    Q.   What's the -- read the definition
10 for anti-diversion customer profile.
11   A.   "Anti-diversion customer profile.
12 A report generated by QRA containing various
13 background, licensing, and analytical metrics
14 relevant to a customer used to assist in the
15 evaluation of threshold -- threshold events."
16   Q.   Have you utilized these reports
17 before, used them in your --
18   A.   Yes.
19   Q.   You're trying to peek and see what
20 I've got over here.
21   A.   Yeah, I'm trying to see which one
22 it is because they changed.
23   Q.   Yeah, I think you're right.  I
24 think they've changed maybe a couple of times,

Page 166

1  but I had one that was attached to a daily
2  threshold reporting policy and procedure.
3      A.   Okay.
4      Q.   This is going to be Exhibit 13,
5  and it's 4301.
6          - - -
7  (Cardinal-Forst Deposition Exhibit 13 marked.)
8          - - -
9      Q.   And I'm not going to really ask
10 you anything other than to turn to page 5 of the
11 document.
12     A.   Okay.  Okay.
13     Q.   Is that what the -- the earlier
14 document, the detecting and reporting suspicious
15 orders, was referring to, is that type of
16 anti-diversion customer profile?
17     A.   This was one of the documents,
18 yes --
19     Q.   Okay.
20     A.   -- which changed over time.
21     Q.   All right.  Okay.  So if you'd
22 turn to the next page.
23         MS. WICHT:  Which document?
24         MR. FULLER:  I'm sorry.

Page 167

1      We're going back to 4226.
2  BY MR. FULLER:
3      Q.   Actually, stay on the same page,
4  page 3.  Then we have the procedure and then the
5  initial review.
6          Do you see that?
7      A.   Yes.
8      Q.   6.11, it says, "The following
9  orders are held or cut, pending review by QRA
10 under this procedure:  Orders of interest
11 referred by a distribution center" -- right?
12     A.   Yes.
13     Q.   -- "or orders that exceed a
14 threshold set for the customer from the drug
15 family."
16         Correct?
17     A.   That's correct.
18     Q.   And that was two ways that orders
19 could be held and reviewed by your department,
20 right?
21     A.   That is correct.
22     Q.   Then I guess 6.1.2 is sort of a
23 catchall that allows you to look at other stuff,
24 too?

Page 168

1      A.   That is correct.
2      Q.   And it says -- 6.1.3 says, "Under
3  this procedure, QRA must first review every --
4  it's all capped --
5          MR. FULLER:  Underline that,
6  Gina.
7  BY MR. FULLER:
8      Q.   -- "every held or cut order under
9  6.1.1 to determine whether the order is
10 suspicious as the term is used in
11 21 C.F.R. 1301.74(b)."
12         Right?
13     A.   Correct.
14     Q.   And it says, "Per the regulation,
15 orders are deemed suspicious if they meet one or
16 more of the three criteria."
17         Is that your understanding of the
18 regulation, Mr. Forst?
19     A.   Yes, it is.
20         MS. WICHT:  Object to form.
21     Q.   Is that you could have any one of
22 the three criteria for an order to be
23 suspicious, correct?
24     A.   Correct.

Page 169

1      Q.   And then required to be reported
2  to the DEA?
3      A.   If it was deemed as suspicious,
4  yes.
5      Q.   Well, if it fits one of the three
6  criteria, then it fits the definition of
7  suspicious, doesn't it?
8          MS. WICHT:  Object to the
9  form.
10     A.   Again, we're with the -- some of
11 the vagueness or the unspecificity of unusual --
12     Q.   Okay.  Well, we'll -- we'll get
13 there.
14     A.   Okay.
15     Q.   So (a) is order of unusual size;
16 (b) order of unusual frequency; and (c) order
17 deviates substantially from the normal pattern
18 for the customer.
19         Did I read those correctly?
20     A.   Yes, you did.
21     Q.   As Cardinal has set them out in
22 their own policies and procedures?
23     A.   Yes, you did.
24     Q.   Okay.  Then 6.1.4, "Orders that

Page 170

1  meet one or more of the criteria in 6.1.3
2  must" -- do you see that word?  We're going to
3  underline that -- "must be reported to the DEA
4  as suspicious."
5          And you agree with that, don't
6  you, Mr. Forst?
7          MS. WICHT:  Object to the
8     form.
9       A.   I can agree to that --
10      Q.   Okay.
11      A.   -- based on the way that we
12  interpreted unusual and frequency.
13      Q.   All right.  Well, let's keep going
14  then, because next we've got 6.1.5.  Here we
15  have Cardinal's definition of orders of unusual
16  size, don't we?
17      A.   Yes, we do.
18      Q.   And let's underline that and mark
19  it up, because orders of unusual size is one of
20  the three criterias that if we meet it, we are
21  supposed to report it to the DEA, aren't we,
22  Mr. Forst?
23          MS. WICHT:  Object to the
24     form.

Page 171

1       Q.   Correct?
2       A.   If it's deemed suspicious.
3       Q.   All right.  So orders of unusual
4  size can be determined two ways, according to
5  Cardinal's definition, correct?  "Orders of
6  unusual size are significantly larger than --
7  it's still 1 -- orders normally placed by the
8  customer" --
9          Did I read that correctly?
10      A.   Yes.
11      Q.   -- "or" -- right?  It's not "and,"
12  it's "or," isn't it?
13      A.   Yes.
14      Q.   So 2, "or by customers that have
15  a -- "have a size and type of business that is
16  similar to the ordering customer's business."
17          Right?
18      A.   Correct.
19      Q.   So if we look at this, two ways we
20  get suspicious orders per Cardinal Health -- or
21  at least orders of unusual size, right?  These
22  are orders of unusual size only, isn't it?
23      A.   Yes, according to the policy.
24      Q.   -- is that they have to be, when

Page 172

1  you follow along with me on the regulation -- to
2  make sure I get this right -- or excuse me --
3  the standard operating procedure, they have to
4  be significantly larger than the orders normally
5  placed by 1, being that customer, correct?
6       A.   Correct, the customer himself.
7       Q.   So we have to look at that
8  customer's history, whoever the ordering
9  customer is.  Whether it's a retail -- a
10  hospital, a chain, whoever it is, we need to
11  look at their history as well, correct?
12      A.   We look at their --
13          MS. WICHT:  Object to the
14     form.
15      A.   We look at their patterns that we
16  have the ability to see.
17      Q.   Sure.  And if it's a customer that
18  you've been selling to for a while, you may have
19  a lengthy history, right?
20      A.   Yes.
21      Q.   And you guys actually have
22  computer systems to help look at that history,
23  don't you, through Tableau, through these --
24  what was that thing we just looked at?

Page 173

1       A.   Oh, the --
2       Q.   The anti-diversion customer
3  profile?
4       A.   Correct.
5       Q.   It gives you ordering history on
6  there as well, right?
7       A.   It gives you -- oh, it's right
8  here.
9          Yes --
10      Q.   Okay.
11      A.   -- it can.
12      Q.   And now, 2, of Cardinal's own
13  policy and procedure is by customers that have a
14  size and type of business similar to the
15  ordering customer, right?
16      A.   Yes.
17      Q.   So in order to be able to
18  determine -- when you get a threshold event, in
19  order to determine whether it meets the criteria
20  of orders of unusual size, you need to be able
21  to look at that customer's history, correct?
22      A.   Correct.
23      Q.   And you look to see if it's
24  unusual based on that customer's purchasing

Highly Confidential – Subject to Further Confidentiality Review

Page 174

1 history, right?
2     A.   That is correct.
3     Q.   And then you also have to be able
4 to find out what customers of like size and type
5 have ordered in the past and compare it to those
6 histories, right?
7          MS. WICHT:  Object to the
8     form.
9     Q.   That's what the policy says, isn't
10 it?
11          MS. WICHT:  Object to the
12     form.
13     A.   If that information is available,
14 yes.
15     Q.   So my question is, that's what the
16 policy says, isn't it, Mr. Forst?
17     A.   It was done if the --
18          MS. WICHT:  Object to the
19     fortunately.
20     A.   -- information is available.
21     Q.   So what was -- so, for example --
22 let's do a hypothetical.  Well, let's use a real
23 life example.  We're going to pretend that
24 everybody in this room is a retail pharmacy,

Page 175

1 okay?
2     A.   Okay.
3     Q.   And that would mean that we're all
4 the same type, correct?
5     A.   Not necessarily.
6     Q.   We're all retail pharmacies.  How
7 did you sub- --
8     A.   Well, I don't know --
9     Q.   Let's say retail independent
10 pharmacies.
11     A.   Okay.
12     Q.   Now we're all the same type,
13 right?
14     A.   You're all considered a retail
15 independent pharmacy.  But, sure, each different
16 and unique based on your patient population,
17 based on the number of scripts, et cetera.
18     Q.   Hold on.  Cardinal's policy and
19 procedure says we have to do it by size and by
20 type, right?
21     A.   It says type of business.
22     Q.   Type of business.  And Cardinal
23 subcategorized its customers into types of
24 business.  We've already seen that in the

Page 176

1 threshold system, right?
2          MS. WICHT:  Object to the
3     form.  Mischaracterizes.
4     A.   Yes, but type can be a broad
5 definition.
6     Q.   Sure.  I understand.  You are
7 going to now try to change how type is defined.
8 I get it.  The policy and procedure is there,
9 though.  You cannot get away from it.
10          So it says type of business.  You
11 tell us right now what different types of
12 business Cardinal categorized customers into.
13          MS. WICHT:  Object to the
14     commentary and the form of the
15     question.
16          MR. FULLER:  Actually, strike
17     that question.
18 BY MR. FULLER:
19     Q.   Where in this policy and procedure
20 does it set out the different types of business?
21 Where in this policy?
22          MS. WICHT:  While he's
23     looking for that, Mike, we've been
24     on the record, I think, over an

Page 177

1     hour and a half now, so whenever
2     you're at a point to take a break,
3     that would be good.
4          MR. FULLER:  Sure.  I'd like
5     to finish with this issue.
6          MS. WICHT:  Sure.
7          MR. FULLER:  And then we can
8     take a lunch break, probably, too.
9     I think it's that time.
10     A.   I don't see the definition of type
11 of business, but I just skimmed through it,
12 so ...
13     Q.   Now, you are aware, are you not,
14 that Cardinal classified types of business into
15 different categories, right?
16          MS. WICHT:  Object to the
17     form.
18     A.   Yes, as a type, but there are also
19 subtypes to that, which I don't think it was
20 categorized as such.  So even though you might
21 be a small retail pharmacy, your customer base
22 would still delineate you to be different
23 than -- you would still be in that type, but
24 your customer base can delineate you to be of a

Page 178

1 different animal than each one of us in the
2 room.
3     Q.   Okay.  I'm just trying to follow
4 the policy and procedures that Cardinal wrote.
5     A.   I understand.
6     Q.   Okay.  So Cardinal delineated
7 customers into types of business, right?
8         MS. WICHT:  Object to the
9     form.
10    Q.   They had an independent
11 retail-type category, correct?
12        MS. WICHT:  Object to the
13    form.
14    A.   Yes.
15    Q.   They had retail chains, correct?
16    A.   Yes.
17    Q.   They had hospitals, right?
18    A.   Yes.
19    Q.   Okay.  They also divided customers
20 into size categories, correct?
21    A.   Yes.
22    Q.   And they did small, medium, and
23 large, based on your knowledge, correct?
24    A.   Correct.

Page 179

1     Q.   So if we're going to apply this
2 policy and procedure, we need to follow whatever
3 categorize -- well, strike that.
4         Cardinal's system designated each
5 customer by its customer type, didn't it?
6         MS. WICHT:  Object to the
7     form.
8     A.   The customer was placed in those
9 different types.
10    Q.   Types of business, right?
11    A.   By types of business, by the
12 information that we had on the customer --
13    Q.   Right.
14    A.   -- so ...
15    Q.   And they were placed in the
16 different size categories, although you don't
17 necessarily recollect how the size was
18 determined?
19    A.   I don't know how the size was
20 determined, correct.
21    Q.   That's -- you've already testified
22 to that.
23         But they were separated into size
24 categories?

Page 180

1     A.   Yes.
2     Q.   And so for a simplistic example,
3 if everybody in here is a retail independent
4 pharmacy and everybody in here is ordering
5 10,000 pills a month of oxycodone and I'm
6 ordering 100,000 pills per month of oxycodone,
7 that's significantly -- and maybe my history is
8 I've ordered 100,000 every month for the past
9 year.
10         You would agree with me that
11 that's not abnormal, it's not unusual, for my
12 ordering history, right?
13        MS. WICHT:  Object to the
14    form.  Hypothetical.
15    A.   I mean, if it's a hypothetical
16 situation, yeah.  I mean, yeah, you -- and that
17 could be -- there could be absolutely no
18 diversion there.
19    Q.   Well, hold on.  We're just talking
20 about my ordering pattern.
21    A.   I know.  So you're staying in your
22 normal realm.
23    Q.   I'm staying in my normal pattern.
24    A.   Right.

Page 181

1     Q.   But compared to everybody else, I
2 would be unusual; can we agree to that?  I'm ten
3 times what everybody else is ordering that is
4 the same --
5     A.   You would --
6     Q.   -- type --
7     A.   You would --
8     Q.   -- and size of customer?
9         MS. WICHT:  Object to the
10    form.  Foundation.  Hypothetical.
11    A.   You would look different.
12    Q.   Now, doesn't necessarily mean for
13 certain that pills are being diverted, does it?
14    A.   No.
15    Q.   Okay.  But it's certainly a red
16 flag that deserves looking into?
17        MS. WICHT:  Object to the
18    form.
19    A.   And that's when we would find --
20 look for other information about that
21 customer --
22    Q.   Sure.  But --
23    A.   -- to determine.
24    Q.   But it fits the definition of

Page 182

1 unusual size, doesn't it?
2          MS. WICHT:  Object to the
3     form.  Foundation.
4     A.   I don't --
5          MS. WICHT:  Hypothetical.
6     A.   I can't speak to that because I'm
7 not sure at what time period.  There is at the
8 end something that's a lot more definitive where
9 you can see all the customers grouped.
10     Q.   There is at the end something more
11 definitive?
12     A.   Well, I mean --
13     Q.   Is there a computer system?
14     A.   -- after like -- when Tableau came
15 out, then you could see by dots the different
16 types of customers that fall into.
17          Prior to that, you had to look and
18 search for those customers.  So the system got
19 more technical and it was a lot easier to look
20 for that information.
21     Q.   So here's what I want to know:
22          For the particular types and sizes
23 of customers, did Cardinal set out what the
24 average was?  Did they give you a sheet that

Page 183

1 says, "Okay.  For retail independents of medium
2 size, this is what the average is"?
3     A.   I don't remember a --
4          MS. WICHT:  Object to the
5     form.
6          I'm sorry.  Go ahead.
7     A.   I don't remember a specific sheet
8 that says this is the average of a small, a
9 medium, or a large customer purchasing this
10 certain drug family.
11     Q.   All right.  And while I know you
12 had plenty of things going on when you were
13 trying to do your job, did you go and calculate
14 what the average was -- and I want to figure out
15 over what geographical area.  So if you're
16 looking at a pharmacy that's in Cuyahoga County,
17 Ohio, the Cleveland area, did you compare it
18 just to other pharmacies in Cleveland?  Did you
19 compare it to like pharmacies across the state?
20 Was the comparison across the country?  Or do
21 you know?
22          MS. WICHT:  Object to the
23     form.  Foundation.  Compound.
24     A.   Each customer was looked at

Page 184

1 individually.  So we would look at what's around
2 them.  We would look at -- it could be the state
3 they're in.  It could be what's around them, if
4 it's a hospital, if it's several other
5 pharmacies, if it's a specialty group of some
6 sort.  So if you're at the Cleveland Clinic,
7 you're probably going to be more of a heart
8 specialist or whatever.
9          So it was an -- it was an
10 independent look at each individual customer.
11 And, yes, we did compare it to size and type of
12 businesses, but, again, they're different and
13 individual.  So each one is going to be -- each
14 one is different.  Even a -- even retail chains
15 that are -- one can be four blocks from the
16 other.  Their customer base could be totally
17 different.
18     Q.   I'm not here to agree or disagree
19 with you.  What I want to know -- and you're
20 saying they look at each customer's
21 individually.
22     A.   Yes.
23     Q.   That's great.  That's the first
24 part of the definition of suspicious --

Page 185

1     A.   Yes.
2     Q.   -- or unusual order.
3     A.   Yes.
4     Q.   The second part is comparing it to
5 likes.  And I want to know how Cardinal did
6 that.  For the seven years that you were there
7 doing this, I want to know -- not guessing.  I
8 want to know how Cardinal -- what geographical
9 area Cardinal looked at.  Was it just within the
10 neighborhood?  Was it within the county?  Was it
11 within the state?  Was it across the country?
12          There are going to be very
13 similarly situated pharmacies like the ones in
14 Ohio in other states.  There just are.  This
15 country isn't that different going from one side
16 to the other.
17     A.   I think it is.
18     Q.   So my point is, how did
19 Cardinal -- what was Cardinal's system for doing
20 that?  Can you answer that question?
21     A.   I can't answer --
22          MS. WICHT:  Object to the
23     form.
24     A.   I can't answer that question.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1  Q.  Okay.  So sitting here today, you
2  can't tell us what system Cardinal had in place
3  to compare similarly situated pharmacies, at
4  least according to this policy and procedure,
5  correct?
6      MS. WICHT:  Object to the
7  form of the question.
8  Mischaracterizes his testimony.
9      A.  As I -- as I said previously, each
10 customer was looked at individually.
11     Q.  I --
12     A.  If you could compare them by size
13 and type that made sense, then yes.
14     Q.  Okay.
15     A.  But, otherwise, each customer is
16 individual customer.
17     Q.  So I'm -- all I'm asking,
18 Mr. Forst, is, do you know and can you tell us
19 the system that Cardinal used to make the
20 similarly situated comparison as it relates to
21 orders of unusual size, orders of unusual
22 frequency and pattern during the seven years
23 that you were in this department?
24     A.  I don't know --

Page 187

1      MS. WICHT:  Object to the
2  form.
3      A.  I don't --
4      Q.  And if you can't, just say "I
5  can't."  That's fine.
6      MS. WICHT:  Object to the
7  form.
8      A.  I don't know the system that they
9  used to do that, no.
10     Q.  Okay.  Now, you've testified that
11 it would make sense to do that if they had the
12 information, right?
13     MS. WICHT:  Object to the
14 form.
15     A.  I have testified that we used all
16 the information that we had available to us to
17 make decisions on whether an order had the
18 potential to be suspicious and to be diverted.
19     MR. FULLER:  Okay.  Let's
20 take our lunch break.
21     THE VIDEOGRAPHER:  We're
22 going off the record at 12:28.
23     - - -
24     Thereupon, at 12:28 p.m. a lunch

Page 188

1  recess was taken until 1:35 p.m.
2     - - -

Page 189

1  Tuesday Afternoon Session
   January 22, 2019
2  1:35 p.m.
3     - - -
4      THE VIDEOGRAPHER:  We are
5  back on the record at 1:35.
6      CROSS-EXAMINATION (CONT'D.)
7  BY MR. FULLER:
8      Q.  All right.  We were finishing with
9  the policy and procedure when we took a break,
10 Mr. Forst.
11     I want to attach a piece of
12 artwork, Number 14, as another demonstrative
13 exhibit for the record.
14     - - -
15 (Cardinal-Forst Deposition Exhibit 14 marked.)
16     - - -
17     Q.  And, Mr. Forst, the -- we were on
18 4226 over on page 4 when we took that break.
19     The definitions for orders of
20 unusual frequency, which is 6.1.6, as well as
21 orders that deviate substantially from the
22 normal ordering pattern, 6.1.7, include the same
23 sort of criteria as orders of unusual size, in
24 that they compare to the customer's history,

Page 190

1 then to history of customers of similar type, as
2 well as size, right?
3          MS. WICHT:  Object to the
4     form.
5     A.   Correct.
6     Q.   Okay.  And if you'd turn to the
7 next page, page 5.  And if you look at 6.1.8.1,
8 orders cut due to order entry errors and not
9 reported to the DEA.
10          How do you determine if something
11 is an order entry error versus a suspicious
12 order?
13     A.   Order entry errors are usually the
14 orders that -- say the customer places an order.
15 They call the distribution center and say "This
16 order was placed in error."  And so they're over
17 their threshold, so the distribution center
18 can't do anything with the order until we act on
19 it and they inform us that that order was placed
20 incorrectly.  They can cut the order, but the
21 order will sit there until we act on it.
22     Q.   And you say "they can cut the
23 order."
24     A.   The distribution center can --

Page 191

1 they can inactivate the order, like we cut
2 orders.
3     Q.   Yes, sir.
4     A.   But we have to respond to it and
5 make a comment on it to clear it through the
6 system.
7     Q.   So the distribution system --
8 center --
9     A.   They can cut it or they can leave
10 it sit there for us if it gets held.
11     Q.   Okay.
12     A.   And then they communicate with us
13 that the order was an entry error or whatever.
14 There are times when there's a -- an order
15 that's a lot larger than what customers normally
16 order.  And at that time, whoever is reviewing
17 the orders can call the customer and says, "This
18 order looks different than normal, what's going
19 on?"  And they would say, "Oh, we didn't mean to
20 order that" or whatever.  So that's how we deal
21 with the order entry errors.
22          And there were -- I don't see
23 those as -- there was very many of those that
24 occurred as a percentage of the orders that we

Page 192

1 cut.
2     Q.   That was a very small percentage;
3 is that what you're saying?
4     A.   I believe so.  I don't know the
5 percentage, though.
6     Q.   It wasn't something that you
7 encountered all the time?
8     A.   No.
9     Q.   Okay.
10     A.   Not that routinely.
11     Q.   Now --
12     A.   Me personally that was doing the
13 orders.
14     Q.   Fair enough.
15          6.1.8.2, held or cut orders
16 reported to the DEA.  So if it's not an order
17 entry error and it's held and then ultimately
18 cut, it's your understanding that it has to be
19 reported to the DEA, correct?
20          MS. WICHT:  Object to the
21     form.
22     A.   Not all cut orders were reported.
23 They had to be -- have an air of suspiciousness
24 around them.

Page 193

1          So there had to be something in
2 the patient's profile that would alert us to
3 say, "This is something that is a suspicious
4 order for some reason."
5          MS. WICHT:  Did you mean to
6     say "patient" in that answer,
7     Chris?  I'm sorry.  Just to --
8          THE WITNESS:  I'm sorry?
9          MS. WICHT:  You said there
10     would be something in the patient's
11     profile.
12     A.   Oh, I'm sorry.  In the --
13          MS. WICHT:  I don't think you
14     meant that.
15     A.   -- in the -- I'm not -- I'm
16 sorry -- in the customer's profile.
17     Q.   Okay.
18          THE WITNESS:  Thank you.
19     Q.   But if it's held or cut, it had to
20 be triggered by something, right?  And this --
21     A.   If it's held, it's triggered by
22 the threshold.
23     Q.   So your testimony to the jury is
24 that you could cut an order that's been

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  triggered by a threshold and not report it to
2  the DEA?
3      A.  Yes.
4          MS. WICHT:  Object to the
5  form.
6      Q.  Even if it's not just an order
7  entry problem?
8      A.  Yes.  It's -- what is around the
9  order that makes it possibly suspicious.  I
10 mean, another example that might not be an -- an
11 order entry error is some customers use machines
12 in their business to fill prescriptions, and so
13 they require maybe a certain brand.
14         And, yes, a brand -- requesting a
15 certain brand name is one of the red flags, but
16 the customer, when he changes the sale, if he
17 changes the brand, he has to go and reconfigure
18 the system to accept that brand.  So they
19 usually try to stay with one brand if they're
20 using automation in their pharmacy.
21         So there are times in the system
22 where, if they choose automatic substitution for
23 a brand in their -- in their setup --
24     Q.  Uh-huh.

