1    IN THE UNITED STATES DISTRICT COURT
2     FOR THE NORTHERN DISTRICT OF OHIO
3            EASTERN DIVISION
4               -  -  -
5

IN RE:  NATIONAL        :   HON. DAN A.
6  PRESCRIPTION OPIATE    :   POLSTER
   LITIGATION             :
7                         :
   APPLIES TO ALL CASES   :   NO.
8                         :   1:17-MD-2804
                          :
9

        - HIGHLY CONFIDENTIAL -
10
   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                -  -  -
12
             January 15, 2019
13
                -  -  -
14
15              Videotaped deposition of
   KEITH FROST taken pursuant to notice, was
16  held at the offices of Morgan Lewis
   Bockius, 1701 Market Street,
17  Philadelphia, Pennsylvania beginning at
   9:30 a.m., on the above date, before
18  Michelle L. Gray, a Registered
   Professional Reporter, Certified
19  Shorthand Reporter, Certified Realtime
   Reporter, and Notary Public.
20
                -  -  -
21
22        GOLKOW LITIGATION SERVICES
       877.370.3377 ph| 917.591.5672
23           deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: STERLING CLUFF, ESQ.
Encino Plaza
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
(818) 839-2333
Scluff@baronbudd.com

- and -

BARON & BUDD, P.C.
BY: WILLIAM G. POWERS, ESQ.
600 New Hampshire Avenue, NW
The Watergate, Suite 10-A
Washington, D.C. 20037
(202) 333-4562
Wpowers@baronbudd.com
Representing the Plaintiffs

MORGAN LEWIS & BOCKIUS, LLP
BY: JOHN P. LAVELLE, JR., ESQ.
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-4824
John.lavelle@morganlewis.com
- and -
MORGAN LEWIS & BOCKIUS
BY: JOHN M. MALOY, ESQ.
101 Park Avenue
New York, New York 10178
(212) 309-6734
john.maloy@morganlewis.com
Representing the Defendant, Rite Aid of
Maryland and the Witness

Page 3

APPEARANCES: (Cont'd.)

PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
BY: DOUGLAS K. ROSENBLUM, ESQ.
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 320-6200
Dkr@pietragallo.com
Representing the Defendant, Cardinal
Health

COVINGTON & BURLING, LLP
BY: J. ALEJANDRO BARRIENTOS, ESQ.
850 Tenth Street, NW
Suite 586N
Washington, D.C. 20001
(202) 662-5769
Abarrientos@cov.com
Representing the Defendant, McKesson
Corporation

Page 4

TELEPHONIC APPEARANCES:

JONES DAY
BY: CHRISTINE D. PROROK, ESQ.
77 West Wacker Drive
Chicago, Illinois 60601
(312) 269-4113
Cprorok@jonesday.com
Representing the Defendant, Walmart

ARNOLD & PORTER KAYE SCHOLER
BY: SEAN A. McCORMICK, ESQ.
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
(213) 243-4000
Sean.mccormick@arnoldporter.com
Representing the Defendants, Endo Health
Solutions; Endo Pharmaceuticals, Inc.;
Par Pharmaceutical Companies, Inc. f/k/a
Par Pharmaceutical Holdings, Inc.

JACKSON KELLY, PALL
BY: ANGELA L. FREEL, ESQ.
221 NW Fifth Street
Evansville, Indiana 47708
(812) 422-9444
alfreel@jacksonkelly.com
Representing the Defendant,
AmerisourceBergen Drug Corporation

Page 5

APPEARANCES: (Cont'd.)

ALSO PRESENT:

Emma Kaboli, Paralegal
(Baron Budd - via telephone)

VIDEO TECHNICIAN:
Devyn Mulholland

LITIGATION TECHNICIAN:
Zach Hone

Page 6

- - -

I N D E X

- - -

Testimony of:

KEITH FROST

By Mr. Cluff        12, 305
By Mr. Lavelle        286

- - -

E X H I B I T S

- - -

NO.        DESCRIPTION        PAGE
Rite Aid
Frost-1        Performance        91
        Management
        Annual Performance
        Review
        FY2014 - Keith Frost
        Rite_Aid_OMDL_0050596-25
Rite Aid
Frost-2        E-mail, 5/20/11        151
        Subject, Quarterly
        Sign Offs
        Rite_Aid_OMDL_0013210-30

Page 7

- - -

E X H I B I T S (Cont'd.)

- - -

NO.        DESCRIPTION        PAGE
Rite Aid
Frost-3        E-mail Thread        176
        3/30/10
        Subject, Cage Access
        Rite_Aid_OMDL_0023217
Rite Aid
Frost-4        E-mail Thread        179
        6/4/10
        Subject, Cage Access
        Rite_Aid_OMDL_0023287
Rite Aid
Frost-5        E-mail Thread        184
        1/18/11
        Subject, Drug Diversion
        Rite_Aid_OMDL_0012113-14
Rite Aid
Frost-6        E-mail Thread        197
        6/25/10
        Subject, DEA CFRs
        Employers/Employees
        Rite_Aid_OMDL_0013963-68
Rite Aid
Frost-7        E-mail Thread        203
        6/30/10
        Subject, Cage Access
        Rite_Aid_OMDL_0011927-28
Rite Aid
Frost-8        E-mail Thread        212
        8/9/10
        Subject, Cage Access
        Rite_Aid_OMDL_0003533-34

Page 8

- - -

E X H I B I T S (Cont'd.)

- - -

NO.        DESCRIPTION        PAGE
Rite Aid
Frost-9        E-mail Thread        220
        2/20/12
        Subject, Cage Access
        Rite_Aid_OMDL_0010825-26
Rite Aid
Frost-10        E-mail Thread        227
        3/31/10
        Subject, DEA Compliance
        Rite_Aid_OMDL_0023456-57
Rite Aid
Frost-11        E-mail Thread        236
        5/5/10
        Subject, Late CD
        Receipts
        Rite_Aid_OMDL_0010116-17
Rite Aid
Frost-12        E-mail Thread        244
        5/30/12
        Subject, Compliance
        Violation
        Rite_Aid_OMDL_0029175-76
Rite Aid
Frost-13        E-mail Thread        249
        7/15/10
        Subject, Cage Product
        In Trash
        Rite_Aid_OMDL_0013911-14

Page 9

- - -

E X H I B I T S (Cont'd.)

- - -

NO.        DESCRIPTION        PAGE
Rite Aid
Frost-14        E-mail Thread        257
        9/26/12
        Subject, CD Inventory
        Rite_Aid_OMDL_0009662
Rite Aid
Frost-15        E-mail, 1/22/13        269
        Subject, CSA Checklist
        Rite_Aid_OMDL_0013234
Rite Aid
Frost-16        E-mail Thread        277
        3/3/14
        Subject, P&P Review
        Report Reaccreditation
        Rite_Aid_OMDL_0015596-77
Rite Aid
Frost-17        Notice of Inspection  287
        Of Controlled Premises
        7/10/12
        Rite_Aid_OMDL_0032621
Rite Aid
Frost-18        E-mail, 7/11/12        290
        Subject, Please Review
        DEA Audit July 11
        Rite_Aid_OMDL_0012547-49

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
1              - - -
2       DEPOSITION SUPPORT INDEX
3              - - -
4
5  Direction to Witness Not to Answer
6  PAGE   LINE
   None.
7
8  Request for Production of Documents
9  PAGE   LINE
   None.
10
11 Stipulations
12 PAGE   LINE
   None.
13
14 Questions Marked
15 PAGE   LINE
   None.
16
17
18
19
20
21
22
23
24
```

Page 11

```
1       THE VIDEOGRAPHER:  We are
2  now on the record.  My name is
3  Devyn Mulholland.  I'm a
4  videographer for Golkow Litigation
5  Services.
6       Today's date is
7  January 15th, 2019.  The time is
8  9:30 a.m.
9       This video deposition is
10 being held in Philadelphia,
11 Pennsylvania, in the matter of
12 National Prescription Opiate
13 Litigation.
14      The deponent is Keith Frost.
15 Counsel will be noted on the
16 stenographic record.  The court
17 reporter is Michelle Gray and will
18 now swear in the witness.
19             - - -
20      ... KEITH FROST, having been
21 first duly sworn, was examined and
22 testified as follows:
23             - - -
24         EXAMINATION
```

Page 12

```
1              - - -
2  BY MR. CLUFF:
3       Q.   Good morning, Mr. Frost.  My
4  name is Sterling Cluff.  I'm from a law
5  firm called Baron & Budd, and I represent
6  plaintiffs in this national opiate
7  litigation.  And I'll be taking your
8  deposition today.  My colleague next to
9  me is Will Powers, who's also with Baron
10 & Budd.  He will be assisting me.
11      And then you may have met
12 the other attorneys around the way.
13 They're all for defendants, except for
14 the trial tech who will be assisting me
15 as well.  Just so you know who all is in
16 the room.
17      So to start off, I'd like to
18 ask you if you've ever had your
19 deposition taken before?
20      A.   No, I haven't.
21      Q.   Okay.  Have you ever
22 testified in a trial at all?
23      A.   Yes.
24      Q.   Okay.  So -- and the trial I
```

Page 13

