Highly Confidential - Subject to Further Confidentiality Review

1              UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF OHIO

2                EASTERN DIVISION

3

    *************************

4

    IN RE:  NATIONAL          MDL No. 2804

5    PRESCRIPTION OPIATE

    LITIGATION            Case No.

6                      1:17-MD-2804

    *************************

7

    APPLIES TO ALL CASES    Hon. Dan A. Polster

8

9    *************************

10

11       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12          CONFIDENTIALITY REVIEW

13     VIDEOTAPED DEPOSITION OF JOSEPH GANLEY

14

15          Friday, July 27th, 2018

16             9:04 a.m.

17

18    Held At:

19        Liberty Hotel

20        215 Charles Street

21        Boston, Massachusetts

22

23

24    REPORTED BY:

25    Maureen O'Connor Pollard, RMR, CLR, CSR

Page 2

1  APPEARANCES:
2
   FOR THE PLAINTIFFS:
3
     JEFF GADDY, ESQUIRE
4    LEVIN PAPANTONIO THOMAS MITCHELL
     RAFFERTY & PROCTOR, PA
5    316 S. Baylen Street
     Pensacola, Florida 32502
6    850-435-7054
     jgaddy@levinlaw.com
7
        -and-
8
     PETER MERRIGAN, ESQUIRE
9    J. TUCKER MERRIGAN, ESQUIRE
     SWEENEY MERRIGAN LAW LLP
10   268 Summer Street
     Boston, Massachusetts 02210
11   617-391-9001
     peter@sweeneymerrigan.com
12   tucker@sweeneymerrigan.com
13
14 FOR McKESSON CORPORATION and THE WITNESS:
15   AMBER CHARLES, ESQUIRE
     ANDREW STANNER, ESQUIRE
16   COVINGTON & BURLING LLP
     One CityCenter
17   850 Tenth Street, NW
     Washington, DC 20001-4956
18   202-662-5518
     acharles@cov.com
19   astanner@cov.com
20
21 FOR CARDINAL HEALTH, INC.:
22   MATTHEW C. MONAHAN, ESQUIRE
     WILLIAMS & CONNOLLY LLP
23   725 Twelfth Street, N.W.
     Washington, DC 20005
24   202-434-5331
     mmonahan@wc.com
25

Page 3

1  APPEARANCES (Continued):
2  FOR AMERISOURCEBERGEN DRUG CORPORATION:
3    SHANNON E. McCLURE, ESQUIRE
     REED SMITH LLP
4    Three Logan Square
     1717 Arch Street, Suite 3100
5    Philadelphia, Pennsylvania 19103
     215-851-8100
6    smcclure@reedsmith.com
7
8  FOR WALMART:
9    SARAH G. CONWAY, ESQUIRE
     JONES DAY
10   555 South Flower Street
     Los Angeles, California 90071-2300
11   213-489-3939
     sgconway@jonesday.com
12
13
   FOR PRESCRIPTION SUPPLY, INC.:
14
     PAUL B. RICARD, ESQUIRE
15   PELINI, CAMPBELL & WILLIAMS LLC
     8040 Cleveland Avenue NW, Suite 400
16   North Canton, Ohio 44720
     330-305-6400
17   pbricard@pelini-law.com
18
19 FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.:
20   ANTHONY M. RUIZ, ESQUIRE
     ZUCKERMAN SPAEDER LLP
21   1800 M Street NW, Suite 1000
     Washington, DC 20036-5807
22   202-778-1800
     R. MILES CLARK, ESQ.
23   aruiz@zuckerman.com
24
25

Page 4

1  APPEARANCES (Continued):
2  FOR MIAMI-LUKEN:
3    WILLIAM J. AUBEL, ESQUIRE
     (Via teleconference.)
4    JACKSON KELLY PLLC
     500 Lee Street East, Suite 1600
5    Charleston, West Virginia 25301
     304-340-1146
6    william.j.aubel@jacksonkelly.com
7       -and-
8  SCOTT D. LIVINGSTON, ESQUIRE
     MARCUS & SHAPIRA LLP
9    One Oxford Centre, 35th Floor
     301 Grant Street
10   Pittsburgh, Pennsylvania 15219-6401
     412-338-4690
11   livingston@marcus-shapira.com
12
   FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
13 SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
   INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
14
     CHARLES B. WEINOGRAD, ESQUIRE
15   ARNOLD & PORTER KAYE SCHOLER, LLP
     601 Massachusetts Avenue, NW
16   Washington, DC 20001-3743
     202-942-5000
17   charles.weinograd@arnoldporter.com
18
19 FOR TEVA PHARMACEUTICALS USA, INC., CEPHALON,
   INC., WATSON LABORATORIES, INC., ACTAVIS LLC,
20 ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC.:
21   PAMELA C. HOLLY, ESQUIRE
     (Via teleconference)
22   MORGAN, LEWIS & BOCKIUS LLP
     101 Park Avenue
23   New York, New York 10178
     212-309-6864
24   pamela.holly@morganlewis.com
25

Page 5

1  APPEARANCES (Continued):
2  FOR RITE AID:
3    JOHN P. LAVELLE, JR., ESQUIRE
     (Via teleconference)
4    MORGAN, LEWIS & BOCKIUS LLP
     1701 Market Street
5    Philadelphia, Pennsylvania 19103-2921
     215-963-5000
6    john.lavelle@morganlewis.com
7
8  FOR HENRY SCHEIN, INC., and HENRY SCHEIN MEDICAL
   SYSTEMS, INC.:
9    BRANDAN MONTMINY, ESQUIRE
     (Via teleconference)
10   LOCKE LORD LLP
     2200 Ross Avenue, Suite 2800
11   Dallas, Texas 75201
     214-740-8445
12   brandan.montminy@lockelord.com
13 FOR MALLINCKRODT, LLC and SPECGX, LLC:
14   WILLIAM T. DAVISON, ESQUIRE
     ROPES & GRAY LLP
15   800 Boylston Street
     Boston, Massachusetts 02199-3600
16   617-951-7000
     william.davison@ropesgray.com
17
   FOR ALLERGAN FINANCE, LLC:
18   KAITLYN L. COVERSTONE, ESQUIRE
19   (Via teleconference.)
20   KIRKLAND & ELLIS, LLP
21   300 North LaSalle Street
22   Chicago, Illinois 60654
23   312-862-2000
24   kaitlyn.coverstone@kirkland.com
25 VIDEOGRAPHER:  Dan Lawlor

Page 6

```
1                    INDEX
2  EXAMINATION                    PAGE
3  JOSEPH GANLEY
4    BY MR. GADDY                  11
5
6
7       E X H I B I T S
8  NO.    DESCRIPTION            PAGE
9  McKesson-Ganley-   Amended Second Notice
   001      of Deposition Pursuant
10          to Rule 30(B)(6) and
            Document Request
11          Pursuant to Rule
            30(B)(2) and Rule 34 to
12          Defendant McKesson
            Corporation.............  18
13
   McKesson-Ganley-  11/20/06 e-mail from
14 002      Elizabeth Gallenagh,
            Bates
15          CAH_MDL_PRIORPROD_DEA07
            _011T1477 through 479....  24
16
   McKesson-Ganley-  Five page printout from
17 003      had website titled
            Distributor.............  27
18
   McKesson-Ganley-  Printout from had
19 004      website titled Board of
            Directors................  31
20
   McKesson-Ganley-  Printout from HDA's
21 005      website titled
            Manufacturer.............  34
22
   McKesson-Ganley-  Printout from HDA's
23 006      website titled Councils
            and Committees...........  42
24
   McKesson-Ganley-  HDMA Industry
25 007        Compliance Guidelines....  59
```

Page 7

```
1  McKesson-Ganley-   6/5/09 letter from HDMA
2  008      to the DEA, Bates
            CAH_MDL_PRIORPROD_DEA12
3           000T1210 through 220....  73
   McKesson-Ganley-   7/8/10 letter from HDMA
4  009      to the DEA, Bates
            CAH_MDL_PRIORPROD_DEA12
5           _000T1234 and 235........  76
6
   McKesson-Ganley-   Industry Compliance
7  010      Guidelines, Bates
            ABDCMDL00045537 through
8           551.....................  79
9  McKesson-Ganley-   E-mail chain, Bates
   011      MCKMDL00407734 through
10          737.....................  89
11 McKesson-Ganley-   10/2/15 e-mail with
   012      attachment, Bates
12          MCKMDL00404967...........  94
13 McKesson-Ganley-   10/24/14 e-mail with
   013      attachment, Bates
14          MCKMDL00405140 through
            142.....................  103
15
   McKesson-Ganley-   PowerPoint, SGAC Annual
16 014      Meeting, November
            12-13, 2014, Bates
17          MCKMDL00407771 through
            787.....................  107
18
   McKesson-Ganley-   Statement from John M.
19 015      Gray, President and
            CEO, HDMA, April 7,
20          2014....................  127
21 McKesson-Ganley-   E-mail chain with
   016      attachment, Bates
22          MCKMDL00403645 through
            654.....................  131
23
   McKesson-Ganley-   E-mail chain with
24 017      attachments, Bates
            ABDCMDL00167570 through
25          580.....................  137
```

Page 8

```
1  McKesson-Ganley-   Public Law 114-145 -
   018      April 19, 2016,
2           Ensuring Patient Access
            and Effective Drug
3           Enforcement Act of 2016..  143
4
   McKesson-Ganley-   Copy of Washington Post
5  019      article, The Drug
            Industry's Triumph Over
6           The DEA, 10/15/17........  148
7  McKesson-Ganley-   E-mail chain, Bates
   020      MCKMDL00406961 through
8           964.....................  152
9  McKesson-Ganley-   Defendant McKesson
   021      Corporation's
10          Objections and
            Responses to
11          Plaintiffs' first Set
            of Interrogatories
12          (Nos. 1-26..............  158
13 McKesson-Ganley-   11/10/17 e-mail with
   022      attachment, Bates
14          MCKMDL00408007 through
            8010....................  166
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
1        P R O C E E D I N G S
2
3         THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Dan Lawlor, I'm a
5  videographer with Golkow Litigation Services.
6         Today's date is July 27, 2018, and the
7  time is 9:04 a.m.
8         This video deposition is being held in
9  Boston, Massachusetts in the matter of National
10 Prescription Opiate Litigation, MDL No. 2804.
11        The deponent is Joseph Ganley,
12 McKesson.
13        Counsel, please identify yourselves,
14 starting with the plaintiff.
15        MR. GADDY:  Jeff Gaddy on behalf of
16 the PEC.
17        MS. CHARLES:  Amber Charles for the
18 McKesson Corporation and the witness, Joe
19 Ganley.
20        MR. STANNER:  Andrew Stanner,
21 Covington & Burling, on behalf of McKesson.
22        MR. RUIZ:  Anthony Ruiz of Zuckerman
23 Spaeder on behalf of CVS RX Services, Inc. and
24 CVS Indiana, LLC.
25        MR. WEINOGRAD:  Charles Weinograd on
```

Page 10

1 behalf of Endo Health Solutions, Endo
2 Pharmaceuticals, Par Pharmaceuticals.
3         MR. RICARD:  Paul Ricard on behalf of
4 Prescription Supply, Inc.
5         MS. MCCLURE:  Shannon McClure on
6 behalf of AmerisourceBergen Drug Corporation.
7         MR. LIVINGSTON:  Scott Livingston,
8 Marcus & Shapira, on behalf of HBC.
9         MR. PETER MERRIGAN:  Peter Merrigan on
10 behalf of the plaintiffs, PEC.
11         MR. TUCKER MERRIGAN:  Tucker Merrigan
12 on behalf of the plaintiffs, PEC.
13         MR. MONAHAN:  Matthew Monahan on
14 behalf of Cardinal Health.
15         MR. DAVISON:  William Davison on
16 behalf of Mallinckrodt LLC and Specgx, LLC.
17         MS. CONWAY:  Sarah Conway on behalf of
18 Walmart.
19         THE VIDEOGRAPHER:  Counsel on the
20 phone, please identify yourselves.
21         MR. LAVELLE:  John Lavelle from Morgan
22 Lewis on behalf of Rite Aid.
23         MS. HOLLY:  Pam Holly from Morgan
24 Lewis on behalf of Teva Pharmaceuticals,
25 Cephalon, and certain of the Actavis-acquired

Page 11

1 entities.
2         MS. COVERSTONE:  This is Kaitlyn
3 Coverstone from Kirkland & Ellis on behalf of
4 Allergen.
5         MR. AUBEL:  Bill Aubel from Jackson
6 Kelly on behalf of Miami-Luken, Inc.
7         THE VIDEOGRAPHER:  The court reporter
8 today is Maureen Pollard, and will now swear in
9 the witness.
10
11         JOSEPH GANLEY,
12 having been first duly identified and sworn, was
13 examined and testified as follows:
14         EXAMINATION
15 BY MR. GADDY:
16     Q.  State your name, please.
17     A.  Joseph Ganley.
18     Q.  And are you employed at McKesson
19 Corporation?
20     A.  I am.
21     Q.  What's your title?
22     A.  Vice president of federal government
23 affairs.
24     Q.  How long have you been in that
25 position?

Page 12

1     A.  Since July, 2014.
2     Q.  Are you registered as a lobbyist?
3     A.  I am.
4     Q.  For how long have you been registered
5 as a lobbyist?
6     A.  I'm not sure.  I assume from July,
7 2014 when I took that role.
8     Q.  Do you work in any particular division
9 or department?
10     A.  I work in the corporate public affairs
11 department.
12     Q.  How many other people work in that
13 department for McKesson?
14     A.  I have to think about this now.  12, I
15 believe.
16     Q.  Okay.  Are all 12 of those individuals
17 registered as lobbyists?
18     A.  No.
19     Q.  About how many are?
20     A.  Two are registered as federal
21 lobbyists.  There are state lobbyists as well.
22     Q.  One of those two being you?
23     A.  Yes.
24     Q.  Is there a registration required for
25 state lobbying?

Page 13

1         MS. CHARLES:  I'm going to object that
2 it's beyond the scope.
3     A.  It varies by state.  There's various
4 registration requirements, but it varies by
5 state.  But yes, many states require
6 registration.
7 BY MR. GADDY:
8     Q.  What are your duties in the position
9 that you currently have?
10     A.  I represent the company before the
11 federal government, so the Congress and the
12 Administration.  I advocate for the company's
13 public policy positions.  I represent the
14 company on trade association boards and
15 committees and industry organizations.  I'm
16 responsible for our public policy strategy at
17 the federal level.
18     Q.  Okay.  Is one of the goals in your
19 position to influence legislation that might
20 impact McKesson?
21     A.  Yes.
22     Q.  What did you do before that current
23 position?
24     A.  I was a director of state government
25 affairs for the northeast region.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.  Also with McKesson?
2    A.  Yes.
3    Q.  How long did you do that?
4    A.  From June of 2011 to July of 2014.
5    Q.  And what were the differences in that
6  position and the position you hold currently?
7    A.  Just the venue.  So I was doing the
8  same work advocating on public policy issues,
9  but at the state government level, in 14
10  northeast states.
11    Q.  Was there any registration required
12  for you to hold that position?
13    A.  There was not.
14    Q.  What states did you cover?
15    A.  I should say -- I should clarify that.
16  There wasn't a -- I was not a registered
17  lobbyist.  We employed outside consultants who
18  were registered lobbyists.  But I personally did
19  not have to register because of the way the
20  rules are written.
21    Q.  Okay.  How many lobbyists did you
22  employ?
23      MS. CHARLES:  Objection.  Beyond the
24  scope.
25    A.  I don't remember exactly.  We had two

Page 15

1  or three.
2  BY MR. GADDY:
3    Q.  Okay.  What states did you cover?
4    A.  I covered Virginia north to all of New
5  England.
6    Q.  Okay.  So you did or did not cover
7  Ohio?
8    A.  I did not.
9    Q.  Who did cover Ohio?
10      MS. CHARLES:  Objection.  Beyond the
11  scope.
12    A.  It varied.  There were different
13  people during that time period.  So from 2011 to
14  2014, it would have been Angela Grover who was
15  the state government affairs person for.
16  BY MR. GADDY:
17    Q.  Was that a particular region or
18  department?
19    A.  Yes.  We divide state government
20  affairs into four regions, the Northeast, the
21  Central region, the West region, and the South.
22    Q.  Okay.  So Ohio would be in the Central
23  region?
24    A.  Ohio would be in the Central region,
25  yes.

Page 16

1    Q.  And Angela Grover was in charge of the
2  state lobbying for the Central region from 2011
3  to 2014?
4    A.  Longer than that, but she, I think,
5  left the company 2015 maybe, 2016, something
6  like that.
7    Q.  Do you know who preceded Ms. Grover?
8      MS. CHARLES:  Objection.  Beyond the
9  scope.
10    A.  Nobody specifically, because we
11  restructured the department.  So when we went to
12  four state government -- four regions we hired
13  Angie to cover the Central region.  So prior to
14  that we had only two regions, one East and one
15  West.
16  BY MR. GADDY:
17    Q.  Do you know who would have covered
18  Ohio before Ms. Grover?
19      MS. CHARLES:  Objection.  Beyond the
20  scope.
21    A.  I don't.
22  BY MR. GADDY:
23    Q.  What region is West Virginia in?
24    A.  In the Northeast.
25    Q.  Okay.  So that would have been your

Page 17

1  area?
2    A.  Correct.
3    Q.  So you've been at McKesson since 2011?
4    A.  Yes.
5    Q.  What field was your employment in
6  before that?
7    A.  I worked at a public affairs firm,
8  Weber Shandwick.
9    Q.  In any prior employment either with
10  that firm you just mentioned or any other, have
11  you ever done any work in the pharmaceutical
12  industry?
13      MS. CHARLES:  Objection to form.
14    A.  Yes.  I mean, when I was at Weber we
15  represented pharmaceutical companies.
16  BY MR. GADDY:
17    Q.  Okay.  Did you ever represent
18  McKesson?
19    A.  No.
20    Q.  Did you ever represent Cardinal
21  Health?
22    A.  No.
23    Q.  AmerisourceBergen?
24    A.  No.
25    Q.  CVS?

Page 18

1    A.  Yes.
2    Q.  Walgreens?
3    A.  No.
4    Q.  Prior to your work at McKesson, had
5  you ever had any experience in the drug supply
6  chain?
7        MS. CHARLES:  Objection.  Form.
8    A.  I'm not sure I know what you mean by
9  "experience in the drug supply chain."
10 BY MR. GADDY:
11   Q.  Let me ask it this way.
12       Prior to your employment at McKesson,
13 had you ever had any interaction with or
14 participation in HDA or HDMA?
15   A.  No.
16   Q.  You've been designated by McKesson on
17 two topics today.
18       I'm going to show you what's been
19 marked as -- we'll call it Ganley 1.
20       (Whereupon, McKesson-Ganley-001 was
21   marked for identification.)
22 BY MR. GADDY:
23   Q.  If you don't mind, turn to Page 8,
24 looking at the numbers on the bottom of the
25 page.  You've been designated on topics numbers

Page 19

1  12 and 13.  Is that your understanding?
2    A.  Mm-hmm.  Yes.
3    Q.  And the first topic is your, meaning
4  McKesson's, participation, relationship or
5  association with any trade organization,
6  including, but not limited to, HDA, and its
7  predecessors, the NACDS and its predecessors,
8  and also PhRMA.
9        Do you see that?
10   A.  Yes.
11       MS. CHARLES:  I think you added a
12   predecessors in there.
13       MR. GADDY:  I did, when talking NACDS.
14   Thank you.
15 BY MR. GADDY:
16   Q.  Are you the person at McKesson who is
17 most knowledgeable to testify about that topic?
18   A.  Yes.
19   Q.  What did you do to prepare to testify
20 on that particular topic?
21   A.  I reviewed information with counsel.
22   Q.  Did you review any documents?
23   A.  Yes.
24   Q.  What did you review?
25   A.  A number of documents.  I don't know.

