1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF OHIO
3                 EASTERN DIVISION
4                   -  -  -
5  IN RE:  NATIONAL     :  MDL NO. 2804
   PRESCRIPTION OPIATE :
6  LITIGATION           :
   ----------------------------------------
7                       :  CASE NO.
   THIS DOCUMENT        :  1:17-MD-2804
8  RELATES TO ALL CASES:
                         :  Hon. Dan A.
9                        :  Polster
10                  -  -  -
         Friday, December 14, 2018
11                  -  -  -
12  HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
            CONFIDENTIALITY REVIEW
13
                    -  -  -
14
               Videotaped deposition of
15  ELIZABETH GARCIA, taken pursuant to
    notice, was held at the law offices of
16  Reed Smith LLP, Three Logan Square, 1717
    Arch Street, Suite 3100, Philadelphia,
17  Pennsylvania 19103, beginning at 9:49
    a.m., on the above date, before Amanda
18  Dee Maslynsky-Miller, a Certified
    Realtime Reporter.
19
                    -  -  -
20
21
22
23        GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com

```
 1    APPEARANCES:
 2
 3         BARON & BUDD, P.C.
           BY:  STERLING CLUFF, ESQUIRE
 4         15910 Ventura Boulevard
           #1600
 5         Encino, California 91436
           (818) 839-9698
 6         Scluff@baronbudd.com
 7         - and -
 8         BY:  WILLIAM POWERS, ESQUIRE
           BY:  NOAH RICH, ESQUIRE
 9         600 New Hampshire Avenue NW
           Suite 10A
10         Washington, DC 20037
           Wpowers@baronbudd.com
11         Nrich@baronbudd.com
           Representing the Plaintiffs
12
13
14         REED SMITH LLP
           BY:  SHANNON E. MCCLURE, ESQUIRE
15         BY:  JOSEPH J. MAHADY, ESQUIRE
           BY:  ROBERT A. NICHOLAS, ESQUIRE
16         Three Logan Square
           1717 Arch Street
17         Suite 3100
           Philadelphia, Pennsylvania 19103
18         (215) 851-8100
           Smcclure@reedsmith.com
19         Jmahady@reedsmith.com
           Rnicholas@reedsmith.com
20         Representing the Defendant,
           AmerisourceBergen Drug Corporation
21
22
23
24
```

```
 1    APPEARANCES: (Continued)
 2
 3         JONES DAY
           BY:  RICHARD M. BRODSKY, ESQUIRE
 4         150 West Jefferson Street
           Suite 2100
 5         Detroit, Michigan 48226
           (313) 733-3939
 6         Rbrodsky@jonesday.com
           Representing the Defendant,
 7         Walmart
 8
 9
10         COVINGTON & BURLING LLP
           BY: KEVIN KELLY, ESQUIRE
11         One CityCenter
           850 Tenth Street, NW
12         Washington, DC 20001
           (202) 662-6000
13         Kkelly@cov.com
           Representing the Defendant,
14         McKesson Corporation
15
16
           WILLIAMS & CONNOLLY, LLP
17         BY: ANDREW C. MCBRIDE, ESQUIRE
           725 Twelfth Street, NW
18         Washington, D.C. 20005
           (202) 434-5000
19         Amcbride@wc.com
           Representing the Defendant,
20         Cardinal Health
21
22
23
24
```

```
 1    APPEARANCES:  (Continued)
 2    VIA TELEPHONE/LIVESTREAM:
 3
 4         BARON & BUDD, P.C.
           BY:  SCOTT SIMMER, ESQUIRE
 5         GRETCHEN KEARNEY, OFFICE MANAGER
           EMMA KABOLI, PARALEGAL
 6         600 New Hampshire Avenue NW
           Suite 10A
 7         Washington, DC 20037
           Ssimmer@baronbudd.com
 8         Representing the Plaintiffs
 9
10
           REED SMITH, LLP
11         BY:  ANNE E. ROLLINS, ESQUIRE
           BY:  SAMANTHA L. ROCCHINO, ESQUIRE
12         Three Logan Square
           1717 Arch Street
13         Suite 3100
           Philadelphia, Pennsylvania 19103
14         (215) 851-8100
           Arollins@reedsmith.com
15         Srocchino@reedsmith.com
           Representing the Defendant,
16         AmerisourceBergen Drug Corporation
17
18         BLASINGAME, BURCH, GARRARD &
           ASHLEY, P.C.
19         BY: ALEXANDRA K. HUGHES, ESQUIRE
           440 College Avenue
20         Suite 320
           Athens Georgia 30601
21         (706) 707-3497
           Ahughes@bbga.com
22         Representing the Plaintiff
23
24
```

```
 1    APPEARANCES: (Continued)
 2    VIA TELEPHONE/LIVESTREAM:
 3
 4          ALLEGAERT BERGER & VOGEL LLP
            BY:  DAVID A. BERGER, ESQUIRE
 5          111 Broadway
            20th Floor
 6          New York, New York 10006
            (212) 571-0550
 7          Dberger@abv.com
            Representing the Defendant,
 8          Rochester Drug Corporation
 9
10
            BAILEY & WYANT, PLLC
11          BY: HARRISON M. CYRUS, ESQUIRE
            Suite 600
12          500 Virginia Street East
            Charleston West Virginia 25301
13          (304) 345-4222
            Hcyrus@baileywyant.com
14          Representing the Defendant,
            West Virginia Board of Pharmacy
15
16
17          ARNOLD & PORTER KAYE SCHOLER LLP
            BY: ANGELA R. VICARI, ESQUIRE
18          250 West 55th Street
            New York, New York 10019
19          (212) 836-8000
            Angela.vicari@arnoldporter.com
20          Representing the Defendant,
            Endo Pharmaceuticals
21
22
23
24
```

```
 1    APPEARANCES: (Continued)
 2    VIA TELEPHONE/LIVESTREAM:
 3
 4           CLARK MICHIE, LLP
             BY: CHRISTOPHER J. MICHIE, ESQUIRE
 5           220 Alexander Street
             Princeton, New Jersey 08540
 6           (609) 423-21426
             Chris.michie@clarkmichie.com
 7           Representing the Defendant,
             Pernix Therapeutics Holdings
 8
 9
10           FOX ROTHSCHILD LLP
             BY: ZACHARY MARTIN, ESQUIRE
11           2700 Kelly Road
             Suite 300
12           Warrington, Pennsylvania 18976
             (215) 345-7500
13           Zmartin@foxrothschild.com
             Representing the Defendant,
14           Validus Pharmaceuticals LLC
15
16    ALSO PRESENT:
      Devyn Mulholland, Videographer
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2                 I N D E X
 3                    -   -   -
 4

    Testimony of: ELIZABETH GARCIA
 5
 6      By Mr. Cluff                        12
 7
 8                    -   -   -
 9              E X H I B I T S
10                    -   -   -
11  NO.            DESCRIPTION            PAGE
12  AmerisourceBergen-Garcia
    Exhibit-1     ABDCMDL00364827-830       19
13
    AmerisourceBergen-Garcia
14  Exhibit-2     LinkedIn Profile;
                  Elizabeth Garcia          25
15
    AmerisourceBergen-Garcia
16  Exhibit-3     ABDCMDL00296978-981      109
17  AmerisourceBergen-Garcia
    Exhibit-4     ABDCMDL00333083-085      159
18
    AmerisourceBergen-Garcia
19  Exhibit-5     ABDCMDL00162348-399      166
20  AmerisourceBergen-Garcia
    Exhibit-6     ABDCMDL00364844-851      195
21
    AmerisourceBergen-Garcia
22  Exhibit-7     ABDCMDL00364861-864      235
23  AmerisourceBergen-Garcia
    Exhibit-8     ABDCMDL00141902-903      270
24
```

```
 1                     -   -   -
 2                 E X H I B I T S
 3                     -   -   -
 4   NO.            DESCRIPTION              PAGE
 5   AmerisourceBergen-Garcia
     Exhibit-9     ABDCMDL00306522-525       279
 6
     AmerisourceBergen-Garcia
 7   Exhibit-10    ABDCMDL00282490           312
 8   AmerisourceBergen-Garcia
     Exhibit-11    ABDCMDL00282491           312
 9
     AmerisourceBergen-Garcia
10   Exhibit-12    United States Code -
                   Section 823               395
11
     AmerisourceBergen-Garcia
12   Exhibit-13    Part 1301 - Section 1301.71;
                   Security Requirements
13                 Generally                 409
14   AmerisourceBergen-Garcia
     Exhibit-14    Part 1301 - Section 1301.74;
15                 Other Security Controls for
                   Non-practitioners         419
16
     AmerisourceBergen-Garcia
17   Exhibit-15    WAGMDL00038287-288        437
18   AmerisourceBergen-Garcia
     Exhibit-16    ABDCMDL00296155-180       437
19
     AmerisourceBergen-Garcia
20   Exhibit-17    ABDCMDL00151721-726       453
21   AmerisourceBergen-Garcia
     Exhibit-18    TEVA_MDL_A_02664130-131   464
22
     AmerisourceBergen-Garcia
23   Exhibit-19    ABDCMDL00364852-856       470
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2                E  X  H  I  B  I  T  S

 3                    -   -   -

 4   NO.            DESCRIPTION              PAGE

 5   AmerisourceBergen-Garcia

     Exhibit-20   ABDCMDL00364858             473

 6

     AmerisourceBergen-Garcia

 7   Exhibit-21   ABDCMDL00364857             482

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -

 2                 DEPOSITION SUPPORT INDEX

 3                          -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page     Line          Page Line          Page Line

 7   44       22

 8

 9

10   Request for Production of Documents

11   Page Line     Page Line       Page Line

12   None

13

14

15   Stipulations

16   Page Line     Page Line       Page Line

17   11      1

18

19

20   Question Marked

21   Page Line     Page Line       Page Line

22   None

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -

 2              (It is hereby stipulated and

 3         agreed by and among counsel that

 4         sealing, filing and certification

 5         are waived; and that all

 6         objections, except as to the form

 7         of the question, will be reserved

 8         until the time of trial.)

 9                     -   -   -

10              VIDEO TECHNICIAN:  We are

11         now on the record.  My name is

12         Devyn Mulholland, I'm a

13         videographer for Golkow Litigation

14         Services.  Today's date is

15         December 14th, 2018.  The time is

16         9:49 a.m.

17              This video deposition is

18         being held in Philadelphia,

19         Pennsylvania in the matter of

20         National Prescription Opiate

21         Litigation.  The deponent is

22         Elizabeth Garcia.  Counsel will be

23         noted on the stenographic record.

24         The court reporter is Amanda
```

Highly Confidential - Subject to Further Confidentiality Review

1    Miller and will now swear in the

2    witness.

3              -  -  -

4         ELIZABETH GARCIA, after

5    having been duly sworn, was

6    examined and testified as follows:

7              -  -  -

8         EXAMINATION

9              -  -  -

10   BY MR. CLUFF:

11        Q.    Good morning, Liz.  I'm

12   sorry, do you go by Liz?

13        A.    Liz.

14        Q.    Is it okay if I call you Liz

15   today?

16        A.    (Witness nods.)

17        Q.    Thank you.

18        My name is Sterling.  We met

19   briefly just before we went on the

20   record.  I represent plaintiffs in this

21   case.  I'm taking your deposition today.

22        Before we get started, I

23   just wanted to learn whether or not

24   you've been deposed before?

 1          A.    No.

 2          Q.    No, okay.

 3                So I'm sure you had an

 4    opportunity to prepare for today's

 5    deposition with your lawyers.  I would

 6    just caution you that nothing that you

 7    discussed in that prep should be

 8    discussed here today with me.

 9                But I would like to go

10    through with some rules of the road for a

11    deposition so that we're kind of both

12    clear on what we're going to do today.

13                The first thing is that

14    everything that we're doing today is

15    being recorded by video and by the court

16    reporter here, transcribed.  And so we

17    have to do our best not to talk over each

18    other and to let everybody finish their

19    sentences and to speak clearly.

20                Does that make sense?

21          A.    That makes sense.

22          Q.    And because we're also on

23    video and the court reporter is trying to

24    hear what we're saying, we have to speak

1    audibly, to the best of our ability.  So

2    if you can, you know, project a little

3    bit so she doesn't have to get after us

4    today.

5         A.    Okay.

6         Q.    Okay.  We also -- you know,

7    we want to make sure today that

8    everything is clear for the record.  So

9    at different times during today's

10   deposition I might ask you a question, if

11   you don't understand my question, you can

12   let me know and I can rephrase it or I

13   can clarify what I'm asking.  But

14   otherwise I'll assume that you understood

15   my question if you answer it.

16              Does that make sense?

17        A.    It makes sense.

18        Q.    So we can agree that if you

19   have a question about my question, you're

20   going to ask me?

21        A.    Yes.

22        Q.    All right.  Good.

23              We also want to make sure

24   that you can give accurate and honest and

Highly Confidential - Subject to Further Confidentiality Review

1   complete testimony today.  So I normally

2   wouldn't ask you questions like this, but

3   are you taking any medication that would

4   affect your ability to give truthful

5   testimony?

6          A.    No.

7          Q.    Do you have any medical

8   conditions that might impair your ability

9   to give honest and complete testimony

10  today?

11         A.    No.

12         Q.    Okay.  Your counsel today,

13  Ms. McClure, is going to, at different

14  times, assert what are called objections.

15  I'm sure she discussed this with you.

16  She's entitled, under the law and the

17  deposition protocol, to make her

18  objections.  And we want to make sure she

19  gets a chance to.

20             So after I ask a question,

21  just a little pause, make sure she can

22  get her objection on the record, and then

23  you can proceed to answer.

24             I am entitled to an answer

1    to my question despite Ms. McClure's

2    objections unless I rephrase or withdraw

3    my question or unless she instructs you

4    not to answer.

5              Does that make sense?

6         A.    That makes sense.

7         Q.    We're also going to be

8    discussing matters today that go back

9    quite a while in time.  So I understand

10   you might not have a perfect recollection

11   of the subject matter we're discussing.

12   But I would ask you not to guess, but I

13   am entitled to your best recollection or

14   your best estimate.

15             Does that make sense to you?

16        A.    That makes sense.

17        Q.    So just to clarify a guess

18   versus an estimate, like, you can

19   estimate how long this table is because

20   you've seen it before, but if you've

21   never seen the table before, I would ask

22   you not to guess at the length.

23             Does that make sense?

24        A.    Makes sense.

1    Q.    There may be times when you

2  don't recall an answer.  I'm entitled to

3  see if there is information that might

4  refresh your recollection, whether that

5  be through documents or additional

6  questions.  So if I follow up on a

7  question where you say that you don't

8  know, just understand what I'm trying to

9  do is see if we can refresh your

10  recollection at all.

11            Does that make sense?

12    A.    Okay.

13    Q.    Okay.  I'd like to hand you

14  a document to get started today.  At

15  different points during today's

16  deposition, I'm going to hand you

17  documents that we're going to mark as

18  exhibits to your deposition.

19            And you're always entitled

20  to review the entirety of the document to

21  make sure that you understand it before I

22  question you about it.  So I'll always

23  give you that opportunity.

24            The only caveat I would give

Highly Confidential - Subject to Further Confidentiality Review

1  is that I understand you flew today -- or

2  you flew out from Colorado for today's

3  deposition.  So I'm trying to be

4  conscious of your time and get us all out

5  of here as quickly as possible.

6          So if I can tell you that

7  there's only a portion of a document I'm

8  going to look at, I'm going to reference

9  that, and then you can determine whether

10  or not, after looking at that section,

11  whether you want to proceed having

12  reviewed it or if you need to review the

13  entire document.

14          Does that make sense?

15      A.      That makes sense.

16      Q.      Sometimes this goes faster

17  if we can just focus on a portion of a

18  document.

19          So I'm going to hand you the

20  first document for today, which we're

21  going to mark as Exhibit-1 to your

22  deposition.  It is a document from your

23  personnel file that is Bates stamped

24  numbered ABDCMDL00364827.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 -  -  -

 2              (Whereupon,

 3         AmerisourceBergen-Garcia

 4         Exhibit-1, ABDCMDL00364827-830,

 5         was marked for identification.)

 6                 -  -  -

 7    BY MR. CLUFF:

 8         Q.    And we're going to talk

 9    about this document a little bit more

10    today.

11              MS. MCCLURE:  You get the

12         one with the stamp.

13    BY MR. CLUFF:

14         Q.    But for right now, I just

15    want to focus on, I believe it's the

16    second page of that document -- excuse

17    me, the third page.

18              You'll see down at the

19    bottom of the document, that says Page 3

20    of 4, and the Bates number on the third

21    page is ending in 0364829.

22              Do you see that?

23         A.    Yes.

24         Q.    Why don't you review that
```

1    page and let me know when you've had a

2    chance to review it.

3          A.    Okay.

4          Q.    So you've had a chance to

5    familiarize yourself with that page?

6          A.    Yes.

7          Q.    We're going the talk about

8    this document more, so I'll give you

9    another chance to look at it later in its

10   entirety, but there's really only two

11   sections that I wanted to discuss right

12   now.

13          If you go back to the page

14   just before it, at the very top, do you

15   see -- and just so you're aware, there's

16   a screen in front of you that will show

17   the document that you're looking at in

18   realtime, and sometimes Zach, who is down

19   here at the end of the table next to me,

20   will highlight the portions of it that

21   I'm referencing so you can use both

22   resources.

23          At the top of the page there

24   it says, ABC Core Leadership

1    Competencies, and there's a Roman Numeral

2    II in front of that?

3            A.    Yes.

4            Q.    And it appears that the

5    information on the next page, Page 3, are

6    comments.

7                  Would those comments be

8    about the ABC core leadership

9    competencies?

10           A.    Yes, I believe so.

11           Q.    I want to direct your

12    attention to the last underlined

13    information there at the bottom of that

14    section.  It's, Integrity and trust.

15                 Do you see that?

16           A.    Yes.

17           Q.    It's also on the screen

18    there in front of you.

19                 And these are comments that

20    you would have written, correct?

21           A.    Yes, correct.

22           Q.    And there you say, I am a

23    direct and truthful person and will

24    present the truth in an appropriate and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    helpful manner.
 2           A.    Correct.
 3           Q.    Is that still true today?
 4           A.    Yes.
 5           Q.    And you continue and say, I
 6    can be counted on to take personal
 7    responsibility for whatever happens, even
 8    if a mistake is made.
 9                 Right?
10           A.    Correct.
11           Q.    Is that still true today?
12           A.    Yes.
13           Q.    I want to direct your
14    attention to another section that's
15    midway up the page from there.
16                 It says, Decision capability
17    and quality.
18                 Do you see that?
19           A.    Yes.
20           Q.    Are these also comments that
21    you would have read -- I mean, you would
22    have written?
23           A.    Yes.
24           Q.    And it says there, I am a
```

1    solid decision-maker, taking the time to

2    think through problems and examine the

3    facts before choosing a course of action.

4              Did I read that accurately?

5         A.   Yes.

6         Q.   And would you say that that

7    is still true today?

8         A.   Yes.

9         Q.   You continue and say that

10   your approach is generally methodical in

11   solving problems and you'll examine

12   situations from a variety of perspectives

13   before a final decision is made.

14             Do you see that?

15        A.   Yes.

16        Q.   Is that still true today?

17        A.   Yes.

18        Q.   I noted those two sections

19   because they stood out to me in your

20   file, and I just wanted to understand if

21   we can approach today's deposition within

22   that same framework?

23             MS. MCCLURE:  Objection.

24             THE WITNESS:  Okay.

1    BY MR. CLUFF:

2         Q.    Okay.  So you intend to be

3    honest and appropriate and helpful today?

4         A.    Yes.

5         Q.    Do you intend to take

6    personal responsibility if we determine

7    that there were mistakes made in your job

8    performance?

9              MS. MCCLURE:  Continuing

10        objection.

11             THE WITNESS:  Yes.

12   BY MR. CLUFF:

13        Q.    And we'll -- do you intend

14   to carefully think through the problems

15   and examine the facts before making your

16   answers today?

17             MS. MCCLURE:  Continuing

18        objection.

19             THE WITNESS:  To the best of

20        my ability, yes.

21   BY MR. CLUFF:

22        Q.    Okay.  Thank you.  You can

23   set that aside.

24             Just as a helpful

1    suggestion, at the bottom of that

2    document, you'll note that I put a

3    sticker that says Exhibit-1.  So later

4    during today's deposition I might refer

5    to exhibits as Exhibit-1.  If you can

6    kind of keep them in order, it makes it

7    easier for you.

8         A.    Okay.

9         Q.    So I'd like to hand you

10   another document.  We'll mark this as

11   Exhibit-2.

12             This is a copy from the

13   Internet, that I printed yesterday, last

14   night, of your LinkedIn profile.  I'd

15   like to give you a chance to read through

16   that.  We're going to go through this

17   document in its entirety.  So I want you

18   to go ahead and take your time to review

19   it.

20             -  -  -

21             (Whereupon,

22        AmerisourceBergen-Garcia

23        Exhibit-2, LinkedIn Profile;

24        Elizabeth Garcia, was marked for

```
 1            identification.)

 2                    -  -  -

 3            MR. CLUFF:  I think I gave

 4       you an extra copy.

 5            THE WITNESS:  Okay.

 6  BY MR. CLUFF:

 7       Q.    So I want to start, do you

 8  see on the first page there is some bold

 9  text that says, Experience?

10       A.    Yes.

11       Q.    And underneath that it says,

12  Corporate investigator?

13       A.    Yes.

14       Q.    And underneath that it says,

15  AmerisourceBergen?

16       A.    Yes.

17       Q.    I note the dates there are

18  2012 to 2017.

19       A.    Correct.

20       Q.    Does that indicate that you

21  are no longer employed by

22  AmerisourceBergen?

23       A.    I am no longer employed by

24  AmerisourceBergen.
```

1    Q.    Do you recall when you left

2   AmerisourceBergen?

3    A.    October 2017.

4    Q.    And what was the reason for

5   your departure from AmerisourceBergen?

6    A.    I needed a change.

7    Q.    Is there any particular

8   reason why you needed a change?

9    A.    I needed a break.  I was

10   burned out.

11    Q.    Why were you burned out?

12    A.    Just volume of work.

13    Q.    Any other reasons?

14    A.    I like to shake it up every

15   five years, for professional development.

16    Q.    Did you have any personality

17   conflicts with members of the diversion

18   control team at AmerisourceBergen that

19   prompted your departure?

20    A.    I did not get along with my

21   immediate supervisor.

22    Q.    And who was that?

23    A.    Eric Cherveny.

24    Q.    What was the reason for you

Highly Confidential - Subject to Further Confidentiality Review

1  two not getting along?

2      A.    Personality differences.

3      Q.    When you left

4  AmerisourceBergen, did you sign any

5  documents about your resignation?

6      A.    No.

7      Q.    I'm sorry, I should ask one

8  more question.

9            Did you resign?

10     A.    I resigned.

11     Q.    And did you give notice of

12  your resignation?

13     A.    I gave two weeks' notice.

14     Q.    Who did you give it to?

15     A.    David May.

16     Q.    Did you give it verbally or

17  in a written form?

18     A.    Verbally and written.

19     Q.    And how did you give it in

20  written form?

21     A.    I just said, my last day is

22  effective whatever date it was.

23     Q.    Was that by e-mail or

24  letter, or some other written form?

1      A.    That was by e-mail, I

2  believe.

3      Q.    Did you, in your verbal or

4  written communications with David May

5  about your resignation, give him any

6  explanation about why you were leaving

7  the company?

8      A.    I just told him I needed a

9  change.

10      Q.    Did you discuss the fact

11  that you did not get along with Eric

12  Cherveny?

13          MS. MCCLURE:  Objection to

14      the form.

15          THE WITNESS:  He already

16      knew that.

17  BY MR. CLUFF:

18      Q.    So that's a good example.

19  Shannon is going to have objections and

20  that's appropriate.  Make sure to try to

21  give her a chance, if you can.

22          So I'm going to ask the

23  question, and we'll give her a chance to

24  object, and then you can give me your

1    answer so that we get that clear.

2              Did you discuss the fact

3    that you did not get along with Eric

4    Cherveny when you told David May that you

5    were resigning?

6              MS. MCCLURE:  Objection to

7         form.

8              THE WITNESS:  He already

9         knew that.

10   BY MR. CLUFF:

11        Q.    Why did he know that

12   already?

13        A.    He knew we were having

14   issues.

15        Q.    How did he know?

16        A.    I don't know.

17        Q.    Had you previously advised

18   David May that you were not getting along

19   with your supervisor, Eric Cherveny?

20        A.    I don't recall.

21        Q.    Was it common knowledge at

22   AmerisourceBergen that you and Eric

23   Cherveny did not get along?

24              MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

```
 1                form.
 2                     THE WITNESS:  I don't know.
 3     BY MR. CLUFF:
 4          Q.    Do you know whether Eric
 5     Cherveny may have explained to David May
 6     that the two of you were not getting
 7     along?
 8                     MS. MCCLURE:  Objection to
 9          form.
10                     THE WITNESS:  I don't know.
11     BY MR. CLUFF:
12          Q.    Did you ever discuss with
13     anybody else at AmerisourceBergen the
14     fact that you were not getting along with
15     Eric Cherveny?
16          A.    I don't recall.
17          Q.    You didn't discuss it with
18     any other of the associates that you
19     worked with?
20          A.    I may have, but I don't
21     remember.
22          Q.    If you had discussed it with
23     other associates, who would it have been?
24                     MS. MCCLURE:  Objection to
```

1           form.

2                    THE WITNESS:  Maybe Nikki

3           Seckinger.

4    BY MR. CLUFF:

5           Q.    Do you recall when that --

6    those conversations may have occurred?

7                    MS. MCCLURE:  Objection to

8           form.  Assumes facts not in

9           evidence.

10                   THE WITNESS:  I don't

11          recall.

12   BY MR. CLUFF:

13          Q.    How long did you work with

14   Nikki Seckinger?

15          A.    I believe 2015 to 2017.

16          Q.    Based on your experience

17   working with her, would you say that you

18   two worked closely together?

19                   MS. MCCLURE:  Objection to

20          form.

21                   THE WITNESS:  On numerous

22          projects.

23   BY MR. CLUFF:

24          Q.    Would you consider her to

1    be, like, a work friend or a colleague?

2           A.    A colleague.

3                 MS. MCCLURE:  Objection to

4          form.

5    BY MR. CLUFF:

6           Q.    What kind of information

7    about your personality conflict with Eric

8    Cherveny would you have shared with her,

9    based on your relationship?

10                MS. MCCLURE:  Objection to

11         form.  Speculation.  Assumes facts

12         not in evidence.  Foundation.

13                THE WITNESS:  I don't

14         recall.

15   BY MR. CLUFF:

16          Q.    Do you recall how long --

17   let me back up.  Strike that.

18                To the best of my ability,

19   I've been trying to call the situation

20   with Eric Cherveny, the two of you not

21   getting along.  I'd like to use some

22   shorter words to shorten my question.

23                Are you okay if I call that

24   a personality disagreement, or how would

1    you describe it?

2         A.    Personality disagreement.

3         Q.    Are you all right if I use

4    those words to describe your relationship

5    with Eric Cherveny?

6         A.    Yes.

7         Q.    How long would you say the

8    personality disagreement between you and

9    Eric Cherveny lasted?

10        A.    Two years.

11        Q.    And did those two years

12   coincide with him becoming your direct

13   supervisor?

14             MS. MCCLURE:   Objection to

15        form.

16             THE WITNESS:   He was my

17        direct supervisor at those times.

18   BY MR. CLUFF:

19        Q.    Did you have any personality

20   conflicts with him before he became your

21   direct supervisor?

22        A.    I didn't know him.

23        Q.    During the two years you

24   worked with Eric Cherveny, do you

Highly Confidential - Subject to Further Confidentiality Review

1    remember any particular examples where

2    the two of you did not get along?

3         A.    Just disagreements on

4    projects.

5         Q.    What kind of projects?

6         A.    Trainings, what they look

7    like.

8         Q.    And so what was the

9    substance of the disagreement?

10        A.    He saw it one way and I saw

11   it another way.

12        Q.    Did Eric Cherveny oversee

13   you in all of your job responsibilities,

14   or just training?

15        A.    All of my job

16   responsibilities.

17        Q.    Were there conflicts between

18   you -- or disagreements, excuse me,

19   between you and Eric Cherveny about other

20   aspects of your job responsibilities

21   besides training?

22             MS. MCCLURE:  Objection to

23        form.

24             THE WITNESS:  Repeat the

1          question.

2     BY MR. CLUFF:

3          Q.     Sure.   You -- I'll rephrase

4     it.   We can kind of walk through it.

5               You previously discussed

6     that you and Eric Cherveny had a

7     personality disagreement about trainings;

8     and he wanted it one way and you wanted

9     it another.

10              Does that make sense?

11         A.     Yes.

12         Q.     Okay.   I'm curious about

13    your other job responsibilities.

14              Did you and Eric Cherveny

15    have any personality disagreements about

16    any of your other job responsibilities?

17         A.     I don't recall.

18         Q.     I may ask you later today,

19    when we talk about some of your job

20    responsibilities, whether you had

21    disagreements with Eric Cherveny.  If I

22    do, just understand that that's what I'm

23    asking about, is this sort of personality

24    disagreement topic.

Highly Confidential - Subject to Further Confidentiality Review

1            Does that make sense?

2      A.    Uh-huh.

3      Q.    So I want to go back to your

4  departure from AmerisourceBergen.

5            Do you understand that

6  you're here testifying today as a witness

7  because of your former employment with

8  AmerisourceBergen?

9      A.    I understand.

10     Q.    Do you have an

11 understanding, without disclosing your

12 discussions with counsel, about the

13 allegations in the lawsuit against

14 AmerisourceBergen?

15           MS. MCCLURE:  I'll just

16      counsel you to -- you can't

17      disclose any conversations that we

18      have had in preparation for your

19      deposition.  You can answer that

20      question yes or no.

21           THE WITNESS:  Repeat the

22      question.

23 BY MR. CLUFF:

24     Q.    Sure.

1           MR. CLUFF:  And, Shannon, go

2       ahead and please make the same

3       instruction, so we're clear.

4   BY MR. CLUFF:

5       Q.   I'm asking if you have an

6   understanding, outside of your

7   conversations with counsel, regarding the

8   allegations in the lawsuit against

9   AmerisourceBergen?

10          MS. MCCLURE:  Same

11      instruction, not to disclose

12      conversations with counsel.

13          THE WITNESS:  Yes.

14  BY MR. CLUFF:

15      Q.   Do you have an -- is that

16  understanding your own or is it derived

17  from information you gained from counsel;

18  yes or no?

19      A.   My own understanding.

20      Q.   Okay.  I'd like to

21  understand your understanding, then.

22          What do you understand to be

23  the allegations against

24  AmerisourceBergen?

```
 1        A.    That AmerisourceBergen is

 2   partially responsible for the opioid

 3   crisis.

 4        Q.    Okay.  Do you understand why

 5   AmerisourceBergen is alleged to have been

 6   responsible for the opioid crisis?

 7             MS. MCCLURE:  Objection to

 8        form.

 9             THE WITNESS:  Because

10        they're a distributor.

11   BY MR. CLUFF:

12        Q.    Are there any other reasons?

13        A.    No.

14        Q.    Your lawyers here today that

15   represent you -- let me ask you this

16   question:  The lawyers sitting next to

17   you today, do they represent you in this

18   deposition?

19        A.    Yes.

20        Q.    Are you aware that they also

21   represent AmerisourceBergen?

22        A.    Yes.

23        Q.    Are you paying the lawyers

24   that represent you today to represent you
```

Highly Confidential - Subject to Further Confidentiality Review

1    in this deposition?

2              MS. MCCLURE:  Objection to

3         form.

4              Do you want her to step out,

5         or do you want you and I to step

6         out?

7              MR. CLUFF:  You can make

8         your objection on the record.

9              MS. MCCLURE:  Objection to

10        getting into counsel/client

11        relationship, and I'm going to --

12             MR. CLUFF:  I'm not

13        exploring the counsel/client

14        relationship.  I'm just asking who

15        is paying who to represent.

16        That's not privileged.

17             MS. MCCLURE:  Hold on.

18             Okay.

19             MR. CLUFF:  So I'll restate

20        my question.

21   BY MR. CLUFF:

22        Q.    Are you paying the lawyers

23   that represent you today to represent you

24   in this deposition?

1    A.    No.

2    Q.    Without disclosing any

3 conversations you had with the lawyers

4 that represent you about today's

5 deposition, do you know who is paying the

6 lawyers to represent you today?

7         MS. MCCLURE:  I'm going to

8         counsel the witness that to the

9         extent any understanding of that

10         is derived from conversations with

11         counsel, that she's instructed not

12         to answer.

13 BY MR. CLUFF:

14    Q.    You can answer my question,

15 subject to that limitation.

16    A.    I don't know.

17    Q.    You don't currently work for

18 AmerisourceBergen, right?

19    A.    Correct.

20    Q.    But you're here testifying

21 as an AmerisourceBergen witness?

22    A.    Correct.

23         MS. MCCLURE:  Objection to

24         form.

1    BY MR. CLUFF:

2         Q.    We all three talked over

3    each other, so I'll apologize and we'll

4    try to clean it up.

5              Is AmerisourceBergen paying

6    you to testify today?

7         A.    No.

8         Q.    When you left

9    AmerisourceBergen, did you have a job

10   that you were accepting?

11             MS. MCCLURE:  Objection to

12        form.

13             THE WITNESS:  No.

14   BY MR. CLUFF:

15        Q.    Are you currently employed?

16        A.    No.

17        Q.    Have you received any

18   compensation for being at today's

19   deposition?

20             MS. MCCLURE:  Objection to

21        form.

22             THE WITNESS:  No.

23   BY MR. CLUFF:

24        Q.    I understand that you had to

 1     travel from Colorado to be here today.

 2            Did you pay for your own

 3     travel expenses and lodging while you're

 4     here for this deposition?

 5         A.    No.

 6         Q.    Do you know who paid for

 7     your travel and lodging while you're here

 8     for the deposition?

 9            MS. MCCLURE:  Same

10         instruction, that to the extent

11         your understanding is derived from

12         counsel, then you're instructed

13         not to answer.

14            THE WITNESS:  I don't know

15         exactly who is paying it.  I don't

16         know.

17     BY MR. CLUFF:

18         Q.    Do you recall when you --

19     how did you select the lawyers that are

20     representing you today to defend you in

21     this deposition?

22            MS. MCCLURE:  Objection to

23         form.

24            Hold on a moment.

```
1                     To the extent any of that --

2         any of your response to that

3         question is derived from an

4         understanding or information that

5         you learned from counsel, then

6         you're instructed not to answer.

7                     THE WITNESS:  I can't answer

8         that.

9   BY MR. CLUFF:

10        Q.   Okay.  I'm going to ask you

11  some additional foundation questions.

12                  Did you reach out to Reed

13  Smith and request that they represent you

14  in today's deposition?

15        A.   No.

16                  MS. MCCLURE:  Hold on.

17                  Okay.  You can answer.

18  BY MR. CLUFF:

19        Q.   I believe you answered no,

20  correct?

21        A.   Correct.

22        Q.   So you were first contacted

23  by Reed Smith about representing you in

24  today's deposition?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MS. MCCLURE:  Objection to

2     form.

3          THE WITNESS:  Yes.

4  BY MR. CLUFF:

5     Q.    I mentioned earlier that I'm

6  sure you met with your counsel to prepare

7  for today's deposition.  There's nothing

8  wrong with that, but I'm entitled to

9  understand the scope of your prep without

10  understanding the substance of the prep.

11          Does that make sense?

12     A.    It makes sense.

13     Q.    Okay.  So have you met with

14  your counsel to prepare for today's

15  deposition?

16     A.    Yes.

17     Q.    Do you recall how many times

18  you met, in person, with counsel that are

19  defending you today?

20     A.    Three times.

21     Q.    And do you recall how long

22  each of those meetings was?

23     A.    Three to five hours; three

24  occasions.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Three occasions.

2          And were each of those

3    occasions between three and five hours?

4    A.    Yes.

5    Q.    Did you have additional

6    meetings with your counsel by phone?

7    A.    No.

8    Q.    So all of your preparation

9    was in person?

10   A.    Yes.

11   Q.    I want to go back to this

12   Exhibit-2 that's in front of you.  And I

13   want to turn back to, I believe it's the

14   third page there -- actually, start at

15   the second page at the very bottom, if

16   you can.

17         Do you see there's a

18   category there, Education, and underneath

19   that it says, Northeastern University?

20   A.    Yes.

21   Q.    If you continue on to the

22   fourth page, you can see there's

23   additional educational fields as well.

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Do you see that?

2            MR. CLUFF:  The third page,

3      please, Zach.

4  BY MR. CLUFF:

5      Q.    And so your education

6  appears to start at University of

7  Colorado; is that right?

8      A.    That's correct.

9      Q.    And what year did you

10  complete your degree at the University of

11  Colorado?

12     A.    1992.

13     Q.    And do you recall how long

14  you were enrolled at the University of

15  Colorado?

16     A.    Four years, I believe.

17     Q.    And did you attend the

18  University of Colorado at Boulder, or any

19  other specific school?

20     A.    At Boulder.

21     Q.    So CU Boulder?

22     A.    CU Boulder.

23     Q.    Is there any reason you

24  chose a degree in environmental biology?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. MCCLURE:  Objection to

2       form.

3              THE WITNESS:  It was my

4       strength.

5  BY MR. CLUFF:

6       Q.    If you move up in the

7  education category, I see that you have a

8  degree, a Master's of science from Regis

9  University?

10      A.    Correct.

11      Q.    When did you obtain that

12  degree?

13      A.    2007.

14      Q.    Between 1992 and 2007, I

15  would presume that you were employed,

16  correct?

17      A.    Correct.

18      Q.    All right.  And is there a

19  reason why you chose a Master's in

20  organizational leadership and

21  development?

22             MS. MCCLURE:  Objection to

23      form.

24             THE WITNESS:  No.

1    BY MR. CLUFF:

2         Q.    Is there anything in your

3    work experience that prompted you to seek

4    out a Master's degree in that field?

5         A.    I was working for Regis at

6    the time and it was free.

7         Q.    In what capacity were you

8    working for Regis?

9         A.    As a recruiter and assistant

10   director of marketing, enrollment.

11        Q.    Where is the Regis

12   University campus located?

13        A.    Denver.

14        Q.    And is that, like, a

15   physical campus, or is it more of an

16   online campus?

17        A.    It's a physical and online.

18        Q.    Did you complete your degree

19   at the physical location or online, or a

20   combination of both?

21        A.    A combination, I believe.

22        Q.    And how long did it take you

23   to complete your degree there?

24             MS. MCCLURE:  Objection to

```
 1              form.

 2                   THE WITNESS:  Three or four

 3              years.

 4    BY MR. CLUFF:

 5         Q.    Were you a full-time or

 6    part-time student?

 7         A.    I was a part-time.

 8         Q.    Did obtaining that Master's

 9    Degree further your career with Regis at

10    all?

11                   MS. MCCLURE:  Objection to

12              form.

13                   THE WITNESS:  I don't think

14              so.

15    BY MR. CLUFF:

16         Q.    You didn't receive any

17    promotions or pay raises because of the

18    Master's?

19         A.    No.

20         Q.    Now, if you look at the

21    bottom of Page 2 and the top of Page 3,

22    it looks like your next educational

23    activity is the Master's from

24    Northeastern.
```

1        But I can tell you, from

2   having looked at this online, that, for

3   some reason, the printout cut out your

4   time at Quantico with the FBI.

5        Do you remember that?

6        A.    I do.

7        Q.    On the copy you have, either

8   at the bottom of 2 or top of 3, why don't

9   you write in what you did, just the place

10  you were and the location at Quantico, so

11  we can have that on the record?

12        MS. MCCLURE:  Where Quantico

13        is?

14        MR. CLUFF:  No, not where

15        Quantico is, just that she

16        received some training at

17        Quantico.

18        MS. MCCLURE:  So you want

19        her to write with pen on this

20        document and write the word

21        "Quantico"?

22        MR. CLUFF:  Well, I want her

23        to describe what she did at

24        Quantico.

1    MS. MCCLURE:  On the

2    document or verbally?

3    MR. CLUFF:  On the document.

4    You can tell me verbally,

5    but then I'd like you to make a

6    note about it on the document just

7    so we have an accurate exhibit.

8    Does that make sense?

9    MS. MCCLURE:  So she can

10   write she was at Quantico, if

11   you'd like.  But I'm not going to

12   have her sit here and write on the

13   document about her time at

14   Quantico.

15   You can ask her verbally

16   about that.

17   MR. CLUFF:  I'm not asking

18   her to write me a dissertation

19   about where she was at and what

20   she did.  I just wanted, similar

21   to how it says Northeastern,

22   Master's of science, you can write

23   Federal Bureau of Investigations,

24   Quantico, and if you received any

1     certifications or training.

2           That's all I'm looking for, so

3     that this document accurately

4     reflects your training.

5               Does that make sense?

6               THE WITNESS:  It makes

7     sense.

8               MS. MCCLURE:  So, for the

9     record, the witness has written,

10    FBI, Quantico, VA, for Virginia,

11    dash, diversion investigator, top

12    secret clearance.

13 BY MR. CLUFF:

14    Q.    So at some point in time,

15 you went to Quantico, Virginia, correct?

16    A.    Yes.

17    Q.    And did you obtain any

18 training in Quantico?

19    A.    Yes.

20    Q.    And who did you obtain that

21 training from?

22    A.    Individual?  I don't recall.

23    Q.    Did you receive training

24 from an organization?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    From DEA.

2    Q.    But that was at the FBI

3    headquarters in Quantico?

4    A.    Correct.

5         MS. MCCLURE:  Objection to

6         form.

7    BY MR. CLUFF:

8    Q.    And what time period was

9    that?

10    A.    2004, for four months.

11    Q.    And did you receive any

12    certifications or degrees while you were

13    there?

14    A.    Just a diploma, I believe,

15    for graduating from the training.

16    Q.    And what was the training

17    that you received the diploma for?

18    A.    Diversion investigator.

19    Q.    And that was for your work

20    at the DEA?

21    A.    Correct.

22    Q.    Okay.  So in terms of the

23    timeline, the training you received at

24    Quantico preceded the Master's you

Highly Confidential - Subject to Further Confidentiality Review

1    received at Regis University; is that

2    right?

3         A.    No.  The Master's was

4    started, I believe, in 2001.  Quantico

5    was kind of in between.  And then I

6    completed the Master's around 2006/2007.

7         Q.    Thank you for explaining

8    that timeline.  That's very helpful.

9              And at some point, moving to

10   Page 2 now, at the bottom, there's the

11   degree from Northeastern.  And that's a

12   Master's of science, regulatory affairs;

13   is that correct?

14        A.    Yes, that's correct.

15        Q.    And when did you obtain that

16   degree?

17        A.    2012.

18        Q.    Is there any reason why you

19   obtained that degree?

20             MS. MCCLURE:  Objection to

21        form.

22             THE WITNESS:  I just wanted

23        to make myself more knowledgeable

24        about regulatory affairs.

```
 1    BY MR. CLUFF:

 2         Q.    Why did you want to make

 3    yourself more knowledgeable about

 4    regulatory affairs?

 5         A.    So that maybe I could obtain

 6    a position in that area.

 7         Q.    "In that area" would be the

 8    area of regulatory affairs?

 9         A.    Correct.

10         Q.    Was there a specific

11    position you had your eye on?

12              MS. MCCLURE:  Objection to

13         form.

14              THE WITNESS:  No.

15    BY MR. CLUFF:

16         Q.    Was there any specific

17    industry in which you were interested in

18    joining?

19              MS. MCCLURE:  Objection to

20         form.

21              THE WITNESS:

22         Pharmaceuticals.

23    BY MR. CLUFF:

24         Q.    Why were you interested in
```

1  joining pharmaceuticals?

2      A.    Because I had previous

3  exposure with DEA.

4      Q.    In your experience, did the

5  Master's of science and regulatory

6  affairs assist you in entering the

7  pharmaceuticals industry?

8          MS. MCCLURE:  Objection to

9      form.

10         THE WITNESS:  I don't know.

11  BY MR. CLUFF:

12     Q.    In your work experience in

13  the pharmaceutical industry, did your

14  Master's degree make you more qualified

15  or less qualified than your peers?

16         MS. MCCLURE:  Objection to

17     form.

18         THE WITNESS:  I don't know

19     what their qualifications were.

20  BY MR. CLUFF:

21     Q.    I want to continue up this

22  page and flip over to the first page.

23         We talked, again, earlier,

24  there's a bold heading, Experience.  And

1    if you start at the bottom of Page 1 and

2    continue down to Page 2, it looks like

3    that is a description of your work

4    experience.

5              Does that look accurate?

6              MS. MCCLURE:  Objection to

7         form.

8              THE WITNESS:  Yes.

9    BY MR. CLUFF:

10        Q.    Okay.  Let's start with the

11   position at the bottom of Page 2.  It's

12   identified on that page as, Diversion

13   investigator, Drug Enforcement

14   Administration.

15             Do you see that on the page?

16        A.    Yes.

17        Q.    It's very faint on the copy,

18   it looks like, but it appears that you

19   worked there from 2004 to 2006?

20        A.    Correct.

21        Q.    Do you believe that's an

22   accurate statement of your work history

23   with the DEA?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Earlier, when we discussed

2  your degree from CU Boulder, you said you

3  believed you graduated in 1992; is that

4  right?

5    A.    Yes.

6    Q.    Do you recall what work

7  history or any positions you held from

8  '92 to 2004?

9    A.    Various clerical positions,

10  Regis University as an online recruiter

11  and assistant director, followed by DEA.

12    Q.    The clerical positions, were

13  those with Regis?

14    A.    No.

15    Q.    Those were with a different

16  company?

17    A.    Correct.

18    Q.    What company was that?

19        MS. MCCLURE:  Objection to

20        form.

21        THE WITNESS:  One was Up

22        With People, and then a firm in

23        Denver for meeting planning.

24  BY MR. CLUFF:

1    Q.    The company you mentioned,

2  Up With People, do you recall the time

3  period where you were with them?

4    A.    I believe '96 to '98.

5    Q.    Okay.  And how about the

6  firm in Denver that did the meeting

7  planning?

8    A.    '98.

9    Q.    Do you recall what you were

10 doing for employment prior to '96?

11   A.    I don't recall.

12   Q.    After 1998, do you recall

13 what you were doing for employment?

14   A.    I went to Regis.

15   Q.    And is that when you were

16 the online recruiter and assistant

17 director?

18   A.    Correct.

19   Q.    And what year -- what years

20 did you hold that position at Regis?

21   A.    Which positions?  Just both

22 positions?

23   Q.    I'm sorry.  Is that two

24 different positions?

1      A.    Two different positions.

2      Q.    Which one did you obtain

3  first?

4      A.    The recruiting position.

5      Q.    And how long were you in

6  recruiting?

7      A.    1999 to 2002, I think.

8      Q.    And then you also mentioned

9  an assistant director position.

10      A.    Yes.

11      Q.    When did you become the

12  assistant director?

13      A.    I believe 2002 to 2004.

14      Q.    And you left the assistant

15  director position to join the DEA?

16      A.    Correct.

17      Q.    Did you go through an

18  application process to join the DEA?

19      A.    Yes.

20      Q.    What was that application

21  process like?

22          MS. MCCLURE:  Objection to

23      form.

24          THE WITNESS:  Apply,

1    interview, background

2    investigation, going to Quantico.

3  BY MR. CLUFF:

4        Q.    Do you remember who you

5  interviewed with?

6        A.    I don't recall.

7        Q.    Do you recall if you had

8  more than one interview, or multiple

9  interviews?

10        A.    I believe I had one

11  interview.

12        Q.    Where was the interview, if

13  you recall?

14        A.    Denver.

15        Q.    You said a background

16  investigation.

17              Do you have any recollection

18  of who conducted the background

19  investigation?

20        A.    I do not.

21        Q.    You also mentioned going to

22  Quantico.

23              Was that part of the

24  application process?

1        A.    That was part of the
2    training after acceptance.
3        Q.    So you obtained the
4    position, and then you went to Quantico
5    to receive training; is that accurate?
6        A.    Correct.
7        Q.    Do you remember what field
8    office of the DEA you joined when you
9    became a diversion investigator?
10       A.    Los Angeles.
11       Q.    And where were you stationed
12    while you worked for the DEA?
13       A.    Los Angeles.
14       Q.    Is that a correct
15    terminology, "stationed," or is there a
16    better terminology?
17       A.    That's fine.
18       Q.    Do you recall who you
19    reported to in Los Angeles when you
20    worked for the DEA?
21       A.    I do not.
22       Q.    Aside from the training at
23    Quantico, did you receive any other
24    training to conduct your job

1  responsibilities as a diversion

2  investigator?

3        MS. MCCLURE:  Objection to

4     form.

5        THE WITNESS:  Just what we

6     were learning out in the field.

7  BY MR. CLUFF:

8     Q.    During the four months at

9  Quantico, what kind of training did you

10  receive?

11    A.    Audit training, computer

12  training and CIC.  We learned about the

13  supply chain, closed system of

14  diversion -- or closed system of supply

15  chain.  And the different classes of

16  business.

17    Q.    You mentioned audit

18  training?

19    A.    Yes.

20    Q.    So aside from those

21  trainings that you just mentioned, was

22  there any other training you received at

23  Quantico?

24    A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall the names of

2  any of your instructors while you were at

3  Quantico?

4    A.    I do not.

5    Q.    So you mentioned audit

6  training.

7          What kind of audit training

8  did you get?

9    A.    Going into a place of

10 business and looking at records and

11 inventories.

12   Q.    And how did that relate to

13 auditing?

14   A.    Just making sure that the

15 records lined up with pill counts.

16   Q.    And why would you, as a DEA

17 investigator, be auditing records and

18 pill counts?

19         MS. MCCLURE:  Objection to

20    form.

21         THE WITNESS:  That's just

22    part of the position.

23 BY MR. CLUFF:

24   Q.    Is there any regulation

1    that, as a DEA agent, you would have been

2    enforcing or working under that would

3    have required you to audit records and

4    pill counts?

5              MS. MCCLURE:  Objection to

6         form.

7              THE WITNESS:  Just making

8         sure they're in compliance with

9         the regulations.

10   BY MR. CLUFF:

11        Q.    Which regulations?

12        A.    Whatever is outlined in 21

13   C.F.R. Part 1300.

14        Q.    Is that the group of

15   regulations that you were enforcing as a

16   DEA agent?

17        A.    Correct.

18        Q.    Are those also the

19   regulations that the companies you would

20   have been auditing were governed by?

21        A.    Correct.

22        Q.    Based on your experience --

23   let me clarify.

24              Based on your experience as

1  an investigator, would 21 C.F.R. 1300 be

2  the group of regulations that governed

3  the companies you were auditing?

4          A.    Correct.

5          Q.    You also -- did you -- when

6  you were being trained on auditing, did

7  you ever receive training about how to

8  audit shipping records?

9              MS. MCCLURE:  Objection to

10         form.

11             THE WITNESS:  I don't

12         recall.

13  BY MR. CLUFF:

14         Q.    Do you ever recall, as a DEA

15  investigator, looking at shipping

16  records?

17         A.    I do not.

18         Q.    Are you familiar with the

19  term "ARCOS"?

20         A.    Yes.

21         Q.    What is your understanding

22  of ARCOS?

23         A.    ARCOS is purchases, made by

24  registrants, of Schedule I and II and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    III.
 2            Q.    And did you receive any
 3    training about ARCOS when you were a DEA
 4    investigator?
 5            A.    I don't recall.
 6            Q.    You mentioned computer
 7    training while you were at Quantico.
 8                  What kind of training did
 9    you receive there?
10            A.    That was NCIC, the National
11    Crime Database.
12            Q.    So the computer training was
13    about NCIC, right?
14            A.    Correct.
15            Q.    And what training did you
16    receive about NCIC?
17            A.    Researching targets.
18            Q.    What do you mean when you
19    say "targets"?
20            A.    Researching possible
21    criminal activity.
22            Q.    Who would the criminals be
23    that you were targeting?
24                  MS. MCCLURE:  Objection to
```

1          form.

2                    THE WITNESS:  Various

3          backgrounds.

4     BY MR. CLUFF:

5          Q.    What kind of backgrounds?

6          A.    Marijuana, cocaine

7     traffickers; drug traffickers.

8          Q.    You talked about being

9     trained on the classes of businesses?

10         A.    Yes.

11         Q.    What kinds of classes of

12    businesses were you trained about?

13         A.    Importers, exporters,

14    chemical manufacturers, distributors,

15    pharmacies.

16         Q.    How about just, like,

17    manufacturers in general that don't

18    necessarily make chemicals?

19               Does that make sense?

20         A.    Yes.

21               Yes.

22         Q.    So you mentioned importers,

23    exporters, chemical manufacturers,

24    distributors and pharmacies.  And we also

1    mentioned manufacturers, you and I.

2              Were doctors ever a part of

3    the classes of businesses you were

4    trained on?

5         A.    No.

6         Q.    I want to circle back to the

7    NCIC training.  You mentioned targets.

8              Were importers ever targets

9    that you were trained about?

10        A.    I don't recall.

11        Q.    Were exporters ever targets

12   that you were trained about?

13        A.    I don't recall.

14        Q.    How about chemical

15   manufacturers, were those targets you

16   were trained about?

17        A.    Possibly, yes.

18        Q.    What training did you

19   receive about chemical manufacturers as

20   targets?

21        A.    If they were compliant with

22   List 1 and List 2 regulations.

23        Q.    What are the List 1 and List

24   2 regulations for chemical manufacturers?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I don't remember.

2          Q.    Do you have a general

3    recollection of why you would be

4    targeting chemical manufacturers for

5    compliance with List 1 and List 2

6    regulations?

7               MS. MCCLURE:  Objection to

8          form.

9               THE WITNESS:  Maybe one

10         chemical was pseudoephedrine at

11         the time.

12   BY MR. CLUFF:

13         Q.    So why would you be

14   targeting chemical manufacturers

15   regarding, for example, pseudoephedrine?

16         A.    Because meth labs were main

17   targets at that time.

18         Q.    And so why would you be

19   targeting chemical manufacturers about

20   pseudoephedrine?

21               MS. MCCLURE:  Objection to

22         form.

23               THE WITNESS:  Because it's a

24         key ingredient used to make meth.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. CLUFF:

2      Q.    So were you trying to ensure

3  that they complied with the regulations

4  governing the manufacture of Sudafed?

5              MS. MCCLURE:  Objection to

6      form.

7              THE WITNESS:  Correct.

8  BY MR. CLUFF:

9      Q.    How about wholesale

10 distributors, were those ever targets

11 that you received training about?

12     A.    Generally.

13     Q.    What was the general

14 training you received about wholesale

15 distributors?

16     A.    Just regulations that

17 pertained to them.

18     Q.    Why were you being trained

19 about the regulations pertaining to

20 wholesale distributors as targets?

21             MS. MCCLURE:  Objection to

22     form.

23             THE WITNESS:  They weren't

24     necessarily targets, but it was

Highly Confidential - Subject to Further Confidentiality Review

```
 1          part of our auditing function.
 2   BY MR. CLUFF:
 3          Q.    What was the auditing
 4   function related to wholesale
 5   distributors?
 6          A.    Records, pill counts, make
 7   sure things line up.
 8          Q.    What kind of records are you
 9   talking about?
10          A.     Inventories.  Are the
11   Schedule IIs separated from Schedule III,
12   IV and Vs?  Security.
13          Q.    How about shipping records?
14          MS. MCCLURE:  Objection to
15          form.  Asked and answered.
16          THE WITNESS:  I don't
17          recall.
18   BY MR. CLUFF:
19          Q.    How about ARCOS data about
20   wholesale distributors, did you receive
21   training about that?
22          MS. MCCLURE:  Objection to
23          form.  Asked and answered.
24          THE WITNESS:  In the field.
```

1    BY MR. CLUFF:

2         Q.    But not at Quantico?

3         A.    I don't recall, but I don't

4    think so.

5         Q.    Did you, when you were at

6    Quantico, receive training about

7    suspicious order reports from the

8    wholesale distributors?

9         A.    No.

10        Q.    Did you receive training

11   about suspicious order reports from

12   wholesale distributors while you were in

13   the field?

14        A.    No.

15        Q.    Was that not part of your

16   job responsibilities?

17             MS. MCCLURE:  Objection to

18        form.

19             THE WITNESS:  I mean, it's a

20        regulation, so it was part of it,

21        I guess.

22   BY MR. CLUFF:

23        Q.    You just personally don't

24   recall receiving training about it?

1      A.    That's correct.

2      Q.    Do you recall what training

3  you received about manufacturers?

4      A.    I do not.

5      Q.    Do you have any general

6  recollection?

7            MS. MCCLURE:  Objection to

8       form.  Asked and answered.

9            THE WITNESS:  Probably

10      records and for audits, and that's

11      it.

12  BY MR. CLUFF:

13      Q.    Do you recall what kind of

14  training you received about the records

15  to audits for manufacturers?

16      A.    Similar, probably, to

17  distributors.

18      Q.    So that would be -- I

19  remember -- or if you -- strike all that.

20            You mentioned records for

21  pill counts, correct?  Would that have

22  applied to the manufacturers?

23      A.    No.

24      Q.    How about, like, inventory

1  training, would that have applied to

2  manufacturers?

3          A.     Inventory.

4          Q.     Separation of C-II from

5  C-III, IV and V, would that apply to

6  manufacturers?

7          A.     I believe so, yes.

8          Q.     How about suspicious order

9  reports for manufacturers?

10         A.     No.

11         Q.     And did you receive training

12 on any of those subjects in the field,

13 aside from when you were at Quantico?

14               MS. MCCLURE:  Objection to

15         form.

16               THE WITNESS:  Not training,

17         per se, we just went out in the

18         field and conducted those audits.

19 BY MR. CLUFF:

20         Q.     You also mentioned training

21 about pharmacies.

22               What training did you

23 receive about pharmacies?

24         A.     Again, records.

1    Q.    What training about records

2  did you receive?

3    A.    Prescriptions, where they

4  separated from the -- the IIs were

5  separated from the III, IV and Vs, by

6  inventory.

7    Q.    What about suspicious order

8  reports, did you receive training about

9  that in relation to pharmacies?

10    A.    No.

11    Q.    Looking at Exhibit-2 again,

12  at the top there, it says -- you write,

13  Lead -- I'm sorry, would you have written

14  this LinkedIn profile?

15    A.    Yes.

16    Q.    So you write, Lead

17  investigator on civil and criminal cases

18  involving pharmaceutical drugs.

19        Do you recall what civil

20  cases you worked on that involved

21  pharmaceutical drugs?

22    A.    I do not.

23    Q.    Do you recall what criminal

24  cases -- I'll caution you that I

1    understand that there is a law

2    enforcement privilege.  So I'm going to

3    ask you some questions about this

4    "criminal cases" language, but I don't

5    want you to divulge anything that would

6    compromise an ongoing criminal

7    investigation.

8              Do you understand?

9    A.    I understand.

10   Q.    Do you recall any criminal

11   cases that you worked on involving

12   pharmaceutical drugs?

13   A.    Maybe a doctor.

14   Q.    Do you recall, generally,

15   what the matter under investigation was?

16   A.    That she was writing

17   fraudulent prescriptions or prescriptions

18   without a medical purpose.

19   Q.    Would that have been in Los

20   Angeles?

21   A.    Yes.

22   Q.    Are you familiar with the

23   term "pill mill"?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Do you know if this doctor

2    was part of a pill mill?

3      A.    I don't think so, but I

4    don't recall.

5      Q.    Are you familiar with a

6    criminal investigation about a pill mill

7    in Los Angeles ever?

8      A.    No.

9      Q.    Going back to civil cases,

10   do you recall being a lead investigator

11   on any civil cases involving a

12   pharmaceutical manufacturer?

13     A.    No.

14     Q.    How about a wholesale

15   distributor?

16     A.    No.

17     Q.    Do you recall any criminal

18   cases about pharmaceutical manufacturers?

19          MS. MCCLURE:  Objection.

20      Asked and answered.

21          THE WITNESS:  A chemical

22      manufacturer.

23   BY MR. CLUFF:

24     Q.    What chemical manufacturer?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I don't recall.

2      Q.    What was the general subject

3  matter under investigation?

4      A.    Recordkeeping.

5      Q.    And what was the

6  recordkeeping violation?

7      A.    They didn't have certain

8  information on their records.

9      Q.    Can you describe what kind

10  of information they had -- were missing?

11      A.    I don't remember.

12      Q.    Do you recall if it was

13  about a specific drug?

14      A.    I don't remember that.

15      Q.    You continue here on

16  Exhibit-2 and say that you conducted

17  regulatory audits of importers,

18  exporters, distributors, and

19  manufacturers of controlled substances;

20  is that correct?

21      A.    That's correct.

22      Q.    We previously talked about

23  the training you received about

24  importers, exporters, distributors and

1    manufacturers.

2              Would you have been using

3    that training when you conducted these

4    regulatory audits?

5         A.    Correct.

6         Q.    Focusing on distributors,

7    what kind of regulatory audits would you

8    have conducted about distributors?

9         A.    Just that they were in

10   compliance with the regulations.

11        Q.    What regulations?

12        A.    The 21 C.F.R. 1300, Part

13   1300.

14        Q.    Do you recall which specific

15   recollections you would have been

16   investigating under Part 1300?

17        A.    Recordkeeping, security.

18        Q.    Anything else?

19        A.    Pill counts.

20        Q.    How about suspicious order

21   monitoring?

22        A.    No.

23        Q.    So you did not audit, in

24   your time at the DEA, suspicious order

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring?

2         A.    No.

3         Q.    Was there somebody in the

4    Los Angeles office that you worked with

5    who was responsible for auditing

6    suspicious order reporting?

7         A.    I don't recall.

8         Q.    Do you recall the identity

9    of any distributors that you audited

10   while you were with the DEA?

11        A.    Cardinal Health and

12   AmerisourceBergen.

13        Q.    Do you recall the time

14   period when you audited Cardinal Health?

15        A.    I don't recall.  Within

16   those two years.

17        Q.    Do you recall if it was the

18   beginning, middle or end, generally, of

19   your time with the DEA?

20        A.    I'd say middle.

21        Q.    How about AmerisourceBergen,

22   do you recall when you audited

23   AmerisourceBergen?

24        A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    If you had to give me an

2    estimate, would you estimate that it was

3    the beginning, middle or end of your time

4    with the DEA that you audited

5    AmerisourceBergen?

6    A.    I'd say middle.

7    Q.    Do you recall what you were

8    auditing when you audited Cardinal

9    Health?

10    A.    Recordkeeping, pill counts,

11    security.

12    Q.    Do you recall the outcome of

13    the audit against Cardinal Health?

14    A.    I do not.

15    Q.    Based on your two years of

16    work with the Drug Enforcement

17    Administration, do you have a general

18    recollection if the audit against

19    Cardinal Health was a good audit or a bad

20    audit?

21            MS. MCCLURE:  Objection.

22            MR. MCBRIDE:  Objection.

23            MS. MCCLURE:  Asked and

24        answered.  Assumes facts not in

Highly Confidential - Subject to Further Confidentiality Review

1    evidence.  Foundation.

2        MR. CLUFF:  Hold on a

3    second.

4        You guys can object, but

5    let's try to not talk over each

6    other.  If we're going to do

7    that -- I'll also note the

8    deposition protocol, if Shannon

9    objects, her objection is

10   preserved for everybody.

11       MR. MCBRIDE:  I understand.

12   I --

13       MR. CLUFF:  I'm not going to

14   argue with you about it.  Let's

15   just all try to -- let's make sure

16   we don't talk over each other.

17       I'm going ask my question

18   again, let's let our counsel

19   object, and then we'll get an

20   answer.

21   BY MR. CLUFF:

22       Q.   Based on your two years of

23   working at the DEA, do you recall if the

24   outcome of the audit against Cardinal

1    Health was a good audit or bad audit?

2                    MS. MCCLURE:  Same

3            objection.  Form.  Assumes facts.

4            Foundation.

5                    THE WITNESS:  I don't

6            recall.

7    BY MR. CLUFF:

8            Q.    Do you recall the name of

9    any individuals you interacted with at

10   Cardinal Health during that audit?

11           A.    No.

12           Q.    How about AmerisourceBergen,

13   do you recall the subject matter of the

14   audit when you conducted the audit of

15   AmerisourceBergen?

16           A.    A regulatory audit.

17           Q.    And what was -- what was the

18   regulatory audit?

19           A.    Records, security, pill

20   counts.

21           Q.    I forgot to ask a question.

22                    Going back to the Cardinal

23   Health audit, do you recall the

24   location -- I'll back up.

1          Did you audit a distribution

2  center?

3          A.    Yes.

4          Q.    Okay.  Do you recall the

5  location of that distribution center?

6          A.    No.

7          Q.    Do you recall if it was

8  somewhere in the general Los Angeles

9  area?

10          A.    Yes.

11          Q.    Okay.  So AmerisourceBergen,

12  just to re-clarify, do you recall what

13  the subject matter of that regulatory

14  audit was again?

15          A.    Just --

16          MS. MCCLURE:  Objection.

17          Asked and answered.

18          THE WITNESS:  Just

19          regulatory assignment.

20  BY MR. CLUFF:

21          Q.    Was this, like, a routine

22  part of your job as a drug enforcement or

23  diversion investigator?

24          MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  It was a part

3          of our audit plan for the year.

4     BY MR. CLUFF:

5          Q.    And do you recall the

6     outcome of the audit of

7     AmerisourceBergen?

8          A.    It was clear.

9          Q.    Clear how?

10         A.    There were no findings that

11    I recall.

12         Q.    You previously told me that

13    you don't recall the findings of the

14    Cardinal Health audit.

15                   Is there a reason you recall

16    the Amerisource findings as opposed to

17    the Cardinal Health findings?

18                   MS. MCCLURE:  Objection to

19         form.

20                   THE WITNESS:  No.

21    BY MR. CLUFF:

22         Q.    Did you do anything to

23    refresh your recollection regarding the

24    findings of the AmerisourceBergen

1    audit --

2              MS. MCCLURE:  Objection to

3         form.

4    BY MR. CLUFF:

5         Q.    -- before today's

6    deposition?

7         A.    No.

8         Q.    Do you recall the name of

9    any people you spoke with at

10   AmerisourceBergen during that audit?

11        A.    The compliance manager,

12   Peter Knipe.

13        Q.    Did that audit occur at an

14   AmerisourceBergen distribution center?

15        A.    Yes.

16        Q.    Was Peter Knipe the head of

17   that distribution center?

18             MS. MCCLURE:  Objection to

19        form.

20             THE WITNESS:  He's the

21        compliance manager.

22   BY MR. CLUFF:

23        Q.    What is a compliance

24   manager?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      They make sure that the DC

2    is in compliance with the regulations.

3        Q.      Does he work at the DC?

4        A.      He does.

5        Q.      I want to just clarify.  You

6    used the term "DC."

7                Does that stand for

8    distribution center?

9        A.      Yes.

10       Q.      Okay.  Thank you.

11               Did you speak with anybody

12   else at AmerisourceBergen during that

13   audit?

14               MS. MCCLURE:  Objection to

15        form.

16               THE WITNESS:  Not that I

17        recall.

18   BY MR. CLUFF:

19       Q.      Were you provided any

20   records by AmerisourceBergen during that

21   audit?

22       A.      I don't recall.

23       Q.      Do you recall looking at

24   shipping records while you were

Highly Confidential - Subject to Further Confidentiality Review

1    conducting the audit of

2    AmerisourceBergen?

3                    MS. MCCLURE:  Objection.

4           Asked and answered.

5                    THE WITNESS:  I don't

6           recall.

7    BY MR. CLUFF:

8           Q.    Do you recall looking at any

9    suspicious order reports when you

10   conducted the audit of AmerisourceBergen?

11          A.    No.

12          Q.    Do you recall looking at any

13   excessive purchase orders when you

14   conducted the audit of AmerisourceBergen?

15                   MS. MCCLURE:  Objection to

16          form.

17                   THE WITNESS:  I don't

18          recall.

19   BY MR. CLUFF:

20          Q.    Do you recall discussing

21   AmerisourceBergen's suspicious order

22   monitoring policies during that audit?

23          A.    I don't recall.

24          Q.    During your time as a Drug

1     Enforcement Administration diversion

2     investigator, did you ever form an

3     understanding of the suspicious order

4     monitoring policies or procedures of any

5     wholesale distributors?

6            MS. MCCLURE:  Objection to

7       form.

8            THE WITNESS:  Clarify,

9       please.  What?

10 BY MR. CLUFF:

11     Q.    Sure.

12            During the two years that

13 you worked for the DEA as a drug

14 investigator, did you form an

15 understanding of the suspicious order

16 monitoring policies or procedures of any

17 wholesale distributor?

18            MS. MCCLURE:  Objection to

19       form.

20            THE WITNESS:  No.

21 BY MR. CLUFF:

22     Q.    Did you ever conduct any

23 audits, that you can recall, of McKesson?

24            MR. KELLY:  Objection to

1          form.

2                    THE WITNESS:  I don't

3          recall.

4    BY MR. CLUFF:

5          Q.    How about manufacturers of

6    controlled substances; do you recall

7    conducting audits of any manufacturers of

8    controlled substances?

9          A.    I don't recall.  Just the

10   chemical manufacturers.

11         Q.    You continue on Exhibit-2,

12   and say, And manufacturers of -- of

13   manufacturers and distributors of List 1

14   chemicals.

15                Is that the chemicals like

16   pseudoephedrine that you were talking

17   about earlier?

18         A.    Yes.

19         Q.    That's a different class of

20   chemicals from, say, opioids, correct?

21         A.    Correct.

22         Q.    All right.  Opioids are not

23   List 1 chemicals, right?

24         A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    In your experience as an

2    employee of the Drug Enforcement

3    Administration, was there a difference

4    between a listed chemical and

5    pharmaceutical drugs like opioids?

6                    MS. MCCLURE:  Objection to

7          form.

8                    THE WITNESS:  Yes.

9    BY MR. CLUFF:

10         Q.    Did regulations about List 1

11   chemicals apply to opioids?

12                   MS. MCCLURE:  Objection to

13         form.

14                   THE WITNESS:  No.

15   BY MR. CLUFF:

16         Q.    So they were different

17   regulations?

18         A.    I believe so.

19         Q.    Were they subject to

20   different standards?

21                   MS. MCCLURE:  Objection to

22         form.

23                   THE WITNESS:  Different

24         regulations, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CLUFF:

2         Q.    So regulations that may be

3    applied to List 1 chemicals did not apply

4    to pharmaceutical drugs like opioids,

5    correct?

6         A.    Correct.

7         Q.    All right.  Are you aware of

8    the DEA ever issuing guidance to

9    manufacturers or distributors about List

10   1 chemicals?

11              MS. MCCLURE:  Objection to

12        form.

13              THE WITNESS:  Not while I

14        was there.

15   BY MR. CLUFF:

16        Q.    You continue in Exhibit-2,

17   and you say that you also analyzed

18   pharmaceutical records to detect

19   regulatory and criminal law violations.

20              Do you see that?

21        A.    I do.

22        Q.    What would be an example of

23   a regulatory violation that you analyzed

24   from pharmaceutical records?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      If they didn't have certain

2   items on the record.  So, for example, a

3   prescription might be missing the doctor

4   and the DEA number.

5       Q.      So you said "certain items

6   on the record."

7           Is the record that you're

8   referring to there the prescription?

9       A.      Prescription, for example.

10      Q.      So one example would be, to

11  paraphrase your testimony, an incomplete

12  prescription?

13          MS. MCCLURE:  Objection to

14      form.

15          THE WITNESS:  Correct.

16  BY MR. CLUFF:

17      Q.      Are there any other examples

18  of regulatory violations that you

19  analyzed from pharmaceutical records?

20      A.      If they were stored

21  properly.

22      Q.      How about ARCOS data?

23  That's a pharmaceutical record, correct?

24          MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

```
 1              form.

 2                   THE WITNESS:  Yes.

 3      BY MR. CLUFF:

 4         Q.    Did you ever analyze ARCOS

 5      data to identify regulatory violations?

 6                   MS. MCCLURE:  Objection to

 7              form.

 8                   THE WITNESS:  Vaguely

 9              remember, yes.

10      BY MR. CLUFF:

11         Q.    What would that analysis

12      have been?

13         A.    Just looking at the Schedule

14      Is, IIs, IIIs.

15         Q.    What were you doing when you

16      looked at the Schedule Is, IIs and IIIs?

17         A.    Who the supplier was.

18         Q.    When you say "supplier," do

19      you mean manufacturers or distributors?

20                   MS. MCCLURE:  Objection to

21              the form.

22                   THE WITNESS:

23              Manufacturer -- well, I don't

24              remember.  Distributors and
```

Highly Confidential - Subject to Further Confidentiality Review

1                manufacturers.

2    BY MR. CLUFF:

3          Q.    How about pharmacies?

4          A.    I don't recall.

5          Q.    So you do recall analyzing

6    ARCOS data related to manufacturers and

7    distributors?

8                MS. MCCLURE:  Objection to

9          form.  Misstates the witness's

10         prior testimony.

11               THE WITNESS:  I do.

12   BY MR. CLUFF:

13         Q.    What do you recall looking

14   at when you reviewed the ARCOS data?

15         A.    Who was ordering, what they

16   were ordering, quantities.

17         Q.    Why were you looking at that

18   information?

19         A.    Just as part of the

20   regulatory process that we went through.

21         Q.    What do you mean by that?

22               MS. MCCLURE:  Objection to

23         form.

24               THE WITNESS:  Being able to

1          pull those records and just look

2          at them and analyze the pattern.

3    BY MR. CLUFF:

4          Q.    Why were you analyzing

5    patterns from ARCOS data?

6          A.    Just to see if there were

7    any spikes.

8          Q.    Why were you looking at

9    spikes?

10         A.    Well, just to see if the

11   patterns were consistent; if there were

12   spikes, there were spikes.

13         Q.    Is there any particular

14   reason why you were looking at spikes?

15              MS. MCCLURE:  Objection to

16         form.

17              THE WITNESS:  Just as a note

18         to see if it deviated from a

19         regular pattern.

20   BY MR. CLUFF:

21         Q.    What does deviating from a

22   regular pattern indicate, based on your

23   experience as a DEA investigator?

24              MS. MCCLURE:  Objection to

1          form.

2                   THE WITNESS:  Just that they

3          might have had a

4          larger-than-normal shipment.

5    BY MR. CLUFF:

6          Q.    Did it ever indicate that

7    there was potential diversion happening?

8                   MS. MCCLURE:  Objection to

9          form.

10                  THE WITNESS:  No.

11   BY MR. CLUFF:

12         Q.    Never?

13         A.    Not that I recall.

14         Q.    So spikes in ordering

15   patterns, based on your experience at the

16   DEA, did not indicate potential

17   diversion?

18                  MS. MCCLURE:  Objection to

19         form.

20                  THE WITNESS:  It may have,

21         it may not have.

22   BY MR. CLUFF:

23         Q.    Okay.  So it may have

24   indicated potential diversion?

1          MS. MCCLURE:  Objection to

2     form.  Asked and answered.

3     Misstates the witness's prior

4     testimony.

5          THE WITNESS:  We don't know

6     that just looking at that order.

7  BY MR. CLUFF:

8     Q.    ARCOS data is reported by

9  the companies who engage in those

10  transactions, correct?

11     A.    Yes.

12     Q.    So, for example, if

13  Amerisource sells an order to a pharmacy,

14  as an example, they report that

15  transaction through the ARCOS process?

16          MS. MCCLURE:  Objection to

17     form.

18          THE WITNESS:  I believe so.

19  BY MR. CLUFF:

20     Q.    So the data you were

21  analyzing came from the companies that

22  you were investigating or auditing?

23          MS. MCCLURE:  Objection to

24     form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  It came from

2      the ARCOS database.

3  BY MR. CLUFF:

4      Q.    And it was put into the

5  ARCOS database by, for example,

6  registrants, correct?

7           MS. MCCLURE:  Objection to

8      form.

9           THE WITNESS:  Correct.

10  BY MR. CLUFF:

11      Q.    So when you, as a DEA

12  investigator, were analyzing the ARCOS

13  data to identify spikes and changes in

14  the ordering pattern, you would agree

15  that the companies who supplied that data

16  could have done the same analysis,

17  correct?

18           MS. MCCLURE:  Objection to

19      form.

20           THE WITNESS:  I don't know

21      what their process was.

22  BY MR. CLUFF:

23      Q.    But the data that you were

24  analyzing came from the registrants,

Highly Confidential - Subject to Further Confidentiality Review

1   correct?

2              MS. MCCLURE:  Objection to

3        form.  Asked and answered.

4              THE WITNESS:  Correct.

5              MR. CLUFF:  Zach, can you

6        put 2 back up, please?

7   BY MR. CLUFF:

8        Q.    Going back to the

9   pharmaceutical records that you

10  identified there in Exhibit-2.

11             Did you ever -- would you

12  consider to be -- sorry, strike that.

13             Are you familiar with the

14  term "suspicious order report"?

15       A.    As a diversion investigator?

16       Q.    Yes.

17       A.    No.

18       Q.    You said you're familiar --

19  let's jump down.

20             Do you see that first bullet

21  point there?  It says, Developed thorough

22  knowledge of Code of Federal Regulations.

23       A.    Uh-huh.

24       Q.    Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1                    Are you aware of a federal

2   regulation that requires registrants to

3   identify and report suspicious orders of

4   controlled substances?

5           A.    There is a regulation --

6                 MS. MCCLURE:  Objection to

7           form.

8                 You may answer.

9   BY MR. CLUFF:

10          Q.    Let me ask you again.

11                MR. CLUFF:  Shannon, you can

12          assert your objection so we have a

13          clear record.

14  BY MR. CLUFF:

15          Q.    Are you aware of a federal

16  regulation that requires registrants to

17  identify and report suspicious orders of

18  controlled substances?

19                MS. MCCLURE:  Objection to

20          form.

21                THE WITNESS:  I'm aware of a

22          regulation that states that

23          registrants need to put policies

24          and procedures in place to guard

1          against suspicious order

2          monitoring.

3               MS. MCCLURE:  Sterling, when

4          you reach a point in the next

5          minute or so, we'd like to take a

6          break.

7               MR. CLUFF:  Sure.  I have

8          just a few questions here.

9     BY MR. CLUFF:

10         Q.    I want to jump ahead.

11              You worked at

12    AmerisourceBergen as an investigator for

13    approximately five years, correct?

14         A.    Correct.

15         Q.    Did you gain any

16    familiarity, or additional familiarity,

17    during that time, with ARCOS data?

18              MS. MCCLURE:  Objection to

19         form.

20              THE WITNESS:  No.

21              MR. CLUFF:  Let's take a

22         break.

23              VIDEO TECHNICIAN:  Off the

24         record at 11:01 a.m.

Highly Confidential - Subject to Further Confidentiality Review

1          -  -  -

2              (Whereupon, a brief recess

3          was taken.)

4              -  -  -

5              VIDEO TECHNICIAN:  We're

6          back on the record at 11:16 a.m.

7    BY MR. CLUFF:

8          Q.    Ms. Garcia, we're back on

9    the record.  I just want to remind you

10   that you're still under oath.

11             We talked earlier about what

12   we referred to as a personality

13   difference between you and Eric Cherveny.

14             Do you recall that?

15         A.    Yes.

16         Q.    At the time Mr. Cherveny

17   became your supervisor, were you aware of

18   the reason why he became your supervisor?

19             MS. MCCLURE:  Objection to

20         form.

21             THE WITNESS:  No.

22   BY MR. CLUFF:

23         Q.    Who was your supervisor

24   before Mr. Cherveny?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Ed Hazewski.

2        Q.      Do you recall why Mr.

3   Hazewski was no longer your trainer?

4                MS. MCCLURE:  Objection to

5        form.

6                THE WITNESS:  No.  I believe

7        he might have gotten a different

8        position.

9   BY MR. CLUFF:

10       Q.      What's that recollection

11  based on?

12               MS. MCCLURE:  Objection to

13       form.

14               THE WITNESS:  Just that he

15       had moved on to another position.

16  BY MR. CLUFF:

17       Q.      Did you find that transition

18  to be disconcerting as an employee at

19  AmerisourceBergen?

20               MS. MCCLURE:  Objection to

21       form.

22               THE WITNESS:  No.  Moves

23       happen all the time.

24  BY MR. CLUFF:

1    Q.    Do you recall filling out a

2    survey that was disseminated by David May

3    in 2015?

4    A.    I don't know what you're

5    talking about.

6    Q.    If I use the term

7    "engagement survey," does that refresh

8    your recollection?

9    A.    That's company-wide.

10   Q.    What was the engagement

11   survey, do you recall?

12   A.    To outline what we were

13   doing as a unit and what our opinions

14   were on that.

15   Q.    When you say "as a unit,"

16   what unit are you referring to?

17   A.    The diversion control team.

18   Q.    And so the engagement survey

19   was a tool to outline what the diversion

20   control team was doing and your opinions

21   on that course of action?

22   MS. MCCLURE:  Objection to

23   form.

24   THE WITNESS:  From what I

1        can recall.

2    BY MR. CLUFF:

3        Q.    Okay.  Do you recall

4    creating a document that you discussed

5    with David May about the engagement

6    survey?

7        A.    No.

8        Q.    If I showed you a copy of a

9    document that appears to be talking

10   points, would that refresh your

11   recollection?

12            MS. MCCLURE:  Objection to

13        form.

14            THE WITNESS:  It might.

15            MR. CLUFF:  I'd like to mark

16        as Exhibit-3 a copy of an e-mail

17        and an attachment, both of which

18        are marked confidential and

19        subject to the protective order.

20        I've combined them into one

21        document to preserve the unity of

22        the family.  The Bates numbers are

23        ABDCMDL00296978, that's the

24        e-mail.  The attachment begins at

Highly Confidential - Subject to Further Confidentiality Review

1          ABDCMDL00296979, and ends with

2          981.

3                    -   -   -

4               (Whereupon,

5          AmerisourceBergen-Garcia

6          Exhibit-3, ABDCMDL00296978-981,

7          was marked for identification.)

8                    -   -   -

9     BY MR. CLUFF:

10          Q.    Go ahead and take a moment

11    and review that.

12               And we're going to talk

13    about this document a little bit later

14    today, but if you look on the last page,

15    there's a letter -- Number 2, CSRA

16    department.  So I'm going to ask you a

17    few questions about that.

18               So you can review the whole

19    thing if you want, but if want to start

20    there and let me know if you want to

21    proceed about that, then you let me know.

22          A.    I'd like to read this whole

23    document.

24          Q.    It's your prerogative.

1    A.    Okay.

2    Q.    Why don't we start at the

3 first page of this document.  Since

4 you've had a chance to review the

5 entirety of the document, let's just talk

6 about it while we're here.

7          Do you see at the top

8 there's a "from" line, it says, Garcia,

9 Elizabeth?

10   A.    Yes.

11   Q.    So would you agree with me

12 that this is an e-mail that you would

13 have sent?

14   A.    Yes.

15   Q.    That it came from you?

16   A.    Yes.

17   Q.    We had a comment on the

18 break that some people down at the other

19 end of the table are having a hard time

20 hearing you and I, so they politely asked

21 me if we could both speak up.  You can

22 talk to them later, I'm just the

23 messenger.

24          If you go down, there's a

1  line that says, To:  May, David.

2              Do you know who David May

3  is?

4        A.    David May?  Yes.

5        Q.    Who is he?

6        A.    He is the vice president of

7  diversion control and security, I

8  believe.

9        Q.    Did you report directly to

10 him in November of 2015?

11       A.    No.

12       Q.    Who reported to him, if you

13 know?

14       A.    Eric Cherveny and Sharon

15 Hartman, I believe.

16       Q.    Who are Eric Cherveny and

17 Sharon Hartman?

18       A.    Eric Cherveny is the

19 director of the diversion control team.

20 And Sharon Hartman is the pharmaceutical

21 compliance director.

22       Q.    Did you report to Eric

23 Cherveny in November of 2015?

24       A.    Yes, I believe.

1    Q.    And prior to the time, just

2 for a clear understanding, that you

3 reported to Eric Cherveny, you reported

4 to Ed Hazewski; is that correct?

5    A.    Prior to, yes.

6    Q.    Do you see the subject, it

7 says, Dave, talking points_engagement

8 survey2.docx?

9    A.    Yes.

10    Q.    And if you look down on the

11 next line, it says, Attachments, Dave

12 talking points_engagement survey 2.docx?

13    A.    Yes.

14    Q.    Do you have an

15 understanding, looking at this e-mail and

16 having reviewed the attachment, whether

17 these are talking points that you would

18 have drafted to discuss with David May?

19         MS. MCCLURE:  Objection to

20    form.

21         THE WITNESS:  He asked the

22    team, during a team call, I

23    believe, for talking points.

24 BY MR. CLUFF:

1    Q.    So David May asked the team

2    for talking points during a call; is that

3    correct?

4    A.    Correct.

5    Q.    And what is the team you're

6    describing?

7    A.    The diversion control team.

8    Q.    And you're a member of the

9    diversion control team?

10    A.    I was.

11    MS. MCCLURE:  Objection to

12    form.

13 BY MR. CLUFF:

14    Q.    Okay.  In the subject and

15    the attachments, there's a reference to

16    engagement survey 2.

17    Do you recall what the

18    engagement survey was?

19    A.    I believe it was a

20    company-wide survey to kind of see what

21    people's thoughts were.

22    Q.    And when you say

23    "company-wide," do you mean all of

24    AmerisourceBergen?

1           MS. MCCLURE:  Objection to

2      form.

3           THE WITNESS:  From what I

4      recall.

5  BY MR. CLUFF:

6      Q.    And then the numeral 2, or

7  the number 2 at the end of the subject

8  and the attachment, do you have a

9  recollection of what that Number 2 stands

10 for?

11     A.    I do not.

12     Q.    Is it possible this was a

13 second version of this document?

14          MS. MCCLURE:  Objection to

15     form.  Asked and answered.

16          THE WITNESS:  It's possible.

17 BY MR. CLUFF:

18     Q.    Where would you have saved a

19 document like this when you were creating

20 it?

21          MS. MCCLURE:  Objection to

22     form.  Assumes facts not in

23     evidence.

24          THE WITNESS:  Probably on my

Highly Confidential - Subject to Further Confidentiality Review

1              hard drive.

2       BY MR. CLUFF:

3              Q.    Please turn the page.

4                    Do you see at the top there

5       it says, Dave-engagement survey.

6                    And that line is underlined?

7              A.    Yes.

8              Q.    So -- and then underneath

9       that, can you see there's very faint

10      text?  There's two little subparagraphs,

11      and then there's a number after each one.

12                   Can you see that?

13             A.    Barely, yes.

14             Q.    Yeah.  It's kind of easier

15      to see on the screen, or maybe on the

16      paper in front of you, whichever one is

17      better.

18                   MR. CLUFF:  Maybe if you

19             shrink it down a little, Zach, so

20             it's not quite as pixilated.

21                   Didn't get much better, I'm

22             sorry.

23      BY MR. CLUFF:

24             Q.    If you can read these, it

1    looks like the first one says, I feel

2    supported during organizational change at

3    AmerisourceBergen (change management).

4                    And it looks like it's

5    either a 59 percent or 69 percent.

6                    Can you make that out?

7         A.    I can barely make that out.

8         Q.    Do you have an

9    understanding, based on looking at this,

10   whether that would have been 59 percent

11   or 69 percent?

12        A.    I can't say for sure.  It's

13   very blurry.

14        Q.    The next line down, maybe

15   you can tell me if I'm getting this

16   correctly.  It says, At

17   AmerisourceBergen, there is open and

18   honest communication (communication).

19                    And next to that, it looks

20   like there's a 58 or possibly a 56

21   percent.

22        A.    I see that.

23        Q.    Do you have a recollection

24   if these were the two questions that were

1    on the engagement survey sent out by

2    David May in 2015?

3          A.    I believe so.

4          Q.    These numbers at the end, I

5    understand that they are hard to read,

6    but would those have been grades or

7    rankings that you gave for

8    AmerisourceBergen on these two questions?

9                MS. MCCLURE:  Objection to

10         form.

11               THE WITNESS:  I don't

12         believe that that was our ranking.

13         I think that was company-wide.

14   BY MR. CLUFF:

15         Q.    So this would reflect a

16   company-wide ranking of how well

17   AmerisourceBergen was doing on these two

18   subjects?

19               MS. MCCLURE:  Objection to

20         form.

21               THE WITNESS:  I believe so.

22   BY MR. CLUFF:

23         Q.    Stepping back a second.

24               You have a Bachelor's degree

Highly Confidential - Subject to Further Confidentiality Review

1   and two Master's degrees, right?

2          A.    Correct.

3          Q.    So you're familiar with,

4   like, a grading system?

5              MS. MCCLURE:  Objection to

6        form.

7              THE WITNESS:  Correct.

8   BY MR. CLUFF:

9          Q.    All right.  59 and 58

10  percent, those are pretty low grades,

11  correct?

12             MS. MCCLURE:  Objection to

13       form.

14             THE WITNESS:  I don't know.

15             MS. MCCLURE:  Assumes facts

16       not in evidence.  Foundation.

17  BY MR. CLUFF:

18         Q.    Sorry.  We got talked over

19  there.  Your answer got talked over with

20  an objection.

21             You're familiar with a

22  grading scale, right, A, B, C, D?

23             MS. MCCLURE:  Objection to

24       form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  Yes.

2    BY MR. CLUFF:

3         Q.    If you got a 59 percent or a

4    58 percent on a test, would you consider

5    that to be a low grade?

6              MS. MCCLURE:  Objection to

7         form.  Misstates -- sorry.

8         Objection to form.  Foundation.

9         Assumes facts not in evidence.

10        Speculation.

11             THE WITNESS:  I can't say

12        for sure.

13   BY MR. CLUFF:

14        Q.    Okay.  But these numbers

15   reflect, based on your recollection of

16   participating in the engagement survey, a

17   company-wide assessment of

18   AmerisourceBergen's performance on these

19   two subjects, correct?

20             MS. MCCLURE:  Objection to

21        form.  Misstates prior testimony.

22        Foundation.  Facts not in

23        evidence.

24             THE WITNESS:  Restate the

Highly Confidential - Subject to Further Confidentiality Review

1      question, please.

2            MR. CLUFF:  Shannon, I'm

3      cool with you objecting, but your

4      objections are getting a little

5      voluminous.  And you made the same

6      objection, very voluminously,

7      twice.

8            The rules are pretty

9      straightforward.  You can just say

10      same objection.

11            MS. MCCLURE:  Sure.  Happy

12      to.

13  BY MR. CLUFF:

14      Q.    Going back, I asked you

15  about these numbers that are next to the

16  two questions.

17            Do you recall that?

18      A.    Yes.

19      Q.    And I asked you if they were

20  your grade of AmerisourceBergen's

21  performance on these two questions.

22            Do you recall that?

23      A.    Yes.

24      Q.    And do you recall telling me

Highly Confidential - Subject to Further Confidentiality Review

1    that you believed this was a company-wide

2    ranking?

3         A.    Yes.

4         Q.    Okay.  So these numbers

5    would reflect a company-wide ranking of

6    associates' view on AmerisourceBergen's

7    performance in relation to these two

8    questions; is that correct?

9              MS. MCCLURE:  Same litany of

10        objections from the last prior

11        question I objected to.

12             THE WITNESS:  I believe so,

13        yes.

14   BY MR. CLUFF:

15        Q.    So looking at the next

16   couple of pages, it looks like you have

17   created an outline of issues to discuss

18   with David May.

19             Is that -- would you agree

20   with that statement?

21        A.    He asked for our feedback on

22   these.

23        Q.    And in response to that

24   request, you created this document?

1    A.    Yes.

2    Q.    And this was in 2015, so you

3  had been working for AmerisourceBergen,

4  at that point, roughly three years?

5    A.    Yes.

6    Q.    In 2015, did you feel like

7  you had developed a good working

8  knowledge of AmerisourceBergen's policies

9  and procedures?

10        MS. MCCLURE:  Objection.

11    Form.

12        THE WITNESS:  Some; some

13    not.

14  BY MR. CLUFF:

15    Q.    Did you feel like you had

16  developed a thorough understanding of the

17  corporate culture at AmerisourceBergen?

18        MS. MCCLURE:  Objection to

19    form.

20        THE WITNESS:  It's a huge

21    corporation, so no.

22  BY MR. CLUFF:

23    Q.    How about within the

24  diversion control team, did you feel like

Highly Confidential - Subject to Further Confidentiality Review

1   you had developed a good understanding of

2   the working culture within the diversion

3   control team?

4               MS. MCCLURE:  Objection.

5         Form.

6               THE WITNESS:  Generally

7         speaking, yes.

8   BY MR. CLUFF:

9         Q.    So on this -- the first page

10  of the memo, but it's the second page of

11  the document I handed you, there is a

12  heading that's underlined that says,

13  Communication.

14              Do you see that?

15        A.    I see that.

16        Q.    I want to look at 1A.  It

17  says, underneath, Communication with our

18  team.

19              Do you see that?

20        A.    I see that.

21        Q.    It says, Decisions seem to

22  be made without gathering feedback from

23  those who are impacted directly on a

24  day-to-day basis.

Highly Confidential - Subject to Further Confidentiality Review

1             Is that something you recall

2       about your working conditions on the

3       diversion control team?

4             A.     Yes.

5             Q.     Stepping down to 1D.

6             Do you see that, it says,

7       Communication to team regarding

8       completion of projects?

9             A.     Yes.

10            Q.     Under D, there's a small

11      Roman Numeral i, that says, Policy

12      documents, with a colon.

13            Do you see that?

14            A.     I see that.

15            Q.     There it says, Although

16      asked to provide input, there has been no

17      communication whether policy documents

18      were made final or not.

19            Do you see that?

20            MS. MCCLURE:  Those policy

21      documents.

22            MR. CLUFF:  Shannon, you can

23      make an objection.  But you don't

24      get to testify.

1        MS. MCCLURE:  You don't get

2    to misstate a document.

3        MR. CLUFF:  Would you like

4    me to reread it?

5        MS. MCCLURE:  Sure.

6        MR. CLUFF:  You can make

7    that objection, you don't get to

8    testify on the deposition.

9        MS. MCCLURE:  Reread.

10   BY MR. CLUFF:

11       Q.   Should we read it again,

12   Liz?

13       A.   Yes.

14       Q.   Great.  It says, Policy

15   document, colon.

16       Do you see that?

17       A.   Yes.

18       Q.   Although asked to provide

19   input, there has been no communication

20   whether those policy documents were made

21   final or not.

22       Is it your recollection,

23   from working at AmerisourceBergen, that

24   often people were unclear about whether

Highly Confidential - Subject to Further Confidentiality Review

1    documents were made final or not?

2              MS. MCCLURE:  Objection.

3         Form.

4              THE WITNESS:  No.  I'm not

5         sure what policy documents I'm

6         referencing.

7    BY MR. CLUFF:

8         Q.    But here you do reference

9    policy documents, and there was a lack of

10   clarity about whether those policy

11   documents were final.

12             Would you agree?

13             MS. MCCLURE:  Form.

14             THE WITNESS:  I'm not sure.

15   BY MR. CLUFF:

16        Q.    You continue in that

17   paragraph, and you say, After researching

18   the ABC website-I was unable to locate

19   them and I'm not sure they were on there

20   to begin with.

21             So you were searching for

22   policy documents on ABC's website and you

23   were unable to find them, correct?

24        A.    We switched systems at that

Highly Confidential - Subject to Further Confidentiality Review

1  point, I believe.  And they may have been

2  on there and I just couldn't locate them.

3       Q.    Right.  So you were unable

4  to locate the policy documents you were

5  searching for, correct?

6       A.    Correct.

7       Q.    All right.  Stepping down to

8  E, it says, Provide positive feedback to

9  all team members.

10           And Roman Numeral I, you

11 say, Identify the strengths of each team

12 member and what he/she can contribute to

13 the team, while not displaying open

14 favoritism.

15           Did I read that correctly?

16      A.    You did.

17      Q.    Do you recall instances of

18 favoritism in the diversion control team?

19      A.    Well, as previously noted,

20 Eric and I had personality differences,

21 so he may have favored one person over

22 another.

23      Q.    Do you recall who he, in

24 your opinion, favored over another?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No.

2          MS. MCCLURE:  Objection.

3    Form.

4    BY MR. CLUFF:

5    Q.    But based on your experience

6    working with him, did you develop an

7    opinion that you were not his favorite?

8    A.    Our interactions were

9    limited.

10   Q.    Looking at Roman Numeral II

11   there, it's ii, it says, Communicating

12   effectively and providing encouragement

13   and support with approachable demeanor.

14   For example, if someone has a different

15   perspective regarding a decision and

16   provides a rationale for their

17   perspective, perhaps listening to the

18   rationale would go a long way to

19   encouraging that person to speak up in

20   future discussions, providing added value

21   to team efforts.

22          Do you recall expressing

23   different perspectives during

24   conversations with your diversion control

1  teammates?

2      A.    Yes.

3      Q.    And those different

4  perspectives were about decisions?

5      A.    Or general feedback on

6  projects.

7      Q.    What kind of decisions do

8  you recall giving perspectives about?

9      A.    I don't recall.

10     Q.    What about general feedback

11 on projects do you receive -- do you

12 recall receiving?

13     A.    I believe I reference one of

14 those here.  A training document.

15     Q.    Can you tell me where you're

16 looking?

17     A.    I'm looking at 296981.

18     Q.    Okay.  So just for the

19 record, that's the last page of the

20 document.

21     A.    Yes.

22     Q.    Ending Bates number 296981.

23          And can you tell me what

24 section you're looking at, please, Liz?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm looking at --

2    Q.    Is it small Roman Numeral i

3  at the top?

4    A.    Yes.

5    Q.    And what about that stands

6  out to you?

7          MS. MCCLURE:  Objection to

8          form.

9          THE WITNESS:  Eric and I saw

10         that differently, that project.

11 BY MR. CLUFF:

12   Q.    Let's read that.

13         It says, Example:  Training

14 of the DC personnel on the old and new

15 OMP program was challenging in terms of

16 how to accomplish the task.

17         What do you recall about the

18 challenges?

19   A.    How to approach it.

20   Q.    What was the difference in

21 how you were approaching the task?

22   A.    Verbal language, how to

23 present it verbally and visually.

24   Q.    Okay.  You continue there

Highly Confidential - Subject to Further Confidentiality Review

1    and say, Decision trees were discussed,

2    with the current version initially

3    rejected because it did not fit the

4    vision of management.

5             Did you draft the initial

6    version, or the current version?

7         A.    Myself and another

8    investigator did, yes.

9         Q.    Would that investigator have

10   been Nikki Seckinger?

11        A.    No.

12        Q.    Who would it have been?

13        A.    Lino Guerreiro.

14        Q.    Is his full name Marcelino

15   Guerreiro?

16        A.    Yes.

17        Q.    And people refer to him as

18   Lino?

19        A.    Yes.

20        Q.    Just to be clear, if we use

21   his name again.

22        A.    Okay.

23        Q.    You recall management

24   rejecting your initial version?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    You proceed and say, After

3   outlining the benefits of the current

4   decision tree versus the tree envisioned

5   by management, in this case, management

6   insisted on their decision tree because

7   of senior position within the company.

8             Do you recall if Eric

9   Cherveny insisted on his version just

10  because he was senior to you in the

11  company?

12            MS. MCCLURE:  Objection to

13       form.

14            THE WITNESS:  I vaguely

15       recall.

16  BY MR. CLUFF:

17       Q.    Do you recall any

18  merit-based reasons why he decided his

19  decision tree was better than yours?

20            MS. MCCLURE:  Objection to

21       form.

22            THE WITNESS:  No.

23  BY MR. CLUFF:

24       Q.    Looking at the last

1    sentence, you say, Exchanges such as

2    these promote mistrust and are

3    counterproductive, at the expense of the

4    betterment of business processes

5    company-wide.

6              Do you see that?

7         A.    I see that.

8         Q.    So you mistrusted your

9    managers, is that what you're trying to

10   communicate here?

11             MS. MCCLURE:   Objection to

12        form.

13             THE WITNESS:   Not mistrust,

14        just a breakdown in communication.

15   BY MR. CLUFF:

16        Q.    But you would agree with me

17   you used the word "promote mistrust,"

18   correct?

19        A.    The words are there, yes.

20        Q.    All right.   What were the

21   decision trees for in this presentation

22   that you're discussing in this portion of

23   the document?

24        A.    For DC, distribution center,

1    personnel training.

2         Q.    And what were the

3    training -- what was the purpose of the

4    training?

5         A.    The training was on

6    suspicious orders.

7         Q.    And what was the decision

8    tree designed to help the DC personnel

9    understand about suspicious orders?

10              MS. MCCLURE:  Objection.

11         Form.

12              THE WITNESS:  It was to

13         describe to them an order of

14         interest that would hit the

15         algorithm in the OMP program.

16    BY MR. CLUFF:

17         Q.    Was that a new OMP program?

18         A.    It was going to be, yes.

19         Q.    And the algorithm was a new

20    process at AmerisourceBergen, correct?

21              MS. MCCLURE:  Objection.

22         Form.

23              THE WITNESS:  Correct.

24    BY MR. CLUFF:

1    Q.    Do you know whether

2  AmerisourceBergen used an algorithm, or

3  some other method of identifying

4  suspicious orders prior to 2015?

5    A.    They used an algorithm, as

6  far as I know.

7    Q.    You're not aware that they

8  used a threshold?

9         MS. MCCLURE:  Objection to

10        form.

11        THE WITNESS:  That's part of

12        the algorithm, I think.

13 BY MR. CLUFF:

14    Q.    Underneath that paragraph

15 that you read, small Roman Numeral i,

16 there's Roman Numeral IIi, it says,

17 Solution.

18         So this is a paragraph where

19 you're proposing a solution for the

20 problem of mistrusting managers; is that

21 correct?

22        MS. MCCLURE:  Objection to

23        form.

24        THE WITNESS:  A solution for

Highly Confidential - Subject to Further Confidentiality Review

 1              better communication.

 2   BY MR. CLUFF:

 3        Q.    Okay.  Was the solution to

 4   help avoid mistrust?

 5              MS. MCCLURE:  Objection to

 6         form.

 7              THE WITNESS:  Just to have

 8         open communication lines.

 9   BY MR. CLUFF:

10        Q.    So the solution you propose

11   is, Acknowledgment must be made -- and

12   those three words are underlined -- that

13   the way ideas are communicated can be

14   more engaging without being

15   argumentative.

16              Did you feel that your

17   manager, Eric Cherveny, was argumentative

18   with you?

19              MS. MCCLURE:  Objection to

20         form.

21              THE WITNESS:  At times.

22   BY MR. CLUFF:

23        Q.    Do you recall times where he

24   was argumentative with you?

1          A.     Not specifics, no.

2          Q.     Was he ever argumentative

3    with you about decisions related to your

4    job responsibilities?

5          A.     Not that I recall.

6          Q.     You continue in this

7    paragraph, and you say, In addition to

8    this, however, delegation of certain

9    tasks without micromanagement is a more

10   effective way to help forge more

11   confidence within the group.

12              Do you recall Eric Cherveny

13   micromanaging you?

14              MS. MCCLURE:  Objection to

15         form.

16              THE WITNESS:  At times, but

17         not overall he wasn't a

18         micromanager.

19   BY MR. CLUFF:

20         Q.     Is there another manager or

21   employee at AmerisourceBergen who was a

22   micromanager?

23              MS. MCCLURE:  Objection to

24         form.

1          THE WITNESS:  Not that I

2     worked for.

3 BY MR. CLUFF:

4     Q.    Here you note that, Engaging

5 in this kind of behavior without

6 micromanagement will help forge more

7 confidence.

8          Would you agree that there

9 was a lack of confidence in management at

10 AmerisourceBergen?

11          MS. MCCLURE:  Objection to

12     form.

13          THE WITNESS:  I don't know.

14     You would have to ask them.

15 BY MR. CLUFF:

16     Q.    I'm asking you, because you

17 wrote, "help forge more confidence."

18          So without being

19 argumentative, I just want to clarify my

20 question.

21          Based on your working

22 experience with management at

23 AmerisourceBergen and as an employee

24 reporting to them, did you feel a lack of

1    confidence in their leadership abilities?

2                    MS. MCCLURE:  Objection to

3          form.

4                    THE WITNESS:  Generally, no.

5    BY MR. CLUFF:

6          Q.    Okay.  Please look at Number

7    2 there, it says, CSRA department, on

8    that same page.

9                    Do you see that?  And there

10   is a Subparagraph A that says, Whenever

11   changes are made organizationally, there

12   is an announcement made after the fact,

13   seemingly without much understanding as

14   to impact on associates.

15                   Do you see that?

16         A.    I see that.

17         Q.    Can you remember any

18   examples where after-the-fact decisions

19   were made that impacted the associates?

20         A.    I don't recall.

21         Q.    If you look down in the next

22   lower case Roman Numeral i, it says,

23   Example.

24                   Do you see that?

1        A.    Yes.

2        Q.    So would this be an example

3    of something that was announced after the

4    fact that impacted associates?

5              MS. MCCLURE:  Objection to

6         form.

7              THE WITNESS:  Yes.

8    BY MR. CLUFF:

9        Q.    So you say, When the

10   director of diversion control decided to

11   move in another direction, all of a

12   sudden, a new person took his place

13   without warning to the associates who

14   would be under the new director.

15             So is the director of

16   diversion control that moved in another

17   direction, was that Ed Hazewski?

18       A.    Ed moved in another

19   direction, yes.

20       Q.    So this is an example of

21   something that was announced after the

22   fact that impacted associates, correct?

23       A.    Yes.

24       Q.    And the new director would

Highly Confidential - Subject to Further Confidentiality Review

1  have been Eric Cherveny; is that right?

2       A.    Yes.

3       Q.    So you continue in that

4  paragraph and say, Sudden shifts like

5  this create apprehension and potentially

6  a negative view of upper management and

7  how inside decisions are made.

8            Do you see that?

9       A.    I see that.

10      Q.    I want to look -- let's just

11 read the last two sentences.  I don't

12 want to leave anything out.

13           It says, Perhaps in this

14 case it was unavoidable, as job changes

15 are not made public while in the process.

16           Do you see that?

17      A.    I see that.

18      Q.    The next sentence you say,

19 However, it generated surprise and

20 resentment among some who would have

21 liked a chance to apply for the position.

22           Looking at this paragraph,

23 was it your understanding, working in the

24 diversion control team, that changes in

Highly Confidential - Subject to Further Confidentiality Review

1    upper management created a negative view

2    of upper management?

3                    MS. MCCLURE:  Objection to

4           form.

5                    THE WITNESS:  That comment

6           was said at the DC level to me.

7           And I repeated it here.

8    BY MR. CLUFF:

9           Q.    So "at the DC level," that

10   means at the distribution center level?

11          A.    Yes.

12          Q.    And so employees at the DC

13   level had, based on what they reported to

14   you, a potentially negative view of upper

15   management; is that correct?

16                   MS. MCCLURE:  Objection to

17          form.

18                   THE WITNESS:  Potentially,

19          yes.

20   BY MR. CLUFF:

21          Q.    Okay.  And looking at the

22   last sentence, you say, It generated

23   surprise and resentment.

24                   Do you recall examples of

Highly Confidential - Subject to Further Confidentiality Review

1    people feeling resentful about the sudden

2    change that was announced after the fact?

3           A.    No.

4           Q.    You also mention people who

5    would have liked to apply for the

6    position.

7                 Do you know who wanted to

8    apply for that position?

9           A.    I do not.

10          Q.    Did you want to apply for

11   the position?

12          A.    No.

13          Q.    How did you feel about Eric

14   Cherveny becoming your new supervisor?

15          A.    Indifferent.

16          Q.    Before Eric Cherveny became

17   your supervisor, you worked for Ed

18   Hazewski for approximately three years,

19   correct?

20          A.    Correct.

21          Q.    Were you aware that Mr.

22   Hazewski had a law enforcement

23   background?

24          A.    Yes.

1    Q.    As a former DEA

2  investigator, did you respect him for his

3  law enforcement background?

4    A.    Yes.

5    Q.    Were you aware if Mr.

6  Hazewski had any, you know, college or

7  postgraduate degrees?

8    A.    I'm not aware of that.

9    Q.    When Mr. Cherveny became

10  your supervisor, and through the two

11  years that you worked for him, did you

12  ever understand whether he had any law

13  enforcement background?

14    A.    I don't recall.

15    Q.    Do you know if he had any

16  law enforcement background?

17    A.    I don't recall.

18    Q.    Do you know if Mr. Cherveny

19  ever completed a college education?

20    A.    I don't know.

21    Q.    Would it concern you if you

22  learned that Mr. Cherveny had no college

23  education?

24         MS. MCCLURE:  Objection.

1    Form.

2             THE WITNESS:  No.

3    BY MR. CLUFF:

4         Q.    Please turn to the second

5    page of this memo.  It's the third page

6    of the document.

7         A.    The second page?

8         Q.    Yes.  So it's one, two,

9    three from the beginning.

10            At the top, you'll see a

11   small Roman Numeral iii.

12        A.    Okay.

13        Q.    It says, Promoting the

14   continued advancement.

15        A.    Yes.

16        Q.    So there you write,

17   Promoting the continued advancement,

18   growth and development of the team

19   members through coaching, delegation and

20   other active management efforts, i.e.,

21   continuous constructive communication.

22            Do you see that?

23        A.    I see that.

24        Q.    Did you ever move up in the

Highly Confidential - Subject to Further Confidentiality Review

1   company?

2       A.    No.

3       Q.    Did you feel like you

4   advanced, grew or developed as a member

5   of the team?

6          MS. MCCLURE:  Objection to

7     form.

8          Go ahead.

9          THE WITNESS:  I feel like I

10     grew.

11  BY MR. CLUFF:

12      Q.    But you just didn't advance?

13      A.    No.

14      Q.    In the five years you worked

15  at AmerisourceBergen, did you ever form

16  any opinions about why you didn't advance

17  at the company?

18      A.    No.

19      Q.    Did you see anybody else

20  advance at the company?

21      A.    The company, in general,

22  there are shifts all the time.

23      Q.    Let me clarify.  Shifts, I

24  think, is a little bit different.  I'm

1   talking about advancement, like moving up

2   in responsibility.

3            Did you see anybody move up

4   in responsibility while you were there

5   for five years at AmerisourceBergen?

6        A.    Yes.

7        Q.    Who was that?

8        A.    Anthony Terrachi went from

9   Bruce Gundi's group, as an investigator,

10  to a director.

11       Q.    Do you have any

12  understanding of why he was promoted to a

13  director?

14       A.    No.

15       Q.    Did you apply for the

16  position of director, or were you

17  attempting to become a director, from a

18  diversion investigator?

19       A.    No.

20            MS. MCCLURE:   Objection.

21  BY MR. CLUFF:

22       Q.    Why not?

23       A.    Wait.  Restate the question.

24       Q.    Sure.

1                     Did you -- I asked two

2     questions at once, so I'll break them up.

3                     Did you ever apply for the

4     position of director at

5     AmerisourceBergen?

6          A.    No.

7          Q.    Were you seeking to become a

8     director in AmerisourceBergen?

9          A.    No.

10         Q.    Why not?

11         A.    I didn't want to.

12         Q.    Looking at this document

13    again, it's letter F, it says, General

14    communication.

15                    Do you see it says, General

16    communication, building common team

17    effort towards common mission.

18                    And then in Subparagraph I

19    it says, Raids by the DEA-the team does

20    not hear about these unless asked to

21    gather records for subpoenas.

22                    Do you recall instances of

23    raids by the DEA while you worked at

24    AmerisourceBergen?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. MCCLURE:  Objection.

2     Form.

3          THE WITNESS:  Raids from the

4     media.

5  BY MR. CLUFF:

6     Q.    Okay.  What were those?

7     A.    Pharmacy raids.

8     Q.    What did you know about

9  pharmacy raids while you were working

10  with AmerisourceBergen?

11          MS. MCCLURE:  Objection to

12     form.

13          THE WITNESS:  After the

14     fact, that they happened.

15  BY MR. CLUFF:

16     Q.    Would you have been asked to

17  gather records for subpoenas in relation

18  to pharmacy raids?

19     A.    If they were an ABC

20  customer.

21     Q.    Would you also have been

22  asked to gather records for subpoenas if

23  DEA -- I mean, DEA agents raided

24  AmerisourceBergen facilities?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. MCCLURE:  Objection to

2     form.

3          THE WITNESS:  I don't know.

4  BY MR. CLUFF:

5     Q.    You continue in that

6  paragraph and say, It would be helpful --

7  it would be useful for the team to be in

8  the loop regarding accounts that have

9  been closed or raided by the DEA or other

10  agencies, as it could help the team

11  identify other customers in the same

12  geographical area who may be at risk of

13  diversion.

14          Do you see that?

15     A.    I see that.

16     Q.    Did you have a concern that

17  the diversion control team didn't know

18  about customers that were being raided at

19  this time?

20          MS. MCCLURE:  Objection.

21     Form.

22          THE WITNESS:  Restate the

23     question, please.

24  BY MR. CLUFF:

1    Q.    Did you have concerns about

2  not knowing about DEA raids in relation

3  to diversion at this time?

4              MS. MCCLURE:  Same

5         objection.

6              THE WITNESS:  Yes.

7  BY MR. CLUFF:

8    Q.    What were your concerns?

9    A.    Just to know who they were

10  and what geographical area it was in.

11    Q.    You make a reference to how

12  knowing this information could help the

13  team identify other customers in the same

14  geographical area who may be at risk of

15  diversion.

16              So I'm trying to understand

17  what you're writing there.  If, say, a

18  pharmacy in Los Angeles got raided, would

19  that mean that other pharmacies in that

20  same location could potentially be at

21  risk for diversion?

22              MS. MCCLURE:  Objection to

23         form.

24              THE WITNESS:  That's hard to

1          answer without looking at those

2          pharmacies.

3     BY MR. CLUFF:

4          Q.    But it would have been

5     helpful to know what geographical area a

6     pharmacy got raided in, right?

7          A.    To maybe focus.

8          Q.    To help identify some that

9     could be at risk for diversion?

10         A.    That could be, yes.

11         Q.    And that was information

12    that was not communicated to the team,

13    correct?

14              MS. MCCLURE:  Objection to

15         form.

16              THE WITNESS:  It was

17         communicated after the fact.

18    BY MR. CLUFF:

19         Q.    Looking down the page,

20    there's another underlined heading that

21    says, Change management.

22              Do you see that?

23         A.    I see that.

24         Q.    It says, Diversion control

Highly Confidential - Subject to Further Confidentiality Review

1    team.

2              Do you see that?

3         A.    I see that.

4         Q.    In A, it says, Policies and

5    procedures.  There has been a steady

6    stream of decisions around policy that

7    has been made in the last nine months or

8    so, some of it clearly outlined and some

9    not as much.

10             Do you recall some unclear

11   policies and procedures that were being

12   implemented at AmerisourceBergen?

13             MS. MCCLURE:  Objection to

14        form.

15             THE WITNESS:  I don't

16        recall.

17   BY MR. CLUFF:

18        Q.    But you wrote here that some

19   decisions around policies were not

20   clearly outlined, correct?

21             MS. MCCLURE:  Objection to

22        form.

23             THE WITNESS:  They were in

24        process.

BY MR. CLUFF:

1    Q.    You continue in that
paragraph, and say, In the instances
where there is no clearcut decision that
is reinforced by policy, it is left up to
the discretion of the investigators to
make day-to-day decisions that impact
customers.

          Do you see that?

    A.    I see that.

    Q.    You were an investigator at
AmerisourceBergen, correct?

    A.    Yes.

    Q.    And you held that position
continuously for five years?

    A.    Yes.

    Q.    And in 2015, you would have
held that position for three years,
correct?

    A.    Correct.

    Q.    So in your work as an
investigator, would you agree with me, as
you write here, that, in some instances,
there were no clearcut decisions to

1  reinforce -- that were reinforced by

2  policy, right?

3            MS. MCCLURE:  Objection.

4            THE WITNESS:  Restate,

5       please.

6  BY MR. CLUFF:

7       Q.    In your work as an

8  investigator at AmerisourceBergen,

9  oftentimes there were no clearcut --

10 there were instances where there was no

11 clearcut decision that was reinforced by

12 an AmerisourceBergen policy?

13            MS. MCCLURE:  Objection to

14      form.

15            THE WITNESS:  I just -- I

16      don't recall looking at the policy

17      or what stage of draft it was in.

18      I don't remember that.

19 BY MR. CLUFF:

20      Q.    But here, you would agree

21 with me, that you write that, In the

22 instances where there is no clearcut

23 decision that is reinforced by policy, it

24 is left up to the discretion of the

Highly Confidential - Subject to Further Confidentiality Review

1    investigator to make day-to-day

2    decisions; is that right?

3         A.    That's right.  I'm asking

4    for more guidance.

5         Q.    The next step down, it says,

6    i, little Roman Numeral ii, Process

7    changes.

8              It says, Example: 590s.

9              What's a 590?

10        A.    It's the questionnaire that

11   a new and existing customer fills out as

12   part of their due diligence file.

13        Q.    Were there different kinds

14   of Form 590s for different customer

15   classes at AmerisourceBergen?

16             MS. MCCLURE:  Objection to

17        form.

18             MR. CLUFF:  Let me clarify.

19   BY MR. CLUFF:

20        Q.    So did, like, retail chain

21   pharmacies have a different 590 than

22   independent retail pharmacies?

23             MS. MCCLURE:  Objection to

24        form.

1          THE WITNESS:  No.  The

2      questions were roughly the same.

3  BY MR. CLUFF:

4      Q.   Did AmerisourceBergen ever

5  create an abbreviated Form 590 for retail

6  chains?

7          MS. MCCLURE:  Objection.

8      Form.

9          THE WITNESS:  It had the

10      same pertinent information, other

11      than ownership.

12  BY MR. CLUFF:

13      Q.   Did AmerisourceBergen ever

14  make an exception for retail chain

15  pharmacies on the way in which they

16  collected due diligence on the Form 590?

17          MS. MCCLURE:  Objection.

18      Form.

19          THE WITNESS:  No.

20  BY MR. CLUFF:

21      Q.   Never?

22      A.   No.

23      Q.   So is it your testimony here

24  today, then, that AmerisourceBergen

1   followed the same policies and procedures

2   about gathering Form 590 information from

3   retail chains as independent retail

4   pharmacies?

5            MS. MCCLURE:  Objection to

6       form.

7            THE WITNESS:  Correct.

8   BY MR. CLUFF:

9       Q.    I'm going to hand you a copy

10  of a document that we're going to mark as

11  Exhibit-4 to your deposition.  Let me

12  describe it for the record, and then I'll

13  hand it to you.

14            It's a multipage e-mail, the

15  top e-mail on the first page is from

16  Garcia, Elizabeth to Tomkowitz, Joseph,

17  subject line:  Forward:  Costco CF-OMP

18  discussion with Jon McArthur.  The Bates

19  numbers are ABDCMDL00333083 to 333085.

20            MR. CLUFF:  Here is a copy

21       for you.

22                 -  -  -

23            (Whereupon,

24       AmerisourceBergen-Garcia

Highly Confidential - Subject to Further Confidentiality Review

1        Exhibit-4, ABDCMDL00333083-085,

2        was marked for identification.)

3                    -   -   -

4   BY MR. CLUFF:

5        Q.    Please take a moment to

6   refresh your recollection with that

7   document.

8             To help you out, Ms. Garcia,

9   the portion of the e-mail I'm going to

10  direct your attention to is the bottom of

11  the first page and the top of the second

12  page.

13       A.    Okay.

14       Q.    It looks like I'm missing a

15  page now.

16            MR. CLUFF:  Can you go to

17       the last page in the exhibit,

18       please, Zach?

19  BY MR. CLUFF:

20       Q.    Do you see there at the

21  bottom, Liz, the e-mail begins from Greg

22  Madsen, and it's to Greg Madsen and a

23  number of other people.  And the subject

24  line is, Costco CF-OMP discussion with

1    Jon McArthur.

2          Do you see that?

3      A.    Yes.

4      Q.    What is Costco CF?

5      A.    Costco Central Fill.

6      Q.    Is that one of

7    AmerisourceBergen's customers?

8      A.    Costco is, yes.

9      Q.    Would you qualify them as,

10    like, a retail chain customer?

11          MS. MCCLURE:  Objection.

12        Form.

13          THE WITNESS:  This was the

14        Central Fill.  So yes.

15    BY MR. CLUFF:

16      Q.    And the rest of that subject

17    line is, OMP discussion with Jon

18    McArthur.

19          Do you have an understanding

20    of what that would refer to?

21      A.    Joe and I had discussions

22    with Jon McArthur of Costco outlining

23    that we wanted to collect due diligence

24    information, I believe.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Who is "Joe" that you refer

2    to?

3    A.    Joe Tomkowitz.

4    Q.    So you and Joe Tomkowitz

5    discussed with Jon McArthur about due

6    diligence you wanted to collect.

7              Is that specifically from

8    Costco?

9    A.    Yes, from the Costco Central

10   Fill.

11   Q.    If you move up the e-mail

12   chain, it looks like there is a response,

13   it blends between the second and third

14   page, from Greg Madsen to Ed Hazewski.

15             Do you see that?  The bottom

16   of Page 2 and the top of Page 3.

17   A.    Yes.

18   Q.    And it looks like it says,

19   from Greg, Ed, Any more information come

20   out of this meeting with Costco about a

21   month ago?  Not sure who is handling

22   this, and let me know who is point on

23   this.

24             Do you see that?

1        A.    I see that.

2        Q.    And then if you go up to the

3   bottom of Page 2, there's an e-mail from

4   Ed Hazewski to Greg Madsen, and a number

5   of other people, and now you're on the cc

6   line.

7             Do you see that?

8        A.    I see that.

9        Q.    And he says, Liz is the

10  point person.  She is off today.  But

11  I'll have her send an update.

12            Do you see that?

13       A.    I see that.

14       Q.    So if you go to the bottom

15  of the first page and the top of the

16  second page, there's an e-mail from you

17  to Greg Madsen.

18            Do you see that?

19       A.    I see that.

20       Q.    You start off, Hello, Greg

21  and Jon.

22            Correct?

23       A.    Yes.

24       Q.    Did you know Greg and Jon,

Highly Confidential - Subject to Further Confidentiality Review

1  obviously, by their first names?

2      A.    Yes.

3      Q.    And Jon is Jon McArthur at

4  Costco?

5      A.    Yes.

6      Q.    Do you know what his

7  position was?

8      A.    I do not.

9      Q.    Okay.  And you write to Greg

10  and Jon, you say, The last conversation

11  we had on July 25th, we discussed the

12  importance of gathering the 590

13  questionnaire demographic information

14  from our chain customers.

15          Do you see that?

16      A.    I see that.

17      Q.    So, again, Costco is one of

18  your chain customers, correct?

19      A.    Yes.

20      Q.    And are chain customers

21  different than independent retail

22  customers?

23      A.    No.  They're still in the

24  same class of retail.

1    Q.    Okay.

2    A.    They're just more of them

3    under one ownership.

4    Q.    You continue and say, Given

5    the regulatory environment resulting from

6    the DEA/Walgreens action.

7         What was the DEA/Walgreens

8    action?

9    A.    DEA fined Walgreens for $80

10   million for records.

11   Q.    Do you recall when that fine

12   was?

13   A.    It might have been 2011,

14   2012, somewhere in there.

15   Q.    If I represented to you that

16   it was in the middle of 2013, would that

17   refresh your recollection?

18        MS. MCCLURE:  Objection.

19        Form.

20        THE WITNESS:  I don't

21        remember the exact date.

22   BY MR. CLUFF:

23   Q.    Okay.  I think it's

24   important that we get the date right, so

1    I'm going to hand you another document.

2    It's a large document, I don't want to

3    waste your time on it.  I'm just going to

4    direct you to one slide so we can get a

5    little bit of clarity on this.

6              And we're going to mark this

7    as Exhibit-5, which is an e-mail Bates

8    marked 162348, that has attachments, one

9    of which is, CSRA summary-DEA briefing

10   Phoenix-05-16-17.ocx.  There's another

11   attachment which is, DEA presentation,

12   distributor briefing, Phoenix5-16-17-PDF.

13   The attachments to the e-mail run from

14   Bates numbers ABDCMDL00162349 to 162399.

15             The entirety of the e-mail

16   and both attachments have been marked as

17   confidential and subject to the

18   protective order.

19             I'll hand you your copy, Ms.

20   Garcia.

21             MR. CLUFF:  And then here

22        you go, counsel.

23                   -   -   -

24             (Whereupon,

Highly Confidential - Subject to Further Confidentiality Review

1           AmerisourceBergen-Garcia

2           Exhibit-5, ABDCMDL00162348-399,

3           was marked for identification.)

4                   -   -   -

5    BY MR. CLUFF:

6           Q.    So let me just help you.

7    Let's lay some foundation on this

8    document, really quick, Liz, and I'll

9    kind of walk you through it so we don't

10   waste anybody's time here today.

11          Do you see at the top

12   there's a "from" line and you're the

13   sender identified in the "from"?

14          A.    Yes.

15          Q.    And the recipient is

16   identified as David May in the "to" line;

17   is that correct?

18          A.    Yes.

19          Q.    So based on your

20   understanding of, you know, writing

21   e-mails at AmerisourceBergen, this

22   appears to be an e-mail you sent to David

23   May, right?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  And you see the

2   subject, DEA briefing memo and

3   presentation?

4      A.    Yes.

5      Q.    Okay.  And then you see

6   there are -- there's an attachments line.

7   The first attachment is, CSRA summary-DEA

8   briefing Phoenix.

9           Do you see that?

10     A.    I see that.

11     Q.    Now, if you turn to the

12   first page and look at the next page in

13   the document, do you see that there is a

14   memo --

15     A.    I see that.

16     Q.    -- titled, DEA distributor

17   briefing-Phoenix, AZ.

18          Do you see that?

19     A.    I see that.

20     Q.    Would you agree this appears

21   to be the first attachment to this

22   e-mail?

23     A.    Yes.

24     Q.    So going back to the cover

1    e-mail, there's a second attachment,

2    separated by a semicolon.

3              Do you see that?

4         A.    Yes.

5         Q.    It says, DEA presentation

6    distributor briefing Phoenix 5-16-17.

7              Do you see that?

8         A.    I see that.

9         Q.    So if you flip back three

10   pages, you'll see what appear to be

11   PowerPoint slides.

12             Do you see that?

13        A.    I see that.

14        Q.    And at the top it says,

15   Distributor initiative?

16        A.    Yes.

17        Q.    Did you attend a distributor

18   briefing in Phoenix in 2017?

19        A.    I did.

20        Q.    Does this appear to be the

21   slide presentation given by the DEA at

22   that briefing?

23        A.    Yes.

24        Q.    Okay.  So it appears that

Highly Confidential - Subject to Further Confidentiality Review

1  this is a true and correct copy of the

2  document that you e-mailed to David May?

3             MS. MCCLURE:  Objection.

4       Form.

5             THE WITNESS:  It appears

6       that way, yes.

7  BY MR. CLUFF:

8       Q.   Okay.  So these slides don't

9  have slide numbers on them, but we can

10 move through the document pretty easily

11 with the Bates numbers.

12      A.   Okay.

13      Q.   I just want to point out --

14 my apologies, it's such a long document,

15 and I may have given you the wrong one.

16           Set that aside.  I think I

17 gave you the wrong document.  That's my

18 fault, I apologize.

19           So let's go back to, I

20 believe it's Exhibit-4, which is the

21 e-mail between you and Mr. Tomkowitz at

22 the top.

23           Do you see that?

24      A.   Yes.

1     Q.    So going back to this

2  portion you wrote in August of 2013, we

3  discussed at the end of that first

4  paragraph, you talked about the

5  DEA/Walgreens action, right?

6     A.    Yes.

7     Q.    And you said that there was

8  an $80 million fine against Walgreens?

9     A.    Yes.

10    Q.    Okay.  So you continue on,

11  on the next page, it says, As a

12  wholesaler/distributor and a DEA

13  registrant.

14         Do you see that paragraph?

15    A.    I see it.

16    Q.    You say, AmerisourceBergen

17  is mandated to know our customers.

18         Correct?

19    A.    Yes.

20    Q.    And you're talking about,

21  just in the subject of this e-mail, I

22  want to be clear, chain customers,

23  correct?

24             MS. MCCLURE:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1    Form.

2              THE WITNESS:  We're talking

3         about Costco Central Fill.

4    BY MR. CLUFF:

5         Q.    At the beginning of this

6    e-mail, you wrote, on August 26th, 2013,

7    you said, We discussed the importance of

8    gathering the 590 questionnaire

9    demographic information from our, quote,

10   chain customers.

11             Do you see that?

12        A.    Yes.

13        Q.    So here we're talking about

14   chain customers, of which Costco is one,

15   correct?

16             MS. MCCLURE:  Objection.

17        Form.

18             THE WITNESS:  Yes.

19   BY MR. CLUFF:

20        Q.    Okay.  So going back to the

21   top of the second page, you say, This

22   process normally begins with the

23   completion of a questionnaire that

24   contains compliance-related questions and

Highly Confidential - Subject to Further Confidentiality Review

1     information, prior to servicing the

2     pharmacy.

3              Do you see that?

4        A.    I see that.

5        Q.    So that's the normal

6     process, correct?

7        A.    Yes.

8        Q.    And you continue and say,

9     These forms are kept on file -- excuse

10    me, The forms are kept on file and serve

11    as the basis to satisfy our, quote, Know

12    Your Customer, closed quote, mandate and

13    as reference for future activity.

14             Do you see that?

15       A.    I see that.

16       Q.    So is it your understanding

17    that the 590s were part of the mandated

18    Know Your Customer requirement?

19             MS. MCCLURE:  Objection.

20        Form.

21             THE WITNESS:  That was an

22        internal ABC requirement.

23    BY MR. CLUFF:

24       Q.    You, here, refer to it as a

1   Know Your Customer mandate.

2            It's your opinion that ABC

3   mandated the Know Your Customer

4   information?

5            MS. MCCLURE:  Objection to

6        form.

7            THE WITNESS:  DEA mandates

8        it, but there's no regulatory

9        statute.

10  BY MR. CLUFF:

11       Q.    But DEA mandates that

12  companies like AmerisourceBergen know

13  their customers, correct?

14            MS. MCCLURE:  Objection to

15        form.

16            THE WITNESS:  They suggest

17        that on their website.

18  BY MR. CLUFF:

19       Q.    I'm sorry, here you use the

20  word "mandate" but you just said

21  suggested.  So I'm just trying to

22  understand which it is.

23            Is it a mandate or a

24  suggestion?

1    A.    It's not --

2         MS. MCCLURE:  Objection to

3    form.

4         THE WITNESS:  It's not a

5    regulatory requirement in the

6    statutes.

7 BY MR. CLUFF:

8    Q.    But here you write that it's

9 mandated.

10        So would you agree with me

11 here that in 2013, you believed that the

12 Know Your Customer information was

13 mandated?

14        MS. MCCLURE:  Objection.

15    Form.

16        THE WITNESS:  I just used

17    that word.

18 BY MR. CLUFF:

19    Q.    So you continue in the next

20 paragraph, Historically,

21 AmerisourceBergen has collected one

22 questionnaire for an entire chain of

23 stores.

24        Do you see that?

1        A.    I see that.

2        Q.    So for independent retail

3   customers, did AmerisourceBergen obtain a

4   590 for each independent retail chain?

5             MS. MCCLURE:  Objection.

6        Form.

7             THE WITNESS:  That was

8        before my time.  I don't know.

9   BY MR. CLUFF:

10       Q.    In 2013, you worked at

11  AmerisourceBergen, correct --

12       A.    Yes.

13       Q.    -- excuse me, correct?

14             In 2013, was it

15  AmerisourceBergen's practice to collect a

16  590 for each independent retail pharmacy?

17             MS. MCCLURE:  Objection.

18        Form.

19             THE WITNESS:  For each

20        independent retail pharmacy, yes.

21  BY MR. CLUFF:

22       Q.    Okay.  And here you're

23  saying, Historically, AmerisourceBergen

24  has collected one questionnaire for an

```
 1    entire chain of stores.

 2              Do you see that?

 3         A.    I see that.

 4         Q.    So that's different than the

 5    way you're treating independent chains --

 6    or independent pharmacies, correct?

 7              MS. MCCLURE:  Objection to

 8         form.

 9              THE WITNESS:  I don't know

10         what the process was before I got

11         the chains.

12    BY MR. CLUFF:

13         Q.    Did somebody else write this

14    sentence for you?

15              MS. MCCLURE:  Objection to

16         form.  Argumentative.

17              THE WITNESS:  No.

18    BY MR. CLUFF:

19         Q.    But you write, Historically,

20    AmerisourceBergen has collected one

21    questionnaire for an entire chain of

22    stores.

23              Do you see that?

24         A.    I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  So did you form an

2    understanding about AmerisourceBergen's

3    historic practices as to chain

4    pharmacies?

5          A.     That was historically before

6    my time of getting chains.

7          Q.     Where did you get this

8    information from?

9          A.     I don't recall.

10          Q.     Did somebody else write it

11    for you?

12               MS. MCCLURE:  Objection to

13          form.  Asked and answered.

14          Argumentative.

15               THE WITNESS:  No.

16    BY MR. CLUFF:

17          Q.     So you wrote it from your

18    own personal knowledge, then?

19          A.     From my understanding, yes.

20          Q.     Okay.  Then you continue and

21    say, However, recent industry events and

22    government actions have caused

23    AmerisourceBergen to reevaluate the

24    process.

Highly Confidential - Subject to Further Confidentiality Review

1                    So would you agree with me

2        that recent industry events and

3        government actions changed

4        AmerisourceBergen's policies and

5        procedures?

6                    MS. MCCLURE:  Objection to

7              form.

8                    THE WITNESS:  I don't know

9              if it was changed.

10       BY MR. CLUFF:

11             Q.    How about reevaluated?

12                   MS. MCCLURE:  Objection to

13             form.

14                   THE WITNESS:  It may have

15             been reevaluated.

16       BY MR. CLUFF:

17             Q.    Do you see where you said,

18       "caused AmerisourceBergen to reevaluate

19       this process"?

20             A.    I see that.

21             Q.    You don't disagree with that

22       statement today, do you?

23                   MS. MCCLURE:  Objection to

24             form.

1          THE WITNESS:  I wrote that

2     here.  I don't know at the time.

3  BY MR. CLUFF:

4          Q.    Who are some chain customers

5  that AmerisourceBergen did business with?

6          A.    Walgreens, Sam's Club,

7  Publix.

8          Q.    How about CVS?

9          A.    Not to my knowledge.

10         Q.    Rite Aid?

11         A.    Not while I was there.  I

12  don't think so.

13         Q.    Let's look back at

14  Exhibit-5.  My colleague here helped get

15  my mind right.

16         A.    Okay.

17         Q.    Okay.  So looking at the

18  slides, if you can go to ABDCMDL00162394.

19             Once again, I'm only showing

20  you this slide so that we can get some

21  clarity on dates.  I'm not going to ask

22  you anything about the substance of this

23  slide at all.

24             I'm looking at the top slide

Highly Confidential - Subject to Further Confidentiality Review

1    on the page.  Go ahead and read that for

2    me.

3         A.    The heading?

4         Q.    Read the entire slide, so

5    you feel comfortable about it and let me

6    know?

7              MS. MCCLURE:  To yourself,

8         you mean?

9              MR. CLUFF:  Yes.

10             MS. MCCLURE:  She thought

11        you meant --

12             THE WITNESS:  I see that top

13        slide, yes.

14   BY MR. CLUFF:

15        Q.    So I previously asked you if

16   you recalled when the Walgreens fine was.

17             Having reviewed that slide,

18   does it refresh your recollection about

19   when the fine was against Walgreens?

20        A.    This is dated in 2013.

21        Q.    Okay.  And what's the month

22   and day?

23        A.    June 1st -- or June 11th.

24        Q.    Does that correct your

1    recollection on when Walgreens would have

2    been fined?

3                    MS. MCCLURE:  Objection to

4            form.

5                    THE WITNESS:  Yes.

6    BY MR. CLUFF:

7        Q.    Okay.  So it appears, based

8    on that slide, that Walgreens was fined

9    at some point in the middle of 2013,

10   correct?

11       A.    Yes.

12       Q.    And looking at the first

13   paragraph there, it was a, quote,

14   Recordbreaking $80 million penalty to

15   resolve a U.S. Drug Enforcement

16   Administration investigation into the

17   company's dispensing practices in

18   Florida, correct?

19                   MS. MCCLURE:  Objection to

20           form.

21                   THE WITNESS:  I can see that

22           written there.

23   BY MR. CLUFF:

24       Q.    Was Walgreens a customer of

1    AmerisourceBergen at this time?

2         A.    I don't recall when they

3    onboarded.

4         Q.    Are you familiar with a

5    suspension of Cardinal Health's Lakeland

6    facilities in March of 2012?

7              MS. MCCLURE:  Objection to

8         form.

9              THE WITNESS:  I don't recall

10        that.

11   BY MR. CLUFF:

12        Q.    Do you recall that as a

13   result of Cardinal Health's suspension in

14   2012 AmerisourceBergen acquired Walgreens

15   as a customer?

16             MS. MCCLURE:  Objection.

17        Form.  Foundation.

18             THE WITNESS:  I don't

19        recall.

20   BY MR. CLUFF:

21        Q.    Do you have any

22   recollection, based on your time at

23   AmerisourceBergen -- strike that.

24             You worked at

Highly Confidential - Subject to Further Confidentiality Review

1  AmerisourceBergen for five years,

2  correct?

3       A.    Correct.

4            MS. MCCLURE:  Objection.

5       Asked and answered.

6  BY MR. CLUFF:

7       Q.    And during your time, I

8  believe you testified that you were

9  responsible for 590 chain due diligence;

10  is that correct?

11            MS. MCCLURE:  Objection.

12       Form.

13            THE WITNESS:  Yes.

14  BY MR. CLUFF:

15       Q.    Was that part of your job

16  responsibilities for the entirety of your

17  career at AmerisourceBergen?

18       A.    In part, yes.

19       Q.    You said "in part."

20            What do you mean by "in

21  part"?

22       A.    Some of those accounts were

23  transferred to other investigators.

24       Q.    Do you recall which accounts

1   were transferred to other investigators?

2          A.    I do not.

3          Q.    But, generally, you were

4   responsible for some part of the chain

5   590 due diligence at AmerisourceBergen,

6   correct?

7          A.    Correct.

8          Q.    And that was throughout your

9   five-year career there?

10         A.    Yes.

11         MS. MCCLURE:  Objection.

12         Asked and answered.

13  BY MR. CLUFF:

14         Q.    So do you recall, your best

15  recollection, if Walgreens became a

16  customer of AmerisourceBergen at the

17  beginning, middle or end of the five

18  years you spent at AmerisourceBergen?

19         A.    Towards the beginning, I

20  believe.

21         Q.    So is that potentially 2012?

22         MS. MCCLURE:  Objection to

23         form.

24         THE WITNESS:  No, not that

Highly Confidential - Subject to Further Confidentiality Review

1       early.

2   BY MR. CLUFF:

3       Q.    How about early 2013?

4            MS. MCCLURE:  Objection.

5       Form.

6            THE WITNESS:  I believe

7       later in 2013.

8   BY MR. CLUFF:

9       Q.    Based on reading this slide

10  and your recollection as an investigator

11  at AmerisourceBergen, do you believe that

12  Walgreens became a customer before or

13  after you became aware of this fine?

14            MS. MCCLURE:  Objection.

15       Form.

16            THE WITNESS:  I don't

17       recall.

18  BY MR. CLUFF:

19       Q.    Okay.  Let's go back to

20  Exhibit-4, please.

21            I want to go back to the

22  second full paragraph on the second page

23  there.  The one that starts,

24  Historically.

Highly Confidential - Subject to Further Confidentiality Review

1              Do you see that?

2       A.    I see that.

3       Q.    We previously talked about

4  the fact that, you know, in the first and

5  second line, you say, Recent industry

6  events and government actions have caused

7  Amerisource to reevaluate the process.

8              Do you see that?

9       A.    Yes.

10      Q.    I'm just trying to give you

11  a point of reference in the document.

12             So you continue on the next

13  sentence and you say, In order to protect

14  our chain partners.

15             Do you see that?

16      A.    Yes.

17      Q.    We are undertaking a

18  comprehensive review of the due diligence

19  files for all of our chain customers.

20             Do you see that?

21      A.    I see that.

22      Q.    So would you agree with me

23  that in this sentence you state that, in

24  order to protect our --

Highly Confidential - Subject to Further Confidentiality Review

1   AmerisourceBergen -- chain partners,

2   Amerisource is undertaking a

3   comprehensive review of the due diligence

4   files for all chain customers; is that

5   accurate?

6        A.    Yes.

7        Q.    The next sentence, you say,

8   That process will begin with the

9   gathering of information outlined in the

10  attached questionnaire from each

11  individual chain customer.

12            Do you see that?

13       A.    I see that.

14       Q.    If you look at the first

15  page, there's nothing attached to this

16  version of the e-mail.

17            Do you see that?

18            MS. MCCLURE:  Objection to

19       form.

20            THE WITNESS:  It's at the

21       bottom of that e-mail.

22  BY MR. CLUFF:

23       Q.    Oh, okay.

24       A.    It's indicated.

1    Q.    So there would have been a

2    document attached to that portion of that

3    e-mail?

4        A.    Correct.

5        Q.    ABC questionnaire

6    responses.xlsx?

7        A.    Yes.

8        Q.    And CSRA Form 590 retail

9    questionnaire_chain, correct?

10       A.    Correct.

11       Q.    So in the next sentence you

12   proceed, This process, in conjunction

13   with our order monitoring program and

14   ongoing review of customer purchases,

15   will go a long way towards our goal of

16   protecting the interests of our valued

17   customers and AmerisourceBergen.

18           Correct?

19           MS. MCCLURE:  Objection.

20       Misstates the document.

21           THE WITNESS:  Correct.

22           MR. CLUFF:  I'm sorry, what

23       was your objection, Shannon?

24           MS. MCCLURE:  That it

1          misstates the document.

2     BY MR. CLUFF:

3          Q.    Ms. Garcia, do you feel that

4     I in any way misstated this document when

5     I read it word for word?

6          A.    You're mixing the order

7     monitoring program with what this

8     document is.

9          Q.    I'm curious.  I read this

10     sentence.  I'll read it again for you.

11          This process, in conjunction

12     with our order monitoring program and

13     ongoing review of customer purchases,

14     will go a long way towards our goal of

15     protecting the interests of our valued

16     customers and AmerisourceBergen.

17          Did I read that accurately?

18          A.    You did.

19          Q.    Okay.  I have a question for

20     you.

21          When you referenced the word

22     "our" in that sentence, does it mean

23     AmerisourceBergen?

24          A.    Yes.

1    Q.    And we previously agreed

2  that this was an e-mail about chain

3  customers, correct?

4              MS. MCCLURE:  Objection.

5         Form.

6              THE WITNESS:  This is about

7         the Costco Central Fill.

8  BY MR. CLUFF:

9    Q.    Let's look at the first

10 e-mail again -- the first paragraph of

11 this e-mail, the one at the bottom of

12 Page 1.

13             MR. MAHADY:  Do you mean

14        Page 3?

15             MR. CLUFF:  Nope, I mean

16        Page 1.  The first paragraph of

17        the e-mail on the bottom of Page

18        1.

19 BY MR. CLUFF:

20   Q.    Do you see that?

21   A.    I see that.

22   Q.    It says, The last

23 conversation we had on July 25th, we

24 discussed the importance of gathering the

1  590 questionnaire demographic information

2  from, quote, our chain customers, closed

3  quote.

4            Do you see that?

5      A.    I see that.

6      Q.    "Our" there, again, refers

7  to AmerisourceBergen, correct?

8      A.    Correct.

9      Q.    And we agreed that Costco

10  was one of AmerisourceBergen's chain

11  customers, correct?

12      A.    Correct.

13      Q.    Right.  And we previously

14  discussed that other chain customers

15  included, for example, Walgreens, right?

16      A.    Correct.

17            MS. MCCLURE:  Objection to

18       form.

19  BY MR. CLUFF:

20      Q.    So let's go back to the

21  middle paragraph in that e-mail on the

22  next page, the one that begins with,

23  Historically.

24            The last sentence, again,

1    reads:  This process, in conjunction with

2    our order monitoring program and ongoing

3    review of customer purchases, will go a

4    long way towards our goal of protecting

5    the interests of our valued customers and

6    AmerisourceBergen.

7              So I'm going to -- two

8    foundational questions there.  "Our,"

9    again, refers to AmerisourceBergen,

10   correct?

11        A.    Correct.

12        Q.    Right.  And we previously

13   discussed that this e-mail is about chain

14   customers, like Costco and Walgreens,

15   correct?

16             MS. MCCLURE:  Objection.

17        Form.

18             THE WITNESS:  Correct.

19   BY MR. CLUFF:

20        Q.    Right.  Would you agree

21   there when you say "our valued

22   customers," you're referring to the chain

23   customers, correct?

24             MS. MCCLURE:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1          Form.

2                    THE WITNESS:  I'm referring

3          to all of our customers.

4    BY MR. CLUFF:

5          Q.    So all of

6    AmerisourceBergen's customers are valued

7    customers; is that correct?

8          A.    That's correct.

9          Q.    Okay.  So AmerisourceBergen,

10   I'm going to quote you on this last line,

11   had a goal of protecting the interests of

12   its valued customers, correct?

13         A.    Correct.

14         Q.    Okay.

15                MR. CLUFF:  Is it 12:30?

16                MS. MCCLURE:  Please, God.

17                MR. CLUFF:  Why don't we

18         take a break?  We'll do a half

19         hour, 45 minutes for lunch.

20                VIDEO TECHNICIAN:  Off the

21         record at 12:26 p.m.

22                    -  -  -

23                (Whereupon, a luncheon

24         recess was taken.)

1                     -   -   -

2                   VIDEO TECHNICIAN:  We're

3           back on the record at 1:18 p.m.

4    BY MR. CLUFF:

5           Q.    Ms. Garcia, thank you for

6    coming back.  We're back on the record,

7    so just to remind you, you're still under

8    oath.

9                   Do you understand that?

10          A.    Yes.

11          Q.    When we broke, we were going

12   through Exhibit-4, which is the e-mail

13   between you and Joe Tomkowitz about the

14   Costco Central Fill customer.

15          A.    Yes.

16          Q.    Okay.  So I just had one

17   follow-up question.

18                  We talked, on Page 2, that

19   last sentence that ends, Our goal of

20   protecting the interests of our valued

21   customers and AmerisourceBergen.

22                  Do you see that?

23          A.    I see that.

24          Q.    I have a tiny question for

Highly Confidential - Subject to Further Confidentiality Review

1    you.

2              This e-mail was written by

3    you in August of 2013, correct?

4         A.    Yes.

5         Q.    And that was roughly two

6    months after that slide we looked at

7    about the Walgreens penalty, correct?

8         A.    Correct.

9         Q.    Okay.  Thank you.  That's

10   all I had for you on that, so we can set

11   that aside for a second.

12             I'd like to hand you a copy

13   of your FY '16 performance evaluation.

14                  -  -  -

15             (Whereupon,

16        AmerisourceBergen-Garcia

17        Exhibit-6, ABDCMDL00364844-851,

18        was marked for identification.)

19                  -  -  -

20   BY MR. CLUFF:

21        Q.    I'll mark it as Exhibit-6.

22   I'll give you a chance to review that.

23             Some of the documents we'll

24   be talking about this afternoon, as I

1  maybe mentioned to you earlier, are going

2  to be a little longer than I would

3  normally discuss with you.

4          I think it's important that

5  you have the opportunity to use them.  If

6  you're going to take a long time to read

7  them, so we can give you enough time, let

8  me know, and maybe we'll consider going

9  off the record so you can read them while

10  we're all sitting here waiting.

11          But I'd prefer not to just,

12  like, burn minutes in the depo if you're

13  amenable to that.

14          MS. MCCLURE:  We're not

15      going to agree to go off the

16      record.  She can read --

17          MR. CLUFF:  You don't have

18      to agree.

19  BY MR. CLUFF:

20     Q.    Maybe I can help you.

21          We can just lay some

22  foundation about this document, Liz, like

23  we've done with some others.

24          So looking at the top there,

Highly Confidential - Subject to Further Confidentiality Review

1  do you see that, Garcia, Elizabeth A., is

2  at the top left corner?

3          A.    Yes.

4          Q.    And that's obviously your

5  name, correct?

6          A.    Correct.

7          Q.    All right.  And in the top

8  right corner, it says, FY '16 performance

9  evaluation.

10              Do you see that?

11          A.    I see that.

12          Q.    And then do you see

13  underneath that, it says,

14  10/01/2015-09/30/2016?

15          A.    I see that.

16          Q.    Okay.  I just want to

17  establish your understanding about the

18  performance evaluation process at

19  AmerisourceBergen, beginning with the

20  time period.

21              So it looks like at

22  AmerisourceBergen you would have received

23  a performance evaluation in sort of the

24  third quarter of every year; does that

Highly Confidential - Subject to Further Confidentiality Review

1    seem accurate?

2           A.     Probably the fourth quarter.

3    The fiscal year starts --

4           Q.     I'm bad at math.

5                  So fourth quarter sounds

6    accurate, right?

7           A.     Maybe.

8           Q.     It happened at the end of

9    the year, how about that?

10          A.     Correct.

11          Q.     Okay.  And the performance

12   evaluation would have been for work that

13   you completed in the prior year?

14          A.     Yes.

15          Q.     Okay.  And how did the

16   performance evaluation process work,

17   generally?

18          A.     So we would go in and add

19   our comments about our own performance,

20   and then followed by the supervisor.

21          Q.     Okay.  And this document in

22   front of you, based on the title, appears

23   to be a performance evaluation for fiscal

24   year 2016?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Okay.  And if you look under

3  your name, there is a line that says,

4  Evaluated by Eric Cherveny.

5            Do you see that?

6      A.    I see that.

7      Q.    So would Eric Cherveny have

8  conducted this performance evaluation

9  with you?

10     A.    Yes.

11     Q.    All right.  And based on

12  your prior testimony, it's your

13  understanding that you would have been

14  provided a chance to make comments in

15  preparation for your evaluation, it

16  sounds like?

17     A.    Correct.

18     Q.    And then would you have gone

19  over those comments with Eric Cherveny?

20     A.    Yes.

21     Q.    Okay.  Do you know if he got

22  a chance to write comments before the two

23  of you would have gone over them?

24            MS. MCCLURE:  Objection to

```
 1              form.

 2                   THE WITNESS:  Yes.

 3       BY MR. CLUFF:

 4              Q.    Okay.  Did you ever look at

 5       a document like this during a performance

 6       evaluation?

 7                   MS. MCCLURE:  Objection to

 8              form.

 9                   THE WITNESS:  Yes.

10       BY MR. CLUFF:

11              Q.    So have you seen this

12       document before, then?

13              A.    I have.

14              Q.    Okay.  You know, looking

15       through it, just generally, does it

16       appear to be a true and correct copy of a

17       document that you would have reviewed in

18       2016 with Eric Cherveny?

19                   MS. MCCLURE:  Objection to

20              form.

21                   THE WITNESS:  It appears to

22              be, yes.

23       BY MR. CLUFF:

24              Q.    So looking at the first
```

Highly Confidential - Subject to Further Confidentiality Review

1  page, there's a line that says, Overall

2  ratings and comments.

3              Do you see that?

4       A.    Overall evaluation?

5       Q.    I'm looking at overall

6  ratings and comments, just above manager.

7       A.    Got you.  Yes.

8       Q.    And then underneath that, it

9  says, Manager overall evaluation.

10      A.    Yes.

11      Q.    And so that would have been

12  Eric Cherveny's comments?

13      A.    Yes.

14      Q.    And then underneath that,

15  there's a line that says, Employee

16  overall evaluation.

17              Do you see that?

18      A.    I see that.

19      Q.    Are those your comments,

20  then?

21      A.    Yes.

22      Q.    Just stepping back for a

23  second, do you recall the 2016 year, in

24  terms of your work?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. MCCLURE:  Objection to

2        form.

3              THE WITNESS:  Let's see,

4        that's fiscal year 2016.

5              Vaguely.

6    BY MR. CLUFF:

7        Q.    Were you enjoying your work

8    at that point in time?

9              MS. MCCLURE:  Objection to

10       form.

11             THE WITNESS:  Yes.

12   BY MR. CLUFF:

13       Q.    We previously talked about

14   personality disagreements between you and

15   Eric Cherveny.

16             By fiscal year 2016, had

17   those developed, or were they ongoing?

18       A.    Those were ongoing off and

19   on.

20       Q.    I want to start with your

21   comments under, Employee overall

22   evaluation.

23             Do you see that on the page?

24       A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    The first sentence, I'll

2    paraphrase, it says that you believe

3    you're meeting core values and business

4    objectives.

5         Do you see that?

6    A.    I see that.

7    Q.    What were the core values,

8    as you understood them, at this time?

9    A.    I don't recall.

10   Q.    Do you have an understanding

11   today, just generally, of what

12   AmerisourceBergen's core values are?

13        MS. MCCLURE:  Objection to

14        form.

15        THE WITNESS:  I don't

16        recall.

17   BY MR. CLUFF:

18   Q.    My question was a little

19   different.  And I don't want to nitpick

20   with you, but I'm going to rephrase it so

21   we're both a little clearer.

22        I understand you don't

23   recall, in 2016, what the core values

24   are.  But I'm curious if you have a

Highly Confidential - Subject to Further Confidentiality Review

1   general understanding, today as you sit

2   here, what AmerisourceBergen's core

3   values are?

4                MS. MCCLURE:  Object to

5        form.

6                THE WITNESS:  I don't

7        recall.  Just ethical and

8        integrity.

9   BY MR. CLUFF:

10       Q.    I could not quite hear you.

11             Did you say just ethical

12  integrity?

13       A.    Being ethical and having

14  integrity.

15       Q.    Being ethical and having

16  integrity?

17       A.    Yep.

18       Q.    You also mentioned business

19  objectives in that sentence.

20             Do you have a recollection,

21  in 2016, what AmerisourceBergen's

22  business objectives were?

23       A.    I do not.

24       Q.    Is AmerisourceBergen a

Highly Confidential - Subject to Further Confidentiality Review

1  for-profit company?

2       A.    Yes.

3       Q.    Do they make a profit from

4  distributing pharmaceutical drugs?

5            MS. MCCLURE:  Objection to

6       form.

7            THE WITNESS:  I assume so.

8       That's their business model.

9  BY MR. CLUFF:

10      Q.    So would one of their

11  business objectives be to continue

12  profiting from the sale of pharmaceutical

13  drugs?

14           MS. MCCLURE:  Objection to

15      form.

16           THE WITNESS:  Yes.

17  BY MR. CLUFF:

18      Q.    Did you ever have any

19  conversations with anybody at

20  AmerisourceBergen, at any time, about

21  AmerisourceBergen's profits or

22  performance as a business related to

23  pharmaceutical sales?

24      A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Let's look at the next

2  sentence in your overall comments.

3           It says, I do need to be

4  challenged in order to stay engaged and

5  am open to new assignments not mentioned

6  here.

7           Were you bored with your job

8  at AmerisourceBergen?

9           MS. MCCLURE:  Objection.

10          THE WITNESS:  No.

11  BY MR. CLUFF:

12    Q.   Did you feel like you were

13  not challenged in your job at

14  AmerisourceBergen?

15    A.   I was challenged in my job.

16    Q.   How come you wrote, I do

17  need to be challenged in order to stay

18  engaged?

19    A.   That's just me as a general

20  observation.

21    Q.   Were you starting to

22  disengage from AmerisourceBergen by

23  September 2016?

24          MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                THE WITNESS:  Not that I

3          recall.

4    BY MR. CLUFF:

5          Q.    You mention, new assignments

6    not mentioned here.

7                Do you have any idea of what

8    new assignments you were looking for in

9    2016?

10               MS. MCCLURE:  Objection to

11         form.

12               THE WITNESS:  I don't recall

13         what I meant by that.

14   BY MR. CLUFF:

15         Q.    The next sentence you say, I

16   believe being able to fully learn more

17   about BOBJ -- that's B-O-B-J -- and how

18   to use it as a data pooling tool, i.e.,

19   building custom templates, reports, et

20   cetera, for subpoenas and other purposes

21   would be a welcome challenge.

22               Do you have a recollection

23   of what BOBJ was?

24         A.    BOBJ was a database.  It

Highly Confidential - Subject to Further Confidentiality Review

1    pulled from the SAP database and visually

2    presented data in a more simplified

3    visual manner that we could pull.  So

4    inquiries.

5          Q.    We've previously -- strike

6    that.

7                Did you know who was

8    responsible for creating the BOBJ

9    database that you've referred to?

10               MS. MCCLURE:  Objection to

11         form.

12               THE WITNESS:  No.

13   BY MR. CLUFF:

14         Q.    Was there anybody at

15   AmerisourceBergen who was the most expert

16   at dealing with the BOBJ database?

17         A.    For our team, I think it was

18   Lino.

19         Q.    So he would have been --

20   would he have been the person you went

21   to, to learn more about using BOBJ for

22   these tasks you described here?

23         A.    Yes.

24         Q.    Do you know how long he's

Highly Confidential - Subject to Further Confidentiality Review

1    been with AmerisourceBergen?

2         A.    I know he was a compliance

3    manager in New Jersey before he joined

4    our team, but I don't know how long.

5         Q.    Let's now look at Mr.

6    Cherveney's overall evaluations that's

7    over yours.

8              He gives you a rating, Fully

9    meets expectations.

10             And in the comment, the

11   first line is, Overall, this has been a

12   very challenging reporting cycle for Liz,

13   as well as the diversion control team as

14   a whole, on a number of fronts.

15             Do you see that?

16             Do you see that?

17        A.    I see that.

18        Q.    Do you recall 2016 being a

19   particularly challenging reporting year

20   for you?

21             MS. MCCLURE:  Objection to

22        form.

23             THE WITNESS:  I believe that

24        was the first full year of the new

Highly Confidential - Subject to Further Confidentiality Review

1          revised OMP system.

2     BY MR. CLUFF:

3          Q.    What was challenging about

4     the revised OMP system?

5          A.    Just implementation and

6     training the divisions.

7          Q.    Anything else?

8          A.    A lot of volume with

9     projects.  A lot of onboarding new

10    customers.

11         Q.    Sorry.  Did you finish your

12    answer?

13         A.    Yes.

14         Q.    Okay.  What do you mean by

15    "a lot of volume with projects"?

16         A.    A lot of 590s being -- that

17    are coming in, from what I remember.

18         Q.    Are you familiar with the

19    distributor due diligence project at

20    AmerisourceBergen?

21              MS. MCCLURE:  Objection to

22         form.

23              THE WITNESS:  Vaguely.

24    BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you have a recollection

2  of what it is, or what it was?

3    A.    No.

4    Q.    Are you familiar with the

5  Form 590 project at AmerisourceBergen?

6    A.    Yes.

7    Q.    What was that?

8    A.    That was collecting 590s

9  from new and existing customers.

10    Q.    Do you recall why

11  AmerisourceBergen was collecting the

12  590s?

13    A.    To complete a due diligence

14  file.

15    Q.    So they were missing due

16  diligence files?

17          MS. MCCLURE:  Objection to

18      form.

19          THE WITNESS:  No.  The due

20      diligence files existed, and there

21      were all kinds of documents in

22      there, but collecting the 590 was

23      just one piece.

24  BY MR. CLUFF:

1      Q.    Was there also some missing

2   information in Lawtrac associated with

3   the 590s?

4              MS. MCCLURE:  Objection to

5         form.

6              THE WITNESS:  In Lawtrac, if

7         those -- if the 590s were not in

8         there, then we were collecting

9         them.

10  BY MR. CLUFF:

11     Q.    And is that one of the

12  projects you were working on in 2016?

13     A.    I believe so, yes.

14     Q.    When you left in 2017, was

15  that project completed?

16     A.    I don't believe so.

17     Q.    Do you know what percentage

18  of that project had been completed?

19     A.    I do not.

20     Q.    But as a general rule, the

21  due diligence files were incomplete,

22  right?

23              MS. MCCLURE:  Objection to

24         form.

1          THE WITNESS:  It was an

2     ongoing process to collect forms.

3  BY MR. CLUFF:

4     Q.   Collect forms that were

5  missing, correct?

6          MS. MCCLURE:  Objection to

7     form.

8          THE WITNESS:  Or other

9     business correspondence.

10  BY MR. CLUFF:

11     Q.   But the 590 forms and the

12  other business correspondence that you

13  mentioned, those were missing from the

14  due diligence files?

15          MS. MCCLURE:  Objection to

16     form.

17          THE WITNESS:  Not

18     necessarily.

19  BY MR. CLUFF:

20     Q.   What do you mean "not

21  necessarily"?

22     A.   I mean, there could have

23  been other business forms in there, in

24  the file.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    So some business forms were

2   in the file, but some were missing,

3   correct?

4                  MS. MCCLURE:  Objection to

5          form.

6                  THE WITNESS:  Depending on

7          the customer.

8   BY MR. CLUFF:

9      Q.    So the answer is yes,

10  depending on the customer?

11                 MS. MCCLURE:  Same

12         objection.

13                 THE WITNESS:  Yes.

14  BY MR. CLUFF:

15     Q.    You also mentioned

16  onboarding new customers.

17                 What customers do you recall

18  onboarding during that time?

19     A.    Too many to recall.

20     Q.    What kinds of categories of

21  customers were you onboarding?

22                 MS. MCCLURE:  Objection to

23         form.

24                 THE WITNESS:  All kinds of

1       business models.

2   BY MR. CLUFF:

3       Q.    What are some examples of

4   different business models that

5   AmerisourceBergen onboards as customers?

6       A.    Hospitals, hospices,

7   independent pharmacies.

8       Q.    How about chain pharmacies?

9       A.    Chain pharmacies.

10      Q.    What's the process of

11  onboarding a customer look like?

12          MS. MCCLURE:  Objection to

13          form.

14          THE WITNESS:  A new

15          customer?  A new customer fills

16          out the 590 and gives us any other

17          pertinent information we ask for,

18          and then we put that in the file

19          and we verify that information.

20  BY MR. CLUFF:

21      Q.    What kind of other pertinent

22  information would we ask for?

23      A.    Copies of licenses, since we

24  only distribute to licensed customers.

1          Q.     How about prescriber

2    information, did you ask for prescriber

3    information?

4          A.     On the 590 we did.

5          Q.     How about information

6    related to prescriptions written by

7    prescribers, did you ask for that?

8                 MS. MCCLURE:  Objection to

9          form.

10                THE WITNESS:  Not for

11         specific prescriptions, no.

12   BY MR. CLUFF:

13         Q.     Is your answer that you

14   didn't obtain prescription information as

15   a part of the new customer onboarding?

16                MS. MCCLURE:  Objection to

17         form.

18                THE WITNESS:  That's

19         correct.

20   BY MR. CLUFF:

21         Q.     But did AmerisourceBergen

22   ever obtain prescription information as

23   part of its due diligence process?

24                MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1           form.

2                   THE WITNESS:  Not as part of

3           its due diligence process, no.

4    BY MR. CLUFF:

5           Q.   What's a pharmacy big

6    report?

7           A.    It's a dispensing data

8    report.

9           Q.    And is that a part of

10   AmerisourceBergen's due diligence

11   process?

12          A.    Only in special

13   circumstances.

14          Q.    But it is a part of the due

15   diligence process, correct?

16          A.    No, not as a regular thing.

17          Q.    I'm not qualifying between

18   regular or special circumstance.  I'm

19   talking about just the general due

20   diligence process that AmerisourceBergen

21   engages in.

22                  Is a pharmacy big report a

23   part of the due diligence process?

24          A.    No.

1                    MS. MCCLURE:  Objection to

2          form.

3    BY MR. CLUFF:

4          Q.    What process is it a part

5    of?

6          A.    Special circumstances, more

7    for existing customers.

8          Q.    Okay.  What special

9    circumstances are you talking about?

10         A.    To double check and monitor

11   certain accounts, and to gather that

12   information as part of the file.

13         Q.    How would you identify these

14   certain accounts that you would be double

15   checking and monitoring?

16         A.    Just to monitor their

17   ordering programs and seeing if there

18   were any unusual purchases.

19         Q.    That sounds more like what

20   you were monitoring.  I'm asking how you

21   identified the accounts that you would be

22   monitoring.

23                    Can you explain that to me?

24                    MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

```
1            form.
2                    THE WITNESS:  Looking at my
3            region and seeing if anything
4            sticks out for any customer.
5   BY MR. CLUFF:
6            Q.    And what would stick out for
7   a customer that would make you want to
8   look for a pharmacy big report?
9                    MS. MCCLURE:  Objection to
10           form.
11                   THE WITNESS:  Perhaps if --
12           let's see -- if they were ranked
13           high in that state, for example.
14  BY MR. CLUFF:
15           Q.    Ranked high for what?
16           A.    For whatever drug it was I
17  was looking at.
18           Q.    What are some examples of
19  drugs that you would have looked at?
20           A.    Hydrocodone, Oxycodone 30.
21           Q.    And are those drugs that
22  were particularly susceptible to
23  diversion?
24                   MS. MCCLURE:  Objection to
```

Highly Confidential - Subject to Further Confidentiality Review

1              form.

2                   THE WITNESS:  Yes.

3    BY MR. CLUFF:

4         Q.    So if a customer in your

5    region stood out to you because of

6    purchases of those drugs, you would

7    potentially obtain a pharmacy big report?

8                   MS. MCCLURE:  Objection to

9              form.

10                  THE WITNESS:  Depending on

11             the totality of the circumstances.

12             I mean, it might have been just a

13             one-off.

14   BY MR. CLUFF:

15        Q.    I've been saying pharmacy

16   big report, I've seen that abbreviated

17   PBR.

18                  Are those the same thing?

19        A.    Yes.

20        Q.    Do you want to call them

21   PBR, or should we stay with pharmacy big

22   report?

23        A.    We can call it dispensing

24   data.

1    Q.    But I've seen it referenced

2    in your documents as pharmacy big report.

3    A.    That's slang for a

4    dispensing report.

5    Q.    So when you obtained a PBR,

6    that included prescription data, correct?

7         MS. MCCLURE:  Objection to

8         form.

9         THE WITNESS:  Yes.

10   BY MR. CLUFF:

11   Q.    It also included

12   de-identified patient data; is that

13   right?

14   A.    Yes.

15   Q.    Where did AmerisourceBergen

16   obtain de-identified patient data?

17   A.    Where did they obtain it?

18   Q.    Yes.

19   A.    We would ask the customer

20   for it directly, and they would assign

21   the de-identification.

22   Q.    Did the PBR, the pharmacy

23   big report, also tell you which doctors

24   were writing prescriptions on behalf --

Highly Confidential - Subject to Further Confidentiality Review

1    that were being filled at

2    AmerisourceBergen customers?

3                    MS. MCCLURE:  Objection to

4          form.

5                    THE WITNESS:  They were

6          writing prescriptions for that

7          pharmacy, yes.

8    BY MR. CLUFF:

9          Q.    Well, I think they weren't

10   writing prescriptions for the pharmacy,

11   but they wrote scripts that got filled at

12   the pharmacy?

13         A.    Yes.

14         Q.    So if you pulled a PBR, you

15   could see, I'm just trying to understand

16   here, at any given pharmacy in your

17   region, what doctors were writing scripts

18   that got filled, correct?

19                    MS. MCCLURE:  Objection to

20         form.

21                    THE WITNESS:  Correct.

22   BY MR. CLUFF:

23         Q.    And then you could also see

24   de-identified patient data for who they

1    wrote prescriptions to, correct?

2         A.    De-identified.  We didn't

3    know who those people were.

4         Q.    So it would be like patient

5    1, patient 2?

6         A.    Correct.

7         Q.    Understood.

8              And you used that as a part

9    of special circumstances when you would

10   look at customers in your region?

11             MS. MCCLURE:  Objection to

12        form.

13             THE WITNESS:  Correct.

14   BY MR. CLUFF:

15        Q.    Were you looking at those

16   two identified potential sources for

17   diversion?

18             MS. MCCLURE:  Objection to

19        form.

20             THE WITNESS:  Restate the

21        question.

22   BY MR. CLUFF:

23        Q.    Sure.

24             Were you looking at

1    prescriber big reports as -- in order to

2    identify potential sources for diversion?

3              MS. MCCLURE:  Objection to

4         form.

5              THE WITNESS:  No.

6    BY MR. CLUFF:

7         Q.    Why were you looking at

8    them?

9         A.    For pattern and drug

10   combinations.

11        Q.    Aren't those red flags for

12   potential diversion?

13             MS. MCCLURE:  Objection to

14        form.

15             THE WITNESS:  Not

16        necessarily.

17   BY MR. CLUFF:

18        Q.    Are they a part of the

19   totality of circumstances that

20   AmerisourceBergen employees looked at in

21   order to identify potential diversion?

22        A.    It could be.

23             MS. MCCLURE:  Objection to

24        form.

1    BY MR. CLUFF:

2         Q.    Please give your counsel

3    just a second.  I know, we're all, you

4    know, getting along.  Give her a second

5    just to object, so we can all be clear.

6              So just to kind of walk back

7    and make sure I understand.  If there was

8    a potential spike or a deviation from a

9    normal ordering pattern in your region,

10   you would potentially pull a prescriber

11   big report; is that correct?

12             MS. MCCLURE:  Objection to

13        form.  Misstates the witness's

14        testimony.

15             THE WITNESS:  Depends on

16        what it was.  Sometimes; not all

17        the time.

18   BY MR. CLUFF:

19        Q.    Are there any other reasons

20   why you would pull a prescriber big

21   report?

22        A.    No.

23        Q.    So those are basically the

24   instances in which you would pull the

Highly Confidential - Subject to Further Confidentiality Review

1    report?

2              MS. MCCLURE:  Objection to

3         form.

4              THE WITNESS:  Correct.

5    BY MR. CLUFF:

6         Q.    Okay.  And we agreed that

7    changes in ordering pattern and deviation

8    from an old pattern are two of the things

9    that AmerisourceBergen employees look at

10   in order to identify potential diversion,

11   correct?

12             MS. MCCLURE:  Objection to

13        form.

14             THE WITNESS:  Restate that

15        question.

16   BY MR. CLUFF:

17        Q.    Sure.

18             I think AmerisourceBergen

19   takes a totality-of-the-circumstances

20   approach to identifying suspicious

21   orders; is that correct?

22             MS. MCCLURE:  Objection to

23        form.

24             THE WITNESS:  If something

1            hits the algorithm, it's an order

2            of interest.  And then we have to

3            go in and look at it and decide if

4            it is unusual size, frequency or

5            pattern.

6      BY MR. CLUFF:

7            Q.    Right.  So unusual size,

8      frequency and pattern are part of the way

9      that AmerisourceBergen identifies

10     potentially suspicious orders; is that

11     what you're saying?

12               MS. MCCLURE:  Objection to

13            form.

14               THE WITNESS:  If it hits the

15            algorithm, it's an order of

16            interest.  And then we go in and

17            actually see, potentially, what's

18            happening with that order.

19     BY MR. CLUFF:

20           Q.    And you go through that

21     process to determine whether or not an

22     order that hit the algorithm is

23     suspicious, correct?

24           A.    Correct.

1    Q.    So when that happens, you

2    sometimes pull a prescriber big -- a

3    pharmacy big report, correct?

4              MS. MCCLURE:  Objection to

5         form.

6              THE WITNESS:  Sorry,

7         restate.

8    BY MR. CLUFF:

9    Q.    You said when an order hits

10   OMP, then you look at the totality of the

11   circumstances to determine whether or not

12   an order of interest is of unusual size,

13   pattern and frequency.

14             Did I summarize that

15   correctly?

16             MS. MCCLURE:  Objection to

17        form.

18             THE WITNESS:  I think so.

19   BY MR. CLUFF:

20   Q.    Okay.  I'm not trying to

21   trick you.  I'm just trying to understand

22   the process.

23             And I asked if that was a

24   part of AmerisourceBergen's effort to

1  identify suspicious orders from orders

2  that hit threshold; is that correct?

3          MS. MCCLURE:  Objection to

4      form.

5          THE WITNESS:  I think so.

6  BY MR. CLUFF:

7      Q.    And I'm trying to

8  understand, is that a situation in which

9  sometimes you would obtain a pharmacy big

10 report as part of your responsibilities?

11         MS. MCCLURE:  Same.

12         THE WITNESS:  A pharmacy big

13     report, you mean?

14 BY MR. CLUFF:

15     Q.    Yes.

16     A.    That could be one factor.

17     Q.    What are some other factors?

18     A.    Just looking at overall

19 pattern; geographically, where they're

20 at; what drugs they've ordered in the

21 last three months.

22     Q.    And that -- just so I

23 understand the content, that pharmacy big

24 report included prescriber data and

Highly Confidential - Subject to Further Confidentiality Review

1  de-identified patient data, correct?

2      A.   Correct.

3      Q.   Let's go back to Exhibit-6,

4  I believe.

5          In the second sentence, you

6  write that -- excuse me, this is Eric

7  Cherveny -- Our team was tasked with

8  multiple projects to be completed in the

9  2017 performance cycle, while

10 simultaneously trying to learn and fully

11 utilize the revised OMP program, along

12 with analytical reporting associated with

13 it.

14         MR. CLUFF:  Do you have an

15     objection, Shannon?

16         MS. MCCLURE:  No, you

17     haven't asked a question, so I'm

18     waiting for the question.

19         MR. CLUFF:  Didn't get there

20     yet.

21         MS. MCCLURE:  Right.

22 BY MR. CLUFF:

23     Q.   Looking at that first

24 portion of the sentence, you identified

Highly Confidential - Subject to Further Confidentiality Review

1   being tasked with multiple projects to be

2   completed in the 2017 performance cycle.

3           Do you recall what those

4   were?

5           MS. MCCLURE:  Form.

6           THE WITNESS:  That could be

7       part of the 590 project.

8           What else?

9           I don't recall any other

10      projects.  I'm sure there were,

11      but I don't recall.

12  BY MR. CLUFF:

13      Q.    And then the next sentence,

14  it says, Liz did a commendable job in

15  supporting our team during this period

16  and played an important role as the DCT

17  training lead.

18          Do you see that?

19      A.    I see that.

20      Q.    The next sentence, because

21  Mr. Cherveny continues to praise you, he

22  says, She also consistently demonstrates

23  herself to be a very strong investigator

24  and is one of our more experienced team

Highly Confidential - Subject to Further Confidentiality Review

1    members.

2              Do you see that?

3         A.    I see that.

4         Q.    Do you feel like that was an

5    accurate statement, that you were a

6    strong investigator?

7         A.    Yes.

8         Q.    And the next sentence, it

9    says, Liz also underwent a formal written

10   counseling during this performance cycle.

11             Do you see that?

12        A.    I see that.

13        Q.    Do you recall that?

14        A.    I do.

15        Q.    Do you recall what that was

16   about?

17        A.    It was about a disagreement

18   with a colleague.

19        Q.    Do you recall who the

20   colleague was?

21        A.    Kevin Kreutzer.

22        Q.    And what was the

23   disagreement about?

24        A.    Workload.

1    Q.    What do you mean by that?

2    A.    Kevin would pass some leads

3  on to me and my region that weren't part

4  of my region.

5    Q.    And so what happened in that

6  situation?

7    A.    We had a disagreement.

8    Q.    Do you remember what was

9  said, or what happened?

10    A.    I do not.

11    Q.    Okay.  The rest of that

12  sentence reads, For being confrontational

13  with members of the DCT, as well as with

14  internal business partners.

15          The reference to

16  "confrontational with members of the

17  DCT," is that the comment you made about

18  Kevin Kreutzer?

19          MS. MCCLURE:  Objection to

20       form.

21          THE WITNESS:  That's the

22       isolated incident, yes.

23  BY MR. CLUFF:

24    Q.    Isolated incident.

Highly Confidential - Subject to Further Confidentiality Review

1              As well as within the
2    internal business partners.
3              Do you see that?
4         A.    I see that.
5         Q.    Do you know what is meant by
6    "internal business partners"?
7         A.    I do not.
8         Q.    Do you know why Eric
9    Cherveny would have written that?
10        A.    I do not.
11        Q.    I am going to hand you a
12   document, it's the corrective action.
13             MR. BRODSKY:  Sterling, can
14        we get a Bates number for
15        Exhibit-6?
16             MR. CLUFF:  Yeah.  Sure.  I
17        thought I gave it at the
18        beginning.  It's ABDCMDL00364844.
19             MR. BRODSKY:  Thank you.
20             MR. CLUFF:  This one that
21        I'm going to hand her -- I'm going
22        to hand you, Ms. Garcia, is
23        Exhibit-7.  ABDCMDL00364861.
24                  -  -  -

```
 1              (Whereupon,

 2         AmerisourceBergen-Garcia

 3         Exhibit-7, ABDCMDL00364861-864,

 4         was marked for identification.)

 5              -  -  -

 6    BY MR. CLUFF:

 7         Q.   I just want to, first off,

 8    establish if you've seen this before.  I

 9    confess I've never worked at a company as

10    large as AmerisourceBergen, so I don't

11    know how things work.

12         A.   I have seen it before, yes.

13         Q.   If you look at the back

14    page -- excuse me, the second-to-last

15    page, the one that ends 863.

16              It looks like there's a line

17    there that says, Associate signature?

18         A.   Yes.

19         Q.   So you would have discussed

20    this with your supervisor and then signed

21    it?

22              MS. MCCLURE:  Objection to

23         form.

24              THE WITNESS:  Yes.
```

```
 1              MS. MCCLURE:   Assumes facts
 2       not in evidence.
 3   BY MR. CLUFF:
 4       Q.    Let's go back to the first
 5   page.
 6              So let's -- just looking
 7   through, let's establish the foundation
 8   for this.
 9              The associate name that's
10   Elizabeth Garcia, that's you, correct?
11       A.    Yes.
12       Q.    Do you see the date, January
13   21, 2016?
14       A.    I see that.
15       Q.    And do you see, a couple of
16   lines down, it says, Incident date,
17   January 21, 2016?
18              Do you see that?
19       A.    Yes.
20       Q.    You previously mentioned the
21   disagreement you had with Kevin Kreutzer.
22       A.    Yes.
23       Q.    Did that disagreement happen
24   on this date?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I don't recall.

2          Q.     Okay.  So let's just go down

3    a page there.  There's a section that

4    says, Reason for corrective action.

5                 Do you see that?

6          A.     Yes.

7          Q.     And there's a check box next

8    to rules violation that's got an X in it.

9                 Do you see that?

10         A.     I see that.

11         Q.     Do you understand that this

12   corrective action was about a rule

13   violation at AmerisourceBergen?

14         A.     That's what it states here.

15         Q.     The next box down says, Type

16   of corrective action.  And there's a

17   check box next to written counseling.

18                Do you see that?

19         A.     I see that.

20         Q.     Did you also have verbal

21   counseling with Eric Cherveny in

22   conjunction with this corrective action,

23   if you recall?

24         A.     I think so.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Let's look to the

2  next page.

3            There's a paragraph there

4  that you see says, Over the course of the

5  2015 calendar year?

6      A.    Yes.

7      Q.    If you look at the bottom of

8  the page just before it, there's a Number

9  1 that says, Statement of the problem.

10           MS. MCCLURE:  The first

11       page?

12           MR. CLUFF:  Yes.  Sorry.

13           THE WITNESS:  Okay.

14  BY MR. CLUFF:

15      Q.    So it says, Number 1,

16  Statement of the problem.

17           And then turning the page,

18  would this text here be a statement of

19  what Eric Cherveny believed to be the

20  problem, in your experience?

21      A.    Yes.

22      Q.    Go ahead and read that for

23  me silently to yourself, and then I'd

24  like to ask you some questions about it.

Highly Confidential - Subject to Further Confidentiality Review

 1          A.    Okay.

 2          Q.    So starting at the top of

 3   that paragraph, you say, Over the course

 4   of the 2015 calendar year, Elizabeth

 5   Garcia, Liz, has been counseled on

 6   multiple occasions regarding instances of

 7   being confrontational and/or

 8   argumentative with diversion control team

 9   members.

10                Do you see that?

11                MS. MCCLURE:  Form.

12                MR. CLUFF:  What's your

13          objection to the form?

14                MS. MCCLURE:  You said,

15          starting at the top of the

16          paragraph, "you said."

17                MR. CLUFF:  You're right.

18   BY MR. CLUFF:

19          Q.    So let's be clear.

20                Eric Cherveny is the one

21   writing this, right, Liz?

22          A.    Correct.

23          Q.    So Eric says -- or writes,

24   Over the course of the 2015 calendar

```
 1    year, Elizabeth Garcia, Liz, has been

 2    counseled on multiple occasions regarding

 3    instances of being confrontational and/or

 4    argumentative with diversion control team

 5    members -- there's an abbreviation, DCT,

 6    and then in parentheses -- including

 7    myself, closed parentheses, as well as

 8    with associates outside of the CSRA

 9    department.

10              Do you recall multiple

11    instances of being confrontational and

12    argumentative with team members?

13        A.    One team member that left.

14        Q.    Who was that?

15        A.    Eric Martin.

16        Q.    Why were you being

17    confrontational with Eric Martin?

18        A.    Again, workload, looking at

19    suspicious orders, I think is what it

20    was.

21        Q.    And what was the workload

22    issue?

23        A.    I don't recall.

24        Q.    Eric writes, Including
```

1    myself.

2              Do you recall instances of

3    being confrontational and/or

4    argumentative with Eric Cherveny?

5         A.    Having disagreements with

6    Eric, yes.

7         Q.    What were those

8    disagreements about?

9         A.    About projects, training,

10   those types of things.

11        Q.    Did you ever have an

12   instance where you were making a decision

13   about a Form 590 that Eric agreed with?

14             MS. MCCLURE:  Objection to

15        form.

16             THE WITNESS:  No, he made

17        those decisions.

18   BY MR. CLUFF:

19        Q.    Did you ever have a

20   disagreement with Eric Cherveny about a

21   decision you were making regarding a

22   suspicious order?

23             MS. MCCLURE:  Objection to

24        form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  No, I don't

2     recall.

3  BY MR. CLUFF:

4          Q.    How about an order of

5  interest that you believed was

6  suspicious?

7          A.    No.

8          Q.    Did you ever have any

9  disagreements with Eric Cherveny about

10  pharmacies that you believed should have

11  been investigated and he disagreed?

12          A.    No.

13          Q.    This says, As well as with

14  associates outside of the CSRA

15  department.

16          Do you recall having

17  disagreements with associates out of the

18  CSRA department?

19          A.    I do not.

20          Q.    What would qualify as an

21  associate outside of the CSRA department?

22          A.    Any of the other functional

23  groups.

24          Q.    What are those?

```
1        A.    Sales.

2        Q.    What else?

3        A.    IT.  I don't know.

4        Q.    Did you ever have

5   disagreements with IT?

6        A.    No.

7        Q.    How about sales?

8        A.    Yes.

9        Q.    What were your disagreements

10  with sales?

11       A.    Over deadlines.  You know,

12  they wanted things approved now.

13       Q.    Did you ever have

14  disagreements with salespeople about

15  customers they wanted onboarded that you

16  disagreed with?

17       A.    No.

18       Q.    Do you ever recall being

19  confrontational or argumentative with the

20  sales associates?

21       A.    Over deadlines.

22       Q.    It says, This area of

23  concern was specifically documented and

24  discussed at length during her 2015
```

1    annual performance review in which she

2    fully acknowledged this deficiency and

3    stated she would work to improve it.

4            Do you see that?

5        A.    I see that.

6        Q.    I don't want to belabor the

7    performance reviews, but we can go

8    through the 2015 one, if you want.

9            My question is just, do you

10   recall being counseled about this during

11   your 2015 performance review?

12       A.    I don't recall that, but if

13   he states it here, then it happened, I

14   guess.

15       Q.    This corrective action that

16   Eric Cherveny has here, it's not a --

17   based on what he's writing, it wasn't an

18   isolated incident, correct?

19       A.    I think this -- the incident

20   with Kevin precipitated this.

21       Q.    But the overall language he

22   uses about being confrontational and/or

23   argumentative, it appears that he

24   believes this is an ongoing problem?

Highly Confidential - Subject to Further Confidentiality Review

1            MS. MCCLURE:  Objection to

2       form.

3            THE WITNESS:  Yes, that's

4       what it appears to be.

5  BY MR. CLUFF:

6       Q.    Do you know if Eric M. left

7  the company because of the disagreements

8  that you had with him?

9       A.    No.  He retired.

10       Q.    You can set 7 aside.  I'm

11  done with that for now.

12       A.    7 aside?

13       Q.    Yes.  So let's go back to 6,

14  which is the FY '16 performance

15  evaluation.

16            MR. CLUFF:  For people on

17       the phone and down the way, it's,

18       the Bates number ABDCMDL00364844.

19  BY MR. CLUFF:

20       Q.    Down at the bottom of the

21  page, Ms. Garcia, there's a heading that

22  says, Business Objectives.

23            Do you see that?

24       A.    I see that.

1    Q.    And there's some text under

2  there that says, Accountability:  I will

3  lead and collaborate where necessary to

4  accomplish tasks that will benefit team

5  success.

6            Is that something that you

7  would have written, or is that an

8  objective that was given to you?

9    A.    I believe I wrote that.

10    Q.    How did you identify that as

11  one of your business objectives?

12    A.    These were pre-done for us.

13  I think.

14            MR. CLUFF:  Hold on.

15                 -  -  -

16            (Whereupon, a discussion off

17       the record occurred.)

18                 -  -  -

19  BY MR. CLUFF:

20    Q.    Let's resume, Ms. Garcia.

21  Sorry about that.

22            Did you have a chance to

23  familiarize yourself a little bit more

24  with the document while we were listening

1    to the phone ringing?

2          A.    Not really.

3          Q.    I don't blame you, it was

4    slightly distracting.  I don't want to

5    accuse Joe of distracting us, but it's on

6    the record now.

7                Looking back at business

8    objectives and the text after the word

9    "accountability."

10         A.    Yes.

11         Q.    Do you see -- I asked you,

12   is that something that you would have

13   identified as a business objective, or

14   was it identified for you as an

15   objective?

16         A.    I believe those were

17   identified for us.

18         Q.    And there's some text at the

19   bottom of that page and on the top of the

20   next page.

21                The text under the bold

22   accountability line, is that stuff that

23   you would have written?

24         A.    Below that bold text, yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    You identify, then, that the

2  DCP/OMP team -- can you tell me what

3  those letters stand for?

4      A.    The diversion control team,

5  I think that's a typo.  And then OMP is

6  order monitoring program.

7      Q.    All right.  So the diversion

8  control team/order monitoring program

9  team is a small unit that requires each

10  person to, quote, pull their weight,

11  closed quote, in order for necessary

12  daily tasks to be completed.

13          Does that sound right?

14      A.    Yes.

15      Q.    And then you said, These

16  tasks include onboarding customers,

17  monitoring orders, consumption reviews

18  and communicating effectively with other

19  departments.

20          What did you mean by

21  "onboarding customers"?

22      A.    Onboarding customers,

23  performing due diligence investigations

24  with the 590.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Anything else involved in

2  that?

3    A.    No.  Just verifying that

4  information.

5    Q.    What about monitoring

6  orders, what were you doing there?

7    A.    Monitoring orders of

8  interest to see if they were potentially

9  suspicious.

10    Q.    How did you do that?

11    A.    It would hit the algorithm,

12  that's an order of interest.  And then

13  once a human being actually clicked on

14  that order, then we would look at who the

15  customer was, where they were located,

16  what they were ordering.

17    Q.    The next one is consumption

18  reviews.

19    What's a consumption review?

20    A.    A consumption review is

21  where a customer appeals to have their

22  thresholds adjusted.

23    Q.    Was that previously called a

24  threshold review at AmerisourceBergen?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.

2        Q.     So they are effectively the

3    same term, correct?

4               MS. MCCLURE:  Objection to

5        form.

6               THE WITNESS:  I don't know.

7    BY MR. CLUFF:

8        Q.     What would you do when you

9    received a consumption review?  What was

10   the process for either granting or

11   denying it?

12              MS. MCCLURE:  Objection to

13       form.  Compound.

14              THE WITNESS:  Just seeing

15       what the customer's needs were,

16       what their justification was, what

17       drug it was, and what they

18       anticipated they needed.

19   BY MR. CLUFF:

20       Q.     Okay.  Would you agree with

21   me that when you were reviewing a

22   consumption review, the goal was to

23   always maintain an entity as an ABC

24   customer?

1          MS. MCCLURE:  Objection to

2      form.

3          THE WITNESS:  I don't think

4      that was the top objective.  We

5      were just looking at the appeal.

6  BY MR. CLUFF:

7      Q.   You note here that one of

8  the things you'll continue to be

9  accountable for, in relation to these job

10  tasks, was playing an integral role in

11  managing chain customers and strategic

12  accounts in terms of due diligence

13  information-gathering.

14          Do you see that?

15      A.   Is that at the top of the

16  next page?

17      Q.   No.  It's the top of the

18  second page.  It's one of the three

19  bullet points.

20      A.   Can you repeat, please?

21      Q.   Sure.

22          You identify three things

23  that you say you will be -- continue to

24  be accountable for, the top line on the

Highly Confidential - Subject to Further Confidentiality Review

1    second page.

2              And there are three bullet

3    points.  And one is, Play an integral

4    role in managing chain customers and

5    strategic accounts in terms of due

6    diligence information-gathering.

7              Does that seem right?

8         A.    Yes.

9         Q.    So you were one of the

10   people who was integral in managing

11   AmerisourceBergen's relationship with its

12   chain customers?

13             MS. MCCLURE:  Objection to

14        form.

15             THE WITNESS:  I was one of

16        those people, yes.

17   BY MR. CLUFF:

18        Q.    So when we talk about chain

19   customers, you're one of the best people

20   to talk to at AmerisourceBergen about

21   that topic, correct?

22             MS. MCCLURE:  Objection to

23        the form.

24             THE WITNESS:  No.  Only in

1          terms of due diligence.

2     BY MR. CLUFF:

3          Q.    Okay.  But how due diligence

4     applied to chain customers, that was one

5     of your areas of expertise?

6               MS. MCCLURE:  Objection to

7          form.

8               THE WITNESS:  Just

9          collecting the data.

10    BY MR. CLUFF:

11         Q.    All right.  I want to move

12    down.

13              It looks here like there is

14    a heading for manager evaluation and

15    employee evaluation.

16         A.    Yes.

17         Q.    Do you see that?

18         A.    Uh-huh.

19         Q.    So I'm trying to understand

20    the process.

21              We previously talked about,

22    on the first page there was a business

23    objective identified for you, correct?

24         A.    Correct.

1    Q.    And then you were given an

2    opportunity to include some review of

3    your own underneath that heading; is that

4    right?

5    A.    Yes.

6    Q.    And then what are the

7    employee evaluation and manager

8    evaluation sections of this form?

9    A.    Employee evaluation is me

10   evaluating myself.  And then manager is

11   Eric, Eric's evaluation.

12   Q.    I want to skip down to,

13   Completing targeted pharmacy visits as

14   assigned.

15        Do you see that bold

16   heading?

17   A.    Yes.

18   Q.    So would this business

19   objective have followed -- have followed

20   a similar pattern, where you were

21   provided an opportunity to include some

22   comments, and then both you and Eric

23   would have been able to include an

24   evaluation?

1          A.    Yes.

2          Q.    Okay.  Pharmacy visits were,

3    historically during your time at

4    AmerisourceBergen, one area of your job

5    responsibilities, correct?

6          A.    Correct.

7          Q.    Would you say it was one of

8    your strongest assets as an employee at

9    AmerisourceBergen because of your

10   background with the DEA?

11         A.    Yes.

12              MS. MCCLURE:  Objection to

13         form.

14   BY MR. CLUFF:

15         Q.    So despite the fact that

16   they were one of your chief strengths,

17   that area of your responsibility was

18   significantly reduced, correct?

19              MS. MCCLURE:  Objection to

20         form.

21              THE WITNESS:  That's

22         correct.

23   BY MR. CLUFF:

24         Q.    If you look on the next

1  page, it says that, Site visits serve not

2  only an inspection-type purpose but are

3  also an opportunity to gather

4  intelligence about the pharmacy

5  personnel, patients, business model,

6  dispensing activities, geography, and in

7  parenthesis you say, where the store is

8  located, and peer comparisons within a

9  certain mile radius.

10            So they were -- it appears

11 that they were a very important part of

12 your work as an investigator, correct?

13            MS. MCCLURE:  Objection to

14       form.

15            THE WITNESS:  During this

16       time period, it was reduced, but

17       yes.

18 BY MR. CLUFF:

19       Q.   So before the reduction, it

20 was an important part of your job

21 responsibilities?

22            MS. MCCLURE:  Objection to

23       form.

24            THE WITNESS:  Yes.

1  BY MR. CLUFF:

2       Q.    You continue, you say, The

3  visits allow me to address any OMP

4  issues, business needs and/or any other

5  factors that may influence how ABC moves

6  forward with that entity, i.e., reducing

7  thresholds, cutting business ties, et

8  cetera.

9            Do you see that?

10      A.    I see that.

11      Q.    So site visits were a way in

12 which you, as an investigator, determined

13 how to address thresholds and whether to

14 cut business ties, correct?

15      A.    Correct.

16      Q.    But in 2016, those visits

17 were significantly reduced, correct?

18            MS. MCCLURE:  Objection to

19       form.

20            THE WITNESS:  We hired an

21       outside consultant, so those

22       visits continued.

23 BY MR. CLUFF:

24      Q.    But you -- your

Highly Confidential - Subject to Further Confidentiality Review

1    responsibility for them was significantly

2    reduced, right?

3         A.     Correct.

4         Q.     You continue and you say

5    that, in your opinion, this is the most

6    effective way to actually know our

7    customers, especially the high-risk ones,

8    in terms of validating or disproving that

9    we are seeing -- excuse me -- what we are

10   seeing in prior generated data for

11   high-risk controls.

12              Do you see that?

13        A.     I see that.

14        Q.     And, again, your

15   responsibility for this had been

16   significantly reduced, correct?

17              MS. MCCLURE:  Objection to

18         form.

19              THE WITNESS:  Reduced, but

20         passed on to the outside

21         consultant.

22   BY MR. CLUFF:

23        Q.     Again, your responsibilities

24   for this were significantly reduced?

1        MS. MCCLURE:  Same

2    objection.

3        THE WITNESS:  Yes.

4  BY MR. CLUFF:

5        Q.   Okay.  You continue, you

6  say, I am not afraid to have

7  uncomfortable discussions in person with

8  pharmacy personnel in order for both the

9  pharmacy and ABC to continue in

10 partnership.

11        Correct?

12        A.   That's what it states,

13 correct.

14        Q.   We previously discussed, I

15 believe, it was in Exhibit-4, that all of

16 AmerisourceBergen's customers are valued

17 customers, correct?

18        MS. MCCLURE:  Objection to

19    form.

20        THE WITNESS:  Potentially

21    correct.

22 BY MR. CLUFF:

23        Q.   Okay.  Well, what is

24 potentially correct about that statement?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I mean, until we do due

2  diligence and all of the background

3  investigation, we don't know if they're

4  valuable or not.

5    Q.    Here you say, to continue in

6  partnership.

7         Did you consider your

8  customers to be business partners?

9         MS. MCCLURE:  Objection to

10        form.

11        THE WITNESS:  We were

12        providing a service that they

13        needed.

14  BY MR. CLUFF:

15    Q.    But here you use the

16  words -- you use the word "partnership."

17         So it was a business

18  partnership, correct?

19        MS. MCCLURE:  Objection to

20        form.

21        THE WITNESS:  I don't know.

22  BY MR. CLUFF:

23    Q.    But you wrote those words?

24    A.    I mean, I stated that here.

1    But I don't know exactly what I meant.

2         Q.    You continue and say, If it

3    is necessary, these discussions could

4    lead to ABC action to terminate the

5    account, depending on what the visit

6    yields.

7              Do you recall visits that

8    led to ABC terminating an account?

9              MS. MCCLURE:  Objection to

10        form.

11             THE WITNESS:  Yes.

12   BY MR. CLUFF:

13        Q.    Do you ever recall instances

14   where you and Eric Cherveny or Ed

15   Hazewski disagreed on whether to

16   terminate an account?

17        A.    I don't recall.

18        Q.    What accounts do you recall

19   terminating?

20             MS. MCCLURE:  Objection to

21        form.

22             THE WITNESS:  An account out

23        in Las Vegas.

24   BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Why did you terminate that

2    account?

3    A.    Joe and I visited that

4    location, and their records didn't match

5    up with what we had.

6    Q.    What was the name of that

7    location?

8    A.    I don't remember.

9    Q.    Do you recall if that

10   location was subject to a DEA raid?

11   A.    I don't recall.

12   Q.    Where would I look in

13   AmerisourceBergen's files to determine

14   when that specific location was cut off

15   by AmerisourceBergen?

16   A.    In their file.

17   Q.    Would it be on a do-not-ship

18   list?

19   MS. MCCLURE:  Objection to

20   form.

21   THE WITNESS:  Possibly.

22   BY MR. CLUFF:

23   Q.    If it were cut off by a DEA

24   raid, would that be reflected in their

Highly Confidential - Subject to Further Confidentiality Review

1    file?

2                MS. MCCLURE:  Objection to

3         form.

4                THE WITNESS:  It could be.

5    BY MR. CLUFF:

6         Q.    Do you recall any other

7    instances where you made a decision to

8    terminate an account?

9         A.    I don't recall.

10        Q.    So in your five years, you

11   recall one instance where you, as an

12   investigator, recommended the termination

13   of an account?

14                MS. MCCLURE:  Objection to

15        form.

16                THE WITNESS:  That's all I

17        recall right now.

18   BY MR. CLUFF:

19        Q.    I want to continue with the

20   rest of that sentence after the

21   semicolon, but I want to read it in its

22   entirety, so we can give it context and

23   I'm not accused of misrepresenting the

24   document.

Highly Confidential - Subject to Further Confidentiality Review

1        It says, If it is necessary,

2   these discussions could lead to ABC

3   action to terminate the account depending

4   on what the visit yields; however, the

5   goal is always to maintain the entity as

6   an ABC customer.

7        Do you see that?

8        A.    I see that.

9        Q.    So you worked at

10  AmerisourceBergen for five years,

11  correct?

12       A.    Correct.

13       Q.    And you were always a

14  diversion investigator at the time,

15  right, during those five years?

16       A.    I was an investigator, yes.

17       Q.    And part of -- pharmacy

18  investigations, that was your job, right?

19            MS. MCCLURE:  Objection to

20       form.

21            THE WITNESS:  That was me

22       and Joe and Kevin's job.

23  BY MR. CLUFF:

24       Q.    And it was something that

Highly Confidential - Subject to Further Confidentiality Review

1   you took pride in, you thought you were

2   really good at, correct?

3          A.    Correct.

4          Q.    And you identified it as one

5   of the most effective ways to actually

6   know your customers, right?

7          A.    Correct.

8          Q.    Especially the high-risk

9   customers, in terms of validating or

10  disproving, essentially, their

11  relationship with AmerisourceBergen?

12              MS. MCCLURE:   Objection to

13         form.

14              THE WITNESS:   Validating or

15         disproving whether they were a

16         good customer to do business with.

17  BY MR. CLUFF:

18         Q.    But then here at the end of

19  the sentence that you wrote, you say, The

20  goal is always to maintain the entity as

21  an ABC customer; is that correct?

22         A.    That's in good faith, yes.

23         Q.    Where is the word "good

24  faith" in that sentence?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. MCCLURE:  Objection to

2      form.

3          THE WITNESS:  I just added

4      that now.

5  BY MR. CLUFF:

6      Q.    So it's not in the document,

7  correct?

8      A.    No.

9      Q.    All right.  When you worked

10  at AmerisourceBergen in your five years

11  as a diversion investigator, was this a

12  policy that was communicated to you by

13  your superiors?

14          MS. MCCLURE:  Objection to

15      form.

16          THE WITNESS:  Was what a

17      policy?

18  BY MR. CLUFF:

19      Q.    That the goal is always to

20  maintain the entity as an ABC customer?

21      A.    No.  That's just me adding

22  that.

23      Q.    So you were operating in

24  isolation when you said the goal is to

1   always maintain the entity as an ABC

2   customer?

3                    MS. MCCLURE:  Objection to

4           form.

5                    THE WITNESS:  That was my

6           positive spin on it.

7   BY MR. CLUFF:

8           Q.    Did you ever have

9   discussions with other investigators

10  about the principle that the goal is to

11  always maintain the entity as an ABC

12  customer?

13          A.    I don't recall.

14          Q.    Do you recall

15  AmerisourceBergen ever making exceptions

16  to the rules for any of its valued

17  business partners?

18                   MS. MCCLURE:  Objection to

19          form.

20                   THE WITNESS:  I don't

21          recall.

22  BY MR. CLUFF:

23          Q.    Okay.  Do you recall ever

24  communicating thresholds to

1    AmerisourceBergen customers?

2              MS. MCCLURE:  Objection to

3         form.

4              THE WITNESS:  Whether it was

5         approved or not, but not the

6         threshold amount or not the

7         thresholds itself.

8    BY MR. CLUFF:

9         Q.    I'm sorry, I'm not trying to

10   pick a fight with you.  I don't really

11   understand your answer, so I'm going to

12   ask it again, and maybe we can clear it

13   up.

14             Do you recall ever

15   communicating thresholds to

16   AmerisourceBergen customers?

17             MS. MCCLURE:  Objection.

18        Asked and answered.

19             THE WITNESS:  No.

20   BY MR. CLUFF:

21        Q.    Do you know if

22   AmerisourceBergen was authorized to

23   communicate thresholds to customers?

24             MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1              form.

2                    THE WITNESS:  No.

3    BY MR. CLUFF:

4         Q.    If AmerisourceBergen

5    communicated a customer -- a threshold to

6    one of its customers, that would have

7    essentially circumvented the suspicious

8    order monitoring program, right?

9                    MS. MCCLURE:  Objection to

10             form.

11                   THE WITNESS:  Correct.

12   BY MR. CLUFF:

13        Q.    Do you ever recall telling

14   customers when they exceeded their

15   thresholds?

16                   MS. MCCLURE:  Objection to

17             form.

18                   THE WITNESS:  I don't

19             recall.

20   BY MR. CLUFF:

21        Q.    If AmerisourceBergen had

22   communicated to a customer when they were

23   exceeding thresholds, would that

24   circumvent the suspicious order

1    monitoring program?

2              MS. MCCLURE:  Objection to

3         form.  Speculative.

4              THE WITNESS:  Yeah, I don't

5         want to speculate on that.  I

6         don't know.

7    BY MR. CLUFF:

8         Q.    Sure.  I'd like to hand you

9    a copy of a document, then.  This is

10   ABDCMDL00141902.

11              -  -  -

12              (Whereupon,

13         AmerisourceBergen-Garcia

14         Exhibit-8, ABDCMDL00141902-903,

15         was marked for identification.)

16              -  -  -

17   BY MR. CLUFF:

18        Q.    I'll give you a copy of

19   that.

20              I think -- can you tell me,

21   Liz, at the bottom it says, 8?

22        A.    Yes.

23        Q.    Is that correct?

24              Okay.  Thank you.  It's a

Highly Confidential - Subject to Further Confidentiality Review

1   two-page e-mail.  Please go ahead and

2   familiarize yourself with it.

3           I'm going to be just asking

4   you about the e-mail that's at the bottom

5   of the first page.  So I don't know if

6   you want to start there and then we can

7   work our way through it.

8       A.    Okay.  Hold on.

9           Okay.

10      Q.    Okay.  So let's just lay the

11  foundation for this e-mail here.

12          Do you see at the top of the

13  first page, it says, From Eric Cherveny

14  to Matthew McElfresh.  On the copy line

15  are David May and Elizabeth Garcia.

16          Do you see that?

17      A.    I see that.

18      Q.    And the subject matter is,

19  OMP reporting?

20      A.    I see that.

21      Q.    And if you look down at the

22  e-mail on the bottom of the page, it says

23  from Elizabeth Garcia to Matthew

24  McElfresh, Eric Cherveny and David May.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    I see that.

3     Q.    Have you had a chance to

4 review this e-mail?

5     A.    Yes.

6     Q.    I want to look at, actually,

7 the first e-mail on the chain, which is

8 on the second page at the bottom there.

9          It starts from Matthew

10 McElfresh, and it's to you and Eric

11 Cherveny.

12          Do you see that?

13     A.    I see that.

14     Q.    He says, Liz/ --  Eric, and

15 the question is -- Are we currently

16 providing any reporting to Walmart

17 regarding Sam's Club's OMP thresholds

18 being met?

19          First of all, what's Sam's

20 Club?

21          That's a question.  What's

22 Sam's Club?

23     A.    Sam's Club --

24          MR. BRODSKY:  Objection.

```
 1    BY MR. CLUFF:

 2          Q.    What's Sam's Club?

 3          A.    Sam's Club is a part of

 4    Walmart, and some of them may have a

 5    pharmacy entity within them.

 6          Q.    When you say "part of

 7    Walmart," what do you mean?

 8          A.    Walmart, I believe, owns

 9    Sam's Clubs.

10          Q.    Is Walmart one of your chain

11    customers, AmerisourceBergen's chain

12    customers?

13          A.    Walmart was not, but Sam's

14    Club was.

15          Q.    Why would you have been

16    reporting Sam's Club OMP thresholds to

17    Walmart?

18                MS. MCCLURE:  Objection to

19          form.

20                THE WITNESS:  We didn't

21          report Sam's Club's numbers to

22          Walmart.

23    BY MR. CLUFF:

24          Q.    The next question is, Do we
```

```
 1   provide any sort of reporting like that

 2   for customers, or does the DEA view that

 3   as colluding?

 4            Do you know what Matthew

 5   McElfresh is talking about there?

 6            MS. MCCLURE:  Objection to

 7       form.

 8            MR. BRODSKY:  Objection.

 9            THE WITNESS:  I don't know

10       what Matt is talking about there.

11   BY MR. CLUFF:

12       Q.   Do you have -- having

13   reviewed the document and having worked

14   at AmerisourceBergen, do you have a

15   general understanding of why he would be

16   asking if the DEA would view this

17   practice as colluding?

18            MS. MCCLURE:  Objection to

19       form.

20            MR. BRODSKY:  Objection.

21            THE WITNESS:  I don't know

22       why he would say that.

23   BY MR. CLUFF:

24       Q.   So he next explains that,
```

Highly Confidential - Subject to Further Confidentiality Review

1    Sam's is asking if we can notify someone

2    when Sam's accounts are hitting or

3    exceeding their thresholds.

4            Do you see that?

5        A.    I see that.

6        Q.    And do you recall responding

7    to this e-mail?

8        A.    I don't recall, but here it

9    is.

10       Q.    So it looks like the e-mail

11   at the bottom of the page there, that's

12   from you to Matthew McElfresh, that's

13   your response?

14       A.    Yes.

15       Q.    Okay.  Sitting here today,

16   you don't recall writing that?

17       A.    I do not.

18       Q.    That was in August 2017,

19   correct?

20       A.    Correct.

21       Q.    But looking at it, do you --

22   looking at this e-mail, do you believe

23   this is a true and correct copy of

24   something that was written and reviewed

1    by you at the time?

2              MS. MCCLURE:  Objection to

3         form.

4              THE WITNESS:  Yes.

5    BY MR. CLUFF:

6         Q.    Okay.  So I want to look at

7    the text of your e-mail.

8              You start off by saying, Hi

9    Matt.

10             Do you see that?

11        A.    I see that.

12        Q.    And you write, We do not

13   report to any customer what their limits

14   are or whether they are exceeding those

15   limits or not, as it is against our

16   policy to do so.

17             Do you see that?

18        A.    I see that.

19        Q.    Okay.  So reporting to a

20   customer about what their limits are or

21   whether they exceeded those limits, the

22   word "limits" in that sentence, does that

23   refer to thresholds?

24             MS. MCCLURE:  Objection to

1      form.

2              THE WITNESS:  Correct.

3      BY MR. CLUFF:

4          Q.    Do you recall any exceptions

5      to this statement, where

6      AmerisourceBergen told somebody what

7      their limits were or whether they

8      exceeded those limits?

9              MS. MCCLURE:  Objection to

10             form.

11             MR. BRODSKY:  Same

12             objection.

13             THE WITNESS:  No.

14     BY MR. CLUFF:

15         Q.    Okay.  You continue and you

16     say, In addition, that would be

17     circumventing our own suspicious order

18     monitoring program; therefore, all

19     threshold limits are not disclosed.

20             Do you see that?

21         A.    I see that.

22         Q.    Do you have any knowledge of

23     instances where AmerisourceBergen

24     informed people about thresholds or

Highly Confidential - Subject to Further Confidentiality Review

1  disclosed thresholds?

2           MS. MCCLURE:  Objection to

3       form.

4           THE WITNESS:  No.

5           MR. BRODSKY:  Same

6       objection.

7  BY MR. CLUFF:

8       Q.   Just looking at that

9  paragraph, I get that there's two

10  sentences, and so I don't want to overly

11  complicate this, though.

12           But looking at the first

13  sentences -- it looks like there are two

14  kinds of information we're talking about

15  here.  The first is what a customer's

16  limit is.

17           Does that make sense?

18           MS. MCCLURE:  Objection to

19       form.

20           THE WITNESS:  Correct.

21  BY MR. CLUFF:

22       Q.   And there's -- a second

23  piece of information is when they exceed

24  those limits?

 1          A.    That's what is written here.

 2          Q.    And the reason you don't do

 3   that is, as I understand it, it looks

 4   like it's twofold.  First, it's against

 5   policy.

 6                Does that make sense?

 7          A.    It makes sense.

 8          Q.    And, second, because it

 9   would circumvent the suspicious order

10   monitoring program?

11          A.    Correct.

12                MS. MCCLURE:  Objection to

13          form.

14   BY MR. CLUFF:

15          Q.    Okay.  All right.  Go ahead

16   and set Exhibit-8 aside for me.

17                I'm going to hand you a copy

18   of a document that's been produced,

19   ABDCMDL00306522.

20                      -   -   -

21                (Whereupon,

22          AmerisourceBergen-Garcia

23          Exhibit-9, ABDCMDL00306522-525,

24          was marked for identification.)

1                       -  -  -

2    BY MR. CLUFF:

3         Q.    It's a multipage e-mail.

4               Go ahead and read the

5    entirety of the document so you can feel

6    familiar with it.

7         A.    I don't remember this,

8    but --

9         Q.    But have you had a chance to

10   look through it and kind of familiarize

11   yourself with it?

12        A.    A little bit, yes.

13        Q.    Let's start at the top.

14              The last e-mail in this

15   chain, which is the top e-mail on the

16   first page, it's from Sharon Hartman to a

17   number of ABC associates, it looks

18   like -- sorry, I said ABC, I meant

19   AmerisourceBergen.

20              You're included on the

21   addressee list, correct?

22        A.    Yes.

23        Q.    And do you see the subject

24   line says, Weekly OMP statistics?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Do you recall, during your

3  time at AmerisourceBergen, that

4  AmerisourceBergen shared weekly OMP

5  statistics with Walgreens?

6    A.    Yes.

7    Q.    What are OMP statistics?

8    A.    Purchases and which

9  customers, which stores, might have hit

10  the OMP.

11    Q.    When you say "might have,"

12  did you tell Walgreens, like, hey, this

13  store might have hit their threshold or

14  that they actually hit?

15         MS. MCCLURE:  Objection to

16      form.

17         THE WITNESS:  They hit OMP.

18  BY MR. CLUFF:

19    Q.    So the weekly OMP

20  statistics, as I understand it from what

21  you just told me, was a report that

22  AmerisourceBergen gave to Walgreens about

23  which stores hit or exceeded their OMP

24  parameters, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Which orders hit OMP, yes.

2        Q.     Was there any other data

3    included in those statistics that you

4    provided to Walgreens?

5        A.     I don't recall.

6        Q.     I had you set aside -- no,

7    never mind.

8               So continuing with what we

9    marked as Exhibit-9, if you look at the

10   very last page, there's an e-mail that

11   starts from Lino Guerreiro.  It goes to

12   Natasha Polster, Eric Stahmann, Patricia

13   Daugherty, Christopher Dymon, Edward

14   Bratton, Nick Leners.

15              Those are all in the "to"

16   line; is that correct?

17       A.     Yes.

18       Q.     Are those all Walgreens

19   employees?

20       A.     Yes.

21       Q.     So that seems to be accurate

22   with your recollection about providing

23   this data to Walgreens, correct?

24       A.     Correct.

1      Q.   Was Walgreens one of

2  AmerisourceBergen's trusted business

3  partners?

4           MS. MCCLURE:  Objection to

5      form.

6           THE WITNESS:  Yes.

7  BY MR. CLUFF:

8      Q.   The date of this e-mail is

9  November 21, 2014, correct?

10     A.   That's correct.

11     Q.   That's a little over a year

12 after AmerisourceBergen -- I mean,

13 Walgreens paid the $80-million penalty we

14 talked about?

15     A.   Correct.

16     Q.   If you go up the chain here,

17 Sharon has some concerns.  She says, It

18 will be interesting to see how this

19 report's action column changes from

20 reject to approved next week, due to

21 changes in process.

22          Do you see that?

23     A.   I do not.  Where is it?

24     Q.   I'm sorry, it's the middle

Highly Confidential - Subject to Further Confidentiality Review

1    e-mail on the second-to-last page, the

2    one that ends in 6524.

3         A.    Okay.

4         Q.    It's on the screen in front

5    of you, too, just so you can see it.

6         A.    Okay.

7         Q.    Do you recall why Sharon

8    thought it would be interesting to see

9    how the report column changes?

10              MS. MCCLURE:  Objection to

11         form.

12              THE WITNESS:  I don't know

13         what she's talking about.

14   BY MR. CLUFF:

15        Q.    And then the next e-mail up,

16   the top of the same page, is from

17   Kimberly St. John.

18              Do you know who that is?

19        A.    She was our coordinator at

20   one point.

21        Q.    Was she also Chris

22   Zimmerman's executive assistant?

23        A.    She moved into that position

24   later.

1      Q.    She writes, Walgreens'

2  orders from this morning were mostly way

3  over threshold or duplicates.

4           She continues, I'm not sure

5  how much that column will change, to be

6  honest.

7           Based on your experience as

8  a person who conducted due diligence for

9  chain pharmacies, do you have any

10 understanding as to why she did not

11 believe changes would be occurring?

12          MS. MCCLURE:  Object to the

13      form.

14          THE WITNESS:  I have no

15      idea.

16 BY MR. CLUFF:

17     Q.    Do you have any recollection

18 about Walgreens' orders being way over

19 the threshold?

20     A.    No.

21     Q.    Would it concern you that a

22 large chain pharmacy like Walgreens had

23 most of its orders be way over threshold?

24          MS. MCCLURE:  Objection to

1              form.  Misstates the document.

2                   THE WITNESS:  No.  Because

3              I'd need to look at it and see

4              what the issue was.

5    BY MR. CLUFF:

6         Q.    Is that another instance

7    where AmerisourceBergen would be

8    operating to protect its valued

9    customers?

10                  MS. MCCLURE:  Objection to

11             form.

12                  THE WITNESS:  No.

13   BY MR. CLUFF:

14        Q.    Would that be another

15   instance where AmerisourceBergen was

16   resolving issues in favor of keeping a

17   customer?

18                  MS. MCCLURE:  Objection to

19             form.

20                  THE WITNESS:  No.

21   BY MR. CLUFF:

22        Q.    But those orders were way

23   over threshold, according to Kimberly St.

24   John?

1          MS. MCCLURE:  Objection to

2     form.

3          THE WITNESS:  It was just

4     pure investigation.

5  BY MR. CLUFF:

6     Q.   I'm sorry?  What was just

7  pure investigation?

8     A.   It's just looking at that

9  isolated order to see what the

10 circumstances were.

11    Q.   Let me back up and

12 understand something here.

13         Kimberly St. John says,

14 Walgreens' orders from this morning were

15 mostly way over threshold or duplicates.

16         And then you just explained

17 to me that something is just looking at

18 the isolated orders to see what the

19 circumstances were.

20         Could you explain that to

21 me?

22    A.   When we look at that order,

23 we're trying to determine what the

24 circumstances were, why that order hit

Highly Confidential - Subject to Further Confidentiality Review

1    OMP.

2           Q.    But as an objective fact,

3    Kimberly St. John states that Walgreens'

4    orders from this morning were mostly way

5    over threshold or duplicates, correct?

6                     MS. MCCLURE:  Objection to

7           form.

8                     THE WITNESS:  But I don't

9           know the context that she's

10          talking about.

11   BY MR. CLUFF:

12          Q.    Do you understand the

13   context of an order exceeding threshold?

14                    MS. MCCLURE:  Objection to

15          form.

16                    THE WITNESS:  Reclarify.

17   BY MR. CLUFF:

18          Q.    Sure.

19                Does AmerisourceBergen use

20   thresholds to identify orders of

21   interest?

22                    MS. MCCLURE:  Objection to

23          form.  When?

24                    THE WITNESS:  If it hits the

1       algorithm.

2    BY MR. CLUFF:

3       Q.    Is the algorithm including a

4    threshold?

5            MS. MCCLURE:  Objection to

6       form.

7            THE WITNESS:  Yes.

8    BY MR. CLUFF:

9       Q.    And so what happens when an

10   order exceeds threshold?

11      A.    It hits the algorithm and

12   it's an order of interest, and then we go

13   in and look at it.

14      Q.    So you asked me what the

15   context was about exceeding threshold.

16            And I will tell you that

17   when I say "exceeding threshold," I

18   describe that process that you just

19   communicated to me.

20            And let's go back to

21   Kimberly St. John's e-mail.  And she

22   says, Walgreens' orders from this morning

23   were mostly way over threshold or

24   duplicates.

1      Do you see that?

2      A.    I see that.

3      Q.    So based on what you just

4   testified to me, is it your understanding

5   that, here, the orders would have

6   exceeded the threshold algorithm that you

7   just described?

8           MS. MCCLURE:  Objection to

9        form.

10          THE WITNESS:  I assume

11       that's what she's talking about.

12   BY MR. CLUFF:

13      Q.    And my follow-up question

14   is, is that a situation in which

15   AmerisourceBergen would have made

16   decisions to protect their business

17   partners?

18          MS. MCCLURE:  Objection to

19       form.

20          THE WITNESS:  I don't

21       understand the question.

22   BY MR. CLUFF:

23      Q.    I previously asked you if

24   Walgreens is a trusted business partner

1    for AmerisourceBergen.

2              Do you recall that?

3         A.    Yes.

4         Q.    Right.  And would you agree

5    with me that they are?

6         A.    Yes.

7         Q.    We previously looked at the

8    e-mail that you wrote to Greg Madsen

9    about Costco, and you instructed him that

10   when you're looking at 590 due diligence,

11   you're always trying to protect your

12   valued customers.

13             Do you remember that?

14             MS. MCCLURE:  Objection to

15        form.

16             THE WITNESS:  Yes.

17   BY MR. CLUFF:

18        Q.    So you told me that when an

19   order exceeds threshold, as Kimberly St.

20   John describes in this e-mail, it goes

21   into a due diligence investigation; is

22   that correct?

23             MS. MCCLURE:  Objection to

24        form.

1              THE WITNESS:  We look at

2         those orders, yes.

3    BY MR. CLUFF:

4         Q.    And my question is, when

5    you're looking at those orders, is

6    AmerisourceBergen trying to protect its

7    customers; yes or no?

8              MS. MCCLURE:  Objection to

9         form.  And you don't have to

10        answer yes or no.

11             THE WITNESS:  I don't want

12        to speculate on that.

13   BY MR. CLUFF:

14        Q.    I didn't ask you to

15   speculate.

16             Let's back up.  We'll lay

17   some foundation for this so you can kind

18   of see where I'm going.

19             You were a diversion

20   investigator for five years at

21   AmerisourceBergen, correct?

22        A.    Correct.

23        Q.    Part of your job

24   responsibilities were to investigate

1    orders that exceeded threshold?

2         A.    Correct.

3         Q.    I believe you referred to

4    those as orders of interest.

5              Does that make sense?

6         A.    Orders of interest, yes.

7         Q.    Okay.  These orders here

8    that Kimberly St. John talks about that

9    exceed threshold, would you qualify those

10   as orders of interest?

11        A.    They hit the algorithm, yes.

12        Q.    And so they needed to be

13   investigated, correct?

14        A.    Correct.

15        Q.    All right.  I'm just asking

16   you, in your process, as a diversion

17   investigator that investigated orders of

18   interest that exceeded threshold, like

19   these identified here by Walgreens,

20   whether you investigated those in a way

21   that protected your customer's interests?

22              MS. MCCLURE:  Objection to

23        form.

24              THE WITNESS:  No.  It's just

1        an isolated order that hit the

2        algorithm that we're looking at.

3        That doesn't mean we told them

4        what their threshold amounts were,

5        or anything else.

6    BY MR. CLUFF:

7        Q.    I'm just asking, when you

8    were investigating these orders, did you

9    do so in a way to protect your customers?

10        MS. MCCLURE:  Objection to

11        form.  Asked and answered.

12        THE WITNESS:  No.  It's just

13        an action that they did to

14        replenish their inventories.

15    BY MR. CLUFF:

16        Q.    Okay.  When we looked

17    through Exhibit-7, I believe, we talked

18    about that decisions were made always in

19    order to keep a customer as an

20    AmerisourceBergen customer.

21        Do you recall that?

22        MS. MCCLURE:  Objection to

23        form.  Mischaracterizes the

24        document.  Misstates the witness's

Highly Confidential - Subject to Further Confidentiality Review

1          prior testimony.

2                    THE WITNESS:  That's what I

3          stated.

4    BY MR. CLUFF:

5          Q.    Okay.  When you, as an

6    investigator, reviewed orders like this

7    that exceeded threshold, did you do so in

8    a way to maintain ABC customers?

9                    MS. MCCLURE:  Objection to

10          form.

11                    THE WITNESS:  It wasn't to

12          protect them.  It was to look at

13          the order, regardless.

14                    MS. MCCLURE:  Can we take a

15          break in a moment?

16                    MR. CLUFF:  We'll break when

17          I'm ready to break, unless Liz

18          needs a break.

19                    THE WITNESS:  I'll take a

20          break.

21                    MR. CLUFF:  Let's take a

22          break.

23                    VIDEO TECHNICIAN:  Off the

24          record at 2:31 p.m.

Highly Confidential - Subject to Further Confidentiality Review

1                    -  -  -

2              (Whereupon, a brief recess

3         was taken.)

4                    -  -  -

5              VIDEO TECHNICIAN:  We're

6         back on the record at 2:49 p.m.

7    BY MR. CLUFF:

8         Q.    Ms. Garcia, we recently took

9    a break.  We're back on the record now.

10   So you understand that you're still under

11   oath?

12        A.    Yes.

13        Q.    Okay.  So let's go back to

14   Exhibit-9, the one we were just talking

15   about.  That's the e-mail with the

16   subject line, Weekly OMP statistics.

17              Do you see that?

18        A.    I see that.

19        Q.    And we were on the third

20   page, and we were looking at Kimberly St.

21   John's e-mail at the top there.

22              Do you see that?

23        A.    I see that.

24        Q.    I want to flip to the front

Highly Confidential - Subject to Further Confidentiality Review

1    one more page, which ends in 6523.  At

2    the top there, there's an e-mail that you

3    write.

4              Do you see it?

5         A.   I see that.

6         Q.   Okay.  And if you recall

7    from the discussion prior to your e-mail,

8    I'm going to paraphrase, but the

9    discussion was, orders from Walgreens

10   that were exceeding thresholds.

11             Do you think that is a fair

12   summary?

13        A.   Yes.

14        Q.   Okay.  Do you recall that --

15   or what do you recall about Walgreens'

16   ordering patterns while you were an

17   employee of AmerisourceBergen?

18             MS. MCCLURE:  Objection to

19        form.

20             THE WITNESS:  They ebbed and

21        flowed.

22   BY MR. CLUFF:

23        Q.   Do you have any recollection

24   about them, you know, having a pattern of

Highly Confidential - Subject to Further Confidentiality Review

1    exceeding their thresholds?

2              MS. MCCLURE:  Objection to

3         form.

4              THE WITNESS:  I don't

5         recall.

6    BY MR. CLUFF:

7         Q.   Do you feel like you

8    personally, as an employee of

9    AmerisourceBergen, had a close working

10   relationship with Walgreens?

11             MS. MCCLURE:  Objection to

12        form.

13             THE WITNESS:  I had a good

14        relationship with Walgreens, yes.

15   BY MR. CLUFF:

16        Q.   What do you mean when you

17   say you had a "good" working relationship

18   with Walgreens?

19             MS. MCCLURE:  Objection to

20        form.

21             THE WITNESS:  I communicated

22        with the WAG integrity team, who

23        are my counterparts at Walgreens.

24   BY MR. CLUFF:

1    Q.    So when you say they were

2    "your counterparts," could you describe

3    what that means?

4    A.    They were investigators

5    also.

6    Q.    And what were they

7    investigating?

8    A.    They monitored their own

9    accounts.

10    Q.    Was there a special or

11    unique relationship between the diversion

12    control team and the WAG team?

13         MS. MCCLURE:  Objection to

14    form.

15         THE WITNESS:  We were

16    counterparts for our respective

17    businesses.

18    BY MR. CLUFF:

19    Q.    Was there any communication

20    between the diversion control team and

21    the WAG integrity team if a Walgreens'

22    order exceeded thresholds?

23         MS. MCCLURE:  Objection to

24    form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  If we saw

2         something unusual, we would call

3         it to their attention.

4    BY MR. CLUFF:

5         Q.    What happened after you

6    called it to their attention?

7              MS. MCCLURE:  Objection to

8         form.

9              THE WITNESS:  I don't know

10        what they did.

11   BY MR. CLUFF:

12        Q.    Would AmerisourceBergen ever

13   take action on an order that exceeded

14   threshold without talking to the WAG

15   integrity team?

16             MS. MCCLURE:  Objection to

17        form.

18             THE WITNESS:  Generally, no.

19   BY MR. CLUFF:

20        Q.    I've been saying WAG

21   integrity team.

22             I'm using the abbreviation,

23   W-A-G, do you know that to mean

24   Walgreens?

Highly Confidential - Subject to Further Confidentiality Review

 1         A.    Yes.

 2         Q.    I'll clear that up in the

 3    future.  I just wanted to be on the same

 4    page.

 5              So you said that, generally,

 6    no, Amerisource didn't take action on

 7    orders that exceeded threshold without

 8    talking to Walgreens, right?

 9         A.    Correct.

10         Q.    So what happened after, in

11    your experience, AmerisourceBergen

12    communicated to Walgreens about an order

13    that exceeded threshold?

14              MS. MCCLURE:  Objection to

15         form.

16              THE WITNESS:  I don't know

17         what action they took on their

18         end.

19    BY MR. CLUFF:

20         Q.    Did you receive any

21    communications back from the Walgreens

22    integrity team at that point?

23              MS. MCCLURE:  Objection to

24         form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  Either at that

2        point or in the future, once they

3        resolved the issue.

4  BY MR. CLUFF:

5        Q.    What do you mean by

6  "resolved the issue"?

7        A.    Whether that is a legitimate

8  need for their patients or not, that

9  order.

10        Q.    And what would happen if

11  Walgreens determined that an order was

12  not for the legitimate needs of a

13  patient --

14              MS. MCCLURE:  Objection to

15        form.

16  BY MR. CLUFF:

17        Q.    -- at AmerisourceBergen;

18  would the order be cancelled?

19        A.    They would indicate, please

20  cancel.

21        Q.    At that point, would you

22  cancel the order?

23              MS. MCCLURE:  Objection to

24        form.

1              THE WITNESS:  Yes.

2    BY MR. CLUFF:

3         Q.    And when I say "you," I mean

4    AmerisourceBergen.

5              After you cancelled the

6    order, would you report that to the DEA?

7              MS. MCCLURE:  Objection to

8         form.

9              THE WITNESS:  Yes.  Unless

10        it was human error or something

11        like that.

12   BY MR. CLUFF:

13        Q.    I want to look now again

14   back to Exhibit-9.

15             The second page, your e-mail

16   in the top part of the page is the one

17   dated November 21, 2014.

18             You say, I agree that action

19   needs to be taken on Walgreens -- which

20   is abbreviated, WAG's -- part to make

21   sure that -- ensure they do not order

22   large amounts over threshold.

23             Do you see that?

24        A.    I see that.

1          Q.    In 2014, reading this

2    sentence, do you have a recollection that

3    Walgreens was ordering over threshold by

4    large amounts?

5                MS. MCCLURE:  Objection to

6          form.

7                THE WITNESS:  I don't

8          recall.

9    BY MR. CLUFF:

10         Q.    But that's what you wrote,

11   correct?

12               MS. MCCLURE:  Objection to

13         form.

14               THE WITNESS:  That's what I

15         wrote.

16   BY MR. CLUFF:

17         Q.    You say here that you agreed

18   with Kim that there won't be much change

19   on Walgreens' part.

20               Do you see that?

21         A.    I see that.

22         Q.    Do you have a recollection

23   today of why you believed that Walgreens

24   would not change their ordering patterns?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I don't know the context,

2   no.

3      Q.    You've read this e-mail,

4   right?

5      A.    I have.

6      Q.    You had an opportunity to

7   review it?

8      A.    Let me look at what I wrote.

9            Okay.

10     Q.    You say -- you agree with

11  Kim that there won't be much change in

12  Walgreens' ordering patterns.

13           Do you recall what that

14  conclusion was based on?

15           MS. MCCLURE:  Objection to

16       form.  Asked and answered.

17           THE WITNESS:  I don't

18       recall.

19  BY MR. CLUFF:

20     Q.    In the next sentence you

21  say, Their solution -- I'm assuming that

22  means Walgreens, right?

23     A.    Correct.

24     Q.    So Walgreens' solution will

1    be to raise the threshold, which means

2    I'll continue to receive many reviews on

3    a daily basis.

4              Reading that sentence, is it

5    your recollection that you were receiving

6    many reviews on a daily basis from

7    Walgreens that were over threshold?

8         A.    They were appealing their

9    threshold amounts.

10        Q.    So they were appealing their

11   threshold amounts on a daily basis?

12             MS. MCCLURE:   Objection to

13        form.

14             THE WITNESS:   Because we

15        were -- we were trying to sync our

16        system with theirs, and there was

17        a glitch that didn't allow that to

18        happen.  So they would appeal the

19        threshold amounts.

20   BY MR. CLUFF:

21        Q.    When we looked at your

22   LinkedIn profile and you described the

23   work you've done at AmerisourceBergen and

24   DEA, I believe you described yourself as

Highly Confidential - Subject to Further Confidentiality Review

1    having a thorough knowledge of the

2    regulations.

3              Does that make sense?

4         A.    Makes sense.

5         Q.    Are you aware of a

6    regulation that allows a distributor and

7    its customer to sync their order

8    monitoring systems?

9              MS. MCCLURE:  Objection to

10        form.

11             THE WITNESS:  That's just

12        general business acumen, I guess.

13   BY MR. CLUFF:

14        Q.    Is that a part of the

15   partnership that Amerisource had with

16   Walgreens?

17             MS. MCCLURE:  Objection to

18        form.

19             THE WITNESS:  I don't know.

20   BY MR. CLUFF:

21        Q.    What does it mean to you

22   when you say the words "sync" the two

23   systems?

24        A.    They were on a different

Highly Confidential - Subject to Further Confidentiality Review

1    platform than ours.  So they would have,

2    I think, visibility, in the future, of an

3    order that might hit OMP on their end.  I

4    don't know.

5          Q.    When you say "visibility,"

6    do you mean into AmerisourceBergen's

7    system?

8          A.    No.  It's a platform that

9    the stores themselves order from and then

10   we see it on our side, from what I

11   recall.

12         Q.    So AmerisourceBergen had

13   visibility into Walgreens' system?

14               MS. MCCLURE:  Objection to

15         form.

16               THE WITNESS:  No.  Sorry.

17         I'm not --

18   BY MR. CLUFF:

19         Q.    I'm just trying to

20   understand.

21         A.    I'm not explaining that

22   right.

23               The stores have a platform

24   that they would order from, or that the

1  system automatically orders from.

2       Q.    Let's stop right there.

3  Let's understand that portion, because it

4  seems like we've got some steps along the

5  way.

6            Walgreens stores had a

7  system that they ordered controlled

8  substances from, from Walgreens, like,

9  central; is that what you're saying?

10           MS. MCCLURE:  Objection.

11           THE WITNESS:  I think so.

12  BY MR. CLUFF:

13       Q.    Okay.  And then what

14  happened next?

15       A.    And then that order gets

16  transmitted over to SAP, which was our

17  system.

18            So they don't have

19  visibility to our system and we don't

20  have visibility to theirs, but they were

21  two different platforms.

22       Q.    So when you say sync the

23  system, do you mean something like

24  helping the two systems communicate with

1    each other?

2                    MS. MCCLURE:  Objection to

3            form.

4                    THE WITNESS:  Yes.

5    BY MR. CLUFF:

6            Q.    Did --

7            A.    Communicate but not visible,

8    sorry.

9            Q.    No.  Finish your answer.  Go

10   ahead.

11           A.    No, that's all.

12           Q.    So your answer was

13   communicate but not visible.

14                    Do you mean not have

15   visibility between the two?

16           A.    Correct.

17           Q.    Understood.

18                    Did Amerisource sync its

19   system with any other customers?

20                    MS. MCCLURE:  Objection to

21           form.

22                    THE WITNESS:  I don't know.

23   BY MR. CLUFF:

24           Q.    So based on your

1  understanding, this may be just a

2  Walgreens-only kind of deal?

3            MS. MCCLURE:  Objection to

4       form.  Misstates the witness's

5       prior testimony.

6            THE WITNESS:  I don't know.

7  BY MR. CLUFF:

8       Q.   Okay.  So if you recall, we

9  got to this e-mail because I asked you if

10  AmerisourceBergen ever communicated

11  thresholds -- or when customers exceeded

12  thresholds.

13            Do you recall that?

14       A.   Yes.

15       Q.   I think that was Exhibit-8,

16  if you want to put it back in front of

17  you.

18            So I'm going to give you two

19  documents.  And they've previously been

20  admitted as exhibits in the deposition of

21  Mr. Hazewski.

22            And I'm going to give you

23  the first one.  And just for clarity, I'm

24  going to put another number on it, even

1    though it's already got a number on it.

2    But for your deposition, we're going to

3    refer to this e-mail as Exhibit-10.

4                        -  -  -

5                    (Whereupon,

6            AmerisourceBergen-Garcia

7            Exhibit-10, ABDCMDL00282490, was

8            marked for identification.)

9                        -  -  -

10   BY MR. CLUFF:

11       Q.    And then I'm going to give

12   you a document to put behind it that

13   we're going to mark as Exhibit-11.

14                       -  -  -

15                   (Whereupon,

16           AmerisourceBergen-Garcia

17           Exhibit-11, ABDCMDL00282491, was

18           marked for identification.)

19                      -  -  -

20               MR. CLUFF:  So let me give

21           you this.  And while you're

22           familiarizing yourself, I'll

23           collect my thoughts.

24               MS. MCCLURE:  It's a little

Highly Confidential - Subject to Further Confidentiality Review

1       small.

2               MR. CLUFF:  Shannon, this is

3           one of the ones we discussed

4           before we went on the record

5           today, where I have a copy of the

6           native file that I can blow up so

7           it's easier for all of us to look

8           at.

9               MS. MCCLURE:  I mean, this

10          is visible to me.

11              Can you see it?

12              THE WITNESS:  Pretty much.

13              MR. CLUFF:  So what I can

14          do, Ms. Garcia, is I can have him

15          load that spreadsheet up on the

16          screen for us all to look at.

17      BY MR. CLUFF:

18          Q.    But let me -- let me make a

19      record right here.

20              So the cover e-mail, which

21      we marked as Exhibit-10, is Bates

22      numbered ABDCMDL00282490.

23              MR. CLUFF:  And for the

24          trial tech, that's Document 49.

1   BY MR. CLUFF:

2           Q.    The spreadsheet, which is an

3   attachment to the e-mail, which we marked

4   as Exhibit-11, that's the one in your

5   right hand there, that is marked as

6   ABDCMDL00282491.

7                 MR. CLUFF:  And that's, for

8           the trial tech, marked as

9           Exhibit-50.

10                I will note that the cover

11          e-mail is marked as, confidential

12          subject to the protective order.

13          For purposes of the deposition, we

14          will designate -- or we will agree

15          with counsel that the spreadsheet

16          is maintaining the same

17          designation.

18  BY MR. CLUFF:

19          Q.    So why don't you look at

20  that cover e-mail and the attachment,

21  please, Ms. Garcia.

22          A.    Okay.

23          Q.    So let's look at the cover

24  e-mail, which we marked as Exhibit-10.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you have that?

2     A.    Okay.

3     Q.    That's an e-mail from Ed

4    Hazewski.

5          Do you see that he is the

6    sender in the "from" line, right?

7     A.    Uh-huh.

8     Q.    And then if you look at the

9    "to" line, it looks like there are a

10   number of Walgreens e-mail addresses

11   there?

12    A.    Yes.

13    Q.    Are those people that you

14   would have communicated with in your work

15   with Walgreens?

16    A.    Yes.  That's the WAG

17   integrity team.

18    Q.    And then you see there's a

19   subject line that says, Data?

20    A.    Yes.

21    Q.    And the attachment is, WAG

22   orders held.xlsx, correct?

23    A.    Correct.

24    Q.    And then -- so this is Ed

1  writing.  And he says, Team WAG -- or

2  team Walgreens -- find attached some data

3  that I believe could be the basis for a

4  part of our discussion.  Briefly, the

5  first tab is all WAG locations that had

6  C-II order lines flagged by the OMP,

7  sorted largest (most lines) to smallest.

8  We can discuss further tomorrow.

9            So my question is, looking

10 at this document, do you have a general

11 understanding that the attachment would

12 have been data provided by

13 AmerisourceBergen to Walgreens?

14      A.    Yes.

15      Q.    And that the data that was

16 provided was C-II order lines flagged by

17 the OMP, correct?

18      A.    Correct.

19            You need a magnifying glass.

20            MR. CLUFF:  Zach, can you

21       put the spreadsheet up, the PDF,

22       please?  And can you blow it up as

23       big as possible so Ms. Garcia can

24       look at it a little bit better?

1          Not much better.  It's

2     marginally better.

3 BY MR. CLUFF:

4          Q.    So based on Ed's e-mail, it

5 looks like the spreadsheet that was

6 attached would have had multiple tabs,

7 correct?

8          Looking at the e-mail, he

9 says, The first tab.

10          A.    I guess that's implied.  I

11 don't see that here, though.

12          Q.    He says, on his sentence, on

13 the Exhibit-10, second sentence, Briefly,

14 the first tab is all Walgreens locations

15 that had C-II order lines flagged by the

16 OMP.

17          A.    Okay.

18          Q.    Okay.  So looking at this

19 exhibit --

20          MR. CLUFF:  Can you show me

21     the bottom left-hand corner of the

22     document, Zach?

23 BY MR. CLUFF:

24          Q.    Do you see down there in the

1    very bottom left-hand corner, there's a

2    note -- I'm trying to blow it up on my

3    screen, too, so I can see it.

4         A.    ABDC -- what's that say?

5         Q.    Down in the bottom

6    right-hand corner, it says, Activity for

7    March totals.

8              Do you see that?

9         A.    Yes.

10        Q.    If you look up at the very

11   top left corner, where the chart starts,

12   there is a column that says, DC.

13             Do you see that?

14        A.    I see that.

15        Q.    Would that have stood for

16   distribution center?

17        A.    Yes.

18        Q.    And then the next chart

19   over, there's a column that says, DEA

20   number?

21        A.    Correct.

22        Q.    Would that be a DEA number

23   of a customer?

24             MS. MCCLURE:  Objection to

1          form.

2                    THE WITNESS:  I don't know

3          if that's referencing the DC or

4          the customer.

5    BY MR. CLUFF:

6          Q.    Okay.  Going over one more,

7    there's a column that says, Customer

8    number.

9                    Do you see that?

10         A.    Okay.

11         Q.    Would that have been the

12   Walgreens -- excuse me, the

13   AmerisourceBergen customer or that

14   customer's DEA number?

15         A.    The customer number is an

16   internal number that's on the ABC side.

17         Q.    In the next column over, it

18   says, Customer name?

19         A.    Yes.

20         Q.    Do you see that?

21                    And if you kind of flip

22   through this, this document, you'll see

23   that they are all Walgreens, correct?

24         A.    I see that, yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     Moving over one more,

2    there's a column that says, Address.

3               Do you see that?

4        A.     I see that.

5        Q.     And next to that is, State.

6               Do you see that?

7        A.     (Witness nods.)

8        Q.     Pursuant to one of the

9    orders in this case, I'm supposed to ask

10   you questions primarily about Ohio

11   jurisdictions.

12              So I took the native

13   document that was attached to that

14   e-mail, and I sorted it only for Ohio.

15              So if you flip through that

16   document, you will see that the state is

17   only Ohio.

18              Do you see that?

19       A.     I see that.

20       Q.     Okay.  So the RX license

21   number, do you see that?

22       A.     I do.

23       Q.     Do you know what that is?

24       A.     That might be their license

Highly Confidential - Subject to Further Confidentiality Review

1    number at the state level.

2        Q.    And then looking next column

3    over, it says, Order date.

4        What is that?

5        A.    When they placed the order.

6        Q.    And then the next column

7    over, that is, Sales order number.

8        Do you see that?

9        A.    I see that.

10        Q.    What is that number?

11        A.    That's the order number, I

12    believe, that's generated by the SAP

13    system.

14        Q.    So, so far, if we track this

15    chart across, we're looking at DEA number

16    for Walgreens customers.

17        And from that, we're able to

18    identify an order date and an order

19    number, correct?

20        A.    Yes.

21        Q.    And the next column over,

22    the heading is, Line.

23        Do you see that?

24        A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Is that the number of lines

2    that would have been included on an

3    order?

4    A.    I don't know.  I believe so.

5    Q.    Okay.  If you look at the

6    column, OMP family, do you see that?

7    A.    Yes.

8    Q.    What would that -- what

9    would that column have reflected in the

10    chart?

11    A.    That was the two-letter

12    acronym for -- or abbreviation for a

13    drug.

14    Q.    So looking down at OX,

15    that's purple, what would that be?

16    A.    Oxycodone.

17    Q.    Do you have an understanding

18    of what BO is at the top of that chart?

19    A.    Buprenorphine.

20    Q.    How about LA?

21    A.    Some kind of a liquid.  I

22    don't remember.

23    Q.    But, generally, you

24    understand that if we looked at the OMP

1    family column here, we can determine what

2    kind of drug was being ordered?

3          A.    Yes.

4          Q.    Maybe it's more appropriate,

5    if I misspoke, to call them drug families

6    were being ordered?

7          A.    Yes.

8          Q.    If you go over one more

9    column, it says, Item number, correct?

10         A.    Correct.

11         Q.    What is an item number?

12         A.    That's the sku, I believe,

13   for that particular item.

14         Q.    Forgive my lay

15   misunderstanding, what's a sku?  Is it an

16   abbreviation?

17         A.    It's a number assigned to

18   different drug products.

19         Q.    Like a S-K-U?

20         A.    Yes.

21         Q.    The next column over is,

22   Material description.

23               Do you see that?

24         A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So that the sort of, like,

2  long-form description of the drug that

3  was contained in the OMP family

4  abbreviation?

5    A.    Yes.

6    Q.    So if we're looking at that

7  column, for example, we see Suboxone,

8  Oxycodone, OxyContin.

9         Do you see that all that?

10   A.    I do.

11   Q.    So those drug families would

12  correspond back to the OMP category?

13   A.    Yes.

14   Q.    If you scroll over to the

15  next column, it says, NDC.

16        What is NDC?

17   A.    You know, I don't know.  I

18  forget.

19   Q.    Looking over at the next

20  column, do you see that category is

21  called, Threshold?

22   A.    I do.

23   Q.    Would that category have

24  been the threshold for this drug family

Highly Confidential - Subject to Further Confidentiality Review

1    or OMP family?

2                 MS. MCCLURE:  Objection to

3            form.

4                 THE WITNESS:  It appears to

5            be, yes.

6    BY MR. CLUFF:

7         Q.    So, for example, in the

8    first line -- let me ask one more

9    question.

10                Is this number, so looking

11   at ███████ in the first column, the first

12   row, would that be dosage units?

13        A.    Yes.

14                MS. MCCLURE:  Objection to

15           form.

16   BY MR. CLUFF:

17        Q.    So that would be ███████

18   dosage units of Suboxone, if you can look

19   at it across there?

20        A.    Yes.

21        Q.    Okay.  Continuing over to

22   the right, it looks like there's a column

23   that says, Override.

24                What is that column?

1     A.    That's the threshold

2     adjustment.

3           Q.    So in this chart, thus far,

4     we, in the last two columns, have

5     identified that thresholds were

6     identified in this document and threshold

7     increases or modifications were

8     identified?

9                 MS. MCCLURE:    Objection to

10          form.

11                THE WITNESS:    In this

12          document, yes.

13    BY MR. CLUFF:

14          Q.    The next line over says,

15    Consumed.

16                What is that?

17          A.    That's how much they ordered

18    in a 30-day period.

19          Q.    And then what's the order

20    quantity?

21          A.    That particular order, how

22    much they ordered.

23          Q.    So looking at -- let's just

24    stay on that first line.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. CLUFF:  Zach, if you can

2         back out just a little bit to show

3         the material description all the

4         way through the order quantity.

5              Perfect.

6    BY MR. CLUFF:

7         Q.    Do you see on the top line

8    there, the material description is

9    Suboxone?

10        A.    Yes.

11        Q.    And if we go across, we see

12   the threshold is █████, right?

13        A.    Yes.

14        Q.    And you said that consumed

15   meant they had consumed that much in a

16   ██████ period, right?

17        A.    A ████████████████████.

18        Q.    So when this order occurred,

19   if I'm reading this chart correctly, they

20   were █████ units over their threshold; is

21   that right?

22             MS. MCCLURE:  Objection to

23        form.

24   BY MR. CLUFF:

1    Q.    I'm just trying to

2    understand how to read this chart,

3    really.

4         A.    Right.

5         Q.    Okay.  And then they placed

6    another order for ███ dosage units?

7         A.    Yes.

8         Q.    So they were already over

9    threshold, and then they continued to

10   order, right?

11              MS. MCCLURE:  Objection to

12        form.

13              THE WITNESS:  If it rolls

14        off after the ███, that number

15        might go -- might decrease, and

16        then this new order comes on.

17   BY MR. CLUFF:

18        Q.    Which number might decrease?

19        A.    Sorry.  The consumed.

20        Q.    So you're talking about the

21   process of orders coming in and out;

22   sometimes the 30-day consumed number

23   might drop and allow for a subsequent

24   order to be fulfilled.  Is that what

Highly Confidential - Subject to Further Confidentiality Review

1    you're saying?

2           A.    Correct.

3           Q.    But on the date that this

4    order was processed, they were already

5    ███████ over their ████████████████, right?

6           A.    That's a snapshot.

7           Q.    Well, on that snapshot of a

8    day, they were ████████ units over just for

9    that order of Suboxone, right?

10          A.    Correct.

11          Q.    If you go down to the third

12   line, it says, OXYCOD/APAP/5/325

13   milligrams.

14                Do you see that?

15          A.    I see that.

16          Q.    And if we go over, the

17   threshold is ████████ dosage units.

18                Do you see that?

19          A.    I see that.

20          Q.    And they order -- their

█████ ████████████████████████████████████████

22   units; is that right?

23          A.    I see it.

24          Q.    I'm not good at math, but

1    the consumed is over the threshold,

2    correct?

3         A.    Correct.

4         Q.    And then they ordered

5    another ▮▮▮ dosage units of Oxycodone

6    APAP?

7         A.    Correct.

8         Q.    Let's go to the next column

9    over that says, Status.

10             Do you see that?

11        A.    I see that.

12        Q.    Do you see the abbreviation

13   CSX?

14        A.    Yes.

15        Q.    Do you know what that means?

16        A.    I believe that was release.

17        Q.    So continuing over, the next

18   column says, Status date.

19             Would that be the date on

20   which the status was changed?

21             MS. MCCLURE:  Objection to

22        form.

23             THE WITNESS:  I don't

24        remember what that is.

1    BY MR. CLUFF:

2         Q.    Moving over to the next,

3    there's a column that says, OMP freeform

4    text.

5              Do you see that?

6         A.    I see that.

7         Q.    It says, Comments -- in the

8    first column, it says, Comments added by

9    A008710 at 18.37.44 on date 03/03/2001.

10             Do you have any idea what

11   that means?

12        A.    Comments added by whoever

13   employee number that is, at that time,

14   military time, on that date.

15        Q.    So that's 1800 hours, 37

16   minutes and 44 seconds?

17        A.    Yes.

18        Q.    That's roughly, like, 6:30;

19   is that right?

20        A.    Eastern Time.

21        Q.    And A008710 would have been

22   someone's employee number?

23        A.    Yes.

24        Q.    Do you know who it was, off

Highly Confidential - Subject to Further Confidentiality Review

1    the top of your head?

2           A.    No.

3           Q.    Where could I find a list of

4    everybody's employee numbers at

5    AmerisourceBergen?

6           A.    I don't know.

7           Q.    Do you have any idea where

8    that would have been kept?

9           A.    No.

10          Q.    Do you know what your

11   employee ID number was?

12          A.    No, I don't remember.

13          Q.    Okay.  Let's go over to the

14   next two columns.

15                Do you see, Overage in DUs?

16          A.    Yes.

17          Q.    And I think on the version

18   that you're looking at, which is in

19   color, there is some red highlighting and

20   red text; is that right?

21          A.    Yes.

22          Q.    Okay.  And so overage in

23   DUs, does "DU" stands for dosage units?

24          A.    Dosage units, yes.

1    Q.    So remember earlier we

2  talked about consumed being over the

3  threshold for that first row, and I asked

4  you if they were ███ over the

5  threshold?

6            Do you remember that

7  question?

8    A.    Yes.

9    Q.    And here it says, Overage in

10  dosage units.  It says, ███?

11    A.    Correct.

12    Q.    And next to that it says,

13  Percentage over.

14            Do you see that?

15    A.    Yes.

16    Q.    Or, Overage percentage.

17    A.    Yes.

18    Q.    ██ percent, right?

19    A.    Yes.

20    Q.    So going back to Exhibit-10,

21  which is the e-mail from Ed Hazewski.

22    A.    Okay.

23    Q.    And it's sent to Walgreens,

24  correct?

1          A.     It's sent to the integrity

2     team.

3          Q.     The Walgreens integrity

4     team?

5          A.     Yes.

6          Q.     And then when we looked at

7     Exhibit-11, that's the spreadsheet,

8     right?

9          A.     Yes.

10         Q.     Would you agree with me that

11    it discloses what Walgreens thresholds

12    are for various OMP families?

13              MS. MCCLURE:  Objection to

14         form.

15              THE WITNESS:  To the

16         Walgreens integrity team only.

17    BY MR. CLUFF:

18         Q.     How do you know what

19    happened with this document after it was

20    sent to the Walgreens integrity team?

21         A.     I don't know.

22         Q.     Okay.  So you'll agree with

23    me that, at a minimum, it was sent to the

24    Walgreens integrity team, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    And it showed them what the

3  threshold was for the Walgreens stores,

4  correct?

5         MS. MCCLURE:  Objection to

6    form.

7         THE WITNESS:  That normally

8    did not happen.  That was

9    corrected later on.

10  BY MR. CLUFF:

11    Q.    I appreciate that

12  explanation.  But my question is a little

13  bit more simple.

14         This is an Excel spreadsheet

15  that was transmitted to the Walgreens

16  integrity team, right?

17    A.    Correct.

18    Q.    And it provided the

19  Walgreens integrity team with an

20  order-by-order analysis of the thresholds

21  for various OMP families, correct?

22    A.    On this document, correct.

23    Q.    It also showed them the

24  override for those thresholds, correct?

1    A.    It did.

2    Q.    It showed them how much they

3  had consumed on their 30-day rolling

4  threshold, correct?

5    A.    Correct.

6    Q.    It showed them the order

7  that went over threshold, right?

8        MS. MCCLURE:  Objection to

9    form.

10        THE WITNESS:  Correct.

11  BY MR. CLUFF:

12    Q.    It showed them the

13  percentage over in dosage units as well,

14  correct?

15    A.    Correct.

16    Q.    Okay.  I'm going to have you

17  go back to Exhibit-8 and the e-mail you

18  wrote to Matthew McElfresh.

19        Do you see that?

20    A.    I see that.

21    Q.    You see in the first line,

22  it says, We do not report to any customer

23  what their limits are?

24        Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I see that.

2        Q.    In the Walgreens document we

3   just looked at, AmerisourceBergen told

4   the Walgreens integrity team what their

5   limits are, correct?

6            MS. MCCLURE:  Objection to

7        form.

8            THE WITNESS:  That's what

9        Lino pulled.

10  BY MR. CLUFF:

11       Q.    And that's what was sent by

12  Ed Hazewski to the Walgreens integrity

13  team, correct?

14       A.    Correct.

15       Q.    You also say, We do not

16  report to any customer whether they are

17  exceeding those limits.

18            Do you see that?

19            I cut a piece of that

20  sentence out, but do you understand the

21  point that I'm making?

22       A.    Yes.

23       Q.    In the spreadsheet we just

24  looked at, that was sent by Ed Hazewski

1    to the Walgreens integrity team, you

2    would agree that AmerisourceBergen told

3    Walgreens whether they exceeded their

4    limits, correct?

5                MS. MCCLURE:  Objection to

6          form.

7                THE WITNESS:  This was an

8          anomaly.  But yes.

9    BY MR. CLUFF:

10         Q.    Just to be clear, the

11   spreadsheet that Ed Hazewski sent to the

12   Walgreens integrity team disclosed to

13   them whether they exceeded their limits,

14   correct?

15               MS. MCCLURE:  Objection to

16         form.  Asked and answered.

17               THE WITNESS:  In this

18         instance, yes.

19   BY MR. CLUFF:

20         Q.    The end of your sentence

21   says, It is against our policy to do so.

22               So you would agree with me

23   that when Ed Hazewski sent that

24   spreadsheet to Walgreens, it violated

Highly Confidential - Subject to Further Confidentiality Review

1    AmerisourceBergen policy, correct?

2                MS. MCCLURE:  Objection to

3          form.

4                THE WITNESS:  Restate the

5          question.

6    BY MR. CLUFF:

7          Q.    Sure.

8                Your e-mail, the sentence

9    here, ends by saying, It is against our

10   policy to do so -- meaning against our

11   policy to report to a customer their

12   limits or when they exceed those limits.

13               My question is, when Ed

14   Hazewski sent that spreadsheet to

15   Walgreens, the integrity team, he was

16   violating AmerisourceBergen policy,

17   correct?

18               MS. MCCLURE:  Objection to

19         form.

20               THE WITNESS:  He sent it to

21         the integrity team.  When I'm

22         talking about customer, I'm

23         talking about the individual

24         independent pharmacy customer and

Highly Confidential - Subject to Further Confidentiality Review

1          that individual store.

2    BY MR. CLUFF:

3          Q.    Are you looking at Exhibit-8

4    with me?

5          A.    8, yes.

6          Q.    If you look at your first

7    e-mail -- or the first e-mail from

8    Matthew McElfresh, he asks you a question

9    about Walmart in relation to Sam's Club.

10          Do you see that?

11          A.    I see that.

12          Q.    He says, I report into

13    Walmart regarding Sam's Club's OMP

14    thresholds being met.

15          Do you see that?

16          A.    I see that.

17          Q.    You previously described to

18    me Sam's Club as a chain pharmacy; is

19    that accurate?

20          A.    That's accurate.

21          Q.    So when you write this

22    e-mail on August 22, 2017 to Matthew

23    McElfresh, you're discussing a chain

24    pharmacy, for example, Sam's Club,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2          A.    Correct.

3          Q.    And you say, quote, We do

4    not report to any customer what their

5    limits are or whether they are exceeding

6    those limits or not, as it is against our

7    policy to do so.

8                Correct?

9          A.    Correct.

10          Q.    Do you see anywhere in that

11   sentence where you say anything about

12   independent pharmacies versus chain

13   pharmacies?

14                MS. MCCLURE:  Objection to

15          form.

16                THE WITNESS:  No, I don't

17          reference an independent store.

18   BY MR. CLUFF:

19          Q.    In fact, in the beginning of

20   that sentence, you say, We do not report

21   to any customer.

22                Do you see that?

23          A.    I see that.

24          Q.    Walgreens is a customer,

1    correct?  Is an AmerisourceBergen

2    customer, correct?

3         A.    Correct.

4         Q.    So they would fall within

5    the definition, presumably, of "any

6    customer"?

7              MS. MCCLURE:  Objection to

8         form.

9              THE WITNESS:  Walgreens is a

10        special circumstance.  They have

11        counterparts on the integrity team

12        that we share this data with.

13   BY MR. CLUFF:

14        Q.    I previously asked you if

15   you ever created -- if AmerisourceBergen

16   ever created exceptions for chain

17   pharmacies like Walgreens, and I believe

18   you told me no.

19             Now you've just told me that

20   this Walgreens situation is a special

21   circumstance.  I want to advise you that

22   I personally believe that those are

23   conflicting statements, and I am not

24   going to make a big deal about it.  But I

Highly Confidential - Subject to Further Confidentiality Review

1    do want to make sure we get clear

2    testimony today.

3                In fact, when we met -- when

4    we began meeting this morning, I showed

5    you a copy of your first performance

6    review, where you identified yourself as

7    a truthful person.  So I would like it if

8    we could really get some clear, truthful

9    testimony on this subject here, okay?

10               MS. MCCLURE:  Object to the

11          implication that you're not.  And

12          objection to the speech.

13               Is there a question you have

14          for the witness?

15   BY MR. CLUFF:

16      Q.    So, Liz, I just want to ask

17   some really simple questions, and we'll

18   walk through this, and then we'll

19   understand, okay?

20               Is Walgreens one of

21   AmerisourceBergen's customers?

22      A.    Yes.

23      Q.    So --

24               MS. MCCLURE:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1          Asked and answered many times.

2               You may answer again.

3               MR. CLUFF:  She already

4          answered.  Thank you, Shannon,

5          your speaking objections are

6          noted.  We'd like you to truncate

7          them and make the same objection

8          briefly if you can.

9               I'm trying to get a clean

10         line of testimony here, and your

11         speaking objections are

12         interrupting it.

13              MS. MCCLURE:  You're asking

14         the same question over and over

15         again.

16              MR. CLUFF:  I'm allowed to

17         ask the same question, because she

18         previously contradicted an answer

19         now.

20              So I'm just trying to get a

21         clear line of testimony.  If you'd

22         like to have her conflicting

23         testimony used to impeach her own

24         testimony later in the deposition,

Highly Confidential - Subject to Further Confidentiality Review

1       we can do that.  Otherwise, I'd

2       like to get a clear record from

3       her about why they were

4       shipping -- giving threshold

5       information and threshold overages

6       to Walgreens.

7               MS. MCCLURE:  Continuing

8       objection to the speech.  Ask your

9       questions of the witness.  I'm

10      going to continue to object to

11      this line of questioning as having

12      been asked and answered.

13              MR. CLUFF:  You have a

14      standing objection now to this

15      line of questioning.

16              MS. MCCLURE:  Thanks.

17              MR. CLUFF:  It's noted.  So

18      you can just reiterate same

19      objection all the way through and

20      we'll note that it is the same

21      objection you've made here now

22      voluminously as a speaking

23      objection.

24   BY MR. CLUFF:

1        Q.    So, Ms. Garcia --

2              MS. MCCLURE:  The only

3        reason I'm obligated to make that

4        same objection is because you're

5        asking the witness questions over

6        and over again.

7   BY MR. CLUFF:

8        Q.    Ms. Garcia, looking at

9   Exhibit-8, is Walgreens one of

10  AmerisourceBergen's customers?

11             MS. MCCLURE:  Same

12       objection.

13             THE WITNESS:  Yes.

14  BY MR. CLUFF:

15       Q.    You write here, in

16  Exhibit-8, on August 22nd, We do not

17  report to any customer what their limits

18  are or whether they are exceeding those

19  limits or not, as it is against our

20  policy to do so.

21             My question, having read

22  that sentence, is, was Walgreens one of

23  AmerisourceBergen's, quote, any

24  customers, closed quote?

Highly Confidential - Subject to Further Confidentiality Review

 1              MS. MCCLURE:  Same

 2         objection.

 3              THE WITNESS:  Walgreens is a

 4         customer.

 5    BY MR. CLUFF:

 6         Q.    Okay.  So according to your

 7    statements in this e-mail, you would

 8    agree with me that telling what -- a

 9    customer what their limits is or whether

10    they are exceeding those limits is

11    against AmerisourceBergen policy,

12    correct?

13              MS. MCCLURE:  Same

14         objection.  Form.

15              THE WITNESS:  Correct.

16    BY MR. CLUFF:

17         Q.    All right.  So going back to

18    Exhibit-10 and 11, that's the e-mail from

19    Ed Hazewski to the Walgreens integrity

20    team.

21              Again, Walgreens is a

22    customer of AmerisourceBergen, correct?

23              MS. MCCLURE:  Objection.

24         Asked and answered.  Same

Highly Confidential - Subject to Further Confidentiality Review

1    objection.

2              THE WITNESS:  Correct.

3    BY MR. CLUFF:

4         Q.    And Mr. Hazewski shares with

5    the Walgreens integrity team an Excel

6    spreadsheet, correct?

7              MS. MCCLURE:  Objection.

8         Asked and answered.

9              THE WITNESS:  Correct.

10   BY MR. CLUFF:

11        Q.    And in that spreadsheet, as

12   we just discussed -- we went through

13   every single column in that spreadsheet,

14   didn't we?

15        A.    Yes.

16        Q.    We saw that the spreadsheet

17   contains a clear description of what the

18   threshold is.

19              You can see it there on the

20   screen in front of you.

21              MS. MCCLURE:  Objection.

22        Asked and answered.

23   BY MR. CLUFF:

24        Q.    Right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     It tells you what the

3    override is, correct?

4          A.     Correct.

5                 MS. MCCLURE:  Objection.

6          Asked and answered.

7    BY MR. CLUFF:

8          Q.     It tells how much they've

9    consumed when they made an order, right?

10                MS. MCCLURE:  Same

11         objection.

12                THE WITNESS:  Correct.

13   BY MR. CLUFF:

14         Q.     And then all the way over to

15   the right, it tells you the exact number

16   of dosage units that that order went

17   over, correct?

18                MS. MCCLURE:  Same.

19                THE WITNESS:  Correct.

20   BY MR. CLUFF:

21         Q.     And the percentage over,

22   correct?

23                MS. MCCLURE:  Same.

24                THE WITNESS:  Correct.

1    BY MR. CLUFF:

2         Q.    Okay.  So going back to

3    Exhibit-8, when Mr. Hazewski sent that

4    Excel spreadsheet to the Walgreens

5    integrity team, it was against policy to

6    do so, correct?

7              MS. MCCLURE:  Objection.

8         Form.

9              THE WITNESS:  Restate.

10        Sorry.

11   BY MR. CLUFF:

12        Q.    When Mr. Hazewski sent that

13   spreadsheet to the Walgreens integrity

14   team, it was against policy to do so?

15             MS. MCCLURE:  Same

16        objection.  Form.

17             THE WITNESS:  No.  Because

18        he sent it to the Walgreens

19        integrity team, who are our

20        counterparts at Walgreens.

21   BY MR. CLUFF:

22        Q.    Can you show me in this

23   e-mail where it says anything about, but

24   you can do it if you send it to an

Highly Confidential - Subject to Further Confidentiality Review

1    integrity team?

2              MS. MCCLURE:  Objection.

3         Argumentative.

4              THE WITNESS:  It's not on

5         here.

6    BY MR. CLUFF:

7         Q.    Okay.  So that qualification

8    you just made is nowhere in this

9    document, correct?

10             MS. MCCLURE:  Objection.

11        Asked and answered.

12             THE WITNESS:  Not in this

13        document.

14   BY MR. CLUFF:

15        Q.    All right.  So just to

16   recap, that spreadsheet had thresholds

17   and how much the customer was over the

18   threshold, correct?

19             MS. MCCLURE:  Objection.

20        Same objection.  Asked and

21        answered.

22             THE WITNESS:  I see

23        thresholds, yes.

24   BY MR. CLUFF:

1        Q.    And you see how they

2   exceeded those thresholds, too, correct?

3                MS. MCCLURE:  Same

4        objection.

5                THE WITNESS:  I see that.

6   BY MR. CLUFF:

7        Q.    Now, back to Exhibit-8.

8                In the next sentence, you

9   write, That would be circumventing our

10  own suspicious order monitoring program.

11                MS. MCCLURE:  Objection.

12        Same.

13  BY MR. CLUFF:

14        Q.    Right?  That's what you

15  wrote?

16                MS. MCCLURE:  Same.

17                THE WITNESS:  I wrote that,

18        yes.

19  BY MR. CLUFF:

20        Q.    Okay.  Great.  Thank you.

21  You can put those aside.  I'm done with

22  them.

23                MR. MAHADY:  Sterling, one

24        quick thing, just so the record is

Highly Confidential - Subject to Further Confidentiality Review

1          clear because you guys zoomed on

2          it.  The date down there --

3                MR. CLUFF:  Yes, that's the

4          date that we would have created it

5          from the native file.

6                MR. MAHADY:  That's what I

7          though.  Just wanted to make that

8          clear.  2018, that's the print

9          date.

10    BY MR. CLUFF:

11         Q.   Liz, if you could -- excuse

12    me, Ms. Garcia, pick up Exhibit-5.

13              We previously discussed -- I

14    believe you testified that you attended a

15    DEA distributor briefing in Phoenix in

16    2017.

17              Do you recall that?

18         A.   Correct.

19         Q.   If you turn back a few pages

20    to the beginning of the slides, do you

21    see the page that begins with, The

22    distributor initiative.

23         A.   Yes.

24         Q.   At the bottom of that slide,

1    it says, August 2005 to the present.

2                In August 2005, you would

3    have been working at the DEA in Los

4    Angeles, correct?

5         A.    Correct.

6         Q.    Do you recall any discussion

7    within the DEA, at that point in time,

8    about the distributor initiative?

9         A.    No.

10        Q.    There's a note here about

11   briefings to 104 firms with 314

12   registrations.

13               Did you ever participate in

14   any of those briefings?

15               MS. MCCLURE:  Objection.

16               THE WITNESS:  No.

17   BY MR. CLUFF:

18        Q.    Looking down at the next

19   page, this says, Briefing overview.

20               Do you see that?

21        A.    I see that.

22        Q.    The first bullet point is,

23   The prescription drug abuse epidemic.

24        A.    I see that.

1    Q.    Do you recall what the DEA

2    discussed under that bullet point, or

3    about that bullet point?

4    A.    They may have given an

5    overview.

6    Q.    I'm going to ask you some

7    questions about this document that your

8    counsel may have discussed with you.  I

9    just want to be really careful that I

10   don't want you to disclose anything that

11   your counsel would have talked to you

12   about or that you would have learned

13   about from your time as an active

14   investigator with the DEA.

15        So I'm just --

16   understanding your -- I want to ask

17   questions about your understanding of

18   this document from when you were there

19   and as you were working as a diversion

20   investigator at AmerisourceBergen.

21        Does that make sense?

22        MS. MCCLURE:  From both time

23   periods?  Her time at --

24        THE WITNESS:  Makes sense.

1            MS. MCCLURE:  I'm just

2       clarifying.

3            MR. CLUFF:  I might ask her

4       if she has an understanding about

5       something here based on her work

6       at DEA.  But I want to be careful

7       that you don't give me anything

8       that would violate the law

9       enforcement privilege.

10            Does that make sense?

11            THE WITNESS:  That makes

12       sense.

13            MR. CLUFF:  So nothing that

14       would compromise an investigation

15       or disclose information about an

16       ongoing investigation.

17  BY MR. CLUFF:

18       Q.    So the second bullet point

19  on that slide is, The closed system of

20  distribution.

21            Do you know what that means?

22       A.    That's the supply chain.

23       Q.    What do you mean by "the

24  supply chain"?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Manufacturers, distributors,

2   importers, chemical manufacturers.

3        Q.      What does it mean to have a

4   closed system of distribution?

5        A.      Going from one point to

6   another point and not going outside that

7   system.

8        Q.      You do see the third bullet

9   point that says, Your responsibilities?

10       A.      Yes.

11       Q.      Do you see it?

12               Second one is, Know Your

13   Customers.

14               Do you see that?

15       A.      Yes.

16       Q.      Is that the same Know Your

17   Customer information that we discussed

18   earlier was mandated by the DEA?

19               MS. MCCLURE:  Objection to

20          the form.

21               THE WITNESS:  I believe so.

22   BY MR. CLUFF:

23       Q.      And you see the next point

24   down is, Red flags.

1                    Do you see that?

2          A.      I see that.

3          Q.      What are red flags?

4          A.      Red flags as they pertain to

5    diversion.

6          Q.      What are they?

7                    MS. MCCLURE:  Objection to

8          the form.

9                    THE WITNESS:  High cash

10         payments, lines out the door at

11         the pharmacy, those types of

12         things.

13   BY MR. CLUFF:

14         Q.      Would a high percentage of

15   controlled substances to noncontrols be a

16   red flag?

17         A.      Possibly.

18         Q.      How about deviations from an

19   ordering pattern, would that be a red

20   flag?

21                  MS. MCCLURE:  Objection.

22                  THE WITNESS:  It depends on

23         the totality of the circumstances.

24   BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But is it one of the

2    potential red flags?

3                MS. MCCLURE:  Objection to

4         form.

5                THE WITNESS:  In the whole,

6         maybe.

7    BY MR. CLUFF:

8    Q.    How about orders of unusual

9    size, would that be one of the overall

10   red flags that AmerisourceBergen, a

11   registrant, should have been looking at?

12               MS. MCCLURE:  Objection to

13        form.

14               THE WITNESS:  We looked at

15        orders of interest.  And then once

16        we looked at the order, then we

17        would look at the drug and the

18        amounts and that type of thing.

19   BY MR. CLUFF:

20   Q.    How did the red flags play

21   into that process you just described?

22               MS. MCCLURE:  Objection to

23        the form.

24               THE WITNESS:  It didn't.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CLUFF:

2         Q.    So if an order exceeded

3    threshold and it became an order of

4    interest, AmerisourceBergen didn't look

5    at red flags?

6              MS. MCCLURE:  Objection to

7         form.

8              THE WITNESS:  Only with the

9         totality of the circumstances, if

10        a deeper dive was required.

11   BY MR. CLUFF:

12        Q.    So unless AmerisourceBergen

13   decided to do a deep dive on an order of

14   interest, they didn't look at red flags;

15   is that what you're saying?

16             MS. MCCLURE:  Objection to

17        form.

18             THE WITNESS:  Red flags were

19        looked at, at the due diligence

20        investigation stage.

21   BY MR. CLUFF:

22        Q.    What stage was that?

23        A.    When they onboarded with

24   ABC.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So let me just understand

2    the process, then.

3           A customer comes -- tries to

4    come on board with ABDC, right?  And

5    there's a due diligence investigation to

6    evaluate whether they should be taken on

7    as a customer?

8    A.    Correct.

9    Q.    Okay.  And part of that was

10   the 590s, right?

11   A.    Correct.

12   Q.    And during that due

13   diligence investigation, Amerisource

14   looked at red flags; is that what you

15   just said?

16           MS. MCCLURE:  Objection to

17        form.

18           THE WITNESS:  Red flags

19        could include disciplinary action,

20        prior, for, maybe, excessive

21        purchases or diversion of drugs or

22        something.

23   BY MR. CLUFF:

24   Q.    And then we'll continue this

1    hypothetical, or just line of

2    understanding that if a customer was

3    approved for service by

4    AmerisourceBergen, they could begin

5    purchasing controlled substances,

6    correct?

7                    MS. MCCLURE:  Objection to

8            form.

9                    THE WITNESS:  Yes.

10   BY MR. CLUFF:

11           Q.    And sometimes orders may

12   have exceeded parameters and become

13   orders of interest; is that right?

14           A.    They would hit the algorithm

15   and be orders of interest.

16           Q.    And part of the algorithm

17   was the thresholds, right?

18                   MS. MCCLURE:  Objection to

19           form.

20                   THE WITNESS:  It was in

21           relation to, yes.

22   BY MR. CLUFF:

23           Q.    You were involved in the

24   rollout of the revised OMP system, right?

1          A.     Yes.

2          Q.     Prior to the review of

3   the -- or the rollout of the OMP system,

4   Amerisource used, exclusively, a 300

5   percent threshold, right?

6              MS. MCCLURE:  Objection to

7          the form.

8              THE WITNESS:  I don't

9          recall.

10  BY MR. CLUFF:

11         Q.     Okay.  But so, an order

12  becomes an order of interest because it

13  hits the parameters, correct?

14         A.     Correct.

15         Q.     And then what I'm trying to

16  understand is, do you look at red flags

17  at that point in time?

18             MS. MCCLURE:  Objection.

19             THE WITNESS:  It's an order

20         of interest.  So haven't opened it

21         yet.

22  BY MR. CLUFF:

23         Q.     What do you do with it then?

24         A.     It stays in the queue until

Highly Confidential - Subject to Further Confidentiality Review

1    we get to it.

2          Q.    What happens when you get to

3    it?

4          A.    When you get to it, you look

5    at the order and the totality of the

6    circumstances.

7          Q.    What are the totality of the

8    circumstances?

9          A.    Looking at what the drug is,

10   who the customer is, customer type, that

11   type of thing.

12         Q.    So at that point in time,

13   you're not looking at red flags anymore?

14              MS. MCCLURE:  Objection to

15         form.

16              THE WITNESS:  You're looking

17         at using tools to look at that

18         order and ascertain if it is

19         suspicious or not.

20   BY MR. CLUFF:

21         Q.    What are the tools that you

22   would look at -- look at that order and

23   ascertain whether or not it's suspicious?

24              MS. MCCLURE:  Object to

1          form.

2                    THE WITNESS:  Dashboards.

3     BY MR. CLUFF:

4          Q.    Is that the BOBJ topic we

5     discussed earlier?

6                    MS. MCCLURE:  Objection.

7                    THE WITNESS:  That could be

8          one of them.

9     BY MR. CLUFF:

10         Q.    Are there other dashboards?

11         A.    There were.

12         Q.    Were there, like, tear

13    sheets?

14         A.    I don't know if that was the

15    term.  Just dashboards.

16         Q.    I'm not trying to argue with

17    you about it.  I'm just trying to

18    understand what's in and what's out at

19    what different point of the analysis.

20                    So it sounds like you were

21    looking at a lot of information.  But I

22    haven't heard you mention red flags when

23    you were reviewing orders of interest.

24                    So my question is, did you

1    or did you not look at orders of interest

2    when you were reviewing -- did you or did

3    you not look at red flags when you were

4    reviewing orders of interest?

5                    MS. MCCLURE:  Objection to

6           form.

7                    THE WITNESS:  We did look

8           for red flags to see if there was

9           anything that would be there.

10   BY MR. CLUFF:

11          Q.    When you were reviewing

12   orders of interest?

13          A.    When we were looking at the

14   order, yes.

15          Q.    Turn with me to Page

16   ABDCMDL00162354.

17                    Do you see the top there, it

18   says, Public health epidemic?

19          A.    Yes.

20          Q.    It's 2000 to 2015.  And it

21   continues, Over 550,000 unintentional

22   drug overdose deaths in the U.S.

23                    Do you see that?

24          A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    In 2015, 52,404 drug-related

2    overdose deaths.

3            Do you see that?

4    A.    I see that.

5    Q.    Can you please pick up

6    Exhibit-4 and turn to the second page?

7            There, at the top of the

8    page, that's the e-mail where you used

9    the language, quote, Towards our goal of

10   protecting the interests of our valued

11   customers and AmerisourceBergen.

12           Do you see that?

13   A.    Is that in the second

14   paragraph?

15   Q.    Yes.

16   A.    I see that, yes.

17   Q.    That e-mail was written in

18   2013, correct?

19   A.    Yes.  Correct.

20   Q.    That's the same time period

21   during which the DEA identified 550,000

22   unintentional overdoses between 2000 and

23   2015?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  You can set that

2    aside.

3         Can you pick up Exhibits-10

4    and 11, please?

5         Just looking at Exhibit-10,

6    that's the e-mail where Ed Hazewski sent

7    the threshold information to the

8    Walgreens integrity team, correct?

9    A.    Correct.

10   Q.    That's dated 2014, correct?

11   A.    Correct.

12   Q.    We agreed earlier that

13   sharing threshold information and when

14   orders exceed threshold not only violates

15   ABC policy, it circumvents OMP; is that

16   right?

17        MS. MCCLURE:  Objection to

18        the form.  Misstates the witness's

19        prior testimony.

20        THE WITNESS:  What did I

21        say?  I don't remember.

22   BY MR. CLUFF:

23   Q.    It's Exhibit-8.

24        So Exhibit-8 is the e-mail

1  where you write to Matthew McElfresh, and

2  you say that, Reporting to any customer

3  their limits or whether they're exceeding

4  limits or not is against our policy.  In

5  addition, that would be circumventing our

6  own suspicious order monitoring program.

7          Right?

8          MS. MCCLURE:  Objection.  Is

9      there a question?

10          MR. CLUFF:  I'm just

11      understanding.

12  BY MR. CLUFF:

13      Q.    That's what you said,

14  correct?

15          MS. MCCLURE:  Objection to

16      form.

17          THE WITNESS:  That's stated.

18  BY MR. CLUFF:

19      Q.    So in Exhibit-10, when Ed

20  sends that spreadsheet, he's violating

21  policy and circumventing the suspicious

22  order monitoring program, correct?

23          MS. MCCLURE:  Objection to

24      the form.  Asked and answered.

1          Misstates the witness's prior

2          testimony.

3                    THE WITNESS:  I don't know.

4    BY MR. CLUFF:

5          Q.    But he sent that e-mail in

6    2014, right?

7          A.    Correct.

8                    MS. MCCLURE:  Objection to

9          form.  Asked and answered.

10   BY MR. CLUFF:

11         Q.    That's during that same time

12   period where the DEA identified 550,000

13   unintentional drug overdoses between 2000

14   and 2015, correct?

15                   MS. MCCLURE:  Objection to

16         the form.

17                   THE WITNESS:  During the

18         same time period, yes.

19   BY MR. CLUFF:

20         Q.    Please pick up Exhibit-6.

21   It's the 2016 performance evaluation.

22         A.    Okay.

23         Q.    You do you see on the second

24   page there, it talks about targeted

1    pharmacy visits as assigned?

2         A.    Where are you?

3         Q.    Second page, at the bottom,

4    it says, Completed target visits --

5    completed targeted pharmacy visits.

6         A.    Yes.

7         Q.    And when we talked about

8    this document, we then looked at the

9    third page to look at your comments

10   that -- on the far right column.

11              Do you see that?

12        A.    I see that.

13        Q.    And at the bottom there, you

14   say, However, the goal is to always

15   maintain the entity as an ABC customer.

16              Do you see that?

17              MS. MCCLURE:  Objection.

18        Asked and answered.

19              THE WITNESS:  I see that.

20   BY MR. CLUFF:

21        Q.    Okay.  And this performance

22   evaluation was between October 2015 and

23   November 2016, correct?

24        A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So that's right around the

2    end of the period where the DEA

3    identified 550,000 unintentional drug

4    overdose deaths between 2000 and 2015,

5    correct?

6                MS. MCCLURE:  Object to

7          form.

8                THE WITNESS:  It's around

9          the same time period.

10   BY MR. CLUFF:

11   Q.    Okay.  I want to go back a

12   couple of pages.  There's a slide that

13   says, Compliance with CSA.  It's on Page

14   162352.

15                It's in Exhibit-5, I'm

16   sorry.

17   A.    Exhibit what?

18   Q.    Exhibit-5, the large

19   PowerPoint from the DEA.

20   A.    Okay.

21                MS. MCCLURE:  Exhibit-5, you

22          said?

23                MR. CLUFF:  Yes.

24                MR. MAHADY:  You said the

1    page ending in 352.

2         MR. CLUFF:  Yes.  You have

3    the benefit of stapled copies.

4    Mine are all loose, so I keep

5    misplacing pages.

6         352, the bottom slide says,

7    Compliance with the CSA.

8         THE WITNESS:  Okay.

9  BY MR. CLUFF:

10        Q.    Do you see that?

11        A.    Yes.

12        Q.    In that slide, it looks like

13   there's some underlining, or is that

14   maybe just in my copy?

15        MR. MAHADY:  I don't see

16   underlining.

17        MS. MCCLURE:  No

18   underlining.

19        MR. CLUFF:  I underlined

20   some in my copy, we won't talk

21   about that.

22  BY MR. CLUFF:

23        Q.    Let's move on to the next

24   page.  There is a pop quiz.  Do you see

1    that?

2              It says, What is the most

3    prescribed prescription drug in the

4    United States?

5         A.    Yes.

6         Q.    Did you circle B or did I

7    circle B?

8         A.    I believe I did.

9         Q.    Is there any reason why you

10   circled hydrocodone?

11        A.    Because that was the answer.

12        Q.    Did you know that was the

13   answer before the DEA revealed it in the

14   next slide?

15        A.    Yes.

16        Q.    How were you aware of that

17   information?

18        A.    Just based on knowledge.

19        Q.    If you move forward a few

20   pages, there's a page that ends in

21   162357.  The top slide says, National

22   overdose deaths.  The bottom slide says,

23   Opioid involvement in benzodiazepine

24   overdose.

1           Do you see that?

2      A.     I see that.

3      Q.     There's some notes in the

4  column next to it that look like they

5  say, BD plus opioid, and then there's a

6  star.

7           Are those your notes?

8      A.     Those are my notes.

9      Q.     What did you mean to

10 communicate with those notes to yourself?

11           MS. MCCLURE:  Objection to

12      the form.

13           THE WITNESS:  BD plus

14      opioid -- I don't remember if this

15      was just to write a note to myself

16      indicating what was said on this

17      slide so I could come back to it

18      later.  I don't know if I assigned

19      a meaning to it.

20 BY MR. CLUFF:

21      Q.     Okay.  Would you move

22 forward, please, a few slides, a few

23 pages, to the page that ends 162359, the

24 top slide reads, Prescription opioid

1    analgesic poisoning deaths.

2              Do you see that?

3         A.    I see that.

4         Q.    Underneath that, it says,

Opioid involved drug poisoning death

rates by state, 1999.

7              Do you see that?

8         A.    Yes.

9         Q.    There's a note next to it

that says, 2003.

11              Do you know what that note

is?

13        A.    I don't remember.

14              MR. CLUFF:  Staying on that

          page, but zooming out, please,

          Zach, so we can see the entire

          page.

18   BY MR. CLUFF:

19        Q.    The next slide says,

Prescription opioid analgesic poisoning

deaths.

22              So it's the same heading,

right?

24        A.    Yes.

1        Q.    But underneath that, the

2   bottom slide says, Opioid involved drug

3   poisoning deaths by state, 2013.

4               Do you see that?

5        A.    I see that.

6        Q.    In the bottom right-hand

7   corner of both slides, it looks like

8   there's a color key, or a color

9   reference.

10              Do you see that?

11       A.    I see that.

12       Q.    So it looks like the darker

13  it gets, the worse the deaths get,

14  correct, or the higher the deaths get?

15              MS. MCCLURE:  Objection to

16       form.

17              THE WITNESS:  That's what it

18       appears, I think.

19  BY MR. CLUFF:

20       Q.    You worked in the West

21  Region when you were at

22  AmerisourceBergen, correct?

23              MS. MCCLURE:  Objection.

24       Form.

1                    THE WITNESS:  In the

2          beginning, yes.

3    BY MR. CLUFF:

4          Q.    And where did you work at

5    the end?

6          A.    The Midwest.

7          Q.    What states were included in

8    the Midwest?

9          A.    Texas, Missouri.

10         Q.    Any others?  How about

11   Oklahoma?

12         A.    Nebraska, Kansas.

13               Oklahoma reported to the

14   Dallas DC.

15               And Utah, I think.

16         Q.    Utah?

17         A.    Yeah, he put Utah in.

18         Q.    I have some family from

19   Utah.  Let's use that.

20               At the top chart, it looks

21   like in the state of Utah, which is right

22   there in the Midwest, it looks like it

23   says 4.0.

24               Can you see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Barely.

2      Q.     The quality on that image is

3  really grainy.  It's better on the paper,

4  I think.

5             Maybe it's a 6.0?

6             MS. MCCLURE:  I'm not sure.

7  BY MR. CLUFF:

8      Q.     How about this, we'll just

9  look at the color.

10             It's gray, correct?

11      A.     I guess so.

12             MS. MCCLURE:  They're all

13      gray.

14  BY MR. CLUFF:

15      Q.     Let's look at the bottom

16  chart.

17             Do you see that?  The great

18  state of Utah.

19      A.     Yes.

20      Q.     It's a white 15.2 in the

21  middle, and that state is now black,

22  correct?

23      A.     Correct.

24      Q.     So just looking at these two

Highly Confidential - Subject to Further Confidentiality Review

1    charts, you were there, you were

2    listening to the DEA talk, did they have

3    any comments to you about the increase in

4    overdose deaths between '99 and 2013?

5         A.    They just noted it in the

6    presentation.

7         Q.    Looking at these two maps

8    overall, would you agree that,

9    nationwide, opioid overdose deaths

10   increased?

11        A.    Drug poisoning death rates.

12              That's what it appears.

13        Q.    Let's move to

14   ABDCMDL00162363.  It's a few pages back

15   in the presentation.

16              The top slide says,

17   Nationwide reported deaths.  The bottom

18   one says, Number of distributor thefts

19   nationwide.

20        A.    Okay.

21        Q.    There's a note there in the

22   margins that says, Internal, with a

23   little line to the other, slash, other,

24   2,695 thefts.

Highly Confidential - Subject to Further Confidentiality Review

1                    Do you see that?

2         A.    I see that.

3         Q.    What does that mean?

4         A.    I would think that's

5    internal to -- internal thefts of

6    whatever business it is.

7         Q.    So do you have any

8    understanding of what an internal theft

9    might be?

10        A.    Someone in the warehouse,

11   maybe, that would take something.

12        Q.    But it would be a theft from

13   within a company's own premises, right,

14   not one between two companies?

15             MS. MCCLURE:  Objection to

16        form.

17             THE WITNESS:  I guess so,

18        yes.

19   BY MR. CLUFF:

20        Q.    So that's different than

21   lost in transit, which is over to the

22   left side of that slide?

23        A.    Correct.

24        Q.    I want to have you move back

Highly Confidential - Subject to Further Confidentiality Review

1    a couple more slides to 162366.

2              The top slide says, Deaths

3    related to pharmaceutical controlled

4    substances.

5              Do you see that?

6        A.    I see that.

7        Q.    The one in the middle, it's

8    Prince Roger Nelson.

9              Do you see that?

10       A.    I see that.

11       Q.    Apparently, underneath

12   there, there's a parenthetical that says

13   Fentanyl.

14             Do you know if Prince died

15   of a Fentanyl overdose?

16             MS. MCCLURE:  Objection to

17        form.

18             THE WITNESS:  That's what

19        was reported in the media.

20   BY MR. CLUFF:

21       Q.    Did you ever hear anything

22   about concerns that AmerisourceBergen

23   might have supplied the pharmacy that

24   dispensed Fentanyl to Prince?

1          MS. MCCLURE:  Objection to

2     form.

3          THE WITNESS:  No.

4  BY MR. CLUFF:

5     Q.    Turning to the next page,

6  ABDCMDL00162367.

7          Top slide says, Our youth.

8          Do you see that?

9     A.    Uh-huh.

10     Q.    Next to that slide, does

11  that appear to be notes that you would

12  have written?

13     A.    Yes.

14     Q.    You wrote, what looks like

15  to me, it says, Pharm parties, quote,

16  grab a spoon, closed quote?

17     A.    Yes.

18     Q.    Do you remember what the DEA

19  was communicating with this slide?

20     A.     I don't recall, other than

21  they were saying that there is parties

22  that people go to and they put

23  pharmaceuticals in a bowl or something.

24  I don't remember.

1      Q.      Move back a couple of pages

2  to 162369.  The top slide appears to be a

3  Drug Enforcement Administration

4  announcement from the Detroit News.

5              Do you see that?

6      A.      I see that.

7      Q.      At the top of the slide

8  there's a note that says, Read.

9              Are those your notes?

10     A.      That's my note.

11     Q.      Were you making a note to

12 yourself that you should read this

13 article?

14     A.      Probably.

15     Q.      Do you ever end up reading

16 it, do you recall?

17     A.      I don't remember.

18     Q.      There's also an arrow in the

19 margin that appears to be pointing to a

20 syntax that says, Chasing the Dragon

21 documentary.

22              Do you see that?

23     A.      I see that.

24     Q.      What was that arrow for?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I don't remember.

2      Q.    I want to look down at the

3  bottom slide on that same page.

4            It says, Increase in

5  overdose deaths, Arizona.

6            Was Arizona a part of your

7  region when you were assigned the West

8  Region?

9      A.    In the beginning it might

10  have been.

11      Q.    The title there says, Data:

12  Arizona heroin, prescription drug

13  overdoses escalating.

14            Do you see that?

15      A.    I see that.

16      Q.    Do you see the date on that

17  article is March 2016?

18      A.    I see that.

19      Q.    Would you have been

20  responsible for that region at that

21  period of time?

22      A.    I don't believe so, no.

23      Q.    Do you know who would have

24  been responsible for that region?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't remember.

2    Q.    Please continue in this

3  document to the page that ends in 162371.

4          Do you see that?

5    A.    Yes.

6    Q.    At the bottom there, it

7  looks like there's a slide that says,

8  Closed system of distribution.

9          Do you see that?

10   A.    I see that.

11   Q.    And there's some arrows that

12  go in a circle.

13         Do you see that?

14   A.    Yes.

15   Q.    All right.  Do you know what

16  a feedback loop is?

17         MS. MCCLURE:  Objection to

18         form.

19  BY MR. CLUFF:

20   Q.    So let me give you an

21  example.

22         When I was younger, there

23  was this graphic that people used to

24  describe the benefits of recycling.  And

1    it had a triangle like that and every

2    side of the triangle had an arrow that

3    led to the next side of the triangle and

4    it says reduce, recycle, reuse.

5              Remember that?

6              That's a feedback loop.  I'm

7    going to call that a feedback loop, okay?

8              MS. MCCLURE:  Objection.

9              THE WITNESS:  Okay.

10   BY MR. CLUFF:

11        Q.    Do you understand the

12   concept of a feedback loop, that every

13   part of it continues to feed the cycle?

14              MS. MCCLURE:  Objection to

15        the form.

16              THE WITNESS:  Yes.

17   BY MR. CLUFF:

18        Q.    Okay.  Looking at this page,

19   I don't know if this is a feedback loop

20   or not, but I'm just trying to

21   understand, looking at this, these arrows

22   here on the bottom slide, appearing on

23   the left, there's an arrow that says,

24   Foreign manufacture.

Highly Confidential - Subject to Further Confidentiality Review

1                    Do you see that?

2          A.    I see that.

3          Q.    Do you have any recollection

4    of why that is lighter than some of the

5    other arrows?

6                    MS. MCCLURE:  Objection to

7          form.

8                    THE WITNESS:  I don't.

9    BY MR. CLUFF:

10         Q.    Okay.  And then it goes to

11   an importer; is that right?

12         A.    Yes.

13         Q.    And a manufacturer, correct?

14         A.    Yes.

15         Q.    And then to the

16   distributors?

17         A.    Yes.

18         Q.    Then to the practitioner,

19   pharmacy, hospital, clinics?

20         A.    Yes.

21         Q.    Are those all examples of

22   customers?

23         A.    Yes.

24         Q.    Okay.  And then there's an

1    arrow that goes to the patient, correct?

2          A.    Yes.

3          Q.    And then there's this arrow

4    with a question mark.

5                Do you see that?

6          A.    Yes.

7          Q.    Do you recall anything about

8    this slide?

9          A.    I don't recall.

10         Q.    All right.  Flip to the next

11   page.  So 162372.

12               Do you see that?

13         A.    Yes.

14         Q.    The top says, Closed system

15   of distribution, correct?

16         A.    Correct.

17         Q.    All right.  Do you see on

18   the right-hand side where it says,

19   Registration?

20         A.    Yes.

21         Q.    You worked at the DEA for

22   two years, correct?

23         A.    Correct.

24         Q.    And when you were at the

1    DEA, you developed a thorough

2    understanding of the rules and

3    regulations, correct?

4         A.    Correct.

5         Q.    Okay.  How would you

6    describe AmerisourceBergen's regulatory

7    obligation as a registrant?

8              MS. MCCLURE:  Objection to

9         form.

10             THE WITNESS:

11        AmerisourceBergen met their

12        regulatory obligations as outlined

13        by the CSA, Controlled Substance

14        Act.

15   BY MR. CLUFF:

16        Q.    I appreciate that

17   explanation.  But not to quibble with

18   you, that wasn't the question that I

19   asked.  So I'm going to make it a little

20   bit more clear, because maybe it was

21   poorly worded.

22             Do you understand the

23   regulatory obligations or duties of a

24   registrant under the Controlled

1    Substances Act?

2           A.    Can you restate, please?

3           Q.    Sure.

4                 Do you understand the

5    regulatory obligations or duties of a

6    registrant under the Controlled

7    Substances Act?

8                 MS. MCCLURE:  Objection to

9           form.

10                THE WITNESS:  They are

11          outlined in the 21 C.F.R. Part

12          1300.

13   BY MR. CLUFF:

14          Q.    So do you have an

15   understanding of them?

16                MS. MCCLURE:  Objection to

17          form.

18                THE WITNESS:  General.

19   BY MR. CLUFF:

20          Q.    What's your general

21   understanding?

22                MS. MCCLURE:  Objection to

23          form.

24                THE WITNESS:  Recordkeeping

Highly Confidential - Subject to Further Confidentiality Review

1        requirements, security, those

2        types of things.

3    BY MR. CLUFF:

4        Q.    Anything else?

5            MS. MCCLURE:  Objection to

6        form.

7            THE WITNESS:  Quotas.

8    BY MR. CLUFF:

9        Q.    What's the quota -- what's

10   the quota requirement?

11           MS. MCCLURE:  Objection to

12       form.

13           THE WITNESS:  Headquarters

14       makes that establishment.

15   BY MR. CLUFF:

16       Q.    And does the quota, does

17   that apply to distributors and

18   manufacturers, just manufacturers, just

19   distributors?  Do you know?

20       A.    Just manufacturers, I

21   believe.

22       Q.    So their manufacturing is

23   subject to a quota, is that what you're

24   telling me?

1    A.    I think so.

2    Q.    Just as a foundational

3  issue, both manufacturers and

4  distributors are registrants under the

5  CSA, correct?

6    A.    Correct.

7    Q.    And when I use the term

8  "CSA," I'm referring to the Controlled

9  Substances Act.

10    Do you understand that?

11    A.    Yes.

12    Q.    Okay.  So I asked you what

13  the -- what you understood to be the

14  duties or obligations of a registrant

15  under the CSRA.

16    And I'm looking at your

17  testimony here.  And you said,

18  recordkeeping requirements, security,

19  those types of things.  And then I asked

20  if there was anything else, and you said

21  quotas.

22    So aside from those, do you

23  know any other duties or responsibilities

24  that a registrant has under the

Highly Confidential - Subject to Further Confidentiality Review

1    Controlled Substances Act?

2              MS. MCCLURE:  Objection to

3        form.

4              THE WITNESS:  Well, right

5        under here it says, Effective

6        controls, 21 C.F.R. 1301.71.

7    BY MR. CLUFF:

8        Q.    Okay.  So is that another

9    one of the duties that a registrant has

10   under the Controlled Substances Act?

11             MS. MCCLURE:  Objection to

12       form.

13             THE WITNESS:  Yes.

14   BY MR. CLUFF:

15       Q.    I want to hand you a copy of

16   a printout of Section 823 of the

17   Controlled Substances Act that I obtained

18   from the DEA's website.

19             We're going to mark it as

20   Exhibit-12.  I'm not trying to -- just so

21   you understand what we are going to do,

22   or what I want to do.  I don't want to

23   argue with you about what the duties are

24   or are not, I just want to understand the

1   scope of what is contained in the CSA and

2   the scope -- and the federal regulations.

3              Does that make sense?

4        A.    Yes.

5              MS. MCCLURE:  Objection to

6        form.

7                 -   -   -

8              (Whereupon,

9        AmerisourceBergen-Garcia

10       Exhibit-12, United States Code -

11       Section 823, was marked for

12       identification.)

13                 -   -   -

14  BY MR. CLUFF:

15       Q.    So I'm going to ask you a

16  question, or some questions about Section

17  823, Subsections A and B.

18              Do you see that?

19       A.    I see that.

20       Q.    Why don't you read those two

21  sections, and let me know when you've had

22  a chance to digest them.

23       A.    Okay.

24       Q.    So at the top there, you can

1    see on the screen, it says, Section 823.

2    There's those two little squiggly S

3    circle with a hole in the middle, that's

4    a section abbreviation that lawyers like

5    to use.  It says, Registration

6    requirements next to it.

7                   And if you look at A and B,

8    those headings are basically the same,

9    except manufacturers and distributors are

10   there, right?

11                  So it refers to

12   manufacturers of controlled substances

13   and distributors of controlled

14   substances, correct?

15                  MS. MCCLURE:  Objection to

16          form.

17                  THE WITNESS:  I see that.

18   BY MR. CLUFF:

19          Q.   Okay.  And then looking at

20   the first line of the paragraph, under A,

21   it says, The Attorney General shall

22   register an applicant to manufacture

23   controlled substances.

24                  Do you see that?

1     A.    I see that.

2     Q.    And I'd like to compare that

3  to the first line of the paragraph under

4  B, it says, The Attorney General shall

5  register an applicant to distribute a

6  controlled substance in Schedule I or II.

7          Do you see that?

8     A.    I see that.

9     Q.    Okay.  And then I want you

10 to look at Subparagraph 1, under A.

11         It says, Maintenance of

12 effective controls against diversion of

13 particular controlled substances.

14         Do you see that?

15    A.    I see that.

16    Q.    Okay.  And then under B,

17 Subparagraph 1, it says, Maintenance of

18 effective controls against diversion of

19 particular controlled substances.

20         Do you see that?

21    A.    I see that.

22    Q.    Okay.  So both manufacturers

23 and distributors have, as a part of their

24 registration requirement, this language

1    about maintaining effective controls

2    against diversion.

3              Do you agree with that

4    statement?

5              MS. MCCLURE:  Mr. Cluff, to

6         the extent you're asking this

7         witness questions about what a

8         statute says, I object, in light

9         of the fact that this witness is

10        not an expert, not an attorney.

11        She's here in a fact witness

12        capacity.

13             So if you're asking her to

14        read what the document says, she's

15        obviously capable of reading and

16        can do that.

17   BY MR. CLUFF:

18        Q.    Ms. Garcia, you worked at

19   the DEA for two years, correct?

20        A.    Correct.

21        Q.    And before you took your

22   job, or as part of accepting your job at

23   the DEA, you attended a four-month

24   training at Quantico, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Correct.

2      Q.     That's with the FBI, right?

3             MS. MCCLURE:  Objection to

4      form.

5 BY MR. CLUFF:

6      Q.     I'm just trying to

7 understand.

8             Is that right?

9      A.     At the academy for DEA, yes.

10     Q.     Okay.  And while you were

11 there, I'm going to use your words from

12 your LinkedIn profile, we can pull it

13 back up if you want to, but I'm just

14 trying to understand your experience.

15     A.     Go ahead.

16     Q.     You said you developed a

17 thorough knowledge of the Code of Federal

18 Regulations.

19            And I'm just trying to

20 understand your knowledge of the Code of

21 Federal Regulations, okay?

22            So I've read to you two

23 sections of 21 U.S.C. 823, which, as you

24 and I have discussed, refers to

1    registration requirements.

2              All I'm asking you to say,

3    and you can say it yes or no, and if you

4    don't understand, that's fine, but does

5    Subparagraph 1 for the manufacturers and

6    Subparagraph 1 for the distributors

7    contain identical language about

8    effective control against diversion of

9    particular controlled substances?

10             MS. MCCLURE:  Standing

11        objection to this line of

12        questioning, to the extent any

13        testimony is being elicited from

14        the witness that is in -- or

15        purporting to be or seeking

16        testimony in an expert witness

17        capacity.  This witness --

18             MR. CLUFF:  Shannon, this is

19        a ridiculous objection.  I didn't

20        ask for her expert testimony.  I

21        asked her about her

22        understanding --

23             MS. MCCLURE:  I wasn't

24        finished talking.

1           MR. CLUFF:  -- of Code of

2      Regulations -- I know, but I'm

3      upset now.  You've done -- look

4      how long your objection is on the

5      transcript.  It's so long.  And

6      doesn't even make sense.

7         I asked her a foundational

8      question about her knowledge of

9      the Controlled Substances Act --

10         MS. MCCLURE:  And again --

11         MR. CLUFF:  -- and her

12      knowledge of the Code of Federal

13      Regulations.  And I'm now asking

14      her a question about her

15      understanding of those rules and

16      regulations, as a former DEA

17      investigator, where she worked for

18      two years, and claimed that she

19      developed a thorough understanding

20      of those rules and regulations.

21         I'm not calling for an

22      expert opinion.  I'm asking about

23      her lay witness understanding of

24      the rules and regulations that

Highly Confidential - Subject to Further Confidentiality Review

1       she, as an auditor at the DEA,

2       worked with.

3               Make your objection.  But

4       it's ridiculous.

5               MS. MCCLURE:  Are you done?

6               MR. CLUFF:  Yes.

7               MS. MCCLURE:  I did not

8       interrupt you intentionally.

9               MR. CLUFF:  Thank you, I

10      appreciate that.

11              MS. MCCLURE:  And I would

12      like to point out the fact that

13      you are continually interrupting

14      me.  Therefore, in light of the

15      fact that I let you make that

16      speech, I'm now going to respond.

17      And I would appreciate it if you

18      did not continue to interrupt me.

19              This witness is here

20      exclusively in a fact witness

21      capacity.  You have previously

22      recognized, in the course of this

23      deposition, the law enforcement

24      privilege.  You've previously

Highly Confidential - Subject to Further Confidentiality Review

1      recognized the fact that while she

2      is previously a DEA diversion

3      investigator, she cannot, and I

4      suspect that you would agree with

5      this, cannot be giving expert

6      testimony or testimony on behalf

7      of the DEA.

8          You have not given the DEA

9      any Touhy notice for this

10     deposition.  I assume you are not

11     attempting to violate Touhy by

12     asking questions of this witness

13     that would do that.

14         She is here exclusively in a

15     fact witness capacity.  She is not

16     an attorney and you cannot ask her

17     to apply laws, rules, regulations

18     to conduct of any distributor or

19     AmerisourceBergen.

20         MR. CLUFF:  Is that the

21     entirety of your objection?

22         MS. MCCLURE:  At this point,

23     that is the entirety of my

24     objection.

Highly Confidential - Subject to Further Confidentiality Review

```
1              And I would like to note
2       that I have a standing objection
3       to anything that you intend to ask
4       this witness about Garcia-12.
5              And in light of the fact
6       that you object to the length of
7       my objections, I will simply note
8       after every question that you
9       asked, that all of my prior
10      objections that we've now stated
11      in the last two to three
12      minutes -- that I've stated in the
13      last two to three minutes on the
14      record, when I say "same
15      objection" to every line of
16      questioning that you have here,
17      that will incorporate that.
18             Do we have that agreement?
19             MR. CLUFF:  Yes.
20             I will note, just for the
21      record, that you were telling me
22      that she's not an attorney and I
23      cannot ask her to apply laws,
24      rules, regulations to conduct of
```

Highly Confidential - Subject to Further Confidentiality Review

1           any distributor or

2           AmerisourceBergen.

3                I do not intend to.  So you

4           can maintain your objection if you

5           want to, but all I'm asking her is

6           if she, as a former DEA

7           investigator, who worked at the

8           DEA for two years, can look at

9           this statute that I've read to

10          her, that I provided to her on a

11          giant screen, and I've given her a

12          copy of, whether Subparagraph 1 of

13          823(a) reads that, The Attorney

14          General shall register an

15          applicant to manufacture a

16          controlled substance.  That's the

17          first line of that paragraph.

18     BY MR. CLUFF:

19          Q.    Do you see that under A?

20          A.    I see that.

21          Q.    And then in 1, it says,

22     Maintenance of effective controls against

23     diversion of a particular controlled

24     substance.

1          Do you see that?

2     A.    I see that.

3     Q.    Based on your work at the

4  DEA, did you develop an understanding

5  that as part of a manufacturer's

6  registration, they needed to maintain

7  effective controls against diversion of

8  particular controlled substances?

9          MS. MCCLURE:  Standing

10     objections.

11          THE WITNESS:  Yes.

12  BY MR. CLUFF:

13     Q.    Looking at 823(d), which is

14  down there, it's highlighted on the

15  screen in front of you.

16          The first line reads, The

17  Attorney General shall register an

18  applicant to distribute a controlled

19  substance, Schedule I or II.

20          Do you see that?

21     A.    I see that.

22     Q.    And down in 1, it says,

23  Maintenance of effective controls against

24  diversion of particular controlled

1   substances into other-than-legitimate

2   medical, scientific and industrial

3   channels.

4           Do you see that?

5       A.    I see that.

6       Q.    In your two years working at

7   the DEA, did you develop an understanding

8   of whether distributors were required to

9   maintain effective controls against

10  diversion of particular controlled

11  substances?

12          MS. MCCLURE:  Standing

13      objection.

14          THE WITNESS:  Generally,

15      yes.

16  BY MR. CLUFF:

17      Q.    Okay.  Based on your work at

18  the DEA, did you develop an understanding

19  that the duties of registrants, whether

20  they be manufacturers or distributors,

21  contained the same duty to maintain

22  effective controls against diversion of

23  particular controlled substances?

24          MS. MCCLURE:  Same.

Highly Confidential - Subject to Further Confidentiality Review

1    Standing.

2        THE WITNESS:  Sorry.

3    Restate.

4  BY MR. CLUFF:

5        Q.    Sure.

6            Based on your work at the

7  DEA, did you develop an understanding

8  that manufacturers and distributors both

9  have a duty to maintain effective

10  controls against diversion of particular

11  controlled substances?

12        MS. MCCLURE:  Standing

13        objection.

14        THE WITNESS:  A general

15        understanding, yes.

16  BY MR. CLUFF:

17        Q.    Yes.  Okay.  Thank you.

18            So looking back at

19  Exhibit-5, which is the DEA PowerPoint,

20  you noted that the slide on Page 162372

21  references 21 C.F.R. 1301.71(A).

22            Do you see that?

23        A.    Yes.

24        Q.    I'd like to hand you a copy

1    of 1301.71(A).

2              MR. CLUFF:  Shannon, Ms.

3        McClure, we can maintain the same

4        agreement about this document if

5        you would like to, as we have with

6        Garcia-12.  And we can maintain

7        your standing objection.

8              MS. MCCLURE:  Great.

9        Thanks.

10                  -   -   -

11             (Whereupon,

12        AmerisourceBergen-Garcia

13        Exhibit-13, Part 1301 - Section

14        1301.71; Security Requirements

15        generally, was marked for

16        identification.)

17                  -   -   -

18   BY MR. CLUFF:

19        Q.    I'd like to ask you some

20   questions about 1301.71(A).  That's the

21   first subparagraph there.

22             Feel free to read that and

23   let me know when you've had a chance to

24   digest it.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    You said A and B?

2          Q.    No, just A.

3                So you had a chance to look

4    at A?

5          A.    Yes.

6          Q.    So let's look at 5, but keep

7    13 next to it.  So 5, it says, Effective

8    controls.

9                Do you see that?

10               And then underneath, it

11   says, 21 C.F.R., there's the section

12   symbol, 1301.71(A), colon.

13               Do you see that?

14         A.    I see that on the slide.

15         Q.    Yes, it's on the slide.  And

16   next to it on the slide, you have a star.

17               Do you see that?

18         A.    I see that.

19         Q.    Do you recall why you put a

20   star next to it?

21         A.    I don't.

22         Q.    Looking at it today, do you

23   have any estimate on why you would have

24   put a star next to it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MCCLURE:  Objection to

 2         the form.  Asked and answered.

 3              THE WITNESS:  No.

 4    BY MR. CLUFF:

 5         Q.    Let's look at the text in

 6    the slide.  It says, All applicants and

 7    registrants shall provide, underline,

 8    effective, underline, controls,

 9    underline, and, underline, procedures to

10    guard against theft and diversion of

11    controlled substances.

12              Did I get that accurately?

13         A.    Yes.

14         Q.    Now, looking at Garcia-13,

15    which is I believe right by your right

16    hand, Paragraph A.

17              Do you see the first line

18    says, All applicants and registrants

19    shall provide effective controls and

20    procedures to guard against theft and

21    diversion of controlled substances?

22              Do you see that?

23         A.    I see that.

24         Q.    So I'm just looking at the
```

Highly Confidential - Subject to Further Confidentiality Review

1    slide and at the regulation.

2              It looks like the slide is a

3    quote from the regulation, would you

4    agree?

5              MS. MCCLURE:  Objection to

6         form.  Standing.

7              THE WITNESS:  Yes.

8    BY MR. CLUFF:

9         Q.    Do you recall, attending

10   this conference, what the DEA discussed

11   in relation to 21 C.F.R. 1301.71(A)?

12             MS. MCCLURE:  Objection to

13        form.  Asked and answered.

14             THE WITNESS:  They just

15        touched on it with everything

16        else.

17   BY MR. CLUFF:

18        Q.    When you worked at the DEA,

19   did you form an understanding as to who

20   issued registrations to manufacturers and

21   distributors?

22        A.    Yes.

23        Q.    Based on your work at the

24   DEA, again, without disclosing anything

Highly Confidential - Subject to Further Confidentiality Review

1  that's protected by the law enforcement

2  privilege, did you form an understanding

3  of what the DEA looked at in order to

4  determine whether a registrant -- or

5  whether an entity should receive a

6  registration?

7          A.    We looked at the security

8  requirements and the building.  And I

9  don't remember anything else.

10         Q.    Why don't you turn the page

11  for me?

12         A.    Which page?

13         Q.    The page in 5, the big

14  PowerPoint presentation.  The next page,

15  the top slide says, Effective controls.

16  Again, there's 21 C.F.R. 1301.71.

17                I've been asking questions

18  about your experience with these

19  regulations during your time with the

20  DEA.

21                I just want to ask a

22  foundational question.  Did you develop

23  any additional understanding of these

24  regulations during your work as an

Highly Confidential - Subject to Further Confidentiality Review

1   investigator for AmerisourceBergen?  And

2   you can answer that yes or no if you want

3   to, because as I said, it's just a

4   foundational question.

5                   MS. MCCLURE:  Objection to

6           form.

7                   THE WITNESS:  No.  I didn't

8           reference the exact regulation

9           regularly, no.

10  BY MR. CLUFF:

11          Q.    Did you ever receive any

12  training, when you were at

13  AmerisourceBergen, on the rules and

14  regulations that governed

15  AmerisourceBergen's registration?

16          A.    I don't recall.

17          Q.    Okay.  So, then, for now,

18  we'll just limit it to your experience

19  with these regulations from your work at

20  the DEA.

21          A.    Okay.

22          Q.    Looking at the top slide on

23  Exhibit-5, it says, Effective controls,

24  21 C.F.R. 1301.71.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    71(A), yes.

3     Q.    And there it reads, In order

4  to determine whether a registrant has

5  provided effective controls against

6  diversion, the administrator shall use

7  the security requirements set forth in

8  sections 1301.72 -- and I'll note that

9  there are two section symbols, and I have

10 referred to that as sections,

11 1301.72-1301.76, as standards for the,

12 underlined, physical security controls

13 and, underline, and, begin underline,

14 operating procedures and, underline,

15 necessary to prevent diversion.

16          Do you see that?

17    A.    I see that.

18    Q.    So previously we've talked

19 about a number of issues, and I heard you

20 use the word, we would look at the

21 security requirements.

22          Do you recall that idea?

23    A.    Yes.

24    Q.    So when you're talking about

Highly Confidential - Subject to Further Confidentiality Review

 1   the security requirements, is it the same

 2   security requirements that are identified

 3   on this slide?

 4         A.    I believe so, yes.

 5         Q.    So that's Sections 1301.72

 6   to 1301.76?

 7         A.    I believe that's where they

 8   are.

 9         Q.    Okay.  Do you recall, when

10   you were a diversion investigator, ever

11   reviewing 1301 to 1301.76?

12              MS. MCCLURE:  Objection to

13         form.

14              MR. CLUFF:  That was a bad

15         question.  Let me withdraw it.

16   BY MR. CLUFF:

17         Q.    Do you recall, when you were

18   a diversion investigator for the DEA,

19   reviewing Sections 1301.71 to 1301.74?

20         A.    Vaguely going to the

21   business, yes.

22         Q.    What do you mean "going to

23   the business"?

24         A.    So if they were applying for

Highly Confidential - Subject to Further Confidentiality Review

1    a DEA license, looking at what controls

2    they had in place.

3         Q.    And when you say "what

4    controls" in place, what kind of controls

5    do you mean?

6         A.    Security, physical security.

7         Q.    And that would have been the

8    security controls identified in 1301.71?

9              MS. MCCLURE:  Objection to

10        form.

11             THE WITNESS:  1301.72 to

12        1301.76.

13   BY MR. CLUFF:

14        Q.    And that's the -- that's the

15   security controls identified in Section A

16   of 1301.71, correct?

17             MS. MCCLURE:  Objection to

18        form.

19             THE WITNESS:  I'd have to

20        look at the regulation.  I don't

21        know.

22   BY MR. CLUFF:

23        Q.    Okay.  It's right there to

24   your right.

Highly Confidential - Subject to Further Confidentiality Review

1           We previously looked at that

2    first sentence that talks about, All

3    applicants and registrants shall provide.

4           Do you see that?

5      A.    I see that.

6      Q.    And the next sentence says,

7    In order to determine whether a

8    registrant -- registrant has provided

9    effective controls against diversion, the

10   administrator shall use the security

11   requirements set forth in SEC

12   S.1301.72-1301.76 as standards for the

13   physical security controls and operating

14   procedures necessary to prevent

15   diversion.

16          Do you see that?

17     A.    I see that.

18     Q.    So are those the security

19   requirements you would have reviewed on

20   the way to evaluate a potential

21   registrant's registration?

22     A.    Do you have a copy of

23   1301.72 and 76?

24     Q.    I have a copy of 1302.74,

1    which is one of the ones in there.

2              I can hand that to you, if

3    you'd like it.

4         A.   If you can, that would be

5    great.

6         Q.   Sure.

7              -   -   -

8              (Whereupon,

9         AmerisourceBergen-Garcia

10        Exhibit-14, Part 1301 - Section

11        1301.74; Other Security Controls

12        for Non-practitioners, was marked

13        for identification.)

14             -   -   -

15   BY MR. CLUFF:

16        Q.   For the record, I'm marking

17   as Exhibit-14 a copy of 21 C.F.R. 1301.74

18   that was obtained from the DEA diversion

19   website.

20             So, Liz, I just want to give

21   you a foundational question to set up

22   some further questions, and then I'll

23   give you a chance to look at this.

24             So in 1301.71, it identified

1    security requirements -- or you

2    identified security requirements as

3    1301.72 to 1301.76.

4              And this is 1301.74, which

5    would have been one of the security

6    requirements, correct?

7        A.    That's what it appears to be

8    here.

9        Q.    Okay.  So I just want to ask

10   you some questions about Sections A and

11   B.  So you can go ahead and look at

12   those.

13       A.    On which exhibit?  I'm

14   sorry.

15       Q.    14, which is 1301.74.

16       A.    Okay.  A and B?

17       Q.    Yep.

18             MS. MCCLURE:  We've been

19        going for an hour and-a-half.

20             MR. CLUFF:  I was going to

21        say, just a few more questions,

22        and then I would love for us all

23        to take a break.

24             THE WITNESS:  My eyes are

1          getting cross-eyed.  Can we take a

2          break, please?

3                  MR. CLUFF:  Sure.  We can

4          take a break.

5                  THE WITNESS:  Thank you.

6                  VIDEO TECHNICIAN:  Off the

7          record at 4:19 p.m.

8                      -  -  -

9                  (Whereupon, a brief recess

10         was taken.)

11                     -  -  -

12                 VIDEO TECHNICIAN:  We're

13         back on the record at 4:38 p.m.

14  BY MR. CLUFF:

15         Q.    Ms. Garcia, we're back on

16  the record.  You're still under oath.

17                 Let's take 12, 13 and 14 and

18  put them to the side.  We'll take

19  Exhibit-5 and put that to the side.  And

20  let's forget they ever existed.

21                 I have some quick questions

22  about some interactions that

23  AmerisourceBergen had with Walgreens.

24  And I've got some e-mails that we can go

Highly Confidential - Subject to Further Confidentiality Review

1   through to kind of just touch on it

2   pretty quickly.  I'll do my best to get

3   to the point as quickly as possible and

4   ask the cleanest questions I can.

5                    MR. CLUFF:  Is there an

6            attorney for Walgreens here?  Is

7            there an attorney for Walgreens on

8            the phone?

9                I have a document here in my

10           list of exhibits that is

11           WAGMDL00038287, it's written by

12           Kimberly St. John from

13           AmerisourceBergen, recipients

14           include a number of individuals.

15           Ms. Garcia is the second person on

16           the list.  Under the CMO, because

17           Ms. Garcia would have received the

18           e-mail, she can view it, even

19           though it's marked confidential.

20                Is there an attorney for

21           Walgreens on the phone or in

22           person?

23   BY MR. CLUFF:

24           Q.    Before I show you this, Liz,

Highly Confidential - Subject to Further Confidentiality Review

1    I want to talk to you a bit.

2              You previously identified a

3    term, you said the Walgreens integrity

4    team.

5              Do you know who that was?

6              MS. MCCLURE:  Objection to

7         form.

8    BY MR. CLUFF:

9         Q.   Let he me back up.

10             Can you describe what the

11   Walgreens integrity team was to me?

12        A.   They are our counterparts at

13   Walgreens.

14        Q.   Do you recall receiving

15   correspondence from the Walgreens

16   integrity team?

17        A.   Yes.

18        Q.   Was that a part of your job

19   at AmerisourceBergen, was to communicate

20   with the Walgreens integrity team?

21        A.   Yes.

22        Q.   Did you do so by phone?

23        A.   Yes.

24        Q.   And by e-mail?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Do you recall having

3  telephonic meetings with the Walgreens

4  integrity team?

5      A.    Yes, on occasion.

6      Q.    Are you aware, in your work

7  at AmerisourceBergen, about any issues

8  with hydrocodone being rescheduled at

9  all?

10     A.    I don't recall.

11     Q.    Are you aware if hydrocodone

12  was rescheduled from Schedule II to

13  Schedule III?

14          MS. MCCLURE:  Objection to

15          form.

16          THE WITNESS:  I believe

17          hydrocodone was rescheduled from

18          III to II.

19  BY MR. CLUFF:

20     Q.    Okay.  Oh, I said it

21  backwards, didn't I?  I said II to III.

22          Do you recall, during 2014,

23  having any meetings with the Walgreens

24  integrity team regarding the rescheduling

1    of hydrocodone?

2          A.    I don't recall.

3          Q.    Is that something that you

4    would have discussed with Walgreens

5    during your time period there?

6                MS. MCCLURE:  Objection to

7          form.  Speculation.

8                THE WITNESS:  We may have.

9    BY MR. CLUFF:

10         Q.    If -- you were responsible

11   for working with the chain pharmacies at

12   AmerisourceBergen, correct?

13               MS. MCCLURE:  Objection to

14         form.

15               THE WITNESS:  Correct.

16   BY MR. CLUFF:

17         Q.    So that was part of the

18   scope of your job responsibilities?

19         A.    Part.

20         Q.    If there was a meeting with

21   the Walgreens integrity team about the

22   hydrocodone rescheduling, would you

23   generally have been included in such a

24   meeting?

1          MS. MCCLURE:  Objection to

2     form.

3          THE WITNESS:  If there was

4     such a meeting.

5          MR. CLUFF:  I believe I've

6     laid a sufficient foundation to

7     establish that Ms. Garcia would

8     have received this document and

9     would have participated in the

10    meeting that it describes.  So I'm

11    going to use this document.

12         Shannon, I understand that

13    you may want to interpose an

14    objection.  Go ahead and state

15    that for the record, but I'm going

16    to move forward.

17         MS. MCCLURE:  Can I see the

18    document?

19         MR. CLUFF:  Sure.  I'm going

20    to give this to your counsel

21    first, before I give it to you,

22    okay?

23         MS. MCCLURE:  Yep.  Okay.

24         MR. CLUFF:  Okay.  Here is

1          your copy.

2              MS. MCCLURE:  For the

3          record, Ms. Garcia is included as

4          a recipient to the e-mail dated

5          9/2/2014.  The e-mail originated

6          with an AmerisourceBergen e-mail

7          address and went to a number of

8          AmerisourceBergen and Walgreens

9          personnel.  And the Bates label is

10         WAGMDL00038287.

11   BY MR. CLUFF:

12         Q.   Ms. Garcia, this is a really

13   simple document.  Let's just first

14   establish, as your counsel helped us

15   here, who it's from and how you may have

16   received it.

17              Do you see up at the top

18   left-hand corner there's a line that

19   says, Appointment?  It's above the black

20   line on the first page.

21         A.   I see that.

22         Q.   And it says, From Kimberly

23   St. John.

24              I believe that you

1  previously identified her as somebody

2  that you worked with, correct?

3       A.    Yes.

4       Q.    Who was she again?

5       A.    She was our coordinator.

6       Q.    Would she have regularly

7  coordinated meetings on behalf of

8  AmerisourceBergen?

9       A.    I think so.

10      Q.    Okay.  Looking at the "to"

11  line, it looks like she sent to herself

12  and then you're listed as the second

13  recipient, Garcia, Elizabeth, right?

14      A.    Yes.

15      Q.    And if we go down the line

16  of recipients, there are some additional

17  AmerisourceBergen employees.

18            Do you see that?

19      A.    I see that, yes.

20      Q.    And it looks like midway

21  down that list, it starts with, M. Hayes,

22  and if you go in, the next addressee is

23  Jeff.Price@Walgreens.com?

24            Do you recognize that name?

1        A.      Sorry, where are you?

2        Q.      Right there on the screen.

3    He highlighted just Jeff.Price.

4        A.      I don't remember.

5        Q.      How about Odell Morgan; do

6    you recognize Odell Morgan?

7        A.      I don't recall.

8        Q.      How about Natasha Polster?

9        A.      Natasha was part of the

10   integrity team.

11       Q.      Eric Stahmann?

12       A.      Integrity team.

13       Q.      Patricia Daugherty?

14       A.      Integrity.

15       Q.      Christopher Dymon?

16       A.      Integrity.

17       Q.      So, generally, looking at

18   the list of Walgreens recipients, it

19   seems like this appointment was sent to

20   the Walgreens integrity team, correct?

21       A.      Yes, correct.

22       Q.      If you look at the subject

23   down there, it says, Hydrocodone

24   rescheduling.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Okay.

2         Q.    And it looks like there's a

3    location.  It says, Dial-in,

4    1-800-315-5963.

5              Do you see that?

6         A.    I see that.

7         Q.    Does that refresh your

8    recollection that maybe this e-mail is

9    about a meeting with the Walgreens

10   integrity team about the hydrocodone

11   rescheduling?

12        A.    That is what it appears to

13   be.

14        Q.    Do you see in the attachment

15   column, or row, there it says, ABC HC

16   C2.doc?

17        A.    I see that.

18        Q.    Do you have any idea what

19   the abbreviation "ABC" stands for?

20        A.    AmerisourceBergen.

21        Q.    Okay.  How about HC, what

22   does that stand for?

23        A.    I don't know what that would

24   be.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Could it be hydrocodone?

2             MS. MCCLURE:  Objection to

3       form.

4    BY MR. CLUFF:

5       Q.    If you know.

6       A.    I guess it could be.

7       Q.    How about C-II, what does

8    that stand for?

9       A.    That could be Schedule II.

10      Q.    Okay.  Let's turn to the

11   next page.

12            The next page is Bates

13   marked WAGMDL00038288.  This would have

14   been the attachment to the parent e-mail.

15            It looks like there's a

16   blank in the "to" line.

17            Do you see that?

18      A.    Yes.

19      Q.    But it's from Tahsa Polster

20   and Denman Murray.

21            Are those members of the

22   Walgreens integrity team?

23      A.    Yes.  Denman was, I think,

24   the IT guy on the integrity team.

1      Q.     But he was part of the

2  integrity team?

3      A.     I think so.

4      Q.     And then the date is

5  September 3, 2014?

6      A.     Yes.

7      Q.     All right.  The subject line

8  is, ABC/WAG hydrocodone schedule change

9  plan.

10            Do you see that?

11     A.     I see that.

12     Q.     Looking at this document and

13  the subject line, do you have any

14  understanding about what this document

15  was about?

16     A.     Let me review.

17            Okay.

18     Q.     So having reviewed this

19  page, did you form an understanding of

20  what this document -- or this meeting was

21  about?

22     A.     This may be about the two

23  systems being able to talk to each other.

24     Q.     Previously, I think we

1    talked about syncing the ABC and

2    Walgreens integrity team systems.

3                Is that --

4                MS. MCCLURE:  Objection to

5         form.

6    BY MR. CLUFF:

7         Q.    Is that what you're

8    referring to here?

9         A.    The pharmacy ordering system

10   and our SAP system.

11        Q.    Okay.  So let's go down the

12   list and see.

13                Do you see that there are

14   these bold underlines, I'd refer to them

15   as headings?

16                Do you see that?

17        A.    I see that.

18        Q.    Do you understand that these

19   would have been discussion points during

20   the meeting between ABC and the Walgreens

21   integrity team?

22                MS. MCCLURE:  Objection to

23        form.

24                THE WITNESS:  That's my

Highly Confidential - Subject to Further Confidentiality Review

1            understanding.

2    BY MR. CLUFF:

3            Q.    The first one is, Hydro

4    inventory availability.

5                 Do you see that?

6            A.    I see that.

7            Q.    And then the next bullet

8    point underneath it is, Allocations.

9                 Do you know what an

10   allocation refers to?

11           A.    Allocations are from the

12   manufacturing side.  I don't recall.

13           Q.    The next bullet point says,

14   MFG supply-interruptions, C-II yearly

15   allotment.  There appears to be Roman

16   Numeral II next to the C.

17                Do you understand what that

18   is?

19           A.    I think that might be in

20   regards to allocations.

21           Q.    Were there concerns about

22   interruptions of supply from the

23   manufacturers in 2014?

24           A.    I don't recall.

1      Q.    Under the heading,

2   Distribution, the second bullet point

3   says, Moving ordering daily to weekly.

4            Do you understand what that

5   was about?

6      A.    I think that was syncing the

7   two systems electronically, or

8   technologically.

9      Q.    Prior to this, was Walgreens

10   ordering on a daily basis as opposed to a

11   weekly basis?

12      A.    I don't know what they were

13   doing on their end.

14      Q.    Under the heading, OMP, the

15   first bullet point, again, Moving

16   ordering daily to weekly.

17            So that was -- was that

18   discussed twice?

19            MS. MCCLURE:  Objection to

20         form.

21            THE WITNESS:  I don't know.

22         It may have been, I don't know.

23   BY MR. CLUFF:

24      Q.    The last bullet point under

1    OMP is listed as, Is using family class

2    going to work for hydro?

3              Do you recall why that was a

4    question?

5         A.    I don't recall.

6         Q.    At the bottom it says, bold

7    underline, Threshold limits.

8              Do you see that?

9         A.    I see that.

10        Q.    So would that indicate that

11   there was a conversation between

12   AmerisourceBergen and the Walgreens

13   integrity team about threshold limits?

14             MS. MCCLURE:  Objection to

15        form.

16             THE WITNESS:  Threshold

17        limits may be as part of the

18        algorithm.  I don't know.

19   BY MR. CLUFF:

20        Q.    So you would have discussed

21   threshold limits as part of the algorithm

22   system with the Walgreens integrity team?

23        A.    I don't recall.

24        Q.    The next bullet point down

1    says, Will OMP limits change.

2              Do you see that?

3         A.    I see that.

4         Q.    Do you recall if there was

5    any discussion with the Walgreens

6    integrity team about changing OMP limits?

7         A.    I don't recall.

8         Q.    Okay.  We can set that

9    aside.

10                   -   -   -

11              (Whereupon,

12         AmerisourceBergen-Garcia

13         Exhibit-15, WAGMDL00038287-288,

14         was marked for identification.)

15                   -   -   -

16              (Whereupon,

17         AmerisourceBergen-Garcia

18         Exhibit-16, ABDCMDL00296155-180,

19         was marked for identification.)

20                   -   -   -

21    BY MR. CLUFF:

22         Q.    I'd like to hand you a copy

23    of a document that is an e-mail with an

24    attachment.  I will tell you, I do not

1    plan to ask you any questions about the

2    attachment, because it's large.

3              But I would like to discuss

4    the e-mail with you, which is one page.

5    So the document is Bates stamped

6    ABDCMDL00296155 is the cover e-mail.  The

7    attachment begins with ABDCMDL00296156.

8              Go ahead and familiarize

9    yourself with that first page, which is

10   the e-mail.  If you'd like to look at the

11   attachment, you may, but, again, I'm not

12   going to ask you any questions about it.

13        A.    Okay.

14        Q.    Down at the bottom of this

15   first page, you'll see in the "from"

16   line, it says, Zimmerman, Chris.

17              Do you know who that is?

18        A.    Chris is the compliance

19   officer.

20        Q.    And --

21        A.    Chief compliance officer.

22        Q.    I'm sorry, you said the

23   chief compliance officer?  Okay.

24              Did you work with him on any

Highly Confidential - Subject to Further Confidentiality Review

1   kind of a regular basis at

2   AmerisourceBergen?

3               MS. MCCLURE:  Objection to

4        form.

5               THE WITNESS:  Not on a

6        regular basis, no.

7   BY MR. CLUFF:

8        Q.    You see the subject line --

9   or excuse me, the "to" line includes May,

10  David; Hazewski, Edward; and Sharon

11  Hartman.

12               Do you see that?

13       A.    I see that.

14       Q.    Do you know -- you worked

15  with them at AmerisourceBergen, correct?

16       A.    Correct.

17       Q.    I believe, at the time, you

18  stated that Ed Hazewski would have been

19  your direct supervisor?

20       A.    March 2014.  He may have

21  been.

22       Q.    At this time, was Sharon

23  Hartman also one of your supervisors?

24       A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    The "cc" line that says,

2    Mays, Steve.

3              Do you know who Steve Mays

4    is?

5        A.    Steve Mays is the senior

6    director of regulatory affairs.  I don't

7    remember.

8        Q.    Did you report to him at

9    all?

10       A.    No.

11       Q.    Did you report to him at all

12   in 2014?

13       A.    No.

14       Q.    Okay.  In the text of the

15   e-mail from Chris to that group it says,

16   I met with David Neu.

17             I want to stop there and ask

18   if you know who David Neu is?

19       A.    David Neu was on the

20   executive lead team for ABC.  I don't

21   remember his title.

22       Q.    Do you recall if he had any

23   specific focus area or specialty in his

24   work with AmerisourceBergen?

1              MS. MCCLURE:  Objection to

2       form.

3              THE WITNESS:  I don't know.

4       I never worked with him.

5  BY MR. CLUFF:

6       Q.    It says, I met with David

7  Neu this morning and he wanted me to send

8  him an e-mail, a out -- it's probably a

9  typo for about, right?

10      A.    Uh-huh.

11             MS. MCCLURE:  Object to

12      form.

13 BY MR. CLUFF:

14      Q.    I'm just asking, do you

15 think a, space, out is a typo for about?

16             MS. MCCLURE:  Same.

17             THE WITNESS:  Probably.

18 BY MR. CLUFF:

19      Q.    Okay.  So, I met with David

20 Neu this morning and he wanted me to send

21 him an e-mail about our order monitoring

22 program with respect to WAG.

23             Does "WAG" there stand for

24 Walgreens?

1    A.    Yes.

2    Q.    Okay.  He continues and

3 says, WAG execs are concerned with DEA

4 and want our perspective on their program

5 and the environment going forward.

6            In that sentence does "WAG"

7 again refer to Walgreens?

8    A.    Walgreens, yes.

9    Q.    Skipping down, Chris says,

10 Ed, can you outline our approach to WAG

11 and the WAG people you deal with.  How

12 often and when you meet, and anything

13 else I should relay to Dave, or

14 suggestions of any improvements.

15            Do you see that?

16    A.    I see that.

17    Q.    Okay.  And bumping up to the

18 top -- or, excuse me, one e-mail up, Ed

19 Hazewski forwards you that e-mail and

20 includes Marcelino Guerreiro.

21            Do you see that?

22    A.    I see that.

23    Q.    It says, Read below and

24 let's discuss.  Would like to provide

1    some data but want to keep it basic and

2    easily understood.  Let me know your

3    availability for a call.

4              Do you see that?

5        A.    I see that.

6        Q.    Do you recall discussing

7    Chris Zimmerman's e-mail with Mr.

8    Hazewski?

9        A.    No, not at all.

10       Q.    Do you have any

11   understanding, reading this e-mail here

12   today, about why Chris -- or Mr.

13   Zimmerman wanted to give David Neu this

14   information?

15       A.    I don't know why.

16       Q.    Did you -- do you recall

17   asking Mr. Hazewski why this project was

18   going on?

19       A.    No.

20       Q.    Looking at your e-mail at

21   the top -- and you send it to Ed Hazewski

22   and Marcelino Guerreiro.

23              Do you see that?

24       A.    I see that.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Subject line is, Re, WAG

2  DEA.

3            "WAG" there, again, refers

4  to Walgreens?

5      A.    Yes.

6      Q.    Does DEA refer to the Drug

7  Enforcement Administration?

8      A.    Yes.

9      Q.    Okay.  And the attachments

10  are Ron Buzzeo_FDLI_current_February

11  2014-MC_SOM.

12            Do you see that?

13      A.    I see that.

14      Q.    Reading that, do you have

15  any idea what that document was, or

16  recollection?

17      A.    I have no recollection.

18      Q.    Looking at your e-mail to Ed

19  you say, I've attached a PowerPoint

20  presentation -- abbreviated as PPT -- I

21  found from Buzzeo dated Feb. 2014

22  regarding SOM.

23            Do you see that?

24      A.    I see that.

1    Q.    Does that refresh your

2    recollection on what that attachment

3    might be?

4    A.    No.

5    Q.    Do you have any idea who

6    Buzzeo is, or what Buzzeo is?

7    A.    I don't remember exactly

8    what that is, no.

9    Q.    You say, Note Slide Number

10   13, suspicious order monitoring

11   program-five key elements as a starting

12   point to evaluate WAG's program.

13        Does "WAG" still refer to

14   Walgreens there?

15   A.    Yes.

16   Q.    Does this refresh your

17   recollection that you were being asked to

18   evaluate Walgreens' program at the time?

19        MS. MCCLURE:  Objection.

20   Form.

21        THE WITNESS:  That's what it

22   appears to be.

23   BY MR. CLUFF:

24   Q.    Okay.  Do you know if

1    AmerisourceBergen was being asked to

2    evaluate Walgreens' program by Walgreens?

3                    MS. MCCLURE:  Object to

4          form.

5                    THE WITNESS:  Sorry,

6          clarify.

7    BY MR. CLUFF:

8          Q.    Sure.

9                Do you know if Walgreens

10   asked AmerisourceBergen to do this

11   evaluation?

12         A.    I don't recall.

13         Q.    Do you have any recollection

14   about whether AmerisourceBergen

15   voluntarily decided to evaluate

16   Walgreens' program?

17                    MS. MCCLURE:  Objection to

18         form.

19                    THE WITNESS:  I don't

20         recall.

21   BY MR. CLUFF:

22         Q.    You say, For example, they

23   have submitted to us the information for

24   the 590; however, do they have a separate

Highly Confidential - Subject to Further Confidentiality Review

1    questionnaire that they use to conduct

2    routine due diligence on their stores or

3    when they are acquiring new businesses?

4                Did you ever get answers to

5    those questions?

6         A.    I think they had a separate

7    questionnaire, but it was a confidential

8    document that nobody saw, from what I

9    recall.

10        Q.    When you say "nobody saw"

11   it, do you mean AmerisourceBergen never

12   saw it as well?

13        A.    They may not have.  I don't

14   remember.

15        Q.    And then the next sentence

16   is, Process to clear orders besides

17   looking at item number and quantity.

18                Did you get an answer to

19   that question?

20        A.    I don't remember.

21        Q.    Okay.  I sort of

22   overpromised and said I would not ask you

23   questions about the slides, but why don't

24   we look at Number 13, which is the slide

Highly Confidential - Subject to Further Confidentiality Review

1    you reference in your e-mail.

2              If you flip back in the

3    document, that slide ends at 296168.

4         A.    Okay.

5         Q.    Just starting at the top

6    there, the heading is, Suspicious Order

7    Monitoring-Five Key Elements.

8              Do you see that?

9         A.    I see that.

10        Q.    Do you have any

11   recollection, reviewing this slide, what

12   this was about?

13        A.    I don't recall this.  But

14   it's related to this top e-mail here.

15        Q.    Okay.  Looking down at the

16   five key elements, do you see the first

17   one is, A defensible SOM model?

18        A.    I see that.

19        Q.    Do you understand "SOM" to

20   stand for suspicious order monitoring?

21        A.    Yes.

22        Q.    Okay.  So would that be one

23   key element of a suspicious order

24   monitoring program?

1                    MS. MCCLURE:  Objection to

2          form.

3                    THE WITNESS:  Identifies

4          orders -- that's the definition of

5          a suspicious order.

6   BY MR. CLUFF:

7          Q.    Okay.  The next one down is,

8   Appropriate due diligence and Know Your

9   Customer activities.

10                   Would you agree that's an

11  element of a suspicious order monitoring

12  program, or a key element of it?

13                   MS. MCCLURE:  Objection to

14         form.

15                   THE WITNESS:  That's an

16         element of due diligence and Know

17         Your Customer.

18  BY MR. CLUFF:

19         Q.    How about, Appropriate

20  review and/or investigations of pended

21  orders, would you agree that's a key

22  element of a suspicious order monitoring

23  program?

24                   MS. MCCLURE:  Objection to

1          form.

2                    THE WITNESS:  Pended orders

3          would be orders of interest if

4          they hit the algorithm.

5    BY MR. CLUFF:

6          Q.    So appropriate review and/or

7    investigations of pended orders would be

8    a key element of a suspicious order

9    monitoring program?

10                    MS. MCCLURE:  Objection to

11          form.

12                    THE WITNESS:  We don't know

13          until we actually look at it.

14    BY MR. CLUFF:

15          Q.    Okay.  But you have to

16    review them, if they hit parameters,

17    right, to determine whether or not

18    they're suspicious?

19          A.    If they're potentially

20    suspicious.

21                    MS. MCCLURE:  Same.

22    BY MR. CLUFF:

23          Q.    At the bottom -- excuse me,

24    the next one down, says, Clear,

Highly Confidential - Subject to Further Confidentiality Review

1  comprehensive SOM SOPs.

2          And we previously discussed

3  that "SOM" stands for suspicious order

4  monitoring, right?

5          A.    Correct.

6          Q.    Do you understand if "SOP"

7  stands for standard operating procedures?

8          A.    I believe so, yes.

9          Q.    So would you agree that

10  clear, comprehensive standard operating

11  procedures are a key element of the

12  suspicious order monitoring program?

13          MS. MCCLURE:  Objection to

14      form.

15          THE WITNESS:  It could be a

16      training document.

17  BY MR. CLUFF:

18          Q.    But having clear,

19  comprehensive training documents is a

20  part of -- is a key element of a

21  suspicious order monitoring program,

22  correct?

23          MS. MCCLURE:  Objection to

24      form.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  Yes, I guess.

2    BY MR. CLUFF:

3         Q.    Okay.  Now I'm done with

4    that document.

5                    MR. CLUFF:  Is there a Teva

6         lawyer here?  Teva?  Teva?

7    BY MR. CLUFF:

8         Q.    Previously, we were

9    discussing Walgreens and the sharing of

10   information regarding thresholds.

11                   Do you recall that?

12        A.    I recall that.

13        Q.    I don't want to rehash that

14   conversation, I promise.

15                   But one of the things that

16   got us on to that conversation is I asked

17   you if AmerisourceBergen ever created

18   exceptions for Walgreens.

19                   Do you recall that?

20        A.    Yes.

21        Q.    I'd like to hand you a copy

22   of Exhibit-17.

23                        -   -   -

24                   (Whereupon,

1          AmerisourceBergen-Garcia

2          Exhibit-17, ABDCMDL00151721-726,

3          was marked for identification.)

4                    -  -  -

5    BY MR. CLUFF:

6          Q.    It's an e-mail chain dated

7    -- ABDCMDL00151721.

8                Please feel free to

9    familiarize yourself with it.  It looks

10   like there's also an attachment, which

11   would have been a second e-mail.

12               MS. MCCLURE:  Is that

13          attachment part of this?

14               MR. CLUFF:  I do not believe

15          it is part of this.

16   BY MR. CLUFF:

17         Q.    So I don't have you wasting

18   your time reading a whole long document

19   that I'm not going to ask you questions

20   about.

21               I'm looking at the second

22   page, there's an e-mail from Degnan,

23   Nancy, to Eric Cherveny.  And then

24   there's a response from Eric Cherveny to

1  that e-mail.  And my questions are about

2  those two.

3            You can feel free to read

4  the entire thing if you want to, but you

5  let me know when you're ready.

6       A.    Okay.

7       Q.    So in that e-mail on Page

8  151722, Nancy Degnan -- do you know who

9  that is?

10      A.    I don't know who that is.

11      Q.    If you look down at the

12  bottom of her e-mail, it identifies her

13  as a knowledge developer.  And there are

14  two Roman Numerals next to it.

15            Do you see that?

16      A.    I see that.

17      Q.    Does that refresh your

18  recollection about who she is?

19      A.    I have no idea who she is.

20      Q.    Okay.  She asks, Hi, Eric.

21  I reached out to the service delivery

22  team (Sara Dalyan and Kate Harper) to

23  determine if Kaiser will also be an

24  exception in the OMP process currently

Highly Confidential - Subject to Further Confidentiality Review

1    published.  I wanted to identify any

2    other differences to the existing process

3    before updating the article.

4              Do you see that?

5         A.    I see that.

6         Q.    And then if you turn to the

7    first page of this chain, Eric Cherveny

8    responds to her at the very bottom.

9              Do you see that?

10        A.    I see that.

11        Q.    You see you're copied on

12   that e-mail in the "cc" line?

13        A.    Yes.

14        Q.    And he writes, Nancy,

15   Walgreens is the only exception to the

16   customer review form.  All other

17   customers and chains will submit the

18   consumption review as per current policy.

19              Do you see that?

20        A.    I see that.

21        Q.    Does this refresh your

22   recollection that AmerisourceBergen

23   created exceptions to its policies and

24   procedures for Walgreens?

1           MS. MCCLURE:  Objection to

2      form.

3           THE WITNESS:  We didn't

4      create policy and procedure

5      exceptions.  The Walgreens

6      integrity team, I believe, wanted

7      to receive threshold reviews

8      directly and not for individual

9      stores -- or from individual

10      stores.

11  BY MR. CLUFF:

12      Q.    Just to be clear, it says,

13  Walgreens is the only exception to the

14  consumption review form.  All other

15  customers and chains will submit the

16  consumption review as per current policy.

17           So was there a current

18  policy in place regarding consumption

19  reviews in 2015?

20      A.    I believe so.

21      Q.    Okay.  And then Walgreens

22  was an exception to that rule, correct?

23           MS. MCCLURE:  Objection to

24      the form.  Asked and answered.

1          THE WITNESS:  They were not

2          an exception to the rule.  It was

3          how and who those consumption

4          reviews would be submitted to.

5     BY MR. CLUFF:

6          Q.    But how and to whom those

7     consumption reviews would be submitted

8     was an exception to the policy, correct?

9          MS. MCCLURE:  Objection to

10          the form.  Asked and answered.

11          THE WITNESS:  No.  The

12          consumption review form was to go

13          through the WAG integrity team;

14          whereas with other customers and

15          other chains, it could be

16          submitted directly to our system.

17     BY MR. CLUFF:

18          Q.    So let me just understand.

19          There was a policy in place

20     in 2015, correct?

21          A.    I think so.

22          Q.    Okay.  And you said, with

23     other customers and other chains, a

24     consumption review form -- you used the

Highly Confidential - Subject to Further Confidentiality Review

1   word "it," but I believe you meant

2   consumption review form -- could be

3   submitted directly to our system.

4              Did I get that right?

5              MS. MCCLURE:  Objection.

6        Asked and answered.

7              THE WITNESS:  Correct.

8   BY MR. CLUFF:

9        Q.   Okay.  And was that the

10  policy?

11             MS. MCCLURE:  Objection.

12        Asked and answered.

13             THE WITNESS:  I don't know

14        if that was in written format.

15  BY MR. CLUFF:

16        Q.   Was that the general

17  procedure that you understood to be the

18  way it worked?

19             MS. MCCLURE:  Objection.

20        Form.

21             THE WITNESS:  I believe so.

22             MS. MCCLURE:  Asked and

23        answered.

24  BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Just give the answer a

2   second so Shannon can get her objection

3   in.   Thanks.

4            Okay.   So Walgreens didn't

5   go through that same procedure, did they?

6            MS. MCCLURE:   Objection.

7        Asked and answered.   Form.

8            THE WITNESS:   They -- the

9            individual stores from Walgreens

10           would submit a consumption review

11           form to the WAG integrity team,

12           and then the WAG integrity team

13           would go to the system.

14  BY MR. CLUFF:

15   Q.    What's "the system" you're

16  referring to?

17   A.    Our -- I think it was

18  Salesforce where the consumption reviews

19  are kept.

20   Q.    So that's a different

21  process than a regular customer would go

22  through, correct?

23            MS. MCCLURE:   Objection to

24           form.   Asked and answered.

1               THE WITNESS:  Because

2          Walgreens has the integrity team,

3          they wanted to go through the

4          integrity team.

5     BY MR. CLUFF:

6          Q.    So because Walgreens had an

7     integrity team, AmerisourceBergen gave

8     them a different process than other

9     customers, is that what you're saying?

10              MS. MCCLURE:  Objection.

11         Asked and answered numerous times.

12         You're becoming argumentative.

13              THE WITNESS:  Sorry,

14         restate.

15    BY MR. CLUFF:

16         Q.    Sure.

17              Because Walgreens had an

18    integrity team, AmerisourceBergen gave

19    them a different process than other

20    customers for submitting consumption

21    reviews?

22              MS. MCCLURE:  Same

23         objection.

24              THE WITNESS:  No.  Walgreens

1          insisted that they wanted to have

2          visibility to those consumption

3          reviews and that they would submit

4          those to the system like everyone

5          else.

6     BY MR. CLUFF:

7          Q.   And then however you want to

8     qualify that process, Eric Cherveny

9     writes and says, Walgreens is the only

10    exception to the consumption review form.

11         Do you see that?

12         A.   I see that.

13         Q.   Okay.  Let's move on.

14         MR. CLUFF:  Is counsel for

15         Teva on the phone or present in

16         the room?

17    BY MR. CLUFF:

18         Q.   Ms. Garcia, do you recall

19    working with a man named Joseph

20    Tomkowitz?

21         A.   Yes.

22         Q.   Do you recall working with

23    Ed Hazewski?

24         A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Are you aware that Joseph

2  Tomkowitz left AmerisourceBergen and went

3  to Teva?

4    A.    Yes.

5    Q.    Did you communicate or

6  correspond with Mr. Tomkowitz after he

7  left AmerisourceBergen?

8    A.    On occasion.

9    Q.    Do you recall communicating

10  with him about past Walgreens hospital

11  locations?

12    A.    I don't recall that.

13    Q.    Do you recall any

14  investigation that you conducted, during

15  your time at AmerisourceBergen, about a

16  location for Walgreens in Beth Israel,

17  New York?

18    A.    I don't recall.

19    Q.    Do you recall ever

20  discussing that location with Mr.

21  Tomkowitz?

22    A.    I don't recall.

23    MR. CLUFF:  Shannon, why

24    don't you look at that before I

Highly Confidential - Subject to Further Confidentiality Review

1          hand it to her?

2              For the record, I'm handing

3          counsel a copy of a document

4          produced by Teva, subject to a

5          confidential designation.

6          Teva_MDL_A_02664130.

7              Ms. Garcia is copied on

8          every aspect of this chain.  In

9          fact, she replies to Mr. Tomkowitz

10          at one point on the chain.

11          Because she's a recipient and

12          author of the document, despite

13          the confidentiality designation,

14          this e-mail allows me to -- the

15          protective order allows me to use

16          it with her.  I'm having counsel

17          for Amerisource review it and

18          determine that she agrees with my

19          analysis.

20              MS. MCCLURE:  I'm not

21          agreeing or disagreeing with the

22          analysis.  I will say that Ms.

23          Garcia is copied on each of the

24          embedded e-mails within this

Highly Confidential - Subject to Further Confidentiality Review

```
 1        chain.

 2              MR. CLUFF:  And she authors

 3        the second-to-the-last in the

 4        chain, or second to the last

 5        e-mail on the first page.

 6              MS. MCCLURE:  Yep.  I agree

 7        that that is an accurate

 8        representation of the document,

 9        that Ms. Garcia sent one of the

10        e-mails in this chain.

11              MR. CLUFF:  Okay.  I'd like

12        to mark it as Exhibit-18 to Ms.

13        Garcia's deposition.

14                   -  -  -

15              (Whereupon,

16        AmerisourceBergen-Garcia

17        Exhibit-18,

18        TEVA_MDL_A_02664130-131, was

19        marked for identification.)

20                   -  -  -

21              MR. CLUFF:  I'll give you a

22        sticker, you have all the copies.

23              MS. MCCLURE:  Oh, I have all

24        the copies?
```

1           MR. CLUFF:  Yes.

2    BY MR. CLUFF:

3           Q.    This is really a one-page

4    e-mail chain, Ms. Garcia.  I just want to

5    cover some basics about your recollection

6    of this.  Let's start at the bottom of

7    the first page.

8                You see there it's from

9    Joseph Tomkowitz@Joseph Tomkowitz --

10   Joseph.tomkowitz@tevaPharm.

11               Do you see that?

12          A.    I see that.

13          Q.    And he writes to Mr.

14   Hazewski and to yourself on July 8th,

15   2014.

16               You see the subject line

17   there is, Walgreens Beth Israel, New

18   York?

19          A.    I see that.

20          Q.    And he writes, Here a blast

21   from the past.  This is a Walgreens

22   on-site hospital location.  We had noted

23   as buying a high percentage of 30

24   milligram when they came onboard and

1    reported some of their OY orders as

2    suspicious.

3              Do you know what "OY" stands

4    for?

5         A.    Oxycodone 30.

6         Q.    Why would you have reported

7    them or some of their OY orders as

8    suspicious?

9              MS. MCCLURE:  Objection to

10        form.

11             THE WITNESS:  This might

12        have been before my time.

13   BY MR. CLUFF:

14        Q.    So you don't recall whether

15   or not you would have been participating

16   in looking at orders for this location?

17             MS. MCCLURE:  Objection to

18        form.

19             THE WITNESS:  I don't

20        recall.

21   BY MR. CLUFF:

22        Q.    Okay.  Is there something

23   about this document to you that makes you

24   believe it might have been before your

1    time?

2          A.    I don't know.

3          Q.    Okay.  Let's look at the

4    second page.

5                There's -- can you see

6    there's a website address at the top

7    there?

8          A.    Yes.

9          Q.    So looking at the beginning

10   of that website address, it looks like it

11   says New York.cbslocal.

12               From that, can you determine

13   whether or not you think this is from,

14   you know, a news organization?

15               MS. MCCLURE:  Objection to

16         form.

17               THE WITNESS:  It appears to

18         be from a news organization.

19   BY MR. CLUFF:

20         Q.    And then if you continue, it

21   looks like there's a date, 2014/07/08.

22               Do you see that?

23         A.    I see that.

24         Q.    And it continues and says --

Highly Confidential - Subject to Further Confidentiality Review

1    I'm going to not read the dashes to save

2    everybody some time and the pain of my

3    voice, but it says, Beth Israel's

4    ex-pharmacy director accused of stealing

5    nearly 200,000 Oxycodone pills.

6              Do you see that?

7         A.    I see that.

8              MR. CLUFF:  Do you want to

9         double check my zeros, Shannon?

10             MS. MCCLURE:  I did.  I'm

11        all over it.

12             MR. CLUFF:  My eyes are

13        waning, too.

14   BY MR. CLUFF:

15        Q.    So going back to the first

16   page, Joe writes, When we first met with

17   Tasha and her group, this was one I asked

18   them about.

19             Reading that, do you have

20   any recollection about discussing this

21   pharmacy or the pharmacist with

22   Walgreens?

23        A.    The "we" in this sentence is

24   him and Ed.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What do you base that

2   statement on?

3    A.    Because I wasn't there.

4    Q.    How do you know you weren't

5   there?

6    A.    They met with Walgreens in

7   Chicago once, I remember that.

8    Q.    Why do you believe this

9   meeting occurred in Chicago?

10    A.    Because Tasha hadn't been

11   out to ABC, as far as I knew.

12    Q.    Okay.  We can set that

13   aside, then.

14         I just have maybe three or

15   four more documents.  Do you want to take

16   another quick break, or do you want to

17   power through?

18    A.    Let's go through.

19    Q.    We're going to give you

20   another break, too, after I wrap up and

21   your lawyers are going to decide whether

22   or not they want to do further

23   questioning.  But I'll get this done

24   quick.

1                    What I'm going to do is hand

2     you my copy of this document that is

3     clean.  I'm going to keep the bad copy,

4     and I am going to give all these other

5     counsel on the other side bad copies,

6     too.

7                    But this document is a copy

8     of an earnings report from 2012 to 2013.

9     It's Bates marked ABDCMDL00364852.

10                        -  -  -

11                   (Whereupon,

12          AmerisourceBergen-Garcia

13          Exhibit-19, ABDCMDL00364852-856,

14          was marked for identification.)

15                        -  -  -

16    BY MR. CLUFF:

17          Q.    Is this -- I'll represent to

18    you that this is a printout of an Excel

19    spreadsheet that was given to me by your

20    counsel.

21                   Is this something you would

22    have ever seen before in your work in

23    AmerisourceBergen?

24          A.    I don't remember.

1    Q.    Were you generally aware of

2    your salary and payment history while you

3    were at AmerisourceBergen?

4    A.    General.

5    Q.    If you look on the second

6    page from the very back, there are some

7    dates at the top left corner.  One is

8    11/23/2012.

9         Do you see that?

10   A.    Sorry, which corner?

11   Q.    The top left corner in the

12   column with the dates in it.

13        MS. MCCLURE:  What page?

14        MR. CLUFF:  The second from

15   the back page.

16        THE WITNESS:  Oh, the second

17   from the back.  Sorry.

18        The earnings report dates?

19   BY MR. CLUFF:

20   Q.    Yes.

21   A.    Okay.

22   Q.    So do you see, if you kind

23   of tab over in the columns, there's an

24   entry that says, Nondiscretionary bonus

Highly Confidential - Subject to Further Confidentiality Review

1    next to a numeral ███████?

2            A.    I see that.

3            Q.    Do you recall receiving a

4    bonus in 2012?

5            A.    I don't recall.

6            Q.    You had only been at the

7    company for a few months by this time in

8    November of 2012, correct?

9            A.    Yes.

10           Q.    Okay.  Do you recall what

11   bonuses were based on in the diversion

12   control team at AmerisourceBergen?

13           A.    No.  I think it was just a

14   general company bonus.

15           Q.    Okay.  You can set that

16   aside.

17                 I'll hand you another

18   document.  This is another printout.

19   This one didn't get a name, but it was

20   produced as ABDCMDL00364858.

21                    -  -  -

22                 (Whereupon,

23           AmerisourceBergen-Garcia

24           Exhibit-20, ABDCMDL00364858, was

Highly Confidential - Subject to Further Confidentiality Review

```
 1              marked for identification.)

 2                   -   -   -

 3    BY MR. CLUFF:

 4         Q.    Go ahead and look at that

 5    for a second.

 6              Do you see on the top left

 7    corner it says, Pay change history?

 8         A.    Yes.

 9         Q.    Have you ever seen a

10    document like this in your work history

11    at AmerisourceBergen?

12         A.    I don't recall.

13              MS. MCCLURE:  Sterling, for

14         the record, I'm going to note that

15         there does not appear to be a

16         confidentiality designation on

17         this.  However, in light of the

18         fact that I believe this was

19         produced in native, I would just

20         request that the highly

21         confidential designation that

22         originally accompanied this

23         document, given the fact that it

24         includes compensation-related
```

1    history, is maintained for

2    purposes of Exhibit-20.

3              MR. CLUFF:  Sure.  I don't

4    remember if you guys gave me this

5    in native and PDF or just in

6    native.  But I'm happy to agree

7    that this should be designated as

8    confidential.

9              MS. MCCLURE:  Highly

10   confidential.

11             MR. CLUFF:  Sure.

12             MS. MCCLURE:  Thank you.

13   BY MR. CLUFF:

14        Q.    So, Liz, looking at the left

15   side of this page, do you see there's an

16   effective date?

17        A.    Yes.

18        Q.    And if you look down at the

19   bottom of the effective date, it looks

20   like that says, June 11, 2012?

21        A.    Yes.

22        Q.    And there's an ad hoc

23   compensation change.

24             Do you recall what that was

Highly Confidential - Subject to Further Confidentiality Review

1    about?

2         A.    No.

3         Q.    I think June 11, 2012 was

4    your hire date with AmerisourceBergen.

5              Does that sound right?

6         A.    Yes.

7         Q.    So that would have been your

8    beginning salary?

9         A.    Yes.

10         Q.    And going up the date column

11   there, it looks like the next entry is a

12   November 3rd, 2013.

13              Do you see that?

14         A.    I see that.

15         Q.    Moving over one column, it

16   says, Ad hoc compensation change.

17              Do you see that?

18         A.    I see that.

19         Q.    And the next column over, in

20   the column, Reason -- do you see that?

21         A.    Yes.

22         Q.    -- it says, Request

23   compensation change, with a little arrow

24   key, adjustment, little arrow key, merit.

Highly Confidential - Subject to Further Confidentiality Review

1        Do you see that?

2    A.    I see that.

3    Q.    And it looks like your

4 salary goes from ████0 to ██████.

5        Do you see that?

6    A.    I see that.

7    Q.    Do you remember getting a

8 merits-based compensation change in 2013?

9    A.    Vaguely.

10   Q.    Do you know what was

11 involved in determining whether to give

12 an associate at Amerisource a

13 merits-based adjustment to their

14 compensation?

15   A.    I would assume performance.

16   Q.    So looking at this, is it --

17 based on your experience at Amerisource,

18 your supervisors believed that your

19 performance warranted a merit-based

20 increase to your compensation?

21   A.    I guess so.

22   Q.    I don't want to belabor the

23 point here, but if you look at all the

24 columns under, Reason, starting at the

Highly Confidential - Subject to Further Confidentiality Review

1   very top, it says, Merit process

2   adjustment; one down it says, Merit

3   process adjustment; one more down, it

4   says, Adjustment, little arrow key,

5   merit.

6            Do you see that?

7       A.   Yes.

8       Q.   So it looks like you

9   received, for every full year that you

10  worked at AmerisourceBergen, a merit

11  adjustment to your compensation, correct?

12      A.   Correct.

13      Q.   And so those would have been

14  based on, you know, meritorious

15  performance at AmerisourceBergen?

16      A.   It appears so.

17      Q.   Do you know what about your

18  performance at AmerisourceBergen

19  warranted a merits-based adjustment?

20      A.   I don't know what metrics

21  they used.

22      Q.   You had a performance review

23  every year at AmerisourceBergen, correct?

24      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Did they ever discuss with

2  you why they were giving you a

3  merits-based compensation increase?

4      A.    I don't recall those

5  conversations.

6      Q.    You can set that aside.

7            MS. MCCLURE:  So, Mr.

8      Sterling, can I just write the

9      words "highly confidential" on

10      here?

11            MR. CLUFF:  Yes, do it.

12  BY MR. CLUFF:

13      Q.    Was any part of your

14  performance or your compensation based on

15  your ability to onboard customers at

16  AmerisourceBergen?

17            MS. MCCLURE:  Objection to

18      form.

19            THE WITNESS:  No.

20  BY MR. CLUFF:

21      Q.    Was any part of your

22  compensation based on your ability to

23  complete due diligence on behalf of

24  customers that wanted to become

1    AmerisourceBergen customers?

2                MS. MCCLURE:  Objection to

3          form.

4                THE WITNESS:  No.

5    BY MR. CLUFF:

6          Q.    Earlier I asked you whether

7    you knew what was considered in

8    determining a merits-based performance

9    increase -- or compensation increase and

10   you told me you were not aware.

11               I've just given you two

12   examples, and you told me those were not

13   included.  Is there some reason, based on

14   your recollection, that you know those

15   were not included?

16               MS. MCCLURE:  Objection to

17         form.

18               THE WITNESS:  Those were

19         never part of our salary base.

20   BY MR. CLUFF:

21         Q.    Part of your job

22   responsibility was conducting due

23   diligence for the chain pharmacies,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Correct.

2      Q.    We previously reviewed that

3  that was something that you took great

4  pride in, correct?

5           MS. MCCLURE:  Objection to

6       form.

7           THE WITNESS:  It was just

8       part of my duties.

9  BY MR. CLUFF:

10     Q.    We also discussed that part

11 of your job duties was to perform

12 investigations of pharmacies, correct?

13     A.    How do you mean?

14     Q.    I think we discussed, in

15 your 2016 performance evaluation, that

16 you, as part of your job responsibilities

17 prior to 2016, went on site visits to

18 pharmacies?

19     A.    Site visits, yes.

20     Q.    I was calling them

21 investigations.

22           Is site visits a better

23 word?

24     A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Happy to use that.

2          And that you referenced site

3    visits as an important tool to determine

4    whether or not Amerisource should

5    continue its relationship with a

6    customer, among other things, correct?

7          MS. MCCLURE:  Objection to

8          form.  Asked and answered.

9          THE WITNESS:  Yes.

10   BY MR. CLUFF:

11   Q.    Did any of your work in

12   conducting site visits on behalf of

13   AmerisourceBergen contribute to the

14   merits-based increase you received during

15   your tenure at Amerisource?

16   A.    No.

17   Q.    How about the Form 590 due

18   diligence for chain customers, did that

19   affect your compensation?

20   A.    No.

21   Q.    I'm going to give you one

22   last document, and then we'll take a

23   break.  I'll keep my small copy and you

24   can have the big copy.

Highly Confidential - Subject to Further Confidentiality Review

1                          -   -   -

2                      (Whereupon,

3          AmerisourceBergen-Garcia

4          Exhibit-21, ABDCMDL00364857, was

5          marked for identification.) S

6                          -   -   -

7                      MR. CLUFF:  Zach, I believe

8          this is Document Number 10.

9                      This is a native spreadsheet

10         that we printed.  It probably was

11         marked previously as highly

12         confidential pursuant to the

13         protective order.

14                     Shannon, if you'd like to

15         write that on the witness's copy,

16         I'm happy to have you do so.  It

17         was produced to plaintiffs as

18         ABDCMDL00364857.

19   BY MR. CLUFF:

20             Q.    Ms. Garcia, would you have

21   ever seen this kind of a document during

22   your time as an employee of

23   AmerisourceBergen?

24             A.    No.  It doesn't look

1    familiar.

2          Q.    Okay.  I'm going to

3    represent to you that this is a record of

4    your payment history.

5          A.    Okay.

6          Q.    If you look in the middle of

7    the first page, you'll see a column that

8    starts with period.  And if you look

9    under that, there are some dates ranges,

10   followed by a parenthesis that says,

11   Payroll:  Bi-weekly.

12                Do you see that?

13         A.    Are you on Page 2?

14         Q.    No, I'm on Page 1.

15         A.    Sorry.  Period, got you.

16         Q.    And if you look over to the

17   right, you can see that it says, Earned.

18   At the top of the column, it says,

19   Associate bonus plan.  Underneath that,

20   it says, PTO USA.  Under that, it says,

21   Salary.

22                So looking at this -- and if

23   you look at the earnings column, does it

24   appear to you to be a record of the

1    payments you would have received from

2    AmerisourceBergen during your employment?

3         A.    I believe so, yes.

4         Q.    At the top there, there's a

5    date, 11/24/2017, which is the payment

6    date or reversal date.

7               Do you see that?

8         A.    Yes.

9         Q.    And if you go all the way

10   over to the earnings, there's an entry

11   that says, ███████████.

12              Do you see that?

13        A.    I see that.

14        Q.    When did you leave

15   AmerisourceBergen, if you can recall?

16        A.    October 2017.

17        Q.    So this payment, which

18   reflects an associate bonus plan payment,

19   was made to you after you left

20   AmerisourceBergen?

21              MS. MCCLURE:  Objection to

22        form.

23              THE WITNESS:  Possibly.

24   BY MR. CLUFF:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So the date is definitely

2    after the date that you just referred to

3    as your separation date, correct?

4            A.    Got you.  Yes.

5            Q.    So that payment would have

6    been received after you left?

7            A.    Yes.

8            Q.    Okay.  Do you recall why you

9    received a bonus from AmerisourceBergen

10   after you left the company?

11           A.    Bonuses were on a fiscal

12   year basis.  So October 1st was the

13   last -- was the beginning of the next

14   fiscal year.

15                 So this was actually bonus

16   from the previous year.

17           Q.    Okay.  So you received a

18   bonus for the fiscal year prior that

19   concluded prior to your departure, is

20   what you're telling me?

21           A.    Yes.

22           Q.    Do you recall what the bonus

23   was calculated on?

24                 MS. MCCLURE:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

 1          form.

 2                    THE  WITNESS:   No.

 3     BY MR. CLUFF:

 4          Q.     What were the performance

 5     metrics, if you can recall, on how

 6     bonuses were calculated?

 7          A.     I don't know that

 8     information.

 9          Q.     If you look down at the very

10     bottom of the page, there's another line

11     in the earned category that says,

12     Associate bonus plan.  The date there is,

13     11/25/2016.  The amount listed in the

14     earnings column says, ███████.

15                    Do you see that?

16          A.     I see that.

17          Q.     So that's a bonus that would

18     have been earned for work conducted in

19     the prior fiscal year?

20          A.     Yes.

21          Q.     And I think we talked

22     earlier that in 2016, that's the year

23     when you had the formal written

24     counseling, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    Yet you still received a

3   bonus?

4        A.    Yes.

5        Q.    So in 2016, I know we

6   discussed that you had a performance

7   review.

8             And so I'm curious if,

9   during that performance review, Mr.

10  Cherveny discussed with you the reasons

11  why you were receiving a bonus?

12       A.    No, I don't recall.

13       Q.    Okay.  If you flip the page

14  and look down at the bottom again, this

15  is now Page 2, the two bottom entries in

16  that highlighted yellow column -- by the

17  way, for the record, the yellow column

18  was highlighted in the version that was

19  produced to us.  So we didn't make any

20  changes to this.

21            It's a nice, helpful

22  reference, though.

23            At the bottom of the yellow

24  column it says, Associate bonus plan.

Highly Confidential - Subject to Further Confidentiality Review

1    The date is, 11/27/15.  The earned amount

2    is, ███████, correct?

3           A.    I see that, yes.

4           Q.    Do you see underneath that,

5    it says, Discretionary bonus-accrued?

6           A.    Yes.

7           Q.    The date is also 11/27/2015,

8    right?

9           A.    Yes.

10          Q.    And the amount is, ███████

11          A.    Yes.

12          Q.    Do you have any recollection

13   on how associates at AmerisourceBergen

14   accrued bonuses?

15          A.    I have no idea.

16          MS. MCCLURE:  Objection.

17          Asked and answered.

18   BY MR. CLUFF:

19          Q.    Let's do that again.

20          MR. CLUFF:  And you can have

21          your objection, Shannon.

22   BY MR. CLUFF:

23          Q.    Do you have any recollection

24   on how associates at AmerisourceBergen

Highly Confidential - Subject to Further Confidentiality Review

1    accrued bonuses?

2            MS. MCCLURE:  Objection.

3        Asked and answered.

4            THE WITNESS:  I have no

5        idea.

6    BY MR. CLUFF:

7        Q.    Okay.  Do you recall

8    discussing this accrued bonus with your

9    supervisor in 2015?

10       A.    I don't recall.

11       Q.    How about the associate

12   bonus plan payment, do you recall

13   discussing the basis for that payment

14   from your supervisor?

15       A.    I don't recall.

16       Q.    On Page 3, at the bottom of

17   the yellow column again, there's an

18   associate bonus plan payment.  The date,

19   1/28/2014.  The amount, ███████████.

20            Do you see that?

21       A.    I see that.

22       Q.    Any recollection about that?

23       A.    No.

24       Q.    Okay.  Flip the page one

1    last time.

2                    There, at the top of the

3    column, there's a discretionary

4    bonus-accrued.  The amount is, ███████.

5    The date is, 9/23/2014.

6                    Do you see that?

7        A.    I see that.

8        Q.    Do you have any recollection

9    of that bonus payment?

10       A.    I do not.

11       Q.    Okay.

12                   MR. CLUFF:  Let's take a

13           break.  That's all the questions

14           I've got for right now.  But let

15           me double check my notes to see if

16           there's anything I want to

17           follow-up on.

18                   VIDEO TECHNICIAN:  Off the

19           record at 5:35 p.m.

20                        -   -   -

21                   (Whereupon, a brief recess

22           was taken.)

23                        -   -   -

24                   VIDEO TECHNICIAN:  We're

1      back on the record at 5:40 p.m.

2          MR. CLUFF:  Ms. Garcia,

3      just, like, three or four more

4      questions.  I'm just -- I'm not

5      sure if we covered this at the

6      very beginning.

7  BY MR. CLUFF:

8      Q.    When you left

9  AmerisourceBergen, I remember you talking

10 about that, at the time, you had been

11 having personality disagreements with

12 Eric Cherveny; is that right?

13     A.    Correct.

14     Q.    And I remember you saying

15 that he was your direct supervisor at the

16 time?

17     A.    Correct.

18     Q.    Did you have any sort of,

19 like, a fear or an apprehension, at the

20 time you left, that you were going to be

21 fired because of the disagreements you

22 had with Eric Cherveny?

23     A.    No.

24         MS. MCCLURE:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1          Form.

2   BY MR. CLUFF:

3          Q.    Sorry.  What was your answer

4   again?

5          A.    No.

6          Q.    And when you left, you said

7   you gave notice.

8                Did you discuss any kind of

9   a severance payment with

10  AmerisourceBergen when you left?

11         A.    No.

12         Q.    And you did not receive one?

13         A.    No.

14         Q.    Okay.  After that

15  merit-based -- excuse me, after the bonus

16  that we discussed you received in

17  November, have you received any payments

18  from AmerisourceBergen at all?

19         A.    No.

20         Q.    Did you have a 401(k) when

21  you worked at AmerisourceBergen?

22         A.    Yes.

23         Q.    Do you still have a 401(k)?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know if it's still

2    administered with the AmerisourceBergen

3    plan?

4    A.    No.

5    Q.    You rolled it over into a

6    different company?

7    A.    It's in the same company,

8    but it's not being managed or anything

9    with ABC.

10    Q.    Do you know if the money is

11    held in the same pool as other ABC

12    associates?

13    A.    I don't know that.

14    Q.    Okay.  You said you're not

15    employed now currently?

16    A.    Correct.

■           ■             ███████████████████

■      ██████

19    MS. MCCLURE:  Objection.

20    Form.  Relevance.

■                ██████████████   █████████

22    BY MR. CLUFF:

23    Q.    Understood.

24    MR. CLUFF:  That's all the

1          questions I have.

2               MS. MCCLURE:  I have no

3          questions.  Anyone in the room or

4          on the phone?

5               MR. CLUFF:  I guess we

6          should ask.  Anyone at the end of

7          table?  Bob?

8               VIDEO TECHNICIAN:  This

9          concludes today's deposition.  The

10         time is 5:42 p.m.  We are off the

11         record.

12                   -  -  -

13         (Whereupon, the deposition

14         concluded at 5:42 p.m.)

15                   -  -  -

16

17

18

19

20

21

22

23

24

1                        CERTIFICATE

2

3

4              I HEREBY CERTIFY that the

5     witness was duly sworn by me and that the

6     deposition is a true record of the

7     testimony given by the witness.

8

9

10

              Amanda Maslynsky-Miller

11            Certified Realtime Reporter

              Dated:  December 16, 2018

12

13

14

15

16

17              (The foregoing certification

18    of this transcript does not apply to any

19    reproduction of the same by any means,

20    unless under the direct control and/or

21    supervision of the certifying reporter.)

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4   over carefully and make any necessary

 5   corrections.  You should state the reason

 6   in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8              After doing so, please sign

 9   the errata sheet and date it.

10              You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    - - - - - -

                  E R R A T A

2                    - - - - - -

3     PAGE    LINE    CHANGE/REASON

4     _____   _____   _____

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

### ACKNOWLEDGMENT OF DEPONENT

2

3      I,_____, do
hereby certify that I have read the
foregoing pages,  1 - 495, and that the

4  same is a correct transcription of the
answers given by me to the questions

5  therein propounded, except for the
corrections or changes in form or

6  substance, if any, noted in the attached
Errata Sheet.

7

8  _____

ELIZABETH GARCIA              DATE

9

10

Subscribed and sworn

11  to before me this
_____ day of _____, 20\_\_\_\_.

12

My commission expires:_____

13

14  _____

Notary Public

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                         LAWYER'S NOTES

2      PAGE    LINE

3      _____  _____    _____

4      _____  _____    _____

5      _____  _____    _____

6      _____  _____    _____

7      _____  _____    _____

8      _____  _____    _____

9      _____  _____    _____

10     _____  _____    _____

11     _____  _____    _____

12     _____  _____    _____

13     _____  _____    _____

14     _____  _____    _____

15     _____  _____    _____

16     _____  _____    _____

17     _____  _____    _____

18     _____  _____    _____

19     _____  _____    _____

20     _____  _____    _____

21     _____  _____    _____

22     _____  _____    _____

23     _____  _____    _____

24     _____  _____    _____