```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                     EASTERN DIVISION

 3

      ------------------------    )

 4    IN RE: NATIONAL             ) MDL No. 2804

      PRESCRIPTION OPIATE         )

 5    LITIGATION                  ) Case No.

      ------------------------    ) 1:17-MD-2804

 6                                )

      THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster

 7    ALL CASES                   )

      ------------------------    )

 8

 9                  HIGHLY CONFIDENTIAL

10        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12              VIDEOTAPED DEPOSITION OF

13                   TOMSON GEORGE

14                  January 14, 2019

15

16                  Chicago, Illinois

17

18

19

20

21

22              GOLKOW LITIGATION SERVICES

                     877.370.3377

23                   deps@golkow.com

24
```

|  | Page 2 |
|---|---|
| 1 |  |
| 2 |  |
| 3 |  |
| 4 | The videotaped deposition of TOMSON GEORGE, |
| 5 | called by the Plaintiffs for examination, taken |
| 6 | pursuant to the Federal Rules of Civil Procedure of |
| 7 | the United States District Courts pertaining to the |
| 8 | taking of depositions, taken before CORINNE T. |
| 9 | MARUT, C.S.R. No. 84-1968, Registered Professional |
| 10 | Reporter and a Certified Shorthand Reporter of the |
| 11 | State of Illinois, at the offices of Bartlit Beck |
| 12 | LLP, Suite 600, 54 West Hubbard Street, Chicago, |
| 13 | Illinois, on January 14, 2019, commencing at 9:01 |
| 14 | a.m. |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

**Page 4**

1  ON BEHALF OF CARDINAL HEALTH, INC.:
2      WILLIAMS & CONNOLLY LLP
        725 Twelfth Street, N.W.
3      Washington, DC  20005
        202-434-5013
4      BY:  KATELYN ADAMS, ESQ.
            kadams@wc.com
5
6  ON BEHALF OF AMERISOURCE BERGEN CORPORATION:
7      JASZCZUK, P.C.
        311 South Wacker Drive, Suite 3200
8      Chicago, Illinois  60606
        312-442-0509
9      BY:  MARGARET M. SCHUCHARDT, ESQ.
            mschuchardt@jaszczuk.com
10
11  ON BEHALF OF WALMART:
12      JONES DAY
        77 West Wacker Drive
13      Chicago, Illinois  60601-1692
        312-782-3939
14      BY:  SCOTT D. QUELLHORST, ESQ.
            squellhorst@jonesday.com
15
16
17  ALSO PRESENT:
18      KATIE MAYO, Paralegal
        kmayo@levinlaw.com
19      Levin Papantonio Thomas Mitchell
        Rafferty & Proctor P.A.
20
21      RODERRICK CONCEPCION, Trial Technician
22
23  VIDEOTAPED BY:  BEN STANSON
24  REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968

**Page 3**

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS:
3      LEVIN PAPANTONIO THOMAS MITCHELL
        RAFFERTY & PROCTOR P.A.
4      316 South Baylen Street, Suite 600
        Pensacola, Florida  32502
5      205-396-3982
        BY:  JEFF GADDY, ESQ.
6          jgaddy@levinlaw.com
            LAURA DUNNING, ESQ.
7          ldunning@levinlaw.com
            (via livestream)
8
9  ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
    aka WALGREEN CO.:
10
        BARTLIT BECK LLP
11      54 West Hubbard Street, Suite 300
        Chicago, Illinois  60654
12      312-494-4475
        BY:  PETER B. BENSINGER, JR., ESQ.
13          Peter.Bensinger@BartlitBeck.com
14
    ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
15  ENDO PHARMACEUTICALS, INC.,
        PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
16      COMPANIES, INC. (f/k/a Par Pharmaceutical
        Holdings, Inc.):
17
        ARNOLD & PORTER KAYE SCHOLER LLP
18      601 Massachusetts Avenue, NW
        Washington, DC  20001-3743
19      202-942-5000
        BY:  ERICA I. GUTHRIE, ESQ.
20          erica.guthrie@arnoldporter.com
            (via telephone/livestream)
21
22
23
24

**Page 5**

1              I N D E X
2  TOMSON GEORGE              EXAMINATION
3      BY MR. GADDY.................  10
4
5
6          E X H I B I T S
7  WALGREENS-GEORGE EXHIBIT          MARKED FOR ID
8  No. 1    Resume of Tomson George, RPh      11
9  No. 2    Document, U.S. DOJ, DEA,          22
            Diversion Control Division,
10          Title 21 Code of Fed.
            Regulations, Part 1301;
11          P-GEN-0010
12  No. 3    5/16/14 e-mail string;           47
            WAGMDL00333310 - 00333313
13
    No. 4    7/12/12 e-mail; WAGMDL00662135   69
14
    No. 5    Binder of documents,             73
15          "Settlement and Memorandum of
            Agreement" with various
16          documents, P-WAG-0001
17  No. 6    Document, "Staff Pharmacist      117
            Bonus Program"; P-WAG-01005
18
    No. 7    Document, "Pharmacy Manager      126
19          Bonus Program";
            WAG00000001 - 00000005
20
    No. 8    Document, "Senior Certified      132
21          Technician Bonus Plan
            Details"; P-WAG-01005
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 6

E X H I B I T S

| WALGREENS-GEORGE EXHIBIT | | MARKED FOR ID |
|---|---|---|

1
2
3   No. 9   2/19/13 e-mail with          137
        attachment;
4       WAGMDL00574919 - 00574926
5   No. 10   12/11/17 e-mail with        152
        attachment;
6       WAGMDL00334471 - 00334495
7   No. 11   12/23/13 e-mail string with    159
        attachment;
8       WAGMDL00267660 - 00267667
9   No. 12   Document, "OxyContin: Its use   164
        and abuse: Hearing before the
10      Subcommittee on Oversight and
        Investigations," etc., August
11      28, 2001"; P-GEN-0047
12  No. 13   Press release, July 1, 2011,    171
        "State Surgeon General
13      Declares Public Health
        Emergency Regarding
14      Prescription Drug Abuse
        Epidemic"; P-GEN-00126
15
    No. 14   Florida Dept. of Health        175
16      2010-2011 PDMP Annual Report;
        P-GEN-00127
17
    No. 15   7/6/11 e-mail to All FL        185
18      Pharmacies;
        WAGFLDEA00000383
19
    No. 16   10/22/11 e-mail string;        191
20      WAGFLDEA00000403 - 00000405
21  No. 17   7/2/12 e-mail string;          202
        WAGMDL00441530 - 00441537
22
23
24

Page 7

E X H I B I T S

| WALGREENS-GEORGE EXHIBIT | | MARKED FOR ID |
|---|---|---|

1
2
3   No. 18   11/27/12 e-mail string;        208
        WAGMDL00440895 - 00440897
4
    No. 19   5/29/13 e-mail string;         216
5       WAGMDL00330437 -- 00330443
6   No. 20   U.S. GAO Report, "Prescription   231
        Drugs, State Monitoring
7       Programs Provide Useful Tool
        to Reduce Diversion";
8       P-GEN-0055
9   No. 21   10/2/08 Colorado US Attny       238
        Office article; P-GEN-0075
10
    No. 22   5/23/12 e-mail string;         242
11      WAGMDL00614056 - 00614059
12  No. 23   5/24/12 e-mail string;         246
        WAGMDL00617478 - 00617481
13
    No. 24   9/25/12 e-mail string;         256
14      WAGMDL00517021 - 00517023
15  No. 25   3/8/13 e-mail string;          259
        WAGMDL0000533039 - 0053304
16      1
    No. 26   9/10/12 e-mail string;         262
17      WAGMDL00517040 - 00517044
18  No. 27   11/13/14 e-mail string with     266
        attachment;
19      WAGMDL0000015270 -00015272
20  No. 28   Lobby Report; P-WAG-00040       271
21  No. 29   8/7/12 e-mail string;          283
        WAGMDL00331103 - 00331110
22
23
24

Page 8

E X H I B I T S

| WALGREENS-GEORGE EXHIBIT | | MARKED FOR ID |
|---|---|---|

1
2
3   No. 30   8/10/12 e-mail string;        286
        WAGMDL00334305 - 00334308
4
    No. 31   8/30/12 e-mail string with     290
5       attachment;
        WAGMDL00678523 - 00678540
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 9

1       THE VIDEOGRAPHER:  We are now on the record.
2   My name is Ben Stanson.  I'm a videographer for
3   Golkow Litigation Services.
4       Today's date is January 14, 2019, and
5   the time is 9:01 a.m.
6       This video deposition is being held in
7   Chicago, Illinois in the matter of the National
8   Prescription Opiate Litigation, MDL No. 2804,
9   pending in the U.S. District Court, Northern
10  District of Ohio, Eastern Division.
11      The deponent is Tomson George.
12      Will counsel please identify yourselves
13  for the record.
14      MR. GADDY:  Jeff Gaddy for the Plaintiffs.
15      MR. BENSINGER:  This is Peter B. Bensinger,
16  Jr. of Bartlit Beck for Defendant Walgreens.
17      MR. QUELLHORST:  Good morning.  Scott
18  Quellhorst, Jones Day, on behalf of Walmart.
19      MS. ADAMS:  Kate Adams, Williams & Connolly,
20  on behalf of Cardinal Health.
21      MR. SCHUCHARDT:  Margaret Schuchardt from
22  Jaszczuk PC on behalf of AmerisourceBergen Drug
23  Corporation.
24      MR. GADDY:  Do we have any folks on the phone?

Page 10

1    MS. GUTHRIE: Erica Guthrie of Arnold & Porter
2 on behalf of the Endo and Par Defendants.
3    THE VIDEOGRAPHER: Thank you. Our Court
4 Reporter today is Corinne Marut. Will you please
5 swear in the witness.
6         (WHEREUPON, the witness was duly
7         sworn.)
8            TOMSON GEORGE,
9 called as a witness herein, having been first duly
10 sworn, was examined and testified as follows:
11            EXAMINATION
12 BY MR. GADDY:
13    Q.   Good morning, Mr. George.
14    A.   Good morning.
15    Q.   State your name, please.
16    A.   First name is Tomson. My last name is
17 George.
18    Q.   And you work at Walgreens, correct?
19    A.   Yes, I do.
20    Q.   What's your current title?
21    A.   Senior manager of professional affairs.
22    Q.   When did that become your title?
23    A.   January 2015. Sorry. I think
24 January 2016. I apologize.

Page 11

1    Q.   Sure. I'm going to show you what I've
2 marked as Exhibit No. 1. Excuse me for throwing it
3 at you.
4         (WHEREUPON, a certain document was
5         marked as Walgreens-George Exhibit
6         No. 1: Resume of Tomson George,
7         RPh.)
8 BY MR. GADDY:
9    Q.   Do you recognize this as a copy of your
10 resume?
11    A.   This is a copy of a resume that I
12 probably had some time ago.
13    Q.   Okay. That was going to be my -- my
14 next question. How up to date is this?
15    A.   This is probably the resume I had back
16 in 2015.
17    Q.   Okay.
18    A.   Prior to my 2016 promotion, so to speak.
19    Q.   So, we'll jump into some of the
20 details in a minute. But if I was to look at the
21 first segment under "Experience," would it be
22 accurate to change "7/2008 to present" to "7/2008
23 till December 2015"?
24    A.   Yeah, absolutely.

Page 12

1    Q.   Okay. So, on the back, I want to see if
2 I can get an understanding of what you're doing
3 now.
4    A.   Okay.
5    Q.   So, senior manager of professional
6 affairs?
7    A.   Um-hmm.
8    Q.   Do you still work here in Deerfield,
9 Illinois?
10    A.   Yes, I do.
11    Q.   And describe for me your duties in your
12 current role.
13    A.   Yeah, I would summarize my duties really
14 into three different buckets at this time. I do
15 serve as the program director for the Walgreens
16 pharmacy technician training program.
17        I also oversee the monitoring of our
18 pharmacists licensure and technician licensure.
19 And then, lastly, I do serve as a liaison to Boards
20 of Pharmacies in a few of the Midwestern states.
21    Q.   Can you kind of give me a range
22 state-wise?
23    A.   Probably mostly neighboring Illinois.
24 So, that would be like a Missouri, Wisconsin,

Page 13

1 Indiana, Ohio, Michigan, and also I think randomly
2 Delaware.
3    Q.   Okay. And you've been in that position
4 since?
5    A.   January 2016.
6    Q.   Since January '16. So, just over two
7 years?
8    A.   Three years.
9    Q.   Three years.
10    A.   Yeah, three years.
11    Q.   Sure. Yes, three years.
12        In your current position do you have any
13 duties that encompass suspicious order monitoring?
14    A.   No.
15    Q.   In your current duties do you -- or
16 excuse me.
17        In your current position do you have any
18 duties involving dispensing policies?
19    A.   Yes.
20    Q.   Would that be related to the training
21 that you do with the pharmacy technicians or the
22 licensures?
23    A.   Not directly. Yeah, I mean, not with
24 regards to that, no.

Page 14

1    Q.   Okay.  In what -- in what way do your
2  current duties involve Walgreens' dispensing
3  policies?
4    A.   I will sit on a policy committee,
5  internal policy committee, which will review any
6  proposed policy updates or establish new policies at the
7  company.
8    Q.   Who else is on that committee?
9    A.   It's hard for me to come up with a
10  comprehensive list, but in general there is
11  representatives from pharmacy legal, pharmacy
12  compliance, our pharmacy operations group.
13    Q.   Who chairs the committee?
14    A.   A gentleman, Adam Kielbasa is the
15  current chair.
16    Q.   Are there folks from the Pharmaceutical
17  Integrity team on that committee?
18    A.   Not -- not specifically, no.
19    Q.   When I say "Pharmaceutical Integrity,"
20  do you know what group I'm referring to within
21  Walgreens?
22    A.   Yes.
23    Q.   You spent your entire career with
24  Walgreens, correct?

Page 15

1    A.   After college, yes.
2    Q.   And you started, and I'm going back to
3  the -- to your resume, and it looks like the lower
4  entry under "Experience," you started in
5  September 2000.  Would that be after you graduated
6  from school?
7    A.   Yes, correct.
8    Q.   Did you go to pharmacy school?
9    A.   Yes, I did.
10    Q.   And you did your undergraduate and
11  pharmacy school at Rutgers?
12    A.   That's correct.
13    Q.   How long of a program is the pharmacy
14  school?
15    A.   At the time that I attended, it was a
16  total of five years.
17    Q.   Is it the same now?
18    A.   No.
19    Q.   What is it now?
20    A.   Generally it's six years.
21    Q.   And it looks like your first position
22  within Walgreens was as a pharmacist?
23    A.   You know, I actually did start while I
24  was in pharmacy school in September of 1998 as a

Page 16

1  pharmacy technician.
2    Q.   Okay.  And you did that for two years
3  and then upon graduation became a pharmacist?
4    A.   That's correct.
5    Q.   You list on here pharmacist and pharmacy
6  manager.  Is that the same position or different?
7    A.   A little bit different.  When I first
8  graduated, my primary role was pharmacist.  I was
9  promoted to pharmacy manager in I believe April of
10  2004.
11    Q.   Did you stay at the same store?
12    A.   I did work in a few different locations,
13  actually.
14    Q.   Okay.  When you were a pharmacy manager,
15  did you also work as a pharmacist?
16    A.   Yes.
17    Q.   Okay.  Would it be fair to say that the
18  pharmacy manager is essentially the head
19  pharmacist?
20    A.   That's correct, yeah.
21    Q.   Okay.  So, prior to -- prior to I think
22  you said '04 when you were promoted to pharmacy
23  manager, you were a pharmacist within a Walgreens
24  store working under another pharmacist who was the

Page 17

1  pharmacy manager?
2    A.   Yeah.
3    Q.   Okay.  From 2000 to 2006 while you were
4  working as a Walgreens pharmacist, did you have the
5  occasion to dispense Schedule II and III narcotics?
6    A.   Yes.
7    Q.   And as a Walgreens pharmacist were there
8  federal rules and regulations that governed your
9  dispensing of Schedule II and III narcotics?
10    A.   Yes.
11    Q.   Did that include things such as your
12  obligation as a pharmacist to determine that the
13  prescriptions for those Schedule II and III
14  narcotics that you were filling were medically
15  necessary?
16    MR. BENSINGER:  Objection; calls for a legal
17  conclusion.  You may answer.
18  BY THE WITNESS:
19    A.   I mean, the best way I can really
20  summarize it is we'd be dispensing controlled
21  substance prescriptions in compliance with state
22  and federal laws.
23  BY MR. GADDY:
24    Q.   Okay.  Was one of the state and federal

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  laws that you had to comply with, did it involve
2  you as a pharmacist having to make a determination
3  that any Schedule II or III drug prescription that
4  you were filling, you had to make a determination
5  that it was medically necessary?
6      A.   I think we would characterize -- I would
7  characterize it more specifically that we were
8  trying to make sure the prescription was valid and
9  if there was any question, we'd contact the
10  physician, for example, to help verify the validity.
11     Q.   If there was any question about whether
12  or not the prescription was valid?
13     A.   Um-hmm.
14     Q.   Okay.  And I'm picking on you.  You got
15  to say yes or no.
16     A.   Yes.
17     Q.   Okay.  So, to you, is there a difference
18  between whether or not a prescription is medically
19  necessary and whether or not a prescription is
20  valid?
21     A.   Yeah, I think there are two different
22  components to that.
23     Q.   Okay.  So, you've told us that one of
24  your duties as a Walgreens pharmacist was to

Page 19

1  determine or try to verify that a prescription was
2  valid, correct?
3      A.   Yep.
4      Q.   As a -- the six or seven years that you
5  were a Walgreens pharmacist, was one of your duties
6  to determine that a prescription for a Schedule II
7  or III drug was medically necessary?
8      MR. BENSINGER:  Objection; calls for a legal
9  conclusion.  You can answer.
10  BY THE WITNESS:
11     A.   I mean, I think it's a little bit hard
12  to say.  I think it's part of the phone call that
13  we called to the physician.  I can't say it's to
14  the same extent that someone would call to verify
15  medical necessity in today's environment.
16  BY MR. GADDY:
17     Q.   Okay.  Let me ask it this way.
18     A.   Sure.
19     Q.   I know this is going back almost 20
20  years.  But do you recall as you sit here today any
21  training or education that was provided to you by
22  Walgreens on -- during your days as a Walgreens
23  pharmacist on how to make any determinations about
24  whether or not a prescription for a controlled drug

Page 20

1  that was given to you was medically necessary?
2      A.   That's something we learned in pharmacy
3  school.  Upon graduation, that's knowledge that we
4  already took into the position.  And then I think
5  within that, you know, obviously as we are working
6  with pharmacists, as a technician, as a graduate
7  intern, those are things that are called out.
8  There wasn't a formal training as you would, you
9  know, maybe incur today.  So, it's a little bit
10  different.
11     Q.   So, no formal training program that you
12  can recall from your time as a Walgreens pharmacist
13  dealing with determining that prescriptions for
14  controlled drugs were medically necessary before
15  you filled those prescriptions, is that accurate?
16     A.   Nothing standardized in that sense,
17  yeah.
18     Q.   During your time as a Walgreens
19  pharmacist, did your stores -- I think you said you
20  worked at several different stores?
21     A.   Um-hmm.
22     Q.   Did your stores receive its Schedule II
23  and III controlled drugs from a Walgreens
24  distribution center?

Page 21

1      A.   Yes.
2      Q.   The entire time that you were a
3  pharmacist?
4      A.   Yes.
5      Q.   Now, are you aware that there's a
6  different set of federal rules and regulations that
7  apply to Walgreens distribution of Schedule II and
8  III controlled drugs as opposed to dispensing?
9      A.   Generally, yes.
10     Q.   Do you have a specific understanding of
11  those rules and regulations --
12     A.   No.
13     Q.   -- related to distribution?
14     A.   No.
15     MR. BENSINGER:  Mr. George, if you would
16  permit Mr. Gaddy to fully complete his question
17  before you begin to answer.  That will assist our
18  Court Reporter and make for a cleaner record,
19  please.
20  BY MR. GADDY:
21     Q.   I'm going to show you what I'm going to
22  mark as Exhibit 2.
23         (WHEREUPON, a certain document was
24          marked as Walgreens-George Exhibit

Page 22

1     No. 2:  Document, U.S. DOJ, DEA,
2     Diversion Control Division, Title
3     21 Code of Fed. Regulations, Part
4     1301; P-GEN-0010.)
5  BY MR. GADDY:
6     Q.  Mr. George, I will represent to you this
7  is a printout from the DEA website.  Do you
8  recognize that logo at the top?
9     A.  Yes.
10    Q.  Okay.  And do you see at the top where
11 it says, "U.S. Department of Justice."
12    MR. GADDY:  This is P-GEN-10, Rod.  P-GEN-10.
13 BY MR. GADDY:
14    Q.  And do you see it says at the top, it's
15 a little bit faded, but it says "Title 21, Code of
16 Federal Regulations" at the top there?
17    A.  Yes, I do.
18    Q.  And below that it says, "Part 1301,
19 Registration of Manufacturers, Distributors and
20 Dispensers of Controlled Substances."
21    Do you see that?
22    A.  Yes.
23    Q.  During the course of your time at
24 Walgreens, have you familiarized yourself with any

Page 23

1  of the federal laws or regulations that apply to
2  dispensing or distributing controlled substances?
3     MR. BENSINGER:  Objection; compound.
4  BY THE WITNESS:
5     A.  Dispensing I would say yes.  Not really
6  around the distribution.
7  BY MR. GADDY:
8     Q.  Okay.  So, that might cut out a lot of
9  things, but let's look at this real quick.
10    A.  Sure.
11    Q.  Just to make sure.  It says 1301.74.  Do
12 you see where I am?
13    A.  Yes.
14    Q.  Under "Security Requirements"?
15    A.  Yes.
16    Q.  And if you go down to Section (b), it
17 says, "The registrant shall design and operate a
18 system to disclose to the registrant suspicious
19 orders of controlled substances.  The registrant
20 shall inform the Field Division Office of the
21 Administration in his area of suspicious orders
22 when discovered by the registrant.  Suspicious
23 orders include orders of unusual size, orders
24 deviating substantially from a normal pattern, and

Page 24

1  orders of unusual frequency."
2     Do you see that?
3     A.  Yeah.
4     Q.  Have you read that before today?
5     A.  During my practice I'm sure, you know,
6  or during schooling, I'm sure I've come across it.
7  But nothing that I can really recall during my
8  work, you know.
9     Q.  At any time while you've been with
10 Walgreens, have any of your job duties, going all
11 the way back to 1998 when you were still in school,
12 ever involved around suspicious orders of
13 controlled substances?
14    A.  Not specifically.
15    MR. BENSINGER:  Objection; vague.
16 BY MR. GADDY:
17    Q.  If I was to ask you about suspicious
18 order monitoring policy, does that mean anything to
19 you?
20    A.  I mean, I have maybe a general
21 understanding of what that would mean or would
22 entail, but that's not something I would apply in
23 my daily practice.
24    Q.  What's your general understanding?

Page 25

1     A.  Probably in reference to what I just
2  read essentially.
3     Q.  Okay.  Would it be fair to say you have
4  a general understanding that Walgreens as a
5  distributor has a duty to be on the lookout for
6  suspicious orders and to report those to the DEA
7  when they find them?
8     A.  If that's the requirement, I would
9  expect that would be the case.
10    Q.  But is that consistent with your general
11 understanding?
12    A.  Yeah, I mean, in reading this statement
13 here, it makes sense to me that that would be the
14 case.
15    Q.  Okay.  You told us that while you were a
16 pharmacist from 2000 to 2006 that your stores
17 received their Schedule II and III controlled drugs
18 from a Walgreens distribution center, correct?
19    A.  That's correct.
20    Q.  And are you aware that at some point in
21 time Walgreens stopped distributing opioids?
22    A.  Yes, I'm aware.
23    Q.  Do you know about when that occurred?
24    A.  Not specifically.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.   Do you know why that occurred?

2    A.   Not specifically.

3    Q.   Okay.  Mr. George, we've taken a lot of
4  other testimony in this case, and I've had the
5  opportunity to learn about some of the internal
6  Walgreens programs, for lack of a better word.  So,
7  I'm just going to ask you generally about them and
8  see if you know anything about them.

9    A.   Sure.

10   Q.   I've heard testimony about a program
11 called an excessive order query that is run at the
12 distribution center.  Do you know anything about
13 that?

14   A.   I do not.

15   Q.   I have heard testimony about line limit
16 reports related to ordering of controlled drugs.
17 Do you know anything about that?

18   A.   I do not.

19   Q.   We have had testimony about the
20 application of the Chemical Handler's Manual to
21 ordering of controlled drugs.  Do you know anything
22 about that?

23   A.   I do not.

24   Q.   We've had testimony about the creation

Page 27

1  or the implementation of tolerance levels or
2  ceilings at particular pharmacies.  Do you know
3  anything about that?

4    A.   Maybe in a general reference, you know,
5  point of view.

6    Q.   Okay.  Tell me generally what your
7  understanding is of those.

8    A.   I've -- in my experience, I may have
9  received or been copied on an e-mail where a store
10 was limited to a certain, you know, ordering
11 threshold, so to speak, but I don't know what --
12 what prompted that or what the outcome of that is
13 or the processes surrounding that.

14   Q.   Have you ever had any involvement in
15 establishing or setting thresholds for any
16 particular stores or pharmacies?

17   A.   No, I have not.

18   Q.   We've also heard some testimony on what
19 I think Walgreens calls internally override
20 requests.  Does that mean anything to you?

21   A.   Not specifically.  Kind of how I
22 described with that e-mail.  I may have been copied
23 on an e-mail that requested an override, you know,
24 but I don't know the outcome or -- and the

Page 28

1  provisions around that procedure.

2    Q.   Why would you be copied on such an
3  e-mail?

4    A.   In my role at Walgreens, it has become
5  common for me to receive e-mails from various field
6  leaders who may have questions and they don't know
7  necessarily where to go and so they may send me an
8  e-mail even though it's not directly within my role
9  or responsibility with the company assuming that
10 maybe I can at least route it to the right person.

11   Q.   Would it be fair to characterize a lot
12 of your or your role at Walgreens as somewhat of a
13 liaison between maybe the pharmacy level and the
14 business side of Walgreens?

15   A.   Yeah, I wouldn't say in a formal sense,
16 but I think it has developed along those lines.  I
17 try to help where I can.

18   Q.   And obviously Walgreens has stores in
19 all 50 states, correct?

20   A.   Yes.

21   Q.   Do you know approximately how many
22 stores Walgreens has?

23   A.   Walgreens, prior to the Rite Aid
24 acquisition, I would say around 8,200.

Page 29

1    Q.   Is Walgreens the largest chain pharmacy
2  in the country?

3    MR. BENSINGER:  Objection; foundation.

4  BY THE WITNESS:

5    A.   I don't know offhand.

6  BY MR. GADDY:

7    Q.   Who would compete with them sizewise?

8    A.   I would think CVS.

9    Q.   Anybody else?

10   A.   Not that I can think of.

11   Q.   Walgreens is headquartered here in
12 Deerfield, Illinois?

13   A.   That's correct.

14   Q.   How long have you been in Deerfield?

15   A.   Since 2006.

16   Q.   I'm going to jump back to your resume.

17   A.   Sure.

18   Q.   It's P-WAG-2313.

19      It looks like in the middle section of
20 your resume there, from '06 to '08 you were a
21 pharmacy systems business analyst.

22      Do you see that?

23   A.   Yes, I do.

24   Q.   Can you explain for me generally what

Page 30

1  your duties were in that position?
2      A.   Yeah, in that position there may be
3  enhancements that were requested or needed to
4  support the business, enhancements to the pharmacy
5  management system, that is.
6          So, my team at the time would
7  essentially serve as almost project managers to
8  help ensure that we've captured the exact needs for
9  that type of enhancement and then also communicated
10 that with the technical team who actually do the
11 programming and essentially making sure that it
12 lands the correct way with the stores.
13     Q.   Okay.  Let me ask it this way.  I've
14 talked to several folks within the Walgreens IT or
15 IS department who were involved in implementing
16 improvements.
17     A.   Um-hmm.
18     Q.   I hear you to be saying that you from
19 the business side are directing those improvements
20 or changes to the system.  Would that be accurate?
21     MR. BENSINGER:  Objection --
22 BY THE WITNESS:
23     A.   Yeah.
24     MR. BENSINGER:  Objection; vague.

Page 31

1  BY THE WITNESS:
2      A.   What I would say is that there would be
3  a request made that would be essentially a project
4  that would be --
5  BY MR. GADDY:
6      Q.   Who makes the request?  Sorry.
7      MR. BENSINGER:  Mr. Gaddy, if you could permit
8  the witness to complete his answer before you
9  interject your next question.  I believe you might
10 have cut off the witness' answer.
11         Mr. George, are you finished?
12     THE WITNESS:  I think I lost my train of
13 thought.
14     MR. BENSINGER:  Would you please read back the
15 question and answer, please.
16         (WHEREUPON, the record was read
17          by the reporter as requested.)
18 BY MR. GADDY:
19     Q.   So, let me essentially ask the question
20 again.
21     A.   Yeah.
22     Q.   Describe for me the process of a request
23 being made and the -- for a project and the
24 implementation of that project.

Page 32

1      A.   There would be various business units
2  that may come across a need that they would, you
3  know, within their group determine that, hey, we do
4  need an enhancement to the pharmacy system to help
5  accomplish that goal.
6          Separately, we may receive employee
7  suggestions which would come from the field and
8  would maybe highlight opportunities to improve, you
9  know, or streamline operations at the pharmacy
10 level so that they can better take care of the
11 patients.
12         Between a couple of those types of
13 situations, projects would essentially be slated or
14 prioritized and then they would be assigned to the
15 various business analysts based upon our capacity.
16     Q.   And you would act as project manager for
17 those projects and direct the computer folks who
18 are actually writing the code or writing the
19 programs?
20     MR. BENSINGER:  Objection; vague.
21 BY THE WITNESS:
22     A.   What we would do is we would make sure
23 that we have a good understanding of what the
24 business need is.  We would help ensure that the

Page 33

1  requirements do not create any unintended
2  consequences from almost like a design standpoint,
3  and then we would make sure that the documentation
4  that the programmers would need would be able to be
5  clear enough for them to carry forth the project.
6      Q.   During your time in that position did
7  you undertake any projects related to the
8  distribution of opioids, Schedule II or III drugs,
9  from Walgreens distribution centers to Walgreens
10 pharmacies?
11     A.   I did not.
12     Q.   During your time in that position did
13 you undertake any projects related to the
14 prevention of diversion of controlled substances?
15     MR. BENSINGER:  Objection; vague.
16 BY THE WITNESS:
17     A.   I don't know what diversion would mean
18 in this example.
19 BY MR. GADDY:
20     Q.   Well, what does diversion mean to you?
21     A.   For me diversion is -- relates to
22 probably employee theft or loss of controlled
23 substances.  That would be the primary.
24     Q.   What do you mean by "loss of controlled

Page 34

1 substances"?
2    A.   Today maybe employee pilferage.  That
3 could be an example.
4    Q.   Do you have any appreciation for a
5 definition of diversion that includes drugs going
6 to people that shouldn't get them outside of the
7 employee theft concept?
8    A.   In the capacity of a fraudulent
9 prescription, I think that would make sense.
10   Q.   Sure.  Let me ask you in that context.
11        You're familiar with the concept of a
12 fraudulent prescription, right?
13   A.   A prescription that was not actually
14 written by a prescriber.
15   Q.   Correct.
16   A.   Yeah.
17   Q.   I mean, that happens, right?
18   A.   Yes.
19   Q.   Okay.  And would you agree that if --
20 that if there was a fraudulent prescription and
21 that prescription is filled by a pharmacist,
22 that -- would that fall within your definition of
23 diversion, pills going to somebody that wasn't
24 supposed to get them?

Page 35

1    MR. BENSINGER:  Objection to form.
2 BY THE WITNESS:
3    A.   I mean, I think -- I'm struggling with
4 people who are not supposed to -- I think you
5 mentioned something along the lines of people who
6 are not supposed to get them.
7 BY MR. GADDY:
8    Q.   Well, then let me try to make it easy
9 for you.  Forget that phrase.
10        An individual who has a fraudulent
11 prescription, presents it at a pharmacy, has that
12 prescription filled.  Does that fall within your
13 definition or your understanding of diversion?
14   A.   I would say that when someone presents a
15 fraudulent prescription, they are looking to divert
16 controlled substance medications.
17   Q.   Okay.  Kind of in a similar vein
18 concept -- are you familiar with the concept of
19 doctor shopping?
20   A.   Yes.
21   Q.   Would individuals who are engaged in
22 doctor shopping and have those -- attempting to
23 have those prescriptions filled at pharmacies,
24 would you agree that those are -- also fail under

Page 36

1 your understanding or definition of diversion?
2    MR. BENSINGER:  Objection; vague.
3 BY THE WITNESS:
4    A.   I think that's a little bit not as
5 clear-cut.  You might have a patient who sees
6 multiple doctors, one being a general practitioner,
7 one being a specialist, and independently they may
8 be prescribing controlled substances.
9 BY MR. GADDY:
10   Q.   Well, is what you just described, is
11 that your definition of doctor shopping?
12   MR. BENSINGER:  Objection; vague.
13 BY THE WITNESS:
14   A.   In the -- my definition of doctor
15 shopping, someone is intentionally seeking
16 prescriptions from multiple doctors, but maybe not
17 for -- I think it's still tough for me to --
18 because there is also people who are doctor
19 shopping but may not really understand, you know,
20 the implication of the situation they're in.
21 BY MR. GADDY:
22   Q.   Would the theft of opioid pills from a
23 person's medicine cabinet, would that fall under
24 your definition of diversion?

Page 37

1    A.   Yes.
2    MR. BENSINGER:  Objection; vague.
3 BY MR. GADDY:
4    Q.   So --
5    MR. BENSINGER:  Can I have that question and
6 answer read back, please.
7        (WHEREUPON, the record was read
8         by the reporter as requested.)
9 BY MR. GADDY:
10   Q.   So, with that understanding of or with
11 that question and answer series that we just had
12 kind of as a backdrop for this next question, did
13 any of the specific projects that you worked on as
14 a business analyst from '06 to '08 relate to the
15 prevention of diversion of controlled substances?
16   A.   None of the projects I worked on had to
17 do with -- actually, I'm trying to recall again.
18        I'm trying to think during that time if
19 for certain if there were.  I can't say
20 conclusively there were none.
21   Q.   You don't remember any as you sit here
22 today?
23   A.   Not around the dispensing of controlled
24 substances.

