Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                        -  -  -
 5

    IN RE:  NATIONAL          :   MDL NO. 2804
 6  PRESCRIPTION OPIATE        :
    LITIGATION                 :
 7                             :
    ------------------------------------------------
 8  THIS DOCUMENT RELATES TO   :   CASE NO.
    ALL CASES                  :   1:17-MD-2804
 9                             :
                               :   Hon. Dan A.
10                             :   Polster
11                        -  -  -
12                   January 30, 2019
13                        -  -  -
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14                 CONFIDENTIALITY REVIEW
15
16             Videotaped deposition of JANET
    GETZEY HART taken pursuant to notice, was held at
17  the law offices of Morgan, Lewis & Bockius LLP,
    1701 Market Street, Philadelphia, Pennsylvania,
18  beginning at 9:34 a.m., on the above date, before
    Ann Marie Mitchell, a Federally Approved
19  Certified Realtime Reporter, Registered Diplomate
    Reporter, Registered Merit Reporter and Notary
20  Public.
21                        -  -  -
22            GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
23               deps@golkow.com
24
```

| Page 2 | Page 4 |
|---|---|

**Page 2**

1 APPEARANCES:
2
3 BARON & BUDD, P.C.
BY: WILLIAM POWERS, ESQUIRE
4 600 New Hampshire Avenue NW
The Watergate, Suite 10-A
5 Washington, DC 20037
(202) 333-4562
6 wpowers@baronbudd.com
Representing the Plaintiffs
7
8
9 BARON & BUDD, P.C.
BY: MARK PIFKO, ESQUIRE
15910 Ventura Boulevard
10 Suite 1600
Encino, California 91436
11 (818) 839-2333
mpifko@baronbudd.com
12 Representing the Plaintiffs
13
14 MORGAN, LEWIS & BOCKIUS LLP
BY: ELISA P. McENROE, ESQUIRE
15 BY: MATTHEW R. LADD, ESQUIRE
1701 Market Street
16 Philadelphia, Pennsylvania 19103
(215) 963-5000
17 elisa.mcenroe@morganlewis.com
matthew.ladd@morganlewis.com
18 Representing Rite Aid
19
20 MORGAN, LEWIS & BOCKIUS LLP
BY: KELLY A. MOORE, ESQUIRE
21 101 Park Avenue
New York, New York 10178
22 (212) 309-6000
kelly.moore@morganlewis.com
23 Representing Rite Aid
24

**Page 4**

1 APPEARANCES VIA TELEPHONE AND STREAM:
2
3 BARON & BUDD, P.C.
BY: GRETCHEN KEARNEY, ESQUIRE
4 BY: JAY LICHTER, ESQUIRE
BY: NOAH RICH, ESQUIRE
5 BY: W. SCOTT SIMMER, ESQUIRE
600 New Hampshire Avenue NW
6 The Watergate, Suite 10-A
Washington, DC 20037
7 (202) 333-4562
gkearney@baronbudd.com
8 jlichter@baronbudd.com
nrich@baronbudd.com
9 ssimmer@baronbudd.com
Representing the Plaintiffs
10
11 MORGAN, LEWIS & BOCKIUS LLP
12 BY: JOHN M. MALOY, ESQUIRE
1701 Market Street
13 Philadelphia, Pennsylvania 19103
(215) 963-5000
14 john.maloy@morganlewis.com
Representing Rite Aid
15
16 BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
17 BY: ALEXANDRA K. HUGHES, ESQUIRE
440 College Avenue
18 Suite 320
Athens, Georgia 30601
19 (706) 744-4135
ahughes@bbga.com
20 Representing the Plaintiffs
21
22
23
24

**Page 3**

1 APPEARANCES (cont.'d):
2
3 ARNOLD & PORTER KAYE SCHOLER LLP
BY: ELISEO R. PUIG, ESQUIRE
4 370 Seventeenth Street
Denver, Colorado 80202
5 (303) 863-1000
eliseo.puig@apks.com
6 Representing Endo Health Solutions Inc.,
Endo Pharmaceuticals Inc., Par
7 Pharmaceutical, Inc. and Par Pharmaceutical
Companies, Inc.
8
9 PIETRAGALLO GORDON ALFANO BOSICK &
10 RASPANTI, LLP
BY: ALEXANDER M. OWENS, ESQUIRE
11 1818 Market Street
Suite 3402
12 Philadelphia, Pennsylvania 19103
(215) 320-6200
13 amo@pietragallo.com
Representing Cardinal Health
14
15
16 COVINGTON & BURLING, LLP
BY: KEVIN KELLY, ESQUIRE
One City Center
17 850 Tenth Street, NW
Washington, DC 20001
18 (202) 662-5272
kkelly@cov.com
19 Representing McKesson
20
21
22
23
24

**Page 5**

1 APPEARANCES VIA TELEPHONE AND STREAM (cont.'d):
2
3 JACKSON KELLY PLLC
BY: SYLVIA WINSTON NICHOLS, ESQUIRE
4 150 Clay Street
Morgantown, West Virginia 26501
5 (304) 284-4105
sylvia.winston@jacksonkelly.com
6 Representing AmerisourceBergen Drug
Corporation
7
8
9 JONES DAY
BY: MIRIAM LIABO, ESQUIRE
10 77 West Wacker
Chicago, Illinois 60601
11 (312) 782-3939
mliabo@jonesday.com
12 Representing Walmart
13
14 BAILEY & WYANT, PLLC
BY: HARRISON M. CYRUS, ESQUIRE
15 500 Virginia Street East
Suite 600
16 Charleston, West Virginia 25301
(304) 345-4222
17 hcyrus@baileywyant.com
18 VIDEOGRAPHER:
DAVID LANE
19
ALSO PRESENT:
20 DAVID SAYRES
Precision Trial Solutions
21
22 EMMA KABOLI
Baron & Budd, P.C.
23 (via stream)
24           - - -

```
- - -
I N D E X
- - -
```

Testimony of: JANET GETZEY HART
By Mr. Powers          10

```
- - -
E X H I B I T S
- - -
```

NO.          DESCRIPTION          PAGE

Rite         Distribution/Customer    99
Aid-Hart-1   Support Center, DEA
             Regulatory Guidelines,
             Policy, Bates stamped
             Rite_Aid_OMDL_0046157
             through
             Rite_Aid_OMDL_0046226

Rite         Rite Aid Distribution    120
Aid-Hart-2   Center DEA Regulatory
             Guidelines,
             Rite_Aid_OMDL_0014804
             through
             Rite_Aid_OMDL_0014874

Rite         Controlled Drug Above    124
Aid-Hart-3   Average Order Monitoring
             Program, Bates stamped
             Rite_Aid_OMDL_0015079
             through
             Rite_Aid_OMDL_0015081

Rite         Pharmacy Replenishment   140
Aid-Hart-4   System Store Order
             History, Bates stamped
             Rite_Aid_OMDL_0015302
             through
             Rite_Aid_OMDL_0015307

Rite         Excel Spreadsheet        160
Aid-Hart-5   Printout, Bates stamped
             Rite_Aid_OMDL_0013151

Rite         Rite Aid Controlled Drug 172
Aid-Hart-6   Reporting Above Average
             Controlled Drug
             Purchases Report, Bates
             stamped
             Rite_Aid_OMDL_0046227
             through
             Rite_Aid_OMDL_0046319

Rite         Email chain, top one     183
Aid-Hart-7   dated 2010-11-16, Bates
             stamped
             Rite_Aid_OMDL_0050632

Rite         Email chain, top one     185
Aid-Hart-8   dated 2010-11-17, Bates
             stamped
             Rite_Aid_OMDL_0050633

Rite         Email chain top one      194
Aid-Hart-9   dated Email dated
             2010-04-11, Bates
             stamped
             Rite_Aid_OMDL_0050628
             through
             Rite_Aid_OMDL_0050630

Rite         Email dated 2011-06-03,  199
Aid-Hart-10  Bates stamped
             Rite_Aid_OMDL_0050634

Rite         Email chain, top one     201
Aid-Hart-11  dated 2002-05-14, Bates
             stamped
             Rite_Aid_OMDL_0046770
             through
             Rite_Aid_OMDL_0046789

Rite         Email chain, top one     209
Aid-Hart-12  dated 2012-07-11, Bates
             stamped
             Rite_Aid_OMDL_0013345
             and
             Rite_Aid_OMDL_0013346

Rite         Email dated 2012-05-18,  213
Aid-Hart-13  Bates stamped
             Rite_Aid_OMDL_0046855
             through
             Rite_Aid_OMDL_0046875

Rite         Email chain, top one     226
Aid-Hart-14  dated 2012-12-18, Bates
             stamped
             Rite_Aid_OMDL_0038054
             and
             Rite_Aid_OMDL_0038055

Rite         Email dated 2013-09-04,  238
Aid-Hart-15  Bates stamped
             Rite_Aid_OMDL_0046648
             through
             Rite_Aid_OMDL_0046662

Rite         Email dated 2013-12-24,  249
Aid-Hart-16  Bates stamped
             Rite_Aid_OMDL_0016186
             and
             Rite_Aid_OMDL_0016187

```
- - -
DEPOSITION SUPPORT INDEX
- - -
```

Direction to Witness Not to Answer

Page Line

62   8

Request for Production of Documents

Page Line

Stipulations
Page Line

Question Marked
Page Line

Page 10

```
1        THE VIDEOGRAPHER:  We're now on
2   the record.  My name is David Lane,
3   videographer for Golkow Litigation
4   Services.  Today's date is January 30,
5   2019.  The time is 9:34 a.m.
6        This deposition is taking place
7   in Philadelphia, Pennsylvania in the
8   matter of National Opiate Litigation,
9   MDL.
10       Our deponent today is Janet
11  Getzey Hart.  Counsel will be noted on
12  the stenographic record.
13       Our court reporter is Ann Marie
14  Mitchell, who will now swear in the
15  witness.
16            - - -
17       JANET GETZEY HART, after having
18  been duly sworn, was examined and
19  testified as follows:
20            - - -
21       EXAMINATION
22            - - -
23  BY MR. POWERS:
24       Q.   Good morning.
```

Page 11

```
1        A.   Good morning.
2        Q.   My name is Will Powers and I
3   represent the plaintiffs in this litigation.
4        Can you please state your full
5   name and spell it for the record?
6        A.   Sure.  Janet Getzey Hart.
7   J-A-N-E-T, Getzey, G-E-T-Z-E-Y, last name Hart,
8   H-A-R-T.
9        Q.   And we are here for your
10  deposition today.
11       Do you understand that?
12       A.   I do.
13       Q.   Have you ever been deposed
14  before?
15       A.   I have.
16       Q.   When was that?
17       A.   20 years ago.
18       Q.   Was that the only time you've
19  been deposed?
20       A.   I've been deposed twice.
21       Q.   What was the other time you were
22  deposed?
23       A.   Probably ten years ago.
24       Q.   And the first time you were
```

Page 12

```
1   deposed, 20 years ago, what was that in
2   connection with?
3        A.   It was related to an alleged
4   price fixing for third parties in Baltimore,
5   Maryland.
6        Q.   And were you working at Rite Aid
7   at that point?
8        A.   I was.
9        Q.   And were you a fact witness
10  during that deposition?
11       A.   I was.
12       Q.   What was the subject of your
13  testimony for that deposition?
14       A.   That there was no collusion as
15  far as not taking a third-party plan.
16       Q.   You also mentioned that you were
17  deposed ten years ago.
18       What was that in connection with?
19       A.   That was in connection with a
20  doctor.
21       Q.   Do you remember the doctor's
22  name?
23       A.   I do not.
24       Q.   When you say in connection with a
```

Page 13

```
1   doctor, what do you mean?
2        A.   I believe there was an action
3   against a doctor and I was deposed in that
4   action.
5        Q.   Why were you deposed?
6        A.   Because I worked for Rite Aid and
7   they had dispensed prescriptions for the doctor.
8        MS. McENROE:  And, Janet, just
9   let him finish his questions before you
10  answer.
11       THE WITNESS:  Oh, okay.
12       MS. McENROE:  Take your time.
13       THE WITNESS:  Sorry.
14  BY MR. POWERS:
15       Q.   Do you know where that doctor was
16  operating?
17       A.   The deposition was in Harrisburg.
18  That's all I remember.
19       Q.   You don't recall where the doctor
20  was actually writing the prescriptions from?
21       A.   I do not.
22       Q.   Do you know which Rite Aid stores
23  were dispensing those prescriptions?
24       A.   I do not.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.    And your counsel just informed
2  you about one of the rules today.  I just want to
3  go over a couple others.
4         Is that all right?
5    A.    Certainly.
6    Q.    Because the court reporter is
7  here writing down everything that we're saying,
8  it's important that only one person is speaking
9  at a time.  So as you've been going back and
10 forth here, you obviously can anticipate some of
11 my questions, but I just ask you to allow me to
12 finish my question fully before you start your
13 answer.
14        Is that okay?
15   A.    Perfect.
16   Q.    And then likewise, I'll let you
17 finish your answer before I ask my questions.
18        Does that sound okay?
19   A.    Perfect.
20   Q.    And the other thing, too, is I
21 need verbal answers.  So no nods of the heads,
22 uh-huhs, uh-uhs, things like that.
23        Does that make sense?
24   A.    Yes.

Page 15

1    Q.    And if for any reason you do not
2  understand a question and require some
3  clarification or explanation of the words I'm
4  using, you must tell me and we'll get that matter
5  resolved before you answer the question.
6         Is that okay?
7    A.    Yes.
8    Q.    So then if you answer any of my
9  questions, I will assume that you understand it.
10        Is that okay?
11   A.    Yes.
12   Q.    Are you currently suffering from
13 any medical disease or illness that in any way
14 interferes with your ability to answer truthfully
15 and completely my questions here today?
16   A.    No.
17   Q.    Are you currently taking any
18 medication or drugs that may in any way interfere
19 with your ability to answer truthfully and
20 completely here today?
21   A.    No.
22   Q.    And the court reporter just swore
23 you in, so do you understand that the testimony
24 you give here today is under oath, just as it

Page 16

1  would be in a courtroom?
2    A.    I do.
3    Q.    So because you're under oath, if
4  you lie or provide intentionally misleading
5  answers, you may be subject to civil or criminal
6  penalties.
7         Do you understand that?
8         MS. McENROE:  Objection to form.
9         THE WITNESS:  I do.
10 BY MR. POWERS:
11   Q.    And we can take breaks when you
12 need them, but you have to answer the question if
13 there is one pending.
14        Is that okay?
15   A.    That's fine.
16   Q.    And as your counsel just did a
17 minute ago, your counsel from time to time may
18 object to my questions, but I'm still entitled to
19 an answer unless your counsel specifically
20 instructs you not to answer.
21        Do you understand that?
22   A.    I do.
23   Q.    Did you prepare for this
24 deposition here today?

Page 17

1    A.    I did.
2    Q.    How did you do that?
3    A.    I met with outside counsel to go
4  over some documents and to discuss Rite Aid's
5  policies, procedures, things along those lines.
6    Q.    And when you say outside counsel,
7  you're referring to Morgan Lewis counsel?
8    A.    I am.
9    Q.    When did you meet with Morgan
10 Lewis counsel?
11   A.    I have met with them various
12 times over the past several months.
13   Q.    About how many times?
14   A.    Perhaps six.
15   Q.    On average, how long were those
16 meetings you had with outside counsel?
17   A.    Some were three to four hours.
18 Some were a complete day.
19   Q.    I want to start with your
20 educational background, Ms. Hart.
21        Actually, before I continue, is
22 it Ms. Hart or Ms. Getzey Hart?
23   A.    Ms. Hart is fine.
24   Q.    Okay.  Did you complete high

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  school?
2      A.    I did.
3      Q.    Where did you complete high
4  school?
5      A.    Greater Johnstown Vocational and
6  Technical High School in Johnstown, Pennsylvania.
7      Q.    And what year did you graduate
8  from high school?
9      A.    1979.
10     Q.    Just let me -- I know you can
11 anticipate my question, but just can you please
12 let me finish my question --
13     A.    I'm sorry.
14     Q.    -- and then you can answer the
15 question.
16           It's okay.
17           So just to be clear, what year
18 did you graduate high school?
19     A.    1979.
20     Q.    Do you have any education beyond
21 high school?
22     A.    I do.
23     Q.    What is that education?
24     A.    It is a BS in pharmacy.

Page 19

1      Q.    Where did you get your BS in
2  pharmacy?
3      A.    Duquesne University.
4      Q.    And where is that located?
5      A.    Pittsburgh, Pennsylvania.
6      Q.    What year did you graduate
7  Duquesne University?
8      A.    1984.
9      Q.    Besides your college education,
10 do you have any other educational background?
11     A.    I do not.
12     Q.    Do you have any certifications of
13 any kind?
14     A.    I am a pharmacist.
15     Q.    What does that mean, that you're
16 a pharmacist?
17     A.    It means I'm registered with the
18 state of Pennsylvania as a pharmacist.
19     Q.    Is that registration current?
20     A.    Yes.
21     Q.    When did you get that? When did
22 you first get that registration as a pharmacist?
23     A.    1984.
24     Q.    Have you kept your registration

Page 20

1  as a pharmacist up to date and current between
2  1984 and now?
3      A.    Yes.
4      Q.    I believe you said you're
5  registered in Pennsylvania. Right?
6      A.    (Witness nods head.)
7      Q.    Are you registered as a
8  pharmacist in any other states?
9      A.    New Jersey.
10           MS. McENROE: Again, just a
11     reminder to respond verbally. So that
12     first answer had been yes.
13           THE WITNESS: Okay.
14 BY MR. POWERS:
15     Q.    So you're registered as a
16 pharmacist in Pennsylvania and New Jersey; is
17 that correct?
18     A.    That is correct.
19     Q.    Any other states?
20     A.    No.
21     Q.    When did you first become
22 registered as a pharmacist in New Jersey?
23     A.    Probably two years after
24 Pennsylvania.

Page 21

1      Q.    And are you currently still
2  registered as a pharmacist in New Jersey?
3      A.    I am.
4      Q.    So from about 1986 to present,
5  you were registered as a pharmacist in New
6  Jersey; is that right?
7      A.    That sounds about right.
8      Q.    No breaks for that registration?
9      A.    No breaks.
10     Q.    After graduation from college in
11 1984, did you start working at Rite Aid at that
12 point?
13     A.    I did.
14     Q.    Are you still currently employed
15 by Rite Aid?
16     A.    I am.
17     Q.    Have you been employed by Rite
18 Aid the entire time, from 1984 until present?
19     A.    I have.
20     Q.    When you started working at Rite
21 Aid in 1984, what was your position?
22     A.    I was a pharmacy intern.
23     Q.    As a pharmacy intern, where did
24 you work?

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    A.    Johnstown, Pennsylvania.
2    Q.    How long were you a pharmacy
3 intern for?
4    A.    Approximately four months.
5    Q.    After your position as a pharmacy
6 intern, what was your next title?
7    A.    Pharmacist.
8    Q.    Now, was that also located in
9 Johnstown, Pennsylvania?
10    A.    It was.
11    Q.    And when you say located in
12 Johnstown, Pennsylvania, is that the Rite Aid
13 corporate offices?
14    A.    It is not.  It's a retail
15 pharmacy location.
16    Q.    Approximately how long were you a
17 pharmacist for at Rite Aid?
18         MS. McENROE:  Objection to form.
19         THE WITNESS:  At the Johnstown
20    store, about six months.
21 BY MR. POWERS:
22    Q.    Where did you go after that?
23    A.    I became a floater pharmacist and
24 worked at various Rite Aid pharmacy locations in

Page 23

1 the general area.
2    Q.    You say -- when you say the
3 general area, what do you mean by that?
4    A.    Around Johnstown.
5    Q.    How long were you a floater
6 pharmacist for?
7    A.    Approximately two years.
8    Q.    So that would be about 1986 you
9 stopped being a floater pharmacist?
10    A.    That sounds correct.
11    Q.    After a floater pharmacist, what
12 was your next position at Rite Aid?
13    A.    I was a pharmacy manager.
14    Q.    How long were you a pharmacy
15 manager for?
16    A.    Approximately one year.
17    Q.    What were your job
18 responsibilities as a pharmacy manager?
19    A.    I was responsible for the
20 profitability of that particular pharmacy.
21    Q.    When you say that particular
22 pharmacy, are you referring to a Rite Aid retail
23 pharmacy location?
24    A.    I am.

Page 24

1    Q.    Where was that location where
2 you --
3    A.    Johnstown.
4    Q.    Sorry.
5    A.    Oh, I'm sorry.
6    Q.    What was the location where you
7 were a pharmacy manager?
8    A.    Johnstown.
9    Q.    Did you have any other
10 responsibilities besides the profitability while
11 you were a pharmacy manager?
12    A.    The responsibilities were to
13 dispense prescriptions, payroll, just running the
14 basic business of the pharmacy.
15    Q.    After your year as a pharmacy
16 manager, what was your next position at Rite Aid?
17    A.    I remained a pharmacist.  But
18 then at that particular time, Rite Aid was
19 purchasing some stores, another drugstore chain,
20 Gray Drug.  And so after that I went out of the
21 pharmacy and was a training pharmacist as new
22 pharmacists were coming on board from the
23 acquisition.
24    Q.    So this would have been around

Page 25

1 1987 that you became a training pharmacist?
2    A.    That sounds correct.
3    Q.    How long did you hold the
4 position as training pharmacist?
5    A.    Probably eight months.
6    Q.    And you said there was a
7 acquisition that Rite Aid made around that time.
8 Correct?
9    A.    Correct.
10    Q.    And the name of the other
11 business that Rite Aid acquired was Gray Drug, do
12 I have that correct?
13    A.    Gray Drug, yes.
14    Q.    So it was your job while you were
15 a training pharmacist to go around to the Gray
16 Drug locations and train them on Rite Aid
17 procedures.
18         Do I have that correct?
19    A.    Yes.  On procedures and the
20 computer system.
21    Q.    And was that also around the
22 Johnstown, Pennsylvania area?
23    A.    That was actually throughout the
24 country.

Page 26

1  Q. After your time as a training
2  pharmacist, what was your next position at Rite
3  Aid?
4  A. I moved to Baltimore to become a
5  pharmacy manager.
6  Q. So that would have been around
7  1988 when you moved to Baltimore?
8  A. That sounds correct.
9  Q. And was that position as a
10 pharmacy manager also for a retail location?
11 A. It was.
12 Q. Were your job responsibilities
13 the same as your previous stint as a pharmacy
14 manager in Johnstown, Pennsylvania?
15 A. They were.
16 Q. How long were you the pharmacy
17 manager in Baltimore?
18 A. Approximately two years.
19 Q. After being a pharmacy manager in
20 Baltimore, what was your next job at Rite Aid?
21 A. I got promoted to be a pharmacy
22 district manager.
23 Q. And that would have been around
24 1990?

Page 27

1  A. Yes.
2  Q. How long were you a pharmacy
3  district manager for?
4  A. Approximately two years.
5  Q. Was that also in Baltimore,
6  Maryland?
7  A. It was.
8  Q. What were your responsibilities
9  as a pharmacy district manager?
10 A. Similar to that as a pharmacy
11 manager, the pharmacy district manager was
12 responsible for anywhere between 25 to 30 stores,
13 as far as staffing, training, profitability.
14 Q. And the 25 to 30 stores that you
15 were responsible for, were those all in the
16 Maryland area?
17 A. Yes.
18 Q. What was your next position after
19 pharmacy district manager?
20 A. Director of professional
21 placement.
22 Q. How long were you the director of
23 professional placement?
24 A. For approximately a year.

Page 28

1  Q. So that would have been around
2  1992 to 1993. Right?
3  A. Correct.
4  Q. What did you do as the director
5  of professional placement?
6  A. I was responsible for going to
7  schools of pharmacy and recruiting pharmacy
8  students to come to work for Rite Aid. And I was
9  responsible for putting together training
10 programs for the region.
11 Q. When you say the region, what
12 region are you referring to?
13 A. Baltimore metro market.
14 Q. After your year as the director
15 of professional placement, what was your next
16 position at Rite Aid?
17 A. Pharmacy division manager.
18 Q. How long were you a pharmacy
19 division manager for?
20 A. Two years.
21 Q. So that would be approximately
22 1993 through 1995?
23 A. That is correct.
24 Q. And what were your job

Page 29

1  responsibilities as a pharmacy division manager?
2  A. Similar to the pharmacy manager
3  and the pharmacy district manager. I was
4  responsible for the profitability and operations
5  of approximately 150 Rite Aid pharmacies in the
6  Baltimore metro market.
7  Q. After your time as the pharmacy
8  division manager, what was your next position at
9  Rite Aid?
10 A. I moved -- I got promoted into
11 the corporate office, and I became a manager of
12 government affairs.
13 Q. And that would have been around
14 1995?
15 A. Correct.
16 Q. Now, when you say the corporate
17 office, are you referring to the Rite Aid offices
18 in Camp Hill, Pennsylvania?
19 A. I am.
20 Q. Were you physically located
21 starting in 1995 in the offices in Camp Hill,
22 Pennsylvania?
23 A. I believe I moved to Camp Hill in
24 1996.

Page 30

1    Q.   When you moved to Camp Hill, it
2  was for the position that you just described, the
3  manager of government affairs.  Right?
4    A.   It was.
5    Q.   What were your job
6  responsibilities as a manager of government
7  affairs?
8    A.   I was responsible for varying --
9  many times varying number of states to follow
10  regulatory and legislation concerning anything
11  that would impact the Rite Aid book of business.
12  I was responsible for compliance with DEA rules
13  and regulations.  And I was responsible for
14  prescription drug monitoring programs and
15  submitting data to a limited number of programs
16  that were there in 1995.
17    Q.   How long were you the manager of
18  government affairs?
19    A.   From 1995 to 2006.
20    Q.   In that time period from 1995 to
21  2006, who was your supervisor?
22    A.   James Krahulec.
23    Q.   Can you spell that last name,
24  please?

Page 31

1    A.   K-R-A-H-U-L-E-C.
2    Q.   Was there anyone else in the
3  government affairs division at Rite Aid during
4  that time period, 1995 to 2006?
5    A.   Can you repeat the question?
6    Q.   Sure.
7         Was anyone else in the government
8  affairs division, let's say, of Rite Aid between
9  that period, 1995 to 2006?
10    A.   We had like an administrative
11  staff, but during that time it was Mr. Krahulec
12  and myself.
13    Q.   Who was the administrative staff?
14    A.   Deb Hurley.
15    Q.   Can you spell the last name?
16    A.   H-U-R-L-E-Y.
17    Q.   How did you train for your job as
18  manager of government affairs?
19    A.   Well, in my capacity as the
20  pharmacy regional person in Baltimore, I had the
21  opportunity at that time to go and testify in
22  Annapolis, meet with legislators.  Mr. Krahulec
23  obviously was only one person and couldn't be at
24  that time in approximately 15 states.  And so if

Page 32

1  there was someone that needed to go before a
2  Senate committee or something like that, they
3  would ask me to go and to provide testimony or to
4  speak on behalf of Rite Aid.  And so having done
5  that a number of times in my previous capacity,
6  the opportunity came up for the additional
7  position in the Rite Aid corporate headquarters,
8  so that's when they promoted me into that
9  position.
10         And then after that, it was
11  really hands-on training with the individuals at
12  the corporate office.
13    Q.   Who were some of the individuals
14  who you did the hands-on training with?
15    A.   Mike Podgurski.
16    Q.   Anyone else?
17    A.   I'm trying to think who else was
18  there at that time.
19         It was pretty much Mike and --
20  Mike and Jim.
21    Q.   When you say Jim, that's James
22  Krahulec?
23    A.   (Witness nods head.)
24         MS. McENROE:  Is that a yes?

Page 33

1         THE WITNESS:  Yes.
2         MR. POWERS:  Sorry.  Yeah, thank
3    you.
4  BY MR. POWERS:
5    Q.   And what was Mike Podgurski's
6  title?
7    A.   I don't know what his title was
8  at that time.  He's had a lot of titles, I don't
9  know what it was specifically at that time.
10    Q.   We've been talking about the
11  government affairs division.
12         What division did Mike Podgurski
13  work in?
14    A.   More pharmacy ops.
15    Q.   And I'm using the word
16  "division."
17         Is that the correct term or
18  department or is there a better term in how Rite
19  Aid describes the organizational structure?
20    A.   It's government affairs
21  department.  It's very small.
22    Q.   Okay.  So it's department, I
23  guess?
24    A.   Yeah.

