```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                      -  -  -

 5   IN RE:  NATIONAL           :

     PRESCRIPTION               :  MDL No. 2804

 6   OPIATE LITIGATION          :

     _____ :  Case No.

 7                              :  1:17-MD-2804

     THIS DOCUMENT RELATES       :

 8   TO ALL CASES               :  Hon. Dan A. Polster

 9                      -  -  -

10              Wednesday, May 29, 2019

11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

12

                        -  -  -

13        Videotaped deposition of  MATTHEW C. GREIMEL,

14   held at the offices of Marcus & Shapira LLP,  One

15   Oxford Center, 301 Grant Street, Suite 3500,

16   Pittsburgh, Pennsylvania  15219, commencing at 9:10

17   a.m., on the above date, before Carol A. Kirk,

18   Registered Merit Reporter and Notary Public.

19

20                      -  -  -

21

22            GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

23                 deps@golkow.com

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1          A P P E A R A N C E S:
 2  On behalf of the Plaintiffs:
 3      MORGAN & MORGAN
        BY:  JAMES YOUNG, ESQUIRE
 4         jyoung@forthepeople.com
        76 South Laura Street, Suite 1100
 5      Jacksonville, Florida  32202
        601-261-2220
 6
 7  On behalf of HBC:
 8      MARCUS & SHAPIRA LLP
        BY:  JOSHUA A. KOBRIN, ESQUIRE
 9         kobrin@marcus-shapira.com
        ROBERT M. BARNES, ESQUIRE
10         rbarnes@marcus-shapira.com
        One Oxford Center, 35th Floor
11      301 Grant Street
        Pittsburgh, Pennsylvania  15219-6401
12      412-338-3345
13
        On behalf of AmerisourceBergen Corporation:
14
        REED SMITH LLP
15      BY:  BRIAN T. HIMMEL, ESQUIRE
           bhimmel@reedsmith.com
16      225 Fifth Avenue
        Pittsburgh, Pennsylvania  15222
17      412-288-3131
18
19  On behalf of Endo Pharmaceuticals, Inc.,
    Endo Health Solutions, Inc., and Par Pharmaceutical
20  Companies, Inc. (Via Teleconference):
21      ARNOLD & PORTER KAYE SCHOLER, LLP
        BY:  ALLISON GARDNER, ESQUIRE
22         allison.gardner@arnoldporter.com
        601 Massachusetts Avenue, NW
23      Washington, DC  20001
        202-942-5150
24
25
```

Page 3

```
 1  On behalf of HD Smith (Via Teleconference):
 2      BARNES & THORNBURG LLP
        BY:  ALYSSA HUGHES, ESQUIRE
 3         alyssa.hughes@btlaw.com
        11 South Meridian Street
 4      Indianapolis, Indiana  46204
        317-261-7881
 5
 6  On behalf of Johnson & Johnson and
    Janssen Pharmaceuticals (Via Teleconference):
 7
        O'MELVENY & MYERS LLP
 8      BY:  TRISHA PARIKH, ESQUIRE
           tparikh@omm.com
 9      Two Embarcadero Center, 28th Floor
        San Francisco, California  94111
10      415-984-8952
11
12  On behalf of McKesson (Via Teleconference):
13      COVINGTON & BURLING LLP
        BY:  ALISON DICIURCIO, ESQUIRE
14         adiciurcio@cov.com
        One CityCenter
15      850 Tenth Street, NW
        Washington, DC  20001
16      202-662-5353
17  On behalf of Henry Schein (Via Teleconference):
18      LOCKE LORD LLP
        BY:  SARAH LANCASTER, ESQUIRE
19         slancaster@lockelord.com
        600 Congress Avenue, Suite 2200
20      Austin, Texas  78701
        512-305-4700
21
22
23
24
25
```

Page 4

```
 1  On behalf of Discount Drug Mart (Via Teleconference):
 2      CAVITCH FAMILO & DURKIN CO. LPA
        BY:  ROBERT WEST, ESQUIRE
 3         rwest@cavitch.com
        1300 East Ninth Street, 20th Floor
 4      Cleveland, Ohio  44114
        216-621-7860
 5
 6  On behalf of Walgreens (Via Teleconference):
 7      BARTLIT BECK LLP
        BY:  LESTER C. HOUTZ, ESQUIRE
 8         lester.houtz@bartlitbeck.com
        1801 Wewatta Street, Suite 1200
 9      Denver, Colorado  80202
        303-592-3177
10
11  On behalf of Purdue Pharma (Via Teleconference):
12      DECHERT LLP
        BY:  DANA MARTIN, ESQUIRE
13         dana.martin@dechert.com
        35 West Wacker Drive, Suite 3400
14      Chicago, Illinois  60601
        312-646-5824
15
16
17  ALSO PRESENT:
18      David Lane, Videographer
19
20          - - -
21
22
23
24
25
```

Page 5

```
 1      VIDEOTAPED DEPOSITION OF MATTHEW C. GREIMEL
 2          INDEX TO EXAMINATION
 3  WITNESS                        PAGE
 4  MATTHEW C. GREIMEL
 5      CROSS-EXAMINATION BY MR. YOUNG:        8
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1  VIDEOTAPED DEPOSITION OF MATTHEW C. GREIMEL
2       INDEX TO EXHIBITS
3  HBC-GREIMEL   DESCRIPTION            PAGE
4  Greimel 1   Plaintiffs' Notice of Oral      10
         Videotaped Expert Deposition of
5        Matthew Greimel
6  Greimel 2   Expert Report of Matthew C.     13
         Greimel

Page 7

1              - - -
2          P R O C E E D I N G S
3              - - -
4       THE VIDEOGRAPHER:  We're now on
5  the record.
6       My name is David Lane,
7  videographer, for Golkow Litigation
8  Services.  Today's date is May 29, 2019,
9  and our time is 9:10 a.m.
10      This deposition is taking place in
11 Pittsburgh, Pennsylvania, in the matter
12 of National Opiate Litigation MDL.  Our
13 deponent today is Matthew Greimel.
14      Counsel will be noted on the
15 stenographic record.
16      Our court reporter today is
17 Carol Kirk, and will now swear in the
18 witness.
19      (Witness sworn.)
20      THE VIDEOGRAPHER:  People on the
21 phone, if you could just mute yourself
22 on your end so we don't get any
23 interference.  I appreciate it.  Thank
24 you very much.
25      MR. YOUNG:  And, Carol, did you

Page 8

1  want to take their appearances just
2  through an e-mail to you, or do you want
3  them to tell you now?
4       THE COURT REPORTER:  E-mail.
5       MR. YOUNG:  Okay.
6              - - -
7          MATTHEW C. GREIMEL
8  being by me first duly sworn, as hereinafter
9  certified, deposes and says as follows:
10         CROSS-EXAMINATION
11 BY MR. YOUNG:
12      Q.   Good morning, Mr. Greimel.
13      A.   Good morning.
14      Q.   As we mentioned before we started,
15 my name is James Young from Morgan & Morgan on
16 behalf of the Plaintiffs in this case.  And I'm
17 going to be here taking your deposition this
18 morning.
19      I assume, given your background,
20 in law enforcement, you've given deposition
21 testimony before?
22      A.   Not specifically deposition, but
23 I've testified in all state superior court,
24 federal court, court of appeals, I guess
25 different kinds of suppression hearings, grand

Page 9

1  jury.  I've testified plenty of times.  Just not
2  in a specific deposition.
3       Q.   So one of the things about
4  deposition testimony is it's just human nature
5  for us to, you know, talk over each other and
6  sort of, you know, give queues, like you're
7  nodding your head now.  That normally wouldn't
8  be captured in the record.  We do have a
9  videographer here that's capturing the video of
10 it.  But it is important that you, you know,
11 wait for the question to be asked and then
12 answer it in a verbal way, so not just nodding
13 of your head.
14      A.   Yes.
15      Q.   There may be times today when your
16 counsel or counsel on the phone object.
17 Traditionally they'll object to the form of my
18 question.  That doesn't mean you shouldn't
19 answer.  Unless they instruct you not to answer
20 it, you're here to give us answers.
21      Some of my questions may not make
22 sense to you.  My wife tells me that all the
23 time, you know, I ask silly questions.  And if
24 it doesn't make sense to you, let me know and
25 I'll try to ask it in a way that does makes

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 sense. I'll clarify it. I'll try to be really
2 direct and candid with you today and ask you to
3 do the same.
4 If you need to take a break at any
5 time, I'm certainly happy to do that. I'm not
6 here to punish you or keep us here all day, as I
7 mentioned at the outset. We'll try and keep it
8 as brief as possible and keep you as comfortable
9 as possible. If you want to use the bathroom or
10 get water, whatever, happy to do that.
11 Any questions before we jump --
12 A. No.
13 Q. Okay.
14 A. Thank you.
15 ---
16 (Greimel Deposition Exhibit 1 marked.)
17 ---
18 Q. So I'm going to show you really
19 today, I think, only two exhibits, one being the
20 notice of this deposition. The other being your
21 report, which I'm sure you're familiar with.
22 So the first thing I'm going to
23 show you is today's notice of taking the
24 deposition. I'm sure you've seen this.
25 A. Yeah.

Page 11

1 Q. And I just ask you to take a look,
2 really, at the attachment to that Exhibit A.
3 And I just want to start off by asking you
4 whether you've brought any documents or
5 materials responsive to Number 1 on Exhibit A.
6 And those would be things that you reviewed
7 since the date of your report that were not
8 identified in your report. So additional
9 materials.
10 MR. KOBRIN: And I may want to --
11 if you're okay with me just stating, I
12 wanted to make a statement at the
13 beginning.
14 MR. YOUNG: Sure.
15 MR. KOBRIN: There's one
16 deposition transcript that we weren't
17 sure if he reviewed before or after, but
18 it's not in the report, which is the
19 Bencivengo deposition transcript.
20 MR. YOUNG: Okay.
21 MR. KOBRIN: And then some of the
22 things, we realize are cited in the
23 footnotes, but we didn't get them in the
24 appendix, but everything else is cited
25 in some form pursuant to footnote

Page 12

1 number 1.
2 MR. YOUNG: Okay. Good
3 clarification.
4 BY MR. YOUNG:
5 Q. So as I understand it from your
6 counsel, some of the materials that you relied
7 on, but did not specifically disclose, are
8 embedded in the footnotes or referenced --
9 A. Yes.
10 Q. -- in your report?
11 A. Yes.
12 Q. Anything other than these things
13 that we've described that you've relied upon or
14 that you intend to rely upon in your testimony
15 at trial?
16 A. Everything that I've relied upon
17 was stuff I've already reviewed.
18 Q. Okay. And did you bring with you
19 today an itemization of the hours you've spent,
20 the compensation paid or to be paid for your
21 work in this matter?
22 A. I don't have an exact itemization,
23 but I can --
24 Q. But one could be obtained --
25 A. Yes. One could be obtained, yes.

Page 13

1 Q. -- through counsel?
2 MR. KOBRIN: Yeah, and we're going
3 to take the position as, I'm sure you
4 imagine, other defendants have taken in
5 this case. But that said, you can ask
6 him questions about his time or --
7 MR. YOUNG: Sure.
8 MR. KOBRIN: -- or his rates.
9 BY MR. YOUNG:
10 Q. And, finally, a copy of your most
11 recent CV or resumé. I know that there's one
12 attached to your report.
13 Are there any supplements or
14 updates since --
15 A. No. That's --
16 Q. -- a few weeks ago?
17 A. That's the most recent that I
18 have.
19 Q. Okay.
20 ---
21 (Greimel Deposition Exhibit 2 marked.)
22 ---
23 Q. And we'll begin by talking about
24 your resumé. So I'll go ahead and hand you what
25 has been marked as Plaintiffs' Exhibit 2, which

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 is your report.
2          I'm sure you're very familiar with
3 it.
4     A.   I've seen it once or twice.
5     Q.   So I want to direct your attention
6 to I think it's Exhibit A of your report, which
7 is your resumé.
8     A.   Defendants' A, yes.
9     Q.   So let's just start, I guess, at
10 the top.
11         You received a BA in psychology
12 from Rutgers in 1997; is that correct?
13     A.   Correct.
14     Q.   Did you begin your studies at
15 Rutgers majoring in psychology?
16     A.   No, I actually started at NJIT in
17 civil engineering.
18         (Reporter clarification.)
19     A.   I started at NJIT, New Jersey
20 Institute of Technology, in civil engineering,
21 but it really -- as I went along, I didn't want
22 to do that for the rest of my life.
23         My whole family is in
24 construction, and my father is an architect. I
25 was very good at it, but it's just -- I couldn't

Page 15

1 see myself doing that for the rest of my life.
2         So I transferred across the
3 street, which Rutgers was directly across the
4 street. In fact, you could take courses from
5 either one, if you're enrolled and wanted to
6 take courses from the other.
7         So I did that. Took courses and
8 eventually transferred over and received a BA in
9 psychology from Rutgers.
10     Q.   Was it your intention when you
11 graduated to pursue a career in psychology?
12     A.   No. I was thinking about -- I did
13 a lot of criminal psychology at first. I guess
14 I watched "Silence of the Lambs" too many times,
15 and I wanted to become a profiler, FBI serial
16 killer profiler. But I went into law
17 enforcement. I just -- I was working with the
18 FBI a bunch of times. I decided the DEA was a
19 better fit.
20     Q.   Did you ever consider attending
21 law school and becoming an attorney?
22     A.   Actually, we were talking about
23 this yesterday. I was -- I was a lot of times
24 working with the assistant U.S. attorneys. They
25 impressed me, and I did like what they were

Page 16

1 doing, so I was -- I was thinking about that.
2 Now that I retired young, I guess I could go
3 back to law school and do that, but I'm not
4 sure.
5     Q.   Do you recall -- this is a shot in
6 the dark.
7         Do you recall your GPA when you
8 graduated from Rutgers?
9     A.   Oh, it was a 3-point -- I don't
10 remember if it was a 3.5 or 3.6. Something like
11 3-point -- mid 3s, maybe 3.4 or 3.6 range. I
12 forget.
13     Q.   That's pretty impressive. I
14 couldn't recall mine, so I'm just curious.
15         Okay. So after you graduated
16 Rutgers in 1997, what were your plans upon
17 graduation? Just to seek a job out in the world
18 somewhere?
19     A.   I was already working with the
20 City of Newark in the mayor's office. And
21 before that, I did an internship with Senator
22 Frank Lautenberg. I did -- I was interested in
23 politics to a point, or at least I liked
24 government. So I -- I was working in at least
25 municipal government at that point. But I

Page 17

1 always did have that urge to go into law
2 enforcement and at one point the military also,
3 but ...
4     Q.   But you never pursued a career in
5 the military or enlisted in the military?
6     A.   No. No, I didn't. I just --
7 timing, I think, was the deal with that, that I
8 did not.
9     Q.   When did you begin your job as
10 a -- in the mayoral administration in the City
11 of Newark?
12     A.   I started working as a mayor's
13 aide in -- I think first I was an intern for a
14 day, and then they switched and hired me over as
15 a mayor's aide after a day. And I was -- let's
16 see. That was March of -- I think it was 1996
17 or something, or 1997, 1997.
18     Q.   So in your resumé, you have a date
19 of May '97, and I don't know if that refreshes
20 your recollection.
21     A.   Okay. That could be it. May '97
22 then.
23         MR. KOBRIN: You could use your
24     resumé.
25         THE WITNESS: Yeah, that's true.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    I should -- I should actually refer --
2  BY MR. YOUNG:
3    Q.   Yeah, and specifically that last
4  page of your resumé is where I'm looking.
5    A.   Yeah, exactly, May '97.
6    Q.   Did you begin an internship or
7  your job as the mayor's aide a day later prior
8  to graduating Rutgers or after graduating
9  Rutgers?
10    A.   I was already working there.
11    Q.   Okay.  So prior to graduating?
12    A.   Just prior.
13    Q.   Do you recall your salary as a
14  mayor's aide?
15    A.   I started as an intern, so they
16  were paying me as an intern, so it was, like, I
17  think, $30,000.  And then -- and then it went
18  up.  After they made me a mayor's aide, I think
19  I was around 45, 50 thousand dollars, which for
20  a kid right out of college isn't that bad.
21    Q.   And how did you find this job as
22  a -- as a mayor's aide?  I know you mentioned
23  you were an intern.  Is that how you found the
24  job?
25    A.   No.  I was driving back from my

Page 19

1  internship with Senator Lautenberg's office, and
2  I saw the mayor of Newark with the CEO of
3  Prudential walking into -- they were building
4  the Prudential Center, or the NJ PAC, the
5  performing arts center, in Newark.
