Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION   |   MDL No. 2804
                                   |
 4   OPIATE LITIGATION             |   Case No. 17-MD-2804
                                   |
 5   This Document Relates to:     |   Judge Dan Aaron Polster
                                   |
 6   The County of Summit, Ohio,   |
     et al., v.                    |
 7   Purdue Pharma L.P., et al.    |
     Case No. 17-op-45004          |
 8                                 |
     The County of Cuyahoga v.     |
 9   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45090          |
10                                 |
     City of Cleveland, Ohio v.    |
11   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45132          |
12                                 |
13
                  TUESDAY, JANUARY 22, 2019
14
                          - - -
15
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                  CONFIDENTIALITY REVIEW
17
                          - - -
18
          Videotaped deposition of EMILY HALL, held at
19      Foley & Lardner LLP, One Biscayne Tower, 2
        Biscayne Boulevard, Suite 1900, Miami, Florida,
20      commencing at 9:15 a.m., on the above date,
        before Kelly J. Lawton, Registered Professional
21      Reporter, Licensed Court Reporter, Certified
        Court Reporter.
22                        - - -
23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

```
 1    APPEARANCES:
 2    WEITZ & LUXENBERG
      BY:  ADAM L. STOLTZ, ESQUIRE
 3         JOSEPHINE A. REINA, ESQUIRE
      700 Broadway
 4    New York, New York 10003
      (212) 558-1310
 5    astoltz@weitzlux.com
      jreina@weitzlux.com
 6    Representing the Plaintiffs
 7
 8    FOLEY & LARDNER LLP
      BY:  KATY E. KOSKI, ESQUIRE
 9    111 Huntington Avenue
      Boston, Massachusetts 02199
10    (617) 342-4000
      kkoski@foley.com
11    Representing Anda, Inc., and the witness
12
13    REED SMITH LLP
      BY:  CRISTINA CÁRDENAS, ESQUIRE
14    1001 Brickell Bay Drive, Suite 900
      Miami, Florida 33131
15    (786) 747-0207
      ccardenas@reedsmith.com
16    Representing AmerisourceBergen Corporation and
      AmerisourceBergen Drug Corporation
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2    JONES DAY
      BY:  NICHOLAS HODGES, ESQUIRE
 3    4655 Executive Drive, Suite 1500
      San Diego, California 92121-3134
 4    (858) 314-1200
      nhodges@jonesday.com
 5    Representing Walmart
 6
      ARNOLD & PORTER
 7    BY:  WREDE SMITH, ESQUIRE
      601 Massachusetts Avenue, NW
 8    Washington, DC 20001-3743
      (202) 942-5000
 9    wrede.smith@arnoldporter.com
      Representing Endo Health Solutions Inc., Endo
10    Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
      Par Pharmaceutical Companies, Inc.,
11    (f/k/a Par Pharmaceutical Holdings, Inc.)
12
      COVINGTON & BURLING LLP
13    BY:  REBECCA G. VAN TASSELL, ESQUIRE
      1999 Avenue of the Stars
14    Los Angeles, California 90067-4643
      (424) 332-4768
15    rvantassell@cov.com
      Representing McKesson Corporation
16
17    KIRKLAND & ELLIS
      BY:  TUCKER HUNTER, ESQUIRE
18    300 North LaSalle Drive
      Chicago, Illinois 60654
19    (312) 862-2000
      tucker.hunter@kirkland.com
20    Representing Allergan Finance LLC
21
22  ALSO PRESENT:
23    ANTHONY BARBARO, Videographer
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        - - -
 2                    I N D E X
 3                        - - -
 4  Testimony of:  EMILY HALL                    PAGE
 5      DIRECT EXAMINATION BY MR. STOLTZ..............   8
 6
 7
 8                   E X H I B I T S
 9              (Attached to Transcript)
10    EMILY HALL DEPOSITION EXHIBITS               PAGE
```

```
11  Anda - Hall    Notice of Videotaped Deposition of    10
    Exhibit 1      Emily Schultz
12

    Anda - Hall    Anda, Incorporated - Anda Overview    40
13  Exhibit 2      - Bates Numbered
                   Anda_Opioids_MDL_0000570926 to
14                 Anda_Opioids_MDL_0000570944
15  Anda - Hall    July 29, 2013 E-mail - Subject:       77
    Exhibit 3      EPIC & IPA NJ - Required
16                 Information - Bates Numbered
                   Anda_Opioids_MDL_0000711634
17

    Anda - Hall    Standard Operating Procedure -        87
18  Exhibit 4      Suspicious Order Monitoring - Bates
                   Numbered
19                 Anda_Opioids_MDL_0000140495 to
                   Anda_Opioids_MDL_0000140497
20

    Anda - Hall    E-mail Chain - Subject:  Remedy -     100
21  Exhibit 5      Control Requests - Bates Numbered
                   Anda_Opioids_MDL_0000133286 to
22                 Anda_Opioids_MDL_0000133287
```

```
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2      EMILY HALL DEPOSITION EXHIBITS              PAGE
 3    Anda - Hall      December 15, 2016 E-mail - Subject:  114
      Exhibit 6        Bucket - Bates Numbered
 4                     Anda_Opioids_MDL_0000147166 to
                       Anda_Opioids_MDL_0000147167
 5
      Anda - Hall      E-mail Chain - Subject:  Acct      121
 6    Exhibit 7        #499221 - Bates Numbered
                       Anda_Opioids_MDL_0000137399
 7
      Anda - Hall      November 27, 2012 E-mail - Subject:  135
 8    Exhibit 8        Presentation - Bates Numbered
                       Anda_Opioids_MDL_0000132591
 9
      Anda - Hall      August 22, 2016 E-mail - Subject:    147
10    Exhibit 9        SOMS - Held Orders - Bates Numbered
                       Anda_Opioids_MDL_0000141492
11
      Anda - Hall      February 16, 2017 E-mail - Subject:  153
12    Exhibit 10       Wegman Oxycodone Order - Bates
                       Numbered
13                     Anda_Opioids_MDL_0000149556 to
                       Anda_Opioids_MDL_0000149558
14
      Anda - Hall      E-mail Chain - Subject:  Suspicious  163
15    Exhibit 11       Customer's Cut Off - Bates Numbered
                       Anda_Opioids_MDL_0000134998
16
      Anda - Hall      E-mail Chain - Subject:  Naltrexone  173
17    Exhibit 12       Tablet - Bates Numbered
                       Anda_Opioids_MDL_0000136972 to
18                     Anda_Opioids_MDL_0000136974
19    Anda - Hall      March 7, 2012 E-mail - Subject:  RA  187
      Exhibit 13       - Top 100 Products for Top 100
20                     Stores Review (Combined with Misc
                       Random Research) and Attachment -
21                     Bates Numbered
                       Anda_Opioids_MDL_0000081549 to
22                     Anda_Opioids_MDL_0000081587
23
24
```

```
 1                    E X H I B I T S
 2    EMILY HALL DEPOSITION EXHIBITS                PAGE
 3   Anda - Hall     E-mail Chain - Subject:  Please    202
     Exhibit 14      Review This Before I Send to
 4                   DEA...Thanks - Bates Numbered
                     Anda_Opioids_MDL_0000132608 to
 5                   Anda_Opioids_MDL_0000132609
 6   Anda - Hall     Personnel File of Emily Hall -     212
     Exhibit 15      Bates Numbered
 7                   Anda_Hall_Personnel_001 to
                     Anda_Hall_Personnel_017
 8
     Anda - Hall     E-mail Chain - Subject:  802433 -  219
 9   Exhibit 16      Drug Store Columbus Ohio - Bates
                     Numbered
10                   Anda_Opioids_MDL_0000136372 to
                     Anda_Opioids_MDL_0000136373
11
     Anda - Hall     E-mail Chain - Subject:  Need Info 223
12   Exhibit 17      - Bates Numbered
                     Anda_Opioids_MDL_0000133103 to
13                   Anda_Opioids_MDL_0000133105
14   Anda - Hall     E-mail Chain - Subject:  EPIC      229
     Exhibit 18      Account - 210466 - Requesting
15                   Control Limit Increase - Bates
                     Numbered
16                   Anda_Opioids_MDL_0000313264 to
                     Anda_Opioids_MDL_0000313269
17
     Anda - Hall     E-mail Chain - Subject:  Questions 241
18   Exhibit 19      Regarding Compliance Decisions -
                     Bates Numbered
19                   Anda_Opioids_MDL_0000150162 to
                     Anda_Opioids_MDL_0000150163
20
21
22
23
24
```

```
 1                        - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3       My name is Anthony Barbaro.  I'm a videographer

 4       for Golkow Litigation Services.  Today's date is

 5       January 22nd, 2019, and the time is 9:15 a.m.

 6              This video deposition is being held at

 7       2 South Biscayne Boulevard, Suite 1900, in Miami,

 8       Florida 33131, In Re:  The National Prescription

 9       Opioid Litigation for the United States District

10       Court, Northern District of Ohio, Eastern

11       Division.  The deponent is Emily Hall.

12              Counsel, would you now please identify

13       yourselves for the record.

14              MR. STOLTZ:  Adam Stoltz for the plaintiffs.

15              MS. KOSKI:  Katy Koski for Anda, Inc., and

16       the witness.

17              MS. CARDENAS:  Cristina Cardenas for

18       AmerisourceBergen from Reed Smith.

19              THE VIDEOGRAPHER:  Counsel on the phone?

20              MR. SMITH:  This is Reed Smith from Arnold &

21       Porter representing Endo & Par.

22              MR. HUNTER:  This is Tucker Hunter, Kirkland

23       & Ellis, on behalf of Allergan Finance, LLC.

24              MR. HODGES:  This is Nick Hodges from Jones
```

Highly Confidential – Subject to Further Confidentiality Review

1       Day on behalf of Walmart.

2               MS. VAN TASSELL:  This is Rebecca Van Tassell

3       from Covington & Burling on behalf of McKesson.

4               THE VIDEOGRAPHER:  The court reporter today

5       is Kelly Lawton, and she will now swear in the

6       witness.

7               THE COURT REPORTER:  Ma'am, would you please

8       raise your right hand.

9               Do you swear or affirm the testimony you're

10      about to give will be the truth, the whole truth,

11      and nothing but the truth?

12              THE WITNESS:  Yes, ma'am.

13              THE COURT REPORTER:  Thank you.

14              EMILY HALL, called as a witness by the

15      Plaintiffs, having been first duly sworn, testified

16      as follows:

17                      DIRECT EXAMINATION

18      BY MR. STOLTZ:

19      Q.    So, Emily, what is your current occupation?

20      A.    I am the senior manager of DEA compliance.

21      Q.    And what is DEA compliance?

22      A.    Currently, my role is not directly related to

23      DEA compliance.  I oversee all of our licensures for

24      all of our facilities as well as our customers and

Highly Confidential – Subject to Further Confidentiality Review

```
 1    our vendors.

 2        Q.   And when you say "licensure," are you

 3    referring to a license to distribute controlled

 4    substances?  Or licensure how?

 5             MS. KOSKI:  Object to form.

 6             THE WITNESS:  State licensure, DEA licensure,

 7        controlled substance licenses.  So I make sure

 8        that our customers are licensed appropriately.  I

 9        make sure our facilities are licensed

10        appropriately, and our vendors.

11    BY MR. STOLTZ:

12        Q.   And in that capacity, you're familiar with

13    both federal and state regulations?

14        A.   Yes, sir.

15        Q.   Okay.  If there's ever a question I ask and

16    you don't understand it, feel free to let me know.

17        A.   Okay.

18        Q.   If you don't tell me that you don't

19    understand, I'm going to assume that you do

20    understand.

21        A.   Okay.

22        Q.   Have you ever testified in a deposition or at

23    trial?

24        A.   No, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2            MR. STOLTZ:  I'd like to show you what should

3      be marked as Exhibit 1.

4            (Anda - Hall Exhibit 1 was marked for

5      identification.)

6            THE WITNESS:  This one is for me?

7            MS. KOSKI:  Yes.  Actually, I didn't get one.

8      We'll figure it out together.

9      BY MR. STOLTZ:

10     Q.    And you can take your time reading it, but

11     have you seen this document before?

12     A.    No, sir.

13     Q.    Okay.  Do you see the second paragraph where

14     it says Ms. Schultz is requested to produce on or

15     before January 22nd, 2019, copies of all documents,

16     data, or information reviewed in connection with

17     preparation for this deposition?

18     A.    Yes, sir.

19     Q.    Did you bring any documents with you in

20     response to this document?

21           MS. KOSKI:  You can answer that question.

22           THE WITNESS:  No, sir.

23     BY MR. STOLTZ:

24     Q.    Did you review any documents prior to this

Highly Confidential - Subject to Further Confidentiality Review

```
1    deposition?

2         A.   Yes, sir.

3         Q.   Were those documents deposition or trial

4    testimony?

5              MS. KOSKI:  I'm going to object and instruct

6         you not to answer.

7              You are not entitled to inquire about the

8         documents -- the substance of the documents she

9         reviewed in preparation for the deposition.

10             MR. STOLTZ:  Okay.

11   BY MR. STOLTZ:

12        Q.   And I apologize if I already asked this, but

13   did you look in your own personal files to find any

14   documents that might be relevant to this litigation

15   prior to this deposition?

16        A.   No, sir.

17        Q.   Did you meet with your attorneys prior to

18   this deposition?

19        A.   Yes, sir.

20        Q.   And was that in person or by phone?

21        A.   In person.

22        Q.   And how many times did you meet with your

23   attorneys?

24        A.   One time.
```

Highly Confidential - Subject to Further Confidentiality Review

 1       Q.    And how long was that?

 2       A.    A few hours.

 3       Q.    If you had to guess, how many hours?

 4       A.    Five.

 5       Q.    Okay.  And who was present?

 6       A.    Katy and James.

 7       Q.    Did you speak to anyone else prior to this

 8   deposition?

 9             MS. KOSKI:  Object to form.

10   BY MR. STOLTZ:

11       Q.    Did you speak to anyone else prior to this

12   deposition in regards to this litigation?

13             MS. KOSKI:  Object to form.

14             THE WITNESS:  No.

15   BY MR. STOLTZ:

16       Q.    You can answer the question.

17       A.    No, sir.  Sorry.

18       Q.    Are you being reimbursed by your employer for

19   your expenses in connection with this deposition?

20             MS. KOSKI:  Object to form.

21             THE WITNESS:  No, sir.

22   BY MR. STOLTZ:

23       Q.    You're not being paid for your time here?

24             MS. KOSKI:  Object to form.

```
 1              THE WITNESS:  Salary.  I'm a salaried
 2     employee.
 3  BY MR. STOLTZ:
 4     Q.   Have you ever received compensation from Anda
 5  or Allergan as a speaker at an event?
 6              MS. KOSKI:  Object to form.
 7              THE WITNESS:  No, sir.
 8  BY MR. STOLTZ:
 9     Q.   I'd like to ask you about your educational
10  background, if you would please briefly describe your
11  educational background after high school.
12     A.   I attended Broward College for two years.
13     Q.   Okay.  And did you graduate from Broward
14  College?
15     A.   No, sir.
16     Q.   What did you study while you were there?
17     A.   I studied general associates.
18     Q.   Okay.  Would you describe your employment
19  background after Broward College?
20     A.   I'm sorry, could you repeat the question?
21     Q.   Can you describe your employment background
22  after leaving Broward College?
23     A.   I worked for Target for a few years.  I moved
24  to Hallmark.  And then I went into Anda, and I have
```

Highly Confidential - Subject to Further Confidentiality Review

1    been working for Anda for 15 years.

2        Q.   Okay.  And you started work -- when did you

3    start working for Anda?

4        A.   In June of 2004.

5        Q.   And what was your position in 2004?

6        A.   I started out as a warehouse clerk, and then

7    shortly after that in 2004, I moved into a compliance

8    clerk role.

9        Q.   Okay.  And what are the duties of a warehouse

10   clerk?

11       A.   Picking, packing, shipping, helping with the

12   operations, getting product out the door.

13       Q.   Okay.  Does that involve actual moving boxes

14   around?

15       A.   Yes, sir.

16       Q.   Okay.  And then you shifted to a compliance

17   clerk.  How did the duties of compliance clerk differ

18   from that of warehouse clerk?

19       A.   So I started working as a compliance clerk,

20   and my main responsibilities was licensure.  So

21   validating our customers' licensure so that they were

22   set up in our systems appropriately enough that they

23   were eligible to order if you were eligible to order.

24       Q.   Just, when you say "eligible to order," just

1     eligible to order pharmaceutical products in general?

2         A.   Yes, based on their state and DEA licenses.

3         Q.   Okay.  And how would you validate a

4     customer's licensure?

5         A.   So we would go out at that time to the state

6     portal and validate directly through each state.

7         Q.   What is a state portal?

8         A.   So each state, almost every state has a

9     website that you can go to for validation.  So you

10    can go to that website on their board of pharmacy or

11    medical board website and validate to make sure that

12    they are active, that they are a good expiration

13    date, what their address is.

14        Q.   And back in 2004, most states had such a

15    portal?

16        A.   Yes, sir.

17        Q.   What would happen if a state didn't have a

18    portal?

19        A.   We would call them.  Make a call direct in to

20    the board.

21        Q.   The board?

22        A.   The individual boards.  So board of pharmacy,

23    medical board, depending on whatever -- whatever the

24    customer falls under.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  So for pharmacy, that would be the

2    board of pharmacy?

3        A.    Yes, sir.

4        Q.    Okay.  And if it was a doctor, that would be

5    a different board?

6        A.    Medical board.

7        Q.    Okay.  So as a compliance clerk, you would

8    ensure that the licensure for customers of Anda were

9    valid?

10       A.    Yes.

11       Q.    Was there anything else you would do as a

12   compliance clerk?

13       A.    At that time, that was my main

14   responsibilities.

15       Q.    Okay.  After working as a compliance clerk,

16   what was your position?

17       A.    I moved to a senior role, and then, from

18   there, I was a registration analyst.

19       Q.    Okay.  And just going back to your time as a

20   compliance clerk, you would be working -- were you

21   working in a particular warehouse?

22            MS. KOSKI:  Object to form.

23   BY MR. STOLTZ:

24       Q.    As a compliance clerk, did you have -- when
```

```
 1    it came to ensuring licenses for customers of Anda,

 2    did you do that for a particular region?

 3        A.   No.

 4             MS. KOSKI:  Object to form.

 5             THE WITNESS:  All of our customers.

 6    BY MR. STOLTZ:

 7        Q.   Okay.  Did you -- what was your business

 8    address at that time?

 9        A.   The place that I worked?

10        Q.   Yes.

11        A.   2915 Weston Road, Weston, Florida.

12        Q.   Okay.  So, as a compliance clerk, you were

13    working in the main office, or were you working in

14    the warehouse itself?

15        A.   That building houses both, so --

16        Q.   Okay.

17        A.   -- it's both a warehouse and office.

18        Q.   Okay.  And then, in 2007, you got -- you

19    changed position to senior compliance coordinator; is

20    that correct?

21        A.   Yes, sir.

22        Q.   And as a senior compliance coordinator, how

23    did your duties change from being a compliance clerk?

24        A.   Took on a few different roles.  Managed the
```

Highly Confidential - Subject to Further Confidentiality Review

1    pedigree and temperature monitoring in our facility,

2    but continued with licensure.

3         Q.    And what was that?  Managed the what?  You

4    said you managed the temperature monitoring, and what

5    was the second thing?

6         A.    Pedigree.

7         Q.    Okay.  What is pedigree?

8         A.    So at one time there was around 30 or so

9    states that had different requirements on pedigrees,

10   so passing pedigree, and Florida was one of those.

11   So for us to pass product to certain wholesalers, we

12   would have to pass pedigree on that product, showing

13   lot and where it came from, who we purchased it from.

14        Q.    And were there also requirements for

15   temperature and humidity?

16        A.    Yes, sir.

17        Q.    Was that state by state?

18        A.    State.

19        Q.    Okay.  Just the state of Florida?

20        A.    Yes, sir.

21        Q.    Okay.  And from there -- let's go back.

22              As senior compliance coordinator, the

23   compliance referred to complying with state

24   regulations as far as pedigree and temperature and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    humidity?

 2              MS. KOSKI:  Object to form.

 3              It's okay.

 4              THE WITNESS:  As well as licensure.

 5    BY MR. STOLTZ:

 6        Q.   Okay.  As well as licensure.  Were there

 7    any -- did you manage a team when it came to -- to

 8    keeping track of licensure?

 9              MS. KOSKI:  Object to form.

10              THE WITNESS:  Not at that time.

11    BY MR. STOLTZ:

12        Q.   Did you know of anyone else who helped in

13    maintaining licensure records?

14              MS. KOSKI:  Object to form.

15              THE WITNESS:  Can you restate that?

16              MR. STOLTZ:  Sure.

17    BY MR. STOLTZ:

18        Q.   Were you the only person at Anda that

19    maintained licensure records?

20        A.   No, sir.

21        Q.   Who else maintained licensure records?

22        A.   Specific names?

23        Q.   Sure.

24        A.   There was the Cynthia Mendoza,
```

 1    Sandra Bautista, and Vivian Harvey.

 2        Q.   And were they all senior compliance

 3    coordinators or --

 4        A.   I believe only one was.

 5        Q.   How did you split up maintaining licensure

 6    records?

 7        A.   Mostly it was shift-driven, so I worked a

 8    later shift than the other people on the team.  So

 9    when I came in, we had shifts on e-mails and shifts

10    on opportunities to work.

11        Q.   And how did you ensure that the licensures --

12    or, excuse me, the licenses were accurate and

13    up-to-date?

14             MS. KOSKI:  Object to form.

15             THE WITNESS:  We would go to the individual

16        boards to verify their -- validate their license.

17    BY MR. STOLTZ:

18        Q.   And how frequently would you update the

19    licensure records?

20        A.   At expiration, depending on when their board

21    expires them, but sometimes throughout on an audit

22    basis.

23        Q.   When -- under what circumstances were audits

24    performed?

```
1        A.    Just random audits.

2        Q.    Okay.  Those audits were completely random?

3        A.    Yes, sir.

4        Q.    What was your next position at Anda?

5        A.    I believe it was registration analyst.

6        Q.    And what is a registration analyst?

7        A.    At that point, I took on managing our

8   licensure for our facilities, so making sure our

9   three facilities were licensed.

10        Q.    When you refer to facility, what are you

11  referring to specifically?

12        A.    We have three facilities, entities, and two

13  of them are distribution centers, and one of them is

14  a broker facility.

15        Q.    What's a broker facility?

16        A.    Sales center.

17        Q.    So like a call center?

18        A.    Yes, sir.

19        Q.    What were your other responsibilities as a

20  registration analyst?

21        A.    SOPs, making sure that they were up-to-date,

22  and as well as licensure for our customers.  So I

23  never lost that responsibility.

24        Q.    And when you refer to SOPs, are you referring
```

```
 1    to standard operating procedures?

 2         A.   Yes, sir.

 3         Q.   And what kind of standard operating

 4    procedures did you maintain?

 5         A.   So we're required as a wholesale distributor

 6    to have up-to-date standard operating procedures on

 7    all of our distribution activities as well as

 8    compliance activities.

 9         Q.   And who else worked with you in maintaining

10    standard operating procedures with respect to

11    compliance and distribution?

12              MS. KOSKI:  Object to form.

13              THE WITNESS:  My manager.

14    BY MR. STOLTZ:

15         Q.   And who was your manager?

16         A.   Michael Cochrane.

17         Q.   What is involved in maintaining a standard

18    operating procedure?

19              MS. KOSKI:  Object to form.

20              THE WITNESS:  Can you be --

21              MR. STOLTZ:  Sure.

22    BY MR. STOLTZ:

23         Q.   Did you draft the standard operating

24    procedure?
```

```
 1        A.    At that time, no, sir.

 2        Q.    So what's involved -- what was your

 3   responsibilities with respect to the standard

 4   operating procedures at that time?

 5        A.    Maintaining, making sure -- partnering with

 6   the respective areas to make sure that they were

 7   up-to-date, and grabbing the correct information.

 8        Q.    Okay.  When you say maintaining, does that

 9   just mean keep making sure it's not destroyed?  What

10   is involved with maintaining a standard operating

11   procedure?

12        A.    Reviewing.  Making sure that we are reviewing

13   it on an annual basis.

14        Q.    What is the purpose of reviewing a standard

15   operating procedure?

16             MS. KOSKI:  Object to form.

17             THE WITNESS:  We have requirements on a state

18        level to have and house standard operating

19        procedures.

20   BY MR. STOLTZ:

21        Q.    And were those requirements -- did those

22   requirements change while you were in that position?

23             MS. KOSKI:  Object to form.

24             THE WITNESS:  Can you clarify what --
```

```
 1              MR. STOLTZ:  Sure.

 2              THE VIDEOGRAPHER:  I'm sorry to interrupt.

 3         They are saying they can't hear you guys.  If you

 4         guys can speak up a little louder, just because

 5         the webcam has to pick you up, too.  I'm sorry.

 6              MR. STOLTZ:  Okay.

 7              MS. KOSKI:  No problem.  Maybe if I push this

 8         up a little higher.

 9    BY MR. STOLTZ:

10         Q.  So would you agree that the purpose of

11    reviewing the standard operating procedures on an

12    annual basis was to ensure that Anda was in

13    compliance with state and federal regulations?

14              MS. KOSKI:  Object to form.

15              THE WITNESS:  No, sir.

16    BY MR. STOLTZ:

17         Q.  So why were the standard operating procedures

18    reviewed on an annual basis?

19         A.  To make sure that Anda was following their

20    own procedures.

21         Q.  So how could you ensure that Anda was

22    following its own procedures?

23         A.  So when you're reviewing and validating on an

24    annual basis, you are partnering with the person that
```

1    is actually doing that process and making sure that

2    they are following that, and if anything has changed,

3    then we need to update the document.

4         Q.   What are some changes, just for an example?

5              MS. KOSKI:  Object to form.

6              Are you asking her to pick any random SOP and

7         give an example of a change?

8    BY MR. STOLTZ:

9         Q.   So when it comes to a compliance SOP, for

10   example, you said that you make sure that Anda is

11   following that SOP, and if anything has changed, we

12   need to update the document.

13             What do you -- what do you mean by "anything

14   has changed"?  Could that refer to state or federal

15   regulations, or is that referring to other type of

16   changes?

17             MS. KOSKI:  Object to form.

18             THE WITNESS:  It would be a change

19        internally.  So if A plus B is no longer

20        equalling C, we need to make sure we document

21        that.

22   BY MR. STOLTZ:

23        Q.   Okay.  So can you just give an example of an

24   internal change that would require --

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.   So, for example, for receiving SOP where a

 2    receiving clerk passes a document to a receiving

 3    analyst and now that document does not -- no longer

 4    goes past the analyst, the receiving clerk manages

 5    it, that would be an example of a change.

 6         Q.   And then from registration analyst, it looks

 7    like you became manager of regulatory compliance?

 8         A.   Yes, sir.

 9         Q.   How did the position differ from your

10    position as a registration analyst?

11         A.   I still managed our licensure for our

12    facility as well as our customers, but now I had some

13    direct reports under me at that point.

14         Q.   And who are those people?  Who are those

15    district reports?

16         A.   The same names that I said earlier:  Vivian

17    Harvey, Sandra Bautista, and Cynthia Mendoza.

18         Q.   So the only difference as a manager of

19    regulatory compliance was that you had direct

20    reports?  Or were there additional responsibilities

21    on top of maintaining accurate licenses for your

22    customers and for Anda?

23              MS. KOSKI:  Object to form.

24    ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. STOLTZ:

 2          Q.   Did your responsibilities change at all when

 3     you became manager of regulatory compliance?

 4          A.   The core of my responsibilities did not

 5     change.

 6          Q.   Okay.  And what is regulatory compliance?

 7          A.   Making sure that we are monitoring and

 8     following state and federal regulations regarding

 9     licensure or so on.

10          Q.   What's "so on"?

11          A.   Federal regulations, changes in the

12     environment.

13          Q.   What do you mean by changes in the

14     environment?

15          A.   When there's a change in the regulations,

16     monitoring them.

17          Q.   When you refer to regulations, are you

18     referring specifically to licensing requirements?

19          A.   Yes, sir.

20          Q.   At any point in your position as manager of

21     regulatory compliance were you -- were you monitoring

22     for suspicious orders by customers of Anda?

23          A.   Yes, sir.

24               MS. KOSKI:  Object to form.
```

```
 1    BY MR. STOLTZ:

 2        Q.   Is that -- is that separate from maintaining

 3    licensure?

 4        A.   Yes, sir.

 5        Q.   So in addition to making sure everyone's

 6    licenses were up-to-date, you also monitored for

 7    suspicious orders?

 8        A.   Yes, sir.

 9        Q.   Okay.  So was there anything else in

10    regulatory compliance that you would -- are there any

11    other responsibilities other than maintaining

12    licensure and ensuring -- ensuring that there are no

13    suspicious orders delivered by Anda?

14            MS. KOSKI:  Object to form.

15            THE WITNESS:  I'm not clear.

16    BY MR. STOLTZ:

17        Q.   Okay.  Sure.

18            What were your responsibilities with regard

19    to monitoring suspicious orders?

20            MS. KOSKI:  Object to form.

21            The objection is as to time, if you care.

22            MR. STOLTZ:  Sure.

23    BY MR. STOLTZ:

24        Q.   At any point before becoming manager of
```

1    regulatory compliance, would you have been involved

2    in monitoring for suspicious orders?

3        A.   No, sir.

4        Q.   When you became manager of regulatory

5    compliance, is that when you started to monitor for

6    suspicious orders?

7        A.   Yes, sir.

8        Q.   Okay.  And did you receive any training in

9    what a suspicious order might look like?

