```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                      - - -

 5   IN RE:  NATIONAL           :
     PRESCRIPTION               :   MDL No. 2804
 6   OPIATE LITIGATION          :
     _____ :   Case No.
 7                              :   1:17-MD-2804
     THIS DOCUMENT RELATES       :
 8   TO ALL CASES               :   Hon. Dan A. Polster
 9                      - - -
10            Tuesday, February 19, 2019
11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
12
                         - - -
13

             Videotaped deposition of CANDACE HARBAUER,
14
     held at the Hilton Garden Inn, Perrysburg, Ohio,
15
     commencing at 9:02 a.m., on the above date, before
16
     Carol A. Kirk, Registered Merit Reporter and Notary
17
     Public.
18
19                      - - -
20
21            GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
22                  deps@golkow.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

A P P E A R A N C E S:

On behalf of the Plaintiffs:
    MCHUGH FULLER LAW GROUP
    BY: LANCE REINS, ESQUIRE
        lance@mchughfuller.com
        ALLAN (A.J.) L. ELKINS, ESQUIRE
        allan@mchughfuller.com
        (via teleconference)
    97 Elias Whiddon Road
    Hattiesburg, Mississippi 39402
    601-261-2220

On behalf of AmerisourceBergen Corporation (via teleconference and text/video streaming)
    JACKSON KELLY PLLC
    BY: SANDRA K. ZERRUSEN, ESQUIRE
        skzerrusen@jacksonkelly.com
    50 South Main Street, Suite 201
    Akron, Ohio 44308
    330-252-9060

On behalf of HBC (via teleconference and text/video streaming):

    MARCUS & SHAPIRA LLP
    BY: ELLY HELLER-TOIG, ESQUIRE
        ehtoig@marcus-shapira.com
    One Oxford Center, 35th Floor
    301 Grant Street
    Pittsburgh, Pennsylvania 15219-6401
    412-338-3345

On behalf of Walmart (via teleconference and text/video streaming):

    JONES DAY
    BY: NICOLE LANGSTON, ESQUIRE
        nlangston@jonesday.com
    77 West Wacker Drive
    Chicago, Illinois 60601
    312-782-3939

Page 3

On behalf of Prescription Supply, Inc.
    FOX ROTHSCHILD LLP
    BY: JAMES C. CLARK, ESQUIRE
        jclark@foxrothschild.com
        STEPHAN A. CORNELL, ESQUIRE
        scornell@foxrothschild.com
        (via teleconference and text/video streaming)
    2700 Kelly Road, Suite 300
    Warrington, Pennsylvania 18976-3624
    330-305-6400

On behalf of Endo Pharmaceuticals, Inc., Endo Health Solutions, Inc., and Par Pharmaceutical Companies, Inc. (via teleconference and text/video streaming):

    ARNOLD & PORTER KAYE SCHOLER, LLP
    BY: CAITLIN MARTINI MIKA, ESQUIRE
        caitlin.mika@arnoldporter.com
    70 West Madison Street, Suite 4200
    Chicago, Illinois 60602
    312-583-2300

On behalf of Johnson & Johnson and Janssen Pharmaceuticals:
    TUCKER ELLIS LLP
    BY: JENNIFER L. STEINMETZ, ESQUIRE
        jennifer.steinmetz@tuckerellis.com
    950 Main Avenue, Suite 1100
    Cleveland, Ohio 44113
    216-592-5000

On behalf of McKesson (via teleconference and text/video streaming):
    COVINGTON & BURLING LLP
    BY: GABRIEL FULMER, ESQUIRE
        gfulmer@cov.com
    One CityCenter
    850 Tenth Street, NW
    Washington, DC 20001
    202-662-5110

Page 4

ALSO PRESENT:
    Michael Newell, Videographer
    Zachary Hone, Trial Technician

        - - -

Page 5

VIDEOTAPED DEPOSITION OF CANDACE HARBAUER

INDEX TO EXAMINATION

WITNESS                          PAGE

CANDACE HARBAUER

    CROSS-EXAMINATION BY MR. REINS:        10

Page 6

1   VIDEOTAPED DEPOSITION OF CANDACE HARBAUER
2        INDEX TO EXHIBITS
3   PSI-HARBAUER   DESCRIPTION              PAGE
4   PSI-Harbauer 1  Document titled "Current    30
        Employees," Bates-stamped
5        PSI0000145-147
6   PSI-Harbauer 2  Code of Federal Regulations,  52
        21 C.F.R. 1301.74
7
    PSI-Harbauer 3  Document titled "Inventory    83
8        Controls, Document Control
        Number: WP-1, Effective
9        Date: June 2000," Bates-
        stamped PSI0000648-652
10
    PSI-Harbauer 4  Document titled "Document     89
11       Name: Controlled Substances,
        Document Control Number:
12       WP-2, Effective Date:  June
        2000," Bates-stamped
13       PSI0000653-654
14  PSI-Harbauer 5  Document titled "Document     89
        Name:  REMS DO NOT SHIP
15       PROGRAM, Document Control
        Number:  WP-13, Effective
16       Date:  February 2011," Bates-
        stamped PSI0000690-692
17
    PSI-Harbauer 6  Document titled "Maximum    100
18       Monthly Quantity Prescription
        Supply," dated 10/2/2008,
19       Bates-stamped PSI0000280-285
20  PSI-Harbauer 7  Letter from Mr. Rannazzisi,  105
        dated 9/27/2006, Bates-
21       stamped CAH_MDL_PRIORPROD_
        DEA07_00837645-837648
22
    PSI-Harbauer 8  Letter from Mr. Rannazzisi,  109
23       dated 12/27/2007, Bates-
        stamped CAH_MDL_PRIORPROD_
24       DEA12_00010980-10980

Page 7

1              - - -
2        P R O C E E D I N G S
3              - - -
4        THE VIDEOGRAPHER:  We are now
5   on the record.  My name is Michael
6   Newell.  I'm a videographer for
7   Golkow Litigation Services.
8   Today's date is February 19, 2019.
9   The time is 9:02 a.m.
10       This video deposition is
11  being held in Perrysburg, Ohio in
12  the matter of National Prescription
13  Opiate Litigation.  The deponent
14  today is Candace Harbauer.
15       Will counsel please identify
16  themselves.
17       MR. REINS:  Lance Reins with
18  McHugh Fuller here on behalf of the
19  Plaintiff.
20       MS. STEINMETZ:  Jennifer
21  Steinmetz from Tucker Ellis on
22  behalf of Janssen and Johnson &
23  Johnson.
24       MR. CLARK:  Jim Clark from

Page 8

1   Fox Rothschild on behalf of
2   Prescription Supply.
3        THE VIDEOGRAPHER:  Anyone on
4   the phone?
5        MS. HELLER-TOIG:  Elly
6   Heller-Toig from Marcus & Shapira
7   for HBC Service Company.  And I
8   also e-mailed my appearance.
9        MS. MIKA:  Caitlin Mika from
10  Arnold & Porter on behalf of Endo
11  and Par entities.
12       MR. ELKINS:  A.J. Elkins,
13  McHugh Fuller law firm, on behalf
14  of the Plaintiffs.
15       MS. LANGSTON:  Nicole
16  Langston from Jones Day on behalf
17  of Walmart.
18       MR. FULMER:  Gabriel Fulmer
19  on behalf of Covington & Burling on
20  behalf of McKesson.
21       MS. ZERRUSEN:  And Sandy
22  Zerrusen from Jackson Kelly on
23  behalf of AmerisourceBergen.
24       MR. CORNELL:  Stephan Cornell

Page 9

1   from Fox Rothschild for
2   Prescription Supply.
3        THE VIDEOGRAPHER:  The court
4   reporter today is Carol Kirk and
5   will now swear in the witness.
6        (Witness sworn.)
7        MR. CLARK:  Mr. Reins, before
8   we begin, I just want to put on the
9   record what we discussed out in the
10  hallway a short time ago.
11       Ms. Harbauer has been out of
12  work for the last ten days dealing
13  with some health issues related to
14  her asthma.
15       She has assured me that she'd
16  like to proceed today and is
17  confident to do so.  I raise it
18  just because we may need to take a
19  few extra breaks so that she can do
20  a breathing treatment.
21              - - -
22       CANDACE HARBAUER
23  being by me first duly sworn, as hereinafter
24  certified, deposes and says as follows:

Highly Confidential - Subject to Further Confidentiality Review

Page 10

CROSS-EXAMINATION

BY MR. REINS:

Q.   Ms. Harbauer, as we discussed before we began, please let me know whenever that arises.  You don't need to put yourself through any additional strain here today.  So just let us know, okay?

A.   Thank you.

Q.   You're welcome.

Could I get you to introduce yourself for the record, please.

A.   Candace Harbauer.

Q.   And, Ms. Harbauer, have you been through a deposition before?

A.   Never.

Q.   Okay.  Your counsel has probably advised you but just a couple ground rules before we begin.  Obviously I'm going to be asking you some questions here today.

Please, because we have a court reporter taking everything down, please let me finish my question before you begin your answer, okay?

At the end of this there will be a

Page 11

written record of what transpired today so we want to be able to have a clean question and a clean answer, okay?

A.   Fine.

Q.   For those same reasons, please verbalize all your answers.  No "uh-huhs," "huh-uhs" or head nods.  I may remind you, "Is that a yes," "Is that a no," if you shake your head, because we need a verbal response, okay?

A.   Okay.

Q.   Lastly, if you answer my question, I'm going to assume two things.  One, you understood it, and, two, you're telling the truth.

Is that fair?

A.   Yes.

Q.   If you don't know something or you need me to rephrase a question, just say so, okay?

A.   Okay.

Q.   All right.  Can you please tell us what you do for a living?

A.   I work for Prescription Supply.

Q.   What do you do for Prescription

Page 12

Supply?

A.   I'm a VP of administration and also human resources and designated representative.

Q.   And Prescription Supply, Inc. also goes by the acronym, I guess, PSI?

A.   Correct.

Q.   Okay.  Tell me a little bit about the company, if you don't mind, the historic background.  Do you know when it was formed?

A.   It was started in 1955 by my grandfather and two of his siblings.  Two of them were pharmacists, and there was a need for a regional pharmaceutical distributor.  It has always been a family run, very small, independent company.  We've grown through the years.  There are approximately 12 family members that work for us now.

We -- because we're small, we have a great communication base with one another and an interworking relationship.  We strive to -- service is our priority, to meet the customers' needs whenever possible and to maintain, you know, a positive, ethical stance.

Page 13

The company is now run by my mother and my uncle as corporate principals.

Q.   And who would that be?

A.   Thomas Schoen and Jacquelyn Harbauer.

Q.   Do you know when Mr. Schoen, Thomas Schoen, took over?

MR. CLARK:  Objection to form.

A.   Precisely, no.  He went through several positions before taking on president.

Q.   Understanding your answer about the company's overall business operations, can you kind of simplify it, if you would.  What exactly do you do?  Do you supply medications, narcotics, things of that nature?  Tell me a little bit in laymen's terms what you do.

MR. CLARK:  Objection to form.

A.   The company is a pharmaceutical wholesaler, primarily.

Q.   And what does that mean?

A.   That we buy directly from the manufacturer and sell to pharmacies or long-term

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 care facilities. Our primary business is
2 independent pharmacies, retail.
3      Q.   And does that include the supply
4 of narcotics?
5      A.   Some.
6      Q.   Which ones?
7      A.   I wouldn't -- couldn't tell you.
8      Q.   All right. And you began with the
9 company when?
10      A.   About 22, 23 years ago.
11      Q.   Has the company grown in that time
12 period?
13      A.   Yes.
14      Q.   How so?
15      A.   We've developed as -- with
16 technology, computers. All the legal
17 regulations that have come up the pike. We've
18 grown in size. Moved into -- built and moved
19 into a new building.
20      Q.   When you say "grown in size," does
21 that include your customer base?
22      MR. CLARK:   Objection to
23      form.
24      Q.   Let me just ask it this way: How

Page 15

1 have you grown in size?
2      A.   Number of employees, increased
3 sales, and customer base.
4      Q.   Let's work in reverse. Customer
5 base, do you know how many customers you have
6 presently?
7      A.   No.
8      Q.   Thousands or --
9      MR. CLARK:   Objection. Form.
10      Q.   If you know.
11      A.   My guess would be -- I really
12 can't give you a definitive answer. We might
13 have two or three thousand customers. They're
14 all not active.
15      Q.   What geographical area are they
16 spread throughout?
