```
 1            UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF OHIO

 2                  EASTERN DIVISION

 3

      IN RE: NATIONAL        )

 4    PRESCRIPTION           )  MDL No. 2804

      OPIATE LITIGATION      )

 5    _____   )  Case No.

                             )  1:17-MD-2804

 6                           )

      THIS DOCUMENT RELATES  )  Hon. Dan A.

 7    TO ALL CASES           )  Polster

 8

               TUESDAY, JANUARY 15, 2019

 9

      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

10             CONFIDENTIALITY REVIEW

11                    - - -

12            Videotaped deposition of Karen

13    Harper, held at the offices of STINSON

14    LEONARD STREET LLP, 7700 Forsyth Boulevard,

15    Suite 1000, St. Louis, Missouri, commencing

16    at 9:09 a.m., on the above date, before

17    Carrie A. Campbell, Registered Diplomate

18    Reporter and Certified Realtime Reporter.

19

20

21

22                    - - -

           GOLKOW LITIGATION SERVICES

23      877.370.3377 ph | 917.591.5672 fax

               deps@golkow.com

24

25
```

Page 2

A P P E A R A N C E S :

1
2
3    KELLER ROHRBACK LLP
     BY: DAVID KO
4      dko@kellerrohrback.com
       DEREK LOESER
5      dloeser@kellerrohrback.com
     1201 Third Avenue, Suite 3200
6    Seattle, Washington 98101
     (206) 428-0562
7    Counsel for Plaintiffs
8
9    BRANSTETTER STRANCH & JENNINGS, PLLC
     BY: TRICIA HERZFELD
10     triciah@bsjfirm.com
     223 Rosa L. Parks Avenue, Suite 200
11   Nashville, Tennessee 37203
     (615) 254-8801
12   Counsel for the Tennessee Action
13
14   ARMSTRONG TEASDALE
     BY: JULIE FIX MEYER
15     jfixmeyer@armstrongteasdale.com
     7700 Forsyth Boulevard, Suite 1800
16   St. Louis, Missouri 63105
     (314) 621-5070
17   Counsel for Cardinal Health, Inc.
18
19   COVINGTON & BURLING LLP
     BY: EMILY KVESELIS
20     ekveselis@cov.com
     850 Tenth Street, NW
21   Washington, DC 20001-4956
     (202) 662-6000
22   Counsel for McKesson Corporation
23
24
25

Page 3

1    JACKSON KELLY, PLLC
2    BY: SYLVIA WINSTON NICHOLS
       sylvia.winston@jacksonkelly.com
3        (VIA TELECONFERENCE)
     150 Clay Street, Suite 500
4    Morgantown, West Virginia 26501
     (304) 284-4138
5    Counsel for AmerisourceBergen
6
7    JONES DAY
     BY: NICHOLAS HODGES
8      nhodges@jonesday.com
     4655 Executive Drive, Suite 1500
9    San Diego, California 92121
     (858) 314-1200
10   Counsel for Walmart
11
12   ROPES & GRAY, LLP
     BY: WILLIAM DAVISON
13     william.davison@ropesgray.com
       ANDREW O'CONNOR
14     Andrew.O'Connor@ropesgray.com
     800 Boylston Street
15   Boston, Massachusetts 02199-3600
     (617) 951-7000
16   Counsel for Mallinckrodt
17
18   ARNOLD & PORTER KAYE SCHOLER, LLP
     BY: DAVID HIBEY
19     david.hibey@arnoldporter.com
         (VIA TELECONFERENCE)
20   601 Massachusetts Avenue, NW
     Washington, DC 20001-3743
21   (202) 942-5000
     Counsel for Endo Pharmaceuticals
22   Inc., and Endo Health Solutions Inc.
23
24
25

Page 4

1    FOX ROTHSCHILD LLP
     BY: JACOB PERSKIE
2      jperskie@foxrothschild.com
         (VIA TELECONFERENCE)
3    1301 Atlantic Avenue, Suite 400
     Atlantic City, New Jersey 08401
4    (609) 572-2355
     Counsel for Validus Pharmaceuticals
5
6
7    VIDEOGRAPHER:
       JAMES ARNDT,
8      Golkow Litigation Services
9
10            – – –
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1              INDEX
2                     PAGE
3    APPEARANCES................................  2
4    EXAMINATIONS
5      BY MR. KO...................................  14
6      BY MS. HERZFELD........................... 454
7      BY MR. O'CONNOR........................... 610
8      BY MS. HERZFELD........................... 615
9      BY MR. KO.................................. 615
10
11           EXHIBITS
12   No.     Description            Page
13   Mallinckrodt  Karen Harper LinkedIn      40
     Harper 1     Profile printout
14
     Mallinckrodt  E-mail(s),          109
15   Harper 2     MNK-T1_0000275504 -
              MNK-T1_0000275524
16
     Mallinckrodt  E-mail(s),          130
17   Harper 3     MNK-T1_0000283074 -
              MNK-T1_0000283098
18
     Mallinckrodt  E-mail(s),          151
19   Harper 4     MNK-T1_0001308810 -
              MNK-T1_0001308811
20
     Mallinckrodt  E-mail(s),          158
21   Harper 5     MNK-T1_0000273902 -
              MNK-T1_0000273909
22
     Mallinckrodt  DEA Compliance All Site   211
23   Harper 6     Conference Call,
              MNK-T1_0000287983 -
24            MNK-T1_0000287985
25

Page 6

1  Mallinckrodt   E-mail(s)               220
2  Harper 7      MNK-T1_0000274572

3  Mallinckrodt   E-mail(s)               230
   Harper 8      MNK-T1_0000419810 -
4                MNK-T1_0000419815

5  Mallinckrodt   Deposition transcript of  225
   Harper 9      Karen Harper taken on
6                November 7, 2013

7  Mallinckrodt   E-mail(s)               240
   Harper 10     MNK-T1_0007146630 -
8                MNK-T1_0007146633

9  Mallinckrodt   E-mail(s)               249
   Harper 11     MNK-T1_0000301994
10 Mallinckrodt   E-mail(s)               262
   Harper 12     MNK-T1_0000419907 -
11               MNK-T1_0000419908
12 Mallinckrodt   E-mail(s)               267
   Harper 13     MNK-T1_0000302096 -
13               MNK-T1_0000302100
14 Mallinckrodt   E-mail(s)               289
   Harper 14     MNK-T1_0000278806 -
15               MNK-T1_0000278810
16 Mallinckrodt   E-mail(s)               300
   Harper 15     MNK-T1_0000270090
17
18 Mallinckrodt   E-mail(s)               326
   Harper 16     MNK-T1_0000280260
19 Mallinckrodt   E-mail(s)               343
   Harper 17     MNK-T1_0000368390 -
20               MNK-T1_0000368391
21 Mallinckrodt   E-mail(s)               346
   Harper 18     MNK-T1_0000279142
22
23 Mallinckrodt   E-mail(s)               347
   Harper 19     MNK-T1_0000301020
24 Mallinckrodt   E-mail(s)               349
   Harper 20     MNK-T1_0000372333 -
25               MNK-T1_0000372334

Page 7

1  Mallinckrodt   E-mail(s)               354
   Harper 21     MNK-T1_0007728295 -
2                MNK-T1_0007728296
3  Mallinckrodt   E-mail(s)               358
   Harper 22     MNK-T1_0000500657 -
4                MNK-T1_0000500660
5  Mallinckrodt   E-mail(s)               371
   Exhibit 23    MNK-T1_0000421850 -
6                MNK-T1_0000421854
7  Mallinckrodt   November 1, 2010 letter to  374
   Harper 24     US Department of Justice
8                from Covidien,
                 MNK-T1_0000280607 -
9                MNK-T1_0000280609
10 Mallinckrodt   Harvard (MI) Summary,   379
   Harper 25     MNK-T1_0000264292
11
   Mallinckrodt   Controlled Substance    393
12 Harper 26     Compliance/Suspicious Order
                 Monitoring Audit 12/07/10,
13               MNK-T1_0000307304 -
                 MNK-T1_0000307308
14
   Mallinckrodt   September 21, 2011 letter to  397
15 Harper 27     Wayne Corona from Karen
                 Harper,
16               MNK-T1_0000970734 -
                 MNK-T1_0000970735
17
18 Mallinckrodt   October 17, 2011 letter from  400
   Harper 28     Karen Harper to 43
19               wholesalers/distributors,
                 MNK-T1_0000289368 -
20               MNK-T1_0000289369

21 Mallinckrodt   E-mail(s)               405
   Harper 29     MNK-T1_0000291258 -
22               MNK-T1_0000291259

23 Mallinckrodt   Brooks Pharmacy Monthly  417
   Harper 30     Total 15mg & 30mg Oxy "Sales
24               Qty Govt UOM" 2010-2011
25

Page 8

1  Mallinckrodt   Island Drug Total 15mg &   422
   Harper 31     30mg Oxy "Sales Qty Govt
2                UOM" 2010-2011
3  Mallinckrodt   November 2, 2010 memorandum  431
   Harper 32     from Karen Harper to Howard
4                Davis,
                 MNK-T1_0000269399 -
5                MNK-T1_0000269400
6  Mallinckrodt   E-mail(s),              444
   Harper 33     MNK-T1_0000485740 -
7                MNK-T1_0000485741
8  Mallinckrodt   E-mail(s),              461
   Harper 34     MNK_TNSTA05123927
9
   Mallinckrodt   E-mail(s),              471
10 Harper 35     MNK-T1_0007185722 -
                 MNK-T1_0007185732
11
   Mallinckrodt   Mallinckrodt Chargeback  496
12 Harper 36     Restriction Reinstatement
                 Listing 11/13/2017,
13               MNK_TNSTA00609639
14 Mallinckrodt   E-mail(s),              502
   Harper 37     MNK_TNSTA05340154 -
15               MNK_TNSTA05340156
16 Mallinckrodt   E-mail(s),              504
   Harper 38     MNK_TNSTA05337163
17
   Mallinckrodt   E-mail(s),              511
18 Harper 39     MNK-T1_0007026593 -
                 MNK-T1_0007026594
19
   Mallinckrodt   Suspicious Order Monitoring  517
20 Harper 40     Chargeback Data 2009, 2010,
                 2011 Combined, Oxy 30 Totals
21               by State and Population
                 MNK_TNSTA05126722
22
23 Mallinckrodt   DIRJ and Pill Mill Physician  531
   Harper 41     Lists,
24               MNK-T1_0007704503

                           533
25

Page 9

1  Mallinckrodt   IMS High Oxy 30 Prescribers  422
   Harper 42     Jan 2012,
2                MNK-T1_0005947296
3  Mallinckrodt   IMS Prescribers thru Jan   535
   Harper 43     2013 - Condensed,
4                MNK-T1_0007704471
5  Mallinckrodt   Prescriber List         535
   Harper 44     MNK-T1_0005947297
6
   Mallinckrodt   Oxy 15 and Oxy 30 Ship to  537
7  Harper 45     and Sold via by month
                 Jan-Dec 2011 run 2-15-12
8                non-merged cells.
                 MNK_TNSTA02527616
9
10 Mallinckrodt   Oxy 15 and 30 Ship to and  540
   Harper 46     Sold via by month Jan-Dec
11               run 2-15-12 non-merged
                 cells.
12               MNK_TNSTA02527616

13 Mallinckrodt   HydroApap 10s Ship to and  543
   Harper 47     Sold via by DEA by month Jan
                 2012-Dec 2012 ALL APAP,
14               MNK_TNSTA02527625
15 Mallinckrodt   HydroApap 10s Ship to Sold  548
   Harper 48     via by mo Jan2015-Dec2015
16               APAP run 1-15-16,
                 MNK-T1_0007717730
17
18 Mallinckrodt   Cardinal Top 40 Oxycodone  551
   Harper 49     30mg Pharmacies As of March
19               2012,
                 MNK-T1_0004592727
20 Mallinckrodt   Pharmacy Information Sheet,  558
   Harper 50     MNK-T1_0004592754 -
21               MNK-T1_0004592758
22 Mallinckrodt   Pharmacy Information Sheet,  562
   Harper 51     MNK_TNSTA05350336
23
24 Mallinckrodt   Cardinal Health March 5-6,  570
   Harper 52     2012 Summary Report,
25               MNK_TNSTA05353270 -
                 MNK_TNSTA05353272

Highly Confidential - Subject to Further Confidentiality Review

---

Page 10

```
 1  Mallinckrodt  Pharmacy Information Sheet,    572
    Harper 53    Cardinal Health,
 2               MNK_TNSTA00612651
 3  Mallinckrodt  Pharmacy Information Sheet,    574
    Harper 54    Cardinal Health,
 4               MNK_TNSTA00607869
 5  Mallinckrodt  Riggs Pharmacies all sales     578
    Harper 55    run T1-30-12,
 6               MNK_TNSTA00612647
 7  Mallinckrodt  Oxy 15 and 30 Shp to and       590
    Harper 56    Sold via by month Jan-Dec
 8               2011 run 2-15-12 non-merged
                 cells,
 9               MNK_TNSTA02527616
10  Mallinckrodt  HydroApap 10s Shp to Sold      593
    Harper 57    via by mo Jan2015-Dec2015
11               325 APAP run 1-15-16,
                 MNK-T1_0007717730
12
    Mallinckrodt  "DEA investigators seeking     602
13  Harper 58    answers in small Tennessee
                 town"
14
    Mallinckrodt  E-mail(s),                     603
15  Harper 59    MNK-T1_0006462195 -
                 MNK-T1_0006462197
16
    Mallinckrodt  E-mail(s),                     606
17  Harper 60    MNK-T1_0007185456 -
                 MNK-T1_0007185457
18
    Mallinckrodt  E-mail(s),                     608
19  Harper 61    MNK-T1_0007259043
20  Mallinckrodt  E-mail(s),                     615
    Harper 62    MNK-T1_0000387492
21
22      (Exhibits attached to the deposition.)
23
24
25
```

Page 11

```
 1       VIDEOGRAPHER:  We are now on      08:49:49
 2  the record.  My name is James Arndt.    09:08:57
 3  I'm a videographer for Golkow          09:09:00
 4  Litigation Services.                   09:09:01
 5       Today's date is January 15th of   09:09:01
 6  2019, and the time is 9:09 a.m.        09:09:05
 7       This video deposition is being    09:09:07
 8  held in St. Louis, Missouri, in the    09:09:09
 9  matter of the National Prescription    09:09:11
10  Opiate Litigation for the United       09:09:14
11  States District Court for the Northern 09:09:15
12  District of Ohio, Eastern Division.    09:09:16
13       The deponent is Karen Harper.     09:09:18
14       Will counsel please identify      09:09:20
15  themselves.                            09:09:22
16       MR. KO:  Good morning.  David     09:09:23
17  Ko, Keller Rohrback, on behalf of      09:09:25
18  plaintiffs.                            09:09:27
19       MR. LOESER:  Derek Loeser from    09:09:28
20  Keller Rohrback for the plaintiffs.    09:09:28
21       MS. HERZFELD:  Tricia Herzfeld,   09:09:30
22  Branstetter, Branch & Jennings, for    09:09:31
23  the Tennessee plaintiffs.              09:09:31
24       MS. FIX MEYER:  Julie Fix         09:09:34
25  Meyer, Armstrong Teasdale, for         09:09:34
```

Page 12

```
 1  Cardinal Health.                       09:09:38
 2       MS. KVESELIS:  Emily Kveselis,    09:09:38
 3  Covington & Burling, for McKesson.     09:09:40
 4       MR. HODGES:  Nick Hodges, Jones   09:09:41
 5  Day, for Walmart.                      09:09:42
 6       MR. DAVISON:  William Davison,    09:09:44
 7  Ropes & Gray, for Mallinckrodt, LLC,   09:09:44
 8  SpecGx, LLC, and the witness.          09:09:45
 9       MR. O'CONNOR:  Andrew O'Connor    09:09:45
10  from Ropes & Gray for Mallinckrodt,    09:09:49
11  LLC, SpecGx and Ms. Harper.            09:09:52
12       VIDEOGRAPHER:  Will counsel       09:09:53
13  present by phone please identify       09:09:53
14  themselves.                            09:09:56
15       MR. HIBEY:  David Hibey of        09:09:58
16  Arnold & Porter for the Endo and Par   09:10:01
17  defendants.                            09:10:03
18       MR. PERSKIE:  Jacob Perskie,      09:10:04
19  Fox Rothschild, for Validus.           09:10:09
20       MS. WINSTON:  Sylvian Winston     09:10:11
21  of Jackson Kelly for the               09:10:12
22  AmerisourceBergen Drug Corporation.    09:10:15
23       VIDEOGRAPHER:  The court          09:10:19
24  reporter is Carrie Campbell, and she   09:10:20
25  will now swear in the witness.         09:10:21
```

Page 13

```
 1       KAREN HARPER,
 2  of lawful age, having been first duly sworn
 3  to tell the truth, the whole truth and
 4  nothing but the truth, deposes and says on
 5  behalf of the Plaintiffs, as follows:
 6
 7       MR. KO:  Before we get started,    09:10:30
 8  I just wanted to note for the record    09:10:32
 9  that yesterday evening Mallinckrodt's   09:10:33
10  counsel had provided some documents,    09:10:35
11  another production of documents,        09:10:38
12  including some documents apparently     09:10:39
13  from Ms. Harper's custodial file.  It   09:10:40
14  appears to be a fairly substantial      09:10:44
15  production.                             09:10:46
16       We didn't get a chance to          09:10:47
17  review those, so I just wanted to note  09:10:48
18  for the record that we reserve the      09:10:49
19  right to reopen this deposition based   09:10:50
20  on that review.                         09:10:52
21       MR. O'CONNOR:  And we believe      09:10:52
22  the documents we produced don't         09:10:53
23  prejudice the plaintiffs in any way,    09:10:55
24  and I'm happy to discuss that further,  09:10:59
25  but do disagree with your               09:11:00
```

Highly Confidential – Subject to Further Confidentiality Review

Page 14

1    characterization.                        09:11:01
2         DIRECT EXAMINATION                   09:11:03
3    QUESTIONS BY MR. KO:                      09:11:04
4         Q.   Good morning.  We met earlier,  09:11:05
5    just a moment ago.                        09:11:06
6         Could you please state and           09:11:07
7    spell your name for the record?           09:11:09
8         A.   Yes.  Karen Harper, K-a-r-e-n,  09:11:09
9    H-a-r-p-e-r.                              09:11:12
10        Q.   Ms. Harper, where do you        09:11:14
11   currently reside?                         09:11:16
12        A.   St. Louis County, Missouri.     09:11:17
13        Q.   Okay.  And I know that you have 09:11:19
14   had your deposition taken at least once   09:11:21
15   before in connection with a matter involving 09:11:23
16   Island Drug Pharmacy.                     09:11:28
17        Have you had your deposition         09:11:29
18   taken at any other time other than that   09:11:30
19   instance?                                 09:11:32
20        A.   Earlier in my life, before I    09:11:32
21   was an employee of Mallinckrodt.          09:11:35
22        Q.   Okay.  So how many times have   09:11:37
23   you been deposed?                         09:11:38
24        A.   Two -- twice.                   09:11:38
25        Q.   Okay.  So you understand        09:11:40

Page 15

1    probably some of the ground rules, but I just 09:11:42
2    want to remind you of a few that are       09:11:44
3    important to me today.                     09:11:47
4         The court reporters have the          09:11:48
5    most important job here in transcribing    09:11:49
6    everything that we're saying, so it's      09:11:52
7    important that we don't talk over one      09:11:53
8    another.  So please wait until I finish my 09:11:54
9    question before you move on to your response, 09:11:56
10   and likewise, I'll wait until you finish your 09:11:58
11   question {sic} before I move on to my next 09:12:00
12   question.                                  09:12:03
13        Does that sound good?                 09:12:03
14        A.   Yes.                             09:12:04
15        Q.   And to the extent I ask a yes    09:12:05
16   or no question, I would ask that you actually 09:12:07
17   in fact answer yes or no, if that's your   09:12:11
18   response, rather than shaking your head or 09:12:11
19   nodding your head.                         09:12:15
20        A.   Understood.                      09:12:16
21        Q.   Okay.  And from time to time     09:12:16
22   counsel at this table may object to my     09:12:17
23   questioning, but unless you get a clear    09:12:19
24   instruction not to respond, I would ask that 09:12:21
25   you respond to my question.                09:12:23

Page 16

1         Okay?                                09:12:23
2         A.   Yes.                             09:12:24
3         Q.   I think we're here for a fairly 09:12:25
4    long time today, so to the extent you need 09:12:27
5    breaks throughout the day, please feel free 09:12:30
6    to ask and I'll do my best to accommodate. 09:12:33
7         Okay?                                09:12:35
8         A.   Thank you.                       09:12:36
9         Q.   Ms. Harper, is there anything   09:12:36
10   that you can think of today that will prevent 09:12:41
11   you from testifying truthfully and honestly? 09:12:43
12        A.   No.                              09:12:46
13        Q.   Great.                           09:12:46
14        Ms. Harper, what did you do to        09:12:47
15   prepare for this deposition today?         09:12:51
16        A.   I met with my attorneys.         09:12:52
17        Q.   Okay.  And who are they?         09:12:54
18        A.   Ropes & Gray.                    09:12:55
19        Q.   Okay.  And Mr. O'Connor and      09:12:58
20   Mr. Davison sitting here today, are those the 09:13:00
21   two individuals that you met with?         09:13:02
22        A.   Yes, among others.              09:13:03
23        Q.   Okay.  And how many attorneys    09:13:04
24   did you meet with?                         09:13:06
25        A.   At least one other.             09:13:06

Page 17

1         Q.   Okay.  And how many times did   09:13:08
2    you meet?                                  09:13:09
3         A.   Five times.                      09:13:09
4         Q.   Okay.  So you met for five       09:13:10
5    different days or five different sessions? 09:13:13
6         A.   Five different sessions.         09:13:14
7         Q.   Okay.  And how many hours total 09:13:16
8    would you say that would be?               09:13:17
9         A.   The first two sessions were      09:13:18
10   eight -- two eight-hour days, so 16 and 16, 09:13:21
11   32.  Then we had an eight-hour day, 40, and 09:13:26
12   another two eight-hour days.  So 56 hours.  09:13:30
13        Q.   Sounds like a lot of             09:13:34
14   preparation.                               09:13:36
15        Other than your outside               09:13:37
16   counsel, or other than Ropes & Gray, were  09:13:42
17   there any other people present during your 09:13:44
18   meetings?                                  09:13:49
19        A.   No.                              09:13:50
20        Q.   Okay.  And in those meetings,    09:13:50
21   did you review any documents?              09:13:53
22        A.   Yes.                             09:13:54
23        Q.   Okay.  And did -- were those     09:13:55
24   documents selected by counsel?             09:13:58
25        A.   Yes.                             09:14:01

Page 18

1    Q.    Okay.  And did you provide any    09:14:02
2  documents in any of these meetings?    09:14:04
3    A.    Not in those meetings.    09:14:06
4    Q.    Okay.  In preparation for this    09:14:09
5  deposition today, have you spoken with any    09:14:15
6  current or former employees of Mallinckrodt    09:14:18
7    A.    Only to the extent that I    09:14:20
8  needed to be absent from work.    09:14:23
9    Q.    Okay.  Are you aware that other    09:14:26
10  former and current employees of Mallinckrodt    09:14:31
11  have been deposed?    09:14:32
12    A.    Yes.    09:14:33
13    Q.    Okay.  Have you spoken with any    09:14:34
14  of those deponents?    09:14:36
15    A.    No, sir.    09:14:37
16    Q.    Okay.  You know who Bill    09:14:38
17  Ratliff is, right?    09:14:41
18    A.    Yes.    09:14:42
19    Q.    Have you spoken with him about    09:14:42
20  this deposition at all?    09:14:44
21    A.    No.    09:14:44
22    Q.    Okay.  Do you know who John    09:14:45
23  Gillies is?    09:14:48
24    A.    Yes.    09:14:48
25    Q.    Have you spoken with him?    09:14:48

Page 19

1    A.    No.    09:14:50
2    Q.    Okay.  Ms. Harper, where did    09:14:53
3  you go to school?  I mean, college, excuse    09:14:55
4  me.    09:14:58
5    A.    I only have a couple of years    09:14:58
6  partial college credits, and so that was at    09:15:00
7  community college district, St. Louis,    09:15:03
8  Missouri.    09:15:06
9    Q.    Okay.  And what was the name of    09:15:06
10  that school?    09:15:07
11    A.    Meramec Community College.    09:15:07
12    Q.    Okay.  And did you actually    09:15:09
13  obtain a degree?    09:15:11
14    A.    I did not.    09:15:11
15    Q.    Okay.  And where did you -- by    09:15:12
16  the way, what year did you stop going to    09:15:18
17  school?    09:15:20
18    A.    So I graduated from high school    09:15:20
19  and took intermittent college classes but    09:15:22
20  never achieved a degree.  So I graduated from    09:15:26
21  high school in 1974.    09:15:28
22    Q.    Okay.  And after you stopped    09:15:30
23  going to community college, where did you    09:15:34
24  first work?    09:15:35
25    A.    Goldman and Gibson.  It was a    09:15:36

Page 20

1  specialty advertising company.    09:15:44
2    Q.    Okay.  And what did you do    09:15:45
3  there?    09:15:46
4    A.    Clerical.    09:15:46
5    Q.    Okay.  When did you first start    09:15:47
6  working at Mallinckrodt?    09:15:49
7    A.    In March of 1975.    09:15:50
8    Q.    Okay.  So there was a brief    09:15:53
9  period of about approximately one year    09:15:54
10  between when you ceased going to community    09:15:56
11  college and when you started working at    09:15:58
12  Mallinckrodt?    09:16:00
13    A.    Yes.    09:16:00
14    Q.    Okay.  And what was your first    09:16:00
15  job at Mallinckrodt?    09:16:02
16    A.    Clerk typist.    09:16:02
17    Q.    Okay.  And clerk typist for    09:16:05
18  what division or department?    09:16:08
19    A.    Purchasing group in the    09:16:09
20  corporate area.    09:16:12
21    Q.    Okay.  And how long did you do    09:16:12
22  that?    09:16:15
23    A.    Approximately one year.    09:16:15
24    Q.    Okay.  I may want to walk    09:16:18
25  through each position you had at    09:16:24

Page 21

1  Mallinckrodt, but why don't we try this way.    09:16:25
2        When did you first become    09:16:28
3  senior manager of controlled substance    09:16:30
4  compliance?    09:16:32
5    A.    I don't remember the year.    09:16:33
6    Q.    Okay.  Do you remember if it    09:16:35
7  was the late '70s or the early '80s?    09:16:36
8    A.    I'm sorry, I don't remember the    09:16:41
9  year.    09:16:42
10    Q.    Okay.  And when I say    09:16:42
11  "controlled substance compliance," it's my    09:16:43
12  understanding that the group was actually    09:16:44
13  called DEA compliance at the time.    09:16:46
14    A.    Correct.    09:16:48
15    Q.    Does that comport with your    09:16:49
16  understanding?    09:16:50
17    A.    Yes.  Yes.    09:16:50
18    Q.    And so you have no recollection    09:16:51
19  of when you became senior manager of DEA    09:16:54
20  compliance?    09:16:56
21    A.    I have recollection, but I    09:16:56
22  can't remember the year.  I'm sorry.    09:17:00
23    Q.    Okay.  And what is your    09:17:02
24  recollection?  Is it approximately -- I mean,    09:17:03
25  are we talking the 1990s that you became the    09:17:05

Page 22

1  senior manager or is it the '80s?          09:17:08
2      A.   It would have been in the -- in   09:17:10
3  the -- after 2000.                         09:17:13
4      Q.   After 2000?                        09:17:14
5      A.   Yes.                               09:17:15
6      Q.   Okay.  So from the period          09:17:16
7  between when you became senior manager of   09:17:17
8  controlled substance compliance, or DEA     09:17:21
9  compliance, and when you were first started 09:17:23
10 at Mallinckrodt, there was approximately    09:17:26
11 25 years that had passed?                   09:17:28
12     A.   Yes.                               09:17:29
13     Q.   Okay.  And how was it that you     09:17:29
14 became senior manager of that group after   09:17:38
15 starting as a clerical typist?              09:17:42
16     A.   I moved into senior manager        09:17:45
17 after I went to the controlled substances   09:17:48
18 compliance group.  I was a coordinator in   09:17:52
19 that department, then became manager and then 09:17:55
20 became senior manager.                      09:17:58
21     Q.   Okay.  And when did you become     09:17:59
22 coordinator of the DEA compliance/CSC?      09:18:04
23     A.   I'm not certain of the year.       09:18:07
24 2001, approximate.                          09:18:11
25     Q.   Okay.  That's -- I believe         09:18:13

Page 23

1  that's when you said you became senior      09:18:15
2  manager.                                    09:18:17
3          I was asking when you first         09:18:18
4  became a coordinator, as you described      09:18:19
5  earlier.  Approximately when was that?      09:18:21
6      A.   No, sir, I'm sorry.  I think I     09:18:22
7  said I became senior manager after year 2000, 09:18:24
8  but I couldn't remember the year.  I        09:18:27
9  apologize.                                  09:18:30
10     Q.   I got it.                          09:18:30
11         So around 2001 is when you          09:18:30
12 became a coordinator --                     09:18:32
13     A.   Yes.                               09:18:35
14     Q.   -- at the control --               09:18:35
15     A.   Yes.                               09:18:36
16     Q.   -- for the DEA compliance          09:18:37
17 group?                                      09:18:38
18     A.   Yes.  Yes.                         09:18:38
19     Q.   That's helpful.  Thank you.        09:18:39
20 And at the time you became                  09:18:40
21 involved in the DEA compliance group, were  09:18:45
22 you aware that Mallinckrodt was manufacturing 09:18:48
23 controlled substances?                      09:18:50
24     A.   Yes.                               09:18:50
25     Q.   Including prescription opioids?    09:18:51

Page 24

1      A.   Yes.                               09:18:52
2      Q.   Okay.  And by the way, have you    09:18:55
3  ever worked for the DEA?                    09:18:59
4      A.   No.                                09:19:00
5      Q.   Have you ever worked for the       09:19:01
6  government?                                 09:19:02
7      A.   No.                                09:19:02
8      Q.   Have you worked in any -- for      09:19:03
9  any employer that -- whose responsibility it 09:19:07
10 was to perform diversion-type activities on 09:19:11
11 controlled substances?                      09:19:16
12     A.   No.                                09:19:16
13     Q.   Okay.  Other than the one year     09:19:17
14 between finishing your -- or other than the  09:19:19
15 one year between when you stopped going to   09:19:23
16 community college and when you started       09:19:26
17 working at Mallinckrodt, fair to say that you 09:19:28
18 had no other employment?                    09:19:30
19         In other words, from 1975 to        09:19:33
20 present, you have always worked at           09:19:34
21 Mallinckrodt, correct?                      09:19:35
22     A.   That is correct.                   09:19:36
23     Q.   Okay.  At the time you joined      09:19:37
24 in 2001, the approximate 2001 time period,   09:19:43
25 when you joined the DEA compliance team,     09:19:46

Page 25

1  approximately how large was that team?      09:19:49
2      A.   Three or four people.              09:19:51
3      Q.   Okay.  And who were those three    09:19:53
4  or four people?                             09:19:54
5      A.   My manager and two other           09:19:54
6  compliance coordinators.                    09:20:00
7      Q.   Okay.  Who was your manager at     09:20:01
8  that time?                                  09:20:03
9      A.   The gentleman's name is Jay        09:20:03
10 Foushee.                                    09:20:07
11     Q.   Okay.                              09:20:07
12     A.   Would you like for me to spell     09:20:07
13 that?                                       09:20:09
14     Q.   That's okay.  We can get it        09:20:09
15 later.                                      09:20:11
16     A.   All right.                         09:20:11
17     Q.   And so you reported to him?        09:20:12
18     A.   Yes.                               09:20:14
19     Q.   Okay.  And you said two other      09:20:15
20 compliance managers.  Who --                09:20:16
21     A.   Compliance coordinators.           09:20:19
22     Q.   Coordinators, excuse me.           09:20:20
23     A.   Yes, sir.                          09:20:20
24     Q.   Thank you.                         09:20:21
25         Who were they?                      09:20:23

Page 26

1      A.    Mary Lewis and a gentleman      09:20:23
2   named Lee Nelson.                        09:20:25
3      Q.    And did the composition or the   09:20:27
4   size of this team change over time?      09:20:34
5      A.    Yes.                             09:20:37
6      Q.    Okay.  Did it expand, I assume?  09:20:39
7      A.    Yes.                             09:20:41
8      Q.    And when did you -- when do you  09:20:41
9   recall when it first expanded beyond the 09:20:46
10  four -- three or four people you've       09:20:48
11  mentioned?                               09:20:52
12     A.    After a few years went by --     09:20:52
13  and I'm sorry, I don't know the year -- the 09:20:55
14  company purchased another -- an additional 09:20:56
15  controlled substances facility in Hobart, 09:21:00
16  New York, and the department grew after that. 09:21:04
17     Q.    Okay.  Did it -- and how -- to   09:21:07
18  what extent did it grow?                 09:21:10
19     A.    There are two persons who were   09:21:12
20  in the DEA compliance group at Hobart,   09:21:14
21  New York, as an isolated department, and we 09:21:17
22  became one group.  And there was another 09:21:21
23  person who was in the group at our Webster 09:21:24
24  Groves narcotics manufacturing facility, so 09:21:28
25  our group became united as one corporate 09:21:29

Page 27

1   department, if you will.                 09:21:33
2      Q.    Okay.  So far to say it          09:21:34
3   doubled in size?  Your group --          09:21:37
4      A.    Yes.                             09:21:39
5      Q.    -- became seven or eight         09:21:39
6   people?                                  09:21:41
7      A.    Yes.                             09:21:41
8      Q.    Okay.  At any time that you      09:21:42
9   were involved in the DEA compliance group, 09:21:44
10  was the group ever comprised of more than ten 09:21:47
11  individuals?                             09:21:51
12     A.    No.                              09:21:51
13     Q.    Okay.  It was always             09:21:52
14  approximately anywhere from three to eight 09:21:53
15  people?                                  09:21:55
16     A.    Yes.                             09:21:55
17     Q.    Okay.  Ms. Harper, are you       09:21:55
18  familiar with the Controlled Substances Act? 09:21:59
19     A.    Yes.                             09:22:00
20     Q.    And are you familiar that        09:22:01
21  pursuant to Controlled Substances Act that 09:22:03
22  registrants have a fundamental duty to   09:22:05
23  maintain effective controls against      09:22:13
24  diversion?                               09:22:10
25     A.    Yes, I believe the language is   09:22:10

Page 28

1   to guard against diversion, but, yes.    09:22:13
2      Q.    Okay.  And are you familiar      09:22:16
3   that under the -- do you mind if I call the 09:22:20
4   Controlled Substances Act the CSA?       09:22:24
5      A.    I don't mind.                    09:22:25
6      Q.    Okay.  Are you familiar that     09:22:26
7   pursuant to the CSA that registrants have a 09:22:27
8   duty to monitor and implement a system to 09:22:30
9   identify suspicious orders?              09:22:32
10         MR. O'CONNOR:  Object to form.     09:22:33
11         THE WITNESS:  Yes, I'm aware.      09:22:35
12  QUESTIONS BY MR. KO:                      09:22:36
13     Q.    Okay.  And these obligations     09:22:37
14  have existed since the time that CSA was  09:22:39
15  enacted, correct?                        09:22:41
16         MR. O'CONNOR:  Object to form.     09:22:42
17         THE WITNESS:  I don't know the     09:22:44
18     date of the CSA versus the creation of 09:22:47
19     CFR 21.                               09:22:53
20  QUESTIONS BY MR. KO:                      09:22:55
21     Q.    Okay.  And by CFR 21, are you    09:22:55
22  referring to the -- what's commonly referred 09:22:57
23  to the regs that are interpreting the CSA? 09:22:59
24     A.    Yes.                             09:23:04
25     Q.    Okay.  Regardless of when they   09:23:04

Page 29

1   were enacted, you understood at the time that 09:23:06
2   you joined the DEA compliance group in 2001 09:23:07
3   that the CSA required registrants to design 09:23:10
4   and implement a system to identify suspicious 09:23:15
5   orders; is that correct?                 09:23:19
6      A.    Yes.                             09:23:19
7      Q.    Okay.  What was your             09:23:21
8   compensation when you first became a     09:23:24
9   coordinator at -- in the DEA compliance group 09:23:27
10  in 2001?                                 09:23:30
11     A.    I don't know.                    09:23:30
12     Q.    Okay.  Can you give us an        09:23:32
13  approximation?                           09:23:34
14     A.    I'm sorry, I really can't.       09:23:35
15     Q.    Was it less than $50,000?        09:23:36
16     A.    I honestly don't know.  I can't  09:23:37
17  remember, I'm sorry.                     09:23:40
18     Q.    Okay.  Was it less than          09:23:41
19  $25,000?                                 09:23:43
20     A.    I'm sorry, I can't remember.     09:23:43
21     Q.    All right.  What was your        09:23:45
22  compensation when you became senior manager 09:23:47
23  of DEA compliance?                       09:23:49
24     A.    I can't remember my salary over  09:23:50
25  the years.                               09:23:52

Page 30

1    Q.    Okay.  Do you have an         09:23:54
2  approximate recollection of how much you   09:23:55
3  made?                               09:23:57
4    A.    No, sir.                     09:23:57
5    Q.    Okay.  Do you recall if it was    09:23:59
6  $75,000 or more or above?            09:24:01
7    A.    No, sir, I don't recall.      09:24:03
8    Q.    Okay.  Do you know what your    09:24:04
9  salary is currently?                 09:24:09
10   A.    Yes.                          09:24:10
11   Q.    Okay.  And you're currently   09:24:13
12 director of controlled substance compliance,   09:24:15
13 correct?                             09:24:18
14   A.    Yes.                          09:24:19
15   Q.    And what is your salary       09:24:19
16 currently?                           09:24:21
17   A.    It's -- I'm going to give you   09:24:21
18 two numbers because I get that mixed up as   09:24:24
19 well, I'm sorry.  It's either ████ or   09:24:27
20 ████ per year.                       09:24:31
21   Q.    ████████████                  09:24:32
22   A.    ████████████                  09:24:34
23   Q.    ████████████                  09:24:35
24 ████████                             09:24:39
25   A.    ████████████                  09:24:40

Page 31

1  ████████                             09:24:42
2    Q.    And when did you start        09:24:42
3  ████████████████?                    09:24:44
4    A.    I don't recall the year.      09:24:44
5    Q.    Okay.  And do you have any    09:24:45
6  other -- do you have a retirement package at   09:24:49
7  all?                                 09:24:51
8    A.    Yes.                          09:24:52
9    Q.    Okay.  And what does that     09:24:53
10 consist of?                          09:24:54
11   A.    It's 401(k).                  09:24:55
12   Q.    Okay.  Other than the 401(k)   09:24:56
13 and ████████████, do you   09:24:58
14 have any other additional compensation in   09:25:01
15 addition to your salary?             09:25:04
16   A.    Yes.                          09:25:05
17   Q.    And what does that consist of?   09:25:07
18   A.    A bonus, an annual bonus.     09:25:08
19   Q.    Okay.  And approximately how   09:25:10
20 much is that?                        09:25:11
21   A.    It's -- it's a percent of the   09:25:11
22 salary based upon the performance of the   09:25:14
23 company.                             09:25:17
24   Q.    Okay.  And what's the         09:25:17
25 approximate percentage that you received last   09:25:18

Page 32

1  year?                                09:25:20
2    A.    It's 20 percent.              09:25:20
3    Q.    Okay.  And has that -- over the   09:25:23
4  time that you've either been senior manager   09:25:27
5  or director of controlled substance   09:25:28
6  compliance, has it been that approximate   09:25:30
7  percentage?                          09:25:32
8    A.    Yes.                          09:25:32
9    Q.    Okay.  Great.                 09:25:34
10        Ms. Harper, have you reviewed   09:25:35
11 any court documents or pleadings in this   09:25:39
12 case?                                09:25:42
13   A.    I'm not certain.              09:25:42
14   Q.    Okay.  Are you aware that     09:25:46
15 there's a case currently pending in Ohio,   09:25:49
16 generally titled the national opioid   09:25:54
17 litigation?                          09:25:56
18   A.    Yes.                          09:25:56
19   Q.    And you're aware that there are   09:25:57
20 approximately 1500 jurisdictions that have   09:25:58
21 filed suit against various manufacturers,   09:26:02
22 distributors and retail pharmacies of   09:26:07
23 prescription opioids?                09:26:08
24   A.    Yes.                          09:26:08
25   Q.    Okay.  And are you aware that   09:26:08

Page 33

1  these jurisdictions have alleged that these   09:26:09
2  entities are responsible for the opioid   09:26:12
3  crisis?                              09:26:14
4    A.    Yes.                          09:26:15
5    Q.    Okay.  By the way, are you    09:26:16
6  aware -- strike that.                09:26:20
7        Are you generally aware that   09:26:20
8  these jurisdictions are alleging that these   09:26:25
9  entities should be responsible for the costs   09:26:28
10 that these entities have incurred as a result   09:26:30
11 of responding to the opioid crisis?   09:26:33
12   A.    Yes, in general.              09:26:35
13   Q.    Okay.  And are you aware of any   09:26:36
14 complaints that have actually been filed   09:26:39
15 against your company?                09:26:42
16   A.    No.                           09:26:43
17   Q.    Okay.  So you haven't read any   09:26:46
18 of the complaints that have been filed   09:26:47
19 against Mallinckrodt?                09:26:50
20   A.    I've read pieces of the MDL,   09:26:51
21 but nothing specific to Mallinckrodt.   09:26:55
22   Q.    Okay.  When you say "pieces of   09:26:56
23 the MDL," what do you mean?          09:26:59
24   A.    The multi-district litigation.   09:27:01
25   Q.    And particularly when you say   09:27:03

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  "pieces," I'm just trying to get an        09:27:04
2  understanding of what you've reviewed.      09:27:06
3      A.    So we receive a pharma news      09:27:07
4  brief every single day, and so there will be  09:27:10
5  excerpts from the various matters related to  09:27:13
6  the MDL, Judge Polster's rulings, et cetera.  09:27:16
7      Q.    I see.                           09:27:20
8          So in other words, you're          09:27:20
9  getting and receiving and reviewing these    09:27:22
10  news updates about the MDL?                 09:27:26
11      A.    Correct.                         09:27:28
12      Q.    Okay.  Great.                    09:27:29
13          Ms. Harper, do you agree that     09:27:30
14  there's an opioid epidemic in this country?  09:27:35
15          MR. O'CONNOR:  Object to form.    09:27:37
16          THE WITNESS:  Yes, I do.          09:27:38
17  QUESTIONS BY MR. KO:                        09:27:39
18      Q.    Okay.  And are you aware that    09:27:41
19  there's been an opioid epidemic in this     09:27:43
20  country for quite some time?                09:27:45
21          MR. O'CONNOR:  Object to form.    09:27:47
22          THE WITNESS:  I don't know,       09:27:47
23      sir, what you mean by "quite some      09:27:50
24      time."                                 09:27:51
25          Can you -- I don't know.          09:27:52

Page 35

1  QUESTIONS BY MR. KO:                        09:27:53
2      Q.    When did you first start         09:27:54
3  believing that there was an opioid epidemic  09:27:57
4  in this country?                            09:28:02
5          MR. O'CONNOR:  Object to form.    09:28:03
6          THE WITNESS:  Approximately        09:28:04
7      mid-2000s.                             09:28:05
8  QUESTIONS BY MR. KO:                        09:28:06
9      Q.    Mid-2000s?                        09:28:07
10      A.    Yes, sir.                        09:28:08
11      Q.    Okay.  Are you familiar with    09:28:08
12  Mallinckrodt's market share of prescription  09:28:10
13  opioids?                                    09:28:13
14      A.    On some products, yes.          09:28:13
15      Q.    Okay.  With respect to the      09:28:18
16  generic product line of Mallinckrodt, are you  09:28:20
17  aware of Mallinckrodt's market share in the  09:28:24
18  generic line of business?                   09:28:27
19      A.    Not overall, no, sir.           09:28:29
20      Q.    Okay.  Are you aware that       09:28:31
21  Mallinckrodt has been either the number one  09:28:34
22  or number two in terms of market share      09:28:36
23  generic manufacturer of prescription opioids  09:28:40
24  for the last 20 or so years?                09:28:42
25          MR. O'CONNOR:  Object to form.    09:28:43

Page 36

1          THE WITNESS:  That is not         09:28:44
2      the sta -- pardon me, the statistic I  09:28:46
3      have heard.                           09:28:48
4  QUESTIONS BY MR. KO:                        09:28:49
5      Q.    Okay.  What is the statistic     09:28:49
6  that you have heard?                         09:28:50
7      A.    That we're in the top five --    09:28:50
8      Q.    Okay.                            09:28:50
9      A.    -- of the share of generic       09:28:53
10  suppliers.                                  09:28:55
11      Q.    Okay.  And generic suppliers of  09:28:55
12  prescription opioids in particular, correct?  09:28:58
13      A.    Yes.                            09:28:59
14      Q.    Okay.  And currently, do you    09:29:00
15  understand that Mallinckrodt has the number  09:29:05
16  one market share of generic prescription    09:29:07
17  opioids?                                    09:29:10
18          MR. O'CONNOR:  Object to form.    09:29:10
19          THE WITNESS:  I don't -- I'm      09:29:11
20      sorry.  I don't know.  I don't know  09:29:12
21      our current market position.          09:29:13
22  QUESTIONS BY MR. KO:                        09:29:14
23      Q.    Okay.  During your time as      09:29:14
24  director or senior manager of controlled    09:29:18
25  substance compliance, have you ever inquired  09:29:21

Page 37

1  as to the market share of Mallinckrodt with  09:29:23
2  respect to prescription opioids?            09:29:26
3      A.    On certain specific drug         09:29:28
4  substances, yes.                            09:29:31
5      Q.    And which specific drug          09:29:32
6  substances?                                 09:29:34
7      A.    So I'll use the example          09:29:34
8  methylphenidate.  When we're applying for    09:29:40
9  quota, if there is an intent or if we have a  09:29:43
10  belief that we will grow our market share, I  09:29:46
11  need to learn the existing market share that  09:29:48
12  Mallinckrodt holds.                         09:29:51
13      Q.    Okay.  And when over the last    09:29:52
14  20 or so years have you inquired into that?  09:29:57
15          Has that been inquiries that      09:30:03
16  you've made on a fairly regular basis?      09:30:04
17          MR. O'CONNOR:  Object to form.    09:30:07
18          THE WITNESS:  Yes, in            09:30:07
19      coordination with quota requests to   09:30:08
20      DEA, yes.                             09:30:09
21  QUESTIONS BY MR. KO:                        09:30:10
22      Q.    And those quota requests on an   09:30:10
23  annual basis, correct?                      09:30:13
24      A.    Quota is granted on an annual    09:30:13
25  basis, but the requests are an iterative    09:30:16

Page 38

1  process throughout a calendar year.      09:30:19
2      Q.   Okay.  And so you would say      09:30:20
3  that you have regularly -- I just want to   09:30:22
4  make sure I understand when you -- when you   09:30:25
5  have inquired into understanding      09:30:28
6  Mallinckrodt's market share, and you've said   09:30:30
7  on a fairly consistent basis, correct?   09:30:32
8      A.   Yes.      09:30:34
9      Q.   Okay.  And consistent means   09:30:36
10  throughout the year, as you've described, in   09:30:40
11  connection with issues when dealing with   09:30:42
12  quota requests to the DEA?      09:30:45
13      MR. O'CONNOR:  Object to form.   09:30:47
14      THE WITNESS:  Yes, throughout   09:30:47
15  the year, but on certain drug      09:30:49
16  substances at different times, sir.   09:30:51
17  QUESTIONS BY MR. KO:      09:30:52
18      Q.   Okay.  Going back to your   09:30:53
19  current position as director of controlled   09:30:57
20  substance compliance --      09:31:01
21      A.   Sorry.      09:31:02
22      Q.   That's okay.      09:31:03
23      -- when did you become      09:31:05
24  director?      09:31:07
25      A.   Within the last six months.   09:31:08

Page 39

1      Q.   Okay.  So fairly recently?   09:31:11
2      A.   Yes, sir.      09:31:12
3      Q.   And before that, you were   09:31:13
4  senior manager of controlled substance   09:31:15
5  compliance, correct?      09:31:17
6      A.   Yes.      09:31:18
7      Q.   Okay.  And so was this   09:31:18
8  considered a promotion?      09:31:20
9      A.   Yes, sir.      09:31:21
10      Q.   Okay.  And who did you replace,   09:31:22
11  if at all?  If anyone?      09:31:25
12      A.   No one.      09:31:27
13      Q.   So was this position created   09:31:28
14  for you?      09:31:30
15      A.   Yes.      09:31:30
16      Q.   Okay.  And what were the   09:31:31
17  circumstances of creating this position?   09:31:34
18      A.   It was an evolution, if you   09:31:36
19  will, of my -- my existing job      09:31:39
20  responsibilities that merited a different   09:31:43
21  title.      09:31:46
22      Q.   Okay.  And now that you're   09:31:46
23  director, do you have people that report to   09:31:55
24  you?      09:31:56
25      A.   Yes.      09:31:56

Page 40

1      Q.   And who reports to you?   09:31:57
2      A.   I have two direct reports.   09:31:58
3  They are managers of controlled substances   09:32:01
4  compliance.      09:32:04
5      Q.   And who are they?      09:32:07
6      A.   There's a gentleman named --   09:32:07
7  his name is Dave Hunter.      09:32:10
8      Q.   And who is the other person?   09:32:14
9  You said there were two?      09:32:17
10      A.   Eileen Spaulding.      09:32:17
11      Q.   Okay.  And you have worked with   09:32:19
12  Mr. Hunter and Ms. Spaulding before, correct?   09:32:21
13      A.   Correct.      09:32:24
14      Q.   And you worked with them in   09:32:25
15  connection with the controlled substance   09:32:26
16  compliance team throughout the time you were   09:32:30
17  senior manager, correct?      09:32:31
18      A.   Correct.      09:32:32
19      (Mallinckrodt-Harper Exhibit 1   09:32:40
20  marked for identification.)      09:32:40
21  QUESTIONS BY MR. KO:      09:32:40
22      Q.   I'd like to hand you an   09:32:41
23  exhibit.  Go ahead and mark this as Harper   09:32:42
24  Exhibit 1.      09:32:56
25      And there's no Bates on this,   09:33:09

Page 41

1  but this -- this appears to be a printout of   09:33:12
2  your LinkedIn profile; is that correct?   09:33:14
3      A.   Yes.      09:33:16
4      Q.   And does that appear to be an   09:33:16
5  accurate reflection or copy of your LinkedIn   09:33:19
6  profile?      09:33:23
7      A.   Yes.      09:33:23
8      Q.   And I don't want to spend too   09:33:23
9  much time on it, but I do want to ask you a   09:33:25
10  question about your involvement in the   09:33:27
11  National Association of Drug Diversion   09:33:33
12  Investigators.      09:33:36
13      Do you see that reference?  I   09:33:37
14  believe that's on the next page.      09:33:38
15      A.   Yes, I see it.  Yes.      09:33:43
16      Q.   And it indicates that you've   09:33:44
17  been a member of the NADDI since 2013?   09:33:46
18      A.   Yes.      09:33:50
19      Q.   What is the NADDI?      09:33:51
20      A.   It's a group -- it's a      09:33:54
21  consortium of industry, law enforcement   09:34:00
22  leaders that assemble to discuss the issues   09:34:05
23  around diversion.      09:34:10
24      Q.   Okay.  And diversion of   09:34:12
25  controlled substances?      09:34:14

Page 42

1   A.   Yes.                         09:34:15
2   Q.   And did you have any         09:34:20
3   involvement in the NADDI prior to 2013?  09:34:21
4   A.   Yes.                         09:34:23
5   Q.   Okay.  And what was that     09:34:28
6   involvement?                      09:34:29
7   A.   We received drug feed -- pardon  09:34:29
8   me, information feed entitled "RX News."  09:34:32
9   Q.   From the NADDI?              09:34:37
10  A.   Yes, sir.                    09:34:40
11  Q.   Other than receiving news from  09:34:41
12  the NADDI, did you have any other type of  09:34:45
13  involvement with them?            09:34:47
14  A.   No.                          09:34:48
15  Q.   Okay.  Were you ever -- the  09:34:50
16  first time you became a member of the NADDI  09:34:55
17  was in 2013?                      09:34:57
18  A.   Yes.                         09:34:58
19  Q.   Okay.  Do you have any       09:35:00
20  involvement with any type of diversion  09:35:02
21  organization prior to 2013?       09:35:05
22  A.   Yes.                         09:35:06
23  Q.   And which one is that?       09:35:08
24  A.   The group name is Midwest    09:35:09
25  Controlled Substances Compliance Discussion  09:35:09

Page 43

1   Group.                            09:35:18
2   Q.   Okay.  And I believe I've seen  09:35:18
3   plenty of references to that group in the  09:35:21
4   documents, but is that -- correct me if I'm  09:35:23
5   wrong, but is that a type of industry working  09:35:27
6   group?                            09:35:28
7   A.   That's correct.              09:35:29
8   Q.   In other words, there were   09:35:29
9   other manufacturers and distributors that  09:35:30
10  were part of that group?          09:35:33
11  A.   No distributors.             09:35:33
12  Q.   Okay.  So manufacturers of   09:35:35
13  prescription opioids were in that group; is  09:35:36
14  that correct?                     09:35:38
15  A.   Yes.                         09:35:38
16  Q.   Okay.  Other than that group,  09:35:39
17  any other organization that you were involved  09:35:46
18  in?                               09:35:47
19  A.   No.                          09:35:48
20  Q.   Okay.  Are you familiar with  09:35:48
21  the National Association of Controlled  09:35:51
22  Substances Authorities?           09:35:53
23  A.   Oh, yes.                     09:35:53
24       I beg your pardon.           09:35:55
25  Q.   Okay.  So you had involvement  09:35:55

Page 44

1   with them?                        09:35:56
2   A.   I'd like to clarify my previous  09:35:57
3   answer.                           09:36:00
4   Q.   Sure.                        09:36:00
5   A.   I have been a member of      09:36:00
6   National Association of Controlled Substances  09:36:02
7   Authorities.                      09:36:05
8   Q.   Okay.  Since when?           09:36:05
9   A.   I don't recall the date.     09:36:06
10  Approximately December 2013 forward.  09:36:11
11  Q.   Okay.  So about the same time  09:36:13
12  you joined the NADDI?             09:36:14
13  A.   Yes, sir.                    09:36:15
14  Q.   Okay.  Did you have any      09:36:16
15  involvement with this National Association of  09:36:17
16  Controlled Substances Authorities prior to  09:36:24
17  2013?                             09:36:24
18  A.   Not that I recall.           09:36:25
19  Q.   Okay.  So fair to say other  09:36:28
20  than the Midwest Substance Compliance working  09:36:33
21  group, prior to 2013 you had no other  09:36:37
22  involvement with any other diversion-type  09:36:43
23  group?                            09:36:45
24  A.   Not that I recall.           09:36:46
25  Q.   Okay.  Did you ever consider  09:36:48

Page 45

1   membership or joining any such groups?  09:36:55
2   A.   No.                          09:36:57
3   Q.   Okay.  Why not?              09:36:58
4   A.   My job was full time and my  09:36:59
5   husband was ill, so I did not participate in  09:37:08
6   extracurricular activities, if you will.  09:37:12
7   Q.   Okay.  And let's take a step  09:37:14
8   back.                             09:37:21
9        When you became -- I understand  09:37:21
10  you don't recall when you became senior  09:37:24
11  manager of controlled substance compliance,  09:37:26
12  but turning back to the first page of your  09:37:28
13  LinkedIn profile, it indicates that -- or at  09:37:30
14  least the profile indicates that you have  09:37:34
15  been senior manager for 43 years.  09:37:35
16       Is that incorrect?           09:37:37
17  A.   That's incorrect.            09:37:38
18  Q.   Okay.  It's more accurate to  09:37:39
19  say that you've been senior manager for some  09:37:41
20  period less than 17 years when considering  09:37:44
21  that you joined the controlled substance  09:37:46
22  compliance group in 2001?         09:37:48
23  A.   Yes.                         09:37:49
24  Q.   Okay.  And when you first     09:37:50
25  became senior manager of the controlled  09:37:55

Page 46

```
1   substance compliance group, what were your      09:37:57
2   general responsibilities?                       09:38:00
3       A.   The same as they were as              09:38:01
4   manager, except with one exception.  I had --   09:38:06
5   when the company met with DEA, I was present     09:38:12
6   at those meetings where I had not been          09:38:16
7   necessarily in my previous position.            09:38:19
8       Q.   Okay.  So in your previous            09:38:21
9   position, you had never communicated -- or       09:38:22
10  never met with the DEA, but when you became     09:38:26
11  senior manager, you became more involved and    09:38:29
12  met actually with the DEA?                       09:38:32
13          MR. O'CONNOR:  Object to form.          09:38:33
14          THE WITNESS:  So I'd like to            09:38:34
15      clarify, please.                             09:38:35
16  QUESTIONS BY MR. KO:                             09:38:36
17      Q.   Sure.                                   09:38:36
18      A.   All through my career in              09:38:37
19  controlled substances compliance, I             09:38:40
20  communicated with DEA in the course of          09:38:41
21  inspections and on quota requests.               09:38:46
22      Q.   Okay.  And so how did that            09:38:51
23  change when you became senior manager?           09:38:54
24      A.   So there were times when we met       09:38:56
25  with DEA in Washington, DC, and I then would     09:38:58
```

Page 47

```
1   participate in those meetings.                   09:39:05
2       Q.   I see.                                   09:39:07
3           And a moment ago when you said           09:39:08
4   that the only thing that really changed was      09:39:16
5   your interactions with the DEA relative to       09:39:19
6   when you were a manager, tell -- please          09:39:22
7   describe what your responsibilities were then    09:39:25
8   as a manager of the controlled substance        09:39:27
9   compliance group.                                09:39:31
10      A.   As a manager of the controlled         09:39:31
11  substances compliance group, I had primary       09:39:33
12  responsibilities associated with the            09:39:38
13  St. Louis plant function in the beginning.       09:39:40
14  And then as time went on, we acquired the        09:39:44
15  Hobart, New York, facility, and they came in     09:39:48
16  as part of our group.                            09:39:53
17          MR. KO:  Sorry, do you mind if          09:40:15
18      we go off the record for just a              09:40:17
19      second?                                      09:40:18
20          VIDEOGRAPHER:  We're going off          09:40:19
21      the record at 9:40 a.m.                      09:40:19
22      (Off the record at 9:40 a.m.)               09:40:25
23          VIDEOGRAPHER:  We are back on            09:40:38
24      the record at 9:40 a.m.                      09:40:44
25
```

Page 48

```
1   QUESTIONS BY MR. KO:                             09:40:46
2       Q.   So when you say you had primary        09:40:46
3   responsibilities associated with St. Louis       09:40:49
4   and Hobart facilities, what exactly do you       09:40:51
5   mean?                                            09:40:54
6       A.   Prior to that, the controlled         09:40:54
7   substances compliance group at each facility    09:40:59
8   operated reporting to the management of their    09:41:02
9   separate sites.  And so eventually the group     09:41:07
10  became one, and my position provided a           09:41:11
11  corporate oversight for all the facilities       09:41:14
12  that had controlled substances compliance        09:41:17
13  personnel.                                       09:41:19
14      Q.   Okay.  And when you became             09:41:19
15  senior manager, those responsibilities           09:41:22
16  continued, correct?                              09:41:24
17      A.   Yes.                                    09:41:25
18      Q.   Okay.  And as you said, you            09:41:26
19  started interacting with the DEA on a more       09:41:28
20  regular basis.                                   09:41:31
21          Do you recall when you first            09:41:32
22  started communicating with the DEA more          09:41:35
23  frequently?                                      09:41:37
24          MR. O'CONNOR:  Object to form.          09:41:38
25          THE WITNESS:  I don't know the          09:41:38
```

Page 49

```
1       year.  Well, it was when I became           09:41:41
2       senior manager, but I don't know that       09:41:44
3       year, I'm sorry.                             09:41:45
4   QUESTIONS BY MR. KO:                             09:41:45
5       Q.   Okay.  Real briefly turning           09:41:45
6   back to your membership in the NADDI, are you    09:41:50
7   aware that they conduct trainings on topics      09:41:54
8   such as diversion?                               09:41:58
9       A.   Yes.                                    09:42:00
10      Q.   Okay.  Did you ever attend any         09:42:00
11  of those trainings?                              09:42:01
12      A.   Yes.                                    09:42:02
13      Q.   Did you ever attend those              09:42:03
14  trainings before 2013?                           09:42:04
15      A.   I don't think so, but I do not         09:42:06
16  know.                                            09:42:09
17      Q.   Okay.  Prior to 2013, did you          09:42:09
18  ever attend any type of training related to      09:42:12
19  diversion?                                       09:42:16
20      A.   Yes.                                    09:42:16
21      Q.   Okay.  And what type of                09:42:17
22  trainings?                                       09:42:18
23      A.   So there were DEA conferences          09:42:19
24  for industry.                                    09:42:22
25      Q.   Uh-huh.  And --                        09:42:26
```

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    A.    And --                09:42:26
2    Q.    Go ahead.  Sorry.            09:42:27
3    A.    I apologize.              09:42:27
4    Q.    That's okay.              09:42:28
5    A.    They're private industry        09:42:29
6  conferences, not -- so they were hosted by    09:42:33
7  other than DEA.                09:42:40
8    Q.    Sure.                09:42:41
9        Similar to the Midwest          09:42:42
10 substance compliance group you were referring 09:42:44
11 to, or something separate?            09:42:45
12   A.    Something separate.          09:42:46
13   Q.    Okay.  And these were put on      09:42:47
14 by, as you said, private entities?        09:42:50
15   A.    Yes.                09:42:52
16   Q.    Okay.  And in the -- from the      09:42:53
17 2001 to 2013 time period, how frequently did  09:42:58
18 you attend these trainings?            09:43:02
19   A.    Approximately one per year.      09:43:03
20   Q.    One per year.  Okay.          09:43:07
21        And the DEA conferences, do you    09:43:08
22 recall going to those on an annual basis or   09:43:10
23 was that less frequent than an annual basis?  09:43:12
24   A.    When they were offered, there      09:43:16
25 was a period of time they weren't offered on  09:43:19

Page 51

1  an annual basis.  But, yes, when they were    09:43:22
2  offered, I would attend, yes.          09:43:23
3    Q.    Okay.  And do you recall        09:43:25
4  attending a DEA conference in the fall      09:43:27
5  of 2008?                  09:43:32
6    A.    I'm so sorry, I'm not good on      09:43:32
7  my years.                  09:43:37
8    Q.    Sure.                09:43:37
9    A.    I can't place the fall of 2008      09:43:37
10 and a conference at that time.          09:43:40
11   Q.    That's fine.  We can get to        09:43:40
12 some documents --              09:43:42
13   A.    Okay.                09:43:42
14   Q.    -- that will hopefully refresh      09:43:42
15 your recollection later.            09:43:46
16   A.    All right.                09:43:47
17   Q.    Do you maintain relationships      09:43:48
18 with any other individuals who have similar    09:43:49
19 jobs as you do for other entities?        09:43:52
20   A.    Yes.                09:43:52
21   Q.    Which individuals and for what      09:44:02
22 entities do they work for?            09:44:04
23   A.    So there's a director of        09:44:05
24 controlled substances compliance at Teva    09:44:12
25 Pharmaceuticals.              09:44:15

Page 52

1    Q.    Uh-huh.                09:44:15
2    A.    Director of controlled          09:44:16
3  substances compliance at Noramco, and      09:44:18
4  representatives -- and I don't know their    09:44:29
5  exact titles -- Actavis and Watson.  So those 09:44:30
6  are the ones that come to mind.          09:44:35
7    Q.    Okay.  And the director of        09:44:38
8  Teva, who is she or he?            09:44:42
9    A.    Her name is Colleen McGinn.      09:44:44
10   Q.    And how long have you known      09:44:47
11 her?                    09:44:49
12   A.    Since I joined the controlled      09:44:49
13 substances compliance group.          09:44:52
14   Q.    In 2001?              09:44:52
15   A.    Yes.                09:44:56
16   Q.    Okay.  And did you speak with      09:44:57
17 her about diversion-type activities?        09:44:58
18        MR. O'CONNOR:  Object to form.    09:45:02
19        THE WITNESS:  Yes.          09:45:03
20 QUESTIONS BY MR. KO:            09:45:03
21   Q.    And how frequent?          09:45:04
22   A.    Intermittently.  I don't know      09:45:05
23 the frequency.                09:45:09
24   Q.    Okay.  Are you aware of Federal    09:45:09
25 Register notices?              09:45:21

Page 53

1    A.    Yes.                09:45:22
2    Q.    Did you regularly review them      09:45:22
3  during your time in the DEA compliance group?  09:45:23
4    A.    Yes.                09:45:26
5        MR. O'CONNOR:  Object to form.    09:45:26
6        THE WITNESS:  Yes.          09:45:28
7  QUESTIONS BY MR. KO:            09:45:28
8    Q.    How frequent would you say you      09:45:28
9  reviewed those?                09:45:30
10   A.    I or someone in my group        09:45:31
11 monitored the Register every single day.    09:45:37
12   Q.    Okay.                09:45:40
13   A.    For DEA notices.            09:45:41
14   Q.    I see.                09:45:43
15        And when did you start doing      09:45:43
16 that?                    09:45:45
17   A.    I don't recall the year.  It --    09:45:46
18 I don't recall the year.            09:45:49
19   Q.    And would you say it was your      09:45:50
20 responsibility to review those notices?      09:45:54
21   A.    Initially, yes.              09:45:57
22   Q.    Okay.  And when did -- and I      09:45:58
23 assume you don't do that anymore if you said  09:46:04
24 "initially"?                09:46:07
25   A.    It depends on the nature of the    09:46:08

Page 54

1   notice that we're antici -- if we're          09:46:09
2   anticipating pivotal Federal Register Notice   09:46:10
3   about quota or our DEA registration, I         09:46:12
4   continue to monitor them, but other -- other   09:46:16
5   folks within my team monitor them on a daily   09:46:18
6   basis.                                         09:46:21
7       Q.   Okay. And who would be those          09:46:22
8   individuals?                                   09:46:24
9       A.   The gentleman's name is Dave          09:46:25
10  Hunter. He's the manager at the St. Louis      09:46:29
11  plant.                                         09:46:31
12      Q.   And he also, as you said              09:46:32
13  before, reports to you directly right now?     09:46:37
14      A.   Yes.                                  09:46:39
15      Q.   Are you aware of reviewing any        09:46:42
16  Federal Register Notices in the mid-2000s?     09:46:44
17      A.   I'm certain -- I'm not certain        09:46:47
18  because I'm mixed up on my years.              09:46:54
19      Q.   Sure.                                 09:46:56
20          But -- so I guess I'm trying to        09:46:56
21  get an understanding of when you started       09:46:58
22  reviewing these Federal Register Notices.      09:47:01
23      A.   Certainly that's helpful.            09:47:03
24          When I joined the controlled           09:47:05
25  substances compliance group.                   09:47:08

Page 55

1       Q.   Okay. Again, we'll get to some        09:47:08
2   of those in a moment.                          09:47:14
3       A.   Okay.                                 09:47:15
4       Q.   Now, when you were in the DEA         09:47:16
5   compliance group, did you become aware of DEA  09:47:25
6   actions and investigations against major       09:47:29
7   distributors?                                  09:47:33
8       A.   Yes.                                  09:47:33
9       Q.   And those major distributors         09:47:34
10  are ABC, Cardinal and McKesson?                09:47:35
11      A.   Yes.                                  09:47:38
12      Q.   And did you review the details        09:47:38
13  of these investigations or DEA actions when    09:47:42
14  you became aware of them?                      09:47:48
15          MR. O'CONNOR: Object to form.          09:47:48
16          THE WITNESS: Not on a detailed         09:47:49
17      level all the time, but at a high          09:47:53
18      level, yes.                                09:47:55
19  QUESTIONS BY MR. KO:                           09:47:56
20      Q.   Okay. Would it be fair to say         09:47:56
21  that these settlements and DEA actions of the  09:47:58
22  distributors caught your attention in          09:48:01
23  mid-2000 time period?                          09:48:04
24          MR. O'CONNOR: Object to form.          09:48:04
25

Page 56

1   QUESTIONS BY MR. KO:                           09:48:05
2       Q.   The mid-2000s?                        09:48:06
3       A.   Yes.                                  09:48:07
4       Q.   Okay. And would it also be           09:48:07
5   fair to say that up to that point, DEA         09:48:11
6   actions were against small or mid-sized        09:48:15
7   distributors related to their diversion-type  09:48:23
8   activities?                                    09:48:24
9       A.   I can't answer that question.        09:48:24
10  I don't know.                                  09:48:26
11      Q.   Now, at some point did you also       09:48:26
12  become aware of an action involving Purdue?    09:48:31
13          MR. O'CONNOR: Object to form.          09:48:36
14          THE WITNESS: Yes.                      09:48:37
15  QUESTIONS BY MR. KO:                           09:48:38
16      Q.   In particular, did you ever           09:48:40
17  become aware of the Purdue consent decree in   09:48:41
18  2007?                                          09:48:45
19      A.   Yes.                                  09:48:45
20      Q.   And are you aware that that           09:48:45
21  investigation revolved around Purdue's         09:48:50
22  manufacturing, promotion and advertising       09:48:54
23  activities of OxyContin?                       09:48:56
24      A.   Yes.                                  09:48:57
25      Q.   Okay. And at the time you             09:48:59

Page 57

1   became aware of that consent decree, I assume  09:49:04
2   you're also aware that Mallinckrodt was        09:49:08
3   manufacturing a generic form of OxyContin?     09:49:10
4          MR. O'CONNOR: Object to form.           09:49:12
5          THE WITNESS: I don't know the           09:49:12
6      timing of when we entered the market        09:49:16
7      for OxyContin -- or, I'm sorry, the         09:49:18
8      generic oxycodone, so I don't know          09:49:22
9      exactly the timing relative to the          09:49:23
10     Purdue matter.                              09:49:25
11  QUESTIONS BY MR. KO:                           09:49:26
12      Q.   Okay. So you are aware that           09:49:26
13  Mallinckrodt has manufactured oxycodone,       09:49:28
14  correct?                                       09:49:31
15      A.   Yes.                                  09:49:31
16      Q.   And oxycodone, generally              09:49:31
17  speaking, is a generic form of a prescription  09:49:34
18  opioid?                                        09:49:36
19      A.   Oxycodone is the name of the          09:49:38
20  molecule, so, yes, it's -- yes, oxycodone is   09:49:39
21  manufactured into the generic, yes.            09:49:43
22      Q.   Okay. And you're also aware           09:49:46
23  that Mallinckrodt manufactured various dosage  09:49:48
24  strengths of oxycodone, correct?               09:49:53
25      A.   Yes.                                  09:49:54

Highly Confidential - Subject to Further Confidentiality Review

Page 58

```
1      Q.   Including oxy 15 milligrams and    09:49:55
2   oxy 30 milligrams, correct?              09:49:58
3      A.   Yes, in the IR release form,      09:49:59
4   yes.                                     09:50:03
5      Q.   And by "IR" you mean immediate    09:50:03
6   release, correct?                        09:50:05
7      A.   Yes, sir.                         09:50:05
8      Q.   Now, one of your primary          09:50:06
9   responsibilities as senior manager of    09:50:28
10  controlled substance compliance was to design  09:50:31
11  and implement a system to identify suspicious  09:50:35
12  orders, correct?                         09:50:37
13          MR. O'CONNOR:  Object to form.    09:50:37
14          THE WITNESS:  We already had a    09:50:39
15      system in place.                     09:50:42
16  QUESTIONS BY MR. KO:                     09:50:43
17      Q.   Okay.  So when you say "we       09:50:43
18  already had a system in place," first of all,   09:50:44
19  when -- what time period are you talking  09:50:48
20  about right now?                         09:50:49
21      A.   All the way back to my days      09:50:50
22  before controlled substances compliance, I     09:50:55
23  was aware that we had a system in place   09:50:58
24  designed to detect orders of unusual pattern,   09:51:02
25  size and frequency.                      09:51:05
```

Page 59

```
1      Q.   Okay.  And what did that          09:51:07
2   system -- what was your understanding of what   09:51:09
3   that system consisted of?                09:51:11
4      A.   There was a algorithm in --       09:51:14
5   programmed by IT into our order entry system    09:51:20
6   that would flag orders for further review.     09:51:26
7      Q.   Okay.  Other than that            09:51:29
8   algorithm, were there any other elements of     09:51:32
9   that system?                             09:51:35
10     A.   Yes, quite a few others.          09:51:36
11     Q.   Okay.  And what did those         09:51:39
12  consist of?                              09:51:41
13     A.   So we had commercial             09:51:42
14  representative -- national account managers     09:51:46
15  that were our eyes and ears and boots on the    09:51:49
16  ground at the customer accounts.  We trained    09:51:51
17  them to be vigilant for any potential sign --   09:51:54
18  red flags that could be indicative of    09:51:59
19  diversion as they visited customers.     09:52:01
20          May I go on, please?             09:52:05
21     Q.   Yeah.                            09:52:06
22     A.   We have customer service          09:52:07
23  representatives who are veteran in the    09:52:08
24  business, and they were in general familiar     09:52:10
25  with customers' order patterns, and so they     09:52:13
```

Page 60

```
1   had responsibility, if they saw anything that   09:52:20
2   appeared to be unusual to them, to escalate     09:52:22
3   to their manager.                        09:52:24
4          We took precautions to make       09:52:26
5   certain that every single order we shipped     09:52:28
6   was to a valid DEA registration, every order    09:52:30
7   for Schedule II drugs was -- that we received   09:52:35
8   a 222 form that was filled out correctly, and   09:52:39
9   that the order -- the address on the 222  09:52:42
10  forms coincided exactly with the ship to  09:52:45
11  address in our company's order management  09:52:48
12  system.                                  09:52:51
13     Q.   Okay.  And I want to get an       09:52:52
14  understanding of when these elements were in    09:52:53
15  place, because I've reviewed a lot of    09:52:57
16  documents in this case and I've been able to    09:53:00
17  determine -- or at least from my          09:53:02
18  interpretation I've been able to see some of    09:53:04
19  these things that you have discussed during     09:53:07
20  certain time periods.  But I want to     09:53:08
21  understand what you said a moment ago when 09:53:10
22  you said that Mallinckrodt always had a   09:53:14
23  system.                                  09:53:15
24          Do you recall that testimony?     09:53:15
25     A.   Yes, I do.                        09:53:17
```

Page 61

```
1      Q.   Are these things that you're      09:53:18
2   describing, are you testifying that      09:53:20
3   Mallinckrodt always had all these elements in   09:53:21
4   connection with the suspicious order      09:53:26
5   monitoring program?                      09:53:29
6          MR. O'CONNOR:  Object to form.     09:53:29
7          THE WITNESS:  There's one that     09:53:30
8      I'm not certain of, but all the other    09:53:35
9      elements, yes, have been in place       09:53:37
10     since I became aware all the way back    09:53:40
11     to my days in manufacturing and within  09:53:42
12     the scope of DEA audits.             09:53:44
13  QUESTIONS BY MR. KO:                     09:53:46
14     Q.   Okay.  So prior to, for          09:53:46
15  example, 2003 --                         09:53:54
16     A.   Yes.                             09:53:54
17     Q.   -- there was -- I just want to    09:53:55
18  make sure I understand.                  09:53:58
19     A.   Certainly.                       09:53:58
20     Q.   The suspicious order monitoring   09:53:59
21  program, as you understand it, consisted of     09:54:01
22  both an algorithm and other factors that you    09:54:04
23  had previously described; is that correct?     09:54:07
24     A.   Yes.                             09:54:07
25     Q.   Okay.  Now, setting aside what    09:54:09
```

Page 62

1  you understood to be the -- by the way, do   09:54:13
2  you mind if I call suspicious order   09:54:17
3  monitoring "SOM" for short?   09:54:19
4      A.   I don't mind.   09:54:20
5      Q.   Okay.  Other than what you   09:54:21
6  believe to be the elements of Mallinckrodt's   09:54:25
7  SOM program, when you became involved as a   09:54:28
8  senior manager of the controlled substances   09:54:33
9  compliance group, is it accurate to say that   09:54:36
10  one of your primary responsibilities was to   09:54:39
11  design and implement a system to identify   09:54:41
12  suspicious orders?   09:54:44
13      MR. O'CONNOR:  Object to form.   09:54:44
14      THE WITNESS:  So, sir, we   09:54:45
15   already had a system in place to   09:54:47
16   identify suspicious orders.   09:54:49
17  QUESTIONS BY MR. KO:   09:54:51
18      Q.   Okay.  Well, it's my   09:54:51
19  understanding that you revised that system   09:54:55
20  over time when you were a senior manager.   09:54:58
21      Is that fair to say?   09:55:00
22      A.   Yes.   09:55:01
23      Q.   Okay.  So during the time that   09:55:02
24  you were senior manager, is it accurate to   09:55:05
25  say that you continued to help design and   09:55:06

Page 63

1  implement Mallinckrodt's suspicious order   09:55:10
2  monitoring system?   09:55:12
3      A.   Yes.   09:55:13
4      Q.   Okay.  Now, a fundamental   09:55:14
5  feature of any SOM program is to prevent   09:55:17
6  diversion of controlled substances, so just   09:55:20
7  prescription opioids manufactured by   09:55:23
8  Mallinckrodt; is that correct?   09:55:24
9      MR. O'CONNOR:  Object to form.   09:55:25
10      THE WITNESS:  Not to prevent,   09:55:26
11   but to guard against diversion.   09:55:30
12  QUESTIONS BY MR. KO:   09:55:32
13      Q.   Okay.  So you have a   09:55:32
14  distinction between prevent and guard   09:55:33
15  against?   09:55:36
16      A.   Yes.   09:55:36
17      Q.   Okay.  And what is that   09:55:36
18  distinction?   09:55:38
19      A.   So prevent is an absolute.  It   09:55:38
20  means we can assure that there's never any   09:55:41
21  diversion of our product.   09:55:44
22      Guard against means to the   09:55:46
23  extent we're able, detect orders that may   09:55:50
24  be -- that are cause for further review,   09:56:00
25  sorry.   09:56:02

Page 64

1      Q.   That's okay.   09:56:03
2      And when you say "may be," is   09:56:04
3  one way to say it that a fundamental feature   09:56:08
4  of a SOM program is to guard against the   09:56:12
5  potential diversion of controlled substances?   09:56:16
6      MR. O'CONNOR:  Object to form.   09:56:17
7      THE WITNESS:  Yes.   09:56:18
8  QUESTIONS BY MR. KO:   09:56:20
9      Q.   Okay.  And guarding against the   09:56:20
10  diversion of prescription opioids is an   09:56:23
11  important responsibility of a company that   09:56:25
12  manufactures prescription opioids; wouldn't   09:56:28
13  you say?   09:56:29
14      A.   Yes.   09:56:31
15      Q.   Okay.  And as we discussed   09:56:32
16  before, the CSA imposes that obligation on   09:56:33
17  registrants in the supply chain, including on   09:56:37
18  Mallinckrodt, correct?   09:56:39
19      MR. O'CONNOR:  Object to form.   09:56:40
20      THE WITNESS:  Yes.   09:56:40
21  QUESTIONS BY MR. KO:   09:56:41
22      Q.   And would you agree with me   09:56:43
23  that that would be one of the most   09:56:45
24  fundamental duties of the CSA?   09:56:46
25      MR. O'CONNOR:  Object to form.   09:56:48

Page 65

1      THE WITNESS:  The CSA covers   09:56:48
2   many aspects, my understanding, for --   09:56:53
3   to maintain the closed system of   09:56:57
4   distribution, and suspicious order   09:57:00
5   monitoring is one of those components.   09:57:02
6  QUESTIONS BY MR. KO:   09:57:03
7      Q.   Sure.   09:57:03
8      And I understand that there are   09:57:04
9  a lot of aspects to the CSA, but from your   09:57:06
10  perspective, would you agree with me that   09:57:09
11  guarding against diversion, as you put it, is   09:57:12
12  one of the fundamental duties of the CSA?   09:57:15
13      MR. O'CONNOR:  Objection.   09:57:17
14   Form.   09:57:18
15      THE WITNESS:  I can't say if   09:57:18
16   it -- yes.  Yes.  Yes.   09:57:22
17  QUESTIONS BY MR. KO:   09:57:23
18      Q.   Okay.  Now, as we discussed   09:57:24
19  before, in connection with these duties, you   09:57:29
20  helped revise Mallinckrodt's suspicious order   09:57:33
21  monitoring program, correct?   09:57:36
22      A.   Correct.   09:57:37
23      Q.   And these revisions occurred   09:57:38
24  generally in the 2000 -- the late, I guess I   09:57:42
25  would say -- I would describe it this way.   09:57:49

Page 66

1    These revisions occurred          09:57:50
2  sometime between the 2008 and 2012 time    09:57:52
3  period.  Would that be fair to say?       09:57:55
4       MR. O'CONNOR:  Object to form.    09:57:57
5       THE WITNESS:  Yes, but they're    09:57:58
6    ongoing to this day, yes.           09:57:59
7  QUESTIONS BY MR. KO:                 09:58:00
8    Q.  Would it be accurate to say      09:58:00
9  that there was increased scrutiny on     09:58:01
10  Mallinckrodt's SOM program in 2008?      09:58:03
11       MR. O'CONNOR:  Object to form.    09:58:07
12       THE WITNESS:  I can't say that.   09:58:07
13  QUESTIONS BY MR. KO:                 09:58:13
14    Q.  Okay.                        09:58:14
15    A.  No.                          09:58:14
16    Q.  Do you recall a time in which   09:58:14
17  you believed there was increased scrutiny on  09:58:18
18  Mallinckrodt's SOM program?              09:58:21
19       MR. O'CONNOR:  Object to form.    09:58:22
20       THE WITNESS:  We had ongoing      09:58:23
21    discussions with DEA, but, yes, yes,  09:58:26
22    there was a time.                  09:58:29
23  QUESTIONS BY MR. KO:                 09:58:29
24    Q.  And approximately what time     09:58:30
25  period was that?                     09:58:31

Page 67

1    A.  We met with DEA in August      09:58:32
2  of 2011, I do remember that date --      09:58:36
3    Q.  Okay.                        09:58:38
4    A.  -- and they had some additional  09:58:39
5  suggestions about potential enhancements of  09:58:41
6  our suspicious order monitoring program.   09:58:43
7    Q.  Do you recall any instances in   09:58:45
8  which you met with DEA prior to that in which  09:58:55
9  you discussed Mallinckrodt's SOM program?   09:58:59
10    A.  Yes.                         09:59:01
11    Q.  Okay.  When was that?         09:59:02
12    A.  I don't remember the year, but  09:59:03
13  there was a discussion with DEA St. Louis on  09:59:06
14  that topic.                          09:59:10
15    Q.  Okay.  By the way, when you     09:59:11
16  became senior manager of controlled substance  09:59:16
17  compliance group -- of the controlled     09:59:19
18  substance compliance group, you were the --  09:59:21
19  you had the primary responsibility of     09:59:24
20  revising and designing Mallinckrodt's SOM   09:59:26
21  program; is that fair to say?           09:59:29
22       MR. O'CONNOR:  Object to form.    09:59:31
23       THE WITNESS:  So it was all --    09:59:32
24    I was part of a team.  It was a team  09:59:32
25    effort, sir.                      09:59:34

Page 68

1  QUESTIONS BY MR. KO:                 09:59:34
2    Q.  Okay.  And when you say you     09:59:35
3  were "part of a team," who was on that team?  09:59:36
4    A.  Security.                     09:59:38
5    Q.  Okay.  And security, is that    09:59:42
6  Bill Ratliff?                        09:59:43
7    A.  It was Bill Ratliff, and he's   09:59:44
8  retired, and now it's John Gillies.       09:59:47
9    Q.  Okay.  Anybody other than Bill   09:59:49
10  Ratliff or John Gillies?                09:59:51
11    A.  Yes, legal.                   09:59:53
12    Q.  Was that Mr. Lohman and        09:59:54
13  Ms. Duft?                            09:59:56
14    A.  Yes.                         10:00:00
15    Q.  Okay.  Who else?              10:00:01
16    A.  Members of the commercial      10:00:06
17  group.  Members of the IT group.         10:00:09
18    Q.  So other than security, legal,  10:00:10
19  commercial and IT, were there any other    10:00:16
20  groups or departments that were part of the  10:00:18
21  SOM team?                            10:00:20
22    A.  Yes.  Members of the SOM team   10:00:21
23  came and went through different iterations of  10:00:23
24  the program, so I don't recall the       10:00:27
25  composition of the team at a specific time,  10:00:29

Page 69

1  but there was a patient and product      10:00:31
2  monitoring group that was a participant in  10:00:34
3  the team.  Credit department was a        10:00:39
4  participant in the team.  And those are the  10:00:42
5  ones I can recall.                    10:00:44
6    Q.  Okay.  Thank you.             10:00:46
7       When you referenced the          10:00:46
8  commercial group a moment ago, what did that  10:00:51
9  consist of?                          10:00:56
10       In other words, who were         10:00:57
11  members of that commercial group?         10:00:59
12    A.  Primarily John Adams.          10:01:00
13    Q.  Anyone else?                  10:01:05
14    A.  A gentleman named Steve Becker.  10:01:07
15    Q.  Okay.  And Steve Becker was a   10:01:09
16  national account manager, correct?       10:01:14
17    A.  Correct.                     10:01:15
18    Q.  Okay.  Were there any other    10:01:16
19  customer service representatives that were  10:01:18
20  part of that group?                   10:01:19
21    A.  Yes.                         10:01:20
22    Q.  Okay.  Who were they?         10:01:21
23    A.  The lady's name is Brenda       10:01:22
24  Rehkop; she's passed away.  Cathy Stewart.  10:01:29
25  Jim Rausch.                          10:01:35

Page 70

1    Q.    And Jim Rausch was part of        10:01:36
2    commercial?                               10:01:40
3    A.    Well, we distinguish --           10:01:40
4    customer service is not considered to be part  10:01:46
5    of commercial, although it would seem that it  10:01:47
6    would be, so customer service is a separate    10:01:49
7    group.                                    10:01:51
8    Q.    Okay.  Than commercial you're       10:01:51
9    saying?                                   10:01:53
10    A.    Yes.                             10:01:53
11    Q.    Now, you mentioned some names       10:01:54
12    of people that have been deposed previously  10:01:57
13    in this case in the past few weeks.  Many of  10:02:01
14    them have testified that you are the person   10:02:05
15    most knowledgeable about Mallinckrodt's SOM  10:02:07
16    program.                                 10:02:10
17        Would you agree with that          10:02:10
18    assessment?                              10:02:11
19        MR. O'CONNOR:  Object to form.      10:02:11
20        THE WITNESS:  Well, I'm not a       10:02:12
21    vain person, but, yes, I know a lot       10:02:17
22    about the program, but it's all been      10:02:18
23    with the contributions of a -- team       10:02:20
24    effort as time has gone on.              10:02:22
25

Page 71

1    QUESTIONS BY MR. KO:                       10:02:23
2    Q.    Sure.                            10:02:23
3        Do you believe there's anyone       10:02:25
4    in the SOM team or anyone else in the       10:02:27
5    company, for that matter, with more knowledge  10:02:30
6    about Mallinckrodt's suspicious order       10:02:31
7    monitoring program than you?              10:02:33
8        MR. O'CONNOR:  Object to form.      10:02:36
9        THE WITNESS:  I'll say that's       10:02:36
10    unlikely.                                10:02:37
11    QUESTIONS BY MR. KO:                      10:02:38
12    Q.    Okay.  By the way, other than      10:02:38
13    the SOM program that you helped revise,    10:02:43
14    design and implement, were there any other  10:02:48
15    programs or systems in place at Mallinckrodt  10:02:53
16    related to diversion of controlled         10:02:57
17    substances?                              10:03:00
18    A.    Yes.                             10:03:00
19    Q.    Okay.  And what were those?        10:03:04
20    A.    So we -- we work with law         10:03:05
21    enforcement and give testimony when        10:03:12
22    requested.  We provide placebos for law    10:03:17
23    enforcement use on specific cases.  We have a  10:03:20
24    department that educates prescribers and   10:03:25
25    patients on the proper prescribing and     10:03:30

Page 72

1    dispensing and consumption of controlled     10:03:34
2    substances.                              10:03:39
3        So we have many programs within     10:03:40
4    Mallinckrodt, as a responsible manufacturer,  10:03:42
5    aimed at guarding against diversion.       10:03:45
6    Q.    Okay.  And taking that last        10:03:46
7    category that you described with respect to  10:03:48
8    educating, I guess the public on safe      10:03:50
9    prescribing and dispensing, when did       10:03:55
10    Mallinckrodt first engage in that type of  10:03:57
11    conduct?                                 10:04:01
12    A.    I do not know the answer.         10:04:01
13    Q.    Do you generally recall if it     10:04:03
14    was after 2010?                          10:04:06
15    A.    I'm sorry, I don't know when      10:04:06
16    the group --                             10:04:08
17    Q.    Okay.                           10:04:10
18    A.    -- was created.                  10:04:10
19    Q.    And then when you described the   10:04:11
20    law enforcement activities, it seemed like to  10:04:12
21    me, and correct me if I'm wrong, that      10:04:16
22    those -- you provided that type of support  10:04:21
23    when they requested it; is that fair to say?  10:04:23
24        MR. O'CONNOR:  Object to form.      10:04:27
25        THE WITNESS:  Yes.                 10:04:28

Page 73

1    QUESTIONS BY MR. KO:                       10:04:30
2    Q.    Okay.  So in other words, there    10:04:30
3    wasn't a program in place in which you were  10:04:32
4    regularly providing testimony, for example,  10:04:35
5    but you were -- you were providing testimony  10:04:37
6    to help law enforcement when they requested  10:04:39
7    it; is that fair?                         10:04:41
8    A.    So I don't know -- I may not be    10:04:42
9    aware of other people in other groups that  10:04:46
10    provided testimony, such as our research    10:04:48
11    scientists, so -- but those are the times  10:04:50
12    that I am aware.                          10:04:54
13    Q.    Okay.  Now, is it accurate to     10:04:55
14    say that one of the -- you mentioned this a  10:04:56
15    moment ago, but I just want to make sure I  10:05:00
16    understand correctly.                     10:05:02
17        But is it accurate to say that      10:05:03
18    one purpose of a SOM program is to identify  10:05:05
19    orders of unusual size?                   10:05:08
20    A.    Yes.                             10:05:10
21    Q.    Okay.  And would it also be --     10:05:11
22    well, why is that?                        10:05:13
23    A.    It's one of the indicators that   10:05:15
24    may be -- that may prompt -- well, should --  10:05:23
25    will prompt additional investigation of that  10:05:26

Page 74

1    order.                                10:05:28
2        Q.    Okay.  And other than that      10:05:29
3    general concept that -- in particular, the    10:05:31
4    size of an order at its most fundamental    10:05:34
5    level is important because an excessive order  10:05:37
6    or an order of -- that's -- that's large    10:05:42
7    could potentially be unusual; is that    10:05:47
8    correct?                          10:05:49
9            MR. O'CONNOR:  Object to form.    10:05:49
10           THE WITNESS:  Yes, but it's all    10:05:50
11       relative to what -- what is large.  I    10:05:55
12       can't define large.              10:05:58
13   QUESTIONS BY MR. KO:                10:05:59
14       Q.    Sure.                     10:05:59
15           But generally speaking,        10:06:00
16   shipping too many prescription opioids could   10:06:01
17   potentially be problematic, correct?       10:06:03
18           MR. O'CONNOR:  Objection to      10:06:05
19       form.                          10:06:06
20           THE WITNESS:  I don't have all    10:06:06
21       the information, I'm sorry, to answer    10:06:08
22       that question completely.          10:06:09
23   QUESTIONS BY MR. KO:                10:06:10
24       Q.    Sure.                     10:06:11
25           Another purpose of a SOM        10:06:11

Page 75

1    program is to identify orders that deviate    10:06:14
2    from a normal pattern; would you agree with   10:06:18
3    me?                               10:06:19
4        A.    Yes.                      10:06:19
5        Q.    Okay.  And it's important to     10:06:20
6    identify ordering patterns at a general     10:06:22
7    level; is that correct?               10:06:25
8        A.    Yes.                      10:06:25
9        Q.    Okay.  And another purpose of a   10:06:27
10   SOM program is to identify orders of unusual   10:06:28
11   frequency; is that fair to say?          10:06:32
12       A.    Yes.  Yes.                  10:06:34
13       Q.    And it's important to identify    10:06:35
14   the timing of orders; that would be fair to    10:06:37
15   say?                              10:06:39
16           MR. O'CONNOR:  Object to form.    10:06:39
17           THE WITNESS:  Yes.            10:06:40
18   QUESTIONS BY MR. KO:                10:06:41
19       Q.    Okay.  And would you agree with   10:06:41
20   me that one of -- or another central purpose   10:06:43
21   of identifying suspicious orders is to avoid    10:06:47
22   filling them for any other purpose than       10:06:50
23   legitimate, scientific or medical needs?     10:06:53
24           MR. O'CONNOR:  Object to form.    10:06:55
25           THE WITNESS:  Yes.            10:06:56

Page 76

1    QUESTIONS BY MR. KO:                10:07:01
2        Q.    Okay.  Would you agree with me    10:07:01
3    that an effective SOM program would be able    10:07:05
4    to identify whether a pharmacy or clinic is    10:07:08
5    ordering excessive quantities of controlled    10:07:12
6    substances?                        10:07:15
7            MR. O'CONNOR:  Object to form.    10:07:15
8            THE WITNESS:  No.             10:07:16
9    QUESTIONS BY MR. KO:                10:07:16
10       Q.    Okay.  You don't believe that    10:07:18
11   would be an effective SOM program, or you     10:07:18
12   wouldn't -- you don't agree with me?        10:07:21
13       A.    So would you please rephrase     10:07:23
14   the question?                       10:07:25
15       Q.    Sure.                     10:07:26
16           Would you agree with me that an    10:07:27
17   effective SOM program would be able to       10:07:28
18   identify whether a pharmacy or a clinic is     10:07:31
19   ordering excessive quantities of controlled    10:07:34
20   substances?                        10:07:36
21           MR. O'CONNOR:  Same objection.    10:07:36
22           THE WITNESS:  So the components   10:07:37
23       of the SOM program that point out a    10:07:43
24       reason for further investigation,      10:07:50
25       they're not singular.  So DEA tells us   10:07:52

Page 77

1        that these things are to be considered    10:07:58
2        during the course of our             10:08:00
3        investigation, but no one factor is    10:08:02
4        conclusively -- indicates diversion.    10:08:05
5    QUESTIONS BY MR. KO:                10:08:12
6        Q.    Sure, I understand that, and I    10:08:13
7    understand that there are several different    10:08:15
8    things that you may consider.           10:08:17
9            But would you agree with me      10:08:18
10   that one aspect of an effective SOM program    10:08:19
11   would be to identify pharmacies or clinics    10:08:24
12   that order excessive amounts of controlled    10:08:26
13   substances?                        10:08:29
14           MR. O'CONNOR:  Object to form.    10:08:29
15           THE WITNESS:  So we do not sell    10:08:29
16       to pharmacies or clinics.  We sell to    10:08:32
17       wholesalers and distributors.         10:08:36
18   QUESTIONS BY MR. KO:                10:08:37
19       Q.    I understand that.           10:08:38
20           But as -- as an entity that       10:08:39
21   sells to wholesalers, distributors, you know   10:08:41
22   that eventually those products are going     10:08:44
23   somewhere else; is that fair to say?        10:08:47
24       A.    Yes.                      10:08:49
25       Q.    The distributors aren't        10:08:49

Page 78

1  necessarily providing them directly to the          10:08:50
2  consumers at that point, correct?                    10:08:54
3      A.  Yes.  Yes.                                    10:08:55
4      Q.  So eventually these                           10:08:55
5  distributors distribute these controlled            10:08:58
6  substances to, among other entities,                10:09:03
7  pharmacies and clinics; is that correct?            10:09:05
8      A.  Yes.                                          10:09:07
9      Q.  Okay.  So would you agree with               10:09:08
10  me that one component of a -- an effective          10:09:10
11  suspicious order monitoring program is to           10:09:14
12  identify whether or not these downstream            10:09:16
13  pharmacies or clinics are ordering excessive        10:09:19
14  quantities of controlled substances?                10:09:21
15      MR. O'CONNOR:  Object to form.                   10:09:22
16      THE WITNESS:  We -- throughout                   10:09:23
17      time we've been asking -- we always              10:09:26
18      ask DEA for additional guidance                 10:09:29
19      because the regulations state "know             10:09:30
20      your customer."                                 10:09:32
21  QUESTIONS BY MR. KO:                                 10:09:33
22      Q.  Right.                                       10:09:34
23      A.  And we weren't aware of an                   10:09:35
24  obligation, if you will, to monitor                 10:09:41
25  customers' customers or if the tools existed        10:09:43

Page 79

1  to do so.                                            10:09:48
2      Q.  And we'll get to that in a                    10:09:49
3  moment, but I just have a very specific             10:09:53
4  question that I was hoping that you could           10:09:55
5  answer.                                              10:09:56
6      Now, you agreed with me that                     10:09:57
7  distributors sell downstream to pharmacies         10:10:01
8  and clinics, correct?                               10:10:03
9      A.  That's correct.                               10:10:04
10      Q.  And at some point -- and I                   10:10:05
11  understand your testimony that you became          10:10:06
12  aware that you had to, in your words, know         10:10:08
13  your customer, correct?                            10:10:10
14      A.  Know your customer is part of               10:10:11
15  the regulations.                                   10:10:13
16      Q.  Okay.                                        10:10:14
17      And then also you talked about                  10:10:14
18  knowing your customer's customer as well,         10:10:16
19  correct?                                           10:10:19
20      A.  Yes.                                         10:10:19
21      Q.  And putting aside when you                   10:10:19
22  became aware of that, I'm simply asking you:       10:10:22
23  Would you agree with me that one component of      10:10:24
24  an effective SOM program would be to identify      10:10:27
25  whether or not a downstream pharmacy or           10:10:31

Page 80

1  clinic is ordering excessive quantities of          10:10:33
2  controlled substances?                              10:10:36
3      MR. O'CONNOR:  Object to form.                   10:10:36
4      THE WITNESS:  So, yes, that                      10:10:38
5      could be one component.                         10:10:41
6  QUESTIONS BY MR. KO:                                 10:10:42
7      Q.  Okay.  Now, would you also                   10:10:42
8  agree with me that an effective SOM program       10:10:49
9  would be able to identify whether or not that     10:10:53
10  downstream pharmacy or clinic was ordering        10:10:56
11  from multiple distributors?                        10:10:58
12      MR. O'CONNOR:  Object to form.                   10:10:59
13      THE WITNESS:  It could be one                   10:11:00
14      component, yes.                                 10:11:03
15  QUESTIONS BY MR. KO:                                 10:11:04
16      Q.  Okay.  And in fact, that was               10:11:04
17  something that was important to Mallinckrodt      10:11:06
18  to try and determine at some point in the, I      10:11:08
19  believe, the 2010 or 2011 time period,            10:11:15
20  correct?                                           10:11:19
21      MR. O'CONNOR:  Object to form.                   10:11:19
22      THE WITNESS:  When we received                  10:11:19
23      guidance from DEA that that was an            10:11:20
24      appropriate thing to monitor, yes.            10:11:22
25

Page 81

1  QUESTIONS BY MR. KO:                                 10:11:23
2      Q.  Okay.  So in other words, if a              10:11:23
3  downstream pharmacy or clinic was ordering        10:11:25
4  the same oxy 15 manufactured by Mallinckrodt      10:11:26
5  from five different distributors, it would be    10:11:30
6  important to know that, correct?                   10:11:32
7      A.  It could be one indicator --              10:11:34
8      Q.  Right.                                       10:11:37
9      A.  -- precipitating further                    10:11:37
10  review.                                            10:11:40
11      Q.  And you would agree with me                10:11:40
12  that an effective SOM program would be able      10:11:41
13  to determine or identify whether or not that     10:11:44
14  downstream pharmacy or clinic was ordering      10:11:47
15  from multiple distributors, correct?             10:11:49
16      MR. O'CONNOR:  Object to form.                  10:11:51
17      THE WITNESS:  Yes.  That's one                 10:11:52
18      component of many, yes.                        10:11:54
19  QUESTIONS BY MR. KO:                                10:11:55
20      Q.  Now, some of these factors we             10:12:07
21  were just discussing, is it fair to say that    10:12:09
22  you acquired this knowledge of -- strike        10:12:14
23  that.                                             10:12:19
24      Was there ever a time when you               10:12:19
25  were senior manager of controlled substance    10:12:28

Page 82

1  compliance where you became aware that  10:12:30
2  relying on a simple algorithm or numerical  10:12:38
3  formulation alone was insufficient for  10:12:41
4  purposes of complying with your duties under  10:12:43
5  the CSA?  10:12:45
6      MR. O'CONNOR:  Object to form.  10:12:45
7      THE WITNESS:  Yes.  10:12:46
8  QUESTIONS BY MR. KO:  10:12:46
9      Q.  Okay.  And approximately when  10:12:46
10  was that?  10:12:48
11      A.  It was a guidance letter from  10:12:51
12  DEA.  10:12:54
13      Q.  Okay.  10:12:54
14      A.  And it was 2006 or 2007.  10:12:54
15      Q.  Okay.  So you would agree with  10:12:59
16  me then that an ineffective SOM program would  10:13:00
17  be one that just simply relies on numerical  10:13:07
18  formulas to try and understand orders that  10:13:11
19  are suspicious; is that fair to say?  10:13:14
20      MR. O'CONNOR:  Object to form.  10:13:17
21      THE WITNESS:  That's the  10:13:17
22      guidance that -- yes, from DEA.  10:13:18
23  QUESTIONS BY MR. KO:  10:13:19
24      Q.  Okay.  Well, regardless of the  10:13:19
25  guidance that you received, I'm just simply  10:13:21

Page 83

1  asking you today, as you sit here in your  10:13:23
2  position as someone that is most  10:13:25
3  knowledgeable about Mallinckrodt's SOM  10:13:28
4  program:  Would you agree with me that an  10:13:31
5  ineffective SOM program would be one that  10:13:34
6  simply relies on numerical formulas to  10:13:38
7  identify suspicious orders?  10:13:40
8      MR. O'CONNOR:  Object to form.  10:13:41
9      THE WITNESS:  Yes.  10:13:42
10  QUESTIONS BY MR. KO:  10:13:42
11      Q.  Okay.  Now, you talked a moment  10:13:49
12  ago about how there was always -- as far as  10:13:51
13  you know, there was always an SOM program at  10:13:54
14  Mallinckrodt as far as -- as long as you  10:13:57
15  could recall.  10:14:01
16      A.  Yes.  10:14:01
17      Q.  Now, from my position, looking  10:14:01
18  at the documents, the first reference I see  10:14:05
19  to an SOM program existing at Mallinckrodt is  10:14:07
20  from 2003.  10:14:11
21      Is it your testimony that an  10:14:13
22  SOM program existed prior to that?  10:14:15
23      A.  Yes.  10:14:16
24      Q.  Okay.  And the program prior to  10:14:17
25  2003 consisted of, in your testimony, of both  10:14:21

Page 84

1  the algorithm and some of the other factors  10:14:24
2  that you were describing before?  10:14:26
3      A.  Yes.  10:14:28
4      Q.  And turning to that algorithm,  10:14:28
5  what was your understanding of what that  10:14:31
6  algorithm consisted of?  10:14:34
7      A.  I don't know the specific  10:14:36
8  multiplier, but it measured each customer  10:14:39
9  against their previous order history.  10:14:43
10      Q.  Okay.  And when you say a  10:14:48
11  "multiplier," what do you mean?  10:14:54
12      A.  There was a formula that  10:14:55
13  indicated -- a cause for additional  10:14:59
14  investigation would be if that order pattern  10:15:02
15  exceeded a certain formula, such 1.5 as a  10:15:07
16  multiplier.  10:15:10
17      Q.  And a 1.5 multiplier relative  10:15:11
18  to what?  10:15:14
19      A.  That customer's previous order  10:15:15
20  pattern.  10:15:18
21      Q.  Okay.  And I have seen some  10:15:18
22  references in the documents to a previous  10:15:20
23  order pattern consisting of anywhere from 7  10:15:22
24  to 18 months.  10:15:26
25      Does that comport with your  10:15:27

Page 85

1  general understanding?  10:15:30
2      MR. O'CONNOR:  Object to form.  10:15:31
3      THE WITNESS:  I don't know.  I  10:15:31
4      know about the 18 months; I don't know  10:15:33
5      about the seven.  10:15:34
6  QUESTIONS BY MR. KO:  10:15:37
7      Q.  Okay.  But generally speaking,  10:15:37
8  what you mean when you say "multiplier" and  10:15:41
9  when you referenced 1.5, are you saying that  10:15:42
10  the algorithm in place before 2003 was  10:15:44
11  utilization of some multiplier relative to  10:15:50
12  the previous ordering history of a  10:15:52
13  Mallinckrodt customer?  Is that accurate?  10:15:55
14      A.  Yes.  Yes.  10:15:57
15      Q.  Okay.  And the customers at the  10:15:57
16  time, of course, are wholesale distributors,  10:15:59
17  right?  10:16:01
18      A.  I can't -- we only sold to  10:16:02
19  other manufacturers from the St. Louis plant  10:16:08
20  manufacturing until we acquired our Hobart,  10:16:12
21  New York, facility, and I always forget what  10:16:16
22  year that was.  I'm sorry.  10:16:18
23      Q.  Okay.  So prior to -- was that  10:16:19
24  generally 2004, 2005; do you know?  10:16:21
25      A.  I can't remember the year, I'm  10:16:24

Page 86

```
 1   sorry.                         10:16:25
 2       Q.   Okay. That's all right.    10:16:25
 3   That's helpful.                 10:16:26
 4       So before acquiring the Hobart   10:16:27
 5   facility, Mallinckrodt was only distributing  10:16:30
 6   to other manufacturers?          10:16:32
 7       A.   Yes, and some researchers, yes.  10:16:33
 8       Q.   Okay.                  10:16:37
 9       A.   But not wholesalers,    10:16:37
10   distributors.                   10:16:39
11       Q.   And these other manufacturers  10:16:39
12   included entities like Purdue?   10:16:42
13       A.   I don't know if Purdue was a   10:16:44
14   customer, but they were dosage pharm   10:16:45
15   manufacturers who chose to buy our bulk   10:16:48
16   narcotics.                      10:16:51
17       Q.   Right. Okay.           10:16:52
18       So then -- thank you for     10:16:53
19   bringing up the bulk narcotics.  10:16:55
20       This order -- excuse me. This   10:16:57
21   SOM program that you're describing, was there   10:17:03
22   an SOM program that existed both with respect   10:17:05
23   to Mallinckrodt's bulk business and its   10:17:08
24   dosage business at the time you became   10:17:14
25   involved in the DEA compliance group?   10:17:17
```

Page 87

```
 1       A.   It always existed for the bulk   10:17:19
 2   business, and it existed when we bought the   10:17:24
 3   Hobart facility. But I'm sorry, I can't   10:17:26
 4   remember what year that was relative to when   10:17:29
 5   I was in the DEA compliance group, but I   10:17:31
 6   believe it was during my time in the DEA   10:17:34
 7   compliance group, yes.           10:17:37
 8       Q.   Okay. And then I just want to   10:17:38
 9   make sure the record is clear because we're   10:17:39
10   talking about the bulk business. But when   10:17:41
11   did you became {sic} aware of an algorithm or   10:17:43
12   a suspicious order monitoring program that   10:17:45
13   applied to the dosage side of Mallinckrodt's   10:17:49
14   business?                       10:17:55
15       MR. O'CONNOR: Object to form.   10:17:55
16       THE WITNESS: When we began   10:17:55
17       participating in the dosage generic   10:17:58
18       business.                   10:18:00
19   QUESTIONS BY MR. KO:             10:18:00
20       Q.   And that was after you acquired   10:18:01
21   the Hobart facility?            10:18:02
22       A.   Yes.                   10:18:04
23       Q.   Okay. So prior to that time,   10:18:04
24   Mallinckrodt did not have -- because they   10:18:06
25   weren't participating. But they did not have   10:18:09
```

Page 88

```
 1   a SOM program for anything other than the   10:18:11
 2   bulk side of the business; is that accurate?   10:18:14
 3       MR. O'CONNOR: Object to form.   10:18:16
 4       THE WITNESS: Yes.           10:18:17
 5   QUESTIONS BY MR. KO:             10:18:19
 6       Q.   Okay.                  10:18:19
 7       MR. O'CONNOR: Counsel, we've   10:18:30
 8       been going a little more than an hour.   10:18:31
 9       Should we take a break?       10:18:35
10       MR. KO: Sure.              10:18:36
11       VIDEOGRAPHER: We are going off   10:18:36
12       the record at 10:18 a.m.     10:18:38
13       (Off the record at 10:18 a.m.)   10:18:39
14       VIDEOGRAPHER: We are back on   10:35:34
15       the record at 10:35 a.m.     10:35:43
16   QUESTIONS BY MR. KO:             10:35:44
17       Q.   Welcome back from the break,   10:35:46
18   Ms. Harper.                     10:35:49
19       A.   Thank you.             10:35:49
20       Q.   Now, at some point in time when   10:35:50
21   you were involved in the controlled substance   10:35:52
22   compliance group, did you become aware of   10:35:54
23   diversion issues in the state of Florida in   10:35:58
24   particular?                     10:36:01
25       MR. O'CONNOR: Object to form.   10:36:02
```

Page 89

```
 1       THE WITNESS: Yes.           10:36:02
 2   QUESTIONS BY MR. KO:             10:36:03
 3       Q.   Okay. And approximately when   10:36:03
 4   was that?                       10:36:04
 5       A.   I don't know the exact year.   10:36:04
 6   I'm sorry.                      10:36:10
 7       Q.   Okay. And were you aware of   10:36:10
 8   the problems that existed in Florida through,   10:36:13
 9   among other things, communications with the   10:36:15
10   DEA?                            10:36:17
11       MR. O'CONNOR: Object to form.   10:36:18
12       THE WITNESS: Yes.           10:36:18
13   QUESTIONS BY MR. KO:             10:36:21
14       Q.   Okay. And is it fair to say   10:36:21
15   that the DEA was focused on the distribution   10:36:24
16   of Mallinckrodt oxy -- oxycodone   10:36:28
17   15 milligrams and oxycodone 30 milligrams?   10:36:32
18       MR. O'CONNOR: Object to form.   10:36:35
19       THE WITNESS: Yes.           10:36:36
20   QUESTIONS BY MR. KO:             10:36:36
21       Q.   Okay. And do you mind if I   10:36:37
22   call that, just for shorthand, oxy 15 and   10:36:40
23   oxy 30s?                        10:36:47
24       A.   I don't mind.          10:36:48
25       Q.   So you were aware at some point   10:36:49
```

Page 90

1  in time when you were involved with the         10:36:52
2  controlled substance compliance group that      10:36:53
3  Mallinckrodt was manufacturing a substantial    10:36:57
4  amount of oxy 15s and 30s that were ending up    10:36:59
5  in Florida; is that accurate?                    10:37:03
6          MR. O'CONNOR: Objection to              10:37:05
7      form.                                        10:37:06
8          THE WITNESS: So I don't know             10:37:06
9      our market share over time, and              10:37:07
10     substantial is -- I don't have enough        10:37:08
11     information relative to other                10:37:10
12     suppliers to answer that question.           10:37:11
13     I'm sorry.                                   10:37:13
14 QUESTIONS BY MR. KO:                             10:37:13
15     Q.   Sure.                                   10:37:13
16          But you knew that -- you became         10:37:13
17 aware at some point that Mallinckrodt was        10:37:16
18 sending hundreds of millions of pills to the     10:37:19
19 state of Florida, and in particular oxy 15s      10:37:22
20 and oxy 30s; is that fair to say?                10:37:25
21     A.   So we sell to wholesalers and           10:37:28
22 distributors who subsequently sell to           10:37:31
23 downstream registrants. Some of those are in    10:37:34
24 Florida, yes, but I believe we only have one     10:37:36
25 distributor actually located within the state   10:37:38

Page 91

1  of Florida.                                      10:37:40
2      Q.   Yeah.                                   10:37:40
3          And setting aside who you                10:37:41
4  directly sold to, at some point in time you     10:37:44
5  became acutely aware of the amount of oxy 15s   10:37:47
6  and 30s that were ending up in Florida,         10:37:51
7  regardless of who you initially sold them to;   10:37:55
8  is that fair to say?                             10:37:58
9      A.   Yes.                                    10:37:58
10     Q.   Okay. And you also became              10:37:59
11 aware that Mallinckrodt-manufactured generic    10:38:03
12 opioids, including oxy 15s and 30s, were         10:38:07
13 being widely abused and diverted in Florida;    10:38:10
14 is that fair to say?                             10:38:16
15          MR. O'CONNOR: Objection to              10:38:16
16     form.                                        10:38:17
17          THE WITNESS: Yes.                       10:38:17
18 QUESTIONS BY MR. KO:                             10:38:17
19     Q.   Okay. And are you also                  10:38:18
20 familiar with the term "the Oxy Express"?        10:38:20
21     A.   Yes.                                    10:38:24
22     Q.   In fact, you gave a                     10:38:24
23 presentation, I believe, at one point in time   10:38:25
24 about the Oxy Express; is that accurate?         10:38:26
25          MR. O'CONNOR: Object to form.           10:38:29

Page 92

1          THE WITNESS: Yes.                        10:38:30
2  QUESTIONS BY MR. KO:                             10:38:30
3      Q.   And the Oxy Express is also             10:38:30
4  shorthand for the migration of pills from       10:38:32
5  Florida up north through the I-75 corridor;     10:38:38
6  is that fair to say?                             10:38:42
7      A.   I'm not certain of the exact            10:38:42
8  road, but, yes, yes, in general.                10:38:44
9      Q.   Okay. But generally speaking,           10:38:45
10 you agree with me that the Oxy Express refers    10:38:47
11 to the migration of pills outside of the        10:38:50
12 state of Florida?                                10:38:51
13     A.   Yes.                                    10:38:52
14     Q.   Okay. And these pill migrated          10:38:52
15 to other states, including, for example,        10:38:55
16 Ohio; is that correct?                           10:38:58
17          MR. O'CONNOR: Objection to              10:38:59
18     form.                                        10:38:59
19          THE WITNESS: Yes.                       10:38:59
20 QUESTIONS BY MR. KO:                             10:39:00
21     Q.   Okay. Have you ever heard the          10:39:01
22 term "blue highway"?                             10:39:04
23     A.   No.                                     10:39:06
24     Q.   Okay. You understood that              10:39:07
25 Mallinckrodt oxy 15s and 30s were blue,         10:39:09

Page 93

1  correct?                                         10:39:13
2      A.   Oh, yes. Yes.                           10:39:13
3      Q.   Okay. And you understood that          10:39:14
4  a distinct feature of these oxy 15s and 30s     10:39:15
5  and -- were -- was the fact that they were      10:39:20
6  blue, and they were one of the only            10:39:22
7  prescription opioids on the market that were    10:39:24
8  that color.                                     10:39:25
9          MR. O'CONNOR: Objection to              10:39:26
10     form.                                        10:39:27
11 QUESTIONS BY MR. KO:                             10:39:27
12     Q.   Do you understand that to be           10:39:28
13 the case?                                        10:39:29
14     A.   So I know that oxy 30s are             10:39:29
15 blue. I'm not certain if oxy 15s are blue or   10:39:32
16 not, sir, I'm sorry. They may be a different    10:39:35
17 color.                                           10:39:38
18     Q.   Okay. So with respect to at            10:39:38
19 least oxy 30 -- and again, we're talking        10:39:39
20 about the IR oxy 30s.                            10:39:41
21     A.   Yes.                                    10:39:43
22     Q.   Those pills were blue, and you         10:39:44
23 understood that those pills were migrating      10:39:47
24 north away from Florida; is that fair to say?   10:39:49
25          MR. O'CONNOR: Objection to              10:39:51

Page 94

1    form.                          10:39:51
2          THE WITNESS: Yes.              10:39:52
3    QUESTIONS BY MR. KO:                 10:39:52
4       Q.   Okay. We'll get to this a    10:39:53
5    little bit later, but about a year and a half  10:40:02
6    ago you obviously became aware of a   10:40:06
7    settlement between Mallinckrodt and DOJ; is  10:40:07
8    that correct?                  10:40:11
9       A.   Yes.                   10:40:11
10      Q.   And the settlement was with   10:40:12
11   respect to Mallinc -- among other things,  10:40:13
12   Mallinckrodt's conduct with respect to  10:40:16
13   suspicious order monitoring of controlled  10:40:21
14   substances, correct?               10:40:23
15      A.   Yes.                   10:40:24
16      Q.   Okay. And the settlement     10:40:27
17   resulted in a $35 million payment by your  10:40:32
18   employer to the government, correct?   10:40:34
19      A.   Yes.                   10:40:36
20      Q.   Okay. And given that the     10:40:38
21   settlement revolved largely around    10:40:40
22   Mallinckrodt's suspicious order monitoring  10:40:44
23   activities -- I mean, that was something that  10:40:48
24   was your responsibility during the relevant  10:40:52
25   time period covered under the settlement; is  10:40:55

Page 95

1    that correct?                  10:40:57
2          MR. O'CONNOR: Objection to    10:40:57
3       form.                    10:40:57
4          THE WITNESS: Yes.             10:40:58
5    QUESTIONS BY MR. KO:                 10:41:00
6       Q.   Okay. And the relevant time   10:41:00
7    period of the settlement, I believe, or the  10:41:02
8    covered conduct as described in the   10:41:04
9    settlement -- actually, strike that.   10:41:07
10         Are you familiar with the terms  10:41:09
11   of the settlement?               10:41:10
12      A.   Yes.                   10:41:10
13      Q.   You reviewed them?          10:41:11
14      A.   Yes.                   10:41:12
15      Q.   Did you play a role in       10:41:13
16   negotiating any of the terms?        10:41:15
17      A.   No.                   10:41:17
18      Q.   Okay. That was presumably done  10:41:18
19   by counsel?                  10:41:21
20      A.   Yes.                   10:41:21
21      Q.   Both in-house and outside     10:41:22
22   counsel?                     10:41:24
23      A.   Yes.                   10:41:24
24      Q.   Okay. Were you consulted at   10:41:25
25   all in connection with the settlement?  10:41:27

Page 96

1       A.   Yes.                   10:41:28
2       Q.   Okay. And I understand the    10:41:29
3    settlement includes a period described  10:41:33
4    "covered conduct."               10:41:37
5          Do you recall that provision of  10:41:37
6    the settlement agreement?           10:41:39
7       A.   Yes.                   10:41:40
8       Q.   And the time period for that  10:41:40
9    covered conduct was from January 1, 2008, to  10:41:42
10   January 1, 2012.                 10:41:47
11         Is that consistent with your   10:41:48
12   understanding?                  10:41:49
13      A.   I don't remember the specific  10:41:50
14   times of the covered conduct, but --   10:41:52
15      Q.   Okay.                   10:41:52
16      A.   I don't. I'm sorry.          10:41:54
17      Q.   All right. That's fine. We    10:41:56
18   can get to that later.             10:41:56
19      A.   Okay.                   10:41:57
20      Q.   But in general terms, there was  10:41:57
21   a period of time in which the government  10:41:59
22   alleged that Mallinckrodt had a deficient SOM  10:42:01
23   program; is that fair to say?        10:42:04
24      A.   I don't know that the term    10:42:06
25   "deficient" was used.              10:42:07

Page 97

1       Q.   Okay.                   10:42:08
2       A.   But, yes, it was mentioned in  10:42:09
3    the memorandum of agreement.         10:42:10
4       Q.   Yeah.                   10:42:13
5          That Mallinckrodt's SOM -- the  10:42:14
6    settlement agreement indicated that   10:42:16
7    Mallinckrodt's SOM program did not comport  10:42:19
8    with the DEA guidelines set forth in a couple  10:42:22
9    letters sent by the DEA; is that correct?  10:42:27
10         MR. O'CONNOR: Objection to    10:42:29
11      form.                    10:42:29
12         THE WITNESS: I don't remember   10:42:29
13      the specifics of the language. I'm  10:42:30
14      sorry.                    10:42:33
15   QUESTIONS BY MR. KO:                 10:42:33
16      Q.   Okay. That's fine.          10:42:33
17         Was this settlement ever       10:42:34
18   discussed in any performance review that you  10:42:37
19   had recently?                  10:42:40
20      A.   No.                   10:42:40
21      Q.   Okay. Was there ever any      10:42:42
22   discussion of you losing your job as a result  10:42:45
23   of the settlement?               10:42:46
24      A.   I offered to quit.          10:42:47
25      Q.   You offered to quit.         10:42:48

Page 98

1  Why was that?  10:42:49
2  A.  So that -- so that perhaps if  10:42:50
3  the company chose to bring someone in my  10:42:55
4  place, that I would gladly leave.  10:42:58
5  Q.  Okay.  And you offered to quit  10:43:01
6  because it was your responsibility during the  10:43:03
7  time of the covered conduct and the time  10:43:06
8  period in the settlement to monitor and  10:43:08
9  revise and design Mallinckrodt's suspicious  10:43:10
10  order monitoring system, correct?  10:43:14
11  MR. O'CONNOR:  Object to form.  10:43:15
12  THE WITNESS:  Yes.  It happened  10:43:15
13  on my watch.  10:43:16
14  QUESTIONS BY MR. KO:  10:43:17
15  Q.  By the way, are you aware of  10:43:23
16  any -- of whether or not the company  10:43:23
17  maintained a personnel file for you?  10:43:27
18  A.  Yes.  10:43:28
19  Q.  Okay.  10:43:31
20  A.  Yes.  10:43:31
21  Q.  And I take it you had annual  10:43:32
22  reviews?  10:43:37
23  A.  Yes.  10:43:37
24  Q.  Okay.  And did you receive  10:43:38
25  copies of these annual reviews to the extent  10:43:39

Page 99

1  they were in writing?  10:43:41
2  A.  Yes, I suppose.  Yes.  10:43:42
3  Q.  Okay.  Do you recall collecting  10:43:48
4  them, keeping them, storing them?  10:43:54
5  A.  No.  10:43:56
6  Q.  Okay.  Do you have any  10:43:56
7  documentation that you keep from the company  10:44:02
8  regarding your personnel file in any fashion?  10:44:05
9  A.  I do not.  10:44:09
10  Q.  Okay.  Everything, you believe,  10:44:10
11  is held by the company with respect to your  10:44:12
12  employment history and your personnel file;  10:44:15
13  is that fair to say?  10:44:17
14  A.  Yes.  10:44:17
15  Q.  Okay.  Earlier this morning we  10:44:18
16  were talking about your understanding of  10:44:30
17  Mallinckrodt's SOM program when you joined  10:44:33
18  that -- the CSC group, correct?  10:44:37
19  A.  Uh-huh.  10:44:39
20  Q.  And by CSC, I'm referring to  10:44:39
21  the controlled substance compliance group.  10:44:41
22  Is that fair to say?  10:44:43
23  A.  Yes.  10:44:44
24  Q.  Or fair to use for purposes of  10:44:44
25  this deposition today?  10:44:45

Page 100

1  A.  Yes.  10:44:46
2  Q.  Okay.  And regarding  10:44:47
3  Mallinckrodt's SOM program, you mentioned the  10:44:49
4  role of national account managers.  10:44:53
5  Do you recall that?  10:44:56
6  A.  I do.  10:44:57
7  Q.  And also that customer service  10:44:58
8  representatives were involved?  10:45:00
9  A.  Yes, that's correct.  10:45:02
10  Q.  And I believe you testified  10:45:03
11  that they were necessary because they were  10:45:05
12  your eyes and ears on the ground -- or eyes  10:45:07
13  and ears to your customers and the customers'  10:45:09
14  customers and also the boots on the ground.  10:45:13
15  Is that an accurate --  10:45:15
16  MR. O'CONNOR:  Objection to  10:45:17
17  form.  10:45:17
18  QUESTIONS BY MR. KO:  10:45:18
19  Q.  -- statement?  10:45:18
20  A.  So they were the eyes and ears  10:45:19
21  to our customers, but I do not necessarily  10:45:21
22  know that they were the eyes and ears to our  10:45:23
23  customers' customers.  10:45:28
24  Q.  Got it.  10:45:29
25  So it's accurate to say that  10:45:29

Page 101

1  you had NAMs, the national account managers,  10:45:32
2  and the CSRs, the customer service  10:45:34
3  representatives, involved because they were  10:45:36
4  your eyes and ears to your customers,  10:45:37
5  correct?  10:45:40
6  MR. O'CONNOR:  Object to form.  10:45:40
7  THE WITNESS:  Yes.  Yes.  Yes.  10:45:40
8  QUESTIONS BY MR. KO:  10:45:41
9  Q.  Okay.  And you -- is it fair to  10:45:42
10  say that you then relied on these NAMs and  10:45:47
11  CSRs to identify and assist with the  10:45:49
12  detection of suspicious orders?  10:45:53
13  MR. O'CONNOR:  Object to form.  10:45:54
14  THE WITNESS:  To assist, yes.  10:45:56
15  To bring things to our attention for  10:46:01
16  further investigation, yes.  10:46:03
17  QUESTIONS BY MR. KO:  10:46:05
18  Q.  And you said earlier that you  10:46:05
19  had a team, and they were part of it, so they  10:46:06
20  were -- they were part of the team in  10:46:08
21  which -- they were part of the SOM team,  10:46:12
22  correct?  10:46:14
23  MR. O'CONNOR:  Object to form.  10:46:15
24  THE WITNESS:  They were part of  10:46:15
25  the SOM team at the time that we were  10:46:18

Page 102

1    enhancing the program but not as an          10:46:20
2    ongoing, current-day member of the           10:46:23
3    team.                                        10:46:25
4    QUESTIONS BY MR. KO:                         10:46:25
5       Q.   Got it.                              10:46:27
6            And when did that occur, that        10:46:27
7    they were...                                 10:46:30
8            Well, when you said they were        10:46:31
9    part of the SOM team at that time, what time 10:46:39
10   period are you talking about?                10:46:41
11      A.   So we went through several           10:46:42
12   projects of enhancing the suspicious order   10:46:50
13   monitoring program, and one of the components 10:46:53
14   was a customer checklist that each customer  10:46:55
15   was to fill out once per year.               10:46:58
16           So the NAMs and the customer         10:47:01
17   service reps were important contributors to  10:47:04
18   that effort because they knew more about the 10:47:06
19   customer side of the house, but as we sit    10:47:10
20   here today, they are not part of the         10:47:13
21   suspicious order monitoring team.            10:47:15
22      Q.   Got it.  Thank you for the           10:47:16
23   clarification.                               10:47:17
24           So at some point in time when        10:47:17
25   you were part of the CSC team, the           10:47:24

Page 103

1    involvement of the NAMs and the customer     10:47:27
2    service reps in the day-to-day monitoring of 10:47:29
3    the customers was removed off their plate; is 10:47:34
4    that fair to say?                            10:47:38
5            MR. O'CONNOR:  Object to form.       10:47:38
6            THE WITNESS:  So I would have        10:47:41
7        never called the NAMs a day-to-day      10:47:41
8        monitoring.  The customer service       10:47:44
9        reps, yes, as they reviewed orders      10:47:46
10       that came in, that has not changed.     10:47:48
11       So I'd like to clarify that point.      10:47:49
12           But when we speak of the            10:47:51
13       suspicious order monitoring team, the   10:47:53
14       commercial -- neither the commercial    10:47:56
15       group nor customer service is           10:47:57
16       currently on the team.                  10:47:59
17   QUESTIONS BY MR. KO:                         10:48:00
18      Q.   Okay.  So when they were part        10:48:00
19   of the team, the NAMs and the CSRs assisted  10:48:02
20   in rooting out potential diversion of        10:48:06
21   Mallinckrodt controlled substances; is that  10:48:10
22   accurate?                                    10:48:12
23           MR. O'CONNOR:  Objection.           10:48:12
24           THE WITNESS:  So they assisted      10:48:13
25       in bringing things to our attention     10:48:15

Page 104

1    for additional investigation.                10:48:17
2    QUESTIONS BY MR. KO:                         10:48:17
3       Q.   Okay.                                10:48:19
4       A.   Not necessarily conclusion          10:48:19
5    diversion.                                   10:48:21
6       Q.   Okay.  That's helpful.              10:48:22
7            And with regard to the SOM           10:48:24
8    program, the NAMs -- so then it's fair to say 10:48:26
9    that the NAMs' and the CSRs' job was to alert 10:48:28
10   you to -- alert you to potential diversion;  10:48:32
11   is that accurate?                            10:48:34
12      A.   Yes, I believe the structure         10:48:35
13   for customer service was they would escalate 10:48:36
14   to their manager first, who would then, if   10:48:39
15   appropriate, come to the controlled          10:48:41
16   substances compliance group with that        10:48:43
17   concern.                                     10:48:44
18      Q.   Okay.  So if a -- if an             10:48:45
19   individual who was a national account manager 10:48:48
20   or customer service representative testified 10:48:50
21   that she or he was not involved in           10:48:54
22   identifying suspicious orders, that would not 10:48:57
23   be accurate, correct?                        10:48:59
24           MR. O'CONNOR:  Objection to          10:49:00
25       form.                                    10:49:01

Page 105

1            THE WITNESS:  It would not be        10:49:01
2        accurate.                                10:49:08
3    QUESTIONS BY MR. KO:                         10:49:15
4       Q.   Okay.  Now, throughout the time     10:49:15
5    you were involved with the CSC and in        10:49:18
6    connection with your duties to revise the SOM 10:49:20
7    program, did you ever consult any third      10:49:25
8    parties or consultants to assist you in      10:49:28
9    implementing and maintaining an SOM program? 10:49:33
10      A.   Yes.                                 10:49:36
11      Q.   Okay.  And which third parties      10:49:37
12   or vendors would those be?                   10:49:38
13      A.   The company is Drug and             10:49:39
14   Chemical Advisory Group.  I'm not certain if 10:49:47
15   they still exist, but that was the firm at   10:49:48
16   the time.  And that group was made up of     10:49:55
17   former DEA executives.                       10:49:58
18      Q.   Okay.  Including Frank              10:49:59
19   Sapienza?                                    10:50:02
20      A.   Sapienza, yes, sir.                  10:50:02
21      Q.   Other than the drug and            10:50:04
22   chemical group, anyone else?                 10:50:05
23      A.   Yes.                                 10:50:06
24      Q.   Who or which entities?              10:50:06
25      A.   A gentleman, Howard Davis.  He      10:50:09

Page 106

1  was retired DEA diversion program manager.  10:50:13
2      Q.   Okay.  Other than the drug and  10:50:20
3  chemical group and Mr. Davis, did you retain  10:50:21
4  any other entities to assist in the  10:50:25
5  implementation of Mallinckrodt's SOM program?  10:50:28
6      A.   Is there a specific time frame  10:50:30
7  to which you refer?  10:50:34
8      Q.   During the time period in which  10:50:35
9  you were senior manager of the controlled  10:50:37
10 substance compliance group.  10:50:40
11     A.   Yes.  10:50:41
12     Q.   Okay.  And who would -- who  10:50:44
13 would that individual be or which entities  10:50:45
14 would that be?  10:50:47
15     A.   So I get -- I get confused  10:50:48
16 because we did not retain the consulting  10:50:50
17 group for this purpose.  They were retained  10:50:55
18 through outside counsel, so Mallinckrodt did  10:50:58
19 not retain them.  10:51:01
20     Q.   I see.  10:51:02
21         So outside counsel, do you mean  10:51:03
22 Ropes & Gray?  10:51:05
23     A.   Yes.  10:51:05
24     Q.   Okay.  And which third-party  10:51:06
25 consultant or vendor are you referring to?  10:51:11

Page 107

1      A.   They've changed names  10:51:12
2  throughout the years.  It was at one time  10:51:14
3  called Buzzeo Consulting.  Their named  10:51:16
4  changed to IQVIA, Quintiles IMS, and now  10:51:20
5  they're known only at IMS.  10:51:27
6      Q.   And my understanding of IMS  10:51:31
7  is -- and IQVIA is that it's a database that  10:51:32
8  tracks detailed patient-level information.  10:51:36
9  So I just want to make sure I understand what  10:51:39
10 you're referring to in terms of their  10:51:41
11 retention.  10:51:44
12         Is it your testimony that you  10:51:45
13 believe that they actually testified as  10:51:47
14 consultants for the company, or did you  10:51:51
15 simply acquire data from them?  10:51:53
16         MR. O'CONNOR:  Objection to  10:51:55
17 form.  10:51:56
18         THE WITNESS:  We did not  10:51:56
19 acquire data from them.  The company  10:51:59
20 may have in some respect, but the old  10:52:01
21 Buzzeo group became a part of the  10:52:04
22 IQVIA IMS organization, so they  10:52:06
23 were -- primarily we dealt with  10:52:13
24 another gentleman who was a former  10:52:15
25 official at DEA.  10:52:18

Page 108

1  QUESTIONS BY MR. KO:  10:52:19
2      Q.   Okay.  Other than the Buzzeo  10:52:19
3  group, the drug and chemical group and  10:52:25
4  Mr. Howard Davis, do you recall any other  10:52:27
5  entities or individuals that Mallinckrodt  10:52:29
6  retained for purposes of implementing its SOM  10:52:31
7  program at the time you were senior manager?  10:52:34
8      A.   Yes.  10:52:36
9      Q.   Okay.  Who else?  10:52:37
10     A.   So there's -- there is a lady  10:52:39
11 who was a former employee.  Her name is  10:52:41
12 Jennifer, but she goes by Jen, Buist,  10:52:45
13 B-u-i-s-t.  10:52:51
14     Q.   And if memory serves me  10:52:51
15 correct, Ms. -- or Jennifer was retained  10:52:55
16 sometime after 2012.  10:52:58
17         Is that consistent with your  10:53:02
18 understanding?  10:53:02
19     A.   Yes.  10:53:02
20     Q.   Okay.  In other words, she  10:53:06
21 wasn't retained -- or she wasn't part of the  10:53:08
22 SOM team in the 2008 to 2012 time period, was  10:53:10
23 she?  10:53:12
24     A.   No.  10:53:13
25         (Mallinckrodt-Harper Exhibit 2  10:53:13

Page 109

1  marked for identification.)  10:53:13
2  QUESTIONS BY MR. KO:  10:53:13
3      Q.   Okay.  Why don't we turn to a  10:53:13
4  new exhibit.  This will be marked as Harper  10:53:22
5  Exhibit 2.  10:53:26
6         And for the record, Harper  10:53:39
7  Exhibit 2 is MNK-T1_0000275504.  10:53:41
8         And, Ms. Harper, I just want to  10:53:54
9  direct you to some pages on this document.  10:53:56
10 And we can get to -- well, let's take a step  10:54:04
11 back.  10:54:08
12         This appears to be an e-mail  10:54:08
13 dated February 23, 2009, from you to Eileen  10:54:11
14 Spaulding and Mary Lewis; is that correct?  10:54:15
15     A.   Yes.  10:54:18
16     Q.   And it's attaching a  10:54:18
17 presentation you're making regarding the  10:54:20
18 controlled substance compliance group?  10:54:22
19     A.   Yes.  10:54:24
20     Q.   Okay.  And I have seen a lot of  10:54:24
21 these presentations, and I believe that you  10:54:28
22 have given some of these presentations, so  10:54:30
23 I'm assuming they look familiar to you, but  10:54:33
24 does this presentation that you see attached  10:54:35
25 to this e-mail -- do you recall this  10:54:36

Page 110

1  particular presentation?                    10:54:40
2         MR. O'CONNOR: Objection to           10:54:41
3     form.                                    10:54:42
4         THE WITNESS: Not this one            10:54:44
5     specifically, but as I read it, I'm      10:54:44
6     familiar -- I'm refamiliarizing          10:54:46
7     myself.                                  10:54:49
8  QUESTIONS BY MR. KO:                        10:54:49
9     Q.   Sure. Do you recall giving          10:54:49
10 presentations to other people or groups at  10:54:52
11 Mallinckrodt regarding the controlled       10:54:55
12 substance compliance roles and              10:54:56
13 responsibilities during the 2008 to 2017 time 10:54:58
14 period?                                     10:55:03
15    A.   Yes.                                10:55:03
16    Q.   Okay. And this was one of           10:55:03
17 those presentations?                        10:55:06
18    A.   Yes.                                10:55:06
19    Q.   Turning to page 2, which you're     10:55:07
20 on --                                       10:55:13
21    A.   Okay.                               10:55:13
22    Q.   -- of the deck, you see that        10:55:14
23 the controlled substance compliance group was 10:55:15
24 established in August 2008.                 10:55:16
25         Do you see that?                    10:55:18

Page 111

1     A.   I see that.                         10:55:18
2     Q.   Okay. And that the name was         10:55:19
3  changed from DEA compliance to the CSC,     10:55:21
4  correct?                                    10:55:29
5     A.   Yes. Yes.                           10:55:29
6     Q.   Okay. And just to help you          10:55:29
7  along, the portion I was referencing just a 10:55:35
8  moment ago was right there.                 10:55:43
9         And so the CSC group of which        10:55:44
10 you were senior manager was established in   10:55:47
11 August 2008, according to this presentation, 10:55:49
12 correct?                                    10:55:51
13    A.   Yes, according to the               10:55:52
14 presentation.                               10:55:54
15    Q.   And is that consistent with         10:55:54
16 your recollection?                          10:55:57
17    A.   I'm so uncertain of the years       10:55:58
18 the different events happened. I know this  10:56:01
19 happened. I see that the presentation reads 10:56:03
20 that way, but if it conflicts with a date   10:56:05
21 that I previously provided, I apologize.    10:56:08
22    Q.   Sure. No need to apologize.         10:56:12
23 This isn't necessarily a memory test.       10:56:15
24    A.   Okay.                               10:56:17
25    Q.   But I'm just curious -- well, I     10:56:18

Page 112

1  want you to confirm that at least as        10:56:19
2  reflected on this deck, the CSC group was   10:56:22
3  established in August of 2008, correct?     10:56:27
4         MR. O'CONNOR: Objection to           10:56:29
5     form.                                    10:56:31
6         THE WITNESS: Yes.                    10:56:32
7  QUESTIONS BY MR. KO:                        10:56:32
8     Q.   And you were senior manager of      10:56:32
9  that group at this time, correct?           10:56:33
10    A.   I was manager.                      10:56:34
11    Q.   You were manager. Okay.             10:56:40
12         And when -- and so at some          10:56:42
13 point you became senior manager?            10:56:44
14    A.   Yes.                                10:56:45
15    Q.   Okay. And as we discussed           10:56:46
16 earlier, you don't recall exactly when?     10:56:47
17    A.   No, I'm sorry.                      10:56:49
18    Q.   Okay. Now, based on this            10:56:51
19 document, is it accurate to say that prior to 10:56:56
20 August 2008 there was no such group at      10:56:58
21 Mallinckrodt called the controlled substance 10:57:00
22 compliance group? Is that correct?         10:57:02
23    A.   Correct.                            10:57:04
24    Q.   Okay. I want to turn to             10:57:04
25 page 11 of this document, of the deck in    10:57:12

Page 113

1  particular. And there is a reference made to 10:57:17
2  the controlled substance compliance team.   10:57:20
3         Do you see that?                     10:57:21
4     A.   Yes, I do.                          10:57:22
5     Q.   And it indicates here that you      10:57:24
6  are the manager, as we just discussed, of   10:57:26
7  controlled substance compliance, correct?   10:57:28
8     A.   Correct.                            10:57:31
9     Q.   And this comprises the entire       10:57:31
10 controlled substance compliance team?       10:57:34
11    A.   Yes.                                10:57:35
12    Q.   And it looks like you reported      10:57:37
13 to Ms. JoAnne Levy?                         10:57:41
14    A.   Levy, yes, sir.                     10:57:43
15    Q.   Levy, thank you.                    10:57:44
16         And what was her role?              10:57:45
17    A.   She was the vice president of       10:57:47
18 the logistics group.                        10:57:50
19    Q.   And did she have any day-to-day     10:57:51
20 involvement with the controlled substance   10:57:54
21 compliance team?                            10:57:55
22    A.   Yes.                                10:57:56
23    Q.   Okay. And what did that             10:57:56
24 day-to-day involvement consist of?          10:57:57
25    A.   As our vice president, she was      10:57:59

Page 114

1 part of the team that enhanced the suspicious 10:58:03
2 order monitoring program. 10:58:09
3 Q. Okay. 10:58:09
4 A. We also deferred to her on 10:58:09
5 certain matters of, pardon me, of quota and 10:58:14
6 other duties related to the DEA compliance 10:58:19
7 group. 10:58:22
8 Q. Okay. Now, with respect to the 10:58:22
9 revisions and implementation of 10:58:30
10 Mallinckrodt's SOM program in particular, is 10:58:31
11 it fair to say that you were the team leader 10:58:36
12 of that particular group? 10:58:38
13 A. No. 10:58:41
14 Q. It's not. 10:58:41
15 You don't believe you were the 10:58:42
16 team leader of -- during -- well, let me take 10:58:43
17 that back. 10:58:47
18 So from the time period of 10:58:47
19 August 2008 to 2012, were you the team leader 10:58:50
20 of Mallinckrodt's SOM program? 10:58:57
21 A. We did not have a designated 10:59:00
22 team leader. 10:59:02
23 Q. Okay. 10:59:03
24 A. And we would have deferred to 10:59:04
25 the most senior official on the team, but we 10:59:06

Page 115

1 did not have a designated leader. 10:59:10
2 Q. And when you say "defer to the 10:59:12
3 most senior official," are you referring to 10:59:13
4 Ms. Levy? 10:59:15
5 A. At that time, yes. 10:59:16
6 Q. Okay. There has been -- again, 10:59:18
7 this isn't a memory test. 10:59:21
8 A. Okay. 10:59:23
9 Q. So if your recollection is 10:59:23
10 different, I totally understand. 10:59:25
11 But I have seen reference to 10:59:27
12 documents that suggest that you were the team 10:59:28
13 leader of the SOM program. 10:59:30
14 Do you -- you dispute that? 10:59:32
15 MR. O'CONNOR: Objection to 10:59:33
16 form. 10:59:34
17 THE WITNESS: I don't dispute 10:59:34
18 that. 10:59:36
19 QUESTIONS BY MR. KO: 10:59:36
20 Q. Okay. You don't dispute that. 10:59:36
21 A. I may have been referenced as 10:59:38
22 the team leader, but I didn't -- I was a key 10:59:40
23 contributor, but I didn't perceive myself as 10:59:43
24 the leader. 10:59:46
25 Q. All right. But as we discussed 10:59:46

Page 116

1 before, it's highly unlikely that anyone else 10:59:47
2 at Mallinckrodt knew more about 10:59:49
3 Mallinckrodt's SOM program other than you, 10:59:52
4 correct? 10:59:54
5 A. Correct. 10:59:54
6 Q. Okay. And in addition to you 10:59:55
7 having involvement in the SOM program at 11:00:02
8 Mallinckrodt, Ms. Spaulding also played a key 11:00:03
9 role; would you agree with that? 11:00:06
10 MR. O'CONNOR: Objection to 11:00:08
11 form. 11:00:10
12 THE WITNESS: Yes. 11:00:10
13 QUESTIONS BY MR. KO: 11:00:10
14 Q. And she's based out of the 11:00:10
15 Hobart office? 11:00:12
16 A. Yes. 11:00:13
17 Q. And by the way, you were based 11:00:13
18 here in St. Louis, correct? 11:00:16
19 A. Yes. 11:00:17
20 Q. And were you based not in the 11:00:17
21 Hazelwood office but a different office? 11:00:20
22 A. I've had three different 11:00:23
23 offices in the St. Louis area. 11:00:25
24 Q. Okay. During the 2008 to 2012 11:00:26
25 time period, where were you located? 11:00:30

Page 117

1 A. I believe I was at Hazelwood. 11:00:32
2 Q. And where was Ms. Levy? 11:00:37
3 A. At Hazelwood. 11:00:42
4 Q. Okay. I want to turn to 11:00:43
5 page 15 of this deck, and here it appears 11:00:45
6 that you are describing some recent 11:00:58
7 developments in the controlled substance 11:01:01
8 compliance group; is that accurate? 11:01:03
9 A. Contributions, yes, sir. 11:01:06
10 Q. Contributions. 11:01:07
11 And one contribution appears to 11:01:07
12 be the implementation of an SOM program? 11:01:09
13 MR. O'CONNOR: Objection to 11:01:14
14 form. 11:01:14
15 THE WITNESS: So it's not 11:01:14
16 qualified here, but we had a program 11:01:18
17 in place, so that would have been an 11:01:20
18 enhancement activity of the SOM 11:01:23
19 program. 11:01:24
20 QUESTIONS BY MR. KO: 11:01:25
21 Q. Okay. And an enhancement 11:01:25
22 activity, in other words, an attempt to 11:01:27
23 revise it and improve the program; is that 11:01:32
24 accurate? 11:01:35
25 A. Yes. Yes. 11:01:35

Page 118

1    Q.    And when -- here it says, "CSOS    11:01:36
2  receipt guidance for customers."    11:01:39
3        What does CSOS refer to?    11:01:40
4    A.    So the DEA implemented an    11:01:42
5  electronic 222 format, and some of our    11:01:45
6  customers are narcotic treatment programs.    11:01:51
7  They had a lot of questions around how to    11:01:54
8  manage their recordkeeping, so we provided    11:01:57
9  guidance to those customers.    11:02:01
10    Q.    Okay.  And the 222 form is a    11:02:02
11  form required by the DEA that every    11:02:04
12  registrant fills out when ordering    11:02:05
13  prescription -- or controlled substances; is    11:02:07
14  that accurate?    11:02:09
15    A.    Schedule II.    11:02:09
16    Q.    Schedule II in particular?    11:02:10
17    A.    Yes.    11:02:12
18    Q.    Thank you.    11:02:12
19        And here, the next reference is    11:02:12
20  to what -- the next item down refers to    11:02:16
21  something we had just previously discussed    11:02:20
22  about Federal Register Notices.    11:02:22
23        Do you see that?    11:02:24
24    A.    Yes.    11:02:24
25    Q.    And so you are informing    11:02:25

Page 119

1  whoever's at this presentation that one    11:02:27
2  contribution of the CSC group is to watch    11:02:30
3  Federal Register Notices that come out that    11:02:39
4  are relevant for Mallinckrodt, correct?    11:02:41
5    A.    Correct.    11:02:41
6    Q.    And the Federal Register    11:02:42
7  Notices, what was your understanding of    11:02:44
8  generally what those consisted of?    11:02:46
9        Actually, take that back.    11:02:48
10        Is it -- a Federal Register    11:02:49
11  Notice -- with respect to the Federal    11:02:54
12  Register Notices that you paid particularly    11:02:57
13  close attention to, those were notices that    11:02:58
14  interpreted certain DEA statutes; is that    11:03:02
15  fair to say?    11:03:05
16        MR. O'CONNOR:  Objection to    11:03:05
17        form.    11:03:05
18        THE WITNESS:  I would not call    11:03:06
19        them interpretations.  They were    11:03:08
20        statements of quota, the US aggregate    11:03:11
21        quota, notices of proposed rulemaking,    11:03:16
22        who had applied to become a new    11:03:19
23        registrant, things like that.    11:03:20
24  QUESTIONS BY MR. KO:    11:03:22
25    Q.    Okay.  And the statements, did    11:03:22

Page 120

1  they also include -- or did you also review    11:03:24
2  and read statements regarding Federal    11:03:30
3  Register Notices of suspicious order    11:03:41
4  monitoring activities?    11:03:42
5        MR. O'CONNOR:  Objection to    11:03:42
6        form.    11:03:43
7  QUESTIONS BY MR. KO:    11:03:43
8    Q.    It was a poor question.  Let me    11:03:44
9  ask it again.    11:03:46
10        When reviewing the Federal    11:03:46
11  Register Notices, did you also see and review    11:03:48
12  notices that related to SOM activities of    11:03:50
13  other registrants?    11:03:52
14    A.    Yes.    11:03:54
15    Q.    And my presumption is that you    11:03:55
16  paid particularly close attention to some of    11:04:00
17  those notices?    11:04:01
18        MR. O'CONNOR:  Objection.    11:04:02
19        THE WITNESS:  One in    11:04:03
20        particular, yes.    11:04:03
21  QUESTIONS BY MR. KO:    11:04:04
22    Q.    Would that be the Southwood --    11:04:04
23    A.    Yes.    11:04:04
24    Q.    -- notice?    11:04:06
25        Okay.  Do you recall when you    11:04:06

Page 121

1  reviewed that one?    11:04:07
2    A.    When DEA called it out in one    11:04:09
3  of their guidance letters as being    11:04:12
4  instructive, that is what we went to    11:04:14
5  immediately and reviewed.    11:04:16
6    Q.    Okay.  And you recall this was    11:04:17
7  generally in the 2007 or early 2008 time    11:04:19
8  period?    11:04:23
9    A.    It was 2006, 2007, approximate,    11:04:24
10  but I don't remember the dates.    11:04:26
11    Q.    Okay.  With respect to    11:04:27
12  participate in RiskMAP program, an FDA    11:04:33
13  initiative, can you describe to the Court    11:04:38
14  what the RiskMAP program was?    11:04:41
15    A.    I don't remember the definition    11:04:45
16  of the acronym, but it pertained -- it was an    11:04:47
17  FDA program where certain drug substances    11:04:53
18  were monitored forward through the supply    11:04:56
19  chain.    11:04:59
20    Q.    Okay.  And when you say    11:05:00
21  "forward," do you mean after they left the    11:05:02
22  warehouses of the manufacturer facility?    11:05:09
23    A.    Yes.    11:05:12
24    Q.    Okay.  So would it be fair to    11:05:13
25  say that another way of saying -- well,    11:05:16

Page 122

1  strike that.                                    11:05:24
2        Now, there's also a reference      11:05:24
3  made to working with the DEA on methadone.      11:05:29
4        Do you see that?                    11:05:35
5  A.   Yes.                                 11:05:36
6  Q.   And Mallinckrodt manufactures a      11:05:36
7  large amount of generic methadone as well,      11:05:38
8  correct?                                   11:05:41
9        MR. O'CONNOR: Objection to        11:05:41
10       form.                               11:05:42
11       THE WITNESS: We manufacture        11:05:42
12       methadone, and I don't again have -- I  11:05:44
13       don't know if we're the largest, or    11:05:45
14       large, but, yes, we manufacture it.     11:05:46
15 QUESTIONS BY MR. KO:                       11:05:47
16 Q.   Okay. And despite not knowing      11:05:48
17 whether or not you are the largest, or large,   11:05:52
18 you do understand that Mallinckrodt has for     11:05:55
19 quite some time manufactured generic           11:05:58
20 methadone, correct?                        11:05:59
21 A.   Yes.                                 11:06:00
22 Q.   Okay. And since at least the      11:06:01
23 mid-'90s, if not prior to that?            11:06:02
24 A.   I don't recall the year because    11:06:06
25 previously it was manufactured by an external   11:06:09

Page 123

1  party and shipped to Mallinckrodt for      11:06:11
2  distribution, so I don't know when we brought  11:06:13
3  the manufacturing in-house.                11:06:15
4  Q.   Sure.                               11:06:17
5  A.   Of the methadone, 40              11:06:17
6  milligrams, that is.                       11:06:19
7  Q.   And thank you for that            11:06:20
8  clarification.                             11:06:21
9        Mallinckrodt manufactured        11:06:21
10 various different strengths of methadone,      11:06:22
11 correct?                                   11:06:25
12 A.   Yes.                                 11:06:25
13 Q.   I believe in 5, 10 and            11:06:27
14 40-milligram dosages, among other quantities?  11:06:30
15 A.   Yes.                                 11:06:33
16 Q.   Okay. And at a certain point     11:06:33
17 in time, the DEA alerted you and the CSC       11:06:35
18 group of methadone abuse and diversion,        11:06:39
19 correct?                                   11:06:41
20       MR. O'CONNOR: Objection to        11:06:42
21       form.                               11:06:45
22       THE WITNESS: They called it       11:06:45
23       the methadone mortality working group.  11:06:46
24       DEA asked us to come to Washington,    11:06:48
25       DC, along with other major        11:06:51

Page 124

1  manufacturers -- there were two or      11:06:53
2  three others -- and have a                 11:06:54
3  collaborative discussion with them in      11:06:57
4  terms of how the 40-milligram              11:06:58
5  methadone specifically was being           11:07:02
6  distributed at pharmacies, and the         11:07:07
7  data that they were seeing related to      11:07:10
8  the mortality that they were               11:07:12
9  associating with those distributions.      11:07:13
10 QUESTIONS BY MR. KO:                       11:07:15
11 Q.   And when you say "mortality,"      11:07:15
12 you're saying that there were a large amount   11:07:18
13 of -- or there were people that were           11:07:19
14 overdosing on methadone at the time that you   11:07:21
15 met with DEA, correct?                     11:07:25
16       MR. O'CONNOR: Objection to        11:07:27
17       form.                               11:07:27
18       THE WITNESS: Yes, but may I       11:07:28
19       please add that that was because there  11:07:29
20       were physicians that were writing them  11:07:33
21       for purposes other than which they     11:07:34
22       were FDA-approved.                 11:07:38
23 QUESTIONS BY MR. KO:                       11:07:39
24 Q.   Okay. And that's based on your   11:07:40
25 understanding what the DEA was telling you,    11:07:42

Page 125

1  correct? Or do you actually have personal   11:07:44
2  knowledge?                                 11:07:46
3  A.   I do not have any personal        11:07:46
4  knowledge.                                 11:07:47
5  Q.   So it was based on what the DEA   11:07:47
6  was telling you?                           11:07:49
7  A.   Yes.                                 11:07:50
8  Q.   And do you recall when --         11:07:50
9  approximately when that meeting in             11:07:51
10 Washington, DC, was?                       11:07:53
11 A.   I don't recall the date.          11:07:54
12 Q.   Was it before 2008?              11:07:57
13 A.   I'm sorry, I don't recall the     11:08:00
14 date.                                      11:08:01
15 Q.   Fair enough.                       11:08:02
16       And going back to the RiskMAP    11:08:02
17 and trying to understand, as you described,    11:08:09
18 the path of a drug that a manufacturer         11:08:12
19 produced, forward, as you said, do you recall  11:08:20
20 at a certain point in time creating a RiskMAP  11:08:25
21 for oxycodone 30?                          11:08:31
22 A.   I do not.                          11:08:32
23 Q.   Okay. You don't recall any      11:08:34
24 involvement in a RiskMAP for oxy 30s or 15s?   11:08:36
25 A.   We may have been asked to         11:08:39

Page 126

1    report in to the -- it was called the patient    11:08:41
2    and product monitoring group.  It was    11:08:44
3    specific to fentanyl in the beginning, but I    11:08:50
4    don't -- I don't know to which other products    11:08:53
5    it may have expanded, but we did annual    11:08:55
6    reporting to that group.    11:08:57
7        Q.  Sure.  Okay.    11:08:58
8            You didn't have any specific    11:09:00
9    responsibility with respect to that RiskMAP    11:09:02
10   report that you may have done for the FDA,    11:09:05
11   correct?    11:09:08
12       A.  So we had responsibility for    11:09:08
13   reporting any thefts or losses of these    11:09:11
14   specific drugs, but it was an internal    11:09:13
15   reporting to the patient and product    11:09:16
16   monitoring group who assembled a whole large    11:09:17
17   report consisting of other information for    11:09:21
18   the FDA.    11:09:24
19       Q.  Okay.  I understand.    11:09:25
20           And did you have any -- a    11:09:26
21   specific involvement with that?    11:09:29
22       A.  Only to the extent if we --    11:09:30
23   they contacted us once a year and asked if we    11:09:32
24   had any recorded thefts or losses, DEA 106    11:09:35
25   forms, for those drug products.    11:09:41

Page 127

1        Q.  Okay.  If you turn to page 18    11:09:42
2    of this deck, and there's a reference made to    11:09:52
3    the cost of noncompliance.    11:10:02
4            Do you see that?    11:10:03
5        A.  I do see it.    11:10:04
6        Q.  And by the way, do you have any    11:10:05
7    reason to doubt that this was a presentation    11:10:07
8    you made, or do you think that someone else    11:10:08
9    made this presentation?    11:10:11
10       A.  I have no reason to doubt I --    11:10:12
11   I did make the presentation.    11:10:14
12       Q.  You did make this presentation?    11:10:15
13       A.  Yeah.    11:10:16
14       Q.  Okay.  So here you're    11:10:16
15   describing the cost of noncompliance, and in    11:10:18
16   particular the cost of noncompliance with the    11:10:22
17   CSA; is that fair to say?    11:10:24
18       A.  Yes.    11:10:25
19       Q.  Okay.  And you are talking    11:10:25
20   about, I think, other fines paid by other    11:10:27
21   pharmacies and other entities and registrants    11:10:32
22   of the CSA, correct?    11:10:36
23       A.  Well, this one is specific to a    11:10:37
24   fine paid by Rite Aid and its subsidiaries.    11:10:41
25       Q.  Right.    11:10:47

Page 128

1            Now, in addition to an actual    11:10:48
2    cost, a business and corporate cost, would    11:10:52
3    you agree with me that the cost of    11:10:54
4    noncompliance is actually overdose deaths?    11:10:55
5            MR. O'CONNOR:  Objection to    11:11:00
6        form.    11:11:01
7    QUESTIONS BY MR. KO:    11:11:02
8        Q.  In other words, there's a human    11:11:02
9    cost of noncompliance, is there not?    11:11:04
10           MR. O'CONNOR:  Objection to    11:11:06
11       form.    11:11:06
12           THE WITNESS:  There is a human    11:11:07
13       cost based upon the diversion of    11:11:10
14       prescription opioids, yes.    11:11:14
15   QUESTIONS BY MR. KO:    11:11:16
16       Q.  And that human cost is    11:11:16
17   manifested in either mortality or morbidity    11:11:17
18   in the form of more people addicted to    11:11:21
19   opioids.  Would you agree with me on that?    11:11:24
20           MR. O'CONNOR:  Objection to    11:11:25
21       form.    11:11:26
22           THE WITNESS:  Correct.  Yes.    11:11:26
23       Sorry.    11:11:27
24   QUESTIONS BY MR. KO:    11:11:27
25       Q.  So in addition to the costs of    11:11:28

Page 129

1    noncompliance here that you list, a real and    11:11:30
2    tangible cost of noncompliance is -- are the    11:11:35
3    amount of lives affected by the abuse and    11:11:38
4    diversion of prescription opioids, correct?    11:11:41
5            MR. O'CONNOR:  Objection to    11:11:42
6        form.    11:11:44
7            THE WITNESS:  I agree, yes.    11:11:44
8    QUESTIONS BY MR. KO:    11:11:45
9        Q.  Okay.  And as we discussed    11:11:45
10   before, many, if not all, of the complaints    11:11:49
11   that have been filed against various entities    11:11:55
12   involved in the supply chain of prescription    11:11:59
13   opioids allege that state and local    11:12:01
14   governments have had to incur the burden of    11:12:09
15   responding to the overdose rates and    11:12:12
16   morbidity rates that have been caused as a    11:12:16
17   result of the opioid crisis?    11:12:19
18           MR. O'CONNOR:  Objection to    11:12:23
19       form.    11:12:24
20           THE WITNESS:  Yes, that is the    11:12:24
21       information that has been reported,    11:12:25
22       yes.    11:12:26
23   QUESTIONS BY MR. KO:    11:12:26
24       Q.  Okay.  And that is -- in    11:12:26
25   addition to the information that has been    11:12:27

Page 130

1 reported, is that consistent with your 11:12:29
2 understanding? Do you believe that to be the 11:12:31
3 case? 11:12:32
4 MR. O'CONNOR: Objection to 11:12:32
5 form. 11:12:33
6 THE WITNESS: I don't have 11:12:33
7 firsthand knowledge of the costs, but 11:12:36
8 I have no reason to doubt that 11:12:39
9 reporting. 11:12:40
10 QUESTIONS BY MR. KO: 11:12:41
11 Q. Okay. By the way, do you 11:12:46
12 know -- do you personally know anyone 11:12:47
13 impacted by the opioid crisis? 11:12:49
14 A. I do not. 11:12:52
15 Q. You're lucky. 11:12:54
16 A. I know. I know that. 11:12:55
17 (Mallinckrodt-Harper Exhibit 3 11:13:05
18 marked for identification.) 11:13:05
19 QUESTIONS BY MR. KO: 11:12:57
20 Q. I want to turn to the next 11:12:57
21 exhibit, which will be marked as Harper 11:13:03
22 Exhibit 3. 11:13:05
23 For the record, this is ending 11:13:11
24 in Bates stamp 283074. 11:13:13
25 And it is an e-mail dated 11:13:24

Page 131

1 April 12, 2011, from you to Michael 11:13:26
2 Santowski. 11:13:31
3 Who is Michael Santowski? 11:13:32
4 A. He was the gentleman to whom I 11:13:35
5 reported at the time. 11:13:38
6 Q. Okay. And he was -- was he 11:13:38
7 part of the controlled substance compliance 11:13:42
8 team? 11:13:43
9 A. We reported to him, so he had 11:13:44
10 oversight for several groups, including ours, 11:13:49
11 yes. 11:13:52
12 Q. I see. 11:13:52
13 And now it appears that you've 11:13:53
14 become the senior manager of the controlled 11:13:54
15 substance compliance group. 11:13:56
16 Do you see that? 11:13:57
17 A. Yes. 11:13:57
18 Q. So at least as of April 12, 11:13:58
19 2011, you were the senior manager of the CSC? 11:14:00
20 A. I agree. 11:14:04
21 Q. Okay. And this is another 11:14:05
22 presentation you made regarding the SOM 11:14:08
23 program at Mallinckrodt. 11:14:12
24 Do you see that? 11:14:13
25 A. So clearly I created the doc 11:14:14

Page 132

1 presentation, but the e-mail indicates it was 11:14:20
2 provided to Michael Santowski for training of 11:14:24
3 the executive committee. So that was a level 11:14:28
4 I didn't -- that was senior executives within 11:14:31
5 the organization. 11:14:32
6 Q. I see. That's very helpful. 11:14:33
7 So you didn't actual present 11:14:35
8 this deck to the executive committee? 11:14:37
9 A. I have a number of slides that 11:14:38
10 I pull in and out of presentations as 11:14:42
11 appropriate for the audience. So I'm certain 11:14:44
12 I presented variations of these slides to 11:14:47
13 different audiences, but I did not present 11:14:50
14 this deck to the executive committee. 11:14:52
15 Q. Okay. That's helpful. 11:14:55
16 But you created the deck for 11:14:56
17 Mr. Santowski, if I understand correctly? 11:14:58
18 A. Yes. 11:15:00
19 Q. Okay. I want to turn to page 4 11:15:01
20 of this deck. And here we have some of the 11:15:07
21 regulations that interpret the CSA. 11:15:19
22 Do you see that? 11:15:21
23 A. I think that's verbatim, but, 11:15:22
24 yes, yes. Not an interpretation, but the 11:15:29
25 statements in the Code of Federal 11:15:32

Page 133

1 Regulations. 11:15:35
2 Q. Okay. Great. Thank you for 11:15:35
3 that clarification. 11:15:36
4 So these are statements that 11:15:37
5 actually appear in the regulations as 11:15:39
6 codified by 21 CFR 1301.74, correct? 11:15:42
7 MR. O'CONNOR: Objection to 11:15:47
8 form. 11:15:47
9 THE WITNESS: Yes. 11:15:47
10 QUESTIONS BY MR. KO: 11:15:48
11 Q. Okay. And we have previously 11:15:48
12 discussed Mallinckrodt's responsibilities 11:15:51
13 with respect to suspicious orders, but I just 11:15:53
14 want to make sure. 11:15:56
15 You would agree that all the 11:15:57
16 responsibilities and requirements set forth 11:16:00
17 here are responsibilities that Mallinckrodt 11:16:02
18 had, correct? 11:16:04
19 MR. O'CONNOR: Objection to 11:16:06
20 form. 11:16:07
21 THE WITNESS: Yes, correct. 11:16:07
22 QUESTIONS BY MR. KO: 11:16:08
23 Q. Okay. And that includes a duty 11:16:08
24 to design and operate a suspicious order 11:16:11
25 identification system. 11:16:15

Page 134

```
1        Mallinckrodt had that duty,    11:16:17
2  correct?                            11:16:18
3     A.   Yes.                         11:16:18
4     Q.   And Mallinckrodt had a duty to  11:16:18
5  require -- or Mallinckrodt had a duty to  11:16:24
6  report suspicious orders to the DEA when  11:16:26
7  discovered via a monitoring process, correct?  11:16:28
8     A.   Yes.                         11:16:31
9     Q.   And Mallinckrodt had a duty  11:16:31
10 to -- had a duty to ensure that this  11:16:34
11 responsibility to report suspicious orders  11:16:38
12 did not end merely with filing a suspicious  11:16:39
13 order report; is that correct?       11:16:43
14        MR. O'CONNOR: Objection to    11:16:44
15    form.                            11:16:45
16        THE WITNESS: So the statement  11:16:45
17    is correct, but I -- I must -- I would  11:16:46
18    like to clarify.                  11:16:49
19        All these are not straight from  11:16:50
20    CFR 21. Some of the statements, I  11:16:53
21    believe, particularly the italicized  11:16:55
22    one at the bottom, may have been   11:16:58
23    culled from a DEA -- one of the DEA  11:17:01
24    guidance letters.                 11:17:04
25
```

Page 135

```
1  QUESTIONS BY MR. KO:                 11:17:04
2     Q.   Okay. But regardless of where  11:17:05
3  it came from, at least at the time of this  11:17:08
4  presentation, you believe that Mallinckrodt  11:17:10
5  had a duty to ensure that their suspicious  11:17:12
6  order responsibilities did not end merely  11:17:17
7  with the filing of a suspicious order report;  11:17:18
8  is that correct?                     11:17:21
9        MR. O'CONNOR: Objection to     11:17:21
10    form.                            11:17:22
11        THE WITNESS: Correct.          11:17:22
12    Correct.                          11:17:22
13 QUESTIONS BY MR. KO:                  11:17:23
14    Q.   And Mallinckrodt also -- you  11:17:23
15 also understand that Mallinckrodt was not  11:17:26
16 going to get any specific guidance from the  11:17:30
17 DEA at this time on whether or not their  11:17:33
18 particular SOM program would be endorsed --  11:17:37
19        MR. O'CONNOR: Objection to     11:17:40
20    form.                            11:17:41
21 QUESTIONS BY MR. KO:                  11:17:41
22    Q.   -- is that accurate?          11:17:41
23    A.   That's accurate.             11:17:42
24    Q.   Okay. And when did you        11:17:43
25 understand DEA to tell you that first; do you  11:17:45
```

Page 136

```
1  have any recollection?               11:17:48
2        MR. O'CONNOR: Objection to     11:17:48
3    form.                            11:17:49
4        THE WITNESS: I'm fairly         11:17:49
5    certain that that was in one of the  11:17:51
6    guidance letters from DEA circa 2006,  11:17:56
7    2007.                             11:17:59
8  QUESTIONS BY MR. KO:                  11:18:00
9     Q.   Okay. And then finally, this  11:18:00
10 last bullet indicates that -- or you would  11:18:04
11 agree with me that Mallinckrodt had a duty to  11:18:08
12 conduct an independent analysis of suspicious  11:18:10
13 orders prior to completing a sale to  11:18:13
14 determine whether or not the controlled  11:18:14
15 substances are likely to be diverted.  11:18:17
16        MR. O'CONNOR: Objection to     11:18:19
17    form.                            11:18:19
18 QUESTIONS BY MR. KO:                  11:18:19
19    Q.   Is that accurate?             11:18:19
20    A.   Yes.                          11:18:20
21    Q.   Okay. Now, turning to the next  11:18:21
22 page, here you put in this presentation the  11:18:30
23 number of people -- the number of registrants  11:18:36
24 there are in the supply chain -- or the  11:18:39
25 number of registrants that are part of the  11:18:43
```

Page 137

```
1  CSA; is that correct?                11:18:44
2     A.   As of that time, yes.         11:18:45
3     Q.   Right, as of that time.       11:18:48
4     A.   Yes.                          11:18:49
5     Q.   And there's a specific quote  11:18:49
6  that you include in this presentation that  11:18:51
7  says that "the DEA must rely on the states  11:18:53
8  and individual registrants to monitor."  11:18:56
9        Do you see that?               11:18:58
10    A.   I do see that.                11:18:58
11    Q.   And the "individual            11:18:59
12 registrants" obviously refers to entities  11:19:00
13 like Mallinckrodt?                    11:19:03
14    A.   Correct.                      11:19:04
15    Q.   And so at least as of this     11:19:05
16 time, the date of this deck, you understood  11:19:07
17 that the DEA was not going to give you  11:19:10
18 specific guidance but was going to rely on  11:19:11
19 registrants like Mallinckrodt to monitor  11:19:16
20 their controlled substances, correct?  11:19:18
21        MR. O'CONNOR: Objection to     11:19:19
22    form.                            11:19:20
23        THE WITNESS: Correct.          11:19:20
24 QUESTIONS BY MR. KO:                  11:19:21
25    Q.   Okay. Now, I want to turn to  11:19:21
```

Page 138

1  page 7 of this particular report, and there's  11:19:29
2  a reference made to Florida. And I know we  11:19:36
3  had spoken a little bit about problems in  11:19:39
4  Florida a moment ago, but on page 7 -- give  11:19:43
5  you a moment to get there.  11:19:49
6       A.  I'm sorry, the front and back  11:19:50
7  is mixing me up.  11:19:52
8       Q.  Yeah.  11:19:53
9       A.  Okay. Thank you. I am at  11:19:53
10  page 7.  11:19:55
11      Q.  Sure.  11:19:56
12      Page 7 gives some color to what  11:19:56
13  we were previously discussing about the  11:19:59
14  problem in Florida, and here you describe  11:20:01
15  that most, if not almost all, 98 percent, of  11:20:04
16  all doctors dispensing oxycodone nationally  11:20:09
17  are in Florida.  11:20:12
18      Do you see that?  11:20:12
19      A.  I do.  11:20:13
20      Q.  So you were aware at the time  11:20:13
21  of this presentation that there was a --  11:20:16
22  almost all of the -- or the top doctors  11:20:20
23  dispensing oxycodone were in Florida,  11:20:23
24  correct?  11:20:25
25      MR. O'CONNOR: Objection to  11:20:26

Page 139

1  form.  11:20:27
2       THE WITNESS: Yes. Accepting  11:20:27
3  as factual this data published by the  11:20:32
4  Florida governor's office, yes.  11:20:35
5  QUESTIONS BY MR. KO:  11:20:38
6       Q.  Right. And you had  11:20:38
7  knowledge -- or you understood there to be a  11:20:39
8  big problem in Florida at this time --  11:20:41
9       MR. O'CONNOR: Objection to  11:20:43
10  form.  11:20:43
11  QUESTIONS BY MR. KO:  11:20:43
12      Q.  -- with respect to prescription  11:20:43
13  opioids manufactured by Mallinckrodt,  11:20:45
14  correct?  11:20:46
15      MR. O'CONNOR: Same objection.  11:20:46
16      THE WITNESS: A problem, yes.  11:20:47
17  The -- sorry. The adjective "big,"  11:20:50
18  again, is a relative term, but, yes, a  11:20:53
19  problem in Florida.  11:20:56
20  QUESTIONS BY MR. KO:  11:20:57
21      Q.  Okay. And in fact, there was  11:20:57
22  substantially more oxycodone manufactured by  11:20:59
23  Mallinckrodt that was being dispensed in  11:21:03
24  Florida than all the other remaining states  11:21:05
25  combined according to this deck, correct?  11:21:07

Page 140

1       MR. O'CONNOR: Objection to  11:21:09
2  form.  11:21:09
3       THE WITNESS: So there are  11:21:09
4  other manufacturers of oxycodone --  11:21:13
5  QUESTIONS BY MR. KO:  11:21:14
6       Q.  I understand that.  11:21:14
7       A.  -- and this is not specific to  11:21:15
8  Mallinckrodt oxycodone.  11:21:16
9       Q.  Okay. But Mallinckrodt  11:21:18
10  manufactured oxy 15s and 30s in large  11:21:19
11  amounts, correct?  11:21:22
12      A.  Mallinckrodt manufactured oxy  11:21:23
13  15s and 30s, and again, "large" is -- I don't  11:21:25
14  have enough reference information relative to  11:21:28
15  the other manufacturers' production to answer  11:21:31
16  the question.  11:21:35
17      Q.  Well, let's talk about that  11:21:36
18  then. The next -- the previous page,  11:21:40
19  actually, page 6, there's a description of  11:21:42
20  oxycodone market share of Mallinckrodt  11:21:45
21  relative to the rest of your competitors.  11:21:47
22      Do you see that?  11:21:50
23      A.  I do see it.  11:21:51
24      Q.  So at least as of Q4 of 2010,  11:21:53
25  it appears that Mallinckrodt has a 52 percent  11:21:59

Page 141

1  share of oxycodone in the nation; is that  11:22:02
2  accurate?  11:22:08
3       MR. O'CONNOR: Object to form.  11:22:08
4       THE WITNESS: Yes.  11:22:09
5  QUESTIONS BY MR. KO:  11:22:11
6       Q.  Okay. And then that rose  11:22:12
7  slightly in Q1 of 2011 -- fiscal year 2011 to  11:22:16
8  56 percent.  11:22:19
9       Do you see that?  11:22:20
10      A.  Yes, I do see that statistic,  11:22:23
11  yes.  11:22:26
12      Q.  All right. And so there --  11:22:26
13  none of Mallinckrodt's competitors are  11:22:27
14  anywhere close to Mallinckrodt's market share  11:22:29
15  based on this table, correct?  11:22:32
16      A.  Correct.  11:22:33
17      Q.  And in fact, as we just  11:22:35
18  previously described and went over, the total  11:22:37
19  percentage of Mallinckrodt's competitors is  11:22:41
20  less than Mallinckrodt's own share of the  11:22:44
21  market of oxycodone, correct?  11:22:47
22      MR. O'CONNOR: Objection to  11:22:50
23  form.  11:22:51
24      THE WITNESS: Yes. As I sit  11:22:51
25  here and perform quick math, yes.  11:22:53

Page 142

1    Yes.                              11:22:55
2    QUESTIONS BY MR. KO:              11:22:56
3        Q.   Okay.  Now, based, I believe --    11:22:56
4    if you turn to page 14 of this deck now,    11:23:05
5    going forward.                    11:23:08
6        And there's reference made to a    11:23:20
7    conversation that Mallinckrodt had with the    11:23:22
8    DEA on July 20, 2010.             11:23:25
9        Do you see that?             11:23:28
10   A.   I do.                       11:23:29
11       Q.   And do you recall that    11:23:29
12   conversation?                     11:23:32
13   A.   I do.                       11:23:32
14       Q.   And you participated in it?    11:23:33
15   A.   Yes.                        11:23:35
16       Q.   Okay.  And we'll get to that in    11:23:35
17   a moment --                       11:23:36
18   A.   All right.                  11:23:37
19       Q.   -- but I just want to talk    11:23:37
20   about some of the things that you've put in    11:23:40
21   this presentation, including the fact that    11:23:42
22   Mallinckrodt is viewed as the kingpin within    11:23:44
23   the drug cartel.                  11:23:47
24       Do you see that reference?    11:23:48
25   A.   I do.                       11:23:50

Page 143

1        Q.   And that was something that the    11:23:50
2    DEA had indicated to you?          11:23:52
3    A.   Yes.                        11:23:53
4        Q.   Okay.  And my presumption is    11:23:55
5    that they expressed that view because    11:23:57
6    Mallinckrodt had the majority of the market    11:23:59
7    share of oxycodone?               11:24:02
8        MR. O'CONNOR:  Objection to    11:24:03
9    form.                             11:24:03
10       THE WITNESS:  I know the view    11:24:03
11   was expressed, but I don't know what    11:24:05
12   the basis was because this is talking    11:24:07
13   about Harvard Drug distributor.    11:24:09
14   QUESTIONS BY MR. KO:              11:24:12
15       Q.   Okay.  So you -- regardless,    11:24:12
16   you recall during this DEA meeting in July    11:24:16
17   of 2010 that DEA had expressed the view that    11:24:20
18   Mallinckrodt was viewed as the kingpin within    11:24:22
19   the drug cartel?                  11:24:24
20   A.   I do.                       11:24:25
21       Q.   Okay.  And we had discussed a    11:24:26
22   little time ago that -- about Mallinckrodt's    11:24:31
23   duties to know their customers' customers,    11:24:34
24   and here you indicate that at least as of the    11:24:36
25   date of this meeting, you understood that DEA    11:24:38

Page 144

1    expected Mallinckrodt to understand and know    11:24:43
2    their customer's customer; is that correct?    11:24:47
3        MR. O'CONNOR:  Objection to    11:24:51
4    form.                             11:24:51
5        THE WITNESS:  Yes, that's per    11:24:51
6    DEA St. Louis, yes.               11:24:53
7    QUESTIONS BY MR. KO:              11:24:54
8        Q.   Okay.  So as of July 20th -- no    11:24:54
9    later than July 20, 2010, you understood that    11:24:56
10   Mallinckrodt had an obligation as required by    11:25:00
11   the DEA to know their customer's customer,    11:25:02
12   correct?                          11:25:05
13       MR. O'CONNOR:  Objection to    11:25:05
14   form.                             11:25:06
15       THE WITNESS:  So it was told to    11:25:06
16   us by DEA St. Louis, but DEA Albany    11:25:07
17   contradicted the statement.       11:25:10
18   QUESTIONS BY MR. KO:              11:25:12
19       Q.   Okay.  And we'll get to that    11:25:12
20   maybe in a moment, but -- well, first of all,    11:25:13
21   is there any indication of a contradiction on    11:25:17
22   this deck?                        11:25:19
23   A.   Well, so the DEA expectation,    11:25:19
24   I'm using that term as all of DEA here when I    11:25:24
25   prepared the bullet point on the slide, but    11:25:28

Page 145

1    the comment came from DEA St. Louis.    11:25:31
2        Q.   Okay.  So when you say that you    11:25:33
3    are referring to DEA -- the DEA expectation,    11:25:34
4    then it is fair to say that based on your    11:25:39
5    conversation with the DEA on July 20th, you    11:25:41
6    understood that Mallinckrodt had an    11:25:43
7    obligation to know your customer's customer;    11:25:46
8    is that correct?                  11:25:50
9        MR. O'CONNOR:  Objection to    11:25:50
10   form.                             11:25:50
11       THE WITNESS:  So again, I'm    11:25:50
12   sorry, it was DEA St. Louis, and it    11:25:51
13   was DEA St. Louis expectation because    11:25:54
14   that was a quote from the             11:25:58
15   conversation.                     11:25:59
16   QUESTIONS BY MR. KO:              11:25:59
17       Q.   Okay.  So I just want to make    11:25:59
18   sure the record is clear.          11:26:01
19       Based on your conversations    11:26:02
20   with DEA St. Louis, it was your understanding    11:26:03
21   that the DEA St. Louis required Mallinckrodt,    11:26:06
22   and in fact expected Mallinckrodt, to know    11:26:10
23   their customer's customer as of July 20,    11:26:13
24   2010; is that correct?            11:26:15
25       MR. O'CONNOR:  Objection to    11:26:16

Page 146

1    form.                          11:26:16
2         THE WITNESS:  Yes.        11:26:16
3    QUESTIONS BY MR. KO:           11:26:17
4         Q.   Okay.  By the way, we talked    11:26:17
5    about Mr. Ratliff a moment ago.         11:26:31
6         When did you first start    11:26:34
7    working with Mr. Ratliff?       11:26:35
8         A.   I don't know the year.    11:26:37
9         Q.   Okay.  It was before the 2008    11:26:38
10   time period?                   11:26:41
11        A.   I don't know when he came to    11:26:41
12   us, I'm sorry.                 11:26:45
13        Q.   Sure.                 11:26:46
14        Do you know who Pete Kleissle    11:26:47
15   is?                            11:26:51
16        A.   Yes.                  11:26:51
17        Q.   He was at DEA, correct?    11:26:52
18        A.   Yes.                  11:26:53
19        Q.   Do you recall any conversations    11:26:53
20   with Pete Kleissle regarding your obligations    11:26:55
21   to know your customer's customer?       11:26:59
22        A.   So when I'm using the term    11:27:01
23   "DEA" here, this conversation was indeed with    11:27:06
24   Pete Kleissle.                 11:27:10
25        Q.   Okay.  So Pete Kleissle    11:27:11

Page 147

1    specifically told you and other people that    11:27:15
2    were at this meeting that you had an    11:27:18
3    obligation to know your customer's customer    11:27:20
4    or --                          11:27:23
5         A.   It was only me.        11:27:23
6         Q.   Only you.  Okay.       11:27:24
7         And who did you share that    11:27:27
8    information with?              11:27:28
9         A.   The person to whom I reported    11:27:28
10   at the time and Bill Ratliff, because I don't    11:27:35
11   believe our group reported to him, but we    11:27:38
12   work in close conjunction with the security    11:27:39
13   group in DEA compliance.       11:27:41
14        Q.   Okay.  And so the person you    11:27:42
15   reported to at the time was Ms. Levy or was    11:27:44
16   it Mr. Santowski?  You don't recall?    11:27:46
17        A.   It was another person, Tom    11:27:48
18   Berry.                         11:27:52
19        Q.   Tom Berry.  Okay.       11:27:52
20        So other than Mr. Berry and    11:27:52
21   Mr. Ratliff, did you talk about this    11:27:54
22   conversation you had with Mr. Kleissle with    11:27:56
23   anyone else?                   11:27:58
24        A.   I may have discussed it --    11:27:59
25   well, clearly I put it in a presentation, so    11:28:04

Page 148

1    I may have carried this information back to    11:28:05
2    the suspicious order monitoring team at the    11:28:08
3    time.                          11:28:10
4         Q.   Okay.  I want to turn back to    11:28:10
5    the table of contents of this deck, which    11:28:26
6    appears on page 2.  And again, I understand    11:28:32
7    that you didn't actually make this    11:28:41
8    presentation, but you prepared all the    11:28:44
9    materials in this presentation, correct?    11:28:47
10        A.   Yes.                  11:28:48
11        Q.   Including some of the things    11:28:50
12   that we went over and also this reference to    11:28:52
13   an OxyContin Express video?    11:28:55
14        A.   Yes.                  11:28:58
15        Q.   And do you recall ever    11:28:59
16   presenting -- I know you didn't make this    11:29:01
17   presentation, but did you recall presenting    11:29:04
18   about the OxyContin Express in other settings    11:29:07
19   at Mallinckrodt?               11:29:13
20        A.   Yes, I believe so.       11:29:13
21        Q.   Okay.  And that video, again,    11:29:13
22   consisted of your understanding of migration    11:29:15
23   of opioid pills moving north from Florida,    11:29:17
24   correct?                       11:29:20
25        A.   Correct.              11:29:21

Page 149

1         Q.   And unfortunately we don't have    11:29:22
2    the video to play, but I believe --    11:29:27
3         A.   Unfortunately, a lot of the    11:29:28
4    time I couldn't get the video to play.    11:29:31
5         Q.   Oh, okay.              11:29:32
6         Well, I believe there's some    11:29:33
7    stills, at least, in this presentation.    11:29:34
8    Turning to page 16.            11:29:36
9         A.   All right.            11:29:37
10        Q.   Do you recall that particular    11:29:47
11   image?                         11:29:48
12        A.   I do.                 11:29:48
13        Q.   This was an image that was    11:29:49
14   included in your video?        11:29:50
15        A.   I don't think so.  I think it    11:29:51
16   was separate.                  11:29:54
17        Q.   This is just an image?    11:29:55
18        A.   Yes.                  11:29:56
19        Q.   Okay.  This was an image of, I    11:29:57
20   think, a pill mill in Florida?    11:29:59
21        MR. O'CONNOR:  Objection to    11:30:01
22   form.                          11:30:01
23        THE WITNESS:  Yes.         11:30:01
24   QUESTIONS BY MR. KO:           11:30:02
25        Q.   And the pill mill was, I    11:30:02

Page 150

1　think -- I think this particular picture was　11:30:04
2　of Tru-Valu, I believe.　11:30:06
3　　　　Does that name ring a bell?　11:30:08
4　　　　MR. O'CONNOR:　Objection to　11:30:12
5　form.　11:30:12
6　　　　THE WITNESS:　The name rings a　11:30:12
7　bell, but I don't have a way of　11:30:13
8　identifying the pharmacy here.　11:30:14
9　QUESTIONS BY MR. KO:　11:30:16
10　　Q.　Okay.　By the way, what's your　11:30:16
11　definition of a pill mill?　11:30:17
12　　A.　The definition of a pill mill,　11:30:18
13　from my perspective, is a facility wherein　11:30:20
14　patients who may not legitimately have the　11:30:28
15　need for a prescription would go and have --　11:30:33
16　some doctors were overprescribing or selling　11:30:38
17　oxycodone specifically within the state of　11:30:43
18　Florida because it was a DEA-registered　11:30:45
19　activity at the time.　11:30:47
20　　Q.　And then, therefore, as a　11:30:48
21　result of the wide -- or overprescription of　11:30:51
22　oxycodone, those particular prescription　11:30:53
23　opioids were being widely abused and　11:30:56
24　diverted; is that correct?　11:30:59
25　　　　MR. O'CONNOR:　Objection to　11:30:59

Page 151

1　form.　11:31:00
2　　　　THE WITNESS:　So, yes,　11:31:00
3　that's -- that's one of the　11:31:02
4　contributing factors, yes.　11:31:03
5　QUESTIONS BY MR. KO:　11:31:05
6　　Q.　Okay.　And you understood　11:31:05
7　during the 2008 through 2012 time period that　11:31:07
8　there were a large amount of pill mills in　11:31:10
9　Florida, correct?　11:31:13
10　　A.　I don't know the number, and I　11:31:14
11　don't have a -- a basis for correlation in　11:31:16
12　terms of large -- I'm sorry, I can't answer　11:31:18
13　the question.　11:31:21
14　　Q.　Relative to any other states　11:31:22
15　that you were looking at during your time as　11:31:25
16　senior manager of controlled substance　11:31:26
17　compliance, do you recall any other state in　11:31:28
18　which you've examined pill mill activities　11:31:32
19　other than Florida?　11:31:34
20　　A.　No, the focus was Florida.　11:31:36
21　　　　(Mallinckrodt-Harper Exhibit 4　11:31:54
22　　marked for identification.)　11:31:54
23　QUESTIONS BY MR. KO:　11:31:40
24　　Q.　Okay.　Okay.　We can set this　11:31:40
25　aside.　Right now turn to what will be marked　11:31:49

Page 152

1　as Harper Exhibit 4.　For the record, that'll　11:31:52
2　end in Bates stamp 496098.　11:31:58
3　　　　Actually, we'll skip that one.　11:32:18
4　Let's go to -- I'll take that one.　Still　11:32:23
5　Exhibit 4.　Strike that.　11:32:32
6　　　　Exhibit 4 is actually ending in　11:32:34
7　Bates stamp 1308810.　That is Harper　11:32:36
8　Exhibit 4.　11:32:44
9　　　　You keep that one.　That's the　11:32:44
10　official copy with the --　11:32:46
11　　A.　Okay.　I apologize.　Sorry.　11:32:48
12　　Q.　No need to apologize.　11:32:49
13　　　　For the record, this is a　11:32:50
14　March 3, 2008 e-mail from you to Bill　11:33:02
15　Ratliff.　11:33:05
16　　　　Do you see that?　11:33:06
17　　A.　I do.　11:33:06
18　　Q.　Do you have any reason to doubt　11:33:06
19　that you sent this e-mail to Mr. Ratliff on　11:33:08
20　March 3, 2008?　11:33:11
21　　A.　No reason to doubt it.　11:33:11
22　　Q.　Okay.　So I know you said a　11:33:13
23　moment ago you don't recall when you started　11:33:14
24　working with Mr. Ratliff, but at least as of　11:33:16
25　March of 2008, you seemed to be working with　11:33:18

Page 153

1　him in connection with DEA compliance,　11:33:20
2　correct?　11:33:24
3　　A.　Correct.　11:33:24
4　　Q.　And it appears that you're　11:33:24
5　preparing some DEA compliance monthly　11:33:25
6　highlights as of February 2008.　11:33:30
7　　　　Do you see that?　11:33:32
8　　A.　Yes.　11:33:32
9　　Q.　And do you recall how　11:33:33
10　frequently you prepared these monthly　11:33:35
11　highlights?　11:33:37
12　　A.　I believe it was monthly.　11:33:38
13　　Q.　And do you recall when you　11:33:39
14　first started preparing these?　11:33:40
15　　A.　I do not.　11:33:42
16　　Q.　And here the distribution is to　11:33:44
17　Mr. Ratliff.　11:33:47
18　　　　Do you recall ever sending　11:33:48
19　these DEA compliance monthly highlights to　11:33:50
20　anyone else?　11:33:55
21　　A.　They would have been sent to　11:33:55
22　the person to whom I reported, so it was Bill　11:33:57
23　Ratliff at the time.　So there would have　11:33:59
24　been other people as -- as my manager changed　11:34:00
25　over time.　11:34:03

Page 154

```
1      Q.   I see.              11:34:04
2           So you sent -- during the time   11:34:04
3   period in which you created a DEA compliance   11:34:07
4   monthly highlight, you sent those to your   11:34:10
5   direct report each month, correct?    11:34:12
6      A.   The person to whom I reported,   11:34:14
7   yes.                     11:34:16
8      Q.   Okay.              11:34:16
9      A.   And I can't rule out no one   11:34:16
10  else received this, but this is directed to   11:34:19
11  Bill Ratliff only on the correspondence.   11:34:22
12     Q.   And as a general matter, these   11:34:24
13  monthly highlights were sent only to your   11:34:26
14  direct report; is that fair to say?   11:34:29
15     A.   The person to whom I reported   11:34:31
16  directly, yes.              11:34:33
17     Q.   Okay.  Thank you.        11:34:33
18          And I just want to go over one   11:34:34
19  quick thing on this particular e-mail.   11:34:38
20          Do you see three sections down   11:34:42
21  the portion of the e-mail that refers to   11:34:46
22  suspicious order monitoring?        11:34:48
23     A.   Yes, I see it.         11:34:49
24     Q.   You indicate to Mr. Ratliff   11:34:51
25  that "the need for a comprehensive review and   11:34:55
```

Page 155

```
1   upgrade of our suspicious order monitoring   11:34:58
2   program has received elevated priority."   11:34:59
3           Did I read that correctly?   11:35:02
4      A.   Yes.               11:35:03
5      Q.   So is it fair to say that as of   11:35:05
6   March of 2008, your belief was that   11:35:08
7   Mallinckrodt's SOM program needed to be   11:35:12
8   reviewed and upgraded and that -- needed to   11:35:15
9   be reviewed and upgraded?          11:35:19
10          MR. O'CONNOR:  Objection to   11:35:20
11      form.                 11:35:20
12          THE WITNESS:  It states -- yes,   11:35:20
13      it states "upgraded."  I would have   11:35:22
14      changed that terminology if I could,   11:35:24
15      but it says "upgraded," yes.   11:35:26
16  QUESTIONS BY MR. KO:            11:35:27
17     Q.   Okay.  And you also state that   11:35:28
18  "as of March 3, 2008, the need to review and   11:35:31
19  upgrade Mallinckrodt's SOM program is an   11:35:36
20  elevated priority"; is that correct?   11:35:40
21     A.   Yes.               11:35:42
22     Q.   Okay.  You can set that aside.   11:35:42
23          Do you recall -- you can refer   11:35:54
24  back to that document if you like, but do you   11:35:55
25  recall why you felt at that particular time   11:35:58
```

Page 156

```
1   that Mallinckrodt's SOM program needed to   11:36:02
2   be -- needed to receive elevated priority?   11:36:04
3      A.   I do.              11:36:08
4      Q.   Yeah.  And what were the   11:36:09
5   reasons for that?              11:36:11
6      A.   So this master compounding   11:36:12
7   pharmacy sale, which we did not make, the   11:36:15
8   matter was brought to our attention by a DEA   11:36:20
9   investigator.  But after the decision was   11:36:23
10  made that that was a suspicious order we   11:36:26
11  would not ship, one of the narcotic -- the   11:36:28
12  NAMs -- but she was on the bulk side.  She   11:36:31
13  said to us, "Ah, I was in that place, and it   11:36:34
14  didn't look right."            11:36:37
15          So that prompted a reeducation   11:36:38
16  of the commercial group, our eyes and ears in   11:36:41
17  the market again, to call to our attention   11:36:45
18  anything that looked abnormal with any of the   11:36:47
19  facilities to which we were selling.   11:36:50
20     Q.   Okay.  And during this time   11:36:52
21  period -- we had talked a moment ago about   11:36:54
22  certain DEA guidance letters that you had   11:36:56
23  received in 2006 through 2007 time period,   11:36:59
24  correct?                  11:37:01
25     A.   Yes.               11:37:01
```

Page 157

```
1      Q.   And those letters were sent by   11:37:01
2   Joseph Rannazzisi, correct?        11:37:04
3      A.   I believe, yes.  Yes, he was   11:37:05
4   deputy assistant administrator.  Yes.   11:37:08
5      Q.   And is it okay for purposes of   11:37:13
6   this deposition to refer to those guidance   11:37:16
7   letters as the Rannazzisi letters?   11:37:17
8      A.   Yes.               11:37:19
9      Q.   Okay.  So was one of the   11:37:19
10  reasons why you were putting more attention   11:37:20
11  to Mallinckrodt's SOM program a result of   11:37:25
12  receiving these -- of receiving the   11:37:28
13  Rannazzisi letters?            11:37:30
14     A.   It caused us to pay -- to give   11:37:31
15  more attention to our suspicious order   11:37:36
16  monitoring, but specifically this event is as   11:37:38
17  I just previously spoke, where we had a   11:37:41
18  Mallinckrodt person out at this facility, and   11:37:44
19  in retrospect they said it didn't look right   11:37:47
20  and it wound up to be a suspicious order.   11:37:50
21          So we wanted to reeducate our   11:37:52
22  sales force about their reviewing customer   11:37:53
23  accounts when they were in there.   11:37:57
24     Q.   Sure.  And I understand the   11:37:59
25  specific example you're giving, and I   11:38:00
```

Page 158

1 appreciate that. You have great recall about 11:38:02
2 that. 11:38:06
3 But in terms of revising and 11:38:06
4 enhancing your SOM program, would it be 11:38:09
5 accurate to say that in early 2008, one of 11:38:12
6 the reasons why you wanted to do so was a 11:38:16
7 result of receiving the Rannazzisi letters? 11:38:19
8 A. Yes. 11:38:20
9 Q. Okay. I want to hand you -- 11:38:21
10 you can set that aside. 11:38:24
11 (Mallinckrodt-Harper Exhibit 5 11:38:25
12 marked for identification.) 11:38:25
13 QUESTIONS BY MR. KO: 11:38:25
14 Q. I want to hand you what's been 11:38:26
15 marked as Harper Exhibit 5, and that ends in 11:38:27
16 Bates stamp 273902. And this is an e-mail, 11:38:31
17 for the record, that you sent to several 11:38:45
18 people dated April 10, 2008. 11:38:47
19 Do you have any reason to doubt 11:38:51
20 that you sent this e-mail on this day and 11:38:55
21 time? 11:38:56
22 A. I have no reason to doubt it. 11:38:56
23 Q. Okay. And here you talk about 11:38:58
24 reference to the Drug and Chemical Advisory 11:39:01
25 Group. That's the group that we were 11:39:05

Page 159

1 discussing before that Frank Sapienza was 11:39:06
2 part of, correct? 11:39:10
3 A. Correct. 11:39:12
4 Q. And so at least as of this 11:39:12
5 time you are consulting with them -- well, is 11:39:14
6 it fair to say that as of April 10, 2008, you 11:39:16
7 are consulting with the Drug and Chemical 11:39:18
8 Advisory Group in connection with your duties 11:39:20
9 to design and implement a suspicious order 11:39:21
10 monitoring program? 11:39:24
11 A. That's correct. 11:39:24
12 Q. Okay. And on the additional 11:39:26
13 items for consideration section, you talk 11:39:29
14 about the Southwood Federal Register Notice. 11:39:33
15 Do you see that? 11:39:37
16 A. I do. 11:39:38
17 Q. And when you describe the 11:39:39
18 Southwood Federal Register Notice, you take 11:39:51
19 some important elements of that notice and 11:39:56
20 relay them to the people you are e-mailing 11:40:03
21 here. 11:40:05
22 Do you see that? 11:40:05
23 A. I do. 11:40:06
24 Q. And so when you -- you are 11:40:06
25 saying that you should incorporate certain 11:40:09

Page 160

1 questions taken from Southwood into a 11:40:12
2 checklist, correct? 11:40:19
3 A. Correct. 11:40:19
4 Q. And this checklist is reference 11:40:21
5 to a customer checklist that Mallinckrodt 11:40:24
6 utilized in connection with this SOM program, 11:40:27
7 correct? 11:40:30
8 MR. O'CONNOR: Objection to 11:40:30
9 form. 11:40:31
10 THE WITNESS: It was being 11:40:31
11 implemented at the time, yes. 11:40:33
12 QUESTIONS BY MR. KO: 11:40:34
13 Q. Okay. So, and when you say 11:40:34
14 "implemented at the time" -- thank you for 11:40:37
15 that -- as of April 10, 2008, there wasn't 11:40:38
16 necessarily a checklist that was final, 11:40:42
17 correct? 11:40:44
18 A. There were several checklists. 11:40:45
19 Okay. 11:40:49
20 So may I explain, please? 11:40:49
21 Q. Sure. 11:40:51
22 A. So there was a customer account 11:40:52
23 setup which had been in existence ad 11:40:53
24 infinitum, but this was a new customer 11:40:59
25 checklist that asked our customers to attest 11:41:01

Page 161

1 to their -- that they had a suspicious order 11:41:05
2 monitoring program. And we got that guidance 11:41:10
3 straight from Drug and Chemical Advisory 11:41:12
4 Group, that that would be a tool to augment 11:41:16
5 our program. 11:41:18
6 Q. Okay. So a moment ago when you 11:41:18
7 said that there was always a customer account 11:41:21
8 setup, as far as you understood, in 11:41:23
9 connection with SOM procedure, prior to this 11:41:24
10 date was there ever a customer checklist that 11:41:28
11 was part of that customer account setup? 11:41:31
12 A. Right. So, no, I'd like to 11:41:33
13 clarify because the previous checklist was 11:41:34
14 not in conjunction with SOM. So this is the 11:41:37
15 first SOM checklist. 11:41:40
16 Q. Great. 11:41:41
17 So accurate to say that as of 11:41:42
18 April of 2008, you are developing the first 11:41:45
19 customer checklist to be filled out in 11:41:47
20 connection with Mallinckrodt's SOM program? 11:41:50
21 Correct? 11:41:53
22 A. That's correct. 11:41:53
23 Q. Okay. And some of the 11:41:54
24 questions that you want included in the 11:41:56
25 checklist, at least your suggestion, if I 11:41:59

Page 162

1  understand correctly, is to try and determine   11:42:01
2  the overall percentage of controlled   11:42:03
3  substance filled by the pharmacy.   11:42:05
4        Do you see that?   11:42:06
5    A.   I do see that.   11:42:07
6    Q.   And so that was an important   11:42:08
7  feature of the checklist to you at this time.   11:42:10
8        MR. O'CONNOR:  Objection to   11:42:11
9  form.   11:42:12
10  QUESTIONS BY MR. KO:   11:42:12
11    Q.   Correct?   11:42:13
12    A.   So it was -- they were   11:42:13
13  statements taken from Southwood, and I'm   11:42:17
14  asking the question:  Should we incorporate   11:42:19
15  these questions?   11:42:21
16    Q.   Okay.  And you're asking the   11:42:23
17  question, "should we incorporate," because   11:42:27
18  you have received a Federal Register Notice   11:42:28
19  that suggests that you should consider asking   11:42:30
20  those questions, correct?   11:42:32
21        MR. O'CONNOR:  Objection to   11:42:33
22  form.   11:42:35
23        THE WITNESS:  Yes.   11:42:35
24  QUESTIONS BY MR. KO:   11:42:35
25    Q.   Okay.  And one question that   11:42:35

Page 163

1  you believe you should ask in light of   11:42:38
2  reviewing Southwood is to determine the   11:42:41
3  overall percentage of controlled substances   11:42:42
4  filled by a particular pharmacy, correct?   11:42:44
5        MR. O'CONNOR:  Objection to   11:42:46
6  form.   11:42:47
7        THE WITNESS:  So we don't ship   11:42:47
8  to pharmacies, so we adapted the   11:42:50
9  spirit of this question to ask the   11:42:53
10  question of our distributor customers.   11:42:56
11  QUESTIONS BY MR. KO:   11:42:59
12    Q.   Right.   11:42:59
13        But the idea is to understand,   11:43:00
14  notwithstanding the fact that you don't ship   11:43:02
15  directly to pharmacies, the idea is to   11:43:04
16  understand what overall percentage of a   11:43:08
17  controlled substance is being filled by a   11:43:12
18  downstream pharmacy, that is, a customer of   11:43:13
19  one of your distributors, correct?   11:43:17
20        MR. O'CONNOR:  Objection to   11:43:18
21  form.   11:43:19
22        THE WITNESS:  That's correct.   11:43:19
23  QUESTIONS BY MR. KO:   11:43:19
24    Q.   Okay.  And another important   11:43:20
25  question that you glean from your review of   11:43:25

Page 164

1  Southwood is to input into the checklist   11:43:27
2  identification of the percentage of   11:43:32
3  prescriptions filled by the -- filled by the   11:43:35
4  pharmacy that originate from the Internet.   11:43:37
5        Do you see that?   11:43:39
6        MR. O'CONNOR:  Objection to   11:43:39
7  form.   11:43:41
8        THE WITNESS:  It was -- yes, it   11:43:41
9  was stated -- it was suggested in   11:43:42
10  Southwood's.   11:43:44
11  QUESTIONS BY MR. KO:   11:43:45
12    Q.   Okay.  And that -- you felt   11:43:45
13  that that was an important element to be   11:43:47
14  included in the checklist at the time,   11:43:49
15  correct?   11:43:51
16    A.   So I pulled -- we pulled these   11:43:52
17  from Southwood's, but they were not   11:43:57
18  applicable to the questions we asked   11:43:59
19  distributors.  Some of them became part of a   11:44:02
20  pharmacy information sheet, so I'm -- I'm   11:44:05
21  confusing the names of our forms, and I   11:44:08
22  apologize for that.   11:44:10
23        So this was taken from   11:44:11
24  Southwood's for evaluation by the team:   11:44:12
25  Could we, should we, incorporate these   11:44:14

Page 165

1  statements into our direct customer   11:44:17
2  checklist.   11:44:19
3    Q.   Right.  And thank you for that.   11:44:19
4        So these are questions that you   11:44:21
5  believe should be incorporated into the new   11:44:23
6  customer checklist that you were working on   11:44:25
7  in April of 2008, correct?   11:44:27
8    A.   I did not know if we should --   11:44:28
9  should use them.   11:44:33
10    Q.   But you believe that they were   11:44:33
11  good suggestions pursuant to your review of   11:44:36
12  Southwood, correct?   11:44:39
13        MR. O'CONNOR:  Objection to   11:44:40
14  form.   11:44:41
15        THE WITNESS:  So I pulled them   11:44:41
16  out of Southwood, but I was learning   11:44:42
17  more and more and more about the   11:44:43
18  business and our customers at the   11:44:45
19  time, and I did not know if these had   11:44:48
20  relevance to be added to this direct   11:44:50
21  customer checklist.   11:44:54
22  QUESTIONS BY MR. KO:   11:44:55
23    Q.   Fair enough.   11:44:55
24        Was the purpose of posing these   11:44:56
25  questions an attempt to understand more, as   11:45:00

Page 166

1  you said, about Mallinckrodt's business?          11:45:04
2  Correct?                                          11:45:06
3          MR. O'CONNOR:  Objection to              11:45:07
4  form.                                             11:45:08
5          THE WITNESS:  Yes.                         11:45:08
6  QUESTIONS BY MR. KO:                              11:45:09
7      Q.    And in particular, the                 11:45:09
8  questions you posed here you were considering      11:45:11
9  to include in your checklist because they          11:45:15
10  provide details of the downstream customer        11:45:18
11  that purchases drugs from distributors that       11:45:21
12  you ship and sell to directly, correct?           11:45:25
13          MR. O'CONNOR:  Objection to              11:45:27
14  form.                                             11:45:28
15          THE WITNESS:  Correct.                    11:45:28
16  QUESTIONS BY MR. KO:                              11:45:32
17      Q.    So is it fair to say that you          11:45:33
18  are trying to understand details of where         11:45:35
19  Mallinckrodt drugs end up in terms of which       11:45:41
20  pharmacy or clinic they go to?                    11:45:45
21          MR. O'CONNOR:  Objection to              11:45:46
22  form.                                             11:45:47
23          THE WITNESS:  We had two                  11:45:47
24  checklists.                                       11:45:51
25          May I restate this?  Is that              11:45:51

Page 167

1  all right with you?                               11:45:54
2  QUESTIONS BY MR. KO:                              11:45:54
3      Q.    Yeah, sure.                             11:45:55
4      A.    So this was within the scope of        11:45:55
5  the suspicious order checklist going to our        11:45:59
6  direct customers.  Okay?  So these questions       11:46:02
7  were not applicable to our business because        11:46:07
8  we sold to wholesaler and distributor.            11:46:08
9          But as time went on, we                   11:46:10
10  developed a pharmacy information sheet which,     11:46:13
11  when we had conversations with the                11:46:16
12  distributors about their customers, we asked      11:46:18
13  these questions from Southwood's:  Are you        11:46:21
14  aware that your pharmacy customer has these       11:46:25
15  percentages, et cetera.                           11:46:27
16          So there are two checklists,              11:46:28
17  and I think they're getting interchanged          11:46:29
18  here, and I apologize for the confusion.          11:46:31
19      Q.    That's okay.  I appreciate the         11:46:33
20  response.  I just have a simple yes or no          11:46:37
21  question.                                         11:46:40
22      A.    All right.                             11:46:41
23      Q.    Is it accurate to say, yes or          11:46:41
24  no, that one of the reasons why you are           11:46:44
25  suggesting the consideration of these            11:46:46

Page 168

1  questions as you learned from Southwood was       11:46:50
2  to understand more about the downstream            11:46:52
3  customer of a distributor that you ship drugs      11:46:54
4  to?                                               11:46:57
5          MR. O'CONNOR:  Objection to              11:46:57
6  form.                                             11:46:58
7          THE WITNESS:  Yes.                         11:46:58
8  QUESTIONS BY MR. KO:                              11:47:01
9      Q.    Okay.  Thank you.                       11:47:02
10          There's also a reference made,           11:47:04
11  next item down -- next paragraph, excuse me,     11:47:08
12  starting with "Kim France."  Do you see          11:47:13
13  there's a reference made to IntegriChain?         11:47:16
14          To help orient you, I've                 11:47:21
15  highlighted it on the screen for you.             11:47:23
16      A.    Oh, thank you.                         11:47:25
17      Q.    Yeah.                                   11:47:25
18      A.    Yes, I see it.                          11:47:34
19      Q.    Okay.  And you participated in         11:47:35
20  the potential retention of IntegriChain, did      11:47:37
21  you not?                                          11:47:42
22      A.    Correct.                               11:47:42
23      Q.    Okay.  And so did Kimberly            11:47:42
24  France, as I understand it?                       11:47:49
25      A.    Yes.                                   11:47:50

Page 169

1      Q.    And who is Ms. France?                  11:47:50
2      A.    She was -- she was with the            11:47:51
3  patient and product monitoring group that had     11:47:53
4  a different focus and goal than the DEA           11:47:56
5  compliance group.                                 11:48:00
6      Q.    Okay.  And both she and you            11:48:01
7  were involved in the potential retention of        11:48:06
8  IntegriChain during this 2008 time period,        11:48:08
9  correct?                                          11:48:12
10      A.    Yes, among others, yes.               11:48:12
11      Q.    Okay.  And this e-mail                 11:48:14
12  specifically states from you that "one of the     11:48:16
13  goals of the Mallinckrodt IntegriChain            11:48:19
14  project being considered as part of RiskMAP       11:48:22
15  is to combine prescription data from Verispan     11:48:24
16  and IMS, added Mallinckrodt sales data and,       11:48:28
17  coupled with ARCOS data from DEA, to provide      11:48:32
18  a mechanism to detect diversion through the       11:48:34
19  supply chain."                                   11:48:37
20          Did I read that correctly?               11:48:38
21      A.    Yes, you did.                          11:48:39
22      Q.    Okay.  And so was one of the          11:48:42
23  purposes of trying to retain IntegriChain to      11:48:44
24  understand where Mallinckrodt prescription        11:48:48
25  opioids were ending up once they had left         11:48:52

Page 170

1  Mallinckrodt facilities in Hobart and          11:48:54
2  St. Louis?                                     11:48:56
3      A.   We were looking at that as a          11:48:57
4  possibility, yes.                              11:49:01
5      Q.   Okay.  And so you were trying         11:49:01
6  to understand and trying to detect diversion   11:49:02
7  throughout the supply chain with the help of   11:49:05
8  IntegriChain; is that correct?                 11:49:09
9          MR. O'CONNOR:  Objection to            11:49:11
10     form.                                       11:49:12
11         THE WITNESS:  Yes, that is the          11:49:12
12     service they offered, yes.                  11:49:13
13 QUESTIONS BY MR. KO:                            11:49:20
14     Q.   Okay.  And can you generally          11:49:21
15 describe to the Court your involvement with     11:49:22
16 this project?                                   11:49:23
17     A.   IntegriChain came in to              11:49:24
18 Mallinckrodt and gave one or two               11:49:28
19 presentations.  I'm not certain.  And then we   11:49:30
20 evaluated the merit of adding that to our       11:49:35
21 suspicious order monitoring, and we decided     11:49:39
22 not to add IntegriChain's services.            11:49:40
23     Q.   And why did you decide not to         11:49:43
24 retain them?                                    11:49:45
25     A.   So IntegriChain was a vendor,         11:49:45

Page 171

1  and their data collection did not add value    11:49:49
2  from our perspective to our suspicious order    11:49:54
3  monitoring program at the time.                 11:49:57
4      Q.   Uh-huh.  And why did you feel         11:49:58
5  like they did not add value?                    11:50:00
6      A.   Well, it was a multitude of           11:50:01
7  data from different sources, not necessarily    11:50:06
8  specific to Mallinckrodt data, and we           11:50:10
9  evaluated it, as I said.                        11:50:14
10         This also says "coupled with           11:50:16
11 ARCOS data from DEA."  DEA has steadfastly      11:50:18
12 throughout time refused to share ARCOS data     11:50:22
13 with anyone, and so that was another key        11:50:25
14 component of their program.                      11:50:28
15         So for those reasons we               11:50:31
16 declined the service.                            11:50:32
17     Q.   Do you recall how long you            11:50:34
18 evaluated whether or not you were going to      11:50:35
19 retain IntegriChain?                             11:50:36
20     A.   It was straightaway, shortly          11:50:38
21 after that one or two presentations.            11:50:42
22     Q.   Okay.  I have seen reference to       11:50:46
23 documents in which you have -- you have asked   11:50:51
24 approval from Bill Ratliff to be part of the    11:50:53
25 IntegriChain project.                            11:50:56

Page 172

1      Do you have any reason to                  11:50:58
2  dispute that?                                   11:50:59
3          MR. O'CONNOR:  Objection to            11:51:00
4      form.                                       11:51:00
5          THE WITNESS:  I have no reason         11:51:00
6      to dispute it.                              11:51:01
7  QUESTIONS BY MR. KO:                            11:51:02
8      Q.   Okay.  So do you recall               11:51:02
9  actually asking for approval from Mr. Ratliff   11:51:04
10 to participate in the potential retention of    11:51:07
11 IntegriChain?                                    11:51:09
12     A.   I do.                                  11:51:10
13     Q.   Okay.  And that was obviously         11:51:11
14 prior to this date, but do you recall whether   11:51:13
15 or not that was in the 2007 time period?        11:51:15
16     A.   I don't recall the date, I'm         11:51:17
17 sorry.                                          11:51:21
18     Q.   Okay.  I want to go forward to        11:51:21
19 the second attachment, titled "IntegriChain     11:51:29
20 Pilot Program and Overview."  And I don't --    11:51:33
21 we don't need to go through this in detail,     11:51:36
22 but do you recall who actually drafted this     11:51:38
23 language?                                        11:51:45
24     A.   It was not me.                        11:51:46
25     Q.   Okay.  Was it someone at             11:51:49

Page 173

1  Mallinckrodt?                                   11:51:50
2      A.   I do not know, or if it was           11:51:50
3  IntegriChain.                                   11:51:53
4      Q.   Okay.  But as far as you know,        11:51:54
5  you didn't draft this particular language,      11:51:55
6  correct?                                        11:51:57
7      A.   I'm positive I did not.               11:51:57
8      Q.   Okay.  Despite not knowing who        11:51:59
9  may have drafted it, as you said, you were      11:52:07
10 considering retention of IntegriChain because   11:52:09
11 they were going to hopefully help detect        11:52:13
12 diversion throughout the supply chain.  So      11:52:17
13 separate and apart from what I'm                11:52:19
14 highlighting, sorry.                            11:52:22
15     A.   Oh, I'm sorry.                        11:52:22
16     Q.   Yeah, no, that's okay.  Let me        11:52:23
17 repeat.                                         11:52:25
18     A.   Okay.                                 11:52:26
19     Q.   You were considering the             11:52:26
20 retention of IntegriChain because they were     11:52:27
21 going to help detect diversion throughout the   11:52:30
22 supply chain, correct?                          11:52:31
23         MR. O'CONNOR:  Objection to            11:52:32
24     form.                                       11:52:33
25         THE WITNESS:  Yes, that was           11:52:33

Page 174

```
 1    what they advertised.  Yes.         11:52:33
 2    QUESTIONS BY MR. KO:               11:52:36
 3       Q.   That was the intent?        11:52:37
 4       A.   Yes.               11:52:37
 5       Q.   And one of the ways that they    11:52:38
 6    would do that was through capturing -- at    11:52:39
 7    least representing to you that they would    11:52:41
 8    capture detailed data, correct?       11:52:43
 9       A.   Correct.           11:52:45
10       Q.   And so -- and in particular, in    11:52:46
11    the second sentence of this background    11:52:48
12    material, it indicates that "detailed data    11:52:51
13    through surveillance and pharmacovigilance is    11:52:56
14    an important resource for the company."    11:53:00
15          Do you see that?       11:53:02
16       A.   I do see that.        11:53:03
17       Q.   Would you agree with that    11:53:03
18    statement?               11:53:04
19       A.   I would not.         11:53:04
20       Q.   You don't believe detailed data    11:53:05
21    is an important resource for the company?    11:53:08
22       A.   I don't understand how    11:53:09
23    pharmacovigilance, which in my understanding    11:53:10
24    is adverse event reporting, could be an    11:53:12
25    important resource for the company.    11:53:18
```

Page 175

```
 1          Also, this statement -- may I    11:53:20
 2    say something else, please?       11:53:22
 3       Q.   Of course.           11:53:24
 4       A.   So this document, it switches    11:53:24
 5    back and forth, so it's confusing in terms of    11:53:26
 6    they're talking about "the company,"    11:53:30
 7    Mallinckrodt, but then "our company,"    11:53:33
 8    indicating IntegriChain.          11:53:36
 9          So it's difficult to -- to    11:53:38
10    define every sentence and under --    11:53:43
11       Q.   Sure.  Fair enough.       11:53:46
12       A.   Thank you.  Thank you.    11:53:47
13       Q.   Fair enough.  And we can put    11:53:47
14    the document aside because I don't mean to    11:53:49
15    put you through a memory test of the actual    11:53:51
16    document.               11:53:53
17       A.   Okay.            11:53:53
18       Q.   I would just ask you separately    11:53:53
19    whether or not you believe detailed data is    11:53:55
20    an important resource for the company to    11:53:57
21    utilize in trying to detect diversion.    11:54:00
22       A.   Yes.  In general, yes.    11:54:03
23       Q.   Okay.  And a moment ago when    11:54:04
24    you were talking about what your    11:54:06
25    understanding of pharmacovigilance is, you    11:54:06
```

Page 176

```
 1    described it as being a report of adverse    11:54:08
 2    events, correct?            11:54:10
 3       A.   Yes.               11:54:11
 4       Q.   Why would -- why would not    11:54:12
 5    considering an adverse event be a fruitful    11:54:17
 6    thing to do in connection with trying to    11:54:20
 7    detect suspicious orders?        11:54:22
 8          MR. O'CONNOR:  Objection to    11:54:23
 9    form.               11:54:24
10          THE WITNESS:  Adverse events    11:54:25
11    were handled by patient and product    11:54:27
12    monitoring, and they were events such    11:54:30
13    as a doctor had a patient on the    11:54:34
14    operating table and had administered a    11:54:35
15    Mallinckrodt medication and there was    11:54:37
16    some unexpected symptom occurring.  So    11:54:38
17    it was like a hotline of       11:54:44
18    pharmacovigilance.            11:54:47
19    QUESTIONS BY MR. KO:               11:54:49
20       Q.   Okay.  And was that -- did --    11:54:49
21    during your time at Mallinckrodt, did you    11:54:51
22    ever receive -- or were you aware of any    11:54:54
23    adverse event reports related to diversion?    11:55:00
24          MR. O'CONNOR:  Objection to    11:55:02
25    form.               11:55:03
```

Page 177

```
 1          THE WITNESS:  Yes.       11:55:03
 2    QUESTIONS BY MR. KO:               11:55:08
 3       Q.   Okay.  And did you -- during    11:55:08
 4    your time at Mallinckrodt, did you ever    11:55:13
 5    receive or were you aware of any adverse    11:55:15
 6    event reports related to the abuse of    11:55:18
 7    prescription opioids manufactured by    11:55:20
 8    Mallinckrodt?            11:55:23
 9       A.   Yes.               11:55:24
10       Q.   Okay.  And notwithstanding the    11:55:27
11    fact that some of these adverse event reports    11:55:29
12    included instances of diversion and abuse,    11:55:31
13    you don't believe that it was necessary to    11:55:35
14    include these -- or consider these reports in    11:55:37
15    connection with Mallinckrodt's duties to    11:55:40
16    implement and design a suspicious order    11:55:42
17    monitoring program?            11:55:44
18          MR. O'CONNOR:  Objection to    11:55:44
19    form.               11:55:46
20          THE WITNESS:  So this was one    11:55:46
21    of the tools that was offered to us,    11:55:49
22    among many, and eventually we realized    11:55:51
23    that we had the chargeback tool which    11:55:55
24    could give us the detailed data about    11:56:00
25    the Mallinckrodt product, whereas    11:56:03
```

Page 178

1    IntegriChain was talking about the        11:56:05
2    universe of products not specific to       11:56:07
3    Mallinckrodt.                              11:56:08
4    QUESTIONS BY MR. KO:                       11:56:08
5        Q.   Sure.  And I understand --        11:56:09
6    maybe it'll help to put the document aside.    11:56:10
7        A.   Okay.                             11:56:13
8        Q.   I really don't have any more      11:56:13
9    questions on it.  I was just asking with      11:56:14
10   respect to your statement about            11:56:16
11   pharmacovigilance and adverse --           11:56:18
12       A.   Uh-huh.                           11:56:18
13       Q.   -- event reports in particular.   11:56:19
14          You had suggested that it was       11:56:19
15   not necessary to review adverse event reports    11:56:24
16   in connection with Mallinckrodt's duties to    11:56:27
17   design and implement an SOM program.          11:56:33
18          Is that what you testified to?      11:56:35
19          MR. O'CONNOR:  Objection to         11:56:37
20   form.                                      11:56:37
21          THE WITNESS:  Yes.                  11:56:37
22   QUESTIONS BY MR. KO:                       11:56:38
23       Q.   Okay.  And my question is, why    11:56:38
24   would you not consider such adverse event    11:56:39
25   reports relating to the abuse and diversion    11:56:42

Page 179

1    of Mallinckrodt prescription opioids that     11:56:44
2    were contained in such adverse event reports    11:56:47
3    as you testified?                          11:56:49
4        A.   Okay.  Please, I'd like to take    11:56:50
5    a break and confer with my attorneys on this    11:56:54
6    answer.                                    11:56:56
7          MR. KO:  Okay.                       11:56:57
8          MR. O'CONNOR:  Answer the           11:56:57
9    pending question.                          11:57:00
10          THE WITNESS:  Because the           11:57:01
11   adverse events that came to my             11:57:03
12   attention were notices of document         11:57:04
13   retention notice of litigation against       11:57:09
14   the company for people who took            11:57:11
15   fentanyl -- various -- various             11:57:19
16   episodes that resulted in abuse or a       11:57:22
17   lawsuit against the company as a           11:57:27
18   result of perceived Mallinckrodt           11:57:30
19   responsibility.                            11:57:33
20   QUESTIONS BY MR. KO:                       11:57:34
21       Q.   Okay.  And with respect to that    11:57:35
22   example in particular about the fentanyl    11:57:37
23   episode, that was related to an overdose?    11:57:41
24          MR. O'CONNOR:  And just for         11:57:48
25   clarity, I'm instructing you not to        11:57:49

Page 180

1    answer to the extent answering his         11:57:52
2    question would reveal any                  11:57:54
3    conversations you had with company         11:57:56
4    counsel.                                   11:57:57
5          THE WITNESS:  Okay.  I can           11:57:58
6    answer because it did not relate to        11:58:01
7    conversation with company counsel.         11:58:04
8    QUESTIONS BY MR. KO:                       11:58:05
9        Q.   Okay.                             11:58:05
10       A.   The adverse event that was        11:58:05
11   reported was a result of someone -- the    11:58:08
12   allegation was stealing fentanyl patches from    11:58:12
13   a glove compartment of a car that was hot.    11:58:16
14   Fentanyl, the active ingredient is activated    11:58:19
15   by heat.  And so the person who suffered the    11:58:21
16   adverse event had stolen the fentanyl,     11:58:24
17   allegedly, taken it and, yes, overdosed.  And    11:58:27
18   I don't know if they expired or not.  I know    11:58:32
19   there was a medical emergency.             11:58:35
20       Q.   Isn't that an example of          11:58:37
21   diversion leading to an opioid overdose?    11:58:39
22       A.   Yes, it's diversion at the        11:58:41
23   patient level, yes.                        11:58:47
24       Q.   Okay.  And diversion at the       11:58:47
25   patient level is something that would be    11:58:49

Page 181

1    important for you to understand that is     11:58:52
2    occurring in connection with your duties as    11:58:53
3    someone responsible for designing and      11:58:57
4    implementing a system to detect suspicious    11:59:00
5    orders, is it not?                         11:59:03
6          MR. O'CONNOR:  Objection to          11:59:04
7    form.                                      11:59:05
8          THE WITNESS:  So it's               11:59:05
9    impossible, completely impossible.  We     11:59:12
10   can monitor potentially down to the        11:59:14
11   pharmacy level, but once the               11:59:15
12   prescription is dispensed, we cannot       11:59:17
13   prevent diversion when it gets into a      11:59:21
14   private person's hands.                    11:59:24
15   QUESTIONS BY MR. KO:                       11:59:25
16       Q.   I know that you may think that    11:59:26
17   you cannot prevent diversion, but my question    11:59:27
18   is simply whether or not it would be       11:59:30
19   important to know whether Mallinckrodt drugs    11:59:33
20   were being diverted in instances like you    11:59:36
21   just described.                            11:59:39
22       A.   Yes.                              11:59:41
23          MR. O'CONNOR:  Objection to         11:59:42
24   form.                                      11:59:43
25

Highly Confidential - Subject to Further Confidentiality Review

Page 182

```
1   QUESTIONS BY MR. KO:              11:59:43
2       Q.   And in particular, it would be    11:59:43
3   important to know -- if there were thousands  11:59:45
4   of overdoses that resulted from diversion of  11:59:46
5   Mallinckrodt drugs, that would be important   11:59:50
6   to know in connection with your duties as     11:59:52
7   a -- someone responsible for implementing an  11:59:55
8   SOM program, correct?             11:59:58
9           MR. O'CONNOR:  Objection to     11:59:59
10      form.                         11:59:59
11          THE WITNESS:  So will you       11:59:59
12      please repeat the question?  I'm    12:00:03
13      sorry.                        12:00:04
14  QUESTIONS BY MR. KO:              12:00:04
15      Q.   Sure.                    12:00:04
16          If there were thousands of      12:00:04
17  overdoses that resulted from the diversion of 12:00:06
18  Mallinckrodt drugs, that would be important   12:00:08
19  to know in connection with your duties as     12:00:11
20  someone responsible for implementing an SOM   12:00:13
21  program, correct?                 12:00:15
22          MR. O'CONNOR:  Objection.       12:00:16
23          THE WITNESS:  Yes.  So the      12:00:17
24      question is hypothetical -- yes,    12:00:20
25      thousands, yes, that would have been a 12:00:21
```

Page 183

```
1   concern.                          12:00:23
2   QUESTIONS BY MR. KO:              12:00:23
3       Q.   And overdose deaths that result  12:00:28
4   from someone taking a pill from a patient is  12:00:32
5   a sign of diversion, is it not?     12:00:35
6           MR. O'CONNOR:  Objection.       12:00:38
7       Form.                         12:00:40
8           THE WITNESS:  It's a form of    12:00:40
9       diversion.  It's misuse of a        12:00:42
10      prescription drug, yes.           12:00:43
11          MR. O'CONNOR:  Counsel, we've   12:00:46
12      been going almost an hour and a half.  12:00:47
13      Should we take another break?       12:00:48
14          MR. KO:  Yeah, I was just going  12:00:50
15      to say it's time for a break.       12:00:52
16          VIDEOGRAPHER:  We are going off 12:00:54
17      the record at 12 p.m.             12:00:55
18      (Off the record at 12:00 p.m.)      12:00:58
19          VIDEOGRAPHER:  We are back on   12:13:39
20      the record at 12:13 p.m.          12:13:43
21  QUESTIONS BY MR. KO:              12:13:45
22      Q.   Welcome back from the break,   12:13:47
23  Ms. Harper.                       12:13:49
24      A.   Thank you.                 12:13:50
25      Q.   Going back to the -- do you    12:13:50
```

Page 184

```
1   have Exhibit 6 in front of you?     12:13:58
2       A.   It's Exhibit 2.            12:14:00
3       Q.   Oh, Exhibit 2.  Okay.  You can 12:14:01
4   set that aside.                   12:14:02
5           I'm going to hand you a copy of 12:14:03
6   what's previously been marked as Exhibit 21   12:14:04
7   of the Stewart deposition.          12:14:06
8           MR. KO:  And for the record,    12:14:18
9       this is -- ends in Bates 274111, and  12:14:20
10      it is an e-mail from Cathy Stewart to  12:14:26
11      several people, and you are among the  12:14:29
12      recipients.                   12:14:32
13  QUESTIONS BY MR. KO:              12:14:32
14      Q.   Do you see that?           12:14:32
15      A.   I do.                     12:14:32
16      Q.   And it's dated May 14, 2008,   12:14:33
17  correct?                          12:14:35
18      A.   Yes.                      12:14:35
19      Q.   And by the way, who is -- or   12:14:36
20  you know Cathy Stewart, right?      12:14:37
21      A.   Yes.                      12:14:39
22      Q.   You worked with her in        12:14:40
23  connection with SOM procedure --    12:14:42
24      A.   Yes.                      12:14:44
25      Q.   -- and activities?          12:14:44
```

Page 185

```
1       A.   (Witness nods head.)         12:14:46
2       Q.   Okay.  And do you respect her  12:14:46
3   opinions?                         12:14:48
4       A.   Yes.                      12:14:48
5       Q.   Okay.  And did you work with  12:14:49
6   her closely throughout the 2008 and 2012 time 12:14:51
7   period?                           12:14:54
8       A.   I can't -- she wasn't in that  12:14:54
9   role for an extremely long time, so I don't   12:14:56
10  know when she left, I'm sorry.      12:14:58
11      Q.   Did you work with her closely  12:15:00
12  in connection with SOM-related activities at  12:15:01
13  Mallinckrodt in the 2007, 2008 time period?   12:15:04
14      A.   I don't know when she started. 12:15:07
15  Clearly it was in May of 2008, but I don't    12:15:12
16  know the start or the end date of when she    12:15:15
17  became part of the initiative.      12:15:18
18      Q.   And you attended a -- you      12:15:21
19  attended a conference with her --   12:15:27
20      A.   Yes.                      12:15:28
21      Q.   -- in 2008, correct?         12:15:29
22      A.   Yes.                      12:15:30
23      Q.   And this was, I believe, in    12:15:30
24  October of 2008, and it was the Buzzeo        12:15:32
25  conference?                       12:15:36
```

Page 186

1    A.    Yes.                    12:15:36
2    Q.    And I know that postdates the    12:15:36
3  date of this letter, but do you recall anyone  12:15:38
4  else attending that conference other than you  12:15:42
5  and Cathy from Mallinckrodt?         12:15:45
6    A.    I do not.                12:15:47
7    Q.    Okay.  So as far as you recall,   12:15:48
8  you were the only -- you and Cathy were the  12:15:55
9  only two that attended the Buzzeo conference  12:15:57
10 in 2008?                      12:16:00
11   A.    Yes.                    12:16:01
12   Q.    And what was her position       12:16:01
13 during the 2008 time period?          12:16:03
14   A.    Manager of dosage customer      12:16:04
15 service.                       12:16:09
16   Q.    Okay.  So she was a customer    12:16:09
17 service rep -- or sorry, excuse me.  She was  12:16:11
18 involved in the customer service group,     12:16:14
19 correct?                      12:16:16
20   A.    Correct.  The reps reported to   12:16:16
21 her.                         12:16:17
22   Q.    Right.                  12:16:18
23        And so she, at least of this     12:16:18
24 time, was having some involvement in the    12:16:23
25 revising of Mallinckrodt's SOM program; is  12:16:25

Page 187

1  that fair to say?                 12:16:29
2    A.    Yes.                    12:16:29
3    Q.    Okay.  And also it appears that  12:16:30
4  at this time the customer service group is   12:16:33
5  having some involvement in the implementation 12:16:35
6  of the revised SOM program.          12:16:38
7        Separate and apart from what     12:16:39
8  the e-mail says, is it your recollection that  12:16:41
9  the customer service group had some       12:16:44
10 involvement in the revising of Mallinckrodt's  12:16:45
11 SOM program in 2008?              12:16:47
12      MR. O'CONNOR:  Objection to      12:16:49
13 form.                        12:16:50
14      THE WITNESS:  Yes.            12:16:50
15 QUESTIONS BY MR. KO:               12:16:50
16   Q.    Okay.  Ms. Stewart says that --  12:16:51
17 in particular that she is advising everyone   12:17:00
18 on this e-mail that she is working with you  12:17:03
19 and Mr. Harper to develop procedures to    12:17:06
20 ensure that Mallinckrodt maintains compliance  12:17:11
21 with DEA requirements to identify suspicious  12:17:15
22 orders; is that correct?              12:17:18
23   A.    So I'm Harper, and it talks      12:17:18
24 about working with me and Bill Ratliff.     12:17:21
25   Q.    Right.                  12:17:23

Page 188

1    A.    Yes.                    12:17:23
2    Q.    So Ms. Stewart is at this time,  12:17:24
3  as of May 14, 2008, working with you and   12:17:27
4  Mr. Ratliff to specifically ensure that     12:17:32
5  Mallinckrodt maintains compliance with DEA  12:17:40
6  requirements related to identification of     12:17:42
7  suspicious orders, correct?           12:17:44
8    A.    I don't see the word          12:17:45
9  "specifically," but, yes, she was assisting   12:17:49
10 with enhancing the program.          12:17:52
11   Q.    Okay.  And then she also        12:17:55
12 mentioned -- mentions that "in light of the   12:17:57
13 recent developments with McKesson, a good  12:17:59
14 deal of focus is being placed on this       12:18:02
15 project."                      12:18:03
16      Do you see that?             12:18:04
17   A.    I do.                   12:18:04
18   Q.    And is she referring to a DEA    12:18:05
19 investigation that ultimately resulted in a   12:18:08
20 DEA action against McKesson in the early 2008 12:18:12
21 time period?                    12:18:16
22   A.    Yes.                    12:18:16
23   Q.    Okay.  And McKesson, as we     12:18:17
24 mentioned before, is a -- is one of the -- or  12:18:21
25 one of the major distributors that faced DEA  12:18:23

Page 189

1  scrutiny regarding their distribution of      12:18:25
2  prescription opioids, correct?          12:18:28
3    A.    Yes.                    12:18:29
4    Q.    Okay.  Now, she goes on to      12:18:32
5  describe generally when an order is deemed   12:18:34
6  peculiar by a customer service rep.        12:18:41
7        Do you see that?             12:18:42
8    A.    Uh-huh.  Yes.              12:18:42
9    Q.    And she says that "an order is    12:18:44
10 deemed peculiar by a customer service rep     12:18:50
11 based on a set of guidelines currently being  12:18:52
12 developed."                    12:18:56
13      Do you see that reference?       12:18:56
14      First sentence of the second      12:19:05
15 paragraph.                     12:19:07
16   A.    Yes, yes, yes, I see it.  Yes,    12:19:07
17 thank you.                     12:19:08
18   Q.    So fair to say as of May 14,      12:19:08
19 2008, Mallinckrodt is developing certain     12:19:13
20 guidelines to determine whether or not an    12:19:15
21 order is peculiar?                 12:19:17
22   A.    It's not correct.            12:19:20
23   Q.    Okay.  Is it -- is that -- is     12:19:21
24 your testimony that it's not correct because  12:19:24
25 you always had a system to determine whether  12:19:25

Page 190

1  or not an order was peculiar?          12:19:28
2      A.    That's correct.          12:19:29
3      Q.    Okay.  So is it fair to say      12:19:30
4  that as of May 14, 2008, you are revising the  12:19:31
5  set of guidelines to determine whether or not  12:19:37
6  it's peculiar?          12:19:39
7      A.    Yes.          12:19:40
8      Q.    Okay.  And what is the      12:19:41
9  difference from your perspective between a    12:19:47
10  peculiar order and a suspicious order?      12:19:49
11      A.    We -- at different times with    12:19:51
12  the enhancements of our program, we called    12:19:58
13  orders "peculiar," we called orders      12:20:01
14  "unusual," and we called orders "suspicious."  12:20:03
15  So at this time, the peculiar order was      12:20:06
16  something that came to our attention and      12:20:10
17  warranted additional review but was not      12:20:14
18  necessarily deemed to be suspicious.      12:20:17
19      Q.    Okay.  So a peculiar order, if    12:20:19
20  I understand your testimony correctly, is not  12:20:21
21  necessarily synonymous with a suspicious    12:20:23
22  order; is that correct?          12:20:26
23      A.    Correct.          12:20:26
24      Q.    Okay.  And if I understand both  12:20:28
25  this e-mail and some other documents I've    12:20:32

Page 191

1  reviewed, my understanding is that once an    12:20:35
2  order is identified as peculiar, certain      12:20:38
3  people make the determination of whether or    12:20:42
4  not the order is ultimately suspicious      12:20:44
5  sufficient to notify the DEA; is that      12:20:46
6  accurate?          12:20:48
7          MR. O'CONNOR:  Objection to      12:20:48
8      form.          12:20:49
9          THE WITNESS:  Yes.          12:20:49
10  QUESTIONS BY MR. KO:          12:20:50
11      Q.    Okay.  And so for purposes of    12:20:50
12  this e-mail from Ms. Stewart to you, among    12:20:54
13  others, she is discussing a revision of what    12:20:58
14  determines a peculiar order, correct?      12:21:03
15      A.    A peculiar order as recognized    12:21:05
16  by customer service.          12:21:11
17      Q.    Okay.          12:21:12
18      A.    Yes.          12:21:12
19      Q.    And is it accurate to say that    12:21:13
20  a peculiar order -- whether or not an order    12:21:17
21  was deemed peculiar was based on an      12:21:22
22  algorithm, as we discussed earlier; is that    12:21:25
23  correct?          12:21:29
24      A.    That was one of the reasons,    12:21:29
25  but in the case of a customer service rep, it  12:21:31

Page 192

1  could have been anything that came to the    12:21:34
2  customer service rep's attention as them    12:21:35
3  being familiar with the account.          12:21:39
4      Q.    Okay.  Because as you testified  12:21:41
5  previously, they were your eyes and ears to    12:21:43
6  the customer, correct?          12:21:47
7      A.    That was the NAMs.  But, yes,    12:21:48
8  the customer service reps were veterans with  12:21:49
9  the accounts, and, yes, they knew the      12:21:51
10  customers.          12:21:56
11      Q.    So would you agree -- because I  12:21:56
12  realize that you are trying to make a      12:22:04
13  distinction between the NAMs and the CSRs.    12:22:08
14          But would it be fair to say      12:22:11
15  that the CSRs had deep knowledge about the    12:22:12
16  customers?          12:22:16
17          MR. O'CONNOR:  Objection to      12:22:16
18      form.          12:22:17
19  QUESTIONS BY MR. KO:          12:22:17
20      Q.    Of Mallinckrodt?          12:22:17
21      A.    I wouldn't use the term "deep    12:22:18
22  knowledge."  They had knowledge of the      12:22:22
23  customers from the customer service      12:22:24
24  perspective.          12:22:26
25      Q.    Okay.  And when you said      12:22:27

Page 193

1  earlier that the NAMs were your eyes and    12:22:29
2  ears, would you also say that the customer    12:22:34
3  service reps to some extent were the eyes and  12:22:36
4  ears for the Mallinckrodt business as well?    12:22:38
5      A.    If you use the term -- making    12:22:40
6  an inferential leap, because the customer    12:22:45
7  service reps didn't see the customers or --    12:22:48
8  they talked to the customers and took      12:22:50
9  customer orders.          12:22:52
10      Q.    Okay.  Let me make sure I      12:22:53
11  understand it.          12:22:55
12          They didn't see the customers,    12:22:55
13  but they talked to them?          12:22:57
14      A.    Yes.          12:22:58
15      Q.    Okay.  So they didn't actually  12:22:58
16  visit them like the NAMs did, but they would  12:23:00
17  speak to them via telephone only?      12:23:03
18          MR. O'CONNOR:  Objection to      12:23:05
19      form.          12:23:06
20          THE WITNESS:  Correct.          12:23:06
21  QUESTIONS BY MR. KO:          12:23:06
22      Q.    But the CSRs had, through these  12:23:06
23  conversations, presumably had knowledge about  12:23:10
24  the customers, correct?          12:23:11
25      A.    Yes.          12:23:13

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    Q.   Turning back to this          12:23:20
2  distinction between peculiar and suspicious,   12:23:21
3  do you ever recall an instance in which an   12:23:23
4  order was identified as suspicious but not   12:23:25
5  peculiar?                12:23:30
6    A.   I don't know that answer.       12:23:31
7    Q.   Okay.  Do you ever recall an     12:23:32
8  instance in which an order was identified as   12:23:36
9  unusual but not peculiar?          12:23:38
10    A.   I can't say.  I'm sorry.       12:23:39
11    Q.   Okay.  Is it accurate to       12:23:43
12  describe at least the -- well, strike that.   12:23:45
13        Prior to the revision of the    12:23:50
14  SOM program in 2008 that's reflected in these   12:23:55
15  e-mails that we're going over, is it accurate   12:24:00
16  to say that an order was first -- an     12:24:04
17  evaluation was made first about whether or   12:24:10
18  not an order was peculiar, separate and apart   12:24:11
19  from an analysis of whether or not an order   12:24:14
20  was suspicious?            12:24:15
21        MR. O'CONNOR:  Objection to     12:24:16
22    form.                12:24:17
23        THE WITNESS:  It appeared, yes.   12:24:17
24    That was a term that we used, yes.    12:24:21
25

Page 195

1  QUESTIONS BY MR. KO:            12:24:23
2    Q.   So in addition to it being a    12:24:24
3  term that you used, is it accurate to say    12:24:26
4  that at Mallinckrodt, before making a     12:24:28
5  determination with respect to whether an    12:24:31
6  order was suspicious, the existing SOM     12:24:33
7  program at the time determined first whether   12:24:37
8  an order was peculiar?          12:24:39
9    A.   Yes, that was the term we used,   12:24:42
10  yes.                  12:24:46
11    Q.   And then once an order was       12:24:46
12  deemed to be peculiar, you subsequently made   12:24:48
13  a determination of whether or not that order   12:24:50
14  was suspicious, correct?          12:24:53
15    A.   Yes.                12:24:55
16    Q.   Okay.  And you had mentioned a   12:24:56
17  moment ago that there were other       12:25:11
18  circumstances besides the algorithm that    12:25:14
19  would potentially make an order peculiar.    12:25:17
20        Do you recall that?        12:25:20
21    A.   Yes.  I'm using the terms      12:25:21
22  "peculiar," "suspicious," "unusual,"     12:25:26
23  interchangeably, yes.          12:25:31
24    Q.   Okay.  Well, I would not like   12:25:32
25  to use those words interchangeably --    12:25:35

Page 196

1    A.   Okay.  All right.  Okay.  Thank   12:25:35
2  you.                  12:25:35
3    Q.   -- and I'm trying to understand   12:25:35
4  the distinctions between them.        12:25:39
5    A.   Okay.  Thank you.          12:25:40
6    Q.   So with respect to          12:25:42
7  identification of a peculiar order, you had   12:25:43
8  previously testified that if an order met a   12:25:44
9  certain threshold by an algorithm determined   12:25:53
10  by Mallinckrodt, it would be deemed peculiar.   12:25:55
11        MR. O'CONNOR:  Objection to     12:25:58
12    form.                12:25:59
13  QUESTIONS BY MR. KO:            12:25:59
14    Q.   Correct?              12:25:59
15    A.   Correct.              12:25:59
16    Q.   And in addition to the        12:26:00
17  algorithm triggering a peculiar order, you   12:26:03
18  had also testified that there were other    12:26:06
19  circumstances that may indicate an order was   12:26:08
20  peculiar as identified by a customer service   12:26:11
21  rep, correct?              12:26:14
22    A.   Correct.              12:26:14
23    Q.   Okay.  And who other than the   12:26:15
24  CSRs had a responsibility or an obligation to   12:26:20
25  determine whether or not this order was    12:26:26

Page 197

1  peculiar?                12:26:28
2        MR. O'CONNOR:  Objection to     12:26:28
3    form.                12:26:29
4        THE WITNESS:  Peculiar, using   12:26:29
5    the strictest definition of the term.   12:26:37
6    The national account managers, if they   12:26:43
7    saw something when they were at the   12:26:43
8    accounts, the customer service review   12:26:43
9    and the peculiar order algorithm     12:26:50
10    detection, yes.          12:26:50
11  QUESTIONS BY MR. KO:            12:26:52
12    Q.   Okay.  So I'm setting aside the   12:26:52
13  algorithm detection.          12:26:54
14    A.   Okay.                12:26:55
15    Q.   So for purposes of identifying   12:26:56
16  an order as peculiar, do you recall any    12:26:59
17  instances in the 2007 through 2010 time    12:27:00
18  period in which orders were identified as    12:27:03
19  peculiar by either a CSR or an NAM, separate   12:27:05
20  and apart from whether or not an algorithm   12:27:10
21  triggered the order to be peculiar?      12:27:14
22    A.   Yes.                12:27:17
23    Q.   Okay.  And other than the CSRs   12:27:18
24  and the NAMs, did anyone else have       12:27:22
25  responsibility with respect to determining   12:27:25

Page 198

1  whether or not that order was peculiar?          12:27:26
2  Separate and apart from the algorithm.          12:27:32
3      A.   Separate from the algorithm?          12:27:33
4      So may I ask a question,          12:27:37
5  please?          12:27:38
6      Q.   Sure.          12:27:38
7      A.   So there was -- we spoke          12:27:39
8  earlier about a circumstance where a DEA          12:27:40
9  investigator contacted Mallinckrodt. It was          12:27:44
10 a compounding pharmacy. So I don't know if          12:27:48
11 that was within the same time frame.          12:27:50
12      But so my point is, peculiar          12:27:52
13 order information could come from an external          12:27:56
14 source, potentially.          12:27:59
15     Q.   Okay. So other than an          12:28:00
16 external source or from some evaluation made          12:28:03
17 by a CSR or an NAM, apart from the algorithm          12:28:06
18 that triggered a peculiar order, were there          12:28:11
19 any other circumstances in which a peculiar          12:28:15
20 order was identified at Mallinckrodt?          12:28:19
21     A.   No.          12:28:20
22     Q.   Okay. Is it your understanding          12:28:21
23 that Mallinckrodt could not ship a peculiar          12:28:30
24 order without first conducting some sort of          12:28:37
25 due diligence on that order?          12:28:38

Page 199

1      A.   It is not.          12:28:39
2          MR. O'CONNOR: Objection to          12:28:39
3      form.          12:28:40
4  QUESTIONS BY MR. KO:          12:28:40
5      Q.   It is not your understanding.          12:28:41
6      So a peculiar order could ship          12:28:42
7  without conducting due diligence then,          12:28:43
8  correct?          12:28:45
9      A.   Correct.          12:28:45
10     Q.   Okay. So isn't that an unusual          12:28:46
11 circumstance?          12:28:55
12         MR. O'CONNOR: Objection to          12:28:55
13     form.          12:28:57
14 QUESTIONS BY MR. KO:          12:28:57
15     Q.   In other words, if you're not          12:28:57
16 performing any -- earlier we made a          12:29:01
17 distinction between peculiar and suspicious          12:29:03
18 orders, correct?          12:29:05
19     A.   Correct.          12:29:05
20     Q.   And the latter is something          12:29:05
21 that you ultimately have to report to the          12:29:07
22 DEA, correct?          12:29:08
23     A.   Correct.          12:29:09
24     Q.   And we had also discussed about          12:29:09
25 how evaluation of a peculiar order is          12:29:16

Page 200

1  necessary to determine whether or not that          12:29:18
2  is, in fact, suspicious, correct?          12:29:21
3      A.   Correct.          12:29:22
4      Q.   So it's your testimony sitting          12:29:23
5  here today that you did not always perform          12:29:27
6  due diligence on peculiar orders before          12:29:29
7  shipping them, correct?          12:29:31
8          MR. O'CONNOR: Objection to          12:29:31
9      form.          12:29:32
10         THE WITNESS: Correct.          12:29:32
11 QUESTIONS BY MR. KO:          12:29:33
12     Q.   Okay. Shipping of a peculiar          12:30:03
13 order without doing due diligence would seem          12:30:04
14 contradictory to what Ms. Stewart is trying          12:30:06
15 to describe here, right?          12:30:10
16         MR. O'CONNOR: Objection to          12:30:12
17     form.          12:30:13
18         THE WITNESS: Yes.          12:30:13
19 QUESTIONS BY MR. KO:          12:30:16
20     Q.   Okay. And to be clear, so the          12:30:17
21 record is clear, she is suggesting that if an          12:30:21
22 order is deemed peculiar, it should be placed          12:30:23
23 on hold and the DEA compliance group will be          12:30:26
24 advised.          12:30:30
25     Do you see that?          12:30:30

Page 201

1      A.   I do.          12:30:31
2      Q.   And in particular, Mr. Ratliff          12:30:32
3  and you are the DEA compliance group as          12:30:34
4  referenced by Ms. Stewart, correct?          12:30:38
5      A.   Correct.          12:30:39
6      Q.   And she also states that "DEA          12:30:40
7  compliance will then conduct a more in-depth          12:30:44
8  investigation and determine if the situation          12:30:47
9  warrants notification to the DEA."          12:30:49
10     Do you see that?          12:30:51
11     A.   I do see it.          12:30:52
12     Q.   And so your testimony, so the          12:30:53
13 record is clear, is that that more in-depth          12:30:55
14 investigation did not always occur, correct?          12:30:58
15         MR. O'CONNOR: Objection to          12:30:59
16     form.          12:31:00
17         THE WITNESS: There were times          12:31:00
18     that we shipped an order before the          12:31:01
19     review was complete, but we never          12:31:03
20     shipped a suspicious order.          12:31:06
21 QUESTIONS BY MR. KO:          12:31:07
22     Q.   Okay. Well, separate and apart          12:31:08
23 from the terminology now --          12:31:09
24     A.   Okay.          12:31:10
25     Q.   -- the process as described by          12:31:11

Page 202

1  Ms. Stewart and your testimony here today,  12:31:14
2  after an order was deemed to be peculiar from  12:31:17
3  a variety of means that we discussed, it was  12:31:22
4  not always the case that the order was placed  12:31:26
5  on hold and an in-depth investigation ensued,  12:31:30
6  correct?  12:31:34
7       MR. O'CONNOR:  Objection to  12:31:34
8    form.  12:31:34
9       THE WITNESS:  So the order was  12:31:34
10   always placed on hold, but sometimes  12:31:35
11   it was released from hold and shipped  12:31:37
12   prior to the completion of the review.  12:31:39
13  QUESTIONS BY MR. KO:  12:31:41
14   Q.  Okay.  Now, a moment ago you  12:31:41
15  said that you believe you never shipped a  12:32:03
16  suspicious order, correct?  12:32:04
17   A.  Correct.  12:32:05
18   Q.  But that is just simply based  12:32:05
19  on your understanding of whether or not that  12:32:09
20  formal label was made by someone at  12:32:11
21  Mallinckrodt, correct?  12:32:15
22       MR. O'CONNOR:  Objection to  12:32:17
23    form.  12:32:18
24  QUESTIONS BY MR. KO:  12:32:18
25   Q.  Let me ask a different way.  12:32:18

Page 203

1       If you release an order without  12:32:20
2  conducting an investigation or performing due  12:32:23
3  diligence, that order could potentially be  12:32:26
4  suspicious, could it not?  12:32:28
5       MR. O'CONNOR:  Objection to  12:32:30
6    form.  12:32:30
7       THE WITNESS:  That's correct.  12:32:30
8  QUESTIONS BY MR. KO:  12:32:31
9   Q.  Okay.  And in particular, just  12:32:48
10  to make sure the record is clear, if you  12:32:50
11  release a peculiar order without conducting  12:32:53
12  an investigation or performing due diligence,  12:32:55
13  that peculiar order could potentially be  12:32:58
14  suspicious, could it not?  12:33:00
15       MR. O'CONNOR:  Objection to  12:33:01
16    form.  12:33:02
17       THE WITNESS:  It could.  12:33:02
18  QUESTIONS BY MR. KO:  12:33:04
19   Q.  Okay.  Okay.  Now, if you turn  12:33:04
20  to the second page of this e-mail -- it's  12:33:32
21  unfortunately just a one-page document.  12:33:41
22   A.  Okay.  Thank you.  12:33:42
23   Q.  And at the top, Ms. Stewart is  12:33:43
24  indicating that "in addition to order  12:33:47
25  quantities by product, we hope to also  12:33:52

Page 204

1  develop criteria for orders that deviate from  12:33:55
2  normal ordering patterns and/or from unusual  12:33:57
3  order frequency.  Not yet sure how to capture  12:34:01
4  this.  Hope to identify an algorithm that  12:34:05
5  will support a parsing through the data to  12:34:08
6  identify patterns, frequency, et cetera."  12:34:10
7       Did I read that correctly?  12:34:13
8   A.  Yes, you did.  12:34:14
9   Q.  So is it accurate to say that  12:34:15
10  as the date of this e-mail, Mallinckrodt had  12:34:17
11  not yet developed a criteria in its  12:34:18
12  suspicious order monitoring system to  12:34:23
13  identify orders that deviate from a normal  12:34:25
14  ordering pattern?  12:34:27
15       MR. O'CONNOR:  Objection to  12:34:28
16    form.  12:34:32
17       THE WITNESS:  Not correct.  12:34:35
18  QUESTIONS BY MR. KO:  12:34:36
19   Q.  Okay.  Is it correct to say  12:34:36
20  that at the date of this e-mail, Mallinckrodt  12:34:37
21  is working on revising the criteria for  12:34:39
22  identifying orders that deviate from a normal  12:34:42
23  ordering pattern?  12:34:44
24   A.  Yes.  12:34:44
25   Q.  And also accurate to say that  12:34:44

Page 205

1  at this time Mallinckrodt is revising its  12:34:46
2  criteria for determining whether or not a  12:34:48
3  usual -- an order that deviates from usual  12:34:53
4  order frequency; is that correct?  12:34:56
5       MR. O'CONNOR:  Objection to  12:34:57
6    form.  12:34:58
7       THE WITNESS:  Correct.  12:34:58
8  QUESTIONS BY MR. KO:  12:34:58
9   Q.  And Ms. Stewart indicates that  12:34:59
10  she's not sure how to capture this as of the  12:35:00
11  date of this e-mail.  12:35:06
12       Do you see that?  12:35:07
13   A.  I see that.  12:35:07
14   Q.  And so is it fair to say that  12:35:08
15  you -- would you agree with this statement,  12:35:09
16  that at the time you weren't sure how to  12:35:11
17  capture this criteria in revising your SOM  12:35:12
18  policy?  12:35:15
19   A.  We were working through the  12:35:16
20  algorithm to understand -- there were several  12:35:18
21  approaches to the analysis, and we had not  12:35:25
22  settled on a specific one at this time.  12:35:28
23   Q.  Okay.  And the algorithm at the  12:35:30
24  time of the -- at the time of this e-mail,  12:35:35
25  what was your understanding what the  12:35:36

Page 206

1  algorithm was?                    12:35:37
2      A.  It was comparing a customer's   12:35:38
3  order history to itself and flagging any   12:35:41
4  order that exceeded a multiplier.       12:35:46
5      Q.  And at the time, do you recall   12:35:49
6  what the multiplier was?           12:35:50
7      A.  I do not.                12:35:51
8      Q.  Do you recall if it was a 2X    12:35:52
9  multiplier?                       12:35:54
10     A.  I do not.                12:35:55
11     Q.  Okay.  In the next paragraph,    12:35:56
12 Ms. Stewart indicates that "the sales force   12:36:06
13 will play a key role in this process by    12:36:07
14 verifying the customer's physical site and   12:36:11
15 operations ring true with the type of    12:36:14
16 business they purport to run."        12:36:16
17     Do you see that?             12:36:17
18     A.  I do.                   12:36:17
19     Q.  Do you agree that the sales    12:36:18
20 force would play this key role in trying to   12:36:20
21 identify the customer's physical site and   12:36:22
22 operations?                      12:36:27
23     A.  That was a suggestion from Drug   12:36:27
24 and Chemical Advisory Group that we did not   12:36:30
25 implement.  We used the sales force, but they   12:36:34

Page 207

1  did not play the key role in determining   12:36:35
2  whether the customer was set up or not.    12:36:38
3      Q.  Okay.  And to be clear, is the   12:36:40
4  sales force discussed here and as you just   12:36:41
5  testified to, are you talking about NAMs and   12:36:46
6  CSRs or both?  Or NAMs or CSRs or both?    12:36:48
7      A.  NAMs.                   12:36:54
8      Q.  Okay.  So the sales force    12:36:55
9  described in this e-mail is just with respect   12:36:56
10 to the national account managers, correct?   12:36:58
11     A.  Yes.                   12:37:00
12     Q.  Okay.  And you can set that    12:37:00
13 aside.  Thank you.                12:37:14
14     Now, is it fair to say that in    12:37:21
15 the early 2008 time period you were working   12:37:27
16 on revising and revamping Mallinckrodt's SOM   12:37:28
17 program?  Is that accurate?         12:37:32
18     A.  Yes.                   12:37:33
19     MR. O'CONNOR:  Objection to     12:37:33
20     form.                    12:37:34
21 QUESTIONS BY MR. KO:               12:37:34
22     Q.  And you had hoped to roll out a   12:37:35
23 formal SOM program at some -- as quickly as   12:37:40
24 possible; is that fair to say?        12:37:45
25     MR. O'CONNOR:  Objection to     12:37:47

Page 208

1      form.                    12:37:48
2      THE WITNESS:  So again -- I'm    12:37:48
3      sorry -- we've always had a program,   12:37:49
4      so we were hoping to enhance it and   12:37:51
5      introduce everyone to the enhancements   12:37:53
6      at that time.               12:37:55
7  QUESTIONS BY MR. KO:               12:37:55
8      Q.  Okay.  And the enhanced     12:37:56
9  version, just so the record is clear, extra   12:37:58
10 attention to the enhanced version was given   12:38:02
11 in early 2008, correct?            12:38:04
12     A.  Yes.                   12:38:05
13     Q.  And it was your hope to roll    12:38:06
14 out an enhanced version as quickly as    12:38:08
15 possible; is that fair to say?        12:38:11
16     A.  Yes.                   12:38:12
17     Q.  And it's important to roll out   12:38:13
18 an enhanced SOM program because failure to do   12:38:15
19 so would result in further diversion and    12:38:18
20 abuse of -- potentially of Mallinckrodt    12:38:21
21 opioids, correct?                12:38:24
22     MR. O'CONNOR:  Objection to     12:38:24
23     form.                    12:38:25
24     THE WITNESS:  So we always had    12:38:25
25     a backbone program in place, and we   12:38:26

Page 209

1      were enhancing the program.      12:38:29
2  QUESTIONS BY MR. KO:               12:38:30
3      Q.  Did you feel that backbone SOM   12:38:32
4  program was sufficient in terms of complying   12:38:34
5  with your duties under the CSA?        12:38:36
6      A.  Yes.                   12:38:38
7      Q.  Okay.  Well, then why did you   12:38:39
8  feel the need to enhance it?         12:38:41
9      A.  Because as time went on, we got   12:38:42
10 further guidance from DEA.  Any piece of   12:38:44
11 information that we gleaned, we acted upon it   12:38:47
12 immediately.  And we led the industry in    12:38:51
13 every aspect of enhancing our suspicious   12:38:53
14 order monitoring program.           12:38:57
15     Q.  Okay.  When you say you acted   12:38:57
16 on everything "immediately," what does that   12:38:59
17 mean?                          12:39:03
18     Did you act on advice from the   12:39:05
19 DEA as soon as you heard it?  Is that what   12:39:07
20 your testimony is today?            12:39:12
21     A.  So immediately -- that was a   12:39:12
22 poor choice of words.  As soon as possible,   12:39:16
23 yes.                           12:39:18
24     Q.  Okay.  And what does "as soon   12:39:19
25 as possible" mean to you?           12:39:21

Page 210

1    MR. O'CONNOR: Objection to          12:39:21
2    form.                    12:39:22
3        THE WITNESS: Depending upon      12:39:22
4    varying amounts of time, depending how  12:39:24
5    long it would have taken to implement   12:39:27
6    the suggestion from DEA.         12:39:28
7  QUESTIONS BY MR. KO:           12:39:29
8    Q.   Okay.  Was it your goal at the  12:39:30
9  time that you were trying to enhance your SOM  12:39:32
10 program in early 2008 to make revisions and  12:39:35
11 roll out a formal enhanced policy as quickly  12:39:38
12 as possible?                12:39:40
13   A.   Yes.                 12:39:42
14   Q.   Okay.  And when would you say   12:39:43
15 you actually rolled out a formal SOM policy  12:39:46
16 that satisfied you, as someone who was in  12:39:49
17 charge of overseeing the SOM program?   12:39:53
18       MR. O'CONNOR: Objection to      12:39:54
19   form.                   12:39:56
20       THE WITNESS: So the existing    12:39:56
21   policy always satisfied me, but we   12:39:58
22   continued to work on enhancing our   12:40:00
23   policies.                 12:40:02
24 QUESTIONS BY MR. KO:           12:40:02
25   Q.   Okay.  And with respect to    12:40:03

Page 211

1  enhancing it in particular as we discussed in  12:40:07
2  early 2008, when would you say that process  12:40:10
3  was actually complete?          12:40:13
4    A.   I can't answer that because    12:40:16
5  enhancements are always ongoing.  They're  12:40:18
6  ongoing up to today.  So there's no start and  12:40:21
7  stop time to the enhancements.      12:40:24
8        (Mallinckrodt-Harper Exhibit 6   12:40:27
9    marked for identification.)       12:40:27
10 QUESTIONS BY MR. KO:           12:40:27
11   Q.   Fair enough.             12:40:28
12       I'm going to hand you a copy of  12:40:28
13 what will be marked as Harper Exhibit 6.   12:40:30
14       And for the record, this is --   12:40:41
15 ends in Bates stamp 387983.        12:40:42
16       Ms. Harper, this appears to be  12:41:00
17 a June 17, 2008, DEA compliance all site  12:41:01
18 conference call with notes attached to it.  12:41:06
19       Is that accurate -- an accurate  12:41:09
20 description of the document?        12:41:13
21   A.   Yes.                 12:41:14
22   Q.   And you were present at this   12:41:14
23 meeting?  You're listed as an attendee?   12:41:15
24   A.   Yes.                 12:41:17
25   Q.   And it appears that the purpose  12:41:17

Page 212

1  of this meeting in the first sentence    12:41:25
2  underneath agenda, it states that "The    12:41:27
3  purpose of the meeting" -- and these calls --  12:41:33
4  "was to share information between sites and  12:41:37
5  to help each other gain a broader knowledge  12:41:39
6  of the supply chain process."       12:41:41
7        Did I read that correctly?     12:41:43
8    A.   Yes.                 12:41:44
9    Q.   And so there were frequent     12:41:44
10 calls at the time to try and better     12:41:45
11 understand and gain knowledge of the supply  12:41:47
12 chain process?               12:41:51
13   A.   Yes.                 12:41:51
14   Q.   Okay.  And I just actually want  12:41:51
15 to turn to your portion of the       12:41:55
16 presentation -- or the notes that capture  12:41:59
17 your presentation, which is at the bottom of  12:42:00
18 page 2.                   12:42:05
19       Do you see where it says,      12:42:07
20 "Karen gave a brief update on Covidien's   12:42:08
21 efforts"?                  12:42:11
22   A.   I do see that.            12:42:12
23   Q.   And by the way, Covidien is --  12:42:12
24 was your -- was the actual -- was the former  12:42:15
25 employer -- was your former employer?   12:42:19

Page 213

1    A.   Right.  Our company has changed  12:42:22
2  corporate structure and ownership, yes.   12:42:25
3    Q.   Thank you.              12:42:26
4    A.   Yes.                 12:42:26
5    Q.   You put it more artfully than   12:42:27
6  me.                     12:42:28
7        Covidien, at the time of       12:42:28
8  2000 -- 2008, Mallinckrodt was essentially  12:42:33
9  Covidien.  And so for purposes of this   12:42:35
10 deposition, when I refer to Covidien, it's  12:42:37
11 synonymous with Mallinckrodt; is that fair?  12:42:40
12   A.   That's fair.             12:42:43
13   Q.   Okay.  And you give a general   12:42:44
14 overview of the SOM program, and you say that  12:42:50
15 your efforts are ongoing to, quote, "Improve  12:42:57
16 our current suspicious order monitoring   12:43:01
17 system in light of recent DEA actions with  12:43:05
18 other registrants regarding this law."   12:43:08
19       Did I read that correctly?     12:43:10
20   A.   Can you point that out to me,   12:43:10
21 please, the sentence?           12:43:13
22   Q.   Sure.  I just highlighted it.   12:43:13
23 It's at the top -- it's the first sentence  12:43:17
24 underneath your portion of the presentation.  12:43:18
25   A.   So I see that that is what it   12:43:20

Page 214

1  reads, but I don't know that I published          12:43:24
2  these notes or if Ms. Woznick was               12:43:26
3  interpreting the discussion and documenting      12:43:32
4  it --                                            12:43:33
5      Q.   Fair enough.                            12:43:35
6      A.   -- as she saw fit.                      12:43:35
7      Q.   Fair enough.                            12:43:37
8          Would you agree with me that            12:43:37
9  one of the reasons why you were seeking to        12:43:38
10 improve Mallinckrodt's SOM system was in         12:43:41
11 light of recent DEA actions at the time?         12:43:45
12     A.   Yes.                                    12:43:48
13     Q.   Okay.  And the persons               12:43:51
14 responsible on the bottom right-hand corner      12:43:56
15 are listed as you and Eileen Spaulding.          12:44:03
16         Do you see that?                        12:44:06
17     A.   I do.                                   12:44:06
18     Q.   And so is it fair to say that         12:44:07
19 based on this document, you and Eileen are       12:44:07
20 the people responsible for implementing an       12:44:11
21 improved SOM program at Mallinckrodt at this     12:44:15
22 time?                                            12:44:17
23         MR. O'CONNOR:  Objection.            12:44:17
24 Form.                                            12:44:18
25         THE WITNESS:  So not in              12:44:19

Page 215

1      isolation.  We were members of the         12:44:20
2      team, and we were the representatives      12:44:21
3      of the DEA compliance group on the         12:44:22
4      team, but there were others on the         12:44:25
5      team.                                       12:44:26
6  QUESTIONS BY MR. KO:                            12:44:26
7      Q.   Okay.  But you guys were -- is       12:44:26
8  it fair to say that you were the team leaders   12:44:30
9  of the SOM team, or do you disclaim that        12:44:31
10 responsibility?                                  12:44:34
11     A.   I --                                    12:44:34
12         MR. O'CONNOR:  Objection to          12:44:34
13 form.                                            12:44:35
14         THE WITNESS:  The leader of the      12:44:35
15     team was always the most senior           12:44:43
16     official, so in one case it was JoAnne    12:44:44
17     Levy.  So I was a key contributor to      12:44:47
18     the team, as was Eileen, but I don't      12:44:50
19     know that I was ever designated as the    12:44:52
20     team leader.                               12:44:53
21 QUESTIONS BY MR. KO:                            12:44:54
22     Q.   Okay.  So is it your testimony      12:44:54
23 that you believe, at least as of the time       12:44:56
24 that JoAnne Levy was your direct report, that   12:44:58
25 she was the team leader of the SOM policy and   12:45:02

Page 216

1  program?                                 12:45:04
2      A.   I believe so, yes.               12:45:04
3      Q.   Okay.  And then at other        12:45:07
4  times -- I believe the name you referenced     12:45:14
5  before was Todd?                          12:45:15
6          I'm sorry, who --              12:45:17
7          MR. O'CONNOR:  Objection to     12:45:18
8  form.                                     12:45:18
9  QUESTIONS BY MR. KO:                     12:45:18
10     Q.   Who did you report to after      12:45:19
11 JoAnne Levy?                             12:45:21
12     A.   Tom Berry.                       12:45:21
13     Q.   Tom Berry.  Thank you.          12:45:22
14     A.   Yeah.                            12:45:24
15     Q.   So Mr. Berry, would you agree   12:45:24
16 that after -- once you began reporting to       12:45:26
17 Mr. Berry, would you say that Mr. Berry was     12:45:31
18 the team leader for the SOM team?        12:45:34
19     A.   No.                              12:45:36
20     Q.   Okay.  At the time that you      12:45:36
21 reported to Mr. Berry, would you say that you   12:45:37
22 were the team leader of the SOM team?    12:45:39
23     A.   So I'm sorry to repeat, but     12:45:41
24 there was no designated leader except in the    12:45:47
25 case of JoAnne Levy, who was the senior        12:45:49

Page 217

1  official.  Tom Berry was not as actively        12:45:52
2  involved in the team because he was new to      12:45:55
3  the controlled substances business, and so I    12:45:58
4  would not state anyone's name specifically      12:46:01
5  during this time period as the leader.          12:46:03
6      Q.   Separate and apart of whether       12:46:04
7  or not there was an official designation, did   12:46:11
8  you consider yourself, along with Eileen        12:46:13
9  Spaulding, to the team leader of implementing   12:46:18
10 an improved SOM program during the 2008 time    12:46:20
11 period?                                         12:46:23
12     A.   Yes.  I would consider it         12:46:23
13 controlled substances compliance               12:46:25
14 responsibility, and I was the leader of that    12:46:26
15 group at that time, yes.                        12:46:28
16     Q.   Okay.  You thank.               12:46:29
17         And this document indicates a       12:46:31
18 deadline.  Do you see that?                     12:46:36
19     A.   I do see it.                       12:46:37
20     Q.   And the deadline, according to    12:46:43
21 this document, is fourth quarter 2008 fiscal    12:46:46
22 year?                                           12:46:50
23     A.   Yes.                               12:46:50
24     Q.   By the way, what was            12:46:50
25 Mallinckrodt's fiscal year?                     12:46:52

Page 218

1    A.    At that time it ended in        12:46:53
2  October -- September.                   12:46:57
3    Q.    September.  Okay.               12:46:58
4        So it was at least as of the      12:47:02
5  date of this call and the notes that were   12:47:05
6  drafted pursuant to this call that an    12:47:10
7  improved SOM program would be complete no   12:47:15
8  later than October of 2008?             12:47:18
9        MR. O'CONNOR:  Objection to       12:47:19
10  form.                                  12:47:19
11        THE WITNESS:  No, sir.           12:47:19
12  QUESTIONS BY MR. KO:                    12:47:20
13    Q.    Is that accurate or is that --  12:47:21
14    A.    No.                            12:47:21
15    Q.    That's incorrect?              12:47:22
16    A.    That's incorrect.              12:47:23
17    Q.    Okay.  So what is this deadline  12:47:24
18  referring to?                          12:47:25
19    A.    The update that would be       12:47:26
20  provided on the next team call.        12:47:27
21    Q.    Okay.  So it wasn't necessarily  12:47:29
22  your goal to complete the SOM revisions by  12:47:31
23  fourth quarter of 2008?                 12:47:35
24    A.    No.                            12:47:36
25    Q.    Okay.  Did you have a -- did    12:47:36

Page 219

1  you have a firm goal at any point in time  12:47:41
2  other than trying to effectuate an improved  12:47:43
3  SOM program as soon as possible?         12:47:46
4    A.    No.                             12:47:47
5    Q.    Okay.  By the way, turning back  12:47:48
6  to the first page, there are a list of   12:47:54
7  attendees.                              12:48:00
8        Are all those people folks on     12:48:02
9  the DEA/controlled substance compliance team?  12:48:06
10    A.    No.                            12:48:10
11    Q.    Okay.  Which individuals were   12:48:11
12  not on the DEA compliance team?         12:48:13
13    A.    Joe Ruffino.                   12:48:15
14    Q.    Okay.                          12:48:23
15    A.    And I can't be certain about    12:48:23
16  Patti Woznick.  So Patti and Joe were in  12:48:27
17  purchasing, and dotted line, Hobart      12:48:30
18  compliance reported to Patti for a while, and  12:48:34
19  then they came into part of this        12:48:37
20  synchronized, coordinated group.  So Patti  12:48:42
21  may or may not have been part of the team at  12:48:45
22  the time.                              12:48:48
23    Q.    Okay.  So other than Joe and    12:48:48
24  potentially Patti, everyone else was a member  12:48:50
25  of the DEA compliance team?            12:48:52

Page 220

1    A.    Yes.  Well, we reported to      12:48:53
2  JoAnne Levy, yes.                       12:48:55
3        MR. KO:  Okay.  And with that,    12:48:59
4  I think we can break for lunch.          12:49:00
5        THE WITNESS:  Okay.              12:49:02
6        VIDEOGRAPHER:  We are going off   12:49:02
7  the record at 12:49 p.m.                12:49:03
8        (Off the record at 12:49 p.m.)    12:49:04
9        (Mallinckrodt-Harper Exhibit 7   13:37:59
10  marked for identification.)             13:36:59
11        VIDEOGRAPHER:  We are back on     13:36:59
12  the record at 1:37 p.m.                13:37:01
13  QUESTIONS BY MR. KO:                    13:37:02
14    Q.    Welcome back from lunch,        13:37:03
15  Ms. Harper.                            13:37:06
16    A.    Thank you.                     13:37:07
17    Q.    I appreciate your patience to   13:37:07
18  stay.  We've got a few more hours to go.  13:37:09
19        I've handed you a copy of        13:37:12
20  what's been marked as Harper Exhibit 7.  13:37:14
21        And for the record, this         13:37:16
22  document ends in Bates 274572.          13:37:17
23        And this is a July 29, 2008,      13:37:21
24  e-mail from you to Mr. Ratliff; is that  13:37:25
25  correct?                               13:37:27

Page 221

1    A.    Yes.                           13:37:27
2    Q.    And this appears to be another   13:37:27
3  monthly report as of July 2008 that you are  13:37:29
4  sending on that we discussed previously  13:37:32
5  today?                                 13:37:35
6    A.    Correct.                       13:37:35
7    Q.    In terms of we had discussed     13:37:36
8  the fact that you had sent monthly reports to  13:37:38
9  Mr. Ratliff.                           13:37:42
10        And I just wanted to ask a few    13:37:43
11  questions on this document.             13:37:45
12        It appears here on the third     13:37:46
13  section down that you are working on a draft  13:37:48
14  of the SOM policy, and you indicate that  13:37:56
15  hopefully the final draft is close to    13:38:02
16  publication.                           13:38:04
17        Do you see that?                 13:38:05
18    A.    I do see it.                   13:38:05
19    Q.    Is it accurate to say as of     13:38:06
20  July 29, 2008, you're working on a final  13:38:07
21  revised draft of the SOM policy?        13:38:10
22    A.    Yes, as it stood at the time,   13:38:14
23  yes.                                  13:38:16
24    Q.    And then you're awaiting        13:38:16
25  feedback from Ms. Stewart?              13:38:18

Page 222

```
1    A.  Yes.                        13:38:19
2    Q.  And that you are hoping to      13:38:19
3  train and implement the revised SOM program   13:38:26
4  in August, later that summer, correct?   13:38:28
5    A.  Yes.                        13:38:30
6    Q.  Okay.  So at this point it's     13:38:31
7  still a work in progress, the revised SOM    13:38:32
8  program, correct?              13:38:35
9        MR. O'CONNOR:  Objection to    13:38:36
10  form.                          13:38:36
11        THE WITNESS:  Yes.  Yes.       13:38:36
12  QUESTIONS BY MR. KO:             13:38:38
13    Q.  And at the bottom of this     13:38:38
14  e-mail, there's another reference to     13:38:44
15  IntegriChain.  I don't want to ask you any   13:38:45
16  questions about that.  We've talked about    13:38:49
17  that.                          13:38:50
18        But you also discuss in this    13:38:50
19  e-mail how, quote, "How review of     13:38:53
20  Mallinckrodt chargebacks could be used to    13:38:55
21  help our customers monitor their customers,"   13:38:57
22  end quote.                    13:39:01
23        Did I read that correctly?      13:39:01
24    A.  Yes.                        13:39:02
25    Q.  So fair -- well, as of the date   13:39:02
```

Page 223

```
1  of this e-mail, is it fair to say that you    13:39:06
2  were considering how to utilize chargeback   13:39:10
3  information to understand how to help    13:39:12
4  customers monitor their customers?     13:39:16
5    A.  Yes, that's correct.           13:39:18
6    Q.  Okay.  You can set that aside.    13:39:19
7        And was one reason to utilize    13:39:22
8  chargeback information -- or strike that.   13:39:39
9        What is your understanding of    13:39:41
10  chargeback -- chargeback data, separate and   13:39:43
11  apart from what's included in that?     13:39:47
12    A.  Like currently my --          13:39:48
13    Q.  Yeah.  What's your            13:39:50
14  understanding of what chargeback data     13:39:51
15  consists of.                    13:39:54
16    A.  Certainly.                   13:39:54
17        We sell to wholesalers and     13:39:55
18  distributors at a certain price, and there    13:39:56
19  are wholesaler/distributor customers, their   13:40:01
20  customers, who have negotiated discounts    13:40:04
21  through purchasing co-ops, et cetera.    13:40:07
22        And so they then purchase from    13:40:10
23  our distributors.  The downstream registrants   13:40:12
24  purchase from our distributor at a lesser    13:40:14
25  price than the distributor has paid    13:40:19
```

Page 224

```
1  Mallinckrodt to begin with.          13:40:20
2        So then in that circumstance,    13:40:21
3  the distributor applies back to Mallinckrodt   13:40:23
4  to made whole -- to be made whole for that   13:40:25
5  differential.  So I'd like to point out that   13:40:28
6  all transactions are not subject to    13:40:32
7  chargebacks, and chargebacks are after the   13:40:34
8  fact, retrospective information.       13:40:36
9    Q.  And when you say "all         13:40:39
10  transactions are not subject to chargebacks,"   13:40:41
11  what you mean by that, if I understand you    13:40:44
12  correctly, is that, you know, chargeback only   13:40:47
13  occurs if a distributor or customer of     13:40:49
14  Mallinckrodt makes such a request to    13:40:50
15  Mallinckrodt, correct?            13:40:52
16    A.  Correct.                     13:40:53
17    Q.  Pursuant to the terms of the    13:40:53
18  agreement between the distributor and    13:40:56
19  Mallinckrodt, correct?            13:40:58
20    A.  That's correct.               13:40:58
21    Q.  Okay.  And separate and apart    13:40:59
22  from whether or not all information, as you    13:41:01
23  describe, is contained in the chargeback    13:41:05
24  information -- or chargeback data, for lack    13:41:07
25  of a better term, was there also a certain    13:41:09
```

Page 225

```
1  point in time where you expanded the     13:41:12
2  examination of, quote/unquote, downstream    13:41:17
3  data?                          13:41:22
4        MR. O'CONNOR:  Object to form.    13:41:22
5  QUESTIONS BY MR. KO:             13:41:23
6    Q.  Let me strike that.            13:41:24
7        In addition to chargeback data    13:41:24
8  as you described, were there any other    13:41:26
9  sources of information that you asked to be   13:41:28
10  pulled for purposes of understanding the    13:41:32
11  obligation to monitor customers' customers?   13:41:36
12    A.  I -- not as you state the      13:41:38
13  question, I'm not aware.            13:41:41
14        (Mallinckrodt-Harper Exhibit 9    13:41:44
15        marked for identification.)     13:41:44
16  QUESTIONS BY MR. KO:             13:41:44
17    Q.  Okay.  I'm going to hand you a   13:41:44
18  copy -- going back to your description of    13:41:46
19  chargebacks, I'm going to hand you a copy of   13:41:48
20  what will be marked as -- I hate to go out of   13:41:50
21  order because I already premarked something,   13:41:52
22  but this is going to be Harper Exhibit 9.    13:41:54
23        And for the record, this is a    13:41:57
24  copy of your deposition transcript that you    13:41:59
25  sat for in connection with the Island Drug   13:42:04
```

Page 226

1  matter that we were discussing earlier today.  13:42:09
2          Do you recall sitting for that  13:42:12
3  deposition?  13:42:12
4      A.  Yes.  13:42:13
5      Q.  And Island Drug was a pharmacy  13:42:13
6  that actually one of your distributors  13:42:15
7  shipped to, correct?  13:42:17
8      A.  May I have a minute to  13:42:18
9  refamiliarize myself with the document?  Is  13:42:27
10 that all right?  13:42:30
11     Q.  Actually, I just want to -- is  13:42:31
12 it for purposes of answering my question?  13:42:31
13     A.  Yes, sir.  13:42:32
14     Q.  You don't need to answer that.  13:42:33
15 I just actually want to turn your attention  13:42:34
16 to page 12.  I'm sorry, page 11.  13:42:36
17         And so in connection with this  13:42:54
18 deposition testimony, do you see the question  13:43:05
19 that's asked:  "And what is a chargeback  13:43:08
20 system, if you'll define that, please?"  13:43:12
21         Do you mind reading your  13:43:14
22 response to that question in the record?  13:43:15
23     A.  I don't mind.  13:43:17
24     Q.  Okay.  Thank you.  13:43:19
25     A.  "Mallinckrodt sells controlled  13:43:20

Page 227

1  substances to wholesalers at a standard  13:43:22
2  price.  Some pharmacies negotiate a  13:43:24
3  discounted price.  When the wholesaler honors  13:43:27
4  the discounted price to the pharmacy, they  13:43:30
5  then submit a chargeback request  13:43:32
6  retroactively to Mallinckrodt so that they  13:43:35
7  can be made financially whole for the  13:43:39
8  difference in price."  13:43:41
9         Is that enough or shall I go  13:43:44
10 on?  13:43:46
11     Q.  Can you please continue?  13:43:46
12     A.  Certainly.  13:43:47
13         "In doing so, the wholesaler  13:43:48
14 tells Mallinckrodt exactly which pharmacy to  13:43:51
15 which the drugs were sold, what the DEA  13:43:53
16 registration number is, the pharmacy address,  13:43:55
17 the quantity, and which drugs they have sold  13:43:58
18 to that pharmacy."  13:44:01
19     Q.  Okay.  And as you sit here  13:44:04
20 today, is that still an accurate description  13:44:06
21 of how you understand the chargeback system?  13:44:11
22     A.  The only thing I would amend,  13:44:13
23 if possible, is to qualify that and say -- so  13:44:16
24 provided there was a chargeback transaction,  13:44:22
25 this is still the case, yes.  13:44:24

Page 228

1      Q.  Okay.  So for purposes of this  13:44:25
2  deposition, is it true that provided there  13:44:29
3  was a chargeback request, Mallinckrodt would  13:44:31
4  know exactly which pharmacy the drugs were  13:44:35
5  sold to?  13:44:37
6      A.  Yes.  13:44:38
7      Q.  And provided that there was a  13:44:39
8  chargeback request, Mallinckrodt would know  13:44:41
9  what the DEA registration number of the  13:44:43
10 downstream entity is, correct?  13:44:46
11     A.  Yes.  13:44:47
12     Q.  And Mallinckrodt would also  13:44:48
13 know exactly which pharmacy address its pills  13:44:50
14 were being shipped to, correct?  13:44:54
15     A.  Correct.  13:44:55
16     Q.  And Mallinckrodt would also  13:44:56
17 understand the quantity of pills being  13:44:58
18 shipped to that particular -- particular  13:44:59
19 pharmacy or clinic, correct?  13:45:02
20         MR. O'CONNOR:  Objection to  13:45:03
21     form.  13:45:04
22         THE WITNESS:  That's correct.  13:45:04
23 QUESTIONS BY MR. KO:  13:45:04
24     Q.  And Mallinckrodt would know  13:45:05
25 exactly which drugs they have sold to that  13:45:06

Page 229

1  particular pharmacy, correct?  13:45:08
2      A.  Correct.  13:45:09
3      Q.  And I want to focus on your  13:45:11
4  qualification when you say you -- this would  13:45:15
5  only be the case if Mallinckrodt obtained a  13:45:19
6  chargeback request.  13:45:22
7          First of all, wasn't it the  13:45:22
8  case that a chargeback request -- it was  13:45:25
9  certainly uncommon if a chargeback request  13:45:28
10 did not occur, correct?  13:45:30
11         MR. O'CONNOR:  Objection to  13:45:32
12     form.  13:45:33
13         THE WITNESS:  Yes.  13:45:33
14 QUESTIONS BY MR. KO:  13:45:36
15     Q.  In most instances, Mallinckrodt  13:45:37
16 and you expected a chargeback request to be  13:45:40
17 made by a distributor, correct?  13:45:43
18     A.  Yes.  13:45:45
19     Q.  And move -- and putting aside  13:45:46
20 whether or not a chargeback was paid, does  13:45:52
21 the chargeback data track all downstream  13:45:56
22 customer sales?  13:45:58
23         MR. O'CONNOR:  Objection to  13:46:00
24     form.  13:46:01
25         THE WITNESS:  "Downstream  13:46:01

Page 230

1    customers" meaning the pharmacy?          13:46:04
2    QUESTIONS BY MR. KO:                       13:46:05
3        Q.   Yes.                              13:46:06
4        A.   Their sales?                      13:46:06
5        Q.   The sales made to the             13:46:07
6    pharmacies by the distributors.            13:46:10
7        A.   For Mallinckrodt product, yes.    13:46:12
8        Q.   Okay. So just so the record is    13:46:15
9    clear, the chargeback data would include all   13:46:17
10   downstream customer sales made by a        13:46:21
11   distributor to a pharmacy or clinic, correct?  13:46:24
12       A.   Correct.                          13:46:27
13       Q.   Okay. And so you can set this     13:46:28
14   one aside.                                 13:46:37
15            (Mallinckrodt-Harper Exhibit 8    13:46:53
16       marked for identification.)            13:46:53
17   QUESTIONS BY MR. KO:                       13:46:53
18       Q.   I'm now going to go back in       13:46:46
19   time -- or back in order and hand you a copy   13:46:47
20   of what's going to be marked -- or what has    13:46:49
21   been marked as Harper Exhibit 4 -- or 8,   13:46:50
22   excuse me.                                 13:46:52
23            And this is a -- for the          13:46:56
24   record, this document ends in Bates 419810,    13:47:00
25   and this is a December 14, 2007, e-mail from   13:47:06

Page 231

1    you to Ms. Levy.                           13:47:10
2            Is that correct?                   13:47:12
3        A.   Yes.                              13:47:12
4        Q.   And going down to the bottom of   13:47:15
5    this page, you indicate that you are       13:47:23
6    receiving -- you have received the attached    13:47:29
7    memo as part of a training at a recent     13:47:33
8    seminar.                                   13:47:35
9            Do you see that?                   13:47:35
10       A.   Yes.                              13:47:36
11       Q.   And the memo is what's            13:47:36
12   contained in this attachment, and it's one of  13:47:38
13   the DEA guidance letters that we referred to   13:47:40
14   earlier today; is that correct?            13:47:42
15       A.   Yes.                              13:47:43
16       Q.   And would it also be fair to      13:47:44
17   say that this is one of the Rannazzisi     13:47:46
18   letters that we referred to? Correct?      13:47:48
19       A.   Yes.                              13:47:50
20       Q.   So as of December 5, 2007, or     13:47:53
21   no later than December 5, 2007, you were in    13:47:58
22   possession of one of the Rannazzisi letters    13:48:01
23   dated December -- September 27, 2006,       13:48:04
24   correct?                                   13:48:08
25       A.   Yes.                              13:48:08

Page 232

1        Q.   Okay. And you indicate that it    13:48:10
2    gives specific guidance on suspicious order    13:48:16
3    monitoring.                                13:48:20
4            Do you see that?                   13:48:20
5        A.   Yes, I do see it.                 13:48:21
6        Q.   And so is it fair to say that     13:48:23
7    you in fact believe it to be the case that     13:48:26
8    this letter was instructive on your        13:48:27
9    obligations to design and implement a      13:48:31
10   suspicious order monitoring system?         13:48:34
11       A.   It was instructive in terms of    13:48:35
12   guidance.                                  13:48:38
13       Q.   Okay.                             13:48:39
14       A.   Yes.                              13:48:39
15       Q.   And you also ask -- or you        13:48:40
16   don't -- you don't ask anything, but Jim    13:48:45
17   Rausch responds to your e-mail.             13:48:47
18            Do you see that?                   13:48:48
19       A.   Yes, I do.                        13:48:49
20       Q.   And he indicates that "We,"      13:48:51
21   being Mallinckrodt, "send a suspicious order   13:48:55
22   report to the DEA monthly."                13:48:57
23            Correct?                          13:48:59
24       A.   Correct.                          13:48:59
25       Q.   Did you ever review any of        13:49:00

Page 233

1    those reports prior to the time of this    13:49:02
2    e-mail?                                    13:49:07
3        A.   I'm not certain.                  13:49:07
4        Q.   Okay. Generally speaking, was    13:49:12
5    it Mr. Rausch's responsibility to send these   13:49:13
6    reports to the DEA monthly?                13:49:14
7        A.   Yes.                              13:49:15
8        Q.   Okay. And do you have an         13:49:16
9    understanding of -- well, earlier we were    13:49:19
10   talking about the distinction between       13:49:22
11   peculiar and suspicious orders.             13:49:24
12            Do you recall that?                13:49:25
13       A.   Yes.                              13:49:25
14       Q.   Is it your understanding that    13:49:26
15   these monthly reports being sent by        13:49:27
16   Mr. Rausch were a compilation of the peculiar   13:49:31
17   orders that Mallinckrodt had identified?    13:49:34
18       A.   Yes.                              13:49:36
19       Q.   Okay. So in other words, it      13:49:38
20   wasn't necessarily the case that they were --  13:49:40
21   that Mallinckrodt was sending any           13:49:42
22   notification of suspicious orders to DEA,    13:49:44
23   correct?                                   13:49:46
24       A.   Correct.                          13:49:46
25       Q.   It was just simply a monthly     13:49:47

Page 234

1  report that contained all the peculiar orders   13:49:49
2  that Mallinckrodt had identified, right?   13:49:51
3      A.   Correct.   13:49:53
4      Q.   Okay. And do you recall -- I   13:49:54
5  know I've asked this question in another form   13:50:08
6  or in a different way, but do you recall   13:50:11
7  prior to December 5, 2007, whether or not   13:50:13
8  Mallinckrodt had ever identified a suspicious   13:50:16
9  order to the DEA?   13:50:18
10     A.   Yes, I do recall.   13:50:20
11     Q.   You do recall instances in   13:50:22
12  which Mallinckrodt identified a suspicious   13:50:24
13  order to the DEA?   13:50:26
14     A.   Yes.   13:50:26
15     Q.   Okay. And when did that occur?   13:50:27
16     A.   So there was the case we talked   13:50:28
17  about with the compounding pharmacy.   13:50:31
18     Q.   Okay.   13:50:34
19     A.   And there were several others,   13:50:35
20  but I don't recall the particulars of those   13:50:38
21  reports.   13:50:40
22     Q.   Fair enough.   13:50:41
23          So you do recall some instances   13:50:41
24  in which suspicious orders were reported to   13:50:45
25  Mallinckrodt prior to December 14, 2007?   13:50:48

Page 235

1      A.   Reported to the DEA?   13:50:52
2      Q.   Yes.   13:50:53
3      A.   Yes, sir.   13:50:54
4      Q.   Okay. And approximately -- I   13:50:54
5  know you've -- you don't know the exact   13:50:58
6  amount, but you've given some examples.   13:51:00
7          Do you know whether or not it   13:51:02
8  was -- there were 10 instances or 50   13:51:04
9  instances?   13:51:06
10         Do you know approximately how   13:51:07
11  many suspicious orders Mallinckrodt reported   13:51:08
12  to the DEA?   13:51:09
13     A.   I will approximate it to be ten   13:51:10
14  or less.   13:51:15
15     Q.   Okay. So in the entire time   13:51:16
16  that you were a part of the DEA compliance   13:51:17
17  team, you recall ten orders being   13:51:21
18  identified -- approximately ten orders being   13:51:24
19  identified as suspicious to the DEA?   13:51:25
20         MR. O'CONNOR:  Objection to   13:51:27
21  form.   13:51:27
22         THE WITNESS:  Prior to this?   13:51:27
23  QUESTIONS BY MR. KO:   13:51:36
24     Q.   Right.   13:51:36
25     A.   Yes. Re -- but -- Rausch was   13:51:37

Page 236

1  sending reports as well, but the confirmed   13:51:41
2  suspicious orders to DEA were ten or less.   13:51:45
3      Q.   Right.   13:51:46
4          And as we discussed, the   13:51:47
5  report -- the monthly reports were just the   13:51:49
6  peculiar orders that Mallinckrodt had   13:51:50
7  identified, correct?   13:51:52
8      A.   Correct.   13:51:52
9      Q.   And not necessarily any -- or   13:51:53
10  not any suspicious orders, correct?   13:51:55
11     A.   Correct.   13:51:57
12     Q.   Okay. By the way, there's   13:51:58
13  reference made to someone by the name of Sean   13:52:07
14  Welch.   13:52:10
15         Do you see that?   13:52:10
16     A.   Yes.   13:52:11
17     Q.   Who is he?   13:52:12
18     A.   He was a co-manager of customer   13:52:13
19  service at that time. I believe Jim Rausch   13:52:19
20  may have reported to him.   13:52:22
21     Q.   Okay. Was he involved on the   13:52:25
22  SOM team as well?   13:52:27
23     A.   Only in terms of being kept   13:52:28
24  informed of our activity.   13:52:36
25     Q.   So he didn't have any   13:52:37

Page 237

1  day-to-day responsibility with respect to the   13:52:44
2  SOM program?   13:52:48
3      A.   He did not.   13:52:49
4      Q.   Okay. And you also indicate,   13:52:49
5  going back to the bottom e-mail from you to   13:52:51
6  Jim and Sean, you say that you received the   13:52:53
7  attached memo as part of a training at a   13:52:56
8  recent seminar.   13:52:58
9          Do you recall which seminar   13:52:59
10  this was?   13:53:00
11     A.   Yes, it was the Buzzeo.   13:53:00
12     Q.   Okay. So the 2007 Buzzeo   13:53:02
13  conference, correct?   13:53:05
14         We'll just -- assuming -- I   13:53:08
15  mean, the e-mail is dated --   13:53:10
16     A.   Yes, yes, yes.   13:53:11
17     Q.   -- December 5th.   13:53:11
18     A.   Because it says "recent," yes.   13:53:12
19     Q.   Right.   13:53:15
20     A.   Yes, sir.   13:53:15
21     Q.   And the Buzzeo conference was   13:53:15
22  an annual occurrence, generally speaking, in   13:53:16
23  the fall of each year, correct?   13:53:19
24     A.   Yes.   13:53:20
25     Q.   Okay. So was it the case   13:53:21

Page 238

1  that -- well, did you ever receive this          13:53:24
2  correspondence from Mr. Rannazzisi prior to       13:53:27
3  the 2007 Buzzeo conference?                        13:53:31
4     A.   No.                    13:53:34
5     Q.   Okay.  In going back to the ten   13:53:35
6  instances in which you recall in which a          13:53:46
7  suspicious order was identified, certainly        13:53:50
8  it's more than one, but I just want to make       13:53:52
9  sure I understand.                    13:53:56
10         Did you say approximately ten,     13:53:56
11 or do you think it was ten or less?               13:53:58
12    A.   Ten or less.                13:53:59
13    Q.   Ten or less.                13:54:00
14         And do you recall if it was        13:54:01
15 five, or where in the spectrum between one        13:54:03
16 and ten?                        13:54:06
17    A.   I'm sorry, I can't recall.  I     13:54:07
18 really can't recall.                  13:54:09
19    Q.   Would it be fair to say,          13:54:09
20 relative to all the peculiar orders that you      13:54:11
21 had reported to you on a monthly basis to the     13:54:13
22 DEA, that the identification of a suspicious      13:54:16
23 order was extremely rare given that number?       13:54:19
24         MR. O'CONNOR:  Objection to        13:54:22
25 form.                        13:54:22

Page 239

1         THE WITNESS:  If we can say         13:54:22
2     extremely rare was a low percentage,       13:54:24
3     if you don't mind that term, yes.          13:54:26
4     Yes.                     13:54:28
5  QUESTIONS BY MR. KO:                 13:54:29
6     Q.   Well, in these peculiar --         13:54:29
7  these monthly peculiar order reports that Jim     13:54:30
8  Rausch was sending to the DEA, did you have       13:54:33
9  any understanding of how many orders were         13:54:35
10 included in that report?                13:54:36
11    A.   I did not.                 13:54:38
12    Q.   Okay.  There were quite a few,      13:54:40
13 weren't there?                    13:54:42
14         MR. O'CONNOR:  Objection to        13:54:43
15 form.                        13:54:44
16         THE WITNESS:  I don't know if       13:54:44
17    this was the report that included the      13:54:47
18    dosage form orders out of Hobart or if     13:54:51
19    this was a separate report that Jim       13:54:54
20    Rausch was sending for the bulk API       13:54:55
21    orders.                   13:55:00
22 QUESTIONS BY MR. KO:                 13:55:00
23    Q.   Fair enough.               13:55:00
24         Well, regardless of whether or     13:55:01
25 not we can clarify that distinction, you do       13:55:05

Page 240

1  agree with me that the actual amount of           13:55:07
2  suspicious orders that were reported to the       13:55:09
3  DEA prior to 2007 was a very low percentage       13:55:10
4  relative to all peculiar orders reported to       13:55:16
5  the DEA, correct?                   13:55:18
6         MR. O'CONNOR:  Objection to        13:55:19
7  form.                        13:55:19
8         THE WITNESS:  Yes, correct.         13:55:19
9  QUESTIONS BY MR. KO:                 13:55:20
10    Q.   Okay.  We can set this one         13:55:21
11 aside.                        13:55:29
12         (Mallinckrodt-Harper Exhibit 10   13:55:29
13    marked for identification.)           13:55:30
14 QUESTIONS BY MR. KO:                 13:55:30
15    Q.   Want to now turn your attention    13:55:30
16 to what's going to be marked as exhibit --        13:55:31
17 Harper Exhibit 10.                   13:55:33
18         And for the record, this          13:55:39
19 document ends in Bates 7146630.             13:55:40
20         And this appears to be -- if       13:55:56
21 you look at the bottom e-mail on the first        13:55:57
22 page, there's a reference made to an e-mail       13:56:00
23 you send to several people on January 4,          13:56:04
24 2008?                        13:56:09
25         Do you see that?               13:56:09

Page 241

1     A.   Yes.                    13:56:10
2     Q.   Any reason to dispute -- or any    13:56:11
3  reason to dispute whether or not you sent         13:56:14
4  this letter -- or e-mail?                13:56:16
5     A.   No.                    13:56:18
6     Q.   Okay.  And on this particular      13:56:19
7  e-mail, you are attaching another memo/DEA        13:56:24
8  guidance letter; is that correct?               13:56:31
9     A.   Yes.                    13:56:33
10    Q.   And this is separate and apart     13:56:34
11 from the prior Rannazzisi letter that we          13:56:39
12 discussed.  This appears to be another one,       13:56:41
13 dated December 27, 2007, correct?               13:56:43
14    A.   Correct.                  13:56:46
15    Q.   And you received this -- you       13:56:46
16 actually received this correspondence,           13:56:49
17 correct?                        13:56:51
18    A.   Correct.                  13:56:51
19    Q.   Directly from Mr. Rannazzisi?      13:56:51
20    A.   Yes.                    13:56:54
21    Q.   Okay.  And turning back to        13:56:55
22 the -- to your e-mail, you indicate that the      13:57:00
23 guidance letter or the memo as referred to in    13:57:08
24 this e-mail that you received on January 4,       13:57:12
25 2000-A -- 2008 targets manufacturers as well     13:57:15

Page 242

1  as distributors in terms of suspicious order    13:57:20
2  monitoring obligations.                         13:57:23
3         Did I read that correctly?               13:57:23
4  A.    Yes.                                       13:57:24
5  Q.    So is it fair to say that as of           13:57:24
6  January 4, 2008, you understand that the DEA    13:57:28
7  expected compliance with the standards set      13:57:31
8  forth in this letter?  Correct?                 13:57:35
9         MR. O'CONNOR:  Objection to              13:57:36
10 form.                                           13:57:36
11        THE WITNESS:  So these aren't            13:57:36
12 regulations.  It's a guidance.                  13:57:39
13 QUESTIONS BY MR. KO:                            13:57:40
14 Q.    Sure.                                      13:57:41
15 A.    So, yes, we understood that              13:57:41
16 this was additional guidance on SOM.            13:57:43
17 Q.    And my question was whether or           13:57:46
18 not you understood that as of January 4,        13:57:49
19 2008, you understood that the DEA expected      13:57:52
20 compliance with the standards set forth in      13:57:56
21 that letter.                                    13:57:58
22        MR. O'CONNOR:  Objection to              13:57:59
23 form.                                           13:57:59
24        THE WITNESS:  No.                        13:57:59
25

Page 243

1  QUESTIONS BY MR. KO:                            13:58:00
2  Q.    So you believed that the things          13:58:00
3  set forth in this letter you did not            13:58:02
4  necessarily have to comply with?                13:58:04
5  A.    No.                                        13:58:06
6  Q.    Okay.  You believe you did not          13:58:06
7  have to comply with -- with the instructions    13:58:09
8  as sent out by Mr. Rannazzisi on...             13:58:14
9  A.    So this is another guidance             13:58:18
10 meant for industry which we attempted to        13:58:20
11 incorporate into our program.  But this was     13:58:23
12 not -- it quotes the regulations, but this      13:58:27
13 was not promulgated in CFR 21.                  13:58:30
14 Q.    I understand that and I -- I            13:58:34
15 very clearly under the distinction that         13:58:35
16 you're trying to make, and my question simply   13:58:37
17 was whether or not you believed you were        13:58:39
18 expected to comply with the instructions set    13:58:42
19 forth in that letter.                           13:58:45
20        MR. O'CONNOR:  Same objection.          13:58:45
21        THE WITNESS:  Yes.                       13:58:46
22 QUESTIONS BY MR. KO:                            13:58:51
23 Q.    All right.  You certainly did          13:58:51
24 not want to follow -- or you certainly          13:58:52
25 believed that Mallinckrodt could not follow     13:58:54

Page 244

1  the instructions set forth in that letter,      13:58:56
2  correct?                                        13:58:58
3         MR. O'CONNOR:  Objection to              13:58:58
4  form.                                           13:58:59
5         THE WITNESS:  Could you please           13:58:59
6  repeat that question?  I'm sorry.               13:59:01
7  QUESTIONS BY MR. KO:                            13:59:02
8  Q.    Sure.                                      13:59:03
9         You certainly believed that             13:59:03
10 Mallinckrodt could not follow the               13:59:07
11 instructions set forth in that letter,          13:59:10
12 correct?                                        13:59:12
13        MR. O'CONNOR:  Objection to              13:59:13
14 form.                                           13:59:13
15        THE WITNESS:  I did not believe         13:59:13
16 that.                                           13:59:14
17 QUESTIONS BY MR. KO:                            13:59:14
18 Q.    Right.                                     13:59:15
19        You believed that Mallinckrodt          13:59:15
20 should follow the instructions set forth in     13:59:17
21 that letter, correct?                           13:59:19
22 A.    Correct.                                   13:59:20
23 Q.    Thank you.                                 13:59:21
24 A.    Yes.                                       13:59:22
25 Q.    That was an inartful question           13:59:22

Page 245

1  by me.  I apologize.                            13:59:24
2         Now, going back to the bottom           13:59:26
3  of that first page, you also reference          13:59:37
4  another -- well, you reference a Federal        13:59:41
5  Register Notice.                                13:59:41
6         Do you see that?                         13:59:44
7  A.    Yes.                                       13:59:44
8  Q.    72 FR 36487.                              13:59:44
9         And I believe that's a                  13:59:51
10 reference to the Southwood Federal Register     13:59:51
11 Notice that we discussed earlier today,         13:59:53
12 correct?                                        13:59:55
13 A.    Yes, it is.                               13:59:55
14 Q.    Okay.  So again, as of January         13:59:57
15 4, 2008, you understood that the DEA was        13:59:59
16 instructing you to read, review and follow      14:00:05
17 the guidelines set forth in that Federal        14:00:11
18 Register Notice, correct?                       14:00:13
19        MR. O'CONNOR:  Objection to              14:00:14
20 form.                                           14:00:14
21        THE WITNESS:  So this is a              14:00:14
22 guidance, and it referenced                     14:00:16
23 Southwood's, and Southwood's was the            14:00:18
24 relationship from a distributor to the          14:00:22
25 pharmacy.  And we sell to                       14:00:23

Page 246

1    distributors, not directly to          14:00:24
2    pharmacies.                        14:00:26
3    QUESTIONS BY MR. KO:              14:00:26
4        Q.   And I understand the         14:00:26
5    distinction being made, but there were     14:00:28
6    certain statements made in Southwood,        14:00:30
7    correct, as we discussed earlier?         14:00:32
8        A.   Yes.                   14:00:33
9        Q.   And it was your understanding    14:00:33
10   that there were certain principles to follow   14:00:36
11   as a result of the statements set forth in    14:00:42
12   Southwood, or did you believe that you did    14:00:43
13   not have to follow those?            14:00:45
14       MR. O'CONNOR:  Objection to       14:00:46
15   form.                        14:00:47
16       THE WITNESS:  Certain          14:00:47
17   principles, yes.                 14:00:48
18   QUESTIONS BY MR. KO:              14:00:49
19       Q.   So in other words, there were    14:00:49
20   certain principles that you believe you had    14:00:50
21   to follow as a result of the Southwood      14:00:52
22   Federal Register Notice, correct?         14:00:54
23       MR. O'CONNOR:  Objection.        14:00:55
24   Form.                        14:00:55
25       THE WITNESS:  Yes.  Correct.      14:00:55

Page 247

1    QUESTIONS BY MR. KO:              14:00:57
2        Q.   So the letters that you had     14:01:06
3    received from Mr. Rannazzisi, as we described  14:01:07
4    were the Rannazzisi letters, just so the    14:01:11
5    record is clear, those are two letters that    14:01:13
6    you became aware of sometime in the 2007,    14:01:16
7    2008 time period?                 14:01:19
8        A.   Yes.                   14:01:20
9        MR. O'CONNOR:  Objection to        14:01:21
10   form.                        14:01:22
11   QUESTIONS BY MR. KO:              14:01:22
12       Q.   And it's your testimony that     14:01:22
13   you only received directly the e-mail -- or    14:01:23
14   the letter reflected in Exhibit 10 directly,   14:01:27
15   correct?                     14:01:30
16       A.   Correct.               14:01:31
17       Q.   Okay.  And in connection with    14:01:33
18   revising and improving Mallinckrodt's SOM     14:01:37
19   program, is one of the reasons for improving   14:01:40
20   the SOM program a result of reading these    14:01:44
21   letters?                     14:01:49
22       MR. O'CONNOR:  Objection.        14:01:49
23       THE WITNESS:  Yes.           14:01:50
24   QUESTIONS BY MR. KO:              14:01:53
25       Q.   Okay.  Thank you.  You can set   14:01:54

Page 248

1    that aside.                    14:01:56
2        Actually, sorry, there was one     14:01:57
3    more question, but maybe you don't need to    14:02:09
4    consult with that actual exhibit.        14:02:12
5        Do you know who Kyle Wright is?    14:02:13
6        A.   Yes.                   14:02:15
7        Q.   He was at DEA, correct?        14:02:17
8        A.   Yes.                   14:02:19
9        Q.   And do you recall meeting with    14:02:20
10   him at various DEA meetings or conferences?    14:02:25
11       A.   Yes.                   14:02:28
12       Q.   And did you meet with him prior   14:02:29
13   to or after the receipt of that e-mail, or do  14:02:33
14   you not recall?                 14:02:36
15       A.   I do not recall.           14:02:37
16       Q.   Do you recall meeting with him    14:02:38
17   in the 2011 time period?             14:02:39
18       A.   I'm sorry, I remember meeting    14:02:40
19   with him at a conference, but not the date.    14:02:42
20       Q.   Sure.                  14:02:44
21       And do you recall the substance    14:02:47
22   of the conversation you had with Mr. Wright?   14:02:51
23       A.   Yes.                   14:02:53
24       Q.   And what was the substance of    14:02:55
25   the conversation you had with him?        14:02:57

Page 249

1        A.   He had been speaking from the    14:02:58
2    podium about suspicious order monitoring, and  14:03:01
3    I asked to speak to him during a breakout    14:03:06
4    session to talk about the attributes of our   14:03:09
5    program.                     14:03:11
6        Q.   Okay.  And I believe we have    14:03:12
7    some documentation about that, so we'll cover  14:03:15
8    that later.                   14:03:17
9        But other than that particular     14:03:18
10   conversation you had with him, do you recall   14:03:21
11   any other meetings or conversations you had    14:03:23
12   with Mr. Wright?                 14:03:24
13       A.   I'm not certain if he was at a    14:03:26
14   subsequent meeting at DEA in 2011.  I can't    14:03:31
15   recall if he was in attendance.          14:03:35
16       Q.   Okay.  Fair enough.          14:03:36
17       (Mallinckrodt-Harper Exhibit 11    14:03:42
18   marked for identification.)           14:04:00
19   QUESTIONS BY MR. KO:              14:04:00
20       Q.   I'm going to hand you a copy of   14:03:38
21   what has been marked as Harper Exhibit 11.    14:03:40
22       A.   Uh-huh.                14:03:40
23       Q.   And for the record, this       14:04:00
24   exhibit ends in Bates 301994, and it appears   14:04:04
25   to be an e-mail chain between you and Jim     14:04:12

Page 250

1  Rausch from April 21, 2008.                   14:04:14
2          Do you see that?                14:04:19
3      A.   Yes.                          14:04:19
4      Q.   And in this e-mail chain, I    14:04:20
5  believe you're asking what the algorithm --   14:04:24
6  you're asking Mr. Rausch what the algorithm    14:04:29
7  is to determine orders of excessive quantity,  14:04:31
8  frequency or outside of the normal pattern;    14:04:36
9  is that correct?                     14:04:38
10     A.   Yes.                          14:04:38
11     Q.   And in particular -- I said     14:04:39
12 "algorithm," but you specifically asked what  14:04:43
13 the current equation is, correct?       14:04:45
14     A.   Yes.                          14:04:47
15     Q.   And he responds that "the       14:04:48
16 metric is 2X the previous fiscal year and     14:04:52
17 year-to-date average for a SKU and customer."  14:04:56
18         MR. O'CONNOR:  Objection to     14:05:00
19     form.                           14:05:04
20 QUESTIONS BY MR. KO:                    14:05:04
21     Q.   Well, let me just make sure the  14:05:05
22 record is clear.                      14:05:06
23         His response to your question    14:05:06
24 is, quote, "Any order quantity that is double  14:05:08
25 the previous fiscal year and YTD" -- in other  14:05:09

Page 251

1  words, year-to-date -- "average for a SKU and  14:05:13
2  customer."                           14:05:15
3          Did I read that correctly?      14:05:16
4      A.   Yes.                          14:05:16
5      Q.   Okay.  And so does this refresh  14:05:17
6  your recollection that in the April 2008 time  14:05:21
7  period, the algorithm that you were using for  14:05:23
8  the peculiar order threshold was 2X the       14:05:24
9  previous fiscal year?                 14:05:26
10     A.   Yes.                          14:05:27
11     Q.   Okay.  And at that time, it's    14:05:28
12 also fair to say based on this e-mail that     14:05:30
13 you didn't actually know until Jim responded   14:05:32
14 what the formula actually was?        14:05:35
15         MR. O'CONNOR:  Objection to     14:05:36
16     form.                           14:05:38
17         THE WITNESS:  That's not        14:05:38
18     correct.                        14:05:39
19 QUESTIONS BY MR. KO:                    14:05:39
20     Q.   Well, why did you ask him then?  14:05:40
21     A.   Because I asked the current     14:05:42
22 equation.  It had moved from 1.5 to 3 to 2.    14:05:44
23 It moved around.                      14:05:47
24     Q.   Right.                       14:05:48
25     A.   The multiplier.  So I asked him  14:05:48

Page 252

1  what the current one is --              14:05:50
2      Q.   Sure.                         14:05:52
3      A.   -- at that time.               14:05:52
4      Q.   I see what you're saying.       14:05:52
5      A.   Okay.                         14:05:54
6      Q.   And so my question was simply:   14:05:54
7  At the time of this e-mail, you did not know   14:05:56
8  the then current equation to determine a       14:05:59
9  peculiar order, correct?             14:06:02
10     A.   That's correct.               14:06:03
11     Q.   And based on your e-mail, you    14:06:04
12 had thought that perhaps it was just a 1.2     14:06:07
13 metric?                             14:06:09
14         MR. O'CONNOR:  Objection to     14:06:11
15     form.                           14:06:12
16         THE WITNESS:  Yes.              14:06:12
17 QUESTIONS BY MR. KO:                    14:06:13
18     Q.   All right.  Okay.              14:06:14
19         And just, again, to be clear,    14:06:17
20 this -- this e-mail talks about an excessive   14:06:19
21 quantity calculation.  That's the title of     14:06:22
22 the e-mail, right?                   14:06:25
23     A.   Yes.                          14:06:26
24     Q.   And Mallinckrodt's then system   14:06:27
25 to determine whether or not an order was of    14:06:36

Page 253

1  an excessive quantity, frequency or outside    14:06:39
2  of normal pattern was to use the 2X metric     14:06:42
3  that we've been describing today; is that      14:06:45
4  correct?                            14:06:47
5      A.   Yes.                          14:06:47
6      Q.   Okay.  You can set that aside.   14:06:49
7          Now, the date of this e-mail is  14:07:02
8  April 21, 2008, correct?             14:07:03
9      A.   Yes, correct.                 14:07:05
10     Q.   And that's approximately three   14:07:07
11 and a half months after you received          14:07:08
12 notification from the DEA, and in particular   14:07:10
13 the second Rannazzisi letter, correct?        14:07:14
14     A.   Yes.                          14:07:17
15     Q.   So is it fair to say that it     14:07:17
16 took you three and a half months to ask        14:07:18
17 Mr. Rausch what your then existing peculiar    14:07:21
18 order algorithm metric was?           14:07:24
19         MR. O'CONNOR:  Objection to     14:07:26
20     form.                           14:07:27
21         THE WITNESS:  We were rewriting  14:07:27
22     the policies in the systems and     14:07:29
23     procedures, and, yes, I did not know  14:07:31
24     it by heart.  So there was a reference  14:07:32
25     made, and I wanted to detail it in the  14:07:34

Page 254

1    procedure.                    14:07:36
2    QUESTIONS BY MR. KO:                14:07:36
3        Q.   Okay.  Thank you for that.    14:07:36
4        And I was just asking whether    14:07:37
5    or not you agree with the fact that it took    14:07:41
6    you three and a half months after receiving    14:07:43
7    the second Rannazzisi letter directed at    14:07:45
8    manufacturers to ask Mr. Rausch what the then    14:07:50
9    existing peculiar order algorithm was.    14:07:59
10        MR. O'CONNOR:  Objection.    14:08:01
11    Form.                        14:08:03
12        THE WITNESS:  Yes.        14:08:03
13    QUESTIONS BY MR. KO:                14:08:03
14        Q.   Okay.  Thank you.  You can set    14:08:03
15    that one aside.                  14:08:16
16        And I think -- or excuse me, I    14:08:18
17    will hand you a copy of what's previously    14:08:19
18    been marked as Exhibit 1 to the Stewart    14:08:21
19    deposition.                    14:08:24
20        MR. KO:  And for the record,    14:08:26
21    this document ends in Bates 299558.    14:08:27
22    QUESTIONS BY MR. KO:                14:08:27
23        Q.   Sorry to jump around, but going    14:08:42
24    back to the previous line of questioning, do    14:08:43
25    you recall why it took you three and a half    14:08:48

Page 255

1    months to ask for the existing algorithm?    14:08:50
2        MR. O'CONNOR:  Objection to    14:08:52
3    form.                        14:08:54
4        THE WITNESS:  I was writing the    14:08:54
5    procedure, and I wanted to document.    14:08:56
6    I knew the algorithm existed; I just    14:08:57
7    did not know the multiplier.    14:08:59
8    QUESTIONS BY MR. KO:                14:09:00
9        Q.   Okay.  And when you say you    14:09:00
10    were "writing the procedure," what are you    14:09:03
11    talking about?                  14:09:05
12        A.   I'm documenting the process    14:09:05
13    flow for our suspicious order monitoring    14:09:09
14    program within Mallinckrodt.        14:09:11
15        Q.   Okay.  And that's reflected in    14:09:12
16    a policy, I mean we'll have a copy of it    14:09:13
17    that we can show you, but it's the actual    14:09:16
18    policy of identifying -- company policy of    14:09:18
19    identifying a suspicious order, correct?    14:09:23
20        A.   Yes.                14:09:24
21        MR. O'CONNOR:  Objection to    14:09:26
22    form.                        14:09:26
23    QUESTIONS BY MR. KO:                14:09:26
24        Q.   All right.  Now, turning back    14:09:27
25    to this document, this appears to be an    14:09:27

Page 256

1    e-mail chain between you -- well, excuse me.    14:09:32
2        It's an e-mail chain involving    14:09:35
3    Mr. Ratliff and Mr. Rausch in which you are    14:09:40
4    also a recipient, dated April 1, 2008; is    14:09:42
5    that correct?                  14:09:46
6        A.   Yes.                14:09:46
7        Q.   And earlier we had spoken about    14:09:48
8    Pete Kleissle of the DEA, and you recall    14:09:58
9    meeting him sometime in 2010, correct?    14:10:01
10        A.   Yes.                14:10:04
11        Q.   And it appears here that    14:10:05
12    Mr. Kleissle has had some interactions with    14:10:06
13    Mr. Ratliff and Mr. Rausch as well, correct?    14:10:09
14        A.   I believe directly with    14:10:11
15    Mr. Ratliff, who was passing on the    14:10:15
16    information to Jim Rausch.        14:10:17
17        Q.   Okay.  And it was also your    14:10:18
18    understanding that Mr. Rat -- or excuse me,    14:10:20
19    Mr. Rausch was sending monthly reports to    14:10:23
20    Mr. Kleissle at DEA --            14:10:27
21        A.   Yes.                14:10:29
22        Q.   -- prior to this time, correct?    14:10:30
23        A.   Yes.                14:10:31
24        Q.   And those were the peculiar    14:10:31
25    order reports that we were discussing    14:10:32

Page 257

1    previously, correct?                14:10:33
2        A.   Yes.                14:10:34
3        Q.   Now, in response to receiving    14:10:36
4    those monthly reports, Mr. Ratliff reports a    14:10:38
5    conversation that he had with Mr. Kleissle    14:10:45
6    about them; is that correct?        14:10:48
7        A.   Correct.                14:10:49
8        Q.   In particular, Mr. Ratliff    14:10:52
9    says, "Pete Kleissle, DEA diversion group    14:10:56
10    supervisor, St. Louis, just called regarding    14:10:58
11    several letters he has received from you    14:11:02
12    detailing suspicious orders."        14:11:04
13        Did I read that correctly?        14:11:07
14        A.   Yes.                14:11:07
15        Q.   He goes on to say, "He advised    14:11:09
16    that he needs more information in that if it    14:11:12
17    is suspicious, why are we filling the order.    14:11:14
18    I explained that we use a calculation based    14:11:17
19    upon an amount previously ordered.  He    14:11:19
20    stated, 'If you think it is suspicious, don't    14:11:23
21    fill it.'  I will go into more detail on    14:11:26
22    Friday."                      14:11:30
23        Did I read that correctly?        14:11:30
24        A.   Yes.                14:11:31
25        Q.   Now, we had discussed earlier    14:11:32

Page 258

1  today about instances in which Mallinckrodt    14:11:38
2  was shipping a peculiar order before making    14:11:42
3  any kind of due diligence determination.    14:11:46
4      Do you recall that testimony?    14:11:49
5      A.   Yes, there was a short period    14:11:50
6  of time, yes.  There was a period of time.    14:11:52
7      Q.   Okay.  And this seems to    14:11:54
8  reflect that practice; is that fair to say?    14:11:57
9      MR. O'CONNOR:  Objection to    14:12:02
10      form.    14:12:03
11      THE WITNESS:  No, not -- no, it    14:12:03
12      does not.    14:12:08
13  QUESTIONS BY MR. KO:    14:12:08
14      Q.   Okay.  Well, Mr. Kleissle is    14:12:08
15  concerned about -- Mr. Kleissle is concerned,    14:12:10
16  is he not, about the fact that Mallinckrodt    14:12:14
17  is actually filling orders --    14:12:17
18      MR. O'CONNOR:  Objection.    14:12:19
19  QUESTIONS BY MR. KO:    14:12:19
20      Q.   -- that appear on the peculiar    14:12:19
21  order report?    14:12:20
22      MR. O'CONNOR:  Objection to    14:12:21
23      form.    14:12:21
24      THE WITNESS:  My understanding    14:12:21
25  of this instruction is, if it's    14:12:23

Page 259

1  suspicious, do not report it and don't    14:12:25
2  ship it.  But if you're going to ship    14:12:28
3  it, it's not suspicious.    14:12:30
4  QUESTIONS BY MR. KO:    14:12:32
5      Q.   Okay.  Well --    14:12:33
6      A.   Sorry.  Sorry.    14:12:34
7      Q.   No, it's okay.  We'll try to    14:12:35
8  unpack that in a moment.    14:12:36
9      A.   Okay.    14:12:37
10      Q.   But he does say, "If you think    14:12:37
11  it is suspicious, don't fill it," correct?    14:12:40
12      A.   Yes.    14:12:42
13      Q.   Okay.  And he also is advising    14:12:43
14  that he needs more information based on the    14:12:48
15  peculiar order reports that Mr. Rausch --    14:12:55
16  Mr. Rausch is sending to him; is that fair to    14:12:57
17  say?    14:12:59
18      A.   Yes.    14:12:59
19      Q.   Okay.  So as of the date of    14:13:01
20  this e-mail, is it fair to say that    14:13:03
21  Mallinckrodt knew from the DEA that they    14:13:05
22  needed more information on the monthly    14:13:09
23  reports that they were sending to DEA?    14:13:11
24      MR. O'CONNOR:  Objection to    14:13:13
25      form.    14:13:14

Page 260

1      THE WITNESS:  Yes.    14:13:14
2  QUESTIONS BY MR. KO:    14:13:14
3      Q.   Okay.  And in response to    14:13:15
4  Mr. Ratliff's e-mail, Mr. Rausch says, "Bill,    14:13:22
5  okay.  I think we just sent the monthly one    14:13:28
6  out yesterday, so maybe that's the one he    14:13:30
7  just got.  We won't send out any more."    14:13:32
8      Did I read that correctly?    14:13:35
9      A.   Yes.    14:13:35
10      Q.   So as of the date of this    14:13:37
11  e-mail, it appears that Mr. Rausch is no    14:13:40
12  longer going to send the peculiar order    14:13:45
13  reports on to DEA; is that accurate?    14:13:46
14      A.   Yes.    14:13:49
15      Q.   And did you agree with that    14:13:50
16  practice?    14:13:51
17      A.   Yes.    14:13:52
18      Q.   Okay.  And you agreed with that    14:13:55
19  because you were going to revamp and improve    14:13:56
20  your SOM program, correct?    14:14:02
21      A.   Yes.    14:14:03
22      Q.   You can set that one aside.    14:14:04
23      Actually, I take that back.    14:14:37
24  Sorry to jump around again.    14:14:39
25      A.   No worries.    14:14:40

Page 261

1      Q.   But can you grab that document    14:14:41
2  again?    14:14:44
3      A.   Is this number 1?    14:14:44
4      Q.   Yes.    14:14:44
5      A.   Stewart?    14:14:46
6      Q.   Stewart Exhibit 1.    14:14:48
7      A.   All right.  Yes, I have it.    14:14:50
8      Q.   And Mr. Ratliff indicates to    14:14:50
9  the recipients of this e-mail, including you,    14:14:57
10  that "I advised that we have a conference    14:15:00
11  call planned with Frank Sapienza on Friday to    14:15:04
12  strengthen our suspicious order    14:15:07
13  identification system."    14:15:10
14      Did I read that correctly?    14:15:10
15      A.   Yes.    14:15:12
16      Q.   So do you agree -- do you agree    14:15:12
17  with Bill's sentiment at that time that your    14:15:13
18  suspicious order monitoring system needed to    14:15:17
19  be strengthened?    14:15:20
20      MR. O'CONNOR:  Objection to    14:15:21
21      form.    14:15:22
22      THE WITNESS:  No.    14:15:22
23  QUESTIONS BY MR. KO:    14:15:22
24      Q.   You did not believe it needed    14:15:22
25  to be strengthened?    14:15:24

Page 262

1      A.    Semantics. I believe it needed    14:15:25
2  to be enhanced, but I would not have used the   14:15:27
3  word "strengthen."                    14:15:29
4      Q.    Okay. So as of April 1, 2008,    14:15:31
5  you believed that Mallinckrodt's suspicious    14:15:34
6  order monitoring program needed to be    14:15:37
7  enhanced?                        14:15:38
8      A.    Yes.                  14:15:38
9      Q.    Okay. You can set that one    14:15:39
10 aside.                          14:15:42
11          I'm now going to hand you a    14:15:53
12 copy of what will be marked as Harper    14:15:55
13 Exhibit 12.                      14:15:57
14          MR. KO: For the record, this    14:15:58
15 is -- ends in Bates stamp 419907.    14:15:58
16          (Mallinckrodt-Harper Exhibit 12    14:16:01
17 marked for identification.)          14:16:02
18 QUESTIONS BY MR. KO:                14:16:02
19      Q.    And this is an e-mail chain in    14:16:21
20 which you are involved in in the late April    14:16:24
21 to early May 2008 time period; is that    14:16:27
22 correct?                        14:16:35
23      A.    Yes.                  14:16:35
24      Q.    And do you have any reason to    14:16:36
25 doubt that you sent and received the e-mails    14:16:39

Page 263

1  reflected in this exhibit?            14:16:43
2      A.    No.                   14:16:44
3      Q.    Okay. And at the very bottom    14:16:45
4  of the first page of the exhibit -- the first    14:16:47
5  page.                          14:16:54
6      A.    Oh, I'm terribly sorry.    14:16:55
7      Q.    That's okay.             14:16:57
8          -- you indicate that on    14:16:58
9  April 23, 2008, you attended a meeting to    14:16:59
10 discuss -- or sorry, you attended a meeting    14:17:01
11 of the Midwest Controlled Substance    14:17:03
12 Discussion Group in Chicago.          14:17:05
13          Do you see that?           14:17:06
14      A.    Yes.                  14:17:07
15      Q.    And that was one of the    14:17:07
16 industry groups involving manufacturers that    14:17:09
17 you had referenced earlier today?    14:17:11
18      A.    Yes.                  14:17:12
19      Q.    And one of the agenda items was    14:17:13
20 suspicious order monitoring, correct?    14:17:18
21      A.    Yes.                  14:17:19
22      Q.    And there is reference made to    14:17:19
23 DEA advice that one member of the industry    14:17:28
24 received.                        14:17:31
25          Do you see that?           14:17:31

Page 264

1      A.    Yes.                  14:17:32
2      Q.    And the DEA advice that    14:17:33
3  member received was that the DEA expected    14:17:37
4  registrants to know their customer, correct?    14:17:41
5      A.    Correct.               14:17:44
6      Q.    And I want to focus on the    14:17:44
7  portion of your e-mail in which you say that    14:17:48
8  "The DEA advice includes comparing" -- quote,    14:17:54
9  "Compare that activity to a bank's obligation    14:17:59
10 to report $10,000 transactions to law    14:18:01
11 enforcement for detection and money    14:18:03
12 laundering while having the ability to detect    14:18:05
13 multiple transactions at $9,999."    14:18:08
14          Did I read that correctly?    14:18:14
15      A.    Yes.                  14:18:14
16      Q.    Is it a fair interpretation of    14:18:16
17 what you're saying here that it's important    14:18:21
18 for registrants to not just know about orders    14:18:22
19 that are actually suspicious and violate DEA    14:18:27
20 regulations or statutes, but also to    14:18:33
21 determine whether or not there are other    14:18:37
22 orders that could potentially violate such    14:18:38
23 duties and statutes under the CSA?    14:18:42
24          MR. O'CONNOR: Objection to    14:18:43
25      form.                      14:18:44

Page 265

1          THE WITNESS: My interpretation    14:18:44
2  of the comment is that the suspicious    14:18:46
3  order monitoring system should detect    14:18:48
4  orders that are causing uplift -- or    14:18:51
5  the algorithm to flag for unusual    14:18:56
6  pattern, size or frequency, but also    14:18:58
7  those that come in by other --    14:19:00
8  analysis come in just under those    14:19:06
9  metrics.                       14:19:07
10 QUESTIONS BY MR. KO:                14:19:07
11      Q.    So ones that could potentially    14:19:08
12 be suspicious and ones that could potentially    14:19:09
13 trigger your algorithm, correct?    14:19:12
14          MR. O'CONNOR: Objection.    14:19:12
15      Form.                     14:19:13
16          THE WITNESS: Yes. Cause for    14:19:13
17 further review, yes.                14:19:16
18 QUESTIONS BY MR. KO:                14:19:18
19      Q.    All right. So in other words,    14:19:18
20 you would agree with me that an effective SOM    14:19:21
21 program would not simply just identify actual    14:19:25
22 orders that are suspicious but orders that    14:19:29
23 come -- using your words, that come close to    14:19:32
24 being suspicious as well, correct?    14:19:37
25          MR. O'CONNOR: Objection to    14:19:38

Page 266

```
 1    form.                      14:19:39
 2          THE WITNESS:  That was the      14:19:39
 3    advice given by this member of      14:19:40
 4    industry, yes.             14:19:41
 5    QUESTIONS BY MR. KO:            14:19:42
 6       Q.    And then regardless of the    14:19:42
 7    advice given by the member of the industry,  14:19:43
 8    is it your opinion that an effective SOM   14:19:45
 9    program would both flag actual suspicious   14:19:47
10    orders and those that come close to being a  14:19:50
11    suspicious order?              14:19:52
12          MR. O'CONNOR:  Objection to    14:19:52
13    form.                      14:19:54
14          THE WITNESS:  Not necessarily,   14:19:54
15    no.                       14:19:55
16    QUESTIONS BY MR. KO:            14:19:55
17       Q.    Okay.  So you don't -- you    14:19:56
18    didn't -- you didn't agree with the DEA   14:19:58
19    advice that was being given?        14:19:59
20       A.    So this is a person at a     14:20:00
21    conference making a comparison, and it was,  14:20:04
22    again, another suggestion.  But we understood  14:20:07
23    that we were still refining our algorithm at  14:20:11
24    the time to detect orders of unusual pattern,  14:20:15
25    size and frequency, not necessarily those   14:20:20
```

Page 267

```
 1    that meet the suggestion.          14:20:23
 2       Q.    Understood.            14:20:25
 3          And you're right, that is the   14:20:26
 4    fundamental duty at the end of the day.  You  14:20:29
 5    were working -- it's correct that at this   14:20:32
 6    time you were working on an algorithm to   14:20:33
 7    detect orders of unusual pattern, size and   14:20:35
 8    frequency, correct?             14:20:42
 9       A.    Yes.                14:20:43
10       Q.    Okay.  You can set that one    14:20:43
11    aside.                     14:20:53
12          (Mallinckrodt-Harper Exhibit 13  14:21:15
13    marked for identification.)         14:21:15
14    QUESTIONS BY MR. KO:            14:21:15
15       Q.    Now, you said previously that   14:21:24
16    you recall attending the Buzzeo conferences  14:21:25
17    in certain years when you were senior manager  14:21:27
18    of controlled substance compliance group,   14:21:29
19    correct?                    14:21:32
20       A.    Yes.                14:21:32
21       Q.    And do you recall attending in  14:21:33
22    2007 and 2008?               14:21:35
23       A.    I don't -- I can't recall the   14:21:37
24    dates.                     14:21:39
25       Q.    I'll hand you a copy of what   14:21:40
```

Page 268

```
 1    has been marked as Harper Exhibit 13.    14:21:52
 2          For the record, this e-mail    14:21:58
 3    chain ends in Bates 302096.         14:22:00
 4          And this is an e-mail dated    14:22:11
 5    November 4, 2008, from Cathy Stewart to    14:22:13
 6    several people, including you, correct?   14:22:15
 7       A.    Correct.              14:22:17
 8       Q.    And they appear to attach notes  14:22:17
 9    that she took at a conference she attended,   14:22:20
10    and I believe that is the Buzzeo conference;  14:22:24
11    is that correct?               14:22:26
12       A.    Yes.                14:22:26
13       Q.    Does this refresh your        14:22:27
14    recollection as to whether or not you     14:22:29
15    attended this particular conference as well?  14:22:30
16       A.    Yes.                14:22:32
17       Q.    And did you in fact attend this  14:22:33
18    conference with Ms. Stewart?        14:22:35
19       A.    Yes.                14:22:35
20       Q.    Okay.  And she indicates in her  14:22:36
21    e-mail to you that "A lot of energy is being  14:22:42
22    focused on suspicious order monitoring."   14:22:46
23          Do you see that?          14:22:50
24       A.    Oh, yes.  Yes, I do.        14:22:51
25       Q.    And do you recall that at     14:22:54
```

Page 269

```
 1    this -- during this Buzzeo conference in   14:22:56
 2    late -- or fall of 2008 that there was in   14:23:01
 3    fact a lot of attention being given to    14:23:03
 4    suspicious order monitoring?        14:23:08
 5       A.    Yes.                14:23:08
 6       Q.    Okay.  And she also indicates   14:23:09
 7    in the second sentence of the second     14:23:17
 8    paragraph -- you know, I've been talking   14:23:21
 9    quite a bit, so I'll let you -- if you don't  14:23:25
10    mind, do you want to read that second     14:23:28
11    sentence?                   14:23:29
12       A.    The second sentence of the     14:23:29
13    second paragraph?              14:23:30
14       Q.    Yeah.               14:23:30
15       A.    "Other highlights, i.e., more   14:23:31
16    intensive focus on carriers, are provided as  14:23:34
17    a heads-up that this is on its way."     14:23:37
18       Q.    And can you read the sentence   14:23:41
19    before that?                 14:23:42
20       A.    "The attached is for        14:23:43
21    informational" -- oh, I'm sorry.       14:23:45
22       Q.    The sentence before that.     14:23:47
23       A.    "As the team leader, I will     14:23:48
24    depend on Karen Harper to determine which   14:23:53
25    areas of our SOM process may need to be    14:23:55
```

Page 270

1  looked at again."                    14:23:57
2      Q.   Okay.  So certainly from the    14:23:58
3  perspective of Ms. Stewart, she believed that  14:23:59
4  you were the team leader of the SOM process;    14:24:01
5  is that correct?                      14:24:04
6      A.   That's what this states, yes.    14:24:04
7      Q.   Okay.  And you, in fact,    14:24:06
8  believed that you were effectively the team  14:24:08
9  leader for the enhancement of the SOM process  14:24:10
10 during this time period, correct?    14:24:12
11          MR. O'CONNOR:  Objection.    14:24:13
12      Form.                            14:24:14
13          THE WITNESS:  Yes.            14:24:14
14 QUESTIONS BY MR. KO:                14:24:15
15      Q.   And turning the next -- turning  14:24:19
16 to the next page, you see her actual notes.    14:24:20
17          Do you recall reading and    14:24:27
18 reviewing these notes?              14:24:29
19      A.   Yes.                        14:24:30
20      Q.   Okay.  She indicates that,    14:24:32
21 quote, "We must also formally document the    14:24:43
22 investigation of each peculiar, suspicious,    14:24:47
23 peculiar, order that gets identified,    14:24:51
24 including the hows and the whys of the logic  14:24:53
25 we used to deem the order appropriate to ship  14:24:55

Page 271

1  or not."                            14:24:58
2          Did I read that correctly?    14:24:59
3      A.   Yes.                        14:24:59
4      Q.   Okay.  And do you recall    14:25:00
5  whether or not you implemented that policy  14:25:01
6  change into the enhanced SOM program?    14:25:05
7          MR. O'CONNOR:  Objection to    14:25:08
8      form.                            14:25:09
9          THE WITNESS:  Yes.  Yes, we    14:25:09
10     did.  Pardon me.                  14:25:12
11 QUESTIONS BY MR. KO:                14:25:13
12     Q.   So is it your testimony that    14:25:13
13 for the revised and enhanced SOM program that  14:25:15
14 you eventually rolled out at a future date    14:25:18
15 from the date of this e-mail, you formally    14:25:21
16 documented every single peculiar order,    14:25:23
17 including the hows and whys of the logic we    14:25:30
18 used to deemed the order appropriate to ship  14:25:35
19 or not?                              14:25:37
20     A.   Yes.                        14:25:37
21     Q.   Okay.  And do you know whether  14:25:37
22 or not those -- and I think earlier I had    14:25:38
23 said "peculiar, suspicious, peculiar," but I  14:25:40
24 mean to say "particular suspicious."    14:25:42
25     A.   That's how the sentence reads.  14:25:43

Page 272

1      Q.   Right.  So --                14:25:43
2      A.   Yes.                        14:25:44
3      Q.   I apologize for that.        14:25:45
4      A.   Quite all right.            14:25:50
5      Q.   Do you know whether or not the  14:25:51
6  formal documentation was contained in any    14:25:52
7  sort of database?                    14:25:56
8      A.   It is, yes.                  14:25:57
9      Q.   Okay.  And what database would  14:25:58
10 that all be kept in?                  14:26:00
11     A.   It's the share drive at    14:26:02
12 Mallinckrodt.                        14:26:05
13     Q.   Okay.  And so your testimony is  14:26:06
14 that every single order that was identified    14:26:08
15 as suspicious was formally documented, or is  14:26:11
16 it your testimony that every single order    14:26:17
17 that was identified as peculiar was formally  14:26:19
18 documented, or both?                14:26:21
19          MR. O'CONNOR:  Objection to    14:26:21
20     form.                            14:26:22
21          THE WITNESS:  Both, but not    14:26:22
22     necessarily at that time.  But as time  14:26:24
23     went on, yes, every order review was    14:26:26
24     documented and why.              14:26:29
25

Page 273

1  QUESTIONS BY MR. KO:                14:26:30
2      Q.   Okay.  And do you recall    14:26:30
3  approximately when that formal documentation  14:26:31
4  began?                              14:26:36
5      A.   In 2012.                    14:26:37
6      Q.   Okay.  So that would be four    14:26:41
7  years after the date of this particular    14:26:44
8  e-mail, correct?                    14:26:48
9      A.   Correct.                    14:26:48
10     Q.   Do you know why it took so    14:26:49
11 along to enact that policy?          14:26:51
12     A.   So we were working on enhancing  14:26:53
13 our program again.  I keep stating that.    14:26:56
14          These are suggestions by    14:27:00
15 breakout speakers and not necessarily -- she  14:27:03
16 talks about they're not all-inclusive,    14:27:06
17 they're for informational purposes.    14:27:09
18          So it was our intent to do so,    14:27:10
19 but we had not completely incorporated the    14:27:13
20 explanation into every order that was    14:27:17
21 reviewed at that time.              14:27:19
22     Q.   But you -- excuse me.  You did    14:27:21
23 ultimately adopt a system whereby you    14:27:25
24 formally documented every peculiar and    14:27:27
25 suspicious order in 2012, correct?    14:27:29

Page 274

1   A.  Yes.      14:27:31

2   Q.  And that's four years after you   14:27:32

3 first discussed the possibility of doing so,   14:27:33

4 correct?      14:27:35

5   A.  It's four years after the topic  14:27:36

6 was made -- mentioned at a conference, yes.   14:27:38

7   Q.  And reference was made by    14:27:40

8 Ms. Stewart that "we must also formally   14:27:44

9 document."      14:27:47

10     Did I read that correctly?   14:27:47

11     So just the record -- just so   14:27:56

12 the record is clear, Ms. Stewart indicates in   14:27:57

13 her notes that, quote, "We must also formally   14:28:00

14 document the investigation of each particular   14:28:04

15 suspicious, open parens, peculiar, close   14:28:09

16 parens, order that gets identified," end   14:28:11

17 quote.      14:28:15

18     Did I read that correctly?   14:28:15

19   A.  Yes, you did.    14:28:15

20   Q.  Okay.  So as of the fall   14:28:16

21 of 2008, she is suggesting, is she not, that   14:28:21

22 you must formally document each suspicious or   14:28:23

23 peculiar order?     14:28:25

24   A.  She is relaying those notes   14:28:25

25 from the conference, not necessarily as a   14:28:29

Page 275

1 mandate that we incorporate them.   14:28:32

2   Q.  Sure.     14:28:34

3   A.  So they're notes that she took   14:28:35

4 at a conference.    14:28:38

5   Q.  Right.  And I understand it's   14:28:39

6 not a mandate, but she is making a suggestion   14:28:39

7 that you should formally document each    14:28:41

8 suspicious and peculiar order, is she not?   14:28:43

9   A.  Not necessarily.  She's   14:28:44

10 relaying comments made at a conference by a   14:28:45

11 speaker.     14:28:47

12   Q.  Okay.  Is it fair to say   14:28:48

13 that -- this Buzzeo conference that you   14:28:49

14 attended each year, it was an important   14:28:53

15 conference, correct?    14:28:56

16   A.  Yes.     14:28:56

17   Q.  And it was a conference in   14:28:56

18 which you would gain important insight    14:28:58

19 regarding your duties under the CSA to   14:29:01

20 maintain effective controls against    14:29:03

21 diversion, among other things, correct?   14:29:05

22     MR. O'CONNOR:  Objection to   14:29:06

23   form.     14:29:06

24     THE WITNESS:  Yes.    14:29:06

25

Page 276

1 QUESTIONS BY MR. KO:    14:29:07

2   Q.  And as we described earlier,   14:29:07

3 there weren't necessarily other    14:29:10

4 extracurricular activities that you were   14:29:12

5 involved in with respect to your diversion   14:29:14

6 responsibilities at Mallinckrodt, correct?   14:29:16

7     MR. O'CONNOR:  Objection to   14:29:18

8   form.     14:29:18

9     THE WITNESS:  Correct.   14:29:18

10 QUESTIONS BY MR. KO:    14:29:19

11   Q.  And so this conference was an   14:29:19

12 important conference for you to attend in   14:29:21

13 which you could further understand your   14:29:23

14 responsibilities under the CSA, correct?   14:29:25

15     MR. O'CONNOR:  Objection to   14:29:27

16   form.     14:29:28

17     THE WITNESS:  Yes.    14:29:28

18 QUESTIONS BY MR. KO:    14:29:28

19   Q.  So is it fair to say that the   14:29:29

20 advice and suggestions that were borne out of   14:29:31

21 this conference were important suggestions to   14:29:34

22 follow?      14:29:38

23     MR. O'CONNOR:  Objection to   14:29:39

24   form.     14:29:40

25     THE WITNESS:  They were   14:29:40

Page 277

1   elements to be considered as part of   14:29:41

2   our suspicious order monitoring   14:29:42

3   program, not necessarily a mandate to   14:29:44

4   be followed.     14:29:46

5 QUESTIONS BY MR. KO:    14:29:48

6   Q.  Okay.  And an element to be   14:29:48

7 considered as of the fall of 2008 was formal   14:29:49

8 documentation of every single peculiar and   14:29:51

9 suspicious order, correct?    14:29:54

10   A.  Yes, based upon one of the   14:29:54

11 conference speakers, yes, sir.   14:29:56

12   Q.  And again, it took you four   14:29:57

13 years to actually implement a system in which   14:30:06

14 you would formally document each peculiar or   14:30:09

15 suspicious order, correct?    14:30:13

16   A.  Yes.     14:30:15

17   Q.  And during that four-year time   14:30:17

18 period, do you have any understanding of how   14:30:21

19 many pills were diverted in the country,   14:30:25

20 Mallinckrodt pills were diverted in the   14:30:27

21 country?      14:30:29

22     MR. O'CONNOR:  Objection to   14:30:29

23   form.     14:30:30

24     THE WITNESS:  I do not.   14:30:30

25

Page 278

1  QUESTIONS BY MR. KO:                14:30:30
2      Q.   Do you have an understanding of  14:30:32
3  whether or not that time period reflected the  14:30:33
4  peak of pills that were being distributed  14:30:39
5  into Florida?                         14:30:43
6          MR. O'CONNOR:  Objection to    14:30:43
7      form.                            14:30:44
8          THE WITNESS:  Yes.            14:30:44
9  QUESTIONS BY MR. KO:                14:30:44
10      Q.   You do have an understanding,  14:30:44
11  correct?                             14:30:45
12      A.   Yes.                        14:30:45
13      Q.   And during that time period   14:30:45
14  there were -- there was a large concern from  14:30:47
15  2008 through 2012 that many of Mallinckrodt  14:30:51
16  pills were going into Florida and being  14:30:54
17  abused and diverted, correct?         14:30:56
18          MR. O'CONNOR:  Objection to    14:30:57
19      form.                            14:30:58
20          THE WITNESS:  Yes.            14:30:58
21  QUESTIONS BY MR. KO:                14:31:00
22      Q.   Okay.  Do you believe that    14:31:04
23  earlier adoption of the formal documentation  14:31:05
24  to identify peculiar or suspicious orders  14:31:07
25  would have helped stop the flow of diversion  14:31:10

Page 279

1  and abuse that was occurring of Mallinckrodt  14:31:13
2  pills had you implemented this policy  14:31:16
3  earlier?                             14:31:18
4          MR. O'CONNOR:  Objection to    14:31:18
5      form.                            14:31:18
6          THE WITNESS:  No.             14:31:18
7  QUESTIONS BY MR. KO:                14:31:19
8      Q.   You don't believe that?       14:31:19
9      A.   I do not.                    14:31:20
10      Q.   Okay.  So you don't -- well,  14:31:21
11  then why did you adopt this formal procedure  14:31:23
12  in 2012?                             14:31:25
13      A.   It was -- as we continued the  14:31:25
14  enhancement of our program, it was --   14:31:30
15          THE WITNESS:  This may be a    14:31:36
16      privileged --                    14:31:37
17          MR. O'CONNOR:  Then I guess I  14:31:39
18      would instruct you not to answer with  14:31:40
19      respect to any sort of attorney-client  14:31:42
20      communications.                  14:31:46
21          But you can answer to the      14:31:46
22      extent you can without getting into  14:31:47
23      those communications with counsel.  14:31:48
24          THE WITNESS:  Okay.           14:31:49
25

Page 280

1  QUESTIONS BY MR. KO:                14:31:52
2      Q.   So are you going to follow your  14:31:58
3  counsel's instruction?               14:31:59
4      A.   Yes, sir.                    14:31:59
5      Q.   Okay.  Now, I know you said   14:32:00
6  earlier that this wasn't necessarily a  14:32:09
7  mandate but a suggestion.             14:32:11
8          But is there any reason you can  14:32:13
9  think of for not following this advice that  14:32:14
10  you learned at the Buzzeo conference in 2008?  14:32:19
11      A.   No.                         14:32:21
12      Q.   Okay.  Now, one thing -- going  14:32:22
13  down to the fifth paragraph of this page,  14:32:27
14  Ms. Stewart writes in her notes that "The  14:32:36
15  general consensus is that sales reps are not  14:32:38
16  considered a good option for on-site  14:32:42
17  investigations and initial review prior to  14:32:44
18  accepting new customers due to their  14:32:47
19  perceived bias in getting the customer  14:32:48
20  approved for sales revenue purposes."  14:32:50
21          Did I read that correctly?     14:32:53
22      A.   Yes.                        14:32:55
23      Q.   And so understanding your     14:32:56
24  perspective that these aren't necessarily  14:33:02
25  mandates, but is it fair to say that one  14:33:04

Page 281

1  thing -- one piece of advice and/or a  14:33:06
2  suggestion that you learned following this  14:33:09
3  conference was that the general consensus is  14:33:11
4  that sales reps should not be involved in  14:33:15
5  reviewing new customers due to their  14:33:19
6  perceived bias in getting sales?      14:33:21
7          MR. O'CONNOR:  Objection to    14:33:23
8      form.                            14:33:24
9          THE WITNESS:  That's correct,  14:33:24
10      and we did not.                  14:33:26
11  QUESTIONS BY MR. KO:                14:33:28
12      Q.   In other words -- well, I think  14:33:29
13  you were asking {sic} my next question.  14:33:32
14          So you never had sales reps    14:33:34
15  involved in initial reviews of -- initial  14:33:36
16  reviews of new customers?             14:33:42
17      A.   So we had -- we had the sales  14:33:43
18  force calling on customers.  We had an  14:33:46
19  independent new customer setup process --  14:33:48
20      Q.   Right.                      14:33:51
21      A.   -- which involved the customer  14:33:51
22  filling out the application.          14:33:52
23          At one time we considered that  14:33:54
24  the sales reps would fill out the     14:33:55
25  application, and we -- we did not utilize  14:33:58

Page 282

1 that --                              14:34:02
2      Q.   Okay.                      14:34:02
3      A.   -- as part of the program. 14:34:02
4           So the customer fills out the  14:34:03
5 application.  We run the credit, the Dun &  14:34:05
6 Bradstreet, et cetera.  And that's the way --  14:34:08
7 so it's not predicated upon the salesperson's  14:34:10
8 review of the customer.              14:34:14
9      Q.   And by the way, the sales reps  14:34:16
10 referred to here, again, are these both NAMs  14:34:18
11 and CSRs, or NAMs or CSRs, or which -- which  14:34:22
12 sales reps is Cathy referring to?   14:34:26
13           MR. O'CONNOR:  Objection to  14:34:27
14 form.                              14:34:28
15           THE WITNESS:  NAMs.       14:34:28
16 QUESTIONS BY MR. KO:                14:34:29
17      Q.   NAMs.  Okay.              14:34:29
18           And so your testimony is that  14:34:29
19 NAMs were not involved in any initial review  14:34:32
20 of new customers?                   14:34:36
21      A.   Not to my knowledge.      14:34:38
22      Q.   Okay.  So if -- if for purposes  14:34:41
23 of the new checklist -- new customer  14:34:46
24 checklist form NAMs had some input and  14:34:49
25 involvement, that would be contrary to your  14:34:51

Page 283

1 expectation --                      14:34:53
2           MR. O'CONNOR:  Objection.  14:34:54
3 Form.                              14:34:55
4 QUESTIONS BY MR. KO:                14:34:56
5      Q.   -- is that correct?       14:34:56
6      A.   I don't -- can you provide more  14:34:57
7 detail to give me more information to answer  14:35:01
8 the question, please?               14:35:03
9      Q.   Sure.                    14:35:04
10           Well, maybe I'll -- I'll try it  14:35:05
11 this way.  Did you believe in the fall  14:35:07
12 of 2008 that it was a good idea to consult  14:35:11
13 national account managers in connection with  14:35:14
14 approval of new customers for purposes of  14:35:17
15 filling out the new customer checklist?  14:35:22
16           MR. O'CONNOR:  Objection to  14:35:24
17 form.                              14:35:25
18           THE WITNESS:  No.        14:35:25
19 QUESTIONS BY MR. KO:                14:35:25
20      Q.   Okay.  And how about with  14:35:26
21 respect to determining whether or not any  14:35:28
22 orders of new customers were peculiar and/or  14:35:33
23 suspicious?  Did you believe that NAMs had  14:35:37
24 any involvement in that process following the  14:35:41
25 fall of 2008?                       14:35:45

Page 284

1      A.   Yes.                     14:35:47
2      Q.   They did have involvement?  14:35:48
3      A.   Yes.                     14:35:49
4      Q.   Okay.  And what involvement --  14:35:50
5 what did that involvement consist of?  14:35:52
6      A.   So if an order was flagged as  14:35:54
7 peculiar, suspicious, unusual, whatever the  14:35:57
8 naming convention was at the time, we would  14:36:00
9 at times consult with the NAMs to ask them if  14:36:05
10 they had more information on the account that  14:36:08
11 would help us in our review of that order  14:36:12
12 that had been flagged.               14:36:14
13      Q.   Okay.  And sometimes they would  14:36:15
14 clear these orders, correct?         14:36:18
15           MR. O'CONNOR:  Objection to  14:36:19
16 form.                              14:36:20
17           THE WITNESS:  Yes.  Yes.  14:36:20
18 QUESTIONS BY MR. KO:                14:36:23
19      Q.   In other words, sometimes they  14:36:24
20 would conclusively -- or sometimes they would  14:36:27
21 make the recommendation to you that that  14:36:28
22 particular order was not suspicious  14:36:31
23 sufficient to alert the DEA, correct?  14:36:34
24           MR. O'CONNOR:  Objection to  14:36:36
25 form.                              14:36:36

Page 285

1           THE WITNESS:  Yes, with  14:36:36
2 appropriate explanation, yes.        14:36:38
3 QUESTIONS BY MR. KO:                14:36:39
4      Q.   Right.                   14:36:40
5           And that explanation, what did  14:36:40
6 that usually consist of?  Was that in the  14:36:43
7 form of an e-mail?  A telephone call?  14:36:46
8           MR. O'CONNOR:  Objection.  14:36:49
9 QUESTIONS BY MR. KO:                14:36:49
10      Q.   How did that message -- how was  14:36:49
11 that message conveyed to you?        14:36:51
12      A.   It could have been either,  14:36:53
13 e-mail or telephone.                14:36:55
14      Q.   But we know at least from the  14:36:56
15 2008 to 2012 time period, there was no formal  14:37:01
16 documentation of that, correct?      14:37:04
17      A.   Not relative to every order  14:37:05
18 that was flagged by the algorithm, correct.  14:37:08
19      Q.   Okay.  And separate and apart  14:37:10
20 from what's included in Ms. Stewart's notes,  14:37:15
21 do you believe having salespeople involved in  14:37:19
22 the identification of suspicious orders is a  14:37:21
23 good thing?                         14:37:25
24           MR. O'CONNOR:  Objection to  14:37:26
25 form.                              14:37:27

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    THE WITNESS: No. They --     14:37:27
2    facilitating in the review, yes, but     14:37:31
3    not in the identification, no. I do     14:37:33
4    not think they should be involved.     14:37:36
5    QUESTIONS BY MR. KO:     14:37:38
6    Q.   Okay. And so if they were --     14:37:39
7    so I understand this is a hypothetical, but     14:37:43
8    bear with me.     14:37:45
9    So would it be appropriate then     14:37:46
10   if a national account manager was the only     14:37:49
11   source for determining whether or not a     14:37:57
12   peculiar order was suspicious or not?     14:38:00
13   A.   Yes.     14:38:01
14   Q.   It would be appropriate?     14:38:01
15   A.   Yes.     14:38:02
16   Q.   So in that case, isn't the NAM     14:38:03
17   the only person providing input as to whether     14:38:07
18   or not an order is suspicious?     14:38:09
19   A.   Yes.     14:38:10
20   Q.   Okay. And so you're saying     14:38:15
21   that's okay?     14:38:16
22   A.   Yes.     14:38:17
23   Q.   Okay. So you don't have any     14:38:17
24   problems, as someone who is in charge of     14:38:20
25   running a suspicious order monitoring     14:38:22

Page 287

1    program, of having national account managers     14:38:24
2    who have an incentive for new sales and new     14:38:29
3    business to be involved in the decision of     14:38:34
4    whether or not to identify an order as     14:38:36
5    suspicious or not?     14:38:39
6    MR. O'CONNOR: Objection to     14:38:39
7    form.     14:38:40
8    THE WITNESS: I do not have any     14:38:40
9    problem with that.     14:38:44
10   QUESTIONS BY MR. KO:     14:38:45
11   Q.   Okay. National account     14:38:45
12   managers at Mallinckrodt were compensated on     14:38:47
13   a commission -- or excuse me.     14:38:48
14   Do you have an understanding of     14:38:50
15   how national account managers were     14:38:52
16   compensated?     14:38:53
17   A.   I do not.     14:38:53
18   Q.   Do you understand that national     14:38:54
19   account managers had a -- received a     14:38:58
20   commission based on the amount of sales     14:39:01
21   activity that they were able to retain?     14:39:04
22   A.   I don't know how their pay is     14:39:06
23   structured.     14:39:08
24   Q.   Okay. Setting aside whether or     14:39:09
25   not you knew how NAMs were paid, don't you     14:39:12

Page 288

1    believe that conflict of interest exists in     14:39:17
2    having an individual who has a financial     14:39:20
3    incentive to create new sales also determine     14:39:23
4    whether or not an order is suspicious?     14:39:25
5    MR. O'CONNOR: Objection to     14:39:27
6    form.     14:39:28
7    THE WITNESS: I believe that     14:39:28
8    the greater incentive is regulatory     14:39:30
9    compliance and DEA compliance, as was     14:39:33
10   carried throughout our organization,     14:39:36
11   would override any financial     14:39:38
12   incentive.     14:39:40
13   QUESTIONS BY MR. KO:     14:39:41
14   Q.   Do you believe that the     14:39:42
15   national account managers had -- believed     14:39:43
16   that they had a greater incentive to comply     14:39:45
17   with the regulatory statutes laid out under     14:39:48
18   the CSA?     14:39:51
19   A.   Yes.     14:39:53
20   Q.   Okay. And you believe -- well,     14:39:54
21   strike that.     14:39:57
22   Do you recall following the     14:39:57
23   date of this particular Buzzeo conference     14:40:13
24   ever discussing removing NAMs from the     14:40:16
25   suspicious order monitoring and peculiar     14:40:22

Page 289

1    order monitoring review structure?     14:40:22
2    A.   No.     14:40:25
3    Q.   Okay. Do you ever recall     14:40:27
4    removing any member of sales force -- that     14:40:30
5    includes NAMs and customer service reps --     14:40:33
6    from the peculiar order/suspicious order     14:40:37
7    review system?     14:40:41
8    A.   No.     14:40:43
9    Q.   Okay. You can set this     14:40:43
10   document aside.     14:40:53
11   (Mallinckrodt-Harper Exhibit 14     14:40:57
12   marked for identification.)     14:40:58
13   QUESTIONS BY MR. KO:     14:40:58
14   Q.   I'm going to hand you a copy of     14:40:58
15   what will be marked as Harper Exhibit 14.     14:40:59
16   Now, do you recall -- I know     14:41:35
17   you said you didn't recall the specifics of     14:41:54
18   how NAMs were compensated at Mallinckrodt,     14:41:57
19   but do you know whether or not they received     14:41:59
20   any bonuses based in part of the volume of     14:42:01
21   their sales of controlled substances     14:42:03
22   manufactured by Mallinckrodt?     14:42:05
23   A.   I do not know.     14:42:06
24   Q.   Did you ever inquire as to     14:42:07
25   whether or not they were being compensated on     14:42:10

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  that basis?                    14:42:11
2      A.   Nope.                 14:42:12
3      Q.   How come you never inquired    14:42:13
4  about that?                    14:42:15
5      A.   Because the controlled    14:42:15
6  substances compliance group operated, to the    14:42:19
7  extent it was possible, autonomously unless    14:42:21
8  we needed guidance from the NAMs on specific    14:42:27
9  orders. So I never knew how they were    14:42:30
10 compensated, why. I don't know how much    14:42:32
11 oxycodone was sold for. I don't know any of    14:42:34
12 the financial pieces of that.    14:42:38
13     Q.   Sure.                  14:42:38
14     A.   Thank you.            14:42:40
15     Q.   Okay. And you say that you    14:42:41
16 needed -- at times you needed guidance from    14:42:45
17 them on specific -- you needed guidance from    14:42:47
18 NAMs on specific orders --    14:42:50
19     A.   Uh-huh.               14:42:53
20     Q.   -- with respect to identifying    14:42:53
21 a peculiar or suspicious order, correct?    14:42:55
22     A.   Not identifying but reviewing.    14:42:57
23     Q.   Reviewing.            14:43:00
24          With the ultimate goal of    14:43:01
25 trying to determine whether or not that order    14:43:02

Page 291

1  was suspicious, correct?       14:43:04
2      A.   Correct.              14:43:05
3      Q.   So NAMs played -- would you    14:43:06
4  agree with me that NAMs played an integral    14:43:10
5  role in determining whether or not an order    14:43:13
6  could potentially be suspicious?    14:43:15
7          MR. O'CONNOR: Objection to    14:43:16
8      form.                      14:43:18
9          THE WITNESS: Certain orders.    14:43:18
10     May I explain or --        14:43:21
11 QUESTIONS BY MR. KO:           14:43:23
12     Q.   Well, let me -- certain orders.    14:43:24
13 Do you mean certain orders that were    14:43:25
14 previously flagged as peculiar?    14:43:27
15     A.   Yes.                   14:43:28
16     Q.   Okay. So once an order was    14:43:29
17 flagged as peculiar, is it accurate to say    14:43:30
18 that NAMs played an integral role in    14:43:34
19 determining whether or not that peculiar    14:43:39
20 order was ultimately deemed to be suspicious    14:43:41
21 sufficient to notify the DEA?    14:43:43
22         MR. O'CONNOR: Objection to    14:43:46
23     form.                      14:43:46
24         THE WITNESS: Not every order.    14:43:46
25

Page 292

1  QUESTIONS BY MR. KO:           14:43:47
2      Q.   Correct.              14:43:47
3          But for some?          14:43:47
4      A.   For some, yes.        14:43:48
5      Q.   Okay. So is it the case that    14:43:50
6  for some orders, national account managers    14:43:53
7  played an integral role in determining    14:43:56
8  whether or not a peculiar order was    14:43:59
9  ultimately determined to be suspicious?    14:44:00
10         MR. O'CONNOR: Objection to    14:44:02
11     form.                      14:44:03
12         THE WITNESS: They assisted in    14:44:03
13     the review, and the ultimate decision    14:44:05
14     about whether the order was suspicious    14:44:06
15     or not rests -- always did rest with    14:44:08
16     the controlled substances compliance    14:44:11
17     group.                     14:44:12
18 QUESTIONS BY MR. KO:           14:44:12
19     Q.   Including you and Mr. Ratliff,    14:44:13
20 among other people, correct?    14:44:14
21     A.   Correct.              14:44:15
22     Q.   Okay. So if -- in the scenario    14:44:16
23 we were just discussing, if the national    14:44:21
24 account manager -- well, strike that.    14:44:25
25         When the national account    14:44:28

Page 293

1  manager was assisting in the review of    14:44:38
2  whether or not a peculiar order was deemed --    14:44:39
3  was going to be deemed as suspicious or not,    14:44:43
4  can you think of any instances in which the    14:44:46
5  input of the national account manager was the    14:44:53
6  only input you received in making a    14:44:55
7  determination of whether or not the order was    14:44:57
8  suspicious?                    14:44:59
9      A.   Yes, outside of the controlled    14:45:00
10 substances compliance group, yes.    14:45:06
11     Q.   Were there instances in which    14:45:07
12 the determination that the -- that you and    14:45:14
13 Mr. Ratliff made as to whether an order was    14:45:17
14 suspicious or not relied solely on the input    14:45:19
15 of a national account manager?    14:45:23
16     A.   Yes.                   14:45:24
17 QUESTIONS BY MR. KO:           14:45:43
18     Q.   Okay. I'm going to hand you a    14:45:38
19 copy of what's going to be marked as Harper    14:45:40
20 Exhibit 14.                    14:45:43
21         MR. KO: And this is, for the    14:45:46
22     record, an e-mail from Dave Hunter to    14:45:51
23     several people, including you, on    14:45:55
24     November 19, 2009, and Bates ending in    14:45:58
25     278806.                    14:46:03

Page 294

1  QUESTIONS BY MR. KO:                     14:46:03
2      Q.   Do you recall this -- or do you   14:46:13
3  have any reason to dispute that you received  14:46:15
4  this e-mail?                             14:46:16
5      A.   I have no reason to dispute.     14:46:17
6      Q.   Okay.  And here Mr. Hunter is    14:46:18
7  attaching notes from the Buzzeo conference I  14:46:21
8  believe he attends in 2009; is that correct?  14:46:27
9      A.   Yes.  Seeing this, so, yes.      14:46:29
10     Q.   Okay.  And do you recall         14:46:33
11 attending this particular Buzzeo conference   14:46:34
12 as well?                                 14:46:35
13     A.   I do not.                        14:46:35
14     Q.   Okay.  So you recall attending   14:46:36
15 the 2008 Buzzeo conference with Ms. Stewart,  14:46:39
16 but you don't recall attending this          14:46:41
17 conference with Mr. Hunter; is that fair?     14:46:43
18     A.   That's fair.                     14:46:46
19     Q.   Okay.  Do you recall Mr. Hunter  14:46:48
20 sending these notes to you about what         14:46:54
21 transpired at this particular Buzzeo          14:46:59
22 conference?                              14:47:01
23     A.   I do not specifically recall      14:47:02
24 it, but I can refamiliarize myself with the   14:47:05
25 content.                                 14:47:08

Page 295

1      Q.   Sure.                           14:47:08
2          And there are notes.  I just      14:47:09
3  want to turn to the first page of notes that  14:47:11
4  he drafts.  These appear to be notes that he  14:47:17
5  has created following his attendance at the   14:47:20
6  2009 Buzzeo conference; is that correct?      14:47:24
7      A.   Yes.                            14:47:25
8      Q.   And looking down at the bottom   14:47:28
9  of this page, he indicates where I'm          14:47:32
10 highlighting right now, "Sir, suspicious      14:47:34
11 order monitoring was certainly a hotbed of    14:47:37
12 discussion."                             14:47:39
13         Do you see that?                  14:47:40
14     A.   So that's a question, yes,       14:47:40
15 that's a question as documented here.         14:47:44
16     Q.   Right.                          14:47:45
17         And it's a question by someone    14:47:46
18 in the audience, some registrant or someone   14:47:47
19 who attended the conference, correct?         14:47:50
20     A.   Yes.                            14:47:51
21     Q.   Okay.  And so it's fair to say   14:47:52
22 that as of the fall of 2009, their           14:47:57
23 continual -- there's continual attention and  14:48:01
24 scrutiny being given to Mallinckrodt's        14:48:02
25 suspicious order monitoring system?          14:48:05

Page 296

1      MR. O'CONNOR:  Objection to          14:48:07
2  form.                                    14:48:08
3          THE WITNESS:  So all suspicious   14:48:08
4  order monitoring systems, not               14:48:14
5  necessarily unique to Mallinckrodt,          14:48:15
6  yes.                                     14:48:16
7  QUESTIONS BY MR. KO:                      14:48:16
8      Q.   Right.  Right.                   14:48:16
9          So as a general matter in 2009,   14:48:17
10 would you agree with the statement that       14:48:19
11 suspicious order monitoring continued to be   14:48:22
12 given close scrutiny by the DEA?             14:48:25
13     A.   Yes.                            14:48:27
14     Q.   Okay.  And the question is       14:48:28
15 asked, "Are there any plans for DEA to        14:48:31
16 publicize information to implement?"          14:48:35
17         Do you see that?                  14:48:37
18     A.   Yes.                            14:48:38
19     Q.   "SOM incorporate algorithms      14:48:39
20 where products are more likely to be         14:48:43
21 diverted."                               14:48:45
22         Did I read that correctly as      14:48:47
23 well?                                    14:48:48
24     A.   You did.                        14:48:48
25     Q.   Okay.  And there is a response   14:48:50

Page 297

1  given by someone at DEA, it appears.         14:48:51
2          Do you see that?                  14:48:54
3      A.   Yes.                            14:48:54
4      Q.   And that's Jim Crawford.         14:48:55
5          Did you know who he has?          14:48:57
6      A.   Yes.                            14:48:59
7      Q.   Okay.  Did you communicate with  14:49:00
8  him at all during the 2008, 2012 time period?  14:49:01
9      A.   No.                            14:49:04
10     Q.   Okay.  But you just knew -- you   14:49:05
11 just knew who he was, but you didn't          14:49:08
12 necessarily communicate with him?            14:49:10
13     A.   Correct.  He and Mark Caverly    14:49:11
14 spoke at the end of every Buzzeo conference.  14:49:15
15     Q.   Got it.                         14:49:16
16         And it's -- he says in response   14:49:17
17 to this question, quote, "Whatever we put out  14:49:20
18 will be outdated by the time we put it out.    14:49:24
19 You're looking at a number.  Tell me how much  14:49:27
20 that we can exceed.  DEA can't do that.  It's  14:49:30
21 part of your due diligence, knowing your       14:49:33
22 customer," end quote.                      14:49:37
23         Did I read that correctly?        14:49:38
24     A.   Yes.                            14:49:39
25     Q.   Okay.  So this appears to be     14:49:39

Page 298

```
1    some Q&As in which -- there is a question in    14:49:41
2    which registrants are asking whether or not    14:49:44
3    DEA will give guidance on an appropriate    14:49:48
4    suspicious order monitoring algorithm.    14:49:54
5         Is that a fair characterization    14:49:55
6    of the question that was asked?    14:49:56
7         MR. O'CONNOR:  Objection to    14:49:58
8    form.    14:49:58
9         THE WITNESS:  Yes.    14:49:58
10   QUESTIONS BY MR. KO:    14:49:59
11        Q.   And the response given was that    14:49:59
12   DEA was not going to provide such concrete    14:50:03
13   guidance; is that correct?    14:50:06
14        A.   I'd like to reread the answer,    14:50:06
15   please.    14:50:10
16        Q.   Sure.    14:50:10
17        A.   Yes, that's the gist of the    14:50:11
18   response, yes.    14:50:19
19        Q.   Okay.  So as of the fall    14:50:20
20   of 2009, is it accurate to say that    14:50:22
21   Mr. Hunter informed you that the DEA was not    14:50:27
22   going to give concrete guidance as to what    14:50:31
23   particular algorithm to implement?    14:50:33
24        A.   Yes.    14:50:35
25        Q.   Okay.  Now, the following    14:50:36
```

Page 299

```
1    question by someone in the audience was,    14:50:39
2    "Well, what then does the DEA expect?"    14:50:43
3         And a response was given by    14:50:45
4    Mr. Caverly.  It says, quote, "Previously DEA    14:50:47
5    sat down with National Drug Association with    14:50:51
6    an algorithm.  DEA standpoint:  You know our    14:50:55
7    customers better than we do.  DEA stepped    14:50:59
8    away from providing guidelines.  It is not    14:51:01
9    going to happen," end quote.    14:51:04
10        Did I read that correctly?    14:51:06
11        A.   Yes.    14:51:06
12        Q.   So as of the date of this    14:51:07
13   e-mail in the fall of 2009, you understood    14:51:09
14   that the DEA was not going to provide    14:51:12
15   guidelines with respect to SOM algorithms,    14:51:15
16   correct?    14:51:18
17        A.   Yes.    14:51:18
18        Q.   You can set that aside.    14:51:25
19        MR. O'CONNOR:  We've been going    14:51:29
20   about an hour 15.  Maybe we should    14:51:30
21   take a break.    14:51:32
22        MR. KO:  Yeah, we can take a    14:51:32
23   break.  Sounds good.    14:51:34
24        VIDEOGRAPHER:  We are going off    14:51:37
25   the record at 2:51 p.m.    14:51:39
```

Page 300

```
1         (Off the record at 2:51 p.m.)    14:51:40
2         VIDEOGRAPHER:  We are back on    15:10:02
3    the record at 3:10 p.m.    15:10:03
4    QUESTIONS BY MR. KO:    15:10:05
5         Q.   Now, Mr. Harper {sic}, is it    15:10:08
6    fair to say from the 2008 through 2009 time    15:10:10
7    period you are continually working to revise    15:10:16
8    and improve the enhanced suspicious order    15:10:17
9    monitoring system at Mallinckrodt, correct?    15:10:20
10        A.   Correct.    15:10:22
11        Q.   Okay.  And you also continue to    15:10:22
12   work on peculiar order algorithms in the 2008    15:10:27
13   through 2009 time period, correct?    15:10:33
14        A.   Correct.    15:10:34
15        Q.   And with respect to the    15:10:34
16   checklists we were discussing previously,    15:10:36
17   you're continually working on revising and    15:10:38
18   implementing a -- both a new customer    15:10:41
19   checklist and a customer checklist throughout    15:10:45
20   the 2008 and 2009 time period, correct?    15:10:47
21        A.   Correct.    15:10:49
22        (Mallinckrodt-Harper Exhibit 15    15:11:00
23   marked for identification.)    15:11:00
24   QUESTIONS BY MR. KO:    15:11:00
25        Q.   Okay.  I'm going to hand you a    15:11:01
```

Page 301

```
1    copy of what's going to be marked as Harper    15:11:02
2    Exhibit 15.  And in conjunction with that,    15:11:06
3    I'm going to hand you also a document that's    15:11:13
4    previously been identified as Exhibit 35 of    15:11:14
5    the Stewart deposition.  They're both right    15:11:16
6    here.    15:11:22
7         For the record, Harper    15:11:23
8    Exhibit 15 ends in Bates stamp 270090.    15:11:24
9         And of course the second    15:11:31
10   document I referenced was Stewart Exhibit 35    15:11:33
11   that ends in 477900.    15:11:37
12        Now, turning your attention    15:11:43
13   first to the e-mail identified as Harper    15:11:44
14   Exhibit 15, this is an e-mail exchange you    15:11:48
15   had with Eileen Spalding dated October 31,    15:11:53
16   2010, correct?    15:11:59
17        A.   Correct.    15:11:59
18        Q.   And earlier when I had -- just    15:12:00
19   a moment ago when we were discussing    15:12:05
20   continual revisions and enhancements to    15:12:06
21   Mallinckrodt's SOM program in the 2008 and    15:12:11
22   2009 time period, it's also safe to say that    15:12:14
23   in 2010 you're also continually working on    15:12:18
24   improving the SOM program, correct?    15:12:21
25        A.   Correct.    15:12:22
```

Page 302

1    Q.   And in fact, that work          15:12:23
2  continues in 2011 as well?             15:12:25
3    A.   Yes.                            15:12:27
4    Q.   When would you say you actually  15:12:28
5  implemented a procedure or an SOM policy that  15:12:31
6  sufficiently addressed some of the concerns  15:12:37
7  you raised in the 2008 time period with  15:12:41
8  respect to Mallinckrodt's SOM program?  15:12:43
9        MR. O'CONNOR: Objection.        15:12:46
10      Form.                             15:12:46
11       THE WITNESS: I don't know the    15:12:46
12      first date of the publication.  Again,  15:12:47
13      just as the program is constantly  15:12:50
14      being enhanced, we're constantly  15:12:53
15      updating our procedure, so I don't  15:12:56
16      have the date of the publication.  I'm  15:12:57
17      sorry.                           15:12:58
18  QUESTIONS BY MR. KO:                  15:12:58
19    Q.   And is it -- do you have a      15:12:59
20  general understanding of the approximate time  15:13:01
21  period of the date of publication?   15:13:03
22       Do you recall whether or not it  15:13:04
23  was after 2011?                       15:13:05
24    A.   I don't recall.               15:13:07
25    Q.   Okay.                         15:13:08

Page 303

1    A.   I just don't know.             15:13:08
2    Q.   You remember a meeting you had  15:13:09
3  with DEA in 2011, often referred to as the  15:13:12
4  earthquake meeting?  Correct?          15:13:14
5    A.   Yes.                           15:13:16
6    Q.   And it's referred to in that    15:13:17
7  manner because there was an earthquake that  15:13:18
8  day outside of DC, in Virginia in particular?  15:13:20
9    A.   Yes.                           15:13:23
10   Q.   As of the date of that meeting,  15:13:24
11  you had not yet adopted a formal procedure  15:13:28
12  for the enhanced SOM program, correct?  15:13:31
13       MR. O'CONNOR: Objection to       15:13:34
14      form.                            15:13:35
15       THE WITNESS: I don't know what   15:13:35
16      date we wrote the procedure, so I  15:13:36
17      can't make -- I cannot answer, I'm  15:13:38
18      sorry.                           15:13:40
19  QUESTIONS BY MR. KO:                  15:13:40
20    Q.   Fair enough.  Okay.           15:13:40
21       So turning back to this         15:13:42
22  particular exhibit, in the second paragraph  15:13:46
23  of the bottom e-mail starting with   15:14:01
24  "Basically," can you read that for the  15:14:04
25  record?                               15:14:06

Page 304

1    A.   "Basically, during the last two  15:14:06
2  years, all peculiar orders that were on the  15:14:09
3  daily report were investigated by CSR  15:14:13
4  manager, were deemed to be okay, and none  15:14:18
5  rose to the level of peculiar.  As you will  15:14:21
6  see, it was not feasible to forward the  15:14:26
7  peculiar order report to DEA due to the  15:14:28
8  lengthiness as we were tweaking the  15:14:34
9  algorithms."                          15:14:36
10   Q.   Okay.  And in the e-mail above,  15:14:37
11  you amend your statement about none rising to  15:14:40
12  the level of peculiar.  And what you actually  15:14:45
13  meant was that no peculiar orders rose to the  15:14:47
14  level of suspicious; is that correct?  15:14:50
15    A.   That is correct.              15:14:52
16    Q.   So as of October 31, 2010, is   15:14:53
17  it accurate to say that Mallinckrodt did not  15:14:59
18  identify a single suspicious order between  15:15:02
19  beginning of 2000 -- excuse me, between  15:15:07
20  August of 2008 to October 31, 2010?  15:15:11
21       MR. O'CONNOR: Objection to       15:15:15
22      form.                            15:15:17
23       THE WITNESS: None that rose to   15:15:17
24      the level of suspicious and reported  15:15:19
25      to DEA, that is correct.         15:15:22

Page 305

1  QUESTIONS BY MR. KO:                  15:15:23
2    Q.   Right.                         15:15:24
3        And so we had discussed earlier  15:15:24
4  about the significant amount of diversion and  15:15:30
5  abuse of Mallinckrodt pills that occurred in  15:15:34
6  Florida in the 2008 through 2012 time period.  15:15:36
7        Do you recall that?            15:15:38
8        MR. O'CONNOR: Objection.        15:15:38
9        THE WITNESS: Significant is     15:15:39
10      your word, but, yes, the diversion,  15:15:40
11      yes.                             15:15:42
12  QUESTIONS BY MR. KO:                  15:15:42
13    Q.   You recall that we discussed    15:15:44
14  diversion and abuse of Mallinckrodt pills  15:15:47
15  occurring in Florida throughout the 2008  15:15:49
16  through 2012 time period, correct?   15:15:51
17    A.   Yes.                          15:15:53
18    Q.   Okay.  And during at least a    15:15:54
19  two-year time period between 2008 and 2010,  15:15:58
20  Mallinckrodt's suspicious order monitoring  15:16:01
21  policy and system did not identify a single  15:16:04
22  suspicious order, correct?           15:16:07
23    A.   Correct.                      15:16:08
24    Q.   Okay.  And in the third        15:16:10
25  paragraph below in your e-mail you state,  15:16:13

Page 306

1  quote, "It is significant to note that          15:16:18
2  neither Sunrise or Harvard triggered the        15:16:21
3  algorithms that were in place for direct        15:16:23
4  customers because we were looking at overall    15:16:25
5  purchase trends for each distributor, not       15:16:26
6  reviewing where the distributors were sending   15:16:29
7  our product, and our program met CFR            15:16:31
8  requirements. In essence, the program was       15:16:37
9  expanded within the last month to our           15:16:41
10 customers' customers."                          15:16:43
11      Did I read that correctly?                 15:16:45
12 A.   Yes.                                        15:16:45
13 Q.   Now, Sunrise and Harvard are               15:16:46
14 two distributors that were customers of         15:16:48
15 Mallinckrodt, correct?                          15:16:49
16 A.   Correct.                                    15:16:50
17 Q.   And they both had their license            15:16:50
18 eventually suspended by the DEA at some time     15:16:52
19 in the 2010 time period?                         15:16:54
20 A.   Correct.                                    15:16:56
21 Q.   And so they had their licenses             15:16:57
22 suspended because they were selling to          15:17:01
23 customers, and in particular, pharmacies and   15:17:03
24 pain clinics that were engaged in              15:17:11
25 diversion --                                    15:17:13

Page 307

1      MR. O'CONNOR:  Objection to                 15:17:13
2  form.                                           15:17:13
3  QUESTIONS BY MR. KO:                            15:17:13
4  Q.   -- correct?                                15:17:14
5  A.   That is what was reported in               15:17:14
6  the media, yes.                                 15:17:17
7  Q.   Okay.  And was it -- and in                15:17:18
8  addition to what was reported in the media,     15:17:20
9  you eventually acquired some level of           15:17:22
10 knowledge of certain orders that Sunrise and   15:17:24
11 Harvard had shipped to pharmacies and clinics 15:17:28
12 in Florida, did you not?                        15:17:31
13      MR. O'CONNOR:  Objection to                15:17:33
14 form.                                           15:17:33
15      THE WITNESS:  Yes.                         15:17:33
16 QUESTIONS BY MR. KO:                            15:17:33
17 Q.   Okay.  And so ultimately                   15:17:34
18 Sunrise and Harvard had their license          15:17:36
19 suspended by the DEA due to suspicious orders  15:17:38
20 that they had shipped in at least the 2008     15:17:41
21 through 2000 {sic} time period; is that        15:17:46
22 correct?                                        15:17:48
23 A.   Yes.                                       15:17:48
24 Q.   Okay.  And here you're                     15:17:49
25 indicating that your suspicious order          15:17:50

Page 308

1  monitoring system did not trigger the           15:17:53
2  algorithms that were in place for that time     15:17:56
3  period.  And I presume the algorithms you're    15:18:01
4  discussing are the peculiar order algorithms,   15:18:04
5  correct?                                        15:18:06
6  A.   Correct.                                    15:18:06
7  Q.   So in other words, because                 15:18:07
8  their orders were not either 2X or              15:18:10
9  potentially 3X of the prior fiscal year, as     15:18:13
10 we previously discussed, there was never a      15:18:18
11 peculiar order flag that was raised with        15:18:23
12 respect to their orders --                      15:18:25
13      MR. O'CONNOR:  Objection to                15:18:26
14 form.                                           15:18:27
15 QUESTIONS BY MR. KO:                            15:18:27
16 Q.   -- fair?                                   15:18:27
17 A.   Fair.                                       15:18:27
18 Q.   Okay.  And you note that your              15:18:28
19 suspicious order monitoring system at the       15:18:32
20 time was unable to identify whether or not      15:18:33
21 certain of their orders were suspicious         15:18:37
22 because, of course, you just had a peculiar     15:18:39
23 order algorithm that was based on a metric of   15:18:43
24 orders relative to prior order history.         15:18:49
25      MR. O'CONNOR:  Objection to                15:18:52

Page 309

1  form.                                           15:18:53
2      THE WITNESS:  So enabling is                15:18:53
3  paraphrasing, but we were looking at            15:18:56
4  different purchasing trends and not at          15:19:01
5  the downstream registrant.                      15:19:05
6  QUESTIONS BY MR. KO:                            15:19:07
7  Q.   Right.                                     15:19:07
8      And I didn't say -- just so the             15:19:08
9  record is clear, I didn't say "enable"; I       15:19:09
10 said "unable."                                   15:19:12
11 A.   Unable, yes.                                15:19:12
12 Q.   Right.                                      15:19:13
13      So Mallinckrodt's suspicious               15:19:14
14 order monitoring program at the time was        15:19:15
15 unable to identify any suspicious orders of     15:19:17
16 Sunrise or Harvard because you were merely      15:19:23
17 looking at a numerical metric of order          15:19:26
18 history -- of orders relative to order          15:19:31
19 history of Sunrise and Harvard, correct?        15:19:33
20      MR. O'CONNOR:  Objection.                  15:19:35
21 Form.                                           15:19:36
22      THE WITNESS:  Correct.                     15:19:37
23 QUESTIONS BY MR. KO:                            15:19:37
24 Q.   Okay.  At the time that you                15:19:45
25 learned that Sunrise and Harvard had their      15:19:45

Page 310

1 licenses suspended by the DEA, did that 15:19:48
2 concern you? 15:19:50
3    A. Yes. 15:19:50
4    Q. Okay. And it also -- and it 15:19:50
5 concerned you because you had been unable to 15:19:52
6 detect the fact that they actually had 15:19:56
7 shipped many suspicious orders, according to 15:19:58
8 the DEA, prior to 2010, correct? 15:20:00
9       MR. O'CONNOR: Objection to 15:20:01
10 form. 15:20:02
11       THE WITNESS: It concerned me 15:20:02
12 because they were direct customers of 15:20:05
13 Mallinckrodt. 15:20:06
14 QUESTIONS BY MR. KO: 15:20:07
15    Q. Okay. And they were direct 15:20:07
16 customers of Mallinckrodt that had 15:20:09
17 Mallinckrodt pills sold to pharmacies and 15:20:12
18 clinics -- strike that. 15:20:16
19       When you say it concerned you 15:20:22
20 because they were direct customers of 15:20:25
21 Mallinckrodt, is it also accurate to say that 15:20:28
22 you were concerned because Mallinckrodt pills 15:20:30
23 may have been diverted or abused as a result 15:20:37
24 of shipments made by Sunrise and Harvard? 15:20:40
25       MR. O'CONNOR: Objection to 15:20:42

Page 311

1 form. 15:20:43
2       THE WITNESS: Yes. 15:20:44
3 QUESTIONS BY MR. KO: 15:20:46
4    Q. Okay. Now, I want to turn to 15:20:47
5 the -- you can keep the e-mail in front of 15:20:49
6 you if you'd like, but this document which is 15:20:53
7 Exhibit 35, that appears to be a chronology 15:20:58
8 of the suspicious order monitoring program 15:21:03
9 from August 2008 through 2010; is that 15:21:05
10 correct? 15:21:08
11    A. That is correct. 15:21:08
12    Q. And it's specifically a 15:21:08
13 chronology of the SOM program regarding 15:21:12
14 Mallinckrodt's dosage products during that 15:21:14
15 time period, correct? 15:21:17
16    A. Correct. 15:21:17
17    Q. And in Exhibit 15, you 15:21:18
18 reference to Ms. Spaulding a chronology, a 15:21:22
19 lengthy chronology, to try and get her up to 15:21:25
20 speed on what has occurred with respect to 15:21:28
21 Mallinckrodt's SOM program. 15:21:30
22       Do you see a reference to that? 15:21:32
23       It'll be at the -- 15:21:38
24    A. Yes, yes, I do. 15:21:39
25    Q. Do you recall whether or not 15:21:41

Page 312

1 this chronology is the chronology that you 15:21:41
2 conveyed to Ms. Spaulding? 15:21:44
3    A. Yes, I believe it is. 15:21:47
4    Q. Okay. And does the 15:21:48
5 chronology -- indicates that in the fall 15:22:04
6 of 2008 -- well, first of all, there's a 15:22:07
7 reference made at the top of the page to an 15:22:09
8 old version that was being sent to DEA 15:22:11
9 Albany. 15:22:15
10       Do you see that? 15:22:16
11    A. Yes, I do. 15:22:16
12    Q. And in your chronology you 15:22:16
13 indicate, quote, "This reporting system was 15:22:22
14 discontinued at the direction of suspicious 15:22:24
15 order monitoring team pending new order 15:22:27
16 algorithms that the SOM team was working to 15:22:30
17 establish." 15:22:32
18       Did I read that correctly? 15:22:33
19    A. Yes. 15:22:33
20    Q. So, again, in the fall of 2008, 15:22:35
21 you are continually working on revising the 15:22:37
22 SOM program, correct? 15:22:40
23    A. Correct. 15:22:41
24    Q. And you had abandoned a 15:22:42
25 reporting system that was in place to send 15:22:45

Page 313

1 reports to DEA Albany as of this date, 15:22:49
2 correct? 15:22:52
3    A. Yes. 15:22:52
4    Q. Okay. Turning to the next 15:22:54
5 page, there's an indication on February 16, 15:23:11
6 2009, that "SOM draft procedure sent to legal 15:23:18
7 department for further review relative to new 15:23:22
8 tasks being created as part of the revised 15:23:29
9 program." 15:23:31
10       Do you see that? 15:23:31
11    A. Yes. 15:23:31
12    Q. So legal played a part in the 15:23:31
13 review of the SOM draft procedures and the 15:23:33
14 ultimate implementation of the revised SOM 15:23:36
15 program; is that fair to say? 15:23:39
16    A. Yes. 15:23:40
17    Q. Okay. And do you recall 15:23:40
18 working with Mr. Lohman and Ms. Duft in 15:23:41
19 connection with implementation of the revised 15:23:45
20 SOM program? 15:23:47
21    A. Yes. 15:23:48
22    Q. Is it fair to say that they 15:23:48
23 had -- in addition to working with them, is 15:23:54
24 it fair to say that they had -- or how would 15:23:56
25 you describe their involvement in the 15:24:01

Page 314

```
 1   implementation of the revised SOM program?     15:24:02
 2          MR. O'CONNOR: I'm just going      15:24:05
 3   to remind the witness not to get into      15:24:06
 4   any specific communications with          15:24:07
 5   counsel.                        15:24:08
 6          THE WITNESS: They were         15:24:09
 7   contributors and reviewers in terms of    15:24:13
 8   the current system set of enhancements    15:24:15
 9   that we were working on.              15:24:17
10   QUESTIONS BY MR. KO:                 15:24:18
11      Q.   Sure.                     15:24:18
12          And do you recall how          15:24:18
13   frequently you communicated with them during  15:24:22
14   this time period?                   15:24:24
15      A.   I do not.                   15:24:25
16      Q.   Okay.  Do you recall whether or  15:24:26
17   not it was monthly communications with them  15:24:27
18   or weekly communications?             15:24:30
19      A.   I do not.                   15:24:32
20      Q.   Relative to other people that   15:24:33
21   you had worked with in connection with    15:24:35
22   revising the SOM policy, do you have any   15:24:36
23   understanding of whether or not their     15:24:40
24   involvement was higher or lower than, for  15:24:42
25   example, your interactions with Mr. Ratliff  15:24:47
```

Page 315

```
 1   in the security department?            15:24:49
 2          MR. O'CONNOR: Objection to      15:24:53
 3   form.                          15:24:53
 4          THE WITNESS: I'm sorry, I       15:24:53
 5   thought you were talking about legal.     15:24:54
 6   QUESTIONS BY MR. KO:                 15:24:55
 7      Q.   I am.  And I'm just trying to   15:24:55
 8   get an understanding --              15:24:57
 9      A.   Okay.                      15:24:57
10      Q.   Because since you can't        15:24:59
11   necessarily recall how involved they were,  15:25:01
12   I'm just trying to get an understanding of  15:25:03
13   perhaps seeing if you knew how much they were  15:25:05
14   involved relative to other groups that    15:25:07
15   part of the SOM team.                15:25:08
16          So it's fair to say that they   15:25:09
17   were part of the SOM -- legal was part of the  15:25:10
18   SOM team, correct?                  15:25:13
19      A.   Correct.                   15:25:13
20      Q.   And you had some interaction   15:25:14
21   with them in implementing an SOM program,  15:25:16
22   correct?                        15:25:19
23      A.   Correct.                   15:25:19
24      Q.   And would you say that that    15:25:20
25   involvement or interaction was more or less  15:25:22
```

Page 316

```
 1   than the interaction you had with other    15:25:26
 2   groups?                         15:25:29
 3      A.   I don't know.  I can't say.     15:25:30
 4      Q.   Okay.                      15:25:33
 5      A.   I can't answer.              15:25:33
 6      Q.   Do you recall if you had any    15:25:33
 7   kind of day-to-day communication with them?  15:25:35
 8      A.   I don't recall, but I do not    15:25:37
 9   think so.                        15:25:43
10      Q.   Okay.  Now, on the next --     15:25:43
11   well, the next entry is redacted, but the  15:25:50
12   entry after that dated March 2, 2009,     15:25:52
13   indicates that "Mr. Rausch continues to work  15:25:54
14   with IS to define the criteria of what would  15:25:57
15   be peculiar -- what would be a peculiar order  15:25:59
16   and how to determine programmatic flags for  15:26:01
17   detection."                      15:26:05
18          Did I read that correctly?      15:26:06
19      A.   Yes, you did.               15:26:06
20      Q.   Okay.  And perhaps it might     15:26:09
21   mean to say problematic, but in any way, we  15:26:10
22   don't need to guess.                15:26:14
23          It's fair to say that as of     15:26:17
24   March 2, 2009, Jim Rausch is continuing to  15:26:19
25   try and define the criteria of what      15:26:24
```

Page 317

```
 1   constitutes a peculiar order.          15:26:26
 2          MR. O'CONNOR: Objection.        15:26:27
 3   QUESTIONS BY MR. KO:                 15:26:27
 4      Q.   Correct?                   15:26:28
 5      A.   That is correct.             15:26:28
 6      Q.   And IS is information systems?  15:26:29
 7      A.   Yes, that's correct.          15:26:31
 8      Q.   And was there a point person   15:26:32
 9   in -- at IS that you worked with or you knew  15:26:34
10   was part of the SOM team?             15:26:37
11      A.   I don't know.               15:26:39
12      Q.   Okay.  Now, further down on    15:26:41
13   June 29, 2009, you indicate that "revised  15:26:48
14   questionnaire -- customer questionnaires are  15:26:54
15   submitted to legal that have been updated  15:26:56
16   based upon CSF focus group meetings Jim    15:26:58
17   Rausch and Cathy Stewart conducted with    15:27:02
18   CSRs."                          15:27:04
19          Did I read that correctly?      15:27:05
20      A.   Yes.                       15:27:05
21      Q.   So again, you're continually   15:27:06
22   working on the customer checklists or     15:27:07
23   questionnaires that will be submitted to   15:27:10
24   Mallinckrodt customers in connection with the  15:27:13
25   SOM program; fair to say?             15:27:15
```

Page 318

1    A.    Yes.                    15:27:17
2    Q.    Okay.  And the -- by the way,    15:27:18
3 in this chronology that you drafted, you    15:27:36
4 represented to Eileen that this was an    15:27:40
5 attempt by you to provide an extensive    15:27:44
6 chronology on SOM activities during this    15:27:49
7 two-year time period.              15:27:52
8         Why were you providing this to    15:27:52
9 her?                          15:27:56
10    A.    I was assigned at the St. Louis    15:27:56
11 plant, working in the plant during a work    15:27:57
12 stoppage which had gone on for an extended    15:28:00
13 period of time, months, and so I wanted to    15:28:04
14 update Eileen on the status of the current    15:28:07
15 system of enhancements.            15:28:10
16    Q.    Okay.  And do you recall    15:28:11
17 whether or not you may have provided this to    15:28:13
18 her in preparation for any meetings that she    15:28:15
19 was having with DEA?              15:28:18
20    A.    I don't recall.          15:28:19
21    Q.    Okay.  And you did reference a    15:28:23
22 work stoppage at Mallinckrodt.  I understand    15:28:26
23 that there was a strike by some employees at    15:28:29
24 Covidien at the time.            15:28:31
25    A.    Is that referenced here?    15:28:31

Page 319

1    Q.    I don't think it is.    15:28:33
2    A.    Okay.                  15:28:34
3    Q.    Yeah, but --            15:28:34
4    A.    All right.              15:28:34
5    Q.    -- just -- just generally there    15:28:35
6 was --                        15:28:35
7    A.    Yes, you're correct.  Yes.    15:28:35
8    Q.    There was a strike by Covidien    15:28:37
9 employees in the 2010 time period.    15:28:39
10         How long did that last?    15:28:41
11    A.    17 weeks, I believe.      15:28:42
12    Q.    Okay.  A fairly long strike.    15:28:51
13    A.    (Witness nods head.)        15:28:52
14    Q.    And during that time period,    15:28:53
15 was there any work done on attempting to    15:28:54
16 improve or revise the SOM process?    15:28:56
17    A.    Yes.                  15:29:00
18    Q.    And who was that work done by?    15:29:01
19    A.    So the work was ongoing, with    15:29:03
20 Jim Rausch working with IT on the algorithms,    15:29:06
21 so other subcomponents of the team continued    15:29:10
22 while I was away.              15:29:13
23    Q.    Okay.  And with respect to this    15:29:15
24 chronology, you have no reason to dispute the    15:29:17
25 accuracy of any of these events that you    15:29:21

Page 320

1 report to Ms. Spaulding, do you?    15:29:25
2    A.    I do not.                15:29:26
3    Q.    Okay.  And by the way, what was    15:29:29
4 the approximate date of the strike?    15:29:30
5    A.    It was in 2010, and I believe    15:29:31
6 it would have started in March or April    15:29:38
7 because our union contract's due in March,    15:29:39
8 but I think they had an extension until    15:29:43
9 April.  So I'm not -- around that time.    15:29:45
10    Q.    Okay.  Great.            15:29:48
11         And it lasted until May or June    15:29:49
12 of 2010?                      15:29:54
13    A.    Or longer.  I can't --    15:29:54
14    Q.    Sure.                  15:29:57
15    A.    I can't remember when it was    15:29:57
16 over.                        15:29:58
17    Q.    Sure.                  15:29:58
18         Turn to page 4 of this report,    15:29:59
19 this chronology.  There's a reference made    15:30:02
20 that on April 30, 2010, the peculiar order    15:30:11
21 calculations changed from a 2X factor to a 3X    15:30:14
22 factor.                      15:30:18
23         Do you see that reference?    15:30:20
24    A.    I do.                  15:30:21
25    Q.    So if I understand correctly,    15:30:22

Page 321

1 the peculiar order algorithm on April 30,    15:30:27
2 2010, increased from 2X to 3X, correct?    15:30:30
3    A.    That's correct.          15:30:36
4    Q.    So in other words, as of April    15:30:36
5 30, 2010, the algorithm that Mallinckrodt    15:30:38
6 utilized to determine whether or not an order    15:30:42
7 was suspicious was by determining whether an    15:30:44
8 order was three times greater than the prior    15:30:50
9 year average; is that accurate?    15:30:54
10    A.    Yes.                  15:30:57
11    Q.    Okay.  And this increase    15:30:58
12 resulted for a variety of reasons, is my    15:31:04
13 understanding, but is one of the reasons that    15:31:08
14 you increased from 2X to 3X because the    15:31:11
15 peculiar order report was too lengthy?    15:31:14
16         MR. O'CONNOR:  Objection to    15:31:18
17    form.                    15:31:19
18         THE WITNESS:  Yes.        15:31:20
19 QUESTIONS BY MR. KO:              15:31:20
20    Q.    So it was creating an    15:31:21
21 administrative burden because there were too    15:31:22
22 many orders to review?            15:31:25
23         MR. O'CONNOR:  Objection to    15:31:26
24    form.                    15:31:27
25         THE WITNESS:  Yes.        15:31:27

Page 322

```
1   QUESTIONS BY MR. KO:                 15:31:29
2       Q.   Okay.  And so you and others     15:31:29
3   believed that increasing the peculiar order  15:31:33
4   algorithm to 3X would reduce the amount of   15:31:37
5   reports that were printed for the SOM team to 15:31:39
6   review, correct?                     15:31:43
7       A.   That's correct, and the hope  15:31:45
8   was that the truly -- the orders that needed  15:31:47
9   to be investigated further would then print   15:31:50
10  based upon this new change in the algorithm.  15:31:54
11      Q.   Okay.  And the increase from 2X  15:31:59
12  to 3X occurs during this time period -- well,  15:32:07
13  strike that.                         15:32:10
14       I believe as of the date of --   15:32:27
15  I know you don't recall when the actual  15:32:29
16  revised SOM policy was formalized, but at  15:32:32
17  least as of the date of this e-mail,  15:32:34
18  October 31, 2010, the revised SOM program had  15:32:36
19  yet to be formalized; is that correct?  15:32:38
20      MR. O'CONNOR:  Objection.     15:32:40
21  Form.                            15:32:41
22      THE WITNESS:  So that         15:32:41
23  depends -- yes.  In a final SOP, yes,  15:32:46
24  but I believe that we were updating    15:32:50
25  our work instructions or our          15:32:52
```

Page 323

```
1   procedures all the way along the line.  15:32:53
2       But, yes, finalized, signed, sealed,  15:32:56
3       yes, it was not at that time.      15:32:59
4   QUESTIONS BY MR. KO:                 15:33:00
5       Q.   And when we talk about the     15:33:00
6   final SOP or SOM procedure, this was a formal  15:33:01
7   document which lays out the criteria for  15:33:04
8   identifying a suspicious order, correct?  15:33:07
9       A.   Correct.                    15:33:10
10      Q.   And so at the time -- as of    15:33:11
11  October 31, 2010, a final SOM procedure that  15:33:13
12  outlines the criteria for identifying a  15:33:19
13  suspicious order had not yet been finalized,  15:33:22
14  correct?                         15:33:25
15      A.   So does this -- oh, that --    15:33:25
16  yes, that's correct based upon this e-mail,  15:33:30
17  yes.                             15:33:32
18      Q.   Okay.  I'm going to hand you a  15:33:47
19  copy of what will be marked as Harper  15:33:49
20  Exhibit 16.                      15:33:50
21      A.   May I put these aside?        15:33:51
22      Q.   Yes, you may.               15:33:52
23      A.   All right.                  15:33:54
24      Q.   Actually, I lied.  It won't be  15:33:54
25  Exhibit 16.  It's previously been marked as   15:34:02
```

Page 324

```
1   Exhibit 33 to the Stewart deposition.  15:34:04
2       MR. KO:  And for the record, it  15:34:15
3       ends in Bates 279975.            15:34:11
4   QUESTIONS BY MR. KO:                 15:34:11
5       Q.   And this appears to be an     15:34:22
6   e-mail exchange between you and Ms. Stewart.  15:34:23
7       Do you see that?                 15:34:25
8       A.   Yes.                       15:34:26
9       Q.   And I just have a couple      15:34:26
10  questions on this.                   15:34:28
11      Ms. Stewart asks on Monday,       15:34:32
12  August 9, 2010, quote, "How's progress on the  15:34:36
13  revised suspicious order monitoring program  15:34:43
14  going?" end quote.                   15:34:44
15      Did I read that correctly?       15:34:47
16      A.   Yes.                       15:34:48
17      Q.   Okay.  And your response -- you  15:34:48
18  respond several things, but your response to  15:34:53
19  this question is, quote, "We had a meeting  15:34:54
20  last week that could only be classified as a  15:34:57
21  train wreck, but the effort will continue and  15:35:00
22  I will not be discouraged.  I will not be  15:35:02
23  discouraged.  I will not be discouraged."  15:35:38
24      Did I read that correctly?       15:35:07
25      A.   Yes.                       15:35:07
```

Page 325

```
1       Q.   Okay.  So fair to say that as  15:35:08
2   of August 9, 2010, at least with respect to  15:35:11
3   the meeting you had on the revised SOM  15:35:14
4   program, you believed that the meeting was a  15:35:16
5   train wreck, correct?                15:35:19
6       A.   That particular meeting, but I  15:35:21
7   don't remember what the meeting was, and it's  15:35:23
8   an inartful term on my part.  But, yes,  15:35:24
9   that's what the e-mail says.          15:35:29
10      Q.   And you have no reason to doubt  15:35:30
11  that you sent this e-mail to Ms. Stewart?  15:35:32
12      A.   I don't.                    15:35:34
13      Q.   Okay.  Were you frustrated at  15:35:35
14  the time in August of 2010 with how the  15:35:39
15  revised suspicious order monitoring program  15:35:42
16  was going?                       15:35:44
17      A.   I would like -- I would like to  15:35:44
18  read this whole e-mail, please, for context,  15:35:51
19  because it appears to be talking about  15:35:53
20  exports, import permits and letters of  15:35:56
21  non-reexport.                    15:35:59
22      So we've switched the            15:36:00
23  conversation to SOM, but I don't see that on  15:36:01
24  this page.                       15:36:04
25      Q.   Sure.  Sure.                15:36:05
```

Page 326

```
1        So I guess -- I'll just ask you   15:36:05
2   a question to save time.                15:36:08
3        Ms. Stewart clearly asks you       15:36:10
4   whether -- how progress on the revised  15:36:12
5   suspicious order monitoring program is going,  15:36:16
6   correct?                                15:36:17
7   A.   Yes.                               15:36:17
8   Q.   And separate and apart --          15:36:17
9   separate and apart from what you responded to  15:36:18
10  her, however inartful that was, my question  15:36:22
11  to you is: Do you recall in the 2010 time  15:36:25
12  period being frustrated at the progress of  15:36:29
13  the revised SOM policy at Mallinckrodt?  15:36:32
14  A.   Yes.                               15:36:35
15  Q.   Okay. And as of August 2010,       15:36:40
16  this is about two and a half years after you  15:36:55
17  first identify SOM as being an elevated  15:36:58
18  priority for you; is that fair to say?  15:37:01
19  A.   Yes.                               15:37:03
20       (Mallinckrodt-Harper Exhibit 16    15:37:07
21  marked for identification.)             15:37:07
22  QUESTIONS BY MR. KO:                    15:37:07
23  Q.   Okay. I'm going to hand you a      15:37:07
24  copy of what's going to now be marked as --  15:37:08
25  you can set that aside.                 15:37:11
```

Page 327

```
1   A.   All right.                        15:37:12
2   Q.   This is a copy of Harper           15:37:13
3   Exhibit 16. And for the record, it ends in  15:37:20
4   Bates 280260.                           15:37:25
5        And this is an e-mail exchange     15:37:37
6   between, again, you and Ms. Spaulding dated  15:37:38
7   September 24, 2010?                     15:37:44
8   A.   Correct, yes.                      15:37:45
9   Q.   And Ms. Spaulding asks at the      15:37:46
10  bottom how a conference call on SOM went.  15:37:54
11       Do you see that?                   15:37:59
12  A.   Uh-huh. I do.                      15:38:00
13  Q.   And you respond, and I'd ask       15:38:01
14  that you read the first full sentence at the  15:38:05
15  top of your e-mail.                     15:38:11
16  A.   "Interesting, the group            15:38:12
17  decided" --                             15:38:15
18  Q.   I'm sorry, just I guess --         15:38:15
19  A.   Oh, I beg your pardon.             15:38:17
20  Q.   Yeah, I guess "pretty well" is     15:38:19
21  the first sentence. Just so just start  15:38:22
22  reading from "pretty well."             15:38:23
23  A.   Oh, I'm sorry.                     15:38:25
24  Q.   That's okay.                       15:38:25
25  A.   "Pretty well. Interesting, the    15:38:26
```

Page 328

```
1   group decided that the actual day-to-day  15:38:28
2   monitoring responsibility should be switched  15:38:31
3   to a non-customer service function in that  15:38:32
4   those that have responsibility to manage the  15:38:38
5   orders have a conflict of interest in  15:38:40
6   deciding which orders should ultimately be  15:38:42
7   shipped, with the ultimate right -- with  15:38:46
8   ultimate right of refusal retained by the  15:38:50
9   controlled substances compliance group."  15:38:55
10  Q.   Okay. Thank you for that.          15:38:56
11       So is it accurate to say that      15:38:57
12  one of the things that came out of this  15:39:00
13  conference call regarding Mallinckrodt's then  15:39:03
14  existing SOM procedure was that you were  15:39:05
15  attempting to shift the day-to-day monitoring  15:39:09
16  responsibility of particular orders to a  15:39:12
17  non-customer service function?           15:39:19
18  A.   That is correct.                   15:39:20
19  Q.   Okay. And earlier we had           15:39:21
20  discussed about -- earlier we had discussed  15:39:27
21  the fact that certain salespeople did not  15:39:29
22  have day-to-day monitoring responsibilities  15:39:32
23  with respect to SOM.                    15:39:34
24       Does this change your testimony    15:39:36
25  at all or refresh your recollection at all  15:39:38
```

Page 329

```
1   that at one point in time NAMs and/or      15:39:40
2   customer service representatives did, indeed,  15:39:44
3   have day-to-day monitoring responsibilities  15:39:49
4   with respect to Mallinckrodt's suspicious  15:39:50
5   order monitoring program?               15:39:52
6        MR. O'CONNOR: Objection to         15:39:53
7   form.                                   15:39:54
8        THE WITNESS: So I'd like to        15:39:54
9   clarify, please.                        15:39:54
10       When we talk about commercial      15:39:55
11  group, that's the NAMs.                 15:39:56
12       Customer service is not called     15:39:58
13  commercial group, unless I              15:40:00
14  inadvertently referred to them as that  15:40:01
15  here. They've never been part --        15:40:04
16  even -- it seems like they would be     15:40:07
17  commercial. They are not commercial     15:40:09
18  group.                                  15:40:10
19       So this is talking about switch   15:40:12
20  from a non-customer service function.   15:40:13
21  QUESTIONS BY MR. KO:                    15:40:15
22  Q.   Okay. So are you referring         15:40:16
23  here to CSRs or NAMs?                   15:40:17
24  A.   CSRs.                              15:40:20
25  Q.   Okay. So then prior to the        15:40:21
```

Page 330

```
 1  date of this e-mail, it would be accurate to    15:40:25
 2  say that CSRs had actual day-to-day             15:40:27
 3  monitoring responsibilities with respect to     15:40:30
 4  Mallinckrodt's SOM program?                     15:40:31
 5      A.   So I'd like to clarify.  It was        15:40:33
 6  Jim Rausch in particular who was the manager    15:40:34
 7  of C -- customer service.                       15:40:36
 8      Q.   Okay.  So what you're saying           15:40:39
 9  then through this e-mail is that you wanted      15:40:41
10  to remove Jim Rausch from the day-to-day        15:40:45
11  monitoring of Mallinckrodt's SOM program?       15:40:48
12      A.   The group decided that, yes.           15:40:50
13      Q.   Okay.  And did you in fact             15:40:52
14  implement this policy change?                   15:40:53
15      A.   Yes.                                   15:40:55
16      Q.   Okay.  Now, I know that you're         15:40:55
17  not referring to NAMs here, but would you       15:41:11
18  agree with me that -- well, first of all, let   15:41:15
19  me back up.                                     15:41:19
20           Do you have any understanding          15:41:19
21  of how many national account managers there     15:41:20
22  were at Mallinckrodt?                           15:41:23
23      A.   I do not.                              15:41:24
24      Q.   Okay.  Does the number four            15:41:25
25  sound accurate to you?                          15:41:29
```

Page 331

```
 1      A.   It's possible.  I just don't --        15:41:30
 2  I don't know.                                   15:41:32
 3      Q.   Okay.  Would you -- if I               15:41:33
 4  represented to you, and assuming that I could   15:41:38
 5  prove at trial that there were approximately    15:41:40
 6  eight national account managers at              15:41:42
 7  Mallinckrodt during the 2005 through 2015       15:41:44
 8  time period, does that -- is that consistent    15:41:48
 9  with your understanding?                        15:41:49
10           MR. O'CONNOR:  Object to form.         15:41:51
11           THE WITNESS:  I just don't know        15:41:52
12      who the NAMs were at any particular         15:41:55
13      time or assigned to which product          15:41:57
14      line.                                       15:41:59
15  QUESTIONS BY MR. KO:                            15:42:00
16      Q.   Sure.                                  15:42:00
17           But you interacted with many of        15:42:00
18  the NAMs, correct?                              15:42:03
19      A.   Correct.                               15:42:04
20      Q.   And how many NAMs did you              15:42:05
21  interact with?                                  15:42:06
22      A.   Four to six, I'm guesstimating.        15:42:06
23      Q.   And among those were Victor            15:42:13
24  Borelli, Steve Becker and Jane Williams,        15:42:16
25  correct?                                        15:42:19
```

Page 332

```
 1      A.   Yes, except Jane Williams was          15:42:19
 2  vice president.  And she was in charge of the   15:42:22
 3  NAMs but not a NAM herself.                     15:42:24
 4      Q.   Right.  Thank you for the              15:42:26
 5  clarification.                                  15:42:27
 6           So during the two -- would it          15:42:27
 7  be accurate to say that during the 2005         15:42:30
 8  through 2017 time period you interacted with    15:42:35
 9  about four NAMs?                                 15:42:37
10      A.   So there was also -- Bonnie New        15:42:39
11  is another.  There was a gentleman who -- a     15:42:46
12  name Dave Irwin.  Again, people transitioned    15:42:51
13  roles over time, and, I'm sorry, I cannot say   15:42:53
14  that at one certain time frame which NAMs I     15:42:54
15  interacted with.                                15:42:57
16      Q.   Sure.  And I'm just trying to          15:42:57
17  get a general understanding.                    15:42:59
18      A.   Okay.                                  15:43:00
19      Q.   So approximately four to five          15:43:01
20  NAMs that you interacted with in connection     15:43:02
21  with your -- in connection with your            15:43:04
22  responsibilities in designing, implementing,    15:43:08
23  an SOM program, correct?                        15:43:09
24      A.   I'll agree with approximately,         15:43:11
25  yes.                                            15:43:13
```

Page 333

```
 1      Q.   Okay.  And despite not knowing         15:43:13
 2  exactly how much NAMs made, was it your         15:43:24
 3  understanding that NAMs were compensated        15:43:26
 4  based on the amount of customers that they      15:43:27
 5  had?                                            15:43:32
 6      A.   No, I didn't -- I didn't know.         15:43:32
 7      Q.   You had no understanding?              15:43:34
 8      A.   Right.                                 15:43:35
 9      Q.   Okay.  To the extent they were         15:43:36
10  compensated based on the volume of pills        15:43:40
11  purchased by their customers, would you agree   15:43:46
12  that that would be a conflict of interest --    15:43:48
13           MR. O'CONNOR:  Object to form.         15:43:51
14  QUESTIONS BY MR. KO:                            15:43:51
15      Q.   -- to the extent they were             15:43:51
16  involved in the SOM monitoring process?         15:43:52
17           MR. O'CONNOR:  Same objection.         15:43:54
18           THE WITNESS:  So I'm sorry, are        15:43:54
19      we making the -- the inferential leap       15:43:55
20      that they were definitely -- because I      15:43:59
21      don't know about their compensation,        15:44:01
22      if it was dollars, pills, accounts,         15:44:01
23      regions.  I don't know that.                15:44:04
24  QUESTIONS BY MR. KO:                            15:44:05
25      Q.   Sure.                                  15:44:06
```

Page 334

1    Assuming that NAMs were paid          15:44:06
2  based on volume of pills sold, at least in     15:44:09
3  part --                                15:44:11
4    A.   Okay.                           15:44:11
5    Q.   -- were paid based on the        15:44:13
6  amount of pills that they were able to sell    15:44:14
7  to a particular customer, would you agree      15:44:16
8  that that would be a conflict of interest to   15:44:18
9  have them involved in evaluating whether or    15:44:21
10  not an order was suspicious?              15:44:23
11        MR. O'CONNOR:  Object to form.      15:44:24
12        THE WITNESS:  No.                 15:44:25
13  QUESTIONS BY MR. KO:                     15:44:26
14    Q.   Okay.  And going back to the     15:44:26
15  e-mail that's in front of you and -- you       15:44:41
16  indicate that at least from this meeting it    15:44:45
17  was agreed that customer service              15:44:51
18  representatives would no longer be involved    15:44:56
19  in the day-to-day monitoring because of       15:44:58
20  their -- because of a conflict of interest.    15:45:00
21        MR. O'CONNOR:  Object to form.      15:45:02
22  QUESTIONS BY MR. KO:                     15:45:03
23    Q.   Do you see it?                   15:45:05
24    A.   Yes.  Yes, I do see that.  Yes.  15:45:06
25    Q.   And what is the conflict of      15:45:09

Page 335

1  interest that you're referring to there?      15:45:10
2    A.   It's a -- you know, it's just a   15:45:11
3  conglomeration of even though customer          15:45:12
4  service is separate from the NAMs and          15:45:16
5  separate from commercial, customer service     15:45:20
6  does maintain a relationship with the          15:45:22
7  customers.  And so that's the basis on which   15:45:24
8  this statement was made.                      15:45:26
9    Q.   Well, how -- how was it any       15:45:28
10  different -- how was the conflict of interest  15:45:34
11  that applies with respect to the customer      15:45:36
12  service group any different than a conflict    15:45:38
13  of interest that would apply with respect to   15:45:40
14  the national account managers?                15:45:43
15    A.   So customer service group        15:45:44
16  maintained the relationship with the           15:45:51
17  customer, as did the NAMs.                    15:45:53
18        Could you repeat that question,    15:45:55
19  please?  I'm getting mixed up as I'm thinking  15:45:56
20  of my answer.  I'm sorry.                     15:46:01
21    Q.   Sure.                           15:46:03
22        How was the conflict of           15:46:03
23  interest that applies with the customer        15:46:04
24  service group that you're referring to in      15:46:07
25  this e-mail differ in any way from the         15:46:10

Page 336

1  conflict of interest that would apply with     15:46:13
2  respect to a national account manager?         15:46:15
3        MR. O'CONNOR:  Object to form.      15:46:16
4        THE WITNESS:  So it doesn't,        15:46:17
5    because neither of them, neither the        15:46:18
6    NAMs or customer service, were --          15:46:20
7    after this, they were not directly         15:46:26
8    responsible for the day-to-day             15:46:28
9    monitoring.  They were consulted or        15:46:29
10    rose situations to our attention.         15:46:31
11  QUESTIONS BY MR. KO:                     15:46:33
12    Q.   I understand that that was       15:46:34
13  the -- what happened after this e-mail, or     15:46:34
14  that change was attempted to be made.  But     15:46:37
15  prior to the date of this, you are             15:46:40
16  indicating, are you not, in this e-mail that   15:46:46
17  a conflict of interest exists with respect to  15:46:47
18  the customer service group?                   15:46:49
19    A.   It does state -- yes, it does     15:46:51
20  state that.                                15:46:59
21    Q.   And you said also that national   15:46:59
22  account managers have involvement in -- in     15:47:01
23  Mallinckrodt customers as well, right?         15:47:04
24    A.   Correct.                         15:47:06
25    Q.   And that approximately four to    15:47:07

Page 337

1  eight national account managers that          15:47:11
2  Mallinckrodt had, they were in charge of       15:47:12
3  wholesale distributors that Mallinckrodt       15:47:15
4  supplied drugs to, correct?                   15:47:18
5        MR. O'CONNOR:  Object to form.      15:47:20
6        THE WITNESS:  Correct.             15:47:20
7  QUESTIONS BY MR. KO:                     15:47:21
8    Q.   And so the -- do you believe     15:47:22
9  that a conflict of interest exists with        15:47:28
10  respect to a national account manager's        15:47:32
11  involvement in the suspicious order            15:47:34
12  monitoring program given that their --         15:47:37
13  assuming this was true -- given that their     15:47:40
14  primary form of compensation was the amount    15:47:44
15  of pills they were able to sell --            15:47:47
16        MR. O'CONNOR:  Object to form.      15:47:49
17  QUESTIONS BY MR. KO:                     15:47:49
18    Q.   -- to a particular Mallinckrodt   15:47:50
19  customer?                                 15:47:52
20        MR. O'CONNOR:  Objection.          15:47:52
21        THE WITNESS:  No, I do not.        15:47:53
22  QUESTIONS BY MR. KO:                     15:47:54
23    Q.   Okay.  It's okay to say no.      15:47:54
24    A.   Oh, I'm sorry.  I'm sorry.       15:48:06
25    Q.   No, don't be sorry.              15:48:09

Page 338

```
1        Here's --                    15:48:09
2     A.   That was for emphasis.     15:48:09
3     Q.   I want to hand you a copy of   15:48:10
4  what's going to be -- what has previously   15:48:11
5  been marked -- you can set that aside --   15:48:12
6  what's previously been marked as Exhibit 44   15:48:17
7  of the Stewart deposition.         15:48:19
8        MR. KO:  And for the record,   15:48:20
9     it's dated -- sorry, that's -- ends   15:48:22
10    in Bates 3028219.               15:48:25
11 QUESTIONS BY MR. KO:               15:48:25
12    Q.   And before turning to the text   15:48:32
13 of this document, Mr. -- as we discussed   15:48:33
14 before, Mr. Borelli is a national account   15:48:37
15 manager, correct?                 15:48:40
16    A.   Yes.                      15:48:40
17    Q.   Okay.  And he was a national   15:48:41
18 account manager in charge of certain   15:48:44
19 distributors that Mallinckrodt shipped pills   15:48:45
20 to, correct?                     15:48:47
21    A.   Yes.                      15:48:48
22    Q.   And the context of this e-mail,   15:48:49
23 or the subject, is Sunrise Wholesale,   15:48:56
24 correct?                         15:48:57
25    A.   Yes.                      15:48:58
```

Page 339

```
1     Q.   And as we discussed before,   15:48:58
2  Sunrise had its license revoked by the DEA in   15:48:59
3  2010 as a result of suspicious orders they   15:49:02
4  were shipping to Florida, correct?   15:49:05
5        MR. O'CONNOR:  Object to form.   15:49:07
6        THE WITNESS:  Yes.          15:49:08
7  QUESTIONS BY MR. KO:               15:49:09
8     Q.   Okay.  And Sunrise was a       15:49:09
9  customer, again, of Mallinckrodt?   15:49:11
10    A.   Yes.                      15:49:13
11    Q.   And is it your understanding   15:49:14
12 that Mr. Borelli was in charge of the Sunrise   15:49:17
13 account?                         15:49:24
14    A.   Yes.                      15:49:24
15    Q.   Okay.  And Ms. Stewart        15:49:24
16 indicates some language to you about   15:49:27
17 Mr. Borelli and indicates that the e-mail   15:49:31
18 importance is high.                15:49:34
19        She says quote, "FYI, the       15:49:35
20 customer service reps all state that Victor   15:49:38
21 will tell them anything they want to hear   15:49:41
22 just so he can get the sale," end quote.   15:49:42
23        Did I read that correctly?   15:49:46
24    A.   You did.                   15:49:46
25    Q.   Okay.  And Mr. Borelli had   15:49:47
```

Page 340

```
1  involvement in the suspicious order   15:49:49
2  monitoring program, did he not?   15:49:51
3     A.   To the extent that we would   15:49:52
4  occasionally ask the NAMs questions after the   15:49:58
5  algorithm indicated an order was for further   15:50:01
6  review, yes, that's correct.       15:50:03
7     Q.   So were there instances in   15:50:03
8  which Mr. Borelli cleared -- or concluded   15:50:04
9  that a peculiar order was not suspicious and   15:50:11
10 relayed that information to you?   15:50:14
11       MR. O'CONNOR:  Object to form.   15:50:15
12       THE WITNESS:  Yes.          15:50:16
13 QUESTIONS BY MR. KO:               15:50:17
14    Q.   Okay.  And the date of this   15:50:18
15 e-mail is May 20, 2008, correct?   15:50:18
16    A.   Yes.                      15:50:21
17    Q.   This is simultaneous to when   15:50:21
18 you are first starting to revamp your -- the   15:50:26
19 revised SOM program, correct?     15:50:31
20    A.   Yes.                      15:50:32
21    Q.   And you learned Mr. Borelli --   15:50:32
22 you learned from Ms. Stewart that all the   15:50:34
23 customer service reps all state that   15:50:36
24 Mr. Borelli will tell them anything they want   15:50:38
25 to hear just so he can get the sale, correct?   15:50:40
```

Page 341

```
1     A.   Yes, I see that that's printed   15:50:44
2  in the e-mail, yes, sir.           15:50:46
3     Q.   Okay.  So given that          15:50:47
4  Mr. Borelli has an incentive to obtain as   15:50:51
5  many sales as possible, is it still your   15:50:54
6  testimony that you believe it's not a   15:50:57
7  conflict of interest for him to be involved   15:50:58
8  in the evaluation of a peculiar order?   15:51:00
9        MR. O'CONNOR:  Object to form.   15:51:01
10       THE WITNESS:  Yes.  Yes.     15:51:03
11 QUESTIONS BY MR. KO:               15:51:03
12    Q.   By the way, how many times did   15:51:04
13 Mr. Borelli confirm that an order was   15:51:05
14 actually suspicious?               15:51:08
15    A.   I don't know.              15:51:10
16    Q.   Well, you had previously -- we   15:51:16
17 had previously discussed an e-mail in which   15:51:18
18 you told Ms. Spaulding that no orders rose to   15:51:19
19 the level of suspicious in the 2008 to 2000   15:51:24
20 {sic} time period --              15:51:26
21    A.   Okay.                     15:51:27
22    Q.   -- correct?                15:51:28
23    A.   Uh-huh.                   15:51:28
24    Q.   So I take it that Mr. Borelli   15:51:29
25 never, ever identified a peculiar order as   15:51:33
```

Page 342

1  being suspicious; is that accurate?       15:51:35
2          MR. O'CONNOR:  Object to form.    15:51:37
3          THE WITNESS:  Yes.                15:51:38
4  QUESTIONS BY MR. KO:                       15:51:39
5      Q.    And the same would be true with  15:51:39
6  respect to Ms. New and Mr. Becker, correct?  15:51:41
7      A.    Yes.  Yes, I'm following you,    15:51:43
8  yes.                                        15:51:44
9      Q.    Yeah.                            15:51:44
10          So to the extent that            15:51:44
11  Mr. Becker or Ms. New evaluated whether or  15:51:46
12  not a peculiar order was suspicious, they   15:51:50
13  never, in fact, reported that such an order  15:51:52
14  was suspicious to you, correct?            15:51:57
15      A.    Correct.                        15:51:58
16      Q.    Okay.  Oh, and with respect     15:51:59
17  to -- so in addition to Ms. New, Mr. Becker  15:52:17
18  and Mr. Borelli, were there any other NAMs  15:52:22
19  during the 2008 to 2000 {sic} time period  15:52:25
20  that informed you that a peculiar order     15:52:30
21  should rise to the level of a suspicious    15:52:33
22  order?                                      15:52:35
23      A.    Tim Berry was a NAM for the      15:52:35
24  generics group at one point, and Dave Irwin,  15:52:38
25  but I just don't remember specifically     15:52:42

Page 343

1  conferring with them in terms of an order   15:52:43
2  that required further review.               15:52:46
3      Q.    Okay.  As you sit -- well,        15:52:48
4  again, based on your representation to       15:52:52
5  Ms. Spaulding that there were no suspicious  15:52:54
6  orders as of October 31, 2010, is it fair to  15:52:57
7  say that no national account manager ever   15:53:00
8  reported to you that a peculiar order should  15:53:03
9  rise to the level of being a suspicious     15:53:05
10  order?                                      15:53:08
11      A.    Yes.                            15:53:08
12          (Mallinckrodt-Harper Exhibit 17   15:53:08
13      marked for identification.)           15:53:08
14  QUESTIONS BY MR. KO:                       15:53:09
15      Q.    Okay.  I want to turn to a copy  15:53:09
16  of what will be marked as exhibit -- Harper  15:53:15
17  Exhibit 17.                                15:53:19
18          And for the record, this          15:53:34
19  document is -- ends in Bates stamp 368390.  15:53:35
20          In an August 26, 2010 e-mail      15:53:50
21  from you to others, you state, "Ginger and  15:53:54
22  Kate," is the first page, "Although we      15:54:00
23  require direct customers to submit a        15:54:04
24  suspicious order monitoring customer        15:54:06
25  questionnaire with proof of their annual DEA  15:54:07

Page 344

1  license renewal, the question whether our   15:54:10
2  customers monitor their customers was removed  15:54:12
3  from the questionnaire by the Mallinckrodt  15:54:14
4  suspicious order monitoring team because     15:54:16
5  there is no actual regulatory obligation to  15:54:19
6  monitor customers' customers."              15:54:23
7          Did I read that correctly with    15:54:25
8  the exception of the insertion "is"?         15:54:26
9      A.    Yes.                            15:54:30
10      Q.    Okay.  And so at -- is it safe   15:54:30
11  to say that prior to -- at some point prior  15:54:33
12  to August 26, 2010, in your customer        15:54:35
13  checklist you had a question of whether or  15:54:40
14  not your customers monitor their customers?  15:54:43
15  Correct?                                    15:54:50
16      A.    Yes.                            15:54:50
17      Q.    But you removed that question    15:54:51
18  from the questionnaire, correct?            15:54:53
19      A.    Yes.                            15:54:53
20      Q.    Set that aside.                 15:54:54
21      A.    All right.                      15:54:54
22      Q.    Did you believe that removing    15:55:10
23  that question from your questionnaire was an  15:55:10
24  enhancement of your SOM program?            15:55:12
25      A.    I don't think it was not, so     15:55:15

Page 345

1  that's a double negative.  I don't think it  15:55:17
2  was to the detriment of the program.        15:55:21
3      Q.    Okay.  So you don't regret       15:55:23
4  removing that question from your            15:55:25
5  questionnaire?                              15:55:26
6      A.    No.                             15:55:27
7      Q.    Okay.  And that's               15:55:28
8  notwithstanding the fact that you did receive  15:55:30
9  guidance from the DEA that they expected you  15:55:33
10  to monitor your customer's customer, correct?  15:55:35
11          MR. O'CONNOR:  Object to form.    15:55:37
12          THE WITNESS:  Correct.           15:55:39
13  QUESTIONS BY MR. KO:                       15:55:39
14      Q.    Okay.  So you received guidance  15:55:40
15  from the DEA that it was important for      15:55:42
16  Mallinckrodt to know your customer's        15:55:46
17  customer, yet you removed that question from  15:55:48
18  your questionnaire; is that accurate?        15:55:50
19          MR. O'CONNOR:  Object to form.    15:55:53
20          THE WITNESS:  Yes.               15:55:53
21          May I add, please?               15:55:54
22  QUESTIONS BY MR. KO:                       15:55:55
23      Q.    This is a yes or no question.    15:55:56
24  That's all I needed.                        15:55:57
25      A.    All right.                      15:55:58

Page 346

1    Q.   Counsel can -- has the        15:55:59
2  opportunity to do some redirect if he would   15:56:01
3  like.                          15:56:02
4    A.   Okay.  Thank you.        15:56:03
5        (Mallinckrodt-Harper Exhibit 18   15:56:07
6    marked for identification.)        15:56:08
7  QUESTIONS BY MR. KO:              15:56:08
8    Q.   I'm going to hand you a copy of   15:56:08
9  what's going to be marked as Harper    15:56:09
10 Exhibit 18.                    15:56:12
11       And for the record, this      15:56:21
12 document ends in Bates 279142.        15:56:22
13       This is an April 29, 2010      15:56:28
14 e-mail you send to Ms. Spaulding regarding   15:56:32
15 suspicious order monitoring.          15:56:36
16       You state, quote, "We have      15:56:38
17 working algorithms, and J. Rausch has been   15:56:43
18 reviewing peculiar orders for several weeks.   15:56:46
19 I have a meeting with Jim tomorrow because   15:56:48
20 the review is taking several hours a day, yet   15:56:50
21 still results in him making a judgment call   15:56:53
22 that he is not comfortable with.  Bottom line   15:56:55
23 is that tomorrow I plan on having something   15:56:59
24 for you to give DEA.  Trying desperately to   15:57:01
25 clear up all loose ends before the potential   15:57:04

Page 347

1  work stoppage."                15:57:06
2        Did I read that correctly?     15:57:07
3    A.   Yes.                  15:57:08
4    Q.   Okay.  And is it accurate to   15:57:09
5  say that as of April 29, 2010, it's your   15:57:12
6  understanding that Mr. Rausch is still making   15:57:16
7  judgment calls on peculiar orders that he is   15:57:19
8  not comfortable with?              15:57:21
9    A.   Yes.                  15:57:22
10   Q.   Okay.  You can set that aside.   15:57:23
11       Now, as we discussed, in      15:57:25
12 addition to algorithms, you had checklists   15:57:34
13 that you were working on at the same time   15:57:38
14 with respect to new and current customers,   15:57:39
15 correct?                      15:57:41
16   A.   Correct.               15:57:41
17       (Mallinckrodt-Harper Exhibit 19   15:57:48
18   marked for identification.)        15:57:48
19 QUESTIONS BY MR. KO:              15:57:48
20   Q.   I'm going to hand you a copy of   15:57:48
21 what's going to be marked as Harper    15:57:49
22 Exhibit 19, and it ends in Bates 301020.   15:57:51
23       And this is a July 22, 2009    15:57:58
24 e-mail from Ms. Stewart to many people,   15:58:00
25 including you, regarding the customer    15:58:02

Page 348

1  checklist.                    15:58:05
2        Is that accurate?         15:58:10
3    A.   Yes, it is, yes.          15:58:11
4    Q.   And she indicates that you left   15:58:12
5  a message regarding a customer checklist,   15:58:16
6  correct?                      15:58:19
7    A.   Yes.  I just had to figure out   15:58:19
8  who was leaving the message.  Yes.  Yes.   15:58:24
9    Q.   Sure.                  15:58:26
10       And Ms. Stewart seems to be     15:58:26
11 referencing some failures on the customer   15:58:28
12 checklist that seemed to be the result of   15:58:31
13 confusion as it relates to the form itself.   15:58:35
14       Do you see that reference?     15:58:39
15   A.   Yes.                  15:58:40
16   Q.   So at the time of this e-mail,   15:58:42
17 there was certainly some confusion with   15:58:44
18 respect to the questionnaire that you were   15:58:46
19 trying to roll out in 2009, correct?    15:58:47
20   A.   Yes.                  15:58:49
21   Q.   And Ms. Stewart indicates that   15:58:49
22 she's actually putting customers that have   15:58:51
23 been put on hold as a result of this customer   15:58:54
24 checklist, and she's actually recommending   15:58:57
25 that they be taken off.            15:59:01

Page 349

1        Is that consistent with how    15:59:03
2  this e-mail reads?              15:59:05
3        MR. O'CONNOR:  Object to form.   15:59:06
4        THE WITNESS:  Yes.         15:59:06
5  QUESTIONS BY MR. KO:              15:59:09
6    Q.   So in other words, while there   15:59:09
7  was confusion surrounding this particular   15:59:10
8  version of the customer checklist, for any   15:59:13
9  customers that were put on hold at that time,   15:59:18
10 she had recommended putting them off of hold   15:59:19
11 and releasing orders; is that correct?   15:59:22
12   A.   Yes.                  15:59:25
13       MR. O'CONNOR:  Object to form.   15:59:26
14 QUESTIONS BY MR. KO:              15:59:27
15   Q.   You can set that one aside.    15:59:28
16       (Mallinckrodt-Harper Exhibit 20   15:59:37
17   marked for identification.)        15:59:37
18 QUESTIONS BY MR. KO:              15:59:37
19   Q.   I'm going to hand you a copy of   15:59:38
20 what's going to be marked as Harper    15:59:39
21 Exhibit 20.                    15:59:40
22       For the record, this ends in    15:59:42
23 Bates stamp 372333.              15:59:44
24       And this is an e-mail exchange   15:59:50
25 that you are having with Ms. Spaulding in   15:59:52

Page 350

1 the -- on February 11, 2011; is that          15:59:56
2 accurate?                                     15:59:59
3     A.   Yes.                    16:00:00
4     Q.   Okay.  And I want to focus on   16:00:05
5 the second e-mail down in the chain that you   16:00:09
6 draft to Ms. Spaulding regarding the customer  16:00:13
7 checklist.                         16:00:20
8          Do you see where you have       16:00:21
9 indicated that you have discovered a          16:00:23
10 disconnect in the system?              16:00:25
11    A.   I do.                   16:00:26
12    Q.   And you're talking about the      16:00:27
13 system of the customer checklist, correct?    16:00:28
14    A.   Yes.                    16:00:30
15    Q.   And you indicate that, quote,     16:00:31
16 "We have significant gaps in that although    16:00:35
17 CDIG send out the annual update SOM customer  16:00:40
18 checklist, when the system indicates customer 16:00:44
19 account DEA registration is nearing renewal   16:00:48
20 time, they do nothing if the SOM customer     16:00:51
21 checklist is not ever returned by the         16:00:54
22 customer."                         16:00:56
23          Did I read that correctly?      16:00:57
24    A.   Yes.                    16:00:57
25    Q.   Okay.  And CDIG basically --     16:00:59

Page 351

1 CDIG stands for customer data integrity       16:01:03
2 group, correct?                       16:01:06
3     A.   Correct.                16:01:07
4     Q.   And they had some involvement    16:01:07
5 in the SOM procedure, in particular the       16:01:08
6 customer checklist, correct?           16:01:11
7     A.   Yes.                    16:01:12
8     Q.   But if I understand this e-mail  16:01:13
9 correctly, is it accurate to say that as of   16:01:16
10 February of 2011 you were -- you discovered   16:01:19
11 that all SOM customer checklists were not     16:01:24
12 actually being returned by the customers,     16:01:28
13 correct?                          16:01:30
14         MR. O'CONNOR:  Object to form.   16:01:30
15         THE WITNESS:  Yes.            16:01:31
16 QUESTIONS BY MR. KO:                   16:01:31
17    Q.   You would agree that this is a   16:01:32
18 significant gap in the review system, would   16:01:33
19 you not?                          16:01:36
20    A.   It's a gap -- yes.  In this      16:01:37
21 component of the review system, yes, it is a  16:01:41
22 gap.                              16:01:43
23    Q.   Because you relied on the        16:01:43
24 customer checklist to obtain information from 16:01:44
25 the customer, correct?                 16:01:47

Page 352

1     A.   Yes.                    16:01:47
2     Q.   And in some instances, you      16:01:48
3 never actually in fact received the           16:01:50
4 checklist, correct?                   16:01:53
5     A.   I believe this says during the   16:01:53
6 renewal.                          16:01:56
7     Q.   Yeah.                   16:01:58
8          During the renewal time period, 16:01:59
9 CDIG does nothing if the SOM customer         16:02:01
10 checklist is ever returned; is that correct?  16:02:05
11    A.   So customers would have sent in  16:02:07
12 an initial checklist, but then this is the    16:02:13
13 annual update that they may not have turned   16:02:17
14 in, and CDIG may not have caught that fact,   16:02:19
15 yes.                              16:02:20
16    Q.   All right.  So they may have      16:02:20
17 turned in a checklist at one point in time,   16:02:21
18 but the requirement and the expectation       16:02:24
19 certainly was that they would turn in at      16:02:26
20 least an annual checklist as well, correct?   16:02:27
21         MR. O'CONNOR:  Object to form.   16:02:30
22         THE WITNESS:  Yes.            16:02:30
23 QUESTIONS BY MR. KO:                   16:02:31
24    Q.   And that wasn't always          16:02:31
25 happening as of 2011, correct?         16:02:32

Page 353

1     A.   Correct.                16:02:33
2     Q.   And so would you say that --     16:02:34
3 we'll move on.  You can set that aside.       16:02:42
4 Thank you.                         16:02:44
5          Now, earlier we were discussing 16:02:53
6 chargebacks.                       16:02:55
7          Do you recall that?            16:02:55
8     A.   Yes.                    16:02:56
9     Q.   Do you remember when you first   16:02:57
10 started looking into utilization of          16:03:01
11 chargebacks -- or chargeback data to         16:03:04
12 understand the details of where your pills,   16:03:09
13 Mallinckrodt pills, were going?        16:03:12
14         MR. O'CONNOR:  Object to form.   16:03:13
15         THE WITNESS:  Yes.            16:03:14
16 QUESTIONS BY MR. KO:                   16:03:15
17    Q.   And when was that?             16:03:15
18    A.   I believe it was within the      16:03:16
19 scope of our involvement in the Sunrise       16:03:19
20 investigation.                     16:03:23
21    Q.   Okay.  And that was in the 2009  16:03:23
22 time period?                       16:03:26
23    A.   I don't remember the -- I'm      16:03:27
24 terrible with my years.  I'm sorry, I don't   16:03:29
25 remember.                         16:03:33

Page 354

1    (Mallinckrodt-Harper Exhibit 21    16:03:33
2    marked for identification.)    16:03:34
3    QUESTIONS BY MR. KO:    16:03:34
4    Q.    Okay.  I'm going to hand you a    16:03:34
5    copy of what's going to be marked as Harper    16:03:35
6    Exhibit 21.    16:03:37
7    A.    Okay.    16:03:39
8    Q.    And this is an e-mail chain    16:03:39
9    involving you, among other people, in the    16:03:58
10   April 17, 2007 time period; is that accurate?    16:04:03
11   A.    Yes.    16:04:06
12   Q.    And I don't believe I    16:04:08
13   identified this document, but it ends in    16:04:09
14   Bates 7728295.    16:04:14
15          Starting with the second to the    16:04:17
16   last e-mail at the bottom of this chain from    16:04:31
17   Vince Kaiman to Jeff Burd in which you are    16:04:33
18   cc'd, as of 2:47 -- let's start there.    16:04:38
19          First of all, who's Vince    16:04:43
20   Kaiman?    16:04:45
21   A.    He was director or vice    16:04:45
22   president of commercial group at that time.    16:04:48
23   Q.    Okay.  And he is inquiring in    16:04:53
24   an e-mail exchange with Jeff Burd whether or    16:04:57
25   not Jeff can also find out of the    16:05:02

Page 355

1    40-milligram sales into the channel, how much    16:05:06
2    of it ends up in clinics.    16:05:08
3          Do you see that portion of the    16:05:13
4    e-mail I'm referencing?    16:05:14
5    A.    Yes.    16:05:15
6    Q.    So in other words, Vince is    16:05:18
7    asking -- and the 40-milligram sales is a    16:05:20
8    reference to the methadone 40 milligrams,    16:05:22
9    correct?    16:05:24
10   A.    Yes.    16:05:25
11   Q.    Manufactured by Mallinckrodt?    16:05:25
12   A.    Yes.    16:05:27
13   Q.    And he is trying to determine    16:05:28
14   where those Mallinckrodt pills ends up in    16:05:31
15   clinics.    16:05:37
16          Is that a fair characterization    16:05:37
17   of the question he's asking Jeff?    16:05:39
18          MR. O'CONNOR:  Object to form.    16:05:41
19          THE WITNESS:  It's how many end    16:05:41
20   up in clinics versus retail.    16:05:43
21   QUESTIONS BY MR. KO:    16:05:46
22   Q.    Okay.  And there's some    16:05:47
23   discussion back and forth about how one might    16:05:52
24   go about doing that, but Vince at some point    16:05:55
25   in the e-mail chain says, "Would chargebacks    16:05:58

Page 356

1    help?"    16:06:03
2          Do you see that?    16:06:07
3    A.    Yes.    16:06:07
4    Q.    Okay.  And Mr. Burd's response    16:06:07
5    is, "Okay, I'll start to look into it.  Yeah,    16:06:12
6    it would be through chargebacks."    16:06:16
7          Do you see that portion of the    16:06:18
8    e-mail?    16:06:20
9    A.    I do.    16:06:20
10   Q.    So is it fair to say that this    16:06:20
11   e-mail chain reflects an understanding by    16:06:22
12   Mallinckrodt employees that they could    16:06:27
13   utilize chargebacks to understand where    16:06:30
14   Mallinckrodt-manufactured pills were ending    16:06:32
15   up?    16:06:36
16   A.    Yes.    16:06:36
17   Q.    And the date of this e-mail is    16:06:36
18   April 17, 2007, correct?    16:06:38
19   A.    Correct.    16:06:39
20   Q.    And you were on this e-mail    16:06:40
21   chain?    16:06:43
22   A.    Correct.    16:06:43
23   Q.    Okay.  And I want to pay -- I    16:06:44
24   want to turn your attention to the top of    16:06:52
25   this e-mail in which Jeff Burd -- by the way,    16:06:54

Page 357

1    who is Jeff Burd?    16:06:58
2    A.    He was in commercial group, but    16:06:59
3    I believe he was on the branded side.  I    16:07:00
4    didn't have any interaction with him.    16:07:02
5    Q.    Sure.    16:07:03
6          And Mr. Burd, who appears was a    16:07:04
7    senior marketing manager, he is -- he    16:07:08
8    indicates that, "Well, we were able to get at    16:07:11
9    this data quicker than I expected, with    16:07:14
10   Kate's help."    16:07:17
11          Do you see that?    16:07:18
12   A.    I do.    16:07:19
13   Q.    So is it a fair    16:07:19
14   characterization of this e-mail that he was    16:07:21
15   able to obtain the chargeback data a lot    16:07:22
16   quicker than he had expected?    16:07:26
17          MR. O'CONNOR:  Object to form.    16:07:27
18          THE WITNESS:  Yes.    16:07:28
19   QUESTIONS BY MR. KO:    16:07:28
20   Q.    Okay.  And if you look at the    16:07:29
21   timestamp, it looks like it takes him --    16:07:30
22   certainly the same day, but he responds    16:07:33
23   within six hours of when he says he will look    16:07:35
24   into it, correct?    16:07:39
25   A.    Yes.    16:07:40

Page 358

```
1        Q.   So in a six-hour time period,    16:07:41
2   is it accurate to say that a Mallinckrodt    16:07:45
3   employee was able to utilize chargeback data   16:07:46
4   to understand where Mallinckrodt products    16:07:50
5   were ending up?                    16:07:52
6            MR. O'CONNOR:  Object to form.    16:07:53
7            THE WITNESS:  Yes.          16:07:53
8   QUESTIONS BY MR. KO:
9        Q.   Okay.  And by the way, do       16:07:56
10  you -- there's a reference here to Kate.  It   16:08:00
11  says that he's able to -- he was able to      16:08:04
12  utilize Kate's help to get this data.        16:08:07
13       Do you see that?               16:08:09
14       A.   Yes, I do.                16:08:09
15       Q.   And that was Kate Neely?       16:08:10
16       A.   Yes.  Kate Muhlenkamp at the    16:08:12
17  time, yes.                     16:08:14
18       Q.   Right.                  16:08:15
19       A.   Yes.                   16:08:15
20       Q.   Thank you.                16:08:16
21       (Mallinckrodt-Harper Exhibit 22    16:08:18
22       marked for identification.)         16:08:18
23  QUESTIONS BY MR. KO:               16:08:18
24       Q.   I'm going to hand you now a     16:08:26
25  copy of what will be marked as Harper       16:08:28
```

Page 359

```
1   Exhibit 22.                     16:08:31
2            And we can go through this      16:08:37
3   document and we can take a break.         16:08:38
4            MR. O'CONNOR:  Okay.         16:08:38
5   QUESTIONS BY MR. KO:               16:08:38
6        Q.   If that doesn't -- or if you     16:08:42
7   don't mind.                    16:08:44
8        A.   That's acceptable, thank you,    16:08:45
9   yes.                       16:08:45
10       Q.   For the record, this e-mail     16:08:53
11  exchange ends in Bates 500657.  And this is   16:08:54
12  an e-mail exchange from actually the 2009 to  16:08:59
13  2010 time period.                 16:09:04
14           And the title of the e-mail is   16:09:08
15  "Chargeback Information Request."          16:09:09
16       Do you see that?               16:09:10
17       A.   Yes, but I see that it started   16:09:11
18  in 2010, not in 2009.               16:09:14
19       Q.   And it's a little confusing     16:09:17
20  because I think that's reference made to a    16:09:19
21  subsequent e-mail.  But if you look at the    16:09:22
22  bottom of the second page, there is an e-mail 16:09:24
23  from you to Tiffany Rowley dated November 19,  16:09:27
24  2009.                       16:09:33
25       Do you see that?               16:09:33
```

Page 360

```
1        A.   Oh, here.  Yes.            16:09:33
2        Q.   Okay.  Now, in that         16:09:41
3   November 19, 2009 e-mail, you ask, among     16:09:45
4   other things, to Tiffany, quote, "Is it      16:09:48
5   feasible to run chargeback summary reports    16:09:53
6   each time we receive information through the   16:09:55
7   industry about DEA actions against pharmacies  16:09:57
8   or physicians?"                  16:09:59
9            Did I read that correctly?      16:10:00
10       A.   Yes.                   16:10:00
11       Q.   So is it fair to say that at     16:10:02
12  least as of November 2000 -- fair to say that  16:10:04
13  as of November 19, 2009, you're inquiring    16:10:11
14  about how to utilize chargeback summary      16:10:15
15  reports to determine where Mallinckrodt pills  16:10:18
16  are ending up?                  16:10:22
17           MR. O'CONNOR:  Object to form.   16:10:23
18           THE WITNESS:  Yes.          16:10:24
19  QUESTIONS BY MR. KO:               16:10:24
20       Q.   Okay.  And was this -- does     16:10:25
21  this refresh your recollection at all that    16:10:28
22  this was about the time you were -- you      16:10:32
23  became interested in utilizing chargeback    16:10:34
24  information consistent with the DEA         16:10:36
25  investigation against Sunrise?           16:10:39
```

Page 361

```
1            MR. O'CONNOR:  Object to form.   16:10:41
2            THE WITNESS:  No.          16:10:42
3   QUESTIONS BY MR. KO:               16:10:44
4        Q.   Okay.                  16:10:44
5        A.   Well, around the same time,     16:10:44
6   but -- this is not speaking of that, but,     16:10:46
7   yes, at the same time, yes, sir, sorry.      16:10:48
8        Q.   Yeah, I understand that this    16:10:50
9   doesn't make any reference --           16:10:51
10       A.   Okay.  I apologize.  Yes.      16:10:52
11       Q.   Yeah, that's okay.          16:10:54
12           Around this time was when       16:10:54
13  Sunrise -- you began looking into Sunrise as  16:10:56
14  well, correct?                   16:10:59
15       A.   Yes.                   16:11:00
16       Q.   And you also were trying to     16:11:01
17  pull chargeback data and chargeback         16:11:04
18  information in connection with understanding  16:11:07
19  where your pills ended up after distributing  16:11:09
20  to Sunrise, correct?               16:11:13
21           MR. O'CONNOR:  Object to form.   16:11:14
22           THE WITNESS:  Yes.  The company  16:11:15
23       was.  I -- yes, not me personally,    16:11:16
24       yes.                    16:11:18
25
```

Page 362

1  QUESTIONS BY MR. KO:                    16:11:18
2      Q.  But it was in connection with    16:11:20
3  your obligations as the team leader of the  16:11:21
4  suspicious order monitoring program --   16:11:23
5      A.  Yes.                 16:11:24
6      Q.  -- right?           16:11:24
7      A.  Yes.                 16:11:25
8      Q.  Okay.  Now, after you asked    16:11:25
9  that question on November 19, 2009,      16:11:29
10 Tiffany -- by the way, who is Tiffany Rowley  16:11:33
11 Kilper?                    16:11:37
12     A.  She -- she was with the         16:11:37
13 contract group, contract administration, but  16:11:41
14 I'm not certain of what her role entailed.   16:11:45
15     Q.  Okay.  But she was someone who   16:11:48
16 you consulted with to pull chargeback    16:11:50
17 information, correct?             16:11:52
18     A.  Yes.                 16:11:53
19     Q.  Okay.  And she responds, "Sure,  16:11:57
20 Karen, I can always provide that data."  16:12:02
21     Do you see that?              16:12:05
22     A.  Yes.                 16:12:05
23     Q.  And unfortunately, for this      16:12:08
24 e-mail exchange there's no date that's   16:12:10
25 indicated for that particular e-mail, but we  16:12:17

Page 363

1  can move up to your Monday, February 22, 2010  16:12:19
2  e-mail.                   16:12:22
3      Do you see that?              16:12:23
4      A.  I do.                16:12:23
5      Q.  And you say, "Tiffany, we        16:12:24
6  exchanged e-mails several months ago about   16:12:27
7  running chargeback reports as a benefit to  16:12:28
8  the business based upon information we   16:12:30
9  receive regarding DEA actions against    16:12:33
10 registrants and industry news."         16:12:35
11     Did I read that correctly?         16:12:39
12     A.  Yes.                 16:12:39
13     Q.  So for whatever reason, three     16:12:41
14 months pass between when you first ask   16:12:45
15 Ms. Kilper to identify and run certain   16:12:49
16 requests with respect to chargeback      16:12:51
17 information and when you follow up again with  16:12:53
18 her about this request; is that accurate?  16:12:59
19     A.  Yes.                 16:13:01
20     Q.  Okay.  And then she responds     16:13:01
21 that same day that -- with some questions,   16:13:03
22 but ultimately she -- well, let me read it   16:13:10
23 for you.                   16:13:13
24     She says, "Karen, if you could     16:13:14
25 give me an estimate of how frequent the  16:13:17

Page 364

1  requests might be or how many end user   16:13:18
2  inquiries per month, I can run this by my   16:13:21
3  manager to ensure she agrees this fits our   16:13:24
4  area.  I just pull the data from Cognos.  16:13:26
5  It's nothing complicated at all.  I'd be   16:13:29
6  happy to train someone in your group to do   16:13:31
7  this if that makes more sense."          16:13:33
8      Did I read that correctly?         16:13:35
9      A.  Yes.                 16:13:35
10     Q.  So as of February 22, 2010, is   16:13:35
11 it accurate to say that Mallinckrodt     16:13:43
12 certainly has the ability to run chargeback  16:13:44
13 information and chargeback data to determine  16:13:51
14 where Mallinckrodt pills are going?      16:13:53
15     MR. O'CONNOR:  Object to form.    16:13:54
16     THE WITNESS:  Yes.            16:13:55
17 QUESTIONS BY MR. KO:                   16:13:55
18     Q.  Okay.  And this request         16:13:55
19 actually originated on November 19, 2009, as  16:13:56
20 indicated by your original e-mail, correct?  16:14:04
21     A.  Yes.                 16:14:06
22     Q.  And she's -- it's accurate to   16:14:08
23 say that at least based on            16:14:11
24 Ms. Rowley-Kilper's characterization, it's   16:14:16
25 nothing complicated at all to pull this data,  16:14:17

Page 365

1  correct?                   16:14:20
2      MR. O'CONNOR:  Object to form.    16:14:20
3      THE WITNESS:  Correct.         16:14:21
4  QUESTIONS BY MR. KO:                   16:14:22
5      Q.  And she would be happy to train  16:14:22
6  someone in your group to do it yourself?  16:14:24
7      A.  Correct.             16:14:25
8      Q.  Did you take her up on her      16:14:26
9  offer?                     16:14:27
10     A.  No.                 16:14:28
11     Q.  Okay.  Ms. Kilper always ran    16:14:28
12 the chargeback reports, correct?         16:14:31
13     MR. O'CONNOR:  Object to form.    16:14:32
14     THE WITNESS:  Not always.      16:14:34
15 QUESTIONS BY MR. KO:                   16:14:34
16     Q.  Did you ever run a chargeback   16:14:35
17 report?                    16:14:36
18     A.  No.                 16:14:36
19     Q.  You had some other people do    16:14:37
20 it, correct?               16:14:38
21     A.  Yes.                 16:14:38
22     Q.  And was there ever a time in    16:14:38
23 which it was indicated to you that it would   16:14:41
24 be difficult to pull this data?         16:14:44
25     A.  No.                 16:14:47

Page 366

1    Q.   Okay.  In fact, it was quite    16:14:49
2    easy and they could -- whomever you directed    16:14:52
3    would always comply with your request for    16:14:55
4    this information, correct?    16:14:57
5         MR. O'CONNOR:  Object to form.    16:14:58
6         THE WITNESS:  Yes.  Yes.    16:14:59
7    QUESTIONS BY MR. KO:    16:14:59
8    Q.   Now, turning to the first page    16:15:00
9    of this e-mail, you indicate -- sorry, not    16:15:03
10   you, but Ms. Johnson, who appears to be a    16:15:09
11   compliance assistant, she asks you whether or    16:15:12
12   not anything has been figured out on the    16:15:16
13   chargeback requests yet.    16:15:18
14        Do you see that?    16:15:19
15   A.   Yes.    16:15:19
16   Q.   And that's dated March 8, 2010?    16:15:24
17   A.   Yes.    16:15:27
18   Q.   And it appears that there was    16:15:28
19   no response by you until Tiffany asks whether    16:15:31
20   or not something was in her court on this,    16:15:37
21   because she never heard back in response to    16:15:40
22   your questions.    16:15:42
23        Do you see that?    16:15:43
24   A.   Yes.    16:15:44
25   Q.   Okay.  And finally at the top    16:15:45

Page 367

1    of this e-mail, you indicate to Carrie that    16:15:48
2    "I have the next steps on this.  I'll discuss    16:15:51
3    with you later this week.  I am booked solid    16:15:53
4    with meetings today.  Thanks for following up    16:15:56
5    to get your project going."    16:15:59
6         Did I read that correctly?    16:16:02
7    A.   Yes.    16:16:02
8    Q.   Okay.  So is it fair to say    16:16:02
9    that there is a approximately four-month time    16:16:03
10   period in which -- between when you first    16:16:05
11   asked for this information and when action is    16:16:07
12   actually taken on obtaining this chargeback    16:16:12
13   information?    16:16:16
14   A.   Yes.    16:16:17
15   Q.   Okay.  And of course it's clear    16:16:23
16   from this e-mail exchange that the ball was    16:16:25
17   in your court to respond to Carrie.    16:16:29
18        And unfortunately I don't have    16:16:31
19   any subsequent documentation of when, in    16:16:33
20   fact, you responded, but at least four months    16:16:35
21   go by between when you first ask and when you    16:16:37
22   again follow up with Tiffany and Carrie on    16:16:40
23   the chargeback data requests, correct?    16:16:43
24        MR. O'CONNOR:  Object to form.    16:16:45
25        THE WITNESS:  Yes.    16:16:45

Page 368

1         MR. KO:  Why don't we take a    16:16:47
2    break.    16:16:52
3         MR. O'CONNOR:  Sure.    16:16:53
4         VIDEOGRAPHER:  We are going off    16:16:54
5    the record at 4:16 p.m.    16:16:55
6         (Off the record at 4:16 p.m.)    16:16:56
7         VIDEOGRAPHER:  We are back on    16:35:05
8    the record at 4:35 p.m.    16:35:06
9    QUESTIONS BY MR. KO:    16:35:07
10   Q.   Welcome back, Ms. Harper.    16:35:08
11   Thank you for your patience today.  I    16:35:11
12   appreciate your -- the time that you have    16:35:13
13   spent, and we have, I think, a few more hours    16:35:14
14   to go.    16:35:19
15        So before we broke, we were    16:35:19
16   talking about utilization of chargeback data.    16:35:22
17        Do you recall that?    16:35:26
18   A.   Yes.    16:35:26
19   Q.   And --    16:35:27
20        MR. O'CONNOR:  Can we go off    16:35:28
21   the record for just a second to put    16:35:30
22   the mic on?    16:35:31
23        THE WITNESS:  Oh, I'm sorry.    16:35:36
24   QUESTIONS BY MR. KO:    16:35:38
25   Q.   So a moment ago we were talking    16:35:57

Page 369

1    about chargebacks, correct?    16:35:58
2    A.   Yes.    16:36:00
3    Q.   And was -- in the late 2009    16:36:00
4    time period you had asked about whether or    16:36:05
5    not someone could run certain chargeback data    16:36:09
6    for you so that you could understand the    16:36:11
7    details of a transaction in which    16:36:15
8    Mallinckrodt was sending its pills to a    16:36:18
9    particular distributor, correct?    16:36:22
10        MR. O'CONNOR:  Object to form.    16:36:23
11        THE WITNESS:  Yes.    16:36:23
12   QUESTIONS BY MR. KO:    16:36:23
13   Q.   And specifically, was it your    16:36:24
14   idea to take the information you learned --    16:36:28
15   well, strike that.    16:36:29
16        One of the reasons for    16:36:34
17   identifying -- or utilizing chargeback    16:36:38
18   information was to take the information you    16:36:40
19   received regarding certain DEA actions    16:36:46
20   against registrants and industry news that    16:36:50
21   you had acquired, correct?    16:36:52
22        MR. O'CONNOR:  Object to form.    16:36:53
23        THE WITNESS:  Yes.    16:36:54
24   QUESTIONS BY MR. KO:    16:36:54
25   Q.   So the idea was to take that    16:36:54

Page 370

1  information regarding specific pharmacies and  16:36:59
2  doctors and go into your data to determine  16:37:04
3  whether or not Mallinckrodt was selling to  16:37:07
4  these pharmacies or physicians, correct?  16:37:10
5      MR. O'CONNOR:  Object to form.  16:37:13
6      THE WITNESS:  Whether or not  16:37:13
7    they were our -- they were downstream  16:37:15
8    customers of the distributors of our  16:37:18
9    product, yes.  16:37:20
10  QUESTIONS BY MR. KO:  16:37:21
11    Q.   Right.  16:37:21
12      So the idea --  16:37:21
13    A.   Yes.  16:37:22
14    Q.   -- of -- one of the reasons for  16:37:22
15  why you utilize chargeback information is to  16:37:26
16  determine whether or not Mallinckrodt was  16:37:29
17  selling to pharmacies or physicians that were  16:37:36
18  customers of distributors that you sold to,  16:37:38
19  correct?  16:37:40
20      MR. O'CONNOR:  Object to form.  16:37:41
21      THE WITNESS:  Yes.  16:37:42
22  QUESTIONS BY MR. KO:  16:37:43
23    Q.   Okay.  And the idea of using  16:37:48
24  this chargeback information was also to make  16:37:49
25  sure your customers/wholesale distributors  16:37:52

Page 371

1  were not also selling Mallinckrodt drugs to  16:37:56
2  these pharmacies or physicians, correct?  16:38:00
3    A.   Yes.  16:38:02
4    Q.   Okay.  And again, you had this  16:38:03
5  idea, or at least you discussed the  16:38:07
6  possibility of obtaining this data, as of  16:38:11
7  November 2009, correct?  16:38:14
8    A.   Yes.  16:38:15
9    Q.   And also turning back to some  16:38:17
10  of the e-mails that we had discussed  16:38:20
11  previously in 2007, you were -- it's accurate  16:38:23
12  to say that Mallinckrodt employees knew as of  16:38:28
13  2007 how to utilize chargeback data to  16:38:31
14  understand where pills were going after they  16:38:34
15  were shipped to Mallinckrodt customers,  16:38:37
16  correct?  16:38:39
17      MR. O'CONNOR:  Object to form.  16:38:39
18      THE WITNESS:  Yes.  16:38:39
19      (Mallinckrodt-Harper Exhibit 23  16:38:51
20  marked for identification.)  16:38:51
21  QUESTIONS BY MR. KO:  16:38:51
22    Q.   Okay.  I'm going to hand you a  16:38:52
23  copy of what will be marked as Harper  16:38:53
24  Exhibit 23.  16:38:55
25      And for the record, this  16:39:02

Page 372

1  document ends in Bates 421850.  16:39:03
2      And this is an e-mail chain  16:39:21
3  from the July 21, 2000 time period regarding  16:39:23
4  Mallinckrodt suspicious order monitoring and  16:39:29
5  the Harvard Drug license suspension.  16:39:30
6      Do you see that?  16:39:32
7    A.   I'm reading the e-mail,  16:39:33
8  please --  16:39:41
9    Q.   Sure.  16:39:41
10    A.   -- so that I can understand the  16:39:41
11  whole context.  16:39:41
12    Q.   Absolutely.  16:39:41
13      And my questions will relate to  16:40:02
14  just the first page of this e-mail.  16:40:04
15    A.   All right.  I'm ready.  Thank  16:40:06
16  you.  16:40:07
17    Q.   Okay.  On July 21, 2010,  16:40:07
18  Mr. Ratliff asks you whether or not, quote,  16:40:14
19  "As an aside, are we capable of knowing our  16:40:19
20  customers' customers with any specificity?"  16:40:22
21  end quote.  16:40:27
22      Did I read that correctly?  16:40:28
23    A.   Yes.  16:40:28
24    Q.   And you respond that same day  16:40:29
25  that -- well, why don't you read the first  16:40:30

Page 373

1  sentence of that e-mail response.  16:40:35
2    A.   "Using chargeback data, it is  16:40:39
3  indeed possible to know our customer's  16:40:41
4  customer with great specificity."  16:40:46
5    Q.   Okay.  And do you have any  16:40:49
6  reason to doubt that you in fact sent that  16:40:50
7  e-mail to Mr. Ratliff on July 21, 2010?  16:40:51
8    A.   No.  16:40:54
9    Q.   And so it's accurate to state  16:40:55
10  that as of July 2010, you understood that you  16:40:58
11  could utilize chargeback data to understand  16:41:03
12  with great specificity knowledge of your  16:41:07
13  customer's customer; is that accurate?  16:41:11
14    A.   Knowledge of who our customer  16:41:14
15  was shipping to, yes.  16:41:20
16    Q.   Okay.  So just so the record is  16:41:21
17  clear, yes or no:  Is it accurate to state  16:41:25
18  that as of July 2010, you understood that you  16:41:26
19  could utilize chargeback data to understand  16:41:32
20  with great specificity where -- where your  16:41:34
21  pills were going after you shipped to the  16:41:38
22  distributor?  16:41:42
23      MR. O'CONNOR:  Object to form.  16:41:42
24      THE WITNESS:  Yes.  16:41:43
25

Page 374

```
1   QUESTIONS BY MR. KO:                16:41:43
2       Q.   You can set that aside.     16:41:46
3            (Mallinckrodt-Harper Exhibit 24  16:41:48
4   marked for identification.)           16:41:49
5   QUESTIONS BY MR. KO:                16:41:49
6       Q.   This is a copy of what will be  16:41:59
7   marked as Harper Exhibit 24.          16:42:00
8            And this ends, for the record,  16:42:09
9   ends in Bates 280607.                 16:42:09
10           And this appears to be a      16:42:31
11  November 1, 2010 letter that you send to Paul  16:42:32
12  Kleissle, correct?                    16:42:38
13      A.   Yes.                         16:42:39
14      Q.   And you'll see later on there's  16:42:40
15  the signature block of you on the second  16:42:43
16  page.                                 16:42:46
17      A.   Yes.                         16:42:47
18      Q.   And is it accurate to say that  16:42:47
19  you're sending him this correspondence on  16:42:49
20  November 1, 2010, to describe to him what you  16:42:52
21  can utilize based on the chargeback    16:42:56
22  information that you are -- that you have  16:42:59
23  been reviewing in that 2010 time period?  16:43:00
24      A.   Yes.                         16:43:03
25      Q.   Okay.  That's all I have on   16:43:04
```

Page 375

```
1   that document.                        16:43:14
2            Now, in connection with running  16:43:15
3   chargeback reports, is it also accurate to  16:43:28
4   say that indirect match reports were reports  16:43:33
5   that you asked to be run to understand the  16:43:40
6   downstream details of a transaction?  16:43:44
7            MR. O'CONNOR:  Object to form.  16:43:46
8            THE WITNESS:  I don't         16:43:47
9       understand the term "indirect match  16:43:49
10      report."                          16:43:50
11  QUESTIONS BY MR. KO:                16:43:52
12      Q.   Okay.  How about -- let's --  16:43:52
13  I'm sorry, let's go back to that document  16:43:55
14  then that we just set aside.          16:43:58
15      A.   All right.                   16:43:59
16      Q.   And in the first sentence of  16:44:00
17  this correspondence to Mr. Kleissle, you  16:44:09
18  ask -- or you indicate, "In an ongoing effort  16:44:12
19  to enhance our existing suspicious order  16:44:15
20  monitoring program and in accordance with 21  16:44:18
21  CFR 1301.74, Mallinckrodt has begun the  16:44:22
22  process of reviewing sales to indirect end  16:44:26
23  user customers, open parens, retail   16:44:30
24  pharmacies, close parens, but geographic  16:44:34
25  region.  This analysis is accomplished by a  16:44:36
```

Page 376

```
1   review of chargeback data."            16:44:39
2            Did I read that correctly?    16:44:41
3       A.   Yes.                         16:44:41
4       Q.   Okay.  And understanding that  16:44:41
5   you don't recall the use of the word  16:44:45
6   "indirect match report," you at least in this  16:44:47
7   correspondence refer to retail pharmacies as  16:44:53
8   indirect end user customers, correct?  16:44:55
9       A.   Yes.                         16:44:58
10      Q.   Okay.  Do you recall a time in  16:45:00
11  which -- and you state to Mr. Kleissle that  16:45:03
12  you can do this and accomplish this by  16:45:07
13  reviewing chargeback data, correct?   16:45:11
14      A.   Yes.                         16:45:12
15      Q.   Okay.  And so do you recall a  16:45:12
16  time in which you had asked for reports to be  16:45:15
17  run on indirect end user customers?   16:45:20
18      A.   Yes.                         16:45:24
19      Q.   Okay.  And these -- you can set  16:45:25
20  that aside.                           16:45:28
21           And in these reports -- you ran  16:45:28
22  certain reports or had asked certain reports  16:45:37
23  to be run in connection with certain  16:45:39
24  customers that you were shipping drugs to,  16:45:44
25  including Harvard, for example, correct?  16:45:49
```

Page 377

```
1            MR. O'CONNOR:  Object to form.  16:45:45
2            THE WITNESS:  Yes.           16:45:51
3   QUESTIONS BY MR. KO:                16:45:53
4       Q.   By the way, when asking others  16:46:04
5   to run reports about indirect end users, did  16:46:06
6   you have a name for these reports, or did you  16:46:13
7   call them by a specific moniker?      16:46:15
8       A.   I believe chargeback reports.  16:46:19
9       Q.   Okay.                        16:46:21
10      A.   Yes.                         16:46:21
11      Q.   So that's helpful.            16:46:22
12           So you -- is it accurate to say  16:46:23
13  that identification of pills that end up --  16:46:28
14  end up at retail pharmacies was accomplished  16:46:35
15  through running chargeback reports?   16:46:38
16      A.   Yes.                         16:46:41
17      Q.   Okay.  And you performed       16:46:41
18  chargeback reports in connection with various  16:46:46
19  distributors that had their license suspended  16:46:50
20  by the DEA, including Harvard, for example,  16:46:52
21  correct?                              16:46:54
22           MR. O'CONNOR:  Object to form.  16:46:55
23           THE WITNESS:  Yes.           16:46:56
24  QUESTIONS BY MR. KO:                16:46:56
25      Q.   Okay.  And also Masters and   16:46:57
```

Page 378

1  Sunrise and Cedardale?          16:46:59
2         MR. O'CONNOR: Same objection.   16:47:05
3         THE WITNESS: Yes.          16:47:06
4  QUESTIONS BY MR. KO:           16:47:06
5     Q.  Okay. Did you also run       16:47:06
6  chargeback reports for customers of    16:47:08
7  KeySource?                16:47:09
8     A.  Yes.           16:47:11
9     Q.  Okay. So is it fair to say    16:47:14
10 that you had chargeback reports run for   16:47:18
11 customers of KeySource, Cedardale, Masters,  16:47:24
12 Sunrise and Harvard?           16:47:29
13    A.  Yes.           16:47:30
14    Q.  And this was all in the 2009 to  16:47:30
15 2010 time period?           16:47:32
16    A.  I'm terrible with my years,    16:47:33
17 but -- I don't know the year.       16:47:36
18    Q.  Okay.           16:47:40
19    A.  The years.         16:47:40
20    Q.  Generally speaking, was it --   16:47:40
21 do you recall these reports being run in the  16:47:42
22 2009 through 2011 time period?      16:47:45
23    A.  Yes.           16:47:47
24    Q.  Okay. Now, the chargeback     16:47:52
25 reports you could distinguish by Mallinckrodt  16:47:58

Page 379

1  drug, correct?             16:48:02
2         MR. O'CONNOR: Objection.   16:48:04
3         THE WITNESS: Yes.          16:48:04
4  QUESTIONS BY MR. KO:           16:48:05
5     Q.  In other words, you could     16:48:05
6  determine -- you could sort by all oxy 15s or  16:48:06
7  30s that Mallinckrodt was sending to a    16:48:13
8  particular customer, correct?       16:48:14
9     A.  Yes.           16:48:16
10        (Mallinckrodt-Harper Exhibit 25  16:48:19
11        marked for identification.)     16:48:20
12 QUESTIONS BY MR. KO:           16:48:20
13    Q.  Okay. I'm going to hand you a   16:48:20
14 copy of what's going to be marked as    16:48:22
15 Exhibit 25.              16:48:25
16        And I will represent to counsel  16:48:30
17 and for the record that this is a      16:48:32
18 demonstrative chart that we have prepared   16:48:33
19 based on chargeback data that you had pulled  16:48:36
20 for Harvard.              16:48:39
21        And we can refer to it in a     16:48:48
22 moment, but again, to be clear, you had run  16:48:51
23 chargeback reports in connection with    16:48:55
24 customers of Harvard Drug, correct?     16:48:57
25    A.  Yes.           16:48:59

Page 380

1     Q.  And do you recall who you had   16:48:59
2  perform that analysis?          16:49:07
3     A.  No.           16:49:08
4     Q.  Either Ms. Spaulding or      16:49:08
5  Ms. Rowley-Kilper?           16:49:10
6     A.  It may have been Ms. Neely.    16:49:11
7     Q.  Ms. Neely, okay.         16:49:13
8        Now, I'll represent for the     16:49:16
9  record that this is a summary of the    16:49:19
10 chargeback information that appears on that  16:49:20
11 report. And if you look at the bottom row   16:49:28
12 total, there appears to be 12,487 total    16:49:33
13 orders recorded in which Harvard Drug sold   16:49:43
14 controlled substances.          16:49:48
15        Do you see that?         16:49:49
16    A.  Yes.           16:49:49
17    Q.  So I'll represent to you for    16:49:50
18 the record that the chargeback data that you  16:49:52
19 had run for Harvard Drug reported that there  16:49:58
20 were 12,000 -- a total of 12,487      16:49:59
21 transactions.              16:50:02
22        MR. O'CONNOR: Counsel, I'm    16:50:03
23        going to object.         16:50:03
24        Just to be clear, are you      16:50:04
25        saying that this is a document that  16:50:06

Page 381

1  you've prepared based on produced      16:50:08
2         data?               16:50:11
3         MR. KO: Based on produced    16:50:11
4         data, the Bates number which appears  16:50:13
5         at the top of this.          16:50:14
6         MR. O'CONNOR: Okay. So the   16:50:15
7         fact that the Bates number is at the  16:50:15
8         top here does not mean that this is a  16:50:17
9         copy of the document we produced?  16:50:18
10        MR. KO: That's -- that's      16:50:20
11        right.              16:50:22
12        MR. O'CONNOR: Okay. Thank   16:50:22
13        you.               16:50:24
14        MR. KO: This itself is not a   16:50:24
15        copy of a document that you produced  16:50:27
16        but is instead based on the      16:50:29
17        information that is -- appears on this  16:50:30
18        Bates number.           16:50:32
19        MR. O'CONNOR: Thank you.    16:50:32
20 QUESTIONS BY MR. KO:           16:50:33
21    Q.  Now, I'll represent to you that  16:50:36
22 this Bates number -- or this document    16:50:38
23 reflects that Harvard Drug was doing business  16:50:44
24 as First Veterinary Supply.        16:50:48
25        Do you recall ever being made   16:50:51

Page 382

1  aware of certain transactions or pills that     16:50:56
2  were being sent to a First Veterinary Supply?   16:50:58
3      A.   No.                                     16:51:00
4      Q.   Okay.  Would you agree with me          16:51:02
5  that sending pills to a -- prescription         16:51:03
6  opioids to a veterinarian clinic would be       16:51:07
7  suspicious or potentially suspicious?           16:51:14
8          MR. O'CONNOR:  Object to form.           16:51:15
9          THE WITNESS:  That depends on            16:51:16
10     the product and the quantities.              16:51:18
11 QUESTIONS BY MR. KO:                             16:51:19
12     Q.   Okay.  Do you recall shipping           16:51:19
13 prescription opioids to vet clinics?            16:51:23
14     A.   I cannot say if we did or did           16:51:25
15 not.                                             16:51:26
16     Q.   Okay.  Harvard Drug -- do you           16:51:27
17 recall when Harvard Drug had its license         16:51:41
18 suspended by the DEA?                            16:51:44
19     A.   2010 or before, around that            16:51:45
20 time.                                            16:51:51
21     Q.   Okay.  And they had their               16:51:52
22 license suspended because of diversion of        16:51:54
23 pills -- diversion of pills by certain           16:51:58
24 customers that they sold to, correct?           16:52:05
25         MR. O'CONNOR:  Object to form.           16:52:07

Page 383

1          THE WITNESS:  Yes.                       16:52:08
2  QUESTIONS BY MR. KO:                             16:52:10
3      Q.   Okay.  And would you agree with         16:52:10
4  me that First Vet Supply is not a physician      16:52:25
5  or a pain clinic?                                16:52:30
6      A.   I don't know their business             16:52:32
7  model.  I don't -- is their DEA registration     16:52:34
8  number the same as Harvard Drug Group?          16:52:38
9      Q.   I believe that to be the case,         16:52:42
10 actually.                                        16:52:44
11     A.   So, many of our distributors            16:52:44
12 had d/b/a second lines, and that's a -- my       16:52:54
13 understanding is a legal term implying the       16:52:57
14 organization of a corporation.  So I only        16:52:59
15 knew this customer as Harvard Drug.              16:53:01
16     Q.   Okay.  Setting aside the name,          16:53:03
17 did you understand that a large percentage of    16:53:10
18 drugs sold by Harvard Drug were going to        16:53:15
19 Florida?  And in particular, I direct you to     16:53:18
20 the percentages that appear in the middle of     16:53:28
21 the screen that show Florida percentage.         16:53:24
22     A.   So total POs doesn't tell me            16:53:28
23 number of drugs.  They could have been          16:53:30
24 purchase orders for a hundred drugs or 10,000   16:53:33
25 dosage units, so I can't -- I don't have         16:53:35

Page 384

1  enough information to answer that question.      16:53:37
2      Q.   Okay.  But if you look at               16:53:39
3  Florida percent POs -- do you see that?         16:53:40
4      A.   I do.                                   16:53:43
5      Q.   Okay.  And is that -- in the            16:53:44
6  chargeback data, you had been able to            16:53:47
7  determine what percentage of purchase orders    16:53:51
8  went to Florida, correct?                        16:53:55
9      A.   No.                                     16:53:56
10     Q.   You did not?                            16:54:01
11     A.   No.                                     16:54:02
12     Q.   Okay.  Wasn't it the case that          16:54:02
13 through the chargeback data you knew you         16:54:08
14 could understand, as we discussed earlier,       16:54:11
15 where the pills that you sold to the             16:54:13
16 distributors were going?                         16:54:16
17     A.   Yes, but in this context, I             16:54:17
18 believe the purchase order to be the purchase    16:54:20
19 order from Harvard to Mallinckrodt as the        16:54:22
20 supplier, not forward through the supply         16:54:25
21 chain.                                           16:54:27
22     Q.   Okay.  So it's your                     16:54:27
23 understanding that this is just -- well,         16:54:28
24 Harvard Drug, do you know where they were        16:54:32
25 located?                                         16:54:35

Page 385

1      A.   I believe Wisconsin.                    16:54:35
2      Q.   Okay.  I think they were in             16:54:37
3  Michigan, but somewhere in the Midwest.          16:54:40
4      A.   All right.                              16:54:42
5      Q.   So you're saying that this is           16:54:42
6  the percentage of initial pills that go to       16:54:43
7  the distributor?                                 16:54:47
8      A.   Again, these are purchase              16:54:48
9  orders.  They could have been for 100 pills      16:54:51
10 or a million pills.  I don't have enough         16:54:55
11 information to answer the question.              16:54:57
12     Q.   Okay.  Turn to the second page          16:54:58
13 of this document.  And so these -- these         16:55:06
14 columns, by the way, are taken straight from     16:55:14
15 the -- I'll represent to you that they're        16:55:16
16 taken straight from the chargeback reports       16:55:18
17 that are reflected by this Bates number.         16:55:22
18         And if you see on the far                16:55:25
19 right-hand side above the oxy 15 and oxy 30      16:55:27
20 sections, do you see the reference to UOM?       16:55:30
21     A.   I do.                                   16:55:34
22     Q.   And what's your understanding           16:55:34
23 of UOM?                                          16:55:35
24     A.   Unit of measure.                        16:55:36
25     Q.   Okay.  And would that actually          16:55:38

Page 386

1  be synonymous with, for example, a pill?  16:55:40
2      A.  Yes.  16:55:44
3      Q.  So that's the actual amount of  16:55:45
4  pills that are being shipped for that  16:55:47
5  particular order, correct?  16:55:51
6      A.  It -- this is a monthly total,  16:55:53
7  so, yes, if we're -- yes, I'm sorry, I didn't  16:55:59
8  have the correlation to -- that a PO equals  16:56:04
9  one month in -- I'm just not familiar with  16:56:08
10  the spreadsheet, so, yes.  16:56:10
11      Q.  Yeah, fair enough.  16:56:12
12      And on the -- on this document  16:56:13
13  there's an indication also of Florida  16:56:18
14  percentage sales, quantity government UOM.  16:56:21
15      Do you see that?  16:56:24
16      A.  Yes.  16:56:24
17      Q.  Do you recall that particular  16:56:25
18  data field in the chargeback information?  16:56:28
19      A.  Yes.  16:56:30
20      Q.  Okay.  And so does that reflect  16:56:31
21  the percentage of pills that went to  16:56:33
22  downstream customers of Mallinckrodt?  16:56:37
23      MR. O'CONNOR:  Object to form.  16:56:40
24  QUESTIONS BY MR. KO:  16:56:45
25      Q.  In other words -- let me ask it  16:56:46

Page 387

1  a different way.  16:56:47
2      Does this percentage reflect  16:56:47
3  the total percentage of pills relative to the  16:56:49
4  total order that ended up in Florida?  16:56:52
5      MR. O'CONNOR:  Object to form.  16:56:55
6      THE WITNESS:  Yes.  16:56:55
7  QUESTIONS BY MR. KO:  16:56:56
8      Q.  Okay.  So you'll see that the  16:56:56
9  summary indicates below that from the fourth  16:57:00
10  quarter 2008 through the second quarter of  16:57:04
11  2010, that at least with respect to oxy 15s,  16:57:06
12  90.5 percent of Mallinckrodt pills that were  16:57:13
13  sold to Harvard ended up in Florida.  16:57:17
14      Do you see that?  16:57:20
15      A.  Yes.  16:57:21
16      Q.  Okay.  And likewise with  16:57:22
17  respect to oxy 30s during that same time  16:57:23
18  period, 88 percent ended up in Florida,  16:57:27
19  correct?  16:57:31
20      A.  Yes.  16:57:31
21      Q.  Okay.  Was it suspicious to you  16:57:31
22  at the time that such a disproportionate  16:57:37
23  percentage of pills were ending up in  16:57:41
24  Florida?  16:57:43
25      MR. O'CONNOR:  Object to form.  16:57:43

Page 388

1      THE WITNESS:  So this report  16:57:44
2  that you extracted from our production  16:57:48
3  information, it is -- it is data that  16:57:51
4  for certain came to me?  16:57:54
5  QUESTIONS BY MR. KO:  16:57:57
6      Q.  Uh-huh.  16:57:59
7      A.  It is?  16:58:00
8      Q.  No.  Yes, this is -- this is  16:58:01
9  data based on chargeback reports that were  16:58:03
10  requested at the direction of you, correct.  16:58:07
11      A.  I -- I don't know.  16:58:11
12      Q.  Okay.  That wasn't my question.  16:58:15
13      A.  Okay.  16:58:17
14      Q.  I'll represent to you that  16:58:17
15  these chargeback reports were run in  16:58:18
16  connection with your investigation of where  16:58:21
17  your pills were going.  16:58:24
18      So my question to you simply  16:58:25
19  is:  Were you aware at the time -- or is it  16:58:28
20  suspicious -- separate and apart from the  16:58:32
21  process of running this report --  16:58:34
22      A.  Uh-huh.  16:58:36
23      Q.  -- is it suspicious to you that  16:58:36
24  90 percent of all pills that you shipped to  16:58:40
25  Harvard Drug end up going to Florida?  16:58:44

Page 389

1      MR. O'CONNOR:  Object to form.  16:58:47
2      THE WITNESS:  Yes, it appears  16:58:48
3  to be a disproportionate percentage of  16:59:24
4  this product going into Florida.  16:59:28
5  QUESTIONS BY MR. KO:  16:59:30
6      Q.  Okay.  Thank you for waiting.  16:59:30
7      A.  It's all right.  16:59:31
8      Q.  And based on this review of  16:59:32
9  Harvard chargeback information, did you also  16:59:41
10  conclude that Harvard's suspicious order  16:59:45
11  monitoring system was inadequate?  16:59:47
12      A.  Can you tell me when -- I don't  16:59:52
13  know when Harvard was suspended.  So was this  16:59:54
14  after their suspension that I had the report  16:59:56
15  pulled?  16:59:59
16      Q.  Well, I would say separate and  16:59:59
17  apart from these numbers --  17:00:01
18      A.  Okay.  17:00:04
19      Q.  -- did you review chargeback  17:00:04
20  data to make the determination of whether or  17:00:07
21  not Harvard's suspicious order monitoring  17:00:10
22  system was effective?  17:00:12
23      MR. O'CONNOR:  Object to form.  17:00:14
24      THE WITNESS:  I don't know.  I  17:00:14
25  don't know how to answer the question.  17:00:20

Page 390

1  QUESTIONS BY MR. KO:                    17:00:23
2      Q.   Okay.  Do you recall a period       17:00:23
3  of time, or do you recall ever reviewing the   17:00:24
4  suspicious order monitoring systems of your    17:00:26
5  distributors?                           17:00:29
6      A.   Of our distributors?              17:00:29
7      Q.   Yes.                           17:00:32
8      A.   To their downstream customers?       17:00:33
9      Q.   Correct.                        17:00:35
10     A.   Yes.                           17:00:35
11     Q.   In other words, Mallinckrodt        17:00:36
12 was the registrant in the CSA that had duties   17:00:38
13 to maintain effective controls against        17:00:42
14 diversion, but so too were distributors as     17:00:44
15 well, correct?                          17:00:46
16         MR. O'CONNOR:  Object to form.       17:00:47
17         THE WITNESS:  Correct.             17:00:47
18     Correct.                           17:00:47
19 QUESTIONS BY MR. KO:                     17:00:48
20     Q.   So distributors like both          17:00:48
21 Harvard or Sunrise, including the major        17:00:53
22 distributors like ABC, McKesson and Cardinal,  17:00:56
23 all had duties to maintain effective controls  17:00:59
24 against diversion, correct?                 17:01:02
25         MS. KVESELIS:  Object to form.       17:01:04

Page 391

1          THE WITNESS:  Correct.             17:01:05
2  QUESTIONS BY MR. KO:                     17:01:06
3      Q.   And all these registrants had       17:01:06
4  duties to implement and design an effective    17:01:08
5  suspicious order monitoring program, correct?  17:01:11
6          MR. O'CONNOR:  Object to form.       17:01:12
7          THE WITNESS:  That guards           17:01:13
8      against -- yes, guards against          17:01:16
9      diversion, yes.                     17:01:18
10 QUESTIONS BY MR. KO:                     17:01:20
11     Q.   And was there a period of time      17:01:20
12 in which Mallinckrodt decided to perform an    17:01:21
13 audit or a review of your distributors' SOM    17:01:25
14 programs?                               17:01:32
15     A.   Yes.                           17:01:32
16     Q.   And during that review and         17:01:32
17 based on that review, did you make            17:01:33
18 determinations as to whether or not you would  17:01:36
19 continue to ship to certain distributors?      17:01:38
20     A.   Yes.                           17:01:40
21     Q.   And one of the reasons for         17:01:40
22 which you decided to stop shipping to certain  17:01:46
23 distributors was as a result of pulling        17:01:49
24 chargeback information in which you could      17:01:52
25 identify details of where your pills were      17:01:54

Page 392

1  going after you shipped them to the           17:01:57
2  distributor, correct?                     17:01:59
3          MR. O'CONNOR:  Object to form.       17:02:00
4          THE WITNESS:  That's one of the      17:02:00
5      reasons that pointed us to a certain    17:02:04
6      distributor, to go and visit them,     17:02:06
7      yes.                            17:02:08
8  QUESTIONS BY MR. KO:                     17:02:08
9      Q.   Okay.  And some of this           17:02:09
10 chargeback data, by the way, some of the      17:02:10
11 chargeback information was provided to you by  17:02:13
12 certain distributors, correct?              17:02:15
13         MR. O'CONNOR:  Object to form.       17:02:17
14         THE WITNESS:  No, this is our        17:02:17
15     information.                        17:02:20
16 QUESTIONS BY MR. KO:                     17:02:20
17     Q.   Okay.  In 2010 you performed --     17:02:21
18 at some point in 2010 you performed some       17:02:36
19 audits of your distributors, correct?         17:02:39
20     A.   Yes.                           17:02:41
21     Q.   And you recall that these          17:02:43
22 audit -- in these audits you actually went to  17:02:46
23 the -- your customer and visited some of       17:02:51
24 their facilities?                        17:02:53
25     A.   Yes.                           17:02:55

Page 393

1      Q.   And you went to -- I believe       17:02:55
2  you performed on-site audits of at least       17:02:58
3  Masters and KeySource; is that correct?       17:03:02
4      A.   Correct.                       17:03:04
5      Q.   Okay.  And these -- what was       17:03:04
6  the purpose of performing these on-site        17:03:06
7  audits?                               17:03:10
8      A.   So we had reviewed -- the          17:03:11
9  purpose was to review their suspicious order   17:03:14
10 monitoring and understand which -- what due    17:03:19
11 diligence they perform when reviewing their    17:03:21
12 customers.                              17:03:24
13         (Mallinckrodt-Harper Exhibit 26      17:03:26
14     marked for identification.)            17:03:27
15 QUESTIONS BY MR. KO:                     17:03:27
16     Q.   Okay.  I'm going to hand you a      17:03:27
17 copy of what's going to be marked as Harper    17:03:28
18 Exhibit 26.                             17:03:30
19         And for the record, this is --      17:03:33
20 ends in Bates 48430.                     17:03:34
21         I just have some general           17:03:47
22 questions about this, so feel free to consult  17:03:49
23 the document if you need to.  But I just want  17:03:51
24 to know whether or not this reflects the       17:03:54
25 written report of your on-site audit to        17:03:56

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1    Masters as of December 7, 2010?        17:04:00
2        A.    Yes.                          17:04:02
3        Q.    And so as you described, one of    17:04:03
4    the purposes of performing this audit was to    17:04:04
5    review Masters' suspicious order monitoring    17:04:08
6    system; is that correct?               17:04:11
7        A.    Yes.                          17:04:11
8        Q.    Okay.  And do you recall     17:04:12
9    actually going out to Masters Pharmaceutical    17:04:17
10   located in Cincinnati, Ohio?           17:04:19
11       A.    Yes.                          17:04:20
12       Q.    And you went there with      17:04:20
13   Mr. Ratliff, correct?                   17:04:21
14       A.    Yes.                          17:04:22
15       Q.    And at the time you -- there    17:04:23
16   was some certain with respect to Masters    17:04:27
17   Pharmaceutical activities, and so that    17:04:30
18   prompted the need for you and Mr. Ratliff to    17:04:32
19   go visit; is that accurate?            17:04:35
20       A.    Yes.                          17:04:40
21       Q.    Okay.  And by the way, Masters    17:04:40
22   Pharmaceutical also had its license suspended    17:04:42
23   by the DEA at some point, correct?      17:04:43
24       A.    Yes.                          17:04:44
25       Q.    Okay.  I believe that was 2014,    17:04:44

Page 395

1    but it related -- is it consistent with your    17:04:49
2    understanding that it related to activities    17:04:51
3    regarding their distribution of prescription    17:04:53
4    opioids in the 2008 through 2014 time period?    17:04:56
5        MR. O'CONNOR:  Object to form.    17:04:59
6        THE WITNESS:  I don't know the    17:04:59
7        date of the covered conduct.         17:05:01
8    QUESTIONS BY MR. KO:                    17:05:04
9        Q.    Okay.  Was there ever a time    17:05:04
10   when you ceased or put a temporary hold on    17:05:10
11   shipping orders to Masters?            17:05:13
12       A.    Yes.                          17:05:14
13       Q.    And that occurred at some point    17:05:14
14   in the late 2010 time period, right?    17:05:16
15       A.    Yes.                          17:05:18
16       Q.    And after this review, it was    17:05:18
17   determined that they were -- it was     17:05:24
18   sufficient to resume shipments to Masters; is    17:05:28
19   that fair to say?                       17:05:34
20       A.    No.                           17:05:34
21       Q.    Or did you -- at the time you    17:05:34
22   ceased sending shipments to Masters in late    17:05:36
23   2010, did you ever resume shipments to    17:05:39
24   Masters?                               17:05:41
25       A.    No.                           17:05:42

Page 396

1        Q.    Okay.                         17:05:43
2        A.    It's my understanding that they    17:05:44
3    have recently been reissued a DEA       17:05:47
4    registration, so I don't know the current    17:05:49
5    status, but from 2010 forward, no.      17:05:50
6        Q.    Fair enough.                  17:05:53
7        And in addition to the on-site    17:05:54
8    audit of Masters, you had done an on-site    17:06:00
9    audit of KeySource as well, correct?    17:06:03
10       A.    Yes.                          17:06:06
11       Q.    Do you recall any other on-site    17:06:06
12   audits that you were -- you participated in?    17:06:09
13       A.    Sunrise, previously, and then    17:06:10
14   there were others subsequently.  But at this    17:06:12
15   time I did not go to Cedardale; several of my    17:06:15
16   colleagues did.                        17:06:19
17       Q.    Got it.                       17:06:20
18       So other than on-site audits    17:06:20
19   performed of Cedardale, KeySource, Sunrise    17:06:23
20   and Masters, are you aware of any other    17:06:28
21   on-site audits that the SOM team conducted?    17:06:30
22       A.    Ever?                         17:06:33
23       Q.    From in the 2009 through 2012    17:06:35
24   time period.                           17:06:38
25       A.    Yes.                          17:06:39

Page 397

1        Q.    Okay.  Which additional on-site    17:06:40
2    audits did you perform?                 17:06:44
3        A.    We went to AmerisourceBergen,    17:06:45
4    McKesson, Cardinal, and I believe HD Smith,    17:06:49
5    although -- yes, HD Smith, yes.         17:06:56
6        Q.    And again, the purpose of these    17:06:59
7    on-site audits was to, among other things,    17:07:01
8    examine and understand their SOM program?    17:07:04
9        A.    Yes.                          17:07:05
10       (Mallinckrodt-Harper Exhibit 27    17:07:19
11       marked for identification.)          17:07:19
12   QUESTIONS BY MR. KO:                    17:07:05
13       Q.    Okay.  Now, turning to -- you    17:07:05
14   can set that aside, and I'm going to hand you    17:07:15
15   a copy of what will be marked as Exhibit 27.    17:07:17
16       And for the record, this ends    17:07:23
17   in Bates 970734.                       17:07:25
18       And this appears to be a letter    17:07:38
19   you drafted to Masters on September 21, 2011,    17:07:40
20   correct?                               17:07:46
21       A.    Yes.                          17:07:46
22       Q.    Okay.  And now, you had    17:07:46
23   testified that you ceased shipments to    17:07:48
24   Masters at the end of 2010; is that correct?    17:07:52
25       A.    Approximate time.  I'm not    17:07:55

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1  certain.                              17:07:57
2     Q.   But despite -- well, you        17:07:57
3  stopped shipping to them, but you are still  17:08:02
4  undergoing a review of their SOM program; is  17:08:05
5  that correct?                          17:08:08
6     A.   At their request, yes.        17:08:08
7     Q.   At their request. Okay.       17:08:09
8          And on -- this culminates in a   17:08:11
9  letter on September 21, 2011, from you to    17:08:15
10 Mr. Corona, who I believe is the president of  17:08:20
11 Masters Pharmaceutical.                17:08:24
12         Is that consistent with your    17:08:24
13 understanding?                         17:08:25
14    A.   I don't know his title. He was  17:08:25
15 an executive, yes.                     17:08:28
16    Q.   Okay. And you indicate that,   17:08:28
17 among other things, "We are not comfortable  17:08:30
18 that your suspicious order monitoring program  17:08:33
19 is robust enough to identify suspicious    17:08:34
20 orders of controlled substances to ensure    17:08:37
21 that the products are being used for      17:08:39
22 legitimate medicinal purposes."           17:08:42
23         Did I read that correctly?      17:08:46
24    A.   Yes.                         17:08:46
25    Q.   And you continue that "As      17:08:46

Page 399

1  parted of our SOM and through evaluation of  17:08:48
2  customer buying patterns and chargeback data,  17:08:50
3  we have identified unusual purchasing      17:08:53
4  patterns by some of your customers for     17:08:54
5  oxycodone 15-milligram and 30-milligram    17:08:56
6  tablets."                              17:09:01
7          Did I read that correctly?      17:09:02
8     A.   Yes.                         17:09:02
9     Q.   So this is an example of how    17:09:03
10 you have utilized chargeback data that     17:09:05
11 Mallinckrodt can acquire to identify certain  17:09:09
12 customer buying patterns, among other things,  17:09:15
13 correct?                               17:09:17
14    A.   Correct.                     17:09:18
15    Q.   And also to identify unusual   17:09:18
16 purchasing patterns by some of Masters'    17:09:22
17 customers, correct?                    17:09:24
18         MR. O'CONNOR: Object to form.   17:09:25
19         THE WITNESS: Correct.         17:09:25
20 QUESTIONS BY MR. KO:                   17:09:26
21    Q.   Okay. And based on that       17:09:26
22 review, you indicate that you are not      17:09:29
23 prepared, Mallinckrodt is not prepared, to    17:09:33
24 resume sales of controlled substances,     17:09:35
25 correct?                               17:09:37

Page 400

1     A.   Yes.                         17:09:37
2     Q.   Okay. So you've done an        17:09:38
3  analysis of their SOM program, and you     17:09:39
4  conclude that Mallinckrodt is not comfortable  17:09:43
5  making any sales to them?               17:09:46
6     A.   Yes.                         17:09:47
7     Q.   You can set that aside.        17:09:47
8          (Mallinckrodt-Harper Exhibit 28  17:10:00
9  marked for identification.)              17:10:01
10 QUESTIONS BY MR. KO:                   17:10:01
11    Q.   And I'm going to hand you a    17:10:01
12 copy of what'll be marked as Harper       17:10:02
13 Exhibit 28.                           17:10:05
14         And for the record, this ends    17:10:07
15 in Bates 289368.                       17:10:08
16         Does this letter look familiar   17:10:15
17 to you, Ms. Harper?                    17:10:18
18    A.   Yes. Yes.                     17:10:19
19    Q.   And this is -- in your ongoing  17:10:19
20 review of chargeback data, you are able to    17:10:21
21 identify through this letter that you send to  17:10:24
22 your customers a series of pharmacies that    17:10:30
23 your customers ship to that you will not be    17:10:36
24 processing chargeback requests for; is that    17:10:39
25 accurate?                              17:10:42

Page 401

1     A.   Yes, and it was also after     17:10:42
2  meeting with the distributors to understand  17:10:46
3  their due diligence at the pharmacy level,    17:10:48
4  yes.                                  17:10:50
5     Q.   Okay. And just so I understand  17:10:50
6  this document and just so the record is    17:10:51
7  clear, I understand you sent this same letter  17:10:53
8  to all 43 wholesale distributors of       17:10:57
9  Mallinckrodt as of October 17, 2011, correct?  17:11:04
10    A.   Yes.                         17:11:06
11    Q.   And so these were all your     17:11:06
12 customers that you shipped Mallinckrodt     17:11:07
13 opioids to, correct, during this time period?  17:11:12
14    A.   Well, specifically oxycodone 15  17:11:14
15 and 30, yes.                          17:11:16
16    Q.   Okay. So 40 -- there were 43   17:11:17
17 wholesale distributors as of October 17,    17:11:20
18 2011, that you had previously done business  17:11:24
19 with that was -- that you had shipped oxy 15s  17:11:27
20 and oxy 30s to, correct?               17:11:29
21         MR. O'CONNOR: Object to form.   17:11:31
22         THE WITNESS: You know, I'd     17:11:32
23    like to clarify my previous -- so    17:11:35
24    these were all wholesalers and      17:11:37
25    distributors of records as purchasing  17:11:39

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1    opioids, but they may not have          17:11:42
2    purchased oxy 15 and 30.  They may       17:11:43
3    have purchased other opioids.            17:11:46
4         So that's the correct answer.       17:11:48
5    QUESTIONS BY MR. KO:                     17:11:50
6         Q.   Okay.  Thank you for the       17:11:50
7    clarification.                           17:11:51
8         A.   You're welcome.                17:11:52
9         Q.   So then is it fair to say that 17:11:53
10   these 43 wholesalers and distributors    17:11:54
11   constituted all the wholesaler distributors 17:11:59
12   that Mallinckrodt did business with in terms 17:12:02
13   of shipping prescription opioids to?     17:12:05
14        A.   To the best of my              17:12:07
15   understanding, yes.                      17:12:08
16        Q.   Okay.  And as we just discussed 17:12:09
17   a moment ago, "effective immediately,    17:12:17
18   Mallinckrodt will no longer process      17:12:21
19   chargebacks from distributor sales of    17:12:22
20   Mallinckrodt products to the pharmacies  17:12:25
21   identified on attachment 1 hereto."      17:12:27
22        And those pharmacies are of         17:12:29
23   course the ones listed in the second page of 17:12:31
24   this document, correct?                  17:12:33
25        A.   Yes.                           17:12:33

Page 403

1         Q.   Okay.  And so you're not       17:12:34
2    necessarily saying here that these pharmacies 17:12:37
3    need to be placed on any kind of do not ship 17:12:40
4    list.  You're simply telling these       17:12:43
5    distributors that you're not going to process 17:12:44
6    any chargeback requests related to these 17:12:46
7    particular pharmacies, correct?          17:12:49
8         MR. O'CONNOR:  Object to form.      17:12:50
9         THE WITNESS:  Sure.                 17:12:50
10   QUESTIONS BY MR. KO:                     17:12:51
11        Q.   Okay.  And by the way, going   17:12:51
12   back to the first paragraph of this      17:12:53
13   correspondence, you indicate to your     17:12:57
14   customers at the end of the first paragraph 17:13:01
15   that, quote, "As a DEA registrant,       17:13:04
16   Mallinckrodt, LLC, a Covidien company,   17:13:06
17   Mallinckrodt, has developed and maintains a 17:13:10
18   comprehensive program that includes review of 17:13:12
19   customer orders, IMS data and chargeback 17:13:14
20   information and, where appropriate,      17:13:17
21   subsequent audits of distributors' suspicious 17:13:20
22   order monitoring programs," end quote.   17:13:22
23        Did I read that correctly?          17:13:26
24        A.   Yes.                           17:13:27
25        Q.   So we discussed the concept of 17:13:27

Page 404

1    Mallinckrodt doing audits of your customers' 17:13:28
2    SOM programs.  I want to understand to what 17:13:33
3    extent you actually utilize IMS data to make 17:13:36
4    certain determinations as well.          17:13:39
5         A.   Okay.  We used IMS data to look 17:13:41
6    at the prescribers of oxycodone 15s and 30s. 17:13:47
7    When we spoke to the distributors about these 17:13:53
8    potentially -- about these pharmacies that 17:13:57
9    displayed red flags, we asked the        17:14:00
10   distributors if they had a list of the top 17:14:04
11   prescribers that were writing RXs at these 17:14:06
12   pharmacies, and then that was a method of 17:14:09
13   comparison that we had to this IMS data list 17:14:12
14   of the top prescribers in the country.   17:14:14
15        Q.   Okay.  And when do you recall  17:14:16
16   first utilizing the IMS data in connection 17:14:22
17   with this review of prescriber-level     17:14:26
18   information?                             17:14:28
19        A.   I don't know when it started.  17:14:28
20        Q.   Okay.  Are you currently       17:14:30
21   utilizing IMS data in connection with your 17:14:34
22   suspicious order monitoring system?      17:14:36
23        A.   No.                            17:14:37
24        Q.   Okay.  Other than for purposes 17:14:38
25   of sending out this letter to make       17:14:39

Page 405

1    distributors aware that chargeback requests 17:14:46
2    will not be honored, do you recall ever  17:14:48
3    utilizing IMS data in connection with SOM 17:14:51
4    activities?                             17:14:55
5         A.   Not that I recall.            17:14:55
6         Q.   You can -- I'd actually ask    17:14:56
7    that you keep that document in front of you, 17:15:08
8    but just probably you can refer to the back 17:15:09
9    because I want to ask you some questions 17:15:11
10   about these pharmacies.                  17:15:12
11        A.   All right.                     17:15:13
12        (Mallinckrodt-Harper Exhibit 29     17:15:15
13   marked for identification.)              17:15:16
14   QUESTIONS BY MR. KO:                     17:15:16
15        Q.   So I'm going to hand you a copy 17:15:16
16   of what will be marked as Harper Exhibit 29. 17:15:17
17        A.   Oh, my gosh.                    17:15:30
18        Q.   And for the record, this       17:15:32
19   document ends in Bates 32384 and is an e-mail 17:15:35
20   from Wayne Corona at Masters to you, dated 17:15:40
21   October 10 -- 20, 2011.                  17:15:46
22        Do you recall this e-mail?          17:15:49
23        A.   Yes.                           17:15:50
24        Q.   Okay.  This is Masters'        17:15:51
25   response to the letter that you had sent to 17:15:55

Page 406

1  them that we just previously discussed that  17:15:59
2  reflects Exhibit 28; is that correct?  17:16:03
3       A.   I don't see -- we had a  17:16:04
4  separate letter addressed -- is this in your  17:16:11
5  pile?  I'm so confused.  17:16:16
6           Okay.  We had a separate letter  17:16:18
7  addressed to Masters.  17:16:23
8       Q.   Okay.  And in that separate  17:16:23
9  letter, you were identifying -- I believe  17:16:24
10  I've seen that, but in that separate letter  17:16:29
11  you identify these same pharmacies; is that  17:16:31
12  correct?  17:16:32
13       A.   Yes.  Yes.  17:16:32
14       Q.   So at some point before this  17:16:34
15  e-mail, you had obviously indicated to  17:16:38
16  Masters that there were certain pharmacies  17:16:40
17  that you weren't going to honor chargebacks  17:16:48
18  to, correct?  17:16:52
19       A.   Yes.  17:16:52
20       Q.   And I assume that there was a  17:16:52
21  separate e-mail sent to Masters, because at  17:16:54
22  the time you weren't doing business with  17:16:57
23  them?  17:16:59
24       A.   I believe this is the time we  17:17:00
25  notified Masters that we were going to  17:17:04

Page 407

1  discontinue sales of Mallinckrodt product to  17:17:07
2  Masters.  17:17:09
3       Q.   Okay.  17:17:10
4       A.   So it would have been a letter.  17:17:10
5           But we sent several letters to  17:17:11
6  Masters, and so I -- the content of each one  17:17:13
7  I can't attest to.  17:17:19
8       Q.   Sure.  Fair enough.  17:17:19
9           In any event, Mr. Corona,  17:17:20
10  who -- it does appear in the end of this  17:17:24
11  e-mail that he is the president of Masters  17:17:27
12  Pharmaceutical.  17:17:29
13           Do you see that?  I've  17:17:29
14  highlighted it.  17:17:38
15       A.   Yes, I do.  Yes.  Yes.  17:17:38
16       Q.   So you had sent some  17:17:39
17  correspondence to Jennifer Seiple at Masters,  17:17:42
18  and you had identified these pharmacies that  17:17:46
19  appear in attachment 1, correct?  17:17:49
20       A.   Yes.  17:17:50
21       Q.   Okay.  And he responds that "As  17:17:51
22  you can see, the dates of termination predate  17:18:03
23  your notification."  17:18:06
24           Do you see that?  17:18:08
25       A.   I do.  17:18:08

Page 408

1       Q.   Okay.  So is it accurate to say  17:18:09
2  that what he's trying to tell you is that for  17:18:12
3  each one of these pharmacies that you have  17:18:15
4  identified as being problematic, he has  17:18:16
5  indicated that Masters has already placed  17:18:21
6  them on Masters' termination list; is that  17:18:24
7  accurate?  17:18:28
8       A.   Yes.  17:18:28
9       Q.   Okay.  And for several of these  17:18:29
10  pharmacies, Masters had placed these  17:18:32
11  pharmacies on the termination list  17:18:36
12  approximately one year prior to you notifying  17:18:39
13  Masters of these problematic pharmacies; is  17:18:42
14  that accurate?  17:18:47
15       A.   Yes.  17:18:47
16       Q.   Okay.  Now, he goes on to  17:18:48
17  say -- and I recall earlier when we discussed  17:18:57
18  how you had indicated to Masters that they  17:19:01
19  had an inadequate SOM program.  17:19:04
20       A.   Yes.  17:19:06
21       Q.   Okay.  And he responds, quote,  17:19:07
22  "In your last two letters to Masters, you  17:19:11
23  have judged our SOMs to be inadequately  17:19:16
24  robust, yet somehow we identified these  17:19:18
25  accounts well before you, exclamation point."  17:19:20

Page 409

1           Did I read that correctly?  17:19:23
2       A.   Yes.  17:19:23
3       Q.   So, again, is it accurate to  17:19:24
4  state that Masters had identified one -- at  17:19:27
5  least one year prior, in some instances, some  17:19:30
6  pharmacies that were deemed to be  17:19:33
7  problematic, sufficient to place them on  17:19:34
8  their termination list before you were able  17:19:36
9  to make that same determination?  17:19:39
10           MR. O'CONNOR:  Object to form.  17:19:40
11           THE WITNESS:  Yes.  17:19:41
12  QUESTIONS BY MR. KO:  17:19:41
13       Q.   Okay.  And earlier we had --  17:19:42
14  you had testified that one of the reasons why  17:19:46
15  you had audited Masters was to review their  17:19:48
16  SOM program, correct?  17:19:51
17       A.   Yes.  17:19:52
18       Q.   Okay.  And yet through your  17:19:53
19  review, you were unable to determine which  17:19:55
20  pharmacies they placed on their termination  17:20:00
21  list, correct?  17:20:02
22       A.   Correct.  17:20:03
23       Q.   Okay.  Isn't that reflective of  17:20:04
24  an inadequate audit on the part of  17:20:10
25  Mallinckrodt?  17:20:12

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1    MR. O'CONNOR: Object to form.    17:20:12
2    THE WITNESS: No.    17:20:13
3    QUESTIONS BY MR. KO:    17:20:13
4    Q.    Okay. Do you feel that had you    17:20:14
5    asked Masters the simple question of which    17:20:16
6    pharmacies they had placed on their do not    17:20:21
7    ship list, you would have also understood    17:20:23
8    that these pharmacies were problematic?    17:20:26
9    A.    I do not know.    17:20:31
10    Q.    Okay. Do you agree with me    17:20:32
11    that had you asked that question in your    17:20:34
12    audit, you would have learned that these    17:20:36
13    pharmacies were problematic?    17:20:38
14    A.    If they would have provided    17:20:40
15    this listing, yes.    17:20:42
16    Q.    Okay. Regardless of whether or    17:20:43
17    not they provided the listing --    17:20:45
18    A.    Uh-huh.    17:20:47
19    Q.    -- the purpose of your audit in    17:20:47
20    late 2010 was to understand Masters' SOM    17:20:50
21    program, was it not?    17:20:56
22    A.    Yes.    17:20:57
23    Q.    And you were doing an    17:20:57
24    independent review?    17:20:58
25    A.    Yes, a Mallinckrodt review of    17:21:01

Page 411

1    their program, yes.    17:21:02
2    Q.    Right.    17:21:03
3    And in connection with that    17:21:04
4    review, did you ever ask them whether or not    17:21:05
5    they had placed certain pharmacies on their    17:21:08
6    do not ship list?    17:21:11
7    A.    I don't -- I don't know. I    17:21:11
8    don't recall.    17:21:14
9    Q.    Okay. Had you asked that    17:21:14
10    question, you would have certainly learned    17:21:15
11    this information, correct?    17:21:18
12    MR. O'CONNOR: Object to form.    17:21:18
13    THE WITNESS: Perhaps.    17:21:19
14    QUESTIONS BY MR. KO:    17:21:20
15    Q.    Okay. Sitting here today, is    17:21:20
16    it reflective of an adequate audit if you    17:21:28
17    didn't ask Masters whether or not they had    17:21:31
18    any pharmacies on their termination list?    17:21:34
19    MR. O'CONNOR: Object to form.    17:21:37
20    THE WITNESS: No.    17:21:37
21    QUESTIONS BY MR. KO:    17:21:38
22    Q.    So to be clear, not asking them    17:21:41
23    whether or not they had pharmacies on their    17:21:45
24    termination list is indicative of an    17:21:47
25    inadequate audit, correct?    17:21:51

Page 412

1    MR. O'CONNOR: Object to form.    17:21:52
2    THE WITNESS: I'm sorry, there    17:21:53
3    were double negatives. Will you    17:21:55
4    please restate? I'm sorry.    17:21:57
5    QUESTIONS BY MR. KO:    17:21:58
6    Q.    Sorry, I have a bad habit of    17:21:58
7    that.    17:22:02
8    So not asking Masters whether    17:22:03
9    or not they had pharmacies on their    17:22:04
10    termination list is indicative of an    17:22:05
11    inadequate audit, correct?    17:22:09
12    MR. O'CONNOR: Object to form.    17:22:10
13    THE WITNESS: I do not agree.    17:22:11
14    QUESTIONS BY MR. KO:    17:22:12
15    Q.    You do not agree.    17:22:12
16    Had you simply asked Masters    17:22:13
17    whether or not certain pharmacies appeared on    17:22:19
18    their do not ship list, you would have    17:22:21
19    learned that certain pharmacies did in fact    17:22:23
20    appear on that list, correct?    17:22:25
21    MR. O'CONNOR: Objection.    17:22:27
22    Asked and answered.    17:22:28
23    THE WITNESS: I don't know if    17:22:28
24    they would have given us this list.    17:22:30
25

Page 413

1    QUESTIONS BY MR. KO:    17:22:33
2    Q.    Okay. But you don't recall    17:22:34
3    ever asking that question?    17:22:35
4    A.    I do not.    17:22:36
5    Q.    Okay. Certainly if you had    17:22:37
6    asked that question, you would have been able    17:22:39
7    to determine whether or not certain    17:22:41
8    pharmacies appeared on their do not ship    17:22:43
9    list, correct?    17:22:45
10    MR. O'CONNOR: Objection.    17:22:45
11    Asked and answered.    17:22:46
12    THE WITNESS: So, sir, I'll    17:22:46
13    answer again. This whole Masters'    17:22:47
14    event became quite adversarial. And I    17:22:51
15    don't mean to be irreverent, because    17:22:55
16    I'm under testimony, but this Wayne    17:22:57
17    Corona, I expected to find a dead    17:22:58
18    chicken on my porch.    17:23:00
19    He called me, he hounded me, he    17:23:02
20    was angry, angry about our decision,    17:23:04
21    and so he was defending, I'm going to    17:23:06
22    say, to Mallinckrodt Masters' SOM    17:23:10
23    program with these series of    17:23:14
24    communications.    17:23:15
25

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1  QUESTIONS BY MR. KO:                 17:23:15
2      Q.   Okay.  Is it fair to say that   17:23:16
3  Masters identified problematic pharmacies   17:23:17
4  before you had identified them in your   17:23:24
5  October 17, 2011 correspondence to them?   17:23:27
6      A.   Yes.                        17:23:30
7          MR. O'CONNOR:  Object to form.   17:23:30
8          THE WITNESS:  According to this   17:23:31
9  e-mail, yes.                        17:23:32
10 QUESTIONS BY MR. KO:                 17:23:33
11     Q.   Okay.  Do you -- had you had   17:23:33
12 the information -- let's take Gulf Coast, for   17:23:39
13 example.                            17:23:42
14         Do you see that -- by the way,   17:23:42
15 do you recall Gulf Coast medical pharmacy?   17:23:46
16     A.   The names all run together.  I   17:23:48
17 do not.  I'm sorry.                  17:23:51
18     Q.   They were -- I believe that   17:23:51
19 they were the subject of a DEA indictment,   17:23:53
20 and they were a particularly problematic   17:23:55
21 customer.                           17:23:58
22         But regardless, in -- as of   17:23:59
23 October 28, 2010, Masters had placed Gulf   17:24:03
24 Coast on their termination list, correct?   17:24:07
25         MR. O'CONNOR:  Object to form.   17:24:09

Page 415

1          THE WITNESS:  Yes.          17:24:10
2  QUESTIONS BY MR. KO:                 17:24:14
3      Q.   And sitting here today, would   17:24:14
4  you agree with me that if you had shipped   17:24:17
5  pills to distributors that sold eventually to   17:24:20
6  Gulf Coast after October 20, 2010, that would   17:24:25
7  have been a problem, correct?       17:24:31
8          MR. O'CONNOR:  Object to form.   17:24:32
9          THE WITNESS:  Not a problem we   17:24:33
10 were aware of.                      17:24:37
11 QUESTIONS BY MR. KO:                 17:24:37
12     Q.   Certainly I understand that you   17:24:39
13 may not have been aware of it, but is it --   17:24:41
14 is it reflective of an effective SOM program   17:24:46
15 if you ship orders to a pharmacy that you   17:24:50
16 know appear on your customer's termination   17:24:53
17 list?                               17:24:56
18         MR. O'CONNOR:  Object to form.   17:24:56
19         THE WITNESS:  If we know a   17:24:57
20 customer -- if we know a pharmacy   17:24:58
21 appears on our customer's termination   17:25:01
22 list, we also discontinue honoring of   17:25:03
23 chargebacks to that pharmacy.       17:25:07
24 QUESTIONS BY MR. KO:                 17:25:07
25     Q.   Okay.  So that's helpful.   17:25:08

Page 416

1  So -- I thank you for that clarification.   17:25:10
2          So to be clear, if you obtain   17:25:11
3  knowledge from a customer that they have   17:25:13
4  placed a particularly pharmacy -- particular   17:25:16
5  pharmacy on their do not ship list, you also   17:25:18
6  would no longer honor chargeback requests   17:25:22
7  from that particular distributor as it   17:25:26
8  relates to pills shipped to that pharmacy,   17:25:29
9  correct?                            17:25:31
10     A.   Correct.                   17:25:32
11     Q.   And it would have also been   17:25:33
12 problematic to do so, right, because that   17:25:36
13 particular pharmacy for a variety of reasons   17:25:38
14 would have certain red flags, correct?   17:25:43
15         MR. O'CONNOR:  Object to form.   17:25:45
16         THE Witness:  Yes.          17:25:45
17 QUESTIONS BY MR. KO:                 17:25:47
18     Q.   And potentially that pharmacy   17:25:48
19 would be engaged in diversion of prescription   17:25:49
20 opioids, correct?                   17:25:52
21         MR. O'CONNOR:  Object to form.   17:25:53
22         THE WITNESS:  Potentially.   17:25:53
23 QUESTIONS BY MR. KO:                 17:25:54
24     Q.   Okay.  And so for each one of   17:25:55
25 these pharmacies that are listed here that   17:25:58

Page 417

1  predate your correspondence on October 17th,   17:26:02
2  you would agree with me that had you known   17:26:11
3  from Masters that they were placed on their   17:26:13
4  termination list, you would have also agreed   17:26:18
5  that these pharmacies were problematic?   17:26:20
6          MR. O'CONNOR:  Object to form.   17:26:22
7          THE WITNESS:  Yes.          17:26:23
8  QUESTIONS BY MR. KO:                 17:26:23
9      Q.   Okay.  And shipping orders --   17:26:24
10 and I understand you don't believe you knew   17:26:27
11 at the time, but shipping orders to these   17:26:30
12 pharmacies after they were placed on a   17:26:33
13 termination list would not be indicative of   17:26:36
14 an effective SOM program, correct?   17:26:38
15         MR. O'CONNOR:  Object to form.   17:26:40
16         THE WITNESS:  Correct.       17:26:40
17         (Mallinckrodt-Harper Exhibit 30   17:27:03
18 marked for identification.)          17:27:03
19 QUESTIONS BY MR. KO:                 17:27:03
20     Q.   Okay.  I'm going to hand you a   17:27:04
21 copy of what's being marked as Harper   17:27:04
22 Exhibit 30.                         17:27:07
23         And for the record, this is a   17:27:10
24 demonstrative based on chargeback information   17:27:12
25 produced to us.  And to be clear, it's not   17:27:15

Page 418

1   any copy provided by your counsel or by          17:27:19
2   Mallinckrodt but something that we have          17:27:24
3   prepared.                                        17:27:25
4        So Brooks Pharmacy was a                    17:27:44
5   pharmacy that appeared on your letter to all     17:27:47
6   distributors, correct?                           17:27:50
7        A.   Yes.                                   17:27:51
8        Q.   Including to Masters, correct?         17:27:51
9        A.   Yes.                                   17:27:53
10       Q.   And Masters had indicated to           17:27:53
11  you that they had already placed Brooks on       17:27:58
12  their termination list as of October 4, 2010,    17:27:59
13  correct?                                         17:28:02
14       A.   Yes.                                   17:28:02
15       Q.   Okay. Based on this chart, it          17:28:03
16  appears that several hundred thousand pills      17:28:09
17  nevertheless shipped to Brooks Pharmacy from     17:28:11
18  the period between October 4, 2010, and          17:28:13
19  October 17, 2011, based on chargeback data       17:28:16
20  that has been provided to us.                    17:28:20
21       Do you see that?                            17:28:21
22       A.   So, yes, but may I ask what the        17:28:22
23  unit of measure is here, please?                 17:28:26
24       Q.   Those are total pills.                 17:28:28
25       A.   Dosage units.                          17:28:30

Page 419

1        Q.   Dosage units.                          17:28:31
2        A.   All right. All right. Thank            17:28:32
3   you.                                             17:28:32
4        Q.   So hundreds of thousands of            17:28:32
5   dosage units/pills are delivered to Brooks       17:28:35
6   Pharmacy through Cardinal between October 4,     17:28:39
7   2010, and October 17, 2011, correct?            17:28:42
8        MR. O'CONNOR: Object to form.               17:28:45
9        MS. FIX MEYER: Object to form.              17:28:46
10       THE WITNESS: The graph                      17:28:47
11   indicates that Cardinal sold this               17:28:49
12   product to that downstream customer.            17:28:52
13       MS. FIX MEYER: Object to the                17:28:55
14   form. Foundation.                               17:28:57
15  QUESTIONS BY MR. KO:                             17:28:58
16       Q.   You can answer the question.           17:28:59
17   She's just lodging her objection for the        17:29:00
18  record.                                          17:29:02
19       A.   Okay. So if I'm to believe the         17:29:02
20   graph is gospel, yes. It appears that           17:29:04
21   Cardinal told that number of dosage units to    17:29:06
22   Brooks Pharmacy.                                17:29:10
23       Q.   And again, had you asked               17:29:10
24   Masters which pharmacies appeared on their      17:29:11
25   termination list, you would have understood     17:29:19

Page 420

1   that Masters put Brooks Pharmacy on their do     17:29:20
2   not ship list as of October 4, 2010, correct?   17:29:25
3        MR. O'CONNOR: Object to form.               17:29:27
4        MS. FIX MEYER: Object to form.              17:29:28
5        THE WITNESS: If they would                  17:29:29
6    have given it to us. We had some               17:29:30
7    customers that declined to provide            17:29:31
8    that information, unfortunately.              17:29:32
9   QUESTIONS BY MR. KO:                             17:29:35
10       Q.   Now -- but we had spoken about         17:29:35
11  an audit before, but you performed an on-site    17:29:36
12  audit of Masters, correct?                       17:29:41
13       A.   Yes.                                   17:29:42
14       Q.   And that on-site audit was all         17:29:42
15  day, I believe?                                  17:29:44
16       A.   Yes.                                   17:29:44
17       Q.   Okay. And again, sitting here          17:29:46
18  today, do you believe that shipments made to     17:29:52
19  a -- an end user after one of your customers     17:29:53
20  puts them on the termination list is             17:30:00
21  indicative of an effective suspicious order      17:30:02
22  monitoring program?                              17:30:04
23       MR. O'CONNOR: Object to form.               17:30:05
24       MS. FIX MEYER: Object to                    17:30:06
25   foundation.                                     17:30:07

Page 421

1        THE WITNESS: If we are aware               17:30:07
2    of it?                                          17:30:08
3   QUESTIONS BY MR. KO:                             17:30:09
4        Q.   Yes.                                   17:30:09
5        A.   So, yes, but not if we're not         17:30:10
6   aware of it.                                     17:30:12
7        Q.   Okay. But you had the ability,        17:30:13
8   and as reflected by this chargeback data that    17:30:16
9   you had acquired, you had the ability to         17:30:19
10  understand where your -- the details of where    17:30:22
11  your pills were going after you shipped them     17:30:24
12  to the distributor, correct?                     17:30:26
13       MR. O'CONNOR: Object to form.               17:30:27
14       THE WITNESS: Yes.                           17:30:29
15  QUESTIONS BY MR. KO:                             17:30:29
16       Q.   Okay. And by the way, as we           17:30:29
17  discussed before, you did an audit of            17:30:35
18  Cardinal's SOM program as well, correct?         17:30:38
19       A.   Yes.                                   17:30:40
20       Q.   And so would you agree that            17:30:40
21  Cardinal could have asked the same question      17:30:41
22  as well?                                         17:30:43
23       MR. O'CONNOR: Object to form.               17:30:44
24       MS. FIX MEYER: Objection to                 17:30:44
25   foundation. Object to form.                    17:30:45

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1       THE WITNESS: I don't know the       17:30:46
2   specifics of Cardinal's interaction       17:30:47
3   with the pharmacies or with their       17:30:49
4   customers, so I don't know that -- I       17:30:51
5   cannot answer.                           17:30:52
6   QUESTIONS BY MR. KO:                     17:30:53
7       Q.  Sure.  Fair enough.             17:30:53
8           Regardless, is it accurate to   17:30:54
9   state, assuming that these numbers are true,  17:30:59
10  that Mallinckrodt shipped hundreds of   17:31:00
11  thousands of pills to customers, including  17:31:05
12  Cardinal, that eventually shipped to Brooks  17:31:10
13  Pharmacy after they were placed on the  17:31:13
14  termination list by Masters?            17:31:16
15      MR. O'CONNOR:  Object to form.      17:31:18
16      MS. FIX MEYER:  Object to form.     17:31:19
17  Object to foundation.                   17:31:22
18      THE WITNESS:  Yes.                  17:31:23
19  QUESTIONS BY MR. KO:                     17:31:23
20      Q.  Set that aside.                 17:31:24
21      (Mallinckrodt-Harper Exhibit 31     17:31:48
22  marked for identification.)             17:31:49
23  QUESTIONS BY MR. KO:                     17:31:49
24      Q.  I'm going to hand you just      17:31:50
25  another quick copy of some data we were able  17:31:52

Page 423

1   to pull from the chargeback information  17:31:54
2   produced by your counsel, and that is -- I'm  17:31:55
3   sorry.  I'm handing you a copy of what will  17:32:00
4   be marked as Harper Exhibit 31.          17:32:02
5       MR. O'CONNOR:  So, again,           17:32:04
6   Counsel, this is a document you          17:32:06
7   created?                                 17:32:07
8       MR. KO:  This is a                  17:32:07
9   demonstrative exhibit created by us,    17:32:08
10  correct, based on the Excel files       17:32:10
11  produced to us.                          17:32:13
12      THE WITNESS:  Yes, I know.  I'm     17:32:13
13  just verifying it against that list,    17:32:13
14  yes.  Okay.                              17:32:16
15  QUESTIONS BY MR. KO:                     17:32:18
16      Q.  So here, I'll -- this is        17:32:18
17  similar to Exhibit 30.  This is a chart that  17:32:19
18  shows pills that were shipped to Island Drug  17:32:23
19  by your customers from the January 2010 to  17:32:28
20  September 2011 time period.             17:32:33
21          And in particular, there is     17:32:35
22  again -- on the left-hand side the numbers  17:32:44
23  are reflective of dosage units --       17:32:45
24      A.  Thank you.                      17:32:47
25      Q.  -- slash pills.                 17:32:47

Page 424

1           And it appears that based on    17:32:50
2   the chargeback data that you had access to,  17:32:53
3   Mallinckrodt had shipped to distributors that  17:32:57
4   shipped to Island Drug in the June 3, 2010,  17:32:59
5   through October 17, 2011 time period,   17:33:03
6   correct?                                 17:33:05
7       A.  Yes.                            17:33:06
8       Q.  Okay.  And similar to Brooks    17:33:06
9   Pharmacy, would you agree with me that  17:33:10
10  shipping drugs to customers who shipped to  17:33:13
11  Island Drug after they appeared on a    17:33:19
12  termination list would be indicative of an  17:33:22
13  inadequate SOM program?                 17:33:26
14      MR. O'CONNOR:  Object to form.      17:33:28
15      THE WITNESS:  No.                   17:33:29
16  QUESTIONS BY MR. KO:                     17:33:29
17      Q.  You would not.                  17:33:30
18      A.  I would not.                    17:33:31
19      Q.  Okay.  You had -- as we         17:33:33
20  discussed before, you had access to this  17:33:38
21  chargeback data, correct?               17:33:40
22      A.  Yes.                            17:33:41
23      Q.  Okay.  And you also performed   17:33:42
24  an on-site audit of Masters, correct?   17:33:45
25      A.  Yes.                            17:33:48

Page 425

1       Q.  And so assuming you had asked   17:33:48
2   them the question of whether or not Masters  17:33:50
3   had placed Island Drug on their do not ship  17:33:53
4   list, would you agree with me that it would  17:33:57
5   be indicative of an inadequate SOM program if  17:34:00
6   you continued to ship drugs to customers who  17:34:05
7   shipped to Island Drug?                 17:34:08
8       MR. O'CONNOR:  Object to form.      17:34:09
9       THE WITNESS:  So the premise is     17:34:09
10  that we would have asked Masters for    17:34:13
11  their do not ship list, and there's no  17:34:15
12  assurance whether they would or would   17:34:20
13  not have provided it.  But if we would  17:34:21
14  have known which customers Masters had  17:34:24
15  terminated, we would have put them on   17:34:26
16  our chargeback restriction list.        17:34:28
17  QUESTIONS BY MR. KO:                     17:34:29
18      Q.  And you would have also -- you  17:34:30
19  would have also determined that you should  17:34:34
20  stop shipping orders to customers that sell  17:34:36
21  to that particular pharmacy as well, correct?  17:34:38
22      MR. O'CONNOR:  Object to form.      17:34:40
23      THE WITNESS:  Stop -- there's a     17:34:40
24  distinction there.  Stop -- stop the    17:34:43
25  payment of chargebacks.  We cannot      17:34:45

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1 totally stop the shipment of 17:34:48
2 Mallinckrodt product to a pharmacy. 17:34:49
3 QUESTIONS BY MR. KO: 17:34:51
4 Q. Okay. You would recommend 17:34:51
5 to -- one of the reasons why you would not 17:34:57
6 honor the chargeback request is to notify the 17:34:58
7 distributor that you would not be paying them 17:35:01
8 the difference between the amount that they 17:35:03
9 agreed upon with you and the subsequent price 17:35:07
10 that they're receiving for the drug in the 17:35:10
11 downstream transaction, correct? 17:35:12
12 A. Yes. 17:35:13
13 Q. Okay. So it would -- in other 17:35:13
14 words, it would alert the distributor -- it 17:35:14
15 would alert the distributor to the 17:35:23
16 possibility that that particular pharmacy was 17:35:25
17 problematic, correct? 17:35:26
18 MR. O'CONNOR: Object to form. 17:35:27
19 THE WITNESS: Yes. 17:35:27
20 MR. KO: Okay. You can set 17:35:29
21 this aside. 17:35:36
22 Why don't we take a quick break 17:35:41
23 and... 17:35:43
24 VIDEOGRAPHER: We are going off 17:35:45
25 the record at 5:35 p.m. 17:35:46

Page 427

1 (Off the record at 5:35 p.m.) 17:35:48
2 VIDEOGRAPHER: We are back on 17:46:10
3 the record at 5:46 p.m. 17:46:12
4 QUESTIONS BY MR. KO: 17:46:14
5 Q. Okay. Thank you again, 17:46:14
6 Ms. Harper. As the court reporter indicated, 17:46:17
7 we have about approximately 25 minutes, and I 17:46:18
8 appreciate your patience thus far today. 17:46:20
9 Going back to our discussion 17:46:22
10 about Harvard, putting aside the details of 17:46:26
11 how that chart was created or the information 17:46:32
12 that you had requested through chargeback 17:46:37
13 reports, sitting here today, you weren't 17:46:39
14 aware that Harvard Drug had sent, on 12,486 17:46:43
15 occasions, oxy 15 and 30 to pain clinics, 17:46:49
16 pharmacies and medical doctors; is that 17:46:53
17 accurate? 17:46:55
18 MR. O'CONNOR: Object to form. 17:46:55
19 THE WITNESS: I'm not aware or 17:46:55
20 I wasn't aware? I'm sorry. 17:46:58
21 QUESTIONS BY MR. KO: 17:47:00
22 Q. Let's take you weren't aware at 17:47:00
23 the time. 17:47:03
24 MR. O'CONNOR: Same objection. 17:47:03
25 THE WITNESS: I wasn't aware at 17:47:04

Page 428

1 the time of their suspension. 17:47:06
2 QUESTIONS BY MR. KO: 17:47:07
3 Q. All right. And you weren't 17:47:07
4 aware of the total amount of oxy 15 and 17:47:09
5 oxy 30 pills they sent to end users, 17:47:11
6 including pain clinics and pharmacies, 17:47:17
7 correct? 17:47:20
8 A. So I realize I'm under oath, 17:47:20
9 and I saw that data that I -- you said I 17:47:23
10 extracted, and I don't know the timing of 17:47:25
11 that in correlation to when their license was 17:47:27
12 suspend, if it was before or after. 17:47:30
13 Q. And I'll represent to you it 17:47:31
14 was before their license was suspended. 17:47:32
15 And I am just simply asking -- 17:47:34
16 A. Okay. 17:47:36
17 Q. -- whether or not at any point 17:47:36
18 in time you became aware of how many orders 17:47:38
19 of oxy 15 or oxy 30s they had sent to pain 17:47:41
20 clinics, pharmacies or medical doctors. 17:47:45
21 A. In Florida? 17:47:47
22 Q. At any time. 17:47:50
23 A. Anywhere? 17:47:50
24 Q. Anywhere. 17:47:51
25 A. Clearly, I must have because -- 17:47:52

Page 429

1 but -- was that chargeback report unique to 17:47:55
2 Florida? 17:47:58
3 I'm sorry. 17:48:00
4 Q. No, that's okay. 17:48:00
5 A. I'm so sorry. I'm getting 17:48:01
6 mixed up here. 17:48:03
7 Q. No, it's okay. 17:48:03
8 Sitting here today, would you 17:48:05
9 agree with me that it would be suspicious for 17:48:20
10 Harvard Drug to sell oxy 15s and oxy 30s to 17:48:21
11 pain clinics, pharmacies and medical doctors 17:48:25
12 through a veterinary supply company? 17:48:28
13 MR. O'CONNOR: Object to form. 17:48:32
14 THE WITNESS: I don't know 17:48:33
15 their corporate structure, so that 17:48:34
16 would have been something, if it had 17:48:36
17 come to our attention, we would have 17:48:38
18 asked Harvard more questions about 17:48:41
19 their -- their business model. 17:48:43
20 QUESTIONS BY MR. KO: 17:48:44
21 Q. Sure. 17:48:44
22 As a general matter, do you 17:48:45
23 recall any instances in which you sold 17:48:46
24 prescription opioids to vet companies? 17:48:48
25 MR. O'CONNOR: Object to form. 17:48:51

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1       THE WITNESS: There may have        17:48:51
2   been one.                              17:48:55
3   QUESTIONS BY MR. KO:                   17:48:55
4       Q.   Okay.  And what -- which      17:48:55
5   instance was that, and when did that occur?  17:48:57
6       A.   It was -- I don't know the    17:48:59
7   date.  I remember a customer -- no, strike  17:49:01
8   that, please.                          17:49:06
9            I'm not aware of any sales to  17:49:06
10  veterinary companies.                  17:49:09
11      Q.   Are you aware of any legitimate  17:49:10
12  medical reason for Mallinckrodt to ship pills  17:49:13
13  to veterinary clinics?  And by "pills" I mean  17:49:19
14  particularly prescription opioids.     17:49:25
15      MR. O'CONNOR:  Object to form.     17:49:26
16      THE WITNESS:  So through some      17:49:27
17      event, I don't remember why, we    17:49:31
18      checked with a couple vets, and indeed  17:49:33
19      there are times when doctors prescribe  17:49:36
20      opioids for pain in animals.       17:49:38
21  QUESTIONS BY MR. KO:                   17:49:41
22      Q.   Would you agree with me that  17:49:42
23  that would be a rare occurrence?       17:49:42
24      MR. O'CONNOR:  Object to form.     17:49:44
25      THE WITNESS:  I don't know the     17:49:45

Page 431

1       frequency.                         17:49:45
2       (Mallinckrodt-Harper Exhibit 32    17:49:57
3       marked for identification.)        17:49:46
4   QUESTIONS BY MR. KO:                   17:49:46
5       Q.   Okay.  I'm going to hand you a  17:49:46
6   copy of what's going to be marked as   17:49:52
7   Exhibit 32.                            17:49:56
8            And for the record, this is --  17:49:59
9   ends in Bates 269399.                  17:50:02
10           Ms. Harper, do you recognize  17:50:17
11  this memo from Howard Davis to you dated  17:50:18
12  November 2, 2010?                      17:50:24
13      A.   I do.                         17:50:24
14      Q.   Okay.  And Howard Davis, as we  17:50:27
15  had discussed before, was a consultant you  17:50:29
16  had retained in connection with your SOM  17:50:31
17  program; is that correct?              17:50:35
18      A.   Yes.                          17:50:36
19      Q.   Okay.  And Howard Davis was   17:50:37
20  ex-DEA?                                17:50:40
21      A.   Yes.                          17:50:41
22      Q.   And I believe he was, in      17:50:41
23  particular, a DRM.                     17:50:43
24           Do I understand --            17:50:45
25      A.   DPM.                          17:50:46

Page 432

1       Q.   Sorry, a DPM?                 17:50:47
2       A.   Yes.                          17:50:47
3       Q.   Do I understand correctly?    17:50:50
4       A.   Yes.                          17:50:50
5       Q.   And what does DPM stand for?  17:50:51
6       A.   Diversion program manager.    17:50:53
7       Q.   Okay.  And he had spent some  17:50:53
8   amount of years at the DEA as a DPM, correct?  17:50:55
9   And I believe in Atlanta?              17:50:56
10      A.   He was in Atlanta when he     17:50:57
11  retired.  Prior to that, he was our group  17:51:01
12  supervisor in St. Louis, so I don't know the  17:51:03
13  date of his promotion.                 17:51:06
14      Q.   Okay.  So before -- are you   17:51:07
15  saying before he went to DEA, he was an  17:51:08
16  employee of Mallinckrodt?              17:51:12
17      A.   No, I'm sorry.  I beg your    17:51:13
18  pardon.                                17:51:15
19           For St. Louis DEA he was      17:51:16
20  diversion group supervisor, and then he was  17:51:18
21  promoted to diversion program manager and  17:51:20
22  went to Atlanta, but I'm not certain of  17:51:23
23  the -- the timing of his move to Atlanta.  17:51:25
24      Q.   I see.                        17:51:28
25           So this is in connection      17:51:30

Page 433

1   with -- this is when he was at DEA, correct?  17:51:31
2       A.   Yes, sir.                     17:51:33
3       Q.   Okay.  And at some point in the  17:51:34
4   2010 time period, Mallinckrodt retained  17:51:36
5   Mr. Davis, correct?                    17:51:39
6       A.   Yes.                          17:51:40
7       Q.   And they retained him         17:51:41
8   specifically to examine the then existing  17:51:43
9   suspicious order monitoring program?   17:51:47
10      A.   Yes.                          17:51:47
11      Q.   Okay.  And so I know he was   17:51:48
12  retained for a brief period of time, but do  17:51:53
13  you recall how long his engagement lasted?  17:51:58
14      A.   A couple of months, at most.  17:52:02
15      Q.   Okay.  Now, this memo, is it  17:52:07
16  accurate to describe it is his overview of  17:52:08
17  the suspicious order monitoring program based  17:52:17
18  on his review?  Is that fair to say?   17:52:19
19      A.   Yes, he was reviewing one     17:52:22
20  particular procedure.                  17:52:24
21      Q.   Okay.                         17:52:25
22      A.   Yes.                          17:52:25
23      Q.   And the procedure is consistent  17:52:25
24  with the formal documents we were referring  17:52:28
25  to earlier that you were in charge of  17:52:29

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1  drafting that outlined the policies and          17:52:32
2  procedures Mallinckrodt would follow to          17:52:37
3  identify potentially suspicious orders,          17:52:38
4  correct?                                          17:52:40
5         MR. O'CONNOR: Object to form.            17:52:40
6         THE WITNESS: Yes.                        17:52:41
7  QUESTIONS BY MR. KO:                              17:52:41
8      Q.  Okay.  And in his review of            17:52:41
9  this particular draft of the suspicious order    17:52:45
10 monitoring program -- actually, let's take a     17:52:50
11 step back.                                        17:52:57
12        During the time that you were            17:52:57
13 drafting and revising these policies, you had    17:53:01
14 previously testified that you were still         17:53:04
15 utilizing a suspicious order monitoring          17:53:08
16 program, correct?                                 17:53:10
17     A.  Yes.                                     17:53:11
18     Q.  And with the suspicious order          17:53:12
19 monitoring program being utilized during a       17:53:16
20 particular time period between 2008 and 2012,    17:53:19
21 would it be reflective of a draft policy that    17:53:23
22 you are writing or would it be reflective of     17:53:27
23 some other policy?                                17:53:32
24        MR. O'CONNOR: Object to form.            17:53:34
25        THE WITNESS: We have a                   17:53:34

Page 435

1     document management system, and              17:53:37
2     then -- so after all the approvals,          17:53:43
3     it's housed there and it's considered        17:53:45
4     a formal policy. However, DEA                17:53:47
5     compliance did not use that system.          17:53:50
6         So indeed this controlled               17:53:52
7     substance compliance 3.0 was in draft       17:53:55
8     form for a while, and I do not know if      17:53:57
9     it was finalized, but we were               17:54:00
10    operating by it.                             17:54:02
11 QUESTIONS BY MR. KO:                             17:54:02
12    Q.  Right.  Okay.  And that's              17:54:03
13 helpful.                                          17:54:05
14        So as you prepared drafts,              17:54:05
15 whatever operative draft that you were          17:54:07
16 working on at the time was also the policy      17:54:10
17 that you would follow with respect to           17:54:15
18 Mallinckrodt's suspicious order monitoring      17:54:16
19 obligations, correct?                            17:54:18
20    A.  Correct.                                 17:54:19
21    Q.  Okay.  Now, he -- Mr. Davis            17:54:20
22 reports to you, as we had discussed before,     17:54:33
23 his evaluation of Mallinckrodt's suspicious     17:54:39
24 order monitoring program at the time.  And in   17:54:44
25 particular, I want to focus on the portion in   17:54:45

Page 436

1  which he says, quote, "Federal Register          17:54:56
2  Notices published as early as 2007, 72          17:54:59
3  Federal Register 36487, state specifically      17:55:02
4  that using formulas that rely on percentages    17:55:05
5  or averages over time has been determined, by   17:55:07
6  the DEA, to be insufficient."                    17:55:10
7         Did I read that correctly?             17:55:12
8      A.  Yes.                                    17:55:14
9      Q.  Okay.  And the Federal Register       17:55:18
10 that he's referring to that's been published    17:55:21
11 as early as 2007, I believe that's also         17:55:24
12 reference to the Southwood notice; is that      17:55:26
13 correct?                                          17:55:27
14     A.  I don't know for certain, but         17:55:27
15 if --                                            17:55:29
16     Q.  Okay.                                   17:55:30
17     A.  Yes, if you say so, yes.              17:55:31
18     Q.  Setting aside which particular        17:55:32
19 Federal Register that refers to, he reports     17:55:35
20 to you as of November 2, 2010, that it is in    17:55:37
21 fact his belief that a suspicious order         17:55:42
22 monitoring program that uses formulas to rely   17:55:48
23 on percentages or averages over time would be   17:55:49
24 insufficient, correct?                           17:55:52
25        MR. O'CONNOR: Object to form.           17:55:53

Page 437

1         THE WITNESS: Those are the             17:55:54
2     statements he made, yes.                    17:55:55
3  QUESTIONS BY MR. KO:                             17:56:15
4      Q.  Okay.  He goes on to state that       17:56:15
5  "an order must not be processed and filled if   17:56:17
6  it is either suspicious or excessive."          17:56:21
7         Do you see that?                        17:56:22
8      A.  Yes.                                    17:56:23
9      Q.  "The existing SOP excels to           17:56:23
10 meet this requirement through a specific        17:56:25
11 evaluation process; however, the numeric        17:56:28
12 formula is problematic.  For example, should    17:56:32
13 an occasion arise where an order is three       17:56:32
14 times over the historical average for that      17:56:35
15 customer in item, or in a situation where the   17:56:36
16 order meets but does not exceed the 3X          17:56:38
17 criteria, it would theoretically be filled      17:56:42
18 through normal processing without further       17:56:44
19 question.  In doing so, in certain cases and    17:56:46
20 as noted in recent immediate suspensions of     17:56:50
21 other large-scale DEA registrants, which are    17:56:53
22 all a matter of public record, Mallinckrodt     17:56:56
23 would be unnecessarily exposing itself to       17:56:58
24 potential liability."                            17:57:00
25        Did I read that correctly?             17:57:02

Page 438

1    A.    Yes.                          17:57:02
2    Q.    Okay.  And the 3X criteria that    17:57:03
3  he's referring to here is the 3X metric that    17:57:05
4  we had discussed before, correct?        17:57:09
5    A.    Yes.                          17:57:10
6    Q.    Okay.  And is it accurate to    17:57:11
7  say that as of November 2, 2010, he is     17:57:14
8  expressing the view that reliance on a    17:57:17
9  numeric formula such as a 3X criteria could    17:57:20
10  potentially expose Mallinckrodt to a     17:57:24
11  liability?  Correct?                17:57:27
12    A.    Yes.                        17:57:27
13    Q.    And in fact, in an example we    17:57:28
14  went over -- or an e-mail we went over    17:57:29
15  earlier today, we discussed the fact that    17:57:31
16  Mallinckrodt's 2X or 3X formula with respect    17:57:36
17  to Harvard or Sunrise did not necessarily    17:57:40
18  trigger a suspicious order, correct?    17:57:44
19        Because those orders did not --    17:57:48
20  were not triggered as a result of the    17:57:50
21  peculiar order system in place, correct?    17:57:53
22        MR. O'CONNOR:  Object to form.    17:57:54
23        THE WITNESS:  Correct.        17:57:54
24  QUESTIONS BY MR. KO:                17:57:55
25    Q.    Okay.  And so it's safe to say    17:57:55

Page 439

1  that prior to the date of this memorandum    17:57:59
2  there were, in fact, instances in which you    17:58:03
3  later discovered that you may have been    17:58:05
4  shipping certain suspicious orders to    17:58:09
5  distributors because you were utilizing this    17:58:12
6  peculiar order algorithm?            17:58:16
7        MR. O'CONNOR:  Object to form.    17:58:18
8        THE WITNESS:  Can you restate    17:58:18
9    that question, please?            17:58:24
10  QUESTIONS BY MR. KO:                17:58:25
11    Q.    Sure.  Let me try --        17:58:25
12    A.    Okay.                      17:58:27
13    Q.    -- again.                  17:58:27
14        Prior to November 2, 2010 --    17:58:29
15    A.    All right.                 17:58:33
16    Q.    -- it's safe to say that there    17:58:34
17  were instances in which you later discovered    17:58:37
18  that you have -- you were shipping suspicious    17:58:41
19  orders to distributors because you were    17:58:45
20  utilizing a 2X or 3X peculiar order    17:58:47
21  algorithm?                        17:58:51
22        MR. O'CONNOR:  Object to form.    17:58:52
23        THE WITNESS:  So the question    17:58:52
24    is, is that problematic?          17:58:55
25

Page 440

1  QUESTIONS BY MR. KO:                17:58:58
2    Q.    I'm just simply asking whether    17:58:59
3  or not you determined that there were        17:59:00
4  instances, prior to 2000 -- November 2, 2010,    17:59:01
5  in which you discovered that you were        17:59:07
6  shipping suspicious orders based on a        17:59:09
7  peculiar order algorithm that was in place at    17:59:14
8  that time.                        17:59:17
9        MR. O'CONNOR:  Same objection.    17:59:18
10        THE WITNESS:  The algorithm        17:59:18
11    points to orders that need to be        17:59:20
12    investigated further and does not        17:59:23
13    necessarily conclude in and of itself    17:59:26
14    that the order is suspicious.        17:59:28
15  QUESTIONS BY MR. KO:                17:59:30
16    Q.    Right.                      17:59:31
17        And I -- I see where the        17:59:31
18  confusion is, because I'm putting a label on    17:59:32
19  a particular order, so let me try it this    17:59:34
20  way.                            17:59:36
21    A.    All right.                  17:59:36
22    Q.    In the e-mail that you had        17:59:37
23  drafted to Eileen Spaulding that we went over    17:59:42
24  earlier today in which you said that no        17:59:45
25  orders -- no peculiar orders had risen to the    17:59:50

Page 441

1  level of suspicious, you also -- do you        17:59:53
2  recall also referencing Harvard and Sunrise?    17:59:56
3        MR. O'CONNOR:  Object to form.    17:59:58
4        THE WITNESS:  Yes.  Yes.        17:59:59
5  QUESTIONS BY MR. KO:                17:59:59
6    Q.    And you specifically reference    18:00:00
7  Harvard and Sunrise because you are saying    18:00:02
8  that those were instances in which the        18:00:05
9  peculiar order algorithm did not flag orders    18:00:09
10  to them that were potentially suspicious.    18:00:13
11        Is that accurate to say?        18:00:18
12    A.    Correct.                    18:00:19
13    Q.    Okay.  And so applied to this    18:00:20
14  memorandum, I am asking you to confirm that    18:00:26
15  prior to November 2, 2010, there were in fact    18:00:29
16  instances in which you shipped potentially    18:00:36
17  suspicious orders because you were utilizing    18:00:38
18  a peculiar order algorithm that relied on the    18:00:41
19  numeric formula.                  18:00:45
20        MR. O'CONNOR:  Object to form.    18:00:47
21        THE WITNESS:  We shipped orders    18:00:48
22    that would have been further        18:00:53
23    investigated if the algorithm was    18:00:56
24    different, but I can't conclude that    18:00:58
25    we shipped suspicious orders because    18:01:00

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1    it's my belief that we have never        18:01:01
2    shipped a suspicious order.              18:01:05
3    QUESTIONS BY MR. KO:                     18:01:05
4        Q.   For what time period?           18:01:06
5        A.   Ever.                  18:01:07
6        Q.   Okay. So your testimony here    18:01:11
7    today is that you believe Mallinckrodt has    18:01:13
8    never shipped a suspicious order?        18:01:15
9        A.   Yes.                  18:01:16
10       Q.   Okay. And that's              18:01:18
11   notwithstanding the settlement that       18:01:19
12   Mallinckrodt had entered into with the DOJ    18:01:22
13   regarding its suspicious order monitoring    18:01:24
14   activities?                       18:01:25
15       A.   Correct.                18:01:26
16       Q.   Okay. And that's             18:01:31
17   notwithstanding the fact that the DOJ has    18:01:31
18   alleged, and Mallinckrodt has in fact     18:01:38
19   admitted in the DOJ agreement, that at    18:01:40
20   certain points in time in 2008 through 2012    18:01:43
21   Mallinckrodt did not have an adequate     18:01:46
22   suspicious order monitoring system?       18:01:49
23       MR. O'CONNOR:  Object to form.       18:01:49
24       THE WITNESS:  I -- I don't -- I      18:01:50
25   don't recall the MOA language.           18:01:56

Page 443

1    QUESTIONS BY MR. KO:                     18:01:57
2        Q.   I guess what I'm trying to ask    18:01:57
3    you is, I understand that -- well, let's take    18:01:59
4    a step back.                      18:02:03
5        I believe you testified earlier     18:02:04
6    today that at least prior to 2008 there were    18:02:05
7    at least ten instances, somewhere between one    18:02:09
8    and ten instances, in which suspicious orders    18:02:14
9    were reported to the DEA.                18:02:17
10       Was that correct?             18:02:18
11       MR. O'CONNOR:  Object to form.       18:02:19
12       THE WITNESS:  Yes.             18:02:19
13   QUESTIONS BY MR. KO:                     18:02:21
14       Q.   So at least there were         18:02:22
15   somewhere north of one but south of ten    18:02:23
16   suspicious orders reported to the DEA?       18:02:25
17       A.   Yes.                  18:02:26
18       Q.   So that's more than the "none"    18:02:27
19   you just indicated to me; is that not     18:02:30
20   accurate?                        18:02:32
21       A.   You asked if we had shipped a    18:02:32
22   suspicious order.                    18:02:34
23       Q.   I see.                 18:02:35
24       A.   But the orders that we had     18:02:36
25   reported between one and ten to DEA were not    18:02:38

Page 444

1    subsequently shipped.                   18:02:41
2        Q.   Got it. Understood.           18:02:41
3        So from -- is it your testimony    18:02:43
4    today that from 2008 to present, Mallinckrodt    18:02:48
5    has not shipped a single suspicious order?    18:02:50
6        A.   Yes. When we talk about        18:02:54
7    suspicious orders, direct orders to our    18:02:56
8    customers.                       18:03:00
9        Q.   Okay. Let's take -- you can    18:03:00
10   set that aside.                   18:03:15
11       I hand you a copy of what will    18:03:19
12   be marked as Harper Exhibit 33.          18:03:20
13       MR. KO:  And for the record,        18:03:23
14   this is Bates -- ends in Bates 485740.       18:03:24
15       (Mallinckrodt-Harper Exhibit 33    18:03:28
16   marked for identification.)              18:03:29
17   QUESTIONS BY MR. KO:                     18:03:29
18       Q.   Do you recognize that e-mail,    18:03:41
19   Ms. Harper?                       18:03:44
20       A.   No, I don't, so I'm going to    18:03:45
21   read it, please --                   18:03:52
22       Q.   Sure.                  18:03:52
23       A.   -- because -- yeah. Okay.       18:03:53
24       Q.   In terms of the September 9,    18:04:40
25   2010 e-mail that you drafted to James Parker,    18:04:47

Page 445

1    do you have any reason to doubt that you sent    18:04:51
2    that?                           18:04:53
3        A.   No.                   18:04:53
4        Q.   And who is James Parker?       18:04:53
5        A.   He was a -- I don't know his    18:04:55
6    title, unless it's on here. He was in our    18:05:01
7    operational excellence program.          18:05:03
8        Q.   Okay. Was he in senior        18:05:07
9    management?                      18:05:09
10       A.   No.                   18:05:10
11       Q.   Okay. And there's a reference    18:05:13
12   to Tom Berry as well, and that was at one    18:05:14
13   point your direct report, as you indicated    18:05:20
14   previously, correct?                 18:05:21
15       A.   Yes, I reported to Tom.        18:05:22
16       Q.   Okay. And you indicate in this    18:05:24
17   e-mail -- the title of the e-mail is "DEA    18:05:30
18   mandated a suspicious order monitoring    18:05:34
19   program"; is that correct?               18:05:35
20       A.   Yes.                  18:05:35
21       Q.   Okay. And you indicate, among    18:05:36
22   other -- well, you say, "Jim, I am working on    18:05:41
23   obtaining the number relating to potential    18:05:45
24   lost business and have assembled some    18:05:50
25   documentation around actual fines imposed for    18:05:51

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1  regulatory noncompliance. I will work on the   18:05:54
2  chart and will have all of the above ready by   18:05:56
3  this weekend."                                   18:05:58
4       Did I read that correctly?        18:05:59
5       A.   Yes.                    18:05:59
6       Q.   And then there's a portion    18:06:00
7  that's redacted, and then you go on to state,   18:06:02
8  "I don't ever want to be perceived as a         18:06:04
9  person who cried wolf by asking for a          18:06:07
10 presentation to the larger group and welcome   18:06:09
11 your feedback."                    18:06:11
12      A.   Okay.                   18:06:13
13      Q.   Did I read that correctly?    18:06:14
14      A.   Yes.                    18:06:14
15      Q.   Okay.  And again, the subject  18:06:15
16 of this e-mail is the SOM program.             18:06:16
17      Is it accurate to say that you    18:06:19
18 are at this point asking Jim, or James, for a   18:06:24
19 presentation to a larger group about           18:06:29
20 Mallinckrodt's SOM program?        18:06:31
21      A.   It appears that way.  I       18:06:32
22 don't -- I do not remember these comments at   18:06:34
23 all about the presentation --       18:06:36
24      Q.   Sure.                   18:06:37
25      A.   -- but I've refamiliarized   18:06:37

Page 447

1  myself with the rest of the e-mail.            18:06:39
2       Q.   Okay.  And I'll ask you a few   18:06:41
3  questions about the previous e-mails.           18:06:44
4       A.   Certainly.              18:06:48
5       Q.   But do you recall what you are  18:06:48
6  referring to by the "presentation to the        18:06:53
7  larger group"?                    18:06:55
8       A.   I don't.                18:06:55
9       Q.   Okay.                  18:06:57
10      A.   I don't.                18:06:57
11      Q.   And when you are suggesting --  18:06:58
12 at the beginning of this e-mail when you are   18:07:01
13 saying you are working on the number relating   18:07:03
14 to potential lost business, are you referring   18:07:05
15 to the potential lost business of              18:07:08
16 Mallinckrodt -- well, strike that.             18:07:12
17      What are you referring to when    18:07:16
18 you're referring to the potential lost         18:07:19
19 business?                         18:07:21
20      A.   We approached Jim Parker      18:07:21
21 because he was operational excellence.  So      18:07:23
22 there is initiative in business Six Sigma.      18:07:26
23 It's a whole process of reviewing a program,   18:07:29
24 fishbone charts, a lot of data gathering        18:07:34
25 designed to improve a program.     18:07:38

Page 448

1       So we approached Jim Parker to    18:07:41
2  ask him if he would lend his operational        18:07:44
3  expertise to the suspicious order monitoring   18:07:47
4  program.  And in order to do that, these        18:07:48
5  folks had to be chartered.  So part of the      18:07:52
6  charter statement was, what's the potential    18:07:54
7  financial impact if we do not do -- perform    18:07:59
8  this project.                     18:08:02
9       So that's why I'm referring to    18:08:03
10 this potential lost business and actual fines   18:08:05
11 which may be composed -- imposed for            18:08:09
12 regulatory noncompliance.          18:08:12
13      Q.   And regulatory noncompliance   18:08:13
14 with the CSA, correct?             18:08:15
15      A.   Yes.                    18:08:17
16      Q.   Okay.  And potential lost      18:08:17
17 business, are you referring to the potential   18:08:19
18 lost business from continuing to do business   18:08:21
19 with your distributors to distribute           18:08:24
20 prescription opioids?              18:08:26
21           MR. O'CONNOR:  Objection to   18:08:27
22      form.                       18:08:29
23           THE WITNESS:  Yes.          18:08:29
24 QUESTIONS BY MR. KO:               18:08:33
25      Q.   Okay.  And so in effect, you're  18:08:33

Page 449

1  doing -- you're asking -- or you are being     18:08:36
2  asked to do some sort of burden/benefit        18:08:39
3  analysis with respect to a more enhanced SOM   18:08:42
4  program relative to the value of the business   18:08:46
5  that Mallinckrodt has in distributing          18:08:51
6  prescription opioids to its distributors.       18:08:53
7       Is that accurate to say?        18:08:55
8           MR. O'CONNOR:  Objection to   18:08:56
9      form.                       18:08:57
10           THE WITNESS:  In order to     18:08:57
11      complete this charter document and get  18:08:58
12      the resources from the operational      18:08:59
13      excellence group.              18:09:00
14 QUESTIONS BY MR. KO:               18:09:01
15      Q.   Okay.  That's all the questions  18:09:01
16 I have on that.                   18:09:04
17      Unfortunately, I just only have    18:09:06
18 one copy of this, so you will be the lucky     18:09:10
19 one to get it.  But this is a copy of the      18:09:12
20 settlement agreement, the memorandum of        18:09:18
21 understanding between Mallinckrodt and the     18:09:23
22 DOJ, and it's previously been marked as         18:09:24
23 Ratliff Exhibit 41.                18:09:26
24      Does this document look          18:09:28
25 familiar to you?                   18:09:29

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1    A.    Yes.                          18:09:29
2    Q.    And I'd ask that you turn to   18:09:29
3    the --                             18:09:34
4          MR. KO:  Sorry, Andrew, but I  18:09:35
5    know that you are probably very     18:09:37
6    familiar with this, so --          18:09:39
7          MR. O'CONNOR:  I'll look over   18:09:40
8    her shoulder.                      18:09:42
9          THE WITNESS:  Do you want to   18:09:42
10   know the page number?              18:09:42
11   QUESTIONS BY MR. KO:               18:09:42
12   Q.    I just want to ask you to turn  18:09:43
13   to Section 4 --                    18:09:44
14   A.    All right.                   18:09:44
15   Q.    -- of the agreement entitled   18:09:45
16   "Admission of Responsibility."      18:09:47
17   A.    Is that acceptance of         18:09:49
18   responsibility?                    18:09:51
19   Q.    Sorry, acceptance of          18:09:52
20   responsibility.  Thank you.         18:09:53
21   A.    All right.                   18:09:55
22   Q.    Do you see that section?      18:09:55
23   A.    Yes.                         18:09:57
24   Q.    And I know that earlier we had  18:09:57
25   been discussing some specific language, and  18:10:20

Page 451

1    certainly didn't expect you to remember   18:10:24
2    specifically what was included.  But in that  18:10:25
3    section, there is reference made that during  18:10:29
4    the covered time period certain aspects of  18:10:33
5    Mallinckrodt's systems to monitor and detect  18:10:36
6    suspicious orders did not meet the standards  18:10:39
7    outlined in the DEA letters provided to you  18:10:41
8    in 2006 and 2007.  Is that accurate?   18:10:43
9    A.    Yes.                         18:10:47
10   Q.    Okay.  And do you -- sitting   18:10:52
11   here today, do you agree with that admission?  18:10:55
12   A.    We admitted no wrongdoing, but,   18:10:57
13   yes, I agree with the MOA -- the statement in  18:11:02
14   the MOA.                           18:11:06
15   Q.    Okay.  And the covered time    18:11:07
16   period, by the way, just so the record is  18:11:09
17   clear -- and you can take a look at the  18:11:10
18   document if you'd like.  But the covered time  18:11:12
19   period for the settlement agreement is from  18:11:15
20   January 1, 2008, through January 1, 2012,  18:11:16
21   correct?                           18:11:19
22   A.    So that's covered conduct, but   18:11:20
23   this paragraph relating to the admission of  18:11:33
24   guilt -- or acceptance of responsibility --  18:11:36
25   very poor choice of words on my part -- is  18:11:40

Page 452

1    talking about a covered time period,   18:11:42
2    January 1, 2012, until -- oh, prior to  18:11:44
3    January 1, 2012, yes.               18:11:55
4    Q.    Okay.  So the covered time     18:11:56
5    period -- and I believe there's --   18:12:00
6    A.    I'm sorry.                    18:12:02
7    Q.    No, it's okay.  It's not your   18:12:03
8    fault.  I should have more -- more copies.  18:12:05
9          So there is a definition of the  18:12:10
10   covered time period in this agreement.  18:12:13
11   A.    All right.                    18:12:15
12   Q.    And you can take a look at the   18:12:16
13   document, but I believe if my memory serves  18:12:19
14   me correct, that the covered time period  18:12:23
15   begins from January 1, 2008, through the date  18:12:25
16   of the signing of that agreement.    18:12:29
17   A.    So that's part of the          18:12:34
18   background.                        18:12:35
19   Q.    Right.                        18:12:36
20   A.    Right.  It's part of the       18:12:39
21   background.                        18:12:40
22   Q.    And so I just want to make sure   18:12:41
23   the record is clear.                18:12:42
24         So for purposes of the         18:12:43
25   Section 4 that we were looking at -- we were  18:12:45

Page 453

1    just looking at the admission of     18:12:46
2    responsibility?                    18:12:48
3    A.    Yes.                         18:12:48
4    Q.    -- there is reference made to   18:12:48
5    the covered -- from the covered time period  18:12:50
6    to January 1, 2012, correct?        18:12:53
7    A.    Yes.                         18:12:56
8    Q.    And so the covered time period   18:12:58
9    begins on January 1, 2008, correct?   18:12:59
10   A.    Yes.                         18:13:02
11   Q.    Okay.  So --                  18:13:04
12   A.    Sorry.                        18:13:07
13   Q.    A lot of flipping back and      18:13:08
14   forth.                             18:13:11
15         But just so the record is       18:13:11
16   clear, the admission of responsibility is  18:13:13
17   that Mallinckrodt agrees that at certain  18:13:15
18   times from between January 1, 2008, through  18:13:18
19   January 1, 2012, certain aspects of   18:13:22
20   Mallinckrodt's system to monitor and detect  18:13:25
21   suspicious orders did not meet the standards  18:13:28
22   set forth in the DEA guidance letters,  18:13:30
23   correct?                           18:13:32
24         MR. O'CONNOR:  Object to form.   18:13:32
25         THE WITNESS:  Correct.         18:13:34

Highly Confidential - Subject to Further Confidentiality Review

Page 454

```
1    QUESTIONS BY MR. KO:              18:13:35
2       Q.   Okay.  And you would agree with  18:13:35
3    that statement, correct?          18:13:36
4            MR. O'CONNOR:  Object -- same  18:13:37
5    objection.                        18:13:40
6            THE WITNESS:  Yes.         18:13:40
7            MR. O'CONNOR:  Counsel, I think  18:13:41
8    we're at time.                    18:13:42
9            MR. KO:  Well, perfect, because  18:13:43
10   I think that was my last question.  18:13:45
11           VIDEOGRAPHER:  Go off the   18:13:50
12   record?                           18:13:52
13           MR. KO:  Yes.              18:13:52
14           VIDEOGRAPHER:  We're going off  18:13:53
15   the record at 6:13 p.m.           18:13:53
16       (Off the record at 6:13 p.m.)  18:13:56
17           VIDEOGRAPHER:  We are back on  18:26:44
18   the record at 6:26 p.m.           18:26:52
19           DIRECT EXAMINATION         18:26:54
20   QUESTIONS BY MS. HERZFELD:        18:26:54
21       Q.   Okay.  Ms. Harper, we're back  18:26:55
22   after a break.  My name is Tricia Herzfeld,  18:26:57
23   and I'm an attorney representing the   18:27:00
24   Tennessee plaintiffs.             18:27:02
25       Do you know anything about the  18:27:02
```

Page 455

```
1    Tennessee litigation?             18:27:05
2       A.   Not specifically, no.     18:27:06
3       Q.   Okay.                     18:27:07
4            MS. HERZFELD:  Before we get  18:27:08
5    started, I just want to lodge the  18:27:08
6    standard objections we've lodged in  18:27:10
7    all of our Mallinckrodt depositions  18:27:12
8    about the lack of timely document  18:27:14
9    production and the unnecessary    18:27:17
10   narrowing of the time limitation for  18:27:19
11   questioning the witness.          18:27:22
12           MR. O'CONNOR:  And I'll lodge  18:27:23
13   our usual objection to the objection.  18:27:25
14           MS. HERZFELD:  Wonderful.  18:27:27
15   Okay.  Moving on.                 18:27:30
16   QUESTIONS BY MS. HERZFELD:        18:27:33
17       Q.   Okay.  Ms. Harper, have you  18:27:33
18   ever been to Tennessee?           18:27:36
19       A.   Yes.                     18:27:37
20       Q.   Okay.  And have you been for  18:27:37
21   business?                         18:27:41
22       A.   Yes.                     18:27:41
23       Q.   Okay.  And how many times?  18:27:42
24       A.   Twice.                   18:27:42
25       Q.   Okay.  And when were those two  18:27:42
```

Page 456

```
1    times?                            18:27:43
2       A.   I don't recall the dates.  18:27:43
3       Q.   Do you recall roughly what  18:27:44
4    years?                            18:27:46
5       A.   So I was at FedEx, but I don't  18:27:48
6    know -- I truly don't know the date.  18:27:50
7       Q.   Okay.                     18:27:54
8       A.   And I was at a small       18:27:54
9    distributor, and I cannot remember the name  18:27:56
10   or the date.                      18:27:59
11       Q.   Okay.  And when you were at  18:28:00
12   FedEx, what was the purpose of that?  18:28:03
13       A.   To watch their nighttime in and  18:28:04
14   out shift operation.              18:28:08
15       Q.   Okay.  And did you find    18:28:08
16   anything deficient in observing that?  18:28:11
17       A.   No.                      18:28:14
18       Q.   And the small distributor that  18:28:14
19   you observed, that was during your time at  18:28:16
20   Mallinckrodt?                     18:28:17
21       A.   Yes.                     18:28:18
22       Q.   Okay.  And do you recall who  18:28:18
23   else was at that meeting?         18:28:19
24       A.   Bill Ratliff.            18:28:20
25       Q.   Okay.  And it was a       18:28:21
```

Page 457

```
1    distributor, not a pharmacy?      18:28:25
2       A.   Yes.                      18:28:26
3       Q.   Okay.  And do you recall    18:28:27
4    finding anything deficient with the  18:28:28
5    operations of that distributor?   18:28:30
6       A.   No.                       18:28:31
7       Q.   Okay.  And would there be   18:28:32
8    documentation someplace of that trip you  18:28:35
9    took with Mr. Ratliff?            18:28:36
10       A.   Yes, at least a meeting notice.  18:28:37
11   I'm not certain, yes.             18:28:43
12       Q.   Okay.  And do you know perhaps  18:28:45
13   if it was after the year 2005?    18:28:47
14       A.   Yes.                     18:28:50
15       Q.   Okay.  Do you think maybe it  18:28:52
16   was more recently than 2010?      18:28:53
17       A.   Yes.                     18:28:55
18       Q.   Okay.  So sometime between 2010  18:28:59
19   and -- do you think it was in the last three  18:29:01
20   or four years?                    18:29:03
21       A.   No.                      18:29:04
22       Q.   Okay.  So maybe sometime    18:29:05
23   between 2010 and 2015?            18:29:06
24       A.   Yes.                     18:29:09
25       Q.   Okay.  Great.  Okay.      18:29:11
```

Page 458

1    And those are the only two     18:29:14
2  times you've been to Tennessee for business;  18:29:16
3  is that correct?              18:29:18
4    A.  Yes.                18:29:18
5    Q.  Okay.  Have you been for      18:29:18
6  pleasure?                 18:29:19
7    A.  No.                18:29:20
8    Q.  Okay.  Do you have any family   18:29:21
9  or relatives in Tennessee?       18:29:23
10   A.  No.                18:29:25
11   Q.  Okay.                18:29:25
12   A.  I stopped over in Tennessee --  18:29:25
13   Q.  Okay.                18:29:27
14   A.  -- once, so, sorry.        18:29:28
15   Q.  That's okay.           18:29:30
16     Were you driving somewhere?    18:29:30
17   A.  I was coming back from Gulf     18:29:31
18 Shores, and I stopped in Memphis to take a   18:29:33
19 rest, yes.                18:29:36
20   Q.  Okay.  And when you say you    18:29:37
21 were coming from Gulf Shores, you meant from  18:29:38
22 Gulf Shores back here to St. Louis?     18:29:41
23   A.  Yes.                18:29:42
24   Q.  Okay.  Did you get to see     18:29:42
25 anything when you were in Memphis?       18:29:44

Page 459

1    A.  No.                18:29:45
2    Q.  Okay.  And do you have any     18:29:47
3  friends that live in Tennessee?     18:29:48
4    A.  No.                18:29:49
5    Q.  Okay.  And you said earlier    18:29:51
6  that you were aware of the opioid epidemic in  18:29:53
7  this country.              18:29:56
8      Do you recall that testimony?   18:29:56
9    A.  Yes.                18:29:57
10   Q.  Okay.  And are you aware of any  18:29:58
11 particular regions of the country where the   18:30:00
12 opioid epidemic seems to have hit harder than  18:30:02
13 others?                  18:30:06
14     MR. O'CONNOR:  Objection.      18:30:07
15   Form.                 18:30:08
16     THE WITNESS:  I read the press,   18:30:09
17   so Florida, Kentucky, Tennessee, yes,   18:30:11
18   I'm familiar with that -- that press.  18:30:18
19 QUESTIONS BY MS. HERZFELD:         18:30:20
20   Q.  Okay.  Okay.  And I think you   18:30:20
21 had already testified that you knew that    18:30:36
22 pills were going from Florida to other     18:30:38
23 states; is that correct, ma'am?      18:30:41
24   A.  Yes.                18:30:41
25   Q.  Okay.  And was -- did you     18:30:42

Page 460

1  understand Tennessee to be one of those    18:30:45
2  states where pills were going from Florida to  18:30:46
3  Tennessee?                18:30:49
4    A.  Yes.                18:30:50
5    Q.  Okay.  And did you understand   18:30:50
6  that when those pills were going from Florida  18:30:54
7  to Tennessee, that they were ending up in the  18:30:56
8  illegal drug market in Tennessee?     18:30:58
9      MR. O'CONNOR:  Object to form.    18:31:01
10     THE WITNESS:  Yes.          18:31:01
11 QUESTIONS BY MS. HERZFELD:         18:31:03
12   Q.  Okay.  And you said before that  18:31:03
13 you'd heard of the Oxy Express.        18:31:06
14     Do you know if that could have   18:31:09
15 been highway I-75 that goes from Florida to   18:31:11
16 Ohio?                   18:31:13
17   A.  I'm sorry, I don't remember the  18:31:14
18 highway number.             18:31:16
19   Q.  Okay.  That's okay.        18:31:16
20     The highway that is the Oxy     18:31:17
21 Express, do you know if it goes through    18:31:21
22 Tennessee?                18:31:23
23   A.  Yes, it does.           18:31:24
24   Q.  Okay.  Okay.  And have you ever  18:31:26
25 had any communication with any law      18:31:35

Page 461

1  enforcement in Tennessee?         18:31:36
2    A.  Yes.                18:31:37
3    Q.  Okay.  And can you tell me     18:31:38
4  roughly how many times?          18:31:40
5    A.  Me, once.             18:31:41
6    Q.  Okay.  And what was the time?   18:31:46
7    A.  I'm not -- I don't want -- I    18:31:49
8  don't want to swear to the year or attest to  18:31:55
9  the year.  I believe it was 2008.       18:31:58
10   Q.  Okay.  And do you recall who it  18:32:00
11 is you were speaking with?        18:32:05
12   A.  No.                18:32:06
13   Q.  Okay.  I'm going to show you    18:32:10
14 what we're going to have marked here as    18:32:11
15 Exhibit 34, which we're going to late file   18:32:14
16 with an e-mail.             18:32:16
17     MS. HERZFELD:  No objection     18:32:18
18   from defendants, yes?          18:32:18
19     MR. O'CONNOR:  Provided it's     18:32:19
20   the copy we see.            18:32:20
21     MS. HERZFELD:  Yes, sir.       18:32:22
22     (Mallinckrodt-Harper Exhibit 34   18:32:23
23   marked for identification.)       18:32:23
24 QUESTIONS BY MS. HERZFELD:         18:32:23
25   Q.  Okay.  And I am going to turn   18:32:24

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1  this around so you can just read it      18:32:24
2  yourself --                             18:32:26
3      A.   Oh, great, because I just --   18:32:26
4      Q.   It's just --                   18:32:28
5      A.   I just had lens implants, so   18:32:28
6  thank you.                              18:32:31
7      Q.   Oh, very good.                 18:32:31
8      And if you want to read down,       18:32:33
9  you can just use your finger, just, you know.  18:32:34
10     A.   Okay.                          18:32:38
11     All right.  I've reread, yes.       18:32:39
12     Q.   Okay.  Great.                  18:33:14
13     And you received this e-mail        18:33:15
14 from Bill Ratliff on Wednesday, July 8, 2009;  18:33:17
15 is that correct?                        18:33:21
16     A.   July 7, 2009.                  18:33:21
17     Q.   July 7th.  Okay.               18:33:38
18     A.   Yes, ma'am.                    18:33:39
19     Q.   And does this e-mail describe a  18:33:43
20 communication that Mr. Ratliff had received  18:33:45
21 from an Officer Dwayne Collins in Morristown  18:33:47
22 talking about pills going from -- being found  18:33:50
23 in an illegal drug transaction in Tennessee  18:33:54
24 that were traced to Florida?             18:33:56
25     A.   Yes.                           18:33:58

Page 463

1      Q.   Okay.  And just for the record,  18:34:00
2  this is a three-page document that is labeled  18:34:03
3  MNK_TNSTA05123927.                       18:34:09
4      Okay.  Great.  Now we're done       18:34:15
5  with that complicated moment.           18:34:17
6      Okay.  And did you personally       18:34:26
7  speak to Officer Dwayne Collins; do you  18:34:27
8  recall?                                 18:34:32
9      A.   I believe the initial contact  18:34:32
10 to Mallinckrodt was to me.              18:34:38
11     Q.   Okay.                          18:34:39
12     A.   And I immediately turn it over  18:34:39
13 to Bill Ratliff.                        18:34:40
14     Q.   Okay.  And once you turned it   18:34:41
15 over to Mr. Ratliff, did you have any further  18:34:43
16 involvement with that situation?        18:34:47
17     A.   Yes.                           18:34:48
18     Q.   Okay.  And what was your       18:34:48
19 involvement?                            18:34:49
20     A.   I helped Mr. Ratliff obtain the  18:34:49
21 reports he was requesting in terms of the  18:34:56
22 shipments of the particular drug product that  18:35:03
23 was the object of the investigation.    18:35:05
24     Q.   Okay.  And is there any other  18:35:07
25 involvement that you had with the situation  18:35:10

Page 464

1  in Morristown?                          18:35:13
2      A.   Only to the extent that the    18:35:14
3  situation in Morristown led us to review --  18:35:18
4  to go to Sunrise distributors.          18:35:24
5      Q.   Okay.  And then I think you've  18:35:26
6  already testified about your involvement with  18:35:27
7  Sunrise today.                          18:35:29
8      A.   Yes.                           18:35:30
9      Q.   Okay.  But other than that,    18:35:31
10 specifically with the Tennessee portion, you  18:35:32
11 didn't have any other involvement in that?  18:35:34
12     A.   There were some chargeback     18:35:37
13 reports --                              18:35:39
14     Q.   Okay.                          18:35:39
15     A.   -- also, but those were        18:35:39
16 gathered to provide to Mr. Ratliff --   18:35:42
17     Q.   Okay.                          18:35:44
18     A.   -- again within the initial    18:35:45
19 course of his investigation.            18:35:47
20     Q.   Okay.                          18:35:48
21     A.   But, no, nothing else.         18:35:48
22     Q.   And do you know -- oh, go      18:35:52
23 ahead.                                  18:35:54
24     A.   I apologize.                   18:35:54
25     Q.   That's okay.                   18:35:55

Page 465

1      A.   I apologize.                   18:35:56
2      So we made the decision to go       18:35:56
3  to Sunrise and conduct an audit.  Mr. Ratliff  18:35:59
4  contacted Pete Kleissle, who was our    18:36:04
5  diversion group supervisor of DEA St. Louis.  18:36:06
6      Pete came to Mallinckrodt, and      18:36:10
7  we had an informal conversation about --  18:36:11
8  where Mr. Ratliff conveyed the circumstances  18:36:16
9  around the law enforcement investigation.  18:36:18
10 And Mr. Ratliff told Pete Kleissle that we  18:36:20
11 intended to go and conduct an audit of  18:36:23
12 Sunrise.  So I was present for that meeting.  18:36:26
13     Q.   Okay.  And so Tennessee was    18:36:29
14 brought up in the context of we received this  18:36:30
15 information from this individual in      18:36:33
16 Morristown?                             18:36:34
17     A.   Yes.                           18:36:35
18     Q.   Okay.  And the chargeback      18:36:35
19 reports that you provided to Mr. Ratliff in  18:36:37
20 furtherance of his investigation in response  18:36:41
21 to this Morristown e-mail, do you recall  18:36:43
22 specifically what information was pulled in  18:36:46
23 those chargeback reports?               18:36:47
24     A.   I don't know specifically what  18:36:48
25 the reports -- how they were tailored or  18:36:57

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1  customized.                          18:36:59
2      Q.   Okay.  Do you know where I    18:37:00
3  could locate those reports?          18:37:01
4      A.   I don't know.                18:37:03
5      Q.   Okay.  Would you have e-mailed   18:37:10
6  them to Mr. Ratliff?                 18:37:11
7      A.   They would have likely been   18:37:12
8  e-mailed from Eileen Spaulding.       18:37:14
9      Q.   Okay.                        18:37:19
10     A.   And potentially on the       18:37:19
11  chargebacks from Kate Muhlenkamp.     18:37:21
12     Q.   Okay.  And it would have been   18:37:25
13  to you and/or Mr. Ratliff?           18:37:29
14     A.   Yes.                         18:37:31
15     Q.   Okay.  And would it have been   18:37:32
16  around that time in 2009?            18:37:34
17     A.   Yes.                         18:37:36
18     Q.   Okay.  And the -- that's all   18:37:39
19  you remember about the chargeback data?   18:37:43
20         Is there anything else you     18:37:45
21  remember?                            18:37:46
22     A.   It was 2009 -- I'm sorry.     18:37:46
23     Q.   That's okay.                 18:37:48
24     A.   That's the drug task force    18:37:49
25  officer call to Mallinckrodt.        18:37:51

Page 467

1      Q.   Yes, ma'am.                  18:37:52
2      A.   I'm sorry.                   18:37:53
3          So can you repeat the last    18:37:53
4  question?                            18:37:56
5      Q.   Sure.                        18:37:56
6          So when the chargeback data was   18:37:57
7  pulled, do you believe that would have been   18:37:58
8  in 2009?                             18:38:01
9      A.   Yes.                         18:38:01
10     Q.   Okay.  Okay.  Okay.  And I    18:38:03
11  think you testified earlier that as part of   18:38:25
12  your job, you were included on certain   18:38:26
13  LISTSERVs where you received news articles?   18:38:29
14     A.   Yes.                         18:38:30
15     Q.   Okay.  And those were the     18:38:31
16  NADDI; is that right?                18:38:34
17     A.   Yes.                         18:38:35
18     Q.   Okay.  Which is the National   18:38:35
19  Association of Drug Diversion Investigators?   18:38:39
20     A.   Yes.                         18:38:39
21     Q.   Okay.  And also RX News?      18:38:39
22     A.   Yes.                         18:38:42
23     Q.   Okay.  And then what is Mudri   18:38:43
24  and Associates?                      18:38:46
25     A.   So National Association of Drug   18:38:50

Page 468

1  Diversion Investigators, the title of their   18:38:55
2  newsletter is RX News.               18:38:56
3      Q.   Okay.                        18:38:57
4      A.   And a lot of them came        18:38:58
5  through -- it was called Mudri, or Mudri,   18:38:59
6  agency.                              18:39:02
7      Q.   Okay.                        18:39:03
8      A.   So it was all connected to    18:39:03
9  these NADDI reports.                 18:39:05
10     Q.   Okay.  So those are all       18:39:06
11  generally the same thing, even if they have   18:39:07
12  different names?                     18:39:09
13     A.   Yes.                         18:39:10
14     Q.   Okay.  Great.                18:39:11
15         And you received those reports   18:39:11
16  as part of your job; is that correct?   18:39:13
17     A.   Yes.                         18:39:15
18     Q.   Okay.  And then did           18:39:16
19  Mallinckrodt take that information and then   18:39:17
20  turn that into a controlled substances   18:39:20
21  compliance monthly newsletter?       18:39:23
22     A.   Yes.                         18:39:26
23     Q.   Okay.  And who was responsible   18:39:27
24  for doing that?                      18:39:28
25     A.   One of my colleagues.  Her name   18:39:29

Page 469

1  is Carrie Johnson, and she's at our Hobart,   18:39:32
2  New York, facility.                  18:39:36
3      Q.   Okay.  And basically in those   18:39:37
4  controlled substances compliance monthly   18:39:39
5  newsletters, it would summarize news articles   18:39:41
6  about controlled substances?         18:39:43
7      A.   Yes.  Well, the reports we had   18:39:44
8  obtained through RX News, yes.        18:39:47
9      Q.   Okay.  And does Mallinckrodt   18:39:49
10  still receive some kind of document that   18:39:53
11  aggregates news articles in that way?   18:39:56
12     A.   I don't know.  We have Google   18:39:58
13  Alerts set, but I don't know that we receive   18:40:03
14  RX News or if they still provide that   18:40:05
15  service.                             18:40:07
16     Q.   Google Alerts is definitely    18:40:08
17  pretty easy to do, right?            18:40:11
18     A.   Yes.                         18:40:12
19     Q.   Okay.  Do you know what words   18:40:12
20  are keyed in for Google Alerts?      18:40:13
21     A.   Yes.                         18:40:16
22     Q.   Could you tell me, please?     18:40:16
23     A.   "Oxycodone."  "Prescription    18:40:18
24  drug."  "Diversion."  "Pharmacy theft."   18:40:23
25  Those are some, but I don't know that's   18:40:28

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1  an all-inclusive list.                18:40:30
2      Q.   Okay.  Thank you, ma'am.     18:40:32
3           Do you know if "pill mill" is  18:40:33
4  in there?                             18:40:34
5      A.   I believe so.                18:40:35
6      Q.   Okay.  And one of the things  18:40:37
7  that you're monitoring is news about pill  18:40:39
8  mills?                                18:40:42
9      A.   Yes.                         18:40:42
10     Q.   Okay.  And specifically pill  18:40:44
11 mills that are dealing in oxycodone?  18:40:45
12     A.   Yes.                         18:40:48
13     Q.   Okay.  And are you aware of   18:40:51
14 that there are pill mills in the state of  18:40:54
15 Tennessee?                            18:40:56
16     A.   I may have received articles to  18:40:56
17 that effect, but not -- no, I'm not -- it's  18:41:00
18 not in my sphere of awareness right now.  18:41:02
19     Q.   Okay.  I can show you some of  18:41:06
20 the articles if you'd like.           18:41:07
21     A.   No, I'll believe you.        18:41:08
22     Q.   Oh, well, I don't want to     18:41:10
23 testify to it.  I just need to know if you  18:41:11
24 were aware from your time at Mallinckrodt --  18:41:15
25     A.   Oh, yes.                     18:41:16

Page 471

1      Q.   -- that there are pill mills in  18:41:17
2  Tennessee.                            18:41:19
3      A.   Yes.  Yes.                   18:41:19
4      Q.   Okay.  Great, ma'am.  Thank   18:41:20
5  you.                                  18:41:22
6           And had you ever heard that   18:41:22
7  those pill mills, some of them had popped up  18:41:23
8  more after pill mills had closed in Florida?  18:41:26
9      A.   Yes.                         18:41:28
10          MR. O'CONNOR:  Object to form.  18:41:29
11 QUESTIONS BY MS. HERZFELD:            18:41:30
12     Q.   So if pill mills closed in    18:41:30
13 Florida, you heard that more had popped up in  18:41:32
14 Tennessee?                            18:41:34
15     A.   Yes, and surrounding states,  18:41:35
16 yes.                                  18:41:37
17     Q.   Okay.  Thank you, ma'am.      18:41:37
18          (Mallinckrodt-Harper Exhibit 35  18:42:59
19     marked for identification.)       18:43:00
20 QUESTIONS BY MS. HERZFELD:            18:43:00
21     Q.   Okay.  We'll mark this next   18:43:00
22 exhibit as number 35.                 18:43:01
23          Okay.  I've handed you what   18:43:17
24 we've marked as Exhibit 35.           18:43:40
25          For the record, it's Bates   18:43:42

Page 472

1  number MNK-T1_0007185722.             18:43:43
2           Okay.  What I've handed you   18:43:53
3  here is an e-mail that you received from  18:43:57
4  Eileen Spaulding dated August 11, 2016; is  18:43:59
5  that correct?                         18:44:03
6      A.   Yes, that's part of the chain.  18:44:03
7      Q.   Okay.  And then the subject is  18:44:05
8  re: Google Alert oxycodone; is that correct?  18:44:07
9      A.   Yes.                         18:44:09
10     Q.   Okay.  And so looking down     18:44:10
11 here, I'm mostly interested in -- who is  18:44:14
12 Heather McKenzie?                     18:44:17
13     A.   She was part of our group --  18:44:19
14 well, she's still part of the controlled  18:44:21
15 substances compliance group, but she for a  18:44:25
16 period of time worked more closely with  18:44:26
17 suspicious order monitoring.          18:44:29
18     Q.   Okay.  And was she working more  18:44:29
19 with suspicious order monitoring or   18:44:32
20 controlled substances compliance in August  18:44:34
21 of 2016?                              18:44:37
22     A.   Suspicious order monitoring.  18:44:37
23     Q.   Okay.  And so it looks to me   18:44:39
24 like Heather McKenzie set up her Google Alert  18:44:41
25 to her work e-mail address and is excited  18:44:44

Page 473

1  that it showed up.                    18:44:47
2           Does that look correct?      18:44:48
3      A.   Yes.  Yes.                   18:44:49
4      Q.   Okay.  And she's e-mailing that  18:44:50
5  to you.                               18:44:51
6           Was that a direction from you  18:44:54
7  to her to set up the Google Alert?    18:44:55
8      A.   Yes.                         18:44:57
9      Q.   Okay.  And why was that?      18:44:58
10     A.   She was taking over the       18:44:58
11 responsibility being passed on from Carrie  18:45:00
12 Johnson.                              18:45:03
13     Q.   Okay.  Great.                18:45:04
14          And then Eileen says, "It seems  18:45:04
15 like there's an awful lot of hits here.  Is  18:45:08
16 this what Jen used to receive?  Just make  18:45:11
17 sure we set up her Google Alerts correctly  18:45:13
18 for the right terms.  Eileen."        18:45:16
19          Do you see where it says that?  18:45:18
20     A.   Yes, and I'd like to clarify my  18:45:21
21 last answer.                          18:45:23
22     Q.   Sure.                        18:45:23
23     A.   So Carrie Johnson did the     18:45:24
24 Google Alerts, and then this prompted my  18:45:27
25 memory.  There was a woman named Jen Buist  18:45:31

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1  who did for them a while.                18:45:34
2      Q.   Okay.                          18:45:34
3      A.   Jen left the company, and then  18:45:36
4  they went to this Heather McKenzie.      18:45:37
5      Q.   Okay.  Great.                  18:45:40
6           And do you know if Heather does  18:45:40
7  them now?                                18:45:41
8      A.   She does not.                  18:45:42
9      Q.   Do you know who does?          18:45:42
10     A.   Yes.                           18:45:44
11     Q.   Who is it?                     18:45:44
12     A.   There's a controlled substances  18:45:45
13 compliance auditor analyst at our Hobart, New  18:45:48
14 York, facility who takes care of them.    18:45:52
15     Q.   And do you know his or her     18:45:53
16 name?                                    18:45:55
17     A.   She's very new.  Rochelle --   18:45:55
18 it's like MoQuay or Mokay.  I'm not certain.  18:46:00
19 She's within the past couple of weeks joined  18:46:03
20 our group.                               18:46:05
21     Q.   Oh, very new.                  18:46:05
22     A.   Yes.                           18:46:06
23     Q.   Okay.  Great.                  18:46:07
24          And in between Rochelle, has    18:46:07
25 Heather had the responsibility from that  18:46:10

Page 475

1  point?                                   18:46:12
2      A.   Yes.                           18:46:13
3      Q.   Okay.  So then Eileen says, as  18:46:16
4  we just said, going back to this, it looks  18:46:20
5  like basically there's a lot of hits there.  18:46:22
6  Is that usual.                           18:46:25
7           Did you respond to her?        18:46:26
8      A.   Yes.                           18:46:27
9      Q.   Okay.  And that's the next     18:46:28
10 e-mail chain here, Thursday, August 11th, at  18:46:29
11 8:56 a.m.; is that right?                18:46:34
12     A.   Yes.                           18:46:36
13     Q.   Okay.  And so in this e-mail   18:46:36
14 you say, "The amount of hits is correct;  18:46:38
15 however, important note:  Not all articles  18:46:40
16 require any kind of chargeback lookup     18:46:42
17 whatsoever."                             18:46:46
18          So let's back up a little bit   18:46:47
19 before we get there.                     18:46:48
20          So you say, "The amount is     18:46:49
21 correct."  Let's start with that.        18:46:51
22          There are, gosh, one, two --   18:46:54
23 nine and a half, roughly, pages of Google  18:47:05
24 hits here.                               18:47:07
25          Is that -- that's what was     18:47:08

Page 476

1  usual?                                   18:47:12
2      A.   So I'm looking to see, please,  18:47:12
3  if these are Google Alerts all from the same  18:47:14
4  day or if it's an accumulation of days.  I  18:47:17
5  cannot tell that by this document.       18:47:21
6      Q.   Okay.  And do you know if you   18:47:22
7  normally had your team running them, the  18:47:25
8  Google Alerts for oxycodone and the other key  18:47:27
9  words we had talked about, once a day or once  18:47:30
10 a week?                                   18:47:33
11     A.   So it's a passive process.  We  18:47:34
12 set up the Google Alerts, and then the Google  18:47:37
13 Alerts come to us automatically based upon   18:47:40
14 Google's search for these key terms.      18:47:43
15     Q.   Okay.  So you don't set the    18:47:45
16 frequency; Google does?                  18:47:47
17     A.   Correct.                       18:47:48
18     Q.   Okay.  Okay.  And so looking at  18:47:49
19 this basically nine and a half pages of hits,  18:47:53
20 that didn't seem unusual to you according to  18:47:55
21 this e-mail?                             18:47:56
22     A.   Correct.                       18:47:57
23     Q.   Okay.  And then when you said,  18:47:57
24 "Not all articles require any kind of     18:47:59
25 chargeback lookup whatsoever," typically did  18:48:02

Page 477

1  some article require chargeback lookup?   18:48:06
2      A.   Yes, if a pharmacy was named.  18:48:08
3      Q.   If a pharmacy was named.  Okay.  18:48:09
4           What about if a physician was   18:48:11
5  named?                                   18:48:12
6      A.   In -- at some point in our      18:48:13
7  program, yes, but not -- not at the current  18:48:21
8  time.                                    18:48:25
9      Q.   Okay.  And what was the period  18:48:26
10 of time that you would do a chargeback lookup  18:48:27
11 if a physician was named?                18:48:30
12     A.   I don't know -- I don't know    18:48:31
13 the span of time.                        18:48:33
14     Q.   Okay.  Do you know for how long  18:48:34
15 it was?  Months?  Years?  Weeks?         18:48:36
16     A.   Months.  I can't say years.     18:48:39
17 Months up to -- up to a year or so.       18:48:46
18     Q.   Okay.  But you don't remember   18:48:49
19 the time period when that happened?      18:48:50
20     A.   No.                            18:48:53
21     Q.   And do you know why that       18:48:53
22 practice was discontinued?               18:48:56
23     A.   The answer may require         18:48:58
24 privileged information.                  18:49:07
25          MR. O'CONNOR:  And of course    18:49:08

Page 478

1   I'll instruct the witness not to        18:49:10
2   answer to the extent it requires        18:49:11
3   revealing communications with a         18:49:13
4   lawyer.                                  18:49:14
5   QUESTIONS BY MS. HERZFELD:               18:49:15
6       Q.   Can you answer the question     18:49:16
7   without telling me what your lawyers told 18:49:17
8   you?                                     18:49:20
9       A.   I cannot.                       18:49:20
10      Q.   Okay.  So I'll take it --       18:49:28
11      A.   I'm sorry.                      18:49:29
12      Q.   That's okay.                    18:49:29
13           So when I ask, at some point    18:49:29
14  did it change looking at chargeback      18:49:32
15  information when the mention of doctors were 18:49:34
16  in these Google hits or the Google news  18:49:37
17  alerts, you're asserting attorney-client 18:49:40
18  privilege to answer that question?       18:49:43
19      A.   Yes, I am.                      18:49:44
20      Q.   Okay.  And your attorney has    18:49:45
21  advised you to assert attorney-client    18:49:46
22  privilege to this question, and you're taking 18:49:49
23  his advice?                              18:49:53
24      A.   Correct.                        18:49:53
25      Q.   Okay.  Okay.  So there's no     18:49:54

Page 479

1   other way you could answer that without  18:49:55
2   telling me what your attorney said?      18:49:56
3       A.   No.                            18:49:58
4       Q.   Okay.  Do you know if the      18:50:00
5   decision to stop monitoring physicians for 18:50:04
6   chargeback data when you've gotten an alert 18:50:09
7   from Google, if that happened within the past 18:50:13
8   two years?                               18:50:15
9       A.   It did not.                     18:50:16
10      Q.   Okay.  Do you know if it        18:50:17
11  happened in the last five years?         18:50:18
12      A.   I'm aware that I'm under oath,  18:50:21
13  and I apologize, I'm just terrible with my 18:50:23
14  dates and years, as we've heard all day long. 18:50:25
15  So I can't -- you continue -- and I       18:50:28
16  appreciate you're trying to help me with a 18:50:32
17  frame of reference in time, but I can't   18:50:34
18  answer the question.                     18:50:36
19      Q.   If you can't answer it, you     18:50:36
20  can't answer it.  I'm just trying to figure 18:50:40
21  out if it was very -- you know, at the    18:50:40
22  beginning, in like 2007, or if we're talking 18:50:42
23  in 2018.                                 18:50:45
24      A.   It's not 2010; it's not 2018.   18:50:48
25      Q.   Okay.                           18:50:57

Page 480

1       A.   It's -- it was active in the    18:50:57
2   early part of 2012 --                    18:51:02
3       Q.   Okay.                           18:51:03
4       A.   -- but I just don't know        18:51:04
5   specifically when it started before that or 18:51:06
6   ended after that.                        18:51:08
7       Q.   Okay.  Great.                   18:51:10
8            So going back to what we        18:51:13
9   have here.  So you said pharmacy would   18:51:15
10  require a chargeback look.  If there was a 18:51:18
11  pharmacy name in Google Alert, that would 18:51:21
12  require a chargeback look from your team; is 18:51:24
13  that right?                              18:51:27
14      A.   Yes.                            18:51:27
15      Q.   Okay.  And if physician named,  18:51:27
16  for a short period of time you did a search 18:51:29
17  for physician information, if they were   18:51:33
18  named?                                   18:51:36
19      A.   Yes.                            18:51:36
20      Q.   Okay.  And what type of search  18:51:37
21  would you do for physicians?             18:51:39
22      A.   So we were -- that was when we  18:51:41
23  were looking at IMS data.                18:51:43
24      Q.   Okay.                           18:51:45
25      A.   And an internal group provided  18:51:46

Page 481

1   us a list of physicians that were the highest 18:51:54
2   prescribers of oxycodone within the country. 18:51:56
3       Q.   Okay.  And you said an internal 18:51:58
4   group provided you that list of physicians. 18:52:01
5            What was the name of the        18:52:03
6   internal group?                          18:52:05
7       A.   Oh, gosh, I can't remember.     18:52:07
8       Q.   Okay.  Do you remember who was  18:52:09
9   on it?                                   18:52:11
10      A.   Yes.                            18:52:12
11      Q.   Okay.  Could you tell me the    18:52:13
12  name?                                    18:52:14
13      A.   Certainly.  There was a lady    18:52:14
14  named Tammy Fraley and a gentleman named 18:52:15
15  Jeremy Stammer.                          18:52:20
16      Q.   Okay.  And they would provide   18:52:23
17  you a list of the top prescribing oxycodone 18:52:26
18  physicians within the country?           18:52:30
19      A.   Yes.                            18:52:32
20      Q.   Okay.  And what would you do    18:52:33
21  with that list?                          18:52:34
22      A.   If we learned the name of a     18:52:35
23  physician for that period of time we were 18:52:39
24  conducting that activity through Google Alert 18:52:41
25  or when we were talking to our wholesaler and 18:52:44

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1  distributor customers about their due          18:52:49
2  diligence with the downstream registrants,     18:52:53
3  the pharmacies, sometimes they had gathered    18:52:55
4  information on who the top prescribers were     18:52:59
5  at a pharmacy.                                  18:53:02
6      Q.   Okay.                                  18:53:03
7      A.   So then we'd compare that name         18:53:03
8  to our list of top prescribers.                18:53:06
9      Q.   Okay.  And then if you found           18:53:08
10 that person on the list of top prescribers,    18:53:10
11 what, if anything, would you do?               18:53:13
12     A.   It was a -- pardon me.                 18:53:14
13     Q.   It's okay.                             18:53:16
14     A.   It was a contributing factor to       18:53:16
15 whether we -- it was another factor in         18:53:20
16 evaluating whether we would restrict the       18:53:23
17 payment of chargebacks to that pharmacy.       18:53:27
18     Q.   Okay.  So I just want to make          18:53:30
19 sure that I'm understanding this correctly.    18:53:31
20          So for a relatively short             18:53:33
21 period of time, somewhere maybe around         18:53:35
22 2012 --                                        18:53:37
23     A.   Yes.                                   18:53:39
24     Q.   Okay.  When you'd receive a           18:53:40
25 Google Alert or other information from a       18:53:42

Page 483

1  distributor's pharmacy or from their           18:53:48
2  information about a physician, you also had a   18:53:49
3  list from an internal group that was the       18:53:52
4  highest prescribers of oxycodone, and you      18:53:55
5  would compare the two and use those as a       18:53:57
6  factor in making a determination of whether    18:54:01
7  you were giving chargebacks?                   18:54:02
8          MR. O'CONNOR:  Objection to            18:54:04
9  form.                                          18:54:05
10         THE WITNESS:  Paying                    18:54:05
11 chargebacks, yes.                              18:54:06
12 QUESTIONS BY MS. HERZFELD:                      18:54:07
13     Q.   Okay.  Paying chargebacks --         18:54:07
14     A.   Yes, ma'am.                            18:54:08
15     Q.   -- not giving chargebacks.            18:54:09
16     A.   Yes.                                   18:54:10
17     Q.   Okay.  I just wanted to make          18:54:10
18 sure I understood that.                        18:54:12
19         But then that practice was             18:54:13
20 discontinued after a relatively short period   18:54:14
21 of time?                                       18:54:17
22     A.   Again, I don't know the stop          18:54:17
23 and the start date or how long we used that    18:54:19
24 as a component of our program.  I don't know.  18:54:22
25     Q.   But it was -- it was stopped          18:54:24

Page 484

1  in, you said you thought, a matter of months,  18:54:26
2  maybe a year.  It wasn't something that went   18:54:29
3  on for years and years?                        18:54:30
4      A.   Yes, that's my approximation,         18:54:31
5  yes.                                           18:54:33
6      Q.   Okay.  Great.                         18:54:33
7          Okay?  And you'd also said in          18:54:33
8  earlier testimony that someone from your team  18:54:39
9  or you would review the Federal Register       18:54:41
10 every day; is that correct?                    18:54:46
11         MR. O'CONNOR:  Objection to            18:54:46
12 form.                                          18:54:47
13         THE WITNESS:  Yes.                      18:54:47
14 QUESTIONS BY MS. HERZFELD:                      18:54:47
15     Q.   Okay.  And in those Federal           18:54:49
16 Register updates, there are updates to the     18:54:53
17 Federal Codes of Regulations; is that right?   18:54:54
18     A.   Yes.                                   18:54:56
19     Q.   Okay.  And there are also, from       18:54:57
20 time to time, updates of, for example,         18:54:58
21 physicians who have been indicted; is that     18:55:00
22 correct?                                       18:55:02
23     A.   Yes.                                   18:55:02
24     Q.   Okay.  And so would you review        18:55:03
25 those Federal Register documents for           18:55:05

Page 485

1  physicians that had been indicted or arrested  18:55:10
2  for anything involving prescription opioids?   18:55:13
3      A.   Yes.                                   18:55:17
4      Q.   Okay.  And what would you do          18:55:18
5  with that information if you saw it?           18:55:20
6      A.   So that would have been during       18:55:21
7  the same amount of time.                       18:55:26
8      Q.   Okay.                                  18:55:28
9      A.   If we're reviewing information        18:55:28
10 gathered by any source that named a            18:55:30
11 prescriber, we were -- we were comparing that  18:55:31
12 to the top prescriber listing of -- that had   18:55:34
13 been supplied to us.                           18:55:38
14     Q.   Okay.  But once that -- that          18:55:39
15 short-term practice ended, did you continue    18:55:41
16 to do that?                                    18:55:44
17     A.   No.                                    18:55:45
18     Q.   Okay.  Okay.  And when you            18:55:46
19 would receive these Google Alerts and it       18:56:01
20 would talk about pharmacies, would you look    18:56:02
21 at the area that the pharmacy was in?          18:56:06
22     A.   Yes.                                   18:56:09
23     Q.   Okay.  And what information           18:56:11
24 would you gather about the area that the       18:56:12
25 pharmacy was in?                               18:56:14

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1    A.   So I'd like to clarify.  It was   18:56:14
2  more so the pharmacy name --          18:56:22
3    Q.   Okay.                 18:56:23
4    A.   -- and that would prompt us to   18:56:23
5  look through our chargebacks.  And if there   18:56:25
6  was a nexus of the city and states -- in the   18:56:30
7  case of Joe's Pharmacy, if the Google Alert   18:56:32
8  said the same city and state as was      18:56:34
9  referenced in our chargeback information, we   18:56:37
10  knew that there was a correlation.       18:56:40
11    Q.   Okay.  But if it said, for   18:56:41
12  example, Joe's Pharmacy in Rocky Top,   18:56:45
13  Tennessee, did you go and do any research on   18:56:50
14  Rocky Top, Tennessee, other than to verify   18:56:52
15  that Joe's Pharmacy was in Rocky Top,      18:56:55
16  Tennessee?              18:56:57
17    A.   At times, yes.       18:56:58
18    Q.   Okay.  And what would prompt   18:56:58
19  you to do that?            18:57:01
20    A.   Some of the media alerts   18:57:01
21  contained things like statements that in a   18:57:04
22  certain region there was an issue, and so   18:57:09
23  then that would prompt us to look at the   18:57:13
24  chargebacks by -- in a specific geographic   18:57:15
25  area.               18:57:18

Page 487

1    Q.   Okay.  So let's finish up with   18:57:19
2  your e-mail here before we move on to the   18:57:24
3  next one.               18:57:25
4    A.   Okay.               18:57:25
5    Q.   So it says, "Google Alerts   18:57:26
6  scanned quickly for any mention of a pharmacy   18:57:27
7  name or address.  If none are contained in   18:57:29
8  the article, an article is about perhaps new   18:57:33
9  legislation or drug takeback initiatives,   18:57:35
10  then no further action is taken."      18:57:39
11        Did I read that correctly?   18:57:41
12    A.   Yes.               18:57:41
13    Q.   Okay.  And is that true, if it   18:57:42
14  was about legislation or drug takeback   18:57:43
15  initiatives, you just skipped over it?   18:57:45
16    A.   Yes.               18:57:48
17    Q.   Okay.  Is there anything else   18:57:48
18  you looked for in those Google Alerts --   18:57:50
19    A.   No.               18:57:52
20    Q.   -- than what we've talked   18:57:53
21  about?               18:57:54
22    A.   No.               18:57:55
23    Q.   Okay.               18:57:55
24    A.   No.               18:57:56
25    Q.   Okay.  And then Eileen writes   18:57:58

Page 488

1  back and says, "Okay, thank you.  I didn't do   18:58:04
2  much with them, as Carrie started the project   18:58:06
3  and then Jen took it over and just wanted to   18:58:08
4  double-check."             18:58:11
5        That seems correct with your   18:58:11
6  memory?               18:58:13
7    A.   Yes.               18:58:13
8    Q.   Okay.  And so going back to the   18:58:14
9  section of the e-mail where you're talking   18:58:15
10  about the amount of hits is correct?       18:58:17
11    A.   Yes.               18:58:21
12    Q.   Okay.  Okay.           18:58:22
13        So when you respond to her   18:58:23
14  about we're looking at pharmacy name and      18:58:25
15  address, you don't mention physician or   18:58:26
16  location, those things we just talked about.   18:58:30
17        That's because that short-lived   18:58:32
18  initiative had already been terminated by   18:58:34
19  that point; is that right?         18:58:37
20        MR. O'CONNOR:  Objection to   18:58:37
21  form.               18:58:38
22        THE WITNESS:  So the physician   18:58:38
23  piece was not part of the program      18:58:42
24  then.  It was an error of omission in   18:58:45
25  the e-mail.  We would indeed do      18:58:48

Page 489

1  further review if a geographic area   18:58:52
2  was mentioned without the benefit of a   18:58:54
3  pharmacy name.            18:58:56
4  QUESTIONS BY MS. HERZFELD:         18:58:57
5    Q.   Okay.  So if a geographic area   18:58:57
6  was mentioned, you would --         18:58:59
7    A.   Yes.               18:59:01
8    Q.   -- but a physician at that   18:59:03
9  point was not in the program?         18:59:07
10    A.   Correct.            18:59:08
11    Q.   Okay.  I just wanted to make   18:59:09
12  sure I understood that.  Thank you.   18:59:11
13    A.   You're welcome.       18:59:11
14    Q.   You can put that aside.   18:59:11
15        Have you ever heard the term   18:59:12
16  "pillbillies"?            18:59:29
17    A.   No.               18:59:31
18    Q.   Have you ever heard the term   18:59:32
19  "blues," referencing Mallinckrodt oxycodone?   18:59:40
20    A.   Yes.               18:59:43
21    Q.   Okay.  What do you understand   18:59:44
22  it to be a term for?            18:59:45
23    A.   A street name for Mallinckrodt   18:59:46
24  oxycodone.              18:59:51
25    Q.   Okay.  And do you know if   18:59:53

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1  that's 15 or 30s?    18:59:55
2    A.  I testified earlier, I'm    18:59:57
3  certain that the 30s are blue, but I don't  18:59:58
4  know for certain the color of the 15s.  19:00:00
5    Q.  Okay.  Was there ever any  19:00:03
6  discussion amongst you and your colleagues  19:00:11
7  about pill mills popping up in Tennessee?  19:00:13
8    A.  Yes.    19:00:16
9    Q.  Okay.  And who did you have  19:00:19
10  that discussion with?    19:00:20
11    A.  It would have been the team.  19:00:21
12  We have a suspicious order monitoring team  19:00:23
13  meeting approximately once a month.  19:00:26
14    Q.  Okay.  And when did you discuss  19:00:29
15  Tennessee?    19:00:31
16    A.  I don't have a date.  19:00:31
17    Q.  Okay.  Do you know how many  19:00:34
18  times you discussed Tennessee?  19:00:34
19    A.  I do not.    19:00:35
20    Q.  Okay.  Do you know if you  19:00:37
21  discussed Tennessee recently?  19:00:38
22    A.  I don't recall discussing it  19:00:40
23  recently.    19:00:43
24    Q.  Okay.  Do you know what the  19:00:44
25  substance was of the conversations about  19:00:45

Page 491

1  Tennessee?    19:00:47
2    A.  So we looked at chargebacks in  19:00:48
3  a number of ways, Google Alerts  19:00:56
4  notwithstanding.    19:00:59
5    Q.  Okay.    19:01:00
6    A.  And so the chargeback reports  19:01:00
7  were sorted by state, so that would prompt a  19:01:05
8  review of the distributions by our customers  19:01:11
9  to end -- end downstream registrants within  19:01:16
10  certain states if the numbers met a certain  19:01:20
11  criteria.    19:01:24
12    Q.  Okay.  Okay.  I'll get back to  19:01:25
13  that in just one second, the state sorting of  19:01:28
14  the chargeback data.    19:01:31
15    A.  Okay.    19:01:32
16    Q.  Other than sorting the  19:01:32
17  chargeback data by state, do you recall any  19:01:34
18  other substantive conversations about pill  19:01:36
19  mills in Tennessee?    19:01:38
20    A.  It was mentioned at DEA  19:01:39
21  conferences.  I don't specifically know which  19:01:42
22  one.    19:01:44
23    Q.  Okay.    19:01:44
24    A.  But we would have brought that  19:01:44
25  back to the suspicious order monitoring team,  19:01:46

Page 492

1  as we would have all the notes that were  19:01:50
2  pertinent, and discussed it relative to  19:01:52
3  suspicious order monitoring.  19:01:55
4    Q.  Okay.  Do you recall when that  19:01:56
5  DEA conference was?    19:01:57
6    A.  I do not.    19:01:59
7    Q.  Okay.  But you think there  19:01:59
8  would have been notes on it?  19:02:01
9    A.  I do not know.    19:02:02
10    Q.  Okay.  And do you recall what  19:02:05
11  they said about Tennessee at that DEA  19:02:08
12  conference?    19:02:11
13    A.  Yes.    19:02:11
14    Q.  What did they say?    19:02:12
15    A.  The DEA showed an interactive  19:02:13
16  map of the migration of the abuse or misuse  19:02:23
17  of oxycodone pills emanating from Florida and  19:02:28
18  moving throughout different states.  19:02:32
19    Q.  Okay.  Do you recall anything  19:02:33
20  else they said about Tennessee?  19:02:41
21    A.  No.    19:02:42
22    Q.  Okay.  And other than what  19:02:43
23  we've discussed, do you recall any other  19:02:45
24  conversations substantively about pill mills  19:02:47
25  in Tennessee?    19:02:50

Page 493

1    A.  No.    19:02:50
2    Q.  Okay.  Okay.  And I think I  19:02:51
3  might have asked you this question before, so  19:03:12
4  if I did, just tell me that I did, and I  19:03:16
5  apologize for asking it before.  19:03:20
6      Other than the discussion we  19:03:20
7  had talked about, the communication with the  19:03:23
8  officer from Morristown and you and  19:03:23
9  Mr. Ratliff, have you ever communicated with  19:03:25
10  any other law enforcement from Tennessee?  19:03:27
11    A.  Not to my knowledge.  19:03:28
12    Q.  Okay.  And do you know if  19:03:29
13  anyone on your team ever did?  19:03:31
14    A.  So I'd like to clarify the  19:03:33
15  previous answer.    19:03:34
16    Q.  Sure.    19:03:34
17    A.  So law enforcement officers  19:03:35
18  from various jurisdictions were members of  19:03:38
19  this National Association of Drug Diversion  19:03:41
20  Investigators.    19:03:44
21    Q.  Okay.    19:03:44
22    A.  And so they came to conferences  19:03:44
23  with us.    19:03:47
24    Q.  Okay.    19:03:47
25    A.  So I may have had a discussion  19:03:47

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1  with them as a member of law enforcement,     19:03:50
2  particularly if we were speaking at the     19:03:52
3  conference and talking about our placebo     19:03:59
4  program for law enforcement.          19:04:01
5      Q.   Okay.  But do you recall any     19:04:02
6  specific conversations with anyone from     19:04:04
7  Tennessee?                   19:04:05
8      A.   No.          19:04:05
9      Q.   Okay.  And other than that     19:04:06
10  conversation with the law enforcement officer  19:04:08
11  from Morristown about a specific          19:04:09
12  investigation, you don't recall any     19:04:12
13  communications about any other specific     19:04:14
14  investigations within Tennessee that you were  19:04:16
15  involved in?                19:04:18
16      A.   No.          19:04:19
17      Q.   Okay.  Or anybody from your     19:04:19
18  team for that matter?          19:04:21
19      A.   So I cannot speak -- I did     19:04:22
20  not -- I wasn't always privy.          19:04:25
21      Q.   Okay.          19:04:26
22      Q.   If our security director, Bill     19:04:27
23  Ratliff, our current vice president of     19:04:31
24  security, John Gillies, was involved in an     19:04:33
25  investigation, but not to my knowledge.     19:04:36

Page 495

1      Q.   Okay.  Okay.  And have you ever     19:04:37
2  reported any Tennessee pharmacies to     19:04:41
3  Tennessee law enforcement?          19:04:45
4      A.   Not to my knowledge.     19:04:47
5      Q.   Okay.  Or to federal law     19:04:51
6  enforcement with jurisdiction over Tennessee?  19:04:54
7      A.   Well, when we restrict the sale     19:04:57
8  of the processing of chargebacks to     19:05:01
9  pharmacies, that's reported to all     19:05:04
10  distributors and to DEA.          19:05:07
11      Q.   Okay.  But other than the DEA,     19:05:09
12  you didn't reach out to anybody at the     19:05:10
13  US Attorney's Office for the Eastern District  19:05:12
14  of Tennessee or anything like that?     19:05:14
15      A.   No.          19:05:16
16      Q.   Okay.  Okay.  And what about     19:05:16
17  any prescribers?  Did you ever report any     19:05:20
18  Tennessee prescribers to any Tennessee law     19:05:22
19  enforcement?                19:05:24
20      A.   Not to my knowledge.     19:05:25
21      Q.   Okay.  What about any Tennessee     19:05:26
22  prescribers to federal law enforcement?     19:05:29
23      A.   Not to my knowledge.     19:05:31
24      Q.   Okay.  Do you know if     19:05:32
25  Mallinckrodt, you were involved at     19:05:39

Page 496

1  Mallinckrodt, with any Tennessee pharmacies   19:05:40
2  being reported to the DEA?          19:05:43
3      A.   Again, if I researched the     19:05:44
4  chargeback-restricted pharmacies, perhaps,     19:05:50
5  but I would not have had any other     19:05:53
6  conversation than that.          19:05:55
7      Q.   Okay.  Do you know how many     19:05:55
8  Tennessee pharmacies have been put on     19:06:05
9  chargeback restriction?          19:06:06
10      A.   I do not.          19:06:07
11      Q.   Okay.          19:06:07
12      A.   I'm saying no, I do not, again.  19:06:16
13          (Mallinckrodt-Harper Exhibit 36  19:06:24
14      marked for identification.)          19:06:25
15  QUESTIONS BY MS. HERZFELD:          19:06:25
16      Q.   Okay.  I'm going to mark this     19:06:25
17  as Plaintiff's Exhibit 36.  It's Bates number  19:06:26
18  MNK_TNSTA00609639.          19:06:28
19          That front page is just a     19:06:34
20  placeholder.          19:06:45
21          If you look at the second one,     19:06:46
22  I will represent to you that we have searched  19:06:48
23  the chargeback restriction database and     19:06:51
24  sorted it by Tennessee.  The title of the     19:06:53
25  document was "Mallinckrodt chargeback     19:07:01

Page 497

1  restriction, underscore, reinstatement list."  19:07:03
2          Are you familiar with a list     19:07:04
3  that's called that?          19:07:05
4      A.   Yes.          19:07:06
5      Q.   Okay.  And are you responsible     19:07:06
6  for creating it?          19:07:07
7      A.   No.          19:07:09
8      Q.   Are you responsible for     19:07:10
9  maintaining it?          19:07:11
10      A.   No.          19:07:11
11      Q.   Do you have input into its     19:07:12
12  creation?          19:07:14
13      A.   I have input into the     19:07:15
14  chargeback restriction or recisions.     19:07:20
15      Q.   Okay.          19:07:22
16      A.   And then someone else on our     19:07:22
17  team creates -- maintains the list.     19:07:23
18      Q.   Okay.  And you have access to     19:07:25
19  the list?          19:07:26
20      A.   Yes.          19:07:26
21      Q.   Okay.  Okay.  So looking at     19:07:27
22  this list, does it look like that is what it  19:07:28
23  is, Mallinckrodt chargeback restriction and  19:07:29
24  reinstatement list?          19:07:34
25      A.   Yes.          19:07:35

Highly Confidential - Subject to Further Confidentiality Review

Page 498

```
1    Q.   And it shows one, two, three,        19:07:35
2  four, five, six, seven, eight, it looks like,  19:07:42
3  eight pharmacies that are on that list.     19:07:50
4        Does that look correct to you?        19:07:52
5    A.   Yes.                                  19:07:53
6    Q.   Okay.  And of that chargeback        19:07:55
7  list, it looks like five were reinstated; is  19:08:11
8  that correct?                               19:08:14
9    A.   Yes.                                  19:08:14
10   Q.   Okay.  And if there were             19:08:15
11  pharmacies that were put on chargeback     19:08:18
12  restriction in Tennessee, they would appear 19:08:19
13  on this list; is that right?               19:08:21
14   A.   I'm assuming that the sort is        19:08:22
15  correct, but given that, yes, they would be  19:08:25
16  on this list.                              19:08:27
17   Q.   Okay.  And each one of these         19:08:28
18  pharmacies that were put on chargeback     19:08:31
19  restriction would have been reported to the 19:08:32
20  DEA?                                        19:08:34
21   A.   Yes.                                  19:08:34
22   Q.   Okay.  You can set that one          19:08:35
23  aside, please, ma'am.                      19:08:38
24        Ma'am, was someone on your team      19:09:12
25  responsible for checking with the Tennessee 19:09:14
```

Page 499

```
1  boards of medical examiners or the Tennessee  19:09:16
2  Board of Pharmacy about specific pharmacies?  19:09:19
3    A.   John Gillies, our vice               19:09:23
4  president of security, may have done that,  19:09:30
5  but I don't know -- he's retired from the  19:09:33
6  FBI, so he had different resources than the  19:09:39
7  rest of the team.  And some of his         19:09:42
8  contributions to the team we didn't under --  19:09:45
9  know his methodology or have that pathway.  19:09:51
10   Q.   Okay.  But to your knowledge,        19:09:55
11  he didn't routinely -- nobody routinely    19:09:56
12  checked with the various state boards of   19:10:00
13  licensing for pharmacies to find out what's 19:10:03
14  going on with pharmacies in a particular   19:10:05
15  state?                                     19:10:08
16        MR. O'CONNOR:  Object to form.       19:10:09
17        THE WITNESS:  Correct.               19:10:09
18  QUESTIONS BY MS. HERZFELD:                 19:10:10
19   Q.   And what about the doctor            19:10:10
20  licensing boards for each state?  Was there 19:10:12
21  routine audit of the doctor licensing boards 19:10:14
22  of each state within your team, to your    19:10:17
23  knowledge?                                 19:10:20
24   A.   Not to my knowledge.                 19:10:20
25   Q.   Okay.  And based on those            19:10:21
```

Page 500

```
1  Google Alerts and other information, you were  19:10:52
2  aware that doctors were being arrested in  19:10:54
3  Tennessee for improperly prescribing       19:10:57
4  oxycodone; is that correct?                19:11:01
5    A.   Yes.                                  19:11:02
6    Q.   Okay.  And based on those            19:11:07
7  Google Alerts and other information, you also 19:11:10
8  knew that some pharmacies were filling     19:11:11
9  improper prescriptions in Tennessee for    19:11:14
10  oxycodone; is that correct?                19:11:16
11        MR. O'CONNOR:  Objection to          19:11:17
12  form.                                      19:11:18
13        THE WITNESS:  Yes.                   19:11:18
14  QUESTIONS BY MS. HERZFELD:                 19:11:19
15   Q.   Okay.  Okay.  And when you           19:11:19
16  talked earlier about chargeback data, I just 19:11:22
17  want to make sure I understand that a little 19:11:24
18  bit.                                       19:11:27
19        You can sort chargeback data in      19:11:27
20  all sorts of different ways, right?        19:11:29
21   A.   Yes.                                  19:11:30
22   Q.   Okay.  So you can sort it, I         19:11:30
23  think we talked about, by state; is that   19:11:32
24  correct?                                   19:11:35
25   A.   Yes.                                  19:11:35
```

Page 501

```
1    Q.   Okay.  And can you sort it by        19:11:36
2  time -- various time periods?              19:11:39
3    A.   Yes.                                  19:11:41
4    Q.   Okay.  And can you sort it by        19:11:42
5  ZIP code?                                   19:11:44
6    A.   Yes.                                  19:11:45
7    Q.   Okay.  And you can sort it by        19:11:46
8  per capita?                                19:11:49
9        MR. O'CONNOR:  Objection to          19:11:51
10  form.                                      19:11:53
11        THE WITNESS:  We did that for a      19:11:53
12  period of time.                            19:11:55
13  QUESTIONS BY MS. HERZFELD:                 19:11:57
14   Q.   Okay.                                19:11:57
15   A.   We know -- I don't believe that      19:11:58
16  we currently use the per capita information.  19:11:59
17   Q.   Okay.  Do you know when you          19:12:01
18  stopped using the per capita information?  19:12:03
19   A.   I'm so sorry, I do not.              19:12:05
20   Q.   Okay.  Do you know why you           19:12:08
21  stopped using the per capita information?  19:12:08
22   A.   I do not.                            19:12:10
23   Q.   Okay.  And you can sort it by        19:12:15
24  pharmacies; is that correct?              19:12:16
25   A.   Yes.                                  19:12:17
```

Page 502

1    Q.   Okay.  And I think you said      19:12:17
2  before if you wanted to, and for a period of   19:12:19
3  time you did, monitor physicians via IMS     19:12:23
4  data?                    19:12:27
5        MR. O'CONNOR:  Objection.      19:12:27
6        THE WITNESS:  Yes.        19:12:28
7        (Mallinckrodt-Harper Exhibit 37   19:13:25
8    marked for identification.)       19:13:26
9  QUESTIONS BY MS. HERZFELD:         19:13:26
10    Q.   Okay.  Ms. Harper, I am going    19:13:27
11  to mark you -- hand you what we will mark as  19:13:31
12  plaintiff's next exhibit, which is number 37.  19:13:33
13        For the record, it's      19:13:37
14  MNK_TNSTA05340154.  It is a two-page      19:13:43
15  document.                19:13:50
16        You want to start from the back    19:14:01
17  forward.  Oh, you've got it.  Good.  Very    19:14:02
18  good.                    19:14:04
19    A.   Yes, ma'am.          19:14:04
20    Q.   Great.  Thank you.        19:14:05
21        And take your time.  Read      19:14:07
22  through it.                19:14:11
23        MR. O'CONNOR:  Counsel, can we    19:14:39
24  go off the record for a minute?      19:14:41
25        MS. HERZFELD:  Sure.        19:14:42

Page 503

1        VIDEOGRAPHER:  We are going off   19:14:43
2  the record at 7:14 p.m.          19:14:44
3        (Off the record at 7:14 p.m.)     19:14:46
4        VIDEOGRAPHER:  We are back on    19:15:26
5  the record at 7:15 p.m.          19:15:27
6        MR. O'CONNOR:  And, Counsel, as   19:15:29
7  we discussed, I'm going to object to     19:15:30
8  the use of this document.  It appears    19:15:33
9  to be protected by the attorney-client   19:15:34
10  privilege and was inadvertently       19:15:37
11  produced, and we'll be making a      19:15:37
12  clawback request to retrieve the     19:15:39
13  document.                19:15:40
14        MS. HERZFELD:  Okay.  And we'll   19:15:41
15  discuss it at a later time.        19:15:43
16        I just have one question for     19:15:44
17  you, ma'am.              19:15:46
18  QUESTIONS BY MS. HERZFELD:         19:15:46
19    Q.   Do you know if Tennessee was a   19:15:47
20  state that was specifically being monitored  19:15:47
21  as one of a number of states by Mallinckrodt  19:15:51
22  for high volume oxycodone sales?      19:15:54
23    A.   Yes.              19:15:57
24    Q.   Okay.  Thank you very much.     19:15:57
25  You can move that aside.          19:15:59

Page 504

1        Do you know why Tennessee was    19:16:00
2  one of those states?            19:16:01
3    A.   So our program monitors all    19:16:02
4  states, all 50 states.          19:16:08
5    Q.   Okay.  But at some point were    19:16:10
6  Kentucky, Tennessee, Ohio, Florida and Texas  19:16:12
7  singled out for specific review?      19:16:20
8    A.   I don't recall.          19:16:22
9        (Mallinckrodt-Harper Exhibit 38   19:16:22
10    marked for identification.)       19:16:59
11  QUESTIONS BY MS. HERZFELD:         19:16:59
12    Q.   Okay.  I'm going to hand you    19:16:22
13  what we will mark as Plaintiff's Exhibit 38.  19:16:57
14  It's MNK_TNSTA05337163.          19:17:00
15        Okay.  And is this an e-mail     19:17:07
16  that you sent on May 13, 2011?      19:17:36
17    A.   Yes.              19:17:40
18    Q.   Okay.  And with it, it looks    19:17:43
19  like the attachments are oxy percentage of   19:17:45
20  sales by dist state master spreadsheet and   19:17:48
21  hydro percentage of sales by state master   19:17:52
22  spreadsheet.              19:17:55
23        Do you see where I'm at?      19:17:55
24    A.   Yes.              19:17:56
25    Q.   Okay.  And it says, "Georgia    19:17:57

Page 505

1  has been added to the statistics per Pat's   19:18:00
2  request."                19:18:03
3        Did I read that correctly?      19:18:03
4    A.   Yes.              19:18:04
5    Q.   Who's Pat?            19:18:04
6    A.   She's one of our attorneys.     19:18:04
7    Q.   Okay.  And you know        19:18:07
8  Tennessee -- if you'll look with me to the   19:18:11
9  second page, you'll see a chart that talks   19:18:13
10  about the personnel of hydrocodone sales in   19:18:24
11  Tennessee from 10/2007 till 2/1/2011.    19:18:25
12        Do you see where I'm at?      19:18:31
13    A.   Yes.              19:18:32
14    Q.   Okay.  Do you know why the     19:18:33
15  percentage of hydrocodone sales were being   19:18:34
16  monitored in Tennessee?          19:18:36
17    A.   So I'd like to note, please,    19:18:37
18  from where this graph came.  Was it part of   19:18:42
19  this packet?              19:18:45
20    Q.   I believe so, yes, ma'am.  I    19:18:47
21  didn't create it.            19:18:49
22    A.   Okay.  All right.         19:18:50
23        So will you please repeat the    19:18:52
24  question?  Sorry.            19:18:54
25    Q.   Sure.  That's okay.        19:18:55

Page 506

1  Do you know why the percentage  19:18:56
2  of hydrocodone sales were being monitored in  19:18:57
3  Tennessee by Mallinckrodt?  19:18:59
4  A.  I do not know.  19:19:00
5  Q.  Okay.  But they were?  19:19:01
6  A.  Yes.  19:19:03
7  Q.  Okay.  And it was not  19:19:04
8  necessarily all 50 states that were pulled  19:19:07
9  out for these specific looks?  19:19:09
10  A.  I do not know that.  19:19:11
11  Q.  Okay.  Let's go through and  19:19:12
12  look.  19:19:13
13  So after this chart that you're  19:19:14
14  on, if you'll flip with me to the next page,  19:19:16
15  it says page 1 at the bottom?  19:19:18
16  A.  Yes.  19:19:20
17  Q.  Okay.  So looking at hydro  19:19:20
18  sales here, it looks like we're looking at  19:19:22
19  the state of?  19:19:25
20  A.  Florida.  19:19:26
21  Q.  Okay.  And two pages later, the  19:19:27
22  one that says page 3, it looks like we're  19:19:32
23  looking at the state of?  19:19:35
24  A.  Oh, I'm sorry.  Texas.  19:19:36
25  Q.  Okay.  19:19:36

Page 507

1  A.  Yes.  19:19:39
2  Q.  Okay.  And flip two more pages  19:19:40
3  with me to page 5.  19:19:42
4  Okay.  And that is the state  19:19:44
5  of?  19:19:45
6  A.  Ohio.  19:19:46
7  Q.  Okay.  Keep flipping.  19:19:46
8  Page 7.  That's the state of?  19:19:49
9  A.  Kentucky.  19:19:52
10  Q.  Okay.  And this is -- looks  19:19:54
11  like the percentage of hydro sales by  19:19:55
12  distributor; is that right?  19:19:57
13  A.  Yes.  19:19:58
14  Q.  Okay.  Keep flipping.  19:19:59
15  Page 9, and the state there is?  19:20:01
16  A.  Tennessee.  19:20:05
17  Q.  Tennessee.  There we go.  19:20:06
18  And that is the percentage of  19:20:08
19  sales by distributor on that chart; is that  19:20:09
20  correct?  19:20:15
21  A.  Yes, the chart states that.  19:20:15
22  Q.  Okay.  And the chart appears to  19:20:20
23  monitor this information from October 2007  19:20:21
24  through March of 2010 on this page going  19:20:24
25  through to the second page, all the way  19:20:27

Page 508

1  through March of 2011; is that right?  19:20:29
2  A.  Yes.  19:20:31
3  Q.  Okay.  And then on page 11, the  19:20:33
4  state is?  19:20:41
5  A.  Georgia.  19:20:42
6  Q.  Okay.  And those are the only  19:20:44
7  states that were included in this handout.  19:20:45
8  So do you know if there was  19:20:48
9  a -- do you know why those states were  19:20:50
10  particularly singled out to have these  19:20:52
11  reports run?  19:20:55
12  A.  I do not.  19:20:55
13  Q.  Okay.  Was there anything about  19:20:56
14  opioid sales to these states that was of  19:20:59
15  note?  19:21:01
16  A.  No.  And unfortunately I  19:21:02
17  don't -- I don't understand -- I don't recall  19:21:05
18  this report --  19:21:08
19  Q.  Okay.  19:21:08
20  A.  -- and I don't understand this  19:21:08
21  unit of measure, this percentage.  19:21:11
22  Q.  Okay.  19:21:13
23  A.  I just don't understand what  19:21:14
24  this page is telling --  19:21:15
25  Q.  Okay.  19:21:16

Page 509

1  A.  -- me.  19:21:17
2  Q.  But you don't doubt that you  19:21:17
3  sent the e-mail with the attachments?  19:21:18
4  A.  No, I don't doubt it.  19:21:21
5  Q.  Okay.  Okay.  So flipping  19:21:25
6  through to the next one, kind of leaving  19:21:26
7  where we -- stopping where we left off and  19:21:28
8  going back to where we were, if you'll just  19:21:31
9  keep going.  19:21:33
10  A.  What page?  Keep going?  19:21:33
11  Q.  Uh-huh.  I can help you out if  19:21:35
12  you want.  19:21:37
13  A.  Okay, certainly.  19:21:38
14  Q.  Yeah.  Yeah.  Make it a little  19:21:38
15  easier for you.  Keep you from paper cuts.  19:21:39
16  There we go.  19:21:45
17  Okay.  And then so -- then on  19:21:46
18  this chart, it looks like the second  19:21:47
19  attachment there is the percentage of  19:21:50
20  oxycodone sales for Tennessee.  19:21:52
21  Do you see that?  19:21:53
22  A.  Yes.  19:21:53
23  Q.  And that's broken down by  19:21:54
24  distributor from 10/1/2007 till 10/1/2011; is  19:21:56
25  that right?  19:22:02

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1    A.   Yes.                          19:22:02
2    Q.   Okay.  And I will posit to you,    19:22:02
3    and if we flip through, it's the same charts    19:22:06
4    breaking down the percentage of oxycodone for    19:22:09
5    various states by distributor for Florida,    19:22:13
6    Texas, Ohio, Kentucky, Tennessee and Georgia,    19:22:18
7    those same states.                   19:22:33
8         Does that look to be correct?    19:22:35
9         MR. O'CONNOR:  You can answer    19:22:39
10   the question.                       19:22:39
11        THE WITNESS:  Yes.              19:22:40
12   QUESTIONS BY MS. HERZFELD:            19:22:40
13   Q.   Okay.  Yes?                    19:22:41
14        MR. O'CONNOR:  Counsel, since    19:22:42
15   we just finished that page, I notice    19:22:43
16   there appears to be an unrelated     19:22:45
17   document attached to the back.       19:22:47
18        MS. HERZFELD:  I do see that.    19:22:48
19   I do.  That's interesting.           19:22:50
20        Okay.  Let's pull off this      19:22:51
21   unrelated document, because I think    19:22:55
22   that's supposed to be separate.      19:22:55
23        My apologies for having some    19:22:59
24   exhibit problems today.  You can tell    19:23:01
25   I'm having exhibit problems today.    19:23:04

Page 511

1         There we go.  Just make this    19:23:07
2    next one Exhibit 39.                 19:23:08
3         (Mallinckrodt-Harper Exhibit 39    19:23:12
4    marked for identification.)          19:23:12
5         MS. HERZFELD:  And for those in    19:23:17
6    the cheap seats, it's               19:23:18
7    MNK-T1_0007026593.                   19:23:22
8         Thank you for pointing that     19:23:27
9    out, Andrew.                        19:23:29
10        MR. O'CONNOR:  You're welcome.    19:23:31
11   QUESTIONS BY MS. HERZFELD:            19:23:32
12   Q.   Okay.  So looking at this next    19:23:36
13   document, this is an e-mail that you sent    19:23:38
14   Anthony Rattini on 10/14/2013; is that    19:23:40
15   correct?                            19:23:45
16   A.   Yes.                          19:23:45
17   Q.   Okay.  And who is Anthony       19:23:47
18   Rattini?                            19:23:58
19   A.   He is, or was, a representative    19:23:58
20   we spoke to at Miami-Luken.          19:24:03
21   Q.   And Miami-Luken is what?        19:24:06
22   A.   It's a distributor.            19:24:09
23   Q.   Okay.  And do you know where    19:24:10
24   they're located?                    19:24:12
25   A.   I do not.                     19:24:12

Page 512

1    Q.   Do you know if they're located    19:24:13
2    in Miami?                           19:24:14
3    A.   I don't know.                 19:24:15
4    Q.   Okay.  Flipping to the third    19:24:17
5    page that says MNK-T1_0007026595.  State    19:24:19
6    ranking for hydrocodone, total dosage units    19:24:26
7    sold to retail, January 1, 2010, through    19:24:30
8    December 31, 2011.                   19:24:34
9         Do you see where I'm at?        19:24:35
10   A.   Yes.                          19:24:36
11   Q.   Could you tell me what number    19:24:37
12   Tennessee is, ma'am?                 19:24:38
13   A.   Tennessee is the third ranking.    19:24:39
14   Q.   Okay.  Great.  Thank you very    19:24:46
15   much.                               19:24:47
16        And the next page, state        19:24:47
17   ranking for oxycodone.  This one ends with    19:24:49
18   6596.  Total dosage units sold to retail on    19:24:56
19   January 1, 2010, through December 31, 2011.    19:25:03
20        And do you see that what number    19:25:07
21   Tennessee is on this list, ma'am?    19:25:08
22   A.   It is -- I have a question      19:25:10
23   about the document, please.          19:25:11
24   Q.   Sure.                         19:25:12
25   A.   This says Drug Enforcement      19:25:12

Page 513

1    Administration.                     19:25:14
2    Q.   Yes, ma'am.                   19:25:14
3    A.   So it's something DEA          19:25:14
4    published.                          19:25:16
5    Q.   Okay.                         19:25:16
6    A.   So that would include, am I    19:25:17
7    correct, all manufacturers of all products?    19:25:19
8    Q.   Ma'am, you're the one who      19:25:22
9    forwarded this, so I wouldn't know.    19:25:24
10   A.   Oh, we did?                   19:25:25
11   Q.   Yeah, I'm going to back up.    19:25:27
12   Okay.  Let me ask this question first, and    19:25:29
13   then we'll back up so you clarify that.    19:25:30
14   A.   Okay.                         19:25:32
15   Q.   So what number is Tennessee on    19:25:32
16   this state ranking for oxycodone in 2011?    19:25:34
17   A.   Number 9.                     19:25:38
18   Q.   Okay.  And in 2000 -- okay.    19:25:39
19   Great.  Thank you.                   19:25:49
20   A.   Okay.                         19:25:49
21   Q.   Okay.  Now going back to what I    19:25:49
22   think what was your concern.  If you back to    19:25:50
23   the very first page, which was the e-mail.    19:25:53
24        If you read the e-mail, it's an    19:25:55
25   e-mail from you, right?              19:25:56

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1    A.   Yes.                    19:25:57
2    Q.   Okay.  It says, "Hi, Tony.  It    19:25:58
3  was very good to speak with you today, and    19:26:02
4  I'm looking forward to finally meeting you in    19:26:03
5  person next week at the DEA conference.  The    19:26:05
6  first PDF attached was pulled from the DEA    19:26:06
7  web page USDOJ.gov, a recent presentation    19:26:10
8  made to HDMA as indicated below.  The second    19:26:13
9  PDF was extracted from DEA web page also,    19:26:17
10 registrant population information pharmacy    19:26:19
11 registrations."                 19:26:22
12       Did I read that correctly?    19:26:22
13   A.   Yes.                    19:26:23
14   Q.   Okay.  So it looks like you    19:26:23
15 attached both of these as attachments to the    19:26:25
16 e-mail that you sent to Mr. Rattini; is that    19:26:28
17 correct?                       19:26:31
18   A.   Yes.                    19:26:31
19   Q.   Okay.  And what is HDMA?    19:26:32
20   A.   It's Healthcare Distribution    19:26:40
21 Management Association.             19:26:44
22   Q.   Okay.  Okay.  Moving on.  You    19:26:44
23 can get rid of that one.          19:26:55
24       Okay.  Was Mallinckrodt    19:26:57
25 concerned about the number of opioids that it    19:27:14

Page 515

1  was shipping to Tennessee?          19:27:16
2       MR. O'CONNOR:  Objection to    19:27:18
3  form.                          19:27:19
4       THE WITNESS:  It's a broad    19:27:20
5  question, so can you -- I'm sorry, I    19:27:26
6  can't answer.                   19:27:30
7  QUESTIONS BY MS. HERZFELD:          19:27:30
8    Q.   Sure.  Okay.  I'll try to --    19:27:31
9  I'll try to narrow it a little bit.    19:27:34
10       It looks like Tennessee,    19:27:35
11 according to some of the charts we've seen,    19:27:37
12 has been at the higher level of numbers of    19:27:38
13 opioids being shipped to it; is that correct?    19:27:43
14       MR. O'CONNOR:  Objection to    19:27:45
15 form.                          19:27:46
16       THE WITNESS:  Yes.          19:27:46
17 QUESTIONS BY MS. HERZFELD:          19:27:47
18   Q.   Okay.  And was that concerning    19:27:48
19 to Mallinckrodt, that Tennessee was -- or    19:27:49
20 concerning to you?  Was that concerning --    19:27:52
21 strike that.                    19:27:54
22       Was it concerning to you in    19:27:54
23 your position at Mallinckrodt that Tennessee    19:27:58
24 was amongst the higher numbers for opioid    19:28:00
25 sales by Mallinckrodt?             19:28:05

Page 516

1       MR. O'CONNOR:  Objection to    19:28:07
2  form.                          19:28:08
3       THE WITNESS:  So we reviewed    19:28:08
4  all the data for all the states, so it    19:28:09
5  was among those that were of concern.    19:28:13
6  QUESTIONS BY MS. HERZFELD:          19:28:16
7    Q.   Okay.  And why was that of    19:28:16
8  concern?                       19:28:18
9    A.   So which charts are we talking    19:28:18
10 about, these last ones from DEA?    19:28:21
11   Q.   Yes.                    19:28:23
12   A.   So I'd like to add that since    19:28:24
13 these were from DEA, all manufacturers -- and    19:28:29
14 there were certain areas of the country that    19:28:33
15 Mallinckrodt may have had zero of the market.    19:28:35
16 There are other hydrocodone manufacturers and    19:28:39
17 oxycodone manufacturers.  So, yes, we studied    19:28:42
18 these graphs as a tool within our program,    19:28:45
19 yes.                           19:28:48
20   Q.   Okay.  But if we go back to,    19:28:48
21 let's see, this one, I think.  Yeah,    19:28:51
22 Exhibit 35.                     19:28:59
23       You agreed with me before that    19:28:59
24 one of the states that Mallinckrodt was    19:29:01
25 monitoring was Tennessee; is that right?    19:29:02

Page 517

1    A.   Yes.  Yes.                19:29:03
2    Q.   Okay.  And so based on    19:29:03
3  Mallinckrodt's own documentation here in    19:29:05
4  Exhibit 35, you were monitoring Tennessee    19:29:08
5  specifically for opioid sales; is that    19:29:12
6  correct?                       19:29:15
7    A.   Yes.                    19:29:15
8    Q.   Okay.  Okay.  You can set that    19:29:19
9  aside.                         19:29:22
10       (Mallinckrodt-Harper Exhibit 40    19:29:29
11 marked for identification.)         19:29:30
12 QUESTIONS BY MS. HERZFELD:          19:29:30
13   Q.   Okay.  I'm going to hand you    19:29:30
14 what we'll mark as Exhibit 40.  And this is    19:29:33
15 MNK_TNSTA05126722 through 6735.  It's front    19:29:39
16 and back document.               19:29:53
17       That type is very, very small,    19:29:55
18 so we'll read through it together if you    19:30:24
19 don't mind.                     19:30:28
20       So the one that says page 1,    19:30:29
21 let's start there.  Okay.          19:30:30
22       At the very top line under    19:30:33
23 where it says A, B and C, what is the title    19:30:34
24 there?  Do you see it, line 1?      19:30:37
25   A.   Yes.                    19:30:39

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1    Q.   What is it?                    19:30:39
2    A.   30-milligram oxy, sum of sales,   19:30:40
3  dosage units by state.                19:30:45
4    Q.   Okay.  So looking at that, it    19:30:46
5  looks like Mallinckrodt was tracking the   19:30:49
6  oxy 30 sales by state in 2009, 2010 and 2011;   19:30:51
7  is that correct?                      19:30:58
8    A.   I see 2010 and I see 2000 --    19:30:58
9  2011.  I don't see 2009 on the chart.    19:31:14
10   Q.   Okay.  I'll show you right       19:31:16
11 here.                                 19:31:17
12   A.   Okay.                          19:31:17
13   Q.   Right under B?                  19:31:18
14   A.   Okay.  I see it now, thank you,   19:31:25
15 yes.                                  19:31:26
16   Q.   2009, 2010, 2011.              19:31:26
17   A.   Yeah.                          19:31:26
18   Q.   Okay.  And what number is       19:31:29
19 Tennessee on this list?               19:31:30
20   A.   This list indicates --         19:31:31
21 Tennessee is seventh listed, but this is by   19:31:46
22 sales dollars, am I correct, not dosage   19:31:51
23 units?                                19:31:54
24   Q.   It says -- it says sum of sales   19:31:54
25 dosage units by state, so...          19:31:56

Page 519

1         Okay.  So it says Tennessee is   19:32:08
2  number 7; is that right?              19:32:11
3    A.   Yes, it does say that.         19:32:12
4    Q.   Okay.  And then if you go over   19:32:16
5  a couple blocks here, it has the various   19:32:17
6  numbers.  Then it says grand percent total,   19:32:22
7  3.64 percent.                         19:32:24
8         Do you see where that's at?     19:32:26
9    A.   I'm having a hard time tracking   19:32:28
10 you.                                  19:32:31
11   Q.   I know, it's so small.         19:32:32
12   A.   On the chart.                  19:32:33
13   Q.   Do you want to use a piece of   19:32:34
14 paper?                                19:32:35
15   A.   Can you give me a column header   19:32:35
16 name?                                 19:32:37
17   Q.   Uh-huh, sure.  Okay.  So let's   19:32:39
18 look at -- we're at number 7, and G.  So 7 G.   19:32:40
19   A.   Okay.  Yes, I see it.          19:32:43
20   Q.   Okay.  And so it says grand     19:32:47
21 total percent is 3.64 percent; is that right?   19:32:48
22   A.   Yes.                           19:32:51
23   Q.   Okay.  And then it says 2010    19:32:51
24 increase.                             19:32:53
25         Can you read that next one for   19:32:53

Page 520

1  me, please?                           19:32:54
2    A.   Yes.  42 percent.              19:32:56
3    Q.   Okay.  And then 2011 increase?   19:32:57
4    A.   11 percent.                    19:33:00
5    Q.   Okay.  And then going over      19:33:03
6  exactly -- stay on that exact line and go   19:33:05
7  over one, and then we're at 15-milligram oxy,   19:33:07
8  sum of sales dosage units by state.  And   19:33:11
9  we're still at number 7 here, Tennessee.   19:33:13
10        Do you see that?               19:33:16
11   A.   I'd like to use a piece of       19:33:17
12 paper --                              19:33:18
13   Q.   Yeah, sure.  It will certainly   19:33:18
14 make it easier.                       19:33:20
15   A.   I'm sorry.  I just had eye       19:33:21
16 surgery.  I'm sorry.                  19:33:26
17   Q.   For sure.  And I'm not trying    19:33:28
18 to make this difficult on you.        19:33:30
19   A.   Okay.  I'm on line 7.          19:33:31
20   Q.   Okay.  And so it shows the 15    19:33:33
21 on line 7.  Then it says percentage of grand   19:33:35
22 total there under Q4, .49 percent; is that   19:33:37
23 right?                                19:33:41
24   A.   Yes.                           19:33:41
25   Q.   Okay.  And then it says units    19:33:42

Page 521

1  per capita, 1.87; is that correct?    19:33:44
2    A.   Yes.                           19:33:47
3    Q.   Units per capita rank,          19:33:48
4  number 5; is that correct?            19:33:52
5    A.   Yes.                           19:33:53
6    Q.   Population rank, 17.            19:33:54
7         And then it goes through the     19:33:58
8  census population through 2010, 2000, 1990.   19:34:02
9         Do you see that?               19:34:06
10   A.   Yes.                           19:34:07
11   Q.   I want to make sure I am         19:34:07
12 staying on the right line.            19:34:09
13        And then it says percentage of   19:34:10
14 US total, 2.03 percent.               19:34:12
15        Do you see that?               19:34:15
16   A.   Yes.                           19:34:15
17   Q.   Okay.  Then if you go -- follow   19:34:15
18 that line all the way to the very end.  It   19:34:20
19 ranks by density and population, and then it   19:34:22
20 says units adjusted for density, 8.85.   19:34:26
21        Do you see that?               19:34:30
22   A.   Yes.                           19:34:31
23   Q.   Okay.  And did you create this   19:34:33
24 chart?                                19:34:35
25   A.   I did not.  I don't understand   19:34:35

Page 522

1  it. I did not.                    19:34:38
2      Q.  Okay.                     19:34:39
3      A.  No.                       19:34:39
4      Q.  Does it appear to be on    19:34:39
5  monitoring chargeback data by state and     19:34:42
6  population?                       19:34:45
7      A.  I don't know. It's monitoring   19:34:45
8  by state and by population, but, again, is it  19:34:54
9  dosage units or dollars. I don't know the   19:34:58
10  units of measure for certain.         19:35:02
11      Q.  Okay. But other than that, not  19:35:04
12  knowing what the unit of measure is, you   19:35:06
13  recognize this as chargeback data by state   19:35:09
14  and population?                    19:35:11
15      A.  I don't recognize where the   19:35:13
16  data came from, I'm sorry.           19:35:17
17      Q.  Okay.                      19:35:18
18      A.  I just don't.              19:35:18
19      Q.  So have you seen this chart    19:35:19
20  before?                           19:35:21
21      A.  No.                        19:35:21
22      Q.  Have you -- did you have      19:35:22
23  reports run like this before?         19:35:24
24      A.  No.                        19:35:26
25      Q.  Do you know if anybody on your  19:35:26

Page 523

1  team did?                         19:35:27
2      A.  I do not know.              19:35:28
3      Q.  Okay. When you save things on  19:35:31
4  a computer in your team back in 2010, 2011,  19:35:34
5  would you have a share drive?         19:35:38
6      A.  Yes.                        19:35:40
7      Q.  Okay. Would it have certain   19:35:40
8  folders in it?                    19:35:43
9      A.  Yes.                        19:35:43
10      Q.  You put stuff in a folder?     19:35:44
11          Was there a folder for       19:35:45
12  suspicious order monitoring?          19:35:47
13      A.  Yes, and I do see the title.   19:35:47
14      Q.  Yes, ma'am.                 19:35:49
15      A.  I see that.                 19:35:50
16      Q.  Uh-huh.                     19:35:51
17      A.  And certainly I can read it,   19:35:52
18  but I -- I don't recall seeing or utilizing  19:35:54
19  this spreadsheet or requesting this    19:35:58
20  spreadsheet, although I do see that the file  19:36:00
21  name indicates that.               19:36:02
22      Q.  Okay.                      19:36:03
23      A.  Yes.                       19:36:03
24      Q.  Do you have any reason to think  19:36:04
25  that it's not accurate?             19:36:05

Page 524

1      A.  Well, I do not.             19:36:06
2      Q.  Okay. Okay. You can set it    19:36:14
3  aside. Thank you.                  19:36:15
4          MR. O'CONNOR: Counsel, as     19:36:19
5  we're getting close to the end here,  19:36:19
6  maybe it's time to take a break. I    19:36:21
7  think we've been going at it for quite  19:36:25
8  a while.                          19:36:27
9          MS. HERZFELD: How long have I  19:36:28
10  been going?
11          VIDEOGRAPHER: A little over an
12  hour. Hour and ten minutes.
13          MS. HERZFELD: Oh, we can take
14  a break, yeah, but -- yeah, sure,
15  okay. Yeah, we can take a break.
16          VIDEOGRAPHER: We are going off  19:36:33
17  the record at 7:36 p.m.              19:36:34
18      (Off the record at 7:36 p.m.)     19:36:35
19          VIDEOGRAPHER: We are back on    19:45:27
20  the record at 7:45 p.m.              19:45:28
21  QUESTIONS BY MS. HERZFELD:           19:45:30
22      Q.  Okay. Great.                19:45:30
23          Ms. Harper, we're back on the  19:45:31
24  record after a quick break. I have a couple  19:45:34
25  more questions for you. Hopefully we'll get  19:45:37

Page 525

1  you out of here relatively quickly.   19:45:39
2          I'm done with that exhibit, so  19:45:41
3  you can set it aside.              19:45:43
4          I have a question about the   19:45:45
5  branded side of Mallinckrodt.        19:45:51
6          Did you deal at all with them?  19:45:52
7      A.  On a fairly limited basis.    19:45:54
8      Q.  Okay. And what was your       19:45:56
9  involvement with the branded side?    19:45:58
10      A.  Only to the extent that they   19:46:00
11  sold branded products that were narcotics.  19:46:06
12      Q.  Okay. So like Exalgo or       19:46:10
13  Xartemis?                         19:46:13
14      A.  Yes.                        19:46:15
15      Q.  Okay. And so I'm going to ask  19:46:15
16  you some questions about that just to figure  19:46:18
17  out if there's -- what your role is.  19:46:19
18          Okay?                       19:46:20
19      A.  Okay.                       19:46:21
20      Q.  So the branded side had target  19:46:22
21  pharmacy lists; is that correct?      19:46:26
22      A.  I don't know.               19:46:27
23      Q.  Okay. Were you ever involved  19:46:28
24  in reviewing target pharmacy lists from the  19:46:30
25  branded sided?                     19:46:33

Highly Confidential - Subject to Further Confidentiality Review

Page 526

1    A.    So I'm going to -- I'm going to    19:46:34
2    clarify my previous answer.    19:46:36
3    Q.    Sure.    19:46:37
4    A.    Because, yes, I believe they    19:46:39
5    had -- I don't know what they were called --    19:46:42
6    Q.    Okay.    19:46:42
7    A.    -- but they -- did you say    19:46:44
8    pharmacies?    19:46:45
9    Q.    Yes, ma'am.    19:46:45
10    A.    I'm not certain about that.    19:46:46
11    Q.    Okay.  What about physicians?    19:46:48
12    A.    Yes.    19:46:49
13    Q.    Okay.    19:46:50
14    A.    Yes.  Yes.    19:46:50
15    Q.    And do you -- what was your    19:46:51
16    involvement in reviewing those target    19:46:54
17    physician lists?    19:46:56
18    A.    When we had -- when we were    19:46:57
19    using the top prescriber list from the IMS    19:47:02
20    data, we would vet that against the speakers    19:47:06
21    list.    19:47:13
22    Q.    Okay.  And what's the speakers    19:47:13
23    list?    19:47:18
24    A.    Those were speakers that -- and    19:47:18
25    I don't know very much about the program, but    19:47:21

Page 527

1    that Mallinckrodt employed to speak on our --    19:47:23
2    I don't know -- I don't know the arrangement,    19:47:28
3    but they spoke on behalf of Mallinckrodt for    19:47:30
4    Mallinckrodt products.  But I don't want to    19:47:33
5    reach too far into the brands because --    19:47:34
6    okay.    19:47:37
7    Q.    Okay.  As long as I understand    19:47:37
8    your answer.    19:47:40
9    A.    Yeah.    19:47:41
10    Q.    Okay.  And so on -- do you know    19:47:41
11    on -- if -- when you looked at those top    19:47:44
12    prescriber lists, did you review those at all    19:47:47
13    from a suspicious order monitoring    19:47:51
14    perspective?    19:47:53
15    A.    Yes.    19:47:54
16    Q.    Okay.  And what did you do for    19:47:56
17    that?    19:47:58
18    A.    So that is when, in the    19:47:58
19    circumstance we spoke about before, if we    19:48:01
20    were reviewing a downstream registrant and    19:48:04
21    their due diligence with a particular    19:48:10
22    pharmacy, if the distributor's file contained    19:48:12
23    information about the top prescribers at    19:48:18
24    those pharmacies, we would vet that against    19:48:19
25    the list of the top prescribers per IMS.    19:48:22

Page 528

1    Q.    Okay.  And top prescribers for    19:48:27
2    Mallinckrodt products, those prescriptions    19:48:31
3    could have been legitimate; is that right?    19:48:32
4    A.    Yes.    19:48:34
5    Q.    Okay.  And those prescriptions    19:48:35
6    also could have been illegitimate?    19:48:37
7    A.    And I'd like to qualify that.    19:48:40
8    Q.    Yes, ma'am.    19:48:41
9    A.    So our top prescriber list --    19:48:42
10    Q.    Yes, ma'am.    19:48:44
11    A.    -- I don't know if that was    19:48:45
12    exclusive to Mallinckrodt product, but it was    19:48:46
13    for oxy 15 and oxy 30.    19:48:47
14    Q.    Okay.  So for the folks that    19:48:50
15    were the top prescribers of oxy 15 and    19:48:53
16    oxy 30, those could be legitimate doctors.    19:48:56
17    They could be at the top of the list; is that    19:48:58
18    right?    19:49:01
19    A.    Correct.    19:49:01
20    Q.    Or those could be people who    19:49:01
21    were operating pill mills.  They could also    19:49:03
22    be at the top of the list?    19:49:05
23    A.    Potentially, yes.    19:49:06
24    Q.    Okay.  And did Mallinckrodt    19:49:07
25    have a way of figuring that out?    19:49:11

Page 529

1    A.    When we used that list and the    19:49:12
2    review with our distributors of their    19:49:18
3    downstream registrants, again, if they    19:49:20
4    provided us the names of the top prescribers    19:49:22
5    at the pharmacy, and if that coincided with    19:49:26
6    the top prescriber list we had within the    19:49:29
7    country, we would have a detailed    19:49:32
8    conversation with the distributor about the    19:49:34
9    fact that that prescriber appeared on the    19:49:37
10    list.    19:49:40
11    Q.    So that they were a top    19:49:40
12    prescriber?    19:49:43
13    A.    Yes.    19:49:43
14    Q.    Okay.  Okay.  And so do you    19:49:44
15    know if anyone from Mallinckrodt sales team    19:49:47
16    was supposed to report signs of diversion to    19:49:52
17    you?    19:49:58
18    A.    We spoke before about the NAMs,    19:49:58
19    the narcotic -- national account managers.    19:50:00
20    Q.    Yes, ma'am.    19:50:02
21    A.    We asked them to be our    19:50:03
22    observers, and if they saw anything at any of    19:50:05
23    our customers that may appear to be a red    19:50:10
24    flag, that they would report to the company.    19:50:11
25    Q.    Okay.  And was that process the    19:50:13

Page 530

```
1   same for the sales team on the branded side?  19:50:15
2       A.   Not to my knowledge.          19:50:18
3       Q.   Okay.  Do you know if there was   19:50:21
4   any sort of suspicious order monitoring     19:50:23
5   training for the sales team on the branded   19:50:25
6   side?                            19:50:27
7       A.   I'm not certain.              19:50:27
8       Q.   Okay.  Do you know if you had a   19:50:28
9   counterpart, a suspicious order person, on   19:50:30
10  the branded side?                 19:50:35
11      A.   Did not.                  19:50:36
12      Q.   Okay.                    19:50:37
13           THE WITNESS:  I have a -- I'm   19:50:40
14  looking at the questioner's mouth a      19:50:42
15  lot, and this thing's in my way.  Can    19:50:46
16  we scoot it or something?  I'm sorry.    19:50:49
17  It's just helping me understand the     19:50:51
18  question.                      19:50:53
19           MS. HERZFELD:  That was very   19:50:54
20  thoughtful.  Thank you.             19:50:58
21           THE WITNESS:  Okay.          19:50:59
22  QUESTIONS BY MS. HERZFELD:              19:50:59
23      Q.   Did Mallinckrodt have a program   19:51:16
24  or procedure in place to connect problem   19:51:18
25  prescribers and problem pharmacies?       19:51:20
```

Page 531

```
1           MR. O'CONNOR:  Objection to    19:51:22
2   form.                          19:51:23
3           THE WITNESS:  Only to the      19:51:23
4   extent I previously described.  If we    19:51:28
5   were talking to a distributor about     19:51:30
6   their downstream sales, sales to a      19:51:33
7   downstream registrant, and if their     19:51:34
8   due diligence, the distributor's due    19:51:36
9   diligence, files contained a list of    19:51:38
10  top prescribers, we would reference     19:51:39
11  that against our listing of top        19:51:40
12  prescribers within the country.         19:51:43
13           (Mallinckrodt-Harper Exhibit 41  19:52:32
14  marked for identification.)            19:52:34
15  QUESTIONS BY MS. HERZFELD:              19:52:34
16      Q.   I'm going to mark this         19:52:34
17  next one as Exhibit 41.  And this is    19:52:35
18  MNK-T1_0007704503.  I'm sorry, it's stapled  19:52:39
19  on the bottom.                   19:52:47
20           Take a minute to take a look at  19:53:27
21  this list.  I'll represent to you that the  19:53:31
22  path it says is -- the file name is DIRJ and  19:53:33
23  pill mill physicians list, 2012, something.  19:53:36
24  It looks like the date it was last modified  19:53:49
25  was 1/16/2012.                   19:53:52
```

Page 532

```
1       Have you seen this list before?    19:53:54
2       A.   No.                     19:53:55
3       Q.   Okay.  Do you know of any list   19:53:56
4   that was kept of pill mill physicians?    19:53:59
5       A.   No.                     19:54:04
6       Q.   Okay.  Do you know what DIRJ     19:54:05
7   stands for?                      19:54:08
8       A.   No.                     19:54:08
9       Q.   Okay.  Do you have any idea who   19:54:08
10  I might ask about this document?        19:54:28
11      A.   Perhaps someone on the branded   19:54:30
12  side.                          19:54:32
13      Q.   Okay.  You suspect this has     19:54:33
14  something to do with branded, perhaps?    19:54:34
15      A.   I suspect that, yes.          19:54:36
16      Q.   Okay.  Very good then.         19:54:37
17      A.   Okay.                    19:54:39
18      Q.   Set it aside.              19:54:39
19           Oh, you know what?  Actually if  19:54:48
20  you'll take it back for one second, it looks  19:54:49
21  like they stapled it all together again.  I  19:54:51
22  don't think we have to put it as a separate  19:54:53
23  exhibit.                       19:54:54
24      A.   So are we still on 41?  Is that   19:54:54
25  correct?                        19:54:56
```

Page 533

```
1       Q.   We are.                  19:54:57
2           If you'll look at the very last   19:54:58
3   page for me, if you flip it over one, I'll   19:54:59
4   represent to you that this list here is the   19:55:03
5   same list but sorted by Tennessee.  It's got  19:55:05
6   the same Bates number.              19:55:07
7           Do any -- looking at that, do    19:55:09
8   any of those names ring a bell to you for any  19:55:13
9   suspected pill mill operations in Tennessee?  19:55:18
10      A.   No.                     19:55:20
11      Q.   Okay.  That was my last         19:55:22
12  question.  Thank you, ma'am.           19:55:22
13           (Mallinckrodt-Harper Exhibit 42  19:55:28
14  marked for identification.)            19:55:30
15  QUESTIONS BY MS. HERZFELD:              19:55:30
16      Q.   Okay.  Mark this next one as     19:55:30
17  Exhibit 42.  It is MNK-T1_00005947296.     19:55:41
18           Okay.  The file name is "IMS     19:56:02
19  high oxy 30 prescribers in January 2013."  I  19:56:06
20  will represent to you that we have modified   19:56:11
21  this list to sort it just by Tennessee.  We   19:56:12
22  haven't changed the contents of it at all.   19:56:17
23           Do you recognize this list,     19:56:20
24  ma'am?                          19:56:21
25      A.   No.                     19:56:21
```

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1    Q.   Is this the IMS data you were    19:56:24
2    talking about earlier, perhaps, looking for    19:56:26
3    physicians?    19:56:29
4    MR. O'CONNOR:  Objection to    19:56:33
5    form.    19:56:33
6    THE WITNESS:  It states IMS    19:56:33
7    data, yes, so, yes.    19:56:34
8    QUESTIONS BY MS. HERZFELD:    19:56:37
9    Q.   Okay.  Have you seen a chart    19:56:37
10   like this that you've consulted before?    19:56:39
11   A.   Perhaps.    19:56:41
12   Q.   Okay.  Do you know if you did,    19:56:47
13   if it would have been on the branded side or    19:56:49
14   the generic side?    19:56:51
15   MR. O'CONNOR:  Objection to    19:56:52
16   form.    19:56:53
17   THE WITNESS:  This would have    19:56:53
18   been the list of -- potentially the    19:56:56
19   list of high prescribers that we were    19:57:01
20   cross-referencing.  However, I don't    19:57:04
21   recall that the list was this large or    19:57:07
22   this long.    19:57:09
23   QUESTIONS BY MS. HERZFELD:    19:57:09
24   Q.   Okay.  So -- okay.  Very good.    19:57:10
25   Moving along.    19:57:17

Page 535

1    (Mallinckrodt-Harper Exhibit 43    19:57:18
2    marked for identification.)    19:57:19
3    QUESTIONS BY MS. HERZFELD:    19:57:19
4    Q.   Next one is Exhibit 43,    19:57:22
5    MNK-T1_0007704471.  And the title on this is    19:57:29
6    "IMS prescribers through January 2013," and    19:57:47
7    we have modified it just to show Tennessee.    19:57:51
8    Have you seen a chart like this    19:57:55
9    before, ma'am?    19:58:20
10   A.   A similar chart with the high    19:58:21
11   prescribers throughout the country is all I    19:58:27
12   recall seeing.    19:58:31
13   Q.   Okay.  Okay.  And if    19:58:32
14   something's in the network share drive, does    19:58:39
15   that mean it's open to everybody within the    19:58:42
16   suspicious order monitoring team to view?    19:58:44
17   A.   Yes.    19:58:46
18   Q.   Okay.  So you would have had    19:58:48
19   access to anything on the share drive?    19:58:49
20   A.   Yes.    19:58:52
21   (Mallinckrodt-Harper Exhibit 44    19:58:57
22   marked for identification.)    19:58:57
23   QUESTIONS BY MS. HERZFELD:    19:58:57
24   Q.   Okay.  Exhibit 44,    19:58:57
25   MNK-T1_0005947297.  The file name on this is    19:59:07

Page 536

1    "Prescriber list."  The date last modified is    19:59:23
2    2/1/2016 on the network share.    19:59:27
3    Have you seen this list before?    19:59:31
4    A.   No.    19:59:32
5    Q.   Do you have any idea what it    19:59:33
6    is?    19:59:34
7    A.   No.    19:59:34
8    Q.   Okay.  Do you know if it has to    19:59:35
9    do with suspicious order monitoring?    19:59:39
10   A.   No.    19:59:43
11   Q.   Okay.  I'm going to note here    19:59:43
12   on the page -- let's start with page 3, all    20:00:01
13   the way at the back.    20:00:05
14   The very top it says, "Alan    20:00:07
15   Pecorella," and the comments are "arrested on    20:00:11
16   8/23/13 on charge of possession of a    20:00:13
17   Schedule II with intent to distribute.    20:00:16
18   State, Tennessee.  On target list, Q2013.    20:00:21
19   Specialty physician assistant."    20:00:25
20   Do you see where that's at?    20:00:27
21   A.   Yes.    20:00:28
22   Q.   Okay.  And if you keep going    20:00:31
23   through a bunch of these, it has various    20:00:33
24   criminal descriptions here.    20:00:37
25   You didn't create this?    20:00:42

Page 537

1    A.   No.    20:00:42
2    Q.   Did you have someone on your    20:00:43
3    team create it?    20:00:44
4    A.   No.    20:00:45
5    Q.   Okay.  You can set that aside.    20:00:47
6    (Mallinckrodt-Harper Exhibit 45    20:01:11
7    marked for identification.)    20:01:12
8    QUESTIONS BY MS. HERZFELD:    20:01:12
9    Q.   Okay.  Just a couple more.    20:01:13
10   Okay.  I'm going to hand you what we've    20:01:22
11   marked as Plaintiff's Exhibit 45,    20:01:24
12   MNK_TNSTA02527616.  And take a look at that    20:01:35
13   for me, please.    20:01:38
14   I will submit to you that we    20:01:44
15   took the information provided to us and    20:01:45
16   sorted by state, so it's Tennessee only.    20:01:47
17   Okay.  And the title of this    20:02:02
18   document is "oxy 15," and then we'll do 30,    20:02:04
19   "sold via by month January through    20:02:08
20   December 2011."  Run -- the run, I am    20:02:11
21   guessing, is report run, 2/15/2012.    20:02:13
22   Do you see that?    20:02:16
23   A.   Yes.    20:02:17
24   Q.   Okay.  So going through this,    20:02:19
25   I'm not going to ask you 800 million    20:02:21

Page 538

1  questions, but we've sorted it by Tennessee.  20:02:25
2  So if you will go with me to the very last  20:02:29
3  page.  20:02:42
4     A.  Page 17?  20:02:42
5     Q.  Page 17, yes, ma'am.  20:02:43
6     A.  All right.  20:02:43
7     Q.  All the way down to the very  20:02:45
8  bottom line that's open, sorting it by state  20:02:46
9  and then totaling the totals for 12 months,  20:02:49
10  can you please read that number in the  20:02:52
11  corner?  20:02:54
12     A.  4,071,300.  20:02:54
13     Q.  Okay.  And do you know if those  20:03:00
14  are sales of pills or bottles?  20:03:05
15     A.  These appear to be chargeback  20:03:12
16  reports --  20:03:19
17     Q.  Yes, ma'am.  20:03:19
18     A.  -- and it would have been  20:03:19
19  dosage units.  20:03:20
20     Q.  Dosage units?  20:03:21
21     A.  Yes.  20:03:22
22     Q.  Okay.  And what is a dosage  20:03:23
23  units?  20:03:24
24     A.  A pill.  20:03:24
25     Q.  Okay.  20:03:24

Page 539

1     A.  Or a tablet or a capsule, yes.  20:03:26
2     Q.  Okay.  So when we take the  20:03:29
3  total number here, 4,071,300, that would be  20:03:30
4  pills of oxy 15 shipped to Tennessee, January  20:03:36
5  through December 2011; is that right?  20:03:41
6     A.  So the front of the chart says  20:03:43
7  "oxy 15s and 30s."  20:03:51
8     Q.  Yes, ma'am.  20:03:53
9     A.  And I just don't see -- it says  20:03:53
10  it's on separate tabs, and I don't see --  20:03:54
11     Q.  Yeah.  So this one is the sheet  20:03:54
12  for oxy 15, and I'm going to show you the  20:03:56
13  next one for oxy 30.  20:03:58
14     A.  All right.  20:03:59
15     Q.  Okay?  20:03:59
16     A.  Got it.  20:04:00
17     Q.  Okay.  So I'm going to go back  20:04:00
18  and ask my question, just to make sure I  20:04:02
19  round that out.  20:04:04
20     So the total here, 4,071,300,  20:04:04
21  that would be the number of pills of oxy 15  20:04:08
22  shipped to Tennessee, January through  20:04:12
23  December of 2011, according to this  20:04:16
24  chargeback data; is that correct?  20:04:17
25     A.  Yes.  20:04:18

Page 540

1     Q.  Okay.  Thank you.  Okay.  20:04:19
2  Moving along.  20:04:22
3     (Mallinckrodt-Harper Exhibit 46  20:04:23
4  marked for identification.)  20:04:23
5  QUESTIONS BY MS. HERZFELD:  20:04:23
6     Q.  Okay.  It's a different tab of  20:04:28
7  the same Bates number, MNK_TNSTA02527616.  20:04:29
8  Okay.  Same chart but for -- the tab for  20:04:43
9  oxy 30.  We've modified this just to  20:04:48
10  Tennessee.  20:04:50
11  And if you'll flip with me to  20:04:51
12  the very last page, if you could read the  20:04:55
13  total for me there, ma'am.  20:05:00
14     A.  12,482,100.  20:05:02
15     Q.  Okay.  So same question on --  20:05:16
16  for this chargeback sheet for -- I want to  20:05:20
17  make sure I understand it.  20:05:28
18  So that's 12,482,100 pills of  20:05:29
19  oxy 30 that were sent to Tennessee, January  20:05:34
20  through December 2011, according to the  20:05:38
21  chargeback data; is that correct, ma'am?  20:05:41
22     A.  Yes.  20:05:42
23     Q.  Okay.  Thank you very much.  20:05:43
24  You can set that aside.  20:05:45
25     Okay.  So if you add those two  20:05:52

Page 541

1  numbers -- I'll submit that the total, so you  20:05:54
2  don't have to do the math, is 16,553,400  20:05:56
3  Mallinckrodt oxy 15 and 30-milligram pills  20:06:00
4  that ended up in Tennessee in one year.  20:06:02
5  Does that sound correct?  20:06:08
6     MR. O'CONNOR:  Objection to  20:06:09
7  form.  20:06:09
8     THE WITNESS:  Yes, based upon  20:06:09
9  these reports you've shown me, yes.  20:06:10
10  QUESTIONS BY MS. HERZFELD:  20:06:12
11     Q.  Okay.  And oxy 15 and oxy 30  20:06:12
12  are not the only oxycodone products that  20:06:16
13  Mallinckrodt manufactures; is that right?  20:06:18
14     A.  Yes.  20:06:20
15     Q.  Okay.  What other products are  20:06:21
16  there?  20:06:22
17     A.  There's oxycodone  20:06:23
18  acetaminophen --  20:06:25
19     Q.  Okay.  20:06:26
20     A.  -- tablets in various  20:06:26
21  strengths, but I don't know the list of  20:06:30
22  strengths.  20:06:31
23     Q.  Okay.  And other than the  20:06:32
24  oxycodone acetaminophen and the two branded  20:06:35
25  we've discussed, Exalgo and Xartemis, do you  20:06:37

Highly Confidential - Subject to Further Confidentiality Review

Page 542

1　know any other opioid products that are　20:06:41
2　manufactured by Mallinckrodt?　20:06:42
3　　　A.　I can't be certain.　Some of　20:06:44
4　the drug substances we distribute in an oral　20:06:47
5　formulation --　20:06:51
6　　　Q.　Okay.　20:06:52
7　　　A.　-- but I don't know if　20:06:52
8　oxycodone is one of them.　20:06:52
9　　　Q.　Okay.　But so far as you know,　20:06:54
10　for oxycodone we've talked about what we　20:06:57
11　have?　20:06:59
12　　　A.　Yes.　20:06:59
13　　　Q.　Okay.　So for the oxycodone　20:06:59
14　with acetaminophen, do you know if　20:07:01
15　spreadsheets like that, like we just looked　20:07:02
16　at, if those exist for the oxycodone with　20:07:04
17　acetaminophen?　20:07:07
18　　　A.　So the chargeback data exists　20:07:08
19　for all products, but the ones we focus on　20:07:10
20　are the oxy 15s, the oxy 30s and the hydro　20:07:15
21　10s.　20:07:20
22　　　Q.　Okay.　So there wouldn't have　20:07:21
23　been a chargeback report necessarily　20:07:23
24　regularly run for oxycodone acetaminophen?　20:07:25
25　　　A.　Correct.　20:07:27

Page 543

1　　　Q.　Okay.　And you mentioned the　20:07:27
2　hydrocodone -- I say hydrocodone; you say　20:07:32
3　hydrocodone.　20:07:34
4　　　A.　That's all right.　20:07:35
5　　　Q.　I apologize for that.　20:07:35
6　　　　You mentioned the hydrocodone　20:07:37
7　10-milligram, you ran chargeback datas for　20:07:39
8　those two; is that correct?　20:07:41
9　　　A.　Yes.　20:07:45
10　　　(Mallinckrodt-Harper Exhibit 47　20:07:46
11　　　marked for identification.)　20:07:47
12　QUESTIONS BY MS. HERZFELD:　20:07:47
13　　　Q.　Okay.　I marked this one as　20:07:53
14　Exhibit 47.　Okay.　And this is　20:07:54
15　MNK_TNSTA02527625.　20:08:06
16　　　If you look at the file name　20:08:13
17　here, it says "Hydro APAP 10 shipped to and　20:08:15
18　sold via W DEA by month, January 2012 through　20:08:20
19　December 2012, all APAP."　20:08:27
20　　　Do you know what any of that　20:08:28
21　means?　20:08:30
22　　　A.　Yes.　20:08:30
23　　　Q.　Could you explain it to me,　20:08:31
24　please?　20:08:32
25　　　A.　So hydrocodone APAP, we sell　20:08:32

Page 544

1　that in various strengths.　20:08:36
2　　　Q.　Uh-huh.　20:08:38
3　　　A.　Some of the products in our　20:08:40
4　line have 5 milligrams of hydrocodone, some　20:08:42
5　have 7 and a half milligrams of hydrocodone,　20:08:46
6　and in this case it's referencing　20:08:49
7　10 milligrams of hydrocodone --　20:08:52
8　　　Q.　Okay.　20:08:53
9　　　A.　-- per pill mixed -- or with　20:08:53
10　acetaminophen contained in the pill as well.　20:08:58
11　　　Q.　Okay.　And when it says, "W　20:09:00
12　DEA," is that with DEA?　20:09:03
13　　　Do you know what that means?　20:09:06
14　　　A.　Yes, that's correct.　20:09:06
15　　　Q.　What does that mean?　20:09:07
16　　　A.　With DEA registration.　20:09:07
17　　　Q.　Oh, with DEA registration.　20:09:08
18　Okay.　20:09:10
19　　　And is the reason that the　20:09:11
20　hydro APAP 10 S was monitored with reports　20:09:13
21　like this via chargeback data because it was　20:09:20
22　susceptible to diversion?　20:09:23
23　　　MR. O'CONNOR:　Objection.　20:09:25
24　Form.　20:09:26
25　　　THE WITNESS:　We were told that　20:09:26

Page 545

1　it was a drug of concern based upon　20:09:27
2　DEA information, yes.　20:09:29
3　QUESTIONS BY MS. HERZFELD:　20:09:30
4　　　Q.　Okay.　Thank you.　20:09:31
5　　　Okay.　So looking at this　20:09:33
6　report, I want to make sure that I understand　20:09:35
7　this correctly.　And you've already answered　20:09:39
8　a lot of my questions, so that's great.　20:09:41
9　　　Okay.　If you'll go with the　20:09:43
10　total to this one on the very last page, that　20:09:45
11　total there reads -- is that -- could you　20:09:50
12　read it for me, please?　20:09:53
13　　　A.　78,184,600.　20:09:54
14　　　Q.　Okay.　And so that would be　20:10:00
15　10-milligram hydrocodone -- hydrocodone APAP　20:10:03
16　pills sold in Tennessee from January 2012 to　20:10:06
17　December 2012; is that correct?　That's what　20:10:11
18　this shows?　20:10:15
19　　　A.　The date at the top says '13.　20:10:16
20　Year 2013.　20:10:21
21　　　Q.　Well, I think that's the date,　20:10:21
22　not -- oh, where do you see?　20:10:22
23　　　A.　Here.　20:10:24
24　　　Q.　Oh, it sure does.　Maybe it's　20:10:27
25　mislabeled.　20:10:29

Highly Confidential - Subject to Further Confidentiality Review

Page 546

1 　　　　Okay. So 2013. Make sure I've　20:10:30
2 got the right chart.　　　　　20:10:33
3 　　　　Well, it sure does say 2013.　20:10:46
4 Okay. So I'm going to modify my question.　20:10:49
5 　　　　So that total there -- okay.　20:10:50
6 So that total there, 78,184,600, that is　20:10:59
7 hydro APAP pills sold in Tennessee during the　20:11:06
8 calendar year 2013. Is that correct,　20:11:10
9 according to this chart?　　　20:11:11
10 　　A. 　Those with 10 milligrams of　20:11:12
11 hydrocodone, yes.　　　　　20:11:14
12 　　Q. 　Okay. Thank you.　　20:11:15
13 　　　　Do you know why that number is　20:11:21
14 so large?　　　　　　　20:11:25
15 　　A. 　I don't have enough information　20:11:26
16 to determine whether this is a large number.　20:11:33
17 　　Q. 　Okay. Do you know how -- what　20:11:37
18 the average was of 10-milligram hydrocodone　20:11:40
19 pills being shipped to a state?　　20:11:42
20 　　A. 　No.　　　　　　20:11:44
21 　　Q. 　Okay. Do you know anything　20:11:47
22 about a Veterans Administration hospital in　20:11:48
23 Tennessee getting shipments of hydrocodone?　20:11:52
24 　　　　MR. O'CONNOR: Objection to　20:11:54
25 　　form.　　　　　　　20:11:55

Page 547

1 　　　　THE WITNESS: Not specifically,　20:11:55
2 　　no.　　　　　　　20:11:56
3 QUESTIONS BY MS. HERZFELD:　　20:11:56
4 　　Q. 　Okay. Do you know if the VA　20:11:57
5 has a warehouse in Tennessee for medication?　20:12:05
6 　　A. 　I do not know.　　　20:12:07
7 　　Q. 　Okay. Have you dealt with the　20:12:08
8 VA, Veterans Administration, at all in　20:12:12
9 supplying their medication?　　20:12:15
10 　　A. 　I know we supply the VA, but　20:12:16
11 I've not had any conversations with the VA.　20:12:18
12 　　Q. 　Okay. Was there a specific　20:12:21
13 person at Mallinckrodt whose job it would　20:12:23
14 have been to deal with the VA?　　20:12:24
15 　　A. 　Yes.　　　　　　20:12:26
16 　　Q. 　Who would that have been?　20:12:27
17 　　A. 　So she's no longer with the　20:12:28
18 company.　　　　　　　20:12:30
19 　　Q. 　Okay.　　　　　20:12:31
20 　　A. 　Her name is Trudy Nicholson.　20:12:32
21 　　Q. 　Okay. And what was Trudy　20:12:34
22 Nicholson's position?　　　　20:12:36
23 　　A. 　National account manager.　20:12:37
24 　　Q. 　Okay. And do you know what her　20:12:38
25 area was?　　　　　　　20:12:40

Page 548

1 　　A. 　VA and other government　20:12:41
2 entities.　　　　　　　20:12:44
3 　　Q. 　Okay. And do you know what　20:12:45
4 year she left?　　　　　　20:12:50
5 　　A. 　Within the past two years.　20:12:51
6 　　Q. 　Okay. Do you know if someone　20:12:53
7 has replaced her?　　　　　20:12:54
8 　　A. 　Yes.　　　　　　20:12:55
9 　　Q. 　Do you know who it is?　　20:12:56
10 　　A. 　I -- there are several new　20:12:57
11 national account managers. I barely know　20:13:00
12 their names, and I don't know their　20:13:05
13 territories.　　　　　　20:13:06
14 　　Q. 　Okay. Do you know what 867　20:13:07
15 data is?　　　　　　　20:13:11
16 　　A. 　I've heard the term, yes.　20:13:11
17 　　Q. 　Okay. Do you know what it is?　20:13:13
18 　　A. 　It has to do with chargebacks,　20:13:14
19 but other than that, it's -- I don't know.　20:13:19
20 　　　　(Mallinckrodt-Harper Exhibit 48　20:14:15
21 　　marked for identification.)　　20:14:16
22 QUESTIONS BY MS. HERZFELD:　　20:14:16
23 　　Q. 　Okay. I'll show you what we'll　20:14:10
24 mark as Plaintiff's Exhibit 48.　　20:14:14
25 Mallinckrodt -- sorry, it's　　20:14:20

Page 549

1 MNK-T1_0007717730.　　　　20:14:23
2 　　　　Take a look at this. My　20:14:31
3 question here is actually pretty simple if　20:14:41
4 you'll just take a look at it.　　20:14:44
5 　　A. 　All right.　　　　20:14:45
6 　　Q. 　Does this also appear to be a　20:14:47
7 chart of hydro APAP 10s sold for the calendar　20:14:48
8 year 2015 to the state of Tennessee?　20:14:51
9 　　A. 　Yes.　　　　　　20:14:53
10 　　Q. 　Okay. That's my only question.　20:14:54
11 　　　　Okay. And you could place any　20:14:55
12 pharmacy on the chargeback data restrictions　20:15:27
13 list; is that right?　　　　20:15:29
14 　　　　MR. O'CONNOR: Objection to　20:15:33
15 　　form.　　　　　　　20:15:34
16 　　　　THE WITNESS: Provided it was a　20:15:34
17 　　pharmacy that purchased through a　20:15:37
18 　　distributor who applied for a　20:15:39
19 　　chargeback reimbursement, yes. Yes.　20:15:41
20 QUESTIONS BY MS. HERZFELD:　　20:15:43
21 　　Q. 　Okay. And you didn't -- you　20:15:44
22 weren't required to fill any orders that　20:15:45
23 seemed suspicious?　　　　20:15:49
24 　　A. 　Correct.　　　　20:15:49
25 　　Q. 　Okay. And were you involved at　20:15:50

Highly Confidential - Subject to Further Confidentiality Review

Page 550

1  all in the review of the distributors top 40    20:15:56
2  pharmacies that began somewhere around    20:15:58
3  October of 2011?    20:16:00
4      MR. O'CONNOR: Objection to    20:16:02
5  form.    20:16:02
6      THE WITNESS: Yes.    20:16:02
7  QUESTIONS BY MS. HERZFELD:    20:16:03
8      Q.  Okay.  And that was --    20:16:03
9  Mallinckrodt reviewed the top 20 pharmacies    20:16:05
10  in Florida and the top 20 pharmacies outside    20:16:07
11  of Florida; is that correct?    20:16:11
12      A.  Yes.    20:16:12
13      Q.  Okay.  And some of those    20:16:13
14  pharmacies that were on the 20 list outside    20:16:16
15  of Florida were in Tennessee; is that right?    20:16:18
16      A.  I don't -- I don't have the    20:16:20
17  list in front of me, but I don't dispute    20:16:24
18  that.    20:16:26
19      Q.  Okay.  And which distributors    20:16:27
20  did you review?    20:16:35
21      You were involved with the    20:16:36
22  Cardinal review?    20:16:37
23      A.  Yes.    20:16:37
24      Q.  Okay.  And if I understand    20:16:40
25  things correctly, one of the things that was    20:16:43

Page 551

1  asked of the distributors was to have them    20:16:50
2  fill out a pharmacy information sheet; is    20:16:52
3  that correct?    20:16:55
4      A.  Yes.  Yes.    20:16:55
5      Q.  Okay.  And were you involved in    20:16:56
6  helping to develop those pharmacy information    20:16:58
7  sheets?    20:17:01
8      A.  Yes.    20:17:01
9      Q.  Okay.  And who else was    20:17:03
10  involved in that?    20:17:05
11      A.  It was a team effort by    20:17:05
12  suspicious order monitoring team members at    20:17:10
13  that time.    20:17:12
14      Q.  Okay.  Okay.  I think we'll go    20:17:12
15  back in our questioning just a little bit    20:17:44
16  here.    20:17:48
17      (Mallinckrodt-Harper Exhibit 49    20:17:55
18      marked for identification.)    20:17:56
19  QUESTIONS BY MS. HERZFELD:    20:17:56
20      Q.  Mark this one as Plaintiff's    20:17:56
21  Exhibit 49.  This one is labeled    20:18:00
22  MNK-T1_0004592727.    20:18:15
23      Is this your handwriting,    20:18:17
24  ma'am?    20:18:23
25      A.  Yes.    20:18:23

Page 552

1      Q.  Okay.  And you recognize it as    20:18:26
2  your handwriting?    20:18:27
3      A.  Yes.    20:18:27
4      Q.  Okay.  Great.    20:18:28
5      And it looks like yet again we    20:18:29
6  have added another document to the back of    20:18:34
7  this, if you'll bear with me for just one    20:18:36
8  second.    20:18:38
9      A.  Oh -- oh.    20:18:39
10      Q.  Yeah, it looks like it got    20:18:44
11  copied on the second back, so we're going to    20:18:45
12  ignore those pharmacy information sheets for    20:18:48
13  a minute, okay?  My apologies.    20:18:50
14      A.  All right.    20:18:53
15      Q.  Okay.  So let's just look at    20:18:53
16  this document as it is.    20:18:55
17      A.  Which page, please?    20:18:56
18      Q.  The first page.    20:18:57
19      A.  This first page?  Okay.  Yes.    20:18:57
20  Got it.    20:18:59
21      Q.  Yes, the one that ends 2727.    20:18:59
22      A.  Got it.    20:19:02
23      Q.  Is this the Cardinal top 40    20:19:02
24  oxy 30 pharmacies as of March 2012?    20:19:04
25      MS. FIX MEYER: Objection.    20:19:09

Page 553

1  Form.  Foundation.    20:19:10
2      MS. HERZFELD: I'm going to    20:19:12
3  object to your objection because    20:19:12
4  you're not a party in our case.    20:19:13
5      MS. FIX MEYER: Okay.    20:19:15
6      THE WITNESS: Yes.    20:19:16
7  QUESTIONS BY MS. HERZFELD:    20:19:19
8      Q.  Okay?  And do you see Tennessee    20:19:20
9  pharmacies on this list?    20:19:21
10      A.  Yes.    20:19:22
11      Q.  Okay.  And which pharmacies do    20:19:23
12  you see that are located in Tennessee on this    20:19:26
13  list?    20:19:28
14      A.  I see Riggs Drug.    20:19:28
15      Q.  Yes, ma'am.    20:19:31
16      A.  And, oh, Riggs Drug again.    20:19:32
17      Q.  Yes, ma'am.    20:19:38
18      A.  And Kinser drugstore.    20:19:39
19      Q.  Okay.  And do you know what    20:19:41
20  that shaded area, pharmacy 90-day review from    20:19:42
21  previous meeting, means?    20:19:46
22      A.  Yes.    20:19:47
23      Q.  What does it mean?    20:19:48
24      A.  It means we had previously    20:19:49
25  spoken to the distributor about these    20:19:54

Highly Confidential - Subject to Further Confidentiality Review

Page 554

1  pharmacies, and they were doing additional      20:19:57
2  review or performing due diligence or -- to      20:20:02
3  some extent, and that we were going to      20:20:06
4  revisit these pharmacies on our next      20:20:08
5  quarterly review.      20:20:10
6          MS. FIX MEYER: Objection.      20:20:11
7  Form. Foundation.      20:20:12
8          MS. HERZFELD: Same objection.      20:20:13
9  QUESTIONS BY MS. HERZFELD:      20:20:14
10      Q.    Pharmacies to be reviewed in      20:20:14
11  quarter 3 CY '12 is that bottom group.      20:20:16
12      What does that mean?      20:20:21
13          MS. FIX MEYER: Objection.      20:20:24
14  Form. Foundation.      20:20:25
15          MS. HERZFELD: Same objection.      20:20:25
16      I'm just going to have a      20:20:26
17  standing objection to any objections      20:20:27
18  from Cardinal's counsel. Cardinal has      20:20:29
19  not cross-noticed us in this      20:20:31
20  deposition, nor is Cardinal part of      20:20:34
21  our case. So our objection is      20:20:36
22  Cardinal doesn't have standing to      20:20:39
23  object.      20:20:40
24  QUESTIONS BY MS. HERZFELD:      20:20:41
25      Q.    You can go ahead.      20:20:41

Page 555

1      A.    So it means what it says.      20:20:42
2  These were the pharmacies that we would      20:20:45
3  discuss with Cardinal at that particular next  20:20:48
4  meeting.      20:20:52
5      Q.    Okay. And what does your      20:20:53
6  handwriting here say?      20:20:56
7      A.    It says, "Riggs not related."      20:20:57
8      Q.    Okay. And what does that mean?      20:20:59
9      A.    I do not know.      20:21:01
10      Q.    Okay. And then what does your      20:21:04
11  handwriting down below say?      20:21:05
12      A.    "Cardinal owns SPS, Specialty      20:21:07
13  Pharmacy Services."      20:21:12
14      Q.    Okay. And what does that mean?      20:21:12
15      A.    I don't know.      20:21:14
16      Q.    Okay. Do you know what      20:21:14
17  Specialty Pharmacy Services is?      20:21:17
18      A.    No.      20:21:18
19      Q.    Okay. And flip with me to the      20:21:19
20  next page.      20:21:27
21      Is that your handwriting on      20:21:28
22  this document as well?      20:21:29
23      A.    Yes.      20:21:30
24      Q.    Okay. Then we'll keep flipping  20:21:36
25  to the next one, the one that looks like      20:21:38

Page 556

1  this. This is the one that ends 59731.      20:21:40
2      Do you see that list?      20:21:47
3      A.    592731?      20:21:48
4      Q.    Yes, ma'am.      20:21:55
5      A.    Yes.      20:21:55
6      Q.    Okay. And so this is Cardinal      20:21:56
7  oxycodone 30 multi-distributor pharmacies as  20:21:58
8  of March 2012.      20:22:02
9      Did I read that correctly?      20:22:04
10      A.    Yes.      20:22:06
11      Q.    Okay. And is that your      20:22:08
12  handwriting to the right?      20:22:09
13      A.    Yes.      20:22:10
14      Q.    And what does that say?      20:22:11
15      A.    It says, "Rock 3 CAH," which is  20:22:12
16  the abbreviation for Cardinal Health,      20:22:20
17  "terminated December 2, 2011."      20:22:23
18      Q.    Okay. And then underneath      20:22:25
19  that?      20:22:27
20      A.    "Bellco picked them up."      20:22:27
21      Q.    Okay. Do you know what any of      20:22:30
22  that means?      20:22:31
23      A.    No.      20:22:32
24      Q.    Okay. And then looking at this  20:22:33
25  list, it looks like there are one, two on  20:22:35

Page 557

1  this list that are in Tennessee.      20:22:40
2      Do you see that?      20:22:41
3      A.    Just a moment, please.      20:22:42
4      Q.    Yeah, sure.      20:22:44
5      A.    Yes.      20:22:45
6      Q.    Okay. And those are Riggs in      20:22:47
7  La Follette, Tennessee, and Riggs Drug in      20:22:50
8  Powell, Tennessee; is that right?      20:22:53
9      A.    Yes.      20:22:54
10      Q.    And so they've been identified      20:22:54
11  as getting oxycodone 30 from multi --      20:22:56
12  multiple distributors; is that right?      20:22:59
13      A.    Yes.      20:23:02
14      Q.    Okay. And so looking at the      20:23:02
15  Riggs Drug, the first one in La Follette,      20:23:04
16  according to this chart it says they were      20:23:07
17  receiving oxycodone 30 from Cardinal and      20:23:09
18  Masters.      20:23:11
19          MS. FIX MEYER: Objection.      20:23:13
20  Form.      20:23:13
21  QUESTIONS BY MS. HERZFELD:      20:23:13
22      Q.    Do you see that?      20:23:14
23          MS. HERZFELD: Standing      20:23:14
24  objection.      20:23:15
25          THE WITNESS: Yes.      20:23:16

Highly Confidential - Subject to Further Confidentiality Review

Page 558

1  QUESTIONS BY MS. HERZFELD:        20:23:16
2    Q.    And then Riggs Drug in Powell,    20:23:17
3  Tennessee, it says they were receiving    20:23:21
4  oxycodone 30 from Cardinal, Masters and    20:23:23
5  HD Smith Wholesale.                20:23:26
6        MS. FIX MEYER: Same objection.    20:23:28
7        MS. HERZFELD: Same objection.     20:23:29
8  QUESTIONS BY MS. HERZFELD:         20:23:31
9    Q.    Am I reading that correctly?     20:23:31
10   A.    Yes.                    20:23:32
11   Q.    Okay. And was this report run    20:23:32
12 every year?                      20:23:40
13   A.    I'm not certain of the         20:23:41
14 frequency.                      20:23:42
15   Q.    Okay. Okay. Then the next      20:23:43
16 one, unfortunately, is really supposed to be  20:23:48
17 another exhibit.                  20:23:49
18       MS. HERZFELD: Should we just    20:23:52
19 mark it separate? Let's just mark it      20:23:53
20 separate.                       20:23:56
21       (Mallinckrodt-Harper Exhibit 50  20:23:56
22 marked for identification.)          20:23:56
23       MS. HERZFELD: Keep that.        20:23:56
24 Okay, you can put that one to the        20:23:56
25 side. Then what we'll do is make this     20:24:20

Page 559

1  the next exhibit. Okay?             20:24:22
2        Okay. So the next exhibit is     20:24:23
3  50. Mark this one as Exhibit 50.         20:24:25
4        MR. O'CONNOR: Just to be       20:24:32
5  clear, what's the Bates number on the     20:24:33
6  exhibit you're marking right now?       20:24:35
7        MS. HERZFELD: I'm going to      20:24:36
8  tell you. It's MNK-T1_0004592758 and    20:24:37
9  2756 and 2754 of this collective        20:24:49
10 exhibit.                       20:24:53
11       MR. O'CONNOR: Just observe      20:24:53
12 that it appears to skip Bates numbers,    20:24:59
13 which suggests there might be pages      20:24:59
14 missing from this document.           20:24:59
15       MS. HERZFELD: It does, and I    20:25:00
16 don't know why that is, but we'll just    20:25:02
17 move along.                     20:25:03
18       MR. O'CONNOR: Well, I would     20:25:04
19 just object to the extent this isn't a    20:25:04
20 document that's --                 20:25:06
21       MS. HERZFELD: Yeah, objection   20:25:07
22 noted.                         20:25:08
23       MR. O'CONNOR: As it's         20:25:08
24 maintained.                     20:25:11
25

Page 560

1  QUESTIONS BY MS. HERZFELD:        20:25:13
2    Q.    Can you take a look at it for    20:25:13
3  me, please?                     20:25:14
4        My first question on these is    20:25:20
5  pretty simple. Is this your handwriting?  20:25:21
6    A.    Yes.                    20:25:23
7    Q.    Okay. And when -- do you      20:25:23
8  recognize these to be pharmacy information  20:25:28
9  sheets?                        20:25:30
10   A.    Yes.                    20:25:30
11   Q.    And these are all pharmacy     20:25:30
12 information sheets for Riggs pharmacy?     20:25:32
13   A.    Yes.                    20:25:34
14   Q.    Okay. Riggs --              20:25:37
15   A.    Except the back --            20:25:37
16   Q.    Okay.                    20:25:38
17   A.    -- is some other chart.         20:25:39
18   Q.    Yeah, ignore that.            20:25:40
19   A.    Okay.                    20:25:41
20   Q.    Okay. So that would be Riggs    20:25:42
21 pharmacy in La Follette, Riggs pharmacy in   20:25:44
22 Jacksboro and Riggs pharmacy in Powell,    20:25:48
23 Tennessee; is that right?            20:25:51
24   A.    Yes.                    20:25:52
25   Q.    Okay. And looking at this,      20:25:53

Page 561

1  you've got your handwritten notes. It goes  20:25:55
2  through, it looks like, portions of the    20:25:57
3  pharmacy information sheet.           20:25:59
4        Where did you get this          20:26:00
5  information?                    20:26:02
6    A.    In a conversation with a        20:26:06
7  wholesaler. It's not identified here.     20:26:09
8    Q.    Okay. And you would agree with  20:26:12
9  me in those three pages of your handwritten  20:26:14
10 notes about the various Riggs that not every  20:26:16
11 section of your pharmacy information sheet is  20:26:21
12 filled out; is that correct?          20:26:24
13   A.    Correct.                  20:26:24
14   Q.    Okay. And did Mallinckrodt, to   20:26:26
15 your knowledge, ever do any site visits at   20:26:29
16 any of these three Riggs pharmacies?      20:26:32
17   A.    Not to my knowledge.           20:26:34
18   Q.    Okay. And do you have any      20:26:34
19 recollection of any conversations about the  20:26:35
20 Riggs pharmacies at all?             20:26:37
21   A.    This pharmacy information sheet  20:26:40
22 would have been the product of a discussion.  20:26:42
23   Q.    Okay. Other than what's        20:26:45
24 written down in your handwritten notes on    20:26:47
25 these pharmacy information sheets, do you    20:26:50

Page 562

1 recall anything about those Riggs pharmacies? 20:26:52
2      A.    No.                    20:26:54
3      Q.    Okay.                  20:26:55
4          (Mallinckrodt-Harper Exhibit 51    20:27:22
5      marked for identification.)      20:27:23
6 QUESTIONS BY MS. HERZFELD:          20:27:23
7      Q.    Okay. I'm going to hand you    20:27:23
8 what we'll mark as Exhibit 51,      20:27:26
9 MNK_TNSTA05350336.                 20:27:36
10         Okay. Do you recognize this    20:27:43
11 document?                          20:27:46
12     A.    Yes.                    20:27:46
13     Q.    Okay. What does it appear to    20:27:47
14 be?                                20:27:49
15     A.    Pharmacy information sheet on    20:27:49
16 Riggs Drug again.                  20:27:54
17     Q.    Okay. And this is the Riggs    20:27:54
18 Drug in La Follette, Tennessee; is that    20:27:56
19 right?                             20:27:59
20     A.    Yes.                    20:27:59
21     Q.    Okay. And that's date    20:27:59
22 10/12/11?                          20:28:02
23     A.    Yes.                    20:28:02
24     Q.    Okay. And if you'll look down    20:28:03
25 here at the notes, it says, "Other notes:    20:28:04

Page 563

1 Explanation of 800 RX total per day. PIC    20:28:06
2 said increases due to physicians switching    20:28:11
3 from hydrocodone APAP mix due to liver    20:28:13
4 concerns."                          20:28:17
5          Do you know where that    20:28:18
6 information was obtained?            20:28:19
7      A.    I do not know.          20:28:20
8          Well, the information would    20:28:25
9 have been provided by Cardinal Health.    20:28:28
10     Q.    Okay. And did you do anything    20:28:30
11 to verify the information provided to you by    20:28:32
12 Cardinal Health?                   20:28:34
13     A.    No.                    20:28:35
14     Q.    Okay. And did anyone in    20:28:37
15 Mallinckrodt, to your knowledge, do anything    20:28:39
16 to verify the information provided by    20:28:40
17 Cardinal Health?                   20:28:42
18     A.    No.                    20:28:42
19     Q.    Okay. Okay. So then the next    20:28:44
20 sentence says, "Near Riggs Medical Center and    20:28:46
21 St. Mary's Hospital."              20:28:49
22         Do you see where it says that?    20:28:52
23     A.    Yes.                    20:28:54
24     Q.    Okay. You obtained that    20:28:54
25 information from Cardinal Health?    20:28:55

Page 564

1      A.    Yes.                    20:28:57
2      Q.    Okay. Riggs Medical Center.    20:28:58
3 Do you know if a Riggs Medical Center exists?    20:29:03
4      A.    I do not.               20:29:05
5      Q.    Okay. Did you do anything to    20:29:06
6 verify whether a Riggs Medical Center exists?    20:29:08
7      A.    No.                    20:29:11
8      Q.    Okay. What about St. Mary's    20:29:12
9 Hospital? It says, "near Riggs Medical    20:29:15
10 Center and St. Mary's Hospital."    20:29:18
11         Do you know how near this    20:29:19
12 pharmacy was to St. Mary's Hospital?    20:29:21
13         MR. O'CONNOR: Objection to    20:29:24
14     form.                      20:29:24
15         THE WITNESS: No.          20:29:24
16 QUESTIONS BY MS. HERZFELD:          20:29:29
17     Q.    Okay. Do you know where La    20:29:29
18 Follette, Tennessee, is?            20:29:32
19     A.    No.                    20:29:32
20     Q.    Do you know where St. Mary's    20:29:33
21 Hospital is?                       20:29:34
22     A.    No.                    20:29:34
23     Q.    If St. Mary's Hospital is    20:29:35
24 45 miles away in Knoxville from La Follette,    20:29:43
25 is that information you would have wanted to    20:29:47

Page 565

1 have known?                        20:29:49
2          MR. O'CONNOR: Objection to    20:29:49
3     form.                      20:29:49
4          THE WITNESS: It's a piece of    20:29:54
5     information, but I don't know how many    20:29:55
6     other medical centers, how many other    20:29:57
7     pharmacies, were within that 45 miles.    20:29:59
8     So it would have been an additional    20:30:03
9     piece of information, but not    20:30:05
10     conclusive.                20:30:07
11 QUESTIONS BY MS. HERZFELD:          20:30:07
12     Q.    Okay. But that's information    20:30:08
13 you would have liked to have had in    20:30:09
14 evaluating this pharmacy?            20:30:11
15         MR. O'CONNOR: Objection to    20:30:12
16     form.                      20:30:13
17         THE WITNESS: We -- it wasn't    20:30:13
18     always provided to us, the proximity    20:30:17
19     of the pharmacy to a hospital, so we    20:30:19
20     took this information as Cardinal    20:30:22
21     represented it to us.      20:30:25
22 QUESTIONS BY MS. HERZFELD:          20:30:27
23     Q.    When you hear "near Riggs    20:30:28
24 Medical Center and St. Mary's Hospital,"    20:30:33
25 would you consider near to be 45 miles away?    20:30:35

Highly Confidential - Subject to Further Confidentiality Review

Page 566

1    MR. O'CONNOR: Objection to        20:30:37
2    form.                            20:30:38
3        THE WITNESS: I don't know La    20:30:38
4    Follette, Tennessee, to know if -- in    20:30:41
5    Missouri, some of the health care    20:30:44
6    centers are hundreds of miles away    20:30:45
7    from where a patient may live and the    20:30:48
8    pharmacy from which they may obtain    20:30:52
9    their prescriptions, so I don't have    20:30:54
10   enough information to answer.        20:30:57
11   QUESTIONS BY MS. HERZFELD:        20:30:58
12   Q.    Okay. But you didn't do    20:30:58
13   anything to check that out, did you?    20:30:59
14   A.    No.                    20:31:00
15   Q.    Okay. And then it says,    20:31:02
16   "Another Riggs drugstore is located in    20:31:03
17   Powell, Tennessee, with oxy 30 milligram    20:31:06
18   year-to-date of approximately 170,000."    20:31:09
19       Do you see that?            20:31:13
20   A.    Yes.                20:31:13
21   Q.    Okay. Did that concern you at    20:31:16
22   all, that there was another Riggs pharmacy so    20:31:18
23   close with that number?            20:31:21
24       MR. O'CONNOR: Objection to    20:31:24
25   form.                        20:31:25

Page 567

1        THE WITNESS: I don't see on    20:31:25
2    this pharmacy information sheet a    20:31:28
3    disposition in terms of whether we    20:31:30
4    restricted chargebacks to the sale    20:31:35
5    of -- of pharmaceuticals to any of    20:31:39
6    these Riggs Drug's facilities.        20:31:40
7        I can tell you it was a topic    20:31:43
8    of conversation with Cardinal, but I    20:31:45
9    don't know the disposition.        20:31:46
10   QUESTIONS BY MS. HERZFELD:        20:31:47
11   Q.    Okay. If you look down at the    20:31:48
12   bottom there, it says, "Result, take off list    20:31:49
13   and honor chargebacks. Requested site visit    20:31:51
14   with 90 days. Low CS percentage is    20:31:54
15   mitigating factor."                20:31:57
16       Do you see that?            20:31:58
17   A.    Yes.                20:31:59
18   Q.    Okay. And so that would be the    20:31:59
19   result from the Mallinckrodt side; is that    20:32:02
20   correct?                    20:32:04
21       MR. O'CONNOR: Objection to    20:32:04
22   form.                        20:32:05
23       THE WITNESS: Yes.            20:32:05
24   QUESTIONS BY MS. HERZFELD:        20:32:09
25   Q.    Okay. When it says "take off    20:32:09

Page 568

1    list," what does that mean?        20:32:13
2    A.    Well, I'd like to clarify the    20:32:15
3    previous information.            20:32:17
4    Q.    Yes, ma'am.            20:32:18
5    A.    I don't know who filled this    20:32:19
6    out.                        20:32:19
7    Q.    Okay.                20:32:19
8    A.    I don't know if it was us or    20:32:20
9    Cardinal --                    20:32:20
10   Q.    Okay.                20:32:20
11   A.    -- because Cardinal was a great    20:32:21
12   collaborative partner. And so as time went    20:32:23
13   on, as opposed to us writing these things in    20:32:26
14   hand, Cardinal would come prepared to    20:32:28
15   conversations or meetings or tell -- or    20:32:30
16   transmit these pharmacy information sheets to    20:32:32
17   us.                        20:32:35
18   Q.    Okay.                20:32:35
19   A.    So I don't know who typed this    20:32:36
20   disposition.                    20:32:42
21   Q.    Okay. Do you know if Riggs was    20:32:43
22   ever put on a chargeback list?        20:32:44
23   A.    I -- yes.            20:32:46
24   Q.    Why don't we look at the list.    20:32:49
25   A.    All right.            20:32:51

Page 569

1    Q.    I'll find it.            20:32:51
2        Would Cardinal have had the    20:32:53
3    ability to tell Mallinckrodt what to put on    20:32:55
4    or take off of a chargeback list?        20:32:57
5        MS. FIX MEYER: Objection.    20:32:59
6    Form.                        20:33:00
7        MR. O'CONNOR: Objection to    20:33:00
8    form.                        20:33:01
9        MS. HERZFELD: Same objection.    20:33:01
10   QUESTIONS BY MS. HERZFELD:        20:33:06
11   Q.    Did Cardinal have that ability?    20:33:06
12   A.    They had -- no, not the    20:33:08
13   ability.                    20:33:13
14   Q.    Okay. Would they make        20:33:13
15   recommendations?                20:33:15
16   A.    Yes.                20:33:15
17   Q.    Okay. And would you follow the    20:33:17
18   recommendations?                20:33:19
19   A.    Yes.                20:33:19
20   Q.    Would you do any independent    20:33:20
21   research to verify their recommendations?    20:33:25
22   A.    I don't -- it would have been    20:33:27
23   situational.                    20:33:33
24   Q.    Okay. I'm going to show you    20:33:35
25   Exhibit 36, which is the chargeback list, and    20:33:38

Highly Confidential - Subject to Further Confidentiality Review

Page 570

1  please let me know if you see Riggs on there,  20:33:42
2  please.  20:33:44
3      A.  I do not.  20:33:44
4      Q.  Okay.  So if Riggs was ever  20:33:47
5  placed on a chargeback list on  20:33:49
6  Mallinckrodt -- by Mallinckrodt, it should  20:33:51
7  appear on the chargeback list; is that  20:33:52
8  correct?  20:33:54
9          MR. O'CONNOR:  Objection to  20:33:54
10  form.  20:33:55
11          THE WITNESS:  Yes.  20:33:55
12  QUESTIONS BY MS. HERZFELD:  20:33:58
13      Q.  Okay.  Okay.  You can set that  20:33:58
14  aside.  20:34:07
15          (Mallinckrodt-Harper Exhibit 52  20:34:57
16  marked for identification.)  20:34:57
17  QUESTIONS BY MS. HERZFELD:  20:34:57
18      Q.  I'm going to show what we'll  20:34:58
19  mark as Exhibit 51?  2?  20:35:00
20          MR. O'CONNOR:  It's 52.  20:35:03
21          MS. HERZFELD:  52?  Thank you.  20:35:06
22  QUESTIONS BY MS. HERZFELD:  20:35:06
23      Q.  This is MNK_TNSTA05353270.  20:35:14
24  Take a look at that for me, please, ma'am.  20:35:26
25          Do you recognize this as the  20:35:45

Page 571

1  summary report for the Cardinal Health  20:35:46
2  suspicious order monitoring audit conducted  20:35:49
3  March 5th through 6th in 2012 in Ohio?  20:35:51
4      A.  Yes.  20:35:53
5      Q.  Okay.  Did you create this  20:35:54
6  document?  20:35:55
7      A.  I don't recall.  20:35:55
8      Q.  Okay.  Looking through it, it  20:35:58
9  says on March 5th, a total of 19 pharmacies  20:36:02
10  located in Florida were reviewed.  20:36:04
11          If you look at the second page,  20:36:06
12  page ending in 53271, a total of 20  20:36:16
13  pharmacies located in non-Florida states were  20:36:22
14  reviewed.  Of the 20, 11 pharmacies have had  20:36:26
15  controlled substance sales restricted by  20:36:28
16  Cardinal.  20:36:28
17          Do you see where that is?  20:36:29
18      A.  Yes.  20:36:30
19      Q.  Okay.  And do you see the list  20:36:30
20  that says non-Florida, non-restricted?  20:36:36
21      A.  Yes.  20:36:41
22      Q.  And what is the one at the  20:36:41
23  bottom there?  20:36:42
24      A.  Riggs Drug.  20:36:42
25      Q.  Okay.  And if you go up two,  20:36:43

Page 572

1  that's Max Pharmacy; is that right?  20:36:44
2      A.  Yes.  20:36:47
3      Q.  Do you know where that's  20:36:47
4  located?  20:36:48
5      A.  No.  20:36:48
6      Q.  Okay.  And then Kinser drug  20:36:49
7  store.  20:36:54
8          Do you see that?  20:36:54
9      A.  Yes.  20:36:55
10      Q.  Okay.  And is Kinser drug store  20:36:55
11  listed in Tennessee?  20:36:57
12      A.  I know the name came up within  20:36:59
13  the course of this deposition.  I'm getting  20:37:00
14  so muddled, I don't know.  I'm sorry.  20:37:02
15      Q.  That's fine.  Okay.  And I  20:37:04
16  think those are my only questions on that  20:37:06
17  document.  20:37:07
18      A.  Okay.  20:37:08
19      Q.  Let's put it aside.  20:37:08
20          Okay.  We'll just go through  20:38:39
21  these next three pretty quickly.  20:38:42
22          (Mallinckrodt-Harper Exhibit 53  20:38:44
23  marked for identification.)  20:38:44
24  QUESTIONS BY MS. HERZFELD:  20:38:44
25      Q.  Number 53, MNK_TNSTA00612651.  20:38:44

Page 573

1          Do you recognize this document  20:39:05
2  as a pharmacy information sheet?  20:39:15
3      A.  Yes.  20:39:17
4      Q.  Do you know if it was filled  20:39:17
5  out by Mallinckrodt or by Cardinal?  20:39:18
6      A.  I do not know.  20:39:21
7          MS. FIX MEYER:  Objection.  20:39:22
8          MS. HERZFELD:  Okay.  Same  20:39:23
9  standing objection.  20:39:25
10  QUESTIONS BY MS. HERZFELD:  20:39:25
11      Q.  Okay.  And it talks about the  20:39:26
12  volume of oxycodone sales to this location;  20:39:28
13  is that correct?  20:39:30
14      A.  Yes.  20:39:30
15      Q.  Okay.  And then at the bottom  20:39:33
16  it says, "Describe physical location and  20:39:34
17  description of pharmacy.  Standalone building  20:39:37
18  on main two-lane road.  Services rural  20:39:40
19  community.  In residential town in Campbell  20:39:44
20  County."  20:39:46
21          Did I read that correctly?  20:39:46
22      A.  Yes.  20:39:47
23      Q.  Okay.  And did Mallinckrodt do  20:39:47
24  anything to verify that information?  20:39:50
25      A.  No.  20:39:51

Highly Confidential - Subject to Further Confidentiality Review

Page 574

1  (Mallinckrodt-Harper Exhibit 54  20:39:53
2  marked for identification.)  20:39:53
3  QUESTIONS BY MS. HERZFELD:  20:39:53
4  Q.  Okay.  Okay.  I'm handing you  20:39:54
5  Exhibit 54, MNK_TNSTA00607869.  20:40:14
6  Do you recognize this as a  20:40:21
7  pharmacy information sheet dated 11/30/2012  20:40:23
8  for the Riggs Drug in La Follette, Tennessee?  20:40:29
9  A.  Yes.  20:40:33
10  Q.  Okay.  And do you know if  20:40:33
11  someone from Mallinckrodt filled this out or  20:40:35
12  somebody from Cardinal filled it out?  20:40:39
13  MR. O'CONNOR:  Objection to  20:40:41
14  form.  20:40:41
15  MS. FIX MEYER:  Objection.  20:40:43
16  THE WITNESS:  No.  20:40:43
17  QUESTIONS BY MS. HERZFELD:  20:40:43
18  Q.  Okay.  And could you please  20:40:43
19  read to me what it says and describe the  20:40:44
20  physical description and location of the  20:40:45
21  pharmacy?  20:40:46
22  A.  "La Follette, Tennessee, is a  20:40:48
23  small town of 7,926 located northwest of  20:40:50
24  Knoxville.  The pharmacy is located in a  20:40:55
25  spacious standalone building with a large  20:40:58

Page 575

1  parking area.  It shares a small amount of  20:41:01
2  space with a medical clinic, which is in the  20:41:03
3  process of moving to a larger building.  The  20:41:06
4  pharmacy is located on the primary business  20:41:10
5  street and the state highway through town."  20:41:13
6  Q.  Okay.  And down at the bottom,  20:41:16
7  the notes, could you read that for me,  20:41:18
8  please?  20:41:21
9  A.  Yes.  20:41:21
10  "All Riggs 15/30s capped.  Have  20:41:22
11  stopped prescribing for certain docs.  Per  20:41:28
12  Cardinal Health" -- that's the abbreviation  20:41:31
13  for Cardinal Health -- "they believe  20:41:38
14  Jacksboro store has made progress.  One store  20:41:42
15  fills 12,000 scripts per month, another fills  20:41:44
16  5,000."  20:41:48
17  Q.  Okay.  So the information  20:41:50
18  that's included in the physical location  20:41:51
19  about the size of La Follette, Tennessee, and  20:41:53
20  description of the building, that's  20:41:58
21  information that was known to Mallinckrodt;  20:41:59
22  is that correct?  20:42:02
23  MR. O'CONNOR:  Objection to  20:42:02
24  form.  20:42:03
25  THE WITNESS:  Yes.  20:42:03

Page 576

1  QUESTIONS BY MS. HERZFELD:  20:42:03
2  Q.  Okay.  And then when it says,  20:42:04
3  "notes, all Riggs have been capped," talking  20:42:06
4  about per Cardinal Health, they believe the  20:42:08
5  Jacksboro store has made progress, Cardinal  20:42:10
6  is being referred to as "they."  20:42:13
7  So do you believe that note was  20:42:14
8  made by somebody at Mallinckrodt?  20:42:16
9  MR. O'CONNOR:  Objection to  20:42:18
10  form.  20:42:19
11  THE WITNESS:  Yes.  20:42:19
12  QUESTIONS BY MS. HERZFELD:  20:42:19
13  Q.  Okay.  And so do you know  20:42:20
14  anything about Riggs 15 and 30s being capped?  20:42:23
15  A.  It says it here, but I don't  20:42:27
16  recall.  20:42:29
17  Q.  Okay.  And what does it mean to  20:42:29
18  cap someone at 15 and 30s?  20:42:30
19  A.  It means a limit was placed on  20:42:35
20  the amount of oxycodone 15s and 30s that a  20:42:38
21  particular pharmacy could receive from a  20:42:41
22  distributor.  20:42:45
23  Q.  Okay.  And why would -- why  20:42:45
24  would that happen?  Why would a cap be put  20:42:47
25  on?  20:42:49

Page 577

1  A.  So this is part of Cardinal's  20:42:49
2  program, and I can't answer the question.  20:42:53
3  Q.  Okay.  When it says, "They  20:42:55
4  believe the Jacksboro store has made  20:42:57
5  progress.  One store fills 12,000 scripts per  20:43:00
6  month, another fills 5,000," does that mean  20:43:03
7  that the numbers went down?  20:43:06
8  MR. O'CONNOR:  Objection to  20:43:07
9  form.  20:43:07
10  THE WITNESS:  I don't know.  20:43:07
11  QUESTIONS BY MS. HERZFELD:  20:43:08
12  Q.  Okay.  Do you know if you had a  20:43:08
13  concern about diversion from these Riggs  20:43:11
14  pharmacies in Campbell County?  20:43:15
15  MR. O'CONNOR:  Objection to  20:43:17
16  form.  20:43:18
17  THE WITNESS:  So by virtue of  20:43:18
18  the fact we had a pharmacy information  20:43:20
19  sheet, it means we discussed these  20:43:22
20  pharmacies with Cardinal and any other  20:43:25
21  distributor that was selling to them.  20:43:27
22  So it was a point of discussion for  20:43:29
23  further review.  20:43:34
24  QUESTIONS BY MS. HERZFELD:  20:43:34
25  Q.  Okay.  So there was discussion  20:43:35

Highly Confidential - Subject to Further Confidentiality Review

Page 578

1  about whether there was potential diversion  20:43:37
2  at these Riggs pharmacies?  20:43:39
3      A.   Yes.  20:43:42
4      Q.   Okay.  And at no time did  20:43:43
5  Mallinckrodt do chargeback restrictions for  20:43:48
6  Riggs pharmacies, according to that chart we  20:43:51
7  saw; is that correct?  20:43:54
8      MR. O'CONNOR:  Objection to  20:43:54
9  form.  20:43:55
10     THE WITNESS:  So, yes, and I  20:43:55
11  misspoke when I said that we had.  20:43:57
12  According to that, Riggs  20:44:00
13  pharmacies were not restricted --  20:44:02
14 QUESTIONS BY MS. HERZFELD:  20:44:03
15     Q.   Okay.  20:44:03
16     A.   -- from chargeback processing.  20:44:04
17     Q.   Okay.  And so that means, to  20:44:05
18  your knowledge, Riggs pharmacies could  20:44:07
19  continue to receive oxycodone 15 and 30s?  20:44:09
20     A.   Yes.  20:44:13
21     Q.   Okay.  Thank you.  20:44:15
22     (Mallinckrodt-Harper Exhibit 55  20:44:18
23  marked for identification.)  20:44:18
24 QUESTIONS BY MS. HERZFELD:  20:44:18
25     Q.   Okay.  55, marking Plaintiff's  20:44:42

Page 579

1  Exhibit 55 here.  It's MNK_TNSTA00612647.  20:45:06
2  Take a look at this for me, please.  20:45:15
3      The file name for this document  20:45:44
4  is "Riggs pharmacies all sales run  20:45:45
5  11/30/2012"; is that correct?  20:45:49
6      A.   Yes.  20:45:50
7      Q.   Did you create this document?  20:45:51
8      A.   No.  20:45:52
9      Q.   Did you direct that it be  20:45:53
10  created?  20:45:56
11     A.   I'm not certain.  20:45:58
12     Q.   Okay.  Okay.  If you'll look  20:46:00
13  with me on page 3.  20:46:19
14     A.   I'm sorry.  Oh, yes.  20:46:24
15     Q.   Do you see that?  20:46:25
16     A.   Yes.  Yes.  20:46:26
17     Q.   Okay.  Does this appear to be a  20:46:27
18  report based on chargeback data to you,  20:46:28
19  ma'am?  20:46:30
20     A.   Yes.  20:46:30
21     Q.   Okay.  And it appears to be a  20:46:31
22  report about the Riggs Drug stores in -- the  20:46:32
23  Riggs Drug stores we were discussing; is that  20:46:39
24  correct?  Jacksboro, La Follette and Powell?  20:46:43
25     A.   So the cover says Riggs  20:46:48

Page 580

1  pharmacies, but I don't see that there's --  20:46:53
2  oh, yes, I do see an identifier on the  20:46:56
3  spreadsheet itself.  Yes, Riggs pharmacies.  20:46:59
4      Q.   Okay.  Great.  20:47:00
5      In looking here, it's kind of  20:47:01
6  hard to review it all.  One, two -- if you  20:47:09
7  look on page 3, down at the bottom, the  20:47:12
8  orange line, it says, "Oxycodone 30-milligram  20:47:35
9  tablets."  20:47:38
10     Do you see where I'm at?  20:47:39
11     A.   Yes.  20:47:40
12     Q.   Okay.  And it indicates that  20:47:41
13  Cardinal Health shipped 292,600 oxycodone  20:47:44
14  30-milligram tablets to Riggs Drug in La  20:47:52
15  Follette, Tennessee, in the calendar year  20:47:56
16  2012; is that correct?  20:48:00
17     A.   So the data began November  20:48:01
18  of 2011.  20:48:08
19     Q.   Oh, you are correct.  20:48:08
20     So from November 2011 to  20:48:10
21  November 2012?  20:48:14
22     A.   Yes.  20:48:15
23     Q.   Okay.  And then it says  20:48:17
24  HD Smith shipped 30 milligrams of oxycodone  20:48:18
25  to that same Riggs location, 1,200 tablets.  20:48:24

Page 581

1      Am I reading that correctly?  20:48:29
2      A.   Yes.  20:48:32
3      Q.   Okay.  Okay.  Staying on page 3  20:48:32
4  with me there, the last blue line, it says  20:49:02
5  oxycodone 15-milligram tablets here for the  20:49:07
6  same Riggs store in La Follette, Tennessee.  20:49:08
7      Do you see where I am now?  20:49:10
8      A.   Yes.  20:49:12
9      Q.   Okay.  And it says that  20:49:12
10  Cardinal Health shipped 84,000 tablets during  20:49:13
11  that same time period; is that correct?  20:49:15
12     A.   Yes.  20:49:17
13     Q.   Okay.  So if you add those two  20:49:20
14  together, I submit to you that would be  20:49:27
15  377,600 Mallinckrodt-made oxycodone  20:49:31
16  15-milligram and 30-milligram tablets going  20:49:37
17  to that one pharmacy in that period of  20:49:39
18  November 2011 to November 2012.  20:49:43
19     Does that sound correct?  20:49:46
20     MR. O'CONNOR:  Objection to  20:49:47
21  form.  20:49:48
22     THE WITNESS:  Yes.  20:49:48
23 QUESTIONS BY MS. HERZFELD:  20:49:48
24     Q.   Okay.  And that's just to one  20:49:49
25  pharmacy, not to what was sent to that  20:49:56

Highly Confidential - Subject to Further Confidentiality Review

Page 582

1   county; is that right?                20:49:58
2        MR. O'CONNOR: Object to form.   20:49:59
3        THE WITNESS: Yes.               20:50:01
4   QUESTIONS BY MS. HERZFELD:           20:50:01
5     Q.  Okay.  Does that number seem   20:50:02
6   too high to you?                     20:50:05
7        MR. O'CONNOR: Object to form.   20:50:06
8        THE WITNESS: A number is one    20:50:07
9   of the indicators we use.  High?  I  20:50:10
10  don't have enough information to      20:50:16
11  compare other states to this          20:50:19
12  particular statistics or other        20:50:23
13  pharmacies, so I can't answer.        20:50:25
14  QUESTIONS BY MS. HERZFELD:            20:50:26
15    Q.  Okay.  So you'd have to have    20:50:27
16  that information in order to be able to make  20:50:28
17  a determination as to whether the number was  20:50:30
18  too high relatively?                  20:50:32
19    A.  Well, "too high" is a relative  20:50:33
20  term, again, so it would be a number that  20:50:37
21  merited further review.               20:50:41
22    Q.  Okay.                          20:50:43
23    A.  Potentially, yes.              20:50:43
24    Q.  And so the types of things that  20:50:44
25  you would want to know in order to make that  20:50:45

Page 583

1   determination would be population?    20:50:47
2     A.  That could be --               20:50:51
3        MR. O'CONNOR: Form.             20:50:52
4        THE WITNESS: -- one piece of    20:50:53
5   information.                         20:50:55
6   QUESTIONS BY MS. HERZFELD:           20:50:55
7     Q.  Okay.  And what about the      20:50:55
8   percent of an aging population of the area?  20:50:58
9     A.  No.                           20:51:02
10    Q.  That's not something you'd want  20:51:04
11  to consider?                         20:51:05
12    A.  Oh, I -- it wasn't a part of   20:51:05
13  our program.                         20:51:09
14    Q.  Okay.  What about nearness to  20:51:10
15  hospitals or other medical facilities; would  20:51:14
16  you want to know that information?    20:51:16
17    A.  Not routinely.                 20:51:18
18    Q.  Okay.                         20:51:22
19    A.  No.                           20:51:22
20    Q.  Okay.  So what types of other  20:51:23
21  information would you need besides just pure  20:51:25
22  number in order to be able to make a  20:51:27
23  determination if a pharmacy was -- was  20:51:30
24  processing suspicious orders?         20:51:33
25       MR. O'CONNOR: Objection to      20:51:34

Page 584

1   form.                                20:51:35
2        THE WITNESS: So the factors     20:51:35
3   listed on the pharmacy information    20:51:38
4   sheet, oxycodone compared to other    20:51:40
5   opioids being dispensed, percent      20:51:46
6   oxycodone 15, 30, relative to other   20:51:50
7   oxy products, and the other factors,  20:51:52
8   including a physical and -- in a      20:51:56
9   physical location and a description of  20:52:02
10  the pharmacy.                        20:52:04
11  QUESTIONS BY MS. HERZFELD:           20:52:04
12    Q.  Okay.  And what types of       20:52:04
13  physical locations would cause you concern?  20:52:05
14       MR. O'CONNOR: Objection to      20:52:09
15  form.                                20:52:11
16       THE WITNESS: I don't -- I       20:52:11
17  don't know offhand.                  20:52:15
18  QUESTIONS BY MS. HERZFELD:           20:52:15
19    Q.  Okay.  Okay.  So the things on  20:52:16
20  the list is what you would consider, on the  20:52:21
21  pharmacy information sheet checklist?  20:52:22
22    A.  Yes.                          20:52:24
23    Q.  Okay.  Is there anything       20:52:25
24  outside of the information, the questions  20:52:26
25  you've got contained in the pharmacy  20:52:29

Page 585

1   information sheet checklist, that you would  20:52:30
2   consider when determining whether a pharmacy  20:52:32
3   may be engaging in diversion?        20:52:35
4     A.  So a Google report would prompt  20:52:38
5   further review.  Those are the factors that  20:52:44
6   come to mind.                        20:52:46
7     Q.  Okay.  But a Google report, if  20:52:47
8   it comes up, right, it's generally going to  20:52:49
9   be when there's been a drug bust at a  20:52:52
10  pharmacy after the fact; is that right?  20:52:54
11       MR. O'CONNOR: Objection to      20:52:55
12  form.                                20:52:56
13       THE WITNESS: Yes.  Yes.         20:52:56
14  QUESTIONS BY MS. HERZFELD:           20:53:00
15    Q.  Okay.  Okay.  If you'll take   20:53:01
16  the same sheet with me, we're going to just  20:53:07
17  spend another minute with it.  And if you'll  20:53:10
18  flip with me to the one that's page 4.  20:53:15
19       If you'll go down to the part   20:53:22
20  that's highlighted in orange.  I guess that's  20:53:24
21  orange.                              20:53:27
22    A.  Oh, I'm sorry.  I'm on the     20:53:28
23  wrong page.                          20:53:30
24    Q.  That's okay.  Page 4.          20:53:30
25    A.  All right.                    20:53:36

Highly Confidential - Subject to Further Confidentiality Review

Page 586

1    Q.    At the top it should say Riggs    20:53:37
2  Drug in Jacksboro, Tennessee.    20:53:39
3        Do you see where I'm at?    20:53:42
4    A.    Yes.    20:53:43
5    Q.    Okay.  And then the orange all    20:53:44
6  the way down at the bottom.    20:53:46
7    A.    Yes.    20:53:47
8    Q.    Okay.  So it says oxycodone    20:53:47
9  30-milligram tablets, and then it would be    20:53:49
10  139,400 tablets were supplied to this    20:53:51
11  pharmacy, Riggs, in Jacksboro, Tennessee, by    20:53:56
12  Cardinal Health in the time period of    20:53:59
13  November 2011 through November of 2012.    20:54:01
14        Did I read that correctly?    20:54:04
15    A.    Yes.    20:54:05
16    Q.    Okay.  And if you go one line    20:54:06
17  up, it talks about oxycodone 15-milligram    20:54:09
18  tablets shipped to that Jacksboro Riggs.    20:54:12
19        That's 38,700; is that correct?    20:54:16
20    A.    Yes.    20:54:19
21    Q.    Okay.  And so if you total    20:54:20
22  that, that would be 178,100 Mallinckrodt    20:54:21
23  oxycodone pills going to that one pharmacy in    20:54:26
24  that time period; is that correct?    20:54:30
25    A.    Yes.    20:54:31

Page 587

1    Q.    Okay.  And the rest of these    20:54:33
2  numbers on there, those are the other    20:54:40
3  controlled substance Mallinckrodt products;    20:54:44
4  is that correct?    20:54:47
5    A.    Yes.    20:54:47
6    Q.    Okay.  And many of those are    20:54:48
7  opioids as well; is that right?    20:54:51
8    A.    Yes.    20:54:52
9    Q.    Is methylphenidate an opioid?    20:54:53
10    A.    Yes.    20:54:59
11    Q.    Okay.  So is everything on this    20:54:59
12  list an opioid?    20:55:01
13    A.    Yes.    20:55:02
14    Q.    Okay.  So if you total all of    20:55:02
15  the opioids then, the Mallinckrodt opioids,    20:55:03
16  sent to Riggs Drug in Jacksboro, Tennessee,    20:55:05
17  during this time period, that would be    20:55:07
18  279,570 Mallinckrodt opioids shipped to this    20:55:10
19  pharmacy during that period of time, I submit    20:55:14
20  to you.    20:55:17
21        Does that seem like a lot of    20:55:18
22  opioids to one pharmacy to you?    20:55:20
23    A.    So I'm sorry.  You're saying    20:55:23
24  that you did the math --    20:55:25
25    Q.    Yes, ma'am.    20:55:25

Page 588

1    A.    -- and added all these?    20:55:26
2    Q.    Yes, ma'am.    20:55:27
3    A.    Okay.  All right.    20:55:27
4    Q.    I'm not going to make you vouch    20:55:27
5  for my math.    20:55:29
6    A.    Okay.    20:55:30
7    Q.    But if I tell you that that    20:55:30
8  totals to 279,570 --    20:55:30
9    A.    Yes.    20:55:30
10    Q.    -- does that seem like a lot    20:55:36
11  Mallinckrodt opioids to go to one pharmacy to    20:55:38
12  you?    20:55:39
13    A.    No, not necessarily.    20:55:39
14    Q.    You would want to look at the    20:55:40
15  factors that are on the pharmacy information    20:55:42
16  sheet; is that right?    20:55:44
17    A.    Yes.    20:55:44
18    Q.    And the Google Alerts; is that    20:55:44
19  right?    20:55:47
20    A.    Yes, and have a conversation    20:55:47
21  with the distributor, yes.    20:55:49
22    Q.    Okay.  Do you know anything    20:55:50
23  about Jacksboro, Tennessee?    20:55:51
24    A.    No.    20:55:53
25    Q.    Okay.  Do you know if Jacksboro    20:55:54

Page 589

1  and La Follette are in the same county?    20:56:01
2    A.    No.    20:56:02
3    Q.    What if I told you they are?    20:56:03
4  They're in Campbell County, Tennessee.    20:56:04
5        Have you ever heard of Campbell    20:56:06
6  County, Tennessee?    20:56:09
7    A.    No.    20:56:09
8    Q.    Okay.  Do you know anything    20:56:10
9  about Campbell County, Tennessee?    20:56:10
10    A.    No.    20:56:12
11    Q.    Has Campbell County, Tennessee,    20:56:12
12  ever been a topic of discussion during your    20:56:14
13  professional time at Mallinckrodt?    20:56:16
14    A.    Not that I recall.    20:56:17
15    Q.    Okay.    20:56:19
16        MR. O'CONNOR:  We're on the    20:56:38
17  12-hour mark.  Are you almost done?    20:56:39
18        MS. HERZFELD:  I am so almost    20:56:43
19  done.    20:56:44
20        MR. O'CONNOR:  Okay.    20:56:44
21        MS. HERZFELD:  I have, I    20:56:44
22  think -- I have two very quick charts    20:56:45
23  and then like three tiny things to ask    20:56:47
24  her about.  Like I'm probably ten    20:56:49
25  minutes.    20:56:51

Highly Confidential - Subject to Further Confidentiality Review

Page 590

1    Do you want to take a break?    20:56:52
2        MR. O'CONNOR: Not if it's    20:56:54
3    going to be ten minutes.    20:56:55
4        MS. HERZFELD: I think it's    20:56:56
5    going to be ten minutes.    20:56:57
6        MR. O'CONNOR: Okay.    20:56:57
7        MS. HERZFELD: I think it's    20:56:57
8    going to be ten minutes. I will try    20:56:58
9    very hard not to lie to you. Okay.    20:56:59
10       MR. O'CONNOR: It's always    20:57:02
11   appreciated.    20:57:04
12       (Mallinckrodt-Harper Exhibit 56    20:57:05
13   marked for identification.)    20:57:06
14   QUESTIONS BY MS. HERZFELD:    20:57:06
15       Q.   I will hand you what I'm    20:57:07
16   marking as Plaintiff's Exhibit 56. This is    20:57:08
17   MNK_TNSTA25 -- I'm sorry, 02527616.    20:57:14
18       This is -- the title is "Oxy 15    20:57:23
19   and 30 shipped to and sold to via month,    20:57:28
20   January through December 2011." And it looks    20:57:31
21   like the report was run 2/15/2012.    20:57:34
22       I will submit to you that we    20:57:37
23   have condensed this just to Campbell County.    20:57:40
24       Okay. So if you take a look at    20:58:01
25   this list, I think you'll notice La Follette    20:58:03

Page 591

1    that we've been talking about and also    20:58:05
2    Jacksboro, which we've already discussed; is    20:58:06
3    that right?    20:58:09
4        A.   Yes.    20:58:09
5        Q.   Okay. And this chart appears    20:58:10
6    to show you chargeback data to the various    20:58:11
7    pharmacies during the period of January 2011    20:58:13
8    through December 2011; is that correct?    20:58:19
9        A.   Yes.    20:58:23
10       Q.   Okay. And we haven't talked at    20:58:26
11   all about a place called Jellico.    20:58:29
12       Have you ever heard of Jellico,    20:58:31
13   Tennessee?    20:58:32
14       A.   No.    20:58:33
15       Q.   Okay. Okay. On this list I    20:58:33
16   think you'll recognize we've got the three    20:58:39
17   Riggs Drugs right at the top, right?    20:58:41
18       A.   Yes.    20:58:42
19       Q.   Okay. Riggs Drug in La    20:58:43
20   Follette and Riggs Drug in Jacksboro.    20:58:46
21       A.   Yes.    20:58:53
22       Q.   Okay. Do you know how many    20:58:54
23   people live in Jellico, Tennessee?    20:59:07
24       A.   No.    20:59:10
25       Q.   Okay. And this spreadsheet is    20:59:11

Page 592

1    for the oxy 15s. Do you see that?    20:59:15
2        I'll show you the oxy 30s next.    20:59:19
3        A.   Yes.    20:59:22
4        Q.   Okay. And if you look at this    20:59:22
5    spreadsheet, you've got Jellico one, two,    20:59:24
6    three, four times.    20:59:27
7        Let's look at the first one.    20:59:27
8    Jellico Drugs.    20:59:30
9        Do you see that?    20:59:31
10       A.   Yes.    20:59:31
11       Q.   And it looks like Jellico Drugs    20:59:31
12   was getting stuff from AmerisourceBergen --    20:59:33
13   getting oxycodone 15 from AmerisourceBergen    20:59:35
14   and Masters; is that correct?    20:59:39
15       A.   Yes.    20:59:40
16       Q.   Okay. So during that time    20:59:46
17   period, it looks like Jellico Drugs received    20:59:48
18   14,400 oxycodone 15 tablets from Masters; is    20:59:51
19   that right?    20:59:57
20       A.   Yes.    20:59:57
21       Q.   And then 12,200 from    20:59:58
22   AmerisourceBergen?    21:00:00
23       A.   Yes.    21:00:01
24       Q.   Okay. And if you go down to    21:00:02
25   the others, you have the Rite Aid,    21:00:04

Page 593

1    number 1935 in Jellico. They received 2500    21:00:08
2    oxycodone 15; is that correct?    21:00:13
3        A.   Yes.    21:00:15
4        Q.   Okay. And then the last one is    21:00:19
5    the family drug center in Jellico by Cardinal    21:00:20
6    Health, and it looks like they received 300    21:00:23
7    oxy 15s; is that right?    21:00:28
8        A.   Yes.    21:00:29
9        Q.   Okay. So if you add all that    21:00:29
10   together, I'll submit to you that that's    21:00:31
11   about 29,400 oxycodone 15s for the town of    21:00:33
12   Jellico.    21:00:40
13       Does that sound right?    21:00:40
14       A.   I have not done the math, but    21:00:41
15   if you say it's true, we'll go with it.    21:00:45
16       (Mallinckrodt-Harper Exhibit 57    21:00:49
17   marked for identification.)    21:00:51
18   QUESTIONS BY MS. HERZFELD:    21:00:51
19       Q.   Okay. I'm going to hand you    21:00:51
20   what's marked as Plaintiff's Exhibit 56? 6?    21:00:53
21       A.   This was 56.    21:00:55
22       Q.   Oh, 57. I left my -- I'll just    21:00:56
23   do another one. 57.    21:01:03
24       Okay. This is the tab -- hold    21:01:04
25   on. It looks like I'm missing one, so you    21:01:13

Highly Confidential - Subject to Further Confidentiality Review

Page 594

1  might have lucked out. Okay. It appears       21:01:27
2  that I'm missing the one for the oxy 30.       21:01:45
3  Okay.                                           21:01:51
4         Did you ever run the numbers           21:01:52
5  for the total number of Mallinckrodt          21:01:58
6  oxycodone products going to Campbell County,  21:02:00
7  Tennessee?                                     21:02:04
8     A.   I do not know.                         21:02:04
9     Q.   Okay. I'm going to...                  21:02:07
10        Okay. I'm going to mark you --          21:02:45
11 I'm going to hand you what we've marked as     21:02:46
12 Plaintiff's Exhibit 57.                        21:02:48
13        Okay. Could you read the file           21:02:50
14 name of this document for me, please, ma'am?  21:02:58
15    A.   "Hydro APAP 10s shipped to and         21:03:00
16 sold via by month, January 2015 through        21:03:04
17 December 2015, 325 milligrams APAP."           21:03:08
18    Q.   Okay. Great.                           21:03:15
19        Okay. I'm going to back up for          21:03:15
20 a second, if you'll set this aside, and we'll  21:03:21
21 talk about it in just a second. I skipped      21:03:23
22 some questions.                                21:03:25
23        Going back to our discussion            21:03:26
24 about Campbell County, do you know what        21:03:27
25 Campbell County's population was in 2010?      21:03:33

Page 595

1     A.   No.                                    21:03:35
2     Q.   Do you know if Mallinckrodt has        21:03:35
3  ever looked specifically at the number of      21:03:37
4  pills it sends to the various counties in      21:03:40
5  Tennessee?                                     21:03:42
6         MR. O'CONNOR: Objection.                21:03:42
7  Form.                                          21:03:43
8  QUESTIONS BY MS. HERZFELD:                     21:03:43
9     Q.   Have you looked by county?             21:03:44
10    A.   I do not know.                          21:03:45
11    Q.   Okay. Did you run any                   21:03:45
12 chargeback reports by county on a routine      21:03:49
13 basis with Tennessee?                          21:03:50
14    A.   No.                                     21:03:51
15    Q.   Okay. What about towns?                 21:03:51
16    A.   The reports can be sorted by           21:03:54
17 towns --                                       21:03:57
18    Q.   Okay.                                   21:03:58
19    A.   -- but not specific to                 21:03:58
20 Tennessee towns.                               21:04:02
21    Q.   Okay. Okay. Had you -- were            21:04:03
22 you aware that in 2015 Campbell County         21:04:09
23 prescribed the third highest morphine          21:04:13
24 equivalent milligrams per capita annually in   21:04:17
25 the country?                                   21:04:19

Page 596

1     A.   No.                                    21:04:19
2     Q.   Is that a list that                    21:04:19
3  Mallinckrodt would look at?                     21:04:21
4         MR. O'CONNOR: Objection to             21:04:22
5  form.                                          21:04:24
6         THE WITNESS: Not within the            21:04:24
7  scope of suspicious order monitoring.          21:04:25
8  QUESTIONS BY MS. HERZFELD:                     21:04:28
9     Q.   Okay. So if the CDC lists             21:04:28
10 counties with the highest prescribing of       21:04:31
11 opioids per capita, is that something you       21:04:34
12 would consult in your job in suspicious order   21:04:36
13 monitoring?                                     21:04:38
14    A.   No.                                     21:04:38
15    Q.   Okay. Think it would be               21:04:40
16 helpful?                                        21:04:44
17        MR. O'CONNOR: Objection to             21:04:44
18 form.                                          21:04:45
19        THE WITNESS: We use various            21:04:45
20 pieces of information at various               21:04:46
21 times, so I can't compare and contrast         21:04:49
22 one thing is more helpful than the             21:04:53
23 other.                                          21:04:56
24 QUESTIONS BY MS. HERZFELD:                     21:04:56
25    Q.   Okay. I think you looked              21:04:57

Page 597

1  before at the chargeback data list, the        21:05:03
2  chargeback restriction list, Exhibit 36.       21:05:05
3  It's Mallinckrodt's chargeback restriction     21:05:09
4  list. If you would take a look at that for      21:05:10
5  me for one more second.                         21:05:14
6         Are you aware of the number of          21:05:16
7  pharmacies that were on that list, how many    21:05:19
8  have been subject of law enforcement action?  21:05:21
9     A.   No.                                     21:05:23
10    Q.   Okay. Are you aware if any of          21:05:24
11 the reinstated pharmacies on that list have     21:05:26
12 been subject of law enforcement action?        21:05:31
13    A.   No.                                     21:05:32
14    Q.   Okay. And do you know if the           21:05:33
15 pharmacies on that list, that were placed on    21:05:35
16 that list, were placed on before or because     21:05:37
17 of -- I'm sorry, I'm going to back up. I'm     21:05:40
18 going to strike that question. We're going     21:05:43
19 to start over.                                  21:05:44
20        Do you know of the pharmacies           21:05:45
21 that were placed on that Mallinckrodt           21:05:48
22 chargeback restriction list, how many of        21:05:50
23 those restricted pharmacies were placed on      21:05:55
24 after law enforcement action?                  21:05:58
25    A.   No.                                     21:06:00

Highly Confidential - Subject to Further Confidentiality Review

Page 598

1    Q.   Okay. You can set it aside,          21:06:00
2  please.                                     21:06:02
3         Have you ever heard of Clay          21:06:03
4  County, Tennessee?                          21:06:08
5    A.   No.                                  21:06:09
6    Q.   Do you know what the population      21:06:09
7  is of Clay County, Tennessee?               21:06:10
8    A.   No.                                  21:06:12
9    Q.   Okay. Has there been any             21:06:12
10 discussion in your professional capacity at 21:06:15
11 Mallinckrodt having to do with Clay County, 21:06:16
12 Tennessee?                                  21:06:19
13   A.   Not that I recall.                   21:06:19
14   Q.   Okay. If you'll take a look at       21:06:21
15 Exhibit 57 for me, please, ma'am.           21:06:23
16        Okay. You've already                 21:06:25
17 identified this document. I will submit to  21:06:27
18 you that we've modified it to show only the 21:06:29
19 town of Celina, Tennessee.                  21:06:33
20        If you'll flip to the page, do       21:06:34
21 you recognize this as chargeback data, ma'am? 21:06:37
22   A.   Yes.                                 21:06:40
23   Q.   Okay. Looking at this               21:06:40
24 chargeback data, does it indicate to you that 21:06:41
25 Rite Aid number 2494 in Celina, Tennessee,  21:06:43

Page 599

1  through McKesson, received 87,000           21:06:55
2  Mallinckrodt hydro APAP 10s?                21:06:59
3    A.   Yes.                                 21:07:05
4    Q.   Okay. And then Anderson              21:07:06
5  Hometown Pharmacy received 500 hydro APAP 10s 21:07:10
6  through McKesson; is that right?            21:07:14
7    A.   Yes.                                 21:07:15
8    Q.   Okay. And then Cumberland            21:07:15
9  River Hospital, also in Celina, Tennessee,  21:07:18
10 through Cardinal received 200 hydro APAP 10s; 21:07:21
11 is that right?                              21:07:24
12   A.   Yes.                                 21:07:24
13   Q.   Okay. And that shows, if you        21:07:25
14 total it -- and I think this math is a little 21:07:28
15 easier -- that's 87,700 hydro APAP 10s sent 21:07:30
16 to Celina, Tennessee, that were Mallinckrodt 21:07:38
17 between January 2015 and December of 2015; is 21:07:42
18 that correct?                               21:07:45
19   A.   Yes.                                 21:07:45
20   Q.   Okay. Did you know that the         21:07:47
21 town of Celina, Tennessee, is -- population 21:07:48
22 is 1,379 people?                            21:07:51
23   A.   No.                                  21:07:54
24   Q.   Do you think that's an              21:07:55
25 appropriate number of hydro APAP 10s to be  21:07:56

Page 600

1  going to a town with 1,379 people?          21:08:01
2        MR. O'CONNOR: Objection to            21:08:04
3    form.                                     21:08:05
4        THE WITNESS: I don't have             21:08:05
5    enough information to answer.              21:08:06
6  QUESTIONS BY MS. HERZFELD:                  21:08:09
7    Q.   Okay. And the information that       21:08:09
8  you would want would be the information     21:08:11
9  that's contained on that pharmacy information 21:08:12
10 sheet that we talked about earlier?         21:08:14
11   A.   Part of the information, yes.        21:08:16
12   Q.   Okay. And the other                  21:08:20
13 information would be information that you get 21:08:21
14 from the Google Alerts; is that right?      21:08:23
15   A.   Potentially.                         21:08:25
16   Q.   Okay. And is there any other        21:08:27
17 information you can think of that you'd want 21:08:28
18 to know to make that decision?              21:08:30
19   A.   So let's circle back, please.       21:08:31
20   Q.   Sure.                               21:08:33
21   A.   We're talking about Celina,         21:08:33
22 Tennessee.                                  21:08:35
23   Q.   Yes, ma'am.                         21:08:35
24   A.   And what's -- what's the            21:08:36
25 question again, please?                     21:08:37

Page 601

1    Q.   The question was if you thought      21:08:38
2  that was an appropriate number of hydro APAP 21:08:40
3  pills to be going to that town.            21:08:46
4    A.   Okay. And I said I can't            21:08:48
5  answer. I don't have enough information.    21:08:50
6    Q.   And so then I said you'd want       21:08:50
7  the information on the pharmacy information  21:08:51
8  sheet that we talked about before in order to 21:08:53
9  make that determination?                    21:08:54
10   A.   Yes, as one of the factors,         21:08:55
11 yes.                                        21:08:59
12   Q.   And one of the other factors        21:08:59
13 would be the information that you gleaned    21:09:00
14 from Google Alerts?                          21:09:01
15   A.   Yes.                                 21:09:02
16   Q.   Okay. And is there any other        21:09:03
17 information that you would feel you need to   21:09:04
18 consult?                                    21:09:08
19   A.   Any other information provided      21:09:08
20 to us by the distributors.                  21:09:14
21   Q.   Okay.                               21:09:16
22   A.   But, no, nothing other than         21:09:16
23 that.                                       21:09:19
24   Q.   Okay. You can set that aside,       21:09:20
25 please, ma'am. Okay. Done with charts.      21:09:21

Highly Confidential - Subject to Further Confidentiality Review

Page 602

1　(Mallinckrodt-Harper Exhibit 58　21:09:26
2　marked for identification.)　21:09:27
3　QUESTIONS BY MS. HERZFELD:　21:09:27
4　Q.　Okay.　Number 58.　If you'll　21:09:35
5　take a look at this for me, please.　21:09:49
6　　　Could you please read the　21:09:59
7　title?　21:09:59
8　A.　"DEA investigators seeking　21:10:00
9　answers in small Tennessee town."　21:10:05
10　Q.　And what does it say after　21:10:08
11　that?　21:10:10
12　A.　There's a header.　21:10:10
13　Q.　Yes, ma'am.　21:10:13
14　A.　Drug Enforcement　21:10:14
15　Administration.　21:10:15
16　Q.　Okay.　So this is a press　21:10:15
17　release coming from the Drug Enforcement　21:10:16
18　Administration?　21:10:18
19　A.　Yes.　21:10:18
20　Q.　Okay.　And then under that it　21:10:19
21　says, "Rural Clay County pharmacies 2017　21:10:26
22　purchases from distributors totaled more than　21:10:28
23　1 million pills."　21:10:30
24　　　Do you see that?　21:10:31
25　A.　Yes.　21:10:31

Page 603

1　Q.　Okay.　And then the date line,　21:10:32
2　what is the city and state that it indicates?　21:10:35
3　A.　Celina, Tennessee.　21:10:37
4　Q.　And then if you could　21:10:39
5　read the first sentence for me, please?　21:10:40
6　A.　"DEA investigators this week　21:10:41
7　conducted inspections at several pharmacy　21:10:45
8　locations in the Clay County, Tennessee,　21:10:47
9　town" -- pardon me -- "of Celina following an　21:10:52
10　inquiry into irregular patterns of pill　21:10:56
11　purchases from drug distribution companies."　21:10:58
12　Q.　Okay.　You can stop there.　21:11:03
13　　　Were you aware of this DEA　21:11:05
14　investigation?　21:11:07
15　A.　No.　21:11:07
16　Q.　Okay.　Thank you, ma'am.　You　21:11:07
17　can set that aside.　21:11:09
18　　　Okay.　In 2017, did you start　21:11:20
19　working on pulling Tennessee order reports?　21:11:25
20　　　MR. O'CONNOR:　Objection.　21:11:27
21　Form.　21:11:28
22　　　THE WITNESS:　I don't know.　21:11:28
23　　　(Mallinckrodt-Harper Exhibit 59　21:11:35
24　marked for identification.)　21:11:36
25

Page 604

1　QUESTIONS BY MS. HERZFELD:　21:11:36
2　Q.　Okay.　I'm going to hand you　21:11:36
3　what I'm going to mark as Exhibit 59,　21:11:48
4　MNK-TN_000642 -- no, 6462195.　21:11:52
5　　　These all got jammed together,　21:12:01
6　guys.　Sorry.　21:12:05
7　　　If you'll look with me all the　21:12:07
8　way down to...　21:12:09
9　　　You don't have to read the　21:12:26
10　whole thing, but if you look where Tom --　21:12:30
11　Thomas Duffel -- three-quarters of the way　21:12:34
12　down the page?　21:12:35
13　A.　Yes.　21:12:36
14　Q.　And he, it looks like, sends an　21:12:36
15　e-mail to you on September 11, 2017, and　21:12:37
16　Debbie Dingle {sic}.　21:12:40
17　　　Do you see that?　21:12:42
18　A.　Yes.　21:12:42
19　Q.　And the subject is regarding　21:12:43
20　need listing of all current and past narcotic　21:12:46
21　SKUs.　21:12:48
22　　　Do you see that?　21:12:49
23　A.　Yes.　21:12:49
24　Q.　Okay.　And so his e-mail to you　21:12:50
25　and Debbie is, "Karen/Debbie, just to make　21:12:53

Page 605

1　sure, I'm sending a list of the items that we　21:12:57
2　used to pull the most recent Tennessee orders　21:13:00
3　report.　I'm assuming that the list will　21:13:02
4　remain constant as we have requests like　21:13:04
5　these.　Please let me know if there are any　21:13:07
6　issues.　Thank you."　21:13:09
7　　　Did I read that correctly?　21:13:13
8　A.　Yes.　21:13:13
9　Q.　Okay.　Do you know what he's　21:13:14
10　talking about?　21:13:16
11　A.　Yes.　21:13:16
12　Q.　Okay.　What he's talking about?　21:13:16
13　A.　He's determining that he has　21:13:17
14　the list of all opioid products to pull this　21:13:20
15　report and other reports.　21:13:22
16　Q.　For Tennessee orders?　21:13:24
17　A.　In this case, yes.　21:13:25
18　Q.　Okay.　And do you know why he　21:13:28
19　was pulling Tennessee orders?　21:13:29
20　A.　No.　21:13:30
21　Q.　You don't?　21:13:31
22　A.　No.　21:13:32
23　Q.　Okay.　Was -- did anybody ever　21:13:32
24　talk to you about pulling Tennessee orders?　21:13:36
25　A.　Clearly they did, but this　21:13:37

Highly Confidential - Subject to Further Confidentiality Review

Page 606

1  could have been a request by -- by counsel.  21:13:41
2      Q.   Okay.  Can you think of any     21:13:51
3  other reason there would have been a request  21:13:53
4  to pull Tennessee numbers?     21:13:55
5      A.   A subpoena, request from      21:13:57
6  counsel, those type of things.     21:14:03
7      Q.   Okay.              21:14:04
8      A.   Yes.              21:14:04
9      Q.   Okay.              21:14:08
10     (Mallinckrodt-Harper Exhibit 60   21:14:17
11  marked for identification.)     21:14:21
12     MR. O'CONNOR:  For the record,    21:14:21
13  I think we're closing in on      21:14:22
14  20 minutes.            21:14:24
15     MS. HERZFELD:  Oh, my gosh,     21:14:24
16  really?  I thought I was doing so     21:14:25
17  well.  I'm so sorry.  So close.     21:14:28
18  QUESTIONS BY MS. HERZFELD:        21:14:32
19     Q.   Okay.  I'm going to hand you     21:14:34
20  60, and I think there's only one after this   21:14:35
21  one.               21:14:37
22     Okay.  I'm going to hand you      21:14:38
23  what's been marked as Plaintiff's Exhibit 60,  21:14:40
24  and that is MNK-T1_0007185456.  Okay.  It is  21:14:45
25  a two-page document.          21:15:03

Page 607

1      Do you recognize this as an     21:15:04
2  e-mail chain between you and David Widder?   21:15:05
3      A.   Yes.              21:15:08
4      Q.   Dated over the course of June   21:15:10
5  2017?               21:15:14
6      A.   Yes.              21:15:14
7      Q.   Okay.  Who is David Widder?   21:15:16
8      A.   He -- he was another person to   21:15:18
9  whom my group reported.         21:15:22
10     Q.   Okay.  What was his position?   21:15:24
11     A.   His title has changed over     21:15:25
12  time, but he's in -- supply chain is the name  21:15:28
13  of his group.          21:15:31
14     Q.   Okay.  And so if you'll go down  21:15:33
15  with me, it looks like David Widder is saying  21:15:35
16  to you in the second e-mail down, Wednesday,  21:15:40
17  June 14, 2017, "No worries.  If we can     21:15:43
18  complete by the end of the week, we'll be in   21:15:46
19  a good spot.  The DEA meeting prep and     21:15:47
20  Tennessee matter are both more pressing."   21:15:51
21     Do you see that?        21:15:53
22     A.   Yes.              21:15:54
23     Q.   And he is responding to you --  21:15:55
24  it's an e-mail, it looks like, earlier that   21:15:58
25  day?               21:16:03

Page 608

1      A.   Yes.              21:16:07
2      Q.   Okay.  "David, that will take   21:16:08
3  an additional day or two to complete.  You'll  21:16:13
4  have it no later than Friday COB.  I'm     21:16:14
5  waiting on slide input from David Hunter.   21:16:15
6  Don has slammed me last night and today with  21:16:18
7  work for the Tennessee matter and DEA meeting  21:16:19
8  prep.  Sorry."           21:16:21
9      What is the Tennessee matter?    21:16:22
10     A.   So I don't know specifically    21:16:24
11  what the Tennessee matter is or was.     21:16:27
12     Q.   Okay.  What was the DEA meeting  21:16:31
13  prep?               21:16:33
14     A.   I don't know.  I don't recall.  21:16:34
15     Q.   Okay.  All right.  And have you  21:16:36
16  read the complaint in the Tennessee matter?  21:16:48
17     A.   No.              21:16:50
18     Q.   Okay.  But it was sent to you;  21:16:51
19  is that right?          21:16:54
20     A.   I'm not certain of that.      21:16:54
21     (Mallinckrodt-Harper Exhibit 61   21:16:57
22  marked for identification.)     21:16:58
23  QUESTIONS BY MS. HERZFELD:        21:16:58
24     Q.   I'm going to give you our very   21:17:04
25  last exhibit, which is 61.  I'm handing you  21:17:05

Page 609

1  what is marked as Plaintiff's Exhibit 61.   21:17:17
2      Okay.  This appears to be an     21:17:19
3  e-mail from Don Lohman and John Gillies and   21:17:28
4  you dated June 14, 2017; is that right?    21:17:33
5      A.   Yes.              21:17:35
6      Q.   Okay.  And it says, filed     21:17:39
7  complaint 6/13/2017, and this was e-mailed to  21:17:42
8  you 6/14/2017; is that right?     21:17:47
9      A.   Yes, I see that.        21:17:48
10     Q.   Okay.  And I just copied the   21:17:49
11  first page of our complaint because it's     21:17:51
12  really super long.          21:17:52
13     A.   Okay.              21:17:53
14     Q.   Did you ever read it?       21:17:54
15     A.   No.              21:17:55
16     Q.   Okay.  You received it, but you  21:17:56
17  didn't read it?          21:17:58
18     A.   It's clear that I received it.   21:17:58
19  I don't recall receiving it, and I don't     21:18:00
20  recall reading it.          21:18:02
21     Q.   Okay.  And so when we were     21:18:03
22  talking before about the Tennessee matter,   21:18:04
23  could it have been the filing of our      21:18:06
24  complaint that was the matter?     21:18:09
25     MR. O'CONNOR:  Objection to     21:18:10

Highly Confidential - Subject to Further Confidentiality Review

Page 610

1    form.                              21:18:10
2         THE WITNESS: I can't answer    21:18:10
3    that question.                     21:18:11
4    QUESTIONS BY MS. HERZFELD:         21:18:11
5         Q.   You can't answer because you   21:18:12
6    don't know or because it's privileged?   21:18:13
7         A.   Oh, because I don't know.   21:18:14
8         Q.   Oh, okay.  Very good.    21:18:16
9         A.   Sorry.                   21:18:20
10        MS. HERZFELD: Okay. I don't   21:18:27
11   think I have any other questions.   21:18:28
12        MR. O'CONNOR: Excellent. Can   21:18:30
13   we go off the record?             21:18:32
14        VIDEOGRAPHER: We are going off   21:18:33
15   the record at 9:18 p.m.           21:18:34
16   (Off the record at 9:18 p.m.)     21:18:36
17        VIDEOGRAPHER: We are back on   21:19:09
18   the record at 9:19 p.m.           21:19:15
19        CROSS-EXAMINATION             21:19:19
20   QUESTIONS BY MR. O'CONNOR:        21:19:19
21        Q.   Ms. Harper, considering the   21:19:20
22   hour, I'll keep this very brief.  Just a few   21:19:20
23   questions.                        21:19:23
24        Earlier today you testified    21:19:23
25   about the scope of information provided   21:19:25

Page 611

1    through chargeback requests.       21:19:27
2         Do you generally recall        21:19:28
3    testifying on that issue?         21:19:30
4         A.   Yes.                     21:19:31
5         Q.   I just want to ask a few   21:19:32
6    questions so the record is clear on this.   21:19:37
7         Does chargeback data allow      21:19:39
8    Mallinckrodt visibility into all the sales of   21:19:41
9    its products made by distributor customers?   21:19:43
10        A.   No.                      21:19:48
11        Q.   Do all distributor customers   21:19:48
12   submit chargeback information?     21:19:52
13        A.   Yes.                     21:19:53
14        Q.   Do all customers of       21:19:54
15   Mallinckrodt product submit chargeback   21:19:56
16   requests?                         21:19:59
17        A.   No.                      21:20:01
18        Q.   And of those Mallinckrodt   21:20:03
19   customers that do from time to time submit   21:20:05
20   chargeback requests, do they submit   21:20:08
21   chargeback requests for every order they   21:20:12
22   receive?                          21:20:16
23        MR. KO: Object to the form.   21:20:16
24        THE WITNESS: I don't know the   21:20:17
25   answer.                           21:20:19

Page 612

1    QUESTIONS BY MR. O'CONNOR:        21:20:19
2         Q.   Okay.  For those companies that   21:20:20
3    submit chargeback requests, are all orders   21:20:22
4    that those companies receive reflected in   21:20:26
5    those requests?                   21:20:28
6         A.   No.                      21:20:30
7         Q.   Okay.  Mallinckrodt        21:20:32
8    manufactures methylphenidate, correct?   21:20:39
9         A.   Yes.                     21:20:44
10        Q.   Do you know what          21:20:45
11   methylphenidate is used to treat?   21:20:46
12        A.   Attention-deficit/hyperactivity   21:20:48
13   disorder.                         21:20:52
14        Q.   Okay.  Is it used to treat   21:20:52
15   pain, as far as you know?         21:20:54
16        A.   I do not know.           21:20:56
17        Q.   Okay.  Is methylphenidate an   21:20:56
18   opioid?                           21:21:00
19        A.   It's a, yes, a synthetic   21:21:01
20   opioid, yes.                      21:21:03
21        Q.   It's a synthetic opioid.  Okay.   21:21:03
22        And do you have any scientific   21:21:10
23   background on which you're basing that   21:21:11
24   statement?                        21:21:16
25        A.   No scientific background, no.   21:21:16

Page 613

1         Q.   Just a few minutes ago you   21:21:17
2    discussed with Ms. Herzfeld a number of   21:21:21
3    charts, including those labeled -- or marked   21:21:26
4    Exhibits 40 through 57, roughly.   21:21:30
5         Do you remember the charts I'm   21:21:33
6    referring to?                     21:21:34
7         A.   Yes.                     21:21:35
8         Q.   Okay.  And many of those charts   21:21:38
9    purported to reflect chargeback data; is that   21:21:44
10   your understanding?               21:21:47
11        A.   Yes.                     21:21:48
12        Q.   Do you have any independent   21:21:49
13   recollection of the chargeback numbers that   21:21:53
14   you saw in any of those charts?   21:21:58
15        A.   No.                      21:22:00
16        Q.   So from time to time when you   21:22:02
17   indicated to Ms. Herzfeld that you thought   21:22:07
18   certain numbers were correct, did you have   21:22:09
19   any basis for saying that other than seeing   21:22:11
20   those numbers on the page -- on the document   21:22:14
21   that she provided you?            21:22:17
22        MS. HERZFELD: Object to the   21:22:17
23   form.                             21:22:19
24        THE WITNESS: No.              21:22:19
25

Page 614

1  QUESTIONS BY MR. O'CONNOR:          21:22:20
2      Q.  With respect to any numbers       21:22:21
3  that you indicated to Ms. Herzfeld that were   21:22:24
4  correct, do you have any basis to believe   21:22:27
5  that they were correct aside from -- aside   21:22:29
6  from the numbers on the document?       21:22:31
7          MS. HERZFELD:  Object to the    21:22:33
8      form.                       21:22:34
9          THE WITNESS:  No.            21:22:34
10         MR. O'CONNOR:  What's the       21:22:35
11     objection?                   21:22:37
12         MS. HERZFELD:  It's convoluted.  21:22:38
13 QUESTIONS BY MR. O'CONNOR:          21:22:42
14     Q.  Okay.  Do you recall responding  21:22:42
15 to Ms. Herzfeld that certain numbers she   21:22:43
16 presented to you were -- appeared to be   21:22:47
17 correct?                      21:22:48
18     A.  Yes.                    21:22:49
19     Q.  With respect to those numbers,   21:22:49
20 do you have any independent basis to believe  21:22:52
21 they are correct?                 21:22:54
22     A.  No.                     21:22:55
23         MR. O'CONNOR:  Okay.  That's    21:22:58
24     all I have.                  21:22:58
25         MS. HERZFELD:  I have one       21:22:58

Page 615

1  question on redirect.             21:22:59
2          REDIRECT EXAMINATION           21:22:59
3  QUESTIONS BY MS. HERZFELD:           21:22:59
4      Q.  Based on those numbers we went   21:23:02
5  over, do you have any reason to think that   21:23:03
6  they'd be incorrect?              21:23:05
7      A.  I don't know the answer, no.    21:23:07
8          MS. HERZFELD:  Okay.  Thank     21:23:11
9      you.                      21:23:13
10         MR. KO:  I'm sorry, folks, but   21:23:13
11     I have one question, of course, in  21:23:14
12     light of your redirect, and I have to  21:23:18
13     use a document for it.          21:23:20
14         (Mallinckrodt-Harper Exhibit 62  21:23:26
15     marked for identification.)      21:23:27
16         REDIRECT EXAMINATION           21:23:27
17 QUESTIONS BY MR. KO:               21:23:28
18     Q.  So I'm going to hand you a copy  21:23:22
19 of what will be marked as -- I don't know   21:23:23
20 what exhibit we're on -- 63?  Oh, 62.  Okay,  21:23:25
21 62.                         21:23:38
22         And that's the --             21:23:38
23 unfortunately, that's the only copy of the   21:23:39
24 exhibit I have.                  21:23:41
25         MR. KO:  Tricia, do you mind --  21:23:45

Page 616

1          MS. HERZFELD:  I'll read the    21:23:49
2      number in.                  21:23:50
3          MR. KO:  Thank you.            21:23:50
4          MS. HERZFELD:  It's            21:23:51
5      MNK-T1_0000387492.            21:23:54
6  QUESTIONS BY MR. KO:               21:23:58
7      Q.  Ms. Harper, just a moment ago   21:24:03
8  Mr. O'Connor was asking you about whether or   21:24:05
9  not -- well, was asking you about chargeback   21:24:10
10 information.                   21:24:12
11         Do you recall that?           21:24:13
12     A.  Yes.                    21:24:13
13     Q.  And the document you have in    21:24:13
14 front of you is an e-mail that you sent to   21:24:17
15 someone at DEA regarding access and your   21:24:19
16 utilization of chargeback info; is that   21:24:24
17 correct?                      21:24:26
18     A.  Yes.                    21:24:26
19     Q.  And at the very end of that     21:24:26
20 e-mail, there's a portion that's underlined.   21:24:29
21 Would you mind reading that into          21:24:31
22 the record?                    21:24:33
23     A.  "That said, Mallinckrodt        21:24:33
24 assumes that most transactions would result   21:24:38
25 in a chargeback request."             21:24:40

Page 617

1      Q.  Okay.  And do you have any     21:24:42
2  reason to dispute that you wrote that   21:24:45
3  language to the DEA on November 1, 2010?   21:24:47
4      A.  No.                     21:24:50
5          MR. KO:  Okay.  That's all I    21:24:51
6      have.                     21:24:52
7          MR. O'CONNOR:  All right.  We   21:24:54
8      can go off the record.          21:24:55
9          VIDEOGRAPHER:  We are going off  21:24:56
10     the record at 9:24 p.m.         21:24:57
11 (Deposition concluded at 9:24 p.m.)       21:24:58
12         - - - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 618

## CERTIFICATE

1
2
3          I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
4    Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
5    of the examination, Karen Harper was duly
sworn by me to testify to the truth, the
6    whole truth and nothing but the truth.
7          I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8    testimony as taken stenographically by and
before me at the time, place and on the date
9    hereinbefore set forth, to the best of my
ability.
10
11         I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
12   nor counsel of any of the parties to this
action, and that I am neither a relative nor
13   employee of such attorney or counsel, and
that I am not financially interested in the
action.
14
15
16
17   _____
CARRIE A. CAMPBELL,
18   NCRA Registered Diplomate Reporter
Certified Realtime Reporter
19   California Certified Shorthand
Notary Public
20   Dated:  January 21, 2019
21
22
23
24
25

Page 619

## INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the
6    appropriate space on the errata sheet for any
7    corrections that are made.
8          After doing so, please sign the
9    errata sheet and date it.  You are signing
10   same subject to the changes you have noted on
11   the errata sheet, which will be attached to
12   your deposition.
13         It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt
16   of the deposition transcript by you.  If you
17   fail to do so, the deposition transcript may
18   be deemed to be accurate and may be used in
19   court.
20
21
22
23
24
25

Page 620

## ACKNOWLEDGMENT OF DEPONENT

1
2
3
4          I,_____, do
hereby certify that I have read the foregoing
5    pages and that the same is a correct
transcription of the answers given by me to
6    the questions therein propounded, except for
the corrections or changes in form or
7    substance, if any, noted in the attached
Errata Sheet.
8
9
10
11
12   _____
Karen Harper          DATE
13
14
15   Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____
18
19   Notary Public
20
21
22
23
24
25

Page 621

1          _ _ _ _ _ _ _

## ERRATA

2          _ _ _ _ _ _ _
3    PAGE  LINE  CHANGE/REASON
4    _____  ____  _____
5    _____  ____  _____
6    _____  ____  _____
7    _____  ____  _____
8    _____  ____  _____
9    _____  ____  _____
10   _____  ____  _____
11   _____  ____  _____
12   _____  ____  _____
13   _____  ____  _____
14   _____  ____  _____
15   _____  ____  _____
16   _____  ____  _____
17   _____  ____  _____
18   _____  ____  _____
19   _____  ____  _____
20   _____  ____  _____
21   _____  ____  _____
22   _____  ____  _____
23   _____  ____  _____
24   _____  ____  _____
25

Highly Confidential - Subject to Further Confidentiality Review

Page 622

_ _ _ _ _ _ _

**LAWYER'S NOTES**

_ _ _ _ _ _ _

| 1 | | | |
|---|---|---|---|
| 2 | | | |
| 3 | PAGE | LINE | |
| 4 | ____ | ____ | _____ |
| 5 | ____ | ____ | _____ |
| 6 | ____ | ____ | _____ |
| 7 | ____ | ____ | _____ |
| 8 | ____ | ____ | _____ |
| 9 | ____ | ____ | _____ |
| 10 | ____ | ____ | _____ |
| 11 | ____ | ____ | _____ |
| 12 | ____ | ____ | _____ |
| 13 | ____ | ____ | _____ |
| 14 | ____ | ____ | _____ |
| 15 | ____ | ____ | _____ |
| 16 | ____ | ____ | _____ |
| 17 | ____ | ____ | _____ |
| 18 | ____ | ____ | _____ |
| 19 | ____ | ____ | _____ |
| 20 | ____ | ____ | _____ |
| 21 | ____ | ____ | _____ |
| 22 | ____ | ____ | _____ |
| 23 | ____ | ____ | _____ |
| 24 | ____ | ____ | _____ |
| 25 | | | |