Highly Confidential - Subject to Further Confidentiality Review

1                UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION
3

    IN RE: NATIONAL          )
4   PRESCRIPTION             )  MDL No. 2804
    OPIATE LITIGATION        )
5   _____  )  Case No.
                             )  1:17-MD-2804
6                            )
    THIS DOCUMENT RELATES     )  Hon. Dan A.
7   TO ALL CASES             )  Polster
8

            WEDNESDAY, AUGUST 1, 2018
9

    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10            CONFIDENTIALITY REVIEW
11                    - - -
12          Videotaped deposition of Nathan J.
13   Hartle, held at the offices of Covington &
14   Burlington, LLP, One City Center, 850 Tenth
15   Street Northwest, Washington, DC, commencing
16   at 9:03 a.m., on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporter, Certified Realtime Reporter,
19   Illinois, California & Texas Certified
20   Shorthand Reporter, Missouri & Kansas
21   Certified Court Reporter.
22                    - - -
            GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
25

Page 2

A P P E A R A N C E S :

MCHUGH FULLER LAW GROUP
BY: MICHAEL J. FULLER, JR., ESQUIRE
   mike@mchughfuller.com
97 Elias Whiddon Road
Hattiesburg, Mississippi 39402
(601) 261-2220

GREENE KETCHUM BAILEY WALKER FARRELL
& TWEEL
BY: PAUL T. FARRELL, JR., ESQUIRE
   paul@greeneketchum.com
419 Eleventh Street
Huntington, West Virginia 25701
(314) 525-9115

LEVIN, PAPANTONIO, THOMAS, MITCHELL,
RAFFERTY & PROCTOR, P.A.
BY: MICHAEL PAPANTONIO, ESQUIRE
   mpapantonio@levinlaw.com
   TROY RAFFERTY, ESQUIRE
   trafferty@levinlaw.com
   BRANDON BOGLE
   bbogle@levinlaw.com
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
(850) 435-7000
Counsel for Plaintiffs

COVINGTON & BURLING LLP
BY: EMILY JOHNSON HENN, ESQUIRE
   ehenn@cov.com
   MEGHAN MONAGHAN, ESQUIRE
   mmonaghan@cov.com
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
Counsel for McKesson Corporation

Page 3

WILLIAMS & CONNOLLY LLP
BY: MIRANDA PETERSEN, ESQUIRE
   mpetersen@wc.com
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5331
Counsel for Cardinal Health, Inc.

REEDSMITH LLP
BY: THOMAS H. SUDDATH, JR., ESQUIRE
   tsuddath@reedsmith.com
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
Counsel for AmerisourceBergen

JONES DAY
BY: CHRISTOPHER J. LOVRIEN, ESQUIRE
   cjlovrien@jonesday.com
555 South Flower Street, 50th Floor
Los Angeles, California 90071-2452
(213) 489-3939
Counsel for Walmart

PELINI, CAMPBELL & WILLIAMS LLC
BY: CRAIG G. PELINI, ESQUIRE
   cgp@pelini-law.com
8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio 44720
(330) 305-6400
Counsel for Prescription Supply,
Inc.

JACKSONKELLY PLLC
BY: WILLIAM J. AUBEL, ESQUIRE
   william.j.aubel@jacksonkelly.com
   (VIA TELECONFERENCE)
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
(304) 340-1146
Counsel for Miami-Luken

Page 4

ZUCKERMAN SPAEDER LLP
BY: CONOR B. O'CROININ, ESQUIRE
   cocroinin@zuckerman.com
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202-1031
(202) 778-1800
Counsel for CVS Indiana, LLC, and
CVS RX Services, Inc.

ARNOLD & PORTER
BY: DAVID D. FAUVRE, ESQUIRE
   David.Fauvre@arnoldporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
Counsel for Endo Pharmaceuticals
Inc., and Endo Health Solutions Inc.

ROPES & GRAY
BY: WILLIAM T. DAVISON, ESQUIRE
   william.davison@ropesgray.com
800 Boylston Street
Boston, Massachusetts 02199-3600
(617) 951-7000
Counsel for Mallinckrodt

MARCUS & SHAPIRA LLP
BY: SCOTT D. LIVINGSTON, ESQUIRE
   livingston@marcus-shapira.com
301 Grant Street, 35th Floor
Pittsburgh, Pennsylvania 15219-6401
(412) 338-4690
Counsel for HBC

MORGAN, LEWIS & BOCKIUS LLP
BY: MONICA C. PEDROZA, ESQUIRE
   monica.pedroza@morganlewis.com
   (VIA TELECONFERENCE)
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
(312) 324-1000
Counsel for Teva Pharmaceuticals
USA, Inc., Cephalon, Inc., Watson
Laboratories, Actavis LLC, Actavis
Pharma, Inc., f/k/a Watson Pharma

Page 5

MORGAN, LEWIS & BOCKIUS LLP
BY: MATTHEW R. LADD, ESQUIRE
   matthew.ladd@morganlewis.com
   (VIA TELECONFERENCE)
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
Counsel for Rite Aid

LOCKE LORD LLP
BY: BRANDAN MONTMINY, ESQUIRE
   brandan.montminy@lockelord.com
   (VIA TELECONFERENCE)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8445
Counsel for Henry Schein, Inc., and
Henry Schein Medical Systems, Inc.

KIRKLAND & ELLIS
BY: KAITLYN L. COVERSTONE, ESQUIRE
   kaitlyn.coverstone@kirkland.com
   (VIA TELECONFERENCE)
300 North LaSalle
Chicago, IL 60654
(312) 862-3671
Counsel for Allergan Finance, LLC

VIDEOGRAPHER:
   DANIEL HOLMSTOCK,
   Golkow Litigation Services

TRIAL TECHNICIAN:
   COREY SMITH,
   Golkow Litigation Services
      - - -

**Page 6**

INDEX

PAGE

APPEARANCES................................... 2

EXAMINATIONS
BY MR. RAFFERTY............................ 15
BY MR. PAPANTONIO........................ 325
BY MS. HENN................................ 490
BY MR. RAFFERTY............................ 501

EXHIBITS

No.  Description  Page

McKesson   McKesson's Controlled   16
Hartle 41  Substance Monitoring Program,
           Regulatory Affairs, Training,
           MCKMDL00336532 -
           MCKMDL00336582

McKesson   Controlled Substance   34
Hartle 42  Monitoring, Discount Drug
           Mart, September 29, 2017,
           MCKMDL00448596 -
           MCKMDL00448636

McKesson   Regulatory Affairs Update,   38
Hartle 43  RNA Leadership Team, November
           20, 2015,
           MCKMDL00430424 -
           MCKMDL00430434

McKesson   Prescription Drug Abuse, The   41
Hartle 44  National Perspective,
           MCKMDL00407451 -
           MCKMDL00407475

**Page 7**

McKesson   GAO Report to the   56
Hartle 45  Subcommittee on Oversight and
           Investigations, Committee on
           Energy and Commerce, House of
           Representatives, May 2002,
           Prescription Drugs, State
           Monitoring Programs Provide
           Useful Tool to Reduce
           Diversion

McKesson   State of Prescription Drug   59
Hartle 46  Abuse, Gary Boggs, Olive
           Branch,
           MCK-AGMS-006-0000880 -
           MCK-AGMS-006-0000933

McKesson   Hartle Presentation speaker   86
Hartle 47  notes,
           MCKMDL00452353 -
           MCKMDL00452375

McKesson   Drug Enforcement   235
Hartle 48  Administration Office of
           Diversion Control,
           ODG/Regulatory Section,
           Effective Controls Against
           Diversion

McKesson   US DEA September 27, 2006   100
Hartle 49  letter from Joseph Rannazzisi
           to commercial entities
           registered with the DEA to
           distribute controlled
           substances,
           MCKMDL00478906 -
           MCKMDL00478909

McKesson   US DEA December 27, 2007   109
Hartle 50  letter to McKesson
           Corporation,
           MCKMDL00478910 -
           MCKMDL00478911

McKesson   McKesson Operations Manual,   131
Hartle 51  Controlled Substance
           Monitoring Program,
           MCKMDL00002509 -
           MCKMDL00002539

**Page 8**

McKesson   McKesson Threshold Change   149
Hartle 52  Form,
           MCKMDL00000527 -
           MCKMDL00000530

McKesson   E-mail(s),   156
Hartle 53  MCKMDL00000520 -
           MCKMDL00000524

McKesson   US DEA August 13, 2014 letter   175
Hartle 54  to Geoffrey Hobart, Covington
           & Burling,
           MCKMDL00409224 -
           MCKMDL00409245

McKesson   E-mail(s),   190
Hartle 55  MCKMDL00430218 -
           MCKMDL00430221

McKesson   E-mail(s),   191
Hartle 56  MCKMDL00430124 -
           MCKMDL00430125

McKesson   Administrative Memorandum of   221
Hartle 58  Agreement,
           MCKMDL00355350 -
           MCKMDL00355363

McKesson   E-mail(s),   222
Hartle 59  MCKMDL00418094

McKesson   "Too Many Bodies in Ohio   229
Hartle 60  Morgue, so Coroner Gets Death
           Trailer," Corky Siemaszko

McKesson   SGAC Annual Meeting, November   240
Hartle 61  12-13, 2014,
           MCKMDL00407771 -
           MCKMDL00407786

McKesson   State of Ohio Board of   247
Hartle 62  Pharmacy,
           Wholesaler/Manufacturer
           Category Three, Wholesale
           Distributor Inspection,
           October 20, 2017,
           MCKMDL00431473 -
           MCKMDL00431477

**Page 9**

McKesson   E-mail(s),   249
Hartle 63  MCKMDL00432230 -
           MCKMDL00432231

McKesson   Ohio Demographics by Cubit   253
Hartle 64

McKesson   Settlement and Release   256
Hartle 65  Agreement and Administrative
           Memorandum of Agreement,
           MCKMDL00337001 -
           MCKMDL00337024

McKesson   US DOJ November 6, 2013   264
Hartle 66  Ihlenfeld letter to Geoffrey
           Hobart,
           MCKMDL00409048 -
           MCKMDL00409049

McKesson   "Systemic and Nationwide"   267
Hartle 67  handwritten demonstrative by
           Mr. Rafferty

McKesson   US DOJ March 20, 2014 letter   271
Hartle 68  from Ihlenfeld to Geoffrey
           Hobart,
           MCKMDL00409174 -
           MCKMDL00409179

McKesson   US DOJ November 4, 2014   305
Hartle 69  letter to Geoffrey Hobart,
           MCKMDL00409453 -
           MCKMDL00409458

McKesson   McKesson Corporation Board of   313
Hartle 70  Directors' Response to
           International Brotherhood of
           Teamsters

McKesson   February 15, 2018 House of   446
Hartle 76  Representatives letter to
           John H. Hammergren

McKesson   "We feel like our system was   422
Hartle 84  hijacked," DEA agents say a
           huge opioid case ended in a
           whimper," The Washington Post

Page 10

1  McKesson    National Center for Health    332
   Hartle 89   Statistics mortality data
2
   McKesson    Prescription Drug Abuse, The   389
3  Hartle 100  National Perspective,
               MCKMDL00330174 -
4              MCKMDL00330198
5  McKesson    Charleston Gazette-Mail    478
   Hartle 101  "Prescription drug abuse
6              plagues small W. Va. Town"
7  McKesson    CDC Morbidity and Mortality   404
   Hartle 102  Weekly Report, CDC Grand
8              Rounds: Prescription Drug
               Overdoses - a US Epidemic
9
   McKesson    State of Prescription Drug    482
10 Hartle 134  Abuse, Gary Boggs, Olive
               Branch,
11             MCKMDL00336833 -
               MCKMDL00336886
12
   McKesson    Photographs, P1.1280 and    476
13 Hartle 135  P1.1280.2
14 McKesson    Printout of Oxy Express and   445
   Hartle 140  Judy's Pharmacy
15
   McKesson    E-mail(s),    428
16 Hartle 141  MCKMDL00413042 -
               MCKMDL00413050
17
   McKesson    "Let's come together to solve   412
18 Hartle 145  the opioid crisis," McKesson,
               MCKMDL00435994
19
   McKesson    Wikipedia McKesson    411
20 Hartle 148  Corporation printout
21 McKesson    Screenshot of the videotaped   365
   Hartle 149  deposition of Michael Oriente
22
   McKesson    Performance Improvement Plan,   371
23 Hartle 161  Micheal Bishop,
               MCKMDL00435221 -
24             MCKMDL00435224
25

Page 11

1  McKesson    Micheal Bishop    382
   Hartle 162  Documentation/Feedback,
2              MCKMDL00454410 -
               MCKMDL00454421
3
   McKesson    Handwritten demonstrative by   402
4  Hartle 163  Mr. Papantonio "Kermit"
5  McKesson    Handwritten demonstrative by   445
   Hartle 165  Mr. Papantonio "Kermit - 406"
6
   (Exhibits attached to the deposition.)
7
8  CERTIFICATE...................513
9  ACKNOWLEDGMENT OF DEPONENT..................515
10 ERRATA.....................516
11 LAWYER'S NOTES...............517
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 12

1      VIDEOGRAPHER:  We are now on
2  the record.
3      My name is Daniel Holmstock.  I
4  am the videographer for Golkow
5  Litigation Services.
6      Today's date is August 1, 2018.
7  The time is 9:03 a.m.
8      This deposition is being held
9  at the law offices of Covington &
10 Burling, LLP, at 850 Tenth Street,
11 Northwest, in Washington, DC, in the
12 matter of In Re: National Prescription
13 Opiate Litigation, pending before the
14 United States District Court for the
15 Northern District of Ohio, Eastern
16 Division, Case Number 1:17-MD-2804.
17     The deponent today is Mr. Nate
18 Hartle.
19     Will counsel please introduce
20 themselves and whom they represent.
21     MR. RAFFERTY:  Troy Rafferty on
22 behalf of the plaintiffs.
23     MR. BOGLE:  Brandon Bogle on
24 behalf of the plaintiffs.
25     MR. PAPANTONIO:  Mike

Page 13

1  Papantonio on behalf of the
2  plaintiffs.
3      MR. FARRELL:  Paul Farrell on
4  behalf of plaintiffs.
5      MR. SUDDATH:  Tom Suddath on
6  behalf of AmerisourceBergen.
7      MR. PELINI:  Craig Pelini on
8  behalf of Prescription Supply.
9      MR. FAUVRE:  David Fauvre on
10 behalf of the Endo and Par
11 Pharmaceutical defendants.
12     MR. DAVISON:  William Davison
13 on behalf of Mallinckrodt LLC, and
14 SpecGx LLC.
15     MR. LOVRIEN:  Chris Lovrien,
16 Jones Day, on behalf of Walmart.
17     MS. PETERSEN:  Miranda
18 Petersen, Williams & Connolly, on
19 behalf of Cardinal Health.
20     MR. LIVINGSTON:  Scott
21 Livingston on behalf of HBC.
22     MR. O'CROININ:  Conor O'Croinin
23 on behalf of CVS.
24     MS. MONAGHAN:  Meghan Monaghan
25 from Covington & Burling on behalf of

Page 14

1  McKesson and the witness.
2      MS. HENN:  Emily Henn on behalf
3  of McKesson and the witness.
4      VIDEOGRAPHER:  Okay.  Will the
5  court reporter please administer the
6  oath?
7      Telephone, sorry, yes.  Yeah,
8  telephone?
9      MS. PEDROZA:  Monica Pedroza on
10  behalf of Teva Pharmaceuticals USA,
11  Inc., Cephalon Inc., Watson
12  Laboratories, Inc., Actavis, LLC and
13  Actavis Pharma, Inc.
14      MR. LADD:  Matthew Ladd on
15  behalf of Rite Aid.
16      MR. AUBEL:  Bill Aubel, Jackson
17  Kelly, on behalf of Miami-Luken, Inc.
18      VIDEOGRAPHER:  Okay.
19      MR. RAFFERTY:  Anybody else?
20      VIDEOGRAPHER:  The court
21  reporter is Carrie Campbell, who will
22  now administer the oath.
23
24      NATHAN J. HARTLE,
25  of lawful age, having been first duly sworn

Page 15

1  to tell the truth, the whole truth and
2  nothing but the truth, deposes and says on
3  behalf of the Plaintiffs, as follows:
4
5      DIRECT EXAMINATION
6  QUESTIONS BY MR. RAFFERTY:
7      Q.    Could you state your name,
8  please?
9      A.    Nathan John Hartle.  I go by
10  Nate.
11      Q.    Mr. Hartle, my name is Troy
12  Rafferty.  I'm going to be asking you some
13  questions today.
14      Okay?
15      A.    Okay.
16      Q.    Who is your current employer?
17      A.    McKesson Corporation.
18      Q.    Okay.  What is your current
19  position?
20      A.    I'm currently the vice
21  president of compliance -- regulatory affairs
22  and compliance.
23      Q.    Vice president of regulatory
24  affairs and compliance.
25      A.    Correct.

Page 16

1      Q.    Is that a new position?
2      A.    It is a new position, new
3  title, as of July 1st.  Prior to that, I
4  was -- senior director of regulatory affairs
5  was my title.
6      Q.    Senior director of regulatory
7  affairs for the retail national accounts or
8  in some other capacity?
9      A.    Correct.  For the retail
10  national accounts.  The new title, I will be
11  taking on the statistics and analytics team
12  here shortly.
13      Q.    Okay.  So is that a
14  different -- the title is different, but is
15  the position different from what you had
16  before?
17      A.    I maintain the certain
18  regulatory -- or the chain responsibilities,
19  and in addition to that will be statistics
20  and analytics.
21      (McKesson-Hartle Exhibit 41
22  marked for identification.)
23  QUESTIONS BY MR. RAFFERTY:
24      Q.    Okay.  I'm going to show you --
25      MR. RAFFERTY:  If we could pull

Page 17

1  up, Corey, 1.795, which we will mark
2  as Exhibit 41 to the deposition.
3  QUESTIONS BY MR. RAFFERTY:
4      Q.    Okay.  What I'm showing you --
5  I'm going to show you some documents
6  throughout the deposition, Mr. Hartle.  I'm
7  going to direct you to certain areas.  If
8  there's a different part that you want to
9  look at or if you want to take a minute to
10  review, I'm fine with that.  Just let me
11  know.
12      Okay?
13      A.    Okay.
14      Q.    But to try and keep things
15  moving, we're under a time -- you know, I've
16  only got a certain amount of time, so I'm
17  going to try and direct you to those areas.
18      Okay?
19      A.    Understood.
20      Q.    All right.  What we have here,
21  if you look, is something entitled
22  "McKesson's Controlled Substance Monitoring
23  Program, Regulatory Affairs Training."
24      Do you see that?
25      A.    I do.

Page 18

1    Q.    Okay.  And I will represent to
2  you that there's not a date on this, but we
3  looked at the production, and there's
4  something referred to as metadata that
5  established that this was produced
6  December 31, 2015.
7        Okay?
8        You were there in your role as
9  senior director of retail and national
10 accounts, correct?
11   A.    Correct.
12   Q.    You started there when?  In
13 McKesson.
14   A.    In May of 2014.
15   Q.    May of 2014.  Okay.
16       And you maintained that same
17 position in charge of retail national
18 accounts until July of this year when your
19 position changed, correct, or your title
20 changed?
21   A.    Title changed, yeah.  And I've
22 added different responsibilities, but I've
23 always had the chain responsibility.
24   Q.    So you've added additional
25 responsibilities, yes?

Page 19

1    A.    Correct.
2    Q.    Okay.  If you'll turn to
3  page .9, I want to just make sure I
4  understand who -- where you sit in the
5  hierarchy of McKesson.  Okay?
6        And in particular, US pharma is
7  the division of McKesson that handles and
8  sells the narcotics, right?  That's the
9  division?
10   A.    Correct.  Correct.
11   Q.    Okay.  So if you look up here,
12 you've got regulatory affairs, retail
13 national accounts, and it says, "Nate Hartle,
14 senior director," right?
15   A.    It does.
16   Q.    Nobody above you?
17   A.    Not on this slide.
18   Q.    Not on that.  Not in terms of
19 retail national accounts?
20   A.    Correct.
21   Q.    Okay.  Because there's one
22 other person, a vice president, I think, at
23 the time, Krista Peck?
24   A.    Senior vice president.
25   Q.    Senior vice president.

Page 20

1        Okay.  So -- and we'll look at
2  that in just a minute.  But you have
3  underneath you some direct reports, including
4  Micheal Bishop.
5        Do you know who Micheal Bishop
6  is?
7    A.    I do.
8    Q.    Okay.  Michael Oriente.  Do you
9  know who that is?
10   A.    I do.
11   Q.    Okay.  Jay Espaillat?
12   A.    Espaillat.
13   Q.    Espaillat.
14       And then Adam Palmer, who
15 reports to Michael Oriente.
16       Do you see that?
17   A.    I do.
18   Q.    And then Jennifer Sheffield,
19 the regulatory affairs admin?
20   A.    Yeah.
21   Q.    Okay.  And that was your team,
22 right?
23   A.    Was, yeah.  It's changed over
24 time.
25   Q.    Okay.  It's changed.  In

Page 21

1  fact -- yeah.  Okay.
2        So if we go now to point --
3  well, how long was that your team?  How long
4  did you have -- in particular looking at the
5  director of regulatory affairs, Michael
6  Oriente, and Micheal Bishop, the regulatory
7  affairs manager, how long were they with you?
8    A.    So it's evolved.  When I --
9  Michael joined the team -- Michael, Adam
10 Palmer -- well, two Michaels and Adam Palmer
11 joined the team in 2014.  Jay was added -- I
12 can't remember the exact time frame, but
13 right around in 2015.  He supports some work
14 I do for the entire regulatory affairs team
15 focused on threshold methodology and some
16 advancements we made.
17   Q.    Okay.  All right.  My specific
18 question is how long they've been with you.
19   A.    How long --
20   Q.    How long were they on your
21 team?
22   A.    Michael's been on the team
23 since 2014.  Adam's been 2014.  Jay's been
24 2015.
25   Q.    Okay.

Page 22

1     A.   Micheal Bishop is no longer
2 here. We've had some adjustments.
3     Q.   But he was with you until 2018,
4 correct?
5     A.   Yes.
6     Q.   Okay. Let's take a look now at
7 the US pharma regulatory affairs. And the
8 reason I want to do this is I want to make
9 sure I know when we're talking today and
10 you're answering questions, in what capacity
11 you're answering them in terms of the
12 hierarchy of regulatory affairs at McKesson.
13     Okay?
14     A.   Understood.
15     Q.   All right.
16     MR. RAFFERTY: So if we could,
17 turn to page .4, Corey.
18 QUESTIONS BY MR. RAFFERTY:
19     Q.   All right. Now this is,
20 according to the CSMP training module that
21 we're looking at, this is supposed to be the
22 US pharma regulatory affairs CSMP team.
23     Do you see that?
24     A.   I do.
25     Q.   Okay. CSMP is the controlled

Page 23

1 substance monitoring program, right?
2     A.   Correct.
3     Q.   And that is really the
4 foundation of the regulatory affairs
5 department in terms of your job
6 responsibilities and duties, right?
7     MS. HENN: Objection to form.
8     THE WITNESS: It is.
9 QUESTIONS BY MR. RAFFERTY:
10     Q.   Okay. And as part of that
11 duty, you have an obligation, a
12 responsibility, a duty, to understand and
13 implement the controlled substance monitoring
14 program of McKesson, true?
15     A.   That's true.
16     Q.   Okay. And if we look at the
17 hierarchy here, there's Gary -- okay, Krista
18 Peck, who is the senior vice president. I
19 assume above her is the president of
20 McKesson?
21     A.   Correct.
22     Q.   Okay. That's Mr. Hammergren
23 right now?
24     A.   No. Above Krista or that
25 position is the president of US pharma.

Page 24

1     Q.   Of US pharma, I'm sorry.
2 That's what -- okay.
3     And who was that at the time;
4 do you remember?
5     A.   It was Mark Walchirk.
6     Q.   Okay. So you got Krista Peck,
7 who is one step away from the president of US
8 pharma, right?
9     A.   Correct.
10     Q.   And then right below her you've
11 got Nate Hartle sitting there as senior
12 director, right?
13     A.   Correct.
14     Q.   You got Lisa Young as the
15 senior director for the west region, right?
16     A.   Correct.
17     Q.   And then Gary Boggs is the
18 senior director for the east region, right?
19     A.   Correct.
20     Q.   Okay. So there were two
21 regions, east and west, and then you, who
22 covered, I assume, regional national -- I
23 always say regional national account --
24 retail national accounts for the entire
25 country, correct?

Page 25

1     A.   Yes, that's correct.
2     Q.   Okay. Now, when we talk about
3 the retail national accounts, we're talking
4 about -- that you were in charge of, we're
5 talking about the Rite Aids, CVS, Walgreens,
6 Walmarts and a bunch of others that I'm not
7 listing, right?
8     A.   A variety of chains.
9     Q.   Chains. Okay.
10     A.   Chains is the best way to talk
11 about it.
12     Q.   Okay. But literally thousands
13 of stores in those chains, right?
14     A.   In some of them.
15     Q.   In some of them.
16     And you're over all of that?
17     A.   Correct, those chains.
18     Q.   From a regulatory controlled
19 substance monitoring program standpoint,
20 true?
21     A.   True.
22     MS. HENN: Objection to form.
23 QUESTIONS BY MR. RAFFERTY:
24     Q.   So tell me, how much of the
25 business in terms of US pharma compared to

Page 26

1 the -- because there's another category of
2 stores called the -- I believe you refer to
3 them as ISMCs; is that right?
4     A.    Correct.
5     Q.    Okay.  And that is the
6 independent small medium chains?
7     A.    Correct.
8     Q.    Is that what that stands for?
9     A.    That's what it stands for, yes.
10    Q.    Okay.  All right.  And that's
11 what Gary Boggs and Lisa Young would have
12 been over in their regions?
13    A.    Yes, that's part of their
14 responsibility.
15    Q.    Okay.  All right.  The retail
16 national accounts, that's a pretty big part
17 of US pharma's business, isn't it,
18 Mr. Hartle?
19         MS. HENN:  Objection to form.
20         THE WITNESS:  It is a larger
21     part of the business.
22 QUESTIONS BY MR. RAFFERTY:
23    Q.    It's a much larger part of the
24 business than the IMC accounts, correct?
25 ISMC, I'm sorry.

Page 27

1         MS. HENN:  Objection to form.
2         THE WITNESS:  Yes, it is.
3 QUESTIONS BY MR. RAFFERTY:
4     Q.    Okay.  When we talk about the
5 CSMP, you also agree that -- that was
6 implemented in 2008, correct?  The first --
7 the first CSMP was put into effect in 2008,
8 true?
9     A.    Correct.
10    Q.    Okay.  And that was as a result
11 and immediately after paying the -- McKesson
12 paid that $13,250,000 fine for the
13 allegations against them by the DEA and DOJ,
14 correct?
15         MS. HENN:  Objection to form.
16         THE WITNESS:  Could you state
17     that again for me, please?
18 QUESTIONS BY MR. RAFFERTY:
19    Q.    Sure.
20         The CSMP that we're talking
21 about, put into effect by McKesson in 2008,
22 true?
23    A.    The initial one is an expansion
24 of the Lifestyle drug monitoring program.  It
25 was the next one in 2008.

Page 28

1     Q.    Okay.  The CSMP -- because it
2 wasn't the CSMP before.  It was the Lifestyle
3 drug management program, right?
4     A.    Correct.
5     Q.    And when we talk about -- when
6 I'm saying the CSMP, I'm talking about the
7 controlled substance monitoring program that
8 you have said is the foundation of the
9 responsibility and the job of the regulatory
10 affairs department.
11         Okay?
12         The CSMP was put into effect in
13 2008, right?
14    A.    Correct.
15    Q.    After the settlement with
16 the -- that McKesson entered into with the
17 DOJ where they settled claims of violations
18 of the Controlled Substance Act and paid a
19 $13,250,000 fine, true?
20         MS. HENN:  Objection to form.
21         THE WITNESS:  It was
22     implemented in that time frame, right
23     at that time -- right after that time.
24 QUESTIONS BY MR. RAFFERTY:
25    Q.    Well, in fact, the two -- and

Page 29

1 in fact -- I'm sorry.  And if I speak over
2 you at any time, it's just -- it's just a
3 habit, and so I apologize.  And so just let
4 me know, or I'm sure Ms. Henn will let me
5 know, and I'll try not to do that.
6         But in fact, the 2008
7 settlement agreement mandated that you
8 implement a program to monitor for suspicious
9 orders, report suspicious orders and stop
10 shipments of -- when you determine there to
11 be a suspicious order, true?
12         MS. HENN:  Objection.  Form.
13         THE WITNESS:  That type of
14     language was in the agreement, yes.
15 QUESTIONS BY MR. RAFFERTY:
16    Q.    Okay.  And in doing that, in
17 response to that, you implemented -- you
18 changed from the Lifestyle -- the Lifestyle
19 drug management program --
20    A.    Monitoring.
21    Q.    Monitoring program, I'm sorry.
22     -- to the CS -- what you now
23 refer to as the CSMP, true?
24    A.    True.
25    Q.    Okay.  And the CSMP, you agree,

Page 30

1 is a national policy for McKesson, right?
2         MS. HENN: Objection to form.
3 QUESTIONS BY MR. RAFFERTY:
4     Q.    Covers --
5     A.    It covers our -- all of our
6 segments.
7     Q.    Yeah, it covers everybody,
8 right?
9         Every customer that you're
10 selling narcotic painkillers to is supposed
11 to be -- McKesson is supposed to be
12 monitoring them and implementing through
13 regulatory affairs the controlled substance
14 monitoring program, correct?
15     A.    Correct.
16     Q.    Okay. There's not -- because
17 we saw those two regions, the east region and
18 the west region. There's not a CSMP east
19 with different policies and procedures and a
20 CSMP west with different policies and
21 procedures, is there?
22     A.    There's not.
23     Q.    Okay. It's just one CSMP?
24     A.    Correct.
25     Q.    And that CSMP covers both the

Page 31

1 ISMC -- the ISMC customers as well as the RNA
2 customers, correct?
3         MS. HENN: Objection to form.
4         THE WITNESS: It does, with
5     some -- I'm sure we'll talk about this
6     later -- some unique differences for
7     this particular chain group.
8 QUESTIONS BY MR. RAFFERTY:
9     Q.    Right.
10         You treat the RNAs in some ways
11 differently than you treat the small
12 pharmacies, right, or the small chain
13 pharmacies?
14         MS. HENN: Objection to form.
15 QUESTIONS BY MR. RAFFERTY:
16     Q.    Inside the CSMP.
17     A.    We do. Have made adjustments
18 based on the characteristics of that segment
19 in different parts of our program.
20     Q.    Okay. I didn't ask you why.
21     A.    Okay.
22     Q.    My question was: You treat
23 them differently inside the CSMP, that you
24 treat the retail national accounts in some
25 ways in the CSMP differently than the ISMCs,

Page 32

1 correct?
2         MS. HENN: Objection to form.
3         THE WITNESS: In some ways we
4     treat them different to accomplish the
5     same goals.
6 QUESTIONS BY MR. RAFFERTY:
7     Q.    So my answer would be yes?
8         MS. HENN: Objection to form.
9         THE WITNESS: We do treat them
10     differently in some ways.
11 QUESTIONS BY MR. RAFFERTY:
12     Q.    Okay. Thank you.
13         All right. I want to talk for
14 a few minutes about the opioid epidemic in
15 the United States.
16         First of all, you agree that
17 there is, in fact, an opioid epidemic in the
18 United States, true?
19     A.    I do agree.
20     Q.    And that epidemic has been
21 going on for years, correct?
22     A.    Based on what I read and what I
23 know, absolutely.
24     Q.    Well, you actually read and
25 know a lot about the epidemic that's going

Page 33

1 on in the country, don't you?
2         MS. HENN: Objection to form.
3         THE WITNESS: I do. That's
4     part of my responsibility -- my
5     business.
6 QUESTIONS BY MR. RAFFERTY:
7     Q.    Yeah.
8         In fact, that's a big part of
9 your business is knowing exactly what's going
10 on in the country in terms of the abuse of
11 narcotic painkillers, right?
12     A.    It's part of my responsibility.
13     Q.    Okay.
14     A.    It's why I do what I do.
15     Q.    All right. In fact, you would
16 agree that this epidemic has had a
17 devastating effect on public health and
18 welfare throughout the country, true?
19     A.    It has.
20     Q.    And in fact, you have spoken
21 and actually given presentations about the
22 opioid epidemic in the country, correct?
23     A.    I have.
24     Q.    In fact, would you agree that
25 the opioid epidemic in the United States of

Page 34

1 America is the deadliest drug epidemic on
2 record in our country's history?
3     A.    I'm not an epidemiologist, but
4 I would believe, yes.
5     Q.    Okay.  Well, let's look at
6 1437.3, which we will mark as Exhibit 41 --
7 42.
8         (McKesson-Hartle Exhibit 42
9     marked for identification.)
10 QUESTIONS BY MR. RAFFERTY:
11     Q.    All right, Mr. Hartle.  You see
12 this controlled substance monitoring,
13 Discount Drug Mart?
14         Do you recognize that?
15     A.    I absolutely do.
16     Q.    Okay.  And it appears, though
17 this one does have a date on it, it's
18 September 29, 2017.  So not really all that
19 long ago, right?
20     A.    Correct.
21     Q.    Okay.  Less than a year ago,
22 right?
23     A.    That is.
24     Q.    And you see down there Nate
25 Hartle, senior director, regulatory affairs,

Page 35

1 right?
2     A.    Yeah, it's my document.
3     Q.    Okay.  Do you recall giving
4 this presentation?
5     A.    I do.
6         MR. RAFFERTY:  If we could,
7     let's turn to .3, Corey.
8 QUESTIONS BY MR. RAFFERTY:
9     Q.    You see that up in the top of
10 one of your slides there on page 3, a
11 headline, "Deadliest Drug Epidemic on Record
12 in Our Nation's History"?
13         Do you see that?
14     A.    Yep.
15     Q.    You wouldn't have put that in
16 your presentation unless you thought it was
17 true, right?
18     A.    No.
19     Q.    So you don't dispute that,
20 right?
21     A.    I do not.
22     Q.    Okay.  It then goes on and
23 says, "The drug problems of past decades pale
24 when compared to the current opioid epidemic
25 which has killed 165,000 Americans from 2000

Page 36

1 to 2014."
2         Did I read that right?
3     A.    You did.
4     Q.    Okay.  Once again, you agree
5 with that statement, right?
6     A.    These are part of the
7 presentation that I gave.
8     Q.    Okay.  If we now go to the next
9 page, page 4, it says over there, "Scope of
10 the problem."  On an average day, an average
11 day in the US, more than 650,000 opioid
12 prescriptions are dispensed.
13         Do you see that?
14     A.    I do.
15     Q.    3,900 people initiate
16 non-medical use of prescription opioids, and
17 then it says 580 people initiate heroin use.
18         You see that?
19     A.    I see those.
20     Q.    And in fact, opioid abuse and
21 addiction is a gateway to heroin use and
22 addiction, correct?
23         MS. HENN:  Objection to form.
24         THE WITNESS:  I'm not a medical
25     expert, but, you know, I've read

Page 37

1     things, I use data from different
2     sources, and they say that.
3 QUESTIONS BY MR. RAFFERTY:
4     Q.    I don't -- okay.  As head of
5 regulatory affairs and the controlled
6 substance monitoring program for national
7 chains of McKesson, would you agree that in
8 fact narcotic painkiller abuse, opioid abuse,
9 is a gateway to heroin use?
10         MS. HENN:  Objection to form.
11         THE WITNESS:  I would agree
12     that it can be, yeah.
13 QUESTIONS BY MR. RAFFERTY:
14     Q.    Okay.  And in fact, 78 people
15 die from an opioid-related overdose every day
16 according to your slide.
17         Do you see that?
18     A.    I see that.
19     Q.    In fact, if you go on to your
20 presentation, page 16, .16, talking about the
21 heroin use, it says -- or what you say in
22 your presentation, or what you put in your
23 presentation, was people who are addicted
24 to -- and then it says, "Opioid painkillers
25 are 40 times more likely to be addicted to

Page 38

1 heroin."
2       Do you see that?
3    A.    I see that.
4    Q.    And you agree with that?
5    A.    I put them in the slides as
6 part of the information that I keep current
7 on.
8    Q.    You agree with that?
9    A.    Again, I'm not an expert in
10 terms of numbers, but I agree with what
11 they're putting out.
12    Q.    Okay.
13    A.    The concepts --
14    Q.    And you wouldn't have put it
15 out there if you thought it was inaccurate,
16 right?
17    A.    I would not have.
18    Q.    Okay.  Talking about the
19 heroin, the gateway to heroin, if we could,
20 let's have 1580.
21       (McKesson-Hartle Exhibit 43
22    marked for identification.)
23 QUESTIONS BY MR. RAFFERTY:
24    Q.    This is another presentation
25 that you gave, Mr. Hartle.  We'll mark this

Page 39

1 as Exhibit 43.  This is another presentation
2 that you gave.  If you look at this --
3       MR. RAFFERTY:  Corey, if you
4    could pull it up, please, 1.580 --
5    1.1580.
6       All right.  Just give me the
7    Elmo.  I'll just use the Elmo.
8 QUESTIONS BY MR. RAFFERTY:
9    Q.    You see there it says,
10 "Regulatory affairs update, RNA leadership
11 team, Nate Hartle, senior director,
12 regulatory affairs."
13       Do you see that?
14    A.    Yes.
15    Q.    November 20, 2015.
16       You see that?
17    A.    I do.
18    Q.    Okay.  Do you recall giving
19 this presentation?
20    A.    I'm going to scan through it
21 real quick just so I can refresh --
22    Q.    Well, let me -- and feel free
23 to, but I'm just going to -- I'm going to
24 start with the second page, so...
25    A.    I -- I believe it was a

Page 40

1 conference call, maybe.  I don't remember
2 exactly all the details from back then, but
3 this is my work, yeah.
4    Q.    It doesn't matter.  This is
5 your work.
6    A.    Yeah.
7    Q.    That's all I wanted to get.
8       Okay.  So if you look here it
9 says, "Addressing prescription drug abuse and
10 heroin use."  And you see it's got a little
11 flow chart, you see?
12       And it goes from the 259
13 million prescriptions of opioids and then --
14 which goes into prescription drug misuse
15 resulting in 1.4 million emergency room
16 visits in 2011.
17       And then that follows with
18 "four out of five users started by
19 misusing" -- in terms of heroin use, "four
20 out of five users started by misusing
21 prescription opioids."
22       You see that?
23    A.    I see that.
24    Q.    And then overdose, "16,000
25 prescription opioid deaths; heroin overdoses

Page 41

1 rapidly increasing."
2       Do you see that?
3    A.    I do see that.
4    Q.    "Four out of five users of
5 heroin started by misusing prescription
6 opioids."
7       Did I read that right?
8    A.    That's what it says.
9       MR. RAFFERTY:  Now, if we could
10    have 1.1355, Corey, that we'll mark as
11    Exhibit 44.
12       (McKesson-Hartle Exhibit 44
13    marked for identification.)
14 QUESTIONS BY MR. RAFFERTY:
15    Q.    Oh, this is a document that
16 says -- it's titled "Prescription Drug Abuse:
17 The National Perspective."
18       It's got McKesson up there in
19 the top right corner.
20       Do you see that?
21    A.    I see that.
22    Q.    And down by the bottom middle
23 it's 2014, McKesson Corporation, correct?
24    A.    Correct.
25    Q.    Okay.  If we go into this and

Page 42

1 you turn to the second page -- .2, Corey --
2 and it talks about the current landscape,
3 epidemic.
4      Do you see that?
5      A.   I see that.
6      Q.   And then it says, "Prescription
7 drug overdoses, a US epidemic.  In 2007,
8 approximately 27,000 unintentional drug
9 overdose deaths occurred in the United
10 States, one death every 19 minutes.
11 Prescription drug abuse is the fastest
12 growing drug problem in the United States."
13      You see that?
14      A.   I do.
15      Q.   A death every 19 minutes,
16 right?
17      A.   Right.  That's what it says.
18      Q.   Okay.  In fact, your company
19 has been in the business of selling opioid
20 and narcotic painkillers for many years,
21 hasn't it?
22      A.   It has.
23      Q.   The same opioid and narcotic
24 drugs that are at the core of the epidemic
25 that we've just been talking about, true?

Page 43

1      MS. HENN:  Objection to form.
2      THE WITNESS:  Those drugs are
3   part of the epidemic.
4 QUESTIONS BY MR. RAFFERTY:
5      Q.   And in fact, it is an epidemic
6 that you have testified McKesson is partially
7 responsible for, correct?
8      MS. HENN:  Objection to form.
9      THE WITNESS:  That we are part
10   of the supply chain and have --
11   absolutely play a role.
12 QUESTIONS BY MR. RAFFERTY:
13      Q.   And you are partially
14 responsible for the United States -- the
15 epidemic and the societal costs as a result
16 of prescription drug abuse in the United
17 States, correct?
18      MS. HENN:  Objection to form.
19 QUESTIONS BY MR. RAFFERTY:
20      Q.   You've testified to that.
21      A.   What I said yesterday is I
22 said, yes, we are partially in the -- what I
23 mean by that is, again, we are part of the
24 overall supply chain and play a role and are
25 in the broader -- we're part of the society,

Page 44

1 so we are part of that.
2      Q.   You're part of it because
3 you're part of society; is that what you
4 mean?
5      A.   We're part of the supply chain
6 and --
7      Q.   A closed supply chain, right?
8      A.   Right.
9      Q.   Meaning not everybody gets to
10 sell drugs, narcotic drugs, in the United
11 States, do they?
12      A.   They do not.
13      Q.   You have to register, and you
14 have to get permission from the DEA and the
15 federal government, right?
16      A.   You do.
17      Q.   And as a result of that
18 privilege to sell those, as a result of that
19 ability to sell those, you have certain
20 responsibilities, don't you?
21      A.   We do.
22      Q.   And part of those
23 responsibilities are to prevent diversion of
24 those narcotic drugs, right?
25      MS. HENN:  Objection to form.

Page 45

1      THE WITNESS:  It's part of our
2   responsibility.
3 QUESTIONS BY MR. RAFFERTY:
4      Q.   Right.
5      And what happens when you fail
6 in that responsibility and drugs are diverted
7 to nonmedical use?
8      MS. HENN:  Objection to form.
9 QUESTIONS BY MR. RAFFERTY:
10      Q.   The epidemic grows, doesn't it,
11 Mr. Hartle?
12      MS. HENN:  Objection to form.
13      THE WITNESS:  There's many
14   things can that happen when drugs are
15   diverted.
16 QUESTIONS BY MR. RAFFERTY:
17      Q.   One of those is the epidemic
18 that we've just been going through increases
19 and grows, doesn't it?
20      A.   It can.
21      Q.   And it has?
22      A.   It has grown.
23      Q.   That's right.
24      And in fact, what you said
25 yesterday, so that we're clear, if I could

Page 46

1 have the Elmo --
2 MR. RAFFERTY: And this is
3 yesterday's rough transcript at
4 page 283, starting on line 17,
5 Counsel.
6 QUESTIONS BY MR. RAFFERTY:
7 Q. So if we look at this, it says
8 specifically -- you were asked the question:
9 "Well, back to McKesson Corporation, which is
10 you sitting in the chair today. Knowing what
11 you know as the 30(b)(6) representative, the
12 corporate designee, knowing about your past
13 conduct" -- and when -- "your" there means
14 McKesson's past conduct -- "knowing about the
15 past interactions with the DEA, I'm going to
16 ask you again: Does McKesson Corporation
17 accept partial responsibility for the
18 societal costs of prescript -- of
19 prescription drug abuse in America?"
20 Do you see that?
21 A. I see that.
22 Q. And then you go on and you
23 say -- you say: "Again, you know, we're part
24 of the closed system, so we're responsible
25 for preventing diversion."

Page 47

1 And then you're asked again:
2 "So the answer is?"
3 And you say: "Again, I think
4 we're responsible for something. I don't
5 know what. How you define all societal
6 costs. I still believe it depends on
7 different circumstances."
8 Question: "Sure. We're not
9 going to parse out percentages."
10 Answer: "Yeah."
11 Question: "Just talking
12 globally for McKesson Corporation, so I don't
13 want to put words in your mouth because it's
14 got to come out of your mouth. So the answer
15 is yes or no?"
16 And you say: "I would say yes,
17 partially."
18 Do you recall that?
19 A. I do.
20 Q. And that is in response to the
21 original question, which was -- because that
22 was a long colloquy or discussion. That's an
23 answer to the original question that you were
24 being asked by counsel, correct?
25 A. That was the original question.

Page 48

1 Q. Yeah.
2 And that was: "Does McKesson
3 Corporation accept partial responsibility for
4 the societal costs of prescription drugs in
5 America?"
6 Answer: "I would say yes,
7 partially."
8 MS. HENN: Objection to form.
9 QUESTIONS BY MR. RAFFERTY:
10 Q. Do you recall giving that
11 testimony yesterday?
12 A. I do.
13 Q. Okay. You understand that
14 yesterday when you were sitting in that chair
15 you were under oath, correct?
16 A. Absolutely.
17 Q. Okay. Just like you are today?
18 A. Absolutely.
19 Q. Okay. So the epidemic that
20 we've been going back -- we've been reviewing
21 in some of the presentations you made about
22 the epidemic, you would agree McKesson is
23 partially responsible for that epidemic,
24 correct?
25 MS. HENN: Objection to form.

Page 49

1 QUESTIONS BY MR. RAFFERTY:
2 Q. Just as you testified
3 yesterday.
4 A. Yeah, again, as I testified
5 yesterday and as -- my intent is we are part
6 of that system, so of course we're
7 accountable and have a role to play within
8 that.
9 Q. I'm not saying a role; I'm
10 talking about responsibility. You have
11 responsibility, right?
12 You have to -- you accept
13 partial responsibility for this epidemic,
14 correct?
15 MS. HENN: Objection to form.
16 THE WITNESS: Accept
17 responsibility for the role that we
18 have, and I clearly know there's an
19 epidemic.
20 QUESTIONS BY MR. RAFFERTY:
21 Q. Well, you -- and you know it's
22 as a result of the diversion of narcotics,
23 right?
24 MS. HENN: Objection to form.
25 THE WITNESS: Clearly that's

Page 50

1    part of it.
2    QUESTIONS BY MR. RAFFERTY:
3        Q.    Clearly.
4              And clearly you sell an awful
5    lot of narcotics.  You, McKesson, sell an
6    awful lot of narcotics in the United States,
7    right?
8        A.    We do.
9        Q.    And in fact, you've been -- you
10   have faced investigations by the DEA and the
11   Department of Justice in regards to your
12   failure to prevent diversion of those
13   narcotics in America, true?
14             MS. HENN:  Objection to form.
15             THE WITNESS:  Could you restate
16       that?
17   QUESTIONS BY MR. RAFFERTY:
18       Q.    You have -- you, as McKesson,
19   you, McKesson --
20       A.    Yeah.
21       Q.    -- has faced investigations for
22   McKesson's failure, while selling narcotics
23   across America, for failing to prevent
24   diversion of those narcotics in America.
25             MS. HENN:  Objection to form.

Page 51

1    QUESTIONS BY MR. RAFFERTY:
2        Q.    Correct?
3        A.    We faced those allegations and
4    held in terms.
5        Q.    Right.
6              And those allegations, we're
7    going to get into those allegations in a bit.
8    But in those -- in those allegations, or
9    after those allegations were made, after
10   those investigations, McKesson paid a fine of
11   $13.25 million in 2008, correct?
12       A.    Correct.
13       Q.    And in 2017 paid a
14   record-setting $150 million fine, correct?
15       A.    That's correct.
16       Q.    And in 2017, in the 2017
17   settlement -- you've reviewed that, right?
18       A.    I have.
19       Q.    You were actually there as
20   senior director of regulatory affairs during
21   the time that McKesson was being investigated
22   and at the time that that -- that agreement
23   was entered into between McKesson and the
24   Department of Justice, right?
25             MS. HENN:  Objection to form.

Page 52

1              THE WITNESS:  I was there
2        during -- during that time.
3    QUESTIONS BY MR. RAFFERTY:
4        Q.    Okay.  And in fact, in that
5    agreement, in that -- in the 2017 settlement,
6    McKesson accepted responsibility for the --
7    for failing to prevent diversion, according
8    to that -- according to the allegations
9    brought, correct?
10             MS. HENN:  Objection to form.
11             THE WITNESS:  We accepted
12       responsibility for certain -- certain
13       orders and things like that.  We did
14       accept responsibility in part.
15   QUESTIONS BY MR. RAFFERTY:
16       Q.    Okay.  And when we say "accept
17   responsibility," you mean accept
18   responsibility for failing to prevent the
19   diversion of narcotics in America, right?
20             MS. HENN:  Objection to form.
21             THE WITNESS:  Certain scenarios
22       related to suspicious orders.
23   QUESTIONS BY MR. RAFFERTY:
24       Q.    Let me ask that again.  When we
25   say "accept responsibility," you mean accept

Page 53

1    responsibility for failing to prevent the
2    diversion of narcotics in America.  That's
3    what you were accepting responsibility for in
4    the 2017 settlement agreement, true?
5              MS. HENN:  Objection to form.
6              THE WITNESS:  Again, I'd like
7        to look at, I mean, the language.  I
8        know we accepted --
9    QUESTIONS BY MR. RAFFERTY:
10       Q.    You don't know?
11       A.    No, I do.  We accepted
12   responsibility --
13       Q.    For --
14       A.    -- you know.
15       Q.    The allegations in that, you
16   know what the allegations were, right?
17       A.    Right.
18       Q.    And they surround McKesson's
19   failure to prevent diversion in America,
20   diversion of narcotics in America, true?
21             MS. HENN:  Objection to form.
22   QUESTIONS BY MR. RAFFERTY:
23       Q.    You know that.
24             MS. HENN:  Objection to form.
25             THE WITNESS:  I understand,

Page 54

1 related to maintaining effective
2 controls in certain situations with
3 suspicious orders, yes.
4 QUESTIONS BY MR. RAFFERTY:
5 Q. Suspicious orders which then
6 allowed drugs to be diverted in the United
7 States, true?
8 MS. HENN: Objection to form.
9 THE WITNESS: That can be the
10 case. Not every suspicious order is
11 diversion.
12 QUESTIONS BY MR. RAFFERTY:
13 Q. Why do you report suspicious
14 orders, Mr. Hartle? Is it just to check the
15 box kind of thing?
16 MS. HENN: Objection to form.
17 QUESTIONS BY MR. RAFFERTY:
18 Q. Why is there a requirement by
19 the DEA and the DOJ that has been in place
20 since 1971 under the Controlled Substances
21 Act to report suspicious orders?
22 MS. HENN: Objection to form.
23 THE WITNESS: It's one of the
24 things intended to prevent diversion.
25

Page 55

1 QUESTIONS BY MR. RAFFERTY:
2 Q. There you go.
3 And in fact, what happens when
4 you fill suspicious orders, they get diverted
5 into illegal uses and feed the epidemic in
6 the United States, true?
7 MS. HENN: Objection to form.
8 THE WITNESS: Again, that can
9 happen.
10 QUESTIONS BY MR. RAFFERTY:
11 Q. Okay.
12 A. That can be, but not all
13 suspicious orders per the regulations are
14 diversion, diverted.
15 Q. Now, you know that since
16 2002 -- since 2002, the diversion of
17 narcotics in the United States has resulted
18 in an epidemic in the United States and
19 incalculable costs to society.
20 Would you agree with that
21 statement?
22 MS. HENN: Objection to form.
23 THE WITNESS: Can you say it
24 once again, please?
25

Page 56

1 QUESTIONS BY MR. RAFFERTY:
2 Q. Yeah.
3 The costs are so high as a
4 result of the epidemic in the United States
5 of the use of narcotics that the GAO
6 specifically said, "Diversion is a
7 multi-billion dollar illicit market
8 nationwide, and diversion is causing
9 incalculable costs to society."
10 Have you ever seen that?
11 MS. HENN: Objection to form.
12 THE WITNESS: I've not seen
13 that specific language, but I
14 understand what you're talking about.
15 It's a number that's very difficult to
16 calculate and assumed to be very, very
17 large.
18 (McKesson-Hartle Exhibit 45
19 marked for identification.)
20 QUESTIONS BY MR. RAFFERTY:
21 Q. I'm attaching Exhibit 45, the
22 May of 2002 GAO report.
23 Did you ever see a copy of
24 this? And it's a long document. I'm going
25 to just refer you to one particular piece.

Page 57

1 A. I don't think I've seen this
2 specific document, no.
3 Q. You've never reviewed this? In
4 the five years you've been involved in
5 monitoring the narcotics being sold by
6 McKesson, you never went back and reviewed
7 any of this?
8 MS. HENN: Objection to form.
9 THE WITNESS: I don't recall
10 this specific one.
11 QUESTIONS BY MR. RAFFERTY:
12 Q. All right.
13 A. I don't.
14 Q. Take a look at page --
15 MR. RAFFERTY: For the record,
16 that was P1.1076, which is now
17 Exhibit 45 to the deposition.
18 QUESTIONS BY MR. RAFFERTY:
19 Q. And if you could, look at the
20 cover page --
21 MR. RAFFERTY: Oh, I need the
22 computer back, please.
23 QUESTIONS BY MR. RAFFERTY:
24 Q. You see that, the GAO? Are you
25 familiar with the GAO?

Page 58

1    A.    I am.
2    Q.    United States government
3 accounting office?
4    A.    It's a part of some of the work
5 in my previous career.
6    Q.    Okay.  In May 2002,
7 "Prescription drug state monitoring programs
8 provide useful tools to reduce diversion."
9         Do you see that?
10    A.    I see that.
11    Q.    Okay.  And then if you turn to
12 .6, "The diversion" -- down in background.
13 It says, "The diversion and abuse" --
14         You see where it starts to say
15 that?
16    A.    I do.
17    Q.    Why don't you read that first
18 sentence for me out loud.
19    A.    "The diversion and abuse of
20 prescription drugs are associated with
21 incalculable costs to society in terms of
22 addiction, overdose, death and related
23 criminal activities."
24    Q.    And then the next sentence?
25    A.    "DEA has stated that the

Page 59

1 diversion and abuse of legitimately produced
2 controlled pharmaceuticals constitute a
3 multi-billion dollar illicit market
4 nationwide".
5    Q.    Now that's in 2002, some
6 16 years ago, right?
7    A.    Correct.
8    Q.    And McKesson at that time is
9 selling throughout the country narcotic
10 painkillers, correct?
11    A.    They were.
12    Q.    And they continue to today,
13 correct?
14    A.    We do.
15    Q.    Now, fast-forwarding for just a
16 moment to 2015, you were shown, I believe, a
17 portion of this presentation, or you've seen
18 this presentation, at least a portion of it.
19         (McKesson-Hartle Exhibit 46
20         marked for identification.)
21 QUESTIONS BY MR. RAFFERTY:
22    Q.    This will be Exhibit P1.851,
23 which will be Exhibit 46 to the deposition.
24         Do you recall being shown this
25 presentation earlier?

Page 60

1    A.    I do remember this from
2 yesterday.
3    Q.    Okay.
4         MR. RAFFERTY:  If we could pull
5 it up, Corey, please.  1.851.
6         Not that one.  That's 84.
7    1.851.
8         There we go.  All right.
9 QUESTIONS BY MR. RAFFERTY:
10    Q.    "State of prescription drug
11 abuse."  Once again, I'll tell you that the
12 metadata -- because there's no date on this
13 once again, but the metadata indicates that
14 this was created September 30, 2015.
15         Okay?
16    A.    Okay.
17    Q.    All right.  At that time you
18 were there at McKesson, senior director of
19 regulatory affairs, right?
20    A.    I was.
21    Q.    And you know Gary Boggs?
22    A.    I do know Gary.
23    Q.    He was the senior director in
24 charge of the east -- the east region,
25 correct?

Page 61

1         MS. HENN:  Objection to form.
2         THE WITNESS:  He was and still
3    is.
4 QUESTIONS BY MR. RAFFERTY:
5    Q.    Okay.  Now, in talking about
6 the state of prescription drug abuse, down
7 here at the bottom of this, if you look at
8 that cover page, it says, "Privileged and
9 confidential.  For internal use only."
10         Do you see that?
11    A.    I see that.
12    Q.    So this wasn't something that
13 McKesson was willing to share with the public
14 or outside of McKesson, right?  What's
15 written in these pages is for internal
16 purposes only --
17         MS. HENN:  Objection.
18 QUESTIONS BY MR. RAFFERTY:
19    Q.    -- not to be shared outside the
20 walls of McKesson.
21         MS. HENN:  Objection to form.
22         THE WITNESS:  That's what that
23    label infers.
24 QUESTIONS BY MR. RAFFERTY:
25    Q.    I mean --

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1   A.   I know what it means.
2   Q.   You've put it on some of your
3  presentations, haven't you?
4   A.   It's been on some.
5   Q.   Okay.  And that's what that
6  means.  It means don't share it with anybody
7  outside the walls of McKesson, right?
8        MS. HENN:  Objection to form.
9        THE WITNESS:  Yes.
10 QUESTIONS BY MR. RAFFERTY:
11  Q.   All right.  Let's look at what
12 Mr. Boggs says in this in terms of the costs
13 associated with this epidemic.
14       If you would, turn to page .7.
15  A.   Can I ask a clarifying
16 question?  You mentioned 2015.
17  Q.   Yeah.
18  A.   Maybe I'm wrong, but I thought
19 yesterday we were talking about 2013, right
20 around the time that when Gary joined.
21  Q.   I don't -- all I can tell you
22 is what the -- the material that was provided
23 to me by McKesson and their counsel --
24  A.   Okay.
25  Q.   -- indicates that this was

Page 63

1  produced in September of 2015.
2   A.   Okay.
3   Q.   Okay?
4   A.   Okay.
5   Q.   If you look at .7, you see that
6  chart?  And you see how -- that line there,
7  the top line, as sales increase so do opioid
8  deaths going all the way back to 1999?
9   A.   I see that chart.
10  Q.   And in fact, increasing also in
11 addition to the deaths are opioid treatment
12 admissions.
13       You see that?
14  A.   I've seen this before.
15  Q.   And your sale of narcotics --
16 when I say "your," I mean McKesson.
17 McKesson's sales of narcotic painkillers had
18 increased over that period of time, true?
19       MS. HENN:  Objection to form.
20       THE WITNESS:  True.  I don't
21 know if I've seen the exact rate
22 and -- you know, in this context, but
23 true.
24 QUESTIONS BY MR. RAFFERTY:
25  Q.   Right.

Page 64

1        And then if you go to .24, "A
2  national epidemic.  More than 45 people die
3  per day" -- I'm sorry, I'll wait until you
4  get there.
5   A.   24, you said?
6   Q.   .24, sir.
7   A.   Okay.  Sorry.
8   Q.   You there?
9   A.   I am.
10  Q.   "A national epidemic.  More
11 than 45 people die per day from prescription
12 opioids, from 4,030 in '99 to 16,651 in
13 2010."
14       You see that?
15  A.   I do see that.
16  Q.   "One in 20 people in the US
17 reported using prescription painkillers
18 nonmedically in the past year.  6,700 new
19 initiates per day, per day, in 2012."  That
20 means 60 -- well, tell me what that means,
21 6,700 new initiates.
22       MS. HENN:  Objection to form.
23       THE WITNESS:  I'm not
24 100 percent sure, but I'm assuming 67
25 new -- they were taking prescriptions

Page 65

1  for the first time.
2  QUESTIONS BY MR. RAFFERTY:
3   Q.   Prescription opioids?
4   A.   Opioids.
5   Q.   Or nonprescription opioids,
6  right?
7        MS. HENN:  Objection to form.
8  QUESTIONS BY MR. RAFFERTY:
9   Q.   Taking opioids, right?
10       MS. HENN:  Objection to form.
11       THE WITNESS:  I believe to be
12 that -- what that means.
13 QUESTIONS BY MR. RAFFERTY:
14  Q.   Okay.  And then it says down
15 there -- so here, McKesson, through Gary
16 Boggs, actually estimates the economic impact
17 to America being greater than $57 billion per
18 year.
19       Did I read that right?
20  A.   That's what it says.
21  Q.   Now, we talked earlier about
22 some of the --
23       MS. HENN:  Objection to form.
24 Belated.  The last question.
25

Page 66

1 QUESTIONS BY MR. RAFFERTY:
2     Q.    Okay.  All right.  We talked a
3 little bit earlier about the rights or --
4 excuse me, strike that.
5         We talked a little bit earlier
6 about the duties and responsibilities that
7 come along with selling and distributing
8 narcotics in the United States.
9         Do you recall that?
10    A.    We have talked about that.
11    Q.    Okay.  In fact, distributors
12 and wholesalers of narcotics have a great
13 responsibility to help prevent the diversion
14 and stop the diversion of narcotics in
15 America, true?
16        MS. HENN:  Objection to form.
17        MR. SUDDATH:  Objection.
18        THE WITNESS:  I think everyone
19    in the closed distribution has a great
20    responsibility to prevent diversion.
21 QUESTIONS BY MR. RAFFERTY:
22    Q.    Including the wholesalers and
23 distributors such as McKesson, correct?
24        MS. HENN:  Objection to form.
25        THE WITNESS:  We're included in

Page 67

1    that, correct.
2 QUESTIONS BY MR. RAFFERTY:
3     Q.    If we look at the second page
4 of Mr. Boggs' presentation, it says, "The
5 impact of effective compliance."
6         Do you see that?
7     A.    I see that title.
8     Q.    Effective compliance and what
9 impact it can have in America, right?
10        MS. HENN:  Objection to form.
11 QUESTIONS BY MR. RAFFERTY:
12    Q.    It says, "Protecting America
13 from prescription drug diversion," right?
14 That's what it says at the top?
15    A.    It does.
16    Q.    Okay.  And then after that it
17 says, "The impact of effective compliance,"
18 right?
19    A.    It does.
20    Q.    Okay.  So compliance in regards
21 to diversion, right?
22        MS. HENN:  Objection to form.
23        THE WITNESS:  I believe that's
24    the core of his presentation.
25

Page 68

1 QUESTIONS BY MR. RAFFERTY:
2     Q.    Okay.  If we could, let's go
3 to --
4         MS. HENN:  Counsel, I just
5    wanted to make one clarifying note.
6         Yesterday Mr. Farrell said that
7    the McKesson metadata for this
8    document indicated that the
9    presentation date is late 2013.  So
10    there's some discrepancy between what
11    he said and what you said.
12        MR. RAFFERTY:  I say it's
13    September 2015.
14        MS. HENN:  Just wanted to make
15    that clear for the record because the
16    witness had noted that he recalled
17    that.
18        MR. RAFFERTY:  I'm sorry, I
19    didn't mean to interrupt you,
20    Ms. Henn.
21        MS. HENN:  That's all right.
22 QUESTIONS BY MR. RAFFERTY:
23    Q.    Does that change your testimony
24 in regards to that document we went through?
25    A.    No, it doesn't change my

Page 69

1 testimony.  I just wanted to be clear of the
2 timing in terms of, you know, Gary's role,
3 when he came on board with McKesson and the
4 context of the presentation.
5     Q.    But it doesn't change your
6 testimony, true?
7     A.    It doesn't change my testimony.
8     Q.    Okay.  If we could, let's go to
9 .8 of the presentation.  "The Controlled
10 Substances Act.  Congress" --
11        You there?
12    A.    Yeah.  Sorry.
13    Q.    "The Controlled Substances
14 Act."  Talked about that earlier.  That's the
15 act that was passed by United States Congress
16 in 1971.
17        You recall that, right?
18    A.    I do.
19    Q.    Okay.  "Congress carve out for
20 controlled substances.  Establishes a closed
21 system of distribution."
22        Closed system.  That means not
23 everybody can come in and just start selling
24 and distributing narcotic painkillers, right?
25    A.    Correct.

Page 70

1    Q.    Okay.  "Creates checks and
2  balances between registrants to protect the
3  public health and safety."
4          Registrants.  That is the
5  people who are allowed to manufacture, sell
6  and distribute narcotics, correct?
7    A.    Yes.
8    Q.    Okay.  Of which McKesson is
9  one, correct?
10   A.    We are.
11   Q.    Okay.  And the purpose of the
12 Controlled Substance Act was to protect the
13 public health and safety, correct?
14         MS. HENN:  Objection to form.
15         THE WITNESS:  It's one of the
16 overriding purposes.
17 QUESTIONS BY MR. RAFFERTY:
18   Q.    And since 1971 and the passage
19 of the Controlled Substances Act -- if you
20 turn to page .9, here Mr. Boggs has "Checks
21 and Balances Under the CSA."  Distributors of
22 controlled substances, and then it lays out a
23 quote from the Controlled Substances Act.
24         Do you see that?
25   A.    I do.

Page 71

1    Q.    Okay.  "The registrant shall
2  design and operate a system to disclose to
3  the registrant suspicious orders of
4  controlled substances.  Suspicious orders
5  include orders of unusual size, orders
6  deviating substantially from a normal pattern
7  and orders of unusual frequency."
8          Do you see that?
9    A.    I see that.
10   Q.    And you agree that is a section
11 from the Controlled Substances Act that has
12 been in place since 1971, true?
13   A.    Yes.
14   Q.    Okay.  Now, in terms of the --
15         MS. HENN:  Objection to form.
16 Sorry.
17 QUESTIONS BY MR. RAFFERTY:
18   Q.    In terms of the ability --
19 well, let's turn to page 13.  "What can
20 happen when these checks and balances
21 collapse."
22         Do you see that?
23   A.    I see that.
24   Q.    When there's -- so the title of
25 this presentation is "Protecting America from

Page 72

1  Prescription Drug Diversion:  The Impact of
2  Effective Compliance."
3          So what this is saying is when
4  there's not effective compliance of the
5  Controlled Substance Act, disasters can
6  happen, right?
7          MS. HENN:  Objection to form.
8  QUESTIONS BY MR. RAFFERTY:
9    Q.    That shows a building
10 collapsing, correct?
11         MS. HENN:  Objection to form.
12         THE WITNESS:  It does show a
13 building collapsing.  I'm not sure
14 what the speaking points and the
15 context was exactly, but it shows a
16 building collapsing.
17 QUESTIONS BY MR. RAFFERTY:
18   Q.    You can't get the general
19 import of that particular slide from this?
20         MS. HENN:  Objection to form.
21         THE WITNESS:  I understand --
22 QUESTIONS BY MR. RAFFERTY:
23   Q.    And it means that if there's
24 not effective compliance, then it can result
25 in catastrophe, disaster, that type of thing,

Page 73

1  correct?
2          MS. HENN:  Objection to form.
3          THE WITNESS:  Something bad, of
4  course.
5  QUESTIONS BY MR. RAFFERTY:
6    Q.    Something really bad?
7          MS. HENN:  Objection to form.
8  QUESTIONS BY MR. RAFFERTY:
9    Q.    That's not just bad.  You see
10 the building collapsing?
11         Do you consider that bad or
12 catastrophic?
13         MS. HENN:  Objection to form.
14         THE WITNESS:  I consider that
15 bad.
16 QUESTIONS BY MR. RAFFERTY:
17   Q.    Bad.  Okay.
18   A.    Yeah, I don't -- however you
19 want to phrase it, it's --
20   Q.    No, that's -- hey, you're the
21 one testifying.  Mr. Hartle thinks that this
22 is bad.
23         Okay.  So we go to now your
24 ability to try to prevent that collapse.
25         Do you see the word there,

Page 74

1  "collapse"?
2      A.    I see that.
3      Q.    McKesson has a particular
4  ability or power as a distributor to prevent
5  that collapse, don't they?
6          MS. HENN:  Objection to form.
7          THE WITNESS:  We have a role in
8      prevention.
9  QUESTIONS BY MR. RAFFERTY:
10     Q.    An important role?
11     A.    Important, absolutely.
12     Q.    Yeah.  Okay.
13         In fact, if we go to page .37,
14  do you see there it says, "Distributors have
15  great power"?  Not just power, but great
16  power.
17         Do you see that?
18     A.    I see that.
19     Q.    And you agree with that, right?
20         MS. HENN:  Objection to form.
21  QUESTIONS BY MR. RAFFERTY:
22     Q.    Distributors have great power
23  when it comes to the ability to prevent the
24  diversion of narcotics in the United States?
25         MS. HENN:  Objection to form.

Page 75

1          THE WITNESS:  I don't know if I
2      would phrase it as great power, but an
3      important role, absolutely.
4  QUESTIONS BY MR. RAFFERTY:
5      Q.    Okay.  Well, Mr. Boggs referred
6  to it as great power.  We can agree on that,
7  right?
8          MS. HENN:  Objection to form.
9          THE WITNESS:  He did.  It's in
10     his deck.
11  QUESTIONS BY MR. RAFFERTY:
12     Q.    And he's a senior director of
13  regulatory affairs, same hierarchical
14  position as you are, right?
15         MS. HENN:  Objection to form.
16  QUESTIONS BY MR. RAFFERTY:
17     Q.    What we saw there back in 2015?
18     A.    He is.
19     Q.    Okay.  And what he describes as
20  great control -- or I'm sorry, great power is
21  it says you control the supply to downstream
22  customers.
23         Do you see that last bullet
24  point there?
25     A.    I do.

Page 76

1      Q.    And it's true, right?  If you
2  don't sell -- if you hold back an order, you
3  don't sell a suspicious order or ship a
4  suspicious order, that order can't be
5  diverted, right?
6      A.    That particular one from us
7  can't.
8      Q.    That's right.
9          And that's the reason -- I
10  think you agreed with me earlier, that's the
11  reason you report and -- you monitor and
12  report suspicious orders.  Because if you
13  determine there's a suspicious order, you
14  don't ship or you're not -- or let me
15  rephrase that -- you're not supposed to ship
16  it, right?
17         MS. HENN:  Objection to form.
18         THE WITNESS:  Can you ask the
19     question again?
20  QUESTIONS BY MR. RAFFERTY:
21     Q.    Yeah.  Yeah.
22         That's the reason, you agreed
23  with me earlier, that monitoring for
24  suspicious orders and reporting suspicious
25  orders is not just a check-the-box type of

Page 77

1  issue, right?  It's not -- it plays an
2  important role in preventing diversion?
3          MS. HENN:  Objection to form.
4          THE WITNESS:  It does.
5  QUESTIONS BY MR. RAFFERTY:
6      Q.    Okay.
7      A.    Or it can and -- it can.
8      Q.    Right.
9          Because according to the
10  regulations, if you are effectively complying
11  with the regulations, once you determine
12  there's a suspicious order, you, as the
13  distributor, McKesson, is not supposed to
14  ship that order, right?
15         MS. HENN:  Objection to form.
16         THE WITNESS:  It depends.  I
17     know there's other -- there's been
18     different -- there's different
19     programs, but...
20  QUESTIONS BY MR. RAFFERTY:
21     Q.    It depends.  Once you
22  determine -- once McKesson determines an
23  order is a suspicious order, McKesson is not
24  supposed to ship that order, true?
25     A.    We don't ship that order,

Page 78

1 right.
2 Q. Well, you actually have faced
3 several investigations and paid massive fines
4 because you did ship suspicious orders,
5 haven't you?
6 MS. HENN: Objection to form.
7 THE WITNESS: In the context of
8 our program today, we have a system
9 that blocks those orders.
10 QUESTIONS BY MR. RAFFERTY:
11 Q. Okay. My question was: You
12 have faced investigations and paid fines
13 based on the fact that McKesson shipped
14 suspicious orders, correct?
15 MS. HENN: Objection to form.
16 THE WITNESS: Those were the
17 allegations in those --
18 QUESTIONS BY MR. RAFFERTY:
19 Q. And you accepted --
20 A. -- and we accepted
21 responsibility on the last one.
22 Q. And paid $150 million fine as a
23 result, right?
24 A. We did.
25 Q. Okay. But getting back to my

Page 79

1 question, you are not supposed -- under the
2 law, McKesson, once they determine an order
3 is suspicious, is not supposed to ship that
4 order, correct?
5 MS. HENN: Objection to form.
6 THE WITNESS: Correct. You're
7 not -- you shouldn't ship suspicious
8 orders.
9 QUESTIONS BY MR. RAFFERTY:
10 Q. Right.
11 And if you effectively comply
12 and you don't ship a suspicious order, then
13 that order can't been diverted into illegal
14 use, true?
15 MS. HENN: Objection to form.
16 THE WITNESS: Correct.
17 QUESTIONS BY MR. RAFFERTY:
18 Q. Okay. Turning to the next
19 page, "With great power comes great
20 responsibility."
21 Do you see that?
22 A. I see that.
23 Q. And you agree with that, right?
24 As a result of being a
25 distributor and having great power in regards

Page 80

1 to the ability to prevent diversion of
2 narcotics in America, you have great
3 responsibility, right?
4 MS. HENN: Objection to form.
5 THE WITNESS: Again, I don't
6 know if I'd phrase it personally as
7 great power, but we have an important
8 responsibility, absolutely.
9 QUESTIONS BY MR. RAFFERTY:
10 Q. Okay. And when you do comply,
11 if there is effective compliance with the
12 Controlled Substances Act and your
13 responsibilities under that Controlled
14 Substances Act, it works and diversion
15 decreases, right?
16 MS. HENN: Objection to form.
17 THE WITNESS: It can decrease.
18 I mean, prevention is not a --
19 necessarily a measurable thing all the
20 time, but that's the idea.
21 QUESTIONS BY MR. RAFFERTY:
22 Q. That's the idea, that's the
23 plan, right?
24 A. In general, that's the concept.
25 Q. That's why the Controlled

Page 81

1 Substances Act is in place, right?
2 MS. HENN: Objection to form.
3 THE WITNESS: It's one of the
4 reasons why it's in place, sure.
5 QUESTIONS BY MR. RAFFERTY:
6 Q. All right. Turning to page 46,
7 "What else impacts diversion?"
8 Sorry, I'll let you get there.
9 Do you see that, "What else
10 impacts diversion?"
11 A. I do.
12 Q. We're still in your
13 colleague's, Mr. Boggs', presentation, right?
14 A. We are.
15 Q. Okay. And for the record,
16 Mr. Boggs, you know, was formerly with the
17 DEA before being hired by McKesson, right?
18 A. I'm aware of that.
19 Q. And involved in diversions with
20 the FDA {sic} or for the FDA, right?
21 MS. HENN: Objection to form.
22 QUESTIONS BY MR. RAFFERTY:
23 Q. Diversion compliance?
24 A. For the DEA, not the FDA.
25 Q. For the -- did I say FDA?

Page 82

1    A.    You did.
2    Q.    For --
3    A.    I want to be accurate.
4    Q.    He was formerly -- no, I
5 appreciate that.  Thank you.
6    A.    Yeah.
7    Q.    Let me rephrase it so the
8 record is clear.
9         Mr. Boggs was formerly involved
10 in the diversion compliance with the DEA,
11 correct?
12    A.    Yes, he was part of the Office
13 of Diversion Control.
14    Q.    Let's see what Mr. Boggs says
15 here about "what else impacts diversion."
16         "Compliance," and there's one,
17 two, three, four -- seven exclamation points
18 after that.
19         Do you see that, "compliance"?
20    A.    I do.
21    Q.    That's what -- what he's
22 talking about there is compliance with the
23 Controlled Substances Act, true?
24         MS. HENN:  Objection to form.
25         THE WITNESS:  I can make some

Page 83

1    assumptions, yeah.  I wasn't -- yeah.
2 QUESTIONS BY MR. RAFFERTY:
3    Q.    Well, it's not tough, is it?  I
4 mean --
5    A.    I wasn't there.  I didn't
6 prepare it, but I believe that's probably the
7 case, yeah.
8    Q.    Okay.  All right.
9         "The checks and balances
10 created by the controlled" -- what's that
11 word, those words? -- "Controlled Substances
12 Act work," right?
13         MS. HENN:  Objection to form.
14 QUESTIONS BY MR. RAFFERTY:
15    Q.    Why don't you read the -- we'll
16 just strike that.
17         Read that first bullet point
18 under "Compliance" with the seven exclamation
19 points.
20    A.    "The checks and balances
21 created by the Controlled Substances Act
22 work."
23    Q.    The next bullet point?
24    A.    "Registrants are a
25 force-multiplier."

Page 84

1    Q.    And the final one, will you
2 read that?
3    A.    "Without sustained sources of
4 supply, major diversion schemes wither away."
5    Q.    "Without sustained sources of
6 supply," what he's talking about there is
7 supply of narcotics, right?
8         MS. HENN:  Objection to form.
9         THE WITNESS:  Correct.
10 QUESTIONS BY MR. RAFFERTY:
11    Q.    Okay.  "Major diversion schemes
12 wither away."  That means diversion
13 decreases, right?
14    A.    That's the idea.
15    Q.    That's the idea.
16         So if there's effective
17 compliance, diversion decreases, true?
18         MS. HENN:  Objection to form.
19         THE WITNESS:  Again, I think
20    that's the idea.  I didn't present it.
21    I don't know what his speaking points
22    were, but that's a general idea.
23 QUESTIONS BY MR. RAFFERTY:
24    Q.    Pretty common sense, isn't it?
25 Even for somebody not in -- not senior

Page 85

1 regulatory affairs director for a distributor
2 of narcotics, it's pretty straight common
3 sense, right?
4    A.    It's fairly common sense,
5 right.
6    Q.    Okay.  And the same would be
7 also fairly common sense, and that is if you
8 don't effectively comply with the Controlled
9 Substances Act, then the opposite happens and
10 diversion increases, correct?
11         MS. HENN:  Objection to form.
12         THE WITNESS:  Diversion can
13    increase.  I don't know if there's an
14    exact, you know --
15 QUESTIONS BY MR. RAFFERTY:
16    Q.    Well, once again, it --
17    A.    It's an option.  I understand
18 what you're saying.
19    Q.    And it's true, right?
20         MS. HENN:  Objection to form.
21         THE WITNESS:  It can be true,
22    yes.
23 QUESTIONS BY MR. RAFFERTY:
24    Q.    Okay.  Now, one of the reasons
25 that this has -- that McKesson has great

Page 86

1 power, as that is phrased by Mr. Boggs, is
2 because as McKesson you service 25,000
3 customers in US pharma for narcotics,
4 correct?
5      MS. HENN:  Objection to form.
6      THE WITNESS:  I don't -- the
7   exact -- if that's the exact right
8   number.  That's the ballpark number,
9   yeah.
10      (McKesson-Hartle Exhibit 47
11   marked for identification.)
12 QUESTIONS BY MR. RAFFERTY:
13   Q.    All right.  Let's take a look
14 at 1.1455.  This is a presentation that you
15 gave, and, once again, there is a habit
16 evidently at McKesson of not putting dates on
17 things.  We don't have a date on this one, so
18 the metadata according to our records
19 produced by McKesson indicate that this was
20 done in August of 2014.  August 20, 2014.
21   A.    August 2014.
22   Q.    That would have been a few
23 months after you started, right?  If you
24 started --
25   A.    Right.  I started in May.

Page 87

1   Q.    And we will mark this as
2 Exhibit 47, I believe.
3      MR. RAFFERTY:  Okay.  For the
4   record, this is P1.1455, which is now
5   Exhibit 47 to the deposition.
6 QUESTIONS BY MR. RAFFERTY:
7   Q.    Do you recognize this
8 particular document, sir?
9   A.    I do.  These are -- yeah, these
10 are notes as I prepare to give presentations.
11   Q.    Right.  These are your speaker
12 notes, for example, for a corresponding
13 PowerPoint slide, right?
14   A.    Correct.
15   Q.    Okay.  Because it says
16 "slide 1" there up at the top, right?
17   A.    Correct.
18   Q.    Okay.  RNA VP.  That's you,
19 right?
20   A.    No.
21   Q.    Okay.  Who is that?
22   A.    So within that retail national
23 accounts or chain segment, each chain has
24 a -- there's vice presidents that manage the
25 relationships with the chains.  So they own

Page 88

1 the relationship to the chain.
2   Q.    Okay.  So do you know who that
3 person was at this time, RNA VP?
4   A.    There are multiple RNA VPs, and
5 this is the presentation that is given at
6 different times to different chains, so I'm
7 not sure which one it would be --
8   Q.    Okay.  So whoever -- whoever it
9 is --
10   A.    -- of that chain.
11   Q.    -- of that chain at that time?
12   A.    Correct.
13   Q.    Okay.
14   A.    Correct.
15   Q.    It goes down and it says, "My
16 name is Nate Hartle."  That's you?
17   A.    Right.
18   Q.    We know that?
19   A.    Right.
20   Q.    Okay.  "And I am senior
21 director of regulatory affairs for McKesson
22 dedicated to our retail national accounts."
23      Do you see that?
24   A.    Right.
25   Q.    "My background is in retail in

Page 89

1 the assets protection and corporate security
2 world, and I have experience and knowledge in
3 the diversion space, including leading
4 efforts focused on both internal theft and
5 the CSMP on the dispensing side."
6      Do you see that?
7   A.    I see that.
8   Q.    You were with Target before you
9 started at McKesson, right?
10   A.    I was.
11   Q.    Okay.  Were you in -- did you
12 have a role or were you in charge of the
13 diversion of narcotics compliant -- the
14 compliance with the regulations of the
15 diversion of narcotics while at Target?
16   A.    While at Target, there was
17 multiple functions involved in pharmacy.  I
18 had a very specific team that was focused on,
19 you know, monitoring diversion, monitoring
20 dispensing across the stores.  So I played a
21 role.
22      We investigated internal theft.
23 We monitored -- we worked internally to
24 create training and education and awareness.
25 So I played a role along with other

Page 90

1  components within Target.
2      Q.    Okay.
3          MR. RAFFERTY:  Let's go to .5
4  of this presentation, Corey.
5  QUESTIONS BY MR. RAFFERTY:
6      Q.    So this is being given to the
7  retail chains, right?
8      A.    So these presentations are
9  given to -- were given initially to retail
10  chains in -- when I first joined the team.
11  And I will -- to add some context to this, as
12  I prepared, these were not read word for
13  word. This is me preparing and using as a
14  guideline.
15      Q.    I understand.
16      A.    So this is not a presentation;
17  it's just speaking points. But I -- so I
18  wanted you to understand.
19      Q.    I wasn't suggesting it was.
20      A.    Right.
21      Q.    But this is something that you
22  wrote, right?
23      A.    It is.
24      Q.    Okay. If you turn to page 5,
25  "Have any of you or your teams had a chance

Page 91

1  to attend any of the DEA sessions or heard
2  Joe Rannazzisi speak?"
3          Do you see that?
4      A.    I do.
5      Q.    Mr. Rannazzisi, he's with the
6  DEA, right?
7      A.    He was.
8      Q.    Was.
9          And he's the one that actually
10  wrote those letters back in 2006 and 2007
11  reiterating what your responsibilities are
12  under the Controlled Substances Act, true?
13          MS. HENN:  Objection to form.
14          THE WITNESS:  He wrote those.
15  QUESTIONS BY MR. RAFFERTY:
16      Q.    Okay.
17      A.    They came from him, sure.
18      Q.    Okay. And it says here,
19  "Again, our intent is to share our intel with
20  you because we have a unique national view."
21          You would agree with that,
22  right? As a distributor, a national
23  distributor, you have a unique national view
24  as it comes to narcotic distribution in the
25  United States?

Page 92

1          MS. HENN:  Objection to form.
2          THE WITNESS:  We do.
3  QUESTIONS BY MR. RAFFERTY:
4      Q.    Okay. "With more than 25,000
5  customers, we have insight into trends so we
6  want to share that with you through updates
7  and interactions. We would also like to
8  learn from you, so any trends or intel you
9  may have would be valuable to us."
10          Do you see that?
11      A.    I see that.
12      Q.    Okay. So 25,000 -- at least
13  with the 25,000 customers, that's the number
14  you used in your presentation, right?
15      A.    I did --
16      Q.    Okay.
17      A.    -- use that initially when I
18  came on board.
19      Q.    And you wouldn't put it in
20  there if you didn't think it was accurate,
21  right?
22      A.    Yeah, I can't speak to where I
23  pulled that from internally with McKesson,
24  but...
25      Q.    So one of the other reasons

Page 93

1  you've got power -- so you've got 25,000
2  customers. One of the other reasons you have
3  great power is because one out of every three
4  pills, prescription pills, taken in the
5  United States is delivered to the pharmacy in
6  trucks owned by McKesson with the McKesson
7  emblem on it, right?
8          MS. HENN:  Objection to form.
9  QUESTIONS BY MR. RAFFERTY:
10      Q.    One out of every three?
11          MS. HENN:  Objection to form.
12          THE WITNESS:  I think that's
13  one out of every three prescriptions.
14  QUESTIONS BY MR. RAFFERTY:
15      Q.    Prescriptions.
16      A.    Not pills. I think --
17      Q.    Okay. One out of every three
18  prescriptions in the United States is
19  delivered to the pharmacy by trucks owned by
20  McKesson with McKesson logos on it, right?
21          MS. HENN:  Objection to form.
22          THE WITNESS:  I don't believe
23  that's 100 percent accurate in terms
24  of trucks owned by McKesson. We use
25  other --

Page 94

1 QUESTIONS BY MR. RAFFERTY:
2     Q.    McKesson supplies --
3     A.    It comes from McKesson.
4     Q.    Sorry, I didn't mean to talk
5 over you.
6          McKesson supplies one out of
7 every three prescriptions taken in the United
8 States, correct?
9          MS. HENN:  Objection to form.
10         THE WITNESS:  That's what's in
11    the company fact sheet.
12 QUESTIONS BY MR. RAFFERTY:
13    Q.    Okay.  And you don't have any
14 reason to dispute that, right?
15    A.    I don't.
16    Q.    And in fact, in the year 2014
17 when you started at McKesson, US pharma, the
18 division that sells the narcotics throughout
19 the country, the division that provides and
20 produces one-third of every prescription in
21 the United States, had $104 billion in
22 revenue, right?
23         MS. HENN:  Objection to form.
24         THE WITNESS:  Sounds about
25    right.  I don't know the exact

Page 95

1    numbers.
2 QUESTIONS BY MR. RAFFERTY:
3    Q.    Okay.  So if 25,000 customers
4 providing -- or supplying one out of every
5 three prescriptions in the United States, and
6 making $104 billion in revenue per year, that
7 gives McKesson great power in its ability, if
8 it chose to do so, to prevent diversion of
9 narcotics in the United States.
10         You would agree with that,
11 right?
12         MS. HENN:  Objection to form.
13         THE WITNESS:  I'd agree that as
14    a large distributor we have absolutely
15    great responsibility based on our
16    scale --
17 QUESTIONS BY MR. RAFFERTY:
18    Q.    Yeah, the responsibility --
19    A.    -- and the number of customers.
20    Q.    I'm sorry.
21    A.    Based on the number of our
22 customers.
23    Q.    Okay.  And your asset -- and
24 your financial ability, right, and the
25 control you have over the number of

Page 96

1 prescriptions being dispensed, that gives you
2 great power?
3         MS. HENN:  Objection to form.
4         THE WITNESS:  We don't have
5    control of what's dispensed.  We don't
6    dispense anything.
7 QUESTIONS BY MR. RAFFERTY:
8    Q.    Well, actually you do, don't
9 you, because if you --
10         MS. HENN:  Just a note to try
11    not to talk over each other, but go
12    ahead with your question.
13 QUESTIONS BY MR. RAFFERTY:
14    Q.    I'm sorry, you want to finish?
15    A.    And we -- pharmacies dispense.
16 We distribute to those pharmacies, right.
17    Q.    Right.
18         And if you don't dispense or if
19 you don't -- maybe we're getting hung up on
20 the word "dispense."
21         If you don't ship an order,
22 then that order -- that narcotic order can't
23 be diverted, right?
24         MS. HENN:  Objection to form.
25

Page 97

1 QUESTIONS BY MR. RAFFERTY:
2    Q.    So you do have the ability to
3 control that?
4         MS. HENN:  Objection to form.
5         THE WITNESS:  Pharmacies get
6    products from a variety of
7    distributors, so they may not be able
8    to dispense the specific item from us.
9    It does not mean they're not receiving
10    it or could receive it from somewhere
11    else.
12 QUESTIONS BY MR. RAFFERTY:
13    Q.    So we might as well fill the
14 suspicious order because somebody else will;
15 is that McKesson's motto?
16         MS. HENN:  Objection to form.
17         THE WITNESS:  Not at all.
18 QUESTIONS BY MR. RAFFERTY:
19    Q.    Okay.
20    A.    Just clarifying that we don't
21 dispense.
22    Q.    But you supply, don't you?
23    A.    Of course.  Absolutely.
24    Q.    Okay.
25         MS. HENN:  Counsel, we've been

Page 98

1 going over an hour.  Would this be a
2 good time for a quick break?  We can
3 make it five minutes.
4         MR. RAFFERTY:  I'll tell you,
5 can I just finish this one document
6 and then we can take ten?
7         THE WITNESS:  That's fine.
8 That's okay.
9 QUESTIONS BY MR. RAFFERTY:
10    Q.    You would agree with me,
11 wouldn't you, Mr. Hartle, that when it comes
12 to compliance under the Controlled Substances
13 Act -- under -- under the Controlled
14 Substances Act, McKesson is responsible for
15 designing and operating a system to
16 determine -- or to suspect -- or to identify
17 suspicious orders, right?
18         MS. HENN:  Objection to form.
19         THE WITNESS:  That's the
20 regulation, absolutely.
21 QUESTIONS BY MR. RAFFERTY:
22    Q.    Okay.  And -- but it is
23 McKesson who decides ultimately whether an
24 order is suspicious, right?
25    A.    Correct.

Page 99

1    Q.    And, therefore, whether or not
2 to ship that order, right?
3    A.    Correct.
4         MR. RAFFERTY:  Okay.  We can
5 take a break now.
6         MS. HENN:  Thank you.
7         VIDEOGRAPHER:  The time is
8 10:16 a.m.  We're going off the
9 record.
10    (Off the record at 10:16 a.m.)
11         VIDEOGRAPHER:  The time is
12 10:29 a.m., and we're back on the
13 record.
14         MR. RAFFERTY:  All right.  Just
15 a little housekeeping here.
16         In a stunning twist of fate, I
17 was actually wrong and Paul Farrell
18 was right.  The date on the Boggs'
19 presentation, which is Exhibit 46 to
20 the deposition, is September 30, 2013.
21         MR. FARRELL:  I'm sorry, Troy,
22 I missed that.
23         MS. HENN:  Thank you, sir.
24         THE WITNESS:  Thank you.
25         MR. RAFFERTY:  It won't happen

Page 100

1 again.  There's a first time for
2 everything.
3 QUESTIONS BY MR. RAFFERTY:
4    Q.    Okay.  Now, getting back to the
5 questions.
6         Mr. Hartle, so we talked
7 earlier about the roles and responsibilities
8 that McKesson has as a distributor of
9 narcotics under the Controlled Substances
10 Act.
11         You would agree with me that in
12 2006 Mr. Rannazzisi, who we just talked about
13 a few minutes ago, on behalf of the United
14 States Department of Justice and the Drug
15 Enforcement Administration, sent a letter to
16 all distributors and registrants reiterating
17 the responsibilities and duties under the
18 Controlled Substance Act, right?
19         MS. HENN:  Objection to form.
20         THE WITNESS:  Yes, he did send
21 that.
22    (McKesson-Hartle Exhibit 49
23    marked for identification.)
24 QUESTIONS BY MR. RAFFERTY:
25    Q.    Okay.  All right.  If we could

Page 101

1 1.1464, which will be exhibit -- excuse me --
2 which will be Exhibit 49 to the deposition.
3         Do you recognize this as being
4 the letter that was sent to McKesson?
5    A.    I do.
6    Q.    Okay.  And in the letter it
7 specifically says at the top, "September 27,
8 2006."
9         Do you see that?  Oh, no,
10 it's 1.1464.
11         All right.  Looking at this
12 particular letter, once again, it's dated
13 September 27, 2006, right?
14    A.    Correct.
15    Q.    Okay.  And he says here, "This
16 letter is being sent to every commercial
17 entity in the United States registered with
18 the DEA to distribute controlled substances."
19         Did I read that right?
20    A.    Yes.
21    Q.    "The purpose of this letter is
22 to reiterate the responsibilities of
23 controlled substance distributors in view of
24 the prescription drug abuse problem our
25 nation currently faces. "

Page 102

1    Did I read that right?
2    A.    You did.
3    Q.    And he specifically uses the
4  word "reiterate" there, true?
5    A.    He does.
6    Q.    Okay.  These aren't new
7  responsibilities; he's reiterating what the
8  responsibilities are, correct?
9        MS. HENN:  Objection to form.
10       THE WITNESS:  Correct.
11 QUESTIONS BY MR. RAFFERTY:
12   Q.    Okay.  And as you go down, I'm
13 not going to go through the entire letter,
14 but let's look at the third full paragraph.
15 "The CSA was designed by Congress to combat
16 diversion by providing for a closed system of
17 drug distribution in which all legitimate
18 handlers of controlled substances must obtain
19 a DEA registration."
20        That's the closed system we
21 talked about earlier, right?
22   A.    It is.
23   Q.    "As a condition of maintaining
24 such registration, must take reasonable steps
25 to ensure that their registration is not

Page 103

1  being utilized as a source of diversion."
2        Did I read that correctly?
3    A.    You did.
4    Q.    Then he says -- he talked
5  specifically about distributors.
6  "Distributors are, of course, one of the key
7  components of the distribution chain.  If the
8  closed system is to function properly as
9  Congress envisioned, distributors must be
10 vigilant" --
11       Do you see that word?
12   A.    I do.
13   Q.    -- "in deciding whether a
14 prospective customer can be trusted to
15 deliver controlled substances only for lawful
16 purposes.  This responsibility is critical,
17 as Congress has expressly declared that the
18 illegal distribution of controlled substances
19 has a substantial and detrimental effect on
20 the health and general welfare of the
21 American people."
22       Do you see that?
23   A.    I do.
24   Q.    And you agree with all of that,
25 true?

Page 104

1        MS. HENN:  Objection to form.
2        THE WITNESS:  I do.
3  QUESTIONS BY MR. RAFFERTY:
4    Q.    Okay.  So distributors must be
5  vigilant.  By that, you would agree with me
6  that distributors must be not only vigilant
7  but proactive in trying to prevent the
8  diversion of narcotics in the United States,
9  true?
10   A.    I would use the phrase --
11 "proactive" is part of it, too, sure.
12   Q.    Proactive.
13   A.    Sure.
14   Q.    It's not a passive
15 responsibility where you just kind of wait
16 and see if somebody calls you up and says,
17 "Hey, listen, I think I'm going to order way
18 too many prescription drugs and divert them."
19 I mean, you got to go out and try to find
20 them, right?
21       MS. HENN:  Objection to form.
22 QUESTIONS BY MR. RAFFERTY:
23   Q.    You have to be vigilant and
24 proactive?
25   A.    It should be part of the -- an

Page 105

1  element of the program.
2    Q.    Okay.  Turning to the second
3  page, sir.  Okay.  Going on to the page 2.
4  "The statu" -- I'm sorry, the third full
5  paragraph.
6        "The statutory factors."  Do
7  you see that sentence?
8    A.    I do.
9    Q.    Okay.  Would you read that,
10 please?
11   A.    "The statutory factors DEA must
12 consider in deciding whether to revoke a
13 distributor's registration are set forth in
14 21 USC 823(e)."
15       Want to keep going?
16   Q.    Yeah, just the next sentence.
17   A.    Okay.  "Listed first among
18 these factors is the duty of distributors to
19 maintain effective controls against
20 diversion -- against diversion of controlled
21 substances into other than legitimate
22 medical, scientific and industrial channels."
23   Q.    Okay.  So maintain effective
24 controls, correct?
25   A.    Correct.

Page 106

1    Q.    The DEA -- the next paragraph
2  says -- lays out that CFR we read about
3  designing and operating a system to disclose
4  suspicious orders.
5         You see that?
6    A.    I do.
7    Q.    Okay.  And then going down to
8  the next one it says, "It bears emphasis that
9  the foregoing reporting requirement is in
10 addition to and not in lieu of the general
11 requirement under 21 USC 823(e) that a
12 distributor maintain effective controls
13 against diversion."
14        Do you see that?
15   A.    I do.
16   Q.    So it's not just what's listed
17 up there right above it, right?
18   A.    Right.
19   Q.    Okay.  "Thus, in addition to
20 reporting all suspicious orders, a
21 distributor has a statutory responsibility to
22 exercise due diligence to avoid filling
23 suspicious orders that might be diverted into
24 other than legitimate medical, scientific and
25 industrial channels."

Page 107

1         Did I read that correctly?
2    A.    You did.
3    Q.    Okay.  So you have to use and
4  exercise due diligence, right?  You would
5  agree with that?
6    A.    Correct, that's what it says in
7  here, yeah.
8    Q.    Well, and you would agree with
9  it?
10   A.    Agree with it.
11   Q.    Okay.  "Due diligence to avoid
12 filling suspicious orders," correct?
13        Okay.  "In a similar vein,
14 given the requirements under 823(e) that a
15 distributor maintain effective controls
16 against diversion, a distributor may not
17 simply rely on the fact that the person
18 placing the suspicious order is a DEA
19 registrant and turn a blind eye to the
20 suspicious circumstances."
21        You see that?
22   A.    I do.
23   Q.    And you agree with that, right?
24        MS. HENN:  Objection to form.
25        THE WITNESS:  I agree with

Page 108

1  that.
2  QUESTIONS BY MR. RAFFERTY:
3    Q.    Just --
4    A.    Just because you're registered.
5    Q.    What that means is just because
6  a pharmacy, for example, that you're
7  supplying the narcotics to happens to also be
8  a DEA registrant doesn't mean that you can
9  just say, "Well, they're a DEA registrant,
10 they've got their obligations, we'll just
11 ship it."
12   A.    Understood.
13   Q.    You agree?
14   A.    I do.
15   Q.    Okay.  "Again, to maintain
16 effective controls against diversion as
17 Section 823(e) requires, the distributor
18 should exercise due care in confirming the
19 legitimacy of all orders prior to filling."
20        You see that?
21   A.    I do.
22   Q.    Okay.  And you see going to
23 page 4, that's signed by Joseph T.
24 Rannazzisi, Deputy Assistant Administrator,
25 Office of Diversion Control.

Page 109

1         You see that?
2    A.    I see that.
3    Q.    Okay.  Now, that was in
4  September of 2006.
5         Now, in December of 2007,
6  Mr. Rannazzisi sent another letter.  You're
7  aware of that, correct?
8    A.    Correct.
9         (McKesson-Hartle Exhibit 50
10 marked for identification.)
11 QUESTIONS BY MR. RAFFERTY:
12   Q.    Okay.  And this will be marked
13 as Exhibit 50 to the deposition.
14        So here, December 27, 2007.
15 Just so happens to be the monitor that I
16 can't see that is there.
17        You see the date there,
18 December 27, 2007, sir?
19   A.    I do.
20   Q.    Okay.  Once again, this one
21 is -- now, this one is specifically addressed
22 to McKesson Corporation.
23        Do you see that?
24   A.    I see that.
25   Q.    Okay.  But even though the

Page 110

1 other one didn't have an address on it, you
2 acknowledge that McKesson received that
3 letter?
4    A.   Yes.
5    Q.   All right.  Once again he says,
6 "This letter is being sent to every entity in
7 the United States registered with the DEA to
8 manufacture or distribute controlled
9 substances."
10       Do you see that?
11   A.   I do.
12   Q.   Okay.  Once again he says, "The
13 purpose of this letter is to reiterate the
14 responsibilities of controlled substance
15 manufacturers and distributors to inform DEA
16 of suspicious orders in accordance with 21
17 CFR 1301.74 subsection B.
18       Do you see that?
19   A.   Right.  I do.
20   Q.   Once again he uses that word
21 "reiterate," right?
22   A.   Yes.
23   Q.   Okay.  Down to the next
24 paragraph it says, "In addition to and not in
25 lieu of the general requirement under 21 USC

Page 111

1 823 that manufacturers and distributors
2 maintain effective controls against
3 diversion, DEA require -- regulations require
4 all manufacturers and distributors to report
5 suspicious orders of controlled substances."
6       You agree that you must report
7 to the DEA all suspicious orders, right?
8       MS. HENN:  Objection to form.
9       THE WITNESS:  That's what's in
10      the language, yes, reporting
11      suspicious orders, yes.
12 QUESTIONS BY MR. RAFFERTY:
13   Q.   And you agree that that's a
14 responsibility that you have as a
15 distributor?
16   A.   To report suspicious orders,
17 yes.
18   Q.   Okay.  Then going down, the
19 regulation -- the regulation clearly
20 indicates that "it is the sole responsibility
21 of the registrant to design and operate such
22 a system."
23       Did I read that right?
24   A.   Yes.
25   Q.   "Accordingly, DEA does not

Page 112

1 approve or otherwise endorse any specific
2 system for reporting suspicious orders."
3       Correct?
4    A.   Correct.
5    Q.   Okay.  And then going further
6 down it says, "The regulation also" -- this
7 is the third full paragraph, sir, I'm sorry.
8       "The regulation also requires
9 that the registrant inform the local DEA
10 division office of suspicious orders when
11 discovered by the registrant."
12       Do you see that?
13   A.   I see that.
14   Q.   And you acknowledge that that
15 is a responsibility of the distributor of
16 narcotics in the United States, is to report
17 it when it's discovered, right?
18   A.   That's in this guidance.
19 That's what he's saying, yeah.  It's not the
20 language in the -- in the specific
21 regulation.
22   Q.   You understand that is a
23 responsibility of distributors?
24   A.   To report suspicious orders,
25 yes.

Page 113

1    Q.   When discovered?
2    A.   I understand that.
3    Q.   You agree with that?
4    A.   I agree with that.
5    Q.   Okay.  "Filing a monthly report
6 of completed transactions does not meet the
7 regulatory requirement to report suspicious
8 orders."
9       Do you see that?
10   A.   I see that.
11   Q.   "Registrants are reminded that
12 their responsibility does not end merely with
13 the filing of a suspicious order report.
14 Registrants must conduct an independent
15 analysis of suspicious orders prior to
16 completing a sale to determine whether the
17 controlled substances are likely to be
18 diverted from legitimate channels."
19       Is that correct?
20   A.   I see that.
21   Q.   And you agree with that?
22   A.   Yes.
23   Q.   And part of that independent
24 analysis is what was being discussed in 2006
25 as exercising due diligence in that

Page 114

1 investigation, correct?
2          MS. HENN:  Objection to form.
3          THE WITNESS:  Due diligence is
4     the way to investigate or gather
5     information, yes.
6 QUESTIONS BY MR. RAFFERTY:
7     Q.    "Reporting an order as
8 suspicious will not absolve the registrant of
9 responsibility if the registrant knew or
10 should have known that the controlled
11 substances were being diverted."
12          Do you see that?
13     A.    I see that.
14     Q.    So what he's saying there is
15 you must not ship suspicious orders.
16 Reporting isn't enough.  If you have a
17 suspicious order, you must not ship it, true?
18          MS. HENN:  Objection to form.
19          THE WITNESS:  Can you say that
20     once again?
21 QUESTIONS BY MR. RAFFERTY:
22     Q.    You must not ship an order if
23 you determine it to be a suspicious order.
24     A.    Suspicious order.  Correct.
25     Q.    And then it goes through and

Page 115

1 describes again that suspicious orders are
2 orders of unusual size, pattern or frequency.
3          You see that?
4     A.    I see that, yeah.
5     Q.    All right.  Then finally
6 turning to page 2, "Registrants" -- the top
7 paragraph.
8          "Registrants that rely on rigid
9 formulas to define whether an order is
10 suspicious may be failing to detect
11 suspicious orders."
12          You see that?
13     A.    I see that.
14     Q.    "For example, a system that
15 identifies orders as suspicious only if the
16 total amount of a controlled substance
17 ordered during one month exceeds the amount
18 ordered the previous month by a certain
19 percentage or more is insufficient."
20          You see that?
21     A.    I see that.
22     Q.    "This system fails to identify
23 orders placed by a pharmacy if the pharmacy
24 placed unusually large orders from the
25 beginning of its relationship with the

Page 116

1 distributors."
2          So if you have -- you have to
3 have more than just an algorithm or a formula
4 to detect suspicious orders; that's what he's
5 telling you there, right?
6          MS. HENN:  Objection to form.
7          THE WITNESS:  Can you ask your
8     question again, clarify your question?
9 QUESTIONS BY MR. RAFFERTY:
10     Q.    Yeah.
11          You can't simply rely upon an
12 algorithm or a formula to determine whether
13 an order is a suspicious order; you have to
14 have and do more than that.  That's what he's
15 telling you.  That's what the regulations
16 call for?
17          MS. HENN:  Objection to form.
18          THE WITNESS:  Yeah, there's
19     other factors that are involved at
20     times that are taken into
21     consideration.
22 QUESTIONS BY MR. RAFFERTY:
23     Q.    So you agree with that?
24          MS. HENN:  Objection to form.
25          THE WITNESS:  That there's --

Page 117

1     it's not solely a rigid formula alone,
2     agreed.
3 QUESTIONS BY MR. RAFFERTY:
4     Q.    All right.  "Also, this system
5 would not identify orders as suspicious if
6 the order were solely for one highly abused
7 controlled substance if the orders never grew
8 substantially."
9          Do you see that?
10     A.    I see that.
11     Q.    "Nevertheless, ordering one
12 highly abused controlled substance, and
13 little or nothing else, deviates from normal
14 pattern of what pharmacies generally order."
15          You agree with that?
16          MS. HENN:  Objection to form.
17          THE WITNESS:  If you have the
18     full context of what the pharmacy is,
19     I agree with that.
20 QUESTIONS BY MR. RAFFERTY:
21     Q.    Okay.  All right.  In
22 implementing a -- in designing and operating
23 an effective system to detect suspicious
24 orders or in performing the due diligence to
25 detect a suspicious order, you would agree

Page 118

1 with me that a distributor of narcotics
2 should err on the side of the public safety
3 and health in making those decisions,
4 correct?
5        MS. HENN: Objection to form.
6        THE WITNESS: Can you -- can
7    you restate that or --
8 QUESTIONS BY MR. RAFFERTY:
9    Q.    Yeah.
10        In making the decision under,
11 for example, the CSMP in place -- or that
12 began in place in 2008, you would agree with
13 me that a distributor of narcotics such as
14 McKesson should err in making those decisions
15 on the side of the public health and safety
16 in America?
17        MS. HENN: Objection to form.
18        THE WITNESS: There's a lot of
19    components that go into a decision
20    like that, and that could be one of
21    them that has -- carries importance,
22    sure. You want to do what's right.
23 QUESTIONS BY MR. RAFFERTY:
24    Q.    Well, but if you're trying to
25 make a judgment call and it could go either

Page 119

1 way, you want to err on the side of public
2 health and safety, right?
3        MS. HENN: Objection to form.
4        THE WITNESS: Naturally you
5    would as a person in the --
6    absolutely. But there's many things
7    that go into designing a system,
8    right.
9 QUESTIONS BY MR. RAFFERTY:
10    Q.    Well, I'm not talking about the
11 design of the system. I'm saying, for
12 example, in your -- in your CSMP when you go
13 down a level 1, 2 or 3 investigation and
14 you're making a decision, because after each
15 level, you would agree with me, a decision
16 has to be made as to whether or not the order
17 is -- could be a suspicious order and whether
18 to take it to the next level of
19 investigation, right?
20        MS. HENN: Objection to form.
21        THE WITNESS: Correct, that's
22    how a tiered process works.
23 QUESTIONS BY MR. RAFFERTY:
24    Q.    And that's how the McKesson
25 tiered process works, right?

Page 120

1        MS. HENN: Objection to form.
2        THE WITNESS: That's how it's
3    defined in the program, yes.
4 QUESTIONS BY MR. RAFFERTY:
5    Q.    That's right.
6        And so in making the decision,
7 for example, whether to take an order as --
8 determine whether an order should go from
9 level 1 to level 2, McKesson and you, as one
10 of the senior directors of regulatory
11 affairs, should err -- if you're going to
12 make an error, you should err on the side of
13 public health and safety?
14        MS. HENN: Objection to form.
15        THE WITNESS: I agree. I don't
16    believe that's not top of mind when
17    you're making those decisions, but in
18    theory, yes, you want to do what's --
19    what's ultimately -- you want to do
20    what's right.
21 QUESTIONS BY MR. RAFFERTY:
22    Q.    Okay. The public health and
23 safety is not at top of mind of McKesson when
24 making those decisions?
25        MS. HENN: Objection to form.

Page 121

1        THE WITNESS: I'm saying in
2    those certain circumstances it's
3    not -- that's not something that
4    somebody processes and goes through
5    and says, okay, what's -- I think they
6    naturally have the public safety in
7    mind. So I would say they do -- it's
8    the ultimate goal of the program in
9    general.
10 QUESTIONS BY MR. RAFFERTY:
11    Q.    Well, if you decide that an
12 order should not be -- that should be
13 shipped -- or I'm sorry, excuse me.
14        If you decide an order is
15 suspicious and should not be shipped, then
16 McKesson loses that business, right? They
17 lose that sale. If you don't ship it, you
18 can't get paid for it, right?
19    A.    That's accurate.
20    Q.    Okay. And in fact, as you're
21 going through and making those decisions,
22 people who are involved in sales, for
23 example, play a part in those decisions in
24 the CSMP, don't they?
25    A.    They play a part in gathering

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 information and collecting information.
2 Regulatory has the decision-making ability.
3      Q.    I understand.
4           But it starts with, for
5 example, the distribution center managers and
6 salespeople, right?
7           MS. HENN:  Objection to form.
8           THE WITNESS:  Because that's an
9 intake point, yeah.
10 QUESTIONS BY MR. RAFFERTY:
11      Q.    Okay.  I want to talk
12 specifically about the CSMP at McKesson, and
13 in particular thresholds.  Okay?
14      A.    (Witness nods head.)
15      Q.    You're familiar with the
16 concept of the thresholds under the
17 controlled safety monitoring program --
18 controlled substance monitoring program,
19 correct?
20      A.    I am.
21      Q.    Okay.  In fact, it's somewhat
22 the foundation.  The thresholds are kind of
23 the foundation of the CSMP, true?
24      A.    They're certainly a core part
25 of the program, foundation of the suspicious

Page 123

1 order portion of that, yeah.
2      Q.    Right.
3           The suspicious order monitoring
4 is performed through thresholds and the
5 setting of thresholds?
6           MS. HENN:  Objection to form.
7           THE WITNESS:  Correct.
8 QUESTIONS BY MR. RAFFERTY:
9      Q.    Okay.  And in fact, in terms of
10 the thresholds, there's two important aspects
11 of thresholds as it pertains to the diversion
12 of narcotics in the United States, and that
13 is, the initial setting of the thresholds and
14 then whether or not there should be a
15 threshold change request granted to increase
16 that threshold, correct?
17      A.    Correct.
18      Q.    Both of those areas are subject
19 to manipulation; you would agree with that?
20           MS. HENN:  Objection to form.
21           THE WITNESS:  Manipulation in
22      terms of -- maybe could you better
23      define what you're --
24 QUESTIONS BY MR. RAFFERTY:
25      Q.    Yeah.  You determine, for

Page 124

1 example -- McKesson.  I keep saying "you."
2 McKesson determines, for example, when a
3 customer comes on board, at what level to set
4 the threshold, right?
5      A.    Correct.
6      Q.    If you set the threshold too
7 high, then there's no chance that that
8 customer, no matter what they're ordering,
9 whether they're -- if they're ordering a --
10 or they're -- it's a suspicious order, ever
11 bumps up against a threshold which never
12 triggers the tiered investigation under the
13 CSMP, true?
14           MS. HENN:  Objection to form.
15           THE WITNESS:  Could you restate
16      that one for me?
17 QUESTIONS BY MR. RAFFERTY:
18      Q.    Yeah.
19           When a customer comes on board,
20 McKesson sets the threshold level for
21 narcotics, correct?
22      A.    Correct.
23      Q.    And they do it in a per-dose,
24 per-month basis, right?
25      A.    Monthly doses, correct.

Page 125

1      Q.    Okay.  And the way it works
2 under your CSMP is the level 1, 2 or 3
3 investigation as to whether or not an order
4 is suspicious is triggered when they exceed
5 or there is a threshold excursion, true?
6           MS. HENN:  Objection to form.
7           THE WITNESS:  True.
8 QUESTIONS BY MR. RAFFERTY:
9      Q.    So if you set the threshold so
10 high that no matter how much a pharmacy
11 orders, even if they ordinarily order 8,000 a
12 month and then they come in and order 12,000
13 one month, if you set the threshold at
14 13,000, then they're never going to bump up
15 against that.  You're never going to do a
16 level 1, 2 or 3 investigation to determine if
17 an order is suspicious, right?
18           MS. HENN:  Objection to form.
19           THE WITNESS:  I wouldn't say
20      never.  I'd say they may; in
21      situations they may not.  There's
22      other ways in which we look at
23      customers that may not be hitting --
24      hitting the thresholds.
25

Page 126

1  QUESTIONS BY MR. RAFFERTY:
2     Q.   The system is designed around
3  the thresholds, correct?
4     A.   That --
5       MS. HENN: Objection to form.
6       Go ahead.
7       THE WITNESS: That piece of the
8  system -- the system's -- order piece
9  of the system is designed around that.
10 QUESTIONS BY MR. RAFFERTY:
11    Q.   Right.
12    A.   I'm just saying that there's
13 other components to the program whereas if a
14 customer did not hit a threshold, that does
15 not mean we're not using other data points to
16 look at them and review and maintain
17 effective controls against diversion.
18    Q.   How many times have you
19 initiated a level 1 investigation when a
20 customer had not reached their threshold?
21      MS. HENN: Objection to form.
22 QUESTIONS BY MR. RAFFERTY:
23    Q.   And I'd like examples.
24      MS. HENN: Objection to form.
25      THE WITNESS: I wasn't around

Page 127

1  during the level 1, really the
2  tiered -- the core of the tiered
3  approach, so --
4  QUESTIONS BY MR. RAFFERTY:
5     Q.   So you can't give me any?
6     A.   I don't have any specific
7  examples.
8     Q.   Okay. So what you were saying
9  there was hypothetical, agreed?
10      MS. HENN: Objection to form.
11      THE WITNESS: Hypothetical. I
12 mean -- yeah, there's different ways
13 to review customers, too, that are
14 used as part of our program, is what
15 I'm saying.
16 QUESTIONS BY MR. RAFFERTY:
17    Q.   Right.
18      But you also agree that your --
19 your suspicious order monitoring regulatory
20 responsibility is done through the setting of
21 thresholds and whether or not customers
22 exceed those thresholds?
23      MS. HENN: Objection to form.
24      THE WITNESS: Yes.
25

Page 128

1  QUESTIONS BY MR. RAFFERTY:
2     Q.   Okay. Now, the other issue is
3  once you set a threshold, when a customer
4  orders in excess of that threshold, you have
5  a system in place, McKesson has a system in
6  place, where you can change that threshold to
7  accommodate the excessive order, correct?
8       MS. HENN: Objection to form.
9       THE WITNESS: Can you restate
10 that again? I want to make sure --
11 we -- we can -- we have a system to
12 adjust thresholds.
13 QUESTIONS BY MR. RAFFERTY:
14    Q.   Yes.
15      So if a customer has a
16 threshold at 8,000 per month -- narcotics per
17 month, and they order and it goes -- and that
18 puts them at 9,000 doses per month, they can
19 initiate or you can initiate a threshold
20 change request and increase that either
21 temporarily or permanently, correct?
22      MS. HENN: Objection to form.
23      THE WITNESS: In that scenario,
24 if a customer orders -- their
25 threshold's 8,000, they order 9,000,

Page 129

1  they're not getting 9,000, just to be
2  clear.
3  QUESTIONS BY MR. RAFFERTY:
4     Q.   Well, they're not getting 9,000
5  right now.
6       MS. HENN: Were you done with
7  your answer?
8       THE WITNESS: Not yet.
9       So they're not getting the
10 9,000. So it's true, a customer can
11 initiate. And once they've been
12 blocked, if they feel like they need
13 more, that they can request that.
14 There is a process.
15 QUESTIONS BY MR. RAFFERTY:
16    Q.   Right.
17      Or, quite frankly, the
18 salesperson or the distribution center can
19 initiate it, correct? Can initiate a TCR, a
20 threshold change request?
21      MS. HENN: Objection to form.
22      THE WITNESS: Can have -- have
23 conversations with the pharmacy about
24 whether they need more or not or if
25 they need to submit one.

Page 130

1 QUESTIONS BY MR. RAFFERTY:
2    Q.   Right.
3         So getting back, so what can
4 happen is -- first of all, we talked about
5 the setting of the thresholds, number one,
6 but number two, even after they're set, they
7 can be increased on a temporary or permanent
8 basis based on the order of the customer,
9 true?
10        MS. HENN:  Objection to form.
11        THE WITNESS:  Based on the
12   request and the facts and
13   circumstances around that, yes --
14 QUESTIONS BY MR. RAFFERTY:
15   Q.   Okay.
16   A.   -- thresholds can be increased
17 for many different reasons.
18   Q.   All right.  So we're going to
19 talk a little bit about how you go through
20 that.
21        So if we could, let's look at
22 1.345.
23        How long has the -- that CSMP
24 was in place from 2008 until when?
25        MS. HENN:  Objection to form.

Page 131

1 QUESTIONS BY MR. RAFFERTY:
2    Q.   The one that was implemented in
3 2008 was in effect until when?
4    A.   2014 when we released the --
5 the ISMC manual.  I believe that's the...
6        (McKesson-Hartle Exhibit 51
7    marked for identification.)
8        MR. RAFFERTY:  This is -- I'm
9    handing counsel P1.345, which is
10   Exhibit 51 to the deposition.
11 QUESTIONS BY MR. RAFFERTY:
12   Q.   I'm showing you what is the
13 March 21, 2013 CSMP.
14        You see that?
15   A.   I do.
16   Q.   This is the CSMP that was put
17 in place after the 2008 settlement and fine
18 of 13.25 million, correct?
19        MS. HENN:  Objection to form.
20        THE WITNESS:  That's when it
21   was put into place after that,
22   correct.
23 QUESTIONS BY MR. RAFFERTY:
24   Q.   Okay.  And if we could, let's
25 look at the first page, McKesson's operating

Page 132

1 manual -- operations manual for pharma
2 distribution, controlled substance monitoring
3 program.
4        You see that?
5    A.   Yep.
6    Q.   All right.  And if you go down,
7 it says, "The purpose of this process is to
8 proactively review the customer orders and
9 purchases for all controlled substances."
10        Do you see that?
11   A.   I see that.
12   Q.   "In order to detect and prevent
13 diversion."
14        That's the purpose of this,
15 right, to detect and prevent diversion?
16   A.   Correct.
17   Q.   "Set and maintain customer
18 thresholds for all controlled substances."
19        Do you see that?
20   A.   I see that.
21   Q.   Then it goes down and it says,
22 "Also, the DEA expects McKesson to, quote,
23 know their customer, unquote."
24        Do you see that?
25   A.   I see that.

Page 133

1    Q.   Okay.  And you agree with that,
2 that DEA expects McKesson to know their
3 customer who they're selling the narcotics
4 to, right?
5    A.   I agree.
6    Q.   If you would, let's go to
7 page 8, .8.
8        All right.  So actually go to
9 .7 first, I'm sorry, the bottom part of .7,
10 "threshold review."
11        Do you see that?
12   A.   I do.
13   Q.   And then it says, "Regulatory
14 department will review/assess customer
15 thresholds during the month.  Additionally,
16 customers that approach a predetermined
17 percentage of threshold maximum or exceed
18 maximums will receive messaging as shown
19 below."
20        And then turn the page.
21 "Threshold warning:  Invoice and delivery doc
22 only."
23        So that means on their invoice,
24 they receive an invoice that says
25 "approaching monthly regulatory purchase

Page 134

1  limit," right?
2      A.    Correct.
3      Q.    So you notify -- so as a
4  customer gets -- now, the customer doesn't
5  know what their -- or not supposed to know
6  what their threshold is, right?
7          MS. HENN:  Objection to form.
8          THE WITNESS:  We don't share it
9      with them.
10  QUESTIONS BY MR. RAFFERTY:
11      Q.    You don't share it with them.
12          There's a reason why you don't
13  share it with them, right?
14      A.    Sure.
15      Q.    And that is so that they can't
16  try to manipulate a way around it, right, and
17  get drugs from other suppliers or other
18  distributors or something like that, right --
19          MS. HENN:  Objection to form.
20  QUESTIONS BY MR. RAFFERTY:
21      Q.    -- as they approach it, so as
22  not to be detected?
23          MS. HENN:  Objection to form.
24          THE WITNESS:  It's one of the
25      reasons, sure.

Page 135

1  QUESTIONS BY MR. RAFFERTY:
2      Q.    Okay.  Yet, when you start to
3  reach a percentage -- and what percentage is
4  that, Mr. Hartle?
5          MS. HENN:  Objection to form.
6  QUESTIONS BY MR. RAFFERTY:
7      Q.    When do they get the
8  notification that they're bumping up against
9  their threshold?
10      A.    I believe it -- that can be a
11  different number at a time and you can adjust
12  that, but I think the standard was
13  90 percent.
14      Q.    Okay.
15      A.    I believe.
16      Q.    So as it gets close to the
17  threshold, you actually notify the customer
18  and say, "Hey, you're bumping up against your
19  threshold," right?
20          MS. HENN:  Objection to form.
21  QUESTIONS BY MR. RAFFERTY:
22      Q.    So at that point -- well,
23  correct?
24      A.    Correct, that's on the invoice.
25  That was on invoice.

Page 136

1      Q.    All right.  So at that point a
2  pharmacy, for example, could certainly
3  estimate what their threshold level is,
4  right?  They know -- they could go back and
5  see how much they've purchased and determine
6  how much -- what their threshold is, right?
7          MS. HENN:  Objection to form.
8          THE WITNESS:  Theoretically.
9  QUESTIONS BY MR. RAFFERTY:
10      Q.    Okay.
11      A.    They can convert things to
12  doses, convert things to base codes.  It's
13  not just a report they run.
14      Q.    All right.  "Threshold warning,
15  Section 2.1.  When a customer that has
16  reached the threshold warning has been
17  detected, the director of regulatory affairs
18  will notify DC management and sales."
19          Do you see that?
20      A.    I see that.
21      Q.    Now, you would agree with me
22  that sales shouldn't be playing any part in
23  regulatory decisions, right?
24          MS. HENN:  Objection to form.
25          THE WITNESS:  They don't play

Page 137

1      any part of regulatory decisions.  We
2      make the decisions.
3  QUESTIONS BY MR. RAFFERTY:
4      Q.    Okay.  I didn't ask you that.
5          You would agree with me that
6  they shouldn't be involved in making
7  regulatory decisions, right?
8          MS. HENN:  Objection to form.
9          THE WITNESS:  The decision, no.
10  QUESTIONS BY MR. RAFFERTY:
11      Q.    Okay.
12      A.    Gathering information for the
13  context of the request, yes.
14      Q.    So what happens here, according
15  to this, is then it says, "Sales and/or DC
16  management may contact the customer to
17  discuss threshold levels at their
18  discretion," right?
19      A.    Right.  That's what it says.
20      Q.    Are you aware of how DC
21  managers and salespeople are paid?
22          MS. HENN:  Objection to form.
23          THE WITNESS:  In general, yes.
24  QUESTIONS BY MR. RAFFERTY:
25      Q.    They have an incentive.

Page 138

1 They're paid on keeping customers and making
2 sales, correct?
3           MS. HENN: Objection to form.
4 QUESTIONS BY MR. RAFFERTY:
5     Q.    That is a part of their
6 compensation?
7     A.    That's how sales works.
8     Q.    So what you're doing here,
9 according to this, is giving them discretion,
10 once there's a threshold -- once somebody is
11 bumping up against the threshold, to reach
12 out to the customer and talk with them about
13 whether or not they should initiate a
14 threshold change request, right?
15           MS. HENN: Objection to form.
16           THE WITNESS: Yes.
17 QUESTIONS BY MR. RAFFERTY:
18     Q.    Okay. The very people that
19 stand to profit from it are the ones talking
20 with the customer to see whether or not they
21 should make a threshold change request and
22 get that order shipped, right?
23           MS. HENN: Objection to form.
24           THE WITNESS: Those in sales
25    that are incentivized based on sales

Page 139

1    are the ones that are part of the
2    intake. I do know we have restricted
3    and blocked incentives around
4    controlled substances.
5 QUESTIONS BY MR. RAFFERTY:
6     Q.    Right. But you're --
7     A.    Being part of the solution --
8 or being part of the compensation.
9     Q.    Right.
10          So you're putting the people
11 who stand to profit personally from the sale,
12 giving them the discretion to reach out, have
13 discussions with the customer as to whether
14 or not to initiate a threshold change
15 request. That's what this says, right?
16           MS. HENN: Objection to form.
17           THE WITNESS: Our sales folks
18    are involved in the process.
19 QUESTIONS BY MR. RAFFERTY:
20     Q.    Okay. It says then, "If a
21 threshold change is requested, follow the
22 change request process in step 1.3."
23          Do you see that?
24     A.    I see that.
25     Q.    Okay. Now it says, "2.2,

Page 140

1 threshold excursion." That means that the
2 order has exceeded the threshold, right?
3     A.    Correct.
4     Q.    "Once a customer has reached
5 their monthly maximum threshold amount, all
6 subsequent orders for that item will be
7 blocked. This triggers the level review
8 process as detailed in level review steps
9 below."
10          You see that?
11     A.    I see that.
12     Q.    So the -- so what we were
13 talking about earlier, the exceeding of the
14 threshold, is what triggers the level review
15 steps, right?
16     A.    Correct.
17     Q.    Okay. And then it says it can
18 be unblocked if it is temporarily changed,
19 permanently changed or if they fall below the
20 threshold by returning product or basically a
21 new month starts, because it's refreshed at
22 the beginning of every month, right?
23           MS. HENN: Objection to form.
24 QUESTIONS BY MR. RAFFERTY:
25     Q.    The threshold is.

Page 141

1     A.    Correct.
2           MS. HENN: Objection to form.
3 QUESTIONS BY MR. RAFFERTY:
4     Q.    Now, in the review process, in
5 the level 1, 2, and 3 review process, retail
6 national accounts are treated differently
7 than smaller accounts; isn't that right?
8           MS. HENN: Objection to form.
9           THE WITNESS: In some ways.
10 QUESTIONS BY MR. RAFFERTY:
11     Q.    Well, and in one way that
12 they're treated differently is when, for
13 example, a Rite Aid on the corner of, you
14 know, Main Street exceeds a threshold, you
15 don't call that particular store; you call
16 headquarters, right?
17     A.    Correct. The relationship is
18 regulatory teams to headquarters team.
19 Headquarters teams to headquarters teams.
20     Q.    Right.
21          And then you gather whatever
22 information -- you don't talk to that
23 particular pharmacy, they do. And they make
24 the determination as to whether or not that
25 threshold should be changed, right?

Page 142

1  MS. HENN: Objection to form.
2  THE WITNESS: They make the
3  determination as to whether they want
4  to request an increase. We make the
5  determination as to whether it should
6  be changed.
7  QUESTIONS BY MR. RAFFERTY:
8  Q. Okay. But you're dealing
9  specifically with the headquarters, not with
10  the -- and you're gathering all information
11  from headquarters, right?
12  MS. HENN: Objection to form.
13  THE WITNESS: Correct.
14  QUESTIONS BY MR. RAFFERTY:
15  Q. And in fact, when you do
16  contact them and when you do start performing
17  a threshold change request for the big
18  accounts, you use an abbreviated form and an
19  abbreviated process, right?
20  MS. HENN: Objection to form.
21  THE WITNESS: Yes, in some
22  ways. And some of those processes are
23  based on the fact that the company --
24  so, for example, you know, teams,
25  large chains, have processes to do

Page 143

1  checks on their employees and
2  background checks and things like
3  that. So that may not be a process
4  that we do in -- on our team, but
5  that's one that the chain team does as
6  part of their normal business.
7  QUESTIONS BY MR. RAFFERTY:
8  Q. So you give them more deference
9  in the process?
10  MS. HENN: Objection to form.
11  THE WITNESS: We recognize that
12  there's certain components that they
13  have in place already that we don't.
14  QUESTIONS BY MR. RAFFERTY:
15  Q. Go ahead.
16  A. That -- that they have -- you
17  know, are better positioned to do in terms of
18  knowing their teams, in the process do
19  background checks or searches or things like
20  that.
21  Q. So you give them more deference
22  in the process?
23  MS. HENN: Objection to form.
24  THE WITNESS: How do you define
25  deference?

Page 144

1  QUESTIONS BY MR. RAFFERTY:
2  Q. Well, you're relying on their
3  processes. You just said because they have
4  their own processes in place, their own
5  policies, that they're treated differently.
6  The way they're treated
7  differently is you give them more deference
8  in the process than you do Dale's Pharmacy,
9  right?
10  MS. HENN: Objection to form.
11  THE WITNESS: In certain parts
12  of the intake in the process, not the
13  decision. We make the decisions.
14  QUESTIONS BY MR. RAFFERTY:
15  Q. And those decisions that you
16  make, for example, on TCRs, those should be
17  based on direct evidence, right?
18  MS. HENN: Objection to form.
19  THE WITNESS: All of the facts
20  and circumstances surrounding the
21  request.
22  QUESTIONS BY MR. RAFFERTY:
23  Q. Listen to my question, please,
24  sir.
25  The decision on a TCR must be

Page 145

1  based on direct evidence, correct?
2  MS. HENN: Objection to form.
3  THE WITNESS: Based on direct
4  evidence we receive and review and
5  research.
6  QUESTIONS BY MR. RAFFERTY:
7  Q. Okay. But you agree that
8  that's what the decision should be based on,
9  is direct evidence?
10  MS. HENN: Objection to form.
11  THE WITNESS: And -- and the
12  interpretation and collection of
13  information and context, yes.
14  QUESTIONS BY MR. RAFFERTY:
15  Q. That direct evidence should be
16  valid business decisions, right? That's part
17  of it?
18  MS. HENN: Objection to form.
19  THE WITNESS: It's one of the
20  pieces of information, yeah.
21  QUESTIONS BY MR. RAFFERTY:
22  Q. I think you've already got this
23  in front of you. It's Exhibit 47. It's your
24  presentation notes.
25  And we also know that doctor --

Page 146

1 or that Mr. Rannazzisi specifically said in
2 his 2007 letter you can't simply rely or turn
3 a blind eye simply because the Rite Aid
4 you're providing drugs to or the CVS you're
5 providing drugs to has their own
6 registrant -- are registrants of the DEA,
7 right?
8           MS. HENN:  Sorry, could you
9      just read that again?  It was a little
10     hard to hear.
11 QUESTIONS BY MR. RAFFERTY:
12     Q.    Yeah.
13           You would agree -- excuse me.
14 You would agree with me that Mr. Rannazzisi,
15 as early as 2007, reiterated the fact that
16 you can't turn a blind eye just because the
17 CVS that you're supplying is also a DEA
18 registrant, right?
19           MS. HENN:  Objection to form.
20           THE WITNESS:  Correct.
21 QUESTIONS BY MR. RAFFERTY:
22     Q.    And if you would, turn to
23 page 15, P1.15.  This is Exhibit 47.
24           Slide 15 says, "Thresholds."
25           Do you see that?

Page 147

1     A.    I do.
2     Q.    "Lastly, appropriate" --
3 there's a second paragraph there.  "Lastly,
4 appropriate adjustments will be made because
5 in the natural course of business we know
6 there will be growth.  To make adjustments,
7 we are really looking for, quote, direct
8 evidence, end quote."
9           That's your phrase, right?
10 That's what you said?
11     A.    That's what I had in my notes.
12 I don't -- yeah.
13     Q.    Okay.  "An understanding of the
14 business model and demonstration of the
15 corresponding responsibility."
16           Do you see that?
17     A.    Yes.
18     Q.    And then it says, "Specifically
19 related to direct evidence, just the fact
20 that the oxycodone sales are increasing is
21 not in and of itself justification to change
22 a threshold.  When we say direct evidence, it
23 is things like" -- and you list them out --
24 "the acquisition of a pharmacy and the
25 details related to projected increases."

Page 148

1           So acquisition of a pharmacy,
2 right?  That's one?
3     A.    Right.
4     Q.    Two, a new clinic opening up.
5           Three, growth in overall
6 prescription business or something else that
7 connects the increase to a change in business
8 model or increased patient activity.
9           You see that?
10     A.    Yeah, they're examples of
11 reasons for a request.
12     Q.    Of direct evidence.
13           And if you don't have that
14 direct evidence, you shouldn't grant an
15 increase in the threshold, correct?
16           MS. HENN:  Objection to form.
17           THE WITNESS:  Yeah, it depends
18     on the facts and circumstances of
19     everything that's being collected.
20     And I think I use direct evidence to
21     mean -- you know, provide information
22     on the reason for the change, why...
23 QUESTIONS BY MR. RAFFERTY:
24     Q.    I'm listening.  I'm just
25 getting the next document, so go ahead.

Page 149

1     A.    I'm fine.
2     Q.    There's got to be a reason.
3 There's got to be a legitimate reason that
4 you obtain with direct evidence.
5     A.    There's got to be a reason.
6     Q.    Well, not just a reason.  It's
7 got to be a valid reason, such as a valid
8 business reason like acquiring another
9 pharmacy, right?
10     A.    That's one of them.
11     Q.    Right.
12           And in making the determination
13 as to whether or not to grant or not grant a
14 threshold change request, you should do that
15 on an individual basis, and it should be
16 based the same -- there should be the same
17 standard for the small pharmacies as the
18 large pharmacies, right?
19           MS. HENN:  Objection to form.
20           THE WITNESS:  Changes are not
21     always on the individual.  There's
22     reasons why changes might be done
23     across multiple locations.
24           (McKesson-Hartle Exhibit 52
25     marked for identification.)

Page 150

1  QUESTIONS BY MR. RAFFERTY:
2      Q.    Okay.  All right.  Well, let's
3  talk about a couple of those.  Let's look at
4  1.1470, which is going to be Exhibit 52.
5          This is a threshold change
6  form.  You're familiar with this, right?
7      A.    I am.
8      Q.    Okay.  And have you reviewed
9  this particular one?
10     A.    Let me take a peek real quick
11 here.
12     Q.    It was in 2008, so it was
13 before you --
14     A.    Well before I joined McKesson,
15 certainly.
16     Q.    Right.
17         But I'm curious if you've seen
18 it since coming to --
19     A.    I have.
20     Q.    Okay.  And you see here it
21 says, "Immediate change request, yes."  You
22 see that?
23         Date, 11/26/08.  You see that?
24     A.    I do.
25     Q.    And then it is "increase amount

Page 151

1  30 percent."
2          Do you see that?  That's the
3  request?
4      A.    I see that.
5      Q.    And it says, "Reason for
6  change, and attach supporting documentation."
7  And it says, "Per agreement between CVS and
8  McKesson, approved by Don Walker on
9  September 25th, to temporarily withhold
10 threshold monitoring until CVS analyzed
11 requested data."
12         Do you see that?
13     A.    I see that.
14     Q.    Are you familiar with this
15 agreement to withhold monitoring their
16 thresholds between McKesson and CVS?
17     A.    I am not.
18     Q.    Do you have, since you're in
19 charge of the national -- the retail national
20 accounts -- CVS would be one of those, right?
21 Now you are, I'm talking about.
22     A.    Yes.
23     Q.    Okay.  And you have been since
24 2014?
25     A.    2014.

Page 152

1      Q.    I'm not suggesting you were at
2  this time.
3      A.    Right.
4      Q.    Okay.  Do you have an agreement
5  with CVS or Rite Aid to not monitor their
6  thresholds?
7      A.    Absolutely not.
8      Q.    Is there a reason -- because
9  you should be monitoring their thresholds,
10 right?
11     A.    We do.
12     Q.    And they should be
13 monitoring -- in 2008, McKesson should have
14 been monitoring their thresholds, correct?
15         MS. HENN:  Objection to form.
16         THE WITNESS:  Correct.
17 QUESTIONS BY MR. RAFFERTY:
18     Q.    Okay.
19     A.    What I don't under -- what I
20 don't know is the context of this.  I
21 don't -- there's reasons why a request across
22 an entire chain might be asked for because of
23 a change in their business model or sourcing.
24 I don't believe this to mean that they're not
25 monitoring or part of the threshold system.

Page 153

1      Q.    Well, here it says they're
2  asking for an across-the-board 30 percent
3  increase, correct?
4      A.    That's what they're asking for.
5      Q.    Okay.  And it says, "Per the
6  agreement between CVS and McKesson, approved
7  by Don Walker on September 25th, to
8  temporarily withhold the threshold
9  monitoring."
10         Do you see that?
11     A.    I see that.
12     Q.    Okay.  So at least here, Don
13 Walker -- you know, who's Don Walker?
14     A.    Don Walker was the senior vice
15 president of distribution operations.
16     Q.    Okay.  And in fact, threshold
17 monitoring, as we talked about, is the
18 foundation of you performing your
19 responsibility for suspicious order
20 monitoring, correct, under the CSMP?
21     A.    It's the foundation of the
22 program --
23     Q.    Okay.
24     A.    -- for that piece.
25     Q.    So if you're not -- if you stop

Page 154

1 monitoring, then suspicious orders can go
2 through without you ever knowing, right?
3          MS. HENN:  Objection to form.
4          THE WITNESS:  Could be.  I do
5 not believe that that's the --
6 sometimes there's language that's put
7 in here from -- you know, from a sales
8 conversa -- or a conversation with
9 CVS, and maybe they said, can we not
10 monitor or can we -- you know, it
11 doesn't necessarily mean that's the
12 language of Don or whoever that was
13 there at the time.
14 QUESTIONS BY MR. RAFFERTY:
15     Q.    Now, you're just making that
16 up, right?
17     A.    I'm not --
18          MS. HENN:  Objection to form.
19 QUESTIONS BY MR. RAFFERTY:
20     Q.    You don't know.  You just said
21 you don't know.
22     A.    I don't know.  I'm speculating,
23 certainly.
24     Q.    You're speculating.  You're
25 guessing.

Page 155

1     A.    I am.  I'll be very clear on
2 that, yeah.
3     Q.    Okay.  Which is another way of
4 saying you're making it up.
5          MS. HENN:  Objection to form.
6 QUESTIONS BY MR. RAFFERTY:
7     Q.    Right?
8     A.    Speculating.  I believe there
9 are reasons why this may not be exactly how
10 it's written on there.
11     Q.    Well, what we've been provided
12 is this, which is a one-page form, and what
13 it says is, "Per the agreement between" --
14          CVS is a pretty big customer of
15 McKesson, right?
16     A.    They're a large customer, sure.
17     Q.    Yeah.
18          You don't want to lose them,
19 right?  That's a big source of business?
20     A.    They're a large customer, sure.
21     Q.    One of the largest?
22     A.    One of our larger customers,
23 yes.
24     Q.    Okay.  So all we have -- we
25 don't have anything attached saying that

Page 156

1 there was some -- whatever it is you just got
2 done saying -- reason.  What we have is him
3 saying there's an agreement signed off by Don
4 Walker to temporarily withhold monitoring,
5 threshold monitoring, right?  That's what we
6 have?
7     A.    That's what's on the paper.
8          MS. HENN:  Objection to form.
9          THE WITNESS:  That's what's on
10 the paper.
11 QUESTIONS BY MR. RAFFERTY:
12     Q.    And that shouldn't be done,
13 right?  You should be monitoring thresholds
14 at all times?
15          MS. HENN:  Objection to form.
16          THE WITNESS:  That's right.
17          (McKesson-Hartle Exhibit 53
18 marked for identification.)
19 QUESTIONS BY MR. RAFFERTY:
20     Q.    Okay.  If we go now to 1.1469,
21 and this will be Exhibit 53.  This is
22 P1.1469, which is now Exhibit 53.  This is
23 another threshold change request.
24          Do you see this?
25     A.    I see this.

Page 157

1     Q.    Okay.  Have you reviewed this
2 before?
3     A.    I have not.
4     Q.    Okay.  Let's look at it, and
5 let's start with -- let's start on the back
6 page.
7          Do you see that, the threshold
8 change form?
9     A.    Yes.
10          MR. RAFFERTY:  Which is .28,
11 Corey.
12 QUESTIONS BY MR. RAFFERTY:
13     Q.    I'm sorry, it's .5.  It's
14 1.1469.5.
15          Do you see that?
16     A.    I do.
17     Q.    Okay.  And here we got
18 11/28/08.  So this is, again, right around
19 that same time period as we just saw the one
20 earlier, which was dated 11/26/08.
21          Do you see that?
22          MS. HENN:  25.
23          MR. RAFFERTY:  I'm sorry, was
24 it 25?
25          MS. HENN:  Well, I guess I see

Page 158

1 two dates. Sorry about that.
2     MR. RAFFERTY: Okay.
3     THE WITNESS: Same general
4     time.
5 QUESTIONS BY MR. RAFFERTY:
6     Q. Same general time period,
7 right?
8     Okay. Let's see what's
9 happening with this one. 11/28/08, customer
10 name, various RNA customers. See attachment.
11     Do you see that?
12     A. I see that.
13     Q. Okay. RNA, that's the retail
14 national accounts. Those are the big ones,
15 right?
16     A. Those are chains.
17     Q. Chains. The big chains,
18 national chains, right?
19     MS. HENN: Objection to form.
20     THE WITNESS: There's actually
21     a variety of chains. Some can be
22     specific to a state, to a geography,
23     national. There's variety of them.
24 QUESTIONS BY MR. RAFFERTY:
25     Q. Well, you call them retail

Page 159

1 national accounts, right?
2     A. That's the name of the
3 segments, but I'm saying within there there's
4 variations.
5     Q. Well, there's Rite Aid, right?
6     A. Sure.
7     Q. CVS, right?
8     A. Sure.
9     Q. Okay. Let's look at this and
10 see what's being requested.
11     "CS requested: Various
12 increase in amount, 30 percent increase."
13     You see that?
14     A. I see that.
15     Q. "Reason for change: Attach
16 supporting documentation. Increase due to
17 Thanksgiving holiday. 30 percent increase."
18     Do you see that?
19     It's on the threshold change
20 form. "Increase due to Thanksgiving holiday,
21 30 percent."
22     A. I see that.
23     Q. I didn't see that listed in
24 that -- those examples of your direct
25 evidence, Thanksgiving.

Page 160

1     Do you believe that
2 Thanksgiving, just writing down "Thanksgiving
3 holiday" and therefore increasing across the
4 board an RNA 30 percent is a valid business
5 direct evidence reason?
6     MS. HENN: Objection to form.
7     THE WITNESS: No.
8 QUESTIONS BY MR. RAFFERTY:
9     Q. And in fact, not only was it
10 increased due to, quote, Thanksgiving
11 holiday, end quote, but it was also, if you
12 look down, "McKesson use only, permanent or
13 temporary threshold change."
14     Do you see that? Number 3
15 under "McKesson use only."
16     A. Oh, I'm sorry. I see that.
17     Q. What does that say afterwards?
18     A. It says "perm."
19     Q. That means?
20     A. Permanent.
21     Q. So because of the Thanksgiving
22 holiday, they're increasing across the board
23 one of your big customers 30 percent, and
24 they're doing it permanently. That's what
25 that means, doesn't it?

Page 161

1     MS. HENN: Objection to form.
2     THE WITNESS: That's what's --
3     you know, you could assume that's what
4     it means. I don't have the context of
5     the whole situation, but --
6 QUESTIONS BY MR. RAFFERTY:
7     Q. Well, okay.
8     A. But that's what's on the paper.
9     Q. Well, here's what it says on
10 the threshold change request. It says,
11 "3" --
12     MR. RAFFERTY: Let's blow that
13     up, Corey.
14 QUESTIONS BY MR. RAFFERTY:
15     Q. "3, permanent or temporary
16 change." So you're either going to write --
17 and then he's got p-e-r-m.
18     What are the first four letters
19 of the word permanent?
20     A. I agree with that. That's
21 what --
22     Q. Okay.
23     A. -- I'm saying. I'm assuming
24 that's what that -- this means.
25     Q. Okay. Well, let's go --

Page 162

1 because we got some e-mails that were
2 attached to this.  So let's take a look at
3 those.
4         Here we got -- if you go to
5 page .3 -- well, first of all, let's back up.
6 Let's go to .4.  From Dave Gustin.
7         Do you know who Dave Gustin is?
8     A.    I do know who Dave Gustin is.
9     Q.    Okay.  Who he is?
10    A.    Dave is a former McKesson
11 employee.  He was a director of regulatory
12 affairs at times.
13    Q.    Okay.  A director of regulatory
14 affairs, right?
15    A.    Correct.
16    Q.    Okay.  One step below you,
17 right?
18    A.    Yes.  One level, yeah.
19    Q.    One level.
20         Directors of regulatory affairs
21 do have decision-making authority, correct?
22    A.    They do.
23    Q.    All right.  From Dave Gustin to
24 Micheal Bishop.
25         Do you know who Micheal Bishop

Page 163

1 is?
2     A.    I do.  Micheal used to work on
3 my team.
4     Q.    Okay.  And in fact, I think we
5 saw him up there earlier this morning.
6 That's one of the reasons I put that chart up
7 there, so we could go back and reference who
8 some people are.
9         Micheal Bishop was on your
10 team, and what position was he?
11    A.    He was a regulatory affairs
12 manager.
13    Q.    Manager.  Okay.
14         And here Dave Gustin is saying
15 on December 16th -- now, remember, the date
16 of this was November 28, 2008.  That was the
17 date of the TCR, right, the threshold change
18 form?
19    A.    Correct.
20    Q.    So here we are -- what is
21 that -- almost three weeks later where he's
22 e-mailing Micheal Bishop:  "Could you do me a
23 favor?  Are you in today?"
24         Do you see that?
25    A.    I see that.

Page 164

1     Q.    And then if we go down to
2 page .3, from Dave Gustin to Micheal
3 Bishop -- well, let's start at the bottom.
4 Micheal Bishop responds that day and says, "I
5 am.  Meeting for next 30."
6         Do you see that?
7     A.    Yes.
8     Q.    Then Dave Gustin responds and
9 says, "I just need a TCR from you signed and
10 dated the 30th.  I will use it for the
11 30 percent increase I made for the RNAs that
12 day after you e-mailed me all those reports."
13         Do you see that?
14    A.    I see that.
15    Q.    So what he's asking him to do
16 is actually fill out forms backdating it to
17 the 30th, correct?
18    A.    He's asking to put the 30th on
19 there.
20    Q.    Okay.  Well, it's not the 30th
21 anymore, is it?
22    A.    No, but the 30th represents --
23 it's supposed to represent the day of the --
24 could be interpreted as the day of the
25 initiation or the request or the formal

Page 165

1 request.
2     Q.    Well, you should be putting
3 that down -- you should be filling that
4 paperwork out when it's being -- when it's
5 being performed, right, not three weeks
6 later?
7         MS. HENN:  Objection to form.
8         THE WITNESS:  Not always.  I
9     mean, you're -- you may make the
10    decisions based on your notes and do
11    the official documentation later.
12 QUESTIONS BY MR. RAFFERTY:
13    Q.    So just fill it out when you
14 get to it.  That's the -- that's the McKesson
15 protocol for allowing across-the-board
16 increases in thresholds for narcotics in
17 America:  Get to the paperwork when you get
18 to it?
19         MS. HENN:  Objection to form.
20         THE WITNESS:  Not at all.
21    Sorry.
22 QUESTIONS BY MR. RAFFERTY:
23    Q.    So that's just a Dave Gustin
24 policy; is that what you're saying?
25         MS. HENN:  Objection to form.

Page 166

1    THE WITNESS:  It's standard to
2  document things after.  You may make
3  the decision based on the information
4  you have in your own notes.  To put it
5  into the format may happen after that.
6  That's not uncommon.
7  QUESTIONS BY MR. RAFFERTY:
8    Q.    Well, he's asking him to date
9  it specifically back three weeks earlier,
10  isn't he?
11    MS. HENN:  Objection to form.
12  QUESTIONS BY MR. RAFFERTY:
13    Q.    Is that how you do business?
14    MS. HENN:  Objection to form.
15    THE WITNESS:  I do business by
16  wanting to document the date that it
17  was initiated, to make sure my
18  documentation is timely.
19  QUESTIONS BY MR. RAFFERTY:
20    Q.    Well, if somebody came in and
21  was looking for it between those dates, they
22  wouldn't find any documentation of it, would
23  they?
24    MS. HENN:  Objection to form.
25

Page 167

1  QUESTIONS BY MR. RAFFERTY:
2    Q.    That they came in between
3  November 28th and December 16th or 17th, they
4  wouldn't find any documentation because none
5  had been made.  And that's why Dave Gustin's
6  asking them to do it now, right?
7    MS. HENN:  Objection to form.
8    THE WITNESS:  What's your
9  question specifically?
10  QUESTIONS BY MR. RAFFERTY:
11    Q.    If somebody was looking for the
12  documentation, for example, a senior director
13  of regulatory affairs, and wanted to know why
14  there was this 30 percent across-the-board
15  increase, let's say on December 1st, they
16  wouldn't find any paperwork, would they?
17    MS. HENN:  Objection to form.
18    THE WITNESS:  Depends.  Depends
19  on how they are -- where they were
20  looking.  Are you saying they wouldn't
21  find it because of the date?
22  QUESTIONS BY MR. RAFFERTY:
23    Q.    There wasn't, because Dave
24  Gustin isn't even asking for the proper forms
25  to be filled out until three weeks later,

Page 168

1  right?
2    MS. HENN:  Objection to form.
3  QUESTIONS BY MR. RAFFERTY:
4    Q.    It's fairly common sense.
5    A.    Yeah, it doesn't mean he
6  doesn't have documentation.  Dave has
7  documentation somewhere.
8    Q.    Once again, you don't know, do
9  you?
10    A.    I don't know.  I don't know.  I
11  wasn't around at the time.  I don't know.
12    Q.    All right.  So let's go to the
13  next one for Micheal Bishop, December 16,
14  2008.  This is the Thanksgiving increases.
15    Evidently they've got a phrase
16  for them, "Thanksgiving increases."
17    Do you see that?
18    MS. HENN:  Objection to form.
19    THE WITNESS:  I see that.
20  QUESTIONS BY MR. RAFFERTY:
21    Q.    And then he says, "Yep, 11/28,"
22  right?
23    A.    I see that.
24    Q.    Okay.  And then going forward,
25  let's see what was actually done.

Page 169

1    December 17th, Dave Gustin
2  sends out an e-mail and says, "All, on
3  November 28th, I was sent a request by
4  Micheal" --
5    That's Micheal Bishop, right?
6    A.    Yes.
7    Q.    -- "for over 200 thresholds to
8  get 30 percent increases for various national
9  accounts.  The attached TCR form covers all
10  RNA increases made that date.  Please sign
11  and file.  This is not routine, but I was the
12  only DRA on and so my time was spent making
13  the changes, and I have missed some
14  e-mails to the DCs.  Include a copy of this
15  e-mail along with the TCR in the file.
16  Thanks for your patience and understanding."
17    So on November 28th, Dave
18  Gustin increased 200 national accounts by
19  30 percent with the sole reason being given
20  of Thanksgiving, right?
21    MS. HENN:  Objection to form.
22    THE WITNESS:  That's what's on
23  the form.  Again, I don't know and I
24  don't have the context of --
25

Page 170

1  QUESTIONS BY MR. RAFFERTY:
2      Q.    Well, that's where the reason's
3  supposed to be, isn't it, on the form?
4          It says, "Reason for change."
5  That's where it should be, right?
6          MS. HENN:  Objection to form.
7          THE WITNESS:  Yes, or with
8      attached supporting documentation.
9  QUESTIONS BY MR. RAFFERTY:
10     Q.    Is there any attached
11 supporting documentation?
12         MS. HENN:  Objection to form.
13         THE WITNESS:  I don't see any.
14 QUESTIONS BY MR. RAFFERTY:
15     Q.    Okay.  And that's not a valid
16 reason to increase 200 accounts 30 percent
17 permanently, because of the Thanksgiving
18 holiday, is it?  That's wrong.
19         MS. HENN:  Objection to form.
20         THE WITNESS:  With only that
21     information, I don't -- that's not the
22     right -- yeah, I mean, that --
23 QUESTIONS BY MR. RAFFERTY:
24     Q.    Well, that's all the
25 information --

Page 171

1      A.    Correct.  I'm just saying there
2  may be more information.  But on its face,
3  no, that's not right.
4      Q.    It's wrong, isn't it?  It
5  shouldn't be done?
6          MS. HENN:  Objection to form.
7          THE WITNESS:  Not in that
8      specific way.
9  QUESTIONS BY MR. RAFFERTY:
10     Q.    Well, not in a general way.
11 Not in any way should 200 accounts be
12 increased 30 percent for the reason
13 "Thanksgiving holiday."  Two words --
14         MS. HENN:  Objection to form.
15 QUESTIONS BY MR. RAFFERTY:
16     Q.    -- "Thanksgiving holiday."
17 30 percent increase.
18         What -- in any way should that
19 be right, correct?
20         MS. HENN:  Objection to form.
21         THE WITNESS:  Agreed.  Again, I
22     don't have -- agree, but I don't have
23     the context for exactly what was
24     behind the scenes.
25

Page 172

1  QUESTIONS BY MR. RAFFERTY:
2      Q.    Well, this is the context we
3  have.  This is the TCR that was filed.  These
4  are the reasons that were given.
5      A.    I understand.
6      Q.    And nothing else.
7          So as senior director of
8  regulatory affairs for the retail national
9  accounts, you can say, looking back, that
10 this is wrong --
11         MS. HENN:  Objection to form.
12 QUESTIONS BY MR. RAFFERTY:
13     Q.    -- and it shouldn't have
14 happened?
15         MS. HENN:  Objection to form.
16         THE WITNESS:  If this is all
17     that I had, then I would not do this.
18 QUESTIONS BY MR. RAFFERTY:
19     Q.    And why?
20     A.    I would need more context.
21     Q.    Yeah.  Because -- and there's
22 absolutely no logic or reason or business
23 reason to increase 200 accounts 30 percent
24 permanently when the explanation is
25 "Thanksgiving."

Page 173

1          Thanksgiving is not a permanent
2  holiday, is it?
3          MS. HENN:  Objection to form.
4  QUESTIONS BY MR. RAFFERTY:
5      Q.    Pretty sure for the week after
6  Thanksgiving, Thanksgiving is not around for
7  another year, right?
8      A.    Permanent in that it happens
9  every year, but not permanent in that sense.
10     Q.    Is that what you think he meant
11 here or are you just being -- I mean, you're
12 making light of it, right?
13         MS. HENN:  Objection to form.
14         THE WITNESS:  No.
15 QUESTIONS BY MR. RAFFERTY:
16     Q.    Because 30 percent is a
17 significant increase for an RNA, isn't it?
18     A.    It could be.  It depends on the
19 amounts.  It's a thousand to 1,300.
20     Q.    Well, that's a significant
21 increase for that store, isn't it, if it's
22 set at a thousand?
23     A.    It depends.
24     Q.    It depends?
25     A.    It depends.

Page 174

1    Q.    If it's set at 10,000, then it
2 goes to 13,000, right, which is an extra
3 3,000 doses of narcotics being dispersed to
4 that store, to that store, on the corner of
5 Main Street every month --
6         MS. HENN:  Objection.
7 QUESTIONS BY MR. RAFFERTY:
8    Q.    -- from now until there's
9 another change because it's permanent, right?
10        MS. HENN:  Objection to form.
11        THE WITNESS:  It could be.
12 QUESTIONS BY MR. RAFFERTY:
13    Q.    Yeah.  3,000 more narcotics put
14 out in a town because of Thanksgiving
15 holiday, right?
16        MS. HENN:  Objection to form.
17 QUESTIONS BY MR. RAFFERTY:
18    Q.    In fact, you have been
19 criticized -- when I say "you," I mean
20 McKesson -- has been criticized for the way
21 you handled threshold change requests after
22 the implementation in 2008 of the CSMP,
23 haven't you?
24        MS. HENN:  Objection to form.
25

Page 175

1 QUESTIONS BY MR. RAFFERTY:
2    Q.    The DOJ, as part of their
3 investigation after 2008, part of that
4 involved how you were handling threshold
5 change requests, true?
6         MS. HENN:  Objection to form.
7         THE WITNESS:  Yes, it was part
8    of those allegations.
9 QUESTIONS BY MR. RAFFERTY:
10    Q.    Okay.  And you've reviewed
11 those -- that correspondence from the DOJ,
12 right?
13    A.    Yes.
14        MS. HENN:  Objection to form.
15 QUESTIONS BY MR. RAFFERTY:
16    Q.    Back in 2014, right?
17    A.    Yes.
18        (McKesson-Hartle Exhibit 54
19    marked for identification.)
20 QUESTIONS BY MR. RAFFERTY:
21    Q.    Let's go to 1.1433.  This will
22 be Exhibit 54.
23        Here we've got a letter from
24 the US Department of Justice, John Walsh,
25 District of Colorado.

Page 176

1         Do you see that?
2    A.    I do.
3    Q.    August 13, 2014.  This is while
4 you're there at McKesson now, right?
5    A.    Excuse me?
6    Q.    You're at McKesson as of August
7 13, 2014?
8    A.    I am.  In May, yeah.
9    Q.    Okay.  You are senior
10 regulatory affairs director for national
11 accounts at that time, true?
12    A.    Correct.
13    Q.    All right.  If we could, let's
14 look at page -- and the title here is
15 "Possible civil action against McKesson
16 Corporation for violations of the Controlled
17 Substances Act."
18        Do you see that?
19    A.    I do.
20    Q.    And it says -- and this is a
21 letter to your -- to McKesson's lawyers at
22 Covington & Burling, the same lawyers here
23 today, right?  The same law firm?
24    A.    The same firm, yeah.
25    Q.    "The United States Attorney's

Page 177

1 Office for the District in Colorado, in
2 conjunction with the DEA, is investigating
3 whether the McKesson Corporation's Aurora
4 distribution center, located at 14500 East
5 39th Avenue, Aurora, Colorado, violated the
6 Comprehensive Drug Abuse Prevention Control
7 Act."
8         Do you see that?
9    A.    I do.
10    Q.    And then throughout this
11 letter, it goes through and lays out several
12 different violations, correct?
13        MS. HENN:  Objection to form.
14        THE WITNESS:  Can you ask that
15    question again, please?
16 QUESTIONS BY MR. RAFFERTY:
17    Q.    Yeah.
18        This letter goes through -- and
19 we're going to go through some of it now and
20 some of it this afternoon, but that's what
21 this letter is doing, is they're notifying
22 McKesson of violations of the Controlled
23 Substance Act, right?
24        MS. HENN:  Objection to form.
25        THE WITNESS:  Their

Page 178

1 allegations, right.
2 QUESTIONS BY MR. RAFFERTY:
3     Q.    Okay.  So here it says, if you
4 turn to .11, skipping ahead, and it says,
5 "McKesson-Aurora's desire for increased sales
6 overrode its obligations to report suspicious
7 orders."
8         Section B, do you see that?
9     A.    Yes.
10    Q.    "Our investigation has revealed
11 a disturbing pattern:  McKesson-Aurora's
12 desire for increased sales and retaining its
13 customers overrode its obligations to report
14 suspicious orders.  We have identified this
15 trend across several different areas:  1,
16 McKesson-Aurora manipulated and circumvented
17 thresholds."
18        Do you see that?
19    A.    I see that.
20    Q.    "Thresholds were supposed to be
21 the linchpin of McKesson's compliance
22 program, but McKesson-Aurora manipulated
23 customers' threshold levels in numerous ways
24 to avoid rigorous internal review."
25        Did I read that right?

Page 179

1     A.    You did.
2     Q.    And in fact it says, "First,
3 McKesson-Aurora set its initial thresholds
4 for its pharmacy customers very high.
5 McKesson-Aurora's review process was not even
6 triggered until an individual pharmacy sold
7 more than 10 percent of that pharmacy's
8 average volume from a 12-month period from
9 2007 to 2008, a year in which McKesson had
10 settled claims because diversion was
11 flourishing in McKesson-supplied pharmacies."
12        Do you see that?
13    A.    I do see that.
14    Q.    That's what we were talking
15 about earlier, right, when I asked you about
16 if you set thresholds too high initially,
17 then the trigger for the evaluation is never
18 set off, right?
19        MS. HENN:  Objection to form.
20        THE WITNESS:  It's what we
21    discussed earlier, correct.
22 QUESTIONS BY MR. RAFFERTY:
23    Q.    Yes.
24        And that's exactly now what the
25 District Attorney in Colorado, the

Page 180

1 US Attorney in Colorado, is telling McKesson
2 they were doing, right?
3        MS. HENN:  Counsel, can I just
4    pause for a minute?
5        Counsel, if there's a need to
6    have conversations, we reserved a room
7    just next door, and I would ask you to
8    either refrain from talking and
9    distracting the witness or please
10   leave the room.  Is that okay?
11       Thank you, sir.
12 QUESTIONS BY MR. RAFFERTY:
13    Q.    All right.  Going down here it
14 says -- that's exactly what your -- the
15 US Attorney in Colorado is accusing McKesson
16 of, right, setting the thresholds too high to
17 avoid the triggering of the tiered review?
18 That's what it says.
19    A.    Right.
20    Q.    Okay.  "In some cases,
21 McKesson-Aurora set thresholds so high at the
22 outset that the pharmacy customer would never
23 exceed it and thus never trigger any review
24 as to whether an order was indeed
25 suspicious."

Page 181

1        Once again, the same thing we
2 were talking about earlier, right?
3        MS. HENN:  Objection.  Go
4    ahead.
5 QUESTIONS BY MR. RAFFERTY:
6    Q.    Correct?
7        MS. HENN:  Objection to form.
8        THE WITNESS:  Right.
9 QUESTIONS BY MR. RAFFERTY:
10    Q.    Right.
11       And that that was -- when I
12 asked you if that was a way to manipulate the
13 threshold process, was to set the threshold
14 so high that it never triggered the tier
15 review, that's what you're being accused of
16 by the US Attorney here, right?
17       MS. HENN:  Objection to form.
18       THE WITNESS:  That's what they
19   have in here, correct.
20 QUESTIONS BY MR. RAFFERTY:
21    Q.    Okay.  "Second" -- if you turn
22 to the next page, which is .12.  "Second,
23 McKesson-Aurora routinely manipulated the
24 thresholds."
25       Do you see that?

Page 182

1    A.   I do.

2    Q.   "It would often preemptively
3 increase the threshold of its customers on
4 particular drugs before the customers had
5 even submitted a TCR seeking a threshold
6 increase."

7    There, that's where we're --
8 that's -- they're talking about actually
9 McKesson employees increasing the thresholds
10 without even a request being made by the
11 customer, right?

12    MS. HENN:  Objection to form.

13 QUESTIONS BY MR. RAFFERTY:

14    Q.   That's what they're talking
15 about?

16    A.   That's what they're talking
17 about.

18    Q.   Okay.  Down in the next
19 paragraph, next full paragraph:  "Time and
20 time again, McKesson-Aurora increased a
21 customer's threshold in a particular month so
22 that the customer did not exceed that
23 threshold and thus trigger McKesson-Aurora's
24 obligation to conduct a level 2 or level 3
25 review, much less file an SOR with the DEA."

Page 183

1    Do you see that?

2    A.   I see that.

3    Q.   And then, "Third,
4 McKesson-Aurora was often willing to increase
5 a pharmacy's threshold for the flimsiest of
6 reasons and without adequate investigation,
7 to give just a few of many examples."

8    First of all, that
9 Thanksgiving, you would refer to that or you
10 would consider that a flimsy reason, right?

11    MS. HENN:  Objection to form.

12 QUESTIONS BY MR. RAFFERTY:

13    Q.   Is Thanksgiving a flimsy
14 reason, or the flimsiest of reasons?

15    MS. HENN:  Objection to form.

16 QUESTIONS BY MR. RAFFERTY:

17    Q.   It may not even qualify as
18 flimsy.

19    MS. HENN:  Same objection.

20    THE WITNESS:  I mean, on the
21 surface it's not, by itself, a reason.
22 There may be circumstances where in
23 certain markets populations change and
24 shift, so -- but on its own --

25

Page 184

1 QUESTIONS BY MR. RAFFERTY:

2    Q.   Did it say anything in that TCR
3 about a population changing or shifting?

4    A.   It didn't.  That's why I'm
5 saying on its own, it's not.

6    Q.   So are you defending the fact
7 that 200 customers were increased 30 percent
8 because of, quote, the Thanksgiving holiday?

9    A.   No.

10    MS. HENN:  Objection to form.

11 QUESTIONS BY MR. RAFFERTY:

12    Q.   Okay.  Well, let's see some of
13 the examples that the US Attorney used here,
14 which are different than the Thanksgiving.

15    "Dale's Pharmacy requested an
16 increase of its oxycodone threshold on
17 December 27, 2010.  Dale's proffered
18 justification was normal business with
19 increased volume during the holidays."

20    Do you see that?

21    "Although there were only four
22 days remaining in the month until Dale's
23 oxycodone would be reset, McKesson-Aurora
24 approved an 8,000 dosage unit increase of
25 Dale's oxycodone threshold, increasing the

Page 185

1 threshold by 20.5 percent from 39,000 to
2 47,000 dosage units."

3    Do you see that?

4    A.   I see that.

5    Q.   "From June 2010 to
6 November 2010, McKesson-Aurora justified
7 many -- multiple threshold increases for
8 Dale's Pharmacy based upon an alleged influx
9 of customers due to the closure of a
10 neighboring pharmacy in Fort Lupton.  Several
11 of the TCRs for Dale's justified requests for
12 threshold increases on the grounds that the
13 API Pharmacy had stopped selling controlled
14 substances.  In point of fact, the API
15 Pharmacy had closed seven years earlier."

16    You see that?

17    A.   I see that.

18    Q.   That's the kind of thing that
19 you're supposed to, if you're actually
20 effectively implementing the CSMP, that you
21 should know, isn't that right, that you
22 should detect?

23    MS. HENN:  Objection to form.

24    THE WITNESS:  It should be a
25 piece of information you should know.

Page 186

1  QUESTIONS BY MR. RAFFERTY:
2      Q.    Well, not -- yeah, that you
3  should find -- you should be able to
4  determine if you're actually doing due
5  diligence and exercising due diligence in
6  whether or not to increase a threshold,
7  right?
8      A.    You should research that.
9      Q.    Okay.  "The pharmacy at Salud,
10 another pharmacy in Fort Lupton, did stop
11 selling controlled substances for 19 days in
12 2010.  However, McKesson-Aurora allowed
13 Dale's to rely on this closure excuse for
14 continued threshold increases for another
15 four months, even after the pharmacy at Salud
16 was back up and running."
17         Once again, something that if
18 McKesson was using and exercising due
19 diligence in its investigation it should
20 determine and it should find out, right?
21         MS. HENN:  Objection to form.
22         THE WITNESS:  Again, that
23     information is critical to the
24     decision, part of it.
25

Page 187

1  QUESTIONS BY MR. RAFFERTY:
2      Q.    And should be found -- and
3  should be discovered?
4          MS. HENN:  Objection to form.
5  QUESTIONS BY MR. RAFFERTY:
6      Q.    Right?
7      A.    It should be part of it, yes.
8      Q.    And if you're exercising due
9  diligence.
10         Going down to the bottom:  "In
11 sum, the thresh -- the thresholds that were
12 originally intended to trigger an
13 investigation that could result in a
14 suspicious order being reported to the DEA
15 never served this purpose.  McKesson did not
16 set and then maintain its thresholds as
17 required by its CSMP.  The thresholds did not
18 meaningfully restrict McKesson-Aurora's
19 customers from obtaining controlled
20 substances."
21         And then read that next
22 sentence, please.
23     A.    It starts "thresholds"?
24     Q.    Yep.
25     A.    "Thresholds were moved to

Page 188

1  accommodate whatever purchasing occurred, or
2  they were set so high that they never
3  triggered any review."
4      Q.    And that's -- that means that
5  the thresholds were being manipulated by
6  McKesson in order to accommodate sales,
7  right?
8          MS. HENN:  Objection to form.
9          THE WITNESS:  That's the
10     allegation in here.
11 QUESTIONS BY MR. RAFFERTY:
12     Q.    Okay.  And for example,
13 allowing, for example, that 30 percent
14 increase to 200 stores because of the
15 Thanksgiving holiday, that would be an
16 example of manipulating thresholds to
17 accommodate sales, wouldn't it?
18         MS. HENN:  Objection to form.
19         THE WITNESS:  And I have zero
20     context for all the information on the
21     decision that was actually made, other
22     than what was in the form.
23 QUESTIONS BY MR. RAFFERTY:
24     Q.    Based on what you've seen in
25 the form, that would be manipulating the

Page 189

1  thresholds to accommodate sales, right?
2          MS. HENN:  Objection to form.
3          THE WITNESS:  I wouldn't phrase
4      it that way, but it's -- again, I
5      would -- it's not a decision that I --
6      I mean, it requires more context than
7      what is on the form.
8  QUESTIONS BY MR. RAFFERTY:
9      Q.    But if that's all the context
10 you have, that would be an example of
11 manipulating the thresholds to accommodate
12 sales, right?
13         MS. HENN:  Objection to form.
14         THE WITNESS:  Of changing the
15     thresholds.
16 QUESTIONS BY MR. RAFFERTY:
17     Q.    All right.  Now let's --
18         MS. HENN:  Counsel, it's
19     getting close to lunch and we've been
20     going on an hour and 20 minutes.
21     Would this be a good time for a break
22     to get some lunch?
23         MR. RAFFERTY:  Well, it's up to
24     the witness, obviously, but if we
25     could accommodate ten more minutes, I

Page 190

1  can get through this particular --
2      THE WITNESS:  What time is it?
3      MS. HENN:  It's 11:52 or 3.
4      THE WITNESS:  That's fine.
5      MR. RAFFERTY:  Is that okay?
6      THE WITNESS:  That's okay.
7      MR. RAFFERTY:  Totally up to
8  you.  I don't want to force you.
9      THE WITNESS:  No, that's okay.
10      MS. HENN:  Don't push it.
11      (McKesson-Hartle Exhibit 55
12  marked for identification.)
13 QUESTIONS BY MR. RAFFERTY:
14      Q.   Now, in setting the
15 threshold -- let's talk about setting the
16 thresholds, because that was -- part of the
17 allegations in here was the thresholds
18 were -- part of the allegations in August
19 of 2014 by the US Attorney was that the
20 thresholds were being set too high, right?
21      MS. HENN:  Objection to form.
22      THE WITNESS:  That's part of
23      the allegation.
24 QUESTIONS BY MR. RAFFERTY:
25      Q.   Okay.  And if we look at

Page 191

1  1.1461, which will be Exhibit 55 to the
2  deposition.
3      Now, this is from Nate Hartle.
4  Do you see that at the top?
5      A.   I do.
6      Q.   Okay.  Now -- and this is dated
7  July 23, 2014, right?
8      A.   Yes.
9      Q.   So just about a month before
10 that letter from the US Attorney, right?
11      A.   Correct.
12      Q.   That we just looked at?
13      A.   Right after I joined.
14      Q.   Okay.  And this is right after
15 you joined, right?
16      (McKesson-Hartle Exhibit 56
17  marked for identification.)
18 QUESTIONS BY MR. RAFFERTY:
19      Q.   Okay.  Now I want to show you
20 1.1458, which will be Exhibit 56 to the
21 deposition.
22      All right.  This is another
23 e-mail from Nate Hartle, September 9, 2014.
24      Do you see that?
25      A.   I do.

Page 192

1      Q.   Okay.  Let's focus on -- now,
2  this is about a month after you got the
3  letter, so let's be clear.
4      You got Exhibit 55, your e-mail
5  dated July 23, 2014, and that's dealing with
6  a TCR, a threshold change request, from
7  Wegmans.
8      Do you see that?
9      A.   I see that.
10      Q.   Okay.  And then the letter from
11 the US Attorney is sent a month later, in
12 August, alleging that the thresholds were
13 being set too high by McKesson in order to
14 avoid detection of suspicious orders.  That
15 was the allegation, right?
16      A.   It was.
17      Q.   Okay.  And then a -- at least a
18 short time after that letter is Exhibit 56,
19 which is the September 9, 2014 letter.
20      Do you see that -- or e-mail?
21      A.   Yes.
22      Q.   All right.  So a month after
23 you -- that letter is sent to McKesson's
24 lawyers, you write a letter -- or an e-mail,
25 I'm sorry, dated September 9, 2014, up at the

Page 193

1  top, and you copy Micheal Bishop as well as
2  Michael Oriente.
3      Do you see that?
4      A.   I do.
5      Q.   And then it says, "Wakefern
6  threshold methodology."
7      You see that?
8      A.   I do.
9      Q.   And what it says is,
10 "Sensitivity:  Company, confidential," right?
11      Don't share it outside the
12 walls of McKesson, right?
13      MS. HENN:  Objection to form.
14      THE WITNESS:  It's classified
15      confidential, yeah.
16 QUESTIONS BY MR. RAFFERTY:
17      Q.   "Bishop:  You asked on the call
18 about the methodology we have used in the
19 past, so below is what we will use.  This
20 will be the same as what we will need to do
21 with the new NRA {sic} volume for
22 hydrocodone."
23      So what you're doing is you're
24 asking -- you're telling him about how to set
25 an initial threshold for this, right?

Page 194

1    A.    Correct.
2    Q.    All right.  And what you say
3  is, let's calculate it using the total doses
4  times distribution settle norm times buffer.
5        Do you see that?
6    A.    I see that.
7    Q.    Okay.  And you're familiar with
8  that calculation being one that you've used
9  during your time at McKesson, right?
10    A.    Well, this is shortly -- I had
11  only been with McKesson for a few months.
12  I'm familiar with that one as having been
13  used.
14    Q.    Okay.  This has been used in
15  the past; that's what you said?
16    A.    Similar concept.
17    Q.    Okay.  "Buffer, we've used
18  25 percent in the past, so that is what I've
19  put in for now.  And then rounding, we will
20  also round up to the nearest 500."
21        Do you see that?
22    A.    I see that.
23    Q.    So to make sure we're clear,
24  you're using a threshold determination that
25  was used in the past, and you're doing it --

Page 195

1  you're using the same threshold process that
2  was used in the past just a few weeks after
3  the US Attorney said you're setting the
4  thresholds too high to avoid detection,
5  right?
6        MS. HENN:  Objection to form.
7        THE WITNESS:  Can you ask that
8    again or rephrase it?
9  QUESTIONS BY MR. RAFFERTY:
10    Q.    Yeah.
11        You're saying here, let's use
12  the same methodology we used in the past,
13  right?  That's what you said?
14    A.    That's what -- that's in here.
15    Q.    Okay.
16    A.    This relates to --
17    Q.    And this was a few weeks after
18  having gotten the letter from the US Attorney
19  specifically alleging that you are setting
20  the thresholds too high in order to avoid
21  detection of suspicious orders, right?
22  That's the time frame?
23    A.    That's the timing.
24    Q.    Okay.  So you stick with the
25  methodology used in the past, and the

Page 196

1  methodology is, you take the total doses
2  and -- well, strike that.
3        The buffer.  What you do is you
4  take a certain number.  Is it the max number
5  for the last six months?  The max number for
6  the last 12 months?  What is it?
7    A.    I'm not sure what it was on
8  this particular one.
9    Q.    Okay.  But that's typically
10  what you've done in the past is taken either
11  the last six months' sales and found the
12  highest month or the last 12 months' sales
13  and found the highest month sales, right --
14        MS. HENN:  Objection to form.
15  QUESTIONS BY MR. RAFFERTY:
16    Q.    -- as the foundation?
17        MS. HENN:  Objection to form.
18        THE WITNESS:  Typically using
19    dispensing data.
20  QUESTIONS BY MR. RAFFERTY:
21    Q.    Okay.
22    A.    Not purchasing.
23    Q.    Okay.  But the highest 12-month
24  or the highest 6-month, right?
25    A.    We've used those --

Page 197

1        MS. HENN:  Objection to form.
2        Go ahead.
3        THE WITNESS:  Those are part of
4    the calculations at the time.
5  QUESTIONS BY MR. RAFFERTY:
6    Q.    Okay.  And then what you do is
7  you take that highest number, the highest
8  number you can get over the last year, and
9  you tack on 25 percent above it, right?
10        MS. HENN:  Objection to form.
11  QUESTIONS BY MR. RAFFERTY:
12    Q.    That's the buffer, 25 percent?
13    A.    That's what a buffer is.
14    Q.    That's what a buffer is.
15        Okay.  So if a store's max
16  number of last 12 months was 10,000, you
17  automatically set the threshold -- or you
18  automatically add a buffer of another 2,500,
19  right?
20        MS. HENN:  Objection to form.
21        THE WITNESS:  That's how the
22    math works.
23  QUESTIONS BY MR. RAFFERTY:
24    Q.    That's how the math works.
25    A.    Dispensing versus purchasing.

Page 198

1    Q.    Okay.  And then what you do
2  after that is you then round it up to the
3  next 500.  So if it's -- if the number ends
4  up falling at 12,501, you then jack it up
5  another 499 and put it at 13,000 so that
6  the -- the max number of dispensing in a
7  month was 10,000, your buffer is now 13,000,
8  or 30 percent higher, than what it is they've
9  ever dispensed in the prior year, right?
10        MS. HENN:  Objection to form.
11        THE WITNESS:  That's the math.
12    The rounding is for -- you can't --
13    for bottle size factors, typically.
14  QUESTIONS BY MR. RAFFERTY:
15    Q.    Well, but you're rounding up.
16  Why not round it down?  You don't round it
17  down, do you?
18    A.    Typically don't.
19    Q.    No.  You round it up because
20  that increases the threshold, and that
21  reduces the risk that they're going to bump
22  up against the threshold and reduce the
23  chance that you're going to have to actually
24  conduct an investigation on somebody as
25  valuable of a customer such as Rite Aid,

Page 199

1  right?
2        You're jacking the thresholds
3  up as high as you can; isn't that what you're
4  doing?
5        MS. HENN:  Objection to form.
6        THE WITNESS:  No.
7  QUESTIONS BY MR. RAFFERTY:
8    Q.    Well, you're not rounding down;
9  we can agree on that, right?
10    A.    The intent --
11    Q.    You're not rounding down.  That
12  was my question.
13    A.    That's -- we're not rounding
14  down.
15    Q.    Right.
16        MS. HENN:  And the witness can
17    finish his answer if he'd like.
18        MR. RAFFERTY:  Well, it wasn't
19    responsive to my question.
20        MS. HENN:  He can finish his
21    answer if he'd like.
22  QUESTIONS BY MR. RAFFERTY:
23    Q.    Go ahead.
24    A.    I don't recall every single
25  detail associated with these, as they've

Page 200

1  been -- they were a few months after I joined
2  the team.  The intent is to allow a customer
3  in -- to purchase, to meet that legitimate
4  dispensing.  And there are reasons why there
5  are buffers on top of a dispensing amount,
6  even a purchasing amount, because there is
7  significant variation in purchasing patterns
8  at times.
9    Q.    It just happens to have the
10  added benefit of increasing the threshold so
11  high that it's 30 percent higher than any
12  time in any month they've ever dispensed,
13  right?  That's just an added bonus?
14        MS. HENN:  Objection to form.
15        THE WITNESS:  I wouldn't call
16    it an added bonus.  Again, the intent
17    is to try to allow them to purchase --
18  QUESTIONS BY MR. RAFFERTY:
19    Q.    Okay.
20    A.    -- to get their legitimate
21  dispensing.
22    Q.    Okay.  Well, you could have --
23  strike that.
24        Let's look at the exhibit, this
25  July 23, 2014 e-mail.  This was the month

Page 201

1  before the August 2014 letter from the
2  US Attorney.
3        "Hi, guys" --
4        This is from you, right, Nate
5  Hartle?
6    A.    It is.
7    Q.    Okay.  "Hi, guys, I took a look
8  this morning and have a few questions and
9  comments."  Now, this is -- the subject
10  matter is "Wegmans TCR request."
11        So what they're looking at is
12  what to set Wegmans levels at.  Would you
13  agree with that?  Threshold?
14        If you look at page .4, Shari
15  Pickell e-mail --
16    A.    Yes.
17    Q.    -- to you -- well, cc'd you.
18        And it says, "Please see the
19  attached TCR report and dispensing data for
20  oxycodone for Wegmans stores."
21    A.    Right.
22    Q.    "With their new contract, they
23  are moving their incremental volume over to
24  McKesson."
25        So they're moving business to

Page 202

1  McKesson now, right?
2      A.    Correct.
3      Q.    "Please adjust thresholds
4  accordingly."  So there's some back and
5  forth.
6            And then ultimately it looks
7  like on the base codes -- what are the base
8  codes 9813 and 9814; do you know?
9      A.    Those aren't -- those aren't
10  current ones in our -- so I can't --
11      Q.    At the time was oxycodone and
12  oxy 30, right?
13      MS. HENN:  Objection to form.
14  QUESTIONS BY MR. RAFFERTY:
15      Q.    Well, either way it's --
16      A.    I can't --
17      Q.    -- it's one -- it's a -- it's
18  a --
19      MS. HENN:  One at a time,
20  please.
21  QUESTIONS BY MR. RAFFERTY:
22      Q.    It's an opioid.
23      A.    Yeah.
24      Q.    They're opioids, right?
25      A.    Yeah.

Page 203

1      Q.    They're Schedule II?
2      A.    They're not the current base
3  code numbers today, so that's why I'm not
4  recalling exactly, but, yeah.
5      Q.    Well, we know they're narcotic
6  painkillers, right?  They're Schedule II
7  drugs?
8      A.    They're listed in here.  I'll
9  give you that.
10      Q.    Oh, oxycodone there.  Where?
11            Yeah, okay.  Yeah, dispensing
12  data for oxycodone.
13      MS. HENN:  What are you
14  referring to?
15      MR. RAFFERTY:  Page .4 in the
16  original e-mail from Shari Pickell.
17      THE WITNESS:  Shari may have
18  put -- transposed the numbers.  The
19  numbers are 9143 and 9144 --
20  QUESTIONS BY MR. RAFFERTY:
21      Q.    You're right.  You're right.
22      A.    -- so I think that's probably
23  the case.
24      Q.    Okay.  Either way.
25      A.    Yeah, right.

Page 204

1      Q.    All right.  So what -- they
2  look here, and it looks like some of the
3  base -- thresholds based on the calculations
4  actually may be going down; is that right?
5      A.    Can you say that again or point
6  me to what you're talking about?
7      Q.    Yeah, well, let's go up here.
8            And you say, "Hi, guys, I took
9  a look this morning and have a few
10  questions/comments."
11            Do you see that?
12      A.    Uh-huh.
13      Q.    "One, do we really want to be
14  lowering thresholds right now?"
15            Do you see you asking that
16  question?
17      A.    Uh-huh.
18      Q.    And then it says and it goes
19  on, "If the current ones are still within
20  normal level, with thresholds barely above
21  the average and sometimes lower than the max,
22  this may cause issues like unnecessary
23  omits," right?
24      A.    Uh-huh.
25      Q.    So what you're saying is, let's

Page 205

1  use a different calculation than what was
2  being proposed, right?
3      MS. HENN:  Objection to form.
4  QUESTIONS BY MR. RAFFERTY:
5      Q.    In number 3?
6            "I was thinking we would do
7  something more like we did with the Rite Aid
8  recently.  For example, we used total RX
9  times the DC norm and add a buffer.  In
10  Wegmans' case, we could probably start with a
11  buffer on top of their max amount."
12            So that's what we were talking
13  about, the system that you were using in
14  September, right?  Take the max amount per
15  month of dispensing --
16      A.    Right.
17      Q.    -- add a buffer.
18            Do you see that?
19      A.    I do.
20      Q.    All right.  And then round up.
21  It says, "Take max and add a buffer, i.e.,
22  20 percent."
23            Back then it was 20 percent in
24  July, right?  It went up to 25 percent in
25  your e-mail in September?

Page 206

1  MS. HENN: Objection to form.
2  QUESTIONS BY MR. RAFFERTY:
3  Q. But here it says, "take" -- it
4  says, "Logic, take max and add a buffer,
5  i.e., 20 percent, to round up to the nearest
6  500."
7  Do you see that?
8  A. I see that.
9  Q. So once again, taking whatever
10 number it is -- and so you give an example
11 down below, store number 1. The max monthly
12 dispensing for that store at 11,800, add the
13 20 percent buffer puts it at 14, 1,060 {sic},
14 new threshold, 14,500.
15 Do you see that?
16 A. I see that.
17 Q. So instead of -- so that's
18 almost 3,000 doses per month higher than
19 their max dispensing, right?
20 MS. HENN: Objection to form.
21 QUESTIONS BY MR. RAFFERTY:
22 Q. That's an example.
23 A. It's an example.
24 Q. Okay.
25 A. I would again contend I don't

Page 207

1  know all the details or recall every single
2  detail, but the idea is to allow for
3  legitimate dispensing and normal variations
4  in purchasing, so --
5  Q. That's not what the US Attorney
6  in Colorado put in the allegations against
7  your company, was it? That's not -- that
8  wasn't -- that wasn't the allegation, was it?
9  MS. HENN: Objection to form.
10 THE WITNESS: No. That's not
11 the language in there, no.
12 QUESTIONS BY MR. RAFFERTY:
13 Q. And in fact, that Aurora
14 conduct in that particular letter was part of
15 the 2017 settlement that resulted in the
16 $150 million fine that McKesson paid,
17 correct?
18 MS. HENN: Objection to form.
19 THE WITNESS: It was one of the
20 allegations that led to the ultimate
21 settlement.
22 QUESTIONS BY MR. RAFFERTY:
23 Q. Right.
24 That you -- that McKesson
25 accepted responsibility for, correct?

Page 208

1  MS. HENN: Objection to form.
2  THE WITNESS: Correct.
3  QUESTIONS BY MR. RAFFERTY:
4  Q. All right. Now --
5  MS. HENN: Counsel, we're going
6  to need to take a break. It's been an
7  hour and 40 minutes.
8  VIDEOGRAPHER: Okay. The time
9  is 12:08 p.m., and we're going off the
10 record.
11 (Off the record at 12:08 p.m.)
12 VIDEOGRAPHER: The time is
13 1:01 p.m., and we're back on the
14 record.
15 QUESTIONS BY MR. RAFFERTY:
16 Q. Mr. Hartle, just to kind of
17 close the loop on where we were before the
18 lunch break.
19 Now, we reviewed a couple
20 documents. I'm not going to go back through
21 where -- the policy that you were using, or
22 the formula you were using, to set new
23 thresholds included the maximum dispensing
24 amount for a month from the previous 12-month
25 period, correct?

Page 209

1  A. I don't know if both of them
2  were 12 months, but we're using the
3  dispensing amounts, yeah.
4  Q. Okay. The max dispensing
5  amount.
6  A. Yeah.
7  Q. And then adding a buffer, as
8  it's referred to, right?
9  A. Correct.
10 Q. And in one it was a 20 percent
11 buffer and one it was a 25 percent buffer,
12 right?
13 A. Uh-huh.
14 Q. Okay. And then rounding up to
15 the nearest 500 in addition to the buffer?
16 A. Right.
17 Q. Okay. So I just want to
18 reorient us. If we could take a look at
19 Exhibit 54 that you've got there, which is a
20 letter from the US Attorney, District of
21 Colorado, dated August 13, 2014.
22 That's -- this is the one that
23 was right in the middle of the two -- the
24 date that was in the middle of the two
25 e-mails that we were discussing.

Page 210

1    You recall that?
2    A.    Yes.
3    Q.    Okay.  So this is August 2014.
4    If we look at page .11, please,
5  what he's -- what he's being critical of, and
6  the allegation in here in terms of the
7  McKesson-Aurora manipulated and circumvented
8  thresholds is, first he says,
9  "McKesson-Aurora set its initial thresholds
10  for its pharmacy customers very high.
11  McKesson-Aurora's review process was not even
12  triggered," meaning the threshold -- a
13  threshold excursion, right?
14    MS. HENN:  Objection to form.
15  QUESTIONS BY MR. RAFFERTY:
16    Q.    "The process was -- the review
17  process was not even triggered until an
18  individual pharmacy sold more than 10 percent
19  of that pharmacy's average volume for a
20  12-month period from 2007 to 2008."
21    You see that?
22    A.    I see that.
23    Q.    Okay.  So if we look at that,
24  what he's saying there is there was a 10
25  percent buffer built in over the pharmacy's

Page 211

1  average volume from a 12-month period, right?
2    A.    Correct.
3    Q.    Which is lower than the 20 to
4  25 percent buffer you used.  And this uses an
5  average volume from a 12-month period, which
6  is lower than the max value for a month in
7  the prior 12 months, right?
8    A.    Correct.  This is purchasing
9  versus dispensing in mine.
10    Q.    So this is actually a lower
11  formula than what you were using, and what he
12  is alleging is the manipulation of the
13  thresholds; isn't that right?
14    MS. HENN:  Objection to form.
15    THE WITNESS:  The percentages
16  are, but, again, this is off of
17  purchasing versus dispensing, which
18  are two different things.
19  QUESTIONS BY MR. RAFFERTY:
20    Q.    Right.  I understand that.
21    A.    Right.
22    Q.    But here it's a 10 percent
23  buffer, and it's the average of the 12-month
24  period, right?
25    A.    Correct.

Page 212

1    Q.    Okay.  Now, if we go back to
2  your July 2014 e-mail, which is exhibit -- it
3  should be one of the just last couple but --
4  I think 55.  55, I'm sorry.
5    This is July 23, 2014, and this
6  is the one where you asked, "Do we really
7  want to be lowering thresholds right now?"
8    Do you see that?
9    A.    I see that.
10    Q.    Now, during this time period in
11  2014, do you know -- when you're asking that
12  question about lowering thresholds, do you
13  know what's going on in the country in terms
14  of the opioid epidemic?
15    A.    I do.
16    Q.    Okay.  In fact, it was during
17  this same time period we looked at the
18  document in 2014 that said that a person was
19  dying in the United States from an opioid
20  overdose every 19 minutes, right?
21    MS. HENN:  Objection to form.
22    THE WITNESS:  Agree.
23  QUESTIONS BY MR. RAFFERTY:
24    Q.    So while you are asking the
25  question, should we be lowering thresholds,

Page 213

1  which is the very mechanism by which you
2  trigger the investigation and the review for
3  suspicious orders, and you're saying should
4  we be lowering them and doing that, people
5  are dying from opioids, right?
6    MS. HENN:  Objection to form.
7    THE WITNESS:  I understand
8  people are dying from opiates.
9  QUESTIONS BY MR. RAFFERTY:
10    Q.    And they're dying while you're
11  asking the question about whether we should
12  be lowering thresholds, right?
13    MS. HENN:  Objection to form.
14    THE WITNESS:  My asking of that
15  question or in -- just in general
16  is -- there's reasons why it may --
17  lowering thresholds, based on the
18  facts and circumstances, may prevent
19  legitimate dispensing.
20    The idea is to make sure we
21  know what the business model change
22  might be and we account for legitimate
23  dispensing.
24  QUESTIONS BY MR. RAFFERTY:
25    Q.    One of the reasons -- one of

Page 214

1 the things that happens when you lower
2 thresholds is it increases omit reports and
3 it increases oversight into the purchasing
4 and helps identify suspicious orders, right?
5    MS. HENN: Objection to form.
6 QUESTIONS BY MR. RAFFERTY:
7    Q.   Isn't that one of the things it
8 does?
9    MS. HENN: Objection to form.
10    THE WITNESS: Can you restate
11 that question for me, please?
12 QUESTIONS BY MR. RAFFERTY:
13    Q.   Yeah.
14    One of the results of lowering
15 thresholds are an increase in omit reports,
16 meaning stops -- where it says, hey, listen,
17 there's a -- there's a -- there's a red flag
18 here, and so you need to look into this and
19 see if it's a suspicious order, right?
20    MS. HENN: Objection to form.
21    THE WITNESS: Right, it can
22 cause -- lowered thresholds could
23 cause omits.
24 QUESTIONS BY MR. RAFFERTY:
25    Q.   It can cause omits. And if you

Page 215

1 have an omit, it triggers an analysis and an
2 investigation as to whether the order is
3 suspicious and therefore subject to being
4 diverted into illegal purposes, right?
5    MS. HENN: Objection to form.
6    THE WITNESS: As part of the
7 previous program, the CSMP --
8 QUESTIONS BY MR. RAFFERTY:
9    Q.   Correct.
10    The program we're talking about
11 and the program that resulted in the 2017
12 settlement, right, that was involved in the
13 2017 settlement and the $150 million fine?
14    MS. HENN: Objection to form.
15    THE WITNESS: Parts of that
16 program.
17 QUESTIONS BY MR. RAFFERTY:
18    Q.   Yes.
19    A.   Yeah.
20    Q.   So when you are questioning
21 lowering thresholds, you know at the time
22 that you're writing that that people are
23 dying because of the opioid epidemic that the
24 company you're working for, McKesson, is
25 partially responsible for, right?

Page 216

1    MS. HENN: Objection to form.
2    THE WITNESS: I know that
3 people are dying during that time.
4 QUESTIONS BY MR. RAFFERTY:
5    Q.   Because of the opioid epidemic,
6 true?
7    A.   True.
8    Q.   The drugs that you're selling?
9    MS. HENN: Objection to form.
10    THE WITNESS: The types of
11 drugs we sell.
12 QUESTIONS BY MR. RAFFERTY:
13    Q.   And the threshold are one
14 method -- lowering thresholds would be one
15 method within which to combat the diversion
16 of drugs, of the opioid drugs, right?
17    A.   It can. Lowering thresholds
18 can limit the ability to get -- for
19 legitimate reasons cause omits that
20 statistically may not be -- should be omits.
21    Q.   Well, all that does is require
22 you to look into it, right? It's just a
23 little more work on McKesson's part. If it
24 turns out the omit should -- it should go
25 through, then it goes through, right?

Page 217

1    MS. HENN: Objection to form.
2    THE WITNESS: We look at a
3 variety of other data points as well
4 as part of our program.
5 QUESTIONS BY MR. RAFFERTY:
6    Q.   My question was a yes or no.
7    MS. HENN: Objection to form.
8    THE WITNESS: Can you restate
9 your question for me, please?
10 QUESTIONS BY MR. RAFFERTY:
11    Q.   If lowering the threshold
12 increases the omit reports, all that requires
13 or entails is more investigation and more
14 research on your part, on McKesson's part, to
15 see whether or not that order is suspicious,
16 right?
17    MS. HENN: Objection to form.
18 QUESTIONS BY MR. RAFFERTY:
19    Q.   You can release it ultimately;
20 you just have to look at it, right?
21    MS. HENN: Objection to form.
22    THE WITNESS: I don't
23 understand the question specifically,
24 what you're trying to --
25

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 QUESTIONS BY MR. RAFFERTY:
2 Q. Well, you're saying it can
3 result in more omit reports, lowering the
4 threshold.
5 A. It could.
6 Q. The upside of having more omit
7 reports is it gives you more oversight
8 because you're looking into the actual
9 transactions more, right?
10 That's the upside, because you
11 should be wanting to do that to prevent
12 suspicious orders, right?
13 MS. HENN: Objection to form.
14 THE WITNESS: That's one of the
15 things that we could do to --
16 QUESTIONS BY MR. RAFFERTY:
17 Q. Right.
18 A. -- to look into more.
19 Q. Yeah, that's right.
20 The downside for McKesson is it
21 causes you to do more work. The more omit
22 reports, the more level 1 reviews and the
23 more you -- the more time you have to spend
24 looking at the actual transaction, fair?
25 MS. HENN: Objection to form.

Page 219

1 THE WITNESS: It's -- in all my
2 experience, in any decisions I've
3 made, I've never factored in and
4 thought about workload.
5 QUESTIONS BY MR. RAFFERTY:
6 Q. I'm just talking about from a
7 practical standpoint, if you increase the
8 omit reports, the only downside, the only bad
9 part of that is you, McKesson, has to do more
10 work to look at those omit -- to look at the
11 orders, right?
12 MS. HENN: Objection to form.
13 THE WITNESS: I don't think
14 that's the only -- again, I think, you
15 know, a downside of not allowing a
16 customer to meet their legitimate
17 dispensing is they can --
18 QUESTIONS BY MR. RAFFERTY:
19 Q. Well, you can clear them in
20 like a minute, right?
21 MS. HENN: Counsel, let's let
22 him finish his answer.
23 MR. RAFFERTY: Sorry.
24 THE WITNESS: That's not how
25 the process works today during this

Page 220

1 time frame.
2 QUESTIONS BY MR. RAFFERTY:
3 Q. Okay. When you get a level
4 1 -- you cleared level 1 omit reports or
5 investigations very quickly, same day in many
6 instances, right?
7 MS. HENN: Objection to form.
8 THE WITNESS: I'm not -- I was
9 not involved in level 1, that CSMP
10 process.
11 QUESTIONS BY MR. RAFFERTY:
12 Q. Okay. But you know that those
13 were cleared and, in fact, had as a policy in
14 many regards to have it cleared within a day?
15 A. Some can be cleared quickly --
16 Q. Okay.
17 A. -- based on the facts and
18 circumstances.
19 Q. Right.
20 So you can clear it; you just
21 have to investigate it, right? You have to
22 spend some time looking at it, right?
23 MS. HENN: Objection to form.
24 THE WITNESS: Some of them,
25 right.

Page 221

1 QUESTIONS BY MR. RAFFERTY:
2 Q. And that's not a bad thing.
3 Shouldn't be.
4 MS. HENN: Objection to form.
5 THE WITNESS: It's not a bad
6 thing to use information to -- other
7 pieces of information to do due
8 diligence.
9 QUESTIONS BY MR. RAFFERTY:
10 Q. But you only get to that if the
11 threshold -- there's a threshold excursion,
12 right?
13 MS. HENN: Objection to form.
14 THE WITNESS: That's one way to
15 trigger a review of a customer.
16 (McKesson-Hartle Exhibit 58
17 marked for identification.)
18 QUESTIONS BY MR. RAFFERTY:
19 Q. Okay. Now -- all right.
20 Looking at P1.88, this is a copy of the
21 administrative memorandum of agreement
22 pertaining to the 2017 settlement.
23 Have you reviewed this before?
24 A. I have.
25 Q. Okay. And if you would, please

Page 222

1  turn to the back page, which is P -- I'm
2  sorry, page 14. Page 14.
3      Oh, I'm sorry, it's 58. I'm
4  sorry, did you -- have you seen this before,
5  Mr. Hartle?
6      A.  I have.
7      Q.  Okay. If you would, turn to
8  page 14. And if you look over there, the
9  signatures of the acting administrator of the
10 Drug Enforcement Administration and assistant
11 administrator for the Diversion Control
12 Division of DEA; do you see that?
13     A.  I see that.
14     Q.  And those are dated January 17,
15 2017, right?
16     A.  Correct.
17     Q.  And that's the date that the
18 agreement was finalized and the $150 million
19 fine was levied, correct?
20     MS. HENN: Objection to form.
21     THE WITNESS: That's the date.
22     (McKesson-Hartle Exhibit 59
23     marked for identification.)
24 QUESTIONS BY MR. RAFFERTY:
25     Q.  Okay. Now, I'm going to show

Page 223

1  you a copy of what we're going to mark as
2  Exhibit 59, which is an e-mail from
3  January 30, 2017, from you. And if you
4  could, I want --
5      MR. RAFFERTY: It's 1.1449,
6  Corey.
7  QUESTIONS BY MR. RAFFERTY:
8      Q.  What I'd like to do is direct
9  your attention to the bottom e-mail first
10 from Dan Jefferies.
11     Do you see that?
12     A.  I do.
13     Q.  Do you know Mr. Jefferies?
14     A.  I do.
15     Q.  Do you recall this e-mail?
16     A.  I do not.
17     Q.  Okay. It says, "Subject,
18 opioid reductions."
19     Do you see that?
20     A.  I see that.
21     Q.  Okay. And he's talking about
22 some discussion at a Topco meeting.
23     Do you see that?
24     A.  I do.
25     Q.  Okay. And he says their

Page 224

1  concerns were, "One, that manufacturers would
2  stockpile the product and release it at a
3  higher price; two, McKesson would stockpile
4  and release at a higher price; and three,
5  thresholds would be dramatically cut."
6      Do you see that?
7      MS. HENN: Objection to form.
8      THE WITNESS: I see that.
9  QUESTIONS BY MR. RAFFERTY:
10     Q.  Okay. And then if you go up,
11 he says here, "I recommend" -- "I commented
12 that this was part of an effort to take out
13 the 25 percent buffer that was put in place a
14 few years ago but wasn't sure how to respond
15 to their question about impact."
16     Do you see that?
17     A.  I see that. I think that --
18 that 25 percent buffer is not related to our
19 buffers. That's related to --
20     Q.  No, I understand.
21     A.  -- the DEA quota, buffer,
22 right.
23     Q.  Right.
24     As to how much raw product can
25 be provided to the manufacturers, correct?

Page 225

1      A.  Correct.
2      Q.  And -- but one of their
3  concerns was going to be that thresholds
4  would be drastically cut, right?
5      MS. HENN: Objection to form.
6      THE WITNESS: Say that again?
7  QUESTIONS BY MR. RAFFERTY:
8      Q.  One of their concerns was that
9  thresholds would be dramatically cut.
10     MS. HENN: Objection to form.
11 QUESTIONS BY MR. RAFFERTY:
12     Q.  I just read it to you.
13     A.  Right. I'm just looking.
14 Right.
15     Q.  Okay. And Topco, so that we're
16 clear, is one of the national chains, the
17 national accounts, right?
18     A.  It's a buying group that has
19 chains associated with it, but it's in our
20 segment.
21     Q.  Right. Okay. It's in your
22 segment --
23     A.  Correct.
24     Q.  -- under your control --
25     A.  Correct.

Page 226

1    Q.    -- which is why you're
2  discussing this with we.
3    A.    Correct.
4    Q.    So up here you respond and you
5  say, "You were right in that the reduction
6  was just taking out a buffer, so we have no
7  concerns and do not anticipate any negative
8  impact.  This should be a nonissue, so it is
9  business as usual from a threshold
10 perspective."
11        Right?  That's what you said?
12   A.    Correct.
13   Q.    And this is January 30, 2017,
14 right after signing -- this is less than two
15 weeks after signing the memorandum of
16 understanding regarding the $150 million fine
17 which included allegations in terms of how
18 your thresholds were set, how your --
19 McKesson's thresholds were set, right?
20        MS. HENN:  Objection to form.
21        THE WITNESS:  That's the
22     timing.
23 QUESTIONS BY MR. RAFFERTY:
24   Q.    Yeah.
25   A.    Yeah.

Page 227

1    Q.    And so within two weeks you're
2  comforting your clients and saying, as far as
3  thresholds -- our thresholds are concerned,
4  it's business as usual, right?
5        MS. HENN:  Objection to form.
6        THE WITNESS:  The context of
7     this is that -- the "business as
8     usual" meaning the thresholds have
9     been established for those customers,
10    they're set in a way that allows them
11    to meet their dispensing, and we don't
12    believe that there's going to be an
13    impact to those.  And if they -- they
14    have a reason to request an increase,
15    that we'd follow the normal process.
16 QUESTIONS BY MR. RAFFERTY:
17   Q.    Right.
18        McKesson is business as usual
19 in regards to the way you set thresholds for
20 your customers, right?
21        MS. HENN:  Objection to form.
22 QUESTIONS BY MR. RAFFERTY:
23   Q.    That's what you're saying
24 there?
25        MS. HENN:  Objection to form.

Page 228

1        THE WITNESS:  For these
2     customers, yeah.
3  QUESTIONS BY MR. RAFFERTY:
4    Q.    Right.
5        Which includes what we just
6  went through, which was the 25 percent buffer
7  or the 20 percent buffer and the max rounding
8  up and all that, correct?
9        MS. HENN:  Objection to form.
10        THE WITNESS:  Logic to
11     determine a threshold for a customer
12     based on their dispensing.
13 QUESTIONS BY MR. RAFFERTY:
14   Q.    Right.
15        The very thing that the DOJ
16 made as part of their -- or that was part of
17 the settlement agreement in 2017, true?
18        MS. HENN:  Objection to form.
19 QUESTIONS BY MR. RAFFERTY:
20   Q.    True?
21   A.    I would say it's not the very
22 thing, the exact thing.
23   Q.    Well, if it's -- if that's
24 being discussed in 2017 as part of the
25 settlement agreement, which it is laid out

Page 229

1  into -- or in the agreement, and you're
2  comforting your clients, no -- your
3  customers, don't worry, it's business as
4  usual, right?  You're not changing your
5  system of setting your thresholds based on
6  what the DEA's doing, right?
7        MS. HENN:  Objection.
8  QUESTIONS BY MR. RAFFERTY:
9    Q.    That's what you're telling your
10 customers?
11        MS. HENN:  Objection to form.
12        THE WITNESS:  That the quota is
13     not changing our thresholds.
14     (McKesson-Hartle Exhibit 60
15     marked for identification.)
16 QUESTIONS BY MR. RAFFERTY:
17   Q.    Well, let's look at -- so
18 business as usual from a threshold
19 standpoint.
20        Let's look at 1.145.
21 Business -- let's see.  Let's talk about what
22 business as usual is for the people living in
23 the state of Ohio at this time.
24        Part of your job in terms of
25 monitoring what's going on in the country in

Page 230

1 terms of the opioids that you're selling is
2 you're supposed to be monitoring the press
3 articles, things that's going on, because
4 those things can actually trigger suspicious
5 order investigations, can't they?
6         MS. HENN:  Objection to form.
7         THE WITNESS:  They can trigger
8     due diligence.
9 QUESTIONS BY MR. RAFFERTY:
10    Q.    Trigger due diligence into
11 investigating whether there's suspicious
12 orders, right?
13        MS. HENN:  Objection to form.
14        THE WITNESS:  Investigating a
15     customer.
16 QUESTIONS BY MR. RAFFERTY:
17    Q.    Investigating a customer.
18        Okay.  Well, while you're
19 comforting your customer, I want to show --
20 that it's business as usual from a threshold
21 perspective in January of 2017, during that
22 time period, are you aware of what's going on
23 in the state of Ohio in terms of the numbers
24 of deaths associated with opioids?
25    A.    I'm aware of the trends.  I

Page 231

1 don't have the specific numbers.
2    Q.    Well, let me show you what
3 we're going to mark as Exhibit 60, which is
4 P1.1453.
5     So here, if you look at the
6 date at the top, it's March 2017.
7     You see that?
8    A.    I do.
9    Q.    Three months after -- roughly
10 three months after your e-mail, correct, of
11 January 2017?
12    A.    Three months after.
13    Q.    So here's what the headline is.
14 Have you ever looked at this article before?
15 You ever seen this?
16    A.    I don't recognize this one.
17    Q.    It says -- the headline is, or
18 the title of it is, "Too Many Bodies in Ohio
19 Morgue, So Coroner Gets Death Trailer."
20        Have you ever heard that phrase
21 "death trailer"?
22    A.    I have not.
23    Q.    Do you know that Ohio, the
24 State of Ohio, had to go out and buy a death
25 trailer because of the number of opioid

Page 232

1 deaths that were occurring in that state back
2 when you were telling your customers it's
3 business as usual?
4         MS. HENN:  Objection to form.
5         THE WITNESS:  I did not know of
6     a death trailer.
7 QUESTIONS BY MR. RAFFERTY:
8     Q.    Okay.  Well, let's look and see
9 what it says.
10        It says, "It's moot testimony
11 to the opioid addiction plague that has been
12 ravaging Ohio, a 20-foot-long air-conditioned
13 trailer with room for 18 bodies."
14        Do you see that?
15    A.    I do see that.
16    Q.    "The Stark County coroner in
17 Canton had a cold storage mass casualty
18 trailer trucked in on Saturday because the
19 morgue was overflowing with bodies, nearly
20 half of the victims from drug overdoses."
21        Do you see that?
22    A.    I do.
23    Q.    Okay.  If you turn to .3, this
24 is a picture from inside the death trailer.
25        Do you see that?

Page 233

1    A.    I do.
2    Q.    And then if you go to .4, and
3 if you look, it says specifically, "Coroners
4 in the counties of Ashtabula and Cuyahoga,"
5 which is where Cleveland is located, "have
6 had to deploy the trailers when their morgues
7 became too jammed, he said.  The medical
8 examiner in Summit County," where Akron is
9 located, "asked the Ohio department to send
10 one over last summer when there was a spike
11 in drug overdoses, the Akron Beacon Journal
12 reported.  Just this year alone, there have
13 been 90 overdose deaths in Stark County and
14 109 in Cuyahoga County, according to the
15 Akron newspaper."
16        Did I read that correctly?
17    A.    You did.
18    Q.    "But the situation in the rust
19 belt states like Ohio, where the drug
20 overdose rate is 2015, was most -- the most
21 recent federal figures available was 29.9 per
22 100,000 people is especially dire."
23        Is that what that says?
24    A.    It does say that.
25    Q.    Now, this is in March of 2017.

Page 234

1  And you're saying even in your position now,
2  which is, if I wrote it down correctly,
3  senior vice -- or vice -- yeah, senior vice
4  president, right?  Are you vice president or
5  senior vice president?
6       A.    Right now?
7       Q.    Yeah.
8       A.    Vice president.
9       Q.    Vice president of regulatory
10  affairs and compliance; is that right?
11      A.    Yes.
12      Q.    Okay.  Even in your role as
13  that, and the fact that you've been the
14  director of -- even though you've been the
15  director, the senior director, of regulatory
16  affairs for retail national accounts, you
17  never saw any of that?  You never saw that
18  article or heard about Ohio having to hire
19  mobile -- having to hire or buy mobile
20  morgues or death trailers?
21      MS. HENN:  Objection to form.
22      THE WITNESS:  I've not seen
23  this specific article.  I've certainly
24  read and been aware and read similar
25  articles.  Never heard of the term

Page 235

1  "death trailer" that I can recall.
2       (McKesson-Hartle Exhibit 48
3  marked for identification.)
4  QUESTIONS BY MR. RAFFERTY:
5       Q.    If we look now at
6  Exhibit 1153 -- you got it?  I already marked
7  these -- which is -- I'm sorry, is marked
8  Exhibit 48.
9       And if you turn to page -- this
10  is the -- just so the -- we identify the
11  document, it's P1.1153, and it is from the
12  DEA, "Effective controls against diversion."
13  Have you seen this before?
14  You know what?  I withdraw the
15  question.  Let's just go to .44.
16      A.    I'd still like to take a quick
17  peek.  I want to see...
18      Q.    Okay.  Go to .44, please.
19  You there?
20      A.    Almost.  .44.  Okay.
21      Q.    Remember we talked earlier
22  about one of your responsibilities the DEA
23  expected you -- one of the things that the
24  DEA expected of McKesson as a distributor was
25  to know your customers?

Page 236

1       You're familiar with that,
2  right?
3       A.    I am.
4       Q.    And here, one of the things it
5  says the DEA is telling you is some factors
6  to consider.  "What do the news reports say
7  about the state or geographical area where
8  the controlled substances being sold to,"
9  correct?
10      A.    Correct.
11      Q.    Okay.  So that's part of what
12  you're supposed to be doing; you're supposed
13  to be paying attention to the news reports,
14  right?
15      MS. HENN:  Objection to form.
16      THE WITNESS:  We do pay
17  attention --
18  QUESTIONS BY MR. RAFFERTY:
19      Q.    Okay.
20      A.    -- attention to them, yes.
21      Q.    You do?
22      A.    Yes.
23      Q.    How do you pay attention to
24  them?
25      A.    I have different feeds and

Page 237

1  monitor news and read news all the time.
2       Q.    Okay.  So just you, like when
3  you're watching CNN in the morning, or do you
4  have actually a system set up where
5  opioid-related articles that come up as a
6  result of -- in states that you're selling to
7  are brought to you?
8       MS. HENN:  Objection to form.
9       THE WITNESS:  I personally have
10  different predesigned searches on my
11  own.  Our teams across the country
12  review reports as well, so we review
13  different news articles.
14  QUESTIONS BY MR. RAFFERTY:
15      Q.    So there's not a particular
16  system or policy set up at McKesson to review
17  various -- just each individual is supposed
18  to kind of monitor it, right?
19      MS. HENN:  Objection to form.
20      THE WITNESS:  Generally.
21  QUESTIONS BY MR. RAFFERTY:
22      Q.    Okay.  So what this says is
23  you're supposed to watch what the news
24  reports are saying.
25      And then the second bullet

Page 238

1  point is, "Is there a problem with controlled
2  substances in this particular state?  If so,
3  what is the problem, what are the controlled
4  substances involved," right?
5      A.    That's what it says.
6      Q.    Okay.  Having to hire a -- or
7  having to buy a death trailer would probably
8  indicate that there's a problem with
9  controlled substances in that state, right?
10         MS. HENN:  Objection to form.
11         THE WITNESS:  Right.  You
12     shouldn't have to do that in a -- in
13     a --
14  QUESTIONS BY MR. RAFFERTY:
15     Q.    No.
16     A.    No.
17     Q.    And it's in the news reports,
18  something you're supposed to be watching out
19  for, right?
20     A.    It's in the news reports.
21     Q.    Okay.  So when you're telling
22  people it's business as usual at McKesson in
23  regards to thresholds, in terms of lowering
24  thresholds, comforting them, the business as
25  usual in the state of Ohio for the morgues is

Page 239

1  they're trying to find a place to store the
2  bodies, right?
3         MS. HENN:  Objection to form.
4         THE WITNESS:  My context for
5     business as usual is that's me
6     communicating with somebody
7     internally, and again, as we talked
8     about, means that we're not changing
9     thresholds based on purely that quota.
10  QUESTIONS BY MR. RAFFERTY:
11     Q.    Well, you're communicating
12  internally to somebody to convey that to one
13  of your big customers:  Don't worry, it's
14  business as usual in regards to thresholds.
15         That's what you're doing,
16  right?
17         MS. HENN:  Objection to form.
18  QUESTIONS BY MR. RAFFERTY:
19     Q.    That's what it says?
20         MS. HENN:  Objection to form.
21         THE WITNESS:  Conveying that we
22     have processes to request increases
23     and how we manage our thresholds.
24         MS. HENN:  Pardon me, Counsel.
25     My realtime -- oh, and the phone cut

Page 240

1  out.
2         MR. RAFFERTY:  Okay.  Well,
3     let's take five minutes and just get
4     it on.
5         MS. HENN:  Let's go off the
6     record for a second.
7         VIDEOGRAPHER:  The time is
8     1:30 p.m., and we're going off the
9     record.
10     (Off the record at 1:29 p.m.)
11         VIDEOGRAPHER:  The time is
12     1:32 p.m., and we're back on the
13     record.
14  QUESTIONS BY MR. RAFFERTY:
15     Q.    All right.  Let's -- all right.
16  Let's look at what else is going on.
17         During 2014, there were some --
18  you're familiar with HDMA.  We talked a
19  little bit about that earlier, right?
20     A.    I am.
21     Q.    That's your trade organization?
22     A.    Right.  Correct.
23         (McKesson-Hartle Exhibit 61
24     marked for identification.)
25

Page 241

1  QUESTIONS BY MR. RAFFERTY:
2     Q.    Okay.  And if we look at 1490,
3  which will be Exhibit 61 to the depo.
4         So this is right around the
5  time you're starting at McKesson, right, May
6  2014?
7     A.    In 2014.
8     Q.    Okay.  "SGAC annual meeting."
9         Do you see that?
10     A.    I see that.
11     Q.    And what is that; do you know?
12     A.    I don't know.
13     Q.    It says "HDMA" down at the
14  bottom, Healthcare Distribution Management
15  Association.  You guys are on the -- you
16  guys.  You're -- McKesson is on the executive
17  committee of that, right?
18     A.    Correct.
19     Q.    Okay.  And it says, if you look
20  at point 2, "HDMA state government affairs
21  capabilities, prepared for the HDMA executive
22  committee expense working group."
23         Do you see that?
24     A.    I do see that.
25     Q.    And one of the things, if you

Page 242

1 turn over a couple of pages to .4, one of the
2 things it says is, "Challenges on the
3 horizon: State efforts to address, reduce,
4 prevent prescription abuse and diversion."
5         Do you see that?
6     A.   I see that.
7     Q.   Okay.  So your trade
8 organization that you're on the executive
9 committee sees states' efforts to reduce and
10 prevent diversion as a challenge to your
11 business, right?
12         MS. HENN:  Objection to form.
13 QUESTIONS BY MR. RAFFERTY:
14     Q.   Not as an opportunity but as a
15 challenge?
16         MS. HENN:  Same objection.
17         THE WITNESS:  I don't know what
18     the speaking points are, but it's on
19     the challenge slide.
20 QUESTIONS BY MR. RAFFERTY:
21     Q.   Okay.  Well, you should welcome
22 that, right?  McKesson should welcome the
23 involvement of any organization, government,
24 private or otherwise, to help reduce
25 diversion, right?

Page 243

1         MS. HENN:  Objection to form.
2         THE WITNESS:  We do.
3 QUESTIONS BY MR. RAFFERTY:
4     Q.   Shouldn't be looked at as a
5 challenge or an obstacle, certainly, should
6 it?
7     A.   There can be challenges with,
8 you know, changing of systems and things that
9 have to be done.  I'm just speculating that
10 could be an example.
11     Q.   Okay.  Well, let's see what --
12 14.55, please.  This is already 47.
13         MS. HENN:  Counsel, one note.
14     This document was labeled Exhibit 48
15     on the actual document, which I'm not
16     sure is right.
17         MR. RAFFERTY:  You know, I
18     know, because I went to mark it and
19     then I set it aside, so...
20         MS. HENN:  At a break or
21     something.  Okay.
22         MR. RAFFERTY:  All right.  So
23     this is already Exhibit 47 that I'm
24     looking at now.
25         MS. HENN:  Okay.

Page 244

1         MR. RAFFERTY:  Is it 47?  No,
2 no, no.  It's already -- no.  No.  I
3 was saying it's previously been
4 marked.  It's your presentation notes.
5         THE WITNESS:  Oh.
6         MS. HENN:  Oh, I see what
7 you're saying.
8         MR. RAFFERTY:  Yeah.
9         MS. HENN:  Pardon me.
10         MR. RAFFERTY:  We had just
11     skipped the number 48 because I took
12     it out of order.
13         MS. HENN:  Understood.
14 QUESTIONS BY MR. RAFFERTY:
15     Q.   So if we look at -- if we look
16 at slide 7, "Abuse trends, overdose deaths."
17         Do you see that, .7?
18     A.   I see that.
19     Q.   "This next slide shows a map
20 related to overdose deaths by state in 2010
21 that was shared at a meeting with ONDCP, and
22 similar ones can be found in different
23 diversion materials.  The reason we share
24 this is because the death rates are alarming
25 and are getting a lot of attention in

Page 245

1 states."
2         You agree with that, right?
3     A.   Correct.
4     Q.   The death rates were alarming,
5 and states and state governments were
6 starting to taking notice and are starting
7 to -- are starting to crack down, correct?
8     A.   And get involved, yes.
9     Q.   Okay.  "States are beginning to
10 react heavily to this trend, and you can
11 expect to see continued activity from elected
12 officials and state Boards of Pharmacy."
13     Right?
14     A.   Correct.
15     Q.   Okay.  Now, the fact of the
16 matter is is you did start seeing, for
17 example, different states and state Boards of
18 Pharmacy cracking down and trying to make
19 sure and reduce diversion through their
20 states, correct?
21         MS. HENN:  Objection to form.
22         THE WITNESS:  Could you ask
23     that again?
24 QUESTIONS BY MR. RAFFERTY:
25     Q.   Yeah.

Page 246

1    You did see that --
2    A.   Yeah.
3    Q.   -- going forward, states and
4  state Boards of Pharmacy being much -- being
5  proactive in trying to make sure and enforce
6  laws to prevent diversion, right?
7        MS. HENN:  Objection to form.
8        THE WITNESS:  Yes, states were
9    being more proactive.
10 QUESTIONS BY MR. RAFFERTY:
11    Q.   Okay.  In fact, the Ohio State
12 Board of Pharmacy has been very critical in
13 the past of McKesson's activities as it
14 relates to preventing diversion, hasn't it?
15       MS. HENN:  Objection to form.
16       THE WITNESS:  I'm not aware of
17    the specific --
18 QUESTIONS BY MR. RAFFERTY:
19    Q.   You don't recall in 2017 the
20 state -- the Ohio State Board of Pharmacy
21 writing to you and telling you about why --
22 asking why several suspicious orders were
23 never being reported to them?
24       MS. HENN:  Objection to form.
25       THE WITNESS:  I'm not recalling

Page 247

1    the documents or the letter
2    specifically.
3        (McKesson-Hartle Exhibit 62
4    marked for identification.)
5  QUESTIONS BY MR. RAFFERTY:
6    Q.   You don't recall that.
7        Okay.  1.1457.  This will be
8  Exhibit 62.
9        Okay.  As we look at
10 Exhibit 62, Mr. Hartle, this is October 20,
11 2017, and it's from the State of Ohio Board
12 of Pharmacy.
13       Do you see that?
14    A.   I see that.
15    Q.   And it's to McKesson
16 Corporation.  And it says,
17 "Wholesaler/manufacturer category 3,
18 wholesale distributor inspection, October 20,
19 2017, written response required."
20       That's a serious -- that's a
21 serious thing, you would agree, right?
22       MS. HENN:  Objection to form.
23       THE WITNESS:  This is serious.
24 QUESTIONS BY MR. RAFFERTY:
25    Q.   This is serious, yeah.

Page 248

1    So if you turn to page 4, it
2  says, "Observation."  Now, this is nine
3  months after the 2017 settlement, right,
4  which was in October of 2017, so nine months
5  later, right?
6    A.   Yeah, later in the year.
7    Q.   Okay.  "Observation: A review
8  of wholesale sale data reported to the Ohio
9  State Board of Pharmacy for drugs containing
10 hydrocodone 10 milligrams, oxycodone
11 10 milligrams and oxycodone 30 milligrams
12 indicated that many sales appeared to be of
13 unusual size, unusual frequency, or that
14 deviate substantially from established buying
15 patterns but were not reported to the Board
16 of Pharmacy as suspicious orders."
17       Do you see that?
18    A.   I see that.
19    Q.   "Specifically, we observed
20 spikes in sales for specific months and a
21 high volume of sales that continue to
22 increase over time to specific pharmacies.
23 See referenced sales in the attached
24 spreadsheet."
25       Do you see that?

Page 249

1    A.   I see that.
2    Q.   So if we look over on the last
3  page, one of those at the top is the Lewis
4  Drugstore, correct?
5    A.   Correct.
6    Q.   Jackson, oxycodone 10, high
7  monthly average sales at 12,500.
8        Do you see that?
9    A.   I see that.
10    Q.   Did you investigate, for
11 example, what the population was in Jackson?
12       MS. HENN:  Objection to form.
13       THE WITNESS:  I'm not aware
14    of -- I don't recall anything about
15    this document or this list.
16 QUESTIONS BY MR. RAFFERTY:
17    Q.   So you've never seen this
18 before?
19    A.   I don't recall it.  I can't say
20 I've never seen it.
21       (McKesson-Hartle Exhibit 63
22    marked for identification.)
23 QUESTIONS BY MR. RAFFERTY:
24    Q.   Let me show you 1456.
25       Now this was, what, nine months

Page 250

1 ago, right? Roughly? It's October 2017.
2 What is that, nine, ten months ago?
3      A.    Right.
4      Q.    And I'll hand you what's been
5 marked as 63.
6           So here we are on October 20,
7 2017, Nate Hartle. That's an e-mail from
8 you, right?
9      A.    Correct.
10      Q.    And if we go all the way down
11 to the bottom, this is forwarding the
12 government contact OBOP WCH.
13           Do you see that?
14      A.    Right.
15      Q.    All right. And up at the
16 top -- or in the middle, I'm sorry, it says
17 there are a few Rite Aids on here.
18           Do you see that?
19      A.    I see that.
20      Q.    BT -- BR 3536705, for example?
21      A.    Right. Three DEA registration
22 numbers and three Rite Aid store numbers.
23      Q.    Right.
24           And so if we look at those,
25 you'll see that those are listed on the

Page 251

1 spreadsheet, right?
2      A.    Correct.
3      Q.    So -- and it says here, "There
4 are a few Rite Aids on here" -- going to list
5 them -- "we might need to discuss this one,
6 as the Ohio BOP isn't just asking for records
7 but is also requesting an explanation for why
8 certain orders at these locations were not
9 reported as suspicious."
10           And then up at the top you
11 respond, saying, "Here are the workbooks,
12 just looking at January '16 through September
13 '17 so we have them. I wouldn't necessarily
14 start to work on any of this yet."
15           So you received this report,
16 correct?
17      A.    Now I -- yeah, this is part of
18 our process when we -- when we do
19 event-triggered-type reviews.
20      Q.    Okay. So, in fact, you
21 received -- so you don't remember it.
22           Were so many Board of
23 Pharmacies from throughout the country
24 contacting you because of increase -- or for
25 failing to report suspicious orders that you

Page 252

1 just forgot this one?
2           MS. HENN: Objection to form.
3           THE WITNESS: We receive
4      different ones. I just don't happen
5      to recall this specific one.
6 QUESTIONS BY MR. RAFFERTY:
7      Q.    Okay. And in fact, this
8 specific one in 2017, this is -- I mean, you
9 have been -- as we've discussed in 2008 and
10 in 2017, throughout that entire time period
11 there have been multiple, multiple times that
12 you have been investigated by federal and
13 state governments for failing to report
14 suspicious orders.
15           You would agree with that,
16 right?
17           MS. HENN: Objection to form.
18           THE WITNESS: Two different
19      settlements.
20 QUESTIONS BY MR. RAFFERTY:
21      Q.    Right.
22           But also state Boards of
23 Pharmacies, right?
24           MS. HENN: Objection to form.
25           THE WITNESS: What's the

Page 253

1      question again?
2 QUESTIONS BY MR. RAFFERTY:
3      Q.    You've been investigated by
4 state Boards of Pharmacy for the same conduct
5 as well?
6           MS. HENN: Objection to form.
7 QUESTIONS BY MR. RAFFERTY:
8      Q.    For failing to report
9 suspicious orders?
10           MS. HENN: Objection to form.
11           THE WITNESS: Some.
12           (McKesson-Hartle Exhibit 64
13      marked for identification.)
14 QUESTIONS BY MR. RAFFERTY:
15      Q.    Okay. In fact, let's look
16 at -- sorry about that.
17           Let me direct you now to 1463,
18 because I think if we -- we looked. We were
19 talking about the Lewis Drugstore in Jackson,
20 high monthly average sales of 12,500, right?
21           MS. HENN: Objection to form.
22 QUESTIONS BY MR. RAFFERTY:
23      Q.    All right. Marking Exhibit 64.
24           This is marked P1.1463. And if
25 you'll see, this is some demographics. And

Page 254

1  what it says here is there are 6,252 people
2  as a population for Jackson, Ohio.
3        Do you see that?
4        MS. HENN: Objection to form.
5  QUESTIONS BY MR. RAFFERTY:
6     Q.    I'm sorry, it's on page 3.
7  Sorry. .3, population.
8     A.    Down here, okay, I see it.
9     Q.    6,252, right?
10    A.    I see that.
11    Q.    Okay. And that means -- so
12 that means, going back now to the exhibit
13 from the Board of Pharmacy on page 5, the
14 monthly sales were averaging 12,500 doses,
15 right?
16       MS. HENN: Objection to form.
17 QUESTIONS BY MR. RAFFERTY:
18    Q.    You see that? For oxy 10?
19       Sorry, I'll give you a minute
20 to get there.
21    A.    12.5, I see that.
22    Q.    Just for oxy 10, right?
23    A.    Correct.
24    Q.    So that's almost two pills for
25 every person that lives in the City of

Page 255

1  Jackson was being shipped there monthly by
2  McKesson, right?
3     A.    Doing that basic math, but we
4  don't know the full context of the servicing
5  population in the county and how many
6  pharmacies and the like, right.
7     Q.    And we know -- well, we do know
8  a couple of things. We know when the Board
9  of Pharmacy flagged it as a suspicious order
10 and, number two, we do know the number of
11 doses that were being sent -- were being sold
12 out of that store on average, and we do know
13 the population, right? Those are facts we do
14 know?
15       MS. HENN: Objection to form.
16       THE WITNESS: We do know those.
17 QUESTIONS BY MR. RAFFERTY:
18    Q.    And the last fact we know is
19 that McKesson didn't report this to the Board
20 of Pharmacy as a suspicious order. We know
21 that, too, right?
22       MS. HENN: Objection to form.
23       THE WITNESS: That's what
24    they're stating in the report.
25

Page 256

1  QUESTIONS BY MR. RAFFERTY:
2     Q.    Okay. And as I said before,
3  this isn't -- there have been -- there was in
4  2008 a settlement that we talked a little bit
5  about earlier involving the failure for -- a
6  failure of McKesson to report suspicious
7  orders of its narcotics, right?
8        MS. HENN: Objection to form.
9        THE WITNESS: I apologize. Can
10    you say that one again?
11 QUESTIONS BY MR. RAFFERTY:
12    Q.    2008 --
13    A.    2008.
14    Q.    -- there was a settlement
15 involving McKesson with allegations that it
16 failed to report suspicious orders, right?
17    A.    Allegations that it failed to
18 report, that's correct.
19       (McKesson-Hartle Exhibit 65
20    marked for identification.)
21 QUESTIONS BY MR. RAFFERTY:
22    Q.    Okay. If we could look now at
23 1.889, which will be Exhibit 65.
24       This is a copy of the
25 settlement and release agreement and

Page 257

1  administrative memorandum of agreement from
2  the 2008 settlement.
3        Do you see that?
4     A.    I do see that.
5     Q.    Okay. Now, if we turn to -- I
6  just want to make a list here.
7        Now, this resulted in the
8  $13.25 million fine, right?
9     A.    Correct.
10       MR. RAFFERTY: Okay. So if I
11    could have a piece of paper, Carol.
12 QUESTIONS BY MR. RAFFERTY:
13    Q.    So if we look over on
14 page .2 -- not .2 -- on page -- Bates
15 stamp -- you see the Bates number down at the
16 bottom?
17    A.    Yeah.
18    Q.    1060 is the page we need to go
19 to. Sorry, mine is not numbered.
20       All right. So this 2008
21 involved -- and it says, "Covered Conduct."
22 Covered conduct involved in this, in the --
23 involved, A, within the District of Maryland,
24 and it involved McKesson-Landover.
25       Do you see that?

Page 258

1    A.    Yes.
2    Q.    So that's Landover, Maryland.
3          And in Landover, Maryland, they
4  allege that there was approximately 3 million
5  dosage units of hydrocodone sold to New Care
6  Pharmacy in Baltimore, and failed to report
7  these as suspicious orders to the DEA when
8  discovered, right?
9          MS. HENN:  Objection to form.
10 QUESTIONS BY MR. RAFFERTY:
11   Q.    That's what it says?
12   A.    That's what it says.
13   Q.    All right.  And then it goes on
14 and lists some other violations and failure
15 to report suspicious orders in that same
16 McKesson-Landover distribution center, right?
17         MS. HENN:  Objection to form.
18         THE WITNESS:  Right, there's
19   others listed.
20 QUESTIONS BY MR. RAFFERTY:
21   Q.    Okay.  And then second, letter
22 B down there is, "Within the middle district
23 of Florida, in October 2005,
24 McKesson-Lakeland sold approximately
25 2.1 million dosage units of hydrocodone to

Page 259

1  seven pharmacies in the Tampa area and failed
2  to report these as suspicious orders."
3  Right?
4          MS. HENN:  Objection to form.
5          THE WITNESS:  That's what it
6    says.
7  QUESTIONS BY MR. RAFFERTY:
8    Q.    Okay.  C is, "From February to
9  September 2007, McKesson-Conroe sold
10 approximately 2 million dosage units of
11 hydrocodone."
12         That's Conroe, Texas, right?
13         MS. HENN:  Objection to form.
14 QUESTIONS BY MR. RAFFERTY:
15   Q.    It says "within the Southern
16 District of Texas"?
17         MS. HENN:  Objection to form.
18         THE WITNESS:  Correct.
19 QUESTIONS BY MR. RAFFERTY:
20   Q.    And then turning the page:
21 "Within the District of Colorado, from
22 September 2005 through November 2007,
23 McKesson-Aurora sold large quantities of
24 hydrocodone to three Colorado pharmacies and
25 failed to report these as suspicious orders."

Page 260

1          That's what it says, correct?
2    A.    That's what it says.
3    Q.    F -- or I'm sorry, E.  "Within
4  the District of Utah, from January 2005
5  through October 2007, McKesson-Salt Lake City
6  sold approximately 824,000 dosage units of
7  hydrocodone, oxycodone and fentanyl and
8  methadone to the Blackfeet Clinic in
9  Browning, Montana, and failed to report these
10 sales as suspicious orders."
11         Is that right?
12   A.    That's what it says.
13   Q.    Okay.  "Within the Eastern
14 District of California, from October 2007
15 through June 2007, McKesson-West Sacramento
16 suffered theft and significant loss of
17 controlled substances on 28 separate
18 occasions and failed to timely submit
19 required theft and loss reports to the DEA."
20         Do you see that?
21   A.    That's what it says as well.
22   Q.    And if you turn to page --
23 Bates number ending 1062, so a couple pages
24 over, "Terms and Conditions."  And it lists
25 out the way the 13.25 million got calculated,

Page 261

1  right?
2    A.    It does.
3    Q.    Okay.  It goes through all
4  those.
5          Now, as a result of this 2008
6  settlement, McKesson agreed to do certain
7  things, didn't they, and improve and to start
8  reporting suspicious orders to the
9  headquarters of the DEA, right?
10         MS. HENN:  Objection to form.
11         THE WITNESS:  They did.
12 QUESTIONS BY MR. RAFFERTY:
13   Q.    Okay.  In fact, it also says,
14 "McKesson represents that it's taking -- it
15 has taken good faith actions to detect and
16 prevent diversion, including agreeing to
17 implement the policies and procedures that
18 are subject of an administrative settlement
19 agreement between it and DEA dated May 2,
20 2008."
21         And then if you turn to the
22 first page, that discusses some of the items
23 that they have discussed, and in particular
24 if you turn to Bates number page ending 1050.
25         And it goes on and says,

Page 262

1 "Obligations" -- under terms and conditions.
2 "Obligations of McKesson. McKesson agrees to
3 maintain a compliance program designed to
4 detect and prevent diversion of controlled
5 substances as required under the CSA and
6 applicable DEA regulations."
7        Do you see that?
8     A.    I see that.
9     Q.    "This program shall include
10 procedures to review orders for controlled
11 substances. Orders that exceed established
12 thresholds and criteria will be reviewed by a
13 McKesson employee trained to detect
14 suspicious orders."
15       Did I read that correctly?
16    A.    Yes.
17    Q.    "Such orders should not be
18 filled" -- I'm sorry, I missed a part
19 there -- "will be reviewed by a McKesson
20 employee trained to detect suspicious orders
21 for the purpose of determining whether, one,
22 such orders should be not filled and reported
23 to the DEA, or based on a detailed review,
24 the order is for legitimate purposes and the
25 controlled substances are not likely to be

Page 263

1 diverted into other than legitimate medical,
2 scientific and industrial channels."
3        Do you see that?
4     A.    Yep. That's what it says.
5     Q.    "Orders identified as
6 suspicious will be reported to the DEA as
7 discussed in Subsection 2."
8        And then it says, "This
9 compliance program shall apply to all current
10 and future McKesson distribution centers."
11       You see that?
12    A.    I do.
13    Q.    Then what this -- what they're
14 referring to there and what you-all did after
15 this was implement that 2008 CSMP, right?
16    A.    Correct.
17       MS. HENN: Objection to form.
18 QUESTIONS BY MR. RAFFERTY:
19    Q.    And that does apply to all
20 current and future McKesson distribution
21 centers, true?
22       MS. HENN: Objection to form.
23       THE WITNESS: It does.
24 QUESTIONS BY MR. RAFFERTY:
25    Q.    Okay. And then it goes on to

Page 264

1 talk about "the obligations undertaken in
2 this paragraph do not fulfill the totality of
3 its obligations to maintain effective
4 controls against diversion."
5        Do you see that?
6     A.    I see that.
7     Q.    Okay. So as a result of the
8 2008 settlement agreement, not only did you
9 pay a fine, but you also agreed to start
10 reporting -- have a system in place and
11 report suspicious orders, right?
12       MS. HENN: Objection to form.
13       THE WITNESS: Correct, one that
14    would be mutually agreed upon with DEA
15    in terms of format.
16 QUESTIONS BY MR. RAFFERTY:
17    Q.    Okay. But in fact, you-all
18 didn't do that, did you, after 2008?
19       MS. HENN: Objection to form.
20       THE WITNESS: I don't believe
21    that's correct.
22       (McKesson-Hartle Exhibit 66
23    marked for identification.)
24 QUESTIONS BY MR. RAFFERTY:
25    Q.    Okay. Well, let's take a look

Page 265

1 at 1.1432. This is Exhibit 66. This is
2 dated November 6, 2013.
3        And this -- okay. November 6,
4 2013, United States Department of Justice,
5 William J. Ihlenfeld, II, Northern District
6 of West Virginia.
7        Do you recall this letter?
8        I mean, you've seen it before,
9 right?
10    A.    I believe so, yes.
11    Q.    Okay. And if we go and we look
12 at page 1, at the bottom paragraph it says --
13 and this is addressed to the lawyers for
14 McKesson, Covington & Burling, and it says,
15 "You are no doubt aware that McKesson entered
16 into a settlement agreement with the United
17 States in May of 2008. The settlement
18 agreement covered the same type of conduct
19 described in the preceding paragraph."
20       You see that?
21    A.    I see that.
22    Q.    Okay. Now, if we look at the
23 preceding paragraph: "As I indicated in my
24 October 23, 2013 letter to Ms. Seeger, the
25 violations which would form the basis of the

Page 266

1  government's claims relate to orders filled
2  by McKesson's former Landover, Maryland,
3  distribution facility.  The claims for
4  penalties under the federal law, it cites,
5  arise from McKesson's failure to design and
6  operate a system to identify suspicious
7  orders for controlled substances and, more
8  importantly, the failure to report suspicious
9  orders."
10        Do you see that?
11     A.   I see that.
12     Q.    And then if we go back down to
13 that paragraph -- so that's -- and it says,
14 "The settlement in 2008 included conduct that
15 occurred at the Landover distribution
16 facility."
17        That was one of them that was
18 listed, right?  I made a list of the 2008
19 organizations.
20        MR. RAFFERTY:  If I could have
21     the --
22        VIDEOGRAPHER:  Elmo?
23        MR. RAFFERTY:  Yeah.
24        MS. HENN:  Counsel, would you
25     mind marking the demonstrative?

Page 267

1        MR. RAFFERTY:  We'll mark it as
2     Exhibit 67.
3        MS. HENN:  Thank you.
4        (McKesson-Hartle Exhibit 67
5     marked for identification.)
6  QUESTIONS BY MR. RAFFERTY:
7     Q.    So Landover, Maryland, was one
8  of those, right?
9     A.   Correct.
10     Q.    Okay.  So if we go through --
11 and it says next, "Between May of 2008 -- May
12 of 2008" --
13        MR. RAFFERTY:  Back to the
14     computer, I'm sorry.
15 QUESTIONS BY MR. RAFFERTY:
16     Q.    -- "and November 15, 2011" --
17 so a three-year period, over a three-year
18 period -- "McKesson did not submit any
19 suspicious order reports related to orders
20 filled by the Landover facility.  McKesson
21 began submitting a very limited number of
22 SORs to the DEA in November of 2011.  It is
23 my informed belief that these SORs were
24 submitted due to requests for information
25 made by the DEA and McKesson's desire to

Page 268

1  close the Landover facility and obtain a
2  registration number for a new facility in
3  Virginia."
4        Do you see that?
5     A.   I see that.
6     Q.    Okay.  So according to the
7  United States Department of Justice, after
8  you signed the 2008 memorandum and paid the
9  $13 million, you did not operate -- design
10 and operate a system to identify suspicious
11 orders, and you did not, for that three-year
12 period they're talking about, report any
13 suspicious orders out of the Landover
14 facility, correct?
15        MS. HENN:  Objection to form.
16        THE WITNESS:  I don't believe
17     that to be 100 percent accurate.
18 QUESTIONS BY MR. RAFFERTY:
19     Q.    You don't believe that to be
20 100 percent accurate?
21     A.   I don't.
22     Q.    Well, that's what the DOJ says
23 right there, right?
24     A.   I know that's what they say.
25     Q.    Okay.  And in fact, this was

Page 269

1  part of the material -- or part of the
2  allegations that were settled in 2017,
3  correct?
4     A.   Correct.
5     Q.    Okay.  It also goes on, if you
6  look at page 2:  "In light of additional SORs
7  submitted by McKesson following the
8  January 2012 meeting, the DEA also focused on
9  suspicious orders filled by McKesson for
10 Family Pharmacy Services and Drug City
11 Pharmacy.  With respect to these five
12 pharmacies, the DEA is aware of no less than
13 318 suspicious orders" -- 318 suspicious
14 orders -- "that McKesson failed to report at
15 the time they were or should have been
16 discovered."
17        Now, you're aware, based on
18 what we read earlier today, that you are
19 supposed to, under the Controlled Substances
20 Act, report suspicious orders when you
21 discover them, right?
22        MS. HENN:  Objection to form.
23 QUESTIONS BY MR. RAFFERTY:
24     Q.    We read that earlier today?
25        MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1   THE WITNESS: In the guidance
2   letter.
3   QUESTIONS BY MR. RAFFERTY:
4   Q.   That's right.
5   A.   Correct.
6   Q.   Okay. "In addition, the DEA
7   and the US Attorney's Office have conducted
8   an analysis of all transactions completed by
9   the Landover distribution facility. This
10  analysis shows that McKesson filled tens of
11  thousands of apparently suspicious orders out
12  of the Landover distribution facility without
13  a single suspicious order report being
14  submitted to the DEA."
15      Do you see that?
16  A.   I see that.
17  Q.   Tens of thousands. Does that
18  strike you as -- that's a lot of suspicious
19  orders, isn't it, Mr. Hartle?
20      MS. HENN: Objection to form.
21      THE WITNESS: It's a large
22  number, sure.
23  QUESTIONS BY MR. RAFFERTY:
24  Q.   Yeah.
25      "Furthermore, the United States

Page 271

1   Attorney's Office became aware of dozens, if
2   not hundreds, of suspicious orders being
3   filled by McKesson for a small, family-owned
4   pharmacy in Grant County, West Virginia. The
5   West Virginia pharmacy in question is Judy's
6   Drugstore. No suspicious order reports for
7   sales to Judy's Drugstore were ever provided
8   to the DEA."
9       Do you see that?
10  A.   I see that.
11  Q.   So that's November of 2013, and
12  you were then contacted after that in March
13  of 2014.
14      (McKesson-Hartle Exhibit 68
15      marked for identification.)
16  QUESTIONS BY MR. RAFFERTY:
17  Q.   This is another letter from the
18  US Department of Justice, US Attorney,
19  William Ihlenfeld, once again with conduct
20  pertaining to that Landover facility,
21  correct?
22      Well, let's -- I'll direct you
23  to it. If you go over to .4. And down below
24  it says, "By comparison, McKesson sold
25  805,000 dosage units of oxycodone to L&M in

Page 272

1   2011. In 2009 and 2010, McKesson sales and
2   regulatory compliance personnel relied on
3   claims of increased prescribing by Drs. Lee
4   and Wade and a nurse practitioner named Brown
5   to justify the regular and substantial
6   increases of L&M's thresholds."
7       So the thresholds were being
8   increased, just like we were talking about
9   earlier, right?
10      MS. HENN: Objection to form.
11  QUESTIONS BY MR. RAFFERTY:
12  Q.   According to this?
13  A.   That's what it says in this
14  document.
15  Q.   Okay. "Apparently McKesson's
16  personnel weren't paying close attention to
17  what was going on at L&M. Dr. Lee was
18  disciplined by the Commonwealth of Virginia
19  in March of 2010 for continuously prescribing
20  controlled substances to patients without
21  establishing or documenting a treatment plan
22  and without properly monitoring the patients.
23      "In July of 2010, Dr. Wade
24  surrendered his DEA registration for cause.
25  Wade was arrested in 2012 and pled guilty to

Page 273

1   illegal distribution of controlled
2   substances. He is currently serving
3   70 months in prison.
4       "In January 2012, Brown was
5   arrested by the FBI." This is the nurse
6   practitioner. "In January 2012 Brown was
7   arrested by the FBI and subsequently
8   surrendered his DEA registration for cause.
9   It should also be noted that
10  McKesson-Landover personnel repeatedly
11  misidentified Brown as a physician in
12  documents that were placed in the CSMP file."
13      That's the kind of thing that
14  you should find out if you're exercising due
15  diligence in investigating a threshold
16  increase, isn't it, Mr. Hartle?
17      MS. HENN: Objection to form.
18      THE WITNESS: It's an important
19  piece of information.
20  QUESTIONS BY MR. RAFFERTY:
21  Q.   An important -- it's a critical
22  piece of information, isn't it?
23  A.   Critical.
24  Q.   It's a piece of information
25  that should stop the order from being filled,

Page 274

1  right?
2        MS. HENN:  Objection to form.
3  QUESTIONS BY MR. RAFFERTY:
4     Q.    If the doctors -- if the reason
5  for increasing the threshold is increased
6  prescriptions by doctors who have been put in
7  jail, surrendered their DEA registrations or
8  pled guilty, that's a pretty good tip that
9  you shouldn't be filling that order and it
10 should be a suspicious order, correct?
11       MS. HENN:  Objection to form.
12       THE WITNESS:  It's a suspicious
13    customer, so...
14 QUESTIONS BY MR. RAFFERTY:
15    Q.    Suspicious customer.
16       Is it your understanding that
17 that's what your obligation was under the
18 Controlled Substances Act, was to report
19 suspicious customers and not suspicious
20 orders?
21       MS. HENN:  Objection to form.
22       THE WITNESS:  I understand our
23    obligation was to report suspicious
24    orders, but part of our program,
25    again, from what I understand mutually

Page 275

1     agreed upon with DEA, was in addition
2     to suspicious orders, suspicious
3     customers.
4  QUESTIONS BY MR. RAFFERTY:
5     Q.    Where is it written down from
6  the DEA that your obligation is to report
7  suspicious customers?  Where is that written
8  down?
9        MS. HENN:  Objection to form.
10       THE WITNESS:  I don't know if
11    it is written down anywhere.  I'm just
12    saying in terms of discussions and as
13    I've learned from leaders at McKesson
14    about those discussions.
15 QUESTIONS BY MR. RAFFERTY:
16    Q.    As you've been told by other
17 people at McKesson, correct?
18    A.    Correct.
19    Q.    You've never seen anything from
20 the DEA that ever says anything about only
21 reporting suspicious customers, right?
22       MS. HENN:  Objection to form.
23 QUESTIONS BY MR. RAFFERTY:
24    Q.    Correct?
25    A.    I don't recall seeing that on

Page 276

1  paper from DEA.
2     Q.    Yeah.  In fact, you've never
3  seen anything from DEA saying anything that
4  your -- anything other than your obligation
5  under the Controlled Substances Act is to
6  report suspicious orders, correct?
7        MS. HENN:  Objection to form.
8        THE WITNESS:  That's what they
9     call out in their guidance, right.
10 QUESTIONS BY MR. RAFFERTY:
11    Q.    Well, that's not what they just
12 call it out in their guidance.  That's what's
13 called out in the federal regulations --
14    A.    Right.
15    Q.    -- and that's what's called in
16 the Rannazzisi letters, and that's what
17 discussed in your actual own CSMP, isn't it?
18       MS. HENN:  Objection to form.
19       THE WITNESS:  It is.
20 QUESTIONS BY MR. RAFFERTY:
21    Q.    Yes.
22    A.    I'm saying in addition to
23 suspicious orders, there's been sharing of
24 suspicious customers as well.
25    Q.    And in fact, if you look at

Page 277

1  page -- that actual argument was proposed to
2  US Attorney Ihlenfeld in response to these,
3  and it is addressed in this letter, correct?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  Could you point
6     to where that's at?
7  QUESTIONS BY MR. RAFFERTY:
8     Q.    Sure.  The first -- the
9  second -- the second -- the third full
10 paragraph.
11    A.    On which page?
12    Q.    Page 1.
13       "I cannot accept."  Do you see
14 that?  Third full paragraph.  "I cannot
15 accept."
16    A.    Why am I not finding this?  Oh,
17 because I'm on page 2.  Sorry.
18    Q.    "I cannot accept that the CSMP
19 implemented by McKesson after the 2008
20 settlement was designed to identify
21 suspicious customers.  It is my informed
22 belief that such a contention is more
23 rationalization than reality."
24       Do you see that?
25    A.    I see that.

Page 278

1    Q.   Okay.  That's what's going on,
2 right?  That's what's going on today,
3 rationalization, not reality?
4         MS. HENN:  Objection to form.
5 QUESTIONS BY MR. RAFFERTY:
6    Q.   You don't have -- well, you
7 don't have any evidence whatsoever that any
8 DEA person ever told you that suspicious
9 customers was what you needed to report, not
10 suspicious orders?
11        MS. HENN:  Objection to form.
12 QUESTIONS BY MR. RAFFERTY:
13   Q.   And if you have it, point me to
14 it.
15        MS. HENN:  Same objection.
16        THE WITNESS:  Yeah, I don't
17     have any of that specific evidence.
18 QUESTIONS BY MR. RAFFERTY:
19   Q.   Okay.  So once again, like
20 earlier, you're guessing, right?
21        MS. HENN:  Objections to form.
22        THE WITNESS:  Based on
23     information that I've heard from
24     McKesson employees and seen in
25     McKesson decks and about some of those

Page 279

1     discussions.
2 QUESTIONS BY MR. RAFFERTY:
3    Q.   From people who have -- from
4 the same employees who are being
5 investigated.  Because that's when this --
6 this was being discussed, while you're being
7 investigated for failing to meet your
8 obligations under the 2008 settlement
9 agreement and under the federal laws,
10 including the Controlled Substance Act,
11 right?
12        MS. HENN:  Objection to form.
13        THE WITNESS:  I understand.
14 QUESTIONS BY MR. RAFFERTY:
15   Q.   That's what rationalization is.
16 That's coming up with a reason, after you
17 start -- after you get caught not
18 implementing and not reporting suspicious
19 orders, right?
20        MS. HENN:  Objection to form.
21        THE WITNESS:  I don't believe
22     that to be 100 percent true.
23 QUESTIONS BY MR. RAFFERTY:
24   Q.   Well, let's what Mr. -- what
25 the US Attorney says about your suspicious

Page 280

1 customer claim.
2         "The 2008 settlement agreement
3 does not require or implicitly suggest a CSMP
4 focused on suspicious customers.  To the
5 contrary, the settlement agreement provides
6 that McKesson shall inform DEA of suspicious
7 orders."
8         Do you see that?
9    A.   I do, and I understand that.
10   Q.   And in fact, it's all --
11 everything that's discussed in that
12 settlement is about suspicious orders, right?
13        MS. HENN:  Objection to form.
14 QUESTIONS BY MR. RAFFERTY:
15   Q.   Yes?
16   A.   Agreed.
17   Q.   If you turn to the second page,
18 "Moreover, any reasonable analysis of the
19 2008 settlement agreement arrives at the
20 conclusion that its aim was to enhance the
21 Comprehensive Drug Abuse Prevention and
22 Control Act and supporting regulatory scheme,
23 not displace it.  It would be" --
24        What's that word?
25   A.   "Grossly."

Page 281

1    Q.   -- "grossly inaccurate."
2         "It would be grossly inaccurate
3 to suggest the parties to the settlement
4 agreement intended to supersede the Act and
5 relevant regulations.  McKesson was subject
6 to the Act and regulations, generally and in
7 particular, both before and after the
8 settlement."
9         Do you see that?
10   A.   I do see that.
11   Q.   Okay.  Then he continues on on
12 page 3 to discuss this allegation that it was
13 customers that you were to be reporting, and
14 he goes through and points out that "all
15 versions of the CSMP PowerPoint prepared and
16 presented by McKesson clearly indicate that
17 the focus of the CMP {sic} was on the order,
18 not the customer."
19        Do you see that?
20   A.   I do see that.
21   Q.   And he, in fact, attaches your
22 own presentations, doesn't he?
23        MS. HENN:  Objection to form.
24        THE WITNESS:  That's what it
25     says.

Page 282

1 QUESTIONS BY MR. RAFFERTY:
2      Q.    "In fact" -- the next
3 paragraph -- "the idea that a distributor
4 would implement a CSMP that concentrates on
5 suspicious customers rather than suspicious
6 orders is contrary to the letter and spirit
7 of those provisions of the Act and
8 regulations aimed at curbing drug diversion."
9           Do you see that?
10     A.    I see that.
11     Q.    "However, even if one accepts
12 arguendo that DEA personnel tacitly accepted
13 a CSMP focusing on suspicious customers, the
14 available evidence indicates that McKesson
15 was not following its own program.  By its
16 own admission, McKesson reported just 35
17 suspicious customers between March 2008 and
18 November 2012."
19          That's almost a four-year
20 period, three-and-a-half-year period, right
21 there, right?
22     A.    I see that.
23     Q.    "According to Mr. Walker" --
24          That's Don Walker, right, the
25 person you described earlier?

Page 283

1      A.    Correct.
2      Q.    -- "McKesson services
3 approximately 25,000 customers daily.  If one
4 assumes that McKesson served the same 25,000
5 customers every day from 2008 to 2012, then
6 McKesson identified just .14 percent of its
7 customers as suspicious.  Obviously, this
8 miniscule percentage is inflated in that
9 McKesson did not have the same 25,000
10 customers every day from '08 to 2012."
11          Do you see that?
12     A.    I do.
13     Q.    Then the last paragraph, "This
14 conclusion is reinforced by other acts or
15 omissions.  Specifically, McKesson has never
16 reported Judy's Drugstore or a JDS order as
17 suspicious.  This is remarkable given the
18 well-documented diversion facilitated by JDS.
19 JDS operated a small pharmacy in a very rural
20 West Virginia county but was ordering
21 inexplicable quantities of Schedule II and
22 III narcotics for an extended period.  JDS's
23 orders were being fueled by the clearly
24 suspicious, if not alarming, prescribing
25 patterns of a local physician, Rajan Masih.

Page 284

1 It is highly improbable that
2 McKesson-Landover was not aware of the
3 problem with JDS and Masih.  I have concluded
4 that McKesson did not report suspicions about
5 JDS because the DEA had not inquired about
6 JDS."
7           Do you see that?
8      A.    I see that.
9      Q.    So in terms of the question
10 about this customer, this suspicious
11 customer, there is -- the CSMP only
12 references -- your own internal policy only
13 references suspicious orders, true?
14          MS. HENN:  Objection to form.
15          THE WITNESS:  I believe so,
16 yeah.
17 QUESTIONS BY MR. RAFFERTY:
18     Q.    Okay.  The 2008 settlement you
19 entered into and made -- and made
20 representations to and promises to in terms
21 of what you're going to do only references
22 suspicious orders, not customers, true?
23          MS. HENN:  Objection to form.
24          THE WITNESS:  Correct.
25

Page 285

1 QUESTIONS BY MR. RAFFERTY:
2      Q.    And you can't, sitting here
3 today, point me to one piece of paper, one
4 note, one anything written down from the DEA
5 ever saying that your obligation was to report
6 suspicious customers, not orders, true?
7           MS. HENN:  Objection to form.
8           THE WITNESS:  I can't point to
9 that.  I know our obligation was to
10 report suspicious orders.
11          My point was, in addition, we
12 were reporting, what I understand --
13 this is before I -- this is before I
14 joined -- that customers were included
15 in that.
16 QUESTIONS BY MR. RAFFERTY:
17     Q.    Let me --
18     A.    That was my original --
19     Q.    Let me ask the question again.
20          You can't point me to a piece
21 of paper anywhere from the DEA, a letter, a
22 memo, a note, anything from the DEA,
23 indicating that your obligation was to report
24 suspicious customers and not orders, true?
25          MS. HENN:  Objection to form.

Page 286

1 THE WITNESS: True.
2 QUESTIONS BY MR. RAFFERTY:
3 Q. It's a yes or no.
4 A. True.
5 Q. True. Thank you.
6 MS. HENN: Counsel, is this a
7 good time for a five-minute?
8 MR. RAFFERTY: Yeah.
9 MS. HENN: Thank you very much.
10 VIDEOGRAPHER: The time is
11 2:18 p.m., and we're going off the
12 record.
13 (Off the record at 2:18 p.m.)
14 VIDEOGRAPHER: The time is
15 2:28 p.m., and we're back on the
16 record.
17 QUESTIONS BY MR. RAFFERTY:
18 Q. All right. Around this same
19 time period, Mr. Hartle, that we were
20 discussing that letter from the US Attorney
21 from West Virginia, there was also other
22 US Attorneys involved in investigating
23 McKesson's failure to report suspicious
24 orders, true?
25 A. Yes.

Page 287

1 Q. In fact, one of those was John
2 Walsh from the District of Colorado, and that
3 letter is August 13, 2004 -- August 13, 2014,
4 correct? It's Exhibit 54.
5 A. Is it August 13, 2014?
6 Q. Yes, sir.
7 A. Correct.
8 Q. All right. If we turn to
9 page 2 of that -- well, go back, just so I
10 can orient.
11 Okay. So you see up there,
12 August 13, 2014. And it's "Re: possible
13 civil action against McKesson Corporation for
14 violations of the Controlled Substances Act,"
15 correct?
16 A. Correct.
17 Q. Okay. So if we go to page 2,
18 it says here in the second full paragraph at
19 the beginning, "The regulatory requirement to
20 report suspicious orders is not meaningless
21 box-checking."
22 Do you see that?
23 A. I see that.
24 Q. And you agree with that, right?
25 MS. HENN: Objection to form.

Page 288

1 THE WITNESS: It's not a
2 meaningless process, no.
3 QUESTIONS BY MR. RAFFERTY:
4 Q. No.
5 In fact, it requires, as we've
6 seen in the regulations, due diligence. It
7 requires proactive and being vigilant, right?
8 MS. HENN: Objection to form.
9 THE WITNESS: That's -- again,
10 it's not meaningless. It requires
11 more than just a box-checking.
12 QUESTIONS BY MR. RAFFERTY:
13 Q. But you agreed with me earlier,
14 though, you should be vigilant, you should be
15 proactive, right, and you should exercise due
16 diligence?
17 A. In our due diligence.
18 MS. HENN: Objection to form.
19 THE WITNESS: Excuse me.
20 QUESTIONS BY MR. RAFFERTY:
21 Q. And then it goes on and says,
22 "Suspicious order reporting serves concrete
23 public safety goals."
24 Do you see that?
25 A. I see that.

Page 289

1 Q. "Distributors are on the front
2 lines and thus in a unique position to
3 promptly advise the DEA when they receive an
4 order that is unusual, deviates from a normal
5 patterns or is otherwise suspicious or
6 inappropriate. If the distributor does not
7 alert the DEA of such orders, then the DEA
8 cannot take the necessary law enforcement
9 steps to investigate the orders and prevent
10 diversion. In this manner, distributors like
11 McKesson-Aurora play a vital role in
12 preventing diversion."
13 Do you see that?
14 A. I see that.
15 Q. And so we're clear, in the 2008
16 settlement there was conduct also involved in
17 the McKesson-Aurora facility, correct?
18 A. Correct.
19 Q. Okay. So then if we turn to
20 .3, page .3, I'm sorry, it says in that top
21 paragraph, "Instead, when McKesson-Aurora
22 received a suspicious order from one of its
23 pharmacy customers, the distribution center
24 manipulated its internal control systems in
25 various ways to avoid having to report that

Page 290

1 order."
2        Now, what they're talking about
3 there is manipulating the threshold change
4 requests, aren't they?
5        MS. HENN:  Objection to form.
6        THE WITNESS:  They're talking
7    about thresholds.
8 QUESTIONS BY MR. RAFFERTY:
9    Q.    Okay.  "The result was that
10 readily available identifiable orders and
11 ordering patterns that were obvious signs of
12 diversion occurring at McKesson-Aurora
13 customer pharmacies went unreviewed and
14 unreported.  In this manner,
15 McKesson-Aurora's desire for increased sales
16 drove its compliance efforts."
17        Do you see that?
18    A.    I see that.
19    Q.    Okay.  Then it goes on and
20 says, "McKesson-Aurora's failure to report
21 suspicious orders to the DEA has had tangible
22 and tragic consequences."
23        Have you reviewed this document
24 before, Mr. Hartle?
25    A.    I have seen it.

Page 291

1    Q.    Okay.  When was the first time
2 you saw this?
3    A.    The first time that I saw it?
4    Q.    Yeah.
5        You were there in August
6 of 2014?
7    A.    I was.  It was clearly after
8 that.  I can't remember exactly when.
9    Q.    It would have been around that
10 time period, though, right?
11    A.    A little bit later before it
12 made its way, I think, for us to be -- to be
13 available to see it.
14    Q.    But, I mean, they're alleging
15 conduct involving the department that you're
16 one of the senior officials in, correct?
17    A.    Correct.
18    Q.    So you would have gotten it?
19    A.    Correct.
20    Q.    Okay.  And it says here, "The
21 tangible and tragic consequences.  At least
22 nine overdose deaths in Colorado can be
23 traced to purchases made at pharmacies that
24 were purchasing unusually high quantities of
25 oxycodone and hydrocodone from

Page 292

1 McKesson-Aurora."
2        Do you see that?
3    A.    I do.
4    Q.    Identified nine deaths as a
5 direct result of diversion involving
6 pharmacies you were providing the narcotics
7 to, right?
8        MS. HENN:  Objection to form.
9        THE WITNESS:  I see that listed
10    in here, yes.
11 QUESTIONS BY MR. RAFFERTY:
12    Q.    So after you got this
13 information in 2014, did you reach out?  Did
14 you try to find who those people were?  Did
15 you try to go to the pharmacy?  Did you try
16 to reach out to anybody in Aurora that was
17 involved in these deaths, any of their family
18 members, to try and figure out how McKesson
19 could not -- could do something to not let
20 this happen again?  Did you do that?
21        MS. HENN:  Objection to form.
22        THE WITNESS:  Personally, no, I
23    did not.
24 QUESTIONS BY MR. RAFFERTY:
25    Q.    "At least two drug trafficking

Page 293

1 organizations were operating out of
2 McKesson-Aurora-supplied pharmacies and
3 diverting prescription drugs for sales on the
4 street, but McKesson-Aurora never once
5 reported those pharmacies' blatant pattern of
6 suspicious ordering to the DEA."
7        Do you see that?
8    A.    I see that.
9    Q.    So nine people dead, two drug
10 trafficking organizations running out of
11 pharmacies that you were selling narcotics
12 to, and no reports to the DEA, right?
13        MS. HENN:  Objection to form.
14        THE WITNESS:  Again, that's --
15    those are the allegations, yes.
16 QUESTIONS BY MR. RAFFERTY:
17    Q.    All after -- years after you
18 signed an agreement with the DEA in 2008 to
19 report suspicious orders and to stop
20 shipments of suspicious orders, right?
21        MS. HENN:  Objection to form.
22        THE WITNESS:  After that
23    settlement agreement, yes.
24 QUESTIONS BY MR. RAFFERTY:
25    Q.    Uh-huh.

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    In fact, amazingly, if you look
2  down in 2011, not only was McKesson turning a
3  blind eye to what was going on at the
4  McKesson-Aurora facility but, in fact, in
5  2011 McKesson-Aurora was recognized as the
6  distribution center of the year and given an
7  award.
8    Do you see that?
9    A.  I do see that.
10   Q.  Do you think the families of
11 those nine people who passed away feel like
12 the Aurora -- McKesson-Aurora distribution
13 center should be given an award?
14   MS. HENN:  Objection to form.
15   THE WITNESS:  I certainly
16 wouldn't feel that way.
17 QUESTIONS BY MR. RAFFERTY:
18   Q.  Now, one of the reasons --
19 well, let's go to page 13 first.
20   Actually, one of the reasons --
21 one of the reasons that from 2008 until 2013
22 suspicious orders weren't being reported to
23 the DEA is because you didn't want anybody
24 even using the word "suspicious" in
25 communications, right?

Page 295

1    MS. HENN:  Objection to form.
2    THE WITNESS:  Are you -- do you
3    have a...
4  QUESTIONS BY MR. RAFFERTY:
5    Q.  Well, it's part of the CSMP
6  that was in place, right, was "don't use the
7  word 'suspicious' in written communications
8  with customers."
9    MS. HENN:  Objection to form.
10 QUESTIONS BY MR. RAFFERTY:
11   Q.  Isn't that right?
12   A.  I can't think of a specific
13 section, but I think that's right.
14   Q.  You can't think of the -- well,
15 one of your jobs as the senior director of
16 regulatory affairs of the RNAs is to know,
17 understand and implement the controlled
18 substance monitoring program at McKesson,
19 right?
20   A.  Correct.
21   Q.  That is the foundation of your
22 job, right?
23   MS. HENN:  Objection to form.
24   THE WITNESS:  It is.
25

Page 296

1  QUESTIONS BY MR. RAFFERTY:
2    Q.  And when you came on board and
3  took that position over, I assume you
4  reviewed the CSMP that was in place at the
5  time?
6    A.  I did.  I was also responsible
7  for evolving and -- that particular segment,
8  but I do review it.
9    Q.  Well, let's take a look at what
10 was in place, because as we just saw, failure
11 to prevent diversion, obviously, from a
12 global standpoint, from the country's
13 standpoint, has created an epidemic.  But as
14 we can see here, it affects and has -- these
15 nine families could tell you affects very
16 personally at a level involving families in
17 the country, correct?
18   MS. HENN:  Objection to form.
19   THE WITNESS:  Absolutely.
20 QUESTIONS BY MR. RAFFERTY:
21   Q.  But what is written in the CSMP
22 and -- strike that.
23   In fact, in -- reporting the
24 suspicious orders, as was just discussed by
25 the US Attorney in his letter, plays a vital

Page 297

1  role in the ability to stop diversion and
2  stop opioid addiction and abuse; isn't that
3  right?
4    MS. HENN:  Objection to form.
5    THE WITNESS:  Can you restate
6    your question, please?
7  QUESTIONS BY MR. RAFFERTY:
8    Q.  Yeah.
9    Reporting of suspicious orders,
10 effectively implementing and following the
11 Controlled Substances Act requirements by the
12 distributors, plays a vital role in
13 preventing diversion and fighting opioid
14 addiction and abuse in this country --
15   MS. HENN:  Objection to form.
16 QUESTIONS BY MR. RAFFERTY:
17   Q.  -- right?
18   A.  It plays a role fighting --
19 preventing diversion.
20   Q.  And it's something that should
21 certainly be taken seriously by companies,
22 especially when they're profiting and making
23 $104 billion a year in sales, right?
24   MS. HENN:  Objection to form.
25   THE WITNESS:  Absolutely.

Page 298

1    MR. RAFFERTY: Okay. Let's
2 look at Plaintiff's 1.345, Corey,
3 which has already been marked as
4 Exhibit 51. Sorry.
5 QUESTIONS BY MR. RAFFERTY:
6    Q.   All right. Do you see that?
7    A.   I do.
8    Q.   This is the CSMP that we talked
9 about earlier, right?
10   A.   Correct.
11   Q.   And if you turn to page .23 --
12 and actually, I'm sorry, if you turn to .22,
13 just to see what section it's under, it's
14 under Due Diligence, number 4, Due Diligence,
15 right?
16   A.   Correct.
17   Q.   And then turn to page .23.
18 "Customer Communications," number 1.
19      Do you see that?
20   A.   I do.
21   Q.   "All communications regarding
22 controlled substances are subject to subpoena
23 and discovery."
24      That means the DEA and the DOJ
25 can subpoena and make sure that they get to

Page 299

1 look at what you're writing, right?
2    A.   Correct.
3    Q.   "Include in the subject line of
4 e-mails customer name and number or account.
5 Write information as if it were being viewed
6 by the DEA."
7      Do you see that?
8    A.   I do.
9    Q.   "Be complete and detailed.
10 Remember to utilize the five Ws - who, what,
11 when, where or why."
12      And then here it says, "Refrain
13 from using the word 'suspicious' in
14 communications. Once McKesson deems an order
15 and/or a customer suspicious, McKesson is
16 required to act. This means all controlled
17 substances sales to that customer must cease
18 and the DEA must be notified."
19      Do you see that?
20   A.   I do.
21   Q.   "Refrain from using the word
22 'suspicious.'"
23      That's exactly what you're
24 supposed to be doing, is looking out pursuant
25 to the Controlled Substances Act for

Page 300

1 suspicious orders, right?
2      MS. HENN: Objection to form.
3      THE WITNESS: That's part of
4    our responsibility, yes.
5 QUESTIONS BY MR. RAFFERTY:
6    Q.   And the reason you're telling
7 your employees not to use the word
8 "suspicious" is because if they use it, then
9 there's a legal obligation to stop shipment.
10 And if you stop shipment, you lose money,
11 right?
12      MS. HENN: Objection to form.
13      THE WITNESS: Can you ask that
14    question again or rephrase it, please?
15 QUESTIONS BY MR. RAFFERTY:
16   Q.   Yeah.
17      What it says here is -- what
18 you say is, "Don't use the word
19 'suspicious.'" "Refrain from using the word
20 'suspicious' in communications."
21      And then there's a sub-bullet
22 which is explaining why, right?
23      MS. HENN: Objection to form.
24      THE WITNESS: There is a
25    sub-bullet, yes.

Page 301

1 QUESTIONS BY MR. RAFFERTY:
2    Q.   "Once McKesson deems an order
3 and/or customer suspicious, McKesson is
4 required to act."
5      Right? You see that?
6    A.   I do see that.
7    Q.   "This means all controlled
8 substances sales to that customer must cease
9 and the DEA must be notified."
10      So what you're telling your
11 employees to do is not use the word
12 "suspicious" because if you do, we're not
13 going to be able -- we're going to be forced
14 to act and we're going to have to stop
15 shipments, and we're going to have to notify
16 the DEA, right?
17      MS. HENN: Objection to form.
18 QUESTIONS BY MR. RAFFERTY:
19   Q.   So don't use the word
20 "suspicious" so we don't trigger that.
21      MS. HENN: Objection to form.
22      THE WITNESS: That's what's in
23    the document. I don't -- I wasn't
24    part of writing it or --
25

Page 302

1  QUESTIONS BY MR. RAFFERTY:
2      Q.    Well, you're part of
3  implementing it, right?
4      A.    Part of the program, sure.
5      Q.    A big part of the program.
6  You're senior director of the national
7  accounts.
8      A.    Right.
9      Q.    Right?
10     A.    Right.
11     Q.    Okay.  And when you came on
12 board with your experience from Target and
13 you, as part of your job, have to know what
14 the CSMP is, you knew this was in there,
15 right?
16          MS. HENN:  Objection to form.
17 QUESTIONS BY MR. RAFFERTY:
18     Q.    You reviewed these policies?
19     A.    I reviewed this document, yeah.
20     Q.    Right.
21          And in fact, this is the exact
22 opposite of what you should be telling your
23 employees in order -- if you -- in order to
24 protect the public health and safety, right?
25          MS. HENN:  Objection to form.

Page 303

1  QUESTIONS BY MR. RAFFERTY:
2      Q.    You shouldn't be discouraging
3  them from using a word that might require you
4  to act, to stop a shipment that might be
5  suspicious.  You shouldn't do that, should
6  you?
7          MS. HENN:  Same objection.
8          THE WITNESS:  We shouldn't
9      discourage using information and
10     acting upon information.
11 QUESTIONS BY MR. RAFFERTY:
12     Q.    This is specifically telling
13 them, don't use the word "suspicious" because
14 if you do, we're going to be required to act,
15 right?
16          MS. HENN:  Objection to form.
17 QUESTIONS BY MR. RAFFERTY:
18     Q.    And to notify the DEA.
19          MS. HENN:  Objection to form.
20          THE WITNESS:  That's what it
21     says in the document.
22 QUESTIONS BY MR. RAFFERTY:
23     Q.    And in fact, it worked, because
24 from 2008 until 2013, according to many of
25 these US Attorneys, you weren't reporting any

Page 304

1  suspicious orders to the DEA, right?
2          MS. HENN:  Objection to form.
3          THE WITNESS:  That's what was
4      alleged.
5  QUESTIONS BY MR. RAFFERTY:
6      Q.    So at least this portion of the
7  CSMP seems to be implemented pretty well by
8  you-all, right?
9          MS. HENN:  Objection to form.
10 QUESTIONS BY MR. RAFFERTY:
11     Q.    Seems to have worked, right?
12     A.    I know...
13          MS. HENN:  Objection to form.
14          THE WITNESS:  What's your
15     question?  Can you rephrase it?
16     Can -- I'm not sure how to answer
17     that.
18 QUESTIONS BY MR. RAFFERTY:
19     Q.    Well, let me ask it this way:
20 Where in this particular section is there any
21 discussion about the public health and
22 safety, about protecting people from opioid
23 abuse, about preventing diversion?
24          MS. HENN:  Objection to form.
25

Page 305

1  QUESTIONS BY MR. RAFFERTY:
2      Q.    What it says is, "Don't use the
3  word 'suspicion' so we're not required to
4  act"; isn't that right?
5          MS. HENN:  Objection to form.
6  QUESTIONS BY MR. RAFFERTY:
7      Q.    That's what it says, sir,
8  correct?
9      A.    That's what it says in the
10 document.
11     Q.    Okay.  All right.  Let's look
12 at 1.1443.  Oh, that's what was -- that's the
13 one we're on now.
14          Oh, 43.  Yes.  And that has
15 previously been marked as Exhibit 54.  Oh,
16 40, I'm sorry.  The numbers are too close.
17 They're 1433 and 1443.  Okay.  So this is
18 Exhibit 1.1443.
19          (McKesson-Hartle Exhibit 69
20     marked for identification.)
21 QUESTIONS BY MR. RAFFERTY:
22     Q.    This is Exhibit 1.1443, now
23 marked as Exhibit 69.
24          This is November 4, 2014, and
25 it is from the US Department of Justice DEA

Page 306

1   in Springfield, Virginia.
2           Do you see that?
3       A.   Yes.
4       Q.   Okay.  And it says, "Re:
5   registration consequences for McKesson
6   Corporation for violations of the Controlled
7   Substance Act."
8       A.   I see that.
9       Q.   And if you go to page 2, .2, it
10  says, "That having" -- this is the first full
11  paragraph, sir.  "That having been said, we
12  remain concerned that McKesson fails to
13  appreciate the serious and systematic {sic}
14  nature of the CSA-related problems that DEA
15  has observed in its several investigations
16  into your client's operations."
17          Do you see that?
18      A.   I do.
19      Q.   "The loss of business that
20  McKesson may experience as a result of
21  surrendering DEA CORs is justified and
22  appropriate consequence that is consistent
23  with the public interest."
24          You see that?
25      A.   I see that.

Page 307

1       Q.   So -- and then in the following
2   paragraph below that, "In order to release
3   all McKesson-owned DEA registrants from
4   administrative liability, as you have
5   requested, the agreed-upon registration
6   consequences must reflect not only the
7   gravity of the offenses but the nationwide
8   scope."
9           Do you see that?  "The
10  nationwide scope of McKesson's failure to
11  report suspicious orders and to maintain
12  effective controls against diversion."
13          Do you see that?
14      A.   I see that.
15      Q.   The next paragraph: "As we
16  have discussed previously, McKesson-Aurora
17  lacked a functional suspicious order
18  reporting system for approximately five
19  years.  McKesson-Aurora reported a total of
20  16 orders as suspicious in one batch,
21  occurring in one quarter, related to one
22  recently terminated pharmacy, while it
23  processed a total of 1.6 million orders for
24  controlled substances from 2008 to 2012."
25          So 16 out of 1.6 million; is

Page 308

1   that correct, Mr. Hartle?
2           MS. HENN:  Objection to form.
3           THE WITNESS:  Those are the
4   numbers listed in here.
5   QUESTIONS BY MR. RAFFERTY:
6       Q.   Now, this goes through and
7   details additional distribution centers that
8   are being investigated and that have been
9   found to fail to report -- have been found
10  failing to report suspicious orders for years
11  after the 2008 agreement was entered into,
12  correct?
13      A.   Can you say that again, please?
14      Q.   Yeah.  Let's turn to page .3.
15          "Like its Colorado counterpart,
16  McKesson's distribution center at 3820 --
17  38220 Plymouth Road, Livonia, Michigan,
18  McKesson-Livonia, reported no suspicious
19  orders for approximately five years after
20  McKesson's settlement with the DOJ."
21          Did I read that right?
22      A.   You did.
23      Q.   That's Livonia, Michigan.
24          And if you go down to the next
25  paragraph:  "McKesson's systemic failures

Page 309

1   were also evident at its distribution center
2   at 3000 Kenskill Avenue, Washington Court
3   House, Ohio."
4           Do you see that?
5       A.   I do.
6       Q.   "Here again, McKesson did not
7   report any orders as suspicious for years
8   after the 2008 settlement with DOJ and DEA."
9           Do you see that?
10      A.   I see that.
11      Q.   "When DEA began to investigate
12  this silence, McKesson's regional director of
13  regulatory affairs told DEA investigators
14  that he did not know what a suspicious order
15  was."
16          Do you see that?
17      A.   I see that.
18      Q.   "And protested that the DEA had
19  not adequately defined the term."
20          Do you see that?
21      A.   I do.
22      Q.   The regional director of
23  regulatory affairs not knowing what a
24  suspicious order is at one of the largest
25  distributors of narcotics in the country; you

Page 310

1 think that's reasonable?
2           MS. HENN:  Objection to form.
3 QUESTIONS BY MR. RAFFERTY:
4      Q.    They should know what a
5 suspicious order is?
6      A.    They should.
7      Q.    Yeah.  Okay.  That is
8 Washington Court House, Ohio.
9           Going on to the next page.
10 "McKesson's system to detect suspicious
11 orders also fell short at the distribution
12 center in Lakeland, Florida.  Once again, in
13 derogation of its responsibilities under the
14 CSA and the 2008 MOA, McKesson-Lakeland
15 failed to report any suspicious orders to DEA
16 for a five-year period."
17           Do you see that?
18      A.    I do.
19      Q.    So that's Lakeland, Florida.
20 That was part of the 2008.  So I'm not going
21 to add that to the chart, but that was part
22 of the 2008 settlement as well, right, that
23 distribution center?
24           MS. HENN:  Objection to form.
25           THE WITNESS:  Correct.

Page 311

1 QUESTIONS BY MR. RAFFERTY:
2      Q.    All right.  "McKesson also" --
3 the next paragraph.  "McKesson also remained
4 silent about suspicious orders received by
5 its distribution center at Methuen,
6 Massachusetts, McKesson-Methuen."
7           Do you see that?
8      A.    I do.
9      Q.    "As with other distribution
10 centers McKesson operated, McKesson failed to
11 report any suspicious orders from May 2008
12 through November 2013, though it sold
13 increasing amounts of oxycodone during the
14 same time period with little to no
15 investigation."
16           Do you see that?
17      A.    I see that.
18      Q.    Methuen -- I don't even know if
19 I'm pronouncing it right -- Massachusetts.
20           And if we go over to tab F, the
21 next paragraph, the first full paragraph.
22 "As noted above, the above examples are
23 illustrative, not exhaustive.  They are meant
24 to illustrate what we mean when we say that
25 we will be driven by the evidence that we

Page 312

1 could present in the administrative
2 proceedings against these registrants.  We
3 have attempted to highlight this evidence in
4 the hopes that you and your client can fully
5 understand why DEA believes that the failings
6 at McKesson were as systematic {sic} as they
7 were serious."
8           Oh, I'm sorry, systemic as they
9 were serious.
10           Do you see that?
11      A.    I do.
12      Q.    Okay.  So the word "systemic."
13           And going back to what we
14 discussed, just so that we can -- you can see
15 what I'm writing down here, back to the first
16 page -- the -- page .2 where it talks about
17 "the agreed-upon registration consequences
18 must reflect not only the gravity of the
19 offenses but nationwide scope of McKesson's
20 failure to report suspicious orders," so
21 nationwide.
22           Now, if we go forward now, this
23 is in November 2014.
24           Now -- well, first of all,
25 let's take a look at 1.098.

Page 313

1           (McKesson-Hartle Exhibit 70
2       marked for identification.)
3 QUESTIONS BY MR. RAFFERTY:
4      Q.    This will be marked as
5 Exhibit 70, and this is the McKesson
6 Corporation's response to the Teamsters.
7           Let's see what happens in 2015,
8 if you look.
9           Now, here, this is -- what this
10 is is this is the board of directors of
11 McKesson responding to the International
12 Brotherhood of Teamsters who were
13 shareholders -- or shareholders in McKesson
14 raising questions about why that
15 $150 million -- the conduct surrounding that
16 $150 million fine, the $13.25 million fine
17 and its failures in regards to the control --
18 the Controlled Substances Act, correct?
19           MS. HENN:  Objection to form.
20           THE WITNESS:  Correct.
21 QUESTIONS BY MR. RAFFERTY:
22      Q.    Okay.  Let's just -- I'm just
23 going to draw you to one particular section
24 because I just went through a whole bunch of
25 different things where it was saying no

Page 314

1 reports were being filed by these different
2 distribution centers for suspicious orders,
3 yet in 2015 -- so zero -- you kept hearing
4 zero -- no reports from 2008 to 2013, no
5 reports from 2000 -- for years, right? Some
6 for five years, right?
7    A.   Correct.
8    Q.   Yet in 2015, you-all --
9    A.   What page are we on?
10    Q.   Sorry.  Page 24 of the report.
11        In 2015, the bottom paragraph:
12 "Since 2015" -- the company provided the
13 following data:  In 2015, after it's been --
14 being investigated by the DEA, the DOJ, the
15 company reported over 230,000 suspicious
16 orders.
17        MS. HENN:  Sorry, so you're on
18 page --
19        MR. RAFFERTY:  Page 24.
20        MS. HENN:  Not .28.
21        MR. RAFFERTY:  Oh, yeah, I'm
22 sorry, mine's not -- sorry.
23 QUESTIONS BY MR. RAFFERTY:
24    Q.   Last sentence on that page.
25    A.   Okay.

Page 315

1    Q.   So no suspicious reports for
2 years, and then here it says the company
3 provided the following data:  In 2015, the
4 company reported over 230,000 suspicious
5 orders.  In 2016, the company reported over
6 220,000 suspicious orders.  And in 2017, the
7 company reported over 145,000 suspicious
8 orders.  Per year.
9        So going from zero for five
10 years to now reporting hundreds of thousands
11 of suspicious orders, right?
12    A.   Systematically reporting,
13 correct.
14    Q.   Okay.  Now, if we could go to
15 the -- let's see, 1.088.  Exhibit 58.  This
16 is the copy we talked about earlier, so I'm
17 only going to go through one particular
18 aspect of it.
19    A.   I apologize, I don't have my 58
20 quite yet.  I'm a bit out of order.
21    Q.   Okay.
22    A.   Sorry about that.  I have it
23 now.
24    Q.   Okay.  If you look at page --
25 this is the administrative memorandum of

Page 316

1 agreement for the 2017 $150 million
2 settlement, correct?
3    A.   Correct.
4    Q.   Okay.  So in here it says on
5 page 3, .3, it says, "Covered Conduct."
6        Do you see that?
7        "For the purpose of this
8 agreement, covered conduct means the
9 following conduct alleged by the government
10 for the covered time period."
11        And it says, "McKesson failed
12 to maintain effective controls against
13 diversion of particular controlled substances
14 into other than legitimate medical,
15 scientific and industrial channels by sales
16 to certain of its customers, in violation of
17 the CSA and CSA's implementing regulations at
18 McKesson distribution centers, including the
19 following."
20        So we're going to go through
21 and list those, and if they're not on this
22 list already, I'm going to add them, okay?
23    A.   Okay.
24    Q.   Aurora, Colorado, that's on
25 there.

Page 317

1        Aurora, Illinois, is not on
2 there.
3        Delran, New Jersey, not on
4 there.
5        Lacrosse, Wisconsin, not on
6 there.
7        Lakeland, Florida, that's on
8 there.
9        Landover, Maryland, that's on
10 there.
11        La Vista, Nebraska.
12        Livonia, Michigan, that's on
13 there.
14        Methuen, Massachusetts, that's
15 on there.
16        Santa Fe Springs, California,
17 that's not on there.
18        Washington Court House, Ohio,
19 that's on there.
20        And West Sacramento,
21 California, that's on there.
22        Those are all the distribution
23 centers in the different states that the
24 allegations from -- in the 2008 and 2017
25 settlement -- if I could have the Elmo --

Page 318

1 involved, correct?
2      All right. So what we have
3 here is, if you look, "The conduct for
4 failing to report suspicious orders" -- and
5 it was cited by and investigated by the DOJ
6 and DEA -- "involve distribution centers from
7 Maryland, Florida, Texas, Colorado, Utah,
8 California, Illinois, Michigan, Ohio,
9 Massachusetts, Wisconsin, Nebraska," and then
10 California, which I'm not counting again.
11 But that makes 12 states, correct, 12
12 different states?
13      MS. HENN: Objection to form.
14      THE WITNESS: Correct.
15 QUESTIONS BY MR. RAFFERTY:
16     Q. Right.
17      Which is one of the reasons it
18 led to the comments by the US Attorney and
19 the Department of Justice as these being
20 systemic and nationwide failures, correct?
21      MS. HENN: Objection to form.
22      THE WITNESS: Correct.
23 QUESTIONS BY MR. RAFFERTY:
24     Q. Okay. And in fact, you're
25 familiar with the concept of the migration of

Page 319

1 diverted drugs, correct, meaning drugs
2 that -- go ahead.
3     A. That move borders.
4     Q. Right.
5     A. Right.
6     Q. Drugs don't just -- because you
7 sell it to one particular pharmacy doesn't --
8 in one particular town doesn't mean that drug
9 is staying in that town, right?
10     A. Agreed.
11     Q. In fact, there's migration all
12 the way -- and it's been well-known and shown
13 that in terms of the drugs, for example, the
14 narcotics that were being sold by McKesson in
15 Florida, and the migration all the way up
16 through the Midwest, into Ohio and throughout
17 the country, correct?
18      MS. HENN: Objection to form.
19      THE WITNESS: Can you say that
20     again? I want to make sure --
21 QUESTIONS BY MR. RAFFERTY:
22     Q. Yeah. You're familiar -- well,
23 let me show you this. Let's just look at
24 this.
25      This is from Exhibit 44, and I

Page 320

1 can just put this up, if you want. It's a
2 chart.
3      This is from, just so you are
4 aware, the prescription drug abuse we looked
5 at earlier.
6     A. I've seen it before.
7     Q. Okay.
8     A. Okay.
9     Q. From McKesson. This is from
10 McKesson in 2014. And this is one of the
11 slides. "Drug diversion, migration out of
12 Florida."
13      And you see the arrow going all
14 the way up through Georgia, Tennessee,
15 Kentucky, Ohio, Missouri?
16     A. Yeah, I'm aware of --
17      MS. HENN: Objection to form.
18      THE WITNESS: Oh, excuse me.
19      Aware of how drugs move and
20     migrate, so...
21 QUESTIONS BY MR. RAFFERTY:
22     Q. Right.
23      So when you're talking about
24 drugs being diverted in 12 different states,
25 it's not limited to those 12 states, right?

Page 321

1 Those drugs move out of those states?
2     A. They can.
3      MS. HENN: Objection to form.
4 QUESTIONS BY MR. RAFFERTY:
5     Q. They can.
6      And in fact, the distribution
7 centers that you're talking about, that when
8 we're talking about distribution centers in
9 these states, those distribution centers
10 actually service pharmacies in other states,
11 right?
12      It's not just because it's
13 located in, you know, Washington Court House,
14 Ohio, that it's not servicing pharmacies in
15 other states or surrounding states, correct?
16     A. Correct. Distribution centers
17 can serve customers in multiple states.
18     Q. Right. So what we're talking
19 about when we talk about 12 states being
20 implicated, that's just the 12 states where
21 the distribution centers are.
22      But when we're talking about
23 systemic and nationwide failures at these
24 distribution centers, we're talking about
25 drugs migrating and the distribution centers

Page 322

1 servicing many other surrounding states as
2 well, correct?
3          MS. HENN:  Objection to form.
4          THE WITNESS:  Can you clarify
5     that question for me, please?
6 QUESTIONS BY MR. RAFFERTY:
7     Q.    Yeah.
8          Remember I had the chart up and
9 showed that there were -- the 12 distribution
10 centers that were at the heart of the 2008
11 and 2017 --
12    A.    Correct.
13    Q.    -- settlements, correct?
14    A.    Yes.
15    Q.    Based on allegations from the
16 DOJ and the DEA, right?
17    A.    Right.
18    Q.    And we know in 2017, at least
19 McKesson accepted responsibility in that
20 particular settlement agreement, right?
21          MS. HENN:  Objection to form.
22 QUESTIONS BY MR. RAFFERTY:
23    Q.    We went through that earlier
24 this morning.
25          MS. HENN:  Same objection.

Page 323

1          THE WITNESS:  Yeah, certain
2     pieces related to specific orders,
3     yes.
4 QUESTIONS BY MR. RAFFERTY:
5     Q.    And specifically -- so what I'm
6 saying is, because we're talking about --
7 trying to see that -- the effect that that
8 has, that diversion has -- based out of
9 distribution centers, it affects not just the
10 state that it's sitting in but many other
11 states that it services as well, correct?
12          MS. HENN:  Objection to form.
13          THE WITNESS:  I agree that
14     diversion migrates.
15 QUESTIONS BY MR. RAFFERTY:
16    Q.    Right.
17    A.    So there's the possibility
18 of --
19    Q.    But in addition to migration --
20 because we agreed on that.  Diversion
21 migrates.  We see that, and McKesson has
22 acknowledged it.  This is just one example of
23 it.
24          You've heard of the oxy
25 express?

Page 324

1     A.    I have.
2     Q.    Okay.  And so in addition to
3 that, though, just from -- not even talking
4 about migration.  Once it's put in place at a
5 pharmacy, the distribution center that is
6 failing in preventing diversion may be
7 servicing pharmacies in several other states,
8 not just the state it sits in.
9          You would agree with that?
10          MS. HENN:  Objection to form.
11          THE WITNESS:  I agree with
12     that.
13 QUESTIONS BY MR. RAFFERTY:
14    Q.    Okay.  Now, one last thing.
15 You were...
16          MR. RAFFERTY:  Let's take a
17     five-minute break.  I think we
18     might -- my part might be wrapping up.
19          VIDEOGRAPHER:  The time is
20     3:08 p.m., and we're going off the
21     record.
22      (Off the record at 3:08 p.m.)
23          VIDEOGRAPHER:  The time is
24     3:17 p.m., and we're back on the
25     record.

Page 325

1          DIRECT EXAMINATION
2 QUESTIONS BY MR. PAPANTONIO:
3     Q.    You've been questioned about
4 the migration of opioids, narcotics, that
5 your company sold, correct?
6          That was right where
7 Mr. Rafferty left off, was asking you about
8 how narcotics that your company distributed
9 migrated around the United States, right?
10          MS. HENN:  Objection to form.
11 QUESTIONS BY MR. PAPANTONIO:
12    Q.    Remember the question before
13 the break?
14    A.    Yeah, we were talking about the
15 concept of migration.
16    Q.    And he talked about the fact
17 that not only was there migration, but you --
18 everywhere this list that he made -- how
19 about -- let me put that back on here.
20          This list that Mr. Rafferty
21 made, these are actually what we call
22 distribution centers, correct?  These are
23 distribution centers, right?
24    A.    Those are the locations of our
25 distribution centers, correct.

Page 326

1    Q.    Right.
2          And the idea of the
3  distribution center is that you just don't
4  distribute in the one state; you may have
5  five states, you may have four states.  They
6  hit other areas besides the states that
7  they're in, correct?
8          MS. HENN:  Objection to form.
9  QUESTIONS BY MR. PAPANTONIO:
10   Q.    Is that a correct statement,
11 sir?
12   A.    Correct.  That's a traditional
13 distribution-type model.
14   Q.    And as a matter of fact, in
15 addition to these, how many distribution
16 sites did you have total?
17         MS. HENN:  Objection to form.
18         THE WITNESS:  It's
19    approximately 30.
20 QUESTIONS BY MR. PAPANTONIO:
21   Q.    Okay.  So in addition to
22 this -- I'm going to mark this exhibit up a
23 little more.  And you had 30 total
24 distribution centers?
25   A.    Approximately.

Page 327

1    Q.    And you would agree that each
2  one of those distribution centers had other
3  states that they serviced, is that correct,
4  besides where they were located, right?
5    A.    Correct.  They typically
6  distribute to different states, yes.
7    Q.    And in addition to that, we
8  would have the problem as you talked about,
9  migration.  And my partner there showed you
10 what he called the oxy express.
11         You've heard the oxy express,
12 right?
13         MS. HENN:  Objection to form.
14         THE WITNESS:  He mentioned
15    that, yeah; he didn't show us
16    anything.
17 QUESTIONS BY MR. PAPANTONIO:
18   Q.    And you would agree that the
19 oxy express you're familiar with before you
20 came in here today.  It's not the first time
21 you've heard it, true?
22   A.    It's not the first time I've
23 heard it.
24   Q.    Okay.  And did you ever study
25 what the effect of the oxy express was on

Page 328

1  those states that he showed you, from Florida
2  to Georgia to Kentucky?
3          Did you ever study what the --
4  what the effect was in each one of those
5  states, how many people died in each one of
6  those states that the oxy express went
7  through before you came in here today?
8          MS. HENN:  Objection to form.
9          THE WITNESS:  I did not study
10    that.  I'm aware of the effects.
11 QUESTIONS BY MR. PAPANTONIO:
12   Q.    Did you ever study, sir, any
13 details about the findings that my partner
14 went over with you this morning that the DEA
15 had made in your failure to report suspicious
16 orders and the end result of what that meant
17 in human life, people dying?
18         Did you ever independently do
19 that in your position in regulatory?
20         MS. HENN:  Objection to form.
21 QUESTIONS BY MR. PAPANTONIO:
22   Q.    At any time.
23         MS. HENN:  Objection to form.
24         THE WITNESS:  Could you
25    rephrase that question, please?

Page 329

1  QUESTIONS BY MR. PAPANTONIO:
2    Q.    Yes, sir.  Yeah.
3          You just saw all the documents
4  my partner went over where they're talking
5  about the failure of the company to follow
6  the law in suspicious orders and in having a
7  system that allows you to keep up with what
8  the distribution of your narcotics are.
9          You remember that?  We just
10 spent hours on that, right?
11         MS. HENN:  Objection to form.
12         THE WITNESS:  I remember our
13    previous conversations.
14 QUESTIONS BY MR. PAPANTONIO:
15   Q.    Okay.  So you remember the
16 documents my partner just showed you from the
17 DEA, right, about the failures of your
18 company to adequately handle the narcotics
19 that your company was shipping all over the
20 country?
21         MS. HENN:  Objection to form.
22 QUESTIONS BY MR. PAPANTONIO:
23   Q.    You remember those documents my
24 partner just went over, right?
25   A.    I do.

**Page 330**

1 Q. Okay. And you also -- so my
2 question is: Did you ever go find out what
3 the net result of that was when you would
4 have an excess of your narcotics shipped to a
5 pharmaceutical company -- or excuse me,
6 scratch that.
7 Did you ever find out what the
8 net result was in human life or death from
9 your narcotics being shipped to a pharmacy in
10 excess of what that pharmacy really needed?
11 MS. HENN: Objection to form.
12 THE WITNESS: I've read many
13 articles and publications about some
14 of the effects of opioid diversion
15 across the country.
16 QUESTIONS BY MR. PAPANTONIO:
17 Q. But, sir, you're head of
18 regulatory, right?
19 A. I'm one of the regulatory
20 leaders.
21 Q. Did you ever go in the field
22 and find out what the human cost of this
23 whole issue is?
24 MS. HENN: Objection to form.
25

**Page 331**

1 QUESTIONS BY MR. PAPANTONIO:
2 Q. Did you ever do that?
3 MS. HENN: Same objection.
4 THE WITNESS: Not go into the
5 field to study the human cost.
6 QUESTIONS BY MR. PAPANTONIO:
7 Q. You understand this -- this
8 case isn't about statistics; it's about human
9 life, right? You understand that, right?
10 MS. HENN: Objection to form.
11 THE WITNESS: I understand
12 that.
13 QUESTIONS BY MR. PAPANTONIO:
14 Q. Okay. And so as a regulator,
15 don't you think it's important that you
16 understand what the loss of human life is due
17 to the failures of your company to follow the
18 law?
19 Is that important to you; yes
20 or no? That's what I'm wondering here, sir.
21 MS. HENN: Objection to form.
22 THE WITNESS: Well, it's
23 important for us to know the impact of
24 diversion across the country.
25

**Page 332**

1 QUESTIONS BY MR. PAPANTONIO:
2 Q. Because you understand
3 diversion ends up in human -- in the loss of
4 human life. You know that, right?
5 MS. HENN: Objection to form.
6 THE WITNESS: I do know that,
7 absolutely.
8 QUESTIONS BY MR. PAPANTONIO:
9 Q. Uh-huh. And as a matter of
10 fact, before you came in here today --
11 MR. PAPANTONIO: Would you
12 share with him 324, please.
13 (McKesson-Hartle Exhibit 89
14 marked for identification.)
15 MS. MOORE: That would be
16 McKesson-Hartle 89.
17 QUESTIONS BY MR. PAPANTONIO:
18 Q. Before you came in here today,
19 sir, you knew that the CDC had been -- had
20 been studying and following exactly what the
21 loss of human life was because of the sale of
22 narcotics in the United States. You knew
23 that they had been studying that, right?
24 A. I do.
25 Q. And so when did you take this

**Page 333**

1 map that's -- you see this map in front of
2 you?
3 A. I do.
4 Q. When did you take it and study
5 it to find out what the net effect was in the
6 loss of human life because of diversion of
7 narcotics from your company? When is the
8 first time you did that --
9 MS. HENN: Objection to form.
10 QUESTIONS BY MR. PAPANTONIO:
11 Q. -- if ever?
12 MS. HENN: Objection to form.
13 THE WITNESS: Can you please
14 rephrase that for me?
15 QUESTIONS BY MR. PAPANTONIO:
16 Q. Yeah.
17 When is the first -- have you
18 ever seen this map?
19 A. I have. I've been at
20 conferences where it's been shared. I've
21 used it in education with others as well.
22 Q. Okay. So you've used it with
23 education. And so as I talk to you about it,
24 you're going to understand as we go through
25 there what the loss of human life was between

Page 334

1 1999 and 2016.
2 You've understood what the
3 human life -- loss of human life was,
4 correct, before we got here today?
5 A. Absolutely.
6 Q. Okay. And it's -- so here's
7 what I want to find out: You knew that in
8 1999 -- see that map up there?
9 You knew in 1999 that is what
10 the death map looked like in 1999, correct?
11 MS. HENN: Objection to form.
12 QUESTIONS BY MR. PAPANTONIO:
13 Q. The CDC death map, you know
14 that's what it looked like in 1999, true?
15 A. True, I've seen this before.
16 Q. Okay. Let me ask you while
17 we're talking about that: Any of these other
18 companies that said they were here today,
19 Cardinal or CVS, were any of them at this
20 place where you talked about the death map?
21 MS. HENN: Objection to form.
22 QUESTIONS BY MR. PAPANTONIO:
23 Q. In your lecture, as you
24 describe it?
25 MS. HENN: Same objection.

Page 335

1 THE WITNESS: I didn't describe
2 it as a lecture.
3 I'm not sure if any -- I've
4 talked with different individual
5 chains.
6 QUESTIONS BY MR. PAPANTONIO:
7 Q. Well, tell me who you've talked
8 to about the loss of human life regarding the
9 sale of narcotics in the United States. What
10 other companies besides you have you had a
11 conversation with besides your company?
12 A. As part of my due diligence and
13 as part of my interaction with chains, I've
14 given presentations to nearly all of them
15 that reference in some way.
16 Q. Okay. Do you remember showing
17 this map to the folks at CVS, ever, saying,
18 "Hey, you might want to take a look at this.
19 CDC has studied this, and the CDC can tell us
20 how many people have been dying between 1999
21 and 2016"?
22 Did you ever do that with CVS?
23 A. I did not share this map with
24 CVS.
25 Q. Did you share it with anybody?

Page 336

1 A. I have.
2 Q. Who did you share it with?
3 MS. HENN: Objection to form.
4 Go ahead.
5 THE WITNESS: I've shared
6 pieces of this with -- I think it was
7 in one of the documents -- Discount
8 Drug Mart.
9 QUESTIONS BY MR. PAPANTONIO:
10 Q. Discount Drug Mart. Was that
11 one of your customers?
12 A. It is.
13 Q. And so when did -- do you
14 remember when you shared it with them?
15 A. When we on-boarded them. And I
16 don't remember the exact date. Earlier in
17 the -- 2017. That's an example I've shared
18 it.
19 Q. Shared it. Okay.
20 So if we look --
21 A. I understand the map.
22 Q. Okay. Good. Good.
23 Do you know who Mr. Oriente is?
24 A. I do.
25 Q. He worked for you, didn't he?

Page 337

1 MS. HENN: Object to the form.
2 THE WITNESS: He does.
3 QUESTIONS BY MR. PAPANTONIO:
4 Q. Did anybody show you the
5 deposition of Mr. Oriente before you came in
6 here today?
7 Did anybody show you that
8 deposition where we questioned him for seven
9 hours?
10 A. I have not seen it.
11 Q. Did you know that Mr. Oriente
12 represented he'd never seen the death map?
13 MS. HENN: Objection to form.
14 QUESTIONS BY MR. PAPANTONIO:
15 Q. Would that surprise you if
16 somebody in charge, somebody in charge of
17 regulatory, said, "I've never even seen the
18 death map"? Would that surprise you?
19 MS. HENN: Objection to form.
20 THE WITNESS: It's a little
21 surprising since it's been in some
22 decks.
23 QUESTIONS BY MR. PAPANTONIO:
24 Q. Uh-huh. And the reason it's
25 been published, sir, is to be able to have

Page 338

1  people like you understand what the expansion
2  of your narcotics was doing to human life in
3  this country. That's one reason the CDC did
4  this; you understand that, right?
5      MS. HENN: Objection to form.
6  QUESTIONS BY MR. PAPANTONIO:
7      Q.   Did you know that?
8      A.   Can you rephrase that, please?
9      Q.   Yeah.
10          One reason the CDC came up with
11  this map is so the entire country could
12  understand what the expansion of narcotics
13  was doing in relation to the loss of human
14  life in this country.
15          Did you know that?
16      A.   Correct, yes.
17      Q.   Okay. And you know part of
18  this case is involved -- the jury is going to
19  hear economists in this case talk about what
20  the economic losses were because of that
21  human life.
22          Did you understand that that's
23  part of the issue that we're involved with
24  here today?
25      MS. HENN: Objection to form.

Page 339

1  QUESTIONS BY MR. PAPANTONIO:
2      Q.   Did you know that?
3      A.   Yes.
4      Q.   Okay. Did you go out and find
5  out what it is that -- when you have people
6  dying or people addicted to drugs in a county
7  or a city, what the economic impact is on
8  that city or county?
9          Did you do any kind of study at
10  all to find out what that economic impact is?
11      MS. HENN: Objection to form.
12          And I'll advise the witness if
13      counsel is asking about attorney work
14      product in relation to the case, he
15      should not respond.
16      MR. PAPANTONIO: I'm not asking
17      him about anything work product.
18  QUESTIONS BY MR. PAPANTONIO:
19      Q.   Sir, have you talked to anybody
20  about what the economic losses are of people
21  that are addicted to drugs in a county and
22  people who have died from drug overdoses in a
23  county or a city?
24          Has anybody shared with you
25  what the economic loss is to the taxpayers

Page 340

1  that live in those cities or counties?
2      MS. HENN: Objection to form.
3      THE WITNESS: No.
4  QUESTIONS BY MR. PAPANTONIO:
5      Q.   All right. So if we look at
6  this map, we start in 1999. You see, that's
7  the first one. And you see down at the very
8  bottom, you see where the brown is at the
9  very bottom? It says that's 30 deaths per
10  every 100,000.
11      A.   I see that.
12      Q.   Right?
13          Now, when you took -- when you
14  looked at this -- I've already asked you
15  whether or not you took it on yourself to
16  find out by going to these various states and
17  counties and cities and finding out what the
18  human impact was. You said you hadn't done
19  that yourself, right?
20      MS. HENN: Objection to form.
21      THE WITNESS: Correct, I
22      haven't done that.
23  QUESTIONS BY MR. PAPANTONIO:
24      Q.   Would you tell me anybody that
25  you know of in your company, McKesson, that

Page 341

1  has given a speech about, "Hey, I knew about
2  the death map, and I went out and I actually
3  tried to find out what the impact was as far
4  as human life in these various counties or
5  cities"?
6      MS. HENN: Objection to form.
7  QUESTIONS BY MR. PAPANTONIO:
8      Q.   Anybody?
9      A.   I don't know anybody who's done
10  that specific task, to go out and inquire
11  about the costs.
12      Q.   Do you think that's pretty --
13  no, how about just -- how about inquire about
14  human life, the loss of human life? That's
15  pretty important, isn't it?
16      MS. HENN: Objection to form.
17  QUESTIONS BY MR. PAPANTONIO:
18      Q.   Yes?
19      A.   We all pay attention to the
20  loss of human life.
21      Q.   Well, let's see how much
22  attention you paid here. Okay?
23          Because the loss of human life
24  starts in 1999. You know where Virginia --
25  West Virginia is on that map?

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    A.    I do.
2    Q.    What would you -- how would you
3 describe where it is on that map? Would it
4 be the brown place right there?
5    A.    In here.
6    Q.    You're going to have to -- are
7 you pointing to the brown area there?
8         Can I put a circle around the
9 brown area?
10   A.    Yeah. Right there.
11   Q.    That's West Virginia, right?
12   A.    Correct.
13   Q.    Now, that's in 1999. They're
14 telling you by this map that 30 people for
15 every 100,000 people have died, correct?
16        MS. HENN: Objection to form.
17 QUESTIONS BY MR. PAPANTONIO:
18   Q.    That's the information that map
19 gives you in 1999.
20        MS. HENN: Objection to form.
21        THE WITNESS: Correct. That's
22 the mortality rate.
23 QUESTIONS BY MR. PAPANTONIO:
24   Q.    And then the -- well, the
25 mortality rate is people dying, right?

Page 343

1    A.    Correct.
2    Q.    Okay. And then we look at the
3 brown place on the map over here to the west,
4 and that's -- where is that, New Mexico?
5    A.    Right there.
6    Q.    Is that New Mexico?
7    A.    I can't tell the outline of the
8 state, but I...
9    Q.    Well, there's one big brown
10 area right there.
11        Do you understand that that --
12   A.    Yeah, that area.
13   Q.    Okay. You understand that's a
14 county, right?
15   A.    Right. Correct.
16   Q.    And what they've -- what the
17 map actually does is it breaks it down into
18 counties. It doesn't just tell you a state.
19 It says, in this county in 1999, we had 30
20 people for every 100,000 people who were
21 dying.
22        That's what this map told you
23 in 1999, right?
24        MS. HENN: Objection to form.
25

Page 344

1 QUESTIONS BY MR. PAPANTONIO:
2    Q.    Correct?
3    A.    Correct.
4    Q.    And nevertheless, you're
5 telling me that you can't tell anybody -- you
6 don't know the name of anybody who went out
7 and did a study to find out how much your
8 company was impacting that death, true?
9        MS. HENN: Objection to form.
10       THE WITNESS: True.
11 QUESTIONS BY MR. PAPANTONIO:
12   Q.    And your company is the number
13 one pharmaceutical company selling narcotics
14 in this country, correct? Number one. Isn't
15 that what --
16       MS. HENN: Objection to form.
17 QUESTIONS BY MR. PAPANTONIO:
18   Q.    Isn't that what you brag about,
19 you're number one?
20   A.    We're the largest.
21   Q.    Yeah, you're the largest.
22       And then the other people right
23 next to you is a company called Cardinal,
24 correct?
25   A.    Correct.

Page 345

1    Q.    Right?
2         And the other one is
3 Amerisource, true?
4    A.    True.
5    Q.    As a matter of fact, you've
6 gone to conventions where all of you-all have
7 been together talking about these types of
8 issues, about the problem of drugs being
9 spread out across the country.
10       MS. HENN: Objection to form.
11 QUESTIONS BY MR. PAPANTONIO:
12   Q.    You've talked about that,
13 right?
14   A.    Members on our team have, yes.
15   Q.    Yeah.
16       So it's not just you in a room
17 talking about it. You've been in a room
18 talking about it with Cardinal. You've been
19 in a room talking about it with Amerisource,
20 which is the second and third largest
21 pharmaceutical narcotics distributor in the
22 country, correct?
23       MS. HENN: Objection to form.
24       THE WITNESS: Correct.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1  QUESTIONS BY MR. PAPANTONIO:
2      Q.   Right?
3          Okay.  And when you talked
4  about it, you actually talked about issues
5  about how many people are dying in these
6  various counties around the country from
7  overdose on their narcotics and your
8  narcotics, right?
9          MS. HENN:  Objection to form.
10 QUESTIONS BY MR. PAPANTONIO:
11     Q.   That's correct, isn't it?
12     A.   Could you restate that?
13     Q.   Yeah.
14          You've actually had
15 conversations with these other companies,
16 Cardinal and Amerisource, about how many
17 people were dying because of their narcotics
18 that they were selling and your narcotics
19 that you were selling.  You've actually had
20 conversations about that --
21         MR. SUDDATH:  Objection.
22         MS. HENN:  Objection to form.
23 QUESTIONS BY MR. PAPANTONIO:
24     Q.   -- true?
25     A.   I have not personally, no.

Page 347

1      Q.   Have you been in a room where
2  that's taken place?
3          MS. HENN:  Objection to form.
4  QUESTIONS BY MR. PAPANTONIO:
5      Q.   I think you already said yes.
6  You want to change that?
7          MS. HENN:  Objection to form.
8  QUESTIONS BY MR. PAPANTONIO:
9      Q.   Have you been in a room, sir,
10 where Amerisource, Cardinal and McKesson have
11 been discussing the expansion of death in
12 this United States because of the narcotics
13 that those companies sold in this country,
14 ever?
15         MR. SUDDATH:  Objection.
16         MS. HENN:  Objection to form.
17 QUESTIONS BY MR. PAPANTONIO:
18     Q.   Have you been there?
19         MS. HENN:  Objection to form.
20         THE WITNESS:  I don't believe
21     that's what I have said.
22 QUESTIONS BY MR. PAPANTONIO:
23     Q.   Well, if you hadn't said it,
24 then that's fine.  You don't -- that's never
25 happened.  Is that your testimony, that's

Page 348

1  never happened?
2      A.   I don't recall that I've been
3  in a room with those three and having that
4  conversation.
5      Q.   Have you ever had that
6  conversation in a room or out of a room, sir?
7          MS. HENN:  Objection to form.
8          MR. PAPANTONIO:  Give me the
9  document.
10         MR. SUDDATH:  Objection.
11 QUESTIONS BY MR. PAPANTONIO:
12     Q.   Have you?  Yes or no?
13         MS. HENN:  Objection to form.
14 QUESTIONS BY MR. PAPANTONIO:
15     Q.   Have you participated in a
16 conversation with Amerisource and Cardinal
17 where you have discussed the expansion of
18 death in this country because of the sale of
19 narcotics?
20         MS. HENN:  Objection to form.
21         MR. SUDDATH:  Objection.
22 QUESTIONS BY MR. PAPANTONIO:
23     Q.   Yes or no?
24     A.   I don't recall.
25     Q.   All right.  Sir, let's go to

Page 349

1  2000.  Let's go to -- the next page is 2000.
2          Could we do something -- what
3  I'd like to do here is keep 1999 up on the
4  left, and let's go through a comparison on
5  the right.
6          So in 2000 -- let's look at
7  that.  Actually, what I'd really --
8          MR. PAPANTONIO:  Can you
9  understand what I'm saying here?  Can
10 you just put one and one, or is that
11 not possible?  One on each -- one on
12 each screen.
13         VIDEOGRAPHER:  No, they're
14 connected.
15         MR. PAPANTONIO:  Okay.  That's
16 fine.  We can do this.
17 QUESTIONS BY MR. PAPANTONIO:
18     Q.   All right.  So you see -- does
19 it look like in 2000 that there's an
20 expansion of the death data taking place, or
21 do you see any difference in that between
22 1999 and 2000?
23         Do you see any appreciable
24 differences in death occurring in this
25 country?

Page 350

1    MS. HENN: Objection to form.
2  QUESTIONS BY MR. PAPANTONIO:
3    Q.   2000.
4    A.   Yeah, you see different
5  states -- or different counties are shaded
6  different colors.
7    Q.   It's expanding, isn't it?
8  Death in the United States is expanding, and
9  this map shows that, doesn't it?
10    A.   Correct.
11    Q.   And still at this point, you're
12  unable to name one person from McKesson that
13  went out to the counties and the cities that
14  are delineated on this death map to find out
15  what you could do to reverse that trend of
16  death; is that a correct statement?
17    MS. HENN: Objection to form.
18    THE WITNESS: Yes.
19  QUESTIONS BY MR. PAPANTONIO:
20    Q.   All right. Let's go to the
21  next one.
22    Can I tell you something? I
23  want you to understand. I'm not blaming you
24  for all this; you understand that?
25    A.   I understand.

Page 351

1    Q.   Okay. I'm just asking
2  questions.
3    A.   I understand.
4    Q.   So please don't think I'm
5  blaming you. You didn't even get there until
6  2008.
7    A.   2014.
8    Q.   2014.
9    So obviously we're not at 2014
10  now.
11    But what is important to me,
12  Mr. Hartle, is this information was available
13  to McKesson. That's all I'm trying to get at
14  right here right now. Okay?
15    A.   Understood.
16    Q.   Okay. So we go to 2001. Tell
17  me whether you see any appreciable difference
18  in the amount of death taking place in the
19  United States between 1999 -- you know what
20  you can do? If it helps you, you can keep
21  1999 right next to you and just tell me
22  whether or not you see an expansion of death
23  in human -- whether you see an expansion of
24  human death because of narcotics in this
25  country.

Page 352

1    Do you see an expansion here?
2    MS. HENN: Objection to form.
3  QUESTIONS BY MR. PAPANTONIO:
4    Q.   In 2001, would you have -- is
5  there anything appreciable that you see that
6  maybe we ought to know about, 2001?
7    A.   Again, different -- different
8  shadings and different expansions.
9    Q.   And tell me what's significant,
10  sir, about the shading and the expansions.
11  Let's focus on that.
12    Do you see the one right in the
13  middle that's kind of a tan, it's -- let's
14  call it a white. It's says there's 15.9
15  human beings dying from drug overdoses for
16  every 100,000 people in those areas.
17    Do you see that tan area?
18    A.   The scale and the shading?
19    Q.   Yes, sir. Yes, sir.
20    A.   I do see that.
21    Q.   Okay. I want you to watch that
22  as we go, okay? There's two things I'd like
23  you to watch. I'd like you to watch that,
24  which is about middle of the graph, right?
25  The middle of the graft is -- graph is 14 --

Page 353

1  14 to 15.9 human deaths per hundred thousand.
2    And I'd like you to keep your
3  eye on that 30 at the bottom where that's 30
4  human beings dying for every 100,000.
5    So let's go to the next one.
6  The next one is 2002.
7    Would you agree, sir, as you're
8  looking at that, as you're looking at that
9  and making your comparison to 1999, would you
10  agree that there's a substantial expansion of
11  human death in the country in 2002?
12    A.   Yes, there's a continued
13  expansion.
14    Q.   Yes, sir.
15    And would you agree that in
16  each one of those -- each one of those areas
17  where we have some color beyond the blue that
18  you had -- that your company was distributing
19  in those areas?
20    A.   Sorry, can you rephrase that?
21    Q.   Yeah, I'm trying to take the
22  blue out right now. I'm going to talk about
23  the blue in just a minute.
24    A.   Okay.
25    Q.   But when we're talking about

Page 354

1 human death where the brown is involved and
2 human death where the tan is involved, you
3 would agree you had a distribution area --
4 you distributed your narcotics in those
5 areas, correct?
6          MS. HENN:  Objection to form.
7          THE WITNESS:  Yes, we have a
8     nationwide distribution model.
9 QUESTIONS BY MR. PAPANTONIO:
10     Q.    Yes, sir, that's what I'm
11 trying to figure out.
12          All right.  Now, the next
13 thing -- that's 2002, and then we have 2003.
14          And in 2003, do you still
15 continue to see an expansion of human death
16 from narcotic overdoses taking place in the
17 United States?  2003.
18     A.    Yes.
19     Q.    And in those areas, those would
20 be areas that McKesson would have distributed
21 narcotics, correct?
22     A.    Again, we distribute
23 nationwide, yes.
24     Q.    When did you start distributing
25 narcotics?  What year?

Page 355

1          MS. HENN:  Objection to form.
2          THE WITNESS:  I'm not 100
3     percent sure.
4 QUESTIONS BY MR. PAPANTONIO:
5     Q.    It was around 1999, wasn't it?
6          MS. HENN:  Objection to form.
7 QUESTIONS BY MR. PAPANTONIO:
8     Q.    Do you know?
9     A.    I don't know.
10     Q.    Okay.
11     A.    I actually don't know.
12     Q.    I'll show you more details on
13 that, but I want to go through this map.
14          Let's go through 2004.  You see
15 an expansion of human death on that map in
16 2004?
17          Are you able to see an
18 appreciable difference between 1999 where
19 people were dying and 2004 where people were
20 dying from narcotic overdoses in the United
21 States?
22     A.    Yes.
23     Q.    All right.  And you would agree
24 that in each one of those areas where you can
25 see an appreciable difference, that your

Page 356

1 company was distributing in those areas,
2 correct?
3     A.    We distribute, again,
4 nationwide.
5     Q.    And then in 2005, you start
6 seeing -- do you -- can you -- it may just be
7 me, but do you start seeing there's even an
8 expansion between New Mexico and California,
9 that it seems to be more and more growing in
10 those areas on the West Coast?
11          Do you see that expansion, sir?
12          If you don't, it might just be
13 my imagination, but it looks like there's an
14 expansion of human death between New Mexico
15 and California.
16          MS. HENN:  Objection to form.
17 QUESTIONS BY MR. PAPANTONIO:
18     Q.    Correct?
19     A.    I can see the shading
20 differences, yeah.
21     Q.    Yeah.
22          And also, if you take -- take a
23 close look around.  Look around where West
24 Virginia is.  You see we started off with
25 just kind of that brown area and then we had

Page 357

1 blue?  You see the tan that's expanding?
2          MR. PAPANTONIO:  Could you put
3     a circle around that, Corey?
4 QUESTIONS BY MR. PAPANTONIO:
5     Q.    You see how that's expanding?
6 Even right around West Virginia there's an
7 expansion area there?
8     A.    I do.
9     Q.    Okay.  In -- after we're done
10 with this, I'm going to be talking about some
11 areas in West Virginia that were affected.
12          We've talked about Landover and
13 Lakeland and Aurora, Salt Lake City.  There's
14 some areas we haven't talked about, and I
15 want to talk to you about West Virginia.
16          And do you know approximately
17 where the pharmacy -- do you know where
18 Kermit, West Virginia, is there?
19     A.    I don't know its exact location
20 in West Virginia, but --
21     Q.    You're familiar with what
22 happened in Kermit?
23     A.    I am.
24     Q.    Okay.  We'll talk about that in
25 just a minute, but let's go through this map.

Page 358

1    Okay.  The next one is 2006.
2    Do you have any kind of
3  appreciation in what the expansion of human
4  death was in 2006 when you compare it to
5  2000 -- to 1999?
6    MS. HENN:  Objection to form.
7    THE WITNESS:  Again, it
8  continues to expand.
9  QUESTIONS BY MR. PAPANTONIO:
10   Q.   Yeah.  If I see some and you
11  don't see it, feel free to tell me.  I say,
12  you know, I may be seeing something that you
13  don't see, and that's fair enough.  We see
14  things different.
15    But do you see where even that
16  area around West Virginia is continuing to
17  expand as far as human death?
18    MS. HENN:  Objection to form.
19  QUESTIONS BY MR. PAPANTONIO:
20   Q.   I'm in 2006.
21   A.   Oh, in 2006?
22   Q.   Yes, sir.
23   A.   Yeah.
24   Q.   When you make that comparison,
25  can you tell an appreciable difference in the

Page 359

1  expansion even beyond 2005?
2    A.   I can see a difference, a few
3  more counties shaded different colors.
4    Q.   Yes, sir.
5    Okay.  And as we go forward --
6  let's continue.  2007, you see an expansion
7  there, don't you?  Look at that West Virginia
8  area.
9    MR. PAPANTONIO:  Circle that
10   West Virginia area for me, would you,
11   Corey?  And then also circle that
12   brown area out west.
13    Do you know where that is?  See
14   that big brown area out west next
15   to -- see that?  There you go.
16  QUESTIONS BY MR. PAPANTONIO:
17   Q.   Did you have -- you had
18  distribution sites in each -- each area
19  that's circled there, you had distribution
20  sites, right?
21   A.   We do.
22   Q.   Okay.  And you know what?  Just
23  for matter of time, let's go ahead -- let me
24  just go ahead and show you what -- let me
25  show you what 2016 looks like.

Page 360

1    MR. PAPANTONIO:  How about
2  putting up 2006 for me, would you?
3    And what I'd like to you do if
4  you could -- is there any way I could
5  get a comparison between 2016 and a
6  comparison between 2009 up on the
7  screen?  Okay.
8  QUESTIONS BY MR. PAPANTONIO:
9    Q.   Do you see a difference between
10  19 -- excuse me, 1999 and 2016?  You see
11  how -- 2016 is the expansion of human death
12  in the United States.
13    A.   Clearly I see the difference.
14    MS. HENN:  Objection to form.
15  QUESTIONS BY MR. PAPANTONIO:
16   Q.   You see a clear difference
17  there.
18    And not only that, but do you
19  also appreciate the fact that of the brown
20  area that has expanded, it is -- that's area
21  that is 30 -- that brown area is 30 human
22  lives per every 100,000 people and -- you see
23  that?
24    A.   I do.
25    Q.   And, sir, I'm not suggesting

Page 361

1  this is -- what year did you get with the
2  company?
3    A.   2014.
4    Q.   And it appears to me that what
5  you did when you came to the company is you
6  did -- you did due diligence on what had
7  occurred before you got there.  As I listened
8  to your testimony this morning, it sounded
9  like you actually did due diligence to figure
10  out how you could do your job, correct?
11    MS. HENN:  Objection to form.
12    THE WITNESS:  Yes, and I had a
13   previous job in which I was doing -- I
14   was focused on diversion and these
15   trends as well.
16  QUESTIONS BY MR. PAPANTONIO:
17   Q.   But you feel like there were
18  certain things that my partner went through
19  with you, some of those documents that nobody
20  had ever shown to you; is that a fair
21  statement?
22    MS. HENN:  Objection to form.
23    THE WITNESS:  There were a few
24   that I hadn't seen.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1 QUESTIONS BY MR. PAPANTONIO:
2     Q.    Yeah.
3          And in order for you to do your
4 job properly, sir, isn't it true that you
5 have to have information?  Correct?
6          In order for you to do your
7 job, the people -- you have to know what
8 happened with the people that came before
9 you, correct?
10     A.    That's part of it, correct.
11     Q.    What did they do is the point.
12 And I had the sense that you did that before
13 you got to the company, true?
14          MS. HENN:  Objection to form.
15          THE WITNESS:  Mostly while in
16     my early stages of the company where I
17     could ask questions and learn.
18 QUESTIONS BY MR. PAPANTONIO:
19     Q.    Yes, sir.
20          All right.  The -- we talked
21 about -- earlier we talked about a hierarchy,
22 and I think it was on -- I think it was on
23 document 7 -- well, it was number 41.  If you
24 look at 41, my partner, Troy, went over
25 details about what the hierarchy is with the

Page 363

1 company.  And it -- 795 is my document, but I
2 think it was marked as 41.
3          Well, let me just ask you --
4 you don't have to go there.  It's okay.  I
5 can just ask you.
6          The structure is Nate Hartle
7 would be senior director.  Underneath you
8 would be Michael Oriente and a guy named
9 Micheal Bishop and Jay Es -- what is it,
10 Espaillat?
11     A.    Espaillat.
12     Q.    Espaillat.
13          And then you've got another
14 one, Adam Palmer.
15     A.    Palmer, right.
16     Q.    As a matter of fact, when you
17 got there to the company, you took a look at
18 some of these folks that were in charge of
19 trying to make sure that -- well, you took a
20 look at the performance of some of these
21 other people that were working under you,
22 right?
23          MS. HENN:  Objection to form.
24          THE WITNESS:  I did as I built
25     the team.

Page 364

1 QUESTIONS BY MR. PAPANTONIO:
2     Q.    Okay.  And one thing that
3 you --
4          MR. PAPANTONIO:  Would you put
5     up -- would you put up photograph --
6     this is -- this is a photograph of
7     Mr. Oriente, and I'm putting it up
8     there because the jury has seen his
9     deposition, and I just want to make
10     sure they know we're talking about the
11     same person.
12          Put up 1557, please.
13          MS. HENN:  And, Counsel, could
14     you please mark it for the record, a
15     demonstrative?
16          MR. PAPANTONIO:  Yeah, we'll
17     mark it as a demonstrative.  What is
18     it?
19          Okay.  Well, excuse me, 1627.
20     1627.  Could you put that up on the
21     screen?
22          MS. HENN:  Will you please mark
23     it with a sticker?
24          MR. PAPANTONIO:  We will mark
25     it.  We will mark it.

Page 365

1          MS. MOORE:  McKesson-Hartle
2     149.
3          (McKesson-Hartle Exhibit 149
4     marked for identification.)
5 QUESTIONS BY MR. PAPANTONIO:
6     Q.    That fellow worked for you,
7 didn't he?
8     A.    He works for me, correct.
9     Q.    And he worked at a place -- you
10 remember all of the discussion about Landover
11 that you had with my partner today?
12     A.    Correct.
13     Q.    That's where he was -- he was
14 director of Landover --
15          MS. HENN:  Objection to form.
16 QUESTIONS BY MR. PAPANTONIO:
17     Q.    -- right?  That was a
18 distribution center.
19     A.    Right.
20     Q.    He was a director of Landover,
21 correct?
22     A.    He was in that facility, yes.
23     Q.    Yeah.
24          And he was the head guy in
25 charge in Landover, true, or were you also

Page 366

1 involved with Landover?
2        MS. HENN:  Objection to form.
3        THE WITNESS:  I was not.
4 QUESTIONS BY MR. PAPANTONIO:
5    Q.    Yeah, Landover had already been
6 closed by the time you got there to the
7 company, right?
8    A.    Yes.
9    Q.    And it was closed, sir, because
10 there were so many violations of law that
11 were coming out of Landover.
12        MS. HENN:  Objection to form.
13 QUESTIONS BY MR. PAPANTONIO:
14    Q.    You know that it was closed in
15 2012 because of that, right?
16        MS. HENN:  Objection to form.
17        THE WITNESS:  I know that it
18    was closed.
19 QUESTIONS BY MR. PAPANTONIO:
20    Q.    It was closed 2012, right?
21    A.    If that's the specific time
22 frame before I got there.
23    Q.    Yeah.  Yes, sir, it's 2012.
24        And this guy, this Oriente who
25 we're looking at right here, he was the one

Page 367

1 in charge of making the decisions about the
2 sale of narcotics from your company to
3 pharmacies in the Landover -- I mean, out of
4 the Landover facility, right?
5        MS. HENN:  Objection to form.
6        THE WITNESS:  I believe that's
7    true.
8 QUESTIONS BY MR. PAPANTONIO:
9    Q.    And after it was closed, where
10 did you -- where did he go, do you know?
11        MS. HENN:  Objection to form.
12        THE WITNESS:  He became a
13    director of regulatory affairs.
14 QUESTIONS BY MR. PAPANTONIO:
15    Q.    Okay.  And could you -- I'm
16 sorry, go ahead.
17    A.    He was a director of regulatory
18 affairs.  He ultimately came to the RNA team.
19    Q.    He's still there.  He's still
20 there, isn't he?
21    A.    He is.
22    Q.    He's still making decisions
23 about the sale of narcotics to people all
24 over this country, right?  True?
25        MS. HENN:  Objection to form.

Page 368

1        THE WITNESS:  He performs due
2    diligence and makes threshold
3    decisions, yes.
4 QUESTIONS BY MR. PAPANTONIO:
5    Q.    And you've got a lot of
6 confidence in his ability to do that, right?
7    A.    I do have confidence in his
8 ability.
9    Q.    Why do you have so much
10 confidence in his ability?
11        Good integrity?  Do you think
12 he has good integrity?
13    A.    I believe so.
14    Q.    How about Bishop, good
15 integrity?
16        MS. HENN:  Objection to form.
17        THE WITNESS:  I know we'll talk
18    about Bishop before.  I've --
19    performance -- did some performance
20    management with him.
21 QUESTIONS BY MR. PAPANTONIO:
22    Q.    Good integrity?
23        Integrity matters in your
24 company, doesn't it?
25        MS. HENN:  Objection to form.

Page 369

1        THE WITNESS:  It does.
2 QUESTIONS BY MR. PAPANTONIO:
3    Q.    Don't you even have -- don't
4 you even have little jingle about integrity?
5 What is -- some kind of mission statement.
6 Do you know what it is?
7        MS. HENN:  Objection to form.
8 QUESTIONS BY MR. PAPANTONIO:
9    Q.    What is that mission statement
10 about integrity?
11    A.    The ICARE principles.
12    Q.    ICARE, that's right.
13        And ICARE, the first thing in
14 it is integrity, right?
15    A.    Right.
16    Q.    And integrity really matters
17 when you're dealing with narcotics, the sale
18 of narcotics, around the country.  That's
19 pretty important, isn't it?
20    A.    It is.
21    Q.    And as a matter of fact, it's
22 such -- it is such part of your mission
23 statement that you actually put it on your
24 documents, the -- what do you call it?  I
25 what?

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1    A.    It's called ICARE.
2    Q.    ICARE.
3          And it's called the ICARE
4  program, and that's the mission statement for
5  your company, right?
6          MS. HENN:  Objection to form.
7  QUESTIONS BY MR. PAPANTONIO:
8    Q.    It's important, isn't it?
9    A.    It's important.
10   Q.    Because if integrity starts
11 failing, then you have people that might be
12 out there breaking the law with narcotics,
13 correct?
14         MS. HENN:  Objection to form.
15         THE WITNESS:  It's a
16    possibility you could have people
17    breaking the law, but I wouldn't
18    characterize it that way.  Integrity
19    is absolutely important.
20 QUESTIONS BY MR. PAPANTONIO:
21   Q.    All right.  And so --
22   A.    That's why --
23   Q.    I'm sorry, go ahead.  Are you
24 finished?
25   A.    We'll talk about it later, I'm

Page 371

1  sure.
2    Q.    Well, let's go ahead and talk
3  about it right now, okay?
4          You actually --
5          MR. PAPANTONIO:  Could you put
6  up -- could you put up 1564?
7          You're going to have mark that
8    for them.  It's 1564, and I don't know
9    what exhibit list -- what the number
10   is going to be.
11         (McKesson-Hartle Exhibit 161
12   marked for identification.)
13 QUESTIONS BY MR. PAPANTONIO:
14   Q.    Why do you --
15         MS. MOORE:  McKesson-Hartle
16   161.
17 QUESTIONS BY MR. PAPANTONIO:
18   Q.    Let me say something clear
19 here.  I'm not questioning your integrity --
20   A.    Right.
21   Q.    -- okay, just so you know that.
22         But you have to evaluate people
23 who work with you, don't you?
24   A.    I do.
25   Q.    And if there's a weak link,

Page 372

1  that weak link, if it's in the northern
2  United States or if the weak link is the
3  western United States, that weak link has an
4  impact on whether or not dangerous narcotics
5  can be wrongfully diverted in this country,
6  true, if people aren't doing their job?
7          MS. HENN:  Objection to form.
8          THE WITNESS:  Could you
9    rephrase that, please?
10 QUESTIONS BY MR. PAPANTONIO:
11   Q.    Yes, sir.
12         If -- you have to evaluate
13 whether people are doing their job in your
14 role?  I mean, you're top of the food chain,
15 aren't you?
16         MS. HENN:  Objection to form.
17         THE WITNESS:  I have to
18    evaluate people, certainly.
19 QUESTIONS BY MR. PAPANTONIO:
20   Q.    Yeah.  And you try to do it
21 honestly --
22   A.    I do.
23   Q.    -- right?
24         Because you try to evaluate
25 those people according to what your mission

Page 373

1  statement is, I take it?
2    A.    I do.
3    Q.    Okay.  Well, let's look at this
4  evaluation.  This is -- this is employee
5  Micheal Bishop.
6          Do you see that?
7    A.    I do.
8    Q.    First paragraph says, "Micheal
9  Bishop" -- and tell me again, what does
10 Micheal Bishop do?
11   A.    He's a regulatory affairs
12 manager.
13   Q.    Yeah.
14         And he was fired from the
15 company, right?
16   A.    He was not.
17   Q.    He wasn't fired?
18   A.    He left on his own.
19   Q.    Would you have fired him?
20         Given the chance, would you
21 have fired Micheal Bishop?
22         MS. HENN:  Objection to form.
23 QUESTIONS BY MR. PAPANTONIO:
24   Q.    You were his manager.
25         Would you have fired Micheal

Page 374

1 Bishop because of his conduct?
2          MS. HENN:  Objection to form.
3 QUESTIONS BY MR. PAPANTONIO:
4      Q.    Before we go into this.
5      A.    I will explain once we get into
6 it the performance improvement plan process,
7 and that is the likely outcome that was going
8 to happen.
9      Q.    Would you have fired him?
10     A.    Yes.
11     Q.    Okay.  That's what I'm
12 wondering.
13          And how long was he with the
14 company?
15     A.    15 years or so.
16     Q.    And that was mostly before you
17 got there, to be -- you know, let's be clear
18 about it.
19     A.    Right.
20     Q.    He was there before you were
21 there?
22     A.    Right.
23     Q.    He was doing things,
24 distributing in his job in distribution, that
25 you had nothing to do with.  Can we agree to

Page 375

1 that?
2          MS. HENN:  Objection to form.
3 QUESTIONS BY MR. PAPANTONIO:
4      Q.    Before you got there,
5 obviously.
6      A.    Absolutely.
7      Q.    All right.  So you took a look
8 at Micheal Bishop.  It says, "Micheal Bishop
9 has not been meeting expectations in his
10 position as a regulatory affairs manager.
11 Micheal has not demonstrated the expected
12 level of accuracy, quality of work or
13 understanding of the program needed in his
14 role."  That's the first sentence.
15          Now, I want to go to a couple
16 parts here because I want to ask you a
17 specific question about a couple of parts.
18     A.    Okay.
19     Q.    If you go down to the bottom of
20 the -- the bottom of that page, Mr. Hartle,
21 it says, "The regular feedback has continued
22 to be in the area of accuracy/quality of
23 work, communication, critical thinking and
24 accountability."
25          You would agree that every one

Page 376

1 of those things are vitally important when a
2 person's making a decision about the
3 distribution drugs -- of narcotic drugs in
4 this country.  That's important, isn't it?
5          MS. HENN:  Objection to form.
6 QUESTIONS BY MR. PAPANTONIO:
7      Q.    Every one of those things are
8 important.
9          In a minute, you know what I'm
10 going to do?  I'm going to let you say what
11 you want to say, but how about staying with
12 me, just let me ask you some questions.
13     A.    I will.  I will say that that
14 is important.
15     Q.    Okay.
16     A.    But I do want to clarify one
17 thing, and I'll explain more later.
18     Q.    That's okay.  I don't -- I want
19 you to explain it.
20     A.    He did not have the
21 decision-making authority during this time --
22     Q.    Okay.  Let me talk --
23     A.    -- to make decisions.
24     Q.    Let me talk some more.  Okay?
25     A.    Okay.

Page 377

1      Q.    It says, "I have discussed with
2 Micheal the importance of his work being
3 accurate because of the risk associated with
4 the setting of regulatory thresholds."
5          Do you see that?
6      A.    I do.
7      Q.    He was in charge of regulatory
8 thresholds, wasn't he?
9          MS. HENN:  Objection to form.
10          THE WITNESS:  He played a role
11 in pulling information and data.
12 QUESTIONS BY MR. PAPANTONIO:
13     Q.    Right.
14          And that's what my partner,
15 Troy Rafferty, has been asking you about all
16 morning?
17     A.    Right.
18     Q.    Even things that you didn't
19 have anything to do with, but he's been
20 asking you questions about regulatory
21 threshold because that's so vitally
22 important, right?
23          MS. HENN:  Objection to form.
24          THE WITNESS:  We did have those
25 conversations.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1 QUESTIONS BY MR. PAPANTONIO:
2      Q.    Yes, sir.
3           And so -- so here we see that
4 we got a guy that you agree should have been
5 fired.  When -- he should have been fired
6 years ago, before -- before you did this.  He
7 should have been fired a long time ago,
8 right?
9           MS. HENN:  Objection to form.
10          THE WITNESS:  I can't say that
11      exactly.
12 QUESTIONS BY MR. PAPANTONIO:
13      Q.    Okay.  Well, you don't have to
14 say it.  I'm just asking the question, and
15 you feel free to respond to the question.
16          It says -- the next page, if
17 you go to it, it says -- it says down at the
18 bottom of that second page:  "After being on
19 the team for almost three years, Micheal has
20 not demonstrated a complete understanding of
21 the CSMP, and he continued to make basic
22 mistakes or inaccurately communicate routine
23 processes or requirements."
24          Correct?
25          MS. HENN:  Objection to form.

Page 379

1 QUESTIONS BY MR. PAPANTONIO:
2      Q.    Do you see that down at the
3 bottom?
4      A.    I see it.
5      Q.    Okay.  Then we go to the next
6 one.  It says -- next page, middle of the
7 page, it says, "Immediately after the issue
8 was identified, he admitted to his failure to
9 review the data on a team call.  He changed
10 the IR to remove any information about his
11 role with the data review."
12          Do you see that?
13          MS. HENN:  Let's just have that
14      read back or if you could repeat it,
15      please, because we're having --
16          MR. PAPANTONIO:  Yeah, it
17      says -- I feel like I'm in a clown car
18      here.  Okay?
19          MS. HENN:  Thank you, sir.
20 QUESTIONS BY MR. PAPANTONIO:
21      Q.    It says, "Immediately after the
22 issue was identified and he admitted to his
23 failure to review the data on a team call, he
24 changed the IR."
25          What is the IR?

Page 380

1      A.    Investigative report.
2      Q.    Yeah.  He actually changed it,
3 didn't he?
4      A.    He did.
5      Q.    He changed it.
6           And that's unlawful to do that.
7 That's breaking the law, correct?
8           MS. HENN:  Objection to form.
9 QUESTIONS BY MR. PAPANTONIO:
10      Q.    That's actually breaking the
11 law.  He can't go changing reports like that,
12 can he?
13          MS. HENN:  Objection to form.
14          THE WITNESS:  I wouldn't
15      characterize that as breaking the law.
16 QUESTIONS BY MR. PAPANTONIO:
17      Q.    Yeah, if he --
18      A.    I mean, he had an explanation
19 that he talked through in terms of what he
20 thought he was doing.
21      Q.    Right.
22          But if he did it and you
23 question his integrity, that's a problem,
24 isn't it?
25      A.    That's why I was holding him

Page 381

1 accountable.
2      Q.    Okay.  And he said he "changed
3 the IR to remove any information about his
4 role with the data review," right?
5           That's what it says, right?
6      A.    That's what it says.
7      Q.    And then if we go to -- I'm not
8 done with Micheal Bishop, so stay with me
9 just a minute here.
10          MR. PAPANTONIO:  Show them,
11      please, 1579.
12 QUESTIONS BY MR. PAPANTONIO:
13      Q.    Now, I want to -- you
14 understand before you got -- before you got
15 to McKesson, there was a lot of water under
16 the bridge about the sale of narcotics all
17 over the country.  There had been a lot of
18 things that occurred with the company in the
19 sale of narcotics --
20      A.    Right.
21      Q.    -- true?
22          MS. HENN:  Objection to form.
23 QUESTIONS BY MR. PAPANTONIO:
24      Q.    Matter of fact, you weren't
25 there in 2008 when they were punished for

Page 382

1 not -- for breaking the law. They were
2 punished for not reporting suspicious orders.
3           You weren't there when that
4 happened, right?
5           MS. HENN: Objection to form.
6           THE WITNESS: I was not there.
7 QUESTIONS BY MR. PAPANTONIO:
8    Q.    But Mr. Bishop was, wasn't he?
9    A.    He was.
10   Q.    Yeah. And Mr. Oriente was,
11 wasn't he?
12   A.    He was.
13   Q.    Okay. Let's go on to this --
14          MS. MOORE: McKesson-Hartle
15 162.
16          (McKesson-Hartle Exhibit 162
17 marked for identification.)
18 QUESTIONS BY MR. PAPANTONIO:
19   Q.    And, sir, here, this is Micheal
20 Bishop, and again, you're doing your job
21 here, correct? You're trying to evaluate
22 this person and say, you know, "What kind of
23 job are they doing. Do we need them around
24 here," right?
25   A.    Correct.

Page 383

1    Q.    All right. So it says,
2 "Micheal Bishop started with regulatory
3 affairs as a manager in the fall of 2014."
4          It goes, "At the time" -- I'm
5 sorry. I'm right here right now. I'm in the
6 middle of the second paragraph.
7          "At the same time, I was taking
8 on more responsibility for the larger
9 regulatory affairs team, so in the fall
10 of 2016 we changed reporting relationships.
11 In partnership with my SVP and HR partner, we
12 moved Micheal Bishop over to become a direct
13 report of DRA Michael Oriente."
14          Was that a move up for Bishop?
15   A.    No. No.
16   Q.    Okay. But he was working with
17 Oriente, correct, Michael Oriente?
18   A.    He was.
19   Q.    So he would have been working
20 in Landover? Landover? Was he working
21 Landover?
22   A.    No.
23          MS. HENN: Objection to form.
24          THE WITNESS: No. No.
25

Page 384

1 QUESTIONS BY MR. PAPANTONIO:
2    Q.    Okay. So then we go -- down
3 here at the bottom it says, "Our continued
4 concerns were related to accuracy" -- do you
5 see that? -- "quality of work, communication,
6 listening, thinking before he acts, a lack of
7 understanding our core CSMP basics, and
8 taking accountability to his actions."
9          It says, "More recently I have
10 continued to question Micheal's integrity, as
11 many times during the conversation or team
12 calls he deflects blame to others. He rarely
13 takes accountability for his actions, and he
14 often shares conflicting messages to his --
15 or changes his story. Recently an issue
16 surfaced where we know he falsified a company
17 document to hide a mistake, and he made our
18 nonexempt team member uncomfortable."
19          Now, let me stop right there.
20 You wrote this report so somebody up above
21 you could review it, right?
22          You didn't write this for
23 yourself, did you?
24          MS. HENN: Objection to form.
25

Page 385

1 QUESTIONS BY MR. PAPANTONIO:
2    Q.    You wanted somebody else in
3 management to take a look at this report,
4 didn't you?
5          MS. HENN: Objection to form.
6          THE WITNESS: I wrote it for
7    both. I wrote it to document as I had
8    been coaching him --
9 QUESTIONS BY MR. PAPANTONIO:
10   Q.    Right.
11   A.    -- and holding him accountable,
12 and I also wrote it to be able to share with
13 our employee relations teams and --
14   Q.    Right.
15   A.    -- as I escalated issues.
16   Q.    And so you wanted management to
17 understand what kind of person they'd had out
18 there on the field for -- how many years was
19 it he was on the field?
20          MS. HENN: Objection to form.
21 QUESTIONS BY MR. PAPANTONIO:
22   Q.    How many years?
23   A.    About 15, but he was located in
24 a centralized -- he wasn't in the field. He
25 was in a centralized headquarters-like office

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1  down in Texas.
2      Q.    Oh, he was in headquarters?
3      A.    He was in a location down in
4  Texas that was a headquarters-like location.
5      Q.    All right. So tell me, after
6  you talked about his lack of integrity, how
7  long did Micheal -- how long did Mr. Bishop
8  stick around?
9          MS. HENN: Objection to form.
10 QUESTIONS BY MR. PAPANTONIO:
11     Q.    How many years? How many years
12 did he stay with McKesson after that report
13 was written about his integrity?
14         MS. HENN: Objection to form.
15         THE WITNESS: That happened in
16     2017, and he left in early 2018.
17 QUESTIONS BY MR. PAPANTONIO:
18     Q.    And did you recommend that he
19 leave?
20     A.    When he left?
21     Q.    Yeah.
22     A.    He left on his own, but I had
23 recommended that in another couple weeks when
24 the performance period ran out that we would
25 terminate his employment.

Page 387

1      Q.    And then -- so you made the
2  recommendation he be fired, right?
3      A.    That's where it was heading.
4      Q.    But he had been there 15 years
5  prior to that time?
6      A.    Correct.
7      Q.    And so in those 15 years -- did
8  you go back and review any work that he had
9  done in 15 years to see whether there was a
10 pattern to him raising thresholds
11 inappropriately or failing to write
12 suspicious orders inappropriately or
13 distributing areas in excess of volume?
14         Did you go back and find out
15 how much damage, if any, Mr. Bishop had done
16 throughout the United States?
17         MS. HENN: Objection to form.
18         THE WITNESS: He wasn't in the
19     regulatory affairs department prior to
20     that.
21 QUESTIONS BY MR. PAPANTONIO:
22     Q.    Yeah.
23     A.    So I did not go back.
24     Q.    What was he doing prior to
25 that?

Page 388

1      A.    He was on a variety of
2  different teams.
3      Q.    Was he in sales?
4      A.    He was on a centralized support
5  function. It wasn't sales.
6      Q.    Supporting sales, though,
7  right? He was supporting a sales
8  organization that sold all over the United
9  States, correct?
10         MS. HENN: Objection to form.
11 QUESTIONS BY MR. PAPANTONIO:
12     Q.    Yes?
13     A.    Technically he was in a
14 support.
15     Q.    Yeah.
16         So he was one of the people
17 that were -- that were technically supporting
18 the -- technically supporting the sales force
19 in the United States for McKesson, correct?
20         MS. HENN: Objection to form.
21 QUESTIONS BY MR. PAPANTONIO:
22     Q.    Yes?
23     A.    He was supporting different
24 components of the broader organization.
25     Q.    All right. Well, let's -- you

Page 389

1  were asked earlier about -- I don't know what
2  this is. It's this map. It's 88 -- mine is
3  872. It's the McKesson --
4          MR. PAPANTONIO: What was that
5      actually marked?
6          MS. MOORE: McKesson-Hartle 100
7      is his copy.
8          MR. PAPANTONIO: Okay. This is
9      McKesson-Hartle 100.
10         (McKesson-Hartle Exhibit 100
11     marked for identification.)
12 QUESTIONS BY MR. PAPANTONIO:
13     Q.    Sir, I was -- I listened to you
14 when you said that you thought there was a
15 responsibility to know what's going on
16 news-wise around the country. If you know
17 what a reporter is saying about a particular
18 area, that's important information to you,
19 and I think you said -- you explained that to
20 my partner. You said, yes, that's important;
21 yes, I keep up with it; no, I can't tell you
22 what everybody else does, but I do. That's I
23 think what you said.
24     A.    Correct.
25     Q.    If I didn't characterize that

Page 390

1  right --
2         MS. HENN:  Objection to form.
3  QUESTIONS BY MR. PAPANTONIO:
4     Q.    Right?
5     A.    Yeah, as part of my entire
6  career, I want to stay in tune with --
7     Q.    And you saw where my partner
8  actually showed you that you were doing what
9  the DEA told you to do, which was to stay
10 abreast of what the newspaper reports are in
11 any given area about problems that there may
12 be with opioids.
13        MS. HENN:  Objection to form.
14 QUESTIONS BY MR. PAPANTONIO:
15    Q.    Do you remember that section
16 that he showed you where the DEA said this is
17 something you should do?
18    A.    Correct.
19    Q.    Okay.  So did you know to do
20 that because the DA directed you -- DEA
21 directed you or did you just think that was a
22 good idea to stay abreast of what was going
23 on with news reports from around the country?
24        MS. HENN:  Objection to form.
25        THE WITNESS:  That's what I do

Page 391

1  as part of my information gathering.
2  QUESTIONS BY MR. PAPANTONIO:
3     Q.    Okay.  Explain to the jury,
4  because this might be the first time they
5  hear this.  Explain to the jury why that
6  information gathering of staying abreast of
7  what newspaper articles are reporting might
8  be important.
9         Go ahead, Mr. Hartle.
10    A.    Okay.  Could you ask that
11 question again?
12    Q.    Yes, sir.
13        Explain to the jury, if you
14 would, why this process that -- I don't want
15 to judge whether you did it on your own or
16 whether the DEA told you to do it, but this
17 process of where you think gathering
18 information from news sources is important.
19 Explain to them why that's important.
20        MS. HENN:  Objection to form.
21        THE WITNESS:  It's important to
22    help understand the landscape, what's
23    going on, different -- different
24    information you can gain to help you
25    better run your program or better

Page 392

1     understand what's happening.
2  QUESTIONS BY MR. PAPANTONIO:
3     Q.    Yes, sir.  Okay.  Good.
4         As a matter of fact, in this
5  document you have in front of you, if you
6  will take a look at it -- by the way, did
7  you -- did you have anything to do in
8  preparing this document?
9         Does this look like something
10 you prepared?  It's a McKesson document.
11    A.    I did not prepare this.  When I
12 came on board, it was being used and shared,
13 and I used --
14    Q.    Okay.
15    A.    -- versions of that with
16 chains.
17    Q.    And as a matter of fact, this
18 document actually reiterated what you, I
19 think -- from what I'm understanding what
20 you're saying, this document reiterated what
21 you were doing on your own, and that is
22 seeking out information in various news
23 sources to find out what's going on in the
24 country.
25        This document -- if you'll go

Page 393

1  to .3.  See that .3 there?  You see it
2  actually goes -- it actually does what you're
3  talking about.  This document actually is a
4  presentation that's being made to somebody
5  through McKesson.
6         Do you know who this
7  presentation would be made to?
8         MS. HENN:  Objection to form.
9  QUESTIONS BY MR. PAPANTONIO:
10    Q.    Would it be salespeople?
11        MS. HENN:  Objection to form.
12        THE WITNESS:  I think it was
13    used in a variety of ways.  I know it
14    was given to, you know, our chain
15    partners.  I've given part of this
16    presentation, versions of it, to
17    external partners as well.
18 QUESTIONS BY MR. PAPANTONIO:
19    Q.    Okay.  And one thing -- I'm
20 sorry, external partners would be your chain
21 partners?
22    A.    Chain partners, sure.
23    Q.    Okay.  Those are people you
24 sold to, just so the jury understands.  Those
25 are your customers?

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1  A.  Customers.
2  Q.  All right.  And so in there,
3  you actually -- this is -- whether you
4  accomplished this -- I don't know whether you
5  accomplished it or not, but this document
6  actually goes -- and it actually says,
7  "Current Landscape."  You see at the top of
8  it, "Current Landscape, Epidemic."  And then
9  it says, "Every component of the distribution
10 chain has been breached."
11       Do you see that?
12 A.  I do.
13 Q.  That's McKesson saying that,
14 and this is what you would talk about when
15 you would make presentations.  You personally
16 would talk about these very things we're
17 about to talk about.
18      MS. HENN:  Objection to form.
19 QUESTIONS BY MR. PAPANTONIO:
20 Q.  "Every component of the
21 distribution chain has been breached."
22      Do you see that?
23 A.  Yeah, exactly.
24 Q.  Okay.  And you see the
25 newspaper articles underneath there?

Page 395

1  A.  I do.
2  Q.  Okay.  The -- here's what --
3  here's what I want to be clear about, because
4  I'm not -- it's just not clear to me as I
5  listened to everything.  Maybe you can clear
6  this up.
7       If you've got -- let's say
8  you've got -- let's get Kermit.
9       MR. PAPANTONIO:  Can I get this
10      thing on here just -- we're going to
11      go back to that same document.
12 QUESTIONS BY MR. PAPANTONIO:
13 Q.  Here's Kermit.
14      Now, salespeople for McKesson
15 you have on the ground around, say, Kermit,
16 West Virginia, correct?  They live around the
17 area, true?
18 A.  We have sales --
19      MS. HENN:  Objection to form.
20      THE WITNESS:  -- sales teams
21      out in the field.
22 QUESTIONS BY MR. PAPANTONIO:
23 Q.  Yes, sir.
24      And one thing they do is they
25 drive around in various areas, true?

Page 396

1       I mean, they drive around in
2  the areas where they live, right?
3  A.  True.
4       MS. HENN:  Objection to form.
5  QUESTIONS BY MR. PAPANTONIO:
6  Q.  I mean, we're just using logic
7  here.  But if you have a salesperson on
8  the -- you've got a -- you've got a
9  salesperson here on the -- on the ground,
10 that salesperson is driving around the City
11 of Kermit, if that's who they're servicing,
12 correct?
13      In other words, they live
14 there.  They live in that area, right?
15      MS. HENN:  Objection to form.
16      THE WITNESS:  Or near there,
17      yes.
18 QUESTIONS BY MR. PAPANTONIO:
19 Q.  Or near.  They live there or
20 near there.
21      So if they're driving in the
22 area in a place like Kermit -- and we're
23 going to talk about Kermit in just a minute.
24 But they're able to actually see the
25 newspapers -- let's talk about what they can

Page 397

1  accomplish.
2       A, they can see the news, true?
3  And that's what you've been talking about,
4  the news is important, true?
5       MS. HENN:  Objection to form.
6       THE WITNESS:  True.
7  QUESTIONS BY MR. PAPANTONIO:
8  Q.  And they're able to see if --
9  they're able to drive around and they -- my
10 gosh, they see a pill mill, right?  They see
11 people standing outside a pill mill, right?
12      MS. HENN:  Objection to form.
13 QUESTIONS BY MR. PAPANTONIO:
14 Q.  I mean, if there's a pill mill
15 there, they can see it, true?
16 A.  They could see that.
17 Q.  And as a matter of fact, the --
18 you've actually seen pictures and actually
19 you have given talks, I think, about what
20 these pill mills look like, haven't you?
21      You've actually seen pictures
22 of what these pill mills look like, true?
23 A.  I have.
24 Q.  As a matter of fact, you have a
25 pill mill -- let's draw a pill mill here.

Page 398

1    A pill mill, you'll sometimes
2 see people actually lined up to get into the
3 pill mill sometimes at eight o'clock in the
4 morning, right?
5    A.    You can see that.  I've seen
6 pictures.
7    Q.    Yeah.
8    And you see people in -- out in
9 the parking lot you'll see people and they
10 got -- they've got license tags from Texas,
11 and they got license tags from Florida.
12    They'll have license tags at a
13 pill mill from all over the country, won't
14 they?  That's one of the things you look for
15 in a pill mill, right?
16    A.    You can see that at times, yes.
17    Q.    Yes, sir.
18    And the other thing at a pill
19 mill that this salesperson could ascertain
20 pretty quickly is whether there's -- whether
21 there's being cash exchanged in the mill; in
22 other words, are these people going and
23 buying these pills for cash?
24    They can ascertain that, right?
25 All they got to do is walk in.

Page 399

1    MS. HENN:  Objection to form.
2 QUESTIONS BY MR. PAPANTONIO:
3    Q.    That salesperson in the field
4 around the pill mill could see that firsthand
5 if they wanted to, true?
6    MS. HENN:  Objection to form.
7    THE WITNESS:  They could
8    potentially see that, yes.
9 QUESTIONS BY MR. PAPANTONIO:
10    Q.    Yes, sir.
11    And so that really is one of
12 the responsibilities for -- and I'm coming
13 back to your theory, because I agree with you
14 on your theory and I'm going to talk to you
15 more about it.
16    The theory is that the person
17 in the field actually has a responsibility to
18 know the customer, know the entire area of
19 what he's selling, he or she is selling,
20 correct?
21    A.    Correct.
22    Q.    And if they observed all this,
23 they actually see all this going on, they
24 ought to report it, shouldn't they?  If they
25 see pill mills taking place and they see

Page 400

1 people lined up around the pill mill at eight
2 o'clock in the morning, standing there in
3 their pajamas, with children, waiting to get
4 in, that's something they ought to report to
5 somebody, shouldn't they?
6    MS. HENN:  Object to form.
7 QUESTIONS BY MR. PAPANTONIO:
8    Q.    Yes?
9    A.    They certainly should report
10 it.
11    Q.    Yes, sir.
12    And in this trial, the jury is
13 going to hear about something called notice.
14 You ever heard that term?  And that is,
15 notice is when your company is told,
16 "something's wrong here, and you ought to
17 take action on it."
18    You ever heard that term?
19 Maybe it's not a term you've heard, but I'm
20 just -- I'm curious, have you ever heard the
21 term?
22    MS. HENN:  Objection to form.
23 QUESTIONS BY MR. PAPANTONIO:
24    Q.    You're on notice that
25 something's wrong in Kermit.

Page 401

1    MS. HENN:  Objection to form.
2    THE WITNESS:  I've heard the
3    term "notice."
4 QUESTIONS BY MR. PAPANTONIO:
5    Q.    Okay.  You understand what it
6 is.
7    A.    I do.
8    Q.    Now, just because I've looked
9 at your file and I didn't see any time when
10 you were doing any kind of field work on the
11 ground where you were -- it was your
12 responsibility to observe pill mills, to
13 observe the news that was taking place in
14 these various counties all over the country.
15 I never saw where that was your
16 responsibility.
17    Is that a fair statement, or
18 did I miss is that?
19    I just reviewed your record.
20    MS. HENN:  Objection.
21 QUESTIONS BY MR. PAPANTONIO:
22    Q.    You were never a salesperson?
23    A.    No, that's a fair statement.
24    Q.    Okay.  You went right up to
25 management in regulatory, correct?

Page 402

1  A.   Correct.
2  Q.   But you're familiar with what
3 these salespeople did, true?
4      MS. HENN:  Objection to form.
5      THE WITNESS:  I'm familiar with
6 it.
7 QUESTIONS BY MR. PAPANTONIO:
8  Q.   Okay.  So let's mark that --
9      MS. MOORE:  McKesson-Hartle
10 163.
11      (McKesson-Hartle Exhibit 163
12 marked for identification.)
13 QUESTIONS BY MR. PAPANTONIO:
14  Q.   What I'm going to do here,
15 if -- you might want to keep this document in
16 front of you that I have here.  I'm just
17 going to go through these -- some of these
18 articles that are here, sir.
19      Okay?
20  A.   Okay.
21  Q.   I want to talk to you about
22 them.  And what I want to ask you about since
23 they're all -- these articles that I'm going
24 to go through are actually in your own -- not
25 yours but your company's flyer that I'm

Page 403

1 showing you here right now, okay, the
2 PowerPoint.
3      So the first thing in there is
4 a discussion about CDC.  I think it's on the
5 previous page.  But you would agree that the
6 CDC was an important source of information
7 for your company.  And I want to be careful I
8 say something.  I want to be careful of
9 something.
10      Anytime I say "you," I'm not
11 talking about you, Mr. Hartle.  I'm talking
12 about your company.  So don't be offended by
13 that.  Understand I'm talking about your
14 company.
15      Okay?
16  A.   Okay.
17  Q.   So anytime -- so you understand
18 that one source of information that your
19 company used was the CDC, right?
20  A.   Correct.
21  Q.   Yes?
22      Okay.  And as a matter of fact,
23 that death map that we just went over, that
24 was created by the CDC, correct, where we saw
25 the progression of death from 1999 to -- yes,

Page 404

1 sir, that was created by the CDC.
2  A.   Correct, I believe it was.
3  Q.   Okay.  And this one I want to
4 show you is 1062.
5      MS. MOORE:  McKesson-Hartle
6 102.
7      (McKesson-Hartle Exhibit 102
8 marked for identification.)
9 QUESTIONS BY MR. PAPANTONIO:
10  Q.   You know why I want to go over
11 some facts here right now?  What I want to do
12 here, Mr. Hartle, is I want to review some of
13 this literature, and I just want to see what
14 it is you observed firsthand after you got
15 there.  Nothing you could have --
16      What were you doing before you
17 went for McKesson, work for McKesson?
18  A.   I worked for Target Corporation
19 where I led -- for about 19 years led
20 investigations on a lot of different
21 subjects, different areas, including in
22 health care --
23  Q.   Right.
24  A.   -- in monitoring diversion,
25 monitoring dispensing.

Page 405

1  Q.   You had -- exactly.  You had a
2 long history of doing that.  That's why they
3 hired you and they made you a supervisor --
4  A.   Correct.
5  Q.   -- correct?
6      You did have a lot of
7 experience there.
8  A.   Correct.
9  Q.   But this was kind of moving you
10 into a new area when you went to work where
11 it dealt with the sale of narcotics.  That's
12 the first time you'd actually dealt with the
13 sale of narcotics, correct?
14  A.   Correct.
15      MS. HENN:  Objection to form.
16 QUESTIONS BY MR. PAPANTONIO:
17  Q.   Okay.  So --
18  A.   As a distributor.
19  Q.   Yes, sir, I gotcha.
20  A.   Yeah.
21  Q.   I gotcha.
22      So as we look at this, I want
23 to ask you about what you would agree with,
24 what you knew, some of this information.  I
25 want to find out how much information you had

Page 406

1 as you were proceeding in your job.
2           This is the CDC.  It says, "CDC
3 grand rounds prescription drug overdoses, a
4 US epidemic."
5           Now, what I see here is that
6 this is January 2012.  And I get that you
7 still weren't there in 2012, correct?
8      A.    Correct.
9      Q.    All right.  And it says -- if
10 you look at this first paragraph, this says,
11 in 20 -- in 20 -- "in 2007" -- you see where
12 I am here?  "In 2007" --
13     A.    Yes.
14     Q.    -- "approximately 27,000
15 unintentional drug overdose deaths occurred
16 in the United States, one death every
17 19 minutes."
18          Now, you know, sir, that
19 actually progressed, that number of death
20 actually progressed at -- went higher after
21 2007.  You know that, or do you?
22     A.    I do.
23     Q.    Okay.  It says, "Prescription
24 drug abuse is the fastest growing drug
25 problem in the United States."

Page 407

1           You, I think, have already said
2 that you agreed with that, and I'm not --
3 well, maybe I misunder -- maybe I did.
4           Do you agree with that?  I want
5 to be fair and make sure I got this right.
6           You do agree that at this point
7 this was the fastest growing health problem
8 in the United States?
9      A.    I agree with the literature.
10 I've read these things, yeah.
11     Q.    Okay.  And again, this is not
12 your responsibility at this place.  At this
13 time you're still at Target, correct?
14     A.    Correct.
15     Q.    You don't have anything to do
16 with all this.
17          It says, "The increase of
18 unintentional drug overdose death rates in
19 years" -- and it gives us -- it gives us a
20 figure we can go to, but it -- "has been
21 driven by increased use of a class of
22 prescription drugs called opioid analgesics.
23 Since 2003, more overdose deaths have
24 involved opioid analgesics than heroin and
25 cocaine combined."

Page 408

1           Right?
2           And you're familiar with that.
3 You understood as we just looked at the map,
4 sir, the progression is pretty apparent.  I
5 mean, this is the CDC talking about starting
6 in 2007, but the progression is pretty
7 apparent, isn't it?  It was apparent to you
8 when you got there?
9           MS. HENN:  Objection to form.
10 QUESTIONS BY MR. PAPANTONIO:
11     Q.    You could do a look-back and
12 see the increase in narcotic use?
13     A.    Agree.
14     Q.    All right.  Then if you look at
15 the bottom it says, "Drug distribution
16 through the pharmaceutical supply chain was
17 the equivalent of 96 milligrams of morphine
18 per person in 1997 and approximately
19 700 milligrams per person in 2007, an
20 increase of 600 percent.  That 700 milligrams
21 of morphine per person is enough for everyone
22 in the United States to take a typical
23 5-milligram dose of Vicodin, hydrocodone,
24 every four hours for three weeks."
25           Had you ever seen numbers like

Page 409

1 that where the CDC went as far and said,
2 "Look, not only can we show you the exact
3 progression of all this, but we can actually
4 tell you how it's actually -- what the impact
5 is person to person."
6           If you look at this, this is
7 saying that 700 milligrams of morphine per
8 person is enough for everyone in the United
9 States to take a typical 5-milligram dose of
10 Vicodin.
11          Do you see that?
12     A.    I've seen things put in terms
13 like this before.
14     Q.    All right.  I want to be real
15 clear about something.  You didn't make the
16 decision about things like marketing and
17 sales for your company; is that a safe
18 statement?
19     A.    It's a very safe statement.
20     Q.    Nobody called Mr. Hartle and
21 said, "Hey, what do you think about us doing
22 a marketing program to increase sales?"
23 That's a true statement, isn't it?
24     A.    True.
25     Q.    I didn't see that in your

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1  record.  If it's there, please tell me if it
2  is.
3      A.    It's a true statement.
4      Q.    Yeah, but you know that went
5  on, that there was a marketing effort by
6  McKesson to increase sales by marketing.  You
7  know that, true?
8          MS. HENN:  Objection to form.
9          THE WITNESS:  I know we have a
10  marketing department, sure.
11  QUESTIONS BY MR. PAPANTONIO:
12      Q.    Yes, sir.
13          And they marketed
14  pharmaceutical -- they marketed narcotics,
15  simply put.  Along with other
16  pharmaceuticals, they marketed narcotics.
17          MS. HENN:  Objection to form.
18  QUESTIONS BY MR. PAPANTONIO:
19      Q.    Yes?
20      A.    Pharmaceuticals and narcotics,
21  sure.
22      Q.    Okay.  So the next -- I'm going
23  to continue with some of these articles.  I
24  just want to -- I'm not going to be able to
25  go through the whole thing, but if there's

Page 411

1  something in an article that you say, "Look,
2  I want to talk about this," feel free to do
3  it.
4          This next one -- this next one
5  is document 1620.
6          MS. MOORE:  That would be
7  McKesson-Hartle 148.
8          (McKesson-Hartle Exhibit 148
9  marked for identification.)
10  QUESTIONS BY MR. PAPANTONIO:
11      Q.    You want to take a look at
12  that, Mr. Hartle, and see what you think?
13          This is -- also, everything
14  that I'm doing right now, up to a certain
15  point, and I'll tell you when that point is,
16  this is simply coming from that document that
17  you have in front of you that is McKesson
18  talking about newspaper articles that were
19  important, right?
20          MS. HENN:  Objection to form.
21  I'm sorry, I don't understand what you
22  just said.
23  QUESTIONS BY MR. PAPANTONIO:
24      Q.    Okay.  Well, let me
25  restatement -- let me restate it.

Page 412

1          I'm going to be talking about
2  that -- that PowerPoint, that McKesson
3  PowerPoint, and in there it is -- there's
4  footnotes, there's places where they talk
5  about news articles.  Okay?
6          I'm going to be talking about
7  those, and so as I go forward, that's what
8  I'm trying to tell you.
9      A.    Okay.
10      Q.    This one is called, "Let's Come
11  Together to Solve the Opioid Crisis."
12          MS. HENN:  Counsel, I'm not
13  sure we have the right document.
14          THE WITNESS:  Yeah.  This is a
15  Wikipedia page.
16          MR. PAPANTONIO:  Oh, wait,
17  wait.  I'm sorry.  1561.  Give him --
18  hold that because I'm going to get to
19  that in just a minute.  1561.
20          MS. MOORE:  McKesson-Hartle
21  145.
22          (McKesson-Hartle Exhibit 145
23  marked for identification.)
24          MR. PAPANTONIO:  Could we blow
25  that up?  He's not going to be able to

Page 413

1  see that.  I can't even read the
2  thing.  If you could read that.  I
3  can't even read it on the paper.
4  Let's see if we can blow it up on the
5  screen.
6  QUESTIONS BY MR. PAPANTONIO:
7      Q.    Did you know that McKesson did
8  an -- they did an ad in the Wall Street
9  Journal?  Do you remember this ad they did?
10          This is after they had been
11  punished by the DEA in 2008, after they had
12  been punished by the Department of Justice in
13  2015, after they had been fined $150 million,
14  after they had been fined $13 million.  I
15  could go on.  But then they put this ad in
16  the newspaper.
17          Did you see this ad in the
18  newspaper?
19      A.    I don't recall.
20          MS. HENN:  Objection to form.
21          THE WITNESS:  Excuse me.
22  QUESTIONS BY MR. PAPANTONIO:
23      Q.    "Let's Come Together to Solve
24  the Opioid Crisis."
25          You see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1    A.    I see that.
2    Q.    You understand if we look at
3  that map that we -- that death map that takes
4  us all through 2016, this is a little bit
5  late for solving the opioid crisis.  If they
6  had an ad in the newspaper, Wall Street
7  Journal, like this that says -- let's read
8  it.  Let's read what it says, because these
9  are really nice words, and I want to see
10  which...
11        It says, "Our nation is in the
12  midst of an enormous epidemic."
13        Now, we can agree, the epidemic
14  had started long before 2017, right?  Right?
15    A.    Yeah, based on CDC information.
16    Q.    But right after they get hit by
17  the Department of Justice for $150 million
18  where they have to admit they were -- they
19  were unlawfully failing to report suspicious
20  orders, those types of things, then this ad
21  comes out and it says, "Our nation is in the
22  midst of an enormous epidemic," right?
23    A.    There's what it says.
24        MS. HENN:  Objection to form.
25

Page 415

1  QUESTIONS BY MR. PAPANTONIO:
2    Q.    It says, "The only way we can
3  solve it is by coming together to create a
4  practical solution."
5        Isn't the practical solution
6  what the DEA was telling you to do in 2008,
7  before you were there?  You went back and
8  looked at the paper.  Wasn't it pretty clear
9  the DEA was trying to tell you there is a
10  solution, but you got to follow the law.
11        You'd agree with that, wouldn't
12  you, the 2008 where they had to pay
13  $13 million?
14        MS. HENN:  Objection to form.
15  QUESTIONS BY MR. PAPANTONIO:
16    Q.    The DEA was trying to tell you:
17  There's a solution; here's what it is.
18        Do you remember that?
19        MS. HENN:  Objection to form.
20        THE WITNESS:  They were
21  reiterating the regulations and
22  expectations.
23  QUESTIONS BY MR. PAPANTONIO:
24    Q.    And then even after 2008, I
25  think my partner spent most of the morning

Page 416

1  establishing that you didn't follow -- not
2  you, but your company didn't follow all that
3  recommendation, and then they got hit again
4  in 2015 for $150 million because they didn't
5  do what they were told to do in 2008.
6        Do you remember that discussion
7  earlier today with my partner?
8        MS. HENN:  Objection to form.
9        THE WITNESS:  I do remember the
10  discussion.
11  QUESTIONS BY MR. PAPANTONIO:
12    Q.    Okay.  So it says, "The only
13  way we're going to solve it is by coming
14  together."
15        What is -- what do you mean,
16  "coming together"?  What -- what was -- how
17  were you going to come together to solve
18  that -- the problem that we saw on that death
19  map that extended from New York to
20  California?  What was -- what is coming
21  together?
22        Would you underline "coming
23  together"?
24        How do you want to come
25  together to solve that problem?  What is --

Page 417

1  did they -- did you have a come-together
2  meeting or something where they said, "We got
3  a solution; now we're going to come
4  together"?
5        MS. HENN:  Objection to form.
6        THE WITNESS:  No, I didn't
7  write this, so I don't know exactly
8  what the meaning was.
9  QUESTIONS BY MR. PAPANTONIO:
10    Q.    I know you didn't write it.
11    A.    Yeah.
12    Q.    I'm not -- again, this isn't a
13  blame game.  I'm just wondering.
14        Do you remember a meeting where
15  we're going to come together and here is our
16  practical solutions to all these people dying
17  in the United States from our narcotics?
18        MS. HENN:  Objection to form.
19  QUESTIONS BY MR. PAPANTONIO:
20    Q.    I'm sorry.
21    A.    Could you ask the question
22  again?
23    Q.    Yes, sir.
24        Do you remember there being a
25  come-together program like -- was a

Page 418

1 come-together program like the ICARE program
2 that you described earlier?
3     A.    I don't recall --
4         MS. HENN:  Objection to form.
5         THE WITNESS:  -- a
6 come-together program.
7 QUESTIONS BY MR. PAPANTONIO:
8     Q.    Okay.  Do you know what
9 practical solutions they were talking about
10 there?
11     A.    I don't --
12         MS. HENN:  Objection to form.
13         Go ahead.
14         THE WITNESS:  I don't know
15 specifically.
16 QUESTIONS BY MR. PAPANTONIO:
17     Q.    All right.  Do you know -- I'm
18 just -- let's read on.  It says, "At McKesson
19 we're working to do our part by continuously
20 enhancing our programs designed to detect and
21 prevent opioid diversion."
22         Isn't that what you told the
23 DEA you were going to do in 2008?
24         Underline that.
25         In 2008, the president of your

Page 419

1 company -- you know Mr. Hammergren?  Have you
2 ever met Mr. Hammergren?
3     A.    Not in person.  I've been to
4 conferences with him.  I know who he is.  He
5 is our CEO.
6     Q.    You know what else I'm
7 interested in?  You ever met Mr. Hobart?  We
8 saw Mr. Hobart's name a lot.  He's an
9 attorney, right?  You've met him?
10     A.    I have.
11     Q.    As a matter of fact, we're here
12 in Covington & Burling here in Washington,
13 DC, and this is where Mr. Hobart's office is,
14 right?  True?
15     A.    Correct.
16     Q.    Did you meet him here in this
17 office?
18     A.    I've met Geoff.
19     Q.    You've met Geoff.  That's his
20 name, Geoff Hobart?
21     A.    Correct.
22     Q.    Did you know also in this --
23 also in this building that we're sitting
24 right here -- you know who Eric Holder is?
25     A.    I do.

Page 420

1     Q.    Did you meet Mr. Eric Holder?
2         You been up to his office?
3         MS. HENN:  Objection to form.
4         THE WITNESS:  I have not.
5 QUESTIONS BY MR. PAPANTONIO:
6     Q.    You haven't met him, right?
7     A.    No.
8     Q.    But you know that Eric Holder
9 was the Attorney General during the time that
10 your company was negotiating to get out of
11 the problems that you had in 2015.  Mr. Eric
12 Holder with Covington Burling, in the very
13 building we're sitting right now, was the
14 Attorney General, right?
15         MS. HENN:  Objection to form.
16 QUESTIONS BY MR. PAPANTONIO:
17     Q.    You know that?
18     A.    I know that.
19     Q.    And you know that his partner
20 who negotiated all these deals was Mr. Geoff
21 Hobart, and he's also right here in this
22 building, right?  The building we're sitting
23 in right here in Washington, DC.
24         MS. HENN:  Objection to form.
25

Page 421

1 QUESTIONS BY MR. PAPANTONIO:
2     Q.    Yes?
3     A.    Yes.
4     Q.    You know that?
5     A.    Yes.
6     Q.    And you know about the article
7 where the DEA was complaining that they had
8 made recommendations about Aurora, where they
9 suggested that Aurora, because of all the bad
10 things that were done in Aurora, that there
11 should be -- there should be fines in excess
12 of a billion dollars.  Do you know that?
13         Do you remember that article
14 that appeared in the Wall Street Journal?
15         MS. HENN:  Objection to form.
16 QUESTIONS BY MR. PAPANTONIO:
17     Q.    I'll get to it in a minute, but
18 I'm just --
19     A.    I think I recall, yeah.
20     Q.    You do recall that.
21         And you recall that those same
22 DEA agents -- the same DEA -- well, let me
23 show it to you.  You've seen it, I know.
24 This is --
25         MS. MOORE:  McKesson-Hartle 84.

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1  It's P1.108.
2      (McKesson-Hartle Exhibit 84
3  marked for identification.)
4  QUESTIONS BY MR. PAPANTONIO:
5      Q.   And you've seen this, right?
6  It's attached -- that's actually attached to
7  one of these documents, but I want to make
8  sure you've seen this before.
9      A.   I have.
10     Q.   All right.  Well, let's read it
11 together since -- let's go from this -- this
12 ad that appeared in the Wall Street Journal
13 about how you're going to come together to
14 solve the crisis in the United States.
15     This headline on this article
16 is, "We feel like our system was highjacked.
17 DEA agents say a huge opioid case ended in a
18 whimper."
19     Now you were actually
20 involved -- at this point, sir, you were
21 involved in the process of simply trying to
22 do your job and provide information to the
23 people so they could work through this
24 problem that existed in 2015, right?
25     MS. HENN:  Objection to form.

Page 423

1  QUESTIONS BY MR. PAPANTONIO:
2      Q.   You were providing them
3  information.  We got to work through the
4  problem of -- we got to work through this
5  problem.  We've been accused of certain
6  things like not reporting suspicious orders
7  in Aurora, right?
8      A.   Could you rephrase that?
9      MS. HENN:  Objection to form.
10 QUESTIONS BY MR. PAPANTONIO:
11     Q.   Yes, sir.
12     A.   I don't understand who is
13 "they."
14     Q.   I want to make sure that I'm
15 clear.
16     You did not participate in
17 anything that occurred dealing with the
18 $150 million fine; yes or no?
19     MS. HENN:  Objection to form.
20     THE WITNESS:  That was before I
21 joined McKesson.
22 QUESTIONS BY MR. PAPANTONIO:
23     Q.   That's right.
24     But nevertheless, you were
25 familiar with the fact that the question had

Page 424

1  been raised by the DEA where they had -- they
2  had actually -- they had actually made a
3  recommendation that there be criminal charges
4  brought against McKesson, true?
5      MS. HENN:  Objection to form.
6  QUESTIONS BY MR. PAPANTONIO:
7      Q.   Take a minute and look at this.
8  I want you to be familiar with it.  I don't
9  want you guessing about this because these
10 questions I'm about to ask you are important.
11     Are you familiar with that
12 article, sir?
13     A.   I am.
14     Q.   I'm kind of short on time so I
15 want to move through this.
16     Here's what I want to ask:  You
17 knew that the DEA was recommending a fine in
18 excess of a billion dollars because of the
19 conduct that took place in Aurora.  You knew
20 that, correct?
21     A.   Correct.
22     MS. HENN:  Objection to form.
23 QUESTIONS BY MR. PAPANTONIO:
24     Q.   In your job you knew that.
25     And in your job you also knew

Page 425

1  that the -- at some point the DEA had said,
2  "this conduct is so bad, we need to have a
3  criminal -- there needs to be criminal
4  prosecution."  You knew that, right?
5      MS. HENN:  Objection to form.
6      THE WITNESS:  I knew that was
7  suggested.
8  QUESTIONS BY MR. PAPANTONIO:
9      Q.   Yes, sir.
10     And you know that Mr. Hobart,
11 Geoff Hobart, handled that case, correct?
12     MS. HENN:  Objection to form.
13     THE WITNESS:  Correct.
14 QUESTIONS BY MR. PAPANTONIO:
15     Q.   And Mr. Hobart is a partner
16 with the Attorney General Eric Holder, a law
17 partner at Covington & Burling with Eric
18 Holder.  You know that, correct?
19     MS. HENN:  Objection to form.
20     THE WITNESS:  I do.
21 QUESTIONS BY MR. PAPANTONIO:
22     Q.   And as a matter of fact, we're
23 sitting in an office as we take this
24 deposition, and in this office is Mr. Eric
25 Holder's office, right?  You know that?

Highly Confidential - Subject to Further Confidentiality Review

---

Page 426

1  MS. HENN: Objection to form.
2  THE WITNESS: I know it's in
3  this complex, sure.
4  QUESTIONS BY MR. PAPANTONIO:
5  Q. In this complex.
6  And you know Mr. Hobart's
7  office is in this complex, correct?
8  MS. HENN: Objection to form.
9  THE WITNESS: Correct.
10 QUESTIONS BY MR. PAPANTONIO:
11 Q. And so Mr. Hobart was able to
12 get -- to move from the DEA talking about a
13 billion dollar -- in excess of a billion
14 dollar fine and potential criminal --
15 criminal prosecution that -- that all
16 suddenly moved to $150 million fine for this
17 conduct that we're talking about in Aurora,
18 right?
19 MS. HENN: Objection to form.
20 QUESTIONS BY MR. PAPANTONIO:
21 Q. You know about that, don't you?
22 A. I know that's what it ended up,
23 yes.
24 Q. Yeah.
25 And what was your involvement

---

Page 427

1  in that? Did you provide information to
2  Mr. Hobart? Did you -- not Mr. Hobart.
3  Did you provide information to
4  McKesson to try to get -- work through this
5  conflict with the DEA?
6  MS. HENN: And just to be
7  cautious, I'll remind you not to
8  discuss any conversations you had with
9  counsel. But his question is about
10 providing information to McKesson.
11 QUESTIONS BY MR. PAPANTONIO:
12 Q. Yeah.
13 Did you provide McKess --
14 McKesson -- did you provide McKesson with
15 information so they could work through this
16 conflict that they were having with the DEA?
17 MS. HENN: Objection to form.
18 THE WITNESS: I'm not sure if
19 I -- yeah, if I provided --
20 QUESTIONS BY MR. PAPANTONIO:
21 Q. Do you remember -- if you don't
22 remember --
23 A. I don't remember.
24 Q. Okay. That's fine. It's okay.
25 If you don't remember, you don't have to --

---

Page 428

1  A. I understand.
2  Q. You don't have to make anything
3  up or try to remember.
4  Okay. Let me keep working
5  here. Here's another news article. It's
6  1526, Document 1526.
7  MR. PAPANTONIO: Carol, do you
8  have a --
9  MS. MOORE: Yes, sir. 1556.
10 MR. PAPANTONIO: Oh, I'm sorry,
11 1556. Yeah. I got it. I got it. I
12 got it.
13 MS. MOORE: McKesson-Hartle
14 141, P1.1556.
15 (McKesson-Hartle Exhibit 141
16 marked for identification.)
17 QUESTIONS BY MR. PAPANTONIO:
18 Q. Mr. Hartle, this is -- take a
19 minute and look at this. Just breeze through
20 it if you can. I got a couple of just small
21 questions for you.
22 But it's got your name at the
23 top of it; do you see that? Nate Hartle.
24 Do you see that, Mr. --
25 A. I do.

---

Page 429

1  Q. Okay. And you know who Karen
2  Harper is? You've dealt with Karen Harper?
3  A. I do.
4  Q. Okay. Now, did you know that
5  there was a representation that was made -- a
6  representation that was made to Congress that
7  your company did not have any way to find out
8  what other drug companies were selling to the
9  various pharmacies? Did you know that?
10 MS. HENN: Objection to form.
11 THE WITNESS: Could you say
12 that again, please? Did I know --
13 QUESTIONS BY MR. PAPANTONIO:
14 Q. Yes, sir.
15 Did you know that there was a
16 representation made -- it wasn't from your
17 company, but there was a representation made
18 to Congress during the Congressional hearings
19 that there -- the reason they didn't know
20 exactly how many drugs were being told --
21 sold in a pharmacy is they didn't know what
22 the other companies were selling to the
23 pharmacy.
24 You ever heard that?
25 MS. HENN: Objection to form.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1    THE WITNESS: I've heard
2  statements like that.
3  QUESTIONS BY MR. PAPANTONIO:
4    Q.    But that wouldn't be true. You
5  had the ability to find out all the drugs
6  that were being sold in a pharmacy. We can
7  agree with that, can't we?
8    MS. HENN: Objection to form.
9  QUESTIONS BY MR. PAPANTONIO:
10   Q.    You could have done an audit
11 anytime?
12   MS. HENN: Objection to form.
13   THE WITNESS: That was part of
14 our process. We would get --
15 QUESTIONS BY MR. PAPANTONIO:
16   Q.    Yes, sir.
17   A.    -- dispensing data and be able
18 to see --
19   Q.    That's what I'm trying to get
20 at. I just want to be clear about something.
21   MS. HENN: Counsel, let's make
22 sure we don't talk on top of each
23 other.
24 QUESTIONS BY MR. PAPANTONIO:
25   Q.    Yeah. So I just want to be

Page 431

1  clear. I think you're -- you're already
2  answering the question. I want to get to a
3  little more direct.
4    A.    Okay.
5    Q.    If you wanted to know whether
6  Cardinal was selling drugs to a pharmacy
7  along with Amerisource, you had the right to
8  audit and find out. You knew exactly how
9  many drugs were being sold in any given
10 pharmacy that you were doing business with,
11 at least when you came along?
12   MS. HENN: Objection to form.
13   THE WITNESS: Correct. We
14 would ask for dispensing to validate.
15 QUESTIONS BY MR. PAPANTONIO:
16   Q.    Right.
17   And dispensing to validate is a
18 way that you can tell if there's a glut of
19 narcotics being sold in any one pharmacy,
20 true?
21   MS. HENN: Objection to form.
22 QUESTIONS BY MR. PAPANTONIO:
23   Q.    You have access to that
24 information?
25   A.    What was the phrase you used

Page 432

1  before?
2    Q.    I used the word "glut," but you
3  don't have to use it. If there were -- you
4  can -- let me rephrase it.
5    You had the right to do an
6  audit and find exactly how many drugs were
7  being -- how many narcotics were being sold
8  to any given pharmacy at any given time by
9  any narcotic company; yes or no?
10   MS. HENN: Objection to form.
11   THE WITNESS: I need you to
12 please restate that again --
13 QUESTIONS BY MR. PAPANTONIO:
14   Q.    Yes, sir.
15   A.    -- so I can be very clear.
16   Q.    Yeah, I want to be clear.
17   MR. PAPANTONIO: Would you read
18 that back? Read that back if you
19 don't mind.
20   She'll read that back to you.
21   (Court Reporter read back
22 question.)
23   MS. HENN: Objection to form.
24 QUESTIONS BY MR. PAPANTONIO:
25   Q.    That's a fair question, isn't

Page 433

1  it? I mean, you know the answer to that.
2  You can do an audit, right?
3    A.    We could request dispensing
4  data to understand what a pharmacy is
5  dispensing.
6    Q.    That's all I'm trying to get
7  to. I just want to make sure I didn't
8  misunderstand it.
9    A.    Right.
10   Q.    And it wasn't you that
11 testified in front of Congress; I'm not
12 suggesting that you did. But if that was
13 represented in front of Congress, that just
14 wouldn't -- if it was represented in front of
15 Congress that it would be absolute -- that
16 McKesson had no way of finding out what other
17 drug companies were selling to any given
18 pharmacy, if that was represented, that
19 wouldn't be true, correct?
20   MS. HENN: Objection to form.
21   THE WITNESS: Can you please
22 say that again?
23 QUESTIONS BY MR. PAPANTONIO:
24   Q.    Yes, sir.
25   A.    Yeah.

Page 434

1    Q.   If it was represented to
2  Congress that McKesson had no way of knowing
3  what other drug companies were selling to any
4  given pharmacy, narcotics, that wouldn't be
5  true, correct?
6         MS. HENN:  Objection to form.
7         THE WITNESS:  I'm not saying
8    that.  We have -- can gain dispensing
9    data --
10  QUESTIONS BY MR. PAPANTONIO:
11    Q.   Yeah.
12    A.   -- which doesn't tell us who it
13  came from as a distributor.
14    Q.   Right.
15    A.   It tells us what they're
16  dispensing.
17    Q.   Exactly.  That's all I care
18  about.  That's what I want the jury to
19  understand.
20         Dispensing data gives you the
21  information on any given day, any given time,
22  how much narcotics is being sold to a
23  pharmacy.
24         MS. HENN:  Objection to form.
25

Page 435

1  QUESTIONS BY MR. PAPANTONIO:
2    Q.   That's true, isn't it?
3    A.   How much is being dispensed by
4  the pharmacy.
5    Q.   Yes.  Yes.
6    A.   Not sold to the pharmacy,
7  dispensed by the pharmacy.
8    Q.   Right.
9         And you can extrapolate from
10  that how many drugs -- how many narcotics
11  they have in their pharmacy, right?
12         MS. HENN:  Objection to form.
13         THE WITNESS:  You can -- you
14    can understand what they're
15    dispensing.
16  QUESTIONS BY MR. PAPANTONIO:
17    Q.   Right.
18    A.   Which drugs, noncontrols, all
19  drugs.
20    Q.   Correct.  If you look at this
21  document that's in front of you, it's 1526.
22         MR. PAPANTONIO:  What did you
23    say that number was?
24         MS. HENN:  And, Counsel, we
25    need to take a break relatively soon.

Page 436

1  We've been going an hour and ten
2  minutes.
3         MR. PAPANTONIO:  Yeah, okay.
4  You want to take a break right now?
5  We'll come back at it.
6         How much -- what have I got,
7  another 45 minutes, something like
8  that?
9         MS. HENN:  I think more like an
10  hour.
11         VIDEOGRAPHER:  Six hours 10
12  minutes on the record.
13         MR. PAPANTONIO:  Okay.  And why
14  don't you take a break.
15         THE WITNESS:  That's fine.
16         VIDEOGRAPHER:  The time is
17  4:39 p.m., and we're going off the
18  record.
19   (Off the record at 4:39 p.m.)
20         VIDEOGRAPHER:  The time is
21  4:50 p.m., and we're back on the
22  record.
23  QUESTIONS BY MR. PAPANTONIO:
24    Q.   Sir, I want to show you -- I
25  want to talk to you about -- you know I used

Page 437

1  that word "glut"?
2    A.   You did.
3         MR. PAPANTONIO:  Okay.  Carol,
4  can I have a piece of white -- just a
5  white piece of paper?  Don't worry
6  about that other.  Give me a piece of
7  white paper and then we'll move on.
8  QUESTIONS BY MR. PAPANTONIO:
9    Q.   I want to show you this 1556.
10  It'll be up on the screen, and I want to ask
11  you about this.
12         Standby.
13         MR. PAPANTONIO:  Oh, here it
14  is.  Let's -- hold on just a second.
15  Let's back up to the beginning of it.
16  It shouldn't be that big.
17         Why don't we start it over.
18  Okay.
19         (Video played.)
20  QUESTIONS BY MR. PAPANTONIO:
21    Q.   Here's what I want to ask you
22  about.  You don't have -- there is no oxy
23  express if the level of narcotics are
24  properly controlled.  If you don't have a
25  glut, an excess, of pharmaceuticals, things

Highly Confidential - Subject to Further Confidentiality Review

---

Page 438

1 like -- things like the oxy express can't
2 even exist because there aren't enough pills,
3 right?  You'd agree with that?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  If there's less
6    pills --
7 QUESTIONS BY MR. PAPANTONIO:
8    Q.    Right.
9    A.    -- sure.
10    Q.    Well, here's what I'm getting
11 at.  Here's really what I'm trying to get to,
12 okay?
13        Let's go back to this.  Let's
14 go back to Kermit.  If you got a town like
15 Kermit -- and in a minute -- you don't have
16 to take my word for it; I'll show you the
17 actual numbers -- that Kermit had a
18 population of about 400 -- I think it's 406
19 people, okay? -- during the time that the --
20 during the time that Congress actually wrote
21 a letter to your president, Mr. Hammergren.
22        Have you ever reviewed that
23 letter that Congress wrote to Mr. Hammergren?
24        MS. HENN:  Objection to form.
25        THE WITNESS:  Dated when?

---

Page 439

1 QUESTIONS BY MR. PAPANTONIO:
2    Q.    I'll have to get to it in a
3 minute.  But I'm going to rely on the facts
4 in that letter, and if I misstate it, it'll
5 be in that letter.
6        But Kermit was in West
7 Virginia, correct?  You know that?
8    A.    Correct.
9    Q.    And it had a population of
10 about 406 people; you know that.  It's a very
11 small population.
12        MS. HENN:  Objection to form.
13        THE WITNESS:  Small population.
14 QUESTIONS BY MR. PAPANTONIO:
15    Q.    Okay.  But nevertheless, it was
16 getting millions of pills shipped into this
17 little area of a population of 406 people;
18 did you know that?
19        Do you know how many million of
20 pills were shipped in, that McKesson actually
21 shipped in?
22        MS. HENN:  Objection to form.
23        THE WITNESS:  I know there were
24    many.
25

---

Page 440

1 QUESTIONS BY MR. PAPANTONIO:
2    Q.    Okay.  We'll talk about
3 specifics in a minute.  I don't expect you to
4 remember numbers.  These are big numbers.
5        So let's just say if I've got
6 millions of pills being shipped into a town
7 that there's only 406 people, part of those
8 are children, right?  So it's not -- it's not
9 406 adults, 406 people in the town -- in this
10 town of Kermit.  And you've got millions of
11 pills being shipped in there, right?
12        Well, we know that 406 people
13 can't use millions of pills.  You know
14 that -- I mean, that's just logical, isn't
15 it?
16        MS. HENN:  Objection to form.
17        THE WITNESS:  I understand.
18 QUESTIONS BY MR. PAPANTONIO:
19    Q.    Yeah.
20        I don't want to put words in
21 your mouth, but we're talking logic now.  If
22 you got a population of 406 people, they
23 can't -- they can't absorb -- I'm going to
24 write those words so we're going to come back
25 to that.  They can't absorb millions of

---

Page 441

1 pills, right?  406 people can't absorb
2 millions of pills year in, year out.  You'd
3 agree with that, narcotics?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  Right.
6 QUESTIONS BY MR. PAPANTONIO:
7    Q.    Okay.  So because of that,
8 because they can't -- the four -- these
9 families, you know, you got momma and daddy
10 and little children and whatever like you see
11 on this film up here.  They can't absorb
12 millions of pills.
13        And there's only a population
14 of 406 people, so where do the pills go?
15 Where do the other millions of pills go?
16        MS. HENN:  Objection to form.
17 QUESTIONS BY MR. PAPANTONIO:
18    Q.    I mean, isn't this kind of
19 logic?
20    A.    I think there's some context
21 that's missing, you know, in terms of the
22 dispensing, the population surrounding the
23 number of pharmacies, the number of people
24 that go to that location --
25    Q.    Right.

---

Page 442

1    A.    -- how many years was the
2  million pills.  I mean, there's additional
3  context, I -- I understand.
4    Q.    Yeah, but you would agree
5  that if there's millions of pills that are
6  supposed to be shipped just to the town of
7  Kermit, then 406 people cannot absorb
8  millions of narcotics.  You would agree with
9  that.  I mean, that's just logic.
10    MS. HENN:  Objection to form.
11  QUESTIONS BY MR. PAPANTONIO:
12    Q.    True?
13    A.    400 people can't consume that
14  many pills.
15    Q.    Yeah.  So let me show you this
16  film again because I'm going to go from this
17  film, and then we're going to talk about
18  specifics about what the actual Congressional
19  letter said about places like Kermit and...
20    There's a family.  There's
21  pills coming in from Judy's Pharmacy.
22    You remember us talking about
23  Judy's Pharmacy earlier on?  I just called it
24  Judy's Pharmacy.
25    A.    I do remember that.

Page 443

1    Q.    Okay.  So Judy's Pharmacy is
2  selling more -- they're getting in all these
3  pills, but the population -- if the
4  population can't cover the pills, then the
5  excess has to go somewhere, correct?
6    MS. HENN:  Objection to form.
7  QUESTIONS BY MR. PAPANTONIO:
8    Q.    I mean, you'd agree with that,
9  wouldn't you?
10    A.    Correct.
11    Q.    Okay.  And one place it goes in
12  diversion is it goes to pill mills, right?
13  Goes to pill mills; that's one place?
14    A.    It can.
15    Q.    And if you got a salesperson
16  out here working that area, she ought to be
17  able to see the pill mills firsthand.  She
18  can actually see what -- she can see the pill
19  mills, people standing outside the pill mills
20  day in and day out to get their pills, right?
21    MS. HENN:  Objection to form.
22    THE WITNESS:  Some of those red
23  flags can be visible, yes.
24  QUESTIONS BY MR. PAPANTONIO:
25    Q.    That would be called -- yeah,

Page 444

1  that's the term, isn't it, red flag.
2    And she can see that if there's
3  cars coming through the town, she can see
4  that they're coming from other states, maybe
5  Florida, maybe Mississippi, maybe Georgia.
6  Wherever it is, she can see the -- she can
7  actually see the license tags of the people
8  that are driving through this little area to
9  get pills, right?
10    MS. HENN:  Objection to form.
11  QUESTIONS BY MR. PAPANTONIO:
12    Q.    She sees that firsthand,
13  correct?
14    MS. HENN:  Objection to form.
15    THE WITNESS:  Again, you could
16  see some of those things occasionally.
17  QUESTIONS BY MR. PAPANTONIO:
18    Q.    All right.  So two things I
19  want to mark.  I want to mark -- I'm going to
20  give you a hard copy of what we just put up
21  there, and let's get it marked.
22    MS. MOORE:  This is
23  McKesson-Hartle 165.
24    MR. PAPANTONIO:  This is the
25  drawing that I did.

Page 445

1    MS. MOORE:  The video is --
2    MR. PAPANTONIO:  And then we'll
3  get the video put in.  I might have --
4  anyway, let me keep moving.
5    MS. MOORE:  1526.
6  McKesson-Hartle 140.
7    (McKesson-Hartle Exhibits 165
8  and 140 marked for identification.)
9  QUESTIONS BY MR. PAPANTONIO:
10    Q.    So we've got -- if we have a
11  glut of pills, we know the pills have to go
12  somewhere.  That's the only thing I'm asking
13  you.  Just common sense tells you if you got
14  too many pills, the pills have got to end up
15  somewhere.  That's my point.
16    You would agree with that,
17  true?
18    MS. HENN:  Objection to form.
19    THE WITNESS:  I understand your
20  point.
21  QUESTIONS BY MR. PAPANTONIO:
22    Q.    All right.  So now let's go and
23  let's look at what -- let's look at what
24  the -- what Congress wrote to the president
25  of your company, what they said about what

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1 was happening in this little area called
2 Kermit.
3        You know where Kermit is,
4 correct?
5        MR. PAPANTONIO:  Let's give him
6 P144.
7        MS. MOORE:  McKesson-Hartle 76.
8        (McKesson-Hartle Exhibit 76
9 marked for identification.)
10 QUESTIONS BY MR. PAPANTONIO:
11    Q.    Okay.  So if we go through this
12 document, this is written Congress -- this is
13 Congress of the United States and -- it's
14 Congress of the United States, and it's
15 written to Mr. Hammergren.
16        Do you see that?
17    A.    Yes.
18    Q.    And Mr. Hammergren is the
19 president of the company.  He's president and
20 chief executive officer of your company,
21 McKesson, and has been all the time you've
22 worked there, correct?
23    A.    Correct.
24    Q.    All right.  So the first
25 paragraph -- let's look at that first

Page 447

1 paragraph.  It says, "Pursuant to the Rules X
2 and XI of the US House of Representatives,
3 the committee is continuing to investigate
4 the opioid epidemic in the US that is taking
5 115 lives a day."
6        You've known that that's a
7 figure that's been thrown around there for a
8 long time, and that is 115 people die every
9 day because of the opioid crisis, correct?
10        MS. HENN:  Object to form.
11        THE WITNESS:  I've seen those
12 type of figures, yeah.
13 QUESTIONS BY MR. PAPANTONIO:
14    Q.    And then it says, "As part of
15 our investigation, the committee wrote to
16 you" -- he's talking to Mr. Hammergren -- "on
17 May 8, 2017, regarding your distribution
18 practices generally, and in particular with
19 West Virginia -- with respect to West
20 Virginia.  As we mentioned in that letter,
21 the opioid epidemic has been particularly
22 devastating to West Virginia."
23        Now, you knew that when you
24 came to work with this company, that West
25 Virginia -- not just West Virginia but other

Page 448

1 parts of this country were devastated by an
2 overabundance, a glut, of opioids.
3        You know that, right?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  I knew certain
6 parts of the country, sure, were
7 impacted by the epidemic.
8 QUESTIONS BY MR. PAPANTONIO:
9    Q.    It wasn't just West Virginia;
10 you know that?
11    A.    I know that.
12    Q.    You knew it was New Mexico.
13 That comes to your mind, doesn't it?
14    A.    Correct.  I know different
15 parts of the country.
16    Q.    Ohio, right?  Kentucky, right?
17 I mean, other -- other parts
18 besides West Virginia.  I'm going to just
19 talk about West Virginia right here.
20        But it says, "As we mentioned
21 in that letter, the opioid epidemic has been
22 particularly devastating to West Virginia.
23 For example, in 2015, West Virginia had the
24 highest opioid overdose death rate in the
25 nation.  In addition to leading to numerous

Page 449

1 deaths, the opioid crisis in West Virginia
2 has also caused many social challenges for
3 its residents and has devastated the
4 economy."
5        Now, you remember me asking
6 you -- we started off, and we were talking
7 about the loss of life.  And we looked at
8 the -- we looked at the death map.  And --
9 but this is saying, yes, loss of life is
10 something that we see, and we also see that
11 loss of life --
12        MR. PAPANTONIO:  Would you
13 underline "devastating the economy"
14 for me, Corey.
15 QUESTIONS BY MR. PAPANTONIO:
16    Q.    It says, "Press reports
17 indicate the epidemic is now estimated to
18 cost West Virginia $8.8 billion a year."
19        Had you ever seen that number
20 that -- that they had calculated it was
21 costing West Virginia $8.8 billion a year?
22    A.    I don't remember that exact
23 figure, but I've seen figures like that.
24    Q.    Yeah.
25        And you understand why it costs

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1 the city or county money, correct?
2         You understand the connection
3 between EMTs, emergency care, hospital care,
4 police, even court -- the court costs.  You
5 understand how all that is an economic loss?
6         MS. HENN:  Objection to form.
7         THE WITNESS:  I understand
8     what's typically included in those
9     types of calculations, yes.
10 QUESTIONS BY MR. PAPANTONIO:
11     Q.    What would you say?  What would
12 you say would be included --
13         MS. HENN:  Objection to form.
14 QUESTIONS BY MR. PAPANTONIO:
15     Q.    -- in those type of economic
16 losses in a county or a city?
17         MS. HENN:  Objection to form.
18         THE WITNESS:  The same types of
19     things that you mentioned.
20 QUESTIONS BY MR. PAPANTONIO:
21     Q.    Okay.  Fair enough.
22         You see it says -- page 2 --
23 page 2.  Go to page 2, please.
24         It says, "Sav-Rite No. 1,
25 Kermit, West Virginia."

Page 451

1         That's a store that you sold
2 pharmaceuticals -- that McKesson sold
3 narcotics to, correct?
4     A.    Correct.  I said correct.
5     Q.    I'm sorry, I didn't hear.
6         It said, "In December of 2016,
7 the Charleston Gazette reported that the
8 Sav-Rite Pharmacy located in Kermit, West
9 Virginia, was among the top purchasers of
10 hydrocodone in West Virginia between 2007 and
11 2012.  According to US Census data, the town
12 of Kermit had a population of 406 individuals
13 in 2010."
14         I used the 400.  You remember
15 using 406 as the population in Kermit?
16     A.    I do.
17     Q.    Okay.  And then it says, "DEA
18 data indicates that over a two-year period,
19 McKesson shipped nearly 5 million doses of
20 opioids to a pharmacy in a town of 406
21 people."
22         Now, let me make something real
23 clear.  That wasn't you.  You didn't make the
24 decision to ship all those opioids to Kermit,
25 did you?

Page 452

1         MS. HENN:  Objection to form.
2         THE WITNESS:  No, I didn't.
3 QUESTIONS BY MR. PAPANTONIO:
4     Q.    But Michael Oriente, who worked
5 for you, he would have been involved in what
6 was happening in Kermit, West Virginia, true?
7         MS. HENN:  Objection to form.
8 QUESTIONS BY MR. PAPANTONIO:
9     Q.    Out of Landover?
10         MS. HENN:  Same objection.
11         THE WITNESS:  He may have been
12     involved.
13 QUESTIONS BY MR. PAPANTONIO:
14     Q.    Okay.  It says, "According to
15 the DEA, automation of reports and
16 consolidation orders, data obtained by the
17 committee, in 2006 McKesson shipped 2,211,630
18 hydrocodone pills and 78,500 oxycodone to
19 Strosnider Pharmacy, a/k/a Sav-Rite Pharmacy
20 No. 1."
21         Do you see that?
22     A.    I see that.
23         MR. PAPANTONIO:  Underline 78
24     million 500 -- 78,500 oxycodone pills.
25 QUESTIONS BY MR. PAPANTONIO:

Page 453

1     Q.    It says, "This means that in
2 2006, McKesson would have shipped in an
3 average of 186,303 codone {sic} pills per
4 month, for a 6,059 hydrocodone pills per
5 day."
6         Do you see that?
7         MS. HENN:  Objection to form.
8         THE WITNESS:  I see that.
9 QUESTIONS BY MR. PAPANTONIO:
10     Q.    All right.  Is that the first
11 time you've seen those kind of numbers?
12     A.    No.
13     Q.    Oh, you'd seen that before
14 today?
15     A.    Generally these numbers, yeah.
16     Q.    Okay.  And it says -- it says,
17 the bottom line in that paragraph, "Applying
18 the DEA data, it can be determined that
19 McKesson supplied 76 percent of the Sav-Rite
20 Pharmacy No. 1 hydrocodone pills that year."
21         When was the first time you saw
22 this document?
23     A.    I can't recall.
24     Q.    You agree by the time you got
25 involved, all the damage had been done to

Highly Confidential - Subject to Further Confidentiality Review

Page 454

1 Kermit, right?
2          MS. HENN: Objection to form.
3 QUESTIONS BY MR. PAPANTONIO:
4     Q.   By the time you got done, they
5 already had an increased rate of addiction,
6 an increased rate of death in Kermit.
7     A.   Yeah.
8          MS. HENN: Objection to form.
9          THE WITNESS: I joined in 2014.
10 QUESTIONS BY MR. PAPANTONIO:
11    Q.   That's all I'm trying to get
12 at.
13         Now the next paragraph it says,
14 "The ARCOS data further shows that in the
15 following year, 2007, McKesson shipped
16 2,624,680 hydrocodone pills and 40,900
17 oxycodone pills to Sav-Rite Pharmacy No. 1.
18 This is equivalent to an average of 218,723
19 hydrocodone pills per month, or 7,191
20 hydrocodone pills per day."
21         Now, sir, if that was shipped
22 into Kermit, those are startling numbers,
23 aren't they? I mean, look, just common
24 sense, those are startling numbers. And I'm
25 not saying you did that, but those are

Page 455

1 startling numbers, aren't they?
2          MS. HENN: Objection to form.
3 QUESTIONS BY MR. PAPANTONIO:
4     Q.   To a population of 406 people?
5     A.   Again, those are large numbers,
6 but again I would -- you know, the context of
7 the prescribing area and the population that
8 that pharmacy may serve could change those a
9 little bit. Doesn't mean it's not -- they're
10 not still large numbers.
11    Q.   Well, you know the DEA
12 evaluated that, and we'll talk about that in
13 a moment. They looked around to see how does
14 Kermit compare to other parts of West
15 Virginia.
16         You know that, right? Correct?
17    A.   I think so.
18    Q.   Okay.
19    A.   You'll have to refresh my
20 memory on that.
21    Q.   So in other words, the idea of
22 saying, well, there were just more hospitals
23 around Kermit or more pharmacies, that
24 doesn't get that many pills into Kermit, does
25 it?

Page 456

1          MS. HENN: Objection to form.
2          THE WITNESS: I understand.
3 QUESTIONS BY MR. PAPANTONIO:
4     Q.   Okay. All right. It says, "In
5 that same year, other distributors shipped
6 1,651,160 total opioids to this pharmacy,"
7 meaning that Sav-Rite No. 1 received --
8 received a total of 4,316,740 doses of
9 opioids pills from all distributors in 7 --
10 in 2007.
11         Now, let me just take a minute
12 here at this very place where we're talking
13 about those number of pills, and let me go
14 back and talk to you about this picture that
15 deals with glut. Okay?
16         I'm going to use the word
17 "glut." If that doesn't work for you, let's
18 call it an overabundance of pills, if you
19 want.
20         But if the people there can't
21 absorb all of these pills that we're talking
22 about, the glut has to go somewhere. That's
23 the point I'm trying to make.
24         Do you understand that?
25    A.   I understand your point.

Page 457

1     Q.   All right. And one place that
2 the glut goes is it's diverted to other parts
3 of that area. You would agree with that,
4 right?
5          MS. HENN: Objection to form.
6 QUESTIONS BY MR. PAPANTONIO:
7     Q.   We know that for a fact?
8     A.   It can be, yes.
9     Q.   All right. Let's go now back
10 to this. And it says -- all right. I'm at
11 the top of page 3. The top of page 3 says,
12 "McKesson alone supplied Sav-Rite No. 1 with
13 roughly eight times the amount of hydrocodone
14 for an average retail pharmacy in rural West
15 Virginia in 2006."
16         In 2006, you were still at
17 Target; is that a correct statement? You
18 weren't at -- you were not at McKesson?
19    A.   I was at Target.
20    Q.   And almost ten times the amount
21 of hydrocodone that an average retail
22 pharmacy -- here's what I'm getting at, you
23 see. They've looked at average comparisons,
24 and it says that that's -- first of all, you
25 see --

Page 458

1    MR. PAPANTONIO:  Underline
2  McKesson at the top of that paragraph
3  there.  McKesson.  We're talking about
4  McKesson.  We're not talking about any
5  other company besides McKesson.
6  QUESTIONS BY MR. PAPANTONIO:
7    Q.    It says, "McKesson alone" --
8    MR. PAPANTONIO:  Underline
9  "alone," please.
10 QUESTIONS BY MR. PAPANTONIO:
11   Q.    -- "supplied Sav-Rite No. 1
12 with roughly eight times the amount of
13 hydrocodone that an average retail pharmacy
14 in rural West Virginia received in 2006, and
15 almost ten times the amount of hydrocodone
16 that an average retail pharmacy -- that an
17 average retail pharmacy in rural West
18 Virginia received in 2007."
19        To be real clear -- I want to
20 make it clear -- this all had happened by the
21 time you got there, correct?
22   A.    It did.
23   Q.    It wasn't -- at this point
24 there's nothing you can do about water under
25 that bridge.  There's nothing you can do

Page 459

1  about what happened in Kermit.
2        Can we agree to that?
3    MS. HENN:  Objection to form.
4    THE WITNESS:  Agreed.
5  QUESTIONS BY MR. PAPANTONIO:
6    Q.    Now, let's go down to -- let's
7  go down here, B.  It says, "B, McKesson
8  resumed supplying opioids to Sav-Rite after
9  federal authorities began investigating the
10 pharmacy and after press accounts publicized
11 law enforcement raids on the pharmacy."
12        Now -- okay.  They'd had -- the
13 place had been raided by the DEA, right?
14        They -- they -- everybody
15 understood at this point that the numbers for
16 400 -- a population of 406 people were ten
17 times what they should have been compared to
18 the average pharmacy, right?
19        According to what we just saw,
20 true?
21    MS. HENN:  Objection to form.
22    THE WITNESS:  According to
23 what's in here, correct.
24 QUESTIONS BY MR. PAPANTONIO:
25   Q.    All right.  And then it goes

Page 460

1  down to and says, "In March 2008, federal
2  authorities began investigating Sav-Rite
3  No. 1 and a medical complex owned by
4  individuals associated with Sav-Rite.  In
5  2009, authorities conducted a raid on the
6  medical complex and on Sav-Rite.  This raid
7  was publicized by, among other sources, the
8  Huntington, West Virginia, Herald Tribune,
9  which reported" -- let's go to the next page.
10        Now, first of all, I want to
11 say this:  You've been here all day long and
12 people have been asking you tough questions,
13 but I want to -- I want to say this:  You
14 knew that the importance of looking at news
15 reports was something that you did in your
16 regulatory process, right?
17    MS. HENN:  Objection to form.
18 QUESTIONS BY MR. PAPANTONIO:
19   Q.    When you came along, you said,
20 "I'm going to look at news reports because
21 that's important," true?
22   A.    It's part of the information,
23 yeah.
24   Q.    We talked about a few already,
25 but we're going to talk about some more.

Page 461

1    A.    Yeah.
2    Q.    But back here they're taking --
3  they're saying that the Gazette newspaper
4  right there in town was telling this story.
5  And let's read what it said.  Let's see what
6  the Gazette said in that newspaper report.
7        It says, "In an area with a
8  population of just a few hundred, the two
9  Sav-Rite pharmacies received millions of
10 doses -- units of the painkiller hydrocodone
11 in 2006, enough to rank 22nd nationally in
12 most hydrocodone units purchased by retail
13 pharmacies."
14        It says, "One federal agent who
15 investigated the pharmacies said
16 prescriptions are filled in such a rate that
17 Sav-Rite workers literally throw bags
18 containing the drugs over a divider and onto
19 a counter in order to keep up the pace.  The
20 agent also noticed that one cash drawer was
21 so full that the clerk could not get it to
22 close properly.
23        Now, let me take you back up
24 with a couple of facts.
25        When you came along -- what

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1 year was it?
2    A.    2014.
3    Q.    2014.
4         This would have been a pretty
5 important bit of information for you if you
6 read that in the newspaper, wouldn't it? If
7 you saw that handle in the newspaper, that
8 would be pretty important to Mr. Hartle,
9 correct?
10        MS. HENN:  Objection to form.
11        THE WITNESS:  It would be
12 important.
13 QUESTIONS BY MR. PAPANTONIO:
14    Q.    And the truth is, at this point
15 McKesson was selling 75 percent of the
16 narcotics that were going to this area,
17 correct?  According to what we just read,
18 75 percent --
19        MS. HENN:  Objection to form.
20 QUESTIONS BY MR. PAPANTONIO:
21    Q.    -- right?
22    A.    According to what you shared
23 earlier and what's in here, yes.
24    Q.    Okay.  And so 75 percent of
25 this problem that we're looking at -- well,

Page 463

1 let me scratch that.  I'll just keep on
2 reading so we can get through this.
3         It says, "The owner of
4 Sav-Rite, James Wooley, was ultimately
5 convicted of conspiracy to acquire or obtain
6 controlled substances and sentenced to prison
7 in 2012."
8         Mr. Hartle would have never
9 made the decision to go back and do business
10 with these people after all this happened,
11 would you?
12        MS. HENN:  Objection to form.
13 QUESTIONS BY MR. PAPANTONIO:
14    Q.    I'm trying to use your
15 judgment.  Understand, the raid took place;
16 man went to prison; McKesson's selling
17 75 percent of the drugs.  It's 10 percent --
18 it's ten times the national average of
19 narcotics.
20        Are you going to go back and do
21 business with Sav-Rite?
22        MS. HENN:  Objection to form.
23 QUESTIONS BY MR. PAPANTONIO:
24    Q.    You think that's good judgment?
25    A.    I would need to have --

Page 464

1         MS. HENN:  Same objection.
2         THE WITNESS:  -- the full
3 context of all the information and --
4 before I made that decision.
5 QUESTIONS BY MR. PAPANTONIO:
6    Q.    How about just the information
7 I gave you just then?  Is that something that
8 would possess you to go back and do business
9 with them?
10        MS. HENN:  Objection to form.
11        THE WITNESS:  That would be
12 part of the information to make the
13 decision.
14 QUESTIONS BY MR. PAPANTONIO:
15    Q.    Yeah.  It'd be important
16 information, wouldn't it?
17    A.    Certainly it's important
18 information.
19    Q.    Yeah.
20         It says, "It does not appear
21 that McKesson shipped drugs to Sav-Rite No. 1
22 between 2008 and 2010; however, DEA data
23 acquired by the committee indicates that in
24 2011 McKesson again began shipping drugs to
25 Sav-Rite No. 1."

Page 465

1         Do you see that?
2    A.    I see that.
3    Q.    Now, let's take a look at the
4 last paragraph there.  "According to federal
5 search warrant, Sav-Rite Kermit was ranked
6 22nd in the nation among retail pharmacies
7 with respect to purchase of hydrocodone dose
8 units.  The average per pharmacy, 2006, was
9 97,431.  Reports citing residents of Kermit
10 and surrounding region state that everyone in
11 Kermit, just about everyone in the wooded
12 hollows of Mingo County" -- that's where my
13 partner there, Paul Farrell, is from.
14        You met Paul Farrell yesterday,
15 right?
16    A.    I did.
17    Q.    Yeah.  It says, "They knew that
18 Sav-Rite was a pill mill."  Sav-Rite was a
19 pill mill.
20        What is a pill mill in your
21 definition of a pill mill?
22    A.    I mean, you could describe them
23 in many ways, but diverting drugs, you know,
24 not dispensing for legitimate medical
25 reasons.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 466

1    Q.    And in the records of McKesson
2  we'll get to in a minute, you remember
3  pictures of pill mills actually being
4  included in PowerPoints that were presented
5  at McKesson, at their meetings, actual
6  PowerPoints of what pill mills looked like,
7  people standing around in line.
8         You remember pictures like
9  that, don't you?
10     A.    I do.
11     Q.    Okay.  It says, "Press reports
12  describe a stampede of customers frequenting
13  the pharmacy, so many that the town had to
14  hire an extra police officer to handle a
15  spike in crime, extra crews to clean up the
16  mess that the clientele left behind."
17         Now here's my -- here's my
18  question:  Why should taxpayers be
19  responsible for cleaning up the mess that was
20  left by McKesson because of what was created
21  by this glut of pills in this town?
22         MS. HENN:  Objection to form.
23  QUESTIONS BY MR. PAPANTONIO:
24     Q.    Do you think that's fair, for
25  taxpayers that have nothing to do with all

---

Page 467

1  this -- they didn't make a dime on selling
2  narcotics.  McKesson made the money selling
3  narcotics.
4         Why should taxpayers have to
5  pay for increased EMTs, for increased police,
6  for cleaning up the mess?  Why should
7  taxpayers have to pay for that?
8         MS. HENN:  Objection to form.
9  QUESTIONS BY MR. PAPANTONIO:
10     Q.    Do you have a good reason for
11  that, why taxpayers should foot that bill?
12         MS. HENN:  Same objection.
13         THE WITNESS:  I don't have a
14     good reason.
15  QUESTIONS BY MR. PAPANTONIO:
16     Q.    Yeah.
17         In other words, taxpayers
18  didn't make money on this.  McKesson made --
19  what were you making -- how many billion
20  dollars a year on the average was McKesson
21  making on selling these pills?
22         MS. HENN:  Objection to form.
23         THE WITNESS:  Again, I don't
24     know specific numbers on --
25

---

Page 468

1  QUESTIONS BY MR. PAPANTONIO:
2     Q.    6 billion?  7 billion?
3         MS. HENN:  Objection to form.
4  QUESTIONS BY MR. PAPANTONIO:
5     Q.    Does that sound right?
6     A.    At this time, I don't know what
7  the numbers were.
8     Q.    But it was in the billions,
9  right?
10         MS. HENN:  Objection to form.
11  QUESTIONS BY MR. PAPANTONIO:
12     Q.    It was in the billions.
13  McKesson was making billions of dollars
14  selling narcotics in places like we're
15  talking about right here, correct?
16         MS. HENN:  Objection to form.
17         THE WITNESS:  It could be.  I'd
18     have to understand the total and the
19     percentages, and I'm not 100 percent
20     sure on that.
21  QUESTIONS BY MR. PAPANTONIO:
22     Q.    So my question is:  If you're
23  making billion -- if you're making money, why
24  should taxpayers have to pay for cleaning up
25  the mess that was left behind while you were

---

Page 469

1  making that money?
2         You don't feel like that's
3  fair, do you?
4         MS. HENN:  Objection to form.
5  QUESTIONS BY MR. PAPANTONIO:
6     Q.    That's not fair, is it?
7     A.    I don't have a response for
8  you.
9     Q.    Mr. Hartle, you know what, I've
10  become accustomed to us talking logic and
11  common sense.  So let me continue that.
12  Okay?
13         Let me ask you this question:
14  It doesn't seem fair that taxpayers should
15  have to foot the bill for EMTs, for police,
16  for hospital care, for court costs that might
17  be attributed to a glut of pills being
18  shipped into an area like this by McKesson.
19  That's just not fair, is it?
20         MS. HENN:  Objection to form.
21         THE WITNESS:  I think logically
22     it doesn't seem fair, but --
23  QUESTIONS BY MR. PAPANTONIO:
24     Q.    That's all --
25     A.    -- but there's many -- there's

---

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1 many involved in the -- you know, in the
2 entire system.
3    Q.   I get that.  I get that.
4         But you would agree that
5 wouldn't be fair.  We can at least move on
6 from there, right?
7         MS. HENN:  Objection to form.
8 QUESTIONS BY MR. PAPANTONIO:
9    Q.   Yes?
10   A.   We can move on from there.
11   Q.   Okay.  So let me go down here.
12 It says, A.  Go down -- see where it says,
13 "According to DEA data, McKesson supplied a
14 pharmacy in Mount Gay-Shamrock" --
15        MR. PAPANTONIO:  Ms. Henn, tell
16 me when I'm -- you're watching the
17 time; I'm not.
18        MS. HENN:  That's not what was
19 that was about, but the videographer
20 can tell you.
21        MR. PAPANTONIO:  How much time
22 do I have left here?
23        VIDEOGRAPHER:  18 minutes, sir.
24        MR. PAPANTONIO:  18 minutes.
25        THE WITNESS:  What page are you

Page 471

1 on, sir?
2 QUESTIONS BY MR. PAPANTONIO:
3    Q.   I'm on the same page.
4    A.   On the same page still?
5    Q.   I'm on the same page.
6         It says, "According to DEA
7 data, McKesson supplied a pharmacy in Mount
8 Gay-Shamrock, West Virginia, with more than
9 six times the amount of hydrocodone than an
10 average pharmacy in rural West Virginia would
11 have been expected to receive."
12        Do you see that?
13   A.   I'm sorry, I was on the
14 previous page.  Let me read that real quick.
15   Q.   "According to DEA data."  Yeah.
16 Yeah.
17        "According to the DEA data,
18 McKesson supplied a pharmacy in Mount
19 Gay-Shamrock, West Virginia, with more than
20 six times the amount of hydrocodone" --
21        It's talking about McKesson
22 here, right?
23   A.   I see that.
24   Q.   Okay.
25        -- "more than six times the

Page 472

1 amount of the hydrocodone that an average
2 pharmacy in rural West Virginia would have
3 been expected to receive."
4         I read that.
5         Then it goes on to say,
6 "DEA" --
7         MR. PAPANTONIO:  When I'm ten
8 minutes -- let me know when I'm ten
9 minutes out.
10 QUESTIONS BY MR. PAPANTONIO:
11   Q.    "DEA ARCOS data showed that
12 between 2006 and 2014, McKesson supplied
13 Family Discount Pharmacy in Mount Shamrock
14 {sic} with 5,122,290 {sic} hydrocodone
15 pills" -- you see that? -- "and 695,000
16 oxycodone pills, for a total of 5,818,020
17 pills."
18        Do you know what the -- do you
19 know what the population of that place was?
20        If I told you it was 1,700,
21 would you be surprised?  Population of 1,700
22 people, would that surprise you?
23        MS. HENN:  Objection to form.
24        THE WITNESS:  It would surprise
25 me.  I don't know what the number is,

Page 473

1 but...
2 QUESTIONS BY MR. PAPANTONIO:
3    Q.    If it's only 1,700, those are
4 startling numbers, aren't they?
5    A.    It's a small population.
6    Q.    Yeah.
7         Okay.  It says, "McKesson
8 provided this pharmacy with 986,500 oxycodone
9 pills, in addition to 300,100 oxycodone
10 pills, a 193 percent increase from the year
11 prior."
12        Do you see that?  "193 percent
13 increase from the year prior" in the amount
14 of narcotics that they're selling to this
15 area.
16        And from -- "this equals an
17 average rate in 2013 of 82,000 hydrocodone
18 pills per month or 2,703 pills per day."
19        You see that?
20   A.    I see those numbers.
21   Q.    "And 25,000 oxycodone pills per
22 month."
23        Now, what I'm asking you did
24 you ever go back and look at this?  When you
25 came into your job, did you go back and look

Highly Confidential - Subject to Further Confidentiality Review

---

Page 474

1 at these kind of numbers and say, "We must do
2 better. People are dying because of this.
3 We must do better"?
4        Did you ever do that?
5        MS. HENN: Objection to form.
6        THE WITNESS: I didn't
7    specifically go back and look at these
8    numbers, but as I came in, and why I
9    joined McKesson, was to help evolve
10    the program and do better and evolve
11    the processes.
12 QUESTIONS BY MR. PAPANTONIO:
13    Q. But by the time you came
14 along --
15        MR. PAPANTONIO: Can I see the
16    death map again, please?
17 QUESTIONS BY MR. PAPANTONIO:
18    Q. You came about -- would you
19 look at the death map, please? By the time
20 you came along in -- did you say 2014?
21    A. 2014.
22    Q. Show the jury -- let's put up
23 on the screen. If you got there 2014, let's
24 look at the damage that was already done even
25 before you were able to do a thing,

---

Page 475

1 Mr. Hartle.
2        2014, that's the map.
3        You see that?
4    A. I've seen that.
5    Q. Okay. And between me and you,
6 I don't hold you responsible for that, but
7 you understand that's what you walked into.
8    A. I understand that.
9        MR. PAPANTONIO: All right.
10    We're going to take a quick break and
11    save ten minutes and see if we can
12    wrap this up real quick.
13        MS. HENN: All right.
14        MR. PAPANTONIO: Thank you.
15        VIDEOGRAPHER: The time is
16    5:25 p.m., and we're going off the
17    record.
18    (Off the record at 5:25 p.m.)
19        VIDEOGRAPHER: The time is
20    5:34 p.m., and we're back on the
21    record.
22 QUESTIONS BY MR. PAPANTONIO:
23    Q. Sir, the -- in document 1165 --
24 let me show this to you and just put this up
25 on the screen. This is 1280. I'll get to

---

Page 476

1 this. It's in 1165, what I'm looking for.
2 1280.
3        MR. PAPANTONIO: This is --
4    we're going to give you a copy of
5    these pictures.
6        MS. HENN: Okay. Just as
7    long --
8        MR. PAPANTONIO: They are
9    attached -- just so you know, they are
10    attached to 1165.
11        MS. HENN: I see.
12        MS. MOORE: This is
13    McKesson-Hartle 135.
14        (McKesson-Hartle Exhibit 135
15    marked for identification.)
16        MR. PAPANTONIO: Sir, do we
17    have that? Do we have that, Corey?
18    Do we have those pictures? Because I
19    can put them up on the -- I can put
20    them on right here if you don't.
21        Okay. Let me go -- oh, there
22    they are. Okay.
23 QUESTIONS BY MR. PAPANTONIO:
24    Q. Sir, these pictures, you've
25 seen pictures similar to this in your own --

---

Page 477

1 in your own PowerPoints, right? These are
2 actually pictures of -- let me just represent
3 to you, these are pictures of pill mills.
4    A. I've seen pictures like this,
5 yes.
6    Q. Okay. And the other part of
7 it, you see these people, they're sitting
8 outside the pill mill waiting to get pills.
9        Do you see that?
10    A. I do see that.
11    Q. And you've seen similar
12 pictures to this in the past, right?
13    A. I have.
14    Q. And it's actually -- some of
15 these pictures have actually appeared in some
16 of the -- some of your literature, some of
17 your PowerPoints, correct?
18    A. Correct.
19    Q. Okay. Let's mark --
20        MR. PAPANTONIO: Did we mark
21    this picture right here?
22        MS. HENN: Yes.
23        MR. PAPANTONIO: Okay.
24 QUESTIONS BY MR. PAPANTONIO:
25    Q. And then I -- let me just go

---

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1 through some -- through a couple -- we don't
2 have much time, but let me just go through a
3 couple of other things.
4          Your theory about -- again,
5 about newspaper articles and reading them and
6 why it's so important for people to know
7 what's going on in the news, I want to show
8 you 951.
9          Had you ever heard of a town of
10 Williamson in West Virginia that actually
11 took on the name of Pilliamson?
12          MS. MOORE:  McKesson-Hartle
13     101.
14          (McKesson-Hartle Exhibit 101
15     marked for identification.)
16 QUESTIONS BY MR. PAPANTONIO:
17     Q.    Had anybody ever told you that
18 the problem was so bad all the way back in
19 2011 -- this is the Charleston Gazette-Mail.
20 And, sir, this is actually -- had you seen
21 see this article before?  This the
22 Gazette-Mail talking about the very area
23 we've been talking about.
24     A.    I'm not sure.
25     Q.    Okay.  Well, just for the

Page 479

1 record, I want to point out that as we go
2 forward, this is a document -- this is a
3 newspaper article that is actually attached
4 to the Congressional record.
5     A.    Okay.
6     Q.    This came out of the hearings
7 of the Congressional record.
8     A.    Okay.
9     Q.    But I just want to ask you:
10 Had you ever heard of Williamson, West
11 Virginia, being -- it called Pilliamson?
12 Headline's "2011," that's the date,
13 "prescription drug abuse plagues small West
14 Virginia town."  And that's in the
15 Gazette-Mail.  And then it says, "a Pulitzer
16 Prize-winning newspaper."
17          Have you ever seen that before,
18 the term "Pilliamson," I guess is what I'm
19 wondering.
20     A.    I believe I may have, yes.
21     Q.    And it says -- I have it
22 right -- it says, "A couple of blocks away,
23 people lined up before 6 a.m. to visit
24 another doctor's -- another clinic's doctor.
25 The community was frustrated.  They called it

Page 480

1 Pilliamson instead of Williamson, said Mingo
2 County prosecuting attorney Michael Sparks.
3 It was an open secret, you might say, federal
4 and state authorities are handling an ongoing
5 investigation of the clinics, but Sparks says
6 prescription drug abuse causes most of the
7 local crimes he prosecutes - robberies,
8 assaults, forgery."
9          Do you see that?
10          "Even though the clinics are
11 now shuttered, substance abuse still plagues
12 the area.  People can still find pills."
13          Do you see that?
14     A.    I do.
15     Q.    Now, you understand the
16 other -- the other part of this.  You
17 understand once opioids -- once people are
18 addicted to opioids, narcotic opioids, their
19 chances of them moving to heroin are
20 dramatically increased.
21          You've heard that before,
22 right?
23     A.    I have.
24     Q.    I think you've actually --
25     A.    It's in my presentations.

Page 481

1     Q.    It's in your presentation.
2 You've talked to people about it.
3          When you were trying to warn
4 other people about this issue, this is
5 something you raised, that the natural
6 progression goes from opioids to heroin,
7 true?
8          MS. HENN:  Objection to form.
9 QUESTIONS BY MR. PAPANTONIO:
10     Q.    You know that?
11     A.    I've shared some of those data
12 points about the -- you know.
13     Q.    Yeah.
14          So I don't have to go into
15 that.  You would agree that that is a fact of
16 life, true?
17          MS. HENN:  Objection to form.
18 QUESTIONS BY MR. PAPANTONIO:
19     Q.    True?  That's all I am asking.
20     A.    Again, I agree that -- what
21 I've read and did -- I did.
22     Q.    Yes, sir.
23          Okay.  This is a chart that is
24 a -- also a part of 1165, document there in
25 front of you.  It's on page -- it's on .7 of

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1 1165.
2 No, sir, it's not in there.
3 It's in 1165. Let me hand you another copy
4 just so I make sure you have it.
5 MS. MOORE: McKesson-Hartle
6 134.
7 (McKesson-Hartle Exhibit 134
8 marked for identification.)
9 QUESTIONS BY MR. PAPANTONIO:
10 Q. If you'll go to their --
11 Mr. Hartle, if you'll look at page 7, .7 --
12 let's say .7 in the top right-hand corner.
13 A. Okay.
14 Q. Is that -- do you see a chart
15 there?
16 A. Yes.
17 Q. Okay. That chart, if you'll
18 notice -- and I think this is -- the point I
19 want to raise here is you see how -- when
20 opioid -- opioid sales increase. Opioid
21 sales actually grow during the same time that
22 you see opioid deaths grow.
23 Opioid sales is the green, is
24 the green line, right? That's opioid sales?
25 A. Correct.

Page 483

1 Q. That's actually -- you're
2 actually increasing sales during these years
3 that people -- that there's an increased
4 amount of death. Your sales are increasing
5 right in line with the increase of death.
6 You see that?
7 MS. HENN: Objection to form.
8 QUESTIONS BY MR. PAPANTONIO:
9 Q. I mean, isn't that --
10 A. I see the sales. Yeah, I
11 understand this chart.
12 Q. Yeah, isn't that what -- that
13 captures that, that if -- while McKesson is
14 selling more narcotics, more people are
15 dying. And this chart shows that, doesn't
16 it? That's what that chart shows, right?
17 MS. HENN: Objection to form.
18 THE WITNESS: Sales across the
19 country, anybody who sells controls,
20 right.
21 QUESTIONS BY MR. PAPANTONIO:
22 Q. Yeah, but this is -- in other
23 words, this is a document -- this is
24 McKesson -- you see on the bottom, this is a
25 McKesson document?

Page 484

1 MS. HENN: Objection to form.
2 QUESTIONS BY MR. PAPANTONIO:
3 Q. So you were aware -- I mean,
4 there's no guesswork here. You know that as
5 people continue to die, you were selling
6 more. People were actually increasing
7 addiction to opioids, which increased sales
8 for McKesson.
9 MS. HENN: Objection to form.
10 QUESTIONS BY MR. PAPANTONIO:
11 Q. Correct?
12 A. I understand this visual and
13 the trends of sales and --
14 Q. Yeah.
15 A. -- addiction.
16 Q. Sir, before you got there, did
17 you know about any discussion that the --
18 that the management at McKesson had actually
19 internalized in their business plan the glut
20 sale of opioids that they knew was going move
21 into diversion across the country?
22 Did you -- had you ever heard
23 any discussion that this glut, this extra --
24 these extra pills that we're selling in
25 places like Kermit, in Stollings, like we've

Page 485

1 just been seeing, that that was actually
2 internalized as part of the business plan of
3 McKesson to where they said, "Yeah, we know
4 this is going on, but you know what, look
5 what it's doing for business. It's
6 increasing our business. It's increasing
7 sales"?
8 Before you got there -- I'm not
9 suggesting you had anything to do with
10 that -- but had you ever heard discussion
11 about the internalization as a business plan
12 of diversion of narcotic drugs from McKesson?
13 MS. HENN: Objection to form.
14 THE WITNESS: Not that I'm
15 aware.
16 QUESTIONS BY MR. PAPANTONIO:
17 Q. All right. Fair enough.
18 Sir, you would agree, won't
19 you, if my partner there, Paul Farrell -- if
20 Paul Farrell were -- just wanted to say,
21 "Hey, this is a pretty good money maker. I
22 want to go to Kermit and I just want to
23 distribute 8 million pills," if he did that,
24 he'd end up in prison, wouldn't he?
25 MS. HENN: Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1  QUESTIONS BY MR. PAPANTONIO:
2      Q.    Wouldn't he?
3          He can't do that.  He can't
4  go -- he can't go to Kermit and distribute 8
5  million narcotic pills.  He'd go to prison,
6  wouldn't he?
7          MS. HENN:  Objection to form.
8          THE WITNESS:  He can't as an
9      individual.
10  QUESTIONS BY MR. PAPANTONIO:
11      Q.    Well, what if he was a
12  corporation, he called it Farrell,
13  Incorporated, and he likes the idea that he
14  can make money selling narcotic pills because
15  he's making a lot of money, what happens if
16  he goes to Kermit and sells 8 million pills?
17          Does he go to prison?
18          MS. HENN:  Objection to form.
19          THE WITNESS:  I don't know.
20  QUESTIONS BY MR. PAPANTONIO:
21      Q.    Well, it's illegal, isn't it --
22          MS. HENN:  Objection to form.
23  QUESTIONS BY MR. PAPANTONIO:
24      Q.    -- for him to go to town and
25  sell 8 million pills.  Paul Farrell shows up

Page 487

1  with a big bag of pills, 8 million pills, and
2  starts selling them in Kermit, that's
3  breaking the law, isn't he?
4          MS. HENN:  Objection to form.
5          THE WITNESS:  It depends on the
6      scenario.  Is he a distributor?  I
7      mean, I don't know.
8  QUESTIONS BY MR. PAPANTONIO:
9      Q.    Well, that's the point, isn't
10  it?  That's the point.
11          You had a special license to do
12  that, and Paul Farrell doesn't, correct?
13  That's the only thing that's different.  You
14  had a license to do it that you -- you had
15  the license based on your obligation to
16  follow the law.  Not you, but McKesson.  They
17  had an obligation to follow the law, and in
18  exchange they had the right to carry a big
19  bag of pills and sell 8 million pills in
20  Kermit, as long as they could justify it as
21  legitimate distribution, true?
22          MS. HENN:  Objection to form.
23          THE WITNESS:  Wouldn't
24      characterize it like that.  We had a
25      license to sell all sorts of

Page 488

1  prescription drugs for many, many
2      reasons.
3  QUESTIONS BY MR. PAPANTONIO:
4      Q.    But the difference between you
5  and Paul, my partner, Farrell there, he
6  doesn't have a license.  So he did that, he
7  sold 8 million extra glut -- excess pills in
8  Kermit, he'd be in a lot of trouble, wouldn't
9  he?
10          MS. HENN:  Objection to form.
11          THE WITNESS:  I'm not sure.  He
12      could.
13  QUESTIONS BY MR. PAPANTONIO:
14      Q.    Yeah.  The difference is you
15  had a license to do it.  Your company had a
16  license that was given to you by the
17  taxpayers of this country, by the consumers
18  in this country.
19          You had the right to sell this
20  drug only because you had that license,
21  right?
22          MS. HENN:  Objection to form.
23  QUESTIONS BY MR. PAPANTONIO:
24      Q.    Right?
25      A.    They gave us the right to sell

Page 489

1  those drugs.
2      Q.    And in exchange, all they asked
3  for is just follow the law.  Just follow the
4  law, report suspicious orders, right?  That's
5  all they asked you to do:  Report suspicious
6  orders, and don't sell too many pills
7  throughout this country.  Don't sell too many
8  pills in places like Kermit.
9          That's all they asked you to
10  do, right?
11          MS. HENN:  Objection to form.
12          THE WITNESS:  Do our part to
13      prevent diversion.
14  QUESTIONS BY MR. PAPANTONIO:
15      Q.    Yeah.  And in exchange they
16  handed you a license, and you could go make
17  money with that license, right?
18      A.    We can.
19          MR. PAPANTONIO:  All right.
20      Thank you, sir.  I don't have any
21      further questions.
22          MS. HENN:  Okay.  Let's go off
23      the record.  I do have some questions,
24      and we'll need to change spots.
25          VIDEOGRAPHER:  Okay.  The time

Page 490

1 is 5:46 p.m. We're going off the
2 record.
3  (Off the record at 5:46 p.m.)
4  VIDEOGRAPHER: The time is
5 5:48 p.m. We're back on the record.
6  CROSS-EXAMINATION
7 QUESTIONS BY MS. HENN:
8  Q. Good afternoon, Mr. Hartle.
9  A. Good afternoon.
10  Q. You testified yesterday and
11 today that you joined McKesson in 2014; is
12 that right?
13  A. I did.
14  Q. Before joining McKesson, you
15 explained that you worked at Target?
16  A. I did.
17  Q. What positions did you hold at
18 Target?
19  A. I had a variety of positions in
20 the almost 19 years that I worked for Target.
21 I worked in both the assets protection and
22 the corporate security divisions and held
23 many different roles at many different
24 levels, from being in the actual stores to
25 leading districts or groups or larger groups

Page 491

1 of stores, primarily focused on threat and
2 fraud in investigations.
3  I additionally led some of the
4 more specialized strategies for Target
5 related to things like organized retail crime
6 and fraud.
7  I worked at headquarters for
8 several years helping develop strategies and
9 building specialized teams, including one
10 focused on health care.
11  Q. Could you describe the team
12 that you were involved with at Target that
13 focused on health care?
14  A. Sure.
15  It was a team that was designed
16 to do several different things. I had been
17 involved in investigating pharmacy cases for
18 years, all way back to when I was in the
19 stores. This team was designed to, you know,
20 help identify and support investigations of
21 pharmacy cases in the field, develop new ways
22 to identify theft in pharmacies through data
23 and in other ways was designed to help
24 develop tools to monitor dispensing of Target
25 stores, and at the base code level across the

Page 492

1 country to drive action and follow up with
2 different locations.
3  We used other analytics related
4 to prescribers to determine when we may want
5 to shut off a particular prescriber, and we
6 also monitored trends across the country and
7 proactively engaged with different offices of
8 diversion control.
9  All of that helped us also
10 influence and help teach and train Target
11 internally and help revise policies and
12 procedures related to pharmacy and diversion
13 specifically.
14  Q. When you joined McKesson in
15 2014, you were a senior director of
16 regulatory affairs?
17  A. Yes.
18  Q. Why did you join McKesson in
19 2014?
20  A. I had a great career at Target
21 and many opportunities, in fact had just been
22 given some additional responsibilities, but
23 have always been driven by the work that
24 we -- my team started and was doing at Target
25 related to diversion. I had an opportunity

Page 493

1 to help teach and train Target team members,
2 help build programs and processes focused on
3 diversion.
4  And when an opportunity came up
5 with McKesson, you know, I -- you know, it
6 allowed me and I felt like I could make a
7 bigger difference across multiple chains. If
8 I could replicate some of the things that I
9 was doing at Target in any way and help other
10 chains and be involved, personally I think I
11 could help make a difference.
12  Q. And in that vein, did you have
13 a particular focus as senior director of
14 regulatory affairs at McKesson?
15  A. Yeah, I was hired to focus on
16 the chains and -- oh.
17  Q. Go ahead.
18  A. I was going to say, and as I
19 came on board, my initial focus was to get to
20 know the chains, to conduct some due
21 diligence, understand their programs and help
22 build out and formalize, you know, the focus
23 on the chains over the course of time.
24  Q. You testified yesterday and
25 earlier today about the evolution of

Page 494

1 McKesson's controlled substance monitoring
2 program.
3          How would you describe that
4 evolution?
5     A.    Well, I clearly wasn't here at
6 McKesson prior to 2014, but I understand that
7 some of the core elements related to
8 Section 55 and some of the things associated
9 with suspicious order reporting -- or reports
10 and processes, you know, they advanced and
11 continued to evolve.
12          And with the Lifestyle drug
13 program we're taking feedback and information
14 to add another element to that program to
15 include focusing on some key drugs, building
16 a review process.  Continue to advance over
17 time, specifically in 2008, to hard-code the
18 threshold methodology or mechanism in the
19 system.  So in 2008, they assigned thresholds
20 across all base codes, all customers, and
21 those served as the mechanism to block
22 suspicious orders.
23          And so over time it's evolved.
24 And as I came on board, we've continued that
25 evolution to try to continue to enhance not

Page 495

1 just on the ISMC side of the business but
2 specifically on my team and related to chains
3 as well.
4     Q.    And you mentioned the
5 thresholds that were implemented.
6          What happened at McKesson when
7 a customer's order exceeded its threshold for
8 a particular base code?
9     A.    When those thresholds were
10 established in 2008 and that mechanism was
11 put into place, any order that exceeded the
12 threshold was blocked and not shipped.
13     Q.    During what period of time has
14 that been the case?
15     A.    Since they were implemented in
16 early 2008.
17     Q.    Turning to the role that you've
18 played at McKesson, the interactions you've
19 had with retail national accounts, how have
20 you -- well, could you describe how you and
21 your team interact with customers who are
22 part of your retail national accounts?
23     A.    We interact in a variety of
24 ways.  When I first came on board, it was a
25 lot of getting to know the chains and their

Page 496

1 programs, you know, talking with them and
2 learning about what type of structure do they
3 have, what type of oversight and compliance
4 and specific teams do they have, what type of
5 policies and procedures do they have related
6 to controlled substances, what type of
7 education and training are they getting as
8 chains, what are they providing to their
9 teams and their stores and their pharmacies,
10 how are they using data to identify areas for
11 follow up and how are they following up on
12 pharmacies.
13          So part of that -- what we do
14 with chains was get to know them at the very
15 beginning when I came on board, but
16 throughout the course of my time with
17 McKesson, we continued to engage at different
18 points in the process.  We meet when we
19 on-board chains.  I will go meet with them
20 personally at their headquarters locations.
21          When stores -- when new stores
22 are on-boarded, we take that opportunity to
23 do our reviews and at times connect with the
24 teams.
25          When threshold change requests

Page 497

1 come in, we're working directly with the
2 chain teams on the requests, getting the data
3 from them, talking about the justification,
4 things like that.
5          So we take every opportunity we
6 can to engage and continue to learn about the
7 chains, along with our regular review of data
8 to monitor them.
9     Q.    Tell me about the policies and
10 procedures that McKesson expects chains to
11 have in place.
12     A.    It's similar to what I shared.
13 We expect there to be oversight.  We expect
14 there to be policies and procedures.  We
15 expect there to be, you know, use of data,
16 you know.  We get -- chains may use data.
17 All of these things may -- they may do in
18 slightly different ways, but the general
19 expectation is to have oversight, to have
20 policies and procedures, to have data to
21 review.  And before a threshold change
22 request even comes to us, before we make our
23 own independent decision, to have a process
24 on their side to review them and do research.
25          So those are the types of

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1 expectations we have of chains.
2    Q.    And you mentioned McKesson
3 making an independent decision about
4 threshold changes related to chains.
5       Could you describe that process
6 and what's involved?
7    A.    Yeah.  The way that threshold
8 requests work as part of our program today is
9 that a chain has their own process and
10 identifies a need or a request to come to us,
11 and they provide us the business
12 justification, they provide us dispensing
13 data.
14       And we have a complete separate
15 review, very consistent with what my peers do
16 on the independent side.  We review the
17 business justification.  We review the
18 purchasing data.  We look at analytics
19 involved with purchasing data.  We look at
20 dispensing.  We do all of those types of
21 things, and we make our own separate
22 decision.  And that means we don't always
23 approve every threshold.  We don't always
24 approve it for the same amount.  We cancel
25 some, we deny some, consistent with what

Page 499

1 works on the ISMC decide.
2       So we view our decision, and
3 the chains know we are there to make our own
4 regulatory decision.
5    Q.    And we've talked about the
6 review that takes place surrounding threshold
7 change requests.
8       Are there also occasions when
9 McKesson may reach out to a chain about data
10 that it sees?
11    A.    There are.
12       One of the other elements or
13 components of our general CSMP as a
14 regulatory affairs group is to do proactive
15 reviews, and at times we will -- we will
16 identify locations that we want to learn more
17 about.  We may see something in the data.  It
18 may just be the top dispensing location for a
19 chain, it may be related to a particular base
20 code, it may be related to something.  But we
21 will reach out proactively to the chain
22 teams, and we expect -- our expectation is
23 that we learn why that might be different.
24       And many times the chains will
25 be able to explain to us why -- why, you

Page 500

1 know, they're different or they may look
2 different.  They may be associated with
3 long-term care or something like that.  But
4 we reach out to them.
5       At times we've also learned
6 that chains have benefitted from that
7 information in terms of the shutting off a
8 doctor or a prescriber or going in to
9 re-review policies with the teams.  And so
10 they oftentimes, you know, take our word and
11 go out and establish action plans on their
12 side of the business.
13       MS. HENN:  Thank you,
14 Mr. Hartle.  I have no further
15 questions.
16       Should we go off the record?
17       MR. RAFFERTY:  Yeah.  Yeah,
18 I'll swap back around.  I've got to
19 grab a couple of documents.
20       VIDEOGRAPHER:  The time is 6:00
21 p.m., and we're going off the record.
22    (Off the record at 6:00 p.m.)
23       VIDEOGRAPHER:  The time is
24 6:03 p.m., and we're back on the
25 record.

Page 501

1       REDIRECT EXAMINATION
2 QUESTIONS BY MR. RAFFERTY:
3    Q.    Mr. Hartle, you were just asked
4 some questions by your counsel.  I just want
5 to follow up on a couple of them.
6    A.    Sure.
7    Q.    First of all, you were asked
8 about the evolution of the CSMP.
9       Do you recall that?
10    A.    I do.
11    Q.    And you talked about how you
12 continued to make improvements throughout
13 from 2008 forward, correct?
14    A.    I remember that.
15    Q.    All right.  From 2008, you'll
16 agree with me, though, that your company,
17 McKesson, made an awful lot of mistakes that
18 fed and created the opioid epidemic for many,
19 many years, correct?
20       If we went through all of those
21 today, it resulted in two settlements in 2008
22 and one in 2017, based on numerous, numerous
23 failures to provide suspicious order reports,
24 correct?
25       MS. HENN:  Objection to form.

Page 502

1    THE WITNESS: Similar to what's
2  in the most recent settlement, we
3  acknowledged, you know, certain
4  things.
5  QUESTIONS BY MR. RAFFERTY:
6    Q.    Okay.  And now that you're
7  making -- I think what I showed you earlier,
8  that now with your evolution of your CSMP,
9  you now went from making zero -- for many
10  years making zero suspicious order reports to
11  making hundreds of thousands now.
12    But my question is this:
13  Because now you are making hundreds of
14  thousands, we shouldn't -- you don't think
15  that that should absolve McKesson of the
16  deaths that you saw with my partner, Mike
17  Papantonio, that were created because of the
18  oversupply and McKesson shipping suspicious
19  orders throughout the country, right?
20    MS. HENN: Objection to form.
21    THE WITNESS: Could you ask
22  that, please, again?
23  QUESTIONS BY MR. RAFFERTY:
24    Q.    Yeah.  Yeah.
25    You talk about the evolution,

Page 503

1  but the fact of the matter is, is while this
2  epidemic was going on, McKesson was
3  continuing to flood the market with
4  suspicious orders, which we've seen time and
5  time again, many examples both that I went
6  through and that my partner went through,
7  showing pills being dumped in.
8    You understand that, right?
9    MS. HENN: Objection to form.
10    THE WITNESS: I understand
11  what's been shared, what we've talked
12  about, yes.
13  QUESTIONS BY MR. RAFFERTY:
14    Q.    Okay.  All right.  Now, because
15  now you're claiming that there was some
16  evolution and you're trying to tweak your
17  process, that doesn't absolve McKesson of the
18  responsibility for all of those deaths that
19  have been created over the years, correct?
20    MS. HENN: Objection to form.
21    THE WITNESS: I'm not saying
22  that.  We're not perfect, so we've
23  been in good faith trying to evolve
24  and do the right thing, and we've
25  acknowledged some shortcomings,

Page 504

1  obviously.
2  QUESTIONS BY MR. RAFFERTY:
3    Q.    Well, all of those -- I'm
4  sorry, go ahead.
5    A.    We're trying to do the right
6  thing and are trying to continue to advance
7  the program.
8    Q.    Well, when you say you're not
9  perfect, I mean, for many years, many, many
10  years, that we went through with the failure
11  to report suspicious orders, it was far from
12  being perfect, wasn't it?  Wasn't even close?
13    MS. HENN: Objection to form.
14    THE WITNESS: I understand
15  there was some shortcomings, sure.
16  QUESTIONS BY MR. RAFFERTY:
17    Q.    All right.  Now one of the
18  things that you also said to counsel was that
19  the enhancements -- or I'm sorry.  If any
20  order -- talking about the thresholds.  You
21  said very emphatically: If any of order
22  exceeded the threshold, it was blocked and
23  not shipped, right?
24    Remember that, when you told
25  your counsel?

Page 505

1    A.    From 2008 when we -- when we
2  enhanced and we added thresholds for every
3  base code.
4    Q.    That's not exactly true, is it?
5  Because it could and was still shipped as
6  long as a threshold change request was filed,
7  right?
8    MS. HENN: Objection to form.
9    THE WITNESS: There could be
10  thresholds that were processed.
11  However, as part of the mechanism
12  that -- if an order was received and
13  if the threshold was X amount, if it
14  exceeded that, those were blocked.
15  That's what I was referring to.
16  QUESTIONS BY MR. RAFFERTY:
17    Q.    Blocked.  But they could be
18  unblocked within hours by granting a
19  threshold change request, true?
20    MS. HENN: Objection to form.
21    THE WITNESS: It was not an
22  order-by-order -- a threshold -- it is
23  true that a threshold request could be
24  made and processed and then allow a
25  customer to order, depending on the

Page 506

1 scenarios.
2 　　　But the mechanism that
3 blocked -- that had the threshold in
4 place and the orders was intact.
5 QUESTIONS BY MR. RAFFERTY:
6 　　Q.　Right.　But --
7 　　A.　Is what I was saying.
8 　　Q.　-- they could be set aside for
9 things such as -- for as flimsy a reason as
10 we saw earlier as the Thanksgiving holiday.
11 　　　Do you recall that?
12 　　　MS. HENN:　Objection to form.
13 　　　THE WITNESS:　There was a
14 process to change thresholds, yes.
15 QUESTIONS BY MR. RAFFERTY:
16 　　Q.　Okay.　Now, you also talked
17 with your counsel about this getting to
18 know -- when she said, how do you communicate
19 and how do you work with the chains, and you
20 talked about getting to know the customer and
21 going out and working with the customer, the
22 chain, right?
23 　　A.　Correct.
24 　　Q.　So you stay pretty in touch
25 with the chain, and you rely upon the chain

Page 507

1 to provide you information in terms of the
2 diversion, correct?
3 　　　MS. HENN:　Objection to form.
4 QUESTIONS BY MR. RAFFERTY:
5 　　Q.　In terms of preventing
6 diversion?
7 　　　MS. HENN:　Objection to form.
8 　　　THE WITNESS:　Could you ask
9 that again?
10 QUESTIONS BY MR. RAFFERTY:
11 　　Q.　Yeah.
12 　　　In terms of -- when you say you
13 get to know the customer, you go out and you
14 continue to -- I think your quote is -- I
15 wrote down the quote -- "continue to learn
16 about the chains" even when they become
17 customers, right?
18 　　A.　Correct.
19 　　Q.　Now, let's talk about your
20 customers, because these customers include
21 Walgreens, right?
22 　　A.　Walgreens is not part of the
23 retail national account chain.　They have --
24 their relationship with McKesson is that they
25 have 340B specific accounts, the -- both

Page 508

1 health service accounts.　So they're not a
2 chain that I manage and -- it's a different
3 part of the business.
4 　　Q.　But they're a customer of --
5 　　A.　They're a customer of
6 McKesson's.
7 　　Q.　Okay.　Were you aware in June
8 of 2030 -- 2013, Walgreens paid an
9 $80 million fine for violation under the
10 Controlled Substance Act?
11 　　　Were you aware of that?
12 　　A.　Yes.
13 　　　MS. HENN:　Objection to form.
14 QUESTIONS BY MR. RAFFERTY:
15 　　Q.　Okay.　Were you aware that
16 CVS -- now, CVS is one of your customers,
17 right, that you monitor?
18 　　A.　They are a customer.
19 　　Q.　And that you were getting to
20 know.
21 　　　When you were getting to know
22 CVS, did you know that in May of 2015 they
23 paid a $22 million fine for unlawful
24 distribution of controlled substances?
25 　　　MS. HENN:　Objection.

Page 509

1 QUESTIONS BY MR. RAFFERTY:
2 　　Q.　Were you aware of that?
3 　　　MS. HENN:　Objection to form.
4 　　　THE WITNESS:　I'm aware of
5 those.
6 QUESTIONS BY MR. RAFFERTY:
7 　　Q.　Okay.　Were you aware when you
8 were getting to know your customer of Costco?
9 　　　Is that one of your customers?
10 　　A.　It is.
11 　　Q.　Okay.　Did you know that in
12 2017, Costco paid an $11.75 million fine?
13 Were you aware of that?
14 　　　MS. HENN:　Objection to form.
15 　　　THE WITNESS:　I'm aware of
16 that.
17 QUESTIONS BY MR. RAFFERTY:
18 　　Q.　Now, also, you mentioned -- you
19 were asked questions about your work at
20 Target.　So you said you actually did some
21 work in the pharmacy, in pharmacy security
22 and that type of thing at Target, right?
23 　　A.　Yeah, I had a team -- yeah, in
24 a variety of different ways over the course
25 of time.



Page 510

1    Q.    And were you there in 2012?

2    A.    I was.

3    Q.    Were you there in 2012 when

4  Target paid a $232,000 fine for overcharging

5  cities, municipalities, for prescription drug

6  coverage?

7          MS. HENN:  Objection to form.

8          THE WITNESS:  I was there

9    during that time frame.

10 QUESTIONS BY MR. RAFFERTY:

11   Q.    Do you recall that?

12   A.    I actually don't.

13   Q.    You don't?

14   A.    Not top of mind.

15   Q.    Well, you said that you'd also

16 worked in doing some diversion, right, when

17 you were at Target, or worked in the

18 diversion prevention at Target?

19   A.    Right.  Right.

20   Q.    So when you came to -- when you

21 came to McKesson then, you certainly should

22 have known the responsibilities and duties of

23 a distributor of drugs, of narcotics, under

24 the Controlled Substances Act, right?

25         MS. HENN:  Objection to form.

Page 511

1          THE WITNESS:  I knew what they

2    were.

3  QUESTIONS BY MR. RAFFERTY:

4    Q.    And you should have known then,

5  when you started at McKesson, the dramatic

6  impact that allowing diversion to occur with

7  the narcotics that you were distributing can

8  have on the public safety and welfare,

9  correct?

10   A.    I know the role that a

11 distributor plays.  That's why -- you know,

12 the impact that they can have.  That's why I

13 came and joined the team.  So I recognize

14 that.

15         MR. RAFFERTY:  Nothing further.

16         MS. HENN:  Thank you.

17         Before we go off the record the

18 last time, I would just, again, ask

19 the court reporter to please mark the

20 transcript highly confidential pending

21 review as ordered by the Court, and we

22 will also reserve the right to read

23 and sign.

24         Thank you very much.

25         VIDEOGRAPHER:  The time is

Page 512

1  6:11 p.m., August 1, 2018.  Going off

2  the record completing the videotaped

3  deposition.

4    (Deposition concluded at 6:11 p.m.)

5          - - - - - - -

Page 513

1          CERTIFICATE

2

3          I, CARRIE A. CAMPBELL, Registered

4  Diplomate Reporter, Certified Realtime
   Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement

5  of the examination, Nathan J. Hartle was duly
   sworn by me to testify to the truth, the

6  whole truth and nothing but the truth.

7          I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the

8  testimony as taken stenographically by and
   before me at the time, place and on the date

9  hereinbefore set forth, to the best of my
   ability.

10

11         I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney

12 nor counsel of any of the parties to this
   action, and that I am neither a relative nor

13 employee of such attorney or counsel, and
   that I am not financially interested in the

14 action.

15

16 _____

17 CARRIE A. CAMPBELL,
   NCRA Registered Diplomate Reporter

18 Certified Realtime Reporter
   California Certified Shorthand

19 Reporter #13921
   Missouri Certified Court Reporter #859

20 Illinois Certified Shorthand Reporter
   #084-004229

21 Texas Certified Shorthand Reporter #9328
   Kansas Certified Court Reporter #1715

22 Notary Public

23 Dated:  August 6, 2018

24

25

Highly Confidential - Subject to Further Confidentiality Review

## Page 514

1   INSTRUCTIONS TO WITNESS

2

3       Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the
6   appropriate space on the errata sheet for any
7   corrections that are made.
8       After doing so, please sign the
9   errata sheet and date it.  You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13      It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25

## Page 515

1   ACKNOWLEDGMENT OF DEPONENT

2

3

4       I,_____, do
    hereby certify that I have read the foregoing
5   pages and that the same is a correct
    transcription of the answers given by me to
6   the questions therein propounded, except for
    the corrections or changes in form or
7   substance, if any, noted in the attached
    Errata Sheet.
8
9
10
11
12  _____
    Nathan J. Hartle          DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
25

## Page 516

1       _ _ _ _ _ _ _
          ERRATA
2       _ _ _ _ _ _ _
3   PAGE  LINE  CHANGE
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____
25

## Page 517

1       _ _ _ _ _ _ _
       LAWYER'S NOTES
2       _ _ _ _ _ _ _
3   PAGE  LINE
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____
25