Highly Confidential - Subject to Further Confidentiality Review

```
1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3
    IN RE: NATIONAL        )
4   PRESCRIPTION           )  MDL No. 2804
    OPIATE LITIGATION      )
5   _____)  Case No.
                           )  1:17-MD-2804
6                          )
    THIS DOCUMENT RELATES  )  Hon. Dan A.
7   TO ALL CASES           )  Polster
8
                 TUESDAY, JULY 31, 2018
9
      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                 CONFIDENTIALITY REVIEW
11                      - - -
12            Videotaped deposition of Nathan J.
13   Hartle, held at the offices of Covington &
14   Burlington, LLP, One City Center, 850 Tenth
15   Street Northwest, Washington, DC, commencing
16   at 9:04 a.m., on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporter, Certified Realtime Reporter,
19   Illinois, California & Texas Certified
20   Shorthand Reporter, Missouri & Kansas
21   Certified Court Reporter.
22                      - - -
             GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
25
```

## Page 2

APPEARANCES:

MCHUGH FULLER LAW GROUP
BY: MICHAEL J. FULLER, JR., ESQUIRE
mike@mchughfuller.com
97 Elias Whiddon Road
Hattiesburg, Mississippi 39402
(601) 261-2220

GREENE KETCHUM BAILEY WALKER FARRELL
& TWEEL
BY: PAUL T. FARRELL, JR., ESQUIRE
paul@greeneketchum.com
419 Eleventh Street
Huntington, West Virginia 25701
(314) 525-9115

LEVIN, PAPANTONIO, THOMAS, MITCHELL,
RAFFERTY & PROCTOR, P.A.
BY: TROY RAFFERTY, ESQUIRE
trafferty@levinlaw.com
BRANDON BOGLE, ESQUIRE
bbogle@levinlaw.com
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
(850) 435-7000

SPANGENBERG SHIBLEY & LIBER LLP
BY: PETER H. WEINBERGER, ESQUIRE
pweinberger@spanglaw.com
(VIA TELECONFERENCE)
1001 Lakeside Avenue East
Cleveland, Ohio 44114
(216) 600-0114
Counsel for Plaintiffs

COVINGTON & BURLING LLP
BY: EMILY JOHNSON HENN, ESQUIRE
ehenn@cov.com
MEGHAN MONAGHAN, ESQUIRE
mmonaghan@cov.com
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
Counsel for McKesson Corporation

## Page 3

WILLIAMS & CONNOLLY LLP
BY: COLLEEN MCNAMARA, ESQUIRE
cmcnamara@wc.com
MIRANDA PETERSEN, ESQUIRE
mpetersen@wc.com
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5331
Counsel for Cardinal Health, Inc.

REEDSMITH LLP
BY: THOMAS H. SUDDATH, JR., ESQUIRE
tsuddath@reedsmith.com
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
Counsel for AmerisourceBergen

JONES DAY
BY: CHRISTOPHER J. LOVRIEN, ESQUIRE
cjlovrien@jonesday.com
555 South Flower Street, 50th Floor
Los Angeles, California 90071-2452
(213) 489-3939
Counsel for Walmart

PELINI, CAMPBELL & WILLIAMS LLC
BY: CRAIG G. PELINI, ESQUIRE
cgp@pelini-law.com
8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio 44720
(330) 305-6400
Counsel for Prescription Supply,
Inc.

JACKSONKELLY PLLC
BY: WILLIAM J. AUBEL, ESQUIRE
william.j.aubel@jacksonkelly.com
(VIA TELECONFERENCE)
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
(304) 340-1146
Counsel for Miami-Luken

## Page 4

ZUCKERMAN SPAEDER LLP
BY: CONOR B. O'CROININ, ESQUIRE
cocroinin@zuckerman.com
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202-1031
(202) 778-1800
Counsel for CVS Indiana, LLC, and
CVS RX Services, Inc.

ARNOLD & PORTER
BY: DAVID D. FAUVRE, ESQUIRE
David.Fauvre@arnoldporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
Counsel for Endo Pharmaceuticals
Inc., and Endo Health Solutions Inc.

ROPES & GRAY
BY: WILLIAM T. DAVISON, ESQUIRE
william.davison@ropesgray.com
800 Boylston Street
Boston, Massachusetts 02199-3600
(617) 951-7000
Counsel for Mallinckrodt

MARCUS & SHAPIRA LLP
BY: SCOTT D. LIVINGSTON, ESQUIRE
livingston@marcus-shapira.com
301 Grant Street, 35th Floor
Pittsburgh, Pennsylvania 15219-6401
(412) 338-4690
Counsel for HBC

MORGAN, LEWIS & BOCKIUS LLP
BY: MONICA C. PEDROZA, ESQUIRE
monica.pedroza@morganlewis.com
(VIA TELECONFERENCE)
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
(312) 324-1000
Counsel for Teva Pharmaceuticals
USA, Inc., Cephalon, Inc., Watson
Laboratories, Actavis LLC, Actavis
Pharma, Inc., f/k/a Watson Pharma

## Page 5

MORGAN, LEWIS & BOCKIUS LLP
BY: JOHN P. LAVELLE, JR., ESQUIRE
john.lavelle@morganlewis.com
(VIA TELECONFERENCE)
1701 Market Street
Philadelphia, Pennsylvania 19103-2921
(215) 963-5000
Counsel for Rite Aid

LOCKE LORD LLP
BY: BRANDAN MONTMINY, ESQUIRE
brandan.montminy@lockelord.com
(VIA TELECONFERENCE)
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8445
Counsel for Henry Schein, Inc., and
Henry Schein Medical Systems, Inc.

KIRKLAND & ELLIS
BY: KAITLYN L. COVERSTONE, ESQUIRE
kaitlyn.coverstone@kirkland.com
(VIA TELECONFERENCE)
300 North LaSalle
Chicago, IL 60654
(312) 862-3671
Counsel for Allergan Finance, LLC

VIDEOGRAPHER:
DANIEL HOLMSTOCK,
Golkow Litigation Services

TRIAL TECHNICIAN:
COREY SMITH,
Golkow Litigation Services
– – –

Page 6

INDEX

PAGE

APPEARANCES.......................................... 2
EXAMINATIONS
 BY MR. FARRELL............................. 15

EXHIBITS

| No. | Description | Page |
|---|---|---|
| McKesson Hartle 1 | Amended First Notice of Deposition Pursuant to Rule 30(b)(6) and Document Request Pursuant to Rule 30(b)(6) and Rule 34 to Defendant McKesson Corporation | 16 |
| McKesson Hartle 2 | Amended Second Notice of Deposition Pursuant to Rule 30(b)(6) and Document Request Pursuant to Rule 30(b)(6) and Rule 34 to Defendant McKesson Corporation | 17 |
| McKesson Hartle 3 | Defendant McKesson Corporation's Objections and Responses to Plaintiffs' First and Second Notices of Deposition Pursuant to Rule 30(b)(6) | 18 |
| McKesson Hartle 4 | Plaintiffs' Notice of Oral Videotaped Deposition of Nate Hartle Pursuant to Federal Rule of Civil Procedure 30(b)(6) | 18 |

Page 7

| McKesson Hartle 5 | 21 U.S.C.A Section 801, Congressional findings and declarations: Controlled substances | 38 |
| McKesson Hartle 6 | House Report No. 91-1444 | 53 |
| McKesson Hartle 7 | 21 CFR Section 1301.74 | 69 |
| McKesson Hartle 8 | Title 21 - Food and Drugs, Federal Register, Vol 36, No. 80, Saturday, April 24, 1971 | 75 |
| McKesson Hartle 9 | 861 Federal Reporter, 3d Series, Masters Pharmaceutical, Inc. Vs. Drug Enforcement Administration | 77 |
| McKesson Hartle 10 | HathiTrust, "Importation and use of opium. Hearings before the committee on Ways and Means of the House of Representatives, 61st Congress, 3d session on HR 25240, HR 25241, HR 25242, and HR 28791, December 14, 1910, and January 11, 1911" | 85 |
| McKesson Hartle 11 | Code of Federal Regulations, Food and Drugs, Section 1301.73 | 93 |
| McKesson Hartle 12 | Drug Operations Manual, MCKMDL00337660 - MCKMDL00337796 | 96 |

Page 8

| McKesson Hartle 13 | HathiTrust, "OxyContin: Its use and abuse: Hearing before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, House of Representatives, 107th Congress, first session, August 28, 2001 | 133 |
| McKesson Hartle 14 | Memorandum for ASA Hutchinson from Glenn A. Fine | 142 |
| McKesson Hartle 15 | Submission of the Honorable Rudolph W. Giuliani, "Buyers Beware: The Dangers of Purchasing Pharmaceuticals over the Internet, June 17, 2004 | 149 |
| McKesson Hartle 16 | US Department of Justice, DEA, September 27, 2006, MCKMDL00478806 - MCKMDL00478909 | 159 |
| McKesson Hartle 17 | April 25, 2007 letter to Linden Barber from McKesson Corporation, MCK-HOI-002-000001 - MCK-HOI-002-000007 | 179 |
| McKesson Hartle 18 | "Lifestyle Drugs & Internet Pharmacies," MCKMDL00403340 - MCKMDL00403348 | 215 |
| McKesson Hartle 19 | McKesson Operations Manual, Lifestyle Drug Monitoring Program, MCKMDL00337308 - MCKMDL00337308 | 237 |
| McKesson Hartle 20 | June 12, 2007 letter to Linden Barber from McKesson, MCKMDL00355527 - MCKMDL00355560 | 238 |

Page 9

| McKesson Hartle 21 | "Controlled Substance Monitoring Program (CSMP), Implementation Strategy - Regulatory Review Document, MCKMDL00267223 - MCKMDL00267229 | 242 |
| McKesson Hartle 22 | Lifestyle Drug Monitoring Program, MCKMDL00355041 - MCKMDL00355050 | 245 |
| McKesson Hartle 23 | US Department of Justice, DEA, December 27, 2007, MCKMDL00478910 - MCKMDL00478911 | 246 |
| McKesson Hartle 24 | Controlled Substance Monitoring Program (CSMP), Denver Sales Meeting, March 10, 2008, MCKMDL00267636 - MCKMDL00267672 | 253 |
| McKesson Hartle 25 | Settlement and Release Agreement and Administrative Memorandum of Agreement, MCKMDL00355561 - MCKMDL00355584 | 254 |
| McKesson Hartle 26 | McKesson Pharmaceutical Controlled Substance Monitoring Program (CSMP), DEA Discussion Document, July 31, 2008, MCK-HOI-002-0000042 - MCK-HOI-002-0000060 | 264 |
| McKesson Hartle 27 | Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc. | 271 |
| McKesson Hartle 28 | HDMA Boards of Directors printout from Wayback Machine | 274 |

Page 10

1  McKesson        State of Prescription        287
2  Hartle 29       Drug Abuse, Gary Boggs,
                   Olive Branch,
3                  MCK-AGMS-006-0000880 -
                   MCK-AGMS-006-0000933
4  McKesson        October 23, 2013 letter      299
5  Hartle 30       from William J.
                   Ihlenfeld, II, to Laureen
6                  E. Seeger,
                   MCKMDL00409046 -
7                  MCKMDL00409047

8  McKesson        November 6, 2013, letter     300
   Hartle 31       from William J.
9                  Ihlenfeld, II, to
                   Geoffrey E. Hobart,
10                 MCKMDL00409048 -
                   MCKMDL00409049
11 McKesson        In the Matter of McKesson    302
   Hartle 32       Corporation, United
12                 States Attorney's Office,
                   Northern District of West
13                 Virginia, DEA Diversion
                   Group - Washington
14                 Division,
                   MCKMDL00409050 -
15                 MCKMDL00409112
16 McKesson        McKesson Corporation,        303
   Hartle 33       Presentation to the US
17                 Attorney's Office,
                   Northern District of West
18                 Virginia and DEA, March
                   12, 2014,
19                 Confidential/Exempt from
                   FOIA,
20                 MCKMDL00409116 -
                   MCKMDL00409173
21
   McKesson        March 20, 2014 letter        304
22 Hartle 34       from William J.
                   Ihlenfeld, II, to
23                 Geoffrey E. Hobart,
                   MCKMDL00409174 -
24                 MCKMDL00409179
25

Page 11

1  McKesson        Settlement Agreement and     305
   Hartle 35       Release,
2                  MCKMDL00355322 -
                   MCKMDL00355348
3
   McKesson        Administrative Memorandum    306
4  Hartle 36       of Agreement,
                   MCKMDL00355513 -
5                  MCKMDL0035526
6  McKesson        Compliance Addendum,         306
   Hartle 37       MCKMDL00355477 -
7                  MCKMDL00355512
8  McKesson        Brief for Healthcare         321
   Hartle 38       Distribution Management
9                  Association and National
                   Association of Chain Drug
10                 Stores as Amici Curiae in
                   Support of Neither Party
11
   McKesson        HDMA Executive Committee     322
12 Hartle 39       printout from Wayback
                   Machine
13
   McKesson        Pharmacy Outlier Report,     367
14 Hartle 40       McKesson Corporation
                   Opioid Shipment to
15                 Summit, OH, page 1 or 49
                   and page 10 of 49
16
   (Exhibits attached to the deposition.)
17
   CERTIFICATE.................................368
18 ACKNOWLEDGMENT OF DEPONENT..................370
   ERRATA.......................................371
19 LAWYER'S NOTES..............................372
20
21
22
23
24
25

Page 12

1        VIDEOGRAPHER:  All right.  We
2  are now on the record.
3        My name is Daniel Holmstock.  I
4  am the videographer for Golkow
5  Litigation Services.
6        Today's date is July 31, 2018.
7  The time on the video screen is
8  9:04 a.m.
9        This video deposition is being
10 recorded at the law firm of Covington
11 & Burling LLP at 850 Tenth Street,
12 Northwest, in Washington, DC, in the
13 matter of In Re: National Prescription
14 Opiate Litigation.  It is pending
15 before the United States District
16 Court for the Northern District of
17 Ohio, Eastern Division.
18       The deponent today is Mr. Nate
19 Hartle.
20       Will counsel please introduce
21 themselves and whom they represent.
22       MR. FARRELL:  Paul Farrell on
23 behalf of the plaintiffs.
24       MR. RAFFERTY:  Troy Rafferty on
25 behalf of the plaintiffs.

Page 13

1        MR. FULLER:  Mike Fuller on
2  behalf of plaintiffs.
3        MR. SUDDATH:  Tom Suddath on
4  behalf of AmerisourceBergen.
5        MR. BOGLE:  Brandon Bogle on
6  behalf of the plaintiffs.
7        MR. PELINI:  Craig Pelini,
8  Prescription Supply.
9        MR. FAUVRE:  David Fauvre on
10 behalf of the Endo and Par
11 Pharmaceutical defendants.
12       MR. LOVRIEN:  Chris Lovrien,
13 Jones Day, on behalf of Walmart.
14       MR. DAVISON:  Bill Davison,
15 Ropes & Gray, on behalf of
16 Mallinckrodt, LLC, and SpecGx, LLC.
17       MS. PETERSEN:  Miranda
18 Petersen, Williams & Connolly, on
19 behalf of Cardinal Health, Inc.
20       MS. MCNAMARA:  Colleen
21 McNamara, Williams & Connolly, on
22 behalf of Cardinal Health, Inc.
23       MR. LIVINGSTON:  Scott
24 Livingston on behalf of HBC.
25       MR. O'CROININ:  Conor

Page 14

1 O'Croinin, CVS.
2     MS. MONAGHAN: Meghan Monaghan,
3 Covington & Burling, on behalf of
4 McKesson and the witness.
5     MS. HENN: Emily Henn,
6 Covington & Burling, on behalf of
7 McKesson and the witness.
8     VIDEOGRAPHER: Via telephone?
9     MS. PEDROZA: This is Monica
10 Pedroza on behalf of Teva
11 Pharmaceuticals USA, Inc., Cephalon
12 Inc., Watson Laboratories, Inc.,
13 Actavis, LLC, and Actavis Pharma, Inc.
14     MR. LAVELLE: John Lavelle on
15 behalf of Rite Aid.
16     MR. MONTMINY: Brendan Montminy
17 on behalf Henry Schein, Inc., and
18 Henry Schein Medical Systems, Inc.
19     MR. AUBEL: Bill Aubel, Jackson
20 Kelly, on behalf of Miami-Luken, Inc.
21     MR. WEINBERGER: Pete
22 Weinberger on behalf of the
23 plaintiffs.
24     VIDEOGRAPHER: The court
25 reporter is Carrie Campbell, who will

Page 15

1 now administer the oath to the
2 witness.
3
4     NATHAN J. HARTLE,
5 of lawful age, having been first duly sworn
6 to tell the truth, the whole truth and
7 nothing but the truth, deposes and says on
8 behalf of the Plaintiffs, as follows:
9
10     DIRECT EXAMINATION
11 QUESTIONS BY MR. FARRELL:
12     Q.  Good morning.
13     A.  Good morning.
14     Q.  Please state your name.
15     A.  My name is Nathan -- I go by
16 Nate -- John Hartle.
17     Q.  And what is your occupation,
18 and who is your employer?
19     A.  I'm currently a vice president
20 of regulatory affairs and compliance for
21 McKesson Corporation.
22     Q.  How long have you been employed
23 by McKesson?
24     A.  Since May of 2014.
25     Q.  Have you ever had your

Page 16

1 deposition taken before?
2     A.  20 years ago when I -- when I
3 worked at a previous employer for a theft
4 case, investigative.
5     Q.  So if you'll bear with me,
6 we're going to do a little bit of paperwork
7 to start -- to start off.
8     A.  Okay.
9     Q.  The first thing is, is are you
10 aware that today you'll be testifying not as
11 Nate Hartle but as McKesson Corporation?
12     A.  I am.
13     (McKesson-Hartle Exhibit 1
14 marked for identification.)
15 QUESTIONS BY MR. FARRELL:
16     Q.  I'm going to have marked and
17 show you McKesson 30(b)(6) Document 1, and
18 this is the first notice of deposition that
19 was filed in this case.
20     Have you had a chance to review
21 this document before today?
22     A.  I do.  I have copies of this.
23     Q.  And you understand that today
24 I'll be asking you questions about the
25 subject matters that are in Exhibit 1, and

Page 17

1 McKesson has been kind enough to designate
2 you as its spokesman to answer these
3 questions?
4     MS. HENN: Objection to form.
5     THE WITNESS: I understand.
6     (McKesson-Hartle Exhibit 2
7 marked for identification.)
8 QUESTIONS BY MR. FARRELL:
9     Q.  There's a second notice.  We'll
10 have that marked as Exhibit 2, and it's MCK
11 30(b)(6)_02.
12     Have you had a chance to review
13 this document before today?
14     A.  I have.
15     Q.  Now, it's my understanding that
16 McKesson has designated you to testify on
17 certain subject matters within this document
18 but not all.
19     Is that your understanding?
20     A.  Correct.
21     Q.  And those numbers are numbers
22 9, 14, 16, 17, 18, 19, 20, 21 and 22.
23     Is that your understanding as
24 well?
25     A.  Yes.

Page 18

1    (McKesson-Hartle Exhibit 3
2    marked for identification.)
3  QUESTIONS BY MR. FARRELL:
4    Q.    The next document, just to be
5  fair, is I'm going to mark as Exhibit 3
6  McKesson's objections and responses to each
7  of these subject matters to create the whole
8  record, if anybody wants to see it.  This
9  will be McKesson 30(b)(6)_3.
10    Have you had a chance to review
11  this document before today?
12    A.    I have.
13    Q.    It's much longer, isn't it?
14    (McKesson-Hartle Exhibit 4
15    marked for identification.)
16  QUESTIONS BY MR. FARRELL:
17    Q.    And finally, I'm going to show
18  you McKesson 30(b)(6)_4, which we've also
19  labeled as Exhibit 4, which is simply the
20  redesignation of the date and location and
21  the subject matters of today's deposition.
22    Have you had a chance to review
23  this document?
24    A.    I have.
25    Q.    So that everybody is on the

Page 19

1  same page, what you'll notice is that there
2  are a number of different Bates stamps that
3  we'll see throughout the day.  For purposes
4  of this deposition, what we've done is we've
5  created a unique and separate Bates stamp
6  just for your deposition, which can be found
7  in the top right-hand corner of, I hope, all
8  of the exhibits today.  And some of them,
9  start MCK 30(b)(6) and then underscore, and
10  then the first number you'll see is the
11  sequential number of exhibits, followed by a
12  dash and then individual page numbers.
13    As we go through later today, I
14  abandon the normal sequential numbering
15  system because we're going to bounce around
16  the timeline a little bit, and instead I use
17  basically a date indicator in the top
18  right-hand corner.
19    A.    Okay.
20    Q.    Now, that being said for
21  everybody on the telephone, a lot of these
22  documents have been produced in this
23  litigation, and what you'll find, to the best
24  of my ability, is I've always tried to find
25  the document that contains the MDL Bates

Page 20

1  stamp in the bottom right-hand corner.
2  Sometimes it's not been all that successful
3  because sometimes the document comes from a
4  prior production and has not yet matriculated
5  or made its way over to the MDL production.
6    But nonetheless, those are the
7  three different Bates stamp numbering systems
8  that we're going to come across today, and
9  when I talk on the record, I'll try to refer
10  just to the MDL number.
11    For the people on the telephone
12  and the record and then for you and I, it'll
13  be easiest for us to use the top right-hand
14  corner.
15    A.    Okay.
16    Q.    When did you first learn that
17  you would be designated as the corporate
18  witness for McKesson?
19    A.    I don't know the exact date,
20  but I believe within the last, say, 30 days
21  or so.
22    Q.    Do you know Gary Boggs?
23    A.    I do know Gary.
24    Q.    Are you aware that he has been
25  designated as a 30(b)(6) designee in another

Page 21

1  litigation pending in West Virginia?
2    A.    I am aware.
3    Q.    Have you read the deposition of
4  McKesson from that litigation?
5    A.    I have.
6    Q.    Is there anything in that
7  deposition that you think is wrong or
8  factually inaccurate?
9    A.    Not that I can recall.
10    Q.    Are you prepared, sitting here
11  today, to adopt or affirm the representations
12  McKesson made in the West Virginia Attorney
13  General litigation?
14    MS. HENN:  Objection to form.
15    THE WITNESS:  Can you ask that
16    again, please?
17  QUESTIONS BY MR. FARRELL:
18    Q.    So it's a little bit of a
19  Plato's Theory of the Forms right now, but
20  for all intents and purposes, McKesson is
21  sitting here in front of me today, and
22  McKesson was sitting before Mr. Lee Javins
23  from the West Virginia Attorney General
24  litigation pending in Boone County several
25  weeks ago.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    And so I'm trying to make the
2 connection that sitting here today McKesson
3 affirms or adopts all of its testimony from
4 the West Virginia litigation.
5    MS. HENN:  Objection to form.
6 This witness is here on -- designated
7 on behalf of McKesson for the topics
8 you've indicated.
9    But you can answer the
10 question.
11    THE WITNESS:  I'm not sure how
12 to answer that question.
13 QUESTIONS BY MR. FARRELL:
14    Q.   Okay.  So the answer is either
15 you adopt your testimony from the prior
16 litigation or you choose not to today.
17    MS. HENN:  Objection to form.
18 QUESTIONS BY MR. FARRELL:
19    Q.   It's okay either way.
20    A.   What's that?
21    Q.   It's okay either way.
22    A.   Yeah.
23    Q.   It's just a question of whether
24 or not I'm going to go back through some of
25 the other subject matters that Gary Boggs

Page 23

1 testified to or whether or not I can rely on
2 that sworn testimony --
3    A.   Okay.
4    Q.   -- to be applicable today.
5    MS. HENN:  Objection to form,
6 and same comment as I made before.
7    MR. FARRELL:  So, Counsel,
8 that's your second speaking objection,
9 and so I would ask that you keep your
10 comments from the record.
11 QUESTIONS BY MR. FARRELL:
12    Q.   So it's okay if you do not want
13 to adopt that prior testimony.  We can go
14 through it today.  You may not have the
15 authority by McKesson to do so.
16    A.   Yeah.  Again, I'm not sure how
17 to answer that question specifically.
18    Q.   It's not a problem.
19    A.   Yeah.  Okay.
20    Q.   Can you tell me what documents
21 you reviewed to prepare for today's
22 testimony?
23    MS. HENN:  I'm going to object
24 to that question as calling for
25 attorney work product and instruct the

Page 24

1 witness not to respond if you're being
2 asked, as I understand you are, for a
3 list of documents counsel showed you.
4 QUESTIONS BY MR. FARRELL:
5    Q.   Okay.  Have all of the
6 documents that counsel shared with McKesson
7 been disclosed in the MDL?
8    MS. HENN:  Do you mean to ask
9 whether the documents Mr. Hartle has
10 used in preparing for the deposition,
11 have they been produced?
12    MR. FARRELL:  Yes.
13    MS. HENN:  I believe that to be
14 the case, yes.
15 QUESTIONS BY MR. FARRELL:
16    Q.   Okay.  So is it fair to say
17 that everything Mr. Hartle reviewed has
18 actually been produced in the litigation
19 today?
20    MS. HENN:  That is my
21 understanding.
22    MR. FARRELL:  The reason I ask
23 is because when I read Mr. Boggs'
24 testimony, there are references to a
25 dozen or so documents that he relied

Page 25

1 upon and discussed that have not yet
2 been disclosed in the MDL.
3    Are you aware of any documents
4 that are pending that have not been
5 produced?
6    MS. HENN:  I know that we're
7 not complete with our productions, but
8 I'm not -- I don't know what those
9 documents -- what documents you're
10 referring to.
11    MR. FARRELL:  So to the extent
12 that there are future documents that
13 are produced that are relevant to the
14 subject matters that are in the
15 30(b)(6) notices, we reserve our right
16 to petition the Court for good cause
17 to extend or continue this deposition.
18    MS. HENN:  I note your
19 reservation of rights.  We may
20 disagree on the ability of plaintiffs
21 to continue this deposition, but let's
22 continue.
23 QUESTIONS BY MR. FARRELL:
24    Q.   Other than the documents
25 provided by counsel to you in preparation for

Page 26

1 this deposition, did you on your own review
2 any documents?
3     A.    Yes, I reviewed a handful of
4 documents that are standard with our program.
5     Q.    Okay.  Can you tell me which
6 ones they are?
7     A.    Can I ask a clarifying
8 question?  Can you repeat -- do the documents
9 that had already -- documents that haven't
10 been produced?  Anything in addition to
11 what --
12     Q.    That would be a swell place to
13 start.
14     A.    You know, as I think about
15 things that I've reviewed, it's standard
16 operating manuals and procedures, and I think
17 likely all that -- that stuff is part of what
18 was produced, so I don't --
19     Q.    That's actually not a very fair
20 way to place it because you probably haven't
21 studied the production list yet from
22 McKesson.
23     A.    No.  No.
24     Q.    So let's talk about it in a
25 different context.

Page 27

1     A.    Okay.
2     Q.    I'm assuming at some point in
3 time your counsel provided you some documents
4 that they culled through based upon the legal
5 documents and that, arguably, has been the
6 subject of some debate between the lawyers on
7 whether that list is producible or not.
8         Aside from that, did you
9 independently go and review anything on your
10 own, document-wise, to prepare for today?
11     A.    Document-wise?  You know, I
12 looked at files of mine, you know, just, you
13 know, what I -- what I have in my own, you
14 know, storage on things that I've done or
15 projects that I've been on and reviewed just
16 a variety of different pieces of information
17 that personally I have.
18     Q.    Where would those files be
19 located?
20     A.    On my computer, whether it be
21 e-mails or in documents on my standard
22 storage on my computer.
23     Q.    Would it be documents from
24 MCK.NET?
25     A.    I don't think there was

Page 28

1 anything stored on MCK.NET, our intra -- the
2 company's intra site.
3     Q.    I just wanted to say MCK.NET.
4     A.    MCK.NET, yeah.
5     Q.    Did you review documents that
6 were on your personal computer -- that's a
7 bad question.
8         Did you review documents that
9 are located on your hard drive of your
10 computer?
11     A.    My work computer?
12     Q.    Yes.
13     A.    Yes.
14     Q.    Would those documents also have
15 been on the server?
16     A.    Could you clarify "server"?
17     Q.    Yeah.  So in general, when you
18 have a network of computers, sometimes
19 there's a central repository where
20 everybody's computer can pull up files from,
21 and then there's also on your own computer a
22 hard drive that nobody else can look at,
23 except you, from your computer station.
24     A.    I understand that, sir, but
25 I -- you know, in terms of the shared

Page 29

1 repository that we use in regulatory affairs,
2 yes, there's documents stored on there that
3 I've reviewed.
4     Q.    What about documents on your
5 personal hard drive on your office computer?
6     A.    Yes, I store documents on my
7 personal office computer.
8     Q.    And those documents you
9 reviewed prior to today's deposition?
10         MS. HENN:  Objection to form.
11         THE WITNESS:  There are some
12     documents.
13 QUESTIONS BY MR. FARRELL:
14     Q.    Did you rely on any of those
15 documents or did any of those documents
16 refresh your recollection about the subject
17 matters of today's deposition?
18     A.    I used --
19         MS. HENN:  Objection to form.
20         Go ahead.
21         THE WITNESS:  I used them to
22     refresh.
23 QUESTIONS BY MR. FARRELL:
24     Q.    Okay.  How about e-mails?  Did
25 you go and review any old e-mails?

Highly Confidential – Subject to Further Confidentiality Review

Page 30

1  A.  I may have looked at a few
2  e-mails.
3  Q.  Do any of them particularly
4  stand out?
5  A.  No.
6  Q.  Who would the e-mails have come
7  from that you were reviewing?
8  MS. HENN:  Objection to form.
9  THE WITNESS:  Could be a
10  variety of people.  I don't recall,
11  you know, specific e-mails that I
12  looked at.  Could be from my team or
13  part of a project or...
14  QUESTIONS BY MR. FARRELL:
15  Q.  And I'm sorry if I asked this
16  before.  How long have you been with
17  McKesson?
18  A.  Since 2014.  May of 2014.
19  Q.  You understand that some of the
20  subject matters today may predate 2014?
21  A.  I do understand that.
22  Q.  Other than documents provided
23  by your lawyer, where did you find documents
24  that predated 2014?
25  MS. HENN:  Objection to form.

Page 31

1  THE WITNESS:  They would be on
2  our shared drive or our space where
3  regulatory affairs -- it's called the
4  R drive.  That's where we would share
5  information.
6  QUESTIONS BY MR. FARRELL:
7  Q.  Okay.  Other than the R drive,
8  where else would we find those documents?
9  MS. HENN:  Objection to form.
10  THE WITNESS:  I'm not sure -- I
11  don't believe I accessed anything else
12  outside of the hard drive.  I know
13  there's other sites, a share point
14  site in the past, but I believe mine
15  were all from the R drive.
16  QUESTIONS BY MR. FARRELL:
17  Q.  Have you reviewed any documents
18  or seen any documents that predate 2006?
19  A.  I have.
20  Q.  And did you -- where did those
21  documents come from?
22  I'll make it easier.  Did those
23  documents come from the lawyers?
24  A.  I have some in the -- the -- my
25  preparation over the past few days, but also

Page 32

1  I do have documents, as I joined McKesson,
2  that I reviewed and had stored either on my
3  personal computer, on my work computer, or
4  the R drive that predate 2006.
5  Q.  All right.  So we're going to
6  jump into some topics.
7  A.  Okay.
8  Q.  Have you read the Masters
9  Pharmaceutical case?
10  A.  Not for a while.  I read it
11  when it first came out, you know.
12  Q.  That was June of 2017.
13  So when I start asking
14  questions, I'm going to do my very best to
15  keep envisioning McKesson's logo sitting in
16  front of me instead of Nate Hartle.
17  A.  Okay.
18  Q.  So let me ask a different way.
19  Is McKesson aware of the
20  publishing of the Masters Pharmaceutical
21  case?
22  MS. HENN:  Objection to form.
23  THE WITNESS:  We are.
24  QUESTIONS BY MR. FARRELL:
25  Q.  You're aware that in Masters

Page 33

1  Pharmaceutical there was a discussion of the
2  reporting requirement?
3  A.  I am.
4  Q.  And does McKesson acknowledge
5  that is the law in the United States?
6  MS. HENN:  Objection to form.
7  THE WITNESS:  Could you ask
8  that question again, please?  Do I --
9  QUESTIONS BY MR. FARRELL:
10  Q.  Sure.
11  I'm jumping out of order a
12  little bit, but I'm going to see if I can
13  actually grab the folder for it.
14  We're not going to premark this
15  because that will absolutely mess up my
16  numbering system, but the top right-hand
17  corner it's Bates stamped 2017_06_30.
18  And I apologize for the
19  flopping of the documents across the big
20  table.
21  This is Masters Pharmaceutical.
22  Has McKesson read this document?
23  MS. HENN:  Objection to form.
24  THE WITNESS:  I believe that
25  several have read this document.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 QUESTIONS BY MR. FARRELL:
2     Q.    Have you read this document in
3 preparation for today's deposition?
4     A.    Did I have it in the past?
5     Q.    No.
6           In preparation for today's
7 deposition, have you read this as McKesson's
8 corporate designee?
9     A.    I did not read this specific
10 right before the deposition.
11    Q.    So it's not -- it's not a
12 memory contest --
13    A.    Right.
14    Q.    -- and that's why I brought the
15 documents --
16    A.    Right.
17    Q.    -- so that -- so that we can
18 talk about some of the subject matters.
19          The first thing I'd like you to
20 do is turn to the Bates stamp page 7. And
21 you'll notice that there are two columns, and
22 in the bottom right-hand corner the paragraph
23 heading number 2.
24          Do you see that?
25    A.    Yes.

Page 35

1     Q.    And midway down through, you'll
2 see that in the parentheses it says the
3 "reporting requirement."
4     A.    I see that.
5     Q.    Do you see it?
6     A.    I do.
7     Q.    And then immediately after
8 that, it describes what the reporting
9 requirement is. And I don't know if you do
10 better reading it aloud or reading it to
11 yourself.
12          Would you like me to read it,
13 or would you like to read it?
14    A.    I can read it.
15    Q.    All right. Starting with "the
16 reporting requirement is a relatively modest
17 one," will you finish the sentence?
18    A.    I read that sentence.
19    Q.    Okay. Now, will you read it
20 aloud?
21    A.    "It requires only that a
22 distributor provide basic information about
23 certain orders to DEA so that DEA
24 investigators in the field can aggregate
25 reports from every point along the legally

Page 36

1 regulated supply chain and use the
2 information to ferret out potentially illegal
3 activity."
4     Q.    Does McKesson acknowledge that
5 it has a duty under the reporting
6 requirement?
7           MS. HENN:  Objection to form.
8           THE WITNESS:  Acknowledge that
9     we -- we, as part of the designing and
10    operating the suspicious order system,
11    have to report suspicious orders.
12 QUESTIONS BY MR. FARRELL:
13    Q.    That wasn't my question.
14          My question is:  Does McKesson
15 acknowledge the reporting requirement, as you
16 just read aloud, is a duty owed by McKesson
17 under the federal regulations and United
18 States Code?
19          MS. HENN:  Objection to form.
20          THE WITNESS:  And it's our
21    responsibility to report suspicious
22    orders.
23 QUESTIONS BY MR. FARRELL:
24    Q.    So the answer to my question is
25 yes --

Page 37

1     A.    Yes.
2     Q.    -- no, or I don't know.
3           MS. HENN:  Objection to form.
4           THE WITNESS:  It is our -- yes.
5 QUESTIONS BY MR. FARRELL:
6     Q.    Okay. Now, I want you to go
7 down, and if you actually flip the page,
8 we'll cheat to the end, and it's the end of
9 the first sentence in the top left-hand
10 corner. In parentheses it says, "The
11 shipping requirement."
12          Do you see that?
13    A.    Where am I looking again?
14 Sorry.
15    Q.    Very top left-hand corner
16 there's a --
17    A.    Okay. Shipping requirement. I
18 see that.
19    Q.    All right. Now what we're
20 going to do is go to the beginning of that
21 sentence on the previous page, and it's the
22 last full sentence. It starts with "once a
23 distributor has."
24          Do you see that sentence?
25    A.    I see that.

Page 38

1    Q.    Now I'm going to give you a
2  chance to read it without -- and digest it
3  for a second.
4    A.    I've read that.
5    Q.    All right.  Now, can you read
6  it aloud for the record?
7    A.    "Once a distributor has
8  reported a suspicious order, it must make one
9  of two choices, decline to ship the order or
10  conduct some due diligence, and if it is able
11  to determine that the order is not likely to
12  be diverted into illegal channels, ship the
13  order."
14    Q.    Does McKesson acknowledge that
15  the shipping requirement is a duty it owes
16  under the United States Code and the Code of
17  Federal Regulations?
18      MS. HENN:  Objection to form.
19      THE WITNESS:  Yes.
20      (McKesson-Hartle Exhibit 5
21  marked for identification.)
22  QUESTIONS BY MR. FARRELL:
23    Q.    We'll come back to this later.
24      All right.  The next document
25  we're going to reference is MCK 30(b)(6)_5.

Page 39

1  And so to make this easy so I don't have to
2  say all those letters and numbers, as we move
3  forward I'm just going to refer to it exhibit
4  such-and-such.
5    A.    Okay.
6    Q.    And when I do, we're talking
7  about the exhibit for this deposition.
8      I'm going to represent to you
9  that there are four pages to this exhibit,
10  that you won't find this exhibit anywhere on
11  the Internet because I made them myself.  I'm
12  going to give you a second to flip through
13  them, and what I'm going to represent to you
14  is that these are four different provisions
15  from four different United States Code
16  provisions.  So I'll give you a second to
17  review.
18    A.    Okay.
19    Q.    So the first thing I want you
20  to take note of on Exhibit 5, page 1, is the
21  top left-hand corner, which is the great seal
22  of our United States Congress.
23      And if you look under the
24  United States Code, Title 21, for food and
25  drugs, under Chapter 13, Drug Abuse

Page 40

1  Prevention and Control, Subchapter 1, Control
2  and Enforcement, Part A, Introductory
3  Provisions, this is the beginning of the
4  Controlled Substances Act.
5      McKesson is aware of and
6  acknowledges that its role in the chain of
7  distribution of opioids is governed by the
8  Controlled Substances Act, agreed?
9      MS. HENN:  Objection to form.
10      THE WITNESS:  Yes.
11  QUESTIONS BY MR. FARRELL:
12    Q.    Now, I'm going to have you look
13  down all the way at all those letters and
14  numbers at the very bottom, Public Law
15  91-513, Title 2.  And the date there is
16  October 27, 1970.
17      McKesson is aware that the
18  Controlled Substances Act has been in force
19  and effect since 1970, correct?
20      MS. HENN:  Objection to form.
21      THE WITNESS:  Correct.
22  QUESTIONS BY MR. FARRELL:
23    Q.    So Section 801, which is on the
24  first page, is Congressional findings and
25  declarations regarding controlled substances.

Page 41

1      Do you see that?
2    A.    I do.
3    Q.    And it says, "The Congress
4  agrees makes the following findings and
5  declarations."
6      And to be fair, paragraph 1,
7  will you read it aloud?
8    A.    "Many of the drugs included
9  within this subchapter have a useful and
10  legitimate medical purpose and are necessary
11  to maintain the health and general welfare of
12  the American people."
13    Q.    Does McKesson acknowledge and
14  agree with that finding?
15      MS. HENN:  Objection to form.
16      THE WITNESS:  Yes.
17  QUESTIONS BY MR. FARRELL:
18    Q.    Now, will you read Section 2
19  aloud, please?
20    A.    "The illegal importation,
21  manufacture, distribution and possession and
22  improper use of controlled substances have
23  substantially and detrimentally effect --
24  have a substantial and detrimental effect on
25  the health and general welfare of the

Page 42

1 American people."
2 Q. Does McKesson acknowledge and
3 agree with those findings?
4 MS. HENN: Objection to form.
5 THE WITNESS: Yes.
6 QUESTIONS BY MR. FARRELL:
7 Q. So you'll notice in paragraph 2
8 it includes distribution, correct?
9 A. Correct.
10 Q. And McKesson is engaged in the
11 distribution business, agreed?
12 A. We are.
13 Q. And that if they do not follow
14 the law as provided by the US code and the
15 Code of Federal Regulations, it has a
16 substantial and detrimental effect on the
17 health and general welfare of the American
18 people, agreed?
19 MS. HENN: Objection to form.
20 THE WITNESS: Could you restate
21 that question for me, please?
22 QUESTIONS BY MR. FARRELL:
23 Q. Yeah.
24 You agree with paragraph 2 --
25 A. Right.

Page 43

1 Q. -- as McKesson's
2 representative, correct?
3 A. Correct.
4 Q. And what it says is that the
5 illegal, and one of the words is
6 distribution, of controlled substances has a
7 substantial and detrimental effect on the
8 health and general welfare of the American
9 people.
10 I'm asking you if McKesson
11 agrees and acknowledges with this finding by
12 Congress in 1970.
13 MS. HENN: Objection to form.
14 THE WITNESS: Yes, that the
15 illegal distribution can -- could
16 potentially have an impact on the
17 American --
18 QUESTIONS BY MR. FARRELL:
19 Q. Well, it doesn't say
20 "potential" in paragraph 2, does it?
21 A. It doesn't.
22 Q. It says that if you break the
23 law, it has a substantial and detrimental
24 effect on the health and general welfare of
25 the American people.

Page 44

1 A. That's what it says, correct.
2 Q. Does McKesson agree and
3 acknowledge that finding?
4 MS. HENN: Objection to form.
5 THE WITNESS: Yes.
6 QUESTIONS BY MR. FARRELL:
7 Q. Now, if you flip to page 2,
8 this is section A 12 of the Controlled
9 Substances Act, and what it says is it places
10 drugs into one of several categories.
11 Is McKesson aware of the
12 scheduling of controlled substances?
13 A. We are.
14 Q. Okay. And what we're dealing
15 with in this litigation primarily today are
16 Schedule II drugs, correct?
17 A. Correct.
18 Q. Now, there was a period of time
19 when certain hydrocodone combination products
20 were Schedule III, but they've since been
21 reclassified as Schedule II, agreed?
22 A. Agreed.
23 Q. And McKesson picked up a book
24 of business when that happened on the HCPs,
25 agreed?

Page 45

1 MS. HENN: Objection to form.
2 THE WITNESS: Can you rephrase
3 the book of business and the question
4 a little bit?
5 QUESTIONS BY MR. FARRELL:
6 Q. Yeah, that was a little too
7 country.
8 Is McKesson aware that its
9 sales of hydrocodone combination products
10 rose following the reclassification of those
11 opioids from Schedule III to Schedule II?
12 A. Yes.
13 Q. So nonetheless, when we're
14 talking about these products, I'm referencing
15 Schedule II for today.
16 A. Understood.
17 Q. So the Schedule II has a
18 definition, does it not, under the United
19 States Code?
20 A. It does.
21 Q. There's three aspects to it.
22 Do you see those three aspects?
23 A. I do.
24 Q. Could you read aspect A?
25 A. "The drug or other substance

Page 46

1 has a high potential for abuse."
2    Q.   McKesson is aware since 1970
3 that it was engaging in business of
4 distributing Schedule II controlled
5 substances which have a high potential for
6 abuse, agreed?
7    A.   Agreed.
8    Q.   And you agree that the opioids,
9 whether they're Schedule II or formerly
10 Schedule III, are drugs that have a high
11 potential for abuse?
12    A.   Agree.
13    Q.   McKesson knows this?
14    A.   We do.
15    Q.   And McKesson has known this
16 from the very beginning of their decision to
17 distribute controlled substances?
18    A.   Agreed.
19    Q.   Would you read paragraph B,
20 please?
21    A.   "The drug or other substance
22 has a currently accepted medical use and
23 treatment in the United States or a currently
24 accept medical use with severe restrictions."
25    Q.   Does McKesson agree and

Page 47

1 acknowledge with this statement from
2 Congress?
3      MS. HENN:  Objection to form.
4      THE WITNESS:  Yes.
5 QUESTIONS BY MR. FARRELL:
6    Q.   Now, read paragraph C, please.
7    A.   "Abuse of a drug or other
8 substances may lead to severe psychological
9 or physical dependence."
10    Q.   Does McKesson agree and
11 acknowledge this finding?
12      MS. HENN:  Objection to form.
13      THE WITNESS:  Yes.
14 QUESTIONS BY MR. FARRELL:
15    Q.   So just to be clear, when we're
16 talking about controlled substances in this
17 litigation, we're talking about opiates and
18 opioids, agreed?
19    A.   Agreed.
20    Q.   And what these are, are these
21 are derivatives of opium in the form of a
22 pill, agreed?
23      MS. HENN:  Objection to form.
24      THE WITNESS:  It's multiple
25    formulations but, yes.

Page 48

1 QUESTIONS BY MR. FARRELL:
2    Q.   What we start with is we start
3 with the poppy plant, agreed?
4      MS. HENN:  Objection to form.
5      THE WITNESS:  Agreed.
6 QUESTIONS BY MR. FARRELL:
7    Q.   Well -- and it's okay if -- I'm
8 just trying to figure out what McKesson
9 knows.
10      McKesson distributes pills from
11 a manufacturer to pharmacies.  That's what
12 they do, yes?
13    A.   Correct.
14    Q.   The pills that you're
15 distributing, you're aware they originally
16 come from the poppy plant?
17      MS. HENN:  Objection to form.
18    Outside the scope.
19      THE WITNESS:  I'm not an expert
20    in the medical field and design, but I
21    understand that, yes.
22 QUESTIONS BY MR. FARRELL:
23    Q.   Does McKesson acknowledge or
24 appreciate that what they're selling are
25 opium pills?

Page 49

1      MS. HENN:  Objection to form.
2      THE WITNESS:  We understand
3    how -- what's in the pills, so, yes.
4 QUESTIONS BY MR. FARRELL:
5    Q.   Okay.  So the opium can be
6 manipulated by the manufacturers to be
7 opiate-like?  Opiate-like, right?  There's
8 opiates and opioid, or opiate-like, and
9 that's how you get hydrocodone and oxycodone
10 and all the different types of opium pills,
11 agreed?
12    A.   Correct.
13      MS. HENN:  Objection to form.
14 QUESTIONS BY MR. FARRELL:
15    Q.   So when I say "opium pills,"
16 what I'm talking about is the big
17 classification of all of these pills derived
18 from the poppy plant.
19      Is that fair?
20    A.   Understood.
21    Q.   All right.  And when we talk
22 about any of the individual pills, whether
23 it's hydrocodone or oxycodone, those all fall
24 within the opium pill umbrella, right?
25      MS. HENN:  Objection to form.

Page 50

1       THE WITNESS:  Yes.
2  QUESTIONS BY MR. FARRELL:
3       Q.    So when McKesson is
4  distributing opium pills, it knows and
5  understands that these pills have a high
6  potential for abuse?
7       A.    We do.
8       Q.    Now, they also -- you also --
9  McKesson understands that these pills do have
10  an accepted medical use in treatment, but
11  they have severe restrictions, agreed?
12       MS. HENN:  Objection to form.
13       THE WITNESS:  We understand the
14  language, yes.
15  QUESTIONS BY MR. FARRELL:
16       Q.    You understand the language of
17  paragraph B?
18       A.    Right.
19       Q.    Opium pills have a place in
20  current medical practice?
21       A.    Yes.
22       Q.    But abusing opium pills may
23  lead to severe psychological and physical
24  dependence?
25       A.    Correct.

Page 51

1       Q.    McKesson understands and
2  acknowledges this?
3       A.    Yes.
4       Q.    And that's why the unlawful
5  distribution of these opium pills, relating
6  back to page 1, has a substantial and
7  detrimental effect on the health and general
8  welfare of the American people.
9       Does McKesson acknowledge that?
10       MS. HENN:  Objection to form.
11       THE WITNESS:  Yes.
12  QUESTIONS BY MR. FARRELL:
13       Q.    Now we're going to flip to
14  page 3, which is Section 821, rules and
15  regulations.
16       Will you please read this
17  aloud?
18       A.    "The Attorney General is
19  authorized to promulgate rules and
20  regulations and to charge reasonable fees
21  relating to the registration and control of
22  the manufacture, distribution and dispensing
23  of controlled substances and to listed
24  chemicals."
25       Q.    All right.  Do you see the date

Page 52

1  of this?
2       A.    I do.
3       Q.    What is the date?
4       A.    October 27, 1970.
5       Q.    Does McKesson acknowledge that
6  Congress gave the United States Attorney
7  General the authority to promulgate rules
8  regarding the distribution of opium pills?
9       MS. HENN:  Objection to form.
10       THE WITNESS:  Yes.
11  QUESTIONS BY MR. FARRELL:
12       Q.    Now let's flip to the next
13  page.  This is the -- this is where we'll be
14  spending most of our time today.  This is
15  page 4, Section 823.
16       This is from the United States
17  Code, and it includes, as you'll see down in
18  paragraph 1, what Congress has said is
19  McKesson's duty.  I'd like you to first read
20  that to yourself.
21       A.    I've read it.
22       Q.    All right.  Does McKesson
23  acknowledge that it has a duty to maintain
24  effective control against diversion of opium
25  pills as mandated by Congress?

Page 53

1       MS. HENN:  Objection to the
2  form.
3       THE WITNESS:  We do.
4       (McKesson-Hartle Exhibit 6
5  marked for identification.)
6  QUESTIONS BY MR. FARRELL:
7       Q.    Now this is a much bigger
8  document, but I promise we won't go through
9  every page.
10       This is going to be marked as
11  Exhibit 6 in the bottom right-hand corner,
12  and in the top right-hand corner it's MCK
13  30(b)(6)_6.
14       For our fans following on the
15  telephone, this is the Congressional history
16  that can be found at 91-1444.  It is Public
17  Law 91-513.
18       Do you remember when we were
19  looking at the United States Code and it
20  referenced Public Law 91-513 from Exhibit 5?
21       A.    Yes.
22       Q.    This is that document, I'll
23  represent to you.
24       A.    Okay.
25       Q.    And what this is, is this is

Page 54

1  the Congressional history of all those codes
2  that we just walked through. And I'm not
3  going to ask you to read the entire document
4  because I've highlighted certain sections for
5  you.
6       The first thing I'd like you to
7  do is I'd like for you to turn to Bates stamp
8  page 5. And while you read the document to
9  yourself, I'm going to read it out loud to
10 save you some time.
11     A.   Okay.
12     Q.   Under Title 2, Control and
13 Enforcement, it states, "The bill provides
14 for control by the Justice Department of
15 problems related to drug abuse through
16 registration of manufacturers, wholesalers,
17 retailers and all others in the legitimate
18 distribution chain and makes transactions
19 outside the legitimate distribution chain
20 illegal."
21     Does McKesson acknowledge this
22 finding from Congress?
23     MS. HENN: Objection to form.
24     THE WITNESS: Yes.
25

Page 55

1  QUESTIONS BY MR. FARRELL:
2      Q.   I'm going to have you to turn
3  to Bates stamp page 8. And again, these are
4  my highlights. Congress didn't highlight
5  this in 1970; Paul Junior did. So while you
6  read it, I'm going to read it out loud.
7      "The bill was designed to
8  improve the administration and regulation of
9  the manufacturing, distribution and
10 dispensing of controlled substances by
11 providing for a closed system of drug
12 distribution for legitimate handlers of such
13 drugs. Such a closed system should
14 significantly reduce the widespread diversion
15 of these drugs out of the legitimate channels
16 into the illicit market, while at the same
17 time providing the legitimate drug industry
18 with a unified approach to narcotic and
19 dangerous drug control."
20     Does McKesson acknowledge the
21 truth of this finding by Congress?
22     MS. HENN: Objection to form.
23     THE WITNESS: Yes.
24 QUESTIONS BY MR. FARRELL:
25     Q.   So let's just talk about this

Page 56

1  for a minute.
2       McKesson understands that in
3  1970 Congress created a closed system,
4  agreed?
5      A.   Agree.
6      Q.   What a closed system means is
7  that laissez-faire economics don't apply,
8  agreed?
9      MS. HENN: Objection to form.
10     THE WITNESS: Have to refresh
11     my memory on laissez-faire economics.
12 QUESTIONS BY MR. FARRELL:
13     Q.   It's just a fancy French word
14 for "hands off." The government is
15 intervening in the marketplace of the chain
16 of distribution for opium pills, agreed?
17     A.   For controlled substances.
18     Q.   Well, for all controlled
19 substances --
20     A.   Correct.
21     Q.   -- but today we're talking
22 about opium pills.
23     A.   Understood.
24     Q.   So the controlled substances
25 are in a chain of distribution that are

Page 57

1  closed off to the rest of the marketplace.
2  McKesson acknowledges that?
3      MS. HENN: Objection to form.
4      THE WITNESS: Correct. It's a
5      closed system.
6  QUESTIONS BY MR. FARRELL:
7      Q.   And in order to participate in
8  the closed system, you have to be one of the
9  select few that gets a registration
10 certificate from the DEA, agreed?
11     A.   Agreed.
12     Q.   And the reason Congress did
13 this was to reduce diversion. Does McKesson
14 acknowledge that?
15     MS. HENN: Objection to form.
16     THE WITNESS: Yes, I believe
17     that was the overall intent.
18 QUESTIONS BY MR. FARRELL:
19     Q.   So it's creating rules to
20 prevent diversion to the best of their
21 ability. McKesson acknowledges that fact?
22     MS. HENN: Objection to form.
23     THE WITNESS: Yes.
24 QUESTIONS BY MR. FARRELL:
25     Q.   Because if McKesson doesn't

Page 58

1 follow the law, then diversion is likely.
2 You agree with that statement?
3          MS. HENN:  Objection to form.
4          THE WITNESS:  I don't know if
5     I'd say -- always characterize it as
6     likely all the time, but diversion can
7     happen.
8 QUESTIONS BY MR. FARRELL:
9     Q.    Okay.  Well, in this specific
10 provision, the United States Congress passed
11 a law to close the system of distribution and
12 enact laws to reduce the widespread diversion
13 of these drugs.  You agree with that?  That's
14 the purpose of this law?
15         MS. HENN:  Objection to form.
16         THE WITNESS:  Yes.
17 QUESTIONS BY MR. FARRELL:
18    Q.    So the idea here is that -- to
19 close the system of distribution so that we
20 keep these dangerous opium pills inside the
21 legitimate market for medical care, agreed?
22    A.    Agreed.
23    Q.    And that's why we have these
24 laws enacted, so that we can do our best to
25 keep these drugs to the patients that need

Page 59

1 them, agreed?
2     A.    Agreed.
3     Q.    And if you don't follow those
4 laws, then what happens is we have diversion
5 into the illicit market?
6          MS. HENN:  Objection to form.
7          THE WITNESS:  That can happen
8     if you don't follow those laws.
9 QUESTIONS BY MR. FARRELL:
10    Q.    And that's the reason Congress
11 created the laws as stated in this finding?
12         MS. HENN:  Objection to form.
13         THE WITNESS:  Correct.
14 QUESTIONS BY MR. FARRELL:
15    Q.    Next I'm going to have you flip
16 to page 11.  And I just highlighted one
17 sentence in here.  And it says, "The price
18 for participation in this traffic," which is
19 illicit drug trafficking, "should be
20 prohibitive."
21         Do you see that sentence?
22    A.    I see that.
23    Q.    Does McKesson acknowledge that?
24         MS. HENN:  Objection to form.
25

Page 60

1 QUESTIONS BY MR. FARRELL:
2     Q.    Does McKesson acknowledge that
3 sentence to be true?
4          MS. HENN:  Objection to form.
5          THE WITNESS:  Yes.
6 QUESTIONS BY MR. FARRELL:
7     Q.    It just makes sense, right?  If
8 you're going to punish somebody and the
9 punishment isn't very severe, they're likely
10 to what?
11         MS. HENN:  Objection to form.
12         THE WITNESS:  To do it again.
13 QUESTIONS BY MR. FARRELL:
14    Q.    Why?
15    A.    There's no penalty or
16 accountability.
17    Q.    And so by making the penalty
18 prohibitive, what does it do?
19         MS. HENN:  Objection to form.
20         THE WITNESS:  Could you ask the
21    question in a -- again?  What --
22 QUESTIONS BY MR. FARRELL:
23    Q.    If you make the penalty
24 prohibitive, then what happens?
25         MS. HENN:  Objection to form.

Page 61

1          MR. MONTMINY:  Objection to
2     form.  Calls for speculation.  This is
3     Brandon Montminy for Henry Schein.
4          MS. HENN:  And just to note for
5     everyone's knowledge, many of you know
6     this, but in the deposition protocol,
7     one defendant's objection counts for
8     all defendants, so there's no need to
9     do depositions {sic} if I'm done then.
10    But if on the phone you can't hear me,
11    I can try to speak up.
12         MR. FARRELL:  So that means
13    you're not allowed to object to this
14    question because Henry Schein objected
15    to it.
16         MS. HENN:  I already did, I'm
17    afraid to say.  There are two.
18 QUESTIONS BY MR. FARRELL:
19    Q.    So back to my original
20 question.
21    A.    Yeah, could you put it in
22 simpler terms in --
23    Q.    Yeah.  Let me put it --
24    A.    Just so I know.
25    Q.    -- in other terms.

Page 62

1    A.    Yeah.
2    Q.    Let's say that a speeding
3 ticket is a dollar.  What would happen across
4 America if a speeding ticket was a dollar?
5        MS. HENN:  Objection to form.
6 QUESTIONS BY MR. FARRELL:
7    Q.    What would happen?
8    A.    It wouldn't hold the same
9 weight or it wouldn't -- it may not deter
10 people from speeding.
11    Q.    What if the speeding ticket was
12 a million dollars?  What would that do?
13        MS. HENN:  Objection to form.
14        THE WITNESS:  I'm just
15 guessing, but likely people would not
16 speed.
17 QUESTIONS BY MR. FARRELL:
18    Q.    Because the penalty would be
19 prohibitive, agreed?
20    A.    Agreed.
21    Q.    Like not to be cute, but
22 McKesson was fined $13 million in 2008 and
23 then was fined again in 2017 $150 million.
24        Do you think that the second
25 fine was intended to be more prohibitive than

Page 63

1 the first fine?
2        MS. HENN:  Objection to form.
3        THE WITNESS:  I believe so.
4 QUESTIONS BY MR. FARRELL:
5    Q.    All right.  Now, let's go to
6 Bates stamp page 26.
7        And it says, "Titles 2 and 3 of
8 the bill deal with law enforcement aspect of
9 drug abuse and provide authority for the
10 Department of Justice to keep track of all
11 drugs subject to abuse, manufactured or
12 distributed in the United States, in order to
13 prevent diversion of these drugs from
14 legitimate channels of commerce."
15        Does McKesson acknowledge the
16 truth of that statement?
17        MS. HENN:  Objection to form.
18        THE WITNESS:  Yes.
19 QUESTIONS BY MR. FARRELL:
20    Q.    This is just another reflection
21 of the US Code that we were reading that
22 Congress is giving the authority to the
23 Department of Justice to enact safety rules
24 in order to prevent the diversion of
25 controlled substances, including opium pills,

Page 64

1 from legitimate channels into illegitimate
2 channels.
3        Does McKesson acknowledge that?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  Yes.
6 QUESTIONS BY MR. FARRELL:
7    Q.    Flip to page 27, the very next
8 page.
9        It says, "The legislation
10 provides that all persons engaged in a
11 legitimate distribution chain involving drugs
12 included in one of the schedules under the
13 bill must be registered with the Attorney
14 General."
15        So again, this is bringing full
16 circle the authority of the Attorney General
17 and the Department of Justice to promulgate
18 rules for those that wish to engage in the
19 closed system of distribution for controlled
20 substances, and McKesson acknowledges that?
21        MS. HENN:  Objection to form.
22        THE WITNESS:  Yes.
23 QUESTIONS BY MR. FARRELL:
24    Q.    Now flip to page 34.  And I
25 would like for you to please read that

Page 65

1 provision that's highlighted aloud.
2    A.    One second.
3        "The illegal importation,
4 manufacture, distribution and possession and
5 improper use of controlled substances have a
6 substantial detrimental effect on the
7 public's health and general welfare."
8    Q.    Does McKesson acknowledge the
9 truth of that statement?
10    A.    Yes.
11    Q.    So if somebody in the chain of
12 distribution breaks the law, it has a
13 substantial detrimental effect on the public
14 health and general welfare, agreed?
15        MS. HENN:  Objection to form.
16        THE WITNESS:  It can.
17 QUESTIONS BY MR. FARRELL:
18    Q.    Now go to page 44.
19        Again, this is another
20 reiteration that Congress authorizes the
21 Attorney General to "promulgate rules and
22 regulations and to charge reasonable fees
23 relating to the registration and control of
24 the manufacture, distribution and dispensing
25 of substances covered by the Act."

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  Does McKesson acknowledge the
2  authority of the Department of Justice and
3  the Attorney General to do so?
4  MS. HENN: Objection to form.
5  THE WITNESS: Yes.
6  QUESTIONS BY MR. FARRELL:
7  Q. Now flip to page 45, the very
8  next one. This is a little bit longer, so
9  I'm going to give you a chance to read it
10  real quick.
11  A. Okay. I've read it.
12  Q. So I'm going to read it aloud,
13  and I'm going to stop and ask you some
14  questions.
15  It's -- Section B of
16  Section 303 states that the Attorney General,
17  when issuing registrations, is going to
18  consider several factors, agreed?
19  A. Can you say that again? I was
20  looking at --
21  Q. Yeah, I was trying to summarize
22  the first four lines.
23  A. Yeah.
24  Q. Basically, what it really boils
25  down to is this is a reiteration of the

Page 67

1  findings behind the statute that I showed you
2  regarding maintaining effective control.
3  So if you drop down to where it
4  says number 1 at the bottom of the page --
5  can you start reading there?
6  A. Yeah. Okay.
7  Q. Will you read that aloud,
8  please, starting with "maintenance of
9  effective controls"?
10  A. "Maintenance of effective
11  controls against diversion of particular
12  controlled substances into other than
13  legitimate medical, scientific and industrial
14  channels."
15  Q. All right. So again, what
16  we're talking about is the enactment of rules
17  to prevent diversion?
18  A. Correct.
19  Q. Last factor, factor 5, would
20  you read that?
21  A. "Such other factors as may be
22  relevant to and consistent with the public
23  health and safety."
24  Q. Does McKesson acknowledge that
25  Congress gave the Department of Justice the

Page 68

1  authority to promulgate rules which govern
2  McKesson so that they maintain effective
3  controls against diversion, and to adopt any
4  other rule they want that may be relevant and
5  consistent with public health and safety?
6  MS. HENN: Objection to form.
7  THE WITNESS: Agree.
8  QUESTIONS BY MR. FARRELL:
9  Q. I just want to make sure that
10  we start off with the premise that the rules
11  we're about to go through aren't designed
12  to -- let me ask it in a better way.
13  The rules that we're about to
14  get into, McKesson acknowledges, are designed
15  with the primary purpose of preventing
16  diversion?
17  MS. HENN: Objection to form.
18  THE WITNESS: Correct.
19  QUESTIONS BY MR. FARRELL:
20  Q. Because diversion impacts
21  public health and safety, and McKesson
22  acknowledges that?
23  A. Yes.
24  MS. HENN: Objection to form.
25  (McKesson-Hartle Exhibit 7

Page 69

1  marked for identification.)
2  QUESTIONS BY MR. FARRELL:
3  Q. The next exhibit we'll have is
4  marked as Exhibit 7, and correspondingly in
5  the top right-hand corner it's MCK
6  30(b)(6)_07-01, and it's just one page.
7  Once we get through this
8  section, we can take a break if you like.
9  All right. So what I'm going
10  to represent to you is that you will not find
11  this anywhere on the Internet either because
12  I made it. In the top left-hand corner is
13  the Department of Justice seal, and in the
14  top right-hand corner is the Drug Enforcement
15  Administration seal, and in the middle is
16  where you can trace down the rules that
17  govern McKesson.
18  Does McKesson acknowledge that
19  Title 21 CFR 1301.74 governs its conduct with
20  the distribution of controlled substances,
21  including opium pills?
22  MS. HENN: Objection to form.
23  THE WITNESS: Yes.
24  QUESTIONS BY MR. FARRELL:
25  Q. Part B is what we're going to

Page 70

1 spend the rest of the day on.
2       Have you read part B before?
3    A.    Yes.
4    Q.    Does McKesson acknowledge that
5 part B governs its conduct?
6       MS. HENN: Objection to form.
7       THE WITNESS: Yes.
8 QUESTIONS BY MR. FARRELL:
9    Q.    Does McKesson acknowledge that
10 for it to be lawfully carrying out its job of
11 dispensing controlled substances and opium
12 pills, it must follow paragraph B?
13       MS. HENN: Objection to form.
14       THE WITNESS: Yes.
15 QUESTIONS BY MR. FARRELL:
16    Q.    And if McKesson does not follow
17 paragraph B, its conduct is illegal?
18       MS. HENN: Objection to form.
19       THE WITNESS: Yes.
20 QUESTIONS BY MR. FARRELL:
21    Q.    To make it clear --
22    A.    Yeah.
23    Q.    -- if McKesson follows
24 paragraph B, its conduct is legal?
25    A.    Correct.

Page 71

1    Q.    And if McKesson does not follow
2 paragraph B, its conduct is illegal?
3       MS. HENN: Objection to form.
4       THE WITNESS: Correct.
5 QUESTIONS BY MR. FARRELL:
6    Q.    And so bringing full circle, we
7 understand that the purpose of this
8 regulation, one of them, is the prevention of
9 diversion, correct?
10       MS. HENN: Objection to form.
11       THE WITNESS: Correct.
12 QUESTIONS BY MR. FARRELL:
13    Q.    So if you engage in illegal
14 conduct and violate paragraph B, the result
15 of that is diversion?
16       MS. HENN: Objection to form.
17 QUESTIONS BY MR. FARRELL:
18    Q.    It's the whole reason this law
19 was enacted?
20       MS. HENN: Objection to form.
21 QUESTIONS BY MR. FARRELL:
22    Q.    Does McKesson acknowledge that?
23    A.    Could you ask the specific
24 question again?
25       MS. HENN: Objection to form.

Page 72

1 QUESTIONS BY MR. FARRELL:
2    Q.    Yeah, it got very complicated
3 because it was a compound question with
4 compound objections.
5       Does McKesson acknowledge that
6 paragraph B that we're looking at here is
7 intended to prevent diversion?
8       MS. HENN: Objection to form.
9       THE WITNESS: Yes.
10 QUESTIONS BY MR. FARRELL:
11    Q.    And that if you follow -- if
12 McKesson abides by paragraph B, its conduct
13 is legal and diversion is prevented?
14       MS. HENN: Objection to form.
15       THE WITNESS: Agreed.
16 QUESTIONS BY MR. FARRELL:
17    Q.    And if McKesson does not abide
18 by paragraph B, its conduct is illegal and
19 the result could be diversion?
20       MS. HENN: Objection to form.
21       THE WITNESS: Agree. The
22    result could be diversion.
23 QUESTIONS BY MR. FARRELL:
24    Q.    Well, if McKesson is
25 distributing orders of unusual size, could it

Page 73

1 be anything other than diversion?
2       MS. HENN: Objection to form.
3       THE WITNESS: It could.
4 QUESTIONS BY MR. FARRELL:
5    Q.    All right. Give me some
6 examples.
7       MS. HENN: Objection to form.
8       THE WITNESS: Maybe the best --
9    a customer adds, you know -- their
10    business model changes or they add --
11    for example, a pharmacy may add
12    contracts with multiple long-term care
13    facilities and require that they now
14    dispense more for legitimate reasons,
15    so they could order more in that
16    context.
17 QUESTIONS BY MR. FARRELL:
18    Q.    So what's the purpose of the
19 Department of Justice making McKesson follow
20 paragraph B?
21       MS. HENN: Objection to form.
22       THE WITNESS: Say that again?
23    What's the purpose of why we
24    follow that? To try to prevent
25    diversion.

Page 74

1    MS. HENN: Mr. Farrell, we've
2 been going over an hour. Would this
3 be a good time for a five-minute
4 break?
5    MR. FARRELL: Let me close up
6 this thing and then we'll get there.
7    MS. HENN: All right.
8    MR. FARRELL: Is that okay?
9    MS. HENN: If it's all right
10 with the witness.
11    THE WITNESS: It's okay.
12 QUESTIONS BY MR. FARRELL:
13    Q.    Okay. At the bottom of
14 Exhibit 7, do you see the numbers in the
15 brackets?
16    A.    I do.
17    Q.    36 FR 7778. Do you know what
18 that means?
19    A.    I don't know off the top of my
20 head.
21    Q.    What about the letters and
22 numbers after that; do you know what that
23 means?
24    A.    The date?
25    Q.    Yes.

Page 75

1    A.    Of course I know the date.
2    Q.    Yes.
3    Does McKesson acknowledge that
4 21 CFR Section 1301.74 has been in force and
5 effect since 1971?
6    MS. HENN: Objection to form.
7    THE WITNESS: Yes.
8    (McKesson-Hartle Exhibit 8
9 marked for identification.)
10 QUESTIONS BY MR. FARRELL:
11    Q.    Just to make sure, I actually
12 pulled 36 Federal Register 778. I'm going to
13 have it marked as Exhibit 8.
14    And I'm not going to ask you to
15 read the whole thing because I was kind
16 enough to highlight for you Bates stamp
17 page 10.
18    And this is from 1971, and this
19 is the document in our United States Archives
20 which adopts the language that we just read
21 in 21 CFR 1301.74.
22    Does McKesson acknowledge this
23 is the law and it has been the law since
24 1971?
25    MS. HENN: Objection to form.

Page 76

1    THE WITNESS: Yes.
2 QUESTIONS BY MR. FARRELL:
3    Q.    The language that you just read
4 in paragraph B, is it the same language
5 that's in the CFR provision that I showed
6 you?
7    A.    It's similar. Not word for
8 word.
9    Q.    Okay. Is there any meaningful
10 difference?
11    A.    No.
12    Q.    You'll acknowledge that that is
13 the law today as reflected in the 2016
14 version that we're not going to have marked
15 but I'm going to show and ask for -- for --
16 you can just trust me on it if you'd like,
17 but you acknowledge that in 20 -- it's the
18 law today, the same?
19    MR. SUDDATH: Objection.
20 QUESTIONS BY MR. FARRELL:
21    Q.    Well, and just to be sure, what
22 I did was I went and ordered the CFR from
23 every year between 1971 and this year, and I
24 looked at every single one of them just to
25 make sure that the law is, and always has

Page 77

1 been, what it says in Masters Pharmaceutical,
2 including in 1996 when OxyContin was
3 launched.
4    So does McKesson acknowledge
5 that the CFR provision in McKesson {sic} is
6 and always has been the law governing
7 McKesson's conduct since 1971?
8    MS. HENN: Objection to form.
9    THE WITNESS: Yes.
10 QUESTIONS BY MR. FARRELL:
11    Q.    I'm sorry. I misspoke.
12    So does McKesson acknowledge
13 that the CFR provision we cited in the
14 Masters Pharmaceutical case is and always has
15 been the law governing McKesson's conduct
16 since 1971?
17    MS. HENN: Objection to form.
18    THE WITNESS: Can I read what
19 was in the Masters case again?
20    (McKesson-Hartle Exhibit 9
21 marked for identification.)
22 QUESTIONS BY MR. FARRELL:
23    Q.    Absolutely.
24    And at this point if you hand
25 it back to me, this'll be a good point for us

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 to mark it as Exhibit 9.
2     A.   So your question again?
3     Q.   Yeah.
4         Does McKesson acknowledge that
5 the CFR provision cited in Masters
6 Pharmaceutical case, which is 21 CFR
7 1301.74 B, is and always has been the law
8 governing McKesson's conduct since 1971?
9         MS. HENN: Objection to form.
10         THE WITNESS: Yes.
11         MR. FARRELL: And
12 unfortunately, I'm not going to be
13 able to get all of my pretty-colored
14 books on the videotape.
15         Let the record reflect that the
16 office of the Federal Register has a
17 kaleidoscope of colors that it uses
18 for the front cover of all of its CFR
19 booklets.
20         And with that, we'll take our
21 first break.
22         VIDEOGRAPHER: The time is
23 10:23 a.m. We're going off the
24 record.
25   (Off the record at 10:23 a.m.)

Page 79

1         VIDEOGRAPHER: The time is
2 10:40 a.m., and we're back on the
3 record.
4 QUESTIONS BY MR. FARRELL:
5     Q.   I forgot to warn you before the
6 break, but during the break, did you have any
7 meaningful conversations with your counsel
8 about your testimony?
9         MS. HENN: Objection to form.
10         THE WITNESS: No.
11 QUESTIONS BY MR. FARRELL:
12     Q.   Did you talk about your
13 testimony at all?
14         MS. HENN: Objection to form.
15         THE WITNESS: Not really my
16 testimony, just --
17         MS. HENN: And I'm just going
18 to instruct the witness not to divulge
19 what we talked about. I don't think
20 that's an appropriate question. I
21 think you got the answer you were
22 looking for.
23         MR. FARRELL: I think I almost
24 got the answer I'm looking for.
25

Page 80

1 QUESTIONS BY MR. FARRELL:
2     Q.   Did you talk to your lawyer
3 about the substance of your testimony during
4 the break?
5         MS. HENN: And I'll instruct
6 the witness not to divulge particulars
7 of what we talked about.
8         But you may answer that
9 question yes or no.
10         THE WITNESS: Yes.
11 QUESTIONS BY MR. FARRELL:
12     Q.   Okay. What did you talk about?
13         MS. HENN: I'm going to
14 instruct the witness not to answer
15 that question as calling for
16 privileged information.
17         MR. FARRELL: Right. But the
18 deposition protocol and the rules
19 governing this litigation state that
20 counsel is not allowed to discuss with
21 the witness the substance of any
22 testimony during a break.
23         And so his answer in the
24 affirmative indicates that that
25 occurred, and so I should be allowed

Page 81

1 to inquire about that.
2         MS. HENN: All right. Well,
3 let's take a break, and we will
4 discuss outside and have a privileged
5 conversation, and we'll see if there's
6 any answer that he can provide without
7 divulging privileged information that
8 I don't believe you're entitled to.
9         MR. FARRELL: Okay. So you're
10 going to have a second conversation
11 during a break about the substance of
12 his testimony?
13         MS. HENN: No, Counsel, that's
14 not what's going to happen. But I'd
15 like to take a break so that I can
16 talk to my witness about answering the
17 question inquiring into discussions
18 with counsel.
19         MR. FARRELL: Okay.
20         MS. HENN: Thank you.
21         VIDEOGRAPHER: The time is
22 10:42 a.m. We're going off the
23 record.
24   (Off the record at 10:42 a.m.)
25         VIDEOGRAPHER: The time is

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 10:46 a.m. We're back on the record.
2 MR. FARRELL: So what did you
3 find out?
4 MS. HENN: Counsel, just to
5 protect the privilege, I'm just going
6 to instruct the witness that when he
7 answered yes to your question and
8 indicated affirmatively that we'd
9 talked about the substance of his
10 testimony, I'm going to ask him to
11 answer your question and tell you what
12 he deemed to be the substance of his
13 testimony, but I'm also going to ask
14 him not to repeat what I -- my
15 response.
16 So let's do that, and we can
17 discuss if you're still concerned.
18 Okay?
19 MR. FARRELL: Not really. Let
20 me make --
21 MS. HENN: Go ahead and ask
22 your question.
23 MR. FARRELL: Let me make it
24 even easier.
25

Page 83

1 QUESTIONS BY MR. FARRELL:
2 Q. Did anything your lawyer say to
3 you cause you to change or withdraw anything
4 you said this morning?
5 A. Absolutely not.
6 Q. Did anything your lawyer told
7 you during the break impact or affect your
8 testimony the rest of the day?
9 A. No.
10 Q. That's fair enough.
11 A. Okay.
12 Q. Aside from the statutory duty
13 and the duty that's in the regulation, does
14 McKesson acknowledge that it has a general
15 duty to protect the public against diversion
16 of controlled substances and opium pills?
17 MS. HENN: Objection to form.
18 THE WITNESS: Could you restate
19 that, please?
20 QUESTIONS BY MR. FARRELL:
21 Q. Does McKesson acknowledge that
22 it has a general duty to protect the public
23 against diversion of controlled substances
24 and opium pills into the illicit market?
25 MS. HENN: Objection to form.

Page 84

1 THE WITNESS: Yes, a general
2 duty as part of our responsibility,
3 regulatory responsibilities and
4 general responsibilities.
5 QUESTIONS BY MR. FARRELL:
6 Q. So let's be careful. I want
7 to -- the wording sometimes makes a
8 difference.
9 A. Okay.
10 Q. Aside from the statute from the
11 United States Code and the regulations
12 promulgated by the Department of Justice,
13 does McKesson acknowledge that it owes a duty
14 to the general public to prevent diversion of
15 controlled substances and opium pills into
16 the illicit market?
17 MS. HENN: Objection to form.
18 THE WITNESS: We do feel
19 strongly about playing a role in
20 preventing diversion.
21 QUESTIONS BY MR. FARRELL:
22 Q. So the answer needs to be
23 "yes," "no," or "I don't know."
24 A. Yes.
25 MS. HENN: Objection to form.

Page 85

1 QUESTIONS BY MR. FARRELL:
2 Q. So your answer is, yes, aside
3 from the statutory and regulatory provisions,
4 McKesson acknowledges that it owes a duty to
5 the general public to prevent diversion of
6 controlled substances and opium pills into
7 the illicit market?
8 MS. HENN: Objection to form.
9 THE WITNESS: Yes.
10 (McKesson-Hartle Exhibit 10
11 marked for identification.)
12 QUESTIONS BY MR. FARRELL:
13 Q. I'm going to mark what is going
14 to be Deposition Exhibit 10. The top
15 right-hand corner is going to be 1910_01_11.
16 And I'll show it to you, to counsel, two
17 extra copies for my new best friends. And
18 I'm going to give you a little introduction
19 to this document before you start flipping
20 through it.
21 The front is the HathiTrust.
22 Are you familiar with the HathiTrust?
23 A. I am not.
24 Q. I wasn't either until this
25 litigation.

Page 86

1    The HathiTrust is an
2 organization, nonprofit organization, that
3 collects public documents and puts them
4 online.
5    A.    Okay.
6    Q.    This one is from December 1910
7 and January 1911.  That's a long time ago,
8 isn't it?
9    A.    That would be a long time ago.
10    Q.    100 years ago.
11    This predates 1970s US Code and
12 the 1971 Code of Federal Regulations, agreed?
13    A.    Clearly, yes.
14    Q.    This is a hearing on -- take a
15 guess.
16    A.    Opioids.
17    Q.    In particular, opium.  And it
18 was about the importation of opium into
19 America back in the early turn of the
20 century.
21    McKesson was around back then,
22 wasn't they?
23    A.    McKesson was -- has been
24 around.
25    Q.    They were around back during

Page 87

1 this time frame, agreed?
2    A.    Agreed.
3    Q.    So why do you think I'm
4 bringing this up?
5    MS. HENN:  Objection to form.
6    THE WITNESS:  I don't want to
7    speculate why I think you're bringing
8    it up.
9 QUESTIONS BY MR. FARRELL:
10    Q.    Guess who testified during this
11 hearing.
12    MS. HENN:  Objection to form.
13    THE WITNESS:  Don't know.
14 QUESTIONS BY MR. FARRELL:
15    Q.    Take a wild guess.
16    MS. HENN:  Same objection.
17    THE WITNESS:  I don't have
18    honestly a guess.
19 QUESTIONS BY MR. FARRELL:
20    Q.    Mr. McKesson.
21    So what I'm going to have you
22 flip to, is I'm going to have you flip to
23 page 72.
24    Now, without going through the
25 entire boring history of commerce clause, the

Page 88

1 United States Constitution, I'm just going to
2 give you a broad statement.
3    What this is, is this is
4 America's first attempt to regulate opium
5 trafficking in America.  And back then there
6 was a big debate on whether or not this was
7 something the federal government can do or
8 it's something that should be left to the
9 states.
10    So what the federal government
11 decided to do was pass the Harrison Narcotic
12 Act.  What that did was it basically taxed
13 opium as a way for the federal government to
14 control, and this is a debate about the
15 taxation on the importation of opium.
16    A.    Okay.
17    Q.    Page 72 is the beginning of the
18 testimony of Mr. McKesson from McKesson &
19 Robbins, which is the predecessor and when
20 McKesson Corporation was in the private hands
21 of the McKesson family.
22    You acknowledge that?
23    A.    Correct.
24    Q.    I'm going to have you flip to
25 page 75.  And if you look near the top, one

Page 89

1 of congressmen asks Mr. McKesson about
2 whether or not he supports this bill.  And
3 I'm going to give you an opportunity to read
4 to yourself the provision before I ask you to
5 read it aloud.
6    A.    Which specific part do you want
7 me to start and end at?
8    Q.    The first time it says
9 "Mr. McKesson."
10    A.    Okay.
11    Q.    He's asked about whether or not
12 he's in favor of the bill.
13    Do you see that?
14    A.    I do.
15    Q.    And his answer is, "Yes, very
16 much in favor of the bill."
17    Do you see that provision?
18    A.    I do.
19    Q.    Now, would you please begin
20 reading the next sentence?
21    A.    Out loud?
22    Q.    Please.
23    A.    "Our firm was founded in 1832,
24 and we have been ever since against the sale
25 of habit-forming drugs and all that kind of

Page 90

1 thing. Orders which have come to us from
2 suspicious people we have put in the hands of
3 the proper authorities for tracing and
4 prosecution, if necessary."
5     Q.    So you agree with me that even
6 before the enactment of the Controlled
7 Substances Act and the Code of Federal
8 Regulations, which we discussed earlier this
9 morning, is that McKesson, Mr. McKesson
10 hisself, was acknowledging that if they have
11 suspicious people, they're going to turn it
12 over to law enforcement for prosecution,
13 agreed?
14        MS. HENN:  Objection to form.
15        THE WITNESS:  Agreed based on
16     what I'm reading in this document.
17 QUESTIONS BY MR. FARRELL:
18     Q.    And this duty predates the US
19 Code and predates the Code of Federal
20 Regulations, agreed?
21        MS. HENN:  Objection to form.
22        THE WITNESS:  Agreed.
23 QUESTIONS BY MR. FARRELL:
24     Q.    So would you agree, would
25 McKesson agree, that it owes a common law

Page 91

1 duty to the American public to prevent
2 diversion if it's engaged in the distribution
3 of controlled substances, including opium
4 pills, to prevent their diversion into the
5 illicit market?
6        MS. HENN:  Objection to form.
7        THE WITNESS:  Can you ask it in
8     a shorter version there?
9 QUESTIONS BY MR. FARRELL:
10     Q.    Probably not.
11        Does McKesson acknowledge it
12 owes a common law duty to the American public
13 to prevent the diversion of controlled
14 substances, including opium pills, into the
15 illicit market?
16        MS. HENN:  Objection to form.
17        THE WITNESS:  Yes.
18 QUESTIONS BY MR. FARRELL:
19     Q.    Now, the first part of the
20 sentence, it kind of grabbed my attention.
21 It says, "McKesson has ever since been
22 against the sale of habit-forming drugs."
23 And this was in 1910.
24        Do you see that?
25     A.    I see that.

Page 92

1     Q.    When did McKesson begin the
2 business of selling opium pills?
3        MS. HENN:  Objection to form.
4        THE WITNESS:  I do not know.
5 QUESTIONS BY MR. FARRELL:
6     Q.    At some point in time
7 McKesson's philosophy changed, and it went
8 from not selling habit-forming drugs to now
9 selling habit-forming drugs, agreed?
10        MS. HENN:  Objection to form.
11        THE WITNESS:  Agreed.
12 QUESTIONS BY MR. FARRELL:
13     Q.    Has McKesson considered, given
14 the presence of the opioid epidemic in
15 America, perhaps returning to the stance of
16 1910 of its founder, Mr. McKesson?
17        MS. HENN:  Objection to form.
18        THE WITNESS:  Again, I'm not
19     aware of that.  Can't answer that
20     question.
21 QUESTIONS BY MR. FARRELL:
22     Q.    Well, you could choose not to
23 sell opium pills anymore in America, could
24 you not?
25     A.    You could choose to.

Page 93

1     Q.    But McKesson chooses to
2 continue to sell opium pills in America,
3 despite the fact that we have an opiate pill
4 epidemic?
5        MS. HENN:  Objection to form.
6        THE WITNESS:  We do.
7        (McKesson-Hartle Exhibit 11
8     marked for identification.)
9 QUESTIONS BY MR. FARRELL:
10     Q.    The next exhibit we're going to
11 have marked as Exhibit 11.  In the top
12 right-hand corner, this is 1996, 04, 01.
13        We've acknowledged that in
14 1971, Department of Justice adopted CFR
15 provision 1301.74, agreed?
16     A.    Agree.
17     Q.    And then we went through and
18 it's the law today, agreed?
19     A.    Agreed.
20     Q.    It's the law that was
21 referenced in the Masters Pharmaceutical
22 case, agreed?
23     A.    Agreed.
24     Q.    And it hadn't changed through
25 all those colorful books I showed you,

Page 94

1  agreed?
2        MS. HENN:  Objection to form.
3        THE WITNESS:  Agreed.
4  QUESTIONS BY MR. FARRELL:
5      Q.    This is a specific year.
6        Can you tell me what year it
7  is?
8      A.    1996.
9      Q.    Why do you think I picked this
10  year?
11        MS. HENN:  Objection to form.
12        THE WITNESS:  I'm not -- I'm
13    not sure.
14  QUESTIONS BY MR. FARRELL:
15      Q.    What happened in 1996 that
16  changed the face of opioid sales in America?
17        MS. HENN:  Objection to form.
18        THE WITNESS:  I'm not
19    100 percent sure.  I'd be speculating.
20  QUESTIONS BY MR. FARRELL:
21      Q.    Well, McKesson's in the
22  business of selling opium pills, correct?
23        MS. HENN:  Objection to form.
24        THE WITNESS:  As part of
25    controlled substances, yes.

Page 95

1  QUESTIONS BY MR. FARRELL:
2      Q.    And in 1996, business began
3  hopping, agreed?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  I'm not sure.  I
6    don't -- I don't -- I can't answer
7    that.  I don't know what the business
8    was before or --
9  QUESTIONS BY MR. FARRELL:
10      Q.    That's fair enough.
11      A.    Yeah.
12      Q.    In 1996, I'll represent to you,
13  OxyContin was launched.  So all I'm trying to
14  establish on page 2 of the exhibit is that
15  under 1301.74 B, the same law was in place
16  when OxyContin was launched.
17        MS. HENN:  Objection to form.
18  QUESTIONS BY MR. FARRELL:
19      Q.    Agreed?
20      A.    Understood.
21      Q.    Not understood --
22      A.    Agreed.
23      Q.    Yeah.
24      A.    Sorry.
25      Q.    This might take a little bit

Page 96

1  longer because, as you can see, this next
2  exhibit is a little bit thicker.
3        (McKesson-Hartle Exhibit 12
4    marked for identification.)
5  QUESTIONS BY MR. FARRELL:
6      Q.    We're going to have it marked
7  as Exhibit 12.
8        MR. FARRELL:  So for the
9    record, the top right-hand corner is
10    2000_07.  The bottom right-hand
11    corner, for all the fans listening on
12    the telephone, is an actual Bates
13    stamp number.  And while this was
14    previously produced to some Attorney
15    Generals, it was also produced in the
16    MDL, so I have an MDL number.  And
17    it's MCKMDL00337660.
18  QUESTIONS BY MR. FARRELL:
19      Q.    Now, does McKesson recognize
20  this document?
21      A.    I do.
22      Q.    And has McKesson reviewed this
23  document in preparation for today's
24  testimony?
25        MS. HENN:  Objection to form.

Page 97

1        THE WITNESS:  I have.
2  QUESTIONS BY MR. FARRELL:
3      Q.    What is this document?
4      A.    This is the operational manual
5  for how controlled substances are handled
6  within McKesson.
7      Q.    And what was the date of
8  enactment?
9      A.    I believe July of 2000.
10      Q.    Okay.  Prior to July of 2000,
11  what was the policy at McKesson regarding the
12  distribution of controlled substances?
13        MS. HENN:  Objection to form.
14    Outside the scope.
15        THE WITNESS:  I can't speak to
16    that.
17  QUESTIONS BY MR. FARRELL:
18      Q.    To your understanding and
19  belief sitting here today as the
20  representative of McKesson, is this document
21  the earliest version of the controlled
22  substance monitoring program adopted by the
23  company?
24        MS. HENN:  Same objections.
25        THE WITNESS:  I can't say for

Page 98

1  certain this is the only one I know
2  of.
3  QUESTIONS BY MR. FARRELL:
4      Q.   I'm not asking you to --
5      A.   Yeah.
6      Q.   -- foreclose the existence of
7  anything else.
8      A.   Right.
9      Q.   Sitting here today as the
10 McKesson designee for the 30(b)(6)
11 deposition, what we're showing you here as
12 Exhibit 12 is the earliest version you're
13 aware of for McKesson's controlled substance
14 monitoring program?
15     MS. HENN:  Objection to form.
16 Outside the scope.
17     THE WITNESS:  Correct, that I'm
18 aware of.
19 QUESTIONS BY MR. FARRELL:
20     Q.   So when I asked you in the
21 30(b)(6) deposition notice to testify
22 regarding all past and present suspicious
23 order policies and procedures, this, to the
24 best of your knowledge, is the first time
25 McKesson has adopted a policy and procedure

Page 99

1  in compliance with the United States Code
2  that we discussed this morning and the Code
3  of Federal Regulations we discussed this
4  morning.
5      MS. HENN:  Objection.
6  QUESTIONS BY MR. FARRELL:
7      Q.   Agreed?
8      MS. HENN:  Objection to form.
9  Outside the scope.
10     THE WITNESS:  I can't -- I
11     can't speak to things that may have
12     happened prior to this date that maybe
13     weren't put in this format and written
14     down on paper, but on paper, this is
15     the one that I recognize.
16 QUESTIONS BY MR. FARRELL:
17     Q.   I need to be a little more
18 clear about it.
19     Are you aware of any other
20 piece of paper in the annals of McKesson
21 Corporation that talk about the duty to
22 comply with the United States Code and the
23 Code of Federal Regulations regarding the
24 distribution of controlled substances?
25     MS. HENN:  Objection to form.

Page 100

1  Outside the scope.
2      MR. FARRELL:  Counsel, it seems
3  to be directly within point A of the
4  30(b)(6) notice.
5      MS. HENN:  We can disagree
6  about that.
7      MR. FARRELL:  Well, I'll read
8  it out loud.
9      "Your past, present, suspicious
10 orders monitoring system, SOMS
11 program, policies and procedures."
12     MS. HENN:  And I'll just object
13 again to the question as outside the
14 scope.
15     And to respond to you,
16 Mr. Farrell, the -- Special Master
17 Cohen has made rulings about the
18 proper time frame for discovery, and
19 so our position is that asking about
20 the annals of McKesson Corporation is
21 outside the scope.
22     But he can answer your question
23 if you want to state it again.
24     MR. FARRELL:  That's a fair
25 point.

Page 101

1  QUESTIONS BY MR. FARRELL:
2      Q.   So sitting here today as
3  McKesson Corporation, you're unaware of any
4  piece of paper that predates Exhibit 12, but
5  there may be; is that fair?
6      MS. HENN:  Objection to form.
7  Outside the scope.
8      THE WITNESS:  That's fair.  I'm
9  unaware, but I -- there may be.
10 QUESTIONS BY MR. FARRELL:
11     Q.   So you don't have any basis in
12 fact, as the McKesson designee today, to
13 discuss what the policies and procedures were
14 for McKesson related to the distribution of
15 controlled substances and opium pills between
16 '96 when OxyContin was launched and the
17 adoption of Section 55, Exhibit 12, in July
18 of 2000; is that a fair statement?
19     MS. HENN:  Objection to form.
20 Outside the scope.
21     THE WITNESS:  That's a fair
22 statement.
23 QUESTIONS BY MR. FARRELL:
24     Q.   So what we're looking at is
25 Exhibit 12.

Page 102

1 Can you tell me the name of
2 this document?
3 A. It's the drug operation manual.
4 It's been -- but it's known as Section 55,
5 often within McKesson, which is also in the
6 title.
7 Q. And as of July 2000, is there
8 any other document related to the
9 distribution of controlled substances in the
10 prevention of diversion other than
11 Section 55?
12 MS. HENN: Objection to form.
13 Outside the scope.
14 THE WITNESS: I'm not following
15 your question 100 percent.
16 QUESTIONS BY MR. FARRELL:
17 Q. Okay. Are you a sports fan?
18 A. I am.
19 Q. What's your favorite sport?
20 A. Wrestling.
21 Q. Very good.
22 How many rules are in the
23 wrestling rule book?
24 A. I couldn't even guess. I don't
25 know.

Page 103

1 Q. But the wrestling rule book is
2 intended to be comprehensive, agreed?
3 A. I would agree.
4 Q. If you're a referee, how many
5 different books do you have to read to know
6 the rules of wrestling on the mat?
7 A. Should be one.
8 Q. Is that the same for this
9 document, Exhibit 12? Is this intended to be
10 the rule book for the distribution of
11 controlled substances for McKesson
12 Corporation?
13 MS. HENN: Objection to form.
14 THE WITNESS: For which time
15 frame?
16 QUESTIONS BY MR. FARRELL:
17 Q. July 2000 until -- and I'll
18 give you a hint -- the 2007 Lifestyles
19 program.
20 MS. HENN: Objection to form.
21 Outside the scope.
22 THE WITNESS: I'm not aware of
23 another one.
24 QUESTIONS BY MR. FARRELL:
25 Q. All right. On page 1, the very

Page 104

1 first paragraph under general, I'd like you
2 to take a minute and read that. And I've
3 never liked just having you -- or just spring
4 that on you. I want you to kind of digest
5 it.
6 A. Just the first paragraph?
7 Q. Just the first paragraph.
8 A. I read it.
9 Q. All right. Now, I'm going to
10 have you read aloud just the first sentence,
11 and I'm going to compliment you that all of
12 your testimony this morning is spot-on with
13 that very first sentence. I couldn't trip
14 you up at all. So I'd like you to read the
15 first sentence aloud, please.
16 A. "The aim of the Controlled
17 Substance Act is to prevent diversion of
18 abusable substances into illicit traffic
19 while ensuring their availability for
20 legitimate medical purposes."
21 Q. So again, we're back to this
22 theme that the Controlled Substances Act was
23 intended to prevent diversion, agreed?
24 MS. HENN: Objection to form.
25 THE WITNESS: Agreed.

Page 105

1 QUESTIONS BY MR. FARRELL:
2 Q. And in July of 2000, McKesson
3 adopted a policy to accomplish that
4 objective; is that fair?
5 MS. HENN: Objection to form.
6 THE WITNESS: They formalized a
7 policy within -- within this document.
8 QUESTIONS BY MR. FARRELL:
9 Q. That's the purpose of this
10 document?
11 A. Right.
12 Q. Who wrote this document?
13 A. I'm not 100 percent sure
14 exactly who wrote it within the McKesson
15 team, but a combination of people.
16 Q. Whose document is this?
17 MS. HENN: Objection to form.
18 THE WITNESS: McKesson's.
19 QUESTIONS BY MR. FARRELL:
20 Q. Is this a document that is kept
21 in the regular course of business for
22 McKesson?
23 MS. HENN: Objection to form.
24 THE WITNESS: It is.
25

Page 106

1  QUESTIONS BY MR. FARRELL:
2      Q.    Is this a true and authentic
3  copy of Section 55 of McKesson's policy?
4          MS. HENN:  Objection to form.
5          THE WITNESS:  I know it's
6      undergoing some revisions.
7  QUESTIONS BY MR. FARRELL:
8      Q.    Well, not as of July 2000.
9      A.    Oh, can you say it again?
10     Q.    Yeah.  This document, sitting
11 here today --
12     A.    Right.
13     Q.    -- is this a document that as
14 of July of the year 2000 was a document
15 created by McKesson in the course of
16 conducting its regular business activities?
17         MS. HENN:  Objection to form.
18         THE WITNESS:  Yes.
19 QUESTIONS BY MR. FARRELL:
20     Q.    So if I hold this document up
21 in a courtroom I can say this is McKesson's
22 drug operations manual related to the
23 distribution of controlled substances that
24 was adopted in July of 2000?
25     A.    Yes.

Page 107

1      Q.    Now, the second sentence,
2  starting with "The Drug Enforcement
3  Administration," can you read that sentence
4  aloud?
5      A.    Sure.
6          "The Drug Enforcement
7  Administration strictly interprets the law
8  and regulations and has imposed significant
9  fines for technical errors in completing
10 forms and keeping records."
11     Q.    So the DEA, even as of July
12 2000, took the Controlled Substances Act very
13 seriously, and McKesson acknowledges that,
14 agreed?
15         MS. HENN:  Objection to form.
16         THE WITNESS:  Correct, or
17     agreed.
18 QUESTIONS BY MR. FARRELL:
19     Q.    Now, would you read the last
20 sentence?
21     A.    "It's extremely important that
22 McKesson employees comply fully with the
23 regulations and the following guidelines."
24     Q.    How important is it?
25         MS. HENN:  Objection to form.

Page 108

1          THE WITNESS:  To recite, it
2      says "extremely important."
3  QUESTIONS BY MR. FARRELL:
4      Q.    And why?
5      A.    To prevent the diversion of
6  controlled substances.
7      Q.    I'm going to have you now flip
8  to page 27.  I'll give you a minute to kind
9  of --
10     A.    The whole --
11     Q.    Yeah, you can just glance it.
12 We're going to walk through it a little bit.
13         We can start with the heading,
14 paragraph A.  What's paragraph A, the very
15 top of the page?  What's it say?
16         Oh, wait a minute, I'm sorry.
17     A.    Am I on the right page here?
18     Q.    I was on the wrong page.
19         Page 27, paragraph G.  Will you
20 read the first paragraph?
21     A.    The heading or the entire --
22 the first --
23     Q.    You can read the heading if
24 you'd like.
25     A.    "DEA continuing education"?

Page 109

1  That piece?
2      Q.    Yes.  And then there's another
3  word underneath that.
4      A.    "Documentation."
5      Q.    What does documentation mean?
6      A.    Is you document something on
7  paper.
8      Q.    Okay.  And will you read the
9  sentence, please?
10     A.    "All compliance training
11 sessions, formal and informal, held in your
12 distribution center must be logged and
13 documented on the DEA continuing education
14 report."
15     Q.    What does that mean?
16         MS. HENN:  Objection to form.
17     Outside the scope.
18         THE WITNESS:  It means you
19     should document the training that's
20     conducted related to compliance.
21 QUESTIONS BY MR. FARRELL:
22     Q.    Okay.  Is there a DEA
23 continuing education report that you're aware
24 of?
25     A.    Not that I'm aware of.

Page 110

1    Q.    You haven't seen any such
2  thing?
3    A.    I don't believe I have, no.
4    Q.    But if we ask for it, it's
5  something McKesson could theoretically go and
6  look for?
7         MS. HENN:  Objection to form.
8  Outside the scope.
9         THE WITNESS:  Theoretically.
10 QUESTIONS BY MR. FARRELL:
11   Q.    All right.  Because the policy
12 seems to indicate you guys have this
13 documentation of compliance training
14 sessions.  And I'll admit to you I haven't
15 seen any, so I was wondering if you'd seen
16 any.
17   A.    I have not.
18   Q.    Now, if you flip to the next
19 page, page 28, at the top it's paragraph A.
20 And will you read the title of paragraph A?
21   A.    "Detecting suspicious orders."
22   Q.    And what's it say over there on
23 the right, that number?
24   A.    1301.74.
25   Q.    What do you think that is?

Page 111

1    A.    That's from the CFR.
2    Q.    All right.  And then under
3  paragraph 1, you see where it says, "DEA
4  regulation defines suspicious orders as
5  follows"?
6    A.    I do.
7    Q.    Will you read what's in the
8  quotation marks?
9    A.    "Suspicious orders include
10 orders of unusual size, orders deviating
11 substantially from a normal pattern and
12 orders of unusual frequency."
13   Q.    Now, if you go down to the
14 paragraph that starts "recent cases," do you
15 see that?
16         Will you read the first
17 sentence?
18   A.    "Recent cases indicate that DEA
19 will seek large penalties from distributors
20 who fail to comply with this regulation."
21   Q.    What do you interpret that to
22 mean?
23         MS. HENN:  Objection.  Outside
24 the scope.
25         THE WITNESS:  Exactly what it

Page 112

1  says.
2  QUESTIONS BY MR. FARRELL:
3    Q.    You got to follow the law?
4         MS. HENN:  Objection to form.
5         THE WITNESS:  Right.
6  QUESTIONS BY MR. FARRELL:
7    Q.    And if McKesson doesn't follow
8  the law, that makes its conduct unlawful?
9         MS. HENN:  Objection to form.
10        THE WITNESS:  Yes.
11 QUESTIONS BY MR. FARRELL:
12   Q.    And McKesson has acknowledged
13 that as early as July of 2000?
14        MS. HENN:  Objection to form.
15 Outside the scope.
16        THE WITNESS:  In this document,
17 yes.
18 QUESTIONS BY MR. FARRELL:
19   Q.    The next sentence says, "It is
20 left to the distributor to define what
21 constitutes an unusual or suspicious order."
22        Do you see that sentence?
23   A.    I do.
24   Q.    And to comply with this,
25 McKesson has adopted this policy; is that

Page 113

1  fair?
2         MS. HENN:  Objection to form.
3  Outside the scope.
4         THE WITNESS:  Yes.
5  QUESTIONS BY MR. FARRELL:
6    Q.    Now, in here it says at the
7  very bottom of the -- it says, "The following
8  reports are produced:  The Drohan data
9  reports."
10        Do you see that, the Drohan
11 Data Center reports?
12   A.    I do see that.
13   Q.    What are the Drohan Data Center
14 reports?
15        MS. HENN:  Objection.  Outside
16 the scope.
17        THE WITNESS:  They're
18 multiple -- that's the -- they're
19 multiple reports that are generated
20 from the system.
21 QUESTIONS BY MR. FARRELL:
22   Q.    Okay.  Is that system still in
23 place, to your knowledge?
24   A.    Not to my knowledge.
25   Q.    Who would I ask if I was going

Page 114

1   to ask questions about the reports in the
2   Drohan Data Center?
3            MS. HENN:  Objection to form.
4            THE WITNESS:  Somebody in our
5   IT department.
6   QUESTIONS BY MR. FARRELL:
7       Q.   Okay.  Flip to the next page,
8   page 29.  Little A talks about controlled
9   substances sales reports.
10           Do you see that?
11      A.   I do.
12      Q.   That's a document that should
13  exist as of July of 2000, agreed?
14           MS. HENN:  Objection to form.
15  Outside the scope.
16           THE WITNESS:  Agreed.
17  QUESTIONS BY MR. FARRELL:
18      Q.   Little B says, "Controlled
19  substance customer purchase report."
20           That's a document that should
21  exist as of July of 2000, agreed?
22           MS. HENN:  Objection to form.
23  Outside the scope.
24           THE WITNESS:  Agreed.
25

Page 115

1   QUESTIONS BY MR. FARRELL:
2       Q.   Little C says, "Daily
3   controlled substance suspicious order warning
4   report."
5            That's a document that should
6   exist as of July 2000, agreed?
7            MS. HENN:  Objection to form.
8   Outside the scope.
9            THE WITNESS:  Agreed.
10  QUESTIONS BY MR. FARRELL:
11      Q.   Next page, little D, "Monthly
12  controlled substance suspicious purchases
13  report."
14           That's a document that should
15  exist as of July 2000, agreed?
16           MS. HENN:  Objection to form.
17  Outside the scope.
18           THE WITNESS:  Agreed.
19  QUESTIONS BY MR. FARRELL:
20      Q.   And little E, "Monthly ARCOS
21  customer recap variance."  Again, another
22  document that should exist as of July 2000 as
23  part of the McKesson suspicious order
24  detecting policy.
25           MS. HENN:  Objection to form.

Page 116

1   Outside the scope.
2   QUESTIONS BY MR. FARRELL:
3       Q.   Agreed?
4       A.   Can you rephrase that in terms
5   of...
6       Q.   Yeah.  We're talking about
7   under paragraph A, which is "Detecting
8   Suspicious Orders."
9       A.   Agreed.
10      Q.   Now, on page 30 there,
11  paragraph B, "Reporting," it says, "The
12  Drohan Data Center will generate the daily
13  controlled substance suspicious order warning
14  reports every two hours, 24 hours a day."
15           Do you see that?
16      A.   I see that.
17      Q.   Have you seen any of those
18  reports?
19           MS. HENN:  Objection.  Outside
20   the scope.
21           THE WITNESS:  I have.
22  QUESTIONS BY MR. FARRELL:
23      Q.   Did you review them in
24  anticipation of today's deposition?
25      A.   I did.

Page 117

1       Q.   And how far back did you review
2   them?
3       A.   I'm not certain of the dates on
4   the examples that I had.
5       Q.   How old?
6       A.   In the early 2000s, I believe.
7   I'd have to look.
8       Q.   Did those reports help inform
9   you of the policies and procedures for
10  McKesson in preparation for today's
11  deposition?
12           MS. HENN:  Objection to form.
13           THE WITNESS:  They did.
14  QUESTIONS BY MR. FARRELL:
15      Q.   And did they help refresh your
16  recollection in preparation for today's
17  testimony?
18           MS. HENN:  Objection to form.
19           THE WITNESS:  They did.
20  QUESTIONS BY MR. FARRELL:
21      Q.   Are those documents important
22  to McKesson for purposes of complying with
23  its duties under the Controlled Substances
24  Act beginning in July of 2000?
25           MS. HENN:  Objection to form.

Page 118

1    Outside the scope.
2        THE WITNESS:  Can you say it
3    again one more time?
4    QUESTIONS BY MR. FARRELL:
5        Q.    Are those documents important
6    to McKesson for purposes of complying with
7    its duties under the Controlled Substances
8    Act beginning in July of 2000?
9        MS. HENN:  Objection to form.
10   Outside the scope.
11       THE WITNESS:  They are
12   important.
13   QUESTIONS BY MR. FARRELL:
14       Q.    Now, this is the interesting
15   thing.  The very next sentence, can you read
16   the next sentence?
17       A.    Right after the "24 hours"?  Is
18   that where we stopped?
19       Q.    Yes, sir.
20       A.    Okay.  "This report can be
21   faxed to your local DEA office before the
22   order is shipped."
23       Q.    So in July 2000, was McKesson
24   still shipping orders that it detected as
25   suspicious?

Page 119

1        MS. HENN:  Objection to form.
2    Outside the scope.
3        THE WITNESS:  From what I
4    understand, there was a review of
5    these reports before they were
6    shipped.
7    QUESTIONS BY MR. FARRELL:
8        Q.    So my question is, is if an
9    order gets picked up as a suspicious order
10   under McKesson's detection system in July
11   of 2000, was McKesson reporting it to the DEA
12   but still shipping it?
13       MS. HENN:  Objection to form.
14   Outside the scope.
15       THE WITNESS:  Let me restate.
16   Reporting to DEA and still shipping
17   it?  I believe so.
18   QUESTIONS BY MR. FARRELL:
19       Q.    So the answer is yes?
20       A.    Yes.
21       Q.    The next sentence says, "It
22   does not rely on an individual's judgment or
23   knowledge to determine reporting
24   appropriateness but rather on statistical
25   fact."

Page 120

1        Do you see that?
2        A.    I see that.
3        Q.    So what that means is, is if
4    your system identifies or detects a
5    suspicious order, there's no judgment
6    subjective involved.  You report it to the
7    DEA as a matter of statistical fact, agreed?
8        MS. HENN:  Objection to form.
9    Outside the scope.
10   QUESTIONS BY MR. FARRELL:
11       Q.    Would you like me to restate
12   it?
13       A.    Yeah, please.
14       Q.    What this means is that in July
15   of 2000, if McKesson's system detected a
16   suspicious order, it is a statistical fact
17   and it is to be reported to the DEA, agreed?
18       MS. HENN:  Objection to form.
19   Outside the scope.
20   QUESTIONS BY MR. FARRELL:
21       Q.    That's what it says?
22       MS. HENN:  Same objections.
23       THE WITNESS:  From what I
24   understand, there was -- you know, the
25   way I interpret this is that the

Page 121

1    report itself is statistically driven,
2    but then there are -- there are
3    reviews done by McKesson personnel to
4    determine if they are suspicious or
5    not.
6    QUESTIONS BY MR. FARRELL:
7        Q.    That's not what this sentence
8    says, though, is it?
9        A.    Not specifically.
10       Q.    It says the opposite, agreed?
11       MS. HENN:  Objection to form.
12   Outside the scope.
13   QUESTIONS BY MR. FARRELL:
14       Q.    I'm just talking about what
15   this document says.
16       A.    It doesn't say exactly what I
17   said.
18       Q.    And I understand the practice
19   may be different than a policy written in
20   July of 2000.  I'm just simply asking on
21   Section 55, the operations manual, it says,
22   "There is no individual judgment in
23   determining when to report."
24       Agreed?
25       A.    It says "reporting

Page 122

1 appropriateness," not when to.
2     Q.    Instead, it's a statistical
3 fact when you report to the DEA?
4         MS. HENN:  Objection to form.
5 Outside the scope.
6         THE WITNESS:  That's not how
7     I'd characterize the statistical fact,
8     when to.
9 QUESTIONS BY MR. FARRELL:
10     Q.    Well, it says, "It does not
11 rely on an individual's judgment or knowledge
12 to determining {sic} reporting
13 appropriateness but rather on statistical
14 fact."
15         That's what it says, agreed?
16     A.    Agreed.
17     Q.    So if, in fact, a daily
18 controlled substance suspicious order warning
19 report is generated, based on statistical
20 facts, it should be reported to the DEA?
21         MS. HENN:  Objection to form.
22 Outside the scope.
23         THE WITNESS:  Correct.
24 QUESTIONS BY MR. FARRELL:
25     Q.    And it was the policy of

Page 123

1 McKesson that even if it was reporting a
2 suspicious order, it was still shipping?
3         MS. HENN:  Objection to form.
4 Outside the scope.
5 QUESTIONS BY MR. FARRELL:
6     Q.    It's what the policy says?
7         MS. HENN:  Same objections.
8         THE WITNESS:  Can you say that
9     again or point me to the policy
10     section you're referring to?
11 QUESTIONS BY MR. FARRELL:
12     Q.    Yes.
13         It says, "This report can be
14 faxed to your local DEA district office
15 before the order is shipped."
16         It does not say, "Halt the
17 order."  It says, "Report it before
18 shipping," agreed?
19         MS. HENN:  Objection to form.
20 Outside the scope.
21         THE WITNESS:  It says it can
22 be, right, agreed.
23 QUESTIONS BY MR. FARRELL:
24     Q.    Now, go to page 31 under
25 Section 2, the very last sentence.  "If an

Page 124

1 order is canceled or cut back, do not fax to
2 the DEA."
3         Do you see that?
4     A.    B, I see that.
5     Q.    I'll give you a chance to catch
6 up because I don't want to be unfair about
7 it.  The last sentence.
8         What this says under B, you fax
9 a copy immediately to your DEA district
10 office, and then if you cancel the suspicious
11 order or cut it back, you do not report it to
12 the DEA.
13         That's what it says, correct?
14         MS. HENN:  Objection to form.
15         THE WITNESS:  In the context of
16     an ordering error or an -- a
17     duplicate, it says that.
18 QUESTIONS BY MR. FARRELL:
19     Q.    Okay.  So you think this
20 applies just -- if an order is duplicated or
21 copied as a clerical error, you don't have to
22 report it?
23     A.    Not 100 percent certain, but
24 that's how I would interpret that.
25     Q.    So if McKesson received an

Page 125

1 order from a customer for a million pills and
2 then cut it back to ten pills, would McKesson
3 still have to report that order?
4         MS. HENN:  Objection to form.
5 Outside the scope.
6         THE WITNESS:  I think it
7     depends on the circumstances.  I...
8 QUESTIONS BY MR. FARRELL:
9     Q.    On page 32, the paragraph in
10 bold that states, "Discontinue," I'm going to
11 read it aloud.
12         "Discontinue faxing the daily
13 controlled substance suspicious order warning
14 report only," and it's underlined "only," "if
15 you receive in writing a notice from your
16 district DEA office telling you they do not
17 want them."
18         Do you see that sentence?
19     A.    I do.
20     Q.    Are you aware of any such
21 writing in the possession of McKesson?
22         MS. HENN:  Objection to form.
23 Outside the scope.
24         THE WITNESS:  Aware of a formal
25     notice from DEA saying that they don't

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 want them?
2 QUESTIONS BY MR. FARRELL:
3    Q.    Correct.
4    A.    Aware of informal discussions
5 and communications but maybe not formal.
6    Q.    So Mr. Boggs, Gary Boggs,
7 testified a couple weeks ago in this case as
8 the 30(b)(6) designee for communications with
9 the DEA.  He testified he was not aware of
10 any such thing.
11        I'm asking you today, as the
12 McKesson designee for the suspicious order
13 monitoring program, whether or not you're
14 aware under Section 55 if McKesson received
15 in writing any notice from the DEA telling
16 them they don't want the reports.
17        MS. HENN:  Objection to form.
18 Outside the scope.
19        THE WITNESS:  I'm not aware.
20 QUESTIONS BY MR. FARRELL:
21    Q.    Why would you have in your
22 policy the insistence that such a directive
23 be in writing?
24        MS. HENN:  Objection to form.
25 Outside the scope.

Page 127

1        THE WITNESS:  Could you ask the
2 question a different way?
3        Why would we request that it be
4 in writing?
5 QUESTIONS BY MR. FARRELL:
6    Q.    Yes.
7    A.    To formalize things,
8 documentation.
9    Q.    Under paragraph F it says, "The
10 monthly controlled substance suspicious
11 purchase reports and the monthly ARCOS
12 customer recap variance must be sent
13 certified mail, return receipt requested."
14        Do you see that?
15    A.    I see that.
16    Q.    Why would McKesson, in its
17 Section 55 policy, want confirmation that it
18 was sending reports to the DEA?
19        MS. HENN:  Objection to form.
20 Outside the scope.
21        THE WITNESS:  To verify that
22 they received them.
23 QUESTIONS BY MR. FARRELL:
24    Q.    Have you seen such reports?
25        MS. HENN:  Objection to form.

Page 128

1        THE WITNESS:  The actual
2 suspicious order report or a
3 verification that they received --
4 QUESTIONS BY MR. FARRELL:
5    Q.    Verification.
6    A.    A verification that DEA -- that
7 we -- I have not seen those reports of
8 verifications.
9    Q.    Now, at the very bottom of the
10 page, page 4, do you see what it -- it says
11 "Continued Reporting Responsibility"?
12    A.    I do.
13    Q.    Will you read that aloud, first
14 sentence?
15    A.    The first -- okay.
16        "Forwarding these reports to
17 DEA does not relieve the distribution center
18 of responsibility to review the reports and
19 note order quantities of unusual size."
20    Q.    So you acknowledge, sitting
21 here today as McKesson, that simply
22 submitting reports to the DEA does not comply
23 with the US Code or the Code of Federal
24 Regulations?
25        MS. HENN:  Objection to form.

Page 129

1 Outside the scope.
2        THE WITNESS:  Agree.
3 QUESTIONS BY MR. FARRELL:
4    Q.    You have a duty to review and
5 note orders of unusual size?
6    A.    It's part of our -- this
7 document program, yes.
8    Q.    Page 33.  It's talking about
9 controlled substances, and it says under
10 paragraph 5, "Controlled substances and
11 List I product order fillers must be aware of
12 our responsibilities.  They are expected to
13 report to management any unusual purchase
14 request before orders are filled."
15        Do you see that?
16    A.    I do see that.
17    Q.    So again, it was the policy of
18 McKesson as of July of 2000 that they were
19 still going to ship suspicious orders as long
20 as they got reported?
21        MS. HENN:  Objection to form.
22 Outside the scope.
23        THE WITNESS:  Can you rephrase
24 that for me, please?
25

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  QUESTIONS BY MR. FARRELL:
2      Q.  Do you agree that it was
3  McKesson's policy as of July 2000 that they
4  were still going to ship suspicious orders as
5  long as the order got reported to the DEA?
6      MS. HENN:  Objection to form.
7  Outside the scope.
8      THE WITNESS:  One more time,
9  please.
10 QUESTIONS BY MR. FARRELL:
11     Q.  Reading this, it appears the
12 July 2000 policy of McKesson was that they
13 were shipping suspicious orders.
14     Can you confirm that?
15     MS. HENN:  Objection to form.
16 Outside the scope.
17     THE WITNESS:  I don't know if I
18 can confirm.  I've not seen what was
19 shipped, but -- I'm not sure how to
20 answer your question 100 percent.
21 QUESTIONS BY MR. FARRELL:
22     Q.  My question is, is under the
23 Section 55 policy adopted by McKesson --
24     A.  Right.
25     Q.  -- in July of 2000, you were

Page 131

1  shipping suspicious orders after reporting
2  them to the DEA?
3      MS. HENN:  Objection to form.
4  Outside the scope.
5      THE WITNESS:  Yes.
6  QUESTIONS BY MR. FARRELL:
7      Q.  Under paragraph 6, "Retail
8  account managers responsibilities," it says,
9  "Our retail account managers can provide
10 another source of useful information."
11     Will you read the next
12 sentence?
13     A.  "In fact, reports of controlled
14 substance diversion are not only a necessary
15 part of an overall security program but also
16 serve the public interest at large."
17     Q.  Does McKesson agree and
18 acknowledge this fact?
19     MS. HENN:  Objection to form.
20     THE WITNESS:  Yes.
21 QUESTIONS BY MR. FARRELL:
22     Q.  This goes back to what we were
23 talking about earlier, is that aside from
24 your regulatory responsibilities, you also
25 perform a function that serves the public

Page 132

1  interest at large?
2      A.  Correct.
3      Q.  Turn to page 117, please.  The
4  bottom paragraph, B, references a
5  "distribution center quarterly DEA
6  checklist."
7      A.  Sorry, I was a little bit
8  behind because of water there.
9      Q.  It's okay.
10     Bottom of the page, paragraph
11 B, "Distribution center quarterly DEA
12 checklist."
13     Do you see that?
14     A.  I see that.
15     Q.  Have you seen any such
16 checklists?
17     A.  I believe I've seen the example
18 in the -- in this document but not filled-out
19 ones.
20     Q.  And what you're referencing is
21 at the end, from pages 123 to 130, is an
22 exemplar of the checklist.
23     A.  If exemplar means example, yes.
24     Q.  So as of July of 2000, McKesson
25 had a policy and procedure for a quarterly

Page 133

1  internal audit or assessment based on what
2  it's called the quarterly DEA checklist for
3  each distribution center, agreed?
4      MS. HENN:  Objection to form.
5  Outside the scope.
6      THE WITNESS:  Agreed.
7  QUESTIONS BY MR. FARRELL:
8      Q.  Sitting here today, though, you
9  have not seen any such document?
10     A.  I've not reviewed a completed
11 one.  I've seen one.
12     Q.  Do they still exist?
13     MS. HENN:  Objection to form.
14 Outside the scope.
15     THE WITNESS:  I'm not sure.
16     (McKesson-Hartle Exhibit 13
17 marked for identification.)
18 QUESTIONS BY MR. FARRELL:
19     Q.  I'm going to have marked as the
20 next sequential exhibit Exhibit 13.  The
21 document in the right-hand corner is
22 2001_0828.
23     Again, this is from the
24 HathiTrust.
25     A.  I see that.

Highly Confidential – Subject to Further Confidentiality Review

Page 134

1    Q.    It's a Congressional record
2  from 2001.
3        Can you read the title of the
4  Congressional investigation?
5    A.    "OxyContin:  Its use and abuse:
6  Hearing before the Subcommittee and Oversight
7  and Investigations of the Committee on Energy
8  and Commerce, House of Representatives, 107th
9  Congress, First Session, August 28th of
10 2001."
11   Q.    Does McKesson acknowledge that
12 the use and abuse of OxyContin was on the
13 national radar at least as early as
14 August 28, 2001, with a Congressional
15 hearing?
16       MS. HENN:  Objection to form.
17       THE WITNESS:  Yes.
18 QUESTIONS BY MR. FARRELL:
19   Q.    I'm going to have you flip to
20 page 8.  This is the introductory statement
21 from the chairman, James Greenwood, on the
22 Subcommittee on Oversight and Investigations.
23 He's from Pennsylvania.
24       Two-thirds of the way down, the
25 sentence says, "These actions, though

Page 135

1  commendable, also appear long overdue."
2        Do you see that sentence?
3    A.    I do see that.
4    Q.    Will you begin reading,
5  starting with "according"?
6    A.    "According to DEA, the number
7  of oxycodone-related deaths has increased
8  400 percent since 1996, the same time period
9  in which the annual number of prescriptions
10 for OxyContin has risen from approximately
11 300,000 to almost 6 million."
12   Q.    And how did these
13 prescriptions -- how did these pills get from
14 Purdue Pharma, who makes OxyContin, to the
15 pharmacies?
16       MS. HENN:  Objection to form.
17       THE WITNESS:  After being
18 prescribed by a doctor --
19 QUESTIONS BY MR. FARRELL:
20   Q.    Yes.
21   A.    -- and sent to pharmacies --
22   Q.    Yes.
23   A.    -- or other by distributors.
24   Q.    Right.
25       So between 1996 and the year

Page 136

1  2001, the number of prescriptions went from
2  300,000 to almost 6 million.  So the
3  OxyContin business was a-booming, wasn't it?
4        MS. HENN:  Objection to form.
5  Outside the scope.
6        THE WITNESS:  It increased
7  significantly.
8  QUESTIONS BY MR. FARRELL:
9    Q.    And McKesson was amongst the
10 distributors that were delivering the pills
11 from Purdue Pharma to the pharmacies?
12       MS. HENN:  Objection to form.
13       THE WITNESS:  We were.
14 QUESTIONS BY MR. FARRELL:
15   Q.    Do you believe that the
16 increase from 300,000 prescriptions to 6
17 million is an increase of unusual size?
18       MS. HENN:  Objection to form.
19 Outside the scope.
20       THE WITNESS:  Could you ask
21 that again?
22 QUESTIONS BY MR. FARRELL:
23   Q.    You go from 300,000
24 prescriptions to 6 million in five years.  Do
25 you think that that is an unusual increase?

Page 137

1        MS. HENN:  Objection to form.
2  Outside the scope.
3        THE WITNESS:  It appears to be
4  a significant increase.  I don't -- I
5  don't have the context of before --
6  everything before, but it's a large
7  increase.
8  QUESTIONS BY MR. FARRELL:
9    Q.    Well, assuming in 1996 there
10 were 300,000 prescriptions and five years
11 later there were 6 million, would you --
12 would you characterize that increase as
13 unusual?
14       MS. HENN:  Objection to form.
15 Outside the scope.
16       THE WITNESS:  I don't know if I
17 would characterize it as -- it's
18 significant.
19 QUESTIONS BY MR. FARRELL:
20   Q.    Significant enough to get
21 McKesson's attention?
22       MS. HENN:  Objection to form.
23       THE WITNESS:  Significant
24 enough.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 QUESTIONS BY MR. FARRELL:
2    Q.   Yes?
3    A.   Yes.
4    Q.   Now, two paragraphs down it
5 says, "In its testimony today" --
6       Do you see that paragraph?
7    A.   I do.
8    Q.   -- "Purdue Pharma will argue
9 that the death figures heralded by newspapers
10 nationwide are inaccurate and are the prime
11 mover of the negative hype surrounding
12 OxyContin."
13       Do you see that sentence?
14    A.   I do see that sentence.
15    Q.   So does McKesson acknowledge
16 that death figures are being heralded by
17 newspapers nationwide as of 2001?
18       MS. HENN: Objection to form.
19 Outside the scope.
20       THE WITNESS: Could you ask
21 that again in a different way, maybe?
22 QUESTIONS BY MR. FARRELL:
23    Q.   Yeah.
24       This is saying that there's
25 newspaper headlines across the country of

Page 139

1 people dying taking opium pills that McKesson
2 is distributing.
3       Does McKesson acknowledge that?
4       MS. HENN: Objection to form.
5 Outside the scope.
6       THE WITNESS: Not that --
7 there's certainly headlines of
8 opioid-related deaths.
9 QUESTIONS BY MR. FARRELL:
10    Q.   In 2001?
11    A.   I don't know of any
12 specifically. I'm assuming there were in
13 that time frame.
14    Q.   And it's a little unfair to ask
15 you because you weren't there in 2001, but as
16 McKesson's corporate designee I'm simply
17 looking for an acknowledgement that the chain
18 of distribution McKesson was involved in is
19 being heralded in newspapers as causing
20 deaths across the country.
21       MS. HENN: Objection to form.
22 Outside the scope.
23 QUESTIONS BY MR. FARRELL:
24    Q.   Does McKesson acknowledge that
25 fact?

Page 140

1       MS. HENN: Same objections.
2       THE WITNESS: I haven't seen
3 any of those headlines, so I can't
4 speak to whether us as a distributor
5 was called out in those.
6 QUESTIONS BY MR. FARRELL:
7    Q.   I'm not asking you if you were
8 called out as a distributor. What I'm asking
9 you is if McKesson acknowledged that the
10 pills that it was selling was causing deaths
11 nationwide and resulted in newspaper
12 headlines across the country.
13       MS. HENN: Objection to form.
14 Outside the scope.
15       THE WITNESS: Yes, pills that
16 we distribute were in headlines.
17 QUESTIONS BY MR. FARRELL:
18    Q.   And Purdue Pharma says that
19 "those headlines are inaccurate and the prime
20 mover of the negative hype surrounding
21 OxyContin."
22       Does McKesson Corporation,
23 sitting here today, concur with Purdue
24 Pharma?
25       MS. HENN: Objection to form.

Page 141

1 Outside the scope.
2       THE WITNESS: Reading the rest
3 of this if you don't -- I'm reading
4 down a little bit more, so...
5       Can you ask your question
6 again?
7 QUESTIONS BY MR. FARRELL:
8    Q.   Yeah.
9       Does McKesson Corporation,
10 sitting here today and testifying, concur
11 with Purdue Pharma that the nationwide
12 newspapers about overdose deaths are
13 inaccurate?
14       MS. HENN: Objection to form.
15 Outside the scope.
16       THE WITNESS: I can't speak to
17 that. I'd just be speculating.
18 QUESTIONS BY MR. FARRELL:
19    Q.   You don't share Purdue Pharma's
20 disavow of the problems caused by its
21 OxyContin pills?
22       MS. HENN: Objection to form.
23 Outside the scope.
24       THE WITNESS: I'm not saying
25 that. I'm saying I can't answer the

Page 142

1 question that you asked earlier.
2 (McKesson-Hartle Exhibit 14
3 marked for identification.)
4 QUESTIONS BY MR. FARRELL:
5 Q. Next exhibit we'll have marked
6 sequentially as Exhibit 4. It's from the
7 Internet. It's document 2002_09_26.
8 MS. HENN: Mr. Farrell, did you
9 mean Exhibit 4 or 14?
10 MR. FARRELL: 14.
11 MS. HENN: Okay.
12 MR. FARRELL: You caught me.
13 QUESTIONS BY MR. FARRELL:
14 Q. And I'm not going to bore you
15 with the details of this, but are you aware
16 of the Office of Inspector General?
17 A. I am.
18 Q. This is a report generated by
19 the OIG in 2002, and what it was talking
20 about was it was talking about the opioid
21 epidemic, and it was talking about the DEA's
22 ability to regulate the industry.
23 Have you reviewed this document
24 before today?
25 A. I have not.

Page 143

1 Q. Give me a second here.
2 On Bates stamp page 12, it's
3 talking about diversion investigators. And
4 it says there were 55 at headquarters and 455
5 in the domestic field offices and 13
6 overseas.
7 Do you see that?
8 A. I do see that.
9 Q. So that means there's just over
10 500 DEA diversion investigators in the
11 country in 2001.
12 MS. HENN: Objection to form.
13 Outside the scope.
14 QUESTIONS BY MR. FARRELL:
15 Q. Responsible for regulating the
16 entire industry of the distribution of
17 controlled substances.
18 Do you know how many
19 transactions McKesson engaged in in the
20 distribution of controlled substances in
21 2001?
22 MS. HENN: Objection to form.
23 Outside the scope.
24 THE WITNESS: I do not have the
25 number off the top of my head.

Page 144

1 QUESTIONS BY MR. FARRELL:
2 Q. The OIG report basically says
3 that as of 2001 there needed to be
4 reassessment because the DEA was understaffed
5 and underfunded and didn't have sufficient
6 tools to be able to regulate the industry.
7 Does McKesson acknowledge and
8 agree with that assessment?
9 MS. HENN: Objection to form.
10 Outside the scope.
11 THE WITNESS: Could you ask
12 that again?
13 MR. FARRELL: Yeah, obviously
14 I'm leading up to some other
15 documents.
16 QUESTIONS BY MR. FARRELL:
17 Q. But does McKesson acknowledge
18 that in 2001 there were 500 DEA diversion
19 investigators trying to monitor all of the
20 transactions in the country?
21 MS. HENN: Objection to form.
22 Outside the scope.
23 THE WITNESS: I see that in the
24 documents. I can't speak to, you
25 know, the DEA's total -- their

Page 145

1 response in total, so I can confirm
2 that's in -- what's in this document.
3 QUESTIONS BY MR. FARRELL:
4 Q. All right. So let's talk about
5 it from a theoretical standpoint.
6 Let's say there were 500
7 highway patrol officers charged with
8 regulating the speed on the highways in the
9 United States of America in the year 2001.
10 Do you believe that that would
11 be a significant challenge, a somewhat of a
12 challenge or not very challengeable at all?
13 MS. HENN: Objection to form.
14 Outside the scope.
15 THE WITNESS: Again, just
16 speculating, it would be a challenge.
17 QUESTIONS BY MR. FARRELL:
18 Q. How many people would speed in
19 America if there were only 500 highway
20 patrolmen in the country?
21 MS. HENN: Same objections.
22 THE WITNESS: I can't even
23 guess or speculate.
24 QUESTIONS BY MR. FARRELL:
25 Q. Do you think that would be a

Page 146

1  lot of people or not a lot of people?
2       MS. HENN:  Same objections.
3       THE WITNESS:  Again, that
4  depends on how many law-abiding
5  citizens you have.  I don't know if I
6  can speculate.
7  QUESTIONS BY MR. FARRELL:
8       Q.    That is so true.
9            What do you think the American
10 citizen would do if they knew there were only
11 500 highway patrolmen?
12      MS. HENN:  Objection to form.
13 Outside the scope.
14      THE WITNESS:  Again, I don't
15 know.  Some people might speed.  Some
16 people might not change their behavior
17 at all.
18 QUESTIONS BY MR. FARRELL:
19      Q.    That's right.
20           What if the penalty, if you did
21 get caught, was only $10?
22      MS. HENN:  Objection to scope.
23 QUESTIONS BY MR. FARRELL:
24      Q.    How would that impact your view
25 of the regulation of the American highways?

Page 147

1       MS. HENN:  Objection to form.
2  Outside the scope.
3       THE WITNESS:  Again, you can
4  speculate.  Some might see that as
5  a -- yeah, it depends.  It really
6  depends.
7  QUESTIONS BY MR. FARRELL:
8       Q.    What if the biggest weapon the
9  highway patrolmen had, which is the
10 revocation of the driver's license, was
11 changed and so now you don't even lose your
12 license?  How would that impact the system?
13      MS. HENN:  Same objections.
14      THE WITNESS:  Impact the
15 system?
16 QUESTIONS BY MR. FARRELL:
17      Q.    Yeah, impact the number of
18 speeders.
19      MS. HENN:  Objection to form.
20 Outside the scope.
21      THE WITNESS:  You can speculate
22 that it may go down.
23 QUESTIONS BY MR. FARRELL:
24      Q.    The number of speeders would go
25 down if you can't lose your license anymore?

Page 148

1       MS. HENN:  Same objections.
2       THE WITNESS:  Oh, if you
3  can't -- sorry, excuse me.  It may go
4  up.
5  QUESTIONS BY MR. FARRELL:
6       Q.    So if there's -- if there's a
7  limited number of regulators and a fine is
8  not substantial and you don't lose your
9  license, are we going to have more speeders
10 or less speeders?
11      MS. HENN:  Objection to form.
12 Outside the scope.
13      THE WITNESS:  Can you rephrase
14 that a little bit?
15 QUESTIONS BY MR. FARRELL:
16      Q.    Yeah.
17      A.    You rolled a few things in
18 there.
19      Q.    You know what I'm trying to get
20 to, right?  If there's not enough law
21 enforcement and the penalty isn't
22 prohibitive, what happens to conduct?
23      MS. HENN:  Objection to form.
24 Outside the scope.
25      THE WITNESS:  Again, it's

Page 149

1  speculative, but it could -- you know,
2  behavior could change.
3  QUESTIONS BY MR. FARRELL:
4       Q.    What if you made billion of
5  dollars by speeding, and there was not enough
6  regulation by law enforcement and the penalty
7  was not very big?  What would that do as an
8  incentive?
9       MS. HENN:  Same objections.
10      THE WITNESS:  Again, it depends
11 on the situation, the scenario.
12 QUESTIONS BY MR. FARRELL:
13      Q.    It really depends on whether or
14 not the individual is a law-abiding citizen
15 or a criminal, agreed?
16      MS. HENN:  Same objections.
17 Object to form.  Outside the scope.
18      THE WITNESS:  It's part of it.
19      (McKesson-Hartle Exhibit 15
20 marked for identification.)
21      MR. FARRELL:  Last exhibit and
22 then we'll take a break, if that's
23 okay.
24      MS. HENN:  That works.
25 QUESTIONS BY MR. FARRELL:

Highly Confidential – Subject to Further Confidentiality Review

Page 150

1    Q.   I'm going to have marked
2  Exhibit 15, and the exhibit in the top
3  right-hand corner is 2004_ 06_17. And for
4  those of you playing at home, this is an
5  excerpt from another Congressional record.
6         This Congressional record was
7  900 pages long, and so I did not copy the
8  whole thing; I just pulled out the part that
9  interested me.
10        This is part of the US Senate
11 Permanent Subcommittee on Investigations, and
12 it was a hearing in June of 2004. And the
13 title of the hearing was "Buyers Beware: The
14 Dangers of Purchasing Pharmaceuticals Over
15 the Internet."
16        Now, McKesson has some
17 experience with this, agreed?
18        MS. HENN: Objection to form.
19        THE WITNESS: Can you define --
20 experience. What type of experience?
21 QUESTIONS BY MR. FARRELL:
22    Q.   Well, McKesson was selling to
23 Internet pharmacies in this time frame,
24 agreed?
25        MS. HENN: Objection to form.

Page 151

1         THE WITNESS: I believe so.
2  QUESTIONS BY MR. FARRELL:
3     Q.   Well, McKesson should know so
4  because you paid a $13 million fine to the
5  DEA for doing that very thing in 2008.
6         MS. HENN: Objection to form.
7         THE WITNESS: Understood.
8  QUESTIONS BY MR. FARRELL:
9     Q.   Okay. So this is a report, and
10 it was -- if you flip to page 2, it was
11 generated by a company called the
12 Pharmaceutical Research Manufacturers of
13 America. I guess they call it PhRMA.
14        Is that how you say it?
15    A.   I don't know.
16    Q.   Well, McKesson is a member of
17 this organization, and so colloquially within
18 your ranks do you call it PhRMA? PhRMA?
19 PhRMA? What do you say?
20        MS. HENN: Counsel, I'm sorry,
21    just a quick clarification. I'm not
22    seeing a reference -- I see reference
23    to Giuliani and his organization, but
24    I don't see PhRMA.
25        Can you just point out where

Page 152

1  you're seeing that?
2         MR. FARRELL: Yeah, it's up on
3  the screen there, and it's in the very
4  middle.
5         MS. HENN: Thank you. I
6  appreciate that.
7  QUESTIONS BY MR. FARRELL:
8     Q.   So does McKesson -- first, does
9  McKesson acknowledge that it is an associate
10 member of the Pharmaceutical Research and
11 Manufacturers of America?
12        MS. HENN: Objection to form.
13 Outside the scope.
14        THE WITNESS: I can't speak to
15 that. I don't know.
16 QUESTIONS BY MR. FARRELL:
17    Q.   I'll represent to you that -- I'll
18 represent to you that you are.
19    A.   Okay.
20    Q.   And do you know who this Rudy
21 Giuliani fellow is?
22    A.   I do know who Mr. Giuliani is.
23    Q.   He's a lawyer, too, isn't he?
24    A.   He is.
25    Q.   And he was hired to do this

Page 153

1  investigation by the pharmaceutical industry.
2         Do you see that?
3         MS. HENN: Objection to form.
4  Outside the scope.
5         THE WITNESS: I don't know if I
6  see where specifically it states that.
7  QUESTIONS BY MR. FARRELL:
8     Q.   It says, "Giuliani Partners has
9  been" --
10    A.   Oh, in the middle. Okay.
11 Sorry.
12    Q.   They have been retained by
13 PhRMA to do an evaluation.
14    A.   Understood. I see that.
15    Q.   Now what I'm going to have you
16 do is I'm going to have you flip over to
17 page 4, and it's interesting what Rudy
18 Giuliani found.
19        Do you see where it says "the
20 distribution chain"?
21        It says, "On its face, it
22 appears that the distribution chain for
23 prescription medicines in the United States
24 is fairly straightforward."
25    A.   I was on the wrong number 4.

Page 154

1    I see where it says that.
2    Q.    And it says, "Manufacturers
3  sell their products to wholesalers."
4    That'd be you, McKesson,
5  correct?
6    A.    Correct.
7    Q.    "Who, in turn, sell the
8  products to retail pharmacies and stores,
9  who, in turn, dispense medicines to patients
10  with prescriptions."
11    Do you see that?
12    A.    Yes.
13    Q.    And that's a straightforward
14  system is what Rudy Giuliani is saying.
15    Will you read the next
16  sentence, please?
17    A.    "It is not until the system is
18  studied in greater detail that one begins to
19  appreciate both the complexities and the
20  vulnerability of the distribution chain and
21  potential for exploitation or abuse."
22    Q.    So big pharma is acknowledging
23  in 2004, through hiring their own expert in
24  presenting to Congress, that this chain of
25  distribution that McKesson is engaged in is

Page 155

1  complex and vulnerable for exploitation or
2  abuse, agreed?
3    MS. HENN:  Objection to form.
4    Outside the scope.
5    THE WITNESS:  It's what they
6    listed in here and documented, yes.
7  QUESTIONS BY MR. FARRELL:
8    Q.    And the very first factor for
9  contributing factors, will you read aloud
10  what it says?
11    A.    "Wholesalers or distributors
12  are primarily regulated by the states, with
13  no uniform standards across state borders.
14  States have a comparatively small number of
15  investigators to monitor the licensed
16  wholesalers; thus, given the sheer number of
17  wholesalers, oversight is minimal."
18    Q.    In the very next paragraph it
19  says, "There are thousands of secondary
20  pharmaceutical wholesalers in addition to
21  McKesson, AmerisourceBergen and Cardinal
22  Health, the big three."
23    Do you see that sentence?
24    A.    I see that.
25    Q.    So this is a recognition by big

Page 156

1  pharma's own consultant that the chain of
2  distribution, at least in 2004 with respect
3  to rogue Internet pharmacies in particular,
4  was subject to exploitation or abuse.
5    MS. HENN:  Objection to form.
6    Outside the scope.
7  QUESTIONS BY MR. FARRELL:
8    Q.    Agreed that's what it says?
9    MS. HENN:  Same objections.
10    THE WITNESS:  Agree that's what
11    it says.
12  QUESTIONS BY MR. FARRELL:
13    Q.    And in fact, McKesson paid a
14  fine for some of these exploitations and
15  abuse in 2008.
16    MS. HENN:  Objection to form.
17  QUESTIONS BY MR. FARRELL:
18    Q.    Agreed?
19    A.    There was a fine as part of the
20  settlement.
21    Q.    Related to this specific topic?
22    MS. HENN:  Objection to form.
23    THE WITNESS:  It was included
24    in the settlement.
25

Page 157

1  QUESTIONS BY MR. FARRELL:
2    Q.    So yes?
3    A.    Yes.
4    Q.    So in 2004, we've got big
5  pharma acknowledging the chain of custody for
6  wholesalers is subject to exploitation or
7  abuse because of a lack of oversight?
8    MS. HENN:  Objection to form.
9    Outside the scope.
10    THE WITNESS:  Would you say
11    that again?  Ask --
12  QUESTIONS BY MR. FARRELL:
13    Q.    In 2004, big pharma hired Rudy
14  Giuliani's firm to do an evaluation of the
15  chain of distribution of prescription
16  medicines, and what he found was that the
17  chain of distribution was subject to
18  exploitation or abuse because of lack of
19  oversight?
20    A.    That's what's stated in the
21  document, correct.
22    Q.    And that during this time
23  frame, McKesson paid a fine for that very
24  thing?
25    MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 THE WITNESS: In the 2008
2 settlement, yes.
3 QUESTIONS BY MR. FARRELL:
4 Q. And that fine was related to
5 McKesson selling an unusual size of
6 prescription opiate pills to rogue Internet
7 pharmacies?
8 MS. HENN: Objection to form.
9 THE WITNESS: Can you ask that
10 again, one more time? Sorry.
11 QUESTIONS BY MR. FARRELL:
12 Q. Yeah.
13 In this time frame, McKesson
14 ended up paying a fine to the DEA for selling
15 too many opium pills to rogue Internet
16 pharmacies in violation of federal law?
17 MS. HENN: Objection to form.
18 THE WITNESS: To be accurate,
19 I'd have to look at the document again
20 in terms of specific language, but it
21 was part of the settlement.
22 QUESTIONS BY MR. FARRELL:
23 Q. We'll get to that after lunch.
24 A. Okay.
25 Q. But you acknowledge that what

Page 159

1 Rudy Giuliani said in 2004 came home to roost
2 with McKesson when it paid a fine in 2008?
3 MS. HENN: Objection to form.
4 Outside the scope.
5 THE WITNESS: I don't know if I
6 would characterize it as coming home
7 to roost, but they're connected or
8 they're related.
9 MR. FARRELL: Take a break.
10 VIDEOGRAPHER: The time is
11 12:04 p.m. We're going off the
12 record.
13 (Off the record at 12:04 p.m.)
14 VIDEOGRAPHER: The time is
15 1:05 p.m. We're back on the record.
16 (McKesson-Hartle Exhibit 16
17 marked for identification.)
18 QUESTIONS BY MR. FARRELL:
19 Q. I'm going to reference
20 Exhibit 16 which we've just had marked. The
21 top right-hand corner is 2006_09_27,
22 Bates-stamped MCKMDL00478906.
23 Do you recognize this document?
24 A. I do.
25 Q. What is it?

Page 160

1 A. It's a letter from DEA to
2 registrants from Joe Rannazzisi.
3 Q. Is this -- you might need help
4 with counsel a little bit on this.
5 I don't see where this letter
6 is addressed to McKesson as the recipient;
7 however, this document was produced by
8 McKesson. And I'm assuming this is the 2006
9 Rannazzisi letter that was sent to McKesson.
10 Is that your understanding?
11 A. Yes.
12 Q. So there's no question
13 September 27, 2006, McKesson received this
14 communication.
15 Do you know whether or not
16 there was one document sent to McKesson or
17 there was a letter sent to each of your
18 distribution facilities?
19 A. That, I do not know.
20 MR. FARRELL: Okay. Can I ask,
21 Counsel, do you know?
22 MS. HENN: I'm sorry, I don't.
23 QUESTIONS BY MR. FARRELL:
24 Q. Anyway, if in fact there is
25 another document that has a specific one,

Page 161

1 you'll agree with me that all of these 2006
2 letters that were sent out, they were sent
3 out to all the registrants across the
4 country?
5 MS. HENN: Objection to form.
6 THE WITNESS: Yeah, that's what
7 I believe to be the case, yeah.
8 QUESTIONS BY MR. FARRELL:
9 Q. In fact, the first sentence
10 says --
11 A. Right.
12 Q. -- this letter is being sent to
13 every commercial entity in the United
14 States --
15 A. Right.
16 Q. -- registered --
17 A. Whether it went to all of our
18 individual DCs, I can't confirm, but --
19 Q. But sitting here today as the
20 McKesson corporate designee, you acknowledge
21 receipt of the September 27, 2006 letter from
22 Joe Rannazzisi?
23 A. Yes.
24 Q. My understanding -- and we'll
25 get into it other documents -- is that prior

Page 162

¹ to this there was actually meetings with the
² DEA regarding allegations that you were not
³ complying with your federal regulations; is
⁴ that fair?
⁵          MS. HENN:  Objection to form.
⁶          THE WITNESS:  I'm aware that
⁷     there were meetings.
⁸ QUESTIONS BY MR. FARRELL:
⁹     Q.    I have been unaware of any
¹⁰ documents produced related to this time
¹¹ frame, meaning 2004, 2005, 2006, related to
¹² the initial investigations or internal
¹³ documents relating to the DEA's
¹⁴ investigation.
¹⁵          Have you seen any of those
¹⁶ documents?
¹⁷          MS. HENN:  Objection to form.
¹⁸          THE WITNESS:  Documents prior
¹⁹     to -- leading up to the settlement or
²⁰     the investigation?  I don't recall.
²¹ QUESTIONS BY MR. FARRELL:
²²     Q.    Okay.
²³     A.    I don't believe so.
²⁴     Q.    I've got some things that we'll
²⁵ go through.  What I'm really curious about,

Page 163

¹ whether or not there was anything prior to
² September 27, 2006, that you recall?
³          MS. HENN:  Objection to form.
⁴          THE WITNESS:  Not that I
⁵     recall.
⁶ QUESTIONS BY MR. FARRELL:
⁷     Q.    So at this point in time, the
⁸ Section 55 policy was still in force and
⁹ effect, correct?
¹⁰     A.    Yes.
¹¹     Q.    Are you sure?
¹²     A.    Yes.
¹³     Q.    Okay.  This letter was
¹⁴ received.
¹⁵          Do you know whether or not it
¹⁶ was circulated amongst McKesson or it was
¹⁷ discussed or reviewed or analyzed?
¹⁸          MS. HENN:  Objection to form.
¹⁹          THE WITNESS:  I'm not
²⁰     100 percent sure I know who all
²¹     received it, so I can't answer that --
²²     I can't answer that specifically.
²³ QUESTIONS BY MR. FARRELL:
²⁴     Q.    Did McKesson change its conduct
²⁵ at all based upon this correspondence?

Page 164

¹     A.    From what I understand in
² talking with a former McKesson employee
³ before this deposition, this was mostly a
⁴ confirmation or a reiteration of the
⁵ regulations, which McKesson knew, and
⁶ highlighting things that were -- you know,
⁷ that the team was doing.  And it was sort of
⁸ a validation of some of the things that they
⁹ had been doing, so the red flags and things
¹⁰ like that.  So not significant changes that
¹¹ I'm aware of.
¹²     Q.    Have you had an opportunity to
¹³ review the 2006 Rannazzisi letter in
¹⁴ preparation for today's deposition?
¹⁵     A.    Yes.
¹⁶     Q.    On behalf of McKesson
¹⁷ Corporation, are you willing to affirm,
¹⁸ acknowledge and validate all of the
¹⁹ statements Mr. Rannazzisi places in his
²⁰ September 27, 2006 correspondence?
²¹          MS. HENN:  Objection to form.
²²     Outside the scope.
²³          THE WITNESS:  Could you be more
²⁴     specific?  Validate every single
²⁵     statement and...

Page 165

¹ QUESTIONS BY MR. FARRELL:
²     Q.    Yeah.
³          Paragraph C of the 30(b)(6)
⁴ notice asks for "testimony regarding
⁵ McKesson's past and present interpretation,
⁶ compliance, agreement and/or disagreement
⁷ with this letter from the DEA outlining the
⁸ duties imposed on a distributor under federal
⁹ law."
¹⁰          So let's start with this:  Is
¹¹ there anything in this letter that you
¹² disagree with?
¹³          MS. HENN:  Objection to form.
¹⁴          THE WITNESS:  I don't believe
¹⁵     there's anything I would disagree
¹⁶     with.
¹⁷ QUESTIONS BY MR. FARRELL:
¹⁸     Q.    Is this an accurate statement
¹⁹ of the law?
²⁰          MS. HENN:  Objection to form.
²¹          THE WITNESS:  I believe it is.
²² QUESTIONS BY MR. FARRELL:
²³     Q.    So as of September 27, 2006,
²⁴ the DEA is advising McKesson -- not advising,
²⁵ but referencing the fact that there was a

Page 166

1 prescription drug abuse problem in the United
2 States of America. That's in the very first
3 paragraph.
4          Does McKesson acknowledge that?
5      A.   Yes.
6      Q.   The next sentence says, "As
7 each of you is undoubtedly aware, the abuse,
8 nonmedical use, of controlled prescription
9 drugs is a serious and growing health problem
10 in the country."
11          Does McKesson agree and
12 acknowledge that fact as of 2006?
13          MS. HENN: Objection to form.
14          THE WITNESS: Yes.
15 QUESTIONS BY MR. FARRELL:
16      Q.   The next full paragraph says,
17 "The Controlled Substances Act was designed
18 by Congress to combat diversion by providing
19 for a closed system of drug distribution in
20 which all legitimate handlers of controlled
21 substances must obtain a DEA registration; as
22 a condition of maintaining such registration,
23 must take reasonable steps to ensure that
24 their registration is not being utilized as a
25 source of diversion."

Page 167

1          Does McKesson acknowledge and
2 agree with that statement?
3          MS. HENN: Objection to form.
4          THE WITNESS: I agree with
5 that.
6 QUESTIONS BY MR. FARRELL:
7      Q.   I'd like you to read the next
8 sentence aloud, please.
9      A.   Where it starts "distributors
10 are"?
11      Q.   Yes.
12      A.   "Distributors are, of course,
13 one of the key components of the distribution
14 chain."
15      Q.   Keep going, please.
16      A.   You want me to read the whole
17 paragraph? Okay.
18          "If the closed system is to
19 function properly as Congress envisioned,
20 distributors must be vigilant in deciding
21 whether a prospective customer can be trusted
22 to deliver controlled substances only for
23 lawful purposes. The responsibility is
24 critical, as Congress has expressly declared
25 that the illegal distribution of controlled

Page 168

1 substances has a substantial and detrimental
2 effect on the health and general welfare of
3 the American people."
4      Q.   So again, this is the DEA
5 reiterating what we've discussed before:
6 that failing to abide by the Code of Federal
7 Regulations has a substantial and detrimental
8 effect on the health and general welfare of
9 the American people.
10          Does McKesson agree and
11 acknowledge with that fact?
12          MS. HENN: Objection to form.
13          THE WITNESS: Yes.
14 QUESTIONS BY MR. FARRELL:
15      Q.   Go to the next page, page 2,
16 the second full paragraph. It says,
17 "Nonetheless, given the extent of
18 prescription drug abuse in the United States,
19 along with the potential -- along with
20 dangerous and potentially lethal consequences
21 of such abuse" -- will you please finish that
22 sentence?
23      A.   "Even just one distributor that
24 uses its DEA registration to facilitate
25 diversion can cause enormous harm."

Page 169

1      Q.   Does McKesson acknowledge and
2 accept that fact?
3          MS. HENN: Objection to form.
4          THE WITNESS: I agree with
5 that.
6 QUESTIONS BY MR. FARRELL:
7      Q.   If you go down to the third to
8 last paragraph, it says, "In addition to
9 reporting all suspicious orders, a
10 distributor has a statutory responsibility to
11 exercise due diligence to avoid filling
12 suspicious orders that might be diverted into
13 other than legitimate medical, scientific and
14 industrial channels."
15          Does McKesson acknowledge and
16 accept that to be true?
17          MS. HENN: Objection to form.
18          THE WITNESS: Yes.
19 QUESTIONS BY MR. FARRELL:
20      Q.   And then the last sentence of
21 the next paragraph says at the end, "The
22 distributor should exercise due care in
23 confirming the legitimacy of all orders prior
24 to filing."
25          Do you see that sentence?

Page 170

1  Not "filing." "Prior to
2  filing."
3  A.  I see that sentence.
4  Q.  All right.  Since I butchered
5  that sentence, will you please read the last
6  sentence that's highlighted on the screen?
7  A.  "The distributor should
8  exercise due care in confirming the
9  legitimacy of all orders prior to filling."
10  Q.  Now, this is in September
11  of 2006, agreed?
12  A.  Agreed.
13  Q.  And this is a clear statement
14  from the DEA; would you agree with that?
15  A.  I would agree with that.
16  Q.  McKesson's official position is
17  that when it received communications from the
18  DEA, the DEA was clear as of 2006?
19  MS. HENN:  Objection to form.
20  Also beyond the scope.
21  THE WITNESS:  The only question
22  I would have about possibility is due
23  care, what the definition of what due
24  care means.
25

Page 171

1  QUESTIONS BY MR. FARRELL:
2  Q.  Okay.  Fair.  Fair enough.
3  If you flip to the next page,
4  there's a laundry list of due care.
5  Do you agree on page 3 going
6  through this, the DEA was clear with McKesson
7  about the circumstances that might be
8  indicative of diversion?
9  MS. HENN:  Objection to form.
10  THE WITNESS:  I wouldn't
11  classify these -- I wouldn't call them
12  due care.  These are to be red flags,
13  indicators.
14  QUESTIONS BY MR. FARRELL:
15  Q.  So in 2006, the DEA is telling
16  McKesson, you have to exercise due care prior
17  to filling an order which you deem to be
18  suspicious, agreed?
19  MS. HENN:  Objection to form.
20  THE WITNESS:  Could you ask
21  that again?  Restate that?
22  QUESTIONS BY MR. FARRELL:
23  Q.  In 2006, the DEA is telling
24  McKesson, you have to exercise due care prior
25  to filling an order which you deem to be

Page 172

1  suspicious, agreed?
2  A.  That's what's in the document,
3  yes.
4  Q.  Okay.  Do you disagree with
5  that?
6  A.  That they shared that, they --
7  I don't disagree with that.
8  Q.  Yet your Section 55 policy, you
9  testified this morning, you were shipping
10  suspicious orders?
11  MS. HENN:  Objection to form.
12  THE WITNESS:  There was a
13  process by which those reports were
14  reviewed, which I would consider to be
15  part of due care in a review.
16  QUESTIONS BY MR. FARRELL:
17  Q.  Is there a due care file for
18  each of those?
19  MS. HENN:  Objection to form.
20  THE WITNESS:  Not that I'm
21  aware of.
22  QUESTIONS BY MR. FARRELL:
23  Q.  So there's no documentation of
24  the due care of each suspicious order that
25  was shipped by McKesson in accordance with

Page 173

1  the July 2000 policies and procedures?
2  MS. HENN:  Objection to form.
3  THE WITNESS:  Could you restate
4  that, please?
5  QUESTIONS BY MR. FARRELL:
6  Q.  Is there any documentation of
7  the due care performed by McKesson from
8  July 2000 onward pursuant to Section 55 with
9  regard to suspicious orders that were
10  shipped?
11  MS. HENN:  Objection to form.
12  Outside the scope.
13  THE WITNESS:  I can't speak to
14  the specific documentation and how it
15  was documented those reviews that were
16  conducted of those specific reports
17  that were generated.  Could have been
18  documentation on a form.
19  QUESTIONS BY MR. FARRELL:
20  Q.  Have you seen such
21  documentation?
22  MS. HENN:  Objection to form.
23  THE WITNESS:  I haven't
24  personally seen examples of that.
25

Page 174

1  QUESTIONS BY MR. FARRELL:
2     Q.   Have you seen any piece of
3  paper that indicates that the suspicious
4  orders that were shipped were subject to a
5  due diligence review beforehand, from
6  July 2000 to 2007?
7         MS. HENN:  Objection to form.
8  Outside the scope.
9  QUESTIONS BY MR. FARRELL:
10    Q.   It doesn't mean they don't
11 exist.
12    A.   Right.
13    Q.   I'm just asking if you've seen
14 them.
15        MS. HENN:  Same objections.
16        THE WITNESS:  I don't believe
17 I've seen -- I haven't seen examples.
18 QUESTIONS BY MR. FARRELL:
19    Q.   So you're taking it on faith
20 that due diligence was, in fact, performed?
21        MS. HENN:  Objection to form.
22 Outside the scope.
23        THE WITNESS:  From what I
24 understand and some of the
25 conversations I've had, that due

Page 175

1  diligence processes did happen and
2  exist, yes.
3  QUESTIONS BY MR. FARRELL:
4     Q.   Well, you'll agree with me that
5  Section 55 seems to indicate that there's no
6  subjective involvement regarding the
7  reporting of suspicious orders; it was a
8  statistical fact.
9         MS. HENN:  Objection to form.
10 Outside the scope.
11        THE WITNESS:  Can you ask that
12 one again?
13 QUESTIONS BY MR. FARRELL:
14    Q.   Yeah, I'm not trying to play
15 word games.
16    A.   I know.
17    Q.   It appears from the Section 55
18 policy that's in writing that McKesson's
19 position was to eliminate subjective review
20 of whether or not a suspicious order was
21 reportable, and that the policy states if
22 it's deemed suspicious as a statistical fact,
23 it should be reported to the DEA.  Agreed?
24        MS. HENN:  Objection to form.
25 Outside the scope.

Page 176

1         THE WITNESS:  Agreed.
2  QUESTIONS BY MR. FARRELL:
3     Q.   So every single order that was
4  deemed suspicious by your monitoring program
5  should have been reported to the DEA from
6  July 2000, at least through Rannazzisi's 2006
7  letter?
8         MS. HENN:  Objection to form.
9  Outside the scope.
10        THE WITNESS:  I believe that's
11 the case, to have faxed that or sent
12 it to the local diversion office.
13 QUESTIONS BY MR. FARRELL:
14    Q.   If McKesson did not report
15 those orders, it was in violation of federal
16 law, agreed?
17        MS. HENN:  Objection to form.
18 Outside the scope.
19        THE WITNESS:  Can you ask that
20 one again or restate?
21 QUESTIONS BY MR. FARRELL:
22    Q.   Yeah.  It's a hypothetical.
23    A.   Right.
24    Q.   If McKesson did not report
25 suspicious orders detected following the

Page 177

1  July 2000 Section 55 policy -- let me start
2  over.  Let me see if I can make this as
3  simple as possible.
4         Beginning in July of the year
5  2000 --
6     A.   Okay.
7     Q.   -- if McKesson did not report a
8  suspicious order it detected pursuant to the
9  Section 55 policy, McKesson was in violation
10 of federal law; agreed or disagree?
11        MS. HENN:  Objection to form.
12 Outside the scope.
13        THE WITNESS:  I agree that it
14 would -- it's -- I don't know.  Maybe
15 ask it again.  I apologize for pausing
16 here.
17 QUESTIONS BY MR. FARRELL:
18    Q.   It's an important question.
19    A.   Yeah.
20    Q.   McKesson has a statutory and
21 regulatory responsibility under federal
22 law --
23    A.   Right.
24    Q.   -- to report suspicious orders
25 to the DEA?

Page 178

1   A.   Correct.
2   Q.   McKesson, in July of 2000,
3  adopted a policy that we've been referring to
4  as Section 55 --
5   A.   Correct.
6   Q.   -- to do that very thing?
7   A.   Correct.
8   Q.   That policy states that it's
9  not a subjective determination of whether to
10 report; it's a statistical fact of whether
11 you should report?
12       MS. HENN:  Objection to form.
13       THE WITNESS:  The report is a
14   statistical -- a statistically
15   generated one, yes.
16 QUESTIONS BY MR. FARRELL:
17   Q.   And whether to report it to the
18 DEA is not a subjective determination; it's
19 mandatory if you detect a suspicious order?
20       MS. HENN:  Objection to form.
21   Outside the scope.
22       THE WITNESS:  I believe that to
23   be the case.
24 QUESTIONS BY MR. FARRELL:
25   Q.   So if you didn't do that, it's

Page 179

1  a violation of federal law?
2       MS. HENN:  Objection to form.
3   Outside the scope.
4       THE WITNESS:  I believe so.
5  QUESTIONS BY MR. FARRELL:
6   Q.   Big if, right?
7   A.   If, right.
8   Q.   If that happened, if McKesson
9  detected a suspicious order following the
10 Section 55 enactment and did not report it to
11 the DEA, that's a violation of federal law?
12   A.   If.
13       MS. HENN:  Objection to form.
14       (McKesson-Hartle Exhibit 17
15   marked for identification.)
16 QUESTIONS BY MR. FARRELL:
17   Q.   I'm going to mark what's going
18 to be Exhibit 17.  The document ID is
19 2007_04_25.  I apologize, there is no MDL
20 Bates stamp that I could locate; however,
21 there is a prior production Bates stamp of
22 MCK-HOI-002 dash a whole bunch of zeros and
23 then 1.
24       I'll give you a few minutes to
25 look through this.

Page 180

1       Sir, have you seen this
2  document before today?
3   A.   I don't believe I've seen this
4  specific one.
5   Q.   I'll give you a minute to
6  review.
7   A.   Okay.  I've read that.  Thank
8  you for taking the time.
9   Q.   No problem.
10       So to start off with on this
11 exhibit, you acknowledge that there was a
12 meeting with the DEA on April 5, 2007.  It's
13 from the very first paragraph.
14   A.   Yes.
15   Q.   So at this point in time, the
16 DEA had issued an order to show cause against
17 McKesson, agreed?
18   A.   Correct.
19   Q.   I've yet to see any
20 documentation of anything that predates
21 April 25, 2007, related to this
22 investigation.
23       Have you seen such documents?
24       MS. HENN:  Objection to form.
25       THE WITNESS:  I don't believe

Page 181

1  so, no.
2  QUESTIONS BY MR. FARRELL:
3   Q.   To the extent that such
4  documents do exist, we again reserve our
5  right to come back and discuss them further,
6  subject to the objection of counsel.
7       But for what we have here, this
8  appears that at least in April of 2007, the
9  DEA had already issued a rule to show cause
10 complaining that one of your distribution
11 centers was not following federal law,
12 agreed?
13       MS. HENN:  Objection to form.
14       THE WITNESS:  That's what they
15   alleged.
16 QUESTIONS BY MR. FARRELL:
17   Q.   When you go to page 2 under
18 Proposed Action Plan, does this indicate to
19 you that McKesson is acknowledging that they
20 need to do better to comply with federal law?
21       MS. HENN:  Objection to form.
22       THE WITNESS:  I think this is
23   acknowledge -- excuse me --
24   acknowledgement of just improvements
25   in the program, taking information in

Page 182

1     to evolve the program based on
2     collaboration with DEA and information
3     they're receiving.
4  QUESTIONS BY MR. FARRELL:
5     Q.    You're in management, are you
6  not?
7     A.   I am.
8     Q.   And have you ever written a
9  proposed action plan for an employee?
10    A.   I have.
11    Q.   And is it just to document
12  something new, or are you trying to correct
13  something?
14      MS. HENN:  Objection to form.
15      THE WITNESS:  There can be many
16    different types of action plans.  I've
17    done both.
18  QUESTIONS BY MR. FARRELL:
19    Q.   Okay.  In this one, the very
20  first sentence says, "We," meaning McKesson,
21  "agree that it is in McKesson's interest to
22  implement a program across all of its DCs
23  that can assist the company in identifying
24  potential excessive purchases and enable the
25  company to work more closely with the DEA."

Page 183

1      Did I read that accurately?
2     A.   You did.
3     Q.   So as of April 25th of 2007,
4  McKesson did not have a program across all of
5  its distribution centers, did it?
6      MS. HENN:  Object to form.
7      THE WITNESS:  I believe that's
8    accurate.  The review of suspicious
9    orders, the DU 45s, consider that to
10    be programmatic, or a program.
11  QUESTIONS BY MR. FARRELL:
12    Q.   So then why did your lawyers
13  for McKesson tell the DEA you were
14  implementing a program across all the
15  distribution centers?
16      MS. HENN:  Objection to form.
17  QUESTIONS BY MR. FARRELL:
18    Q.   There's only one of two
19  reasons:  One is that there was no program,
20  or two is that all of the distribution
21  centers were not following it.
22      MS. HENN:  Objection to form.
23  QUESTIONS BY MR. FARRELL:
24    Q.   Can you think of a third
25  alternative?

Page 184

1      MS. HENN:  Objection to form.
2      THE WITNESS:  I don't think
3    it's that black and white in terms of
4    how you implement a program in
5    business, or when you mentioned a
6    personnel action plan, it could be a
7    combination of both.  It could be to
8    improve upon what you've been doing
9    because of new information or trends
10    or data that you've received.  It
11    could be a number of things.
12  QUESTIONS BY MR. FARRELL:
13    Q.   As a McKesson corporate
14  designee, are you willing to admit here today
15  that as of April 25, 2007, McKesson was not
16  fulfilling its obligations under federal law
17  regarding the monitoring of the distribution
18  of controlled substances?
19      MS. HENN:  Objection to form.
20      THE WITNESS:  Can you ask that
21    again, please?
22  QUESTIONS BY MR. FARRELL:
23    Q.   As a McKesson corporate
24  designee, are you willing to admit here today
25  that as of April 25, 2007, McKesson was not

Page 185

1  fulfilling its obligations under federal law
2  regarding the distribution of controlled
3  substances?
4      MS. HENN:  Objection to form.
5      THE WITNESS:  I believe in
6    partnership with DEA and always in
7    good faith, McKesson was believed to
8    be compliant with the regulations.
9  QUESTIONS BY MR. FARRELL:
10    Q.   I understand that McKesson as a
11  corporate entity -- McKesson, it's not a
12  person, right?  McKesson Corporation is a
13  fictional piece of paper that creates a
14  business model, agreed?
15      MS. HENN:  Objection to form.
16  QUESTIONS BY MR. FARRELL:
17    Q.   Is there a Mr. McKesson still
18  running the company?
19    A.   No, there's not.
20    Q.   All right.  So McKesson is a
21  corporation?
22    A.   Agreed.  I understand that.
23    Q.   And in April of 2007, it was
24  meeting with the federal government, the DEA,
25  and changing the way it was doing business,

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 agreed?
2          MS. HENN: Objection to form.
3          THE WITNESS: Changing,
4      enhancing, adding.
5 QUESTIONS BY MR. FARRELL:
6      Q.    Okay. And in part, it was
7 because McKesson was not fulfilling its
8 obligations under federal law?
9          MS. HENN: Objection to form.
10 QUESTIONS BY MR. FARRELL:
11     Q.    Can that even be disputed?
12          MS. HENN: Same objection.
13 QUESTIONS BY MR. FARRELL:
14     Q.    You paid a $13 million fine as
15 a result of this investigation.
16          Can you not acknowledge today,
17 in 2007 there were shortcomings in your
18 controlled substance monitoring program?
19          MS. HENN: Objection to form.
20          THE WITNESS: We denied those
21      allegations in that settlement, and we
22      obviously -- as any program does,
23      wants to improve and expand and take
24      new information in.
25

Page 187

1 QUESTIONS BY MR. FARRELL:
2      Q.    So you paid $13 million as a
3 tax write-off?
4          MS. HENN: Objection to form.
5          THE WITNESS: As a settlement
6      between both parties.
7 QUESTIONS BY MR. FARRELL:
8      Q.    To settle what? Allegations of
9 what?
10          MS. HENN: Objection to form.
11          THE WITNESS: Issues related to
12      the regulations.
13 QUESTIONS BY MR. FARRELL:
14     Q.    The allegations were that
15 McKesson was not fulfilling its obligations
16 under federal law, agreed?
17     A.    Those was the allegations.
18     Q.    And McKesson wrote an action
19 plan and paid a fine to the DEA to get a
20 release for its conduct?
21          MS. HENN: Objection to form.
22          THE WITNESS: I think that's
23      accurate. We did.
24 QUESTIONS BY MR. FARRELL:
25     Q.    And on page 2 of this exhibit,

Page 188

1 it says you're going to implement this
2 Lifestyle Drug Monitoring Program by May 1,
3 2007.
4          Do you see that paragraph?
5     A.    I do.
6     Q.    So is it fair to say that
7 Section 55, which was in force beginning in
8 July of 2000, was replaced on May 1, 2007, by
9 the Lifestyle Drug Monitoring Program?
10          MS. HENN: Objection to form.
11          THE WITNESS: I don't think
12      it's fair to say it was completely
13      replaced.
14 QUESTIONS BY MR. FARRELL:
15     Q.    Modified, amended.
16          So that we're no longer
17 referencing Section 55, we're now going to
18 begin referencing the Lifestyle Drug
19 Monitoring Program.
20          MS. HENN: Objection to form.
21          THE WITNESS: There's
22      components of both that still existed.
23 QUESTIONS BY MR. FARRELL:
24     Q.    Formulated and assimilated into
25 the Lifestyle Drug Monitoring Program?

Page 189

1          MS. HENN: Objection to form.
2          THE WITNESS: Parts of it.
3      This was an advancement of that.
4 QUESTIONS BY MR. FARRELL:
5     Q.    Okay. You'll see in
6 paragraph 2 that it says that you are
7 "developing the technology that will enable
8 each McKesson distribution center to generate
9 an automated report to identify threshold
10 sales."
11          Do you see that?
12     A.    I do.
13     Q.    Prior to this, you did not have
14 that technology?
15          MS. HENN: Objection to form.
16          THE WITNESS: I can't speak to
17      whether we actually had the technology
18      to create a report like that, but I
19      think this is referencing -- you know,
20      putting that into -- into play with
21      the idea of establishing thresholds
22      and creating reports off of that. So
23      we didn't have that report.
24 QUESTIONS BY MR. FARRELL:
25     Q.    You remember this morning we

Page 190

1 went through Section 55 with all those
2 reports that you were generating with the --
3 what was it called, Drohan Data Center?
4     A.    Correct.
5     Q.    Right?
6          But in 2007, you're still
7 developing technology to generate summary
8 reports?
9          MS. HENN:  Objection to form.
10 QUESTIONS BY MR. FARRELL:
11     Q.    Doesn't make sense, does it?
12     A.    No, I believe it does.  There's
13 additions to this.  This is -- those previous
14 reports were at the item level, and they were
15 generated using a certain algorithm.
16          So what's referenced in here is
17 the new concept of accumulating all of those
18 items that have the same DEA base code into a
19 monthly accumulation.  So there's IT work,
20 project work, to make those things happen,
21 so...
22     Q.    There weren't any monthly
23 reports generated from the Section 55 policy?
24     A.    There were monthly reports.
25          MS. HENN:  Objection to form.

Page 191

1 QUESTIONS BY MR. FARRELL:
2     Q.    So how does this enhance that?
3          MS. HENN:  Objection to form.
4          THE WITNESS:  Again, this
5     program added monthly accumulations of
6     thresholds.
7 QUESTIONS BY MR. FARRELL:
8     Q.    Great.  That's the next
9 paragraph.
10     A.    Okay.
11     Q.    And you've identified 8,000
12 pills by base code as the threshold for each
13 customer, agreed?
14          MS. HENN:  Objection to form.
15          THE WITNESS:  For those four
16     specific base codes called out.
17 QUESTIONS BY MR. FARRELL:
18     Q.    And that includes hydrocodone
19 and oxycodone?
20     A.    It does.
21     Q.    And that's because the DEA told
22 McKesson that the average pharmacy in America
23 was selling 5,000 oxycodone pills and 5,000
24 hydrocodone pills per month?
25          MS. HENN:  Objection to form.

Page 192

1 Outside the scope.
2          THE WITNESS:  I know the amount
3     was derived from communication with
4     DEA in some of the averages.
5 QUESTIONS BY MR. FARRELL:
6     Q.    We'll get to that in a second.
7          But in general, the DEA in 2007
8 is telling McKesson the average pharmacy is
9 5,000 pills a month for each of these four
10 drugs, two of which are oxycodone and
11 hydrocodone, and that McKesson is promising
12 with its proposed action plan following an
13 investigation and a rule to show cause to
14 adopt a threshold of 8,000 pills.
15          MS. HENN:  Objection to form.
16          Outside the scope.
17 QUESTIONS BY MR. FARRELL:
18     Q.    That's what it says.
19     A.    Right.
20          MS. HENN:  Same objections.
21 QUESTIONS BY MR. FARRELL:
22     Q.    And then following that, on the
23 next page it talks about the level of
24 reviews.  Page 3.  The top of the page says,
25 "The customer will not be allowed to exceed

Page 193

1 the 8,000 monthly dosage limit until a due
2 diligence review has been completed."
3     A.    I see that.
4     Q.    So what this is basically doing
5 is McKesson is saying that the base threshold
6 is 8,000 pills, and anything above that is
7 suspicious and will not be reported until a
8 due diligence review has been completed.
9          MS. HENN:  Objection to form.
10 QUESTIONS BY MR. FARRELL:
11     Q.    Is that a fair and accurate
12 assessment of your Lifestyle Drug Monitoring
13 Program?
14          MS. HENN:  Objection to form.
15          THE WITNESS:  Can you ask that
16     question again?
17 QUESTIONS BY MR. FARRELL:
18     Q.    In 2007, McKesson is telling
19 the DEA, in the midst of a DEA investigation
20 of McKesson, that it's going to adopt a
21 proposed action plan, and it's outlined in
22 this April 25, 2007 letter, agreed?
23     A.    Agreed.
24     Q.    And as part of that, McKesson
25 has told the DEA we're going to start

Page 194

1 adopting thresholds.
2     A.     Agreed, for those four base
3 codes.
4     Q.     This is the first time in
5 McKesson's history that it was using
6 thresholds?
7         MS. HENN:  Objection to form.
8     Outside the scope.
9         THE WITNESS:  Monthly
10     thresholds, correct.
11 QUESTIONS BY MR. FARRELL:
12     Q.     In fact, nobody in the country
13 was doing thresholds prior to this?
14         MS. HENN:  Objection to form.
15     Outside the scope.
16         THE WITNESS:  I'm not aware if
17     others were.
18 QUESTIONS BY MR. FARRELL:
19     Q.     McKesson set an 8,000 threshold
20 limit for each customer for hydrocodone and
21 oxycodone.
22     A.     Correct.
23     Q.     Anything above that was going
24 to be halted until a due diligence review
25 could be completed.

Page 195

1         MS. HENN:  Objection to form.
2         THE WITNESS:  That's what I
3     understand the process to be.
4 QUESTIONS BY MR. FARRELL:
5     Q.     So going back to the 2006
6 Rannazzisi letter, this is an acknowledgement
7 under the shipping requirement that you must
8 halt suspicious orders until due diligence is
9 performed?
10         MS. HENN:  Objection to form.
11         THE WITNESS:  Can you ask that
12     again or restate that, please?
13 QUESTIONS BY MR. FARRELL:
14     Q.     Mr. Rannazzisi, in his 2006
15 letter from the DEA to McKesson, informed
16 McKesson of its duty to halt suspicious
17 orders, agreed?
18     A.     Was that the specific language
19 or was that the due --
20     Q.     We can go back and take a look
21 at it.
22     A.     Yeah.  Exercise due care.
23     Q.     I mean, I don't care what
24 standard we're using right now; you can say
25 due diligence or due care.  But the idea

Page 196

1 being is in 2006, the DEA is telling McKesson
2 if you get a suspicious order, you have to
3 halt and you cannot ship it until you look
4 into it.
5         MS. HENN:  Objection to form.
6         THE WITNESS:  Can we look at
7     that specific language?
8 QUESTIONS BY MR. FARRELL:
9     Q.     Sure.
10     A.     Can you point it out to me?
11     Q.     I hope so.  2006_09_27, page 2,
12 beginning with the paragraph, "Thus,"
13 two-thirds of the way down, "in addition to
14 reporting all suspicious orders" -- right?
15 What does that say?  "In addition to
16 reporting all suspicious orders."
17         "All" means what?
18     A.     All.
19     Q.     So if you get a suspicious
20 order, what is McKesson supposed to do?
21     A.     To report it.
22     Q.     And if you don't, is that
23 lawful or unlawful?
24         MS. HENN:  Objection to form.
25         THE WITNESS:  That doesn't meet

Page 197

1     the expectation or the guideline that
2     they lay out in this communication.
3 QUESTIONS BY MR. FARRELL:
4     Q.     Which makes -- and that
5 guideline is premised upon what?
6         MS. HENN:  Objection to form.
7         THE WITNESS:  The CFR.
8 QUESTIONS BY MR. FARRELL:
9     Q.     And so that makes it lawful or
10 unlawful?
11         MS. HENN:  Objection to form.
12         THE WITNESS:  Unlawful.
13 QUESTIONS BY MR. FARRELL:
14     Q.     The next part:  "A distributor
15 has a statutory responsibility to exercise
16 due diligence to avoid filling suspicious
17 orders."
18         Agreed?
19     A.     I agree with that language.  It
20 doesn't say -- that's not halt.
21     Q.     Well, it's a halt until you do
22 due diligence --
23     A.     Yeah.
24     Q.     -- right?
25     A.     It's not a block.  Yeah, it's

Page 198

1  a...
2      Q.    Maybe this is just a
3  terminology issue.
4      A.    Might be.
5      Q.    Block -- all I'm saying is, is
6  that McKesson's not allowed to ship a
7  suspicious order without looking into it
8  first, agreed?
9          MS. HENN:  Objection to form.
10         THE WITNESS:  That's how I read
11     that language.
12 QUESTIONS BY MR. FARRELL:
13     Q.    That is the law?
14     A.    Yeah.
15     Q.    Yes?
16         MS. HENN:  Objection to form.
17         THE WITNESS:  The law is to
18     design a system to identify suspicious
19     orders.
20 QUESTIONS BY MR. FARRELL:
21     Q.    That's one part of the law.
22     A.    Right.
23     Q.    What does the CFR say?
24         MS. HENN:  Objection to form.
25         THE WITNESS:  To identify

Page 199

1      orders of unusual size, pattern and
2      frequency.
3  QUESTIONS BY MR. FARRELL:
4      Q.    And so if you ship a suspicious
5  order without doing due diligence, is that
6  lawful or unlawful?
7          MS. HENN:  Objection to form.
8          THE WITNESS:  Again, I'm -- the
9      CFR says you must design and operate a
10     system, right, and to identify
11     suspicious orders.  I don't believe it
12     says to halt them.
13 QUESTIONS BY MR. FARRELL:
14     Q.    It does?
15     A.    In that specific language.
16     Q.    It does or does not?
17     A.    Does not.
18     Q.    Is your interpretation of
19 federal law that you're allowed to ship a
20 suspicious order without conducting due
21 diligence?
22         MS. HENN:  Objection to form.
23 QUESTIONS BY MR. FARRELL:
24     Q.    Maybe this explains why
25 McKesson paid a $150 million fine.

Page 200

1          MS. HENN:  Objection to form.
2  QUESTIONS BY MR. FARRELL:
3      Q.    Let's get back to it.
4          Masters Pharmaceutical has a
5  reporting requirement and a shipping
6  requirement.  We reviewed it this morning,
7  agreed?
8      A.    Parts of it, correct.  Agreed.
9      Q.    It's premised upon a code
10 provision.  The United States Congress passed
11 a US Code provision in 1970, agreed?
12     A.    Agreed.
13     Q.    And it passed -- the Department
14 of Justice enacted regulations which are
15 binding as federal law related to this very
16 topic, agreed?
17     A.    Agreed.
18     Q.    And if you don't follow those
19 rules, McKesson can be fined by the federal
20 government?
21     A.    Agreed.
22     Q.    McKesson's been fined twice
23 that I know of, once for 13 million in 2008
24 and once for 150 million in 2017, for
25 violating these very laws.

Page 201

1          MS. HENN:  Objection to form.
2          THE WITNESS:  That's what was
3      alleged.
4  QUESTIONS BY MR. FARRELL:
5      Q.    So my question to you is:  Is
6  that the shipping requirement that you have
7  to halt a suspicious order under federal law
8  until you do due diligence is and always has
9  been the law in the United States of America?
10         MS. HENN:  Objection to form.
11     Outside the scope.
12         THE WITNESS:  Can you ask that
13     again, please?
14 QUESTIONS BY MR. FARRELL:
15     Q.    The shipping requirement and
16 the reporting requirement as outlined in the
17 Masters Pharmaceutical case is and always has
18 been the law in the United States of America?
19         MS. HENN:  Objection to form.
20     Outside the scope.
21         THE WITNESS:  I believe that's
22     the law.  I mean...
23 QUESTIONS BY MR. FARRELL:
24     Q.    Well, you're McKesson --
25         MS. HENN:  Did you finish your

Page 202

1 answer?
2        THE WITNESS: I did. I didn't
3 really have a -- yeah.
4        MS. HENN: Okay. Just making
5 sure.
6 QUESTIONS BY MR. FARRELL:
7    Q.    So your answer is yes?
8        MS. HENN: Objection to form.
9        THE WITNESS: Yes.
10 QUESTIONS BY MR. FARRELL:
11    Q.    I don't want to -- I don't want
12 you to hesitate.
13    A.    I'm not a legal expert.
14    Q.    I'm not asking you to be a
15 legal expert.
16    A.    Right.
17    Q.    I'm asking McKesson
18 Corporation -- I know this -- to be fair, I
19 understand you are in a role with McKesson
20 being asked to step in the shoes of a
21 corporation and answer on its behalf.
22    A.    Right.
23    Q.    So I'm not trying to be rude,
24 and I know I'm pressing you.
25    A.    Right.

Page 203

1    Q.    But what I'm trying to do is,
2 for the record, create McKesson's position.
3 And I've asked for McKesson to designate
4 someone to announce its position, and
5 fortunately it's you.
6        So let me repeat the question.
7 The shipping requirement and the reporting
8 requirement as outlined and defined in the
9 Masters Pharmaceutical case and always has
10 been the law in the United States of America;
11 agree or disagree?
12        MS. HENN: Object to the form
13 of the question. It's outside the
14 scope.
15        THE WITNESS: I agree that
16 that's the law.
17 QUESTIONS BY MR. FARRELL:
18    Q.    And if you don't follow the
19 law, that makes it unlawful?
20        MS. HENN: Objection to form.
21        THE WITNESS: If you don't
22 follow a law, that would be unlawful.
23 QUESTIONS BY MR. FARRELL:
24    Q.    And if you don't follow the
25 shipping requirement, that's unlawful?

Page 204

1        MS. HENN: Objection to form.
2        THE WITNESS: And if you don't
3 follow the law, I would agree.
4 QUESTIONS BY MR. FARRELL:
5    Q.    And if you don't follow the
6 reporting requirement, that's the law?
7        MS. HENN: Objection to form.
8        THE WITNESS: Again, if you
9 don't follow the law, if you don't
10 follow the guidelines, it would be
11 unlawful.
12 QUESTIONS BY MR. FARRELL:
13    Q.    So when you look at paragraph 7
14 of Exhibit 17, the 2007 correspondence from
15 McKesson to the DEA, you are announcing that
16 you're going to adopt new measures,
17 additional measures, revised, amended,
18 changed, more measures, to comply with
19 federal law?
20        MS. HENN: Objection to form.
21 QUESTIONS BY MR. FARRELL:
22    Q.    Agree or disagreed?
23        MS. HENN: Objection to form.
24        THE WITNESS: We're
25 communicating that we were enhancing

Page 205

1 the program.
2 QUESTIONS BY MR. FARRELL:
3    Q.    In response to allegations that
4 you were not fulfilling your obligations
5 under the shipping requirement and reporting
6 requirement?
7        MS. HENN: Objection to form.
8        THE WITNESS: In part due to
9 allegations.
10 QUESTIONS BY MR. FARRELL:
11    Q.    Now, this letter is addressed
12 to Linden Barber.
13        Do you know who Linden Barber
14 is?
15    A.    I've heard of Linden Barber.
16    Q.    How have you heard of him?
17    A.    Just in my past experience even
18 prior to McKesson, knowing he was in DEA.
19    Q.    Do you know where he is now?
20    A.    He's at Cardinal.
21    Q.    Cardinal Health?
22        How come you-all didn't hire
23 him?
24    A.    I can't speak to that. I don't
25 know. I'm confident in the people we have on

Page 206

1 the team.
2    Q.    Paragraph 8: "McKesson will
3 maintain records of customers that have been
4 authorized to exceed the monthly thresholds
5 and document the basis for such decisions."
6         Do you see that?
7    A.    I do.
8    Q.    Have you reviewed those
9 records?
10        MS. HENN:  Objection to form.
11 QUESTIONS BY MR. FARRELL:
12    Q.    Where can I find the list of
13 customers that have been authorized to sell
14 more than 8,000 pills a month?
15        MS. HENN:  Objection to form.
16    Outside the scope.
17        THE WITNESS:  I've seen
18    examples of the checklist or
19    spreadsheets that notate the review.
20 QUESTIONS BY MR. FARRELL:
21    Q.    Very good.
22        The spreadsheets.  If a
23 customer -- well, we'll get there in a few
24 minutes.
25    A.    Performs.

Page 207

1    Q.    Yeah.  It says here, "This
2 authority will be reviewed on an ongoing
3 basis by the distribution center operations
4 and regulatory staff and periodically
5 reviewed by corporate regulatory staff."
6         So the review done by the
7 distribution center operations and regulatory
8 staff, have you seen any of those documents?
9         MS. HENN:  Objection to form.
10    Outside the scope.
11 QUESTIONS BY MR. FARRELL:
12    Q.    Was this implemented?
13    MS. HENN:  Same objections.
14    THE WITNESS:  Which -- there's
15    two questions there.
16 QUESTIONS BY MR. FARRELL:
17    Q.    You can answer in either order.
18    MS. HENN:  Objection to form.
19    THE WITNESS:  This is part of a
20    review process, a tiered review
21    process, that's started with
22    distribution manager's review.  And
23    so -- and escalated.  It involved
24    regulatory affairs at times, so, yes,
25    it was implemented.

Page 208

1 QUESTIONS BY MR. FARRELL:
2    Q.    Because I haven't seen any of
3 these records.
4         Have you seen these records?
5         MS. HENN:  Objection to form.
6         THE WITNESS:  The records
7    documenting whatever review was taken
8    place?
9 QUESTIONS BY MR. FARRELL:
10    Q.    Yeah, let me -- let me -- let
11 me make it simple.
12         I could theoretically show you
13 that a Rite Aid, in May of 2007 in Akron,
14 Ohio, ordered 26,000 oxycodone pills.  Under
15 this lifestyle policy, what it seems to
16 indicate is that that's more than 8,000 a
17 month.
18         You'll agree that 26,000 is
19 more than 8,000?
20    A.    I will agree to that.
21    Q.    And under this policy, you're
22 not allowed to ship it until you do what?
23         MS. HENN:  Objection to form.
24         THE WITNESS:  A review or some
25    due diligence.

Page 209

1 QUESTIONS BY MR. FARRELL:
2    Q.    And that due diligence should
3 be located where?
4         MS. HENN:  Objection to form.
5         THE WITNESS:  Leaning in close
6    to me.
7 QUESTIONS BY MR. FARRELL:
8    Q.    I'm anticipating the answer.
9    A.    I'm not 100 percent sure where
10 all of the files were put, as I wasn't in the
11 distribution center, but in a customer file.
12    Q.    Perfect.
13         Have you seen the customer
14 files for Cuyahoga County and Summit County?
15    A.    I have not.
16    Q.    Me either.
17         Do they exist?
18    A.    I can't speak to that.  I don't
19 know.
20    Q.    Okay.  One of the 30(b)(6)
21 topics that I asked was to talk about these
22 due diligence files.
23         You're telling me you haven't
24 seen any of the due diligence files for any
25 pharmacy in Summit County and Cuyahoga

Page 210

1  County?
2       MS. HENN: Objection to form.
3  Outside the scope.
4  QUESTIONS BY MR. FARRELL:
5     Q.   It's okay if you haven't, and I
6  don't want you guessing.
7     A.   No, I understand.
8     I've seen files. I don't know
9  about files during this time frame with a
10  Level 1, 2 or 3 review. I can't recall.
11    Q.   Let me ask you this: How --
12  how many pharmacies in May of 2007, in
13  Cuyahoga and Summit County, do you reckon
14  ordered more than 8,000 pills of hydrocodone
15  or oxycodone?
16      MS. HENN: Objection to form.
17  Outside the scope.
18      THE WITNESS: I don't know.
19  I'd be guessing.
20  QUESTIONS BY MR. FARRELL:
21    Q.   Let's say there's ten. Should
22  there be ten customer files that document why
23  McKesson was exceeding 8,000 pills a month?
24      MS. HENN: Objection to form.
25      THE WITNESS: There should be

Page 211

1  documentation.
2  QUESTIONS BY MR. FARRELL:
3     Q.   And if there was no due
4  diligence performed but those pills were
5  still shipped, is that lawful or unlawful?
6       MS. HENN: Objection to form.
7  QUESTIONS BY MR. FARRELL:
8     Q.   Do you want me to repeat the
9  question?
10    A.   Sure.
11    Q.   If, if, if, three ifs, no due
12  diligence was performed, yet McKesson still
13  shipped more than 8,000 oxycodone pills to a
14  pharmacy in Cuyahoga or Summit County in May
15  of 2007, is that lawful or unlawful according
16  to the federal regulations?
17      MS. HENN: Objection to form.
18  QUESTIONS BY MR. FARRELL:
19    Q.   Why are you struggling with
20  this?
21    A.   I'm just thinking. I mean,
22  it's -- if it's -- it wouldn't be lawful.
23    Q.   That makes it...
24    A.   If there weren't documentation.
25  Or due diligence, excuse me.

Page 212

1     Q.   Then it would be lawful or
2  unlawful?
3       MS. HENN: Objection to form.
4       THE WITNESS: It would be
5  unlawful.
6  QUESTIONS BY MR. FARRELL:
7     Q.   So it's summarizing altogether.
8  If in May of 2007 McKesson is shipping to a
9  pharmacy in Cuyahoga or Summit County,
10  Cleveland, Ohio, or Akron, Ohio, more than
11  8,000 pills of hydrocodone or more than 8,000
12  pills of oxycodone, without conducting a due
13  diligence review, then McKesson is engaging
14  in unlawful conduct according to federal law,
15  agreed?
16      MS. HENN: Objection to form.
17      THE WITNESS: Can you ask it
18  again? I apologize. Let's pause
19  here. I'm not a lawyer.
20  QUESTIONS BY MR. FARRELL:
21    Q.   I know you're not. And again,
22  I'm going to reiterate --
23    A.   There's discretion in how this
24  due diligence is done and documented, so I'm
25  trying to understand.

Page 213

1     Q.   That's right. So -- you're
2  right. So let me see if I can say it again.
3       If in May of 2007 McKesson
4  Corporation is shipping to a pharmacy in
5  Cuyahoga or Summit County, Cleveland, Ohio,
6  or Akron, Ohio, more than 8,000 pills of
7  oxycodone or more than 8,000 pills of
8  hydrocodone without conducting due diligence,
9  then McKesson Corporation is engaging in
10  unlawful conduct according to federal law?
11      MS. HENN: Object to form.
12      THE WITNESS: I don't know how
13  to answer that exactly. It depends.
14  QUESTIONS BY MR. FARRELL:
15    Q.   Depends on what?
16      If you ship more than 8,000
17  pills without conducting due diligence,
18  McKesson is engaging in unlawful conduct
19  according to federal law?
20      MS. HENN: Objection to form.
21      Go ahead.
22      THE WITNESS: It can be
23  interpreted that way. I mean, it --
24  QUESTIONS BY MR. FARRELL:
25    Q.   Well, the DEA certainly

Page 214

1 interprets it that way, agreed?
2     A.    They have.
3     Q.    And McKesson has paid fines
4 based on that DEA interpretation, agreed?
5         MS. HENN:  Objection to form.
6         THE WITNESS:  We've paid fines.
7     Again, we're --
8 QUESTIONS BY MR. FARRELL:
9     Q.    Based on the allegations by the
10 DEA that you shipped suspicious orders
11 without conducting due diligence?
12        MS. HENN:  Objection to form.
13     Go ahead.
14        THE WITNESS:  Based on those
15     allegations.
16 QUESTIONS BY MR. FARRELL:
17     Q.    Yes.
18     A.    Right.
19     Q.    The answer is yes?
20     A.    Yes.
21     Q.    See, a yes just gets me moving
22 faster.  Oh, this one's gonna be fun.
23        MR. FARRELL:  Why don't we take
24     a quick break.
25        MS. HENN:  Okay.

Page 215

1         VIDEOGRAPHER:  The time is
2     2:08 p.m., and we're going off the
3     record.
4      (Off the record at 2:08 p.m.)
5         VIDEOGRAPHER:  The time is
6     2:20 p.m., and we're back on the
7     record.
8         (McKesson-Hartle Exhibit 18
9     marked for identification.)
10 QUESTIONS BY MR. FARRELL:
11     Q.    The next exhibit we're going to
12 have marked is Exhibit 18.
13         For reference, the top
14 right-hand corner is 2007_04_XX.  The reason
15 it's XX is the metadata has not yet told me
16 what day of the month it is.
17         Do you know what day of the
18 month this conference was back in 2007?
19     A.    I can't think off the top of my
20 head, no.  Yeah.
21     Q.    The Bates stamp, we have a MDL
22 Bates stamp of MCKMDL00403340.
23         Do you recognize this document?
24     A.    I do.
25     Q.    What is it?

Page 216

1     A.    This is a presentation given by
2 Don Walker about -- at a company meeting
3 about the Lifestyle Drug Program.
4     Q.    And Don Walker at the time
5 was -- would be working for McKesson?
6     A.    Yes.
7     Q.    So this is a McKesson document?
8     A.    Excuse me, yes.
9     Q.    It's produced in the MDL by the
10 McKesson lawyers?
11     A.    Yes.
12     Q.    From the McKesson files?
13     A.    Yes.
14     Q.    And is a true and accurate copy
15 of the presentation given at the national
16 operations conference in 2007?
17        MS. HENN:  Objection to form.
18        THE WITNESS:  Yes, I believe
19     so.  I wasn't there, but I believe so,
20     yeah.
21 QUESTIONS BY MR. FARRELL:
22     Q.    So this national operations
23 conference 2007, this is a conference that is
24 just for McKesson employees.  Is that your
25 understanding?

Page 217

1     A.    Yeah, they typically are.
2     Q.    It's from -- Mr. Boggs
3 testified about it previously.  So this was
4 in 2007.  Management basically gets together,
5 and Don Walker is the senior vice president
6 of distribution operations, is giving a
7 presentation on a number of topics in the
8 form of a PowerPoint slide?
9     A.    Correct.
10        MS. HENN:  Objection to form.
11 QUESTIONS BY MR. FARRELL:
12     Q.    Yes?
13     A.    Correct.
14     Q.    So the title of this is
15 "Lifestyle Drugs and Internet Pharmacies."
16        "Lifestyle drugs" is an
17 interesting choice of words.
18        Do you know where it came from?
19     A.    It's my understanding that's
20 the language that was -- the DEA used as well
21 and had referenced.
22     Q.    Some of the files that I've
23 seen has the DEA asking McKesson where you
24 came up with the oxycodone, hydrocodone and
25 opium pills as lifestyle drugs.

Page 218

1    MS. HENN: Objection to form.
2    THE WITNESS: All I can tell
3  you is I -- what I've heard is that
4  it's the term that came from DEA.
5  QUESTIONS BY MR. FARRELL:
6    Q.  On page 2, it identifies
7  several different topics: public health
8  issue, DEA focus, McKesson involvement,
9  current status, and Lifestyle Drug Monitoring
10  Program. So these will be our jeopardy
11  questions today.
12    Public health issues. Can you
13  read what the very -- on page 3, can you read
14  what the first item is?
15    A.  "Abuse of prescription drugs
16  has risen 66 percent since 2000."
17    Q.  So this is McKesson telling
18  McKesson employees that we're in the business
19  of selling opium pills, and abuse has risen
20  66 percent since 2000.
21    Does that not give you,
22  Mr. McKesson Corporation, pause to think
23  about whether or not your role in the chain
24  of distribution is contributing to the abuse?
25    MS. HENN: Objection to form.

Page 219

1    THE WITNESS: Can you ask that
2    again, please?
3  QUESTIONS BY MR. FARRELL:
4    Q.  This is McKesson telling
5  McKesson employees that abuse of prescription
6  drugs has risen 66 percent since the year
7  2000.
8    Does that not give you,
9  Mr. McKesson Corporation, pause to think
10  about whether or not your role in the chain
11  of distribution is contributing to such
12  abuse?
13    MS. HENN: Objection to form.
14    THE WITNESS: I think it's --
15    it should give everybody pause that
16    that was the trend that was going on,
17    and it's a piece of information shared
18    with leaders to inform them. So --
19  QUESTIONS BY MR. FARRELL:
20    Q.  But not everybody is selling
21  opium pills; McKesson is.
22    MS. HENN: Counsel, can we just
23    make sure we let the witness finish
24    his answers?
25    MR. FARRELL: Sure. I was

Page 220

1  trying to make a snarky remark.
2    MS. HENN: Thank you.
3  QUESTIONS BY MR. FARRELL:
4    Q.  Not everyone is engaged in the
5  chain of distribution of opium pills, though?
6    MS. HENN: Objection to form.
7    THE WITNESS: Agree.
8  QUESTIONS BY MR. FARRELL:
9    Q.  So I'm asking you, McKesson
10  Corporation, whether or not you have any
11  regrets about selling so many opium pills.
12    MS. HENN: Objection to form.
13    Outside the scope.
14    THE WITNESS: Back to your
15    question about this, I would -- sure
16    that gives you pause, I mean, to
17    understand that there's an epidemic
18    out there. And clearly there's many
19    players involved in the flow of
20    distribution.
21  QUESTIONS BY MR. FARRELL:
22    Q.  As of 2007, McKesson is
23  recognizing that opioid painkillers kill more
24  than cocaine and heroin combined, agreed?
25    MS. HENN: Objection to form.

Page 221

1    THE WITNESS: Agree.
2  QUESTIONS BY MR. FARRELL:
3    Q.  And these are McKesson's words.
4    Where is McKesson getting this
5  data from?
6    MS. HENN: Objection to form.
7    Outside the scope.
8    THE WITNESS: I don't know
9    specifically where they -- their
10    source of data for that particular
11    line, but information from different
12    sources. Could be DEA, could be CDC,
13    it could be wherever.
14  QUESTIONS BY MR. FARRELL:
15    Q.  It says here, "Rogue Internet
16  pharmacies distributing oxycodone,
17  hydrocodone, phentermine and alprazolam," yet
18  McKesson was selling to rogue Internet
19  pharmacies, true?
20    MS. HENN: Objection to form.
21    Outside the scope.
22    THE WITNESS: Can you ask that
23    again, please?
24  QUESTIONS BY MR. FARRELL:
25    Q.  McKesson is noting that rogue

Page 222

1 Internet pharmacies are selling oxycodone and
2 hydrocodone, yet what's missing from this
3 slide is the fact that McKesson was supplying
4 the pills to the rogue Internet pharmacies.
5      MS. HENN:  Objection to form.
6      THE WITNESS:  And what's your
7   specific question again?
8 QUESTIONS BY MR. FARRELL:
9   Q.   What gives?
10      MS. HENN:  Objection to form.
11      THE WITNESS:  I don't know what
12   type of response a "what gives"
13   question is.
14 QUESTIONS BY MR. FARRELL:
15   Q.   Yeah.  You're noting that
16 people are dying, and part of the reason is
17 that rogue Internet pharmacies are out there.
18 Yet McKesson, during this time frame, is
19 selling to some of those very same Internet
20 pharmacies, and that's what the DEA fined you
21 for.
22      So is this ignorance of who
23 you're selling to?  Is this repackaging,
24 reframing the issue?  Or is it just flat out
25 a misrepresentation?

Page 223

1      MS. HENN:  Objection to form.
2   Outside the scope.
3      THE WITNESS:  This is raising
4   awareness in -- about the issues that
5   are the public health issues,
6   communicating with leaders and sharing
7   the -- where McKesson is enhancing the
8   program.
9 QUESTIONS BY MR. FARRELL:
10   Q.   But you understand that the
11 rogue Internet pharmacies were getting their
12 pills from, among other people, McKesson,
13 agreed?
14   A.   I understand.
15      MS. HENN:  Objection to form.
16 QUESTIONS BY MR. FARRELL:
17   Q.   Agreed?
18   A.   I understand.  Agreed.
19   Q.   I'm asking if you understand.
20 I want you to confirm that the rogue Internet
21 pharmacies were in fact getting some of their
22 pills from McKesson.
23      MS. HENN:  Objection to form.
24      THE WITNESS:  I don't have
25   specific details on that, but --

Page 224

1 QUESTIONS BY MR. FARRELL:
2   Q.   You understand that to be true?
3   A.   -- I understand that to be
4 true.
5   Q.   So McKesson Corporation admits
6 it was selling oxycodone and hydrocodone to
7 rogue Internet pharmacies in and around 2007?
8      MS. HENN:  Objection to form.
9   Outside the scope.
10      THE WITNESS:  Again, I don't
11   know the specific examples and --
12 QUESTIONS BY MR. FARRELL:
13   Q.   I'm not asking for specific
14 examples.
15   A.   Right.
16   Q.   I'm asking you to confirm that
17 in 2007, McKesson Corporation was selling
18 oxycodone and hydrocodone to rogue Internet
19 pharmacies.
20      MS. HENN:  Objection to form.
21      And, Counsel, I'll just ask you
22   to let him finish his answers so that
23   he can get his answers out.
24      MR. FARRELL:  Yes, ma'am.
25      THE WITNESS:  Again, I don't

Page 225

1   have the specific examples.  I believe
2   that to be true, but I don't know the
3   specific details.
4 QUESTIONS BY MR. FARRELL:
5   Q.   The next page, page 4,
6 "Internet pharmacies."  It says,
7 "Investigative work hours have doubled."
8      Do you know what it doubled
9 from or to?
10   A.   I do not.
11   Q.   "Cutting supply critical to
12 success."
13      What does that mean?
14   A.   I don't know.  I don't know
15 what the speaking points or -- it's one
16 bullet.  I'm not sure how it was represented
17 or communicated.
18   Q.   Do you know what price
19 diversion is?
20   A.   Not specifically.
21   Q.   Was McKesson at this time
22 considering that some of the Internet
23 pharmacies were competing with McKesson for
24 business?
25      MS. HENN:  Objection to form.

Page 226

1    THE WITNESS: I do not know.
2    Pricing is not my area.
3    QUESTIONS BY MR. FARRELL:
4    Q.    Okay. It says, "Wholesalers.
5    DEA expects that you know your customers."
6    What does that mean? It's in
7    quotations.
8    A.    Right.
9    MS. HENN: Objection to form.
10   MR. FARRELL: Well, it is in
11   quotations, isn't it?
12   MS. HENN: I was objecting to
13   asking what DEA means when they said
14   "know your customers." That was what
15   was my objection.
16   QUESTIONS BY MR. FARRELL:
17   Q.    So McKesson is writing a slide
18   following a meeting with the DEA, reporting
19   to the DEA employees what the DEA's focus
20   was, and what McKesson is reporting is that
21   the DEA expects you to know your customers.
22   Is that fair?
23   A.    That's fair.
24   Q.    And when we do, quote, "know
25   our customers," end quote, that's a tag line

Page 227

1    for distributors with regard to knowing the
2    customers you're selling opium pills to?
3    MS. HENN: Objection to form.
4    THE WITNESS: That is a DEA tag
5    line.
6    QUESTIONS BY MR. FARRELL:
7    Q.    And then the next sentence, can
8    you read it out loud, please?
9    A.    The next bullet?
10   Q.    Yes.
11   A.    "Wholesalers accountable for
12   controlling quantities shipped."
13   Q.    Is that true or not true?
14   MS. HENN: Objection to form.
15   THE WITNESS: Can you add a
16   little more context to your question?
17   I know it's a true/false question,
18   but --
19   QUESTIONS BY MR. FARRELL:
20   Q.    Yes.
21   The DEA expects the wholesalers
22   to be accountable for controlling quantities
23   that they ship.
24   Is that fair or unfair?
25   MS. HENN: Objection to form.

Page 228

1    Go ahead.
2    THE WITNESS: That's what
3    the -- that's what the DEA expects, I
4    guess, yeah.
5    QUESTIONS BY MR. FARRELL:
6    Q.    Does McKesson acknowledge that
7    it is accountable for controlling the
8    quantities of opium pills shipped to American
9    pharmacies?
10   A.    We're accountable as a
11   distributor.
12   Q.    The next thing says, "5,000
13   dose units is average."
14   The average American pharmacy
15   in 2007, as reported by the DEA to McKesson,
16   was that 5,000 doses of oxycodone or 5,000
17   doses of hydrocodone was average.
18   A.    That's what the DEA -- DEA
19   calculations.
20   Q.    And McKesson at least validated
21   that number by repeating it on a slide to the
22   national operations conference in 2007.
23   MS. HENN: Objection to form.
24   QUESTIONS BY MR. FARRELL:
25   Q.    Agreed?

Page 229

1    A.    I wouldn't say that they
2    validated. We just repeated what was shared.
3    Q.    Did McKesson undertake any
4    investigation to determine what the average
5    was itself?
6    A.    I believe they did. I can't
7    speak to the examples, but we've used
8    analysts and reviewed data when developing
9    thresholds and...
10   Q.    Does McKesson acknowledge that
11   in 2007 5,000 dose units was average in the
12   United States of America?
13   MS. HENN: Objection to form.
14   Outside the scope.
15   THE WITNESS: We acknowledge
16   that's what the DEA shared. I mean,
17   there's many ways to get averages.
18   QUESTIONS BY MR. FARRELL:
19   Q.    Sitting here today, does
20   McKesson Corporation have any reason to
21   disagree or dispute the DEA's estimation of
22   what the average dose unit was?
23   MS. HENN: Objection to form.
24   Outside the scope.
25   THE WITNESS: What I would

Page 230

1  share is I believe that average is a
2  very rudimentary average, all
3  pharmacies divided by pills, and so it
4  doesn't account for different pharmacy
5  size.  So it's the number that is the
6  result of that basic calculation.
7  QUESTIONS BY MR. FARRELL:
8      Q.    And as we saw from your prior
9  correspondence, McKesson was relying upon
10 that average when it estimated its threshold
11 of 8,000 units per month per pharmacy?
12         MS. HENN:  Objection to form.
13         THE WITNESS:  It was using that
14     data point.  I mean not relying on
15     that number solely but using that as
16     one data point.
17 QUESTIONS BY MR. FARRELL:
18     Q.    So the answer is yes?
19         MS. HENN:  Objection to form.
20         THE WITNESS:  Not yes to that
21     fact we relied on it.  We used the
22     data point.
23 QUESTIONS BY MR. FARRELL:
24     Q.    So McKesson Corporation used
25 the 5,000 dose unit as an average supplied

Page 231

1  the DEA as a data point when it set a
2  threshold of 8,000 units per pharmacy per
3  month?
4      A.    I would say that's fair.
5      Q.    The next page, page 5,
6  "McKesson Involvement, September 5th DEA
7  meeting in Washington, DC, outlined Internet
8  issue."
9         Have you reviewed any documents
10 pertaining to that meeting or the Internet
11 issue that's being referenced?
12     A.    I don't believe so.
13     Q.    Neither have I, because it
14 hasn't been produced, because I'm sure
15 counsel is going to argue it falls outside of
16 Discovery Decision Number 3.
17     The next one, "November 5, DEA
18 notified McKesson, six pharmacies in Florida,
19 excessive hydrocodone."
20         Have you seen that
21 correspondence?
22     A.    I can't recall if I've seen
23 that specific one.
24     Q.    You thinking about the one we
25 just read?  That was April of 2007.  This one

Page 232

1  is talking about a November 5th
2  correspondence.
3      A.    I don't recall.
4      Q.    The next one, "January 6, 2007,
5  meeting with DEA in Washington, DC."
6         And would you read what the
7  bullet point says?
8      A.    "Clear message from DEA."
9      Q.    So at this point in time,
10 McKesson is acknowledging to its entire
11 national operations conference that the
12 message they're receiving from the DEA was
13 clear?
14         MS. HENN:  Objection to form.
15     Outside the scope.
16         THE WITNESS:  Like parts of the
17     message, sure.
18 QUESTIONS BY MR. FARRELL:
19     Q.    So which parts were unclear?
20     A.    I don't know all of the message
21 that were communicated from DEA and how they
22 were communicated.
23     Q.    We can start with the
24 November 2006 letter from Joe Rannazzisi.
25 Certainly if there was some unclear message

Page 233

1  that was being sent, it would be at least
2  like a footnote here, right?  Instead it
3  says, "Clear message from DEA."
4         MS. HENN:  Objection to form.
5     Outside the scope.
6         THE WITNESS:  I don't know that
7     I -- I don't know what was
8     specifically discussed in that
9     specific meeting, so I don't know the
10    types of messages that were shared in
11    that meeting.
12 QUESTIONS BY MR. FARRELL:
13     Q.    As of April of 2007, which we
14 believe to be the date of this conference,
15 have you seen any documentation anywhere in
16 the records of McKesson Corporation that
17 indicate that any message from the DEA to
18 date had been unclear?
19         MS. HENN:  Objection to form.
20     Outside the scope.
21         THE WITNESS:  Have I seen
22     formal documentation where somebody
23     said DEA was unclear?
24 QUESTIONS BY MR. FARRELL:
25     Q.    That was my question, yes.

Page 234

1  A.  I have not seen any of that
2  documentation.
3  Q.  "October '06, order to show
4  cause.  Response, settle."
5  That's the message McKesson is
6  telling its national operations conference,
7  is they get an order to show cause from the
8  DEA, and your response is to enter into a
9  memorandum of understanding?
10  MS. HENN:  Objection to form.
11  THE WITNESS:  I don't know what
12  the context of the communication at --
13  this is one bullet point at a meeting
14  presented to a group.  So there's
15  certainly speaking points and an
16  explanation.  I -- so...
17  QUESTIONS BY MR. FARRELL:
18  Q.  Fair enough.
19  Next page, page 6, "Current
20  Status, April '07, meeting with DEA
21  attorneys.  What we have done:  Created new
22  report in process."
23  This gets back to my earlier
24  questions of this new process is the
25  Lifestyle Drug Monitoring Program?

Page 235

1  A.  Correct.
2  Q.  It's a new process?
3  A.  It is.
4  Q.  Not a revision, not an
5  amendment, not a modification, not a --
6  what's the other word you used?
7  A.  I called it an addition to the
8  existing program.
9  Q.  Okay.
10  A.  An enhancement.
11  Q.  Next page, page 7, "Establish
12  threshold for excessive quantities, 8,000
13  dose units.  Thorough due diligence of
14  customers exceeding threshold."
15  You agree this is, in fact,
16  what the law requires?
17  MS. HENN:  Objection to form.
18  Outside the scope.
19  THE WITNESS:  Could you ask
20  that again?  This -- is it this
21  specific bullet you're talking about?
22  QUESTIONS BY MR. FARRELL:
23  Q.  Yeah, this is McKesson's
24  Lifestyle Drug Monitoring Program, which is
25  an action plan submitted to the DEA to show

Page 236

1  this is what you're going to do to fulfill
2  your obligations under federal law.
3  MS. HENN:  Objection to form.
4  THE WITNESS:  I'd say that's
5  what we're doing to enhance our
6  knowledge of our customers and meet
7  our requirements and enhance our
8  program.
9  QUESTIONS BY MR. FARRELL:
10  Q.  You're making it sound like
11  this was just a voluntary effort out of the
12  thin air.  This was in response to the DEA
13  charging McKesson with misconduct.
14  MS. HENN:  Objection to form.
15  THE WITNESS:  I understand
16  that.
17  QUESTIONS BY MR. FARRELL:
18  Q.  You agree?
19  A.  Agree.
20  Q.  Now, page 9, "Daily dosage
21  summary report."  This is an important point,
22  "8,000 dose unit threshold."  But above
23  that -- next page, not 8, the next page.
24  A.  9?
25  Q.  Yeah.

Page 237

1  "8,000 dose unit threshold,
2  generic base code."  What this means is is
3  that McKesson, when its calculating the
4  threshold, is doing it by generic base code,
5  meaning you don't get 8,000 oxy 10s and 8,000
6  oxy 20s and 8,000 oxy 40s; you get 8,000
7  oxys.
8  A.  Correct.  With that base
9  ingredient.
10  Q.  Based on a four-digit base code
11  that -- provided by the DEA?
12  A.  Yes.
13  (McKesson-Hartle Exhibit 19
14  marked for identification.)
15  QUESTIONS BY MR. FARRELL:
16  Q.  We'll mark as 19, top
17  right-hand corner is 2007_5_15, Bates-stamped
18  MCKMDL00337303.
19  Is this, in fact, the Lifestyle
20  Drug Monitoring Program at McKesson?
21  A.  Yes.
22  Q.  Do you recognize this document
23  as a true and authentic version of the
24  Lifestyle Drug Monitoring Program?
25  A.  I do.

Page 238

1    Q.    And is it a document kept in
2  the regular course of business and produced
3  by your lawyers in this litigation?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  Yeah.
6  QUESTIONS BY MR. FARRELL:
7    Q.    You'll note under "reports,"
8  under "generic ingredient, base code and
9  dosage threshold," it's again affirming what
10 you've told the DEA you're going to do, and
11 that is you're going to set 8,000 doses as
12 the threshold per base code.
13   A.    Correct.
14   Q.    The bottom right-hand corner,
15 you'll see a date generated.
16       What does it say?
17   A.    May 16, 2007.
18       (McKesson-Hartle Exhibit 20
19       marked for identification.)
20 QUESTIONS BY MR. FARRELL:
21   Q.    Exhibit 20, top right-hand
22 corner, 2007_06_12, Bates-stamped
23 MCKMDL00355527.
24       I'll represent to you again,
25 this was produced by your counsel in this

Page 239

1  litigation.  It is another communication
2  dated June 12, 2007, by McKesson's lawyer to
3  the DEA.  And this is an update regarding the
4  progress of the implementation of the
5  Lifestyle Drug Monitoring Program.
6        In the second sentence it
7  states, "As I stated in our last
8  conversation, McKesson has implemented this
9  program nationally, in quote, across its 30
10 distribution centers throughout the country."
11       Again, does this imply to you
12 that you were not implementing a national
13 policy prior to this?
14       MS. HENN:  Objection to form.
15       THE WITNESS:  It implies we
16       weren't implementing this specific new
17       policy across the country.
18 QUESTIONS BY MR. FARRELL:
19   Q.    Page 21 is a copy of a sample
20 letter you told the DEA you were sending
21 across the country.  And in the second full
22 paragraph, starting with the word
23 "pharmaceutical," it says --
24   A.    I'm sorry, what page was that?
25   Q.    Page 21.

Page 240

1        It says, "Pharmaceutical
2  wholesalers, including McKesson, are being
3  held accountable for controlling the
4  qualities of these drugs -- quantities of
5  these drugs shipped to customers and will be
6  held responsible for reviewing trends as
7  indicated by the customer's order history."
8        This is 2007, in an
9  acknowledgement by McKesson that it will be
10 held accountable for excessive orders,
11 agreed?
12       MS. HENN:  Objection to the
13       form.
14       THE WITNESS:  Agreed.
15 QUESTIONS BY MR. FARRELL:
16   Q.    And then the next paragraph you
17 go so far as to say, "Shipment and monitoring
18 of these drugs will be measured by dose units
19 rather than sale units, with 8,000 dose units
20 as the threshold for excessive quantities."
21       So again, this is a recognition
22 that above 8,000 units of oxycodone and
23 hydrocodone is presumptively excessive, which
24 will trigger your three-level due diligence?
25   A.    Correct.

Page 241

1    Q.    The following page, page 22, is
2  an actual declaration, an affidavit that
3  you're asking people to sign about the
4  reasons they want to sell more than 8,000
5  pills.
6    A.    Correct.
7    Q.    And on page 25 is a pharmacy
8  questionnaire presumably sent to every
9  pharmacy in the country that was a customer
10 of McKesson, asking for certain data about
11 the controlled substances they're purchasing
12 from McKesson.
13       MS. HENN:  Objection to form.
14 QUESTIONS BY MR. FARRELL:
15   Q.    This is what you're telling the
16 DEA that you'll be doing from here on out
17 starting in 2007.
18   A.    I don't know if this pharmacy
19 questionnaire was sent to every single
20 pharmacy.  Chains are a little bit different.
21   Q.    I think we'll get into that
22 tomorrow.
23   A.    Okay.  I'm sure we will.
24   Q.    But in general, you're sending
25 it out to all the independent pharmacies at

Page 242

1 least, agreed?
2     A.   I actually don't know what the
3 schedule was and the communication plan. And
4 if you can point me to where we...
5     Q.   All I'm suggesting is that you
6 were telling the DEA that you're going to be
7 these things.
8     A.   We're going to use
9 questionnaires to gather more information on
10 our customers.
11     Q.   Right.
12         (McKesson-Hartle Exhibit 21
13 marked for identification.)
14 QUESTIONS BY MR. FARRELL:
15     Q.   Next document is 21.  Top
16 right-hand corner, 2007_11_26.  This is a
17 February 2008 PowerPoint presentation
18 entitled "Controlled Substance Monitoring
19 Program, CSMP, Implementation Strategy -
20 Regulatory Review Document."
21         Have you seen this document
22 before?
23     A.   I don't believe I've seen this
24 document.
25     Q.   All right.

Page 243

1     A.   No.
2     Q.   It's my understanding that the
3 CSMP was going to replace the Lifestyles
4 program?
5     A.   Correct.
6     Q.   And this document is talking
7 about in March of 2008 you're going to be
8 implementing pilot programs and then rolling
9 it across the country?
10         MS. HENN:  Objection to form.
11 QUESTIONS BY MR. FARRELL:
12     Q.   Why it's called "Denver Pilot"
13 at the top.
14         My question to you is:  Why did
15 you replace --
16     A.   Can I finish reading this?
17     Q.   Sure.
18     A.   Pretty quickly.  Thank you.
19         Okay.  Thank you.
20     Q.   Yeah.
21         So you agree with what I said?
22     A.   You'll need to restate whatever
23 you said.
24     Q.   It appears that the -- this
25 CSMP is the replacement to the Lifestyle Drug

Page 244

1 Monitoring Program.  It's going to be a pilot
2 program in Denver in March of 2008 and then
3 rolled out across the country?
4         MS. HENN:  Objection to form.
5         THE WITNESS:  Yes, it's going
6     to be an enhancement to the Lifestyle
7     Drug Monitoring Program, piloted,
8     rolled out, ultimately replaces.
9 QUESTIONS BY MR. FARRELL:
10     Q.   What's the main difference
11 between the CSMP in 2008 and Lifestyles 2007?
12     A.   The main difference is the
13 addition of -- expanding upon that threshold
14 concept.  In the Lifestyle Drug Monitoring
15 Program there's four base codes that are
16 used, and those trigger reports.
17         The CSMP establishes a
18 threshold for every single base code for all
19 controlled substances, and it is a hard stop,
20 block -- you know, if a customer exceeds --
21 attempts to exceed that threshold, it is a
22 hard stop and block of that order.  So it
23 really takes the threshold concept to the
24 next level.
25     Q.   I thought we were already

Page 245

1 blocking excessive purchases above 8,000 in
2 the absence of due diligence.
3     A.   It's a systematic block.  The
4 system is blocking it.
5     Q.   Troy wants to know what that
6 means.
7     A.   What a systematic block means?
8 It means exactly what it -- it's done by the
9 system.  So a customer orders, orders
10 accumulate against their threshold amount,
11 and if an order goes over the threshold
12 amount or would put them over the threshold
13 amount, the system by itself recognizes that,
14 blocks it, does not ship it.
15         (McKesson-Hartle Exhibit 22
16 marked for identification.)
17 QUESTIONS BY MR. FARRELL:
18     Q.   This is Exhibit 22.  Top right,
19 2007_12_6, Bates-stamped MCKMDL00355041.
20 This is another version of the Lifestyle Drug
21 Monitoring Program, and what I'm -- you may
22 not know the answer to this, but on the very
23 last page, page 10, it has revision 1.7 dated
24 December 6, 2007, added threshold guidelines.
25 But then when you look on page 1, it appears

Page 246

1  to have removed the thresholds for oxycodone
2  and hydrocodone.
3       Can you help me understand
4  that?
5       A.   Sure.
6           There were components of the
7  Lifestyle Drug Monitoring Program that
8  carried over into the CSMP, i.e., the level
9  1, 2, 3 reviews.
10          What changed from a threshold
11 perspective is that in the Lifestyle Drug
12 Monitoring Program it was just those four
13 base codes, and it was to generate reports
14 when orders would -- went over that amount
15 and -- to trigger the due diligence review.
16          And so the CSMP, in essence,
17 for these four base codes, these became hard
18 coded thresholds in the new program.  And so
19 it's really just a transition of certain
20 elements of the Lifestyle Drug Program into
21 the next one, if that helps, if that makes...
22          (McKesson-Hartle Exhibit 23
23          marked for identification.)
24 QUESTIONS BY MR. FARRELL:
25      Q.   Next document, Exhibit 23,

Page 247

1  2007_12_27, Bates stamp MCKMDL00478910.  This
2  is the December 27, 2007 Rannazzisi letter.
3       Do you recognize this document?
4       A.   I do.
5       Q.   McKesson Corporation
6  acknowledges receipt of this communication
7  from the DEA dated December 27, 2007,
8  correct?
9       MS. HENN:  Objection to form.
10      THE WITNESS:  Yes, we received
11 it.
12 QUESTIONS BY MR. FARRELL:
13      Q.   This is a true and authentic
14 version of the McKesson letter?
15      A.   I believe so.
16      Q.   And you kept it in the routine
17 business of collecting records,
18 record-keeping at McKesson?
19      A.   I can't speak to where this was
20 stored and -- I don't know, but --
21      Q.   But it came from McKesson; it's
22 got your Bates stamp on it?
23      A.   I may be a little confused on
24 your question.
25      Q.   I just want you to validate --

Page 248

1       A.   It came us.
2       Q.   You're just acknowledging you
3  received this letter?
4       A.   Correct.
5       Q.   All right.  We can walk through
6  this entire letter, but I'm going to first
7  start broadly.
8           Does McKesson acknowledge that
9  the facts and guidelines set forth in the
10 2007 Rannazzisi letter are true and an
11 accurate representation of the obligations
12 McKesson has under federal law?
13      MS. HENN:  Objection to form.
14      THE WITNESS:  Can you ask that
15 question again?
16 QUESTIONS BY MR. FARRELL:
17      Q.   Yeah.
18          This is the second time the DEA
19 is writing a dear registrant letter to
20 everybody in the country.
21      A.   Understood.
22      Q.   Basically what it's saying is,
23 you people still aren't getting it; here's
24 what your obligations are under federal law.
25          And it includes the duty to

Page 249

1  halt suspicious orders, perform due diligence
2  and report when necessary to the DEA, agreed?
3       MS. HENN:  Objection to form.
4  QUESTIONS BY MR. FARRELL:
5       Q.   Could it be any clearer?
6       MS. HENN:  Objection to form.
7       THE WITNESS:  It's the same
8  information they've shared before,
9  with some additions.
10 QUESTIONS BY MR. FARRELL:
11      Q.   And it's clear, you have a duty
12 to halt suspicious orders, perform due
13 diligence and report when necessary.
14          This is an affirmation a decade
15 preceding the shipping requirement and the
16 reporting requirement in the Masters
17 Pharmaceutical case, agreed?
18      MS. HENN:  Objection to form.
19      THE WITNESS:  You rolled a
20 couple things in there together.  Can
21 you ask me -- what's the specific
22 question?
23 QUESTIONS BY MR. FARRELL:
24      Q.   This is a 2007 letter, which
25 predates the Masters Pharmaceutical case by a

Page 250

1 decade. And I'm asking you whether or not
2 you agree that this letter sets forth the
3 shipping requirements and the reporting
4 requirements as outlined in Masters
5 Pharmaceutical.
6 　　　　MS. HENN: Objection to form.
7 　　　　THE WITNESS: I'm going to read
8 　this again just so --
9 QUESTIONS BY MR. FARRELL:
10 　　Q.　Sure.
11 　　　　The second to the last
12 paragraph is probably the most helpful.
13 　　A.　What's that?
14 　　Q.　The second to last paragraph
15 may be the most helpful.
16 　　A.　On the very last -- okay.
17 Before I get there --
18 　　Q.　It states, "Lastly, registrants
19 that routinely report suspicious orders, yet
20 fill these orders without first determining
21 that order is not being diverted, may be
22 failing to maintain effective controls
23 against diversion."
24 　　　　It's what you and I have been
25 talking about for the last two hours,

Page 251

1 correct?
2 　　A.　Correct.
3 　　Q.　This is an accurate statement
4 of federal law from the DEA to McKesson,
5 agreed?
6 　　　　MS. HENN: Objection to form.
7 　　　　THE WITNESS: Agreed.
8 QUESTIONS BY MR. FARRELL:
9 　　Q.　This is the same thing the DC
10 Circuit Court of Appeals said in 2017,
11 agreed?
12 　　　　MS. HENN: Objection to form.
13 　　　　THE WITNESS: Agreed.
14 QUESTIONS BY MR. FARRELL:
15 　　Q.　I don't need to put this in
16 there. But backing up to the last exhibit we
17 had from February of 2008, can you pull that
18 up?
19 　　　　MS. HENN: You talking about
20 　Exhibit 21?
21 　　　　MR. FARRELL: Yes.
22 QUESTIONS BY MR. FARRELL:
23 　　Q.　I'm going to represent to you
24 that the way that we pull these documents up
25 on the electronic system is you can pull it

Page 252

1 up in a -- basically a photocopy version like
2 you're seeing here, but there's also a native
3 format, which is actually the PowerPoint.
4 　　A.　Okay.
5 　　Q.　And so what I'm showing you on
6 the screen is the same exact document, and
7 the only reason I produced it in native
8 format is that at the very bottom of each of
9 the pages, except for the first one, there's
10 a date.
11 　　　　MR. FARRELL: So if you flip to
12 the next page on the screen up there,
13 Corey.
14 　　　　MS. HENN: Do you want to just
15 hand the copy over --
16 　　　　MR. FARRELL: Yeah.
17 　　　　MS. HENN: -- if that's easier?
18 　　　　MR. FARRELL: I just want you
19 to affirm the date on it.
20 　　　　MS. HENN: And do you have like
21 an identifier? I know for these kinds
22 of native documents --
23 　　　　MR. FARRELL: Not that I can
24 figure out. I'm not that good.
25 　　　　MS. HENN: All right.

Page 253

1 　　　　THE WITNESS: So what do you
2 　need me to do? What are you asking?
3 QUESTIONS BY MR. FARRELL:
4 　　Q.　What the date is.
5 　　A.　On the front page?
6 　　Q.　On the color version, on page 2
7 maybe.
8 　　A.　Oh, on the bottom? 11/26 of
9 '07. November 26, 2007.
10 　　　　(McKesson-Hartle Exhibit 24
11 　marked for identification.)
12 QUESTIONS BY MR. FARRELL:
13 　　Q.　Okay. The next exhibit is
14 going to be Exhibit 24. It's 2008_03_10.
15 It's another PowerPoint presentation at the
16 Denver sales meeting, March 10, 2008.
17 　　　　Have you seen this document
18 before?
19 　　A.　I do not believe I've seen this
20 one.
21 　　Q.　It has a bunch of redacted
22 stuff in here.
23 　　　　MR. FARRELL: Counsel, do you
24 know if that was recorded in the
25 privilege log?

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    MS. HENN: I don't know off the
2  top of my head, but we can certainly
3  check.
4    MR. FARRELL: I think that's
5  the main reason. It basically is
6  talking about your CSMP, the
7  three-level review, and the rollout
8  with a bunch of stuff redacted. I
9  just wanted to put it in the record so
10 we can fool with it later.
11    MS. HENN: Is this a good --
12 the witness would like a break.
13    MR. FARRELL: Sure.
14    MS. HENN: Could we just maybe
15 pause for just five minutes?
16    MR. FARRELL: Yep.
17    VIDEOGRAPHER: The time is
18 3:08 p.m. We're going off the record.
19  (Off the record at 3:08 p.m.)
20    VIDEOGRAPHER: The time is
21 3:16 p.m. We're back on the record.
22    (McKesson-Hartle Exhibit 25
23 marked for identification.)
24 QUESTIONS BY MR. FARRELL:
25    Q.   We'll mark Exhibit 25. It's a

Page 255

1  2008_05_02, Bates stamp MCKMDL00355561.
2    Do you recognize this document?
3    A.   I do.
4    Q.   What is it?
5    A.   It's the settlement agreement
6  from 2008.
7    Q.   Between?
8    A.   Between McKesson and the DEA,
9  DOJ.
10   Q.   Settling what?
11   A.   Settling allegations of things
12 related to our responsibilities as a
13 distributor.
14   Q.   Right.
15    So you'll forgive me for
16 spending so much time for the last several
17 hours building up to the duties and
18 responsibilities under the federal
19 regulations, leading up to May 2, 2008, where
20 you signed a memorandum -- administrative
21 memorandum of agreement paying a $13 million
22 fine for allegedly violating all of those
23 rules we've been discussing.
24    MS. HENN: Objection to form.
25

Page 256

1  QUESTIONS BY MR. FARRELL:
2    Q.   And I'll acknowledge on page 2
3  the middle whereas clause that McKesson
4  denied doing anything wrong.
5    Sitting here today, McKesson
6  continue to assert that it did nothing wrong
7  despite the fact that it paid a fine in 2008?
8    MS. HENN: Objection to form.
9    THE WITNESS: We do. I believe
10   we were in good faith working with DEA
11   and denied the allegations.
12 QUESTIONS BY MR. FARRELL:
13   Q.   So you deny you did anything
14 wrong. You deny you broke the law?
15    MS. HENN: Objection to form.
16    THE WITNESS: I stand behind
17   what's in this document.
18 QUESTIONS BY MR. FARRELL:
19   Q.   Now, you weren't at McKesson,
20 but you're sitting here as McKesson, so
21 you're taking the position that's in the
22 document: We didn't do anything wrong.
23    But you acknowledge that at
24 least in 2008 the DEA -- it's beyond doubt
25 now what the DEA could possibly mean when

Page 257

1  they want you to fulfill your obligations
2  under federal law, agreed?
3    MS. HENN: Objection to form.
4    THE WITNESS: It is beyond
5    doubt -- can you say that again?
6    Rephrase it?
7  QUESTIONS BY MR. FARRELL:
8    Q.   I can rephrase it, yes.
9    A.   Yeah.
10   Q.   I'm trying to establish whether
11 or not McKesson Corporation believes as of
12 May 2, 2008, the DEA could be any clearer
13 about its expectations of McKesson
14 Corporation under the federal regulations
15 related to the distribution of opium pills.
16    MS. HENN: Objection to form.
17    Outside the scope.
18 QUESTIONS BY MR. FARRELL:
19   Q.   I can walk through all of the
20 various communications leading up to this,
21 but you'll agree with me there was a 2006
22 letter, a 2007 letter, there were
23 presentations, there were meetings, there was
24 a rule to show cause, there's a settlement
25 agreement, you got fined $13 million.

Page 258

1   Nobody, no reasonable person,
2  could say that the DEA failed to tell
3  McKesson what the rules of the road were.
4   MS. HENN: Objection to form.
5  Outside the scope.
6   THE WITNESS: I agree that they
7   mentioned that in many -- in many ways
8   and many times. There's still -- you
9   know, there are areas of the
10  regulation that are still unclear, and
11  DEA does not provide clear guidance on
12  what is an order of unusual size,
13  frequency and pattern. They put that
14  back on the distributors to design our
15  own.
16   So they're not -- they're clear
17  on that guidance, but not on how to do
18  it all the time.
19 QUESTIONS BY MR. FARRELL:
20  Q.   All right. So it's clear in
21 2008 what they're telling the DEA -- telling
22 McKesson is that whatever you're doing, we
23 think it's not enough?
24   MS. HENN: Objection to form.
25   THE WITNESS: It's clear that

Page 259

1   that's what they were alleging.
2  QUESTIONS BY MR. FARRELL:
3   Q.   And one of the things that's
4  clear is that you have a duty to halt
5  suspicious orders and perform due diligence.
6   Is there any reasonable person
7  in the United States of America as of 2008
8  could possibly argue that it's unclear
9  whether or not you should halt a suspicious
10 order before shipping?
11   MS. HENN: Objection to form.
12   THE WITNESS: I can't speak for
13  all reasonable people in the US.
14 QUESTIONS BY MR. FARRELL:
15  Q.   Well, what if somebody came up
16 and said, "We don't know whether or not we
17 have a duty to halt before shipping a
18 suspicious order," what you say to them as of
19 May 2, 2008, on the heels of paying
20 $13 million to the DEA?
21   MS. HENN: Objection to form.
22  Outside the scope.
23   THE WITNESS: Can you ask that
24  again?
25

Page 260

1 QUESTIONS BY MR. FARRELL:
2  Q.   Yes.
3   Would you be a moron if you
4  took the position out of May 2, 2008, that
5  the DEA was unclear as to whether or not you
6  could ship a suspicious order?
7   MS. HENN: Objection to form.
8  Outside the scope.
9   THE WITNESS: I wouldn't call
10  anybody a moron, but it's clear what
11  they expect.
12 QUESTIONS BY MR. FARRELL:
13  Q.   And they expect what?
14  A.   To design and operate a system
15 to disclose suspicious orders.
16  Q.   And?
17   MS. HENN: Objection to form.
18   THE WITNESS: And report.
19 QUESTIONS BY MR. FARRELL:
20  Q.   And?
21   MS. HENN: Same objection.
22 QUESTIONS BY MR. FARRELL:
23  Q.   Is it clear whether or not you
24 can ship a suspicious order without
25 conducting due diligence?

Page 261

1   MS. HENN: Objection to form.
2  Outside the scope.
3   THE WITNESS: I think it
4  depends. It's -- there are other
5  types of suspicious order systems.
6  QUESTIONS BY MR. FARRELL:
7   Q.   I understand. I'm just trying
8  to take it from a very basic standpoint.
9   Could the DEA have made it any
10 clearer that McKesson has a duty to monitor
11 and detect suspicious orders?
12   MS. HENN: Objection to form.
13  Outside the scope.
14   THE WITNESS: To monitor and
15  detect suspicious orders.
16 QUESTIONS BY MR. FARRELL:
17  Q.   That's what it says.
18  A.   Very clear.
19  Q.   Could they have been any
20 clearer that if you get a suspicious order,
21 you can't just ship it?
22   MS. HENN: Objection to form.
23  Outside the scope.
24   THE WITNESS: That's clear.
25

Page 262

1  QUESTIONS BY MR. FARRELL:
2      Q.   Clear or very clear?
3          MS. HENN:  Objection to form.
4          THE WITNESS:  It's very clear.
5  QUESTIONS BY MR. FARRELL:
6      Q.   Can you report the suspicious
7  order to the DEA and still ship it?
8          MS. HENN:  Objection to form.
9  Outside the scope.
10          THE WITNESS:  Can you ask that
11  one again or restate it?
12  QUESTIONS BY MR. FARRELL:
13      Q.   Can you report the suspicious
14  order to the DEA and still ship it?
15          MS. HENN:  Same objections.
16          THE WITNESS:  Without due
17  diligence or some sort of review?
18  QUESTIONS BY MR. FARRELL:
19      Q.   If you're reporting a
20  suspicious order to the DEA, what are you
21  doing?
22          MS. HENN:  Objection to form.
23          THE WITNESS:  Okay.  Can we
24  start with the original question?  I'm
25  getting a little -- I want to make

Page 263

1  sure I'm going to answer your question
2  right --
3  QUESTIONS BY MR. FARRELL:
4      Q.   Yeah, I'm going to show you --
5      A.   -- the right question.
6      Q.   I'm going to show you here in a
7  few minutes some of your brethren who still
8  haven't gotten the message by May 2008, and
9  I'm trying to see if you'll call them morons.
10          So what I'm asking you is from
11  McKesson's corporation, is it clear by May 2,
12  2008, you -- the shipping requirement and the
13  reporting requirement?
14          MS. HENN:  Objection to form.
15  Outside the scope.
16          THE WITNESS:  That's how we
17  designed our program, and that's what
18  we believed it to be.
19  QUESTIONS BY MR. FARRELL:
20      Q.   Based on federal law?
21          MS. HENN:  Objection to form.
22          THE WITNESS:  Based on the
23  regulations and the guidance and the
24  information we collected.
25          (McKesson-Hartle Exhibit 26

Page 264

1  marked for identification.)
2  QUESTIONS BY MR. FARRELL:
3      Q.   I'll mark Exhibit 26.  Top
4  right is 2008_07_031.  It's Bates stamp
5  MCK-HOI-002-0000042.
6          Have you seen this document
7  before?
8      A.   Yes, I have.
9      Q.   And what is it?
10      A.   This is a PowerPoint.
11      Q.   Made by who?
12      A.   By McKesson.
13      Q.   For purposes of?
14      A.   Discussion with DEA.
15      Q.   Regarding?
16      A.   Our controlled substance
17  monitoring program.
18      Q.   And it's dated when?
19      A.   It's dated July 31, 2008.
20      Q.   So this is before or after your
21  settlement agreement with the DEA?
22      A.   Shortly after.
23      Q.   So that must have been kind of
24  awkward, right, your coming in after paying
25  the fine?

Page 265

1          What are you doing here?  Are
2  you giving the DEA an update of all of the
3  parts of your action plan you're
4  implementing?
5          MS. HENN:  Objection to form.
6          THE WITNESS:  I can't say if it
7  was awkward or not, but standard -- or
8  a communication and updating them on
9  what we were doing.
10  QUESTIONS BY MR. FARRELL:
11      Q.   Go to page 004.  Roman numeral
12  number III, "Block orders that exceed
13  thresholds."
14          That's because you have a duty
15  to halt suspicious orders, correct?
16          MS. HENN:  Objection to form.
17  Outside the scope.
18          THE WITNESS:  That's how we
19  designed our new program, to block.
20  QUESTIONS BY MR. FARRELL:
21      Q.   And is that a requirement of
22  federal law?
23      A.   It's our interpretation of how
24  we --
25          MS. HENN:  Same objection.

Page 266

1    Go ahead.
2    THE WITNESS:  Our
3  interpretation of how -- what we
4  thought we needed to do with our
5  program.
6  QUESTIONS BY MR. FARRELL:
7    Q.    Page 5.  In April of 2007, you
8  created your three-tier review process.
9    Do you see that?
10    A.    Correct.  Yep.
11    Q.    That means prior to that, you
12  didn't have a three-tier review process --
13    MS. HENN:  Objection to form.
14  QUESTIONS BY MR. FARRELL:
15    Q.    -- under Section 55.
16    MS. HENN:  Objection to form.
17    THE WITNESS:  We did not.  We
18  had a different process.
19  QUESTIONS BY MR. FARRELL:
20    Q.    September 2007, DEA meeting
21  triggered new development.  This is your new
22  CSMP, and this is what you're describing to
23  the DEA, agree?
24    A.    Agree.
25    Q.    Bate Stamp 8.  If you're over

Page 267

1  your threshold, what happens to your order?
2    A.    It gets blocked.
3    Q.    Why?
4    A.    That's the design of our
5  system.
6    Q.    For what purpose?
7    A.    To report suspicious orders --
8    Q.    Why is that important?
9    A.    -- block.
10    To prevent diversion, to play a
11  role in preventing diversion.
12    Q.    The more pills that get
13  diverted, what happens?
14    MS. HENN:  Objection to form.
15    THE WITNESS:  You can assume
16  that there's more abuse.
17  QUESTIONS BY MR. FARRELL:
18    Q.    Do you believe there's a direct
19  correlation between the more pills that get
20  sold and the more pills that get diverted?
21    MS. HENN:  Objection to form.
22    THE WITNESS:  Can you rephrase
23  that question?
24  QUESTIONS BY MR. FARRELL:
25    Q.    Yes.

Page 268

1    Is there a relationship between
2  the number of pills that get sold and the
3  number of pills that get diverted?
4    MS. HENN:  Objection to form.
5    THE WITNESS:  It's hard to say,
6  but you could assume that the -- you
7  know --
8  QUESTIONS BY MR. FARRELL:
9    Q.    I don't want you to assume.
10    A.    Yeah.
11    Q.    I want you to use common sense.
12    A.    Yeah.  Using common sense and
13  basic logic, you could assume the more pills
14  that are out there, the more potential for
15  diversion there could be.
16    Q.    So if I were to tell you that a
17  company sold 100 pills and 10 of them got
18  diverted, and then I come back to you and say
19  a year later, a thousand pills got sold, what
20  does common sense and logic tell you as
21  McKesson Corporation how many pills get
22  diverted?
23    MS. HENN:  Objection to form.
24    THE WITNESS:  I don't think
25  it's that easy of a connection to say

Page 269

1    that happened.  There could be many
2    different reasons why a thousand
3    pills -- there may be an increase of a
4    thousand pills with zero diversion.
5  QUESTIONS BY MR. FARRELL:
6    Q.    That's true.
7    Do you expect as McKesson
8  Corporation to find in general a direct
9  correlation to volume of pills sold and
10  volume of pills diverted?
11    MS. HENN:  Objection to form.
12    Outside the scope.
13    THE WITNESS:  Depends.  I don't
14    know if there's a statistic on how
15    many pills are diverted.  Again,
16    there's reasons why you may have very
17    large volumes of pills for legitimate
18    reasons and there may be zero
19    diversion.
20  QUESTIONS BY MR. FARRELL:
21    Q.    That's true.  Let me ask it a
22  different way.
23    Do you believe it's foreseeable
24  that the more pills you sell, the more pills
25  get diverted?

Page 270

1    MS. HENN: Objection to form.
2    THE WITNESS: I would say that
3 there -- that, you know, the volume
4 of -- the more pills you have, there
5 could be, could be more to diversion.
6 It doesn't mean that there is. Or I
7 would foresee that just an increase in
8 volume is going to increase diversion.
9 There could be.
10 QUESTIONS BY MR. FARRELL:
11    Q.    The more pills that are
12 diverted -- let me ask you a different way.
13    A.    Okay.
14    Q.    Does McKesson believe that the
15 more pills that get diverted, the more pills
16 get abused?
17    MS. HENN: Objection to form.
18    Outside the scope.
19    THE WITNESS: Sorry, could you
20    rephrase that one again? Let me --
21 QUESTIONS BY MR. FARRELL:
22    Q.    As McKesson Corporation, do you
23 acknowledge that the more pills that get
24 diverted, the more pills get abused?
25    MS. HENN: Same objections.

Page 271

1    THE WITNESS: Again, I'd say
2    what I said previously: It could --
3    that could be a possibility. It
4    depends, but...
5 QUESTIONS BY MR. FARRELL:
6    Q.    Are people diverting pills to
7 engage in lawful conduct?
8    MS. HENN: Objection to form.
9    THE WITNESS: I don't know why
10    everybody is diverting pills every
11    single time, but generally, no.
12 QUESTIONS BY MR. FARRELL:
13    Q.    Right.
14    So in general, the more pills
15 that gets diverted, the more abuse and
16 addiction we find with prescription opium
17 pills?
18    A.    There's that possibility.
19    (McKesson-Hartle Exhibit 27
20    marked for identification.)
21 QUESTIONS BY MR. FARRELL:
22    Q.    I'm going to have marked what
23 is Deposition Exhibit 27. The top right-hand
24 corner is 2012_5_9.
25    This is an amicus brief.

Page 272

1    Do you know what an amicus
2 brief is?
3    A.    I do not. I do not have legal
4 background.
5    Q.    Okay. McKesson Corporation is
6 a member of the Healthcare Distributors and
7 Manufacturers Association, now known as the
8 Healthcare Distributors Association, agreed?
9    A.    Healthcare Distributors
10 Management Association?
11    Q.    Management, I'm sorry, yes.
12    A.    Yes.
13    Q.    Okay. And on May 9, 2012,
14 Cardinal Health had gotten itself into a
15 little trouble with the DEA, hadn't it?
16    MS. HENN: Objection to form.
17    THE WITNESS: I'm aware of that
18    time frame and...
19 QUESTIONS BY MR. FARRELL:
20    Q.    They got in trouble with the
21 DEA, very similar to how McKesson got in
22 trouble with the DEA in 2008, agreed?
23    MS. HENN: Objection to form.
24    THE WITNESS: I haven't
25    reviewed this document or all the

Page 273

1    details, but in spirit, in general.
2 QUESTIONS BY MR. FARRELL:
3    Q.    So in -- on May 9th of 2012,
4 HDMA, the Healthcare Distribution Management
5 Association, wrote a brief to a federal court
6 here in Washington, DC, in support of
7 Cardinal Health and against the DEA.
8    Was McKesson Corporation aware
9 of this amicus brief?
10    MS. HENN: Objection to form.
11    Outside the scope.
12    MR. FARRELL: It's actually
13    not. It's actually referenced
14    directly in the notice.
15    MS. HENN: I'm not sure that's
16    the case, but we can disagree about
17    that.
18    THE WITNESS: I don't know for
19    100 percent certain, but I assume so.
20 QUESTIONS BY MR. FARRELL:
21    Q.    Well, I don't want you to
22 guess. This is relatively important.
23    Have you seen any
24 acknowledgement within McKesson Corporation
25 validating or affirming or reviewing or

Page 274

1  participating in this amicus brief?
2     A.   I have not.
3     Q.   Are you aware of McKesson being
4  involved at all in the amicus briefs?
5        MS. HENN: Objection to form.
6        THE WITNESS: I'm not.
7        (McKesson-Hartle Exhibit 28
8  marked for identification.)
9  QUESTIONS BY MR. FARRELL:
10    Q.   I'm going to have marked
11 Exhibit 28, 2012_05_05.
12       Are you aware of the Wayback
13 Machine?
14    A.   Excuse me?
15    Q.   Are you aware of the Wayback
16 Machine?
17    A.   I am not.
18    Q.   The Wayback Machine is an
19 Internet service that's free, and what it
20 does is it's able to go and bring up old
21 websites based on dates and time.
22       And it just so happens that the
23 Wayback Machine captured the HDMA website in
24 May of 2012.  This comes from the HDMA
25 website, and this is a list of the board of

Page 275

1  directors.
2        Now, what's an executive
3  committee on a board of directors?
4        MS. HENN: Objection to form.
5  Outside the scope.
6        THE WITNESS: That's the senior
7  leaders driving this group.
8  QUESTIONS BY MR. FARRELL:
9     Q.   And, Mr. McKesson Corporation,
10 you were on the executive committee of HDMA
11 of 2012, were you not?
12       MS. HENN: Objection to form.
13 Outside the scope.
14       THE WITNESS: One of our senior
15 leaders is.
16 QUESTIONS BY MR. FARRELL:
17    Q.   You're in the senior leadership
18 of HDMA, and you signed off on an amicus
19 brief submitted to a federal court in
20 Washington, DC, in support of one of your
21 colleagues and members, Cardinal Health.
22       MS. HENN: Objection to form.
23 Outside the scope.
24 QUESTIONS BY MR. FARRELL:
25    Q.   So I'm going to ask you a

Page 276

1  couple of questions about it.
2     A.   Okay.
3     Q.   If you flip to page 3...
4     A.   Of the brief?
5     Q.   Of the brief.
6        The very bottom of the page --
7        MS. HENN: Are you talking
8  about the Bates numbers or the --
9        MR. FARRELL: Yeah, the Bates
10 number.
11       MS. HENN: Thank you.
12 QUESTIONS BY MR. FARRELL:
13    Q.   It says, "HDMA's members have
14 not only statutory and regulatory
15 responsibilities to detect and prevent
16 diversion of controlled prescription drugs,
17 but undertake such efforts as responsible
18 members of society."
19       Do you see that?
20    A.   I do.
21    Q.   Do you recognize this as an
22 acknowledgement that all of the distributors
23 in the country have a common law duty to the
24 people of the United States of America to
25 prevent diversion of controlled substances

Page 277

1  because you're selling controlled substances?
2        MR. SUDDATH: Objection.
3        MS. HENN: Objection to form.
4  Outside the scope.
5        THE WITNESS: Okay.  Could you
6  ask me that again?
7  QUESTIONS BY MR. FARRELL:
8     Q.   Do you recognize this as an
9  acknowledgement that all of the distributors
10 in the country have a common law duty to the
11 American citizens to prevent controlled
12 substances from being diverted into the
13 illicit market?
14       MR. SUDDATH: Objection.
15       MS. HENN: Objection to form.
16 Outside the scope.
17 QUESTIONS BY MR. FARRELL:
18    Q.   I mean, isn't this what we
19 talked about earlier?
20    A.   I do.
21    Q.   You do, don't you?  Yes?
22    A.   Yes.
23    Q.   Because it's not just
24 statutory, regulatory.  You're engaged in
25 selling opium pills.  You owe a duty to the

Page 278

1 American people to do your very best to
2 prevent diversion.
3          MS. HENN:  Objection to form.
4     Outside the scope.
5 QUESTIONS BY MR. FARRELL:
6     Q.     Agreed?
7     A.     Agreed.
8     Q.     And this is your trade
9 organization making the same representation
10 to a federal court in Washington, DC?
11          MS. HENN:  Same objections.
12     Objection to form.  Outside the scope.
13          THE WITNESS:  Yes.
14 QUESTIONS BY MR. FARRELL:
15     Q.     Next sentence:  "The public
16 health dangers associated with the diversion
17 and abuse of controlled prescription drugs
18 have been well-recognized over the years by
19 Congress, DEA, HDMA and its members, and
20 public health authorities."
21     Is that all true?
22          MS. HENN:  Objection to form.
23     Outside the scope.
24          THE WITNESS:  Yes.
25

Page 279

1 QUESTIONS BY MR. FARRELL:
2     Q.     The next sentence.  This is the
3 part that I'd like to talk to you about, the
4 highlighted part.  "The agency," meaning DEA,
5 "has failed to provide meaningful guidance to
6 assist the regulated industry in complying
7 with the DEA's interpretation of its
8 implementing regulations.  HDMA respectfully
9 submits that despite the agency's oft-recited
10 refrain that the regulations are clear, the
11 regulated industry does not know the rules of
12 the road because DEA has not adequately
13 explained them."
14          McKesson has said the opposite
15 publicly and to its own people, agreed?
16          MS. HENN:  Object to form.
17 QUESTIONS BY MR. FARRELL:
18     Q.     Remember the slide that said
19 clear?  Remember your testimony about the
20 letters and the settlement agreement?  You
21 said a few minutes ago it was clear.
22     A.     I do remember all of that.  I
23 also --
24          MS. HENN:  Object to form.
25          Go ahead.

Page 280

1          THE WITNESS:  Oh, excuse me.
2          I also remember saying that
3     certain parts of those regulations
4     related to what a suspicious order is
5     is not clear.
6 QUESTIONS BY MR. FARRELL:
7     Q.     Page 7.  "The societal costs of
8 prescription drug abuse are" -- what's it
9 say?
10     A.     I flipped to the wrong page.
11 Excuse me.
12     "Huge."
13     Q.     And if a distributor engages in
14 unlawful conduct, should the distributor be
15 held accountable for such societal costs?
16          MS. HENN:  Objection to form.
17 Outside the scope.
18          THE WITNESS:  Can you repeat
19 that, please?
20 QUESTIONS BY MR. FARRELL:
21     Q.     If a wholesale distributor
22 engages in unlawful conduct, should it be
23 held accountable for the societal costs of
24 prescription drug abuse?
25          MR. SUDDATH:  Objection.

Page 281

1          MS. HENN:  Same objections.
2          THE WITNESS:  I believe
3     distributors have a responsibility in
4     preventing diversion.
5 QUESTIONS BY MR. FARRELL:
6     Q.     So should they be held
7 accountable for the societal costs that are
8 documented in this pleading and referenced as
9 huge?
10     A.     I think it depends.
11          MS. HENN:  Objection to form.
12 QUESTIONS BY MR. FARRELL:
13     Q.     Depends on what?
14          MS. HENN:  Same objection.
15          Go ahead.
16          THE WITNESS:  It depends on the
17     facts and circumstances and, you know,
18     the information about the specific
19     situation.
20 QUESTIONS BY MR. FARRELL:
21     Q.     If a distributor repeatedly
22 fails to report suspicious orders, do you
23 believe it should be held accountable for the
24 societal costs of prescription drug abuse?
25          MR. SUDDATH:  Objection.

Highly Confidential – Subject to Further Confidentiality Review

Page 282

1    MS. HENN:  Objection to form.
2    THE WITNESS:  And I believe it
3  depends.
4  QUESTIONS BY MR. FARRELL:
5    Q.    On?
6    A.    The facts and circumstances.
7    Q.    How about the facts and
8  circumstances which led to McKesson paying
9  $150 million fine?
10    MS. HENN:  Objection to form.
11    THE WITNESS:  Again, I think it
12  depends.
13  QUESTIONS BY MR. FARRELL:
14    Q.    Do you think McKesson is partly
15  responsible for the societal costs of
16  prescription drug abuse in America?
17    MS. HENN:  Objection to form.
18    THE WITNESS:  Could you ask
19  that one again, please?
20  QUESTIONS BY MR. FARRELL:
21    Q.    Do you think McKesson is partly
22  responsible for the societal costs of
23  prescription drug abuse in America?
24    MS. HENN:  Objection to form.
25    THE WITNESS:  Again, there's a

Page 283

1  lot of people involved in -- it's a
2  very complicated and multi-faceted
3  issue, so...
4  QUESTIONS BY MR. FARRELL:
5    Q.    We'll get to the other people
6  in a second.
7    MS. HENN:  Are you done with
8  your answer?
9    THE WITNESS:  I am done.
10    MS. HENN:  Okay.
11  QUESTIONS BY MR. FARRELL:
12    Q.    We'll get to the others in a
13  second.  I want to talk about McKesson first.
14  This is your opportunity to
15  accept partial responsibility for the
16  societal costs of prescription drug abuse in
17  America; yes or no?
18    MS. HENN:  Objection to form.
19  Also outside the scope.
20    THE WITNESS:  So again, it
21  depends on -- it depends.
22  QUESTIONS BY MR. FARRELL:
23    Q.    You're McKesson Corporation.
24    A.    Right.
25    Q.    You're sitting here today.  You

Page 284

1  have the opportunity to look in the camera
2  and tell the jury whether or not you accept
3  partial responsibility for the societal costs
4  of prescription drug abuse in America.
5    MS. HENN:  Objection to form.
6  Outside the scope.
7  QUESTIONS BY MR. FARRELL:
8    Q.    I'd ask you to answer yes or
9  no.
10    MS. HENN:  Same objections.
11    THE WITNESS:  I'm not sure how
12  to answer that -- that question
13  specifically.
14  QUESTIONS BY MR. FARRELL:
15    Q.    Well, you can say yes or --
16    A.    I understand that.
17    Q.    -- you can say no.
18    A.    I understand that.
19    MS. HENN:  Objection to form.
20  QUESTIONS BY MR. FARRELL:
21    Q.    If I asked you the same
22  question in your personal capacity, would
23  that help you answer the question better?
24    MS. HENN:  Same objection.
25  Objection to form.

Page 285

1    THE WITNESS:  Again, it
2  depends -- I would say it doesn't
3  change my answer.  It depends on the
4  role that they played.
5  QUESTIONS BY MR. FARRELL:
6    Q.    Well, back to McKesson
7  Corporation, which is you sitting in the
8  chair today.  Knowing what you know as the
9  30(b)(6) representative, the corporate
10  designee, knowing about your past conduct,
11  knowing about the past interactions with the
12  DEA, I'm going to ask you again:  Does
13  McKesson Corporation accept partial
14  responsibility for the societal costs of
15  prescription drug abuse in America?
16    MS. HENN:  Objection to form.
17    THE WITNESS:  Again, you know,
18  I -- we're part of the closed system,
19  so we're responsible for preventing
20  diversion.
21  QUESTIONS BY MR. FARRELL:
22    Q.    So the answer is?
23    MS. HENN:  Objection to form.
24    THE WITNESS:  Again, I think
25  we're responsible for something.  I

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 don't know what -- how you define all
2 societal costs and -- I still believe
3 it depends on different circumstances.
4 QUESTIONS BY MR. FARRELL:
5 Q. Sir, we're not going to parse
6 out percentages.
7 A. Yeah.
8 Q. Let's just talk globally for
9 McKesson Corporation. So I don't want to put
10 words in your mouth because it's got to come
11 out of your mouth. So the answer is yes or
12 no.
13 MS. HENN: Objection to form.
14 THE WITNESS: I would say yes,
15 partially.
16 QUESTIONS BY MR. FARRELL:
17 Q. How about Purdue Pharma? Does
18 McKesson Corporation take the position that
19 Purdue Pharma is partially responsible for
20 the societal costs of prescription drug abuse
21 in America?
22 MS. HENN: Objection to form.
23 Outside the scope.
24 THE WITNESS: I'm not going to
25 answer for other companies. I'm --

Page 287

1 it's like I answered my question:
2 Those involved in this space,
3 depending on the facts and
4 circumstances, may be. So, yes.
5 QUESTIONS BY MR. FARRELL:
6 Q. Flip to page 8, the last
7 paragraph. Your trade organization is saying
8 that the "DEA's goal, the prevention of
9 diversion of controlled prescription drugs,
10 is, of course, a public good."
11 Does McKesson validate,
12 acknowledge and affirm that statement?
13 MS. HENN: Objection to form.
14 THE WITNESS: Absolutely. The
15 prevention of the diversion of
16 controlled substances is good for the
17 public.
18 (McKesson-Hartle Exhibit 29
19 marked for identification.)
20 QUESTIONS BY MR. FARRELL:
21 Q. Next exhibit I'm going to have
22 marked is Exhibit 29. It's Exhibit
23 2013_09_13. It's Bates stamp
24 MCK-AGMS-006000880.
25 Have you seen this document?

Page 288

1 A. I have not.
2 Q. Do you know who Gary Boggs is?
3 A. I do know Gary.
4 Q. I'll represent to you that on
5 the metadata that was provided by the --
6 McKesson, indicates that this presentation is
7 dated in late 2012 -- wait, late 2013, I
8 think, probably before Gary Boggs came on to
9 McKesson. We'll ask him when we depose him.
10 But anyway, this is a McKesson
11 spreadsheet from Gary Boggs. Gary Boggs is
12 former DEA.
13 A. PowerPoint, not spreadsheet.
14 Q. Yeah, I'm sorry.
15 A. Okay.
16 Q. He's former DEA, correct?
17 A. Correct.
18 Q. He was the number 2 man on Joe
19 Rannazzisi, yes?
20 A. Yes.
21 Q. And as we'll see later, he was
22 actually in the room for one of the
23 presentations when DEA was negotiating with
24 McKesson on the 2008 settlement.
25 Is that your memory as a

Page 289

1 corporate entity?
2 MS. HENN: Objection to form.
3 THE WITNESS: I wasn't aware
4 that he was specifically in the room,
5 but...
6 QUESTIONS BY MR. FARRELL:
7 Q. The title of this PowerPoint
8 slide is what?
9 A. Oh, "State of prescription drug
10 abuse."
11 Q. And on the second page, talks
12 about the impact of effective compliance.
13 And it uses lots of America-related stuff,
14 eagles and flags and such.
15 Do you see that?
16 A. I do see that.
17 Q. "Protecting America from
18 Prescription Drug Diversion."
19 The next page is a history of
20 understanding the problem, and on page 4 it
21 talks about a collision course.
22 And presumably this is two
23 planes colliding in the air, and that's
24 OxyContin and Percocet.
25 Do you see that?

Page 290

1    MS. HENN: Objection to form.
2    THE WITNESS: I see that.
3  QUESTIONS BY MR. FARRELL:
4    Q.   "In the late 1990s, doctors
5  aggressively prescribing painkillers - a
6  radical change in health care behavior."
7         And that radical change in
8  health care behavior did what to the number
9  of prescriptions?
10    MS. HENN: Objection to form.
11    THE WITNESS: Increased them.
12  QUESTIONS BY MR. FARRELL:
13    Q.   Which resulted in an increase
14  or decrease in the number of pills McKesson
15  sold?
16    A.   I don't know exact numbers, but
17  it increased.
18    Q.   And then the last part,
19  "Manufacturers fueled the use of prescription
20  painkillers."
21        This is coming from your new
22  head of regulatory affairs at McKesson,
23  agreed?
24    MS. HENN: Objection to form.
25    THE WITNESS: Can you say that

Page 291

1  again?
2  QUESTIONS BY MR. FARRELL:
3    Q.   Yeah.
4    A.   He's not -- he wasn't the head
5  of regulatory affairs.
6    Q.   Then, but he is now?
7    A.   He's one of the leaders on the
8  regulatory affairs team.
9    Q.   Okay. And this is his
10  statement that "Manufacturers fueled the use
11  of prescription painkillers."
12        Is that McKesson's position?
13    MS. HENN: Objection to form.
14    THE WITNESS: I don't know if
15   that's his own specific words or he
16   got that from a previous deck from
17   DEA. I'm not sure.
18  QUESTIONS BY MR. FARRELL:
19    Q.   We'll have to ask him.
20        But I'm asking McKesson whether
21  or not it shares this view.
22    MS. HENN: Objection to form.
23  Outside the scope.
24    THE WITNESS: Manufacturers are
25   part of the closed system, like -- and

Page 292

1  played a role.
2  QUESTIONS BY MR. FARRELL:
3    Q.   Does McKesson believe the
4  manufacturers fueled the use of prescription
5  painkillers?
6    MS. HENN: Objection to form.
7  Outside the scope.
8    THE WITNESS: I think they
9   played a role. I think there's many
10   reasons -- many things that fueled the
11   epidemic.
12  QUESTIONS BY MR. FARRELL:
13    Q.   So would you rather just punt
14  on the question?
15    MS. HENN: Objection to form.
16    THE WITNESS: That's what I'm
17   going to share. That's my answer.
18  QUESTIONS BY MR. FARRELL:
19    Q.   So yes or no, does McKesson
20  Corporation believe manufacturers fueled the
21  use of prescription painkillers?
22    MS. HENN: Objection to form.
23  Outside the scope.
24    THE WITNESS: Like I said,
25   my -- they're part of the system.

Page 293

1  They played a role.
2  QUESTIONS BY MR. FARRELL:
3    Q.   So the answer is?
4    A.   They played a role. I wouldn't
5  say -- I wouldn't characterize it as fueled.
6  I don't know that I would use that language.
7    Q.   Fair enough.
8        The next page, 5 and 6,
9  document Purdue Pharma's $635 million fine,
10  Cephalon's $425 million fine.
11        Going to page 7, it's comparing
12  the US rates of opioid overdose deaths, sales
13  and treatment admissions.
14        Do you see that?
15    A.   I see that.
16    Q.   What is the correlation between
17  opioid sales and opioid deaths? Are they
18  related or unrelated?
19    MS. HENN: Objection to form.
20    THE WITNESS: They're both
21   increasing at a similar rate.
22  QUESTIONS BY MR. FARRELL:
23    Q.   So that means they're related
24  or unrelated?
25    MS. HENN: Objection to form.

Page 294

1  THE WITNESS: They appear to be
2  related.
3  QUESTIONS BY MR. FARRELL:
4  Q.  Does McKesson believe that
5  opioid sales are related to opioid deaths?
6  MS. HENN: Objection to form.
7  Outside the scope.
8  THE WITNESS: Can you ask that
9  one more time, please?
10 QUESTIONS BY MR. FARRELL:
11 Q.  Does McKesson believe that
12 opioid sales are related to opioid deaths?
13 MS. HENN: Objection to form.
14 Outside the scope.
15 THE WITNESS: The volume of
16 opioids in the market and diversion is
17 related to opioid deaths, certainly.
18 QUESTIONS BY MR. FARRELL:
19 Q.  Page 8, the Controlled
20 Substances Act, the very last provision says,
21 "Creates checks and balances between
22 registrants to protect the public health and
23 safety."
24 Again, this is again a
25 reaffirmation from Gary Boggs, who is now one

Page 295

1  of your senior regulatory affairs management,
2  acknowledging that the registrants and the
3  DEA have a duty to protect the public health
4  and safety, agreed?
5  A.  Agreed.
6  Q.  Page 13. It says, "What can
7  happen when these checks and balances
8  collapse?"
9  What do you believe this is a
10 picture of?
11 MS. HENN: Objection to form.
12 THE WITNESS: It's a building
13 falling down.
14 QUESTIONS BY MR. FARRELL:
15 Q.  A disaster?
16 A.  It's a building that's falling
17 down. Why it fell down could be a disaster.
18 Q.  What do you infer from
19 Mr. Boggs' implication?
20 A.  That things can go wrong,
21 something can happen.
22 Q.  Page 16, pictures of pain
23 clinics and people waiting in line to
24 purchase pills sold by McKesson to
25 pharmacies.

Page 296

1  MS. HENN: Objection to form.
2  MR. FARRELL: You're right.
3  That's not necessarily a picture of
4  McKesson.
5  QUESTIONS BY MR. FARRELL:
6  Q.  You would agree with me that if
7  a McKesson sales agent came upon a pain
8  clinic and saw this, that would be a red
9  flag?
10 MS. HENN: Objection to form.
11 THE WITNESS: It would.
12 QUESTIONS BY MR. FARRELL:
13 Q.  Page 17, historical comparison.
14 He's comparing the opioid crisis to the BP
15 oil spill where 11 people were killed and BP
16 paid 40 billion, plus 16 billion to the Clean
17 Water Act.
18 Have more or less than 11
19 people been killed by the opioid crisis?
20 A.  Clearly more.
21 Q.  Have more people died today
22 than 11 people?
23 MS. HENN: Objection to form.
24 THE WITNESS: Based on the
25 statistics, yes.

Page 297

1  QUESTIONS BY MR. FARRELL:
2  Q.  Page 24. Does McKesson
3  acknowledge and agree there is a national
4  epidemic of prescription pill addiction,
5  abuse, morbidity and mortality?
6  MS. HENN: Objection to form.
7  THE WITNESS: Absolutely.
8  QUESTIONS BY MR. FARRELL:
9  Q.  Does McKesson acknowledge the
10 economic impact of this national epidemic in
11 America is greater than $57 billion per year?
12 MS. HENN: Objection to form.
13 Outside the scope.
14 THE WITNESS: I don't know
15 where that -- the -- how the 57
16 billion was derived, but there's
17 clearly an -- or an economic impact to
18 the country.
19 QUESTIONS BY MR. FARRELL:
20 Q.  Page 37, "distributors have
21 great power." The last provision.
22 You, McKesson Corporation,
23 control the supply to downstream customers.
24 Does McKesson acknowledge that duty?
25 MS. HENN: Objection to form.

Page 298

1    THE WITNESS:  We control what
2 we sell.
3 QUESTIONS BY MR. FARRELL:
4    Q.    So yes?
5    A.    Yes.
6    Q.    Page 38.  And Mr. -- I take
7 exception with Mr. Boggs here.  He attributes
8 this to some guy named Voltaire, but actually
9 this is Spiderman.  "With great power comes
10 great responsibility."
11    Does McKesson acknowledge that?
12    You don't have to answer that
13 question.
14    Page 41, "Detecting Suspicious
15 Orders."  Most importantly, Mr. Boggs is
16 telling McKesson that you cannot ignore what.
17    A.    Warning signs.
18    Q.    Page 46, "Without sustained
19 sources of supply, major diversion schemes
20 wither away."
21    Who are the major sources of
22 supply?
23    MS. HENN:  Objection to form.
24    THE WITNESS:  Those in the
25 closed system of distribution:

Page 299

1 manufacturers, distributors.  There's
2 also sources, illicit sources, outside
3 of the closed network.
4 QUESTIONS BY MR. FARRELL:
5    Q.    They all originate within the
6 closed network, do they not?
7    MS. HENN:  Objection to form.
8    THE WITNESS:  What do you mean
9 by "all originate"?
10 QUESTIONS BY MR. FARRELL:
11    Q.    Well, Bob, in his trailer in
12 southern West Virginia, isn't making
13 OxyContin pills.
14    A.    No, I'm saying there's other --
15 I understand your point.  They come
16 ultimately from the manufacturer,
17 distributor, pharmacy.
18    (McKesson-Hartle Exhibit 30
19 marked for identification.)
20 QUESTIONS BY MR. FARRELL:
21    Q.    Exhibit 30, 2013_10_23, Bates
22 stamp MCKMDL00409046.  This is October 23,
23 2013.
24    McKesson is in trouble again
25 with the DEA, agreed?

Page 300

1    MS. HENN:  Objection to form.
2    THE WITNESS:  There's
3 allegations.
4 QUESTIONS BY MR. FARRELL:
5    Q.    Same ones as before, agreed?
6    MS. HENN:  Objection to form.
7    THE WITNESS:  Related to the
8 regulations.
9 QUESTIONS BY MR. FARRELL:
10    Q.    Same as the 2008?
11    MS. HENN:  Objection to form.
12    THE WITNESS:  Around suspicious
13 orders.
14    (McKesson-Hartle Exhibit 31
15 marked for identification.)
16 QUESTIONS BY MR. FARRELL:
17    Q.    Exhibit 31, dated November 6,
18 2013.  It's 2013_11_6, MCKMDL00409048.
19    It's again from the United
20 States Attorney in the Northern District of
21 West Virginia.  It's talking about further
22 explanations.
23    You would agree with me this is
24 the same conduct that McKesson got in trouble
25 for in 2008?

Page 301

1    MS. HENN:  Objection to form.
2    THE WITNESS:  Yeah, it has to
3 do with suspicious orders, which is
4 similar.
5 QUESTIONS BY MR. FARRELL:
6    Q.    And it's Covington & Burlington
7 at a place called 1201 Pennsylvania Avenue,
8 Northwest.
9    Do you know where that is?
10 Isn't that here?
11    MS. HENN:  Old office.
12    MR. FARRELL:  The old office.
13 All right.
14    THE WITNESS:  In town.
15 QUESTIONS BY MR. FARRELL:
16    Q.    But again, this is the same
17 thing.
18    Do you know Bill Ihlenfeld?
19    A.    I do not.
20    Q.    Yeah, he was the US Attorney
21 for the Northern District of West Virginia
22 and a classmate of mine.  He's calling on
23 McKesson, and he's essentially telling
24 McKesson, "Hey, you're not doing your job
25 again."

Page 302

1 MS. HENN: Objection to form.
2 QUESTIONS BY MR. FARRELL:
3 Q. "And you're dumping pills into
4 my state."
5 MS. HENN: Same objection.
6 (McKesson-Hartle Exhibit 32
7 marked for identification.)
8 QUESTIONS BY MR. FARRELL:
9 Q. Exhibit 32, 2014_1_XX,
10 MCKMDL00409050. In fact, they put a whole
11 presentation together.
12 Have you seen this
13 presentation?
14 A. I have seen this one.
15 Q. I'm not going to go through
16 this because we'll go through with it a lot
17 more tomorrow.
18 In essence, what I'm trying to
19 accomplish here is that you understand that
20 the United States District Attorney for the
21 Northern District of Ohio, and then it turns
22 out other ones, including Colorado, are
23 basically telling McKesson: You have a
24 systemic failure to monitor, detect and
25 report suspicious orders.

Page 303

1 Is that what they're alleging?
2 MS. HENN: Objection to form.
3 THE WITNESS: Yes, that's what
4 they're alleging.
5 (McKesson-Hartle Exhibit 33
6 marked for identification.)
7 QUESTIONS BY MR. FARRELL:
8 Q. Exhibit 33, this is your
9 response, 2014_03_12, Bates-stamped
10 MCKMDL00409116.
11 This is you responding, saying,
12 "Nuh-uh, no, we didn't."
13 Does that about wrap it up?
14 MS. HENN: Objection to form.
15 QUESTIONS BY MR. FARRELL:
16 Q. You've seen this document
17 before?
18 A. I have not, so I'm going to go
19 through it.
20 Q. Okay. My summary of this is
21 that McKesson's response is, "We don't have
22 to report all suspicious orders. We only
23 have to report suspicious customers."
24 Does that sound familiar?
25 MS. HENN: Objection to form.

Page 304

1 THE WITNESS: I haven't
2 finished reading this, but I know
3 there was discussions with DEA about
4 both.
5 QUESTIONS BY MR. FARRELL:
6 Q. We agree that you saw from
7 Section 55 on McKesson has said, "If you
8 ain't going to turn in suspicious orders, you
9 need to have it in writing."
10 Neither you nor Mr. Boggs has
11 ever been able to find such a piece of
12 writing.
13 MS. HENN: Objection to form.
14 (McKesson-Hartle Exhibit 34
15 marked for identification.)
16 QUESTIONS BY MR. FARRELL:
17 Q. In fact, Exhibit 34 is the
18 response to the presentation, March 20, 2014.
19 It's 2014_03_20, MCKMDL00409174, from my good
20 friend Bill Ihlenfeld's office, which
21 basically says "bull."
22 MS. HENN: Counsel, just to
23 clarify, I think Exhibit 33 you
24 might -- you have two documents in
25 here.

Page 305

1 MR. FARRELL: Maybe. It may
2 have included it.
3 MS. HENN: Ah, is that why?
4 MR. FARRELL: Maybe.
5 MS. HENN: Okay. That's fine.
6 Just wanted to make sure you knew.
7 QUESTIONS BY MR. FARRELL:
8 Q. And at this point in time, it
9 appears that McKesson had hired AGI --
10 A. Can I read this one? I have
11 not read this one before.
12 Q. Okay. I'm not going to drill
13 you on that letter. It's got --
14 A. No, I'm about done. I just
15 wanted to read the summary here, too.
16 Okay. Thank you.
17 Q. Now, skipping through all of
18 the other correspondence because we'll get
19 into that more tomorrow, more recently, as a
20 result of all of this, even though McKesson
21 is denying liability, you understand that
22 McKesson did enter into another settlement
23 agreement?
24 A. I understand that.
25 (McKesson-Hartle Exhibits 35,

Page 306

1    36 and 37 marked for identification.)
2  QUESTIONS BY MR. FARRELL:
3    Q.   2017_01_05A, 35, Exhibit 35,
4  MCKMDL00355322, the settlement agreement and
5  release.
6      Exhibit 37, 2017_01_5B,
7  MCKMDL00355477.
8      MS. HENN:  Did you skip 36?
9  QUESTIONS BY MR. FARRELL:
10   Q.   I didn't.
11     36 will be 2017_01_05B, the
12  compliance addendum.
13     MS. HENN:  37.
14     MR. FARRELL:  Oh, okay, I'm
15  sorry.  But it's okay because we'll
16  just put 36 as the administrative
17  memorandum, which is 2017_01_5C,
18  MCKMDL0355513.
19     MS. HENN:  And, Counsel, we've
20  been going about an hour, so if we
21  could have a break at a good stopping
22  point.  It doesn't have to be this
23  second, but if there's one very soon,
24  that would be great.
25     MR. FARRELL:  Yeah, very soon.

Page 307

1      MS. HENN:  Great.
2  QUESTIONS BY MR. FARRELL:
3    Q.   Just to acknowledge, McKesson's
4  still is denying liability, and this time the
5  cost has become more prohibitive with the
6  fine, 150 million.
7      MS. HENN:  Objection to form.
8  QUESTIONS BY MR. FARRELL:
9    Q.   Agreed?
10   A.   Agreed.  We settled with the
11  settlement agreement, agreed.
12   Q.   McKesson's distribution
13  facilities were systematically failing to
14  report suspicious orders and resulted in a
15  $150 million fine assessed by the DEA and
16  paid by McKesson Corporation; true or not
17  true?
18     MS. HENN:  Objection to form.
19     THE WITNESS:  We did pay that
20  fine, $150 million.
21  QUESTIONS BY MR. FARRELL:
22   Q.   Because you were systematically
23  not reporting suspicious orders?
24     MS. HENN:  Same objection.
25     THE WITNESS:  That was at the

Page 308

1  core of it.
2  QUESTIONS BY MR. FARRELL:
3    Q.   So let's just be fair.  There
4  were certain distribution facilities that
5  utterly failed to fulfill their obligations
6  under federal law to monitor, detect, halt
7  and report suspicious orders, which resulted
8  in McKesson paying the largest fine in the
9  history of the DEA; true or not true?
10     MS. HENN:  Objection to form.
11     THE WITNESS:  Could you
12  simplify that question a little bit?
13  QUESTIONS BY MR. FARRELL:
14   Q.   Yeah.
15     McKesson wasn't following the
16  law and got fined $150 million?
17     MS. HENN:  Objection to form.
18     THE WITNESS:  We acknowledged
19  that certain orders did not get
20  flagged in our system.
21  QUESTIONS BY MR. FARRELL:
22   Q.   Thousands.
23     MS. HENN:  Objection to form.
24  QUESTIONS BY MR. FARRELL:
25   Q.   Thousands of orders?

Page 309

1    A.   Orders.
2    Q.   Like some facilities reported
3  none.
4      MS. HENN:  Objection to form.
5  QUESTIONS BY MR. FARRELL:
6    Q.   Yes?
7    A.   Systematically none.
8    Q.   Systematically none.
9      And it wasn't just an isolated
10  distribution facility.  It was several
11  different facilities across the spectrum at
12  McKesson had utterly failed to comply with
13  federal regulations to prevent diversion of
14  controlled substances?
15     MS. HENN:  Objection to form.
16     THE WITNESS:  We believed we
17  were in good faith working with DEA as
18  part of the 2008 agreement to report
19  customers and report orders in a
20  different way that was mutually agreed
21  upon.  So --
22  QUESTIONS BY MR. FARRELL:
23   Q.   Yeah, I'm not asking --
24   A.   -- I would say --
25     MR. FARRELL:  You're right.

Page 310

1   You're right.
2       THE WITNESS:  I know you say
3   zero, but I -- you know, there are
4   situations and scenarios where we
5   reported based on what we agreed to
6   with the DEA, based on that settlement
7   agreement.
8       So I understand systematically
9   they weren't being reported, but they
10  were being reported in other ways.
11  QUESTIONS BY MR. FARRELL:
12      Q.   Sitting here today does
13  McKesson Corporation acknowledge that it
14  utterly failed in its obligations to prevent
15  diversion of opium pills into the American
16  illicit market?
17      MS. HENN:  Objection to form.
18      THE WITNESS:  No, I don't
19  believe we utterly failed.  We, again,
20  in good faith over the years have
21  worked with DEA, taken guidance,
22  developed programs, enhanced programs,
23  evolved them over the course of time.
24      So I wouldn't characterize it
25  as utterly failing.

Page 311

1   QUESTIONS BY MR. FARRELL:
2       Q.   Well, when you report zero
3   suspicious orders over years at the same time
4   selling tens of millions of opium pills into
5   a community, you're not meeting your
6   obligations under federal law, agreed?
7       MS. HENN:  Objection to form.
8       THE WITNESS:  Again, there's
9   certain times in which we acknowledged
10  that we did not report orders.  That
11  does not mean that we did not conduct
12  diligence, that we did not evolve our
13  program to help prevent.
14  QUESTIONS BY MR. FARRELL:
15      Q.   And I understand the desire to
16  want to say in good faith you did your best.
17  What I'm asking for is a very simple
18  acknowledgement that McKesson was not
19  following the law and got fined for it on two
20  occasions.
21      MS. HENN:  Objection to form.
22      THE WITNESS:  Those were the
23  allegations.
24  QUESTIONS BY MR. FARRELL:
25      Q.   Do you accept those allegations

Page 312

1   as partially true?
2       MS. HENN:  Objection to form.
3       THE WITNESS:  Again, we --
4   partially, in the second agreement, we
5   did acknowledge that, you know, we
6   didn't identify all the suspicious
7   orders that we could have.
8   QUESTIONS BY MR. FARRELL:
9       Q.   In fact, in some distribution
10  facilities you didn't identify any?
11      MS. HENN:  Objection to form.
12  QUESTIONS BY MR. FARRELL:
13      Q.   This isn't like we missed a
14  needle in a haystack.  This is we missed the
15  hay.
16      MS. HENN:  Objection to form.
17      THE WITNESS:  So the thing I
18  would just share is that, again, all
19  of those orders were blocked and not
20  shipped.  And we may not have
21  systematically, as I mentioned
22  earlier, reported, but --
23      MR. FARRELL:  Hold on.
24      MS. HENN:  Wait, he's not done
25  with his answer.

Page 313

1       THE WITNESS:  I'm just
2   reiterating the point I made earlier
3   about the 2008 agreement, mutually
4   discussing with DEA the fact that we
5   were focusing on customers and would
6   report suspicious orders in a mutually
7   format -- a mutually-agreed-upon
8   format.
9       So you say zero, but it may not
10  always be zero.
11  QUESTIONS BY MR. FARRELL:
12      Q.   Just to be fair with you, we're
13  going to take a break.
14      A.   All right.
15      Q.   I have the transactional data
16  in Cuyahoga and Summit County from McKesson
17  sales of opium pills.  I also have the
18  suspicious order reports.
19      So let's be clear:  McKesson
20  didn't get in trouble for blocking orders and
21  not reporting them.  McKesson paid a record
22  fine for shipping suspicious orders and not
23  reporting them.
24      MS. HENN:  Objection to form.
25      THE WITNESS:  Say that again.

Page 314

1    I want to be very clear what I heard.
2  QUESTIONS BY MR. FARRELL:
3    Q.   Me, too.
4    A.   Yeah.
5    Q.   You're telling me that
6  McKesson's conduct that it admitted to,
7  McKesson's position is that it blocked
8  suspicious orders and then just simply didn't
9  report them in the right way.  That's your
10 position?
11   A.   We systematically -- based on
12 the design of our system, orders were
13 blocked.
14   Q.   You believe that McKesson was
15 blocking all the suspicious orders and paid
16 $150 million because of the manner in which
17 it reported?
18   A.   Earlier I said we did
19 acknowledge that some orders, not all, we
20 didn't block.
21   Q.   Okay.  So let's get back --
22   A.   We didn't -- let me rephrase
23 that.  We acknowledge that our system may not
24 have detected orders that could be deemed as
25 suspicious.

Page 315

1    Q.   And that the orders that your
2  system did detect as suspicious, you still
3  shipped anyway without reporting them?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  No.
6  QUESTIONS BY MR. FARRELL:
7    Q.   You believe that's not true?
8    A.   Based on my understanding of
9  our systems and how things work in -- when
10 they hit a threshold and they're blocked,
11 those do not get shipped.
12   Q.   All right.  So fair --
13   A.   That's how we define those
14 suspicious orders.
15   Q.   Fair enough.
16        Let me ask you this:  If your
17 system detects a suspicious order and you
18 ship it anyway and you don't report it, is
19 that unlawful?
20        MS. HENN:  Objection to form.
21        THE WITNESS:  Please say that
22 again.
23 QUESTIONS BY MR. FARRELL:
24   Q.   If your system detects a
25 suspicious order and you ship it anyway

Page 316

1  without reporting it, is that unlawful?
2        MS. HENN:  Objection to form.
3        THE WITNESS:  I think it
4  depends.
5  QUESTIONS BY MR. FARRELL:
6    Q.   On?
7    A.   There could be a technical
8  glitch --
9    Q.   Okay.
10   A.   -- or some computer error.  I
11 mean --
12   Q.   I'm talking about hundreds and
13 hundreds and hundreds of orders that are
14 red-flagged by McKesson and shipped anyway
15 without reporting a suspicious order.
16        The US Attorney for the
17 Northern District of West Virginia doesn't
18 say this was a technical glitch.  He says it
19 was a systematic failure by your company to
20 abide by West Virginia law -- or federal law.
21        You paid a record fine, and
22 you're disavowing the underlying conduct
23 today?
24        MS. HENN:  Objection to form.
25        THE WITNESS:  I'm just trying

Page 317

1  to communicate that our system that
2  was designed to detect suspicious
3  orders using the concept of thresholds
4  blocked all of the -- blocked those
5  suspicious orders.
6        We recognize that and
7  acknowledge that it may not have
8  picked up on all of the suspicious
9  orders and...
10        MR. FARRELL:  One more and
11 we'll take a quick break.
12        MS. HENN:  If it's okay, I'd
13 like to take it now.  It's been now an
14 hour and 15 minutes.  It's pretty
15 tiring to be a witness.  So if we
16 could just take a five-minute break,
17 that would be great.
18        MR. FARRELL:  Okay.
19        MS. HENN:  Thank you.
20        VIDEOGRAPHER:  The time is 4:29
21 p.m.  We're going off the record.
22  (Off the record at 4:29 p.m.)
23        VIDEOGRAPHER:  The time is
24 4:45 p.m.  We're back on the record.
25        MR. FARRELL:  Thank you.

Page 318

1    So we have about an hour left;
2    we've been going about -- almost six
3    hours.  So by agreement we've kept the
4    deposition days to seven hours long,
5    and I'll honor that.
6        MS. HENN:  More than by
7    agreement.  It's also ordered by the
8    judge.
9        MR. FARRELL:  No question.
10       MS. HENN:  Just a slight
11   clarification.
12       MR. FARRELL:  No question.
13   Seven hours of answering questions is
14   enough for anybody.
15       MS. HENN:  It is.
16       MR. FARRELL:  That being said,
17   I know there's a burden on travel and
18   arrangements; we have a tight
19   schedule.  So what I'm going to do is
20   I'm going to finish up some topics,
21   and I'm going to state for the record
22   that I have not been able to get
23   through all of the designated topics
24   today.
25       That being said, there are some

Page 319

1    additional topics that you were not
2    designated for.  There's essentially
3    two notices.
4        So what we're -- what I'm going
5    to do is recommend that I finish up
6    the topics that I want to get to, and
7    then tomorrow is your fact deposition.
8    And what we'll do is work out with
9    counsel if there are any of these
10   questions that can be answered in
11   writing to avoid you having to come
12   back and testify on things that can be
13   answered.
14       And then in addition, there are
15   records and there are -- there is
16   transactional data historically and
17   suspicious order report historically
18   that have not been disclosed yet
19   because of our tight schedules that
20   I'll -- I will be going to ask --
21   eventually to ask for some additional
22   time from you to finish the stuff we
23   didn't get to finish and to ask
24   questions about documents that have
25   not been disclosed yet.

Page 320

1        Obviously, it's going to be
2    subject to the objection of your
3    lawyers, and I just wanted to place
4    that on the record.
5    QUESTIONS BY MR. FARRELL:
6        Q.    Jumping in real quick, I'm not
7    going to spend a whole lot of time on this; I
8    have a very specific question.
9        Before we get into the
10   document, there's a reference in here about
11   heroin, and I just wanted to see if I could
12   cut to the chase with you.
13       A.    Okay.
14       Q.    As the McKesson corporate
15   representative, do you acknowledge that abuse
16   of prescription opium pills is a gateway to
17   the initiation of heroin?
18       MS. HENN:  Objection to form.
19       Outside the scope.
20       THE WITNESS:  Based on
21       everything that I've read and in the
22       media and statistics and discussion, I
23       would agree -- agree to that.
24   QUESTIONS BY MR. FARRELL:
25       Q.    If you abuse prescription

Page 321

1    opiates, the CDC says that you're 40 times
2    more likely to initiate heroin use.
3        Does McKesson acknowledge
4    that -- that prescription opiate pill abuse
5    is a driving factor in the heroin epidemic
6    we're also experiencing?
7        MS. HENN:  Objection to form.
8        Outside the scope.
9        THE WITNESS:  Yeah, it's a
10       factor.
11   QUESTIONS BY MR. FARRELL:
12       Q.    That was easy.
13       A.    Yeah.
14       Q.    All right.  Back to this amicus
15   business.
16       (McKesson-Hartle Exhibit 38
17       marked for identification.)
18   QUESTIONS BY MR. FARRELL:
19       Q.    I'm going to mark as
20   Exhibit 38, it's 2016_04_04.  This is another
21   amicus brief.  This one is Masters
22   Pharmaceutical.
23       Does McKesson acknowledge that
24   in 2016 when this amicus brief was submitted
25   that it was still on the executive committee

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  of HDMA?
2      MS. HENN:  Objection to form.
3  Outside the scope.
4      THE WITNESS:  I can't speak to
5  that.  If I saw a list of who was on
6  the executive committee...
7      (McKesson-Hartle Exhibit 39
8  marked for identification.)
9  QUESTIONS BY MR. FARRELL:
10     Q.    Fair enough.  Exhibit 39,
11 2016_04_05, the Wayback Machine.
12     So looking at the Exhibit 39,
13 can you acknowledge that McKesson was on the
14 executive board of HDMA --
15     A.    Yes.
16     Q.    -- at the time that this amicus
17 brief was submitted?
18     A.    Yes.
19     Q.    Have you had a chance to review
20 the amicus brief?
21     A.    I had a chance to look at some
22 of the highlighted sections.
23     Q.    So let's go to 2016_04_04,
24 page 5.
25     A.    Page 5.

Page 323

1      Q.    Down the right-hand side, you
2  can see two-thirds of the way down it starts,
3  "DEA."  The one below that.  Yeah.
4      "DEA has required distributors
5  not only to report suspicious orders but to
6  investigate orders by interrogating
7  pharmacies and physicians and take action to
8  halt suspicious orders before they are
9  filled.  Those added obligations would
10 significantly expand a report-only duty of
11 distributors under the long-standing
12 regulatory scheme and impose impractical
13 obligations on distributors."
14     Is that McKesson's position?
15     MS. HENN:  Objection to form.
16 Outside the scope.
17     THE WITNESS:  Obviously we're
18 part of the organization.  In parts,
19 you know, I agree with the added --
20 what it would -- you know, the added
21 responsibility or time that it would
22 take to -- you know, to investigate
23 each order.
24     I don't know if I'm answering
25 your question, but...

Page 324

1  QUESTIONS BY MR. FARRELL:
2      Q.    You're stumbling toward it.
3      A.    Yeah.
4      Q.    Let's go to page 6, a little
5  more direct.  The second highlighted
6  provision:  "As the final order in this case
7  underscores, however, DEA now appears to have
8  changed its position to require that
9  distributors not only report suspicious
10 orders but investigate and halt suspicious
11 orders."
12     This is a 2016 document by your
13 trade organization, of which McKesson sits on
14 the executive board, and its telling the DC
15 Circuit Court of Appeals that it does not
16 have a duty to investigate and halt
17 suspicious orders.
18     Does McKesson validate this
19 position?
20     MS. HENN:  Objection to form.
21     THE WITNESS:  Can you rephrase
22 that for me?
23 QUESTIONS BY MR. FARRELL:
24     Q.    Yeah.
25     In 2016, your trade

Page 325

1  organization is telling the second highest
2  court in the land, the DC Circuit Court of
3  Appeals, that the DEA is now requiring them
4  to investigate and halt suspicious orders.
5      Haven't we agreed that's been
6  the duty since 1971?
7      MS. HENN:  Objection to form.
8  Outside the scope.
9  QUESTIONS BY MR. FARRELL:
10     Q.    Tough position to defend, isn't
11 it?
12     MS. HENN:  Same objections.
13     THE WITNESS:  You know, again,
14 I -- I recognize that other
15 distributors have different systems
16 and have worked with DEA over the
17 years on different methodologies,
18 whether it's a threshold to block it
19 or it's a hold and investigate and
20 then block it.  And so, you know, I
21 recognize that.
22 QUESTIONS BY MR. FARRELL:
23     Q.    You recognize this position is
24 problematic given your experience, McKesson
25 Corporation, with the DEA?

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1      MS. HENN: Objection to form.
2      THE WITNESS: I recognize that
3   I'm sure there's lots of disagreements
4   about this.
5   QUESTIONS BY MR. FARRELL:
6      Q.   Yeah.
7      But we're still trying to
8   figure out from internal communications
9   whether or not McKesson signed off on this
10  brief.
11     Are you aware of whether or not
12  they signed off on this?
13     MS. HENN: Objection to form.
14     THE WITNESS: I don't -- I am
15  not aware of the process that goes
16  into signing off on these briefs and
17  what that specific looks like. I know
18  how trade organizations work and how
19  they get to a point of consensus.
20  QUESTIONS BY MR. FARRELL:
21     Q.   Let me ask you in a different
22  way.
23     We talked about the original
24  enactment of the Controlled Substances Act
25  where the penalty for engaging in unlawful

Page 327

1   conduct should be prohibitive.
2      Do you remember talking about
3   that this morning?
4      A.   I do.
5      Q.   And so in 2008, McKesson
6   Corporation paid $13 million, and in 2017,
7   McKesson paid $150 million.
8      What would happen in today's
9   world if McKesson went to the DEA and said,
10  "We don't have a duty to investigate and halt
11  suspicious orders"? What do you reckon would
12  happen then?
13     MS. HENN: Objection to form.
14     Outside the scope.
15     THE WITNESS: I'm not sure
16  exactly what would happen, but they
17  wouldn't be thrilled.
18  QUESTIONS BY MR. FARRELL:
19     Q.   So what do you think the fine
20  will be next time?
21     A.   I can't speculate what it would
22  be. It depends on the facts and
23  circumstances and...
24     Q.   So just simply stated, sitting
25  here today, McKesson Corporation, do you

Page 328

1   accept or reject the position your trade
2   organization is taking regarding the
3   interpretation of the shipping requirement
4   and reporting requirement?
5      MS. HENN: Objection to form.
6      Outside the scope.
7      THE WITNESS: I apologize. Can
8   you ask -- ask me again or rephrase?
9   Do we accept --
10  QUESTIONS BY MR. FARRELL:
11     Q.   Yeah.
12     The sentence you see up there
13  on the screen --
14     A.   Yeah.
15     Q.   -- submitted by your trade
16  organization to which McKesson sits as an
17  executive board member, this is a position in
18  a legal document submitted to the second
19  highest court in the United States of
20  America.
21     Sitting here today, does
22  McKesson Corporation accept or reject this
23  position?
24     MS. HENN: Objection to form.
25     Outside the scope.

Page 329

1      THE WITNESS: I'd say we accept
2   this -- accept this --
3   QUESTIONS BY MR. FARRELL:
4      Q.   You accept --
5      A.   -- as part of that
6   organization.
7      Q.   What is that?
8      A.   As being part of that
9   organization.
10     Q.   So your position today is
11  McKesson does not have a duty to investigate
12  and halt suspicious orders?
13     MS. HENN: Objection to form.
14  QUESTIONS BY MR. FARRELL:
15     Q.   You're in a tough spot here.
16     A.   I can tell you what our program
17  does, right? We halt -- we block suspicious
18  orders.
19     Q.   All right. So let's go
20  further. Page 8. "The 2006 letter from Joe
21  Rannazzisi fails to explain how the statutory
22  command of the US Code 823 Section E, a
23  command that the Attorney General consider
24  when adjudicating an application for
25  registration of the applicant's maintenance

Page 330

1  of effective controls against diversion" --
2       MS. HENN: I'm sorry, you're on
3  page 8. I believe the witness is on
4  page 9.
5       THE WITNESS: Oh, excuse me.
6  Sorry. I was figuring that out when I
7  looked up there.
8  QUESTIONS BY MR. FARRELL:
9       Q.   I'm sorry.
10      A.   No, that's me.
11      Q.   Basically, the position in this
12 brief is they're trying to figure out how in
13 the world that 2006 letter became a command
14 to distributors to engage in due diligence
15 and avoid filling suspicious orders.
16      MS. HENN: Objection to form.
17 QUESTIONS BY MR. FARRELL:
18      Q.   How can you defend this
19 position, knowing that Masters Pharmaceutical
20 opinion that was released rejected in its
21 entirety this position?
22      So what I'm really trying to
23 figure out is whether McKesson has been so
24 intransigent that it continues to pay fines
25 to the DEA fighting its interpretation of the

Page 331

1  federal regulations until such time as the DC
2  Circuit Court of Appeals told them so.
3       MS. HENN: Objection to form.
4       MR. FARRELL: Terrible
5  question?
6  QUESTIONS BY MR. FARRELL:
7       Q.   You get the gist of what I'm
8  asking you?
9       A.   Can you ask it in a different
10 way?
11      Q.   Yeah.
12      This appears to say that
13 McKesson does not have a duty to engage in
14 due diligence, nor does it need to avoid
15 filling suspicious orders.
16      Is that your position sitting
17 here today?
18      MS. HENN: Objection to form.
19 QUESTIONS BY MR. FARRELL:
20      Q.   "You can't make me," is that
21 the position McKesson is taking?
22      MS. HENN: Objection to form.
23 QUESTIONS BY MR. FARRELL:
24      Q.   I promise I'll quit if you just
25 simply say that this position here is

Page 332

1  nonsense.
2       MS. HENN: Objection to form.
3       THE WITNESS: I can say -- I
4  can't say that it's nonsense. I'm not
5  sure how to answer this one
6  specifically.
7  QUESTIONS BY MR. FARRELL:
8       Q.   Go to page Bates stamp 9.
9  "Nothing in the federal regulations requires
10 distributors to investigate the legitimacy of
11 orders or to halt shipments of any orders
12 deemed to be suspicious."
13      Does McKesson disavow this
14 statement or agree with it?
15      MS. HENN: Objection to form.
16      THE WITNESS: You know, I do
17 think the language of the regulations,
18 you know, "design and operate a system
19 to disclose suspicious orders," gets
20 interpreted in many different ways,
21 and that -- and that's how different
22 organizations, distributors, develop
23 their program.
24 QUESTIONS BY MR. FARRELL:
25      Q.   Respectfully, that's how you

Page 333

1  get fined $150 million.
2       MS. HENN: Objection to form.
3  QUESTIONS BY MR. FARRELL:
4       Q.   The next sentence: "There is
5  no prohibition on shipment of suspicious
6  orders."
7       That's wrong, isn't it?
8       MS. HENN: Objection to form.
9  QUESTIONS BY MR. FARRELL:
10      Q.   Make it easier. Let's go to
11 page 12.
12      "DEA's regulations had sensibly
13 imposed a duty on distributors simply to
14 report suspicious orders, but left it to DEA
15 and its agents to investigate and halt
16 suspicious orders."
17      Nonsense or not nonsense?
18      MS. HENN: Objection to form.
19 QUESTIONS BY MR. FARRELL:
20      Q.   Or no comment? I'm giving you
21 an out.
22      A.   I would say no comment. I'm
23 not sure how to answer that specifically.
24      Q.   Well, the answer should be
25 someone needs to call HDMA and figure out why

Page 334

1 they're taking nonsense positions, but I'll
2 leave that to somebody else.
3         All right. Homestretch. Some
4 toys. As many at this table probably know,
5 I'm the ARCOS nerd.
6         You're familiar with ARCOS?
7     A.   I'm familiar with what it is,
8 yep.
9     Q.   I'm the guy that's been banging
10 away trying to get access to ARCOS for the
11 better part of a year and a half, and I got
12 some.
13         Now, what this is is the
14 transactions by every distributor in the
15 country between 2006 and 2014, and it's
16 related to Cuyahoga and Summit County. Now,
17 we also have the rest of the country, so I'm
18 able to determine national averages, state
19 averages and county averages for every
20 distributor, including McKesson. But we're
21 not going to get into all of that today
22 because what I really need is I need the
23 transactional data dating back to 1996. I'm
24 missing a decade. I have '06 to 2014.
25         Last week, July 25th, your

Page 335

1 counsel provided a spreadsheet that gave us
2 2006 to 2018. All right? So we've had it
3 for a week. I played with it a little bit.
4         But I don't have the decade
5 from the launch of OxyContin to 2006 yet, but
6 I'm working on it. So one day we may come
7 back and have to talk about this
8 transactional data in a different context.
9         But that being said, one of the
10 interesting things that I did was I grabbed
11 the data provided by your counsel, and I
12 pulled it up and took a look at it.
13         MR. FARRELL: Corey, can you
14   pull that up?
15 QUESTIONS BY MR. FARRELL:
16     Q.   Now, the first thing I want you
17 to note is this is highly confidential.
18 Nobody in here is allowed to talk about it
19 outside this room.
20         And it's MCKMDL00478913.
21         MR. FARRELL: Is that right?
22         MS. HENN: I see
23   MCKMDL00478913. That may be the same.
24 QUESTIONS BY MR. FARRELL:
25     Q.   Okay. Can either you or your

Page 336

1 counsel confirm that this is the complete
2 transactional data for McKesson in Cuyahoga
3 and Summit counties between 2006 and 2018?
4         MS. HENN: Object to form.
5         Go ahead.
6         THE WITNESS: I wasn't involved
7 in pulling it, so I can't -- without
8 seeing, I can't confirm that it's
9 everything.
10         MR. FARRELL: Yeah, it's really
11 a question for your counsel, but I'm
12 not allowed to put her under oath, so
13 I'm hoping she'll volunteer.
14         MS. HENN: That's my
15 understanding, but I'm not the person
16 who is most knowledgeable about this,
17 so you should ask one of my
18 colleagues.
19 QUESTIONS BY MR. FARRELL:
20     Q.   So all of these questions are
21 predicated on the fact that this appears to
22 be the transactional data that was uploaded
23 to RICOH Relativity by McKesson, but because
24 there's no discovery document that itemizes
25 what's what, this is all I know.

Page 337

1         Spreadsheet has up top the
2 Bates stamp number.
3         MR. FARRELL: And, Corey, if
4 you'll click on the letter A, it'll
5 tell us how many transactions there
6 are.
7 QUESTIONS BY MR. FARRELL:
8     Q.   There's a big number down
9 there. Do you see that?
10         What's that say?
11     A.   393,479.
12         MS. HENN: Just a question to
13 clarify. Are we in the Summit County
14 right now?
15         MR. FARRELL: Oh, yeah, we're
16 in Summit County.
17         MS. HENN: Thank you.
18         MR. FARRELL: We'll just stay
19 in Summit County.
20         MS. HENN: Okay.
21 QUESTIONS BY MR. FARRELL:
22     Q.   All right. Now, you see up
23 there at the very top of column H, it looks
24 like it's January -- no, wait. What is that?
25 Yeah, January 2, 2006.

Highly Confidential – Subject to Further Confidentiality Review

Page 338

1  Do you see that, letter H?
2  A.  I do.
3  Q.  So when we're looking at that,
4  that's all I got.
5  A.  Okay.
6  Q.  So one of the things that we
7  can do is we can sort it.  So if you go over
8  to letter M, column M, which is base code,
9  you see all those base codes?
10  A.  I see those.
11  Q.  Do you know what oxycodone's
12  base code is?
13  A.  9143.
14  Q.  So let's sort column M by 9143
15  only.
16  So he's going to go over there
17  and click on the left, go to the data, hit
18  the filter, come on over, hit the drop-down
19  menu, close out and then hit 9143.  Bam.
20  Now, if you keep scrolling over
21  to the right, what he can do is he can go
22  into column O and tabulate all of the orders
23  of oxycodone.
24  So it seems like here there are
25  119,000 orders for oxycodone in this time

Page 339

1  frame into Summit County, and the total
2  number of pills McKesson delivered into
3  Summit County was 47 million 346 -- wait.
4  47 --
5  MS. HENN:  You're totaling up
6  the dose column here?
7  MR. FARRELL:  Yeah.
8  QUESTIONS BY MR. FARRELL:
9  Q.  47,734,648 doses of oxycodone
10  into Summit County.
11  Is that a lot or not a lot?
12  MS. HENN:  Objection to form.
13  THE WITNESS:  I have to
14  understand the number of pharmacies,
15  the number of -- you know, it's a
16  large number in and of itself, but I'd
17  need to understand how many customers
18  is that, how many pharmacies is that.
19  QUESTIONS BY MR. FARRELL:
20  Q.  Summit County, Ohio.  It's
21  Akron, Ohio, right?
22  A.  Right.
23  Q.  That seems like a big number,
24  doesn't it?
25  MS. HENN:  Objection to form.

Page 340

1  THE WITNESS:  Well, relative to
2  what?
3  QUESTIONS BY MR. FARRELL:
4  Q.  Relative to the number of
5  people that need to be taking oxycodone
6  pills.
7  MS. HENN:  Objection to form.
8  QUESTIONS BY MR. FARRELL:
9  Q.  Because remember, there was a
10  period of time where there were 300,000
11  prescriptions of OxyContin, and then -- in
12  '96, and then by 2001 there were 6 million,
13  right?
14  So when we get the data for the
15  first ten years, we're going to see a
16  progression of the number of pills being
17  delivered.  Okay?
18  So one of the things that I'm
19  going to have you do is we're able to do some
20  analysis with the ARCOS data.
21  MR. FARRELL:  So, Corey, if
22  you'll bring up Summit County PDF.
23  MS. HENN:  Do you have a
24  document that we can look at?  No?
25  MR. FARRELL:  Not yet, no.

Page 341

1  QUESTIONS BY MR. FARRELL:
2  Q.  This is our initial assessment
3  between 2006 and 2014 of the top pharmacies
4  in Summit County by volume.
5  MS. HENN:  By volume of?
6  MR. FARRELL:  Pills of
7  hydrocodone and oxycodone.
8  QUESTIONS BY MR. FARRELL:
9  Q.  So if you scroll to the very
10  next page, you're going to see this is what
11  we kind of generate.  You'll see the black
12  line is the national level, the red line is
13  the state level, the purple line is the
14  county level.  And this is Summit County, and
15  this is both hydrocodone and oxycodone.
16  And sometimes these
17  fluctuations make sense because under your
18  business model sometimes you lose accounts,
19  sometimes you gain accounts.  But in essence,
20  you see all way over at the far right-hand
21  side where the big spike comes in?  That's
22  probably the reclassification of hydrocodone
23  combination products from three down to two,
24  which I'm assuming means that McKesson picked
25  up the Rite Aid contract.

Page 342

1    MS. HENN: Counsel, just -- I
2 just want to interpose really quickly.
3 We would like this in the record with
4 an exhibit number, at least maybe the
5 version you have. I think that's
6 going to be necessary to understand
7 the deposition transcript and required
8 by the protocol.
9    MR. FARRELL: That's fair
10 enough.
11    MS. HENN: But I don't want to
12 interrupt you. Please continue.
13 QUESTIONS BY MR. FARRELL:
14    Q.   So now what I'm going to do is
15 I'm going to -- we're going -- --
16    A.   Can I answer the question that
17 you had before --
18    Q.   Yeah.
19    A.   -- about the Rite Aid piece?
20    Q.   Yeah.
21    A.   Because I think there's two
22 dynamics related to that time frame. One is
23 the up-scheduling of hydrocodone, moving it
24 from a III to a II, which happened in the
25 fall of 2014 --

Page 343

1    Q.   Right.
2    A.   -- September-ish, October-ish
3 somewhere in there. Additionally, with Rite
4 Aid specifically, that was them moving out of
5 their warehouse business to us during that
6 same time frame.
7    So there's a couple of factors
8 in there that are going to impact those, and
9 we'd need to see the full context of.
10    Q.   Yes, we would, wouldn't we?
11    A.   Yeah.
12    Q.   The full context is necessary
13 to understand this picture, don't you think?
14    A.   And when I say "full context,"
15 I mean there are noncontrols, too, so we
16 understand how big these pharmacies are, what
17 type of ratios these are to the total
18 picture.
19    Q.   That's called due diligence.
20    MS. HENN: Objection to form.
21 QUESTIONS BY MR. FARRELL:
22    Q.   Right?
23    A.   That being -- looking at a
24 percentage like that?
25    Q.   Yeah.

Page 344

1    A.   That's part of the due
2 diligence process.
3    Q.   Now let's go to page 8. This
4 is where we're going to kind of nail in a
5 little bit so you can see where I'm coming
6 from.
7    This is oxy -- wait, that's not
8 even true. That's a bad one. I don't want
9 to go to 8. I want to go to 10.
10    This is oxycodone only for Rite
11 Aid Store Number 3151.
12    Do you see that?
13    A.   I see that.
14    Q.   Do you see anywhere on this
15 chart a monthly order of unusual size?
16    MS. HENN: Object to form.
17    THE WITNESS: These are monthly
18 totals.
19 QUESTIONS BY MR. FARRELL:
20    Q.   Yes.
21    A.   Right. I don't have the full
22 context of this picture, and an example --
23    Q.   Fair enough.
24    A.   -- I don't know -- there are
25 examples where acquisitions of other

Page 345

1 pharmacies, growth in noncontrolled, growth
2 in all the total business. So for me to
3 answer that, I would need to understand more.
4    Q.   So looking at this table -- it
5 goes back to January of 2006 -- how many
6 months exceeded 8,000?
7    A.   It looks like all of them.
8    Q.   So based upon what you
9 understand of Section 55 and the Lifestyle
10 Control Drug Monitoring Program and then the
11 CSMP, you would expect there to be a block on
12 orders greater than $8,000 {sic} unless
13 somebody at McKesson did due diligence to
14 raise the limit? 8,000 doses.
15    MS. HENN: Objection to form.
16    THE WITNESS: I'm trying to
17 acclimate myself to the time -- the
18 timeline here for a second.
19 QUESTIONS BY MR. FARRELL:
20    Q.   Well, it shouldn't matter,
21 because it doesn't matter what time frame
22 we're talking about. There's not a single
23 order that is below the threshold of 8,000.
24    So let's just take one
25 particular month. Let's look at May of 2011,

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1 which is the tallest spike of 60,000 pills.
2 That's -- 60,000 is more than 8,000?
3     A.    It is.  And so to -- when the
4 thresholds were implemented as part of the
5 CSMP in 2008, there was a level setting,
6 resetting, of thresholds.  So you had
7 existing customers, and there was the -- a
8 process by which those monthly thresholds
9 were set.  So it doesn't mean that every
10 threshold beyond, you know, April of 2008 is
11 at 8,000.  They were customized based on due
12 diligence and use of data.
13     Q.    I completely understand.
14     A.    Yeah.
15     Q.    What I'm asking -- that's what
16 I'm asking you to walk me through.
17     A.    Okay.
18     Q.    There are orders more than
19 8,000.
20     A.    There are monthly totals --
21 monthly accumulation.
22     Q.    Of greater than 8,000 pills of
23 oxycodone?
24     A.    Correct.
25     Q.    By one pharmacy in Summit

Page 347

1 County?
2     A.    Correct.
3     Q.    So we would expect, if McKesson
4 was following its own policies and
5 procedures, there to be some explanation for
6 that in the customer file?
7         MS. HENN:  Objection to form.
8         THE WITNESS:  Yes.
9 QUESTIONS BY MR. FARRELL:
10     Q.    Because if there's not, that's
11 a problem, isn't it?
12         MS. HENN:  Objection to form.
13         THE WITNESS:  I wouldn't
14     classify it as a problem.  It could
15     have happened and may not have been
16     documented accordingly.  It doesn't
17     mean due diligence wasn't conducted.
18 QUESTIONS BY MR. FARRELL:
19     Q.    It just means there's no proof
20 of it.
21         MS. HENN:  Objection to form.
22 QUESTIONS BY MR. FARRELL:
23     Q.    Agreed?
24     A.    In writing.
25     Q.    Okay.  Fair enough.

Page 348

1     A.    Okay.
2     Q.    Maybe somebody can testify that
3 they recall about it.
4     A.    Yeah.
5     Q.    So now what I want to do is now
6 that I just acclimated you to this, we're
7 going to focus on May of 2011.  So let's go
8 back to the original spreadsheet for Summit
9 County transaction.
10         And what we're going to do is
11 we're going to start in column C, and we're
12 going to limit it to Rite Aid 3151.  All
13 right.  We've already limited the base code
14 to 9143, so now we're going to go over to the
15 billing date and we're going to limit it to
16 2011/05.
17         So he's going to type in the
18 search box 2011/05, and that's going to give
19 us all of the transactions in May of 2011.
20     A.    Can I make one clarification on
21 the dates --
22     Q.    Yes.
23     A.    -- for you?
24         You see two dates, column H and
25 column I.

Page 349

1     Q.    Yes.
2     A.    Column H is the date that that
3 was billed.
4     Q.    Yes.
5     A.    Column I is the date that that
6 order was placed.
7     Q.    Yes.
8     A.    Bounced against our system and
9 our threshold and checked against whatever
10 threshold, whether it was -- this one is not
11 8,000, but for whatever the threshold is.
12         So if you're wanting to match
13 what happened in a particular month to a
14 particular threshold, you would have to use
15 the sales order date.
16     Q.    Perfect.
17         So let's go undo column H.
18     A.    Now, I will throw one other
19 piece of information out there.  There's
20 other dates.  There's other dates in our
21 system, so there could be a slight -- it
22 could be a margin of error with the date.
23     Q.    I'll give you that.
24     A.    Okay.
25     Q.    So now let's go to column I,

Page 350

1 and we're going to do the same thing,
2 2011/05.
3       So now let's go over to the
4 doses, column O. Let's just take --
5 highlight the entire column of O and see what
6 it says. 62,700 doses of oxycodone. Okay?
7       So now what we're going to do
8 is go to the other spreadsheet that was given
9 to us, which is the same Bates stamp number
10 except for it's a 12 instead of a 13, I
11 think. This, without any other title,
12 appears to be the omit report and suspicious
13 order report by McKesson for Summit and
14 Cuyahoga County.
15       MR. FARRELL: Counsel?
16       MS. HENN: Again, I'm not the
17 best person to ask that question of.
18 You can ask the witness if you'd like.
19 QUESTIONS BY MR. FARRELL:
20    Q.   Do you recognize this
21 spreadsheet?
22    A.   Can you scroll -- scroll to the
23 right?
24       The reason I'm pausing is
25 because the way I typically look at them,

Page 351

1 there's different columns and there's things
2 that are classified in different ways, so the
3 data pulled is a little bit different.
4    Q.   I imagine that you're seeing it
5 on a computer monitor, and this is probably
6 the printout of the data in Excel format.
7    A.   Say that again?
8    Q.   I can try.
9    A.   To the best of your ability.
10    Q.   You probably see this more on a
11 computer screen than on a piece of paper?
12    A.   Correct.
13    Q.   And so what we're doing is
14 seeing --
15    A.   Right.
16    Q.   -- the extraction of the data
17 from whatever program you're running.
18    A.   I think this is -- I just want
19 to be sure. I know we've looked at data in
20 this format. I've seen this.
21       I believe that is the omits.
22    Q.   Good.
23       Now, if we go over to column D,
24 let's make sure we put that in -- can we put
25 that in -- sort it by -- or organize it by

Page 352

1 transaction date? So you're going to have to
2 go up and hit "sort" and -- from biggest to
3 smallest. Can you do that?
4       Yeah. Like, you know, instead
5 of alphabetical order, can we just make sure
6 that that column is in -- I think if you just
7 go to column D, if you highlight column D,
8 then go to home -- can you click on the tab
9 "home" next to "file" and then go all the way
10 over to "sort" and "filter" on the far
11 right-hand side and hit -- yeah, A to Z
12 should work.
13       Well, then -- yeah, hit the
14 drop-down button. Let's just make sure we
15 have the earliest one. Yeah, 2008.
16       So this appears -- you only
17 have omit reports beginning in '08.
18    A.   System-generated omit reports.
19    Q.   Okay. What are the other omit
20 reports?
21       MS. HENN: Objection to form.
22       THE WITNESS: I have seen
23 examples of, as we were talking about
24 earlier, customers being reported to
25 DEA offices with attached spreadsheets

Page 353

1 and information on orders. And so I'm
2 not sure of the mechanism -- I mean,
3 those aren't in the same system that
4 these were pulled.
5 QUESTIONS BY MR. FARRELL:
6    Q.   So just to be clear, you
7 understand Summit County and Cuyahoga County
8 are alleging that McKesson and others flagged
9 suspicious orders and didn't report them or
10 didn't flag suspicious orders. The whole
11 thing comes down to -- is you sold 62,000
12 doses in May of 2011 into Summit County. And
13 so when you look at this, if you could go to
14 column E, which is the reported date to the
15 DEA, you see it's blank. And as he scrolls
16 down, he's going to continue to scroll down
17 until he finds some time frame in which one
18 of these orders that got flagged by your
19 system was actually reported to the DEA.
20       So keep on going. I can tell
21 you it's 2013, the first one that pops up.
22       So it looks like August 1,
23 2013, is the first time in Summit County,
24 Ohio, that McKesson reported a suspicious
25 order to the DEA.

Page 354

1    MS. HENN: Objection.
2  QUESTIONS BY MR. FARRELL:
3    Q.   That's what it looks like.
4    MS. HENN: Objection to form.
5    THE WITNESS: I know that's how
6  that was -- that was pulled and the
7  time frame that the blocked orders
8  were sent, transmitted to
9  headquarters.
10    Prior to that, based on
11  discussions with DEA, out of the 2008
12  settlement, you know, there were
13  customers -- I can't say if there were
14  customers specifically in this county,
15  I'm talking about in terms of, you
16  know, the program. We know there were
17  reports of suspicious orders, along
18  with customers.
19  QUESTIONS BY MR. FARRELL:
20    Q.   All right. So to be clear,
21  right now all I can tell you is what the
22  record is in this litigation. And on behalf
23  of Summit County, it appears that the first
24  suspicious order that was reported, based on
25  the data provided by McKesson, was August 1,

Page 355

1  2013.
2    So if you, McKesson
3  Corporation, are aware of suspicious orders
4  that predate this, I'd love to see them.
5    A.   Understood.
6    Q.   Now, if we take column D and we
7  filter it with just 2011/05. So what this
8  is, is you recall there's 62,000 pills that
9  were distributed into Summit County in May
10  of 2011.
11    Remember that?
12    A.   Yes.
13    Q.   This is the omit report for the
14  number of orders from Rite Aid 3151 that got
15  flagged by your system.
16    How many of those orders got
17  reported?
18    A.   Based on the spreadsheet, none.
19    Q.   So what I'm trying to figure
20  out is if you look at -- on May 20, it looks
21  like your system flagged oxycodone 7.5s on
22  the omit report. And if we go and we look,
23  it wasn't turned in to the DEA. And when we
24  go and we pull up the transaction data, it
25  appeared you shipped it anyway.

Page 356

1    So assuming that fact to be
2  true, what would we need to see in the due
3  diligence file to justify the shipping of an
4  order that got flagged by your omit report?
5    MS. HENN: Objection to form.
6    THE WITNESS: I'm trying to
7  understand the situation. So can we
8  talk through it again --
9  QUESTIONS BY MR. FARRELL:
10    Q.   Yeah.
11    A.   -- in terms of the mechanics of
12  the here?
13    Q.   So we know there were a whole
14  bunch of transactions in May of 2011 that
15  resulted in 62,000 pills being delivered into
16  Summit County.
17    A.   Understood.
18    Q.   It looks like your system
19  flagged Rite Aid 3151 for oxycodone base code
20  9143 on May 20 but did not report it to the
21  DEA. And I'll suggest to you, and we don't
22  have to do it today, that if you go and look
23  at the transactions, while these two --
24  May 20th two oxycodone orders appear on your
25  omit report, other oxycodone on the same day

Page 357

1  did not. And in fact, even though you
2  flagged the May 20 order, you still sold more
3  pills later in the month.
4    So I'm trying to figure out
5  what I would see in a file, what documents
6  would I need to see to make sense of the fact
7  that your system is only flagging a couple of
8  the orders of 62,000, number one, and number
9  two, make sense of how these flagged orders
10  didn't get reported to the DEA.
11    What documents theoretically
12  would exist?
13    MS. HENN: Objection to form.
14    THE WITNESS: I'm not sure what
15  documents specifically would exist. I
16  think there's a couple components to
17  this, or pieces to talk through. One
18  of them is this time frame, 2000 --
19  QUESTIONS BY MR. FARRELL:
20    Q.   '11.
21    A.   Correct.
22    -- was during the time frame
23  where post the 2008 agreement, in
24  conversations with DEA and discussions about
25  the fact that we were -- we were going to

Page 358

¹ report customers, and suspicious orders along
² with that, that -- you know, there's --
³ there's a time -- timing issue here.
⁴     Q.    So you understand the position
⁵ about reporting suspicious customers McKesson
⁶ made to the United States District Attorney
⁷ in northern West Virginia and resulted in
⁸ you-all getting fined 150 million.  So what
⁹ I'm trying to figure out is whether or not
¹⁰ the same systemic errors were going on for --
¹¹ which resulted in these pills going to
¹² Cuyahoga and Summit County.
¹³     Do you see where I'm going with
¹⁴ it?
¹⁵     MS. HENN:  And, Counsel, I
¹⁶ would just point out that he said he
¹⁷ had a couple parts to his answer, and
¹⁸ we need to listen to his whole answer
¹⁹ to know what it is.
²⁰     Go right ahead.
²¹     THE WITNESS:  The other piece
²² that I just wanted to connect -- or
²³ discuss quickly is you mentioned an
²⁴ order being placed the next day.
²⁵ That's -- that's how the model works.

Page 359

¹     We had a monthly accumulation.  If
² they placed an individual order over
³ that amount, it omits.  But if there's
⁴ still room -- for example, if they
⁵ have a threshold of 10,000 and they
⁶ tried to place an order of 11,000 but
⁷ hadn't purchased any for that month,
⁸ they still have that 10,000 monthly
⁹ threshold that they could order the --
¹⁰ accumulate against the next day.
¹¹     So there's reasons why you may
¹² see an omit -- omitted order and a
¹³ purchase the next day.
¹⁴ QUESTIONS BY MR. FARRELL:
¹⁵     Q.    Let's go back to the other
¹⁶ spreadsheet, which should be May of 2011.
¹⁷     83 orders in one month for
¹⁸ oxycodone from one pharmacy.  Let's go all
¹⁹ the way to the bottom and see what the last
²⁰ date is.
²¹     May 26, May 26, May 25th.  I
²² mean, it looks like there's 1,800 oxy 30s on
²³ May 25th.
²⁴     Oxy 30s are the number one
²⁵ abused pill in America, and you distributed

Page 360

¹ 1800 of them on May 25th after your system
² flagged on May 20th other orders.
³     And when you look on May 20th,
⁴ there's one, two, three, four, five, six,
⁵ seven different oxycodone orders, including
⁶ 500 oxy 80s.
⁷     How is it conceivable that you
⁸ were filling this many orders of oxycodone
⁹ for this amount and your system not only
¹⁰ isn't flagging all but three, but you're not
¹¹ reporting any of them?
¹²     MS. HENN:  Objection to form.
¹³     THE WITNESS:  I would need to
¹⁴ see the details on this specific --
¹⁵ I've not researched this specific
¹⁶ pharmacy, these specific dates, these
¹⁷ specific orders, what the thresholds
¹⁸ are.  I don't understand.  I don't
¹⁹ have any of that insight to be able to
²⁰ piece that together.
²¹ QUESTIONS BY MR. FARRELL:
²²     Q.    And I'm not expecting you to
²³ just throw it out in the middle of nowhere.
²⁴     A.    Okay.
²⁵     Q.    But you understand what we're

Page 361

¹ doing is we're going back and trying to
² reconstruct what happened in Summit County,
³ and part of the story is you sold 60,000
⁴ pills to one pharmacy in one month.
⁵     A.    I understand that.  Part of the
⁶ context is the overall size of that pharmacy,
⁷ not -- not specifically just including the
⁸ impact of 60,000 doses but the number of
⁹ prescriptions, what percentage of oxycodone
¹⁰ is that of the total, what type of -- you
¹¹ know, how big is their patient population.
¹² You know, there's other factors that are
¹³ helpful in understanding in putting some
¹⁴ context around these numbers.
¹⁵     Q.    Like, for instance, is it the
¹⁶ only pharmacy in the area?
¹⁷     A.    Maybe.
¹⁸     Q.    All right.  Let's go back to
¹⁹ the PDF --
²⁰     A.    Maybe they have multiple
²¹ long-term care or hospice facilities.  I
²² don't know until I, you know, have that
²³ information.
²⁴     Q.    Go back to the PDF.
²⁵     Rite Aid.  Do you see 325 East

Page 362

1 Waterloo Road, Akron, number 2 pharmacy?
2     Look at what the number 4 one
3 is, just right down the street.
4     So again, I think it's worth
5 looking into, don't you think?
6     A.    I agree. I would love to have
7 more context and get into the details.
8     Q.    Okay. This is going to draw an
9 objection from your counsel. What would be a
10 reason to set a threshold for 999,999?
11     MS. HENN: Objection to form.
12     THE WITNESS: There are -- in
13     the system there are subsets to base
14     codes, and so a -- for example, 91 --
15     91 -- 9193, which is hydrocodone, may
16     have some subsets for reporting
17     purposes for us. There may be a
18     subset, and there could be one or more
19     of these. There could be a subset for
20     10 milligram. There could be a subset
21     for the single entity hydrocodone.
22     And so we can carve those out
23     from reporting purposes. That's --
24     the 999,999 does not mean that they
25     can get 999,000 pills. It means that

Page 363

1     that base code does not conflict with
2     the main parent -- what I would call a
3     parent base code.
4     And so it's for reporting
5     purpose only. It has nothing to do
6     with allowing the amount of that total
7     base code. The parent trumps that
8     one. It's for reporting purposes
9     only.
10 QUESTIONS BY MR. FARRELL:
11     Q.    Do you know how many doses
12 McKesson distributed of oxycodone nationwide
13 from January 1, 2006 and December 31, 2014?
14 This is from ARCOS.
15     A.    I don't have that number.
16     MS. HENN: Objection to form.
17 QUESTIONS BY MR. FARRELL:
18     Q.    9,288,258,480 doses of
19 oxycodone nationwide. That's more than
20 there's people in our country.
21     Distributed 423 million
22 oxycodone doses in the state of Ohio. That's
23 over 119 billion milligrams of oxycodone.
24     Do you think that's too many?
25     MS. HENN: Objection to form.

Page 364

1     THE WITNESS: You know, I
2     can't -- I can't say on the data and
3     the comparison compared to -- those
4     are data points to look at. They're
5     big numbers, no doubt.
6 QUESTIONS BY MR. FARRELL:
7     Q.    Do you agree that one of the
8 foreseeable harms of engaging in unlawful
9 conduct in the distribution of prescription
10 opioids is diversion?
11     MS. HENN: Objection. Form.
12     THE WITNESS: Could you ask
13     that again?
14 QUESTIONS BY MR. FARRELL:
15     Q.    One of the harms --
16     A.    You said foreseeable first, but
17 harms --
18     Q.    I'll go back and do it.
19     Do you agree that one of the
20 foreseeable harms of engaging in unlawful
21 conduct in the distribution of prescription
22 opioids is diversion?
23     MS. HENN: Objection to form.
24     THE WITNESS: I think it can
25     be.

Page 365

1 QUESTIONS BY MR. FARRELL:
2     Q.    Do you agree that filling
3 suspicious orders is a direct and proximate
4 cause of prescription opioid abuse,
5 addiction, morbidity and mortality?
6     MS. HENN: Objection to form.
7     THE WITNESS: Filling specific
8     orders?
9     MS. HENN: Suspicious orders is
10     the word he used.
11     THE WITNESS: Suspicious
12     orders.
13     There's a lot of reasons for --
14     that orders may get flagged as
15     suspicious, so I think it depends.
16 QUESTIONS BY MR. FARRELL:
17     Q.    That's fair.
18     A.    They'll get flagged as an order
19 of unusual size, frequency or pattern and not
20 mean that it's suspicious or
21 diversion-related.
22     Q.    Do you believe the prescription
23 opiate epidemic is an immediate hazard to
24 public health and safety?
25     MS. HENN: Objection to form.



Page 366

1      THE WITNESS:  How do you -- how
2  are you defining "immediate hazard"?
3  QUESTIONS BY MR. FARRELL:
4  Q.    A hazard.
5  A.    A hazard?
6      Sure.
7      MR. FARRELL:  Okay.  We will
8  adjourn with the reservation of rights
9  for one day, continuing the subject
10  matters that most interest the
11  plaintiffs in the MDL in the 30(b)(6)
12  notices.
13      MS. HENN:  And, I mean, we will
14  object to continuing past the limit
15  set by the Court.  We feel that there
16  was a lot of time today that was spent
17  asking legal questions that could have
18  been spent on topics.
19      MR. FARRELL:  There was also a
20  lot of time spent reading documents
21  that were listed in my 30(b)(6).
22      MS. HENN:  Documents that you
23  put in front of the witness and wanted
24  him to read.
25      But more importantly, I wanted

Page 367

1  to ask the court reporter to please
2  designate this transcript
3  provisionally highly confidential,
4  which is required under the deposition
5  protocol, and I also wanted to reserve
6  the right to read and sign.
7      I have no questions, and so I
8  think we are finished.
9      VIDEOGRAPHER:  Okay.  The time
10  is 5:47 p.m., July 31, 2018.  Going
11  off the record completing today's
12  videotaped session.
13      (McKesson-Hartle Exhibit 40
14  marked for identification.)
15  (Deposition concluded at 5:47 p.m.)
16      - - - - - - -
17
18
19
20
21
22
23
24
25

Page 368

1      CERTIFICATE
2
3      I, CARRIE A. CAMPBELL, Registered
  Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
  hereby certify that prior to the commencement
5  of the examination, Nathan J. Hartle was duly
  sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
  foregoing is a verbatim transcript of the
8  testimony as taken stenographically and by and
  before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
  ability.
10
      I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
  nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
  employee of such attorney or counsel, and
13  that I am not financially interested in the
  action.
14
15
       _____
17  CARRIE A. CAMPBELL,
  NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
  California Certified Shorthand
19  Reporter #13921
  Missouri Certified Court Reporter #859
20  Illinois Certified Shorthand Reporter
  #084-004229
21  Texas Certified Shorthand Reporter #9328
  Kansas Certified Court Reporter #1715
22  Notary Public
23  Dated:  August 3, 2018
24
25

Page 369

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8      After doing so, please sign the
9  errata sheet and date it.  You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13      It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you.  If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 370

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4     I,_____, do
hereby certify that I have read the foregoing
5  pages and that the same is a correct
transcription of the answers given by me to
6  the questions therein propounded, except for
the corrections or changes in form or
7  substance, if any, noted in the attached
Errata Sheet.
8
9
10
11
12
_____
Nathan J. Hartle          DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
25

Page 371

1       _ _ _ _ _ _ _
ERRATA
2       _ _ _ _ _ _ _
3  PAGE  LINE  CHANGE
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____
25

Page 372

1       _ _ _ _ _ _ _
LAWYER'S NOTES
2       _ _ _ _ _ _ _
3  PAGE  LINE
4  _____ _____ _____
5  _____ _____ _____
6  _____ _____ _____
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____
25