Page 195

1      A.  -- and we're out of that brand
2  that they normally use in their machine,
3  unbeknownst to them, it will auto substitute the
4  other thing for them, and that's not what they
5  want.
6          So there are times that that
7  happens.  There are times that the wrong brand
8  just gets shipped because the tech or whatever
9  ordered the wrong stuff.  So those would --
10 those are not really order entry errors.
11 They're getting the product that they ordered,
12 but they don't get specifically what they need
13 for the machine.
14     Q.  But does that constitute a cut
15 order?  What's being cut, then, if they --
16     A.  Well, if it -- if it pushes it
17 over threshold, it would be cut.  And then you
18 would have to back it out because of that so
19 that they -- you know, the accrual is
20 appropriate.
21     Q.  Hold on.  So let's just make sure
22 we're on the same page.
23         You're saying they have to
24 re-place the order because someone shipped them

Page 196

1  the wrong --
2      A.  No.  We didn't ship -- we didn't
3  ship the wrong thing.  If it was auto
4  substituted, the system shipped what it auto
5  substituted --
6      Q.  Right.
7      A.  -- because it was a generic that
8  was interchangeable.
9          If -- if the -- let's say the tech
10 ordered it and then it was incorrect -- I guess
11 you could call it an order entry error -- and
12 they shipped the different brand, then they had
13 to ship that back to us before we would let them
14 order the specific one, unless there was a good
15 reason that we knew in the process they had
16 placed the return statement or whatever.
17     Q.  So -- but in those scenarios,
18 they're returning -- let's just call it the
19 wrong product?
20     A.  Yes.
21     Q.  Okay.  So it's not really a
22 threshold event because some of the --
23     A.  Well, it is if it goes over
24 threshold.  If they're close to that threshold

Page 197

1  and it bumps them over, it would stop that
2  order.
3      Q.  Right.
4      A.  If I'm reviewing it and I don't
5  know that they're -- they need a specific brand
6  per the machine, it could be released and sent.
7  And then we're like, "Well, why did you send
8  this?  This isn't what we use in our machines."
9          And then it would have to be
10 returned.
11         And it -- you know, if it was
12 ahead of time and it was over and they told us,
13 well, then, it's an order entry error.  But --
14     Q.  When you say "ahead of time," what
15 do you mean?
16     A.  Well, I mean, like I say, you
17 know, if they notice that they ordered the wrong
18 thing or it was going to -- they were going to
19 get shipped the wrong thing, then it would be
20 considered an order entry error.
21     Q.  All right.  Let's go to 4919.
22             ---
23  (Cardinal-Forst Deposition Exhibit 15 marked.)
24             ---

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    MR. FULLER:  And this is
2    going to be -- I'm sorry --
3    Plaintiffs' Exhibit Number 15, 4919
4    for the record.
5  BY MR. FULLER:
6    Q.    And, Mr. Forst, you see this
7  apparently is a corporate quality and regulatory
8  compliance manual.
9       Do you see that there?
10   A.    Yes.
11   Q.    And its issue date is June 15th of
12 2006?
13   A.    Yes.
14   Q.    And it's signed off by Stephen
15 Reardon, vice president, quality and regulatory
16 affairs?
17   A.    Yes.
18   Q.    And that's the same Mr. Reardon
19 you mentioned earlier --
20   A.    Correct.
21   Q.    -- correct?
22       Okay.  Now, this is actually --
23 well, it's not entered before your time at
24 Cardinal because you were actually with

Page 199

1  Cardinal, but you were in Texas at this point in
2  time, correct?
3    A.    Yes.
4    Q.    Okay.  Do you know when this
5  policy went out of effect?
6    A.    No.
7    Q.    Okay.  And we've looked at some of
8  the policies that you were on already today,
9  right?
10   A.    Correct.
11   Q.    I think the earliest one that went
12 into effect was December of 2008.  I believe it
13 was December 22nd, if memory serves.
14       Does that seem right?
15   A.    That sounds correct, yes.
16   Q.    Okay.  So if you will turn to the
17 second page, it says, title, "Required Reports
18 to the DEA."
19       Do you see that?
20   A.    Yes.  I'm sorry.  I was looking --
21   Q.    And the Purpose is "To comply with
22 DEA and Cardinal Health, Inc. requirements to
23 report transactions, thefts, drug destructions
24 and suspicious orders to the DEA and DEA ARCOS

Page 200

1  Unit."
2       Did I read that correctly?
3    A.    Yes, you did.
4    Q.    And then the scope is
5  pharmaceutical distribution facilities.
6       Do you ever recall being shown
7  this policy and procedure?
8    A.    No.
9    Q.    Okay.  Well, if you'll turn to --
10 page 5 is where we get to the order on
11 suspicious -- the section on suspicious orders.
12       Do you see that near the bottom of
13 the page, "Suspicious Orders"?
14   A.    Yes.
15   Q.    Can you read 5a aloud for us,
16 please?
17   A.    "Wholesalers must design and
18 operate a system that will disclose suspicious
19 orders to the wholesaler."
20   Q.    Okay.  And you agree with that,
21 correct?
22   A.    Why am I -- "Wholesalers must
23 design and operate a system that will disclose
24 suspicious orders to the wholesaler."

Page 201

1       What wholesaler are we doing?
2    Q.    Wholesale distributors.  Cardinal,
3  for example.
4    A.    The sentence doesn't seem to make
5  sense to me, but -- I mean, we'll disclose
6  suspicious orders to the wholesaler, so the
7  wholesaler is reporting them to a wholesaler?
8    Q.    Well, you have to design and
9  operate a system to disclose suspicious orders
10 to yourself, right?  It's part of the
11 regulation?
12   A.    That's what it seems to say, yes.
13   Q.    I mean, that's part of the actual
14 regulation isn't it?
15   A.    Okay.  Yeah.  So you'd have to
16 know what's --
17   Q.    You have to have a system to
18 identify suspicious orders.
19   A.    Right.  Okay.
20   Q.    Okay.
21   A.    I agree with that.
22   Q.    And a.i. says -- read that one for
23 us, if you don't mind.
24   A.    "The facility must inform the DEA

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 field office in the areas of all suspicious
2 orders."
3    Q.   Okay.  You agree with that as
4 well, correct?
5    A.   It's --
6    Q.   So let's go to --
7    A.   Based on the definition of
8 suspicious orders, yes.
9    Q.   Okay.  Let's go to --
10    A.   Again, it's vague.
11    Q.   -- ii.
12        Read that one for us.
13    A.   "Suspicious orders include orders
14 of unusual size, orders deviating from a normal
15 pattern, and orders of unusual frequency."
16    Q.   Okay.  You agree that's the
17 definition that the regulation gives related to
18 suspicious orders, do you not?
19    A.   Yes.
20    Q.   All right.  Read b for us.
21    A.   "Wholesalers must establish
22 written criteria of what constitutes a
23 suspicious order."
24    Q.   Okay.  Did Cardinal have, to your

Page 203

1 knowledge when you joined them, a written
2 criteria for what constitutes a suspicious
3 order?
4    A.   I believe it was in one of the
5 policies, but I can't say directly.
6    Q.   You don't have any recollection of
7 what that definition would have been or that
8 criteria would have been?
9    A.   The definition would have probably
10 been what the DEA guidelines are.
11    Q.   This asks for a written criteria
12 of what constitutes a suspicious order.
13        Do you have any recollection of
14 seeing that before?
15    A.   No.
16        MS. WICHT:  Object to the
17    form.
18    Q.   If you go down to c -- it's there
19 on page 6 -- it says, "Each facility shall
20 submit to the DEA office on a monthly basis via
21 registered or certified mail, return receipt
22 requested, or via Federal Express or UPS with a
23 tracking number an ingredient limit report."
24        And, again, I think I asked you

Page 204

1 when we got started about ingredient limit
2 reports and you don't recollect necessarily
3 seeing an ingredient limit report, do you?
4    A.   No.  Excuse me.  No.
5        MR. FULLER:  3501.
6        (Discussion off the record.)
7        MR. FULLER:  Jennifer, this
8 is one of the documents on that USB
9 I gave you earlier, too --
10        MS. WICHT:  Oh.
11        MR. FULLER:  -- that who
12 knows where it went?
13        MS. WICHT:  It's down there
14 somewhere.  Okay.
15        MR. FULLER:  This is going to
16 be Exhibit --
17        MS. WICHT:  16.
18        MR. FULLER:  -- 16, 3501.
19            - - -
20 (Cardinal-Forst Deposition Exhibit 16 marked.)
21            - - -
22 BY MR. FULLER:
23    Q.   And my understanding from other
24 witnesses is this prints out a little

Page 205

1 differently than the way it may have looked back
2 in the day.  I don't know why, but it's just the
3 way we got it.
4        This says, "Compliance Group
5 Ingredient Limit Report," and it has a run date
6 there of May 9th of 2008.
7        This is during your time frame
8 within the regulatory department at Cardinal,
9 correct?
10    A.   Correct.  It's right after I
11 started.
12    Q.   And the Ingredient Limit Report,
13 we see "Ingredient Limit Report Summary,
14 Non-ARCOS Report" there in the first part of the
15 section.
16        Do you see that?
17    A.   Yes.
18    Q.   Now, to save us some time, I'm
19 going to sort of give you a thumbnail sketch.
20 You're more than happy -- more than welcome to
21 look, but I believe there's non-ARCOS
22 reportables in here.  There's a hospital
23 section.  But we're going to jump forward to
24 page 274.

Page 206

1      Can you tell me when you've found
2 that.
3      A.   Okay.
4      Q.   Okay.  So the first customer
5 listed on this page -- although we have some of
6 the prior page there -- is Customer 2848,
7 CVS 3360.
8      Do you see that?
9      A.   Yes, I do.
10      Q.   And it provides the address as
11 well as the DEA number and then the ingredient
12 we're measuring, correct?
13      MS. WICHT:  Object to the
14      form.
15      A.   According to the report, yes.
16      Q.   And if we go down a little bit, we
17 have where it looks like there was a page break.
18 And, again, it says month of April '08.  Factor
19 used, it says factor of 4.
20      Do you see that there?
21      A.   Oh, yes, I see it.  Thank you.
22      Q.   Any idea why they would be using a
23 factor of 4 in the ingredient limit report?
24      A.   I don't even --

Page 207

1      MS. WICHT:  Object to the
2      form.
3      A.   I don't even know what that factor
4 of 4 means.
5      Q.   Okay.  And we saw earlier with the
6 thresholds they were using, at least for certain
7 controls, a factor of 3, correct?
8      MS. WICHT:  Object to the
9      form.
10      A.   Correct, but I'm not sure that
11 factor is the same as this factor.
12      Q.   I'm not saying it was.  I just
13 asked if you recalled us looking at the factor
14 of 3 earlier.
15      A.   Yes.
16      Q.   Okay.  And in discovery it's been
17 indicated that it was a DEA-approved factor.
18      Do you have any knowledge of DEA
19 approval to any multiple factor being used by
20 Cardinal?
21      A.   No.
22      Q.   No one from the DEA ever told you
23 to use a multiple factor?
24      MS. WICHT:  Object to the

Page 208

1      form.
2      A.   No.
3      Q.   Did you ever see any letters from
4 the DEA or from Cardinal to the DEA confirming
5 conversations where it was suggested to use a
6 multiple factor related to thresholds?
7      MS. WICHT:  Object to the
8      form.
9      A.   No.
10      Q.   Okay.  Now, let me ask you this:
11      If, in relation to the ingredient
12 limit report, as you saw from the policy and
13 procedure that we were looking at on page 6
14 there, it was sent to the DEA after it's ran --
15 and it clearly was ran after the end of the
16 month because it contains the information for
17 the entire prior month -- in your mind, is that
18 a sufficient and adequate way to monitor the
19 potential diversion of controlled substances
20 simply by sending a report a month after all the
21 substances have been shipped?
22      MS. WICHT:  Object to the
23      form.  No foundation.  Vague.  And
24      calls for a legal conclusion.

Page 209

1      A.   I can't comment on that because
2 I'm not familiar with this report.
3      Q.   Well, do you want to take a moment
4 and familiarize yourself with it?
5      MS. WICHT:  Same objections,
6      even if he spends the whole
7      afternoon looking at it.
8      A.   No, I'm not familiar with this
9 report because this comes from the distribution
10 center.  I wouldn't have seen this report.
11      Q.   What is it that you would have to
12 familiarize yourself with the report about?
13      So the premise of my question is
14 if the system in place, according to the policy
15 and procedure, is to send a list of orders that
16 exceed some sort of threshold after the month is
17 over and after all the pills have shipped, you
18 would agree that that is not a sufficient policy
19 and procedure to prevent diversion, correct?
20      MS. WICHT:  Object to the
21      form.  No foundation.  Calls for a
22      legal conclusion.  And vague.
23      A.   Again, I am unfamiliar with this
24 form or that process.

Highly Confidential – Subject to Further Confidentiality Review

Page 210

1    Q.   I -- well, we have the process in
2  front of us.  We have the policy and procedure
3  that Cardinal utilized.
4    A.   I wasn't at Cardinal at that time,
5  so I'm not --
6    Q.   Yes, sir, you were.
7    A.   Well --
8    Q.   You were --
9    A.   -- I was not at Cardinal in the --
10 at a distribution center where this would be --
11   Q.   I get that.  I understand that.
12 You don't have to be for me to ask you this
13 question.
14       You are one that's been trained by
15 Cardinal, and based on your history and
16 experience, you can testify because you did it
17 for Cardinal, evaluated their systems, improved
18 on their systems.
19       I'm asking you, is this a
20 sufficient system?
21   A.   I -- my --
22       MS. WICHT:  Object to the
23   form.  No foundation.  Vague.
24   A.   I --

Page 211

1        MS. WICHT:  And calls for a
2    legal conclusion.
3    A.   I -- now I've forgotten what I was
4  going to say.
5        MS. WICHT:  Sorry.
6    A.   I didn't design the systems.  I
7  reviewed orders held by the systems in place to
8  determine whether they were possibly suspicious.
9  And, to the best of my ability, that's what my
10 role was.
11       I didn't design the forms.  I
12 wasn't the IT person.  I wasn't the person at
13 the distribution center when this was set up in
14 2006.  So I can't honestly comment on this form.
15   Q.   You would agree with me that
16 shipping suspicious orders -- shipping
17 suspicious orders is not a valid system based on
18 your understanding of the regulations, correct?
19       MS. WICHT:  Object to the
20   form.  Vague.  Calls for a legal
21   conclusion.
22   A.   I can't -- I don't know what this
23 form --
24   Q.   I'm not --

Page 212

1    A.   -- information the form was
2  sending, so ...
3    Q.   Listen to my question.
4    A.   If it's calling them suspicious
5  orders --
6    Q.   Just listen to my question and
7  answer my question.  I did not ask you about
8  that form that you keep trying to do -- relate
9  this to.  I'm just asking you the question.
10       Earlier you testified that if an
11 order was suspicious, you wouldn't ship it,
12 right?
13   A.   That is correct.
14   Q.   Because that's not compliant with
15 the regulations, correct?
16       MS. WICHT:  Object to the
17   form.  No foundation.
18   Mischaracterizes his testimony.
19   A.   If it was allegedly suspicious or
20 from what it looks to me as being suspicious,
21 no.
22   Q.   So any system -- you would agree
23 that any system that allowed suspicious orders
24 to be shipped is not a sufficient system,

Page 213

1  correct?
2        MS. WICHT:  Object to the
3    form.  No foundation.  Calls for
4    speculation and a legal conclusion.
5    A.   I don't know that the system did
6  not --
7    Q.   I didn't ask you about the system,
8  sir.  Just listen to my question, Mr. Forst.
9        I am asking you that a system --
10 if someone put in place a system that allowed
11 suspicious orders to be shipped, that that
12 wouldn't be complying with the regulations as
13 you understand them, correct?
14       MS. WICHT:  Object to the
15   form.  No foundation.  Calls for a
16   legal conclusion.
17   A.   I can't answer that question.
18   Q.   Why can't you answer that
19 question?  You've already told us that it would
20 be against the regulation to ship a suspicious
21 order, right?
22       MS. WICHT:  Object to the
23   form.  Mischaracterizes his
24   testimony.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 MR. FULLER: Counsel, just
2 object to form, please. The
3 deposition protocol is clear that
4 these talking objections are
5 inappropriate.
6 MS. WICHT: Well, the
7 deposition protocol is also clear
8 that you're not supposed to
9 mischaracterize his testimony back
10 to him.
11 MR. FULLER: And I'm not.
12 And, no, the deposition protocol
13 doesn't say that.
14 BY MR. FULLER:
15 Q. So go ahead and answer -- well,
16 let me ask it again.
17 You agree with me that it would be
18 violative of the regulation to ship a suspicious
19 order, correct?
20 MS. WICHT: Object to the
21 form. Calls for a legal
22 conclusion.
23 A. If it was known to be suspicious.
24 Q. Potentially suspicious, right?

Page 215

1 MS. WICHT: Object to the
2 form --
3 A. Potentially suspicious.
4 MS. WICHT: -- of the
5 question.
6 Q. That would be --
7 A. No. If it was known to be
8 suspicious, yes.
9 Q. Well, what if it was known to be
10 potentially suspicious? You testified earlier
11 you have an obligation to report suspicious
12 orders.
13 Potentially suspicious orders,
14 right?
15 MS. WICHT: Object to the
16 form. Compound. Vague.
17 A. Mine is not an automated system.
18 Mine is a decision based on my -- the
19 information that's given to me, the information
20 the system sends me.
21 Q. Yes, sir. So -- I mean, that
22 didn't answer my question. Were you done with
23 your answer?
24 A. Mm-hmm, yes. I mean --

Page 216

1 Q. My question, again, is you have an
2 obligation under the regulation not to ship a
3 potentially suspicious order, correct?
4 MS. WICHT: Object to the
5 form. Foundation.
6 A. That is correct.
7 MS. WICHT: Calls for a legal
8 conclusion.
9 Q. I apologize. Your counsel keeps
10 making talking objections. So you'll have to
11 let her finish.
12 A. Sorry.
13 Q. And it's clearly interrupting the
14 flow of the deposition.
15 So you would agree with me that
16 any system that allowed the shipment of
17 potentially suspicious orders would not be a
18 sufficient system to comply with the regulation,
19 right?
20 MS. WICHT: Object to form.
21 Foundation. Calls for a legal
22 conclusion.
23 A. I can't comment on the design of
24 the system.

Page 217

1 Q. Well, you know --
2 A. If it was designed to do that, it
3 should be able to fulfill that regulation.
4 Again, I can't say that -- whether or not this
5 did it or not. I was not there.
6 Q. I'm not asking you whether this
7 did it or not.
8 I just asked you, "You have an
9 obligation under the regulation not to ship a
10 potentially suspicious order, correct?"
11 "Answer: That is correct."
12 You still agree with that
13 testimony, right?
14 A. Yes.
15 MS. WICHT: Object to form.
16 Q. Okay.
17 MS. WICHT: Calls for a legal
18 conclusion.
19 Q. So -- and the reason you can't do
20 that -- well, you said it. It's under the
21 regulation. It would be violative of the
22 regulation to ship potentially suspicious
23 orders, correct?
24 MS. WICHT: Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  Calls for a legal conclusion.
2      A.   Again, I can't answer that because
3  I'm really not understanding what your question
4  is because I have this in front of me, a report
5  I haven't seen.
6      Q.   Here -- well, let's take a break
7  and you can move everything out from in front of
8  you that's confusing you and then we'll come
9  back.
10          THE VIDEOGRAPHER:  We're
11      going off the record at 2:03.
12          (Recess taken.)
13          THE VIDEOGRAPHER:  We're back
14      on the record at 2:11.
15  BY MR. FULLER:
16      Q.   Mr. Forst, I've written down a
17  question and an answer.  The question was, "My
18  question is again" -- excuse me -- "again is,
19  you have an obligation under the regulation not
20  to ship a potentially suspicious order,
21  correct?"
22          And your answer was, "That is
23  correct."
24          Do you stand by that testimony, or

Page 219

1  do you wish to change that answer?
2          MS. WICHT:  Objection.  Calls
3      for a legal conclusion.
4      A.   Reading your question as you have
5  it written, I do not believe the word "ship" is
6  in the regulation.  We have a right to report a
7  suspicious order, but it can be shipped.  The
8  reporting of a suspicious order can actually
9  happen after the fact.
10      Q.   So your understanding -- and so
11  your understanding now is that you can ship
12  suspicious orders, right?
13          MS. WICHT:  Object to the
14      form.  Calls for a legal
15      conclusion.
16      Q.   And it's not against the law.
17          MS. WICHT:  Sorry.
18      Q.   That's your testimony to the jury?
19          MS. WICHT:  Object to --
20      Q.   Now --
21          MS. WICHT:  I'm sorry.
22      Object to the form.  Calls for a
23      legal conclusion.
24          MR. FULLER:  Tell him yes.

Page 220

1      That's fine.
2      A.   Well, if the regulation doesn't
3  say "ship" in it -- I mean, there are times that
4  you're going to find that an order might be
5  suspicious long after it's shipped.  So the
6  regulation is to report suspicious orders.
7      Q.   The regulation also requires you
8  to maintain effective controls against
9  diversion, doesn't it?
10          MS. WICHT:  Object to --
11      Q.   That's actually the code.
12          MS. WICHT:  Object to the
13      form.
14      Q.   Right?
15      A.   Effective against diversion, yes.
16      Q.   Yes.  So do you believe --
17      A.   Just because an order is --
18      Q.   Hold on.
19      A.   -- suspicious does not mean --
20      Q.   Let me finish my question.
21      A.   -- it's necessarily going to be
22  diverted.
23      Q.   Do you believe shipping suspicious
24  orders is maintaining effective controls against

Page 221

1  diversion?
2          MS. WICHT:  Object to the
3      form.  Foundation.  Calls for a
4      legal conclusion.
5      A.   No.
6      Q.   So maintaining effective controls
7  against diversion would be preventing shipping
8  suspicious orders, right --
9          MS. WICHT:  Object to the
10      form.
11      Q.   -- not shipping them?
12          MS. WICHT:  Sorry, Mike.
13      Object to the form.  Calls
14      for a legal conclusion.
15      A.   Could you repeat the question
16  again, please.
17      Q.   Sure.  You understand that -- I
18  mean, the testimony has been since even the
19  early 2000s, this country has been in the middle
20  of an opioid epidemic, right?
21      A.   Yes.
22      Q.   People are dying at obscene
23  numbers in this country mainly due to
24  prescription opioids, not even the illicit

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  stuff, right?
2      MS. WICHT:  Object to the
3  form.  Foundation.
4      A.  I don't know if that information
5  is totally correct.
6      Q.  Have you read that?
7      A.  I haven't read it.  I -- my
8  understanding --
9      Q.  Have you seen the news stories?
10     A.  -- is now heroin is.
11     Q.  Have you seen news stories on it,
12  prescription opioids?
13     A.  Yes.
14     Q.  And the abuse and the epidemic
15  this country is facing?  That our kids are
16  dying?
17     A.  I've seen stories.
18     Q.  That kids are dying from
19  prescription opioids?
20     A.  Yes.
21     Q.  So what I'm trying to find out, as
22  one in charge of anti-diversion at Cardinal, one
23  who makes the ultimate decision as to whether an
24  order gets shipped or not, I'm just trying to

Page 223

1  find out what the obligation is under -- that
2  Cardinal believes or you believe -- I just want
3  to know what Mr. Forst believes -- is the
4  obligation under the regulations, can you or can
5  you not ship a suspicious order?  Yes or no?
6      MS. WICHT:  Object to form.
7  Calls for a legal conclusion.
8  Asked and answered.
9      A.  If I don't know at the time that
10  order is suspicious and it's shipped and I find
11  out later on, I can't unship an order.
12     Q.  Okay.  So if you --
13     A.  My goal is to -- if -- when I see
14  it and it's stopped, if it is potentially
15  suspicious, it will be not shipped.
16     Q.  And that's what the regulation
17  requires, correct?
18     MS. WICHT:  Object to the
19  form.
20     A.  The regulation --
21     MS. WICHT:  Calls for a legal
22  conclusion.
23     A.  -- has nothing to say about
24  shipping.  It's reporting potentially suspicious

Page 224

1  orders.
2      Q.  And the code section has to deal
3  with shipping, correct?
4      MS. WICHT:  Object to the
5  form.  No foundation.  Calls for a
6  legal conclusion.
7      A.  Can I see the code?
8      Q.  The one we already looked at,
9  maintaining effective controls against
10  diversion.
11     Here's all I want to find out,
12  Mr. Forst:  According to Mr. Forst, in his
13  almost 40 years of experience, is it legal to
14  ship an order that we know is suspicious?
15     A.  If I know it's suspicious --
16     MS. WICHT:  Object to the
17  form.  Foundation.  Calls for a
18  legal conclusion.
19     A.  You're making me understand that
20  that order is suspicious.  Mine is potentially
21  suspicious.
22     Q.  Okay.  Now --
23     A.  Potentially suspicious is
24  different than suspicious.

Page 225

1      Q.  Okay.  The reg doesn't say
2  potentially suspicious, does it?
3      A.  The reg says suspicious order.
4      Q.  Okay.  And I understand how you
5  want to qualify with potentially suspicious, and
6  I -- I'm not going to quibble with you on that
7  one.  That one I'm fine with.  So let me re-ask
8  the question.
9      Is it Mr. Forst's position and
10  understanding of his obligations that we can
11  ship a potentially suspicious order or not?
12     MS. WICHT:  Object to the
13  form.  Foundation.  Calls for a
14  legal conclusion.
15     A.  Have I reviewed the suspicious
16  order?  Have I reviewed the order, that is,
17  quote, suspicious?
18     Q.  If you -- it's a potentially
19  suspicious order, yes, sir.
20     A.  If I determine it's potentially
21  suspicious, I would not allow that to be shipped
22  under the process of the Cardinal Health policy.
23     Q.  And so we're on the same page, the
24  term "potentially suspicious," that means a

Page 226

1 chance that it may be diverted, correct?