```
1  assume you were also placed under oath --
2       A.   Yes.
3       Q.   -- so you are familiar
4  with --
5       Okay.  Thank you.
6       MR. LAVELLE:  Just wait
7  until the question is finished
8  before you answer it.
9  BY MR. CLUFF:
10      Q.   Right.  So since you haven't
11 given a deposition before, I'd like to
12 lay down or discuss some sort of rules of
13 the road that we call admonitions.  One
14 of them, as your counsel just pointed
15 out, is that we try not to talk over each
16 other because we're trying to take down
17 an accurate written record of today's
18 proceedings.  So if you could, to the
19 best of your ability give me a chance to
20 finish my question.  I will do my best to
21 let you finish your answer.  And your
22 counsel at times today will be
23 interposing objections to my questions.
24 And we should both do our best to let him
```

Page 14

1 finish those before we speak as well.
2 Does that make sense?
3     A.   Yes.
4     Q.   Also because we are taking a
5 written record of the proceedings, we ask
6 that you, to the best of your ability,
7 give an audible answer rather than saying
8 "mm-hmm" or "unh-unh" or shaking your
9 head. Like "yes," "no," "I don't know"
10 or whatever you deem a more appropriate
11 answer to be. Does that make sense?
12     A.   Yes. And this is the
13 microphone here in front of me.
14     Q.   Yeah, that thing in front of
15 you does appear to be a microphone. That
16 is probably for the telephone though.
17 You've got a microphone on your shirt
18 which is recording you audibly as well.
19         As a reminder, when we take
20 breaks, be sure to take that off, so that
21 you don't walk out with it.
22         Since you're under oath, we
23 will understand today that the answers
24 that you're giving are the best

Page 15

1 recollection that you can give. In order
2 to make that a clear record for the
3 proceedings we ask that you not guess.
4         However at times I may ask
5 you questions to better explore your
6 recollection or your understanding. And
7 I may also at times ask you for an
8 approximation or an estimate. Do you
9 know the difference between an estimate
10 and an approximation or a guess?
11     A.   Yes.
12     Q.   Okay. We're going to be
13 covering a lot of information today that
14 may at times seem confusing to you. If
15 at any point in time you don't understand
16 my question, please ask me to clarify it.
17 If not, I will assume that you understood
18 the question. Does that make sense?
19     A.   Yes.
20     Q.   Okay. Is there any reason
21 today health-wise that you cannot give a
22 full and complete deposition?
23     A.   No.
24     Q.   Are you on any medication or

Page 16

1 under any medical treatment that would
2 prevent you from giving a full and
3 complete deposition today?
4     A.   No.
5     Q.   Are there any reasons that
6 your memory or recollection may be
7 impaired during today's deposition?
8     A.   No.
9     Q.   Okay. Do you understand why
10 you're here to be deposed today?
11     A.   Yes.
12     Q.   Okay. What is your
13 understanding?
14     A.   That there's a lawsuit
15 against some drug companies for the
16 opioid issues going on in the country.
17     Q.   I should also give you one
18 more clarification. At times I may ask
19 you questions that could potentially call
20 for an answer that is influenced or based
21 on conversations that you had with your
22 counsel today. If you believe that a
23 question I asked requires you to disclose
24 information or conversations that you had

Page 17

1 with your attorney, please let me know.
2 And your attorney will also object if he
3 feels that a question I asked asks for
4 what's called attorney/client privilege.
5 So I don't want you to disclose any
6 attorney/client privilege today.
7         Is that clear? Does that
8 make sense?
9     A.   Yes.
10     Q.   So going back to the reason
11 you're here to testify today. We
12 noticed -- we as plaintiffs noticed your
13 deposition in relation to a defendant in
14 this case, Rite Aid specifically.
15         Are you currently employed
16 by Rite Aid?
17     A.   Yes, I am.
18     Q.   And what position do you
19 hold at Rite Aid currently?
20     A.   I'm currently a department
21 manager of a department called
22 centralized products.
23     Q.   Okay. What does the
24 centralized products department do?

Page 18

1    A.   They pick front -- what we
2  call other front-end items in the stores,
3  cosmetics, energy drinks, vitamins,
4  ethnic beauty care.  And we also manage
5  the pseudoephedrine control cage in the
6  building.
7    Q.   When you say they pick, what
8  do you mean they pick?
9    A.   Our associates get the items
10 and put them in packages or totes to send
11 to our customer stores.
12   Q.   So they're actually picking
13 the items out of some group of inventory
14 to be delivered to the stores?
15   A.   Yes, out of forward pick.
16   Q.   What's a forward pick?
17   A.   A forward pick is a location
18 where the product is loose in boxes or
19 sometimes it could be cases.  It's an
20 area where, when the orders download, a
21 light lights up.  It's called a
22 pick-to-light system.  And a number
23 appears.  And that's what the store wants
24 of that particular item in that

Page 19

1  particular location.  And the associate
2  goes to that location, look at the
3  number, and puts the item into the tote
4  or box, and then extinguishes the light,
5  and moves onto the next location for the
6  next item that the store wants.
7    Q.   This work that the
8  associates are doing, the picking work,
9  is that happening -- where is that
10 happening?
11   A.   Distribution center wide,
12 different departments have the same
13 Pick-to-Light system, it's just they have
14 different items to put into the boxes or
15 totes.
16        One department might have
17 shampoos and bleach.  We have cosmetics
18 and vitamins.  Another one might have
19 bulk cases that they're put into totes.
20   Q.   As a manager in this
21 department, are you assigned to a
22 specific location?
23   A.   My department covers
24 different locations to -- to parts of the

Page 20

1  building.  But being a manager in the
2  building, part of my responsibility is to
3  help other departments when I see it
4  necessary.  So we -- we are a global
5  system where we help each other out.  But
6  I'm mainly responsible for my centralized
7  products department.
8    Q.   Do you work at the Perryman
9  distribution center?
10   A.   Yes.
11   Q.   Have you always worked at
12 the Perryman distribution center?
13        MR. LAVELLE:  Object to
14   form.
15        THE WITNESS:  With Rite Aid,
16   yes.
17 BY MR. CLUFF:
18   Q.   So the work that you
19 oversee, other than you are a manager of
20 the centralized products, that is -- that
21 work is conducted at the Perryman
22 distribution center?
23   A.   Yes, it is.
24   Q.   How long have you held this

Page 21

1  position as manager of centralized
2  products?
3    A.   Well, this is like my second
4  tour of it.  Before I was an operations
5  manager of that, when it was -- included
6  pharmacy and our cigarettes department.
7  But that operations manager level has
8  been done away with a few years ago, so
9  now it's a department level position.
10 And so I've been doing this since 2010.
11   Q.   You mentioned that this is
12 your second tour as a manager of
13 centralized products.  And before that --
14 or -- or in between those tours maybe,
15 you were an operations manager of
16 pharmacy and cigarettes; is that correct?
17   A.   Yes, yes.
18   Q.   When did you hold the
19 position of operational manager over
20 pharmacy and cigarettes?
21   A.   It gets sort of complex.
22 When they first opened the building I was
23 night operations manager for four and a
24 half years.  And all the assistant

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  managers on nightshift from seven
2  departments, which included the pharmacy
3  department, all reported up to me.  So
4  that was for four and a half years.
5      And then for another two
6  years as a department manager, I took
7  over the pharmacy department and
8  cigarettes.
9      Then after that, took over
10  other departments as Operations Region 1,
11  Region 2, our satellite facility and
12  shipping department for two years.  Then
13  came back to pharmacy for two years as a
14  department manager for Rx, pharmacy, and
15  cigarettes for a year.  And then after
16  that I went to the replenishment
17  department which controls all of the
18  drivers and the stockers in the building,
19  for a year and a half.  And then came
20  back in 2010 till present to take over
21  the pharmacy and cigarettes and
22  centralized products department.
23      Q.   Is the -- the pharmacy and
24  cigarettes, is that a part of the

Page 23

1  centralized products department?
2      A.   No longer.
3      Q.   Was it at the time in 2010?
4      A.   Yes.
5      Q.   You gave me a lot of
6  information about different positions.
7  So I just kind of want to understand the
8  timeline here.
9      You said when they first
10  opened the building you were a night
11  operations manager for four and a half
12  years?
13      A.   Correct.  Yes.
14      Q.   When you refer to the
15  building, do you mean the Perryman
16  distribution center?
17      A.   Yes.
18      Q.   Do you recall what -- when
19  that was?
20      A.   1998 in August is when we
21  started the nightshift, until March 2003.
22      Q.   So you held the position of
23  nightshift manager from '98 to 2003, is
24  that your recollection?

Page 24

1      A.   Mm-hmm, yes.
2      Q.   And during that time you
3  said all of the nightshift -- all the
4  assistant managers in the nightshift
5  reported to you, correct?
6      A.   Yes.
7      Q.   And you referred to seven
8  departments which included the pharmacy
9  department?
10      A.   Yes.
11      Q.   What were the seven
12  departments?
13      A.   Pharmacy, cigarettes,
14  centralized products, the
15  shipping/outbound department, inbound
16  department, Regional 1 department,
17  Region 2 department, and the
18  replenishment department, stocking and
19  driving.
20      Q.   Pharmacy and cigarettes is
21  one department, correct?
22      A.   We try to keep it together
23  like that because they both dealt with
24  compliance, state or federal issues.  And

Page 25

1  we'd rather have that under one umbrella
2  as opposed to spreading it out.
3      Q.   You said after you were the
4  night manager, then you said for another
5  two years you were a department manager
6  over pharmacy and cigarettes?
7      A.   No.  After the night
8  manager, which is end of February 2003,
9  beginning March 2003, I was operations
10  manager for pharmacy and cigarettes.
11      Q.   And how long did you hold
12  that position?
13      A.   Oh, that was for two years.
14      Q.   So sometime in 2005?
15      A.   Mm-hmm.
16      MR. LAVELLE:  You -- you
17  need to give an audible answer
18  such as no --
19      THE WITNESS:  I'm sorry.
20  2003 to 2005, yes.
21  BY MR. CLUFF:
22      Q.   I believe then you testified
23  that you went to the replenishment
24  department?

Page 26

1    A.   From 2005 to 2007 they put
2 me in charge of Region 1, Region 2,
3 outbound, and our satellite facility.
4 And that was for two years.
5    Q.   What's Region 1?
6    A.   It's, if you walk into our
7 stores, it's any -- a lot of -- shampoos,
8 candy bars, hair nets, nail clips,
9 bleach, a lot of different front-end
10 items.
11    Q.   What's Region 2?
12    A.   Region 2 is sort of like the
13 Region 1 except it's more bulk case.  We
14 have a lot of cases going out and very
15 large items, like your 2, 3-gallon kinds
16 of bleach, bulk kind of picking.
17 Non-conveyor belt kind of items that
18 people have to pick by hand on -- with
19 machinery and you can't put it on the
20 line to convey to our shipping
21 department.
22    Q.   What -- what other
23 responsibilities of the outbound
24 department and the satellite facility

Page 27

1 that you were managing?
2    A.   With the outbound department
3 we had to make sure that all of our
4 trailers were loaded properly and that --
5 for example, we talk about pharmacy and
6 control drugs, that everything was
7 brought over correctly, that all control
8 drugs and pharmacy packages and totes all
9 looked exactly the same per DEA
10 requirements so you can distinguish
11 between a legend drug or control drug.
12 And that any control drugs brought over
13 to the shipping area were properly being
14 held in control-type cages and handed out
15 and signed for properly to the different
16 trucks that went to our DCs properly.
17    Q.   And -- and what about the
18 responsibilities as a manager of the
19 satellite facility, what did that entail?
20    A.   I had a department manager
21 work over there.  And that was mainly a
22 seasonal facility.  When you have
23 harvest, garden, Christmas is a big one.
24 We don't have enough room in our main

Page 28

1 Perryman distribution center, so we had
2 to rent a facility to accommodate that.
3 Then that was one of those seasonal
4 things, so you get a lot of product for
5 like three or four months.  The season go
6 away, then you might get garden, tools
7 for a couple months.  So it was a
8 facility that the population of the
9 workers would go up and down as -- as the
10 year went along.
11    Q.   So what was the next
12 position that you held after 2007?
13    A.   After 2007 I came over to
14 pharmacy again for a year.  It was just
15 pharmacy and cigarettes at that time.
16 That's when they eliminated the
17 operations manager level for budgetary
18 reasons.  I was there for a year.
19    Q.   And what did you do after --
20 what was your next position after that?
21    A.   After that I took over the
22 replenishment department, and
23 replenishment entailed the drivers and
24 stockers, and I was there for a year and

Page 29

1 a half, till 2010.
2         And then I came back to
3 pharmacy and cigarettes in 2010, and
4 centralized products.
5    Q.   And those are the positions
6 you've held since 2010, correct, the
7 pharmacy and cigarettes and --
8    A.   Centralized products.
9    Q.   Yes.
10         MR. LAVELLE:  Please wait
11      until the question is finished
12      before you answer it.
13         THE WITNESS:  Okay.
14 BY MR. CLUFF:
15    Q.   Between 2010 and the
16 present, what years did you hold
17 managerial responsibilities for pharmacy
18 and cigarettes?
19    A.   2010 to now, so it's nine
20 years later, so far.
21    Q.   Were you a manager over
22 pharmacy and cigarettes for that entire
23 time period?
24    A.   2010 till now, yes.

Highly Confidential – Subject to Further Confidentiality Review

Page 30

1  Q.  At what point between 2010
2  and the present were you a manager of the
3  centralized products?
4      A.  I am -- same, same period.
5      Q.  So those responsibilities
6  are sort of overlapping?
7      A.  Yes.
8      Q.  Understood.  Thank you.
9         During your time period with
10  Rite Aid, excuse me, have you been
11  responsible for managing the distribution
12  or -- or shipping of controlled
13  substances?
14         MR. LAVELLE:  Object to
15         form.
16         THE WITNESS:  Yes.  It came
17         under my purview.
18  BY MR. CLUFF:
19      Q.  In -- in what positions were
20  you responsible for overseeing the
21  distribution and shipping of controlled
22  substances?
23      A.  What positions?
24      Q.  Let me clarify.  At one

Page 31

1  point you discussed that, in your
2  experience, Rite Aid tried to keep the
3  pharmacy and cigarettes department
4  together because those both involved
5  compliance.
6      A.  Yes.
7      Q.  Did -- did your work in --
8  in those two departments involve
9  overseeing distribution or shipping of
10  controlled substances?
11      A.  Yes.
12      Q.  Are there any other
13  managerial positions that you held that
14  involved overseeing the shipment or
15  distribution of controlled substances?
16      A.  No.  Just operations manager
17  or department manager.
18      Q.  Do you recall which
19  controlled substances or which types of
20  controlled substances you were
21  responsible for?
22      A.  Yes.  Not all by name.  But
23  we only did III through V.
24      Q.  Do you recall if any of

Page 32

1  the -- let me back up.  When you say III
2  through V, do you mean those are the
3  schedules of controlled substances that
4  you were responsible for?
5      A.  Yes.
6      Q.  Do you recall if any of
7  those substances included prescription
8  opioids?
9      A.  No, I do not.
10      Q.  Do you recall if, during the
11  time period when you've worked at Rite
12  Aid, Rite Aid distributed or shipped
13  hydrocodone combination products?
14      A.  We shipped hydrocodones.
15      Q.  Would your work as a manager
16  have involved overseeing shipments of
17  hydrocodone?
18      A.  Yes.
19      Q.  Okay.  When you used the
20  word "compliance" to refer to the work
21  with the pharmacy and cigarette products,
22  what did you mean by compliance?
23      A.  Well, there's different -- I
24  mean, you have pharmacy, and you have

Page 33

1  cigarettes.  Which one are you asking
2  about?
3      Q.  Let's focus on pharmacy.
4      A.  Okay.  Pharmacy, we followed
5  all the regulations that were established
6  in the Code of Federal Regulations that
7  the DEA puts out.  And we also followed
8  the Maryland Pharmaceutical Appendum for
9  processing controlled drugs and other
10  pharmacy products.
11      Q.  When you refer to the
12  regulations that were established that
13  the DEA put out, what do you mean
14  specifically?
15      A.  Well, the Code of Federal
16  Regulations is -- specifies that before
17  you can handle any kind of controlled
18  substance, you have to have procedures
19  which account for the proper receiving of
20  items, make sure they're not counterfeit
21  and they're only coming from registered
22  DEA authority -- vendors, that you store
23  them properly, meaning that you inventory
24  them regularly and that you do not have

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 expired products in a cage, that when you
2 pick them that you use correct order
3 picking procedures, that you ship it
4 correctly to the stores, and that you
5 properly have controls into the proper
6 shipment of controlled drugs, and you
7 have full accountability and inventory
8 control of all items.
9      Q.   During your tenure with Rite
10 Aid, while there was a pharmacy
11 department -- actually, let me ask this
12 other question.
13         Are you aware if Rite Aid at
14 any point stopped distributing or
15 shipping hydrocodone products?
16         MR. LAVELLE:  Object to
17    form.
18         THE WITNESS:  Rite Aid
19    stopped shipping any controlled
20    substances in 2014, September,
21    October time frame.  And that
22    include legend drugs as well.
23 BY MR. CLUFF:
24    Q.   Those are what legend drugs?

Page 35

1    A.   Over-the-counter drugs,
2 other prescription drugs that are not
3 controlled substances.
4    Q.   So Rite Aid stopped
5 distributing legend drugs in 2014 as
6 well?
7    A.   Yes.
8    Q.   Do you -- are you aware of
9 when Rite Aid began distributing
10 hydrocodone products?
11    A.   When you mean Rite Aid, are
12 you talking about the Perryman
13 distribution center or Rite Aid in
14 general?
15    Q.   Let's start with Rite Aid in
16 general.
17    A.   No.  It was -- when I -- I
18 was hired in 1998, and they had been
19 doing it a number of years.  So I don't
20 know when they started.
21    Q.   So when you were hired they
22 were already shipping hydrocodone
23 products?
24    A.   Yes.

Page 36

1    Q.   So when I ask questions
2 about those hydrocodone products then,
3 I'd like us to just understand that my
4 questions refer to that time period
5 before 2014 when Rite Aid stopped
6 distributing them.  Does that make sense?
7    A.   Yes.
8    Q.   So before Rite Aid stopped
9 distributing the hydrocodone products in
10 2014, did Rite Aid have in place policies
11 or procedures to address all of the
12 compliance work that you just described
13 to me?
14    A.   Yes.
15    Q.   The first one that you
16 mentioned earlier was making sure that
17 the products Rite Aid receives or ships
18 were not counterfeit.  Does that make
19 sense?
20         MR. LAVELLE:  Object to
21    form.
22         THE WITNESS:  Yes.
23 BY MR. CLUFF:
24    Q.   Or do you recall that at

Page 37

1 least?
2    A.   Yes.
3    Q.   Would you have been
4 responsible for implementing Rite Aid's
5 policies and procedures about that aspect
6 of compliance?
7    A.   I would be responsible to
8 make sure that we had policies and
9 procedures in place, that associates were
10 trained in executing those, and that we'd
11 have audits to make sure that the
12 associates were doing those correctly.
13    Q.   You mentioned a number of
14 other compliance activities.  We can go
15 look at that list, but I want to just ask
16 a broader question.  Were you responsible
17 for making sure that Rite Aid had
18 policies and procedures in place for all
19 of the compliance work that you
20 previously described?
21    A.   Yes.
22    Q.   You also mentioned associate
23 training.  Were you responsible for
24 associate training on all of the

Page 38

1 compliance work that you previously
2 described?
3     A.   I was responsible -- I was
4 responsible for ensuring that training
5 was being conducted.  I was not an actual
6 trainer.
7     Q.   And then you also mentioned
8 audits.  Were you also responsible for
9 ensuring that compliance was audited?
10     A.   My responsibility as far as
11 doing audits was an internal thing,
12 ensure that quality was being done
13 correctly, that we were doing inventories
14 on schedule as per the Code of Federal
15 Regulations.  But we went beyond that and
16 did internal audits on our own.
17     Q.   The responsibility for
18 making sure that Rite Aid had policies
19 and procedures in place, associate
20 training, and audits, was that within
21 your managerial responsibilities from
22 1998 to 2014?
23     A.   Again, I wasn't there the
24 whole time, 1998 through -- I was there

Page 39

1 in 2003.  I can't comment on what
2 procedures and procedures were in place
3 before I got there in 20003.
4     Q.   Starting in 2003 you were
5 the manager at Perryman?
6     A.   Yes.
7     Q.   Okay.  So from 2003 to 2014,
8 was it part of your job responsibilities
9 for that entire time period to make sure
10 Rite Aid had policies and procedures in
11 place?
12     A.   Correct.
13     Q.   Okay.  And it was also part
14 of your job responsibilities to ensure
15 that associates were being trained?
16     A.   Yes.
17     Q.   And also part of your job
18 responsibilities to be overseeing or
19 ensuring that these internal audits were
20 conducted?
21     A.   Yes.
22     Q.   Is there anyone else
23 affiliated with the Rite Aid Perryman
24 distribution center that had

Page 40

1 responsibility for those -- those job
2 functions or responsibilities?
3         MR. LAVELLE:  Object to
4     form.
5         THE WITNESS:  Yes.
6 BY MR. CLUFF:
7     Q.   Who would that be?
8     A.   Any department managers that
9 would be working there, any assistant
10 managers that would have been working
11 there, the DEA coordinator, as well as
12 any leads that we had at the time.  Leads
13 would be our hourly paid supervisors.
14     Q.   What policies and procedures
15 did Rite Aid have in place between 2003
16 and 2014 to ensure that the controlled
17 substances they were distributing or
18 shipping were not counterfeit?
19     A.   Rite Aid had a policy that
20 the receiver, which happened to --
21 actually, the receiver was part of the
22 inbound department.  They worked in the
23 control cage.  They were required to have
24 a background check.  So they technically

Page 41

1 were assigned to that position, but they
2 weren't assigned to the pharmacy
3 department.  But all of the receivers
4 were trained to verify that any vendors
5 had the correct DEA number, that -- they
6 had -- they had ways of inspecting the
7 packaging to make sure that the verbiage
8 was correct, that they had a proper NDC
9 number and UPC number, that the dating
10 was correct, according to their packing
11 slip.
12     Q.   You also said that part of
13 the compliance work was ensuring that
14 product came from licensed DEA
15 registrants.  What policies and
16 procedures did Rite Aid have in place to
17 ensure that it was complying with that
18 part of its obligations?
19         MR. LAVELLE:  Object to
20     form.
21         THE WITNESS:  Well, that was
22     part of their policy and
23     procedure, that you had to go
24     through a series of steps to

Page 42

1  validate that the items were
2  coming from a DEA-approved vendor
3  and that -- I mean, we had
4  receiving -- standing operating
5  procedures, you know, an overview
6  on how to do it.  But the
7  technical, exactly how to receive
8  it, you had to open up one case to
9  inspect each item from each case
10 to make sure that was correct and
11 dated properly.
12     I mean, there's series of
13 steps within each procedure that
14 they had to follow.
15 BY MR. CLUFF:
16     Q.   Was there a written policy
17 and procedure document that they had to
18 follow?
19     A.   They had an internal inbound
20 receiving document that explained to them
21 exactly how to receive a problem -- a
22 product, if there was any issues, that
23 they were supposed to call the pharmacy
24 buyer in corporate for anything that

Page 43

1  might have been out of the ordinary as
2  far as not meeting the NDC number or if
3  the quantity that they shipped was
4  different than what was on the packing
5  list. So yeah, there was all that.
6     Q.   You mentioned part of the
7  compliance work being that there was no
8  expired product?
9     A.   Yes.
10     Q.   That's just ensuring that
11 the product isn't past its use by date?
12     A.   That's correct, or it's
13 within a certain date of shipping.  We
14 never received anything that was short
15 dated more than six months because you
16 didn't know when it was going to go out
17 to the stores.
18     Q.   You mentioned using correct
19 picking procedures.  What policies and
20 procedures did Rite Aid have in place to
21 ensure correct picking procedures?
22     A.   Well all of associates --
23 the pick-to-light was uniform throughout
24 the whole building.  So everybody, in the

Page 44

1  first three or four days, all were
2  trained on how to properly use that
3  system, because an associate in pharmacy
4  could be sent to Region 1, for example,
5  for the day or for a few hours if they
6  were short staffed or something.
7     So they are all trained on
8  how to properly put out the lights, short
9  down product, and have you within a
10 three-day time period.
11     Q.   What do you mean by short
12 down product?
13     A.   Meaning if a picker went to
14 a slot and that particular tote asked for
15 ten and there was nothing stocked in the
16 ten and they -- after they went around to
17 the back, there was nothing there for
18 them and there was only eight, they would
19 short it down to eight and only send
20 eight to the store.  So that the store
21 wouldn't be billed for more than what
22 they were getting.
23     Q.   Were there ever instances
24 where an associate would go to pick a

Page 45

1  product and determine that even though
2  there was inventory -- there was
3  sufficient inventory available, that they
4  still were not going to completely fill
5  an order?
6     MR. LAVELLE:  Object to
7  form.
8     THE WITNESS:  I don't know.
9  Again, the question -- are you
10 talking about building-wide or are
11 you talking about
12 pharmacy-specific or --
13 BY MR. CLUFF:
14     Q.   Pharmacy specific.
15     A.   -- or control cage specific?
16     Q.   Well, let's -- let's start
17 with pharmacy specific.  And I'll -- I'll
18 give you a little more clear explanation
19 kind of using what you described.
20     A.   Okay.
21     Q.   So let's say an associate is
22 told go -- go pick Product X in the
23 amount of ten.
24     A.   Right.

Page 46

1  Q.  And they get there and they
2  look at the order form and they say,
3  well, I can't fill that for ten, I have
4  to fill it for five, did that ever happen
5  in the pharmacy department?
6  A.  While I was controlling the
7  pharmacy department, that would not
8  happen.  First, the light would light for
9  a certain amount, and we were fortunate
10  during the time that we had -- we had our
11  own pharmacy stockers and drivers.  And
12  that's what was good about it, as opposed
13  to the other part of the building, when I
14  said I was the replenishment manager, the
15  front-end departments didn't have unique
16  stockers and drivers.  Pharmacy was the
17  only department in that whole building
18  that had it, that's why we had control
19  access into the whole pharmacy area in
20  general, that's legend, and then we had a
21  further access into the control cage.
22  So both places had their own
23  stockers and drivers to ensure that the
24  quality of the product being put in the

Page 47

1  slots was correct.  And that means
2  inventory, dating and all that.
3  So getting back to your
4  question, if somebody wanted -- needed
5  ten and there was only five, our
6  department was controlled enough that we
7  had leads and managers that would go look
8  for that product.  If it wasn't there,
9  we'd go to the storage location and pull
10  that product to satisfy the store's
11  needs.  And only if there was none left
12  in pharmacy would we short it down.
13  Q.  Okay.  And let's talk about
14  the controls now.  And I --
15  A.  It would have been the same
16  procedure for them.
17  Q.  Let me ask you a question
18  then.
19  So what was the normal
20  procedure for receiving an order from a
21  store for controlled substances?
22  A.  Again, the inbound receiving
23  clerk would receive the product.  Write
24  down exactly what they had.  Fill out

Page 48

1  their proper paperwork.  And attach a --
2  what we called a load ID to that
3  particular item's pallet, whatever
4  quantity it is, could be a whole pallet,
5  a couple cases, what have you, and then
6  another associate would take that, scan
7  that load ID and the system would tell
8  that driver where to locate that product.
9  So the product would be put
10  away into the storage rack or it may go
11  straight to the floor to pick -- to pick,
12  for an associate to send to a store when
13  asked.
14  Q.  When the -- the pickers in
15  the -- the control cage, when they
16  received an order did they -- or let me
17  ask you a foundational question.
18  Are you aware if Rite Aid
19  had thresholds for its stores related to
20  controlled substance products?
21  A.  There were thresholds
22  established throughout certain items when
23  it got -- were sent out a certain
24  quantity, no more than.

Page 49

1  Q.  What's your understanding of
2  a threshold?
3  A.  Threshold is that an
4  order -- a store should not order more
5  than their established threshold.  And we
6  would not send more than what the
7  established threshold was.
8  Q.  Do you have an understanding
9  of how the thresholds that you've
10  described were set at Rite Aid?
11  A.  I'm familiar with how it was
12  set.
13  Q.  Can you describe how they
14  were set?
15  A.  Janet Hart's team in
16  corporate would establish thresholds
17  based on sales of stores of certain
18  items.
19  Q.  Did you have any
20  participation in the establishment of
21  thresholds?
22  A.  No.
23  Q.  How do you understand that
24  Janet Hart's team set the thresholds?

Page 50

1    A.    They would communicate that
2  to us.
3    Q.    You said that thresholds
4  were established throughout certain items
5  and that that would result in only a
6  certain quantity being sent out, no more
7  than that.  Is that -- is that your
8  understanding?
9        MR. LAVELLE:  Object to
10  form.
11        THE WITNESS:  Yes.
12  BY MR. CLUFF:
13    Q.    When you say certain items,
14  are you referring to specific controlled
15  substances or some other products, do you
16  know?
17    A.    I'm only talking about the
18  control items in the control cage.
19    Q.    Okay.  Previously we talked
20  about hydrocodone products.  Were there
21  thresholds for hydrocodone products?
22    A.    Yes.
23    Q.    The pickers in the control
24  cage, did they have visibility into what

Page 51

1  the thresholds were for the hydrocodone
2  products?
3    A.    We had posted certain items
4  that stores habitually ordered a lot.
5  They would be posted throughout the
6  picking area for them not to exceed and
7  to report any excess -- any orders that
8  were above that amount to a lead or a
9  manager.
10    Q.    So if you can help me walk
11  through the process.  Let's -- let's go
12  back to the order picker in the control
13  cage.
14        So they receive a list of
15  items that they should be picking,
16  correct?
17    A.    No.
18    Q.    No.  Okay.  How does it work
19  for them then?
20    A.    We had different people
21  doing different things.
22    Q.    Okay.
23    A.    You had pickers that would
24  pull a tote, which the items would be

Page 52

1  picked into, to go to different bays or
2  zones or slots.  And as they scan the
3  tote's ID, now that tote ID belongs to a
4  store.  So that store wants X amount of
5  quantity dependent on what locations
6  items are.
7        So an associate would walk
8  to a location and might have eight.  So
9  they would put eight into the tote,
10  extinguish the -- the light, and go to
11  see if there's another location for that
12  store.
13        They might have only wanted
14  one item.  They might want a couple
15  items.  So they would go or push that
16  tote to the next zone to satisfy that
17  order.
18        We have another associate,
19  what we call the paperwork person, that
20  would print all the pick list IDs, what
21  we call green bar, which lists on
22  hardcopy all of the items that the store
23  ordered for that order.  They would match
24  that item numbers and tote number with

Page 53

1  the tote, and put that into the tote.
2  And it would also print a shipping label
3  to be placed on the lid of the tote after
4  matching the tote ID so that the
5  store's -- correct store was put on the
6  tote ID, matched the tote ID number, the
7  pick list that was supposed to -- that
8  matched the product that was in the tote
9  was in the tote, and then once the
10  picking was done, that tote would be
11  100 percent audited at one of our
12  auditing tables.  Each and every tote in
13  the control cage was 100 percent audited.
14    Q.    So it sounds like there
15  maybe are two stages in the packing
16  process.  The first is with the
17  associates that are actually taking the
18  totes and filling them using the
19  pack-light system, correct?
20        MR. LAVELLE:  Object to
21  form.
22        THE WITNESS:  Yes.
23  BY MR. CLUFF:
24    Q.    Okay.  So those associates

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 that are -- are filling totes using the
2 pack-light system, they don't have a list
3 of what items are being ordered for that
4 tote?
5         MR. LAVELLE:  Object to
6     form.
7         THE WITNESS:  No.  They
8     have, throughout the -- the
9     department we have a threshold of
10     no more than 5,000 units go to --
11     pills or units go to any
12     particular store.  So if they went
13     to a location and let's say it had
14     bottles of 500 pills in it, and
15     the thing lit up.  I don't know,
16     let's try to do the math.  500,
17     that would be 10.  If it's like
18     11, they would not send -- put 11
19     in the tote.  They would only put
20     10.
21 BY MR. CLUFF:
22     Q.   Okay.  I see you understand
23 kind of where I'm heading, kind of
24 understand what the -- the process is.

Page 55

1         So a tote picker would go to
2 a part of the store where the light lit
3 up, and let's say that light was for
4 hydrocodone products.  And we'll use your
5 example of a 500-pill bottle.  And let's
6 say the request was for 11, as you
7 suggested.
8         How would the -- the Rite
9 Aid associate who was filling the tote
10 know not to fill for more than 5,000
11 units?
12         MR. LAVELLE:  Object to
13     form.
14         THE WITNESS:  Because that
15     would be -- that would be the
16     threshold.
17 BY MR. CLUFF:
18     Q.   Okay.  How did the associate
19 know that that was the threshold?
20     A.   Because we had them
21 typewritten, no more than 10 of 500
22 bottles, no more of five, 100 bottles.
23 Because different items come in different
24 packaging at different times.  So we made

Page 56

1 sure, to avoid any mispicking even though
2 we did 100 percent audit, that an item
3 would be located that's not side by side.
4 In other words, you would not have a
5 package of 500-pill bottles next to a
6 package of 100-pill bottles, because if
7 somebody looked at the light, they could
8 mispick it and grab this by -- this many
9 by mistake, whatever.  We purposely
10 separated them so those kind of errors
11 wouldn't happen.
12         So then once that happened,
13 it goes to our audit table and then they
14 show everything that the store was
15 supposed to have ordered and what was
16 actually picked in the tote.  And
17 sometimes those were incorrect as well.
18 The store might have wanted only eight,
19 but the light might have lit up seven or
20 something.  So they would have to have
21 one more added to it.  But we'd call the
22 stores first.  Or if it lit up, they only
23 wanted 9, it could have loaded up 10.
24 The order sheet would say whether it was

Page 57

1 9 and we'd put the product back.
2         And then any associate that
3 made an error got a corrective action.
4     Q.   I want to stay with this
5 like, first phase which is the tote, the
6 tote filling --
7     A.   Okay.
8     Q.   -- the picking to fill the
9 totes.
10     A.   Mm-hmm.
11     Q.   I asked how the -- the
12 associates knew that there was a
13 5,000-unit threshold.  And you said that
14 we have them typewritten?
15     A.   Yes.
16     Q.   Earlier you mentioned that
17 there was something posted in the control
18 cage.  Is the typewritten thing you
19 mentioned the same as the thing you
20 mentioned that was posted?
21         MR. LAVELLE:  Object to
22     form.
23         THE WITNESS:  No.  Because I
24     think --

Page 58

BY MR. CLUFF:

Q.   Hold on, let's -- let's --
let's do it so I don't lose track.  What
is the typewritten information that you
were talking about?

A.   The item, the threshold
items were typewritten and posted for the
number of items that we had.  And they
were -- the font was like 36-inch font --
font, posted in the control cage, for
certain stores could only get this amount
or might be able to get this amount.

The typewritten list that
I'm referring to is called a pick list ID
which is downloaded automatically through
the order system which shows everything
that a store ordered, and then when we
did a tote audit, when we would count how
many items, we'd indicate individually
how many items the store was actually
getting into that tote.

Q.   Okay.  So there was --

A.   That stayed -- that stayed
with the tote to the store, so when the

Page 59

pharmacist got it or whoever checked in
that tote at the store would have that
packing list to verify exactly what we
said we sent them they were getting.

Q.   So there was a pick list ID
that moved with the tote --

A.   Correct.

Q.   -- as it was filled?

A.   Yes.

Q.   Understood.

MR. LAVELLE:  Please wait
until the question is finished
before you answer.

THE WITNESS:  Thank you.

BY MR. CLUFF:

Q.   Okay.  And then there was
also a posted document that you said for
the products that -- the thresholds that
explained what the thresholds were?

A.   Yes.

Q.   Am I understanding that
correctly?

A.   Yes.

Q.   Okay.  So for example, if we

Page 60

are talking about hydrocodone products,
that would have been included on this
posted document?

A.   If they had a threshold
established, yes.

Q.   Do you know if there was a
threshold for hydrocodone products?

A.   I don't remember.

Q.   Do you remember which
products were subject to a 5,000 unit
threshold?

A.   All the products in here
except pseudoephedrine.  They were only
24.

Q.   So all product in the
control cages were subject to a
5,000-unit threshold?

A.   No more than 5,000 units.

Q.   So as a pick -- as a picking
associate who would fill the totes went
through, if they saw that a store's pick
list ID called for an order that would
exceed the 5,000-unit threshold, what
happened?

Page 61

A.   They, one, would not send
them.  They would short it to an amount
below that.  They would let either a lead
or an assistant manager know that the
store exceeded the amount allowed.  And
then that lead or assistant manager would
place a phone call to the store -- we
used a phone log -- to mention to the
store, "Do you realize that you ordered
this," or whatever the conversation was.
But they were only going to get the
allowable amount.

Q.   So when the picking
associate is going through filling the
tote, how would he or she know that an
order that they were looking at was going
to go over this 5,000-unit threshold?

A.   Well, they use math, like
the rest of us.  I mean, if you're only
allowed 5,000 and you have a package of
five bottles, you're not going to send
more than ten -- if the light lights up
at 11, you're only going to send ten.

The --

Page 62

1    Q.   Sorry.  I didn't mean to
2 interrupt you.  Go ahead.
3        The 5,000-unit threshold,
4 was that per week or per month?  Do you
5 know?
6    A.   I believe it was for per
7 order.
8    Q.   What would happen if a store
9 had two orders during a one-week period
10 that were both for the max of 5,000
11 units?
12    A.   Corporate would have had to
13 approve that order to -- that store to do
14 another order, or the point of sale in
15 the store might have been that they've
16 sold that based on the scripts.
17    Q.   And would that -- would that
18 order then have then been approved and
19 shipped?
20        MR. LAVELLE:  Object to
21    form.
22        THE WITNESS:  The only
23    orders approved would have been if
24    corporate allowed it for them to

Page 63

1    order a second -- second amount.
2 BY MR. CLUFF:
3    Q.   You say if the picking
4 associates saw an order that was over the
5 5,000-unit number they would have shorted
6 that order; is that correct?
7    A.   Yes.
8    Q.   And then they would have
9 informed their lead or assistant manager
10 of the over-order, essentially?
11    A.   Yes.
12    Q.   Do you know who the
13 people -- those leads or assistant
14 managers would have been between 2003 and
15 2014?
16        MR. LAVELLE:  Object to
17    form.
18        THE WITNESS:  You mean, like
19    names?
20 BY MR. CLUFF:
21    Q.   Yeah.
22    A.   I could come up -- I could
23 remember some names, not all names.
24    Q.   Do you remember -- which

Page 64

1 names do you remember?
2    A.   Marian Wood.
3    Q.   Anybody else?
4    A.   Kim Brown, Linda Stewart,
5 Debra Chase.  That's all I can recall
6 right now.  A lot of them left the
7 company since that time.
8    Q.   You said that when those
9 leads, those assistant managers received
10 a report of an order that went over the
11 5,000 units, they would -- they would
12 call the store; is that accurate?
13    A.   They would attempt to call
14 the store to verify their order, let them
15 know that their order exceeded it and
16 they were only going to get a certain
17 amount.
18    Q.   What was the purpose of that
19 phone call to the store?
20    A.   Well, so that the store knew
21 that they were only getting a certain
22 amount, that the order exceeded what the
23 authorized amount was to send to them,
24 and that -- we would let corporate know

Page 65

1 that they exceeded that amount.
2        And sometimes the stores
3 might have a new tech or something like
4 that, they could have mis-ordered it in
5 the first place.  But let the pharmacist
6 know if someone might have -- someone
7 might have made a mistake.
8    Q.   You mentioned that you would
9 let corporate know that the store
10 exceeded that amount.  Is that a
11 different phone call than the call to the
12 store?
13    A.   Yes.  Because if a store,
14 when we called the resolution, and they
15 said, oh, well we meant to say eight and
16 we said 18, we wouldn't use that call to
17 corporate on it.  But if the store
18 constantly made the same mistake over and
19 over, it may indicate maybe they weren't
20 trained or something like that.  So we
21 wanted to make sure corporate would know.
22    Q.   That was essentially a
23 quality control call to corporate to let
24 them know how the store was performing?

Page 66

1     MR. LAVELLE: Object to
2 form.
3     THE WITNESS: Yes.
4 BY MR. CLUFF:
5     Q.   What if an order came in at
6 the end of the day while a pharmacy or
7 store was closed, would you call that
8 store or how would you deal with that?
9     MR. LAVELLE: Object to
10 form.
11     THE WITNESS: What do you
12 mean come in at the end of the day
13 when the store is closed? We had
14 a day shift and a night shift. So
15 the orders are point of sale.
16 They come down through the system.
17 Night shift picks them. And we
18 pick them during days. That
19 wouldn't coincide with a pharmacy
20 being closed or anything.
21     If we couldn't get ahold of
22 the store, we would set that aside
23 and let the day shift DEA
24 coordinator or manager attempt to

Page 67

1     call the store if the store was
2     not open.
3 BY MR. CLUFF:
4     Q.   Going back to the overall
5 compliance duties that you discussed
6 earlier. You mentioned ensuring that all
7 of the products at the distribution
8 center were stored properly. Do you
9 recall that?
10     A.   Yes.
11     Q.   What responsibility did you
12 have for ensuring that Rite Aid's
13 products at Perryman were stored
14 properly?
15     A.   Temperature controlled
16 environment. The whole pharmacy
17 department was temperature controlled,
18 sort of like an air conditioner. They
19 all had to be stored in required
20 temperatures, 77 degrees, and that their
21 humidity was at such a level that was
22 acceptable throughout the summer months
23 and throughout the year. And we had
24 numerous temperature recording and

Page 68

1 humidifier monitoring machines throughout
2 the whole pharmacy and control cage area.
3     Q.   How about security? Were
4 you responsible for physical security of
5 the products at the Perryman center?
6     MR. LAVELLE: Object to
7 form.
8     THE WITNESS: I was
9 responsible to make sure that we
10 had the correct facility --
11 security items in place. The
12 engineer make sure that the
13 control cage was built to standard
14 and the DEA approved everything
15 that we have in the facility.
16 BY MR. CLUFF:
17     Q.   One more follow-up for you
18 about the thresholds and the calls that
19 were placed about order changes. You
20 mentioned that there would be calls to
21 corporate to let them know how a store
22 was ordering. Do you recall that?
23     A.   Yes.
24     Q.   Do you know if there are any

Page 69

1 records or summaries of those phone
2 calls?
3     A.   We have records of what we
4 call the phone control log, where if an
5 associate thought the order was incorrect
6 for the store, that we'd write down the
7 store number, the quantity of the order,
8 and that we would call an associate who
9 we talked to, and a resolution.
10     Very rarely did we ever have
11 to -- and I don't even know if we ever
12 had to call corporate on a store going
13 out of pattern or ordering constantly
14 more than they were supposed to. But
15 that was a procedure in place.
16     Q.   So this -- did you say full
17 control log or phone control log?
18     A.   Phone.
19     MR. CLUFF: If we can get
20 that cleaned up on the record
21 after. Okay. Thanks.
22 BY MR. CLUFF:
23     Q.   So this phone control log,
24 that would be a record of the calls, for

Page 70

1 example, to the stores when they went
2 over the 5,000-unit number?
3        A.   Or it could be below that
4 they normally ordered.  Some stores were
5 weekly deliveries.  Some were biweekly.
6 And these associates, very few -- hardly
7 any turnover.  So they knew stores that
8 we -- whether it was from West Virginia
9 whatever, certain patterns that the
10 stores always ordered this or that.
11        So if they were a biweekly
12 store and they ordered less than what
13 they normally order, we'd put that in
14 there and call them as well too to make
15 sure, "Hey, you ordered 13.  You ordered
16 15.  Is this a correct order?"
17        So there was a familiarity
18 with us and the store relationship
19 developing.
20        Q.   And the people who were
21 making those calls, that was the leads
22 and managers, correct?
23        A.   Yes.
24        Q.   And so there's a log of all

Page 71

1 of those phone calls that occurred?
2        A.   There are numerous logs
3 throughout the years of those phone
4 calls.
5        Q.   So I was asking about the
6 calls to corporate about the stores to
7 see if there was a log of those calls
8 separate from this phone call log that
9 you just described.
10        Is there one?
11        MR. LAVELLE:  Object to
12     form.
13        THE WITNESS:  I don't recall
14     if there was a log for that or
15     not.  I think we would -- Marian
16     or somebody closer to it would
17     call corporate if we noticed that
18     a store ordered more than they
19     were supposed to.  And the store
20     would have -- might have responded
21     to Marian or whoever called, well,
22     we need this because of the sales.
23     Marian might have called Janet
24     Hart and said hey, this store said

Page 72

1 that this quantity is not enough,
2 and then it would be up to Janet
3 Hart to make -- or her group to
4 determine whether, well, based on
5 sales maybe it should be increased
6 or no, it's not.
7        But they were the approval
8 authority for any kind of
9 thresholds or amounts shipped to
10 the stores.
11 BY MR. CLUFF:
12        Q.   You said based on sales
13 maybe it should be increased or no.  When
14 you say sales, do you mean the amount of
15 drugs that a Rite Aid store was
16 dispensing?
17        A.   Based on the sales of how
18 many scripts the stores had, I guess at
19 that time or that they were -- the
20 patients they had.  I mean I don't know
21 what all the metrics that Janet Hart and
22 them used for that.  I only know it's
23 based on point of sales that the store
24 was using.

Page 73

1        Q.   So your understanding is
2 that -- that sales information was used
3 to understand whether a threshold should
4 be increased?
5        MR. LAVELLE:  Object to
6     form.
7        THE WITNESS:  As I
8     understand it, it might have been
9     part of it.
10 BY MR. CLUFF:
11        Q.   You -- you mentioned that
12 you almost never called corporate about a
13 store that was ordering over its
14 threshold, was that -- did I get that
15 right?
16        MR. LAVELLE:  Object to
17     form.
18        THE WITNESS:  I can't recall
19     a store -- I mean corporate being
20     called for that reason.
21 BY MR. CLUFF:
22        Q.   Do you recall corporate
23 being called for any other reason?
24        MR. LAVELLE:  Object to

Page 74

```
1    form.
2         THE WITNESS:  I don't
3    recall.  Again, I'm not physically
4    working in the control cage
5    24 hours.  Those are the people
6    that work there, the assistant
7    managers and the leads, and the
8    DEA coordinator.
9  BY MR. CLUFF:
10        Q.   So if we wanted to talk to
11   somebody about how often corporate was
12   called, it would be the leads or the
13   managers who were working in the cage?
14        A.   Or the DEA coordinator,
15   correct.
16        Q.   Are you aware if corporate
17   ever took action on a store that was
18   consistently ordering above its
19   threshold?
20        A.   I'm not aware of that.
21        Q.   Are you aware if corporate
22   ever took any action on a store that was
23   ordering consistently under its
24   threshold?
```

Page 75

```
1         A.   Again, not being corporate,
2  I don't know, I'm not aware of what they
3  did or did not do.
4         Q.   And you were -- when you
5  refer to corporate, is there a person
6  you're referring to at corporate who
7  would have been aware of that
8  information?
9         A.   Janet Hart.
10        Q.   Anybody else?
11        A.   No, that I'm aware of.
12        Q.   Okay.  I want to go back to
13  the storage issues we were talking about.
14  We've been going about an hour.  I
15  propose that we talk about this physical
16  security stuff for a second, and then we
17  can take a break, if that's all right
18  with you?
19        A.   I'm fine.
20        Q.   So going back to the
21  physical security.  You talked about
22  the -- the cages and making sure they
23  were built to the DEA's specs, do you
24  recall that?
```

Page 76

```
1         A.   Yes.
2         Q.   Okay.  Were you in charge of
3  ensuring that the -- the cage
4  construction complied with DEA
5  regulations?
6         A.   I was a manager in charge
7  that the DEA would only approve certain
8  cage construction.  The industrial
9  engineer on site would have been the
10  person that contracted the people to
11  build the cage to the DEA specifications,
12  and then DEA would come out, which they
13  did when we expanded the cage, to ensure
14  that it met their compliance.  The -- the
15  metal gauge on the fence, and that they
16  were close, and all of that.
17        Q.   So the -- the engineer would
18  have been responsible for building the
19  cage as -- as you stated, correct?
20        A.   He would have been
21  responsible for hiring the contractors to
22  build the cage to the specifications to
23  DEA, correct.
24        Q.   Are you aware that in
```

Page 77