Page 20

1  I mean, there was a whole binder full of
2  documents.
3    Q.  Any in particular that you recall?
4    A.  Yeah.  I mean, there were e-mails,
5  agendas, there were -- I believe there were
6  documents you all indicated you were going to
7  ask about.
8    Q.  So you had the opportunity to review
9  those?
10   A.  Yes.
11   Q.  Okay.  So that would -- I assume what
12 you're referring to there are documents that
13 were produced by other defendants?
14   A.  I believe they were produced by
15 McKesson and other defendants, yes.
16   Q.  Okay.  And you had the opportunity to
17 review the documents that were produced by other
18 defendants that we had to get permission to use
19 in this deposition?
20   A.  Yes.
21   Q.  Does McKesson belong to or participate
22 in any trade associations or organizations?
23   A.  Yes.
24   Q.  And would one of those be the HDA or
25 HDMA?

Page 21

1    A.  Yes.
2    Q.  I've used those terms interchangeably.
3  Are those the same organization?
4    A.  Yes.
5    Q.  What's your understanding of when and
6  how the name changed?
7        MS. CHARLES:  Objection to form.
8    A.  They rebranded.  They decided that
9  Health Distribution Management Association was
10 unclear, and so they decided to rename
11 themselves a year and a half ago or so, two
12 years ago.
13   Q.  Was there any substantive change
14 within the organization as a result of that
15 rebranding?
16       MS. CHARLES:  Objection.  Beyond the
17 scope.
18   A.  No.
19 BY MR. GADDY:
20   Q.  Did the members that they represent
21 change in any form or fashion from your
22 participation within the organization?
23       MS. CHARLES:  Objection.  Beyond the
24 scope.
25   A.  I don't believe so, but I don't -- you

Page 22

1  know, presumably new members come in
2  occasionally. I don't know. So, I mean, the
3  scope of their membership didn't change, but
4  individual members may have come and gone, or
5  merged, or been acquired, or whatever.
6  BY MR. GADDY:
7      Q.  What is that organization?
8          MS. CHARLES: Objection. Form, beyond
9  the scope.
10     A.  HDA is a trade association that
11 represents pharmaceutical wholesale
12 distributors.
13 BY MR. GADDY:
14     Q.  Do you know any wholesale distributors
15 that it represents in addition to McKesson?
16     A.  Yes.
17     Q.  Can you tell us?
18     A.  AmerisourceBergen, Cardinal Health,
19 H.D. Smith, Burlington Drug. I don't -- there's
20 probably other regional distributors, but I
21 couldn't give you all the names. I don't know
22 all of them.
23     Q.  And those are all companies that
24 perform the same job function, is that correct?
25         MS. CHARLES: Objection. Beyond the

Page 23

1  scope.
2      A.  Generally speaking, yes.
3  BY MR. GADDY:
4      Q.  Those are all companies that have
5  common goals and common purposes?
6          MS. CHARLES: Objection. Beyond the
7  scope, form.
8      A.  I couldn't speak to -- I couldn't
9  speak to the goals or purposes of our
10 competitors, but --
11         MS. MCCLURE: Jeff, just to clarify
12 the record, we have an understanding, correct,
13 that an objection for one serves as an objection
14 for all so we don't need to hear from over here?
15         MR. GADDY: Of course.
16 BY MR. GADDY:
17     Q.  How long has McKesson been a member of
18 the HDA?
19     A.  Many years. Many decades. I don't
20 know exactly when we first became a member. And
21 HDA at some point kind of reconstituted, had
22 fallen into kind of -- it was going through some
23 difficult times and it was reconstituted, new
24 leadership was brought in. But more than
25 20 years certainly.

Page 24

1      Q.  From your understanding, or McKesson's
2  understanding of participation within HDA, is
3  the same true for the other drug wholesalers
4  that you mentioned, such at Cardinal Health and
5  AmerisourceBergen?
6          MS. CHARLES: Objection. Beyond the
7  scope.
8      A.  I don't know the answer as to when
9  they joined.
10 BY MR. GADDY:
11     Q.  Have each of those companies been
12 members as long as you've been with McKesson?
13         MS. CHARLES: Objection. Form, beyond
14 the scope.
15     A.  Yes.
16 BY MR. GADDY:
17     Q.  I'm going to show you what I'm going
18 to mark as Ganley 2.
19         (Whereupon, McKesson-Ganley-002 was
20         marked for identification.)
21 BY MR. GADDY:
22     Q.  Have you seen this document before?
23     A.  Yes.
24     Q.  When did you have the opportunity to
25 see this?

Page 25

1      A.  When preparing for this deposition.
2      Q.  And do you recognize this to be a
3  November 20th, 2006 e-mail from an employee of
4  HDMA?
5      A.  Yes.
6      Q.  And if you look down, do you see that
7  the subject of this e-mail is "HDMA - Two items
8  for today's call"?
9      A.  Yes, I do.
10     Q.  Is that something that's common within
11 HDA, to have weekly or biweekly calls amongst
12 members, or members of different committees?
13         MS. CHARLES: Objection. Form.
14     A.  Yes.
15 BY MR. GADDY:
16     Q.  And if you look at the -- there were
17 quite a number of recipients on this e-mail,
18 correct?
19         MS. CHARLES: Objection. Form.
20     A.  Yes.
21 BY MR. GADDY:
22     Q.  And do you see the first recipient to
23 that e-mail was a McKesson employee?
24     A.  Yes.
25     Q.  The second recipient of that e-mail

Page 26

1  was a Henry Schein employee?
2      A.  Yes.
3      Q.  If you go down to the next line, you
4  see there was a recipient from Miami-Luken?
5      A.  Yes.
6      Q.  And below that, there was a recipient
7  from Cardinal Health?
8      A.  Yes.
9      Q.  And if you go directly below that, you
10  see there was a recipient from
11  AmerisourceBergen?
12      A.  Yes.
13      Q.  Is it safe to assume that, in fact,
14  these individuals who were receiving this
15  correspondence from HDMA, that all of these
16  companies were members of HDMA at the time that
17  this e-mail was sent?
18          MS. CHARLES:  Objection.  Form.
19      A.  Yes.
20  BY MR. GADDY:
21      Q.  You have no reason to dispute that all
22  these companies were members of HDMA going back
23  to 2006 at least?
24      A.  I have no reason to dispute that.
25          MS. MCCLURE:  Objection.

Page 27

1  BY MR. GADDY:
2      Q.  Is it your expectation they were
3  members going back farther than that?
4          MS. CHARLES:  Objection.  Form, beyond
5  the scope.
6      A.  I don't know when the other companies
7  joined.
8  BY MR. GADDY:
9      Q.  Are you familiar with the fact that
10  HDA has a website?
11      A.  Yes.
12      Q.  And have you been to that website
13  before and seen it?
14      A.  Yes.
15      Q.  I'm going to show you what we'll mark
16  as Ganley 3.
17          (Whereupon, McKesson-Ganley-003 was
18          marked for identification.)
19      A.  Thank you.
20  BY MR. GADDY:
21      Q.  Do you recognize this as being a
22  printout from the HDA's website?
23      A.  It appears to be, yes.
24      Q.  And if you look at the bottom of the
25  first page there, you see the web address down

Page 28

1  at the bottom of the page?
2      A.  Yes.
3      Q.  And you recognize that as being the
4  web address for the HDA's website?
5      A.  Yes.
6      Q.  And if you look at the top left-hand
7  corner of the page, we see the logo of the HDA,
8  correct?
9      A.  Yes.
10      Q.  Okay.  And the title of this page
11  looks to be "Distributor."
12          Do you see that?
13      A.  Yes.
14      Q.  Okay.  And down towards the bottom of
15  the page it says that the "HDA has 36
16  distributor members."
17          Do you see that?
18      A.  Yes.
19      Q.  Does that number sound accurate to
20  you?
21          MS. CHARLES:  Objection.  Beyond the
22  scope.
23      A.  Yes.
24          MS. MCCLURE:  Objection.  Form.
25  BY MR. GADDY:

Page 29

1      Q.  And you see the first member listed
2  there is AmerisourceBergen?
3      A.  Yes.
4      Q.  And the next one listed is Anda?
5      A.  Yes.
6      Q.  And if you turn the page, do you see
7  Cardinal Health is listed as a member of HDA?
8      A.  Yes.
9      Q.  If you go down a few lines, do you see
10  that Henry Schein is listed?
11      A.  Yes.
12      Q.  If you go down a few more, do you see
13  McKesson?
14      A.  Yes.
15      Q.  Below there is Miami-Luken?
16      A.  Yes.
17      Q.  And if you turn the page, four down
18  you'll see that Prescription Supply is also a
19  member of the HDA, correct?
20      A.  Yes.
21      Q.  And the fact that all of those
22  wholesalers are members of HDMA, is that
23  consistent with McKesson's understanding based
24  on its participation within the HDA?
25          MS. CHARLES:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  A.  Yes.
2  BY MR. GADDY:
3  Q.  Does -- would you qualify McKesson as
4  being active within the HDA?
5      MS. CHARLES:  Objection.  Form.
6  A.  Yes.
7  BY MR. GADDY:
8  Q.  Does McKesson have members on the
9  executive committee?
10     MS. CHARLES:  Objection.  Form.
11  A.  We have a member on the executive
12  committee.
13  BY MR. GADDY:
14  Q.  Does McKesson have any members on the
15  board of directors of HDA?
16  A.  Yes.
17  Q.  Does Cardinal Health have any members
18  on the executive committee?
19     MS. CHARLES:  Objection.  Beyond the
20  scope.
21  A.  I don't know the answer to that.
22  BY MR. GADDY:
23  Q.  I'm going to show you what I'll mark
24  as Ganley 4.
25

Page 31

1      (Whereupon, McKesson-Ganley-004 was
2       marked for identification.)
3  A.  Thank you.
4  BY MR. GADDY:
5  Q.  Do you recognize this, again, as being
6  a printout from the HDA website?
7  A.  Yes, I do.
8  Q.  Again, you see the web address at the
9  bottom of the page?
10  A.  Yes.
11  Q.  And you see the brand of HDA up in the
12  top left corner?
13  A.  Yes.
14  Q.  Okay.  And you see the title of this
15  page is "Board of Directors"?
16  A.  Yes.
17  Q.  And you see the first individual
18  listed is -- I'm going to mispronounce his last
19  name I'm sure, but Jon Giacomin?
20  A.  Jon Giacomin.
21  Q.  Jon Giacomin.
22      And who does he work for?
23      MS. CHARLES:  Objection.  Beyond the
24  scope.
25  A.  I think Cardinal.

Page 32

1  BY MR. GADDY:
2  Q.  Okay.  And if you actually turn the
3  page, you'll see it at the top of the very next
4  page.
5  A.  Yes.
6  Q.  He works for Cardinal Health?
7  A.  Yep.
8  Q.  And if you stay on -- I'm sorry, if
9  you turn to Page 3, at the top left do you see
10  the President/CEO of Miami-Luken?
11     MS. CHARLES:  Objection.  Form.
12  A.  Yes.
13  BY MR. GADDY:
14  Q.  Is he also a member of the board of
15  directors on HDA?
16     MS. CHARLES:  Objection.  Beyond the
17  scope.
18  A.  Yes.
19  BY MR. GADDY:
20  Q.  And next to him, do you see an
21  employee of Henry Schein?
22  A.  Yes.
23  Q.  And if you turn to Page 4, top middle,
24  do you see a McKesson employee who is a member
25  of the board of directors for HDA?

Page 33

1  A.  Yes.
2  Q.  And if you look at the bottom left of
3  that page, do you see an employee of
4  AmerisourceBergen who was on the board of
5  directors for HDA?
6  A.  Yes.
7      MS. CHARLES:  Objection.  Form.
8  BY MR. GADDY:
9  Q.  Based on McKesson's participation
10  within the HDA, are these board of directors
11  consistent with McKesson's understanding of who
12  is a participant within the HDA?
13     MS. CHARLES:  Objection.  Form, beyond
14  the scope.
15  A.  Yes.
16  BY MR. GADDY:
17  Q.  Now, in addition to distributors,
18  there are also pharmaceutical manufactures who
19  are members of the HDA, correct?
20     MS. CHARLES:  Objection.  Beyond the
21  scope.
22  A.  I believe that's right.
23  BY MR. GADDY:
24  Q.  Do you know any manufacturers who are
25  members?

Page 34

1     MS. CHARLES: Objection. Form, beyond
2  the scope.
3     A. I don't.
4  BY MR. GADDY:
5     Q. I'm going to show you what I'm going
6  to mark as Ganley 5.
7        (Whereupon, McKesson-Ganley-005 was
8        marked for identification.)
9     A. Thank you.
10 BY MR. GADDY:
11    Q. Once again, do you recognize this as
12 being a printout from the HDA's website?
13    A. Yes.
14    Q. And you recognize the web address at
15 the bottom of the first page?
16    A. Yes.
17    Q. And the branding of HDA in the top
18 left-hand corner?
19    A. Yes.
20    Q. And if you turn to Page 2, four
21 down -- or first, let me back up just a bit.
22       On the first page, do you see the
23 title of this page is "Manufacturer"?
24    A. Yes.
25    Q. And you see below that it says,

Page 35

1  "Manufacturers considering an HDA membership are
2  primarily engaged in developing, manufacturing
3  or labeling healthcare products."
4        Do you see that?
5     A. Yes.
6     Q. And then down on the bottom it says,
7  "HDA has 128 manufacturer members."
8        Do you see that?
9     A. Yes.
10    Q. And if you turn the page, four down do
11 you see that Allergen is a member of the HDA?
12       MS. CHARLES: Objection. Beyond the
13 scope.
14    A. Yes.
15 BY MR. GADDY:
16    Q. And if you turn to Page 4, do you see
17 that Endo Pharmaceuticals is also a member of
18 the HDA?
19       MS. CHARLES: Objection. Beyond the
20 scope, form.
21    A. Yes.
22 BY MR. GADDY:
23    Q. If you go down to the bottom of the
24 page, do you see that Johnson & Johnson is a
25 member of the HDA?

Page 36

1     MS. CHARLES: Same objections.
2     A. Yes.
3  BY MR. GADDY:
4     Q. If you go to Page 5, do you see in the
5  middle of the page that Mallinckrodt is a member
6  of the HDA?
7        MS. CHARLES: Same objections.
8     A. Yes.
9  BY MR. GADDY:
10    Q. If you go to Page 6, do you see that
11 Par Pharmaceutical is a member of HDA?
12       MS. CHARLES: Same objections.
13    A. Yes.
14 BY MR. GADDY:
15    Q. If you go down, do you see that
16 Patriot Pharmaceuticals, a subsidiary of
17 Janssen, is a member of the HDA?
18       MS. CHARLES: Same objections.
19    A. Yes.
20 BY MR. GADDY:
21    Q. If you go down four up from the
22 bottom, do you see Purdue Pharma is a member of
23 the HDA?
24       MS. CHARLES: Same objections.
25    A. Yes.

Page 37

1  BY MR. GADDY:
2     Q. And if you go to the next page, do you
3  see towards the bottom that Teva Pharmaceuticals
4  is a member of the HDA?
5        MS. CHARLES: Same objections.
6     A. Yes.
7  BY MR. GADDY:
8     Q. Based on McKesson's participation
9  within the HDA, are these manufacturer members
10 consistent with your understanding of HDA
11 membership?
12       MS. CHARLES: Objection. Beyond the
13 form -- beyond the scope, form.
14    A. Yes.
15 BY MR. GADDY:
16    Q. So there's no doubt the membership of
17 HDA or HDMA includes both distributors and
18 manufacturers, correct?
19       MS. CHARLES: Objection. Form, beyond
20 the scope.
21    A. Correct.
22 BY MR. GADDY:
23    Q. Now, does HDA have different
24 conferences, committees, and working groups?
25       MS. CHARLES: Objection. Beyond the

Page 38

1    scope.
2        A.  Yes.
3    BY MR. GADDY:
4        Q.  And is McKesson active in any of
5    those?
6        A.  We are active in a number of them,
7    yes.
8        Q.  Which ones is McKesson active in?
9        A.  The federal -- well, the Executive
10   Committee, the Board, the Public Policy
11   Committee or Council, the Federal Government
12   Affairs Committee, the State Government Affairs
13   Committee, the Regulatory Affairs Committee, the
14   Industry Relations Council.  There's probably
15   one or two others.  There might be a legal
16   working group.  But those are the primary ones
17   that we're engaged with.
18       Q.  Are you involved in the Federal
19   Government Affairs Committee presently?
20       A.  I am.  I'm the chair.
21       Q.  Are there any employees with Cardinal
22   Health who also serve on that committee?
23       MS. CHARLES:  Objection.  Beyond the
24   scope.
25       A.  Yes.

Page 39

1    BY MR. GADDY:
2        Q.  Any employees of AmerisourceBergen who
3    also serve on that committee?
4        MS. CHARLES:  Same objection.
5        A.  Yes.
6    BY MR. GADDY:
7        Q.  Any employees of Miami-Luken who also
8    serve on that committee?
9        MS. CHARLES:  Same objection.
10       A.  I don't know the answer to that.  And
11   I should say it's not -- there's not sort of a
12   formal membership in the committee.  If you're a
13   member of HDA, you're welcome to call in and
14   join any of these working group conference
15   calls.  I don't recall somebody specifically
16   from Miami-Luken that regularly participates in
17   the Federal Government Affairs Committee.
18       But my point is, it's not like you're
19   either a member or not.  The federal government
20   committee has a call.  Anybody who is doing
21   federal affairs work for any of the member
22   companies is, you know, is able to participate
23   in that call.
24   BY MR. GADDY:
25       Q.  About how many people actively

Page 40

1    participate in the committee such, as federal
2    government affairs?
3        MS. CHARLES:  Objection.  Form, beyond
4    the scope.
5        A.  Varies from meeting-to-meeting or
6    call-to-call, but a dozen or more.
7    BY MR. GADDY:
8        Q.  Are there any other committees that
9    you personally participate in?
10       MS. CHARLES:  Objection.  Beyond the
11   scope.
12       A.  The Public Policy Council.
13   BY MR. GADDY:
14       Q.  Are there any --
15       A.  And the -- sorry.  And the Regulatory
16   Affairs Council.
17       But again, "participate in" being the
18   operative word.  In other words, I don't
19   necessarily join every Regulatory Affairs
20   Council call.
21       Q.  For each of those committees, the
22   Public Policy Council and the Regulatory Affairs
23   Committee, are there employees from Cardinal
24   Health who participate in those committees?
25       MS. CHARLES:  Objection.  Beyond the

Page 41

1    scope.
2        A.  Yes.
3    BY MR. GADDY:
4        Q.  Are there employees from
5    AmerisourceBergen who participate in each of
6    those two committees?
7        MS. CHARLES:  Same objection.
8        A.  Yes.
9    BY MR. GADDY:
10       Q.  You previously, I presume, used to
11   participate in the State Government Affairs
12   Committee?
13       A.  Yes.
14       Q.  When you did so, did you work with any
15   employees from Cardinal Health on that
16   committee?
17       A.  Yes.
18       Q.  Did you work with any employees from
19   AmerisourceBergen on that committee?
20       A.  Yes.
21       Q.  Do you personally work on the Industry
22   Relations Council or committee?
23       A.  I do not.
24       Q.  But you indicated there is somebody
25   from McKesson who does?