Page 38

1    Q.   Well, my question was related to the
2  prevention of diversion of controlled substances.
3    A.   Now, I did work on projects that relates
4  to the reporting of controlled substance data to
5  the state prescription monitoring programs.
6    Q.   Okay.
7    A.   Which I think are used to help prevent
8  diversion.
9    Q.   Okay.  We'll get into that in a minute.
10  Anything else?
11    A.   Nothing I can remember at this time.
12    Q.   Okay.  Are you aware of anybody who did
13  work on -- in the same role that you had, kind of
14  the project manager role, anybody who did work on
15  programs related to the distribution of opioids
16  from Walgreens distribution centers to Walgreens
17  pharmacies?
18    A.   It would be hard for me to speak to
19  that.  I generally just -- I'm aware of the project
20  I'm assigned.
21    Q.   Okay.  Did you work on any projects
22  related to the evaluation of dispensing patterns of
23  controlled substances in your time in that role?
24    A.   I did not.

Page 39

1    Q.   And any projects related to the
2  identification of suspicious orders of controlled
3  substances during your time in that role?
4    A.   No, I did not.
5    Q.   You testified earlier that while you
6  might have been aware that there were rules and
7  regulations regarding Walgreens' role as a
8  distributor, that that wasn't an area of expertise
9  for you.  Would that be fair?
10    A.   That's correct.
11    Q.   Okay.  Do you know, if I was to look for
12  that person or that department or that division,
13  who would you suggest that I talk to?
14    MR. BENSINGER:  Objection; vague, foundation.
15  BY THE WITNESS:
16    A.   You're asking about -- could you please
17  repeat the question again.
18  BY MR. GADDY:
19    Q.   Sure.  Who at Walgreens does have a
20  knowledge and understanding of Walgreens'
21  obligations under the federal rules and regulations
22  as it relates to Walgreens' role as a distributor
23  of opioids?
24    MR. BENSINGER:  Objection; foundation.

Page 40

1  BY THE WITNESS:
2    A.   I mean, I think -- I mean, at this time
3  we don't have distribution centers, so it may be
4  hard for me to provide any names in that example.
5  BY MR. GADDY:
6    Q.   What about historically, when Walgreens
7  did have distribution centers?
8    A.   I didn't really interact with anyone
9  directly at the distribution centers.  I would
10  assume that people in the distribution centers
11  would have that knowledge.  People closer to me who
12  would interact with them would probably be people
13  with the Rx inventory teams that would -- I don't
14  know to what degree that they, you know, would be
15  required to have that knowledge.
16    Q.   Okay.  Are the Rx inventory team, is
17  that different from the Rx Integrity team?
18    A.   Yes.
19    Q.   Is the Rx inventory team a division or a
20  group that's still in place today?
21    A.   Yes.
22    Q.   Is that a division or group that was in
23  place, looking back, while Walgreens was
24  distributing controlled substances?

Page 41

1    A.   Yes.
2    Q.   Is that group headquartered here in
3  Deerfield also?
4    A.   Yes.
5    Q.   Tell me some of the people from that
6  group.
7    A.   Barb Martin and Denman Murray.
8    Q.   Anybody else?
9    A.   Those are the two primary names that
10  come to mind.
11    Q.   If we move up on your resume, it looks
12  like you then spent the next, and I guess you told
13  us this new cutoff date, you spent the next seven
14  or eight years working as a manager of pharmacy
15  regulatory systems, is that correct?
16    A.   Yes.
17    Q.   And underneath there you included some
18  bullet points that I guess lay out some of the
19  duties that you had in that role.  Would that be
20  fair?
21    A.   Yes.
22    Q.   The first bullet point, it says you
23  "proactively work with Government and Community
24  Relations."

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    Do you see that?
2    A.   Yes, I do.
3    Q.   You're not a lobbyist, are you?
4    A.   I am not.
5    Q.   Do you work with Walgreens' lobbyists
6    from time to time in that role?
7        MR. BENSINGER:  Objection; vague.
8    BY THE WITNESS:
9    A.   There may be -- I mean, it was not
10   any -- I may receive questions through our
11   government relations team that was related to them
12   supporting lobbyists.
13   BY MR. GADDY:
14   Q.   What would be the purpose of that?
15       MR. BENSINGER:  Objection; foundation.
16   BY THE WITNESS:
17   A.   I wouldn't know always the intent.  It
18   was more to provide more insight or clarity as to,
19   you know, really around prescription monitoring
20   programs and how they operate.
21   BY MR. GADDY:
22   Q.   From time to time would you give or
23   provide information to the government relations
24   folks or the lobbyists on state laws or state

Page 43

1    regulations that were being proposed related to
2    pharmacies?
3    A.   Can you repeat the question, please.
4    Q.   Sure.  From time to time would you give
5    or provide information to the government relations
6    folks or the lobbyists within Walgreens on state
7    laws or state regulations that were being proposed
8    and how they would impact the Walgreens pharmacies?
9        MR. BENSINGER:  Objection; compound.
10   BY THE WITNESS:
11   A.   In my role, what would happen is we
12   would see proposed rules, and in this specific
13   example, mostly around prescription drug monitoring
14   programs and how the state would like to change the
15   reporting requirements; and I would provide
16   comments to the appropriate, whether it be
17   government relations team member as to whether or
18   not those proposed rules are consistent with how
19   those programs work in other states.
20   BY MR. GADDY:
21   Q.   Okay.  Would the purpose of you
22   providing information to these government relations
23   team members be to allow them to lobby either for
24   or against different proposals that are being made?

Page 44

1    A.   I wouldn't say "lobby" is the word I
2    would use.  Again, when there are proposed rules,
3    we try to work with the state to help make sure
4    they understand how those rules could impact
5    pharmacies and, yes, in some cases positively or
6    negatively, especially if it's not consistent with
7    how other states have been operating them.
8    Q.   Did you also work, in that role, also
9    work with trade organizations or trade
10   associations?
11   A.   National Association of Chain Drug
12   Stores is an organization that we also provide
13   those comments to.
14   Q.   Were there any other trade organizations
15   or associations that you would liaison with outside
16   of NACDS?
17   A.   None that come to mind at this time.
18   Q.   Did you serve on any boards or
19   committees of NACDS?
20   A.   I did not.
21   Q.   Are you aware of anybody within
22   Walgreens who did?
23   A.   Can you repeat the question again.
24   Q.   Sure.  Are you aware of anybody within

Page 45

1    Walgreens who served on any boards or committees of
2    NACDS?
3    A.   I understand that there may be a policy
4    committee that Rick Gates was on, and I believe
5    there is representation at a higher level, being
6    Association of Chain Drug Stores, that there would
7    be representatives at a higher level but I don't
8    know all the logistics of the structure, so to
9    speak.
10   Q.   Does NACDS have any group or committee
11   that's related to the state prescription drug
12   monitoring programs?
13       MR. BENSINGER:  Objection; foundation.
14   BY THE WITNESS:
15   A.   I don't know their whole structure, so
16   to speak, what type of -- I mean, it's kind of
17   outside my general knowledge base.
18   BY MR. GADDY:
19   Q.   So, you don't know if they had -- if
20   they had a committee or a group that was related to
21   state PDMPs?
22   A.   I don't know that.
23   Q.   Okay.  If you continue reading in that
24   first bullet point, you say that you "proactively

Page 46

1 work with Government and Community Relations,
2 various national pharmacy organizations."
3     Is that NACDS is that you're referring
4 to there?
5     A.   Yes.
6     Q.   "And state regulators to develop
7 programs that do not negatively impact pharmacies."
8     Do you see that?
9     A.   Yes.
10     Q.   Would it be fair to characterize that as
11 your -- as kind of the overarching goal of what you
12 were doing when you were working with government
13 relations folks or national pharmacy organizations
14 like NACDS?
15     A.   I can't say that, you know, it's the
16 only thing that comes up.
17     Q.   Are you finished?
18     A.   I am.  I finished, yeah.
19     Q.   Okay.  Sorry.
20     So, I think you mentioned the -- that
21 one area that you would give information or
22 feedback to the lobbyists or the trade associations
23 on was prescription drug monitoring programs,
24 correct?

Page 47

1     A.   That is correct.
2     Q.   Are there any other areas that you would
3 give input or feedback to those people on to make
4 sure that there aren't programs coming out that are
5 going to negatively impact Walgreens?
6     A.   I mean, if there were controlled
7 substance regulations around dispensing that were
8 not consistent with other state or federal laws,
9 those are items that we would call out.
10     Q.   Okay.  I'm going to show you what I have
11 marked as Exhibit No. 3.
12     (WHEREUPON, a certain document was
13     marked as Walgreens-George Exhibit
14     No. 3:  5/16/14 e-mail string;
15     WAGMDL00333310 - 00333313.)
16 BY MR. GADDY:
17     Q.   This is P-WAG-2209 we've marked as
18 Exhibit No. 3.
19     If you look at the first page at the
20 top, do you recognize this as an e-mail chain that
21 you're involved in?
22     A.   Yes.
23     Q.   And if you look at -- if you go to the
24 second page, at the very bottom of the page, do you

Page 48

1 see the original e-mail here is in May of 2014 from
2 you?
3     Do you see that?
4     A.   Yes.
5     Q.   And you're writing to, it looks like, an
6 individual named Darren Kennedy.  Who is that?
7     A.   Darren Kennedy, according to this
8 e-mail, was an operations manager at our facility
9 in Tempe, Arizona.
10     Q.   Do you see the subject line for this
11 e-mail chain is "Potential mail order rule for
12 controlled drugs in Ohio"?
13     Do you see that?
14     A.   I do see that.
15     Q.   And if you go down to your first e-mail,
16 you write, "Darren," and you got to flip the page,
17 and you say, "How challenging would this be?"  And
18 then it looks like you've maybe pasted a proposed
19 amendment or regulation into the body of the
20 e-mail.
21     Do you see that?
22     A.   I do see that.
23     Q.   And what it says is "For mail order
24 prescriptions of drugs of concern, the terminal

Page 49

1 distributor of dangerous drugs shall comply with
2 the following:  As part of the initial registration
3 process of an individual in a mail order
4 prescription drug plan and prior to the drug of
5 concern being dispensed, the terminal distributor
6 of dangerous drugs shall obtain all identification
7 information, including the full name,
8 identification number, identification type,
9 signature, and a copy of a form on the
10 identification."
11     Do you see that?
12     A.   I do.
13     Q.   And is this a law or regulation that was
14 being proposed in the State of Ohio about requiring
15 proof of identification prior to dispensing
16 controlled substances through the mail?
17     A.   Based upon the subject, that's what I
18 would expect it to involve.
19     Q.   Okay.  And if you look at the next
20 e-mail up in the chain, Darren -- do you see where
21 Darren responds?
22     A.   I'm sorry.  Which page are we on now?
23     Q.   It's the second page.
24     A.   Is that the one that's marked 311 at the

Page 50

1 bottom?

2    Q.   Correct.  And about three-quarters of

3 the way down the page we see Darren's response to

4 you on May 15, 2014 at 5:03.  Do you see where I

5 am?

6    A.   Yes.

7    Q.   Okay.  And his response is, "Terminal.

8 I'll discuss with the group but first thought is

9 very costly and would have to redo all" -- is PG

10 product groups or do you know?

11    A.   I actually don't know what that stands

12 for.

13    Q.   "First thought is very costly and would

14 have to redo all PGs as turnaround time would be

15 greatly impacted."

16       Is that what he wrote back?

17    A.   That is correct.

18    Q.   And would this exchange here be an

19 example of where you're in your position serving as

20 a liaison between the business unit and other

21 business groups or departments to collect

22 information about the potential change in the law?

23    MR. BENSINGER:  Objection; vague.

24 BY THE WITNESS:

Page 51

1    A.   In this example, I shared with Darren

2 something that's not consistent with other states

3 to understand if this would be a challenge for

4 their location to comply with.

5    Q.   Okay.  Well, what was being proposed was

6 that in order to obtain controlled substances by

7 mail in Ohio that the patient would have to show

8 identification, correct?

9    MR. BENSINGER:  Objection; foundation.

10 BY THE WITNESS:

11    A.   I mean, looking at the -- the subject

12 heading, I don't recall exactly.  But that's -- it

13 appears that that's what's being proposed is that

14 as part of initial registration, the individual

15 must provide identification information to the mail

16 order pharmacy.

17 BY MR. GADDY:

18    Q.   And why would -- well, let me ask it

19 this way.

20       Would you agree it's Walgreens' policy

21 to ask for identification if a person comes into

22 their store to have a controlled substance

23 prescription filled?

24    A.   Can you repeat the question again,

Page 52

1 please.

2    Q.   Sure.  Would you agree that it's current

3 Walgreens policy to request identification if a

4 patient comes into a store to have a controlled

5 substance prescription filled?

6    A.   I don't know if that's true in all

7 cases.  I think it's -- depends on what the state

8 laws are.

9    Q.   Okay.  Is that a recommended best

10 practice of Walgreens?

11    MR. BENSINGER:  Objection; foundation.

12 BY THE WITNESS:

13    A.   I believe there is a policy around

14 making sure that if you do not know the patient,

15 that you should obtain or request identification

16 information.

17 BY MR. GADDY:

18    Q.   And why would that be a policy?

19    A.   I don't know.

20    MR. BENSINGER:  Objection; foundation.

21 BY MR. GADDY:

22    Q.   Okay.  So, if we go back to the e-mail,

23 Darren says he'll discuss but the first thought is

24 very costly.  And do you see above that you have

Page 53

1 your response?  Same page.

2    A.   Gotcha.

3    Q.   Immediately above it.

4    A.   Yep.

5    Q.   You write, "That is my thought as well,

6 and we are trying to argue against it.  I just have

7 to put it in a way for the legislators to

8 understand."

9       Do you see that?

10    A.   I do.

11    Q.   And, again, is this exchange that we're

12 seeing here consistent with your role as a liaison

13 between the different states and the business units

14 to determine how potential laws or regulations

15 would impact the pharmacies?

16    A.   It is an example of me obtaining

17 feedback on a proposed rule.

18    Q.   And your comment in that e-mail that we

19 just looked at where you say, "I just have to put

20 it in a way for the legislators to understand," is

21 that consistent with you gathering information so

22 that it could be communicated to the rule makers so

23 that you can influence how -- whether or not a rule

24 is adopted or how it's adopted?

Page 54

1    A.   We try to educate the legislators if
2  there is a potential impact that they are not aware
3  of.  In this example I can also understand that
4  there could be a patient access issue.
5    Q.   Okay.
6    A.   And, so, we want patients to also not
7  completely be, you know -- lose access to
8  medication just because of a requirement and trying
9  to find that balance between patient access and
10 whatever the proposed rule is as well.  Really
11 trying to educate them on the pros and cons.
12   Q.   When you raised the issue with Darren in
13 the e-mail that we looked at just a moment ago, did
14 he raise the issue of patient access?
15   MR. BENSINGER:  Objection; vague.
16 BY THE WITNESS:
17   A.   He doesn't appear to be, but I would be
18 curious to know what he meant by "turnaround time
19 would be greatly impacted."
20 BY MR. GADDY:
21   Q.   What he says is his first thought is it
22 would be very costly, correct?
23   A.   That's correct.
24   Q.   When you respond you say, "That is my

Page 55

1  thought as well and we are trying to argue against
2  it."  Correct?
3    A.   That's correct.
4    Q.   And if you go to the next page, it looks
5  like Darren responds and lists some bullet points
6  with ways to argue against this proposed law.
7        Do you see that?
8    A.   I'm just reading it.  I'm sorry.
9    Q.   That's fine.  Take your time.
10   A.   Yeah, it seems that they called out some
11 bullet points that would also impact patients with
12 this law.
13   Q.   So, for example, on the first one he
14 says, "Many patients are seniors and may not have
15 technology skills or equipment to send a copy of
16 their license."
17        Correct?
18   A.   I read that.
19   Q.   Second one, he says, "Patients may not
20 be or would be unaware of legislation change and
21 this would cause delay of therapy."
22        Do you see that?
23   A.   I do.
24   Q.   Okay.  And then do you see your ultimate

Page 56

1  response up at the top of the page where you write
2  back and you say, "This is great information"?
3    A.   Yes.
4    Q.   Fair to say that you were going to use
5  this information in your attempts to make sure
6  that this law did not get passed in Ohio?
7    A.   I can't say that's fair.  I think what I
8  tried to do is obtain all the information to
9  educate those folks involved, stakeholders, to
10 understand the impact.
11   Q.   Okay.  And what we saw from Darren is
12 that the impact to Walgreens is that this was going
13 to be costly, correct?
14   A.   I did not see that.  I saw he made a
15 mention to costly, but then I also saw him talk
16 about patients and how they may be impacted and
17 there may be a delay in therapy.
18   Q.   Okay.  Let's look at it just to make
19 sure that we're on the same page.
20   A.   Okay.
21   Q.   Second page, three-fourths of the way
22 down, in Darren's immediate response to you asking
23 him about the proposed law, and I think your
24 question was, "How challenging would this be?"  And

Page 57

1  his response is, "Terminal."  Correct?
2        And then he says, "I'll discuss with the
3  group but first thought is very costly."
4        Do you see that?
5    A.   I do see that.
6    Q.   That was the first thing, that was the
7  first issue that Darren raised, correct?
8    A.   That's correct.
9    Q.   Okay.  Let's jump back to your resume.
10   MR. BENSINGER:  Mr. Gaddy, we have been going
11 for about an hour.
12   MR. GADDY:  Yeah, no problem.
13   MR. BENSINGER:  Would it be convenient to take
14 our first break now that you're finished with
15 Exhibit 3?
16   MR. GADDY:  Absolutely.
17   MR. BENSINGER:  Can we go off the record just
18 for a short break?
19   MR. GADDY:  Of course.
20   MR. BENSINGER:  Thank you.
21   THE VIDEOGRAPHER:  We are off the record at
22 10:00 a.m.
23        (WHEREUPON, a recess was had
24          from 10:00 to 10:11 a.m.)

Page 58

1    THE VIDEOGRAPHER: We are back on the record
2  at 10:11 a.m.
3  BY MR. GADDY:
4    Q.   Mr. George, I want to go back to your
5  resume if you still have that in front of you.
6        The second bullet point under the
7  "Manager, Pharmacy Regulatory Systems" says, "Serve
8  as the subject matter expert on pharmacy regulatory
9  systems both" -- "for both internal Walgreens
10  business groups and external regulatory agencies
11  and associations."
12       Do you see that?
13    A.   I do.
14    Q.   What I want to make sure I have an
15  understanding of is exactly what you are a subject
16  matter expert in.
17    A.   It's a good question. I think that the
18  best way for me to describe it is given my previous
19  experience working on the pharmacy systems in
20  itself, that I can understand how difficult certain
21  changes would be to the system if need be and
22  also -- that's probably the best way to describe
23  being a subject matter expert.
24    Q.   Okay. Let me ask you a couple specific

Page 59

1  questions about that.
2        Are you -- do you consider yourself a
3  subject matter expert when it comes to Walgreens'
4  distribution of controlled substances to its own
5  stores?
6    A.   I do not.
7    Q.   Do you consider yourself a subject
8  matter expert as it relates to federal rules and
9  regulations related to dispensing of controlled
10  substances?
11    A.   Can you repeat that again, please.
12    Q.   Sure. Do you consider yourself a
13  subject matter expert as it relates to the federal
14  rules and regulations related to dispensing of
15  controlled substances?
16    A.   I have definitely more knowledge in that
17  area than the distributor side of things.
18    Q.   Okay. But when you call yourself a
19  subject matter expert in your resume, is that what
20  you're talking about?
21    MR. BENSINGER: Objection; vague.
22  BY THE WITNESS:
23    A.   I think it's more within the context of
24  the system that we have in place.

Page 60

1  BY MR. GADDY:
2    Q.   What do you mean by "the system"?
3    A.   The pharmacy management system. So, in
4  Walgreens example is IntercomPlus specific.
5    Q.   Okay. IntercomPlus is a software that
6  Walgreens uses?
7    A.   That's correct.
8    Q.   Okay. So, when you're calling yourself
9  a subject matter expert on the pharmacy regulatory
10  system, you are specifically talking about the
11  IntercomPlus system?
12    A.   That is correct.
13    Q.   Okay. That's helpful. Thank you.
14       You say this is "for both internal
15  Walgreens business groups and external regulatory
16  agencies and associations."
17       What do you mean by "external regulatory
18  agencies and associations"?
19    A.   Similar to when there may be proposed
20  rules, some agencies may reach out to me in advance
21  as a stakeholder essentially to understand what
22  types of complications that type of rule may have.
23    Q.   How any proposed rule would jibe with
24  Walgreens' software?

Page 61

1    A.   That's correct.
2    Q.   Okay. The next bullet point, it says,
3  "Oversee Walgreens' controlled substance reporting
4  to 47 different state agencies or Boards of
5  Pharmacy."
6       Do you see that?
7    A.   Yes.
8    Q.   Is that talking about PDMPs?
9    A.   That is correct.
10    Q.   Are you familiar with ARCOS?
11    A.   Barely.
12    Q.   Okay. What do you mean by "barely"?
13    A.   Well, the concept of I think there is
14  reporting to the DEA of distribution essentially of
15  controlled substances from a distributor to a
16  pharmacy and that data extract. I think that's
17  pretty much what I know.
18    Q.   During any of your time at Walgreens
19  have you had any involvement in the reporting of
20  information to ARCOS?
21    A.   Not to ARCOS. I believe Ohio did
22  implement something similar. And, so, I think I
23  was involved a little bit in helping make sure we
24  got that covered.

Page 62

1    Q.    So, all of the controlled substance
2  reporting that you were involved in deals with
3  states as opposed to federal?
4    A.    Correct.
5    Q.    What three states are not covered?
6    A.    At this -- at that moment in time,
7  Missouri for sure was one of the states that was
8  not covered.  I can't recall the other states at
9  that time that were -- did not have an active
10 program.
11   Q.    You mentioned Ohio.  Ohio has a PDMP?
12   A.    That is correct.
13   Q.    Do you remember approximately when that
14 was initiated?
15   A.    It's hard for me to say.
16   Q.    Do you know the name of the Ohio system?
17   A.    I think it's referred to as OARRS.
18   Q.    Is there any particular body or agency
19 within Ohio that is charged with monitoring or
20 overseeing the OARRS program?
21   MR. BENSINGER:  Objection; foundation.
22 BY THE WITNESS:
23   A.    I understand that the Board of Pharmacy
24 administers the program and would determine if some

Page 63

1  pharmacy is compliant or not.
2  BY MR. GADDY:
3    Q.    What information is reported in Ohio?
4    MR. BENSINGER:  Objection; foundation.
5  BY THE WITNESS:
6    A.    Ohio's prescription drug monitoring
7  program requires a number of data elements.  A lot
8  of them are consistent with what you would normally
9  find on a prescription essentially, for example,
10 patient name, address, drug information, quantity,
11 days supply.
12 BY MR. GADDY:
13   Q.    As it relates specifically to the Ohio
14 reporting system of OARRS, do you recall whether or
15 not there was any information that Walgreens or any
16 other pharmacy was required to report that
17 Walgreens didn't already have?  Does that make
18 sense?
19   MR. BENSINGER:  Objection; foundation.
20 BY THE WITNESS:
21   A.    I think there has been maybe a couple of
22 instances where Ohio wanted to -- wanted pharmacies
23 to report something that was not generally provided
24 on a prescription, if that makes any sense.

Page 64

1  BY MR. GADDY:
2    Q.    Sure.  Can you give me an example of
3  that?
4    A.    I think more recently ICD-10 codes is
5  something that they most recently adopted.
6    Q.    When you say "most recently," what's the
7  time period for that?
8    A.    I don't know the exact date, but let's
9  say in the last couple years.
10   Q.    Before or after Walgreens stopped
11 distributing?
12   A.    After.
13   Q.    And what's an ICD-10 code?
14   A.    It's a diagnosis code that I think is
15 usually used for billing purposes.
16   Q.    And that's information that Walgreens
17 did not traditionally collect or keep?
18   A.    It's an item that's not generally
19 provided by the doctor on all prescriptions.  So,
20 therefore, if it's not available on the
21 prescription, Walgreens wouldn't necessarily have
22 access to it, for example.
23   Q.    Anything else that would fall under that
24 same category that you can think of?

Page 65

1    A.    I think -- let me think what else.
2      That might be the only thing I remember
3  right now.  That's more recent I think, so that's
4  why I probably remember it.
5    Q.    What about in West Virginia, do they
6  have a reporting system there?
7    A.    They do.
8    Q.    Do you know what that one's called?
9    A.    I think the acronym probably starts with
10 a C, but I can't remember the whole.
11   Q.    Do you know when that was established?
12   A.    I don't know offhand.
13   Q.    And do you know what information was
14 reported there?
15   A.    In general a lot of the prescription
16 monitoring programs require similar data elements.
17 The one thing that's probably unique about West
18 Virginia is they require identification information
19 of patients when they're picking up the controlled
20 substance prescription.
21   Q.    Let me ask you about that.  I think you
22 already told me Walgreens operates in all 50
23 states, correct?
24   A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Q.   And would it be fair to say that there
2  are -- that different states have different
3  requirements?
4    A.   Different states can have different
5  requirements.
6    Q.   Okay.  What is Walgreens' position when
7  a certain state such as let's use this West
8  Virginia example might require a measure that's
9  more secure or more protective such as requiring
10 identification?
11       Does Walgreens' policy demand that that
12 measure only be followed within West Virginia or
13 does Walgreens roll that more protective policy out
14 across the country?
15   MR. BENSINGER:  Objection; foundation, calls
16 for speculation.
17 BY THE WITNESS:
18   A.   Yeah, I think there is a lot there
19 that -- trying to go through here, right.
20       The -- I think there is a couple of
21 things that come to mind, and I'm hoping that this
22 information could help answer the question.
23       So, one I think, Walgreens is trying to
24 balance access to medications and compliance with

Page 67

1  state rules and regulations.  And, so, obviously
2  they want to make sure the patients have access but
3  also want to follow state laws and federal laws.
4        So, in the example of West Virginia that
5  requires identification on every single
6  prescription that's picked up, that is not
7  something that is rolled out in all states.  That
8  one example would be something that's more
9  state-specific because there could be a burden on
10 patients who may not have an ID on them at the time
11 they're picking up the prescription.
12       So, you know, it does become a little
13 challenging.
14 BY MR. GADDY:
15   Q.   Okay.  Walgreens still dispenses
16 controlled substances in West Virginia, correct?
17   A.   That is correct.
18   Q.   The next bullet point says, "Analyze and
19 coordinate system enhancements required for
20 Walgreens to maintain compliance with pharmacy
21 state rules and regulations."
22       Is that kind of similar to what you have
23 told us about as far as directing improvements to
24 the software?

Page 68

1    A.   Yeah, I mean, I think what in that
2  example, you know, if a state does require
3  something that we don't currently -- Walgreens does
4  not currently have available, you know, to turn on,
5  you know, overnight, for example, and that there
6  would be software improvements necessary, then I
7  would work with essentially, for example, the
8  business analyst, which was a previous role of
9  mine, to make sure they understand what the
10 requirements are so that they can make sure they
11 document and communicate to the computer
12 programmers.
13       We'd also work with legal as them being
14 the true experts as to what, you know, is legally
15 required in a given sense and make sure they
16 validate that we're meeting the rules and regs of
17 that state.
18   Q.   Is it common when you are working with
19 compliance with regulations for you to have
20 interactions with the legal department?
21   A.   Yes.
22   Q.   And are folks in the legal department
23 involved in the compliance function at Walgreens?
24   A.   When there are compliance questions, we

Page 69

1  will often interact with our legal attorneys to
2  help them validate what the true requirement is.
3    Q.   Next bullet point says, "Monitor
4  compliance and identify potential risks."
5        What compliance are you talking about?
6  Is that state, state requirements?
7    A.   Yeah, state requirements is generally
8  where I operated.  So, that would be what I would
9  expect that to refer to.
10   Q.   I show you what I will mark as
11 Exhibit No. 4.
12       (WHEREUPON, a certain document was
13        marked as Walgreens-George Exhibit
14        No. 4: 7/12/12 e-mail;
15        WAGMDL00662135.)
16 BY MR. GADDY:
17   Q.   Do you recognize this as being an e-mail
18 from you?
19   A.   I do.
20   Q.   And it's from July of 2012 and it looks
21 like you write, "Hi Mike, Can you please forward
22 the following bio to Marcy for consideration as a
23 representative on the iSTOP work group?"
24       Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    A.   Yes.
2    Q.   What's the iSTOP work group?
3    A.   I forgot what the acronym exactly stands
4  for, but it was a New York State program.  I
5  believe New York was looking to find out ways to
6  address some of their concerns around prescription
7  drug abuse.
8    Q.   Then if you look down in the bio, at the
9  bottom, it says, "Tomson George is a manager of
10 pharmacy regulatory systems at Walgreen Company or
11 Corporation.  He currently manages the reporting of
12 controlled substance drug information to the 43
13 state PDMPs and helps coordinate the tracking
14 of" -- that's pseudoephedrine?
15   A.   That's correct.
16   Q.   -- "at Walgreens pharmacies."
17        Is that description consistent with what
18 you were doing in your role as the manager of
19 pharmacy regulatory systems?
20   A.   Yeah, those were definitely a couple
21 things I was involved with for sure.
22   Q.   So, back in the time of this e-mail,
23 July 2012, you didn't have any duties that
24 encompassed the distribution of opioids from

Page 71

1  Walgreens distribution centers to Walgreens
2  pharmacies?
3    A.   That is correct.
4    Q.   Okay.  Are you aware that in 2013
5  Walgreens paid what at the time was the largest
6  ever settlement to the DEA based on allegations
7  that Walgreens had violated the Controlled
8  Substance Act with regard to its distribution and
9  dispensing of opioids?
10   A.   I'm not aware of all the particulars.
11 I'm aware there was some settlement agreement.
12   Q.   Tell me what you know about it.
13   A.   Pretty much what's available in public
14 headlines, along the lines of $80 million I
15 believe.  That's pretty much all I know.
16   Q.   How did you gain that understanding or
17 that knowledge of the settlement?
18   MR. BENSINGER:  Mr. George, I admonish you, to
19 the extent that your answer might reveal the
20 substance of attorney-client communications, to
21 confer with me before you answer.  Otherwise, you
22 may go ahead and answer the question.
23 BY THE WITNESS:
24   A.   I don't recall whether I learned of it

Page 72

1  in a more of a public domain first or as part of my
2  work.  That's pretty much I think all I can comment
3  on that.
4  BY MR. GADDY:
5    Q.   Okay.  Explain to me the context in
6  which you learned about it through work.
7    A.   I may have been sitting at my desk and
8  seen -- I mean, I don't believe anyone informed me
9  directly, if that's what you're asking, that
10 Walgreens had some sort of settlement.
11   Q.   Any communication whatsoever from a
12 Walgreens business about, to you or to Walgreens
13 employees, about the settlement?
14   A.   Not that I can remember.
15   Q.   Did anybody at Walgreens ever show you
16 the settlement agreement?
17   A.   No.
18   Q.   Have you ever seen the settlement
19 agreement?
20   A.   No.
21   Q.   Are you familiar with what an Order to
22 Show Cause is?
23   A.   Not specifically.
24   Q.   Has anybody -- do you recall anybody at

Page 73

1  Walgreens ever showing you an Order to Show Cause
2  that was issued to the -- to Walgreens?
3    A.   No.
4    Q.   Do you have a general understanding of
5  how the process of a DEA investigation would work
6  into a company such as Walgreens?
7    A.   I do not.
8    Q.   Do you have an understanding that
9  subpoenas were issued, that Walgreens had to -- by
10 the DEA, that Walgreens had to turn over documents
11 that included policies, e-mails and that after the
12 DEA had an opportunity to review that material,
13 that they issued an Order to Show Cause to
14 Walgreens?  Do you have an understanding of that
15 general process?
16   A.   Only as you explained it right now.
17   Q.   I will show you what we'll mark as
18 Exhibit No. 5.
19        (WHEREUPON, a certain document was
20        marked as Walgreens-George Exhibit
21        No. 5:  Binder of documents,
22        "Settlement and Memorandum of
23        Agreement" with various documents,
24        P-WAG-0001.)

Page 74

BY MR. GADDY:

Q. And do you see at the very first page of Exhibit No. 5 up in the top middle it says, "Settlement and Memorandum of Agreement"?

A. I do.

Q. You've never seen this before?

A. I have not.

Q. Nobody at Walgreens ever showed this to you?

MR. BENSINGER: Asked and answered.

BY THE WITNESS:

A. Not that I'm aware of, no.

BY MR. GADDY:

Q. If you look at the very bottom, middle of the page it says 1 of 349?

A. Yes.

Q. Okay. I'm going to use that to direct you to page numbers, just so you know where I am.

A. Thank you.

Q. If you don't mind, go to page 28 for me, please.

Now, you're aware that in this time frame Walgreens distributed opioids to their stores, correct?

Page 75

A. Which time frame again?

Q. 2012ish.

A. Yeah, I don't remember exactly the date that they stopped.

Q. Okay. Let's look at this. You see that at that page up in the top right-hand corner it says, "U.S. Department of Justice, Drug Enforcement Administration"?

A. I see that.

Q. And below that we see the date, September 13, 2012?

A. I see that.

Q. And over on the left-hand side of the page do you see where it says, "In the matter of Walgreens Company," and it has a Jupiter, Florida address?

A. I do.

Q. And the heading in the middle of the page says, "Order to Show Cause and Immediate Suspension of Registration."

Do you see that?

A. Yes.

Q. And it says in the second paragraph there, "Notice is hereby given to inform Walgreens

Page 76

Corporation of the immediate suspension of DEA Certificate of Registration," and then it has a number there, "pursuant to 21 USC Section 824(d), because such registration constitutes an imminent danger to the public health and safety."

Do you see that?

A. I do.

Q. Did anybody within Walgreens ever tell you that the DEA had alleged that the Walgreens Jupiter distribution center, that were it to continue to operate, it constituted an imminent danger to the public health and safety?

A. No one has mentioned that to me.

Q. Has anybody ever at Walgreens ever sat down with you and explained what led to the DEA investigation and the $80 million settlement?

A. No.

Q. Would you agree that the $80 million settlement that I think you told us you had heard about is a substantial settlement amount to pay?

MR. BENSINGER: Objection; vague.

BY THE WITNESS:

A. It's more money than I have, I would say.

Page 77

BY MR. GADDY:

Q. If you go down to the paragraph numbered No. 1 at the bottom of the page, it says, "Walgreens' Jupiter, Florida distribution center is registered with DEA as a distributor in Schedules II through V pursuant" to a particular DEA registration number.