Page 34

1     Q.   Okay. How does the government
2 affairs department fit into the larger
3 organizational structure of the Rite Aid
4 corporate office?
5     MS. McENROE: Objection to form.
6     THE WITNESS: We monitor
7 legislation and then provide updates to
8 the corporate departments that are
9 involved. If it's a tax issue, we would
10 forward the legislation to the tax
11 department. If it was a pharmacy issue,
12 we would forward it to the pharmacy
13 department. We also had control or
14 looked over DEA rules and regulations.
15 And if there was a question concerning,
16 you know, a DEA rule or regulations,
17 pharmacy operations or the other
18 departments would come and ask us
19 questions or ask us to investigate and
20 provide an answer back to them.
21 BY MR. POWERS:
22     Q.  For DEA issues, you mentioned the
23 pharmacy departments.
24     Any other departments you worked

Page 35

1 with on DEA issues?
2     A.   Logistics.
3     Q.   And who did you work with in the
4 logistics department?
5     A.   I don't remember who was in
6 logistics back then.
7     Q.   Besides logistics and pharmacy,
8 any other departments you worked with on DEA
9 issues for your time period '95 through 2006?
10     A.   I think that's it.
11     Q.   Anyone else besides the pharmacy
12 department, besides Mike Podgurski that you
13 worked with?
14     A.   There were various individuals in
15 the various -- in that department that I would
16 work with.
17     Q.   Can you name the ones you
18 remember?
19     A.   Sure. Scott Jacobson.
20     Q.   Do you remember Scott Jacobson's
21 title?
22     A.   VP pharmacy operations.
23     Q.   Anyone else?
24     A.   Not at this time.

Page 36

1     Q.   You also mentioned before that
2 you gave testimony, I believe you said, to
3 governmental organizations; is that correct?
4     A.   That is correct.
5     Q.   What test -- can you give me some
6 examples of the testimony that you gave?
7     A.   Certainly. There were pieces of
8 legislation to -- where there was going to be a
9 reimbursement cut to Medicaid where the
10 dispensing fee was going to be reduced. And we
11 obviously, from a business perspective, we did
12 not want that to occur, so we would testify in
13 order to maintain the dispensing fee.
14     Q.   Did you give testimony to state
15 government agencies?
16     A.   I did.
17     Q.   What were the state government
18 agencies that you testified to?
19     A.   I've testified before the
20 Maryland General Assembly, or a subcommittee of
21 the assembly.
22     Q.   Anywhere else besides the
23 Maryland General Assembly?
24     A.   The Pennsylvania General

Page 37

1 Assembly.
2     Q.   Anywhere else?
3     A.   Maine.
4     Q.   Anywhere else?
5     A.   Vermont.
6     Q.   Anywhere else?
7     A.   Those are the ones that I can
8 recall.
9     Q.   Did you ever testify about DEA
10 compliance issues before any of the state bodies
11 that you just named?
12     MS. McENROE: Objection to form.
13     THE WITNESS: For the time period
14 when I was a manager of government
15 affairs, not that I remember.
16 BY MR. POWERS:
17     Q.   Did you ever testify before
18 federal agencies during the time period of 1995
19 through 2006?
20     A.   I did not.
21     Q.   Have you ever testified before
22 federal agencies during your entire time at Rite
23 Aid?
24     A.   I believe no.

Page 38

1    Q.    And to be clear, when I say
2 federal agencies, I'm also including legislative
3 bodies.
4         Is that okay?
5    A.    That's fine.
6    Q.    Does that change your answer?
7    A.    No.
8    Q.    What is the government affairs
9 department relationship with the distribution
10 centers?
11        MS. McENROE:  Objection to form.
12        THE WITNESS:  We work together.
13 BY MR. POWERS:
14    Q.    Do the distribution centers
15 report to the government affairs office?
16    A.    They do not.
17    Q.    Was there a typical contact
18 person at each distribution center that you would
19 work with?
20    A.    There were contact individuals at
21 the distribution centers.
22    Q.    Did those contact individuals
23 have a particular title at the distribution
24 centers?

Page 39

1    A.    DEA coordinator.
2    Q.    So is it fair to say then the
3 government affairs office would interact with the
4 DEA coordinators at each individual distribution
5 center?
6    A.    I myself would interact more with
7 the person that was in charge of the DEA
8 coordinators at the corporate office.
9    Q.    Who was the person in charge of
10 the DEA coordinators at the corporate office?
11    A.    There was a director of
12 logistics, regulatory, something along that title
13 line.  I don't know the official title.
14    Q.    Would that be the logistics -- in
15 the logistics department that you talked about
16 earlier?
17    A.    Yes.
18    Q.    Does the name Kevin Mitchell ring
19 a bell for you?
20    A.    Yes.
21    Q.    Is that one of the people that
22 you would have been working with in the logistics
23 department?
24    A.    Yes.

Page 40

1    Q.    How about Chris Belli, does that
2 name sound familiar to you?
3    A.    Yes.
4    Q.    Is that one of the people you've
5 been working with in the logistics department?
6    A.    Yes.
7    Q.    And are those people, Chris Belli
8 and Kevin Mitchell, the people you're referring
9 to when you say the person in charge of the DEA
10 coordinators at the logistics department?
11    A.    Yes.
12    Q.    So after 2006, you ceased -- your
13 title ceased to be manager of government affairs.
14 Correct?
15    A.    Correct.
16    Q.    What did your title become at
17 that point?
18    A.    Director, government affairs.  I
19 got a promotion.
20    Q.    Is that your current title,
21 director of government affairs?
22    A.    It is.
23    Q.    Have you held the position of
24 director of government affairs continuously from

Page 41

1 2006 until the present?
2    A.    I have.
3    Q.    What happened to James Krahulec
4 when you became the director of government
5 affairs?
6    A.    James Krahulec passed away in
7 2006 or so.  And Mike Podgurski moved in to
8 government affairs.  So from when I was a
9 director of government affairs, Mike Podgurski
10 then became my boss.
11    Q.    Did that move of Mike Podgurski
12 to becoming your boss happen at the same time you
13 became director of government affairs?
14    A.    Close to the same time frame,
15 yes.
16    Q.    Who else was in your department
17 when you became the director of government
18 affairs?
19    A.    There would have been an
20 individual, Michael Yount.
21    Q.    How do you spell that last name?
22    A.    Y-O-U-N-T.
23    Q.    When did Mr. Yount start in the
24 government affairs department?

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    A.    I don't remember.

2    Q.    Was it around the time you became

3 the director of government affairs?

4    A.    I believe it was prior to that

5 point.

6    Q.    So Michael Yount was part of the

7 government affairs department before you became

8 director of government affairs?

9    A.    Yes.

10    Q.    How long did Michael Yount work

11 in the government affairs office?

12    A.    I don't recall.

13    Q.    Does he still work in the

14 government affairs office?

15    A.    He does not.

16    Q.    Do you know when he left?

17    A.    I don't remember.

18    Q.    Was it more or less than ten

19 years ago when Michael Yount left?

20    A.    It was more than ten years ago

21 that he left.

22    Q.    How come you did not mention

23 Michael Yount before when I asked you who else

24 worked in the government affairs office while you

Page 43

1 were the manager of government affairs?

2         MS. McENROE:  Objection to form.

3         THE WITNESS:  I just completely

4    forgot about Michael.

5 BY MR. POWERS:

6    Q.    Besides Michael Yount, anyone

7 else work in the government affairs office

8 between '95 and present?

9    A.    Not that I remember.

10    Q.    Did Amy Knisely ever work in the

11 government affairs department?

12    A.    Amy Knisely did, yes.

13    Q.    How come you didn't mention her

14 when I asked who else worked in the government

15 affairs department just now?

16    A.    You didn't specify a time frame.

17 We were discussing until -- we were discussing

18 the 2006.  And Amy Knisely wasn't in the

19 government affairs department in 2006.

20    Q.    My question was -- I'm reading

21 off the transcript here, besides Michael Yount,

22 anyone else work in the government affairs office

23 between 1995 and the present?

24    A.    Oh, okay.  Yes.

Page 44

1    Q.    Who else worked in the government

2 affairs office between 1995 and the present?

3    A.    Amy Knisely.

4    Q.    Anyone else?

5    A.    Sarah Everingham, Andrea Bucher.

6    Q.    Anyone else?

7    A.    Derrick Ridley.

8    Q.    How do you spell that last name?

9    A.    R-I-D-L-E-Y.

10    Q.    Anyone else?

11    A.    Sarah Hilbolt.

12    Q.    How do you spell that last name?

13    A.    H-I-L-B-O-L-T.

14    Q.    Anyone else?

15    A.    In government affairs was Grace

16 Schuyler.

17    Q.    Anyone else?

18    A.    Jermaine Smith.

19    Q.    And when I say anyone else, feel

20 free to name more than one person at a time.

21    A.    Okay.

22    Q.    Anyone else besides who you've

23 mentioned so far?

24    A.    I'm thinking.

Page 45

1         Yong Choe.

2         Those are to the best of my

3 knowledge.

4    Q.    I believe you testified earlier

5 that in -- from 1995 to 2006, the only people in

6 the government affairs office were yourself,

7 James Krahulec, and for some period of that time

8 Michael Yount.  Right?

9    A.    And Deb Hurley.

10    Q.    How come the government affairs

11 office got so much bigger after 2006?

12         MS. McENROE:  Objection, form.

13         THE WITNESS:  There was the

14    addition of additional people because the

15    responsibilities were expanding.

16 BY MR. POWERS:

17    Q.    Why do you say the

18 responsibilities were expanding?

19    A.    Prior to 2006, there were a very

20 limited number of state prescription monitoring

21 programs.  And more states kept coming onboard

22 with prescription monitoring programs.  So there

23 was more data submission to those programs.  And

24 then error corrections, when there would be an

Page 46

1 error that was sent to the program. And that was
2 taking up increasing amounts of time.
3       There was also additional
4 heightened awareness around DEA rules and
5 regulations. Legislation was getting more
6 involved.
7    Q.   During that period after 2006,
8 who in the government affairs office had
9 responsibility in any shape or form for dealing
10 with the DEA rules and regulations?
11       MS. McENROE: Objection to form.
12       THE WITNESS: That would be
13 myself.
14 BY MR. POWERS:
15    Q.   Anyone else?
16    A.   Yes.
17       May I make an addition to an
18 individual in government affairs?
19    Q.   Sure.
20    A.   I don't believe I mentioned
21 Andrea Bucher.
22    Q.   Okay. Anyone else besides
23 yourself in the government affairs office that
24 dealt with DEA's rules and regulations?

Page 47

1    A.   Since then?
2    Q.   Since 2006.
3    A.   Amanda Glover.
4    Q.   Was she also in the government
5 affairs office?
6    A.   She is in regulatory affairs, but
7 she dealt with DEA.
8    Q.   Anyone else besides Amanda
9 Glover?
10    A.   Mike Podgurski.
11    Q.   But he's not in government
12 affairs. Right?
13    A.   No. Mike was in government
14 affairs.
15    Q.   Oh, okay.
16    A.   He was in operations prior to
17 2006.
18       Grace Schuyler.
19    Q.   Anybody else?
20    A.   Not that I remember at this time.
21    Q.   And you mentioned, was it Amanda
22 Glover?
23    A.   Yes.
24    Q.   That she was in the regulatory

Page 48

1 affairs department. Right?
2    A.   Yes.
3    Q.   Is that a separate department
4 from government affairs?
5    A.   Yes.
6    Q.   Did you ever work with other
7 people from the regulatory affairs department
8 while you were the director of government
9 affairs?
10    A.   Yes.
11    Q.   Who else from regulatory affairs
12 did you interact with?
13    A.   Zach Hicks.
14    Q.   Can you spell that?
15    A.   H-I-C-K-S.
16    Q.   Anyone else?
17    A.   Greg Mills. That's it.
18    Q.   Do you know who the director of
19 the regulatory affairs office was during this
20 time period, starting in 2006?
21    A.   There was no regulatory affairs
22 department in 2006. I think why there's some
23 confusion here is what happened was government
24 affairs split off from regulatory affairs

Page 49

1 approximately two years ago. And so that's why
2 there's some confusion as far as the individuals
3 and where they worked, because what happened is,
4 even though I still maintained the title of
5 government affairs, I'm in regulatory affairs.
6 So that may be adding to the confusion.
7    Q.   Okay. Just so I have this
8 correctly here, the department was the department
9 of government affairs from 1995 up until about
10 2017?
11    A.   There still is a department of
12 government legislative and regulatory, but --
13 from following that. But there's a regulatory --
14 department of reg -- a department of regulatory
15 affairs as well. So you still -- you have two
16 now.
17    Q.   Okay. So from 1995 until
18 current, there was a department of government and
19 regulatory affairs. Right?
20    A.   (Witness nods head.)
21       Yes.
22    Q.   And then approximately two years
23 ago, around 2017, there's a separate department
24 named regulatory affairs?

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    A.    Correct.

2    Q.    Okay.  Why was the regulatory

3  affairs department created in 2017?

4    A.    There was heightened awareness on

5  many regulatory affairs issues, such as DEA,

6  HIPAA, and so the decision was made to create a

7  department.

8    Q.    Who was the person in charge of

9  the regulatory affairs office starting in 2017?

10   A.    Amanda Glover.

11   Q.    And she would have been

12 previously employed in the government affairs and

13 regulatory affairs department prior to 2017; is

14 that right?

15   A.    She was not.

16   Q.    Do you know where she was before?

17   A.    Pharmacy operations, I believe.

18   Q.    How did your job responsibilities

19 as the director of government affairs change when

20 the new regulatory affairs department was

21 created?

22   A.    I had less responsibilities for

23 state legislative and regulatory following

24 legislation than I had previously.  I had bumped

Page 51

1  up and down between the number of states that I

2  covered.  And I went down to two states to cover

3  because of the other increasing responsibilities.

4    Q.    What were your increasing

5  responsibilities?

6    A.    DEA compliance, prescription

7  monitoring program compliance.

8    Q.    You started talking a little bit

9  about it there, but as the director of government

10 affairs between 2006 and 2017, what were your job

11 responsibilities?

12   A.    Similar to my responsibilities as

13 manager of government affairs.

14   Q.    Can you explain what you mean by

15 that?

16   A.    Sure.  I did the same thing,

17 pretty much.  I was in charge of DEA compliance

18 as far as providing information, questions to the

19 various departments throughout the company.  I

20 was responsible for prescription monitoring

21 programs.  And I was responsible for legislative

22 and regulatory for two states.  At present, I'm

23 down to one state.

24   Q.    What two states were you in

Page 52

1  charge of legislative and regulatory for?

2    A.    Maryland and Delaware.

3    Q.    When you say in charge of

4  legislative and regulatory, what do you mean by

5  that?

6    A.    I mean follow any legislation

7  that impacts Rite Aid's book of business and then

8  provide that information to the various

9  departments that would be impacted by the

10 legislation or the regulation, work with groups

11 to put forth a response to the legislation,

12 provide comments, anything that needed to be done

13 related to those issues.

14   Q.    And you also mentioned that you

15 had responsibility for prescription monitoring

16 programs.

17        Can you explain that?

18   A.    Certainly.  In each state that

19 Rite Aid does business, we're required by law to

20 report any controlled substance data for

21 prescriptions that we dispense to the state.  In

22 each state, we send the data on a daily basis.

23 And then what happens is we get errors back,

24 where the stores will say put a symbol in the

Page 53

1  name.  They'll say -- it's a K9 and they put

2  parentheses around the K9, so that comes back as

3  an error.  And then we're responsible for

4  correcting that and sending it back to the

5  prescription monitoring program.

6        We need to stay up on all of the

7  different formats and all of the different

8  standards related to the prescription monitoring

9  program so that we stay in compliance, because

10 there are significant fines associated with it if

11 we're not in compliance.

12   Q.    Are you talking about the

13 prescription monitoring programs, are those

14 particular prescription monitoring programs in

15 each state?

16   A.    Yes, they're in each state.

17   Q.    And the prescription monitoring

18 programs, are they different in each state?

19   A.    They are.

20   Q.    Do the prescription monitoring

21 programs have anything to do with Rite Aid's role

22 as a distributor of controlled substances?

23        MS. McENROE:  Objection, form.

24        THE WITNESS:  There are certain

Page 54

1    states that require distributor data to
2    be sent to them.
3  BY MR. POWERS:
4      Q.    You also mentioned that as
5  director of government affairs that you were in
6  charge of DEA compliance.
7          Can you explain what you mean by
8  that?
9      A.    Certainly.  If there was a DEA
10 question or a new DEA rule or regulation that
11 came up, it's my job to communicate that to store
12 operations; to logistics, if it involves
13 transporting drugs; to provide, you know,
14 guidance into policies and procedures as far as
15 compliance with DEA rules and regulations.
16     Q.    You said it's your job to
17 communicate the DEA compliance issues.
18         How would you communicate to the
19 other Rite Aid employees?
20     A.    If there was a proposed piece of
21 legislation, I would either forward an email to
22 the individuals that are in the correct
23 department.  We could possibly have a discussion
24 about the proposed regulation to determine how it

Page 55

1  would impact the Rite Aid book of business.
2      Q.    So besides emailing the
3  appropriate people and having discussions, did
4  you do anything else to communicate new rules and
5  regulations?
6      A.    I mean, we might have a meeting,
7  a meeting as such to discuss it and determine
8  what our action plan would be.
9          And then we could -- we would
10 have an email communication as far as rolling it
11 out to the stores and what we were going to
12 communicate to stores to do to be compliant.  So
13 that was all a part of the process.
14     Q.    Was there any standard procedure
15 about how to communicate a new DEA rule or
16 regulation?
17     A.    The standard procedure for myself
18 is to communicate it to our VP of pharmacy
19 operations.  If it was logistics, the VP of
20 logistics.  Anybody that was involved in that
21 particular matter would be communicated on so
22 that they were aware of pending or then passed
23 legislation.
24     Q.    When you say communicated to the

Page 56

1  VP of operations or the VP of logistics, was that
2  just communicate via email?
3      A.    Email typically, yes.  And then
4  typically what would happen is they would read it
5  and call me back and then we'd start a
6  discussion.
7      Q.    We've been talking about new
8  rules and regulations.
9          How do you communicate
10 long-standing rules and regulations regarding DEA
11 compliance?
12         MS. McENROE:  Objection to form.
13         THE WITNESS:  We do that in a
14     number of ways.  We have DEA reminder
15     messages that we send to all of our
16     stores on a weekly basis.  Those messages
17     include compliance with CSA and the CFR,
18     where they are how to execute an order
19     form, things along those lines.
20 BY MR. POWERS:
21     Q.    How are those DEA reminder
22 messages sent to the stores?
23     A.    They are sent in what we call a
24 management planner.

Page 57

1      Q.    What is a management planner?
2      A.    It's a weekly message board that
3  goes out to all of our pharmacies.
4      Q.    Is this an electronic system?
5      A.    Yes.
6      Q.    Who would have access to that
7  electronic system?
8      A.    The pharmacist, our field
9  management, people in corporate.
10     Q.    You've been talking about
11 communicating with the stores.
12         How about DEA policies and
13 procedures related to distribution, how did you
14 communicate those?
15     A.    DEA with -- for distribution,
16 would go to the VP of logistics.  And then
17 they're individuals during that time period that
18 we mentioned, Kevin Mitchell, Chris Belli,
19 communication would go to them if there was
20 something impacting the distribution centers.
21     Q.    And those communications would
22 also be just via email?
23     A.    Typically, yes.
24     Q.    Any other ways besides email?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    A.    Normal communications.  Their
2  offices are not too -- their office was not too
3  far from mine, so we would have conversations.
4    Q.    You mean just like walk down to
5  their office?
6    A.    Yep.
7    Q.    How did you communicate existing
8  or long-standing DEA regulations regarding
9  distribution of controlled substances?
10      MS. McENROE:  Objection to form.
11      THE WITNESS:  I didn't
12    communicate to the distribution centers.
13    That responsibility would have been on
14    Chris or Kevin Mitchell, depending on the
15    time.  But I was not directly
16    communicating to the distribution
17    centers.
18  BY MR. POWERS:
19    Q.    How did you communicate existing
20  DEA rules and regulations to either Chris Belli
21  or Kevin Mitchell?
22    A.    I don't know that I did that on a
23  routine basis.  I believe they were very well
24  versed in existing DEA rules and regulations.

Page 59

1    Q.    You also mentioned that it was
2  your job to formulate guidance as to the policies
3  and procedures regarding DEA compliance; is that
4  right?
5    A.    That is correct.
6    Q.    How did you formulate the
7  guidance?
8    A.    I would look at a regulation
9  and/or a proposed rule and say, how would this
10  impact Rite Aid.  And then if there was a certain
11  action plan that I thought would work as far as
12  rolling out the guidance, then I would put a
13  communication together and say, hello, this is
14  the new DEA regulation and this is how I feel we
15  should do something with it.
16    Q.    What did you rely on when you
17  were formulating the guidance?
18    A.    The -- what had been proposed or
19  what had come out, the industry information that
20  it was out there, and my own knowledge.
21    Q.    Did you ever consult anyone else
22  within Rite Aid about formulating guidance
23  regarding DEA regulations?
24    A.    Certainly.

Page 60

1    Q.    Who?
2    A.    Amanda Glover.
3    Q.    Anyone else?
4    A.    Mike Podgurski, Zach Hicks, Greg
5  Mills.
6    Q.    Anyone else?
7    A.    Scott Jacobson.
8    Q.    Did you ever consult anyone
9  outside of Rite Aid when you were formulating
10  guidance on DEA regulations?
11    A.    Occasionally.
12    Q.    Who?
13    A.    We had outside counsel at one
14  point, Hyman, Phelps & McNamara.
15    Q.    When was that, when you had
16  Hyman, Phelps & McNamara help you with
17  formulating DEA guidance?
18    A.    2010 and back.
19    Q.    You say and back, do you mean
20  before 2010?
21    A.    Yes, yes.  And that could give or
22  take.  That was just pretty much when we stopped
23  communicating.  But we still sent communications
24  to them, but not like asking questions or

Page 61

1  whatever.
2    Q.    Do you know approximately when
3  you started using Hyman, Phelps & McNamara for
4  guidance -- excuse me, to formulate guidance on
5  DEA regulations?
6    A.    I don't remember.
7    Q.    Can you give me an approximate
8  date?
9    A.    At least 2000.
10    Q.    And who would you talk to at
11  Hyman, Phelps & McNamara about DEA regulations?
12    A.    Karla Palmer.
13    Q.    Anyone else?
14    A.    Larry Houck.
15    Q.    Can you spell that last name?
16    A.    H-O-U-C-K.
17    Q.    Anyone else besides Karla Palmer
18  and Larry Houck?
19    A.    John Gilbert.
20    Q.    Anyone else?
21    A.    Those were the three main
22  individuals.
23    Q.    How did you communicate with
24  Hyman, Phelps & McNamara?

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    A.    Either email or a phone call.

2    Q.    And you mentioned there was some

3 communication with Hyman, Phelps & McNamara after

4 2010. Right?

5    A.    There is, yes.

6    Q.    What was the nature of that

7 communication after 2010?

8         MS. McENROE: Objection, calls

9    for privileged information. I instruct

10   the witness not to answer.

11        Do you have a more specific

12   question not seeking privileged

13   information? The word "nature" is not

14   specific to not seek privileged

15   communications.

16 BY MR. POWERS:

17   Q.    After 2010, how did your -- or

18 how did Rite Aid's relationship with Hyman,

19 Phelps & McNamara change?

20   A.    I would occasionally call them to

21 ask them a question. I also communicate with

22 Karla Palmer in the instance where there is a

23 prescriber --

24        MS. McENROE: Hold on -- nothing

Page 63

1    substantive. So just in terms of the

2    nuts and bolts. That's it.

3         THE WITNESS: Okay. So I would

4    send email communications to them or call

5    them.

6 BY MR. POWERS:

7    Q.    I'm just trying to understand why

8 you gave 2010 as the end date for your

9 relationship with Hyman, Phelps & McNamara.

10        How come you used 2010 as the

11 date that you ended the relationship, but it

12 seems like you communicate after 2010 with Hyman,

13 Phelps?

14   A.    They were primarily our counsel

15 prior to that time. And then at that point we

16 had a settlement agreement and they worked us

17 through the settlement agreement. And then our

18 counsel went to another firm.

19   Q.    What was the firm after Hyman,

20 Phelps & McNamara?

21   A.    Morgan Lewis.

22        THE WITNESS: May we take a

23   break?

24        MS. McENROE: Yeah. It's been

Page 64

1    about an hour anyway.

2         MR. POWERS: Sure. That's fine.

3         THE VIDEOGRAPHER: Going off the

4    record at 10:30 a.m.

5         - - -

6         (A recess was taken from

7    10:30 a.m. to 10:44 a.m.)

8         - - -

9         THE VIDEOGRAPHER: We're back on

10   the record at 10:44 a.m.

11 BY MR. POWERS:

12   Q.    Welcome back, Ms. Hart.

13        Before we took the break, we were

14 talking about a settlement agreement that Rite

15 Aid had had.

16        Can you explain what that

17 settlement agreement was?

18   A.    Rite Aid entered into a

19 settlement agreement with the Drug Enforcement

20 Administration in 2009.

21   Q.    What was the nature of that

22 settlement?

23        MS. McENROE: Objection to form.

24        THE WITNESS: There are alleged

Page 65

1    recordkeeping violations, alleged missing

2    drugs.

3 BY MR. POWERS:

4    Q.    Did you have any involvement in

5 the discussions that led to that settlement

6 agreement?

7    A.    I did.

8    Q.    What was the nature of your

9 involvement?

10        MS. McENROE: Objection to form.

11        Also, just careful caution

12   here -- and I know it originally came up

13   in the context of privileged information

14   and communication with counsel.

15        I caution you not to discuss

16   anything you discussed with counsel or

17   you learned from counsel.

18        THE WITNESS: Okay.

19        For the settlement agreement, I

20   had obtained documents, looked at the

21   records based on the allegations of the

22   Drug Enforcement Administration and

23   reviewed the documents to determine if

24   the allegations were correct or not. I

Page 66

1       visited various stores to look for
2       records.  I met with various AUSAs to
3       provide records with outside counsel.
4   BY MR. POWERS:
5       Q.    Was there anything else in the
6   settlement agreement beyond recordkeeping
7   violations?
8           MS. McENROE:  Objection to form.
9           THE WITNESS:  There were
10      allegations of medications lost or
11      medications that weren't accounted for.
12      That was the other part of my
13      recollection of it.
14  BY MR. POWERS:
15      Q.    Anything else?
16          MS. McENROE:  Objection to form.
17          THE WITNESS:  There could be
18      more, I just don't remember.
19  BY MR. POWERS:
20      Q.    Did the settlement agreement have
21  any allegations regarding Rite Aid knowingly
22  filling prescriptions for controlled substances
23  that were not issued for legitimate medical
24  purposes?

Page 67

1           MS. McENROE:  Objection to form.
2           THE WITNESS:  It did.
3   BY MR. POWERS:
4       Q.    In your role as the director of
5   the government affairs office in 2009, did you
6   make any changes as a result of that 2009
7   settlement with the Department of Justice?
8           MS. McENROE:  Objection to form.
9           THE WITNESS:  Rite Aid had been
10      making changes up to the settlement
11      agreement.  Part of the settlement
12      agreement was counting of hydrocodone and
13      acetaminophen on a quarterly basis.  We
14      implemented the MethCheck system in our
15      stores.
16          But prior to the 2009 settlement,
17      we had put in a comprehensive program.
18      And that program continues to evolve.
19  BY MR. POWERS:
20      Q.    Let me specify my question.
21          As a direct result of the 2009
22  settlement, what changes were made at Rite Aid?
23          MS. McENROE:  Objection to form.
24          THE WITNESS:  We updated our DEA

Page 68

1       computer-based training.  We enhanced our
2       DEA store checklist.
3   BY MR. POWERS:
4       Q.    Anything else?
5       A.    There could be more, I just don't
6   remember.
7       Q.    As a result of the 2009
8   settlement, did Rite Aid make any changes with
9   regards to its operations as a controlled
10  substance distributor?
11          MS. McENROE:  Objection to form.
12          THE WITNESS:  We did not.  The
13      Rite Aid distribution center was not
14      involved in the settlement agreement.
15  BY MR. POWERS:
16      Q.    I think you mentioned -- you
17  referred to it as a counting on a quarterly basis
18  of hydrocodone.
19          What does that mean?
20      A.    That means that every quarter
21  Rite Aid would count the hydrocodone that we had
22  on our shelves and balance it to make sure that
23  the inventory was correct.
24      Q.    When you say on the shelves, you

Page 69

1   mean on the shelves at the individual pharmacies?
2       A.    In the stores, yes.
3       Q.    What is the DEA computer-based
4   training that you referred to earlier?
5       A.    It is training for pharmacists
6   to -- in all aspects of DEA guidance related to
7   222 Forms, everything that -- what to look for
8   for a prescription.  Everything that would be
9   required.
10      Q.    And that DEA computer-based
11  training, was that only for the individual Rite
12  Aid stores?
13          MS. McENROE:  Object to the form.
14          THE WITNESS:  It was.
15  BY MR. POWERS:
16      Q.    So we were talking earlier about
17  resources outside of Rite Aid that you used in
18  your position in government affairs to formulate
19  guidance on DEA regulations.  Right?
20      A.    Correct.
21      Q.    And you mentioned outside
22  counsel, which we've talked about.
23          Is there anyone else outside of
24  Rite Aid that you used to formulate guidance

Page 70

1 about DEA regulations?