6         So I kind of stopped and
7  introduced myself.  Took a tour with the mayor
8  and Art Ryan, who was the CEO of Prudential, of
9  the performing arts center, which was under
10  construction.  And the mayor liked me and wanted
11  me to work for him as an intern.  As I said,
12  worked for one day as an intern, and then they
13  hired me full time as an aide.
14    Q.   Did Senator Lautenberg make a
15  recommendation for you to the mayor?
16    A.   I don't know if he did.  I never
17  asked him to.  I would hardly see
18  Senator Lautenberg.  He'd stop into the office,
19  go to his office specifically and leave.  We'd
20  rarely see him.
21    Q.   And how did you get the position
22  with Senator Lautenberg?
23    A.   I went to his office one day,
24  which was in Newark, and asked if they had any
25  internships.

Page 20

1    Q.   Okay.  And who was the mayor at
2  that time?
3    A.   Sharpe James.
4    Q.   Was he the -- I guess you were a
5  mayor's aide for one year.  It was always for
6  Mayor James?
7    A.   Yes.
8    Q.   Okay.  And he was a longstanding
9  mayor --
10    A.   He was a mayor for, like,
11  30 years, or something to that effect.
12    Q.   Did you during your time as a
13  mayor's aide ever have occasion to work on any
14  pharmaceutical or drug policy issues?
15    A.   No.  I mainly worked -- I was a
16  liaison between the police and fire departments
17  for the City of Newark for the mayor.  I would
18  call either the police director or the fire
19  director and go over different issues that
20  different, I guess, civic leaders had in areas
21  regarding crime or buildings that were -- needed
22  to be taken down because they're fire hazards,
23  or just different policy issues, but nothing
24  specific regarding pharmaceutical.
25    Q.   How about illicit street drugs?

Page 21

1  Anything --
2    A.   Yes.  I mean, a lot of the
3  complaints were in regards to drug dealing.
4    Q.   And you mentioned you split time
5  between the -- or oversaw both the police and
6  the fire departments.  Did you have any
7  background or training with regard to
8  supervising police or fire departments?
9         MR. KOBRIN:  Object to form.
10    A.   No, I didn't at that point.  I was
11  a -- just basically graduated college.
12    Q.   Did you receive any specific
13  training or support in order to oversee the
14  Newark police and fire departments while you
15  were a mayor's aide?
16    A.   I wasn't in charge of them.  I was
17  just more of a liaison that would tell them or
18  speak with the different department heads as to
19  issues that they should look into.  I wouldn't
20  tell them, "Send 20 police officers to this
21  location and set up a command post" or anything.
22    Q.   I understand.
23         Okay.  So how long were you a
24  mayor's aide for Mayor Sharpe?  On your resumé,
25  it says to July '98.  Is that accurate?

Page 22

1   A.   That's -- that's right.  It's just
2 a little bit over a year.
3   Q.   Okay.  And you, I take it from
4 your resumé, transitioned to a different job in
5 the City of Newark?
6   A.   Yes.
7   Q.   Give me the background on that.
8 How did you transition?  Did you -- did somebody
9 approach you about another job, or did you seek
10 out another job?
11   A.   Well, the mayor wanted me to do
12 what interested me, and what interested me were
13 the police and fire department.  And at that
14 point I did a lot of work with the police
15 department, so I spoke to the mayor and I spoke
16 to the police director to see if there's any
17 position that I could assist and get more
18 exposure.  And that's when I went over to the
19 police department.
20   Q.   The position, the title, you have
21 on your resumé is assistant deputy director,
22 administrative officer, police spokesman.
23   A.   Yes.
24   Q.   Is that three different positions
25 over time, or was that --

Page 23

1   A.   It's -- it was a conglomeration of
2 positions at the same time that they gave me all
3 the titles for.  I worked countless hours every
4 day on all those things.  And a lot of them had
5 major overlap.
6   Q.   I want to talk specifically about
7 serving as the police spokesman.  Did you have
8 any studies at Rutgers or really anywhere else
9 that were focused on the duties attendant to
10 being a police spokesman?  In other words,
11 public relations courses or journalism courses?
12   A.   Well, I took -- I took a lot of
13 literature courses that dealt -- I have taken
14 journalism courses, and there was -- when I was
15 a mayor's aide, another thing I did a lot was
16 interacting with the media.  So I had a lot of
17 on-the-job training.
18   Q.   And do you recall -- the tenure
19 you have on your resumé is July '98 to
20 January 2000.  During that limited time period
21 as a police spokesman, did you have occasion to
22 handle any media coverage relating to
23 pharmaceutical drugs or opioids specifically?
24   A.   No.  The main problem in Newark
25 regarding any drug was more the illicit

Page 24

1 narcotics, the street drugs.
2   Q.   Do you recall any significant
3 arrests or indictments that related to your work
4 during that time in the City of Newark relating
5 to pharmaceuticals or opioids?
6   A.   No.
7   Q.   So who was your supervisor -- was
8 your supervisor at the Newark Police Department
9 a law enforcement person or an administrative
10 person?
11   A.   Law enforcement person.
12   Q.   And what was that person's name
13 and title?
14   A.   At the time the deputy director of
15 the police department, Rocco Malanga, he was --
16 I worked directly underneath him.  He headed the
17 police department's office of community affairs
18 and public relations.
19   Q.   Okay.  So that -- that's why I
20 asked about administrative versus law
21 enforcement.  That sounds like more of an
22 administrative job than a law enforcement job.
23   A.   Oh, yes.
24   Q.   Okay.
25   A.   Yeah, I was not a law enforcement

Page 25

1 officer at that point.
2   Q.   Yes.  And your supervisor was also
3 not a law enforcement --
4   A.   He was a law -- he was a police
5 officer who was elevated to that -- it's an
6 administrative position.
7   Q.   Okay.
8   A.   But he was a law enforcement
9 officer.
10   Q.   I see.
11       In your resumé, it says that you
12 assisted -- during this tenure in your career,
13 you "assisted in the creation, instituting, and
14 restructuring of, among other things, the Drug
15 Abuse Resistance Education or DARE program."
16       Can you give us a little bit of
17 background about the DARE program and what you
18 did there?
19   A.   The DARE -- the DARE program was
20 underneath our public relations department,
21 community affairs.  It was an ongoing program,
22 which is a national program aimed at school-aged
23 children to keep them away from drugs, give them
24 other options, tell them, you know, that drugs
25 are bad and the evils of drugs, and a lot of

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 education. So I helped beef up that area of the
2 police department.
3 Q. Did the DARE program cover
4 prescription drugs as well as illegal drugs, or
5 was it exclusively focused on illegal or illicit
6 drugs?
7 A. At that time, it was primarily
8 illegal illicit drugs.
9 Q. During this tenure, this July '98
10 to January 2000, did you receive any type of
11 specialized training or instruction or education
12 about the dangers of prescription drugs or
13 prescription drug abuse?
14 A. At that time prescription drug
15 abuse wasn't a main topic. It was the illicit
16 street drugs that were -- at least the main
17 issue in the City of Newark.
18 Q. Okay. And I take it from your
19 resumé, you left that position in January of
20 2000 to join the fire department. Tell me about
21 what led to that decision to leave the Newark PD
22 and join the fire department.
23 A. I did a lot of work with the
24 emergency management department within the fire
25 department, and I liked that position. I liked

Page 27

1 what they did. I liked the impact, being able
2 to help people dealing with disasters. So I
3 switched over to that position.
4 I was just trying to get exposure,
5 trying to learn new things. My overall career
6 goal was to go into law enforcement, but I
7 wanted to get well rounded.
8 Q. And there was an opportunity to go
9 to the fire department to, I guess, get well
10 rounded. Is that your --
11 A. Yes. And I really enjoyed the
12 emergency management job.
13 Q. Okay. And I noted -- I had to
14 think to myself the timing of 9/11. You
15 actually left there in August of 2001, just a
16 month before 9/11.
17 A. Just a month before. And I was in
18 the academy during 9/11. We actually saw the
19 buildings go down while we were doing a PT in
20 Branch Brook Park.
21 Q. Wow. The job duties that you
22 had -- I guess you were at the Newark Fire
23 Department from January 2000 to August 2001.
24 The job duties that you had there, were they
25 similar in scope to what you did at the police

Page 28

1 department previously?
2 A. No. This was a lot more hands-on,
3 running emergency management-type situations and
4 disasters within the city, anything from major
5 fires to chemical leaks to small plane crashes
6 or anything to that nature.
7 Q. Do you recall your supervisor's
8 name and title for that job?
9 A. The overall commander of emergency
10 management was Robert Swales.
11 Q. And his title was commander?
12 A. He was the -- coordinator of
13 emergency management was his exact title.
14 Q. Okay. Do you recall your salary?
15 A. At that time I was probably around
16 $70,000.
17 Q. And I didn't ask, but do you
18 recall your salary while you were at the police
19 department as assistant deputy director?
20 A. Around $60,000.
21 Q. So in August of 2001, what led you
22 to leave the Newark Fire Department?
23 A. I was offered a -- I took the
24 police test earlier that year, and I was offered
25 a position within the Newark Police Department

Page 29

1 based on my score.
2 Q. And on your resumé, you have the
3 time period August 2001 to September 2005, and
4 the position description is police
5 officer/detective. I take that to mean that you
6 didn't start out as a detective but became one
7 during that time?
8 A. Yes, correct.
9 Q. Okay. When did you become a
10 detective?
11 A. Let's see. In 2004, March of
12 2004. That was the March.
13 Q. Okay.
14 A. Yeah, March 2004.
15 Q. Is that a separate test that you
16 have to take to become a detective?
17 A. No. It's an appointment in the
18 City of Newark.
19 Q. Is that typical for local police
20 departments?
21 MR. KOBRIN: Object to form.
22 Q. If you know.
23 A. A lot of departments, it's an
24 appointment. I know New York PD, it's a -- you
25 have to take a test. It's a whole other -- I

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 think LAPD also.

2     Q.   From TV shows, I've always heard,
3 you know, "You have to pass your detective's
4 test." That's my base of knowledge, so ...
5     Okay. So just to walk through a
6 little bit about your tenure with the Newark PD.
7 So you started in August of 2001, and you say
8 here that you were the academy platoon leader
9 responsible for 60 recruits.
10     Explain to me a little bit about
11 what the academy platoon leader does.
12     A.   I was a platoon leader. Since
13 there's 120 recruits, there's two platoon
14 leaders. You would have squad leaders, six
15 squad leaders, because each -- you divided it
16 into six teams of ten. And then you would be
17 basically the liaison between the academy staff
18 and the recruits.
19     So if they wanted a specific thing
20 done, they tell you, and you'd figure out how to
21 do it. And then you'd delegate it to your squad
22 leaders, tell them what to do, and then they'd
23 tell their personnel to do it.
24     Q.   I see. So it's part of the
25 hierarchy of the recruits?

Page 31

1     A.   Yes.
2     Q.   You were the upper echelon of the
3 hierarchy?
4     A.   Yes.
5     Q.   And it says you received the
6 instructor's award. What is the instructor's
7 award given for?
8     A.   The number one recruit overall.
9     Q.   And you graduated the police
10 academy in December of 2001; is that right?
11     A.   Correct.
12     Q.   And you began -- and this is --
13 obviously, I'm just taking it from your resumé.
14 You began in the patrol division, east district,
15 in 2001. You stayed there until March of 2004,
16 right?
17     A.   Let's see. Yes. Correct.
18     Q.   Okay. What's the -- the
19 designation "east district." How many districts
20 are there?
21     A.   At that time there's four
22 districts.
23     Q.   Are they compass points; east,
24 west, south --
25     A.   Yeah, exactly. It's based upon --

Page 32

1     Q.   And you were a uniformed patrol
2 officer at that time?
3     A.   Started off as uniformed patrol
4 officer for about six months. And then they
5 made my partner and I plain clothes street
6 crimes because we were, I guess, doing a good
7 job.
8     Q.   Okay. While you were in this
9 patrol division, east district, did you have
10 occasion to work on any cases involving
11 prescription drugs or specifically opioids?
12     A.   It's -- I mean, not like real
13 investigations. But you'd start -- we'd start
14 coming across people with a couple of diverted
15 pills here and there.
16     Q.   There's another item under here
17 I'm curious about. It says you were the captain
18 of the team that participated on The Today Show,
19 America's bravest and finest competition. I've
20 not heard of what. What's that about?
21     A.   That was the summer after 9/11.
22 It was -- they had teams from across the
23 country. They wanted two policemen, two
24 firemen, one of which had to be a female. And
25 we competed in this obstacle course challenge.

Page 33

1     Q.   I do remember this.
2     A.   And we were the -- we made it to
3 semifinals, so ...
4     Q.   Okay. Did your appearance air on
5 national TV?
6     A.   Yes, it did.
7     Q.   Oh, that's pretty cool.
8     Okay. So in March of 2004, you,
9 it looks like, transitioned to what's called
10 Neighborhood Enforcement Stabilization Task
11 Force. What exactly is that?
12     A.   It was a task force that was
13 targeting the most violent areas in the City of
14 Newark. And at the time it was primarily in the
15 west district. It was kind of -- it was a crime
16 suppression kind of detail.
17     Q.   And that's a very brief period,
18 just March to April of '04.
19     A.   Yes.
20     Q.   Was that just a limited duration
21 of the task force, or was it just your
22 participation?
23     A.   That's when -- because before, I
24 said March, but it was really April. April was
25 when I was promoted to detective. So that's why

Page 34

1  I -- I was promoted to detective, and then I was
2  assigned to criminal investigations bureau and
3  loaned out to the DEA as a task force officer.
4      Q.   Okay.  And I want to understand
5  that.  So you were an employee of the Newark
6  Police Department, but they had a collaboration
7  with the DEA to give them officers?
8      A.   Yes.  That's -- that's a program
9  within the DEA.  They have -- and several other
10 federal agencies.  They accept police officers,
11 detectives from other departments to help
12 supplement their manpower, and also give them
13 expertise in certain areas that the department
14 might not necessarily have.
15     Q.   But at all times, you were an
16 employee and paid by the Newark Police
17 Department, not the federal government?
18     A.   Correct.  Although they reimbursed
19 for some overtime, I think.
20     Q.   Did they give you a car?
21     A.   Yes.
22     Q.   The DEA?
23     A.   The DEA did give me an Enterprise
24 rental car.
25         MR. KOBRIN:  Object to form.

Page 35

1         When you said "at all times," you
2  just mean during this period where he
3  was actually working for the Newark
4  Police Department --
5         MR. YOUNG:  Yes.
6         MR. KOBRIN:  -- not when he later
7  worked for the DEA?
8         MR. YOUNG:  Yes.  Sorry.
9         THE WITNESS:  Good point.
10 BY MR. YOUNG:
11     Q.   Okay.  So you're on loan to the
12 DEA.  And I note in your resumé during this time
13 period, you received a number of awards.  We
14 don't need to go through them all, but kudos to
15 you.  It looks like you had a stellar career --
16     A.   Thank you.
17     Q.   -- with the Newark Police
18 Department.
19         Did you ever have any complaints
20 taken out against you or investigations into
21 your actions as a police officer?  During this
22 time, by the way.
23     A.   During the 2001, 2005?  It's a
24 general thing within Newark that people make
25 complaints.  Nothing was ever sustained, because

Page 36

1  it was all fabricated complaints.  They usually
2  did that to, like, "Oh, you arrested me" or
3  you -- like, we locked them up and get their
4  stash of drugs and their gun and all that.  It
5  was a way of retribution a lot of times.  But
6  they'd make some things saying we stole money or
7  beat them up or ...
8      Q.   Do you recall how many of those
9  types of complaints you received during this
10 tenure?
11     A.   Not many.  And they were all
12 non-sustained.
13     Q.   Was there ever any -- I'll call it
14 Internal Affairs.  It might be Office of
15 Professional Responsibility.  Different
16 departments call it different things.
17         Any of those internal
18 investigations done into your work for the
19 Newark Police Department at this time?
20     A.   Well, they have to investigate
21 every and all allegations made, but everything
22 was non-sustained.
23     Q.   Okay.  I guess that was -- yeah,
24 my question was whether there was more than a
25 cursory investigation, a deeper dive.

Page 37

1      A.   No.  Once -- once they -- they'll
2  fully investigate everything to the point where
3  they know that it's either a real allegation or
4  not.
5      Q.   And from this point,
6  September 2005 going all the way back to when
7  you were a mayor's aide, were you ever the
8  subject of litigation, a civil suit, or any kind
9  of criminal investigation, anything like that?
10     A.   No.
11         MR. KOBRIN:  Object to form.
12     A.   No.  No, I was not.
13     Q.   Okay.  So September 2005, you
14 transitioned over to the DEA to begin a 13-year
15 career as a DEA special agent.  You also in your
16 resumé say "supervisor."
17         At what point in time did you
18 become a supervisor for the DEA?