10       A.   Yes.

11            MS. KOSKI:  Object to form.

12   BY MR. STOLTZ:

13       Q.   And what type of training was that?

14       A.   I received internal training as well as

15   industry training.

16       Q.   Okay.  The industry training, when did that

17   occur?

18       A.   I would say around 2009.

19       Q.   Do you recall what organization put on that

20   training?

21       A.   Yes, sir.

22       Q.   And what was the name of that organization?

23       A.   DEA.

24       Q.   Okay.  Did anyone else come to that training?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. KOSKI:  Object to form.

2   BY MR. STOLTZ:

3        Q.   Did anyone else -- any other representatives

4   from Anda -- were any other representatives of Anda

5   in attendance at that training?

6        A.   Yes, sir.

7        Q.   And who were the individuals?

8        A.   Miguel Palma.

9        Q.   And what was his position at Anda?

10       A.   I don't know his exact title, but he was a

11  manager for controlled substances in the warehouse.

12       Q.   And why is it that Anda sent you to learn

13  about suspicious orders in 2009?

14             MS. KOSKI:  Object to form.

15             THE WITNESS:  To gain some industry

16       knowledge.

17  BY MR. STOLTZ:

18       Q.   But that wasn't a part of your -- was that

19  part of your job description in 2009?

20       A.   Not specifically attending DEA conferences.

21       Q.   Were you monitoring for suspicious orders in

22  2009?

23       A.   Not me specifically.

24       Q.   Who was?
```

```
 1       A.   I can't say for certain.

 2       Q.   Would it have been the individual you

 3   mentioned?  Miguel Palma?

 4       A.   Miguel Palma?  I can't say.

 5       Q.   So in 2009, Anda sent you and Miguel Palma to

 6   learn about monitoring suspicious orders and what

 7   suspicious orders looked like.

 8            Is that accurate?

 9            MS. KOSKI:  Object to form.

10            THE WITNESS:  No, that's not what I said.

11   BY MR. STOLTZ:

12       Q.   Okay.  What did you say?

13            MS. KOSKI:  Object to form.

14            You can answer.

15            THE WITNESS:  I attended a DEA conference.

16   BY MR. STOLTZ:

17       Q.   And did Anda send you to that DEA conference?

18       A.   Yes, sir.

19       Q.   And what was the subject matter?

20       A.   There was various different courses.

21       Q.   And what were the various different courses?

22       A.   Overall, the DEA regulations.  There was our

23   goals, 222 forms, talked about quota.  Those were the

24   topics I can remember off the top of my head.
```

```
 1        Q.    Do you recall that -- them speaking about

 2   suspicious orders?

 3        A.    I can't recall.

 4        Q.    So in 2009, you can't recall whether or not

 5   the DEA training included references to suspicious

 6   orders?

 7        A.    Correct.

 8        Q.    They didn't refer to what a suspicious order

 9   might look like?

10        A.    I don't recall.

11        Q.    Okay.  What was Miguel Palma's position at

12   Anda?

13              MS. KOSKI:  Objection.

14              THE WITNESS:  Like I stated before, I don't

15        know his exact title, but he was a manager of

16        controls in the warehouse.

17   BY MR. STOLTZ:

18        Q.    And do you recall how long the training was?

19        A.    Three days, I believe.

20        Q.    Do you remember where it occurred?

21        A.    It was in Tampa, Florida.

22        Q.    Was it a requirement that Anda send a

23   representative to the industry training?

24              MS. KOSKI:  Object to form.
```

```
 1              THE WITNESS:  I do not know.

 2   BY MR. STOLTZ:

 3       Q.   How shortly after becoming a registration

 4   analyst did you attend that DEA training?

 5       A.   I couldn't say for certain.

 6       Q.   So earlier on in the deposition, you said you

 7   received training on what a suspicious order might

 8   look like, but then you said that you don't recall

 9   whether or not you received training as to what a

10   suspicious order looked like.

11              Did you -- did you recall remembering --

12   excuse me.

13              Did you, in fact, receive training on what a

14   suspicious order looked like, or did you not?

15              MS. KOSKI:  Object to form.

16              THE WITNESS:  I don't believe that I said

17      that I never received suspicious orders training.

18   BY MR. STOLTZ:

19       Q.   In reference to the DEA training in 2009, you

20   said that you had received training as to what a

21   suspicious order looks like.  That's the same meeting

22   that -- we're talking about the same meeting?

23       A.   No, sir.

24       Q.   There are two different industry -- there was
```

1     two different training sessions in 2009?

2          A.    No, sir.

3          Q.    So I'm just trying to understand.  There was

4     just the one three-day training in Tampa, Florida,

5     that was put on by the DEA?

6          A.    In 2009, yes.

7          Q.    In 2009?

8          A.    I believe it was 2009, yes, sir.

9          Q.    And you went to that meeting with Miguel

10    Palma?

11         A.    Yes, sir.

12         Q.    Okay.  And when you said that you received

13    training as to what a suspicious order looks like,

14    what were you referring to?

15         A.    Our -- our electronic monitoring is a -- I

16    had -- internal training on that from my manager.  It

17    was a leadership training, internal.

18         Q.    And that was in addition to the training you

19    received at the DEA training in Tampa?

20         A.    Yes, sir.

21         Q.    And that training --

22         A.    That didn't occur in 2009.

23         Q.    Okay.  And when did the -- when did the

24    internal training occur?

```
 1        A.    That was around 2010.

 2        Q.    Okay.  And was that training formalized, or

 3   was that sort of more of an informal mentorship

 4   relationship?

 5              MS. KOSKI:  Object to form.

 6              THE WITNESS:  Can you clarify?

 7   BY MR. STOLTZ:

 8        Q.    Did you receive formal training in 2010 as to

 9   what you referred to as your electronic system?

10        A.    Our monitoring system, yes, sir.

11        Q.    How long was that training?

12        A.    It was ongoing.

13        Q.    And who trained you?

14        A.    The management of compliance at that time.

15        Q.    And who was that individual?

16        A.    Michael Cochrane and Patrick Cochrane.

17        Q.    And when you say your monitoring system, what

18   was the name of that system?

19              MS. KOSKI:  Object to form.

20              THE WITNESS:  Our electronic monitoring -- so

21         it was a monitoring system where you were

22         collecting information, due diligence, looking at

23         customers.

24   ///
```

```
 1    BY MR. STOLTZ:

 2        Q.   Okay.  What -- was there -- how did you refer

 3    to that monitoring system internally at Anda?

 4        A.   A monitoring system.

 5        Q.   All right.  So when did you receive -- you

 6    said you received that training on the electronic

 7    monitoring system in 2010?

 8        A.   Yes, sir.

 9        Q.   Okay.  Was -- was that monitoring system --

10    did you use that in your day-to-day -- in your

11    day-to-day responsibilities?

12             MS. KOSKI:  Object to form.

13             THE WITNESS:  Part of.

14    BY MR. STOLTZ:

15        Q.   So when you said you didn't monitor for

16    suspicious orders until 2011, did you mean 2010?

17             MS. KOSKI:  Object to form.

18             THE WITNESS:  I don't recall saying 2011.

19    BY MR. STOLTZ:

20        Q.   So when is it that it was part of your job to

21    monitor for suspicious orders?

22        A.   2010.

23        Q.   And that's when you were a registration

24    analyst or when you were manager of regulatory
```

1    compliance?

2        A.    At that time manager of regulatory

3    compliance.

4        Q.    So is it fair to say that your main

5    responsibilities as a manager of regulatory

6    compliance were to monitor licensure activities,

7    monitor trends as far as state and federal

8    regulation, and also monitor for suspicious orders?

9        A.    Yes, sir.

10       Q.    Why does Anda have a regulatory compliance

11   department?

12            MS. KOSKI:  Object to form.

13   BY MR. STOLTZ:

14       Q.    In your understanding, why does Anda have a

15   regulatory compliance department?

16       A.    To make sure that we are following state and

17   federal.

18       Q.    State and federal regulations?

19       A.    Oh, I'm sorry, yes.  I said it in my head.

20       Q.    So as manager of regulatory compliance, were

21   you the manager of the entire regulatory department

22   at Anda?

23       A.    No, sir.

24       Q.    And that was Michael Cochrane?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes, sir.

 2        Q.   How did your position differ from that of

 3   Robert Brown?

 4             MS. KOSKI:  Object to form.

 5             THE WITNESS:  Can you please clarify?

 6             MR. STOLTZ:  Sure.

 7   BY MR. STOLTZ:

 8        Q.   What was Robert Brown's position at Anda?

 9        A.   He was the, I believe, associate director of

10   DEA compliance.  I'm sorry, I don't remember his

11   exact title.

12        Q.   Sure.

13             And how did you guys -- how did you and

14   Robert Brown manage the regulatory department?  Did

15   your responsibilities differ in any way?

16             MS. KOSKI:  Object to form.

17             THE WITNESS:  When?

18             MR. STOLTZ:  In 2011.

19             THE WITNESS:  I'm sorry, I'm not clear what

20        the question is.

21             MR. STOLTZ:  Sure.

22   BY MR. STOLTZ:

23        Q.   I'm just trying to get an idea of, I guess,

24   the organizational sort of top-down structure of the
```

```
1    regulatory department, and it's my understanding that

2    Michael Cochrane was the head of the regulatory

3    department.

4         Is that accurate?

5    A.   Yes, sir.

6    Q.   And underneath him was yourself and

7    Robert Brown?

8    A.   Yes, sir.  That was not 2011.  That was 2012,

9    Robert Brown came on board.

10   Q.   Okay.  Do you know why Robert Brown came on

11   board?

12        MS. KOSKI:  Object to form.

13        THE WITNESS:  I'm not sure.

14   BY MR. STOLTZ:

15   Q.   Okay.  Did you have different, I guess,

16   direct reports, or did you share direct reports?

17        MS. KOSKI:  Object to form.

18        THE WITNESS:  I'm not clear on what you're

19        asking me.

20   BY MR. STOLTZ:

21   Q.   So you testified earlier that Cynthia Mendoza

22   and other individuals would report to you directly.

23   Were those the same individuals that would report to

24   Robert Brown, or did you have different folks that
```

1    would report to you?

2       A.   There was -- he had a separate team.

3       Q.   Okay.  What were -- how did the

4    responsibilities of your team differ from the

5    responsibilities of his?

6       A.   So my team managed licensure as well as those

7    other few things that we talked about:  SOPs,

8    temperature, pedigree.  His team managed the DEA.

9       Q.   Your team didn't manage -- when you say his

10   team managed DEA, what do you mean?

11      A.   DEA compliance.

12      Q.   Did your team manage DEA compliance?

13      A.   No, sir.

14      Q.   Did Sandra Bautista manage DEA compliance?

15      A.   No, sir.

16      Q.   Cynthia Mendoza, did she?

17      A.   No, sir.

18      Q.   Did Natasha Jean-Charles manage DEA

19   compliance?

20      A.   No, sir.

21      Q.   I'm going to show you what is marked as

22   Exhibit 2.

23           (Anda - Hall Exhibit 2 was marked for

24   identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. STOLTZ:  I apologize for the awkward

 2         stapling.

 3              MS. KOSKI:  I think you might have put the

 4         sticker on the back.

 5              MR. STOLTZ:  No, it's just funky.  Well, did

 6         I?  Well, either way.

 7              MS. KOSKI:  Do you want me to fix the sticker

 8         so it's on the front page?

 9              MR. STOLTZ:  Yes.  Thank you.

10              Exhibit 2 is bearing Bates numbers 000570944

11         to 570926.

12    BY MR. STOLTZ:

13         Q.   Do you recognize this document?

14         A.   No, sir.

15         Q.   I'd like to -- you to refer to the page

16    bearing Bates number 570934.

17              MS. VAN TASSELL:  Excuse me.  This is Rebecca

18         Van Tassell for McKesson.

19              Could you state the prefix for those numbers?

20              MR. STOLTZ:  Sure.

21         Anda_Opioids_MDL_000570934.

22              MS. VAN TASSELL:  Thank you.

23              MR. STOLTZ:  In the future I'll just refer to

24         the prefix in the event that it's not
```

```
 1          Anda_Opioids_MDL.

 2    BY MR. STOLTZ:

 3          Q.   Do you see the second slide here?  It says

 4    "Controlled Substance Compliance."

 5          A.   Yes, sir.

 6          Q.   Is this an organizational chart of who was in

 7    charge of controlled substance compliance at Anda?

 8          A.   No, sir.

 9          Q.   What is this?

10          A.   This is an org chart of regulatory

11    compliance.

12          Q.   Okay.  Does it say "Controlled Substance

13    Compliance" at the top of the slide?

14          A.   Yes, sir.

15          Q.   And do you see where it says your name?

16          A.   Yes, sir.

17          Q.   And underneath you, it has the names of

18    Sandra Bautista, Cynthia Mendoza, Natasha

19    Jean-Charles, and Arlene O'Reilly.

20               Is that accurate?

21          A.   Yes, sir.

22          Q.   And do you mind reading for me their

23    positions?

24          A.   Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Senior DEA compliance clerk, senior DEA

 2      compliance clerk, DEA compliance clerk, and

 3      administrative assistant.

 4         Q.   So when you testified earlier that your

 5      direct reports didn't deal with DEA compliance, what

 6      did you mean by that?

 7         A.   They only -- only DEA they at this time

 8      touched was DEA's registrations.

 9         Q.   And DEA registrations refers to DEA licenses?

10         A.   Yes, sir.

11         Q.   And those -- they in no way ever dealt with

12      suspicious order monitoring?

13              MS. KOSKI:  Object to form.

14      BY MR. STOLTZ:

15         Q.   Did they -- did they ever, any of your direct

16      reports, have any involvement in suspicious

17      monitoring, or were they only -- were they only

18      dealing with controlled substances as it related to

19      license -- licensure?

20         A.   Yes, sir.

21         Q.   You mentioned that in 2011 part of your

22      responsibilities included monitoring for suspicious

23      orders.  Were you doing that on your own, or did your

24      direct reports also contribute to monitoring for
```

```
1    suspicious orders?

2            MS. KOSKI:  Object to form.

3            THE WITNESS:  No.

4    BY MR. STOLTZ:

5        Q.   Let me rephrase the question.

6            You mentioned that in 2011 that part of your

7    responsibilities were monitoring for suspicious

8    orders.

9            Is that accurate?

10       A.   Yes, sir.

11       Q.   Were any of your direct reports involved with

12   monitoring suspicious orders?

13       A.   No, sir.

14       Q.   So when their positions refer to senior DEA

15   compliance clerk, the DEA compliance is referring to

16   what?

17       A.   It's more of a standard.  So you're fitting

18   into a form.  A title is fitting into a form, but

19   they did not have any oversight -- just that it's

20   just a title.

21       Q.   Sure.

22            Did they have any involvement whatsoever in,

23   I guess, standard operating procedure with regards to

24   monitoring for suspicious orders?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   No, sir.

 2      Q.   What was your involvement in monitoring for

 3   suspicious orders?

 4           MS. KOSKI:  Object to form.

 5   BY MR. STOLTZ:

 6      Q.   How did you monitor for suspicious orders?

 7           MS. KOSKI:  Object to form.

 8           THE WITNESS:  Can you please verify?

 9           MR. STOLTZ:  Sure.

10   BY MR. STOLTZ:

11      Q.   In 2011, part of your responsibilities were

12   monitoring for suspicious orders.  What does that

13   mean?

14      A.   Doing due diligence on our customers.

15      Q.   What type of due diligence?

16      A.   Dispensing data -- collecting dispensing

17   data, collecting customer questionnaires, reviewing

18   them, looking at their location and geographics.

19      Q.   And did anyone -- did you -- did you do the

20   due diligence?

21      A.   Yes, sir.

22      Q.   So would you collect dispensing data?

23      A.   Yes, sir.

24      Q.   And you would collect questionnaires?
```

```
 1        A.   Yes, sir.

 2        Q.   Would you review the questionnaires?

 3        A.   Yes, sir.

 4        Q.   And you would review the location?

 5        A.   Yes, sir.

 6        Q.   And the geographics?

 7        A.   Yes, sir.

 8        Q.   Did anyone underneath you, specifically

 9   Sandra Bautista, Cynthia Mendoza, Natasha

10   Jean-Charles, did they also collect dispensing data?

11        A.   No, sir.

12        Q.   Would they collect questionnaires?

13        A.   No, sir.

14        Q.   Would they ever review the questionnaires?

15        A.   No, sir.  They had no involvement.

16        Q.   They had no involvement.

17             So what was -- in what way would you -- I

18   guess --

19             Would you specifically collect the dispensing

20   data?

21             MS. KOSKI:  Object to form.

22   BY MR. STOLTZ:

23        Q.   Who would collect dispensing data?

24             MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Can you please clarify?

 2              MS. KOSKI:  You're asking a name of a person?

 3              MR. STOLTZ:  I'm trying to understand if she

 4       was out collecting dispensing data or if someone

 5       was sending the dispensing data to her.

 6              THE WITNESS:  Requesting it from our

 7       customers.

 8   BY MR. STOLTZ:

 9       Q.   Okay.  You would directly request the data

10   from customers?

11       A.   Myself or a field sales representative.

12       Q.   Okay.  And when it came to, say, like a

13   national chain, how would you go about requesting

14   dispensing data?

15       A.   Request it from the sales rep.

16       Q.   Okay.  Who would be -- was -- wouldn't -- who

17   was in charge of -- who was the point of contact for

18   retail chain pharmacies?

19              MS. KOSKI:  Object to form.

20              THE WITNESS:  Can you please clarify?

21   BY MR. STOLTZ:

22       Q.   You mentioned a sales rep would collect the

23   dispensing data when you needed it for a customer.

24              What type of customers did Anda have?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Retail pharmacies, hospice, long-term care

 2   pharmacies, closed-door, just to name a few.

 3        Q.   And does that also include, like, smaller

 4   individually owned pharmacies?

 5        A.   Yes, sir.

 6        Q.   Were the sales reps -- who were the sales

 7   reps for the national retail chains?  Were those the

 8   same folks that would be sales reps for individual

 9   pharmacies?

10             MS. KOSKI:  Object to form.

11             THE WITNESS:  No, sir.

12   BY MR. STOLTZ:

13        Q.   Okay.  Were they in a different department?

14        A.   Yes, sir.

15        Q.   When you said dispensing data, what does that

16   mean?

17        A.   Dispensing data is a format that can be

18   pulled from a pharmacy showing what they have done in

19   an X amount of time frame.

20        Q.   What they have done as far as?

21        A.   Dispensed.

22        Q.   Okay.  And did -- what was the purpose of

23   asking for dispensing data?

24             MS. KOSKI:  Object to form.
```

```
 1      BY MR. STOLTZ:

 2          Q.   Why did you ask for dispensing data?

 3          A.   To see the big picture of the pharmacy.

 4          Q.   And why did you need to see the big picture

 5      of the pharmacy?

 6          A.   To understand if it's a pharmacy that we

 7      choose to do business with.

 8          Q.   What are some reasons why you would choose

 9      not to do business with a pharmacy?

10              MS. KOSKI:  Object to form.

11      BY MR. STOLTZ:

12          Q.   Whose -- whose decision was it to -- who

13      decided whether or not Anda wanted to do business

14      with a pharmacy?

15          A.   The compliance department.

16          Q.   Was that your department?

17          A.   Yes, sir.

18          Q.   Did you decide whether or not a particular

19      pharmacy was a pharmacy that Anda wanted to do

20      business with?

21              MS. KOSKI:  Object to form.

22              THE WITNESS:  Can you please clarify?

23      BY MR. STOLTZ:

24          Q.   In your position as the manager of regulatory
```

1    compliance, was it part of your job responsibilities

2    to decide whether or not a particular pharmacy was a

3    pharmacy that Anda wanted to do business with?

4        A.   Yes, sir.

5        Q.   What are some of the factors involved in that

6    decision?

7        A.   Reviewing a customer's due diligence -- I

8    mean, excuse me.

9             Reviewing the due diligence of a customer,

10   including dispensing data, customer questionnaires,

11   the geographics.

12       Q.   And did you ever decide a particular pharmacy

13   was not a pharmacy that Anda wanted to do business

14   with?

15            MS. KOSKI:  Object to form.

16            THE WITNESS:  Can you please clarify?

17   BY MR. STOLTZ:

18       Q.   Was there ever a time when you decided that a

19   particular customer of Anda was not a pharmacy that

20   Anda wanted to do business with?

21       A.   Yes, sir.

22       Q.   Do you remember any of those occasions?

23       A.   Not specifically.

24       Q.   Can you think of an example?

```
 1        A.   No, sir.

 2        Q.   Why -- do you recall -- why would Anda not

 3   want to do business with a particular pharmacy based

 4   on due diligence?

 5             MS. KOSKI:  Object to form.

 6             THE WITNESS:  Can you please clarify?

 7   BY MR. STOLTZ:

 8        Q.   You referenced looking at the particular

 9   factors when deciding whether or not a customer was a

10   customer that Anda wanted, and that included

11   dispensing data, the contents of a customer

12   questionnaire, and/or the geographics.

13             When it comes to dispensing data, what type

14   of dispensing data would indicate that a customer was

15   not a customer that Anda wanted to do business with?

16        A.   Top products, opioids on the top products,

17   bad mix, not a good -- not a good variety.

18        Q.   What is a bad mix?

19        A.   Not a good variety of products.

20        Q.   Were those the only factors?

21        A.   Part of it.

22        Q.   Were there other factors?

23        A.   That's all I can think of right now.

24        Q.   So dispensing data would reveal whether or
```

1    not opioids or controlled substances were a large

2    portion of that pharmacy's business?

3        A.   Yes, sir.

4        Q.   And if -- and if a pharmacy's business --

5    if -- excuse me.

6             If the proportion of a pharmacy's business --

7    or excuse me.

8             If a large proportion of a pharmacy's

9    dispensed drugs were controlled substances, that

10   would be a factor in deciding whether or not Anda

11   wanted to do business with them?

12       A.   Part of the decision, yes.

13       Q.   Do you recall what proportion would make you

14   not take them as a customer?

15            MS. KOSKI:  Object to form.

16   BY MR. STOLTZ:

17       Q.   What portion of -- how much opioids compared

18   to their other products dispensed would a pharmacy

19   have to dispense in order for Anda not to want to do

20   business with?

21       A.   There's no set number.  It varies on each

22   situation specific to that pharmacy or customer.

23       Q.   What type of situations would justify a

24   relatively large portion of opioids compared to other

1    products dispensed?

2        A.    Depending on where they are located.  Like I

3    said before, how their questionnaire, what shows on

4    the questionnaire, their geographics, what is their

5    type of business.

6        Q.    So a retail -- would that standard ever get

7    applied differently depending on whether or not a

8    pharmacy was a large chain or whether it was an

9    individual pharmacy?

10       A.    No, sir.

11       Q.    But you did mention that that was a

12   subjective determination, right?

13           MS. KOSKI:  Object to form.

14           THE WITNESS:  I'm not clear.

15   BY MR. STOLTZ:

16       Q.    So when it came to reviewing due diligence,

17   specifically dispensing data, there were situations

18   in which a relatively large -- a pharmacy that was

19   dispensing a relatively large amount of opioids

20   compared to other drugs dispensed, there would be

21   reasons why that would be justified?

22           MS. KOSKI:  Object to form.

23           THE WITNESS:  I don't have specifics in front

24       of me.  I would have to --

1    BY MR. STOLTZ:

2        Q.   Well, hypothetically, as manager of the

3    regulatory department, what are the types of

4    instances that would justify a pharmacy dispensing a

5    large amount of opioids compared to other products?

6        A.   I'm sorry, I wouldn't be able to say.  It's

7    more of a big picture.

8        Q.   Okay.  Big picture, so --

9             MS. KOSKI:  Object to form.

10   BY MR. STOLTZ:

11       Q.   So looking at the big picture, what are some

12   instances in which a large amount of opioids

13   dispensed compared to other products, looking at the

14   big picture, what are some just general reasons why

15   that wouldn't be alarming for Anda?

16            MS. KOSKI:  Object to form.

17            THE WITNESS:  Can you please clarify?

18            MR. STOLTZ:  Sure.

19   BY MR. STOLTZ:

20       Q.   When a pharmacy is dispensing a large amount

21   of opioids compared to other products dispensed, that

22   wouldn't necessarily mean that a -- that it was a

23   customer that Anda didn't want to do business with,

24   right?

```
 1              MS. KOSKI:  Object to form.

 2              THE WITNESS:  Correct.

 3   BY MR. STOLTZ:

 4       Q.   And what are some of the factors in deciding

 5   whether or not -- all right.

 6              So let's say there's Pharmacy A and B, and

 7   both of them -- 50 percent of the products that both

 8   of them dispense are opioids.  Or less.  Let's say

 9   20 percent.

10              Are there instances in which one pharmacy

11   could be -- are there instances in which Anda would

12   not want to do business with one as opposed to the

13   other?

14       A.   So depending on geographics, their

15   speciality, also who -- who's their primary,

16   understanding, like I said, the bigger picture of the

17   customer.  Dispensing data is not like the end-all.

18   It's like a bigger picture of all the facts.

19       Q.   Sure.

20              When you said who's their primary, what does

21   that mean?

22       A.   Their primary wholesaler.

23       Q.   And how would knowing who their primary

24   wholesaler affect the determination?
```

1       A.   Well, it's an understanding, because Anda is

2   a secondary, so -- we're a secondary wholesaler.

3   Understanding who is their primary relationship with.

4       Q.   How would that matter?

5       A.   It's knowing your customer, understanding who

6   they are, who they do business with.

7       Q.   So how would -- how would who their primary

8   distributor -- how would knowing who their primary

9   distributor affects that determination?

10          MS. KOSKI:  Object to form.

11  BY MR. STOLTZ:

12      Q.   Why does knowing who their primary

13  distributor matter when it comes to dispensing

14  controlled substances to a customer of Anda?

15      A.   It's not specific.  It's more of

16  understanding who they are and what they're -- who

17  they are doing business with overall.

18      Q.   Right.

19      A.   And understanding who that business core is.

20      Q.   So part of due diligence is collecting data

21  on a customer, right?

22      A.   Yes, sir.

23      Q.   And the purpose of having that data is to

24  determine whether or not that customer is a customer

1    that Anda wants?

2        A.    Yes, sir.

3        Q.    How is knowing who their primary

4    distributor -- how does that help Anda or yourself as

5    the manager of regulatory compliance, how does that

6    help you determine whether or not a customer is a

7    customer you want to keep as opposed to refuse to

8    dispense controlled substances to them, for example?

9        A.    So understanding if they have more than one

10   primary, if they have other secondaries,

11   understanding where we fit in their big picture of

12   their business.

13       Q.    Is it a situations where a pharmacy would

14   have more than one primary?

15       A.    Possibly.

16       Q.    If a customer were to have more than one

17   primary, how would that affect Anda's decision to

18   continue to dispense controlled substances to that

19   customer?

20           MS. KOSKI:  Object to form.

21           THE WITNESS:  Can you please clarify?

22           MR. STOLTZ:  Sure.

23   BY MR. STOLTZ:

24       Q.    You mentioned that it would be important to

1    understand whether or not a pharmacy had more than

2    one primary, if there are other secondaries, just so

3    Anda could understand where it fit as far as

4    dispensing controlled substances to that customer.

5            Why was it important to know where Anda fit

6    as far as dispensing controlled substances to a

7    particular customer?

8        A.   To understand who they are or who they are

9    doing business with and where we fall in that -- in

10   that picture.

11       Q.   Right, I understand that, that you want to

12   know who they are and who they are doing business

13   with.  But -- and that's why you asked those

14   questions.

15           But why is it important to know who they are

16   and who they are doing business with?

17       A.   So that we know who our customers are.

18       Q.   What other factors were involved in knowing

19   who your customer is other than who else is selling

20   to them?

21       A.   Dispensing data, questionnaire, geographics.

22       Q.   Was it important to know who a primary

23   distributor was in order to -- would you ever contact

24   the primary distributor?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Not me specifically.

 2        Q.    Would someone at Anda ever contact a primary

 3   distributor?

 4        A.    I don't know.

 5        Q.    What is a secondary distributor?

 6        A.    We're filling out-of-stocks.  When a primary

 7   is out of stock and we have the product, we fulfill

 8   the orders for them.

 9        Q.    Did you ever follow up with a primary

10   distributor to figure out why they were out of stock?

11              MS. KOSKI:  Object to form.

12              THE WITNESS:  Not me specifically.

13   BY MR. STOLTZ:

14        Q.    But someone at Anda would do that?

15        A.    I can't say for certain.

16        Q.    Why is it important to know your customer?

17              MS. KOSKI:  Object to form.

18   BY MR. STOLTZ:

19        Q.    As part of regulatory compliance, what does

20   knowing your customer have to do with regulatory

21   compliance?

22        A.    Providing a bigger picture on if we want to

23   do business with a specific customer or not.

24        Q.    What does -- how does deciding whether or not
```

1    you want to do business with a specific customer or

2    not, how does that relate to regulatory compliance?

3        A.   I'm not clear.

4        Q.   Why would the regulatory compliance

5    department be making decisions as to who Anda wants

6    to do business with?

7        A.   Licensing requirements.

8        Q.   Any other requirements?

9        A.   I'm sorry, I'm not clear.

10       Q.   Was knowing your customer part of ensuring

11   that Anda did not ship suspicious orders?

12            MS. KOSKI:  Object to form.

13            THE WITNESS:  I'm still not clear.  I'm

14       sorry.

15   BY MR. STOLTZ:

16       Q.   You said knowing your customer is important

17   to the regulatory compliance department because of

18   licensing requirements, correct?

19       A.   Yes, sir.

20       Q.   So isn't checking licensing requirements --

21   doesn't that just require going to the state portal

22   and making sure everything is up-to-date?