17      MR. CLARK:   Objection to
18      form.
19      A.   We are in -- predominantly a
20 regional supplier, but we do service many
21 states.
22      Q.   Do you know which ones?
23      A.   Not offhand all of them, no.
24      Q.   Do you know ballpark how many

Page 16

1 states?
2      MR. CLARK:   Objection to
3      form.
4      A.   In my opinion, 30.
5      Q.   Okay. So when you say small
6 family business, large customer base, though,
7 right?
8      MR. CLARK:   Objection. Form.
9      A.   Large -- can you define what you
10 mean by "large" --
11      Q.   That's okay.
12      A.   -- because that's a comparative
13 statement.
14      Q.   Sure. That's fair.
15      How many employees do you have?
16      A.   Approximately 80.
17      Q.   And you said you moved into a
18 larger facility. What do you mean? How large
19 is your facility?
20      MR. CLARK:   Objection. Form.
21      A.   We are in a building we built
22 specifically -- well, Prescription Supply -- we
23 rent a building that was designed for us, and
24 it's, I believe, 30,000 square feet.

Page 17

1      Q.   You said your sales have
2 increased. How so?
3      MR. CLARK:   Objection to
4      form.
5      A.   Just based on the fact that we've
6 been able to increase our employee base and have
7 added additional state licenses.
8      Q.   Do you know since 1996 how much
9 your sales have increased?
10      A.   No. I couldn't tell you.
11      Q.   Do you know who would be most
12 knowledgeable about that?
13      A.   Probably the corporate president.
14      Q.   You just know they have increased?
15      A.   I -- yes.
16      Q.   But you don't know by what grade
17 percentage?
18      A.   No.
19      Q.   Tell me a little bit about when
20 you started.
21      MR. CLARK:   Objection to
22      form.
23      A.   I was actually with the company
24 for a short time when I graduated from college

Page 18

1  before I went into my career choice at that
2  point, which was education, and did warehouse
3  work, learning the business and did some
4  accounting work.  Then after many years, came
5  back and started serving as credit manager,
6  human resources.  We are a small company and,
7  therefore, we wear many hats and develop into
8  positions.
9      Q.   When you say "small company," do
10  you know how you rank in the industry, if you
11  know?
12          MR. CLARK:  Objection to
13      form.
14      A.   I really don't have a clue.  I
15  know we are the smallest in Ohio.
16      Q.   And do you know what your average
17  sales are in a given year?
18          MR. CLARK:  Objection.  Form.
19      A.   No.
20      Q.   Do you know if they're in the
21  millions?
22          MR. CLARK:  Same objection.
23      A.   I -- I don't know.
24      Q.   You don't see the books?

Page 19

1      A.   I don't review the books, no.
2      Q.   Fair enough.
3          All right.  I do want to talk to
4  you -- I know you said it's a family business.
5  I want to kind of talk to you about the cast of
6  characters, the folks that work in the business,
7  okay?
8          So we're going to look at a
9  document.  Specifically this is PSI-1010.
10      A.   Okay.
11          MR. REINS:  I have a hard
12      copy if you want one.
13          MR. CLARK:  I appreciate it.
14          MR. REINS:  So, Zach, if you
15      could kind of zoom in at the top
16      and we'll work our way down.  All
17      right.  Perfect.
18  BY MR. REINS:
19      Q.   All right.  So we're just learning
20  a little bit about your company today, so
21  obviously we've received some items in discovery
22  kind of telling us who's who and maybe you can
23  help elaborate on that.
24          Obviously you've mentioned the

Page 20

1  president is Thomas Schoen, and it also says "DR
2  supervisor."
3          Do you know what that stands for?
4      A.   Designated representative
5  supervisor.  So he is my supervisor.
6      Q.   Okay.  Is he everyone's
7  supervisor?
8      A.   Yes.
9      Q.   Okay.  There's no DR supervisor
10  he's subservient to I'm guessing?
11          MR. CLARK:  Objection to
12      form.
13      A.   Correct.
14      Q.   Now, underneath that is
15  secretary-treasurer.  And who would that be?
16      A.   Jacquelyn Harbauer.
17      Q.   All right.  And what relation
18  would that be to you?
19      A.   My mother.
20      Q.   Gotcha.  And then that would be
21  your, obviously, uncle's sister?
22      A.   Correct.
23      Q.   All right.  And then we have VP of
24  sales, Christopher Schoen?

Page 21

1      A.   Correct.
2      Q.   What relation?
3      A.   Cousin.
4      Q.   Okay.  And who is he the son of?
5      A.   Tom.
6      Q.   Okay.  And do you know what -- and
7  forgive me.  I skipped your mom.  Do you know
8  what your mom does as a secretary and treasurer?
9          MR. CLARK:  Objection to
10      form.
11      A.   I -- I know she is overall
12  responsible for board minutes, you know,
13  financial, overseeing the accounting department,
14  controller, those types of things.
15          (Reporter clarification.)
16      A.   Controller.  Sorry.  Controller.
17  And the licensing, regulatory.  She's over
18  myself as well.
19  BY MR. REINS:
20      Q.   Okay.  And so the -- and I'm
21  sorry.  When you said earlier you came back
22  after several years, what year was that?
23      A.   That I came back?
24      Q.   Yes, ma'am.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    A.   I'm guessing it was 1996, '97.

2    Q.   Okay.  Probably best to finish up

3 your time.  So when you first came back, what

4 was your position?

5    A.   Credit manager.

6    Q.   What did that mean?

7    A.   I worked with collections,

8 accounts receivable and the controller.

9    Q.   What's your educational

10 background?  What was your degree in?

11    A.   I have a Master's of Science in

12 administration, educational administration, and

13 a bachelor of education.

14    Q.   Gotcha.  And so when you finished

15 that first position, you transitioned into a new

16 one obviously?

17        MR. CLARK:  Objection to

18    form.

19    A.   When I finished being credit

20 manager?

21    Q.   Yes, ma'am.

22    A.   I transitioned, yes, into more of

23 the vice president and was assisting the

24 secretary/treasurer with licensing,

Page 23

1 developmental for our VAWD certifications.  As

2 the regulatory requirements have blossomed in

3 the last 20 years, the need to have a person

4 directly involved with that, is what I came

5 into.

6        I also do human resources, some --

7 it's delegated responsibilities.  Primarily I

8 deal with job descriptions and training.

9    Q.   When you talk about your

10 regulatory position, is that that you are an

11 assistant, I guess, to your mother in that role?

12    A.   Correct.

13        MR. CLARK:  Objection to

14    form.

15    Q.   When did you begin doing that?

16    A.   When did I begin doing that?

17    Q.   Yes, ma'am.

18        MR. CLARK:  Objection to

19    form.

20    Q.   You said as time went on --

21    A.   I -- I honestly don't remember

22 when.

23    Q.   Would it be longer than two, three

24 years ago or --

Page 24

1    A.   Oh, longer than that.

2    Q.   Okay.

3    A.   I -- I know that -- as I said, as

4 the regulatory environments increased, so did

5 the development of the position, licensing and

6 all of that.

7    Q.   So -- and you might not be able to

8 answer this.  Before 2010 or after, if you know?

9        MR. CLARK:  Objection to

10    form.

11    A.   I couldn't say.  It would be pure

12 guess.

13    Q.   All right.  Do you know how long

14 after you left the credit manager position you

15 got into regulatory services?

16        MR. CLARK:  Objection to

17    form.

18    Q.   Months, years?

19    A.   I --

20        MR. CLARK:  Same objection.

21        Go ahead.

22    A.   When I transitioned from one, I

23 had been out ill for a period of time, so when I

24 came back, the credit management position had

Page 25

1 been filled by another personnel, so I began to

2 work more closely with the corporate

3 secretary/treasurer and develop that.

4    Q.   So I'm going to say this as

5 carefully as I can.  I do not want to know

6 anything about your health condition whatsoever.

7 But given that you had a health issue, does

8 that -- do you know when that was, without

9 revealing anything about your health condition?

10        MR. CLARK:  Objection to

11    form.

12    A.   I'm guessing seven years ago.

13    Q.   Okay.

14    A.   But it -- in my -- that's to the

15 best of my recollection.

16    Q.   And I appreciate that.

17        And I guess this would be a good

18 time to -- when you start -- when you got

19 transitioned into that role, can you tell me

20 specifically what your duties and

21 responsibilities were?

22        MR. CLARK:  Objection to

23    form.

24    A.   It began with getting our VAWD

Page 26

1 certification.
2    Q.   Your what? I'm sorry?
3    A.   VAWD, verified authorized
4 wholesale distributor, verification through the
5 National Association of Boards of Pharmacy.
6    Q.   What did that certification allow
7 you to do?
8    A.   To sell in multiple states as that
9 is a requirement for licensure.
10    Q.   And what did you have to undergo
11 to do that?
12       MR. CLARK:  Objection to
13    form.
14    A.   There was developmental phases of
15 policy and procedures.  There was on-site
16 audits.  It took a long time to get the
17 certification.
18    Q.   So I'm going to ask you this
19 question, but I want you to understand I know
20 dates and times may be difficult for you.  Just
21 do the best you can, okay?
22       Do you know when that
23 certification was ultimately approved?
24       MR. CLARK:  Objection to

Page 27

1    form.
2    A.   I believe nine or ten years ago,
3 to the best of my recollection.
4    Q.   Okay.  So when you came back after
5 your health issue, was it already approved?
6    A.   No.
7    Q.   Okay.  I'm not really a math guy,
8 but I think we approximated that into about
9 seven years?
10    A.   Seven years?  Then I would have
11 misspoken.
12    Q.   That's okay.
13    A.   I -- again, it's hard to recall.
14    Q.   Those are not points I'll be
15 scoring today on math, so I promise you.  So
16 we're just trying -- that actually is a helpful
17 process.  So if we know that it was about ten or
18 eleven years ago, do you know how long you
19 worked on it before it was approved?
20       MR. CLARK:  Objection to
21    form.
22    A.   I know the process was begun
23 before I came back.  The entire length of time,
24 maybe a year.

Page 28

1    Q.   Okay.  That's wonderful.
2       MR. CLARK:  Before you ask
3 the next question, did we lose
4 power here?
5       THE WITNESS:  I have no
6 screen.
7       MR. REINS:  I just hadn't
8 talked about it in a while.
9       MR. CLARK:  I want to make
10 sure we're up and running.
11       MR. REINS:  The power is
12 still running.
13       MR. CLARK:  Okay.
14 BY MR. REINS:
15    Q.   All right.  So after that, you
16 helped in that process, what other regulatory
17 duties and responsibilities did you have, if
18 any?
19       MR. CLARK:  Objection to
20    form.
21    A.   I had responsibility to keep a
22 knowledge base, if possible, of regulatory
23 requirements, working with the licensures, so
24 ensuring that we are compliant with all the

Page 29

1 regulations for each license, including DEA,
2 being aware of governmental changes.
3    Q.   All right.  Any other duties and
4 responsibilities, other than what we've
5 discussed so far, when you transitioned to your
6 new role?
7       MR. CLARK:  Objection to
8    form.
9    Q.   I think you touched on the human
10 resource aspect as well, so I didn't know if
11 there was anything else.
12    A.   Those are my primary
13 responsibilities.
14    Q.   Okay.  And you've held those
15 consistently since the best you've approximated
16 for us here today?
17    A.   Yes.
18    Q.   Okay.
19       MR. CLARK:  Objection to
20    form.
21       Just give me a second to get
22 my objection on --
23       THE WITNESS:  Yeah.  I'm
24 sorry.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 MR. CLARK: No problem.
2 You're doing fine.
3 - - -
4 (PSI-Harbauer Exhibit 1 marked.)
5 - - -
6 BY MR. REINS:
7 Q. All right. Looking back at the
8 current employee roster that has been produced
9 to us, which will ultimately be Plaintiff's
10 Exhibit Number 1. Next we have VP of sales
11 which is Christopher Schoen.
12 What is your understanding of what
13 his responsibilities are, if you know?
14 A. To oversee the sales department.
15 Q. So when you have 30-plus states,
16 how do you do that? Is there a -- obviously a
17 sales department?
18 MR. CLARK: Objection to
19 form.
20 A. We have -- Chris oversees -- we
21 have a telemarketing force that is overseen by
22 another director of marketing. She oversees the
23 telemarketing staff. We have what we call
24 customer service representatives in-house, and

Page 31

1 they deal with customers, and then we have an
2 outside -- a very small outside sales force of
3 one and a half people.