2     A.   It has the possibility of being

3 diverted.

4     Q.   Okay.  And so then my follow-up

5 question is, is if we have a system in place --

6 ignore anything in front of you, okay?

7        If we have a system in place that

8 is allowing potentially suspicious orders to be

9 shipped, that's not an effective system based on

10 the regulations, correct?

11        MS. WICHT: Object to form.

12     Foundation.

13     A.   I don't know if the system --

14        MS. WICHT: Calls for a legal

15     conclusion.

16     A.   -- is allowing --

17        THE COURT REPORTER:  I need

18     you to wait until she finishes.

19        THE WITNESS:  I'm sorry.

20        MS. WICHT:  Objection to

21     form.  Foundation.  Calls for a

22     legal conclusion.

23        Thank you.

24     A.   Okay.  Please repeat the question.

Page 227

1     Q.   Sure.  If we have a system in

2 place that is allowing potential suspicious

3 orders to be shipped, then we're -- the system

4 is not in compliance with the regulations,

5 correct?

6        MS. WICHT:  Same objections.

7     A.   When I started at Cardinal Health,

8 the system in place would not allow orders over

9 a certain threshold to be shipped.  Those orders

10 were reviewed to see if there was potential --

11 potential -- potentially -- potentially risk of

12 diversion.

13     Q.   Potential suspicious orders,

14 right?

15     A.   Correct.

16     Q.   The way we've framed that today?

17     A.   Correct.

18     Q.   Okay.  I'm not asking what went on

19 at Cardinal.  That's not my question, because

20 I -- so when I premised this question, I said

21 ignore everything in front of you.

22        My question is, if we have a

23 system in place that allows for the shipment of

24 potentially suspicious orders, can we agree that

Page 228

1 that system is not in compliance with the

2 regulations?

3        MS. WICHT:  Object to the

4     form.  Foundation.  Calls for a

5     legal conclusion.

6     A.   I'm not familiar with any system

7 that is totally foolproof.  So I would say what

8 you're saying is correct.

9     Q.   So you agree --

10     A.   That is correct.  I have an issue

11 with the word "ship" because, like I said

12 previously, an order can be shipped and then

13 realized later that it is suspicious and it

14 needs to be reported as such.

15     Q.   But you do agree now that a system

16 that allows us to ship known potential

17 suspicious orders is not a system that complies

18 with the regulation?

19     A.   If it's an --

20        MS. WICHT:  Object to the

21     form.  Foundation.  Calls for a

22     legal conclusion.

23     A.   If it's known to be suspicious,

24 yes.

Page 229

1     Q.   Fair enough.

2        Now, if you'll -- the policy and

3 procedure now, if you'll put it back in front of

4 you, 4919.  That's the one that was in place

5 when you were there, but -- oh, actually ...

6        So I think this is the question I

7 asked you:  "A system that allows for the

8 shipment of potentially suspicious orders does

9 not comply with the regulatory requirements,

10 correct?"

11        Mr. Forst, you tell me what your

12 answer is.

13        MS. WICHT:  Object to the

14     form.  No foundation.  Vague.  And

15     calls for a legal conclusion.

16     A.   This is a system.  Again, a

17 general system that would do that -- and there's

18 absolutely nothing that prevents it from doing

19 it, there's no thresholds in place, there's

20 nothing in place -- I would say that is correct.

21     Q.   All right.

22        MS. WICHT:  Just for purposes

23     of the record, the demonstrative

24     that Mr. Fuller has just written

Page 230

1  was not the witness' answer.
2      MR. FULLER: Okay. So I'll
3  ask him the question again.
4      MS. WICHT: The answer is in
5  the transcript.
6      MR. FULLER: I'm sorry. I
7  thought this was my noticed
8  deposition, not yours, Counsel.
9      MS. WICHT: Okay. I'm
10  free -- you're free to ask your
11  questions, Mr. Fuller. It's no
12  problem. I'm just --
13      MR. FULLER: Okay.
14      MS. WICHT: -- pointing out
15  that the -- what you've written
16  down on the sheet of paper that's
17  going to be marked as an exhibit to
18  this deposition is not what the
19  witness said, as the transcript
20  will reflect.
21  BY MR. FULLER:
22      Q.  So, Mr. Forst, I'm going to ask
23  the question again.
24      A system that allows for the

Page 231

1  shipment of potential -- and look, if we need to
2  rewrite the question, you help me. We'll
3  rewrite it.
4      How should we rewrite it?
5      A.  I'm okay with the question. I
6  just -- the answer that I gave is not that
7  answer.
8      Q.  Well, then I want an answer to
9  this question, because your answer restructures
10  my question. So we need to change the question.
11      MS. WICHT: You just told him
12  he could do that.
13      Go ahead.
14      Q.  And I'm happy to do that.
15      A.  So --
16      MS. WICHT: Wait. Hang on.
17      Q.  Go ahead.
18      MS. WICHT: Is the question
19  pending the one --
20      MR. FULLER: No, no.
21      MS. WICHT: -- that's written
22  down?
23      What's the question?
24      MR. FULLER: No. The witness

Page 232

1  was fixing to talk and then you cut
2  him off. Please --
3      MS. WICHT: Because there --
4      MR. FULLER: -- resist from
5  doing it.
6      MS. WICHT: -- wasn't a
7  question pending.
8      MR. FULLER: Yes, there is.
9      MS. WICHT: All right. Then
10  go ahead and say it.
11  BY MR. FULLER:
12      Q.  Go ahead.
13      A.  So your question to me is, if I'm
14  writing the question, my question would be a
15  system that allows for the shipment of
16  potentially shipped -- suspicious orders does
17  not comply with the regulatory requirements if
18  there are no parameters within the system to
19  stop orders in some fashion, such as a threshold
20  or whatever, if it just blatantly -- the system
21  doesn't exist unless it does something to stop
22  something.
23      Q.  Okay.
24      MS. WICHT: That question,

Page 233

1      obviously, was subject to my same
2      objections as when Mr. Fuller asked
3      it the last ten times.
4      Q.  And so if I'm understanding you,
5  if -- even if the system has a threshold, it
6  doesn't stop them, doesn't stop the orders, that
7  is not much of a threshold, right?
8      MS. WICHT: Object to the
9      form.
10      Q.  You're -- hold on. Let me follow
11  up on your question.
12      Let's go back to your question,
13  Mr. Forst.
14      I apologize because it keeps going
15  and I got to scroll back.
16      A.  That's all right.
17      Q.  You said if there are no
18  parameters within the system to stop orders in
19  some fashion such as a threshold --
20      A.  To stop them for review --
21      Q.  Right?
22      A.  -- again.
23      Q.  When you say "such as a
24  threshold," you're assuming that the threshold

Page 234

1 actually holds the shipment if it's breached,
2 correct?
3     A.  No.
4        MS. WICHT: Object to the
5 form.
6     A.  What I'm saying is there should be
7 a parameter in place whether the order is
8 shipped or not because the regulation doesn't
9 say it has to be stopped.
10       I would hope there would be
11 something there. I don't know. I'm not that
12 expert. But there should be something there
13 that reports that these instances, the product
14 doesn't meet whatever the parameter loaded in
15 the system as defined as a suspicious order is.
16     Q.  And -- now -- all right. So let's
17 address that. And let me make sure I'm on the
18 same page with you.
19       You're suggesting that the system
20 has to have some sort of mechanism to stop an
21 order from shipping.
22     A.  I did not say --
23     Q.  Hold on. Let me finish.
24       Well, so then in your mind, as

Page 235

1 long as we have a threshold in place, whatever
2 it is -- say the threshold is 100 pills and we
3 blow through that and we ship 10,000 pills and
4 we know the threshold is 100 and we know that it
5 went past it but we're still shipping, that's
6 okay?
7       MS. WICHT: Object to form.
8 Foundation. Hypothetical. And
9 calls for a legal conclusion.
10     A.  I can't answer that.
11     Q.  Why can't you answer that?
12     A.  There's way too many things that
13 are all over the place.
14       Why would you -- number one, if
15 the system is designed to meet the regulation --
16     Q.  Well, that's part of the problem.
17 Let's start there. A hypothetical --
18     A.  I didn't design the system.
19     Q.  I'm not saying you designed any
20 system. Well, I mean, the records speak to
21 yourself with what you did in -- in the systems,
22 but let's back up to this question.
23       What I'm trying to find out from
24 you is a system -- whatever you want to call it,

Page 236

1 whoever it is -- if it ships potentially
2 suspicious orders, does it comply with the
3 regulation or not?
4       MS. WICHT: Object to form.
5 Foundation. Calls for a legal
6 conclusion. Asked and answered.
7     A.  I can't answer that.
8     Q.  Why not? You've already said you
9 have an obligation that you're not complying
10 with the regulation if you allow a suspicious
11 order to be shipped or potentially suspicious
12 order to be shipped.
13     A.  Potentially suspicious order.
14       MS. WICHT: Object to the
15 form.
16     Q.  So if the system allows the same
17 thing, it's violative of the reg just like you
18 would be if you allowed a suspicious order to be
19 shipped, correct?
20       MS. WICHT: Object to the
21 form.
22     Q.  What's the difference between a
23 system that allows it and you allowing it?
24     A.  But I don't --

Page 237

1       MS. WICHT: Object to form.
2 Mischaracterizes his prior
3 testimony. And calls for a legal
4 conclusion.
5       MR. FULLER: Please, let's
6 just object to form. One, you're
7 cutting off the witness when the
8 witness starts to answer.
9 BY MR. FULLER:
10     Q.  Go ahead.
11     A.  I have a problem with the word
12 "shipment."
13     Q.  All right. Well --
14     A.  So --
15     Q.  -- let --
16     A.  -- does the reg say that it should
17 stop a potentially suspicious order, or does it
18 have -- the reg say that there has to be a flag
19 that there's a potentially suspicious order and
20 it is then reported whether before the fact or
21 after the fact?
22     Q.  Well, and that's -- that's what I
23 want to find out, Mr. Forst. That's what I want
24 to find out.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    Because -- and I've asked you
2 repeatedly if you believe the reg and the code
3 section allows for the shipment of suspicious
4 orders, or potentially suspicious orders, how
5 we've redefined those today. And you've told me
6 that it does not allow for it, that maintaining
7 effective controls against diversion does not
8 allow for it. The record's clear. You've
9 answered that question.
10    A.    Right.
11        MS. WICHT: Object to the --
12    Q.    So if the code -- the United
13 States Code doesn't allow for the shipping of
14 suspicious orders, we can agree on that,
15 potentially suspicious orders, right?
16        MS. WICHT: Object to the
17    form. Mischaracterizes his
18    testimony. And calls for a legal
19    conclusion.
20    A.    I can't. I can't answer that
21 question.
22    Q.    You already have. Are you
23 retracting your earlier answer?
24        MS. WICHT: Object to the

Page 239

1    form.
2    Q.    It's fine if you want to. You can
3 change your testimony as many times as you want.
4    A.    The question is not -- it can't be
5 as clear and simple as that.
6    Q.    Well, no, it is as clear and
7 simple as that. When people have tried to muddy
8 it up, that's why we found our -- find ourselves
9 right now sitting in the middle of an opioid
10 epidemic, is because people didn't comply with
11 the regulatory obligations. That is as clear
12 and simple as that.
13        MS. WICHT: That's not a
14    question. That's a speech. And --
15    Q.    Yeah. Let's take another break
16 and I'll go back and find your earlier testimony
17 and see if you want to change it.
18        MR. FULLER: Let's go off the
19    record.
20        THE VIDEOGRAPHER: We're
21    going off the record at 2:32.
22        (Recess taken.)
23        THE VIDEOGRAPHER: We're back
24    on the record at 2:47.

Page 240

1 BY MR. FULLER:
2    Q.    All right.
3        MS. WICHT: Mr. Fuller,
4    before there's a question pending,
5    I want to put on the record a
6    continuing objection to this line
7    of questioning that I assume you're
8    about to continue on the basis
9    of -- on all the bases that I've
10    stated and also on the basis of
11    Special Master Cohen's ruling in
12    September of 2018 in the context of
13    the Walgreens deposition that
14    witnesses are not to be asked about
15    legal conclusions or their
16    agreement or disagreement with
17    regulatory requirements, including
18    shipping or reporting requirements.
19        I think these are improper
20    questions.
21        MR. FULLER: Special Master
22    Cohen's ruling only applied to
23    30(b)(6) witnesses. It did not
24    apply to individuals.

Page 241

1        So if you're done, we can --
2        MS. WICHT: I understand that
3    you disagree.
4        MR. FULLER: Fair enough.
5        MS. WICHT: I want a
6    continuing objection.
7        MR. FULLER: Absolutely. No
8    problem at all.
9 BY MR. FULLER:
10    Q.    There you go.
11        So this is the question and answer
12 copied verbatim from page 199 of the -- I guess
13 it's a draft transcript at this point.
14        And it says, "Do you believe
15 shipping suspicious orders is maintaining
16 effective controls against diversion?" Oh, I
17 forgot to write your answer.
18        You said no. Now, do you want to
19 change that answer at this point?
20        MS. WICHT: Object to the
21    form of the question.
22    A.    Yes.
23    Q.    Okay. How do you want to change
24 that answer now?

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    A.   "Do you believe shipping
2  suspicious orders is maintaining effective
3  controls against diversion?"
4         Well, if we're looking at the
5  reg --
6    Q.   Well, first of all, maintaining
7  suspicious orders doesn't -- or excuse me --
8  maintaining effective controls against diversion
9  doesn't have anything to do with the reg.
10        But go ahead.  Sorry.
11        MS. WICHT:  Subject to the
12     same objections.
13    Q.   The U.S. Code says that a
14  distributor such as Cardinal has to maintain
15  effective controls to prevent diversion.  And
16  your testimony is that shipping suspicious
17  orders would not be maintaining effective
18  controls against diversion.  That's the U.S.
19  Code.  That's law passed by Congress.  It's not
20  a regulation.
21        Regulation on suspicious orders,
22  you're right, doesn't say verbatim anything
23  about shipping.  But explain to this jury how
24  you can maintain effective controls against

Page 243

1  diversion if you're shipping suspicious orders
2  throughout this country.  Tell the jury that.
3         MS. WICHT:  Object to the
4      form of the question.  Foundation.
5      Calls for a legal conclusion.
6    Q.   Go ahead.
7         MS. WICHT:  Hypothetical.
8    Q.   Tell the jury how this country is
9  in the middle of an epidemic and Mr. Forst
10  believes it's okay to ship suspicious orders.
11        MS. WICHT:  Object to the
12     form of the question.
13     Mischaracterizes his testimony, in
14     addition to all the other
15     objections.
16    A.   When I was with Cardinal Health,
17  the system that we had set up --
18    Q.   Okay.
19        MS. WICHT:  Let him finish
20     his answer.
21        MR. FULLER:  No, no.  This
22     isn't the answer to the question.
23        MS. WICHT:  You don't -- let
24     him --

Page 244

1         MR. FULLER:  This has --
2         MS. WICHT:  -- finish his
3      answer.
4         MR. FULLER:  -- nothing to do
5      with what was going on at Cardinal
6      Health.  I didn't ask anything
7      about Cardinal Health.
8         MS. WICHT:  Are you going to
9      let him answer or not?
10    A.   Again, when I was at Cardinal
11  Health, my job was to review orders that were
12  held by a system that were deemed possibly being
13  suspicious.  Those orders were held using a
14  threshold.  I reviewed those orders.  If there
15  was anything that pertained that they might be
16  potentially suspicious, those orders were cut
17  and not shipped.
18        MR. FULLER:  So I'm going to
19     certify this whole line of
20     questioning, and we'll file a
21     motion to require the witness to
22     actually answer the questions being
23     asked.
24        I'll move on.  And I'll

Page 245

1  attach both of these exhibits.
2         I need two exhibit stickers,
3      please.
4         17 is going to be the
5      document with two questions on it.
6            - - -
7  (Cardinal-Forst Deposition Exhibit 17 marked.)
8            - - -
9         MR. FULLER:  18 will be the
10     one that we just discussed since
11     being back on the break with one
12     question on it.
13           - - -
14  (Cardinal-Forst Deposition Exhibit 18 marked.)
15           - - -
16  BY MR. FULLER:
17    Q.   All right.  So at 4419 -- do you
18  still have that document over there somewhere?
19        MR. FULLER:  4419.
20        4919.  My bad.  Sorry
21     everybody.
22        MS. WICHT:  What is it?
23        MR. FULLER:  4919.
24    A.   Yes.

Page 246

1     MR. FULLER:  I apologize.
2 BY MR. FULLER:
3     Q.   If you'd turn to page 35 of that
4 document.
5     Have you ever seen this part of
6 the policies and procedures that were in place
7 when you arrived at Cardinal?
8     MS. WICHT:  Object to the
9     form of the question.
10    A.   No.
11    Q.   And I don't know if it helps you
12 or not, but if you look -- page 6 refers to this
13 document.  See E down there at the bottom of the
14 page, Dosage Limit Charts?
15    A.   Yes.
16    Q.   "ED04.00 must be posted in the
17 cage vaults."
18    Were you aware of a system where
19 there was a posting in the cage vaults, the
20 facilities that you were overseeing for
21 anti-diversion purposes to identify excessive
22 purchases related to Schedule IIs and
23 Schedule III drugs?
24    A.   I'm not familiar with that in a

Page 247

1 cage vault.
2     Q.   Okay.  So if you'll turn back to
3 page 35.  Have you ever seen this document
4 before related to excessive purchases for
5 different control II schedules?
6     A.   No.
7     Q.   If you turn to the next page, it
8 should be a similar document of excessive
9 purchases for IIIs, IVs and Vs.
10    Do you see that there?
11    A.   Yes.
12    Q.   And are you -- have you any
13 recollection of seeing these or hearing about
14 this system at Cardinal when you arrived?
15    A.   Not to my recollection.
16    Q.   Okay.  And, again, when you came
17 in -- it was February of 2008 when you came into
18 the regulatory department, correct?
19    A.   That is correct.
20    Q.   And as we saw from your
21 performance evaluation, part of your job was
22 assisting with certain policies and procedures
23 related to regulatory, right?
24    A.   These are from the distribution

Page 248

1 section.
2     Q.   Sir, my question was, part of your
3 job was to help with the policies and procedures
4 related to regulation, correct?
5     A.   That is --
6     MS. WICHT:  Object to the
7     form.
8     I'm sorry.
9     A.   That is correct --
10    Q.   Okay.
11    A.   -- under the anti-diversion part
12 that I was assigned when I got there.
13    Q.   So let's go to the -- 3514.
14    MR. FULLER:  This is -- I'm
15    sorry -- going to be Plaintiffs'
16    Exhibit 19, P1.3514 for the record.
17    - - -
18 (Cardinal-Forst Deposition Exhibit 19 marked.)
19    - - -
20 BY MR. FULLER:
21    Q.   Mr. Forst, you actually sent this
22 e-mail, didn't you?
23    A.   Yes.
24    Q.   This was back in November of 2009;

Page 249

1 is that right?
2     A.   Correct.
3     Q.   It's "Drug use called epidemic in
4 Mass" -- meaning Massachusetts -- "OxyContin,
5 heroin imperil public health commission seeks
6 help for addicts."
7     Do you see that?
8     A.   Yes.
9     Q.   Did I read that correctly?  Did I
10 read that --
11    A.   Yes.  I'm sorry.
12    Q.   Okay.  Read the first sentence of
13 the article to us, please.
14    A.   "'Abuse of OxyContin and heroin in
15 Massachusetts has reached epidemic levels and
16 must be attacked with the same fervor now being
17 directed toward controlling the H1N1 flu virus,'
18 a special state commission said yesterday."
19    Q.   And if you go down two paragraphs,
20 read, "The Commonwealth is losing men and
21 women."
22    Read that for the jury.
23    A.   "'The Commonwealth is losing men
24 and women on its streets at a rate of 42 to 1,

Page 250

1  compared to what the state is losing in two wars
2  overseas,' the panel said in its executive
3  summary."
4      Q.   Why would you circulate this to --
5  and it looks like most of the persons in the
6  anti-diversion group, correct?
7      A.   Correct.
8      Q.   You have Mark Hartman, Mr. Moné,
9  Mr. Morse, Mr. Rausch, Shannon -- how do you
10  pronounce her last name? -- is it Shaffer?
11      A.   Yes.
12      Q.   And who is she?
13      A.   I believe she was one of the
14  technicians -- or the analysts that worked with
15  us.  And I believe she was contract, but I'm not
16  sure.
17      Q.   Okay.  But most of those people
18  are in the anti-diversion group, correct?
19      A.   That's correct.
20      Q.   So why would you forward this to
21  everyone?
22      A.   Because we always stay -- tried to
23  stay current as to what was going on with the
24  epidemic and where it was happening and what

Page 251

1  drugs we needed to be focusing on and what
2  states to look at, et cetera.
3      Q.   And that's --
4      A.   It was an FYI only document, just
5  for people to look at and understand what we're
6  trying to fight.
7      Q.   But it's important to stay
8  informed as to what's going on --
9      A.   Exactly.
10      Q.   -- when you're dealing with these
11  controlled substances and shipping them --
12      A.   Exactly.
13      Q.   -- and shipping them across the
14  country, right?
15          MS. WICHT:  Object to the
16  form of the question.
17      A.   Yes.
18      Q.   And you even mentioned even
19  particularly with problems in particular states.
20          Were there particular states that
21  had more of a problem than other states that
22  you're aware of?
23          MS. WICHT:  Object to the
24  form of the question.

Page 252

1      A.   This looks like a public health
2  issue across the country.  I'm sure there were
3  states that had higher issues based on whether
4  it's the population, whether it's the type of
5  individuals there.  I mean, that all falls into
6  it.
7      Q.   And I completely get that, but my
8  question to you was, were you aware of any
9  states that had a more -- a bigger problem than
10  particularly other states --
11          MS. WICHT:  Object to the
12  form.
13      Q.   -- based on your job?
14      A.   The states that appeared to have
15  large problems were in the Ohio Valley next to
16  West Virginia --
17      Q.   Yes, sir.
18      A.   -- Florida, and possibly the
19  Houston area of Texas.  Those are the ones that
20  stick out in my mind when I first got to
21  Cardinal Health.
22      Q.   So part of Ohio.  Would you
23  include West Virginia as well in that?
24      A.   I would include parts of West

Page 253

1  Virginia in that.
2      Q.   Or when you say the Ohio River
3  Valley, you're talking about all around the
4  river region there?
5      A.   Correct.  And my geography of
6  Ohio, since I have -- I haven't lived here all
7  my life, but, yes, down in the bottom corner,
8  Youngstown and that area.  So, yes.
9      Q.   And then parts of West Virginia.
10          What about parts of Kentucky?
11      A.   The Appalachias in Kentucky.
12      Q.   So sort of the -- and I -- okay.
13          Did you ever become aware that a
14  lot of the Appalachian states were being more
15  heavily hit than other regions of the country?
16          MS. WICHT:  Object to the
17  form.
18      A.   It appeared that they were more
19  heavily hit.
20      Q.   Did Cardinal ever do anything to
21  look into that and see why, what's going on,
22  what's the distribution pattern in some of the
23  Appalachian states to similarly situated other
24  states and why is there a disparity, if there is

Page 254

1 one at all?
2        MS. WICHT:  Object to the
3 form.
4    Q.   Do you know if Cardinal did that
5 comparison?
6        MS. WICHT:  Sorry.
7        Object to the form.
8 Compound.
9    A.   I know the analytics team looked
10 at several different factors, individual states
11 across the country.  And that would probably
12 include Ohio, West Virginia, Florida, states
13 that are very prominent.
14    Q.   And you say probably included.  It
15 would make sense --
16    A.   Oh.
17    Q.   -- that they were included?
18    A.   It would make sense that it would
19 include that, yes.
20        MS. WICHT:  Object to the
21 form.
22    Q.   You don't know, sitting here
23 today, whether they actually included them or
24 not, nor the results of whatever comparisons

Page 255

1 they did, do you?
2        MS. WICHT:  Object to the
3 form.
4    A.   I don't know how their comparisons
5 were.  I know they looked in states like West
6 Virginia, Ohio, and Florida.
7    Q.   Now, if they made some
8 determinations or some findings or just had
9 additional information, as one -- I'm assuming
10 that you reviewed threshold triggers from all of
11 those states, right?
12    A.   Yes.
13        MS. WICHT:  Object to the
14 form.
15        Was that question just
16 whether he reviewed thresholds from
17 those states?
18        MR. FULLER:  Threshold
19 triggers.
20        MS. WICHT:  Sorry.  There was
21 a lead-in about the analysis.
22        MR. FULLER:  Threshold
23 triggers from all those states.
24        MS. WICHT:  Okay.  Thank you.