```
1  order -- do you have any understanding
2  about whether or not Rite Aid was
3  required to obtain a registration from
4  the DEA to distribute controlled
5  substances?
6         MR. LAVELLE:  Object to
7     form.
8         THE WITNESS:  Yes, we always
9     have had that.
10 BY MR. CLUFF:
11        Q.   Are you aware whether Rite
12 Aid as a registrant was required to
13 provide effective controls against
14 diversion?
15        A.   Yes.  We always had
16 effective controls against diversion.
17        Q.   What's your understanding of
18 what diversion is?
19        A.   Diversion is any theft,
20 misappropriation, misuse of any pharmacy
21 items, which includes control drugs.
22 Not in -- we had procedures, a lot of
23 procedures in place to make sure that
24 didn't happen.  We had SOPs where each
```

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 associate taking out the trash had to
2 have a lead or a manager inspect for any
3 loose bottles that might have fallen into
4 the trash or got caught up in the -- in
5 the plastic before throwing it away on
6 the conveyor line. Any instances of
7 bottles on -- on the floor, we reported
8 that to the leads and managers. Because
9 humans being humans, you pick something
10 up and drop it and then continue and not
11 really realize that you dropped it, or
12 what have you.
13     And we were real good at
14 that, because we, at the end of every
15 day, which we -- there's no requirement
16 anywhere, for both shifts, did a forward
17 pick inventory for everything. And we
18 weren't really -- we're not required to
19 do it. There's nothing in the federal
20 regulations for that. They don't require
21 biennial inventory or a annual inventory.
22 We did it daily, the forward picks.
23     Q. What's a forward pick
24 inventory?

Page 79

1     A. I mean if we go back to what
2 I explained to you what a forward pick
3 was, that's what the -- where the product
4 is, where the associates pick the product
5 out of the boxes and put in the totes.
6 Well, forward pick inventory is we
7 inventory every one of those pick slots
8 at the end of each shift to make sure
9 that it matches up, the system inventory
10 for it.
11     Then monthly we did storage
12 inventories as well.
13     Q. When I asked you what your
14 understanding of diversion is, you said
15 that it was any theft, misappropriation,
16 misuse of any pharmacy items including
17 drugs.
18     Are you aware of any other
19 kind of diversion that Rite Aid was
20 required to prevent?
21     MR. LAVELLE: Object to
22     form.
23     THE WITNESS: Well,
24     over-ordering, excessive orders.

Page 80

1     That includes the shipping
2 department as well. I mean, you
3 ship it, that's why I said when I
4 was in charge of the outbound
5 department, we were only delivered
6 control drugs, and it's strapped,
7 tote-tied, red totes to the
8 outbound shipping areas whether it
9 was to a crosswalk DC or to our
10 local stores, in an approved cage
11 that only trained associates, in
12 those cages in the outbound
13 department, would sign those totes
14 out to the truck right before it
15 was ready to depart for the
16 stores.
17 BY MR. CLUFF:
18     Q. Are you aware of what a
19 suspicious order is?
20     A. Yes.
21     Q. What's your understanding of
22 the term "suspicious order"?
23     A. Suspicious order would have
24 been, in my estimation, a gross amount of

Page 81

1 orders that the store, through -- break
2 its pattern, ordered more than it
3 normally does, a large amount above it,
4 or it could be less than, as far as that
5 goes as well. And it does not -- it's
6 just not in sync of what a normal store
7 would have -- would do when they place an
8 order.
9     Q. During your time as a
10 manager from 2003 to 2014, are you aware
11 of any suspicious orders being reported
12 by Rite Aid to the DEA?
13     A. No, I'm not aware -- aware
14 of any of that.
15     Q. Is that because it never
16 occurred?
17     MR. LAVELLE: Object to
18     form.
19     THE WITNESS: From my --
20     from my distribution center it
21     never occurred.
22 BY MR. CLUFF:
23     Q. And when you say from your
24 distribution center it never occurred, do

Page 82

1 you mean that your distribution center
2 never reported a suspicious order to the
3 DEA?
4     A.   Yes.
5     Q.   Are you aware of any
6 investigations of potentially suspicious
7 orders during the time period you were
8 the manager at Perryman between 2003 and
9 2014?
10         MR. LAVELLE:  Object to
11     form.
12         THE WITNESS:  Are you
13     referring to investigations of the
14     Perryman distribution center?
15 BY MR. CLUFF:
16     Q.   No.  My question was a
17 little more specific.
18         So are you aware, at
19 Perryman, if there was ever an
20 investigation about a potentially
21 suspicious order between 2003 and 2014?
22         MR. LAVELLE:  Object to
23     form.
24         THE WITNESS:  No, I'm not

Page 83

1     aware of that.
2 BY MR. CLUFF:
3     Q.   Is that because no
4 investigations were ever conducted?
5         MR. LAVELLE:  Object to
6     form.
7         THE WITNESS:  I'm not aware
8     of any investigation.
9 BY MR. CLUFF:
10     Q.   You used the term earlier
11 "excessive ordering."  What does that
12 term mean to you?
13     A.   Excessive ordering means
14 that a store is ordering a quantity that
15 they are not allowed to on a consistent
16 pattern over and over again.  And that
17 looks suspicious, that it's not in their
18 character based on our dealings with
19 them.
20     Q.   So excessive ordering in
21 your opinion looked suspicious?
22         MR. LAVELLE:  Object to
23     form.
24         THE WITNESS:  What -- what's

Page 84

1     the question?  Excessive ordering
2     looks suspicious, is that what the
3     question is?
4 BY MR. CLUFF:
5     Q.   Yeah.  Here is what you
6 said:  You said excessive ordering means
7 that a store is ordering a quantity that
8 they are not allowed to on a consistent
9 basis, and it looks suspicious.
10         So my question is, to just
11 understand your answer that, that to you,
12 excessive ordering looked suspicious?
13         MR. LAVELLE:  Object to
14     form.
15         THE WITNESS:  Well, I hope
16     we're not getting confused with
17     above the threshold.  Because a
18     store may order above threshold,
19     but that doesn't mean that it's,
20     in my opinion, a suspicious order.
21     It could be just a mistake.
22 BY MR. CLUFF:
23     Q.   Yeah, is that -- I'm sorry,
24 I didn't mean to talk over you.

Page 85

1         That -- that was not my
2 question.  My question was really just
3 based on -- on the answer you just gave,
4 which is that excessive ordering was a
5 pattern of a store consistently ordering
6 more than that it was allowed to, and
7 then I believe you said that that looks
8 suspicious.  So is it --
9     A.   It -- it could be
10 suspicious --
11         MR. LAVELLE:  Object to
12     form.  Wait till the question is
13     finished before you answer it,
14     sir.
15 BY MR. CLUFF:
16     Q.   And always make sure you
17 give your counsel an opportunity to
18 object.
19         But to go back to this
20 question that I had earlier about
21 excessive ordering.
22     A.   Mm-hmm.
23     Q.   I asked you, you know, what
24 your understanding of excessive ordering

Page 86

1 was. Do you recall that?
2     A.   Yes.
3     Q.   Okay.  And then we were
4 looking -- I was looking at your answer
5 on realtime.  We have a feed of the
6 transcript that comes out, so I was kind
7 of looking at what was transcribed of
8 your answer.
9         And you said that excessive
10 ordering was a store ordering over the
11 quantity consistently that they are
12 allowed to.  Is that how you understood
13 excessive ordering patterns?
14         MR. LAVELLE:  Object to
15     form.
16         THE WITNESS:  Yes.
17 BY MR. CLUFF:
18     Q.   And to you, was an excessive
19 ordering pattern, was that suspicious?
20         MR. LAVELLE:  Object to
21     form.
22         THE WITNESS:  What -- what
23     is the question, to me an
24     excessive ordering is suspicious,

Page 87

1     is that what you said?
2 BY MR. CLUFF:
3     Q.   An excessive ordering
4 pattern in your experience as a manager
5 from 2003 to 2014, did you believe that
6 was suspicious?
7         MR. LAVELLE:  Object to
8     form.
9         THE WITNESS:  Well, we
10     didn't have an instance, what you
11     just said.
12 BY MR. CLUFF:
13     Q.   What do you mean you didn't
14 have that instance?
15     A.   You said as a manager, based
16 on my experience, would excessive
17 ordering be suspicious.  Well, we didn't
18 have that pattern of excessive ordering.
19 And as a matter of fact, when we had the
20 DEA audit back in 2012, they were real
21 happy with our excessive ordering
22 monitoring system.  They walked through
23 the whole cage because they spent all day
24 there looking at how we picked all of our

Page 88

1 pick list IDs, all of our postings, our
2 control logs, how we audited 100 percent
3 of our totes.  And they were very, very
4 happy with the way we had our controls in
5 place, and they wished other places did
6 the same thing we did.
7         And they didn't see -- we
8 showed them the phone logs.  They said
9 you know, this is fine, you're keeping
10 track of anything.  And nothing looked
11 out of place to them.  That was the
12 second of four audits they had of our
13 facility.
14     Q.   When that DEA audit
15 occurred, did you tell them that you had
16 never reported a suspicious order from
17 the Perryman center?
18     A.   I don't recall that.
19         MR. CLUFF:  Let's take a
20     little bit of a break.
21         THE WITNESS:  Sure.
22         MR. CLUFF:  Maybe just five,
23     ten minutes.
24         THE VIDEOGRAPHER:  Off the

Page 89

1     record, 10:39 a.m.
2         (Short break.)
3         THE VIDEOGRAPHER:  We are
4     back on the record at 10:59 a.m.
5 BY MR. CLUFF:
6     Q.   Okay.  Mr. Frost, we're back
7 on the record, so you are under oath
8 again.
9         Before we broke we were
10 talking about excessive ordering
11 patterns.  Do you recall that?
12     A.   Yes.
13     Q.   Okay.  And you talked about
14 there were these, what you referred to as
15 phone call logs about orders from Rite
16 Aid stores that were -- were over the
17 5,000-unit mark.  Do you recall that?
18     A.   Yes.
19     Q.   Do you know if those --
20 those call logs were also referred to as
21 above average order call logs?
22     A.   No.  I don't know if they
23 were referred to that at all, like that.
24     Q.   Were they ever referred to

Page 90

1 as excessive order logs?

2    A.   Yes.

3    Q.   How about threshold logs?

4    A.   Yeah.  Same thing.

5    Q.   So if we -- if we looked at

6 one of those, those logs, that would be a

7 record of calls that were made about

8 orders that were deemed to be excessive?

9        MR. LAVELLE:  Object to

10      form.

11      THE WITNESS:  Above the

12      order threshold.

13 BY MR. CLUFF:

14   Q.   And then also excessive,

15 because they were above the order

16 threshold?

17   A.   Yeah, that's excessive,

18 above the threshold, more than required.

19   Q.   Yeah.  But none of those

20 orders would have been reported to the

21 DEA, right?

22   A.   No.

23   Q.   So as part of the litigation

24 Rite Aid produced a copy of what has been

Page 91

1 referred to as personnel files.  So I

2 have a copy here today that I'd like to

3 kind of walk through with you, and the

4 way that this works is that I put a

5 sticker on the copy that I give to you to

6 mark it as an exhibit number.

7        So I'm going to put that, so

8 that I don't mess up any of the text, I'm

9 going to put that at the top here.  We're

10 going to mark that Frost Exhibit 1.  So

11 I'm going to hand you that.  And then

12 later today if I end up referring back to

13 this document, I'll refer to it as

14 Exhibit 1.  Does that make sense?

15   A.   Sure.

16      (Document marked for

17      identification as Exhibit

18      Rite Aid-Frost-1.)

19 BY MR. CLUFF:

20   Q.   Okay.  So I don't know if

21 you've ever seen that before.  I have

22 some questions about it that I want to go

23 through with you.

24      You're free to familiarize

Page 92

1 yourself with it.  So if you'd like to do

2 that for a minute, go ahead.  If you want

3 me to just proceed with my questions, you

4 just let me know.

5        MS. FREEL:  Could you please

6      state the Bates number for the

7      record.

8        MR. CLUFF:  Yeah.  That was

9      really loud.  The Bates number

10      Rite_Aid_OMDL_0050596.  It's a

11      30-page -- wait.  Maybe I started

12      it one page short.

13      Yeah, 50596.  And the last

14      page ends at 50625.

15 BY MR. CLUFF:

16   Q.   Did you take a moment to

17 familiarize yourself with that,

18 Mr. Frost?

19   A.   Yes.

20   Q.   To start I want to ask some

21 background information about what kind of

22 information it appears is in the

23 personnel file.  If you look at the first

24 page, at the very top left corner it says

Page 93

1 "performance management."

2        Do you see that?

3    A.   I do.

4    Q.   Looking at this page of the

5 document in the center, it also says,

6 "Annual performance review, FY 2014."

7        Do you see that?

8    A.   I do.

9    Q.   While you've been employed

10 at Rite Aid, did you receive yearly

11 performance reviews?

12   A.   Yes.

13   Q.   Would you have received one

14 for every year that you've been employed

15 at Rite Aid?

16   A.   Yes.

17   Q.   Okay.  Moving down into the

18 middle of the page, it looks like it

19 says, "DC salary competencies."

20      Do you see that?  It's the

21 last line of text just before the chart

22 begins.

23      Just to give you a little

24 bit of heads-up.  There's a screen here

Page 94

1 in front of your counsel to your left.
2 We've got an electronic document --
3      A.   Okay.  Okay.
4      Q.   -- that you're looking at.
5 And so sometimes I might refer to
6 information on the page.  And Zach, who's
7 our trial tech, will highlight that
8 information.  So it can kind of help you
9 follow along if my instructions are not
10 more clear.
11           But do you see where it says
12 salary competencies there?
13      A.   Sure do.
14      Q.   Okay.  Do you know what a DC
15 salary competency is?
16      A.   Yes.
17      Q.   What is it?
18      A.   It's a competency of all
19 managerial positions.
20      Q.   Okay.  And then if you look
21 immediately under that, there's a
22 heading, column heading that says
23 "self-assessment"?
24      A.   Yes.

Page 95

1      Q.   And then immediately to the
2 right of that it says "supervisor
3 assessment"?
4      A.   Yes.
5      Q.   So what was the process for
6 these annual reviews?  Did you do an
7 assessment of yourself before meeting
8 with a supervisor?
9      A.   Yes.
10      Q.   And would you have done that
11 self-assessment using this chart that's
12 presented on Page 1 of Exhibit 1?
13      A.   Yes.
14      Q.   And then what was the
15 process after you conducted the
16 self-assessment?  What happened next?
17      A.   It would be given to my
18 supervisor to do their assessment.
19      Q.   And then what happened after
20 your supervisor did their assessment?
21      A.   We both sign the assessment,
22 and that's it.
23      Q.   Would you have discussed
24 your self-assessment with your

Page 96

1 supervisor?
2      A.   Before -- before the
3 assessment?  Before his assessment?
4      Q.   At any time before you both
5 signed it.
6      A.   During the annual review
7 process, we might have.
8      Q.   During the annual review
9 process, would you have discussed your
10 supervisor's assessment?
11      A.   Yes.
12      Q.   So my question, I guess,
13 leads up to, during the annual review
14 process, both you and your supervisor
15 would have had a chance to review this
16 document before it was signed, correct?
17      A.   Yes.
18      Q.   I want to go to the next
19 page which ends in Bates Number 509597.
20           Do you see there on the left
21 side, the first full row, it says
22 "strategic skills"?  Do you see that?
23      A.   Where are we at here?
24      Q.   That page right there.

Page 97

1      A.   Okay.
2      Q.   If you go over -- one, two,
3 three, four -- five columns there's a
4 bold line that says "strength."
5           Do you see that?
6      A.   Yes.
7      Q.   And then underneath that
8 there is another one that says
9 "opportunity."  And under that there's
10 another bold line that says "comments."
11           Do you see that?
12      A.   I see it.
13      Q.   Under the comments section,
14 it says, "All holiday rolls successful.
15 DEA and VAWD portion of CS audit
16 successful" -- or -- "CSA audit
17 successful."
18           Do you see that?
19      A.   I see it.
20      Q.   What is a -- what is a DEA
21 and VAWD audits that are referenced
22 there?
23           MR. LAVELLE:  Object to
24      form.

Page 98

1      THE WITNESS:  A DEA audit?
2   BY MR. CLUFF:
3      Q.   Yeah.
4      A.   It's an inspection of our
5   control cage procedures.
6      Q.   So sometime in 2014 the DEA
7   inspected the control cage procedures?
8      A.   It doesn't mean necessarily
9   that they did it.  But they might have
10  made phone calls or they might have
11  there -- it's a comment, and VAWD.  So I
12  threw it altogether.  I mean, they might
13  not have specifically showed up that
14  year.  But that doesn't mean that I don't
15  put it down as a strength.
16     Q.   Okay.  What does the "VAWD
17  portion of CSA audit successful" refer
18  to?
19     A.   Verified Accredited
20  Wholesale Distribution.  It's -- that's
21  what it is.
22     Q.   What is that?
23     A.   It's an organization in the
24  United States that all pharmaceutical --

Page 99

1   pharmacists get together and agree that
2   distribution centers should meet minimum
3   standards in processing, receiving,
4   shipping and storing pharmacy drugs.
5      Q.   Was that some sort of a
6   certification that Rite Aid was required
7   to obtain to distribute or sell
8   controlled substances?
9      MR. LAVELLE:  Object to
10     form.
11     THE WITNESS:  It's not a
12     requirement but the State of
13     Maryland likes for their
14     distribution centers to be
15     certified in VAWD.
16  BY MR. CLUFF:
17     Q.   And was the VAWD
18  certification part of your job
19  responsibilities?
20     A.   I prepared the SOPs to
21  explain to the VAWD organization what we
22  did with our pharmacists.
23     Q.   If you go over two more, it
24  looks like that would be the column for

Page 100

1   the supervisor assessment.
2      A.   Mm-hmm.
3      Q.   The comment there is -- I
4   want to focus on a portion of it that
5   says, "Keith is always on top of the
6   required DEA and VAWD requirements and
7   single-handedly provides the criteria
8   needed to assure full compliance within
9   those guidelines."
10     Do you see that?
11     A.   I see it.
12     Q.   When your supervisor refers
13  to full compliance within those
14  guidelines, was he referring to DEA
15  guidelines or VAWD requirements, do you
16  know?
17     MR. LAVELLE:  Object to
18     form.
19     THE WITNESS:  No, I don't
20     know.
21  BY MR. CLUFF:
22     Q.   Was it your experience that
23  you were single-handedly providing
24  criteria to necessarily assure full

Page 101

1   compliance?
2      A.   I authored all of the VAWD
3   SOPs.
4      Q.   Were there a separate set
5   of -- when you say VAWD, were you using
6   VAWD as a word?
7      MR. LAVELLE:  Object to
8      form.
9      THE WITNESS:  It's an
10     abbreviation for the Verified
11     Accredited Wholesale Distribution.
12  BY MR. CLUFF:
13     Q.   Okay.  So is there a
14  separate set of operating procedures for
15  the VAWD?
16     A.   Versus?
17     Q.   Just DEA compliance
18  guidelines or Rite Aid standard operating
19  procedures?
20     MR. LAVELLE:  Object to
21     form.
22     THE WITNESS:  No, there's no
23     separate.
24  BY MR. CLUFF:

Page 102

1  Q.  Let's move down to the next
2  row on that same page.  Do you see on the
3  left-hand side it says "performance"?
4  A.  Yes.
5  Q.  Okay.  If we go over into
6  the middle column where there's the same
7  bold headings, strength, opportunity,
8  comment.
9  Do you see that?
10  A.  Yes.
11  Q.  Okay.  And that's the
12  portion that you would have created for
13  your self-assessment, correct?
14  A.  Correct.
15  Q.  Under the bold heading that
16  says, "Opportunity, customer focus -
17  understands the customer."
18  Do you see that?
19  A.  Yes.
20  Q.  What did you mean when you
21  said that was an opportunity to
22  understand the customer?
23  A.  Oh, that was referring to --
24  we refer in our building that departments

Page 103

1  are also our customers, not just stores.
2  So that's where I put that focus, another
3  department.
4  Q.  What department were you
5  referring to?
6  A.  I don't recall which one I
7  was referring to back then.
8  Q.  So at Rite Aid, just so that
9  I understand, based on what you just
10  testified, Rite Aid associates view
11  customers and other departments as
12  customers, right?
13  A.  Yes.
14  Q.  Okay.  And is there any sort
15  of policy or corporate culture around
16  relationship to the customer, i.e., the
17  stores?
18  A.  Repeat the question.
19  Q.  Yeah.  It was not a really
20  well-worded question.
21  So I'm sure you've heard the
22  saying, "The customer is always right."
23  Do you know what I mean?
24  MR. LAVELLE:  Object to

Page 104

1  form.
2  THE WITNESS:  Yes.
3  BY MR. CLUFF:
4  Q.  Okay.  Was there any sort of
5  like a corporate culture like that at
6  Rite Aid regarding servicing its
7  customers?
8  MR. LAVELLE:  Object to
9  form.
10  THE WITNESS:  I don't know
11  what "like that" means.  The
12  stores were supposed to give them
13  the product on time.  That's
14  servicing our stores.
15  BY MR. CLUFF:
16  Q.  Please turn to the next
17  page.  Here there's another chart with a
18  heading over it that says "career
19  aspirations."
20  Do you see that?
21  A.  I do.
22  Q.  On the left on the bottom it
23  says, "Associate career goals/interests."
24  Do you see that?

Page 105

1  A.  Yes.
2  Q.  Okay.  And there, that's a
3  portion that you would have written,
4  correct?
5  A.  Yes.
6  Q.  And you wrote, "Would like
7  to maintain department manager level
8  position in company given that Rx is
9  being dissolved."
10  What did you mean when you
11  wrote that?
12  A.  Well, pharmacy was being
13  dissolved in 2014.  And there was no --
14  no guarantee that there would be a
15  position available in the distribution
16  center for me.
17  Q.  We may have discussed this
18  earlier.  But I just want to make sure
19  that we kind of close the loop between
20  this document and what we discussed
21  earlier.  Why was pharmacy being
22  dissolved in 2014?
23  A.  Business decision, that's
24  the only thing I can say.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.   Did it have anything to do
2  with Rite Aid's decision to stop
3  distributing hydrocodone products?
4    A.   I have no idea.
5    Q.   Was a manager level position
6  made available for you after pharmacy was
7  dissolved?
8    A.   Yes.
9    Q.   I want to move ahead a few
10 pages in this document.  If you --
11 looking at the bottom of the document,
12 you'll see there are what we -- we refer
13 to as Bates numbers.  Do you see that in
14 the bottom right corner?
15   A.   Okay.
16   Q.   So if you move forward to
17 the eighth page, that number -- that page
18 ends in 50603.
19   A.   Okay.
20   Q.   All right.  So -- yeah,
21 you've got the right page.  Looking at
22 the top of that document it looks like
23 this is an annual performance review for
24 FY 2013.  Do you see that?

Page 107

1    A.   Okay.
2    Q.   Starting in the first row of
3  the -- the chart there, the associate
4  objective is referred to as service, do
5  you see that?
6    A.   Mm-hmm.
7         MR. LAVELLE:  Give an
8    audible answer.
9         THE WITNESS:  Sorry, yes.
10 BY MR. CLUFF:
11   Q.   And -- okay.  If you go over
12 to the supervisor assessment, it looks
13 like the supervisor gave an assessment of
14 needs development.  Do you see that?
15   A.   Okay.
16   Q.   It says, "The on-time goal
17 was missed by .41 percent with a 97.59
18 versus a goal of 98 percent."
19        Do you know what that refers
20 to?
21   A.   Yes.
22   Q.   What does that refer to?
23   A.   The building's outbound
24 delivery goals.

Page 108

1    Q.   And what were those delivery
2  goals in 2013?
3    A.   I don't know.  It says here
4  98 percent.
5    Q.   Well, what are they
6  measuring in terms of delivery goals?
7    A.   The outbound department
8  truck typically had about three at the
9  most, maybe four stores, and they had to
10 be at those stores within a certain
11 amount of time window to make the
12 deliveries to the stores.
13   Q.   So then, this means that
14 they missed that -- that goal by less
15 than .5 of a percent?
16   A.   Yes.
17   Q.   Okay.  The next sentence in
18 that -- in that little box says, "AES
19 survey results came in at a 47 versus a
20 48 for FY '12 resulting in a negative
21 3.36 percent result."
22        Do you know what AES survey
23 there refers to?
24   A.   Yes.

Page 109

1    Q.   What does that refer to?
2    A.   It's the associate
3  satisfaction survey.
4    Q.   What is an associate
5  satisfaction survey?
6    A.   The associates in the
7  building -- well, actually supply chain,
8  but our building, had the opportunity and
9  myself included as managers to answer a
10 series of questions concerning the -- the
11 building.
12   Q.   What do you mean answer a
13 series of questions about the building?
14   A.   Well, and supply chain.
15 Like one question would be, I intend to
16 be in Rite Aid, working for Rite Aid in
17 the next six months.
18   Q.   I'm trying to understand who
19 would have been filling out the survey
20 and what it would have been about, so I
21 want to back up and just get a little
22 more clarification here.
23        You said something about the
24 supply chain.  What were you referring to

Page 110

1 when you used the phrase "the supply
2 chain"?
3          MR. LAVELLE:  Object to
4     form.
5          THE WITNESS:  All
6     distribution centers.
7 BY MR. CLUFF:
8     Q.    So all of the Rite Aid
9 associates who worked in a distribution
10 center were able to fill out this survey?
11     A.    As well as corporate Rite
12 Aid also.
13     Q.    Okay.  And the survey was
14 about workplace or job satisfaction?
15     A.    Correct.
16     Q.    Were there any questions
17 about the performance of job
18 responsibilities on that kind of a
19 survey?
20     A.    No.
21     Q.    And you recall filling out
22 these surveys?
23     A.    I think they were phone
24 calls.  You dialed a number and the

Page 111

1 survey would be over the phone.
2     Q.    Do you ever recall reviewing
3 any written results of those surveys?
4     A.    Maybe once.
5     Q.    When, when was that?
6     A.    I don't remember.
7     Q.    What do you recall
8 reviewing?
9     A.    The general -- general
10 manager would get up in front of all the
11 managers there, and they would just
12 discuss what percentage this question
13 got, versus maybe other distribution
14 centers, so just go over the results of
15 the building.
16     Q.    So if, for example, you
17 called in and went through the telephonic
18 survey, do you know if your answers were
19 recorded at all?
20     A.    They are all anonymous.
21     Q.    But the results were kept
22 somewhere based on your understanding, it
23 sounds like?
24     A.    Yes.  Whatever company the

Page 112

1 Rite Aid hired to answer -- ask those
2 questions.
3     Q.    Do you know what company
4 Rite Aid hired to ask those questions?
5     A.    No, I do not.
6          MR. CLUFF:  I want to make a
7     note on the record, Counsel,
8     let's -- let's take an opportunity
9     later to meet and confer about
10     those.  I'm not sure if they've
11     been produced.  I'm not saying
12     that they should have been, but I
13     just want to take the opportunity
14     at some point.
15          MR. LAVELLE:  Okay.  We can
16     discuss that offline.
17          MR. CLUFF:  Yeah.
18 BY MR. CLUFF:
19     Q.    All right.  Let's go down to
20 the next row under the associate
21 objectives column.  It says growth.  Do
22 you see that?
23     A.    Yes, I do.
24     Q.    Okay.  Going over to the

Page 113

1 supervisor assessment column, it looks
2 like the assessment is meets
3 expectations.  And then it continues and
4 it says, "FY '13 UPH goal was missed by
5 3.05 percent."  Do you know what a UPH
6 goal was?
7     A.    Units per hour goal I think.
8     Q.    So what is units per hour
9 goal measuring?
10     A.    That would -- measures the
11 buildings, how many units were produced
12 based on the number of hours it took to
13 produce it.  So it would take all the
14 associate hours worked and divide it into
15 the units.
16     Q.    Okay.  At the bottom of this
17 page, there's a -- there is a row that
18 says overall comments, and then on the
19 right side it says overall supervisory.
20 Do you see that?
21     A.    Yes.
22     Q.    And it looks like the
23 comments there bleed over to the next
24 page, which would be on the back side of

Page 114

1 the one you're looking at.
2    A.   Okay.
3       MR. LAVELLE:  Other
4 direction.
5       THE WITNESS:  Oh okay.
6 Okay.
7 BY MR. CLUFF:
8    Q.   In the middle there, the
9 supervisor writes, "I would like to see
10 Keith take more of a leadership role and
11 provide positive input/recommendations on
12 a daily basis" -- "daily basis."
13       Do you see that?
14    A.   Yes.
15    Q.   Do you recall what, if
16 anything, your supervisor at this time
17 would have communicated about you taking
18 a leadership role?
19       MR. LAVELLE:  Object to
20 form.
21       THE WITNESS:  Yes.
22 BY MR. CLUFF:
23    Q.   Okay.  What -- what did --
24 what do you recall?

Page 115

1    A.   These objectives that we're
2 just looking at, you mentioned here,
3 objectives.  These are building goals.
4 So all managers have to meet -- these
5 were how the building did and all
6 managers were based on how the building
7 met.
8       This, what you're talking
9 about here, was a question that -- that I
10 made sure that my departments were
11 working efficiently and top notch and the
12 supervisor just wanted me to share some
13 of my experience with some of the other
14 departments.
15    Q.   Go ahead and turn the page
16 for me.  And --
17    A.   What page are we on now?
18    Q.   I think you turned two, they
19 are a little stuck together.  Do you see
20 that one -- yeah, right there, that at
21 the very top right corner it says 3 of
22 40?
23    A.   Yes.
24    Q.   Okay.  There at the top of

Page 116

1 the chart there is a row that says
2 interpersonal skills.  Do you see that?
3    A.   Yes, I do.
4    Q.   Okay.  In the
5 self-assessment column, you wrote, meets
6 expectations, and then in the bottom
7 there's some text under that, the bold
8 word "comment."  Do you see that block?
9    A.   Yes, I do.
10    Q.   In the middle there, you
11 write, "Participates in CSA audit team"?
12    A.   Yes.
13    Q.   What was the CSA audit team?
14    A.   It was a supply chain audit
15 team that traveled to distant --
16 different distribution centers and did
17 internal audits for the distribution
18 centers.
19    Q.   Okay.  How did -- how were
20 those audits conducted?
21    A.   How were they conducted?
22    Q.   Mm-hmm.
23    A.   Well, it was a group of us
24 from different distribution centers and

Page 117

1 we would like say go to Woodland, and we
2 had a series of questions on different
3 areas of the distribution center's
4 operation.  And we'd go and look for
5 items that pertain to that checklist.
6    Q.   How were the distributions
7 selected for audits?
8    A.   The -- there is a schedule
9 posted.  Every DC knows when they are
10 going to be audited during the year.
11    Q.   So the audits were not by
12 surprise or at random?
13    A.   Not these, these audits, no.
14    Q.   And these were internal