Page 42

1    A.  Yes.
2        MS. CHARLES:  Objection.  Form.
3    BY MR. GADDY:
4    Q.  Would you be able to speak on whether
5    or not individuals from other wholesale
6    distributors work on that committee or council
7    as well?
8        MS. CHARLES:  Objection.  Beyond the
9    scope, form.
10   A.  Yes.
11   BY MR. GADDY:
12   Q.  Are there employees from Cardinal
13   Health who participate in that committee or
14   council?
15   A.  Yes.
16   Q.  Are there employees from
17   AmerisourceBergen who participate in the
18   Industry Relations Council?
19   A.  Yes.
20   Q.  I'm going to show you what I'm going
21   to mark as Ganley 6.
22       (Whereupon, McKesson-Ganley-006 was
23       marked for identification.)
24   A.  Thank you.
25   BY MR. GADDY:

Page 43

1    Q.  Do you, again, recognize this as being
2    a printout from HDA's website?
3    A.  Yes.
4    Q.  Again, you see the web address at the
5    bottom of the page?
6    A.  Yes.
7    Q.  And the title of this page is
8    "Councils and Committees"?
9    A.  Yes.
10   Q.  And there on the very first page we
11   see the Public Policy Council that you were
12   speaking about earlier, correct?
13   A.  Yes.
14   Q.  If you turn the page, at the top of
15   Page 2 do you see the Industry Relations
16   Council?
17   A.  Yes.
18   Q.  And it says there that this counsel is
19   "composed of distributor and manufacturer
20   members," is that correct?
21   A.  Yes.
22   Q.  Is that consistent with McKesson's
23   understanding of who participates in the
24   Industry Relations Council?
25   A.  Yes, it is.

Page 44

1    Q.  It says that this committee "provides
2    leadership on pharmaceutical distribution and
3    supply chain issues."
4        Do you see that?
5    A.  Yes.
6    Q.  And is that consistent with McKesson's
7    understanding about what those distributor and
8    manufacturer members do on that council?
9        MS. CHARLES:  Objection.  Beyond the
10   scope.
11   A.  Yes.
12   BY MR. GADDY:
13   Q.  If you turn to Page 9, you'll see it
14   lists there a Contracts and Chargebacks Working
15   Group.
16       Do you see that?
17   A.  Yes.
18   Q.  Does McKesson participate in that
19   working group?
20   A.  I don't know the answer to that.
21   Q.  Okay.  You see there that it says,
22   "This working group explores how the contract
23   administration process can be streamlined
24   through process improvements or technical
25   efficiencies.  It also creates and exchanges

Page 45

1    industry knowledge of interest to contract and
2    chargeback professionals."
3        Do you see that?
4    A.  Yes.
5    Q.  And then below there it indicates that
6    both manufacturers and distributors participate
7    in that working group?
8    A.  Yes.
9    Q.  Is that consistent with McKesson's
10   understanding based on its participation within
11   the HDA?
12   A.  You know, I have --
13       MS. MCCLURE:  Objection.
14   A.  I have to be honest with you.  I've
15   never heard of this working group, never come
16   across it in my interactions with HDA.
17   BY MR. GADDY:
18   Q.  From McKesson's perspective, is it
19   safe that say that manufacturers and
20   distributors work together under the umbrella of
21   the HDA?
22       MS. MCCLURE:  Objection.
23       MS. CHARLES:  Objection.  Form, and
24   scope.
25   A.  I think -- I did say it depends.

Page 46

BY MR. GADDY:

Q. Well, from McKesson's perspective, there certainly are issues or circumstances in which manufacturers and distributors work together under the umbrella of the HDA.

MS. CHARLES: Objection. Form.

BY MR. GADDY:

Q. Is that true?

MS. CHARLES: Beyond the scope.

A. Yes, it's true that there are examples where that happens, yes.

BY MR. GADDY:

Q. And why would it be --

A. For example, the Public Policy Council doesn't have any manufacturer members. Our federal government affairs call, there's never a manufacturer on that call. So in some cases it's distributors and manufacturers, in other cases it's just distributors.

Q. Why would it be beneficial for McKesson to be a member of a trade association where distributors and manufacturers can work together under the same umbrella?

MS. CHARLES: Objection. Beyond the scope, form.

Page 47

A. I don't know. I'm not sure I know why it would be beneficial.

BY MR. GADDY:

Q. Well, what's the purpose that -- why is McKesson a member of the HDA?

A. We're a member of the HDA because there's value in being a member of a trade association that can speak, advocate, and educate on behalf of the entire industry.

Q. And this also allows for the free exchange of information between like-minded companies, is that correct?

MS. CHARLES: Objection. Form, beyond the scope.

A. Yeah, within -- you know, within the construct of what's allowed, yes.

BY MR. GADDY:

Q. And it allows for the free exchange of information amongst companies that have like-minded goals?

MS. CHARLES: Objection. Form, beyond the scope.

A. Sure. Generally speaking, yeah.

BY MR. GADDY:

Q. You agree that the members of the HDA,

Page 48

from McKesson's perspective based on your participation within the HDA, have common goals when it comes to rules and regulations and DEA enforcement?

MS. CHARLES: Objection. Form, beyond the scope.

A. Generally, yes.

BY MR. GADDY:

Q. Well, let me break it down.

You agree that from McKesson's perspective, based on their participation within the HDA, that the members, which include Cardinal Health, AmerisourceBergen, Miami-Luken, Purdue Pharma, Endo, Teva, that they have common goals when it comes to rules and regulations?

MS. CHARLES: Objection. Form, beyond the scope.

A. I can only speak to the distributors, again, because I have not been part of public policy conversations that include the manufacturers. So while the manufacturers are members, they don't generally participate in the Public Policy Council or the government affairs committees.

BY MR. GADDY:

Page 49

Q. Which are the ones that you participate in?

A. Public Policy Council, Federal Government Affairs Committee, State Government Affairs Committee, Regulatory Affairs Committee.

Q. Who would be the person for us to -- who would be the person within McKesson most knowledgeable to talk about the Industry Relations Council?

A. I mean, I could speak about it, but --

Q. Let me ask it this way.

A. I'm trying to think who --

Q. Who from McKesson serves on that committee?

A. I'm trying to think who serves on that committee right now. There's been some turnover. And again, it's probably not one individual, it's probably a couple of people who participate. But I don't know the answer right now.

Q. You don't know the names of anybody that serves on that committee for McKesson, or served on that committee within the last five years?

A. I know some individuals who

Page 50

1  participate, or have participated within the
2  last five years.
3      Q.  Can you give us their name?
4      A.  Sure.  Scott Mooney is one.  I'm not
5  sure who else.  Within the last five years, it
6  would have also included Bruce Russell, a guy by
7  the name of Gary Hilliard participated.  Both of
8  them are no longer with McKesson.  Scott is
9  still with McKesson.
10     But again, it's difficult to answer
11 the question specifically because multiple
12 people from McKesson would have participated at
13 different moments.  Right.  All of these
14 councils are kind of structured that way.  So
15 the agenda will go out for a particular meeting
16 or call to a broad range of people within a
17 company.  And so, for example, I'm the chair of
18 the Federal Government Affairs Committee, but
19 there's probably three or four other McKesson
20 people who would listen into any given FGAC
21 call, depending on the agenda.  It's not like an
22 exclusive meeting or call.
23     Q.  Let me go back to my last question and
24 ask you just as it relates to distributors.
25     From McKesson's perspective, based on

Page 51

1  its participation within HDA, do the wholesale
2  distributor members have common goals when it
3  comes to rules and regulations?
4      MS. CHARLES:  Objection.  Form.
5      A.  Yes.
6  BY MR. GADDY:
7      Q.  From McKesson's perspective, based on
8  their participation within the HDA, do the
9  wholesale distributors have common goals when it
10 comes to DEA enforcement?
11     MS. CHARLES:  Objection.  Form.
12     A.  Yes.
13 BY MR. GADDY:
14     Q.  From the perspective of McKesson,
15 based on its participation within the HDA, do
16 the wholesale distributor members have common
17 goals when it comes to drug annual production
18 quotas?
19     MS. CHARLES:  Objection.  Form.
20     A.  There may be some differing points of
21 view on that.  But I don't know that I could
22 speak to the other companies' perspective on
23 that issue.
24     But I believe HDA has some vaguely
25 worded language that speaks to the need to think

Page 52

1  thoughtfully about production quotas, or
2  something like that.  I don't know that they
3  fully endorsed reducing production quotas, but
4  maybe they have.  I'd have to look.
5  BY MR. GADDY:
6      Q.  I want to kind of shift a little bit
7  and talk about some of the things that HDA does
8  for its members.
9      A.  Sure.
10     Q.  Would one of things that HDA would do
11 be send letters to state or federal lawmakers on
12 behalf of its members?
13     MS. CHARLES:  Objection.  Beyond the
14 scope.
15     A.  Yes.
16 BY MR. GADDY:
17     Q.  And it can send letters on behalf
18 of -- HDA can send letters on behalf of all of
19 its members because all the members, as you
20 said, have a common purpose or common goals?
21     MS. CHARLES:  Objection.  Form, beyond
22 the scope.
23     A.  Well, it would send a letter on behalf
24 of its members with the members' approval.
25 BY MR. GADDY:

Page 53

1      Q.  Sure.
2      So members would have to approve any
3  letter that went to state or federal lawmakers?
4      MS. CHARLES:  Objection.  Beyond the
5  scope.
6      A.  It's not that hard-and-fast.  It sort
7  of depends.  If it's a substantive letter --
8  generally speaking, the way HDMA works is if
9  it's a substantive letter, HDA would draft it,
10 it would be circulated to the members, there
11 would probably be a call to discuss it, there
12 might be edits that go back and forth between
13 the members and HDA, and again, not all members,
14 but some members might choose to weigh in on a
15 particular topic.
16     Generally speaking, something like
17 sending a substantive letter to a government
18 official would be sort of approved, you know, by
19 sort of consensus before HDA did that.  HDA
20 wouldn't send a letter, a substantive letter to
21 a government official within having some
22 consensus among its members.
23 BY MR. GADDY:
24     Q.  And consensus, when you use that term,
25 means that everybody agrees?

Page 54

1 MS. CHARLES: Objection. Form.
2 A. Yeah, I'd say it a little differently
3 than how you just said it. It means nobody
4 objects. Right.
5 So generally speaking, there would be
6 a discussion where we want to send this letter
7 to so-and-so, the letter would be distributed to
8 the members, there would be some kind of
9 indication that, you know, if anybody has any
10 concerns let us know by Friday at 4, otherwise
11 we'll assume you're all okay with it. Right.
12 BY MR. GADDY:
13 Q. So if something -- if a substantive
14 letter is published by the HDA on behalf of its
15 members, it can be assumed that nobody objected?
16 MS. CHARLES: Objection. Beyond the
17 scope.
18 A. Yes, either didn't object or didn't
19 reply.
20 BY MR. GADDY:
21 Q. So some of the other things that HDA
22 will do on behalf of its members is take
23 position on legislation, correct?
24 MS. CHARLES: Objection. Beyond the
25 scope.

Page 55

1 A. Yes.
2 BY MR. GADDY:
3 Q. And based on McKesson's participation
4 within the HDA, another thing that HDA will do
5 on behalf of its members is write letters to the
6 media representing the position of its members?
7 MS. CHARLES: Objection. Form.
8 A. Yeah, rarely. I mean, engage with the
9 media, certainly. Write letters to the media I
10 think is not what they would do. But yes, press
11 releases and, you know, op eds, things like
12 that, yes.
13 BY MR. GADDY:
14 Q. And specifically as it relates to this
15 case, one of the things that HDA did was publish
16 what they called Industry Compliance Guidelines?
17 MS. CHARLES: Objection. Form.
18 A. Yes.
19 BY MR. GADDY:
20 Q. And we talked a little bit just a
21 moment ago about the process that HDA goes
22 through when they want to -- the example we were
23 using there was draft a substantive letter to a
24 lawmaker. Would --
25 A. And I'm sorry to interrupt. The

Page 56

1 distinction I'm making is HDA probably does send
2 what I would call non-substantive letters
3 without any real process. So if it's --
4 Q. Sure.
5 A. -- cover letter for annual report or
6 something, that wouldn't be edited and refined.
7 That's the distinction I'm making between
8 substantive and not substantive.
9 Q. Fair clarification.
10 A. You know, "congratulations on getting
11 elected" is not a letter that would go through
12 any significant process or something like that.
13 Q. Understood.
14 Speaking specifically to the Industry
15 Compliance Guidelines that HDA published, would
16 that be the type of document that would
17 undergo -- that would be circulated to its
18 members for approval prior to being published?
19 MS. CHARLES: Objection.
20 A. Yes. Generally speaking, yes.
21 BY MR. GADDY:
22 Q. Well, you said "generally speaking."
23 There was -- 2008, HDA published a set of
24 Industry Compliance Guidelines, correct?
25 A. Yes.

Page 57

1 Q. Did that 2008 draft of the Industry
2 Compliance Guidelines, was that circulated to
3 its members for review and comment prior to
4 being published?
5 MS. CHARLES: Objection. Beyond the
6 scope.
7 A. Yes.
8 BY MR. GADDY:
9 Q. Did McKesson have an opportunity to
10 review that document prior to it being
11 published?
12 A. Yes.
13 Q. Who within McKesson reviewed that
14 document?
15 A. It was folks on our Regulatory Affairs
16 team.
17 Q. Okay. Anybody in particular?
18 A. Some of the folks I mentioned. I know
19 Don Walker reviewed it, Mike Oriente, probably
20 Gary Hilliard. I can't say for certain, but it
21 would have been the folks within the regulatory
22 affair team. Maybe Bruce Russell.
23 Q. What was -- and ultimately, did
24 McKesson approve the publication of the 2008
25 Industry Compliance Guidelines?

Page 58

1     MS. CHARLES: Objection. Form.
2     A. "Approve" is not sort of the word I
3  would use. I mean, I think the way -- again,
4  the way these things get done is they're sort
5  of -- they're consensus documents, so consented,
6  I mean, I don't know -- I'm not trying to be
7  knit-picky, but "approve" implies there was some
8  vote taken or something like that, and that's
9  not really the way it works. Sort of, you the
10 document to a good place and everybody agrees
11 that we're going to go ahead and publish it.
12 BY MR. GADDY:
13    Q. Did McKesson have the opportunity to
14 review the 2008 Industry Compliance Guidelines
15 prior to them being published?
16    A. Yes.
17    Q. Did McKesson raise any objection
18 whatsoever to them being published?
19    MS. CHARLES: Objection. Form.
20    A. There were probably edits and comments
21 made during the drafting process, I'm sure.
22 BY MR. GADDY:
23    Q. Was there any objection made by
24 McKesson to the 2008 Industry Compliance
25 Guidelines being published?

Page 59

1     MS. CHARLES: Objection. Form.
2     A. No.
3  BY MR. GADDY:
4     Q. I'm going to show you -- I'm on Number
5  7? I'm going to show you what we're going to
6  mark as Ganley 7.
7        (Whereupon, McKesson-Ganley-007 was
8     marked for identification.)
9     A. Thank you.
10    MR. GADDY: Shannon, if you don't
11 mind, I was going to use the projector.
12    MS. MCCLURE: I'll move.
13 BY MR. GADDY:
14    Q. Do you recognize this document as
15 being the 2008 Industry Compliance Guidelines
16 that were published by the HDA?
17    A. Yes.
18    Q. Why were these guidelines published?
19    A. I don't know specifically why they
20 were published. But generally speaking, you
21 know, HDA would publish something like this,
22 HDMA at the time would publish something like
23 this to educate stakeholders about what the
24 industry does and what our procedures are, and
25 to share information among the companies, among

Page 60

1  its membership.
2     Q. Was it McKesson's idea to draft and
3  publish these?
4     A. I don't know the answer to that.
5     Q. Do you know whether or not these
6  Industry Compliance Guidelines being published
7  by HDA had anything to do with the 2008 civil
8  penalty that McKesson paid?
9        MS. CHARLES: Objection. Form.
10       A. I don't know the answer to that.
11 BY MR. GADDY:
12    Q. Were you aware that McKesson paid a
13 civil penalty in 2008?
14       MS. CHARLES: Objection. Beyond the
15 scope.
16       A. I am aware, yes.
17 BY MR. GADDY:
18    Q. And are you aware that it related to
19 allegations that McKesson had failed to report
20 suspicious orders of opioids?
21       MS. CHARLES: Objection. Beyond the
22 scope.
23       A. Yes.
24 BY MR. GADDY:
25    Q. And these Industry Compliance

Page 61

1  Guidelines speak exactly to that topic, is that
2  correct?
3        MS. CHARLES: Objection. Form, beyond
4  the scope.
5        A. And more. Yes, they speak to
6  compliance generally, among other things.
7  BY MR. GADDY:
8     Q. If you look in the top of the page, it
9  says, the "Healthcare Distribution Management
10 Association Industry Compliance Guidelines."
11       Do you see that?
12       A. Yes.
13    Q. Goes on to say, "Reporting Suspicious
14 Orders and Preventing Diversion of Controlled
15 Substances."
16       A. Yes.
17    Q. Do you see that?
18       And you understand that's the contents
19 of this document?
20       A. Yes.
21    Q. In the first paragraph there, second
22 sentence, it says that "Manufacturers,
23 distributors, pharmacies and healthcare
24 practitioners share a mission and responsibility
25 to continuously monitor, protect and enhance the

Page 62

1  safety and security of this system to combat
2  increasingly sophisticated criminals who attempt
3  to breach the security of the legitimate supply
4  chain."
5       Do you see that?
6       A.  Yes.
7       Q.  And it was McKesson's position that
8  that was their role within the supply chain,
9  correct?
10      MS. CHARLES:  Objection.  Form.
11      A.  I'm not sure what you mean by "their."
12 I mean, yes, we would agree with the statement
13 that "Manufacturers, distributors, pharmacies
14 and healthcare practitioners share a mission and
15 responsibility to continuously monitor, protect
16 and enhance the safety and security of this
17 system."  We would agree with that statement.
18 BY MR. GADDY:
19      Q.  Okay.  And if you go down to the
20 second paragraph, starting in the middle of the
21 paragraph it says, "These Industry Compliance
22 Guidelines are consistent with, and further
23 extend, the distributors' track record of
24 supporting and implementing initiatives designed
25 to improve the safety, security and integrity of

Page 63

1  the medicine supply"?
2       A.  Yes.
3       Q.  It says, "They have been prepared in
4  recognition of a growing problem of misuse and
5  diversion of Controlled Substances."
6       Do you see that?
7       A.  Yes.
8       Q.  And back in 2008, McKesson agreed with
9  this statement, correct?
10      MS. CHARLES:  Objection.  Form.
11      A.  Yes.
12 BY MR. GADDY:
13      Q.  If you go down to the next paragraph,
14 it says that "distributors are uniquely situated
15 to perform due diligence in order to help
16 support the security of the controlled
17 substances they deliver to their customers."
18      Do you see that?
19      A.  Yes.
20      Q.  And this was a statement that McKesson
21 agreed with back in 2008 when these were
22 published?
23      MS. CHARLES:  Objection.  Form.
24      A.  Yeah, we agreed to the whole document.
25 BY MR. GADDY:

Page 64

1       Q.  The same opportunity that McKesson had
2  to review and comment, that same opportunity,
3  per your understanding based on McKesson's
4  participation within HDA, that same opportunity
5  would have been given to Cardinal Health?
6       A.  I would imagine, yes.
7       Q.  That same opportunity would have been
8  given to AmerisourceBergen?
9       MS. MCCLURE:  Objection.
10      A.  I would imagine, yes.
11 BY MR. GADDY:
12      Q.  If you turn to Page 2, you'll see
13 there's numbering up in the top right-hand
14 corner.
15      A.  Yes.  Thank you.
16      Q.  Down towards the bottom third of the
17 page, the guidelines cite some of the federal
18 regulations that apply to distributors, correct?
19      A.  Yes.
20      Q.  And in the first sentence of that
21 regulation it says, "The registrant shall design
22 and operate a system to disclose to the
23 registrant suspicious orders of controlled
24 substances."
25      Do you see that?