Do you see that?

A. I do.

Q. Did you have an understanding that Walgreens had a distribution center in Jupiter, Florida?

A. I did.

Q. Do you know how many distribution centers Walgreens had that distributed opioids?

A. I do not.

Q. It goes on to say, "The Jupiter distribution center is one of 12 distribution centers owned and operated by Walgreens Corporation headquartered in Deerfield, Illinois. Walgreens also operates more than 7,800 Walgreens retail pharmacies in the United States."

Do you see that?

A. I do.

Page 78

1  Q.  I think you told us earlier today that
2  prior to the acquisition of Rite Aid that Walgreens
3  was around 8,200?
4  A.  That was my understanding.
5  Q.  Okay.  Since adding Rite Aid -- and
6  Walgreens owns Rite Aid now, correct?
7  A.  Not all --
8  MR. BENSINGER:  Objection; foundation.
9  BY THE WITNESS:
10  A.  Not that I understand to be all Rite
11  Aid.  I think there are some Rite Aid locations
12  that Walgreens has acquired.
13  BY MR. GADDY:
14  Q.  Okay.  Now that Walgreens has acquired
15  some Rite Aid locations, approximately how many
16  locations does Walgreens have including the Rite
17  Aids, do you know?
18  A.  I can't give an exact number.
19  Q.  If you go to the Paragraph No. 2 on that
20  same page, it says, "Since at least 2009, the State
21  of Florida has been the epicenter of a notorious,
22  well-documented epidemic of prescription drug
23  abuse."
24  Do you see that?

Page 79

1  A.  I do.
2  Q.  Do you agree with that sentence?
3  A.  I don't know the date or timing, but I
4  understand that Florida has gained a lot of
5  attention on this issue.
6  Q.  Well, let me ask it this way.  In your
7  role within Walgreens as a pharmacist from 2000 to
8  2006, a business analyst for a couple of years and
9  then from '08 on through at least this time period
10  as a manager in charge of state pharmacy
11  regulations, did you have an understanding in the
12  2009, 2010, 2011 time period that Florida was well
13  known as the epicenter of a prescription drug abuse
14  crisis?
15  A.  What I remember during my time is that
16  there was a lot of attention in Florida.  I think
17  more -- it's hard to say exactly where that
18  attention was sourced from.  But I do also remember
19  that the State was looking to help address the
20  issue.
21  Q.  In your professional role at Walgreens,
22  were you ever requested by anybody within Walgreens
23  to implement any programs or take any steps to
24  address the prescription drug abuse that was

Page 80

1  happening in Florida?
2  MR. BENSINGER:  Objection; vague.  You can
3  answer.
4  BY THE WITNESS:
5  A.  It's hard for me to say.  I remember
6  discussions around changes to policies and
7  procedures in Florida, but I can't remember if that
8  was related to a new rule or regulation or if it
9  was more on the voluntary side.  I can't remember.
10  BY MR. GADDY:
11  Q.  As you sit here today do you have any
12  memory whatsoever of any voluntary action that
13  Walgreens took prior to this Order to Show Cause
14  that came in September of 2012, do you recall any
15  voluntary action that Walgreens took related to the
16  distribution or dispensing of controlled substances
17  within the State of Florida?
18  A.  I don't recall, but I'm not sure if I
19  would have been involved in that process either.
20  I'm mostly involved with the regulatory and when
21  those changed along those lines from a compliance
22  standpoint.
23  Q.  But nothing that you're aware of?
24  A.  No.

Page 81

1  Q.  That paragraph goes on to say, "In
2  July 2011, the Florida Surgeon General declared a
3  public health emergency based on the prescription
4  pill epidemic which results in an average of seven
5  overdose deaths per day in Florida."
6  Do you see that?
7  A.  I do.
8  Q.  Did you have an independent knowledge
9  prior to seeing this here that there was a public
10  health emergency declared in Florida back in
11  July of 2011?
12  A.  I can't say I'm -- I knew of a July 2011
13  public health emergency, if that's what you're
14  asking.
15  Q.  It goes down to paragraph 3.  It says,
16  "Oxycodone is a dangerously addictive Schedule II
17  controlled substance."
18  Do you agree with that portion of that
19  sentence?
20  A.  I don't know if that's how I'd
21  specifically characterize it.  Oxycodone being a
22  Schedule II drug has addictive properties.  But I
23  think that, you know, any drug could also be
24  dangerous, you know.

Page 82

1    So, it's a matter of making -- it's what
2 pharmacists do also to make sure that they help
3 protect the patient so that when a prescription is
4 dispensed that it's done so in a safe manner.
5    Q.   Okay?  You said -- you said there that
6 any drug could be dangerous?
7    A.   Sure.
8    Q.   Is oxycodone the same as just any other
9 drug in your opinion?
10    A.   I mean, it's classified by the DEA as a
11 Schedule II drug, which gives it a higher rating in
12 their scale as far as potential risk related to
13 addiction.
14    Q.   Okay.  Do you agree or disagree that
15 oxycodone is a dangerously addictive drug?
16    A.   It can be an addictive drug, but I also
17 understand many people take it safely every day.
18    Q.   Do you agree or disagree that we're in
19 the midst of a public health crisis related to
20 opioid abuse?
21    A.   I think there is definitely a lot of
22 people impacted by the issue every single day.
23    Q.   What do you mean by "impacted"?
24    A.   There are people who do overdose from

Page 83

1 controlled substance medications.
2    Q.   Do you agree there is a lot of people
3 that are addicted to drugs such as oxycodone?
4    A.   That's what I understand.
5    Q.   With that backdrop, with that
6 understanding that a lot of people are addicted to
7 it, a lot of people I think you just said overdose
8 from it, do you agree or disagree that oxycodone is
9 a dangerously addictive Schedule II controlled
10 substance?
11    MR. BENSINGER:  Asked and answered.
12 BY THE WITNESS:
13    A.   I don't think I can categorically
14 subscribe to that statement as a...
15 BY MR. GADDY:
16    Q.   That sentence goes on to say, "which is
17 known to be highly abused and diverted in the State
18 of Florida."
19    Do you see that?
20    A.   Is that paragraph 2 still?
21    Q.   Yeah.  I'm sorry.  It's the second half
22 of that first sentence.  No, I'm sorry.  We are in
23 paragraph 3 now.
24    A.   I'm sorry.

Page 84

1    Q.   Let's read the whole sentence again.
2    It says, "Oxycodone is a dangerously
3 addictive Schedule II controlled substance which is
4 known to be highly abused and diverted in the State
5 of Florida."
6    Do you see that?
7    A.   I do.
8    Q.   We just spent a moment talking about the
9 first portion of that sentence.  The second
10 portion, it says, "Oxycodone is known to be highly
11 abused and diverted in the State of Florida."
12    Do you agree with that sentence?
13    A.   I don't --
14    MR. BENSINGER:  Objection; foundation.
15 BY THE WITNESS:
16    A.   I don't know if I have enough
17 information to completely agree with that sentence.
18 I've heard of that type of conversation.
19 BY MR. GADDY:
20    Q.   Had you heard of that or were you aware
21 of that back in September of 2012 when this
22 document was published?
23    A.   I could not say I was.
24    Q.   Did anybody -- are you aware or do you

Page 85

1 have any memory of anybody at Walgreens making you
2 aware of the information contained within that
3 sentence?
4    A.   No one at Walgreens notified me of that
5 first sentence that you talked about.
6    Q.   So, in the time period leading up to
7 this document, which is dated September 13, 2012,
8 do you have any understanding of any suspicious
9 order monitoring program that Walgreens had in
10 place on the distribution side?
11    A.   It wouldn't be part of my job role, so
12 it would be hard for me to comment on.  I mean...
13    Q.   Is the answer no, that you don't have
14 any understanding of that, that we should talk to
15 other people about the suspicious order monitoring?
16    A.   Yes, if that's your focus of the
17 question, I would not be the person to talk to
18 about that.
19    Q.   What about on the pharmacy side, so the
20 dispensing side.  What systems were in place to
21 allow pharmacies to monitor their dispensing
22 practices?
23    A.   Which date would you like me to think
24 about?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.   Again, this is in the time period
2 leading up to the date of this document, which is
3 September 2012, and what I'm asking is:  What
4 policies or programs did Walgreens have in place on
5 the dispensing side to ensure that only valid,
6 appropriate, medically necessary prescriptions were
7 filled?
8    MR. BENSINGER:  Objection; foundation.
9 BY THE WITNESS:
10    A.   On the topic of dispensing controlled
11 substances, I think three things come to mind
12 around controlled substances that I was at least
13 familiar with to some level.
14      One is Walgreens' good faith dispensing
15 policies and procedures.  Second is I think as part
16 of the pharmacist drug utilization review, I think
17 there was a warning message, for example, if a
18 prescription was being refilled early and then,
19 third, as it relates to prescription drug
20 monitoring reporting.
21 BY MR. GADDY:
22    Q.   So, as far as programs that were in
23 place to ensure that only appropriate and medically
24 necessary prescriptions were filled, you're

Page 87

1 pointing us to three things:  The good faith
2 dispensing program?
3    A.   Um-hmm.
4    Q.   The drug utilization review and any
5 prescription drug monitoring program, correct?
6    A.   Yeah.
7    Q.   Are these policies or procedures that
8 are in place within the pharmacies or are these
9 policies and procedures that give folks in the
10 business side of Walgreens the visibility to see
11 what's going on in their pharmacies?
12    MR. BENSINGER:  Objection; foundation.
13 BY MR. GADDY:
14    Q.   Let me strike that and ask that a
15 different way.
16      Are those pharmacy programs?
17    A.   Yeah, the pharmacy -- the locations and
18 the pharmacists and technicians inside, those would
19 be the ones that are impacted by what I just called
20 out.
21    Q.   Okay.  And we'll look in a minute at
22 exactly when the Florida PDMP went into place.  I
23 think it was 2011.
24      But prior to this date that we're

Page 88

1 talking about, September 2012, how long do you
2 believe the good faith dispensing program had been
3 in place?
4    A.   I don't know offhand, to be honest.
5    Q.   Okay.  And what about that drug
6 utilization review?
7    A.   That -- I mean the concept of the system
8 checking for, you know, drug interactions,
9 including early refills, that's been there since
10 the day I was a pharmacist.  I don't know the exact
11 timing, whether or not the early refill portion was
12 there from Day One or it came into effect at some
13 point during my time with Walgreens Company.
14    Q.   But those are three programs or three
15 tools that were available to pharmacists during
16 this time period, correct?
17    A.   Yeah, depending on the state and the
18 prescription drug monitoring program, I would
19 expect that the other two would apply as well.
20    Q.   But would you agree that good faith
21 dispensing program that you are talking about here
22 had been in place for several years?
23    A.   That's what I understand.
24    Q.   If you go down to paragraph 4, still on

Page 89

1 page 29, it says, "Since 2009, Walgreens' Jupiter
2 Florida distribution center has been the single
3 largest distributor of oxycodone products in
4 Florida.  At about the same time as the abuse of
5 prescription drugs became an epidemic in Florida,
6 Walgreens' Florida retail pharmacies, supplied by
7 Respondent, commanded an increasingly large
8 percentage of the state's growing oxycodone
9 business."
10      Do you see that?
11    A.   I do.
12    Q.   Is that information that you were aware
13 of?
14    MR. BENSINGER:  Objection; vague.
15 BY THE WITNESS:
16    A.   I don't -- I mean, I'm not familiar with
17 the document and the statements that you just read
18 wouldn't have been something that I would have been
19 I think aware of in my role at the company.
20 BY MR. GADDY:
21    Q.   It says, "In 2010, only three Walgreens
22 retail pharmacies were in the top 100 purchasers of
23 oxycodone within Florida.  In 2011, 38 Walgreens
24 pharmacies made the top ten" -- excuse me -- "the

Page 90

1  top 100 and six were in the top ten. Through
2  May 2012, 44 Walgreens pharmacies are in the top
3  100 oxycodone purchasers, all of them supplied by
4  Respondent."
5      Do you see that?
6  A.  I do.
7  Q.  Do you agree that there's a correlation
8  between the amount of opioids dispensed and the
9  amount that would have to be distributed to those
10 stores?
11     What I mean by that is the more drugs a
12 pharmacy dispense, the more drugs they're going to
13 have to order from a distribution center, correct?
14 A.  That does make sense to me.
15 Q.  Okay. You understand the information in
16 paragraph 4 to be talking about how Walgreens
17 stores within the State of Florida gained an
18 increasingly large percentage of the oxycodone that
19 was dispensed within the state?
20 A.  I do read that here.
21 Q.  During this time period, 2009, 2010,
22 2011, 2012, who at Walgreens would be monitoring
23 this rise in volume in oxycodone going to Florida?
24 MR. BENSINGER:  Objection; foundation.

Page 91

1  BY THE WITNESS:
2  A.  I don't know of anyone that would be
3  specifically monitoring any increase in oxycodone
4  specifically.
5  BY MR. GADDY:
6  Q.  Do you know of any department or piece
7  of software that would be monitoring such an
8  increase in volume?
9  MR. BENSINGER:  Objection; compound,
10 foundation.
11 BY THE WITNESS:
12 A.  I mean, it would be outside of my
13 general knowledge base in my role at the company
14 for me to know that type of information.
15 BY MR. GADDY:
16 Q.  And at the time that this increase is
17 happening, the 2010 with three Walgreens pharmacies
18 in the top 100, 2011, 38 Walgreens pharmacies in
19 the top 100, and 2012, 44 Walgreens pharmacies in
20 the top 100, as far as oxycodone prescriptions go,
21 during that time period the good faith dispensing
22 program and the drug utilization review are in
23 effect, correct?
24 A.  That's my understanding.

Page 92

1  Q.  And at least for some of that time
2  period the Florida PDMP is in effect?
3  A.  If the Florida PDMP started in 2011,
4  that would be correct.
5  Q.  Those programs, the good faith
6  dispensing, the drug utilization review and the
7  PDMP, again, assuming it's in place in a particular
8  state, would those same three programs be the same
9  safeguards that were in place regardless of what
10 state we're looking at?
11 A.  I think two for sure and then the PDMP
12 if one was active in that state.
13 Q.  Okay. So, the good faith dispensing and
14 the drug utilization review would have been the
15 safeguards in place in all 50 states and then
16 potentially a PDMP?
17 A.  Yeah, around dispensing purposes,
18 correct.
19 Q.  That would be the same answer if we're
20 talking about Ohio, correct?
21 A.  Yep.
22 Q.  Same answer if we're talking about West
23 Virginia?
24 A.  I don't -- well, West Virginia,

Page 93

1  depending on the timing, we also have some of those
2  ID requirements. I forgot when that was
3  implemented as well. That could have been an
4  additional element.
5  Q.  If you look at paragraph 5, it says,
6  "According to DEA records, in 2011, Walgreens
7  operated 7,862 retail pharmacies in the
8  United States. Sixteen of the top 25 largest
9  Walgreens retail oxycodone purchasers, included the
10 top 6 purchasers" -- excuse me -- "including the
11 top 6 purchasers, were in Florida and supplied by
12 Respondent. The following table shows these six
13 stores and their yearly oxycodone purchases for
14 2009 through 2011."
15     Do you see that and then do you also see
16 the chart on the following page?
17 A.  I do.
18 Q.  Okay. And do you understand the
19 information that this -- that this -- that this
20 chart is relaying and how it's set up as far as the
21 store location in the left-hand column and then the
22 oxycodone purchases by dosage unit for each of the
23 three years in the next three columns?
24 A.  Yeah, I do see those headings.

Page 94

1    Q.   And for the first store there in Hudson,
2 Florida, it looks like in 2009 they purchased
3 388,000 dosage units of oxycodone.
4       Do you see that?
5    A.   Yes, I do.
6    Q.   And the following year, 2010, they
7 purchased 913,000 dosage units, correct?
8    A.   I see that.
9    Q.   And in 2011, that same store purchased
10 over 2.2 million dosage units of oxycodone,
11 correct?
12   A.   I do see that.
13   Q.   Would you agree with my very rough math
14 that it looks like that's approximately a 5 times
15 increase in oxycodone purchases from 2009 to 2011?
16   A.   In that range, yeah.
17   Q.   And that occurred while this pharmacy
18 had a good faith dispensing program, correct?
19   A.   Again, I don't remember exactly which
20 year the good faith dispensing policy started, but
21 at some point I would expect that would be in
22 place.
23   Q.   This occurred while this pharmacy had
24 the drug utilization review, correct?

Page 95

1    A.   That's correct.
2    Q.   And assuming the PDMP went into place in
3 2011, at least a portion of it had the benefit of
4 the PDMP also?
5    A.   That makes sense.
6    Q.   If you look at the second entry there
7 for the Fort Myers store, 3099, you see that in
8 2009 they had 95,000 purchases of -- or excuse
9 me -- 95,000 dosage units of oxycodone that they
10 purchased, correct?
11   A.   I do.
12   Q.   In 2010, they purchased 496,000 dosage
13 units of oxycodone, correct?
14   A.   I do.
15   Q.   And, again, in 2011, it looks like they
16 purchased over 2.1 million dosage units of
17 oxycodone.
18      Do you see that?
19   A.   I do see that.
20   Q.   And, again, just using very, very rough
21 math, would you agree that's approximately a 20
22 times increase in the number of oxycodone dosage
23 units being purchased from 2009 to 2011?
24   A.   In that range, yes.

Page 96

1    Q.   And, again, this would have been while
2 Walgreens good faith dispensing program and the
3 drug utilization review and at least a little bit
4 of the prescription drug monitoring program were in
5 place, correct?
6    A.   That is correct.
7    Q.   I promise we won't look at all of them,
8 but this will be the last one we do.
9       But do you see No. 3, store 06997 for
10 Oviedo, Florida, in 2009 they ordered 80,000 dosage
11 units of oxycodone?
12   A.   I see that.
13   Q.   And in 2010 that went up to 223,000.  Do
14 you see that?
15   A.   I do see that.
16   Q.   And that in 2011 it went up to over
17 1.6 million dosage units of oxycodone.
18      Do you see that?
19   A.   I do.
20   Q.   About how many times did those -- the
21 dosage unit of oxycodone purchased increased from
22 '09 to '11 with that particular store?
23   MR. BENSINGER:  Objection; vague.
24 BY THE WITNESS:

Page 97

1    A.   Are you asking me to divide 1.6 million
2 by 80,000 roughly?
3 BY MR. GADDY:
4    Q.   Roughly 16-time increase.  Does that
5 sound about right?
6    A.   Yeah, I -- I don't want to get hung up
7 on math, but it's an increase.
8    Q.   You've got no reason to dispute at least
9 a 16-time increase in oxycodone dosage units going
10 to this particular Walgreens pharmacy from 2009 to
11 2011, do you?
12   A.   Yes.
13   Q.   And, again, just like the other two,
14 this would be while Walgreens' good faith
15 dispensing program was in place, while the drug
16 utilization review was in place and at least a
17 portion of it would have been while the Florida
18 PDMP was in place, correct?
19   A.   That's correct.
20   Q.   Did you, prior to us looking at this
21 information in this chart just now within this
22 Order to Show Cause that was issued by the DEA, did
23 you have any understanding that this amount of
24 oxycodone and this much of an increase of oxycodone

Page 98

1 was going to Walgreens pharmacies during this time
2 period?
3      A.   I was not familiar with this extent in
4 2012, if that's what you're asking.
5      Q.   Did anybody with Walgreens ever sit down
6 with you or are you aware of them sitting down with
7 anybody else within Walgreens and saying, "This is
8 what happened in these situations in Florida.  We
9 made mistakes.  Let's learn from these mistakes and
10 put some corrective actions in place"?
11      MR. BENSINGER:  Objection; compound.
12 BY THE WITNESS:
13      A.   And there is a lot there.
14      MR. BENSINGER:  Vague.
15 BY THE WITNESS:
16      A.   But no one has reviewed these statistics
17 with me during my time at Walgreens in 2012, for
18 example.  Whether or not they've had conversations
19 with other people, I don't know if I could speak to
20 that.
21 BY MR. GADDY:
22      Q.   One of the areas that you had some
23 significant involvement in at Walgreens is the
24 prescription drug monitoring programs, correct?

Page 99

1      A.   That is correct.
2      Q.   And you agree that, and we'll look at
3 the exact date in just a minute I promise, but I'll
4 represent to you that it's in 2011, one goes into
5 effect in the State of Florida.
6      A.   Okay.
7      Q.   You agree that Florida had a PDMP?
8      A.   Yes.
9      Q.   And has one today?
10      A.   Yes.
11      Q.   Did anybody ever come to you with these
12 numbers at Walgreens and ask you, "How are we
13 getting these increases in oxycodone prescriptions
14 when Florida's implemented a prescription drug
15 monitoring program"?
16      MR. BENSINGER:  Objection.
17 BY THE WITNESS:
18      A.   I don't --
19      MR. BENSINGER:  Misleading.
20 BY THE WITNESS:
21      A.   I don't think anyone would have that
22 type of conversation with me for a couple different
23 reasons because I think they are two separate
24 pieces.

Page 100

1      When pharmacies report into the
2 prescription drug monitoring program there is no --
3 it just goes into the State's database.  So, the
4 State would probably have greater visibility into
5 that type of information.  So, I wouldn't expect
6 someone to be actively using that data to monitor
7 the extent of any dispensings described in this
8 chart.
9 BY MR. GADDY:
10      Q.   Okay.  Walgreens' pharmacists in Florida
11 have access to the PDMP data in the State of
12 Florida, correct?
13      A.   Yeah, they have access to it, correct,
14 yep.
15      Q.   Are the Florida Walgreens pharmacists
16 encouraged to utilize that database to see whether
17 or not there are large increases in opioids being
18 dispensed by their pharmacy?
19      MR. BENSINGER:  Objection; foundation.
20 BY THE WITNESS:
21      A.   That's not how a database is used by a
22 pharmacist, generally speaking.  You would as a
23 pharmacist, upon receiving a prescription, if there
24 is any issues, concerns raised during your review

Page 101

1 or if there is a state law, rule that requires
2 otherwise on a case-by-case basis, you would be
3 looking at a specific patient and looking at their
4 controlled substance history for any trends of
5 misuse or overutilization.
6 BY MR. GADDY:
7      Q.   So, the answer is no, Walgreens
8 pharmacists are not encouraged to look at the PDMP
9 to determine whether or not their particular
10 pharmacy or neighboring pharmacies are seeing a
11 large increase in the dispensing of controlled
12 substances?
13      MR. BENSINGER:  Objection; foundation.
14 BY THE WITNESS:
15      A.   Walgreens pharmacists are -- have access
16 to the PDMP to review specific patients
17 information.  You can't view other pharmacies'
18 information in that database.
19 BY MR. GADDY:
20      Q.   If you will turn for me, please, to
21 page 39 down at the bottom of the page.
22      Do you see up at the top of the page it
23 says, "In view of the foregoing"?  Do you see where
24 I am?

Page 102

1    A.  I do see that.

2    Q.  It says, "In view of the foregoing, and

3 based on information before the agency as of the

4 issuance of this notice, it is my preliminary

5 finding pursuant to certain statutes that

6 Walgreens' continued registration is inconsistent

7 with the public interest."

8      Do you see that?

9    A.  I do.

10    Q.  It goes on to say that "Under the

11 summarized facts and circumstances described

12 herein, it is also my preliminary finding,

13 significantly in light of the rampant and deadly

14 problem of prescription controlled substance abuse

15 in Florida, that Respondent's continued

16 registration while these proceedings are pending

17 constitutes an imminent danger to the public health

18 and safety."

19      Do you see that?

20    A.  I do.

21    Q.  It says, "Accordingly, pursuant to the

22 provisions of certain statutes and regulations,

23 that the DEA Certificate of Registration," and it

24 gives the number, "is hereby suspended, effective

Page 103

1 immediately."

2      Do you see that?

3    A.  I do.

4    Q.  Did you have an understanding that the

5 DEA suspended the ability of the Jupiter

6 distribution center to distribute any controlled

7 substances?

8    MR. BENSINGER:  Objection; vague.

9 BY THE WITNESS:

10    A.  At some point I became aware of the

11 Jupiter distribution center was not allowed to

12 distribute controlled substances.

13 BY MR. GADDY:

14    Q.  Okay.  How did you become aware of that?

15    A.  It's hard for me to really remember.

16 Again, it could have been through public, newspaper

17 headline type situation, article, could have been

18 through at work, you know, maybe general

19 conversation or something along those lines.

20    Q.  You understand that the DEA is saying

21 here that Walgreens' ability to continue to

22 distribute opioids from the Jupiter distribution

23 center constitutes an imminent danger to the public

24 health and safety.  Do you understand them to be

Page 104

1 saying that?

2    A.  I do read that here.

3    Q.  Okay.  Thinking back to those numbers of

4 oxycodone dosage units going to those different

5 pharmacies, do you agree with that statement that

6 pharmacies dispensing that much -- that many dosage

7 units of controlled substance is a danger to the

8 public safety?

9    MR. BENSINGER:  Objection; calls for a legal

10 conclusion.

11 BY THE WITNESS:

12    A.  I think that -- it looks like they ruled

13 based upon a number of factors that there was a

14 danger as stated here.  You know, looking at the

15 numbers on their own, I don't know if I can

16 independently just draw that conclusion because

17 there may be other factors involved.

18      As pharmacies do dispense prescriptions,

19 it also relates to, you know, what prescriptions

20 are being dropped off at the pharmacy, what

21 patients, you know, what their needs are, you know,

22 general vicinity and things like that.  That could

23 vary as well.

24 BY MR. GADDY:

Page 105

1    Q.  Okay.  Is it normal for a pharmacy to

2 increase the amount of oxycodone that it's

3 dispensing by 5 times or 16 times or 20 times over

4 a two-year period?

5    MR. BENSINGER:  Objection; foundation.

6 BY THE WITNESS:

7    A.  I couldn't -- I couldn't tell you that.

8 BY MR. GADDY:

9    Q.  Do you agree or disagree or have no

10 opinion on the DEA's statement here that Walgreens

11 continuing to be able to distribute controlled

12 substances from the Jupiter, Florida distribution

13 center constitutes an imminent danger to the public

14 health and safety?

15    A.  I mean, reading the statement, obviously

16 that is a strong statement; and I would expect that

17 whatever findings that contributed to that

18 statement were based upon evidence that they would

19 review.

20    Q.  You'll agree that the DEA is an

21 authority when it comes to controlled substances

22 and monitoring the diversion and drug abuse

23 associated with them?

24    A.  They're an agency that's tasked with

Page 106

1 regulating controlled substances, and part of that
2 is ensuring that controlled substances are I guess
3 safely distributed from one point to the patient at
4 the end of that.
5    Q.   And when making decisions like the
6 statements that we have been looking at here in
7 this document, you would defer to the DEA and their
8 judgment on issues such as that?
9    MR. BENSINGER:  Objection.
10 BY THE WITNESS:
11    A.   I don't know if I would --
12    MR. BENSINGER:  Foundation.
13 BY THE WITNESS:
14    A.   -- go that far.  I think that they are
15 charged with enforcing the regulations.  And,
16 again, I don't know the particulars of this case or
17 what would have prompted them to come with that
18 specific statement.
19 BY MR. GADDY:
20    Q.   You don't have any reason to disagree
21 with the statements the DEA is making here, do you?
22    A.   I wouldn't know enough about the
23 situation to go one way or the other.
24    Q.   Okay.  So, this document we are looking

Page 107

1 at was the Order to Show Cause.  I want to spend
2 just a moment to look at the settlement agreement
3 itself.  Okay.  The settlement agreement is going
4 to be the very first page.  We're just going to
5 start on the very first page of the document.
6    A.   Page 1 of 349?
7    Q.   Correct.  Do you see above that there is
8 also a numbering that says page 1 of 13.
9         Do you see that?
10    A.   Oh, I do.
11    Q.   And so that's going to be the settlement
12 agreement.
13         You see there in the first paragraph at
14 the top of the page it says, "This Memorandum of
15 Agreement is entered into between the DOJ, the DEA
16 and Walgreens."
17         Do you see that?
18    A.   I do read that.
19    Q.   And you've never seen this, correct?
20    A.   Not as part of my job or...
21    Q.   Have you ever seen this ever?
22    A.   Maybe during prep briefly.
23    Q.   Okay.  Outside of the context of this
24 deposition or any preparation you did for this

Page 108

1 deposition, have you ever seen this document?
2    A.   No.
3    Q.   If you don't mind, turn with me, please,
4 to page 7.
5    A.   7 of 13?  I guess that's the same either
6 way, right?
7    Q.   Yes, sir.  Do you see at the top of the
8 page there is a heading that says, "Walgreens
9 General Obligations"?
10    A.   I do.
11    Q.   And under paragraph C there do you see
12 the requirement that Walgreens pay $80 million?
13    A.   I do.
14    Q.   I think you told us earlier that that
15 was more money than you have, correct?
16    A.   That's correct.
17    Q.   Okay.  Do you agree or disagree that
18 that's a substantial civil settlement to pay?
19    MR. BENSINGER:  Objection; vague.
20 BY THE WITNESS:
21    A.   I don't know what the range of civil
22 settlements is and I don't know what percentage of
23 this -- I mean, to some people maybe $80 million
24 isn't a lot of money, but --

Page 109

1 BY MR. GADDY:
2    Q.   I'm sorry.  I couldn't hear you.
3    A.   For some people $80 million is, you
4 know, maybe not as much as other people like me.
5    Q.   To who do you think $80 million would
6 not be a lot of money?
7    A.   Maybe some multi-billionaires.
8    Q.   Like Stefano Pessina?
9    A.   I don't know.
10    Q.   Is he a billionaire?
11    A.   He is.
12    Q.   He's Walgreens Boots Alliance' CEO?
13    A.   That's what I understand.
14    Q.   So, you think this probably wasn't a lot
15 of money to him?
16    A.   I don't -- I don't know.  I'm not going
17 to speak for him specifically, but I'm just -- I
18 think I can put this in better context of the type
19 of money I have.
20    Q.   Okay.  Do you have an understanding that
21 this is the largest settlement that had ever been
22 paid at the time related to this issue?
23    A.   I do not really know that until you
24 pointed it out earlier today.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  Q.   Does that surprise you?

2  A.   Surprise me that this is the largest

3  settlement?  I mean, it's not an area that I'm

4  actively monitoring, so I think any figure that you

5  tell me, you know, I guess would be surprising

6  because I wouldn't know it going in.

7  Q.   What is your take on the fact that

8  you've spent your career with Walgreens from, you

9  know, before you even graduated school in '98 all

10 the way through today and that in 2013 the DEA shut

11 down a distribution center because it said that

12 Walgreens posed an imminent danger to the public

13 health and safety and to get out of it, Walgreens

14 had to pay the largest settlement ever to the DEA?

15 How does that impact your opinion of Walgreens and

16 the company that you work for?

17     MR. BENSINGER:  Objection.  This is argument.

18 BY THE WITNESS:

19 A.   I think there is a lot involved with a

20 settlement in general.  So, I don't know what

21 prompted Walgreens to agree to the $80 million.

22 So, it's hard for me to speak to that, that piece.

23 BY MR. GADDY:

24 Q.   Okay.  In spite of everything that we've

Page 111

1  looked at as it relates to this settlement, do you

2  remain proud to be an employee of Walgreens?

3  A.   Yes, I do.

4  Q.   Flip for me, please, to page 11.  You

5  see this was signed by Walgreens on June 10, 2013.

6     Do you see that?

7  A.   Yes.

8  Q.   Signed by it looks like a Thomas

9  Sabatino.

10 A.   That's correct.

11 Q.   Do you know Mr. Sabatino?

12 A.   Not personally.

13 Q.   And if you'd flip for me, please, to

14 page 14.  There is actually an addendum to this

15 settlement agreement.

16     Do you see that?

17 A.   Page 14 of 349?

18 Q.   Yes, sir.

19 A.   Addendum.  Title "Addendum:  Prospective

20 Compliance"?

21 Q.   Correct.

22 A.   Yes, I do see that.

23 Q.   And it says there in that first

24 sentence, "The parties agree that Walgreens will

Page 112

1  maintain the following specific compliance measures

2  for the duration of this agreement."

3     Do you see that?

4  A.   I do.

5  Q.   And the first item listed under A.1,

6  "General," it says, "Walgreens will maintain a

7  Department of Pharmaceutical Integrity."

8     Do you see that?

9  A.   I do.

10 Q.   I think we've talked about that a little

11 bit already.  You're familiar with the

12 Pharmaceutical Integrity division, correct?

13 A.   I am.

14 Q.   Were you aware that the existence of

15 that department is a requirement of the DEA

16 settlement agreement?

17 A.   I may have heard of that at some point,

18 but I don't think I ever saw this statement that

19 would have prompted me to know that factually.

20 Q.   There was no Pharmaceutical Integrity

21 unit while you were at Walgreens pharmacy, correct?

22 A.   While I was a pharmacist working in the

23 stores there was no Pharmaceutical Integrity team.

24 Q.   That was a unit that was derived out of

Page 113

1  this process with the DEA, correct?

2  A.   That's what it looks like here.

3     MR. BENSINGER:  Objection; foundation.

4     Mr. George, if you just permit me to

5  interject my objection before you answer, please.

6  BY MR. GADDY:

7  Q.   If you go to, you see section B starts

8  talking about items that relates to pharmacies?  Do

9  you see that?

10 A.   I do.

11 Q.   And if you go to paragraph 4, you see

12 that it says, "Walgreens remains committed to

13 properly training its pharmacy personnel to deal

14 with evolving diversion-related issues."

15     Do you see that?

16 A.   Yes.

17 Q.   It says, "Walgreens will continue to

18 enhance its good faith dispensing policy and

19 training materials to identify red flags of

20 potential diversion for pharmacists to consider in

21 making professional judgments regarding the

22 dispensing of controlled substances."