2    A.    I would utilize trade groups.

3    Q.    Which trade groups?

4    A.    The National Association of Chain
5 Drug Stores, the individual state associations,
6 Maryland Association of Chain Drug Stores.  There
7 are retail groups or -- in each of the states
8 that would work on legislation or regulation and
9 formulate information in how it should be rolled
10 out.

11    Q.    Besides those trade groups you
12 just mentioned, anything else?  Any other parties
13 or organizations outside of Rite Aid that you
14 used to formulate guidance about controlled
15 substances in Rite Aid?

16    A.    The National Association of
17 Boards of Pharmacy.

18    Q.    Did you ever consult guidance
19 from the Healthcare Distributors Alliance, the
20 HDA?

21    A.    Never.

22    Q.    How about the HDMA, I believe is
23 the prior name?

24    A.    No.

Page 71

1    Q.    So besides outside counsel and
2 the trade groups you mentioned, did you rely on
3 any other outside individuals or groups to help
4 you formulate guidance about the rules and
5 regulations surrounding controlled substances?

6    A.    Not that I can recall.

7    Q.    To be clear, this is for the
8 entire time that you were working in the
9 government affairs office between 1995 and 2006?

10    A.    Yes.

11    Q.    And your answer is the same?

12    A.    Yes.

13    Q.    When you started in the
14 government affairs office in 1995, what efforts
15 did you make to make sure that Rite Aid was in
16 compliance with the current and existing
17 regulations regarding controlled substances at
18 that point?

19        MS. McENROE:  Objection to form.

20        You may respond.

21        THE WITNESS:  We reviewed the
22    policies and procedures that were in
23    place.  We looked at organization in our
24    stores.  We looked at distribution

Page 72

1 centers as far as their compliance.  So
2 we did an overall view of our entire
3 processes.

4 BY MR. POWERS:

5    Q.    When you say "we" in your
6 previous answer, who are you referring to?

7    A.    Jim Krahulec, myself, pharmacy
8 operations.

9    Q.    Who from pharmacy operations?

10    A.    It would have been Scott Jacobson
11 or Mike Podgurski.

12    Q.    How did you do your review of the
13 policies and procedures that were in place?

14    A.    We looked at issues that had come
15 in from various state inspection notices.  If
16 there was a recordkeeping allegation from a state
17 board of pharmacy, we looked at those and
18 determined what some of the more prevalent ones
19 were, ones that we were seeing at that point.
20 And then we developed different tools that our
21 pharmacists could use to organize recordkeeping
22 and maintain proper compliance.

23    Q.    You also said you looked at the
24 organization in your stores, what did you mean by

Page 73

1 that?

2    A.    What we were finding was that one
3 store would keep invoices in one location in one
4 drawer and the other store would keep them in the
5 back room with other documentation.  And it was
6 not -- there was not consistency throughout.  So
7 at that point then, we developed a DEA
8 recordkeeping box that we sent to the store on a
9 yearly basis where there are specific folders for
10 all of the required DEA documents.  So that in
11 every store, all the documents are in one place
12 and can be located.

13    Q.    Is that a physical box you --

14    A.    It's a physical box, yes.

15    Q.    You also said that you looked at
16 the distribution centers as far as their
17 compliance.

18        What do you mean by that?

19    A.    I mean, we looked at the
20 distribution centers from the standpoint of was
21 the cage secure, were there good security
22 policies and procedures in place.  Were there
23 criminal background checks.  Was the alarm system
24 working.  Were the SOPs correct.

Page 74

1    Q.    How did you determine whether the
2  SOPs were correct?
3    A.    I got together with logistics,
4  and we had a discussion and went through that,
5  through the SOPs.
6    Q.    And logistics, that would have
7  been Chris Belli or Kevin Mitchell?
8    A.    Yes.
9    Q.    Did you do a periodic review of
10 the SOPs for the distribution centers?
11   A.    I did not.  They were done by our
12 IA team, internal assurance team, and by the
13 logistics Chris Belli/Kevin Mitchell team.
14   Q.    And, sorry, we've been saying
15 SOPs.  We should be clear for the record.
16       We're talking about standard
17 operating procedures?
18   A.    Correct.
19   Q.    Before you reviewed the company's
20 SOPs for compliance, how did you familiarize
21 yourself with what was required from a compliance
22 perspective?
23       MS. McENROE:  Objection to form.
24       THE WITNESS:  I was pretty

Page 75

1    familiar in my role as the PDM, pharmacy
2    district manager, in my role as the
3    pharmacy division manager with compliance
4    with DEA rules and regulations.  From the
5    standpoint of, that was -- at that point,
6    you were also responsible for that in the
7    stores.
8        From the distribution side, it
9    was sort of a read and learn and
10   understand the rules and regulations.
11 BY MR. POWERS:
12   Q.    So you just read the rules
13 yourself regarding the rules and regulations
14 about dispensing controlled substances; is that
15 right?
16   A.    Or I'd interact with the industry
17 leaders to have discussions about what they were
18 doing, the different best practices that were out
19 there.
20   Q.    Who were the industry leaders you
21 interacted with?
22   A.    People at NACDS, people at the
23 Maryland Association of Chain Drug Stores.
24   Q.    Anyone else at Rite Aid that you

Page 76

1  consulted about the policies and procedures
2  regarding the distribution of controlled
3  substances?
4    A.    Back in the -- when I first came,
5  1995, Jim Krahulec was well versed.  And he was
6  my mentor, so I learned a lot from him as well.
7    Q.    Did you ever update your
8  understanding of what was required under the
9  Controlled Substances Act or other regulations
10 regarding controlled substances?
11       MS. McENROE:  Objection to form.
12       THE WITNESS:  Can you repeat the
13   question?
14 BY MR. POWERS:
15   Q.    Sure.
16       Besides when you started in the
17 government affairs office in 1995, what other
18 actions did you take to familiarize yourself with
19 the rules and regulations regarding the
20 distribution of controlled substances?
21   A.    I would attend various
22 conferences throughout the country to attain
23 knowledge.
24   Q.    Besides the conferences, what

Page 77

1  else did you do to familiarize yourself with the
2  rules and regulations surrounding the
3  distribution of controlled substances?
4    A.    That was pretty much it.
5    Q.    Did you do any periodic review of
6  the Rite Aid policies and procedures regarding
7  distribution during your time in the government
8  affairs office?
9    A.    I may have.  That responsibility
10 to put those into the distribution center rested
11 with Chris and Kevin to work with the SOPs.  That
12 was their primary responsibility.
13   Q.    So it's your testimony that the
14 logistics department was primarily responsible
15 for the Rite Aid policies regarding compliance
16 with the rules and regulations about the
17 distribution of controlled substances; is that
18 right?
19       MS. McENROE:  Objection.
20       THE WITNESS:  They were the
21   experts of logistics and what went on at
22   the distribution centers.  So, yes, they
23   were responsible for the SOPs.  I myself
24   would coordinate with them to review the

Page 78

1    SOPs and determine if they were correct.
2  BY MR. POWERS:
3    Q.    In determining whether those SOPs
4  were correct, what did you rely on?
5    A.    DEA rule and regulation, various
6  industry resources.
7    Q.    Did anyone else at Rite Aid help
8  you determine whether those regulations were
9  correct?
10    A.    Mr. Krahulec in the beginning.
11  And then once I had a better knowledge base,
12  primarily myself.
13    Q.    And you mentioned that you went
14  to some conferences about the rules and
15  regulations regarding controlled substance
16  distribution.
17        What were those conferences?
18    A.    I went to a DEA conference, a
19  pharmacy diversion awareness conference where
20  that was discussed.
21        So various DEA conferences.
22    Q.    When you say DEA conferences, are
23  you talking about conferences put on by the DEA?
24    A.    Yes.

Page 79

1    Q.    And you also mentioned a
2  diversion awareness conference.
3        What was that?
4    A.    That was the DEA also.
5    Q.    Do you remember how many DEA
6  conferences you actually attended?
7    A.    From 1995 to present?
8    Q.    Yes.
9    A.    12, 15.
10    Q.    And before you started working in
11  the government affairs office, do you know how
12  Rite Aid ensured compliance with the rules and
13  regulations regarding the distribution of
14  controlled substances?
15        MS. McENROE:  Objection to form.
16        THE WITNESS:  Could you state
17    that again?
18  BY MR. POWERS:
19    Q.    Sure.
20        Before you started working in the
21  government affairs office, do you know how Rite
22  Aid ensured compliance with the rules and
23  regulations regarding the distribution of
24  controlled substances?

Page 80

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  I do not.
3  BY MR. POWERS:
4    Q.    During your time in the
5  government affairs office, did you implement any
6  new procedures or policies regarding the
7  distribution of controlled substances by Rite
8  Aid?
9        MS. McENROE:  Objection.
10        THE WITNESS:  I myself did not
11    implement any policies and procedures for
12    the distribution of controlled
13    substances.  The logistics team may have
14    done that, something I was not aware of.
15    But I myself did not implement any.
16  BY MR. POWERS:
17    Q.    Do you know if the logistics team
18  implemented any new policies or procedures
19  regarding the distribution of controlled
20  substances during your time in the government
21  affairs office?
22        MS. McENROE:  Objection.
23        THE WITNESS:  I believe they did.
24  BY MR. POWERS:

Page 81

1    Q.    What were those procedures, new
2  procedures and policies?
3    A.    A lot around implementing
4  upgraded camera systems, upgrading cages,
5  upgrading picking directions.
6    Q.    Anything else?
7    A.    Those are the ones that come to
8  mind.
9    Q.    When you say "upgrading picking
10  directions," what do you mean by that?
11    A.    There were various pick machines
12  that were in the distribution center.  And in
13  order to be -- have orders more accurate, they
14  would develop upgrades to those machines so that
15  the actual people that pick the product in the DC
16  had a much easier job.
17    Q.    And you said it was possible that
18  the logistics department implemented policies and
19  procedures for the distribution centers that you
20  were not aware of; is that right?
21    A.    That is correct.
22    Q.    Did the logistics department have
23  to get your approval or -- let me phrase that a
24  different way.

Page 82

1        Did the logistics department have
2   to get government affairs department approval
3   before implementing a new policy or procedure at
4   the distribution centers?
5        MS. McENROE:  Objection to form.
6        THE WITNESS:  Typically they
7        would get approval, yes.
8   BY MR. POWERS:
9        Q.    Was it required?
10       MS. McENROE:  Objection to form.
11       THE WITNESS:  I don't know that
12       it was required.  That was just our
13       process.
14  BY MR. POWERS:
15       Q.    And Rite Aid distributed
16  controlled substances up until late 2014.
17  Correct?
18       A.    That's correct.
19       Q.    And the products that Rite Aid
20  distributed included hydrocodone combination
21  products.  Right?
22       A.    That is correct.
23       Q.    When Rite Aid was distributing
24  controlled substances -- actually, let me back up

Page 83

1   a second here.
2        When we're talking about Rite
3   Aid's distribution, can we agree that we're just
4   talking about the time period up until late 2014
5   when Rite Aid was distributing controlled
6   substances?
7        A.    Yes.
8        Q.    Okay.  When Rite Aid was
9   distributing controlled substances, did Rite Aid
10  have a suspicious order monitoring program?
11       A.    We did.
12       Q.    When has that suspicious order
13  monitoring program been in place since?
14       A.    The suspicious order monitoring
15  program has been in place since 1995, when --
16  that I became aware of it.  It could have been in
17  place prior to that, but...
18       Q.    To the best of your knowledge,
19  the suspicious order monitoring program was in
20  place from 19 -- at least 1995 until 2014?
21       A.    Yes.
22       Q.    How did you familiarize yourself
23  with the suspicious order monitoring program when
24  you first started in the government affairs

Page 84

1   office?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  I read the SOPs and
4        reviewed the policies and procedures and
5        became aware of the different aspects of
6        the suspicious order monitoring program.
7   BY MR. POWERS:
8        Q.    Did the suspicious order
9   monitoring program change at all between when you
10  first became aware of it and when Rite Aid
11  stopped distributing controlled substances?
12       MS. McENROE:  Objection to form.
13       THE WITNESS:  It did change.
14  BY MR. POWERS:
15       Q.    How did it change?
16       A.    We added another -- a component
17  of -- we had an asset protection that would
18  monitor part of our suspicious order monitoring
19  program.  And we upgraded and updated asset
20  protection monitoring of our -- portion of our
21  suspicious order monitoring program.
22       Q.    When did that happen?
23       A.    I would say around 2010.
24       Q.    And what was the nature of that

Page 85

1   upgrade?
2        A.    We got a new computer system that
3   asset protection used to -- for the detection of
4   theft and diversion called NaviScript/NaviCase.
5   And that particular system had a series of key
6   performance indicators that were monitored by
7   asset protection.  Those key performance
8   indicators were previously monitored by another
9   system, but this was just an upgraded system.
10       Q.    What was the previous system that
11  monitored the KPIs?
12       A.    That was an internal system in
13  asset protection.  I don't know the name of it.
14       Q.    And the NaviCase/NaviScript
15  system you just talked about, that was to monitor
16  theft of controlled substances.  Right?
17       MS. McENROE:  Objection, form.
18       THE WITNESS:  That was to monitor
19       theft, but the other key performance
20       indicators also monitored ordering, cycle
21       counts.  There were 90 KPIs.
22  BY MR. POWERS:
23       Q.    What do you mean by cycle counts?
24       A.    A cycle count is when a

Page 86

1 pharmacist in a store goes into the system and
2 says that we have -- they have 96 tablets on the
3 shelf. And what happens is the system says
4 they're supposed to have 100. And they count
5 down to 96 and say, okay, I now have 96 instead
6 of the 100.
7      Q.    Did the NaviScript/NaviCase
8 system keep track of the inventory at the
9 distribution centers?
10         MS. McENROE: Objection to form.
11         THE WITNESS: Can you phrase the
12     question differently?
13 BY MR. POWERS:
14      Q.    It sounds to me like you were
15 talking about the NaviScript/NaviCase system with
16 regards to the individual stores. Right?
17      A.    Yes.
18      Q.    Did the NaviScript/NaviCase
19 system have any functionality with regards to the
20 distribution centers?
21         MS. McENROE: Objection to form.
22         THE WITNESS: The Navi system
23     from a distribution standpoint, it did
24     not maintain inventory, but it maintained

Page 87

1     order data from the distribution center
2     to the stores.
3 BY MR. POWERS:
4      Q.    So the Navi -- you said the Navi
5 system could see what was being sent from the
6 distribution center to the individual stores; is
7 that right?
8      A.    Yes.
9      Q.    Do you know who designed Rite
10 Aid's suspicious order monitoring system
11 originally?
12      A.    I do not.
13      Q.    Did you personally make any
14 changes to the Rite Aid suspicious order
15 monitoring program?
16         MS. McENROE: Objection to form.
17         THE WITNESS: I don't recall
18     making any changes. From my perspective,
19     again, I may have reviewed some changes
20     that logistics were doing, but I myself,
21     I don't recall making any changes.
22 BY MR. POWERS:
23      Q.    That suspicious order monitoring
24 system that Rite Aid had used thresholds. Right?

Page 88

1         MS. McENROE: Objection to form.
2         THE WITNESS: That was one of the
3     components.
4         Oops, sorry.
5 BY MR. POWERS:
6      Q.    And the thresholds were set at
7 5,000 dosage units, 5,000 dosage units for each
8 national drug code. Right?
9         MS. McENROE: Objection to form.
10         THE WITNESS: 5,000 dosage units
11     per each NDC per order.
12 BY MR. POWERS:
13      Q.    Per order.
14         And when you say "per order,"
15 that's per order by each individual pharmacy.
16 Right?
17      A.    Yes.
18      Q.    And you said the thresholds was
19 one component of the suspicious order monitoring
20 system.
21         What were the other components?
22      A.    Another component was our
23 ordering process and an algorithm that was
24 established by Rite Aid to submit orders to the

Page 89

1 distribution center from our corporate office,
2 based on an individual store's movement.
3      Q.    The ordering process you're
4 talking about there, is that the auto
5 replenishment system?
6      A.    It is.
7      Q.    So the auto replenishment system
8 is part of your suspicious order monitoring
9 program?
10      A.    It is.
11      Q.    How long has the auto
12 replenishment system been in place for?
13      A.    As far back as I know, as I can
14 recall.
15      Q.    Even as your time as a
16 pharmacist?
17      A.    I don't know that.
18      Q.    But --
19      A.    Definitely since 1995.
20      Q.    How is the auto replenishment
21 system used in the Rite Aid suspicious order
22 monitoring system?
23         MS. McENROE: Objection to form.
24         THE WITNESS: It is utilized to

Page 90

1   generate an order for an individual
2   store.
3         From the suspicious order
4   monitoring process, we know our stores'
5   volume, we know our stores' dispensing,
6   and we're able to take ███████ worth of
7   that dispensing data, place an order so
8   that there's the correct amount on hand,
9   put a slight override into that and
10  place -- provide that to our stores to
11  place an order.
12        An order cannot go over that
13  algorithm coming out of -- from the --
14  from the order going to the distribution
15  center.
16 BY MR. POWERS:
17   Q.   How is the limit of the -- just
18 the auto replenishment system different than the
19 threshold limit?
20        MS. McENROE:  Objection to form.
21        THE WITNESS:  The automated
22  system is different in that it generates
23  an order based on that store's need.
24        When you get to the threshold of

Page 91

1   the 5,000 dosage units, that threshold
2   was established as another parameter as
3   part of the process.  So it is quite
4   possible that an order could be placed
5   that met the algorithm that was for 5,100
6   tablets to be ordered and the threshold
7   system then at that point in time would
8   kick in and drop that down to 5,000
9   tablets.
10 BY MR. POWERS:
11   Q.   But the 5,000 dosage unit
12 threshold, that's not in any electronic form, is
13 it?
14   A.   The 5,000 threshold is based on
15 the pickers at the distribution center.
16   Q.   So the auto replenishment system
17 could generate an order that was above the 5,000
18 unit thresholds.  Right?
19   A.   That is correct.
20   Q.   And it would then fall on the
21 responsibility of the individuals in the
22 distribution center to then enforce that 5,000
23 dosage unit threshold.  Right?
24   A.   That is correct.

Page 92

1   Q.   How does the auto replenishment
2 system identify, report or not ship suspicious
3 orders?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  The auto
6   replenishment system does not generate a
7   suspicious order.
8 BY MR. POWERS:
9   Q.   It is impossible for the auto
10 replenishment system to generate a suspicious
11 order; is that right?
12        MS. McENROE:  Objection to form.
13        THE WITNESS:  Based on the
14  algorithm and what is built into it,
15  there's not a suspicious order that's
16  generated by the order system.
17 BY MR. POWERS:
18   Q.   My question, though, is, is it
19 impossible for the auto replenishment system to
20 generate a suspicious order?
21        MS. McENROE:  Objection to form,
22  asked and answered.
23        THE WITNESS:  Could you ask the
24  question again?

Page 93

1 BY MR. POWERS:
2   Q.   Sure.
3        Is it impossible for the Rite Aid
4 auto replenishment system to generate a
5 suspicious order?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  Yes.
8 BY MR. POWERS:
9   Q.   The auto replenishment system you
10 said was based on the need of the individual
11 pharmacy.  Right?
12   A.   Correct.
13   Q.   What do you mean when you say by
14 need?
15   A.   Based on what is needed to
16 service our patient base, based on that store's
17 previous movement of a particular product.
18        So you would have a drug.  We
█████ ███████████████████████████████████████
█████ ████████████████████████████████████████
█████ █████████████████████████████████████████
22 above the highest order that the store could
23 generate.  That would go through the system and
24 be -- then would go to the store to be reviewed.

Page 94

1     Q.   And the data you're talking
2 about, that is dispensing data. Right?
3     A.   Dispensing data.
4     Q.   And the dispensing data is simply
5 the amount of product that was sold at that
6 particular Rite Aid location. Right?
7         MS. McENROE: Objection to form.
8         THE WITNESS: The amount of
9     product that was dispensed to our
10     patients, yes.
11 BY MR. POWERS:
12     Q.   So the auto replenishment system
13 doesn't look at who is writing the prescriptions
14 for those patients?
15         MS. McENROE: Objection to form.
16         THE WITNESS: It does not.
17 BY MR. POWERS:
18     Q.   It doesn't look at the amount of
19 controlled substances as opposed to the amount of
20 noncontrolled substances at that Rite Aid
21 location. Right?
22         MS. McENROE: Objection to form.
23         THE WITNESS: It does not, but
24     the asset protection KPIs would look at

Page 95

1     that.
2 BY MR. POWERS:
3     Q.   The auto replenishment system
4 doesn't do anything to determine the medical need
5 for the individual patients, does it?
6         MS. McENROE: Object to form.
7         THE WITNESS: It does not.
8         Sorry.
9 BY MR. POWERS:
10     Q.   Have you ever heard of the term
11 "red flags of diversion"?
12         MS. McENROE: Objection to form.
13         THE WITNESS: I've heard of the
14     term "red flags."
15 BY MR. POWERS:
16     Q.   What is your understanding of the
17 term "red flags"?
18     A.   Red flags is when dispensing a
19 controlled substance prescription, a pharmacist
20 has a corresponding responsibility to make sure
21 that the prescription is dispensed for a valid
22 medical need in the course of the usual practice
23 of the prescription. The pharmacist is to review
24 the prescription and look at various elements of

Page 96

1 the prescription to make sure that it is for a
2 valid medical reason.
3     Q.   What are the various elements of
4 the prescription to make sure that it is valid --
5 to make sure that it is valid for a medical
6 reason?
7     A.   You need to know the patient,
8 does the pharmacist know the patient. You need
9 to know the prescriber, is the prescriber known
10 to the patient. You would look at, as far as a
11 red flag, what is the distance between the
12 patient and the prescriber.
13         You would look at the original
14 hard copy prescription that's presented to you to
15 determine, does it look like it's a forgery. Is
16 there watermarks on it or something that would
17 identify it as a fraudulent prescription.
18         You would look at the particular
19 type of prescription and prescriber to make sure
20 that it was a proper prescription. Then you
21 could -- and if all of those were met, then at
22 that point the pharmacist would make the decision
23 to dispense the prescription.
24     Q.   How about payment in cash, was

Page 97

1 that a red flag of diversion?
2     A.   It could be.
3     Q.   Does the auto replenishment
4 system look at any of the red flags of diversion
5 you just discussed in your previous answer?
6         MS. McENROE: Objection to form.
7         THE WITNESS: It does not.
8 BY MR. POWERS:
9     Q.   So if those red flags of
10 diversion that we just talked about were
11 occurring, forged prescriptions, paying in cash,
12 things like that, the auto replenishment system
13 would not have any way of detecting that. Right?
14         MS. McENROE: Objection to form.
15         THE WITNESS: It would not.
16 BY MR. POWERS:
17     Q.   You also talked about the auto
18 ■    ████████████████████████████ Is that just the dispensing data?
19 ████████████████████████████ Is that just the dispensing data?
20     A.   Yes.
21     Q.   And that's just purely the volume
22 of product dispensed. Right?
23         MS. McENROE: Objection to form.
24         THE WITNESS: Yes. Dispensed to

Page 98

1    the patient.
2    BY MR. POWERS:
3        Q.    The 5,000 dosage unit threshold
4    that the distribution center -- well, let me back
5    up there.
6            The 5,000 dosage unit threshold
7    was used by the distribution centers; right?
8        A.    That is correct.
9        Q.    And that 5,000 dosage unit
10   threshold was the same for every distribution
11   center?
12       A.    It was.
13       Q.    And it was -- that 5,000 dosage
14   unit threshold was the same for every store that
15   the distribution centers distributed to.
16   Correct?
17           MS. McENROE:  Objection to form.
18           THE WITNESS:  It was.
19   BY MR. POWERS:
20       Q.    Were there any exceptions to that
21   5,000 dosage unit threshold?
22       A.    There were exceptions.
23       Q.    So besides some of the stores
24   with exceptions, there was a generic threshold

Page 99

1    limit for all Rite Aid stores?
2            MS. McENROE:  Objection to form.
3            THE WITNESS:  Yes.  5,000 per
4    NDC.
5               - - -
6            (Deposition Exhibit No. Rite
7    Aid-Hart-1, Distribution/Customer Support
8    Center, DEA Regulatory Guidelines,
9    Policy, Bates stamped
10   Rite_Aid_OMDL_0046157 through
11   Rite_Aid_OMDL_0046226, was marked for
12   identification.)
13              - - -
14   BY MR. POWERS:
15       Q.    I'm going to hand what's been
16   marked as Rite Aid-Hart Exhibit 1.  It's a
17   document, somewhat lengthy, but I'm going to
18   direct your attention to a particular page in it.
19   The Bates number on the document is
20   Rite_Aid_OMDL_0046157 through 46226.
21           Are you familiar with the
22   document in Hart Exhibit 1?
23       A.    Yes.
24       Q.    What is that document?

Page 100

1        A.    DEA regulatory guidelines for the
2    customer support center.
3        Q.    What is the customer support
4    center?
5        A.    That is the distribution center.
6        Q.    So customer support center is
7    synonymous with distribution center?
8        A.    Yes.
9        Q.    I'm going to ask you to turn to
10   the section VI, "Excessive Order Monitoring."
11   It's page VI-1 on the bottom there.
12           MS. McENROE:  It's a Bates number
13   ending in 179.
14   BY MR. POWERS:
15       Q.    Are you familiar with this page?
16       A.    I am.
17       Q.    When was the last time you saw
18   this particular document in Exhibit 1?
19       A.    Yesterday or the day before.
20       Q.    What is the page we're looking at
21   in Exhibit 1 ending in Bates 179?
22       A.    It's excessive order monitoring.
23       Q.    Is this a policy and procedure
24   for the Rite Aid distribution centers?