19     A.   I was usually the senior agent in
20 the group behind the group supervisor.  So I was
21 supervisor many times.  Whenever the supervisor
22 is out on vacation, the senior agent becomes the
23 supervisor, or I was also loaned out to
24 different task forces at different times where
25 I'd supervise the task force.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.   I see.  So "supervisor" isn't a
2  job title.  It's more a --
3    A.   No.  The actual titles that we'd
4  have, if you go for the promotion, would be
5  group supervisor.  So I was an acting group
6  supervisor or supervisor of different task
7  forces that I was on loan to.
8    Q.   Got it.
9        Okay.  So tell me about the
10 transition you make to the DEA.  You were at
11 Newark PD on loan to the DEA, and then in
12 September 2005, transitioned fully to work for
13 the DEA.  How does that happen?
14   A.   While I was on loan to the DEA,
15 the special agent in charge and a couple of the
16 assistant special agents in charge sat me down
17 and spoke to me, talked to me about joining the
18 DEA.  They thought that I'd make a good agent,
19 that I should join.
20       So I agreed, and I -- you have to
21 go through a whole application process.  I put
22 in an application, which is a whole background
23 check.  You have to do a psychological exam, a
24 polygraph, a physical fitness test, a physical,
25 written test.

Page 39

1        And after I went through the
2  entire process, I was slotted into a basic agent
3  class down at Quantico in September of 2005.
4    Q.   Had you previously applied to be a
5  special agent?  Gone through that process you
6  just described?
7    A.   No.  It was just that one time,
8  and I was hired.
9    Q.   When you are hired by the DEA, is
10 there a particular focus or designation that
11 they give you to say, "Okay.  You're going to
12 work on this type of activity the DEA
13 investigates" versus other types of activity?
14       Does that make sense?  Did you
15 have -- did you have a focus or a specialty when
16 you first started?
17   A.   Not really.  You come out of the
18 academy as a special agent, and you're expected
19 to be able to investigate all drug crimes,
20 anything underneath Title 21.
21   Q.   The DEA also has something called
22 Office of Diversion Control, I think.
23   A.   Yes.
24   Q.   Did you work for them?
25   A.   I worked with them many times.  I

Page 40

1  was never officially assigned to a diversion
2  group, but we were all expected to work
3  diversion cases as special agents.
4    Q.   Okay.  But would you say that your
5  primary responsibilities during your career with
6  the DEA were on the criminal side of drug
7  investigations?
8    A.   Most of the cases I did work were
9  more on the --
10       MR. KOBRIN:  Object to form on
11   that.
12       Go ahead.
13   A.   Most of the cases were more on the
14 illicit drugs, the cartels, the gangs, violence.
15 But I had several dozen -- a couple dozen cases
16 that were diversion cases as well.
17   Q.   And the diversion cases were
18 criminal in nature as well, right?
19   A.   Yes.
20   Q.   They were not administrative
21 functions of the Office of Diversion Control,
22 right?
23   A.   No.  Agents do criminal
24 investigations.
25   Q.   Are there employees of the DEA

Page 41

1  that do more administrative functions like
2  inspections of pharmaceutical facilities?
3    A.   Correct.  That would be a
4  diversion investigator.
5    Q.   So they're not a special agent?
6    A.   No, they're not.
7    Q.   Is there a hierarchy within DEA
8  such that special agents look down upon
9  diversion investigators?
10   A.   We don't look down on them, but
11 there is a hierarchy that we are -- even if you
12 look at the organizational chart, we are above
13 them.
14       Like, let's say that I was
15 assigned to a diversion group.  I would -- and
16 there's ten people in the group.  They have it
17 all based upon seniority.  You're given a
18 designation.  I was usually -- the boss would be
19 01.  The senior agent would be 02.
20       Now, going to a diversion group,
21 there could have been a diversion investigator
22 that's been there for 30 years.  I could be a
23 brand-new agent coming out of the academy, and
24 let's say it was a three-person group, it would
25 01 the supervisor.  I'd automatically become the

Page 42

1  02 above the person that's been doing it for
2  30 years because the investigator is not the
3  same distinction.
4      Q.  Sure.
5          Are there other positions within
6  the DEA besides those two that you just
7  described, the investigator and special agent
8  within that hierarchy?
9      A.  There's --
10     Q.  There's a whole bunch?
11     A.  There's a -- I mean, you have
12 demand reduction.  You have all different
13 civilian-type positions.
14     Q.  And you were always a special
15 agent or supervisor during your tenure, no other
16 position?
17     A.  No.  Once you're a special agent,
18 you're a special agent.  Even if you go up the
19 ranks, you're still -- an 1811 is what the exact
20 designation is.
21     Q.  Is that a reference to a
22 federal --
23     A.  Federal code.  Everything is
24 numbered and has codes and ...
25     Q.  Do investigators for diversion

Page 43

1  control carry firearms?
2      A.  No.  They don't carry firearms,
3  handcuffs.  They can't make arrests.
4      Q.  Gotcha.
5          Okay.  So you mentioned that you
6  had worked at least a dozen diversion-type
7  cases.  I want to talk about those, if we could.
8          Do you recall the first instance
9  in which you were assigned to work a case
10 involving diversion?
11     A.  I've worked a couple dozen,
12 actually.  But within probably the second year
13 that I was an agent, I was --
14     MR. KOBRIN:  I just want to warn
15 you not to get too much into details of
16 your investigations or any ongoing
17 investigations or information that would
18 be confidential in nature.
19     Sorry to interrupt.
20     MR. YOUNG:  Yeah, sure.
21     A.  So, in general, when I was assigned.  I
22 was helping one of the diversion groups with a
23 case by my second year as an agent.  That was
24 probably the first one.
25     Q.  And certainly without revealing

Page 44

1  any, you know, confidential details, what were
2  the circumstances of that investigation, if you
3  recall?  Was it pharmaceutical manufacturer
4  diversion from a warehouse?  Was it from a
5  wholesaler?  Was it from a retailer?  You know,
6  what was the -- what was the nature of the
7  diversion?
8      A.  Retailer doctor.
9      Q.  And was it involving opioids?
10     A.  Yes.
11     Q.  Was it in New Jersey?
12     A.  Yes.
13     Q.  Was all of your work done in
14 New Jersey, or did you have a broader area than
15 that?
16     A.  Go anywhere in the country,
17 technically anywhere in the world that we have
18 an office.  I've -- I've had cases that have
19 gone to Europe, to Mexico.  A lot of -- a lot of
20 things we do have overlap into New York City.
21 So we do a lot in New York City.  Some stuff
22 goes to Philadelphia, Washington, Maryland, a
23 lot of the contiguous states of New Jersey.
24     Q.  So I assume that there are DEA
25 special agents in those cities you just

Page 45

1  described, like New York and Philadelphia.  How
2  do you determine who works a case when it
3  originates in New Jersey but it has a connection
4  to New York?
5      A.  It would be -- if it started in
6  New Jersey and the base is in New Jersey and we
7  started the case, it will be our case.
8          Now, we could -- we could even
9  deal with the U.S. Attorney's Office, let's say,
10 Southern District of New York in Manhattan if it
11 happened in Manhattan.  We would interface with
12 that office as a New Jersey agent because we had
13 jurisdiction throughout the entire country.
14     So, I mean, if we needed help from
15 the office, like additional manpower or, "Hey,
16 can you -- we're in Jersey right now.  We know
17 that something is happening on 52nd Street.  Can
18 you send a couple cars out to get an eyeball on
19 it or do a little surveillance, follow that guy
20 around for us while we're trying to get over
21 there."
22     So, I mean, there's a lot of
23 collaboration between offices, but generally if
24 an office starts a case and has a nexus to
25 another location, we would follow it through

Page 46

1 unless it was -- like the nexus was to LA, so
2 it's not really feasible for us to go from
3 Jersey to LA. So we'd give all -- we'd probably
4 go and meet with the agents in LA, give them
5 everything that we have, say, "Hey, these are
6 the guys that you guys should be watching." We
7 might both go up on wiretaps, do a collaborative
8 effort that way.
9     Q.   Okay. And specifically with
10 regard to diversion cases, did those cases
11 originate from the Office of Diversion Control
12 or from the special agent side, or is it just a
13 mix?
14     A.   Well, there's special agents in
15 the Office of Diversion Control.
16     Q.   I should clarify.
17     How did you -- let's just take the
18 first instance you recall working on a diversion
19 case. How did that case originate?
20     MR. KOBRIN:  And, again, same
21     warning regarding confidential
22     information.
23     Q.   Yeah. And I'm not looking for
24 confidential information. I'm really looking at
25 "We got a call from diversion control about a

Page 47

1 suspicious physician or a suspicious pharmacy,"
2 like how the case comes to light.
3     A.   That one was an informant.
4     Q.   So an informant that you all were
5 working with at the Newark DEA said, "Hey,
6 there's this shady doctor or this shady
7 pharmacy," something like that?
8     A.   Something like that. I won't
9 really --
10     Q.   Okay. How about the other
11 instances? I think you mentioned a couple dozen
12 of diversion cases. What are the other
13 originations of those cases?
14     A.   A lot of them were informants. In
15 fact, most, if not all. But I think a couple of
16 them were from other offices sending these
17 like -- like I said, like how we'd work with LA,
18 stuff like that.
19     Q.   Did you ever work a diversion case
20 that originated as a result of an inspection of
21 a registrant of either a manufacturer or
22 distributor or a dispenser of controlled
23 substances?
24     A.   Not that I know of.
25     Q.   Have you ever conducted

Page 48

1 inspections of registrants during your tenure
2 with the DEA?
3     A.   That's not generally what a
4 special agent does.
5     Q.   Have you received training to
6 conduct the inspections, if you were asked to
7 conduct an inspection?
8     A.   I would be able to do one.
9     Q.   You've witnessed inspections of
10 registrants performed by others in the DEA?
11     MR. KOBRIN:  Object to form.
12     A.   I haven't had to go out and do
13 inspections, so I wouldn't have witnessed it.
14 But any -- any agent would be expected, if asked
15 to go do an inspection of a registrant, to be
16 able to do it.
17     Q.   When you transitioned from Newark
18 PD to the DEA, what was your starting salary
19 with the DEA?
20     A.   Let's see. The salary went down
21 to -- at the academy, I think it was 46,000.
22 And then as soon as you graduate, you get the
23 availability pay, so it went up another 10,000.
24 So mid 50s.
25     Q.   So you took a pay cut to join the

Page 49

1 DEA?
2     A.   Yes. I was -- with overtime in
3 Newark PD as a detective, I was probably making
4 around 90- to 100,000 dollars every year.
5     Q.   So I have to ask. Why the move?
6 Was it just long-term career advancement?
7     A.   I really liked the job working
8 with the DEA. I thought that their mission was
9 excellent. The people I worked with, the
10 training. It was all around -- it fit. It was
11 a good fit.
12     MR. KOBRIN:  You liked the
13     Enterprise car.
14     A.   The Enterprise car was the best.
15     Q.   Call that a G ride, right?
16     A.   Well, the rental car -- oh, man.
17 Yeah, I got some really good G rides in the
18 beginning. You get the best.
19     Q.   Did you ever get any seized
20 vehicles to drive? I've always seen that on TV
21 and movies.
22     A.   I was never given one. Although,
23 I've seized vehicles. But we had a couple that
24 were made into undercover cars. Like we had a
25 couple high-end cars that they put cameras in

Page 50

1 and trackers and shut off -- engine shutoff
2 switches and all kinds of interesting stuff.
3    Q.   I think there's the TV show "Bait
4 Car."
5    A.   Yeah.  Ours didn't have the locks.
6 It was -- we had ones with traps in them, the
7 concealed compartment.  They had a lot of
8 interesting -- all kinds -- I mean, I can't
9 really -- yeah, I was right at -- I was right at
10 the level.  Yeah.
11    Q.   So tell me about your salary
12 increases over time at the DEA and sort of what
13 triggers them.  Is it just tenure, or are there
14 promotions that happen or --
15    A.   There are promotions.  Every year
16 within your first several years, your -- I
17 started as a GS-9 level.  Which as a DEA agent,
18 you start as a GS-7 or a GS-9.  To get a GS-9,
19 you either have to have a master's or police
20 detective experience, something -- something
21 that sets you apart from your average person.
22    So I started as a 9, which means
23 that within a year of my graduation, I was
24 eligible for a promotion to an 11.  Don't ask me
25 why they skipped 10.

Page 51

1    FBI agents start at 10 for some
2 reason, but -- but it's based upon performance.
3 Your boss has to sign off saying that you met
4 all the different requirements.  So I was
5 promoted to 11 after the first year.  The next
6 year would be a 12.  Same criteria.  Then after
7 a 12, when you're in grade, you can put in for
8 the promotion to senior agent.
9    So within three years, if you
10 start off as 9, you can become a senior agent, a
11 13, but you have to put in a whole packet
12 proving that you deserve to be a senior agent.
13    You have to put in at least
14 three -- when I did it, at least three different
15 big cases, complex investigations, wiretaps, all
16 that kind of stuff.  And it has to be approved
17 by your boss, the assistant special agent in
18 charge of division, the special agent in charge
19 of division, and then headquarters has to
20 approve it.  So it's --
21    Q.   And did you, in fact, achieve
22 that?
23    A.   I got it.  It's called an "early
24 promotion."  So within three years, I was a 13.
25    Q.   And what was the pay at that point

Page 52

1 then when you were a GS-13?
2    A.   I was -- it was back to around
3 what I was making as a Newark police officer.
4    Q.   And the benefits with the federal
5 government under the DEA, were they better than,
6 the same as, or worse than the Newark PD
7 benefits?
8    A.   Overall, worse.  The -- I just
9 remember being -- Newark police officer, my
10 medical benefits, I really didn't have any
11 copays, could go anywhere.
12    I'll tell you, just being a
13 recently retired person from the federal
14 government, for an injury, the -- which you have
15 to fight for your pension.  It's -- if I went
16 out as a police officer, I would have gotten
17 two-thirds pay tax free.  So it's a lot -- a lot
18 lower with the federal government.  So overall
19 the benefits aren't as good.
20    Q.   Are you in the Federal Employees
21 Pension Program, or are you in a 401(k)?
22    A.   If you're under the FERS system,
23 your pension is based upon three different
24 factors.  It would be a percentage of your pay
25 based upon years worked, and then you are

Page 53

1 eligible for Social Security.  You don't have to
2 wait until you're 67 or whatever your age would
3 have been.  And you -- there's a 401(k).  It's
4 called a Thrift Savings Plan.  The government
5 will put in up to 5 percent matching.  But I
6 always maxed it out every year.
7    Q.   And I do want to talk about your
8 retirement from the government, but we'll just
9 pause that for a moment while we work
10 chronologically through this.
11    During your 13 years as a special
12 agent in New Jersey, did you receive any
13 complaints or were you the subject of any
14 investigations that were looked into by Internal
15 Affairs or OPR or any of those types of
16 entities?
17    A.   I know that one guy made a
18 complaint against my whole squad saying we used
19 excessive force, which was unfounded.  That's --
20 I think that was the only complaint over the
21 entire -- my entire tenure.
22    Q.   Were you ever a defendant in
23 litigation, either civil or criminal litigation,
24 during that time?
25    A.   I've had -- there was a couple of

Page 54

1 lawsuits that came up that were -- that were
2 thrown out.
3       Q.   Okay.  Let's -- how many total
4 lawsuits were there?
5       A.   I think two.  Two maybe.
6       Q.   And what was the nature of the
7 first one, if you recall?
8       A.   Something about improper arrest or
9 something to that effect.
10      Q.   And this is one, I assume, where
11 the DEA represented you?  You didn't have to
12 obtain your own counsel?
13      A.   Oh, correct.
14      Q.   And that was just dismissed?
15      A.   I had a warrant from a federal
16 judge to lock the guy up, so there was probable
17 cause.
18      Q.   And how about the second one?
19      A.   It's the same --
20      Q.   Same kind of thing?
21      A.   -- thing.
22      Q.   Were you ever the subject of a
23 deprivation of civil rights or a 1983 action?
24           MR. KOBRIN:  Object to form.
25      A.   No, just voluntary lawsuits.

Page 55

1       Q.   How about civil lawsuits where
2 someone sued you for something outside the DEA?
3           MR. KOBRIN:  Having nothing to do
4 with his DEA work?  Just general?
5           MR. YOUNG:  Yeah, just in general.
6       A.   No.
7           MR. KOBRIN:  Object to form.
8       A.   Never.
9       Q.   You're lucky.
10      A.   Life's not over yet.
11      Q.   That's true.
12           Okay.  So you received during your
13 tenure with the DEA a number of commendations
14 and awards and things like that.  I think you
15 list some of them on your resumé.
16           Are any of the awards that you
17 received -- and I'm using "awards" in the
18 broadest sense.  It might be recognition or
19 commendation or -- you know, I'm trying to think
20 of other words to describe the kudos and
21 attaboys that you may have received.