23       A.   Sure, yes.  That was part of my

24   responsibilities.

```
 1        Q.    So understanding whether or not a pharmacy is

 2   licensed to order controlled substances would not

 3   require knowing what their dispensing data looked

 4   like?

 5        A.    I'm sorry, I'm not clear.

 6        Q.    So part of knowing your customer is

 7   understanding their dispensing data, having them

 8   answer questionnaires, geographics, understanding who

 9   their primary distributor is, whether Anda is the

10   secondary distributor, if there are other secondary

11   distributors, other primary distributors.

12             How does any of that relate to licensure?

13        A.    I'm sorry, I thought we were talking about my

14   responsibilities.

15             So I'm not clear.

16        Q.    We're talking about why Anda would ask

17   certain questions or why the regulatory department

18   was in charge of knowing a customer.  You mentioned

19   that knowing the customer is important for licensing

20   requirements.

21             I'm asking why it is that things like

22   geographics, who the primary supplier is, dispensing

23   data, what or how does any of that have to do with

24   licensing requirements?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   DEA requirements.  I'm sorry.  I didn't

 2   understand what your question was.

 3        Q.   Okay.  What are those DEA requirements?

 4        A.   Knowing your customer.

 5        Q.   And why was it important to know your

 6   customer?

 7        A.   To understand the big picture of the

 8   customer, what they're doing, what their speciality

 9   is, who they're -- who they are doing business with.

10        Q.   And it's your understanding that it's a DEA

11   regulation to understand the big picture of the

12   customer, including what they are doing, what their

13   speciality is, and who they are doing business with?

14             MS. KOSKI:  Object to form.

15             You can answer.

16             THE WITNESS:  Knowing your customer, and

17        knowing is being part of it.

18   BY MR. STOLTZ:

19        Q.   So knowing your customer is a DEA

20   requirement?

21             MS. KOSKI:  Object to form.

22   BY MR. STOLTZ:

23        Q.   DEA regulation?

24             MS. KOSKI:  Object to form.
```

```
 1               You are asking her what the lot is?

 2               MR. STOLTZ:  No.  I'm asking her why the

 3          DEA -- excuse me -- the manager of regulatory

 4          compliance and the folks -- the DEA compliance

 5          managers were concerned with knowing their

 6          customer and if that was part of their

 7          understanding as far as complying with DEA

 8          requirements.

 9               MS. KOSKI:  You can answer.

10               THE WITNESS:  Yes, sir.

11     BY MR. STOLTZ:

12          Q.   And that related to monitoring suspicious

13     orders as well?

14          A.   Yes, sir.

15          Q.   How could knowing your customer help you

16     monitor suspicious orders?

17          A.   So if an order is only suspicious with a big

18     picture, looking at -- excuse me, is not suspicious

19     when you look at the big picture of a customer, and

20     all those other things with knowing your customer

21     plays a role in that.

22          Q.   So how would knowing who a primary

23     distributor is relate to a determination as to

24     whether an order is suspicious or not?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Not a determination.  Just a factor.

 2        Q.    How is it a factor?

 3        A.    Just one part of the puzzle.  If we are the

 4   secondary, who is their primary?  Just -- just an

 5   understanding of who the customer is.  It's just one

 6   factor of the big picture.

 7        Q.    And how would that factor -- how could that

 8   factor influence a determination?

 9              I'm just trying to understand how it's

10   relevant who the primary distributor is in

11   determining whether an order is suspicious or not.

12        A.    Like I said, that is only one factor.  So

13   it's just one field of --

14        Q.    Of course.

15        A.    -- of review.

16        Q.    But each one of those factors is part of a

17   determination as to whether an order is suspicious or

18   not.

19              Is that accurate?

20        A.    Yes, sir.

21        Q.    So then how does the primary distributor

22   factor into that determination?

23        A.    I don't know.

24        Q.    Don't you make the decisions as to whether or
```

Highly Confidential - Subject to Further Confidentiality Review

1    not a customer is one that Anda wants to do business

2    with?

3         A.   At that time, yes.

4         Q.   So how would who the primary distributor is

5    factor into your decision?

6         A.   I don't know.

7         Q.   How would geographics factor into your

8    decision?

9         A.   Understanding how many people are in that

10   area, how many different pharmacies are in that area,

11   just getting a better under -- a better view of

12   what's happening in that location.

13        Q.   And how would dispensing data factor into

14   that decision?

15        A.   Understanding what they're dispensing.

16        Q.   And that would include understanding the

17   portion of their dispensed drugs that were controlled

18   substances?

19        A.   Yes.

20        Q.   Were there any other things you would look

21   for in dispensing data to determine whether or not an

22   order was suspicious?

23             MS. KOSKI:  Object to form.

24             THE WITNESS:  Could you please clarify?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. STOLTZ:  Sure.

 2    BY MR. STOLTZ:

 3         Q.   You testified earlier that the purpose of

 4    asking for dispensing data was to better understand

 5    what portion of that pharmacy's business related to

 6    dispensing opioid products compared to the other

 7    products they dispensed.

 8              Were there any other reasons why you asked

 9    for dispensing data other than for understanding that

10    proportional relationship?

11         A.   Yes.  Knowing your customer, yes.

12         Q.   So just knowing how much they dispensed in

13    general?

14         A.   Overall.  So noncontrols as well.  Just what

15    is their mix, what are they doing, how much is going

16    out in a specific time frame.

17         Q.   Okay.  And typically, how -- as a secondary

18    distributor -- as a secondary distributor, did you

19    ask for -- how did you have dispensing data for a

20    pharmacy?

21                 MS. KOSKI:  Object to form.

22                 THE WITNESS:  Can you clarify?

23    BY MR. STOLTZ:

24         Q.   How did you collect dispensing data for
```

1      Anda's customers?

2          A.    Request it.  So we either compliance or sales

3      representative requested it.

4          Q.    Okay.  And they would provide to you their

5      full dispensing data over a period of time?

6          A.    Yes, sir.

7          Q.    Typically what -- what period of time did you

8      ask for?

9          A.    I believe it was three months at the time.

10         Q.    Three months?

11               And was it always three months?

12         A.    I can't be certain.

13         Q.    When -- when do you remember that it was

14     three months for sure?

15         A.    I believe it was 2011, 2012.

16         Q.    Three months of dispensing data?

17         A.    I believe so.

18         Q.    Was that usually like the previous three

19     months?

20         A.    Yes, sir.

21         Q.    Okay.  In your position as the manager of

22     regulatory compliance, if Anda got a new customer or

23     if there was a customer that had previously ordered

24     controlled substances, how would you determine

1    whether or not to supply controlled substances to

2    that pharmacy?

3            MS. KOSKI:  Object to form.

4            THE WITNESS:  Can you clarify?

5            MR. STOLTZ:  Sure.

6    BY MR. STOLTZ:

7        Q.  Did regulatory compliance -- did the

8    regulatory compliance department ever make a

9    determination as to whether -- excuse me.

10           Was it part of Anda's standard operating

11   procedure to collect -- to know your customer prior

12   to ever dispensing controlled substances to a

13   customer?

14           MS. KOSKI:  Object to form.

15           THE WITNESS:  Can you please clarify?

16   BY MR. STOLTZ:

17       Q.  At what point did -- excuse me.

18           If a pharmacy contacted Anda and had not

19   previously ordered controlled substances from Anda or

20   had never previously ordered any substances from

21   Anda, would that customer be able to buy controlled

22   substances from Anda?

23           MS. KOSKI:  Object to form.

24           THE WITNESS:  No, sir.

```
 1    BY MR. STOLTZ:

 2        Q.   If that customer wanted to buy controlled

 3    substances from Anda, how would they go about doing

 4    that?

 5        A.   They would request -- the sales rep or

 6    compliance would request for a customer questionnaire

 7    and dispensing data to be filled out for review.

 8        Q.   And who would review that?

 9             MS. KOSKI:  Object to form.

10    BY MR. STOLTZ:

11        Q.   Would you review the customer questionnaire

12    and dispensing data?

13        A.   Yes, sir.

14        Q.   And based on that, you would decide whether

15    or not to supply controlled substances to that

16    customer?

17        A.   Yes, sir.

18        Q.   Would you -- after you decided to supply

19    controlled substances to a customer, were they

20    limited in the amount of controlled substances they

21    could order from Anda?

22        A.   Yes, sir.

23        Q.   And what was that limit?

24             MS. KOSKI:  Object to form.
```

```
 1              THE WITNESS:  It would vary.

 2    BY MR. STOLTZ:

 3         Q.   What would it vary on?

 4         A.   So the basic -- base -- excuse me -- base

 5    limits would be a thousand -- set at a thousand.  If

 6    they were approved and they had just gone through the

 7    approval process and were approved, in fact,

 8    approved, they would get a base of a thousand -- a

 9    thousand units for each family, minus oxycodone and

10    methadone.

11         Q.   So oxycodone and methadone wouldn't factor

12    into the thousand units?

13         A.   No, sir.

14         Q.   How much oxycodone or methadone could they

15    order?

16         A.   Zero.

17         Q.   Zero.

18              So after a new customer came to Anda and they

19    wanted to order controlled substances, they would be

20    allowed a thousand units for each family but that

21    wouldn't include methadone and oxycodone?  They

22    wouldn't be able to order that?

23         A.   Yes, sir.

24         Q.   What would they have to do to order oxycodone
```

1    or methadone?

2        A.   They would have to do a specific request

3    requesting those products.  Those were not just

4    given.

5        Q.   Okay.  And do you know why oxycodone and

6    methadone weren't included in the thousand-unit

7    limit?

8        A.   To have more security, basically, on those

9    specific products and a tighter understanding of

10   who's purchasing them from us.

11           MS. KOSKI:  Someone on the phone, can you

12       mute?  We can hear a lot of paper shuffles.

13           Thank you.

14   BY MR. STOLTZ:

15       Q.   Were oxycodone or methadone treated

16   differently with respect to DEA regulations than

17   other controlled substances?

18           MS. KOSKI:  Object to form.

19   BY MR. STOLTZ:

20       Q.   Are oxycodone or methadone, are they

21   Controlled II substances?

22       A.   Yes, sir.

23       Q.   Why did Anda treat them differently than

24   other Controlled II substances?

```
 1       A.   Higher abuse rate for those two specific

 2   products.

 3       Q.   When did oxycodone or methadone start being

 4   treated differently by Anda?

 5       A.   I believe from my knowledge it was around

 6   that time, 2011-ish time -- 2010.  Excuse me, 2010 to

 7   2011, sorry.

 8       Q.   And who made that decision?  Do you recall?

 9       A.   Compliance management.

10       Q.   Would that have been you?

11       A.   Michael Cochrane.

12       Q.   Was there ever a time where other drugs were

13   treated differently, other controlled substances were

14   treated different than others, specifically opioids?

15            MS. KOSKI:  Object to form.

16            THE WITNESS?  Can you please clarify?

17            MR. STOLTZ:  Sure.

18   BY MR. STOLTZ:

19       Q.   Starting around 2011-ish time, we know that

20   oxycodone and methadone were not included in the

21   initial thousand-unit limit.

22            Was there ever a time after 2011 where more

23   Controlled II substances or Controlled III substances

24   were added to that list of oxycodone and methadone
```

Highly Confidential - Subject to Further Confidentiality Review

1    as -- as more prone to abuse?

2         A.   I don't know the exact year but compliance

3    management made restrictions on fentanyl as well.

4         Q.   And was that the same restriction, just that

5    it wouldn't be included in the initial thousand?

6         A.   Yes, sir.

7         Q.   Do you know if Controlled III opioids were

8    subject to the thousand -- thousand-unit limit?

9         A.   Controlled II.  Opioids are in Schedule II.

10        Q.   Sure.

11             Before drugs like hydrocodone or other

12   combination products were Controlled II -- excuse me.

13             When you say family, a thousand units per

14   product family, what is a family?

15        A.   A chemical family.

16        Q.   Okay.  And when hydrocodone products were

17   Schedule III, was that part of the opioid chemical

18   family?

19        A.   That was before my time.

20        Q.   Do you recall when hydrocodone products were

21   Schedule III?

22        A.   Prior to 2010.

23        Q.   So can you just sort of take me through the

24   process of -- I don't know how you would refer to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it -- take me through the process of, you know, when

 2    an initial customer comes to Anda, how the -- how

 3    it's decided whether or not that customer is eligible

 4    to order controlled substances.

 5           Was there a standard operating procedure with

 6    respect to that process?

 7        A.   Yes, sir.

 8        Q.   What was it?

 9        A.   The review of the dispensing data -- well,

10    requesting, right.  So once it's requested and we

11    received it, it's a review of dispensing data,

12    questionnaire; like I had said before, the

13    geographics.

14        Q.   And all of that data was collected prior to

15    allowing a customer to order controls?

16        A.   Yes, sir.

17        Q.   Was that always the case?

18           MS. KOSKI:  Object to form.

19           THE WITNESS:  Can you please clarify?

20    BY MR. STOLTZ:

21        Q.   Before allowing a customer to order controls,

22    they were required to send in the dispensing data and

23    answer questionnaires.

24           What else were they required to send in?
```

```
 1        A.    Dispensing data, questionnaires, and in some

 2   cases we would request for pictures.

 3        Q.    Pictures of what?

 4        A.    Of the pharmacy.

 5        Q.    Why are pictures of the pharmacy relevant?

 6        A.    To understand the location, see how -- what

 7   it looked like on the inside if we couldn't retrieve

 8   them online.

 9        Q.    Okay.  Would you ever do a site visit?

10        A.    No, sir, not me specifically.

11        Q.    Would someone in one of your direct contacts

12   do site visits?

13              MS. KOSKI:  Object to form.

14   BY MR. STOLTZ:

15        Q.    Or, excuse me, direct reports?

16        A.    Direct report, no, sir.

17        Q.    Who would go on site visits?

18        A.    There has been compliance leadership that has

19   gone on site visits.

20        Q.    And why -- why were -- why only sometimes

21   would site visits be conducted?

22              MS. KOSKI:  Object to form.

23              THE WITNESS:  I don't know.

24   ///
```

```
 1    BY MR. STOLTZ:

 2         Q.   Okay.  Was there ever an instance where

 3    customers were allowed to buy controlled substances

 4    while you were the manager of regulatory compliance

 5    prior to providing questionnaires, diligence reports,

 6    or dispensing data?

 7              MS. KOSKI:  Object to form.

 8              THE WITNESS:  Not that I'm aware of.

 9    BY MR. STOLTZ:

10         Q.   What was EPIC?

11         A.   EPIC is a buying group.

12         Q.   What is a buying group?

13         A.   They are a group of -- specifically, that's a

14    group of pharmacies that get together and have a

15    special pricing plan for going through this EPIC

16    group.

17         Q.   So would those mostly be individual, small

18    pharmacies?

19         A.   Yes, sir.

20         Q.   So they would sort of band together in order

21    to get better prices?

22         A.   Yes, sir.

23         Q.   Is it kind of like a buyer's club?

24              MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            THE WITNESS:  I don't know.

 2   BY MR. STOLTZ:

 3       Q.   Like the movie Dallas Buyers Club?  Matthew

 4   McConaughey?

 5            All right.

 6       A.   I do like Matthew McConaughey, though.

 7       Q.   Sure.

 8            How many stores in EPIC?

 9       A.   Oh, I don't know.

10       Q.   But it could be more than 50?

11       A.   I'm sorry, I do not have that answer.

12       Q.   What about IPA NJ?  Was that also a buyers

13   group?

14       A.   I believe so, but I don't have specifics on

15   them.

16       Q.   I'm going to show you what's been marked as

17   Exhibit 3.

18            (Anda - Hall Exhibit 3 was marked for

19   identification.)

20            MR. STOLTZ:  Bearing Bates Number 711634.

21            THE WITNESS:  Thank you.

22   BY MR. STOLTZ:

23       Q.   Is this an e-mail from Latoya Samuels to you

24   and others?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Yes, it appears that way.

 2       Q.    And was -- this was sent on July 29th of

 3    2013?

 4       A.    Yes, sir.

 5       Q.    And at the time you were the manager of

 6    regulatory compliance?

 7       A.    Yes, sir.

 8       Q.    And Latoya Samuels, she was also in the

 9    regulatory compliance department?

10       A.    She worked under Robert Brown under the DEA

11    compliance side.

12       Q.    Do you recall getting this e-mail?

13       A.    No, sir.

14       Q.    What does the first sentence say?

15       A.    The attached report contains a list of active

16    accounts within the EPIC and IPA New Jersey, NJ,

17    buying groups without a questionnaire and/or dispense

18    data on file.

19       Q.    What's the second sentence say?

20       A.    Many accounts within the groups purchased a

21    high volume of controls.

22       Q.    So were there instances in which Anda's

23    customers could buy a high volume of controls prior

24    to providing a questionnaire or dispensing data to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     Anda?

 2          A.   I don't know the specific case.

 3          Q.   I'm not asking for a specific case.  I'm

 4     asking if that's something that happened.

 5               MS. KOSKI:  Object to form.

 6               You can answer.

 7               THE WITNESS:  The -- as far as I know, the

 8          policy is that we are to obtain the due diligence

 9          up front.  With this e-mail, I -- you know, I

10          don't know what she was referring to.

11     BY MR. STOLTZ:

12          Q.   Is she referring to buying groups of multiple

13     pharmacies called EPIC that purchase a high volume of

14     controls in this e-mail?

15               MS. KOSKI:  Object to form.

16               THE WITNESS:  That's what's written here.

17     BY MR. STOLTZ:

18          Q.   And does she say that there are accounts

19     within EPIC that do not have a questionnaire or

20     dispensing data?

21          A.   Yes, that's what it says.

22          Q.   What's the last sentence of that first

23     paragraph say?

24          A.   It is important for us to receive this
```

Highly Confidential - Subject to Further Confidentiality Review

1    information to determine control eligibility as we

2    are required by the DEA to "know our customers."

3        Q.   So knowing -- how does knowing your customers

4    relate to determining control eligibility?

5            Let me ask that again, or differently.

6            "Control eligibility," does that mean whether

7    or not a customer is allowed to buy controls or not?

8        A.   Yes, sir.

9        Q.   And "controls," that's referring to

10   controlled substances?

11       A.   Yes, sir.

12       Q.   So earlier you said it was important to get

13   dispensing data, questionnaires, geographics on a

14   customer in order to determine whether or not they

15   were eligible to purchase controls from Anda.

16           Is that accurate?

17       A.   Yes, sir.

18       Q.   So were there instances where customers were

19   able to buy a high volume of controls prior to

20   providing the necessary information to regulatory

21   compliance?

22           MS. KOSKI:  Object to form; asked and

23       answered.

24           You can answer.

```
 1    BY MR. STOLTZ:

 2        Q.   Were buying groups treated differently by

 3    regulatory compliance than individual pharmacies?

 4        A.   No, sir.

 5        Q.   Why do you think EPIC was able to buy

 6    controlled -- a high volume of controls without ever

 7    providing information to regulatory compliance?

 8             MS. KOSKI:  Object to form.

 9             THE WITNESS:  I can't -- I can't specify on

10        this.  I don't know.  I don't know the details of

11        this.

12    BY MR. STOLTZ:

13        Q.   What does -- in the next paragraph, Latoya

14    Samuels says:  We have been in communication with

15    NAMS for quite some time, and they are well --

16    well-informed regarding the requirements and the

17    current status.

18             What is NAMS?

19        A.   National account manager.

20        Q.   But -- so earlier you mentioned that your

21    responsibilities involved collecting this data --

22    "data" being dispensing data -- amongst other

23    factors.

24             How is it that you don't know the details of
```

1    this?

2            MS. KOSKI:  Object to form.

3            THE WITNESS:  I only did that for 2010, 2011,

4       and maybe a little bit of 2012.

5    BY MR. STOLTZ:

6       Q.   So your testimony is that prior to this

7    e-mail, you had no involvement with regulatory

8    compliance as it related to knowing your customer?

9            MS. KOSKI:  Object to form.  Mischaracterizes

10       testimony.

11   BY MR. STOLTZ:

12      Q.   Was it no longer your responsibility to know

13   your customer and monitor for suspicious orders after

14   2015 -- or after 2012?

15      A.   Mine specifically, yes.

16      Q.   When did that responsibility change?

17      A.   Robert Brown -- when Robert Brown was

18   onboarded, he had some training time, and then he

19   took over that area.

20      Q.   Why were you included on this e-mail?

21      A.   Just maybe an FYI.  I can't say for certain.

22      Q.   So after Robert Brown was hired, you had no

23   involvement in monitoring suspicious orders or

24   collecting dispensing data or other factors or

1    deciding -- excuse me.

2          After Robert Brown was hired, did you have --

3    did you review dispensing data?

4          MS. KOSKI:  Object to form.

5    BY MR. STOLTZ:

6    Q.   Did you review dispensing data for

7    customers -- for new customers that wanted to be

8    eligible for ordering controlled substances from Anda

9    after Robert Brown was hired?

10   A.   There might have been a period while he was

11   in training, but after that, no.  My responsibilities

12   went back to my full-time licensure.

13   Q.   And how else did your responsibilities as

14   manager of regulatory compliance change after

15   Robert Brown was hired?

16   A.   I went back to my original role of licensure.

17   Q.   In the last paragraph, she says:  A meeting

18   to discuss the IPA NJ group will be set for the near

19   future and further details will follow at that time.

20         Was it your understanding that you would be

21   in attendance at that meeting?

22   A.   No, sir.

23   Q.   But that she was -- so it's your

24   understanding that she was giving you details as to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    when a meeting would occur and when -- just as an

 2    FYI?

 3         A.   I was just a cc on this, yes.

 4         Q.   It says it was sent to you.

 5         A.   To me and one, two, three, four, five, six,

 6    seven, eight, nine, ten, eleven -- twelve other

 7    people.

 8         Q.   But it wasn't -- you weren't cc'd.

 9         A.   Yes, sir.

10         Q.   You were a direct --

11         A.   Yes, sir.

12         Q.   Do you know if EPIC continued to order

13    controlled substances from Anda after this e-mail was

14    sent?

15         A.   I can't say for certain.

16         Q.   Do you know if EPIC ever provided the

17    requested data?

18         A.   I can't say for certain.

19         Q.   Do you know if these accounts were ever shut

20    down or if these accounts were ever determined to be

21    customers that Anda did not want to do business with?

22         A.   I can't say.

23              MS. KOSKI:  When you get to a good stopping

24         point, I think we have been going for about two
```

```
 1        hours.  I'm not rushing you now, but if now is

 2        good.

 3             MR. STOLTZ:  Now is good.

 4             THE VIDEOGRAPHER:  The time is 11:03 a.m.

 5        We're going off the record.

 6             (Recess from 11:03 until 11:15 a.m.)

 7             THE VIDEOGRAPHER:  The time is 11:15 a.m.  We

 8        are now back on the record.

 9   BY MR. STOLTZ:

10        Q.   So the DEA regulations that Anda was

11   complying with -- regulatory compliance was in charge

12   of making sure Anda complied with, did that include

13   laws under the Controlled Substance Act?

14             MS. KOSKI:  Object to form.

15             THE WITNESS:  Can you please clarify?

16   BY MR. STOLTZ:

17        Q.   Did Anda have a duty to report suspicious

18   orders under the Controlled Substance Act?

19             MS. KOSKI:  Object to form.

20             I'll instruct you not to answer.

21             That's outside the special master's

22        limitation on questions regarding that.

23             You don't have to answer that question.

24   ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   So when was it that you stopped being

 3    responsible for monitoring suspicious orders or

 4    maintaining due diligence files, for example?

 5        A.   Me specifically, once Robert got on board in

 6    2012, he had a training period.  And once he was

 7    situated, I -- I stopped.

 8        Q.   Did you have standard operating procedures

 9    for suspicious order monitoring?

10            MS. KOSKI:  Object to form.

11            THE WITNESS:  We had SOPs for -- we have SOPs

12        for knowing your customer, yes.

13    BY MR. STOLTZ:

14        Q.   And you had SOPs for the new customer set-up

15    process with regard to controls eligibility?

16        A.   Yes, sir.

17        Q.   And you also had SOPs for increasing that

18    limit of a thousand units --

19        A.   Yes, sir.

20        Q.   -- of controlled substances?

21            And SOPs for reviewing suspicious orders?

22        A.   It was an all-inclusive SOP, I believe.

23        Q.   Okay.  I'm going to show you what's been

24    marked as Exhibit 4.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              (Anda - Hall Exhibit 4 was marked for

2       identification.)

3       BY MR. STOLTZ:

4            Q.   Does this document look familiar to you?

5            A.   Yes, sir.

6                 MR. STOLTZ:  Excuse me.  The Bates Number is

7       140495.

8       BY MR. STOLTZ:

9            Q.   Is this the suspicious order monitoring

10      policy, or was it the suspicious order monitoring SOP

11      for Anda?

12           A.   Yes, that's what the title is.

13           Q.   And this SOP applies to all Anda DEA

14      compliance analysts?

15                Is that accurate?

16           A.   Yes, sir.

17           Q.   On Page 3, Bates Number 140497, it has the

18      revision history at the bottom of the page.  And it

19      says here you reviewed and/or revised this SOP in

20      June of 2013, June of 2014, August of 2014, and

21      February of 2015.

22                Is that accurate?

23           A.   Yes, that's how it appears.

24           Q.   And this SOP refers specifically to the
```

1    monitoring of suspicious orders?

2        A.    That's the title.

3        Q.    And is it your testimony that you were not

4    involved in suspicious order monitoring after

5    Robert Brown was hired by Anda?

6        A.    I stated earlier I partner with the

7    individual groups to make sure that the SOPs are

8    up-to-date on an annual basis.

9        Q.    In revision history, did Robert Brown ever

10   revise this document, at least up to and including

11   February 1st, 2015?

12           MS. KOSKI:  Object to form.

13           You may answer.

14           THE WITNESS:  His name is not on here.

15   BY MR. STOLTZ:

16       Q.    And is it your testimony that he was in

17   charge of suspicious order monitoring once he was

18   hired?

19       A.    Yes.

20       Q.    But that you were -- does it say you edited

21   this document on February 1st, 2015?

22       A.    Yes, it reads that.

23       Q.    So you had the ability to actually alter the

24   suspicious order monitoring SOP after you no longer

```
 1    had any involvement in suspicious order monitoring?

 2              MS. KOSKI:  Object to form.

 3    BY MR. STOLTZ:

 4        Q.   Is that your testimony?

 5        A.   As I just stated, that I manage all the SOPs

 6    for the distribution, as well as compliance, and I

 7    work directly with the individual departments or

 8    group manager to make sure that the SOPs are updated

 9    annually.

10        Q.   And that includes making changes to the SOP

11    itself up to February 2015?

12        A.   When applicable, yes, sir.

13        Q.   So is it fair to say that you were involved

14    with suspicious order monitoring at least until

15    February of 2015?

16              MS. KOSKI:  Object to form.

17              THE WITNESS:  The SOP.

18    BY MR. STOLTZ:

19        Q.   You were involved in the SOP for what?

20        A.   This SOP Number 40, I helped update it

21    annually.

22        Q.   What is the title of this SOP?

23        A.   Suspicious order monitoring.

24        Q.   So you were involved in the standard
```

1    operating procedure, including editing the standard

2    operating procedure, for suspicious order monitoring

3    until 2015?

4         A.   For all SOPs that relate to compliance as

5    well as distribution.

6         Q.   What's a user-defined multiplier?

7         A.   Where are you reading that?

8         Q.   Under 1.0, Scope.  It's the last line.  End

9    of the last line.

10        A.   So meaning the algorithm.  The internal

11   algorithm.

12        Q.   Do you recall what the algorithm was?

13        A.   No, sir.

14        Q.   The multiplier itself, the user-defined

15   multiplier, refers to the algorithm?

16        A.   Yes, sir.

17        Q.   And Anda had an algorithm back when this

18   document was drafted in December of 2011?

19        A.   Yes, sir.

20        Q.   What was involved in the review of this SOP?

21        A.   Sitting down with Michael and Robert to make

22   sure that these are the policies for the specific

23   SOP.

24        Q.   So Michael Cochrane, the executive director

Highly Confidential - Subject to Further Confidentiality Review

1    of regulatory compliance; Robert Brown, the director

2    of compliance; and yourself, the manager of

3    regulatory compliance, would annually review the

4    standard operating procedure with respect to

5    suspicious order monitoring?

6        A.   Yes, sir.

7        Q.   What, if any, measures did Anda put in place

8    to prevent the diversion of opioids other than

9    monitoring suspicious orders?

10            MS. KOSKI:  Object to form.

11            THE WITNESS:  The due diligence beforehand,

12        setting up the customer.

13   BY MR. STOLTZ:

14       Q.   Would that also include reporting suspicious

15   activity to the DEA?

16            MS. KOSKI:  Object to form.

17            THE WITNESS:  Can you please clarify?

18   BY MR. STOLTZ:

19       Q.   Would Anda ever report suspicious orders,

20   orders of interest, to the DEA for the purpose of

21   preventing diversion?

22       A.   Yes, sir.

23       Q.   Do you recall if anyone at Anda or yourself

24   reported a suspicious order or an order of interest

1    to the DEA for the purpose of preventing diversion?

2              MS. KOSKI:  Object to form.

3              THE WITNESS:  Yes, sir.

4    BY MR. STOLTZ:

5         Q.   Can you recall specific instances?

6         A.   No, sir.

7         Q.   Would you agree that suspicious orders

8    indicate that diversion may be taking place?

9              MS. KOSKI:  Object to form.

10             THE WITNESS:  Can you please clarify?

11   BY MR. STOLTZ:

12        Q.   Would you agree that suspicious orders, like

13   suspiciously large orders or orders that deviate from

14   their dispensing patterns, would indicate that

15   diversion is taking place?

16             MS. KOSKI:  Object to form.

17   BY MR. STOLTZ:

18        Q.   The diversion of opioid products?

19             MS. KOSKI:  Same objection.

20             THE WITNESS:  Possibly.

21   BY MR. STOLTZ:

22        Q.   Would you agree that one of the purposes of

23   Anda's suspicious order monitoring policy was to

24   prevent or minimize diversion?