4 Q. When you look at all of that, the
5 telemarketing staff, the customer service staff,
6 Chris, any of the other people that work with
7 him, Mr. Schoen -- I say Chris because he's --
8 there's several Mr. Schoens. Do you know how
9 many people that would be, approximately?
10 MR. CLARK: Objection to
11 form.
12 A. My guess would be eight to ten.
13 Q. And then you've got the one and a
14 half person? You got --
15 A. He's -- the half person is a
16 part-time buyer --
17 Q. Okay.
18 A. -- and a part-time sales rep where
19 he would visit Michigan stores. And then we
20 have a gentleman who visits our Ohio stores.
21 Q. That's a good definition of half a
22 person. I got it.
23 We were talking about the
24 regulatory. There's you, your mom. Is there

Page 32

1 anybody else that's part of the regulatory
2 division in the time period we've discussed?
3 MR. CLARK: Objection to
4 form. Misstates the testimony.
5 A. I think that many of our personnel
6 have to be aware of the rules and regulations.
7 Q. Sure. But how many are actually
8 designated in the regulatory department, besides
9 you and -- it is you and your mom, right?
10 A. My --
11 MR. CLARK: Same objection.
12 Q. You can answer.
13 A. Tom also oversees so, you know.
14 Q. Okay. Anyone else?
15 A. No.
16 Q. All right. And here's where you
17 can educate me, because VP-IS Kirk Harbauer --
18 A. Correct.
19 Q. -- he is your --
20 A. Brother.
21 Q. -- brother. I see a lot of
22 report -- his name is involved in different
23 reporting and e-mails and letters and things.
24 Is he not involved in the regulatory process?

Page 33

1 MR. CLARK: Objection to
2 form.
3 A. His -- he carries -- he ensures
4 that the necessary reporting is sent, for
5 example, ARCOS reporting, or there are states
6 that require we send in sales history of
7 controlled substances, so the computer
8 department -- well, Kirk. I should rephrase
9 that. Kirk will develop the necessary program
10 to do that. And so we say that he is involved
11 because of that purpose.
12 Q. But he actually just completes the
13 reporting --
14 A. Technology.
15 MR. CLARK: Hold on. Let him
16 finish his question.
17 A. I apologize.
18 Q. No, that's okay. I think I might
19 have got it out there.
20 He's responsible for executing the
21 reporting necessary pursuant to the regulations,
22 safety rules?
23 MR. CLARK: Objection to
24 form.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1      Go ahead.
2      A.   He gets the reports out.
3      Q.   Okay.  Who has decided or who has
4   made the decision as to how to report?
5      MR. CLARK:  Objection to
6   form.
7      Q.   What to report, how to report.
8      MR. CLARK:  Same objection.
9      A.   It depends on the rules and
10  regulations.
11     Q.   So let's start with that then.
12  What rules and regulations are you obligated to
13  follow as the regulatory -- what position is it,
14  regulatory advisor?
15     MR. CLARK:  Objection to
16  form.
17     A.   My title is VP admin and human
18  resources and DR, designated representative.
19     Q.   So in order to comply with the
20  rules, you need to know what they are, right?
21     A.   Are.
22     Q.   So what rules are you required to
23  follow?
24     A.   All --

Page 35

1      MR. CLARK:  Objection to
2   form.
3      A.   All federal.  With the state,
4   local.
5      Q.   Have you reviewed all of those
6   rules and regulations?
7      MR. CLARK:  Objection to
8   form.
9      Q.   The ones that apply to your
10  business, of course.
11     A.   Have I reviewed them all?
12     Q.   Yes.
13     A.   Honestly, I couldn't believe that
14  it -- that was even possible.  I would say no.
15  I will say that I am aware of the requirements
16  of many things.
17     Q.   What are you -- are you aware of
18  the Controlled Substances Act?
19     A.   Yes.
20     Q.   What do you believe that obligates
21  you to do or not do?
22     MR. CLARK:  Objection to
23  form.
24     A.   I see it as --

Page 36

1      MR. CLARK:  I just want to
2   object to the extent it calls for a
3   legal conclusion.
4      MR. REINS:  And I will
5   recognize, because I read some of
6   your prior depos, that that is well
7   contemplated in any objections to
8   form.
9      MR. CLARK:  Okay.
10     MR. REINS:  But you are
11  welcome to state your objections as
12  you see fit.
13     A.   Would you repeat the question,
14  please?
15     Q.   Of course I will.
16     MR. CLARK:  Just to be clear,
17  I have not been involved in any
18  other depositions.
19     MR. REINS:  Oh, really?  Oh,
20  okay.  I've seen that objection
21  several times.
22  BY MR. REINS:
23     Q.   I think the question that was
24  posed to you is:  Sitting here today, what do

Page 37

1   you believe the Controlled Substances Act
2   obligates your company to do or not to do?
3      MR. CLARK:  Same objection.
4      A.   I see the purpose of the act is to
5   regulate the flow of pharmaceuticals throughout
6   the industry.  There are many requirements in
7   monitoring, licensing, regulatory -- monitoring,
8   licensing, reporting.
9      Q.   Do you know why these rules and
10  regulations have come into play?
11     MR. CLARK:  Objection to
12  form.
13     A.   I couldn't state the intent of
14  them, but I -- I think it's to regulate the
15  industry.
16     Q.   Do you know why the industry needs
17  to be regulated?
18     MR. CLARK:  Same objection.
19     A.   As with most industries, there is
20  always illegal activity involved, and so by
21  regulating, I see it as an attempt to try to
22  keep things in proper channels.
23     Q.   You understand that we're in the
24  midst of an opioid crisis?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1       MR. CLARK: Objection to
2   form.
3     Q.   Correct?
4     A.   I agree from what I have read and
5 heard on the news, that I believe there is an
6 opioid crisis.
7     Q.   You understand and recognize it's
8 affecting all races, all genders, in this
9 country, correct?
10       MR. CLARK: Objection to
11   form.
12     A.   It affects many people.
13     Q.   Many communities in this country,
14 correct?
15       MR. CLARK: Same objection.
16     A.   Yes.
17     Q.   And it's found to be, some of the
18 drugs, specifically oxycodone, have been abused
19 heavily in this nation, correct?
20       MR. CLARK: Objection to
21   form.
22     A.   I can't -- that's what the news
23 says.
24     Q.   Do you not agree with that?

Page 39

1       MR. CLARK: Objection to
2   form.
3     A.   I can't disagree or agree. I have
4 no personal knowledge of it.
5     Q.   Sitting here today, as someone
6 who's involved in the regulatory safety rules
7 and employing those in your company for PSI, you
8 don't know one way or another whether we're --
9 oxycodone is addictive?
10       MR. CLARK: Objection to
11   form.
12     A.   Do I know if oxycodone is
13 addictive, is that what you just stated?
14     Q.   Yes. Based on all the literature,
15 publications, congressional hearings, everything
16 that's available to you, do you know that?
17       MR. CLARK: Objection to
18   form.
19     A.   I have been told that OxyContin is
20 addictive, yes.
21     Q.   Who told you that?
22       MR. CLARK: Objection to
23   form.
24     A.   That's from the news and -- that's

Page 40

1 where I would get my information.
2     Q.   Your company has not had meetings
3 on the addictive nature of a product that you're
4 distributing?
5       MR. CLARK: Objection to
6   form. Argumentative.
7     A.   To my knowledge, we have not.
8     Q.   Okay. I think we're on a new
9 title now. VP HR manager DR. Have we
10 covered -- I think we have -- all the duties and
11 responsibilities for which you hold?
12     A.   Yes.
13     Q.   All right. You're also vendor
14 verification. What does that mean?
15     A.   Part of the requirements of VAWD
16 are to ensure that who we are purchasing from
17 and selling to are properly licensed, inspected,
18 and so I do verify all licenses of potential
19 vendors and maintain records on those.
20     Q.   Assistant to the president, James
21 Schoen. What relation is he to the president?
22     A.   Son.
23     Q.   How does he assist his dad?
24       MR. CLARK: Objection to

Page 41

1   form.
2     A.   I really couldn't tell you what he
3 does in that respect.
4     Q.   Okay. Does he get a paycheck?
5       MR. CLARK: Objection to
6   form.
7       MR. REINS: Withdraw.
8 BY MR. REINS:
9     Q.   Next we have -- and I'm not quite
10 sure what that position is, Robert Schoen, what
11 relation?
12     A.   That's also a son of Tom.
13     Q.   And what does that stand for?
14     A.   Warehouse manager.
15     Q.   Gotcha. And what are his duties
16 and responsibilities?
17     A.   To oversee the warehouse.
18     Q.   The warehouse is where all the --
19     A.   Product.
20     Q.   Is kept?
21       So oversee it. Are there policies
22 and procedures that govern the warehouse, if you
23 know?
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1   Q.   Okay.  As part of your position,
2  are you responsible for implementing and
3  revising policies and procedures within your
4  company?
5        MR. CLARK:  Objection to
6     form.
7        A.   I work with the development of the
8  policy in writing, along with Mr. Schoen, Tom
9  Schoen, to ensure that our policies are
10 compliant to rules and regs, and that the
11 procedures can best meet those.
12       Q.   It's you and Mr. Schoen, Thomas
13 Schoen, that do that --
14       A.   And --
15       MR. CLARK:  Hold on a second.
16    Let him finish the question.
17       Q.   Sorry.  That's okay.  I was done.
18 That's okay.
19       MR. CLARK:  Objection to
20    form.
21       Can you read back the
22    question --
23       A.   Repeat that.  I'm sorry.
24       Q.   No.  You don't have to be.  And

Page 43

1  remember my standing offer for breaks.  Whenever
2  you get to that point, okay?
3        A.   I'm getting close.
4        Q.   Okay.  We'll just finish this part
5  up, and then we'll go --
6        A.   Thank you.
7        Q.   -- unless you just give me the
8  look, okay?
9        I believe the question was, in
10 regards to the development and revision of
11 policies and procedures specifically, who was
12 involved -- and I thought I understood you to
13 say yourself and Thomas Schoen --
14       A.   Okay.
15       Q.   -- but I may be incorrect.
16       MR. CLARK:  Objection to
17    form.
18       A.   And it would be all relevant
19 personnel.  If it was a warehouse procedure,
20 warehouse manager.  If it is sales or
21 purchasing, it -- relevant personnel.
22       Q.   How about when we're talking about
23 the Controlled Substances Act or the federal
24 regulations regarding shipping and/or diversion

Page 44

1  of narcotics, who would that be?
2        A.   That would also include Jim
3  Schoen, Jim Schoen, the --
4        Q.   The assistant?
5        A.   He is the assistant, but he is --
6  he also is the controlled substance handler,
7  Schedule II.
8        Q.   What does that -- we tried to talk
9  about his job a little bit ago, but I think --
10       A.   Well --
11       MR. CLARK:  Let him finish
12    his question.
13       Q.   Yeah.  That's okay.  That's how
14 it's going to work.  Something will come to you.
15 It's not a gotcha game.  So it's great when that
16 happens.
17       So tell me -- now that we've
18 discussed that, tell me what exactly he does in
19 that position based on what you just described.
20       MR. CLARK:  Objection to
21    form.
22       A.   Jim is the one who monitors and
23 fills controlled substance orders.  He's
24 responsible for knowing the customer,

Page 45

1  maintaining education within the field.
2        Q.   So he would participate in the
3  development and/or revision of those policies
4  that touched those issues?
5        A.   Yes.
6        MR. CLARK:  Objection to
7     form.
8        Q.   Would he be the ultimate one to,
9  according to the federal regulations, stop a
10 shipment if it's "suspicious"?
11       MR. CLARK:  Objection to
12    form.
13       Q.   If you know.
14       A.   He would be part of the process.
15       MR. REINS:  Take a break?
16    You want to take a break?
17       MR. CLARK:  Yes.
18       THE WITNESS:  Could I please?
19       MR. REINS:  Yeah, of course
20    you can.
21       THE WITNESS:  Thank you.
22       MR. REINS:  Yes, ma'am.
23       THE VIDEOGRAPHER:  We're
24    going off the record at 9:40 a.m.

Page 46

1      (Recess taken.)

2      THE VIDEOGRAPHER: We're back

3   on the record at 9:50.

4 BY MR. REINS:

5    Q. All right. Going back and looking

6 at the exhibit here. I think we -- we have

7 covered the warehouse manager, Mr. Robert

8 Schoen. The next two I think are pretty

9 self-explanatory.

10      Director of purchasing, what does

11 that mean?