Page 256

1    A.   I reviewed thresholds from those.
2 Or I -- I reviewed orders that reached
3 thresholds from those states.
4    Q.   Okay.  Were you ever provided any
5 information to help you understand why this
6 disparity between, say, the Ohio River Valley
7 versus -- I don't know -- Iowa?
8        MS. WICHT:  Object to the
9 form.
10    A.   Yes.  I mean --
11    Q.   So what information was provided
12 to you?
13    A.   The information was provided -- we
14 had to look out for pill mills.  We had to look
15 out for people going down the Blue Highway,
16 whatever it was called, and the lingo that --
17 you know, drug dealers, that was the corridor
18 between Florida and West Virginia and Ohio.
19    Q.   What sometimes has been labeled as
20 the Oxy Express?
21    A.   Oxy Express, Blue Corridor.  It
22 has several different names, yes.
23    Q.   Sure.  And what's your
24 understanding of what that was?  What was the

Page 257

1 Blue Corridor or the Oxy Express, at least as it
2 was explained to you?
3    A.   It was where drugs, whether
4 obtained legally or illegally, were spread down
5 the coast and disseminated illegally in Florida,
6 or vice versa.  It could go both ways.
7    Q.   Because a lot of people went from
8 the Ohio River Valley area down to Florida.
9    A.   Mm-hmm.
10    Q.   Is that yes?
11        MS. WICHT:  Object to the
12 form.
13    A.   Yes, that was what I was informed.
14 Yes.
15    Q.   And then they would bring the
16 drugs back home, back to the Ohio River Valley?
17        MS. WICHT:  Object to the
18 form.
19    A.   My understanding was it went both
20 ways.  So you could go both ways.
21    Q.   Yeah.  And -- now, you mentioned
22 something earlier that Cardinal was distributing
23 drugs for -- let me find my reg so I can -- for
24 legitimate medical purposes, right?

Page 258

1    A.   Correct.

2    Q.   So legitimate medical purposes,

3  you sort of need to know the medical need in the

4  areas, correct?

5    A.   That is correct.

6    Q.   So explain to the jury what

7  Cardinal did to determine what the medical need

8  was in some of these particularly harder-hit

9  areas.  And let's talk about portions of Ohio,

10  for example.

11       What did Cardinal do specifically

12  to determine what the medical need was and to

13  develop a system to make sure they weren't

14  exceeding that medical need?

15       MS. WICHT:  Object to the

16       form of the question.

17    A.   I can't address exceed medical

18  need.  I can say with the system that we used,

19  we did as much due diligence on our customers

20  there that we could.  And, again, some customers

21  were large customers and required more

22  medications than other customers, based on their

23  proximity, based on the proximity of like

24  hospitals around them, based on proximity of

Page 259

1  what type of physician practices were there.

2       We sent out investigators to check

3  out the ones that were like higher volumes to

4  make sure that there was no signs of diversion

5  going on, according to the list of what you're

6  looking for for signs of diversion.  We went

7  back several times to double check to make sure

8  that if we missed something, that we would catch

9  up on it.  We asked for more information for

10  those customers.  Not that we didn't ask for

11  information across the board --

12    Q.   Right?

13    A.   -- but if it was something in an

14  area that we focused on, we tried to do the best

15  that we could do to evaluate each and every

16  pharmacy that we served.

17    Q.   Well, let's talk about that.  That

18  was a little bit different with chains, correct?

19       MS. WICHT:  Object to the

20       form.

21    A.   Correct.

22    Q.   On dealing with the chains.  And

23  let's talk about CVS.

24       Cardinal relied on the chains to

Page 260

1  do their investigative and report back to

2  Cardinal as to what their findings were, if any,

3  right?

4    A.   That's my understanding.

5       MS. WICHT:  Object to the

6       form.

7    A.   That's my understanding, yes.

8    Q.   Now, you've been one that -- about

9  what's in the regulation, right?  There's no

10  shipping -- there's no term "shipping" in the

11  regulation.

12       Do you remember that testimony?

13    A.   Yes.

14    Q.   I want you to show me where --

15  anywhere in the reg or the code where it allows

16  you to rely on the pharmacy or the chain parent

17  to do the due diligence or do the investigation

18  for you.

19       MS. WICHT:  Object to the

20       form.  Foundation.  And calls for a

21       legal conclusion.

22    A.   I don't believe there's anything

23  in the regulation that actually requires you to

24  do that.

Page 261

1    Q.   So you don't believe that you're

2  required to do due diligence?

3       MS. WICHT:  Object to the

4       form.  Calls for a legal

5       conclusion.

6    Q.   Maintain --

7    A.   Yeah, but due -- but due diligence

8  can also include other forms of gathering

9  information.  You can gather it from the owners

10  of the pharmacy.  You can gather it from your

11  other customers.  Example, CVS --

12    Q.   So --

13    A.   -- who also has a distribution

14  center and a DEA license that -- there, so ...

15    Q.   Do you know how many times DEA --

16  or the -- Cardinal or any of its pharmacies have

17  been fined in this country over the -- say the

18  past eight years, how many tens of hundreds of

19  millions of dollars they've paid in fines for

20  not complying with the Controlled Substances

21  Act?

22       MS. WICHT:  Cardinal?  Is

23       that what you --

24       MR. FULLER:  No.  I'm sorry.

Page 262

1  CVS.
2       MR. MOYLAN:  Objection.
3  Form.
4       MS. WICHT:  Object to the
5  form.
6       A.   I could think of maybe two or
7  three, but I don't know the circumstances behind
8  all of that.
9       Q.   Well, I mean, let's be honest with
10 ourselves.  We're not going to want to rely on
11 CVS to do our due diligence for us if they're
12 being fined repeatedly for not doing a good job
13 in compliance with the Controlled Substances
14 Act, are we?
15      MR. MOYLAN:  Objection.
16      MS. WICHT:  Object to the
17 form.  No foundation.  To the
18 extent it calls for a legal
19 conclusion.
20      A.   I can't answer that question.
21      Q.   I figured.
22      Now, you did go down and do
23 surveillance on a CVS because Mr. Gilberto asked
24 you to in Florida, right?

Page 263

1       A.   A group of us went down and did
2  surveillances on pharmacies in Florida, yes.
3       Q.   Now, your normal course with any
4  other pharmacy that wasn't part of a chain would
5  be to go in and do an on-site investigation,
6  right?
7       MS. WICHT:  Object to the
8  form.
9       A.   That was for retail independents,
10 yes.
11      Q.   But, because of the deal with CVS,
12 you weren't allowed to go in and do an inside --
13 in-store investigation, were you?
14      MS. WICHT:  Object to the
15 form.  No foundation.
16      A.   I am not aware of any deal with
17 CVS.
18      Q.   Well, then why didn't you go in
19 and do the investigation inside?
20      A.   I did go inside.
21      Q.   Then why didn't you go your
22 investigation?
23      So you talked to the pharmacist,
24 right?

Page 264

1       A.   I -- no, I didn't talk to the
2  pharmacist.
3       Q.   You asked for the drug usage logs
4  of what they had been shipping out, right?
5       A.   No, I did not.
6       Q.   You asked for their highest
7  prescribers, correct?
8       A.   No, I did not.
9       Q.   Well, that's what you would do at
10 any other retail independent pharmacy, isn't it?
11      A.   That's what the investigators
12 would do.
13      Q.   And you said you as a pharmacist,
14 you can even be more pointed in your questions
15 and your investigation when you --
16      A.   Yes.
17      Q.   -- go do it, correct?
18      A.   Yes.  But, again, that was not --
19      Q.   Did you do that when you were --
20      A.   -- my function.
21      Q.   Hold on.  Did you do that when you
22 were at CVS?
23      MS. WICHT:  You interrupted
24 his answer, Mike, so don't tell him

Page 265

1  to hold on.
2       Q.   Did you do that when you were
3  surveilling the CVS?
4       A.   It wasn't a full investigation.
5  It was a surveillance.
6       Q.   Do you have any idea how many
7  pills or dosage units that CVS was receiving
8  from Cardinal?
9       A.   Based on however many years ago,
10 eight years ago, no.
11      Q.   Was it explained to you why you
12 were going there to do the investigation, or to
13 do the surveillance, as you've put it?
14      A.   My understanding was the DEA asked
15 us to do some -- look at some information in
16 Florida on customers -- oops, I'm sorry --
17      MS. WICHT:  Sorry.
18      A.   -- on customers.  That was what
19 was told to me.  That's as much as I know.
20      Q.   And who told that to you?
21      A.   That was in a group discussion
22 when -- I believe it was Doug Emma and I and
23 several of the pharmacists went all across
24 Florida and the -- and the investigators.

Page 266

1    Q.   So how many different pharmacies
2  did you visit?
3        A.   Maybe seven or eight.  Mostly
4  hospitals.
5        Q.   Now, would that be what all of you
6  all visited, or was that just what you visited
7  when you were down in Florida?  Or do you
8  recall?
9        A.   I don't recall.  It was between
10 seven and ten, and most of mine were hospitals.
11       Q.   How many pharmacies did you do
12 other than the 219 CVS?
13           MS. WICHT:  Object to the
14       form.
15       A.   I don't know.  Nine or ten.  I
16 mean -- oh, you mean total?
17       Q.   No, I mean other pharmacies.  How
18 many --
19       A.   Other like CVS or Walgreens or
20 other --
21       Q.   Or retail independents, pharmacy,
22 drugstore, non-hospital.
23       A.   Probably four retail independents,
24 maybe six hospitals, and two or three

Page 267

1  surveillance for CVSs.
2        Q.   Okay.  So that would be two or
3  three different CVS stores that you sat outside
4  of?
5        A.   It was.  They weren't necessarily
6  on my list.  If they were, I went there.  But if
7  we drove past a CVS or a Walgreens and if we had
8  time, we would stop and do a surveillance and
9  look for, you know, cars in the parking lot with
10 out-of-state plates, see if there was a line at
11 the pharmacy, go in the pharmacy and walk around
12 and see what -- who's at the counter or
13 whatever.
14       Q.   Were you -- did you have any
15 information on the pharmacies that were on your
16 list before --
17       A.   I had information on the
18 pharmacies that were on my list.
19       Q.   And what type of --
20           MS. WICHT:  Be sure to let
21       him finish the question before you
22       start your answer, okay?
23       A.  I'm sorry.
24           MS. WICHT:  That's okay.

Page 268

1        A.   Yes.
2           MS. WICHT:  Thank you.
3        Q.   And what type of information did
4  you have?
5        A.   It was -- ranged from very little
6  to maybe their -- their dispensing information.
7  There were some that we possibly had a list of
8  doctors that we had compiled from somewhere that
9  they were possibly filling prescriptions for and
10 that could have been a source from them, or just
11 notices that we -- in the area from newspaper
12 notices of questionable physicians.
13          Again, I couldn't look at the
14 prescriptions.  That's a HIPAA violation for me
15 because I'm not in any part of that.  So I would
16 have to ask the pharmacist questions about --
17 and go through the ten things:  Do you do your
18 due diligence?  Are you familiar with your
19 physician's practice?  Do you know what his
20 specialty is?  Do you know of any legal action
21 that may or may not have been taken against him
22 with controlled substances?
23          So there was that list.  And it
24 was very similar to what the investigators used.

Page 269

1        Q.   And that was for the retail
2  independents, right?
3        A.   That is correct.
4        Q.   Okay.
5        A.   And the hospitals also.
6        Q.   Okay.  Fair enough.
7           Do you know if -- strike that.
8           When about was this that you made
9  this trip to Florida with some others?
10       A.   I'm thinking it was 2010, but I'm
11 not sure what month.
12          MR. FULLER:  All right.
13       Let's do -- well, here.  I need
14       3505.
15          Plaintiffs' Exhibit 20, 3505.
16              - - -
17   (Cardinal-Forst Deposition Exhibit 20 marked.)
18              - - -
19 BY MR. FULLER:
20       Q.   All right.  Mr. Forst, this is an
21 e-mail that -- you're the last one on the chain,
22 right?
23          MR. FULLER:  This is going to
24       be -- didn't I say Plaintiffs'

Page 270

1   Exhibit 20?  Okay.  Great.
2   BY MR. FULLER:
3       Q.    And this is another chain
4   pharmacy, right, K-Mart?
5       A.    Yes.
6       Q.    And, to your knowledge, the same
7   rules that applied to CVS applied to K-Mart,
8   correct?
9           MS. WICHT:  Object to the
10  form.
11      A.    I'm sorry.  Repeat the question.
12      Q.    The same practices that applied to
13  CVS applied to K-Mart, correct?
14          MS. WICHT:  Object to the
15  form.
16      A.    I -- I believe that is correct.
17      Q.    Now, let me ask.  So there's this
18  designation of chain versus retail independent.
19          How many pharmacies had to be in
20  a, quote/unquote, chain for it to be categorized
21  as a chain at Cardinal, if you know?
22      A.    I don't know that information.
23      Q.    Who would know?
24      A.    Michael Moné, possibly, and Nick

Page 271

1   Rausch.
2       Q.    Maybe Nick Rausch would know, too?
3       A.    Yes.
4       Q.    Okay.  And so at the bottom of the
5   page it sort of starts off with Derek e-mailing
6   Alan and Aaron.
7           Do you see that?
8       A.    Yes.
9       Q.    And the subject line -- read the
10  subject line for us.
11      A.    "K-Mart 4103 under C-II review
12  again.  SOM event."
13      Q.    All right.  It says, "Alan, Thank
14  you for notifying us that K-Mart 4103 has seen a
15  large increase in shipments for DEA base
16  oxycodone/hydrocodone products over the last
17  several months."
18          Turn to the next page.  It says,
19  "Based on the information provided by Cardinal
20  and our dispensing history at the store, we have
21  investigated and considered" -- "concluded that
22  there is no suspicious activity.  Please
23  increase the threshold by 15 percent going
24  forward to help eliminate possible holds and

Page 272

1   allow products to flow without interruption.
2   Thank you, Derek."
3           Did I read that right?
4       A.    Yes.
5       Q.    Now, generally speaking, Cardinal
6   doesn't get more feedback from the chains than
7   that, do they?
8           MS. WICHT:  Object to the
9   form.
10      A.    I'm not familiar with all the
11  information that comes from the chains, because
12  some of it could go to Michael and Nick for
13  their analysis.
14      Q.    Well, we know from -- well, let's
15  continue up this chain, then --
16      A.    That's fine.
17      Q.    -- this chain e-mail.
18          All right.  So then Alan forwards
19  it to Debbie Todd and Maranda.
20          And Debbie Todd's in your
21  department, right?
22      A.    Yes.
23      Q.    Okay.  It says, "Maranda, Please
24  see K-Mart's response to the SOM event for store

Page 273

1   4103. Alan."
2           Right?
3       A.    Mm-hmm.
4       Q.    Now, do we know at this point
5   whether the order is being held or whether it
6   was already shipped that triggered this event?
7       A.    I don't -- I can't answer that
8   with the -- I can't answer that by looking at
9   this document.
10      Q.    Okay.  What would we need to
11  answer that?  If you wanted to find that out,
12  what would you do?
13      A.    Well, I would look at the date.
14  And I'm assuming -- again, assuming -- that
15  there is an attachment or something -- even
16  maybe in a previous e-mail, because I don't see
17  it here -- that's explaining about when and
18  where that incident occurred or that threshold
19  event occurred.  But I don't see it here, so I
20  don't know what the attachment says.
21      Q.    I don't know there was an -- this
22  is what I was given.
23      A.    I don't even know if there was
24  a -- you know, I don't even know.  But, I mean,

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1 just from this information, there had to be some
2 discussion somewhere --
3      Q.   Okay.  Well, let's keep going up
4 the chain.
5      A.   -- verbal discussion.
6           Yes.
7      Q.   So Debbie then says it to -- sends
8 it to you and Shirlene Justus, right?
9      A.   Correct.
10      Q.   And this is all the same day,
11 correct?
12      A.   Well, it started on August 31st,
13 so --
14      Q.   Well, fair.
15      A.   -- it's been about -- it's been
16 about a week or so, yes.
17      Q.   The e-mail that we started reading
18 from --
19      A.   Correct.
20      Q.   -- is all in the same day?
21      A.   Correct.
22      Q.   That K-Mart has now e-mailed back
23 and let Cardinal know that it's conducted an
24 investigation and it's fine to ship --

Page 275

1      A.   Yes.
2      Q.   -- and they want to increase their
3 threshold.
4           They don't really give a reason
5 why, do they?
6           MS. WICHT:  Object to the
7      form.  Excuse me.  Sorry.
8      A.   They don't have a reason why here.
9      Q.   Okay.  And then Ms. Todd forwards
10 it to you --
11      A.   Yes.
12      Q.   -- and says, "See below."
13           And read your response to the
14 jury.
15      A.   My response is, "Please adjust the
16 customer's oxycodone's family threshold by
17 20 percent.  Here is the DEA number and they're
18 serviced out of Knoxville."
19      Q.   "Thank you, Chris," right?
20      A.   Yes.
21      Q.   Now, they only asked -- K-Mart was
22 only asking for a 15 percent increase in their
23 threshold, right?
24      A.   Yes.  That's what they requested.

Page 276

1      Q.   And you gave them an extra
2 5 percent on top of that, didn't you?
3           MS. WICHT:  Object to the
4      form.
5      A.   Again, since it's been --
6      Q.   Well, you gave them an extra
7 5 percent on top of that, right?
8      A.   Yes, because I probably looked at
9 the information that I had in front of me, and
10 that was something that was -- still felt
11 comfortable that there was no obvious signs of
12 diversion going on from the information we had
13 in the file.
14      Q.   So -- and that would be
15 information that's contained within the
16 customer's due diligence file, Know Your
17 Customer type of information, right?
18      A.   Content Manager --
19           MS. WICHT:  Object to the
20      form.
21      A.   -- yes.
22      Q.   Okay.
23      A.   Content Manager.
24      Q.   So we should be able to go back

Page 277

1 and see what type of information was in there.
2           Now, would you have done any
3 documentation as to why or the basis for your
4 increasing the threshold?
5           MS. WICHT:  Object to the
6      form.
7      A.   Again, it was probably a
8 discussion after I reviewed the stuff.  I
9 reviewed the information that I had in front of
10 me.
11           And, again, I don't even remember
12 this, but it was always review what was in the
13 file, is there any signs of potential diversion,
14 possibly what size store is it, is there
15 rationale for the request, and then you would
16 make a decision on whether you would move the
17 threshold or not.
18      Q.   So let's walk through this
19 process.  So this is a chain, so we may not have
20 all the information we have for the retail
21 independent, correct?
22      A.   Right.
23           MS. WICHT:  Object to the
24      form.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    Q.   And sitting here today, you don't
2  know what information you had and didn't have?
3    A.   I can't see in Content Manager off
4  of this, no.
5    Q.   And when you say "Content
6  Manager," that's the due diligence?
7    A.   That was the -- that was --
8        MS. WICHT:  Object to the
9  form.
10   Q.   What we talked about earlier,
11 right?
12   A.   That was the information system
13 that we used to place our documents.
14   Q.   Okay.  And all these would have
15 been electronically stored, correct?
16   A.   That is correct.
17   Q.   And at this point in time, 2011,
18 you had the ability to use Tableau as well,
19 right?
20   A.   No.
21   Q.   You didn't have Tableau in 2011?
22   A.   I do not believe so.
23   Q.   Really?  Interesting.
24   A.   If we had the ability to use

Page 279

1  Tableau, I would -- did not have access to it.
2  So maybe Nick or whoever had started working on
3  it, but I don't remember being able to use
4  Tableau in 2011.
5    Q.   Okay.
6    A.   Because I don't -- I don't -- I
7  can't answer that yes or no, but that date does
8  not sound correct to me.  It's probably in this
9  time frame, but I think it's past 2011 before
10 Tableau was available.
11   Q.   And you could be right, Mr. Forst.
12 You could be right.
13       You had the customer
14 anti-diversion profiles?
15   A.   Yes.
16   Q.   Right?
17   A.   Mm-hmm.
18   Q.   Okay.  That would have been
19 something that you would have looked at?
20   A.   Yes.
21   Q.   For whatever information that you
22 had to plug into that?
23   A.   Correct.
24   Q.   We may not have any site visit

Page 280

1  investigations because this is a chain?
2    A.   Correct.
3        MS. WICHT:  Object to the
4  form.
5    Q.   Okay.
6    A.   You may have a surveillance visit,
7  but I don't know that.
8    Q.   And we probably don't have any
9  dosage usage documents because this is a chain?
10       MS. WICHT:  Object to the
11 form.
12   Q.   Right?
13   A.   I don't know that with K-Mart.
14   Q.   Well, if it got treated like CVS,
15 we wouldn't have any, correct?
16   A.   That --
17       MS. WICHT:  Object to the
18 form.
19   A.   That is correct.
20   Q.   Okay.  So then maybe a
21 surveillance, if one was done -- and we can go
22 back and look in the file and see -- and the
23 purchase history --
24   A.   Yes.

Page 281

1    Q.   -- assuming they were purchasing
2  from us for a while.
3        What else would be in there
4  related specifically to the customer?  I mean,
5  certainly you could look at the population,
6  where it's at --
7    A.   You could look at that.  You could
8  see other, possibly, stores around it, where in
9  the country is this K-Mart.
10   Q.   I guess that goes to comparing it
11 to similarly situated.  We could look and see
12 what others around them were getting or in the
13 county or state or whatever, correct?
14   A.   If we had information around that
15 area, yes, or a pharmacy that we had information
16 on, yes.
17   Q.   Okay.  Sitting here today, you
18 don't recall doing any of that, one way or
19 another, correct?
20   A.   Recall doing any --
21   Q.   Making that type of comparison.
22   A.   Well, that would be in a decision
23 that -- I wouldn't make a decision of 20 percent
24 if I didn't have other things to validate what I

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1 was -- to give me a comfort zone that there's no
2 diversion happening or potential diversion at
3 this pharmacy.
4     Q.   And then other than this e-mail
5 when you're increasing it 20 percent, you would
6 do some documentation to defend your judgment to
7 make that increase, right?
8     A.   My documentation --
9         MS. WICHT:  Object to the
10 form.
11     A.   My documentation would have been
12 in Content Manager.
13     Q.   That's what I mean.  It would be
14 somewhere?
15     A.   Yes.
16     Q.   Okay.
17         MS. WICHT:  Object to the
18 form.
19     Q.   Now, if we're increasing them
20 without a sufficient reason, that's not a
21 justifiable excuse to increase it either, right?
22         MS. WICHT:  Object to the
23 form.  Vague.
24     A.   Again --

Page 283

1     Q.   Strike that.  Let me ask you a
2 different question.  Strike that question.
3         What type of reasons justified an
4 increase in threshold in Mr. Forst's mind?
5     A.   So has there a pharmacy around
6 them possibly been bought and closed recently
7 and they obtained the files.
8     Q.   You mean bought by them and they
9 took the customers?
10     A.   Well, you can buy the files, but
11 you don't give them a -- I wouldn't put on top
12 of their threshold what the thresholds of that
13 other pharmacy was because -- I would maybe give
14 them 5 percent because most of those customers
15 are going to probably choose to go somewhere
16 else.  They won't necessarily go to that --
17     Q.   Sure.
18     A.   -- store that buys them.
19     Q.   Sure.
20     A.   Are there any new facilities in
21 the area, like a hospital that's expanded in
22 some area?  I mean, you -- the list is --
23     Q.   So I wonder if the DEA shut down a
24 pharmacy next door.