15 audits that were conducted by Rite Aid?
16    A.   Yes.  Internal assurance.
17    Q.   The questions that were
18 created for these audits or that were
19 used for these audits, who created them?
20       MR. LAVELLE:  Object to
21 form.
22       THE WITNESS:  There was a
23 group of individuals from
24 corporate, staff, depending on

Page 118

1   what their area of expertise were,
2   they would come up with the
3   questions.
4   BY MR. CLUFF:
5       Q.   When an audit was conducted,
6   would you take these questions with you
7   to the audit?
8       A.   Yes.
9       Q.   Okay.  And how would you
10  answer the questions?  Would you write on
11  the -- the paper itself or would you just
12  make notes and then record it later
13  electronically?
14          MR. LAVELLE:  Object to
15      form.
16          THE WITNESS:  We had the
17      questions, and as an audit member,
18      we would look, depending on what
19      the question was, whether we were
20      looking at a policy or make an
21      observation.  And then we'd write
22      down a yes or no.  That would be
23      turned into the team leader, and
24      the team leader would then

Page 119

1   summarize everything and give the
2   distribution center a score.
3   BY MR. CLUFF:
4       Q.   The team leader, was that
5   the team leader of the audit?
6       A.   Yes.
7       Q.   Okay.  So the -- the team
8   leader would receive these -- these forms
9   from the members of the audit team that
10  were at a distribution center?
11      A.   Yes.
12      Q.   And then they would compile
13  that into a summary and give the
14  distribution center a score?
15      A.   Correct.
16      Q.   Okay.  Do you know what
17  happened with the papers that were turned
18  in to the team leader?
19      A.   No, I do not know.
20      Q.   Were you ever a team leader
21  for audits of distribution centers?
22      A.   No.
23      Q.   If you can recall, how many
24  of these audits do you think that you

Page 120

1   participated in during your time at Rite
2   Aid?  Let me narrow it down.  How about
3   between 2003 and 2014?
4           MR. LAVELLE:  Object to
5       form.
6           THE WITNESS:  Five.
7   BY MR. CLUFF:
8       Q.   Do you recall which
9   distribution centers you would have
10  audited?
11      A.   I know the ones that I --
12  yeah, Woodland, Tuscaloosa -- Woodland,
13  California; Tuscaloosa, Alabama; Pontiac,
14  Michigan; Liverpool, New York; Lancaster,
15  California.  I'm trying to get them
16  during that time frame.  And maybe
17  Wilsonville, Oregon.
18      Q.   Between 2003 and 2014, was
19  the Perryman center audited?
20          MR. LAVELLE:  Object to
21      form.
22          THE WITNESS:  Yes.
23  BY MR. CLUFF:
24      Q.   Do you recall how many

Page 121

1   times?
2       A.   No.
3       Q.   After an audit was conducted
4   and the team lead created the summary,
5   did the team leader then give that
6   summary and the results to the manager of
7   a distribution center?
8       A.   The general manager, yes.
9       Q.   Between 2003 and 2014, who
10  is the general manager of the Perryman
11  distribution center?
12      A.   We had a couple of them.  I
13  might not remember them all.  John
14  Cooper, Tim Peifley.
15      Q.   How do you spell
16  Mr. Peifley's last name?
17      A.   P-E-I-F-L-E-Y.  Norman
18  Duncanson, Gary Knopka.
19      Q.   How do you spell
20  Mr. Knopka's last name?
21      A.   K-N-O-P-K-A.
22      Q.   These individuals would have
23  received the results of an audit of the
24  Perryman distribution center?

Page 122

1   A.   Yes.
2       Q.   And would those individuals
3   have shared any of the results with
4   the -- of an audit of Perryman with you?
5       A.   Yes.
6       Q.   Do you recall receiving the
7   results of any Perryman distribution
8   center audits?
9       A.   The general manager would
10  have shared the results with us.
11      Q.   How would they have shared
12  those with you?
13      A.   They would have all the
14  managers come together and they would
15  discuss the results.
16      Q.   Would you have been handed a
17  copy or given a copy by e-mail?
18          MR. LAVELLE:  Object to
19      form.
20          THE WITNESS:  He would use a
21      PowerPoint on the screen and the
22      supply chain would put all the
23      audit reviews on the shared drive.
24  BY MR. CLUFF:

Page 123

1       Q.   Do you recall viewing
2   PowerPoint presentations about the
3   distribution center audits?
4       A.   Yes, I do.
5       Q.   What kind of information
6   would have been contained in those
7   PowerPoints?
8       A.   They would have covered if
9   any area in the building got an auto
10  fail, meaning red, or a yellow where
11  there's opportunity, or green for pass.
12      Q.   Going back to the document
13  that's in front of you, Exhibit 1.  That
14  same row, "interpersonal skills" under
15  your self-assessment, you continue after
16  the line that we just discussed and say,
17  "Ensured all associates received fair and
18  objective evaluation and training."
19          Do you see that?  It's under
20  the column section --
21      A.   Okay.
22      Q.   Okay.  And the next sentence
23  is, "Developed operation procedures for
24  CD QA stations and ensured training was

Page 124

1   effective."
2           Do you see that sentence?
3       A.   Yes.
4       Q.   What are CD QA stations?
5       A.   Control drug quality
6   assurance stations.
7       Q.   What are the operating
8   procedures that you would have developed
9   for the control drug quality assurance
10  stations?
11      A.   How to use the machine.
12      Q.   So the CD QA stations were a
13  machine?
14      A.   It was a scanning device so
15  that associates could scan each and every
16  item that they picked.
17      Q.   So as they were picking
18  them, then after they had -- after they
19  picked them, they had to run them through
20  this scanning machine to make sure they
21  were correct?
22      A.   Yes.
23      Q.   And that happened in the
24  control cages?

Page 125

1       A.   Yes.
2       Q.   These CD QA stations, was
3   that a new technology that Rite Aid was
4   implementing at this time?
5       A.   Yes.  Prior to that they
6   were manually done.
7       Q.   So the quality assurance
8   happened manually before these were
9   implemented?
10          MR. LAVELLE:  Object to
11      form.
12          THE WITNESS:  Yes.
13  BY MR. CLUFF:
14      Q.   Moving over to the right in
15  that same chart.  It says, "Supervisor
16  assessment."  And the supervisor also
17  rated this as meets expectations.
18          Do you see that?
19      A.   Yes.
20      Q.   Under the comment section,
21  in the center, it says, "Keith does not
22  always express his disagreement in the
23  correct forum.  This sometimes leads his
24  team to appear negative in their

Page 126

1 willingness to the 'one team' concept."
2          What is the one team
3 concept?
4      A.   One building.
5      Q.   Okay.  What does that mean
6 to you?
7      A.   One building?  It means all
8 the departments working in the same level
9 and speed and working together.
10     Q.   When your supervisor wrote,
11 "Keith does not always express his
12 disagreement in the correct forum," do
13 you recall in 2013 what that might refer
14 to?
15          MR. LAVELLE:  Object to
16     form.
17          THE WITNESS:  No, I do not.
18 BY MR. CLUFF:
19     Q.   Do you recall any instances
20 between 2003 and 2014 where you disagreed
21 with something that your general manager
22 was doing at the distribution center in
23 Perryman?
24     A.   No, I do not.

Page 127

1      Q.   Do you recall any instances
2 where you disagreed with something that
3 was happening at the corporate level?
4      A.   No, I do not.
5      Q.   Do you recall any instances
6 where you disagreed with something that
7 was happening at Rite Aid?
8      A.   At Rite Aid?
9      Q.   Mm-hmm.
10     A.   Rite Aid in general or the
11 DC in particular?
12     Q.   Let's start with Rite Aid in
13 general.
14     A.   No.
15     Q.   Okay.  How about at the DC?
16     A.   I might have showed my
17 displeasure if I thought a department
18 wasn't doing their share, wasn't meeting
19 their metrics like I was in Rx.
20     Q.   Do you recall any
21 departments that weren't meeting their
22 metrics or not doing their share?
23     A.   No.
24     Q.   This one team concept, was

Page 128

1 it essentially that Rite Aid wanted the
2 departments at the DC center to all work
3 together and kind of get along?
4      A.   Get along?  What do you mean
5 get along?
6      Q.   Let's just limit that
7 question to work together, that they
8 would all work together.
9          MR. LAVELLE:  Object to
10     form.
11          THE WITNESS:  To work
12     efficiently together.
13 BY MR. CLUFF:
14     Q.   Okay.  The manager continues
15 and says, "Keith will need to work with
16 his team to assure that they are looking
17 at the big picture and understand the
18 needs of all versus the individual
19 department."
20          Do you see that?
21     A.   I see it.
22     Q.   Do you recall what your
23 manager was talking about in there?
24     A.   I'm vaguely familiar with

Page 129

1 what he meant.
2      Q.   Okay.  What did he mean?
3 What's your vague recollection?
4      A.   Rx had the best UPH quality
5 and control of any department in the
6 building.  It was constantly meeting its
7 metrics.  And the other departments
8 weren't close.
9      Q.   So how did that refer to the
10 needs of all versus the individual
11 department?
12     A.   Well, back to the other
13 pages, they wanted more resource
14 leveraging and experience and knowledge
15 to help the other departments out.
16     Q.   So they wanted your
17 department to help the other departments?
18     A.   Wanted us to give more
19 associates a little more quicker, if they
20 were understaffed, that kind of thing.
21     Q.   At the bottom of that page
22 it says -- the next row is talent
23 management.
24          Do you see that?

Page 130

1    A.   Okay.
2    Q.   If you flip to the next page
3  which would be behind the one that you're
4  looking at, as you flip it.  At the top
5  it will say 4 of 30.
6         MR. LAVELLE:  Other
7  direction.
8         THE WITNESS:  Okay.
9         MR. LAVELLE:  What's the
10  Bates number?
11         MR. CLUFF:  50606.
12         MR. LAVELLE:  Got it.  Yep.
13         MR. CLUFF:  Okay, great.
14  BY MR. CLUFF:
15    Q.   At the top there, the row
16  that we just talked about continues, all
17  the way to the right in the supervisor
18  assessment portion, it says, "Taking
19  risks is a part of our everyday planning
20  if we are going to work as 'one team' and
21  think outside the box."
22    A.   Okay.
23    Q.   "Sometimes Keith is
24  resistant to try things beyond the status

Page 131

1  quo."
2         What are some of the things
3  beyond the status quo that you were
4  resistant to trying?
5         MR. LAVELLE:  Object to
6  form.
7         THE WITNESS:  I always, as a
8  department manager, always wanted
9  to make sure that pharmacy was
10  going to meet its objectives and
11  not -- and not, not meet its
12  objectives.
13  BY MR. CLUFF:
14    Q.   So what -- in doing that,
15  what were -- like, what did you have to
16  do that prevented you from trying things
17  outside the status quo?
18         MR. LAVELLE:  Object to
19  form.
20         THE WITNESS:  He might have
21  asked for four or five associates.
22  And if I thought that four or five
23  associates would prevent pharmacy
24  from meeting its stocking goals,

Page 132

1  picking goals, or shipping goals,
2  I might have resisted that
3  request.
4  BY MR. CLUFF:
5    Q.   Who would that request have
6  come from?
7    A.   Maybe my ops manager
8  possibly.
9    Q.   Do you remember at Rite Aid
10  at any point in time if the company was
11  encouraging associates to engage in
12  boundary breaking and/or adjusting
13  behavior?
14         MR. LAVELLE:  Object to
15  form.
16         THE WITNESS:  No, I do not.
17  BY MR. CLUFF:
18    Q.   If you can flip to the next
19  page at the top, it will say 5 of 40.
20  The Bates number will be 50607.
21    A.   Okay.
22    Q.   Got it?  At the bottom there
23  it says -- there is a row that says
24  "overall competency rating."

Page 133

1    A.   Okay.
2    Q.   And your supervisor ranked
3  it as meets expectations.
4         Do you see that?
5    A.   I do.
6    Q.   Okay.  In the middle of that
7  paragraph, there's a sentence that
8  starts, "Facilitating change."
9         Do you see where I'm at?
10    A.   Mm-hmm.
11    Q.   "Facilitating change is an
12  opportunity for Keith both in boundary
13  breaking and adjusting behavior."
14         Do you see that?
15    A.   I see it.
16    Q.   Do you have any recollection
17  what that means?
18    A.   I have no idea.
19    Q.   Okay.  Continuing it says,
20  "Sometimes Keith visibly shows his
21  discontent with a change to his team
22  through his responses and body language.
23  It is fine to provide feedback regarding
24  one's objections to a change as long as

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  in the end it is understood what the
2  change intels (sic) and assuring that the
3  team does not see that discontent."
4         Do you see that?
5     A.  I do.
6     Q.   And then the last sentence
7  is, "It's hard to sell it like you wrote
8  it if the team already knows you didn't."
9         What did "sell it like you
10 wrote it" mean?
11    A.   I don't know what that
12 means.
13    Q.   Reading that paragraph, or
14 the second half of that paragraph, do you
15 have any understanding what your -- what
16 your supervisor was referring to about
17 these changes that you seemed resistant
18 to?
19    A.   No, I don't.
20    Q.   During this time in 2013, do
21 you recall any other changes that were
22 being proposed about -- about your team
23 that you were unhappy with?
24    A.   No.

Page 135

1     Q.   Let's go to the next page.
2  In the top right corner it will say 6 of
3  40, and the Bates number will be 50608.
4     A.   Okay.
5     Q.   There again, like we talked
6  about in 2014, there's a chart that says
7  career aspirations, right?
8     A.   Mm-hmm.
9     Q.   And in the lower left corner
10 it says associate career goals/interests.
11 Do you see that?
12    A.   I do.
13    Q.   And you wrote, "After being
14 the part of the removal of the operations
15 manager level in the distribution center,
16 I have tried unsuccessfully to be
17 promoted to a senior operations manager."
18        Do you see that?
19    A.   I do.
20    Q.   Do you recall what you meant
21 when you were writing that?
22    A.   Yeah.  They eliminated -- I
23 think I mentioned to you a while back,
24 that they -- they eliminated the

Page 136

1  operations manager level.  Myself and two
2  other people were made department
3  managers.
4     Q.   Was that a demotion in
5  effect?
6     A.   It's no longer -- it wasn't
7  an operations manager.  It was department
8  manager, because they wanted to save
9  money.
10    Q.   What do you mean they wanted
11 to save money?
12    A.   Well, when you -- an
13 operations manager, you qualified for a
14 10 percent bonus versus a 5 percent
15 bonus.
16    Q.   So in moving you back down
17 to a department manager, they essentially
18 eliminated some of your potential bonus?
19    A.   Correct.
20    Q.   And then what is this
21 reference to "trying unsuccessfully to be
22 promoted to a senior operations manager,"
23 what does that mean?
24    A.   One department -- one senior

Page 137

1  operations manager had left and I had
2  interviewed for it.
3     Q.   Okay.  And you were not
4  selected?
5     A.   Correct.
6     Q.   Was there any discussion
7  about why you were not selected?
8     A.   No.
9     Q.   Who ended up receiving that
10 position?
11    A.   I don't recall who it was.
12    Q.   Let's move forward a few
13 pages.  This page will now say Page 1 of
14 22, and the Bates number will be 50610.
15    A.   Okay.
16    Q.   Do you see that?
17    A.   Yes.
18    Q.   The top there it says annual
19 performance review, FY 2012.  Do you see
20 that?
21    A.   Yes.
22    Q.   Okay.  Midway down the page
23 at the top of the chart, there is an
24 objective that says business -- business

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 growth. Do you see that?
2    A.   Yes.
3    Q.   In the objective details
4 column, there is a Number 1.  It says,
5 "Support RAPTAR and CCC initiatives."
6         What are RAPTAR initiatives?
7    A.   RAPTAR is respect,
8 accountability -- an interaction term
9 among associates in the building and
10 supply chain.
11    Q.   What was the goal of the
12 RAPTAR initiative?
13    A.   To be treated as you'd like
14 to be treated.
15    Q.   What was a CCC initiative?
16    A.   That was the committee
17 established among associates to make
18 improvements in the building, suggested
19 improvements.  Community -- community
20 relations and that sort of thing.
21    Q.   What were some of the
22 suggested improvements of the building?
23    A.   The initiatives.  I don't
24 remember if they had any particular one

Page 139

1 that they -- housekeeping, I think, in
2 the building might have been one of them.
3    Q.   When you refer to
4 housecleaning, do you mean cleanliness?
5    A.   Yes.
6    Q.   Going down one more row,
7 there's another objective that says
8 customer/associate satisfaction.  Do you
9 see that?
10    A.   Yes.
11    Q.   Going all the way over to
12 the right under supervisor assessment,
13 there is a Roman numeral -- or there's a
14 letter, a Number 1-A, 2-A, 3-A, 4-A?
15    A.   Okay.
16    Q.   Number 2-A says, "Both
17 departments reporting to Keith exceeded
18 their RAR goals."
19         Do you see that?
20    A.   Okay.
21    Q.   What are RAR goals?
22    A.   I don't recall what that
23 stands for right now.
24    Q.   Let's move forward three

Page 140

1 pages.  In the top right corner it will
2 say Page 4 of 22, and the Bates number
3 will be 50612.
4    A.   Okay.
5    Q.   In the middle there, there
6 is a row that says opportunities.
7    A.   Okay.
8    Q.   Under that it says customer
9 focus, do you see that?
10    A.   Yes.
11    Q.   Under the associate
12 assessment you write, "Maintain feedback
13 from stores."  What did you mean when you
14 wrote that?
15    A.   Oh.  I thought that it
16 would -- would have been nice for us to
17 have something established where the
18 stores could say, oh, you're making our
19 deliveries on time.  Just get some kind
20 of feedback on how we as a distribution
21 center were doing servicing them.
22    Q.   Did you implement that?
23    A.   Implement that?
24    Q.   Yeah.

Page 141

1    A.   This was a -- we -- one of
2 our HR managers, senior HR managers
3 allowed us to go visit stores.
4    Q.   Were there any kind of --
5    A.   It was called greet and
6 meet.  No reports.
7    Q.   Okay.  So one of the HR
8 managers allowed, you said us to go visit
9 stores.  Who is us?
10    A.   Well, I mean a couple
11 department managers gave us a couple
12 stores that we could go visit.
13    Q.   Who else went with you on
14 those visits?
15    A.   I had one manager with me,
16 we did it one time.
17    Q.   Who was that?
18    A.   Our safety manager, that's
19 now our safety manager, but at the time
20 was another department manager.
21    Q.   And what was the purpose
22 from your perspective of going to visit
23 that store?
24    A.   To see how our deliveries

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 were being made.  I mean, if they opened
2 up a tote, if everything was good and
3 wasn't damaged and it wasn't trashy.
4     Q.   While you were there, you
5 didn't look at any of the prescriptions
6 that were being filled, did you?
7     A.   No.
8     Q.   You didn't look at any of
9 the customers that were coming in to have
10 their prescriptions filled?
11     A.   No.
12     Q.   Did you look at whether or
13 not customers were paying in cash versus
14 using insurance?
15     A.   No.
16     Q.   Did you look at the
17 percentage of controlled substances that
18 were being dispensed versus any other
19 products?
20     A.   No.
21     Q.   And you said there was no
22 written report of that meeting created,
23 right?
24     A.   No.  I don't remember any

Page 143

1 report.
2     Q.   Moving over to supervisor
3 assessment and that same customer focus
4 line.  Your supervisor writes, "Keith
5 needs to improve his interactions with
6 and accountability to his peers within
7 the DC management team."
8     A.   Mm-hmm.
9     Q.   Do you know what that
10 referred to?
11     A.   How I got along with maybe
12 other department managers that were not
13 meeting expectations.
14     Q.   Did you have a hard time
15 getting along with other managers if they
16 didn't meet expectations?
17     A.   No.
18         MR. LAVELLE:  Object to
19 form.
20 BY MR. CLUFF:
21     Q.   Do you know why then your
22 supervisor identified it as an area for
23 you to improve on?
24     A.   If somebody would have made

Page 144

1 a comment that I disagreed with, I might
2 have rolled my eyes or I might have said
3 something that they needed to do their
4 share of the work.
5     Q.   If you go down one row on
6 that supervisor assessment, there's a row
7 that says building collaborative
8 relationships.  Do you see that?
9     A.   I do.
10     Q.   And your supervisor writes,
11 "In keeping with the previous comments,
12 Keith needs to develop his relationships
13 among the managers in the DC.  His
14 knowledge and experience can only assist
15 the DC operations if he engages with the
16 team."
17         Do you recall what your
18 supervisor was referring to there?
19     A.   No.
20     Q.   Did you have a hard time
21 getting along with other associates at
22 the Perryman distribution center?
23     A.   No.
24         MR. LAVELLE:  Object to

Page 145

1 form.
2 BY MR. CLUFF:
3     Q.   How about other managers?
4     A.   No.
5     Q.   At any time when you were a
6 manager at the Perryman center from 2003
7 to 2014, were you ever asked to do
8 anything you didn't agree with?
9     A.   No.
10     Q.   Were you ever asked to send
11 any orders that you felt like shouldn't
12 have been shipped?
13     A.   No.
14     Q.   I want to move forward to a
15 number of pages, to the page that has the
16 Bates Number 50616.
17     A.   Okay.
18     Q.   Looking at this document, at
19 the very top in -- in that black square
20 that says FY '12, salary-objective
21 planning worksheet?
22     A.   Mm-hmm.
23     Q.   Do you know what this would
24 have been?

Page 146

1 A. It would have just been an
2 objective for the upcoming year, at the
3 annual review on what we would like to
4 try to see happen the next year.
5 Q. Looking down, there's
6 another chart here on this document.
7 Like some of the other charts we've been
8 looking at, correct?
9 MR. LAVELLE: Object to
10 form.
11 THE WITNESS: I mean, this?
12 BY MR. CLUFF:
13 Q. Yeah.
14 A. Yeah. Similar to the other
15 ones.
16 Q. In the second row of that
17 chart it says customer/associate
18 satisfaction. And then there's a
19 Number 5. It says, "Drive improvement in
20 the three AES questions identified for
21 focus in FY '11."
22 Do you see that?
23 A. Okay.
24 Q. Those AES questions, is that

Page 147

1 that -- the satisfaction survey that we
2 talked about earlier?
3 A. Yes.
4 Q. Okay. Do you have any
5 recollection of what these three AES
6 questions identified for focus in FY '11
7 were?
8 A. No, I don't remember what
9 that was back then.
10 Q. Let's move forward to the
11 page that ends in 50622. In the top
12 right corner it should say Page 6 of 8.
13 Do you see that?
14 A. Yes.
15 Q. Okay. And in the center, it
16 says annual performance review FY 2011.
17 Do you see that?
18 A. Okay.
19 Q. So looking at this page, do
20 you -- do you have an understanding this
21 would have been your performance review
22 for year -- fiscal year 2011?
23 A. Yes.
24 Q. Looking at the bottom of the

Page 148

1 page there, it says, "Opportunities build
2 collaborative relationships," right, on
3 the supervisor assessment side of the
4 page?
5 A. Yes.
6 Q. And then your supervisor
7 wrote, "Keith comes across defensive,
8 accusatory, and negative in certain
9 situations leaving others involved
10 feeling that he is resistant,
11 uncooperative, and unapproachable. This
12 serves to be an igniter of tension within
13 meetings and other situations making it
14 uncomfortable for others."
15 Do you see that?
16 A. I see it.
17 Q. Do you have any recollection
18 of what your supervisor is referring to
19 at that point in time?
20 A. At that point in time, no.
21 Q. Do you recall being in any
22 meetings that were uncomfortable for
23 other people?
24 A. No, I do not.

Page 149

1 Q. Do you recall any instances
2 where you were accusatory or negative
3 about others involved in the
4 conversation?
5 A. No.
6 Q. You have no recollection of
7 the substance of that comment?
8 A. No.
9 Q. Okay. Flip to the next
10 page. At the top it will say Page 7 of
11 8. The Bates number will be 50623.
12 A. Okay.
13 Q. Looking down at the bottom,
14 it says, "Supervisor comments on
15 development for career goals/interests."
16 Do you see that?
17 A. Yes.
18 Q. Your supervisor writes, "In
19 order for Keith to advance, he must focus
20 on improving his communication and
21 interpersonal skills. I suggest that he
22 invest in himself with attendance in a
23 course that will help him to gain
24 dexterity and grace in dealing with

Page 150

1 others, to recognize how he comes across
2 to others, to become more conscious of
3 his body language and to say what he
4 needs to say without offending or
5 creating conflict."
6 Do you recall discussing
7 that with your supervisor?
8 A. I must have, if it's there.
9 Q. What do you recall about
10 that conversation?
11 A. Just what it states here.
12 Q. What were these instances of
13 offense or creating conflict that are
14 referred to in the last line?
15 MR. LAVELLE: Object to
16 form.
17 THE WITNESS: I have no idea
18 where I -- why he put that down
19 there.
20 BY MR. CLUFF:
21 Q. Do you recall ever taking a
22 course that was described or recommended
23 to you like that?
24 A. No, I don't.

Page 151

1 Q. I want to talk about some
2 policies and procedures now. You can set
3 that to the side. I'll hand you a
4 document that we're going to mark as
5 Exhibit 2.
6 (Document marked for
7 identification as Exhibit
8 Rite Aid-Frost-2.)
9 BY MR. CLUFF:
10 Q. It's a Rite Aid produced
11 document. It's been marked as Rite
12 Aid -- Rite_Aid_OMDL_0013210, which is an
13 e-mail that has an attachment. I've
14 included the attachment with the
15 document.
16 The attachment begins at the
17 same prefix ending in 0013211 through
18 0013230.
19 Looking at the cover page --
20 give me just a second to catch up with
21 you. You'll see that there's an e-mail
22 from Kirsten Dennison. Do you know that
23 name?
24 A. Yes, I do.

Page 152

1 Q. Who is Kirsten Dennison?
2 A. Well, before she got married
3 she was inventory control manager.
4 Q. Was she the inventory
5 control manager after she got married as
6 well?
7 A. Yes, but it was a different
8 last name.
9 Q. Okay. Ms. Dennison e-mails
10 you and Nick Zoltan.
11 Do you see that?
12 A. Yes, I do.
13 Q. Who is Nick Zoltan?
14 A. He was, I don't know at this
15 time, he could have been an operations
16 manager, could have been a department
17 manager.
18 Q. Also copied on this e-mail
19 is a person with the e-mail address,
20 N-W-O-J-C-I-K.
21 Do you see that?
22 A. Yes.
23 Q. Do you know what that
24 person's name was?

Page 153

1 A. I think it was Nick Wojcik.
2 I think it was one of her leads or
3 assistant managers possibly.
4 Q. Her being Kirsten?
5 A. Yes.
6 Q. Are all of the people that
7 are included on this e-mail, are they
8 from the Perryman distribution center?
9 A. Yes.
10 Q. The subject is, "Forward:
11 Quarterly narrative signoffs - Quarter 4,
12 FY 2011 - review and approve process
13 described." Do you know what that
14 subject line meant or referred to?
15 A. Not for sure.
16 Q. Do you see there's a line
17 there that says "received." And
18 underneath that, there's some underlying
19 text that says L.04.03-warehouse
20 management systems.doc?
21 A. Yes.
22 Q. What's a warehouse
23 management system?
24 A. It's what the warehouse uses

Page 154

1 to manage all of its systems. Pick
2 department, storage, replenishment,
3 shipping.
4     Q.   Is warehouse a distribution
5 center or is that some --
6     A.   No.
7     Q.   -- different sort of --
8     A.   WMS.
9         MR. LAVELLE:  Object to
10    form.  Again, you've got to wait
11    until the question is finished.
12        THE WITNESS:  Warehouse
13    management system.
14        MR. LAVELLE:  Mr. Frost, you
15    have to wait until the question
16    was finished before you answer.
17 BY MR. CLUFF:
18    Q.   Yeah, we'll back it up and
19 go through it again.  It's all good.
20        So you worked at the
21 Perryman distribution center.  Is that
22 different from the warehouse that is
23 described in the warehouse management
24 system?

Page 155

1     A.   No.
2     Q.   So they're the same thing?
3     A.   Warehouse management system
4 is the operations system of what operates
5 the distribution center.
6     Q.   So when you were a manager
7 in the distribution center, the warehouse
8 management system is a document that
9 would have been used to govern the
10 operations of the distribution center?
11    A.   It's not a document.  It's a
12 system that we use.  We operate that way
13 right now.  We have our own management
14 warehouse system.
15    Q.   If you turn the page, you'll
16 see that there's a document in the top
17 there, there is a text box.  It says,
18 "Purpose:  Inventory narrative."
19        Do you see that?
20    A.   Yes.
21    Q.   And then underneath that,
22 "Scope:  Warehouse management system."
23 And the source is, "Interviews of
24 facility and corporate management and

Page 156

1 observations of processes at the
2 centers."
3         Do you see that?
4     A.   Yes.
5     Q.   So is this document the
6 warehouse management system or what is
7 this document that we're looking at?
8         MR. LAVELLE:  Object to
9     form.
10        THE WITNESS:  It's a
11    document to outline the management
12    warehouse system.
13 BY MR. CLUFF:
14    Q.   Would you have been involved
15 in creating this document that outlines
16 the warehouse management system?
17    A.   No.
18    Q.   Do you know why Kirsten
19 would have forwarded this to you?
20    A.   As an inventory, she would
21 just know if there was any changes in any
22 processes in different parts of the
23 building that we might be managing.
24    Q.   Looking down at general

Page 157

1 information, at the top it says there's
2 Tim Peifley.
3     A.   Yes.
4     Q.   That's the general manager
5 of the Aberdeen, Maryland, Perryman DC?
6     A.   Yes.
7     Q.   And that's one of the
8 general managers that you previously
9 identified that you worked with?
10    A.   Yes.
11    Q.   Would the general manager
12 have been responsible for ensuring that
13 this warehouse management system was
14 followed at the Perryman distribution
15 center?
16    A.   I don't know.
17    Q.   Do you know if any of your
18 job responsibilities would have been
19 governed by this warehouse management
20 system?
21    A.   No.
22    Q.   Are you telling me that none
23 of your responsibilities would have been
24 governed by this or that you don't know

Page 158

1 whether they would have been governed?
2     A.   This document would not
3 govern anything that I do.  I contribute
4 into -- this document summarizes what I
5 do and what the other departments do.
6     Q.   Understood.  So if we read
7 this document, then we can understand it
8 to be a summary of the processes that
9 occurred at the Perryman distribution
10 center?
11     A.   Yeah.  A very small summary.
12     Q.   Why do you say it's a very
13 small summary?
14     A.   Because it's only a few
15 pages and we do a lot of things.
16     Q.   Do you see at the bottom of
17 the page there are -- there's a page
18 number above the Bates number?
19     A.   Okay.
20     Q.   Okay.  I'd like you to turn