Page 65

1       MS. CHARLES:  Objection.  Form.
2       A.  I do.
3  BY MR. GADDY:
4       Q.  And the word "suspicious orders" is
5  underlined, correct?
6       A.  It is, yes.
7       Q.  Okay.  And if you look at the bottom
8  of the paragraph, it says that emphasis was
9  added by the HDA when they published this,
10 correct?
11      A.  Presumably, yes.  It says "Emphasis
12 added."
13      Q.  Okay.  It says "suspicious orders,"
14 correct?
15      A.  That's what it says.
16      Q.  Not suspicious customers?
17      A.  Right.
18      Q.  And this is language that McKesson had
19 the opportunity to see, review, comment and
20 object to, if they so desired, before these were
21 published in 2008?
22      MS. CHARLES:  Objection.  Form.
23      A.  Yes.
24 BY MR. GADDY:
25      Q.  If you go down to the next paragraph

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 it says, "Although distributors have been
2 required to identify and report 'suspicious
3 orders' of controlled substances and listed
4 chemicals, increasing concerns about the
5 potential misuse of prescription controlled
6 substances have elevated awareness within the
7 supply chain and have led to increased
8 expectations by DEA."
9    Do you see that?
10   A.  I do.
11   Q.  And based on McKesson's participation
12 within HDA, this was McKesson's understanding at
13 the time these were published?
14   MS. CHARLES:  Objection.  Form.
15   A.  Sorry, can you ask that again?
16 BY MR. GADDY:
17   Q.  Sure.
18   Based on McKesson's participation
19 within HDA, this sentence right here represents
20 McKesson's understanding at the time these
21 guidelines were published.
22   MS. CHARLES:  Same objection.
23   A.  I'm struggling with McKesson's
24 understanding of what?
25 BY MR. GADDY:

Page 67

1    Q.  The sentence that we just read.
2 McKesson agreed, approved, and signed off on
3 this prior to it being published, correct?
4    A.  Yes, they would have agreed to the --
5 I mean, by consensus this document would have
6 been agreed to, yes.
7    Q.  Also by Cardinal Health?
8    MS. CHARLES:  Objection.
9    A.  Presumably, but I can't speak to that.
10 BY MR. GADDY:
11   Q.  And also by AmerisourceBergen?
12   MS. CHARLES:  Objection.  Beyond the
13 scope.
14   MS. MCCLURE:  Objection.  Form.
15   A.  Presumably.
16 BY MR. GADDY:
17   Q.  If you go to Page 3, do you see the
18 first full paragraph, it says, "With the strong
19 endorsement and expertise of our members, the
20 HDMA has developed the following Industry
21 Compliance Guidelines for preventing diversion
22 and reporting suspicious orders."
23   Do you see that?
24   A.  Yes.
25   Q.  Is it your understanding that McKesson

Page 68

1 strongly endorsed these Industry Compliance
2 Guidelines as the HDMA represents right there?
3    MS. CHARLES:  Objection.  Form.
4    A.  I can't speak to the level of our
5 endorsement.  We would have approved the
6 document being published.
7 BY MR. GADDY:
8    Q.  And you would have approved the
9 document with that language in there
10 representing that the members, which includes
11 McKesson, strongly endorse the document?
12   MS. CHARLES:  Objection.  Form.
13   A.  Yes.
14 BY MR. GADDY:
15   Q.  Same, at this time we know that
16 Cardinal Health was also a member, correct?
17   MS. CHARLES:  Objection.  Form, beyond
18 the scope.
19   A.  Yes.
20 BY MR. GADDY:
21   Q.  And AmerisourceBergen was also a
22 member, correct?
23   MS. CHARLES:  Same objections.
24   A.  Yes.
25 BY MR. GADDY:

Page 69

1    Q.  If you turn to Page 7, do you see in
2 Section II(a), you see that the guidelines speak
3 to "Monitoring for Suspicious Orders"?  Just the
4 title there, II(a).
5    A.  Yes.  Sorry.  "II. Monitoring for
6 Suspicious Orders," yeah.
7    Q.  And if you go about halfway down the
8 paragraph, you see that it says that a
9 distributor must be design and operate a system
10 to disclose to the registrant suspicious orders
11 of controlled substances?
12   Do you see that?
13   A.  Yes.  It's a citation of the CFR.
14   Q.  And again, do you see that HDA added
15 emphasis to several phrases within that
16 sentence?
17   A.  Yes.
18   Q.  And one of those phrases that they
19 added emphasis to was "suspicious orders,"
20 correct?
21   A.  Yes.
22   Q.  Not suspicious customers, correct?
23   MS. CHARLES:  Objection.  Form.
24   A.  It says "suspicious orders."
25 BY MR. GADDY:

Page 70

1    Q.   If we turn to Page 9, do you see
2  there's a section Roman Numeral III in the
3  middle of the page about suspend or stop an
4  order of interest?
5    A.   Yes.
6    Q.   It says there, "If an order meets or
7  exceeds a distributor's threshold, as defined in
8  the distributor's monitoring system, or is
9  otherwise characterized by the distributor as an
10 order of interest, the distributor should not
11 ship the order to the customer, in fulfillment
12 of that order, any units of the specific drug
13 code product as to which the order met or
14 exceeded a threshold or as to which the order
15 was otherwise characterized as an order of
16 interest."
17       Do you see that?
18   A.   Yes, I do.
19   Q.   And specifically as to the second half
20 of that paragraph that starts "should not ship
21 to the customer," HDA chose to underline that
22 section, correct?
23   A.   Yes, it appears so.
24   Q.   And again, this is language that
25 McKesson had the opportunity to review, comment

Page 71

1  on, and object to beforehand if they wanted,
2  correct?
3       MS. CHARLES:  Objection to form.
4    A.   Yeah, we had an opportunity to review
5  and comment on the entire document.
6  BY MR. GADDY:
7    Q.   And this is the -- this would be
8  another section that, according to the HDA, its
9  members strongly endorsed?
10       MS. CHARLES:  Objection.  Form.
11   A.   Yeah, I guess so.
12 BY MR. GADDY:
13   Q.   The last section we're going to look
14 at is on Page 12.  Do you see Section V towards
15 the bottom of the page?
16   A.   Yes.
17   Q.   It says, "Immediate DEA Notification."
18       Do you see that?
19   A.   Yes.
20   Q.   It says, "Under 21 CFR 1301.74(b)" --
21 you understand that to be the regulation that
22 requires distributors to report suspicious
23 orders?
24       MS. CHARLES:  Objection.  Form.
25   A.   I do.

Page 72

1  BY MR. GADDY:
2    Q.   It says under that section, "orders
3  designated as 'suspicious' must be reported to
4  the DEA 'when discovered.'"
5       Do you see that?
6    A.   Yes.
7    Q.   And do you see that that language is
8  in quotations?
9    A.   Yes.
10   Q.   And is it your understanding that that
11 language comes verbatim from the regulation?
12       MS. CHARLES:  Objection.  Form, beyond
13 the scope.
14   A.   I don't know the answer to that.  I
15 would assume so from the plain reading of it,
16 yes.
17 BY MR. GADDY:
18   Q.   And again, this is language that,
19 according to the HDA, McKesson strongly
20 endorsed?
21       MS. CHARLES:  Objection.  Form, beyond
22 the scope.
23   A.   I think HDA said its membership
24 generally endorses it.  I don't think they
25 attributed the endorsement to any individual

Page 73

1  company.
2  BY MR. GADDY:
3    Q.   Fair.
4       Let me show you what I'll mark as
5  Ganley 8.
6       (Whereupon, McKesson-Ganley-008 was
7       marked for identification.)
8    A.   Thank you.
9  BY MR. GADDY:
10   Q.   Do you recognize this document?
11   A.   I do.
12   Q.   Have you seen this before?
13   A.   Yes.
14   Q.   When have you seen it?
15   A.   During preparing for this deposition.
16   Q.   Do you recognize this to be a June 5,
17 2009 letter from the HDA, HDMA at the time, to
18 the DEA?
19   A.   Yes.
20   Q.   And the subject of the letter dealt
21 with a bill that dealt with online pharmacies?
22   A.   Yes.
23   Q.   If you turn to Page 3, second full
24 paragraph, do you see that the HDMA there says,
25 "As the agency is aware, HDMA has expended

Page 74

1  significant resources in the development of its
2  Industry Compliance Guidelines" --
3      A.  Sorry, you said second full paragraph.
4  Okay.  I'm with you.
5      Q.  I'll start over.
6      "As the agency is aware, HDMA has
7  expended significant resources in the
8  development of its 'Industry Compliance
9  Guidelines:  Reporting Suspicious Orders and
10  Preventing Diversion of Controlled Substances.'"
11      That's the document we just looked at,
12  correct?
13      A.  Yes.
14      Q.  It says, "That document does contain
15  guidance on appropriate inquiry to be made to
16  pharmacy customers prior to the shipment of
17  controlled substances, including questions
18  regarding Internet sales."
19      Do you see that?
20      A.  Yes.
21      Q.  Is that McKesson's understanding, that
22  the HDMA expended significant resources to
23  develop that document?
24      MS. CHARLES:  Objection.  Beyond the
25  scope.

Page 75

1      A.  I think "significant resources" is an
2  exaggeration.
3  BY MR. GADDY:
4      Q.  Would this letter, a letter from the
5  HDMA to the DEA, be one that was circulated for
6  review and comment?
7      A.  Yes.
8      Q.  This is a letter that the membership
9  of the HDMA would have had consensus approval on
10  prior to it going out?
11      MS. CHARLES:  Objection.  Form.
12      A.  Yes.
13      MS. CHARLES:  Jeff, we've been going
14  about an hour.  Is this a good time?
15      MR. GADDY:  Sure.
16      THE VIDEOGRAPHER:  We're going off
17  record.  The time is 10:01.
18      (Whereupon, a recess was taken.)
19      THE VIDEOGRAPHER:  Going back on the
20  record beginning at Media File Number 2.  Time
21  is 10:14.
22  BY MR. GADDY:
23      Q.  Mr. Ganley, I'm going to show you
24  what's been marked as Number 9.  Do you
25  recognize this document?

Page 76

1      A.  Yes.
2      (Whereupon, McKesson-Ganley-009, was
3      marked for identification.)
4  BY MR. GADDY:
5      Q.  Is this another document that you had
6  to see in preparation for your testimony today?
7      A.  I believe so.
8      Q.  Do you recognize this as a July 8,
9  2010 letter from HDMA to the DEA?
10      A.  That's what it says, yes.
11      Q.  Do you see in the first paragraph
12  there HDMA says, "The member companies of HDMA
13  are committed to fulfilling their obligations
14  under the CSA, including the maintenance of
15  effective controls to guard against the
16  diversion of controlled substances."
17      Do you see that?
18      A.  I do see it.
19      Q.  Is this another one of the letters
20  that would have been distributed to membership
21  to voice any objections had they so chosen?
22      MS. CHARLES:  Objection to form.
23      A.  Yes.
24  BY MR. GADDY:
25      Q.  If you go down to the second

Page 77

1  paragraph, do you see there it says, "Since
2  2008, HDMA members have been able to utilize the
3  association's 'Industry Compliance Guidelines:
4  Reporting Suspicious Orders and Preventing
5  Division of Controlled Substances' as a template
6  for meeting their obligations under the CSA."
7      Do you see that?
8      A.  I do see it.
9      Q.  So do you see here that HDMA is
10  representing that those Industry Compliance
11  Guidelines that we looked at a few minutes ago
12  can be used by members as a template?
13      MS. CHARLES:  Objection.  Beyond the
14  scope, form.
15      A.  It says, "have been able to utilize
16  them as a template."
17  BY MR. GADDY:
18      Q.  Do you see in the next sentence it
19  says, "This guideline was commended by DEA Chief
20  Counsel Wendy Goggin in an October 17, 2008
21  letter to HDMA"?
22      A.  That's what it says, yes.
23      Q.  We've seen letters from HDMA that
24  indicate, A, that significant resources were
25  used to -- were expended to generate those

Page 78

1    Industry Compliance Guidelines, correct?
2          MS. CHARLES: Objection. Form.
3          A. That's what the letter says, yes.
4    BY MR. GADDY:
5          Q. We've seen that HDMA has represented
6    that its members can use those guidelines as a
7    template to comply with the Controlled Substance
8    Act, correct?
9          MS. CHARLES: Objection to the form.
10         A. That's what this letter says, yes.
11   BY MR. GADDY:
12         Q. And we've also seen correspondence
13   from the HDMA that indicates the DEA has
14   commended the HDMA for the publication of those
15   guidelines, correct?
16         MS. CHARLES: Objection. Form.
17         A. That's what this says.
18   BY MR. GADDY:
19         Q. In 2013, HDMA made a -- added a
20   supplement to those guidelines, is that correct?
21         A. I don't know that I'd characterize it
22   as supplement.
23         Q. How would you characterize it?
24         A. A new header. I don't know. I'm not
25   sure what word I would use to describe. They

Page 79

1    had a statement that accompanied the guidelines.
2          Q. They added a statement to the
3    guidelines?
4          A. Yes.
5          Q. Okay. Other than the addition of a
6    statement, did anything else about the
7    guidelines change?
8          MS. CHARLES: Objection. Beyond the
9    scope.
10         A. I don't believe so.
11   BY MR. GADDY:
12         Q. I'm going to show you what's been
13   marked as Ganley 10.
14         (Whereupon, McKesson-Ganley-010 was
15         marked for identification.)
16         A. Thank you.
17   BY MR. GADDY:
18         Q. Do you recognize this as being the
19   2013 Industry Compliance Guidelines that HDMA
20   published?
21         A. Yes.
22         Q. And would it be fair to say the top
23   three paragraphs are the preamble that was added
24   in 2013 by HDMA?
25         A. Yes, it says -- yes.

Page 80

1          Q. As far as adding this preamble to the
2    guidelines, is this the type of substantive
3    document that would have been circulated by HDMA
4    to its members to give them an opportunity to
5    review, comment, and object?
6          A. Yes.
7          Q. Do you know specifically if this was
8    circulated to McKesson to review, comment and
9    object upon?
10         A. I don't know specifically, but I'm
11   sure it was.
12         Q. And the fact that it was published
13   indicates there were no objections to this final
14   version?
15         MS. CHARLES: Objection. Form.
16         A. It's sort of a hard question to
17   answer. I'm not trying to be difficult or
18   knit-picky. But the way HDA operates when
19   publishing things, as I said, is sort of on this
20   consensus basis. And it's not to say that
21   members might not have an objection to something
22   in the document, but they choose not to sort of,
23   you know, object to the document being
24   published. In other words, you know what I
25   mean? Does that make sense? It's sort of a --

Page 81

1    BY MR. GADDY:
2          Q. Sure.
3          So to clarify my question --
4          A. As consensus as it can be. It doesn't
5    necessarily mean everybody agrees with every
6    part of the document.
7          Q. To clarify my question, would it be
8    fair to say that no member voiced an objection
9    after having the opportunity to do so?
10         A. It would be --
11         MS. CHARLES: Objection. Beyond the
12   scope.
13         A. It would be fair to say that the fact
14   that it was published indicates that nobody
15   objected to it being published.
16   BY MR. GADDY:
17         Q. Based on McKesson's participation
18   within the HDMA, what is your understanding of
19   why this preamble was added to the Industry
20   Compliance Guidelines?
21         A. My understanding is based on the
22   language of the preamble, and --
23         Q. Let me ask it differently, then.
24         Do you have any understanding, or does
25   McKesson have any understanding as to why this

Page 82

1  preamble was added, other than what we see
2  printed in front of us?
3      A.  Well, I think -- I'm not sure I
4  understand the question.  An understanding other
5  than what we see printed in front of us?  I
6  think they're one in the same.
7      Q.  Okay.  Well, so I'll just ask my
8  question again, then.
9          What is McKesson's understanding for
10  why this preamble was added?
11     A.  It was -- my understanding is that it
12  was added to clarify the purpose of the Industry
13  Compliance Guidelines.
14     Q.  Why did HDMA and its members in 2013,
15  five years after they were originally published,
16  feel the need to clarify?
17         MS. CHARLES:  Objection.  Scope.
18         MS. MCCLURE:  Objection.  Form.
19     A.  Again, based on the reading of what's
20  here, they were clarifying that the Industry
21  Compliance Guidelines are not meant to
22  constitute an industry standard.
23  BY MR. GADDY:
24     Q.  That's not my question.
25         My question is, why did they feel the

Page 83

1  need to clarify?
2          MS. CHARLES:  Objection.  Beyond the
3  scope, form.
4          MS. MCCLURE:  Objection.  Form.
5      A.  I don't know.
6  BY MR. GADDY:
7      Q.  Did it have anything to do with the
8  fact that McKesson was being investigated in
9  2013 by the DEA?
10         MS. CHARLES:  Objection.  Beyond the
11  scope.
12     A.  I don't know.
13  BY MR. GADDY:
14     Q.  In the last sentence of the first
15  paragraph it says that these guidelines -- it
16  says, "It was not intended to be, and should not
17  be understood to constitute, an 'industry
18  standard' or statement of the state-of-the-art
19  with regard to individual companies' practices."
20         Do you see that?
21     A.  I see it.
22     Q.  We already know that -- we've already
23  looked at documents where HDMA has indicated
24  that they expended significant resources to
25  compile these guidelines, correct?

Page 84

1      A.  That's what they said.
2      Q.  We've already seen documentation that
3  HDMA suggested that their members could use
4  these guidelines as a template to comply with
5  the Controlled Substance Act, correct?
6          MS. CHARLES:  Objection.  Form.
7      A.  That's what the letter said, yes.
8  BY MR. GADDY:
9      Q.  And we know that HDMA was told in 2008
10  that they were actually commended by the DEA for
11  the guidelines that they published, correct?
12         MS. CHARLES:  Objection.  Form.
13     A.  That's what it said.
14  BY MR. GADDY:
15     Q.  So McKesson has no understanding
16  whatsoever why HDMA and its members felt the
17  need to clarify the purpose of these guidelines
18  in 2013?
19         MS. CHARLES:  Objection.  Form.
20     A.  I think the decision to include this
21  statement was to be clear that it's not meant --
22  that they were not meant to be an industry
23  standard.
24  BY MR. GADDY:
25     Q.  I understand that that's what they

Page 85

1  were trying to make clear with this preamble.
2  Why did they feel the need to make that clear?
3  That's my question.
4          MS. CHARLES:  Objection.  Form.
5  BY MR. GADDY:
6      Q.  And if you don't know, you can tell me
7  you don't know.  But do you know, does McKesson
8  know, you as the person who has testified that
9  you're most knowledgeable about this topic, do
10  you know why the HDMA and its members felt the
11  need in 2013 to clarify what these guidelines
12  were and were not supposed to do?
13         MS. CHARLES:  Objection.  Form, beyond
14  the scope.
15     A.  I don't.
16  BY MR. GADDY:
17     Q.  Were you aware that in 2013 McKesson
18  was being investigated by the DEA for failing to
19  report suspicious orders?
20         MS. CHARLES:  Objection.  Beyond the
21  scope.
22     A.  I am aware, yes.
23  BY MR. GADDY:
24     Q.  Are you aware that as a result of
25  that, McKesson paid a significant -- a

Page 86

1 substantial civil penalty?
2 　　　MS. CHARLES: Same objection, and
3 objection to form.
4 　　　A. I am.
5 BY MR. GADDY:
6 　　　Q. In the last paragraph, the
7 second-to-last sentence says, "In light of
8 passage of time and revised industry practices,
9 HDMA is considering revision of the ICGs."
10 　　　Do you see that?
11 　　　A. Yes.
12 　　　Q. That has not happened, has it?
13 　　　A. I don't believe so, no.
14 　　　Q. These have not been -- these Industry
15 Compliance Guidelines have not been revoked,
16 repealed, or replaced by HDMA, correct?
17 　　　MS. CHARLES: Objection. Beyond the
18 scope.
19 　　　A. I wouldn't agree --
20 　　　MS. MCCLURE: Objection. Form.
21 　　　A. I wouldn't agree with the
22 characterization of revoked or repealed. That's
23 not something HDA would ever do. Things aren't
24 revoked or repealed. There's no -- this wasn't
25 enacted.