23     Do you see that?

24 A.   I do read that.

Page 114

1    Q.   Do you recall that there were
2  significant changes made to the good faith
3  dispensing program after this settlement?
4    A.   I remember a change made to the policy
5  that seemed to be more comprehensive.
6    Q.   And those changes were made after this
7  settlement was entered between Walgreens and the
8  DEA?
9    A.   When was the date of this settlement?
10   Q.   I think we just looked at it.  June 10,
11 2013.
12   A.   Yeah, I don't know if the changes were
13 made in 2012, 2013 specifically, but...
14   Q.   Either while the DEA investigation was
15 happening or immediately after it.  Would that be
16 fair?
17   A.   That would be fair.
18   Q.   And you see that a requirement of the
19 settlement agreement was that Walgreens had to
20 continue to enhance its good faith dispensing
21 policy, correct?
22   A.   That's correct.
23   Q.   Because we know that policy was in place
24 when we see this rise in oxycodone dosage units in

Page 115

1  some of those Walgreens pharmacies in Florida,
2  correct?
3    A.   Yeah, that's my understanding those were
4  already in effect.
5    MR. BENSINGER:  Mr. Gaddy, if you're going on
6  to another document, can we now take our next
7  break?
8    MR. GADDY:  Of course.
9    THE VIDEOGRAPHER:  We are off the record at
10 11:17 a.m.
11         (WHEREUPON, a recess was had
12            from 11:17 to 11:25 a.m.)
13   THE VIDEOGRAPHER:  We are back on the record
14 at 11:25 a.m.
15 BY MR. GADDY:
16   Q.   Mr. George, I'm going to stay on the
17 same page and go down to Paragraph No. 6.
18   A.   Okay.
19   Q.   It says, "Beginning in 2014, Walgreens
20 will exclude any accounting for controlled
21 substance prescriptions dispensed by a particular
22 pharmacy from bonus computations from pharmacists
23 and pharmacy technicians at that pharmacy."
24         Do you see that?

Page 116

1    A.   I do.
2    Q.   Okay.  And you understand that up until
3  this agreement and up until the end of the year
4  2013, that one of the items that was calculated or
5  included in the calculus for determining a
6  pharmacist's bonus was how many prescriptions they
7  filled?
8    MR. BENSINGER:  Objection; foundation.
9  BY THE WITNESS:
10   A.   I'm not specifically familiar with the
11 fundamentals involved with calculating the bonus.
12 I don't remember any specifics around controlled
13 substances at any point.
14 BY MR. GADDY:
15   Q.   But you see here that part of the
16 settlement agreement in paragraph 6 on page 15 here
17 is that beginning in 2014 the DEA and Walgreens
18 agreed that Walgreens would exclude controlled
19 substance prescriptions dispensed as part of the
20 bonus computation for pharmacists.
21         Do you see that?
22   A.   I do read that, yeah.
23   Q.   When you were a pharmacist from 2000 to
24 2006 with Walgreens, did a part of your

Page 117

1  compensation package include bonuses?
2    A.   In position as pharmacy manager, I don't
3  recall receiving -- outside of being a pharmacy
4  manager, I don't recall really receiving a bonus,
5  but it may have been based upon the location, that
6  maybe we weren't as qualified for it.  I don't
7  know.
8    Q.   Let me show you what I will mark as
9  Exhibit No. 6.
10         (WHEREUPON, a certain document was
11            marked as Walgreens-George Exhibit
12            No. 6:  Document, "Staff Pharmacist
13            Bonus Program"; P-WAG-01005.)
14 BY MR. GADDY:
15   Q.   This is P-WAG-1005.  Do you see up at
16 the top of the page it says, "Staff Pharmacist
17 Bonus Program"?
18   A.   I do see that.
19   Q.   Would that have been your role at
20 Walgreens from 2000 to 2004?
21   A.   Yes.
22   Q.   And under "Overview" it says, "The
23 purpose of the pharmacy bonus is to recognize and
24 reward the persons responsible for improving a

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  store's pharmacy operation."
2      Do you see that?
3   A.  Yes, I do.
4   Q.  It goes on to say, "The best evidence of
5  a well-run pharmacy is the increase in
6  prescriptions and pharmacy sales."
7      Do you see that?
8   A.  Yes I do.
9   Q.  Do you agree with that sentence?
10   A.  I think there is a lot more involved
11  with running a pharmacy, but in general if you're
12  providing good customer service and taking care of
13  your patients, you won't lose prescriptions.  So...
14      But there is other factors that could be
15  related to an increase in prescription sales that
16  might not be related to a well-run pharmacy as
17  well.
18   Q.  Well, just before the break we looked at
19  a list of several stores that looked like they
20  increased their controlled substance prescriptions
21  by either 5, 16 or 20 times the volume that they
22  are doing.  Would you agree that that's evidence of
23  a well-run pharmacy there?
24      MR. BENSINGER:  Objection; argumentative.

Page 119

1  BY THE WITNESS:
2   A.  I don't know if that's how I would
3  correlate the two.
4  BY MR. GADDY:
5   Q.  Okay.  So, let me just ask you again.
6  Do you agree or disagree that the best evidence of
7  a well-run pharmacy is the increase in prescription
8  in sales?
9   A.  I do not categorically agree with that
10  sentence.
11   Q.  And if you look down at the bottom of
12  the page it says, "Definition of Bonus Components."
13      Do you see that?
14   A.  I do see that.
15   Q.  And the first item listed there is
16  "12-month sales."
17      Do you see that?
18   A.  Yes.
19   Q.  It says, "This means the pharmacy
20  department sales (both prescription and
21  prescription miscellaneous) during the 12-month
22  bonus period."
23      Do you see that?
24   A.  I do.

Page 120

1   Q.  The next one is "12-month unadjusted
2  script," and in parentheses it says, "Number of
3  scripts."
4      Do you see that?
5   A.  I do.
6   Q.  And it says, "This means pharmacy
7  department scripts filled during the 12-month bonus
8  period excluding any 90-day adjustments."
9      Do you see that?
10   A.  I do.
11   Q.  And do you see any indicator under that
12  one, under that particular bonus component, that
13  excludes prescriptions for controlled substances?
14   A.  I do not.
15      MR. BENSINGER:  Mr. Gaddy, I note that this
16  document has no Bates number on it.  I take it,
17  therefore, that this is not a document that was
18  produced by any party in the case.
19      MR. GADDY:  It was produced by Walgreens.  I
20  don't know if the Bates number got cut off when it
21  was printed, but it's a Walgreens production
22  document.
23      MR. BENSINGER:  I'd be grateful if you could
24  inquire as to the Bates number so that I can

Page 121

1  understand whether in fact this document was
2  produced by Walgreens or you obtained it from some
3  other source.
4      MR. GADDY:  It's up there on the screen.
5      MR. BENSINGER:  Am I to understand, then, that
6  the physical hard copy that you have marked has
7  omitted the Bates number?
8      MR. GADDY:  It looks like it didn't -- didn't
9  get transferred there when the document was
10  printed.
11      MR. BENSINGER:  Could you identify the
12  document for the record since the exhibit itself
13  has omitted the Bates number so that we have a
14  clear transcript.
15      MR. GADDY:  Sure, it looks like WAGFLDEA7.
16  BY MR. GADDY:
17   Q.  Mr. George, I can't remember where we
18  left off, but in the second bonus component you see
19  that it takes into account the number of
20  prescriptions that were filled?
21   A.  I do see that.
22   Q.  And do you see any indication that it
23  exempts or excludes from that calculation
24  prescriptions for controlled substances?

Page 122

1    A.   I do not.
2    Q.   And would it make sense to you, then,
3  that that's the program that DEA is talking about
4  when they are telling Walgreens that they can no
5  longer account for controlled substance
6  prescriptions in bonus calculations?
7    MR. BENSINGER:  Objection; calls for
8  speculation, foundation.
9  BY THE WITNESS:
10   A.   I'm just comparing both documents.  I
11 mean, you know, this is apparently -- I've never
12 seen this document before.  So, that's the only
13 part, you know.  Obviously I understand there was a
14 bonus program.  Is there multiple bonus programs,
15 you know.
16 BY MR. GADDY:
17   Q.   You see at the top of the page this is a
18 staff pharmacist bonus program, correct?
19   A.   Yes.
20   Q.   And you see that one of the components
21 of the staff pharmacist bonus was the number of
22 prescriptions filled?
23   A.   Yes.
24   Q.   And that would have included

Page 123

1  prescriptions for controlled substances, correct?
2    MR. BENSINGER:  Objection; foundation.
3  BY THE WITNESS:
4    A.   It seems to me it's a general reference
5  to the script volume for that store.  Controlled
6  substance or non-controlled substance aren't
7  segmented out one way or the other.
8    Q.   And the more prescriptions that were
9  filled, the bigger the bonus would be, correct?
10   MR. BENSINGER:  Objection; foundation.
11 BY THE WITNESS:
12   A.   It says that the number of prescriptions
13 dispensed is a component of the bonus.  I don't --
14 I haven't read the rest of the document to see how
15 that plays out.
16 BY MR. GADDY:
17   Q.   Okay.  If you turn the page and look at
18 the bonus formula, which is about two-thirds of the
19 way down the page.  Do you see where I am?
20   A.   Yes.
21   Q.   And it lists a primary, an improvement
22 and then the total bonus.
23      Do you see that?
24   A.   Yes.

Page 124

1    Q.   And if you look under the primary bonus,
2  the components are last year's 12-month
3  prescription sales, correct?
4    A.   Yes.
5    Q.   Which would include -- you didn't see
6  anywhere where controlled substances were segmented
7  out of that, did you?
8    A.   I have not seen that yet.
9    Q.   So, that would include controlled
10 substances, correct?
11   MR. BENSINGER:  Objection; foundation.
12 BY THE WITNESS:
13   A.   If it's not excluded, then it would be
14 included I assume.
15 BY MR. GADDY:
16   Q.   And the other inclusion or the other
17 component is last year's 12-month adjusted scripts.
18      Do you see that?
19   A.   I do see that.
20   Q.   And, again, controlled substances
21 weren't excluded out of that, were they?
22   MR. BENSINGER:  Same objection.
23 BY THE WITNESS:
24   A.   I don't see any notation here.

Page 125

1  BY MR. GADDY:
2    Q.   And as far as calculating the primary
3  bonus for a staff pharmacist, the bigger the sales
4  and the bigger the number of scripts, the bigger
5  the bonus, correct?
6    A.   Looking at the primary specifically if
7  you were comparing two stores, I would see a larger
8  number under the primary bucket if store B's
9  prescription volume was greater than store A's.
10   Q.   Okay.  So, yes, the more sales including
11 controlled substances and the more prescriptions
12 filled including controlled substances, the bigger
13 the bonus, correct?
14   MR. BENSINGER:  Objection; foundation.
15 BY THE WITNESS:
16   A.   Prescriptions in general, there would be
17 a bigger bonus.  It now -- I don't think it says
18 controlled substances or not.  So, if prescriptions
19 went up and the controlled substance went down, the
20 store would also be eligible for a larger bonus
21 based upon this primary calculation.
22 BY MR. GADDY:
23   Q.   Okay.  But every prescription for a
24 controlled substance that is filled by the store

Page 126

1 increases the bonus size for that particular store?
2     MR. BENSINGER:  Objection; foundation.
3 BY THE WITNESS:
4     A.   As controlled substances would
5 contribute to total volume is what you're
6 suggesting in the calculation, that's what it would
7 suggest, yes.
8 BY MR. GADDY:
9     Q.   Let me show you what I'll mark as
10 Exhibit No. 7.
11         (WHEREUPON, a certain document was
12         marked as Walgreens-George Exhibit
13         No. 7:  Document, "Pharmacy Manager
14         Bonus Program"; WAG00000001 -
15         00000005.)
16 BY MR. GADDY:
17     Q.   This is P-WAG-2076.  Do you see at the
18 top of the page here, this is the pharmacy manager
19 bonus program?
20     A.   Yes, I do read that.
21     Q.   And this would have been the position
22 that you were in from 2004 through 2006?
23     A.   April 2004 to approximately March of
24 2006.

Page 127

1     Q.   And if you look under the "Overview"
2 section, you see that it says, "The purpose of the
3 pharmacy bonus is to recognize and reward the
4 persons responsible for improving a store's
5 pharmacy operation."
6         Do you see that?
7     A.   I do read that.
8     Q.   And, again, it says, "The best evidence
9 of a well-run pharmacy is the increase in
10 prescriptions and pharmacy sales."
11         Do you see that?
12     A.   I do read that.
13     Q.   I think you've already told us you don't
14 completely agree with that sentence?
15     A.   That's correct.
16     Q.   And if we go down and look at the
17 components of the bonus for a pharmacy manager, the
18 first component is the 12-month sales meaning
19 pharmacy department sales, both prescription and
20 prescription miscellaneous.
21         Do you see that?
22     A.   I do.
23     Q.   And that would include controlled
24 substances, correct?

Page 128

1     MR. BENSINGER:  Objection; foundation.
2 BY THE WITNESS:
3     A.   It doesn't say that it would exclude
4 controlled substances.  So I would assume it
5 includes it.
6 BY MR. GADDY:
7     Q.   The next component is the 12-month
8 unadjusted script saying number of scripts.  It
9 says, "This means pharmacy department scripts
10 filled during the 12-month bonus period excluding
11 any 90-day adjustments."
12         Do you see that?
13     A.   I do.
14     Q.   Do you see where controlled substance
15 prescriptions are excluded?
16     A.   I don't see any references to controlled
17 substances one way or the other.
18     Q.   Would that indicate to you that
19 prescriptions for OxyContin are included here?
20     MR. BENSINGER:  Objection; foundation.
21 BY THE WITNESS:
22     A.   Given that it doesn't exclude controlled
23 substances or make any notation and it's a general
24 reference to prescription volume, then OxyContin I

Page 129

1 believe would fall under that category.
2 BY MR. GADDY:
3     Q.   Would that indicate to you the
4 prescriptions for Vicodin and Lortab are included
5 in this bonus calculation?
6     A.   Along the same methodology, being a
7 prescription, this seems to be referencing
8 prescription volume, then I think they would be
9 treated the same.
10     Q.   Would this include to you the
11 prescriptions for fentanyl would be included in
12 this pharmacy manager bonus calculation?
13     MR. BENSINGER:  Objection; foundation.
14 BY THE WITNESS:
15     A.   I think fentanyl, along with any other
16 prescription drug, controlled substance or not
17 controlled substance, would be included within this
18 calculation.
19 BY MR. GADDY:
20     Q.   It goes down, it says, "Average daily
21 scripts.  This means the calculated average per day
22 the number of scripts the pharmacy department
23 filled during the 12-month bonus period not
24 including adjustment for 90-day scripts."

Page 130

1  Do you see that?

2  A.  I do see this.

3  Q.  Would your answers be the same as far as

4  those particular drugs, whether it's oxycodone,

5  hydrocodone combination products or fentanyl, as

6  far as you can tell those would all be included

7  here too, correct?

8  A.  Yep, I don't see any references that

9  indicate it would be excluded.

10  Q.  And if you look to the next page under

11  "Bonus Formula."  Do you see where I am?

12  A.  Yeah, towards the bottom?

13  Q.  Correct.

14  A.  Okay.

15  Q.  And do you agree with me that just like

16  the staff pharmacist bonus structure that we just

17  looked at, that the more controlled substances that

18  are sold and the more controlled substance

19  prescriptions that are filled, the bigger the bonus

20  is going to be?

21  MR. BENSINGER:  Objection; foundation.

22  BY THE WITNESS:

23  A.  I would -- what I would say is that they

24  fill more prescriptions in general, then they would

Page 131

1  be -- one store could fill more controlled

2  substances than another store but the other store

3  might be eligible for a higher bonus because their

4  overall prescription volume might be higher.

5  BY MR. GADDY:

6  Q.  My question is:  When a customer comes

7  into a pharmacy under this bonus plan and that

8  customer presents a prescription for OxyContin or

9  Vicodin or hydrocodone or any hydrocodone

10  combination product or fentanyl and that pharmacist

11  fills that prescription, that increases that

12  pharmacist's bonus, correct?

13  MR. BENSINGER:  Objection; foundation.

14  BY THE WITNESS:

15  A.  Any prescription brought to that

16  pharmacist could increase that pharmacist's bonus.

17  BY MR. GADDY:

18  Q.  Even the ones for OxyContin, Vicodin,

19  Lortab, fentanyl, correct?

20  A.  Yes.

21  Q.  I show you what I'll mark as

22  Exhibit No. 8.

23  (WHEREUPON, a certain document was

24  marked as Walgreens-George Exhibit

Page 132

1  No. 8:  Document, "Senior Certified

2  Technician Bonus Plan Details";

3  P-WAG-01005.)

4  MR. GADDY:  Pete, it looks like we have the

5  same printing issue here.  This is Bates No. WAG 6

6  or WAGFLDEA6.

7  MR. BENSINGER:  Could you identify the WAGDEA

8  Bates number of what you marked as George

9  Exhibit 7.  It appears that Bates number was also

10  omitted from the paper document you've marked as

11  George Exhibit 7.

12  MR. GADDY:  It's 7 also.

13  BY MR. GADDY:

14  Q.  You with me on Exhibit No. 8?

15  A.  Senior certified technician bonus plan

16  details.

17  Q.  Correct.  And it looks like at the top

18  of the page this bonus plan went into effect May 1,

19  2009.  Do you see that?

20  A.  I do see that.

21  Q.  Second bullet point says, "Premium pay

22  based on average script per day for home store, not

23  individual performance."

24  Do you see that?

Page 133

1  A.  I do.

2  Q.  And then it says it's paid out on the

3  tiers below.

4  Do you see that?

5  A.  I do.

6  Q.  Do you see anywhere in this particular

7  document that controlled substances are excluded

8  from the calculation of a senior certified

9  technician's bonus?

10  A.  I do not see any references to

11  controlled substances or non-controlled substances

12  in this calculation.

13  Q.  And if you look at the calculation there

14  in the middle of the page, do you agree with me

15  that the more prescriptions filled per day, the

16  higher the bonus plan is?

17  MR. BENSINGER:  Objection; foundation.

18  BY THE WITNESS:

19  A.  It says here, the way I'm reading it, if

20  a pharmacy averages more prescriptions in a given

21  day, that the senior certified technician bonus is

22  eligible at a higher tier, which is a certain

23  dollar per hour increase.

24  BY MR. GADDY:

Page 134

1    Q.   Would you agree with me there is a
2  financial incentive for there to be more
3  prescriptions filled on a daily basis?
4      MR. BENSINGER:  Objection to form.
5  BY THE WITNESS:
6    A.   You know, I don't know if I see this as
7  an incentive for filling more prescriptions.  The
8  way that we always viewed this is if you're
9  providing good customer service, you will hopefully
10 see the results of that in increased volume and
11 part of that would be a share reward of sorts for
12 that performance.
13 BY MR. GADDY:
14   Q.   Is it true or not that the more
15 prescriptions are filled on a daily basis for this
16 particular plan, the higher pay structure or bonus
17 structure a senior certified technician would fall
18 into?
19     MR. BENSINGER:  Objection; foundation.
20 BY THE WITNESS:
21   A.   I mean, that's what I read here that
22 there is a higher tier that would be eligible based
23 upon prescription average.
24 BY MR. GADDY:

Page 135

1    Q.   You've mentioned customer service
2  several times.  Is there a factor that you see in
3  this bonus plan that takes into account any sort of
4  customer feedback or survey results from customers,
5  anything like that?
6    A.   I do not see that in what we've reviewed
7  so far.
8    Q.   Would you agree that in all of the bonus
9  structures that we reviewed there was no
10 consideration of customer feedback, customer survey
11 results, customer satisfaction results in any of
12 those bonus plans?
13   A.   Well, at least what you presented to me.
14 Again, I was not familiar with these documents
15 prior to this.  But what we've reviewed so far,
16 I've not seen any reference to those themes.
17   Q.   In fact, the only components of the
18 bonus plans that we looked at for the staff
19 pharmacist and the pharmacy manager dealt with the
20 number of prescriptions and the amount of sales for
21 a pharmacy, correct?
22   A.   So far that's what we reviewed.
23   Q.   And as we looked at the bonus plan for a
24 certified pharmacy technician, the only

Page 136

1  consideration into how big of a bonus a certified
2  technician gets is the number of average
3  prescriptions filled per day, correct?
4      MR. BENSINGER:  Objection; foundation.
5  BY THE WITNESS:
6    A.   I'm just reviewing the second component
7  on this page.
8        The only references I see on this
9  page are related to prescription volume.
10 BY MR. GADDY:
11   Q.   Were you aware of a prior settlement
12 between Walgreens and the DEA revolving around
13 allegations that Walgreens had a pharmacy operating
14 in violation of the Controlled Substance Act in
15 San Diego, California?
16   A.   I may have remembered a conversation
17 with legal in reference to a DEA situation in
18 San Diego, but I don't know if it's one and the
19 same.
20   Q.   Okay.  With this settlement agreement
21 that we just looked at, do you recall that it was
22 signed June 10, 2013?  Does that sound right?
23   A.   June 2013.  I don't know if it was 10 or
24 11.

Page 137

1    Q.   June 2013.  We can agree on that?
2    A.   Um-hmm.
3    Q.   I show you what I'll mark as
4  Exhibit No. 9.
5        (WHEREUPON, a certain document was
6         marked as Walgreens-George Exhibit
7         No. 9:  2/19/13 e-mail with
8         attachment; WAGMDL00574919 -
9         00574926.)
10 BY MR. GADDY:
11   Q.   Do you see that this is a -- cover
12 page here is an e-mail from Tasha Polster?
13   A.   I do see that.
14   Q.   Do you know who Ms. Polster is?
15   A.   At this time she was the director of the
16 Pharmaceutical Integrity Department.
17   Q.   Do your job duties cause you to interact
18 with her or her team at all?
19   A.   Yes, and for a period of time I did
20 report to Tasha Polster.
21   Q.   Okay.  During what period of time did
22 you report to her?
23   A.   April -- I'm sorry.  I think maybe --
24 let's go with spring of 2015 until I took on my new

Page 138

1 position in January 2016. So, maybe nine months
2 roughly.
3   Q.   Okay. And your job duties during that
4 time frame related to what we went over earlier on
5 your --
6   A.   Yes, yes.
7   Q.   -- on your resume?
8   A.   It was not part of the Pharmaceutical
9 Integrity function at all.
10   Q.   It had nothing to do with suspicious
11 order monitoring?
12   A.   No.
13   Q.   Or distribution?
14   A.   No.
15   Q.   Or any of that stuff?
16   A.   No.
17   Q.   Okay. Do you see the subject line of
18 this e-mail is "MOA"?
19   A.   I do.
20   Q.   And in the body Tasha writes, "Please
21 find a copy of the MOA, with my notes on it as to
22 which part is handled by whom."
23       Do you see that?
24   A.   I do.

Page 139

1   Q.   And if you turn the page, do you see at
2 the top it says "Administrative Memorandum of
3 Agreement."
4       Do you see that?
5   A.   Yes.
6   Q.   And it looks to be a fairly similar
7 structure type document that we spent a lot of time
8 looking at earlier?
9   MR. BENSINGER:  Objection; vague.
10 BY THE WITNESS:
11   A.   I mean, I think some of the -- some of
12 the particulars are different, right.
13 BY MR. GADDY:
14   Q.   You recognize it to be a different
15 document?
16   A.   Right.
17   Q.   Okay. Good deal. Do you see at the top
18 it says, "This Administrative Memorandum of
19 Agreement is entered into by," it says, "DEA and
20 Walgreens."
21       Do you see that?
22   A.   I do.
23   Q.   And then under "Background," it says,
24 "On September 30," in the first paragraph there, it

Page 140

1 says, "On September 30, 2009, the Deputy Assistant
2 Administrator, Office of Diversion Control, DEA,
3 issued an Order to Show Cause proposing to revoke
4 the DEA Certificate of Registration" of a
5 particular Walgreens store located in San Diego,
6 California.
7       Do you see that?
8   A.   I do.
9   Q.   Does this jog your memory to the issue
10 that about a DEA investigation into a particular
11 Walgreens pharmacy?
12   A.   I mean, in general I know of San Diego,
13 Colorado DEA possibly. That's -- but, again, I
14 can't confirm that this is the exact location that
15 I have in mind.
16   Q.   Did you have any involvement with
17 responding to any subpoenas issued or Orders to
18 Show Cause that were sent to Walgreens related to
19 this?
20   A.   Not that I remember.
21   Q.   Okay. It goes on in the next paragraph
22 to say the Order to Show Cause alleged that this
23 particular Walgreens -- you recognize that
24 Walgreens with the number after it to be one

Page 141

1 particular Walgreens store?
2   A.   Yeah, Walgreens No. 6094.
3   Q.   Each store has its own number?
4   A.   Yes, correct.
5   Q.   So the Order to Show Cause alleged that
6 this particular Walgreens "dispensed controlled
7 substances to individuals based on purported
8 prescriptions issued by physicians who were not
9 licensed to practice medicine in California, they
10 dispensed controlled substances to individuals
11 located in California based on Internet
12 prescriptions issued by physicians for other than a
13 legitimate medical purpose and/or the outside the
14 usual course of professional practice, and they
15 dispensed controlled substances to individuals that
16 that particular store knew or should have known
17 were diverting the controlled substances."
18       Do you see that?
19   A.   I do read that.
20   Q.   If you look at the last page of this
21 document, 7 of 7, do you see that this agreement
22 was signed by Richard Ashworth with Walgreens in
23 March of 2011?
24   A.   I do see that.

Page 142

1    Q.   That would be about two years, two years
2  and three months before the other settlement was
3  entered, correct?
4    A.   Yeah, the one from June of 2013 you're
5  saying.
6    Q.   Right.
7    A.   Yes.
8    Q.   So, this settlement was entered in
9  March of 2011 and after this one was over, we had
10 the Florida investigation, correct?
11   A.   That's correct.
12   Q.   And if you turn to page 2 of 7, do you
13 see under paragraph 4 it says, "Obligations of
14 Walgreens"?
15   A.   2 of 7, yep.  And "Obligations of
16 Walgreens," correct.
17   Q.   And you see there you've got some notes
18 on the sides of the page there?
19   A.   Yes.
20   Q.   And you recall from the body of the
21 e-mail that Ms. Polster had written, "Here's a copy
22 of the MOA with my notes on it" showing who handles
23 what.
24   A.   Yes, I read that.

Page 143

1    Q.   Okay.  And under 4.a, this -- this
2  obligation that Walgreens agreed to back in
3  March of 2011 says, "Walgreens agrees to maintain a
4  compliance program to detect and prevent the
5  diversion of controlled substances."
6        Do you see that, paragraph 4.a?
7    A.   4.a.
8    Q.   I'm on page 2 of 7.
9    A.   Can you start at the beginning of that
10 sentence again?
11   Q.   It's the very first sentence.
12   A.   Oh.
13   Q.   "Walgreens agrees to maintain."
14   A.   Okay, yep.
15   Q.   You with me?
16   A.   Yep.
17   Q.   Okay.  And it will be up on the -- I
18 should have told you this earlier but it will always be
19 up on the screens, too.
20   A.   Oh, okay.
21   Q.   If you want to look there.
22   A.   Thank you.
23   Q.   "Walgreens agrees to maintain a
24 compliance program to detect and prevent diversion

Page 144

1  of controlled substances as required under the
2  Controlled Substance Act and applicable DEA
3  regulations."
4        Do you see that?
5    A.   Yes, yes.
6    Q.   And that was an agreement that Walgreens
7  entered into back in March of 2011, correct?
8    A.   Yes.
9    Q.   It goes on in that paragraph to say,
10 "This program shall include procedures to identify
11 the common signs associated with the diversion of
12 controlled substances, including but not limited to
13 doctor shopping and requests for early refills."
14       Do you see that?
15   A.   I do.
16   Q.   And this was an agreement, again, that
17 Walgreens made two years prior to entering into the
18 Florida settlement agreement that we've spent some
19 time looking at earlier today?
20   A.   Yes.
21   Q.   Out to the side of paragraph A do you
22 see where Ms. Polster writes, "This is in the good
23 faith dispensing policy."
24       Do you see that?

Page 145

1    A.   Yes, I do.
2    Q.   And that's the policy that I think you
3  told us was in effect prior to a lot of the
4  allegations that we saw in the Florida issue,
5  correct?
6    A.   That's correct.
7    Q.   And that would have been a policy that
8  was in effect at the time of the San Diego problem
9  as well, correct?
10   A.   San Diego, what date should I be using
11 for that reference?  Are you saying 2009?
12   Q.   Correct.
13   A.   Yeah.  I expect there was a good faith
14 dispensing policy in advance of that 2009 date.
15   Q.   The next paragraph, B, says, "Walgreens
16 shall implement a system to notify the local DEA
17 office within two business days of refusal to fill
18 a prescription for a controlled substance."
19       Do you see that?
20   A.   I do.
21   MR. BENSINGER:  I object to the incomplete
22 recitation of the sentence and direct you to the
23 entirety of the sentence.
24 BY MR. GADDY:

Page 146

1    Q.    In paragraph C you see it says,
2   "Walgreens shall implement and maintain policies
3   and procedures to ensure that prescriptions for
4   controlled substances are only dispensed to
5   authorized individuals pursuant to federal and
6   state law and regulations."
7        Do you see that?
8    A.    I do see that.
9    Q.    And again, over to the side do you see
10  where Ms. Polster writes that that's in the good
11  faith dispensing policy?
12   A.    I do see that.
13   Q.    And that's a policy that would have been
14  in place prior to this September 2009 San Diego
15  issue and prior to the issues that we saw in
16  Florida in that settlement agreement as well,
17  correct?
18   A.    You know what's not clear to me is her
19  e-mail is dated 2013.  The 2009 date's referenced
20  on page 1 of 7.  So, I don't know these comments if
21  they are related to what was in effect in 2013 or
22  prior to 2009.
23   Q.    Okay.  That's fair.  If you go to the
24  next, next page, in paragraph D it states,

Page 147

1   "Walgreens shall not knowingly fill an invalid
2   prescription or prescription that it reasonably
3   believes was issued for other than a legitimate
4   medical purpose or by a practitioner acting outside
5   the usual course of professional practice."
6        Do you see that?
7    A.    I do read that.
8    Q.    And, again, that's an agreement that
9   Walgreens made back in March of 2011, correct?
10   A.    That's correct.
11   Q.    If you go down to paragraph G, I think
12  we see where you start to come into play here?
13   A.    Um-hmm.
14   Q.    Paragraph G, it says, "All dispensing
15  records submitted by Walgreens to prescription
16  monitoring programs (in those states that have or
17  will implement such a system) shall, to the effect
18  required under applicable state law, contain a
19  prescriber's valid, active DEA registration
20  number."
21        Do you see that?
22   A.    I do see this.
23   Q.    And that says it's handled by you,
24  correct?

Page 148

1    A.    The paragraph seems to be associated
2   with my name.
3    Q.    Okay.  Were you involved in any meetings
4   with Ms. Polster or anybody else at Walgreens
5   wherein you went through this settlement agreement
6   and had explained to you which agreements Walgreens
7   had made with DEA that you were responsible for
8   filling?
9    A.    I don't remember having that type of
10  meeting.
11   Q.    Do you remember Ms. Polster ever telling
12  you that you had a responsibility for complying
13  with a settlement agreement that Walgreens had
14  entered into with DEA?
15   A.    Not a settlement agreement.  I don't
16  think she framed it that way.
17   Q.    Do you remember Ms. Polster -- or I
18  think the other person copied on this e-mail was
19  Rex Swords.  Do you know who that is?
20   A.    Yes.
21   Q.    Who is Mr. Swords?
22   A.    At the time I think he was Tasha's boss.
23  I think his roles have changed since that time.
24   Q.    Do you recall either Ms. Polster,

Page 149

1   Mr. Swords or anybody else at Walgreens showing you
2   this settlement agreement between Walgreens and the
3   DEA and explaining to you what Walgreens had agreed
4   to do?
5    A.    I do not remember that.
6    Q.    Did anybody tell you that you had a
7   responsibility for some aspects of the settlement
8   that Walgreens had entered into with DEA?
9    A.    No.
10   Q.    Paragraph H, it says, "Walgreens shall
11  provide pharmacists with access to state PMPs and
12  pharmacists shall be required to follow state
13  guidelines and requirements for use and review of
14  information provided by the state PMP on dispensing
15  controlled substances."
16        Do you see that?
17   A.    I do.
18   Q.    On the notes on the side, it looks like
19  Ms. Polster writes, "All states where PMP is
20  available have the firewalls down so stores can
21  access the site."
22        What does that mean?
23   MR. BENSINGER:  Objection; foundation.
24  BY THE WITNESS:

Page 150

1    A.    I don't know what she specifically is
2  trying to call out here.  The term "firewall"
3  usually refers to any sort of security block within
4  the or intranet that may have blocked websites.
5  But I'm not aware of any websites being blocked
6  that are related to PMPs.
7  BY MR. GADDY:
8    Q.    And during this time frame, I think in
9  2013, the date of this e-mail, also in 2009 when
10 this Order to Show Cause was entered, and 2011 when
11 this particular agreement was assigned, would it be
12 fair to say that PMPs fell directly under your
13 purview?
14   A.    Yes.
15   Q.    Do you recall Ms. Polster or Mr. Swords
16 or anybody else at Walgreens ever alerting you to
17 any issue related to firewalls and access to PMPs?
18   A.    Not with the firewall reference, no.
19   Q.    And about two years after this
20 settlement agreement was signed in March of 2011 we
21 had the second settlement agreement in Florida
22 signed in June of 2013, correct?
23   A.    Yeah, those are the two dates I think
24 we've reviewed so far, yeah.

Page 151

1    Q.    We touched on this a little bit earlier.
2          Would you agree that as we sit here
3  today that our country is in the midst of an opioid
4  epidemic --
5    MR. BENSINGER:  Objection.
6  BY MR. GADDY:
7    Q.    -- related to abuse of prescription
8  opioids?
9    MR. BENSINGER:  Objection; vague.
10 BY THE WITNESS:
11   A.    I think that's what like the CDC has
12 issued guidance on, so, and that's -- I think we
13 are definitely in a tough situation for sure.
14 BY MR. GADDY:
15   Q.    Would you say that we're in an opioid
16 crisis?
17   A.    I would say there is a problem that has
18 to do with controlled substances in this country,
19 yeah.
20   Q.    Is there a reason that you don't want to
21 say we're in an opioid crisis?
22   A.    Well, yeah, because, I mean, when I
23 think about this problem, I think every day people
24 are doing things to help with this issue and so my

Page 152

1  hope is things are getting better every single day.
2  So, at what point does a crisis stop being a
3  crisis?  I don't know.
4    Q.    Okay.  I show you what we'll mark as
5  Exhibit No. 10.
6          (WHEREUPON, a certain document was
7           marked as Walgreens-George Exhibit
8           No. 10:  12/11/17 e-mail with
9           attachment; WAGMDL00334471 -
10          00334495.)
11 BY MR. GADDY:
12   Q.    Do you recognize this as being an e-mail
13 that you are copied on -- or excuse me -- you're on
14 the "To" line?
15   A.    I do.
16   Q.    And the subject says, "Final Version"?
17   A.    That's what the subject says, correct.
18   Q.    And what's the name of the attachment?
19   A.    "Opioid Crisis Webinar" dated
20 December 11, 2017.
21   Q.    So, just over a year ago, correct?
22   A.    Yes.
23   Q.    And if you turn the page, do you see the
24 title page of this presentation that was being sent

Page 153

1  to you, correct?
2    A.    Correct.
3    Q.    And the title of the presentation is
4  "The Opioid Crisis," correct?
5    A.    That is correct.
6    Q.    And this is a presentation that you
7  actually were involved in presenting?
8    A.    That's correct.
9    Q.    Has something changed between
10 December 2017 and now as it relates to whether or
11 not you would -- you're comfortable calling what
12 we're in the midst of an opioid crisis?
13   A.    I mean, I think things are changing
14 every single day, laws, every month, are happening
15 that are limiting controlled substances.  You have
16 Walgreens, you know, putting out, working on
17 Naloxone programs and we have got our drug
18 take-back programs.  I think these prescription
19 drug monitoring programs are evolving as well.  I
20 think everyone is doing a little bit better with
21 the situation.
22          But, again, who's -- I mean, I think the
23 term "crisis," you know, has a huge connotation
24 associated with it.  So, like, what's the threshold

Page 154

1 that makes it a crisis? Again, I don't know.