Page 101

1        A.    It doesn't say it on that page,
2    but it says it on -- well, it doesn't say policy
3    and procedure.
4        Q.    I'm not asking what the page
5    says.  I'm asking your own explanation of it.
6        A.    Oh, yes.
7        Q.    So just to be clear, the page
8    reflected in Exhibit 1 entitled "Excessive Order
9    Monitoring" is a policy and procedure regarding
10   excessive order monitoring for the Rite Aid
11   distribution centers; is that right?
12       A.    Yes.
13       Q.    Would this policy and procedure
14   apply to all Rite Aid distribution centers?
15       A.    Yes.
16       Q.    Is this particular policy and
17   procedure a part of Rite Aid's suspicious order
18   monitoring program?
19       A.    Yes.
20       Q.    Do you know who wrote this
21   document?
22       A.    I do not.
23       Q.    Did you have any input into what
24   is spelled out on page ending in 179 of

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  Exhibit 1?
2      A.   I'm sure I did.
3      Q.   Do you know when you did that,
4  when you had your input?
5      A.   I don't remember.
6      Q.   Was this the policy and procedure
7  regarding excessive order monitoring when you
8  first started in the government affairs office in
9  1995?
10     A.   I believe so.
11     Q.   Did this policy and procedure
12 here on the page ending 46179 ever change during
13 your time in the government affairs office at
14 Rite Aid?
15     A.   Yes.  This is not the most
16 current policy.
17     Q.   How did the policy change from
18 when it first started in 1995?
19     A.   There were some tweaking of it
20 along the way, words here and words there.  This
21 particular page I believe was changed to
22 suspicious order monitoring from excessive order
23 monitoring.
24     Q.   Was that the only change that was

Page 103

1  made on this particular policy?
2      A.   I don't remember.
3      Q.   But it's the only change you can
4  recall right now.  Right?
5      A.   Yes.
6           MS. McENROE:  Just let him finish
7      his questions.
8           THE WITNESS:  Oh, I'm sorry.
9           Just hit me.
10 BY MR. POWERS:
11     Q.   Who would have a copy of the
12 document in Exhibit 1 as a whole?
13          MS. McENROE:  Objection to form.
14          THE WITNESS:  The logistics
15     person at the corporate office.  And
16     there would be a copy at each of the
17     distribution centers.
18 BY MR. POWERS:
19     Q.   And when you say a copy, do you
20 mean a hard copy like in paper form?
21     A.   I would believe so, yes.
22     Q.   Did you have a copy of the
23 document in Exhibit 1?
24     A.   I may have had one in my file,

Page 104

1  but it wasn't typically my document.
2      Q.   What do you mean by "my
3  document"?
4      A.   I didn't -- I wasn't the author
5  of it, so...
6      Q.   Do you know how the document in
7  Exhibit 1 was used at the distribution centers?
8           MS. McENROE:  Objection to form.
9           THE WITNESS:  I believe that it
10     was as part of the operating procedures.
11     And it was maintained in the drug cage,
12     and individuals were trained on the
13     suspicious order monitoring process.
14 BY MR. POWERS:
15     Q.   Did you have any role in the
16 training of individuals at distribution centers
17 on the procedures outlined here on page 46179?
18     A.   I have trained the DEA
19 coordinators at the distribution centers.  The
20 section of Suspicious Order Monitoring typically
21 was not one that I would cover.
22     Q.   Who would cover that?
23     A.   Again, either -- the logistics
24 person who was their superior.

Page 105

1      Q.   Did you train anyone else besides
2  distribution center employees on Rite Aid's
3  excessive or suspicious order monitoring
4  procedures?
5      A.   Not that I recall.
6      Q.   In the paragraph number 1 there
7  on page 46179, the first sentence says, "All
8  orders containing controlled substances are
9  reviewed and verified for order quantity and size
10 to not exceed the determined order history
11 threshold."
12          Do you see that?
13     A.   I do.
14     Q.   Is that the 5,000 dosage unit
15 threshold we were talking about earlier?
16     A.   That is not.
17     Q.   What is this threshold here?
18     A.   Those -- the review and the
19 verified order quantity is part of the algorithm
20 to determine what the order should be.
21     Q.   That's the auto replenishment
22 system?
23     A.   Auto replenishment.
24     Q.   Who is doing the reviewing and

Page 106

1 verifying referred to in that sentence I just
2 read?
3     A.    I'm going to backtrack and say I
4 believe that you were correct, and that is the
5 individuals that are in the cage.  And then if it
6 goes over the 5,000, it is going to the
7 department manager.
8     Q.    So just so I have a clear record
9 on this, the first sentence of paragraph 1 on
10 this page refers to an order history threshold.
11          And your understanding, your
12 correct understanding is that that is in fact the
13 5,000 dosage unit threshold.  Right?
14     A.    Yes.
15     Q.    So who reviews and verifies the
16 order quantity and size referred to there in the
17 first sentence of paragraph 1?
18     A.    The individuals that do the
19 picking at the distribution center.
20     Q.    Do you have any role in reviewing
21 or verifying the order quantities?
22     A.    I do not.
23     Q.    Does anyone in the government
24 affairs office?

Page 107

1     A.    We do not.
2     Q.    Then it says in the second
3 sentence there, "Any order exceeding the
4 threshold is immediately forwarded to the
5 department manager for further investigation."
6          Do you see that?
7     A.    I do.
8     Q.    Who would the department manager
9 in this sentence refer to?
10     A.    I would believe typically it
11 would be the DEA coordinator.
12     Q.    And that would be an individual
13 at the distribution center.  Right?
14     A.    That would be, yes.
15     Q.    Paragraph 3, it says, in the
16 first sentence, "A review is performed to
17 determine the legitimacy of the order."
18          Do you see that?
19     A.    I do.
20     Q.    Who performs that review?
21     A.    The distribution center
22 personnel.
23     Q.    And what are they relying on to
24 determine the legitimacy of the order?

Page 108

1          MS. McENROE:  Objection to form.
2          THE WITNESS:  They would rely on
3 the auto replenishment system to
4 determine if the quantity of the order
5 went through the auto replenishment
6 system.  They would verify with the
7 pharmacist at the pharmacy if the order
8 was correct.  So they would do a -- they
9 would perform something to that effect.
10 BY MR. POWERS:
11     Q.    Is there any written policy or
12 procedure about how they are supposed to perform
13 this review to determine the legitimacy of an
14 order?
15          MS. McENROE:  Objection to form.
16          THE WITNESS:  There is a policy.
17 BY MR. POWERS:
18     Q.    What is that policy?
19     A.    The policy is there is a log
20 maintained if there's an order that is -- that
21 there is -- to determine the legitimacy of the
22 order, and the log is maintained in the cage of
23 the distribution center.
24     Q.    Is there a written policy that

Page 109

1 spells out that that log is supposed to be
2 maintained in the distribution center?
3     A.    I believe so, yes.
4     Q.    Besides the log, any other
5 written policies about how to determine the
6 legitimacy of an order?
7     A.    Not to the best of my knowledge.
8     Q.    And we're talking about the
9 legitimacy of the order.
10          What does the legitimacy of the
11 order mean here?
12          MS. McENROE:  Objection to form.
13          THE WITNESS:  If the order was
14 definitely needed by the pharmacy.
15 BY MR. POWERS:
16     Q.    And when you say "needed by the
17 pharmacy," that's purely referring to the volume
18 needed of the prescription.  Right?
19          MS. McENROE:  Objection to form.
20          THE WITNESS:  That is correct.
21 BY MR. POWERS:
22     Q.    There's no effort here when
23 determining legitimacy of the order to
24 investigate those red flags of diversion we

Page 110

1 talked about before. Right?
2          MS. McENROE: Objection to form.
3          THE WITNESS: There is none.
4 BY MR. POWERS:
5     Q. The next sentence says,
6 "Appropriate" -- in paragraph 3 says,
7 "Appropriate documentation of the review is
8 maintained on file."
9          Do you see that?
10     A. I do.
11     Q. What appropriate documentation is
12 maintained on file?
13     A. That would be the log that was
14 maintained -- that was kept after the phone call
15 was made.
16     Q. Anything else?
17     A. That would be it.
18     Q. Moving on to paragraph 4, the
19 first -- I guess the only sentence, it says, "Any
20 order which is determined to be suspicious will
21 be immediately reported to the corporate office,
22 who will notify the local DEA Field Division
23 Office of the Administration."
24          Do you see that?

Page 111

1     A. I do.
2     Q. Is the distribution center the
3 one who is determining whether the order is
4 suspicious or not?
5          MS. McENROE: Objection to form.
6          THE WITNESS: They are.
7 BY MR. POWERS:
8     Q. How do they determine whether the
9 order is suspicious or not?
10          MS. McENROE: Objection, form.
11          THE WITNESS: They would look at
12     the quantity of the order. They would
13     look at the -- at the distribution
14     center, they know the previous store's
15     history from picking the order every
16     week. They may see a store that has
17     ordered five of a particular item. And
18     then one week off, there could be 15
19     ordered. So at that point they would
20     say, this store always gets five. Let's
21     call the store and determine if they
22     really wanted 15.
23 BY MR. POWERS:
24     Q. Were there any written policies

Page 112

1 or procedures about how the distribution center
2 was supposed to determine whether an order was
3 suspicious?
4          MS. McENROE: Objection to form.
5          THE WITNESS: There are policies
6     and procedures to determine a suspicious
7     order, yes.
8 BY MR. POWERS:
9     Q. You were talking about the
10 distribution center looking at the history of the
11 order.
12     A. Uh-huh.
13     Q. Was there any guidance given to
14 the distribution centers to determine what would
15 be used to determine, regarding order history,
16 what was suspicious?
17          MS. McENROE: Objection, form.
18          THE WITNESS: Can you repeat the
19     question?
20 BY MR. POWERS:
21     Q. Sure.
22          You said the distribution center
23 employees knew the stores they were picking for.
24 Right?

Page 113

1     A. Correct.
2     Q. And they gained that knowledge
3 through picking for those stores periodically
4 during their jobs. Right?
5          MS. McENROE: Objection to form.
6          THE WITNESS: Correct. They pick
7     a store once a week.
8 BY MR. POWERS:
9     Q. So besides just being the one who
10 picks that store every week, was there any way --
11 any other way that the distribution center
12 employees were supposed to determine whether or
13 not an order was suspicious?
14          MS. McENROE: Objection to form.
15          THE WITNESS: To the best of my
16     knowledge, no.
17 BY MR. POWERS:
18     Q. And in paragraph 4 here, it says,
19 "Any order which is determined to be suspicious
20 will be immediately reported to the corporate
21 office."
22          Who at the corporate office would
23 the suspicious orders be reported to?
24     A. That would be me.

Page 114

1    Q.    Were any suspicious orders ever
2  reported to you at the corporate office?
3    A.    There were none reported to me.
4    Q.    And to be clear, you never
5  received a report of a suspicious order your
6  entire time working in the corporate office from
7  1995 through 2018.  Correct?
8    A.    I did not.
9    Q.    Going down to paragraph 5, it
10 says, if a suspicious order is reported to
11 corporate, the corporate government affairs will
12 determine whether to "ship" or "do not ship."
13        Do you see that?
14   A.    I do.
15   Q.    And this is the same corporate
16 office that we just referred to, the government
17 affairs office.  Right?
18   A.    That is correct.
19   Q.    So that would be you?
20   A.    That would be me.
21   Q.    How would you make the
22 determination of whether to ship or not ship?
23   A.    There would be a number of
24 factors that would come into play.  The very

Page 115

1  first factor that I would look at is if it was an
2  auto ship order, that it came through the
3  algorithm and that was what the algorithm
4  provided.  That would be a key one.
5        A second one would be to look at
6  the size of the order, to determine if the
7  unusual size of it was due to something at the
8  pharmacy that was placing the order, if there was
9  something unusual happening at that pharmacy.
10   Q.    Anything else you would look at?
11   A.    That would be it.
12   Q.    Was there any written policy or
13 procedure about how to make that decision about
14 whether to ship or not ship?
15   A.    To the best of my knowledge, no.
16   Q.    So the factors you just testified
17 about that you would use to determine whether to
18 ship or not ship, those were just ones that you
19 yourself personally came up with.  Right?
20   A.    Yes.
21        MS. McENROE:  Objection to form.
22        THE WITNESS:  Sorry.
23 BY MR. POWERS:
24   Q.    What were those based on, those

Page 116

1  factors based on?
2    A.    Based on my knowledge of the
3  industry, based on my years of experience having
4  dealt with the DEA for a period of -- for a long
5  period of time, and knowing how to review a store
6  as far as its book of business, going way back to
7  even my days as the pharmacy district manager in
8  the Baltimore market.
9    Q.    But to be clear, you never had to
10 make the decision whether to ship or not ship
11 because you never received any report of a
12 suspicious order.  Right?
13   A.    That is correct.
14   Q.    And going down to paragraph 6, it
15 says, "All discussions, investigations and
16 reports will be maintained in the file designated
17 'Suspicious Orders.'"
18        Do you see that?
19   A.    I do.
20   Q.    Am I correct to assume that there
21 was no file designated suspicious orders because
22 there were no suspicious orders?
23   A.    You are correct.
24   Q.    Who would keep that file, if

Page 117

1  there was one?
2    A.    Our office would maintain a file.
3  And there would be a file maintained at the
4  individual distribution center.
5    Q.    How did you ensure that the
6  policy we just talked about in Exhibit 1
7  reflected on page 46179 was followed at the
8  distribution centers?
9        MS. McENROE:  Objection to form.
10        THE WITNESS:  The distribution
11   center has constant monitoring.  They
12   have audits completed by our internal
13   audit group and by asset protection, and
14   by logistics and transportation, where
15   there are individual groups that go into
16   each of the distribution centers once a
17   year on behalf of Rite Aid and have a
18   checklist of compliance to review at the
19   distribution centers.
20        So there is a review done to make
21   sure that the processes are being
22   followed related to suspicious orders,
23   security.  All of the policies and
24   procedures are reviewed and there is a

Page 118

1    specific checklist completed.
2  BY MR. POWERS:
3      Q.    Did you personally have any
4  responsibility for ensuring compliance with the
5  excessive or suspicious order monitoring
6  procedure?
7          MS. McENROE:  Objection to form.
8          THE WITNESS:  Those particular
9      checklists were, again, completed by
10     logistics.
11 BY MR. POWERS:
12     Q.    But my question is, did you have
13 any personal responsibility for ensuring the
14 distribution center compliance with the excessive
15 order monitoring or suspicious order monitoring
16 procedure?
17         MS. McENROE:  Objection to form.
18         THE WITNESS:  I had
19     responsibility for reviewing the policies
20     and procedures and the checklists and
21     that, but the sole responsibility as far
22     as like the monitoring and if there was
23     something that needed to be corrected or
24     something along those lines, that would

Page 119

1    rest with logistics.
2          MS. McENROE:  Hey, Will, we've
3      been going about an hour.  When you find
4      a good time for a break, that would be
5      appreciated.
6          MR. POWERS:  Yeah, we can take a
7      break now.  That's fine.
8          MS. McENROE:  Great.  Thank you.
9          THE VIDEOGRAPHER:  Going off the
10     record at 11:41 a.m.
11         - - -
12     (A recess was taken from
13     11:41 a.m. to 11:58 a.m.)
14         - - -
15         THE VIDEOGRAPHER:  We're back on
16     the record at 11:58 a.m.
17 BY MR. POWERS:
18     Q.    Welcome back, Ms. Hart.  I'm
19 going to hand you what's been marked as Rite
20 Aid-Hart Exhibit 2.  It's, once again, a large
21 document, but I'm only going to talk to you about
22 one page.  It is Bates number
23 Rite_Aid_OMDL_0014804 through 14873.  Take a look
24 at that.

Page 120

1          - - -
2      (Deposition Exhibit No. Rite
3  Aid-Hart-2, Rite Aid Distribution Center
4  DEA Regulatory Guidelines,
5  Rite_Aid_OMDL_0014804 through
6  Rite_Aid_OMDL_0014874, was marked for
7  identification.)
8          - - -
9          THE WITNESS:  Thank you.
10 BY MR. POWERS:
11     Q.    I'm going to direct your
12 attention specifically to the page Rite
13 Aid_OMDL_0014828.
14     This page here, 14828 in
15 Exhibit 2, appears to be a similar document and
16 page to the one we were just looking at in
17 Exhibit 1.  Right?
18         MS. McENROE:  Objection to form.
19         THE WITNESS:  It does.
20 BY MR. POWERS:
21     Q.    And I don't know if the trial
22 tech could actually pull up Exhibit 1 and put it
23 side to side on the monitor in front of you with
24 the page in Exhibit 2.

Page 121

1          MS. McENROE:  And for the record,
2      I'm just setting the witness up with the
3      hard copy versions of Exhibits 1 and 2.
4          MR. POWERS:  Sure, yes.
5  BY MR. POWERS:
6      Q.    So I'm going to refer to you in
7  hard copy between the two pages we've been
8  talking about, page 46179 in Exhibit 1 and page
9  14828 in Exhibit 2.
10     Do you have those pages in front
11 of you?
12     A.    I don't think this is the right
13 page.
14     Yes.
15     Q.    With these documents side to
16 side, can you see if there are any other changes
17 to this policy besides the title changing from
18 Excessive Order Monitoring to Suspicious Order
19 Monitoring?
20         MS. McENROE:  Objection to form.
21         THE WITNESS:  It appears as if
22     number 5 has changed.
23 BY MR. POWERS:
24     Q.    What is the nature of the change

Page 122

1 in number 5?
2     A.    Number 5 changed to, "If a
3 suspicious order is reported to Corporate, the
4 Corporate Government Affairs will determine
5 whether to 'ship' or 'do not ship.'"
6     Q.    I understand that the text is
7 different.
8          Is the procedure that is to be
9 followed any different?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  It remains the
12     same.
13 BY MR. POWERS:
14     Q.    Besides the wording of paragraph
15 5 and the title of the document, any other
16 changes to the policy and procedure regarding
17 suspicious order monitoring?
18     A.    I don't see any.
19     Q.    Do you know who made the decision
20 to change this policy from being entitled
21 "Excessive Order Monitoring" to "Suspicious Order
22 Monitoring"?
23     A.    I believe it would have been
24 someone in logistics.

Page 123

1     Q.    Any idea who in logistics?
2     A.    Perhaps Chris Belli.
3     Q.    Do you know when the title of
4 this document was changed from "Excessive Order
5 Monitoring" to "Suspicious Order Monitoring"?
6     A.    I do not.
7     Q.    Do you know why it was changed
8 from "Excessive Order Monitoring" to "Suspicious
9 Order Monitoring"?
10     A.    I do not know.
11     Q.    Who would know that?
12     A.    Chris Belli.
13         MS. McENROE:  Objection to form.
14 BY MR. POWERS:
15     Q.    Anyone else?
16     A.    I believe it would rest with
17 logistics.
18     Q.    And you believe it would have
19 been during the timeframe Chris Belli was working
20 in logistics?
21     A.    Yes.
22     Q.    What is that knowledge based on?
23     A.    Some discussion that I remember
24 having at the time when Chris was putting it --

Page 124

1 this together and redid the front page and
2 information like that.
3     Q.    Did Chris Belli consult you about
4 whether he should change the policy name from
5 excessive order monitoring to suspicious order
6 monitoring?
7     A.    I don't recall.
8     Q.    You can put those exhibits to the
9 side.
10         I'm going to hand you what's been
11 marked as Hart Exhibit 3.  The Bates number on
12 this exhibit is Rite_Aid_OMDL_0015079 through
13 15081.
14         - - -
15         (Deposition Exhibit No. Rite
16     Aid-Hart-3, Controlled Drug Above Average
17     Order Monitoring Program, Bates stamped
18     Rite_Aid_OMDL_0015079 through
19     Rite_Aid_OMDL_0015081, was marked for
20     identification.)
21         - - -
22 BY MR. POWERS:
23     Q.    Take a look at that.
24     A.    (Reviewing document.)

Page 125

1     Q.    Are you familiar with the
2 document in Exhibit 3?
3     A.    I am.
4     Q.    What is the document in
5 Exhibit 3?
6     A.    It is a sign-off sheet for the
7 controlled drug above average order monitoring
8 program.
9     Q.    When was the last time you saw
10 the document reflected in Exhibit 3?
11     A.    Yesterday or the day before.
12     Q.    How was the document in Exhibit 3
13 used at Rite Aid?
14         MS. McENROE:  Objection to form.
15         THE WITNESS:  It was used to
16     document that the individuals that were
17     in the controlled drug cage picking
18     orders understood the above average order
19     monitoring program and what was required
20     of them when picking controlled
21     substances.
22 BY MR. POWERS:
23     Q.    Was this particular document in
24 Exhibit 3 used at every distribution center?

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1      MS. McENROE: Objection to form.
2      THE WITNESS: This or a form of
3   it, I believe.
4   BY MR. POWERS:
5      Q.   So the distribution centers used
6   different documents, different written documents,
7   to spell out the above average order monitoring
8   program procedures?
9      MS. McENROE: Objection, form.
10  BY MR. POWERS:
11     Q.   Is that correct?
12     A.   If you look at this particular
13  form, on the bottom here, across to the revision,
14  this says, "D.C. 10 DEA," with the DEA number on
15  there. So that leads me to believe this was the
16  form that was used in the Perryman Distribution
17  Center.
18     Q.   But this was not the form that
19  was used in other distribution centers besides
20  Perryman to explain the above average order
21  monitoring program?
22     MS. McENROE: Objection to form.
23  BY MR. POWERS:
24     Q.   Is that right?

Page 127

1      A.   I could not say for certain.
2      Q.   Did you review the document in
3   Exhibit 3 while it was being drafted?
4      A.   I believe so.
5      Q.   Did you provide feedback about
6   what should be included in this procedure
7   reflected in Exhibit 3?
8      A.   I would say yes.
9      Q.   What feedback did you provide?
10     A.   I probably would have tweaked the
11  language a little bit, depending on, you know,
12  what the wording was.
13     Q.   And it looks to me like this
14  Exhibit 3 outlines a procedure about what a
15  distribution center employee is supposed to do
16  when an order comes in over threshold. Right?
17     MS. McENROE: Objection to form.
18     THE WITNESS: Correct.
19  BY MR. POWERS:
20     Q.   Besides the document reflected in
21  Exhibit 3, is the procedure about what to do when
22  an order comes in over threshold written down any
23  other place?
24     MS. McENROE: Objection to form.

Page 128

1      THE WITNESS: I believe it's in
2   the standard operating procedures as
3   well.
4   BY MR. POWERS:
5      Q.   Is that a separate document than
6   the ones we looked at in Exhibit 1 and 2?
7      A.   I think it would be 1 or 2, in 1
8   or 2.
9      Q.   Just so I'm perfectly clear, you
10  think that the procedure that is reflected in
11  Exhibit 3 about what to do when an order comes in
12  above average is also reflected in the SOPs in
13  Exhibit 1 and 2; is that right?
14     MS. McENROE: Objection to form.
15     THE WITNESS: I honestly don't
16  know.
17  BY MR. POWERS:
18     Q.   Looking at Exhibit 3, it says in
19  the first -- the first paragraph in all caps
20  there, "Any person who picks a controlled drug
21  order is responsible for documenting all
22  requested orders that are above the posted
23  threshold."
24     Do you see that?

Page 129

1      A.   I do.
2      Q.   What does that mean?
3      A.   That's making the picker that's
4   in the cage picking responsible for documenting
5   any orders that are above the posted threshold.
6      So that would be the
7   Pick-to-late, when we talk about the 5,000
8   threshold that we talked about earlier, and then
9   if there was any other threshold above 5,000
10  dosage units that was approved by government
11  affairs that were in place at the distribution
12  center.
13     Q.   So the threshold referred to in
14  that first all caps paragraph in Exhibit 3 is the
15  5,000 dosage unit threshold. Right?
16     A.   Yes.
17     Q.   And it looks like it says that
18  the orders above threshold should be documented.
19  Right?
20     A.   Correct.
21     Q.   And they're documented in the
22  above average order monitoring log; is that
23  right?
24     A.   Correct.



Page 130

1  Q.   In the third paragraph, the
2  second paragraph that is not in all caps, it
6         Do you see that?
7  A.   I do.
8  Q.   And it looks like it's referring
9  to the amount as the threshold.  Right?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  Can you repeat the
12  question?
13 BY MR. POWERS:
14 Q.   Sure.  I'll back up a little bit.
15 A.   Okay.
16 Q.   In the first sentence of the
17 paragraph we're looking at there, it says, "If
18 the store verifies the quantity is correct the
19 associate notifies them that we cannot send more
20 than 50 units."
21        Do you see that?
22 A.   I do.
23 Q.   Then the next sentence says,
24

Page 131

1
2        Do you see that?
3  A.   I do.
4  Q.   So it's -- the 50-unit amount
5  referred to there in those two sentences is the
6  same as the 5,000 dosage unit threshold.  Right?
7  A.   The 50 units is the same, yes.
8

Page 132

1  Q.   So I want to back up a second
2  here.
3        We talked about the 5,000 dosage
4  unit threshold.  Right?
5  A.   Yes.
6  Q.   How is that 5,000 dosage unit
7  threshold calculated?
8        MS. McENROE:  Objection to form.
9        THE WITNESS:  5,000 across the
10  board.
11 BY MR. POWERS:
12 Q.   I'm asking, though, how did the
13 threshold come to be 5,000 dosage units?
14 A.   I don't know.
15 Q.   You have no idea how the 5,000
16 dosage unit threshold was decided upon?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  I don't.
19 BY MR. POWERS:
20 Q.   Who would know that?
21 A.   I don't know.  Perhaps at that
22 time my boss, Jim Krahulec.
23 Q.   So the 5,000 dosage unit
24 threshold was in place in 1995 when you started

Page 133

1  in government affairs; is that right?
2  A.   That's correct.
3  Q.   Was the 5,000 dosage unit
4  threshold in place when you first started at Rite
5  Aid in 1984?
6  A.   I don't know that.  In a store
7  you're not familiar with that, with what happens
8  at the distribution center.
9  Q.   And to be clear, that 5,000
10 dosage unit threshold for the Rite Aid
11 distribution centers never changed the entire
12 time that you were in government affairs; is that
13 right?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  That is correct.
16 BY MR. POWERS:
17 Q.   So how is the 50-unit threshold
18 referred to in Exhibit 3 based on a
   the threshold never changed in
20 the entire time that you were in the government
21 affairs office?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  Can you repeat
24 that?

Page 134

BY MR. POWERS:

1 BY MR. POWERS:
2   Q.   I'll break it down a little bit.
3   A.   Okay.
4   Q.   So the 5,000 dosage unit
5 threshold never changed.  Right?
6   A.   Right.
7   Q.   But this Exhibit 3 here is saying
8 ███████████████████████████████████
  █ ████████████████████████████████
  █  ████████████████████████████
  █ ██████████████████████████████████
  █ ████████████████████
13   A.   This document is wrong.
14   Q.   So the distribution center is
15 relying on this document, Exhibit 3, but it's
16 wrong; is that right?
17   A.   That's correct.
18   Q.   Did you ever look into or
19 investigate in any way why the threshold was set
20 at 5,000 dosage units when you started in the
21 government affairs office?
22   A.   I did not.
23   Q.   Did you ever look into or
24 investigate in any way why the threshold was

Page 135

1 5,000 dosage units during your entire time at
2 Rite Aid?
3   A.   I did not.
4   Q.   Did anyone, to the best of your
5 knowledge, investigate why the threshold was set
6 at 5,000 dosage units during your time at Rite
7 Aid?
8   A.   I do not know if anybody did.
9   Q.   And the procedure outlined in
10 Exhibit 3 here calls for the distribution center
11 employees to short an order if the order comes in
12 above the threshold.  Right?
13   A.   Correct.
14   Q.   What does that mean?
15   A.   It means takes the order down to
16 the 5,000 dosage units.
17   Q.   Is that also called cutting an
18 order?
19      MS. McENROE:  Objection to form.
20      THE WITNESS:  It could be.
21 BY MR. POWERS:
22   Q.   So if an order comes in, let's
23 say at 8,000 dosage units, the distribution
24 center procedure would be to call the pharmacy

Page 136

1 first.  Right?
2   A.   Correct.
3   Q.   And when they call the pharmacy,
4 it would be to ask if the pharmacy truly wanted
5 that 8,000 dosage unit amount.  Right?
6   A.   Correct.
7   Q.   And if the pharmacy said, yes, we
8 want that full amount, the distribution center
9 employee was then to say, you can't have that
10 full amount.  Right?
11   A.   That's correct.
12   Q.   And the distribution center
13 employee would say, you can only have the
14 threshold amount, which was 5,000.  Right?
15   A.   That's correct.
16   Q.   And so then the distribution
17 center would then confirm that the pharmacy still
18 wanted that full 5,000 amount.  Right?
19   A.   Yes.
20   Q.   And then the distribution center
21 would fill or partially fill that original order
22 for only up to the threshold amount.  Right?
23      MS. McENROE:  Objection to form.
24      THE WITNESS:  That's correct.