22           Were any of those related to work
23 that relates in any way to your engagement in
24 this case?  So, in other words, work that
25 informs your opinions that are referenced in

Page 56

1 your report or that you may testify at trial in
2 this matter?
3           MR. KOBRIN:  Object to form.
4       Q.   Do you understand my question?
5       A.   No.  Can you rephrase it?
6       Q.   It was long-winded and convoluted.
7           I'm trying to determine if any of
8 the great things that you did at the DEA relate
9 to the opinions that you're proffering in this
10 case.  So, in other words, did you win an award
11 for a diversion case involving opioids in
12 New Jersey and you did such a great job in that
13 case that it's relevant to, you know, your
14 opinions and testimony in this case?
15           MR. KOBRIN:  Object to form.
16      A.   I'd say most of my outstanding
17 performance awards had some of my work that I
18 did in diversion cases included within that.
19 It's an overall award that you get for your
20 year's -- that year's work, whether or not you
21 did a good job.  And some of those years, you
22 know, one of the major cases I might have worked
23 was a diversion case, so that -- so, yes, based
24 on your question.
25      Q.   Okay.  It says you received two

Page 57

1 commendations from the New Jersey Narcotics
2 Enforcement Officers Association for heading
3 extremely impactful investigations against
4 violent organizations.
5           Would either of those
6 commendations involve diversion work?
7       A.   No.  Most of your diversion people
8 were not violent.  They're doctors, pharmacists,
9 or whatever.  Those were gang investigations,
10 wiretaps.
11      Q.   The other one that is specifically
12 mentioned is the U.S. Attorney's award for
13 outstanding investigation.
14           Do you know if that particular
15 investigation related to diversion work?
16      A.   That was a heroin mill.
17      Q.   So opioids of a type, but illicit
18 opioids?
19      A.   Yes.
20      Q.   You would agree with that?
21      A.   Yes, it's an opiate.  I mean, most
22 of my work has been either technically all
23 opiates, except for, I think, one cocaine job
24 and one meth job.  All the rest have been some
25 form of opiates.

Page 58

1    Q.   And who was the U.S. attorney, if
2  you recall, that -- at the time that gave you
3  that award?  Was that Chris Christie?
4    A.   No, no.  That was right after him.
5    Q.   That's the only one I know, so ...
6    A.   Fishman.  Yeah, Chris Christie was
7  the U.S. attorney right before and then became
8  the governor.  It was -- Paul Fishman was the
9  U.S. attorney.
10    Q.   The other things that you have
11  listed on your resumé here under the bullet
12  points, do any of them particularly stand out to
13  you as being relevant or impactful for purposes
14  of your value as an expert in this case?
15         MR. KOBRIN:  Object to form.
16    A.   I mean, they're all
17  investigatory-type positions, so ...
18    Q.   So --
19    A.   For the most part, except for a
20  couple collateral jobs.
21    Q.   So let's start with the first
22  bullet point.  It says "Primary responsibility
23  is to make arrests and seize assets relative to
24  federal-level drug investigations targeting
25  narcoterrorists, gangs, and other violent drug

Page 59

1  trafficking organizations and individuals."
2         Is there a particular aspect of
3  that description that is applicable or relevant
4  to your expertise in this case?
5    A.   Just the federal-level drug
6  investigation part.  The other -- your diversion
7  cases don't usually involve narcoterrorists, but
8  some gangs do distribute the diverted
9  prescription drugs.
10    Q.   The next bullet point has a couple
11  of different organizations; HIDTA task forces,
12  mobile enforcement team, high impact team,
13  CeaseFire, Newark gang investigations, and
14  Newark violence reduction task force.
15         Any of those task forces have a
16  particular focus or relevancy on prescription
17  drug diversion?
18    A.   The HIDTA task force basically --
19  it goes after all -- or whatever is a problem
20  within that area.  So we did do diversion cases
21  within the HIDTA task force.  The mobile
22  enforcement team, we were in Camden.
23    Q.   And let me just stop you.
24         The HIDTA task force diversion
25  cases that you did, those were criminal cases

Page 60

1  that you and special agents worked to begin
2  prosecution -- or to refer prosecutions,
3  criminal prosecutions, to people, right?
4         MR. KOBRIN:  Object to form.
5    A.   Special agents -- also we worked
6  with diversion investigators and task force
7  officers.  But, yes, it's for criminal
8  prosecution.
9    Q.   Did any of the work that you did
10  with the HIDTA task force relate to
11  noncriminal -- I'm not sure if you refer to that
12  as administrative or civil in nature, but the
13  noncriminal side of diversion control?
14    A.   No.  Agents do criminal
15  investigations.
16    Q.   Okay.  How about the mobile
17  enforcement team?
18    A.   That was targeting, at the time,
19  Camden.  Camden was the most violent city in the
20  country.  We targeted a couple of their top
21  problems and issues, most of which was crack
22  cocaine, but there was heroin and there was some
23  prescription pills along with the gang that was
24  distributing drugs on the street.
25    Q.   I take it that any of the work

Page 61

1  that the mobile enforcement team did would have
2  been criminal in nature also?
3    A.   Yes.
4    Q.   The high impact team.  Describe
5  that for us.
6    A.   That was another focused on an
7  area between Newark and Irvington, that there
8  was a lot of different crime-ridden
9  neighborhoods impacted by all types of drugs and
10  violence, and they just wanted proactive
11  investigations done.
12    Q.   Again, criminal work?
13    A.   All criminal.
14    Q.   CeaseFire?
15    A.   CeaseFire was similar, but that
16  was -- that was more violent-type drug/gun-type
17  cases.
18    Q.   Okay.  Newark gang investigations.
19  That's sort of self-describing.  It involved the
20  gangs of Newark?
21    A.   Gangs.  But they did do some --
22  they were selling oxycodones and OxyContins.
23    Q.   And so as part of your work
24  relating to the OxyContin and oxycodone
25  trafficking by the Newark gangs, did you have

Page 62

1 occasion to investigate any of the defendants in
2 this case?
3     MR. KOBRIN: Object to form. I'm
4     not sure he knows who all the defendants
5     are in this case.
6     THE WITNESS: Yeah.
7     MR. KOBRIN: And I don't think I
8     would want to identify it to that level
9     just in the interest of not revealing
10     any confidential information if he was
11     involved in anything.
12 BY MR. YOUNG:
13     Q. Would the work from the Newark
14 gang investigations be pending at this point in
15 time? Is there any of the things that you
16 worked on that are still pending, or are they
17 all closed investigations?
18     A. There could be some pending. I'm
19 not exactly sure.
20     Q. Yeah. And so I don't want to know
21 about any pending investigations, but certainly
22 closed investigations that are historical in
23 nature.
24     MR. KOBRIN: Unless they were
25     confidential in nature. I just don't

Page 63

1     want him to cross the line. Even if it
2     was closed, if it was never public, I
3     don't want him to reveal any nonpublic
4     information.
5 BY MR. YOUNG:
6     Q. Do you recall whether or not you
7 investigated any wholesalers or distributors
8 during your Newark gang investigation's
9 OxyContin or oxycodone work?
10     A. There's no wholesalers or
11 distributors in Newark.
12     Q. How about manufacturers? Do you
13 recall whether manufacturers were the subject of
14 any of that work?
15     A. There's no manufacturers in Newark
16 either.
17     Q. Okay. So the last one is the
18 Newark violence reduction task force. Describe
19 what the -- I mean, it's somewhat
20 self-descriptive. It's intended to reduce
21 violence, but what was the geographic and
22 subject matter focus of that?
23     A. Basically the -- a lot of the same
24 areas as the CeaseFire and high impact team
25 areas, in the same areas as the Newark gang

Page 64

1 investigations usually worked. It's just these
2 drug, crime-ridden areas within Newark that just
3 needed some help. So we tried to do any
4 proactive measures that we could to help those
5 neighborhoods.
6     Q. Were there any noncriminal aspects
7 to the work that you did there?
8     MR. KOBRIN: Object to form.
9     A. No. I only do criminal
10 investigations.
11     Q. Okay.
12     MR. KOBRIN: We're pushing about
13     an hour. Do you want to take a break at
14     some point? Is this a good time?
15     MR. YOUNG: Yeah. Let's just blow
16     through these last bullets point and
17     then we'll take a break. Just 10 more
18     minutes. Are you okay? If you need a
19     break now, it's --
20     MR. KOBRIN: Do you want to take a
21     break, or do you want to -- it's up to
22     you.
23     THE WITNESS: If we just have a
24     couple more, that's fine.
25     MR. YOUNG: Yeah, 10 minutes more

Page 65

1     on this section, tops.
2 BY MR. YOUNG:
3     Q. So the next bullet point is
4 "Special agent and acting group supervisor for
5 the asset removal group." It says, "In charge
6 of overseeing the investigation, prosecution,
7 and adjudication of all criminal assets in the
8 New Jersey division of the DEA."
9     Can you in layman's terms explain
10 to us what that group did, what you did there?
11     A. Any and all things seized, except
12 for drugs or, you know, actual evidence like
13 that. Any assets seized, which would be cars,
14 bank accounts, crypto currency, Learjets, gold
15 bullion, whatever, would go through this group,
16 and we would interface with the U.S. Attorney's
17 Office and the Asset Forfeiture Division.
18     Q. Did any of the assets involved
19 there relate to registrants under the Controlled
20 Substances Act?
21     A. Yes.
22     Q. Give us some examples of ones that
23 you recall.
24     MR. KOBRIN: And, again, same
25     warning. Don't reveal any confidential

Page 66

1 information regarding ongoing
2 investigations or nonpublic information.
3     THE WITNESS:  Okay.
4     A.   Many vehicles, houses, bank
5 accounts.
6     Q.   When I say "who," I really mean
7 what type of registrant; a pharmacy, a
8 distributor, a manufacturer?
9     A.   Pharmacies, doctors.
10     Q.   Any wholesaler or distributor
11 subjects or defendants in those forfeitures?
12     A.   No.  It's -- basically all the
13 investigation that I've seen regarding drug
14 diversion has been from independent pharmacies
15 in Newark, Internet pharmacies, and bad, dirty
16 doctors.
17     Q.   Did you ever have occasion during
18 your tenure with the DEA to investigate
19 nonindependent pharmacies for diversion?
20     A.   None of them ever came up.  It was
21 always independent pharmacies, and then there
22 was ties to Internet pharmacies, but it was
23 always independents.  Never had any problems
24 with any of the chain pharmacies.
25     Q.   And that's you personally.  Are

Page 67

1 you aware whether or not anyone in the
2 New Jersey DEA had occasion to investigate any
3 nonindependent or national retail pharmacies?
4     MR. KOBRIN:  Object to form.
5     A.   I worked a lot with the
6 different -- especially in asset forfeiture, we
7 had to work with the different diversion
8 investigators or agents that were doing
9 diversion cases, and everything was from doctors
10 and independent pharmacies.
11     Q.   Okay.  The other -- a few bullet
12 points here.  One is "Member and supervisor of
13 the DEA special response team."  I take it none
14 of the special response team work that you did
15 relates in any way to diversion?
16     A.   Well, it's basically a SWAT team,
17 but we did seat at a couple different
18 diversion arrests.
19     Q.   Oh.  So SWAT -- special response
20 team or the SWAT team was involved in arrests of
21 physicians or pharmacies, independent
22 pharmacies, I think, are the two that you
23 identified, during your tenure?
24     A.   I can't really think of specific
25 cases, but there was need on a couple times

Page 68

1 for that kind of response.
2     Q.   Do you know who was supplying the
3 individuals that were the subject of those
4 arrests?  In other words, the source of their
5 pills?
6     MR. KOBRIN:  Same warning
7 regarding confidential information or
8 nonpublic information.
9     A.   Yeah, a lot of those are part of
10 ongoing.  Are you asking if it came from
11 different manufacturers or distributors or --
12     Q.   Yes.
13     A.   Yeah, I can't -- that's -- those
14 are all -- a lot of those are ongoing.
15     Q.   As part of your investigation,
16 would that have been something that you would
17 look into to see how they were getting their
18 supply of the pills?
19     A.   Yes.  Our -- that's a huge thing
20 in our training, is you always try to go up, up
21 the chain, always.
22     Q.   And did you ever work a case which
23 went up the chain and identified a licensed
24 distributor or registrant's distributor as a
25 target of a criminal investigation?

Page 69

1     MR. KOBRIN:  Object to form.
2     Same warning.  And if you answer,
3     just answer generally.  Don't get into
4     specifics.
5     A.   Yes.
6     Q.   Do you recall how many occasions
7 you identified a licensed distributor as a
8 potential defendant or target of such an
9 investigation?
10     A.   One -- one comes to mind.  It's
11 not generally -- it doesn't generally happen.
12     Q.   What types of investigative
13 tools -- well, that's getting into a different
14 area we'll get into it in a second.  Let's blow
15 through these bullet points and take a break.
16     Okay.  You also say you were a
17 class counselor and instructor for the Basic
18 Agent Class 201 in Quantico.  I assume there's
19 some aspects of that that touch on diversion?
20     A.   Yes.  Every basic agent class is
21 trained in diversion, and I -- a lot of the
22 counselors would have to sit in with them on
23 different instruction that they were getting.
24 And they basically got a refresher course again
25 on diversion.

Page 70

1  Q.  The next one is that you were the
2  "DEA designee and team leader for special agent
3  personnel to provide law enforcement assistance
4  during domestic national disasters."
5  Were you chosen to be that
6  designee because of your background at the
7  Newark PD and fire department?
8  A.  I think the emergency management
9  had a lot to do with it and the fact that I was
10  a team leader on SRT.
11  MR. YOUNG:  Okay.  And I think
12  that's basically the bullet points.
13  Underneath that is just the
14  commendations that you had, which I
15  think we've already talked about.
16  So this is as good a time as any
17  to take a break.
18  THE VIDEOGRAPHER:  Going off the
19  record at 10:18 a.m.
20  (Recess taken.)
21  THE VIDEOGRAPHER:  We're back on
22  the record at 10:45 a.m.
23  BY MR. YOUNG:
24  Q.  So when we left off, we had just
25  gone through the bullet list within your CV

Page 71

1  under your DEA experience.  And I wanted to
2  circle back to something, which is your
3  departure from the DEA.  And I think you
4  mentioned in your prior testimony that you had
5  an injury, or -- I think it was an injury, you
6  said.
7  A.  Yeah, medical.
8  Q.  Tell us about the nature of that.
9  A.  Basically most of my spine is
10  titanium at this point, so ...
11  Q.  Was this an accident?
12  A.  A combination of all kinds of
13  things over the years.  Excessive wear and tear
14  and a couple injuries at the DEA.
15  Q.  Were there job-related injury
16  claims that you made against the DEA under,
17  like, workers' compensation?
18  A.  One of the times I just went to
19  the hospital that day.  And then I was a young
20  agent.  I just kept going back to work with a
21  concussion.  But it just caused more -- over the
22  years got worse and worse from that injury.
23  And, of course, at this time I tried to reopen
24  the claim to get surgery, and they -- they just
25  deny it.  So I just went through insurance.

Page 72

1  Q.  Have you thought about hiring a
2  law firm to handle that?
3  MR. BARNES:  Do you do workers'
4  comp?
5  A.  You do?  There you go.
6  Q.  What was the accident that caused
7  the original concussion or incident?
8  A.  That would be the -- the neck
9  injury would be -- it was during an arrest, an
10  accident in a surveillance vehicle.
11  Q.  A car accident?
12  A.  Kind of.  It was -- I didn't hit
13  anything.  It was basically getting thrown into
14  the roof of a van based on hitting a bump at a
15  high speed.
16  Q.  And you suffered a concussion in
17  that accident?
18  A.  I smashed my head on the ceiling
19  very hard.
20  Q.  Did you also suffer a spine
21  injury?
22  A.  I wouldn't doubt that that --
23  that's according to the neurosurgeon with the
24  neck injuries that I had to have fusions for,
25  based on.

Page 73

1  Q.  Did you miss time from work after
2  that accident?
3  A.  The actual accident?  As I stated,
4  I went to the hospital that day, and I just --
5  it was my case.  We just did a major takedown,
6  so I just kept going back to work.
7  Q.  So you just went to the hospital
8  and you were released the same day?
9  A.  Yes.
10  Q.  And went right back to work?
11  A.  Made sure I didn't have a brain
12  bleed or something.
13  Q.  Okay.  And did you have any other
14  workplace accidents or incidents that caused you
15  injury in which you sought medical treatment?
16  A.  Just I had another incident where
17  I hit my head, but I didn't get treatment.  I
18  guess a couple years later is when, between
19  these incidents, I ended up having to get neck
20  surgery.