```
 1        A.    Yes.

 2        Q.    Would you agree that signs of diversion can

 3   be observed through dispensing data?

 4              MS. KOSKI:  Object to form.

 5              THE WITNESS:  Possibly.

 6   BY MR. STOLTZ:

 7        Q.    Would you agree that a failure to collect

 8   data could lead to diversion?

 9              MS. KOSKI:  Object to form.

10              THE WITNESS:  Can you please clarify?

11   BY MR. STOLTZ:

12        Q.    Would you agree that the failure to collect

13   dispensing data, questionnaire, or other data

14   required by Anda before making a sale of opioids, do

15   you agree that the lack of that data could cause Anda

16   to ship suspicious orders and contribute to

17   diversion?

18              MS. KOSKI:  Object to form.

19              THE WITNESS:  Possibly.

20   BY MR. STOLTZ:

21        Q.    When Anda collected dispensing data, did it

22   collect that on a rolling basis or was that only

23   when -- when Anda collected dispensing data, what

24   instances would Anda collect dispensing data for
```

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances?

2        A.    The policy states for new customers.

3        Q.    What about when a customer wanted to order

4    more controlled substances than was allowed by Anda?

5        A.    Possibly, yes.

6        Q.    Typically, how many months would Anda ask for

7    dispensing data?

8        A.    I believe when -- 2011, 2012, I believe it

9    was about a three-month period.

10       Q.    Would you agree that on order -- orders of

11   unusual frequency would indicate that diversion was

12   taking place?

13           MS. KOSKI:  Object to form.

14           THE WITNESS:  Not necessarily.

15   BY MR. STOLTZ:

16       Q.    Would you agree it's possible?

17       A.    Possible.

18       Q.    Would you agree that three months of

19   dispensing data is not enough dispensing data to see

20   unusually -- let me rephrase that.

21           As a manager of regulatory compliance, were

22   you able to determine whether or not an order

23   deviated from their standard averages as far as

24   dispensing data, could you determine a deviation with

Highly Confidential - Subject to Further Confidentiality Review

1    only three months of dispensing data?

2            MS. KOSKI:  Object to form.

3            THE WITNESS:  Can you please clarify?

4    BY MR. STOLTZ:

5        Q.   How could you determine whether or not an

6    order was unusual if you only had three months of

7    dispensing data?

8        A.   There was an algorithm built to determine.

9        Q.   And that algorithm was based on the three

10   months of dispensing data?

11       A.   No.  The algorithm is based on the customer,

12   and then there's some -- it might even be in this

13   SOP, some -- some criteria that stops an order.  And

14   one of those being unusual frequency.

15       Q.   And the data that was input into that

16   algorithm would include three months of dispensing

17   data?

18       A.   No, sir.

19       Q.   What would be inputted into the algorithm?

20       A.   As a secondary, the data of that customer

21   doing business with Anda.

22       Q.   So Anda -- so after Anda approved the

23   customer to order controlled substances from it, it

24   would no longer look at the three months dispensing

Highly Confidential - Subject to Further Confidentiality Review

1    data from when it was initially approved.  At that

2    point, it would rely on the data of what Anda itself

3    had dispensed to that customer?

4          MS. KOSKI:  Object to form.

5          THE WITNESS:  Not necessarily.

6    BY MR. STOLTZ:

7      Q.   What else would it rely on?

8          MS. KOSKI:  Object to form.

9          You can answer, if you can answer.

10         THE WITNESS:  Can you clarify, please?

11         MR. STOLTZ:  Sure.

12         THE WITNESS:  Thanks.

13   BY MR. STOLTZ:

14     Q.   So you said as a secondary, the data of what

15   would be inputted into the algorithm would be -- as a

16   secondary, the data of what would be inputted into

17   the algorithm that customer doing business with Anda.

18         So just correct me if I'm wrong, but my

19   understanding of that statement is that in order to

20   determine whether a particular order was unusual, the

21   algorithm would look at the entirety of the history

22   and course of conduct, business with that particular

23   customer, and Anda?

24     A.   Correct.

1      Q.   As a secondary distributor, how could Anda

2   ever know the aggregate amount of opioids that a

3   customer was ordering from other sources?

4           MS. KOSKI:  Object to form.

5           THE WITNESS:  The dispensing data.

6   BY MR. STOLTZ:

7      Q.   The three months of dispensing data or was --

8   was the aggregate dispensing data for customers

9   collected throughout a course of business with Anda,

10   or was that only at the initial stage of deciding

11   whether or not they were eligible for controls?

12           MS. KOSKI:  Object to form.

13           THE WITNESS:  Can you please clarify?

14           MR. STOLTZ:  Sure.

15   BY MR. STOLTZ:

16      Q.   Did Anda collect aggregate -- collect the

17   aggregate dispensing data of its customers,

18   specifically customers that used Anda as a secondary

19   distributor?

20      A.   Yes, sir.

21      Q.   So Anda was aware of the full amount of what

22   a -- Anda would know exactly how much a customer had

23   dispensed in opioids over every month that that

24   customer had been allowed to order opioids from Anda?

```
 1            MS. KOSKI:  Object to form.

 2            THE WITNESS:  I'm sorry, I'm still not clear.

 3            MR. STOLTZ:  Sure.

 4    BY MR. STOLTZ:

 5       Q.   So on one hand we have Anda knowing what it

 6    dispenses to a customer, right, and that data is

 7    filtered through an algorithm in order to determine

 8    whether or not an order is suspicious.

 9            Is that accurate?

10       A.   Yes, sir.

11       Q.   And that data was only what Anda was

12    distributing to a particular customer.

13            Is that accurate?

14       A.   Yes, sir.

15       Q.   So would Anda know -- did Anda continue to

16    collect the aggregate amount -- so what a customer

17    was getting from a primary distributor, would it know

18    what it was getting from a primary distributor as

19    well as what Anda was distributing to that customer?

20       A.   Correct.  The dispensing data.

21       Q.   And it would have that data for every month

22    that Anda had -- was doing -- was distributing

23    controlled substances to that customer?

24            MS. KOSKI:  Object to form.
```

```
 1              THE WITNESS:  No.

 2   BY MR. STOLTZ:

 3       Q.   How many months?

 4       A.   As I stated, I think at that time we

 5   requested around three months, but it varied based on

 6   customer.

 7       Q.   Okay.  So past -- past the three months that

 8   you would collect, Anda wouldn't continue to ask

 9   those customers for their -- the entirety of their

10   dispensing data, or was there ever a time -- past the

11   initial three months of dispensing data that was

12   requested, was there an instance where Anda would

13   ever ask for aggregate data as to the total amount of

14   opioids that were being ordered both from Anda and

15   from primary distributors?

16       A.   Yes, sir.

17       Q.   And when did that occur?

18       A.   So at initial as well as -- it varies per

19   customer, but sometimes if a customer was coming for

20   an increase and the data was older or it's been

21   awhile since we had some fresh data, we would

22   request.

23       Q.   But until that time, until a customer asks

24   for an increase, Anda wouldn't know how much it had
```

 1    ordered from its primary distributor in the month

 2    prior?

 3         A.    Can you please clarify?

 4         Q.    Sure.

 5               Unless a customer asks for an increase, Anda

 6    wouldn't check to see how much that customer was

 7    dispensing in aggregate, specifically opioids?

 8         A.    Dispensing data as well as our internal

 9    system allowing us to capture what they were doing

10    with Anda.

11         Q.    But that dispensing data wouldn't be

12    up-to-date.  It would be from when they initially

13    became eligible to buy controls?

14         A.    Initially when they became eligible and as

15    well as in situations we would request further

16    dispensing data.

17         Q.    And one of those situations would be when

18    they would ask for an increase in how much they could

19    order?

20         A.    Possibly, yes.

21               (Anda - Hall Exhibit 5 was marked for

22    identification.)

23    BY MR. STOLTZ:

24         Q.    I'm showing you what's been marked as

Highly Confidential - Subject to Further Confidentiality Review

```
1    Exhibit 5.

2         A.    Okay.

3         Q.    Bates Number 133286?

4               And I just want to refer to you -- refer you

5    to the third e-mail on the first page.

6               Is that an e-mail from Pat Williams to you?

7         A.    Yes, it appears that way.

8               MS. KOSKI:  Are you in the middle of the

9         first page?

10              MR. STOLTZ:  Yeah.  Yeah.  Middle of the

11        first page, e-mail sent at 6:03 p.m., The subject

12        line, "Remedy - Control Requests."

13   BY MR. STOLTZ:

14        Q.    So what is Patricia Williams referring to

15   when she says Remedy - Control Requests in the

16   subject line?  Excuse me, what does Sabrina Solis?

17   She sent the first e-mail.  What is she referring to

18   by "Remedy - Control Requests"?

19        A.    I could assume she's talking about our

20   remedies, our internal system where we funnel

21   opportunities from various departments.  It's a --

22   basically like a task management system.

23        Q.    And if a customer of Anda wanted to increase

24   its limits on controlled substances or increase the
```

```
 1    limits that Anda imposed upon that customer, what was

 2    the -- what was the process for that?

 3         A.   We set up a process for the task management,

 4    remedy, so this internal system that's called Remedy.

 5         Q.   So would the customer contact their sales rep

 6    and ask for an increase?

 7         A.   Yes, sir.

 8         Q.   And then what would that sales rep do?

 9         A.   Submit a task in Remedy.

10         Q.   And who would review that?

11         A.   The DEA analyst.

12         Q.   Okay.  And one of the things Patricia

13    Williams is worried about are what happens when one

14    of the sales reps sends in a request for an increase.

15              MS. KOSKI:  Object to form.

16    BY MR. STOLTZ:

17         Q.   What -- that last dash on the 6:03 p.m.

18    e-mail, what -- do you mind reading that for me?

19         A.   The last dash?

20         Q.   Yeah.  Sure.

21         A.   The risks associated with sending in a

22    request for an increase.  I have just recently sent

23    the sales managers some information based on some

24    things I've seen occur when a dispensing data is
```

```
 1    submitted.  They run a risk of all controls being

 2    pulled when we see what they are dispensing as an

 3    aggregate volume.

 4        Q.   So is it fair to say that Anda would not

 5    collect the aggregate volume of controls that its

 6    customers were being -- were dispensing?

 7             MS. KOSKI:  Object to form.

 8             THE WITNESS:  No, sir.

 9    BY MR. STOLTZ:

10        Q.   What does Patricia -- what is your

11    understanding of when we see that what they are

12    dispensing as an aggregate volume?  Does she mean

13    that Anda didn't previously see what they were

14    dispensing as an aggregate volume?

15             MS. KOSKI:  Object to form.

16             THE WITNESS:  I don't know what she was

17        referring to.

18    BY MR. STOLTZ:

19        Q.   Do you think she means that regulatory

20    wouldn't look at aggregate volume until an increase

21    was requested?

22             MS. KOSKI:  Object to form.

23             THE WITNESS:  No, sir.

24    ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   So is it no or you don't know what she's

 3    referring to?

 4        A.   I don't know what she's referring to.  I said

 5    no to your last question.

 6        Q.   So you don't know what she's referring to but

 7    you know that she's not saying that regulatory

 8    wouldn't have the aggregate volume of dispensing data

 9    until a request for an increase?

10            MS. KOSKI:  Object to form.

11            THE WITNESS:  Can you please clarify?

12    BY MR. STOLTZ:

13        Q.   Are you saying that she is not saying -- are

14    you saying that she is not referring to regulatory's

15    ability to see what customers are dispensing as an

16    aggregate volume?

17            MS. KOSKI:  Object to form.

18            THE WITNESS:  No, sir.

19    BY MR. STOLTZ:

20        Q.   No as in she is referring to the regulatory's

21    ability to see an aggregate volume?  Or no as in

22    that's definitely not what she's referring to?

23        A.   I don't know what she's referring to.  I can

24    tell you that compliance does request dispensing data
```

1    on an aggregate form, so . . .

2        Q.    Do they request that data throughout the

3    relationship -- does Anda have every month of

4    aggregate dispensing data for all its customers that

5    are eligibles for controls?

6        A.    No, sir.

7        Q.    Does Anda only ask for aggregate data when a

8    customer has asked for an increase in their control

9    limit?

10        A.    No, sir.

11        Q.    Are there other instances in which Anda asks

12    a customer for aggregate dispensing volume?

13        A.    New customer.

14        Q.    Is that the only instance in which Anda asks

15    for aggregate dispensing data at to volume of opioids

16    dispensed?

17            MS. KOSKI:  Object to form.

18            THE WITNESS:  I can't say a hundred percent

19        that that would be the only two reasons.

20    BY MR. STOLTZ:

21        Q.    Do you know of any other reasons why Anda

22    would have -- would request the aggregate volume of

23    dispensed controls?

24        A.    Not off the top of my head.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Is it true that sales was frustrated that

2    whenever they asked for an increase in the control

3    limit, not only would that control limit be denied,

4    but regulatory compliance would decide that that

5    customer was not a customer that Anda wanted to do

6    business with?

7            MS. KOSKI:  Object to form.

8            THE WITNESS:  I can't say what their feeling

9        was, but I can say that compliance was the final

10       deciding factor if Anda was going to do business

11       with -- controlled business with a customer.

12   BY MR. STOLTZ:

13     Q.   Wouldn't you agree that prior to that

14   increase -- would you agree that had Anda had that

15   aggregate data, aggregate volume of controls being

16   dispensed -- if Anda had collected aggregate

17   dispensing data prior to an increase request, isn't

18   it true that many of these customers would have been

19   shut off from buying controls?

20           MS. KOSKI:  Object to form.

21           THE WITNESS:  I can't say that.

22   BY MR. STOLTZ:

23     Q.   But can you say that customers often were

24   shut off from controls when aggregate dispensing data

Highly Confidential - Subject to Further Confidentiality Review

```
1    was supplied to Anda?

2         A.    At times, yes.

3         Q.    And if that data had been available prior to

4    that time, they would have been cut off from controls

5    then, right?

6              MS. KOSKI:  Object to form.

7              THE WITNESS:  I can't say.

8    BY MR. STOLTZ:

9         Q.    When someone in sales had a question of -- a

10   question about regulatory compliance, would they

11   often come to you?

12        A.    Possibly, yes.

13        Q.    And are requests for an increase in

14   controlled substance limits -- are those called

15   opportunities?

16        A.    Remedy is where the opportunity lies.  It's

17   just a task management.

18        Q.    Did Anda ever conduct any audits of its own

19   suspicious order monitoring policies?

20             MS. KOSKI:  Object to form.

21             THE WITNESS:  Can you please clarify?

22   BY MR. STOLTZ:

23        Q.    Did Anda ever contract with outside third

24   parties in order to determine the effectiveness of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    their suspicious order monitoring policies?

 2              MS. KOSKI:  Object to form.

 3              THE WITNESS:  I can't say for certain.

 4        Q.   Were you ever provided any incentive to

 5    identify suspicious orders?

 6              MS. KOSKI:  Object to form.

 7              THE WITNESS:  Can you please clarify?

 8    BY MR. STOLTZ:

 9        Q.   Did Anda ever incentivize you to find

10    suspicious orders?

11              MS. KOSKI:  Object to form.

12    BY MR. STOLTZ:

13        Q.   Were you ever -- did you receive a bonus from

14    Anda?

15              MS. KOSKI:  Object to form.

16              THE WITNESS:  Yes.

17    BY MR. STOLTZ:

18        Q.   And what was your bonus based on?

19        A.   My bonus was based on my performance for the

20    previous year.

21        Q.   And was part of your performance identifying

22    suspicious orders?

23              MS. KOSKI:  Object to form.

24              THE WITNESS:  At one time, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   Do you know if Anda has ever been penalized

 3    by state or federal entities relating to its

 4    monitoring or reporting related to controlled

 5    substances?

 6             MS. KOSKI:  Object to form.  Calls for

 7        conclusion of law.

 8             If you know as a matter of fact, you can

 9        answer the question.  You can answer if you know

10        as a matter of fact.

11             THE WITNESS:  I don't know as a matter of

12        fact, no.

13    BY MR. STOLTZ:

14        Q.   Would you agree that once opioids are

15    diverted, there's no way to control or even determine

16    where they will end up geographically?

17             MS. KOSKI:  Object to form.

18             THE WITNESS:  I can't say for certain.

19    BY MR. STOLTZ:

20        Q.   Isn't it possible that a pharmacy

21    over-ordering -- isn't it possible that a large --

22    unusually large order of opioids sent to one state

23    could easily end up diverted to another state?

24             MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Are you asking her a hypothetical?

 2              MR. STOLTZ:  Yes.

 3              MS. KOSKI:  About whether something is

 4       possible or not?

 5              MR. STOLTZ:  Sure.

 6   BY MR. STOLTZ:

 7       Q.   Would you agree that -- how about this.

 8              Would you agree that Anda can't control or

 9   even determine where -- where pills that it has

10   shipped -- opioids that are shipped -- it doesn't

11   have control or can't determine where those opioids

12   wind up?

13              MS. KOSKI:  Object to form.

14              THE WITNESS:  That's why it's important for

15       us to know who our customer is.

16   BY MR. STOLTZ:

17       Q.   So you would agree?

18              MS. KOSKI:  Object to form.

19              THE WITNESS:  I don't -- can you please

20       clarify?

21   BY MR. STOLTZ:

22       Q.   Would you agree that Anda -- in a large order

23   by Anda -- wouldn't you agree that Anda doesn't

24   have -- hold on.
```

```
 1              Would you agree that Anda's profits increase

 2    with the volume of drugs supplied to pharmacies?

 3              MS. KOSKI:  Object to form.

 4              THE WITNESS:  Yes.

 5    BY MR. STOLTZ:

 6       Q.   If a suspicious order is held, what happens

 7    next?

 8              MS. KOSKI:  Object to form.

 9              THE WITNESS:  A review of that customer

10        occurs.

11    BY MR. STOLTZ:

12       Q.   What are the consequences of that review?

13              MS. KOSKI:  Object to form.

14              THE WITNESS:  Clarify, please.

15    BY MR. STOLTZ:

16       Q.   What is the purpose of reviewing that

17    customer?

18              MS. KOSKI:  Object to form.

19              THE WITNESS:  To make sure that this is an

20        order that we want to ship to this customer.

21    BY MR. STOLTZ:

22       Q.   And if you decide that that is an order that

23    you do not want to ship, then what happens?

24       A.   Hypothetically, I mean, the policy is to
```

```
1    report it and cut the customer off.

2         Q.   So the policy -- after a suspicious order is

3    held for review and ultimately is not shipped, the

4    policy is to report it?  Who do you report it to?

5         A.   To the local DEA offices.

6         Q.   And when you report that suspicious order, do

7    you report just the customer, or is it the order

8    itself?  How does that work?

9              MS. KOSKI:  Object to form.

10             THE WITNESS:  It varies.

11   BY MR. STOLTZ:

12        Q.   What does it vary on?

13        A.   If there is an order to report, we report the

14   order.  If there's only a customer to report, we

15   would report the customer.

16        Q.   In what type of instances would -- do you

17   report an order as opposed to a customer that ordered

18   it?

19             MS. KOSKI:  Object to form.

20             THE WITNESS:  Can you please clarify?

21   BY MR. STOLTZ:

22        Q.   Well you said that either you report the

23   customer or you report the order itself.  I'm just

24   asking:  What type of scenario would you report the
```

1    order and not the customer?

2         A.    No, I'm sorry.   To clarify, the order will

3    always come over -- will always get reported with a

4    customer, yes.

5         Q.    What other type of customers did Anda have --

6    or what other -- what other types of customer did

7    Anda distribute opioids to?

8              MS. KOSKI:  Object to form.

9    BY MR. STOLTZ:

10        Q.    Other than pharmacies, who did Anda

11   distribute opioids to?

12             MS. KOSKI:  Object to form.

13             THE WITNESS:  Can you please clarify?

14   BY MR. STOLTZ:

15        Q.    Anda distributed drugs to pharmacies, retail

16   chains.  What other types of customers?

17        A.    In this time frame, the majority was all

18   pharmacies, whether it was an independent or --

19   excuse me -- retail, closed door, open door.

20        Q.    Okay.  Would Anda ever distribute to other

21   wholesalers or distributors?

22             MS. KOSKI:  Object to form.

23             THE WITNESS:  I believe after -- around this

24        time, there may have been one other wholesaler,

```
 1      but our practice was not to distribute to

 2      wholesalers.

 3  BY MR. STOLTZ:

 4      Q.   When you decided that a customer is one that

 5  Anda no longer wanted to do business with, did you

 6  report that customer to the DEA?

 7      A.   Yes, sir.

 8      Q.   Was that always the policy while you were in

 9  charge of making those type of decisions?  Until

10  Robert Brown was hired?

11      A.   Yes, sir.

12      Q.   Who was responsible for reporting suspicious

13  orders to the DEA?

14      A.   Compliance.

15      Q.   And that was your department?

16      A.   Yes, sir.

17      Q.   I'm going to show you what's been marked as

18  Exhibit 6.

19          (Anda - Hall Exhibit 6 was marked for

20  identification.)

21          MR. STOLTZ:  Bearing the Bates Number of

22      147166.

23  BY MR. STOLTZ:

24      Q.   And this is Mary Barber -- an e-mail from
```

```
 1    Mary Barber to you in 2016.

 2            Is that accurate?

 3       A.   Yes, it appears that way.

 4       Q.   And the subject line is "Bucket."

 5            Is that true?

 6       A.   Yes, sir.

 7       Q.   I guess I have the same question that Mary

 8    had:  Can you explain the multiplier on the SOMS

 9    reason codes?

10            Can you -- can you explain to me what the

11    multiplier on the SOMS reason code is?

██        ██        ████████████████████████████████

13    times.

14       Q.   What does that mean?

██        ██        ████████████████████████████████

██    █████████████████████████████████████████████████

██    █████████████████████████████████████████

██    ████████████████████████████████████████████

██    ███████████████████████

20       Q.   And the multiplier is referring to their

21    control limits?

22            MS. KOSKI:  Object to form.

23    BY MR. STOLTZ:

24       Q.   Is this referring to control limits?
```

```
 1       A.    No, sir.

 2       Q.    What does bucket refer to?

 3       A.    This is the algorithm for our internal

 4   suspicious order monitoring.

 5       Q.    So this refers to suspicious order

 6   monitoring?

 7       A.    Yes.  This is the actual algorithm here, just

 8   simplified.
```

█    █  █    ███████████

█    █████████████

```
11             MS. KOSKI:  Object to form.

12   BY MR. STOLTZ:
```

█    █    ████████████████

█    ██████████████████

█    ████

```
16             MS. KOSKI:  Object to form.

17             THE WITNESS:  No, sir.

18   BY MR. STOLTZ:

19       Q.    So what is the multiplier?

20       A.    This has nothing to do with customer limits.

21   That is what is flagged as a suspicious order.

22       Q.    Okay.

23       A.    It's two separate.

24       Q.    Can you explain the difference?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    So a limit is what a customer is granted,

 2   right?  This is your limit.  You can't go over this

 3   limit when we talked about 1,000-unit family limit.

 4             This is an algorithm.  So if they place an

 5   order within that 1,000 family unit, let's say one

 6   piece of something, and it gets flagged based on this

 7   algorithm, any of these steps, that is now considered

 8   a suspicious order in the bucket.  Bucket.

 9        Q.    And then that bucket would be referred to the

10   DEA?  If a customer's order got put in the bucket,

11   that bucket is being sent to the DEA, or is it being

12   sent somewhere else?

13        A.    No.  This is an internal bucket to review

14   suspicious orders.

15        Q.    So a customer would have to order more than

16   eight times its average in order for that order to be

17   held?

18        A.    No.  So you take the whole -- the whole

19   line -- you take the DEA quantity for that month.  So

20   everything they did for that month, times it by the

21   six-month -- I mean, excuse me, divide it by the

22   six-month time frame, and then you multiply that by

23   the multiplier.

24        Q.    So would it be possible for -- so if
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     somebody -- if somebody ordered past their limit --

 2     let's say their limit is 5,000 units.  If a customer

 3     tried to order 6,000 units, is that a suspicious

 4     order?

 5         A.   A customer cannot order past their limit.

 6         Q.   Okay.  And if they attempt to order past

 7     their limit, what happens then?

 8         A.   They can't.

 9         Q.   Does that ever get reported in any system?

10         A.   No.

11         Q.   Does that order ever get referred to the DEA

12     as suspicious?

13         A.   Not that I'm aware of.

14         Q.   What is the purpose of the control limit?

15         A.   It's a comfort level for us to give them a

16     specific quantity for a family based on when we set

17     them up and we did the review on them.

18         Q.   Is the control limit mechanism in which Anda

19     can avoid shipping suspicious orders?

20              MS. KOSKI:  Object to form.

21              THE WITNESS:  Can you please clarify?

22     BY MR. STOLTZ:

23         Q.   Is the control limit purpose to avoid

24     shipping suspicious orders to customers?
```

```
 1        A.   No, sir.

 2        Q.   It's the control -- so it's your testimony

 3   that the control limit that's imposed upon Anda's

 4   customers, specifically related to controlled

 5   substances, is entirely separate and apart from the

 6   suspicious order monitoring system?

 7             MS. KOSKI:  Object to form.  It

 8        mischaracterizes testimony.

 9             You can answer if you can answer it.  You can

10        let him know if you can't.

11   BY MR. STOLTZ:

12        Q.   Anda doesn't want to ship suspicious orders,

13   right?

14        A.   Yes.

15        Q.   And part of that reason is because, if it

16   does, it can contribute to diversion?

17        A.   Yes, sir.

18        Q.   And another reason would be that it could

19   have fines imposed?

20             MS. KOSKI:  Object to form.

21   BY MR. STOLTZ:

22        Q.   And part of regulatory compliance's job is to

23   avoid situations where Anda is contributing to the

24   diversion of opioids, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Putting the company at risk, yes, sir.

2        Q.    And one way to put the company at risk would

3   be to -- to contribute to diversion?

4              MS. KOSKI:  Object to form.

5   BY MR. STOLTZ:

6        Q.    One way to put the company at risk would be

7   to accidentally ship suspicious orders.

8              Is that accurate?

9        A.    Possibly, yes, sir.

10       Q.    Is the purpose behind the control limit

11  imposed by Anda upon its customers to avoid getting

12  Anda into -- to avoid putting the company at risk?

13       A.    That's part of, yes, sir.

14       Q.    And how are those limits decided upon?

15       A.    At new account setup, we have a standard

16  setup limit for basic retail pharmacies that are of a

17  certain size.  But if anything, from there, if

18  there's a greater volume or a bigger pharmacy, then

19  we can review individually.

20       Q.    So if a mom-and-pop pharmacy has a limit of

21  1,000 units and they are within that limit for as

22  long as Anda's been doing business with them, all of

23  a sudden that pharmacy orders 100,000 units, they

24  wouldn't be able to get that from Anda?
```

```
 1        A.    Correct.

 2        Q.    Would that be a suspicious order?

 3              MS. KOSKI:  Object to form.

 4              THE WITNESS:  No.  The limit is set.  So they

 5        cannot go past that limit unless it's requested.

 6   BY MR. STOLTZ:

 7        Q.    Right.  I understand why the limit is set.

 8   The limit is set to prevent pharmacies from ordering

 9   more than their limit, correct?

10        A.    If they attempted -- if they had a 1,000

11   limit family and they attempted to order 100,000,

12   they would not be able to.

13        Q.    They would not be able to?

14        A.    They have a hard stop, yes.

15        Q.    And that would not be reported to the DEA?

16        A.    No.

17        Q.    I'm going to show you what's been marked as

18   Exhibit 7.

19              (Anda - Hall Exhibit 7 was marked for

20   identification.)

21              MR. STOLTZ:  Bates number 137399.

22   BY MR. STOLTZ:

23        Q.    Do you recognize this e-mail from Mary Barber

24   to you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No, sir.

 2        Q.    But this is an e-mail from Mary Barber to

 3   you?

 4        A.    It appears that way.

 5        Q.    And this was sent on -- in August of 2013?

 6        A.    Yes, sir.

 7        Q.    And Mary Barber is a DEA compliance analyst,

 8   right?

 9        A.    Yes, sir.

10        Q.    Was she one of your -- did she direct -- did

11   she report directly to you?

12        A.    No, sir.

13        Q.    She asks you -- what does she ask you to do

14   in -- excuse me.

15              She says to you and Sabrina Solis and Latoya

16   Samuels, she says:  New account.  Control is denied.

17   DD on file.  Customer 499221, Staywell Pharmacy.

18   Located in Tampa, Florida.

19              She then sends a follow-up e-mail to you less

20   than an hour later, saying:  Please do not report

21   this account.

22              Did you have the final say on whether or not

23   to report an account or an order to the DEA?

24              MS. KOSKI:  Object to form.
```

```
 1                    THE WITNESS:  Can you please clarify?

 2   BY MR. STOLTZ:

 3        Q.   You testified earlier that once a customer

 4   made a suspicious order, that would be referred to

 5   the DEA, right?

 6        A.   Yes, sir.

 7        Q.   Was that an automatic process, or would you

 8   have the autonomy to decide whether or not to report

 9   that suspicious order?

10             MS. KOSKI:  Object to form.  Mischaracterizes

11        the document.

12   BY MR. STOLTZ:

13        Q.   Was reporting suspicious orders to the DEA --

14   was that an automatic process?

15        A.   No, sir.

16        Q.   Would you decide whether or not you wanted to

17   report a suspicious order to the DEA?

18             MS. KOSKI:  Same objection.

19             You can answer.

20             THE WITNESS:  At this time, no.  The analyst

21        would make the determination.