12    A. Our primary buyer.

13    Q. Okay. Can you explain?

14    A. John Cromly buys many of our lines

15 of -- from the manufacturers and making sure we

16 have product.

17    Q. How does he do that, if you know?

18      MR. CLARK: Objection to

19   form.

20    A. I know that he places -- you know,

21 he looks at usage and he places the orders.

22    Q. Okay. How many set of eyes do you

23 think in the company looks at an order before it

24 gets filled?

Page 47

1      MR. CLARK: Objection to

2   form.

3    A. I couldn't say. It depends on how

4 the order comes in.

5    Q. Sure.

6    A. It -- I couldn't say.

7    Q. Multiple folks, fair to say?

8      MR. CLARK: Objection to

9   form.

10    A. A few will see it. I mean, the --

11 if it comes in via computer, it can be held, it

12 can not be held. The person who pulls it sees

13 the order. The person who checks it sees the

14 order.

15    Q. So if you get it on a computer, is

16 it e-mailed? How do you get the order on a

17 computer?

18      MR. CLARK: Objection to

19   form.

20    Q. I'll rephrase.

21      You mentioned computer. You might

22 get an order. Please tell me how that works.

23    A. EDI. We have a website. They can

24 buy directly on the website. That's our

Page 48

1 primary. Or the telemarketer or salesperson can

2 enter the order directly into the computer.

3    Q. Where does it go from there?

4      MR. CLARK: Objection to

5   form.

6    A. It's either held or it's released

7 to a pick slip.

8    Q. Tell me -- a pink slip I think.

9    A. Pick.

10      MR. CLARK: Pick.

11    Q. Pick slip. What is a pick slip?

12    A. We are a manual wholesaler, so

13 it's a piece of paper that has the products

14 listed for our pullers to go to the shelves and

15 get.

16    Q. Okay. So it comes in -- so it

17 would come through -- if they did it on the

18 website, it would go -- so how would it get to

19 the pullers?

20      MR. CLARK: Objection to

21   form.

22    A. If the order -- if there's no

23 reason to stop it, the order would be translated

24 to a pick slip, piece of -- physical piece of

Page 49

1 paper, and the pullers take the paper with a

2 cart and go and pull the product.

3    Q. Who is the one that makes the

4 decision whether to stop it?

5      MR. CLARK: Objection to

6   form.

7    A. There are many reasons why an

8 order could be stopped.

9    Q. Tell me.

10      MR. CLARK: Same objection.

11    A. Credit, insufficient quantity. We

12 don't have it in stock because of manufacture.

13 I'm speaking generally, not specifically to

14 controlled substances.

15    Q. Okay.

16    A. That's a few I can think of off

17 the top of my head.

18    Q. Let's throw controlled substances

19 in there.

20      MR. CLARK: Objection to

21   form.

22    A. If it's a controlled substance, we

23 also have a threshold limit, so it could be held

24 for threshold purposes, which would make it an

Page 50

1 order of interest. In --
2      Q.   Go ahead. I'm so sorry.
3      A.   I don't deal with them directly as
4 far as filling orders on a regular basis, so I
5 know that there are many reasons why an order
6 could be held.
7      Q.   Any others that you can think of
8 other than what you just identified, exceeding
9 the threshold, regarding controlled substances?
10         MR. CLARK: Objection to
11     form.
12     A.   Unusual size, unusual frequency,
13 out of their normal ordering pattern, a new
14 customer, insufficient paperwork.
15     Q.   I gotcha. Let's talk about those.
16 First and foremost, who sets the threshold?
17         MR. CLARK: Objection to
18     form.
19     A.   I believe that was -- I can't
20 speak to exactly how it was -- the thresholds
21 were determined. I know that was information
22 gleaned from sales history, purchasing.
23     Q.   Who would know?
24         Part of what I'm doing here today

Page 51

1 is some stuff you may know, some stuff someone
2 else may know, and that's perfectly fine. But
3 do you know who would know how the thresholds
4 were set?
5      A.   I know that current thresholds are
6 evaluated by Jim Schoen.
7      Q.   Okay. "Current" leads a guy like
8 me to believe that might have changed. Do you
9 know who it was before him?
10         MR. CLARK: Objection. Form.
11     A.   When it was originally developed,
12 Kirk was involved with crunching the numbers.
13     Q.   Okay.
14     A.   And obviously Tom Schoen.
15     Q.   Kirk, Tom, and Jim Schoen?
16     A.   (Indicates affirmatively.)
17     Q.   Yes?
18     A.   Yes. Sorry.
19     Q.   No. Don't be.
20         MR. CLARK: You've been doing
21     well so far.
22         MR. REINS: Yeah. I mean,
23     that's an amazingly long stretch
24     for a rookie.

Page 52

1         MR. CLARK: Good job.
2         MR. REINS: Yeah.
3 BY MR. REINS:
4      Q.   All right. So before I leave you
5 here today -- this is probably not going to
6 break your heart -- those would be the better
7 folks to ask about the threshold limits and the
8 criteria?
9      A.   In my opinion, yes.
10     Q.   Fair.
11         Let's talk about the other things,
12 though, the unusual size, unusual frequency.
13 And probably not a bad time, because that
14 language sounds kind of familiar for me -- to
15 me -- to pull up PSI-103.
16         This look familiar?
17         MR. CLARK: Objection to
18     form.
19         - - -
20     (PSI-Harbauer Exhibit 2 marked.)
21         - - -
22 BY MR. REINS:
23     Q.   So this is going to be -- let me
24 withdraw that.

Page 53

1         Ma'am, we're looking now at -- and
2 this will be Plaintiff's Exhibit Number 2 to the
3 deposition. This is the Code of Federal
4 Regulations, which you identified earlier,
5 Subsection 1301.74, specifically Subsection (b).
6         And we'll be talking about the
7 last sentence there, "Suspicious orders include
8 orders of unusual size, orders deviating
9 substantially from a normal pattern, and orders
10 of unusual frequency," kind of the language you
11 just used, if not identical, right?
12         MR. CLARK: Objection to
13     form.
14     A.   Similar language.
15     Q.   Fair.
16         So when I see this and then I hear
17 you speak, now my question to you is, how does a
18 company like yours, servicing 30 states,
19 identify, come up with criteria specifically to
20 identify what would constitute unusual size,
21 frequency, or deviation from the normal pattern?
22         MR. CLARK: Objection to
23     form.
24     A.   When we -- customers fill out a

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 controlled substance questionnaire when they
2 wish to purchase with us from controlled
3 substances. On there many questions are asked
4 about usage. That is reviewed by Jim Schoen,
5 along with other information, geographic
6 location, type of the store.
7         It can include a site visit
8 previous to purchase, usage logs, verification
9 of physicians. Basic due diligence, in my
10 opinion. Because we are a secondary provider of
11 pharmaceuticals, buying patterns change. To
12 determine if something is unusual, our primary
13 thrust is Know Your Customer.
14         Jim has been -- his experience,
15 20-some years in this area, as well as his
16 educational -- continuing education, he knows
17 customers, talks to the customers almost daily,
18 understands their buying patterns.
19         Because we're secondary, there are
20 times the primary is out of it, so they will buy
21 from us.
22         So to answer shortly, you use a
23 lot of information to determine if something is
24 unusual or if it reaches threshold.

Page 55

1     Q.  And that's two really good points.
2 Let me start with the first one. The first,
3 does Jim see every order?
4     A.  Yes.
5     Q.  Okay. The due diligence that you
6 spoke to me about, because your uncle had made
7 reference that you might be someone that kind of
8 is the record keeper or keeping of certain
9 documents. Are there documents to reflect the
10 due diligence was actually done?
11         MR. CLARK: Objection to
12     form.
13     A.  The controlled substance
14 questionnaire is there. I don't do the actual
15 in-depth investigation. That's Jim Schoen, and
16 so you would have to ask him.
17     Q.  And that's fair. You'll never
18 hurt my feelings if you say that. Don't abuse
19 it, though, just because you want to leave here
20 today.
21         The -- understanding everything
22 you just said, is there not a trigger in the
23 system, if you know, that if there is a certain
24 percentage of an increase in an order or certain

Page 56

1 type of mathematical formula that would trigger
2 a review, if you know?
3         MR. CLARK: Objection to
4     form.
5     A.  I don't know.
6     Q.  Okay. Would that be a Jim
7 question?
8     A.  Probably.
9     Q.  Okay.
10     A.  Or Kirk.
11     Q.  Or Kirk.
12         And the follow-up to that question
13 is, if you know, do you have to exceed the
14 threshold in order for this review to take
15 place?
16         MR. CLARK: Objection to
17     form.
18     Q.  If you know.
19     A.  I don't know.
20     Q.  Okay. Going back now to what is
21 Exhibit 1, which is PSI-1010, and it's actually
22 going to be the third page of that document.
23         So now we're looking at a -- do
24 you know what this is, let me just say?

Page 57

1     A.  Yes.
2     Q.  What is it?
3     A.  It's an organizational chart of
4 the company.
5     Q.  Yes, ma'am. And so we've got at
6 the top the board of directors, which is your
7 uncle and your mother; is that correct?
8     A.  Correct.
9     Q.  Are they the only two board
10 members?
11     A.  They're the officers of the
12 company and the board members.
13     Q.  Okay. Are there any other board
14 members, if you know?
15     A.  Not to my knowledge.
16     Q.  Okay.
17         MR. CLARK: Lance, before you
18     go on --
19         MR. REINS: Sure.
20         MR. CLARK: -- can I ask a
21     housekeeping question?
22         MR. REINS: Yeah.
23         MR. CLARK: The document has
24 two different Bates numbers and

Highly Confidential - Subject to Further Confidentiality Review

1  you're referring to the one up top.
2      MR. REINS:  I am.
3      MR. CLARK:  I'm not sure
4  where that comes from.
5      MR. REINS:  Yeah.  So we have
6  internal numbers.  I'm happy to use
7  the other one.  I can identify it
8  for Zach, and then we can use the
9  other one for the record as well.
10     MR. CLARK:  If we can just
11  clarify, just so if we're looking
12  back at exhibits --
13     MR. REINS:  Absolutely.
14     MR. CLARK:  -- I'll know
15  we'll have the exhibits.
16     MR. REINS:  So to be clear,
17  those are your Bates numbers on the
18  bottom, correct?
19     MR. CLARK:  Correct.
20     MR. REINS:  So Exhibit No. 1
21  is Bates numbered PSI-145 through
22  147.  We're looking at 147 right
23  now.
24     MR. CLARK:  Thank you.

1      MR. REINS:  Yeah, of course.
2  BY MR. REINS:
3      Q.   And then obviously underneath
4  that -- and we're not going over the things
5  we've already established, but under Mr. Schoen,
6  Thomas Schoen, that is, there are several
7  positions, and then I think you did this -- it
8  was helpful.  You've already kind of covered
9  this, which is, you're on your -- and I don't
10  mean this lightly.  I mean it's your mother,
11  Ms. Harbauer's side of the chart; is that right?
12     A.   Correct.
13     Q.   And what do we call -- that right
14  side of the chart where you're under and
15  Mr. Buck is under, is this more the regulatory
16  side then?
17     MR. CLARK:  Objection to
18  form.
19     Q.   Or you could characterize it some
20  other way if it's more appropriate.
21     A.   It really isn't the regulatory
22  side.  It has to do more with secretarial and
23  treasurer.
24     Q.   Chain of command, right, I guess?

1      MR. CLARK:  Same objection.
2      A.   You have to categorize, so that's
3  how they broke it down.
4      Q.   You do report directly to your
5  mother?
6      A.   And to Tom.
7      Q.   And to Tom.  Okay.  And then
8  Mr. Buck we've kind of talked about -- have we
9  talked about Mr. Buck's position?  Controller.
10  No, I don't think we did.
11         What's his position?
12     A.   He oversees the accounting
13  department and controller AP.
14     Q.   Okay.  All right.  Let me just
15  look and see if there's anything else.  I think
16  we've talked about the other folks for the most
17  part.
18         Order checker, what do those folks
19  do?
20     MR. CLARK:  Objection to
21  form.
22     Q.   Do you see them there in the
23  middle?
24     A.   When an order has been manually

1  pulled, it's sent down the run.
2         (Reporter clarification.)
3      A.   The pick slip is scanned into the
4  computer with a bar code, and then each product
5  bar code is scanned to verify accuracy of the
6  order fulfillment.