Page 284

1     A.   I don't know that.
2     Q.   Well, I'm not saying you know
3 that.  Is that a legitimate reason to increase
4 thresholds?
5         MS. WICHT:  Object to the
6 form.
7     A.   That wouldn't make any sense to do
8 it, but --
9     Q.   What do you mean, it wouldn't make
10 any sense to do it?
11     A.   Well, I mean, you wouldn't just go
12 do it -- you would have to look to see -- the
13 DEA goes into the store and shuts down that
14 pharmacy --
15     Q.   Yeah.  So you have to keep --
16     A.   -- so -- and K-Mart obtained some
17 of those customers that were possibly at that
18 store.  That doesn't tell me those
19 prescriptions -- all those prescriptions at that
20 store that was shut down were subject to
21 diversion.
22         I mean, you're going to have
23 customers that have medical needs, so -- and the
24 due -- the pharmacist at the K-Mart should also

Page 285

1 be doing their due diligence on any prescription
2 they fill for a customer.
3     Q.   Well, I mean, c'mon.  That goes
4 across the entire country with all pharmacists,
5 right?
6     A.   Yes.
7     Q.   Okay.  So that's nothing special
8 about this K-Mart, correct?
9         MS. WICHT:  Object to the
10 form.
11     A.   No, but if they're doing their due
12 diligence.
13     Q.   I'm just -- I'm just asking if the
14 DEA closed down a pharmacy nearby, is that a
15 reason to increase the threshold?  Yes or no?
16     A.   It depends.
17     Q.   Okay.  Have you ever heard of the
18 cockroach effect?
19     A.   Vaguely, yes.
20     Q.   Have you ever heard Ms. Howenstein
21 talk about the cockroach effect?
22     A.   Ms. Howenstein?  Oh, Kimberly
23 Howenstein?
24     Q.   I think that's her name,

Page 286

1  Ms. Howenstein, Kim.
2      A.   No, not to my knowledge.
3      Q.   Ask her about the cockroach
4  effect.
5          So I wonder if Cardinal shut off
6  a -- another customer nearby, would that be a
7  reason to have increased thresholds for this
8  pharmacy?
9      A.   Again, it depends on the
10  information that I have.
11      Q.   So really, increasing thresholds
12  or setting thresholds and evaluating suspicious
13  orders all comes down to information that you
14  have in your possession, right?
15      A.   Yes, and then other information
16  that we can garnish if we can find information.
17      Q.   Sure, sure.  And we're truly
18  trying to look for objective data to make a
19  sound decision when we're talking about
20  increasing thresholds, distributing controlled
21  substances, typically Schedule IIs, which are,
22  in most states, labeled as dangerous drugs,
23  right?
24          MS. WICHT:  Object to the

Page 287

1      form.
2      A.   All the data that we tried to find
3  we hoped -- and was objective.  We tried to make
4  it as objective as possible --
5      Q.   Right.  I mean, that's the goal --
6      A.   -- and use it correctly.
7      Q.   Right.  Right.  So, you know, for
8  example, if someone was trying to get an
9  increase in thresholds and, for example, K-Mart
10  here telling us those are no signs of diversion,
11  if we saw signs of diversion maybe on our
12  surveillance, me may not want to increase the
13  threshold like they're asking, correct?
14          MS. WICHT:  Object to form.
15  Foundation.  Hypothetical.
16      A.   That would be correct and
17  rational.
18      Q.   Okay.
19      A.   If I don't have the information
20  that might be making me not agree to change this
21  to 20 percent, then I don't know what I don't
22  know.
23      Q.   That's a true statement.
24          So what other legitimate reasons

Page 288

1  are there for increasing thresholds?  Can you
2  tell the jury?
3      A.   I believe I --
4      Q.   Well, you answered some.
5      A.   Some.
6      Q.   I'm just asking if there's any --
7      A.   Some more?
8      Q.   -- more that you can think of.
9      A.   I went practice, I went new
10  hospitals in the area, possibly new
11  practitioners in the area, but I'd want to know
12  what their specialty is.
13      Q.   When you -- and you say "new
14  hospitals in the area."  Well, just because a
15  new hospital --
16      A.   Well, it could be a hospital
17  adding more beds.  It could be a hospital adding
18  another service, if I could find out that
19  information.  So ...
20      Q.   Now, what does Cardinal do when
21  they have that situation to determine whether
22  any of those hospital patients are actually
23  filling scripts at that pharmacy?  Because you
24  would agree with me, would you not, if they're

Page 289

1  not -- even if you have a new cancer center move
2  in --
3      A.   I can --
4          MS. WICHT:  Let him finish
5      the question.
6      Q.   -- but they don't -- but that
7  pharmacy doesn't fill any of their scripts,
8  there's no reason to increase that pharmacy's
9  threshold, right?
10          MS. WICHT:  Object to the
11      form of the question.
12      A.   But, again, that's information
13  I -- I'm not privy to information where somebody
14  goes to get their prescription filled.
15      Q.   Well --
16      A.   Most people usually go when
17  they're treated within either a mile or two of
18  their home if it's convenient or a mile or two
19  of where they've been treated.
20      Q.   Now, is there research on that
21  that suggests that?
22      A.   I don't know if there's any
23  research on that.  But just as an experience
24  from the customers that have -- I've served and

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 my colleagues around the country that -- you
2 know, you ask the question where do you get your
3 customers from, and most of them say it's
4 usually someone close by or it's a facility that
5 has healthcare, like a -- an emergency clinic or
6 whatever that would give you a prescription for
7 something. So you're going to get to the
8 closest one that you have.
9     Q.   So can you tell us -- well, strike
10 that.
11         Is increasing a threshold by
12 20 percent a pretty large or significant
13 increase, generally speaking?
14     A.   It depends on what --
15         MS. WICHT: Object to the
16 form.
17     A.   It depends on what the threshold
18 is.
19     Q.   Well, no matter if it's one or --
20 or ten, it's still going to be 20 percent, isn't
21 it?
22     A.   Correct. But that number -- I
23 mean, 20 percent of ten is what? So that would
24 make it 12.

Page 291

1     Q.   Right. 20 percent of 100 would
2 make it 120.
3     A.   Right. So I don't know what --
4     Q.   What they were at?
5     A.   I don't know what they were at.
6 If they were at 2,000, that would, what, make it
7 2400.
8     Q.   4,000 dosage units a month, is
9 that a pretty significant increase?
10         MS. WICHT: Not 4,000.
11     Q.   400 dosage units?
12     A.   No, that's not a significant
13 increase.
14         Again, I don't know what the
15 product is and how often -- how many times a day
16 it's given. It's just oxycodone family.
17     Q.   And sitting here today, you don't
18 know if K-Mart actually provided any additional
19 information to Cardinal or not?
20     A.   I'm not sure at that point in time
21 what information they provided. I believe it
22 changed over time.
23     Q.   Now, let's talk about CVS 219, the
24 one you did surveillance on.

Page 292

1         You're aware that they were
2 getting obscene amounts of controlled
3 substances, particularly oxycodone, correct?
4         MR. MOYLAN: Objection to
5 form.
6         MS. WICHT: Object to the
7 form.
8     A.   I was aware that their numbers
9 were larger than --
10     Q.   Were you also aware that from the
11 time you did your investigation, Cardinal
12 continued to increase its thresholds up until
13 the point of the DEA coming in and getting
14 involved with Cardinal in 2012 --
15         MR. MOYLAN: Objection.
16         MS. WICHT: Object to the --
17     Q.   -- end of 2011?
18         MS. WICHT: Object to the
19 form.
20     A.   I did my visit. And when I was
21 there -- and it's a point in time -- there was
22 no indications of any diversion going on. There
23 was no cars in the parking lot that were from
24 out of state. There was no lines. There was

Page 293

1 none of that.
2         As far as the threshold changes
3 for some of the chains, those were done
4 analytically, and that would have been done
5 through Michael or Nick and his team. So they
6 had information that we didn't necessarily see
7 and documentation coming in.
8     Q.   When you say those were done
9 analytically, what do you mean? Some sort of
10 formula?
11     A.   They had some formulary analysis.
12 They had -- their -- they would analyze the data
13 and -- I wish I could find the term, but I
14 can't -- see what was trending, see what looked
15 reasonable. I don't know exactly what all their
16 parameters were, if it was population changes or
17 anything like that, but ...
18     Q.   Now, Mr. Moné's talked in the past
19 about there being a chain-wide threshold.
20         Are you aware of that?
21     A.   A chain-wide threshold?
22     Q.   Yes, sir.
23     A.   I'm not familiar with what he --
24 what he means by "chain-wide threshold" or if

Page 294

1 it's something that was implemented or not.
2     Q. That may be a good question, too.
3     MR. FULLER: 4213.
4     - - -
5 (Cardinal-Forst Deposition Exhibit 21 marked.)
6     - - -
7 BY MR. FULLER:
8     Q. Exhibit 21 is 4213.
9     Have you ever seen this before?
10     A. I can't say that I'm familiar with
11 this document.
12     Q. If you'd turn to page 8,
13 paragraph 17.
14     Do you see that there?
15     A. Yes.
16     Q. Now, this is Mr. Moné's sworn
17 testimony -- or declaration. It says,
18 "Thresholds for chain pharmacies that open a new
19 pharmacy are set based on the standard threshold
20 for the entire chain because Cardinal Health has
21 determined that chain pharmacy customers
22 generally have a known ordering pattern for a
23 majority of their stores."
24     A. Okay.

Page 295

1     Q. So do you have any understanding
2 of what this general standard threshold is for
3 the different chains?
4     A. No.
5     Q. So that may be something that's a
6 little different than what we looked at earlier
7 related to setting thresholds; you know, we went
8 through that threshold setting policy and
9 procedure that didn't segregate out chains,
10 right?
11     A. No. Well, this says "opens a new
12 pharmacy," so this is a startup.
13     Q. Right. But it also says that
14 there is a standard threshold for the entire
15 chain, doesn't it?
16     A. Yes.
17     Q. It says, "Pharmacy's" --
18     MS. WICHT: Object to the
19 form.
20     Q. -- "threshold is set based on the
21 standard threshold for the entire chain."
22     A. Yes. I don't know what that
23 standard threshold --
24     Q. You don't have any idea what he's

Page 296

1 talking about?
2     A. No.
3     Q. Okay. Now, what about there being
4 a logistical -- a sophisticated logistic
5 regression model for pointing out or detecting
6 at-risk customers? Are you aware of whether
7 Cardinal was running some sort of logistical
8 model?
9     MS. WICHT: Object to the
10 form.
11     A. That would be Nick Rausch and his
12 group, so I --
13     Q. You have no idea?
14     A. -- I probably would not have known
15 what they were doing. I know that they did
16 statistical analysis all the time.
17     Q. They did number stuff and you
18 stayed out of number stuff, or their number
19 stuff at least?
20     MS. WICHT: Object to the
21 form.
22     A. Yes.
23     Q. Okay.
24     - - -

Page 297

1 (Cardinal-Forst Deposition Exhibit 22 marked.)
2     - - -
3     Q. Plaintiffs' Exhibit 22, 4323.
4     Now, certainly, Mr. Forst, you've
5 seen this e-mail before because you're on it,
6 right?
7     A. Yes.
8     Q. And this is back in -- was it
9 2010, February 2010? January or February 2010,
10 I guess.
11     A. Yes.
12     Q. Right?
13     A. Yes.
14     Q. Do you know who Jennifer -- I
15 guess it's Hug.
16     A. I believe she was a PBC.
17     Q. That's a salesperson, right?
18     A. Right. Probably, I believe, a
19 manager. Yeah, manager of retail national
20 accounts.
21     Q. It's a pharmacy business
22 consultant, PBC; is that right?
23     A. I believe that's the terminology.
24     Q. And she e-mails Jason. Who's

Page 298

1 Jason; do you know? Looks like someone at CVS.

2     A. I don't know, unless it would be

3 the -- it was someone in loss prevention just by

4 looking at the information.

5     Q. Okay. Well, let's read this.

6     A. That was sent to Maranda.

7     Q. It says, "Jason, Can you please

8 have your LP department" -- which I guess is

9 loss prevention. Makes sense, right?

10     A. Yes.

11     Q. -- "your LP department look into

12 the ordering habits of two stores below. We

13 have seen a huge jump in oxycodone purchases

14 from both. Please see the detail for each

15 store."

16     And then it provides some

17 information on the two stores. It's CVS 850 and

18 CVS 219, correct?

19     A. Yes.

20     Q. Okay. And if you turn over to the

21 next page, it says, "Thank you for your

22 guidance" -- excuse me -- "Thank you for any

23 guidance you can give us on the continued

24 increases we are seeing for the classes of

Page 299

1 drugs" -- or "for this class of drugs."

2     And then Jason responds back. He

3 says, "Jenn, From LP, the store 850 and 219 are

4 okay. They're comfortable with the levels."

5     Do you see that there?

6     A. Yes.

7     Q. And then it -- apparently Jennifer

8 sends to Maranda, you, and Mr. Moné -- it says,

9 "Maranda, I wanted to -- "I wanted to forward

10 you the information from CVS' LP department in

11 reference to the two SOM events attached.

12 Please let me know if you have any additional

13 concerns. Thank you."

14     Right?

15     A. Yes. I don't see any SOM events

16 attached.

17     Q. Right. They are not attached.

18     And what does an SOM event look

19 like?

20     A. It was -- it was what the held

21 orders were called in the suspicious order

22 monitoring system. So it was a threshold event.

23     Q. And what type of information did

24 it give?

Page 300

1     A. The threshold event?

2     Q. Yes, sir.

3     A. It was the drug product, I think

4 the amount ordered. You also had the visibility

5 of the threshold.

6     Again, I don't have that

7 information in front of me so ...

8     Q. Right. So that's in February.

9 Then let's fast forward to September.

10     MR. FULLER: I need 4948.

11     This is going to be

12 Plaintiffs' Exhibit 23.

13     - - -

14    (Cardinal-Forst Deposition Exhibit 23 marked.)

15     - - -

16 BY MR. FULLER:

17     Q. So we're what, about seven -- six,

18 seven months later; is that right?

19     A. Yes.

20     Q. And you're on this e-mail chain as

21 well, right? You've read this? You've seen

22 this?

23     A. Yes. It's directing me to do an

24 action for Michael.

Page 301

1     Q. And if we start down near the

2 bottom, there's a Paul Farley who sends an

3 e-mail to Mr. Moné and it includes a Brian

4 Jackson.

5     Who is Paul Farley?

6     A. I'm not familiar with a Paul

7 Farley.

8     Q. Well, he says, "Michael, I'll

9 continue to try to reach you by phone, but I

10 wanted to recap my conversation with CVS this

11 morning."

12     Do you see that?

13     A. Yes.

14     Q. It says -- and this CVS ended up

15 causing a lot of problems for Cardinal, didn't

16 it?

17     MS. WICHT: Object to the

18 form.

19     MR. MOYLAN: Object to the

20 form.

21     Q. CVS 219?

22     MS. WICHT: Same objection.

23     A. I'm not always familiar with the

24 CVS store numbers.

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    Q.   CVS 219 was one of the CVS stores
2  that was the basis of the immediate suspension
3  order --
4    A.   Okay.
5    Q.   -- in February.
6    A.   Okay.
7    Q.   You're aware of that right?
8    A.   Yes.
9    Q.   So this CVS store caused some
10 problems for Cardinal, correct?
11        MR. MOYLAN:  Objection to
12   form.
13        MS. WICHT:  Object to the
14   form.
15    A.   You could call that a problem,
16 yes.
17    Q.   Okay.  Well, let's -- let's read
18 what he -- and I -- by "he," I mean Paul
19 Farley -- relayed from CVS.
20        It says, "I spoke with Brian
21 Whalen at CVS a couple of times this morning
22 regarding Store 219 and other locations you
23 referenced at NACDS.  I also reviewed your
24 slides with him.  He tells me that he responded

Page 303

1  to Cardinal's last March on inquiries for these
2  same stores.  At that time, CVS experienced an
3  increase in sales of oxycodone due to the DEA
4  closing stores in the area."
5        Cockroach effect, right?
6        MS. WICHT:  Object to the
7    form.
8    A.   If that's what the definition of
9  cockroach effect is, yes.
10    Q.   Ask Ms. Howenstein.
11        MS. WICHT:  Well --
12    Q.   Let's go on down a little bit.
13        MS. WICHT:  -- nobody here
14   has defined what it is --
15    A.   Yeah.  Yeah.
16    Q.   Let's go down a little bit.
17        MS. WICHT:  -- so I don't see
18   how he could possibly answer that
19   question.
20    Q.   "None of these stores show
21 significant growth or shrinkage issues."
22        Do you see that?  "None of these
23 stores show significant growth or shrinkage
24 issues."

Page 304

1    A.   Oh, okay.  I need to look at my
2  monitor.  Yes, I see it.  Thank you.
3    Q.   Okay.  Now, we know that's not
4  true, don't we?
5        MS. WICHT:  Object to the
6    form.
7    A.   I don't know that information.
8    Q.   We can certainly check it, because
9  Cardinal can look at its own sales and see if
10 it's selling them or distributing to them
11 significant growth, right?
12        MS. WICHT:  Object to the
13   form.
14    A.   Again, this is --
15        MS. WICHT:  Mischaracterizes
16   the document.
17    A.   Again, this is -- started off
18 addressed to Michael.
19    Q.   I understand that.  I'm not asking
20 you who it's addressed to.  I don't care who
21 it's addressed to.  It doesn't matter to me at
22 this point.
23        CVS is telling Cardinal that there
24 are -- none of these stores are showing

Page 305

1  significant growth or shrinkage issues.
2        That's what they're saying to
3  Cardinal, right?
4    A.   That's what the document says.
5    Q.   And if Cardinal is distributing
6  the drugs to them, the controlled substances,
7  Cardinal can go and check, can't they?
8        MS. WICHT:  Object to the
9    form.  Foundation.
10    A.   Cardinal can check --
11    Q.   Yeah, Cardinal can go and pull up
12 on the computer --
13        MS. WICHT:  Let him finish
14   his answer.  He was in the middle
15   of a sentence.
16        MR. FULLER:  No, he wasn't.
17        MS. WICHT:  Let him finish.
18        MR. FULLER:  No, he wasn't.
19    A.   Well, CVS also self warehouses
20 some of their controls.
21    Q.   Control IIIs, not Control IIs,
22 right?
23    A.   V through IIIs, whatever.
24    Q.   Not Control IIs, correct?

Page 306

1    A.   Not IIs, correct.  So whether we
2  have access to seeing that information, I'm not
3  sure of that.
4    Q.   Let's focus on OxyContin -- or
5  oxycodone.  Sorry.
6    A.   Okay.
7    Q.   And secondly, let's dispel this
8  issue that you've thrown up.
9       Cardinal doesn't care what IIIs
10  through Vs are going there, because Cardinal
11  doesn't distribute them, right?
12      MS. WICHT:  Object to the
13      form.
14    A.   I don't know the answer to that
15  question.
16    Q.   Well, you just told me CVS had its
17  own warehouse and was distributing its own IIIs
18  through Vs and Cardinal didn't have access to
19  that information.
20    A.   That doesn't necessarily mean that
21  we didn't care that we didn't have access to
22  that information.
23    Q.   All right.
24    A.   I don't know if there was -- in

Page 307

1  the analysis if that was taken into account,
2  because that was not my area of expertise -- or
3  my area that I did.  I wasn't part of the
4  analytics group.
5    Q.   So CVS says none of these stores
6  show significant growth or shrinkage, correct?
7    A.   That's what this says, yes.
8    Q.   And then it says, "Additionally,
9  CVS has a new attorney working with the DEA.
10  They acknowledge that Florida has been cracking
11  down on pill mills, and that is driving more
12  legitimate traffic to the CVS stores."
13      Right?
14    A.   That's what it says in the
15  document.
16    Q.   It says, "Brian will send your
17  slides over to LP" -- loss prevention -- "for
18  their review and response.  They will not
19  provide -- they will not provide the doctor or
20  patient information you requested unless it is
21  requested by the DEA."
22      They're refusing to provide
23  information that Cardinal asked them for, aren't
24  they?

Page 308

1    A.   According to the document, yes.
2    Q.   He was quite adamant about this.
3  "He does not expect Cardinal to interrupt
4  service to CVS stores since they have responded
5  in the manner that we originally agreed upon
6  when launching the SOM program."
7       Did I read that right?
8    A.   Yes.
9    Q.   So they're telling you -- they're
10  telling Cardinal, "You better not interrupt our
11  service because we're doing what you asked us to
12  do and we're not going to give you the
13  information that you asked for."
14      And it says, "Any disruption to
15  service will impact patient care and patient
16  care with pain medication is critical as you are
17  aware.  I ask that you release any pending
18  orders and update Gilberto."
19      Did I read that correctly?
20    A.   Yes.
21    Q.   So let's see what Cardinal did.
22      Mr. Moné forwards that to you,
23  correct?
24    A.   Correct.

Page 309

1    Q.   "Okay to release the CVS held
2  orders for this weekend."
3       That's what he tells you to do,
4  doesn't he?
5      MS. WICHT:  Object to the
6      form.
7    A.   Yes, but he has information that I
8  don't see.
9    Q.   How do you know he has information
10  you don't see?  How do you know he has any
11  additional --
12      MS. WICHT:  Besides the next
13      sentence in the e-mail that you're
14      not reading?
15    Q.   -- information?
16    A.   "We will be working through
17  another solution.  Please place this e-mail in
18  the repository."
19    Q.   Okay.  You tell me.  What does
20  that -- does that say he has information that
21  you don't see or that you don't have?
22    A.   I don't know what he has.  I don't
23  know what he's looking at.
24    Q.   Well, counsel tried to make a

Page 310

1 cautionary objection that, oh, it's --
2      MS. WICHT: Let him finish --
3      MR. FULLER: -- in the next
4   sentence.
5      MS. WICHT: -- his answer.
6 BY MR. FULLER:
7     Q. And there is nothing in the next
8 sentence about missing information or additional
9 information he has, is there?
10     A. Are we talking about "We will be
11 working through another solution. Please place
12 this in the e-mail" -- is that the sentence
13 that --
14     Q. That's apparently what -- she said
15 the next sentence, so that would be the next
16 one.
17      MS. WICHT: What's the
18   question?
19     Q. So is there anything there that
20 indicates he had additional information? Where
21 does it say he -- that I --
22     A. There's nothing there that
23 indicates he has additional information.
24     Q. Oh, okay.

Page 311

1     A. I don't know the context of --
2     Q. Because I was being --
3     A. -- this down here at the bottom.
4      MS. WICHT: Except that he
5   has another solution.
6      Go ahead. Ask your
7   questions.
8     Q. Does it say he has another
9 solution?
10     A. "We will be working through
11 another solution."
12     Q. It doesn't say he has one, does
13 it? Does it say, "I have another solution"?
14     A. I'm not privy to this conversation
15 down here. I'm only privy to the part that I
16 was asked to release the held orders. That
17 could have been a bottle of 100. I don't even
18 know what that held order was --
19     Q. Sure. Sure.
20     A. -- and to place this information
21 in the repository.
22     Q. And I apologize, Mr. Moné, but
23 someone was accusing me of misleading when I
24 weren't, and what they're supposed to do is

Page 312

1 certainly they can cross you on this information
2 when it's their turn and stop the speaking
3 objections and -- and I don't even know what
4 they're called, the statements -- the accusatory
5 statements on the record.
6      MS. WICHT: Mr. Forst.
7     Q. And then you respond that "Please
8 add to the repository. Thanks."
9     And I'm assuming that you lifted
10 the -- or released the orders as instructed,
11 correct?
12     A. I would -- I would assume that is
13 correct.
14     Q. Okay.
15      MR. FULLER: Let's go to
16   4663.
17      This is Plaintiffs' Exhibit
18   24.
19      - - -
20   (Cardinal-Forst Deposition Exhibit 24 marked.)
21      - - -
22 BY MR. FULLER:
23     Q. So we know back in February we had
24 concerns about CVS 219, correct?

Page 313

1      MS. WICHT: Object to the
2   form.
3     Q. The first e-mail we looked at was
4 February --
5     A. Apparently, yes.
6     Q. -- was February 2010; is that
7 right?
8     A. Yes.
9     Q. Then we look in September of 2010
10 and we see there's concerns again because
11 they're again breaching threshold limits; is
12 that right?
13     A. They are exceeding their
14 threshold, yes.
15     Q. And if we look at what's been
16 attached as 4663, this document includes the
17 threshold information and actual shipments on a
18 monthly basis for these four pharmacies. And I
19 say four. It's CVS 219, Gulf Coast, CVS 5195,
20 and CareMed.
21     Do you have any familiarity with
22 any of those pharmacies, Mr. Forst?
23     A. I'm familiar with the 219 store.
24 I know information of the Gulf Coast. I'm not

Page 314

1  sure what 5195 is. And I'm not sure about
2  CareMed.
3      Q.   So let's look at 219.
4          In September of 2010, CVS tells us
5  that there has been no significant increase or
6  shrinkage at the store, right?
7      A.   My document is turned around.
8          On September 30th, I believe,
9  that's correct.
10     Q.   Okay. And in the past nine
11 months, at least according to document 4663,
12 their accrual, meaning monthly dosage, of
13 oxycodone has increased from 141,000 to 281,000,
14 and the thresholds went from 118,000 pills per
15 month to 235,000 pills per month, correct?
16     A.   According to the document, yes.
17     Q.   That would seem like some
18 significant growth. Can we agree on that?
19         MS. WICHT: Object to the
20 form.
21     A.   I'm not -- I can't answer that
22 because I'm not sure what significant growth
23 definition is over here, and I also noticed that
24 these orders are all at the end of the month.