21 to Page 4.  At the top you'll see there's
22 a heading that says receiving.  As a
23 manager in Perryman from 2003 to 2014,
24 were you responsible for overseeing

Page 159

1 receiving drugs -- receiving products at
2 the Perryman center?
3         MR. LAVELLE:  Object to
4     form.
5         THE WITNESS:  What's the
6     question again?
7 BY MR. CLUFF:
8     Q.   Sure.  While were you
9 manager at Perryman from 2003 to 2014,
10 would you have been responsible for
11 overseeing receiving at Perryman?
12         MR. LAVELLE:  Object to
13     form.
14         THE WITNESS:  No.
15 BY MR. CLUFF:
16     Q.   No?
17     A.   No.
18     Q.   Who would have been
19 responsible for that?
20     A.   The inbound receiving
21 manager, inbound manager.
22     Q.   You were never responsible
23 for inbound receiving at Perryman between
24 2003 and 2014?

Page 160

1     A.   No.
2     Q.   Understood.  Do you know who
3 would have been responsible for that
4 during 2003 to 2014?
5     A.   We had different department
6 managers in inbound during that time
7 frame.
8     Q.   Do you remember any of them?
9     A.   Yes.
10     Q.   Who can you remember?  If
11 you can't recall, it's not critical.
12     A.   Wow, this goes back.
13     Q.   Seems like you are having a
14 hard time recalling.  Let's move on to
15 some other --
16     A.   Yeah, I just can't remember
17 a lot of the names.
18     Q.   That's okay.  It's not a
19 memory test.  It's just whatever you can
20 recall.  So let's turn to Page 4, which
21 would still be in this receiving section.
22     A.   Mm-hmm.
23     Q.   If you'll flip the page.
24 And do you see here on this page that

Page 161

1 you're looking at, Page 4, it's the one
2 to your right-hand side.
3     A.   Okay.
4     Q.   There are some bullet points
5 and then text associated with each of
6 those bullet points.
7         Do you see that?
8     A.   Yes.
9     Q.   In the middle, there's a
10 bullet point that begins, "The receiving
11 process over Rx receipts is identical to
12 the front-end process except for the
13 following procedures."
14         Do you see that?
15     A.   Yes.
16     Q.   What are Rx receipts?
17     A.   Receipts that -- packing
18 slips for pharmacy.
19     Q.   Okay.  And it says here
20 that's identical to the front-end
21 process, correct?
22     A.   Yes.
23     Q.   Okay.  Between 2003 and
24 2014, you were responsible for pharmacy,

Page 162

1  correct?
2      A.   Yes.
3      Q.   And pharmacy was abbreviated
4  Rx in documents at Rite Aid?
5      A.   Yes.
6      Q.   So then, is this section
7  here something that you would have been
8  responsible for, these Rx receipts?
9      A.   No.
10     Q.   No.  Do you know who would
11  have been?
12     A.   The inbound department
13  manager.
14     Q.   Okay.  Under that line, can
15  you see there are three indented little
16  arrows?
17     A.   Yes.
18     Q.   The first one says --
19  actually I want to look at the third one,
20  I'm sorry.  It says, "McKesson receipts
21  are monitored through the full-time
22  McKesson employee that works in the
23  Perryman DC.  Any McKesson receipt that
24  is either an overage or shortage will be

Page 163

1  reviewed and verified by this employee.
2  An E-form is completed by the Rx
3  receiving office and is signed by the
4  McKesson employee noting his agreement
5  with the reconciliation information noted
6  in this E-form.  This E-form is provided
7  to Rx purchasing and Rx AP department."
8      Do you recall that there was
9  a full-time McKesson employee that worked
10  at the Perryman distribution center?
11     A.   Yes.
12     Q.   Was that true for the entire
13  time period between 2003 and 2014?
14     A.   I don't know.
15     Q.   Do you recall how long there
16  was a full-time McKesson employee at the
17  Perryman distribution center?
18     A.   While I was managing any
19  parts of pharmacy there was always a
20  McKesson representative, from 2003 to
21  2014.
22     Q.   What did you understand to
23  be the McKesson employee's job
24  responsibilities to be at the Perryman

Page 164

1  distribution center?
2      A.   Well, as I understood it,
3  that they were supposed to reconcile any
4  shortages, outdates, overages, with --
5  and be a liaison with our corporate buyer
6  in Harrisburg.
7      Q.   Earlier we talked about
8  orders by Rite Aid stores that might
9  exceed that 5,000-unit threshold.  Do you
10  recall that?
11     A.   Yes.
12     Q.   If a Rite Aid store had
13  their order cut to 5,000 units, they
14  could order additional product from
15  McKesson directly, correct?
16     A.   I don't know that.
17     Q.   Okay.  Do you know if this
18  McKesson employee had any -- any
19  interaction with orders from -- directly
20  from Rite Aid stores?
21         MR. BARRIENTOS:  Object to
22     form.
23         MR. LAVELLE:  Object to
24     form.

Page 165

1          THE WITNESS:  No, I do not.
2  BY MR. CLUFF:
3      Q.   Do you know who at Rite Aid
4  negotiated or agreed to allow a McKesson
5  employee to be full-time at Rite Aid
6  facilities?
7          MR. LAVELLE:  Object to
8      form.
9          THE WITNESS:  No, I do not.
10  BY MR. CLUFF:
11     Q.   Do you know if there was a
12  McKesson employee stationed at each one
13  of Rite Aid's distribution centers or
14  just Perryman?
15         MR. LAVELLE:  Object to
16     form.
17         THE WITNESS:  I do not know
18     that.
19  BY MR. CLUFF:
20     Q.   Do you know who in the
21  company would have been responsible for
22  interacting with McKesson about this
23  employee that was at the Perryman
24  distribution center?

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    MR. LAVELLE:  Object to
2 form.
3    THE WITNESS:  No, I don't.
4 BY MR. CLUFF:
5    Q.   Let's go to Page 6.  Do you
6 see there's a grey box that says
7 picking?
8    A.   Okay.
9    Q.   Is that something that would
10 have been within your job
11 responsibilities?
12    A.   I would have been a super --
13 my people would have been responsible for
14 that.  It would come under my umbrella.
15    Q.   Okay.  If you turn to
16 Page 8, still within the receiving
17 section.  You're going the right way.
18    A.   Oh, I have 6, then it goes
19 to 7, then I have a --
20    MR. LAVELLE:  Next page.
21    THE WITNESS:  It skips --
22 oh, okay.  Out of sequence, all
23 right.
24 BY MR. CLUFF:

Page 167

1    Q.   Maybe they are out of order.
2 We'll talk to the printer about that
3 later.  Sorry about that.
4    Do you see at the top there
5 it says controls?
6    A.   Yes.
7    Q.   Would the controls have been
8 within your job responsibilities within
9 the category of picking?
10    A.   Yes.
11    Q.   Do you see in the second
12 bullet point where it says, "WMS does not
13 permit over receiving a tote"?
14    A.   Yes.
15    Q.   What does that mean?
16    A.   I don't understand what that
17 means.
18    Q.   The third bullet point says,
19 "Quality control is randomly conducted at
20 each pick area to ensure tote contents
21 match the store order assigned in the
22 system."
23    Do you see that?
24    A.   Yes.

Page 168

1    Q.   Do you know what that means?
2    A.   Yes.
3    Q.   What does it mean?
4    A.   Internally and
5 building-wide, inventory control did
6 monthly store audits at random.  Just
7 pick a store and pick everything -- audit
8 everything that was in that store that
9 was being shipped to them.  And we also
10 in pharmacy and control drugs did random
11 audits for quality purposes.
12    Q.   Let's go to Page 9.  It
13 should be --
14    A.   Okay.
15    Q.   Do you see that where it
16 says shipping?
17    A.   Yes, I do.
18    Q.   Is that something that would
19 have been within your job
20 responsibilities between 2003 and 2014?
21    A.   No.
22    Q.   Okay.  If you move forward
23 two pages to Page 10.
24    A.   Okay.

Page 169

1    Q.   Do you see there in the --
2 in the first full paragraph it says,
3 "Rite Aid's DC performed several
4 different procedures to discover order
5 picking errors before they are shipped to
6 the stores."
7    Do you see that?
8    A.   Yes.
9    Q.   The sentence -- next
10 sentence continues, "These procedures are
11 as follows:  Drill downs, line checks and
12 truck audits."
13    Are those the audits that
14 you've been discussing, those -- those
15 three kinds of procedures?
16    MR. LAVELLE:  Object to
17 form.
18    THE WITNESS:  So what's the
19 question?  I'm reading it, so
20 what's the question?
21 BY MR. CLUFF:
22    Q.   I'm just trying to
23 understand if these are the kind of
24 audits that you've been discussing when

Page 170

1 you previously talked about audits.
2     A.   They are some, yes.
3     Q.   Okay.  Do you know what a
4 limbo location is?
5     A.   As I understand it, it's the
6 location that the -- the system thinks
7 something is there, but there is nothing
8 there.
9     Q.   Were you -- did you have any
10 responsibility for limbo locations when
11 you were in Perryman between 2003 and
12 2014?
13     A.   Not me personally, no.
14     Q.   Did you ever interact with
15 anybody from Cardinal Health when you
16 were the manager at the Perryman
17 distribution center between 2003 and
18 2014?
19     A.   No.
20     Q.   You previously mentioned
21 McKesson.  Did you ever interact with
22 anybody from McKesson between 2003 to
23 2014?
24     A.   Just the on-site

Page 171

1 representative.
2     Q.   Do you recall who that would
3 have been?
4     A.   It was Todd.  I don't know
5 what his last name is.
6     Q.   Was there somebody at the
7 Perryman distribution center whose
8 responsibility it was to interact with
9 the McKesson employee?
10     A.   Well, the receiving
11 department.
12     Q.   But you don't recall who the
13 manager of that department was?
14         MR. LAVELLE:  Objection.
15     Asked and answered.
16         THE WITNESS:  We had
17     multiple managers.  No one in
18     particular.  It was just he was on
19     the floor while they were
20     receiving McKesson product.
21 BY MR. CLUFF:
22     Q.   Did you ever interact with
23 anybody from AmerisourceBergen between
24 2003 and 2014?

Page 172

1     A.   I don't remember anything
2 from AmerisourceBergen between 2003 and
3 2014.
4     Q.   Do you recall interacting
5 with any other wholesale distributors
6 between 2003 and 2014?
7     A.   No, I do not.
8     Q.   You can set that document
9 aside.
10         MR. LAVELLE:  Counsel, can
11     we take a break?
12         MR. CLUFF:  Yeah.
13         THE VIDEOGRAPHER:  Off the
14     record at 12:09 p.m.
15         - - -
16         (Lunch break.)
17         - - -
18     A F T E R N O O N   S E S S I O N
19         - - -
20         THE VIDEOGRAPHER:  We are
21     back on the record at 12:46 p.m.
22 BY MR. CLUFF:
23     Q.   Okay.  Welcome back from
24 lunch, Mr. Frost.  We're back on the

Page 173

1 record.  So you're -- you're under oath
2 again.
3         I want to go through some
4 more documents with you this afternoon.
5 One of the things that I'm curious about
6 is vault access or cage access for the
7 controlled products.  Is that something
8 that you understand?
9     A.   Yes.
10     Q.   Okay.  Would you refer to
11 the area where controlled substances were
12 stored as the vault or the cage or what
13 term would you use?
14         MR. LAVELLE:  Object to
15     form.
16         THE WITNESS:  The cage.
17 BY MR. CLUFF:
18     Q.   And was restricting or
19 granting access to the cage one of your
20 job responsibilities?
21     A.   Yes.
22     Q.   And that would have been
23 during the time that you were the
24 pharmacy manager from 2003 to 2014?

Page 174

1    A.   Yes.
2    Q.   What was the process for
3 approving somebody to get access to the
4 cage?
5    A.   Initially everybody had to
6 have a background check through law
7 enforcement, come back competitive,
8 before they'd be granted access.
9    Q.   Did you say come back
10 competitive before they would be granted
11 access?
12    A.   Yes.  Competitive means --
13 yes.
14    Q.   So law enforcement would
15 clear their background check, and then
16 they could be granted access?
17    A.   Whatever the law enforcement
18 agencies or whatever background checks
19 they made.
20    Q.   Do you recall creating a
21 procedure for granting cage access at any
22 point in your time as the pharmacy
23 manager?
24    A.   It was not typed up.  It was

Page 175

1 a verbal procedure.
2    Q.   What was the verbal
3 procedure?




24    If they were going to work

Page 176

1 there, we would send them to security or
2 security or AP would give them a PIN
3 number to use to scan their badge and
4 input their PIN number to get into the
5 cage.
6    Q.   I'll hand you a document
7 that I marked as Frost Exhibit 3.
8      (Document marked for
9      identification as Exhibit
10      Rite Aid-Frost-3.)
11 BY MR. CLUFF:
12    Q.   It was produced with Bates
13 Number Rite_Aid_OMDL_0023217.
14      This is a short e-mail.  Do
15 you see there at the bottom, Marian Wood
16 writes to you and copies -- apparently
17 it's herself, ████████@RiteAid.com?
18    A.   Right.
19    Q.   In this time period in 2010,
20 what was the relationship between you and
21 Marian Wood in terms of supervision?
22    A.   I believe Marian Wood was
23 the DEA coordinator at the time.
24    Q.   Would she have been working

Page 177

1 under you in the pharmacy department?
2    A.   Yes.
3    Q.   She writes, "Keith, please
4 fill out the attached and turn into HR,
5 (Nelly), I will send the request.  Kim
6 and I never got around to creating a
7 procedure for this."
8      Do you see that?
9    A.   Yes, I do.
10    Q.   Do you recall why she was
11 asking you to fill out an attached form
12 and turn it into -- to HR?
13    A.   I don't know exactly what
14 this is for.
15    Q.   Do you see where she writes;
16 "Kim and I never got around to creating a
17 procedure for this"?
18    A.   Yes, I do.
19    Q.   Do you know what that refers
20 to?
21    A.   No, I don't.
22    Q.   Is it possible that she's
23 talking about the procedure for granting
24 cage access that you just discussed?

Page 178

1    MR. LAVELLE: Object to
2 form.
3    THE WITNESS: It might have
4 been possible in the sequence of
5 events to get access.
6 BY MR. CLUFF:
7    Q.   As part of
8 AmerisourceBergen's -- sorry, Rite Aid's
9 regulatory and compliance obligations,
10 was restricting cage access to only
11 approved people part of the -- the
12 responsibility?
13    MR. LAVELLE: Object to
14 form.
15    THE WITNESS: Rite Aid, I
16 don't know anything about Rite
17 Aid. The distribution center,
18 which was the cage, that Marian
19 and I managed, it was our
20 responsibility to give access to
21 people in the cage.
22 BY MR. CLUFF:
23    Q.   Was restricting access part
24 of your responsibility at the Perryman

Page 179

1 distribution center to comply with the --
2 the regulatory obligations that Rite Aid
3 has?
4    MR. LAVELLE: Object to
5 form.
6    THE WITNESS: No.
7 BY MR. CLUFF:
8    Q.   So if people who didn't have
9 approved cage access were in the
10 controlled cage, that wouldn't be a DEA
11 violation?
12    MR. LAVELLE: Object to
13 form.
14    THE WITNESS: DEA violation?
15 No.
16 BY MR. CLUFF:
17    Q.   How about like a regulatory
18 obligation -- or a violation, excuse me?
19    A.   No.
20    Q.   I'm going to hand you a
21 document that was produced by Rite Aid.
22 Rite_Aid_OMDL_0023287.
23    (Document marked for
24    identification as Exhibit

Page 180

1    Rite Aid-Frost-4.)
2 BY MR. CLUFF:
3    Q.   Here again at the bottom you
4 see Marian Wood writes to you?
5    A.   Mm-hmm.
6    Q.   And the subject is cage
7 access?
8    A.   Yes.
9    Q.   It says, "Keith, we need to
10 discuss the cage access list. I believe
11 there are folks that should be removed."
12    Do you have any recollection
13 of why she would want some folks removed?
14    A.   No.
15    Q.   Do you have any concerns
16 that there are people who might have cage
17 access that should be removed?
18    A.   No.
19    Q.   What would be a reason for
20 removing a privilege cage access?
21    A.   I don't know what her reason
22 was back in 2004.
23    Q.   I believe that e-mail was
24 written in 2010. Do you see that?

Page 181

1    A.   Oh, okay. I was looking at
2 before that.
3    Q.   Yeah. It looks like this is
4 from June 4, 2010.
5    How about in 2010? Do you
6 have any recollection of why people may
7 have had their cage access revoked in
8 2010?
9    A.   It may be more than needed.
10    Q.   I think you talked about
11 earlier in the process of granting
12 authorization for people to access the
13 cage, they had to sign some paperwork; is
14 that right?
15    A.   What -- I don't understand
16 what paperwork, what -- what are you
17 talking about?
18    Q.   Were -- were associates who
19 received access to the cage required to
20 sign any paperwork?
21    A.   If they received training.
22    Q.   Okay. What was that
23 document they were required to sign about
24 the training?

1  A.  We had a number of training
2 documents.
3  Q.  Like what?
4  A.  Trash removal, excessive
5 order monitoring.
6  Q.  What was the training that
7 they received about excessive order
8 monitoring?
9  A.  They were showed on-the-job
10 training on how to pick, how the
11 Pick-to-Light system worked, what to do
12 if a certain number came up on the light
13 and it wasn't what it was supposed to be.
14 And how they were supposed to report it
15 to a leader and manager.
16  Q.  Did they ever receive any
17 training that instructed them to report
18 suspicious orders to the DEA?
19  A.  No.
20  Q.  Did they ever receive any
21 training that they were supposed to
22 report excessive orders to the DEA?
23  A.  No.
24  Q.  Were associates at Rite Aid

1 required to sign a responsibility form
2 related to reporting drug diversion?
3  A.  Yes.
4  Q.  What was the basis of
5 requiring them to sign that document?
6  MR. LAVELLE:  Object to
7  form.
8  THE WITNESS:  I don't -- I
9  don't understand what you mean by
10  basis.
11 BY MR. CLUFF:
12  Q.  Do you recall why employees
13 were required to sign that form?
14  A.  Yes.  We didn't -- we wanted
15 to make sure that all associates were
16 diligent, and -- and aware that -- to
17 prevent any theft, stolen or missing
18 control drugs were not -- were not
19 happening.
20  Q.  What about suspicious orders
21 as a form of diversion, were employees
22 required to report that?
23  MR. LAVELLE:  Object to
24  form.

1  THE WITNESS:  They were
2  required to tell their assistant
3  manager or lead if there is
4  excessive ordering in their line.
5  When they went to pick a product,
6  if it was more than it was
7  supposed to and they had to short
8  it, they were to tell their lead
9  or assistant manager.
10 BY MR. CLUFF:
11  Q.  But were they required to
12 report it to the DEA?
13  A.  No.
14  Q.  How about excessive orders,
15 were they required -- were associates
16 required to report those orders to the
17 DEA?
18  A.  No.
19  Q.  I'm going to hand you an
20 e-mail and attachment that we're going to
21 mark as Exhibit 5.
22  (Document marked for
23  identification as Exhibit
24  Rite Aid-Frost-5.)

1 BY MR. CLUFF:
2  Q.  It's been produced as
3 Rite_Aid_OMDL_0012113.  And the
4 attachment is 0012114.
5  Do you see there the cover
6 document is an e-mail?
7  A.  Yes.
8  Q.  The original e-mail is
9 written by Julie DeLuca.  Do you see
10 that?
11  A.  Okay.
12  Q.  Do you know who Julie DeLuca
13 is?
14  A.  No, I don't know who she is.
15  Q.  And it looks like Julie
16 DeLuca writes to a person with an e-mail
17 address ███████@riteaid.  Do you know
18 who C. Guthrie is?
19  A.  I do.
20  Q.  Whose -- and it looks like
21 at the top it's spelled out in full
22 Connie Guthrie.  Do you know who Connie
23 Guthrie is?
24  A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1     Q.   Who's that?

2     A.   She was at the time senior

3 human relations, human resources manager

4 in the DC 10.

5     Q.   And it looks like Connie

6 forwards you a document called drug

7 diversion.docx on January 18, 2011.  Do

8 you see that?

9     A.   Yes, I do.

10     Q.   Then she asks you, "How does

11 this look," right?

12     A.   Yes.

13     Q.   If you turn the page that

14 you're looking at over on the back.

15 There is a Rite Aid handout.  It says

16 Section 30 -- 1301.91, employee

17 responsibility to report diversion.

18 Okay?

19     A.   Yes.

20     MR. LAVELLE:  Object to

21    form.

22 BY MR. CLUFF:

23     Q.   Do you recall why Connie was

24 asking you how this document looked?

Page 187

1     A.   Why she -- why she did it

2 or?

3     Q.   Why she was forwarding it to

4 you and asking you how it looked?

5     A.   To see if it made sense.

6     Q.   What does that mean?

7     A.   That the wording on it

8 was -- was correct.  That maybe she left

9 something out, or if it applied to how we

10 have been doing drug diversion, and

11 simplify the process.  Just to -- to use

12 it as another form of document that the

13 employees -- to understand what drug

14 diversion was.

15     Q.   Let's look at the text of

16 this document.  In the first -- first

17 paragraph it says, "An employee who has

18 knowledge of drug diversion from his

19 employer by a fellow employee has an

20 obligation to report such information to

21 a responsible security official of the

22 employer."

23     Do you see that?

24     A.   Yes, I do.

Page 188

1     Q.   The employer there referred

2 to is Rite Aid; is that right?

3     MR. LAVELLE:  Object to

4    form.

5     THE WITNESS:  I don't know.

6    It just says the employer.  So

7    it's in our distribution center.

8 BY MR. CLUFF:

9     Q.   Okay.  The last line it says

10 a responsible security official.  Who

11 would that be at the Maryland

12 distribution center?

13     A.   Okay.  So where is that at

14 here?

15     Q.   The last line of the first

16 paragraph.

17     A.   Yeah, it would be like an

18 associate asset protection, one of our

19 guards.

20     Q.   So if an employee became

21 aware of drug diversion from -- by a

22 fellow employee, they were supposed to

23 report it to asset protection?

24     A.   There would be a vehicle for

Page 189

1 them to be able to do that.

2     Q.   What was that vehicle?

3     MR. CLUFF:  The record

4 reflects that he held up the -- the

5 document --

6     THE WITNESS:  Right.

7     MR. CLUFF:  -- that we've

8 marked as Exhibit 5.

9 BY MR. CLUFF:

10     Q.   I'm not really clear what

11 you mean by holding up the document

12 though.

13     A.   Well, it -- it's allowing

14 the associate to know that they should

15 not hold any drug diversion to

16 themselves, but they are to let somebody

17 know, whether it's asset protection, a

18 lead or a manager, that's what it is

19 meant to be, convey.

20     Q.   So you said to let somebody

21 know whether it's asset protection, a

22 lead or a manager.  I'm just trying to

23 understand who, who would be the people

24 or persons that an employee was supposed

Page 190

1  to report drug diversion to?
2       MR. LAVELLE:  Object to
3  form.
4       THE WITNESS:  All of the
5  above.  All of the above.  If an
6  associate saw something that was
7  missing out of a case or
8  something -- this applied to
9  pharmacy as well.  I mean we had
10 these posters all over the
11 pharmacy, not just the cage.
12      They were -- they were told
13 to let somebody know if something
14 was missing.
15 BY MR. CLUFF:
16      Q.   Okay.  Then you said this
17 was to let them know that there was a
18 vehicle to do that.  What -- what was the
19 vehicle through which they would -- they
20 would make these kinds of complaints or
21 report this kind of information?
22      MR. LAVELLE:  Object to
23 form.
24      THE WITNESS:  They would

Page 191

1  speak it.
2  BY MR. CLUFF:
3       Q.   So was there any sort of a
4  written report created if the employee
5  notified a security official of potential
6  diversion?
7       A.   No.
8       Q.   Never?
9       A.   No.
10      Q.   Okay.  In the next paragraph
11 it says, "The employer shall treat such
12 information as confidential and shall
13 take all reasonable steps to protect the
14 confidentiality of the information and
15 identity of the employee furnishing
16 information."
17      Do you see that?
18      A.   I do.
19      Q.   Okay.  Reading that
20 paragraph, do you have any understanding
21 that a written report of diversion would
22 have been created if an employee reported
23 it?
24      MR. LAVELLE:  Object to

Page 192

1  form.
2       THE WITNESS:  If we reported
3  it to security, I don't know what
4  they did with it.
5  BY MR. CLUFF:
6       Q.   Okay.  Did you ever have any
7  occasion to report diversion that you're
8  aware of?
9       A.   No.
10      Q.   Do you know if there was any
11 diversion ever reported out of the
12 pharmacy department?
13      A.   No, I do not.
14      Q.   Do you understand there's a
15 connection between preventing diversion
16 and the public interest?
17      MR. LAVELLE:  Object to
18 form.
19      THE WITNESS:  No.
20 BY MR. CLUFF:
21      Q.   Is it your testimony that
22 you don't have an understanding about
23 that fact, or that there is no connection
24 between preventing diversion and serving

Page 193

1  the public interest?
2       MR. LAVELLE:  Object to
3  form.
4       THE WITNESS:  I do not know
5  that there's a connection between
6  diversion and protecting the
7  public interest.
8  BY MR. CLUFF:
9       Q.   Do you know if Rite Aid,
10 your current employer, is committed to
11 protecting the public interest?
12      MR. LAVELLE:  Object to
13 form.
14      THE WITNESS:  I'm sure they
15 are.
16 BY MR. CLUFF:
17      Q.   So then, are they committed
18 to reporting diversion whenever they
19 encounter it?
20      MR. LAVELLE:  Object to
21 form.
22      THE WITNESS:  What was the
23 question again?
24 BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    Q.   If they're committed to
2  protecting the public interest, are they
3  committed to reporting diversion whenever
4  they encounter it?
5        MR. LAVELLE:  Object to
6  form.
7        THE WITNESS:  So I don't
8  understand who's reporting it
9  whenever they encounter it.
10 BY MR. CLUFF:
11   Q.   Rite Aid?
12       MR. LAVELLE:  Same.
13       THE WITNESS:  Rite Aid, the
14  distribution center?
15 BY MR. CLUFF:
16   Q.   We just looked at Exhibit 5,
17  right?
18   A.   Mm-hmm.
19   Q.   It says, "An employee who
20  has knowledge of drug diversion has an
21  obligation to report such information to
22  responsible security official of the
23  employer," correct?
24   A.   Yes.

Page 195

1    Q.   Would you agree with me that
2  all associates at Rite Aid have an
3  obligation to report diversion when they
4  become aware of it?
5    A.   Yes.
6    Q.   So when I ask if Rite Aid is
7  committed to reporting diversion, I mean
8  every associate at Rite Aid and the
9  company.  Do you have an understanding of
10  whether or not Rite Aid is committed to
11  reporting diversion when it becomes aware
12  of it?
13       MR. LAVELLE:  Object to
14  form.
15       THE WITNESS:  I know our
16  distribution center is committed
17  to diversion.
18 BY MR. CLUFF:
19   Q.   But not reporting suspicious
20  orders, correct?
21       MR. LAVELLE:  Object to
22  form.
23       THE WITNESS:  That's not
24  correct.

Page 196

1  BY MR. CLUFF:
2    Q.   While you were the manager
3  of the pharmacy department at the
4  Perryman distribution center between 2003
5  to 2014, did you ever report a suspicious
6  order to the DEA?
7        MR. LAVELLE:  Object to
8  form.  Objection, asked and
9  answered.
10       THE WITNESS:  I don't
11  understand when you said, object
12  to what?  Asked and answered?
13       MR. LAVELLE:  You can ask
14  for the question to be repeated or
15  you can answer the question or you
16  can tell him if you don't
17  understand the question.
18       I objected to the form of
19  the question.
20       THE WITNESS:  Okay.  Okay.
21  So repeat your question, please.
22 BY MR. CLUFF:
23   Q.   While you were the manager
24  of the pharmacy department at the

Page 197

1  Perryman distribution center between 2003
2  and 2014, did you ever report a
3  suspicious order to the DEA?
4        MR. LAVELLE:  Object to
5  form.  Objection, asked and
6  answered.
7        THE WITNESS:  No.
8  BY MR. CLUFF:
9    Q.   I'm going to hand you a copy
10  of a document that was produced by Rite
11  Aid Rite_Aid_OMDL_0013963 and the
12  attachment to that document which begins
13  at Rite_Aid_OMDL_0013967 to 0013968.
14       (Document marked for
15  identification as Exhibit
16  Rite Aid-Frost-6.)
17 BY MR. CLUFF:
18   Q.   Did you get a chance to
19  review that document?
20   A.   I did.
21   Q.   Let's start at the bottom of
22  the top page.  That's an e-mail from Kim
23  Brown to a number of individuals.  The
24  subject line is "DEA CFRs

Page 198

1 employers/employees."
2         Do you see that?
3     A.   Yes, I do.
4     Q.   And Kim Brown writes, "All
5 of our cage associates and any associate
6 used temporarily in the cage have to sign
7 an acknowledgment for drug diversion."
8         Do you see that?
9     A.   Yes, I do.
10    Q.   She writes, "The same
11 verbiage shown below for C.F.R. 1301.91
12 is in our policy verbatim."
13        Do you see that?
14    A.   Yes.
15    Q.   If you turn back two pages,
16 it looks like she has copied some
17 portions of the C.F.R.
18        Do you see that?  On the
19 page to your right?
20    A.   The one on the back of the
21 first page or the second page?
22    Q.   The second page.
23    A.   Okay.
24    Q.   Do you see some selections

Page 199

1 from the Code of Federal Regulations
2 there?
3     A.   Yes.
4     Q.   Look at Section 1301.91,
5 "Employee responsibility to report drug
6 diversion."
7     A.   Yes.
8     Q.   And there it reads, "Reports
9 of drug diversion by fellow employees is
10 not only a necessary part of an overall
11 employee security program but also serves
12 the public interest at large."
13        Do you see that?
14    A.   Yes.
15    Q.   So would you agree with me
16 now that at least that DEA believed that
17 reports of drug diversion served the
18 public interest at large?
19        MR. LAVELLE:  Object to
20    form.
21        THE WITNESS:  Yes.
22 BY MR. CLUFF:
23    Q.   That section continues.  "It
24 is, therefore, the position of DEA that

Page 200

1 an employee who has knowledge of a drug
2 diversion from his employer by a fellow
3 employee has an obligation to report such
4 information to a responsible security
5 official of the employer."
6         Do you see that?
7     A.   Yes, I see that.
8     Q.   Did you ever talk to anybody
9 from DEA about who a responsible security
10 official of the employer should be?
11    A.   No.
12    Q.   Do you know if any employees
13 have ever been drug -- or cage access
14 without having signed or acknowledging
15 their responsibilities under 1301.91?
16        MR. LAVELLE:  Object to
17    form.
18        THE WITNESS:  No.
19 BY MR. CLUFF:
20    Q.   When an employee was given
21 access to the controlled cages, where
22 would documentation of that access be
23 kept?
24    A.   The asset protection office

Page 201

1 had it.  Plus, I had a list of people,
2 and myself and Marian Woods, of the
3 people who went through background
4 checks, three-year background checks.
5     Q.   Were there any instances
6 where people were given access without
7 having gone through the necessary
8 background check and other information?
9         MR. LAVELLE:  Object to
10    form.
11        THE WITNESS:  Yeah.  They
12    had to be escorted if they were.
13 BY MR. CLUFF:
14    Q.   How would they have been
15 escorted?
16    A.   They would have been with an
17 associate there to work alongside them
18 for the day or an hour or so.
19    Q.   Would they have -- would
20 they have been included on this list of
21 people who were given access?
22    A.   No.
23    Q.   How would anybody have known
24 that they were allowed to be in the cage

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 then?
2     A.   We have, as you enter the
3 cage -- it applies to auditors as well --
4 there was an escort list there, an
5 associate that had access to be listed
6 there in A, and then the B signature
7 would be for the person that was to be