Page 87

1 BY MR. GADDY:
2 　　　Q. Okay. To McKesson's understanding,
3 has HDMA ever disavowed these guidelines?
4 　　　MS. MCCLURE: Objection. Form.
5 　　　A. I'm not sure I know what you mean by
6 "disavowed." But, again, disavowing is not
7 something HDA does.
8 BY MR. GADDY:
9 　　　Q. As far as McKesson's understanding,
10 these Industry Compliance Guidelines still
11 represent HDMA's position on this issue?
12 　　　MS. CHARLES: Objection. Form.
13 　　　A. I wouldn't say position on the issue,
14 no. They're guidelines.
15 BY MR. GADDY:
16 　　　Q. And McKesson's understanding is these
17 remain the guidelines of HDMA?
18 　　　A. Yes. These are the HDMA guidelines,
19 yes.
20 　　　Q. Which department within McKesson would
21 have had the ability to review and comment on
22 this preamble before it was added?
23 　　　A. It would have been the public affairs
24 department, and possibly others within the
25 company. But certainly the public affairs

Page 88

1 department would have been the lead, my
2 department.
3 　　　Q. Would Don Walker have had input on
4 that document?
5 　　　A. He probably would have, yes.
6 　　　Q. And he's in Regulatory Affairs,
7 correct?
8 　　　A. Yes.
9 　　　Q. Mike Oriente would have had input on
10 that document?
11 　　　A. He may have, yes.
12 　　　Q. Bruce Russell may have had input on
13 that document?
14 　　　A. Potentially.
15 　　　Q. And those are all individuals within
16 Regulatory Affairs?
17 　　　A. Yes.
18 　　　Q. Now, HDMA also conducts lobbying
19 activity on behalf of its members, correct?
20 　　　A. Yes.
21 　　　Q. And we've already covered that its
22 members -- HDA's membership includes
23 manufacturers and distributors, correct?
24 　　　MS. CHARLES: Objection. Form.
25 　　　A. The membership includes manufacturers

Page 89

1 and distributors, yes.
2 BY MR. GADDY:
3 　　　Q. I'm going to show you what we've
4 marked as Ganley 11.
5 　　　(Whereupon, McKesson-Ganley-011 was
6 　　　marked for identification.)
7 BY MR. GADDY:
8 　　　Q. Do you recognize this document?
9 　　　A. Yes, I do.
10 　　　Q. Okay. Did you have the opportunity to
11 review this in preparation for this deposition
12 today?
13 　　　A. Yes, I believe so.
14 　　　Q. And do you see that this is a
15 November, 2014 e-mail that was forwarded on by
16 Michael Oriente?
17 　　　A. Yes.
18 　　　Q. And he sent the e-mail to Nate Hartle,
19 amongst others, correct?
20 　　　A. Yes, there are a number of recipients.
21 　　　Q. And if you look down, about halfway
22 down the page you see the e-mail that he's
23 forwarding actually comes from HDMA, correct?
24 　　　A. Yes.
25 　　　Q. Second paragraph of the letter, you

Page 90

1  see that they say, "Here at HDMA, we hope the
2  productive exchange of ideas and teamwork will
3  continue throughout the coming year and we look
4  forward to continuing to work together to
5  advocate for your member company interests."
6       Do you see that?
7       MS. CHARLES: Objection. Form.
8    A.  I do see it.
9  BY MR. GADDY:
10   Q.  And is that consistent with McKesson's
11  understanding that one of the things that HDMA
12  did was advocate for its member company
13  interests?
14   A.  Yes, that's what it says here.
15   Q.  Well, I'm asking, is that consistent
16  with McKesson's understanding of one of the
17  things that HDMA does for its members?
18   A.  Yes.
19   Q.  If you turn to Page 3 of the document,
20  and again the page number is up at the top
21  right, do you see this Summary of the 2014 --
22  tell us what that acronym stands for.
23   A.  The SGAC acronym?
24   Q.  Yes.
25   A.  State Government Affairs Committee.

Page 91

1    Q.  Were you -- did you participate on
2  that committee in 2014?
3    A.  For part of 2014 I did, yes.
4    Q.  Do you know if you attended that
5  summer retreat?
6    A.  I don't know when the retreat was. I
7  would have stopped participating in the State
8  Government Affairs Committee in July. I don't
9  know when this meeting was.
10   Q.  Okay. And one of the things, or one
11  of the primary things that the State Government
12  Affairs Committee does is direct state lobbying
13  efforts, correct?
14       MS. CHARLES: Objection. Form.
15   A.  Yes.
16  BY MR. GADDY:
17   Q.  And if we look kind of through the
18  list, there's several kind of questions and
19  answers or topics about -- as it relates to
20  lobbying. Do you see at the bottom of the page
21  it asks, "Are members participating in the
22  desired amount of lobbying efforts?"
23       Do you see that?
24   A.  Yes.
25   Q.  So in addition to HDMA lobbying, it

Page 92

1  expects its members to lobby as well?
2       MS. CHARLES: Objection. Form, beyond
3  the scope.
4    A.  Depending on the issue, yeah.
5  BY MR. GADDY:
6    Q.  If you turn to Page 4, do you see in
7  the first bolded section it asks "How should
8  success be measured in the states?"
9       Do you see that?
10   A.  Yes.
11   Q.  And the first standard that the HDMA
12  lists based out of the discussion of the State
13  Government Affairs Committee for measuring
14  success in the states would be to "Prevent
15  onerous legislation from being enacted."
16       Do you see that?
17       MS. CHARLES: Objection. Form.
18   A.  I do see it.
19  BY MR. GADDY:
20   Q.  And from McKesson's participation
21  within the HDMA, is that McKesson's
22  understanding of one of the goals of the State
23  Government Affairs Committee, is to prevent
24  onerous legislation from being enacted?
25   A.  Yes.

Page 93

1    Q.  And by "onerous legislation," as far
2  as onerous to who, that would be onerous
3  legislation to the wholesale distributors,
4  correct?
5       MS. CHARLES: Objection. Form.
6    A.  I think onerous could mean that and
7  more.
8  BY MR. GADDY:
9    Q.  Okay. Well, they would not want --
10  the members of the HDMA would not want
11  legislation that was onerous to its members, to
12  them, correct?
13       MS. CHARLES: Objection. Form, beyond
14  the scope.
15       MS. MCCLURE: Objection.
16   A.  To distributors, yes.
17  BY MR. GADDY:
18   Q.  And that's McKesson's understanding
19  from their participation within the HDMA, and
20  specifically your participation in the State
21  Government Affairs Committee, true?
22       MS. CHARLES: Objection. Form.
23   A.  When you say that's my understanding,
24  what's "that"? I don't --
25  BY MR. GADDY:

Page 94

1  Q.  McKesson's understanding from your
2  participation within HDMA, and specifically on
3  the State Government Affairs Committee, is that
4  one of McKesson's goals would have been to
5  prevent onerous legislation from being enacted?
6      MS. CHARLES:  Objection.  Form.
7      A.  The goal of the State Government
8  Affairs Committee -- one of the goals of the
9  State Government Affairs Committee is to prevent
10 onerous legislation from being enacted.
11 BY MR. GADDY:
12     Q.  I'm going to show you what I'm going
13 to mark as Ganley 12.
14         (Whereupon, McKesson-Ganley-012 was
15         marked for identification.)
16     A.  Thank you.
17 BY MR. GADDY:
18     Q.  Do you recognize this document?
19     A.  Yes.
20     Q.  And is this a document that you
21 specifically reviewed in preparation for this
22 deposition today?
23     A.  I'm not sure.
24     Q.  But it's an e-mail you've seen?
25     A.  Yes.

Page 95

1      Q.  If you look at the top of the page, do
2  you see this is an e-mail from an employee of
3  HDMA?
4      A.  Yes.
5      Q.  And he's writing to the State
6  Government Affairs Committee?
7      A.  It says to SGAC, yes.  I can't say who
8  is actually in the "To" field.
9      Q.  Is that -- I'm glad you mentioned
10 that.  Is that something that's common now; when
11 you receive e-mails from HDMA, do you generally
12 see who all is receiving the e-mail, or is it a
13 blind copy format, or is it a Listserv, or do
14 you know?
15     A.  It all depends.  And I don't know that
16 there's any particular logic to it, to be honest
17 with you.  I think, as I said to you, sometimes
18 these task forces have lots of members, and so I
19 think for ease or convenience when sending to a
20 large group like that, they use the BCC field.
21     Q.  And it looks like that's what was done
22 in this case, because he sent it to himself?
23     A.  I would assume, yes.
24     Q.  And ended up in McKesson's file?
25     A.  It says "To SGAC," so yes.

Page 96

1      Q.  And the subject of this e-mail is
2  "State Drug Abuse Task Force Chart."
3          Do you see that?
4      A.  Yes.
5      Q.  If you turn to Page 2, you see the
6  front page of the State Drug Abuse Task Force,
7  correct?  Of the chart, I'm sorry.
8      A.  Yes.
9      Q.  What are State Drug Abuse Task Forces?
10         MS. CHARLES:  Objection.  Beyond the
11 scope.
12     A.  So I believe that the states had set
13 up various task forces to look at the drug abuse
14 issue, or to tackle the drug abuse issue, many,
15 many states did that.  And what I believe this
16 to be is sort of a document that captures the
17 activity within those task forces.
18 BY MR. GADDY:
19     Q.  Okay.  Would it be fair to say that
20 McKesson's understanding, based on participation
21 within HDA, of the State Drug Abuse Task Forces
22 is that the general goals of these task forces
23 were to prevent or reduce prescription drug
24 abuse?
25         MS. MCCLURE:  Objection.

Page 97

1          MS. CHARLES:  Objection.  Form.
2      A.  Probably all drug abuse, but yes.
3          And, you know, I can't speak to the
4  mission statement of each one of the different
5  states' Drug Abuse Task Force, but probably
6  prescription drug abuse, and elicit drug abuse,
7  and drug abuse generally.
8  BY MR. GADDY:
9      Q.  That's fair.
10         And McKesson and all other HDMA
11 members via HDA were keeping track of what was
12 going on in those different task forces,
13 correct?
14         MS. CHARLES:  Objection.  Form, beyond
15 the scope.
16     A.  Yes.  Well, let me rephrase.
17         HDA was on behalf of the industry.
18 BY MR. GADDY:
19     Q.  Correct, on behalf of its members?
20     A.  Right.
21     Q.  Which includes McKesson?
22     A.  Right.
23     Q.  Which includes Cardinal Health?
24     A.  Yes.
25     Q.  Which includes AmerisourceBergen?

Page 98

1      MS. CHARLES: Objection to form.
2 BY MR. GADDY:
3     Q. Correct?
4     A. Yes.
5     Q. Which includes Purdue Pharma, correct?
6      MS. CHARLES: Objection. Form.
7     A. Yes.
8 BY MR. GADDY:
9     Q. Which includes Endo, Teva, Johnson &
10 Johnson, Janssen, correct?
11      MS. CHARLES: Objection to form.
12     A. The membership includes those people?
13 BY MR. GADDY:
14     Q. Yes.
15     A. Yes, the membership includes those
16 people.
17     Q. And if you look just here --
18     A. Those manufacturers, though, would not
19 have been on this e-mail, so that's the
20 distinction I'm trying to draw. They don't
21 participate in the SGAC or the FGAC.
22     Q. But they're all members of HDA?
23     A. They're members of HDA.
24     Q. If you just look at the first page
25 here, you see there are several states where

Page 99

1 HDMA's -- under the column of "HDMA Action," it
2 indicates that HDMA is monitoring what's
3 happening with these different task forces?
4     A. That's what it says, yes.
5     Q. Would it be fair to say that one of
6 the reasons that HDMA is monitoring what's
7 happening within these task forces is that they
8 want to be on the lookout for any potential
9 onerous legislation that is proposed out of any
10 of these task forces?
11      MS. CHARLES: Objection. Form, beyond
12 the scope.
13     A. I mean, I think HDA has an interest in
14 understanding what's going on in the task forces
15 for a whole host of reasons. I mean, these are
16 public policy task forces that are going to come
17 up with public policies that impact healthcare
18 in our industry.
19 BY MR. GADDY:
20     Q. And they could come up with
21 legislation that could impact your industry as
22 well?
23      MS. CHARLES: Objection. Form.
24     A. Yeah.
25 BY MR. GADDY:

Page 100

1     Q. Turn to Page 5 for me, please.
2     Does McKesson agree that a state
3 having a drug abuse task force is a good thing?
4      MS. CHARLES: Objection. Beyond the
5 scope.
6     A. Yes.
7 BY MR. GADDY:
8     Q. And you see here on Page 5 there's an
9 entry for the state of New Jersey, correct?
10     A. I don't see New Jersey here. On 5?
11     Q. I'm sorry, look at the number on the
12 top right-hand.
13     A. Sorry.
14     Yes. That's what it says.
15     Q. And under next to "New Jersey" under
16 the column of "Relevance," it says that "On
17 April 29, 2015 Governor Christie signed three
18 bills aimed at preventing prescription drug and
19 opioid abuse, creating more medicine drop-off
20 locations statewide and another establishing a
21 statewide Opioid Law Enforcement Task Force."
22     Do you see that?
23     A. I do see that.
24     Q. Does McKesson agree that bills aimed
25 at preventing prescription drug and opioid abuse

Page 101

1 would be a good thing?
2      MS. CHARLES: Objection. Beyond the
3 scope.
4     A. I wouldn't say -- that's too general
5 to answer.
6 BY MR. GADDY:
7     Q. Okay.
8     A. I mean, you could have a bill that was
9 aimed at preventing prescription drug abuse that
10 was not good, that we didn't think would solve
11 the problem, that we would think would be a bad
12 bill and a different solution. I mean, we are
13 committed to solving the prescription drug abuse
14 problem, but not every bill that has that aim is
15 necessarily -- we would necessarily endorse or
16 agree with.
17     Q. Understood.
18     McKesson agrees that preventing
19 prescription drug and opioid abuse is a good
20 thing, correct?
21     A. Yes. Of course.
22      MS. CHARLES: Objection. Beyond the
23 scope.
24 BY MR. GADDY:
25     Q. Two columns over under "HDMA Action,"

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  do you see where it says, "HDMA will continue to
2  track further legislation that is a result of
3  these recent bills. In addition to possibly new
4  programs, HDMA will monitor how programs are
5  paid for and if it affects our industry."
6      Do you see that?
7      A. Yes.
8      Q. And is this another example of HDMA
9  monitoring potential legislation that may come
10  out of these drug abuse task forces?
11      MS. CHARLES: Objection. Form.
12      A. Yes, it says, "HDMA will continue to
13  track further legislation."
14  BY MR. GADDY:
15      Q. And would it also be fair to say that
16  if it is determined that New Jersey wants
17  wholesale distributors to pay for some of these
18  plans, that would be an example of legislation
19  that would be onerous to the wholesale
20  distributors?
21      MS. CHARLES: Objection. Form, beyond
22  the scope.
23      A. Not necessarily.
24  BY MR. GADDY:
25      Q. But certainly HDMA was going to

Page 103

1  continue tracking to see who was going to have
2  to pay for these programs that Governor Christie
3  was suggesting, correct?
4      MS. CHARLES: Objection. Form, beyond
5  the scope.
6      A. This says, "HDMA will monitor how
7  programs are paid for."
8  BY MR. GADDY:
9      Q. So yes?
10      MS. CHARLES: Same objections.
11      A. That's what it says, yes.
12  BY MR. GADDY:
13      Q. I'm going to show you what I'm going
14  to mark as Ganley 13.
15      (Whereupon, McKesson-Ganley-013 was
16      marked for identification.)
17      A. Thank you.
18  BY MR. GADDY:
19      Q. Do you recognize this document?
20      A. Yes, I do.
21      Q. And is this another document that you
22  reviewed in preparation for this deposition?
23      A. Yes.
24      Q. And do you see this as being an
25  October 24, 2014 e-mail from HDMA?

Page 104

1      A. Yes.
2      Q. And again, it's addressed to the State
3  Government Affairs Committee within HDMA?
4      A. That's correct.
5      Q. And it looks like it attaches an
6  agenda, correct?
7      A. Yes. It says, "Call Agenda and
8  Materials."
9      Q. If you turn the page, you see the
10  agenda, correct?
11      A. I do.
12      Q. And under "State Activity Discussion,"
13  the third item down is "Tennessee ARCOS
14  Reporting"?
15      A. Yes.
16      Q. Turn for me, if you would, please, to
17  Page 39, again using the numbers in the top
18  right-hand corner of the page.
19      A. Okay.
20      Q. And do you see we're -- here we're
21  looking at a chart that lists states and bills
22  that have been proposed in different states?
23      A. Yes.
24      Q. And at the bottom of the page it
25  starts a section entitled "Controlled

Page 105

1  Substance"?
2      A. Yes, it says, "Controlled Substance
3  (Not Scheduling)."
4      Q. If you flip the page to 40, do you see
5  that it addresses two bills within the state of
6  Tennessee?
7      A. Yes.
8      Q. Okay. And the first one, starting the
9  second column from the left, do you see it says,
10  "Suspicious Orders Legislation"?
11      A. The first one?
12      Q. Yes, the one on the top.
13      A. Yes.
14      Q. It says, "Requires wholesalers to take
15  reasonable measures to identify suspicious
16  orders. Any orders greater than 5,000 unit
17  doses of any controlled substance shall assess."
18      Do you see that?
19      A. Yes.
20      Q. Okay. And then over in the right-hand
21  column, do you see the note that was inserted
22  from HDMA?
23      A. Yes.
24      Q. And it indicates that "Was amended to
25  include HDMA language."

Page 106

1    Do you see that?
2    A.  I do.
3    Q.  And based on McKesson's participation
4  within the HDMA, and specifically your
5  participation in the State Government Affairs
6  Committee, would it be McKesson's understanding
7  that HDMA had language inserted into that Texas
8  bill -- I'm sorry, into that Tennessee bill?
9        MS. CHARLES:  Objection.  Form.
10    A.  It's my understanding that the bill
11  was amended to include language that was
12  recommended by HDMA.
13  BY MR. GADDY:
14    Q.  So HDMA actually had a hand in writing
15  the law that was going to directly apply to the
16  wholesale distributors within the state of
17  Tennessee?
18        MS. CHARLES:  Objection.  Beyond the
19  scope, form.
20    A.  I would not agree with that, no.
21  BY MR. GADDY:
22    Q.  This indicates that HDMA had language
23  included in the bill, correct?
24        MS. CHARLES:  Objection.
25  BY MR. GADDY:

Page 107

1    Q.  Can we agree on that?
2        MS. CHARLES:  Same objections.
3    A.  It was amended to include language
4  that HDMA had recommended, yes.
5  BY MR. GADDY:
6    Q.  Okay.  I show you what's been marked
7  as Ganley 14.
8        (Whereupon, McKesson-Ganley-014 was
9        marked for identification.)
10  BY MR. GADDY:
11    Q.  Do you recognize this document?
12    A.  Yes.
13    Q.  And do you recognize this to be a
14  PowerPoint or presentation from the State
15  Government Affairs Annual Meeting in November of
16  2014?
17    A.  That's what it says, yep.
18    Q.  Would you have attended this meeting?
19    A.  I don't believe so.  I'm not positive.
20  I may have, but it would have been after July
21  when I switched over to federal, but...
22    Q.  Can you turn to Page 5 for me, please?
23    A.  Yes.
24    Q.  And do you see the title of the slide
25  here is "HDMA State Government Affairs

Page 108

1  Department - Current."
2        Do you see that?
3    A.  Yes.
4    Q.  It indicates that the current State
5  Government Affairs budget for 2014 was $883,889.
6        Do you see that?
7        MS. CHARLES:  Objection.  Beyond the
8  scope.
9    A.  I see that.
10  BY MR. GADDY:
11    Q.  And is that consistent with your
12  understanding, with McKesson's understanding
13  based on their participation within the HDA?
14        MS. CHARLES:  Objection.  Form.
15    A.  It what consistent, the dollar figure?
16  BY MR. GADDY:
17    Q.  Sure.
18        MS. CHARLES:  Objection.  Form.
19    A.  I wouldn't necessarily have line of
20  sight to what their budget is, but that's what
21  it says.
22  BY MR. GADDY:
23    Q.  And that's not surprising to McKesson,
24  that HDMA has a budget of $883,000 dedicated to
25  State Government Affairs lobbying, correct?