2 　　Q.　I guess my question for you is: Why

3 were you comfortable calling it a crisis in

4 December of 2017 but you're not today?

5 　　A.　I don't know if I -- I don't know if I

6 see anything here that says I was comfortable

7 calling it a crisis in 2017.

8 　　Q.　Okay. Well, this was a presentation you

9 were a part of, correct?

10 　　A.　Yes, there is a specific agenda item

11 around PDMP, which was my area of expertise, that I

12 spoke to. I did not put together the presentation

13 as a whole, however.

14 　　Q.　Okay. And we're looking at the second

15 page?

16 　　A.　That's correct.

17 　　Q.　And it lists the agenda and it's got you

18 listed there for PDMPs, correct?

19 　　A.　That's correct.

20 　　Q.　Do you know who Steven Gregory is?

21 　　A.　I believe he is the boss of Michele

22 Davidson who had sent me the e-mail.

23 　　Q.　What's his role?

24 　　A.　He works in government relations in the

Page 155

1 office in Washington, D.C.

2 　　Q.　Okay. Is he one of the lobbyists?

3 　　A.　I wouldn't call him a lobbyist.

4 　　Q.　Do you know if he's a registered

5 lobbyist?

6 　　A.　I do not know.

7 　　Q.　He is one of the people that speaks with

8 federal legislators about federal laws that would

9 impact Walgreens?

10 　　MR. BENSINGER: Objection; foundation.

11 BY THE WITNESS:

12 　　A.　I don't know what his day-to-day is. My

13 understanding, he had a little to do with policy

14 versus -- I don't know where he -- what his

15 interactions are, to be honest.

16 BY MR. GADDY:

17 　　Q.　Were you in attendance when this

18 PowerPoint was presented?

19 　　A.　Yes, I was.

20 　　Q.　And if you flip through two pages, the

21 slide's numbered No. 4 in the bottom right-hand

22 corner of the slide and it says, "Background." Are

23 you with me?

24 　　A.　Yes.

Page 156

1 　　Q.　It says, "Drug overdose deaths have

2 reached epidemic proportions in the U.S. and

3 require a complex, multifaceted approach."

4 　　Do you see that?

5 　　A.　Yes, I do.

6 　　Q.　Do you have any reason to disagree with

7 that sentence?

8 　　A.　No.

9 　　Q.　It goes on to say that "According to

10 HHS." Do you know who that is?

11 　　A.　Health and Human Services I believe.

12 　　Q.　Okay. It says, "175 people die daily

13 from the drug crisis."

14 　　Do you see that?

15 　　A.　I do.

16 　　Q.　Do you agree or disagree that 175 people

17 dying every day is a crisis?

18 　　A.　It's bad. It's not a good thing. I

19 think any time anyone dies, it's a bad thing.

20 　　Q.　It says, "Since 1999 the number of

21 American overdose deaths involving opioids

22 quadrupled."

23 　　Do you see that?

24 　　A.　I do.

Page 157

1 　　Q.　And, so, during that period, from 1999

2 to when this presentation was presented in 2017,

3 you agree that during that entire time period

4 Walgreens was in the opioid business?

5 　　MR. BENSINGER: Objection.

6 BY THE WITNESS:

7 　　A.　Walgreens dispensed prescriptions that

8 may have included opioids during that time.

9 BY MR. GADDY:

10 　　Q.　And for a significant period of that

11 time period Walgreens also distributed opioids to

12 their stores?

13 　　A.　Yes.

14 　　Q.　It goes on to say that "Approximately

15 six in ten drug overdose deaths involved opioids."

16 　　Do you see that?

17 　　A.　I do.

18 　　Q.　Was this information new to you when you

19 heard this presented or was this information that

20 you knew?

21 　　A.　I'm trying to recall the presentation.

22 These aren't -- are not statistics that I would

23 have dealt with in my day-to-day job prior to this

24 presentation. I think this was background

Page 158

1 information being communicated to a number of
2 individuals to educate them on the issue and where
3 it currently stands. So...
4       But I -- I don't know if I was -- while
5 I did attend -- while I did attend the
6 presentation, I don't know if I was focused on this
7 slide. I was probably preparing for the subsequent
8 slides that I was supposed to cover.
9       Q.   If you look at the next page, Slide
10 No. 5, it says, "Americans consume more opioids
11 than any other country."
12       Do you see that?
13       A.   Yes, I do.
14       Q.   Do you have any understanding of why
15 that is?
16       A.   I don't know exactly why. I know that's
17 something that's definitely been the attention of
18 many people who have been working in this space.
19       Q.   We might come back to this in just a
20 little bit, so keep it close.
21       I show you what I'm going to mark as
22 Exhibit 11.
23       (WHEREUPON, a certain document was
24       marked as Walgreens-George Exhibit

Page 159

1       No. 11: 12/23/13 e-mail string
2       with attachment; WAGMDL00267660 -
3       00267667.)
4 BY MR. GADDY:
5       Q.   And do you recognize this to be an
6 e-mail chain between you and Ms. Polster?
7       A.   Yes.
8       Q.   Okay. And the subject of -- subject
9 line of this e-mail is "A Painful Dilemma"?
10       A.   Yes.
11       Q.   And these are e-mails it looks like from
12 back in December of 2013, correct?
13       A.   That's correct.
14       Q.   Are you aware of what's being referred
15 to in that subject line, "A Painful Dilemma"?
16       A.   It looks like this organization that was
17 putting together a national drug abuse summit sent
18 out an e-mail blast probably to e-mail subscribers
19 with that subject heading "Painful Dilemma."
20       And when I turn to the next page, it
21 says, "A Painful Dilemma: Balancing Prescription
22 Drugs and Pain."
23       Based upon the title, I think this story
24 probably talks about the challenges that

Page 160

1 pharmacists or maybe prescribers face in trying to
2 balance how to treat patients and pain.
3       Q.   If you turn the page one more time where
4 we got 662 at the bottom.
5       A.   Okay.
6       Q.   It looks like we actually see the --
7 "A Painful Dilemma: Balancing Rx Drugs and Pain."
8       Do you see that?
9       A.   Okay. Yes.
10       Q.   It says there, it says, "Pain sends us
11 to the doctor more than anything else and for about
12 the last 15 years, Americans have often left their
13 doctors' offices with prescriptions for powerful
14 painkillers once reserved for only the worst
15 injuries."
16       Do you see that?
17       A.   Yes.
18       Q.   It goes on to say, "Bombarding pain and
19 opioid medication" -- excuse me.
20       "Bombarding pain with opioid medication
21 was a dramatic shift in U.S. medicine, pushed by a
22 profitable drug industry that leads the education
23 of doctors who otherwise get little training to
24 treat their patients' top complaint."

Page 161

1       Do you see that?
2       A.   I do.
3       Q.   It goes on to say, "The result has been
4 a public health disaster."
5       Do you see that?
6       A.   Yes.
7       Q.   It says, "We know now that the pills
8 flooding this country more than any other in the
9 world leave millions in pain. They fuel our worst
10 ever heroin crisis. And they kill 17,000 Americans
11 a year - in Ohio, opioids kill three people a day,
12 more than who die in traffic accidents."
13       Do you see that?
14       A.   Yes.
15       Q.   Is what we just read there consistent
16 with your understanding?
17       MR. BENSINGER: Objection; vague.
18 BY THE WITNESS:
19       A.   I mean, I'm not -- in terms of
20 illustrating that this is an issue, yes. I don't
21 know if I can speak to some of the particulars here
22 and comment on those.
23 BY MR. GADDY:
24       Q.   Let me ask it this way. Is there

Page 162

1 anything that we just read that you disagree with?
2    A.   I mean, I don't have any information to
3 disagree with paragraph 1.
4        The second paragraph, I can't speak to
5 prescriber education.
6        And the third paragraph, I understand
7 that the U.S. has the most prescribed I think,
8 what, opioids, what we just reviewed recently in
9 that chart.  I wouldn't know the specifics around
10 Ohio.
11    Q.   Okay.  If you go back to the first
12 page of this document, it looks like, was there
13 some type of summit or conference that was hosted
14 by this group?
15    A.   Yes.
16    Q.   Have you been to any of those during
17 your time at Walgreens?
18    A.   I've attended at least one.  I can't
19 recall if I attended two or more.
20    Q.   As a Walgreens pharmacist during the
21 time period of 2000 to 2006, were you aware of the
22 diversion and abuse of opioids during that time
23 period?
24    A.   Not on a national sense.  I, you know,

Page 163

1 as a pharmacist, you just know about the patients
2 that you take care of and so you do your best to
3 take care of those patients, help prevent potential
4 drug interactions, you know, and, you know, if you
5 come across a prescription of concern, you'd call
6 the doctor to help verify that it's legitimate and
7 appropriate and whether or not the doctor -- have a
8 discussion of whether or not the doctor should look
9 at a different therapy or not.
10    Q.   During the time that you were a
11 pharmacist at Walgreens from 2000 to 2006, did
12 Walgreens provide you with any training or
13 education on the issue of the diversion and/or
14 abuse of opioids such as oxycodone products or
15 hydrocodone combination products?
16    A.   I mean, I don't remember anything
17 formal.  Much of my training came to me in pharmacy
18 school and in practice with, as I became a
19 pharmacist, as a graduate intern and technician.
20        But, you know, it was something that I
21 think we were generally aware of that there could
22 be an issue and, you know, how to look for
23 potential signs and contact the physician when
24 there's a question and document those

Page 164

1 conversations.
2    Q.   But no formal training or education from
3 Walgreens that you can remember, correct?
4    A.   Not that I can remember.
5    Q.   Okay.  Was there a class in pharmacy
6 school or a particular area of study related to
7 diversion and abuse of controlled substances?
8    A.   Not a class with that subject heading,
9 no, not that I remember.
10    Q.   Let me show you P-GEN-47, which I will
11 mark as Exhibit No. 12.
12        (WHEREUPON, a certain document was
13        marked as Walgreens-George Exhibit
14        No. 12:  Document, "OxyContin: Its
15        use and abuse: Hearing before the
16        Subcommittee on Oversight and
17        Investigations," etc., August 28,
18        2001"; P-GEN-0047.)
19 BY MR. GADDY:
20    Q.   Do you see the title of this document at
21 the top of the page it says, "OxyContin its use and
22 abuse:  Hearing before the Subcommittee on
23 Oversight and Investigations of the Committee on
24 Energy and Commerce, in the House of

Page 165

1 Representatives, 107th Congress, first session."
2        Do you see that?
3    A.   Yes, I do read that.
4    Q.   And this was dated August 28, 2001.
5        Do you see that?
6    A.   I do.
7    Q.   That would have been during the time
8 period in which you were a Walgreens pharmacist?
9    A.   That is correct.
10    Q.   And are you familiar generally with the
11 concept that the United States Congress has
12 different committees and subcommittees that from
13 time to time may have hearings on matters or
14 conduct investigations and take testimony on
15 different issues?
16    A.   I have a general understanding of that
17 concept, yes.
18    Q.   And if you would, turn for me, please,
19 if you look at the top right-hand corner, to use
20 that as our page number, that should be a 006 is
21 where I'm going.
22        Do you see that at the top of the
23 page it says, "OxyContin:  Its use and abuse,
24 Tuesday, August 28, 2001."

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    Do you see that?
2    A.   Yes.
3    Q.   As a Walgreens pharmacist, were you
4 aware during this time period that there were
5 Congressional hearings happening on the use and
6 abuse of OxyContin?
7    A.   I was not aware.
8    Q.   If you go down to the -- it looks like
9 it's the fourth paragraph that starts, "The use and
10 abuse," on that same page?
11    A.   Yes.
12    Q.   It says, "The use and abuse of OxyContin
13 provides quite a dilemma for us in Congress and for
14 the American public.  For some, OxyContin is the
15 angel of mercy; for others, it is the angel of
16 death.  To those who suffer severe chronic pain, it
17 brings welcome relief.  But for those who abuse
18 this highly addictive drug, it can bring even
19 greater suffering."
20    Do you see that?
21    A.   I do.
22    Q.   Were you aware as a Walgreens pharmacist
23 back in August of 2001 that OxyContin was a drug
24 that was already being abused by individuals?

Page 167

1    A.   I don't recall anything specific about
2 OxyContin.  I think controlled substance in general
3 again and especially Schedule II drugs, that's
4 something you pay attention to and help, you know,
5 prevent I guess if there is any potential concerns
6 with a given prescription.
7    Q.   But you don't recall any formal training
8 or education that you received from Walgreens while
9 you were a Walgreens pharmacist during this time
10 period?
11    MR. BENSINGER:  Asked and answered.
12 BY THE WITNESS:
13    A.   I don't recall anything specific to
14 OxyContin.
15 BY MR. GADDY:
16    Q.   It goes on to say that "Today we'll hear
17 from law enforcement officials who argue that
18 OxyContin is quickly becoming the abuser's drug of
19 choice, surpassing heroin and cocaine in some
20 jurisdictions."
21    Do you see that?
22    A.   I do.
23    Q.   And was that information that you were
24 familiar with back in 2001 as a Walgreens

Page 168

1 pharmacist?
2    A.   I can't say that statement is something
3 that I remember really being familiar with at the
4 time.
5    Q.   If you turn to page 7, the very next
6 page, start with the first full paragraph that
7 starts, "Sadly."  Do you see where I am?
8    A.   I do.
9    Q.   It says, "Sadly, prescription drug abuse
10 is a growing national problem.  According to the
11 National Institute of Drug Abuse, as recently as
12 1999, more than 9 million Americans, aged 12 and
13 older, reported that they used prescription drugs
14 at least once that year for non-medical reasons.
15 Nor is the prescription drug abuse a new problem.
16 For example, from 1990 to 1998, the number
17 individuals initiating misuse or abuse of pain
18 relievers increased by 181 percent."
19    Do you see that?
20    A.   I do.
21    Q.   Is that information that you recall
22 being made aware of during your time as a Walgreens
23 pharmacist?
24    A.   Not specifically.  I do not remember

Page 169

1 that.
2    Q.   Is that the type of information or is
3 that information the type that you were given any
4 formal education or training on by Walgreens during
5 your time as a pharmacist?
6    A.   Nothing formal, no.
7    Q.   If you'd turn to page 11 for me, please.
8 Again, looking at the top right-hand corner.
9    A.   Okay.
10    Q.   Do you see towards the top of the
11 page you see that it starts here, it has the
12 "Testimony of Terrence W. Woodworth, deputy
13 director, Office of Diversion Control, Drug
14 Enforcement Administration."
15    Do you see that?
16    A.   I do.
17    Q.   And if you go down to the bottom of the
18 page, the last paragraph on the page of
19 Mr. Woodworth's testimony, it starts, "During the
20 last two years."  Do you see where I am?
21    A.   Yes.  "During the last two years."
22    Q.   He says, "During the last two years, DEA
23 has noted a dramatic increase in the illicit
24 availability and abuse of OxyContin.  As early as

Page 170

1  1999, DEA assisted the State of Maine in the
2  investigation of an organized ring of individuals
3  who used forged, stolen, and altered prescriptions
4  to divert thousands of dosage units of OxyContin to
5  abusers.  While OxyContin diversion and abuse
6  appear to have begun more in rural areas, such as
7  Appalachia, it has spread to urban areas.  To date,
8  at least 14 states have experienced increased abuse
9  and diversion of OxyContin including the State of
10  Pennsylvania and New Hampshire."
11      Do you see that?
12  A.  Yes, I do.
13  Q.  And back in August of 2001 were you
14  aware as a Walgreens pharmacist of the DEA's
15  position on the increase of abuse and diversion of
16  specifically OxyContin?
17  A.  I was not.
18  Q.  Did you receive any formal education or
19  training or any formal notification from Walgreens
20  about the DEA's position on the increase in abuse
21  and diversion of OxyContin?
22  A.  I do not remember that, no.
23  Q.  Had you been provided that information
24  by Walgreens, is that something that you would have

Page 171

1  taken into consideration when you were asked to
2  fill or dispense those types of prescriptions?
3      MR. BENSINGER:  Objection; hypothetical, calls
4  for speculation.
5  BY THE WITNESS:
6  A.  I mean, in general, you know, anything
7  that Walgreens gives me in terms of training, it's
8  something you pay attention to.
9  BY MR. GADDY:
10  Q.  I'm going to show you what's been marked
11  as Exhibit No. 13.
12      (WHEREUPON, a certain document was
13      marked as Walgreens-George Exhibit
14      No. 13:  Press release, July 1,
15      2011, "State Surgeon General
16      Declares Public Health Emergency
17      Regarding Prescription Drug Abuse
18      Epidemic"; P-GEN-00126.)
19  BY MR. GADDY:
20  Q.  We referenced this earlier when looking
21  at the Florida settlement agreement, but do you
22  recognize this?  At the top of the page, it says,
23  "State Surgeon General declares public health
24  emergency regarding prescription drug abuse

Page 172

1  epidemic."
2      Do you see that?
3  A.  I do.
4  Q.  And at the top left-hand corner do you
5  see that this happened July 2011?
6  A.  I do.
7  Q.  Looking at this document now, I know we
8  mentioned it earlier, but do you recall this
9  announcement being made in the State of Florida?
10  A.  Not specifically.  But, again, there is
11  a lot of activity in Florida around this time, you
12  know.
13      Again, I think we talked about I think
14  the prescription drug monitoring program was
15  launched in 2011, so I think there is a lot of
16  announcements in general.  So, it's hard to
17  probably keep track of this one specifically.
18  Q.  Would it be fair to say that this would
19  have been on your radar, with the prescription drug
20  monitoring program coming around the same time,
21  this would have been something that was within your
22  base of knowledge?
23  A.  I think that what would be part of my
24  knowledge is if anything within House Bill 7095

Page 173

1  impacted pharmacy dispensing of controlled
2  substances.  I think that's where -- how I would
3  probably be more involved with this document.
4  Q.  Your involvement would be on looking at
5  the regulation and whether or not that's going to
6  impact Walgreens pharmacies?
7  A.  If Walgreens had to change anything in
8  accordance with the new law, absolutely.
9  Q.  Okay.  But you see here in that
10  paragraph that you're looking at, the second
11  paragraph on the page, it says that that law, House
12  Bill 7095, "was signed into law in response to
13  Florida's epidemic of prescription drug abuse.  Its
14  intent is to protect public health and safety by
15  stopping the many prescription drug overdose deaths
16  in Florida."
17      Do you see that?
18  A.  Yes.
19  Q.  Would you agree that in this time period
20  it was not a secret that there were problems with
21  diversion and abuse of prescription drugs in
22  Florida?
23      MR. BENSINGER:  Objection; vague, argument.
24  BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    A.    I mean, I think if you're asking the
2  question about whether or not Florida was having
3  issues with controlled substances, which prompted
4  lots of laws and the prescription drug monitoring
5  program being launched, that would make sense to
6  me.
7  BY MR. GADDY:
8    Q.    Is that something that you knew and you
9  were aware of?
10   A.    I knew that legislators felt it was an
11 issue that they had to address with regulations.
12   Q.    When you say "issues," you're talking
13 about overdose deaths?
14   A.    Overdose deaths, yeah, that would make
15 sense, yes.
16   MR. BENSINGER:  Mr. Gaddy, if you're going to
17 mark a new exhibit, now would be a convenient time
18 for us to take our lunch break before we do.
19   MR. GADDY:  That is not a problem.
20   THE VIDEOGRAPHER:  We are off the record at
21 12:29 p.m.
22       (WHEREUPON, a recess was had
23         from 12:29 to 1:14 p.m.)
24   THE VIDEOGRAPHER:  We are back on the record

Page 175

1  at 1:14 p.m.
2  BY MR. GADDY:
3    Q.    Mr. George, before we broke for lunch we
4  were talking about some of the actions in Florida,
5  and I think we were touching on about the issue of
6  the Florida legislature implementing a PDMP, a
7  prescription drug monitoring plan, based on the
8  issues that Florida was having related to opioids,
9  whether it's abuse or diversion or death.
10       Do you recall that?
11   A.    Yes.
12   Q.    I'm going to show you what I'm going to
13 mark as Exhibit 14 to your deposition.
14       (WHEREUPON, a certain document was
15         marked as Walgreens-George Exhibit
16         No. 14:  Florida Dept. of Health
17         2010-2011 PDMP Annual Report;
18         P-GEN-00127.)
19 BY MR. GADDY:
20   Q.    This is a report from the Florida
21 Department of Health, 2010-2011 Prescription Drug
22 Monitoring Program Annual Report.
23       Do you see that?
24   A.    Yes.

Page 176

1    Q.    Before we jump into this, let me just
2  kind of ask you generally.  What is -- we've used
3  the acronym PDMP.  What is a PDMP?
4    A.    Oh, sure.  PDMP is a prescription drug
5  monitoring program.  Some states call it PMP.  Some
6  states call it PDMP.
7        In essence, I think there is really a
8  few things to understand about the PDMP.  One, the
9  data supplied by pharmacies, prescription data,
10 represents their dispensing, which patients they
11 have dispensed prescriptions to.  That is then
12 basically reported to the State authority that
13 administers the program in a given state, and
14 basically the data then is now accessible by
15 authorized users.  In most cases the primary users
16 are prescribers or pharmacists, but in other cases
17 it could be law enforcement under special
18 privileges and such.
19       And ultimately, you know, when you think
20 about some of the benefits of the prescription drug
21 monitoring program, it really allows a practitioner
22 or pharmacist who may have a concern of a given
23 patient to help use it as a tool to look at that
24 individual patient to see their controlled

Page 177

1  substance history, see if there is any signs of
2  misuse, overuse of a controlled substance
3  prescription.
4    Q.    Generally speaking -- I understand there
5  is going to be some differences on a state-by-state
6  basis.  But generally speaking can you kind of give
7  me the bullet points of the type of information
8  that would be entered into a PDMP?
9    A.    Yeah, essentially you have a --
10 essentially it's a snapshot of the prescription as
11 how it's dispensed.  You will have prescriber
12 detail, so which doctor issued the prescription,
13 which pharmacy would have dispensed the
14 prescription, and then you have patient demographic
15 details.
16       And then you would have, again, some of
17 the more intricate prescription details as far as
18 the drug, the quantity, the days supply, the date
19 of dispensing from the pharmacy.  Generally that
20 could be the date the prescription is processed in
21 their system.
22       Then you may have an indicator as to the
23 form of payment from a -- whether it be an
24 insurance, Blue Cross, for example, or whether they

Page 178

1  paid cash or maybe it was a Medicaid plan of some
2  sort.
3      Q.   Okay.  So, it would be pretty standard
4  for these PMPs to require you to report name and
5  date of birth of the patient?
6      A.   Correct.
7      Q.   You're also going to have the name of
8  the doctor that wrote the script?
9      A.   The pharmacy would actually report the
10 prescriber DEA in most instances.  The state may
11 use that DEA to cross-reference with their database
12 and then populate the name.  But the pharmacy can
13 also report the name of the prescriber as well.
14     Q.   It's obviously going to include the
15 pharmacy that fills any prescriptions?
16     A.   Yes.
17     Q.   Okay.  And it's going to include
18 information about their history of controlled
19 substances that have been filled, such as the date
20 those prescriptions were filled, the pharmacies
21 they were filled at, the strengths of the scripts?
22     A.   Um-hmm.
23     MR. BENSINGER:  Object.
24 BY MR. GADDY:

Page 179

1      Q.   The quantity.  Is that fair?
2      MR. BENSINGER:  Objection; vague.
3  BY THE WITNESS:
4      A.   Yeah, I mean, in general if you were to
5  look up a specific patient and their history, you
6  would see information about their dispensing
7  history, which drugs, and the strengths would also
8  be included along with which locations dispense
9  those prescriptions and which prescribers issue
10 those prescriptions.
11     Q.   Would it be fair to say that these are
12 tools that could be used by either doctors or
13 pharmacists to determine whether or not
14 prescriptions would be appropriate to be written or
15 prescriptions would be appropriate to be filled?
16     A.   I don't know if it's as black and white
17 as that, but I think it's definitely a tool that
18 they could use in reference to see if there is any
19 concerns that would cause them to think twice
20 before issuing or dispensing a controlled
21 substance.
22     Q.   Okay.  And is it -- would you agree that
23 it's pretty standard that the pharmacists have
24 access to these databases within the different

Page 180

1  states?
2      A.   Pharmacists are allowed access in pretty
3  much every state at this point.  I think originally
4  wasn't set up that way, but at this point, yeah,
5  pharmacists do have access.
6      Not all pharmacists, you know, pursue
7  access or register with the State, you know, and
8  actually have an account.  But by law they do have
9  access if they -- if they register.
10     Q.   Okay.  Fair to say that in some states
11 it's required for pharmacists to regulate -- excuse
12 me -- to register and some states it's not?
13     A.   That's correct.
14     Q.   Outside of the PDMP, is there any
15 Walgreens system or Walgreens-specific database
16 that would give a pharmacist that same information
17 that's contained within a state PDMP?
18     A.   Walgreens pharmacists generally have
19 access to Walgreens data.  The PDMP allows you to
20 see information that's -- you know, represents
21 other pharmacies as well.  So, Walgreens does not
22 have direct access to that situation.
23     What you might see that's related is you
24 might have a third party plan who may notice that a

Page 181

1  patient was dispensed a given prescription at
2  Location A and if they realize that that
3  prescription is being filled again at another
4  location maybe too early, they may provide a
5  message back to the pharmacy.  But, again, it's not
6  to the same degree as a PDMP.
7      Q.   Okay.  I want to make sure that I can
8  understand the visibility that a Walgreens
9  pharmacist would have on a patient's prescription
10 history.
11     Fair to say that with your typical PDMP,
12 you could see -- a Walgreens pharmacist could see
13 the history of a particular patient, including any
14 prescriptions they had filled at a CVS or a Walmart
15 or a Rite Aid or Bob's Pharmacy.  They could see
16 all of that?
17     A.   Yeah, any prescription that was
18 dispensed by any pharmacy for that patient in a
19 given state, they would have access to that when
20 looking up that individual patient.
21     Q.   Okay.  And fair to say that a Walgreens
22 pharmacist who does not utilize the PDMP, they
23 would certainly have access to that patient's
24 history with Walgreens but not with any other

Page 182

1 pharmacy, is that correct?
2    A.   Yeah, I mean, not to the same degree, by
3 any means, no.
4    Q.   So, if you look at this document, turn
5 with me, if you don't mind, please, to page 2 in
6 the bottom right-hand corner.
7        And do you see in the middle of the
8 page, the second paragraph, it says, "The Florida
9 PDMP was created by the 2009 Florida Legislature as
10 an initiative to encourage safer prescribing of
11 controlled substances and to reduce drug abuse and
12 diversion within the State of Florida."
13        Do you see that?
14    A.   I do read that.
15    Q.   Do you agree with what's stated there in
16 that sentence as the general thought behind why
17 PDMPs are used?
18    MR. BENSINGER:  Objection; foundation.
19 BY THE WITNESS:
20    A.   The -- I mean, yeah, PDMPs are used as
21 a -- a reference tool to help prescribers and
22 pharmacists make better educated decisions around
23 their prescribing or dispensing practices.
24 BY MR. GADDY:

Page 183

1    Q.   Sure. And you would agree that there
2 are tools that doctors or pharmacists can use to
3 help reduce drug abuse and diversion as it relates
4 to controlled substances?
5    A.   Yeah. These databases can be -- can
6 serve as a tool for drug abuse and diversion.
7    Q.   It goes on to state that "The Florida
8 statute created the PDMP within the Florida
9 Department of Health for the purpose of providing
10 information that can help guide a healthcare
11 practitioner's prescribing and dispensing decisions
12 regarding highly abused controlled substance
13 prescription drugs."
14        Do you see that?
15    A.   I do read that.
16    Q.   And, again, you have no disagreement
17 with that sentence, correct?
18    A.   Yes. Specifically I think Schedule II
19 to Schedule IV drugs are what's defined in Florida,
20 but yes.
21    Q.   Okay. And, obviously, in order for a
22 pharmacist to utilize this tool that is intended to
23 help reduce drug abuse and diversion, they have to
24 register for the PDMP and they have to actually

Page 184

1 access the PDMP, correct?
2    A.   That's correct.
3    Q.   If you go down to the -- it looks like
4 it's the fourth paragraph, on the page about
5 halfway through that paragraph there is a sentence
6 that starts "The PDMS," the prescription drug
7 monitoring system. Do you see that?
8    A.   Oh, yeah.
9    Q.   It says that's "a web-based program that
10 facilitates the collection and analysis of medical
11 and pharmacy data to enable state regulators and
12 practitioners to detect and prevent diversion,
13 abuse and misuse of controlled substance
14 prescription drugs."
15        Do you see that?
16    A.   I do read that.
17    Q.   And do you see the first sentence of the
18 next paragraph, that's what we have been alluding
19 to earlier today. It says, "In Florida the PDMP
20 became operational on September 1, 2011."
21        Do you see that?
22    A.   I do.
23    Q.   I will show you what I will mark as
24 Exhibit No. 15.

Page 185

1        (WHEREUPON, a certain document was
2        marked as Walgreens-George Exhibit
3        No. 15:  7/6/11 e-mail to All FL
4        Pharmacies; WAGFLDEA00000383.)
5 BY MR. GADDY:
6    Q.   This is P-WAG-2167.
7        Do you recognize this as a communication
8 that looks like you sent out to all Florida
9 pharmacies.
10    A.   Yep. Yes, this is something I would
11 have sent.
12    Q.   And it looks like this was sent back in
13 July of 2011, so about roughly two months before
14 the Florida PDMP went online, correct?
15    A.   Yes.
16    Q.   You say, "All Florida pharmacies: The
17 Florida Prescription Drug Monitoring Program known
18 as E-FORCSE," is the acronym, "is anticipated to be
19 operational by September 1, 2011. Florida will be
20 the 38th state to implement a prescription drug
21 monitoring program."
22        Do you see that?
23    A.   I do.
24    Q.   Goes on to say, "The PDMP will require

Page 186

1  pharmacies to provide controlled substance
2  dispensing information" -- excuse me -- "controlled
3  substance dispensing data to the state on a weekly
4  basis. The data will be stored in a database so
5  that it can be made available to healthcare
6  practitioners to help guide their decisions when
7  prescribing and dispensing controlled drugs."
8       Do you see that?
9    A.  Yes.
10   Q.  And, again, that's what we have talked
11 about earlier that if a pharmacist wants to utilize
12 this database or this tool to help them in their
13 dispensing decisions, they'd have to access the
14 PDMP, correct?
15   A.  Right.
16   Q.  One of the things that could happen when
17 a pharmacist accesses and looks at the PDMP is they
18 could see within their information that would lead
19 them to believe that maybe it's a prescription that
20 should not be filled, is that correct?
21   A.  That's correct.
22   Q.  The next section says, "What we need
23 to" -- "What we need to do" -- or "What do we need
24 to do?"

Page 187

1       It says, "All reporting requirements
2  will be handled by the corporate office.
3  Pharmacies will only be required to ensure
4  controlled substances" -- "that each controlled
5  substance prescription contains accurate and
6  complete data prior to dispensing. Pharmacy team
7  members should pay close attention to required
8  fields such as the date of the prescription, the
9  patient's full name, address and date of birth, the
10 drug name, the NDC number, quantity and strength of
11 the controlled substance dispensed, and the
12 prescriber name, DEA number and NPI number."
13      Do you see that?
14   A.  Yes, I do.
15   Q.  And is that consistent with what we
16 talked about a few minutes ago as far as the type
17 of general information that is reported to these
18 PDMPs?
19   A.  Yes, I would say so.
20   Q.  And you agree that if a pharmacist has
21 access to that type of information and actually
22 reviews the PDMP that that can inform their
23 decisions about whether or not prescriptions that
24 they are presented are medically necessary and

Page 188

1  should actually be filled?
2    A.  It's -- it's something that they can
3  definitely refer to to help with that decision.
4    Q.  Goes on to say, it says, "Why do we need
5  to do this?"
6       And you write, "In order to comply with
7  pharmacy rules and regulations for the State of
8  Florida."
9       Do you see that?
10   A.  That's correct.
11   Q.  The next section says, "Are pharmacists
12 required to access the database prior to dispensing
13 controlled substance prescriptions?"
14      And what you say there is, "This will be
15 voluntary."
16      Do you see that?
17   A.  I do.
18   Q.  Goes on to say, "Neither prescribers nor
19 pharmacists will be required to access the
20 database."
21      Do you see that?
22   A.  Yes.
23   Q.  Was there any Walgreens policy at this
24 time frame that encouraged pharmacists to access

Page 189

1  the PDMP when they were presented with a controlled
2  substance prescription?
3    A.  I don't believe there was a specific
4  policy at this time, in July of 2011. Part of the
5  challenges we had with the PDMPs was that there was
6  such a variation as to how to access and what each
7  system included.
8       And, so, being a national chain, it was
9  tough to really come up with some standardized
10 processes. We were still trying to learn along
11 with these state systems essentially how to make
12 the data as useful as it could be.
13      I think a lot of work was actually done
14 in 2012 and beyond, both on the state side and in
15 pharmacies, and try to help really create an
16 environment where I think it's -- it provided the
17 most optimal value.
18      So, at this time I think it was a
19 challenge to really come up with those standardized
20 processes, but I think it was something definitely
21 in our -- in our thought process.
22      This communication I think was just kind
23 of reflecting what the law essentially required.
24   Q.  Okay. And the law was, is that it was

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  voluntary for a doctor and a pharmacist to access
2  the PDMP?
3     A.   That's correct.
4     Q.   Okay.  And we agree that the PDMP,
5  specifically the one in Florida, contained
6  information that could be a helpful tool for a
7  doctor or a pharmacist in determining whether or
8  not to write a prescription or whether or not to
9  fill a prescription, correct?
10    A.   Yes.
11    Q.   And you would agree that if neither the
12 doctor nor the pharmacist look at the PDMP in
13 deciding whether or not to write or fill a
14 particular prescription, that that's a tool they're
15 leaving in their toolbox and not exercising for the
16 purposes of that particular prescription?
17    A.   Yeah, I mean, not -- I can't say that a
18 PDMP is relevant to all prescribers or I can't say
19 PDMP is relevant to every single pharmacist in
20 their practice setting.
21         So, that's where I think, at least at
22 this time, it was something that was still trying
23 to figure out exactly, you know, the best way to
24 take advantage of this information.