Page 137

1 BY MR. POWERS:
2   Q.   And sometimes when the
3 distribution center was filling orders from
4 pharmacies after business hours, they would not
5 be able to call the pharmacy.  Right?
6   A.   That is correct.
7   Q.   In that instance, the
8 distribution center would just go ahead and cut
9 the order down to the threshold amount and ship
10 it at that cut amount.  Right?
11      MS. McENROE:  Objection to form.
12      THE WITNESS:  That is correct.
13 BY MR. POWERS:
14   Q.   And that blanket 5,000-unit --
15 5,000 dosage unit threshold is for every Rite Aid
16 store.  Right?
17      MS. McENROE:  Objection to form.
18      THE WITNESS:  The 5,000 blanket
19 is for every Rite Aid store except for
20 the few stores that have the exception.
21 BY MR. POWERS:
22   Q.   And that 5,000 dosage unit
23 threshold doesn't take into account any
24 variations between the different stores in terms

Page 138

1 of volume. Right?
2     A.   It does not.
3     Q.   It doesn't take into account or
4 look at the prescribing physicians at the
5 particular locations. Right?
6     A.   It does not.
7     Q.   It doesn't look and take into
8 consideration whether a particular store is
9 serving a large hospital, does it?
10     A.   It does not.
11     Q.   So a Rite Aid store in rural Ohio
12 would have the same distribution center threshold
13 as a Rite Aid store in downtown Cleveland.
14 Right?
15         MS. McENROE: Objection to form.
16         THE WITNESS: The 5,000 would
17     apply to both stores.
18 BY MR. POWERS:
19     Q.   Does anyone else beside the
20 distribution center employees have responsibility
21 to contact the pharmacy when an order comes in
22 over threshold?
23         MS. McENROE: Objection to form.
24         THE WITNESS: When an order comes

Page 139

1     in over threshold, that rests with the
2     DC.
3 BY MR. POWERS:
4     Q.   Did anyone ever call you in
5 government affairs about orders coming in over
6 threshold?
7     A.   Not that I recall, no.
8     Q.   Do you know if anyone in
9 government affairs was ever contacted about
10 stores consistently ordering above threshold?
11         MS. McENROE: Objection to form.
12         THE WITNESS: Not that I recall.
13 BY MR. POWERS:
14     Q.   And we talked about stores that
15 had exceptions to the 5,000 dosage unit
16 threshold. Right?
17     A.   Correct.
18     Q.   How was it determined that a
19 store would get an exception to the 5,000 dosage
20 unit threshold?
21     A.   We would look at the dispensing
22 history for that particular store, the order
23 history for that particular store, and make a
24 determination as far as if what the adjust --

Page 140

1 what the suggested order continuously for that
2 store came in above the threshold, we would take
3 that into account as well.
4         - - -
5         (Deposition Exhibit No. Rite
6     Aid-Hart-4, Pharmacy Replenishment System
7     Store Order History, Bates stamped
8     Rite_Aid_OMDL_0015302 through
9     Rite_Aid_OMDL_0015307, was marked for
10     identification.)
11         - - -
12 BY MR. POWERS:
13     Q.   I'm going to hand you what's been
14 marked as Hart Exhibit 4. It is a document that
15 is Bates labeled Rite_Aid_OMDL_0015302 through
16 15307. Take a look at that.
17     A.   Thank you.
18         MS. McENROE: Just for the
19     record, Will, so that I'm not confusing
20     myself, I agree the Bates range goes that
21     direction.
22         Do you know how this was produced
23     together with an email behind a document?
24         MR. POWERS: I believe this Bates

Page 141

1     range was identified by Rite Aid in its
2     interrogatory responses in this
3     particular order and range.
4         MS. McENROE: Got it. Okay.
5         THE WITNESS: (Reviewing
6     document.)
7 BY MR. POWERS:
8     Q.   Direct your attention to the
9 third to last page in Exhibit 4, with the Bates
10 number 15305. It looks like the beginning of an
11 email chain.
12         Do you see that?
13     A.   I do.
14     Q.   It looks like at the top here
15 it's an email from Andrea Bucher to you, Janet
16 Hart, on November 12, 2010. Right?
17     A.   The email is from me to Andrea.
18     Q.   Oh, I'm sorry. I have that
19 backwards.
20         It's an email from you to Andrea
21 Bucher in 2010. Right?
22     A.   Correct.
23     Q.   And it looks like you are
24 reviewing the order history of store 3151?

Page 142

1    A.    That is correct.

2    Q.    And in particular, you're
3 reviewing the hydrocodone threshold for store
4 3151. Right?

5    A.    For the product 5/500. Correct.

6    Q.    And was it your office that would
7 make the determination whether or not to give a
8 threshold exception to a particular store?

9    A.    It would be.

10    Q.    And that's a threshold exception
11 to the 5,000 dosage unit threshold. Right?

12    A.    That's correct.

13    Q.    And it looks like in the top
14 email there, you're asking Andrea Bucher to "run
15 reports" for Monday. Right?

16    A.    Correct.

17    Q.    What reports are you referring
18 there?

19    A.    A DUR report, a screen print from
20 the computer system, and reports like that.

21    Q.    Are those reports the pages
22 reflected in the first three pages of Exhibit 4,
23 15302 through 15304?

24    A.    They are.

Page 143

1    Q.    And it looks like the first page
2 of Exhibit 4, 15302, is the store order history.
3 Right?

4    A.    That is correct.

5    Q.    15303 is the dispensing history.
6 Right?

7    A.    That's correct.

8    Q.    And the 15304 is the DUR report.
9 Right?

10    A.    That is correct.

11    Q.    And besides these three reports,
12 did you use anything else to determine whether a
13 store would receive a threshold exception?

14    A.    These were the primary reports
15 that we used.

16    Q.    Was there anything else you used
17 to determine whether a store would get a
18 threshold exception?

19    A.    We may have looked at the store
20 itself. We may have looked at where it was
21 located. Those were things that we would review
22 also for a threshold increase.

23    Q.    If you looked at anything besides
24 these three reports here in Exhibit 4, where

Page 144

1 would that be -- where would a record of that be
2 reflected?

3    A.    It could be in the file. It
4 could be just something that we did verbally. It
5 doesn't have to be reflected anywhere.

6    Q.    Did you do -- strike that.

7         Was there any written procedure
8 about how you were to determine whether a
9 threshold increase would be granted?

10    A.    No written procedure, no, that
11 I'm aware of.

12    Q.    It was just something that you
13 yourself determined. Right?

14    A.    True.

15         I would like to make note on this
16 one DUR report that you had produced here, it
17 looks like if you look at Andrea's 45,000 divided
18 by 12. When you look at the DUR report, it's
19 only a four-month period of time. It's not a
20 12-month period of time.

21    Q.    Were you supposed to look at a
22 12-month period of time to determine whether a
23 threshold exception was appropriate?

24    A.    It all depends.

Page 145

1    Q.    Why did you feel the need to
2 point out that this was only a four-month period
3 of time here?

4    A.    The four-month period of time
5 increases the amount of dosage units that would
6 have been dispensed in that -- for that period of
7 time. So instead of taking the 45,000 and
8 dividing it by 12 months, the usage for that
9 store would have been the 45,000 divided by the
10 four months.

11    Q.    So Andrea Bucher's handwritten
12 note on page 15304 of Exhibit 4 is incorrect
13 then?

14    A.    Yes.

15    Q.    Did you ever go and physically
16 visit a store when you were determining whether
17 or not that store should get a threshold
18 increase?

19    A.    I have visited a store for a
20 threshold increase.

21    Q.    When was that?

22    A.    Within the last three or four
23 years. Obviously we stopped distributing in
24 2014, so it was prior to that. I'm going to say

Page 146

1 probably two years prior to us stopping
2 distributing hydrocodone.
3      Q.    Do you remember where that store
4 was?
5      A.    Brodheadsville, Pennsylvania.
6      Q.    Did you visit that store because
7 it was close to where you were residing at the
8 time?
9           MS. McENROE:  Objection to form.
10          THE WITNESS:  I did not.
11 BY MR. POWERS:
12     Q.    Why did you feel the need to
13 visit that particular store in person?
14     A.    There was a lot of hydrocodone
15 that was dispensed from that particular pharmacy.
16 And we were looking at it as far as the mix of
17 doctors and things along those lines.  And so I
18 went out to visit the store.
19     Q.    Besides that store in
20 Pennsylvania you just mentioned, did you ever go
21 to any other stores in person to determine
22 whether or not they should receive a threshold
23 increase?
24     A.    No.

Page 147

1      Q.    So it was just the one time?
2      A.    Yes.
3      Q.    Did you ever review the
4 percentage of controlled substances dispensed
5 versus the controlled -- percentage of
6 noncontrolled substances dispensed when
7 determining if a store should get a threshold
8 increase?
9      A.    We do.  We did.
10     Q.    How is that reflected?
11     A.    How is it reflected?
12          MS. McENROE:  Objection to form.
13 BY MR. POWERS:
14     Q.    In the documentation for a --
15     A.    Well, it's not in the --
16          MS. McENROE:  Let him finish his
17     question.
18          THE WITNESS:  Oh, sorry, sorry.
19 BY MR. POWERS:
20     Q.    How is the looking at the mix of
21 controlled substances to all dispensing reflected
22 in any written documentation you reviewed to
23 determine whether a store should get a threshold
24 increase?

Page 148

1           MS. McENROE:  Objection to form.
2           THE WITNESS:  It's not reflected
3      in this documentation.
4 BY MR. POWERS:
5      Q.    Did you do that for every store
6 when determining whether the store should get a
7 threshold increase?
8      A.    We did not.
9      Q.    Why did you decide to do it for
10 particular stores and not other stores?
11     A.    We did it based on the volume of
12 the store, the size of the increase that was --
13 they were asking for.  There were different
14 parameters.  Each one of them is a little
15 individual situation.
16     Q.    You said there are different
17 parameters you looked at.
18          What are the parameters you
19 looked at when determining whether a threshold
20 increase was warranted?
21     A.    Primarily what's on this
22 document, but we also look at the store overall.
23 We would look at it to determine if it was up in
24 business overall.

Page 149

1      Q.    When you say we looked at the
2 store overall, who is "we"?
3      A.    Either Andrea or myself, but
4 someone in government affairs.
5      Q.    Anyone else besides Andrea ever
6 look at the stores to determine whether they
7 warranted a threshold increase?
8           MS. McENROE:  Objection to form.
9           THE WITNESS:  I think at some
10     point once we brought Amy Knisely on, she
11     may have looked at threshold increases.
12 BY MR. POWERS:
13     Q.    And these three reports here on
14 the first three pages of Exhibit 4, those only
15 reflect the amount of products ordered.  Right?
16     A.    They do.
17     Q.    So they don't have any insight,
18 those three reports don't have any insight into
19 what doctors are prescribing.  Right?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  They do not.
22 BY MR. POWERS:
23     Q.    They don't have any insight into
24 whether the prescriptions are being dispensed in

Page 150

1 combination with other controlled substances.
2 Right?
3     A.   They do not.
4     Q.   They don't reflect whether these
5 particular prescriptions in dispensing are being
6 done -- are being paid for in cash. Right?
7     A.   They do not.
8     Q.   And besides running these three
9 reports to determine whether a store got a
10 threshold increase, there was no other thing or
11 things that you did every single time a store
12 requested a threshold increase. Right?
13     MS. McENROE: Objection to form.
14     THE WITNESS: Could you repeat
15   the question?
16 BY MR. POWERS:
17     Q.   Sure. I'll break it down a
18 little further.
19     Did you run these three reports,
20 the order history report, the dispensing history
21 and the DUR report, every time a store requested
22 a threshold increase?
23     A.   Yes.
24     Q.   Besides the three reports, did

Page 151

1 you do anything else every single time that a
2 threshold increase was requested?
3     A.   Not every single time.
4     Q.   Individual Rite Aid stores could
5 also order controlled substances, including
6 opioids, from McKesson. Right?
7     A.   That is correct.
8     Q.   Did you ever compare the McKesson
9 ordering history for a particular store when you
10 were determining whether a store could get a
11 threshold increase?
12     MR. POWERS: Objection to form.
13     MR. KELLY: Objection.
14     THE WITNESS: The information
15   that's reflected on these reports, the
16   DUR and the dispensing, would include the
17   McKesson product that was dispensed.
18     So this would be a total of both
19   the distribution center and the McKesson
20   product.
21     So that -- so when you see those
22   numbers there, McKesson was included,
23   because if the McKesson was -- product
24   was dispensed, it would be included in

Page 152

1 the DUR.
2 BY MR. POWERS:
3     Q.   You said included in the DUR.
4     Would it be included in all three
5 reports, including the dispensing history and the
6 store order history in the same manner?
7     A.   Yes.
8     Q.   So if I'm looking at the second
9 page of Exhibit 4 on page 15303, I'm looking
10 there in the left-hand column under "Week
11 Ending," "2010-11-27," and it says the quantity
12 is 2,052.
13     Do you see that?
14     A.   Yes.
15     Q.   So that 2,052 quantity would
16 include the quantity distributed by Rite Aid, but
17 also include the quantity distributed by McKesson
18 as well?
19     MS. McENROE: Objection to form.
20     THE WITNESS: That is correct.
21 BY MR. POWERS:
22     Q.   I should actually clarify that.
23     The quantity of 2,052 would be
24 the total amount dispensed by Rite Aid, supplied

Page 153

1 by both Rite Aid and McKesson. Right?
2     A.   That is correct.
3     MR. KELLY: Objection to form.
4 BY MR. POWERS:
5     Q.   And if you made the decision to
6 adjust a threshold at a particular store, how did
7 you communicate that decision?
8     A.   We would communicate it to the
9 distribution center and to the pharmacy district
10 manager of that particular store, that there
11 would be a threshold increase.
12     Q.   How did you communicate?
13     A.   Typically email. And then we
14 would provide a copy of this documentation to the
15 distribution center for their file as well.
16     Q.   And when you say this
17 documentation, you're referring to the reports
18 reflected in Exhibit 4?
19     A.   Yes.
20     Q.   Why did you provide the
21 documentation to the distribution center?
22     A.   So that if they had a DEA audit,
23 they would be able to provide the DEA the
24 reasoning and the usage to document why it was

Page 154

1  above the 5,000 dosage units.
2         MS. McENROE:  Will, before we
3  move on, if it's a good time for lunch at
4  some point soon, if you'll let us know.
5         MR. POWERS:  Yeah.  Are you okay
6  to do one more document and then we can
7  break for lunch?
8         THE WITNESS:  Sure.
9         MR. POWERS:  Okay.  Actually, you
10 know what, let's just take a break now
11 for lunch.  That's fine.
12        MS. McENROE:  Great.
13        THE VIDEOGRAPHER:  Going off the
14 record at 12:38 p.m.
15                - - -
16        (A luncheon recess was taken from
17 12:38 p.m. to 1:30 p.m.)
18                - - -
19        THE VIDEOGRAPHER:  Back on the
20 record at 1:30 p.m.
21 BY MR. POWERS:
22    Q.    Welcome back, Ms. Hart.
23    A.    Thank you.
24    Q.    You understand that you're still

Page 155

1  under oath.  Right?
2     A.    I do.
3     Q.    Could you turn back to Exhibit 4
4  there for a second.
5         Do you know whether store 3151 --
6  let me back up.
7         These reports are to determine
8  whether store 3151 gets a threshold increase.
9  Right?
10    A.    Correct.
11    Q.    Do you know if store 3151 did in
12 fact get a threshold increase?
13    A.    I know they did.
14    Q.    On the second page of Exhibit 4,
15 the dispensing history there, are those
16 quantities in dosage units?
17    A.    They are.
18    Q.    Why did store 3151 get a
19 threshold increase if all the quantities here are
20 under 5,000 dosage units?
21    A.    There could be a few reasons for
22 that, based on when the order is received.  Just
23 because you have -- just because you dispensed
24 less than 5,000 doesn't mean that there's not a

Page 156

1  flux from day to day to day.  And there could
2  be an order in process where you're not going to
3  get it in a timely manner.
4     Q.    What do you mean, an order in
5  process?
6     A.    If you're going to dispense in a
7  week 4,464, for example, the second number there,
8  you have to have more than 4,464 on your shelf.
9  You could get to that quantity and dispense it,
10 and there may be no additional product on your
11 shelf.  You have to make room for an order that
12 was shipped -- remember an order was once a week.
13 You have to make room for an order that was
14 shipped, allow it to get to the particular
15 pharmacy.  And while it's in transit, you would
16 need more product on your shelf.
17    Q.    So, for example, on the second
18 page of Exhibit 4 there, the middle column there,
19 it says, "Week Ending," and underneath it, it
20 says, "Week Ending," 2010-11-20."  Right?
21    A.    Yes.
22    Q.    And that's 4,154 dosage units.
23 Right?
24    A.    Which one are you at?

Page 157

1     Q.    The week ending 11/20, I believe
2  the number is 4,154.
3     A.    Correct.
4     Q.    So in that instance, that would
5  be the total dispensing for that week in dosage
6  units.  Right?
7     A.    Correct.
8     Q.    So I don't know if you can do the
9  math on the fly here, but it'd approximately be
10 about 846 dosage units left on the shelf after
11 that week.  Right?
12    A.    That is correct.  But it's a
13 moving total from order to order.  So that is
14 what would be on the shelf.  But there's also
15 the movement of it as far as when you get your
16 order, when the order is actually shipped type
17 thing.
18    Q.    So you don't actually have to be
19 ordering over -- or let me strike that.
20        You don't have to be dispensing
21 over the thresholds in dosage units to get a
22 threshold increase; is that correct?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  Typically you would

Page 158

1  look at, from this one here, when the
2  order was received from the store, when
3  it was shipped from the distribution
4  center, and would determine if you needed
5  an increase or not.
6       It's typical that they may not
7  reach that 5,000, but it's also, there
8  are circumstance where they would need
9  more than 5,000.
10 BY MR. POWERS:
11      Q.    How did you make the
12 determination to increase the threshold of that
13 store 3151 based on this data here in Exhibit 4?
14      A.    Andrea Bucher made the decision.
15      Q.    Andrea Bucher made the decision
16 to increase the threshold?
17      A.    Yes, yes.
18      Q.    She said that you made the
19 decision.
20      MS. McENROE:  Objection to form.
21      THE WITNESS:  I'm sorry.  She may
22 have talked to me about it, but this is
23 her calculation and her handwriting on
24 here.

Page 159

1  BY MR. POWERS:
2       Q.    I'm not asking who calculated
3  these numbers or ran these numbers.
4            I'm asking who made the final
5  decision whether or not store 3151 would get a
6  threshold increase.
7       MS. McENROE:  Objection to form.
8  BY MR. POWERS:
9       Q.    Who did that?
10      A.    I don't remember.
11      Q.    Andrea Bucher's testimony was
12 that all she did was run the reports and then
13 handed it off to you and you made the decision.
14      A.    That's quite possible.
15      MS. McENROE:  Objection to form.
16 BY MR. POWERS:
17      Q.    And you don't recall why in this
18 particular instance for store 3151 you gave them
19 a threshold increase?
20      A.    I do not.
21      Q.    Was there often confusion about
22 whether you or Andrea was going to make a
23 decision about whether to give a store a
24 threshold increase?

Page 160

1       MS. McENROE:  Objection to form.
2       THE WITNESS:  Andrea and I
3  discussed threshold increases back in the
4  time when we were distributing controlled
5  substances.  Her office is directly next
6  door to mine.  So it's not unusual for us
7  to discuss threshold increases.
8  BY MR. POWERS:
9       Q.    Who had the ultimate say about
10 whether a store got a threshold increase?
11      A.    I had the ultimate say.
12      Q.    I'm going to hand you what's been
13 marked as Hart Exhibit 5.
14            - - -
15            (Deposition Exhibit No. Rite
16      Aid-Hart-5, Excel Spreadsheet Printout,
17      Bates stamped Rite_Aid_OMDL_0013151, was
18      marked for identification.)
19            - - -
20      THE WITNESS:  Thank you.
21 BY MR. POWERS:
22      Q.    It's, once again, a multiple-page
23 document.  And it --
24      MS. McENROE:  Will, do you have

Page 161

1  the Bates range for this?  And can you
2  represent it's a complete document?
3       MR. POWERS:  That's a good
4  question.
5       I can grab the Bates number
6  range.
7       I believe it's a native Excel
8  sheet, so --
9       MS. McENROE:  And this is the
10 full printout of the full thing?
11      MR. POWERS:  Yes.
12      The Bates number on the document
13 is Rite_Aid_OMDL_0013151.
14      MS. McENROE:  Thank you.
15      And are these different workbooks
16 from the Excel spreadsheet?  Because I'm
17 having a hard time.  It kind of looked
18 like the columns are cut off.
19      MR. POWERS:  I believe there are
20 different tabs in the spreadsheet.
21      MS. McENROE:  Okay.
22      MR. POWERS:  And I'll say right
23 now, I'm not going to get too much into
24 the substance of it, so I don't think

Page 162

1 that will matter about the different
2 cutoffs and things.
3 THE WITNESS: (Reviewing
4 document.)
5 BY MR. POWERS:
6 Q. I realize the formatting might be
7 a little bit off in Exhibit 5, but generally do
8 you recognize what is reflected in Exhibit 5?
9 MS. McENROE: Objection to form.
10 THE WITNESS: I do.
11 BY MR. POWERS:
12 Q. What is Exhibit 5?
13 A. It appears to be an above average
14 report from the distribution center.
15 Q. And that's the same above average
16 report we were talking about before in relation
17 to Exhibit 3. Right?
18 MS. McENROE: Objection to form.
19 THE WITNESS: That is true,
20 though the document is not marked that
21 it's from the Perryman Distribution
22 Center.
23 BY MR. POWERS:
24 Q. How do you know it's from the

Page 163

1 Perryman Distribution Center?
2 A. I don't know that it's from the
3 Perryman Distribution Center.
4 Q. Oh, I see what you're saying.
5 You're saying Exhibit 3 was for
6 Perryman Distribution Center and you're not sure
7 if this threshold log is from Perryman
8 Distribution Center; is that right?
9 A. Correct. Because I didn't see it
10 marked anywhere on the log.
11 Q. Okay. These -- the document in
12 front of you marked as Exhibit 5, can we agree to
13 call that a threshold log?
14 A. Yes.
15 Q. Is that the term that was used in
16 the distribution centers to refer to a document
17 like this, Exhibit 5?
18 MS. McENROE: Objection to form.
19 THE WITNESS: I think there were
20 various terms for it, but all the general
21 term overall.
22 BY MR. POWERS:
23 Q. What were some of the various
24 terms it was referred to as?

Page 164

1 A. Above Average report, tech log,
2 you know, depending on the person.
3 Q. Do you know when the threshold
4 logs were first started to be recorded?
5 MS. McENROE: Objection to form.
6 THE WITNESS: I believe there
7 were always threshold logs at the
8 distribution centers.
9 BY MR. POWERS:
10 Q. When you say "always," do you
11 mean ever since your time at Rite Aid?
12 A. Yes. Well, since the
13 distribution center opened and started servicing
14 the stores.
15 Q. And are you referring to all
16 distribution centers?
17 A. Yes.
18 Q. So all distribution centers since
19 they opened kept threshold logs; is that right?
20 A. To the best of my knowledge, that
21 is.
22 Q. Were all of the distribution
23 centers using the same basic format to keep these
24 threshold logs?

Page 165

1 A. I don't know that.
2 Q. Did you ever review these
3 threshold logs in your position in government
4 affairs?
5 A. I had reviewed some of these
6 logs, yes.
7 Q. Did you review the threshold logs
8 periodically?
9 A. Periodically, yes.
10 Q. Was it on any set schedule?
11 A. A few times a year, quarterly.
12 Q. So every three months
13 approximately. Is that fair?
14 A. Yes. Approximate, yes.
15 Q. Did anyone else review these
16 threshold logs at the corporate office?
17 MS. McENROE: Objection to form.
18 THE WITNESS: I believe Chris
19 Belli and Kevin Mitchell received these
20 logs as well.
21 BY MR. POWERS:
22 Q. Do you know why Kevin Mitchell
23 and Chris Belli received the threshold logs?
24 MS. McENROE: Objection to form.

Page 166

1    THE WITNESS:  To review them and
2  make sure that their personnel and that
3  their associates were doing what they
4  were supposed to be doing.
5  BY MR. POWERS:
6    Q.   How would the threshold logs
7  demonstrate that?
8    A.   Simply having the log, completing
9  the log, making sure that that log is part of the
10 standard operating procedures.
11   Q.   Do you know if they were viewed
12 for any other purpose besides that?
13   MS. McENROE:  Objection to form.
14   THE WITNESS:  I do not know.
15 BY MR. POWERS:
16   Q.   You said you reviewed these logs
17 quarterly.  Right?  Approximately quarterly?
18   A.   Approximately quarterly, yes.
19   Q.   Why were you receiving these
20 logs -- or let me rephrase that.
21   Why were you reviewing these logs
22 quarterly?
23   A.   To look at the quantities
24 ordered, to eyeball the report to see if there

Page 167

1  was any store that stuck out as, you know,
2  continuously appearing on the logs.  Just to look
3  for any abnormalities.
4    Q.   Did you use any set criteria to
5  determine whether a store was ordering out of
6  pattern or was appearing as an abnormality?
7    A.   I did not.
8    Q.   It just was your own feeling
9  about it?
10   A.   And it should also --
11   MS. McENROE:  Objection to form.
12   THE WITNESS:  It should also be
13   noted that not all the drugs on this list
14   are controlled substances.
15 BY MR. POWERS:
16   Q.   Why does that matter?
17   A.   It's -- those -- if they're not a
18 controlled substance, there's no -- they're not
19 subject to quantities or things like that.
20   We have individual standards
21 established for some of the products, but they're
22 not involved in the -- in the distribution of
23 controlled substances.
24   Q.   I was asking before about whether

Page 168

1  you used any criteria to determine whether the
2  store was ordering abnormally.
3    And you said no.  Right?
4    A.   Nope.
5    Q.   So you're just using your own
6  feeling about whether a store is ordering
7  abnormally.  Right?
8    MS. McENROE:  Objection to form.
9    THE WITNESS:  That is correct.
10 BY MR. POWERS:
11   Q.   Was there anyone else who
12 reviewed these logs besides Chris Belli, Kevin
13 Mitchell and yourself?
14   MS. McENROE:  Objection to form.
15   THE WITNESS:  Not that I know of.
16 BY MR. POWERS:
17   Q.   Besides reviewing the logs for
18 abnormalities quarterly, did you use the logs in
19 any other way?
20   A.   Not that I remember.
21   Q.   What would you do if you
22 discovered an abnormality in one of these logs?
23   A.   If I discovered an abnormality in
24 one of the logs, I would reach out to the

Page 169

1  pharmacy district manager and tell them of the
2  order and have them investigate the order and why
3  it was placed.
4    Q.   Did you ever do that?
5    A.   I'm sure I did.
6    Q.   Where would the record of those
7  communications be?
8    MS. McENROE:  Objection to form.
9    THE WITNESS:  Some may be in
10   email.  Some may be verbal.
11 BY MR. POWERS:
12   Q.   When you say verbal, do you mean
13 a phone call?
14   A.   Yes.
15   Q.   When you communicated with the
16 pharmacy district manager about one of these
17 abnormalities that you identified, what would you
18 discuss?
19   MS. McENROE:  Objection to form.
20   THE WITNESS:  I would discuss how
21   the order is placed, what quantity was
22   ordered and was there a need for the
23   increase at the store from the
24   distribution center.  And also was the

Page 170

1  order placed in error, was the order --
2  did there need to be an asset protection
3  investigation, things along those lines.
4  BY MR. POWERS:
5     Q.    Did you make a record of those
6  communications at all?
7     A.    If I did, it would be in email.
8  Typically it may be a phone call.
9     Q.    So besides an email, there was
10 no -- there was no log of these communications
11 that you would have had with the distribution --
12 or, excuse me -- with the individual pharmacy
13 managers about particular stores that you had
14 questions about from the threshold log; is that
15 right?
16    A.    Pharmacy district managers. And
17 that is right.
18    Q.    Do you ever recall noticing
19 abnormalities of stores consistently ordering
20 hydrocodone products?
21    A.    There could be stores that
22 consistently ordered hydrocodone, of course.
23    Q.    But I'm saying in this process
24 we've just talked about, where you contact the

Page 171

1  pharmacy district manager as a result of the
2  threshold log, do you specifically recall any
3  instances where you contacted the pharmacy
4  district manager as a result of hydrocodone
5  orders?
6     A.    I don't remember specific to
7  hydrocodone.
8     Q.    How about specific to any opioid
9  product that Rite Aid distributed?
10       MS. McENROE:  Objection to form.
11       THE WITNESS:  I do not.
12 BY MR. POWERS:
13    Q.    Did you use these threshold logs
14 that you were reviewing quarterly to determine
15 whether particular orders were suspicious orders?
16    A.    I did not.
17    Q.    Do you know if Chris Belli and
18 Kevin Mitchell used these logs to determine if
19 orders were suspicious orders?
20       MS. McENROE:  Objection to form.
21       THE WITNESS:  I do not.
22 BY MR. POWERS:
23    Q.    To be clear, when you got these
24 threshold logs, these orders reflected in the

Page 172

1  threshold logs had already been shipped.
2  Correct?
3     A.    Yes.
4     Q.    I'm going to hand you what's been
5  marked as Rite Aid Exhibit Number -- or Rite
6  Aid_Hart Exhibit Number 6.  It's a multi-page
7  document with the Bates number
8  Rite_Aid_OMDL_46227 through 46319.  It's a pretty
9  long document.  I'm just going to ask you
10 questions about the first page.
11       MS. McENROE:  And, Will, do
12 you -- can you reference this is a
13 complete document?
14       MR. POWERS:  I believe, once
15 again, it's the range that was identified
16 in the interrogatory responses.
17            - - -
18       (Deposition Exhibit No. Rite
19 Aid-Hart-6, Rite Aid Controlled Drug
20 Reporting Above Average Controlled Drug
21 Purchases Report, Bates stamped
22 Rite_Aid_OMDL_0046227 through
23 Rite_Aid_OMDL_0046319, was marked for
24 identification.)