21  Q.  Did you miss time from work in
22  order to get your neck surgery?  I assume that
23  you did, but --
24  A.  Oh, yeah.  It was for all the
25  different surgeries.  I had four spinal fusions,

Page 74

1 lumbar reconstruction. I was out for months.
2 Went through all my -- all my sick time,
3 vacation time.
4     Q.  Do you know approximately how much
5 time from work you missed as a result of this
6 injury?
7     A.  I'm not exactly sure how many --
8 because I had four different surgeries. Each
9 one I'd be out -- one I did back to back. So
10 even while I was out, though, I was still doing
11 work-related stuff from home. So I don't
12 know -- even though I put in for sick time or
13 whatever, I would still follow up, get calls
14 from the U.S. Attorney's Office on different
15 cases or whatever. So even though I was out, I
16 was still working to a point. But, I mean,
17 recovery from a spinal fusion would be at least
18 a couple months.
19     Q.  What was the date of the first
20 spinal fusion surgery?
21     A.  Let me see. That was probably --
22 I think it was January of 2011. I'm not exactly
23 sure.
24     Q.  I won't hold you to it. I was
25 just trying to figure out within the chronology

Page 75

1 of your tenure with the DEA, if it was at the
2 end or the beginning or what.
3     And you mentioned, I think, that
4 you had several surgeries following that?
5     A.  I had three more fusions.
6     Q.  Do you recall the dates,
7 approximately, or times frames of those?
8     A.  One was early 2013, and then the
9 last two were back to back in early 2016.
10     Q.  When you returned to work from
11 those surgeries, did you return in a light-duty
12 capacity, or were you back to full speed?
13     MR. KOBRIN: Object to form.
14     A.  Depending on the time, I'd -- you
15 know, I'd go back to work, right back to my
16 group and pick up my duties. Then as the
17 surgeries went on, after my fourth surgery, I
18 went back -- I helped instruct a little bit and
19 then went back again.
20     Q.  The work that you did in bullet
21 point 2 of the DEA section of your resumé, those
22 task forces, was all of that work done prior to
23 your spine surgery in 2011, or did you do any of
24 that kind of task force work after your first
25 spine surgery?

Page 76

1     MR. KOBRIN: Object to form.
2     A.  The HIDTA task force I did from
3 the beginning of my career. Mobile enforcement
4 team -- 2011 I was in the mobile enforcement
5 team. And then all the other ones were after.
6     Q.  After. Okay.
7     Were there physical limitations
8 that your physicians placed on you with regard
9 to what you could do at work?
10     A.  Maybe for the first couple weeks
11 don't try to go all out kind of things. And
12 then -- and then you're back. When you're back,
13 you're back. That's it.
14     Q.  You never felt like you were
15 limited -- that your spinal fusion limited your
16 ability to perform your job?
17     A.  I -- I never thought it did.
18     Q.  Okay. So tell me how all these
19 injuries culminate to a departure from the DEA.
20 What made you decide to take retirement?
21     A.  Well, after that many surgeries,
22 it's -- and the fact that I -- you know, I'm
23 part of the SRT and all these other things, and
24 doing the general job as an agent is pretty -- a
25 lot of wear and tear. So it's -- my doctor kept

Page 77

1 recommending, you know, "If you keep going,
2 you'll have to have surgery number 5." So it
3 was time.
4     Q.  When did you make that decision?
5 I note in your resumé it says November 2018 is
6 your last tenure with the DEA, but I assume you
7 had sort of sought the paperwork and the
8 approval to do this before then?
9     A.  Only -- I guess I spoke to my boss
10 and basically only did it a couple months
11 beforehand. And then right now -- after you go
12 out, you have to apply for your pension. So I'm
13 in the middle of that process now.
14     Q.  Your departure from the DEA was
15 due entirely or only partly to your injury? In
16 other words, were you leaving the DEA to go
17 pursue other interests, or was it that you
18 couldn't continue in your job because of your
19 injuries?
20     A.  It was all based upon the injury.
21 I just didn't want to have surgery number 5.
22     Q.  But you also decided to pursue a
23 career as an expert witness, at least your
24 resumé depicts. In the same month, November of
25 2018, you began working as a law enforcement

Page 78

1 expert witness?
2      MR. KOBRIN:  Object to form.
3      Q.   Is that accurate?
4      A.   Well, I started looking into it at
5 that point.  So I didn't get my first case in
6 November of '18.
7      Q.   But you did begin holding yourself
8 out in November of '18 as a law enforcement
9 expert witness?
10     A.   Let's see.  Yeah, I think I
11 contacted some -- my wife's an expert witness as
12 a nurse, so ...
13     Q.   Okay.  Did you market yourself in
14 November of '18 to outsiders as an expert
15 witness?
16     A.   I've never self-marketed myself,
17 except for maybe on my LinkedIn page or
18 whatever.  But besides that, it would -- TASA is
19 an expert witness group that refers cases, and I
20 registered with TASA.
21     Q.   Did you have to pay money to do
22 that, or is it just a --
23     A.   No.  You just -- you just have to
24 show that you have expertise, prove that you
25 have expertise.  And they do background checks

Page 79

1 on you.  They check your education, your work
2 background.  And then after they do whatever
3 they do to be able to verify that you are who
4 you say you are and have the expertise that you
5 do, then they -- they would then market you or
6 try to plug you into cases that would fit.
7      Q.   Do you recall when you updated or
8 modified your LinkedIn page to reflect your
9 seeking work as an expert witness?
10     A.   Probably early 2019 sometime.
11     Q.   So not November or December of
12 '18?
13     A.   No, no.
14     Q.   Okay.  Did anybody help you?  For
15 example, your wife, did she give you some input
16 on what would look good on your LinkedIn page?
17     A.   No, no.
18     Q.   You just did it on your own?
19     A.   Just did all that on my own.  Did
20 my resumé on my own.
21     Q.   The areas of expertise that are
22 depicted on your resumé, on page 1 of your
23 resumé, beginning with "active shooter response
24 and training" and ending with "witness," are
25 those reflected in your LinkedIn page or bio?

Page 80

1      A.   I think -- I'm not sure if I have
2 all these on -- I might say "see resumé" or -- I
3 have "Resumé Attached" at the bottom.  You could
4 go click on a resumé at the bottom, I think.  I
5 think.  I don't know.  I haven't done anything
6 with it, no.
7      Q.   I won't hold you to it.  I know
8 LinkedIn can recommend some areas, and I didn't
9 know if these came from LinkedIn or these were
10 developed by yourself.
11     A.   No.  These are things that I have
12 training and expertise in.  I've taken courses
13 or certifications or ...
14     Q.   How many engagements have you had
15 as an expert since leaving the DEA?
16     A.   Three.
17     Q.   Including this one?
18     A.   Yes.
19     Q.   So two other ones?
20     A.   Correct.
21     Q.   Okay.  Let's talk about those.
22          When was the first one?
23     A.   It was probably, I think, January
24 of 2019, this year.
25     Q.   Okay.  So -- and who was that

Page 81

1 with?  If you can reveal.  I don't know if these
2 are confidential.
3      A.   There's still -- they're still
4 ongoing as far as I know, those cases.
5      Q.   Okay.  So I'd just ask you to --
6      A.   One is.
7      Q.   -- generalize the engagement, so
8 the type of industry sector that retained your
9 services.
10     A.   It was basically -- let's see.
11 They are both gang-type, expert witness-type
12 cases.
13     Q.   And are you supporting the
14 prosecution or the defense?
15     A.   Let's see.  Both of those are
16 defense.
17     Q.   So is it a law firm that engaged
18 you?
19     A.   It's a small -- like a
20 single-person law firm.
21     Q.   A lawyer?
22     A.   A lawyer, yes.
23     Q.   Who was representing some
24 individuals accused of gang-related crimes?
25     A.   Kind -- it's not -- they were not

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 accused of gang -- each case was they were
2 victims of gangs, and one guy was facing
3 deportation. But this one is over, so ... He
4 couldn't go back to his country because he was
5 targeted by the criminal organization in his
6 country to -- for injury or death. So they
7 needed expertise as to the way organized crime
8 and gangs work.
9    Q.   Do you know if the DEA is
10 supporting the prosecution of those cases?
11       MR. KOBRIN: Object to form.
12    A.   No, they're not.
13    Q.   Do you view any conflict in
14 serving as an expert in cases in which the DEA
15 is on the other side of the case?
16    A.   No. The one --
17       MR. KOBRIN: Object to form.
18       THE WITNESS: I'm sorry.
19       MR. KOBRIN: I don't think he's
20       ever -- he said there aren't any cases
21       where the DEA is on the other side.
22       Just a clarification.
23 BY MR. YOUNG:
24    Q.   Yeah. Should that situation occur
25 in the future, if someone were to engage you as

Page 83

1 an expert in a case in which the DEA was the
2 agency on the other side prosecuting the case or
3 supporting the prosecution for the
4 U.S. Attorney's Office, would that be an
5 exclusionary factor for you? In other words, a
6 conflict that would keep you from taking that
7 engagement.
8    A.   Yes. We have to -- we have to
9 contact the counsel even as -- division counsel
10 regarding cases that we do, or the lawyers
11 contact the DEA itself.
12    Q.   Other than your three engagements
13 as a law enforcement expert witness, are you
14 engaged in other means of employment at this
15 point in time?
16    A.   No.
17    Q.   So when you're not working in one
18 of those three capacities, those engagements,
19 how do you spend your time?
20    A.   Well, I like to go to the gym. I
21 walk my dog, do things around the house.
22    Q.   Do you do any additional
23 coursework or studies relating to your expert
24 witness practice?
25    A.   I'm looking into different things

Page 84

1 I can take or maybe advanced college courses.
2    Q.   I think you mentioned earlier
3 potentially law school.
4    A.   I was thinking about that. Who
5 knows. It might happen.
6       MR. KOBRIN: I think you mentioned
7       it. I don't know if he was thinking
8       about it.
9    Q.   Since leaving the DEA, have you
10 attended any type of courses or done any
11 self-study in order to support your expert
12 witness business?
13    A.   No. I've only been retired for a
14 few months.
15    Q.   You mentioned in your resumé that
16 you hold a top secret clearance. Did you -- was
17 that a function of being a special agent with
18 the DEA?
19    A.   Yes. You have to be able to
20 attain and hold a top secret clearance to be a
21 DEA agent.
22    Q.   And how does that work? Do you
23 keep that after you retire?
24    A.   It's every five years you get
25 recertified. I was certified in 2016. So I'd

Page 85

1 have it through 2021. But, I mean, I'm not,
2 obviously, working in that capacity, so ...
3    Q.   Is that something that you could
4 use, though, as an expert witness? Does your
5 top secret clearance give you an ability to look
6 at information that a normal person like me, for
7 example, wouldn't be able to look at?
8       MR. KOBRIN: Object to form.
9    A.   No.
10    Q.   So you --
11    A.   No.
12    Q.   -- need to be a special agent with
13 the DEA or --
14    A.   You have to be working for law
15 enforcement and have that top secret clearance
16 to be able to utilize any kind of database that
17 would be granted by having that clearance.
18 After you're no longer an active agent, you
19 don't have access to those.
20    Q.   You also say you were trained by
21 the Spartan Group in dignitary protection.
22       What's the Spartan Group?
23    A.   It's a group of former special
24 forces guys that have classes on self-defense,
25 firearms, and actual dignitary protection, how

Page 86

1 to move high-value targets and protect
2 personnel.
3     Q.   When did you do that training?
4     A.   That was probably late '90s,
5 almost 20 years ago.
6     Q.   So where were you working at the
7 time you received that training?
8     A.   I was at the police department.
9 It was something I did because I wanted to do
10 it.
11     Q.   This was not part of your job with
12 the Newark Police Department? This was a side
13 thing that you did?
14     A.   It's a side thing, but the people
15 in the Newark Police Department who went to the
16 dignitary protection detail squad went through
17 that training, and I took several weeks off and
18 did it on my own.
19     Q.   Did you ever do any moonlighting
20 or side work in dignitary protection or security
21 detail?
22     A.   As a police officer, we did
23 security work. I've done security work for
24 PSE&G, utility company.
25        (Reporter clarification.)

Page 87

1     A.   PSE&G. It's a utility company in
2 New Jersey.
3     Q.   Other than that, while you were at
4 the police department, have you ever done any
5 other type of, you know, side work or
6 moonlighting as a dignitary protection or
7 security?
8     A.   Let's see. I might have done a
9 security -- helping do security at a location
10 for Watkins Truck. Helped a -- one guy couldn't
11 show up for his shift one day, so I covered for
12 him as a police officer. I mean, it's just
13 security work.
14     Q.   Did you ever work on a security
15 detail for Mayor James?
16     A.   No.
17     Q.   When you were at the Newark PD,
18 either as the assistant deputy director or as an
19 officer, did you ever do any work with the
20 mayor's office at all?
21     A.   After I became a police officer,
22 no.
23     Q.   How about in a personal capacity?
24 Did you ever -- were you ever involved in any of
25 the mayoral campaigns that Mayor James had?

Page 88

1       MR. KOBRIN: Object to form.
2     A.   Briefly in one campaign, except
3 for -- I worked midnights, so I really wasn't
4 able to help that much.
5     Q.   There's not a lot of campaigning
6 happening at midnight?
7     A.   Well, that's when I worked. You
8 can't campaign while you work, but I was
9 sleeping most of the day.
10     Q.   I gotcha.
11       Was there a point in time when
12 Mayor James was accused of misusing police
13 personnel to support his campaign? Are you
14 familiar with that?
15       MR. KOBRIN: Object to form.
16     A.   I remember -- I think some of his
17 protection detail got in -- something with
18 credit cards and his girlfriend or something
19 like that. That was after I -- I was no longer
20 with the mayor's office, but I was with the
21 police department, and I remember seeing that in
22 the paper.
23     Q.   Did that -- based on your brief
24 tenure with the mayor of a little over a year,
25 did that surprise you to learn that he was under

Page 89

1 investigation?
2       MR. KOBRIN: Object to form.
3     A.   There was always rumors. You'd
4 always hear it. I mean, you always heard that
5 the FBI was trying to investigate him for 20,
6 30 years or something.
7     Q.   As an aside, I don't know if you
8 know, but Mayor James is actually from
9 Jacksonville, Florida.
10     A.   Oh, really?
11     Q.   Yeah.
12       MR. BARNES: That explains
13 everything.
14     Q.   Yeah, it was very newsworthy when
15 he was indicted.
16     A.   I'm sure. I'm sure.
17       MR. KOBRIN: He's not a native son
18 of Newark.
19       MR. YOUNG: No, no. He's a
20 Floridian.
21 BY MR. YOUNG:
22     Q.   Okay. A few other things. Let me
23 see. I had a list of things I wanted to make
24 sure I hit with you.
25       Do you know -- talking about your

Page 90

1 engagement on this case, I think you had listed
2 in your report your hourly rate. But just for
3 the record, what's the hourly rate that you're
4 charging the client in this matter?
5     A.   It's $200 an hour for review and
6 $250 an hour for deposition.
7     Q.   And how --
8         MR. KOBRIN: Just for clarity, I'm
9     not actually sure, but I think -- he
10    mentioned TASA. They might have a
11    higher charge to the law firm than that.
12    There might be a slightly higher charge
13    that we receive. I thought I would let
14    you know that.
15        MR. YOUNG: That's a good point.
16        MR. KOBRIN: Yeah.
17 BY MR. YOUNG:
18    Q.   Is your engagement here through
19 TASA?
20    A.   Yes. My understanding is they
21 charge on top of my fee.
22    Q.   Gotcha.
23    A.   So whatever is being billed would
24 be my fee plus their fee.
25    Q.   Understood. But TASA pays you --

Page 91

1 I assume you're an independent contractor for
2 TASA? You get a 1099 from them?
3     A.   Yes, I do.
4     Q.   And do you know how much they've
5 paid you to date?
6     A.   To date, they've paid -- around
7 $20,000 is what they've paid.
8     Q.   So in my simple lawyer math mind,
9 I say 200 an hour and $20,000, meaning that you
10 did 100 hours of work?
11    A.   That's what I've gotten paid for.
12    Q.   Okay. You may have done more work
13 that you haven't gotten paid for yet?
14    A.   Correct.
15    Q.   And you obviously anticipate being
16 paid for your time here today?
17    A.   Yes.
18    Q.   Who keeps track of your time? Do
19 you have a third party or an outside person, or
20 do you do it yourself?
21    A.   I do it myself. I write down each
22 day what I do, what hours, and then submit that
23 to TASA, and they do all the billing.
24    Q.   Okay. Does TASA ever audit your
25 bills or give you feedback to say, "Hey, you

Page 92

1 shouldn't -- you should round this up" or "round
2 this down" or "this is too much time" or "too
3 little time"?