22   BY MR. STOLTZ:

23        Q.   Why would she send this to you?

24             MS. KOSKI:  Object to form.
```

1    BY MR. STOLTZ:

2         Q.   It says that she is a DEA compliance analyst.

3         A.   To report this to the DEA.

4         Q.   What does she say to you?

5         A.   I'm sorry?

6         Q.   What did she say to you?

7         A.   New account.  Controls denied.

8         Q.   In the later e-mail.

9         A.   Do not report.

10        Q.   So she's asking you to not report the account

11   for a suspicious order.

12             MS. KOSKI:  Object to form.  Mischaracterizes

13        the document.

14   BY MR. STOLTZ:

15        Q.   Is she asking you not to report an account to

16   the DEA?

17        A.   It appears that way.

18        Q.   But that was -- that was DEA -- that was the

19   compliance analyst's decision on whether or not to do

20   that, or was it your decision?

21        A.   The DEA analyst's decision.

22        Q.   Isn't Mary Barber a DEA compliance analyst?

23        A.   Yes, sir.

24        Q.   Then why should she be asking you not to

```
 1    report this account to the DEA if it was her decision

 2    to make?

 3         A.   She's saying she doesn't want it reported.

 4    Her follow-up e-mail says she does not want it

 5    reported.

 6         Q.   Is she asking you not to report it?

 7         A.   Yes, it appears that way.

 8         Q.   Was it the standard operating procedure for a

 9    DEA compliance analyst, at least in 2013 or up to

10    2013, to tell you whether or not something should be

11    reported?

12         A.   There was a report that would get submitted,

13    and everyone would funnel it through that specific

14    person.  Maybe at that time it was me.  I can't say

15    for certain.

16         Q.   Do you recall the name of that report, if it

17    had a standard name or a format?

18         A.   I believe the report is called Customer

19    Cutoff.

20         Q.   And that Customer Cutoff Report, that

21    would -- or might have come through you, up through

22    2013?

23         A.   Yes, sir.  Around 2010 until -- I'm not sure

24    the end time, but probably around this time.
```

1    Q.    And you would decide whether or not to send

2    that report to the DEA?

3    A.    No, sir.

4    Q.    Did the person who had that job of getting

5    the Customer Cutoff Report, would they have that

6    decision as to whether or not to report it to the

7    DEA?

8    A.    The analyst would make the final

9    determination.

10    Q.    And at this point you may have been an

11    analyst?

12    A.    No, sir.

13    Q.    But you may have been the person making the

14    decision at this point?

15    A.    No, sir.  The analyst, Mary Barber.

16    Q.    You just testified that, you know, when I

17    asked you, and that Customer Cutoff Report, that

18    would come through you up until 2013?  And you said,

19    yes, sir, around 2010 until -- I'm not sure.

20        So at one point it was your responsibility to

21    send or not send a cutoff -- a Customer Cutoff Report

22    to the DEA?

23    A.    The file at one point was sent by me.  The

24    analyst would make the final determination.

```
 1              MS. KOSKI:  I just want you to know lunch is

 2        available whenever you want to stop.

 3              MR. STOLTZ:  Yeah.  Sure.  Let's take lunch.

 4              MS. KOSKI:  You want to do it now?

 5              MR. STOLTZ:  Yeah.

 6              THE VIDEOGRAPHER:  The time is now 12:27.  We

 7        are going off the record.

 8              (Recess from 12:27 until 1:18 p.m.)

 9              THE VIDEOGRAPHER:  The time is 1:18 p.m.  We

10        are now back on the record.

11  BY MR. STOLTZ:

12        Q.   I wanted to direct you back to SOP 40.  And

13  was that Exhibit 5?  Is it Exhibit 5?  4?

14        A.   Four.

15        Q.   I wanted to direct you to the bottom of

16  Page 2, being "The Following Are Release Reasons for

17  Held Orders."

18              When it says release reasons -- or, excuse

19  me, what does release mean in the context of this

20  sentence?

21        A.   Release is in our internal SOMS system.

22        Q.   So would release mean that an order will

23  ship?  Is that what it means, that it's no longer

24  held?
```

1    A.    Correct.

2    Q.    What are some of the reasons why a held order

3    would ultimately be shipped according to this

4    document?

5    A.    Did you want me to read it?

6    Q.    Sure.

13          Oh, I'm sorry.

14          MS. KOSKI:  It's a double-sided document.

15          THE WITNESS:  Consistent with customer class

16    order pattern, administration release, customer

17    call not required, released unchanged with

18    DEA/state authority concurrence.  Orders that

19    exceed the above criteria and cannot be released

20    with an appropriate reason listed above will be

21    reported to the appropriate state and federal

22    agencies.

23    BY MR. STOLTZ:

24    Q.    What does an administration release mean?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I'm not sure.  I'm assuming that would be the

 2   analyst release.

 3        Q.   So one of the reasons why a held order can be

 4   delivered is because someone thinks that it should

 5   be?

 6             MS. KOSKI:  Object to form.

 7   BY MR. STOLTZ:

 8        Q.   An analyst decides that it should be?

 9        A.   Correct.  All orders are reviewed by

10   analysts, yes.

11        Q.   Okay.  And one of the reasons here, at reason

██   ████████████████████████████████████████████████████

██   ████████████████████████████

14             How -- why would that affect an order's

15   suspiciousness?

16             MS. KOSKI:  Object to form.

17   BY MR. STOLTZ:

██      ██   ████████████████████████████████████████████████

██   ████████████████████████████████████████████████

██   ████████████████████████████

██      ██   ████████████████████████████████████████████████

██   ████████████████████████████████████████████████████

██   ████████████████████████████████████      ██████████████

██   ████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review

▮    ▮    ████████████████████████

▮    ██████████████████████████████

▮    ████████████████████████████

▮    ████████████████

```
 5      A.   Possibly.

 6      Q.   Okay.  And that would be a reason for

 7 potentially releasing that order from being held and

 8 delivering that order?

 9      A.   Well, after the full review is done, yes,

10 sir.

11      Q.   What are the reasons given for not releasing

12 a suspicious order according to this document?

13      A.   I'm sorry, could you please clarify?

14      Q.   So this is the standard operating procedure

15 with regard to suspicious order monitoring?

16      A.   Yes, sir.

17      Q.   This is sort of the -- I guess the

18 step-by-step process in deciding whether or not

19 suspicious orders will be delivered or if they will

20 be held indefinitely, pending a report to the DEA,

21 right?

22      A.   Yes, sir.

23      Q.   And here we see eight reasons why you could

24 release an order.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Knock on conference room door.)

 2         MS. KOSKI:  Come on in.

 3  BY MR. STOLTZ:

 4     Q.   And first, I suppose, an analyst, if they are

 5  reading this, is supposed to read it from left to

 6  right, top to bottom?

 7     A.   Yes, sir.

 8     Q.   Kind of like a flowchart?

 9     A.   Yes, sir.

10     Q.   So first it asks:  Is there an increased

11  supply to a new or existing patient, right?

12         Well, once they got to finally Step 6 in the

13  process, they would get to the reasons why a held --

14  a held order can be released, right?

15         MS. KOSKI:  Object to form.

16         THE WITNESS:  Yes, sir.

17  BY MR. STOLTZ:

18     Q.   And they would start with one, increase

19  supply to new or existing customer or patient, and

20  they would go through each one of those to decide

21  which one of those would apply and which one of those

22  could explain the increased order, the unusual order.

23         And they would go through all eight of those

24  potential reasons as to why an order would be
```

Highly Confidential - Subject to Further Confidentiality Review

1    increased.

2         What I'm asking is:  Where -- where is the

3    list of situations in which an order should not --

4    should continue to be held?

5    A.   Just to clarify, the order wouldn't be

6    increased.  It would be released, not increased --

7    Q.   Right.

8    A.   -- based on the limits.

9    Q.   That's what I meant.

10   A.   Okay.  So I don't see them on here, but based

11   on your due diligence review, right.  So there is an

12   option to delete an order, and it would get reported

13   there.

14   Q.   Deleted orders get reported to the DEA?

15   A.   Yes, sir.

16   Q.   Okay.  And this is the -- are you aware of

17   another standard operating procedure with regards to

18   suspicious order monitoring?

19   A.   I believe there is a newer version.

20   Q.   Okay.  But this was the -- this was the most

21   updated version up until at least February of 2015?

22   A.   Yes, sir.

23   Q.   And on the standard operating procedure,

24   there's no indication of what situations would be

```
 1    appropriate for an order to be held?

 2             MS. KOSKI:  Objection.  Mischaracterizes the

 3        document.

 4    BY MR. STOLTZ:

 5        Q.   Is there any instructions or guidance as to

 6    when a release should not be applied?

 7        A.   From first glance, no, it doesn't appear.

 8        Q.   Okay.  You can take your time and read the

 9    whole document.

10        A.   Okay.

11             So nowhere specifically it says, but it's a

12    document referring to how to review and how to make a

13    determination.

14        Q.   Okay.  When it comes to a situation where

15    there's a promotion for a controlled substance, those

16    aren't indefinite promotions, are they?  Those are

17    usually limited time offers?

18             MS. KOSKI:  Object to form.

19             THE WITNESS:  As far as I am aware, when I

20        was in this role, I was not aware of any

21        promotions.

22    BY MR. STOLTZ:

23        Q.   Okay.

24        A.   So I can't answer that.
```

```
 1        Q.   So if there was a reason to release a hold

 2   or -- and I know it doesn't pertain to this

 3   document -- but increase the limit for a customer on

 4   a limited basis, for example, a promotion that Anda

 5   was offering, would that increase and their limits

 6   also be limited to that time period?  Or would that

 7   continue on indefinitely?

 8             MS. KOSKI:  Object to form.

 9             THE WITNESS:  I can't say, because I was not

10        aware of any promotions.  So I don't know.

11   BY MR. STOLTZ:

12        Q.   Was there ever a time when limits would be

13   lowered?

14             MS. KOSKI:  Object to form.

15             THE WITNESS:  Possibly.  I can't say for

16        certain.

17   BY MR. STOLTZ:

18        Q.   I want to refer back to the second exhibit we

19   went over, Bates Number 570926.  This is a PowerPoint

20   we went over earlier today.

21             Do you recognize it from earlier today?

22        A.   Yes, sir.

23        Q.   Okay.  This PowerPoint was part of an

24   attachment to an e-mail that I'm going to show you as
```

1    soon as I can find it.  But it was part of an

2    attachment that was sent to you and -- just you at

3    this point.

4          I'm going to show you what's been marked as

5    Exhibit 8, bearing Bates number 132591.

6          (Anda - Hall Exhibit 8 was marked for

7    identification.)

8    BY MR. STOLTZ:

9      Q.   And this is an e-mail chain.  Michael

10   Cochrane is sending you that PowerPoint, and he asks

11   you to:  Take a look and tell me what you think.

12         MS. KOSKI:  Are you indicating that this

13         e-mail was the cover e-mail to this Anda overview

14         PowerPoint?  Usually the attachments are in

15         sequential Bates ranges.

16         MR. STOLTZ:  The PowerPoint showed up a

17         couple times in her custodial file, and this is

18         the one I have.  But let me just . . .

19         MS. KOSKI:  It's your deposition.  I just

20         want to be clear that to the extent there's

21         content in the e-mail, it's not necessarily

22         reflected in this attachment.

23         MR. STOLTZ:  Okay.  I think in context it

24         will make a little bit more sense.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   So you have a few thoughts on this draft

 3    presentation.

 4             Do you remember the purpose of this

 5    presentation, by the way?

 6        A.   No, sir.

 7        Q.   Was it something that you sent to the DEA?

 8        A.   I don't know, sir.

 9        Q.   Okay.  Well, if you look at Page 16, which I

10    know might be difficult because this is stapled

11    awkwardly, you'll see a slide that says "Controlled

12    Substance Compliance," and it's the order of interest

13    review process.

14             So this looks to be a situation in which an

15    order is held for review, much like the SOP for the

16    suspicious order monitoring.

17             Is that accurate?

18        A.   Yes, sir.

19        Q.   And at the end of this flowchart, after

20    someone at Anda determines the validity of the order

21    based on the review, there's two things that could

22    happen, right, based on this draft PowerPoint?  One

23    of those is release the order for shipment; and the

24    other is report to DEA as a suspicious order.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Is that accurate?

2          MS. KOSKI:  Object to form.

3    BY MR. STOLTZ:

4       Q.   What are the two things that can happen after

5    ar review of the order of interest?

6       A.   Based on what this reads?  Report to DEA as a

7    suspicious order.  Release order for shipment or

8    report to DEA.

9       Q.   Okay.  And as you can see in that e-mail

10   that's marked as Exhibit 8, when Michael Cochrane

11   asks you for your thoughts, you refer to a number of

12   issues, but in particular, you refer to an issue on

13   Page 16, which is referring to this PowerPoint,

14   right?

15      A.   It appears so.

16          MS. KOSKI:  I'm going to object to preserve

17       the record that they are not sequential Bates

18       numbers.  So we don't know if it actually refers

19       to that PowerPoint.

20          MR. STOLTZ:  Okay.

21   BY MR. STOLTZ:

22      Q.   And you say:  Be careful stating report to

23   DEA as a suspicious order, in quotes.

24          And on this Slide 16 or Page 16, it says

 1    literally that.  It says:  Release order of shipment

 2    or report to DEA as a suspicious order.

 3            Right?

 4        A.   Yes, sir.

 5        Q.   And you say:  Be careful stating a report to

 6    DEA as a suspicious order because we do not do that.

 7            Was the policy of Anda in -- by November 27th

 8    of 2012 to not report suspicious orders to the DEA?

 9        A.   I don't remember this specific document, but

10    a suspicious order was more of a specific -- excuse

11    me -- suspicious customer to us.  So when it became a

12    customer -- at this time, we reported it as a

13    customer.  So it was more about the wording.

14            But I don't remember this specific document.

15        Q.   Here's the PowerPoint with the sequential

16    Bates.

17            (Conferring with counsel.)

18            MS. KOSKI:  You printed in native.  That's

19        what it is.

20            MR. STOLTZ:  Well, I'll be happy to provide

21        it with the Bates numbers on the bottom, but the

22        Bates numbers for the PowerPoint are also 132598.

23    BY MR. STOLTZ:

24        Q.   Just to go back to what you said, you said

Highly Confidential - Subject to Further Confidentiality Review

1    that at that time, at least by 2012, November of

2    2012, Anda would not report suspicious orders but

3    would report suspicious customers?

4        A.   It was considered a suspicious customer --

5    sorry, that word is tricky today -- suspicious

6    customer.

7        Q.   Are there SOPs as to when -- at what point

8    does a customer become suspicious?  Are there an

9    amount of suspicious orders that the customer has to

10   make before they become suspicious?

11       A.   At this point, it was -- based on what this

12   flow is showing, it's at -- determining the validity

13   of the order based on reviews.  So somebody was

14   reviewing it and determining if that order and that

15   customer was suspicious.

16       Q.   Where does it say that?  On the PowerPoint?

17       A.   Correct.  Right before that last point, it

18   says:  Determine the validity of the order based on

19   review.

20       Q.   And then at that time, according to your

21   e-mail, either that order would be released --

22   someone would release that order for shipment or

23   what?  If the order was going to be held, it wouldn't

24   be reported to the DEA as a suspicious order.  So

1    what would happen if an order wasn't released?  It

2    would just be held indefinitely?

3            MS. KOSKI:  Object to form.

4    BY MR. STOLTZ:

5        Q.  What would happen if a shipment wasn't

6    released in November of 2012?

7        A.  It would be a suspicious customer, and it

8    would be reported that way.

9        Q.  So what you meant to say in this e-mail, you

10   meant to say:  Be careful stating report to DEA as a

11   suspicious order because we do not do that, dot, dot,

12   dot, report to DEA as a suspicious customer?

13       A.  No.  I meant to say what I said here.

14       Q.  I'm just trying to understand what that is.

15   So --

16       A.  This is -- what I'm saying to him is saying

17   report -- having to say "report suspicious order" is

18   not accurate.  It's a suspicious customer.

19       Q.  And did you ever report a suspicious

20   customer?

21       A.  Yes, sir.

22       Q.  At what point did it change to reporting a

23   suspicious order?

24       A.  I can't say for certain.

```
1       Q.   But it did at some point change to reporting

2   suspicious orders?

3       A.   It was a multiple.  I spoke about this

4   earlier where it is -- I'm sorry -- suspicious

5   customer or a suspicious order.

6       Q.   So there is instances in which Anda would

7   report a suspicious order and other instances in

8   which they would report a suspicious customer?

9       A.   Yes, sir.

10      Q.   I think we went over this as well, but

11  when -- if -- if a customer made a suspicious order

12  and that order was held by Anda and ultimately not

13  released by Anda, how is it that that customer

14  wouldn't also be suspicious, just the order itself

15  would be?

16      A.   Well, it would.  As I stated earlier, you're

17  still -- we would still submit the customer

18  information.  It would just have, along with it, an

19  order -- specific order tied to it.

20      Q.   So, in 2012, you would just give the DEA a

21  suspicious customer without reference to a particular

22  order?

23      A.   We were doing all of our validation up front

24  with the customers.  So we were basically fielding
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    off who we wanted to do business with prior to them

 2    becoming a customer and becoming -- having suspicious

 3    orders.

 4         Q.   So by doing your validation up front -- I'm

 5    just trying to understand what's changed.

 6              By doing your validation up front, you were

 7    able to avoid having any suspicious orders?

 8         A.   We were still monitoring orders, but they

 9    were orders of interest, not suspicious orders.

10         Q.   Orders of interest?

11         A.   Yes, sir.

12         Q.   Were there any other levels of, like,

13    particular orders or strange orders?  Just orders of

14    interest and then suspicious?

15              MS. KOSKI:  Object to form.

16              THE WITNESS:  Yes, sir.

17    BY MR. STOLTZ:

18         Q.   How many different tiers of suspicion were

19    there?

20              MS. KOSKI:  Object to form.

21    BY MR. STOLTZ:

22         Q.   Were there other tiers of suspicion --

23    suspicious orders?

24         A.   All orders are orders of interest until they
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    become suspicious.

 2         Q.   So all orders go through this flowchart, SOP

 3    Number 40?

 4         A.   Every single control order that processes

 5    through our system goes through the -- at this time,

 6    it would have been through the algorithm that you are

 7    looking at there.

 8         Q.   It says here at the top of SOP 40:  The

 9    directive contained in this SOP applies to all DEA

10    compliance analysts who are involved in the review of

11    a sales order deemed to be of interest.

12              Are you saying that all orders are deemed to

13    be of interest?

14         A.   All orders that hit the -- this -- that go

15    through the algorithm and process out are considered

16    orders of interest.

17         Q.   Okay.  So not all orders of controlled

18    substances are orders of interest?

19         A.   No, sir.

20         Q.   And is it an order of interest because it's

21    suspicious?

22         A.   No, sir.

23         Q.   Why is it an order of interest?

24         A.   This goes back to the other document,
```

1    Exhibit 6, that the algorithm that was built, that is

2    what deems an order of interest.  So once it -- once

3    an order is taken and it processes through the

4    system, it goes through all these steps, these seven

5    steps, and if any of these are positive, it becomes

6    an order of interest.

7         Q.   What is the purpose of that algorithm?

8         A.   To capture orders of interest.

9         Q.   The purpose of the algorithm is to capture

10   orders of interest?

11        A.   Yes, sir.

12        Q.   It is not to capture suspicious orders?

13        A.   No, sir.

14        Q.   Do you have an algorithm for capturing

15   suspicious orders?

16        A.   Orders of interest can become a suspicious

17   order.  So after you review it and it -- if things

18   don't check out, then it becomes a suspicious order.

19        Q.   So the algorithm identifies what could be

20   suspicious orders, but they can't be deemed -- they

21   can't be deemed suspicious until someone -- someone

22   finds out whether or not one of these eight factors

23   is at play, like an increased supply to new/existing

24   customer or patient or increased supply to a new

```
 1    facility, consistent with order pattern, increase in

 2    stock due to promotion, first time order, consistent

 3    with customer class order pattern, administration

 4    release, or released unchanged with DEA/state

 5    authority concurrence.

 6             All of those could be reasons why an order of

 7    interest wouldn't be suspicious?

 8        A.   Correct.

 9             MS. KOSKI:  Object to form.

10    BY MR. STOLTZ:

11        Q.   And you are not sure what administration

12    release means?

13        A.   No, I'm not sure.

14        Q.   Were there ever situations in which you or

15    others in regulatory compliance would preemptively

16    increase the limits on a customer prior to a large

17    sale or a -- for example, a promotional -- a limited

18    time promotion in order to avoid triggering the

19    algorithm?

20             MS. KOSKI:  Object to form.

21             THE WITNESS:  Like I said before, I can't

22        speak to any promotions.  But regardless, the

23        algorithm tech would catch.  So if you read over

24        what the algorithm catches, it would catch any
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          order that is out of frequency, out of the normal

2          use of business.

3     BY MR. STOLTZ:

4          Q.   And those orders would automatically be held?

5          A.   (Nodding head.)

6          Q.   What was the turnaround for an order being

7     held?  How long does it take from an order being held

8     to an order ultimately being released?

9          A.   It varies.

10          MS. KOSKI:  Object to form.

11     BY MR. STOLTZ:

12          Q.   Was there ever, you know, a time that

13     compliance was shooting for or was there a maximum

14     amount of time it could take?  I mean, it just

15     varies?  It could take a year?  It could take two

16     minutes?

17          A.   Yes, sir.

18          Q.   Wouldn't that make it difficult to do

19     business?

20          MS. KOSKI:  Object to form.

21          THE WITNESS:  I don't think so.

22     BY MR. STOLTZ:

23          Q.   If someone ordered 100 units of opioids from

24     Anda and Anda held that for years, after awhile, that
```

```
 1    they would no longer need that order, would they?

 2             MS. KOSKI:  Object to form.

 3             THE WITNESS:  I can't say.

 4    BY MR. STOLTZ:

 5        Q.   Don't drugs have an expiration date?

 6        A.   Sure.

 7        Q.   Isn't Anda's position in the market to supply

 8    customers when they are unable to find product

 9    elsewhere?

10        A.   If it's a legit process, right.  So if it

11    hits as an order of interest, someone has to make

12    sure we want to ship on it.

13        Q.   How many people would review held orders?

14             MS. KOSKI:  Object to form.

15    BY MR. STOLTZ:

16        Q.   How many people at Anda's responsibility was

17    to review held orders at the time that you say you

18    were dealing with reviewing suspicious orders?

19        A.   Possibly up to five.

20        Q.   I'm going to show you what I'm going to mark

21    as Exhibit 9, Bates Number 14 -- 141492.  Just as

22    soon as I can get the sticker.

23             (Anda - Hall Exhibit 9 was marked for

24    identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Thank you.

 2    BY MR. STOLTZ:

 3        Q.   Is this an e-mail from Latoya Samuels to you

 4    and others in August of '16?

 5        A.   Yes, it appears that way.

 6        Q.   And what is this e-mail about?  What --

 7    what's the context of this e-mail?

 8        A.   The subject is "SOMS Held Orders."

 9        Q.   And it includes a month-by-month total of

10    held orders from January 2016 to August of 2016.

11             Is that accurate?

12        A.   It appears that way.

13        Q.   And during that time, there were thousands of

14    held orders, right?

15             MS. KOSKI:  Object to form.

16             THE WITNESS:  It appears that way.

17    BY MR. STOLTZ:

18        Q.   Well, let's do the math.  So -- so at some

19    point, you know, earlier on that year, you would have

20    about 35 -- in the 30s held orders a day, right?

21             How many -- how many held orders on average

22    did you have in January?

23        A.   It says daily average, 37.

24        Q.   So there was 37 held orders for review by the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    five individuals whose job was to do that?

 2        A.   Well, now you are talking about 2016 when I

 3    wasn't involved.  So that was when Robert was in

 4    charge, and he had -- let me count for you.  I think

 5    it's more than five at that time.

 6        Q.   Okay.

 7        A.   Six -- six people, I believe it was.

 8        Q.   Okay.  Six people, including Robert Brown?

 9        A.   Six.

10        Q.   So initially in January it's too bad.  What

11    is it, like, five -- five held -- held orders for

12    review per person, if that?

13             MS. KOSKI:  Object to form.

14             THE WITNESS:  It appears that way.  I'm not

15        doing the math but . . .

16    BY MR. STOLTZ:

17        Q.   When you were in charge of suspicious order

18    monitoring, how long would it take you to review a

19    held order?

20        A.   It would vary depending on the order.

21        Q.   Could you make a guess, an average?

22        A.   No.  I'm sorry.

23        Q.   Would it be somewhere in between an hour and

24    a day?
```

```
 1        A.   I don't -- I'm sorry, I don't know.

 2        Q.   Would it take a week?

 3        A.   It could.  I don't know.

 4        Q.   Did it ever take a week?

 5        A.   Possibly.

 6        Q.   It possibly took -- would it ever take longer

 7   than a week?

 8        A.   I'm sorry, I don't know.

 9        Q.   You don't recall how long it took you to

10   review a held order based on the suspicious order

11   monitoring SOP that you and others drafted and

12   reviewed every year from 2011 to 2015?

13            MS. KOSKI:  Object to form.  Mischaracterizes

14       testimony.

15   BY MR. STOLTZ:

16        Q.   You have no idea how long this takes?

17        A.   No.  I'm sorry.

18        Q.   Would it be possible for six individuals to

19   review 480 held orders in a day?

20        A.   Possibly.

21        Q.   How many would that be per person?

22            Sorry.  I'll do the math.

23            MS. KOSKI:  You are asking her to do the

24       math?
```

1            MR. STOLTZ:  No, that's fine.

2            MS. KOSKI:  We need one of the big

3       calculators.

4            MS. REINA:  It's 80.

5    BY MR. STOLTZ:

6       Q.   So it's possible that a person could review

7    80 held orders in a day?

8       A.   Yes, sir.

9       Q.   Okay.  Did you ever review 80 held orders in

10   a day?

11      A.   Possibly.

12      Q.   Does that seem like an unusually large amount

13   to you?

14      A.   I don't -- I really don't know.

15      Q.   Do you know if any of these orders were

16   reported to the DEA?

17      A.   I can't say based on this document, no.

18      Q.   Do you recall whether or not in 2016 from

19   January to August if any orders were referred to the

20   DEA?

21            MS. KOSKI:  Object to form.

22            THE WITNESS:  I can't say.  I'm sorry.  I

23       wasn't really directly involved.

24   ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2         Q.   Is it possible that none of these orders were

 3    referred to the DEA?

 4         A.   I don't know.

 5         Q.   If these orders were released from being

 6    held, would there be a record as to the reason they

 7    were released?

 8         A.   Yes, sir.

 9         Q.   And where would that reason be?

10         MS. KOSKI:  Object to form.

11    BY MR. STOLTZ:

12         Q.   How is that reason recorded?

13         A.   In our internal system, when you release it,

14    you release it with a code based on what we were

15    reading in that SOP, the one through eight, I believe

16    it was.  You release it with a release code, and you

17    can always refer back to that.

18         Q.   And the internal system, was there a name for

19    that system?

20         A.   We really called it a bucket.  That was just

21    our -- what we called it but -- it was our order of

22    interest bucket.

23         Q.   Okay.  And if you increased -- if you had a

24    larger multiplier, you could avoid things going into
```

Highly Confidential - Subject to Further Confidentiality Review

1    the bucket, right?

2        A.    The larger --

███    ███    ████████████████████████

4    looking at before.  You said, the bigger the

5    multiplier, the more -- the less we'll have in the

6    bucket; the smaller the multiplier, the more we'll

7    have in the bucket, right?

8        A.    If you increase your multiplier, you will

9    have less hit the bucket; if you decease your

10    multiplier, you will have more hit the bucket.

11        Q.    Okay.  Who is in charge of setting those

12    multipliers?

13        A.    I'm sorry, I don't know.

14        Q.    Okay.  I want to show you what I'm going to

15    mark as Exhibit 10.

16            (Anda - Hall Exhibit 10 was marked for

17    identification.)

18            MR. STOLTZ:  And, again, I apologize for the

19        awkward stapling.