7  BY MR. REINS:
8      Q.   Got it.
9         Fleet manager?
10     A.   We deliver locally with our own
11  set of cars.  He's responsible for overseeing
12  vehicles.
13     Q.   Okay.  The other states, how do
14  you get the drugs there?
15     MR. CLARK:  Objection to
16  form.
17     Q.   The other states, how do you get
18  the products there?  I'm sorry.
19     A.   Common carrier.
20     MR. CLARK:  Same objection.
21         Go ahead.
22     A.   Common carrier.
23     Q.   Okay.  All right.  Thank you.  I
24  think we're done with this one.  I'll hand these

Page 62

1 over so I don't misplace them.
2         We did take your uncle's
3 deposition. He was actually specifically
4 delegated -- designated as a 30(b)
5 representative to speak on behalf of the
6 company. I'd like to look at, if we could, from
7 that deposition, PSI-1006, page 66.
8         Starting at line 11. His
9 testimony was -- and going to line 21. Yes.
10 "That Prescription Supply also
11 agrees and accepts that since 1971 there has
12 been a shipping requirement, meaning that it
13 cannot ship orders that are in any way
14 suspicious."
15         "Yes" is the answer.
16         Line 17, "And that the reason we
17 don't ship suspicious orders is because we don't
18 want to contribute to potential diversion of
19 controlled substances."
20         Answer, "Yes."
21         You acknowledge and agree, just
22 like your uncle, that there is a shipping
23 requirement in the regulations, corrected?
24         MR. CLARK: Objection to

Page 63

1 form.
2     A.   I agree that there is a shipping
3 requirement, yes.
4     Q.   And to be clear, meaning if there
5 is a suspicious order, it should not be shipped
6 until it's fully investigated, correct?
7     A.   When there --
8         MR. CLARK: Same objection.
9         Go ahead.
10     A.   When there is an order of
11 interest, it is investigated prior to shipment.
12     Q.   And that is the regulations,
13 correct?
14         MR. CLARK: Same objection.
15     Q.   That's what the regulations
16 require, correct?
17         MR. CLARK: Same objection.
18     A.   The regulations require review of
19 the order.
20     Q.   And preventing the shipment and
21 investigating it, correct, of suspicious
22 orders -- or orders of interest, as you say?
23     A.   Order --
24         MR. CLARK: Same objection.

Page 64

1     A.   Orders of interest are reviewed
2 and determined whether they're to be held or
3 suspicious or filled. There is a requirement,
4 yes.
5     Q.   And you're also required to notify
6 the Drug Enforcement Agency, correct --
7         MR. CLARK: Same objection.
8     Q.   -- if it is a suspicious order?
9         MR. CLARK: Same objection.
10     A.   When deemed suspicious, yes.
11     Q.   Now, let's go ahead and maybe you
12 can help me out. When does an order of interest
13 become suspicious to PSI?
14         MR. CLARK: Objection to
15 form.
16     A.   I don't make that determination.
17     Q.   Who does?
18     A.   That, again, would be Jim Schoen.
19     Q.   What's your relationship to Jim?
20     A.   Cousin.
21     Q.   I don't know if he's going to like
22 you anymore. Kidding, of course, for the
23 record.
24         Okay. Then that's what we'll

Page 65

1 discuss with him.
2         Now, would he also be the best one
3 to speak to as to whether shipments have been
4 held since these regulations have been in place?
5         MR. CLARK: Objection to
6 form.
7     A.   In my opinion, he would be one of
8 the people, yes.
9     Q.   Would you be -- I get one shot
10 with you. So should I -- would he be more
11 appropriate to ask than yourself, based on what
12 you've told me already?
13     A.   As I don't -- I do not personally
14 deal with orders.
15     Q.   And that's fair. I hope you
16 understand I just have to -- if I don't ask you
17 a question, I have to establish why I didn't.
18 So ...
19         Now, sitting here today, we'll
20 look at the same deposition, page 150, starting
21 on line 11 going to line 17. Again, this is
22 Mr. Schoen.
23         "Right. And I've looked at the
24 discovery that has been provided and that we're

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 going to just sort of put out there that
2 8000-pound gorilla that may be standing over my
3 shoulder. Prescription Supply did not report
4 any suspicious orders, did they?
5 Answer, "That's correct."
6 On line 17.
7 MR. CLARK: Objection to
8 form.
9 Q. And just to be clear, just one
10 more quote, which happened again later, this is
11 page 162, line 19:
12 "Okay. Do you -- during this time
13 period prior to '13, do you recollect ever
14 reporting suspicious orders?
15 "No, we never reported suspicious
16 orders."
17 MR. CLARK: Same objection.
18 Q. Are you aware of that?
19 MR. CLARK: Same objection.
20 A. I'm not sure what this document
21 is -- this is his deposition, correct?
22 Q. Yes, it is. Yes.
23 A. Okay. Because your first
24 reference is very unclear about the gorilla. I

Page 67

1 don't understand.
2 Q. That was not my question.
3 A. Okay.
4 Q. I would not have worded it that
5 way.
6 A. All right.
7 Q. I'm just kidding.
8 What it is is -- just to be very
9 clear. This is the sworn testimony of your
10 uncle under oath as a 30(b) designee
11 specifically speaking on behalf of the company.
12 The point of the question that I'm
13 asking you is, sitting here today, are you
14 aware, based on his testimony, if you have a
15 different understanding that there was any
16 reporting as to any of the agencies regarding
17 suspicious orders?
18 MR. CLARK: Objection to
19 form. Do you have a time period on
20 that?
21 MR. REINS: Any time is what
22 I'm asking right now. Obviously
23 when she worked there.
24 A. In my understanding, we sent in

Page 68

1 various -- variance reports to the DEA on a
2 monthly basis, which was the initial suspicious
3 order monitoring system as they helped to design
4 it for us.
5 Q. That specific reporting was done
6 by Kirk, and I'm guessing he's the one to talk
7 to as to those reports and the information
8 contained therein; is that fair?
9 A. That is fair.
10 Q. Okay. Whether anything qualified
11 as a quote/unquote suspicious order, I think I
12 need to talk to Kirk and Jim, based on what
13 you've told me?
14 A. Definition of suspicious --
15 Q. Yes.
16 A. -- again, at that time was not --
17 so yes, I would talk to them.
18 Q. Okay. Fair.
19 All right. Shifting gears. I'm
20 going to now talk to you about -- because you're
21 uncle did identify you as someone with
22 knowledge, and I think we spoke about the
23 policies and procedures. So we're going to talk
24 about some of those, okay?

Page 69

1 A. Yes.
2 Q. We are going to look at --
3 MR. REINS: So, Zach, for
4 your purposes, PSI-4040.
5 For record purposes, PSI-648.
6 And, folks, I have hard copies. If
7 anybody wants one, just let me
8 know, but --
9 Q. All right. So we're --
10 MR. CLARK: I'll take a hard
11 copy.
12 MR. REINS: Oh, absolutely.
13 MR. CLARK: Thank you.
14 BY MR. REINS:
15 Q. So we are going to talk here
16 about -- this one is called Prescription Supply,
17 Inc. This is Inventory Controls, and obviously
18 that's the document name. And then underneath
19 it says "Document control number: WP-1."
20 Do you know what that is
21 indicative of?
22 A. Warehouse procedure 1.
23 Q. Gotcha. And forgive me. I don't
24 believe we have it, but if we have, I apologize,

Page 70

1 but -- so obviously there are warehouse policies
2 and procedures. Do you know how many there are?
3          MR. CLARK: Objection. Form.
4     Q.   Let me ask a better question.
5 There's a table of contents, correct?
6          MR. CLARK: Same objection.
7     A.   All the policies and -- the
8 written policies and procedures we have are in
9 the documents that have been provided.
10     Q.   Just to cover myself, there are
11 warehouse policies and procedures. Are there
12 other department policies and procedures?
13          MR. CLARK: Same objection.
14     A.   For example, human resources, HR1,
15 2, or 3, background checks, those types of
16 things.
17     Q.   Got it.
18     A.   So the control number was placed
19 simply for organizational purposes.
20     Q.   What do you mean?
21     A.   The document -- so that -- it was
22 easier to reference.
23     Q.   How many WPs are there?
24     A.   I believe 13 or 14.

Page 71

1     Q.   And those have developed over the
2 years?
3     A.   Correct.
4     Q.   For instance, this one was -- the
5 effective date is June 2000, meaning that's when
6 it first became -- came into effect, correct?
7     A.   Correct.
8     Q.   Now, if we wanted to see --
9 there's a number of revision dates there. If we
10 wanted to know what was revised specifically in
11 accordance with a particular date, do you have
12 the older versions so that we can compare to see
13 what was added and/or edited?
14          MR. CLARK: Objection to
15 form.
16     A.   There may be some if it was saved
17 to the cloud. And all documents were not always
18 saved to the cloud originally back then. The
19 revision dates coincide with annual reviews.
20     Q.   Well, you say "annual reviews,"
21 but there's not a revision date until 2008,
22 which would be eight afters after it was
23 created, correct?
24     A.   A revision date. That doesn't

Page 72

1 mean it wasn't reviewed.
2     Q.   Gotcha. So it was reviewed
3 annually but the first time it was revised was
4 2008?
5     A.   Correct.
6          MR. CLARK: Objection to
7 form. Give me a second.
8          THE WITNESS: Yes. Thank
9 you.
10          MR. REINS: Got it.
11          I'm going to -- if there
12 isn't a request out there -- and
13 that would be my ignorance -- but I
14 will simply put and make it known
15 that we're going to want those,
16 whatever is available in the cloud,
17 to try to determine the revisions
18 that have been made historically,
19 okay?
20          MR. CLARK: We'll take it
21 under advisement.
22          MR. REINS: Sure. Yeah. I
23 know you're not agreeing, but I
24 guess finding out what's out there

Page 73

1 is going to be the first step.
2 BY MR. REINS:
3     Q.   All right. So this policy says,
4 "Prescription Supply, Inc. will monitor
5 inventory for cyclical accounts."
6          What does that mean?
7     A.   We do inventory checks on lines on
8 a regular basis so that we are not overstocking
9 product. So we do counts -- they're cyclical in
10 that they're every month or every two months or
11 whatever.
12     Q.   Okay. Suspicious purchases and
13 losses, I think we've covered that as best we
14 can.
15          Theft or otherwise missing
16 products.
17          I'm not going to take you through
18 this entire document, but I'm going to take you,
19 under "Responsibilities," the fourth paragraph
20 starting with, "Customer service representatives
21 and/or warehouse manager shall forward all
22 suspicious prescription product orders to the
23 director of purchasing prior to fulfillment."
24          Forgive me. I feel like I should

Page 74

1  know, but director of purchasing?
2      A.   John Cromly.
3      Q.   So he's involved in this as well,
4  then, I guess?
5          MR. CLARK:  Objection to
6  form.
7      Q.   Let me rephrase.
8          Is Mr. Cromly also to be notified
9  specifically if there's an unusual order or
10 suspicious prescription product order?
11         MR. CLARK:  Objection.  Form.
12     A.   That refers especially to incoming
13 product and then for -- on his part, but, yes,
14 he is involved in the process.
15     Q.   Explain "incoming," what's the
16 concern there?
17         MR. CLARK:  Objection to
18 form.
19     Q.   Please explain what you mean by
20 "incoming."
21     A.   If we receive an order that has
22 been misshipped from the manufacturer, too much
23 of a product, the wrong product, he is notified
24 and involved.

Page 75

1      Q.   So this is really -- since that's
2  his role, this is really speaking to incoming,
3  not really outgoing?
4      A.   Correct.
5      Q.   Okay.  Let's skip down to the
6  bottom.  Starting with IT manager.  "IT manager
7  shall be responsible for suspicious order
8  monitoring reports and sharing concerns with
9  DR/DR supervisor."
10         IT manager would be Kirk, correct?
11     A.   Yes.
12     Q.   And DR/DR supervisor would be?
13     A.   Tom and myself -- or myself.
14     Q.   Okay.  But you're saying Jim would
15 be involved in this as well, though?
16         MR. CLARK:  Objection to
17 form.
18         MR. REINS:  I'll withdraw
19 that.
20 BY MR. REINS:
21     Q.   Next it says, "He/she is
22 responsible for sending all reports to DEA and
23 governing state agencies and maintaining records
24 for at least six years or as required by law."

Page 76

1          So the he/she being responsible
2  for sending the DEA reports, that would be Kirk,
3  correct?
4      A.   Correct.
5      Q.   Based on the criteria, which we'll
6  discuss with him, thresholds, all of those
7  issues, correct?
8          MR. CLARK:  Objection.  Form.
9      Q.   Which we've already covered,
10 right?