Page 315

1      Q.   Those are the totals for the
2  month, sir.
3      A.   But this is an order at the end of
4  the month, this date, because that comment says
5  that there was an order there, I believe. Is
6  this out of the --
7      Q.   So you believe on one day CVS --
8      A.   No, no, no.
9      Q.   -- ordered 281,600 --
10     A.   No, no, no.
11     Q.   -- dosage units --
12     A.   No.
13     Q.   -- of oxycodone 30-milligram 100s?
14 Is that what you're telling the jury?
15     A.   No.
16     Q.   And that Cardinal delivered them?
17     A.   No, that's not what I'm saying.
18     Q.   Oh, okay.
19     A.   Where is this screenshot from; do
20 you know?
21     Q.   It was information provided by
22 Cardinal to the DEA.
23         MS. WICHT: No, it was
24 information that the DEA attached

Page 316

1  to a filing. If you're going to
2  say what the document is and you're
3  incorrect, then I'm going to
4  correct you.
5          MR. FULLER: No. You're
6  absolutely wrong. The
7  information -- DEA didn't make up
8  the threshold. The information
9  came from Cardinal, Counsel.
10 Unless you're willing to stipulate
11 on the record that the DEA had
12 access to Cardinal's thresholds,
13 then --
14         MS. WICHT: My point is that
15 the document is a DEA government
16 exhibit. Whatever this document
17 is, it was created by DEA.
18         MR. FULLER: Well, I disagree
19 with you.
20         MS. WICHT: That was the
21 correction.
22         MR. FULLER: If you want to
23 cross him with it, you can.
24     A.   Okay. Back to the question.

Page 317

1      Q.   Yes, sir.
2      A.   Please repeat the question.
3      Q.   I don't care what Mr. CVS'
4  definition of significant growth is. Clearly
5  it's completely different --
6      A.   I'm --
7      Q.   -- than what the person --
8          MS. WICHT: Wait, wait, wait.
9  He hasn't asked the question yet.
10     A.   Okay. What's the --
11     Q.   -- what any other person would
12 deem significant growth.
13     A.   Okay.
14     Q.   My question to you was, the
15 growth, at least according to this document,
16 that we see at CVS 219 from January to
17 September, when it doubles in threshold as well
18 as actual dosage units delivered, is
19 significant, correct?
20         MS. WICHT: Object to the
21 form.
22     A.   Again, I don't know the parameters
23 of the discussion. I don't know what has
24 changed with this store. I'm not really sure

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1 where the -- what this -- this looks like it was
2 pulled at the end of each month. That's just by
3 looking at the date. So I can't comment on a
4 document that I'm not sure what the information
5 is saying, except for I'm looking at two
6 numbers. One's bigger than the threshold, and
7 it's an accrual.
8     I don't know what was shipped.
9 That's an accrual. I don't know how much of
10 this was shipped. The accrual doesn't
11 necessarily mean the product was shipped.
12    Q.   So your testimony is the accrual
13 amount, the amount -- the process through
14 Cardinal doesn't mean it was shipped?
15    A.   That's an accrual. I don't know
16 what the shipped amount is.
17    Q.   Mr. Forst --
18    A.   Does this accrual --
19    Q.   Hold on.
20       Go ahead. I'm sorry.
21    A.   I don't understand what the
22 document -- where it's from and what accrual in
23 a column means. Does the accrual in this
24 document mean a shipped quantity, or does the

Page 319

1 accrual in this column mean the amount of
2 product that the customer tried to order and was
3 or was not necessarily shipped?
4    Q.   Okay. So let's back up,
5 Mr. Forst.
6       First you started off this long
7 answer with I don't know what the situation with
8 this conversation was referring to, the earlier
9 document between Mr. CVS and Mr. Moné, correct?
10   A.   Correct.
11   Q.   I told you already I don't care
12 about what their interpretation is of
13 "significant." I don't care about that. I'm
14 not asking you about that.
15      I'm asking you, Mr. Forst, sitting
16 here in Columbus, Ohio reviewing threshold
17 events, if you see an accrual account go from --
18 if shipped product go from 141,000 to 281,000,
19 is that a significant increase?
20       MS. WICHT: Object to the
21    form.
22   Q.   Or is it not? Maybe it's not.
23       MS. WICHT: Object to the
24    form.

Page 320

1    A.   I don't know the definition on
2 this piece of paper of what this accrual number
3 is.
4    Q.   I'm asking you to accept as true
5 it's the number of pills shipped for purposes of
6 my question, okay?
7    A.   If it's for the purposes of your
8 question and this is actually the shipped
9 quantity, then yes, it shows some growth.
10       MS. WICHT: Object to the
11    form of the question.
12   Q.   Just some growth, right?
13       MS. WICHT: I didn't want to
14    interrupt the witness.
15   A.   I don't know --
16   Q.   Not significant growth?
17   A.   I don't know the parameters of
18 what has changed in these months at this store.
19   Q.   They're getting a whole lot more
20 pills of OxyContin -- or excuse me -- oxycodone,
21 right?
22       Let me ask you, assuming for the
23 purposes of my question that the accruals are
24 shipped amounts and that the thresholds are

Page 321

1 accurate as well. Each time they exceeded that
2 threshold, someone in your department would have
3 had to clear that shipment, correct?
4       MS. WICHT: Object to the
5    form.
6    A.   Again, accrual on here, in all the
7 terminology that I've ever used at Cardinal,
8 does not mean shipped. If you're telling me
9 this was shipped -- and I don't see that
10 documented on here that that says that's
11 shipped -- I can't answer the question because I
12 don't know what this accrual column means.
13   Q.   All right. Well, I actually told
14 you how to interpret it, because I said for the
15 purpose of my question, let's assume it says
16 shipped.
17       Well, hold on. We can do this a
18 different way.
19       MS. WICHT: Would this be an
20    okay time for a break while you
21    find the document?
22       MR. FULLER: Oh, sure.
23    Absolutely.
24       THE VIDEOGRAPHER: We're

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1 going off the record at 4:08.
2 (Recess taken.)
3 THE VIDEOGRAPHER: We're back
4 on the record at 4:30.
5 BY MR. FULLER:
6 Q. All right. I apologize. I was
7 looking for a document and I think it was about
8 time for a break. As it was.
9 And, Mr. Forst, your concern is
10 whether accrual was actually shipped, right,
11 related to document 4663?
12 A. That is correct.
13 Q. All right. I'm going to pass to
14 you P1.3786, which is Exhibit 25 for the record.
15 - - -
16 (Cardinal-Forst Deposition Exhibit 25 marked.)
17 - - -
18 Q. Do you see this e-mail that
19 Mr. Rausch prepared and sent to Gilberto
20 Quintero?
21 A. Yes.
22 Q. And Michael Moné. It says "CVS
23 Talking Points" is the subject, correct?
24 A. Yes.

Page 323

1 Q. And then it also says,
2 "Attachments: CVS Talking Points, October 22,
3 2010," which would be right after this September
4 of '10 e-mail, correct?
5 A. Yes. September 30th, yes.
6 Q. And then Mr. Rausch writes,
7 "Gilberto, Per your request, attached please
8 find talking points specific to CVS store
9 located in Sanford, Florida."
10 You know where that's at, Sanford,
11 Florida, right? You've been there?
12 A. I know where Sanford, Florida is.
13 Q. Well, let's turn to the next page.
14 It's CVS Pharmacy 219.
15 Do you see that there?
16 A. Yes.
17 Q. Supply chain integrity and
18 anti-diversion. Now, let's blow up this graph
19 so we can actually see it.
20 All right. Do you see that there
21 on the screen?
22 A. Yes.
23 Q. It says, "CVS Pharmacy 219," and
24 then it has boxes for the average store as well?

Page 324

1 A. Yes.
2 Q. And let's be fair. It says, "CVS
3 store average," and the other CVS stores. So
4 it's comparing 219 to similarly situated other
5 CVS pharmacies, right?
6 MS. WICHT: Object to the
7 form.
8 A. Apparently, yes.
9 Q. Okay. So let's -- and my question
10 earlier was related to January of 2010 and up to
11 September of 2010 and how many pills were being
12 shipped and whether there was a significant
13 increase, right? Remember that conversation we
14 had?
15 A. That is correct.
16 Q. All right.
17 MR. FULLER: So, Ms. Gina,
18 can you help us draw lines -- oh,
19 there you go. Lookie there.
20 BY MR. FULLER:
21 Q. January 2010 and a line on
22 September 2010.
23 Do you see that now with the
24 lines?

Page 325

1 A. Yes.
2 Q. All right.
3 MR. FULLER: Now, Ms. Gina,
4 if you can draw lines across. All
5 right.
6 BY MR. FULLER:
7 Q. So like -- much like what our
8 document says, which you said accruals didn't
9 necessarily mean shipped, it says -- what does
10 it say? 141,000 and some change as far as
11 pills?
12 Now, I'm talking about on --
13 A. Yeah. January 10th, yes.
14 Q. -- 4663.
15 A. Yeah.
16 Q. And then September -- and
17 September is -- the accrual on the -- on 4663 is
18 280, and it looks like we're about 280 on the
19 other one as well, right, well above 250?
20 A. Okay.
21 Q. And that's in dosage unit
22 quantity. Do you see that on the side of the --
23 A. Yes.
24 Q. -- the graph?

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1   A.   Yes.
2   Q.   Okay.  So from information
3 Mr. Rausch is giving to Gilberto -- who is
4 senior to Mr. Rausch and you guys, right?
5   A.   That is correct.
6   Q.   Okay.  He's giving his boss
7 monthly information as far as distribution of
8 oxycodone, at least according to this chart,
9 right?
10   A.   That is correct.
11   Q.   Well, let's read and see what
12 other information Mr. Gilberto got.  It says,
13 "High quantity when compared to other CVS
14 stores."
15       Do you see that there?
16   A.   Yes.
17   Q.   It says 2,800 percent more than
18 the average CVS store over the past three
19 months, three-quarters of a million dosage
20 units -- pills -- of oxycodone compared to only
21 25,000 for the average store.
22       Right?
23   A.   Yes, I see that.
24   Q.   Is that a significant difference

Page 327

1 in your mind --
2       MS. WICHT:  Object to the
3   form.
4   Q.   -- the 25,000 pills compared to
5 725,000 pills?  I'm just trying to figure out
6 if -- Mr. Forst, if that's a significant
7 difference.
8   A.   That's a significant difference.
9       MS. WICHT:  Object to the
10   form.
11   Q.   Okay.  Rapid rate of growth.
12       Well, now we know Mr. CVS said in
13 his e-mail that there was no significant
14 increase or shrinkage, right?  Isn't that what
15 he said?
16   A.   According to the e-mail, correct.
17   Q.   Well, I mean --
18   A.   Or according to the -- this
19 document, yes.
20   Q.   Right.  I mean, we don't think
21 somebody altered his e-mail, do we?
22   A.   No, I'm not saying that.
23   Q.   Okay.
24   A.   I'm just saying according to the

Page 328

1 document I have in front of me, yes.
2   Q.   That's what it says, right?  Rapid
3 growth.  "86 percent increase in quantity
4 purchased (first nine months of 2010 compared to
5 2009).  See graph to the right for additional
6 detail."
7       So do you agree that that is a
8 rapid rate of growth --
9       MS. WICHT:  Object to the
10   form.
11   Q.   -- for CVS 219?
12   A.   That is a large rate of growth.
13   Q.   I mean, listen, you can differ --
14 you can disagree with Mr. Rausch.  He's the one
15 that prepared this and said rapid rate of
16 growth.  You can say he's wrong.  Don't feel bad
17 about it.
18       Do you agree or disagree that
19 that's a rapid rate of growth?
20   A.   It appears --
21       MS. WICHT:  Object to the
22   form.
23   A.   -- to be a rapid rate of growth.
24   Q.   Okay.

Page 329

1       MS. WICHT:  Sorry.
2   Q.   Unbalanced product mix.  Do you
3 see that point that he has there?
4   A.   Yes.
5   Q.   "58 percent of all purchases are
6 for oxycodone."
7       Now, generally speaking, the only
8 thing CVS is buying is Control IIs from you
9 guys, right?
10   A.   Yes, as far as I'm familiar with.
11 And I'm not sure whether we have information on
12 the other products or not.
13   Q.   Apparently we had some information
14 that he was able to compare and figure out that
15 almost 60 percent of their purchases are
16 oxycodone products, right?
17       MS. WICHT:  Object to the
18   form.  No foundation.
19   Mischaracterizes the document.
20   Q.   I'm sorry.  Did I mischaracterize
21 this, Mr. Forst, or is that what it says?
22   A.   Of the purchases from Cardinal --
23 I don't know, because I don't know the
24 background -- I don't know what other parts are

Page 330

1 in the mix. I don't know what's behind that.
2     Q. Well, what could it be? Let's ask
3 you that. Strike that. It doesn't really
4 matter.
5         It's information that Mr. Rausch
6 felt significant enough to provide to
7 Mr. Gilberto, right?
8         MS. WICHT: Object to the
9     form.
10     A. Yes. I can -- yes. Apparently
11 the request was made to him to look at the
12 store, so yes.
13     Q. And knowing Mr. Rausch, he's not
14 going to give inaccurate or incomplete
15 information to Mr. Gilberto, is he?
16         MS. WICHT: Object to the
17     form.
18     A. I can't comment on Mr. Rausch's --
19     Q. Well, is he a standup guy? Is he
20 going to give him what he's asked for?
21         MS. WICHT: Object to the
22     form.
23     Q. Or do you know? I mean, you
24 worked with him for a good period of time.

Page 331

1     A. He's going --
2         MS. WICHT: Object to the
3     form.
4     A. He's going to give him the
5 information requested. But I don't know what is
6 included in this unbalanced product mix, so I
7 don't know if he has access to the other
8 controls or not.
9     Q. All right. Having this
10 information now, does it cause you any concern
11 about CVS 219?
12         MS. WICHT: Object to the
13     form.
14     A. Again, the number appears large.
15 I don't know what is happening around the store,
16 but the number does seem like the growth is
17 large.
18     Q. Would you cut them off if it was
19 you? If it was your decision, Mr. Forst,
20 knowing what you know -- you've been in the
21 industry almost 40 years, an expert of sorts --
22 based on your training, background, and
23 experience, would you cut this pharmacy off back
24 in 2010?

Page 332

1         MS. WICHT: Object to the
2     form. Calls for speculation.
3     A. My position at Cardinal was to
4 review the orders. The decision to cut off
5 customers was above me. So that would not be in
6 my purview because, again, I don't know all the
7 information about all the other CVS stuff.
8     Q. Well, hold on. You say it
9 wouldn't be in your purview. Your purview was
10 to --
11     A. I agree --
12     Q. I'm sorry. Go ahead.
13     A. No. Finish your question.
14     Q. Well, your purview was to evaluate
15 threshold events and make a determination of
16 whether you're going to release it or cut the
17 threshold, right?
18         MS. WICHT: Object to the
19     form.
20     Q. Whether it was potentially
21 suspicious orders?
22     A. Release it or cut the order, yes.
23     Q. And do you have the ability to
24 halt a customer?

Page 333

1     A. Have the ability to what? I'm
2 sorry.
3     Q. To stop shipping to a customer?
4     A. Yes, I can cut the orders and stop
5 shipping.
6     Q. So would you stop shipping to
7 CVS 219 back in September of -- when we see this
8 type of growth, these type of numbers, would
9 Mr. Forst stop shipments of controlled
10 substances to CVS 219?
11         MS. WICHT: Object to form.
12     Calls for speculation.
13     Q. Now, you were back at this store
14 sometime in 2010. You've already testified to
15 that.
16     A. But I didn't see any outward signs
17 of diversion, so ...
18     Q. Do you always have to see outward
19 signs of diversion?
20         MS. WICHT: Object to the
21     form.
22     A. I would be uncomfortable selling
23 that much to the store.
24     Q. Do you know if Cardinal cut them

Page 334

1  off in 2010, CVS 219?
2      A.  I'm not sure when Cardinal cut off
3  that -- CVS 219.
4      Q.  Do you know if Cardinal ever cut
5  them off?
6      A.  I don't know that answer either.
7      Q.  Do you know whether -- so sitting
8  here today, you don't know whether Cardinal ever
9  cut off CVS 219?
10     A.  Whether it was a Cardinal function
11 or DEA terminating their license, no, I don't.
12 Not this store.
13     Q.  So you know eventually this store
14 got cut off?
15     A.  Yes.
16     Q.  Because both the store and
17 Cardinal lost their ability to distribute and,
18 for the CVS, receive controlled substances,
19 right?
20         MS. WICHT:  Object to the
21     form.
22     A.  That was a statement.
23     Q.  I'm sorry?
24     A.  Can you repeat your statement

Page 335

1  before right, please.
2      Q.  Sure.  Eventually both Cardinal
3  and CVS lost their ability to deal -- at least
4  CVS 219 -- in controlled substances, correct?
5         MS. WICHT:  Object to the
6      form.
7      A.  When CVS 219 was -- lost their
8  license by the DEA, yes.
9      Q.  And Cardinal lost their license
10 partially because of their conduct with CVS 219.
11         MS. WICHT:  Object to the
12     form.
13     Q.  And you know, sitting here today,
14 that Cardinal continued to distribute these huge
15 volume of controlled oxycodones to CVS 219 up
16 until after they were served with an inspection
17 warrant by the DEA?
18         MR. MOYLAN:  Objection.
19         MS. WICHT:  Object to form.
20     No foundation.
21     A.  I'm not familiar with an
22 inspection.
23     Q.  Okay.  Well, let's see.
24         Plaintiffs' 4214, Exhibit 26.

Page 336

1         - - -
2  (Cardinal-Forst Deposition Exhibit 26 marked.)
3         - - -
4      Q.  So I will represent to you that
5  Cardinal got served with its administrative
6  inspection warrant in October 2011.
7         Now, look at this document.  This
8  document is another Michael Moné affidavit or
9  declaration.
10        Do you see that?
11     A.  Yes.
12     Q.  And it's filed in the matter of
13 Cardinal Health versus Eric Holder.
14        Do you see that as well?
15     A.  Yes.
16     Q.  In the United States District
17 Court for the District of Columbia.
18        Do you see that?
19     A.  Yes.
20     Q.  It says, "My name is Michael Moné.
21 I am the Vice President for Supply Chain
22 Integrity of Cardinal Health.  I have personal
23 knowledge of the facts set forth and believe
24 them to be true, based on my experience in the

Page 337

1  pharmaceutical industry or upon information
2  provided to me by others.  This declaration
3  covers the period since I assumed my current
4  position.  If asked to do so, I could testify
5  truthfully about the matters contained herein."
6         That's what Mr. Moné said, isn't
7  it?
8      A.  Yes.
9      Q.  And let's go to what he says on
10 paragraph 46 on page 25.  And you can tell at
11 the top of this document he -- well, actually,
12 if you go to the last page -- let's see.
13        He signed it on -- or executed it
14 on February 6th of 2012.
15        Do you see that?
16     A.  Yes.
17     Q.  Let's see what he has to say at
18 paragraph 46.
19        Mr. Moné says, "Cardinal Health
20 had already lowered the oxycodone thresholds for
21 these stores months ago.  On December 16, 2011,
22 Cardinal Health lowered the oxycodone threshold
23 for CVS 5195 to 18,000 dosage units.  And on
24 November 10th, 2011, Cardinal Health lowered the

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1  monthly oxycodone threshold for CVS 219 to
2  45,800 dosage units."
3       Did I read that right?
4       A.  Yes, you did.
5       Q.  So, clearly, Cardinal continued to
6  ship and do business with store -- CVS store 219
7  from the time point where you said you'd be
8  nervous selling that type of volume to them all
9  the way to the end of 2011.  Did you know this
10  was happening?
11       MS. WICHT:  Object to the
12       form.
13       A.  Did I know -- clarify.
14       Q.  That you were shipping this type
15  of volume to a single store in Sanford, Florida.
16       MS. WICHT:  Object to the
17       form.
18       A.  I don't recall that, no.
19       Q.  We saw all the threshold
20  increases.  Who would have had to increase those
21  thresholds for the chain?  Who would that go
22  through?  Would that go through you?
23       A.  No.  My routine role was not
24  usually changing thresholds with the chain

Page 339

1  unless I was directed by someone to do that.
2       Q.  Someone else would give you
3  direction to do that, you wouldn't do that
4  yourself?
5       A.  Yes, but usually it was done
6  through the analytics department.
7       Q.  The numbers guys?
8       A.  Yes.
9       Q.  All right.  Well -- but each of
10  these threshold events that we saw numerous
11  threshold breaches, on that earlier document,
12  those would come through you, right, because the
13  shipments would have to stop as soon as they hit
14  or reached that threshold, correct, each time,
15  right?
16       A.  Yes.
17       Q.  And someone would have to review
18  that and then make the affirmative decision to
19  go ahead and ship that type of volume to
20  Sanford, Florida, correct?
21       A.  Someone would make the decision to
22  ship or cut the held order.  So if these are
23  true ships as opposed to accrual -- I mean, I
24  don't know what --

Page 340

1       Q.  So is there still a question in
2  your mind after we looked at the information
3  given to Gilberto?
4       A.  No, no, no.  I mean, I'm just
5  referring to the document and the title here.
6       Q.  Sure.  And what my point is, is it
7  wasn't something that happened automatically,
8  meaning they didn't get cleared automatically.
9  Somebody actually had to look at that volume
10  each time and evaluate that volume each time
11  based on the information they had and then
12  decide, "Okay.  It's a good idea to send over
13  200,000 dosage units in one month to one
14  pharmacy in Sanford, Florida."
15       Right?
16       MS. WICHT:  Object to the
17       form.
18       A.  I can't answer that because I'm
19  not sure what the quantities were that were held
20  at each -- each time, even though they are over
21  threshold.
22       Q.  Well, we know what the threshold
23  was, so it had to be at least at the threshold
24  or above to be held based on your automated

Page 341

1  system, correct?  We know they had to reach that
2  height, hundreds of thousands of pills a month,
3  before they tripped the threshold?
4       A.  But, again, going back to the
5  report, all those dates are at the very end of
6  the month.
7       Q.  Okay.  I get that.  I get that.
8       A.  And I don't know how many days are
9  in certain months.  I'm not saying that the
10  numbers are small.
11       Q.  Whoa, whoa.  What's this about how
12  many -- well, some days -- some months have 30.
13  Some months have --
14       A.  I understand that.
15       Q.  Hold on.  Let me finish.
16       Some months have 31, with the
17  exception of February, which is coming up soon.
18  It has 28, but every fourth year it has 29.  So
19  that's how many days are in the month, okay?
20       So whether it's 30 or 31, that
21  justifies a quarter of a million pills into one
22  pharmacy?
23       A.  No.
24       Q.  Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    A.   What I'm trying to explain is
2  there are a number of, like, Mondays and
3  Tuesdays in a month when most pharmacies order.
4  So, again, the number is large.
5    Q.   Irrespective of how many Mondays
6  or Tuesdays in the month, you wouldn't have been
7  comfortable shipping this type of volume to this
8  pharmacy, correct?
9    A.   That number is large.
10       MS. WICHT:  Object to the
11       form.
12    Q.   No matter how many Mondays or
13 Tuesdays in the month, you would have not been
14 comfortable sending this type of volume to that
15 pharmacy, correct?
16       MS. WICHT:  Object to the
17       form.
18    A.   The number is large.
19       MR. FULLER:  All right.  I'll
20       certify the question.
21 BY MR. FULLER:
22    Q.   And let me ask if you know -- and
23 maybe you don't know.  CVS, in and of itself,
24 makes up about 20 percent -- I mean, they're a

Page 343

1  huge chain.  They make up about 20 percent of
2  Cardinal's business, correct?
3    A.   I don't know the exact number.
4    Q.   They make up a significant
5  percentage of Cardinal's business, correct?
6       MS. WICHT:  Object to the
7       form.
8    A.   Yes.
9    Q.   And Cardinal, just shortly prior
10 to this, went through the painful process of
11 losing the Walgreens business to ABC, correct?
12       MS. WICHT:  Object to the
13       form.
14    A.   Walgreens did leave and go to ABC,
15 but I'm not sure of the process.
16    Q.   Chains get treated differently at
17 Cardinal than other customers, don't they?
18       MS. WICHT:  Object to the
19       form of the question.  Vague.
20    A.   I don't know.  The orders don't
21 get treated differently.
22    Q.   Well --
23    A.   The orders that are reviewed
24 anyway.

Page 344

1    Q.   -- hold on.  Wait a second.
2       The orders that get reviewed don't
3  get treated differently?  So the retail
4  independents, you may actually conduct an
5  on-site investigation.  Chains don't get that.
6  That's reviewing for orders, right?
7       MS. WICHT:  Object to the
8       form.
9    Q.   Right?
10    A.   The -- could you repeat your
11 question, please.
12    Q.   Sure.  You said that orders don't
13 get treated differently.  The process that's
14 gone through to clear orders to set thresholds,
15 the information that's gleaned, because you
16 don't get it from CVS, is clearly different,
17 right?
18       MS. WICHT:  Object to the
19       form.
20    A.   The information is different, yes.
21    Q.   So chains are treated differently
22 than retail independents, correct?
23       MS. WICHT:  Object to the
24       form.