8 escorted, and the person that had access
9 would have to be with that person the
10 entire time.  And then you put the date
11 and the time that they entered the cage
12 and then a date and time that they left
13 the cage.
14     Q.   So if I understand you
15 correctly, there was essentially a
16 sign-in sheet outside of the cage?
17     A.   No.  There was a sign-in
18 sheet inside the cage.
19     Q.   Inside the cage.
20         Do you know where that
21 sign-in sheet was kept after it
22 filled up?
23     A.   No.  Destroyed it.
24     Q.   So other than that, other

Page 203

1 than that sign-in sheet, was there any
2 other record of who was given access to
3 the -- the controlled cages?
4     A.   Security kept a list of all
5 the people that had access to the
6 security cage.
7         (Document marked for
8         identification as Exhibit
9         Rite Aid-Frost-7.)
10 BY MR. CLUFF:
11     Q.   Let me give you another
12 document.  We're going to mark it as
13 Exhibit 7.  It's been produced as
14 Rite_Aid_OMDL_0011927 to 0011928.
15         This is a two-page document.
16 But if you look at the back of the
17 document in front of you, you'll see that
18 it's just My Rite Aid symbol.  And on the
19 front it appears to be an e-mail chain
20 between you and Ms. Marian Wood, correct?
21     A.   Okay -- yes.
22     Q.   The subject is cage access.
23 Do you see that?
24     A.   Yes.

Page 204

1     Q.   Would that refer to the
2 controlled substances cage we've been
3 discussing?
4     A.   Yes.
5     Q.   Looking at the bottom,
6 Marian Wood writes, "Keith, I would
7 recommend taking off the following people
8 from cage access:  Chad Mitchell and
9 Nikki Williams."
10         Do you know who either Chad
11 Mitchell or Nikki Williams were?
12         MR. LAVELLE:  Object to
13     form.
14         THE WITNESS:  I know who
15     Chad Mitchell is -- was.
16 BY MR. CLUFF:
17     Q.   Who is Chad Mitchell?
18     A.   Industrial engineer.
19     Q.   So at one point he would
20 have been given challenge access?
21     A.   Yes.
22     Q.   Do you know what that would
23 have been for?
24     A.   To ensure that the cage met

Page 205

1 specifications and if there was any
2 repair work in there, he could recommend
3 how to get it repaired.
4     Q.   Speaking of specifically
5 Chad.  The next e-mail up you write back
6 to Ms. Wood and say, "I already took off
7 Chad's name last month."
8         Do you know why she would be
9 asking for his name to be removed if you
10 already took it off?
11         MR. LAVELLE:  Object to
12     form.
13         THE WITNESS:  No, I don't
14     know.
15 BY MR. CLUFF:
16     Q.   Going back to Ms. Woods'
17 original e-mail to you.  She continues,
18 "Also there is a Jesse Jones on the
19 access list, but I don't remember giving
20 him access.  I can't find any paperwork
21 on a background check for him.  Did you
22 approve him?  He is listed as a lead but
23 I don't know where."
24         Do you see that?

Page 206

A.   Yes.

Q.   Moving up in the chain about Mr. -- Mr. Jones, you write, "Don't know a Jesse Jones."  Do you have any recollection today who Jesse Jones was?

A.   No, I do not, no.

Q.   Moving up the chain again, Marian replies to you and says, "Chad's name is still on the list."

Do you know why his name still would have been on the list if you allegedly took it off the month before?

MR. LAVELLE:  Object to form.

THE WITNESS:  It could have accidentally printed on the list before it was removed.

BY MR. CLUFF:

Q.   And then she asks, "My question was did you authorize Jesse Jones?"

Do you see that?

A.   Do you mean did you approve him, is that what that -- this means?

Page 207

Oh okay.  Yes, I see that.

Q.   And then you write back to her and say, "I would not authorize someone I don't know."

Do you see that at the top?

A.   Yes.

Q.   So according to this e-mail chain, there is some person named Jesse Jones who has cage access, but no one knows how that person got there?

MR. LAVELLE:  Object to form.

THE WITNESS:  No, not necessarily.

BY MR. CLUFF:

Q.   What do you mean not necessarily?

A.   We -- Marian and I approved everybody -- all the names that were posted to get access.  Now, part of security's responsibility is to send us the list of people that they think should -- has access to the list and we can delete their names before we post it.

Page 208

And that's what we would do.

Q.   Jesse Jones is on the access list, right?

MR. LAVELLE:  Object to form.

BY MR. CLUFF:

Q.   At the time that Marian writes this e-mail, Jesse Jones is on the access list?

A.   According to what she said.

Q.   And she doesn't remember giving him access, right?

A.   That's what she said.

Q.   And you don't even know who Jesse Jones is, do you?

A.   That's what I said there.

Q.   So how did -- how would this person have gotten access to the cage?

A.   They wouldn't have had access to the cage.  They might have been on the list, but they didn't have access to the cage.

Q.   If they are on the list, can't they have access?

Page 209

A.   No.

Q.   How so?

A.   As I explained to you a few minutes ago, Marian and I approved anybody that was supposed to be on the access list.  When security sent names and came up with a list, their name could have inadvertently systemically got put on the list, control access cage list, because we have people who get approval on badges.  And it is a manual system where security goes in there and scans who has access to the pharmacy area and the cage area.

Well, part of my responsibility and Marian's was every month, we got -- went over the whole entire pharmacy access list and the cage access list, and deleted any names and highlighted names, gave it back to security, said these are the following people that have access, to make sure that only the people that worked there had access.  So Jesse names -- Jesse

Page 210

1 James came out on the thing, we would
2 have discovered it like Marian found out.
3 We would have deleted the name before we
4 post it, gave it back to security and the
5 name would have been taken off the access
6 list.
7 Q. So the -- the goal of this
8 correspondence was to make sure that
9 nobody was on the list unless they were
10 supposed to have access, right?
11 A. Correct.
12 Q. But we already know from
13 this document that you thought you had
14 taken Chad Mitchell's name off a month
15 ago and then his name was still on the
16 list, correct?
17 A. Yes.
18 Q. Do you see that name Nikki
19 Williams?
20 A. Yes.
21 Q. Okay. Do you recall if
22 Nikki Williams' name was taken off the
23 list at this point?
24 A. No, I do not recall.

Page 211

1 Q. Do you see your e-mail in
2 the center there that says -- dated
3 June 30, 2010, where you say, "Will take
4 off Nikki"?
5 A. Okay.
6 Q. So you were committed to
7 taking Nikki off, right?
8 MR. LAVELLE: Object to
9 form.
10 THE WITNESS: Yes.
11 BY MR. CLUFF:
12 Q. And that's because she no
13 longer should have had access?
14 A. I don't know what the reason
15 was -- what the reason was back in 2010.
16 Q. Regardless of the reason,
17 she was no longer supposed to have
18 access, correct?
19 A. Correct.
20 Q. Okay. And if she had
21 access, even though she was not -- if she
22 was on the list, even though she didn't
23 have access, would that violate Rite
24 Aid's policy?

Page 212

1 MR. LAVELLE: Object to
2 form.
3 THE WITNESS: Distribution
4 center says we would only put
5 people in the cage that had access
6 to the cage after going through a
7 year -- three-year background
8 check.
9 (Document marked for
10 identification as Exhibit
11 Rite Aid-Frost-8.)
12 BY MR. CLUFF:
13 Q. Okay. I'm going to hand you
14 a two-page document that's been produced
15 by Rite Aid as Rite_Aid_OMDL_0003533 to
16 3534. The second page is on the back of
17 the document.
18 A. Okay.
19 Q. If you can look at the
20 bottom e-mail that bleeds over onto the
21 second page. Marian Wood writing to you
22 and a group of other people, including
23 Larry Ringgold and N. Williams.
24 Do you see that?

Page 213

1 A. Yes.
2 Q. Who is N. Williams?
3 A. Nathan Williams. He is the
4 security manager -- security manager.
5 Q. Who is Larry Ringgold?
6 A. At the time he was a
7 supervisor that worked for Nathan
8 Williams.
9 Q. Do you see that Ms. Wood
10 writes, "Please remove the following
11 people from cage access: Chad Mitchell,
12 Nikki Williams"?
13 A. Yes.
14 Q. Nikki Williams is the same
15 person you agreed to take off the list on
16 Wednesday, June 30th, correct, that was
17 in Exhibit 7?
18 A. Yes.
19 Q. On July 1st, Larry Ringgold
20 says, "No problem. I will take care of
21 it."
22 Do you see that?
23 A. Yes, I do.
24 Q. So both you and Mr. Ringgold

Page 214

1  were going to take care of taking Nikki
2  Williams off the list, right?
3      A.   I instructed Larry to take
4  the names off.  He was supposed to take
5  the names off the list.
6      Q.   Moving up to the top e-mail
7  there that's from Ms. Wood to you, Keith
8  Frost.  It's dated 2010-08-09, which
9  would be August 9th, right?
10      She writes, "Keith, I am not
11  sure how this is happening, but Nikki
12  Williams was taken off the cage access
13  list back on July 1st.  Today she has
14  been scanning in and out of the cage.
15  How can she have access and not be on the
16  list?"
17      Do you see that?
18      A.   Yes.
19      Q.   Do you have an answer for
20  that question?
21      MR. LAVELLE:  Object to
22  form.
23      THE WITNESS:  Yeah, probably
24  Larry made a mistake and didn't

Page 215

1  take her name off the list like he
2  should have.
3  BY MR. CLUFF:
4      Q.   So she wasn't supposed to be
5  in the cages anymore, correct?
6      MR. LAVELLE:  Object to
7  form.
8      THE WITNESS:  Yes, according
9  to this she should not have.
10  BY MR. CLUFF:
11      Q.   But she was still scanning
12  in and out of the cages that holds
13  controlled substances?
14      MR. LAVELLE:  Object to
15  form.
16      THE WITNESS:  I don't know
17  what month this was -- Marian was
18  referring to.  It could have been
19  the last day of July -- or June or
20  July.
21  BY MR. CLUFF:
22      Q.   Ms. Wood writes, "Nikki
23  Williams was taken off the cage access
24  list back on July 1."

Page 216

1      A.   Okay.
2      Q.   And then, the date of this
3  e-mail is August 9th.  "Today she has
4  been scanning in and out of the cage."
5      So a month and nine days
6  later she's still scanning in and out of
7  the cage, correct?
8      A.   Okay.  So maybe she did,
9  yeah.
10      Q.   What's the purpose of
11  preventing people from accessing the
12  controlled substances cage if they don't
13  have access?
14      MR. LAVELLE:  Object to
15  form.
16      THE WITNESS:  Repeat the
17  question please.
18  BY MR. CLUFF:
19      Q.   Sure.  Let me ask it a
20  little more specifically.
21      A.   Okay.
22      Q.   Does Rite Aid restrict the
23  people who have access to the controlled
24  substances cage in order to prevent

Page 217

1  diversion?
2      MR. LAVELLE:  Object to
3  form.
4      THE WITNESS:  The DC 10 has
5  a list of names that have
6  authorized access into the cage
7  due to the -- due to the work
8  that's performed.  And limit to
9  those people.
10      We have people that have
11  background checks that used to
12  work in the cage, work in other
13  departments, but are no longer
14  needed there.  They still have
15  valid background checks.  So the
16  list limits the amount of people
17  that we have working in the cage.
18  BY MR. CLUFF:
19      Q.   That wasn't quite the
20  question that I -- that I asked.
21      Earlier we talked about that
22  Rite Aid is -- has regulatory
23  responsibility as a registrant, correct?
24      A.   Yes.

Page 218

1    Q.   And part of those are to
2 maintain effective controls to prevent
3 diversion?
4    A.   Yes.
5    Q.   My question is, in your
6 experience as a manager in the -- excuse
7 me -- the Perryman distribution center,
8 whether restricting cage access was apart
9 of Rite Aid's efforts to comply with the
10 requirement to maintain effective
11 controls to prevent diversion?
12        MR. LAVELLE:  Object to
13    form.
14        THE WITNESS:  Part of our
15    internal procedures was to have a
16    control access list to limit a
17    number of people working in the
18    control cage to only those that
19    had background checks.
20 BY MR. CLUFF:
21    Q.   And was that part of Rite
22 Aid's efforts to maintain effective
23 controls to prevent diversion?
24        MR. LAVELLE:  Object to

Page 219

1    form.
2        THE WITNESS:  It was one of
3    our security measures to keep the
4    people that were trained properly
5    into the cage.
6 BY MR. CLUFF:
7    Q.   Why were you concerned about
8 keeping people out of the cage if they
9 weren't trained properly?
10    A.   Well, they wouldn't know
11 what they were doing.  Only trained
12 people that had access to the cage were
13 allowed into the cage.
14    Q.   If they didn't know what
15 they were doing, wasn't it possible that
16 they could engage in diversion?
17    A.   No.
18    Q.   Were people ever given
19 access to the cages before background
20 checks were completed on their behalf?
21    A.   Yes.
22    Q.   In what instances?
23    A.   DEA inspector.
24    Q.   How about any Rite Aid

Page 220

1 associates?
2    A.   Sure.  Supply chain auditors
3 coming from other DCs.  The general
4 manager under a proper escort were
5 allowed into the cage.
6    Q.   Are those the only instances
7 in which a Rite Aid associate who didn't
8 have a background check would be given
9 access to the cage?
10    A.   That would be allowed in
11 there, correct.
12    Q.   Are you sure?
13        MR. LAVELLE:  Object to
14    form.
15        THE WITNESS:  That's all I
16    can remember.
17        (Document marked for
18    identification as Exhibit
19    Rite Aid-Frost-9.)
20 BY MR. CLUFF:
21    Q.   I'm going to hand you a copy
22 of a document produced by Rite Aid.  It's
23 a two-page e-mail chain beginning at
24 Rite_Aid_OMDL_001825, to 001826.

Page 221

1        Appears to be an e-mail
2 chain primarily between you and Ms. Wood
3 with some other people copied in the
4 middle from Rite Aid?
5    A.   We're talking about eight or
6 nine?  Nine?  Okay.
7        MR. LAVELLE:  It should be
8    nine.
9        THE WITNESS:  Okay.
10 BY MR. CLUFF:
11    Q.   This is Exhibit 9.  Looking
12 at Ms. Wood's original e-mail to you
13 dated February 20th, do you see that on
14 the second page?
15    A.   Yes.
16    Q.   On the back page?
17    A.   Mm-hmm.
18    Q.   "Keith, I understand there
19 is a new girl in the cage.  Her name is
20 Tammy Coakley.  She went to the security
21 desk, talked to Larry Ringgold and told
22 him she is now in the cage and needs
23 access, and he gave it to her."
24        Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1     A.   Yes.
2     Q.   And then Ms. Wood asks you,
3  "Did you give approval?  Do we know when
4  her last background check was?  I would
5  think Larry knows the process, and I
6  don't understand why she was given
7  access.  She hadn't even had a day's
8  training yet."
9         Do you see that?
10    A.   Yes.
11    Q.   So is this an example of
12 someone given cage access without
13 training or without a background check?
14       MR. LAVELLE:  Object to
15    form.
16       THE WITNESS:  Larry made a
17    mistake in giving her access.
18 BY MR. CLUFF:
19    Q.   So Larry violated Rite Aid
20 at that point?
21    A.   He violated our internal
22 procedures on how to properly give access
23 to somebody into the cage, which requires
24 a background check first.  She was in

Page 223

1  pharmacy.  So she had a background check.
2  She just didn't have a second background
3  check for the control cage.
4     Q.   She had not complied with
5  the procedure for getting cage access,
6  correct?
7     A.   Larry should not have given
8  her access without having that come back
9  competitive, without having an escort.
10    Q.   And she didn't even had a
11 day's training yet either, correct?
12       MR. LAVELLE:  Object to
13    form.
14       THE WITNESS:  I do not know
15    if she didn't have training.
16 BY MR. CLUFF:
17    Q.   If you look at the back
18 page, Ms. Wood's e-mail to you dated
19 February 20th, do you see that?
20    A.   Okay.
21    Q.   And the last sentence says,
22 "She hasn't even had a day's training
23 yet."
24       Do you see that?

Page 224

1     A.   Okay.
2     Q.   Do you know if Rite Aid had
3  any internal policies or procedures about
4  discipline for people who violated
5  policy?
6     A.   We have progressive
7  discipline for a lot of people, for a lot
8  of instances, policies.
9     Q.   How about an instance like
10 this where Larry gave somebody cage
11 access who shouldn't have had it?  Was
12 there any disciplinary proceeding?
13       MR. LAVELLE:  Object to
14    form.
15       THE WITNESS:  I do not know.
16 BY MR. CLUFF:
17    Q.   Do you know if there are any
18 instances of people given access to the
19 cage who didn't have background checks or
20 training?
21    A.   No.
22    Q.   Did it concern you that
23 Larry wasn't following the internal
24 policies and procedures about cage

Page 225

1  access?
2        MR. LAVELLE:  Object to
3     form.
4        THE WITNESS:  I'm sure I
5     wasn't happy in this instance.
6  BY MR. CLUFF:
7     Q.   What would you have done as
8  a result of this instance?
9        MR. LAVELLE:  Object to
10    form.
11       THE WITNESS:  I would have
12    notified his manager.
13 BY MR. CLUFF:
14    Q.   Who was his manager?
15    A.   Nathan Williams.



Page 226

23  Q.   Is there some point in time
24 during which the Perryman distribution

Page 227

1 center was out of compliance with that
2 requirement?
3      A.   I do not know.
4         (Document marked for
5      identification as Exhibit
6      Rite Aid-Frost-10.)
7 BY MR. CLUFF:
8      Q.   I'm going to hand you a copy
9 of a document produced by Rite Aid --
10 Rite Aid as Rite_Aid_OMDL_0023456.  It's
11 a two-page document.
12      A.   Okay.
13      Q.   Okay.  So, on the bottom of
14 the first page, and continuing over to
15 the back side, there's an e-mail from
16 Larry Ringgold to ▮▮▮▮▮@RightAid,
17 Joyce Sweitzer, MWood, Tahir Senoussi,
18 Bill Morrow, and KFrost.
19         You were copied on this
20 e-mail, right?
21      A.   Which -- are you looking at
22 the back or the front?
23      Q.   The very bottom on the
24 front.  Do you see there's a line that

Page 228

1 says, "From Larry Ringgold."  And then if
2 you turn to the back, you can see there's
3 a "to" line?
4      A.   Okay.
5      Q.   You see you're copied on the
6 last line of the "to" section there?
7      A.   Okay.
8      Q.   And do you see the subject,
9 DEA compliance?
10      A.   Mm-hmm.
11      Q.   Let's look at the subject --
12 or the text of that first e-mail.  "FYI,
13 the monthly Rx cage and vault test was
14 conducted today.  Everything was good and
15 we are once again compliant for the month
16 of March."
17         Do you see that?
18      A.   Okay.
19      Q.   Earlier we talked about
20 pharmacy cage or controlled substances
21 cages or vault tests, I asked if those
22 come from DEA requirements.
23         Looking at this e-mail, can
24 you -- can you tell me what understanding

Page 229

1 you have about why the subject line would
2 be "DEA compliance"?
3      A.   Because there was a term
4 that anything that dealt with KTU's DEA
5 compliance, DEA requires that you have a
6 secure monitoring system, but he used the
7 word DEA compliance in there, the term
8 that he used globally whenever he was
9 talking about the cage.
10      Q.   That's a term that Larry
11 Ringgold used globally?
12      A.   Yes.  Yes.
13      Q.   Okay.  Do you see at the end
14 there where it says "once again compliant
15 for the month of March"?  Do you see
16 that?
17      A.   Mm-hmm.
18      Q.   What does that mean,
19 "compliant for the month of March"?
20      A.   Meaning that he did the --
21 the test.
22      Q.   Okay.  Moving under the --
23 the front page, if you flip back over to
24 the front -- okay, you're there.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    The bottom e-mail that you
2 write to Ms. Wood says, "Marian, do
3 you" -- "do you put a copy of this in a
4 folder?"
5    And then she replies and
6 says, "No because Larry keeps a log."
7    Do you see that?
8    A.   Mm-hmm.
9    Q.   So there would have been a
10 log of these monthly tests of the motion
11 sensors?
12    A.   Correct.
13    Q.   And then you ask, "How do we
14 know, or how do you know if he misses one
15 or it isn't done correctly?  Remember how
16 they used to mess this up?"
17    A.   Mm-hmm.
18    Q.   What did you mean when you
19 said they used to mess this up?
20    A.   He might not have done it on
21 the last day of the month.  Or he might
22 have done it a week later, than right at
23 the very last of the month.
24    Q.   Is it possible that he just

Page 231

1 didn't do it sometimes?
2    A.   I don't know.
3    Q.   But if he did do it, it
4 would be reflected in this log that he
5 kept?
6    A.   Or send us an e-mail.
7    Q.   Do you know if he saved
8 those logs anywhere?
9    A.   No, I do not know.
10    Q.   Did you ever talk to him
11 about those logs at all?
12    A.   I remember talking to him
13 about the logs.
14    Q.   What was the substance of
15 that conversation?
16    A.   Are you keeping a log.
17    Q.   And what did he say?
18    A.   Yes.
19    Q.   But you didn't ask him where
20 he kept the logs?
21    A.   No.
22    Q.   Do you recall ever having
23 any pharmacy department meetings?
24    A.   Yes.

Page 232

1    Q.   How often would you hold
2 pharmacy department meetings or attend
3 pharmacy department meetings?
4    A.   If I thought there was a
5 need for one.
6    Q.   Would you have been the
7 person to call the pharmacy department
8 meeting?
9    A.   Not necessarily.
10    Q.   Were there ever any
11 regularly scheduled meetings of the
12 pharmacy department?
13    A.   No.
14    Q.   Do you know who Janet
15 Kuzma-Miller is?
16    A.   Yes, I know who she is.
17    Q.   Who is she?
18    A.   She used to be an assistant
19 manager that worked for me.
20    Q.   In the pharmacy department
21 at Perryman?
22    A.   Yes.
23    Q.   Do you recall having a
24 pharmacy department meeting in

Page 233

1 September of 2010 approximately?
2    MR. LAVELLE:  Object to
3    form.
4    THE WITNESS:  I don't
5    remember that.  I don't remember
6    that.
7 BY MR. CLUFF:
8    Q.   Do you know what a concealed
9 shortage is?
10    A.   Yes.
11    Q.   What's a concealed shortage?
12    A.   It means a vendor sends
13 something to us, supposedly all intact,
14 whether it was like 12 or six.  And when
15 we received it, it wasn't -- something
16 was missing.  That's a concealed
17 shortage.
18    Q.   Do you know what the 24-hour
19 rule is in -- in connection to you
20 receiving controlled substances?
21    A.   Yes.
22    Q.   What is it?
23    A.   Try to receive a substance
24 within 24 hours.

Page 234

1    Q.   What does it mean to receive
2   a substance?
3        A.   Get it into your inventory.
4        Q.   So the idea is that you
5   would have a delivery occur from a
6   vendor, and then it would have to be
7   received into inventory within 24 hours?
8        A.   Yes.
9        Q.   And if that didn't happen,
10  was it a DEA violation?
11       A.   No.
12       Q.   What would it be a violation
13  of?
14       A.   It just wasn't in our
15  inventory yet.
16       Q.   Was there ever any concern
17  at Rite Aid that controlled substances
18  were not making it into inventory within
19  24 hours?
20       A.   No.
21       Q.   Is the answer no, there was
22  never a concern or just no, you don't
23  recall?
24       A.   No, we weren't concerned

Page 235

1   with it being in the inventory.
2        MR. CLUFF:  We've been going
3    about an hour.  Why don't we take
4    another break.
5        MR. LAVELLE:  Sure.
6        THE VIDEOGRAPHER:  Off
7    record at 1:42 p.m.
8        (Short break.)
9        HE VIDEOGRAPHER:  We are
10   back on the record at 2:00 p.m.
11  BY MR. CLUFF:
12       Q.   Okay.  We are back on the
13  record.  So you're back under oath,
14  Mr. Frost.
15       A.   Okay.
16       Q.   When we broke we were
17  talking about receiving orders and then
18  getting them into inventory.  I just want
19  to talk about two documents really
20  quickly, kind of round out that
21  discussion.
22       One is a document that was
23  produced by Rite Aid as Rite_Aid_OMDL_ --
24       MR. CLUFF:  I did that

Page 236

1   again.  I marked my copy that has
2   highlighting on it.
3        It's produced as
4   Rite_Aid_OMDL_00100116 to 117.
5   It's Number 9 or 6.
6        (Document marked for
7   identification as Exhibit
8   Rite Aid-Frost-11.)
9   BY MR. CLUFF:
10       Q.   Did you have a chance to
11  review that?
12       A.   I did.
13       Q.   Okay.  I want to look at the
14  first e-mail in the chain which is on the
15  back page, if you flip it over.
16       And there, there is an
17  e-mail from Marian Wood to you, and Tahir
18  Senoussi and B. Sordillo and N. Brodie.
19  Do you see that?
20       A.   Yes.
21       Q.   The subject is late CD
22  receipts.  Do you know what that means?
23       A.   Yes.
24       Q.   What does it mean?

Page 237

1        A.   In this case it was a pallet
2   of CDs that were offloaded probably by a
3   truck and was not moved to the control
4   cage according to Marian in a timely
5   manner.
6        Q.   You used the phrase "CD."
7   What does CD refer to?
8        A.   Control drugs.
9        Q.   Okay.  So we were talking
10  earlier about control drugs being moved
11  into inventory.  I asked if that had ever
12  happened before, where they weren't moved
13  in on time and whether there was some
14  concern about it.  And here it looks like
15  there was some concerns about it, in
16  2010, correct?
17       MR. LAVELLE:  Object to
18   form.
19       THE WITNESS:  Marian would
20   have some concerns about it.
21  BY MR. CLUFF:
22       Q.   She writes, "We are
23  continuing to take delivery of product
24  into the building and not receiving into

Page 238

1  the system until the next day."
2       Do you see that?
3    A.   Yes.
4    Q.   So this was a continuing
5  problem?
6       MR. LAVELLE:  Object to
7    form.
8       THE WITNESS:  No.
9  BY MR. CLUFF:
10   Q.   She writes, "We are
11 continuing to take delivery of product
12 into the building and not receiving it
13 into the system," correct?
14   A.   Yes.
15   Q.   Okay.  So this document
16 indicates that it was a continuing
17 problem, right?
18       MR. LAVELLE:  Object to
19    form.  Objection, asked and
20    answered.
21       THE WITNESS:  That was
22    Marian's opinion.
23 BY MR. CLUFF:
24   Q.   The next paragraph she says,

Page 239

1  "This is a DEA (C.F.R. 1304.21-D) and
2  regulatory compliance regulatory
3  checklist Number 19 violation."
4       Do you see that?
5    A.   Yes.
6    Q.   Earlier I asked you if
7  failing to take controlled substances
8  into inventory within 24 hours was a
9  regulatory violation and you said no.  Do
10 you recall that?
11   A.   Yes.
12   Q.   Does this refresh your
13 recollection about whether it's a
14 regulatory violation?
15   A.   No, it doesn't refresh my
16 memory on that.
17   Q.   Well, at least as far as
18 this e-mail is concerned, Marian believed
19 that it was a DEA violation, correct?
20   A.   Yes.
21   Q.   She writes, "A decision has
22 to be made, are we going to continue
23 doing this and risk fines and penalties
24 for each occurrence from the DEA and/or

Page 240

1  failed audits by the regulatory
2  compliance team, or if a procedure will
3  be put into place to get these late
4  deliveries received."
5       Do you see that?
6    A.   Yes.
7    Q.   Do you recall any instances
8  in which Rite Aid made a decision to
9  continue with a business practice even
10 though it was a DEA violation?
11       MR. LAVELLE:  Object to
12    form.
13       THE WITNESS:  No.
14 BY MR. CLUFF:
15   Q.   So this is the only instance
16 then where that question was asked?
17       MR. LAVELLE:  Object to
18    form.
19       THE WITNESS:  I don't know
20    what questions are asked on a
21    habitual basis.
22 BY MR. CLUFF:
23   Q.   I wasn't really asking about
24 a habitual basis.  I was asking about any

Page 241

1  instances that you can recall where
2  somebody may have asked are we going to
3  continue in this practice that violates
4  the DEA regulations or if we are going to
5  make a procedure to get it done right.
6  Do you recall anything like that?
7       MR. LAVELLE:  Object to
8    form.
9       THE WITNESS:  I don't recall
10    anything like that.
11 BY MR. CLUFF:
12   Q.   If you turn over to the
13 front page which looks like you've
14 already done.  Bill Morrow.  Do you know
15 who Bill Morrow is?
16   A.   Yes.
17   Q.   Who is Bill Morrow?
18   A.   Senior operations manager.
19   Q.   It looks like he's got a
20 signature block there that says senior
21 operations manager, as you indicated,
22 Mid-Atlantic customer support center.
23       What's the Mid-Atlantic
24 customer support center?

Page 242

1   A.   Our building in Perryman.
2   Q.   That's the Perryman
3 distribution center?
4   A.   Yes.
5   Q.   He says, "We need to comply.
6 What is preventing us from complying?"
7       Do you see that?
8   A.   Yes.
9   Q.   And then Brian Sordillo
10 replies. Who is Brian Sordillo?
11   A.   He was an inbound assistant
12 receiving manager.
13   Q.   He asks, "What is the
14 guideline/compliance on receiving
15 controlled drugs?"
16       So he didn't even know what
17 the -- what the guideline was, right?
18   A.   I don't know if he did or
19 didn't.
20   Q.   But he's asking the
21 question, what -- what the guidelines
22 are, right?
23   A.   Yes.
24   Q.   Marian Wood writes, "The

Page 243

1 date of delivery is the date of receipt.
2 It does not state we have 24 hours.
3 Nikolai knows this. The chain of custody
4 I have states the shipment was unloaded
5 from the truck at 1400 and not taken to
6 the cage until 1538."
7       Do you see that?
8   A.   Yeah.
9   Q.   And at the top she writes to
10 Brian Sordillo only, you're not copied on
11 that, but we're just looking at how the
12 chain evolved here.
13       She writes, "Now that we
14 know it states that it must be received
15 that day, I will get with Tahir to have a
16 plan in place," correct?
17   A.   Yes, that's what she says.
18   Q.   So did you ever talk to her
19 about having a plan in place for
20 receiving controlled substances within
21 24 hours after delivery?
22   A.   I remember having
23 discussions to that effect.
24   Q.   What were the substance of

Page 244

1 those discussions?
2   A.   Well, that if a delivery
3 came at 11:59 that it would be impossible
4 to receive it in one minute before it
5 changed the day.
6   Q.   So were there any -- she
7 said, "I will give it to Tahir to have a
8 plan in place." Do you know if a plan
9 was ever put in place?
10   A.   Tahir was our department
11 manager in Rx, yes.
12   Q.   So was a plan put in place
13 then?
14   A.   Yes.
15   Q.   So presumably this problem
16 should have been resolved in 2010?
17   A.   The plan was for Tahir to
18 make sure that anything that was in the
19 control cage under accountability would
20 be received by the night crew, and they
21 start at 7 o'clock at night.
22   Q.   I'll show you another
23 document produced by Rite Aid as
24 Rite_Aid_OMDL_0029175.

Page 245

1       (Document marked for
2       identification as Exhibit
3       Rite Aid-Frost-12.)
4       THE WITNESS:  Okay.
5 BY MR. CLUFF:
6   Q.   Let's start with the first
7 e-mail in the chain. It begins on the
8 bottom of the front page.
9   A.   Mm-hmm.
10   Q.   Flip over. We'll look, if
11 you flip over, Mr. Frost. At the bottom
12 of that front page you'll see there's an
13 e-mail from Marian Wood to a number of
14 people. If you flip over to the back.
15       You'll see you're -- you're
16 copied on that e-mail from Ms. Wood. Do
17 you see that?
18   A.   Okay.
19   Q.   Do you see the subject is
20 compliance violation, do you see that?
21   A.   Yes.
22   Q.   She writes, and says, "We
23 had a compliance violation on receipts