Page 109

1        MS. CHARLES:  Objection.  Form.
2    A.  No.
3  BY MR. GADDY:
4    Q.  And it indicates that there is an
5  additional budget of $235,000 for contract
6  lobbyists, correct?
7    A.  That's what it says.
8    Q.  So over a million dollars at HDMA's
9  disposal to conduct lobbying on behalf of its
10  members within State Government Affairs issues,
11  correct?
12        MS. CHARLES:  Objection.  Form, beyond
13  the scope.
14    A.  I wouldn't agree with the
15  characterization "at their disposal."  It's
16  their budget for the State Government Affairs
17  team.
18  BY MR. GADDY:
19    Q.  Where does their budget come from?
20    A.  The dues of members.
21    Q.  Okay.  All members pay dues?
22        MS. CHARLES:  Objection.  Beyond the
23  scope, form.
24    A.  I believe so.
25  BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  Q. Okay. McKesson certainly pays dues to
2  HDA, correct?
3  A. We do.
4  Q. How much does McKesson pay?
5  A. It's -- I know the total dollar figure
6  we pay to HDA. I don't know what the dues are.
7  Some of it is for conferences and events and
8  stuff, so I haven't seen the breakdown of what
9  the dues are.
10  Q. What's the total dollar figure that
11  McKesson pays to HDA?
12  A. For the most recent year, it was
13  $4 million.
14  Q. What was it the year before that?
15  A. Around $1.5 million.
16  Q. What was it the year before that?
17  A. I don't know the answer to that.
18  Probably -- I don't know. I'd be guessing.
19  Q. Okay. Can you tell me with any
20  accuracy whatsoever the amount that McKesson
21  paid to HDA, other than the 4 million for last
22  year and the 1.5 million for the year before
23  that?
24  A. Can I tell you what the previous years
25  were with any accuracy?

Page 111

1  Q. Yes.
2  A. No.
3  Q. In addition to dues, what are other
4  ways in which McKesson pays money to HDA?
5  MS. CHARLES: Objection. Form.
6  A. There could be a number of different
7  ways. If HDA was going to do a -- you know,
8  participate in a trade show of some kind, there
9  might be an assessment that they would pro rata
10  assess the members to pay for if it was some
11  kind of expense that wasn't anticipated in the
12  budget. If they were going to do any
13  advertising, something like that.
14  BY MR. GADDY:
15  Q. What's your understanding of why --
16  just so I understand, are the payments made on a
17  traditional calendar basis? So when you say
18  "most recent year," would that be $4 million in
19  2017, or is it a fiscal year type concept?
20  A. I don't know whether it's fiscal year
21  or calendar year. But yes, there's an annual
22  bill.
23  Q. Was the $4 million for 2017, is that
24  how you would characterize it, or 2018?
25  A. I think it was 2018.

Page 112

1  Q. Okay. One and a half million in 2017?
2  A. I believe that's right.
3  Q. Why was there an additional two and a
4  half million dollars expended in 2018 that
5  wasn't expended in 2017?
6  A. HDA had expenses related to
7  advertising and public affairs that were outside
8  of the scope of the budget that was originally
9  contemplated.
10  Q. What were the advertising and public
11  affairs expenditures directed to?
12  A. There was a host of things. There was
13  the -- I'm butchering the name of the coalition.
14  They created a coalition called The Alliance
15  Against Opioid Abuse, I believe, that HDA is
16  helping to organize, so a group of stakeholders
17  focused on how to curb public policy solutions
18  to prescription drug abuse.
19  Q. Did the increase of two and a half
20  million dollars in expenditures from 2017 to
21  2018 also have to do with HDA's response to the
22  Washington Post articles that came out in 2017?
23  MS. CHARLES: Objection. Form.
24  A. Yes.
25  BY MR. GADDY:

Page 113

1  Q. Did it also have to do with the
2  60 Minutes episode from CBS that came out in
3  2017?
4  MS. CHARLES: Same objection.
5  A. Yes.
6  BY MR. GADDY:
7  Q. Can you tell us how much of the
8  additional expenditures by McKesson, how much of
9  that two and a half million dollars was related
10  to facilitating HDA's response to the Washington
11  Post articles and the CBS 60 Minutes episodes?
12  MS. CHARLES: Objection. Form.
13  A. I can't. I don't know what is
14  attributable to -- the dues at HDA are
15  calculated on the basis of your annual revenue,
16  so larger members pay more than smaller members.
17  So I can't tell you what percentage of that
18  increase is attributed to public affairs and
19  advertising efforts.
20  BY MR. GADDY:
21  Q. What other members would be in the
22  same category as McKesson as far as size and,
23  therefore, paying more?
24  MS. CHARLES: Objection. Beyond the
25  scope, form.

Page 114

1    A.  I'm not familiar enough with all the
2  revenue numbers for all the members.  But in the
3  same order of magnitude, Cardinal, ABC,
4  certainly.
5    Q.  ABC is AmerisourceBergen?
6    A.  Yes.
7    Q.  If we go back to the document, do we
8  see here that HDMA has an employee obligated to
9  cover state legislation in all 50 states in the
10  country?
11      MS. CHARLES:  Objection.  Beyond the
12  scope.
13    A.  Yes.
14  BY MR. GADDY:
15    Q.  If we turn to the next page --
16    A.  This is not accurate as of now,
17  though.
18    Q.  As far as who is covering what
19  section?
20    A.  Three of these people listed are no
21  longer with HDA.
22    Q.  Okay.
23    A.  And I don't know the size of their
24  State Government Affairs team now.  I believe
25  it's smaller, but it might still be four people.

Page 115

1  I'm not sure.
2    Q.  But it is true --
3    A.  This is as of 2014.
4    Q.  Understand.
5      But it is true that HDMA continues to
6  monitor state legislation in all 50 states?
7      MS. CHARLES:  Objection.  Beyond the
8  scope.
9    A.  Yes, that is true.
10  BY MR. GADDY:
11    Q.  If you turn to Page 6, do you see that
12  it lists kind of an organization or a structure
13  chart there for the State Government Affairs
14  agency?
15    A.  Yes.
16    Q.  And over to the right, do you see that
17  it says, "Currently 158 member company
18  representatives"?
19      Do you see that?
20    A.  Yes.
21    Q.  And would it be consistent with your
22  understanding that that includes both the
23  distributors and the manufacturers who are
24  members of HDMA?
25      MS. CHARLES:  Objection.  Form, beyond

Page 116

1  the scope.
2    A.  I have no idea where they got that
3  number.
4  BY MR. GADDY:
5    Q.  Well, we saw earlier today there's
6  only 36 wholesale distributors that are members
7  of HDMA, correct?
8    A.  That's correct.
9    Q.  And then we also saw earlier today
10  that there are approximately 120 manufacturing
11  members who are members of HDMA, correct?
12    A.  That's correct.  The State Government
13  Affairs Committee would have about six people in
14  the meeting, so I don't know where they get 158
15  member company representatives.
16    Q.  But that's what they say?
17      MS. CHARLES:  Objection.  Beyond the
18  scope.
19    A.  That's what the document says.
20  BY MR. GADDY:
21    Q.  It says that it's representing the
22  interests of 158 company representatives --
23  member company representatives, correct?
24      MS. CHARLES:  Objection.  Form, beyond
25  the scope.

Page 117

1    A.  I don't know what it's saying.  It
2  says, "Currently 158 member company
3  representatives."  I'm saying that's a gross
4  exaggeration.
5  BY MR. GADDY:
6    Q.  If you turn to the next page, Page 7,
7  do you recognize this as being a priority list
8  dashboard?
9    A.  Yes.  It says, "Dashboard Priorities
10  for SGA."
11    Q.  Is this a format that you've seen
12  before in your work with HDMA?
13    A.  Yes.
14    Q.  And the top item that's highlighted is
15  "Controlled Substance Issues."
16      Do you see that?
17    A.  Yes.
18    Q.  And you see that that's listed as a 1
19  for not only SGA, but also FGA, which is Federal
20  Government Affairs?
21    A.  Yes.
22    Q.  Regulatory Affairs next to -- to the
23  right?
24    A.  Yes.
25    Q.  And also public affairs?

Page 118

1    A.  I don't know what "PA" stands for.
2    Q.  Okay.  Well, 1 would be top priority,
3  correct?
4    MS. CHARLES:  Objection.  Beyond the
5  scope.
6    A.  Yeah.
7    MS. CHARLES:  Form.
8    A.  Yes.
9  BY MR. GADDY:
10    Q.  Okay.  And then farther down on the
11  right, for the Education Committee, controlled
12  substance issues are a priority 2, is that
13  correct?
14    A.  Yes, that's what it says.
15    Q.  So it's a top priority for Federal
16  Government Affairs which does federal lobbying,
17  correct?
18    MS. CHARLES:  Objection.  Beyond the
19  scope.
20    A.  Yeah, it's Federal Government Affairs.
21  BY MR. GADDY:
22    Q.  And it's a top priority -- controlled
23  substance issues are a top priority for Federal
24  Government Affairs, correct?
25    MS. CHARLES:  Same objection.

Page 119

1    A.  That's what it says, yes.
2  BY MR. GADDY:
3    Q.  Top priority for State Government
4  Affairs, correct?
5    A.  That's what it says, yes.
6    Q.  Top priority for Regulatory Affairs,
7  correct?
8    MS. CHARLES:  Same objection.
9    A.  That's what it says.
10  BY MR. GADDY:
11    Q.  When it comes to the Education
12  Committee, it's a level 2 priority, correct?
13    MS. CHARLES:  Same objection.
14    A.  That's what this says.
15  BY MR. GADDY:
16    Q.  On Page 8, it refers to the NACDS as a
17  colleague organization.
18    Do you see that?
19    A.  That's what it says.
20    Q.  That stands for the National
21  Association of Chain Drugstores?
22    A.  Yes.
23    Q.  Is McKesson a member of that?
24    A.  We are.
25    Q.  Is Cardinal Health a member of that?

Page 120

1    MS. CHARLES:  Objection.  Beyond the
2  scope.
3    A.  I don't know.
4  BY MR. GADDY:
5    Q.  Is AmerisourceBergen a member of that?
6    MS. CHARLES:  Same objection.
7    A.  I don't know.
8  BY MR. GADDY:
9    Q.  Does NACDS also conduct lobbying
10  activity on behalf of its members?
11    MS. CHARLES:  Same objection.
12    A.  They do conduct lobbying activity,
13  yes.
14  BY MR. GADDY:
15    Q.  Okay.  And do you see here it
16  indicates they also have directors charged with
17  covering the entire 50 states?
18    MS. CHARLES:  Objection.  Form.
19    A.  I think so.  That seems to be what
20  this chart indicates.  But they don't have any
21  names here, so I don't...
22  BY MR. GADDY:
23    Q.  Does McKesson pay money to the NACDS?
24    A.  We pay dues, yes.
25    Q.  How much does McKesson pay to them?

Page 121

1    A.  I think it is several hundred thousand
2  dollars.
3    Q.  Would that be consistent over the last
4  several years?
5    A.  I don't know the answer to that, but I
6  would think it wouldn't have changed much.
7    Q.  Back to the amount of money that
8  McKesson pays to the HDA, going back several
9  years prior to the 4 million and the one and a
10  half million dollar figures that you told me,
11  would their annual contributions to HDA be
12  closer to the one and a half million, or the 4
13  million?
14    MS. CHARLES:  Objection.  Form.
15    A.  They would be closer to the one and a
16  half million, and they would decrease over time
17  as you go backwards, because they're tied to
18  revenue.
19  BY MR. GADDY:
20    Q.  I understand.
21    A.  So as the company has grown, our dues
22  have gone up.  Depending on what time period
23  you're looking at.  If revenue is up, the dues
24  would go up; if revenue was down, the dues would
25  go down.

Page 122

1    Q.  Now, we looked at a State Government
2  Affairs document earlier that discussed the
3  concept of measuring success by preventing the
4  passage of onerous legislation.
5        Do you remember that?
6        MS. CHARLES:  Objection.  Form.
7    A.  It was one of the goals, yes --
8  BY MR. GADDY:
9    Q.  Okay.
10    A.  -- that was listed.  One of many.
11    Q.  And in attempting to meet their goals,
12  would it be fair to say that the HDMA would
13  expect that from time to time there would be
14  particular challenges that they would have to
15  face?
16        MS. CHARLES:  Objection.  Form, beyond
17  the scope.
18    A.  I'm not sure I know what you mean by
19  "challenges."
20  BY MR. GADDY:
21    Q.  Well, let's look at this.  Turn to
22  Page 4 for me, please?
23    A.  Of this document, 14?
24    Q.  You see up at the very top it says
25  "Challenges on the Horizon."

Page 123

1        Do you see that?
2    A.  Yes, that's what it says.
3    Q.  And we're talking about challenges to
4  the State Government Affairs Committee, correct?
5        MS. CHARLES:  Objection.  Beyond the
6  scope.
7    A.  It's in the State Government Affairs
8  document, yes.
9  BY MR. GADDY:
10    Q.  Okay.  And this is a committee that
11  McKesson serves on, correct?
12    A.  Correct.
13    Q.  And the first challenge that it lists
14  that they're going to face is what?
15        MS. CHARLES:  Objection.  Form.
16    A.  I'm not sure it's first, I mean, it's
17  at the top of the bullet list here, but it's
18  "State efforts to address, reduce, prevent Rx
19  abuse and diversion."
20  BY MR. GADDY:
21    Q.  And "Rx" means prescription, right?
22    A.  Yes.
23    Q.  So the first challenge listed here for
24  the State Government Affairs Committee is "State
25  efforts to address, reduce, or prevent

Page 124

1  prescription abuse and diversion."
2        MS. CHARLES:  Objection.  Form.
3  BY MR. GADDY:
4    Q.  Is that correct?
5    A.  That's what it says, yeah.
6    Q.  And that's McKesson's understanding as
7  it relates to its participation within the HDA,
8  and specifically its participation in the State
9  Government Affairs Committee, correct?
10    A.  What's McKesson's understanding?
11    Q.  That this is one of the challenges
12  that HDA was going to face moving forward?
13        MS. CHARLES:  Objection.  Form.
14    A.  Yes, "State efforts to address,
15  reduce, prevent Rx abuse and diversion" was a
16  public policy we were interested in, yes.
17  BY MR. GADDY:
18    Q.  It was a challenge for you, correct?
19        MS. CHARLES:  Objection.  Form.
20  BY MR. GADDY:
21    Q.  That's how it's listed here?
22    A.  This is listed generally, so an
23  individual piece of legislation could pose a
24  challenge, or it could not, depending on what
25  was in the piece of legislation.  So state

Page 125

1  efforts generally.
2    Q.  Now, HDMA also conducts federal
3  lobbying on behalf of its members, correct?
4    A.  Yes.
5        Well, let me just comment on the form.
6  "On behalf of" has implications in the lobbying
7  laws, so I wouldn't say on behalf of.  I would
8  say HDMA conducts federal lobbying representing
9  the issues affecting the industry.
10    Q.  Understood.
11    A.  HDMA is not a lobbyist for McKesson
12  and registered as such under the laws.  There's
13  nuance there.
14    Q.  There's one in particular, one law
15  that's been passed in particular that has gotten
16  a lot of attention.  Agree with that?
17        MS. CHARLES:  Objection to form.
18  Beyond the scope.
19    A.  I'm not sure what law you're talking
20  about.
21  BY MR. GADDY:
22    Q.  You're really not?
23    A.  Related to opioid abuse?
24    Q.  Yes.
25    A.  S. 483, I assume.

Page 126

1    Q.   We talked earlier about the Washington
2    Post article and the CBS 60 Minutes episode, and
3    that was directly related to what you just
4    called S. 483, correct?
5        A.   Yes.
6        Q.   Do you know the name of that bill, or
7    that law?
8        MS. CHARLES:  Objection.  Beyond the
9    scope.
10       A.   The Ensuring Patient Access and
11   Effective Drug Control Act, I think.
12   BY MR. GADDY:
13       Q.   And that's a bill that McKesson
14   actively supported, correct?
15       A.   Yes.
16       Q.   It's a bill that the HDMA actively
17   supported, correct?
18       A.   Yes.
19       Q.   It's a bill that all of HDA members
20   actively supported, correct?
21       MS. MCCLURE:  Objection.
22       MS. CHARLES:  Objection, beyond the
23   scope, form.
24       A.   I don't know the answer to that.
25   BY MR. GADDY:

Page 127

1        Q.   I'm going to show you what's been
2    marked as Ganley 14.
3        (Whereupon, McKesson-Ganley-015 was
4        marked for identification.)
5    BY MR. GADDY:
6        Q.   Do you recognize this as being --
7        MS. CHARLES:  Are we on 14 or 15?  15.
8    BY MR. GADDY:
9        Q.   I'm sorry, 15.
10       Mr. Ganley, do you mind striking
11   through that 14 at the bottom and making it 15
12   for me, please?  Thank you.
13       Do you recognize this document as
14   being a statement from John Gray?
15       A.   That's what it says, yes.
16       Q.   And he's the CEO of HDMA, correct?
17       A.   Yes.
18       Q.   If you turn the page to the top of
19   Page 2, do you see where he says, "I am John
20   Gray, President and CEO of HDMA.  Thank you for
21   the opportunity to discuss with the Subcommittee
22   important legislation introduced by
23   Representatives Blackburn and Marino, the
24   Ensuring Patient Access and Effective Drug
25   Enforcement Act"?

Page 128

1        Do you see that?
2        A.   Yes.
3        Q.   So president and CEO of HDMA advocated
4    directly to Congress for this bill, correct?
5        MS. CHARLES:  Objection.  Form, beyond
6    the scope.
7        A.   Yes.
8    BY MR. GADDY:
9        Q.   From McKesson's point of view, did you
10   have an understanding of the goal of that bill?
11       A.   Yes.
12       Q.   What was that?
13       MS. CHARLES:  Objection.  Beyond the
14   scope.
15       A.   The goal of the bill was to clarify
16   language in the Controlled Substance Act
17   regarding the definition of imminent danger and
18   a corrective action plan.
19   BY MR. GADDY:
20       Q.   The definition of imminent danger
21   would be entirely new language, correct?
22       MS. CHARLES:  Objection.  Beyond the
23   scope, form.
24       A.   Imminent danger was not defined -- is
25   not defined in the Act.

Page 129

1    BY MR. GADDY:
2        Q.   Correct.
3        So it would have been new language,
4    correct?
5        MS. CHARLES:  Same objections.
6        A.   Yes.
7    BY MR. GADDY:
8        Q.   And the corrective action plan would
9    be an entirely new clause in the Act, correct?
10       MS. CHARLES:  Same objections.
11       A.   Yeah, there was an amendment to -- the
12   bill was an amendment to the Controlled
13   Substances Act.
14   BY MR. GADDY:
15       Q.   Did you have direct interaction with
16   any member of Congress regarding this bill?
17       MS. CHARLES:  Beyond the scope.
18       A.   Yes.
19   BY MR. GADDY:
20       Q.   Who did you have interaction with?
21       MS. CHARLES:  Same objection.
22       A.   I'm not sure I could list them all.
23   BY MR. GADDY:
24       Q.   Did you have interaction with
25   Congressman Marino?