Page 191

1     Q.   But you agree that if you don't look at
2  the information, you can't take advantage of it?
3     A.   Yes.
4     Q.   I show you what I'll mark as
5  Exhibit No. 16.
6          (WHEREUPON, a certain document was
7           marked as Walgreens-George Exhibit
8           No. 16:  10/22/11 e-mail string;
9           WAGFLDEA00000403 - 00000405.)
10 BY MR. GADDY:
11    Q.   And if you flip to the second page of
12 this document, at the bottom half of that page, you
13 see the original e-mail that we were just looking
14 at?
15    A.   What page again?  I'm sorry.
16    Q.   Second page, about two-thirds of the
17 page.
18    A.   Yes.
19    Q.   It looks like we see that original
20 e-mail?
21    A.   Um-hmm.
22    Q.   It looks like if you look immediately
23 above that, it looks like you respond to that
24 e-mail chain?

Page 192

1     A.   That's correct.
2     Q.   You write, "Good evening.  E-FORCSE,
3  the prescription drug monitoring program, will soon
4  be providing access for pharmacists to review
5  patient data."  It says, "Even though access is not
6  mandatory, we will be delivering communications to
7  all Florida pharmacies to help guide those
8  pharmacists who would like access to the state's
9  database."
10         Do you see that?
11    A.   Yeah, I do read that.
12    Q.   It says, "This communication will be
13 delivered once all details have been confirmed -
14 how to request access and where to go to view
15 patient information."
16         Do you see that?
17    A.   Yeah.
18    Q.   And, again, the -- you note that the
19 access of this material for Florida pharmacists is
20 a voluntary program?
21    A.   Yes.
22    Q.   If you go back up to the first page, it
23 looks like you get an e-mail from a Terence
24 Collins.

Page 193

1          Do you see that?
2     A.   Yes.
3     Q.   Do you know who that is?
4     A.   Trying to remember if he was a district
5  manager or a pharmacy supervisor.  I don't remember
6  offhand which role he played.
7     Q.   And this e-mail was sent, it looks like,
8  on October 19, 2011.
9          Do you see that?
10    A.   Yes.
11    Q.   That's going to be roughly a month and a
12 half, six weeks after the PDMP has been in place?
13    A.   Yes.
14    Q.   And the question being asked there is,
15 "Hey Tomson, When can we expect the next
16 communication to go out to stores?  We are getting
17 a lot of questions about the registration process.
18 Please advise."
19         Do you see that?
20    A.   Let's see here.  Yep, I do see that.
21    Q.   So, at this point the program has been
22 in place for a month and a half, six weeks, and at
23 this point in time the Florida stores have not been
24 told how to register to see the PDMP?

Page 194

1    A.   You know, I can't completely agree with
2  that assessment.  While you do have one document
3  that mentions that it was being launched, let's
4  say, on September 1st, 2011, I can't say when the
5  materials that are necessary to communicate to
6  pharmacists became available that we would actually
7  be able to communicate.
8         So, whether that was available on
9  September 1st, August 30 or 31st or October 1st or
10 October 15 of 2011, I don't have that information
11 available.
12   Q.   Okay.  You don't take any issue with the
13 Florida Department of Health information that the
14 program went live on September 1st, 2011, do you?
15   A.   I think there is -- when you launch a
16 program, there is a date that I think on paper the
17 program launches; but, you know, I will be curious
18 to see if we have any documentation that says when
19 the necessary information to access the program
20 became available to authorized users.
21   Q.   Okay.  Let's look up and look at your
22 response.  It looks like you write back the same
23 day.  You say, "Hi Team, I am hoping for the
24 communication to be delivered either end of this

Page 195

1  week or early next week."
2         Do you see that?
3    A.   Yep.
4    Q.   You write, "The main thing stores should
5  know is that pharmacist registration is not
6  mandatory."
7         Do you see that?
8    A.   Yes.
9    Q.   Was it your impression that the main
10 thing the Florida pharmacists needed to know about
11 the new PDMP program was that they did not have to
12 register to participate in the program?
13   A.   Yeah, I think the context is a little
14 bit different here.  The number that -- it was my
15 understanding probably at the time that there may
16 have been a misinterpretation as to what the law
17 represented and many pharmacists, being new to the
18 PDMP and the concept of the PDMP, may have felt
19 that it was going to require them to register and
20 access it.  So, I wanted to make sure I clarified
21 that potential misinformation that could be out
22 there.
23        But, obviously, we do want to facilitate
24 access and that's the purpose of the communication

Page 196

1  and the posting of information on our Storenet.
2    Q.   Based on some of the documents that
3  we've looked at earlier today about the number of
4  opioids going into the State of Florida and the
5  number of people dying from opioid-related
6  overdoses within the State of Florida, would it
7  make sense that some of the pharmacists within the
8  State of Florida might have wanted to have access?
9    A.   Oh, sure, absolutely.
10   Q.   But in response to them requesting it,
11 the comment that you made to them is the main thing
12 they need to know is that access is not mandatory?
13   MR. BENSINGER:  Object.
14 BY THE WITNESS:
15   A.   Because that's what the law says.
16   MR. BENSINGER:  Object to the
17 characterization.
18 BY MR. GADDY:
19   Q.   And that's what you were doing was just
20 making sure that they were informed about the law?
21   A.   That's correct and that if they would
22 like access, we have information posted.
23   Q.   In the next paragraph there in your
24 response you say, "The links point the pharmacist

Page 197

1  to training documentation as well, which I would
2  expect has answers to common questions."
3         Do you see that?
4    A.   I do see that.
5    Q.   Did you in your role as overseeing
6  compliance with the PDMPs throughout the country,
7  did you go to -- make any trips to Florida, do any
8  presentations on the PDMP to educate the pharmacy
9  managers or the district supervisors or anything
10 like that on the Florida PDMP and what it could do
11 for them?
12   A.   I did not go to any of the -- yeah, I
13 did not go to Florida to educate those on how the
14 system works, if that's what you're asking.
15   Q.   Did you do anything to facilitate the
16 use of the Florida PDMP by Florida Walgreens
17 pharmacists outside of forwarding some e-mails with
18 some links for where to go to register?
19   A.   Yeah, I mean, outside of sending the
20 communication that let them know how to request
21 access and where the training documentation that's
22 owned by the State is published, no, I did not
23 provide any additional assistance to the Florida
24 pharmacists as far as this system being launched in

Page 198

1 2011.
2    Q.   Are you aware of recent proposed changes
3 within Florida that would have made it mandatory
4 for pharmacists to review the PDMP?
5    A.   Yes.
6    Q.   Were those changes -- as far as when
7 that was occurring within the State of Florida, did
8 that fall under your job duties as far as gathering
9 information about that or communicating with any
10 other business groups about that potential change?
11    A.   So, when those changes went into effect,
12 I was in my more current role, which is less
13 centered on PDMPs.  Certainly I have a little
14 background in there.  So, I probably facilitated
15 some discussions on this.  But it wasn't --
16 wouldn't have been my primary responsibility to
17 help support that law change.
18    Q.   But, again, I think we have covered some
19 of this, but you agree that the information that a
20 pharmacist can find within the PDMP can be useful
21 in helping that pharmacist determine whether or not
22 to fill a particular prescription?
23    A.   That's correct.
24    Q.   Was Walgreens, or do you know, was

Page 199

1 Walgreens in favor of or against a change in the
2 regulation that would have required them to check
3 the PDMP?
4    MR. BENSINGER:  Objection; foundation.
5 BY THE WITNESS:
6    A.   Yeah, I don't -- I mean, I think
7 Walgreens as an entity separate from myself,
8 looking at the proposed rules or law changes, that
9 is, I think what was unique about Florida is it
10 required doctors and pharmacists to check on every
11 single controlled substance prescription, which we
12 have history in other states that it's not -- when
13 the doctor is checking on every prescription they
14 issue and the pharmacist is also checking, for
15 example, on the new prescriptions that are -- they
16 are receiving, you know, standard what I would
17 expect is many of the practices that you see in
18 pharmacy today already take into account all the
19 other situations like, let's say, refills would
20 come into play.
21    And, so, I think -- I think if there is
22 one concern that, you know, at least I personally
23 had with the way that the law was essentially
24 drafted and I think implemented was it was

Page 200

1 requiring pharmacists to check on prescriptions
2 after it's already been checked by a doctor and a
3 pharmacist already one time and so now you're
4 checking again.
5    There is other things happening in the
6 pharmacy.  And without having system integration,
7 some of those tools, it makes it, you know, an
8 increasing difficult burden to juggle all of those
9 things in the pharmacy.
10    So, I think it's really that aspect that
11 was really creating a little heartburn is not that
12 we didn't believe in the access, it was just, you
13 know, all the parameters that were kind of being
14 put into -- in place with the -- with the law.
15    Q.   In short, Walgreens didn't want their
16 pharmacists to have to check after a doctor had
17 already checked.  Is that fair?
18    MR. BENSINGER:  Objection; mischaracterization.
19 BY THE WITNESS:
20    A.   We wanted the pharmacist to use their
21 professional judgment.  We believe that the
22 pharmacist had the proper training to do so.  So,
23 it may not be necessary to legislate that.
24 BY MR. GADDY:

Page 201

1    Q.   Well, you agree that Walgreens
2 pharmacists had already been told by you that it
3 was not mandatory for them to register and look at
4 the PDMP?
5    A.   I think that's -- so, if you look at the
6 timelines and when it was launched in 2011, that
7 communication we reviewed, I was commenting on the
8 expectations of the law.
9    Since that time, I believe, I don't
10 know -- is it 2012, 2013 -- there were changes in
11 the policies that actually did direct our
12 pharmacists to use the PDMP when dispensing
13 controlled substances as part of their good faith
14 dispensing.
15    And by that time that the more recent
16 laws that I think you are talking about, I expect
17 it would be a standard practice for our pharmacists
18 to check the PDMP whenever appropriate.
19    Q.   And those would be enhancements that
20 were made to the good faith dispensing policy after
21 the DEA investigation in Florida that resulted in
22 the settlement agreement?
23    A.   Yeah, from a timing standpoint, yeah, I
24 believe that's correct.

Page 202

1    Q.   So, pre-DEA investigation, Walgreens'
2  position was that it was not mandatory for Florida
3  pharmacists to check the PDMP.  After the DEA
4  investigation and settlement, it was at that point
5  in time encouraged for Florida pharmacists to check
6  the PDMP?
7    A.   I think they're still a little bit
8  different.  Again, I'd still characterize
9  communication to let them know what the laws are in
10 their state and we want our pharmacists to follow
11 the state laws, you know.  But, yes, it did evolve
12 and our policies did include references to PDMP.
13   Q.   Let me show you what I will mark as
14 Exhibit 17.
15        (WHEREUPON, a certain document was
16         marked as Walgreens-George Exhibit
17         No. 17:  7/2/12 e-mail string;
18         WAGMDL00441530 - 00441537.)
19 BY MR. GADDY:
20   Q.   Do you recognize this as an e-mail chain
21 that you're involved in?
22   A.   I see I'm copied on page 1.
23        Okay.  I see I'm copied on page 1.
24   Q.   It looks like it's an e-mail to you on

Page 203

1  page 1, correct?
2    A.   I'm sorry.  Yeah.
3    Q.   And the subject says, "PMP pilots in" I
4  guess it's Indiana and Ohio?
5    A.   Yes.  "PMP pilots in Indiana and Ohio."
6    Q.   Okay.  And this is from July 2012,
7  correct?
8    A.   That's correct.
9    Q.   Are you aware of what's being referred
10 to, it looks like at the bottom of the page, there
11 is beginning of an article, "New Health IT Effort
12 Aimed At Reducing Prescription Drug Abuse to be
13 Tested in Indiana and Ohio"?
14        Do you see that?
15   A.   Yeah.  Let me -- I have a general
16 understanding, but I did want to just review this
17 briefly to make sure I have got a good
18 understanding of what's being communicated here.
19        The way I read this document, there was
20 a roundtable or task group of sorts that convened
21 and at the outset of that work, there is some
22 recommendations brought forth to help increase
23 access to PDMPs and there's a pilot that was being
24 stood up I believe, from what I'm reading on the

Page 204

1  second page of this document, project in Indiana
2  which demonstrates how emergency department staff
3  can receive a patient's controlled substance
4  history directly from their medical record system
5  and the project was in collaboration between NABP,
6  Appriss and State of Indiana.
7        I don't know if I see the specific
8  reference to Ohio.  I might have missed as far as
9  what the -- oh, it says here the Ohio pilot will
10 test by having a drug risk indicator in the
11 electronic health record and how that affects the
12 clinical decision-making.
13        So, I think those were the two pilots
14 that were being communicated here.
15   Q.   Okay.  Both of these are states that
16 have PDMPs, correct?
17   A.   That is correct.
18   Q.   Okay.  And both of these states had
19 PDMPs before this date, correct?
20   A.   Before this date, yes, correct, yeah.
21   Q.   And these are efforts being made by both
22 Indiana and Ohio to further enhance their PDMPs,
23 correct?
24   A.   That's -- yep.

Page 205

1    Q.   You agree that each of these states are
2  continuing to take efforts to abat -- excuse me --
3  combat drug abuse and diversion within their
4  states?
5    A.   Yes.
6    Q.   If you look at the -- it's the second
7  full paragraph on the second page that starts "The
8  CDC."
9    A.   Yes.
10   Q.   It says, "The CDC has declared that the
11 United States is in the midst of an epidemic of
12 prescription drug overdose deaths.  Deaths from
13 prescription drugs now outnumber deaths from heroin
14 and cocaine combined.  Over the past decade,
15 prescription drug-induced deaths have approached
16 motor vehicle deaths as the leading cause of all
17 injury deaths."
18        Do you see that?
19   A.   Yes.
20   Q.   If you go down to the next full
21 paragraph, about the middle of that paragraph on
22 the right-hand side it starts, "PDMPs collect."
23   A.   Yep, I see it.
24   Q.   Are you with me?

Page 206

1    A.   Yes.
2    Q.   It says, "PDMPs collect a considerable
3  amount of useful information; however, many states
4  do not use these databases enough."
5       Do you have an opinion on that sentence?
6    MR. BENSINGER:  Objection; vague.
7  BY THE WITNESS:
8    A.   Looking at 2012, and I kind of
9  referenced this in earlier comments, that prior to
10  2012 I think PDMPs did a good job of collecting
11  data but they didn't really as good of a job as
12  they do today as to making that data available in
13  an easy-to-access or easier-to-access manner.
14       And, so, I think there was some
15  conversations here that contemplated looking at
16  ways to improve accessibility.
17  BY MR. GADDY:
18    Q.   It says, "Improving realtime access to
19  the information contained in the PDMPs will provide
20  an incentive to healthcare providers to use the
21  programs."
22       Do you see that?
23    A.   I do.
24    Q.   And then I think you found it just a

Page 207

1  moment ago, but you see down at the bottom of the
2  page where it talks about the Ohio pilot program?
3    A.   Yes.
4    Q.   It says, "The Ohio pilot project will
5  test the impact of having a drug risk indicator in
6  the electronic health record and how that
7  impacts" -- or "affects clinical decision-making."
8       Do you see that?
9    A.   I do.
10    Q.   From your work with the PDMPs, was that
11  a pilot that was actually put into place?
12    A.   I believe -- I don't believe Walgreens
13  participated in that specific pilot.  But I would
14  expect that, I mean, yeah, I can't remember offhand
15  when it would have started or when it would have
16  completed.  But this idea of a drug risk indicator
17  I believe has been incorporated into the Ohio PDMP
18  system.
19    Q.   Okay.  And is that something that after
20  the DEA investigation and settlement, is that a
21  database that Walgreens now encourages their
22  pharmacists within Ohio to check?
23    A.   Yeah.  In general we have got our
24  Walgreens good faith dispensing policies that

Page 208

1  reference PDMP access and then also I believe Ohio
2  state law recently changed and mandated pharmacists
3  to access the PDMPs.
4    Q.   In what way?
5    A.   I believe -- it's a little bit nuanced,
6  but I think at least for every new prescription and
7  maybe it's once a year for existing patients, they
8  should be checking prior to dispensing a controlled
9  substance.
10    Q.   Let me show you what I will mark as
11  Exhibit 18.
12       (WHEREUPON, a certain document was
13        marked as Walgreens-George Exhibit
14        No. 18: 11/27/12 e-mail string;
15        WAGMDL00440895 - 00440897.)
16  BY MR. GADDY:
17    Q.   You agree that in order for the PDMPs to
18  be effective and accomplish their goals that the
19  information entered into them has to be accurate,
20  correct?
21    A.   Accurate data does help improve the
22  effectiveness of PDMPs.
23    Q.   And if you look at the -- this document
24  here, do you recognize this as being a

Page 209

1  November 2012 e-mail chain that you are included
2  in?  Do you see that on the first page?
3    A.   Yes.
4    Q.   And if you look down, it looks like your
5  e-mail at the bottom of the first page, and you
6  say, "Based on this report, I'm expecting that over
7  the next couple of years New York will start being
8  more aggressive in their review of our controlled
9  substance data for quality and accuracy."
10       Do you see that?
11    A.   Yes.
12    Q.   Is New York a state that was -- that had
13  a PDMP program?
14    A.   Yes.
15    Q.   And is New York a state that you've
16  dealt with often in your duties related to state
17  PDMP or enforcing state regulations?
18    A.   Yeah, it was definitely a state that I
19  had interacted with on a number of occasions.
20    Q.   Was New York a state that you would
21  interact with more often than others?
22    A.   Yes, I would say so, yeah.
23    Q.   Were they more aggressive than other
24  states in implementing programs such as PDMPs and

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 other programs that were designed to combat abuse
2 and diversion of drugs?
3    A.    You know, it's an interesting question.
4 I think what really prompted me to communicate more
5 frequently with New York is they had a unique, a
6 unique data requirement that was different from any
7 other states that made it a challenge to report
8 records to them accurately and that has to do with
9 a prescription serial number requirement.
10        So, that was something we were
11 constantly working with the State to help improve
12 the process around.  It was not something that
13 directly impacted Walgreens.  It impacted many
14 pharmacy stakeholders, from my understanding.
15        Another state in that same vein who had
16 a similar requirement realized that that
17 requirement was so unique, it was actually
18 detracting from the -- basically the integrity of
19 the database because it was just too challenging
20 for pharmacies to accurately capture that
21 information.  So, like another state actually
22 removed the requirement.
23        So, that's really what prompted a lot of
24 my New York conversations, just reviewing that

Page 211

1 situation and trying to improve the process.
2        New York, compared to other states -- I
3 forgot.  Prior to them implementing the iSTOP
4 program, I think if you compared them to other
5 states, they were actually probably less -- I
6 don't -- I don't think their program was as mature
7 as other states' programs.  Let's put it that way.
8    Q.    Let's look at the article that was
9 attached to the e-mail chain.  Do you see the title
10 of the article is "Audit Spurs Improvements At
11 Health Department's Bureau of Narcotic Enforcement"?
12        Do you see that?
13    A.    Yes, I do.
14    Q.    Just above that you see it was released
15 on November 21, 2012?
16    A.    Yes.
17    Q.    And it says in the first paragraph,
18 "The State Health Department's Bureau of Narcotic
19 Enforcement tightened processes for combating abuse
20 of prescriptions for controlled substances during
21 an audit by the State Comptroller's office that
22 ultimately found hundreds of thousands of
23 prescriptions that may have been abused, poor
24 controls over unused prescription forms and

Page 212

1 significant variations in bureau drug investigation
2 practices across the state."
3        Do you see that?
4    A.    Yep.
5    Q.    It goes on to say, "'The abuse of
6 prescription medications has reached epidemic
7 proportions and the costs to society are
8 enormous,'" said Mr. DiNapoli.
9        Do you see that?
10    A.    Yep.
11    Q.    It goes down a couple paragraphs,
12 starting with "DiNapoli's auditors."  Do you see
13 where I am?
14    A.    Yeah, I do see that.
15    Q.    It says, "DiNapoli's auditors examined
16 28.5 million prescriptions dispensed over a
17 15-month period and found more than 325,000
18 prescriptions for controlled substance, filled more
19 than 565,000 times, contained errors or
20 inconsistencies in critical information."
21        The next paragraph, it goes on to say,
22 "Zolpidem (a drug sometimes marketed as Ambien),
23 oxycodone (a pain medication commonly marketed as
24 OxyContin), and hydrocodone (a pain medication

Page 213

1 sometimes marketed as Vicodin), accounted for
2 nearly half of the drugs acquired with these
3 prescriptions."
4        Do you see that?
5    A.    I do read that.
6    Q.    You agree that if you have errors such
7 as these that they can decrease the effectiveness
8 of a PDMP?
9    A.    Yeah, that there's a lack of information
10 in the PDMP.  It does not allow it to be as
11 valuable as it could be.
12    Q.    And if it's not as valuable as it could
13 be, it's not as helpful as it could be to Walgreens
14 pharmacists that happen to look at the PDMP to
15 inform their dispensing decisions?
16    A.    Yeah, the interesting thing is prior to
17 the implementation of iSTOP, there were some
18 discussion at the state level that I participated
19 and I helped educate New York State to let them
20 know that their program is probably subpar compared
21 to some other states.
22        And I think one of the things I
23 highlighted for them was that they collected their
24 information I think on a monthly basis while other

Page 214

1 states had been moving to weekly. And I also don't
2 believe pharmacists had access to their state
3 program until this iSTOP legislation was
4 implemented.
5          So, that was something else that I
6 highlighted for them is that if they actually
7 provided access to pharmacists, it may be utilized
8 more so.
9     Q.   And I'm -- sorry if my question wasn't
10 clear, but I'm not talking specifically to
11 New York.
12    A.   Oh.
13    Q.   But I'm talking, you know, across the
14 country.
15          If pharmacists, Walgreens pharmacists or
16 elsewhere, are not inputting accurate data into the
17 PDMP, that impacts how helpful the PDMP for
18 pharmacists who are dispensing controlled
19 substances, correct?
20    A.   Yes.
21    MR. BENSINGER:  Objection; argumentative.
22 BY THE WITNESS:
23    A.   If the database is missing records
24 because of prescription errors, obviously you don't

Page 215

1 get a full -- you don't have full access to a given
2 patient's history.
3          And that was actually one of my points
4 of contention with the State of New York and some
5 other states when they do have unique requirements
6 that actually, again, detract from the ability for
7 pharmacies to provide as accurate information as
8 they would hope for.
9 BY MR. GADDY:
10    Q.   And if you have an incomplete picture, I
11 think is what you called it, if a pharmacist has an
12 incomplete picture of a particular patient, it
13 could lead to that patient having a prescription
14 for controlled substances filled that maybe would
15 not have been filled had the pharmacist had access
16 to accurate information?
17    A.   I think the PMPs are one of the several
18 indicators or tools that a pharmacist may
19 reference. So, I would hope that that would not be
20 the only thing that they are relying upon.
21          But if you're looking at a report and
22 it's incomplete, it could affect your
23 decision-making.
24    Q.   I show you what I will mark as

Page 216

1 Exhibit 19.
2          (WHEREUPON, a certain document was
3          marked as Walgrens-George Exhibit
4          No. 19:  5/29/13 e-mail string;
5          WAGMDL00330437 -- 00330443.)
6 BY MR. GADDY:
7    Q.   Do you recognize this as another e-mail
8 correspondence that you are a part of?
9    A.   Yes.
10    Q.   And it looks like you were sent this
11 e-mail in May of 2013, about six months after that
12 last e-mail we looked at, by Al Carter. Who is
13 Mr. Carter?
14    A.   At the time he was my boss.
15    Q.   And what's his -- what was his title or
16 role then?
17    A.   Director of professional affairs.
18    Q.   And does he still have the same
19 position?
20    A.   He does not.
21    Q.   What's he do now?
22    A.   He's a divisional vice president I
23 believe of compliance with basically
24 non-pharmacy-related, let's say, roles.

Page 217

1    Q.   Okay. And it looks like he sent you an
2 attached PowerPoint and he says here, "Take a look
3 at this and give me your thoughts in the morning."
4          Do you see that?
5    A.   Yes, I do see that.
6    Q.   Okay. And if you turn to the PowerPoint
7 presentation, it states that "Pharmacy Affairs
8 Organizational Review" is the title of it and it's
9 dated May 2013. Correct?
10    A.   Yes.
11    Q.   And if you turn the page again, it says,
12 "Pharmacy Affairs Organizational Review - Executive
13 Summary."
14          Do you see that?
15    A.   Yes.
16    Q.   It says, "Regulations require the
17 company to report controlled substance
18 prescriptions to 45 state PMPs. All 50 states are
19 expected to have similar programs in the next few
20 years."
21          Do you see that?
22    A.   Yes.
23    Q.   And earlier when we looked at some of
24 the Florida communications that you sent out, there

Page 218

was some information in there that said that the
reporting would be handled by corporate. Do you
recall that?

Q. Yes, I do.

Q. Was the reporting of the dispensing
information handled by folks here in Deerfield?

A. At the time of this document? It was a
joint process, but primarily based out of
Deerfield, correct.

Q. It goes on to say, "Currently, the
reporting is completed by one FTE." Is that
full-time equivalent?

A. That's correct.

Q. So, basically meaning one employee?

A. Yes.

Q. "Currently, the reporting is completed
by one FTE in the Deerfield office and one
dedicated FTE in Danville."
     Where is Danville?

A. Danville, Illinois. I think it's closer
to Indiana.

Q. That's another Walgreens office?

A. Yes.

Q. It says, "Overflow is completed on an

Page 219

ad hoc basis by staff in Danville. Submission
deadlines are being missed due to not having enough
dedicated headcount assigned to monitor and correct
database errors."
     Do you see that?

A. Yes.

Q. What deadlines are being referred to
there?

MR. BENSINGER: Objection; foundation.

BY THE WITNESS:

A. In general, a state has a requirement to
report a given prescription within, you know, X
days after it's been dispensed. So, if a
prescription is being rejected by the State due to
an error, then what's at risk is you would not be
able to meet that initial requirement for frequency
reporting.

BY MR. GADDY:

Q. Okay. And what your boss is reporting
here in this PowerPoint is that Walgreens is
missing deadlines, correct?

A. I don't know if that's my main takeaway,
but I think we're trying to justify additional
headcount to help support reporting.

Page 220

Q. Well, during this time period Walgreens
has roughly 8,000 stores within the U.S., correct?

A. Yeah, I believe so.

Q. At this time Walgreens is I think a
Fortune 50, if not Fortune 25 company?

A. Yeah, I believe Fortune 50.

Q. Do you know about how many employees
Walgreens has?

A. I have no idea.

Q. But at this time in 2013 Walgreens had a
single individual in the Deerfield office dedicated
to doing this reporting along with some folks in --
a second person in Danville, correct?

A. Yes, that's correct.

Q. And according to this document,
submission deadlines are being missed due to not
having enough dedicated headcount, correct?

A. That's correct.

Q. Goes on to say that there is -- that
Walgreens is risking a "minimum fine of $500 per
unreported record." Correct?

A. That's correct.

Q. Also, the databases that Walgreens
pharmacists and CVS pharmacists and Walmart

Page 221

pharmacists and Rite Aid pharmacists rely on to
help make determinations about whether
prescriptions should be filled, those databases are
also not as accurate as they could be if some of
these deadlines are being missed, correct?

A. Yeah, if they are missing records from
the database, then, yeah, they are definitely
impacted.

Q. If you turn the page, there is a slide
on the background of controlled substance
reporting.
     Do you see in that first bullet point,
it says that when invalid or missing data is not
accepted by the state database, it usually requires
correction within a week.
     Do you see that?

A. That's correct.

Q. It goes on to say that "Until the record
is corrected and resubmitted, it's not considered
as being reported."
     Do you see that?

A. Yes.

Q. The next bullet point says, "Previously,
not many practitioners were using the state PDMP

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 database so if invalid records were not timely
2 corrected, the risk to the company was low."
3        Do you see that?
4    A.   I do read that, yes.
5    Q.   What does that mean to you?
6    A.   I think probably a couple things come to
7 mind here.  One, if practitioners are not regularly
8 using the system or the database, then the impact
9 in general is not as significant as if they were
10 actively using it.
11        And then I think, secondly, when
12 practitioners are using it, they will inform the
13 State if they feel like the record is incomplete
14 or, you know, the patient's history is incomplete.
15    Q.   So, fair to say that in this time period
16 more people are beginning to use the PMPs?
17    A.   That's correct.
18    Q.   And people are starting to notice when
19 there are errors from prescriptions that were
20 dispensed by Walgreens?
21    MR. BENSINGER:  Objection; foundation.
22 BY THE WITNESS:
23    A.   Yeah, I don't know if I see that yet in
24 this document.  But, you know, when more people are

Page 223

1 using it, it makes sense that they are more apt to
2 notice any data inconsistencies.
3 BY MR. GADDY:
4    Q.   If you turn to the next page, it's
5 entitled "Risk Assessment," correct?
6    A.   That's correct.
7    Q.   What is the risk that's being discussed,
8 do you know?
9    A.   Of not having the prescription errors
10 resolved on a timely basis.
11    Q.   And what could be the outcome of that?
12    MR. BENSINGER:  Objection; foundation.
13 BY THE WITNESS:
14    A.   I think we talked through a couple
15 things just now as far as, you know, from a
16 compliance standpoint, you know, not having the
17 records in the system, you know, the pharmacies are
18 required to have it there.
19        I think that's, you know, looking at my
20 role at the company at the time, that's my main, my
21 main goal is to make sure that we're compliant.
22 BY MR. GADDY:
23    Q.   It says there under the "Current State"
24 that one employee "can on average resolve about

Page 224

1 3,000 errors per week."
2        Do you see that?
3    A.   I do.
4    Q.   It says there is a backlog of over
5 22,000 records?
6    A.   That's correct.
7    Q.   And that with the average number of new
8 errors that come in each week that you need almost
9 three folks to resolve all the current errors.
10        Do you see that?
11    A.   I do see that.
12    Q.   If you see there, it then talks about
13 the specific risk that Mr. Carter notes in the
14 PowerPoint.
15        Do you see that?
16    A.   I do.
17    Q.   It says, "Two current FTEs can only
18 handle 6,000 errors per week.  For the fiscal year
19 2013 gap of 2,800 records per week not being
20 corrected.  For the remainder of fiscal year 2013,
21 potential fine of over $16 million."
22        Do you see that?
23    A.   I do.
24    Q.   Would you agree that that would be a

Page 225

1 significant fine that Walgreens would have to pay
2 if they did not take care of these issues?
3    A.   That's the case that we're trying to
4 make here.
5    Q.   Safe to say that this PowerPoint was
6 assembled by, put together by your boss or your
7 unit just in an effort to get more staffing to help
8 with this problem?
9    A.   Yes.
10    Q.   It goes on to the next section there and
11 it says, "Future State."  It says estimated average
12 number of errors per week as of September 1, 2013
13 is 10,000 and that you need over three individuals
14 to resolve all those errors on a weekly basis.
15        It says the estimated average number of
16 errors once all 50 states have a PMP is 12,000 with
17 one and a half errors per store per week and you
18 will need four individuals to resolve all those
19 errors on a weekly basis.
20        Do you see that?
21    A.   I do.
22    Q.   And if you see the -- under the "Risk,"
23 you see they note the future, the potential fine
24 moving forward is over $100 million?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    A.   I do see that.

2    Q.   And, again, that was information that

3 you and your team were putting together to justify

4 just being able to hire more than the one and a

5 half or two people that you had working on this at

6 the time?

7    A.   That's correct.

8    Q.   Who would you make -- who would you make

9 a request like that to?

10    A.   I don't -- so, I am like probably one

11 layer removed from where this ultimately goes to.

12 I think I was helping to compile the necessary

13 details to justify the headcount, but I can't

14 remember what the structure was to help approve

15 that type of request.

16    Q.   After telling the, I guess, the more

17 senior folks that you would have to make that

18 request to about the potential of a $16 million

19 fine currently and the potential of an over

20 $100 million fine down the road, were you able to

21 get more people?

22    A.   We did.

23    MR. BENSINGER:  Mr. Gaddy, I see that this may

24 be a convenient time for us to take a short break.

Page 227

1 Is that acceptable to go off the record briefly?

2    MR. GADDY:  Yes, that's fine.

3    THE VIDEOGRAPHER:  We are off the record at

4 2:13 p.m.

5        (WHEREUPON, a recess was had

6         from 2:13 to 2:22 p.m.)

7    THE VIDEOGRAPHER:  We are back on the record

8 at 2:22 p.m.

9 BY MR. GADDY:

10    Q.   Mr. George, throughout the course of the

11 day we have made several or I have made several

12 references to HCPs without really talking about

13 what those are.  So, can you tell us what those

14 are?

15    A.   Hydrocodone products.

16    Q.   Sure.  Hydrocodone combination products?

17    A.   Yes.

18    Q.   Do you have an understanding what those

19 are?

20    A.   I believe so.  Products containing

21 hydrocodone.

22    Q.   Okay.

23    A.   And usually acetaminophen.

24    Q.   Okay.  Sure.  You're familiar with drugs

Page 228

1 such as Lortab or Vicodin --

2    A.   Yes.

3    Q.   -- that contain hydrocodone and

4 acetaminophen?

5    A.   Um-hmm.

6    Q.   And you agree those would be classified

7 as opioids?

8    A.   Yes.

9    Q.   And do you recall that there was a

10 period of time when those particular drugs, the

11 hydrocodone combination products, were classified

12 as Schedule III drugs?

13    A.   Yes.

14    Q.   And do you agree that there was a period

15 of time where there was a push by Congress and the

16 DEA to reclassify those or reschedule those to

17 Schedule II?

18    A.   Yes.

19    Q.   And I know we talked a little bit

20 earlier when we were looking at your resume that

21 one of the things that you did in your prior

22 position was work with some of the government

23 relations type folks to provide them information to

24 help them do their jobs to make sure that they

Page 229

1 weren't programs or changes made that could

2 negatively impact pharmacies.