Page 173

1            - - -
2       THE WITNESS:  (Reviewing
3  document.)
4  BY MR. POWERS:
5     Q.    Do you recognize the exhibit
6  reflected -- do you recognize the document
7  reflected in Exhibit 6?
8     A.    I do.
9     Q.    What is this?
10    A.    "Above Average Controlled Drug
11 Purchases Report."
12    Q.    And can you explain what this
13 document -- or how this document was used?
14       MS. McENROE:  Objection to form.
15       THE WITNESS:  I believe asset
16 protection would run this report on a
17 monthly basis to identify where there was
18 the potential for the above average
19 purchase of controlled substances for a
20 particular drug.
21 BY MR. POWERS:
22    Q.    Did you ever review a report like
23 this in Exhibit 6 personally?
24    A.    I don't ever remember reviewing

Page 174

1 this report. I believe it was more asset
2 protection.
3     Q. Do you know if this report was
4 used to determine whether orders were suspicious
5 orders or not?
6         MS. McENROE: Objection to form.
7         THE WITNESS: I do not know that.
8 BY MR. POWERS:
9     Q. Does anyone in government affairs
10 besides yourself regularly review the report as
11 reflected in Exhibit 6?
12         MS. McENROE: Objection to form.
13         THE WITNESS: I do not know if
14     Mr. Krahulec had gotten the report prior
15     to me coming on. And I'm not sure of
16     that.
17 BY MR. POWERS:
18     Q. But to the best of your personal
19 knowledge, in the time that you were in
20 government affairs, no one else in government
21 affairs reviewed reports like the one represented
22 in Exhibit 6?
23         MS. McENROE: Objection to form.
24         THE WITNESS: That is correct.

Page 175

1 BY MR. POWERS:
2     Q. So I asked you a little while ago
3 whether or not Rite Aid had a suspicious order
4 monitoring program. Right?
5     A. Yes.
6     Q. And we've talked about a couple
7 different documents so far.
8     And in addition to the documents
9 I've shown you, we've talked about the NaviScript
10 system and the order replenishment system.
11 Right?
12     A. Yes.
13     Q. Is there anything else that we
14 have not talked about that you would consider
15 part of Rite Aid's suspicious order monitoring
16 system?
17         MS. McENROE: Objection to form.
18         THE WITNESS: Did you mention the
19     threshold at the distribution center?
20 BY MR. POWERS:
21     Q. I meant to include that in the
22 documents that we were talking about.
23     A. Okay.
24     And I would include, we talk

Page 176

1 about NaviScript and NaviCase, but that would be
2 the asset protection team at the corporate office
3 that would be involved in that as well.
4     Q. So we've discussed all the facets
5 of the Rite Aid suspicious order monitoring
6 program so far; is that correct?
7         MS. McENROE: Objection to form.
8         THE WITNESS: That I can recall,
9     yes.
10 BY MR. POWERS:
11     Q. And to be clear, we've talked
12 about the -- the operating procedure in -- which
13 was entitled either Excessive Order Monitoring or
14 Suspicious Order Monitoring, and that was
15 represented in Exhibits 1 and 2. Right?
16     A. Correct.
17     Q. We talked about the controlled
18 drug above average order monitoring program
19 policy and procedure reflected in Exhibit 3.
20 Right? That's the one used at the Perryman
21 Distribution Center?
22         MS. McENROE: Objection to form.
23         THE WITNESS: Yes, that is
24     correct.

Page 177

1 BY MR. POWERS:
2     Q. We've talked about the reports
3 run to increase the threshold amount and the
4 process to increase the threshold amount for
5 particular stores. Right?
6     A. Yes, we have.
7     Q. And we've talked about the 5,000
8 dosage unit threshold. Right?
9     A. Yes, we have.
10     Q. And we've talked about the auto
11 replenishment system and the NaviScript/Navi --
12 the Navi systems. Right?
13         MS. McENROE: Objection to form.
14         THE WITNESS: Yes, we have.
15 BY MR. POWERS:
16     Q. And that -- those things I just
17 mentioned, those are all the elements to the Rite
18 Aid suspicious order monitoring program.
19 Correct?
20         MS. McENROE: Objection to form.
21 BY MR. POWERS:
22     Q. And actually, let me back up.
23     We also talked about the
24 threshold logs, too. Right?

Page 178

1    A.    That is correct.
2    Q.    So all those things I just
3  mentioned, as reflected in Exhibits 1 through 5
4  and as well as the NaviScript system, the auto
5  replenishment system and the threshold of 5,000
6  dosage units, those elements fully represent the
7  Rite Aid suspicious order monitoring system.
8  Right?
9        MS. McENROE:  Objection to form.
10       THE WITNESS:  That I can recall
11    at this time.
12 BY MR. POWERS:
13    Q.    Are you familiar with the Buzzeo
14  company?
15    A.    I am.
16    Q.    Is it also called -- I don't know
17  how to pronounce this exactly, but Cegedim?
18    A.    I am.
19    Q.    It's the same company?
20    A.    (Witness nods head.)
21    Q.    You have to answer --
22    A.    Yes.  I'm sorry, yes.
23    Q.    So if we just refer to it --
24  throughout our discussion, I can just refer to it

Page 179

1  as the Buzzeo company, we'll know what we're
2  talking about?
3    A.    That's fine, yes.
4    Q.    What kind of services did Buzzeo
5  offer?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  Ron Buzzeo offered
8     services related to regulatory compliance
9     with DEA rules and regulations.  There
10    was a wealth of services that Ron and his
11    company offered.
12       They offered a program to go into
13    pharmacies and review the pharmacies as
14    far as compliance with DEA rules and
15    regulations.  They offered programs on
16    suspicious order monitoring.  They
17    ordered up programs on how to detect
18    theft and diversion.  There was a wide
19    gamut of programs that they had offered
20    related to controlled substances.
21 BY MR. POWERS:
22    Q.    Did Rite Aid ever use any of
23  those Buzzeo services?
24    A.    I believe we did, yes.

Page 180

1    Q.    What was the extent of Rite Aid's
2  use of Buzzeo services?
3    A.    Our logistics teams utilized
4  Buzzeo services to review and inspect the
5  distribution centers for compliance.
6    Q.    Are you referring to audits when
7  you say review and inspect?
8        MS. McENROE:  Objection to form.
9        THE WITNESS:  Define what you
10    mean by "audit."
11 BY MR. POWERS:
12    Q.    There's been testimony that
13  Buzzeo company came in and audited the Perryman
14  Distribution Center at some point in time.
15       Is that the same thing you're
16  referring to when you say reviewed and inspected?
17       MS. McENROE:  Objection to form.
18       THE WITNESS:  I guess there's two
19    terms for the definition "audit."
20       There's an audit of everything in
21    the entire distribution center, from
22    paperwork to security to everything along
23    those lines.  And then there's an
24    individual audit for like specific

Page 181

1  controlled substances, so that you would
2  balance when a controlled substance came
3  in and when it came out to make sure that
4  all the drugs in the distribution center
5  were accounted for.  So, yes, I would say
6  that would be an audit.
7  BY MR. POWERS:
8    Q.    Did Buzzeo ever perform audits on
9  Rite Aid facilities, as you just described an
10  audit?
11    A.    I believe he did at the Perryman
12  Distribution Center.
13    Q.    Do you know when that was?
14    A.    I don't remember.
15    Q.    Were you involved in that process
16  of Buzzeo auditing the Perryman Distribution
17  Center?
18    A.    I was not.
19    Q.    You also mentioned that Buzzeo
20  had conferences.  Right?
21    A.    I don't think I mentioned
22  conferences.
23    Q.    Did Buzzeo have conferences?
24    A.    Buzzeo had conferences.

Page 182

1    Q.    Did you ever attend any of the
2  Buzzeo conferences personally?
3    A.    I may have attended one
4  conference when I first came into government
5  affairs, but that was pretty much the extent of
6  my attending Buzzeo conferences.
7    Q.    Do you know if anyone else from
8  Rite Aid attended Buzzeo conferences?
9    A.    Yes.  Members of the logistics
10  team would attend the conferences.
11    Q.    Who from the logistics team would
12  attend the Buzzeo conferences?
13    A.    It varied from year to year, but
14  typically either the person that was in the
15  position of Kevin Mitchell or Chris Belli.  I
16  know that occasionally the DEA coordinators would
17  attend the Buzzeo conference.
18    Q.    When you say "DEA coordinators,"
19  you're talking about distribution center
20  employees?
21    A.    Yes.
22    Q.    I am going to hand you what's
23  been marked as Exhibit 7.  It's a one-page email
24  Bates stamped Rite_Aid_OMDL_0050632.

Page 183

1         - - -
2         (Deposition Exhibit No. Rite
3    Aid-Hart-7, Email chain, top one dated
4    2010-11-16, Bates stamped
5    Rite_Aid_OMDL_0050632, was marked for
6    identification.)
7         - - -
8  BY MR. POWERS:
9    Q.    In Exhibit 7 there, it looks like
10  an email chain between you and Kevin Mitchell in
11  2010; is that right?
12    A.    That is correct.
13    Q.    And in the second to last email
14  on -- towards the top of the page on Exhibit 7,
15  Kevin Mitchell writes to you, Janet Hart, and
16  says, "When I get back to the office next week,
17  we need to talk about Suspicious order
18  monitoring... at Buzzeo's conference last week
19  and what we have in place probably isn't
20  sufficient anymore.  I'll give you a shout so
21  that we can 'brain-storm.'"
22         Do you see that?
23    A.    I do.
24    Q.    So from this email, I take it

Page 184

1  that Kevin Mitchell went to a Buzzeo conference.
2  Correct?
3    A.    It appears so.
4    Q.    Do you know who decided who was
5  able to go to the Buzzeo conferences?
6    A.    I don't know.  I was a different
7  department from logistics, and since logistics
8  had jurisdiction over the cage, they would
9  decide.  If I chose to go, I would ask my boss
10  and say, can I go to the Buzzeo concert --
11  conference.
12    Q.    And it looks like Kevin Mitchell
13  is -- wants to talk to you about suspicious order
14  monitoring, because he thinks that what Rite Aid
15  has in place isn't sufficient anymore.  Right?
16         MS. McENROE:  Objection to form.
17         THE WITNESS:  That's what's on
18    the communication.
19  BY MR. POWERS:
20    Q.    And then you respond to him at
21  the top there, "Sounds good."  Right?
22    A.    Correct.
23    Q.    And the date on that email in
24  Exhibit 7 is November 2010.  Right?

Page 185

1    A.    Yes.
2         - - -
3         (Deposition Exhibit No. Rite
4    Aid-Hart-8, Email chain, top one dated
5    2010-11-17, Bates stamped
6    Rite_Aid_OMDL_0050633, was marked for
7    identification.)
8         - - -
9  BY MR. POWERS:
10    Q.    I'm going to hand you what's been
11  marked as Exhibit 8.  It is another email, one
12  page, with Bates number Rite_Aid_OMDL_0050633.
13         Exhibit 8, the bottom email there
14  is from you, Janet Hart, to Maggie Perritt, Kevin
15  Mitchell, Andrew Palmer.  And it looks like you
16  copied yourself as well.  Right?
17    A.    Yes.
18    Q.    And the subject line of that
19  email is "Suspicious Monitoring."  Right?
20    A.    Yes.
21    Q.    And you're asking that group of
22  people you sent the email to, "Can we" have a
23  "meeting at 10:30?  I have a meeting at the
24  capitol at 9."

Page 186

1        Do you see that?

2    A.    Yes.

3    Q.    Do you know if this meeting

4 you're referring to in Exhibit 8 is a follow-up

5 to Kevin Mitchell's email on Exhibit 7 about

6 wanting to talk about Rite Aid's suspicious order

7 monitoring?

8    A.    I believe so.

9    Q.    And why did you send this to

10 Maggie Perritt?

11       Am I pronouncing her name

12 correctly?

13    A.    Yeah, you're pronouncing it

14 correctly.

15    Q.    Why did you send this email about

16 suspicious order monitoring to Maggie Perritt?

17    A.    Maggie Perritt was in pharmacy

18 operations and was knowledgeable of the

19 suspicious order monitoring algorithm and how the

20 system worked.

21    Q.    When you say "suspicious order

22 monitoring algorithm," what are you referring to?

23    A.    The algorithm for placing the

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 187

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 to place the order.

3    Q.    Is that also the auto

4 replenishment system that we talked about before?

5    A.    Yes.

6    Q.    Why are you referring to it as a

7 suspicious order monitoring system?

8       MS. McENROE:  Objection, form.

9       THE WITNESS:  In this one, since

10    it's under suspicious monitoring, that's

11    why I was referring to that, is that --

12    because that was the title of this

13    particular meeting and she was bringing

14    that aspect of it into it.

15 BY MR. POWERS:

16    Q.    So Maggie Perritt was the expert

17 on the auto replenishment system that was invited

18 to the suspicious order monitoring meeting; is

19 that right?

20       MS. McENROE:  Objection to form.

21       THE WITNESS:  From the pharmacy

22    operations side, yes.

23 BY MR. POWERS:

24    Q.    And then we talked about Kevin

Page 188

1 Mitchell.

2       Who was Andrew Palmer?

3    A.    Andrew Palmer was a director in

4 asset protection at the time, I believe.

5    Q.    Why did you invite him to this

6 meeting about suspicious order monitoring?

7    A.    Because he was also key as part

8 of it as well.  Him and his team were involved

9 with the analytics related to asset protection

10 and the analytics related to the key performance

11 indicators that were looked at from the asset

12 protection side.

13    Q.    How did you use the -- let me

14 back up.

15       Did you use the asset protection

16 analytics to determine whether orders were

17 suspicious or not?

18       MS. McENROE:  Objection to form.

19       THE WITNESS:  We used the asset

20    protection analytics to review orders and

21    look for abnormalities.  We did not use

22    the analytics from asset protection prior

23    to an order being shipped.

24 BY MR. POWERS:

Page 189

1    Q.    So you only used the asset

2 protection analytics after the order was shipped;

3 is that right?

4    A.    To the best of my knowledge, yes.

5    Q.    And at this meeting referred to

6 in Exhibit 8, do you know what was discussed

7 about why Kevin Mitchell thought that the Rite

8 Aid suspicious order monitoring wasn't sufficient

9 anymore?

10       MS. McENROE:  Objection to form.

11       THE WITNESS:  Can you ask that

12    question again?

13 BY MR. POWERS:

14    Q.    Sure.

15       We saw in Exhibit 7 Kevin

16 Mitchell saying that Rite Aid's suspicious order

17 monitoring system probably isn't sufficient

18 anymore.

19       Do you recall that?

20    A.    I do.

21    Q.    Okay.  And then you eventually

22 had a meeting to discuss the suspicious order

23 monitoring program at Rite Aid.  Right?

24    A.    It appears so, yes.

Page 190

1    Q.    And Kevin Mitchell was at that
2  meeting.  Right?
3    A.    Yes.
4    Q.    What did Kevin Mitchell -- why
5  did Kevin Mitchell think that the Rite Aid
6  suspicious order monitoring program wasn't
7  sufficient anymore?
8         MS. McENROE:  Objection to form.
9         THE WITNESS:  I think Kevin's
10        thought process on the meeting and what
11        he wanted to discuss was that the 5,000
12        tablet dosage limit was not sufficient to
13        be a suspicious order monitoring program.
14        At the meeting, what was discussed and
15        why I invited Andy Palmer and Maggie
16        Perritt is everybody had a piece of the
17        puzzle, but everybody was not on the same
18        page.  So we had to put everybody on the
19        same page as far as the program, to
20        understand the program in its entirety.
21 BY MR. POWERS:
22    Q.    Who was in charge of the program
23  in its entirety?
24         MS. McENROE:  Objection to form.

Page 191

1         THE WITNESS:  Kevin Mitchell.
2  BY MR. POWERS:
3    Q.    So the person who was in charge
4  of the program in its entirety didn't understand
5  it; is that right?
6         MS. McENROE:  Objection to form.
7         THE WITNESS:  I didn't say he
8        didn't understand it.  I said he -- or I
9        meant he didn't understand all of the
10        components.
11 BY MR. POWERS:
12    Q.    So the person in charge of the
13  program did not understand all of the components
14  of the program; right?
15        MS. McENROE:  Objection to form.
16        THE WITNESS:  I believe that to
17        be true.
18 BY MR. POWERS:
19    Q.    Did you make any changes as a
20  result of this meeting in 2011 to the suspicious
21  order monitoring program at Rite Aid?
22    A.    I do not believe so.
23    Q.    What roles did Andy Palmer and
24  Maggie Perritt play in the suspicious order

Page 192

1  monitoring program?
2         MS. McENROE:  Objection to form,
3        asked and answered.
4  BY MR. POWERS:
5    Q.    Let me back up and let me break
6  that question down.
7         What role did Andy Palmer play in
8  the suspicious order monitoring program?
9    A.    Andy Palmer brought the asset
10  protection portion of the program.
11    Q.    And when you say asset
12  protection, that refers to theft or loss of
13  physical product; is that correct?
14        MS. McENROE:  Objection to form.
15        THE WITNESS:  Asset protection
16        was not just simply theft or loss of
17        product.  Asset protection had many KPIs
18        at their fingertips in order to look at
19        ordering parameters from a store, in
20        order to look at, from a store
21        perspective, cycle counts down.  In a
22        store, there was various things that they
23        looked at and developed in response to
24        ordering and cycle counts.

Page 193

1  BY MR. POWERS:
2    Q.    But those -- I think you said
3  those asset protection analytics were not used to
4  identify suspicious orders, were they?
5         MS. McENROE:  Objection to form.
6         THE WITNESS:  They were used to
7        look at ordering of the stores and
8        identify abnormalities after the fact.
9  BY MR. POWERS:
10    Q.    So is the answer no, they were
11  not -- the analytics were not used to identify
12  suspicious orders.  Right?
13        MS. McENROE:  Objection to form.
14        THE WITNESS:  They were not
15        utilized to identify suspicious orders.
16 BY MR. POWERS:
17    Q.    And Maggie Perritt's role at that
18  meeting reflected in Exhibit 8 was to be the
19  expert on auto replenishment system.  Right?
20    A.    That is correct.
21    Q.    I'm going to hand you what's been
22  marked as Hart Exhibit 9.
23              - - -
24         (Deposition Exhibit No. Rite

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    Aid-Hart-9, Email chain top one dated
2    Email dated 2010-04-11, Bates stamped
3    Rite_Aid_OMDL_0050628 through
4    Rite_Aid_OMDL_0050630, was marked for
5    identification.)
6            - - -
7 BY MR. POWERS:
8    Q.    This is Rite_Aid_OMDL_0050628
9 through 0050630.  Take a look at that.
10   A.    (Reviewing document.)
11   Q.    So Exhibit 9 looks like an email
12 exchange.
13          And it's an email at the top
14 there of Exhibit -- the first page of Exhibit 9
15 that is forwarded from Kevin Mitchell to you,
16 Janet Hart, in 2011.  Correct?
17   A.    Yes.
18   Q.    And the title of the email is
19 "Suspicious Order Monitoring."  Right?
20   A.    Yes.
21   Q.    And it looks like Kevin Mitchell
22 is forwarding you an email from Kimberly Birklin.
23 Correct?  There at the second email on the first
24 page?

Page 195

1    A.    Yes.
2    Q.    Who is Kimberly Birklin?
3    A.    Kimberly Birklin was the DEA
4 coordinator for the Liverpool Distribution
5 Center.
6    Q.    And also in that email from
7 Kimberly Birklin, she copies Beth Mawhinney.
8          Do you know who that is?
9    A.    Yes.  I believe it's another
10 individual at the Liverpool Distribution Center.
11   Q.    And Kimberly appears to be asking
12 about "SOM procedures for our building."  And she
13 says, "Do you know if we are moving in this
14 direction for our order management system?"
15          Do you see that?
16   A.    I do.
17   Q.    And she puts a link there, and it
18 looks like it's a link to Cegedim.com.  Right?
19   A.    Yes.
20   Q.    And then on the next page of
21 Exhibit 9, it looks like there's a screenshot she
22 included in her email.  And it looks like it's a
23 screenshot of a -- it looks like it's a
24 suspicious order monitoring program there,

Page 196

1 doesn't it?
2    A.    Yes.
3    Q.    And this Cegedim page, this is
4 also the same thing as the Buzzeo company we've
5 been discussing.  Correct?
6    A.    Yes.
7    Q.    And Kevin Mitchell forwards this
8 email from Kimberly Birklin to you, Janet Hart,
9 asking, "We never put anything in writing for
10 this... can we?"
11          Do you see that?
12   A.    I do.
13   Q.    Do you know what Kevin Mitchell
14 was referring to there about putting something in
15 writing?
16   A.    I believe after Andy, Maggie,
17 Andy and myself and Kevin got together and
18 determined that our suspicious order monitoring
19 program was in fact compliant, Kevin wanted a
20 document to provide to the distribution centers
21 of the program, so that if they were -- had a DEA
22 inspection, they would be able to provide an
23 outline.
24   Q.    You said that you determined that

Page 197

1 the Rite Aid system was compliant.
2          How did you make that
3 determination?
4    A.    We looked at the different
5 components of it and determined that, because of
6 the Code of Federal Regulations, the DEA not
7 providing true guidance on a suspicious order
8 monitoring program, we met the -- we met the
9 requirements of that.
10   Q.    What do you mean by the DEA --
11 when you said the DEA did not provide true
12 guidance?
13   A.    The DEA did not put out what an
14 order -- a suspicious order monitoring program
15 should look at exactly.  They would say that it
16 should meet your book of business, but they never
17 put out a list of -- suspicious order monitoring
18 must be numbers 1 through 8 that you must have in
19 your program.
20   Q.    Did you look at anything else
21 besides the Code of Federal Regulations itself to
22 determine that your suspicious order monitoring
23 system was compliant?
24   A.    I don't remember if we did or

Page 198

1  not.
2      Q.    Did you look at any Buzzeo
3  materials to determine whether it was compliant
4  or not?
5      A.    We did not.
6      Q.    Did you look at other
7  distributors' suspicious order monitoring
8  programs to determine whether your Rite Aid
9  system was compliant?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  We did not, from
12     the perspective of our system was
13     different than other distributors and our
14     system was different from the Buzzeo
15     programs that were offered in the fact
16     that we were a closed system.  Part of
17     other distributors that are out there,
18     their system was know -- part of it is
19     know your customer, where obviously we
20     know our customer.  And so we looked at
21     it from that approach.
22  BY MR. POWERS:
23      Q.    When you say you know your
24  customer, are you referring to the customers as

Page 199

1  the individual Rite Aid stores?
2      A.    I am.
3      Q.    So in your view, you never got
4  DEA guidance on the sufficiency of Rite Aid's
5  suspicious order monitoring program; is that
6  right?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  We never got DEA
9     guidance.
10              - - -
11         (Deposition Exhibit No. Rite
12     Aid-Hart-10, Email dated 2011-06-03,
13     Bates stamped Rite_Aid_OMDL_0050634, was
14     marked for identification.)
15              - - -
16  BY MR. POWERS:
17      Q.    I'm going to hand you what's been
18  marked as Exhibit 10.  The Bates number on this
19  document is Rite_Aid_OMDL_0050634.
20      A.    (Reviewing document.)
21      Q.    So the exhibit marked as
22  Exhibit 10 looks like an email from Kevin
23  Mitchell to you, Janet Hart.
24         And it's dated 2011, June 3rd.

Page 200

1  Right?
2      A.    Yes.
3      Q.    Kevin Mitchell writes to you, "We
4  need to get the explanation on suspicious order
5  monitoring in writing.  I Thought Maggie was
6  going to put something in writing.  Did you ever
7  get anything?"
8         Do you see that?
9      A.    I do.
10      Q.    What is this email referencing?
11      A.    I believe it's referencing the
12  previous -- one of the previous emails that we
13  went over, as far as getting together a one-page
14  document to provide to the distribution centers
15  for their DEA inspections.
16      Q.    Do you know if that document was
17  ever put together?
18      A.    To the best of my knowledge, it
19  was not.
20      Q.    Do you know what would have been
21  included in such a document?
22         MS. McENROE:  Objection to form.
23         THE WITNESS:  All of the
24     components of what we've been discussing,

Page 201

1     the thresholds, automatic -- auto
2     replenishment, the asset protection piece
3     of the program.
4  BY MR. POWERS:
5      Q.    Do you know why Maggie Perritt
6  never put that document together?
7      A.    I believe she left the company.
8      Q.    And no one else did it instead of
9  Maggie Perritt?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  I believe there was
12     a lapse somewhere in the process to
13     replace her.  It wasn't an automatic
14     person that came on board.
15         MS. McENROE:  When you got a
16     chance, we have been going about an hour,
17     for a quick break.
18         MR. POWERS:  Okay.  I got it.
19     Just a couple more questions on this
20     line.
21         MS. McENROE:  Sure.
22              - - -
23         (Deposition Exhibit No. Rite
24     Aid-Hart-11, Email chain, top one dated

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    2002-05-14, Bates stamped
2    Rite_Aid_OMDL_0046770 through
3    Rite_Aid_OMDL_0046789, was marked for
4    identification.)
5            - - -
6    BY MR. POWERS:
7        Q.    I should have asked you.
8            Are you okay to go a few more
9    minutes?
10       A.    (Witness nods head.)
11       Q.    I'm going to hand you what's
12   marked Exhibit 11.  It's a document, an email and
13   attachment, Bates number Rite_Aid_OMDL_0046770
14   through 46789.
15       A.    (Reviewing document.)
16       Q.    Are you familiar with the
17   document in Exhibit 11?
18       A.    (Reviewing document.)
19       Q.    I'll say that I'm not going to
20   ask you direct questions about the email
21   attachment.
22           I'm just saying, are you
23   generally familiar with this document in
24   Exhibit 11?