4     A.   TASA just --
5     Q.   Does whatever you bill?
6     A.   Whatever I send, that's what they
7 forward.
8     Q.   So TASA prepares your invoices and
9 sends them to the clients?
10    A.   Yes.
11    Q.   Is that true for all three
12 engagements?
13    A.   Yes. Because I've never
14 advertised.
15    Q.   With regard to your personal
16 financial interests, do you have any financial
17 interest in HBC?
18    A.   No, I do not.
19    Q.   Or Giant Eagle to the extent
20 that's a distinguishing entity?
21    A.   No, I do not.
22    Q.   You've never been employed by them
23 separately?
24    A.   No.
25    Q.   In the outset, I asked you about

Page 93

1 prior deposition testimony, and you had a litany
2 of prior instances in which you've offered your
3 testimony, including grand juries and other
4 things. I just want to walk back through those
5 again just so I can get a sense of the breadth
6 and scope of where you've testified and in what
7 types of matters.
8         So, first, are all the matters
9 that you're referring to criminal in nature?
10    A.   Yes.
11    Q.   You've never testified before a
12 congressional or a legislative body like the
13 New Jersey House of Representatives or
14 New Jersey Senate -- I don't know if they have
15 both houses there, but --
16    A.   They do, but no.
17    Q.   Okay. How about the United States
18 Congress? Have you ever appeared before
19 Congress?
20    A.   No, I haven't.
21    Q.   Have you ever offered any written
22 testimony that, to your knowledge, has been
23 submitted to Congress or proffered in
24 congressional testimony? Maybe in one of your
25 cases, one of your investigations?

Page 94

1    A.   Not that I know of.
2    Q.   Okay.  So grand juries.  How many
3  grand juries have you appeared before, if you
4  recall?
5    A.   Federal or state?
6    Q.   Let's start with federal.  Is it
7  hundreds?
8         MR. KOBRIN:  You can give an
9      estimate, if you need to.
10   Q.   Yeah, I'm not trying to pin you
11 down.  I'm just trying to get a --
12   A.   It's a lot.  I mean, it's
13 probably, I'd say, at least 100.
14   Q.   Okay.  And state?
15   A.   At least -- I mean, a lot during
16 that time period, too.  It wasn't many years,
17 but it was a lot.  At least 100.
18   Q.   The work that you did with the
19 DEA, would all of that -- I shouldn't put it
20 that way.  But did most of the work that you did
21 there go to a federal grand jury as opposed to a
22 state grand jury, or were there also state grand
23 jury cases that you worked on during your time
24 at the DEA?
25   A.   While I was at the DEA, basically

Page 95

1  all -- I don't really remember any state grand
2  jury -- testifying in state grand jury.  It was
3  all federal grand jury.
4    Q.   Okay.
5    A.   We always want to go with a
6  federal case being a federal agency.
7    Q.   So your state grand jury
8  experience would be limited to the time that you
9  were a Newark Police Department detective?
10   A.   I was very busy.
11   Q.   Okay.  Did any of the testimony
12 that you proffered to state grand juries involve
13 violations of the state or federal Controlled
14 Substances Act?
15        MR. BARNES:  I'm going to
16     interpose an objection.  I'm a former
17     AUSA, and I want to remind the witness
18     of grand jury secrecy rules.  You're not
19     to disclose anything that occurred in
20     any way before a federal or state grand
21     jury.
22   Q.   Yeah.  And I'm not looking for the
23 meat of the matter.  I'm simply looking to know
24 whether or not any of the testimony you
25 proffered related to violations of the state or

Page 96

1  federal CSA.
2         MR. BARNES:  Again, that would
3      disclose grand jury material.
4         MR. YOUNG:  You're instructing him
5      not to answer?
6         MR. BARNES:  Yes, I am.
7         MR. YOUNG:  Okay.
8         MR. KOBRIN:  Just as to grand
9      jury.  So you can go on to other things
10     related to investigations, but things
11     behind the doors of a grand jury.
12 BY MR. YOUNG:
13   Q.   Yeah.  So the cases that you
14 worked which went to the grand jury that
15 resulted in convictions or plea deals that are
16 now closed, did any of those involve violations
17 of the state or federal Controlled Substances
18 Act?
19        And, again, I don't want to know
20 about the grand jury testimony.  I want to know
21 about the cases that you worked that resulted in
22 convictions or plea deals.
23   A.   Going to state grand jury or
24 federal grand jury?
25   Q.   State.

Page 97

1    A.   It wouldn't -- none of the state
2  stuff would have federal acts.
3    Q.   And I don't know if New Jersey has
4  a state controlled substances law like Florida
5  and other states do.
6    A.   No.  It's just drug law.
7    Q.   Okay.  So with regard to the
8  federal grand juries -- again, I don't want to
9  know anything you proffered to the federal grand
10 jury.  I simply want to know, of those cases
11 that resulted in convictions or plea deals, did
12 any of those involve violations of the CSA, or
13 Controlled Substances Act?
14   A.   Regarding grand jury testimony, I
15 testified in --
16        MR. KOBRIN:  Again, just talk
17     generally about the cases, the federal
18     cases.  I think the grand jury can be
19     taken out of it, if that's okay.
20        MR. YOUNG:  Yeah.  It's probably
21     the cleaner way to do it.
22 BY MR. YOUNG:
23   Q.   So disregard grand juries.
24   A.   Okay.
25   Q.   Of the cases that you worked that

Page 98

1 resulted in convictions or plea deals while at
2 the DEA, how many of those, if you recall,
3 involved violations of the federal Controlled
4 Substances Act?
5     A.  At least a couple dozen.
6     Q.  And those would be the same cases
7 that you referred to earlier as the diversion
8 cases?
9     A.  Yes. That's what we want, all CSA
10 stuff. We just in general call it "diversion
11 cases."
12     Q.  Were there any non-diversion cases
13 that you worked on at the DEA that involved
14 violations of the CSA?
15     A.  Yes.
16     Q.  Okay. What are those instances?
17     MR. KOBRIN: And, again, same
18   warning regarding confidential nonpublic
19   information.
20     A.  Regarding the instances? I can't
21 really -- a lot of them are ongoing-type cases,
22 so I -- I mean, we kind of briefly touched on
23 this earlier regarding -- in general the cases
24 regarding the independent pharmacies and the
25 doctors, the dirty doctors. Those were in

Page 99

1 general what the cases were, and there was about
2 a couple dozen of them.
3     Q.  Are there dirty doctor, as you
4 described it, cases that you can talk about that
5 the matters are closed and no longer pending?
6     A.  I'm not sure, because -- I mean, I
7 don't know if they've closed while -- I mean, I
8 haven't been gone that long, but some could have
9 closed while I have been gone. Some might still
10 be going on.
11     Q.  Your tenure with the DEA began in
12 2005, some 14 years ago.
13   Do you recall in 2005 or 2006
14 working on any dirty doctor cases at the DEA?
15     A.  Within a couple years of being an
16 agent, I was working -- I'm going to say the
17 first one was -- it was an independent pharmacy.
18     Q.  And just -- I understand there's
19 some limitations. You don't want to get into
20 the confidential nature of these kinds of cases.
21   But generally, when you say an
22 independent pharmacy case that you worked on,
23 describe for me the type of conduct that such a
24 pharmacy would engage in that would rise to the
25 level of criminality for the DEA to investigate.

Page 100

1     MR. KOBRIN: Object to form.
2     A.  In general, a pharmacy that we
3 would have information is basically doling out
4 opiates at -- fake prescriptions or with no
5 checks, or they're not -- you know, they're not,
6 you know, living up to their end of the CSA or
7 CFRs or anything, so super-high volumes that
8 just aren't commensurate with what they should
9 be doing based on the size of the store.
10     Q.  Did you receive some specialized
11 training to give you insight into some of the
12 factors that you just described, like the
13 relationship of the size of the store to the
14 volume of the sales of controlled substances?
15 How did you know to make sense of the relevance
16 of the size of the store compared to the size of
17 the sales volume?
18     MR. KOBRIN: Object to form.
19     A.  We received training in general --
20 I mean, that area is pretty broad in the CFR,
21 but it's -- a lot of it is through experience
22 after the training or with working with
23 different investigators that have been doing it
24 for years, or other agents.
25     Q.  When you say "investigators," do

Page 101

1 you mean people from the Office of Diversion
2 Control?
3     A.  Yes. Within each office, division
4 office, there are diversion investigators.
5     Q.  So when you first began working on
6 cases involving diversion, were you -- I'm going
7 to say "trained." I don't know what the right
8 term of art is in law enforcement, but I would
9 call it trained by those investigators or
10 instructed or kind of read in by the
11 instructors, or was there some other way that
12 you learned how to do a diversion case?
13     MR. KOBRIN: Object to form.
14     A.  Well, you learn how to do an
15 investigation at the academy. Investigation is
16 investigation, whether it's a diversion
17 investigation, an investigation into money
18 laundering, investigation into Pablo Escobar.
19 Investigation is investigation. They all
20 basically do the same kind of steps to do it.
21   So I was doing investigations with
22 the DEA before I became an agent. So I was
23 trained with on-the-job training. And then I
24 went to the academy and they trained me even
25 further. And then you come out of the academy

Page 102

1 and you're placed with another agent, senior
2 agent, who trains you even more.
3         And then you -- basically, you
4 learn something new every day.  And through
5 experience of other people, you learn things
6 regarding the matters you're talking about,
7 regarding volumes of a store or different
8 specifics.
9         Q.    So how did you find out what the
10 volume of sales was from a given suspicious
11 pharmacy?  Where do you get that information?
12         MR. KOBRIN:  Object to form.
13         A.    That was -- I can't -- I can't --
14 in general, where can you get that?
15         MR. KOBRIN:  I'm going to warn you
16     again, don't give away any kind of
17     investigative techniques that are
18     otherwise not public.
19         Q.    Are there investigative techniques
20 regarding the sales volume of pharmacies that
21 are nonpublic?
22         MR. KOBRIN:  That's a "yes" or
23     "no."
24         A.    Well, I mean, there's databases
25 that are utilized.

Page 103

1         Q.    Let me simplify it.
2         Was the source of information that
3 you used to determine the sales volume of
4 particular pharmacies the ARCOS database?
5         A.    I -- I specifically -- mine came
6 from other ways.  It wasn't the ARCOS database.
7         Q.    These other ways that you're
8 describing, are these nonpublic things that you
9 can't describe?
10         A.    It's not -- it's not any database.
11         Q.    Okay.  So you -- I think you
12 testified earlier that in most of these
13 diversion cases, an informant is what led you to
14 open the investigation and begin the
15 investigation, right?
16         A.    That's used a lot.  Some
17 investigations come through informants,
18 cooperating defendants, or other law enforcement
19 agencies giving you the lead.
20         Q.    Were any of the informants able to
21 give you sales volume information about these
22 suspicious pharmacies or physicians?
23         A.    They can't give exact information
24 like -- like the ARCOS database that you
25 mentioned earlier, but you could -- you could go

Page 104

1 yourself to, let's say, a pharmacy and see a
2 line around the corner and all day long, and
3 it's just abnormal.  Then you'd investigate from
4 there.
5         I mean, investigation has a whole
6 bunch of parts.  You know, you have to build
7 your probable cause.  So you add, you know,
8 that's -- that's -- you know, that's not --
9 doesn't look right, and then this doesn't look
10 right.
11         And then you might use other
12 techniques to gain information, you know, and
13 you start adding everything together, and then,
14 you know, you form your investigation and you go
15 further.
16         Q.    Why would a line of people around
17 the corner outside a pharmacy be suspicious
18 or -- I can't remember the word that you used,
19 but --
20         A.    Well, if they're all obviously
21 high, then it's pretty suspicious.
22         Q.    How do you know if the people are
23 high?
24         A.    That's through a lot of training
25 and experience I've had.  If you're an

Page 105

1 inner-city police officer for a bunch of years,
2 you could tell if someone is high or not.
3         Q.    Could you drive up to any pharmacy
4 and if there was a line outside, would you be
5 able to, in light of your skills and experience
6 and training, discern that the customers waiting
7 in line were drug-seeking customers?
8         MR. KOBRIN:  Object to form.
9         A.    I mean, if they're basically in a
10 zombie-like stupor and falling over like certain
11 pharmacies that we've investigated, then, yes,
12 you can tell.  You can't tell every person who's
13 a drug seeker just by looking at them.  But
14 there are some obvious signs for people who are
15 hardcore addicts.
16         Q.    Are there other what I would call
17 "indicia" or symptoms of suspicion for a
18 pharmacy other than the line out the door?  What
19 are the other things you would look for to
20 identify a suspicious pharmacy?
21         MR. KOBRIN:  Object to form, and
22     the same warning as earlier regarding
23     investigative techniques.
24         A.    Yeah.  I don't know if I can get
25 into a lot of that because it's a lot of stuff

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  they teach down at Quantico that they don't
2  really want us describing.
3      Q.   I understand.
4           Would a high prevalence of
5  out-of-state license plates be a warning sign or
6  an indicia of suspicion to you at a pharmacy?
7           MR. KOBRIN:  Object to form.
8      A.   Sure.  That would be another thing
9  that you can key on.
10     Q.   Why is that?
11     A.   Because usually you don't travel
12  out of state to go to a pharmacy if -- basically
13  every place has a neighborhood pharmacy, at
14  least one.
15     Q.   What about a high percentage of --
16  not necessarily out-of-state license plates, but
17  prescriptions coming from out of state, so the
18  people may be from in state but the
19  prescriptions may be from another state?  Would
20  that be a symptom to you?
21          MR. KOBRIN:  Object to form.
22     A.   It could be indicative, but the
23  person could also be on vacation.  I mean,
24  it's -- as I said, with an investigation, you
25  have to kind of look at everything and then form

Page 107

1  an opinion based upon everything you see.  You
2  know, each thing builds on the next.  But that
3  would be something that you'd look at.
4      Q.   Did you ever assess the percentage
5  of controlled substances as a function of the
6  total number of prescriptions for a given
7  pharmacy that you were investigating?
8           MR. KOBRIN:  Object to form.
9      Q.   In other words, a pharmacy
10  dispenses lots of drugs, not just controlleds,
11  right?  When you were doing your investigations
12  into diversion, did you consider that as a
13  factor, that it had a high ratio or percentage
14  of controlleds among all prescriptions?
15     A.   A high ratio of controlleds
16  compared to everything else?
17     Q.   Yes.
18     A.   That's not necessarily -- it can
19  be indicative, but that doesn't necessarily mean
20  anything.  As long as there's valid
21  prescriptions, then that's just -- it could be
22  right next to a pain clinic.  So, you know, you
23  don't know.
24          But it all depends on, as I said,
25  the circumstances.  And I wouldn't necessary --

Page 108

1  when we're doing a diversion investigation,
2  we're looking for diversion.  So we go right at
3  what's being diverted and prove whether or not
4  it was or not and go from there.
5      Q.   So my question was simply whether
6  or not that was a factor that you considered in
7  any of your investigations into diversion, the
8  percentage or the ratio of controlleds to total
9  prescriptions.  Is that not something you ever
10  looked at?
11     A.   That wasn't something that was
12  germane to any of the cases I did.
13     Q.   How about the percentage of
14  customers who pay in cash?  Would that be
15  relevant to a diversion investigation?
16     A.   That would be a flag for a
17  pharmacist.
18     Q.   Is that something that you looked
19  at or considered in any of your diversion
20  investigations, the number of cash-pay
21  customers?
22     A.   Not necessarily.  It was more
23  making sure that there was legitimate
24  prescriptions and controls in place, but that --
25  that would be a flag that a pharmacist should

Page 109

1  look into.
2      Q.   Are there guidelines that the DEA
3  uses, if you know, as to what an acceptable
4  percentage of cash-pay prescriptions would be?
5      A.   I don't know.
6      Q.   There's not like a Mendoza Line of
7  cash pay?
8      A.   There might be.  That's just --
9  wouldn't be germane to what I'm doing, really,
10  so ...
11     Q.   Okay.  How about the prevalence of
12  a single prescriber among all controlled
13  prescriptions for a given pharmacy?  In other
14  words, if a pharmacy has a lot of controlleds
15  going out the door and they're all related to a
16  single provider, would that be a sign of some
17  suspicion for you?
18     A.   That -- that would definitely be
19  something we would look at.
20     Q.   Is that something that you did
21  look at or consider in any of the diversion
22  investigations you conducted at the DEA?
23     A.   It did come into some cases
24  regarding doctors and pharmacies.
25     Q.   And in your experience, have you

Page 110

1  found close relationships between doctors and
2  pharmacies in the cases in which you've
3  investigated diversion?
4        So in your diversion cases which
5  involved bad pharmacies, did you find that those
6  pharmacies had close relationships with, you
7  know, the big writing prescribers? And,
8  correspondingly, when you were investigating bad
9  doctors, did you find that those doctors had
10 particular cozy relationships with particular
11 pharmacies?