20            MS. KOSKI:  Thank you.

21            MR. STOLTZ:  Exhibit 10 bearing the Bates

22        Number 149556.

23    BY MR. STOLTZ:

24        Q.    And this is an e-mail from Stephanie

```
 1    Giammalvo to you, Sabrina Solis, and Jay Spellman,

 2    cc'ing others.

 3            What was Jay Spellman's position?

 4            MS. KOSKI:  Object to form.

 5    BY MR. STOLTZ:

 6        Q.   What did Jay Spellman do for Anda at this

 7    time?

 8        A.   At this time, Jay Spellman was the executive

 9    director of distribution and compliance.

10        Q.   And then what did Sabrina Solis do?

11        A.   Sabrina is the manager of regulatory

12    compliance.

13        Q.   Okay.  So to you, the executive director of

14    compliance, and then the manager of regulatory

15    compliance.

16            And it looks like -- so what was Stephanie's

17    position?  Was it a senior national account manager?

18        A.   Yes, it appears that way.

19        Q.   And why is she letting you know that Wegmans

20    is doing a push order to their stores on a two- to

21    three-week order on oxycodone, 10 milligrams and

22    20 milligrams?

23            MS. KOSKI:  Object to form.

24            THE WITNESS:  Can you please clarify?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   Why would someone in sales be telling someone

 3    in regulatory about a large upcoming order of

 4    oxycodone 10 milligrams and 20 milligrams?

 5             Is that the same oxycodone that's liable to

 6    be abused such that it was not included in the

 7    original thousand-unit limit?

 8             MS. KOSKI:  Object to form.  Compound.

 9    BY MR. STOLTZ:

10        Q.   You testified earlier that the initial --

11    initially, stores would be given a thousand-unit

12    order an a particular family?

13        A.   Sure.

14        Q.   One of those things that was outside of that

15    limit was oxycodone.

16             Is that accurate?

17        A.   Yes.

18        Q.   And the other thing was methadone?

19        A.   Yes, sir.

20        Q.   Okay.  Why would someone in national accounts

21    be telling regulatory about an upcoming sale of a

22    large amount of oxycodone 10 milligrams and

23    20 milligrams?

24        A.   I don't remember the specific case, but most
```

```
 1      likely she was alerting us because she needed us to

 2      review and make sure that the accounts were going to

 3      be eligible.

 4          Q.   Was it so you could ensure that these

 5      wouldn't be held orders?

 6               MS. KOSKI:  Object to form.

 7               THE WITNESS:  Can you please clarify?

 8  BY MR. STOLTZ:

 9          Q.   Was Stephanie Giammalvo letting you and

10      others in regulatory compliance know beforehand about

11      a large purchase of oxycodone so you could ensure

12      that none of those orders were held for review in

13      the -- per SOP 40?

14               MS. KOSKI:  Object to form.

15               THE WITNESS:  No.  As I stated before, even

16           if it goes out of the order -- if it's an unusual

17           frequency or an unusual size, it will still be

18           held as a suspicious order.

19  BY MR. STOLTZ:

20          Q.   What do you say back to Stephanie on Page 1?

21          A.   Hi, Stephanie.  We will review current limits

22      and adjust any accounts accordingly.  We will let you

23      know once the 70 accounts are complete.

24          Q.   So are you saying that you are going to
```

```
 1     increase the current limits and adjust accordingly

 2     such that Wegmans can make a large order of oxycodone

 3     20 milligrams and 10 milligrams?

 4          A.   I don't remember this specific request, but

 5     what I'm -- I believe I'm saying is that we will

 6     review.

 7          Q.   You will review current limits and then what?

 8          A.   We will review the customer, what we have on

 9     file.

10          Q.   What does it say here?

11          A.   We will review current limits and adjust any

12     accounts accordingly.

13          Q.   Okay.  So this is 2017, right?

14          A.   Yes, sir.

15          Q.   And by 2017, you were not involved in

16     reviewing current limits and adjusting any

17     accounts -- or were you?

18          A.   In January 2017, Robert Brown was laid off

19     and I filled an interim role into December of 2017

20     when Sabrina Solis stepped in.

21          Q.   Sabrina Solis says:  The control limits were

22     reviewed and they are okay for the order.

23               Does that mean that none of these orders will

24     be held?
```

```
 1      A.   As I stated before, the algorithm will still

 2   catch the orders.  What she is stating is she

 3   reviewed the customers and everything -- and they are

 4   eligible and set for this order.  They have been

 5   approved.

 6      Q.   Prior to going through the algorithm?

 7      A.   There's limits, and there's an algorithm.

 8      Q.   Did Wegmans -- did their limits ever go down

 9   after this one-time purchase?

10           MS. KOSKI:  Object to form.

11   BY MR. STOLTZ:

12      Q.   Was there any SOP for bringing limits down

13   after a one-time purchase of a large amount of

14   opioids?

15           MS. KOSKI:  Object to form.

16           THE WITNESS:  I can't say for certain.

17   BY MR. STOLTZ:

18      Q.   Who would have -- would you agree that if

19   limits didn't return to their number prior to a

20   limited time increase, customers could order far more

21   than they normally would have been able to in the

22   future?

23           MS. KOSKI:  Object to form.

24           THE WITNESS:  Can you clarify?
```

```
 1              MR. STOLTZ:  Sure.

 2    BY MR. STOLTZ:

 3         Q.   In this circumstance, it looks like Wegmans

 4    is getting an increase in their limits due to a

 5    one-time purchase of oxycodone, right?

 6         A.   Yes, sir.

 7         Q.   If their limits aren't returned -- if their

 8    limits aren't put back to the level prior to the

 9    large purchase, wouldn't it be possible for Wegmans

10    to continue to purchase a large amount of opioids

11    despite the fact that they are not making a large

12    one-time purchase of oxycodone?

13              MS. KOSKI:  Object to form.

14              THE WITNESS:  Limits are based on the

15         overall, so the dispensing data.  So we feel

16         comfortable at that point, if they do come back

17         to us, that they are at a comfortable place.  We

18         have determined that that's what our limit -- how

19         we set our limits.

20    BY MR. STOLTZ:

21         Q.   So you would be comfortable increasing limits

22    indefinitely after the review of a one-time large

23    purchase of a controlled substance?

24              MS. KOSKI:  Object to form.  Mischaracterizes
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      testimony.
 2   BY MR. STOLTZ:
 3      Q.   Did Anda have any concerns or -- in your
 4   understanding while you were acting manager or acting
 5   suspicious order reviewer, did you ever have any
 6   concerns that allowing a customer to have an increase
 7   indefinitely based on a one-time buy would allow them
 8   to order far more than was usual for a pharmacy of
 9   that size?
10      A.   Well, this specific case, if Sabrina reviewed
11   it as the analyst, well, she was the manager at that
12   time.  If she reviewed it, I feel comfortable with
13   her decision.
14      Q.   Was there ever a time that limits were
15   re-reviewed?  For example, you looked at the SOP
16   policy in general on a yearly basis.  Would limits
17   themselves ever be reviewed after they were set?
18           MS. KOSKI:  Object to form.
19           THE WITNESS:  Possibly.
20   BY MR. STOLTZ:
21      Q.   In the time that you were in charge of
22   suspicious order monitoring, whether that was after
23   Robert Brown being laid off or prior to his hiring,
24   were limits ever reviewed after they were set?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Possibly.  I can't say for a specific case.

 2      Q.    But there was never any policy to do so?

 3            MS. KOSKI:  Object to form.

 4            THE WITNESS:  Specifically reviewing the

 5      customer in general.

 6            So, as I stated before, the whole picture of

 7      the customer, re-reviewing them, making sure --

 8      someone the size of a Wegmans, re-reviewing and

 9      making sure we are comfortable with where they

10      stand.

11   BY MR. STOLTZ:

12      Q.    Were customers ever re-reviewed -- was there

13   ever a specific policy that you can recall to

14   re-review customers in situations other than where

15   they are asking for an increase in their control

16   limit?

17            MS. KOSKI:  Object to form.

18            THE WITNESS:  I can't say for certain.

19   BY MR. STOLTZ:

20      Q.    So that you know of, there was no policy to

21   do so?

22            MS. KOSKI:  Object to form.

23            THE WITNESS:  I can't say for certain.

24   ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. STOLTZ:

2        Q.   It was -- you were running the department

3    prior to Robert Brown being hired and then after him

4    being laid off?

5            MS. KOSKI:  Object to form.  Mischaracterizes

6        testimony.

7    BY MR. STOLTZ:

8        Q.   Were you in charge of suspicious order

9    monitoring when Robert Brown was not with Anda?

10       A.   Yes.

11       Q.   While you were in charge of that, of

12   suspicious order monitoring, did you ever implement a

13   policy to review limits in situations other than

14   where a customer's asking for an increase in limits?

15       A.   We reviewed -- re-reviewed customers, yes.

16       Q.   I understand that you re-reviewed customers.

17           Did -- was there a policy that you can recall

18   to re-review customers in situations other than where

19   they were asking for an increase in limits?  And if

20   there was a policy, can you let me know what that

21   policy was?

22           MS. KOSKI:  Object to form.

23           THE WITNESS:  A written policy?  Is that what

24       you're --
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2         Q.   I don't know.

 3         A.   I guess --

 4         Q.   Maybe you wrote it down or -- I'm just asking

 5    you how you ran your department.

 6              Did you ever instruct anyone, written or

 7    otherwise, to re-review customers in situations where

 8    they were not asking for an increase in controlled

 9    substances?

10         A.   Possibly.

11         Q.   Possibly?

12         A.   Yes, sir.

13         Q.   Can you think of a reason why you might

14    possibly do that?

15         A.   I can't say for certain.

16              (Anda - Hall Exhibit 11 was marked for

17    identification.)

18    BY MR. STOLTZ:

19         Q.   I'm showing you what's been marked as

20    Exhibit 11, bearing the Bates number --

21              MS. KOSKI:   Thank you.

22         Q.   -- 134998.

23              And this is dated April 15th, 2011, right?

24         A.   Yes, it appears that way.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And that's -- that was before the PowerPoint

2    presentation in 2012.

3             Was that before the PowerPoint

4    presentation -- or your edits to the PowerPoint

5    presentation in 2012?

6        A.    Exhibit 8 was from November 27, 2012.

7        Q.    Okay.  And what is it -- what was your edit

8    on Page 16?

9        A.    Page 16:  Be careful stating report to DEA as

10   a suspicious order because we do not do that.

11       Q.    And what does Gayle Lane of the DOJ send to

12   you and others at Anda?

13       A.    You want me to read her response?

14       Q.    Yes.

15       A.    Okay.

16             Please review 21 CFR.

17             The registrant shall inform of suspicious

18   orders when discovered by the registrant.  You are

19   required to report to DEA at the time of the order --

20   at the time of the order what was ordered.  So it is

21   not enough to let us know of customers you have cut

22   off after you have researched them.  If you deem an

23   order suspicious, you need to notify DEA at that

24   time.

1      Q.    So in 2012, you still weren't reporting

2    suspicious orders.

3            Is that accurate?

4            MS. KOSKI:  Object to form.

5    BY MR. STOLTZ:

6      Q.    Was it your statement that in 2012 -- in

7    2012, did you state that we do not report to the DEA

8    suspicious orders?

9      A.    We report suspicious customers.

10     Q.    And what does Gayle Lane say about reporting

11   suspicious customers in 2011?

12     A.    Did you want me to re-read it?

13     Q.    Sure.

14     A.    Please review 21 CFR.  The registrant shall

15   inform of suspicious orders when discovered by the

16   registrant.  You are required to report to DEA at the

17   time of the order what was ordered.  So it is not

18   enough to let us know if a customer -- let us know of

19   customers you have cut off after you have researched

20   them.  If you deem an order suspicious, you need to

21   notify DEA at that time.

22     Q.    But even still, ten months later, Anda is not

23   reporting suspicious orders and reporting suspicious

24   customers.

Highly Confidential - Subject to Further Confidentiality Review

1          Is that your testimony?

2          MS. KOSKI:  Object to form.

3          THE WITNESS:  I can't speak to what Michael

4      discussed with Gayle after this e-mail.  But,

5      yes, customers -- suspicious customers.

6  BY MR. STOLTZ:

7      Q.   I'm not asking about what was discussed with

8  Gayle after this e-mail.

9      A.   Okay.

10     Q.   I'm saying ten months after this e-mail from

11 Gayle Lane at the Department of Justice on the Weston

12 Diversion Group, Anda was still not reporting

13 suspicious orders but reporting suspicious customers?

14     A.   Yes, sir.

15          MS. KOSKI:  Object to form.

16 BY MR. STOLTZ:

17     Q.   Do you know when Anda made the transition to

18 reporting suspicious orders as opposed to suspicious

19 customers?

20          MS. KOSKI:  Object to form.

21          THE WITNESS:  No.

22 BY MR. STOLTZ:

23     Q.   Do -- was it a decision that you made or was

24 it a decision that Robert Brown made?

```
 1        A.    It was a decision somebody else made.  I did

 2    not make it.

 3        Q.    So it was at least after Robert Brown was

 4    hired and you transitioned to just focusing on

 5    licensures?

 6             MS. KOSKI:  Object to form.

 7             THE WITNESS:  Possibly.

 8    BY MR. STOLTZ:

 9        Q.    Well, if you didn't make the decision, then

10    necessarily it would have occurred after you were out

11    of the loop as far as suspicious order monitoring

12    goes, right?

13        A.    Possibly, yes.

14        Q.    And when was that again?

15        A.    I was in that role 2010 to maybe 2012.

16        Q.    Okay.  This e-mail is from November of 2012.

17    So it would have at least occurred after

18    November 2012?

19        A.    I can't say for certain.

20        Q.    Well, at this point, you're still in charge

21    of suspicious order monitoring, right?

22             MS. KOSKI:  Object to form.

23             THE WITNESS:  It was around that time that

24         Robert transitioned in, in 2012.  I don't know
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        the exact --

 2             MR. STOLTZ:  Okay.

 3   BY MR. STOLTZ:

 4        Q.   So at least up until November of 2012 Anda

 5   was reporting suspicious customers and not suspicious

 6   orders?

 7        A.   Yes, sir.

 8             THE VIDEOGRAPHER:  Off the video record at

 9        2:27.

10             (Recess from 2:27 until 2:33 p.m.)

11             THE VIDEOGRAPHER:  The time is 2:33 p.m.  We

12        are now back on the record.

13   BY MR. STOLTZ:

14        Q.   So during the whole time that you were at

15   Anda, the main focus of your employment -- at least

16   one of your main responsibilities was focused around

17   licensing, right?

18        A.   Yes, sir.

19        Q.   And that would entail making sure that the

20   customers had valid licenses to purchase

21   pharmaceuticals, right?

22        A.   Yes, sir.

23        Q.   And each state is a little bit different?

24        A.   For controlled substance?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    For any type of licensing.

 2        A.    Yes, sir.

 3        Q.    When it comes to controlled substances, are

 4   states different?

 5        A.    Some states have a controlled substance

 6   license and some states do not.

 7        Q.    Okay.  So I guess some states kind of track

 8   the federal rules and other states don't?

 9              MS. KOSKI:  Object to form.

10   BY MR. STOLTZ:

11        Q.    Would part of -- part of understanding

12   licensure wouldn't just be limited to the states,

13   right?  It would also be limited -- it would also

14   extend to requirements under the federal regulations

15   and federal code?

16        A.    Yes, sir.

17        Q.    And you mentioned that -- about how

18   frequently would -- are there separate licenses for

19   controlled substances and noncontrolled substances?

20        A.    In each state, it varies.  So each state has

21   different requirements.

22        Q.    As to federal law, is there a different

23   license for controlled substances and noncontrolled?

24        A.    Federal is your DEA registration.
```

```
 1      Q.   Okay.  It's the DEA registration?

 2      A.   Yes, sir.

 3      Q.   And what type of information can you tell

 4   from a DEA registration?

 5      A.   The DEA registration has the name, the

 6   address, the schedules that they're approved for as

 7   well as expiration date, how much they paid for their

 8   registration, and when it was issued.

 9      Q.   There's a situation where you could -- maybe

10   a facility's DEA registration was out of date or

11   their DEA registration put them in a category of

12   customer that Anda didn't want to sell to, or at

13   least policy-wise didn't want to sell to.

14          Could Anda, for example, substitute in one of

15   the practitioner's DEA registration and sell product

16   directly to that individual in order to get product

17   to the customer that's DEA registration may have been

18   out of date?

19          MS. KOSKI:  Object to form.

20          THE WITNESS:  No, I'm not -- I'm sorry.  I'm

21      not sure --

22          MR. STOLTZ:  Sure.  That was a terrible

23      question.

24   ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   So doctors have DEA registrations, right?

 3    Not all of them but some?

 4        A.   Yes, sir.

 5        Q.   And a pharmacy would have a DEA registration?

 6        A.   Yes, sir.

 7        Q.   Assuming, if they wanted one.

 8             What are some of the other classes of

 9    entities that can have a DEA registration?

10        A.   Anyone that is going to handle controlled

11    substances is required to have a DEA registration.

12        Q.   Okay.  If a pharmacist's DEA registration was

13    out of -- would a pharmacist himself or herself would

14    they have a DEA registration?

15        A.   No.  The pharmacy would have it.

16        Q.   Okay.  What about -- what about a clinic or a

17    hospital?  Would the doctor have a DEA registration

18    in addition to the hospital having a DEA

19    registration?

20        A.   Not -- a clinic and hospitals would be two

21    different classifications.  Some clinics won't have

22    their own licensure, and they would rely on the

23    physician.  And hospitals -- typically a hospital has

24    their own DEA registration.
```

```
 1        Q.   Okay.  But there could be situations in

 2   which -- well, there would be situations in which,

 3   you know, a hospital would have a DEA registration

 4   and doctors within that hospital would have a DEA

 5   registration?

 6             MS. KOSKI:  Object to form.

 7   BY MR. STOLTZ:

 8        Q.   Could you sort of have overlapping DEA

 9   registrations is what I'm asking?

10             MS. KOSKI:  Object to form.

11             THE WITNESS:  The DEA can issue multiple DEA

12        registrations at the same address for different

13        people or different entities.

14   BY MR. STOLTZ:

15        Q.   Okay.  So then if you wanted to -- if you

16   wanted to avoid scrutiny for selling opioids to a

17   hospital or a clinic that had a DEA registration,

18   couldn't you use the doctor that works there's DEA

19   registration and sell to them directly as opposed to

20   that clinic?

21             MS. KOSKI:  Object to form.

22             THE WITNESS:  Can you please clarify?

23   BY MR. STOLTZ:

24        Q.   In situations where there are more than one
```

1    DEA registration at one location -- and that's

2    something that's possible, right?

3         A.   Yes, sir.

4         Q.   Okay.  In situations where there are two --

5    more than one DEA registration at one location, would

6    it be possible to avoid DEA scrutiny by selling to

7    one and not the other?

8              MS. KOSKI:  Object to form.

9              THE WITNESS:  It just depends on who's our

10        customer.  I'm still not sure -- I'm unclear on

11        what your question is.

12             MR. STOLTZ:  I'm marking Exhibit 12, Bates

13        Number 136972.

14             (Anda - Hall Exhibit 12 was marked for

15    identification.)

16   BY MR. STOLTZ:

17        Q.   So if you go back to the beginning of this

18   e-mail chain, which I understand you are not on, an

19   individual named Suparna asks Christine A. Miller to

20   send 34 bottles of 30-count Mallinckrodt Naltrexone

21   to the enclosed address at attention of Rick and

22   copies the pharmacy director, Rick, who was the

23   director of pharmacy at 3400 Enterprise Way, Miramar,

24   Florida.

Highly Confidential - Subject to Further Confidentiality Review

1          And it looks like you weren't able to supply

2     what was asked for but you were able to supply 1,000

3     tablets, and you explained that that was all that was

4     left in the inventory, right?

5          A.   Ten pieces.

6          Q.   Okay.  And Al -- Albert Paonessa, who was he?

7          A.   Al Paonessa was the previous president of

8     Anda.

9          Q.   Okay.  And he says:  Actually, hold on.  We

10     need to confirm that we are allowed to sell to that

11     type of license.

12          What does he mean "that type of license"?  Is

13     he referring to the license of the clinic or the

14     license of the pharmacist?

15          A.   I can't say for certain.  I don't know.  I

16     don't remember this.

17          Q.   Okay.  Well, you reply that the facility

18     didn't have a state license, so we had to set up the

19     account under the physician in charge's name.

20          Is that accurate?

21          A.   That's what it reads.

22          Q.   So was the physician in charge ordering this

23     amount or was the facility ordering the amount?

24          MS. KOSKI:  Object to form.

 1    BY MR. STOLTZ:

 2        Q.   Was it common to -- was it common to use a

 3    physician in charge's DEA registration as opposed to

 4    the facility that was actually receiving the

 5    controlled substances?

 6             MS. KOSKI:  Object to form.  Mischaracterizes

 7         the document.

 8             THE WITNESS:  I can't say for certain this

 9         was a controlled substance, this product.

10    BY MR. STOLTZ:

11        Q.   Well, it is.

12             But regardless, a DEA registration, is that

13    going to be required for all types of -- all types of

14    pharmaceuticals or just controlled substances?

15             MS. KOSKI:  Object to form.

16    BY MR. STOLTZ:

17        Q.   A DEA registration is required for ordering

18    controlled substances, right?

19        A.   For the -- yes.

20        Q.   Would you need a DEA registration to order

21    Tylenol?

22        A.   In our system, we -- as a new customer or an

23    existing customer, we try and have all of their

24    licensure on file.  And some of that is for

```
 1    chargeback reasons.  So the DEA is their -- the link,

 2    the notifier, when things get sent back for

 3    chargeback.  Not necessarily a controlled substance

 4    buying customer or a controlled substance order; just

 5    account maintenance.

 6        Q.   Who is requesting 1,000 tablets and why is

 7    Albert Paonessa --

 8             The facility requests the 34 bottles of

 9    30-count Mallinckrodt Naltrexone, 50-milligram

10    tablets.

11             Is that accurate?

12        A.   It appears in the first e-mail that a

13    Ricardo -- oh, I'm sorry, a Ricardo is the contact.

14    A Suparna is requesting.

15        Q.   Right.

16             And he's asking that it be sent to Ricardo

17    Castaneda at the Comprehensive Clinical Development

18    located at 3400 Enterprise Way.

19             And pharmacy directors, do they have DEA

20    registrations?

21        A.   This pharmacist, no.  It would be through the

22    facility if the facility had one.

23        Q.   And it looks like Albert is concerned that

24    you're not allowed to sell to that type of license,
```

Highly Confidential - Subject to Further Confidentiality Review

 1    right?

 2        A.    I don't know.  I don't know what the license

 3    is.  There's no other attachment so it's hard for me

 4    to speculate.

 5        Q.    So in order to get around not being able to

 6    sell to this clinic, you suggest that -- why did you

 7    need to set up an account in the physician in

 8    charge's name?

 9              MS. KOSKI:  Object to form.  Mischaracterizes

10        the document.

11    BY MR. STOLTZ:

12        Q.    Why did -- why did you set up an account

13    under the physician in charge's name?

14        A.    I don't know.  I can't -- I don't remember

15    this specific case.

16        Q.    Was it because the facility did not have a

17    state license?

18        A.    I'm sorry.  I can't be sure of that.

19        Q.    Did you say the facility did not have a state

20    license?

21        A.    Yes.

22        Q.    And then you said:  So we had to set up an

23    account in the physician in charge's name?

24        A.    Yes.

```
 1        Q.   So in Anda's records -- in Anda's records --

 2             MS. KOSKI:  Can you mute on the phone,

 3        please.

 4   BY MR. STOLTZ:

 5        Q.   In Anda's records, it wouldn't reflect -- if

 6   you were to look up the -- I don't know, the task

 7   history or whatever internal electronic system Anda

 8   has, if you were to look up that history for this,

 9   would it show that you delivered Naltrexone tablets

10   to the facility or to the physician in charge?

11        A.   I can't say for sure.

12        Q.   It looks like you set up an account under the

13   physician in charge's name, right?  And by account,

14   what -- what are you referring to?

15        A.   An account is what the customer has at our --

16   at our -- in our system that captures the order.  So

17   it's through that customer.

18        Q.   So in your system?

19        A.   An internal system, yes, sir.

20        Q.   In your internal system, this particular

21   order would show up as an order made by the physician

22   in charge, right?

23        A.   It appears that way, but I don't know.

24        Q.   Did Anda have a policy of not distributing
```

```
 1     controlled substances to clinics?

 2             MS. KOSKI:  Object to form.  Mischaracterizes

 3       the document.

 4     BY MR. STOLTZ:

 5       Q.   When you were in charge of suspicious order

 6     monitoring, which would have been in February of

 7     2012, did you or did anyone else in regulatory -- the

 8     regulatory department implement a policy of not

 9     distributing controlled substances to clinics?

10       A.   Pain clinics.

11       Q.   This was a pain clinic?

12       A.   I can't say for certain.

13       Q.   When was that implemented, that policy?

14       A.   June 2010-ish.  I'm not a hundred percent

15     certain.

16       Q.   Were you a part of those conversations, or

17     that's just what you heard?

18             MS. KOSKI:  Object to form.

19             THE WITNESS:  Can you please clarify?

20             MR. STOLTZ:  Sure.

21     BY MR. STOLTZ:

22       Q.   When that decision was made -- you seem to

23     have a specific understanding of when that decision

24     was made.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you know why that decision was made?

 2       A.    To discontinue the sale of controlled

 3    substances to pain clinics.

 4       Q.    And why was that policy implemented?

 5              MS. KOSKI:  Object to form.

 6              THE WITNESS:  I can't say for certain.

 7    BY MR. STOLTZ:

 8       Q.    Why do you remember that it was in June of

 9    2010?  Is there anything else that happened in June

10    of 2010?

11       A.    June -- the reason I remember is in June 2010

12    is because our physicians were -- there was

13    expirations that occurred on that day.  So when I see

14    a customer, I can see that date of an expiration.

15       Q.    What do you mean an expiration?

16       A.    Expiration date on one of their licensure.

17       Q.    Oh.

18       A.    Sorry, it was one of those where you join

19    things.

20       Q.    So it was after -- I guess after June of

21    2010, that's when Anda was no longer going to

22    distribute to pain clinics?

23       A.    Pain clinics, yeah.  I believe it was 2010,

24    that decision, but . . .
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   But it didn't have a similar policy with

2    regards to physician in charges, or did it?

3            MS. KOSKI:  Object to form.

4    BY MR. STOLTZ:

5        Q.   Did Anda continue to distribute controlled

6    substances to pain clinics by sending those --

7    sending those pills to the physician in charge by

8    using their DEA registration?

9            MS. KOSKI:  Object to form.

10           THE WITNESS:  No, sir, not that I'm aware of.

11   BY MR. STOLTZ:

12       Q.   How long after 2010 did Anda continue to

13   distribute pain pills to pain clinics?

14           MS. KOSKI:  Object to form.

15   BY MR. STOLTZ:

16       Q.   Is this the only instance that you can think

17   of in which pain pills were sent to a pain clinic?

18           MS. KOSKI:  Object to form.  Mischaracterizes

19       the testimony.  She didn't say it was a pain

20       clinic.  She said she didn't know.

21   BY MR. STOLTZ:

22       Q.   What are some other reasons why Anda would

23   not be allowed to sell controlled substances to a

24   type of license in 2012?
```

```
 1              MS. KOSKI:  Object to form.  Foundation.

 2    BY MR. STOLTZ:

 3        Q.    What -- what is required as far as licenses

 4    before -- what licenses are required before someone

 5    can order controlled substances?

 6        A.    State license; if their state requires a

 7    controlled substance, a controlled substance license;

 8    and a DEA registration.

 9        Q.    And -- and what types of licenses is Anda not

10    allowed to distribute controlled substances to in

11    2012?

12        A.    There was a decision made to not sell to

13    wholesalers and pain clinics.

14        Q.    Is Comprehensive Clinical Development -- was

15    that a wholesaler?

16        A.    I can't say for certain.

17        Q.    Do you know if they had physician in

18    charges -- if they had a physician in charge at a

19    wholesale facility?

20              MS. KOSKI:  Object to form.

21    BY MR. STOLTZ:

22        Q.    Does Anda as a wholesaler have a physician in

23    charge?