11         MR. CLARK:  Same objection.
12     A.   He's responsible for ensuring the
13 reports get sent.
14     Q.   Got it.
15         Do you review those reports before
16 they get sent?
17         MR. CLARK:  Same objection.
18     A.   No.
19     Q.   Did you review those reports at
20 all?
21         MR. CLARK:  Objection to
22 form.
23     A.   I have seen the reports, some of
24 them.

Page 77

1      Q.   You did not get them as a matter
2  of course, correct?
3          MR. CLARK:  Objection to
4  form.
5      A.   I do not.
6      Q.   Okay.  Did your uncle, if you
7  know?
8          MR. CLARK:  Objection to
9  form.
10     A.   In my opinion, he does see the
11 reports.
12     Q.   Okay.
13         MR. CLARK:  Just go off the
14 record for one second.
15         MR. REINS:  Sure.
16         (Brief off-record discussion.)
17         MR. REINS:  Are we off or on?
18         THE VIDEOGRAPHER:  I need --
19         MR. REINS:  That's okay.  No,
20 no.  We'll stay on.
21 BY MR. REINS:
22     Q.   And this might be my ignorance.
23 Do you have more than one uncle in the business?
24     A.   No.

Page 78

1    Q.    The -- okay.  Next paragraph.
2    Second sentence, "He/she shall report any
3    unaccounted losses or problems to DR/DR
4    supervisor and, when delegated, to appropriate
5    authority (Northwood Police), DEA."
6            Next sentence, "Controlled
7    substance handler shall also document all
8    transactions and communications, holding copies
9    of all paperwork as required by law for at least
10   six years."
11           Controlled substance handler is?
12   A.    Jim Schoen.
13   Q.    There you go.
14           Do you know -- again, I'm just
15   asking.  Do you know what documents were
16   specifically kept in regards to these duties and
17   responsibilities?
18           MR. CLARK:  Objection to
19   form.
20   A.    I know there are federal forms and
21   required forms, but I don't know the specifics.
22   Q.    And you don't know specifically
23   what was maintained as well, correct?
24           MR. CLARK:  Same objection.

Page 79

1    Q.    Because those folks dealt with it
2    personally?
3            MR. CLARK:  Same objection.
4    A.    They would have handled all the
5    paper trail.
6    Q.    "DR" -- this is the third full
7    paragraph, "DR/DR supervisor shall jointly
8    review all reports and information approving
9    necessary changes, formulating and carrying out
10   all internal investigations, recommending and
11   establishing necessary procedural changes,
12   notifying all applicable agencies, which are
13   identified therein, storage of records as
14   required by law for at least six years."
15           Again, that would be Jim, Kirk,
16   correct?
17           MR. CLARK:  Objection to
18   form.
19   A.    It says "DR/DR supervisor."  I'm
20   not clear on your question.
21   Q.    Who is it referring to, the DR/DR
22   supervisor?
23   A.    Tom and myself.
24   Q.    Okay.  But I think we've covered

Page 80

1    that -- in fairness to you, I know what this
2    says, but you've testified here today honestly,
3    correct?
4    A.    Absolutely.
5    Q.    So meaning -- and what I mean by
6    that is, even though it says your position,
7    you've really elaborated for us the folks that
8    are truly involved in maintaining these records,
9    correct?
10           MR. CLARK:  Objection to
11   form.
12   A.    They are also -- yeah.  They're --
13   they are involved in the process, yes.
14   Q.    Heavily involved, respectfully?
15           MR. CLARK:  Same objection.
16   A.    I would agree with that.
17   Q.    Okay.  We saw the quote, and you
18   agreed with it, from your uncle's deposition
19   that -- regarding the shipping requirement or
20   the prevention of shipping in certain instances.
21   I have a hard copy of this document just so you
22   can take a look at it.
23           I don't see anything in this
24   policy and procedure -- and I'm not here to rush

Page 81

1    you, so take -- I'm sure you've seen this
2    before, this policy?
3    A.    I have.
4    Q.    Okay.  Maybe even in preparation
5    for today.  So my question to you is, I did not
6    see anything in here regarding the shipping
7    requirement.
8            MR. CLARK:  Objection to
9    form.
10   Q.    First question is, am I correct?
11           MR. CLARK:  Same objection.
12   A.    The shipping requirement?
13   Q.    Meaning stopping orders from being
14   shipped for unusual activity, "suspicious
15   orders."
16           MR. CLARK:  Objection to
17   form.
18   A.    I would have to reread this
19   thoroughly.  I believe more specifically it's
20   covered under a different procedure.
21   Q.    And that was going to be my next
22   question.  Do you know what procedure that would
23   be?
24           MR. CLARK:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 form.
2     A.   I believe it's the controlled
3 substance.
4     Q.   Okay.
5     A.   I don't recall the number,
6 document control number.
7     Q.   We'll get there.  I think I have
8 that one.  So my -- let me just finish up with
9 this one.
10         Was there any policies and
11 procedures dealing with these issues that are
12 dealt with in here, suspicious orders,
13 reporting, things of that nature, before June of
14 2000?
15         MR. CLARK:  Objection to
16     form.
17     A.   There were no written policies.
18     Q.   Okay.  Were there non-written
19 ones?
20         MR. CLARK:  Same objection.
21     Q.   If you know.
22     A.   I believe so, because we -- again,
23 I'm not filling the orders, so I --
24     Q.   Okay.  Fair enough.

Page 83

1         MR. CLARK:  Are you finished?
2     Were you done?
3         THE WITNESS:  Yeah.
4 BY MR. REINS:
5     Q.   But you're not aware of any
6 written procedures prior to this one, correct?
7         MR. CLARK:  Objection to
8     form.
9     A.   That is correct.
10     Q.   And if I wanted to -- given the
11 time frame you told me you came back, you're not
12 the one to ask if there are policies that are
13 unwritten, correct?
14         MR. CLARK:  Same objection.
15     A.   Tom and Jackie -- Tom -- well, Tom
16 primarily would -- is the one.
17     Q.   Okay.
18         MR. REINS:  We'll make that
19     Exhibit 3.
20         - - -
21     (PSI-Harbauer Exhibit 3 marked.)
22         - - -
23 BY MR. REINS:
24     Q.   So if we go back to his

Page 84

1 deposition, this is 1006, page 155, line 12. He
2 was asked the question, specifically your uncle,
3 in the deposition:
4         "Do you know if Prescription
5 Supply has maintained copies from the original
6 of June of 2000?
7         "I don't know.
8         "Who would be the best person at
9 Prescription Supply to ask.  Any idea?
10         "Well, yeah.  I mean the --
11         "And what I'm looking for, is
12 there someone that would just deal with this
13 administrative stuff, that may be --
14         Answer, "Candy would have -- Candy
15 Harbauer would have probably been doing most of
16 this."
17         You've testified to the best of
18 your abilities as to what you recall, correct?
19         MR. CLARK:  Objection to the
20     preamble.
21         Go on.
22     Q.   Are you Candy?
23     A.   I am.
24     Q.   Okay.  Fair enough.

Page 85

1         All right.  I do want to talk
2 about -- there's -- the next policy and
3 procedure.
4         MR. REINS:  And this is going
5     to be, Zach, for you, this is PSI
6     1007.
7         For record purposes, it's PSI
8     653.
9 BY MR. REINS:
10     Q.   All right.  And here's the one I
11 think we're talking about, controlled
12 substances.  And you said, I think there's
13 another one that deals with that, right?  The
14 issue of the shipment issue, correct?
15     A.   Correct.
16     Q.   Now, I'm going to -- this is a
17 short one.  So I'm going to give you a hard
18 copy.
19     A.   Thank you.
20     Q.   You're welcome.
21         This will be Plaintiff's
22 Exhibit 4.  And correct me if I'm wrong.  I
23 don't see it in -- anything about shipping or
24 stopping shipments regarding suspicious orders

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 in here?

2  A.  I -- as I quickly scan this, I

3 concur it's not written there.

4  Q.  Okay.

5  A.  I know it's written.  I just can't

6 tell you where.

7  Q.  I'll just put on the record that

8 if you have a policy that deals with that, if

9 you could produce it to us.

10  Now, there is one we're going

11 to -- there's one more we're talking about,

12 which we'll talk about it in a minute.  But

13 these were all the ones that were in effect in

14 2000, correct?

15  MR. CLARK:  Objection to

16 form.

17  A.  These were written --

18  Q.  Yes.

19  A.  -- in 2000.

20  Q.  Okay.  And this is WP-2, so this

21 would be the warehouse policy number 2, correct?

22  A.  Correct.

23  Q.  I think it kind of touches on what

24 we just went over, correct, the other policy,

Page 87

1 for the most part?

2  MR. CLARK:  Objection.  Form.

3  A.  I don't understand your question.

4  Q.  Let me withdraw it and rephrase.

5  Under "Responsibilities," third

6 paragraph, it says, "IT manager shall compile

7 reports monthly regarding purchases of

8 controlled substances, threshold limits and

9 suspicious order monitoring."

10  Next paragraph, "DR/DR

11 supervisor" -- that's you, and your uncle,

12 correct?

13  A.  Correct.

14  Q.  -- "shall review all relevant

15 purchase and sales reports, consult with IT

16 manager for necessary changes and handle any

17 concerns or problems as they arise."

18  If he saw something suspicious or

19 if he saw an order of concern, he should have

20 advised you, correct?

21  MR. CLARK:  Objection to

22 form.

23  A.  When Kirk was doing the variance

24 reports, yes, he did advise Tom of concerns --

Page 88

1  Q.  Okay.

2  A.  -- of orders of interest.  The

3 threshold system stops orders.

4  Q.  Okay.  Do you know -- other than

5 the reporting that Kirk did, are you aware of

6 any other documents that were created regarding

7 potential concerns in regarding to ordering?

8  MR. CLARK:  Objection to

9 form.

10  A.  Can you explain your question a

11 little more for me.

12  Q.  Yeah.  Of course.  Are there --

13 were there any other documents generated as a

14 result of what we just read, if you know?

15  MR. CLARK:  Same objection.

16  A.  The variance reports, you'd have

17 to ask -- because I'm not dealing with it.  I

18 know we have other forms that are used by Jim

19 Schoen.

20  Q.  Okay.  That is exactly what I was

21 trying to ask you, so thank you.

22  That's Exhibit Number 4.

23  ---

24  (PSI-Harbauer Exhibit 4 marked.)

Page 89

1  ---

2 BY MR. REINS:

3  Q.  Same question, just to finish up

4 on that policy, whether there were policies

5 regarding that particular issues covered in

6 there before 2000, you would be -- you're not

7 aware of any written policies, correct?

8  MR. CLARK:  Objection to

9 form.

10  A.  I am not aware of any written

11 policies prior to that.

12  Q.  Okay.  We'll move on to another

13 policy that has been produced to us.  This might

14 be the one you were thinking of.  It's called

15 "The REMS do not ship program."

16  I'm going to hand that to you so

17 you have a hard copy.  This will be Plaintiffs'

18 Exhibit Number 5.

19  ---

20  (PSI-Harbauer Exhibit 5 marked.)

21  ---

22 BY MR. REINS:

23  Q.  Take a moment and look it over.

24 And I'm just going to level with you.  I did not

Page 90

1 see anything about suspicious orders and holding
2 here, so I don't think that you meant this, but
3 you're free to look it over.
4         You're shaking your head I am
5 correct, right?
6         MR. CLARK: Objection to
7     form.
8     Q.   Let me rephrase the question.
9     A.   Thank you.
10    Q.   Ma'am, is it -- do you take the
11 position that this particular policy and
12 procedure, which is Plaintiff's Exhibit
13 Number 5 -- and again, this is going to be --
14 this is PSI-690 for the record, and we have it
15 on the screen in front of us.
16        Do you take the position that this
17 deals with the shipping requirements under the
18 federal regulations?
19    A.   No, it does not.
20    Q.   Okay.  Do you still maintain or
21 believe that there is a policy out there that
22 deals with that issue?
23        MR. CLARK: Objection. Form.
24    A.   I believe there is.

Page 91

1     Q.   Okay.  Any idea what it's called?
2         MR. CLARK: Same objection.
3     A.   I -- I honestly would have to
4 review it -- review all the policies and I could
5 find it, but I ...
6     Q.   Can you and I agree on a basic
7 principle?  There should be one, right?