Page 345

1    A.   Chains are treated in a different
2  manner.  And I'm not sure all the parameters of
3  how they are managed on the analytical side --
4    Q.   I get that.
5    A.   -- and arrived at that.
6    Q.   I get that.  My only point is,
7  chains are treated differently, to the extent
8  you may not know all the details, right?
9    A.   That is correct.
10       MS. WICHT:  Object to the
11       form.
12    Q.   Okay.  Did you make a
13 recommendation after your visit -- site visit to
14 219?  If I get their due diligence file, will I
15 see a report in there from your site visit with
16 a recommendation?  Sorry.  From your
17 surveillance visit.
18    A.   A recommendation on?
19    Q.   Recommendation as to whether
20 they're at risk.  My understanding is that most
21 of the investigators, at least according to
22 Mr. Morse, when they would do an investigation
23 of some sorts, would make a recommendation,
24 whether high risk, no risk, moderate risk for

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1  diversion issues.
2      A.   I believe my report was -- I
3  visited the store and I didn't see any red flags
4  at the store when I was at the time.
5      Q.   Okay.  And that would be a written
6  report that would be in that store's -- on that
7  system you talked about earlier, right, with its
8  due diligence file?
9          MS. WICHT:  Object to the
10  form.
11      A.   There should be some report there.
12      Q.   Would you ever ask the numbers
13  people for any sort of analytics when you were
14  doing reviews?
15      A.   Occasionally.
16      Q.   What type of information would you
17  ask for from the analytics people?
18      A.   Usually it was can you tell me
19  more about the state demographics and
20  information like that or area demographics
21  like --
22      Q.   Population?
23      A.   Not necessarily population, but
24  like the number of hospital facilities in

Page 347

1  certain areas, et cetera.
2      Q.   And would you have a certain -- I
3  want to say scope, but I don't know if that's
4  the right word.
5          So if you're looking at a
6  pharmacy, say, in Portsmouth, Ohio -- do you
7  know where Portsmouth is?
8      A.   Yes.
9      Q.   -- how big of an area would you
10  ask for?  Just within the county?  Within the
11  town?  Would you ask for the whole southern part
12  of the state?
13      A.   I would usually at least county,
14  if not -- if it was a rural area, you'd ask
15  for -- I would probably try to look at like five
16  or six counties, and it being in the center
17  around it.
18      Q.   The surrounding areas?
19      A.   Yes.
20      Q.   What else?  What other type of
21  analytical information would you ask for?
22      A.   If we had other stores there that
23  we could compare to the store of interest.  And,
24  if not, I mean, is there something as an

Page 348

1  analytics department that you could give me to,
2  you know, give me some relative information to
3  make a decision on that.  A store, if it was a
4  store, or if it was an area or whatever.
5      Q.   Were there regular reports that
6  your analytics people would send to you guys,
7  you pharmacists?  I've been told that there's
8  like a 75 percent of threshold report, that
9  there are red flags and yellow flags for growth
10  in certain -- certain percentage growth over
11  monthly periods.
12      A.   Is this in a document of some --
13      Q.   That's my understanding.  What do
14  you remember?
15      A.   I remember an occasional document,
16  but I don't remember monthly documents like
17  that.
18      Q.   When you say "occasional
19  document," occasional document --
20      A.   Oh, it's like maybe every three or
21  four months you would see a document like that.
22  Now, I don't know if the document was produced
23  every month and it wasn't shared.  But, yes, I
24  know there was some documents like that with

Page 349

1  different demographic information on them.
2      Q.   And are you referring to the
3  75 percent of thresholds or the flagged one that
4  I mentioned, because I sort of mentioned two.
5  Or let me ask it differently.
6          When you say you recall that type
7  of document, what information would be in the
8  documents that you do recall?
9      A.   It would be like sections of the
10  country.  God, that's been so long ago.  I can't
11  really -- and it would be like states with oxy
12  or hydro as their major purchases.  Again, it's
13  been so long ago, I can't -- I don't -- I
14  can't -- I'm not going to guess to recall what
15  was all in that document.
16      Q.   Were there any documents that you,
17  yourself, particularly liked working with that
18  you would regularly request?
19      A.   I would look at the 75 percent
20  report.  That was a regular document that all
21  the pharmacists had access to, and that was a
22  report to show about where in -- under the
23  threshold the customer was so we could try to do
24  some advanced work.  If they were getting close

Page 350

1 to thresholds, just to make sure that --
2     Q.   You say "advanced work."
3     A.   Well, I mean, like every month as
4 you -- as you purchase, the percentage of your
5 threshold -- the report would say when these
6 customers get to 75 percent.  And then we would
7 look at them at what point in time if they got
8 to 75 percent.  If it was the last part of the
9 week, we would say -- you know, we would look
10 and say, "These thresholds look like they're set
11 correctly for the customers that we have no
12 concerns on."
13         So it was just a guide to see how
14 much work might be coming down the pike at the
15 end of the month.
16     Q.   And you staggered the cycles,
17 right, at some point?  Do you know what I'm
18 referring to?  That was a poor question.
19     A.   Yeah.  They were on different --
20 each distribution center --
21     Q.   Yes, you're right.
22     A.   -- the report was staggered so
23 that the workload was pretty much smoothed out
24 as opposed to --

Page 351

1     Q.   So not all the cycles ended at the
2 end of the month, correct?
3     A.   Correct.  So it wasn't one big
4 push at the end of the month, which gave us more
5 time to review the threshold events as opposed
6 to trying to push them through quickly.
7     Q.   And going back to your 75 percent
8 comment.  So if -- say we're only on the 15th of
9 March and the customer's already reached
10 75 percent.  That might be a concern, right?
11     A.   It might be a concern, but it
12 wasn't necessarily a concern because some
13 customers -- like most hospitals order like once
14 a month.  So if they ordered on whatever the
15 fourth or fifth day of the month was and they
16 were at 75 percent, that wasn't going to be a
17 concern, because if you look at their ordering
18 history, you could see what their pattern
19 normally was.
20     Q.   Sure.  Sure.  And that's fine.
21         Now, how about retail pharmacies?
22 My understanding is that they try to maintain
23 very low inventories so that they don't
24 necessarily order all their pills at the

Page 352

1 beginning of the month.  They place repeated
2 orders throughout the month.
3     A.   It depends on how their business
4 model works.  Some people are afraid to run out
5 of stuff because of shortages or things like
6 that, so they'll have a larger shelf amount to
7 get them through.
8         For a hospital as an example, I
9 had to keep at least three to four weeks of
10 backup stock in case of emergencies.  So it
11 depends on how they run their business unit.
12     Q.   So, say, for example, that it's
13 not a pharmacy that -- or a hospital that orders
14 in one lump at the beginning of the month, it's
15 one that does it sporadically.  If they're
16 hitting 75 percent come mid month, what do you
17 do?  Is that something that would be triggered
18 first of all?
19     A.   No.  It's just a look at that
20 customer.  Some of the pharmacists would take
21 the report and see if they needed to possibly do
22 a site visit.  If that customer, you know,
23 has --
24     Q.   Sort of the --

Page 353

1     A.   -- you know, threshold amounts
2 that seem to be a lot higher in -- than, you
3 know, one or two occasionally or something like
4 that, they'd look at it.  And if it was a
5 hospital and Bill was doing it, he would call
6 the hospital and speak to them to see if there
7 was a change in their purchasing pattern or if
8 there is something on the shortage list.
9         So, I mean, there's several
10 different things that you could look at or try
11 to look at just to see where your customer was
12 falling.  And, you know, certainly look for
13 diversion, but also for customers that you were
14 very sure of that there was no diversion going
15 on so that you're not interfering with the
16 customer at the end of the month or at the end
17 of their cycle.
18     Q.   So let me ask.  So the 75 percent,
19 that was like a type of report you had --
20     A.   Mm-hmm.
21     Q.   -- that would sort of try to give
22 you sort of an overview of what's going on,
23 right?
24     A.   Correct.

Page 354

1   Q.   There's also other triggers out
2  there that could be potential signs of
3  diversion, correct?
4        MS. WICHT:  Object to the
5  form.
6    A.   Other triggers out there?
7    Q.   Yeah, other things that could be
8  signs of a potential diversion.  For example, I
9  think one of the things mentioned in that
10 document Mr. Rausch prepared for Gilberto was
11 the percentage of oxycodone and balanced --
12   A.   Correct.
13   Q.   -- whatever it was.
14   A.   Correct.
15   Q.   And one of the things that my
16 understanding is you guys -- I say "you guys" --
17 Cardinal compared was, for example, controlled
18 with non-controls.  Percentage of cash sales.
19   A.   Yes.  Further along in the process
20 when we had more analytics, yes, we would
21 compare them.
22       THE COURT REPORTER:  We had?
23       MR. FULLER:  More analytics.
24       THE WITNESS:  More analytics.

Page 355

1    Sorry.
2  BY MR. FULLER:
3    Q.   And you guys ended up with this
4  Tableau system in place -- we may disagree or
5  not be able to --
6    A.   Correct.
7    Q.   -- lock down when.
8    A.   It was in 2012, 2013 when it was
9  probably introduced.  I'm not exactly familiar.
10   Q.   So my question would be, what
11 other automated type of triggers or -- strike
12 that.  Let me ask it differently.
13       When a threshold happens,
14 threshold -- meaning threshold breaching the
15 threshold, there was an automated system in
16 place that would hold the order, correct?
17   A.   That is correct.
18   Q.   There's an e-mail that went out to
19 certain specific people, correct?
20   A.   Later in the process, yes.
21   Q.   There was also a report that all
22 these pharmacies who had held orders would be
23 put on?
24   A.   I'm not --

Page 356

1    Q.   You can't go into your system in
2  the morning and check and see what all the held
3  orders are?
4    A.   Oh, yes.  That was -- that was the
5  held order report, yes.
6    Q.   Okay.
7    A.   Yes.
8    Q.   There you go.  Held order report.
9  Who would have thunk?
10   A.   I thought you meant like an end of
11 the month report or something.
12   Q.   No, no, just a report that you can
13 access.
14   A.   Right.
15   Q.   And certainly you probably
16 accessed it or somebody accessed it every day
17 because you probably have customers calling
18 somebody to find out why their order was held,
19 right?
20   A.   At the beginning, it was a report
21 that was printed by IT and given to us.  Later
22 on in the system we could generate that from the
23 distribution centers that the pharmacists were
24 covering, so we could do it during the day.

Page 357

1    Q.   Oh, as they happened?
2    A.   So as -- yeah, you would check
3  periodically to see the orders that were being
4  held.
5    Q.   So here's my question:  Are
6  there -- and I would label that as a trigger,
7  okay?  Meaning that once they hit the threshold,
8  it triggered some sort of other event.  It
9  triggered the held order.  It triggered this --
10   A.   Well, the threshold was the held
11 order event that it triggered.
12   Q.   -- breached threshold report or
13 thing that you can look at --
14   A.   Right.
15   Q.   -- right?
16   A.   They're all essentially the same,
17 whether it's on the computer screen, whether
18 it's on the piece of paper or wherever.  It's
19 all essentially the same information.  It's just
20 presented differently.
21   Q.   Sure.  So my question is, with
22 these other potential red flags or indicators of
23 maybe potential diversion, were there other
24 triggers that would go off?

Page 358

1 So, for example, at one point in
2 time, ordering more hydrocodone than
3 oxycodone -- assuming you ordered IIs and IIIs
4 from you guys -- was considered a potential sign
5 of diversion, at least according to Mr. Morse in
6 his testimony.
7 Could there or would there be
8 other triggers -- and I'm not -- I'm just using
9 that as an example -- set up to alert you guys
10 of, "Hey, maybe this is something we want to
11 look at," other than just the thresholds of the
12 75 percent reports?
13 A. That would have been through the
14 analytics department setting up requests or
15 whatever made by --
16 Q. But I don't mean just requests. I
17 mean something that was routinely shot out.
18 A. Well, that would come from the
19 analytics department.
20 Q. Right. But I'm assuming it would
21 have to come to you guys because you guys are
22 the ones that are evaluating the potential
23 suspicious orders, right?
24 A. As the system grew, there were

Page 359

1 more and more reports available to the
2 pharmacist.
3 Q. So what other type of reports --
4 A. And, again, after 2012, my role
5 slowly changed away from reviewing the orders
6 because of Tableau.
7 Q. So explain that to me. How did
8 Tableau change what you were doing?
9 A. They changed the process from more
10 of a qualitative to a quantitative process. So
11 where the pharmacist was reviewing the orders
12 and looking for all the information, it became
13 more of a looking at the numbers more carefully
14 and still using the qualification around the
15 numbers.
16 Q. So more of an objective versus
17 subjective standard?
18 A. It became more and more objective,
19 yes.
20 MR. FULLER: How much more
21 time we got, Mikey Mike?
22 THE VIDEOGRAPHER: An hour
23 and ten.
24

Page 360

1 BY MR. FULLER:
2 Q. So you mentioned as it progressed,
3 the pharmacist would get more and more reports.
4 What type of reports?
5 A. Well, the reports -- I can't say
6 there were more and more reports. The Tableau
7 function allowed them to pull up more
8 information pertinent to either the type of
9 customer, the drug family.
10 Again, I didn't work with the
11 Tableau reports that much, so -- it could see a
12 scatter plot of all the pharmacies and where
13 they fall in their purchases of that drug
14 family. And you could generate that on
15 customers, on an individual basis. So each
16 customer's plot would be different.
17 Q. Because the Tableau document, you
18 could actually change the dashboard?
19 A. You could change the parameters of
20 what you were looking for to focus in on what --
21 the information you were looking for, yes.
22 Q. So -- and I guess that's my
23 question. Were there more -- let's just say,
24 for example -- I was deposing Mr. Morse. You

Page 361

1 know Steve, right?
2 A. Yes.
3 Q. I was deposing him over in Texas,
4 where you hail from as well, and we looked at a
5 pharmacy out of Woodstock that he got provided
6 up in New York.
7 A. Okay.
8 Q. He got provided the Tableau
9 document and he says, "Yeah, when I looked at
10 it, it stuck out to me that they were getting
11 significantly more hydro, almost all hydro,
12 compared to the OxyContin" -- "or oxycodone."
13 I'm like, "Well, that would be a
14 red flag."
15 He's like, "Yes, it would be
16 during that time frame."
17 And the only reason he went to
18 look at that was because the DEA requested from
19 Cardinal the hydro and oxycodone purchases by
20 that pharmacy. So the e-mail reads, "Hey, we
21 need someone to go do a site visit," so
22 Mr. Morse goes and does a site visit.
23 My point being -- is that being
24 that that's a red flag, was there something in

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1 the system set up to trigger, say, "Hey, look at
2 me. I have this large number of hydro versus
3 oxycodone. That might be a red flag somebody
4 wants to look at," because, as Mr. Morse pointed
5 out, he didn't have access to these reports, but
6 had it been brought to his attention, he
7 certainly would have looked into it. But it
8 didn't get brought to his attention until the
9 DEA made the inquiry.
10     So what I'm trying to figure out,
11 was Cardinal being proactive in setting flags or
12 alarms like it did with thresholds or 75 percent
13 reports with any of these other factors that you
14 guys looked at when you were looking at
15 potential diversion issues?
16     MS. WICHT: Object to the
17     form.
18     A.  As the anti-diversion program
19 evolved, there were more and more things that we
20 were able to look at and see. So if you're
21 using the hydrocodone and oxycodone ratio as an
22 example, we did know that -- I mean, certain
23 states, depending on the state, the requirements
24 of the state -- for example, Texas required a

Page 363

1 triplicate prescription. So you would see a lot
2 more hydrocodone in that state. States that
3 didn't require triplicate prescriptions, they
4 could be both or a mixture of each.
5     You also had to look at -- or you
6 could look at, like, what are the schools of
7 medicine and the residents. You look at what
8 the residents are taught while they're doing it,
9 and the -- you know, the distribution of the
10 schools and how those are taught. I mean, you
11 could see those little patterns.
12     So, yes, you could -- you could
13 ask for those things. Specifically something
14 would happen across the board. You would stay
15 with, you know, what's the percentage of oxy in
16 the group or percentage of hydro in the group,
17 or a combination of that. The top four drugs
18 you would ask that.
19     So we had access to all those.
20     Q.  Well, no. I understand that you
21 had access to it. And Mr. Morse made that
22 clear, "If we wanted to look at it, we could."
23 He said, "Even though I didn't have direct
24 access, if I wanted to see it, I could go ask

Page 364

1 somebody."
2     A.  Right.
3     Q.  But if it's not drawn to our
4 attention -- it's like thresholds. You guys
5 service, what, 30,000 customers, somewhere in
6 that neighborhood?
7     A.  The number sounds --
8     Q.  Ballpark?
9     A.  -- in the ballparkish, yes.
10     Q.  Okay. Mr. Forst, sitting at your
11 desk just up the road here in Ohio, you have no
12 idea if a threshold is breached unless the
13 trigger goes off and it's brought to your
14 attention, correct?
15     A.  That's correct.
16     Q.  So the same thing with the other
17 potential triggers -- and I'm just using that
18 term generically -- was there some that
19 automated? Not that you had to go ask for it,
20 because like Mr. Morse mentioned, he would have
21 never asked about Woodstock, New York and that
22 particular pharmacy and the number of hydro
23 unless the DEA inquired. Was there some sort of
24 automated thing that would just trigger it?

Page 365

1     MS. WICHT: Object to the
2     form.
3     A.  Again, as the system evolves,
4 there are more and more things that you could
5 look at. Suggestions from the pharmacists went
6 to the analytics people about "I would like to
7 be able to see this."
8     Q.  Right.
9     A.  If it was possible, they would
10 certainly try to do that for you as a group and
11 roll it out as a program that you could -- I
12 mean, we also had SQ -- an SQL program so that
13 we could -- if we had the right parameters, we
14 could put in the customer and pull the
15 information for ourselves.
16     So there was tools that we could
17 look for things. Either they would supply
18 specific information back to us, or if we -- it
19 was a special thing, we had the ability to
20 better access that information on our own. And
21 if it wasn't accessible by us, we could ask for
22 the information, and they could run reports for
23 us.
24     Q.  Now, let me -- and this may be --

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1 and don't take this the wrong way, but this may
2 be above your pay grade. But it's my
3 understanding, working with Tableau, that
4 Tableau has the ability to set triggers. You
5 tell the software that if this happens, they'll
6 give you a notification. For example, hydro,
7 excess of oxycodone. Or another one that I
8 talked to Mr. Morse about was the hydro 10/325s
9 being the more abused substance. We saw on a
10 dashboard how that was like over 80 percent,
11 which, according to some other documents at
12 Cardinal, put it to the 95th percentile, which
13 he agreed would be a red flag.
14         Were there flags like that that
15 would go off -- well, strike that.
16         To your knowledge, there weren't
17 flags like that that were just automatic? It
18 required someone to ask for it, correct?
19     A.   With the Tableau system that I was
20 familiar with --
21     Q.   Yes, sir.
22     A.   -- those were not in place yet.
23 So they may have been put in place after I moved
24 away from that. But, again, I'm not a

Page 367

1 programmer, and I'm not familiar with the
2 dynamics of Tableau.
3         I'm not saying yes or no, that you
4 can or cannot do that.
5     Q.   Right. You just don't know --
6 you're not aware of it being in place during
7 your time frame --
8     A.   Correct.
9     Q.   -- looking at these orders?
10     A.   Correct.
11     Q.   Now, we know they had the ability
12 to do the threshold issue, at least back to '08,
13 when those were being put into place, correct?
14         MS. WICHT: Object to the
15 form.
16     A.   The threshold issue --
17     Q.   Yeah, where the thresholds would
18 trigger and you would get a notification --
19     A.   Oh, yes.
20     Q.   -- of the thresholds --
21     A.   Yes.
22     Q.   -- and it would stop the order.
23 It was an automated process.
24     A.   Yes.

Page 368

1     Q.   So we know at least back to '08
2 they had the ability to put in this automated
3 process, whether it be you're breaching a
4 certain number or oxy is greater than hydro, or
5 your hydro 10s are exceeding 50 percent,
6 whatever, there was at least the technology out
7 there to do it, correct?
8     A.   The technology --
9         MS. WICHT: Object to the
10 form.
11     A.   -- for thresholds were -- yeah,
12 2008. I don't -- I'm not familiar with the
13 technology as it moved through and as it grew,
14 what more and more could be done with the
15 systems that we used. That would be an IT
16 question.
17         MR. FULLER: Fair enough.
18 Let's take another quick break.
19         THE VIDEOGRAPHER: We're
20 going off the record at 5:20.
21         (Recess taken.)
22         THE VIDEOGRAPHER: We're back
23 on the record at 5:35.
24

Page 369

1         MR. FULLER: All right.
2 Let's go to 3708.
3         - - -
4     (Cardinal-Forst Deposition Exhibit 28 marked.)
5         - - -
6         MR. FULLER: 3708 for the
7 record is going to be Plaintiffs'
8 Exhibit Number 28, I think.
9         MS. WICHT: Was there a 27?
10 I think it's --
11         MR. FULLER: Oh, never mind.
12 Yeah. Well, yeah. I have it --
13         MS. WICHT: It's stickered
14 28. Okay. That's fine. It's 28.
15         MR. FULLER: It is. Sorry.
16         MS. WICHT: That's okay.
17         MR. FULLER: For the record,
18 I think we're skipping 27, or if I
19 can peel it off, I'll use it.
20         MS. WICHT: That's fine.
21 BY MR. FULLER:
22     Q.   Now, this e-mail is October 19th
23 of '07. Do you see that from a Steve Lawrence?
24 Do you know who Steve Lawrence is?

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1    A.   Yes, I'm familiar with
2  Mr. Lawrence.
3    Q.   It sounds familiar?  Do you not
4  know who he is?
5    A.   Yes, I'm familiar with Steve
6  Lawrence.
7    Q.   Okay.  What was Mr. Lawrence's
8  position; is, was?
9    A.   He was one of the executive
10 officers I believe at the time, or he was over
11 the sales group.
12   Q.   When you say "executive officers,"
13 he's relatively high up, right?
14   A.   He was, yes.  I think he's now the
15 CEO.
16   Q.   Sure.
17   A.   I don't know that for a fact.
18   Q.   I mean, did you just, like, make
19 that up?
20   A.   No.
21   Q.   Heard it somewhere?
22   A.   Yes.
23   Q.   Okay.  So he sends this e-mail --
24 and this is October of '07, October 19th, 2007

Page 371

1  to Mr. Reardon, Mr. Michael -- is that Ambrose?
2  We'll go with it.  A-m-b-r-o-s-e for the record.
3  Michael Bender, Jeff Brannon, Jim Worley, Eric
4  Brantley.
5        You know who Mr. Brantley is,
6  right?
7    A.   Yes, I know Mr. Brantley.
8    Q.   Okay.  He's in anti-diversion,
9  correct?
10   A.   He was in quality and regulatory
11 affairs when I got there.  I'm not sure what
12 his --
13   Q.   QRA?
14   A.   Right -- his title was or where
15 his functionality was.
16   Q.   Okay.  Fair enough.
17        So this is regarding Martinez
18 Pharmacy, Laredo, Texas.  This is Mr. Lawrence
19 writing here at the end.  He says, "My marketing
20 analytics group could help here.  If we new" --
21 and I think he meant k-n-e-w instead of n-e-w --
22 'the triggers' we could develop a report which
23 would only show those stores that hit the
24 triggers.  The data is in SDW and we can get

Page 372

1  history by location by item going back 33
2  months.  We could build a table to the CINs" --
3  what are CINs; do you know?
4    A.   I believe those are the drug code
5  numbers for the purchases -- like their item
6  numbers, I believe.
7    Q.   Okay.  -- "build a table to the
8  CINs for all these products and monitor the
9  items sales against your defined triggers.  I'd
10 be more than glad to sit down with everyone and
11 see if we can't create something that is less
12 manual and hopefully more accurate."
13        Did I read that right?
14   A.   Yes.
15   Q.   So -- and, again, this is before
16 you got there.  But even Mr. Lawrence, at least
17 at this time frame -- and this is the time frame
18 that things are starting to happen with the DEA,
19 correct?
20        MS. WICHT:  Object to the
21   form.
22   A.   I'm not familiar with that time
23 frame before I came there, when the DEA started
24 actually looking more and more.

Page 373

1    Q.   Sure.  But you know, at least one
2  the time you got there, they had suspended the
3  licenses --
4    A.   Yes, I did.
5    Q.   -- at four different distribution
6  centers?  Right?
7    A.   Three, and I think we turned in --
8    Q.   Voluntarily turned in one?
9    A.   Yes.
10   Q.   After they issued an
11 administrative warrant, correct?
12   A.   I don't know that process, but --
13   Q.   Okay.  But -- and this is just
14 what we were talking about earlier, right,
15 triggers, and Mr. Lawrence is proposing that his
16 group -- and I think you're right.  SDW -- let's
17 see if it says.  It doesn't say at the bottom of
18 his name.  I think he's in some sort of sales
19 and marketing group.  But he offers to help
20 create these, doesn't he?
21        MS. WICHT:  Object to the
22   form.
23   Q.   To create a system to set off
24 triggers; "you guys just give me the criteria"?