24 from Saturday 5/26. A shipment was

Page 246

1 unloaded on 5/26 at essentially midnight,
2 12:05 a.m., it was taken in the cage at
3 12:09 a.m. However, it was not received
4 until Tuesday 5/29 at 7:25 a.m."
5      Do you see that?
6      A.   Yes.
7      Q.   So this product -- this
8 product was delivered on Saturday and not
9 received until Tuesday.  So two days
10 later, three days later?
11      A.   Okay.
12      Q.   She says, "Just an FYI, the
13 DEA can fine us up to $10,000 per
14 occurrence."
15      Do you see that?
16      A.   Mm-hmm.
17      Q.   Isn't this the same subject
18 we were talking about in Exhibit 11 from
19 2010?
20          MR. LAVELLE:  Object to
21      form.
22          THE WITNESS:  Is it the same
23      what?
24 BY MR. CLUFF:

Page 247

1      Q.   The same subject, receiving
2 shipments within 24 hours.
3      A.   Yes.
4      Q.   And that's the same
5 situation that Tahir was going to have a
6 plan to deal with in 2010?
7      A.   It was Memorial Day weekend.
8 It was different from that.
9      Q.   The reason the shipment was
10 delayed three days was because it was
11 Memorial Day weekend?
12      A.   It appears to be so.
13      Q.   But this was still an
14 ongoing issue in 2012, correct?
15          MR. LAVELLE:  Object to
16      form.
17          THE WITNESS:  It was -- it
18      was an instance where this didn't
19      happen.
20 BY MR. CLUFF:
21      Q.   So two years later there's
22 at least one more instance when shipments
23 were not being received within the
24 DEA-allotted time period?

Page 248

1          MR. LAVELLE:  Object to
2      form.
3          THE WITNESS:  It was one
4      instance after that, yes.
5 BY MR. CLUFF:
6      Q.   Are you aware of any other
7 instances, now that we've talked about at
8 least two of them in two years?
9      A.   No.
10      Q.   Earlier we talked about
11 trash disposal, I think, as part of the
12 responsibilities that your department was
13 obligated to be monitoring in the
14 pharmacy department.  Is that -- is that
15 right?
16      A.   Controlled cage department.
17      Q.   What was the concern with
18 controlled substances potentially being
19 thrown out?
20      A.   The concern?
21      Q.   Mm-hmm.
22      A.   Well, we didn't want a
23 bottle or two to be left in a box or in
24 the plastic and taken accidentally out of

Page 249

1 the cage.
2      Q.   Why would you want to
3 prevent that?
4      A.   Drug diversion.
5      Q.   So throwing -- throwing
6 controlled substances out in the trash is
7 one way that diversion could occur?
8      A.   It's an instance.
9          (Document marked for
10      identification as Exhibit
11      Rite Aid-Frost-13.)
12 BY MR. CLUFF:
13      Q.   I'm going to hand you a
14 document that we're going to mark
15 Exhibit 13.  It's Rite_Aid_OMDL_0013911,
16 and an e-mail attachment that has a
17 picture attached to that.  The entire
18 chain runs from 13911 to 13914.
19      A.   Okay.
20      Q.   Starting at the back, as you
21 can see, there's a picture of what
22 appears to be the inside of a trash can,
23 a cardboard box, and a number of bottles.
24          Do you see that?

Page 250

1    A.   Yes, I do.

2    Q.   It appears from the cover

3 e-mail of this document that this was a

4 picture that was forwarded to you by an

5 associate named Marcie.  When you guys

6 are investigating for potential diversion

7 through the trash, is this the kind of

8 evidence that you would be seeing?

9        MR. LAVELLE:  Object to

10   form.

11       THE WITNESS:  No.

12 BY MR. CLUFF:

13   Q.   When you were conducting

14 investigations about diversion through

15 the trash, what kind of investigation

16 would have been conducted?

17       MR. LAVELLE:  Object to

18   form.



Page 251

Page 252

15   Q.   When -- this instance aside,

16 I'm just using --

17   A.   Okay.

18   Q.   -- this as an example of how

19 an investigation may have occurred.

20 Let's say, like, you know, in this kind

21 of an instance where there was a

22 suspicion of potential diversion.

23       Who -- what department at

24 the Perryman distribution center would

Page 253

1 have conducted that investigation?

2    A.   Two departments.  The

3 pharmacy department and security

4 department.

5    Q.   Would those have been

6 separate investigations or a joint

7 investigation between the two

8 departments?

9    A.   Well, I can't recall any

10 investigation that happened.  But it

11 would have been both of us, because we

12 don't monitor the cameras, security does.

13   Q.   You said you can't recall

14 any investigations.  Is that because

15 there was never any conducted or just

16 because it's been so long that you don't

17 remember any?

18   A.   I don't remember any.

19   Q.   What would happen if it was

20 determined that an associate was stealing

21 product out of the cages or the vaults at

22 the -- at the Perryman center?

23       MR. LAVELLE:  Object to

24   form.

Page 254

1       THE WITNESS:  Well, first of
2    all, they would have been fired.
3    And then HR would have to make a
4    determination whether they needed
5    to be reported to the police or
6    intentionally or what have you.
7  BY MR. CLUFF:
8       Q.   Would they have been
9  reported to the DEA at all?
10       A.   That associate that was
11  fired?  No.
12       Q.   What about the theft or the
13  loss, would those have been reported to
14  the DEA?
15       A.   No.
16       Q.   Did Rite Aid have any policy
17  or procedure about when theft or loss
18  should be reported to the DEA?
19       A.   No.
20       Q.   It was not Rite Aid's policy
21  to do that when a theft or a loss was
22  detected?
23       A.   On receipts.
24       Q.   What does that mean?

Page 255

1       A.   Inadvertent loss, suspicious
2  order monitoring.  We file a 106 with the
3  DEA if we thought the shipper or the
4  vendor might not know about something not
5  coming to us, or if the stuff was damaged
6  we'd file a DEA -- a 41 form, submit it
7  to the DEA.
8       Q.   So you said there was an
9  inadvertent loss, suspicious order
10  monitoring, and then we file a 106 with
11  the DEA.  Is an inadvertent loss a part
12  of Rite Aid's suspicious order monitoring
13  policy or are those two separate
14  concepts?
15       MR. LAVELLE:  Object to
16    form.
17       THE WITNESS:  Just
18    inadvertent loss, I meant to say
19    concealed damaged when we get
20    stuff from the vendor we always
21    reported those to the DEA.
22  BY MR. CLUFF:
23       Q.   And then the suspicious
24  order monitoring you referenced, what was

Page 256

1  that?
2       A.   Above the threshold,
3  excessive order monitoring program that
4  we had.
5       Q.   Okay.  And you mentioned
6  that the shipper or the vendor might not
7  know something about a product not coming
8  to Rite Aid.  Is that going to result in
9  a report to the DEA as well?
10       A.   Yeah, that's part of the
11  106.
12       Q.   Okay.  And what's the Form
13  41?
14       A.   Damage.  Like sometimes if
15  we get something from a shipper, if it
16  was damaged or something, we report that
17  because that could be a form of diversion
18  or something from the shipper or the
19  vendor if they didn't worry about, so we
20  wouldn't be charged.
21       Q.   If Rite Aid sent a shipment
22  to a store, and it showed up in the store
23  and there was some damage and product was
24  missing out of that shipment when it

Page 257

1  arrived at the store, would that result
2  in a report to the DEA?
3       A.   I don't know.
4       Q.   Would that have been outside
5  your purview?
6       A.   Yes.
7       Q.   I'm going to hand you a
8  document and a copy of the spreadsheet
9  that was attached to it.
10       (Document marked for
11    identification as Exhibit
12    Rite Aid-Frost-14.)
13  BY MR. CLUFF:
14       Q.   It's been produced as
15  Rite_Aid_OMDL_0009662.  The spreadsheet
16  that was attached had two pages, one is
17  titled 1.12-5.12.  And the second is
18  titled 6.12 to 9.12.  But the spreadsheet
19  was produced in native as
20  Rite_Aid_OMDL_0009663.
21       And we'll mark it as
22  Exhibit 14.
23       So at the bottom of that
24  front page there's an e-mail from Marian

Page 258

1  L. Wood to you Keith Frost, Nathan
2  Williams, and Larry Ringgold?
3      A.   Okay.
4      Q.   And the subject is CD
5  inventory.  Do you see that?
6      A.   Mm-hmm.
7      Q.   Okay.  And the subject line
8  CD, does that refer to controlled
9  substances or control drugs?
10     A.   Right.
11     Q.   Okay.  She writes, "Keith,
12 when I came in this morning I see that
13 nightshift was short one unit of a C3A
14 buprenorphine 8 mg tab LS 30, 105, 06 E
15 07."
16          What is one unit of -- what
17 is she describing there, the one unit of?
18     A.   A bottle of whatever that
19 item is.
20     Q.   Okay.  What does C3A stand
21 for?
22     A.   I'm not sure.  I think it's
23 the ARCOS is C3.
24     Q.   Is that like Control List 3?

Page 259

1          MR. LAVELLE:  Object to
2      form.
3          THE WITNESS:  C3 is a Class
4      3, and the -- and A designation I
5      think means an ARCOS item.
6  BY MR. CLUFF:
7      Q.   Oh, okay.  Then she
8  continues, "Last week 9/20 end of day was
9  short two units, C3A hydro/APAP, 10/325."
10         Do you know what that refers
11 to?
12     A.   No.
13     Q.   Does hydro refer to
14 hydrocodone in that?
15     A.   I believe so.
16     Q.   She says, "When they were
17 finished the inventory on Friday they
18 were short another unit for a total of
19 three."
20         Then it says, "I am not
21 comfortable with this many C3A
22 shortages."
23         When there was a shortage
24 like this, would there have been an

Page 260

1  investigation conducted?
2  ████  ███████████████████████████
3  ████  ██████████████████████████
4  ████  ████████████████
5      Q.   And if you identified that
6  an associate had misplaced the
7  substances, what would have happened?
8      A.   Misplaced?
9      Q.   Yeah, like put it in the
10 wrong place, put it in the wrong pallet,
11 something like that.
12     A.   Well, they would have
13 received a corrective action.
14     Q.   And what if it was
15 determined that they were stealing?
16     A.   If they were stealing they
17 would be fired.  Theft is a firing
18 offense.
19     Q.   Can you recall an instance
20 where somebody was disciplined or fired
21 because of a shortage during their shift
22 in the cage?
23     A.   An instance, no.
24     Q.   If you flip the page.

Page 261

1  You'll see the first page of a
2  spreadsheet and on the column to the left
3  it says week ending.  Do you see that?
4      A.   2/24?  I mean, there's a lot
5  of week-ending items.  I don't know which
6  one you're referring to.
7      Q.   Yeah, I'm just saying that
8  that's what that that document is.
9      A.   Okay, yeah.
10     Q.   And it looks like it's got
11 dates from January to May of 2012 there?
12     A.   Okay.
13     Q.   And then it says there is an
14 item description two columns over.  It
15 appears that there are various classes of
16 drugs there, correct?
17         And then the location is --
18 I'm curious about what those location
19 codes are.
20         Can you -- can you tell me
21 what those would have been?
22     A.   I mean for example,
23 10507B08?
24     Q.   Yeah, that's a good one.

Page 262

1    A.   That's a forward pick
2  location.
3    Q.   Okay.
4        How about if you go down to
5  4/20/2012 where it says Item Number
6  89319.  The item description is C3A hydro
7  CDN/APAP, and then the location is 105 06
8  C06.  Where would that location be?
9    A.   Where is that one at?
10        Okay.  Yeah, it was a
11  forward pick location.  These are all
12  forward pick locations.
13    Q.   Do -- what was the purpose
14  of keeping this spreadsheet, just to
15  track where the shortages were?
16    A.   Right.  So when we do weekly
17  adjustments, we could account for
18  shortages or overages in any forward
19  pick.
20    Q.   Do you report any shortages
21  to the DEA?
22    A.   These shortages, no.
23    Q.   Is there a reason why not?
24    A.   Probably was reconciled by

Page 263

1  the end of the week.  Like you might have
2  a bottle that rolls underneath it, or if
3  an associate has a mispick.
4    Q.   Can you tell me where in
5  this e-mail or this document it says that
6  these have been reconciled someplace
7  else?
8    A.   It's not listed anywhere
9  in -- in the document.
10    Q.   If I were looking for
11  evidence that these were reconciled,
12  where would I find that?
13    A.   Marian Wood did a
14  reconciliation every week.
15    Q.   How did she do that?
16    A.   Pluses and minuses.  We do
17  inventory, like I said, at the end of
18  every day, and end of every shift.  And
19  then we look at the allocations based on
20  that, based on inventory.  If it was a
21  daily, we'd look at -- to see what the
22  store orders were, because we did the
23  100 percent audit.  If the store looked
24  like it might have gotten more than it

Page 264

1  was supposed to, we'd make a call to the
2  store and say hey, you might have got
3  three, instead of two.  We noticed that
4  we are short in a forward pick.  Please
5  let us know.
6        So we'd let the customer
7  service action send a message to the
8  store, say hey, you might have an overage
9  or you might have a short.
10    Q.   So my question is more about
11  where Ms. Wood's reconciliations would be
12  located.
13        Did she do those by
14  computer, was it by phone call, did she
15  create any documentation of those
16  reconciliations?
17        MR. LAVELLE:  Object to
18    form.
19        THE WITNESS:  Well -- well,
20    you can see she obviously wrote it
21    down.  I mean we kept -- we kept
22    track of everything based on our
23    inventory on it.  So she would
24    have wrote it down on a control

Page 265

1    log.
2  BY MR. CLUFF:
3    Q.   Where -- but I'm looking at
4  this spreadsheet.  You can look on the
5  back of the first page.  I don't see
6  anywhere on there, maybe you can help me,
7  that it talks about a reconciliation.  So
8  would there have been a separate document
9  where she kept those?
10        MR. LAVELLE:  Object to
11    form.
12        THE WITNESS:  Yes.
13  BY MR. CLUFF:
14    Q.   And did you ever see a
15  document like that that she worked in?
16    A.   A document like -- like we
17  are talking about?
18    Q.   A reconciliation document?
19    A.   Yes.
20    Q.   Okay.  So she kept those as
21  a regular part of her work?
22    A.   Yes.  And the DEA clerk.
23    Q.   Let's look at the -- the
24  front page again.  At the top there's an

Page 266

1 e-mail from Rebecca Strickland. Do you
2 know who Rebecca Strickland is?
3    A.   Yes.
4    Q.   Who is that?
5    A.   She used to be an assistant
6 manager in pharmacy.
7    Q.   Was she in the -- the
8 Perryman distribution center?
9    A.   Yes.
10   Q.   She writes back -- oh,
11 excuse me. Looks like from the top you
12 write back to all of these people copied
13 on the to line. Would those all have
14 been your assistant managers at Perryman?
15   A.   Yes. Assistant managers,
16 DEA coordinator, and Marian Wood, yes.
17   Q.   Okay. And you write, "We
18 have to get a better handle on these
19 losses."
20       Do you see that?
21   A.   Mm-hmm.
22   Q.   If you felt like they were
23 losses, how come they weren't reported to
24 the DEA?

Page 267

1    A.   Well, what I meant was
2 discrepancies where -- where we did an
3 inventory and there were minus one.
4    Q.   Is there a difference
5 between a discrepancy and a loss?
6    A.   Yeah. A loss means that you
7 can't locate the -- the item.
8    Q.   And you called these losses
9 meaning that you couldn't locate these
10 items?
11       MR. LAVELLE: Object to
12    form.
13       THE WITNESS: I can't
14    recall, you know, what the context
15    I was saying that word.
16 BY MR. CLUFF:
17   Q.   But this document at least
18 indicates that they were lost?
19       MR. LAVELLE: Object to
20    form.
21       THE WITNESS: They were
22    not in -- it was not in the
23    forward pick is what it indicates.
24 BY MR. CLUFF:

Page 268

1    Q.   Earlier we talked about
2 audits, if you recall. I think you
3 indicated that there was an internal
4 audit process of each of the distribution
5 centers?
6    A.   Mm-hmm.
7       MR. LAVELLE: You need to
8    give audible answers.
9       THE WITNESS: Yes.
10 BY MR. CLUFF:
11   Q.   I don't -- I don't want to
12 go through a laborious discussion about
13 audit process. But I do have a copy of
14 the audit checklists and I'd like to just
15 go through them. I'm going to hand you a
16 copy.
17       But before I do, I want to
18 let you know that I'm not trying to have
19 an exceedingly long discussion. I just
20 want to kind of verify for the record
21 that this is what the audit checklists
22 look like and that this is what -- what
23 would have been used during one of the
24 audits.

Page 269

1       So I'm going to hand you a
2 document I'm going to mark as Exhibit 15.
3 It's been produced as
4 Rite_Aid_OMDL_0013234.
5       (Document marked for
6    identification as Exhibit
7    Rite Aid-Frost-15.)
8 BY MR. CLUFF:
9    Q.   That is the e-mail. There
10 are nine documents attached -- this is
11 for the record. Nine documents attached
12 to the record, each of which was a
13 natively produced Excel spreadsheet.
14       This document includes
15 every -- every tab from each one of those
16 spreadsheets. And I want to kind of just
17 look through them -- have you look
18 through them really quickly and let me
19 know whether or not, based on your
20 recollection, those appear to be true and
21 accurate copies of what would have been
22 used during the time period.
23       MR. LAVELLE: So we don't
24    get confused, I'm going to move

Page 270

1 these over by the court reporter.
2 THE WITNESS: Okay. Yeah,
3 this would have been a
4 representative checklist used by
5 the -- the DEA audit to go through
6 the distribution center.
7 BY MR. CLUFF:
8 Q. Do you recall if there were
9 any revisions to these ever?
10 A. Yes.
11 Q. It was a document that kind
12 of evolved over time?
13 A. Mm-hmm, yes.
14 Q. I have some other copies of
15 this, of this e-mail that also have some
16 of these same attachments that I
17 determined I would not print. So I'm not
18 going to ask you to guess about the
19 contents of those.
20 A. Okay.
21 Q. I was just asking if -- if
22 you recalled that they kind of changed
23 over time --
24 A. Yes.

Page 271

1 Q. -- and had some revisions
2 made --
3 A. Yeah.
4 MR. LAVELLE: Please wait
5 until the question is finished
6 before you answer, otherwise the
7 record's going to be confused.
8 BY MR. CLUFF:
9 Q. Yeah, just to get a clear
10 answer.
11 MR. CLUFF: Thanks,
12 Mr. Lavelle.
13 BY MR. CLUFF:
14 Q. You do recall that these
15 documents changed over time to some
16 extent?
17 A. Yes.
18 Q. Okay. I want to look just
19 really briefly at the -- the cover
20 e-mail. It's from Joseph -- I would say
21 Dellaquilla, but it's got a lot of Ls so
22 I don't know how to say it.
23 And he sends it to a number
24 of people, including yourself there,

Page 272

1 the -- the last on the list. Do you see
2 that?
3 A. Yes.
4 Q. Okay. And he says, "Team,
5 attached are the checklists for audit
6 areas. Please disperse to the a.m. and
7 complete an area audit for your assigned
8 processes."
9 Do you see that?
10 A. Yes.
11 Q. So what he had been sending
12 you, this, as part of this list, to
13 conduct an audit of the Perryman
14 distribution center?
15 A. Of my area.
16 Q. Your area within the
17 Perryman distribution center?
18 A. Yes.
19 Q. Okay. So earlier we talked
20 about audits occurring where there was an
21 internal group that went to other
22 distribution centers, right?
23 A. Yes.
24 Q. So was there another audit

Page 273

1 process where people from -- where people
2 would audit their own distribution
3 center?
4 A. We do that to prepare for
5 the official audit.
6 Q. So there was an audit to
7 prepare for the internal audit. Is that
8 what you mean?
9 A. Correct.
10 Q. Looking at this list of
11 attachments. Do you see that at the
12 bottom there, it says, "Audit work
13 papers, 9/14/21"? Yes?
14 A. 9/14/12.
15 Q. 9/14/12, thank you.
16 And then there are a number
17 of other documents that range from A.01
18 to A.09, all which can have different
19 names?
20 A. Yes.
21 Q. Looking at that list, A.01
22 through A.09, can you tell me which of
23 those areas would have been your assigned
24 processes?

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    A.   Within the regulatory
2  checklist, the control cage area.
3    Q.   Looking at the top of the
4  list, it says operations checklist.  Do
5  you know who would have been responsible
6  for that area or that process?
7    A.   Joe Dellaquilla would have
8  delegated that to a -- it could have been
9  an outbound manager or another Region 1
10 department manager or Region 2.
11   Q.   How about the transportation
12 checklist?  Who would have been in charge
13 of that process?
14   A.   Outbound manager in most
15 cases or the transportation senior ops
16 manager.
17   Q.   Next one down says
18 inventory-SOX checklist.  What is an
19 inventory-SOX checklist?
20   A.   Inventory control.
21   Q.   Who would have been
22 responsible for that?
23   A.   Inventory control manager.
24   Q.   What is the quality

Page 275

1  checklist looking at generally?
2    A.   Audits on totes, what we
3  send to stores.
4    Q.   Just making sure that they
5  contain accurately what was supposed to
6  be in the tote?
7    A.   Correct.
8    Q.   Do you know who would have
9  been responsible for that process?
10   A.   It would have been inventory
11 control.
12   Q.   The next one down is
13 regulatory checklist.  You said that
14 would have been your responsibility?
15   A.   Yes.
16   Q.   What were the areas of
17 inquiry in the regulatory checklist?
18   A.   Well, they controlled the
19 pharmacy control cage, also for a period
20 of time I was responsible for the EPA and
21 FDA portion of the regulatory control.
22   Q.   What was the FDA portion of
23 the regulatory control?
24   A.   Food storage.  Because we

Page 276

1  have chocolate in the building too, to
2  make sure that they were clean and
3  housekeeping areas.
4    Q.   The next one down is a
5  physical security assessment.  What would
6  the inquiry there have been?
7    A.   That would be a security,
8  asset protection.
9    Q.   And who would have been
10 responsible for that -- that checklist?
11   A.   Nathan Williams.
12   Q.   And he was the supervisor
13 for Larry Ringgold?
14   A.   Yes.
15   Q.   The next one down is an
16 administrative checklist.  Do you see
17 that?
18   A.   I do.
19   Q.   Who would have been
20 responsible for that?
21   A.   That could have been a
22 combination between human resources and
23 somebody working for the general manager.
24 Could have been the facilities manager.

Page 277

1    Q.   And then there's another one
2  that says human resources checklist.
3  Would that have been the HR department?
4    A.   Yes.
5    Q.   The last one is audit work
6  papers.  Do you recall generally what
7  that one was generally about?
8    A.   Those -- when an audit team
9  goes out, they are given worksheets,
10 certain areas like receiving or
11 maintenance have a long list of items
12 that they have to check off that require
13 work papers to add totals.  There's like
14 20 items of probably different things
15 that they had to look at.
16   Q.   You can set that aside.
17 That's all I wanted to do with that.
18       Earlier we talked about a
19 VAWD certification.  Do you recall that?
20   A.   Yes.
21       (Document marked for
22       identification as Exhibit
23       Rite Aid-Frost-16.)
24 BY MR. CLUFF:



Page 278

1    Q.   Okay.  I'm going to hand you
2  a copy of a document that was produced as
3  Rite_Aid_OMDL_0015596 to 0015598.  There
4  are two documents attached to that e-mail
5  which run from 0015599 to 0015677.
6          Here again, I don't want to
7  ask you a lot of questions about the
8  substance of the document itself.  I want
9  to lay the foundation of what this is and
10 how it would have been used.  So just
11 generally familiarize yourself with it
12 and I'll have a few questions for you.
13     A.   Okay.  Okay.
14     Q.   The first e-mail in the
15 chain, it's at the bottom of the second
16 page that ends 15597.  If you flip the
17 page just one -- yeah.  It looks like
18 there's an e-mail from VAWD@NABP.net to
19 Jim Akers and ███████@RiteAid.com.
20         Do you see that?
21     A.   Yes.
22     Q.   The subject of that -- or
23 the text of that e-mail beings in the
24 first paragraph.  It says, "Attached,

Page 279

1  please find the results of our review of
2  the policies and procedures that were
3  submitted in support of the Verified
4  Accredited Wholesale Distributors
5  reaccreditation process."
6          Do you see that?
7      A.   Yes.
8      Q.   So in order to get an
9  accreditation with the VAWD, did Rite Aid
10 need to submit policies and procedures to
11 show that they complied with the VAWD
12 recommendations?
13     A.    Like this first paragraph
14 says.  It says reaccreditation.  We
15 already were accredited.  But for
16 reaccreditation, we had to go through the
17 same process again, pay the $1,500
18 application fee, and resubmit policies
19 and procedures if we had any changes.
20     Q.   Okay.  So flip forward a
21 couple pages.  You'll see a document that
22 has a yellow graphic in the center, right
23 there to your left.  It says, "The
24 National Association of Boards of

Page 280

1  Pharmacy VAWD program."
2          Do you see that?
3      A.   Yes.
4      Q.   Is this the reaccreditation
5  packet that would have been filled out?
6      A.   It's a packet.  I don't know
7  if it's necessarily for reaccreditation.
8  But it just -- so it's a list of policies
9  that they wanted the distribution centers
10 to comply with.
11     Q.   Okay.  Let's turn to the
12 table of contents.  It's the page that
13 ends at 15601.
14     A.   Okay.
15     Q.   And you see there's a
16 guidance checklist there.  And it looks
17 like there are a number of different
18 headings under that guidance checklist.
19         Do you see that?
20     A.   Yes.
21     Q.   Would Rite Aid have been
22 submitting policies and procedures that
23 fell within each one of these guidance
24 checklists, do you recall?

Page 281

1      A.   VAWD would have wanted to
2  see them if they had any questions about
3  any of them, yes.
4      Q.   Okay.  Do you see where it
5  says, "Controlled substances," and if you
6  go over to the number it says Page 10?
7      A.   Yes.
8      Q.   Let's go to that just really
9  quick.  Page 10 is the Bates number that
10 ends in 0015661.
11     A.   Okay.
12     Q.   Do you see that?
13     A.   Mm-hmm.
14     Q.   Okay.  So in the top box it
15 says controlled substances in the gray
16 field.
17         Do you see that?
18     A.   Yes.
19     Q.   And it says, "Controlled
20 substances policies and procedures should
21 detail," and there are a number of items.
22         Do you see that?
23     A.   Yes.
24     Q.   And then in the bottom box

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1 it says, "List names of policies and
2 procedures and documents that meet this
3 requirement," followed by Numbers 1
4 through 5.
5    A.   Yes.
6    Q.   Those Numbers 1 through 5
7 policies and procedures that Rite Aid
8 would have submitted as complying with
9 this guideline?
10       MR. LAVELLE:  Object to
11       form.
12       THE WITNESS:  Those would
13       have been policies or procedures
14       that the VAWD wanted to look at.
15 BY MR. CLUFF:
16    Q.   So they would be asking Rite
17 Aid to provide these so that they could
18 look at them?
19    A.   Yes.
20    Q.   Okay.  If you move forward
21 in the document to Rite_Aid_OMDL_0015625.
22 Do you see at the top of the page it
23 says, "Rite Aid of Maryland
24 Incorporated," and then it says,

Page 283

1 "Standard operating procedures index"?
2    A.   Yes.
3    Q.   So would these have been
4 policies and procedures that Rite Aid
5 submitted for VAWD to review?
6    A.   Yes.
7    Q.   If you -- if you turn
8 forward a couple pages to the page that
9 begins 0015627.
10    A.   Okay.
11    Q.   Do you see at the top there,
12 there's a text box that has signatures in
13 it.  It says, "Rite Aid DC Number 10
14 standard operating procedures disaster
15 plan"?
16    A.   Yes.
17    Q.   Looking at this one just as
18 an example, in the right side it says,
19 "SOP Number 1."
20       Do you see that?
21    A.   Yes.
22    Q.   It says, "Effective date."
23 Is that the effective date of this
24 policy?

Page 284

1    A.   Yes.
2    Q.   And then under that it says,
3 "Supersedes 1/5/2009."  Is that the
4 version that this -- that this document
5 supersedes?
6    A.   Yes.
7    Q.   I don't know if you can make
8 it out in the version that you're looking
9 at.  But can you tell who would have been
10 the signatories to this policy or
11 procedure?
12    A.   I prepared it.  I can't make
13 out the signatures.  Received by and
14 approved by.
15    Q.   On the left-hand side,
16 there's a reviewed by.  It looks like
17 that signature begins with a K.  Is that
18 your signature?
19    A.   Yes, that's my signature.
20    Q.   The effective date here is
21 2010, but the signatures are 6/3/2013.
22 Do you know why there would have been a
23 three-year gap there?
24    A.   No.

Page 285

1    Q.   But, looking at this you
2 would believe it to be a true and correct
3 copy of a policy and procedure that would
4 have been in effect at this time period?
5    A.   Yes.
6    Q.   Okay.  You can set that
7 aside.  I just wanted to make sure that
8 we all understood what that was.
9       Do you know what exception
10 reports are?
11    A.   Exception reports?
12    Q.   Yeah.
13    A.   No, I -- I don't know.  I
14 know the term, I don't really know which
15 particular reports exception reports
16 were.
17    Q.   Were you required to work
18 with exception reports as the manager of
19 pharmacy in Perryman?
20    A.   Like I said, I don't recall
21 the exception reports.
22       MR. CLUFF:  Let's take a
23       break for five minutes.  Let me
24       just look at my notes.  I think

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    I'm done.
2         THE VIDEOGRAPHER:  Off the
3    record at 2:51 p.m.
4         (Short break.)
5         THE VIDEOGRAPHER:  We are
6    back on the record at 2:58 p.m.
7         MR. CLUFF:  This is
8    plaintiff's counsel, Sterling
9    Cluff.  I'm not in the camera
10   because Mr. Lavelle and I have
11   switched seats.  I have no further
12   questioning today for Mr. Frost.
13        Mr. Lavelle, I understand,
14   has some redirect so he is going
15   to take the mic.
16        MR. LAVELLE:  Thank you.
17             - - -
18        EXAMINATION
19             - - -
20   BY MR. LAVELLE:
21   Q.   Good afternoon, Mr. Frost.
22   A.   Good afternoon.
23   Q.   You were asked some
24   questions earlier today by plaintiff's

Page 287

1    counsel Mr. Cluff, in which you
2    referenced a DEA audit in 2012.  Do you
3    recall that testimony, sir?
4    A.   Yes, I do.
5    Q.   Were you involved in the DEA
6    performing an audit of the Perryman
7    facility in 2012?
8    A.   Yes, I was.
9    Q.   What was your role with
10   respect to that audit?
11   A.   Well, it's -- I was
12   responsible for escorting the two DEA
13   inspectors through the whole control drug
14   division -- I mean, cage to show them
15   physically what we all did, and provide
16   any documents that the inspectors
17   required.
18   Q.   All right.  I'd like to mark
19   an exhibit please.
20        (Document marked for
21        identification as Exhibit
22        Rite Aid-Frost-17.)
23   BY MR. LAVELLE:
24   Q.   All right.  Mr. Frost, we've

Page 288

1    put in front of you what we marked as
2    Exhibit Frost 17.  Do you recognize this
3    document, sir?
4    A.   Yes, I do.
5    Q.   Can you tell us what it is?
6    A.   It's a document that the two
7    DEA inspectors presented to myself and to
8    general managers, matter of fact, that