Page 130

1      MS. CHARLES: Same objection.
2     A. Yes.
3 BY MR. GADDY:
4     Q. Congresswoman Blackburn?
5      MS. CHARLES: Same objection.
6     A. Yes.
7 BY MR. GADDY:
8     Q. Senator Hatch?
9      MS. CHARLES: Same objection.
10     A. Yes.
11 BY MR. GADDY:
12     Q. Senator Rubio?
13      MS. CHARLES: Same objection.
14     A. Personally, no, not with Senator
15 Rubio.
16 BY MR. GADDY:
17     Q. From your participation within HDMA,
18 is it your understanding that HDMA also would
19 have had contact with many members of Congress
20 regarding this bill?
21     A. Yes.
22      MS. CHARLES: Objection to form.
23 BY MR. GADDY:
24     Q. I'm going to show you what we're going
25 to mark as Number 16.

Page 131

1     (Whereupon, McKesson-Ganley-016 was
2     marked for identification.)
3 BY MR. GADDY:
4     Q. Do you recognize this document?
5     A. Yes.
6     Q. And do you recognize this as being an
7 e-mail from HDMA to several committees within
8 HDMA, including Federal Government Affairs,
9 Regulatory Affairs, and State Government
10 Affairs?
11     A. That's what it says, yes.
12     Q. And do you see down at the bottom of
13 the page here, it looks like a second sentence
14 of that earlier e-mail says, "In light of our
15 continued efforts on Capitol Hill to enact HR
16 471/S 483."
17     Do you see that?
18     A. Yes, I do.
19     Q. And so no doubt this was a bill that
20 HDMA strongly supported?
21      MS. CHARLES: Objection. Form, beyond
22 the scope.
23     A. HDA, or HDMA and then later HDA
24 supported the bill, yes.
25 BY MR. GADDY:

Page 132

1     Q. If you'd flip to Page 3, do you see an
2 agenda that was attached to this e-mail?
3     A. Yes, I do.
4     Q. And you see that one of the items on
5 the agenda, the second bullet point under
6 "Issues," talked about policy options?
7     A. Yes.
8     Q. Turn to Page 7 for me, please. Do you
9 see at the bottom of the Page 7 that HDA
10 indicates in this -- in the bottom block,
11 "Further Clarity in the Controlled Substances
12 Act. Support clarification of terminology in
13 the CSA, particularly the definition of
14 'imminent danger' as well as establishment of a
15 corrective action process."
16     Do you see that?
17     A. Yes, I do.
18     Q. And it says that HDMA actively
19 supports that federal legislation, correct?
20     A. Yes, it does.
21     Q. Is that consistent with your
22 understanding?
23      MS. CHARLES: Objection. Form.
24     A. Yes, it is.
25 BY MR. GADDY:

Page 133

1     Q. From McKesson's perspective relative
2 to its participation with the HDMA, was the
3 purpose of the adding the definition of imminent
4 danger and instituting the corrective action
5 plan, that those items would make it easier or
6 harder for DEA to investigate wholesale
7 distributors?
8      MS. CHARLES: Objection to form.
9     A. Neither.
10 BY MR. GADDY:
11     Q. From McKesson's perspective, based on
12 its participation within the HDMA, would adding
13 those two provisions to the Controlled Substance
14 Act make it easier or harder for the DEA to
15 issue immediate suspicion orders -- excuse me,
16 immediate suspension orders to wholesale
17 distributors?
18      MS. CHARLES: Objection to form.
19     A. I don't know that it would make it
20 easier or harder. It was adding specific
21 language into the bill where a definite -- where
22 a term was undefined.
23 BY MR. GADDY:
24     Q. Let's talk about the imminent danger
25 definition. Correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    A. Right.
2    Q. The corrective action plan, that
3  didn't exist before?
4    A. Right. It was a different regulatory
5  tool. It was written into the law for DEA.
6    Q. Okay. And that tool -- tell me if you
7  agree or disagree, that tool gave any wholesale
8  distributor who was notified that they may have
9  been out of compliance with the Controlled
10  Substance Act, it allowed them 30 days to
11  correct their behavior prior to any immediate
12  suspension order being issued.
13    MS. CHARLES: Objection to form.
14  Beyond the scope.
15    A. No, I would not agree with that
16  characterization of it. It created a corrective
17  action plan system where the wholesaler could
18  submit to the DEA a corrective action plan that
19  would be approved or not.
20  BY MR. GADDY:
21    Q. After they were informed they were out
22  of compliance, they then had an ability to
23  correct their behavior prior to any immediate
24  suspension order being issued, correct?
25    MS. CHARLES: Objection to form.

Page 135

1  Beyond the scope.
2    A. No, that's not correct.
3  BY MR. GADDY:
4    Q. Do you agree that the bill that HDMA
5  was pushing or advocating for and that McKesson
6  was advocating for was amending a law that had
7  previously been used to penalize McKesson?
8    MS. CHARLES: Objection. Form, beyond
9  the scope.
10    A. It was amending the Controlled
11  Substances Act.
12  BY MR. GADDY:
13    Q. And McKesson had previously been
14  penalized on two separate occasions for
15  violating the Controlled Substance Act, is that
16  correct?
17    MS. CHARLES: Objection. Form, beyond
18  the scope.
19    A. I'm not sure I know what "penalized."
20  There were settlements related to the Controlled
21  Substances Act, yes.
22  BY MR. GADDY:
23    Q. Well, McKesson paid a 13 and a half
24  million dollar settlement in 2008, correct?
25    MS. CHARLES: Objection. Beyond the

Page 136

1  scope.
2    A. Yes.
3  BY MR. GADDY:
4    Q. Okay. And that was for violations of
5  the Controlled Substance Act, correct?
6    MS. CHARLES: Objection. Beyond the
7  scope, form.
8    A. It was a settlement. I'm not sure --
9  there was an admission of violations. I don't
10  know the specifics of the settlement. But it
11  was a settlement arising out of the Controlled
12  Substances Act.
13  BY MR. GADDY:
14    Q. Are you not aware that McKesson
15  admitted violations of the Controlled Substance
16  Act pursuant to that agreement?
17    A. I haven't looked at --
18    MS. CHARLES: Objection. Form, beyond
19  the scope.
20    A. I haven't looked at the two
21  settlements.
22  BY MR. GADDY:
23    Q. As you sit here today, you don't know
24  whether or not McKesson has ever admitted that
25  they violated the Controlled Substances Act

Page 137

1  before?
2    MS. CHARLES: Same objections.
3    A. I would have to look at the settlement
4  language. I'd have to review it, which is not
5  something I did in preparation for this.
6  BY MR. GADDY:
7    Q. And you're aware that they paid a
8  $150 million civil penalty in 2016?
9    MS. CHARLES: Same objections.
10    A. Yes.
11    MS. CHARLES: It's been about another
12  hour, so whenever you have a good time.
13    MR. GADDY: Now is fine.
14    THE VIDEOGRAPHER: Going off the
15  record. The time is 11:10.
16    (Whereupon, a recess was taken.)
17    THE VIDEOGRAPHER: Going back on the
18  record beginning of Media File Number 3. Time
19  is 11:21.
20    MR. GADDY: Are we on Number 16?
21    MS. CHARLES: We did 16.
22    MR. GADDY: Thank you.
23    (Whereupon, McKesson-Ganley-017 was
24    marked for identification.)
25  BY MR. GADDY:

Page 138

1  Q. Mr. Ganley, I'm going to show you
2 what's been marked as Number 17.
3  A. Thank you.
4  Q. Do you recognize that document?
5  A. I do.
6  Q. And is this a document that you
7 specifically looked at in preparation for this
8 deposition today?
9  A. It is.
10  Q. And if you start approximately in the
11 middle of the page, you see an e-mail from an
12 employee of HDMA?
13  A. Yes.
14  Q. And this is an e-mail that was
15 received by individuals from Cardinal Health,
16 AmerisourceBergen, and McKesson, including you,
17 correct?
18  A. Correct.
19  Q. Okay. And the subject of this e-mail
20 is "Feedback requested - new proposed language
21 on S. 483," correct?
22  A. That's correct.
23  Q. And as we already discussed, that is
24 the law that HDMA advocated for, that McKesson
25 advocated for, that dealt with the definition of

Page 139

1 imminent danger and the institution of a
2 corrective action plan, correct?
3  MS. CHARLES: Objection to form.
4  A. That's correct.
5 BY MR. GADDY:
6  Q. Okay. And we see there's a line there
7 that says, "Please keep this confidential within
8 your company."
9  Do you see that in the top of the body
10 of the e-mail?
11  A. Top of the body of the e-mail.
12  Q. It's bolded and underlined.
13  A. Oh, yes. Sorry.
14  Q. Below that it says, "Staff from
15 Senators Hatch and Whitehouse spoke with DEA and
16 DOJ on the language changes that were suggested
17 by Endo and Purdue Pharma. I have attached the
18 suggested edit, as well as the introduced
19 language."
20  Do you see that?
21  A. Yes.
22  Q. So Purdue Pharma and Endo were,
23 according to this, suggesting language changes
24 to the bill in question, correct?
25  A. That's correct.

Page 140

1  Q. Okay. If you read down a couple
2 paragraphs, do you see the paragraph that starts
3 "Based on"?
4  A. Yes.
5  Q. It says, "Based on our conversation on
6 what we intend to accomplish with this part of
7 the bill, they have suggested an alternative to
8 the definition of imminent danger in (B)(2). It
9 would read," and then it has a proposed
10 definition of imminent danger.
11  Do you see that?
12  A. Yes.
13  Q. And this potential language that was
14 going to be inserted into this bill was
15 circulated to McKesson, Cardinal Health, and
16 AmerisourceBergen, is that correct?
17  MS. CHARLES: Objection to form.
18  A. It was circulated by HDA, yes.
19 BY MR. GADDY:
20  Q. By HDA to its members, which includes
21 Cardinal Health, McKesson, and
22 AmerisourceBergen, correct?
23  A. Yes.
24  Q. Then on the next page, the very last
25 paragraph, do you see there that the

Page 141

1 representative of HDMA writes, "Please let me
2 know as soon as possible if you have concerns
3 with this new proposed language. I will also be
4 working with our outside counsel to get his
5 feedback."
6  Do you see that?
7  A. Yes.
8  Q. So is HDMA within this e-mail asking
9 for feedback from McKesson, Cardinal Health,
10 AmerisourceBergen on the specific language
11 that's going to be inserted into this proposed
12 bill?
13  MS. CHARLES: Objection to form.
14  A. They're asking for feedback on this
15 language, yes.
16 BY MR. GADDY:
17  Q. Okay.
18  A. Whether it's going to be inserted into
19 the bill at this point remains unclear. This is
20 Endo and Purdue's language that they've sent to
21 Hatch, Hatch has sent to HDA.
22  Q. Well, this is not Endo and Purdue's
23 language. Do you understand that?
24  A. I'm sorry.
25  Q. This is language that's been suggested

Page 142

1 by HDMA and that they're circulating to
2 McKesson, AmerisourceBergen, and Cardinal Health
3 to see if they want to comment on it.
4     Do you see that?
5     A.  No.
6         MS. CHARLES:  Objection to form.
7 BY MR. GADDY:
8     Q.  Well, look at -- turn to Page 3.  This
9 is the edits that were suggested by Endo and
10 Purdue.
11     Do you see that?
12     MR. WEINOGRAD:  Objection.
13     MS. CHARLES:  Objection to form.
14     A.  I don't see that.
15 BY MR. GADDY:
16     Q.  Well, let's go back to the first page
17 of the e-mail.  First paragraph.  "I have
18 attached the suggested edits, as well as the
19 introduced language...for your reference."
20 That's referring to the edits from Endo and
21 Purdue, correct?
22     A.  It's difficult from this document to
23 figure out who wrote these suggested edits.
24 It's unclear to me who wrote the suggested
25 edits.

Page 143

1     Q.  Okay.  Well --
2     A.  I know Endo and Purdue had changes
3 that they wanted to the bill at the last minute,
4 and that they communicated those changes to
5 Hatch's office.  Hatch then went through the
6 process of checking with DEA and DOJ as to
7 whether those changes were acceptable.
8     Q.  Can we agree that in the second
9 paragraph from the bottom there is a proposed
10 language to be inserted into the bill that HDMA
11 circulates to McKesson, AmerisourceBergen, and
12 Cardinal Health for them to review and comment
13 on?
14     A.  Yes.
15     MS. CHARLES:  Objection to form.
16     A.  This is proposed language, yes.  I
17 don't know whose language it is, is what I'm
18 getting at.  I don't know who drafted it.
19 BY MR. GADDY:
20     Q.  I show you what's been marked as
21 Exhibit 18.
22     (Whereupon, McKesson-Ganley-018 was
23     marked for identification.)
24     A.  Thank you.
25 BY MR. GADDY:

Page 144

1     Q.  Do you recognize this as being the law
2 that was ultimately passed?
3     A.  Yes, I believe so.  It says "Public
4 Law," so yes.
5     Q.  If you turn to Page 2, do you see the
6 definition in the middle of the page, there's
7 a -- looks like it's (a)(2), (a)(2), (b)(2)?  Do
8 you see the definition of imminent danger?
9     A.  Yes.
10     Q.  If you look at the last document that
11 you had where we saw the proposed language that
12 was given to McKesson, Cardinal Health, and
13 AmerisourceBergen, does it look like that
14 language made it into the bill?
15     A.  No.
16     Q.  Does it look like the language that
17 made it into the bill that became law is
18 substantially similar to what McKesson,
19 AmerisourceBergen, and Cardinal Health were
20 permitted to comment on?
21         MS. CHARLES:  Objection to form.
22 Beyond the scope.
23     A.  With respect to this definition?
24 BY MR. GADDY:
25     Q.  Sure.

Page 145

1     A.  No.  It's meaningfully different, if
2 I'm looking at the right thing.
3         MS. CHARLES:  It might help to clarify
4 which --
5     A.  You're talking about this section,
6 what is listed on Page 3 of Exhibit 12 -- 17
7 rather.
8 BY MR. GADDY:
9     Q.  No, no, no.  I'm sorry.  I'm talking
10 about the language from the prior page.
11     A.  Sorry.
12     Q.  The language -- if you look at the
13 screen, the language that's labeled C.  If you
14 look at the screen.
15     A.  Sorry.
16     Q.  The language labeled C.
17     A.  Yes.
18     Q.  Did that language makes its way into
19 the final bill as far as the definition of
20 imminent danger, this language that McKesson,
21 Cardinal Health, and AmerisourceBergen were
22 asked to comment on?
23         MS. CHARLES:  Objection to form.
24 Beyond the scope.
25     A.  It's similar, yes.

Page 146

1    MS. CONWAY: Is the record going to
2 reflect what you mean by the language with a C
3 mark next to it?
4    MR. GADDY: I believe so. Yes, it's
5 being recorded.
6    MS. CHARLES: I think that we'll see
7 the video screen. I think the issue is that his
8 version doesn't have the C.
9    Could you just read the language
10 perhaps?
11 BY MR. GADDY:
12    Q. Sure. It's the section that we talked
13 ad nauseam about a few minutes ago. It says,
14 "In this subsection, the phrase 'imminent danger
15 to the public health or safety' means that, due
16 to the failure of the registrant to maintain
17 effective controls against diversion or
18 otherwise comply with the obligations of a
19 registrant under the subchapter, or subchapter 2
20 of this title, there is a substantial likelihood
21 of immediate threat that controlled substances
22 will be diverted for use other than legitimate
23 medical, scientific, or industrial purposes."
24    Are we on the same page, Mr. Ganley?
25    A. Yes.

Page 147

1    Q. And I believe your testimony was that
2 that language substantially made it into the
3 bill that was passed as law?
4    MS. CHARLES: Objection to form.
5    A. This language is the language that was
6 put forward by Hatch, and it's almost identical
7 to the language that's in the law.
8 BY MR. GADDY:
9    Q. It is the language that was circulated
10 to McKesson, Cardinal Health, and
11 AmerisourceBergen for them to comment on prior
12 to it becoming law, correct?
13    MS. CHARLES: Objection to form.
14    A. It was circulated by HDA.
15 BY MR. GADDY:
16    Q. Okay. When you said "Hatch," you're
17 referring to Senator Oren Hatch?
18    A. Yes.
19    Q. Now, we touched on this earlier, but
20 after this bill became law, there was criticism
21 of the law by way of media reports in the
22 Washington Post and on CBS 60 Minutes, correct?
23    MS. CHARLES: Objection. Beyond the
24 scope.
25    A. Yes. There were media reports, yes.

Page 148

1 BY MR. GADDY:
2    Q. I'm going to show you what I will mark
3 as 19.
4    (Whereupon, McKesson-Ganley-019 was
5    marked for identification.)
6 BY MR. GADDY:
7    Q. Do you recognize this as being one of
8 the, I think, two Washington Post articles that
9 were published on the topic of this law?
10    A. Yes, I do.
11    Q. And if you see in the headline there,
12 it says, "The Drug Industry's Triumph Over The
13 DEA."
14    Do you see that?
15    A. That's what it says.
16    Q. It says, "Amid a targeted lobbying
17 effort, Congress weakened the DEA's ability to
18 go after drug distributors, even as
19 opioid-related deaths continue to rise."
20    Do you see that?
21    A. I do.
22    Q. In the first paragraph of the article
23 it says, "In April 2016, at the height of the
24 deadliest drug epidemic in US history, Congress
25 effectively stripped the DEA of its most potent

Page 149

1 weapon against large drug companies suspected of
2 spilling prescription narcotics into the
3 nation's streets."
4    Do you see that?
5    A. I do see that.
6    Q. And is this consistent with some of
7 the criticism that was publicized in the
8 Washington Post and the CBS 60 Minutes episode?
9    MS. CHARLES: Objection to form.
10 Beyond the scope.
11    A. Yes, it's consistent with the
12 criticism.
13 BY MR. GADDY:
14    Q. If you turn to Page 2 and go to the
15 very bottom of the page, it says, "For years,
16 some drug distributors were fined for repeatedly
17 ignoring warnings from the DEA to shut down
18 suspicious sales of hundreds of millions of
19 pills, while they racked up billions of dollars
20 in sales."
21    Do you see that?
22    A. Yes, I see it.
23    Q. In fact, McKesson was twice fined for
24 ignoring warnings from the DEA, is that correct?
25    MS. CHARLES: Objection to form.

Page 150

1 Beyond the scope.
2     A.  I wouldn't agree with the
3 characterization of ignoring warnings.
4 BY MR. GADDY:
5     Q.  Do you agree that McKesson was twice
6 fined for violating the Controlled Substance
7 Act?
8         MS. CHARLES:  Same objections.
9     A.  Again, I'd have to look at the
10 settlements, but they were -- we settled two
11 issues with the DEA, yes.
12 BY MR. GADDY:
13     Q.  You say issues.  Those issues were
14 failing to report suspicious orders of opioids,
15 correct?
16         MS. CHARLES:  Same objections.
17     A.  That was the allegation.
18 BY MR. GADDY:
19     Q.  Well, it's the allegation that
20 McKesson admitted.
21         MS. CHARLES:  Same objection.
22     A.  Again, I'd have to look at the
23 settlement.
24 BY MR. GADDY:
25     Q.  What did you say your title was?