3        Do you recall that?

4    A.   Pharmacies and patients alike.

5    Q.   Okay.  When you were a pharmacist, those

6 drugs were classified as Schedule III drugs,

7 correct?

8    A.   That's correct.

9    Q.   And, generally speaking, can you tell us

10 some of the differences between drugs that are

11 classified as Schedule II and Schedule III as far

12 as some of the security requirements that are

13 placed on the drugs?

14    MR. BENSINGER:  Objection; calls for legal

15 conclusion, foundation.

16 BY THE WITNESS:

17    A.   Just from my experience in the pharmacy,

18 if I was going to talk about what's different and

19 how a pharmacy generally approaches those drugs

20 from a security standpoint.

21 BY MR. GADDY:

22    Q.   Sure.

23    A.   Schedule II drugs are usually stored in

24 a more secure safe, let's say, with the pharmacist

Page 230

1 key.

2    Q.   Would you agree that generally speaking
3 the rules and regulations that apply to Schedule II
4 drugs usually call them to be kept a little bit
5 more secure than other drugs?

6    A.   I think in practice that's what you will
7 notice. I can't say that's 100% across the board.
8 My recollection is there is some variance as to how
9 the DEA requires Schedule II drugs, that they
10 provide some flexibility, that they could be
11 interdispersed with other non-controlled substance
12 prescriptions.

13    Q.   Okay. So, the interdispersed option
14 means that you can have Schedule III drugs sitting
15 on the shelf with blood pressure medication,
16 diabetes drugs or other non-controlled medications
17 where you can't do that with Schedule IIs?

18    MR. BENSINGER: Objection; calls for legal
19 conclusion.

20 BY THE WITNESS:

21    A.   I would have to take a second look. I
22 was under the impression that you could also
23 interdisperse Schedule II drugs.

24 BY MR. GADDY:

Page 231

1    Q.   Okay. Do you have an understanding of
2 whether or not hydrocodone combination products are
3 the type of drugs that are commonly diverted and
4 abused?

5    A.   I wouldn't have specific insight into
6 that. I think given that hydrocodone products are
7 now a Schedule II drug, I would expect that the DEA
8 took that into consideration when they moved it to
9 a more restrictive class.

10    Q.   I will show you what I will mark as
11 Exhibit 20.

12      (WHEREUPON, a certain document was
13      marked as Walgreens-George Exhibit
14      No. 20: U.S. GAO Report,
15      "Prescription Drugs, State
16      Monitoring Programs Provide Useful
17      Tool to Reduce Diversion";
18      P-GEN-0055.)

19 BY MR. GADDY:

20    Q.   This is a -- we looked at one of these
21 earlier, but this is another report, a GAO report
22 to a committee of the House of Representatives.
23      Do you see that?

24    A.   I do.

Page 232

1    Q.   And you see this one is dated May 2002?

2    A.   Yes, I do.

3    Q.   And the topic of this one actually is
4 one that you may be familiar with. It says, "State
5 Monitoring Programs Provide Useful Tool to Reduce
6 Diversion."

7      Do you see that?

8    A.   I do.

9    Q.   Is this a report that you're familiar
10 with?

11    A.   I do not believe so. I did not review
12 any 2002 documents on this subject.

13    Q.   Okay. Is this a -- do you recall at any
14 time during your career at Walgreens and
15 specifically when you were charged more with
16 monitoring the different PDMPs across the country
17 that you reviewed anything related to this report?

18    A.   The one dated 2002?

19    Q.   Correct.

20    A.   No, I do not recall reviewing anything
21 related to this report.

22    Q.   If you turn, looking at the bottom
23 center of the page, to page 1.

24    A.   Okay.

Page 233

1    Q.   And you see at the top of the page there
2 is the United States General Accounting Office
3 letterhead up there and then the date of this
4 letter is May 17, 2002.

5      Do you see that?

6    A.   Yes, I do.

7    Q.   And do you see, just starting at the
8 beginning of this letter, it reads, "The increasing
9 diversion of prescription drugs for illegal use is
10 a disturbing trend in the nation's battle against
11 drug abuse. Prescription drug diversion is the
12 channelling of licit pharmaceuticals for illegal
13 purposes or abuse. It can involve activities such
14 as 'doctor shopping' by individuals who visit
15 numerous physicians to obtain multiple
16 prescriptions, illegal sales of prescription drugs
17 by physicians or pharmacists, and prescription
18 forgery."

19      Do you see that?

20    A.   I do.

21    Q.   Is that consistent with your
22 understanding of ways that licit pharmaceuticals
23 such as controlled substances can be diverted into
24 illegal channels?

Page 234

1    A.   Yeah, I think these -- I think this
2  sentence describes potential channels for
3  diversion.
4    Q.   And these are channels, would you agree,
5  that you were aware of back in the time period of
6  2000 to 2006 while you were a Walgreens pharmacist?
7    A.   I mean, I think conceptually I think
8  this is -- these are items that would be something
9  I would have known about. I can't say that I have
10  any specific knowledge of illegal sales of
11  prescription drugs by physicians or pharmacists.
12    Q.   But conceptually you had an
13  understanding of these issues?
14    A.   Yeah.
15    Q.   It goes on to say, "The most frequently
16  diverted prescription drugs are those that are
17  prone to abuse, addiction and dependence such as
18  hydrocodone (the active ingredient in Lortab and
19  many other drugs), diazepam (Valium), the drug
20  Ritalin and oxycodone (the active ingredient in
21  OxyContin and many other drugs)."
22    Do you see that?
23    A.   I do.
24    Q.   Back in this time period when you were a

Page 235

1  practicing pharmacist with Walgreens, did you have
2  an understanding that hydrocodone, such as Lortab,
3  Vicodin, and also oxycodone were two of the drugs
4  that were prone to abuse, addiction and dependence?
5    A.   I mean, I would say that any controlled
6  substance is prone to abuse or addiction.
7    Q.   Did you recall receiving any specialized
8  or specific training or education from Walgreens,
9  any formalized education or training on those
10  issues?
11    MR. BENSINGER:  Asked and answered.
12  BY THE WITNESS:
13    A.   No formal training.
14  BY MR. GADDY:
15    Q.   It goes on to say that "According to the
16  DEA, increases in the extent of prescription drug
17  abuse and in emergency room admissions related to
18  prescription drug abuse, as well as an increase in
19  the theft and illegal resale of prescription drugs,
20  indicate that drug diversion is a growing problem
21  nationwide."
22    Do you see that?
23    A.   I do.
24    Q.   In the last sentence of that paragraph

Page 236

1  there, it says, "The abuse and illegally diverted
2  prescription drugs" -- excuse me.  "The abuse of
3  illegally diverted prescription drugs is associated
4  with serious consequences, including addiction,
5  overdose and death."
6    Do you see that?
7    A.   I do.
8    Q.   Did you have an understanding of those
9  facts back in 2000 to 2006 time frame when you were
10  a Walgreens pharmacist?
11    A.   Yeah, I mean, I would say that, yeah,
12  these drugs, if taken, you know, over a certain
13  threshold can definitely reduce -- I mean, could
14  result in addiction, overdose or death, yeah.
15    Q.   Would this have been information that
16  you had within your knowledge base at any point in
17  time when you were asked to provide input on the
18  potential to reclassify hydrocodone combination
19  products from Schedules III to II?
20    MR. BENSINGER:  May I have that question read
21  back, please.
22    (WHEREUPON, the record was read
23    by the reporter as requested.)
24    MR. BENSINGER:  Objection; foundation.  You

Page 237

1  can answer.
2  BY THE WITNESS:
3    A.   I -- I -- again, I think this directly
4  could apply to a number of controlled substances,
5  not just hydrocodone being a controlled substance.
6  BY MR. GADDY:
7    Q.   Well, and my question is specifically
8  related to hydrocodone combination products that
9  were at one point in time classified as
10  Schedule III.
11    Is this information that we just went
12  over, that hydrocodone combination products are
13  prone to abuse, addiction and dependence, that the
14  abuse of products such as hydrocodone combination
15  products is associated with serious consequences,
16  including addiction, overdose and death, are those
17  facts that were within your base of knowledge when
18  you were asked for information or involved in
19  providing information about the potential of HCPs
20  being changed from Schedule III to Schedule II?
21    A.   I mean, I see in the document it talks
22  about diverted prescription drugs.  Lortab,
23  hydrocodone being in Schedule III, carry a higher
24  risk designation compared to the Diazepam that is

Page 238

1 referenced in this article.
2          Again, any of these drugs including
3 hydrocodone products would have the same potential
4 risk but at varying degrees based upon DEA
5 designation.
6     Q.   And from the standpoint of my question
7 you could forget about the article.
8     A.   Oh.
9     Q.   Okay.  My question is in the 2013, 2014
10 time period when there is an effort by the DEA to
11 have hydrocodone combination products reclassified
12 from III to II, this information that we just
13 looked at here, that hydrocodone combination
14 products are subject to abuse, addiction and
15 dependence, that the consequences of those drugs
16 being illegally diverted is addiction, overdose and
17 death, is that information that you had within your
18 knowledge base at that time, 2013, 2014?
19     A.   Yes.
20     Q.   Okay.  Let me show you what I'm going to
21 mark as Exhibit No. 21.
22          (WHEREUPON, a certain document was
23          marked as Walgreens-George Exhibit
24          No. 21:  10/2/08 Colorado US Attny

Page 239

1          Office article; P-GEN-0075.)
2 BY MR. GADDY:
3     Q.   Do you see at the top left-hand corner
4 of this page this is a document from the U.S.
5 Attorney's Office in Colorado?
6     A.   I do see that.
7     Q.   And under the heading of "News," there
8 is the date of August -- excuse me -- October 2,
9 2008.
10          Do you see that?
11     A.   Yeah, I do.
12     Q.   And the title of this particular article
13 is "Cardinal Health, Inc. agrees to pay 34 million
14 to settle claims that it failed to report
15 suspicious sales of widely abused controlled
16 substances."
17          Do you see that?
18     A.   I do.
19     Q.   We have talked a lot today about some of
20 the Walgreens investigations that were performed by
21 the DEA.
22          During the course of your employment at
23 Walgreens did you ever come to be aware of any
24 other drug companies, whether it's pharmacy chains

Page 240

1 or distributors, that were investigated and fined
2 by the DEA?
3     A.   I think in general I was aware of a fine
4 against Cardinal Health and then maybe a couple of
5 the other chains as well.  But, again, I wasn't
6 familiar with the specifics with any of those.
7     Q.   Would this have been information that
8 was provided to you by folks within Walgreens or
9 information that you picked up on your own?
10     A.   Probably most cases what I might have
11 picked up on my own.
12     Q.   Do you see here in this particular
13 release -- if you start at the second sentence
14 of -- let's just read the whole first paragraph.
15          It says, "Cardinal Health, Inc., one of
16 the nation's largest distributors of pharmaceutical
17 drugs, has agreed to settle allegations that it
18 violated federal reporting provisions relating to
19 the handling of certain controlled substances
20 regulated by the DEA.  Under the agreement between
21 the company and seven United States Attorney's
22 offices, Cardinal Health agreed to pay 34 million
23 in civil penalties for alleged violations of its
24 obligations under the Controlled Substance Act."

Page 241

1          Do you see that?
2     A.   Yes.
3     Q.   If you go on to the next paragraph, it
4 says, "Cardinal Health, which operates 27
5 DEA-registered distribution facilities, failed to
6 report to DEA suspicious orders of hydrocodone that
7 it then distributed to pharmacies that filled
8 illegitimate prescriptions originating from rogue
9 Internet websites."
10          Do you see that?
11     A.   Yes, I do.
12     Q.   Did you have an understanding prior to
13 this 2013-2014 time period where there was an
14 attempt to reschedule hydrocodone combination
15 products that the DEA had been investigating and
16 sanctioning companies who were distributing that
17 drug, in their opinion, in a reckless manner?
18     A.   I don't think I had specific knowledge
19 of that.
20     Q.   If you go down to the bottom of the
21 page, the very last sentence on that page, do you
22 see it says, "Hydrocodone is the most commonly
23 diverted and abused controlled pharmaceutical in
24 the United States."

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 Do you see that?
2 A. Yes, I do.
3 Q. Did you know that to be true?
4 A. I did not know that to be true.
5 Q. Have you ever heard that before prior to
6 sitting here today?
7 A. Can't say for certain I have heard that
8 exact phrase.
9 Q. I show you what I'll mark as
10 Exhibit No. 22.
11 (WHEREUPON, a certain document was
12 marked as Walgreens-George Exhibit
13 No. 22: 5/23/12 e-mail string;
14 WAGMDL00614056 - 00614059.)
15 BY MR. GADDY:
16 Q. Do you see at the top of the page here
17 there is a May 23, 2012 e-mail from a Carol Kelly
18 with NACDS.
19 A. Okay.
20 Q. Do you know Ms. Kelly?
21 A. I don't believe so.
22 Q. And you see the subject line of this
23 particular e-mail is, "Urgent/Manchin
24 amendment/potential call to Greg Wasson."

Page 243

1 Do you see that?
2 A. I do see that in the subject.
3 Q. Do you know who is being referred to
4 there with the Manchin amendment?
5 A. No, I don't know offhand. I assume it's
6 in the document, though.
7 Q. And the other part of that subject line
8 says, "Potential call to Greg Wasson." Do you know
9 who Mr. Wasson is?
10 A. At the time I believe he was the CEO of
11 Walgreens.
12 Q. If you go down to the below e-mail, you
13 see that it was originally sent again from Carol
14 Kelly to Debbie Garza and Ed Kaleta with Walgreens.
15 Do you see that?
16 A. Yes.
17 Q. Do you know either Debbie or Ed?
18 A. Yes, they were both in the government
19 relations office in Washington D.C.
20 Q. Okay. Were -- during the course of your
21 time in -- during this time frame, 2012, the
22 position that you were in then, did you from time
23 to time work with or correspond with folks such as
24 Ed and Debbie in Washington on issues?

Page 244

1 A. From time to time.
2 Q. It says, "Debbie and Ed, This Manchin
3 amendment was filed this afternoon and we hear the
4 Senator has the votes to pass it."
5 Are you familiar with Joe Manchin, the
6 Senator from West Virginia?
7 A. Yeah, I've seen him on TV.
8 Q. Okay. It goes on to say, "PhRMA, GPHA
9 and HDMA are all against it and I expect that NCPA
10 will also send up a note against it tonight."
11 Do you know what those acronyms are?
12 A. NCP -- let's see. I can't say I know
13 exactly, but I think in general HDMA is drug
14 distributors I believe.
15 Q. Trade association?
16 A. Yeah, trade association I think.
17 NCPA is Community Pharmacy Association
18 maybe, more related to independents, community
19 pharmacy.
20 Q. You recognize them all to be trade
21 associations?
22 A. Yes.
23 Q. Okay. Just so we can get a sense of
24 what the amendment is that's being talked about, do

Page 245

1 you see where it says, "Note from Kevin"?
2 A. Yes.
3 Q. It says, "Yes, we would oppose this. It
4 would make all products containing hydrocodone a
5 C-II. Right now only plain hydrocodone products
6 are C-II. This would make combination hydrocodone
7 products C-II."
8 Do you see that?
9 A. I do see that.
10 Q. And is this consistent with your
11 recollection that in this time frame there was a
12 push to reschedule hydrocodone combination products
13 from III to II?
14 A. Yeah, I mean, I remember there was a
15 push that ultimately resulted in that drug class
16 change.
17 Q. Ultimately the change was -- the change
18 happened from III to II?
19 A. Yes.
20 Q. If we go back up to where we were
21 looking, it says the trade associations are all
22 against it. Then it says, "Please see first below
23 the note from Kevin explaining the problems with
24 the amendment and then the blast e-mail Marc just

Page 246

1  sent to all health LAs against it. We understand
2  from staff that Manchin may call Greg to tell him
3  why he's offering this."
4        And Greg would be Greg Wasson that we
5  see in the subject line?
6     A.  That's what I expect, yes.
7     Q.  So, it looks like the Senator may be
8  calling the CEO of Walgreens to discuss this
9  amendment that he's proposed, correct?
10    A.  That's what it looks like.
11    Q.  It says, "Basically the problem is so
12 bad in West Virginia that he has to do something."
13       Do you see that?
14    A.  Yes. I do see that.
15    Q.  I show you what I will mark as
16 Exhibit No. 23.
17       (WHEREUPON, a certain document was
18        marked as Walgreens-George Exhibit
19        No. 23: 5/24/12 e-mail string;
20        WAGMDL00617478 - 00617481.)
21 BY MR. GADDY:
22    Q.  Do you recognize this as being another
23 e-mail chain?
24    A.  Yes, it is another e-mail chain,

Page 247

1  correct.
2     Q.  Okay. And if you go to -- it's actually
3  the second-to-last page of the document, at the --
4  in the middle of the page, it looks like an
5  Alexander Patt forwarded an article to you and
6  asked you whether or not the Feds were making all
7  hydrocodone C-II.
8        Do you see that?
9     A.  I do see that.
10    Q.  And if we look at the article below
11 there, it says, "U.S. Senators on Wednesday evening
12 unanimously passed an amendment to the FDA
13 reauthorization bill that would reclassify all
14 hydrocodone substances and make punishment for
15 their trafficking more severe. The amendment
16 introduced by Senator Joe Manchin from West
17 Virginia would reclassify painkillers like Vicodin
18 and Lortab as Schedule II drugs which also affects
19 how they are to be stored and prescribed."
20       Do you see that?
21    A.  I do.
22    Q.  And it looks like, if you look at the
23 top of that page, when you received this e-mail
24 that you forwarded on to who I think you told us

Page 248

1  was your boss, Al Carter, to ask him if he knew
2  anything about this, correct?
3     A.  That's correct.
4     Q.  Looks -- if you flip to the prior page,
5  it looks like he had not. So, then you forwarded
6  the e-mail to Steven Gregory. Correct?
7     A.  Yes.
8     Q.  What was your interest in finding out if
9  this was something that was taking place?
10    A.  Really, you know, it's hard for me to
11 exactly remember, but I would imagine that if this
12 was reclassified as Schedule II, there would be a
13 number of items that we'd have to essentially
14 analyze to figure out what compliance with that
15 change would be because it wouldn't be -- I don't
16 think I would expect a simple change to allow for
17 compliance.
18    Q.  Okay. You were worried about what
19 impact it might have on Walgreens pharmacies that
20 you might have to implement changes for?
21    A.  Yeah, how to -- how difficult it would
22 be, what things we would have to account for from a
23 compliance standpoint.
24    Q.  And if you flip to the next page, you

Page 249

1  see where Steven Gregory responds to you, correct?
2     A.  Yes, I do see that.
3     Q.  It says, "Yes, the Manchin amendment
4  passed in the PDUFA bill last night. Apparently,
5  this amendment came out of nowhere. The bottom
6  line is it's the only Senate" -- "it's only in
7  Senate bill and we along with other pharmacy groups
8  will fight hard to get it struck in conference."
9        Do you see that?
10    A.  Yes.
11    Q.  No doubt that Walgreens was against this
12 bill passing, correct?
13    A.  Yeah, I think we were concerned about
14 the implications on patient access.
15    Q.  Okay. It goes on to say, "The amendment
16 would make all products containing hydrocodone a
17 C-II. Right now only plain hydrocodone products
18 are C-II. This would make combination hydrocodone
19 products C-II."
20       Correct?
21    A.  Yes, I see that.
22    Q.  Okay. During this time period you said
23 that you're concerned about patient access.
24 Walgreens pharmacies dispense Schedule II drugs,

Page 250

1 correct?

2    A.   That's correct.

3    Q.   And patients are able to get access to
4 their oxycodone?

5    A.   Um-hmm.

6    Q.   Walgreens was against hydrocodone
7 combination products being reclassified as
8 Schedule III?

9    A.   That's correct.  For patient access
10 purposes, you know, concern.

11    Q.   Keeping in mind the document that we
12 just looked at that said hydrocodone is the most
13 commonly abused product or, excuse me, most
14 commonly abused prescription drug, wouldn't you
15 think it would be appropriate for that to be
16 classified as a Schedule II drug?

17    A.   I don't think that would be like within
18 my -- I don't think I'd be the one to make that
19 call.  You noted an article in 2008.  If it was an
20 immediate need, I would assume the DEA would have
21 made that change in 2009, but they didn't.  So, I
22 don't believe it's a black-and-white situation.

23       I would expect the DEA took that into
24 account over the years to figure out when is the

Page 251

1 right time that they felt it was necessary to make
2 those changes and support those changes.

3    Q.   You would defer to the DEA and their
4 recommendations on classification of drugs?

5    A.   I believe it's part of their role or
6 responsibility with the Government to weigh in on
7 the drug classifications.

8    Q.   Sure.  And my question is:  Would you
9 defer to them on what they think is appropriate for
10 the classification of drugs?

11    A.   Ultimately whatever they schedule the
12 drug as is what our pharmacies and I would expect
13 practitioners to follow.

14    Q.   Well, you can see from the fact that
15 there is having to be bills introduced in the
16 Senate that it's a legislature issue, not a DEA
17 issue, as far as how drugs are classified, right?

18    A.   Yeah, I believe so.

19    Q.   Okay.  So, my question to you is:  Would
20 you defer to DEA's position where they believe
21 drugs should be classified or would you not?

22    A.   You know, I think when you have a
23 conversation around scheduling a drug, there is
24 multiple stakeholders that would contribute to

Page 252

1 provide their perspective on the issue and so I
2 don't know if it's just as simple as the DEA and
3 their thought on the topic on their own is really
4 the only thing that would be factored in.

5    Q.   Okay.  So, I'll go back to my earlier
6 question is, knowing what we just read in the
7 previous document that hydrocodone is the most
8 abused prescription drug, don't you believe that it
9 would be appropriate for it to have the higher
10 classification level and therefore be subject to
11 the additional security requirements that come with
12 the Schedule II as opposed to a Schedule III?

13    A.   I mean, given --

14    MR. BENSINGER:  Object.

15       Excuse me, Mr. George.  You have to let
16 me and other counsel interpose objection before you
17 answer.

18       I object to the hypothetical, calls for
19 speculation.

20 BY THE WITNESS:

21    A.   I mean, given it is a Schedule II drug
22 now, I'm not sure I exactly follow it because it is
23 a Schedule II drug now.  So, I would expect that
24 all those involved kind of sign on for that.

Page 253

1 BY MR. GADDY:

2    Q.   Well, Walgreens didn't sign on for it.
3 It says, "We along with other pharmacy groups will
4 fight hard to get it struck in conference."

5       Correct?

6    A.   That's what I read here.

7    Q.   Walgreens was not going along with
8 having hydrocodone combination products
9 reclassified to Schedule II, were they?

10    A.   I think we were concerned with patient
11 access.

12    Q.   Okay.  It says, "This amendment would
13 make all products containing hydrocodone a C-II.
14 Right now only plain hydrocodone products are C-II.
15 This would make combination products a C-II."

16       And it looks like what Steven does here
17 is kind of lay out his case against the
18 reclassification.

19       He says, "This wouldn't help with
20 diversion and abuse.  OxyContin is already C-II and
21 it is one of the most abused medications."

22       Do you see that?

23    A.   I do read that.

24    Q.   Okay.  The language is interesting to

Page 254

1 me, "one of the most abused medications." We just
2 saw that what is the most abused medication?
3     A.    The article --
4     MR. BENSINGER: Objection. Objection;
5 foundation, vague.
6 BY THE WITNESS:
7     A.    From the article, it indicated that
8 hydrocodone was.
9 BY MR. GADDY:
10     Q.    He then goes on to say, "This would
11 inconvenience patients with chronic pain who would
12 not be able to get refills on combination
13 hydrocodone medications. These patients would have
14 to see their doctors to get every prescription
15 because C-II prescriptions cannot be phoned into
16 the pharmacy. This would greatly increase costs to
17 every pharmacy and every pharmacy chain warehouse
18 because C-II products have to be stored in
19 heavy-duty safes."
20     Do you see that?
21     A.    I do read that.
22     Q.    So, it looks like his first bullet point
23 says that oxycodone is -- his first bullet point is
24 this wouldn't help with diversion and abuse.

Page 255

1 Second bullet point is the patient access issue
2 that you were talking about. The third bullet
3 point is cost to Walgreens and other pharmacies.
4 Correct?
5     A.    Yes, it --
6     MR. BENSINGER: Object to the summary.
7 BY THE WITNESS:
8     A.    It looks like there is three things that
9 are referenced here, yep.
10 BY MR. GADDY:
11     Q.    And it looks like in the e-mail above
12 you give some additional input, correct?
13     A.    Yes.
14     Q.    You say in No. 1, "No refills also means
15 increased patient traffic for doctors who are
16 already struggling to keep up with patient demand.
17     No. 2, "The additional visit may require
18 additional co-pays - cost to patients, insurance
19 and healthcare.
20     And, 3, "It may not be feasible to store
21 the number of affected products within the
22 traditional pharmacy narcotic cabinet."
23     Do you see that?
24     A.    I do.

Page 256

1     Q.    And the first two that you note there
2 relate to patient access as far as needing to see a
3 doctor again to get a refill, correct?
4     A.    Doctor and then also cost, yep.
5     Q.    Sure. But both issues are related to
6 having to go back to the doctor to get a refill?
7     A.    Yes.
8     Q.    Okay. I will show you what I'm marking
9 as Exhibit 24.
10     (WHEREUPON, a certain document was
11     marked as Walgreens-George Exhibit
12     No. 24: 9/25/12 e-mail string;
13     WAGMDL00517021 - 00517023.)
14 BY MR. GADDY:
15     Q.    And do you see this is a September 2012
16 e-mail from you?
17     A.    I do see that.
18     Q.    And the subject line is "APhA
19 information request for the FDA hydrocodone
20 meeting."
21     Do you see that?
22     A.    I do.
23     Q.    And you write here, "Dan, the costs to
24 patients and pharmacies, when required to dispense

Page 257

1 hydrocodone products one time at a fill, was
2 expected to be our biggest argument, but the data I
3 have received thus far from IT only 3% of new
4 hydrocodone prescriptions have at least one refill
5 authorized." (As read.)
6     Do you see that?
7     A.    I do.
8     Q.    You go on to say, "I don't think this
9 information will help our case."
10     Do you see that?
11     A.    Yes.
12     Q.    What you found when you actually looked
13 into it is that these new hydrocodone prescriptions
14 don't have a refill authorized anyway, at least the
15 vast majority of the time, correct?
16     A.    That's what this e-mail says.
17     Q.    So, when you were writing to the
18 government relations folks and giving them some
19 bullet points that they could use to argue against
20 this, what you thought, according to this e-mail,
21 was going to be your biggest argument ended up not
22 helping your case at all, correct?
23     A.    That's what it appears.
24     Q.    And it looks like if you go down in this

Page 258

1 e-mail chain that you were looking into this as a
2 request to give information to NACDS.
3         Do you see that?
4         Looking at the e-mail directly below
5 yours.  It says, "Following up on this request have
6 we given NACDS any information?"
7     A.   Oh, I see, yes.
8     Q.   Did you make any presentation to NACDS?
9     A.   I don't think I presented to NACDS.
10     Q.   Did you provide any information to
11 NACDS?
12     A.   I may have provided some information
13 along these lines.
14     Q.   After you found out that what you
15 thought was going to be your best argument against
16 the reclassification of hydrocodone combination
17 products, did you make NACDS aware that you found
18 out that that actually wasn't going to help your
19 case?
20     A.   I can't recall.
21     Q.   Do you recall if you sent any
22 communication to the government relations folks and
23 let them know that what you thought had been your
24 best argument, the patient access issue, was

Page 259

1 actually not going to help your case?
2     A.   According to this e-mail, I think I cc'd
3 our government relations contact.  So, I would
4 assume that this would have informed them of that
5 information.
6     Q.   Do you know what they went and did with
7 that information?
8     A.   I do not know.
9     Q.   I show you what I will mark as
10 Exhibit 25.
11         (WHEREUPON, a certain document was
12         marked as Walgreens-George Exhibit
13         No. 25:  3/8/13 e-mail string;
14         WAGMDL0000533039 - 00533041.)
15 BY MR. GADDY:
16     Q.   This is another e-mail exchange.  But if
17 you look in the middle of the second page, you'll
18 see the communication from Senator Joe Manchin's
19 office.  Are you with me?
20     A.   Is this the e-mail from Benjamin
21 Nathanson?
22     Q.   Correct.  There's a -- it says, "Hey,
23 Ben, can you please this circulate this Dear
24 Colleague to health and judiciary staffers?

Page 260

1 Additional information and the bill text is
2 attached."
3         Do you see that?
4     A.   Yes.
5     Q.   And then it goes down to say, "End
6 Prescription Drug Abuse and Co-Sponsor the Safe
7 Prescribing Act of 2013."
8         Do you see that?
9     A.   Yes.
10     Q.   And if you go down to the bottom, this
11 letter is signed by Senator Joe Manchin?
12     A.   Yes.
13     Q.   It says, "Dear Colleague, we invite you
14 to join us in addressing one of the principal
15 factors driving the prescription drug abuse
16 epidemic nationwide - the easy availability of
17 hydrocodone combination pills like Vicodin, Norco,
18 Lorcet and Lortab, which are currently listed as
19 Schedule III drugs under the Controlled Substance
20 Act.  The Safe Prescribing Act of 2013 would move
21 these drugs up to Schedule II, making it more
22 difficult to prescribe and obtain them."
23         Do you see that?
24     A.   Yes.

Page 261

1     Q.   It goes on to say that "Prescription
2 drug abuse in the United States has become an
3 epidemic that is wreaking havoc on countless
4 families and devastating communities."
5         Do you see that?
6     A.   Yes.
7     Q.   It goes on to at the very bottom
8 sentence or -- excuse me -- the second-to-last
9 sentence of this paragraph starts, "This
10 Schedule III provision was."
11         Do you see that?
12     A.   Yes.
13     Q.   It says, "This Schedule III provision,"
14 talking about the current one, "was included
15 decades ago based on long-outdated information
16 about the use of narcotics and their effects on the
17 human body.  Largely due to their easy
18 availability, hydrocodone combination drugs have
19 since become subject to widespread abuse
20 nationwide."
21         Do you see that?
22     A.   I do.
23     Q.   And at any time are you aware that
24 Walgreens reversed its position and decided to

Page 262

1 support the rescheduling or reclassification of
2 hydrocodone combination products to Schedule II?
3    A.   I'm not aware of that.
4    Q.   I will show you what I have marked as
5 Exhibit 26.
6         (WHEREUPON, a certain document was
7         marked as Walgreens-George Exhibit
8         No. 26:  9/10/12 e-mail string;
9         WAGMDL00517040 - 00517044.)
10 BY MR. GADDY:
11    Q.   And do you recognize this as being an
12 e-mail chain between you and it looks like Debbie
13 Garza, who I think you've already told us was a
14 member of the government relations team?
15    A.   Um-hmm.
16    Q.   And it looks like this is a continuation
17 of that earlier e-mail chain where the -- they are
18 asking for information on the impact of this
19 potential change and how it might affect Walgreens.
20        Do you see that?
21    A.   Can you repeat that again.
22    Q.   Sure.  Again, it looks like -- looking
23 at the subject line.
24    A.   Okay.

Page 263

1    Q.   "APhA information request for FDA
2 hydrocodone meeting."
3        Do you see that?
4    A.   Yes.
5    Q.   Do you recall we have seen that subject
6 line before?
7    A.   Yes.
8    Q.   It looks like this is a continuation of
9 the chain where they are asking you for information
10 about Walgreens' dispensing practices with
11 hydrocodone to help them with their efforts in DC?
12    A.   Yes.  It looks like a continuation of
13 the previous e-mail that we reviewed.
14    Q.   And it looks like in this top paragraph
15 here you tell them the total number of hydrocodone
16 combination products that were dispensed by
17 Walgreens pharmacies?
18    A.   Yes.
19    Q.   And how many total hydrocodone
20 combination products were dispensed for the year,
21 including the new, refill and copy?
22    A.   Let me take a look here again because I
23 want to make sure it's representing a year.
24        I think it's representing a 12-month

Page 264

1 time period.  Total number of dispensings, I have
2 over 18 million dispensings.
3    Q.   That means over 18 million prescriptions
4 for hydrocodone combination products were filled by
5 Walgreens pharmacies?
6    A.   That's what this looks like.
7    Q.   What's the next number indicate?
8    A.   This would say how many new
9 prescriptions were received by doctors -- from
10 doctors for patients of Walgreens.
11    Q.   So, over 3-1/2 million?
12    A.   That's what it looks like.
13    Q.   Okay.  So, as you looked into how the
14 scheduling change would impact Walgreens, you saw
15 that there were over 18 million prescriptions that
16 would be impacted, at least looking back to the
17 previous calendar year?
18    A.   Yeah.  Yes.  More specifically, I would
19 think that the people who are impacted are probably
20 somewhere between the 3 million with unique
21 prescriptions and the balance difference would be
22 the 15 million between those because I think the
23 15 million would represent the refills that a
24 Schedule III hydrocodone prescription would afford

Page 265

1 them.
2    Q.   Okay.  Did you do anything or were you
3 asked to do anything into looking into how the
4 change of the rescheduling might impact the number
5 of prescriptions for hydrocodone combination
6 products that were filled?
7    MR. BENSINGER:  Objection; vague.
8 BY THE WITNESS:
9    A.   I can't remember all the specifics.  I
10 think one of the -- one of the elements that I
11 think people were curious about was that refill
12 component and how that would impact patients.
13        And, so, I think if I were to work on
14 this, that would be one of the things I would be
15 working to help bring that information forward.
16 BY MR. GADDY:
17    Q.   Did you do any look to see -- were you
18 requested to do any look to look at any loss of
19 sales or loss of revenue that would be incurred by
20 Walgreens if this change was put into place and it
21 was -- there was more security applied to the
22 Schedule III drugs?
23    A.   I don't remember any conversations on
24 revenue for this.  I think the security and storage

Page 266

1  of the drugs, I think that was part of the
2  conversation because from a compliance standpoint
3  we'd have to go and build out maybe additional
4  cabinet space to secure these drugs, move them from
5  the general inventory stock to, you know, our
6  narcotics cabinet.
7      Q.   Okay.  I will show you what I'll mark as
8  Exhibit 27.
9          (WHEREUPON, a certain document was
10         marked as Walgreens-George Exhibit
11         No. 27: 11/13/14 e-mail string
12         with attachment; WAGMDL0000015270
13         -00015272.)
14 BY MR. GADDY:
15     Q.   And do you recognize this as an e-mail
16 that was sent to you?
17     A.   Yes, I do.
18     Q.   And it looks like this was sent in
19 November 2014?
20     A.   Yes.
21     Q.   And as I think you've made reference to,
22 despite Walgreens' opposition that ultimately this
23 change was passed and hydrocodone combination
24 products did become reclassified as Schedule II

Page 267

1  drugs, correct?
2      A.   The hydrocodone drugs products,
3  combination products, were rescheduled from
4  Schedule III to Schedule II.
5      Q.   Okay.  And Walgreens continues to
6  dispense those drugs?
7      A.   Yes, we do.
8      Q.   Continues to carry them within their
9  pharmacies?
10     A.   Yes, we do.
11     Q.   Continues to fill prescriptions for
12 them?
13     A.   Yes, you know, generally speaking.
14     Q.   And this is an e-mail from Mr. Bratton
15 to you with -- where he says, "I appended the
16 slides for the HCP reschedule impact."
17         Do you see that?
18     A.   I do see that.
19     Q.   And if you turn to the first page of the
20 slide show, you see that it says, "Chicago
21 Government Relations Meeting"?
22     A.   I do see that, yes.
23     Q.   And it looks like this presentation was
24 primarily given by Rex Swords?