Page 203

1        A.    Yes.
2        Q.    It looks like in the first page,
3    on the first and second page, the emails,
4    Exhibit 11, it looks like the first one in the
5    string is from Gerald Haas to a group of people.
6            Do you see that?
7        A.    Yes.
8        Q.    At the bottom of the first page?
9        A.    Yes.
10       Q.    Who is Gerald Haas?
11       A.    I don't remember Gerald.
12       Q.    He says, "Attached is a
13   presentation that was given to me by the
14   Liverpool DEA team from their recent" attendant
15   "at a conference."
16           Do you see that?
17       A.    I do.
18       Q.    And then right above Gerald's
19   email, William Miller emails the same -- forwards
20   the same email and the attached presentation to
21   Sophia Lai.  Right?
22       A.    That is correct.
23       Q.    And Sophie Lai then goes -- goes
24   ahead and forwards on that same email to you

Page 204

1    above that.  Right?
2        A.    That is correct.
3        Q.    And then you -- then you forward
4    it on to Christopher Belli at the very top there.
5            Do you see that?
6        A.    Yes.
7        Q.    Why did you forward this along to
8    Christopher Belli?
9        A.    At this particular time, Chris
10   Belli had replaced Kevin Mitchell and was
11   responsible for the DEA coordinators and
12   logistics side of it.
13       Q.    And you ask Christopher Belli,
14   "Did you set up the webinar and/or visit?"
15           Do you see that?
16       A.    I did.
17       Q.    What were you referring to when
18   you said that?
19       A.    I don't remember.
20       Q.    And it looks like the attachment
21   to the email is another document from the Cegedim
22   organization.  Right?
23       A.    Yes.
24       Q.    And that's the same one we've

Page 205

1    been talking about, the Buzzeo people.  Right?
2        A.    Yes.
3        Q.    So were you asking whether or not
4    Chris Belli was setting up webinars and visits
5    with the Buzzeo folks?
6        A.    It could be.
7        Q.    Do you know if he ever did that?
8        A.    I don't remember.
9            Before we go back to -- go to
10   another document, may I go back and expand upon
11   an answer to a past question?
12       Q.    Sure.
13       A.    You had asked me the question,
14   had Rite Aid seeked guidance from the DEA or had
15   gotten any comments from the DEA.
16           The Perryman Distribution Center
17   was inspected by the DEA in 2005, 2009 and 2012.
18   As the standard operating procedures and the
19   suspicious order monitoring programs were
20   reviewed at all of those times, and there was no
21   deficiencies noted.  I just wanted to make that
22   part of the record, to say -- when I say we
23   didn't seek DEA guidance, but we had the DEA that
24   went to the distribution centers and did some

Page 206

1 inspections.
2     Q.     Were you present at any of those
3 DEA audits?
4     A.     I was not.
5     Q.     So you don't have any firsthand
6 knowledge of those audits, do you?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  I have -- there's
9     various emails and communications from
10     the individuals that were at the DEA
11     audits.
12 BY MR. POWERS:
13     Q.     But you didn't talk to any of the
14 DEA agents who did the inspections, did you?
15     A.     Not that I remember.
16     Q.     So all the information that you
17 learned about those DEA audits was from someone
18 at the distribution center itself?
19     A.     That is correct.
20         MS. McENROE:  Will, before we
21     move to another document, can we take a
22     comfort break?
23         MR. POWERS:  Sure.
24         THE VIDEOGRAPHER:  Going off the

Page 207

1     record at 2:30.
2             - - -
3         (A recess was taken from
4     2:30 p.m. to 2:51 p.m.)
5             - - -
6         THE VIDEOGRAPHER:  Back on the
7     record at 2:51 p.m.
8 BY MR. POWERS:
9     Q.     Right before the break we were
10 talking about DEA inspectors.  Right?
11     A.     Yes.
12     Q.     Do you know any DEA inspectors
13 personally?
14     A.     I know a lot of DEA inspectors.
15     Q.     Do you know any DEA -- do you
16 know -- let me back up here.
17         Those DEA inspectors that you
18 know personally, do you know any of them who
19 audited the Perryman Distribution Center?
20     A.     I do know one of the DEA agents
21 that audited Perryman.
22     Q.     Who was that?
23     A.     Doug -- Don Tush.
24     Q.     How do you know Don Tush?

Page 208

1     A.     When I had the Baltimore market,
2 that was also Don's area from the DEA.  So he
3 would visit stores or seek prescriptions, things
4 like that.
5     Q.     When you say you had the
6 Baltimore market, what time period was that from?
7     A.     That was prior to 1995 when I
8 moved into the corporate office.
9     Q.     So you knew him from your time in
10 Baltimore.  Right?
11     A.     I did.
12     Q.     So that would have been sometime
13 before '95.  Right?
14     A.     Yes.
15     Q.     So you knew Don Tush for a while
16 before he audited the Perryman facility in 2012.
17 Right?
18         MS. McENROE:  Objection to form.
19         THE WITNESS:  Yes.  But then I
20     moved out of the area to Camp Hill.
21 BY MR. POWERS:
22     Q.     I'm going to hand you what's been
23 marked as Hart Exhibit 12.  It's some emails with
24 the Bates stamp Rite_Aid_OMDL_0013345 through

Page 209

1 3346.
2             - - -
3         (Deposition Exhibit No. Rite
4     Aid-Hart-12, Email chain, top one dated
5     2012-07-11, Bates stamped
6     Rite_Aid_OMDL_0013345 and
7     Rite_Aid_OMDL_0013346, was marked for
8     identification.)
9             - - -
10 BY MR. POWERS:
11     Q.     Take a look at that.
12     A.     (Reviewing document.)
13     Q.     Looking at Exhibit 12, it looks
14 like this is an email exchange between -- or
15 starting with, on the second page of Exhibit 12,
16 starting with an email from Chris Belli to you
17 copying Rick Chapman and Keith Frost.  Right?
18     A.     Yes.
19     Q.     And it looks that Chris Belli is
20 letting you know that the DEA just arrived in
21 Perryman for an inspection.  Right?
22     A.     Yes.
23     Q.     And that inspection he's
24 referring to in this email in Exhibit 12, that's

Page 210

1 the 2012 audit by the DEA of the Perryman
2 facility?
3     A.    Yes.
4     Q.    Then on the first page of Exhibit
5 12, the second email from the bottom is from
6 Keith Frost to you and Christopher Belli.  Right?
7     A.    Yes.  And Rick Chapman.
8     Q.    And copying Rick Chapman.  Right.
9         And in that email, Keith Frost
10 says, "Janet, Donald Tush sends his regards."
11        Do you see that?
12     A.    I do.
13     Q.    And then you respond to Keith's
14 email by saying, immediately above that, "Did all
15 go OK?  I have known him a long time....send mine
16 to him as well."
17        Do you see that?
18     A.    I do.
19     Q.    So you knew Donald Tush well
20 enough that he was sending his regards to you.
21 Right?
22     A.    Yes.  We worked very closely on
23 many matters, even to this day.
24     Q.    Do you consider Donald Tush a

Page 211

1 personal friend?
2     A.    No.
3     Q.    And you also send your regards
4 back to Don Tush.  Right?
5     A.    I did.
6     Q.    Did you ever discuss this audit
7 with Don Tush?
8     A.    I did not.
9     Q.    Did you ever discuss the 2012
10 audit with any DEA employee?
11     A.    I did not.
12     Q.    You can put that exhibit to the
13 side.
14        Before the break, we were also
15 talking about the Buzzeo organization.  Correct?
16     A.    Correct.
17     Q.    And the Buzzeo organization had
18 expertise in things like suspicious order
19 monitoring.  Correct?
20        MS. McENROE:  Objection to form.
21        THE WITNESS:  I'm not sure that I
22        would say that they had expertise.  I
23        think they had presentations and
24        programs.  I'm not sure they had

Page 212

1 expertise.
2 BY MR. POWERS:
3     Q.    Do you know if the Buzzeo
4 organization had former DEA employees in its
5 employment?
6     A.    They did.
7     Q.    Rite Aid used the Buzzeo
8 organization to perform some audits at the
9 distribution center, at least the distribution
10 center in Perryman.  Right?
11     A.    We did.
12     Q.    So if Buzzeo did not have the
13 expertise, why did you allow -- why did Rite Aid
14 allow Buzzeo to come do audits?
15        MS. McENROE:  Objection.
16        THE WITNESS:  He was -- the
17        Buzzeo organization had knowledge of the
18        rules and laws and regulations.  And many
19        times, it's much better to have someone
20        with eyes from the outside come in and
21        look at your operations and do an audit
22        and review, as a second set of eyes
23        looking at your policies and procedures.
24 BY MR. POWERS:

Page 213

1     Q.    Do you consider Buzzeo's
2 knowledge of the rules and laws and regulations
3 not to be expertise?
4        MS. McENROE:  Objection to form.
5        THE WITNESS:  I think they are
6        one of the industry-leading companies
7        that have products that they sell to
8        pharmacies and distribution centers to go
9        out and do audits and accountabilities.
10        - - -
11        (Deposition Exhibit No. Rite
12        Aid-Hart-13, Email dated 2012-05-18,
13        Bates stamped Rite_Aid_OMDL_0046855
14        through Rite_Aid_OMDL_0046875, was marked
15        for identification.)
16        - - -
17 BY MR. POWERS:
18     Q.    I'm going to hand you what's been
19 marked Rite Aid-Hart Exhibit 13.  The Bates
20 number on this exhibit is Rite_Aid_OMDL_46855
21 through 46875.  It's an email and an attachment.
22        Why don't you take a look at
23 that.
24     A.    (Reviewing document.)

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    Q.    Once again, this is a multi-page
2  document.  I'm going to tell you, I'm going to
3  ask questions about the email and only particular
4  pages in the attachment, if that helps your
5  review.
6    A.    Pardon me.  The first page and
7  what other pages?
8    Q.    Please feel free to review the
9  attachments to the extent you need to, but I will
10 only be asking questions about a couple
11 particular pages that we can -- that I can
12 identify to you when we get to them.
13   A.    Okay.
14        (Reviewing document.)
15   Q.    So the first page of Exhibit 13,
16 it looks like an email.  Right?
17   A.    Yes.
18   Q.    It looks like it's from someone
19 named Dave Jakubowski at Cegedim; is that right?
20   A.    Yes.
21   Q.    Who is Dave Jakubowski?
22   A.    I'm going to guess a salesperson.
23   Q.    This email was addressed to you
24 and Chris Belli.  Correct?

Page 215

1    A.    Yes.
2    Q.    And the email starts, "Hello
3  Janet and Chris, Once again, thanks for taking
4  time from your busy schedules to participate in
5  our SOM presentation and discussion this
6  morning."
7         Do you see that?
8    A.    I do.
9    Q.    And in there when it says "SOM,"
10 I take that to mean suspicious order monitoring
11 presentation.
12        Do you agree?
13   A.    I agree.
14   Q.    Do you know what led to the
15 suspicious order monitoring presentation that was
16 given by Dave Jakubowski to you and Chris Belli?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  I don't really
19   know.
20 BY MR. POWERS:
21   Q.    Do you recall that Dave -- that
22 Mr. Dave Jakubowski gave you and Chris Belli a
23 presentation about suspicious order monitoring in
24 2012?

Page 216

1    A.    If the email says he did, then he
2  did.
3    Q.    You have no reason to believe
4  otherwise.  Right?
5    A.    Right.
6    Q.    And then he looks like he says in
7  the second paragraph, the last sentence there,
8  "I've included a PDF copy of the slides from our
9  WebEx for your reference."
10        Do you see that?
11   A.    Pardon?  Where is that?
12   Q.    It's actually highlighted on the
13 screen in front of you too if that's easier to
14 see, but it's the second sentence in the second
15 paragraph.
16   A.    Yes.
17   Q.    It looks like there's an
18 attachment to this email entitled "Cegedim Buzzeo
19 PDMA SOM Compliance Solutions presentation.pdf."
20        Do you see that?
21   A.    Yes.
22   Q.    I believe that's the attachment
23 reflected in the other pages of Exhibit 13.
24        Does that make sense to you?

Page 217

1    A.    Yes.
2    Q.    Further down in the first page of
3  Exhibit 13, he says, Mr. Jakubowski says in the
4  fourth paragraph, "I have had the pleasure of
5  meeting and having dinner with Mike Podgurski and
6  Tammy Royer during the NACDS closing ceremony
7  event in Boston last year."
8         Do you see that?
9    A.    Yes.
10   Q.    Who is Tammy Royer?
11   A.    She was an SVP of pharmacy
12 operations.
13   Q.    What role would she have with
14 regards to suspicious order monitoring?
15        MS. McENROE:  Objection to form.
16        THE WITNESS:  I don't necessarily
17   know that Tammy would necessarily be
18   involved in suspicious order monitoring.
19   Buzzeo has a plethora of programs that
20   impact dispensing of prescriptions,
21   recordkeeping at pharmacies.  So in that
22   respect, she would be involved with them.
23 BY MR. POWERS:
24   Q.    And then later on in that same

Page 218

1 paragraph we were just looking at, it says,
2 "Since Ron Buzzeo has in the past worked with
3 Mike, Tammy, and you Janet, I'm certain if"
4 this -- "if his schedule allows, he would like to
5 be there too."
6          Do you see that?
7     A.   I do.
8     Q.   What work did you do with Ron
9 Buzzeo?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  I think between
12     myself and Jim Krahulec, we may have done
13     a few things with Ron, which is how I got
14     to know him.  I don't know that -- I
15     can't remember specifically what we did
16     with him.
17 BY MR. POWERS:
18     Q.   Do you know what work Mike did
19 with Ron Buzzeo referred to here in this
20 sentence?
21     A.   I do not know.  Again, I think
22 it's related to controlled substances.  Everybody
23 in all the departments would come together and
24 they may go to a meeting and discuss controlled

Page 219

1 substances.
2     Q.   But you don't know specifically
3 what work Ron Buzzeo did for or with Mike?
4     A.   Well, it doesn't really say that
5 he did work.  The sentence says, I had the
6 pleasure of meeting and having dinner with Mike
7 and Tammy.  It doesn't necessarily say that he
8 worked with them.
9     Q.   The sentence says, "Since Ron
10 Buzzeo has in the past worked with" --
11     A.   Oh, yeah.  Sorry.
12     Q.   -- "Mike, Tammy, and you Janet."
13          So I take that to mean that he --
14 that Ron Buzzeo has in fact worked with Mike.
15 Right?
16     A.   You are correct.  I apologize.
17     Q.   So do you know specifically what
18 work Ron Buzzeo did with Mike Podgurski?
19     A.   I do not.
20     Q.   Do you know what work Ron Buzzeo
21 did with Tammy Royer?
22     A.   I do not.
23     Q.   Moving down in this email to the
24 last paragraph, it says, "Paul Hamby and I will

Page 220

1 put together a proposal and budgetary pricing for
2 a high level assessment of your current SOM
3 program for your consideration if you should
4 decide to have a professional outside consultant
5 review and report for future planning and process
6 improvements to your internal systems and
7 statistical model."
8          Do you see that?
9     A.   I see it.
10     Q.   Do you know if Rite Aid ever went
11 forward with this Buzzeo proposal to perform a
12 high level assessment of the Rite Aid SOM
13 program?
14     A.   I do not believe we did.
15     Q.   Do you know why Rite Aid did not
16 go forward with the Buzzeo assessment of its SOM
17 program?
18         MS. McENROE:  Object to the form.
19         THE WITNESS:  I believe that part
20     of this particular looking at the
21     proposal or looking at the SOM was to
22     make a comparison between what Buzzeo was
23     offering and what Rite Aid already had in
24     place.  And at that particular time, we

Page 221

1     determined that what we had in place was
2     sufficient.
3 BY MR. POWERS:
4     Q.   You say at that particular time.
5          That would have been in 2012?
6     A.   Yes.
7     Q.   Did you -- did some of the
8 previous exhibits we talked about where you met
9 with Maggie Perritt and Andy Palmer, those
10 meetings about the suspicious order monitoring
11 program at Rite Aid were in 2010.  Right?
12     A.   That is correct.
13     Q.   Did you do a separate analysis of
14 whether the Rite Aid program was sufficient in
15 2012?
16     A.   I believe we had internal
17 discussions of the individuals involved after the
18 presentation.
19     Q.   Were those discussions recorded
20 anywhere?
21     A.   To the best of my knowledge, no.
22     Q.   Were those discussions held in
23 person?
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    Q.    Where were they held?
2    A.    At the corporate office where
3 everybody is located.
4    Q.    Who would have participated in
5 those discussions about this suspicious order
6 monitoring system in 2012?
7    A.    Chris, myself, perhaps Sophia or
8 Andy, depending on who was in asset protection at
9 that time. Maybe perhaps someone from pharmacy
10 operations.
11         The thing to understand with this
12 is Buzzeo is one vendor that's out there. There
13 are other vendors as well.
14    Q.    Did Rite Aid ever use any other
15 vendor to evaluate its suspicious order
16 monitoring program?
17    A.    We did not.
18    Q.    Did Rite Aid ever get the
19 proposal and pricing referred to here in the last
20 paragraph of Exhibit 13?
21    A.    I did not see a proposal.
22    Q.    I want to direct your attention
23 to page with the Bates number 46868 of
24 Exhibit 13.

Page 223

1         Are you there?
2    A.    Yes. 868?
3    Q.    Correct.
4    A.    Uh-huh.
5    Q.    And it looks like this -- this
6 page is part of the presentation that was given
7 to you and Chris Belli in 2012; is that right?
8    A.    Yes.
9    Q.    And the title of this slide is
10 "Suspicious Order Monitoring-Challenges." Right?
11    A.    Yes.
12    Q.    And then the second one -- or,
13 I'm sorry, excuse me.
14         The first bullet point there says
15 "Is an order size 'threshold' system sufficient?"
16         Do you see that?
17    A.    I do.
18    Q.    And then on the second page --
19 or, excuse me, the next page, 46869, it looks
20 like Buzzeo answers that question and says in the
21 bullet point -- or the list entitled "SOM Model,"
22 it says, "Can not be threshold based."
23         Do you see that?
24    A.    I do.

Page 224

1    Q.    So it looks like Buzzeo is saying
2 here, in 2012, that a suspicious order monitoring
3 system cannot be threshold based. Right?
4         MS. McENROE: Objection to form.
5         THE WITNESS: That is what's
6    stated on the slide.
7 BY MR. POWERS:
8    Q.    Then on that page 46869 again, it
9 says that the "SOM Model" heading there -- under
10 the "SOM Model" heading there, it says,
11 "Statistically based model" is "highly
12 recommended." Right?
13    A.    That is correct.
14    Q.    And Rite Aid used, at this time
15 in 2012 and in fact since, the entire time you've
16 been at Rite Aid, a threshold-based system as
17 part of its suspicious order monitoring. Right?
18         MS. McENROE: Objection to form.
19         THE WITNESS: The threshold was
20    one component of the program. It was not
21    the entire suspicious order monitoring
22    program. Statistically-based model that
23    is highly recommended is built into our
24    automatic replenishment system. It's

Page 225

1    looking at individual drugs and
2    individual pharmacies for their order
3    statistics and their order parameters.
4    So two of the components that you have
5    just identified are part of the Rite Aid
6    suspicious order monitoring program.
7 BY MR. POWERS:
8    Q.    The other thing on the previous
9 page 46868 says, the second bullet point, "Can
10 orders be 'cut' to allow product to be shipped
11 (vs. triggering SOM flags)?"
12         Do you see that?
13    A.    I do.
14    Q.    Do you know if Buzzeo advised
15 that the orders should not be cut to allow
16 products to be shipped?
17    A.    I do not know.
18    Q.    But Rite Aid did cut its orders
19 before shipping them to get them below the
20 threshold. Right?
21         MS. McENROE: Objection to form.
22         THE WITNESS: The orders that
23    were cut were orders based upon our own
24    thresholds established. There's --

Page 226

1 that's not necessarily a suspicious
2 order. And again, it would have been
3 generated by our own computer algorithm
4 for an individual store.
5 BY MR. POWERS:
6 Q. But my question is just simply,
7 Rite Aid did cut its orders to get them below the
8 5,000 dosage unit threshold. Right?
9 MS. McENROE: Objection to form.
10 THE WITNESS: We cut the orders
11 to 5,000 dosage units.
12 BY MR. POWERS:
13 Q. I'm going to hand you what's been
14 marked as Rite Aid Hart Exhibit 14. It's an
15 email exchange, 38054 through 38055.
16 Take a look at that.
17 - - -
18 (Deposition Exhibit No. Rite
19 Aid-Hart-14, Email Hart, top one dated
20 2012-12-18, Bates stamped
21 Rite_Aid_OMDL_0038054 and
22 Rite_Aid_OMDL_0038055, was marked for
23 identification.)
24 - - -

Page 227

1 THE WITNESS: (Reviewing
2 document.)
3 BY MR. POWERS:
4 Q. It looks like the document
5 reflected in Exhibit 14 starts with an email from
6 Jessica Ruffin to you, copying Jennifer Wyatt,
7 Patricia Jones and William Walker. Right?
8 A. Yes.
9 Q. Who is Jessica Ruffin?
10 A. An associate at Liverpool
11 Distribution Center.
12 Q. At the bottom, her signature
13 says, "Distribution Center #35." Right?
14 A. Yes. I believe that's -- oh,
15 maybe that's Tuscaloosa.
16 Q. I believe it is Tuscaloosa.
17 Do you know if Jessica Ruffin was
18 the DEA coordinator at the Tuscaloosa facility?
19 A. I don't remember.
20 Q. And Jessica Ruffin writes to you,
21 "Janet, Can you please confirm the threshold
22 amounts that we discussed at the DEA conference
23 so that we can have something to put in our
24 files?"

Page 228

1 Do you see that?
2 A. I do.
3 Q. What DEA conference is she
4 referring to here?
5 A. I believe that was a conference
6 that Chris Belli had put together for all of the
7 DEA coordinators to come together and have
8 everybody's level set with having different
9 people present different things to them.
10 Q. Did you present at that
11 conference?
12 A. I believe I did.
13 Q. Did you talk about threshold
14 amounts at that conference?
15 A. I don't remember.
16 Q. And it looks like Jessica Ruffin
17 is asking you to confirm the threshold amounts.
18 Right?
19 A. Yes.
20 Q. And it looks like she has a list
21 there.
22 "Liquids -- 50 bottles; Pills --
23 ████ ████████
24 Suboxone Film -- 5000 doses." Right?

Page 229

1 A. Yes.
2 Q. And she's asking for a
3 confirmation of those threshold limits so she can
4 put it in her files. Right?
5 A. Yes.
6 Q. Was it not a standard operating
7 procedure of Rite Aid to have the threshold
8 limits in the files of the distribution centers?
9 MS. McENROE: Objection to form.
10 THE WITNESS: They should be in
11 the distribution centers, yes.
12 BY MR. POWERS:
13 Q. And the threshold amounts haven't
14 changed the entire time you were at Rite Aid.
15 Right?
16 MS. McENROE: Objection to form.
17 THE WITNESS: They have not.
18 BY MR. POWERS:
19 Q. So why does Jessica Ruffin not
20 know what the threshold amounts were?
21 MS. McENROE: Objection, form.
22 THE WITNESS: There was some
23 confusion about the Suboxone film
24 tablets. Those particular medications

Page 230

1 come in bottles of 30 pills only.  So
2 there was some question as to what was
3 out there, the number of bottles that
4 were in some of the policies and
5 procedures.  And stores that needed the
6 product were getting back, based on the
7 number of bottles, when three bottles
8 would equal one of another bottle.
9        So there was some discussion
10 about putting the 5,000 doses on there to
11 clear that particular item up.
12 BY MR. POWERS:
13    Q.    And so far we've been mostly
14 talking about the 5,000 dosage unit thresholds,
15 but it looks like here she's asking -- Jessica
16 Ruffin is asking for the threshold limits in
17 number of bottles or boxes.  Right?
18    A.    Liquids?
19    Q.    Well, it says, yeah, liquids
20 50 bottles, pills 5,000.  It doesn't have a unit
21 there.
22    A.    Yeah.  The difference there is
23 that is pseudoephedrine, which is a List I
24 chemical, not a controlled substance.  That was

Page 231

1 different than a controlled substance 5,000
2 tablet limit. ██████████████████████████
██  ███████████  tablets a week to any given store in
4 an order.
5    Q.    You said 5,000 tablet limit.
6        Is it a 5,000 tablet limit or a
7 5,000 dosage unit?
8    A.    Dosage unit limit.
9    Q.    Was there confusion at the
10 distribution centers about how to calculate what
11 constituted a dosage unit?
12        MS. McENROE:  Objection to form.
13        THE WITNESS:  There is confusion
14 in the industry about what to calculate
15 as a dosage unit.  For example, liquids,
16 they're at 50 bottles.  You can have a
17 dose in a liquid where you have the
18 active ingredient of 5 milligrams of a
19 drug in a teaspoon, which may be a dose,
20 or you can have a dose with 5 milligrams
21 of an active ingredient in a tablespoon,
22 which could be a dose.
23        So calculating dose from liquid
24 to liquid to liquid is difficult, based

Page 232

1 on how the individual liquids are
2 manufactured.
3 BY MR. POWERS:
4    Q.    Whose responsibility was it to
5 translate the dosage units, the 5,000 dosage unit
6 threshold, into the particular item's form, shall
7 we say?
8        MS. McENROE:  Objection.
9        THE WITNESS:  For the liquids,
10 the bottle limit was 50 bottles.
11        However, that one sometimes was high and
12 that would be cut back.
13 BY MR. POWERS:
14    Q.    But my question, really I'm just
15 trying to understand, if the distribution center
16 limit is 5,000 dosage units.  Right?
17    A.    (Witness nods head.)
18    Q.    Was it up to the distribution
19 centers -- each individual distribution center to
20 figure out how to calculate what constituted
21 5,000 dosage units in terms of pills, bottles,
22 tabs, et cetera?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  It was not their

Page 233

1 determination or not their job to
2 calculate the liquids.  They basically
3 based it on tablets and capsules and pill
4 forms versus the milliliters or the
5 liquid form.
6 BY MR. POWERS:
7    Q.    Putting liquids aside for a
8 second, what about just regular pills.
9        Whose responsibility was it to
10 calculate what constituted 5,000 dosage units?
11    A.    It was the distribution center's
12 pickers that would establish if there was 5,000
13 dosage units.
14    Q.    So the distribution center
15 associates would be the ones who have to figure
16 out how many bottles a particular controlled
17 substance would equal 5,000 dosage units; is that
18 right?
19    A.    Yes.  Through the formula that we
20 looked at on one of the forms earlier.  I think
21 it was the picker form that they signed that
22 talked about the 10 bottles, 100 bottles, the
23 50 bottles, based on that.
24    Q.    And that was Exhibit 3, I

Page 234

1 believe, the Controlled Drug Above Average Order
2 Monitoring?
3    A.    Yes.
4    Q.    Did you provide guidance about
5 how to calculate the number of bottles that
6 equaled 5,000 dosage units?
7    A.    I may have on individual
8 products, but there's -- there are a tremendous
9 number of liquids to do calculations on.  So
10 simply stating the 50 bottles was the best of all
11 solutions.
12    Q.    Then going back to the first page
13 of Exhibit 14 here, you write an email in the
14 middle of the page replying to Jessica Ruffin,
15 saying, "This sounds correct however we are
16 looking to change to true suspicious order
17 thresholds as soon as possible."
18        Do you see that?
19    A.    I see that.
20    Q.    You use the word "true suspicious
21 order thresholds."
22        Are those somehow different than
23 the 5,000 dosage unit threshold that we've been
24 talking about?

Page 235

1    A.    They are not different than the
2 overall program, which would be the 5,000 dosage
3 units, the algorithms, the asset protection side
4 of it.  Together, that is our suspicious order
5 program.
6    Q.    You say you're looking to change
7 to true suspicious orders.
8        How can you change to something
9 that is already in place?
10    A.    We were looking to combine the
11 suspicious order program together, as we had
12 discussed previously, and make sure that
13 everything was aligned at that particular point
14 and everybody knew exactly what the program was.
15    Q.    Because as you testified before,
16 some people did not understand exactly what the
17 program was.  Right?
18        MS. McENROE:  Objection to form.
19        THE WITNESS:  Some people did not
20    understand the program in its entirety.
21 BY MR. POWERS:
22    Q.    And one of those people was Kevin
23 Mitchell.  Right?
24        MS. McENROE:  Objection to form.

Page 236

1        THE WITNESS:  I believe that to
2    be the case, yes.
3 BY MR. POWERS:
4    Q.    And Kevin Mitchell was concerned
5 about the thresholds that were in place at the
6 order -- at the Rite Aid suspicious order
7 monitoring program.  Right?
8        MS. McENROE:  Objection to form.
9        THE WITNESS:  Kevin Mitchell
10    identified that in an email, that he was
11    concerned.  Follow-up with that was Kevin
12    Mitchell identified that what we had in
13    place were correct and all we needed to
14    do was commit that to paper and so that
15    we could give a good tool to the
16    distribution centers to utilize.
17 BY MR. POWERS:
18    Q.    But the words you chose to write
19 here were "change to true suspicious order
20 thresholds."  Right?
21    A.    That is correct.
22    Q.    How come you didn't say we are
23 looking to combine our existing program?
24        MS. McENROE:  Objection to form.

Page 237

1        THE WITNESS:  I don't know.
2 BY MR. POWERS:
3    Q.    How come you didn't say we're
4 looking to simply explain our threshold program?
5        MS. McENROE:  Objection to form.
6        THE WITNESS:  I don't know.
7 BY MR. POWERS:
8    Q.    You specifically chose to say
9 "change to true suspicious order thresholds."
10 Right?
11    A.    I put that in the email, yes.
12    Q.    Was that a result of your
13 conversations with the Buzzeo organization?
14    A.    I don't believe so.  The Buzzeo
15 association was in May and this email is in
16 December.  So there would have been some
17 communication if we were going to go over that
18 period of time.
19        I think another piece of the
20 puzzle here also is, since we are healthcare
21 providers and we want our patients to get the
22 proper medications that they need and have our
23 pharmacists have the ability to dispense them,
24 that we wanted to make sure that our patients

Page 238

1 weren't suffering by the threshold of the 5,000.
2 And so this was the beginning of where we were
3 looking to bring everything together and perhaps
4 enhance the program.
5     Q.    Did you ever -- did Rite Aid ever
6 change to true suspicious order thresholds, as
7 you referred to in this email?
8         MS. McENROE:  Object to form.
9         THE WITNESS:  We had suspicious
10        order programs in place.  I don't believe
11        that we made any changes to the program.
12 BY MR. POWERS:
13    Q.    And just to be clear, you never
14 made any changes to the suspicious order
15 monitoring program the entire time that Rite Aid
16 distributed controlled substances.  Correct?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  That is correct.
19                  - - -
20        (Deposition Exhibit No. Rite
21        Aid-Hart-15, Email dated 2013-09-04,
22        Bates stamped Rite_Aid_OMDL_0046648
23        through Rite_Aid_OMDL_0046662, was marked
24        for identification.)