12       MR. KOBRIN: Object to form.
13    A.   Yes, that does come into play.
14 There's a lot of relationships between dirty
15 doctors and dirty independent pharmacies.
16    Q.   And I know we touched on this
17 before, but I just want to make sure I cover it.
18       Did you -- in the two dozen or so
19 diversion cases you've mentioned, did you ever
20 investigate to determine whether or not the
21 supplier of the pharmacy, or to the extent that
22 there were physicians dispensing an office in
23 New Jersey -- I don't know if that ever happened
24 here or not, but it did in Florida -- that the
25 supplier of the pills to your targets was

Page 111

1  complying with their obligations under the law?
2        MR. KOBRIN: Object to form.
3     A.   That information would be sent to
4  different officers or agencies -- I mean,
5  different offices to follow up on.
6     Q.   Which offices would that go to?
7     A.   It could go to the Office of
8  Diversion Control. It could go to -- if we
9  found out that it was being shipped from Ohio,
10 we might call the Ohio office, "Hey, we got this
11 at a pharmacy. You might want to look into this
12 distributor, or at least make sure that their
13 controlleds are proper at least regarding this
14 pharmacy."
15    Q.   Are there any other federal
16 agencies besides the Office of Diversion Control
17 within DEA that you would, I would just say,
18 share information with or report your suspicion
19 of a bad supplier or a supplier that wasn't
20 complying with its regulatory obligations?
21       MR. KOBRIN: Object to form.
22    A.   Within DEA, it would be -- it
23 might be the main headquarters office, or it
24 could be -- that would be the Office of
25 Diversion Control so that they could funnel it

Page 112

1  out to -- it might be an agent or a diversion
2  team investigator agent that is investigating
3  that specific person or distributor or whatever,
4  and then that would be information for them in
5  their case.
6     Q.   But that's not something that a
7  non-diversion control special agent would look
8  into?
9     A.   Anyone who would have a case on
10 that specific entity that we found information
11 on. Because, as I said, all agents -- agents
12 have cases in diversion. Whether you're in a
13 diversion group or a non-diversion group, you
14 still have diversion cases.
15       So I might -- I might be somewhere
16 and I have a case on some manufacturer, and I
17 would get leads from other offices, "Hey, I got
18 this. I arrested this person, and it's coming
19 back to your target."
20    Q.   So a manufacturer could be
21 investigated by special agents within the DEA
22 outside of the Office of Diversion Control?
23    A.   Agents can investigate any --
24    Q.   Okay.
25    A.   -- anyone and anything that -- as

Page 113

1  long as it's within our scope.
2     Q.   Do you know during your tenure
3  with the DEA whether or not any non-diversion
4  control special agents investigated any
5  manufacturers? I don't need to know the
6  manufacturers' names. Just generally.
7        MR. KOBRIN: To the extent that it
8     wouldn't violate any nonpublic
9     information or release any confidential
10    information.
11    A.   Any investigation that's done is
12 going to be done by an agent. It's criminal.
13    Q.   Yeah.
14    A.   Which would be diversion. So
15 anything that's diversion is going to be
16 criminal, and it's going to be handled by an
17 agent. So I don't know specifically -- I don't
18 have -- I'm not -- I'm not down in operations or
19 anything in headquarters, so I don't know who
20 has what case.
21    Q.   And I guess what I'm trying to
22 discern is where the sort of front of the house
23 and back of the house are separated. And my
24 understanding until today was that manufacturers
25 and distributors were investigated by the Office

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  of Diversion Control, that they had the primary
2  oversight for those entities.
3      A.   That's their primary focus, but
4  any agent can do the investigation.  In fact,
5  once it's criminal, it has to be done by an
6  agent, whether that's an agent that works
7  specifically under the umbrella -- because it's
8  one house.  We're just one house.  It's not
9  really split --
10     Q.   Yeah.
11     A.   -- because we overlap.  One day I
12 could be in HIDTA Group 1.  Next day I could be
13 in Tactical Diversion Squad 7.  You know,
14 it's -- and you're expected to jump out of that
15 group and run in in that group and go.
16     Q.   I gotcha.
17         But you personally have not had
18 occasion to investigate a manufacturer for
19 diversion, right?
20     MR. KOBRIN:  Same warning.
21     A.   Well, the most I could say is a
22 lead was sent on a case regarding a
23 manufacturer.
24     Q.   A lead was sent to you, or you
25 sent a lead to someone?

Page 115

1      A.   A lead sent to someone else.
2      Q.   Yeah.  And that's sort of my
3  point, is there's someone else who's supposed to
4  do those investigations, right?
5      MR. KOBRIN:  Object to form.
6      A.   Well, if there's a major
7  manufacturer in Jersey and I happen to get good
8  information, I could open the case and I could
9  be the person getting the leads from Ohio, from
10 Jacksonville, Florida, from wherever.  So I mean
11 it's ...
12     Q.   Sure.  And I understand that you
13 can, that that is a possibility under the ambit
14 of the regulations and authority that the DEA
15 has generally.
16         But I'm asking more practically.
17 When information is produced that suggests a
18 violation of the CSA by a manufacturer, which
19 entity or which arm of the DEA is the one that
20 investigates that?  Is it the special agents
21 that are doing criminal investigations, or is it
22 the Office of Diversion Control?
23     MR. KOBRIN:  Object to form.
24     Asked and answered.
25     A.   Basically whoever got the

Page 116

1  information.  Whoever has the case open.
2      Q.   So in a hypothetical, if you
3  received information from an informant that a
4  New Jersey-based manufacturer -- we'll call them
5  Drug Corp -- that Drug Corp was overshipping and
6  not complying with the CSA, that's something
7  that you would take on yourself and you would
8  investigate?
9      MR. KOBRIN:  Object to form.
10     Q.   Yes?
11     A.   Yes.  It's not -- like, if you're
12 trying -- we don't have to give it to, let's
13 say, Diversion Group 4 or something like that.
14     Q.   Right.
15         Again, my question isn't whether
16 you have to or not, but what the protocol is,
17 right?  Like what the reality would suggest.
18     A.   The reality with the DEA is if you
19 come up with the information and you're starting
20 a case, that no one else is using that specific
21 target or is targeting that specific entity,
22 whether it's a manufacturer, distributor,
23 pharmacist, doctor, it's your case.
24     Q.   Okay.
25     A.   It doesn't matter whether you're

Page 117

1  in whatever group.
2      Q.   I asked you about you conducting
3  investigations into manufacturers for CSA
4  violations.  I think I previously asked you, but
5  I just want to clarify.
6          Did you have occasion to
7  investigate violations of the CSA by
8  distributors?
9      MR. KOBRIN:  Object to form.
10         Same warning.
11     A.   I mean, it's -- it was another
12 thing with the lead going somewhere, because I
13 didn't have the open case on that.  That's about
14 as much as I can say.
15     Q.   Okay.  Back to your resumé just
16 briefly.
17         You list these expert areas.  It
18 says, "My expertise is in the following areas."
19 And, again, it goes "active shooter" through
20 "witness."
21         Which areas within here would you
22 say relate to the work that you did in this
23 case?
24     A.   Anything with drug investigations.
25     Q.   Okay.  So there's -- beginning at

Page 118

1 DEA is where drugs start, right after that.
2          So would drug abuse be part of the
3 work that you did in this case?
4      A.   A lot of the diverted drugs go to
5 the abusers, so technically, yes.
6      Q.   Okay.  Drug enforcement?
7      A.   Yes.
8      Q.   Drug identification?
9      A.   That's -- I mean, to know the
10 difference between the different opiates, to
11 that extent.
12     Q.   That didn't form part of the work
13 that -- or opinions that you rendered in this
14 case?
15     A.   To the point that you need to know
16 about opiates, opioids, Schedule II,
17 Schedule III.  So --
18     Q.   And then --
19         MR. KOBRIN:  He's saying it did.
20     And your question was it didn't, so I
21     think -- I'll object to form, but I just
22     wanted to set the record straight that
23     he suggests it did inform his expertise
24     in this case.
25         MR. YOUNG:  Yeah.  With the caveat

Page 119

1     that it was -- he provided.
2 BY MR. YOUNG:
3      Q.   The next one is drug
4 investigations?
5      A.   Yes.
6      Q.   And that has a parenthetical
7 following it which says "domestic and
8 international."
9          Is there anything international
10 drug investigation-related that you did
11 involving this case?
12     A.   In this case, no.
13     Q.   Drug trafficking.  Does that
14 describe part of the work that you did in this
15 case?
16     A.   No.
17     Q.   Smuggling?
18     A.   No.
19     Q.   Okay.  If you want to take a
20 minute and just look.  I didn't see any other
21 ones in here that were relevant.
22         Oh, I'm sorry.  There is one.
23 Pharmaceutical diversion in the Ps.  It's done
24 alphabetical.
25     A.   Yeah.  Yes.  The answer to that

Page 120

1 would be "yes."  Yes, it would.
2      Q.   Okay.  Let me just take a quick
3 look at my little cheat sheet and make sure I've
4 got all my little boxes checked.
5          Do you recall the approximate date
6 in which you were retained -- and I don't know
7 if that was -- if you got a notice through TASA
8 or an e-mail or something, but when you were
9 actually retained as an expert in this case?
10     A.   In March, early March, probably
11 second week of March.
12     Q.   And do you know how many total
13 hours -- I know we talked about 100 hours that
14 have been paid so far.
15         Do you know how many total hours
16 you've put in on this case?
17     A.   It's approximately -- there's a
18 lot of records, a lot of depositions.  I'm a
19 one-man crew.  Probably in the area of
20 400 hours, a significant amount of hours.
21     Q.   You have outstanding bills to TASA
22 for the other 300?
23     A.   Yes.
24     Q.   Any sense in terms of forecasting
25 the future how much additional time you plan to

Page 121

1 put into this engagement?
2      A.   After the deposition, I mean,
3 unless I'm needed for something else.
4      Q.   So there's no continuing
5 engagement after today's deposition with the
6 exception of trial testimony?
7      A.   As far as I know.
8      Q.   And just to clarify again, you
9 were engaged through TASA.  You had no prior
10 relationship or knowledge of either the
11 defendant who engaged you or the law firms that
12 are representing them?
13     A.   No, I didn't.
14     Q.   How did you come up with your rate
15 of 200 an hour?  Did your wife give you any
16 input in that?
17         MR. KOBRIN:  Object to form.
18     A.   I think I kind of looked on the
19 Internet for general ranges.  I spoke to people
20 in TASA as to what the witnesses with my
21 experience might charge.
22         Since I was a beginner, at least
23 this specific -- even though I have a multitude
24 of experience, but just starting off as an
25 expert witness, I started my rate at the low

Page 122

1 end.
2      Q.   Do you plan on raising it sometime
3 soon? After this case maybe?
4          MR. KOBRIN:  Object to form.
5      A.   It would be nice, yeah.
6      Q.   Depending on the outcome?
7          MR. KOBRIN:  Object to form.
8          MR. YOUNG:  Withdrawn.  Withdrawn.
9 Just a joke.
10          MR. KOBRIN:  Don't answer that.
11          MR. YOUNG:  Just a joke.
12 BY MR. YOUNG:
13      Q.   How about professional
14 organizations?  Other than TASA, which is, I
15 guess, a network to engage you, are you a member
16 of any type of expert witness organizations?
17      A.   No, I'm not.
18      Q.   How about retired law enforcement
19 organizations?
20      A.   At one time I was a member of the
21 Fraternal Order of Police.
22      Q.   Not currently?
23      A.   Not currently.  I mean, that was
24 when I was a Newark police officer.  Because a
25 federal agency can't have a union.  Apparently

Page 123

1 it's a -- against the law for us to have a
2 union.  But I -- so I retained my membership
3 with them, but then as the years went on, there
4 was no reason to.
5      Q.   And I noticed you're wearing a
6 lapel pin today.  Is that a DEA agent badge?
7      A.   Well, it's the agent badge.  It's
8 the Survivor Benefit Fund.  It's basically a
9 fund that goes for the families of agents killed
10 in the line of duty.
11      Q.   Do you -- I know you mentioned on
12 your resumé that you do quite a bit of volunteer
13 work.  Is that one of the entities that you do
14 volunteer work for?
15      A.   No.  I do local things around
16 where I live.
17      Q.   Do you have a different CV that
18 you use or that you put out to the public to
19 market yourself other than the one that you've
20 shared with us today?
21      A.   No.  This is the only one I have.
22      Q.   Okay.
23      A.   Should I do a new one?
24      Q.   Home stretch here, I promise.
25          When you were engaged through

Page 124

1 TASA, walk me through the process of that
2 engagement.  You received, what, an e-mail from
3 them or a phone call?
4      A.   I received an e-mail asking to
5 give them a call.  I called them up.  They
6 briefly described what the case was, asked if I
7 had -- you know, if I thought that that would be
8 a case that I'd be able to help with or be able
9 to work on or have any expertise with.
10          I said, "Yes."  Then my name was
11 then forwarded to the law firm, and then I was
12 contacted by them, the law firm.  Bob, actually.
13 And then they spoke to me, and basically
14 interviewed my background, and then --
15          MR. KOBRIN:  Don't get too much
16      into your communications that would have
17      led to the information in forming your
18      report.
19          THE WITNESS:  Okay.
20 BY MR. YOUNG:
21      Q.   How many times did you speak to
22 the law firm?  Just the one?
23      A.   Before I was retained?
24      Q.   Yes.
25      A.   Once on the phone, and then I came

Page 125

1 out to meet with them so that they could -- a
2 bunch of different lawyers spoke to me to make
3 sure that I had the proper expertise.
4      Q.   Was that here in Pittsburgh?
5      A.   I think I was sitting in that seat
6 (indicating).
7      Q.   It was in this room that we're in
8 now?
9      A.   Yes.
10      Q.   Okay.  Other than this law firm,
11 have you spoken to other law firms about your
12 engagement in this case?
13      A.   I haven't talked to anyone else
14 regarding this case besides my lawyers here and
15 you right now.
16      Q.   Have you spoken to any employees
17 for the defendant who you're opining on their
18 behalf?
19      A.   No.
20      Q.   Did you propose a scope of
21 services to the law firm, or did they propose a
22 scope of services to you?
23          MR. KOBRIN:  Object to form.
24      Q.   Do you know what I mean by "scope
25 of services"?

Page 126

1   A.   Well, they had me explain my
2   entire background, my experience.  And then they
3   made a determination amongst themselves as to
4   whether or not my experience and expertise would
5   actually be good enough for the case to be an
6   expert or not.
7        Q.   But in terms of your approach to
8   this engagement, what you did and how you built
9   your report, did you propose that to the law
10  firm, or did the law firm propose that to you?
11       MR. KOBRIN:  Object to form.
12       A.   How I did my report?
13       Q.   Well, how you went about your work
14  in this case, right?  Obviously you weren't
15  involved in the case to begin with, so you
16  didn't know what information there was out
17  there, right?
18       A.   Oh, correct.  Yes.
19       Q.   So they provided you with
20  information?
21       A.   A lot of information, yes.
22       Q.   How much information would you say
23  you've reviewed in page count, if you could
24  estimate?
25       A.   I can't tell you how many

Page 127

1   thousands of pages.  They give me all the --
2   basically everything in the back here,
3   everything in the back.  It's full depositions,
4   two-day depositions, and, you know, video
5   depositions, and then all the different manuals
6   and -- you know, the stuff that's listed in the
7   back.  There's a lot of records.
8        Q.   And you're referring to, I
9   believe, Appendix B to Exhibit 2 of your
10  deposition?
11       A.   Correct.
12       Q.   That's the list of the materials
13  that you relied upon in forming your report?
14       A.   Correct.
15       Q.   Section 2, "Documents Produced in
16  This Litigation," the first item there is called
17  the "Diversion Investigators Manual."
18       You reviewed that in preparation
19  for your report, right?
20       A.   Correct.
21       MR. KOBRIN:  Object to form.
22       Q.   Is that the first time that you
23  reviewed that "Diversion Investigators Manual"?
24       A.   I've seen the manual before.
25       Q.   When you say "seen" it, you mean

Page 128

1   you've read it, or just seen it on someone's
2   desk?
3        A.   I haven't read it -- I didn't read
4   it cover to cover, but I reviewed parts of it.
5   Plus, after a while, the DEA went to electronic
6   forms, so you really -- if you needed any
7   information regarding anything that's either out
8   of the diversion manual, agent manual,
9   operations manual, you type it into the Internet
10  search, and it would come up with whatever, and
11  it would be right on your screen.  So you really
12  didn't need the manuals after that.
13       Q.   But when you referred to the
14  physical manual, not the electronic version,
15  what -- to the extent you recall, what were the
16  occasions which caused you to consult the
17  "Diversion Investigators Manual"?  Were those
18  diversion investigations you were working on?