24        A.    No.  We have what is called designated
```

1    representatives.

2         Q.    Are they physicians?

3         A.    No, sir.

4         Q.    What is a designated representative?

5         A.    A designated rep is a specific person that is

6    in charge of the daily operations for the facility,

7    and certain states require them to be licensure --

8    licensed.  Take classes, take a test, get licensed.

9         Q.    But they are not physicians?

10        A.    Some can be but not at Anda.

11        Q.    It is not a requirement?

12        A.    Correct.

13        Q.    So when Albert says, "We must confirm that we

14   are allowed to sell to that type of license," the two

15   licenses that he would be concerned about would be

16   either a wholesaler or a pain clinic?

17             MS. KOSKI:  Object to form.

18             THE WITNESS:  I can't say for sure.

19   BY MR. STOLTZ:

20        Q.    Are there other instances -- are there other

21   types of licenses that Anda was not allowed to sell

22   to in 2012?

23        A.    I can't say.  I really -- I don't know what

24   this is.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Weren't you the -- in charge of licensure?

 2        A.    Sure.

 3        Q.    Wasn't that one of your main

 4   responsibilities?

 5        A.    Yes, sir.

 6        Q.    And that was your main -- one of your main

 7   responsibilities in February of 2012?

 8        A.    Licensure, yes.

 9        Q.    And as part of that, your job was to ensure

10   that you were allowed -- and part of that would be

11   knowing what licenses you are allowed to sell to,

12   right?

13        A.    Yes, sir.

14        Q.    So in February of 2012, what licenses were

15   you not allowed to sell to?

16              MS. KOSKI:  Object to form.

17   BY MR. STOLTZ:

18        Q.    You don't know?

19        A.    Pain clinics and wholesalers.

20        Q.    Are those the only two type of licenses?

21        A.    Those are the two I remember for that time

22   frame.

23        Q.    Okay.  Was that a self-imposed rule?

24        A.    Can you please clarify?
```

```
 1        Q.    When I asked "What licenses are you not

 2   allowed to sell to," was that a self-imposed

 3   limitation?  Did Anda put those limitations on itself

 4   or was that a requirement by state or federal

 5   regulations?

 6        A.    That was an Anda decision.

 7        Q.    Are there some states that have a rule as to

 8   licenses that can be sold to by a wholesaler?

 9        A.    Not that I'm aware of, sir.

10        Q.    Okay.  So when it says -- so was Pharm D a --

11   was that a customer or was that referring to someone

12   else?

13        A.    Most likely, that stands for pharmacist.

14        Q.    Okay.  So that's kind of a typical, like,

15   qualification on somebody's -- for a pharmacist, that

16   would put, like, their address?

17        A.    I believe so.

18        Q.    Okay.  And Christine Miller, who did she work

19   for?

20        A.    It appears Christine Miller worked for

21   Watson.

22        Q.    At this time you were -- I mean, you have

23   always been in regulatory compliance.  Why -- why did

24   Albert Paonessa forward this to you?
```

```
 1              MS. KOSKI:  Object to form.

 2              THE WITNESS:  I can't be certain.

 3    BY MR. STOLTZ:

 4         Q.   So what was that internal system called?  I

 5    mean, how could you sort of monitor the tasks or

 6    whatever for a particular customer?

 7         A.   I believe you are referring to Remedy.

 8         Q.   Okay.  That would be what I'm referring to.

 9              So a system like Remedy, is that where you go

10    to see whether a customer had been denied, met their

11    limit for a certain month, that sort of thing?

12         A.   Remedy is more task-oriented.  So a rep will

13    send a request to a specific department asking for,

14    hey, please update the phone number, update the

15    address.  That's a task.

16         Q.   If a -- if a customer or an order was

17    reported to the DEA, where -- where would that show

18    up?  Would that also be on Remedy or on a different

19    electronic system?

20         A.   It would be in the Excel file called

21    "Customer Cutoff."  That's where those are captured.

22         Q.   And would that -- would that information ever

23    be put into Remedy or T PS or the O drive?

24         A.   TPS.  In the notes section of TPS.  You know,
```

```
 1    it would vary that they would have a note saying the

 2    customer was cut off.  Most of the time, it would.

 3         Q.   And but then would it also include a note

 4    whether or not a customer was ultimately reported to

 5    the DEA?

 6              MS. KOSKI:  Object to form.

 7    BY MR. STOLTZ:

 8         Q.   Where -- where -- where in Anda's internal

 9    systems, electronic or otherwise, would -- would a

10    customer's -- a customer getting reported to the DEA,

11    where would that be reflected?

12         A.   In that Excel file with the -- Customer

13    Cutoff file.

14         Q.   So that wouldn't make it into the notes of a

15    due diligence file or TPS or --

16         A.   Possibly.

17         Q.   Possibly but not all the time?

18         A.   I can't say a hundred percent of the time.

19              MR. STOLTZ:  I'm going to show you what I'm

20         marking as Exhibit 13, Bates number 81549, and

21         its attachment, 81550.

22              (Anda - Hall Exhibit 13 was marked for

23    identification.)

24              MS. KOSKI:  Do you have another copy for her?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. STOLTZ:  Oh, of course.  Sorry about
 2       that.
 3   BY MR. STOLTZ:
 4       Q.   So is this an e-mail to you from
 5   Sabrina Solis?
 6       A.   Yes.  To myself and one other person.
 7       Q.   And what is the subject of this?
 8       A.   "RA - Top 100 Products for Top 100 Stores
 9   Review (Combined with Miscellaneous Random Research).
10       Q.   Okay.  And the e-mail itself, there's not
11   much here.  It just says:  Please see attached.
12       A.   Yes, sir.
13       Q.   I have a document here.  It looks like these
14   first couple of pages, 81550 and 81552, that must
15   refer to the miscellaneous research?
16       A.   Yes, it appears that way.
17       Q.   Part of this miscellaneous refers to
18   McKesson's controlled substance monitoring program.
19            Does McKesson publish its controlled
20   substance monitoring program?
21            MS. KOSKI:  Object to form.
22   BY MR. STOLTZ:
23       Q.   How is it that Sabrina Solis became aware of
24   McKesson's controlled substance monitoring program?
```

```
 1        A.    I can't say for certain.

 2        Q.    Do you know if it was common for wholesale

 3    distributors to share their controlled substance

 4    monitoring program?

 5              MS. KOSKI:  Object to form.

 6    BY MR. STOLTZ:

 7        Q.    Were you able -- being in charge of

 8    suspicious order monitoring, at least during this

 9    time period, were you ever aware of what other

10    distributors were doing with respect to suspicious

11    order monitoring?

12        A.    No, not me specifically.

13        Q.    Would someone at Anda be aware of what other

14    distributors were doing with respect to suspicious

15    order monitoring?

16        A.    I can't say for certain.

17        Q.    Do you think Sabrina Solis would know?

18        A.    I can't say for certain.

19        Q.    You mentioned earlier that part of knowing

20    your customer was knowing who their primary

21    distributor was.

22              Is that accurate?

23        A.    Yes, sir.

24        Q.    And would that also include knowing how that
```

1    primary distributor monitors that shared customer for

2    suspicious orders?

3         A.   Me specifically?

4         Q.   If you wanted to know your customer and part

5    of that included knowing who their primary

6    distributor was, would that also include knowing how

7    that primary distributor monitored that shared

8    customer for suspicious orders?

9         A.   No.

10             MS. KOSKI:  Object to form.

11             THE WITNESS:  No, sir.

12   BY MR. STOLTZ:

13        Q.   Would a primary distributor ever share with

14   Anda dispensing data?

15             MS. KOSKI:  Object to form.

16             MS. VAN TASSELL:  This is Rebecca Van Tasell.

17             Object to form.

18   BY MR. STOLTZ:

19        Q.   While you were in charge of regulatory

20   compliance and suspicious order monitoring, that

21   included knowing a customer, right?

22        A.   Yes, sir.

23        Q.   And part of knowing your customer was knowing

24   the primary distributor for that customer?

```
 1        A.    Yes, sir.

 2        Q.    Other than just in general knowing a

 3   customer, how would a primary distributor -- how

 4   would -- how would who the primary distributor is

 5   matter with regards to monitoring suspicious order

 6   monitoring?

 7             MS. KOSKI:  Object to form.

 8             MS. CARDENAS:  Object to form.

 9             THE WITNESS:  Can you please clarify?

10             MR. STOLTZ:  Sure.

11   BY MR. STOLTZ:

12        Q.    How is a primary distributor relevant to

13   monitoring for suspicious orders?

14             MS. CARDENAS:  Object to form.

15             THE WITNESS:  As I stated earlier, just

16        knowing your customer, knowing who they are doing

17        business with.

18   BY MR. STOLTZ:

19        Q.    Right.

20             Obviously, there's knowing who they are doing

21   business with, but how does that relate to monitoring

22   for suspicious orders?  How -- in what way would that

23   empower Anda to more effectively monitor for

24   suspicious orders?
```

```
 1            MS. CARDENAS:  Object to form.

 2            THE WITNESS:  It's just a field.  It's an

 3       understanding of who they are doing business

 4       with.

 5   BY MR. STOLTZ:

 6       Q.   Do you think it would be easier to monitor

 7   for suspicious orders if you knew how much the

 8   primary distributor was distributing to that shared

 9   customer?

10            MS. VAN TASSELL:  Object to form.

11            MS. KOSKI:  Object to form.

12            THE WITNESS:  There's people from the ceiling

13       talking.

14            Sorry.

15            Can you please clarify?

16   BY MR. STOLTZ:

17       Q.   Would you agree that it was difficult to know

18   your customer without having -- without knowing

19   exactly how much the primary distributor was

20   dispensing to them?

21            MS. CARDENAS:  Object to form.

22            THE WITNESS:  I don't think "difficult" is

23       the appropriate word.

24   ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. STOLTZ:

 2        Q.   And what word would you use?

 3        A.   It is -- knowing that we are secondary and

 4   understanding where our position is, I don't think

 5   it's difficult.  It's just what it is.

 6        Q.   But in your capacity as a secondary

 7   distributor, there would be information that you

 8   would be missing, right?

 9        A.   Yes, sir.

10        Q.   So this miscellaneous research, is this

11   miscellaneous research research regarding Rite Aid

12   and McKesson's suspicious order policies?

13             MS. KOSKI:  Object to form.

14             THE WITNESS:  Can you please clarify?

15             MR. STOLTZ:  Sure.

16   BY MR. STOLTZ:

17        Q.   And you can take your time to read this as

18   well.

19        A.   Okay.

20        Q.   But after you do read it, if you wouldn't

21   mind explaining the subject matter of this

22   miscellaneous research.

23             Does this research refer to Rite Aid and

24   McKesson's suspicious order monitoring policy?
```

```
 1      A.    It appears that -- that way.

 2      Q.    Okay.  Is Trifecta -- is Trifecta a program

 3  that Anda uses?

 4      MS. KOSKI:  Object to form.

 5  BY MR. STOLTZ:

 6      Q.    What is Trifecta?

 7      A.    I can't say.  I don't know.

 8      Q.    Is it something you are familiar with?

 9      A.    No, sir.

10      Q.    Is it something you ever used in your

11  employment with Anda?

12      A.    I'm not familiar.

13      Q.    What about NaviScript?  Is that something

14  that Anda -- or you ever -- you ever used while you

15  were at Anda?

16      A.    No, sir.

17      Q.    And NaviScript -- it says "NaviScript - Daily

18  Review."

19      It says:  District managers have access to 71

20  key performance indicators for data analysis to

21  identify suspicious activity ranging from third party

22  scripts, cash scripts, deleted scripts, deleted and

23  sold, filled script, sales, line voids, voids,

24  et cetera.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              This wasn't something that Anda loss

 2    prevention district managers used?

 3        A.   No, sir.

 4        Q.   Do you think it's something that McKesson

 5    loss prevention district managers used?

 6        A.   I can't say for certain.

 7              MS. VAN TASSELL:  Object to form.

 8    BY MR. STOLTZ:

 9        Q.   Do you know if Sabrina Solis ever worked for

10    McKesson?

11        A.   As far as my knowledge, no, she did not.

12        Q.   Do you have any idea why she would have

13    knowledge of the specific software used by McKesson

14    in --

15              MS. VAN TASSELL:  Object to form.

16    BY MR. STOLTZ:

17        Q.   -- in identifying suspicious activity?

18        A.   No, sir.

19        Q.   If we turn the page -- to Bates number 81553,

20    you will see store number at the top of a long list

21    of pharmaceuticals.

22              And is it accurate to say that they are

23    arranged by quantity, most to least?

24              MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  It appears it's descending

 2      order for total quantity dispensed.

 3   BY MR. STOLTZ:

 4      Q.   And what are the top two most dispensed

 5   pharmaceuticals from Store 11546?

 6      A.   It appears that they are oxycodone HCL

 7   1500-milligram tablet and oxycodone HCL 30-milligram

 8   tablet.

 9      Q.   Then on Bates number 81555, what is the top

10   most dispensed drug from that location?

11      A.   It appears it is oxycodone HCL 30-milligram

12   tablet.

13      Q.   And what was the total quantity dispensed?

     ██    ██    ████████

15      Q.   And then the next most dispensed product,

16   that's amphetamine.

17              How many -- what was the total quantity

18   dispensed there?

     ██    ██    ██████████████████    ████

     ██    ███████████████

21      Q.   Okay.  Please turn to Bates number 81558.  It

22   looks to be referring to Store 193.  The top-most

23   dispensed product is oxycodone 30 milligrams.

24              Is that accurate?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    It appears that way.

2        Q.    And then the next is tramadol?

3        A.    Yes, sir.

4        Q.    And then we have cough syrup, and then two

5    different, looks like, strengths of hydrocodone with

6    acetaminophen.

7              Is that accurate?

8        A.    Yes, sir.

9        Q.    On Bates number 81560, it refers to Store

10   Number 803.  It says that the top -- top-most

11   prescribed -- or, excuse me, dispensed drug is

12   Gabapentin, followed by Metformin, followed by

13   hydrocodone.

14             Is that accurate?

15       A.    Yes, it appears that way.

16       Q.    And then for RA Store 3182, bearing the Bates

17   number 81562, the top two most dispensed drugs are

18   oxycodone with acetaminophen, followed by hydrocodone

19   acetaminophen, followed by tramadol.

20             Is that accurate?

21       A.    It appears that way.

22       Q.    I know this is tedious.

23             Then Bates number 81564.  It says RA Store

24   3689.
```

```
 1              RA, does that stand for Rite Aid?

 2       A.    I believe so.

 3       Q.    And these store numbers, does that refer

 4    to -- what does that refer to?

 5       A.    That is their internal store number.

 6       Q.    Rite Aid's internal store number?

 7       A.    Yes.

 8       Q.    So for Rite Aid Store Number 3689, of the top

 9    five most dispensed drugs, four are opioids; isn't

10    that correct?

11              Oxycodone, oxycodone, oxycodone acetaminophen

12    10-325, and then oxycodone acetaminophen 5-325?

13       A.    It appears that way.

14       Q.    For Rite Aid Store 3782, let's look at the

15    top.

16              The most prescribed drug -- or dispensed drug

17    is Amoxicillin, followed by oxycodone acetaminophen,

18    followed by tramadol in the five spot with oxycodone

19    acetaminophen in the sixth spot and hydrocodone

20    acetaminophen in the eighth spot.

21              Is that accurate?

22       A.    It appears that way.

23       Q.    For Rite Aid Store 3157, the top-most

24    prescribed -- excuse me, dispensed drug is Albuterol,
```

1    followed by tramadol, which is an opioid, and

2    hydrocodone, then hydrocodone again, then Gabapentin,

3    and then oxycodone.

4         Is that accurate?

5    A.   It appears that way.

6    Q.   For Rite Aid Store 2346, the top two most

7    prescribed drugs are oxycodone acetaminophen and then

8    oxycodone 30-milligram respectively, followed by

9    oxycodone in the fourth most dispensed spot, with

10   tramadol at the fifth most, hydrocodone at the sixth

11   most, and oxycodone HCL 15-milligram in the seventh

12   most dispensed drug from that location.

13        Is that accurate?

14   A.   It appears that way.

15   Q.   For Rite Aid Store 4575, it looks like

16   tramadol is the most commonly dispensed drug in that

17   location, followed by Metformin -- followed by

18   oxycodone HCL 30-milligram in the fourth-most

19   dispensed drug, and then oxycodone in the fifth-most

20   dispensed drug, followed by oxycodone in the seventh

21   and the eighth with hydrocodone in the ninth-most

22   dispensed drug from that location.

23        Is that accurate?

24   A.   It appears.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Then Rite Aid Store 4706 -- and this is --

 2   this has a different line.  It has "Top 100 Products

 3   for Top 100 Stores."

 4             Was this the top 100 Rite Aid stores as far

 5   as total drugs dispensed, or is it referring to top

 6   100 in some other respect?

 7        A.   I'm sorry, I can't say for certain.

 8        Q.   Okay.  For Rite Aid Store 4706, tramadol is

 9   the second-most dispensed with oxycodone as the third

10   most, hydrocodone as the fifth most, with oxycodone

11   as the seventh, hydrocodone as the ninth, and then --

12             Is that accurate?

13        A.   Yes, it appears that way.

14        Q.   For Store 5232, hydrocodone is the most

15   dispensed drug, followed by hydrocodone acetaminophen

16   as the fourth-most, followed by Gabapentin, tramadol,

17   methadone, and oxycodone, in that order?

18        A.   Yes, sir.

19        Q.   For Store 5235, hydrocodone is the

20   second-most dispensed with tramadol as the fourth,

21   methadone as the fifth, oxycodone as the sixth,

22   hydrocodone as the seventh.

23             Is that accurate?

24        A.   It appears that way.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    For Store Number 5288, it looks like

 2   hydrocodone is the most commonly dispensed,

 3   pharmaceutical of any kind, followed by hydrocodone

 4   as the fourth-most and oxycodone as the sixth-most,

 5   then followed by tramadol as the seventh-most.

 6             Is that accurate?

 7        A.    Yes, it appears that way.

 8        Q.    For Store 5332, the top two most dispensed

 9   pharmaceuticals are both hydrocodone.

10             Is that accurate?

11        A.    Yes, sir.

12        Q.    And then oxycodone following up in the fifth-

13   and sixth-most dispensed drug?

14        A.    It looks like sixth and seventh, yes, sir.

15        Q.    Oh, okay.  Thank you.

16             For Store 6330, hydrocodone is the most

17   dispensed drug, followed by oxycodone and then

18   oxycodone again.

19             Is that accurate?

20        A.    Yes, it appears that way.

21        Q.    We're almost done, I promise.

22             And then Store 10437, the top three-most

23   dispensed drugs are all oxycodone.

24             Is that accurate?
```

```
 1        A.   Yes, it appears that way.

 2        Q.   After this -- you received this e-mail, did

 3   Anda -- did Anda distribute controlled substances to

 4   any of those stores?

 5             MS. KOSKI:  Object to form.

 6             THE WITNESS:  I can't say for certain.

 7   BY MR. STOLTZ:

 8        Q.   I want to show you what's been marked as

 9   Exhibit 14 -- not this one.

10             (Anda - Hall Exhibit 14 was marked for

11   identification.)

12             THE WITNESS:  Thank you.

13             MR. STOLTZ:  You got it?

14             MS. KOSKI:  Thank you.

15             MR. STOLTZ:  This is bearing the Bates number

16        of 132608.

17   BY MR. STOLTZ:

18        Q.   And is this an e-mail to you from Claude M.

19   Redd at the United States Department of Justice?

20        A.   Yes, it appears that way.

21        Q.   And he says he's the group supervisor with

22   the DEA in Louisville, Kentucky and was wondering why

23   your company has terminated Stanton Drug and KB

24   Pharmacy LLC as customers.
```

```
1              I was unsure if there was something that we
2    should know about due to their DEA registration that
3    they hold with us.
4              When you reported a suspicious customer,
5    would you just let the DEA know that you had
6    terminated your relationship with a particular
7    customer?
8              MS. KOSKI:  Object to form.
9    BY MR. STOLTZ:
10      Q.   What was -- what was -- what did you refer to
11   that document as being called?
12      A.   Customer Cutoff.
13      Q.   A Customer Cutoff?
14      A.   Yes, sir.
15      Q.   And that would be a spreadsheet?
16      A.   It's an Excel spreadsheet, yes, sir.
17      Q.   And what was included on that spreadsheet?
18      A.   Multiple tabs.  One referring to new
19   customers that were applying for controls with us
20   that we determined we didn't want to do business
21   with; a separate tab for existing customers that we
22   terminated doing controlled substance business with.
23      Q.   Was there any tab that included a reason as
24   to why Anda either chose not to do business initially
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with a customer or chose to cut off business with

 2    that customer?

 3        A.   At this time, I don't believe so.

 4        Q.   So he would have seen this Excel spreadsheet

 5    that sort of, amongst other things, includes this

 6    information that he has below his e-mail with, you

 7    know, the date -- I'm assuming that's when they were

 8    cut off -- along with -- what's that second number?

 9        A.   I can't be for certain, but most likely, that

10    is the internal Anda account number.

11        Q.   Okay.  And then that third number, what could

12    that be?

13        A.   That probably refers to their DEA

14    registration number.

15        Q.   Okay.  And then you reply:  Please excuse the

16    delay of this response.  I have been on this

17    vacation.

18             Or excuse me, you don't actually reply to

19    him, but you send to Michael Cochrane.

20             And what does the second paragraph say?

21        A.   After review, we determined that as a new

22    pharmacy Stanton Drug was dispensing high quantities

23    of oxycodone as well as there are -- as they are not

24    much mix -- much of a mix of control versus
```

```
 1    noncontrols in the top products.  Due diligence is

 2    attached under 151135.

 3        Q.   And then what does that third paragraph say?

 4        A.   KB Pharmacy stood out to us as a concern

 5    because of the ratio between the hydrocodone and

 6    testosterone against all other products dispensed.

 7             Due diligence is attached under 497669.

 8        Q.   So would you agree that one of the factors in

 9    determining whether or not a customer is suspicious

10    would be looking at the proportion of controls to

11    noncontrols?

12        A.   Yes.

13        Q.   Would you agree that -- would you agree that

14    the Rite Aid stores that we just referenced all had

15    high quantities of controls as their top products?

16             MS. KOSKI:  Object to form.

17             THE WITNESS:  It appears that way.

18    BY MR. STOLTZ:

19        Q.   But you are not aware if Anda continued to

20    distribute to any of these reports after this report

21    was put together by Sabrina?

22        A.   The Rite Aid report?  No, sir.

23             MR. STOLTZ:  Just for reference, the Bates

24        number of the -- of the last exhibit is 132608.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  That is Exhibit 14?

 2              MR. STOLTZ:  Yeah.

 3              Right?

 4              THE WITNESS:  Yes.

 5   BY MR. STOLTZ:

 6       Q.   Who is Howard Davis?

 7       A.   Howard Davis was an employee at Anda in 2011,

 8   I believe it was.

 9       Q.   Do you know when he left?

10       A.   He was there for approximately 90 days or so.

11   I don't have an exact date.  Maybe 2011.

12       Q.   He was only at Anda for 90 days?

13       A.   Yes, sir, I believe it was 90 days.

14       Q.   Do you recall why he left the company?

15       A.   It was a performance review at that 90-day

16   piece.

17       Q.   What is data waived?  Does that mean anything

18   to you?

19       A.   No, sir.  I'm not familiar.

20              MR. STOLTZ:  Can we take a break?

21              MS. KOSKI:  Sure.

22              THE VIDEOGRAPHER:  Off the record at 3:42.

23               (Recess from 3:42 until 3:59 p.m.)

24              THE VIDEOGRAPHER:  The time is 3:59 p.m.  We
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        are now back on the record.

 2   BY MR. STOLTZ:

 3        Q.   You mentioned earlier that the TPS or Remedy

 4   wouldn't always show notes as to why an account had

 5   been shut down for controlled substances, right?

 6        A.   You asked me if a -- if it -- if TPS notes

 7   would reflect that we reported it to the DEA, I

 8   believe.

 9        Q.   Okay.  Would those reports include whether or

10   not an account was shut down?

11             MS. KOSKI:  Object to form.

12   BY MR. STOLTZ:

13        Q.   Shut down with respect to controlled

14   substances?

15        A.   The Excel file that goes to the DEA?

16        Q.   No.

17             So I'm talking about -- I guess I'm talking

18   about TPS or Remedy -- I'm not sure but -- in Anda's

19   internal systems.  If there was a customer that was

20   turned off for controlled substances, the fact they

21   had been turned off for controlled substances, that

22   would be reflected on TPS?

23        A.   Yes, sir.

24        Q.   Would -- would the reason why they had been
```

```
 1    turned off be reflected on TPS?

 2         A.   It might not necessarily go into detail.

 3         Q.   So it would just be like a little blur over

 4    something sometimes?

 5         A.   Yes, sir.

 6         Q.   Why was there -- in SOP 40, why did you add a

 7    noncontrolled substance hold in 2015?

 8              MS. KOSKI:  It's Exhibit 4?

 9              THE WITNESS:  Four.

10              I can't say the specifics on why this was

11         added.

12    BY MR. STOLTZ:

13         Q.   Okay.  So when you were working on suspicious

14    order monitoring prior to Robert Brown coming on

15    board, that included -- that included order of

16    interest review process.

17              Did it also include control limit increase

18    process?

19         A.   Yes, sir.

20         Q.   And it also included whether or not to turn

21    on a customer for controls in the first place?

22         A.   Yes, sir.

23         Q.   And when somebody was initially turned on for

24    control, it would be turned on for 1,000 units?
```

```
 1        A.    Typically.

 2        Q.    What is a unit?  I mean, what does that refer

 3    to?  Is that like a pill bottle or --

 4        A.    So 1,000, in that family, they would be able

 5    to receive 1,000 tabs, let's say.  So a tab -- if a

 6    bottle is 100 -- or 500 in a bottle, they will be

 7    able to receive two bottles.

 8        Q.    Okay.  Was that ever -- was that always

 9    just -- so you're kind of on both ends of the -- you

10    know, on one hand, you are doing this in 2012, and

11    then you take over for Robert Brown on a temporary

12    basis in 2017?

13        A.    Yes, sir.

14        Q.    Do you recall when he was fired?

15              MS. KOSKI:  Object to form.

16    BY MR. STOLTZ:

17        Q.    When was Robert Brown fired?

18              MS. KOSKI:  Object to form.

19              THE WITNESS:  He was laid off in -- around

20        January-ish -- January/February 2017.

21    BY MR. STOLTZ:

22        Q.    Okay.  When you were running controlled

23    substance compliance in 2012, "units" referred to

24    tabs.
```

```
 1              Did they refer to tabs in 2017?

 2      A.   Yes, sir.

 3      Q.   Was there ever any consideration given to the

 4   actual strength of the tabs?  So, for example, would

 5   oxycodone 30-milligram be in the same family as

 6   oxycodone 15-milligram?

 7      A.   The same family, the chemical family, yes,

 8   sir.

 9      Q.   Okay.  So I could -- I could -- if I was a

10   customer and I had a limit of 1,000 tabs, I could

11   buy, for example, 1,000 oxycodone 30 milligrams or I

12   could order 1,000 oxycodone 15-milligram, but both of

13   those would -- either would reach my limit, right,

14   even though one is twice as much of the chemical as

15   the 15-milligram?

16              MS. KOSKI:  Object to form.

17              THE WITNESS:  The chemical family, yes.

18   BY MR. STOLTZ:

19      Q.   So 1,000 tabs is not very much.

20              MS. KOSKI:  Object to form.

21   BY MR. STOLTZ:

22      Q.   Would customers ever be given more than

23   1,000 -- what was the purpose for such -- such a

24   low -- a low threshold to start?  I mean, was there
```

1    ever a process where someone could have a threshold

2    that was much higher -- much higher on the front end?

3            MS. KOSKI:  Object to form.

4            THE WITNESS:  We typically started with

5        1,000, especially with new customers, until we

6        could get a feel for what their business is and

7        how they were going to utilize Anda.

8    BY MR. STOLTZ:

9        Q.   Okay.  Were -- did you ever treat thresholds

10   differently with -- if you were a primary distributor

11   as opposed to a secondary distributor?

12           MS. KOSKI:  Object to form.

13           THE WITNESS:  If we were a primary, our -- it

14       would all depend on the due diligence, the

15       dispensing data, where that -- what that customer

16       was doing, and the bigger picture.

17   BY MR. STOLTZ:

18       Q.   Okay.  But there were times when Anda was a

19   primary across the board -- was -- was Anda ever the

20   primary distributor across all chemical families?

21       A.   I can't say for sure that we were.

22       Q.   But were there times when Anda was the

23   primary with respect to a certain chemical family?

24       A.   Yes, I believe so.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.

2              (Anda - Hall Exhibit 15 was marked for

3        identification.)

4        BY MR. STOLTZ:

5        Q.    I'm going to show you what's been marked as

6        Exhibit 15, bearing the Bates of

7        Anda_Hall_Personnel_001.

8        A.    Yes, sir.

9              MS. KOSKI:  Thanks.

10             MR. STOLTZ:  I'm sorry I don't have an

11             additional copy.  I'm happy to put it on the

12             ELMO.

13             MS. KOSKI:  And for the record, we have

14             produced this with a temporary Bates so that we

15             could get it to you quickly, but it will be

16             produced in the normal course as part of a bigger

17             production, just for people reading the

18             transcript.

19       BY MR. STOLTZ:

20       Q.    So this is at least a portion of your

21       personnel file, right?

22       A.    Yes, it appears so.

23       Q.    The performance reviews only start in 2016.

24             Did you get performance reviews prior to
```

```
 1    2016?

 2        A.    Yes, sir.

 3        Q.    What's a brand service program?

 4        A.    Brand service program is a support function

 5   that we provided for our parent company, helping them

 6   get distributions for some of their samples as well

 7   as the prescription assistance program.

 8        Q.    And what is EDI?

 9        A.    EDI is an Electronic Database Interchange.  I

10   believe that's what it stands for.

11        Q.    What is NTIS data?

12        A.    NTIS is a service that the DEA uses for

13   national -- I'm sorry, I'm not even going to do the

14   abbreviation.

15        Q.    Sure.

16        A.    I'm not really sure.

17              It's a DEA service that -- where you can go

18   and validate DEA registrations.

19        Q.    Okay.  And it has your goal here in, I guess,

20   2016:  Management and creation of an exception bucket

21   that houses all variances between NTIS data feed

22   and TPS customer master.

23              What does that mean?

24        A.    So that is basically we were trying to at
```

1    this point go to an automated where NTIS was feeding

2    us data on a daily basis to give us validation on DEA

3    registrations.  So it would come into our system, and

4    then an exception bucket would be something that's

5    not matching that somebody would manually go in and

6    review.

7         Q.   Okay.  Do you remember why the Groveport,

8    Ohio facility was closed?

9         A.   We transitioned that facility to Olive

10   Branch, Mississippi because they were closer to the

11   FedEx hub.

12        Q.   And when it came to regulatory compliance,

13   did the regulatory compliance department ever have an

14   employee located at the warehouses, whether that was

15   in Groveport or Mississippi?

16        A.   No, we did not have somebody from compliance

17   at either of those facilities.

18        Q.   What was -- what was the virtual warehouse

19   system?  Did you have any familiarity with the

20   virtual warehouse at Anda?

21        A.   No, sir.

22        Q.   And who was your supervisor?  Was that

23   Jay Spellman?

24             MS. KOSKI:  Object to form.

```
 1                THE WITNESS:  At which time?

 2   BY MR. STOLTZ:

 3        Q.   2016.

 4        A.   Yes, sir.

 5        Q.   And what was his title?

 6        A.   I believe his title is executive director on

 7   distribution and compliance.

 8        Q.   Did he eventually -- who eventually took on

 9   Robert Brown's role?

10        A.   Sabrina Solis.

11        Q.   Okay.  Was there ever a time that

12   Jay Spellman took on that role?

13        A.   Not directly, but he oversaw the whole

14   department.

15        Q.   Was -- what's the -- how's the new automated

16   program?

17        A.   So we receive a feed on a weekly basis that

18   shows us -- a third-party company goes out to each of

19   the different boards and validates licensure, and

20   then they send it to us in an automated feed weekly.

21        Q.   Okay.  But prior to that, it was all done

22   sort of manually?

23        A.   Yes, sir.

24        Q.   2017, it has some of your tasks here?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Can you just tell us what page

 2       number you are on?

 3              MR. STOLTZ:  Yeah.  Eleven.

 4              MS. KOSKI:  Thank you.

 5    BY MR. STOLTZ:

 6       Q.   It says:  Increase production and analytical

 7    thinking in regards to controlled substance decisions

 8    while maintaining strict and thorough DEA compliance,

 9    while recognizing the need to increase customer

10    sales.

11              Was this -- is this included here because

12    Robert Brown was no longer at -- at Anda?  Why in

13    2017 were you -- were one of your tasks focused on

14    controlled substance decisions while in other years

15    it seems to be focused on licensure?

16       A.   2017, Robert Brown was laid off from the

17    company, and I took an interim role until

18    Sabrina Solis came on full time in December of 2017.

19       Q.   So about how long were you in that role?

20       A.   Around January/February to December.

21       Q.   Okay.  So almost a whole year?

22       A.   Yes, sir.

23       Q.   What was Med Pro?

24       A.   I'm sorry?
```

1      Q.    Med Pro.

2      A.    Med Pro is the company -- the third-party

3   company that we used for the -- that -- automated --

4   licensure automation, excuse me.