8         MR. CLARK: Objection to
9     form.
10    A.   I agree that there is one.
11    Q.   There is one and there needs to be
12 one, correct?
13        MR. CLARK: Same objection.
14    A.   I agree that there is one that --
15    Q.   This is my one shot with you.  So
16 just for whatever -- just go with me.  If there
17 isn't one for whatever reason, there should be
18 one, correct?
19        MR. CLARK: Objection to
20    form.
21    A.   There are procedures for it.
22 That's what I'm saying.  And there need to be
23 procedures for it.
24    Q.   Fair.  You'd be shocked if there

Page 92

1 wasn't?
2         MR. CLARK: Objection to
3     form.
4     A.   I'm not sure "shocked" is the
5 right word.
6     Q.   What would you be?
7         MR. CLARK: Objection.
8     Q.   Surprised?
9         MR. CLARK: Objection.
10 Argumentative.
11    A.   I believe there is one.
12    Q.   Okay.
13    A.   Yes.
14    Q.   Have you seen it recently?
15        MR. CLARK: Same objection.
16    A.   I have not reviewed these
17 documents in a -- since they were submitted
18 months ago.
19    Q.   This policy we just looked at,
20 what does this deal with?
21        MR. CLARK: Do you want to
22    give her the document?
23    Q.   I'm sorry.
24    A.   REMS is Risk Education Mitigation

Page 93

1 System.  It's put into place normally as a
2 requirement of the manufacturer to ensure that
3 pharmacists are instructed properly on how to
4 administer or dispense the products.
5 Pharmacists are required to sign up on various
6 websites, and we are required not to sell unless
7 they are registered on the program.
8     Q.   Got it.
9         Were you involved in the
10 investigation by the Ohio State Board of
11 Pharmacy?
12        MR. CLARK: Objection to
13    form.
14    A.   Involved in what way?
15    Q.   That's what I want to know.  You
16 either were or you weren't.  I have the reports.
17 I just didn't know if you were personally
18 involved in that.  The investigation of it, the
19 due diligence, the working with the state,
20 any -- I don't know the answer to it, so ...
21        MR. CLARK: Objection to
22    form.
23    A.   I guess I need to clarify.  Are
24 you talking about the initial one that was in

Page 94

1 spring, or the October one.
2    Q.   Let's take them one at a time.
3    A.   Okay.
4    Q.   The one in spring of what year?
5    A.   Was it 2017, I believe?
6    Q.   Right.
7    A.   I think --
8    Q.   Do you -- so go ahead.  Yes,
9 ma'am.  Were you involved in that one?  Sorry.
10    A.   I was asked to present documents
11 of policies and procedures.  I was asked
12 information about continuing education.  As I
13 recall, that's predominantly -- I was basically
14 pulled in and out.
15    Q.   Okay.  Limited involvement?
16    A.   Yes.
17    Q.   Specifically regarding the
18 policies?
19    A.   Correct.
20         MR. CLARK:  Objection to
21    form.
22    Q.   Were there policies that you
23 provided to them that we haven't looked at
24 today?

Page 95

1         MR. CLARK:  Objection to
2    form.
3    A.   You have all our policies.
4    Q.   Okay.  But did you speak with them
5 about any policies that we didn't talk about
6 here today?
7         MR. CLARK:  Objection to
8    form.
9    A.   I do not recall.  I do not believe
10 so.
11    Q.   Are there separate policies and
12 procedures regarding the compliance of the state
13 regulations versus the federal regulations, are
14 there -- or should they be compiled in both?
15         MR. CLARK:  Objection to
16    form.
17    A.   You have all the policies and
18 everything is one --
19    Q.   Policy?
20    A.   -- policy.
21    Q.   Okay.  Do you know what they were
22 investigating in the spring?
23         MR. CLARK:  Objection to
24    form.

Page 96

1    A.   In the spring?
2    Q.   The one you were just speaking of.
3    A.   I believe they were just coming in
4 for a routine inspection.  They had not been
5 there since we moved into the building.
6    Q.   All right.  And then when was the
7 second one that you were referencing?
8         MR. CLARK:  Objection to
9    form.
10    A.   We -- in the fall, we received a
11 investigation, I guess is the word.  They were
12 requesting information about some specific
13 pharmacies.
14    Q.   Do you know what the outcome of
15 that investigation -- well, first of all, were
16 you involved in that investigation?
17         MR. CLARK:  Objection to
18    form.
19    A.   What I did was to basically
20 compile the information, type the responses and
21 submit them.
22    Q.   You typed them?
23         MR. CLARK:  Objection to
24    form.

Page 97

1    Q.   I'm sorry.  You were the one who
2 actually responded, or was it Tom?
3         MR. CLARK:  Same objection.
4    A.   As a small company, we interface.
5    Q.   Okay.
6    A.   And so it's all together.  I mean,
7 we -- we talk about it.  We formulate it.  I do
8 the physical typing.  He reviews.
9    Q.   Okay.  Did you verify the
10 information before you typed it?
11         MR. CLARK:  Objection to
12    form.
13    A.   I received the information from
14 sales history, reporting that they pulled up, or
15 from Jim Schoen and his information, and from
16 Tom.
17    Q.   Gotcha.  So you were more of a
18 facilitator of the information, not the
19 originator, so to speak?
20    A.   That's a fair statement.
21    Q.   Okay.  Do you know what the
22 outcome was of that?
23         MR. CLARK:  Objection to
24    form.

Page 98

1    A.   I understand that they replied
2 back, and then my assumption and my opinion was
3 that -- that there were no -- they understood
4 what the explanations were and it was
5 satisfactory because there was no responses
6 after that.
7    Q.   Do you know that to be true,
8 meaning, did you ever see any documentation
9 either clearing the company or finding no
10 deficiencies?
11    MR. CLARK:  Objection to
12    form.
13    Q.   Meaning -- no disrespect, but
14 there might have been something that came
15 through the course of correspondence that you
16 may not have seen, for whatever reason.  But
17 have you ever seen anything in writing clearing
18 the company?
19    MR. CLARK:  Objection to
20    form.
21    A.   Boy.  I honestly can't tell you
22 whether there was a final e-mail that said thank
23 you very much.  You know, that's very probable,
24 but I couldn't swear to it one way or the other.

Page 99

1    Q.   Fair.
2    A.   I know -- that's fine.
3    Q.   You know I'm not going to let you
4 get away with that.
5    What do you know, ma'am?
6    MR. CLARK:  Objection to
7    form.
8    A.   Not enough.
9    Q.   Was there anything else about that
10 investigation that you had, any other feedback
11 from them?
12    MR. CLARK:  Same objection.
13    A.   Not to my knowledge.
14    Q.   Okay.  So how about any other
15 investigations into the company are you aware
16 of?
17    MR. CLARK:  Objection to
18    form.
19    Q.   By not just the state, by federal
20 government or anything else, if you're aware.
21    A.   We have had routine audits.
22    Q.   Okay.  Have there ever been
23 violations, deviations found in these audits, if
24 you know?

Page 100

1    MR. CLARK:  Objection to
2    form.
3    A.   There have been recommendations
4 made to improve documentary procedures.
5    Q.   By what agencies?
6    A.   The one that I think of is the
7 DEA.
8    Q.   Okay.  Do you know when that was?
9    MR. CLARK:  Objection to
10    form.
11    A.   It was in one of the routine
12 audits.  I know the information has been
13 supplied.  I don't recall if it was 2008 or '13
14 or '15.  I -- my guess is -- I don't know.  I
15 can't tell you.
16    Q.   All right.  Let me show you a
17 document and see if this might be it.
18    MR. REINS:  This is PSI-407,
19    Zach.
20    Record purposes, PSI-280.
21    - - -
22    (PSI-Harbauer Exhibit 6 marked.)
23    - - -
24

Page 101

1 BY MR. REINS:
2    Q.   I give you a hard copy because,
3 you know, you're free to look over the document
4 as you see fit.  This is a document -- I'll
5 probably attach it just for -- so everybody can
6 see it later, Exhibit Number 6.  This is called
7 "Maximum Monthly Quantity Prescription Supply."
8    The reason why I'm showing it to
9 you as the lead-in is, "This document outlines
10 the modifications to the On Line Solutions
11 Systems to satisfy the DEA requirements to
12 prevent shipping certain Medication Families
13 beyond a wholesaler determined Maximum Quantity
14 for each Month."
15    Do you remember any -- being
16 involved at all in this?  And I understand,
17 you've explained the different worlds now.  So I
18 really wasn't even going to show you this, but
19 you brought this up.
20    A.   No, I was not involved.
21    MR. CLARK:  Let him finish
22    his question.
23    MR. REINS:  I was done.
24    MR. CLARK:  Okay.  Objection

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 to form.
2       Go ahead.
3       A.    I was not involved with this.
4       Q.    Okay.  So you do not have
5 familiarity with this issue?
6       A.    I do not.
7       Q.    And I had a feeling.  I'm going to
8 take those back.  And I will attach not -- well,
9 yeah, I will attach it so we know what we have
10 looked at.
11       MR. CLARK:  When you have a
12       good moment to break, I'd like to
13       take another five minutes.
14       MR. REINS:  Yeah.  I'll tell
15       you, though, I'm getting -- I'm
16       almost done, for what it's worth.
17       MR. CLARK:  Can we still do a
18       five-minute break?
19       MR. REINS:  Oh, yeah, of
20       course.  Let's do it now.
21       MR. CLARK:  Okay.  Good.
22       THE VIDEOGRAPHER:  We're
23       going off the record at 10:45.
24       (Recess taken.)

Page 103

1       THE VIDEOGRAPHER:  We're back
2       on the record at 10:53.
3 BY MR. REINS:
4       Q.    All right.  Ma'am, before we took
5 a break, we were talking about any agencies,
6 whether it would be federal or state, that may
7 have made recommendations.  You had mentioned
8 you recall that happening.  I showed you a
9 document, which was a swing and a miss.
10       So tell me what you recall about
11 that, meaning what agency -- I think you
12 mentioned DEA.
13       A.    It was DEA that I recall, and it
14 was something about -- initialing the inventory
15 report was one.  There was something else, but
16 I -- I specifically cannot recall it, but it was
17 a documentary recommendation.
18       Q.    Do you know if -- did you keep
19 those records?  Do you know if you have those --
20       A.    Those were --
21       MR. CLARK:  Hold on a second.
22       Let him finish.
23       Objection to form.
24       Q.    So I think -- and this is -- I

Page 104

1 should have said this a while ago.  It's not
2 just let me finish.  It's your attorney wants to
3 object potentially.
4       A.    I understand.
5       Q.    So it's kind of a me finish and a
6 pause and then answer, so ... and that's my
7 fault.  I should have said that before.
8       There's no way you remember my
9 question, so let me go ahead and rephrase it.
10       We were asking about the --
11 whether you have any of these records still,
12 these reports, these findings.
13       MR. CLARK:  Objection to
14       form.
15       A.    They were submitted -- copies of
16 the audits were submitted to you, and in there I
17 know I scanned the information.
18       Q.    So you believe we have it all?
19       A.    I do believe so.
20       Q.    The policy and procedure you said
21 before about shipping -- and we've covered that.
22 I'm not belaboring it.  I know you believe there
23 is one.  Do you know when that was created, the
24 one you recall?

Page 105

1       MR. CLARK:  Objection to
2       form.
3       A.    I assume the 2000 when we were
4 documenting everything.
5       Q.    All right.  I'm going to show you
6 now --
7       MR. REINS:  This is going to
8       be, Zach, PSI-301.  Record
9       purposes -- no, we're going to go
10       with that.  That's a real long
11       number.  It will ultimately be
12       Exhibit Number 7.
13       - - -
14       (PSI-Harbauer Exhibit 7 marked.)
15       - - -
16 BY MR. REINS:
17       Q.    You're free to -- I'll give you a
18 hard copy.
19       A.    Thank you.
20       Q.    All right.  So we're going to now
21 look at -- and I'll tell you a little bit of
22 background, because you're going to say, "Why am
23 I looking at this?"
24       This document was specifically

Page 106

1 mailed out to all of the distributors. It's
2 been my understanding, stipulated, that PSI also
3 received one of these, but you all don't have a
4 copy anymore so we're using this one as a go by
5 because we believe the language is standard,
6 okay?
7      A.   I accept that.
8      Q.   Okay.  Fair enough.
9           MR. CLARK:  I object to the
10 form.  But go ahead.
11     Q.   Hopefully I didn't misstate that.
12          So this is going to be dated
13 September 27, 2006, and this is going to be
14 basically from the Department of -- I'm sorry.