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1    A.   Apparently --
2         MS. WICHT:  Object to the
3    form.
4    A.   -- by this document.
5         Apparently that's what this
6    document says, yes.
7    Q.   Okay.  Now, would you agree with
8    me at least that having triggers on these
9    different risk factors for potential diversion
10   may be a helpful tool?
11        MS. WICHT:  Object to the
12   form.
13   A.   They may or may not be a helpful
14   tool.  It depends on how the triggers are set up
15   and what he's looking at.
16   Q.   Well -- and that's the thing.
17   Someone with knowledge is going to have to help
18   have input on setting up these triggers,
19   correct?  Just like when they started initially
20   setting up this threshold system and setting
21   triggers for these thresholds, if you don't do
22   it right, it's not going to work right.  It's
23   only as good as the effort and substance that
24   you put into it, correct?

Page 375

1         MS. WICHT:  Object to the
2    form.
3    A.   That is correct.
4    Q.   So at least according to
5    Mr. Lawrence, it appears that the technology is
6    there at Cardinal to be able to monitor for
7    triggers; can we agree with that?
8         MS. WICHT:  Objection to the
9    form.  Foundation.  Calls for
10   speculation.
11   A.   Again, I wasn't there at this
12   time.  Based on this statement, that's what it
13   appears.
14   Q.   Okay.  And, again, you mentioned
15   you know Mr. Lawrence.  Do you have any reason
16   to doubt his veracity and the statements he
17   makes?
18   A.   I don't know Mr. --
19        MS. WICHT:  Object to the
20   form.
21   A.   I don't know Mr. Lawrence that
22   well.  I just know that he's one of the higher
23   officers at Cardinal Health.
24   Q.   Fair enough.

Page 376

1    A.   I've never personally met
2    Mr. Lawrence, to my knowledge.
3    Q.   Okay.  Was he based out of the
4    corporate office here?
5    A.   Yes, I believe that is correct.
6    Q.   But you still never met him in
7    person?
8    A.   I might have seen him in the hall
9    and knew who he was, but I didn't have a
10   conversation with him or introduce myself to him
11   or anything like that.
12   Q.   No actual interaction that you're
13   aware of?
14   A.   That I'm aware of, no.
15   Q.   Okay.  And you have no idea
16   whether anybody ever took Mr. Lawrence up on his
17   offer set out in this e-mail, do you?
18   A.   Again, before my time, so I don't
19   know.
20        ---
21   (Cardinal-Forst Deposition Exhibit 27 marked.)
22        ---
23        MR. FULLER:  This doesn't
24        have at P1 number, but it's

Page 377

1    Cardinal Health, Inc.'s Second
2    Supplemental Objections and
3    Responses to Plaintiffs' First
4    Combined Discovery Requests filed
5    today.  And it's going to be
6    Plaintiffs' Exhibit 27.  I'm sorry.
7    BY MR. FULLER:
8    Q.   And, Mr. Forst, I want to tell
9    you, I know you ain't seen this document before,
10   because it just got filed a little bit ago.
11        But do you see where it says, "In
12   Re:  National Prescription Opioid Litigation"?
13   A.   Yes.
14   Q.   Yeah.  Unfortunately, I just got
15   the document, so I don't think we're going to
16   have it on the screen.  Oh, we may.  Hold on.
17   There we go.  "In Re:  National Prescription
18   Opioid Litigation," do you see that?
19   A.   Yes, I do.
20   Q.   Okay.  And as I read the title,
21   Cardinal Health, Inc.'s Second Supplemental
22   Objections and Responses to Plaintiffs' First
23   Combined Discovery."
24        Do you see that there?

Page 378

1    A.   Yes, I do.

2    Q.   And then if you'll turn to page 7.

3         MS. WICHT:  Just note for

4    purposes of the record that the

5    document is designated "Highly

6    Confidential Pursuant to the

7    Protective Order."

8    Q.   That means you cannot talk about

9    it outside of this room or a little drone will

10   swoop down -- it's owned by Amazon, by the

11   way -- and scoop you up, Mr. Forst, okay?

12   A.   Amazon doesn't know where I live.

13   Q.   They have drones, though.  They

14   can track you.

15        MS. WICHT:  You'd be the only

16   person in the country, if that's

17   true.

18        I'm sorry.  What page?

19        MR. FULLER:  Page 7.

20        MS. WICHT:  Thank you.

21   BY MR. FULLER:

22   Q.   And you see there at the top it's

23   Supplemental Response to -- excuse me.

24   Supplemental Response and Objection to Request

Page 379

1    Number 2, January 22, 2019, which I think is

2    today.

3    A.   Yes, I see that.

4    Q.   And if you go down to the second

5    paragraph, it says, "Ingredient Limit Reports,"

6    and that's what we talked a little bit about

7    earlier.

8         Do you recollect that?

9    A.   Yes, I do.

10   Q.   -- "were created on a monthly

11   basis for each of the following customer

12   classifications:  Hospitals/managed care, retail

13   customers, and other."

14        Then it gives a cite to the

15   record.  And then it says, "For each customer

16   classification Cardinal Health calculated the

17   total grams of each controlled substance in

18   Schedules II through V purchased in the last 12

19   months.  Cardinal Health then calculated the

20   monthly average grams purchased by customers in

21   each classification."

22        Now, having this information,

23   Mr. Forst, can we figure out, assuming we have

24   sales data, what the average is?

Page 380

1         MS. WICHT:  Object to the

2    form.

3    A.   Based on the information that was

4    just put in front of me, I don't know the answer

5    to that question.

6    Q.   Well, let's look at it for a

7    second.  It says, "For each customer

8    classification" -- which that has been set out

9    above as hospital/managed care, retail

10   customers, and other -- "Cardinal Health

11   calculated the total grams of each controlled

12   substances in Schedule II through V purchased in

13   the last 12 months."

14        Now, Cardinal obviously would have

15   the sales data that it sold as far as product

16   for the last 12 months, right?

17   A.   That would seem reasonable, yes.

18   Q.   I'm glad I am finally being

19   reasonable, Mr. Forst.

20        Now, what we don't know -- and

21   they say they use this information to calculate

22   the monthly average, right?  But the problem

23   with this answer is it doesn't tell us for what

24   geographical area, does it?  We don't know if

Page 381

1    it's by county, state, or the entire nation, do

2    we?

3         MS. WICHT:  Object to the

4    form.

5    A.   Again, I don't know what's all in

6    the document, so I can't answer that question.

7    Q.   No.  I'm just asking, those two

8    sentences, it doesn't tell us whether it's the

9    state, county, or the entire country, does it?

10   A.   Those two sentences do not state

11   that.

12   Q.   All right.  Well, let's keep

13   reading because maybe it does.

14        "Cardinal Health then multiplied

15   the resulting averages by a factor approved by

16   the DEA."

17        Again, this mentions something

18   that you and I chatted about earlier.  You know

19   of no DEA approval related to any multiplying

20   factor, do you, Mr. Forst?

21   A.   I'm not aware of one.

22   Q.   You haven't seen anything in

23   writing on it?  You haven't been told about it?

24   Nothing that you recollect related to an

Page 382

1  approval by the DEA, correct?
2      A.   Unless it was those factors that
3  were at the very beginning of the 3, 8, and
4  whatever that number -- if that's the same
5  factor, the first time I've seen that is when I
6  was in here.
7      Q.   So before that, you haven't --
8  before being in here, you hadn't seen those --
9      A.   I didn't -- if you would have
10 asked me the factor, I would have not known what
11 you were talking about there.
12     Q.   You would have thought I was
13 crazy?
14     A.   Well, I already thought that,
15 but ...
16     Q.   Fair enough.
17     A.   No, I would not know what those
18 were.
19     Q.   Fair enough.
20          It says, "factors approved by the
21 DEA, which resulted in the maximum amount of
22 those substances that customers could purchase
23 or receive in a month without the orders being
24 included in the Ingredient Limit Report."

Page 383

1          Do you see that?  Did I get that
2  right?
3      A.   Yes, I see that.
4      Q.   Okay.  The next says, "The factors
5  as they were applied by Cardinal Health were
6  included on the face of the report provided to
7  the DEA."
8          And I think we saw that.  We saw a
9  factor of 4 at some point in that Ingredient
10 Limit Report that I showed you.
11         Do you recall that?
12     A.   I remember a report with -- a
13 report with factor of 4.  Whether it's this
14 report or not, I'm not sure.
15     Q.   Fair enough.  And you don't have
16 any idea where that factor came from, do you?
17     A.   No, I do not.
18     Q.   Okay.  Mr. Forst, what -- again,
19 you came in right during the time of the
20 suspension of -- suspension or surrendering the
21 four different distribution licenses; is that
22 right?
23     A.   Correct.  It was four or five
24 months after that, I believe.

Page 384

1      Q.   Well, I mean, actually, your start
2  date was the 1st, and the suspensions and
3  surrendering occurred between the end of
4  November and then the first part of January.
5      A.   So three months about.
6      Q.   So what type of look-back or
7  review did Cardinal do, to your knowledge,
8  related to the allegations made by the DEA to
9  determine what the problems were?
10         MS. WICHT:  Object to the
11         form of the question.
12             And I just would caution you
13         that I don't know whether that's a
14         conversation you discussed with
15         attorneys for Cardinal Health at
16         the time.  But if you did, those
17         conversations would be privileged,
18         and you shouldn't include them.
19         MR. FULLER:  I disagree on
20         this issue.  If there is any
21         sort --
22         MS. WICHT:  You're free to
23         disagree --
24         MR. FULLER:  -- of review

Page 385

1  that was done --
2          MS. WICHT:  -- but that's my
3  instruction to the witness.
4      A.   I can't remember any discussions
5  about that.
6      Q.   What type of review was done of
7  the prior shipments that made up the actions by
8  the DEA?
9      A.   From when I was there --
10         MS. WICHT:  Object to the
11         form.
12     A.   I'm not aware of the process that
13 occurred before I was there.  All I'm aware of
14 is it was a decentralized process.
15     Q.   Well, I understand that, but I'm
16 asking what type of look-back did Cardinal do to
17 see what the problems were?  Did they relook at
18 the suspicious orders or the potential orders
19 that the DEA was alleging were suspicious?  What
20 type of retrospective review did they do?
21     A.   I'm not familiar --
22         MS. WICHT:  Object to the
23         form.
24     A.   I'm not familiar with that

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1 information.
2    Q.   Do you know who did that review?
3       MS. WICHT: Object to the
4 form.
5    A.   I don't know who did that review.
6    Q.   Okay. Were you ever provided the
7 results of that review --
8       MS. WICHT: Object to the
9 form.
10    Q.   -- so that you could apply them in
11 developing and working on these new systems
12 going forward.
13       MS. WICHT: Object to the
14 form.
15    A.   I don't know what that document
16 would look like, so I don't know.
17    Q.   Okay. Turn to page 27 of this
18 document, if you don't mind. Down there near
19 the bottom of the page, it says, "QRA
20 Pharmacists."
21       Do you see that on the right-hand
22 side?
23    A.   Yes.
24    Q.   It says, "QRA Pharmacists received

Page 387

1 daily notification of all threshold events and
2 reviewed each held order and the rationale
3 provided by the customer to determine whether,
4 based on the totality of the information
5 available, the order appeared reasonable and was
6 not likely to be diverted."
7       Now, when it says "QRA
8 Pharmacists," that would be including you,
9 correct?
10    A.   I would imagine that would be,
11 yes, me.
12    Q.   And when it says it reviewed the
13 rationale provided by the customers, did the
14 customers always provide a rationale related to
15 a threshold event?
16    A.   If we had the rationale, that's
17 what we did review.
18    Q.   Okay.
19    A.   And, again, this is early in the
20 process.
21    Q.   And then it reads that "The
22 information available may have included, for
23 example, the customer's profile."
24       Well, if they're a customer, you'd

Page 388

1 certainly have that to your availability,
2 correct?
3    A.   Yes.
4    Q.   "The customer's business type" --
5 and those are the categories that we discussed
6 earlier. Independent retail?
7    A.   Yes.
8    Q.   Chain, government, hospital,
9 whatever the case may be, correct?
10    A.   Yes.
11    Q.   This is information about whether
12 Cardinal was the primary or secondary
13 distributor, the drug family that triggered the
14 threshold event, the customer's total number of
15 threshold events in general for a specific drug
16 family -- or excuse me -- in general and for the
17 specific drug family and the customer's monthly
18 drug family limit.
19       Did I read that correctly?
20    A.   Yes.
21    Q.   Now, was it during this time that
22 the -- let me make sure I get it right --
23 anti-diversion customer profiles were being
24 created or utilized?

Page 389

1       MS. WICHT: Object to the
2 form.
3       What time frame are we
4 talking about?
5    Q.   Go ahead. You can answer.
6    A.   I'm trying to find -- find a time
7 frame. I can't answer that because I'm not
8 really sure of the time frame that that -- one
9 of the forms came out. But we did have
10 information that we could evaluate.
11    Q.   So let me also ask you -- I showed
12 you the policy and procedure that was enacted in
13 June of 2006 earlier today.
14       Do you remember that?
15    A.   Yes, the one from the distribution
16 centers.
17    Q.   That Mr. Reardon signed?
18    A.   Yes.
19    Q.   Do you know when that went out of
20 effect and new policies and procedures were
21 being put in place? Because I'll tell you, the
22 only thing I can find related to the thresholds
23 and stuff wasn't enacted until December of 2008.
24       Does that sound right?

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1    MR. FULLER:  Object to the
2    form.
3    A.   I don't know that -- I don't know
4    that information.  I don't know when one stopped
5    and when one started.
6    Q.    So, for example, if we go back to
7    4570 -- excuse me.  4547.
8    MS. WICHT:  Do you know the
9    exhibit number?  Sorry.  10?
10    MR. FULLER:  Exhibit 10.
11    MS. WICHT:  Thank you.
12 BY MR. FULLER:
13    Q.   If you don't want to keep digging,
14 it's right in front of you on the screen,
15 Mr. Forst.
16    A.   That's fine.
17    Q.   So this is one of those documents
18 that you owned, right?
19    A.   Yes.  According to the system, I
20 was the owner of this document.
21    Q.   And it was new and first enacted
22 when?  When was the issue date?
23    A.   Well, the issue date for this
24 document is 12/22/08.  The previous issue new,

Page 391

1 there is a new -- I believe there was a new
2 policies and procedures system that was set up.
3 So any document that was added to this system
4 possibly had the previous issue as new, so ...
5    Q.   Well, that's because there's no
6 older versions, right?
7    A.   Not necessarily.
8    MS. WICHT:  Object to the
9    form.
10    Not necessarily.
11    Q.   Okay.  So you believe there's an
12 older version of an on-site investigation policy
13 and procedure?
14    Now, here's what I'm trying to
15 lock down:  I'm trying to figure out when the
16 changes occurred in policies and procedures.
17 The Defendants have been ordered to tell us step
18 by step, year by year, when policies and
19 procedures went out, when new ones came in.  And
20 I'm having trouble from this time frame, because
21 as you saw, we have June of '06, right?
22    A.   Yes.
23    Q.   And then I don't see any new ones
24 until December of '08.  Can you tell us when

Page 392

1 these new ones went into place?
2    A.   No.
3    MS. WICHT:  Object to the
4    form.
5    A.   No, I can't, because, again, I
6 believe this is a new system that houses the
7 forms.  So if this is a new one or if it's one
8 that has just been revised and it's new to the
9 system, new would be the default of the system,
10 that there's nothing here before this.
11    Well, if it's a new system, there
12 wouldn't be anything there before it.
13    Q.   Okay.
14    A.   Because I know these documents in
15 the system are referenced, and if one replaces
16 another, but if they're all just being loaded
17 into the system, my understanding is that means
18 it's new.
19    Q.   Well, that's fine.  I'm just
20 trying --
21    A.   If you needed to clarify it, you
22 would probably need to talk to someone that runs
23 the policies and procedures system that they
24 have that houses this -- all this information.

Page 393

1    Q.   And who runs that; do you know?
2 Or any idea who did run it?
3    A.   Jason Stouffer I think is a
4 contact.
5    Q.   Now, is that -- does he run --
6    A.   And he is totally -- it is all the
7 policies of Cardinal Health.
8    Q.   So it's not just the
9 anti-diversion; it's everybody?
10    A.   Everything is housed in one place
11 as my understanding.
12    Q.   Jason is the keeper of all that?
13    A.   Jason Stouffer either is the
14 keeper, or he could direct you to the keeper if
15 he's still there, so yes.
16    Q.   Okay.  Oh, I've been told that in
17 2012, related to the DEA guidance, that Cardinal
18 created more objective criteria for determining
19 or looking at diversion issues.
20    Do you know what those new
21 objective criteria were in 2012?
22    A.   I can't recall them off the top of
23 my head.
24    Q.   Can you give me an example of one?

Page 394

1    A.   I don't want to speculate.  I just
2 can't think of it off the top of my head right
3 now.
4    Q.   Well, is it the objective criteria
5 such as the percentage of controls versus
6 non-controls or the percentage of cash sales?
7    A.   Those would sound familiar, so
8 yes.
9    Q.   You may not be sure, but you think
10 those are some of them?
11    A.   Yes, yes.
12    Q.   So, again, my question is going to
13 go to triggers.  So if that's an objective
14 criteria, just knowing the percentage, you would
15 agree with me doesn't do anything for us?  We
16 have to have some sort of what's the triggering
17 event if we're making it objective and not
18 subjective?
19         Does that question make sense?
20    A.   No.  I'm sorry.
21    MS. WICHT:  Object to the
22 form.
23    Q.   So making something objective
24 means what to you?

Page 395

1    A.   It means that you have more and
2 more data that you're looking at that's --
3    Q.   The base?
4    A.   The base quantifiable data --
5    Q.   Right.
6    A.   -- as opposed to being subjective
7 for -- an individual might look at something and
8 the -- two different individuals could come to a
9 different conclusion on --
10    Q.   Right.
11    A.   -- the subject.
12    Q.   So when we're looking at data and
13 these percentages, someone could say, "Well, I
14 don't worry about it being high until after it's
15 50 percent."
16         Somebody else could say, "Well,
17 anything above 25 is high to me."
18         So what I'm trying to figure out
19 is what the threshold level was for concern on
20 these objective criteria.  Because you have to
21 have something to measure it against.  Just
22 having a percentage doesn't do you any good
23 unless you're measuring against a mark, right?
24    A.   Right.

Page 396

1    MS. WICHT:  Object to the
2 form.
3    Q.   So do you know what that measuring
4 mark was for these objective criteria?
5    A.   I don't know what that measuring
6 mark was.  That was --
7    Q.   Did you -- and I know we're taxing
8 your memory on -- you know, some time ago.
9         But to your recollection, was
10 there some sort of mark that Cardinal did put in
11 place related to the differing objective
12 criteria?  Or maybe they just said there was an
13 objective criteria and never placed a mark.
14    A.   I don't know that answer.
15    MR. FULLER:  Okay.  Let's
16 take another quick break.  Let me
17 look at my notes.  But I may be
18 done with you, Mr. Forst.
19    THE VIDEOGRAPHER:  We're
20 going off the record at 6:08.
21    (Recess taken.)
22    THE VIDEOGRAPHER:  We're back
23 on the record at 6:17.
24

Page 397

1 BY MR. FULLER:
2    Q.   Mr. Forst, during your time at
3 Cardinal, did you have any concerns about the
4 distribution patterns of the controlled
5 substances?
6    MS. WICHT:  Object to the
7 form.
8    A.   Could you repeat that.  I'm sorry.
9    Q.   Sure.  During your time at
10 Cardinal, did you have any concerns about the
11 distribution patterns of the orders that they
12 were filling across the country?
13    MS. WICHT:  Object to the
14 form.
15    A.   Not any orders that I reviewed,
16 no.
17    Q.   Did you have any concern about
18 other orders they were filling?
19    A.   I wouldn't have --
20    MS. WICHT:  Object to the
21 form.
22    A.   I wouldn't have seen all those
23 orders, so I can't --
24    Q.   Would you have seen --

Page 398

1    A.   -- answer that question.

2    Q.   I'm sorry.  Go ahead.

3    A.   I can't answer that because I saw

4  the orders that I saw.  Other orders were

5  processed by other people.

6    Q.   Before you went to do the

7  surveillance on pharmacy 2 -- CVS 219, I believe

8  it was -- is that right?  219?

9    A.   I believe -- I believe that's the

10  correct number on it.

11    Q.   Okay.  Would you have been

12  provided with that sales data that you mentioned

13  today made you nervous about distributing to?

14    MS. WICHT:  Object to the

15    form.

16    A.   I don't remember the information

17  that I was provided with.

18    Q.   So you can't say one way or

19  another whether --

20    A.   No, I cannot.

21    Q.   -- that was provided to you or

22  not?

23    A.   No, I cannot.

24    Q.   Did those numbers cause you

Page 399

1  concern being what I showed you today as to the

2  sales pattern with at least CVS 219?

3    MS. WICHT:  Object to the

4    form.

5    A.   As I said previously, those

6  numbers are high.

7    MR. FULLER:  I don't have

8    anything further.

9    MS. WICHT:  We don't have any

10    questions.

11    THE VIDEOGRAPHER:  We're

12    going off the record at 6:19 p.m.

13    - - -

14    Thereupon, at 6:19 p.m., on Tuesday, January

15  22, 2019, the deposition was concluded.

16    - - -

17

18

19

20

21

22

23

24

Page 400

1    CERTIFICATE

2  STATE OF OHIO      :

    SS:

3  COUNTY OF FRANKLIN  :

4

5    I, CHRISTOPHER J. FORST, do hereby certify

6  that I have read the foregoing transcript of my

7  cross-examination given on January 22, 2019; that

8  together with the correction page attached hereto

9  noting changes in form or substance, if any, it is

10  true and correct.

11    _____

    CHRISTOPHER J. FORST

12

13    I do hereby certify that the foregoing

14  transcript of the cross-examination of CHRISTOPHER J.

15  FORST was submitted to the witness for reading and

16  signing; that after he had stated to the undersigned

17  Notary Public that he had read and examined his

18  cross-examination, he signed the same in my presence

19  on the _____ day of _____, 2019.

20

21    _____

    NOTARY PUBLIC - STATE OF OHIO

22

23  My Commission Expires:

24  _____, _____.

Page 401

1    CERTIFICATE

2  STATE OF OHIO      :

    SS:

3  COUNTY OF FRANKLIN  :

4    I, Carol A. Kirk, a Registered Merit

  Reporter and Notary Public in and for the State of

5  Ohio, duly commissioned and qualified, do hereby

  certify that the within-named CHRISTOPHER J. FORST was

6  by me first duly sworn to testify to the truth, the

  whole truth, and nothing but the truth in the cause

7  aforesaid; that the deposition then given by him was

  by me reduced to stenotype in the presence of said

8  witness; that the foregoing is a true and correct

  transcript of the deposition so given by him; that the

9  deposition was taken at the time and place in the

  caption specified and was completed without

10  adjournment; and that I am in no way related to or

  employed by any attorney or party hereto or

11  financially interested in the action; and I am not,

  nor is the court reporting firm with which I am

12  affiliated, under a contract as defined in Civil Rule

  28(D).

13

    IN WITNESS WHEREOF, I have hereunto set my

14  hand and affixed my seal of office at Columbus, Ohio

  on this 25th day of January 2019.

15

16

17

18    _____

    CAROL A. KIRK, RMR

19    NOTARY PUBLIC - STATE OF OHIO

20  My Commission Expires:  April 9, 2022.

21    - - -

22

23

24

Page 402

```
1        DEPOSITION ERRATA SHEET
2   I, CHRISTOPHER J. FORST, have read the transcript
    of my deposition taken on the 22nd day of January
3   2019, or the same has been read to me.  I request that
    the following changes be entered upon the record for
4   the reasons so indicated.  I have signed the signature
    page and authorize you to attach the same to the
5   original transcript.
6   Page  Line  Correction or Change and Reason:
7   ___  ____  _____
8   ___  ____  _____
9   ___  ____  _____
10  ___  ____  _____
11  ___  ____  _____
12  ___  ____  _____
13  ___  ____  _____
14  ___  ____  _____
15  ___  ____  _____
16  ___  ____  _____
17  ___  ____  _____
18  ___  ____  _____
19  ___  ____  _____
20  ___  ____  _____
21  ___  ____  _____
22  ___  ____  _____
23  ___  ____  _____
24  Date _____ Signature _____
```