9    there was a notice of inspection of
10   control premises, that they were going to
11   do an audit of our facility.
12   Q.   Do you see that there is a
13   date on this document?
14   A.   Yes; December 10, 2012.
15   Q.   December 10th, 2000 --
16   A.   I mean, sorry.  July 10,
17   2012.  Sorry.
18   Q.   Does looking at this
19   document, in particular, that date, help
20   you remember when the DEA came to the
21   Perryman facility in 2012?
22   A.   Yes.
23   Q.   When was that?
24   A.   10:50 in the morning.

Page 289

1    Q.   And what day?
2    A.   Oh, July 10, 2012.
3    Q.   Is your signature on this
4    document somewhere?
5    A.   Yes.
6    Q.   Where is your signature on
7    this document?
8    A.   Right next to Debra Chase's,
9    down in the bottom right.
10   Q.   Did the DEA tell you in
11   advance that they were coming?
12   A.   No.
13   Q.   Was it a surprise then?
14   A.   Yes.
15   Q.   Did you spend time with the
16   DEA in addressing whatever issues they
17   had during the audit?
18   A.   Yes.
19   Q.   Did you supply information
20   to the DEA?
21   A.   Yes.
22   Q.   Did they ask questions of
23   you?
24   A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    Q.   Did they come back a second
2  day?
3    A.   Yes.
4    Q.   Were you involved in their
5  visit the second day?
6    A.   I was.
7    Q.   What did you do with the DEA
8  the second day they were there?
9    A.   Same as the first day, if
10  they wanted other documents that we had
11  to request from corporate or any
12  additional information, we would provide
13  them.  And then if they wanted to see the
14  control cage again.
15    Q.   Did you have occasion to
16  write up a memorandum summarizing what
17  happened when the DEA came for this
18  audit?
19    A.   Yes, I did.
20    MR. LAVELLE:  I'd like to
21  mark another exhibit then please.
22    (Document marked for
23  identification as Exhibit
24  Rite Aid-Frost-18.)

Page 291

1  BY MR. LAVELLE:
2    Q.   Mr. Frost, we've put in
3  front of you what we marked for
4  identification as Frost 18.  It appears
5  to be an e-mail plus a document attached
6  to it.  I want to ask you questions about
7  the e-mail first.
8    A.   Sure.
9    Q.   Do you recognize this
10  e-mail, sir?
11    A.   Yes, I do.
12    Q.   Did you write this e-mail?
13    MR. CLUFF:  Mr. Lavelle, not
14  to interrupt, but I don't know
15  that we got the Bates number on
16  the record for the counsel on the
17  phone.
18    MR. LAVELLE:  Okay.  I'm
19  sorry.  Very good point.  For
20  Frost-17, the Bates number was
21  Rite_Aid_OMDL_0032621.
22    For Frost-18, which is a
23  document I currently am discussing
24  with the witness, it's

Page 292

1    Rite_Aid_OMDL_0012547 through
2    2549.
3    Thank you, Mr. Cluff.
4  BY MR. LAVELLE:
5    Q.   So I think my question to
6  you, Mr. Frost, was did you send this
7  e-mail?
8    A.   I did.
9    Q.   And the subject line, can
10  you read that for us, please?
11    A.   "Please review DEA audit
12  July 11th."
13    Q.   Who did you send this e-mail
14  to?
15    A.   All my direct reports, the
16  DEA coordinator, and the DEA clerk.
17    Q.   And can you read for the
18  members of the jury who are viewing this
19  video, what you wrote in the text of your
20  e-mail?
21    A.   On this first page here?
22    Q.   Yes, please.
23    A.   "Great job, everyone, for
24  making this audit very successful.

Page 293

1  Please share with our associates."
2    Q.   Why did you send this e-mail
3  to the people you sent it to?
4    A.   I wanted them to be aware of
5  all of the areas that the DEA auditors
6  looked at.
7    Q.   And then we have an
8  attachment to this e-mail.  I'd like you
9  to turn to the second page of this
10  document.  It's got Bates Number 12548 on
11  it.  Do you recognize this document, sir?
12    A.   Yes.
13    Q.   Did you prepare this
14  document?
15    A.   I did.
16    Q.   When did you prepare this
17  document?
18    A.   On July 11th, after the
19  audit was completed.
20    Q.   Why did you prepare this
21  document?
22    A.   Well, I wanted all of the
23  addressees on the front of the document,
24  and I did send it to my corporate

Page 294

1 office -- office as well, to let them
2 know a summary of all the items that the
3 inspectors looked at, and the results of
4 each item that they looked at.
5    Q.  All right. Can you read for
6 the members of the jury viewing this
7 video what you wrote under Roman
8 Numeral I at the top of this memo?
9    A.  Roman Numeral I, "DC 10 DEA
10 audit results, no findings or
11 discrepancies, 100 percent
12 accountability."
13    Q.  What did you mean when you
14 wrote that, Mr. Frost?
15    A.  I meant that the DEA
16 inspectors can find nothing wrong or
17 inconsistent with how we operated the
18 control drug cage.
19    Q.  What did you mean by
20 100 percent accountability?
21    A.  That means every item that
22 we had stored, shipped, or received, we
23 could account for each and every item.
24    Q.  All right. I just want to

Page 295

1 take you now through -- briefly what you
2 have under Roman Numeral II, the summary
3 of the audit.
4       Can you read for the members
5 of the jury what you wrote under Number 1
6 there, please?
7    A.  Yes.
8       "Two inspectors from the DEA
9 arrived yesterday at approximately
10 10:40 a.m. to conduct an unannounced
11 audit."
12    Q.  And was that correct at the
13 time that you wrote it?
14    A.  Yes.
15    Q.  What did you write on
16 Number 2?
17    A.  "On Tuesday they asked for
18 and received an organizational chart,
19 information on med turn, our reverse
20 distributor, which company does our drug
21 testing, which company handles our alarm
22 security, et cetera."
23    Q.  And then what do you have
24 under Number 3?

Page 296

1    A.  "On Tuesday we also
2 conducted a physical count of eight
3 control drug items in both the forward
4 pick and the storage location.
5 100 percent correct. Today the
6 audits" -- "the auditors did an
7 accountability of wholesale years" --
8 "whole year's worth of receipts,
9 distribution, which is movement, and
10 adjustments of these same eight items,
11 period 2 July, 2011, to 10 July, 2012.
12 The results were 100 percent
13 accountability."
14    Q.  And that was accurate when
15 you wrote it?
16    A.  Yes.
17    Q.  You referred to in that
18 section a physical count of eight CD
19 items. What are you referring to there?
20 What does that mean?
21    A.  The inspectors went in there
22 and said, "We want to look at these eight
23 control drug items, and we want to see
24 their storage, their receipts, the

Page 297

1 distribution, and counts of these items
2 in the control cage."
3    Q.  Did the DEA tell you in
4 advance which ones they were going to
5 pull?
6    A.  No.
7    Q.  Did they ask you to identify
8 which ones to look at?
9    A.  No.
10    Q.  They just randomly selected
11 some?
12    A.  Correct. They just had a
13 list of items that we had in the control
14 cage, and they highlighted eight items
15 and said, "We want to see these items."
16    Q.  Is that typical of the way
17 the DEA would conduct an audit in your
18 experience?
19       MR. CLUFF: Objection.
20 Calls for speculation.
21 BY MR. LAVELLE:
22    Q.  In your experience, is
23 that --
24    A.  Out of the four, they all

Page 298

1 did it the same way.
2     Q.   Number 4, you write that
3 some more information about what the DEA
4 inspectors arrived and looked at,
5 correct?
6     A.   Yes.
7     Q.   What do you have listed
8 there -- it's a long list, and I won't
9 ask to you read them all.  But you have
10 Items A through N that the DEA inspectors
11 looked at.  What are those items?
12     A.   Looked at the control cage
13 alarm test for vault and entire cage
14 between us and checkpoint; provide copies
15 of all state and DC licenses, as well as
16 copy of the VAWD certificate; listed CD
17 vendors and addresses; the filing of any
18 thefts or losses that we might have
19 occurred for that whole year period;
20 looked at inventory results of the
21 biennial and annual inventory; went to
22 asset protection department to look at
23 the camera monitoring room to observe;
24 provided copy of CD pick list and receipt

Page 299

1 POs that we use for receiving; observe
2 the associates picking in the cage; and
3 observed the associates using the new
4 quality assurance stations to verify all
5 control drug picks.  And they liked the
6 fact that we were using technology to
7 reduce human error.
8     Q.   All right.  You mentioned
9 there under G, "File of thefts and losses
10 106s from July 1, 2011, to July 10,
11 2012."
12     A.   Correct.
13     Q.   What does that refer to?
14     A.   That would refer to any
15 items that we thought through the
16 receipt -- receipt process or any process
17 that we would have filed with the DEA
18 office, in the Baltimore office.
19     Q.   All right.  I next want to
20 turn to what you have under Roman Numeral
21 III on your memory.  Can you read that
22 for the members of the jury, please?
23     A.   "Shout out, both DEA
24 inspectors are very impressed and pleased

Page 300

1 to see that Rite Aid demonstrates its due
2 diligence by having an excellent
3 excessive order monitoring program.  They
4 mentioned that the DEA is taking a harder
5 look at all distributors to ensure that
6 order monitoring processes are in place
7 and effective."
8     Q.   Mr. Frost, what do you
9 recall about the discussions that you and
10 your colleagues had with the DEA
11 inspectors about the order monitoring
12 program during this audit?
13     A.   All right.  Well, what was
14 nice about it when I brought them to the
15 control cage, they saw that we had posted
16 quantities not to exceed the threshold
17 by.  And one at random -- just talked to
18 one of our pickers, asked them, "What do
19 you do if you notice that the light
20 lights up more than, for example, this
21 item has."  And the associate would
22 explain to him what they do, talk to a
23 lead, or a manager.
24         We went from there and

Page 301

1 explained the whole excessive order
2 monitoring process.  We took them to the
3 phone logbook, if we had to call the
4 store, and what the lead or manager would
5 do when they talk to the store, in other
6 words find a -- resolve the issue, "Why
7 did you order this?  You're only going to
8 get this amount."  Explain why we only
9 send them authorized quantity.  They
10 looked at our quality control purpose on
11 how we did 100 percent audit on each and
12 every tote and indicated any
13 discrepancies on there.  So if we had to
14 investigate a forward pick we could.
15         They were impressed with how
16 we did our daily inventories and how we
17 kept control of all of our totes that we
18 sent to the outbound area, by tote ID and
19 by store number and how if we ever on
20 occasion thought that we might have
21 overpicked a store, that we would
22 physically go to the trailers ourselves,
23 pull the totes off of the trailers before
24 they even went to the stores, and pop all

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 the seals to investigate and do a tote
2 audit of those items that we were
3 sending.
4      Q.   Let me follow up on a couple
5 of those specific items.
6      A.   Sure.
7      Q.   Mr. Frost, did you discuss
8 with the DEA that there was a threshold
9 system in place?
10      A.   Yes.  Established by
11 corporate office.
12      Q.   And did you discuss with the
13 DEA during their audit in 2012 that the
14 limit for orders was 5,000 units?
15      A.   Yes.  We explained that
16 whole process and that's what they liked
17 about it too, that we had something
18 established from our headquarters.
19      Q.   Did you discuss with the DEA
20 inspectors that there were some stores
21 for which there was a different limit
22 than 5,000?
23      A.   Anything that was above the
24 threshold would have been approved.  Yes,

Page 303

1 we discussed it with them, and they were
2 approved only by our corporate offices.
3      Q.   Did you show the DEA
4 inspectors the excessive order logs?
5      A.   Yes.  We showed them all of
6 that.
7      Q.   Was there anything that the
8 DEA asked for relating to your order
9 monitoring program that you were not able
10 to provide them?
11      A.   Not that -- we were able to
12 provide them anything that they wanted to
13 see.
14      Q.   And what was the end result
15 of this review by the DEA, what did they
16 tell you?
17           MR. CLUFF:  Objection.
18      Calls for speculation.
19           THE WITNESS:  I can only go
20      by what I repeat down here, that
21      they were very happy that we had
22      an effective program, that
23      everybody understood how it
24      operated.

Page 304

1 BY MR. LAVELLE:
2      Q.   Did the DEA tell you that
3 you needed to make any changes in the
4 order monitoring program?
5      A.   They did not.
6      Q.   Now, at the end of this
7 audit, did the DEA give you anything else
8 to tell you that you had completed the
9 audit?
10      A.   No.  They don't give you any
11 findings or any recommendations.  They
12 don't give you any report at all, I
13 believe.
14      Q.   So the only document you
15 received from the DEA relating to this
16 audit was what we marked previously as
17 Frost 17; is that correct?
18      A.   Correct.  That's the only
19 document.  They just call -- at the end,
20 they'll summarize it, call the general
21 manager in there and say we find nothing,
22 and then leave.
23           MR. LAVELLE:  That's all I
24      have for you.  Thank you,

Page 305

1      Mr. Frost.
2           THE WITNESS:  You're
3      welcome.
4           MR. CLUFF:  Let me break
5      five minutes.  Not even five.  Two
6      minutes.
7           THE VIDEOGRAPHER:  Off the
8      record at 3:13 p.m.
9           (Short break.)
10           THE VIDEOGRAPHER:  We are
11      back on the record at 3:20 p.m.
12                 - - -
13           EXAMINATION
14                 - - -
15 BY MR. CLUFF:
16      Q.   Okay.  Mr. Frost, we are
17 back on the record.  I'm going to have
18 some questions for you about Exhibit 17
19 and 18 which your counsel just discussed
20 with you.
21      A.   Okay.
22      Q.   Put those back in front of
23 you so we can refer to them easily.
24           Starting with Exhibit 17, I

Page 306

1  believe you testified that this is the
2  notice you got of an unannounced DEA
3  inspection or audit; is that right?
4      A.  Yes.
5      Q.  Okay.  Do you recall the
6  names of the DEA inspectors who conducted
7  this audit over the two days?
8      A.  I think one of the
9  gentleman's name was Tush.  And I think
10  the other one was Hunt.  But I'm not
11  exactly sure.
12      Q.  Are those their last names?
13      A.  Yeah.
14      Q.  If you look down here at the
15  bottom of Exhibit 17, there is a -- there
16  are two signature lines under the heading
17  witnesses in bold.  Do you see that?
18      A.  Yes.
19      Q.  Are those the names of the
20  DEA agents who served this notice?
21      A.  Yes.
22      Q.  Okay.  So it looks like on
23  the first line it's Jeffrey Hunt
24  potentially?

Page 307

1      A.  Yes.
2      Q.  Does that refresh your
3  recollection about who that was?
4      A.  Yes.
5      Q.  Looking at the second line,
6  can you tell if that name is Tush or
7  Dush?
8      A.  I think it's Tush, T-U-S-H.
9      Q.  Okay.  Looking at that text
10  before Tush, can you make out who -- what
11  the first name might be?
12      A.  No.
13      Q.  Do you recall what DEA field
14  office these gentlemen were from?
15      A.  I believe they were from the
16  Baltimore office.
17      Q.  If I suggested to you that
18  Mr. Tush's first name was Don, would that
19  refresh your -- refresh your
20  recollection?  Or Donald?
21      A.  It wouldn't refresh it.  I
22  mean if I could look into this, it might
23  look like a Donald, but I'm not going to
24  say yes or no on that.

Page 308

1      Q.  When you received this
2  notice, did you e-mail anybody within
3  Rite Aid about the fact that you had been
4  served this notice?
5      A.  One of our requirements, I
6  think it's ADM 10 or 13, I can't remember
7  which, is for us to notify the corporate
8  office when the DEA inspectors arrive at
9  our facility.
10      Q.  Who would that have been in
11  the corporate office that you would have
12  notified?
13      A.  It would have been -- at the
14  time it would have been somebody who was
15  handling -- director of compliance,
16  either Kevin Mitchell or Chris Belli was
17  at that time.  I just can't remember who
18  it was at the time.  And then they would
19  notify vice presidents.
20      Q.  You said then they would
21  have notified whom?  I'm sorry, I missed
22  it.
23      A.  They would have notified any
24  corporate officers that they needed to

Page 309

1  let know.
2      Q.  Do you recall whether or not
3  you notified Mr. Mitchell or his
4  colleague in the corporate office?
5      A.  No.
6      Q.  Do you recall if you had any
7  conversations with anybody from the
8  corporate office by telephone or in
9  person regarding this DEA audit?
10      MR. LAVELLE:  Object to
11      form.
12      THE WITNESS:  No, I was
13      involved with the auditors.
14  BY MR. CLUFF:
15      Q.  Between the first and second
16  day of the audit, did you communicate by
17  phone, in person, or by e-mail with
18  anybody at the corporate office about the
19  first day of the audit?
20      MR. LAVELLE:  Object to
21      form.
22      THE WITNESS:  I don't recall
23      any conversation or anything like
24      that.

Page 310

BY MR. CLUFF:

Q.   Did you have any conversations with anybody from the corporate office about the second day of the audit?

A.   I don't recall that.

Q.   Do you recall whether or not anybody from your corporate office asked you to prepare the memo and the e-mail that are designated as Exhibit 18 to your deposition?

A.   Nobody asked me to do that.

Q.   Who is Gary Meihls, M-E-I-H-L-S?

A.   Senior operations manager.

Q.   Where does he work?

A.   Where does he work now?

Q.   Where did he work in 2012?

A.   In the DC, Perryman distribution center.

Q.   Okay.  The subject line of Exhibit 18, if you look at that for me, is, please review DEA audit July 11th.  Do you see that?

Page 311

It's 18.  To your left.

A.   Oh.  Okay.

Q.   Yeah, looking at the subject line, do you see please review?

A.   Mm-hmm.

Q.   Were you asking him to review the memo that you wrote?

A.   Was I asking who?

Q.   Gary Meihls.

A.   Meihls.  Let me see if his name is on here.

Q.   Yeah, we'll start at the top.

A.   I don't see his name listed here.

Q.   Sorry, I was using a different version of Exhibit 18.

A.   Okay.

Q.   The subject line of Exhibit 18, if you look at that, is still please review DEA audit July 2011.  Why was it important to you or why were you asking these people who received Exhibit 18 to review the DEA audit July

Page 312

11 letter?

MR. LAVELLE:  Object to form.

THE WITNESS:  Well, it was important to me that they were all my direct reports and it indicated in the summary of all the audit results, all the areas that we're always striving to do our best in that were looked at.

BY MR. CLUFF:

Q.   You previously talked about that during the inspection you took the DEA auditors into the controlled cage; is that right?

A.   Yes.

Q.   And you said that the auditors talked to an associate?

A.   Yes.

Q.   Were you present for every part of that conversation, or did you just see it occurring?

MR. LAVELLE:  Object to form.

Page 313

THE WITNESS:  I remember us approaching the pick area, and the auditor asking an associate some questions.

BY MR. CLUFF:

Q.   What were the questions that he asked the associate?

A.   I don't know exactly what they asked.

Q.   Okay.  Then how do you recall what the answers were?

A.   What do you mean?  I don't understand.

Q.   You previously testified the associate would explain to him what they do, talk to a lead or a manager.  My question was, what were the questions?  And you said you don't recall.  But here you've testified that you recall what the associate told the DEA auditor?

A.   Oh, I asked -- I remember them asking them, "So you use excessive order monitoring."  And the associate said, "Yes."  And they said, "Can you

Page 314

1  explain that to me." So that part I did
2  hear.
3      Q.  I'm confused. I previously
4  asked you if you recalled what questions
5  the auditor asked the associate. And you
6  told me that you didn't recall. But now
7  all of the sudden you recall again?
8          MR. LAVELLE: Object to
9      form.
10         THE WITNESS: Because I
11     remembered that we had the posting
12     there, and he made a point of
13     asking the associate about that
14     posting.
15 BY MR. CLUFF:
16     Q.  Okay. You previously
17 discussed the posting.
18         Well, do you remember who
19 the associate was?
20     A.  No, I don't.
21     Q.  Okay. This Exhibit 18 and
22 Exhibit 17 together indicate that the
23 audit occurred between 7/10 and 7/11; is
24 that correct?

Page 315

1      A.  Yes.
2      Q.  Okay. Is there someplace
3  where I could find records of which
4  associates were in the cage that day or
5  those two days?
6      A.  No.
7      Q.  So just to be clear, you
8  remember the answers to the questions
9  that the DEA auditor asked but you do not
10 remember who the associate was?
11     A.  Yes.
12     Q.  Okay. And then back to my
13 question, is there anywhere that I could
14 find a log of who accessed the cage on
15 those two days?
16     A.  I don't know of any such log
17 or record or anything going back -- going
18 back nine or seven years.
19     Q.  Was it not Rite Aid's policy
20 or procedure in 2012 to keep a record of
21 people who accessed the control cages at
22 that time?
23         MR. LAVELLE: Object to
24     form.

Page 316

1          THE WITNESS: No.
2  BY MR. CLUFF:
3      Q.  So it was not the policy?
4      A.  No.
5          MR. LAVELLE: Object to
6      form.
7  BY MR. CLUFF:
8      Q.  Please look at Exhibit 18.
9  And look at the memo that you wrote.
10     A.  Okay.
11     Q.  Did anybody else review this
12 memo before you disseminated it to the
13 associates at the Perryman distribution
14 center?
15     A.  No.
16     Q.  Did you send this to anybody
17 at corporate to review before you sent it
18 out?
19     A.  No.
20     Q.  Let's look at Item Number 4.
21 It starts, "Today the DEA inspectors
22 arrived at 10:20 and continued looking
23 at." And then your counsel showed you
24 that there are Subparagraphs A through N.

Page 317

1      A.  Mm-hmm, yes.
2      Q.  Do you recall -- do you
3  recall what day you wrote this memo on?
4      A.  I believe I wrote it on the
5  11th, because it was a two-day audit.
6      Q.  Would you agree that this
7  document was more accurate than your
8  current recollection today?
9          MR. LAVELLE: Object to
10     form.
11         THE WITNESS: If I typed it
12     on the 10th or the 11th, then it
13     would be more accurate than seven
14     years later.
15 BY MR. CLUFF:
16     Q.  So to the extent that you're
17 testifying today about things that you
18 recall that are not reflected in this
19 document, they are less accurate than the
20 document itself?
21         MR. LAVELLE: Object to
22     form.
23         THE WITNESS: No.
24 BY MR. CLUFF:

Page 318

1    Q.   Why is that?
2    A.   Why is my recollection more
3 accurate than what's on the document?
4    Q.   Yes.
5    A.   I might not have included
6 everything on the document.
7    Q.   You didn't want to be
8 thorough and complete when you wrote a
9 memo bragging about how good Rite Aid did
10 in a DEA audit?
11        MR. LAVELLE:  Object to
12    form.
13        THE WITNESS:  I think I was
14    pretty thorough and complete.
15 BY MR. CLUFF:
16    Q.   This is a thorough and
17 complete recollection of what happened?
18        MR. LAVELLE:  Object to
19    form.
20        THE WITNESS:  Yes.
21 BY MR. CLUFF:
22    Q.   Okay.  So then, your
23 recollection, to the extent that it does
24 not comply with this memo, is inaccurate,

Page 319

1 correct?
2        MR. LAVELLE:  Object to
3    form.
4        THE WITNESS:  No.
5 BY MR. CLUFF:
6    Q.   Again, why is that?
7        MR. LAVELLE:  Object to
8    form.
9        THE WITNESS:  I thought I
10    was thorough and put everything in
11    here that I could recollect.
12 BY MR. CLUFF:
13    Q.   Okay.  So your counsel
14 earlier asked you to testify to the jury,
15 in case the jury gets to watch this video
16 today.  And what I'm asking you today is,
17 which should we rely on, your
18 recollection or the memo that you wrote
19 on the day of the DEA audit?
20        MR. LAVELLE:  Object to
21    form.
22 BY MR. CLUFF:
23    Q.   And my question earlier to
24 you was, did you mean for this to be a

Page 320

1 full and complete statement of what you
2 recalled at the time that you wrote it
3 about the DEA audit that occurred on the
4 10th and 11th of July in 2012?
5        MR. LAVELLE:  Object to
6    form.  Objection, asked and
7    answered.
8        THE WITNESS:  No.  It was
9    just a summary of what we went
10    through during the audit.
11 BY MR. CLUFF:
12    Q.   You previously testified
13 that the DEA auditors spoke with an
14 associate whose name you can't recall --
15    A.   Yes.
16    Q.   -- about what was happening
17 in the control cage, correct?
18    A.   Yes.
19        MR. LAVELLE:  Object to
20    form.  Objection, asked and
21    answered.
22 BY MR. CLUFF:
23    Q.   Can you tell me where that's
24 included in this memo?

Page 321

1    A.   I don't see it included in
2 the memo.
3    Q.   Okay.  So that didn't matter
4 to you when you wrote this letter,
5 correct?
6        MR. LAVELLE:  Object to
7    form.
8        THE WITNESS:  No.
9 BY MR. CLUFF:
10    Q.   What's your recollection
11 based on then, since that's not included
12 in this memo?
13        MR. LAVELLE:  Object to
14    form.  Objection, asked and
15    answered.
16        THE WITNESS:  Please
17    rephrase -- repeat your question.
18 BY MR. CLUFF:
19    Q.   Let's move on.
20        You talked about showing the
21 DEA auditors the phone logs, correct?
22    A.   Yes.
23    Q.   The excessive order logs?
24    A.   Yes.

Page 322

1    Q.   Okay.  At the time you
2   showed them the phone logs did you inform
3   the DEA auditors that you conduct no due
4   diligence before cutting an order?
5        MR. LAVELLE:  Object to
6   form.
7        THE WITNESS:  What was that
8   again?
9   BY MR. CLUFF:
10   Q.   Did you inform the DEA
11  auditors that when you receive an order
12  that exceeds threshold, you do no due
13  diligence before you cut the order?
14       MR. LAVELLE:  Object to
15  form.
16       THE WITNESS:  What does that
17  mean, no due diligence before cut
18  the order?
19  BY MR. CLUFF:
20   Q.   Do you see -- let's look at
21  Exhibit 18, the memo.
22   A.   Okay.
23   Q.   Roman Numeral III.  Do you
24  see that?

Page 323

1    A.   Yes, I do.
2    Q.   Do you see in the second
3   line, it says that, "Rite Aid
4   demonstrates its quote due diligence"?
5    A.   Yes.
6    Q.   Do you know what due
7   diligence is?
8    A.   Yes.  I have my definition
9   for due diligence.
10   Q.   Okay.  Did you do any due
11  diligence at Rite Aid before cutting an
12  order to bring it back under threshold?
13       MR. LAVELLE:  Object to
14  form.
15       THE WITNESS:  Yes.  We
16  cut -- we cut the order.
17  BY MR. CLUFF:
18   Q.   That's the extent of Rite
19  Aid's due diligence?
20       MR. LAVELLE:  Object to
21  form.
22       THE WITNESS:  No.  After
23  that, we would -- if it was
24  excessive to the threshold, we

Page 324

1   would write it down on the phone
2   log.
3   BY MR. CLUFF:
4    Q.   And that's the extent of the
5   due diligence?
6    A.   And call the store and let
7   them know that they were ordering more
8   than their threshold, and we were only
9   sending them what we were authorized to
10  send them by corporate and asked them why
11  they might have put that down, ordered
12  more than it was supposed to.
13   Q.   In that process, did you
14  tell the DEA auditors that Rite Aid never
15  reports orders as suspicious to the DEA?
16       MR. LAVELLE:  Object to
17  form.
18       THE WITNESS:  No.
19  BY MR. CLUFF:
20   Q.   Did you tell the DEA
21  auditors that the Perryman distribution
22  center had never reported a suspicious
23  order during your tenure as the manager
24  of the pharmacy department?

Page 325

1    A.   No.
2    Q.   So that information was
3   withheld from the DEA, correct?
4        MR. LAVELLE:  Object to
5   form.
6        THE WITNESS:  No.
7   BY MR. CLUFF:
8    Q.   No, it was not withheld?
9    A.   No.
10   Q.   I'm sorry.  I just asked if
11  you told the DEA that information.  You
12  said no.
13   A.   Correct.
14   Q.   Aside from this memo that
15  you wrote that's not an official
16  statement of the DEA, are you aware of
17  any other document reflecting approval by
18  the DEA of any policy or procedure that
19  Rite Aid had in place between 2003 and
20  2014?
21       MR. LAVELLE:  Object to
22  form.
23       THE WITNESS:  I don't know
24  what they have document wise.

Page 326

BY MR. CLUFF:

1 Q. Have you ever received a
2 communication from the DEA in writing
3 telling you that the policies and
4 procedures in place at Perryman between
5 2003 and 2014 were in compliance with DEA
6 regulations?
7          MR. LAVELLE: Object to
8      form. We're beyond the scope of
9      the redirect at this point.
10          THE WITNESS: Well, again,
11      we had four audits from DEA.
12      They're not required to give us
13      any kind of information at all.
14      And at their briefings they don't.
15      This is the kind of document that
16      they give us. No findings, no --
17      they don't do anything else.
18 BY MR. CLUFF:
19 Q. I understand that. That's
20 not my question.
21          My question is, now in the
22 four audits that you've just referred to,
23 have you ever once received a statement

Page 327

1 from the DEA about the Perryman
2 distribution center indicating that the
3 DEA believed it was in compliance with
4 DEA regulations?
5 A. We had statements when we
6 expanded the control cage that it was
7 compliant.
8 Q. So the control cage is the
9 only instance that you can tell me where
10 DEA officially said you're in compliance?
11          MR. LAVELLE: Object to
12      form.
13          THE WITNESS: No, I can't
14      remember anything else.
15 BY MR. CLUFF:
16 Q. Okay.
17          MR. CLUFF: That's all I
18      got.
19          MR. LAVELLE: No further
20      questions for the witness.
21          The witness reserves the
22      right to read and sign.
23          THE VIDEOGRAPHER: This
24      concludes this deposition. The

Page 328

1 time is 3:35 p.m. We are off the
2 record.
3          (Excused.)
4          (Deposition concluded at
5 approximately 3:35 p.m.)

Page 329

1
2          CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6 deposition is a true record of the
testimony given by the witness.
7
         It was requested before
8 completion of the deposition that the
witness, KEITH FROST, have the
9 opportunity to read and sign the
deposition transcript.
10
11
12
         _____
13 MICHELLE L. GRAY,
A Registered Professional
Reporter, Certified Shorthand
14 Reporter, Certified Realtime
Reporter and Notary Public
15 Dated: January 18, 2019
16
17
18          (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 330

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 331

- - - - - -
### E R R A T A
- - - - - -

PAGE  LINE  CHANGE

_____ _____ _____
   REASON: _____
_____ _____
   REASON: _____
_____ _____
   REASON: _____
_____ _____
   REASON: _____
_____ _____
   REASON: _____
_____ _____
   REASON: _____
_____ _____
   REASON: _____
_____ _____
   REASON: _____
_____ _____
   REASON: _____
_____ _____
   REASON: _____

Page 332

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 333, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
KEITH FROST                    DATE

Subscribed and sworn
to before me this
_____ day of _____, 20_____.
My commission expires:_____

_____
Notary Public

Page 333

## LAWYER'S NOTES

PAGE  LINE
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____