Page 151

1     A.  Vice president of Federal Government
2 Affairs.
3     Q.  As the vice president of Federal
4 Government Affairs, you're sitting here in 2018,
5 and you don't know that McKesson has on two
6 separate occasions admitted to violating the
7 Controlled Substance Act?
8         MS. CHARLES:  Objection to form.
9 Beyond the scope.
10     A.  I don't know specifically what we've
11 admitted.  I haven't reviewed those settlements.
12 BY MR. GADDY:
13     Q.  It goes onto the next page to say,
14 "The new law makes it virtually impossible for
15 the DEA to freeze suspicious narcotic shipments
16 from the companies, according to internal agency
17 and Justice Department documents and an
18 independent assessment."
19         Do you see that?
20     A.  I see it.
21     Q.  Now, we looked earlier at some
22 documents where HDMA was doing some, I guess
23 what I would call offensive lobbying in favor of
24 that particular law, correct?
25         MS. CHARLES:  Objection to form.

Page 152

1     A.  HDA was lobbying in favor of this law,
2 yes.
3 BY MR. GADDY:
4     Q.  Okay.  After these media reports came
5 out, HDMA continued to lobby in support of the
6 bill, and actually defended the bill, correct?
7         MS. CHARLES:  Objection to form.
8 Beyond the scope.
9     A.  It was a law, so they weren't lobbying
10 on it because it was a law.
11         HDA aggressively pushed back on these
12 media reports, yes.
13 BY MR. GADDY:
14     Q.  Okay.  From a public policy
15 perspective, I guess.
16     A.  Public relations perspective.
17     Q.  Thank you.  That's more accurate.
18         I'm going to show you what we'll mark
19 as Exhibit 20.
20         (Whereupon, McKesson-Ganley-020 was
21         marked for identification.)
22 BY MR. GADDY:
23     Q.  Did you have the opportunity to review
24 this document before?
25     A.  I don't believe so.

Page 153

1     Q.  Okay.  Well, do you see that it's an
2 e-mail from HDA in October of last year?
3     A.  Yes.
4     Q.  And you see it attaches a story from a
5 law firm in DC?
6         MS. CHARLES:  Objection to form.
7     A.  I do.
8 BY MR. GADDY:
9     Q.  And if you turn to the second page, do
10 you see another e-mail in this chain from HDA
11 where they indicate they're providing a list
12 that summarizes some of HDA's responses to the
13 60 Minutes and Washington Post articles on
14 opioid abuse?
15     A.  Yes, I do.
16         MS. CHARLES:  Objection to form.
17 BY MR. GADDY:
18     Q.  And if you look on Page 3, do you see
19 those responses by HDMA somewhat summarized?
20         MS. CHARLES:  Objection to form.
21     A.  Somewhat.  They're not really
22 summarized.  They're linked.
23 BY MR. GADDY:
24     Q.  Sure.  Fair.
25         Based on your participation within

Page 154

1  HDMA, is this your, McKesson's, understanding of
2  some of the steps that HDA took to, I think as
3  you said, aggressively respond to some of the
4  reporting that was out there by the Washington
5  Post and CBS?
6       MS. CHARLES:  Objection to form.
7       A.  Yes.
8  BY MR. GADDY:
9       Q.  That response included letters to four
10  separate committees, two House committees and
11  two Senate committees?
12       MS. CHARLES:  Objection to form.
13       A.  Yes.
14  BY MR. GADDY:
15       Q.  It included some media updates.  John
16  Gray, the CEO, wrote a letter to the editor of
17  the Washington Post?
18       A.  He did.
19       Q.  He wrote a viewpoint piece in USA
20  Today?
21       A.  He did.  He was invited to.
22       Q.  Okay.  And there was also advertising
23  that was done by HDA, correct?
24       A.  Yes.
25       Q.  And the advertising included ads on

Page 155

1  the website Politico and website The Hill?
2       A.  Yes.
3       Q.  Would it be fair to say this is where
4  some of the four and a half million dollars that
5  McKesson paid to HDA was used by HDA?
6       MS. CHARLES:  Objection to form.
7  Beyond the scope.
8       A.  Could be.  This was part of the public
9  affairs effort that I referenced earlier.
10  BY MR. GADDY:
11       Q.  I believe, as you referenced earlier,
12  some of that four and a half million dollars
13  went directly to this public affairs effort to
14  respond to the publicity that had been generated
15  by the Washington Post and the CBS 60 Minutes
16  piece?
17       MS. CHARLES:  Objection to form.
18       A.  Yeah, there was a public affairs
19  effort aimed at correcting the inaccuracies of
20  the reporting that was not anticipated in the
21  HDA budget for that year, yes.
22  BY MR. GADDY:
23       Q.  Is McKesson also a member of the an
24  organization referred to as PhRMA, P-H-R-M-A?
25       A.  We are not.

Page 156

1       Q.  Outside of the two we've already
2  discussed, HDA and NACDS, what other trade
3  associations does McKesson pay dues to?
4       A.  I don't think I could give you an
5  exhaustive list for a couple of reasons.  We're
6  members of a number of trade associations, and
7  we publish the larger ones on our website, but
8  I'd have to look at the list to give you all of
9  them.
10       But also, there are smaller trade
11  associations that we may belong to where an
12  individual general manager or somebody in the
13  business has the ability to join a trade
14  association without sort of seeking corporate
15  approval.  So, for example, the guy who runs
16  Boston can, you know, pay $1,000 to join the
17  Boston Chamber of Commerce if he wants to
18  without having to -- because of the dollar
19  figures, he doesn't necessarily have to sort of
20  clear that by anybody.  There's some autonomy in
21  that area.
22       So there's probably hundreds of trade
23  associations, quote unquote, that we pay some
24  kind of dues to.
25       Q.  Okay.

Page 157

1       A.  I mean, I could give you the big ones.
2       Q.  Sure.
3       Does McKesson pay dues for its
4  employees to be members of trade organizations?
5       MS. CHARLES:  Objection.  Beyond the
6  scope.
7       A.  For its employees, no.
8  BY MR. GADDY:
9       Q.  So --
10       A.  If I understand the question
11  correctly.  I mean, the corporate entity would
12  join a trade association, and then individual
13  employees would represent the company working
14  with that trade association.
15       Q.  Okay.  So you gave an example if
16  somebody wanted to be on the Chamber of Commerce
17  in the City of Boston and they had to pay $1,000
18  dollars, that individual would have to pay that
19  out of his pocket -- his or her pocket?
20       A.  No, no.  What I'm saying is if the
21  Chamber of Commerce approached the McKesson
22  business leader for the Boston area and said, we
23  would like McKesson to become a member of the
24  Boston Chamber of Commerce, that business leader
25  would probably not need to get approval to do

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  that because the dollar figures were such --
2  there's different rules within the business as
3  to what kind of expense needs to be approved.
4  If he has budget for joining trade associations
5  and it's $1,000 for McKesson to be a member, you
6  know, he could probably do that without having
7  to seek any additional corporate approval for
8  that.
9        So that's why I'm saying it's hard to
10 say. When you said, tell me a list of all the
11 trade associations, I don't know.
12    Q. Okay. My question is who is writing
13 that check, the individual employee or McKesson?
14    A. In the hypothetical I gave you, it
15 would be McKesson joining the trade association.
16    Q. Let me show you Number 21.
17       (Whereupon, McKesson-Ganley-021 was
18       marked for identification.)
19 BY MR. GADDY:
20    Q. These are the interrogatory responses
21 that McKesson submitted to us.
22       If you'll turn to Page 13 at the
23 bottom.
24    A. Going off the page number at the
25 bottom?

Page 159

1    Q. Yes.
2    A. Okay.
3    Q. And do you see in the very bottom
4  paragraph it indicates that "McKesson has
5  identified certain industry organizations in
6  which McKesson employees have been involved,"
7  and it lists some there.
8       Do you see that?
9    A. Yes.
10    Q. Are you familiar with some of those?
11       (Witness reviewing document.)
12    A. Yes, there's both trade associations
13 here, and then also standards bodies.
14    Q. Okay. And is it your understanding
15 that there are individual employees who are
16 members of these associations, or that it is
17 McKesson as a corporate entity that's a member?
18    A. It's my understanding that McKesson as
19 a corporate entity is involved in these.
20    Q. Does McKesson offer any bonuses or
21 incentives for its employees to be members of
22 any trade associations or committees within
23 trade associations?
24       MS. CHARLES: Objection. Beyond the
25 scope.

Page 160

1    A. Sorry, can you ask me that again?
2  BY MR. GADDY:
3    Q. Sure.
4       So, for example, you serve on the
5  Federal Government Affairs Committee within
6  HDMA. Do you get any bonus or incentive for
7  participating in that committee?
8       MS. CHARLES: Same objection.
9    A. No. It would be nice, though.
10 BY MR. GADDY:
11    Q. If you flip to Page 14, there are a
12 list of industry or trade organizations where
13 they indicate McKesson has made total payments
14 exceeding $50,000.
15       Do you see that?
16    A. I do.
17    Q. Are you able to tell me the amounts
18 paid by McKesson, outside of the ones we've
19 already talked about, the HDMA, that McKesson
20 has made to any of these different entities?
21    A. Some, yes; others, no.
22    Q. Okay. American College of Health Care
23 Administrators?
24    A. I don't know.
25    Q. The Business Roundtable?

Page 161

1    A. I don't know.
2    Q. Health Forum?
3    A. I don't know.
4    Q. HealthIT Now?
5    A. That one I do know. It's $50,000.
6    Q. And that's paid on an annual basis?
7    A. Yes.
8    Q. The Health Industry Distributors
9  Association?
10    A. That is -- the dues -- I don't know
11 the dollar figure, but the dues to that are tied
12 to the revenue of our medical-surgical business.
13    Q. Okay. Is it more than $100,000?
14    A. Probably.
15    Q. More than a million dollars?
16    A. I don't know.
17    Q. The Healthcare Leadership Council?
18    A. I believe that's a quarter of a
19 million.
20    Q. You already told us the HDA.
21       International Federation of
22 Pharmaceutical Distributors?
23    A. I don't know.
24    Q. KLAS Enterprises?
25    A. I don't know.

Page 162

1    Q.   National Electric Manufacturers
2    Association?
3        A.   I don't know.
4        Q.   Pacific Business Group on Health?
5        A.   I don't know.
6        Q.   Senior Care Pharmacy Coalition?
7        A.   I don't know.
8        Q.   State Privacy and Security Coalition?
9        A.   I don't know.
10       Q.   Going up to the bullet point list just
11   above that, there's the HDA Traceability
12   Implementation Workgroup.
13           Do you see that?
14       A.   Yes.
15       Q.   Who within McKesson serves on that?
16       A.   Scott Mooney, among maybe others, but
17   he is our lead.
18       Q.   Okay.  On HDA Federal Government
19   Affairs, other than you, who else serves on
20   that?
21       A.   Claire Brandewie now.
22           And again, "serves on," I'm not trying
23   to be too nuanced, but "serves on" implies some
24   formality.
25       Q.   What should I say?

Page 163

1        A.   Participates in their meetings is the
2    way I would describe it.
3        Q.   Okay.
4        A.   Because if you want the complete list.
5        Q.   Yes, sorry.
6            So if you don't mind, for Federal
7    Government Affairs, tell me who participates in
8    those and what their position is in McKesson.
9        A.   So myself.  Occasionally Pete Sloan,
10   who is the senior vice president of Corporate
11   Public Affairs.  Claire Brandewie, who is a
12   senior manager of Federal Government Affairs and
13   brand new to the company.
14       Q.   Okay.  What about State Government
15   Affairs?
16       A.   It would be the members of our State
17   Government Affairs team.  So it would be -- you
18   want their names?
19       Q.   Yes, please.
20       A.   Chris Vaughan.  It would be Tracy
21   Russell, Matt Ottiger, and Allison Rose.
22       Q.   And there was an individual that you
23   told me her name earlier, Angelica?
24       A.   Angela Grover.
25       Q.   Okay.  Is she with McKesson anymore?

Page 164

1        A.   She is not.
2        Q.   Okay.  Of the people that you just
3    mentioned that serve on -- or sorry, that
4    participate in the State Government Affairs
5    Committee, which of those people that you named
6    would have duties that encompassed the state of
7    Ohio?
8        A.   It would have been Angela Grover
9    before she left the company, and now Matt
10   Ottiger.  O-T-T-I-G-E-R.
11       Q.   Who from McKesson participates in the
12   Regulatory Affairs Committee?
13       A.   There are a number of people that
14   participate in those meetings.  Many of the
15   folks I just mentioned.  There's a significant
16   overlap with the Federal Government Affairs
17   Committee, the State Government Affairs
18   Committee.  There's probably some folks from our
19   Regulatory Affairs team that always participate
20   in those calls.  There may be a lawyer or two
21   who dials in on any given call, depending on the
22   topic, or somebody from a business -- somebody
23   from the US PhRMA business, depending on the
24   topic.
25       Q.   Any names that you haven't already

Page 165

1    mentioned that would also serve in Regulatory
2    Affairs, or participate in the Regulatory
3    Affairs Committee?
4            MS. CHARLES:  Objection to form.
5        A.   Lita Brenna, Nate Hartle, Gary Boggs
6    might participate in those calls, again
7    depending on the topic.  It could be anybody in
8    the law department, depending on the topic.
9    BY MR. GADDY:
10       Q.   Who from McKesson participates in
11   Industry Relations Committee?
12       A.   Scott Mooney is our lead there.
13       Q.   Has McKesson ever been a member of the
14   American Pain Foundation?
15       A.   I don't believe so.
16       Q.   What about the American Academy of
17   Pain Medicine?
18       A.   I don't believe so.
19       Q.   What about the Pain Care Forum?
20       A.   I'm not sure.
21       Q.   Who would be the best person to ask
22   about these?
23       A.   The Pain Care Forum, I assume,
24   probably.
25       Q.   You assume that's who we should ask

Page 166

1  about it is what you're saying, is that right?
2      A.  I mean, we could look it up.  I'm just
3  not aware of whether we're a member of the Pain
4  Care Forum or not.
5      Q.  What about the American Pain Society?
6      A.  I don't believe so.
7      Q.  Is there any department or division
8  within McKesson that's responsible for being --
9  for McKesson being a part of any association or
10 trade organization?
11      MS. CHARLES:  Objection.  Beyond the
12 form -- beyond the scope.
13      A.  Generally, no.  They're autonomous
14 decisions that can be made by individual
15 business units or departments.
16 BY MR. GADDY:
17      Q.  I'm going to show you --
18      A.  We don't have a -- there's not an
19 association department or something like that
20 that would centralize all that.
21      Q.  I show you what's been marked as
22 Ganley 22.
23      (Whereupon, McKesson-Ganley-022 was
24      marked for identification.)
25 BY MR. GADDY:

Page 167

1      Q.  Do you recognize this document?
2      A.  I don't.
3      Q.  Okay.  Do you see it's an e-mail from
4  HDA?
5      A.  Yes.
6      Q.  And if you turn to the second page, do
7  you see that there is a map of the country
8  talking about "2018 State Representation"?
9      Do you see that?
10      A.  Yes.
11      Q.  Are you familiar with this?
12      A.  I'm not.
13      Q.  Okay.
14      A.  I'm trying to figure out what it
15 depicts.
16      Q.  Okay.  What is your -- I'm asking you,
17 do you have an understanding of what this means
18 or what this is representing?
19      A.  I think it's trying to show where
20 different companies have lobbyists.
21      Q.  Okay.  What does it indicate for the
22 state of Ohio?
23      A.  It's a little hard to tell.  I can't
24 tell from the colors.
25      Do you have a color version of it?

Page 168

1      Q.  I don't.
2      A.  It shows that there are four lobbyists
3  there.
4      Q.  Okay.  Well, from your understanding,
5  does McKesson have a lobbyist in Ohio?
6      MS. CHARLES:  Objection to form.
7  Beyond the scope.
8      A.  I believe we do.
9  BY MR. GADDY:
10      Q.  And who would that be?
11      A.  I don't know the answer to that.
12      Q.  Does, from your understanding, does
13 HDA have a lobbyist in Ohio?
14      MS. CHARLES:  Objection.  Beyond the
15 scope.
16      A.  I don't know.  If I'm -- depending on
17 the colors, this seems to indicate they do.
18 BY MR. GADDY:
19      Q.  From your understanding, does Cardinal
20 Health have a lobbyist in Ohio?
21      MS. CHARLES:  Objection.  Beyond the
22 scope.
23      A.  Again, I can't tell from the colors on
24 this, but it looks as if they may.
25 BY MR. GADDY:

Page 169

1      Q.  And from your understanding, does
2  AmerisourceBergen have a lobbyist in Ohio?
3      MS. CHARLES:  Same objection.
4      MS. MCCLURE:  Form.
5      A.  I can't tell.  I don't have any
6  knowledge one way or the other.
7      MR. GADDY:  Okay.  Take a quick break.
8  I might be done.
9      MS. CHARLES:  Sure.
10      THE VIDEOGRAPHER:  Going off record.
11 The time is 11:50.
12      (Whereupon, a recess was taken.)
13      THE VIDEOGRAPHER:  Go back on the
14 record beginning of Media File 4.  Time is
15 11:58.
16      MR. GADDY:  I'll tender the witness.
17      MS. CHARLES:  No questions.
18      MS. MCCLURE:  Before you go off the
19 record, just a request.  In light of the fact
20 there were highly confidential documents used
21 during this deposition, including deposition
22 exhibits from AmerisourceBergen at least,
23 pursuant to the protective order the parties
24 have a certain number of days to designate
25 portions of the transcript as confidential that

Page 170

1  reference those are highly confidential
2  exhibits.  So we're just reiterating our request
3  that in the meantime, of course, the entire
4  transcripts needs to be treated as highly
5  confidential pursuant to the protective order.
6          Any disagreement regarding that?
7          MR. GADDY:  No.
8          MS. CHARLES:  We'll reserve read and
9  sign.
10         Can you read the full amount that we
11 were on the record?
12         THE VIDEOGRAPHER:  Total time on the
13 record is two hours and 24 minutes.
14         MS. CHARLES:  Thank you.
15         THE VIDEOGRAPHER:  This concludes
16 today's deposition.  We are going off the
17 record.  The time is 11:59.
18         (Whereupon, the deposition was
19         concluded.)
20
21
22
23
24
25

Page 171

1  COMMONWEALTH OF MASSACHUSETTS )
2  SUFFOLK, SS.              )
3          I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
4  and Notary Public in and for the Commonwealth of
5  Massachusetts, do certify that on the 27th day
6  of July, 2018, at 9:04 o'clock, the person
7  above-named was duly sworn to testify to the
8  truth of their knowledge, and examined, and such
9  examination reduced to typewriting under my
10 direction, and is a true record of the testimony
11 given by the witness.  I further certify that I
12 am neither attorney, related or employed by any
13 of the parties to this action, and that I am not
14 a relative or employee of any attorney employed
15 by the parties hereto, or financially interested
16 in the action.
17         In witness whereof, I have hereunto
18 set my hand this 31st day of July, 2018.
19
20 _____
21    MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22    Realtime Systems Administrator
23    CSR #149108
24
25

Page 172

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8          After doing so, please sign the
9  errata sheet and date it.  It will be attached
10 to your deposition.
11         It is imperative that you return
12 the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt of
14 the deposition transcript by you.  If you fail
15 to do so, the deposition transcript may be
16 deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

Page 173

1          - - - - - -
              E R R A T A
2          - - - - - -
3  PAGE  LINE  CHANGE
4  ___ ___ _____
5     REASON: _____
6  ___ ___ _____
7     REASON: _____
8  ___ ___ _____
9     REASON: _____
10 ___ ___ _____
11    REASON: _____
12 ___ ___ _____
13    REASON: _____
14 ___ ___ _____
15    REASON: _____
16 ___ ___ _____
17    REASON: _____
18 ___ ___ _____
19    REASON: _____
20 ___ ___ _____
21    REASON: _____
22 ___ ___ _____
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 174

ACKNOWLEDGMENT OF DEPONENT

    I, _____, do Hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
JOSEPH GANLEY        DATE

Subscribed and sworn
To before me this
_____ day of _____, 20____.
My commission expires: _____

_____
Notary Public

Page 175

LAWYER'S NOTES
PAGE  LINE
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____