Page 268

1      A.   Yes, it's his name on the title page.
2      Q.   And did you participate in or attend
3  this presentation?
4      A.   I don't remember attending this one.
5  Let me take a look.
6      Q.   If you'll turn to the slide for me
7  entitled, it's on Page No. 4, "Hydrocodone
8  Combination Products Reschedule."
9      A.   Okay.
10     Q.   Do you see where I am?
11     A.   Yes.
12     Q.   It says, "The State of New York
13 rescheduled hydrocodone containing products to a
14 C-II in February of 2013.  Since this time we have
15 seen a drop in HCP prescriptions filled of 29.2%."
16         Do you see that?
17     A.   Yes.
18     Q.   And lower prescriptions filled means
19 less revenue for Walgreens, correct?
20     MR. BENSINGER:  Objection; foundation.
21 BY THE WITNESS:
22     A.   I think there is a number of factors
23 that come into play when it comes to revenue for
24 Walgreens.  So, I don't know if I can categorically

Page 269

1  say that.
2  BY MR. GADDY:
3      Q.   Well, there is less prescriptions being
4  filled, correct?
5      A.   That's correct.
6      Q.   And Walgreens gets paid when
7  prescriptions are filled, correct?
8      A.   That's correct.
9      Q.   And it looks like there is about a 30%
10 drop just in the New York stores based on their
11 change in February 2013 of prescriptions getting
12 filled, correct?
13     A.   That's right.
14     Q.   So, Walgreens in New York is getting
15 paid 30% less than they were before as it relates
16 to HCP prescriptions, correct?
17     MR. BENSINGER:  Objection; foundation, calls
18 for speculation.
19 BY THE WITNESS:
20     A.   Yeah, I mean, the example I want to tell
21 you, there is probably prescriptions that Walgreens
22 fills that they lose money on.  So, I don't know
23 how the math ultimately would work out unless I
24 have access to that information.

Page 270

1    So, theoretically, if you are filling a
2  prescription you lose money on and you don't fill
3  as much of that medication, you might actually have
4  more revenue.
5  BY MR. GADDY:
6    Q.   Does Walgreens lose money prescribing
7  opioids, filling opioid prescriptions?
8    MR. BENSINGER:  Objection; foundation.
9  BY THE WITNESS:
10   A.   I don't know.
11  BY MR. GADDY:
12   Q.   Okay.  So, what you do know is that
13  prescriptions filled of hydrocodone combination
14  products in New York went down 29.2% after the
15  change was implemented there, correct?
16   A.   That's what this screen says.
17   Q.   And that would indicate that
18  approximately 30% fewer prescriptions are being
19  filled and therefore paid for than they were before
20  that change, correct?
21   A.   That's correct.
22   Q.   And if you look at it nationally, in the
23  second box there or the second column, it says,
24  "The DEA rescheduled HCPs to a C-II nationally as

Page 271

1  of October 2014.  Since the reschedule we have seen
2  a drop in HCP prescriptions of 20.6%."
3    Do you see that?
4    A.   Yes.
5    Q.   Again, any revenue that Walgreens was
6  making off of hydrocodone combination products has
7  gone down by at least 20.6% based on that change,
8  correct?
9    MR. BENSINGER:  Objection; foundation.
10  BY THE WITNESS:
11   A.   If there was revenue generated from
12  these prescriptions, then there would be a decrease
13  up to 20.6% I assume.
14  BY MR. GADDY:
15   Q.   Okay.  I will show you what I will mark
16  as Exhibit 28.
17    (WHEREUPON, a certain document was
18     marked as Walgreens-George Exhibit
19     No. 28: Lobby Report;
20     P-WAG-00040.)
21  BY MR. GADDY:
22   Q.   You saw from those earlier documents
23  that it was late 2012 and into 2013 that these
24  amendments and bills were being proposed by Senator

Page 272

1  Manchin, correct?
2    A.   Yeah, I think generally that's the
3  correct time frame.
4    Q.   And we just saw in these other documents
5  that we just looked at that after this passed
6  ultimately the number of HCP prescriptions filled
7  in Walgreens stores went down, correct?
8    A.   Yes.
9    Q.   And I'm showing you what I've marked as
10  Exhibit 28, which you see at the top right-hand
11  corner it indicates this is a lobbying report?
12   A.   Okay.
13   Q.   Are you familiar with these forms?
14   A.   No, I've never seen one before.
15   Q.   Okay.  Let's go through it fairly
16  quickly.  In the box in the top middle of the
17  page do you see it says "Registrant Name"?  It says
18  "Organization or lobbying firm"?
19   A.   Okay.
20   Q.   Do you see that?
21   A.   Yes.
22   Q.   And it says Walgreens Corporation?
23   A.   I do see that.
24   Q.   And then it has an address there, and

Page 273

1  then in the middle of the page it says "Type of
2  Report."
3    Do you see that?
4    A.   Yes.
5    Q.   And it says that this is the year 2013
6  and it's the quarter 1 box is checked.
7    Do you see that?
8    A.   Yes.
9    Q.   And then on the "Income or Expense," on
10  the right-hand side, under "Organization," it says,
11  "Expense relating to lobbying activities for this
12  reporting period were."
13    Do you see that?
14   A.   I do.
15   Q.   And it indicates there that Walgreens
16  spent $590,000 lobbying in the first quarter of
17  2013.
18    Do you see that?
19   A.   Yes, I do.
20   Q.   And as you turn the page, so that we are
21  looking at page 2 of 24, if you look at the very
22  bottom.
23   A.   Okay.
24   Q.   Do you see it says "Lobbying Activity"

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  at the top?

2      A.  Yes.

3      Q.  And then do you see in the box there,

4  there is an entry for which specific bill is being

5  lobbied?

6      A.  Yes.

7      Q.  Do you see that?

8      A.  Um-hmm.

9      Q.  It indicates, "Senate 621 and HR 1285,

10  the Safe Prescribing Act of 2013, all provisions

11  regarding amendment of the Controlled Substance Act

12  to make any substance containing hydrocodone a

13  Schedule II drug."

14      Do you see that?

15      A.  Yes, I do.

16      Q.  And while there may have been other

17  bills or Senate or House bills that were lobbied

18  on, this was one of the bills that at least in the

19  first quarter of 2013 Walgreens spent $590,000

20  lobbying on, correct?

21      A.  This was --

22      MR. BENSINGER:  Objection; foundation and

23  object to the lawyer testimony.

24  BY MR. GADDY:

Page 275

1      Q.  I don't know if -- I don't know if we

2  got your answer or not.

3      You see that this is one of the bills

4  that was being lobbied on in the first quarter of

5  2013 by Walgreens?

6      A.  The document, that's what it looks like

7  it indicates here.

8      Q.  And we know that Walgreens was against

9  that reclassification from everything we have

10  looked at, correct?

11      A.  Yeah, we had concerns with the

12  implications of that drug class change.

13      Q.  If you turn to page 7 of 24, do you see

14  again a lobbying report and if we look in the

15  middle again for Walgreens Corporation in the

16  middle of the page for the second quarter of 2013.

17      Do you see that?

18      A.  We are on page 7 of 24.  Second quarter,

19  yes.

20      Q.  Okay.  And if we look down in the box in

21  the bottom right of the page, do you see that

22  during this quarter Walgreens spent $410,000

23  lobbying?

24      A.  I do see that.

Page 276

1      Q.  And if you turn the page one time so

2  that you are at 8 of 24, do you see that again one

3  of the bills that they spent over $400,000 lobbying

4  against was again the Safe Prescribing Act of 2013,

5  all provisions regarding the amendment of the

6  Controlled Substance Act to make any substance

7  containing hydrocodone a Schedule II drug.

8      Do you see that?

9      A.  I do see that in the document.

10      Q.  If you go down under No. 17 it asks you

11  who you lobbied, and it's entered the U.S. House of

12  Representatives and the U.S. Senate.

13      Do you see that?

14      A.  I do see that.

15      Q.  And then down below that it lists the

16  name of the individuals that are actually doing the

17  lobbying.  And you see there listed, among other

18  folks, Debbie Garza who you were trading some

19  e-mails with on this topic?

20      A.  That's correct.

21      Q.  If you turn with me, please, to page 14

22  of 24.  Do you see the lobbying report for the

23  third quarter of 2013 for the Walgreens

24  Corporation?

Page 277

1      A.  I do.

2      Q.  And if you look down in the bottom right

3  box, how much did Walgreens spend lobbying during

4  this quarter?

5      A.  It says $580,000.

6      Q.  And if you turn the page again, do you

7  again see that it was the same bill, the Safe

8  Prescribing Act of 2013 and all provisions

9  regarding the amendment of the CSA to make any

10  substance containing hydrocodone a Schedule II drug

11  was again a bill that was lobbied against by

12  Walgreens?

13      A.  I do.

14      Q.  And, again, you see that Ms. Garza is

15  listed there along with other folks in the

16  government relations department?

17      A.  I do.

18      Q.  And the last one we'll look at is

19  page 20 of 24.  Do you see the fourth quarter of

20  2013 and the lobbying report for that?

21      A.  I do.

22      Q.  How much was spent by Walgreens

23  Corporation in the fourth quarter of 2013 on all

24  lobbying activities?

Page 278

1    MR. BENSINGER: Objection; foundation.
2  BY THE WITNESS:
3    A.  On page 20 of 24.
4  BY MR. GADDY:
5    Q.  Correct.
6    A.  The document references quarter 4, I see
7  $1 million figure.  Is that what you're asking
8  about?
9    Q.  Correct.
10    A.  Okay.
11    Q.  The document indicates that Walgreens
12  spent a million dollars lobbying in the fourth
13  quarter of 2013?
14    A.  Oh, I understand.
15    Q.  Do you see that?
16    A.  Yeah, the expense relates to lobbying
17  activities during that period was $1 million.
18    Q.  Okay.  And then if you turn with me to
19  page 22 of 24, do you see there, there is two
20  separate entries.
21       Do you see that?
22    A.  Yes.
23    Q.  And the second entry again applies to
24  the Safe Prescribing Act and the provisions looking

Page 279

1  to make hydrocodone combination products a
2  Schedule II drug.
3       Do you see that?
4    A.  Yes, I do.
5    Q.  Again, do you see Ms. Garza listed
6  there?
7    A.  I do.
8    Q.  Would you agree with me from looking at
9  this lobbying disclosure that Walgreens made not
10  only a time investment from the research that you
11  did and the other folks, but also a financial
12  investment in fighting the reclassification of
13  hydrocodone combination products from III to II?
14    A.  I would say they made a significant
15  investment in speaking with Legislators on those
16  proposed bills.
17    Q.  And ultimately, in spite of Walgreens'
18  efforts, that bill did pass and hydrocodone
19  products were rescheduled?
20    A.  That's correct.
21    Q.  And Walgreens continues to be in
22  business and fill prescriptions for hydrocodone
23  combination products?
24    A.  Yes.

Page 280

1    Q.  And hydrocodone combination products,
2  which, as we saw, are the most abused prescription
3  drug, are now subject to a higher level of
4  security, correct?
5    A.  Yeah, hydrocodone being a Schedule II
6  drug, there are additional restrictions in place
7  for Schedule II drugs in comparison to
8  Schedule IIIs.
9    Q.  And don't you agree that that's a good
10  thing that drugs like hydrocodone combination
11  products, which, as we saw, were the most abused
12  prescription drugs, are subject to the higher level
13  of security requirements?
14    MR. BENSINGER: Objection; argumentative.  You
15  may answer.
16  BY THE WITNESS:
17    A.  I think that -- I think that hydrocodone
18  products were already a Schedule III category, that
19  with proper education and training, probably would
20  have been able to allow patients to safely have
21  those medications and have access to them.
22       I can't comment on what's most
23  appropriate or not.  I don't know if that's in my
24  general, you know, area of expertise.

Page 281

1  BY MR. GADDY:
2    Q.  Okay.  Well, you recall when we kind of
3  started going down this line that one of the first
4  things we looked at was a GAO report to Congress
5  from back in 2002 about PDMPs that talked about how
6  drugs such as hydrocodone combination products were
7  prone to addiction, abuse and death.  Do you recall
8  that?
9    A.  I remember that, yes.
10    Q.  So, this issue has been present going
11  back to at least 2002, correct?
12    A.  That's what it looks like from the
13  document.
14    Q.  And -- but yet here in 2013 Walgreens
15  spent over $2 million during the year and at least
16  some of that money was spent on lobbying against
17  this change, correct?
18    A.  Working with legislatures -- legislators
19  on the bill.
20    Q.  If this has been such a big problem,
21  there has been reports to Congress on it back to
22  2002, don't you think that maybe the time for
23  providing education to patients maybe is over and
24  it's time to make a bigger change?

Page 282

1    MR. BENSINGER: Objection. This is argument.
2  BY THE WITNESS:
3    A.  Yeah, I don't know if that's as simple
4  as you make it out to be.
5    But I think there is -- everyone has a
6  role in helping address this issue, and I think by
7  working together we can help improve the situation
8  as it is.
9    MR. BENSINGER: Mr. Gaddy, we have been going
10  for about an hour. Can we go off the record for a
11  short break now?
12    MR. GADDY: That's fine. I think I only have
13  about 15, 20 minutes left, just so you know.
14    THE VIDEOGRAPHER: We're off the record at
15  3:23 p.m.
16    (WHEREUPON, a recess was had
17    from 3:23 to 3:32 p.m.)
18    THE VIDEOGRAPHER: We are back on the record
19  at 3:33 p.m.
20  BY MR. GADDY:
21    Q.  Mr. George, we talked a little bit
22  earlier today about the National Association of
23  Chain Drug Stores. Do you recall that generally?
24    A.  I think so.

Page 283

1    Q.  Okay. And that's a trade association
2  that represents pharmacies and of which Walgreens
3  is a member, correct?
4    A.  That's correct.
5    Q.  And let me just show you what's been
6  marked as Exhibit 29.
7    (WHEREUPON, a certain document was
8    marked as Walgreens-George Exhibit
9    No. 29: 8/7/12 e-mail string;
10    WAGMDL00331103 - 00331110.)
11  BY MR. GADDY:
12    Q.  Do you recognize this as being an
13  August 7, 2012 e-mail from Suzanne Hansen to a
14  bunch of individuals, including you?
15    Do you see that?
16    A.  Yes.
17    Q.  And the subject of the e-mail is "NACDS
18  Pharmacy Operations Committee - Action Required:
19  DEA Interim Solution."
20    Do you see that?
21    A.  Yes.
22    Q.  And the e-mail says, "All, you have been
23  selected to serve on various working groups at
24  NACDS to work on a DEA data solution. See below

Page 284

1  for names and task assignments."
2    Do you see that?
3    A.  I do.
4    Q.  And previously today I had asked you if
5  you were ever a member of any group or committee on
6  the NACDS, and I think you told me no; and maybe
7  this is just something different, but it looks like
8  at this point in time you were assigned to a
9  working group at NACDS.
10    Do you see that?
11    A.  Yes. I do see that. Curious. Trying
12  to figure out exactly how we would have conducted
13  any discussions, if there was any formal working
14  group setting.
15    Q.  Let me ask you this question. Is this
16  just something that you forgot about or is this
17  something that you put into a different category
18  that wasn't encompassed by my question earlier?
19    A.  Minimally it's something I forgot about,
20  but it could be something that I perceived as a
21  different category. It depends on how -- based
22  upon this e-mail, how did things develop I think,
23  you know.
24    Q.  Outside of this DEA interim solution

Page 285

1  working group, do you recall any other working
2  groups that you were on for -- with NACDS?
3    A.  I don't remember any, no.
4    Q.  Okay. If you see there in the -- it
5  looks like second line down, that you were assigned
6  to data intake.
7    Do you see that?
8    A.  Yes.
9    Q.  And do you recall participating in this
10  working group?
11    A.  At this moment I actually do not, but as
12  I review materials, maybe it becomes more apparent.
13    Q.  Okay. It goes on below the assignments.
14  It says, "I wanted to share with you the latest set
15  of notes on the DEA solution and ask for feedback
16  in any areas you see fit as you review. Please
17  send your comments to me or Mary Jo Ward and we
18  will collect the feedback to send back to NACDS."
19    Do you see that?
20    A.  Yes.
21    Q.  Do you recall what is meant by the
22  "DEA solution" or the "DEA data solution"?
23    A.  I don't recall at this moment. Maybe
24  something will trigger my memory as I work through

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 this document.

2 Q. Let's look at Exhibit No. 30. This is
3 going to be your response to this e-mail chain.

4 (WHEREUPON, a certain document was
5 marked as Walgreens-George Exhibit
6 No. 30: 8/10/12 e-mail string;
7 WAGMDL00334305 - 00334308.)

8 BY MR. GADDY:

9 Q. And do you see this is a response to
10 that below e-mail about three days later from you?

11 Do you see that?

12 A. Yes.

13 Q. And let's look, you write, "Suzanne, I
14 reviewed the various solutions in the documents you
15 provided. Attached are some comments related to
16 these solutions as well as suggestions on other
17 business partners that may be able to provide
18 similar solutions."

19 Do you see that?

20 A. Yes.

21 Q. Is any of this jogging your memory?

22 A. A little bit. I could venture to guess
23 a little bit more so. I still don't know if I
24 actively participated in a committee, but I might

Page 287

1 have provided feedback to the actual committee
2 based upon some of the notes within this document
3 or solution that were presented in this document.

4 Q. What's your understanding of what you
5 were looking into here?

6 A. Is it okay if I review --

7 Q. Of course.

8 A. -- some of this stuff?

9 Looking at the document, the Exhibit 29
10 that you presented, and looking at the topics here,
11 it appears that from my recollection, and, again,
12 looking at 2012 as the reference date, at that
13 point I think one of the things that Walgreens was
14 struggling with is how do we -- how do we I think
15 provide more meaningful information to the
16 pharmacist. And there were a couple different
17 proposed solutions based upon the, I think, the
18 primary source of that information, so to speak.

19 So, for example, I believe in 2012 there
20 wasn't as much data integration between state to
21 state. So, if a pharmacist, for example, in the
22 State of Illinois received a prescription from
23 pharmacists in another state, they may need to go
24 to two different websites for each respective state

Page 288

1 prescription drug monitoring program to review that
2 patient's two different controlled substance
3 histories.

4 So, looking at a way I think to maybe
5 develop a solution that could provide a pharmacist
6 with a more, you know, consolidated data, kind of
7 almost like a one-stop shop, so to speak. I think
8 that was really what was in question here.

9 And I think there is one that would have
10 been based upon some data provided by an
11 organization, by IMS, one by the NABP PMP
12 Interconnect program, which they were looking to
13 connect various state databases so that there would
14 be more interstate data sharing.

15 The other one had to do with that
16 scoring of patient's controlled substance history
17 that I believe Ohio might have initially put forth
18 as part of that pilot we talked about earlier.

19 And then the -- is that the last one?
20 There might have been one more that I might have
21 missed here. I thought it said Surescripts.

22 Oh, the first one, I'm sorry, was
23 Surescripts, which is I think the entity that helps
24 facilitate data exchange when it comes to

Page 289

1 e-prescribing.

2 Q. Why was it called the DEA data solution?

3 A. That I don't know.

4 Q. It looks like, and I'm going back to I
5 think I'm on No. 30, and your e-mail back to
6 Suzanne, you say, "I reviewed the various solutions
7 presented in the documents provided. Attached are
8 some comments related to these solutions as well as
9 suggestions on other business partners."

10 So, would it be fair to say that you
11 reviewed the information about those different
12 vendors or service providers and then offered some
13 feedback to the folks at Walgreens?

14 A. Yes, that makes sense.

15 Q. Okay. Do you know who Suzanne is or
16 what her role was?

17 A. Yeah, I think at the time she was a vice
18 president with the company. It's hard for me to
19 figure out who was directly reporting to her at the
20 time. But she was a vice president.

21 Q. Okay. Why was it that you were asked to
22 be the one to review this, do you know?

23 MR. BENSINGER: Objection; foundation.

24 BY THE WITNESS:

Page 290

1   A.   I don't know why she asked me to look at
2   this, but I had done some work with NABP in the
3   past I think trying to set up the integration
4   between state PMPs and participate in some of those
5   discussions.
6       So, I probably had a little more
7   background in some of the nuances on a couple of
8   these solutions.
9   BY MR. GADDY:
10  Q.   Okay.  I'm going to show you what I will
11  mark as Exhibit 31, which I believe is going to be
12  a pitch that you were made or it was made to you by
13  the folks at IMS.
14      (WHEREUPON, a certain document was
15      marked as Walgreens-George Exhibit
16      No. 31:  8/30/12 e-mail string with
17      attachment; WAGMDL00678523 -
18      00678540.)
19  BY MR. GADDY:
20  Q.   What is IMS?
21  A.   They're not currently known as IMS.  I
22  believe they are currently known as IQVIA.  I can't
23  say I'm an expert on what they bring, but I
24  understand that a number of entities may report

Page 291

1   deidentified data into this organization so that
2   they can provide industry level reporting
3   essentially.
4   Q.   Okay.  If you look at this document I
5   just put in front of you, it's an e-mail chain from
6   August of 2012.
7       Do you see that?
8   A.   Yes.
9   Q.   It looks like it's between you and an
10  individual who at the very least has an IMS Health
11  e-mail address, correct?
12  A.   That's correct.
13  Q.   If you go to the bottom of the second
14  page, it looks like it's the first reach-out to
15  you, and then in the third page it says, "Hossam
16  will be at Walgreens tomorrow at 2 p.m. and staying
17  until Thursday afternoon.  We'd like to get time to
18  follow up on your questions regarding the patient
19  capabilities of the controlled substance reporting
20  system."
21      Do you see that?
22  A.   Yes.
23  Q.   And ultimately do you recall that you
24  ended up having this meeting with the IMS folks?

Page 292

1   A.   I don't remember if we had this specific
2   meeting that's kind of being referred to, but I do
3   believe we did meet at some point.
4   Q.   If you go back to the e-mail in the very
5   first page, the very top e-mail, it says, "Tomson,
6   it was great meeting you yesterday.  Attached is a
7   deck that describes the different deployment
8   options for the IMS Controlled Substance Ratings
9   Solution."
10      Do you see that?
11  A.   Yes.
12  Q.   Is this material that you would have
13  reviewed kind of in cohort with this other
14  assignment that you had about providing feedback to
15  the Walgreens folks on which of these vendors you
16  should go with, if any?
17  A.   Yeah, this would have been the solution
18  I think that's referenced in Exhibit 29 that would
19  have been under the IMS category.
20  Q.   Okay.  Did you have meetings similar to
21  this one and were you provided material such as
22  this for those other folks as well?
23  MR. BENSINGER:  Objection; vague.
24  BY THE WITNESS:

Page 293

1   A.   I don't know if -- I might have already
2   had some background knowledge on some of the other
3   ones.  This, from my recollection, was something
4   newer that this entity was pursuing.  So, I think I
5   need to have a more in-depth conversation to
6   understand what angle they were looking at.
7   BY MR. GADDY:
8   Q.   You mean this was a newer product for
9   IMS?
10  A.   Yes.  That's my recollection.
11  Q.   If you'd turn with me -- it doesn't look
12  like these are numbered, but I am on the first
13  page of the PowerPoint presentation.
14  A.   First page.  Okay.
15  Q.   You see it says "IMS CS."  You
16  understand that to be controlled substance?
17  A.   Yes.
18  Q.   "Ratings Solution."  It says, "An
19  industry solution to an important societal issue."
20      Do you see that?
21  A.   Yes.
22  Q.   And it looks like the rest of the slides
23  are numbered, so now I'm at slide 2.
24  A.   Yep.

Page 294

1    Q.   And it says, "Actions taken in Florida
2  unravel symptoms of a nationwide issue:  IMS
3  analysis."
4        Do you see that?
5    A.   I do see that.
6    Q.   And it looks like at the top three boxes
7  indicates a couple of specific incidences that I
8  guess they are referencing happened in Florida and
9  the bottom six boxes looks like it gives some
10  specific data points from Florida.
11        Do you see that?
12    A.   Yes.
13    Q.   And is it your understanding that,
14  similar to the Florida PMP that we talked about
15  earlier, that these would be data points that were
16  gathered from all pharmacies, not just Walgreens
17  pharmacies?
18        MR. BENSINGER:  Objection; foundation.
19  BY THE WITNESS:
20    A.   Yeah, I wouldn't know how they compiled
21  it.
22  BY MR. GADDY:
23    Q.   Essentially what IMS is representing to
24  you that they can provide you the type of data that

Page 295

1  you're seeing in these boxes about, for example,
2  the number of patients who were filled multiple
3  C-II prescriptions.  Do you see that in the box on
4  the left-hand side?
5    A.   Yes, I see that.
6    Q.   And next to that in the middle of the
7  page, the number of prescriptions paid for in cash?
8    A.   I do see that.
9    Q.   And is this information that Walgreens
10  has the ability to determine for their own stores?
11        MR. BENSINGER:  Objection; foundation.
12  BY THE WITNESS:
13    A.   I don't know.  That wouldn't be
14  something I would have been involved with.
15  BY MR. GADDY:
16    Q.   If you turn to slide 6, it talks about
17  that this program would have the ability to
18  identify pharmacies with high ratings relative to
19  benchmarks and identify trends in controlled
20  substance of interest dispensing.
21        Do you see that?
22    A.   I do see that.
23    Q.   And if you turn the page to the very
24  next page, it talks about how its data can identify

Page 296

1  pharmacies with large number of patients and
2  doctors that generate high ratings.
3        Do you see that?
4    A.   On page 7?
5    Q.   Correct.
6    A.   Yes, I do see that.
7    Q.   And do you know whether or not Walgreens
8  had the ability to determine this data for
9  themselves?
10        MR. BENSINGER:  Objection; foundation.
11  BY THE WITNESS:
12    A.   Yeah, I don't think they would have the
13  information at least to the extent that IMS is
14  providing, but yeah.
15  BY MR. GADDY:
16    Q.   Did you make a recommendation that
17  Walgreens utilize IMS or any other of these
18  systems?
19    A.   I think there is probably pros and cons
20  for each one.  I don't remember exactly what my
21  recommendation for IMS was.
22    Q.   Did Walgreens ultimately utilize one of
23  these systems?
24        MR. BENSINGER:  Objection; foundation.

Page 297

1  BY THE WITNESS:
2    A.   Do you mind if I take a look at the
3  summary again?
4  BY MR. GADDY:
5    Q.   Sure.  I don't think the answer is in
6  there, but you're welcome to look.
7    A.   Walgreens did perform some pilot,
8  internal pilot with No. 3.  And I think they are in
9  the early stages of trying to implement No. 2.
10    Q.   Which number are you looking at?
11    A.   Sorry.  On document Exhibit 29.
12    Q.   And you are referring to them as 2 and
13  3.  Are you talking about the page numbers?
14    A.   Oh, no, sorry.  Page 8 and 9.
15    Q.   Do you have -- tell me the last three
16  numbers in the bottom right-hand corner.
17    A.   Oh, sorry.
18    Q.   If you don't mind.
19    A.   1108 and 1109.
20    Q.   Okay.  So, 1108 is the NABP PMP
21  Interconnects program?
22    A.   Yes.
23    Q.   And if you don't mind telling me again,
24  that one used the pilots or how did you utilize

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1 this one?

2    A.  Yeah, this one is currently funded and

3 going through design in order to implement.

4    Q.  And what was the other one?

5    A.  1109. That was piloted in preparation

6 for looking at No. 2 as well. I'm sorry. The

7 previous page.

8    Q.  Sure. I got you. Okay.

9    So, it looks like you were asked to

10 start looking into this in August of 2012, correct?

11    A.  That's correct.

12    Q.  Between August 2012 and now, were any of

13 these programs or any programs like this

14 implemented by Walgreens other than the one on --

15 ending in Bates Nos. 108 that you say has now been

16 funded and is going through design?

17    MR. BENSINGER: Objection; foundation.

18 BY THE WITNESS:

19    A.  I don't know if I have all the details.

20 There may have been something similar to the IMS

21 solution that they were exploring or had something

22 similar in mind.

23 BY MR. GADDY:

24    Q.  Okay. But regardless, back in August of

Page 299

1 2012, you were asked to look into these different

2 options and provide your feedback, correct?

3    A.  Yes.

4    MR. BENSINGER: Asked and answered.

5 BY MR. GADDY:

6    Q.  And you did that and you provided your

7 feedback here in, if not this e-mail, in the next

8 one we looked at, correct?

9    A.  Yes, correct.

10    Q.  And you provided that feedback in

11 August of 2012?

12    A.  That's correct.

13    Q.  And as we sit here today, you're not

14 aware of any other program that has been

15 implemented to date, correct?

16    MR. BENSINGER: Objection; vague.

17 BY THE WITNESS:

18    A.  With regards to these four solutions, I

19 am not aware of anything that's already been

20 implemented across the chain, for example.

21 BY MR. GADDY:

22    Q.  Okay. And, again, this was a -- the

23 purpose of looking into this was so that

24 pharmacists could have more visibility on what was

Page 300

1 happening on a national level with their patients

2 to help inform their dispensing decisions and

3 whether or not prescriptions for controlled

4 substances should or should not be filled by the

5 pharmacist, correct?

6    A.  I don't know if that's how I'd

7 completely describe it. I think each solution

8 brought a little bit different, you know, say, if

9 you want to call it benefit to the process.

10    Ultimately I think Walgreens is

11 struggling to come up with a standardized process

12 given that there were multiple state prescription

13 monitoring programs and none of them were

14 necessarily integrated, so it was tough to develop

15 a standardized process.

16    And, so, I think these solutions that

17 were I think discussed were opportunities to look

18 at something that could build a standardized

19 process.

20    Q.  And over the last six to seven years

21 from then to now, has Walgreens taken advantage of

22 any of those opportunities that were presented in

23 this program, have any of those been implemented?

24    MR. BENSINGER: Objection; foundation.

Page 301

1 BY THE WITNESS:

2    A.  I'm not aware of anything, again, with

3 these four in mind. At the same time I do believe

4 Walgreens implemented what I would call more of a

5 manual standardized process with regards to the

6 good faith dispensing and ensuring pharmacists do

7 know to check the PMP.

8 BY MR. GADDY:

9    Q.  Okay. And those were changes that I

10 think we discussed earlier were made after the DEA

11 investigation and settlement of 2013, correct?

12    A.  From a timeline standpoint, that's

13 accurate.

14    MR. GADDY: I don't have any more questions

15 for you right now, Mr. George.

16    MR. BENSINGER: We reserve the right to read

17 and sign.

18    THE VIDEOGRAPHER: We are off the record at

19 3:55 p.m.

20    (Time Noted: 3:55 p.m.)

21    FURTHER DEPONENT SAITH NAUGHT.

22

23

24

Page 302

1
2      I, CORINNE T. MARUT, C.S.R. No. 84-1968,
    Registered Professional Reporter and Certified
3    Shorthand Reporter, do hereby certify:
           That previous to the commencement of the
    examination of the witness, the witness was duly
4    sworn to testify the whole truth concerning the
    matters herein;
5          That the foregoing deposition transcript
    was reported stenographically by me, was thereafter
6    reduced to typewriting under my personal direction
    and constitutes a true record of the testimony
7    given and the proceedings had;
           That the said deposition was taken
8    before me at the time and place specified;
           That the reading and signing by the
9    witness of the deposition transcript was agreed
    upon as stated herein;
10         That I am not a relative or employee or
    attorney or counsel, nor a relative or employee of
11   such attorney or counsel for any of the parties
    hereto, nor interested directly or indirectly in
12   the outcome of this action.
13   _____
14   CORINNE T. MARUT, Certified Reporter
15
       (The foregoing certification of this
16   transcript does not apply to any
    reproduction of the same by any means, unless under
17   the direct control and/or supervision of the
    certifying reporter.)
18
19
20
21
22
23
24

Page 304

1      - - - - - -
          E R R A T A
2      - - - - - -
3
4 PAGE LINE CHANGE
5 _____ ____ _____
6      REASON: _____
7 _____ ____ _____
8      REASON: _____
9 _____ ____ _____
10      REASON: _____
11 _____ ____ _____
12      REASON: _____
13 _____ ____ _____
14      REASON: _____
15 _____ ____ _____
16      REASON: _____
17 _____ ____ _____
18      REASON: _____
19 _____ ____ _____
20      REASON: _____
21 _____ ____ _____
22      REASON: _____
23 _____ ____ _____
24      REASON: _____

Page 303

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.  You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7      After doing so, please sign the errata
8  sheet and date it.
9      You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12      It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the
15 deposition transcript by you.  If you fail to do
16 so, the deposition transcript may be deemed to be
17 accurate and may be used in court.
18
19
20
21
22
23
24

Page 305

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4      I, TOMSON GEORGE, do hereby certify
5  under oath that I have read the foregoing pages,
6  and that the same is a correct transcription of the
7  answers given by me to the questions therein
8  propounded, except for the corrections or changes
9  in form or substance, if any, noted in the attached
10 Errata Sheet.
11
12
13 _____
14 TOMSON GEORGE          DATE
15
16
17 Subscribed and sworn
   to before me this
18 _____ day of _____, 20____.
19 My commission expires:_____
20
   _____ Notary Public
21
22
23
24

Page 306

LAWYER'S NOTES

PAGE LINE

1
2
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____