Page 239

1                  - - -
2 BY MR. POWERS:
3    Q.    I'm going to hand you what's been
4 marked as Rite Aid-Hart Exhibit 15.  This is an
5 email, again with some attachments.  The Bates
6 numbers on this exhibit are Rite_Aid_OMDL_0046648
7 through 46662.
8         And I'm going to try to do the
9 same thing as we've done with some of these other
10 emails with long attachments.  I'm just going to
11 ask you about the initial email and just a
12 particular couple pages that are attached to the
13 email.
14    A.    (Reviewing document.)
15    Q.    Have you had a chance to review
16 Exhibit 15?
17    A.    I have.
18    Q.    So it looks like the cover page
19 of Exhibit 15 is an email from Ed Harris at
20 Buzzeo PDMA to Tammy Royer.  And it cc's you and
21 Sophia Lai.  Right?
22    A.    Correct.
23    Q.    And in the middle of the
24 paragraph there on the first page of Exhibit 15,

Page 240

1 it says, "Per our discussion I would like to set
2 up a conference call with you, Janet Hart, and
3 Sophia Lai to discuss SOM/drug diversion
4 compliance issues over the next couple of weeks
5 if possible."
6         Do you see that?
7    A.    I do.
8    Q.    And once again, the SOM acronym
9 here, does that stand for suspicious order
10 monitoring?
11    A.    It does.
12    Q.    Did you ever set up the
13 discussion that Ed Harris refers to in this
14 sentence?
15    A.    I don't believe so.
16    Q.    Why not?
17    A.    Again, we had been reviewing our
18 suspicious order monitoring program, had talked
19 about it, as you've identified in the
20 communications presented, and did not have the
21 need to have a meeting with him.  To the best of
22 my knowledge, I don't remember it occurring.
23        Part of the reason why Tammy is
24 the individual that this was addressed to is that

Page 241

1 I typically did not attend the NACDS conference.
2 Sophia did not attend the NACDS conference.  So
3 we were not there to have the communication.
4    Q.    You mentioned NACDS before as a
5 resource that you used to determine how Rite Aid
6 was to comply with various regulations regarding
7 controlled substances, though.  Right?
8    A.    Yes.
9    Q.    But you didn't attend the
10 conferences for NACDS?
11    A.    Certain individuals from our
12 corporation attended the conferences.  I myself
13 may have attended one or two.  But traditionally
14 that was not within my scope, as there were all
15 different things at those particular meetings.
16 There are hundreds of vendors with counting
17 machines and other types of automation and just
18 not what was within my job description.
19    Q.    So even though you relied on
20 NACDS to inform your interpretation of various
21 regulations regarding controlled substances, you
22 thought it was not necessary to go to their
23 conferences; is that right?
24        MS. McENROE:  Objection to form.

Page 242

1  THE WITNESS:  Not go to their
2  conferences, but there were work groups,
3  conference calls, other types of
4  communications that were participated in.
5  Simply to go to a conference was not in
6  my best interest of time, since the
7  portion of what's at the conference
8  related to my position was very, very
9  limited.
10 BY MR. POWERS:
11     Q.    And turn to the second page of
12 Exhibit 15, second and third pages, I guess,
13 Bates number 46649 and 46650.
14        Do you see those pages?
15     A.    I do.
16     Q.    Do you recognize this particular
17 document and those two pages?
18     A.    I have seen the document.
19     Q.    When was the last time you saw
20 this document?
21     A.    Within the last two days.
22     Q.    When was the first time you saw a
23 document -- this document?
24     A.    Probably at a meeting with

Page 243

1  counsel prior -- as preparation prior to the last
2  two days.
3     Q.    I don't want to get into what you
4  discussed with counsel, but before meeting with
5  counsel and being shown this document, what was
6  the -- did you ever see this document before
7  that?
8     A.    I don't remember seeing the
9  document.
10    Q.    Do you know if Rite Aid received
11 this document in pages 46649 and 46650,
12 Exhibit 15?
13        MS. McENROE:  Objection to form.
14        THE WITNESS:  I did not receive
15     or view the document at the corporate
16     office.  I'm not sure if it went to the
17     distribution center or someone else
18     within the organization.
19 BY MR. POWERS:
20    Q.    The first sentence on the first
21 page of this document says, "This letter is being
22 sent to every entity in the United States
23 registered with the Drug Enforcement
24 Administration (DEA) to manufacture or distribute

Page 244

1  controlled substances."
2        Do you see that?
3     A.    I see that.
4     Q.    And Rite Aid was a DEA
5  registrant.  Right?
6        MS. McENROE:  Objection to form.
7        THE WITNESS:  We were.
8  BY MR. POWERS:
9     Q.    Did each distribution center have
10 its own DEA registration?
11    A.    They did.
12    Q.    So do you know if this particular
13 letter that was sent to every registrant was sent
14 to every distribution center at Rite Aid?
15    A.    I'm going to go back and clarify
16 my answer to the previous question.
17        Not all Rite Aid distribution
18 centers had DEA numbers.  There were a limited
19 number of them that had a DEA number.
20    Q.    Were there Rite Aid distribution
21 centers that did not distribute controlled
22 substances?
23    A.    Yes.
24    Q.    Did every Rite Aid distribution

Page 245

1  center that did distribute controlled substances
2  have a unique DEA registration number?
3     A.    They did.
4     Q.    Do you know if this letter
5  reflected here in Exhibit 15 from the DEA was
6  sent to every Rite Aid distribution center that
7  had a DEA registration number?
8     A.    From the first sentence of the
9  letter, it appears that it was sent to all
10 registrations, registrants, which would be the
11 Rite Aid distribution centers.
12    Q.    But you never saw this letter
13 yourself at the corporate office before starting
14 to prepare for this deposition with counsel?
15    A.    I do not remember seeing this
16 letter in 2007.
17    Q.    Well, I'm not asking you if you
18 saw it in 2007.  I'm asking if you saw it at any
19 point before you started preparing for this
20 deposition?
21    A.    No.
22    Q.    Did you see any similar letters
23 to this one during your time working for Rite
24 Aid?

Page 246

1    MS. McENROE: Objection to form.
2    THE WITNESS: Not that I
3 remember. No, I'll take that back.
4    There was a second letter that I
5 had -- bless you.
6    There was a second letter that I
7 had looked at, at a different time sent
8 by Mr. Rannazzisi.
9 BY MR. POWERS:
10   Q.   Do you know the time frame when
11 you looked at that letter?
12   A.   I looked at it at the same time I
13 looked at this letter with counsel.
14   Q.   So just so we're clear, this 2007
15 letter from Joseph Rannazzisi is a separate
16 letter from the one you were talking about just
17 now? There's two letters from Rannazzisi that
18 you have seen as of today?
19   A.   Yes.
20   Q.   The 2007 letter reflected in
21 Exhibit 15 you had not seen prior to beginning to
22 prepare for this deposition. Right?
23   A.   That's correct.
24   Q.   How about the second letter from

Page 247

1 Mr. Rannazzisi, had you seen that letter before
2 you began to prepare for this deposition?
3    A.   I had not.
4    Q.   So you have not seen any letter
5 from Mr. Rannazzisi during your time working for
6 Rite Aid?
7    MS. McENROE: Objection to form.
8    THE WITNESS: I did not.
9 BY MR. POWERS:
10   Q.   You can put that exhibit to the
11 side.
12    You talked a little bit earlier
13 about Rite Aid's efforts to combine the different
14 elements of the suspicious order monitoring
15 program into one location; is that right?
16   A.   That is correct.
17   Q.   When did that occur?
18   A.   We started the process, based on
19 this documentation, it looks like late 2012,
20 2013.
21   Q.   And why did you feel you needed
22 to do that?
23    MS. McENROE: Objection to form.
24    THE WITNESS: Because it was too

Page 248

1 much of a manual process. All the
2 processes were there, but they were in
3 different pieces. And we wanted to bring
4 it all together in one site, so that it
5 would be readily retrievable and the
6 corporate offices and the coordinators at
7 the DCs would have access to one
8 particular portal site that would bring
9 everything together. And in addition,
10 perhaps enhance the process.
11 BY MR. POWERS:
12   Q.   And why was it a problem that it
13 was a manual process?
14    MS. McENROE: Object to form.
15    THE WITNESS: It was just time
16 and labor intensive. There were numerous
17 individuals working on different pieces
18 of the process. And if you could put it
19 into an electronic format where everybody
20 could gain quick asset -- access, that
21 would eliminate a lot of the manual
22 processes.
23    - - -
24    (Deposition Exhibit No. Rite

Page 249

1    Aid-Hart-16, Email dated 2013-12-24,
2    Bates stamped Rite_Aid_OMDL_0016186 and
3    Rite_Aid_OMDL_0016187, was marked for
4    identification.)
5    - - -
6 BY MR. POWERS:
7    Q.   I'm going to hand you what has
8 been marked as Rite Aid-Hart Exhibit Number 16.
9 It is -- surprise, surprise -- another email and
10 attachments. The email is Bates stamp
11 Rite_Aid_OMDL_0016186. And the attachment, which
12 was a native Excel sheet, just has one Bates
13 number, although it's a couple different pages.
14 The Bates number of the attachment is
15 Rite_Aid_OMDL_0016187.
16   A.   (Reviewing document.)
17   Q.   Is the document -- the email and
18 attachment reflected in Exhibit 16 familiar to
19 you?
20   A.   Yes.
21   Q.   When was the last time you saw
22 this document?
23   A.   Back in 2013-2014.
24   Q.   And what does this document

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1 reflect?
2      A.     This was a proposal that we were
3 putting together to develop a regulatory
4 compliance department within the corporation.
5      Q.     Did Rite Aid ever actually put
6 together that regulatory compliance organization?
7      A.     We did not put it together in
8 this format.  It was changed numerous times since
9 that to, right now, what we discussed as far as
10 regulatory compliance under VP Amanda Glover.
11      Q.     And was this also -- well, let me
12 back up.
13           It looks like in the attachment
14 to this email that there are -- it looks like job
15 titles at the top of each different page.
16           Like, for example, on the second
17 page of Exhibit 16, it says "Department Head" at
18 the top.  Right?
19      A.     That is correct.
20      Q.     Am I interpreting that correctly,
21 that those are different titles for different
22 positions for people in the regulatory compliance
23 department?
24      A.     Those were what was proposed.

Page 251

1 Obviously you wouldn't call it a department head
2 when you develop the job description, but those
3 are what were proposed as far as job function and
4 names.
5      Q.     And this would have been in 2013,
6 it looks like, from the cover email.  Right?
7      A.     Yes.
8      Q.     So this was during the time frame
9 when Rite Aid was still distributing controlled
10 substances out of its own distribution centers.
11 Right?
12      A.     Yes.
13      Q.     And then you say there in the
14 first page of the email, "Robert, Attached are
15 responsibilities for each position in the new
16 department.  Black...we do today and will not
17 change.  Red...We do the activity today, but
18 expect greater volume.  Yellow...completely new
19 activity."
20           Do you see that?
21      A.     I do.
22      Q.     So it looks like those color
23 coding correspond to the job descriptions in the
24 attachment.  Right?

Page 252

1      A.     It does.
2      Q.     So if you want to turn to the
3 second page of Exhibit 16 for the "Department
4 Head," once again, down at the bottom, it says,
5 yellow, "Completely new activity -- need to do"
6 lower -- "to lower risk and increase compliance."
7           Right?
8      A.     It does.
9      Q.     And under "Department Head," it
10 looks like it has a chart.
11           Are those the job
12 responsibilities that the department head would
13 be undertaking?
14      A.     I believe so, yes.
15      Q.     And then it divides them up into
16 columns for the job responsibilities should be
17 done daily, weekly and monthly.  Right?
18      A.     Correct.
19      Q.     And so, for example, the very
20 first one under "Daily," it says, "High level
21 communications with DEA agents/investigators,
22 state Board of Pharmacy agents and other
23 regulatory agencies."  Right?
24      A.     Correct.

Page 253

1      Q.     So that particular cell has no
2 highlighting or is not in red text.  Right?
3      A.     Correct.
4      Q.     So that means that that
5 particular function is already being done at Rite
6 Aid.  Right?
7      A.     That is correct.
8      Q.     So moving over to the "Weekly"
9 column, the first one there is in red text.
10 Right?
11      A.     Correct.
12      Q.     And that one says, "Review all
13 suspicious prescribers with Director, Controlled
14 Substances for an action plan:  clinic
15 protocol/shut-off/re-evaluate in 3 months."
16 Right?
17      A.     Correct.
18      Q.     And so that particular job
19 responsibility, because it's in red text, means
20 that it -- Rite Aid is doing that activity in
21 2013, but just will be done in greater volume
22 going forward.  Right?
23      A.     True.
24      Q.     So the one under -- so the cell

Page 254

1 under "Weekly" there is in yellow highlighting.
2 Right?
3    A.   Yes.
4    Q.   So that means that this is a
5 completely new activity.  Right?
6    A.   Uh-huh.
7    Q.   That means that is not being done
8 at the time at Rite Aid.  Right?
9    A.   Uh-huh.
10   Q.   I'm sorry, I need a verbal
11 answer.
12   A.   Yes.
13   Q.   Just so I have this clearly, one
14 is the -- the cells highlighted in yellow in this
15 document, the activity described is not being
16 done at all at the time in 2013.  Correct?
17   A.   Correct.
18   Q.   And not just by the department
19 head or anything, it's not being done by anyone
20 at Rite Aid.  Right?
21       MS. McENROE:  Objection to form.
22       THE WITNESS:  That is correct.
23 BY MR. POWERS:
24   Q.   So there under "Department Head,"

Page 255

1 it says, "Develop dashboard reporting for
2 controlled substances and establish criteria to
3 identify trends within all aspects of controlled
4 substances, listed chemicals and PMP Programs."
5 Right?
6    A.   Yes.
7    Q.   So that was not being done at
8 Rite Aid in 2013.  Right?
9    A.   Correct.
10        Keep in mind that that's not
11 related to the distribution center.  The trends
12 and all aspects of controlled substances was
13 related to the dispensing pharmacies.
14   Q.   I'm just asking if it was done at
15 Rite Aid at all.
16   A.   Okay.
17   Q.   And that would include at the
18 distribution centers.
19   A.   Okay.
20       MS. McENROE:  You can make your
21       answers complete.  It's okay.
22       THE WITNESS:  Thank you.
23 BY MR. POWERS:
24   Q.   So moving on to the page with the

Page 256

1 title "Specialist, Regulatory Compliance," it's I
2 think the third page, a little 3 at the bottom.
3        Over in the left-hand column for
4 "Daily," there's a cell that says "Suspicious
5 Order Monitoring, Distribution Centers."  And
6 it's highlighted in yellow.  Right?
7    A.   That is correct.
8    Q.   So that's a completely new
9 activity that is not being done at Rite Aid at
10 the time.  Right?
11       MS. McENROE:  Objection to form.
12       THE WITNESS:  That activity was
13       not being done on a daily basis at the
14       corporate office.  The suspicious order
15       monitoring program was in place.  This
16       was bringing it in to the corporate
17       office at that particular point of time.
18       That does not mean that it wasn't being
19       done.
20 BY MR. POWERS:
21   Q.   But the yellow highlighting says
22 completely new activity.  So this says it's a
23 completely new activity.
24       Didn't you just testify that

Page 257

1 that's what that meant?
2       MS. McENROE:  Objection to form.
3       THE WITNESS:  It is a completely
4       new activity, but the completely new
5       activity is for the department that we
6       were putting together at the time.
7 BY MR. POWERS:
8    Q.   It doesn't specify that here in
9 this document, though, does it?
10       MS. McENROE:  Objection to form.
11       THE WITNESS:  It doesn't specify
12       it in the document.
13 BY MR. POWERS:
14   Q.   Moving down further in that
15 particular column, the next yellow cell says,
16 "Report suspicious orders from the DC to the DEA
17 (when identified and confirmed)."
18       That's also identified as a
19 completely new activity in this document.  Right?
20       MS. McENROE:  Objection to form.
21       THE WITNESS:  It is, again, for
22       the department that we would again bring
23       it in to the corporate office.  When we
24       were developing the department, we were

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  attempting to get everything from a
2  regulatory compliance under one roof and
3  that was part of that.
4  BY MR. POWERS:
5      Q.   You testified earlier, though,
6  that the cells identified by the yellow
7  highlighting meant that it was not being done by
8  anyone at Rite Aid.  Right?  That's what you
9  testified to earlier?
10      MS. McENROE:  Objection to form.
11      THE WITNESS:  Then I misspoke.
12      It was not being done by anybody in the
13      corporate office.  That would be done by
14      the individuals at the distribution
15      center.
16  BY MR. POWERS:
17      Q.   But this document doesn't specify
18  that, does it?
19      A.   It does not.
20      Q.   Going further down in that column
21  that we're just looking at, it says in the bottom
22  there, "Develop a program to establish trends in
23  controlled substance ordering from McKesson, ANDA
24  and Rite Aid Distribution Centers."

Page 259

1       Do you see that?
2       A.   I do.
3       Q.   And that's also identified as a
4  completely new activity.  Right?
5       A.   It is.
6       Q.   And then over in the "Monthly"
7  column in that same page, it says, "Review
8  McKesson and DC threshold
9  requests/actions/outcomes on a quarterly basis
10  looking for issues/trends and reassess current
11  need."  Right?
12       A.   It does.
13       Q.   And once again, that's something
14  that's identified as completely new activity.
15  Right?
16       A.   The completely new activity was
17  to review it on a quarterly basis.  Trends,
18  requests for threshold increases, were reviewed
19  on a one-by-one basis.  So yes, this was a new
20  establishing a quarterly review.
21       Q.   So you weren't reviewing trends
22  except on a one-by-one basis before this?
23       A.   Correct.
24       Q.   And you said some of the other

Page 260

1  things that we talked about in the daily column
2  here on the "Specialist, Regulatory Compliance"
3  page, you said those were being done at the
4  distribution center.  Right?
5       A.   Yes.
6       Q.   What's your basis for saying
7  that?
8       A.   The distribution center was
9  responsible for the picking, reviewing the
10  orders, determining if it was suspicious or not,
11  making the phone call to the pharmacist.  And at
12  the same time, if there was a suspicious order,
13  the distribution center was responsible to report
14  that in to corporate.  That was part of their
15  standard operating procedures.
16       Q.   I just want to be clear.  You
17  just said that the distribution center was
18  responsible for determining whether a particular
19  order was suspicious or not; is that right?
20       A.   The distribution center was
21  responsible for identifying orders and
22  determining if they were suspicious, yes.
23       Q.   Moving on to the next page, the
24  one entitled "Senior Analyst, Controlled

Page 261

1  Substances."
2       In the "Daily" column, which is
3  another yellow highlighted cell, it says,
4  "Utilize IMS tool to identify potential
5  exceptions for individual Rite Aid" stores.
6       Do you see that?
7       MS. McENROE:  Objection.  Just
8  for clarification, I think it says
9  locations instead of stores, Will.
10      MR. POWERS:  Oh.  Sorry.
11      MS. McENROE:  Do you want to just
12  read that one again?
13  BY MR. POWERS:
14      Q.   It says in the "Daily" column
15  there, on the bottom cell on the page, entitled
16  "Senior Analyst, Controlled Substances," "Utilize
17  IMS tool to identify potential exceptions for
18  individual Rite Aid locations."
19      Do you see that?
20      A.   I do.
21      Q.   What does the IMS tool refer to
22  there?
23      A.   It is an industry tool of all the
24  data from dispensing pharmacies -- retail

Page 262

1 dispensing pharmacies that is DEA identified that
2 provides analytics and data to the company.
3     Q.    And what is the potential
4 exception referred to here?
5     A.    An exception would be a Rite Aid
6 pharmacy that would be an outlier, such as, say,
7 a store that dispensed the highest amount of
8 oxycodone, then we would want to look at that
9 book of business at that time.  This is
10 identified as new because the IMS tool was just
11 rolled out at that particular time.  It was in
12 its infancy and we had just started to use the
13 tool in 2013.
14     Q.    Before 2013, did Rite Aid ever
15 use the IMS tool?
16     A.    Not related to controlled
17 substances.  Rite Aid uses the IMS data for other
18 different types of analytics for different
19 departments.  It was just the controlled
20 substance tool was new at that time.
21     Q.    Looking over in the "Monthly"
22 column on this same page, "Senior Analyst,
23 Controlled Substances," it looks like in the
24 second cell, the third cell and the fourth cell,

Page 263

1 and I'll read them in order, they're all
2 highlighted in yellow.  Right?
3     A.    Yes.
4     Q.    It says, "Routine analysis of
5 stores trending high in oxycodone sales.
6         "Routine analysis of stores
7 trending high in hydrocodone sales.
8         "Routine analysis of stores
9 trending high hydromorphone sales."  Right?
10     A.    Correct.
11     Q.    And those are identified with
12 yellow highlighting as completely new activities.
13 Right?
14     A.    The routine analysis of that was,
15 yes, a new activity.
16     Q.    So Rite Aid was not doing a
17 routine analysis of stores with trending high
18 oxycodone, hydrocodone or hydromorphone before
19 2013.  Right?
20         MS. McENROE:  Objection.
21         THE WITNESS:  We did not do a
22     routine analysis, but we did do analysis.
23     This was, again, putting some structure
24     to the analysis to make it more routine.

Page 264

1 BY MR. POWERS:
2     Q.    You said you did some analysis.
3         How did you do that analysis?
4         MS. McENROE:  Objection.
5         THE WITNESS:  We ran data from
6     our dispensing system and looked at the
7     various stores, as far as the various
8     products, identified outliers and then
9     would do a follow-up on that.
10 BY MR. POWERS:
11     Q.    Did you do that, running the
12 dispensing data and looking for outliers, to
13 determine whether orders were suspicious orders?
14         MS. McENROE:  Objection to form.
15         THE WITNESS:  The analysis of
16     these items were not related to
17     suspicious orders.  It was related to
18     individual stores and their dispensings.
19 BY MR. POWERS:
20     Q.    So the trends that you were doing
21 analysis of before 2013 of sales of oxycodone,
22 hydrocodone and hydromorphone were not related to
23 identifying suspicious orders?
24     A.    They were not.

Page 265

1     Q.    Further down in the "Monthly"
2 column there, once again, they're all -- all
3 these cells are highlighted in yellow.  It says,
4 "Analysis of top prescribers for oxycodone.
5         "Analysis of top prescribers for
6 hydrocodone.
7         "Analysis of top prescribers for
8 hydromorphone.
9         "Analysis of top prescribers for
10 methadone.
11         "Analysis of top prescribers for
12 buprenorphine."
13         Do you see those particular
14 cells?
15     A.    I do.
16     Q.    So Rite Aid was not doing
17 analysis for those particular drugs before 2013;
18 is that correct?
19         MS. McENROE:  Objection to form.
20         THE WITNESS:  That is not
21     correct.  We were doing analysis.  It was
22     not being done on a monthly basis.  And,
23     again, we wanted to bring this all into
24     the one department.  But there were

Page 266

1    analysis of prescribers for oxycodone,
2    hydrocodone.  It was just not monthly and
3    it was not on a routine basis.
4    BY MR. POWERS:
5        Q.    But once again, these are all
6    columns -- all cells highlighted in yellow are
7    described as a completely new activity.  Right?
8        A.    True.
9        Q.    And there's no modifier in front
10   of "analysis."  It does not say, like above,
11   routine analysis in these ones that I just read.
12   Right?
13       A.    True.
14       Q.    So that means that, as I read
15   this document, that any analysis was a completely
16   new activity, according to this document.
17           Isn't that right?
18           MS. McENROE:  Objection to form,
19   misstates testimony.
20           THE WITNESS:  That is how it may
21   read to you, yes.
22   BY MR. POWERS:
23       Q.    And what do you do with any
24   analysis of stores trending high in oxycodone,

Page 267

1    hydrocodone, hydromorphone or methadone?
2           MS. McENROE:  Objection to form.
     ██       ████████████████       █████████
     ██       █████████████████████████
     ██       ███████████████████████████████
     ██       █████████████████████████████████
     ██       ██████████████████
     ██       ██████████████████████████
     ██       ████████████████████████████
     ██       ██████████████████████████
12          Now, in the overall scheme of all
13       of the items that are on here, I still
14       would like to point out, leading back to
15       the case at hand, the only drug that was
16       ever distributed by the distribution
17       center in question was the hydrocodone.
18       And again, that was when it was a
19       Schedule III controlled substance.
20   BY MR. POWERS:
21       Q.    Those hydrocodone analyses that
22   were done, what were the -- was there a name for
23   that analysis when it was done?
24           MS. McENROE:  Objection to form.

Page 268

1           THE WITNESS:  It was just a
2    running of all hydrocodone dispensings
3    from the particular pharmacies.
4    BY MR. POWERS:
5        Q.    And who performed that analysis?
6        A.    We would do it in our department
7    through the analytics.  Or if my team wasn't as
8    sophisticated, we would have asset protection
9    also try to run some other reports.
10       Q.    When you say your department, you
11   mean the government affairs department?
12       A.    Yes.  The people that worked for
13   me.
14       Q.    And did you use that analysis of
15   the hydro -- or excuse me -- hydrocodone sales to
16   identify potentially suspicious orders?
17       A.    We did not use that to identify
18   suspicious orders.
19       Q.    Did you document that analysis in
20   any way?
21       A.    There would be analysis, yes, in
22   files in my office that were turned over.
23       Q.    Do you know if you turned over
24   those files to your attorneys?

Page 269

1        A.    I did.
2        Q.    Is there a particular name for
3    the file that they are kept in?
4        A.    It would be hydrocodone.  That
5    would be it.  Or it would be an analytics
6    hydrocodone and the year.  That's about it.
7           MS. McENROE:  We've been going a
8    little over an hour.
9           MR. POWERS:  You read my mind.
10   Let's take a break.
11          THE VIDEOGRAPHER:  Going off the
12   record at 3:56.
13              - - -
14          (A recess was taken from
15   3:56 p.m. to 4:26 p.m.)
16              - - -
17          THE VIDEOGRAPHER:  We're back on
18   the record at 4:26 p.m.
19          MR. POWERS:  I have no further
20   questions for the witness.
21          MS. McENROE:  Great.  Thank you.
22   We have no further questions as well.
23   And we view this as the end of Ms. Hart's
24   fact deposition.

**Page 270**

1  MR. POWERS:  Yes.  She's coming
2  back for the 30(b)(6) tomorrow.
3  MS. McENROE:  Agreed.  Thank you.
4  THE VIDEOGRAPHER:  This ends
5  today's deposition.  We're going off the
6  record.  The time is 4:26 p.m.
7  (Witness excused.)
8  (Deposition concluded at
9  approximately 4:26 p.m.)

**Page 271**

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, JANET GETZEY HART, have the opportunity to read and sign the deposition transcript.

_____
ANN MARIE MITCHELL, a Federally Approved Certified Realtime Reporter, Registered Diplomate Reporter, Registered Merit Reporter and Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

**Page 272**

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

**Page 273**

- - - - - -
E R R A T A
- - - - - -

PAGE LINE CHANGE
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____
___ ___ _____
REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1
2         ACKNOWLEDGMENT OF DEPONENT
3
4         I,_____, do
5   hereby certify that I have read the foregoing
6   pages, 1 - 274, and that the same is a correct
7   transcription of the answers given by me to the
8   questions therein propounded, except for the
9   corrections or changes in form or substance, if
10  any, noted in the attached Errata Sheet.
11
12
13  _____
14  JANET GETZEY HART              DATE
15
16
17  Subscribed and sworn
    to before me this
18  _____ day of _____, 20____.
19  My commission expires:_____
20
    _____
21  Notary Public
22
23
24