19       MR. KOBRIN:  Object to form.
20       A.   Basically since I was expected to
21  be able to do diversion cases, I -- you know,
22  it's always good to be as well rounded as you
23  can.  So I'd review different manuals and see if
24  there's any updates, because the manuals would
25  be updated.  There's always new things coming

Page 129

1   out, things to look for.  I really can't get
2   into what's -- a lot of stuff is redacted.  I
3   can't really talk about it.
4        Q.   So did you have access to a
5   physical copy of the "Diversion Investigators
6   Manual" at your workplace?
7        A.   I could -- I could have gotten one
8   in hand at any time if I wanted, but it's a lot
9   easier on the computer.
10       Q.   Yeah.
11       So before you had the computer
12  access, there was a sort of binder or manual
13  that was available for you to use?
14       A.   I think they just gave that out
15  of -- they always gave those out.  It was always
16  on the intranet system since the day I was even
17  a task force officer.  You could look stuff up.
18       Q.   How about number 2, "Legal
19  guidance on reporting suspicious orders pursuant
20  to 21 CFR 1301"?  Had you seen that before this
21  engagement?
22       A.   That specific memorandum, no, I
23  did not.
24       Q.   Okay.  How about the "Chemical
25  Handler's Manual" dated January 2004?  Is that

Page 130

1 something that you've previously seen?
2     A.   I saw a "Chemical Handler's
3 Manual" back when I was in emergency management,
4 because we had a lot of different things that we
5 had to deal with in emergency management
6 regarding chemicals.  But a lot of that
7 "Chemical Handler's Manual" from 2004 would have
8 been after, because that's a revision, and
9 that's more about Sudafed and making meth and
10 all that.
11     Q.   Okay.  Subchapter 514 "Quotas,"
12 types of quotas, that looks like it also cites
13 to the "Diversion Investigators Manual."  Is
14 that something that you would have seen before?
15     A.   I knew about quotas, but I didn't
16 specifically see that, no.
17     Q.   How about the next one,
18 Chapter 51, "Policy and Interpretations"?
19     A.   Same thing.
20     Q.   Okay.
21     A.   I mean, I knew about quotas,
22 but ...
23     Q.   I assume number 6, same thing.
24 Quotas again?
25     A.   Exactly.

Page 131

1     Q.   How about number 7,
2 Appendix 5311A, "Requirements to Report
3 Suspicious Orders"?  Was that the first time you
4 had seen that appendix?
5     A.   That specific appendix, yes.  But
6 we knew according to the CFR, that you had to
7 report suspicious orders; 106 form, DEA
8 Form 106.
9     Q.   And the next one, it seems to be a
10 subset of that.  So I assume same answer?
11     A.   Yes.
12     Q.   And 9 and 10 seem to be similar in
13 their scope.  It's coming from the "Diversion
14 Investigators Manual."  These are the 5126,
15 "Requirement to Report Suspicious Orders."
16          Was this the first occasion that
17 you had to look at those specific documents?
18     A.   These specific ones.  I know I've
19 probably seen versions of them in the electronic
20 form, though.  But, I mean, a lot of this stuff
21 that we dealt with was actual diversion.
22 Suspicious orders aren't necessarily diversion.
23 So it's -- you know, when we got to it, it was
24 most likely a diversion-type criminal matter.
25     Q.   You also have some statutory and

Page 132

1 regulatory materials that you reference at the
2 end.  Were these -- let's take the first one,
3 21 CFR 1301.71.  Is that something that you
4 would have reviewed during your time and tenure
5 with the DEA?
6     A.   In general, you're supposed to
7 know about the security requirements.
8     Q.   Yeah.  I just wasn't sure, you
9 know, if -- those are sort of the laws that
10 you're investigating.  I didn't know to what
11 extent you're actually going and reading the
12 laws, you know.
13     A.   You're expected --
14          MR. KOBRIN:  Object to form.
15     A.   You're expected to know them.  So
16 you should at least review them.
17     Q.   The same with Section 801?
18     A.   Yeah, 21 USC, yes.  It's 801.
19     Q.   So after your -- jumping back to
20 your leaving the DEA, after your first surgery,
21 your first spinal fusion, did the follow-up care
22 involve prescription opioids for pain relief?
23     A.   After surgery, yeah.
24     Q.   Do you remember the particular
25 brand and dosage of the prescription you

Page 133

1 received?
2          MR. KOBRIN:  Object to form.  This
3     is well beyond the scope.
4     Q.   Go ahead.
5     A.   The exact brand and dosage?  I
6 know it's --
7     Q.   If you recall.  If you don't
8 recall ...
9     A.   I know it was probably -- I don't
10 really remember.  I mean, that was six --
11 probably Percocets or something.  I'm not
12 exactly sure.
13     Q.   Do you know where you got the
14 prescription filled?
15          MR. KOBRIN:  Object to form.  Same
16     objection.
17     A.   CVS Pharmacy.
18     Q.   Is that where you typically get
19 your prescriptions filled?
20     A.   Either there or the Wegmans
21 Pharmacy -- they're right by my house.
22     Q.   And you mentioned that you had
23 several surgeries.  Did you receive follow-up
24 prescriptions for opioids for pain control after
25 each of those surgeries?

Page 134

1    MR. KOBRIN: Object to form.
2    A. For -- yeah, you always -- each
3  surgery they gave at least a prescription for
4  some form of pain medication.
5    Q. You're not currently taking pain
6  medication?
7    A. Not -- no.
8    Q. But you are in some level of pain
9  from your back surgeries?
10    A. It hurts right now, yeah.
11    Q. You've never faced any personal
12  addiction issues with opioids, have you?
13    A. No, I have not.
14    Q. How about any family members? Any
15  family members --
16    MR. KOBRIN: Object to form.
17    Q. -- face any addiction issues?
18    A. With opioids, no.
19    Q. As part of your volunteer work,
20  you mentioned a bunch of charitable
21  organizations. Anything relating to opioids or
22  addiction in your charitable work?
23    A. No.
24    Q. You know, like church-based groups
25  or things like that?

Page 135

1    A. No. It's like Monmouth County
2  SPCA.
3    (Reporter clarification.)
4    A. Monmouth County SPCA. I like
5  animals.
6    MR. YOUNG: Let me take a look at
7    my notes real quick, and I think that
8    will wrap it up. Yeah, let's go off.
9    THE VIDEOGRAPHER: Going off the
10    record at 11:55 a.m.
11    (Recess taken.)
12    THE VIDEOGRAPHER: We're back on
13    the record at 12:02 p.m.
14  BY MR. YOUNG:
15    Q. So just a few things to follow up
16  on, and then we'll wrap up.
17    Do you have any plans currently to
18  use demonstratives if you were to testify at
19  trial? Do you know what I mean by
20  "demonstratives"? Poster boards or a PowerPoint
21  presentation, anything outside of your report?
22    A. I don't have any prepared.
23    Q. Okay. Page 2 of your report,
24  which is Exhibit 2 to your deposition, has a
25  summary of your conclusions, and they're

Page 136

1  lettered A through E. We don't necessarily have
2  to read through or walk through them now.
3    But as you sit here today, are all
4  of these opinions still your opinions, or have
5  you changed or modified your opinions in any
6  way?
7    A. No. These are still my opinions.
8    Q. And the basis for your opinion is
9  found either in the report that you've prepared
10  or in the supporting materials that you've
11  referenced and nowhere else, right?
12    A. Or my experience and training.
13    Q. Sure. Which isn't specifically
14  listed, but, yeah, that's one of the things --
15    A. I guess it's in the actual resumé,
16  CV, so ...
17    Q. You have no corrections to make of
18  your report? Any inaccuracies or recently
19  discovered -- I think your counsel mentioned --
20    MR. KOBRIN: Yeah, I was going to
21    say.
22    Q. -- one missing reference to maybe
23  an Endo deposition?
24    MR. KOBRIN: The Bencivengo
25    deposition is not in the --

Page 137

1    (Reporter clarification.)
2    MR. KOBRIN: The Bencivengo --
3  Fred Bencivengo's deposition is not
4  listed, and I think there are two
5  depositions which Mr. Greimel cited in
6  his footnotes but are not included in
7  the --
8    MR. YOUNG: Okay.
9    MR. KOBRIN: So pursuant to
10  footnote 1, everything he has relied on
11  is cited in the report or included in
12  the appendix. But just because there
13  were some redundancy between them, I
14  wanted to flag that some of the things
15  in the footnotes are not in the
16  appendix.
17  BY MR. YOUNG:
18    Q. And have you formed any opinions
19  about other experts in this litigation to the
20  extent that you've reviewed their reports?
21    A. I've seen some plaintiff expert
22  reports. I mean, I didn't really -- I didn't
23  comment on them in my report. I knew that there
24  were some reports that were being produced by
25  defense witnesses, which I listed the names of

Page 138

1 the individuals.
2     Q.   Did you have personal knowledge of
3 any of the other experts who have been
4 identified in this litigation; for example, some
5 of the DEA experts?
6         MR. KOBRIN:  Object to form.
7     A.   I don't know any of them
8 personally, no.
9     Q.   You don't have any opinions about
10 any of the experts on a personal nature?
11     A.   No.
12     Q.   If you didn't know them,
13 obviously, --
14     A.   No.
15     Q.   I had to ask.
16         Have you ever heard of any of the
17 Plaintiffs' DEA experts prior to your engagement
18 in this case?
19     A.   No, I haven't.  We're a small
20 agency but big enough that you don't really know
21 everyone, so ...
22     Q.   How about any of the Defendants'
23 experts who may have worked at the DEA?  Had you
24 ever heard of any of them prior to your
25 engagement in this case?

Page 139

1         MR. KOBRIN:  Object to form.
2     A.   None of the experts, no.
3     Q.   Okay.  Are you aware of any facts
4 that would influence or change your opinions as
5 found in your report here, as you sit here
6 today?
7     A.   No.  I'm not aware of anything
8 that would change my opinion, no.
9     Q.   Do you feel that your review of
10 any additional materials would impact or change
11 your conclusions drawn in your report in any
12 way?
13         MR. KOBRIN:  Object to form.
14     A.   I'd be happy to review anything.
15 And obviously if it did, I would do so.  But I
16 don't know of anything at this point that would
17 even do that.
18     Q.   Yeah, and I should clarify.
19 Really what I mean is, when you were drafting
20 your report, did you think to yourself, "I wish
21 I had document X or, you know, access to other
22 information in order to make these conclusions"?
23         MR. KOBRIN:  Object to form.
24     A.   If there was anything that I
25 thought I might need, I did ask counsel, and

Page 140

1 they provided it.
2     Q.   What are those things that you
3 asked for?
4         MR. KOBRIN:  Object to form.
5         Don't get into specific
6         conversations.  If you want to say
7         generally.
8     A.   In general, just some documents
9 regarding some of the -- let's see here.  I
10 don't remember which documents right offhand.
11     Q.   While you're thinking through
12 that, let me ask my question in a different way.
13         As you were reviewing some of
14 these materials, did you see something
15 referenced in the materials that was not
16 provided to you?  For example, in a deposition
17 transcript, you may see a reference to a
18 particular statute or a particular form or
19 whatever, and that material was not provided to
20 you.  Did you have occasion to reach out to
21 counsel to ask for those materials?
22     A.   Well, regarding, I guess,
23 depositions, because different people would be
24 talking about a specific person in a deposition,
25 and, you know, they weren't flooding me with,

Page 141

1 "Here's 30 depositions right now."  They'd
2 give -- "Do you have, let's say, Walter Durr's
3 deposition?"
4         "Yes.  Here, we'll send it to
5 you."
6         So, you know, like that kind of
7 stuff.
8     Q.   So you would see a name referenced
9 in a particular deposition and ask to get the
10 deposition of that person?
11     A.   Yes.
12     Q.   Okay.  Other than that, were there
13 other -- I would call them "reference
14 materials," but non-deposition transcripts that
15 you sought out to help form your opinions in
16 this case?
17     A.   Nothing I specifically sought out.
18 It know that it was basically I wanted to see
19 depositions to see what this one specific person
20 said, if it contradicted or if it went in line
21 with what evidence they were talking about
22 basing their -- whatever they're saying on.
23     Q.   The items listed under "Documents
24 Produced in This Litigation," there's -- under
25 the DEA "Diversion Investigator Manual" section,

Page 142

1  were all of these materials provided to you, or
2  did you request any of them?
3      A.   They were provided to me as
4  reference.
5      Q.   How about the next section,
6  "Written Discovery"?  Was that provided to you,
7  or did you request it?
8      A.   It was provided.
9      Q.   And under "Pleadings," was that
10  provided to you, all those pleadings?
11      A.   Yes.
12      Q.   And same with "Discovery Rulings"?
13      A.   Yes, they were.
14      Q.   And how about "Statutory and
15  Regulatory Materials"?
16      A.   They were, but, I mean, I've had
17  access to those.
18      Q.   Sure.  But you didn't specifically
19  ask for item 1, 2, or 3 on this list?  You were
20  actually provided those, not at your request?
21      A.   I think they were -- at first they
22  were provided.
23      Q.   Okay.  And I think you -- I
24  understand you're new to the expert witness
25  industry, but I just want to make sure I have

Page 143

1  this.
2          What's the degree of certainty
3  that you have on your opinions?  How confident
4  are you?
5      A.   I'm extremely confident.
6      Q.   And if you reviewed in tomorrow's
7  paper, for example, or saw a documentary on TV
8  or received some new information through any
9  source whatsoever that substantially changed or
10  modified your opinions as expressed in this
11  report, would you notify your counsel of that?
12      MR. KOBRIN:  Object to form.
13      A.   Of course I would.
14      MR. YOUNG:  That's all the
15  questions I have for you.  Thanks very
16  much.
17      THE WITNESS:  Okay.
18      MR. KOBRIN:  Thank you.  I think
19  we're all set.
20      THE VIDEOGRAPHER:  This ends
21  today's deposition.  We're going off the
22  record at 12:11 p.m.
23      (Signature not waived.)
24          - - -
25      Thereupon, at 12:11 p.m., on Wednesday, May

Page 144

1  29, 2019, the deposition was concluded.
2          - - -
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 145

1      CERTIFICATE
2
3
4
5      I, MATTHEW C. GREIMEL, do hereby certify
6  that I have read the foregoing transcript of my
7  cross-examination given on May 29, 2019; that together
8  with the correction page attached hereto noting
9  changes in form or substance, if any, it is true and
10  correct.
11      _____
        MATTHEW C. GREIMEL
12
13      I do hereby certify that the foregoing
14  transcript of the cross-examination of MATTHEW C.
15  GREIMEL was submitted to the witness for reading and
16  signing; that after he had stated to the undersigned
17  Notary Public that he had read and examined his
18  cross-examination, he signed the same in my presence
19  on the _____ day of _____, 2019.
20
21      _____
        NOTARY PUBLIC
22
23  My Commission Expires:
24  _____, _____.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1          CERTIFICATE
2
3
4      I, Carol A. Kirk, a Registered Merit
   Reporter and Notary Public. do hereby certify
5  that the within-named MATTHEW C. GREIMEL was
6  by me first duly sworn to testify to the truth, the
   whole truth, and nothing but the truth in the cause
7  aforesaid; that the deposition then given by him was
   by me reduced to stenotype in the presence of said
8  witness; that the foregoing is a true and correct
   transcript of the deposition so given by him; that the
9  deposition was taken at the time and place in the
   caption specified and was completed without
10 adjournment; and that I am in no way related to or
   employed by any attorney or party hereto or
11 financially interested in the action; and I am not,
   nor is the court reporting firm with which I am
12 affiliated, under a contract as defined in Civil Rule
   28(D).
13
14
15
16
17
18      _____
              CAROL A. KIRK, RMR
19
20 My Commission Expires:  April 9, 2022.
21              - - -
22
23
24
25

Page 147

1      DEPOSITION ERRATA SHEET
2  I, MATTHEW C. GREIMEL, have read the transcript
   of my deposition taken on the 29th day of May 2019, or
3  the same has been read to me.  I request that the
   following changes be entered upon the record for the
4  reasons so indicated.  I have signed the signature
   page and authorize you to attach the same to the
5  original transcript.
6  Page  Line  Correction or Change and Reason:
7  ___  ____  _____
8  ___  ____  _____
9  ___  ____  _____
10 ___  ____  _____
11 ___  ____  _____
12 ___  ____  _____
13 ___  ____  _____
14 ___  ____  _____
15 ___  ____  _____
16 ___  ____  _____
17 ___  ____  _____
18 ___  ____  _____
19 ___  ____  _____
20 ___  ____  _____
21 ___  ____  _____
22 ___  ____  _____
23 ___  ____  _____
24 Date _____ Signature _____
25