5      Q.    What was the Vendor Master cleanup

6   initiative?

7      A.    The Vendor Master cleanup is working with our

8   vendors to get them to provide us corrected business

9   records.  So who they are shipping it to, who they

10  sold it to, the four -- the four whos:  Who they are

11  selling it to, who they are shipping it to, who sold

12  it to us, and who is shipping it to us.

13     Q.    So when this was written, was Anda a hundred

14  percent compliant with all vendor relationships and

15  state laws?

16          MS. KOSKI:  Object to form.

17          And instruct you not to answer to the extent

18     it calls for a legal conclusion, I think, at the

19     end, although I didn't understand the question.

20          You may want to restate the question.

21          I would instruct her not to -- if you didn't

22     intend to do that, then I would object as to

23     form.

24  ///

```
1      BY MR. STOLTZ:

2          Q.   Did you complete Task 1.3?

3          A.   Yes.

4               So we're actually working with the Florida

5      Business and Professional Regulation; that's who

6      oversees our licensure in the state of Florida.  And

7      we have partnered with them to basically get -- pass

8      this information on industry-wide.  We're their

9      guinea pig.

10         Q.   I'm not sure I understand.

11              Their guinea pig as far as --

12         A.   Maybe that was not the right choice of words.

13         Q.   So what do you mean by guinea pig?

14         A.   We've partnered with them to work with the

15     industry.  So apart from Anda, this is industry-wide

16     to help everyone, educate them on the Florida

17     regulations.  So whoever is selling to us and

18     shipping to us has to oblige by these rules because

19     they are shipping into the state of Florida.

20         Q.   Okay.  So when it says "state law," it is

21     referring to Florida law?

22         A.   Yes, sir.

23         Q.   It is not referring to any other state law?

24         A.   As far as I know, it's our relationship with
```

```
 1    Florida.

 2            (Anda - Hall Exhibit 16 was marked for

 3    identification.)

 4    BY MR. STOLTZ:

 5       Q.   I want to show you what's been marked as

 6    Exhibit 16 --

 7       A.   Thank you.

 8       Q.   -- bearing the Bates number 136372.  And this

 9    was back when Howard Davis was still with Anda.

10            MS. KOSKI:  Could we get a copy?

11            MR. STOLTZ:  Yeah.  Sorry about that.

12    BY MR. STOLTZ:

13       Q.   Now, at this time in December of 2011, was

14    Howard Davis in charge of controlled substance

15    compliance?

16            MS. KOSKI:  Object to form.

17    BY MR. STOLTZ:

18       Q.   What was Howard Davis's role?

19       A.   He was hired to oversee DEA analysts.

20       Q.   Okay.  So he had the position that

21    Robert Brown ended up getting hired for?

22       A.   Yes, sir.

23       Q.   And this is from an e-mail from Howard Davis

24    to Patricia Williams and yourself as well as
```

Highly Confidential - Subject to Further Confidentiality Review

1    Michael Cochrane and Sabrina Solis.  And the subject

2    is a drugstore in Columbus, Ohio, Store 802433.

3           Do you know what 802433 refers to?  I mean,

4    obviously it refers to the drugstore.  Is that an

5    internal Anda number?

6       A.   Most likely it's an Anda.  It refers down

7    below.  It says TPS number.  That would be our

8    internal customer number.

9       Q.   Oh, okay.  I see.

10          And Pat Williams, she was in sales, right?

11      A.   Pat Williams oversaw the sales department.

12   I'm not sure what her title was.

13      Q.   And sales, they would typically have access

14   to TPS?  Did they have access to Remedy as well, or

15   they would only be able to make opportunity -- like,

16   create opportunities that would be kicked up to

17   someone else through Remedy?

18          MS. KOSKI:  Object to form.

19          THE WITNESS:  So they would be able to go

20      into Remedy and create an opportunity, a task.

21   BY MR. STOLTZ:

22      Q.   But they wouldn't necessarily be able to --

23   to access Remedy?

24      A.   (Nodding head.)

1    Q.    They would be able to?

2    A.    Yes, sir.

3    Q.    So when she's saying can we find out why this

4    account was suddenly cut off from buying controls, is

5    that the type of information that would be included

6    in TPS or Remedy?

7    A.    So there's -- in TPS, there's separate

8    sections.  There's the customer review where a sales

9    rep can see the notes on a customer, and then there's

10   private compliance notes.  So there would have been

11   notes in TPS.

12         If at this time we had Remedy up and going --

13   I'm not sure if we did in December 2011, probably --

14   then there would have been -- the customer -- I mean,

15   excuse me, the rep would have sent us an opportunity.

16   Q.    Okay.  And then Howard Davis sends back to

17   Patricia Davis and you and Michael Cochrane and

18   Sabrina Solis how the drugstore pharmacy in Columbus,

19   Ohio had a suspicious ordering pattern that would

20   have been difficult to defend if the DEA came in and

21   asked about it.

22         The account was turned off from controlled

23   substances on December 5th, 2011.  I regret any

24   confusion that you were not notified

Highly Confidential - Subject to Further Confidentiality Review

1    contemporaneously of this action.

2         Was sales usually notified contemporaneously?

3    A.   Through opportunities.  So if a rep submits

4    an opportunity for an increase or a new customer, the

5    task goes back to them once we close it.

6    Q.   And at this time in 2011, December of 2011,

7    you were working with controlled substance

8    compliance; is that accurate?

9    A.   That was part of my responsibility, yes.

10   Q.   And was it your understanding at that time

11   that it was -- it was your responsibility to report

12   suspicious customers to the DEA?

13   A.   Yes, sir.

14   Q.   And if a pharmacy had a suspicious ordering

15   pattern that would be difficult to defend if the DEA

16   came and asked about it, would that be a suspicious

17   customer to you?

18   A.   Based on this information, what he's saying

19   here with his recap, yes.  But I don't know.  I don't

20   know this customer.

21   Q.   Do you know if this drugstore was ever

22   referred to the DEA as a suspicious customer?

23   A.   No, I don't know, sir.

24   Q.   Do you know if it was the policy of Anda to

Highly Confidential - Subject to Further Confidentiality Review

1    report suspicious customers contemporaneously with

2    turning off a customer from controlled substances?

3        A.   Yes, that was the policy at Anda.

4        Q.   Was that the policy in December of 2011?

5        A.   Yes, sir.

6             (Anda - Hall Exhibit 17 was marked for

7    identification.)

8             MR. STOLTZ:  I'm going to show you what's

9        been marked as Exhibit 17, bearing the Bates

10       number of 133103.

11            THE WITNESS:  Thank you.

12            MS. KOSKI:  Thank you.

13   BY MR. STOLTZ:

14       Q.   This e-mail chain starts in November of 2011.

15   And at that time you were working -- one of your

16   responsibilities was controlled substance

17   compliance -- was one of your responsibilities

18   controlled substance compliance in November of 2011?

19       A.   Yes, sir.

20       Q.   And the subject of the initial e-mail is

21   "Need Info."  Why is it that Sabrina needed info on

22   this list of pharmacies?

23       A.   I can't say for certain.  I'm not familiar

24   with these customers.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Sure.

 2              It looks like she's asking specifically for

 3    dispensing data on the pharmacies she lists below,

 4    and then lists a number of pharmacies in the Ohio

 5    area, at least a few of them.

 6              Then Sabrina sends an e-mail to both you and

 7    Michael Cochrane as well as Valerie J. Nemia.

 8              And -- was Valerie, was she -- was she an

 9    employee at Anda?

10        A.    Valerie Nemia, yes.

11        Q.    What was her position?

12        A.    Sales.  I don't know her exact title.

13        Q.    Yeah, she was the sales manager.  There was

14    different -- there was different reps.  Okay.

15              Based on Sabrina's e-mail, it says -- she

16    says to Valerie:  We removed controls to the accounts

17    below due that no dispensing data was provided for

18    review.

19              Does this mean that these accounts had --

20    were able to order controls from Anda despite the

21    fact that no dispensing data was provided?

22              MS. KOSKI:  Object to form.

23    BY MR. STOLTZ:

24        Q.    Were customers -- were those customers able
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    to order controls without providing dispensing data

2    to Anda?

3         A.   I can't know for certain.

4         Q.   It says here that no dispensing data was

5    provided and that controls were removed as a result.

6    It says:  Controls were removed due to the fact that

7    no dispensing data was provided.

8              So would you agree that the reason that

9    controls were shut off was because no dispensing data

10   was provided for the listed stores?

11        A.   I can't say what we had on file for them.

12        Q.   I'm not asking, you know, what you had in

13   general or the -- all the information you had.  But

14   can't you agree that there was no dispensing data?

15        A.   I can agree that she is saying that they did

16   not send dispensing data based on her November 1st

17   request, but I can't agree that there was nothing on

18   file for them.

19        Q.   Of course.

20             But at the very least, there was no

21   dispensing data on file for them?

22        A.   No, sir.

23        Q.   Are you saying there was no dispensing data?

24        A.   No.  I'm saying I can't say that.  I don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    know.

2         Q.   What does "no dispensing data" mean to you?

3         A.   Well, reading her sentence, she's saying they

4    did not send the dispensing data for -- provided.  So

5    for review based on her November 1st request.

6         Q.   So if they didn't have to send dispensing

7    data, how would Anda have dispensing data?

8         A.   I can't say what they had on file prior to

9    November 1st.  Maybe they had dispensing data on file

10   in a due diligence file.

11              She requested it November 1st.  And then it

12   appears that on December 6th she said she was going

13   to be turning them off because they did not provide

14   her dispensing data.

15        Q.   It looks like at least Bi-Mart was a

▮    ████████████████████████████████████████████

17   Shannon says in this e-mail chain.  And then

18   William Versosky pipes in later to Michael Cochrane,

19   and he says:  Based on the size of this chain, I need

20   this treated as very high priority.  The note says

21   that the account was shut off due to not having a

22   dispensing report.

23              Is he referring to the lack of dispensing

24   data that Sabrina Solis refers to when she cut off
```

1    controls to Bi-Mart?

2        A.    It appears that way.

3        Q.    Please let me know if there's something else

4    happening and any updates you can.

5            MS. KOSKI:  Is that a question for the

6        witness?

7            MR. STOLTZ:  No.  I'm sorry.

8    BY MR. STOLTZ:

9        Q.    Then Michael Cochrane replies to William

10   Versosky:  Take a look at the attached file that is

11   their October data.  Their numbers don't look good

12   with us or in general.  This was also an account that

13   the Columbus DEA asked us for information on during

14   an audit earlier this year, dot, dot, dot.

15           I'm not sure if they were being watched, but

16   I can definitely tell you we are.  There's some other

17   chains we should take controlled substances --

18   substance access away from as well.

19           Was the purpose of taking controlled

20   substance access away to avoid repercussions from the

21   DEA or was that to prevent diversion?

22           MS. KOSKI:  Object to form.

23           You are asking her what Michael Cochrane

24       means?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. STOLTZ:  What her interpretation of what

 2       he meant.

 3              THE WITNESS:  I can't say.

 4   BY MR. STOLTZ:

 5       Q.   Was it your feeling that Anda was being

 6   watched in 2011 -- December of 2011?

 7       A.   No, sir.

 8       Q.   When he's saying "being watched," is he

 9   referring to the DEA?

10       A.   I can't say, sir.

11              THE WITNESS:  I think it's time for all of us

12       to take a cruise.

13              MS. KOSKI:  That's a kind of torture that you

14       have to look out the window at the cruise ships

15       coming in and out.

16              THE WITNESS:  They're going on vacation.

17              MR. STOLTZ:  What's that?

18              THE WITNESS:  The cruise ships.

19              MR. STOLTZ:  I promise you, we're almost

20       finished.

21              THE WITNESS:  Great.  Thank you.

22   BY MR. STOLTZ:

23       Q.   Were you aware of the large fines that the

24   DEA imposed on Cardinal and McKesson and other
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributors?

 2              MS. CARDENAS:  Object to form.

 3              MS. VAN TASSELL:  Object to form.  This is

 4         Rebecca Van Tasell.

 5              MS. KOSKI:  You can answer.

 6              THE WITNESS:  Just general from the news.

 7              MR. STOLTZ:  Just a couple more documents and

 8         we'll get out of here.

 9    BY MR. STOLTZ:

10         Q.    Who is Mezanne Moo Young?

11         A.    Mezanne Moo Young works in our procurement

12    department for nontrade items.

13              MR. STOLTZ:  Just two more documents.

14              I'll show you what I'll mark as Exhibit 18.

15         It's bearing the Bates numbers 313264.

16              (Anda - Hall Exhibit 18 was marked for

17    identification.)

18              MS. KOSKI:  Thank you.

19    BY MR. STOLTZ:

20         Q.    And this is an e-mail from Johnny Kincaide

21    on -- sent to you and others, and it's in regards to

22    an EPIC Account, 210466.

23              And EPIC was a buying group, right, or a

24    purchasing alliance or --
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1        A.   A buying group, yes, sir.

 2        Q.   Okay.  And 210466, that refers to the buying

 3   group or to a specific account within that buying

 4   group?

 5        A.   I assume that that 210466 is tied to a

 6   specific pharmacy -- a pharmacy customer.

 7        Q.   And who was John Kincaide?

 8        A.   John Kincaide was a DEA analyst.

 9        Q.   So Rachelle Vance, she was a sales rep, or

10   what was her role at Anda?

11        A.   Rachelle Vance is a national accounts.

12        Q.   National accounts?

13        A.   Sales.  I don't remember if she's a manager

14   or director, but she worked in the national account

15   department.

16        Q.   And I guess one of her accounts was EPIC?

17        A.   Yes, it appears so.

18        Q.   And you get involved to the e-mail chain, and

19   it's because, I guess, Rachelle Vance has looped you

20   in to EPIC account requesting a control limit

21   increase, right?

22        A.   It appears that John Kincaide forwarded me

23   the e-mail.

24        Q.   Oh, okay.  And you say:  I think my team and
```

Highly Confidential - Subject to Further Confidentiality Review

1    I are feeling a bit confused on why this has become

2    an issue.

3            What is the issue and why -- do you recall

4    why your team was feeling confused?

5        A.   No, I'm not certain.  No, sir.

6        Q.   It says here that an increase was granted and

7    we requested updated data despite no additional data

8    coming in since July 2014.

9            Was it common to grant increases without new

10   data on file?

11           MS. KOSKI:  Object to form.

12   BY MR. STOLTZ:

13       Q.   This occurred in October of 2017, and it says

14   here the last data that came in from EPIC was 2014.

15           Is this consistent with Anda's standard

16   operating procedures with respect to control limit

17   increases?

18       A.   It varies, customer to customer.

19       Q.   And was -- do -- I suppose to buying groups,

20   to -- how does it vary?  Based on specific customers?

21   Or does it vary based on trade classes?

22       A.   It varies on customer.

23       Q.   So each customer gets treated a little bit

24   differently?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2   By MR. STOLTZ:

 3        Q.   Why would you treat customers differently?

 4        A.   Depending on how often they order from us,

 5   how many times their orders hitting in our order of

 6   interest bucket.  Variables.

 7        Q.   Why would -- why would how often they order

 8   from Anda be relevant to whether or not an increase

 9   in controls is granted?

10        A.   I'm not clear on your question.

11        Q.   You said that one of the ways -- the reasons

12   customers were treated differently could depend on

13   how often they order from Anda.

14              My question is:  Why would the frequency of

15   their orders from Anda be relevant when deciding

16   whether or not to increase a control limit?

17        A.   So somebody that hasn't done business with us

18   in six months, seven months, or very minimal would be

19   treated a little bit different than somebody --

20   possibly could be treated a little bit different than

21   somebody who was buying -- purchasing from us every

22   day.

23        Q.   Would a customer -- a frequent customer be

24   granted increases -- if a -- if a customer frequently
```

```
 1    ordered from Anda, would they be more likely to get a

 2    control limit increase --

 3              MS. KOSKI:  Object to form.

 4    BY MR. STOLTZ:

 5         Q.   -- upon request?

 6              MS. KOSKI:  Sorry.  Object to form.

 7              THE WITNESS:  Not necessarily, no.

 8    BY MR. STOLTZ:

 9         Q.   But it would be relevant in deciding whether

10    or not a controlled limit increase would be granted

11    to that customer upon their request?

12         A.   Each customer would be handled differently.

13    It would vary.

14         Q.   And is this the same EPIC buying group that

15    hadn't supplied dispensing data back in 2012, 2011?

16              MS. KOSKI:  Object to form.

17    BY MR. STOLTZ:

18         Q.   We discussed EPIC a little bit earlier when

19    we were going over buying groups?

20         A.   Yes, sir.

21         Q.   And there was an instance in which they

22    hadn't provided any data, whether -- they either

23    didn't provide any data or they provided piecemeal

24    data, and they were ordering quite a bit -- a high
```

```
 1    level of controls.

 2            Is that the same EPIC buying group, or is

 3    this a different EPIC buying group?

 4            MS. KOSKI:  Object to form.

 5            THE WITNESS:  I don't remember our original

 6        conversation, but EPIC wouldn't be providing us

 7        data.  It would be the individual pharmacy.

 8            MR. STOLTZ:  Sure.

 9    BY MR. STOLTZ:

10        Q.  So despite not having any data since

11    July 2014 and not being reviewed since January of

12    2015, this request by this particular EPIC account

13    for an increase in their control limit was granted?

14        A.  I'm not sure it says that.

15        Q.  I think the second to last sentence of the

16    first paragraph says the increase was granted and we

17    requested updated data.

18        A.  The specific customer has been reviewed

19    since -- has not been reviewed since January 2015.

20    No additional information has been requested since

21    July 2014.  It is geographically located in a high

22    abuse area.  The increase was granted and we

23    requested updated data.

24            I don't know if that's referring back in 2015
```

```
 1    or 2014.  I can't say for certain.

 2         Q.   The increase -- you're not sure whether or

 3    not -- I'm just trying to understand what you are

 4    unsure of.

 5              The increase was granted.  You're not sure if

 6    that refers to something that happened in 2015 or

 7    2014?

 8         A.   Correct.

 9         Q.   It looks like this particular store sends --

10    excuse me, Rachelle Vance, who is the director of

11    account management -- one of her accounts is EPIC --

12    it looks like she asked John Kincaide, who was a part

13    of -- he was a compliance analyst?

14         A.   Yes, sir.

15         Q.   She says:  Let us know what you will need to

16    increase limits.

17              And that was in October of 2017, right?

18              Is that what she asks?

19         A.   I'm sorry.  I was on the wrong page.

20              Yes.  Yes, sir.

21         Q.   Okay.  So back to your contribution to this

22    e-mail chain.

23         A.   Sure.

24         Q.   When you say the increase was granted, is
```

Highly Confidential - Subject to Further Confidentiality Review

1    that referring to the latest request for an increase

2    in 2017?

3        A.   I can't say for certain based on the wording

4    of this.  I don't -- I can't recall.

5        Q.   I think my team and I are feeling a bit

6    confused on why this has become an issue.

7             It seems that the issue is that Jeff Sherr,

8    president of EPIC, is telling Rachelle:  I don't

9    understand.  We just gave you dispensing data.  We

10   can't continue to do business this way.

11       A.   I don't recall.  I don't remember this

12   e-mail.

13       Q.   Okay.

14       A.   So I can't say what the -- what we were

15   confused about.

16       Q.   So you -- you're -- you think that when

17   you're saying the increase was granted in an e-mail

18   chain about an increase that was just granted on

19   October 2nd of 2017, you were referring to events

20   that are not referenced anywhere in this e-mail chain

21   that occurred in 2014 or 2015?

22            MS. KOSKI:  Object to form.

23            THE WITNESS:  It appears -- it appears I'm

24       giving a recap of what occurred in 2015 and 2014,

1        and then after that, stating the increase was

2        granted.  But I don't know.  I'm sorry, I don't

3        know.

4    BY MR. STOLTZ:

5        Q.   And then you say:  This is not unusual or out

6    of the normal business procedures that are in place.

7             Was it not unusual for out of the normal

8    business procedures to grant an increase for

9    controlled substances with -- without review for

10   several years?

11       A.   Again, I don't know the dates.

12       Q.   You weren't working in controlled substance

13   compliance in 2015 or 2014, right?

14       A.   No, sir.

15       Q.   And you weren't in charge of increasing

16   limits in 2014 or 2015 or even 2016, right?

17       A.   No, sir.

18       Q.   But you were in 2017, which is when this

19   e-mail chain occurs, right?

20       A.   Yes, sir.

21       Q.   So when you say the increase was granted, you

22   have to be referring to 2017, right?

23            MS. KOSKI:  Object to form.

24   ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STOLTZ:

 2        Q.   How would you have any knowledge of 2014 or

 3    2015 as far as increases being granted or why those

 4    increases were granted?

 5        A.   We capture notes in our internal system, TPS.

 6    But, again, I can't say for certain about these

 7    specific cases.

 8        Q.   Do you think it's possible that you're

 9    confused because the customer is complaining while

10    getting what he asked for, which was an increase in

11    control limits?

12        A.   Can you please clarify?

13        Q.   Was it confusing to you that the customer was

14    upset about having to provide dispensing data even

15    though that customer got precisely what he asked for,

16    which was an increase in his control limit?

17        A.   Again, I don't remember why we were confused

18    at that point.  I do not recall this e-mail.

19        Q.   Why would -- why would whether or not an

20    increase was granted when you were not working in

21    controlled substance compliance, why -- in what way

22    would that respond to Rachelle Vance's concern that

23    Jeff S. was upset about giving dispensing data?

24        A.   It appears I was just giving a recap.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    You're giving a recap of events that occurred

2    when you were not working in controlled substance

3    compliance in response to an e-mail chain that is

4    referencing only events that happened in 2017?

5         A.    It appears I was giving a recap of that

6    customer history with the compliance department.

7         Q.    And that customer, how long had they been a

8    customer?  Since July of 2014 or prior?

9         A.    I can't say for certain, sir.

10        Q.    If you were giving a history of this

11   account's relationship with compliance, why is there

12   no mention of when the specific customer started

13   ordering from Anda?

14        A.    I don't know, sir.

15        Q.    Has EPIC been an account since long before

16   July 2014?

17              MS. KOSKI:  Object to form.

18   BY MR. STOLTZ:

19        Q.    Wasn't EPIC an account when you were with

20   regulatory compliance -- or, excuse me, in controlled

21   substance compliance in 2011, 2012?

22        A.    EPIC is not an account.

23        Q.    EPIC is a buyer's club.

24              Was that a buying club that Anda distributed
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    controlled substances to when you were working with

2    controlled substance compliance in 2011 and 2012?

3              MS. KOSKI:  Object to form.

4              THE WITNESS:  I can't say for certain.

5    BY MR. STOLTZ:

6         Q.   So would you please look at Exhibit 3 for me,

7    please.  And that was bearing Bates number 711634.

8              This is in reference to EPIC accounts, right?

9    Also IPA NJ buying groups?

10        A.   In reference to EPIC, yes, sir.

11        Q.   And that was in July 29th of 2013?

12        A.   Yes, sir.

13        Q.   And the fact that -- the fact that many of

14   these accounts don't have a questionnaire or

15   dispensing data on file and that many of the accounts

16   within the groups purchased a high volume of controls

17   back in July of 29th, 2013, that -- that wasn't part

18   of the recap that you're saying this e-mail sent out

19   on October 28th of 2017, that you wouldn't have

20   included that?

21             MS. KOSKI:  Object to form.

22             THE WITNESS:  I can't say for certain when

23        this account came on board and then they joined

24        the EPIC buying group.
```

```
 1   BY MR. STOLTZ:

 2       Q.   It says here that Jeff Sherr is the president

 3   of EPIC.

 4            MS. KOSKI:  Is that a question?

 5            MR. STOLTZ:  Yeah.

 6   BY MR. STOLTZ:

 7       Q.   Do you know if he was the president of EPIC

 8   in 2013?

 9       A.   No, sir, I'm not aware.

10       Q.   Is that an elected position?

11            MS. KOSKI:  Object.

12            THE WITNESS:  I'm not -- I'm not aware.

13            MR. STOLTZ:  My last exhibit, Exhibit 19.

14            (Anda - Hall Exhibit 19 was marked for

15   identification.)

16            THE WITNESS:  Thank you.

17            MS. KOSKI:  Thank you.

18            MR. STOLTZ:  And this has the Bates

19   number 150162.

20   BY MR. STOLTZ:

21       Q.   So it looks like Davis Lemoine -- I'm not

22   sure how to pronounce that -- contacted Mr. Gatto at

23   Anda.  Mr. Gatto, he was in compliance, right?

24       A.   Yes, sir.
```

```
 1        Q.    Was he a compliance analyst?

 2        A.    Yes, sir.

 3        Q.    And David Lemoine, according to this e-mail,

 4   is a divergent investigator for the Drug Enforcement

 5   Administration.

 6              And he says that:  As per our conversations

 7   earlier today, in September 2015, when he received an

 8   updated list of customers not eligible to purchase

 9   controls from Anda.

10              This is September 2015.  Is he referencing

11   the Customer Cutoff Excels that you had sent to the

12   DEA?

13        A.    I would believe so.

14        Q.    It looks like the Customer Cutoff Excel would

15   also include reasons -- or, excuse me, the e-mail

16   included with the list stated the determinations were

17   not based on suspicious orders but rather the receipt

18   and review of additional information, including

19   updated dispense data.

20              The Customer Cutoff Excel, was that -- was

21   that sort of in the same line of reporting a

22   suspicious customer as opposed to reporting

23   suspicious orders?

24        A.    It was both.  So it started off initially as
```

Highly Confidential - Subject to Further Confidentiality Review

1    a suspicious customer, and when there was suspicious

2    orders, those were added to that list as well.

3        Q.   So these orders -- or, excuse me, these

4    customers were suspicious but not -- not because of

5    their suspicious orders but rather receipt and review

6    of additional information?

7            MS. KOSKI:  Object to form.

8            THE WITNESS:  I can't say if -- which

9        customers he's specifically referring to.

10   BY MR. STOLTZ:

11       Q.   Could a customer be suspicious in the absence

12   of suspicious orders from a regulatory controlled

13   substance compliance?

14       A.   Yes, sir.

15       Q.   What are some ways in which a customer could

16   be suspicious in the absence of suspicious orders

17   with respect to controlled substance compliance?

18       A.   A new account review.  So this -- a new

19   account review as well as an increase -- internal

20   increase request.

21       Q.   So -- so a customer -- you could determine

22   whether or not a customer was suspicious without ever

23   actually delivering an order to that customer?

24       A.   Yes, sir.

```
 1          Q.    Okay.  And that would be based on the

 2     dispensing data that they provided you?

 3          A.    The due diligence, yes, sir.

 4          Q.    Okay.

 5                MR. STOLTZ:  I have no further questions.

 6                MS. KOSKI:  I don't have any questions.

 7                MS. CARDENAS:  No questions on my end.

 8                MS. KOSKI:  Any questions from anyone on the

 9     telephone?

10                I think we're good.

11                THE VIDEOGRAPHER:  The time is 5:20 p.m.  We

12     are going off the record.  This marks the end of

13     the deposition.

14                (Whereupon, the deposition concluded at

15     5:20 p.m.)

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               C E R T I F I C A T E

 2

 3            I, KELLY J. LAWTON, Registered Professional

 4    Reporter, Licensed Court Reporter, and Certified

 5    Court Reporter, do hereby certify that, pursuant to

 6    notice, the deposition of EMILY HALL was duly taken

 7    on January 22, 2019, at 9:15 a.m. before me.

 8            The said EMILY HALL was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness.

16

17            _____

18            KELLY J. LAWTON, RPR, LCR, CCR

19

20            (The foregoing certification of this

21    transcript does not apply to any reproduction of the

22    same by any means, unless under the direct control

23    and/or supervision of the certifying reporter.)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4           Please read your deposition over carefully

 5    and make any necessary corrections.  You should state

 6    the reason in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8

 9           After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12           It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you.  If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     - - - - - -

 2                    E R R A T A

 3                     - - - - - -

 4    PAGE    LINE    CHANGE

 5    _____   _____   _____

 6       REASON:  _____

 7    _____   _____   _____

 8       REASON:  _____

 9    _____   _____   _____

10       REASON:  _____

11    _____   _____   _____

12       REASON:  _____

13    _____   _____   _____

14       REASON:  _____

15    _____   _____   _____

16       REASON:  _____

17    _____   _____   _____

18       REASON:  _____

19    _____   _____   _____

20       REASON:  _____

21    _____   _____   _____

22       REASON:  _____

23    _____   _____   _____

24       REASON:  _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3           I, EMILY HALL, do hereby acknowledge that I

 4      have read the foregoing pages, 1 to 249, and that the

 5      same is a correct transcription of the answers given

 6      by me to the questions therein propounded, except for

 7      the corrections or changes in form or substance, if

 8      any, noted in the attached Errata Sheet.

 9

10

11      _____      _____

12      EMILY HALL                                        DATE

13

14

15

16

17      Subscribed and sworn to before me this

18      _____ day of _____, 20____.

19      My Commission expires: _____

20

21      _____

        Notary Public

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____   _____

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____
```