15 U.S. Department of Justice Drug Enforcement
16 Agency Administration.  Take a moment and look
17 it over because my first question is going to
18 be, do you recall this, receiving this letter?
19          MR. CLARK:  Before you
20 answer, I object to the form.
21          MR. REINS:  You certainly
22 find me objectionable, sir.
23          MR. CLARK:  Nothing personal.
24          MR. REINS:  None taken.

Page 107

1      A.   Just reading the first few
2 paragraphs, I can tell you I don't believe I
3 have seen this document.
4      Q.   Fair enough.
5           My second question is going to
6 build off of that but it may not make sense
7 based on what you just said.  But there were
8 some revisions not before 2008.  I know you said
9 you would review the policies and procedures
10 annually.
11          Let me start again, okay, so we
12 get a clean -- so let me shift gears, okay.
13          You testified earlier that you
14 would review the company's policies and
15 procedures annually; am I correct?
16     A.   That is correct.
17     Q.   You said that doesn't necessarily
18 mean we would revise it, and there were no
19 revisions, according to the policies and
20 procedures we discussed, before December of
21 2008, I'll represent to you.
22          MR. CLARK:  Objection to
23 form.
24     Q.   This letter was in September of

Page 108

1 2006 regarding a number of things, including
2 shipping requirements.  Do you recall ever
3 having a conversation with anybody within your
4 company about this letter in relation to the
5 existing policies and procedures?
6           MR. CLARK:  Objection.  Form.
7      A.   I, having not seen the letter,
8 can't -- would not have discussed it.
9      Q.   Thank you.
10          MR. CLARK:  Did you mark
11 this?
12          MR. REINS:  I did, Number 7.
13          MR. CLARK:  Okay.
14          MR. REINS:  Did you get a
15 copy?  Yeah.
16          MR. CLARK:  I did.  Thank
17 you.
18          MR. REINS:  Madam court
19 reporter, I accidentally gave you
20 my highlighted copy.  Can you
21 restamp it?  Make a copy of it.  I
22 don't like the highlighting in the
23 record.
24          - - -

Page 109

1      (PSI-Harbauer Exhibit 8 marked.)
2           - - -
3 BY MR. REINS:
4      Q.   All right.  So this is another one
5 that was done December of the following year.
6 This will be Plaintiff's Exhibit Number 8.  And
7 you probably know we're going to treat it the
8 same way.  This was December 27, 2007.  This is
9 again by the DEA regarding the rules and
10 regulations regarding controlled substances and
11 the duties and obligations.
12          And so my question to you will be,
13 do you recall reviewing this one?
14          MR. CLARK:  Objection to
15 form.
16     A.   I do not recall, to the best of my
17 knowledge, after just scanning this, that I saw
18 this.
19     Q.   Fair to say, then, that you do not
20 have a recollection or belief that this was
21 contemplated in regards to amending or revising
22 the policies and procedures for the company?
23          MR. CLARK:  Objection to
24 form.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    A.   I can't -- I can't speak to what
2  someone else thought.  I -- I know that I did
3  not see this.  I did not have a discussion
4  regarding this.
5    Q.   Fair enough.
6         But please correct me if I'm
7  wrong.  You were the person who was involved in
8  the revision and updating of the policies and
9  procedures, correct?
10        MR. CLARK:  Objection to
11   form.
12   A.   I am involved in that process,
13  yes.
14   Q.   Yes, ma'am.
15        Can you and I agree that having
16  all available information, specifically
17  information regarding potential regulations and
18  clarification of regulations, if you don't have
19  policies and procedures on those issues, that
20  there should be a discussion?
21        MR. CLARK:  Objection to
22   form.
23   A.   Can you restate that?
24   Q.   Of course.

Page 111

1    A.   Thank you.
2    Q.   And I'll do it slower.  If you
3  don't have policies and procedures regarding
4  certain regulations that govern your company,
5  and the DEA sends out a letter and says, "Hey,
6  as a reminder, these are the regulations and
7  this is how you need to follow them."
8         If you don't have policies on
9  those issues, would that be an opportune time to
10  develop some?
11        MR. CLARK:  Objection to
12   form.
13   A.   I would agree that it should -- if
14  they're not already in place, they should be
15  developed.
16   Q.   For the safety -- for the reasons
17  we discussed earlier -- of the communities,
18  correct?
19        MR. CLARK:  Object to form.
20   A.   To be in compliance with the law
21  and regulations.
22   Q.   And to try and prevent drug
23  diversion, which has affected many communities
24  in this country, correct?

Page 112

1         MR. CLARK:  Objection to
2    form.
3    A.   The whole Controlled Substances
4  Act is to help regulate and to follow these
5  regulations, and if I -- that letter appeared to
6  be a further explanation of that process; is
7  that correct?
8    Q.   That's correct.
9    A.   Okay.
10   Q.   I guess what -- and I'm not
11  debating it -- I don't think I am.  The purpose
12  of the Controlled Substances Act is to try and
13  minimize abuse and diversion in this country,
14  correct?
15        MR. CLARK:  Objection.
16   Argumentative.  Calls for a legal
17   conclusion.  Form.
18   A.   I would agree that it's -- it is
19  trying to regulate the process and keep the
20  product in -- yes.
21   Q.   Keep people safe, correct?
22        MR. CLARK:  Objection to
23   form.
24   A.   To keep the pharmaceutical

Page 113

1  industry regulated and to keep the drugs in the
2  system, keep it legal is ...
3    Q.   Let me give you back that
4  document.
5    A.   Thank you.
6    Q.   I'm sorry.  That's the wrong one.
7  The one before it, which is going to be Exhibit
8  Number 7.
9    A.   Thank you.
10   Q.   Are you with me?
11   A.   I have 7.
12        MR. CLARK:  Before -- this is
13   your highlighted copy.
14        MR. REINS:  Okay.  Yeah.  Let
15   me -- I'm going to fix that.  We'll
16   get that fixed.
17        MR. CLARK:  I'll give her my
18   clean copy.
19        MR. REINS:  Okay.  Thank you,
20   sir.
21        THE WITNESS:  Thank you.
22  BY MR. REINS:
23   Q.   So we're now looking at Exhibit
24  Number 7, which is specifically from the DEA,

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 and I want to look quickly at the background
2 paragraph. "As each of you is undoubtedly
3 aware, the abuse (nonmedical use) of controlled
4 prescription drugs is a serious and growing
5 health problem in this country."
6        Do you take issue with that
7 sentence --
8        MR. CLARK: Objection to
9    form.
10    Q.    -- by the -- by the Drug
11 Enforcement Administration?
12        MR. CLARK: Same objection.
13    A.    That is their stance. That's what
14 it says they believe.
15    Q.    I know what it says, ma'am,
16 respectfully, but do you take issue with that
17 statement?
18        MR. CLARK: Same objection.
19    A.    No, I do not.
20    Q.    You know that this is a growing
21 health crisis in our nation; do you not?
22        MR. CLARK: Objection to
23    form. Argumentative.
24    A.    I know that illegal diversion of

Page 115

1 drugs causes problems.
2    Q.    You know that the abuse of legal
3 drugs is causing a problem, correct?
4        MR. CLARK: Objection to
5    form. Argumentative.
6    A.    Based on the news that I have
7 heard, yes, I would say that abuse of drugs is
8 creating a health problem.
9    Q.    And as a distributor of some of
10 those drugs, you have an obligation -- you
11 mentioned to me in the beginning of this
12 deposition -- do you remember the word you
13 used -- "ethics." You have an ethical
14 obligation to make sure you are not part of the
15 problem but part of the solution; is that fair
16 to say?
17        MR. CLARK: Objection to
18    form. Misstates the testimony.
19    Argumentative.
20    Q.    Would you agree with that?
21        MR. CLARK: Same objection.
22    A.    I'm sorry. Would you repeat it?
23    Q.    Sure.
24        You stated at the beginning of

Page 116

1 this deposition that you try to operate your
2 company in an ethical manner; is that right?
3    A.    Yes.
4    Q.    What I'm asking you is, you have
5 an ethical obligation to make sure, follow all
6 of these safety rules and regulations to the
7 utmost of your abilities to make sure that you
8 are not part of the problem of the opioid
9 crisis, correct?
10        MR. CLARK: Objection to
11    form.
12    A.    We have -- we have the
13 responsibility and the legal duty to comply with
14 the law to the best of our ability and, you
15 know, to -- to follow the rules and regs.
16 That's what we're obligated to do.
17    Q.    And the reason why we started this
18 discussion is, the very purpose of these rules
19 and regs are to protect the safety of our
20 citizens, correct?
21        MR. CLARK: Objection to
22    form.
23    A.    Based on what you showed me, the
24 reading of the words, it appears that's what it

Page 117

1 said, yes, that -- I can't speak to their
2 intent, but that's what it looks like.
3    Q.    Based on what you read?
4        MR. CLARK: Objection to
5    form.
6    A.    What you showed me earlier.
7    Q.    But no internal investigation as
8 to how the company, your company -- let me
9 rephrase that. I'm going to withdraw that
10 question.
11        The only information you've heard
12 regarding the epidemic, as some are calling it,
13 is based on what you've seen on the news,
14 correct?
15        MR. CLARK: Objection to
16    form.
17    Q.    And what you're reading here?
18        MR. CLARK: Same objection.
19    A.    Yes.
20        MR. REINS: I have no more
21    questions, ma'am. I appreciate
22    your time here today.
23        THE WITNESS: Thank you.
24        MR. CLARK: I have no

Page 118

1      questions.
2              THE VIDEOGRAPHER:  We're
3      going off the record at 11:07 a.m.
4          (Signature not waived.)
5              - - -
6          Thereupon, at 11:07 a.m., on Tuesday,
7      February 19, 2019, the deposition was concluded.
8              - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 120

1              CERTIFICATE
2    STATE OF OHIO      :
                  SS:
3    COUNTY OF FRANKLIN  :
4        I, Carol A. Kirk, a Registered Merit
     Reporter and Notary Public in and for the State of
5    Ohio, duly commissioned and qualified, do hereby
     certify that the within-named CANDACE HARBAUER was by
6    me first duly sworn to testify to the truth, the whole
     truth, and nothing but the truth in the cause
7    aforesaid; that the deposition then given by her was
     by me reduced to stenotype in the presence of said
8    witness; that the foregoing is a true and correct
     transcript of the deposition so given by her; that the
9    deposition was taken at the time and place in the
     caption specified and was completed without
10   adjournment; and that I am in no way related to or
     employed by any attorney or party hereto or
11   financially interested in the action; and I am not,
     nor is the court reporting firm with which I am
12   affiliated, under a contract as defined in Civil Rule
     28(D).
13
         IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of office at Columbus, Ohio
     on this 22nd day of February 2019.
15
16
17
18              _____
              CAROL A. KIRK, RMR
19              NOTARY PUBLIC - STATE OF OHIO
20   My Commission Expires:  April 9, 2022.
21              - - -
22
23
24

Page 119

1              CERTIFICATE
2    STATE OF OHIO      :
                  SS:
3    COUNTY OF _____:
4
5        I, CANDACE HARBAUER, do hereby certify that
6    I have read the foregoing transcript of my
7    cross-examination given on February 19, 2019; that
8    together with the correction page attached hereto
9    noting changes in form or substance, if any, it is
10   true and correct.
11              _____
              CANDACE HARBAUER
12
13       I do hereby certify that the foregoing
14   transcript of the cross-examination of CANDACE
15   HARBAUER was submitted to the witness for reading and
16   signing; that after she had stated to the undersigned
17   Notary Public that she had read and examined her
18   cross-examination, she signed the same in my presence
19   on the _____ day of _____, 2019.
20
              _____
21              NOTARY PUBLIC - STATE OF OHIO
22
23   My Commission Expires:
24   _____, _____.

Page 121

1          DEPOSITION ERRATA SHEET
2    I, CANDACE HARBAUER, have read the transcript
     of my deposition taken on the 19th day of February
3    2019, or the same has been read to me.  I request that
     the following changes be entered upon the record for
4    the reasons so indicated.  I have signed the signature
     page and authorize you to attach the same to the
5    original transcript.
6    Page  Line  Correction or Change and Reason:
7    ___ ___ _____
8    ___ ___ _____
9    ___ ___ _____
10   ___ ___ _____
11   ___ ___ _____
12   ___ ___ _____
13   ___ ___ _____
14   ___ ___ _____
15   ___ ___ _____
16   ___ ___ _____
17   ___ ___ _____
18   ___ ___ _____
19   ___ ___ _____
20   ___ ___ _____
21   ___ ___ _____
22   ___ ___ _____
23   ___ ___ _____
24   Date _____ Signature _____