```
 1              UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3                      - - -

 4   IN RE:  NATIONAL            )

     PRESCRIPTION               )  MDL No. 2804

 5   OPIATE LITIGATION          )

     _____ )  Case No.

 6                              )  1:17-MD-2804

     THIS DOCUMENT RELATES      )

 7   TO ALL CASES               )  Hon. Dan A. Polster

 8                      - - -

 9          THURSDAY, NOVEMBER 15, 2018

10      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

11

                        - - -

12

13        Videotaped deposition of Mark Hartman,

14   held at the offices of BakerHostetler, 200 Civic

15   Center Drive, Suite 1200, Columbus, Ohio, commencing

16   at 9:06 a.m., on the above date, before Carol A. Kirk,

17   Registered Merit Reporter and Notary Public.

18

19                      - - -

20

21

22

23          GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                A P P E A R A N C E S:
 2   On behalf of the Plaintiffs:
 3        MCHUGH FULLER LAW GROUP
          BY:  MICHAEL J. FULLER, JR., ESQUIRE
 4             mike@mchughfuller.com
               AMY J. QUEZON, ESQUIRE
 5             amy@mchughfuller.com
          97 Elias Whiddon Road
 6        Hattiesburg, Mississippi  39402
          601-261-2220
 7
               and
 8
          GRAY & WHITE
 9        BY:  MARK K. GRAY, ESQUIRE
               mgray@grayandwhitelaw.com
10             MATTHEW L. WHITE, ESQUIRE
               mwhite@grayandwhitelaw.com
11        713 East Market Street
          Louisville, Kentucky  40402
12        502-805-1800
13             and
14        LEVIN PAPANTONIO THOMAS MITCHELL
          RAFFERTY & PROCTOR PA
15        BY:  ARCHIE C. LAMB, JR., ESQUIRE
               alamb@levinlaw.com
16        316 South Baylen Street, Suite 600
          Pensacola, Florida  32591
17        205-435-7000
18             and
19        SIMMONS HANLY CONROY, LLC
          BY:  RICK KROEGER, ESQUIRE
20             rkroeger@simmonsfirm.com
          One Court Street
21        Alton, Illinois  62002
          618-259-2222
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    On behalf of the Cardinal Health, Inc.
 2          WILLIAMS & CONNOLLY LLP
            BY:  STEVEN M. PYSER, ESQUIRE
 3               spyser@wc.com
                 MATTHEW C. MONAHAN, ESQUIRE
 4               mmonahan@wc.com
            725 Twelfth Street, N.W.
 5          Washington, DC  20005
            202-434-5331
 6
 7    On behalf of the AmerisourceBergen:
 8          REED SMITH LLP
            BY:  BRIAN T. HIMMEL, ESQUIRE
 9               bhimmel@reedsmith.com
            Reed Smith Centre
10          225 Fifth Avenue, Suite 1200
            Pittsburgh, Pennsylvania  15222
11          412-288-4058
12
      On behalf of Walmart:
13
            JONES DAY
14          BY:  CASTEEL BORSAY, ESQUIRE
                 cborsay@jonesday.com
15          325 John H. McConnell Boulevard, Suite 600
            Columbus, Ohio  43215-2673
16          614-469-3939
17
      On behalf of Prescription Supply, Inc.
18
            PELINI, CAMPBELL & WILLIAMS LLC
19          BY:  WILLIAM M. SHACKELFORD, ESQUIRE
                 wms@pelini-law.com
20          8040 Cleveland Avenue NW, Suite 400
            North Canton, Ohio  44720
21          330-305-6400
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   On behalf of McKesson:
 2        COVINGTON & BURLING, LLP
          BY:  MEGHAN E. MONAGHAN, ESQUIRE
 3             mmonaghan@cov.com
          850 Tenth Street, NW
 4        Washington, DC  20001
          202-662-5531
 5
 6   On behalf of CVS Indiana, LLC and CVS RX Services,
     Inc.:
 7
          ZUCKERMAN SPAEDER LLP
 8        BY:  DANIEL P. MOYLAN, ESQUIRE
               dmoylan@zuckerman.com
 9        100 East Pratt Street, Suite 2440
          Baltimore, Maryland  21202
10        410-949-1159
11
     On behalf of Mallinckrodt LLC, and SpecGX LLC:
12
          HAHN, LOESER & PARKS LLP
13        BY:  CHRIS GORDON, ESQUIRE
               cgordon@hahnlaw.com
14        65 East State Street, Suite 1400
          Columbus, Ohio  43215
15        614-453-7137
16
17   ALSO PRESENT:
18      A.J. Elkins, McHugh Fuller
        Karla Shivers, McHugh Fuller
19      Edna Jamison, McHugh Fuller
        Katelyn Adams, Cardinal Health
20      Twila Hulett, Levin Papantonio
21   VIDEOGRAPHER:
22      Darnell Brown, Golkow Litigation Services
23   TRIAL TECHNICIAN:
24      Gina Veldman, Precision Technologies
```

```
 1        VIDEOTAPED DEPOSITION OF MARK HARTMAN

 2                INDEX TO EXAMINATION

 3  WITNESS                                        PAGE

 4  MARK HARTMAN

 5       CROSS-EXAMINATION BY MR. FULLER:           12

         CROSS-EXAMINATION BY MS. QUEZON:          312

 6       REDIRECT EXAMINATION BY MR. PYSER         355

         RECROSS-EXAMINATION BY MR. FULLER:        372

 7

 8

 9            INDEX TO CERTIFIED QUESTIONS

10  1.  PAGE 37, LINE 21

11  2.  PAGE 213, LINE 13

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        VIDEOTAPED DEPOSITION OF MARK HARTMAN
 2                  INDEX TO EXHIBITS
 3    EXHIBIT                DESCRIPTION                PAGE
 4    Cardinal-Hartman 1     E-mail string ending with   16
                             an e-mail to Mr. Sherman
 5                           from Mark, dated 12/20/07
                             Bates-stamped CAH_
 6                           MDL2804_02881821 - 2881822
 7    Cardinal-Hartman 2     E-mail string ending with   34
                             an e-mail to Mr. Dolch and
 8                           others from Mr. Kaufmann,
                             dated 1/21/08, Bates-
 9                           stamped CAH_MDL_PRIORPROD_
                             DEA07_00827893 and 827894
10
      Cardinal-Hartman 3     Settlement and Release       61
11                           Agreement and
                             Administrative Memorandum
12                           of Agreement, Bates-
                             stamped CAH_MDL_
13                           PRIORPROD_DEA12_00001571
                             through 1618
14
      Cardinal-Hartman 4     21 C.F.R. 1301.74           111
15
      Cardinal-Hartman 5     United States Code          104
16                           Annotated, Title 21. Food
                             and Drugs; Chapter 13.
17                           Drug Abuse Prevention and
                             Control, P1.4916 through
18                           P1.4916.4
19    Cardinal-Hartman 6     Handwritten document        126
                             prepared by Attorney
20                           Fuller
21    Cardinal-Hartman 7     E-mail string ending with   128
                             an e-mail to gatorxjd1210@
22                           msn.com from Mark, dated
                             5/26/10, Bates-stamped
23                           CAH_ MDL2804_02881832
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)
 2     EXHIBIT              DESCRIPTION            PAGE
 3     Cardinal Hartman 8   PowerPoint Bates-stamped   149
                            CAH_MDL_PRIORPROD_DEA07_
 4                          01181262 through 1181332
 5     Cardinal-Hartman 9   Document Bates-stamped     165
                            CAH_MDL2804_02102331
 6                          through 2102338
 7     Cardinal-Hartman 10  E-mail string ending with  184
                            an e-mail to Ms. Conway
 8                          and Mr. Bonnell from
                            Mr. Hartman, dated
 9                          1/11/08, Bates-stamped
                            CAH_MDL_PRIORPROD_DEA07_
10                          00109258 and 109259
11     Cardinal-Hartman 11  E-mail string ending with  192
                            an e-mail to Mr. Reardon
12                          from Mr. Hartman, dated
                            1/28/08, Bates-stamped
13                          CAH_MDL_PRIORPROD_DEA07_
                            00875539 through 875541
14
       Cardinal-Hartman 12  Attachment 48 to           203
15                          Defendants' Opposition to
                            Plaintiff's Motion for
16                          Preliminary Injunction
17     Cardinal-Hartman 13  E-mail string ending with  220
                            an e-mail to Ms. Justus
18                          from Mr. Harman, dated
                            8/24/09, with attachment,
19                          Bates-stamped CAH_MDL_
                            2804_00282303 - 282336
20
       Cardinal-Hartman 14  E-mail to Mr. Tolar from    249
21                          Mignette Strife, with
                            attachment, dated 7/27/06,
22                          Bates-stamped CAH_MDL_
                            PRIORPROD_DEA07_00828657
23                          through 828674
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1              INDEX TO EXHIBITS (CONT'D)
  2    EXHIBIT              DESCRIPTION              PAGE
  3    Cardinal-Hartman 15  E-mail string ending with  259
                            an e-mail to Mr. Varela
  4                         from Mr. Kurtz, dated
                            12/5/07, Bates-stamped
  5                         CAH_MDL_PRIORPROD_DEA07_
                            00135433
  6
       Cardinal-Hartman 16 (Not marked.)
  7
       Cardinal-Hartman 17  Cardinal Health Job        263
  8                         Description of Cage and
                            Vault Clerk, Bates-
  9                         stamped CAH_MDL_
                            PRIORPROD_DEA07_00138622
 10                         and 138623
 11    Cardinal-Hartman 18  (Not marked.)
 12    Cardinal-Hartman 19  Video clip
 13    Cardinal-Hartman 20  (Not marked.)
 14    Cardinal-Hartman 21  GAO Report, "Oxycontin     313
                            Abuse and Diversion and
 15                         Efforts to Address the
                            Problem"
 16
       Cardinal-Hartman 22  E-mail to Mr. Brantley and  323
 17                         others from Mr. Reardon,
                            dated 9/14/07, with
 18                         attachment, Bates-stamped
                            CAH_MDL_PRIORPROD_DEA07_
 19                         01198345 through 1198358
 20    Cardinal-Hartman 23  ARCOS Summary for Cuyahoga  333
                            County and Summit Counties
 21
       Cardinal-Hartman 24  Document titled "Process    341
 22                         to Establish SOM Threshold
                            Limits," Bates-stamped
 23                         CAH_MDL_PRIORPROD_AG_
                            0004208 through 4211
 24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    EXHIBIT              DESCRIPTION              PAGE
 3    Cardinal-Hartman 25  Document titled "Cardinal   341
                           Health SOM Program,"
 4                         Bates-stamped CAH_MDL_
                           2804_00228327 through
 5                         228329
 6    Cardinal-Hartman 26  Document titled "Cardinal   341
                           Health Oxycodone Sales to
 7                         Summa Health System -
                           Akron Campus"
 8
      Cardinal-Hartman 27  Document titled "Cardinal   342
 9                         Health Oxycodone Sales to
                           CVS #03355"
10
      Cardinal-Hartman 28  Surveillance Site Visit     343
11                         Report, Bates-stamped
                           CAH_MDL2804_00000196
12
      Cardinal-Hartman 29  Document titled "Cardinal   345
13                         Health Oxycodone Sales to
                           CVS #03083"
14
      Cardinal-Hartman 30  Document titled "Oxycodone  346
15                         Shipped by Cardinal," two
                           pages
16
      Cardinal-Hartman 31  E-mail to Mr. Dolch and     382
17                         others from Mr. Henderson,
                           others, dated 12/19/07,
18                         with attachment, four
                           pages, Bates-stamped
19                         CAH_MDL_PRIORPROD_DEA07_
                           00968835
20
      Cardinal-Hartman 32  Demonstrative drawing       396
21                         prepared by Attorney
                           Fuller
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                      - - -

2              P R O C E E D I N G S

3                      - - -

4          THE VIDEOGRAPHER:  Good morning.

5      We are now on the record.  My name is

6      Darnell Brown, and I'm the videographer

7      with Golkow Litigation Services.

8      Today's date is November 15, 2018, and

9      the time is 9:06 a.m.

10          This video deposition is being

11     held in Columbus, Ohio, in the matter of

12     National Prescription Opioid Litigation

13     for the United States District Court for

14     the Northern District of Ohio.  The

15     deponent is Mark Hartman.

16          Counsel, please identify

17     yourselves for the record.

18          MR. FULLER:  Mike Fuller on behalf

19     of the Plaintiff.

20          MS. QUEZON:  Amy Quezon on behalf

21     of the Plaintiff.

22          MR. KROEGER:  Rick Kroeger on

23     behalf of the Plaintiff.

24          MR. ELKINS:  A.J. Elkins on behalf
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            of the Plaintiff.

 2                 MR. GRAY:  Mark Gray on behalf of

 3            the Plaintiffs.

 4                 MR. WHITE:  Matt White on behalf

 5            of the Plaintiffs.

 6                 MR. SHACKELFORD:  Bill Shackelford

 7            on behalf of Prescription Supply

 8            Company.

 9                 MR. GORDON:  Chris Gordon on

10            behalf of Mallinckrodt, LLC, and

11            SpecGX LLC.

12                 MS. BORSAY:  Casteel Borsay on

13            behalf of Walmart.

14                 MS. MONAGHAN:  Meghan Monaghan on

15            behalf of McKesson.

16                 MR. MOYLAN:  Daniel Moylan on

17            behalf of CVS.

18                 MR. HIMMEL:  Brian Himmel on

19            behalf of AmerisourceBergen Corporation.

20                 MS. ADAMS:  Katelyn Adams on

21            behalf of Cardinal Health.

22                 MR. MONAHAN:  Matthew Monahan on

23            behalf of Cardinal Health.

24                 MR. PYSER:  Steven Pyser on behalf
```

```
 1              of Cardinal Health and the witness.

 2                   THE VIDEOGRAPHER:  The deponent

 3              [sic] is Carol Kirk, who will now swear

 4              in the witness.

 5                   (Witness sworn.)

 6                   MR. FULLER:  Can we get everybody

 7              else on the phone to introduce

 8              themselves, please, for the record.

 9                   Is there anybody on the phone?

10                   Mr. Hartman, they didn't find us

11              very interesting today, apparently.

12                   THE WITNESS:  It's a shame.  I was

13              hoping for record numbers.

14                   MR. FULLER:  You know,

15              pay-per-view, maybe.  All right.  Well,

16              I'm guessing there is nobody on the

17              phone.

18                        - - -

19                   MARK HARTMAN

20   being by me first duly sworn, as hereinafter

21   certified, deposes and says as follows:

22              CROSS-EXAMINATION

23   BY MR. FULLER:

24              Q.   Mr. Hartman, you currently have a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    consulting company; is that right?

 2            A.    Yes.

 3            Q.    And how long has that consulting

 4    company been in existence?

 5            A.    Two years, maybe.

 6            Q.    And you sort of hesitated.  Is it

 7    because you're not doing very much work with it

 8    or what's --

 9            A.    That's right.  That's right.

10            Q.    Are you basically retired at this

11    point?

12            A.    Yes.

13            Q.    Okay.

14            A.    Yeah.

15            Q.    And did you retire after leaving

16    Cardinal?

17            A.    No.

18            Q.    What work did you have after

19    leaving Cardinal?  And that was approximately

20    2000 and -- early 2010?

21            A.    February 2010.

22            Q.    Okay.

23            A.    I left Cardinal at that time

24    period, and in March of 2010, I joined Rexel,
```

```
 1    French-based company.  I worked here in the

 2    United States.

 3            Q.    Mm-hmm.

 4            A.    I was at Rexel about 18 months,

 5    left there.  And then I joined a private

 6    company, Guild Associates, here locally in

 7    Dublin, Ohio, chemical engineering firm.

 8            Q.    And what type of work did you do

 9    for Rexel?

10            A.    I was the VP of operations.  So

11    for the United States, I had the operations

12    within the facilities, logistics, you know,

13    efficiency, processes, practices, things like

14    that.

15            Q.    And then why did you leave Rexel

16    and go to -- and I'm sorry -- the name?

17            A.    Guild Associates.

18            Q.    Guild Associates?

19            A.    Rexel is a great company.  I was

20    traveling 100 percent of the time.  I was living

21    in Dublin, Ohio.  My office was in Dallas.

22    Guild Associates was ten minutes from my house

23    here in Dublin.  It was a nice opportunity to

24    step into another role as CEO there.  So I -- I
```

Highly Confidential - Subject to Further Confidentiality Review

1    took the option to move back home and then

2    finish out my career at Guild.

3           Q.    And how long were you with Guild?

4           A.    Four years, eight months.

5           Q.    And then did you retire from Guild

6    at that point?

7           A.    Yes.

8           Q.    And you've remained basically

9    unemployed since then?

10          A.    Pretty much.  I've got a partner

11   who has an enterprise he's starting up, and I've

12   invested with him.  I'm pretty much a silent

13   partner, but it's a leadership consulting

14   business, an event business.  I -- we haven't

15   done any work together in the consulting role.

16   I've just invested with him and maybe down the

17   road we'll do some work.

18          Q.    And who is that partner?

19          A.    Craig Lucas.

20          Q.    Okay.  And what's the name of that

21   company?

22          A.    Authenica, A-u-t-h-e-n-i-c-a.

23          Q.    So after leaving Cardinal in

24   February of 2010 -- correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yeah.

 2            Q.    Okay.  Did you do any consulting

 3    for Cardinal from that point forward?

 4            A.    Never.

 5            Q.    Okay.  And you worked for Cardinal

 6    for over a decade; is that right?

 7            A.    Yes.

 8            Q.    Okay.  Let's pull up P13900.

 9                        - - -

10        (Cardinal-Hartman Exhibit 1 marked.)

11                        - - -

12            MR. FULLER:  And, Steve, I'm just

13        going to hand you all the copies and let

14        you pass them out; is that okay?

15            MR. PYSER:  Yeah, that's great.

16        Thank you.

17            MR. FULLER:  Sure.

18            This will be marked Plaintiff's

19        Number 1 or -- yeah, however y'all label

20        them.

21            (Discussion held off the record.)

22    BY MR. FULLER:

23            Q.    So, Mr. Hartman, sort of how this

24    is going to work, is you have a screen in front
```

Highly Confidential - Subject to Further Confidentiality Review

1   of you.  You'll see the document that I'm

2   referring to on the screen, and wherever I'm

3   flowing or we're flowing on the document will be

4   highlighted for you, as well as potentially

5   blown up.  So you'll have the hard copy in front

6   of you as well as the screen to use.  Okay?

7         A.    Okay.

8         Q.    All right.  Have you seen this

9   e-mail before?

10        A.    Yes.

11        Q.    This is an e-mail that explains

12  back in December of 2007 you were taking

13  appointment as a senior vice president of Supply

14  Chain Integrity and regulatory operations for

15  HSCS; is that correct?

16        A.    That's right.

17        Q.    And what is HSCS, for the jury?

18  Healthcare Supply Chain Services?

19        A.    Thank you.

20        Q.    You're welcome.

21        A.    I forgot the acronym.

22        Q.    I understand.  I understand.

23              And if you look down at the

24  announcement portion, and this was sent out, at

Highly Confidential - Subject to Further Confidentiality Review

```
 1    least according to the e-mail, when?

 2          A.    December 19, 2007.

 3          Q.    Okay.  And let me ask, had you

 4    left Cardinal for a brief period at that point?

 5          A.    Hadn't left.  We were going

 6    through a reorganization.  My position was being

 7    eliminated, the one I was in previously, so we

 8    were looking for roles inside of the company and

 9    I was looking externally as well.

10                This position became available,

11    and Cardinal offered it to me.  So there was

12    about a month in there between that role ending

13    that I was in and then this role coming up.

14          Q.    So were you actually unemployed

15    during that time?

16          A.    No, I was still a Cardinal

17    employee.

18          Q.    You just didn't have a spot?

19          A.    That's right.

20          Q.    Fair enough.  Fair enough.

21                And if you will, read the first

22    sentence for us.

23          A.    Of the announcement?

24          Q.    Yes, sir.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    "We are pleased to announce the

 2   appointment of Mark Hartman to the position of

 3   Senior Vice President, Supply Chain Integrity

 4   and Regulatory Operations for HSCS reporting to

 5   both of us."

 6              Q.    And "both of us" indicates who?

 7              A.    And -- let's see.

 8              Q.    If you look at the front section.

 9              A.    So that's Jeff Henderson and

10   Gary Dolch.

11              Q.    And who is Mr. Henderson; do you

12   know?

13              A.    Yes.  He's the -- he was the chief

14   financial officer at the time and the interim

15   CEO.

16              Q.    And the CEO for Healthcare Supply

17   Chain Services, correct?

18              A.    HS -- yeah, yes, that's correct.

19              Q.    The acronym that we were

20   struggling with earlier?

21              A.    Correct.

22              Q.    And who is Mr. Dolch?

23              A.    EVP quality and regulatory

24   affairs.
```

```
 1              Q.    And just for the jury, EVP is

 2    what?

 3              A.    Executive vice president.

 4              Q.    Fair enough.

 5                    And then go on, if you will, and

 6    read your portion where it describes your role,

 7    what role you'll be filling for Cardinal.

 8              A.    "Mark will be responsible for

 9    leading HSCS' initiative to build and operate

10    state of the art diversion prevention, supply

11    chain integrity and regulatory compliance

12    processes and systems."

13              Q.    And you know when you were coming

14    into this role that the supply chain integrity

15    was lacking, correct?

16              A.    In what way?

17              Q.    It wasn't sufficient?

18                    MR. PYSER:  Object to form.

19              Q.    Or do you disagree with that?

20              A.    Yeah.  I'm not sure it was not

21    sufficient.

22              Q.    Let's continue.  Read the next

23    sentence for us.

24              A.    "This position is a critical role
```

Highly Confidential - Subject to Further Confidentiality Review

1   for the company as supply chain integrity

2   continues to become an area of increased focus

3   by regulatory agencies and customers alike."

4          Q.    And you're aware during this time

5   that this was an issue of focus, particularly

6   for the DEA?

7          A.    I'd become aware of it as the role

8   was offered to me.

9          Q.    Okay.  You also became aware that

10  Cardinal had three facilities get their license

11  suspended for the lack of supply chain

12  integrity, correct?

13               MR. PYSER:  Object to form.

14         A.    As the role was offered to me,

15  that's when I became aware of what had happened.

16         Q.    Okay.  And that was that three

17  distribution centers, Lakeland, Swedesboro, and

18  Washington, had their license stripped from them

19  because of supply chain integrity issues.  Is

20  that your understanding?

21               MR. PYSER:  Object to form.

22         A.    Their licenses were suspended, as

23  I came to understand.

24         Q.    Did the DEA just come in and

1    suspend them for no reason?

2              What were the allegations, if you

3    know, Mr. Hartman?

4         A.    I would need to review it, but I

5    believe it was due to the anti-diversion issues

6    that the company was facing with the DEA.

7         Q.    And that's included in supply

8    chain integrity; isn't that right?

9         A.    That's right.

10        Q.    Okay.  So it was the supply chain

11   integrity issues that caused the license to be

12   suspended.  We can agree on that, correct?

13        A.    Yes.

14        Q.    Okay.  Continue reading,

15   "Reporting to Mark ..."

16        A.    "... will be Steve Reardon, Vice

17   President, Quality and Regulatory Affairs for

18   HSCS, and Michael Moné, Vice President of

19   Anti-Diversion."

20        Q.    So if we're looking at the

21   hierarchy now, when you come into this

22   position -- and this is a new position for you,

23   correct?

24        A.    Yes.

```
 1              Q.    Had you worked in regulatory

 2    before?

 3              A.    No.

 4              Q.    You're taking over both the QRA,

 5    quality regulatory affairs, and the

 6    anti-diversion segment, correct?

 7              A.    Correct.

 8              Q.    And you have Mr. Reardon and

 9    Mr. Moné reporting to you?

10              A.    Yes.

11              Q.    And you're aware that Mr. Reardon

12    had been with the company for quite some time;

13    is that right?

14              A.    Yes.

15              Q.    And Mr. Moné was a more recent

16    hire?

17              A.    He came from one of our divisions

18    into HSCS.

19              Q.    Okay.  And at this time when you

20    take the position, who are your direct reports?

21              A.    Steve Reardon and Michael Moné.

22              Q.    Okay.  No, no, no.  I apologize.

23    Let me ask the question again.

24                    Who were you directly reporting
```

1    to?

2           A.    Okay.

3           Q.    Sorry about that.

4           A.    Yeah.  I was reporting directly to

5    Gary Dolch for my role.

6           Q.    And what was Mr. Henderson's role?

7           A.    He, at the time, was a CFO.  HSCS

8    president had left the company earlier.  So he

9    was in that interim role as CEO.  But for my

10   time there, as I entered the role, Gary Dolch

11   was the person that I reported to directly, and

12   then later on that was just officially made as

13   we agreed that reporting to Gary was the -- was

14   the best way for us to run the department.

15          Q.    Fair enough.

16                So let's move up to your

17   forwarding of this e-mail.

18          A.    Sure.

19          Q.    And who is it that you send this

20   e-mail to and when do you do that?

21          A.    Strat Sherman on December 20,

22   2007.

23          Q.    Is that a Mr. or Ms. Sherman?

24          A.    Mr.

```
 1              Q.    Mr.  Who is Mr. Sherman?

 2              A.    He had done work at Cardinal

 3    Health as a consultant.  Continued to stay in

 4    contact with him, so I was letting him know I

 5    was back in the job.

 6              Q.    And what's the name of that

 7    company he works for?

 8              A.    Accompli.

 9              Q.    Do you know what Accompli does?

10              A.    A consulting firm.

11              Q.    That Cardinal has used in the

12    past?

13              A.    Used in the -- not in -- not in

14    anti-diversion but in the past had used them,

15    and that's where I met him.

16              Q.    And just out of curiosity, what

17    type of issues would they consult on?

18              A.    We were in other roles.  We were

19    running a transformation of the organization.

20    And Strat worked primarily on HR issues and just

21    the work of transformation because it's so big

22    and broad.  We would work across lines.

23              Q.    What type of transformation?

24              A.    Cardinal was involved with back --
```

 1   particularly -- I mean, it was a pretty big

 2   operation, but back office consolidations.  We

 3   had many acquisitions, several divisions, and

 4   like most corporations, you look at your back

 5   office operations and look for ways to become

 6   more efficient.  So that's what the

 7   transformation was primarily about.

 8          Q.   Got it.  And in this e-mail, you

 9   say that "Cardinal Corporate working for Gary D.

10   and Jeff H."

11               That's Mr. Dolch and

12   Mr. Henderson; is that correct?

13          A.   Yes.

14          Q.   And "Here is the news that was

15   sent out."

16               Read the next sentence for us,

17   please.

18          A.   "A real surprise to be asked back,

19   but the recent issues need lots of attention."

20          Q.   Why were you surprised to be asked

21   back?

22          A.   I didn't expect that a job would

23   pop up.

24          Q.   Was there any issues with your

```
 1    departure when you left?

 2          A.    No.

 3          Q.    No bad blood, from your opinion?

 4          A.    None.

 5          Q.    Okay.  And it says "Hence, a new

 6    role for me."

 7                Right?

 8          A.    Correct.

 9          Q.    And then read the sentence, "I

10    think I'm adding ..."

11          A.    ... "immediate help and will have

12    the opportunity to effect the longer term."

13          Q.    Continue.

14          A.    "I like that as I have lots of

15    sweat equity in this place and we're too good to

16    be driven down."

17          Q.    And you'd been there for quite

18    some time?

19          A.    Yes.

20          Q.    Almost a decade by this point,

21    correct?

22          A.    Yes.

23          Q.    '98 was when you started or about

24    there?
```

```
 1              A.     Probably about -- yeah, about ten

 2      years.

 3              Q.     Which, if I'm not wrong, is a

 4      decade?

 5              A.     I think you're right on that.

 6              Q.     I hope so.

 7                     The reason you were concerned

 8      about the company being driven down is because

 9      the company had a result-oriented culture; isn't

10      that true?

11                     MR. PYSER:  Object to form.

12              Q.     And bad decisions were being made

13      at the higher levels?

14              A.     I don't know what you mean by

15      that.

16              Q.     Do you know what -- have you ever

17      heard of a result-oriented culture?

18              A.     Sure.

19              Q.     Okay.  So are you agreeing or

20      disagreeing that Cardinal operated in a

21      result-oriented culture, focused on the end

22      game?

23              A.     Cardinal's a public company.  We

24      drove for efficiencies and to drive the best
```

1    business for our shareholders and certainly to

2    be a profitable company.

3           Q.    That's what shareholders want to

4    see, right?

5           A.    Sure.

6           Q.    I mean, they want the returns?

7    People invest.  I mean, it's a publicly traded

8    company, as you mentioned, right?

9           A.    Correct.

10          Q.    Stockholders, not around -- just

11   around the country, but around the world?

12          A.    That's right.

13          Q.    And the leadership is responsible

14   to the board of directors who's elected and

15   appointed by the shareholders; isn't that true?

16          A.    Yep.

17          Q.    And so the focus is going to be

18   making money, right?

19          A.    Well, I'm not sure that's the only

20   focus any company has.  Our focus is to deliver

21   and service our customers, to service the

22   industry we're in, and certainly to make money.

23          Q.    Sure.

24          A.    It's not the only purpose that

Highly Confidential - Subject to Further Confidentiality Review

```
1   you're there as a corporation.

2          Q.    So let me ask you again.  Based on

3   your decade of experience with Cardinal, did

4   they or did they not have a result-oriented

5   culture?

6          A.    Certainly.  We were results

7   oriented.

8          Q.    And there were times that bad

9   decisions were made, as we saw by the suspension

10  of three licenses from distribution centers?

11              MR. PYSER:  Object to form.

12         Q.    Correct?

13         A.    I think in this case, as I got

14  into it, or the situation -- what you have to

15  understand is I hadn't worked in this space.  It

16  was new to me.  And what I found is that our

17  processes and systems were working, and what

18  happened was, the DEA changed on us

19  immediately -- then they put the immediate

20  suspensions in place, and that's when I stepped

21  in and began to learn much more about it.

22         Q.    So --

23         A.    So when you say "bad decisions," I

24  don't know that I agree with that.
```

1      Q.    So your processes and systems were

2   working, in your opinion?

3      A.    It wasn't during my time frame.

4      Q.    You weren't reporting -- excuse

5   me.  You guys weren't -- you were reporting all

6   suspicious orders?

7      A.    It wasn't during my time frame.

8   As I understand our processes, and this is after

9   I came into role, we were of the belief that our

10  processes and systems were working.

11     Q.    And just to clarify, you believe

12  the processes and systems that were in place

13  prior to you taking on that role in December of

14  '07, the systems and processes at Cardinal

15  Health were working related to anti-diversion?

16     A.    I wasn't there at that time.  I

17  wasn't in the role.  I had no -- no part of

18  that.  What I came to understand was, we

19  believed -- I wasn't in it.  We believed that

20  our processes and systems were working.

21     Q.    I understand that.  I understand

22  that.

23           Now, would you agree or disagree,

24  when you come into this role, this new role as

1    head of regulatory, you need to see what systems

2    were in place and what was being done before to

3    decide the right path to fix it or correct it or

4    do whatever it is you're going to do, correct?

5           A.    When I came into role, of course,

6    to your point about the immediate suspensions,

7    that's pretty severe.  I didn't spend time

8    looking back.  We immediately jumped in to try

9    to figure out what it is we needed to do and

10   push forward.

11          I didn't spend a lot of time going

12   back.  I didn't look at a lot of the process.  I

13   didn't spend time on them.  We pushed forward so

14   that we could get the DEA's support and -- as

15   quickly as we could get our suspensions lifted,

16   get our DCs back online.

17          Q.    So you've already testified that

18   you believe the systems that were in place prior

19   to were adequate.

20          A.    I testified that --

21          Q.    Hold on.  Let me finish, please.

22          A.    -- we understand that our systems

23   and processes worked at the time.

24          Q.    Mr. Hartman, you have to let me

Highly Confidential - Subject to Further Confidentiality Review

```
 1    finish my question before you start answering.

 2    Okay?

 3            A.    I understand.

 4            Q.    And I will let you finish your

 5    answer before I start asking my next question.

 6            A.    Very good.

 7                  MR. PYSER:  For the record,

 8            Counselor, the question seemed complete.

 9                  MR. FULLER:  No, it wasn't

10            complete.  I assure you I was still

11            going.

12                  MR. PYSER:  Well, when you pause

13            after a full sentence, it's

14            understandable that the witness

15            thought --

16                  MR. FULLER:  I did not --

17                  MR. PYSER:  -- you made a complete

18            question.  Please don't criticize him

19            for trying to answer your question.

20                  MR. FULLER:  No.  I'm not

21            criticizing him at all.  I just said not

22            how the depo is to proceed.

23                  THE WITNESS:  I'm ready to listen.

24
```

```
 1   BY MR. FULLER:

 2          Q.    Thank you, Mr. Hartman.

 3                You've already testified that you

 4   believe that the systems in place were

 5   sufficient.  I want to know, if you didn't look

 6   back, what is the basis for saying that the

 7   systems were sufficient?

 8          A.    I said that we, my colleagues at

 9   Cardinal that I joined in the department,

10   believed that our processes and system worked.

11          Q.    All right.  So those people who

12   operated the system that caused the severe

13   suspension of three licenses believed they were

14   doing the right thing, right?

15          A.    I think that's correct.

16          Q.    Okay.

17                MR. FULLER:  Let's go to 4391.

18                        - - -

19        (Cardinal-Hartman Exhibit 2 marked.)

20                        - - -

21   BY MR. FULLER:

22          Q.    This will be Plaintiff's Exhibit

23   Number 2.

24                So, Mr. Hartman, if you'll look at
```

 1    the second e-mail in the chain there from

 2    Mr. Dolch, it includes you; is that correct, on

 3    January 21, 2008?

 4          A.    It includes me.  I can see that.

 5          Q.    Do you recall getting this e-mail?

 6          A.    I don't recall this.  I have to

 7    read it, so give me a minute.

 8          Q.    Have you seen this e-mail before,

 9    Mr. Hartman?

10          A.    Yes.

11          Q.    I mean, certainly you have.  It

12    was sent to you, right?

13          A.    Yeah.  I recall -- I recall

14    getting -- seeing this.

15          Q.    Now, since the time you got it --

16    let me ask.  You prepared for this deposition;

17    is that correct?

18               MR. PYSER:  I caution you not to

19          reveal the content of any communications

20          with counsel.

21          Q.    Yeah.  Don't tell me anything that

22    your lawyers told you.

23          A.    Yes.

24          Q.    Okay.  And how much time did you

```
 1    spend preparing for this depo, either the first

 2    time it was set or this time, combined?

 3            A.     Probably 20 hours, I'd say.

 4            Q.     Okay.  And counsel sitting next to

 5    you, Mr. Pyser, represents you in this matter;

 6    is that right?

 7            A.     Yes.

 8            Q.     At what point did you decide to go

 9    out and hire a lawyer?

10            A.     I didn't hire a lawyer.

11            Q.     So Mr. Pyser doesn't represent you

12    at this time?

13            A.     Sorry.  I didn't understand your

14    question.

15            Q.     So I want to know when you

16    decided, "Hey, I need a lawyer.  I'm going to

17    call someone and hire a lawyer."

18                   When did you make that

19    determination?

20                   MR. PYSER:  Just going to caution

21            you again not to reveal the content of

22            any communications we've had.

23            A.     I'm going to say September time

24    frame.  I don't remember the exact date.
```

```
 1              Q.    So what caused you to decide you

 2    needed a lawyer?  Because I didn't serve you

 3    with a subpoena.

 4              A.    I was notified that I was a

 5    potential deposition candidate.

 6              Q.    And who were you notified by?

 7              A.    Initially a lawyer from

 8    BakerHostetler.

 9              Q.    Do you know who that lawyer was?

10              A.    I don't remember her name, because

11    I didn't talk to her again.  Just once.

12              Q.    Okay.  And what did you guys

13    discuss?

14                    MR. PYSER:  Object to form.

15              Excuse me.  Objection.

16                    Don't answer that question on the

17              grounds of privilege.

18    BY MR. FULLER:

19              Q.    Did you hire that lawyer?

20              A.    No.

21              Q.    So she wasn't your attorney,

22    right?

23                    MR. PYSER:  Objection.  It's

24              privileged.  There's a common interest
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              between Cardinal Health and Mr. Hartman.

 2              The communications he had with the

 3              lawyer from BakerHostetler who called,

 4              who I believe is actually a Cardinal

 5              Health employee in their legal

 6              department, are privileged and are not

 7              the subject of this deposition.

 8                   MR. FULLER:  I'll certify the

 9              issue, and we'll take it up with the

10              Judge.

11      BY MR. FULLER:

12              Q.   All right.  So when after that

13      point did you decide to hire

14      Williams & Connolly, or did they call you, too?

15              A.   I -- we -- I think it was shared

16      e-mail, phone numbers, and I don't recall if I

17      called first or Steve called me first sometime

18      in September, I'm going to say.  Again, I don't

19      remember the dates.  But I'm going to say

20      sometime in September is probably around that

21      phone call.

22              Q.   So did you already have

23      Mr. Pyser's number or e-mail address, or did he

24      e-mail you first?
```

```
 1              A.    I believe it was provided from the

 2     first contact that I had.

 3              Q.    The young lady with

 4     BakerHostetler?

 5              A.    Whoever called me first is how

 6     that contact occurred.

 7              Q.    Fair enough.  Fair enough.

 8                    And -- strike that.

 9                    All right.  So let's turn to

10     the -- let me back up.  I apologize.  I'm

11     jumping a bit too fast.

12                    The original e-mail, what's the

13     subject line?

14              A.    It is "GLT Communication."

15              Q.    "Subject" line, not the "to" line.

16              A.    Oh, excuse me.

17              Q.    That's all right.

18              A.    "In the penalty box."

19              Q.    In the penalty box.  Who is this

20     e-mail from?

21              A.    Kerry Clark.

22              Q.    Who is Mr. Clark; do you know?

23              A.    CEO.

24              Q.    CEO of what?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Cardinal Health.

 2            Q.    All of Cardinal or one of these

 3    divisions?

 4            A.    Would be all of Cardinal.

 5            Q.    So he's the top dog?

 6            A.    He's the CEO.

 7            Q.    The president, the top boss?

 8            A.    He's the CEO.

 9            Q.    Is that a top boss?

10                  MR. PYSER:  Object to form.  Asked

11            and answered.

12                  MR. FULLER:  Well, no.  I asked if

13            he's the top boss.  He said he's the

14            CEO.  I don't know if they're one and

15            the same.

16    BY MR. FULLER:

17            Q.    Is he the top boss?

18                  MR. PYSER:  Object to form.

19            A.    He is the CEO.

20            Q.    What does that mean?

21            A.    He runs the company.

22            Q.    So he is the top boss?  He had the

23    ability to hire and fire you?

24            A.    Oh, yes.
```

```
 1          Q.    Mr. Dolch?

 2          A.    Yes.

 3          Q.    Mr. Henderson?

 4          A.    Yes.

 5          Q.    Just about anybody he wanted to

 6    that was employed with Cardinal?

 7          A.    Well, that's probably true.

 8          Q.    Fair enough.

 9                And let's go to the second page of

10    his e-mail.

11                Do you see there he says,

12    "Obviously, the biggest are the SEC issue, two

13    consecutive Alaris" -- did I just pronounce that

14    right?

15          A.    I think so.

16          Q.    -- "Alaris recalls" and "a number

17    of MPT recalls."

18                What are "MPT"?

19          A.    No clue.

20          Q.    Fair enough.

21                "And the DEA controlled substance

22    license suspensions in three locations."

23                If you'll read from there for me.

24          A.    "Beyond these, Gary Dolch's
```

1    quarterly QRA report lists a startling number of

2    issues, including six OSHA violations and a

3    significant fine at a Syracuse, New York

4    facility."

5         Q.    Do you know what all the issues

6    were in Mr. Dolch's QRA report?

7         A.    I don't.

8         Q.    Did you ever see the report?

9         A.    I don't remember it.

10         Q.    Now, I'm assuming if he's doing a

11    quarterly report, and this is January, it

12    probably would have been for the last quarter of

13    2007; is that fair?

14         A.    More than likely, yeah, I would

15    agree with that.  I think so.

16         Q.    Do you know if you were ever

17    provided with that report?

18         A.    I don't recall seeing it.  I might

19    have.  I mean, I was in Gary's -- obviously

20    reporting to Gary, but we were pretty focused on

21    anti-diversion, so I wasn't spending a lot of

22    time in meetings other than what we had going on

23    there.

24         Q.    Well, and the QRA report would

Highly Confidential - Subject to Further Confidentiality Review

```
 1   cover anti-diversion, correct?

 2        A.    I would -- I would assume so.  He

 3   comments on it here.

 4        Q.    Okay.  And then read the next

 5   sentence.

 6        A.    "Shocking, isn't it?"

 7        Q.    No.  "If you added up ..."

 8        A.    Oh.  "If you added up the -- if

 9   you add up our fines, settlements, and lost

10   business over the last 18 months, the total

11   would come to close to 1 billion."

12        Q.    And clearly Mr. Clark is --

13   clearly Mr. Clark is not happy with this, is he?

14        A.    Oh, yeah.  I agree with that.

15   He's -- it's his company.  He wants ideal

16   performance.

17        Q.    A billion dollars to lose is a lot

18   of money, isn't it?

19        A.    A billion dollars is definitely a

20   big sum.

21        Q.    No question about that, right?

22        A.    It's a big sum.

23        Q.    Now, let's go down to the next

24   paragraph.  Excuse me.  Two.  Can you start
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   where it says "As we begin" and read that aloud

 2   for the jury, please.

 3           A.    Yes.   "As we begin -- as we begin

 4   to look at the Voice of the Employee results,

 5   which are being compiled and analyzed as we

 6   speak, it's clear we have vertical communication

 7   issues and our employees do not fully trust

 8   their leaders."

 9           Q.    Now, let me ask -- stop there.

10   Voice of the Employee, that was a survey that

11   was sent out to all the employees at Cardinal;

12   is that right?

13           A.    That's correct.

14           Q.    And you got that when you were on

15   the operational side as well; isn't that true?

16           A.    Yes.

17           Q.    And Mr. Clark here is telling

18   everybody that our employees do not fully trust

19   our leaders?

20           A.    That's what he says.

21                 MR. PYSER:  Object to form.

22           Q.    That's a problem, isn't it?

23                 You're former military, correct?

24           A.    Yeah.  That's always -- that's
```

```
 1    always an issue.

 2           Q.    I mean, it's not just an issue.

 3    It's a problem.  That's something you do not

 4    want if you're operating a company to the best

 5    of its ability, correct?

 6           A.    Well, as -- you know, as I recall,

 7    you know, during this time period, there was

 8    lots going on besides what he writes here.  We

 9    were in a -- we were in severe economic

10    downturn.  All companies were suffering at that

11    point.  And if I recall, which I have nothing to

12    base it on other than other companies I worked

13    at -- at a time period like that, trust of

14    leaders is always on the low end.

15           Q.    And clearly Cardinal was no

16    exception.  Cardinal's employees did not trust

17    its leadership at this time --

18           A.    I think his words are --

19           Q.    -- according to Mr. Clark?

20           A.    -- "do not fully trust."  So

21    there's differences there between "do not trust"

22    and "do not fully trust."

23           Q.    So then partially trust.

24           A.    So then if you're taking them
```

```
 1   and -- if you're taking the whole group, having

 2   worked there, and my memory from when I was

 3   there, and my own performance, I think I was

 4   pretty highly trusted at all times.

 5           Q.    Even when you were in QRA?

 6           A.    Even when I was in QRA.

 7           Q.    Fair enough.

 8                 Read the next sentence aloud for

 9   us.

10           A.    "Perhaps our results-oriented

11   culture is leading to ill-advised or

12   short-sighted decisions."

13           Q.    This is coming to the captain of

14   the ship, isn't it?  Mr. Clark is the --

15           A.    The CEO.

16           Q.    -- the CEO, the top dog.  There's

17   no one above him other than the board of

18   directors, right?

19           A.    Yes, that's correct.

20           Q.    And he's saying this

21   results-oriented -- read that again.

22                 What does it say?

23           A.    "Our results-oriented culture is

24   leading to ill-advised or short-sighted
```

```
 1   decisions."

 2           Q.   And he's referring back to --

 3                MR. PYSER:  Object to form.

 4           Incomplete part of the sentence.

 5           Q.   And he's referring back to the

 6   issues that we just talked about, costing the

 7   company a billion dollars, isn't he?

 8           A.   Well, he wrote it.  I assume so.

 9   You have to ask him if he's referring to

10   anything else.

11           Q.   I will be happy to do that.

12                Read the next sentence for us.

13           A.   "We need to work this out, and

14   action planning around the Voice of the Employee

15   results will be an important part of our March

16   GLT meeting."

17           Q.   And help us out.  What's "GLT"?

18   That's an acronym I can't help you with.  Sorry.

19           A.   Global leadership team.

20           Q.   Global leadership team?

21           A.   Yes.

22           Q.   Do you know who was on the global

23   leadership team?

24           A.   Don't ask me to name them.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    can't remember the numbers.  I'm going to -- I

2    would -- I would be guessing, but, you know,

3    the -- 50 of the senior people, 60, 100, I don't

4    know who he had on the global leadership team,

5    but that was -- that was a senior team of

6    managers.

7            Q.   So the e-mail's originally

8    forwarded by Mike Kaufmann.

9            Do you see that there?

10           A.   In the e-mail string you're

11   seeing -- saying?

12           Q.   Yes, sir.

13           Mr. Clark sends it to

14   GLT Communication, right?

15           A.   Give me a moment.

16           Q.   Sure.

17           A.   Okay.  I've read that, Mike's

18   e-mail.

19           Q.   So Mr. Clark sends this e-mail to

20   his GLT Communication group, right?

21           A.   Yes.

22           Q.   And then from there, Mr. Kaufmann

23   forwards it to Mr. Dolch; is that correct?

24           A.   Yes.
```

```
 1            Q.    And who is Mike Kaufmann?

 2            A.    At this time, Mike is the

 3     leader -- I want to say title was president.  It

 4     might have been CEO of the medical side of the

 5     business.

 6            Q.    And that's since changed, correct?

 7            A.    Yes, that changed.

 8            Q.    He's currently the CEO?

 9            A.    He is, yes.

10            Q.    Over the entire company?

11            A.    He -- yes.

12            Q.    He replaced Mr. Barrett?

13            A.    Who replaced --

14            Q.    Mr. Clark.

15            A.    -- Kerry Clark.

16            Q.    So going back to that second

17     page -- let's finish this out.

18                  In the last paragraph there, do

19     you see halfway down through the last paragraph,

20     it says, "The final DEA resolution may have

21     comparable outcome."

22            A.    I see that.

23            Q.    Read the next sentence for us.

24            A.    "While the Legal and QRA functions
```

1   are responsible for helping us run our

2   businesses, the general managers are ultimately

3   responsible for the results."

4          Q.    Continue on for the next sentence.

5          A.    "General managers are accountable

6   for ensuring their units operate according to

7   quality, legal/regulatory standards.  So general

8   managers need to proactively search for

9   potential quality, legal/regulatory issues.  And

10  when they find them, they need to make them --

11  make the hard, right calls; not easy, wrong

12  calls."

13         Q.    And was that something that you

14  recognized was going on at Cardinal; they were

15  making the easy wrong calls?

16              MR. PYSER:  Object to form.

17         Vague.

18         A.    In my time period at Cardinal and

19  the places that I worked, I would not agree with

20  that.

21         Q.    Fair enough.

22              So here, according to Mr. Clark,

23  the general managers are responsible for the

24  operations, including legal and regulatory

```
 1   compliance; is that right?

 2         A.    I'm sorry.  I was lost in reading

 3   this again.

 4         Q.    Sure.

 5         A.    I'll listen.  Go ahead.

 6         Q.    The general managers are the ones

 7   ultimately responsible, according to Mr. Clark,

 8   for regulatory compliance?

 9         A.    Yes.

10         Q.    You're coming into a role where

11   you're going to be over the regulatory

12   compliance department; is that correct?

13         A.    Yes.

14         Q.    Regulatory compliance affects a

15   lot of the issues Mr. Clark is talking about in

16   this e-mail; isn't that right?

17         A.    Yes.

18         Q.    And he's talking repeatedly about

19   a result-oriented culture leading to wrong

20   decisions; isn't that true?

21               MR. PYSER:  Object to form.

22         Misstates evidence.

23         A.    I think as a leader, he's talking

24   about -- when you have issues and problems at a
```

```
 1    company, you call those out, you use words

 2    around results orientation, certainly.  I agree

 3    with that.  And to get better execution.

 4          Q.    All right.  Let's go back to

 5    Mr. Clark's words.  "Perhaps our result-oriented

 6    culture is leading to ill-advised or

 7    short-sighted decisions."

 8                He's not mincing words there, is

 9    he?

10          A.    I don't know.  You'll have to ask

11    him.  I don't --

12          Q.    Well, that's what it says, right?

13          A.    Oh, sure.  You read that all the

14    time in corporations.

15          Q.    How many times --

16          A.    We talk about those things all the

17    time.  It's a -- it's a constant and considered

18    phrase to use whether it's in a big event or

19    some small event.

20          Q.    Okay.

21          A.    So seeing this the first time in a

22    lot of years, I understand what you're asking,

23    and I would say, yes, Kerry is definitely

24    calling out these issues and making the
```

1   statements that we need to get better.

2        Q.   You say the statement's used all

3   the time, Mr. Hartman.  How many other times did

4   you here it at Cardinal Health?

5        A.   Oh, frequently we would talk about

6   it at meetings.  You know, we're never happy

7   with our results.

8        Q.   So you'd frequently talk about

9   that our result-oriented culture is leading to

10  ill-advised decisions?

11            MR. PYSER:  Object to form.

12       A.   That is not correct.

13            MR. PYSER:  Object to form.

14       Misstates prior testimony.

15       Q.   You just told the jury that you

16  hear that phrase all the time.

17       A.   We talk about it, because as a

18  corporation -- I'm sorry.  Go ahead.

19            MR. PYSER:  Object to form.

20            Go ahead.  You can answer the

21       question.

22       A.   What I'm commenting on is that in

23  a corporation, in a public company, your role is

24  always to improve performance.  You're trying to

```
 1    provide the investment that our shareholders

 2    have on us, that our employees have on us, and

 3    you're constantly trying to improve.

 4                 So having been in roles like this

 5    for much of my career, the conversations in any

 6    meetings, no matter how good you are doing, no

 7    matter how many great reports you got, you

 8    always talk about better results, better

 9    execution, better performance from the company

10    for our customers.

11          Q.    And your testimony to the jury is

12    that we heard this verbiage, "result-oriented

13    culture is leading to ill-advised or

14    short-sighted decisions" regularly at Cardinal,

15    isn't it?

16                 MR. PYSER:  Object to form.

17          A.    That is not -- that is not what my

18    testimony is.  My testimony was results

19    orientation is -- the comment of ill-advised is

20    a comment from Kerry Clark.  You'll have to ask

21    him.  I read the -- I probably read the e-mail

22    at the time and continued to do my job.

23          Q.    Your new job?

24          A.    Correct.
```

```
1              Q.    Which was fixing the regulatory

2    department because it just had three

3    distribution centers' licenses suspended and got

4    fined $13.5 million, right?

5                    MR. PYSER:  Object to form.

6              A.    I'm unaware of the 13.5 you're

7    referring to.

8              Q.    So you don't know about the

9    company also paying a fine on top of losing

10   their license?

11                   MR. PYSER:  Object to form.

12             Q.    Did anybody ever show you, when

13   you came into this position to fix this

14   department, the deal that Cardinal worked with

15   the Department of Justice and the immediate

16   suspension orders that were issued?

17             A.    I might have.  I don't recall

18   that.

19             Q.    You don't ever recall reviewing

20   that?

21             A.    The $13.5 million settlement --

22   but to answer your question --

23             Q.    Well, hold on.

24             A.    -- when I came into the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    department, as I began to understand where we

 2    were -- and, yes, I was brand new into it, and I

 3    am a leader of the organization that's well

 4    trusted.  What I came to understand is that we

 5    felt we were doing the right things, according

 6    to anti-diversion.

 7                  And my role, when I came in, was

 8    to look at what now had happened with the

 9    immediate suspensions because the DEA had

10    changed course on us.

11          Q.    Changed course when, Mr. Hartman?

12          A.    I -- you know, I -- the e-mails

13    that I've seen is at some point in 2007, it

14    seems there was some e-mails that came about how

15    suspicious order monitoring was supposed to take

16    place, and that is what I came in to do, is to

17    then understand that, to expand our department,

18    to improve our processes from where we were, and

19    to get our licenses back.

20          Q.    We'll get to expanding the

21    department in just a moment.  You're saying in

22    2007, this -- there was some sort of change.

23    Did you look at anybody else's deposition in

24    this matter?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    No.

 2              Q.    Do you know -- so do you know who

 3    Ms. Norris is, Jennifer Norris?

 4              A.    Yes.  Yeah, I know Jennifer.

 5              Q.    She's a lawyer, right?

 6              A.    Yes.

 7              Q.    With Cardinal Health?

 8              A.    Yes, that's correct.

 9              Q.    Do you know how she testified as

10    to what the statutory obligation was?  She was

11    put up as a 30(b) --

12              A.    I think you're going to tell me.

13              Q.    Hold on.

14                    She was put up as a 30(b)

15    designee, meaning to speak on behalf of the

16    company, and do you know what Cardinal said what

17    their statutory -- or their regulatory

18    obligation was?

19                    MR. PYSER:  Hold on before you

20              answer.  Do not reveal any of the

21              content of communications between you

22              and counsel.  If you know otherwise, you

23              can answer the question.

24              A.    I'm sorry.  The question -- I --
```

Highly Confidential - Subject to Further Confidentiality Review

1    you asked me if I know what she said.

2              Q.    I want to know if you know what

3    Cardinal's position was, what the regulatory

4    requirements were, as it related to them.

5              A.    I don't know what they testified

6    to.

7              Q.    They never shared that with you?

8              A.    No.

9              Q.    Even back then in 2007 when you

10   took on this position in regulatory?

11             A.    Oh, I don't know.  They might

12   have.  It's ten years ago.  I don't recall what

13   those conversations were.  My mind was single

14   focused on, we have immediate suspensions.  We

15   have three DCs offline.  What do we need to do

16   to work with the DEA to get our processes and

17   systems to where it's agreeable to them to get

18   our -- to get our licenses lifted so we could

19   get our DCs back online and service our

20   customers.  And that's what my -- that's what my

21   focus was.

22             Q.    And certainly you then took on the

23   duty to look at those three DCs -- when we say

24   "DCs," for the jury's benefit we're talking

```
 1   about distribution centers, right?

 2          A.    Correct.

 3          Q.    You took the opportunity to look

 4   what was going on at those three DCs to

 5   determine what needed to be fixed, right?  How

 6   are you going to fix a problem if you don't know

 7   what the problem is, Mr. Hartman?

 8                MR. PYSER:  Object to form.

 9          A.    To your point, I'm certain we

10   looked hard at that.  What we spent our time on

11   was what was the DEA demanding of us to meet

12   their criteria today at that time, for -- at

13   that time -- anti-diversion, and that's what we

14   spent all of our time to bring those processes

15   and systems up.

16          Q.    But Mr. Hartman, what I want to

17   know --

18          A.    Yes.

19          Q.    I think what the jury would want

20   to know, is when Mr. Hartman come into this new

21   role, did Mr. Hartman take the time, not we, not

22   this royal "we."  Did Mr. Hartman take the time

23   to look at what the issues were going on at

24   those three distribution centers that had just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   received a humongous fine and had their license

 2   stripped from them?

 3           A.   I'm sure I --

 4                MR. PYSER:  Object to form.

 5           A.   I don't recall the time I spent on

 6   that, on each DC.  I'm sure I did.  It was

 7   necessary to know who the players were, what

 8   impact it was to us, what operational concerns

 9   we had to adjust in order to deliver and service

10   customers in that area from other distribution

11   centers.  And that's what we did.

12                And when we say "we," yeah, I'm

13   the leader, and my role is to understand what's

14   the strategy to go forward for us to get these

15   license suspensions lifted appropriately by the

16   DEA and we meet the conditions that they -- that

17   they have.  So that -- that's what I did.

18                And so the "we," to me, is always

19   going to be there for you, sir.  It's the -- you

20   know, I had subject matter experts that I relied

21   on to work with me on this.

22           Q.   Who is your supply chain integrity

23   subject matter expert?

24           A.   Well, it would be -- the two
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    leaders were Michael Moné and Steve Reardon.

 2           Q.    So they were the subject matter

 3    experts in this area; is that your testimony?

 4           A.    Yes.

 5           Q.    Okay.

 6           A.    As the leaders of those groups.

 7           Q.    Well, you were the ultimate leader

 8    of the group, right?

 9           A.    As I came into role, yes.

10           Q.    Okay.  All right.  Let's go to

11    P14230.

12                       - - -

13         (Cardinal-Hartman Exhibit 3 marked.)

14                       - - -

15    BY MR. FULLER:

16           Q.    Let's take a look, Mr. Hartman,

17    and see what actually was going on at those

18    three distribution centers.  And you have no

19    recollection specifically of what was

20    transpiring at those distribution centers at the

21    time you came in; is that right?

22           A.    I didn't say no recollection.  You

23    asked me how much time I had spent on them, I

24    thought.
```

1    Q.    No, sir.  I asked if you had dug

2    down and looked at what was going on.

3    A.    Certainly I looked at what was

4    going on, but ...

5    Q.    Then tell the jury what was going

6    on at the three distribution centers that got

7    their licenses suspended.

8    A.    Again, this was after -- this was

9    before my time of stepping into role, and I did

10   not have input or any involvement in the

11   regulatory affairs as I believe this happens.

12   So with what you put in front of me, this -- is

13   this the immediate suspension orders?  What are

14   we looking at?

15   Q.    Sir, this is the -- not only the

16   immediate suspension orders, but also the

17   settlement and release agreement that was

18   entered by your company, Cardinal, during the

19   time you were filling this role, during the time

20   that you were over the regulatory division.

21   MR. PYSER:  Object to form.

22   Q.    And these immediate suspension

23   orders that are attached, one is from November,

24   right before you got there.  Two are from

1   December.  Another one from January.  And you

2   were there in January, right?  You were in the

3   role?

4           A.    That -- that was Houston, yes.

5           Q.    And were you involved in the

6   decision by the Houston distribution center to

7   voluntarily give up its license and stop

8   shipping controlled substances?  Because by the

9   time -- you're there in the driver's seat,

10  right?

11          A.    Working on our anti-diversion

12  processes and practices.  So that decision, I

13  might have been in the room to listen in.  I

14  don't know that I was in any way -- that I -- I

15  certainly wasn't the one that made that decision

16  around Houston.

17          Q.    Were you involved in that decision

18  around Houston?

19          A.    I don't recall.

20          Q.    Okay.

21          A.    I mean, I recall certainly Houston

22  and the suspension.  I'm sure I was in a meeting

23  or two, but ...

24          Q.    And you know that ultimately they

Highly Confidential - Subject to Further Confidentiality Review

```
 1    voluntarily gave up --

 2           A.    I do know that.

 3           Q.    -- their license to deliver and

 4    distribute controlled substances based on the

 5    conduct that the government found going on

 6    there, right?

 7                 MR. PYSER:  Object to form.

 8           Misstates evidence.

 9           A.    Yes.

10           Q.    Okay.  So let's turn to page 16,

11    and I'll tell you, Mr. Hartman, there may be

12    page numbers on the bottom, but if you look at

13    the upper left-hand -- or excuse me -- upper

14    right-hand corner, as you will recollect, I

15    called out 4230?

16           A.    Yes.

17           Q.    So that's the number we go by.

18    And then it will be point whatever page number

19    it is.

20           A.    Okay.

21           Q.    So if you go to .16, that will be

22    page 16 that I'm referring to.  Okay?

23                 And all the documents will be

24    marked the same way, just for ease for -- you
```

```
 1    and I can communicate back and forth.  Okay?

 2           A.    Okay.

 3           Q.    All right.  This is going to be

 4    Plaintiff's Number 3, I believe, right?  Yeah.

 5                 So this is Auburn, Washington.

 6    That is one of the facilities that when you came

 7    in, was having its license suspended; is that

 8    correct?

 9           A.    Yes.

10           Q.    This is one of the facilities that

11    you were tasked with getting its license back?

12           A.    Yes.

13           Q.    Do you know when you obtained the

14    license back, when the DEA issues were resolved?

15           A.    My recollection is November of

16    2008, but I'm not sure if that's accurate.

17           Q.    This is an Order to Show Cause and

18    Immediate Suspension of Registration.

19                 Do you see that?

20           A.    Yes.

21           Q.    And it was issued when?

22           A.    November 28, 2007.

23           Q.    And by that time, you were already

24    in talks with Cardinal to come back into this
```

```
 1    position, correct?

 2            A.    I don't think so.  I think it was

 3    more December before I got a call from Cardinal

 4    that they wanted to talk to me about this role.

 5    I don't think it was in November.

 6            Q.    Now, we know that the date of your

 7    announcement was the 19th of December?

 8            A.    Correct.

 9            Q.    So it would have to have been

10    before then; is that fair?

11            A.    It was, yes.

12            Q.    Because I'm assuming they didn't

13    announce you took the job before they talked to

14    you about taking the job?

15            A.    It was pretty -- it's pretty close

16    to the 19th.  I don't recall the exact dates,

17    but it wasn't -- you know, it was in the

18    December time frame, and I think it was closer

19    to my actual announcement date.  Again, I don't

20    recall the exact dates.

21            Q.    If you go to, actually, page 17

22    now, paragraph B.

23                  Do you see that there?

24            A.    Yes.
```

```
 1            Q.    And a little over halfway through

 2     the paragraph, do you see "Specifically,

 3     Respondent distributed ..."?

 4            A.    Yes.

 5            Q.    Can you read that all the way to

 6     the end of that paragraph.

 7            A.    "Specifically, Respondent

 8     distributed in excess of 600,000 dosage units of

 9     hydrocodone to Horen's Drugstore from March 2007

10     through September 2007, including over 116,000

11     dosage units in July, over 129,000 dosage units

12     in August, and over 122,000 dosage units in

13     September."

14            Q.    That's excessive numbers, isn't

15     it?  Over 100,000 units to a single drugstore

16     per month?

17                  MR. PYSER:  Object to form.

18            A.    Yes, I think that's -- that's the

19     issue, as I see it, isn't it?  We're looking at

20     one raw set of data, and the issue here is that

21     we've got a system that's now been developed

22     with approval of drugs to DEA providing the

23     increase of ingredients for the quotas to go up

24     and up, and then us fulfilling prescriptions to
```

Highly Confidential - Subject to Further Confidentiality Review

1   licensed pharmacies with prescriptions from

2   licensed doctors.

3              So when you ask me that, as we

4   looked at this, there's lots of data that goes

5   into it, and I don't have the answers to it.  I

6   relied on my experts to help me understand it

7   better as we built systems out and put our

8   strategies in place.

9       Q.    And that's Mr. Moné and

10  Mr. Reardon?  Those are the experts you relied

11  on?

12      A.    In the anti-diversion space,

13  particularly in this question, would be

14  Michael Moné.

15      Q.    Okay.  And you talk about licensed

16  doctors and pharmacies just filling

17  prescriptions.  You're aware that your company

18  was filling a ton of Internet pharmacies that

19  didn't have legitimate doctor prescriptions,

20  correct?

21              MR. PYSER:  Object to form.

22          Misstates testimony and misstates

23          evidence.

24      A.    Yes.  There were some Internet

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacies that we had to deal with.

2          Q.    And the problem was, they weren't

3    legitimate doctor prescriptions, correct?

4                MR. PYSER:  Object to form.

5          A.    I don't know that.

6          Q.    And you also know that the DEA

7    came to Cardinal and met with Cardinal in 2005

8    and explained the issue and the concern with the

9    Internet pharmacies?

10         A.    No knowledge of that.

11         Q.    No one ever shared that with you?

12         A.    Not that I recall.

13         Q.    How about the meetings that

14   Cardinal had with the DEA and the presentations

15   that were given to Cardinal in 2006 related to

16   this issue?

17         A.    Again, prior to my time.  I wasn't

18   involved.

19         Q.    No one ever shared that with you?

20         A.    Not that I recall.

21         Q.    So when you came into this

22   position, no one ever shared all the information

23   the DEA had provided to Cardinal related to

24   anti-diversion; is that your testimony?

```
 1                    MR. PYSER:  Object to form.

 2           A.    My testimony is that I don't

 3     recall, and in meetings that I was at corporate

 4     headquarters in my transformation role, I was

 5     not directly involved in the day-to-day business

 6     of our operating units.

 7           Q.    I'm asking if you were involved in

 8     the day-to-day operation of anti-diversion.

 9     That was your new department, right?

10           A.    Yes.

11           Q.    And they didn't provide you any of

12     the information, that you can recall, the DEA

13     had provided to Cardinal for years related to

14     Internet pharmacies and their obligations, did

15     they?

16           A.    I don't recall what we -- we

17     probably -- we could have talked about it.  I

18     don't -- I just don't recall it.  It's ten years

19     ago.

20           Q.    This is not -- it's nothing that

21     sticks out in your mind, right?

22           A.    It's not where I spent my time.  I

23     didn't look back.  I spent my time looking

24     forward to solve our problem.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And the problem was Washington,

2     Auburn, at least one of the problems, correct?

3          A.     One of them, yes.

4          Q.     And we see right here that over

5     600,000 dosage units are going to -- how did you

6     pronounce it -- Horon's Drugstore?

7          A.     Horen's, I believe.

8          Q.     Do you know today if that was an

9     Internet pharmacy?

10         A.     I don't recall.

11         Q.     Is 600,000 dosage units for that

12    time frame reasonable, March through September?

13              MR. PYSER:  Object to form.

14         A.     Again, there's lots of factors

15    that have to be taken into place during my time

16    period that we looked at as we built our system

17    and determined what were problems and what were

18    issues.

19         Q.     And that's the problem, right?  Is

20    that the earlier system didn't bring this to

21    anyone's attention, because certainly you would

22    agree if this was -- had been brought to

23    someone's attention that Cardinal wouldn't have

24    stood for this?

```
 1                    MR. PYSER:  Object to form.  Pure

 2           speculation.  Incomplete hypothetical.

 3                    MR. FULLER:  Okay.  Counsel, just

 4           "object to form" is fine.  That's what

 5           the deposition protocol requires.  If

 6           you are speaking objections, the Court

 7           says that's completely inappropriate.

 8                    Thank you.

 9  BY MR. FULLER:

10           Q.    You can answer the question.

11           A.    Would you give it to me again?

12           Q.    Yes, sir.

13                    So we know that the DEA found,

14  from Cardinal's own documents, that they were

15  delivering over 600,000 dosage units of

16  hydrocodone to this one drugstore in Washington,

17  right, through March -- through September of

18  '07.

19                    MR. PYSER:  Object to form.

20           Q.    Certainly if that had been called

21  to Cardinal's attention, they would not have

22  allowed that to continue, correct?

23                    MR. PYSER:  Object to form.

24           A.    I think one of the points here is
```

1    that if I understood some of the prior system,

2    these were being reported to the DEA through the

3    reporting that they did, and the DEA had the

4    information.  In the new world with DEA as to

5    how they were coming at anti-diversion with the

6    distributors, we put in a process to look at any

7    of these types of volumes in consideration of

8    other criteria that we used under Michael's

9    team.

10           Q.    Okay.

11           A.    So to answer your question, I

12   would need more information about them.

13           Q.    And you say "about them."  Are you

14   talking about Horen's drugstore?

15           A.    That's the one you asked me about,

16   right?

17           Q.    Yes, sir.

18                 So you need more information to

19   justify whether 600,000 dosage units, over

20   100,000 for each month, is reasonable or not?

21   Is that what you're telling the jury?

22                 MR. PYSER:  Object to form.

23           A.    It's prior to my time.

24           Q.    No, no, no.  You said you needed

```
 1    more information.  You can't determine --

 2    again --

 3            A.    I'm saying that within our

 4    process, once I stepped into role, we put into

 5    practice our anti-diversion practices, which the

 6    DEA approved of.

 7            Q.    The DEA gave approval, a stamp of

 8    approval to your anti-diversion processes --

 9            A.    We --

10            Q.    -- is that what you're telling the

11    jury?

12            A.    In -- well, in my understanding of

13    what happened, we got our licenses, the

14    suspended licenses, back so that we could

15    operate those distribution centers.  They

16    investigated our system, and we continued to

17    operate that same system that we had shown them,

18    everything that we were doing since I came into

19    the role and the practices and procedures that

20    we put into place.

21            Q.    And that system ended up getting

22    them another suspension in 2013 down in Florida,

23    correct?

24                  MR. PYSER:  Object.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    My understanding.

 2              Q.    And I know that was after you

 3   left, right?

 4              A.    Correct.

 5              Q.    You don't know how that system

 6   that you put in place was being operated after

 7   you left, do you?

 8              A.    I don't.

 9              Q.    Okay.  Now, you said earlier DEA

10   changed its course in 2007, but then you also

11   just testified that you weren't necessarily

12   aware of the meetings the DEA had and the

13   information they provided to Cardinal?

14              A.    I was not aware of those meetings

15   in the earlier dates that you stated.

16              Q.    So what meetings were you aware

17   of?

18              A.    When I stepped into the role going

19   forward -- and if I was aware of it, I've

20   forgotten.  It's ten years later, and I suspect,

21   to your point, you know, somebody probably

22   talked to me about it.  We didn't -- I didn't

23   spend a whole lot of time looking back.  I spent

24   all of our time going forward to solve our
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    issue, to get our licenses back, and to serve

 2    our customers.

 3            Q.    But you looked at Washington,

 4    Florida, when they got the immediate suspension

 5    orders, right?

 6            A.    After I -- after I got into role,

 7    at some point, I'm sure I did.

 8            Q.    Well, let's turn to page 20.

 9            Does this appear to be another

10    immediate suspension order?

11            A.    It does.

12            Q.    And for which Cardinal

13    distribution center; can you tell?  Cardinal

14    Health of Lakeland, Florida?

15            A.    Yes.

16            Q.    And it was issued December 5,

17    2007; is that right?

18            A.    Yes.

19            Q.    Now, are you aware of the extreme

20    amount of pills being distributed in Florida

21    during this time frame related to the Internet

22    pharmacies?

23            MR. PYSER:  Object to form.

24            A.    Again, it was prior to me stepping
```

1    into role.

2           Q.    I got that.  You made that clear.

3                 But you're in there to fix this

4    problem, right?

5           A.    That's correct.

6           Q.    And so you got to look and see

7    what the problem is you're trying to fix, don't

8    you?

9           A.    Yes, we did.

10          Q.    Okay.  So do you know if today is

11   the first day you're seeing this immediate

12   suspension order or not?

13          A.    Oh, I'm sure it's not.  I'm

14   certain I looked at it.  Again, we didn't -- I

15   didn't spend a lot of time on it.

16          Q.    You say you're sure you're not,

17   but you don't have any independent recollection

18   of ever seeing this until I showed it to you

19   today, do you?

20          A.    I don't remember dates and times

21   in December as I came into role.  They probably

22   put this in front of me, and as I said, I didn't

23   spend time on this.  I spent time on trying to

24   understand, what do we need to do and how do we

Highly Confidential - Subject to Further Confidentiality Review

1    move forward.

2            Q.    Right.  Because the system that

3    was in place obviously was broke, and you got

4    sucked in to fix it, correct?

5            MR. PYSER:  Object to form.

6            Q.    That was your job, to fix their

7    system; isn't it?

8            A.    As I got into role --

9            Q.    Was your job to fix their system

10   or not?

11           MR. PYSER:  Counsel, let him

12           finish his answers after you ask the

13           question.

14           A.    My job was to take our system,

15   expand it and improve in light of these

16   suspensions and knowledge of what do we need to

17   do to get our licenses back.

18           Q.    Fair enough.

19               So explain to the jury what that

20   system was back in 2007.

21           A.    I wasn't aware of -- I did not

22   participate in regulatory affairs.

23           Q.    Sir, you just told the jury that

24   your job was to expand the system you had.  How

1    can you expand the system if you don't know what

2    it is?

3          A.    Because I had two team members on

4    board.  They had teams now.  Michael had another

5    team with anti-diversion, which was pretty new,

6    and Steve Reardon had the original --

7          Q.    That was just created, right?

8          MR. PYSER:  Counsel, let him

9          finish his answer before you ask another

10         question.

11         Q.    It was just created, wasn't it?

12         A.    I think Michael came into role

13   just prior to myself.

14         Q.    And you're the leader of this

15   division?

16         A.    Yes.

17         Q.    And your testimony to the jury is

18   that you didn't bother to look back at the prior

19   systems in place, correct?

20         MR. PYSER:  Objection.  Misstates

21         testimony.

22         Q.    You didn't look back.  You only

23   looked forward.  We're going to expand those

24   systems.  We're not going to look at them to see

Highly Confidential - Subject to Further Confidentiality Review

1    what they were.  At least I'm not, as

2    Mr. Hartman?

3                    MR. PYSER:  Object to form.

4           Misstates testimony.

5           A.    I didn't -- I think my comment

6    was, I didn't spend a lot of time looking back.

7    I literally jumped into role.  Steve Reardon had

8    the original anti-diversion practices, the

9    reporting that took place under him.

10   Michael Moné came in for us to build out and

11   respond to this criteria of the DEA now.

12                    So as I got into role, we spent

13   all of our time there while Steve Reardon

14   continued to operate our practices at that time.

15   So to tell you I'm some expert on it, I'm not.

16   I didn't -- I didn't try to be an expert on it.

17   I looked at, what do we need to do to go

18   forward.

19          Q.    Okay.

20          A.    In the course of all that, I'm

21   sure the folks talked to me.  We had meetings,

22   consultations around it, discussions, but our

23   focus was solely on, what are we going to do and

24   how do we immediately get after this?

```
1              Q.    So let's first look at -- well,

2    now let's move on from Washington to Florida.

3                    And if you look at Number 2 there

4    on the immediate suspension order.

5                    Do you see that?

6              A.    I see it.

7              Q.    Do you see where it says "From

8    August 2005 to October 2007 ..."

9                    Can you continue.

10             A.    "... Respondent distributed over

11   8,000,000 dosage units of combination

12   hydrocodone products to customers that it knew

13   or should have known were diverting hydrocodone

14   into the other -- into other than legitimate

15   medical, scientific, and industrial channels."

16             Q.    Did you do anything to determine

17   whether that was an accurate statement or not?

18                   Did you do anything to verify

19   whether the DEA was wrong?

20                   MR. PYSER:  Object to form.

21             A.    I spent no time on that.

22             Q.    You didn't worry about that?

23             A.    I worried about what we had been

24   suspended for and what we needed to do to have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the system in place that Cardinal would be able

 2    to serve our customers and we would be able to

 3    meet the requirements of DEA.

 4            Q.    So this is what you were suspended

 5    for --

 6            A.    I understand you.

 7            Q.    -- dumping 8 million dosage units

 8    to drugstores and pharmacies that Cardinal knew

 9    or should have known were being diverted?

10                 MR. PYSER:  Object to form.

11            Q.    Right?  That's what it says.

12            A.    That's the accusation.

13            Q.    Okay.  Let's go to page 30 of the

14    document.  I want to take a quick look at the

15    Texas distribution, the Texas -- Stafford,

16    Texas, show cause order.

17                 Did you get there, Mr. Hartman?

18            A.    Yes.

19            Q.    Okay.  And this is a show cause

20    order that we mentioned earlier for Texas, isn't

21    that right?  The Stafford distribution center?

22            A.    Yes.

23            Q.    And when was it issued?

24            A.    January 30, 2008.
```

```
 1              Q.    This is during your time frame

 2    heading up this division; you're in this role

 3    full time now, right?

 4              A.    I had been there six weeks.

 5              Q.    Exactly.  So let's go down --

 6    let's see.  Let's go down to page 31.  On

 7    paragraph 7, this is from January of 2007

 8    through September 11, 2007.  "Registrant

 9    distributed approximately 1.385" -- well, excuse

10    me.  "1,381,500 dosage units of hydrocodone to

11    Richmond Pharmacy, or approximately 160 [sic]

12    dosage units each month."

13              Does that cause you any concern,

14    that a distribution center under your watch was

15    making those type of distributions to a single

16    pharmacy?

17              MR. PYSER:  Object to form.

18              A.    What I spent my time on was not

19    trying to refute or change or fight with the DEA

20    about these accusations.

21              Q.    Yes, sir.

22              A.    I spent all of my time on, what do

23    we need to do to improve our system and

24    practices and training and anything else we
```

1    needed to do in order to get our licenses back,

2    serve our customers, and do what the DEA said we

3    needed to do.

4           Q.    And you made that abundantly

5    clear.  But my question is, does this type of

6    distribution pattern cause you any concern as

7    the head of the regulatory department?

8           A.    I didn't spend time looking at it.

9    I had a team that was now investigating.  With

10   our new practices, we were getting ready to

11   put -- as we got them in place, and we -- it

12   took some time.  It wasn't that we had it day

13   one.  To look at these kind of issues and what

14   were the practices, what are the issues, what

15   are -- what is being said here, what is our

16   performance around this.

17                I didn't spend time on trying to

18   figure out what's right or what went wrong.  I

19   spent my time on the process and the -- and the

20   system, using my subject matter experts to look

21   at these issues.

22          Q.    Again, my question, you're in this

23   role for approximately three years, right?  End

24   of 2007 to 2010?

```
 1              A.    Yeah, yeah.

 2              Q.    You were the head of

 3      anti-diversion and supply chain integrity,

 4      correct?

 5              A.    Yes.

 6              Q.    I want to know as the leader of

 7      that group, does this type of distribution cause

 8      you any concern?  I'm asking whether dumping

 9      1.3 million dosage units in a short period of

10      time into one pharmacy is problematic?

11              A.    I see.  I take exception to your

12      word "dumping."  We are --

13              Q.    Shipping, we'll call it.

14              A.    We are a distributor responding to

15      legitimate orders at a pharmacy who is serving

16      prescriptions written by licensed DEA doctors.

17      So when you say "dumping," I don't agree with

18      that.

19                    Does it cause me concern?  Once we

20      built our system, as I got there, in my time

21      period, and we looked at facilities, these kind

22      of issues could be problematic, or they might

23      not be given the data that we used.

24                    MR. PYSER:  Register an objection
```

Highly Confidential - Subject to Further Confidentiality Review

 1              to form on there.

 2                   Just give me a chance to interject

 3              objections before you answer.

 4         Q.    So, again, my question is, does

 5    this type of distribution cause you concern or

 6    not?  Either it does or it doesn't.

 7                   MR. PYSER:  Object to form.  Asked

 8              and answered.

 9         Q.    That's a yes-or-no question.

10         A.    It's not a yes-or-no answer.

11         Q.    Clearly -- and I'm thinking that

12    the answer may be written on the wall behind me

13    because you keep giving the same one.

14                   MR. PYSER:  Object to form.

15              Argumentative.

16         Q.    So let's go on.

17                   Let's roll down this paragraph.

18    It says, "Registrant distributed 66,000 dosage

19    units of hydrocodone to Richmond on September 4,

20    2007."

21                   Do you see that there?

22         A.    Yes.

23         Q.    Continue from there for me,

24    please.

```
 1              A.     "6,000 dosage units on

 2   September 5, 2007; 12,000 dosage units on

 3   September 6, 2007; 18,000 dosage units on

 4   September 7, 2007; 48,000 dosage units on

 5   September 10, 2007."

 6              Q.     That's good enough.

 7                     Does that not cause you any

 8   concern, tens of thousand dosage units day after

 9   day?

10              A.     We have to -- we have to look at

11   the pharmacies, their practices, where they're

12   located.

13              Q.     Absolutely.  And do you think

14   there's any legitimate medical need for tens of

15   thousands of pills day after day to be dumped

16   into Texas?

17              A.     I wasn't --

18                     MR. PYSER:  Counsel, again, let

19              the witness finish his answer.  I don't

20              think he was done before you interjected

21              with another question.

22              Q.     Again, do you think that there's

23   any medical legitimate need to dump tens of

24   thousands of pills on the 4th, 5th, 6th, and 7th
```

```
 1   and 10th of September?  I mean a period of five

 2   days.

 3           A.    Again, "dump" is not a word that I

 4   would use.

 5           Q.    Distribute.

 6           A.    Distributing to licensed

 7   pharmacies where they're serving licensed

 8   doctors, writing prescriptions, is what we

 9   responded to.  And as I -- and, again, as I came

10   into role, I didn't spend my time trying to

11   figure out each of these particular instances.

12   I spent my entire time on the strategy and how

13   we respond to DEA and solve our issues there and

14   improve our system with DEA.

15           Q.    So once you put your system in

16   place, if this type of distribution happened,

17   that would be okay with Mr. Hartman?

18                 MR. PYSER:  Object to form.

19           Q.    Right?

20                 MR. PYSER:  Object to form.  Calls

21           for speculation.

22           A.    What would have been okay is if

23   our system said that those -- that the

24   distribution of those products served the
```

1    purpose without being called as an order of

2    interest, then, yes, I would have been okay.

3         Q.    And for that, we would need to see

4    a due diligence file to substantiate the medical

5    need for this type of dosage, correct?

6              MR. PYSER:  Object to form.

7         A.    We would have had our processes

8    working to look at every order that comes in and

9    determining where it fits within our processes

10   and practices and then making a call on that

11   order and that pharmacy.

12        Q.    So these processes that you're

13   talking about, you don't know what they are back

14   in 2007, right?  It was before your time?

15        A.    Vaguely -- I'm vaguely familiar

16   because, obviously, I -- you know, we've talked

17   about it.  I recall certainly at the time we

18   must -- we talked about them.  Steve Reardon was

19   still operating them, but I was not intimately

20   involved with them.  I'm not an expert on them.

21        Q.    When did you become intimately

22   involved with them?  Ever?

23        A.    Not the prior ones.

24        Q.    What about the new ones?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     The new ones, I would say I was

2     involved with.  I think I knew them well.  I

3     never tried to be the subject matter expert.  I

4     relied on my team of people that we put in place

5     for the DEA conditions that had been placed on

6     us in order to meet those needs and to be within

7     their purview operating the way they felt we

8     should.  And we did that.

9          Q.     And when you came in to Cardinal

10    after being there over a decade, you knew that

11    the regulatory department was understaffed and

12    underfunded, didn't you?

13              MR. PYSER:  Object to form.

14         A.     I don't recall how I felt about

15    it.  You know, we operated with them in our --

16    in our space, they gave us good advice and

17    counsel, and it was a department that I would --

18    I've certainly worked with from time to time,

19    but I don't recall any specific instances of

20    what we were doing there -- I -- and any issues

21    that we had.

22         Q.     Well, when you came into the

23    division, is it not true that you created a

24    supply chain integrity department that

Highly Confidential - Subject to Further Confidentiality Review

1   Michael Moné headed up and had to push to get

2   additional staff for him?

3           A.    Oh, sure.  Yes.

4           Q.    You actually over-doubled the

5   staff working on regulatory issues, didn't you?

6           A.    Oh, we -- in response to the DEA

7   conditions, which were now placed upon us and

8   then they put the immediate suspension orders

9   and closed our DCs or suspended the licenses,

10  yes, absolutely.  Sure I did.

11          Q.    The DEA conditions that were put

12  upon us, what DEA conditions are you referring

13  to?

14          A.    The suspicious order monitoring,

15  their conditions of how you report those now.

16  That changed.

17          Q.    That changed?

18                So it's your belief that the

19  controlled substance suspicious order monitoring

20  requirement and reporting it to the DEA wasn't

21  always there?

22                MR. PYSER:  Object to form.

23          That's not what he said.  Misstates

24          prior testimony.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Not in the --

 2                    THE WITNESS:  Yeah.  Thank you.

 3              A.    Not in the form of when I got into

 4      role as to what we were now expected to do.

 5      That's what I understood, and that's what we

 6      worked diligently on.

 7              Q.    Well, what was the difference?

 8      Tell the jury.  Explain to the jury what the

 9      difference was, if you know.

10              A.    I -- well, I'm no expert, as I

11      told you.  I didn't spend any time going back.

12      But what I am aware of is that we filled out

13      forms and reports every month that went to the

14      DEA for years.  Those went to the DEA.  They

15      accumulated them.  And then they were the

16      holders of that information.

17                    That's prior to my time.  So,

18      again, I'm not an expert on it.  I then moved

19      into my role, and we set off to make sure that

20      our suspicious order monitoring system was

21      developed with more IT and analytics involved,

22      that our suspicious order reporting then

23      responded to that system, and we built out our

24      Know Your Customer training to involve our --
```

1    and give advice to our field teams as to the

2    help and support that we needed now.

3              Q.   So, admittedly, you're no expert

4    on diversion or anti-diversion or supply chain

5    integrity, right?

6              MR. PYSER:  Object to form.

7              A.   I think I'm good at it, but I

8    claim to be no expert.

9              MR. PYSER:  Counsel, we've been

10             going about an hour and 15 minutes.

11             Let's take a break.

12             MR. FULLER:  Fair enough.

13             THE VIDEOGRAPHER:  The time is now

14             10:25.  Going off the record.

15             (Recess taken.)

16             THE VIDEOGRAPHER:  Okay.  The time

17             is now 10:53.  Back on the record.

18   BY MR. FULLER:

19             Q.   Mr. Hartman, we were talking when

20   we took the break about the regulatory

21   compliance and what was required of Cardinal

22   Health.

23             Do you recall that?

24             A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  And are you familiar with

2    what the regulations require for Cardinal Health

3    as it relates to anti-diversion under the

4    Controlled Substances Act?

5              A.    I think so.

6              Q.    Well, explain to the jury what the

7    statutory obligations are of Cardinal under the

8    Controlled Substances Act, as you knew them,

9    during your time frame at Cardinal?

10                   MR. PYSER:  Object to form.  Calls

11             for a legal conclusion.

12                   MR. FULLER:  Well, hold on.  Let's

13             address that.  Counsel's saying it calls

14             for a legal conclusion.

15   BY MR. FULLER:

16             Q.    You were -- your job was to head

17   up anti-diversion and regulatory compliance,

18   right?

19             A.    Yes.

20             Q.    So in order for you to do your

21   job, you had to know what the Controlled

22   Substances Act and the relevant regulations

23   require, didn't you?

24             A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    I mean, you can't do your job if

2  you don't know what you have to comply with, can

3  you?

4      A.    That's right.

5      Q.    Not very well at least, right?

6      A.    I would say that's right.

7      Q.    Okay.  So explain to the jury what

8  your understanding was of Cardinal's obligations

9  under the Controlled Substances Act?

10          MR. PYSER:  Same objection.

11     A.    We were required to have a

12  suspicious order monitoring system, and we were

13  to have reported suspicious orders to the DEA.

14  I don't think that's a quote of the regulation.

15     Q.    All right.  So you're saying your

16  obligations under the Controlled Substances Act

17  was suspicious order monitoring system, that one

18  had to be created, implemented, and utilized by

19  Cardinal during this time frame, correct?

20     A.    Cardinal was to have -- as a

21  distributor, to be licensed by the DEA, had to

22  have a suspicious order monitoring system.

23     Q.    Now, do you know when you came

24  into your position in the end of 2007, December,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2         A.    That's right.

3         Q.    Whether that requirement was

4    already in existence for Cardinal?

5         A.    We took what Cardinal had and

6    continued to expand and build upon it.

7         Q.    That's not my question.  So I want

8    you to listen to my question.

9               I want to know, and I want the

10   jury to hear, whether you believe this

11   obligation was already in existence for Cardinal

12   prior to you taking over in December of 2007.

13   Either it was in existence or it wasn't in

14   existence.

15        A.    When I stepped into role, Cardinal

16   had a suspicious order monitoring system which

17   we built on and expanded under my -- under my

18   tenure.

19        Q.    Mr. Hartman, I'll ask the question

20   again, and I ask that you listen to my question.

21   Okay?

22              I'm asking you, was the suspicious

23   order monitoring requirement already in place by

24   the government upon Cardinal.  I didn't ask you

```
 1    if Cardinal had a suspicious order monitoring

 2    system.  We can agree those are two separate

 3    questions, right?

 4              MR. PYSER:  Object to form.

 5         Q.   One, was it a regulation in place

 6    that Cardinal had to comply with; and, two, the

 7    answer you're giving is, did Cardinal have a

 8    suspicious order monitoring system.  We'll get

 9    to that point, I promise.

10              So, again, my question is, do you

11    understand whether this obligation to have and

12    operate a suspicious order monitoring system was

13    in place when you came into the job in December

14    of 2007?

15              MR. PYSER:  Object to form.

16         A.   As I stepped into role, my

17    colleagues felt that we had that system in place

18    that met the obligation, and then I worked to

19    build on and expand it based on the DEA's

20    criteria, new criteria of how we needed to

21    improve it.

22         Q.   So Mr. Hartman, again, maybe my

23    question wasn't clear.  I didn't ask you what

24    Cardinal had in place and didn't have in place.
```

```
 1   Okay?  Are you understanding me right now?

 2          A.    Understanding.

 3          Q.    Okay.  I'm asking you, was this

 4   regulation actually in place and required of

 5   Cardinal when you came in in December of 2007,

 6   or was this something enacted by the government

 7   after that point?

 8          A.    Is that the same question you've

 9   been asking me?

10          Q.    Yes, sir.

11          A.    So you're asking me if the

12   Controlled Substances Act was in place?

13          Q.    I'm asking you if that

14   regulation -- if that requirement, which you

15   testified to just now, was already in place when

16   you came into the position in December of 2007,

17   or was it a new requirement that was passed

18   sometime after you came into that position?

19          A.    The Controlled Substances Act had

20   been in place for a long time.

21          Q.    Do you know how long?  Because you

22   testified earlier things had changed, and I want

23   to try to sort this out.

24          A.    Back in the '70s, I believe, is
```

1    when it was first passed.

2            Q.    So you believe this requirement

3    was in place since the 1970s?

4            A.    I think so.

5            Q.    Now, you mentioned operating a

6    system and then you mentioned another

7    requirement.  What was that other requirement

8    that you believe was in place when you came into

9    this role?

10           A.    To report suspicious orders to the

11   DEA.

12           Q.    And you and I can agree, can we

13   not, those are two different requirements, one

14   is to have a system in place and operate that

15   system; the other is actually to report things,

16   suspicious orders, to the DEA, right?

17           A.    I agree with that.

18           Q.    Okay.  Now, this report suspicious

19   orders to the DEA, when did -- was this

20   requirement already in place when you came into

21   the role, or was this something new after you

22   came into the role?

23           A.    I'm not clear on whether you're

24   asking me if the Controlled Substances Act was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in place, or if you're asking me specifically

 2    about Cardinal.  Which are you asking me?

 3         Q.    I'm asking whether the regulation

 4    was in place.

 5         A.    The regulation was in place.

 6         Q.    And do you know how long that

 7    regulation had been in place?

 8         A.    I believe it's all part of the

 9    original Controlled Substances Act, so I presume

10    from its inception.

11         Q.    So 1970s again, right?

12         A.    Yes.

13         Q.    So you believe Cardinal had the

14    obligation to have a suspicious order monitoring

15    system and, therefore, to report suspicious

16    orders to the DEA since the 1970s, right?

17              MR. PYSER:  Object to form.  Calls

18         for a legal conclusion.

19         A.    Yes.

20         Q.    Okay.  Now -- sorry.

21              Do you know whether there was

22    any -- well, let me ask, just to make sure we're

23    complete.  Were there any other requirements

24    that you're aware of related to the Controlled
```

1    Substances Act or anything else related to

2    anti-diversion?

3              A.    Related to the Controlled

4    Substances Act, the regulation.  Those were the

5    two elements of it --

6              Q.    Okay.

7              A.    -- as I understand it.

8              Q.    Now, do you agree or disagree that

9    there was a U.S. Code that required Cardinal to

10   maintain effective controls against diversion of

11   particular controlled substances into other than

12   legitimate medical, scientific, and industrial

13   channels?

14             A.    It sounds right.  I'd need to see

15   the document, but I think you're reading from

16   it.

17             Q.    Well, we're going to show you the

18   document.  Don't worry about that.

19                   4916, please.

20                   Have you ever looked at the

21   Controlled Substances Act, Mr. Hartman?

22             A.    Yes.

23             Q.    When did you do that?

24             A.    I don't recall when, but as I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    stepped into the role, I probably would have

 2    looked at this act so -- to see what it was that

 3    we were supposed to abide by.

 4            Q.    So when you say "I probably would

 5    have," that's different than yes.

 6            A.    I don't recall.  It's ten years

 7    ago when I did --

 8            Q.    Okay.

 9            A.    -- or didn't.  My -- I answered

10    your question in that I did, certainly looked at

11    it.

12            Q.    Okay.  And so this is portions of

13    the Controlled Substances Act.  As you know,

14    it's multiple pages and a little lengthy, right?

15                  Is that correct, or do you

16    remember?

17            A.    No.  I remember the act to be this

18    regulation in front of me or the pieces that we

19    focused on.

20            Q.    Okay.  So the portion in front of

21    you is from the United States Congress.

22                  Do you see that seal there?

23                  MR. PYSER:  Object to form.

24            Q.    Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Let me take a look at the document

2     for a minute.  You're asking me some questions

3     about it from a long time ago.

4          Q.     And you hadn't reviewed this in

5     preparation for your deposition; is that what

6     you're telling us?

7                 MR. PYSER:  Object to form.

8          Q.     Did you review the regulations

9     that apply to the controlled substances in your

10    regulatory department?

11         A.     I --

12                MR. PYSER:  Object to form.

13                Don't answer questions about what

14         you did and didn't review in

15         preparation.  If he wants to ask you if

16         you reviewed this particular document,

17         we'll allow you to answer that question.

18    BY MR. FULLER:

19         Q.     Did you review the U.S.C., the

20    United States Code, the Controlled Substances

21    Act document?

22                MR. PYSER:  If you recall.

23         A.     In preparation, you're asking me?

24         Q.     Yes, sir.

```
 1              A.    I don't recall looking at that

 2    document in detail if we did.

 3              Q.    Fair enough.

 4                    Go ahead and take a look at what

 5    we've provided you.

 6                    Have you had a chance to look at

 7    it, Mr. Hartman?

 8              A.    One second.

 9              Q.    Sure.

10              A.    Okay.

11              Q.    All right.  So this is a document

12    that's being marked as Plaintiff's 5 -- being

13    marked as Plaintiff's 5 is portions of the

14    United States Code.

15                         - - -

16         (Cardinal-Hartman Exhibit 5 marked.)

17                         - - -

18    BY MR. FULLER:

19         Q.    Do you see that in front of you

20    where it says "Chapter 13.  Drug Abuse and

21    Prevention Control.  Subchapter, Control and

22    Enforcement"?

23              A.    Yes.

24              Q.    It says, "Introductory
```

```
1    Provisions."

2              Do you see that there?

3         A.    Yes.

4         Q.    And then it says:  "Section 801.

5    Congressional findings and declarations;

6    controlled substances."  And these are findings

7    and declarations by the United States

8    government.

9              You're aware of that, right?

10        A.    That's what it says.

11        Q.    And it says, "Congress makes the

12   following declarations."  I want you to read

13   Number 2 to us.

14        A.    "The illegal importation,

15   manufacture, distribution, and possession of

16   improper use of controlled substances have a

17   substantial and detrimental effect on the health

18   and general welfare of American people."

19        Q.    And do you agree or disagree with

20   that, that the illegal importation and

21   distribution of controlled substances can have a

22   substantial and detrimental effect on the health

23   and general welfare of the American people?

24              MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    It's a regulation for the United

 2    States.  Of course I agree with it.

 3              Q.    Well, I'm asking if you agree with

 4    the declaration.

 5              A.    Of course I do.

 6              Q.    Okay.  Let's go to page 4 of the

 7    document.

 8                    MR. PYSER:  Counsel, for the

 9              record, that we're clear, this is an

10              excerpt of pieces of the United States

11              Code that you've created, correct?

12                    MR. FULLER:  As I stated earlier,

13              yes, sir, it is.

14    BY MR. FULLER:

15              Q.    Do you see subsection 823,

16    "Registration requirements"?

17              A.    Yes.

18              Q.    Okay.  And read Number 1 aloud to

19    us -- which is one of the registration

20    requirements for a distributor, right?

21              A.    "Maintenance of effective control

22    against diversion of particular controlled

23    substances into other than legitimate medical,

24    scientific, and industrial channels."
```

```
 1              Q.    Do you know what that means?

 2                    MR. PYSER:  Object to form.

 3              A.    I believe I do.

 4              Q.    Well, explain to the jury what

 5    that requirement requires for Cardinal Health.

 6              A.    It requires a distributor to have

 7    a system in place to monitor controlled

 8    substances and to report.

 9              Q.    Well, it says "effective controls

10    against diversion."  So not only do you have to

11    report, you have to try to prevent diversion,

12    right?

13              A.    I think preventing diversion is

14    always the right thing to do.

15              Q.    Well, I'm wanting to know if

16    that's what the regulation, this United States

17    Code that our U.S. Congress enacted -- I want to

18    know if that's what the U.S. Congress is

19    requiring from Cardinal?

20                    MR. PYSER:  Object to form.

21              Misstates evidence.  This Code requires

22              the Attorney General to take actions.

23                    MR. FULLER:  Okay.  A.J., where's

24              that deposition protocol?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I've asked you, Mr. Pyser, now a
 2         couple times to not do talking
 3         objections, and then according to the
 4         deposition protocol on subsection C,
 5         Objections and Directions Not to Answer.
 6         "All objections, except those to form
 7         and privilege, are reserved until --
 8         reserved until trial or other use.
 9         Counsel shall refrain from engaging in
10         colloquy during the depositions.  No
11         speaking objections are allowed."
12              I would ask you to please refrain
13         and follow the deposition protocol,
14         which you guys have agreed to.
15              MR. PYSER:  I will follow the
16         deposition protocol.  I have been
17         following the deposition protocol, and
18         I'm sure all your colleagues on the
19         Plaintiff side will never make another
20         speaking objection.
21              So we can proceed, Counsel.
22              MR. FULLER:  Okay.  I just want
23         assurance from you that you're not going
24         to continue the speaking objections.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  That was not a

 2         speaking objection.  I was explaining

 3         the basis for my objection when you

 4         misstate evidence.

 5              MR. FULLER:  Okay.

 6              MR. PYSER:  Continue, and I will

 7         abide by the deposition protocol.

 8              MR. FULLER:  The order of the

 9         Court is only form objections, and if I

10         want a clarification as to what the form

11         objection is, I will certainly ask.

12              MR. PYSER:  Continue your

13         examination.

14              MR. FULLER:  But until I do so, I

15         would ask you to refrain from the

16         speaking objections.  I appreciate it.

17         Thank you.

18    BY MR. FULLER:

19         Q.   Again, Mr. Hartman, I apologize

20    for that.

21              This U.S. Code requires that the

22    registrant maintain effective controls against

23    diversion, right?

24              MR. PYSER:  Object to form.
```

```
 1              A.    That's what it says.

 2              Q.    We have to try to prevent

 3     diversion.  Isn't that the idea that you get

 4     from the code?

 5              A.    That's what it says.

 6              Q.    That should be what everyone tries

 7     to do, isn't it, or shouldn't it be?

 8                    MR. PYSER:  Object to form.

 9              A.    I agree with preventing diversion.

10              Q.    Okay.  So not only do we --

11     according to what you said, we have to report,

12     we also have to try to prevent diversion,

13     correct?

14              A.    Yes.

15              Q.    And if we are shipping orders that

16     we know are suspicious or are likely to be

17     diverted, you would agree that we'd be breaking

18     this law?

19                    MR. PYSER:  Object to form.  Calls

20            for a legal conclusion.

21              A.    I'm sorry, the question one more

22     time.  If we're --

23              Q.    Sure.

24                    If we're shipping orders that we
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    know are suspicious or are likely to be

 2    diverted, then we're not complying with this

 3    regulation?

 4              MR. FULLER:  Object to form.  Same

 5         objection.

 6         Q.    Correct?

 7         A.    I agree with that.

 8         Q.    Okay.  So that's the U.S. Code.

 9    We've talked about that.  That's the Controlled

10    Substances Act.  So let's move to 4916 -- or,

11    no, 4915.

12              THE VIDEOGRAPHER:  Counsel, your

13         mic fell off.

14                    - - -

15         (Cardinal-Hartman Exhibit 4 marked.)

16                    - - -

17    BY MR. FULLER:

18         Q.    So you understand the difference,

19    Mr. Hartman, this is a C.F.R., Code of Federal

20    Regulations, not enacted by Congress, but

21    enacted by an agency given the authority to

22    institute regulations.  Okay?

23         A.    Yes.

24         Q.    Okay.
```

```
 1              A.     Thank you.

 2              Q.     And this is 21 -- this is going to

 3    be Plaintiff's 4.  This is 21 C.F.R. 1301.74.

 4                     Do you see that there?

 5              A.     Yes.

 6              Q.     And the title of the section is

 7    "Other security controls for non-practitioners,

 8    narcotic treatment programs, and compounders for

 9    narcotic treatment programs."

10                     And read section b for us, if you

11    would.

12              A.      "The registrant shall design and

13    operate a system to disclose to the registrant

14    suspicious orders of controlled substances.  The

15    registrant shall inform the Field Division

16    Office of the Administration in his area of

17    suspicious orders when discovered by the

18    registrant.  Suspicious orders include orders of

19    unusual size, orders deviating substantially

20    from normal pattern, and orders of unusual

21    frequency."

22              Q.     Okay.  And is this what you were

23    referring to when you gave us Rules 1 and 2?

24                     Let's go to the overhead, please.
```

```
 1                   Is this what you were referring to

 2      when you gave us the CSA Rules 1 and 2 that we

 3      wrote down earlier?

 4           A.    Yes.

 5           Q.    Okay.  So in addition to that,

 6      based on 4916 and the U.S. Code, we also have a

 7      third obligation; is that right?

 8                   MR. PYSER:  Object to form.  Legal

 9           conclusion.

10           Q.    And that's to maintain effective

11      controls against diversion of particular

12      controlled substances.  We have to try to

13      prevent them.

14                   MR. PYSER:  Object to form.

15           Q.    Is that right?  I mean, that's

16      what you testified to earlier.

17           A.    I'm sorry.  What are you saying

18      the third requirement is?

19           Q.    We have to maintain effective

20      controls against diversion.  We have to try to

21      prevent diversion, according to the United

22      States Congress.

23                   MR. PYSER:  Object to form.

24           Misstates evidence.
```

```
 1              A.    You're back -- you're saying the

 2      third component from the U.S. --

 3              Q.    From the code.

 4              A.    From the code?

 5              Q.    Yes, sir.  We have our

 6      regulation --

 7              A.    I follow what you're saying.

 8              Q.    So we have our regulation, right,

 9      that deals with suspicious orders and reporting

10      suspicious orders; is that fair?

11              A.    Yep.

12              Q.    Okay.  We also have our U.S. Code

13      that requires us to maintain effective controls

14      against diversion.  We have to try to prevent

15      diversion.

16              A.    Yes.

17              MR. PYSER:  Object to form.

18          Misstates evidence.

19              Q.    And I will represent to you that

20      the U.S. -- the CSA, the Controlled Substances

21      Act, was passed in 1970.

22              Does that coincide with your

23      recollection?

24              A.    Yes.  That ...
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    All right.  And you mentioned

 2    earlier that something had changed with the DEA,

 3    right?

 4            A.    Yes.

 5            Q.    Now, let's talk about it for a

 6    second.  Because we have these three

 7    obligations.  If we spot somebody that's getting

 8    a suspicious order, that's an order that we

 9    think may be diverted, right?

10            A.    If we -- if we determine it's a

11    suspicious order versus an order of interest, a

12    suspicious order.

13            Q.    I understand the industry likes to

14    make that distinction, and that's fine.  But if

15    it's determined to be a suspicious order, that

16    means we have a concern about it being diverted,

17    right?

18                  MR. PYSER:  Object to form.

19            Q.    Well, let me ask, do you know what

20    a suspicious order is, Mr. Hartman?

21            A.    Certainly.  We put in our

22    practices in order to try to identify any

23    suspicious orders which, in our system, we

24    looked at thresholds that we had established for
```

Highly Confidential - Subject to Further Confidentiality Review

1    our customers, and we used a expert team to

2    review those orders.

3              And then we looked at the specific

4    customers and any information that we had on

5    them, and then gathered more if we had a

6    threshold event to determine if we felt that was

7    a suspicious order.

8         Q.    So what is the definition of a

9    suspicious order, Mr. Hartman?  Can you tell the

10   jury what that is.

11             MR. PYSER:  Object to form.

12        A.    What we put in place was to try to

13   respond to and make sure that we were within the

14   confines of this specific code of suspicious

15   orders, include orders of unusual size, orders

16   deviating from the normal pattern and orders of

17   unusual frequency.  That was the principal we

18   used when we established -- when I got into

19   place the enhancements to our system.

20        Q.    And the idea behind that is that

21   we want to prevent suspicious orders or orders

22   that may be diverted, right?

23        A.    That's correct.  I agree with

24   that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    So if we have an order that we

 2    think may be diverted, if we're going to

 3    maintain or try to prevent diversion, we're not

 4    going to ship it, are we?

 5                  MR. PYSER:  Object to form.

 6            Q.    So we think --

 7            A.    If it was a suspicious order, we

 8    would not ship it.

 9            Q.    And as far as you know, that's

10    been the requirement of these code sections

11    we've looked at?

12            A.    No.  That's not the -- that's --

13    when I came into role, that is the change I've

14    been talking about.

15            Q.    That's the change.  Well --

16            A.    The "not ship."

17            Q.    Okay.

18            A.    That changed through the DEA as

19    they -- they evidently evolved in how they were

20    going to address anti-diversion.  As I got into

21    role, that's how I understood it.

22            Q.    Fair enough.  But let's talk about

23    that.

24            A.    Okay.
```

1          Q.     You already testified that the

2    Controlled Substances Act, the Congressional

3    Record, requires us to try to prevent diversion,

4    right?

5                 MR. PYSER:  Object to form.

6          Q.     Is that correct?

7          A.     That's what it says.

8          Q.     And that goes all the way back to

9    1970, doesn't it?

10         A.     That's what you stated to me was

11   the passing of the law, I believe.

12         Q.     I think the records will show

13   that.  And it will show that that has not

14   substantially changed since that time.

15                So if that's the case, why would

16   we ever ship a suspicious order?

17                MR. PYSER:  Object to form.

18         Q.     If we got -- if we have an

19   obligation to try to prevent diversion, we need

20   not to ship to those who we think may be

21   diverting.  You would agree with that, don't

22   you?

23                MR. PYSER:  Object to form.  Legal

24                conclusion.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    And you're free to disagree.
 2     Listen, Mr. Hartman, you can testify that we
 3     should ship suspicious orders.
 4           A.    I would never testify that way.
 5           Q.    Because you know that the law
 6     doesn't require it and it's not the right thing
 7     to do, correct?
 8                 MR. PYSER:  Object to form.
 9           A.    But the -- but the conditions with
10     which we had been operating for years, and the
11     reports that we had filed, changed in process
12     when I came into role, and that's the piece that
13     I understood.  And as I told you before, I
14     didn't spend any time on that.  We then went to
15     enact the systems that met these new conditions.
16           Q.    But let's just talk about common
17     sense.  Okay?  Let's forget about roles.  Let's
18     forget about things that people told you
19     changed, because you weren't there then and you
20     don't know, right?
21                 MR. PYSER:  Object to form.
22           Q.    You weren't in this department
23     during this time of this supposed change?
24           A.    I was not, and I didn't spend a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    lot of time on the past practices.

 2            Q.    You testified earlier you didn't

 3    look back.  You were only looking forward,

 4    right?  Isn't that what you testified to?

 5            A.    I think what I said was, we spent

 6    time talking about the past.  I didn't spend a

 7    lot of my time on it.

 8            Q.    Sure.  Okay.

 9            A.    I spent all of my time on the

10    conditions that we were under with the immediate

11    suspension orders, how we could meet those

12    conditions that were upon us and have the system

13    that would allow the DEA to come in and say to

14    us, we got our licenses back and we could

15    operate it -- our normal supply chain.  That's

16    what I did.

17            Q.    Okay.  Fair enough.

18            A.    So when you say I didn't -- I

19    didn't look back, I looked back, but not to any

20    substantial degree.  I focused on the future.

21            Q.    And you knew when you came in that

22    these three requirements were set out by the

23    Controlled Substances Act and the relevant

24    regulations, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2          A.    To my -- sorry.

 3                    MR. PYSER:  Go ahead and answer.

 4          A.    To my recollection, what I was

 5   focused on were those first two elements of the

 6   Controlled Substances Act.  I -- that's what I

 7   was focused on.

 8          Q.    I understand that.

 9          A.    The -- the --

10          Q.    But Cardinal also had to comply

11   with United States Code, the Controlled

12   Substances Act.

13          A.    I --

14                    MR. PYSER:  Counsel, please let

15          him finish his answers.  You cut him off

16          again.

17          Q.    Right?

18          A.    What I was focused --

19                    MR. PYSER:  Object to form.

20                    THE WITNESS:  I'm sorry.

21                    MR. PYSER:  Go ahead.

22          A.    What I was focused on was the two

23   elements that I originally spoke to you about.

24   That's what I spent my time on.  I didn't spend
```

```
 1    any time on this -- the United States Code

 2    annotated.  It was inherent in the job that you

 3    weren't going to do diversion.  But if you're

 4    asking about was I, you know, educated in and

 5    working through this code itself, no, I was not.

 6            Q.    So, listen, we -- let's back up

 7    for a second.  Okay?  I mean, I think the record

 8    is clear what you already testified to.

 9    Cardinal had to comply with the Controlled

10    Substances Act, correct?

11            A.    Yes.

12            Q.    The Controlled Substances Act

13    requires that you try to prevent diversion.

14    You've already testified to that, right?

15                 MR. PYSER:  Object to form.  Legal

16          conclusion.

17            Q.    Do you -- hold on.  Let me --

18    strike that question.

19                 Do you not have an understanding

20    that the whole premise behind the Controlled

21    Substances Act is to prevent diversion?

22                 MR. PYSER:  Object to form.

23            Q.    Yes or no?

24            A.    Well, I -- you know, for me it was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about the suspicious orders, how we identified

 2    them to the DEA requirements and how we reported

 3    those to the DEA per their requirements under

 4    the immediate suspensions that Cardinal had

 5    received prior to me coming in the role, and

 6    that's where I spent my time.

 7         Q.    So you didn't worry about this

 8    trying to prevent diversion aspect of it?

 9         A.    That's incorrect.

10         Q.    So you did worry about it?

11         A.    Any system would worry about that.

12         Q.    Okay.  So you would agree, as you

13    did just a moment ago, that you're not going to

14    ship suspicious orders because of the fear of it

15    being diverted, correct?

16              MR. PYSER:  Object to form.

17         A.    We're not -- we wouldn't ship

18    suspicious orders, specifically trying to

19    address this call-out of unusual size, deviating

20    substantially from normal pattern, orders of

21    frequency, because diversion was not coming from

22    us.  We were trying to stop -- if -- we were

23    trying to stop those orders, suspicious orders,

24    under these conditions.
```

```
 1          Q.    Okay.  And those conditions had

 2    been in place since 1970s, as you've testified,

 3    right?

 4          A.    That's what I understand.

 5                MR. PYSER:  Object to form.

 6          Q.    And whether -- this whole DEA

 7    change in position, let's set that aside.

 8                From a common sense perspective,

 9    therefore, we're not going to ship any orders

10    that we identify as suspicious, correct?

11                MR. PYSER:  Object to form.

12          Vague.

13          A.    Right.

14          Q.    Because if we have the fear of

15    them being diverted, we're not living up --

16    forget our legal obligation.  We're not living

17    up to our moral obligation as a responsible

18    corporation, are we?

19                MR. PYSER:  Object to form.

20          A.    I don't agree with your premise

21    here of what was being done.

22          Q.    I'm not saying it was being done.

23    I didn't say -- listen to my question,

24    Mr. Hartman.  I didn't say it was being done.
```

Highly Confidential - Subject to Further Confidentiality Review

1          I said, if we do ship suspicious

2    orders, we wouldn't be living up to that moral

3    obligation that we have to all those people we

4    serve out there?

5          A.    We built out and expanded our

6    program based on the DEA criteria in order to

7    find those suspicious orders and then to not

8    ship them.

9          Q.    That wasn't my question,

10   Mr. Hartman.  My question is, if we were

11   shipping suspicious orders at any time, orders

12   that we identified that could be diverted, we're

13   not holding up our end of the moral spectrum as

14   a responsible corporate entity, are we?

15               MR. PYSER:  Object to form.

16         A.    I don't -- I don't agree with your

17   premise.

18         Q.    Okay.  So you believe if we ship

19   suspicious orders, that's okay?

20         A.    I've already told you I don't.

21         Q.    So which is it?  You can't have it

22   both ways.

23               MR. PYSER:  Object to form.

24         Q.    So let me try it differently, see

```
 1    if we connect.

 2              From the enactment of the

 3    requirement to identify suspicious orders, you

 4    would agree that we should not -- we should not

 5    ship any orders that we deem suspicious,

 6    correct?

 7              MR. PYSER:  Object to form.

 8         Vague.

 9         A.    Yes.

10         Q.    Okay.

11              MR. FULLER:  We'll mark that as

12         Plaintiff's 6.

13                    - - -

14       (Cardinal-Hartman Exhibit 6 marked.)

15                    - - -

16    BY MR. FULLER:

17         Q.    All right.  Mr. Hartman, when you

18    were filling this regulatory role and when --

19    the little look back you did, you're aware that

20    there were budgetary battles, correct, with

21    trying to secure sufficient resources for the

22    regulatory department, right?

23              MR. PYSER:  Object to form.

24         A.    Boy, there were -- there's always
```

Highly Confidential - Subject to Further Confidentiality Review

1    budgetary battles.

2            Q.    Particularly with regulatory,

3    right?

4            A.    That -- I don't know that.  I

5    wasn't in role.  I was in a -- in corporate

6    functions.  So I -- I didn't spend time there.

7    That could be true.

8            Q.    So did you ever hear of budgetary

9    battles going on with regulatory and them not

10   getting what they believe the resources they

11   needed to do their job with anti-diversion?

12           A.    In my time period, I not only got

13   everything I wanted, I had the support of the

14   CEO on that.

15           Q.    What about outside your time

16   period?  Are you aware of budgetary battles and

17   regulatory not getting what they needed to do

18   their job?

19           A.    I was not aware of regulatory.  I

20   was certainly aware of --

21           Q.    What were you aware of?

22           A.    Well, I was on the corporate

23   functions.  It's a corporate -- it's a

24   corporate -- budget battles happen all the time.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    I want to know with QRA --

 2              A.    I was not knowledgeable of that.

 3              Q.    -- or supply chain integrity, if

 4    you were ever made aware of budget battles

 5    occurring before, after, at any time?

 6              A.    Any time?  Yes.  After I left

 7    Cardinal, Michael had communicated with me.

 8              Q.    That's Mr. Moné, correct?

 9              A.    Yes, Michael Moné.  Had

10    communicated with me that they were at budget

11    time.  I was not at Cardinal.  And I responded

12    to him, basically to "Stay tough.  Stick with

13    it."

14              Q.    Because it's a budgetary battle?

15              A.    Budgetary battle.

16              Q.    Let's look at that.  It's 3904.

17                         - - -

18         (Cardinal-Hartman Exhibit 7 marked.)

19                         - - -

20    BY MR. FULLER:

21              Q.    And who was the -- you said the

22    CEO even approved your budgets.  Who were you

23    referring to?  Or you had the support.

24              A.    When I went into role, the -- one
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of the meetings I had prior to taking the role

 2    was with Kerry Clark, and we talked about the

 3    role, and I talked about the fact that I would

 4    need his support before I accepted the role.

 5            Q.    Right.

 6            A.    I would need his support to get

 7    whatever I needed to do whatever I needed to do.

 8            Q.    Because from the information that

 9    you already knew, you knew it was going to

10    require additional resources and additional

11    staff to be able to do the job the way you

12    wanted it to be done, correct?

13            A.    For my time period, that's

14    correct.

15            Q.    Okay.  So let's look at --

16                  MR. FULLER:  Is this Number 7?

17                  MS. QUEZON:  Yes.

18    BY MR. FULLER:

19            Q.    All right.  So let's look at

20    Exhibit Number 7.  It's 3904 in the upper right;

21    is that correct, Mr. Hartman?

22            A.    Yes.

23            Q.    Okay.  And this is that e-mail

24    between you and Mr. Moné, isn't it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.     Correct.

 2            Q.     And it was sent back and forth

 3    between your personal accounts.  That's not your

 4    Cardinal e-mail account, is it?

 5            A.     Correct.

 6            Q.     And Mr. Moné, what's his e-mail

 7    address there?

 8            A.     J-a-t-r-o --

 9            Q.     I think it's a G.

10            A.     I'm sorry.

11    G-a-t-o-r-x-j-d1210@msn.com.

12            Q.     Is he a Gator fan?

13            A.     He is a big Gator fan.

14            Q.     Well, me and him may get along

15    because I went to the University of Florida.

16            A.     I hope you do.  He's a good guy.

17            Q.     Good.  It seems like you guys got

18    along even outside of work; is that right?

19            A.     Oh, yes.

20            Q.     And is he still with the company?

21            A.     Yes.

22            Q.     And what is his position

23    currently, if you know?

24            A.     I don't know the title.  I believe
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    he's in regulatory, the regulatory office.

2           Q.    Okay.  And this is sent to you

3    shortly after you leave; isn't that true?

4           A.    May 26, 2010.  I had been gone

5    about a quarter.

6           Q.    So -- because you left in

7    February --

8           A.    Yes.

9           Q.    -- right?

10                So March, April, and then May?

11          A.    Yes.

12          Q.    Okay.  And so we lay the

13   groundwork here, the budgetary time frame runs

14   from July 1 to June 30, correct?

15          A.    Yes.

16          Q.    That's the fiscal year?

17          A.    That's the fiscal year, yes.  At

18   that time, it was.  I suppose it still is.

19          Q.    Sure.

20                And the budgetary process,

21   therefore, takes part in probably the first and

22   second quarter of the year, right?

23          A.    Yeah.  Budgetary -- yeah, they go

24   all year long.
```

```
 1              Q.    I can imagine so.  I can imagine

 2    so.

 3                    All right.  So let's take a look

 4    at this.  Mr. Hartman says, "Hey, Mark" -- or

 5    excuse me.  Mr. Moné says, "Hey Mark."  And then

 6    read the second sentence there.

 7              A.    "We lost in the budget defense big

 8    time and Giacomin is mounting an attack on QRA

 9    and we don't seem to have a strategy or at least

10    we are not being kept informed."

11              Q.    Who is Giacomin?  Tell the jury

12    who Giacomin is.

13              A.    John, I believe at that time, was

14    the president of the pharma division at

15    Cardinal.

16              Q.    And I'll represent to you that

17    documents are a little unclear, but it indicates

18    from 2008 to sometime in 2010 he was executive

19    vice president of operations.

20              A.    Yes.

21              Q.    And then in 2010, he became

22    president of U.S. pharmaceutical.

23                    Does that seem to coincide with

24    your recollection?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    When in 2010 did he --

2          Q.    That's the part that's unclear.

3   I'm not sure.

4          A.    Yeah, so I'm not sure what role

5   John was in here.  But to your point, I do

6   recall he was executive vice president of

7   operations later on somewhere in 2010 time

8   frame.

9          Q.    Right.  So he's either executive

10  VP of ops or he was president of pharmaceutical,

11  right?

12         A.    Yeah.

13         Q.    Fair enough.

14               And he apparently -- or at least

15  according to Mo- -- and did you actually speak

16  to Mr. Moné about this?

17         A.    I don't recall any live

18  conversations.  I think --

19         Q.    Just the e-mail?

20         A.    Just the e-mail.

21         Q.    And he indicates that "We lost the

22  budget defense big time."  Which indicates his

23  budget got cut, right?

24               MR. PYSER:  Object to form.

```
 1             A.    Yes.  So --

 2             Q.    They cut his budget.

 3             A.    -- I think you have to put it in

 4    context of "big time."  What Michael was

 5    fighting for, as you'll see in a later e-mail,

 6    was one position that they were fighting for,

 7    which was an administrative position.  And the

 8    argument was, I believe at the time -- again, my

 9    recollection is that the system was now doing

10    that work and they would use that head count,

11    that person, in another role someplace else.

12             Q.    And he goes on to say, that

13    "Giacomin is mounting an attack on QRA."

14             A.    Yes.

15             Q.    I mean, the guy in operations --

16             A.    Right.

17             Q.    -- right?

18                   And you had a little bit of a

19    concern about reporting to people in operations

20    at one time, too, didn't you?

21             A.    Well, I made sure, based on my

22    role, that I stayed independent from anybody

23    else to influence me.

24             Q.    Particularly operations, because
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   what are they going to want to do?  Just what

2   they did here --

3           A.    Well, they didn't --

4           Q.    -- is attack?

5           A.    I think in the later e-mail you'll

6   find that didn't happen.

7           Q.    We'll see.  We'll see.  Let's keep

8   going.

9           A.    You have all my documents, right?

10          Q.    I -- we have them all.  Your

11  counsel has them all, right?

12          A.    Yes.  Everything I -- I gave him

13  everything that I have.

14          Q.    Okay.

15          A.    So -- and later on he addresses

16  that he kept the head count.  And that was the

17  whole commentary there about this.

18          Q.    Let's keep going.

19                "Giacomin is mounting an attack on

20  QRA.  We don't have a strategy or at least we

21  are not being kept informed.  And it's because

22  we have no presence on the fourth."

23                What's "the fourth"?  Tell the

24  jury what "the fourth" is.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    The fourth -- the fourth floor was

2    where the leadership team for pharma was

3    officed.  I was there.  In my tenure, I moved us

4    off of the fourth to the third floor where the

5    regulatory group had been.  So they remained --

6    evidently they remained on the third floor.  So

7    when he says "on the fourth floor," he's talking

8    about physical proximity, I believe.

9          Q.    Right.  To decision-makers?

10          A.    I suppose.

11          Q.    And it's the lack of visibility,

12    just what you mentioned, down on the third --

13    listen.  Maybe you've forgotten.

14          A.    You're in the -- you're in the

15    budget battle -- you know, got to have what you

16    need, and we had gotten everything we needed.

17    And he was fighting for one head count.  To him,

18    that was big.  We had talked about it before I

19    left.  You know, keep that position.

20          Q.    And this is Moné.  So this is the

21    QRA side, right, quality regulatory affairs?

22          A.    Well, and he was specifically the

23    anti-diversion side.

24          Q.    The anti-diversion?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    And how many people did he

 3    actually have?

 4              A.    At that time, I don't know, but --

 5    I'd have to see his org chart.  I mean, when we

 6    built it out, we had six, seven, eight in his

 7    group, between the pharmacists --

 8              Q.    Right.

 9              A.    -- the investigators and the

10    administrative staff that supported that whole

11    group on his side.

12              Q.    Sure.

13              A.    And then there was Steve Reardon's

14    side.

15              Q.    Which is -- what do you call that

16    side?

17              A.    He was -- he was regulatory

18    affairs.

19              Q.    Regulatory affairs.

20              So on Moné's side, if you take

21    away one of seven, that's a pretty big cut.

22    Greater than 10 percent at least, right?

23              A.    Well, just for perspective, what

24    we had talked about is that our systems had
```

```
1    begun to do lots of the administrative work as

2    opposed to human beings.  So in my view, as you

3    can -- I think you can see through my e-mail,

4    you know, it's a budget battle.  You could lose,

5    but stay after it.  Don't lose it.  Which he

6    didn't.

7            Q.    Well, you're telling him, "Keep up

8    the good fight."

9            A.    Which he didn't.  And he retained

10   his positions, and he retained what he needed.

11           Q.    So we'll talk about that.  But you

12   also are aware that prior to your taking this

13   position, there are also budget battles and

14   deficiencies in what the regulatory department

15   had as well, aren't you?

16           A.    When you said -- before my time, I

17   was not intimately involved with regulatory

18   affairs, so I -- I'm not aware of the budget

19   battles, if you will, that they had.  I wasn't

20   aware.  I wasn't with them.  I didn't

21   participate in their parts of the meetings where

22   we'd go through the budget, you know, the budget

23   needs, the budget requirements, the things we

24   were going to do for the next year.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Let me ask, when you came into the

 2     department, clearly needed to make changes,

 3     didn't you?

 4              A.     Again, when I was just coming into

 5     the department, I didn't understand what was

 6     happening.  I didn't know much about it.

 7              Q.     But didn't you already know that

 8     you needed more resources?

 9              A.     But I -- well, when I talked to

10     Kerry, that's exactly what any good executive

11     would do.  The first thing they do is --

12              Q.     Absolutely.

13              A.     -- ask for the money, ask for the

14     support, and that's what I got during my time

15     frame.

16              Q.     And you weren't going to do it to

17     be wasteful, were you?

18              A.     You don't do that.

19              Q.     Fair enough.

20                     Keep reading on -- "after the lack

21     of visibility."  What does Mr. Moné says -- say?

22              A.     "We are about to find out that

23     some of our recent unpopular decisions were

24     correct, though the yelling continues.  Issues
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   at borschow have created another firestorm on

 2   the price diversion side."

 3         Q.    It says "our unpopular decisions

 4   were correct."  Do you know what he's referring

 5   to?

 6         A.    I have -- I have no knowledge what

 7   he's referring to.  I can surmise that.  In our

 8   role as an anti-diversion, we made plenty of

 9   calls, and we certainly discussed it.  And the

10   calls that we made were debated, at the end of

11   the day.  What Michael said we were going to do,

12   and I supported, or if I was going to be the

13   decision-maker on it, which a few of them I

14   was -- I don't recall which ones -- we called

15   the shot.

16         Q.    And it was the unpopular call

17   related to anti-diversion in not shipping

18   controlled substances, right?

19               MR. PYSER:  Object to form.

20         Speculation.

21         Q.    Those were the tough calls?

22         A.    Well, the tough calls are anytime

23   you have a -- certainly anytime you have a

24   customer and they hit a threshold and then
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   you're making -- doing the review around, is

 2   that a suspicious order, what other information

 3   is there?  And do -- and then does it -- do we

 4   need to deem it a suspicious order?  They're all

 5   tough calls.

 6          Q.    Absolutely.  And that was y'all's

 7   obligation -- I say y'all, regulatory's

 8   obligation was to make those tough decisions,

 9   those unpopular-by-everybody-else decisions,

10   correct?

11          A.    And we did.

12          Q.    And that's why you wanted to work

13   out from underneath operations or anybody else

14   who you mentioned may have influence upon you,

15   correct?

16          A.    That's correct.

17          Q.    Because you didn't want that to

18   happen because you saw and you know that it

19   wouldn't be the best way to run the regulatory

20   department; isn't that true?

21          A.    Being separate, have a completely

22   independent voice around what actions we took

23   was how I saw to get the job done, and during my

24   time frame, that's what we did.
```

1          Q.     And when you came into the

2    department and made those changes, that's not

3    the way it was being done.  It was oversaw by

4    those who didn't like unpopular decisions,

5    correct?

6                 MR. PYSER:  Object to form.

7          A.     You know, I don't know where the

8    reporting structure was.  Again, I was heads

9    down in a corporate function and some pretty big

10   things we had going on.  I was not operating in

11   the division at that time.  So I -- you know,

12   Steve Reardon will certainly be able to respond

13   to those questions as to where we were, what we

14   were doing.

15         Q.     Now, let's go up to your response.

16         A.     Okay.

17         Q.     You say, "Wow, an accident" --

18   now, we didn't read the part where Mr. Moné got

19   into a car accident, right?

20         A.     Don't want to read that?

21         Q.     No, no.

22         A.     That's --

23         Q.     That's important?

24         A.     Well, he takes care of people

```
 1    there.
 2          Q.    I understand.  I understand.
 3                And then you mentioned the budget
 4    battle that we've already talked about, right?
 5    That's what you called it?
 6          A.    Oh, yeah.  Well, there isn't --
 7    there isn't a -- if you want to define it any
 8    different way, any discussion you have around
 9    budgets are always battles around what you need
10    and then what you want.  And what you try to
11    decipher as a corporation is, the needs, what
12    are the needs to help our business and to move
13    it forward, support our customers?
14                The wants oftentimes get layered
15    in there, and they're difficult to discern.  You
16    know, big companies, big budgets.  And so I
17    always refer to it as the budget battles.
18          Q.    And it clearly was to Mr. Moné.
19    Read what you go on to say.
20          A.    "You know there is a likelihood
21    you will not get the head count backfill."
22          Q.    Keep going.
23          A.    "I would not cave on that, but
24    privately prepare for the worst."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Finish out.

 2            A.    "I'll certainly see if I can get

 3     those guys a note to support you and thusly

 4     Shirlene."

 5            Q.    And Shirlene is Ms. Justus, right?

 6            A.    Yes.

 7            Q.    Okay.  And she actually came to

 8     that division or that department with you when

 9     you took on that role?

10            A.    That's right.

11            Q.    And she had been working with you

12     previously in your other roles at Cardinal?

13            A.    Correct.

14            Q.    And is she still there, as far as

15     you know?

16            A.    As far as I know.

17            Q.    Okay.  And it sounds like -- it

18     next goes on to say, "It sounds like the

19     situation is unfolding a bit like we projected."

20     Right?

21            A.    That's what I said.

22            Q.    Continue reading for us.

23            A.    "It's a shame if the department is

24     relegated to less-than-needed authority or
```

```
 1   investment.  It will haunt the organization at

 2   some point."

 3          Q.    Now, let me stop you there.  Is

 4   this the haunting you're referring to?

 5                MR. PYSER:  Object to form.

 6          A.    The --

 7          Q.    The haunting you're referring to.

 8   These bad decisions related to regulatory and

 9   these lawsuits that have now been brought upon

10   the company for creating this epidemic.  Is that

11   the haunting you're referring to?

12          A.    No, that's not what I'm referring

13   to.

14          Q.    What haunting are you referring

15   to?

16                MR. PYSER:  Object to form.  And

17          objection on the last one too.  Same

18          objection.

19          A.    I'm talking about the fact that

20   the haunting is taking away from the

21   organization a head count that we felt we needed

22   badly.  Didn't want.  We felt we needed.  Other

23   people in the organization could think it's a

24   want or a need that we -- excuse me.  A want
```

```
 1    that we were just putting forward.

 2              We're saying here the haunting

 3    part of this is to lose that head count.  So --

 4    and if any -- and, of course, it should say -- I

 5    wrote that, authority or investment.  The whole

 6    point is, while I was there, I had everything

 7    that I wanted, and the investment was behind me.

 8    And that was -- what I didn't want Michael to

 9    lose was that position of investment that he

10    felt he needed.

11         Q.    From others in the organization,

12    right?

13         A.    Sure, yes.

14         Q.    And now he feels like Giacomin is

15    attacking him, and the haunting that's coming,

16    you're right, is the lack of support, the lack

17    of investment.  And the result is what we see

18    here today, an opioid epidemic going on in our

19    country; isn't that true?

20              MR. PYSER:  Object to form.

21         A.    That was not my inference here.

22    My inference was around the budget and what

23    Michael needed in order to do the job for

24    Cardinal Health.  And if you know from further
```

```
 1    e-mails, he retained his position, and budget

 2    was good.

 3            Q.    And you know we're now facing an

 4    opioid epidemic in this country, don't you?

 5                 MR. PYSER:  Object to form.

 6            A.    I sure do.

 7            Q.    And we have been for a long time,

 8    haven't we?

 9                 MR. PYSER:  Object to form.

10            A.    I'd agree with "long time."

11                 MR. FULLER:  Let's take another

12        break.

13                 THE VIDEOGRAPHER:  The time is now

14        11:47.

15                 (Recess taken.)

16                 THE VIDEOGRAPHER:  The time is now

17        12:00 p.m.  Back on the record.

18    BY MR. FULLER:

19            Q.    All right, Mr. Hartman.  We were

20    talking about the budget battles that were

21    occurring.  How many people were in regulatory

22    when you came into that position in December of

23    2007?

24                 Mr. Reardon was there, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Oh, yeah.

 2                    I don't recall.  I'm guessing, but

 3    I'm going to assume in the seven, eight, nine,

 4    ten range.  I'm not sure.

 5              Q.    And now -- and Mr. Moné's side,

 6    supply chain integrity, was just being created,

 7    right?

 8              A.    Yes.

 9              Q.    Okay.  And that hadn't been fully

10    staffed yet, correct?

11              A.    No.

12              Q.    No, I'm right, it hadn't been

13    fully staffed, or no, I'm wrong and it had been

14    fully staffed?

15              A.    Ask me the question, and I'll give

16    you that answer.

17              Q.    Fair enough.

18                    Mr. Hartman, when you came into

19    the regulatory department, Mr. Moné had already

20    been hired, correct?

21              A.    Yes.

22              Q.    And his section was called what

23    again?

24              A.    Anti-diversion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Anti-diversion.

 2                  The staffing for his department

 3    had not been completed as of that point in time,

 4    correct?

 5            A.    Correct.

 6            Q.    Okay.  So let's go -- and you just

 7    testified you're not sure about the staffing

 8    when you came in.

 9                  Did you look at anything to

10    indicate what the staff had been in the past for

11    anti-diversion, the regulatory departments?

12            A.    Like all things, I'm sure we

13    looked back.  We looked at it.  And we just put

14    stakes in the ground and moved forward and what

15    do we need and how do we get those resources.

16    So ...

17            Q.    Let's go to 4765.

18                          - - -

19        (Cardinal-Hartman Exhibit 8 marked.)

20                          - - -

21    BY MR. FULLER:

22            Q.    Mr. Hartman, as you can see, this

23    is an Operation 1 Cardinal Health quality

24    management meeting document, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And it's dated January 13, 14 of

 3    2005; is that right?

 4          A.    Yes.

 5          Q.    Okay.  This would have been when

 6    you were with the company, just not in

 7    regulatory; is that fair?

 8          A.    Yes.

 9          Q.    So if you turn all the way back to

10    page 64.  We want to take a quick look at just a

11    couple things related to the regulatory

12    department at the time.

13                During that time it was still

14    called QRA or quality regulatory affairs; is

15    that correct?

16          A.    I agree with that.  I -- probably.

17          Q.    Okay.  It says here the QRA model.

18                Do you see that?

19          A.    Where -- are you on the top side

20    or --

21          Q.    Yes, sir.  If you look on the

22    screen, because those printouts are hard to

23    read.

24          A.    Yeah.
```

```
 1            Q.    The screen in front of you may

 2    help.

 3            A.    Oh.  Gotcha.

 4            Q.    She blows it up so our eyesights

 5    can work.

 6                  So, Mr. Hartman, this indicates,

 7    on page 64 here, that it's internal client

 8    perspective of QRA; is that right?

 9            A.    Yes.

10            Q.    Okay.  And it says, "The QRA

11    model."  Read the first bullet point to us.

12            A.    "Quality is not a mindset at

13    Cardinal Health.  We are not proactive.  This is

14    not a high enough priority today."

15            Q.    Then it goes on to say, "When

16    financials are tight, quality suffers," doesn't

17    it?

18            A.    It says that.

19            Q.    Now, during this time, you weren't

20    in this department; is that fair?

21            A.    That's correct.

22            Q.    Now, do you know from your

23    experience in the department that having a

24    regulatory mindset, having a compliance mindset,
```

```
 1   is very important to the operations of the

 2   business, isn't it?

 3          A.    Yes.

 4          Q.    Having sufficient resources so

 5   that people can do their jobs is also

 6   detrimental for the compliance department, isn't

 7   it?

 8          A.    It's important to have the right

 9   resources to do the regulatory job.

10          Q.    And not just the right resources

11   and number of people, but also the right

12   support, like you said?  You specifically went

13   to Clark and got his assurance that he would

14   back you on what you needed to be able to do the

15   job the way you saw fit, didn't you?

16          A.    I did that.

17          Q.    If we go on, it says "Need to

18   understand" -- or excuse me.  "Corporate quality

19   organization - not sure what their role should

20   be."

21                And our screen went blank.  There

22   we go.  Let's try that again.

23                The next line, Mr. Hartman, reads,

24   "Corporate quality organization - not sure what
```

Highly Confidential - Subject to Further Confidentiality Review

1    the role should be."

2              Corporate quality should have an

3    absolute laser beam on what their role should be

4    in the organization, shouldn't they?  They've

5    got to know what their focus is to be able to do

6    their jobs?

7         A.    In 2005, I -- again, we were -- we

8    were organizing ourselves differently.  I don't

9    know what this document is, so I'd need to take

10   some time on it so that I could -- I won't be

11   able to answer your question because I -- that

12   might be the new organization of a department.

13        Q.    And that's fair.  But you would

14   agree, would you not, that corporate quality

15   should know what their role is?

16        A.    Corporate quality should know what

17   their role is given a new department has time to

18   establish what they're about and the resources

19   that they have and how it was reorganized

20   potentially.

21        Q.    Absolutely.

22              Then it says, "Need to understand

23   roles and what will be at Business or Segment

24   level."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?  Do you see that

 2     there?  Did I read it correctly?

 3             A.    Yeah, yeah, I see it.

 4             Q.    Okay.  And then, "Corporate

 5     Centers of Excellence would be of value."

 6                    You would agree with that,

 7     wouldn't you?

 8             A.    Yes.

 9             Q.    And then, "Would like to see

10     stronger regulatory affairs" --

11             A.    Let me come back on that.

12     Corporate Centers of Excellence.  Okay.  If I'm

13     going to respond to this, I need to look at this

14     document.  I think I'm aware of the time period

15     we're talking about.  And that time period would

16     be the genesis of responses that I can give you

17     as opposed to looking at one segment on here.

18                    Can I do that?

19             Q.    Well, here's the thing.  Your

20     counsel wants to finish by 12:30 to take a lunch

21     break, and that's fine, but I want to finish

22     with this document.  And I have a limited amount

23     of time.

24             A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And I'm not going to waste my

 2    seven hours that we have letting you go through

 3    a big old document that somebody hadn't bothered

 4    to show you before.

 5              A.    I -- can I just take a minute?

 6              Q.    Absolutely.

 7              MR. PYSER:  You can take as much

 8         time as you want.  If he wants to show

 9         you a document --

10              MR. FULLER:  And we'll go off the

11         record and you'll review it, and then

12         we'll come back on the record.

13              MR. PYSER:  Wait till there's a

14         question.

15              A.    Yeah.

16              Q.    You were the one that said you

17    wanted to take a look at it, Mr. Hartman.  Go

18    ahead.

19              A.    I'm vaguely in the time frame.  I

20    wasn't in quality.  I'll take your questions.

21              Q.    Okay.  So the next section is

22    "People."

23              Do you see that there?

24              A.    Yes.
```

```
 1              Q.    And read the first bullet point.

 2              A.    "Under-resourced today."

 3              Q.    Not enough people, not enough

 4    resources.  That's what it's saying, correct?

 5                    MR. PYSER:  Object to form.

 6              A.    Yeah.  This is a document in

 7    response to the reorganization at Cardinal, and

 8    I oversaw and was a part of watching all of

 9    these departments.  It's a big, big

10    transformation.  Big.  Lots of involvement.

11    Huge changes.  I'll just tell you that I didn't

12    have a function that didn't come in with

13    anything different than this kind of lineup of

14    under-resourced or underfunded or needs money.

15              Q.    Okay.  We'll -- and we'll deal

16    with that.

17              A.    And everybody had -- and that gets

18    back to the budget battle comment where I talked

19    to you about wants -- or needs versus wants.

20    And what we found in all of this, as we moved

21    forward to reorganize and make ourselves more

22    efficient, there was a tremendous number of

23    wants.  What we had to get at were the needs,

24    and I don't know how this resulted.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    We'll see.  And here's the thing,

 2   Mr. Hartman, because Cardinal's entrusted with

 3   dealing with what has been labeled and

 4   legislatively enacted as dangerous drugs.

 5              You're aware of that, right?

 6   Control IIs are --

 7              MR. PYSER:  Object to form.

 8        Q.    -- by definition dangerous drugs.

 9   You're aware of that, correct?

10        A.    Yes.

11        Q.    This is not a place to skimp.  You

12   would agree with that?  Regulatory needs to be

13   beefed up so they can do the job they need to do

14   in compliance with the regulations we talked

15   about earlier.

16              We can both agree on that as well,

17   correct?

18              MR. PYSER:  Object to form.

19        A.    Well, the only -- the only thing I

20   agree with is this is a document that came out

21   in a major transformation from one of the

22   functions about, we need more money, we need

23   more resources.  And the way to do that is to

24   highlight things like you're seeing right here,
```

Highly Confidential - Subject to Further Confidentiality Review

1    and I saw that in every single department that

2    came forward.

3              Q.    Fair enough.

4              A.    And it doesn't mean that they were

5    underfunded or they were under-resourced.  That

6    does not say that here, when you get to the

7    corporate level of looking at the functions.

8              Q.    Hold on.  So you're the doc --

9    saying this document doesn't say they're not

10   under-resourced?

11             A.    No.  I'm saying that what's said

12   here is not necessarily a corporate position or

13   where we were at on quality as to how Cardinal

14   saw it.  This is what the department is saying.

15             Q.    Exactly.  Exactly, Mr. Hartman.

16   It is the QRA department saying we're

17   under-resourced.

18             A.    But it doesn't say it's -- it

19   doesn't mean it's necessarily right or that they

20   are under-resourced as we develop the

21   departments in this new organization.

22             Q.    Sure.  It doesn't mean it's true.

23   It's just what they're saying?

24             A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Fair enough.

 2                    The next bullet point says,

 3       "People we have are good.  Don't have enough

 4       bench strength."

 5                    And you would agree again, that in

 6       regulatory you have to have the depth.  You have

 7       to have the good people up and down the ladder,

 8       correct?

 9              A.    You have to have good people.

10              Q.    It says then, "Need to upgrade and

11       deepen talent."

12                    You don't disagree with that

13       either, do you?

14              A.    There isn't a budget discussion, a

15       department I've run, a place I've been, a thing

16       I've actually tried to execute and get done

17       where "need to upgrade" and "deepen talent"

18       doesn't exist.  I agree with it.

19              Q.    And then, "Not enough people"

20       again, right?  That's what it says?

21              A.    It says that, yes.

22              Q.    That's what the QRA department is

23       saying during this time frame?

24              A.    That's what they said.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And then go to processes.

 2                    "The process" -- and you're aware

 3     of this.  This is the regulatory department,

 4     bullet point 1:  "Keeps us out of trouble but

 5     not very proactive or innovative."

 6                    You would agree, would you not,

 7     that you need to be proactive in regulatory?

 8         A.    Prior to my time, the "keep us out

 9     of trouble," I agree with.  The "not very

10     proactive or interactive," I don't know to agree

11     with you in the matter that we're talking about.

12     Cardinal was a big company.  This is referring

13     to broad specter regulatory groups.

14              Q.    Let's talk about it.

15                    Are you aware of the New York AG

16     action for selling and diverting related to

17     price fixing?

18                    MR. PYSER:  Object to form.

19         A.    I'm aware of it -- or I'm sorry.

20                    MR. PYSER:  Misstates evidence.

21              Q.    Go ahead.

22         A.    Ask me again.

23              Q.    Are you aware of the New York AG

24     action related to diversion and price diversion?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Same objection.

 2           A.    I'm aware of it.

 3           Q.    Okay.  And Cardinal then -- after

 4   that action happened, then took steps to put

 5   policies and procedures into place to react to

 6   it, correct?

 7           A.    I -- again, it's before my time.

 8           Q.    So you don't know?

 9           A.    I don't know in that case what was

10   done.

11           Q.    Fair enough.

12                 In the 2000- --

13           A.    But understand that the New York

14   Attorney General's action of price diversion is

15   completely separate and different from the

16   matter we're talking about in anti-diversion.

17   Completely separate.  The two do not intermix.

18                 There is nothing there that puts

19   the two of those two things together, other

20   than, while I was in role, Michael Moné did have

21   that action put under him for some period of

22   time.  I didn't work on it.  I didn't spend any

23   time on it.  And I think we were downstream on

24   it, if you will.
```

1      Q.    So your understanding is that the

2    New York AG action didn't involve diversion?

3            MR. PYSER:  Object to form.

4        Misstates testimony.

5        A.    Price diversion.

6        Q.    Right.

7              And also divert -- the New York AG

8    agreement indicates that they are selling to

9    individuals that they know are diverting

10   controlled substances.  They're selling to

11   closed-door pharmacies in Arizona that are

12   turning around and shipping to Kentucky, right?

13           MR. PYSER:  Object to form.

14       A.    I don't know.  I was -- I wasn't

15   involved in the matter.

16       Q.    And then in 2007, you get pulled

17   into this new position?

18       A.    Yes.

19       Q.    In reaction to what?

20       A.    The immediate suspension orders.

21       Q.    The immediate suspension orders.

22             The lack of being proactive,

23   because there was meetings going on with the DEA

24   all the way back in 2005 warning them about

1    Internet pharmacies, which was the main issue in

2    the immediate suspension orders in 2007, wasn't

3    it?

4              MR. PYSER:  Object to form.

5         Q.   Do you know?

6         A.   That's a long statement you just

7    made.  What -- I need to hear your question so I

8    can answer you.

9         Q.   Sure.

10             You said that you didn't agree

11   that regulatory wasn't proactive.  Proactive

12   would entail taking steps before being forced

13   to, right?  Reacting, acting in advance of,

14   correct?

15        A.   If you're asking me if we were not

16   reactive, this was prior to my time, and what

17   I've stated to you is that this is a budget

18   discussion, and as you look at it, this might be

19   the appropriate -- this might be a -- Gary

20   Dolch's prep meeting.  I have no idea what was

21   originally -- which was finally presented, if

22   what I'm looking at here is a document.

23             So I can't answer you on it.  I

24   don't have knowledge of where they were or where

Highly Confidential - Subject to Further Confidentiality Review

```
 1   they weren't.

 2         Q.    Okay.  So what we can agree to is

 3   that QRA indicates on this slide that it keeps

 4   us, Cardinal, out of trouble, but is not very

 5   proactive or innovative.  That's what it says,

 6   isn't it?

 7         A.    That's what it says.

 8         Q.    Okay.  The next point -- let's go

 9   down to -- yeah, the next one, "Site level

10   measurements and incentives can hinder

11   investment and quality."

12               That's also a concern that -- at

13   least they were having at this point in time,

14   right?

15         A.    That's what they said.

16         Q.    Okay.  Now, you made a good point,

17   Mr. Hartman.  You said, look, this may have just

18   been at this one time, this big reorganization.

19               Were you ever shown anything to

20   indicate this same problem between 2005 and the

21   time you came into the position?  Did anybody

22   ever share anything with you that would indicate

23   this is a systemic problem, a problem with the

24   entire system?
```

```
1              A.    In my roles, I don't recall

2    conversation -- a conversation around -- or

3    conversations around regulatory in my time

4    period.

5              Q.    So let's go to 36- -- or excuse

6    me.  3868.

7              A.    Oh, another document?

8              Q.    Yes, sir.

9                        - - -

10       (Cardinal-Hartman Exhibit 9 marked.)

11                       - - -

12              MR. FULLER:  What number am I up

13         to?

14              MS. SHIVERS:  This is 9.

15              MR. FULLER:  This is going to be

16         Plaintiff's Exhibit Number 9.

17              MR. PYSER:  Counsel, do you have

18         another copy of Exhibit 9?

19              MR. FULLER:  I'm sure we do.

20              MS. SHIVERS:  No.

21              MR. FULLER:  That's the only one

22         we have, I think.  See if we have

23         another one.  We'll check.

24              MR. PYSER:  Well, as you were
```

```
1              pointing out earlier, the depo protocol

2              requires certain things.  One of them is

3              that you have a copy for counsel.

4                   MR. FULLER:  Sure.  Why don't we

5              go ahead and take our lunch break now,

6              and we'll go make copies.

7                   MR. PYSER:  That's fine.

8                   THE VIDEOGRAPHER:  The time is now

9              12:18.  Going off the record.

10                            - - -

11         Thereupon, at 12:18 p.m. a lunch

12          recess was taken until 1:23 p.m.

13                            - - -

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                          Thursday Afternoon Session

                            November 15, 2018

 2                          1:23 p.m.

 3                          - - -

 4             THE VIDEOGRAPHER:  The time is now

 5        1:23.  Back on the record.

 6          CROSS-EXAMINATION (CONT'D.)

 7   BY MR. FULLER:

 8        Q.    All right, Mr. Hartman.  Before we

 9   took the lunch break, we were talking a little

10   bit about the staffing issues and the regulatory

11   department.  I think, just so it's clear, we

12   looked previously at the 2005 time frame; is

13   that correct?

14        A.    Yes.

15        Q.    Okay.  I'll provide you with 3868.

16   I'll provide it to your counsel, and he can pass

17   it out.

18             Had you seen this document before

19   today?

20        A.    I don't recall seeing it, and --

21        Q.    So you --

22        A.    I don't recall seeing this

23   document.  Yeah, this is prior to my time, I

24   think.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Fair enough.

 2              So you have no recollection and no

 3   one showed you this document before today,

 4   correct?

 5              A.    No.

 6              Q.    Fair enough.

 7              So this is --

 8              MR. FULLER:  What number is it?

 9         Did we give it a number yet?

10              MS. SHIVERS:  It's 9.

11   BY MR. FULLER:

12              Q.    Okay.  This is Plaintiff's 3868,

13   but, Mr. Hartman, for the purposes of the

14   deposition, it's going to be Exhibit 9.  Now, at

15   the top of this document, it indicates that it's

16   the Drug Distribution Compliance Budget Review,

17   Fiscal Year 2007.

18              Do you see that there?

19              A.    Yes.

20              Q.    And so this is a fiscal year 2007,

21   which is going to start in July of 2006,

22   correct?

23              A.    I think we can assume that, right.

24              Q.    Okay.  So this may be sometime,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    like we talked about earlier, the budgetary

 2    process in the first part of 2006 before the

 3    budget becomes active in July?

 4           A.    Sure.

 5           Q.    Okay.  And this talks about it's

 6    the Department Budget Highlights/Assumptions -

 7    Bullet Point, budgetary variance from forecast,

 8    new hires, organizational chart, expenses, '07

 9    budget trend, and the actual/forecast trend from

10    2006; is that correct?

11           A.    Yes.

12           Q.    Okay.  So, for example, this would

13    be part of the process you would have gone

14    through after you arrived in December of 2007.

15    You would have went through that process

16    sometime in the first part of 2008; is that

17    fair?

18           A.    Yes, I would have --

19           Q.    Okay.

20           A.    -- in some regard.

21           Q.    So let's turn to the next page.

22    You see the budgetary -- or excuse me --

23    "Compliance Budget Review, Fiscal Budget

24    Highlights and Assumptions."
```

1          Do you see that there?

2     A.    I see it, yes.

3     Q.    And it has "Director,

4  Quality & Regulatory Affairs."

5          Can you read that first sentence

6  in that section for us aloud, please.

7     A.    "Current department staff work --

8  current department staff workloads are at full

9  capacity."

10    Q.    Full capacity.  That would lead

11 one to believe that the staff that it is there

12 is being used to the fullest extent possible,

13 correct?

14          Is that what that generally means?

15    A.    Full capacity means you're working

16 just like we always work in every job we've got.

17    Q.    Fair enough.

18          Read the next sentence for us.

19    A.    "Effective management" -- okay.

20 "Effective management of current projects and

21 initiatives is difficult."

22    Q.    Difficult.

23          And then let's go on.  So, so far

24 compliance department has told us that their

```
 1   full capacity and effective management for

 2   current projects is -- and initiatives is

 3   difficult.  But then read the next sentence.

 4           A.    "Resources to take on new

 5   initiatives and the ability to improve and

 6   enhance existing programs are lacking."

 7           Q.    Lacking.  Lacking resources.

 8                 Now, let's back up for a second,

 9   because we saw similar concerns voiced in 2005,

10   correct?

11           A.    We saw that.

12           Q.    By the regulatory department?

13           A.    Yes.

14           Q.    And there may have been some

15   reorganization that you pointed on going on back

16   then.

17           A.    Yes.

18           Q.    Now we're 2006 looking for the

19   2007 budget, right?

20           A.    Yes.

21           Q.    And we're seeing the same kind of

22   lack of resource concerns, are we not, being

23   voiced by the compliance department?

24           A.    I wasn't there.  I don't --
```

```
1           Q.    That's what it says, isn't it?

2           A.    Again, I can't -- I can't tie

3    those two documents together as to what the

4    issues are and what they're doing.

5           Q.    I'm not asking you to tie them

6    together.  I'm just asking you what compliance

7    department is telling the budgetary people is

8    that they need more resources.  The resources

9    they have for existing programs is lacking;

10   isn't that what they're saying?

11                MR. PYSER:  Object to form.  Calls

12          for speculation.

13          A.    The only way I can respond to you

14   is that in every budget meeting and budget

15   review, every department made the same kind of

16   comments looking for not only the needs but

17   their wants.

18          Q.    And at this point in time, my

19   question is, Mr. Hartman, isn't the compliance

20   department saying they're lacking resources to

21   do the existing programs?

22          A.    In this document, that's what this

23   says.

24          Q.    And then they say specifically, "A
```

```
 1   resource is needed to manage EH&S."

 2              Do you know what that is?

 3        A.    Environmental health and safety.

 4        Q.    The program build-out.

 5        A.    Did I get that right?

 6        Q.    I believe so.

 7              And let's continue to all the

 8   areas that they need resources in.

 9              "Standard operating procedure

10   development," right?

11        A.    Yes.

12        Q.    "Maintenance and document

13   control," correct?

14        A.    Yes.

15        Q.    "NABP, wholesaler accreditation

16   process," right?

17        A.    Yes.

18        Q.    "New complex state licensing

19   requirements and to assist in ongoing

20   initiatives, such as pedigree," correct?

21        A.    That's what it says.

22        Q.    And specifically related to us,

23   "supply chain integrity," right?

24              MR. PYSER:  Object to form.
```

```
 1          A.    I --

 2          Q.    Is that what it says?

 3          A.    I see that, but I --

 4          Q.    "Web-based regulatory training and

 5    day-to-day management of field activities."

 6                That's what they're listing that

 7    they need assistance with as far as additional

 8    resources, at least according to this document;

 9    is that correct?

10                MR. PYSER:  Object to form.  And

11          please let the witness finish his

12          answer.

13          A.    The only comment I wanted to give

14    you, when it says "pedigree" and then "supply

15    chain integrity," at that time those were tied

16    together because that was another fundamental

17    concern, was pharmaceuticals moving over road.

18                And so when we talked about, if I

19    recall correctly, supply chain integrity, that's

20    what that was being referred to, was pedigree,

21    and then how those products would be tracked and

22    traced on the road.  It wasn't a requirement at

23    that time, but it appeared to be coming.

24          Q.    Fair enough.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Just to clarify.  I think that's

2     what that meant there.

3          Q.     And, therefore, regulatory is

4     asking for additional resources to help manage

5     these initiatives and projects, correct?

6          A.     I see the comment.  Is there

7     another page that's -- of their ask?  Because in

8     the budget they then would ask, I presume; the

9     numbers, the head count.

10         Q.     Right.  But this says specifically

11    a resource is needed, and they list all those

12    topic areas, correct?

13         A.     I see what you're saying.  Yeah,

14    they're saying the director of quality and

15    regulatory affairs as the new head count.

16    Agreed.

17         Q.     Okay.  So let's go to page 5.

18                This is, "Organizational Chart,

19    Quality & Regulatory Affairs."  Remember I asked

20    you about the makeup of the department when you

21    came in, right?

22         A.     Yes.

23         Q.     You weren't sure how many people

24    were there.  Now, here we can see, Mark Parrish

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is the president and CEO of PDPS, right?

 2            A.    Yeah, that's right.

 3            Q.    What is "PDPS," for the jury?

 4            A.    Pharmaceutical -- I don't remember

 5    the acronym.

 6            Q.    Distribution and Prescription

 7    Supply or something like that?

 8            A.    You know, I think Mark -- it

 9    actually meant something a little different,

10    because he actually was in charge of

11    pharmaceutical and medical, I think.

12            Q.    Fair enough.

13            A.    The two divisions, so yes.  I

14    don't know what it means.  I can't remember the

15    acronym.

16            Q.    So he's the head honcho of

17    whatever this division is, PDPS, correct?

18            A.    That's right.

19            Q.    So under him we have Mr. Reardon,

20    correct?

21            A.    Yes.

22            Q.    And he was in regulatory when you

23    arrived in December of '07; isn't that fair?

24            A.    Yes.
```

1          Q.    So we know we have Mr. Reardon,

2     and then we have Kristeen Nicholson-Miller is

3     another person in this organizational structure,

4     but she's an administrative assistant, correct?

5          A.    Yes.

6          Q.    And by "administrative

7     assistant" -- I don't mean to demean the role,

8     because it's a very important role, but we're

9     not talking about someone that goes out and

10     performs regulatory functions, correct?

11          A.    Generally that's not how I use

12     mine, but, yes, I -- that may be true in this

13     case.  You'll have to ask Mr. Reardon about it.

14          Q.    Fair enough.

15                And then the third employee we

16     have is Mr. Brantley, correct, as a manager?

17          A.    Yes.

18          Q.    And we have two more, Don Bennett

19     and Elaine Trautman --

20          A.    Yeah.

21          Q.    -- both as managers.  And it

22     appears they're searching or asking for at least

23     positions.

24          A.    I see that.

```
 1              Q.    So at least at this time, in '06,

 2    in our QRA department we have -- and we'll give

 3    credit for administrative assistant.  We have

 4    five people, at least according to this

 5    corporate structure, don't we?

 6              MR. PYSER:  Object to form.  Calls

 7         for speculation.

 8         A.    Okay.

 9         Q.    I mean, do you have any

10    information to disagree with this?  Do you know

11    something else?

12         A.    The only -- I don't think -- I

13    don't think I do, but I know there were field

14    compliance people.  I don't know where they

15    reported.  If they didn't report to Steve, then

16    they would probably work hand-in-hand with his

17    department.

18         Q.    Fair enough.

19         A.    I don't know that's fact.  I'm

20    just saying as I recall.

21         Q.    But we can at least say within the

22    corporate offices, this is the QRA team --

23         A.    Yes.

24         Q.    -- during this time frame at
```

1    least?

2            A.    Yes.

3            Q.    And this QRA team is responsible

4    for the 27 distribution centers in overseeing

5    compliance with all 27 distribution centers,

6    correct?

7            A.    If that's the number at the time,

8    then that would be right.

9            Q.    Okay.

10           A.    I don't remember the exact number

11   of distribution centers we had.

12           Q.    And these distribution centers are

13   spread across the country, aren't they?

14           A.    Yes.

15           Q.    From Washington state -- I think

16   it's Auburn in Washington state, correct?

17           A.    Yes.

18           Q.    All the way down to Lakeland,

19   Florida?

20           A.    Yes.

21           Q.    Let's go to the next page.  And

22   let's start at the top again.

23                 This appears to be a budget for

24   the compliance department; is that right?  It

```
 1   says, "Region/Department:  Compliance."

 2        A.    Yep, that's what it looks like.

 3        Q.    It says, "Forecast '06" -- excuse

 4   me.  "Fiscal year '06 forecast (actuals through

 5   March 31, '06)."

 6             Do you see that there?

 7        A.    Yes.

 8        Q.    And that would be consistent with

 9   what we talked about earlier as to when they

10   would be preparing for the '07 budget, correct?

11        A.    Yes.

12        Q.    Sometime in the first half of

13   2006?

14        A.    Yeah.

15        Q.    And let's go through and look at

16   this for just a moment.  If we go down to the

17   fiscal year unusuals for '07.

18             Do you see that section?

19        A.    Yes.

20        Q.    And we drop down to the first

21   segment under there, "Additional travel for new

22   FTEs."

23             What are "FTEs"?

24        A.    Full-time employees.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    We also have -- let's see.

 2    "Relocation for new director."

 3              Do you see that second one?

 4              A.    I do.

 5              Q.    So this budget includes adding

 6    those new employees in that they're requesting,

 7    correct?

 8              A.    Yes, looks like that.

 9              Q.    What -- according to this, what is

10    the ask from compliance for 2007 fiscal year?

11              A.    Are you asking me what this budget

12    was asking for?

13              Q.    Yes, sir.

14              A.    It appears to be $997,000.

15              Q.    So less than a million dollars is

16    what compliance is asking for for their entire

17    corporate department, correct?

18              A.    Well, I mean, we tend to --

19              MR. PYSER:  Object to form.

20              A.    We tend to round.  I mean, a

21    million dollars would probably be --

22              Q.    We'll say a million dollars.  Fair

23    enough?

24              A.    Okay.  Let's say that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  A million dollars.

 2                    Now, you know that shortly after

 3    this, you prepared a PowerPoint presentation

 4    which represents that Cardinal was making,

 5    generating revenue of $87 billion, correct?

 6              A.    Ask me that again.  Did you say I?

 7              Q.    Yes.  Let's back up.

 8                    You know that Cardinal generates

 9    revenue in the billions of dollars, correct?

10              A.    Yes.

11              Q.    And if documents indicated that

12    revenue was around $87 billion, you wouldn't

13    have any reason to dispute that, would you?

14              A.    No.

15              Q.    Do you know what percentage a

16    million dollars makes of 87 billion?

17              A.    Well, I'd need to do the math, but

18    it's a -- it's a small percentage.

19              Q.    A very small fraction of a

20    percentage point, right?

21              A.    That's what it is.

22              Q.    How does that -- and let me ask.

23                    Do you have any idea what the

24    sales team's budget was?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I have no idea.

 2              Q.    So Mr. Lanctot -- do you know

 3     Mr. Lanctot?

 4              A.    It doesn't ring a bell.

 5              Q.    Regional sales manager for the

 6     central United States?

 7              A.    I don't recall him.  I might know

 8     him.  I might have met him.  I don't recall him.

 9              Q.    So you -- he testified that he had

10     a sales force of over 100 persons.

11              A.    Okay.

12              Q.    For the center of the United

13     States.

14              A.    Okay.

15              Q.    And that there was an east and a

16     west.

17                    Fair to say sales budget is going

18     to be far in excess of a million dollars, isn't

19     it?

20                    MR. PYSER:  Object to form.

21              Q.    Just based on the number of

22     employees alone.

23              A.    Yes.

24              Q.    Without question, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    This budget, if you were coming in

 3   during this time frame, wouldn't be sufficient

 4   for you, would it?

 5               MR. PYSER:  Object to form.  Calls

 6          for speculation.

 7          A.    I don't know.  I wasn't there.  I

 8   wasn't in the department.

 9          Q.    Well, you --

10          A.    When I took it over, I've already

11   told you what I did.

12          Q.    And let's back up.

13                You were there at Cardinal during

14   this time?

15          A.    I was, yes.

16          Q.    You just weren't in the regulatory

17   or compliance department?

18          A.    That's right.

19          Q.    So let's go to what you did do.

20   Let's go to 3874.

21                         - - -

22        (Cardinal-Hartman Exhibit 10 marked.)

23                         - - -

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. FULLER:

 2           Q.   And, again, you'll have the hard

 3   copy, and it will be in front of you.

 4                The initial e-mail here is

 5   "Anti-Diversion."

 6                Do you see that, the subject line?

 7           A.   Yes.

 8           Q.   And it's from a Michele Conway?

 9           A.   Yes.

10           Q.   January 11, 2008, shortly after

11   you joined the division, right?

12           A.   Yes.

13           Q.   And who is Michele Conway?

14           A.   Michele was a financial manager, I

15   believe, at the time.

16           Q.   And who is Brian -- is it Bonnell?

17           A.   Yes, Brian Bonnell.

18           Q.   Who is he?

19           A.   I believe he was Michele's

20   superior, finance department.

21           Q.   Okay.  And Michele -- or excuse

22   me.  Yeah, Michele is writing to Brian in the

23   initial e-mail, indicating that you guys had

24   met?
```

```
 1              A.    Okay.

 2              Q.    Is that correct?

 3              A.    I don't recall it, but I'm sure we

 4    did.

 5              Q.    She says, "I met with Mark."  I'm

 6    assuming it's you because you're the only one --

 7    other one on the e-mail chain, correct?

 8              A.    Yes.

 9              Q.    And it says, "I -- and gained

10    greater understanding of increased CAH staffing

11    and supply chain integrity and anti-diversion

12    department," right?

13              A.    Okay.

14              Q.    And if we go down to the parts

15    that she's clarifying.  She says, "Two points,"

16    and read the first point to us, Mr. Hartman,

17    where it starts "Field QRA."

18              A.    "Field QRA realignment to ensure a

19    full-time QRA person in every DC (22 DCs, NLC,

20    and ParMed).  Currently there are 12 full-time,

21    FT, positions already filled and 12 areas where

22    there are people partially filling those roles

23    which will need to be converted to full-time

24    roles."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And that's something that you set

 2    out to do when you came into this division; is

 3    that correct?

 4              A.    Yes.

 5              Q.    You wanted full-time people at

 6    each one of the distribution centers?

 7              A.    Correct.

 8              Q.    You felt that that was important

 9    and that's what needed to be done to effectively

10    manage the compliance role, right?

11              A.    Yes.

12              Q.    And this is where I think we get

13    to Mr. Moné.  Read the next bullet for us.

14              A.    "Creation of anti-diversion

15    department that will be headed by Michael Moné,

16    VP, currently staffed with one director,

17    E. Brantley, and two investigators.  The future

18    state of this department in the very near term

19    is to have two directors and six investigators.

20    Eric Brantley will not assume one of the

21    director roles but will move into a role

22    supporting NYIG-related items.  Mark and his

23    admin will be part of this group.  The total

24    projected head count for anti-diversion
```

1    department is 12."

2            Q.    So you're taking it from three to

3    twelve in the anti-diversion department, at

4    least according to this e-mail?

5            A.    Yeah.  I think the number -- I

6    think those numbers are right.

7            Q.    Because prior to you stepping in

8    and getting involved, it appears, for however

9    long anti-diversion was around, that there was

10   one director, Mr. Brantley, correct?

11               It's right on that e-mail.

12           A.    What was -- was that his role --

13   you showed me the prior document.  Is that from

14   where you saw Eric's name?

15           Q.    No, sir.  If you look at the

16   e-mail you just read.

17           A.    Yeah.  Okay.

18           Q.    It says, "Currently staffed with

19   one director, E. Brantley."

20           A.    Okay.  I gotcha.

21               Yes.

22           Q.    And two investigators?

23           A.    Yes.

24           Q.    So you increased it by fourfold

```
 1    coming into this department, right?

 2         A.    It looks like it.

 3         Q.    And is, again, that because you

 4    felt that was what was necessary to be able to

 5    monitor compliance through all these

 6    distribution centers?

 7         A.    Yeah.  As I came into role, I

 8    was -- and understanding as I got into role

 9    these immediate suspensions, what we needed to

10    do, the changes that had come from the DEA and

11    what we needed to do in order to accommodate

12    those changes, yes, I was out to staff this with

13    more people.

14         Q.    Now, we talked about the situation

15    on changes, and we're not going to revisit that

16    because I think we made that clear.  But you

17    were envisioning, when you came into this

18    department, fixing it to the point that you

19    could feel comfortable that proper compliance

20    was being maintained; is that right?

21         A.    I came into the role under some

22    pretty tenuous circumstances that Cardinal had

23    been issued the suspensions.

24         Q.    Three suspensions, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    It was three suspensions.

2            Q.    And another Order to Show Cause?

3            A.    That's right.

4            Q.    And it was voluntarily given up?

5            A.    In January of 2008 --

6            Q.    And then a fine as well?

7            A.    Houston --

8                  MR. PYSER:  Counsel, let him

9            finish his answer before you ask another

10           question.

11                 MR. FULLER:  Sure.  I apologize.

12   BY MR. FULLER:

13           Q.    Go ahead.

14           A.    Okay.  What -- the fine you're

15   talking about is from when?  What fine were you

16   mentioning just now?

17           Q.    The DEA investigation related to

18   the suspensions.

19           A.    So later in 2008, when we had a

20   settlement?  Okay.  Let me come back to -- I'm

21   sorry.  What was I commenting on?  You threw me

22   on the fine.

23           Q.    No, no, no.  You're fine.  I

24   apologize.  It's my fault.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    So in any case, you basically
2      supersized the compliance department when you
3      came into it?
4              A.    I increased it to what I wanted,
5      not only needed.
6              Q.    Okay.  We talked earlier -- I
7      believe the testimony is clear -- that you
8      didn't go in there just asking for stuff that
9      you didn't need?
10             A.    Anything I asked for, we had
11     looked at, figured out what was necessary for us
12     to do, and anything that -- as I've commented to
13     you on budgeting, if I wanted it, I got it.
14             Q.    In actuality, you needed more than
15     what was actually given to you.
16                   Let's go to 3896.
17                   Do you remember about your
18     employees complaining about having to work
19     nights, weekends, as well as days?
20             A.    In what time period?  Because
21     every group I've ever had, we would complain
22     about those things, including myself.
23             Q.    This time period.  This time
24     period.
```

```
 1              A.    Sure.  Yeah.

 2                       - - -

 3        (Cardinal-Hartman Exhibit 11 marked.)

 4                       - - -

 5   BY MR. FULLER:

 6              Q.    Who's Steven Lawrence?

 7              A.    Let's see.

 8                    So this is January 28th of 2008.

 9              Q.    I think it's actually -- the

10   e-mail from Mr. Lawrence is January 26th.  Then

11   at the bottom of that first page.

12                    You've got a different document.

13                    MS. QUEZON:  What exhibit are we

14          on, Mike?  Is that 11?  3896?

15                    MR. FULLER:  Yeah.

16                    Can I get that back?  That's the

17          number I have.  Is that the same one?

18                    (Discussion held off the record.)

19                    MR. FULLER:  Oh, you got the

20          invoice and stuff too.  I'm not worried

21          about that.  There you go.  Sorry about

22          that.

23                    MS. QUEZON:  What exhibit are we

24          on?  Is it 11?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. VELDMAN:  It is 11, yeah.

 2              MR. FULLER:  Thank you.

 3              So this would be Plaintiff's

 4         Exhibit Number 11.  Is it still bottom

 5         of the first page?  It is, right?  Yeah.

 6              MS. VELDMAN:  That's what you

 7         want?

 8              MR. FULLER:  Yeah.

 9    BY MR. FULLER:

10         Q.   I'm sorry, Mr. Hartman.

11              Bottom of the first page, I think,

12    begins the e-mail chain; is that right?

13         A.   Yes, it looks like that.  Yes.

14         Q.   And that's from Steven Lawrence?

15         A.   Okay.  Yes.

16         Q.   And I think you said January 28th,

17    but I want to make sure the record is clear.

18    It's Saturday, January 26th --

19         A.   I see that.

20         Q.   -- 2008.

21         A.   I see that.

22         Q.   And this is after you've come into

23    this department.  Like you mentioned earlier,

24    you've been there six weeks, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes, yes.

 2            Q.    And Mr. Lawrence.  Who is

 3    Steven Lawrence?

 4            A.    At this time -- well, you know,

 5    Steve was on the pharmaceutical side of

 6    business, and I -- I'm recalling at this time

 7    period, he was the -- I don't know title.  He

 8    was the marketing -- marketing guy.  Probably

 9    SVP.  Might have been VP, SVP.  I don't -- I

10    don't recall his role during this time period.

11            Q.    All right.  And this e-mail is

12    going to a whole bunch of different groups,

13    correct?  GNSA retail?

14            A.    Yes.  A lot of people.

15            Q.    Managers, sales managers, so forth

16    and so on?

17            A.    Yes.

18            Q.    And cc'd to yourself, Mr. Moné?

19            A.    Yes.

20            Q.    Todd Cameron, Thomas -- how do you

21    pronounce it?

22            A.    Todd Cameron, Mark Hartman,

23    Tom DeGemmis.

24            Q.    DeGemmis.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And read the subject for us.

 2          A.     "Threshold system and customer

 3    issues - Detailed summary, so I apologize for

 4    the lengthy e-mail."

 5          Q.     So if you turn to the second page.

 6          A.     Okay.

 7          Q.     And the second paragraph there,

 8    Mr. Lawrence says, "We currently are working

 9    very hard to staff up our QRA group.  Please

10    understand that we are working day, night,

11    weekends, but they have been understaffed, and

12    Mark Hartman is working hard to get the

13    situation rectified."

14                    Right?

15          A.     That's what it says.

16          Q.     Do you remember the staff having

17    to work day, night, and weekends to try to keep

18    up at this point in time?

19          A.     We were all working -- we worked a

20    lot of hours.  I don't remember the --

21          Q.     You don't recall this

22    specifically?

23          A.     Right.

24          Q.     But you recall this time being
```

```
 1   very challenging?

 2          A.    Yes, we -- well, with three

 3   immediate suspension orders, I guess we're still

 4   yet to see the Houston situation.  Yeah, we were

 5   working very, very hard in a lot of fronts.

 6          Q.    And your focus at that point was

 7   compliance; am I right?

 8          A.    Yes.  Compliance with the DEA

 9   guidelines that we were now operating under.

10          Q.    Now, you say "compliance with the

11   new DEA guidelines."  We saw the regulations.

12   The regulations hadn't changed in over 30 years,

13   40 years, right?

14          A.    That's what we talked about.

15          Q.    We looked at the CSA?

16          A.    Yes.

17          Q.    And we looked at the regulation as

18   a subpart of the Controlled Substances Act,

19   right?

20          A.    Right.

21          Q.    Those have been consistent through

22   time and are still in place today, as far as you

23   know?

24          A.    Those regulations were consistent.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Which wasn't consistent was the DEA conditions,

2    because as I had commented to you -- you're

3    drawing on your chart there.  What changed in

4    that is I came on board.  The number one thing

5    that we would talk about was that we could not

6    ship a suspicious order, and that was one of the

7    biggest changes that came out of the DEA prior

8    to my time.

9              Because Cardinal had been meeting

10   the guidelines, requirements of the DEA in the

11   reports that they had put in, and that's what I

12   came to understand.  And one of the elements of

13   a big world that we had to work on and fix that

14   happened was in that time period, with those

15   same regulations, to your point, that I

16   understand didn't change.  The guidelines

17   changed.

18        Q.    So -- well, we can agree to

19   disagree on some things, Mr. Hartman.

20             But you're saying that when you

21   came in, you had to design a system that halted

22   suspicious orders.  Is that what you're telling

23   the jury?

24             MR. PYSER:  Object to form.

```
1              Q.    That would not allow a suspicious

2    order to be shipped?

3              A.    I improved a system to identify

4    suspicious orders, and now -- and now, as the

5    team explained it to me -- and now we could not

6    ship that order.

7              Q.    And "now" as of when?  As of

8    December?

9              A.    December of 2007 when I stepped

10   into role.

11             Q.    So that was a new --

12             A.    That's how I understood it.

13             Q.    That's -- and is it your

14   understanding that prior to that point in time,

15   Cardinal was shipping suspicious orders?

16             A.    I -- well, what I know -- again --

17             Q.    I'm just asking you, yes or no,

18   prior to that point in time, was Cardinal

19   shipping suspicious orders, if you know?

20                   MR. PYSER:  Object to form.

21             A.    What limited amount I know is that

22   Cardinal was responding to the DEA with specific

23   reports that were at the end of month, and I do

24   know that DEA -- that Cardinal employees were in
```

1   touch with DEA, and I know that those orders

2   were shipped, because the requirement was an

3   end-of-month report.  There was -- there wasn't

4   another requirement on that.

5           So when you say, "Was it a

6   suspicious order shipped," I don't know that,

7   but it could be, because it was -- it was -- it

8   was an end-of-month report, was the requirement.

9   That's what I know of that system.

10          MR. FULLER:  So let's pull back up

11      4915.

12  BY MR. FULLER:

13      Q.   So, Mr. Hartman, this is the

14  regulation --

15          MR. PYSER:  Do you want to give

16      him the exhibit number so he can find it

17      as well.

18      Q.   4915.  P5, Number 5.

19          Do you have that in front of you,

20  Mr. Hartman?  It's also on the screen.

21      A.   Yep.

22      Q.   So point to the jury to where that

23  regulation says that you can monthly report

24  suspicious orders.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PYSER:  Object to form.

 2              MR. FULLER:  No, it's not 16.

 3         It's 15, please.  No, no, no -- yes, I

 4         want the suspicious order requirement.

 5         It's 4915.  Thank you.

 6              MR. PYSER:  Then you've given the

 7         witness the wrong exhibit number.

 8         Q.    Four.

 9              So, Mr. Hartman, I want you to

10    explain to the jury where it says that we can

11    delay reporting suspicious orders to the end of

12    the month.  Where does this regulation say that?

13              MR. PYSER:  Object to form.

14         A.    I'm not the expert in this.

15              MR. FULLER:  I've got the -- thank

16         you.

17    BY MR. FULLER:

18         Q.    Again, and we'll solidify that you

19    are not the expert in anti-diversion or supply

20    chain integrity, correct?

21         A.    Never tried to be and haven't been

22    an expert in any role I've had.  I lead

23    organizations and we take on the work that we

24    have to do and we do it well.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Now, Mr. Hartman, just yes or no.

 2    Are you a expert in supply chain integrity or

 3    anti-diversion?

 4                     MR. PYSER:  You can answer the

 5              question as you'd like.

 6              Q.     Yes or no.

 7              A.     I would not label myself as an

 8    expert.

 9              Q.     Fair enough.

10              A.     Nor have I in any job I've ever

11    had.

12              Q.     So does this regulation indicate

13    that you can delay reporting or does it say that

14    it has to be reported when discovered?

15                     MR. PYSER:  Object to form.  Legal

16              conclusion.

17              A.     All I'm telling you, at the time

18    when I stepped into role, what I came to

19    understand were the changes that were made by

20    the DEA, and we were operating with DEA guidance

21    prior to my time, according to my team and those

22    that were there, and that's what they told me

23    about in December of 2007 was one of the major

24    changes that we had to address.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    What DEA guidance are you

 2    referring to?

 3                  Are you sure?  Did you

 4    double-check your team?

 5                  MR. PYSER:  Object to form.

 6            Q.    Did you double-check your team,

 7    Mr. Hartman?

 8            A.    I don't recall.

 9            Q.    Did you call the DEA and ask them

10    yourself?

11            A.    Many times.  I tried to -- I tried

12    to talk to them, and I know my team did talk to

13    them.

14            Q.    Who -- who did you call at DEA?

15            A.    Let's see.  The names that I

16    recall are Larry Cody, was the principal

17    attorney that Cardinal worked with at the DEA.

18    I think his supervisor was Linden Barber.  There

19    were --

20            Q.    Who now works for Cardinal, right?

21                  MR. PYSER:  Object to form.

22            Q.    No, McKesson.  No, Cardinal.

23                  Do you know if he works for

24    Cardinal now?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   MR. PYSER:  Please allow the

 2            witness to finish his answer before you

 3            cut him off.  It keeps happening.  You

 4            got to let him finish his answer.

 5                   MR. FULLER:  He's got to answer

 6            the question being asked, too.

 7            A.    I'm aware of that.

 8            Q.    Okay.

 9            A.    And there were a couple -- I'm

10     trying to answer the last question.

11            Q.    I'll strike it.

12                   So were you provided with the

13     letters from the DEA when you came into your

14     role that set out what they expected?

15            A.    I reviewed the ones that were

16     earlier from my -- before my time frame.

17            Q.    Okay.  You reviewed those?

18            A.    Well, yeah, I read through them,

19     but then there was another one that came pretty

20     soon after I was in role.

21            Q.    Fair enough.  So let's go to 4050.

22                          - - -

23         (Cardinal-Hartman Exhibit 12 marked.)

24                          - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. FULLER:

2          Q.    And if you'll turn to the second

3   page.

4                MR. PYSER:  What exhibit number

5        are we on?

6                MS. SHIVERS:  It's 12.

7                MR. PYSER:  Thank you.

8   BY MR. FULLER:

9          Q.    This is Joe Rannazzisi's letter to

10  all the wholesale distributors, September of

11  2006.

12               Do you see that?

13         A.    I see it.

14         Q.    This would have been one of those

15  that you reviewed, correct?

16         A.    It certainly would have.  I -- I'm

17  sure I did.

18         Q.    This was sent to the Lakeland

19  facility distribution center.

20               Do you see that?

21         A.    Yes.  I see it.

22         Q.    It's a distribution center

23  Cardinal owned.  It's one that got its license

24  suspended twice over the past decade, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I believe that's right.

 2              Q.    So if you'll turn to page 3.

 3                    And do you see in the middle of

 4    the page where it talks about, "The DEA

 5    regulations require all distributors to report

 6    suspicious orders of controlled substances."

 7                    Do you see that, Mr. Hartman?

 8              A.    Counsel, I see it on the screen.

 9                    MR. PYSER:  Counsel, I think

10              there's some confusion.  You're saying,

11              page 3 using 4050.3.  The witness may be

12              on the third page of the document.

13              Q.    Page 3, upper right-hand corner,

14    Mr. Hartman.

15                    MR. PYSER:  Use the right-hand

16              corner so we're all on the same page.

17              A.    Okay.

18              Q.    You've got the page now?

19              A.    Ask me the question because I

20    wasn't finding the comment that you were talking

21    about.  DEA --

22              Q.    Let me see.  Yes, you're on the --

23    so in the upper right-hand corner you're at

24    4050.3 now, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    I see it.

2            Q.    Is that correct?  You're on the

3    right page?

4            A.    Yes.

5            Q.    Okay.  So do you see there,

6    Mr. Hartman, where the DEA -- it says, "The DEA

7    regulations require all distributors to report

8    suspicious orders of controlled substances"?

9                  Did I read that correctly?

10           A.    Yes.

11           Q.    And then it says, "Specifically

12   the regulation states," and it cites 21 C.F.R.

13   1301.74(b), which is the same exact regulation

14   that we've already looked at, correct?

15           A.    It looks that way.

16           Q.    And then it says, what we already

17   established, does it not, that it bears emphasis

18   that, "The foregoing reporting requirement is in

19   addition to and not lieu of the general

20   requirement under 21 U.S.C." -- which is the

21   United States Code we looked at earlier,

22   823(e) -- "that a distributor maintain effective

23   controls against diversion," doesn't it?

24                  Isn't that what it says,
```

```
 1   Mr. Hartman?

 2           A.    That's what it says.

 3           Q.    And read the next sentence aloud

 4   to us.

 5           A.    Where are you?

 6           Q.    "Thus, in addition to."

 7           A.    "Thus, in addition to reporting

 8   all suspicious orders, a distributor has a

 9   statutory responsibility to exercise due

10   diligence to avoid filling suspicious orders

11   that might be diverted into other than

12   legitimate medical, scientific, and industrial

13   channels."

14           Q.    You have to do your due diligence

15   or not ship your suspicious order; isn't that

16   what it's saying, Mr. Hartman?

17                 MR. PYSER:  Object to form.

18           A.    I'd have to review the whole

19   document.  I mean, this is before my time.  I

20   just told you, what I focused on when I went

21   into the role in December of 2007, that one of

22   the major changes that we had to address was the

23   not ship component.

24           Q.    Right.  And you also said that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   reviewed the earlier letters, which this was,

 2   from the DEA and that it was a -- your people,

 3   your people, told you it was a new requirement

 4   that you understood in December of 2007, a new

 5   guidance by the DEA, which is set out in this

 6   letter sent in September of 2006 --

 7                  MR. PYSER:  Object to form.

 8         Q.    -- right?

 9                  MR. PYSER:  Object to form.

10         Misstates the testimony.

11         A.    It said it was sent in 2006.

12         Q.    You don't dispute that, do you?

13         A.    No.

14         Q.    If it was sent in 2006 and

15   Cardinal received it in 2006, in September, they

16   knew then that they shouldn't be -- if they

17   didn't know it before, shouldn't be shipping

18   suspicious orders; we can agree with that, can't

19   we?

20                  MR. PYSER:  Object to form.

21         A.    I wasn't there.  I don't know what

22   the --

23         Q.    You were there.  You were at

24   Cardinal during this time.
```

```
 1              A.    I wasn't in the department.

 2              Q.    If this letter was sent to

 3     Cardinal, doesn't this give them the warning

 4     they need?

 5                    MR. PYSER:  Object to form.

 6              A.    I wasn't in the department.  I

 7     didn't receive the letter at that time.

 8              Q.    I'm not asking you if you did.

 9     I'm asking you to use common sense.  And does

10     this letter tell them exactly what you said they

11     weren't told about until December of 2007?

12                    MR. PYSER:  Object to form.

13                    Argumentative.  Asked and answered.

14              A.    Better answered by those that were

15     in place.  I don't have an opinion on it.

16              Q.    I'm not asking those that were in

17     place.  I'm asking you, because you've testified

18     the regulations or guidance changed.  You

19     testified that Cardinal didn't know about it

20     until December 2007?

21              A.    I did not say "didn't know about

22     it."  I said that was one of the major

23     requirements that we had to address.

24              Q.    And you testified that your people
```

```
1    told you that it was new as of December 2007.

2    The record will speak for itself.

3                I want to know --

4         A.    It was new to me.

5                MR. PYSER:  Object to form.

6         Q.    Well, of course it was.

7                MR. PYSER:  Object to form.  Give

8         me a chance to object.  Object to form.

9         Misstates testimony.

10        Q.    So you don't think this letter of

11   2006 from September puts Cardinal on notice?

12               MR. PYSER:  Object to form.  Calls

13        for a legal conclusion.

14        A.    I don't know what the regulatory

15   department was doing at that time.  So I don't

16   know what their reaction to it was or what was

17   discussed or what they did.

18        Q.    Well, they weren't doing much

19   because they only had five people.

20               MR. PYSER:  Object to form.

21        Argumentative.

22        Q.    So my question is, prior to

23   December of 2007, was Cardinal shipping

24   suspicious orders, yes or no, or I don't know?
```

```
1          A.    Before my time.

2          Q.    Do you know?

3          A.    I don't know.

4          Q.    You don't know whether Cardinal

5    was shipping suspicious orders before your time,

6    even though you came into this department, you

7    looked into all these issues and these different

8    distribution centers where licenses were

9    suspended, and you don't know if they were

10   shipping suspicious orders or not?

11                MR. PYSER:  Object to form.  Asked

12         and answered.

13         A.    Prior to my time.  We talked about

14   the environment we were in.  We talked about the

15   issues that we had and whether we were

16   calling -- or these accusations were accurate or

17   not.  I was brand new in role and trying to

18   figure out how to go forward.  That's what I

19   did.

20         Q.    And you've testified that you

21   reviewed these guidance letters, these letters

22   from the DEA, right?

23         A.    I know I read them at some point

24   in there early in my entry into the role.  I
```

```
 1    don't -- I didn't spend time on them, nor did I

 2    try to decipher them, other than to understand,

 3    what do we need to do at Cardinal?

 4            Q.    Absolutely.   Absolutely.

 5                  And the letter tells you what you

 6    need to do, right?

 7            A.    And that's what we would have

 8    pulled off of that, put it into a Gantt chart

 9    and a format and gone after it.

10            Q.    And it says that you need to do

11    due diligence before you ship suspicious orders,

12    and if not, you need to stop them, correct?

13            A.    And in my time -- I'm sorry.

14                  MR. PYSER:  Object to form.

15            Q.    Yes or no?

16            A.    In my time frame, that's exactly

17    what we went out to do.

18            Q.    Should it have been done before

19    your time frame?

20                  MR. PYSER:  Object to form.  Calls

21            for speculation.

22            A.    I wasn't in the department.  I

23    don't know exactly what was going on and what

24    the guidance was from the DEA, other than the
```

1    changes that I was made aware of.

2         Q.    I'm not asking you what was going

3    on.  I'm not asking you whether you were in the

4    department.  I'm asking you, should they have

5    been stopping suspicious orders before that time

6    frame?

7              MR. PYSER:  Object to form.  Calls

8         for a legal conclusion.

9         Q.    Yes or no?

10        A.    They should have been applying our

11   system to the guidance that we had from the DEA

12   in following that job.

13        Q.    That's not my question.

14             My question -- I'm going to ask it

15   one last time -- is, should they have been

16   stopping suspicious orders even prior to the

17   time that you came into the department, yes or

18   no?

19             MR. PYSER:  Object to form.  Asked

20        and answered.

21        A.    Prior to my time, Cardinal Health

22   team, I wasn't in charge of and didn't have

23   involvement with.  They were conducting

24   themselves, what they felt and they told me was,

Highly Confidential - Subject to Further Confidentiality Review

1    according to the DEA guidelines, and that's how

2    they conducted themselves.

3            Q.    That's not my question, and I'm

4    going to move on and certify that question, and

5    we'll ask the special commissioner to rule that

6    you have to answer the question I'm asking and

7    not one of your own choosing.

8                    MR. FULLER:  So with that, we'll

9            take another break.

10                   THE VIDEOGRAPHER:  The time is now

11           2:10.  We're going off the record.

12                   (Recess taken.)

13                   THE VIDEOGRAPHER:  The time is now

14           2:28.  Back on the record.

15                   MR. PYSER:  Addressing the comment

16           from counsel right before the break.

17           Two points.  The first one is that

18           Mr. Hartman has been answering the

19           questions, so I think the complaint and

20           the threat to go to the special master

21           is inappropriate.

22                   The second, I direct counsel's

23           attention to a discovery dispute between

24           Walmart and the Plaintiffs, dated

```
 1              August 31st, 2018, in a letter Walmart

 2              wrote which discussed the very type of

 3              testimony that Plaintiffs are seeking

 4              here about the interpretation with the

 5              Dear Registrant letters from the DEA.

 6                   And, in particular, Special Master

 7              Cohen's ruling dated September 3, 2018,

 8              in which Special Master Cohen ruled that

 9              Plaintiffs are entitled to obtain

10              testimony regarding compliance with

11              these subtopics, including the letter

12              that Plaintiffs were asking about here.

13              But not regarding past, present

14              interpretation agreement and/or

15              disagreement.

16                   We again submit that you're asking

17              for legal conclusions, and Special

18              Master Cohen has already ruled those

19              inappropriate.

20                   MR. FULLER:  No.  Special Master

21              Cohen, in that specific order, has rated

22              it to a 30(b) depo.

23      BY MR. FULLER:

24              Q.   Last I checked, you weren't a
```

```
 1   30(b) designee, were you?

 2           A.    You'll have to explain that to me.

 3           Q.    It's above my head, too,

 4   sometimes.

 5                 MR. FULLER:  Okay.  That's fine.

 6           We'll let Mr. Cohen decide it.

 7   BY MR. FULLER:

 8           Q.    So, Mr. Hartman, according to your

 9   testimony earlier today, before we took the

10   break, when you came in to the compliance

11   department in December of 2007, you were

12   informed by your specialty experts, subject

13   matter experts, as to what the status of

14   regulatory issues were, correct?

15           A.    Yes.

16           Q.    And you were informed at that time

17   that there was some sort of new requirement from

18   the DEA that suspicious orders not be shipped?

19           A.    That's my recollection.

20           Q.    And who -- which of your subject

21   matter experts -- I'm assuming it was either

22   Mr. Moné or Mr. Reardon, that explained that to

23   you?

24           A.    I don't recall who it was, but
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    I -- I suspect both were in the room at the same

2    time with, perhaps, other people as we talked

3    about this.

4            Q.    So whose purview would that have

5    fell under, because they're two separate

6    departments, right?

7            A.    We operate --

8            Q.    Supply chain integrity?

9            A.    Yes, that's right.

10           Q.    And regulatory compliance?

11           A.    That's right.

12           Q.    So whose purview would that have

13   fallen under?

14           A.    In regards to this situation, we

15   were operating as one team at that point.  They

16   were running their individual departments.  When

17   we met and collaborated, it would have generally

18   been with both Michael Moné and Steve Reardon,

19   and other attendees as well.  So I can't answer

20   who all was in the room.

21                But whose purview was it under?

22   In this regards, I suspect it was Steve Reardon

23   explaining to us where they had been and where

24   we were.  And Michael Moné, brand-new enroll --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    well, pretty new enroll, a little before me --

2          Q.    Sure.

3          A.    -- probably interpreting for me,

4    to help me understand, what do we need to do.

5    And then I set out with, how do we get there?

6    How do we -- how do we start putting the

7    strategy in place and move forward with these

8    guidelines?

9          Q.    And when you say it was likely

10   Mr. Reardon, that was because he was regulatory

11   compliance; is that correct?

12         A.    Yes.

13         Q.    Okay.  And you say, how do we get

14   there?  The job you were tackling is how to

15   implement a system that would prevent the

16   shipment of suspicious orders?

17         A.    How do we improve and build out

18   our system to meet these requirements, on top of

19   the system that was already in place.

20         Q.    Right.  And the new requirement, I

21   think as you have portrayed it, was the shipping

22   or not shipping of suspicious orders, correct?

23         A.    Well, there were many elements of

24   this.  There was the Know Your Customer piece
```

1    and the training that would go along with that.

2    An IT system that we were -- you know, we now

3    needed to build upon and add more analytics to

4    it.  So to answer your question, there were

5    several pieces that we immediately set sail on

6    to work on.

7            Q.    Right.

8            A.    To improve upon.

9            Q.    And one of those was not shipping

10   suspicious orders, correct?

11           A.    In our system, when we came upon a

12   suspicious order, then to ensure there was -- we

13   did not ship it.

14           Q.    Okay.  And again, that is part of

15   the new system that you were trying to roll out

16   and implement during this first part of 2008; is

17   that right?

18               MR. PYSER:  Object to form.

19           Misstates the testimony.

20           A.    Yes.

21           Q.    Let's go to 4689.

22               MR. FULLER:  Did I get that right?

23               MS. SHIVERS:  No.

24               MR. FULLER:  3892.  I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              This is going to be Plaintiff's

 2         Exhibit --

 3              MS. SHIVERS:  13.

 4              MR. FULLER:  Yes, Plaintiff's 13.

 5                   - - -

 6         (Cardinal-Hartman Exhibit 13 marked.)

 7                   - - -

 8  BY MR. FULLER:

 9         Q.    Mr. Hartman, have -- well, this

10  e-mail has your name on it, so I'm assuming

11  you've seen it before, correct?

12         A.    I -- sure.  I'm sure I have.

13         Q.    And you see the subject matter is

14  "UT Presentation"; is that right?

15         A.    Yes.

16         Q.    It relates to a presentation that

17  you did at the University of Tennessee; is that

18  correct?

19         A.    Yes.

20         Q.    And if you turn to the next page,

21  I believe it will be page 2.  There's the

22  exhibit that was part of that e-mail.

23              Does that look familiar to you?

24         A.    Presentation I gave at that time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And what was it that you were

 2    doing?  This says "Supply Chain Integrity,"

 3    right?

 4            A.    Yeah.

 5            Q.    And this is dated November 6 of

 6    2008.  Was that your understanding, the date of

 7    the presentation?

 8            A.    It probably was, but I -- I had

 9    May in my mind, like another six or seven months

10    later, but I don't recall when the presentation

11    was given.

12            Q.    Okay.  Well, at least this

13    document that we've found indicates it's

14    November 6 of 2008 --

15            A.    Yes.

16            Q.    -- right?

17            A.    I see that.  Yep.

18            Q.    Okay.  Now, other than your

19    memory, do you have any other reason to dispute

20    that this presentation at least was given at

21    some point in that time frame?

22            A.    I'd have to go through the

23    presentation, but, yeah, it looks like it's the

24    presentation that I delivered at a University of
```

1    Tennessee meeting of some sort, and I don't

2    recall what it was.

3            Q.    Okay.  So -- and that was going to

4    be my next question.  What kind of meeting was

5    this?

6            A.    It was an industry meeting.  A lot

7    of concerns around supply chain integrity.  So

8    the more focused nuance of this meeting was

9    around shipping of products and so forth, if I

10   recall, and I was talking about, from our

11   perspective, all of the issues that could exist,

12   and I can't remember if I -- I must have talked

13   about like things we were doing and how we were

14   trying to improve upon the system.

15           Q.    Sure.  Sure.

16                 And this was, again, other

17   industry individuals attending this meeting, to

18   the best you can recollect?

19           A.    Yes.

20           Q.    So if we go to page 3, I think

21   you'll see it indicates there Cardinal Health?

22           A.    Yes.

23           Q.    It says one of the -- the "Leading

24   provider of products, services and technologies

```
 1   for the healthcare industry/headquartered in

 2   Dublin, Ohio."

 3                Right?

 4        A.    Yes.

 5        Q.    And that's where the headquarters

 6   still is today; isn't that true?

 7        A.    Yes.

 8        Q.    It says, "No. 19 on the

 9   Fortune 500," and "43,500 employees in more than

10   25 countries."

11                Correct?

12        A.    That's what it says.  That's

13   right.

14        Q.    And you believe that information

15   to be true or you wouldn't have put it in the

16   PowerPoint, right?

17        A.    Yes.

18        Q.    And at this time we know you have

19   maybe quadrupled the size of the regulatory

20   team, at least in corporate, and were up to

21   about 12 or 15, right?

22        A.    Well, again, on the anti-diversion

23   team, that's where we were.  But as I said, as a

24   department, the regulatory affairs piece and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   anti-diversion, we were acting pretty closely as

 2   one department.

 3          Q.    Sure.

 4          A.    And in the regulatory affairs

 5   department, we would have had 30-some employees.

 6          Q.    You think you had 30-some

 7   employees in regulatory affairs?

 8          A.    That's how -- I don't know the

 9   exact number.  But we had one in every DC as a

10   compliance officer, and then we had our

11   headquarters staff.

12          Q.    Okay.

13          A.    We had licensing people.  We had

14   other folks in the regulatory affairs group, not

15   just working on anti-diversion.  So to answer

16   the number, I don't know, but we were operating

17   pretty closely as one team together on our

18   regulatory affair issues.

19          Q.    So that 30-plus number that you're

20   referring to, that's counting all the DCs --

21          A.    The distribution -- yeah --

22          Q.    -- or the individuals that you had

23   out at the individual distribution centers,

24   correct?
```

```
 1              A.    So, again, under anti-diversion,

 2      we built out Michael Moné's team.  And then the

 3      piece that we built under Steve Reardon's team

 4      was a compliance officer at each of the

 5      facilities.

 6              Now, the responsibilities were --

 7      while we put them in there was predominantly,

 8      out of the blocks, for anti-diversion, but they

 9      also were there to support other regulatory

10      affairs in the building -- in the distribution

11      center, I should say.

12              Q.    So -- and, again, if we go back

13      just to corporate, we're still looking at maybe

14      20 people, right?

15              A.    Well, at corporate?

16              Q.    Yes.

17              A.    Some number like that.

18              Q.    Fair enough.

19              So -- and then you also indicate,

20      "Headquartered in Dublin, Ohio, Cardinal is an

21      $87 billion global company."

22              87 billion, at least at this time,

23      during 2007, correct?

24              A.    That's what it says.
```

```
 1              Q.    And this is your presentation that

 2    you gave, right?

 3              A.    Yeah.  I think perspective here

 4    is, I also worked for Pepsi-Cola and I ran

 5    similar, you know, few billion divisions where

 6    our profits were higher than the kind of profits

 7    that we earn at Dublin.

 8                    So, you know, in my world, it was

 9    always kind of perspective around how many

10    people do you have, and we had 5,000 employees

11    in the pharmaceutical side of the business.  The

12    revenues that we generated was for the whole

13    corporation, not just pharma.  They were -- they

14    were the biggest piece.  But the employee count

15    was actually probably on the smaller side

16    because you tried to be very, very efficient.

17                    So to your point, just to clarify

18    a little bit, a distribution company has

19    incredibly thin margins.  So when we use the

20    revenue number in these aspects, the reality is,

21    that's to kind of show our size, but it's really

22    about the profit side, which is much thinner.

23              Q.    What you put in your presentation

24    is that you're a $87 billion company with over
```

```
 1    40,000 employees, right?

 2            A.    To present to these people on the

 3    whole Cardinal Health, not just pharmaceutical.

 4            Q.    Absolutely.  Top to bottom.

 5    That's what's all included, and that's how much

 6    money we generate?

 7            A.    Yes, that's right.  That's how

 8    much we -- how much revenue that we take in.

 9            Q.    How much money we generate, right?

10    How much we bring in?

11            A.    And then you got to add in, when

12    you talk about these scenarios in a business

13    context, you have to talk about what's the

14    profitability of an organization.

15            Q.    When you were giving this

16    presentation, did you talk about the

17    profitability?

18            A.    In this one, I didn't.

19            Q.    Okay.  Let's go to page 4.

20            A.    At least in -- I don't think I

21    did.

22            Q.    I wasn't there.  I didn't get the

23    invite.

24            A.    I don't remember it specifically
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    either.  Do I need to go through it, though,

2    if --

3            Q.    If you want to go off the record

4    and flip through it, you're more than happy.

5    It's your presentation.

6                  MR. PYSER:  You can go through it

7            on the record, if you want, as much as

8            you need to answer the questions.

9                  MR. FULLER:  He will not take my

10           time.

11           A.    Okay.  Well, let's just move on

12   and if I get to a spot, you'll give me a second

13   to look it over.

14           Q.    Fair enough.  Fair enough.

15                 So this is your picture, right?

16   Mr. Hartman, Mark Hartman, senior vice

17   president, supply chain integrity and regulatory

18   operations.  Joined Cardinal in 1998.

19           A.    That's a younger me.

20           Q.    Not much.  You look the same.

21           A.    Come on.

22           Q.    It says, "Oversight to Cardinal's

23   health, pharmaceutical, anti-diversion controls

24   and pedigree efforts," correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    "Regulatory oversight for

 3    Cardinal's 27 pharmaceuticals and 50 medical

 4    distribution centers nationally."

 5                    Across the entire country, right?

 6              A.    Yes.

 7              Q.    And let's talk about that.  When

 8    you were building out this new system, which,

 9    obviously, you had accomplished some by the time

10    we get to this presentation, your system was

11    being devised to be applied across the entire

12    country, wasn't it?

13              A.    Yes.

14              Q.    All distribution centers?

15              A.    Yes.

16              Q.    It was a systemic application

17    from, like we talked about earlier, Auburn,

18    Washington, all the way down to Lakeland

19    Florida?

20              A.    Yes.

21              Q.    And you wanted that because you

22    wanted everybody operating under the same rules?

23              A.    Yes.

24              Q.    Everybody performing the functions
```

Highly Confidential – Subject to Further Confidentiality Review

```
1   the same way?

2           A.     Consistency and commonality is

3   what we were after.

4           Q.     Absolutely.

5                  Let's go to page 5.

6                  This is entitled "Supply Chain

7   Integrity."

8                  Do you see that?

9           A.     Yes.

10          Q.     And there you go again.  "Supply

11  Chain Integrity is a holistic approach to the

12  supply chain ecosystem of an industry aimed at

13  creating a safe and secure supply chain from

14  manufacturer to end user."

15                 And let's talk about that just for

16  a second, because this supply chain that you're

17  working with is what is known as a "closed

18  system," isn't it?

19          A.     I think that's the term we used,

20  yes.

21          Q.     It's also the term the legislature

22  used in creating the CSA as well.  Okay?

23                 But do you know or have an

24  understanding what that means?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                  MR. PYSER:  Object to form.

2           A.    Give me an explanation so that I

3      can understand better what you're asking me.

4           Q.    Closed system.  We have a closed

5      system of distribution.  It's not open to

6      everybody, is it?

7           A.    Well, a closed system, I assume

8      that's correct.  And in our world, that's right.

9                  MR. FULLER:  Can we flop to the

10             ELMO, please.

11     BY MR. FULLER:

12          Q.    So the closed system that you work

13     in starts with the manufacturers, doesn't it?

14          A.    Yes.

15          Q.    That's who makes the medication,

16     the pills, the controlled substances that

17     Cardinal sells and distributes; is that fair?

18          A.    Yes.

19          Q.    The manufacturers sell to the

20     wholesale distributors, right?

21          A.    Predominantly.

22          Q.    There's some exceptions.  Some

23     manufacturers are also licensed distributors and

24     may distribute directly; is that fair?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes, yes.

 2              Q.    So we have the manufacturers to

 3    the distributors.  So far, unless you're a

 4    licensed registrant, you don't get to play in

 5    this game, do you?

 6                    MR. PYSER:  Object to form.

 7              A.    That would be correct.

 8              Q.    The distributors -- you have to be

 9    careful who you sell to, don't you, very careful

10    who you sell to when you're dealing with

11    controlled substances, particularly, correct?

12              A.    Who are you referring to?  What's

13    your question?

14              Q.    Whoever you sell to.  Whoever

15    you're selling controlled substances to.  Don't

16    you do a lengthy investigation of those

17    individuals to make sure they're a registrant,

18    that you know your customer, so forth and so on?

19              A.    I believe we do those elements,

20    yes, in our system.

21              Q.    Okay.  And those would be,

22    generally speaking, drugstores and pharmacies?

23              A.    Yeah, generally -- well, no.  You

24    know, drugstores, pharmacies, hospitals,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    long-term care.

 2         Q.    Basically an end user, the way the

 3    system is designed, right?

 4         A.    Yeah.  I think that's right.

 5         Q.    And we'll add hospitals there and

 6    long-term care, LTC; is that okay?

 7         A.    Sure.

 8         Q.    And, basically, when we talk about

 9    it being a closed system, means unless you are

10    licensed as one of these entities, you can't

11    play ball, doesn't it?

12              MR. PYSER:  Object to form.

13         A.    I don't know that -- I don't know

14    the definition that you're using in "closed

15    system."  I know how we operated, and I don't

16    recall any nuances to that.  That's a general

17    description, and I don't know if there's --

18         Q.    Can you sell to someone that's not

19    a registrant a controlled substance?

20         A.    No, I don't think so.

21         Q.    You don't think so or you don't

22    know?

23         A.    No, I'm not --

24         Q.    Are you sure?
```

1          A.     Well, in our world, we sold to our

2    customers who we had done our diligence on to

3    have in our system.

4          Q.     To make sure that they are a

5    registrant and that you can legally sell to

6    them, right?

7          A.     That would be probably how we did

8    it.

9          Q.     Well, let's hope so, correct?

10              MR. PYSER:  Object to form.

11         Q.     I mean, do you know if you sold to

12   people who aren't registrants?

13         A.     I have no knowledge of any of

14   that.  I -- no.

15         Q.     And do you know why you operate in

16   the closed system?

17              MR. PYSER:  Object to form.  Legal

18         conclusion.

19         A.     To protect the supply chain.

20         Q.     And that's important, isn't it?

21         A.     Sure.

22         Q.     And it's important because we're

23   dealing with substances that are -- if they're a

24   control II, labeled as being dangerous and

```
 1   highly addictive, correct?

 2           A.    I guess I would suggest that it's

 3   beyond that because we have other

 4   pharmaceuticals that are equally as important to

 5   be protected in the supply chain for the

 6   handling, their care, to get to the right place

 7   at the right time.

 8           Q.    So according to Mark Hartman, we

 9   do this to protect the supply chain.

10                 And as of December 2007, you were

11   the one for Cardinal overseeing the protection

12   of the supply chain; is that fair?

13           A.    December 2007?

14           Q.    Yes, sir.

15           A.    Yes.

16           Q.    Up until February of 2010 when you

17   left the company?

18           A.    Yes.

19           Q.    You were the one, the man in

20   charge of ensuring supply chain integrity?

21           A.    Through my teams, that's what we

22   did.

23           Q.    You had people that worked for

24   you.  You weren't doing it alone, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Yep.

2            Q.    But as the captain of the ship, it

3    was your ship to sail, right?

4            A.    That's what we did.

5            Q.    Okay.  And let's go back to 3892.

6    It says here, "Cardinal began work in Supply

7    Chain Integrity as a response to leaks within

8    the pharmaceutical value chain."

9                  And that's because when you were

10   brought in, Cardinal had leaks in their system?

11   They had leaks in the supply chain, right?

12                 MR. PYSER:  Object to form.

13           A.    Yes.

14           Q.    And that was part of what you were

15   there to help correct, isn't it?

16           A.    Yes.

17           Q.    Now, we're going to bounce around

18   to a couple different documents, Mr. Hartman.

19                 And -- now, let's talk about it.

20   You have -- and I think you've alluded to it.

21   You have extensive experience in business,

22   correct?

23           A.    Yes.

24           Q.    And you know for a system,
```

1    whatever system, supply chain system,

2    engineering systems, whatever it is, if we have

3    people we're supervising, we need to give them

4    the resources, training, system, and enough

5    people to do the job, right?  Correct?

6            A.    That would be a principal role.

7            Q.    That's an important aspect, making

8    sure our people are competent, are educated,

9    trained, and have the resources they need to

10   perform whatever tasks we give them, correct?

11           A.    That's an important role for sure.

12           Q.    So, for example, at Cardinal, you

13   guys had what's referred to as pickers.

14                 Do you know what a picker is,

15   Mr. Hartman?

16           A.    Yes.

17           Q.    Tell the jury what a picker is.

18           A.    So in the distribution centers, of

19   course, you had a staff of people in order to

20   run the distribution center.  So you had to have

21   people who received orders.  You had to have

22   people who picked orders, went to the

23   transportation people who loaded the orders, and

24   then drivers, of course, where we would take it

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to the customers.

 2                  So the picker part of this would

 3    be in the evenings generally so that we could

 4    pick, pack, and ship some 30- or 40,000

 5    deliveries that next day to get those drugs into

 6    our customers' hands so that we could help them

 7    reduce inventories, be more efficient and for

 8    them to have a better practice in their

 9    business.  And the picker is a key part because

10    they put the right products into our delivery

11    mechanisms --

12          Q.    Totes?

13          A.    -- to get -- see, you know -- you

14    know this.  You're just seeing if I do.

15          Q.    Some of your people have taught me

16    a little bit.

17          A.    Okay.

18          Q.    So you have pickers that pick and

19    place things in totes, and you have checkers

20    that double-check what pickers are picking,

21    don't you?

22          A.    Yes.

23          Q.    And that's all part of the supply

24    chain in getting things out, and like you
```

```
 1    mentioned, we have a huge volume going out of

 2    our distribution centers?

 3          A.    Yes, we do.

 4          Q.    For example, Mr. Baranski -- do

 5    you know Mr. Baranski, Wheeling distribution

 6    center?

 7          A.    I probably met him.  I -- the name

 8    is familiar to me, but I don't -- I don't

 9    know -- I don't remember him real well.

10          Q.    He was the -- or is still the

11    director of operation over the Wheeling

12    distribution center.

13          A.    Okay.

14          Q.    And he testified that they had

15    about 1.7 million orders going out every month,

16    every month, and I forget the geographical area

17    that he covered, but it was a number of states:

18    West Virginia, Ohio, part of Pennsylvania, I

19    think some others as well.

20          A.    Okay.

21          Q.    Don't hold me to that.

22                But he covers a huge number of

23    pharmacies and customers, right?

24          A.    Yes.
```

```
 1           Q.    As do all your distribution

 2     centers, because you have -- I mean, at least

 3     according to your presentation -- about 27 to

 4     cover the entire country, correct, at least on

 5     the pharmaceutical side?

 6           A.    Yeah.  A little interesting tidbit

 7     for you is that we located them in places so

 8     that we would not have anybody further out than

 9     six hours from a distribution center, and then

10     we had overlaps that we insured our customers

11     were supplied every day even if we had to

12     expedite an order to them so they had the

13     pharmaceuticals to serve the patients that are

14     in that drugstore to get their drug -- needed

15     drugs the next day.

16           Q.    So --

17           A.    So that's the reason for the

18     number of distribution centers.

19           Q.    So -- and let me make sure I'm

20     understanding.  So you strategically placed your

21     distribution centers so you could reach any

22     location in the country within six hours

23     driving?

24           A.    That was the desired approach.  We
```

1    didn't accomplish that to 100 percent, but

2    pretty much we were in that -- we were in that

3    performance pattern.

4         Q.    So let's go back to 4765,

5    Plaintiff's Exhibit Number 8, that you have in

6    your stack there, Mr. Hartman.  You can keep

7    your presentation out because we're going to go

8    back and forth from that.

9         A.    Okay.

10        Q.    If you'll turn to page 15 of that,

11   again, the upper right.

12        A.    Okay.

13        Q.    Page 15.

14              And this, again, is that

15   presentation that we looked at earlier, and we

16   were back on page 64, talking about the staffing

17   issues related to regulatory.

18              You recall that earlier?

19        A.    Yes.

20        Q.    It's the same document.  It's just

21   an earlier page.  Okay?

22        A.    Yes.

23        Q.    And if you look, it says, "Fiscal

24   Year 2005 Current State and Estimated Regulatory

```
 1   Training Costs."

 2              Do you see that there?

 3        A.    Yes.

 4        Q.    And "PTS."

 5              What is "PTS"?

 6        A.    I can describe it.  I can't

 7   remember -- I can't -- I cannot remember the

 8   acronym.

 9        Q.    Fair enough.  Let's just roll

10   through this real quick.

11              "PTS - Inconsistent training

12   across sites."

13              Do you see that there?

14        A.    I see that.

15        Q.    Then it goes through the next one,

16   "MPS/PD - Redundant training across sites; high

17   potential for resource sharing."

18              We want to be as economical as we

19   can with our resources, don't we?

20        A.    Oh, yes.  Yeah.

21        Q.    Then we go down to the next slide

22   at the bottom of the page, and it says, "Current

23   State - Problem/Issues."

24              It says, "Lack of corporate."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Do you see that there?
 2        A.    Yes.
 3        Q.    Read that to us, if you don't
 4   mind, Mr. Hartman.
 5        A.    "Lack of corporate sponsorship for
 6   training; authority (if there is any real
 7   accountability) rests at individual sites in
 8   most cases; in most cases no repercussions for
 9   problems in training (not showing up; not
10   completing; failing testing)."
11        Q.    And what does the next line read?
12        A.    "Training process is non-existent
13   in some sites."
14        Q.    And if we're talking about
15   regulatory, regulatory compliance, we need to
16   make sure, throughout the entire company, all
17   40,000-plus employees are properly trained on
18   their obligations in that regard, don't we?
19        A.    That's the objective.
20        Q.    And it wouldn't be acceptable if
21   we had non-existent training at some of our
22   sites, would it?
23        A.    That's why we have reviews and
24   then we put together plans to go address that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    If you read, "Numerous

2    483 references."  Read that for us.

3          A.    "Numerous 483 references to

4    insufficient training (one of the root causes or

5    symptom of causes:  Staff not trained; trainers

6    not qualified, effectiveness was not measured;

7    training not provided in any timely manner;

8    curriculum not developed or no minimum training

9    requirements.)"

10         Q.    If that was the case -- and during

11   2005, you weren't involved in regulatory and the

12   training for regulatory, were you?

13         A.    No.

14         Q.    If that was the case, that would

15   be concerning, would it not?

16               MR. PYSER:  Object to form.

17         Speculation.

18         A.    Again, this is a comment in a

19   review that we would have to understand what the

20   comment is directed at.  I don't know what

21   particular -- as you can see, there's four big

22   divisions there.  I don't know what the

23   reference is to, where these comments are

24   referenced to, what division or which part of
```

```
 1    the company.

 2              Q.    Sure.

 3                    But if it's going on in any part

 4    of the company, it's not acceptable, you would

 5    agree?

 6              A.    Yes, I would.

 7              Q.    Then it goes --

 8                    MR. PYSER:  Object to form.

 9              Q.    Then it reads, "Redundant training

10    across most segments with little or no resource

11    sharing."

12                    Do you see that?

13              A.    Yes.

14              Q.    Now, we talked about pickers, for

15    example.  Even with pickers, we've got to make

16    sure they're properly trained as it relates to

17    regulatory compliance, don't we?

18              A.    Yes.

19              Q.    Pickers, checkers, everybody in

20    our distribution centers, it's vitally important

21    because those are the people sending out the

22    pills, isn't it?

23              A.    Yes.

24              Q.    And if they're not given the
```

```
 1    resources or the education to do their job, it's

 2    a recipe for disaster, isn't it?

 3              MR. PYSER:  Object to form.

 4         A.    No, I don't agree with that.

 5    The --

 6         Q.    So it's okay if we don't give

 7    them --

 8         A.    Well, they're picking products off

 9    of shelves based on the specific number, a

10    location.  So at that point, then, that picker

11    turns it over to a checker, so that to your

12    point, if we did make a mistake, if we did pick

13    the wrong product, if we picked too many, we had

14    a checking station that was very accurate to

15    make sure that we got the right products and the

16    right quantities going to the right place.

17         Q.    Well, you say the picker is

18    picking by numbers -- or by, I guess, SKU maybe,

19    right?

20         A.    Correct.

21         Q.    So is a checker checking by SKU?

22         A.    When I was there, the way our

23    checking system was -- worked, was automated.

24    The tote would come --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    It was done by computer, is what
2    you're telling me?
3              A.    It was a -- yes.
4              Q.    Okay.
5              A.    It was a somewhat manual yet
6    automated check process.  So I don't think it's
7    confidential anymore.  We held it highly
8    confidential for a long time.  But we would have
9    a picking route which we knew was the fastest
10   and best way for a human being to move through a
11   distribution center section, not the whole
12   thing.  And they would have an order and they
13   would have a cart with many totes, and they
14   would actually go to the specific location.
15   Early on, it was on paper.  Later on, it's
16   automated.
17             Q.    Computerized somehow?
18             A.    Computerized.
19             Q.    Okay.
20             A.    And those products would then go
21   into the totes, which are for specific
22   customers.
23             Q.    Each tote is for a specific
24   customer, is what you're saying?
```

```
 1            A.    Each tote, as I recall.  I don't
 2    know if they changed process on me or -- but
 3    each tote.  So then the tote would serpentine
 4    through fast, efficient, get the right products
 5    to the right customer, would go to a checker
 6    station.
 7            Those checkers would either dump
 8    the products out on a table or out of the tote,
 9    scan every one, and the device would actually
10    tell them if it was a wrong item for that order.
11            Q.    Got it.  It would make sure that
12    they had picked whatever was ordered, whatever
13    the item was?
14            A.    Our job was to get the exact right
15    products and the exact quantities to the
16    pharmacy.  They needed them for the next day for
17    those patients and customers coming in.  So,
18    yes, we were -- we were pretty anal about that.
19            Q.    But, again, we need to make sure
20    pickers and checkers are properly trained so
21    they can perform their functions?
22            A.    Well, of course.  But in the
23    spirit of that, in the distribution center,
24    mistakes are going to get made.  We -- I think
```

```
 1    we've even commented on that.

 2                   So pickers were in doing their job

 3    and the checking station -- while we had trained

 4    people, the device, the automation, was the

 5    thing that assured us the right products and the

 6    right quantities were getting into the right

 7    totes for the right customers.

 8           Q.    Fair enough.  Fair enough.

 9                   So let's continue this issue of

10    leaks.

11                   MR. FULLER:  I need 4444, please.

12                            - - -

13        (Cardinal-Hartman Exhibit 14 marked.)

14                            - - -

15    BY MR. FULLER:

16           Q.    Mr. Hartman, if you look at 4444,

17    it's an e-mail with an attachment.  I believe if

18    you go to the third page, it indicates this is

19    July 27, 2006.

20                   Do you see that?

21           A.    You said third page?

22           Q.    Yes, sir.  I'm sorry.

23           A.    Yes.  July 27, '06.

24           Q.    And it says "confidential" up at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the top?

 2            A.    Yes.  I see that.

 3            Q.    This is supposed to be secret,

 4    right?

 5                  MR. PYSER:  Object to form.

 6            Q.    Somebody indicated it was supposed

 7    to be confidential?

 8            A.    I think your term "secret" is a

 9    wholly different -- you know, I think you

10    commented on my military background.  Secret is

11    a completely different category.

12            Q.    Confidential clearance versus

13    confidential clearance?

14            A.    Confidential -- well,

15    "confidential" just means that we keep it

16    in-house to our -- whoever needs to see it.  It

17    would be, 1 guess, my descriptions, I don't

18    recall.  I don't know.  But that's how I saw

19    confidential.  You just don't leave them around.

20    You don't hand them out to everybody.  It's who

21    needs to see it.

22            Q.    Fair enough.

23                  And this is regulatory compliance

24    review, June 2006, pharmaceutical distribution,
```

```
 1    Birmingham, Alabama, right?

 2          A.    Okay.

 3          Q.    You guys had a distribution

 4    center, or do have, in Birmingham, Alabama,

 5    right?

 6          A.    Yes, we do.

 7          Q.    And if you'll turn to the section

 8    on "Significant Issues" on page 4.

 9                Do you have that in front of you?

10          A.    Yes.

11          Q.    Have you seen these type of

12    reports before?  I would assume in your

13    regulatory department you would review these

14    regularly?

15          A.    And in my early career jobs on the

16    pharma side, I certainly saw them.

17          Q.    Fair enough.

18                "Significant Issues, DEA."  And go

19    down to where it says "There is no system."

20                Do you see that?

21                "There is no system to determine

22    excessive or suspicious ordering by customers of

23    controlled substance products."

24          A.    Yes, I see it.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.    That's not a good regulatory

 2   system, is it?

 3                MR. PYSER:  Object to form.

 4          A.    Again, you have these kind of

 5   audits in order to put together plans and

 6   execute against them to improve systems and

 7   processes.

 8          Q.    Absolutely.  Absolutely.

 9                This was an ongoing process at

10   Cardinal, right?

11          A.    What?

12          Q.    This sort of audit review system.

13          A.    Yes.

14          Q.    It wasn't something new in 2006?

15          A.    I don't think so.  I think this

16   was an ongoing process that we exercised.

17          Q.    So for some period of time,

18   unbeknownst to us sitting here today, the

19   Birmingham, Alabama, facility had no system to

20   determine excessive or suspicious orders of

21   controlled substances.

22                Can you and I agree, Mr. Hartman,

23   that that would mean that the Birmingham, as a

24   registrant, would be breaking the law based on

Highly Confidential - Subject to Further Confidentiality Review

```
1    the regulations we read earlier?

2              MR. PYSER:  Object to form.  Calls

3         for a legal conclusion.

4         A.    No.

5         Q.    It wouldn't be breaking the law?

6         A.    No.

7         Q.    Why not?  Strike that.

8              MR. PYSER:  You asked the

9         question.

10             MR. FULLER:  And I struck it.

11             MR. PYSER:  He can answer the

12        question.

13             MR. FULLER:  No, he can't.  I

14        struck the question.

15             MR. PYSER:  If you want to answer

16        the question, go ahead.

17             MR. FULLER:  No, I struck the

18        question.

19        A.    The reality is that, exactly as I

20   told you in the prior systems, we were operating

21   in a manner that we believed we were conducting

22   ourselves as the DEA required us to, which

23   meant --

24        Q.    Well, you already told us --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Headquarters was providing reports

 2    to the DEA on a monthly basis that we were

 3    required to report.  And the DEA agreed with

 4    that.  They told us we were doing a good job.

 5    That's what I know about the prior system.  I

 6    don't know a lot about it.  Others will be able

 7    to tell you much more, but that's what I know.

 8              Q.    So, Mr. Hartman, you testified

 9    earlier that the regulation required -- the

10    regulation and statute required three things.

11    One, to operate a suspicious order monitoring

12    system, right?

13              A.    Yes.

14              Q.    This says Birmingham, as a

15    registrant, has no suspicious ordering system,

16    doesn't it?  I mean, isn't that what it says

17    here?

18              A.    That's what the document --

19              Q.    No system?

20              A.    -- says.

21              Q.    So that means they're breaking the

22    law.

23              A.    I don't know that -- I don't know

24    if that -- if that included or didn't include
```

1   the actions on the part of the headquarters for

2   that facility.

3          Q.    We're going by what this document

4   says, because it doesn't say --

5          A.    I see what it says, and I'm

6   responding to the fact that I don't know.  I

7   wasn't there.  I'm just giving you my comment.

8          Q.    Sure.

9                And it says "no system," right?

10               MR. PYSER:  Object to form.

11         A.    It says "no system."

12         Q.    And the law requires you to have a

13  suspicious order monitoring system, doesn't it?

14               MR. PYSER:  Object to form.  Calls

15         for a legal conclusion.

16         Q.    Yes or no?

17         A.    The code calls for us to operate

18  and maintain a suspicious order monitoring

19  system.

20         Q.    Fair enough.

21               So let's go to page 7.

22               You see "Controlled Substance

23  Order Filling" --

24         A.    Yes.  I see it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    -- at the bottom of the page?

 2              A.    Yes.

 3              Q.    It says there "Observation."  Read

 4     the observation to us, Mr. Hartman.

 5              A.    "There is no system in place to

 6     determine excessive purchasing of controlled

 7     substance products."

 8              Q.    And what is the Corrective Action?

 9     It's going to "Create a system to determine

10     excessive purchasing by customers of controlled

11     substance products and report any excessive

12     purchases to the DEA on a monthly basis," right?

13              A.    Yes.

14              Q.    That's the same system you said

15     was being done out of corporate?

16              A.    Well --

17              Q.    Isn't it?

18              A.    -- what I understand is the

19     corporate system rolled up the information from

20     each of the field sites in order to put the

21     report together, which then went to DEA, which

22     provided the information around the reports that

23     were required at the time.  That's how the

24     system, I believe, worked.
```

```
 1              Q.    Well, this says that they weren't

 2    even reporting the monthly basis.  And it says,

 3    "Post charts of products and dosage limits in

 4    the crates and vaults."

 5              Part of the corrective action,

 6    right?

 7              MR. PYSER:  Object to form.

 8         Q.    Is that what it says, Mr. Hartman?

 9         A.    You said something about crates.

10         Q.    I'm sorry.  Cage and vault.

11         A.    Oh.  I'm sorry.

12              Okay.  "Post charts of products

13    and dosage limits in the cage/vault."

14         Q.    And then, "Remind vault personnel

15    they should be policing and identifying

16    individual orders that appear excessive in

17    relation to what other customers are buying

18    and/or customer purchase history."

19              Isn't that what it says?

20         A.    I see it.

21         Q.    And that was a policy that

22    Cardinal had across the board, isn't it?

23         A.    To my understanding, it was.

24         Q.    And those are the pickers and the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    checkers, aren't they?

2              Who picks the products,

3    Mr. Hartman?

4         A.    See, I --

5              MR. PYSER:  Object to form.

6         A.    Yeah.  So part of this is the

7    other side of the team, too.  So I don't know

8    what they're referring to here, if it's

9    everybody or if it's the receiving team is the

10   day team as well.  I wasn't there.  I don't

11   know.

12        Q.    And then it says, "When a narcotic

13   order appears excessive, have a supervisor

14   approve the DEA Form 222 before it's filled."

15              Isn't that what it says?

16        A.    That's what it says.

17        Q.    It doesn't say report it, does it?

18              Does it say report it there?

19        A.    It does not say report.

20        Q.    It says "have a supervisor approve

21   the 222 form before it's filled."

22              MR. PYSER:  Object to form.  Asked

23         and answered.

24        Q.    Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    That's what it says.

 2          Q.    Okay.

 3                MR. FULLER:  Give me 4722.

 4          Actually, give me 4631.

 5          A.    Now, I suspect the context of that

 6    last question is to have a supervisor approve so

 7    that they can review the order.

 8                MR. FULLER:  Go ahead and give me

 9          4722 and have her pull that.  Thanks.

10                MS. QUEZON:  What exhibit number

11          are you on?

12                MR. FULLER:  This is 15.  It's

13          going to be Plaintiff's 15.

14                          - - -

15          (Cardinal-Hartman Exhibit 15 marked.)

16                          - - -

17    BY MR. FULLER:

18          Q.    Mr. Harman -- excuse me --

19    Hartman.  You have number 4722, which is now

20    Plaintiff's Exhibit 15 for purposes of this

21    deposition.

22                This appears to be an e-mail; is

23    that right?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    From a Bob Kurtz.  Do you know

 2   Bob Kurtz from down in Florida?

 3              A.    It doesn't ring a bell.

 4              Q.    To Rafael Varela?

 5              A.    I don't remember.

 6              Q.    And this is dated what?

 7              A.    December 5, 2007.

 8              Q.    Okay.  And if you'll go down to

 9   the third paragraph/line there.  It starts "The

10   manual process."

11                    Do you see that?

12              A.    Yes.

13              Q.    It says, "The manual process we

14   perform now with the discovery of suspected

15   excessive purchase being left up to the keyer

16   notifying myself or a picker/double checker/QCer

17   questioning the amount being purchased -- or

18   excuse me -- processed seems to leave ample

19   opportunity to failure -- excuse me -- for

20   failure."

21                    Did I read that right?

22              A.    Yes.

23              Q.    So the process that we've already

24   talked about, at least according to this
```

```
 1    employee of Cardinal's, leaves --

 2                 MR. FULLER:  And underline that

 3           for me, if you would --

 4           Q.    -- "leave ample opportunity for

 5    failure."

 6                 Then it goes on to say, "A system

 7    generated flag would be more complete or

 8    thorough method of determining spikes or

 9    excessive quantities that we want -- excuse

10    me -- than what we are currently performing."

11                 Do you see that there?

12           A.    Yes.

13           Q.    And it says, "As you know, I've

14    investigated many accounts.  I track their

15    ordering history and have reached out for

16    guidance and directions.  But without 'someone'

17    bringing a suspected excessive quantity order to

18    our attention, many, many more could be going

19    out the door" -- what does it say?

20           A.    "Under our noses."

21                 MR. FULLER:  If you'll underline

22           that.

23    BY MR. FULLER:

24           Q.    "Going out the door under our
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   noses."

 2              This is coming from somebody

 3   that's working in Lakeland during the time that

 4   Lakeland got its license suspended, right?

 5              That's this time frame, isn't it?

 6       A.    Yes.

 7       Q.    And they have concerns about,

 8   apparently, the system that was in place back

 9   then relying on pickers and checkers.  That's

10   what their voicing, correct?

11              MR. PYSER:  Object to form.

12         Misstates evidence.

13       A.    It looks like he's calling out

14   some inefficiencies that he felt needed to be

15   worked on.

16       Q.    Now, you know that the policy and

17   procedure relied on pickers and checkers to

18   identify excessive orders in the distribution

19   centers, correct?

20       A.    That's my recollection, yes.

21       Q.    Now, so these pickers and

22   checkers, these people that are policing our

23   excessive orders in the distribution centers, do

24   you know what kind of qualifications that these
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pickers would have to have, these people that we

 2    have policing our highly dangerous controlled

 3    substances?  What kind of -- I mean, do they

 4    have DEA backgrounds; do you know?

 5                MR. PYSER:  Object to form.

 6         A.    Not that I'm aware of, unless

 7    somebody just hired in that happened to have

 8    that.

 9         Q.    Do you know if they have any sort

10    of law enforcement experience?

11         A.    Not that I'm aware of.

12         Q.    Do you know if they have any sort

13    of diversion experience?

14         A.    Not that I'm aware of.

15         Q.    And these are the -- at least part

16    of the system that Cardinal was relying on on

17    these pickers is policemen, basically, to pick

18    up on excessive orders, at least according to

19    this person.

20                MR. FULLER:  Let's go to 3879.

21                MR. PYSER:  Object to form.

22                      - - -

23        (Cardinal-Hartman Exhibit 17 marked.)

24                      - - -
```

```
 1   BY MR. FULLER:

 2          Q.    3879, which is Plaintiff's

 3   Exhibit 16 --

 4                MS. SHIVERS:  17.

 5          Q.    -- 17, is Cardinal Health job

 6   description.

 7                Do you see that?

 8          A.    Yes.

 9          Q.    Cage and vault clerk.  These are

10   our pickers for the cage and vault; is that

11   right, Mr. Hartman?

12                The vault is where we store our

13   controlled IIs, right?

14          A.    Cage and vault, yes.

15          Q.    Schedule IIs, our oxycodones, our

16   hydrocodones, all the opioids are going to be

17   stored in there, correct?

18          A.    That's right, yes.

19          Q.    This is our cage and vault clerk.

20   This is our policeman for excessive orders.

21   "Summary:  Responsible for restocking shelving

22   and/or case lines according to stock advisory

23   information in an accurate and effective manner

24   in order to avoid shortages or mispick of any
```

1    product according to the laws and regulations

2    for handling controlled substances."

3                    And let's go down to the bottom

4    under "Education and/or Experience" and see what

5    Cardinal Health required for these policemen.

6                    Tell the jury what Cardinal's

7    requirements were to be a policeman for the

8    controlled substances or for people who are

9    supposed to be policing excessive orders at all

10   the distribution centers across the country.

11                   MR. PYSER:  Object to form.

12           A.    "Qualifications.  To perform this

13   job successfully, an individual must be able to

14   perform each essential duty satisfactorily.  The

15   requirement listed below are representative of

16   knowledge, skill, and/or ability required.  The

17   reasonable accommodations may be made to enable

18   individuals with disabilities to perform the

19   essential functions."

20           Q.    And what's the education and

21   experience requirement that Cardinal Health has

22   for these employees?

23           A.    High school diploma or equivalent,

24   warehousing or distribution experience

```
 1    preferred.

 2           Q.    A high school diploma or

 3    equivalent.  No special training on diversion,

 4    at least according to this, right?

 5           A.    This is an old logo.  I can't even

 6    imagine the time frame this was from.  This is

 7    pretty far back.  So I have no idea, first of

 8    all, if this is what exists today or later.

 9    I -- this is an old -- this is a very old

10    document.

11           Q.    Mr. Hartman, it was part of what

12    the lawyers and Cardinal produced to us in this

13    regard.  This is what I have to go off of.

14           A.    So there's not a time frame on

15    this?

16           Q.    It was produced in 2007 to the

17    DEA.  You can tell that by the Bates number.

18                 MR. PYSER:  If we're going to be

19            interpreting that, that means it's from

20            sometime before 2007.

21           Q.    So, Mr. Hartman, again, there's no

22    regulatory training or education required for

23    this position, right?

24                 MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Not according to this document.

 2            Q.    There's no certification

 3     requirement for this individual, correct?

 4                  MR. PYSER:  Object to form.

 5            A.    Certification in regards to --

 6            Q.    Anti-diversion, supply chain

 7     integrity, anything.  It's a high school --

 8            A.    I don't know that.  I wasn't -- I

 9     wasn't there.  I don't know what qualifications

10     they then interpreted once they got the

11     candidates in the house to determine who was

12     going to be working in those roles.

13            Q.    What is the educational experience

14     requirement, Mr. Hartman?

15            A.    And in that cage/vault area, if I

16     recall correctly, we always -- we always looked

17     for our experienced and best people there.  So

18     you would post the job description, so that was

19     not necessarily for external candidates alone.

20     That was for internal candidates who had worked

21     in the distribution center perhaps for periods

22     of time or long periods of time.

23                  MR. FULLER:  Well, I -- okay.

24            Let's go to Baranski 1, video, please.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Video played.)

 2                    "Q.  Now, when we're going

 3                    to pick up a product --

 4                    and let's deal with the

 5                    controls.

 6                    "A.  Sure.

 7                    "Q.  If you have -- and I

 8                    guess this depends on how

 9                    you get the order.  If I'm

10                    going to pick up the same

11                    substances both in a brand

12                    name and in a generic, how

13                    do I know which to grab if

14                    I'm the picker?

15                    "A.  The unit tells them

16                    what location to go to.

17                    "Q.  And would the order

18                    have specified whether it

19                    was picking up a generic --

20                    you know, something made by

21                    a particular manufacturer

22                    versus a generic?

23                    "A.  We teach our people to

24                    pick from location to tote.
```

```
 1                    I don't even care if they

 2                    know the product.  I want

 3                    them to know the location

 4                    to tote."

 5                    (Video stopped.)

 6                    MR. PYSER:  Objection to form.

 7            Vague as to time frame.

 8     BY MR. FULLER:

 9            Q.    He doesn't even care if they know

10     the product.  "Location to tote."  That's the

11     individual running the Wheeling distribution

12     center for about a decade.

13                    If a picker doesn't even know the

14     product, it makes it very hard to point out

15     excessive orders, doesn't it?

16                    MR. PYSER:  Objection to form.

17            Vague as to time frame.

18                    MR. FULLER:  Counsel, I'm going to

19            ask you one more time, please stop the

20            speaking objections.  You're continuing

21            to do it, and you're trying to direct

22            the witness.

23                    MR. PYSER:  I'm not trying to

24            direct the witness.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FULLER:  And I've had enough

 2         of it.  If it happens again, I will

 3         suspend.  Just letting you know.  You

 4         know, I was very polite at first.  I

 5         then cited the depo protocol, and then

 6         you continue to not comply with the

 7         requirements.

 8              MR. PYSER:  I disagree with what

 9         you're saying.

10              MR. FULLER:  Just state objection

11         to form.

12              MR. PYSER:  If you want to explain

13         why I disagree --

14              MR. FULLER:  I don't need your

15         explanations.

16              MR. PYSER:  -- I'm happy to have

17         Mr. Hartman leave the room and explain

18         to you why I think it's appropriate.

19              MR. FULLER:  I don't need your

20         explanations.  I don't need your

21         explanation.  If you want to cross the

22         witness on any of this, as you know, you

23         are more than welcome to do it.  If you

24         want -- if you think I'm misrepresenting
```

```
1              something, that's your opportunity to

2              clean it up.

3                    MR. PYSER:  If you don't want the

4              explanation as to why what you're doing

5              is misleading, that's fine.  Continue.

6                    MR. FULLER:  I absolutely don't

7              care.  You're right.  Don't.

8   BY MR. FULLER:

9              Q.    Mr. Hartman, you saw

10  Mr. Baranski's testimony.  He doesn't even care

11  if the pickers know what they're picking,

12  according to what he said, correct?

13                   MR. PYSER:  Same objections.

14                   MR. FULLER:  Strike that.

15             Q.    Let me ask it differently.

16                   You have to know what you're

17  picking to be able to pick up on excessive

18  orders, right?

19                   MR. PYSER:  Same objection.

20             A.    I don't agree with that.  Systems

21  have been put in place now.

22             Q.    Now, or back then?

23             A.    I don't know the time frame we're

24  talking about.  I --
```

```
 1              Q.    Okay.  So let's back up and let's

 2    clarify that.

 3              So prior to 2007, pickers need to

 4    know what they're picking to be able to spot

 5    excessive orders, correct?

 6              MR. PYSER:  Object to form.

 7         A.    Prior to my role in the regulatory

 8    group is what you're asking me?

 9         Q.    Yes, sir.

10              MR. PYSER:  Object to form.

11         A.    It would depend on if we had

12    systems in place to actually identify if they

13    were wrong or excessive orders, and I don't know

14    that.

15         Q.    We saw the e-mail --

16              MR. FULLER:  Bring back up for him

17         4722, which is Plaintiff's Exhibit 15.

18    BY MR. FULLER:

19         Q.    An e-mail says an employee is

20    telling Cardinal that they're afraid -- third

21    paragraph -- fourth paragraph down, "Many, many

22    more could be going out the door under our

23    noses."

24              These are people at your
```

 1   distribution centers with concerns about the way

 2   the system is operating.  You get that, right?

 3                Do you understand that that's a

 4   concern that this individual has and he's trying

 5   to bring it to someone's attention?

 6        A.    The question is?

 7        Q.    Do you get that this person, in

 8   Exhibit 15, is trying to bring to the attention

 9   of someone that there's problems with the

10   system, that --

11        A.    That could exist.

12        Q.    -- many, many, more pills could be

13   going out right underneath our own noses?

14                MR. PYSER:  Object to form.

15        A.    That could exist.

16        Q.    Yes.  And Florida's license was

17   suspended at this time because of failure to

18   comply with suspicious order reporting

19   requirements, right?

20                MR. PYSER:  Object to form.

21        A.    During this time frame, that's

22   correct.

23        Q.    Clearly, it couldn't exist or

24   maybe could exist.  It did exist?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2          Q.    Do you not find any problems with

 3    a system that relies on a high school-educated

 4    individual being the policeman for Cardinal

 5    related to excessive orders?

 6                    MR. PYSER:  Object to form.

 7          A.    So you're asking me if I don't

 8    think a high school graduate can look at an

 9    order and pick the product as they're directed?

10    I don't agree with that, that a high school

11    graduate can't do that job.

12          Q.    That is not the question.  If you

13    would listen to the question, Mr. Hartman.

14    We've been going through this all day long.

15    Listen to the question and answer the question I

16    ask and not the one you want to answer.  Okay?

17                    My question is, this e-mail isn't

18    complaining about high school graduates picking,

19    is it?  Look at 4722, Exhibit 15.  Are they

20    complaining and raising a concern about pickers

21    not being able to pick?

22                    MR. PYSER:  Object to form.

23          Q.    Yes or no, Mr. Hartman.

24                    MR. PYSER:  Object to form.
```

```
 1              A.    It appears he's calling out some

 2    situations and issues that he sees in his

 3    distribution center that he's looking, again, to

 4    get some program and some strategies in place to

 5    resolve.

 6              Q.    And his concern is with the

 7    pickers being the policemen to identify

 8    excessive orders.

 9                    Let's read what he says.  He says,

10    "The manual process we perform now with the

11    discovery of suspected excessive purchases being

12    left up to keyer notifying me or a picker or

13    double-checker or QCer questioning the amount of

14    the process seems to leave ample opportunity to

15    failure."

16                    Right?  Is that how it reads?

17              A.    It appears that he's calling out,

18    as an individual, a person -- a issue that he

19    sees of multiple people involved, and he's

20    saying that presents a problem.  I don't know if

21    it is or isn't.

22              Q.    Well, we know --

23              A.    And I, quite frankly, don't think

24    that we should stop from hiring a high school
```

```
 1    diplomaed employee to do jobs in our

 2    distribution centers.

 3            Q.    Absolutely agree with you.

 4                  What I think we should do, is we

 5    should have sufficient systems to spot

 6    suspicious orders so we comply with the law,

 7    right?

 8            A.    We should have --

 9            Q.    Right?  Should we have sufficient

10    systems to spot suspicious orders?

11            A.    I wasn't there at the time to

12    comment on this.

13            Q.    No, no.  I'm not asking if you

14    were there at the time.  I'm asking you if it"s

15    your understanding that we should have

16    sufficient systems to spot suspicious orders;

17    yes or no?

18            A.    As I got into role --

19            Q.    Yes or no?

20            A.    -- we put a system together to

21    enhance our program to involve not only

22    analytics and more IT work, the Know Your

23    Customer piece and training, and that's what I

24    did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    So, Mr. Hartman, tell the jury

 2    whether the law requires Cardinal to have a

 3    sufficient system to spot suspicious orders --

 4    suspicious order in place.

 5                  MR. PYSER:  Object to form.

 6            A.    I don't know that that's an exact

 7    quote, but I think that's the law that we abide

 8    by.

 9            Q.    And you agree that Cardinal has an

10    obligation to prevent diversion the best they

11    can, right?

12                  MR. PYSER:  Object to form.

13            A.    Cardinal Health has a

14    responsibility to identify suspicious orders, to

15    monitor those, to have a program in place, to

16    make its best evaluation, and if they determine

17    a suspicious order, to report that to the DEA so

18    the DEA has all the information that we believe

19    is relevant to a potential problem.

20            Q.    And is Cardinal still able to ship

21    that suspicious order?

22            A.    Under my time frame, we were not.

23    The rules had changed.

24            Q.    And you believe prior to, you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    could, at least according to what you've been

 2    told?

 3                   MR. PYSER:  Object to form.

 4           Q.    Right?

 5           A.    Told my team and I talked about,

 6    that's the changes I walked into the job that

 7    they outlined for me.

 8           Q.    And it was your understanding,

 9    based on what they explained to you, that prior

10    to that time, that wasn't a requirement?

11           A.    The not ship piece is what

12    changed.

13           Q.    Right.

14           A.    Because we were sending in reports

15    that the DEA approved.  That was their guidance,

16    and Cardinal was sending those in on a monthly

17    basis, as they aggregated them, from the

18    distribution centers, supplied them to the DEA

19    so they had all of the information that we had,

20    and they could identify where those problems

21    existed.  That's what we did, to my recollection

22    and knowledge, prior to me going into the role.

23                   Going into the role, I went

24    forward to enhance and improve our system;
```

```
 1    better analytics, a better IT system for us to

 2    work with, an opportunity for us to expand on

 3    Know Your Colleagues -- Know Your Customer, the

 4    training for that, as well as I expanded the

 5    team and investigators.

 6            Q.    And my question was a simple one.

 7    You say that that's the part that changed, and

 8    you're referring to the shipping requirement,

 9    right, or the not shipping requirement?

10            A.    How I recall it in that time

11    period.

12            Q.    Right.  And so it's your

13    understanding that prior to that change, you

14    could ship a suspicious order, correct, or do

15    you know?

16                  MR. PYSER:  Object to form.

17            A.    Sorry.

18                  MR. PYSER:  Go ahead.

19            A.    The only part that I'm aware of --

20    or I think what was going on is that our team

21    felt they were abiding by the DEA guidelines,

22    which meant that they aggregated data on a

23    monthly basis.  So when you asked me, "Can you

24    ship a suspicious order?" the reality is, is
```

1    that the orders were already out of the

2    distribution center as the reports went into the

3    DEA.

4              That's what I recall the team

5    telling me about how it was operating, and I

6    come into role and I put down some pretty strong

7    measures for us to take the DEA's guidance and

8    to move forward.

9         Q.   And let me just make sure I

10   understand.  That's because the orders were

11   shipped the next day after the order was made,

12   generally speaking, right?

13        A.   Generally, that's right.

14        Q.   And as you described earlier, it

15   was to be able to get the medications, whatever

16   it may be, to the drugstore as quickly as

17   possible to keep down inventory and all that

18   kind of stuff that we talked about earlier,

19   correct?

20        A.   This is an efficient supply chain.

21   We're trying to take costs out of the system,

22   certainly for -- for the pharmacies who, if --

23   before these supply chains were operated in that

24   capacity, they were getting deliveries maybe one

```
 1    or two times a week.  You had to carry a lot

 2    more inventory, much higher costs.

 3           Q.    Sure.

 4           A.    Costs are passed on.

 5           Q.    Sure.

 6           A.    So you work hard to get a very

 7    efficient system in place.

 8           Q.    So the way the system was working

 9    when you came in, is that the suspicious orders

10    reports, this monthly reporting was done at the

11    end of the month, or, I'm assuming, the

12    beginning of the next month, whenever it was

13    compiled, right?

14           A.    That's what I -- that's how I

15    recall it being described to me.  Again, brief

16    detail.  As I told you earlier, I didn't spend a

17    lot of time trying to go backwards.

18           Q.    You were looking forward?

19           A.    I put a stake in the ground to go

20    forward.  What is the DEA requiring us?  We

21    tried to call them.  We tried to talk to them.

22    We tried to understand, what is it we need to

23    do?  It's changed.

24           Q.    And because the report is not
```

```
 1   going out until the end of the month, all the

 2   month -- orders made during the month were

 3   already gone?

 4         A.    That's my understanding.  Well,

 5   the orders were gone, for sure.

 6         Q.    Yeah.

 7         A.    My understanding was the report

 8   went in at the end of the month.

 9         Q.    Sure.

10               THE WITNESS:  Can I ask if we take

11         just a really quick break?

12               MR. FULLER:  Oh, no, no.  Fine.

13         Absolutely.  We've been going a while.

14               THE VIDEOGRAPHER:  The time is now

15         3:35.  We are going off the record.

16               (Recess taken.)

17               THE VIDEOGRAPHER:  The time is now

18         3:55.  Back on the record.

19   BY MR. FULLER:

20         Q.    Mr. Hartman, we bounced off your

21   presentation, but let's go back to your

22   presentation on page 6.

23         A.    13?

24               MR. PYSER:  It's the one with 3892
```

```
1            at the top.
2                 MS. SHIVERS:  13.
3            Q.   Yeah, it's 13.  3892 up at the
4    top.
5            A.   Okay.
6            Q.   You got that one?
7            A.   Yes.
8            Q.   All right.  If you look at page 6.
9    Let's continue on.
10                You see this where it says we
11   all -- "We are all responsible"?
12           A.   Oh, at the top?
13           Q.   Yes, sir.
14           A.   I see.
15           Q.   Hold on.  It will blow up on the
16   screen in front of you.
17                Okay.  You see there where it
18   says, "We are all responsible"?
19           A.   Yes.
20           Q.   As you mentioned, this was a
21   meeting with other individuals in the supply
22   chain, correct?
23           A.   Several industry supply chains,
24   not pharmaceutical.  All sorts of supply chains
```

```
1    in the room.  All sorts of participants.  I

2    don't remember the number, but it was a pretty

3    big group.

4           Q.    Fair enough.

5                 And at this point you're talking

6    about diversion issues, correct?

7           A.    No, I'm talking about -- in this

8    presentation, supply chain integrity, I'm

9    talking about all of the ways that I saw that a

10   supply chain could get affected by many, many

11   different aspects of a supply chain from

12   distribution center to in transportation to

13   just --

14          Q.    But it's all forms of diversion,

15   right, either stealing, problems with

16   delivery --

17          A.    Oh, no, no, no.  No, I was -- no.

18   This is much, much broader.  This is talking

19   about the integrity of the whole supply chain

20   from things like, you know, a wrong order going

21   to a wrong store.  Nothing to do with diversion.

22   You know, a keyed script from a -- and they're

23   getting a large order of some drug -- you know,

24   all of those were what I was talking about in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the supply chain integrity for this broad

 2    audience that we need to pay attention to so

 3    that we don't have gaps and we don't lose

 4    product.  We don't have problems inside of that

 5    supply chain.

 6          Q.    So you weren't talking about

 7    diversion at all in this?

 8          A.    One element of diversion was in

 9    this.  That was one comment in -- well, it was

10    one of my, if you will, bubbles that I popped up

11    as a potential problem in the supply chain.

12          Q.    Sure.  Let's talk about this.

13                It says, "We are all responsible."

14    And what did you say in the bottom in the notes?

15          A.    I said, "I don't know about you,

16    but this stuff scares me.  ███████████████

███ ██████████████████████████     ███████████

███ ███████████████████████████

███ █████████████████████   Our kids are obviously

20    finding ways to get drugs and in many cases,

21    it's coming from illegitimate means."

22          Q.    Illegitimate means.  It's not

23    keying something wrong, right?

24          A.    No, no.  It could be coming right
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    out of the cabinet at home.

 2           Q.    Due to the glut of pills available

 3    in the country, right?

 4                 MR. PYSER:  Object to form.

 5           Q.    Right?  There's over-excessive

 6    pills in the country at this point in time.

 7    We're in the middle of an opioid epidemic, would

 8    you agree?

 9           A.    See, I have a much -- I

10    100 percent agree with you on the opioid

11    epidemic.  And my narrative is much broader than

12    the one you're trying to portray here because

13    the FDA approves drugs.  The DEA approves the

14    ingredients for all of that volume that you're

15    talking about.  And a licensed doctor prescribes

16    them and a licensed pharmacy dispenses them.

17                 So my narrative for the whole

18    time, from when I stepped into role, until

19    today, remains the same.

20                 MR. FULLER:  So let's play the

21           Hartman video, please.

22                 (Video started.)

23                 "This yellow one, this

24                 is my postpartum depression.
```

```
 1                    This one, sciatica, whatever

 2                    that is.  I got these after

 3                    my hysterectomy or my

 4                    prostatectomy or some -ectomy.

 5                    And this guy is for the pain

 6                    from my last hip replacement.

 7                    This orange one, it is --

 8                    "Getting drugs can be easy as

 9                    opening your medicine cabinet."

10                    MR. PYSER:  Before we continue,

11             Counselor, I'd ask that any video --

12                    (Video stopped.)

13                    MR. FULLER:  No, no.  Go ahead and

14             finish the video, please.

15                    (Video started.)

16                    "I've taken maybe four

17                    different types of pills.

18                    I took Xanax, which was a

19                    majority of what the pills

20                    were.  I took a roxy.  I

21                    took Percocets.

22                        "But once you're in,

23                    all the different pills are

24                    dumped into a pile or a
```

```
 1                  bowl, something kids call

 2                  trail mix.

 3                      "We put it on the table

 4                  and mix it up and whatever

 5                  you got is what you got.

 6                      "And what kids get are

 7                  fistfuls of pills."

 8                      "Go on and slip me two

 9                  Xanax bars.  I'm ready to get

10                  full.  5th of Crown to wash

11                  it down.  I'm downtown snapping

12                  rules.  Ain't no shame up in

13                  my game.  In fact, I'm mentally

14                  deranged.  Oxycontin in my

15                  system.  Man I'm feeling kinda

16                  strange.

17                  Watch me ...

18                  Go on and slip me two Xanax

19                  bars.  I'm ready to get full.

20                  5th of Crown to wash it down.

21                  I'm downtown snapping rules.

22                  Ain't no shame up in my game.

23                  In fact, I'm mentally deranged.

24                  Oxycontin in my system.  Man
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      I'm feeling kinda strange.

 2                      Watch me choke about this dope.

 3                      Blueberry from Texas ...

 4                      (Video stopped.)

 5    BY MR. FULLER:

 6           Q.    Mr. Hartman, that video was part

 7    of your presentation, wasn't it?

 8                      MR. PYSER:  Before we continue,

 9               Counselor, I'd ask that any exhibit --

10               any video that's watched during the

11               deposition be marked as an exhibit and

12               be provided to all counsel.

13                      MR. FULLER:  That's fine.

14    BY MR. FULLER:

15           Q.    I mean, that was part of your

16    presentation, wasn't it, Mr. Hartman?

17           A.    Yes.

18           Q.    That was attached to your

19    PowerPoint, correct?

20           A.    Yes.

21           Q.    So if counsel provided the

22    PowerPoint, he already has the video, right?

23           A.    I don't -- I've no clue.

24           Q.    Well, that's where we got it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I don't know.

 2          Q.    I got it from him.

 3          A.    I don't know if he's got it or

 4     not.

 5          Q.    And you were concerned.  You said

 6     this stuff scares you, ███████████████████

       █  █████  ███████████████████████████

       █  ███████████████████████   And it's a

 9     reality that with the opioid epidemic, this

10     stuff is available.  It is easily accessible

11     because of the issues that have presented itself

12     and the availability of these medication across

13     all lines.

14              And one of the things that you

15     were striving to do is trying to ensure that

16     Cardinal wasn't contributing to that, correct?

17              MR. PYSER:  Object to form.

18          A.    I had a distinct passion around

19     the job I was in.  ██████████████████████

       █  ██████████████████████████████████

       █  ████████████████████████████████████

       █  ████████████████  ████████████████████

       █  ██████████████████████████

24          Q.    Absolutely.
```

Highly Confidential - Subject to Further Confidentiality Review

3          So when you ask me about this job,

4    what I did, why would you even go into that,

5    it's because I have a very distinct passion

6    around it.  And that's that side.

14          So I appreciate you asking.  But I

15   hope it was in reflection of the fact that I

16   showed those videos in this as one piece of the

17   supply chain for those of us that work in it,

18   that must do everything we can to prevent it and

19   stop it.  And this is how the kids were getting

20   their drugs in a big way back in those days.  I

21   showed those videos.

22          Q.   Absolutely.

23          And it wasn't the only way kids

24   were getting their drugs.  There were legal

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Internet pharmacies with no patient/doctor

 2   relationships, and those prescriptions were

 3   being filled, too, weren't they, and that was

 4   part of the 2007 suspensions?

 5              MR. PYSER:  Object to form.

 6              Mr. Hartman, do you need a minute

 7        before we continue, or are you okay?

 8              THE WITNESS:  I'm fine.  I'm good.

 9   BY MR. FULLER:

10        Q.    But there were multiple ways --

11        A.    Yes.  There were multiple ways

12   that drugs were being diverted into the street,

13   into people's hands.  Yes, I agree with that.

14        Q.    And let's start with the basic

15   premise that -- we talked earlier about this

16   closed system.  We wrote out this chain, if you

17   will, the integrity supply chain.

18        A.    Yes.

19        Q.    These drugs aren't like meth that

20   can be cooked in a trailer.  These drugs have to

21   come out of this supply chain somewhere, whether

22   it's mom and dad's cupboard, whether it's a

23   legal script, and you have recognized in your

24   presentation that the wholesale distributors are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a chokepoint.  They are the middle man between

 2    the manufacturers and the pharmacies.

 3                   And when they go as far as

 4    applying for and receiving a registration to be

 5    able to deal in these substances, they take on

 6    certain statutory obligations; we can agree, can

 7    we not?

 8                   MR. PYSER:  Object to form.

 9         A.    Yes.

10         Q.    And they need to be held

11    accountable for ensuring those obligations are

12    carried out, don't they?

13         A.    Yes.

14                   MR. PYSER:  Object to form.

15         Q.    And that obligation didn't start

16    with Cardinal when you took on this role, did

17    it?  This obligation with Cardinal goes back to

18    the beginning when they first started dealing in

19    controlled substances.  And I say dealing.  When

20    they first started providing the distribution of

21    controlled substances well before you came in

22    this role, correct?

23                   MR. PYSER:  Object to form.

24         A.    Yeah, and the narrative is much
```

Highly Confidential - Subject to Further Confidentiality Review

1    broader than that, because our government

2    agency -- and it's a narrative I've had from

3    when I walked in the job to the day that I'd sit

4    in front of you today.  Our government agencies

5    failed us.  It was a failed strategy to come

6    after the distributors.

7              It was a failed aspect of this

8    whole consideration of the opioid crisis to

9    leave out of the narrative how those ingredients

10   get to be the manufacturers to make these

11   volumes of drugs so that distributors, the

12   little piece of this, the distributors, are

13   fulfilling legitimate orders at pharmacies in

14   almost all regards for them to dispense them,

15   written by licensed DEA doctors.  That's my

16   narrative.  That's how I see it.

17         Q.   So let's approach it that way.

18   You say we're going after distributors.  Many

19   distributors have admitted to breaking the law.

20              Are you aware of that?

21              MR. PYSER:  Object to form.

22         A.   I'm not that close to it.  It's

23   been ten years since I've been in this role.

24         Q.   Okay.  Well, they have.

```
 1                  And you would agree with me that

 2     they should be held to their obligations under

 3     the law, should they not?

 4                  MR. PYSER:  Object to form.

 5          Q.   Yes or no?

 6          A.   I -- you know, I don't know who

 7     has made comments or who's made admissions.  I

 8     know that we've undergone accusations at the

 9     time period that I'm at the company, and we

10     responded to those.  And we put our system in

11     place to deal with this problem.

12                  And I personally made sure that we

13     did everything that we knew to do to be in

14     compliance with how the DEA required us to act

15     as a company in Cardinal Health.  And please

16     remember, I didn't do that because I was in a

17     job alone.  I did that out of a personal

18     passion.

19          Q.   So, again, let me go back to my

20     question.

21                  My question is, should they be

22     held to complying with the laws that they

23     undertook to fulfill when they became a

24     registrant?
```

```
 1              A.    Any registrant should be holding

 2     themselves to the law.

 3              Q.    Let me ask, you have a driver's

 4     license, don't you?

 5              A.    Of course, I do.

 6              Q.    And you drove here today, correct?

 7              A.    You know what time I left?

 8              Q.    I have no idea what time you left.

 9              A.    5:30.  I was worried about the

10     weather.  I wanted to make sure you and I met.

11     I was here in this building about 6:30.

12              Q.    Well, I was up working at that

13     point, too.  And it would have been in the

14     building we would have met at other than having

15     to come over here.

16              A.    I did drive here.

17              Q.    And if you sped, if you broke the

18     speed limit on the way here, just because you

19     got caught doesn't mean -- or didn't get caught,

20     doesn't mean it's okay, does it?

21                    You should abide by the law

22     whether or not you get caught, correct?

23              A.    Yes, I agree with that.

24              Q.    Speeding rules, speeding limits
```

```
 1    are one of the safety rules we have in our

 2    country to try to keep people safe on the

 3    street, fair?

 4            A.    Yes.

 5            Q.    The statutory obligations that we

 6    looked at earlier are the safety rules to try to

 7    keep us safe when we're dealing with controlled

 8    substances.  Can we agree with that?

 9                  MR. PYSER:  Object to form.

10            A.    Oh, I understand that.

11            Q.    And that's part of what you tried

12    to do at Cardinal, is ensure compliance with

13    those, correct?

14            A.    No.  I did do that.  I didn't try.

15                  MR. FULLER:  So let's pull up the

16            Congressional testimony, clip 6.

17                  (Video started.)

18                  "MS. WALTERS:  Now, when

19                  Cardinal began setting

20                  threshold limits for

21                  pharmacies in 2008, the

22                  company set family

23                  discount's hydrocodone

24                  threshold at 27,000 doses
```

```
 1              a month.  In a little over

 2              a year, Cardinal adjusted

 3              the pharmacy's threshold 14

 4              times.  And by August 2009,

 5              it was cleared to receive

 6              110,000 hydrocodone pills a

 7              month.  The pharmacy's

 8              threshold for hydrocodone

 9              reached a peak of 150,000

10              dosages a month in

11              January 2010, a level it

12              remained at for a year and

13              a half before Cardinal

14              officials reviewed and

15              reduced it.

16                  "Mr. Barrett, when a

17              pharmacy goes over its

18              monthly drug threshold,

19              does Cardinal inquire about

20              the reason for the higher

21               drug order?

22              "MR. BARRETT:  Thank you,

23              Congressman.

24                  "Today if an order
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              reaches its threshold, it

 2              simply stops.  So the process

 3              is, the threshold is set, and

 4              the threshold is set based

 5              on a number of factors; the

 6              size of the community it

 7              serves -- not just the

 8              population but the community

 9              it serves.  Other factors.

10              Does it serve a hospice

11              center or a surgical center,

12              et cetera.

13                  "If an order reaches

14              that threshold, that limit,

15              it simply stops.

16              "MS. WALTERS:  But in the

17              past, did it -- did it

18              question it before today's?

19              "MR. BARRETT:  So as I look

20              back at some of the historical

21              documents, I think the

22              thresholds probably should

23              have been set with a different

24              set of eyes.  I've mentioned
```

```
 1              this notion of asking

 2              different questions, and

 3              I think today would probably

 4              set those quite differently.

 5                  "But I think at the time

 6              of those pharmacies you

 7              referred to, thresholds probably

 8              should have been adjusted down

 9              more quickly.

10      "MS. WALTERS:  Did they -- did

11              Cardinal make an assessment

12              as to whether the explanation

13              for increasing the threshold

14              made sense and verified it in

15              any way?

16      "MR. BARRETT:  It's hard for

17              me to answer that fully.

18              Again, this is part of the

19              history.  I have no reason

20              to question the good intent

21              of those doing that kind of

22              assessment.  They were

23              professionals.

24                  "I think they were
```

```
 1                    looking at the incoming order

 2                    of prescribing.  I think now

 3                    we know some of that

 4                    prescribing was driven by

 5                    some behavior that we would

 6                    have liked to have caught

 7                    in the physician world.

 8                    And today that simply could

 9                    not happen."

10                    (Video stopped.)

11   BY MR. FULLER:

12           Q.    So that was during your watch.

13   2008 to 2010, did a pharmacy in Mount Gay, West

14   Virginia -- do you know how big Mount Gay is?

15           A.    I do not.

16           Q.    Less than 2,000 people.

17                    MR. PYSER:  Object to form.

18           Q.    They have thresholds for

19   hydrocodone of 27,000 a month for that pharmacy

20   that went up to over 100,000 per month and

21   remained there, at least according to the

22   congressional testimony, for over a year.

23                    Does that cause you any concern

24   that that was happening in the system that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   put in place?

 2           A.    You know --

 3           Q.    14 threshold increases over a

 4   year's time.

 5           A.    The system I put in place was with

 6   some subject matter experts.  I relied on them.

 7   They did their jobs, and in our system we used a

 8   threshold approach to monitor each and every

 9   order.  And then we used a judgment factor,

10   Michael Moné and his team, to look at those

11   orders.  Was there something more we needed to

12   know?

13              Is that area a bigger area than

14   the 2000 you're referring to in the town?  Were

15   they near a hospital?  Were they near -- were

16   there other pharmacies that aren't in that

17   location?  So I don't have any recollection of

18   the account.  I don't have any recollection of

19   getting involved in it.  Michael and team were

20   handling that part of our business.

21              I was working very hard at making

22   sure we were responding to the DEA, setting up

23   our systems, making sure we're getting trained

24   and to move forward so that we could restore our
```

```
 1    supply chain, the distribution center license

 2    suspensions.

 3            Q.    And that was a priority, is

 4    getting the license reinstituted?

 5            A.    The priority was to put a system

 6    in place as fast as we could that abided by the

 7    DEA guidance that we now knew, when I walked

 8    into the role, that we now knew, as fast as we

 9    could.  And, yes, that that hopefully would

10    result in the restoration of our licenses for

11    those distribution centers.

12            Q.    But over --

13            A.    So the priority was to get the

14    system in place that we were now working

15    against, the guidance from the DEA, to improve

16    ourselves, to make it better, and to do the

17    appropriate jobs as they were now requiring of

18    us.

19            Q.    But your system, that new and

20    improved system, allowed hundreds of thousands

21    of pills into a small -- used to be mining town

22    in southern West Virginia.  There's no big

23    hospital around there.  There's no big cancer

24    treatment center around there.  It's a small
```

Highly Confidential - Subject to Further Confidentiality Review

1    town with 2,000 people, Mr. Hartman, and they

2    were getting over 100,000 pills a month from

3    your company under your new system.

4              Your CEO even admitted that the

5    thresholds were too high.  It would be done

6    differently now.  That's the system that was in

7    place 2008 to 2010, right?

8         A.    What I just described to you is

9    the system we had.  We put a system in place

10   that depended on an enhanced capability, at that

11   time what we called "predictive analytics," and

12   today they call it AI, so that we could monitor

13   each and every order.

14             We established thresholds, which,

15   frankly, were -- I believe were based off of DEA

16   guidance.  DEA guidance.  And then we put that

17   in place so that we could monitor those orders

18   coming in.  And in our system, the one we chose

19   to implement, included professionals like

20   Michael Moné and his team -- or it was his team,

21   I should say, not like him.  It was him and his

22   team to look at each of those orders that hit a

23   threshold and then determine what we were going

24   to do about it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    So you knew Michael Moné was

 2    subsequently demoted because of quality and

 3    regulatory issues, correct?

 4                    MR. PYSER:  Object to form.

 5              A.    I'm not aware of that.  He was a

 6    vice president under me.  Is he not a vice

 7    president today?

 8              Q.    Have you not seen the internal

 9    report that was done based on the 2012, 2013

10    investigation where it says he was too

11    subjective for that role and he was transferred

12    out of there?

13                    MR. PYSER:  Object to form.

14              Q.    Have you not seen that?

15              A.    I haven't seen that.

16              Q.    You mentioned the threshold

17    system.  What was this sophisticated threshold

18    process you went through?  Was that when IBM was

19    hired or Deloitte or Dendrite to assist with

20    developing a threshold system?

21              A.    Deloitte worked closely with us as

22    we developed our systems.  I came into role.  We

23    had them as external consultants to work side by

24    side with us.
```

1          Q.    And they worked with your

2    regulatory team?

3          A.    They did.

4          Q.    What about IBM?  Were they also

5    retained?

6          A.    I -- I don't have any recollection

7    of IBM, whether they were there or not or why

8    they would have been there.  Of course we're

9    working with our IT group hand-in-hand to do,

10   you know, what we had wanted to get done.  I

11   don't have a recollection of IBM.

12         Q.    And was Deloitte drafting or

13   designing this threshold system?

14         A.    Well, Deloitte had, I recall, two

15   or three -- well, probably three or four people

16   on the team who worked very closely with us.

17   There was a couple of young IT types analy- --

18   with an analytical background that assisted

19   Michael, who was working with our IT department.

20   I don't recall who was front and center for us.

21   I just -- I don't recall who that person was to

22   build this system.

23         Q.    But that was in Michael Moné's

24   sort of wheelhouse, right?

```
 1              A.    It was, and it was Michael and

 2     these two assistants, and then we had a more

 3     senior manager from Deloitte that was working

 4     primarily with me --

 5              Q.    Who was that?

 6              A.    -- on the broader system.

 7              Q.    Who was that?

 8              A.    Mike Deloso.

 9              Q.    Mike Deloso.

10                    And then you mentioned that the

11     DEA provided some sort of approval to this

12     threshold process?

13              A.    I'm referencing the fact that when

14     we -- you know, our whole -- you know, during my

15     time, that whole mission was, get that system in

16     place, respond to the DEA guidance that we now

17     have.  Because I walked in in December of 2007.

18                    Let's do everything we can to get

19     that system up and in place, which included the

20     analytics from an IT perspective, the Know Your

21     Customer piece for training, for our field

22     representatives, the investigators with their

23     processes and practices.

24                    And I'm sure I'm not addressing a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    couple of the big -- you know, other areas, but

 2    that was our whole world, was get that done as

 3    fast as possible.  And I say approval so that we

 4    could get to a point that we knew was going to

 5    happen, at least in discussions, were going to

 6    be inspections to approve our system.

 7                 So if I recall correctly, the --

 8    in November, we got our licenses back through an

 9    agreement, and we went through a series of

10    inspections.  There was a time frame around it,

11    and I recall February of '09.  So when I say

12    approval, that's what I'm referring to, as to

13    how they came back and allowed us to have our

14    licenses back and we went back and got to the

15    business of our supply chain.

16         Q.    And so you're not suggesting that

17    they specifically provided guidance on how to

18    create these thresholds.  You're suggesting

19    that, we got our license back so we complied

20    with whatever they were asking us to do?

21         A.    Yeah.  What I was referring to

22    there, if I -- if I recall right -- and, again,

23    Michael Moné is going to be the expert on this

24    to be able to talk to you about that.  But in
```

1    the early days, DEA had provided a multiplier of

2    2 and 8.

3              And as I recall, as we came in,

4    Michael instituted that -- a process that, you

5    know, as you're looking at an account to set the

6    threshold, you use the multiplier, and he

7    included a 5 in that to try to have even a

8    broader, more detailed approach, not just 2 and

9    8, but 2, 5, and 8 as the multipliers.  That's

10   what I recall.

11             And that was the guidance, I

12   believe -- again, I'm not the expert.  We went

13   off of -- from the earlier days with the DEA, in

14   setting thresholds or multipliers around, you

15   know, suspicious orders and those kind of

16   things.

17        Q.    Let's go to page 22 of your

18   presentation, Mr. Hartman.

19             Let me know when you're there.

20        A.    Yes.

21        Q.    It's blown up in front of you

22   because I know it's small.

23        A.    Yeah.

24        Q.    This is where you indicate that in

Highly Confidential - Subject to Further Confidentiality Review

```
1    2005 to 2006, the DEA began a series of informal

2    discussions with the supply chain, correct?

3          A.    Yes.

4          Q.    And you're aware that during that

5    time frame, they actually met personally with

6    Cardinal, correct?

7          A.    So in this time frame, when I

8    delivered this presentation, and it still sticks

9    in my mind that it's further out than this date.

10   I don't know that.  It seems like it was.  I

11   gathered a lot of inputs around the supply chain

12   discussion from many different industry folks to

13   provide them all the ways that we were thinking

14   about leaks, meaning how the supply chain gets

15   interrupted.  That's the term "leaks" that I

16   use, was how does it get interrupted.

17               So, yes, I wrote this in here.  I

18   certainly -- I know I had probably seen those

19   memos before.  I was gathering data.  Quite

20   frankly, this presentation, I got great

21   assistance on from the Deloitte folks, because I

22   think it was a Deloitte-sponsored meeting at the

23   University of Tennessee.

24         Q.    And you indicate the message was,
```

```
 1    "Anti-diversion is everyone's responsibility,"

 2    correct?

 3             A.    Yes, I did.

 4             Q.    And that "The uptake was not as

 5    rapid and robust as the administrative

 6    wanted" -- excuse me -- "as the administration

 7    wanted," correct?

 8             A.    That's what I said.

 9             Q.    And it's meaning that the DEA

10    wasn't happy with it as quickly as everyone was

11    responding to their guidance?

12             A.    I'm pretty sure that --

13                   MR. PYSER:  Object to form.

14             Q.    Correct?

15             A.    That's probably what I meant

16    there.

17             Q.    And then you mentioned in 2006 to

18    2008, and this is the relevant time frame where

19    you come into the picture, the DEA began a

20    series of regulatory actions to promote change.

21                   And that regulatory action did

22    institute change at Cardinal, didn't it?

23             A.    Yes.

24             Q.    It brought you into this role to
```

```
 1   develop this new system for Cardinal, correct?

 2           A.    Yes.

 3                 MR. FULLER:  All right.  We're

 4           going to take another quick break, and

 5           Ms. Quezon is going to take over and ask

 6           you some questions for a while if that's

 7           okay, and probably even if it's not

 8           okay.

 9                 THE VIDEOGRAPHER:  The time is now

10           4:25.  We're going off the record.

11                 (Recess taken.)

12                 THE VIDEOGRAPHER:  The time is now

13           4:35.  Back on the record.

14                       - - -

15                 CROSS-EXAMINATION

16   BY MS. QUEZON:

17           Q.    Mr. Hartman, when you and

18   Mr. Fuller just kind of finished up speaking, I

19   know that one of the subjects that y'all touched

20   upon was the epidemic.  And when it was

21   initially broached early in your deposition, I

22   think you agreed that -- that it's been going on

23   for some time now.

24                 Was that your testimony earlier?
```

```
 1              A.    I think so.

 2              Q.    Okay.  And if we could pull up

 3    1087.  And I'm not sure if you're familiar with

 4    this particular document, Mr. Hartman, but this

 5    is the -- it's an OAG -- a GAO report -- pardon

 6    me -- from 2003.  And this is Plaintiff's

 7    Exhibit 21.

 8                         - - -

 9        (Cardinal-Hartman Exhibit 21 marked.)

10                         - - -

11    BY MS. QUEZON:

12              Q.    And I guess the first question is,

13    are you familiar with this particular report?

14              A.    No.

15              Q.    Okay.  We're not going to go

16    through the whole thing, but if I can just point

17    out a couple of things to you and just see

18    whether you agree or were aware of some of the

19    descriptions of what was happening in the United

20    States.  And this is back, again, in December of

21    2003.

22                    And if we can go to page 10.  And

23    about three quarters of the way down that first

24    full paragraph, beginning with the sentence,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    "The rapid growth in OxyContin sales, which

 2    increased the drug's availability in the

 3    marketplace, may have made it easier for abusers

 4    to obtain the drugs for illicit purposes."

 5             Do you see that?

 6        A.    I do.

 7        Q.    And it also talks about some

 8    states that may have been predisposed to

 9    diversion.

10             Do you see that as well?

11        A.    Diversion that may have

12    predisposed some states.  Yes, I see that.

13        Q.    Okay.  Well, let me first ask you,

14    would you agree that the availability of a

15    controlled substance in the marketplace would

16    increase the likelihood for diversion?

17        A.    The availability?

18        Q.    Yes, sir.

19             The more of the drug that is out

20    in the marketplace, the higher the likelihood

21    that the drug could be diverted and abused?

22        A.    Well, that seems logical.  The

23    reality is that, you know, going back to this

24    time frame, and as I've already stated from my
```

Highly Confidential - Subject to Further Confidentiality Review

1    narrative, the DEA continues to increase

2    ingredients for manufacturers to make more and

3    more of the controlled substances.

4                    So when we say "availability to be

5    diverted," the reality, as I see it, as a

6    distributor, or at least at the point when I was

7    in the job, these are prescriptions that are to

8    be written by DEA-licensed doctors.  So the

9    presumption is they're being dispose -- they're

10   being dispensed by a DEA-licensed pharmacy going

11   into patients' hands to go home for whatever

12   medical treatment they needed.

13                   So it makes it difficult to say,

14   would I agree with it's all going or it's more

15   likely for diversion.  In my world, it's a

16   medical supply chain that's being fulfilled for

17   a patient that has a legitimate prescription

18   from a doctor.

19        Q.   Well, you started by saying it

20   seems logical.  So -- and I'm not going to argue

21   with you that there are many factors that may

22   have gone into where we find ourselves today.

23   But on a simplistic level, would you agree that

24   the -- that the glut of the -- of the controlled

1    substance, the more there is out there, that

2    it's going to increase the likelihood for

3    diversion and abuse?

4            A.    Again, it seems logical on the

5    surface, but we have to look beyond that.

6            Q.    And we will, but can you agree

7    that that would be one factor to consider, the

8    amount of the controlled substance available?

9            A.    Yes.

10           Q.    Okay.  And let's go, if we can, to

11   page 35, and I think this is sort of a different

12   way of stating it, but it leads into a chart

13   that I want to take a look at, if we can.  It's

14   that bottom paragraph there, sir.  I'll wait

15   until you get there.

16                 Once again, just simply states,

17   "The large amount of OxyContin available in the

18   marketplace may have increased opportunities for

19   abuse and diversion.  Both DEA and Purdue have

20   stated that an increase in drugs availability in

21   the marketplace may be a factor that attracts

22   interest by those who abuse and divert drugs."

23                 Sort of a different way of saying

24   it, but would you agree with both Purdue and DEA

```
1    in that -- in that conclusion?

2         A.    Yes.  I see where they may have.

3         Q.    Okay.  And if we can go to the

4    following page, page 36.  And so this is just

5    simply a table that tracks from 1996, which if

6    you're not familiar, is when OxyContin was

7    released into the marketplace, up until 2002.

8               And do you see, sir, there the

9    increase in the number of prescriptions rising

10   from 316,000, about 317,000 if we round up, in

11   the year 1996, to 7,234,204 by the year 2002?

12        A.    I see that.

13        Q.    Okay.  Now, this period of time

14   was well before you were brought in to

15   regulatory or any type of compliance at

16   Cardinal, correct?

17        A.    Yes.

18        Q.    All right.  And this was the

19   period of time when suspicious orders, at least

20   according to your previous testimony, were being

21   identified by Cardinal but shipped, correct?

22        A.    What -- to my understanding.

23        Q.    Sure.

24        A.    And, again, I am not an expert on
```

1    it, and I'm sure you'll talk to people that are.

2    The Cardinal system was following the DEA

3    guidance and instructions that we were to submit

4    monthly reports.  So when you say I said

5    suspicious orders were being shipped, if I said

6    that, certainly what I meant was, they could

7    have been because those were monthly reports,

8    and any order that prior month that is now being

9    reported at the end of the month was already out

10   the door.

11        Q.    Right.  But you weren't reporting

12   every single order to the DEA?  I mean, in ARCOS

13   you were, but this was something separate,

14   right, this monthly report?

15        A.    My recollection is there was

16   ARCOS -- please don't ask me to define what that

17   is -- and ingredient limit report.

18        Q.    And those are the ones -- I'm

19   sorry.  Go on.

20             MR. PYSER:  Finish your answer.

21        A.    And those -- and those were the

22   ones that were required to go to the DEA.  There

23   might have been others, but -- and that

24   specifically spelled out and showed the DEA

1    where the products were going.

2         Q.    The suspicious products were

3    going, not every product, right, the limit

4    reports?

5         A.    Limit reports, yes.  I'm not real

6    clear on that -- these reports.  That was my

7    understanding as I took the role as to how we

8    thought we were complying with -- we feel

9    changes happened, hence we pushed forward in

10   changes that the DEA had imposed on us.

11        Q.    Sure.  You thought that the

12   requirement was to report suspicious orders to

13   the DEA.  And then when you came in, your team

14   explained to you that the DEA had changed the

15   rules, according to them, and that now not only

16   did you have to report, but you had to stop

17   shipment?

18        A.    My time frame -- so December -- my

19   understanding is, what changed is -- well, a lot

20   of things changed.  But, yes, now it was a

21   "don't ship a suspicious order."

22        Q.    Right.  Not just --

23        A.    That's my understanding.

24        Q.    Not just identify and report, but

1    identify, report, don't ship?

2         A.    That's my understanding.

3         Q.    Okay.  So, again, during this

4    period of time when we go from 300,000 oxies --

5    316,000 oxies in 1996 to 7,200,000 in 2002, that

6    was during the period -- during the period of

7    time that Cardinal was identifying, reporting,

8    and shipping?

9              MR. PYSER:  Object to form.

10        A.    Again, I'm -- I don't have a -- I

11   don't have a clear understanding of that prior

12   system.  As I took over, the team that I had

13   felt that they were meeting the obligations.  So

14   I'm just going to say I don't know.

15        Q.    But you knew that the change that

16   they explained to you --

17        A.    In December of 2007.

18        Q.    -- is that "we can't ship

19   anymore"?

20        A.    That, I understood.

21        Q.    Okay.  Let's go to page 14, if we

22   can.  And, sir, this is in regards to the -- how

23   long sort of this epidemic has been building.

24              And the report to Congress here

```
 1   says, "Media reports of OxyContin abuse and

 2   diversion began to surface in 2000.  These

 3   were -- reports first appeared in rural areas of

 4   some states, generally in the Appalachian

 5   region, continued to spread to other rural areas

 6   and larger cities in several states.  Rural

 7   communities in Maine, Kentucky, Ohio,

 8   Pennsylvania, Virginia, and West Virginia were

 9   reportedly being devastated by the abuse and

10   diversion of OxyContin."

11            And then if we go on to the next

12   page, sir, about halfway down, that first

13   paragraph, "The media also reported on deaths

14   due to OxyContin.  For example, a newspaper's

15   investigation of autopsy reports involving

16   oxycodone-related deaths found that OxyContin

17   had been involved in over 200 overdose deaths in

18   Florida since 2000."

19            Were you aware, sir, that there

20   were certain parts of the country that were

21   being affected more significantly than other

22   parts of the country when it came to the opioid

23   epidemic?

24            A.    During what time period?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Any time period.

 2            A.    At this time period that you're

 3    reading from, I was not.

 4            Q.    When did you become aware?

█      █     ████████████████████████████████

█      ████████████████████████████████████████████

 7    I started to become much more informed in

 8    understanding this problem in December of 2007.

█      █     █████████████████████████████████

█      ██████████████████████████████████████

█      █     █████████████████████

█      █     ████████████  █████████████████

█      ████████████████████████████████████

█      ███████████████████████████████

█      ███████████  █████████████████████████████████

█      ████████████████████████████████████████

█      ██████████████████████████████████████

█      █████████  ████████████████████████████████

█      ██████████████

█      █     ████████████

█      █     █████████████████ if we can, to the

22    time frame just before December of 2007.

23                 MS. QUEZON:  And it's P14195,

24                 please.  Exhibit 22.
```

```
 1                      - - -

 2         (Cardinal-Hartman Exhibit 22 marked.)

 3                      - - -

 4         A.    This isn't this document.

 5         Q.    No.  And you can just set that in

 6    front of you.  Oh, sorry.  Here's both of them.

 7    My bad.

 8               MS. QUEZON:  Sorry, Steve.

 9         A.    Okay.

10         Q.    Have you seen this e-mail before?

11         A.    Prior to my time in role, and I

12    don't recall it.

13         Q.    Okay.  Attached to this, sir, is a

14    suspicious order monitoring system that was put

15    in place by AmerisourceBergen.

16               Have you -- are you familiar with

17    that?

18         A.    When I came in role, looking back,

19    didn't do a deep dive.  I know I must have

20    looked at documents.  I suspect I looked at that

21    document, and for what I was doing, we simply

22    marched forward at Cardinal around developing

23    and improving those aspects of the new

24    requirements and improving the system that we
```

Highly Confidential - Subject to Further Confidentiality Review

1    had.  So I might have looked at it.  I don't

2    recall using it other than probably reviewing

3    it.

4            Q.    Okay.  Let's take a look at what

5    Mr. Reardon has to say about it, if we can.

6    And, again, this is in September of 2007.  And

7    it starts, "HDMA," and can you tell the jury who

8    that is, for the record.

9            A.    You're on the front page?

10           Q.    Yes, I am.  I'm so sorry.

11           A.    Your question?

12           Q.    HDMA, the e-mail begins with those

13   initials.

14           A.    Healthcare Distributors, at that

15   time, Manufacturers Association, I believe.

16           Q.    All right.  And is that like a

17   interest group, like an industry group?

18           A.    It was an industry association.

19           Q.    All right.  "Met with DEA

20   officials last Friday to discuss the Agency's

21   current policy position on suspicious orders of

22   controlled substances.  A summary highlighting

23   the key points are attached for your review.

24   They're setting a new standard with which we

1    must comply.  This is all coming about as a

2    result of the problems with Internet pharmacies

3    and controlled substance diversion.

4              "Recently, they suspended an ABC

5    registration and used the suspension to get them

6    to implement a complex and onerous suspicious

7    order monitoring program that meets the criteria

8    spelled out in the HDMA meeting summary."

9              In your -- and I know you said

10   didn't do a deep dive of it.  Did you find ABC's

11   suspicious order monitoring program to be

12   onerous and complex?

13        A.    I don't recall, but I suspect that

14   given the role I went into and the way I conduct

15   myself and the way I entered the position to get

16   whatever I needed, at the time I walked in the

17   job, I wouldn't have cared what complexity was

18   in front of me.  We were going to do it.

19        Q.    And in fairness, this was prior to

20   any of the Cardinal suspensions, correct?

21        A.    Yes -- well, yes, if it's

22   September, then we were, what, in November and

23   December and January following on months.

24        Q.    Now, it looks like in the second

Highly Confidential - Subject to Further Confidentiality Review

```
 1    paragraph, it says "Additionally, I'm aware that

 2    McK" -- McKesson, correct?

 3              A.    Yes.

 4              Q.    -- "is in ongoing negotiations

 5    with the DEA related to an Order to Show Cause.

 6    An Order to Show Cause affords a registrant the

 7    opportunity to argue where why a registration

 8    should not be suspended or revoked.  I think it

 9    would be safe to assume the DEA will use this

10    opportunity to get McKesson to implement an

11    ABC-like program."

12              And then finally at the end, it

13    says, "We need to be proactive and implement a

14    program that we develop that will satisfy DEA

15    expectations and is not dictated to us by the

16    agency pursuant to regulatory action.  The ABC

17    program is not customer friendly and results in

18    delayed filling and delivery of controlled

19    substance orders to the customer."

20              Now, you weren't brought in in

21    September when there was at least some

22    acknowledgment that a system needed -- a program

23    needed to be implemented and developed, right?

24              A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1             Q.    It wasn't until after the -- at

2     least one suspension of a distribution center

3     that Cardinal corporate turned to you and asked

4     you to come into that role?

5             A.    Yes.

6             Q.    Now, Mr. Fuller talked to you a

7     little bit about threshold limits, and I want to

8     talk to you a little bit more about them.

9                   MS. QUEZON:  If we could pull up

10            3859, please.

11    BY MS. QUEZON:

12            Q.    And while we do that, I take it

13    you entered into some discussions with Deloitte,

14    was it, that helped you with the threshold

15    program?

16            A.    Deloitte assisted us in the

17    mechanics of putting together the program that

18    was designed -- you know, that it was designed

19    by Michael Moné, and, I suspect, some of his

20    other team member pharmacists.  Deloitte would

21    have been on the -- what I would say is the

22    tactical side of the pieces that we needed to

23    work on to get after it.

24            Q.    Okay.  So it would have been
```

1    Moné's theory or general idea of what needed to

2    be put in place to establish the thresholds and

3    then the mechanics of it were handled by

4    Deloitte?  Is that --

5           A.   Well -- well, I would just say,

6    the Deloitte support guys for that would have

7    assisted other people at Cardinal to put those

8    pieces in place.  So there were Cardinal players

9    in this beyond the two Deloitte tactical

10   gentlemen that we had, with Moné instructing

11   them.

12              But also there would have been

13   people from IT working on this and taking the

14   information to work the program, to put the

15   right algorithms in, to -- you know, to do those

16   components.  It wasn't just Deloitte.

17          Q.   And who would have come up with

18   the algorithms?

19              And if it was a team effort, tell

20   me that, but give me who was heading up the

21   team.

22          A.   Michael Moné.

23          Q.   Okay.  Okay.  All right.  Are you

24   familiar with the SOP or the standard operating

Highly Confidential - Subject to Further Confidentiality Review

```
 1   procedure or process to establish SOM threshold

 2   limits that I've handed to you?

 3           A.    I'm recalling it as you've handed

 4   it to me.

 5           Q.    Okay.  And, again, this would have

 6   been -- and specific questions about it, they

 7   would likely be better put to Mr. Moné?

 8           A.    In this case, I think both

 9   Mr. Moné and -- well, definitely, Mr. Moné.

10           Q.    Okay.  All right.  And we can see

11   by its issue date there on the front that this

12   was issued in December of 2008, so that would

13   have been approximately a year after you took

14   the position, correct?

15           A.    Yes.

16           Q.    And under Previous Issue, it

17   states clearly that this is a new process to

18   establish suspicious order monitoring threshold

19   limits, correct?

20           A.    Yeah.  That word "new," I don't

21   know about.

22           Q.    All I'm saying -- sorry.

23           A.    Our policy -- it says -- I'm

24   sorry.  You have another question?
```

```
 1              Q.    No, no, go on.  You finish.  I
 2    didn't want to interrupt you.
 3              A.    Yeah, so it's the only thing I'm
 4    looking at that bothers me, because we had
 5    already established things, at least in my time,
 6    plus back in the earlier times with Cardinal
 7    under Steve Reardon, I suspect there were
 8    policies and procedures in place.
 9                    So I don't know why "new" gets in
10    there.  At the time Cardinal's going through --
11    as I've said, we go through lots of changes.
12    Corporations do this all the time.  You change
13    headers.  You put new requirements on what has
14    to be on a document for a policy.  So, again, I
15    don't know what the word "new" implies here
16    other than it's saying new here and I --
17              Q.    You don't know what "new" means?
18              A.    I don't.  I -- because we would
19    have had policies and practices before.
20              Q.    All right.
21                    MR. PYSER:  Object to form.
22              Q.    Well, let's go ahead and look at
23    the methodology that begins at 4.2 in the bottom
24    of that page, and it states that this is going
```

```
1    to be the methodology.

2                  And then the next page, "4.2.1,

3    Extract and format list of customers and

4    historical sales data.  .2, Differentiate

5    customers through segmentation.  Segmentation of

6    customers is preferred but is an optional step.

7    3, Evaluate historical controlled substance

8    sales data per drug family, per month for each

9    customer segment to establish appropriate

10   threshold limits."

11                 And then under A and B and on

12   through, "We're going to use that historical

13   data, calculate a threshold limit and then we're

14   going to multiply that" -- and I'm on 6 now,

15   small Roman numeral 6 -- "multiply the monthly

16   quantity for each segment by a factor of 3, 5,

17   or 8."

18                 So for the 3 factor is for

19   Schedule II drugs:  Hydrocodone, oxycodone,

20   alprazolam, phenetamine drug families, correct?

21        A.    Yes.

22        Q.    All right.  So if I'm

23   understanding this correctly -- and please tell

24   me if I'm wrong -- we're going to figure out
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   what the -- over a year-long historical sales

 2   data, if we have it -- unless it's a new

 3   pharmacy, obviously -- but if we've got a

 4   12-month historical sales data, we're going to

 5   take all that, figure out exactly how much, on

 6   average, oxycodone is being sold or hydrocodone

 7   is being sold by the pharmacy.

 8            We're going to take that average

 9   and then we're going to multiply it by 3 and

10   that's going to be the threshold.  Is that a

11   simple summary of how these thresholds were set?

12            MR. PYSER:  Object to form.

13        A.   Michael will have to walk you

14   through the exact specific steps.  I was not the

15   subject matter expert.  I admit it.  Michael

16   was.  I relied on him.  The 3, 5, and 8, I

17   distinctly remember.  And what's here in your

18   description was something that we -- in my

19   recollection, is something that we continued to

20   use as DEA guidance from the prior, previous to

21   my coming in and building out and improving this

22   system.  The 5 came from Michael inserting a new

23   level to be used as a multiplier.

24        Q.   All right.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     That's what I recall.

2          Q.     But we know that we are looking at

3     historical sales data to at least get our base,

4     and then we use the multiplier?

5          A.      If that says this here, then I

6     have to -- I agree with that.

7          Q.     All right.  And since this is, at

8     least according to the document, a new standard

9     operating procedure for the setting of the

10    thresholds, we're going to be setting that base,

11    that average sale level, in 2008 going forward?

12              MR. PYSER:  Object to form.

13         A.     Yes, taking that -- those

14    averages, that data, and the multiplier would

15    establish it for a particular customer.

16              MS. QUEZON:  Okay.  Let's pull up

17         3800, please, P13800.

18                     - - -

19        (Cardinal-Hartman Exhibit 23 marked.)

20                     - - -

21    BY MS. QUEZON:

22         Q.     Now, I'll give you a minute to

23    take a look at this, but I'll explain basically

24    what this is.  This is a summary from the ARCOS

```
1    data for Cuyahoga County, Ohio.  The next page

2    is Summit County, Ohio.  And the final one is a

3    combination of the two counties, of both Summit

4    and Cuyahoga.

5                And this is -- if you look in the

6    first column, obviously, it's the years.  1996

7    is when OxyContin came out into the market until

8    2017.  And the second column is the total dosage

9    units.

10               And do you see there in 1996 for

11   oxycodone and hydrocodone combined, there was

12   1,324,262 total dosage units?

13        A.    Yes.

14        Q.    Now, I want us to move up to when

15   we're going to be setting our thresholds.

16               MR. PYSER:  Counsel, can you

17          clarify, is this Cardinal Health data

18          or --

19               MS. QUEZON:  Yes, just Cardinal

20          Health.

21               MR. PYSER:  Thank you.

22   BY MS. QUEZON:

23        Q.    So now we're going up to where

24   we're going -- where Cardinal is going to be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    setting their thresholds, their base before they

 2    multiply it by 3 in 2008.

 3                 And now we're at 13,337,200 total

 4    dosage units, correct?

 5         A.    That's what it says.

 6         Q.    And that's where we're setting our

 7    base for thresholds, right?

 8                 MR. PYSER:  Object to form.

 9         A.    We're setting our base for

10    12 drugs.  Is that what I'm reading?

11         Q.    This is oxy and hydrocodone.

12                 MR. PYSER:  Object to form.

13         A.    Okay.  You asked me about 2000 --

14    did you say 13,337,000 --

15         Q.    -- 200 total dosage units.  Yes,

16    sir.

17         A.    And is that for 12 drugs?  Was it

18    12 drugs?

19         Q.    That's for the drugs that contain

20    oxycodone and hydrocodone.

21         A.    Just different forms of it?

22         Q.    Yes.  Yes, sir.

23                 MR. PYSER:  Object to form.

24         A.    Okay.  I'm sorry.  Your question
```

```
1    was?

2            Q.    My question was, that's going to

3    be our base number in -- the 2008 number is

4    where we're going to start setting thresholds,

5    correct?

6            A.    If this data is accurate and it's

7    Cardinal Health's, I would agree that's probably

8    right --

9            Q.    Okay.

10           A.    -- for threshold setting.

11           Q.    Let's go to the two counties

12   combined, if we can.

13                 So in 1996, Cardinal distributed

14   total dosage units of 2,022,506 total dosage

15   units into both Summit and Cuyahoga combined.

16   By 2008 -- that -- it's a 988.08 percentage

17   change to 20,184,956 total dosage units.  And

18   it's at that year where we're going to be

19   setting our thresholds, correct?

20                 MR. PYSER:  Object to form.

21           A.    Of course, because those are the

22   products that are available based on the DEA

23   approving ingredients for these drugs to be

24   manufactured to licensed DEA doctors to write
```

1   prescription for Cardinal's slice of the

2   distribution chain to move legitimate pharma --

3   pharmaceuticals -- and this being a small piece

4   of that, overall pharmaceutical picture to

5   DEA-licensed pharmacies who are dispensing these

6   drugs.

7        Q.    Now, you were eventually told,

8   sir, that sending a bunch of limit reports at

9   the end of a month did not fulfill your

10  responsibility under the Controlled Substances

11  Act, correct?

12        MR. PYSER:  Object to form.

13        A.    I don't know that we were told not

14  to send them.  I still believe we were sending

15  them.  What we were told is that the guidance

16  from the DEA changed, and we had to respond to

17  that.  And that's when I stepped into role.  And

18  I can't claim that I began all of the change.  I

19  suspect some was happening prior to, and others

20  can talk about that.  But that's where I stepped

21  in, took over, and began doing what I did.

22        Q.    And prior to you taking over and

23  doing all the things that you discussed with

24  Mr. Fuller, the only thing that you were aware

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that Cardinal was doing -- and I understand you
 2    got this information from your team because you
 3    weren't in that section.  You weren't in
 4    regulatory at the time.  But the only thing that
 5    you were aware that Cardinal was doing was these
 6    monthly end-of-the-month reports that identified
 7    suspicious orders that they had already shipped?
 8                 MR. PYSER:  Object to form.
 9          A.     Again, I don't claim to have great
10    recollection on the forms that were sent in.
11    It's what I'm recalling today as you're talking
12    to me.  Yes, that was elements of it.  But there
13    were other parts and pieces to the team, to the
14    regulatory body, the group of people working on
15    it who did other things, who did other
16    inspections, and so forth.  So it wasn't -- I
17    don't think it was only the reports that went
18    in.  I think there were other -- there's
19    certainly other activity in that regulatory body
20    in regards to this.  I don't -- I don't recall
21    what all that was or what it was.  All I know is
22    what happened once I stepped into role, is my
23    clearest -- my clearest recollection of where we
24    went.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And after you stepped into that
 2    role, I think you mentioned to Mr. Fuller a
 3    number of times that the main thing you were
 4    concentrating on is the new -- as you call it,
 5    the new guidance of the stop shipment?
 6            A.    Yes.  That was an element of it.
 7            Q.    Sure.
 8            A.    There were many -- there were
 9    other pieces.  I mean, there was the Know Your
10    Customer, you know, the whole idea that they
11    came out with that guidance.  To your point, the
12    ABC system certainly gave indications.  I don't
13    recall all of what was in there, but this robust
14    system, we certainly grabbed on to that and we
15    took off trying to develop and build our own.
16            Q.    And started reporting suspicious
17    orders and not shipping them if they were
18    suspicious?
19            A.    Well, again, I'm not going to
20    comment.  I don't -- I don't have the -- I don't
21    have the visibility or knowledge of the prior
22    life as reporting suspicious orders, but, yes,
23    under our system, we built and enhanced -- we
24    built an analytics system.  We enhanced and
```

```
 1    improved our prior systems and reported

 2    suspicious orders under that.

 3              MS. QUEZON:  Let's go to 4699

 4         please.  Theirs is prettier than mine.

 5    BY MS. QUEZON:

 6         Q.   I'll give you a minute to take a

 7    look at it.

 8              Are you familiar with this type of

 9    summary report?

10         A.   I recall this, seeing this.

11         Q.   Okay.  And at the top there, it

12    says, "February 2009 Summary."

13              Do you see that?

14         A.   Yes.

15         Q.   And it looks like that these are

16    different suspicious order monitoring events per

17    distribution center, different types of summary

18    information for 2008 from March of 2008 to

19    February of 2009, correct?

20         A.   It looks like that.

21         Q.   All right.  Let's go to page 2

22    of 3.  And what I want to look at is that -- is

23    that table at the right top corner, "Suspicious

24    orders reported to the DEA."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  And this is throughout all of

 2     Cardinal, correct?

 3          A.    If that's what the report is

 4     about.  I don't recall what -- I suspect it is.

 5          Q.    All right.  And do you see, sir,

 6     that in August of 2008, September of 2008, and

 7     October of 2008, there were zero suspicious

 8     orders reported?

 9          A.    Yes.  I see that.

10          Q.    A couple of months -- let's see,

11     in June there were two throughout the entire

12     United States.  In December, there were two.

13     And in February there were two.

14                  Do you see that?

15          A.    I see that.

16                  MS. QUEZON:  Okay.  Let's go to --

17          let's go to 3842, please.

18                         - - -

19       (Cardinal-Hartman Exhibits 24 - 26 marked.)

20                         - - -

21                         - - -

22                  MS. QUEZON:  Oh, I'm sorry.  What

23          exhibit number are we on?

24                  MS. SHIVERS:  3859 is
```

```
 1              Plaintiff's 24.  Plaintiff 4699 is

 2              Plaintiff 25.  3842, which is this last

 3              one, is Plaintiff's 26.

 4   BY MS. QUEZON:

 5         Q.    Okay.  Now, sir, this is

 6   Cardinal's oxy sales to Summa health system

 7   in -- on the Akron campus.  And do you see from

 8   September to October of 2008, there was

 9   143 percent increase in oxycodone?

10              Do you see that?

11         A.    I see it.

12         Q.    All right.  And as we just saw in

13   the last Cardinal summary, zero suspicious

14   orders reported for that particular month,

15   correct?

16         A.    That's what it says.

17         Q.    Let's go to 3834.  What number is

18   that?

19                    - - -

20      (Cardinal-Hartman Exhibit 27 marked.)

21                    - - -

22              MS. SHIVERS:  27.

23              MS. QUEZON:  27.

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. QUEZON:

 2          Q.    It says, "Cardinal Oxycodone Sales

 3    to CVS #03355."

 4                There is a 1,250 percent increase

 5    from October to November of 2008 with

 6    0 suspicious orders reported.

 7                Were you aware of that?

 8          A.    I don't recall if I was at the

 9    time or not.

10          Q.    Let's go to 3796.

11                      - - -

12       (Cardinal-Hartman Exhibit 28 marked.)

13                      - - -

14    BY MS. QUEZON:

15          Q.    Are you familiar with due

16    diligence files?

17          A.    I recall that we had due diligence

18    files, yes.

19          Q.    I'm going to hand you what has

20    been provided to us as the entire due diligence

21    file for that last CVS.  And this is a site

22    visit in March of 2016.

23                Now, sir, we can agree --

24          A.    This is when?
```

```
 1            Q.    March of 2016.

 2            A.    March of 2016?

 3            Q.    Mm-hmm.  Yes, sir.

 4            A.    Okay.  So I have left Cardinal.

 5            Q.    Oh, yeah.

 6                  We can agree, sir, that with a

 7   1,250 percent increase in oxycodone in a month,

 8   that at the very least, there should have been

 9   some due diligence; can we not?

10                  MR. PYSER:  Object to form.

11            A.    Our system was one where we

12   employed analytics, thresholds, and a

13   professional team to review any order that hit

14   those thresholds and make determinations around

15   them.  And that was Michael Moné's team, and I

16   relied on them, and they used other data that

17   they may find.  And I have no recollection or

18   would know what's in due diligence files then or

19   back in 2010.

20            Q.    I'm going to ask you as head of

21   that regulatory division, can we at least agree

22   with a 1,250 percent increase in a month, that

23   there should be some explanation?

24                  MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    And, again, my professional team

 2    with pharmacists would review those orders if

 3    they had hit thresholds and would have done some

 4    due diligence if they felt required.

 5              MS. QUEZON:  Let's do 3837.

 6                   - - -

 7         (Cardinal-Hartman Exhibit 29 marked.)

 8                   - - -

 9    BY MS. QUEZON:

10              Q.    Plaintiff 29.

11              Sir, this is the OxyContin sales

12    to CVS 03083.  And so we're clear, these are all

13    in Ohio in Cuyahoga or Summit County.

14              Again, we have a 434 percent

15    increase from August to October 2008.  There

16    were 0 suspicious orders reported.  And not --

17    and no due diligence file.

18              Can we agree that that is

19    inappropriate?

20              MR. PYSER:  Object to form.

21              A.    The system that we were working

22    with was one where we had built an

23    anti-diversion team that had analytics and a

24    process that anytime they hit thresholds, to
```

Highly Confidential - Subject to Further Confidentiality Review

1    then review and determine if actions were needed

2    to be taken.  If they were, they were brought to

3    my attention.  I don't recall what happened here

4    or anything about the account.

5         Q.    Let's take a look, Mr. Hartman, if

6    we can, how the system worked before you got --

7    you were appointed to that position, during the

8    time that you were appointed to that position,

9    and after in the State of Ohio.

10                    - - -

11        (Cardinal-Hartman Exhibit 30 marked.)

12                    - - -

13              MR. FULLER:  Let's take 3865,

14        please.

15   BY MS. QUEZON:

16        Q.    Now, I want to remind you real

17   quick the -- that Ohio specifically was one of

18   the states that in 2003, the GAO report to

19   Congress said, this is one of the states that is

20   getting hit harder than others for whatever

21   reason.

22              In your position, did you ever

23   look at those specific states when you became

24   aware in December of 2007 that this state was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    getting hit harder than others in the United

 2    States?  Did you ever compare it to what was

 3    maybe happening in Illinois or in California?

 4              MR. PYSER:  Object to form.

 5         A.   I don't recall whether I did that

 6    or not.

 7         Q.   Do you know if anyone from your

 8    team did that?

 9         A.   I know we went through a

10    tremendous amount of analytics, comparisons

11    looking at the system.  I can't tell you that I

12    know specifically that that happened, but I do

13    know that we worked very hard at trying to

14    compare the data that we had as to what we were

15    going to do.

16              And, of course, we're working on

17    the whole United States with a system that we

18    were putting in place to be in compliance with

19    the DEA guidelines that we felt were new, that

20    we had to respond to, and make sure it was

21    rolled out across the country.

22         Q.   Well, let's look --

23         A.   So, no, I don't know that we

24    actually compared state by state.  It might have
```

1    been done.

2            Q.    Well, let's do it.  And I picked

3    Illinois for a reason.  Because Illinois is

4    pretty close geographically to Ohio, and

5    Illinois has a million more people in its

6    boundaries than Ohio does.  But they're pretty

7    comparable when it comes to geography and to

8    population.  If you can look with me in 2006.

9            MS. QUEZON:  And if we can do

10           the -- let's do the PowerPoint.

11           All this is is just a

12           demonstrative aid of the actual numbers

13           here.  If we can look in 2006 in

14           Illinois, there were 4,964,195 dosage

15           units of oxycodone shipped only by

16           Cardinal into Illinois.  In that same

17           year, 67 million pills shipped into

18           Ohio.

19           Now, I understand this is during

20    the period of time when suspicious orders, at

21    least according to what you were told, were not

22    being halted.  They -- that requirement was not

23    yet there.  But let's keep looking.

24           In 2007, about 6 million pills

Highly Confidential - Subject to Further Confidentiality Review

```
 1    into Illinois, and into Ohio almost 73 million

 2    pills with a population of a million fewer

 3    people.

 4              Did you know this was going on?

 5              MR. PYSER:  Object to form.

 6         A.    I personally became aware --

 7         Q.    Around 2007?

 8         A.    -- in December 2007.

 9         Q.    Well, let's go ahead and get

10    there.

11              In 2008, 6 million pills into

12    Illinois.  75 million pills -- 75.5 million

13    pills into Ohio.  In 2009, about 7 million

14    pills.  85 million pills into Ohio.

15              Now, sir, if we -- if we go back

16    to our simple -- our simplified premise that the

17    more pills that had flooded into a community,

18    the higher the likelihood of abuse and

19    diversion, can you start to get a picture of why

20    Ohio suffered so much more greatly than other

21    places?

22              MR. PYSER:  Object to form.

23         A.    What I do know is my own narrative

24    about what's going on here, and it begins with
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    our government.
2           Q.    Do you take any responsibility?
3    Any responsibility, sir?
4                MR. PYSER:  Object to form.
5                Please let the witness answer the
6                question.
7           Q.    This isn't the government putting
8    the pills into Ohio.  This is your company.
9                MR. PYSER:  Object to the form.
10          A.    These pills -- these pills are
11   available because the DEA, who is the licensee,
12   sets the quotas for a distributor to fulfill
13   orders from licensed DEA pharmacies for
14   prescriptions written by licensed DEA doctors.
15   That's what I know at the time, other than my
16   head was down, banging away at trying to get my
17   company in a position that we had responded to
18   the DEA's immediate suspension orders, to get
19   our systems in place in response to those so
20   that we could get our licenses back, serve our
21   customers -- that's what I know.
22          Q.    Mr. Hartman, had you known in
23   2007, had you done this analysis when you came
24   in, or 2008, and you knew that for a state with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a million fewer people, you were sending in ten

 2    times the amount of oxycodone, would you have

 3    done something differently?

 4              MR. PYSER:  Object to form.

 5         A.    I don't know.

 6              MS. QUEZON:  Can we total this?

 7    BY MS. QUEZON:

 8         Q.    When all is said and done, sir,

 9    Cardinal sent in to the State of Ohio

10    800 million pills, and into Illinois, with a

11    million more people in it, 76 million pills?

12              MR. PYSER:  Object to form.

13              MS. QUEZON:  Could we take just

14         about five minutes, and I may be just

15         about through.

16              THE VIDEOGRAPHER:  The time is now

17         5:27.  We're going off the record.

18              (Recess taken.)

19              THE VIDEOGRAPHER:  The time is now

20         5:35.  Back on the record.

21    BY MS. QUEZON:

22         Q.    Mr. Hartman, I just have a couple

23    more questions.

24              First of all, and if it's for
```

1    personal reasons, you can just say it's for

2    personal reasons.  But why did you end up

3    leaving Cardinal?

4         A.    Another job.

5         Q.    Okay.  Now, you've made it very

6    clear that you are upset with our government

7    over the DEA quotas.  Let me start off by

8    asking, do you understand what those quotas

9    actually mean and how they're set by the DEA?

10        A.    If I did, I don't recall.  I

11   couldn't state it today.

12        Q.    Do you know whether or not the DEA

13   relies upon information given to them by

14   manufacturers and distributors in setting the

15   quotas?

16             MR. PYSER:  Object to form.

17        A.    That would certainly seem right.

18        Q.    So if the DEA has mistakenly set

19   quotas, it would be as a result of information

20   given to them by the distributors and the

21   manufacturers?

22        A.    No, I don't agree with that at

23   all.

24             MR. PYSER:  Object --

```
 1           Q.    Do you know one way or the other,
 2  sir; do you know even how they're set?  You told
 3  me you didn't.
 4           A.    Well --
 5                 MR. PYSER:  Object to form and
 6           same objection on the last question as
 7           well.
 8           A.    At the point in time we're at, and
 9  when we look at the fact that DEA never cut
10  quotas until -- what?  2014?  And even at that
11  time, they maintained, I believe, an article
12  said 25 percent contingency.  It seems to me, my
13  narrative, that there was plenty of pure
14  evidence to suggest this crisis going on that
15  you're talking about.
16           Q.    Sort of like increasing
17  thresholds, right?
18                 MR. PYSER:  Object to form.
19           A.    Our process was to review and set
20  thresholds according to pharmacies dispensing
21  legitimately written scripts from DEA-licensed
22  doctors at DEA-licensed pharmacies.
23           Q.    And the DEA was relying on the
24  manufacturers and the distributors to set the
```

```
 1    quotas, weren't they?

 2                MR. PYSER:  Object to form.

 3          A.    The DEA had a set of guidance that

 4    they had provided to us, I learned about in

 5    2007, December, and then we set out to get after

 6    that process of setting those thresholds in my

 7    time frame.

 8          Q.    I'm talking about the quotas.

 9    Just like you were trying to explain to me that

10    you relied on the dispensers, on the pharmacy to

11    set your thresholds, the DEA relied on

12    information from the distributors and the

13    manufacturers to set the quotas; didn't they?

14                MR. PYSER:  Object to form.

15          A.    I don't know.  That's what you're

16    telling me.

17                MS. QUEZON:  Okay.  I don't have

18          anything else.

19                MR. PYSER:  I've got some

20          questions.

21                MS. QUEZON:  Want to switch?

22                MR. PYSER:  Given the cameras, why

23          don't we switch.

24                MS. QUEZON:  Sure.
```

```
 1                    THE VIDEOGRAPHER:  The time is now

 2          5:39.  We're going off the record.

 3                    (Pause in proceedings.)

 4                    THE VIDEOGRAPHER:  The time is now

 5          5:40.  Back on the record.

 6                         - - -

 7                    REDIRECT EXAMINATION

 8   BY MR. PYSER:

 9          Q.    Good afternoon, Mr. Hartman.  My

10   name is Steve Pyser.  I represent Cardinal

11   Health.  I have a few questions for you

12   following up on the examination from Plaintiffs.

13                    You spoke a little bit about your

14   background, but I wanted to make sure we got the

15   full picture.  Can you just introduce yourself

16   to the jury and tell us about your education.

17          A.    Okay.  I'm Mark Hartman.  My

18   formal education was at United States Military

19   Academy, West Point.  I was there from 1975 to

20   1979, and I consider greatly part of my

21   leadership training also included that I'm an

22   airborne ranger and attended those schools and

23   earned their -- and earned those credentials.

24          Q.    After you graduated West Point, I
```

```
 1    assume you served in the Army for a period of

 2    time?

 3            A.    I did.

 4            Q.    About how long?

 5            A.    Five years.

 6            Q.    And after you left the service,

 7    what was your job experience before joining

 8    Cardinal Health?

 9            A.    Quick run was I worked for

10    American Hospital Supply, a distributor, for

11    about four years.  I worked for Pepsi-Cola for

12    ten years.  I worked for one year for a auto

13    parts supplier, about one year, and then that

14    led me to Cardinal Health for my next 12-plus

15    years.

16            Q.    Okay.  And you may have already

17    said, but approximately what year did you join

18    Cardinal?

19            A.    1998.

20            Q.    And can you take me through --

21    you've talked a lot today about the job you took

22    in December 2007, but can you take me through

23    the lead-up to some of the other jobs that you

24    held at Cardinal before 2007.
```

```
 1              A.    And prior to Cardinal, I had a

 2    fair amount of experience as a general manager

 3    in the -- in a distribution world at Pepsi-Cola.

 4    I came into Cardinal in a very similar kind of

 5    job.  I had at the time three distributions

 6    centers, which we consolidated into one in

 7    Aurora, Illinois.  I had approximately

 8    200 employees, and I had a staff that supported

 9    me and a sales team, and we represented a chunk

10    of the Midwest region, and we did approximately

11    $1.3 billion in revenue.

12              After that role for not quite --

13    well, maybe a little over a year, I was brought

14    to our headquarters as a senior vice president

15    of operations.  So in that role, I supported all

16    the field locations and those functions with

17    logistics, policies, procedures, and

18    efficiencies.  We were doing a lot of building

19    at that point.  I had a team of engineers where

20    we built the facilities.  And then, of course,

21    helped them transition into them and so forth in

22    many of the various roles there, in that

23    operations role.

24              From there I went to -- I was
```

```
 1    executive vice president of field sales and

 2    operation.  I reported to our president.  I had

 3    the part of the company where we had the -- a

 4    general management structure with -- at that

 5    point, the 24 distribution centers reporting in

 6    through that team to me.  5,000 employees.  I

 7    think at that point, we were about $40 billion

 8    in sales.

 9              And then I went into the EVP of --

10    I can't remember the title we had now.  It's the

11    transformation.  So I talked a little bit about

12    it about earlier today.  We had a major

13    transformation going on trying to reorganize and

14    make our back office much more efficient.  And I

15    had various departments and people under me and

16    scrutiny on these transformations that were

17    going on in the various departments.  And we

18    would try to work with them, consolidate,

19    counsel, advise.

20              And then I was -- I was -- I

21    went -- stayed in that role principally to this

22    role.

23         Q.   So fair to say prior to taking

24    over the anti-diversion related role that you
```

```
 1    had in December 2007, you've been at fairly high

 2    levels of Cardinal Health?

 3           A.    Yes.

 4           Q.    From your perspective, having

 5    worked in different -- excuse me -- areas of

 6    Cardinal Health, what is Cardinal Health's role

 7    in the healthcare system in the United States?

 8           A.    Well, I can't remember our

 9    moniker, but, I mean, principally it's to

10    deliver medications, you know, through our

11    supply chain to, you know, the licensed

12    pharmacies, hospitals, and any of the legal

13    entities in a safe, secure way, in order to

14    ensure that those products are available for

15    patients when they need them.

16           Q.    The portfolio of products that are

17    being shipped to hospitals and pharmacies and

18    other medical care facilities, are they broader

19    than the controlled substances that have been

20    talked about earlier today?

21           A.    Much broader.  There was --

22           Q.    Does Cardinal Health also ship

23    medical supplies, in addition to

24    pharmaceuticals?
```

1        A.     Yes.

2        Q.     So everything from aspirin to

3    crutches; is that kind of the concept?

4        A.     Band-Aids.  Whatever is needed in

5    locations is generally something we would have

6    supplied.

7        Q.     If you could, just give us a

8    little view of kind of what the team was that

9    you were working with in terms of the senior

10   leadership in an anti-diversion or QRA role in

11   December 2007 when you came into the role.

12       A.     Michael Moné was where I met him,

13   because he was in role just a bit prior to me

14   stepping into role.  Of course, I got to know

15   Michael much, much better.

16              But what I knew going in is that

17   Michael was a degreed pharmacist.  He was a

18   degreed lawyer in the regulatory space, as I

19   recall remembering that.  And the key part for

20   me was that he had come out of Cardinal from the

21   Medicine Shoppe business, but he had worked

22   prior to that on the Kentucky pharmacy board,

23   and he had put in place the Kentucky program to

24   monitor or for doctors, I believe, to use.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    So I don't remember exactly what

 2       interactions he had on that, but I know he

 3       played a key role.  But that was important to me

 4       because he seemed to have all the credentials as

 5       we were working in this anti-diversion space.

 6               Q.   And when you took over, did you

 7       have the budget that you needed to staff out the

 8       regulatory department and anti-diversion team?

 9               A.   I -- everything that I needed, I

10       had, and I had that commitment from the CEO.

11       And even as that changed, we continued to have

12       that support.

13               Q.   Was there ever a time during your

14       work with QRA and anti-diversion from 2007

15       through 2010 where you asked for additional

16       resources and were told no?

17               A.   No.

18               Q.   Did you believe at the time when

19       you were working anti-diversion that the program

20       had adequate resources?

21               A.   During my time frame?

22               Q.   Yes.

23               A.   Yes.

24               Q.   All right.  On the regulatory side
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of your work, was there someone else there in

 2    addition to Michael Moné?

 3              A.    Steve Reardon.

 4              Q.    And what were Mr. Reardon's

 5    general job duties?

 6              A.    I got to know Steve when I -- he

 7    was at Cardinal prior to me, and so, of course,

 8    I worked with him from time to time, you know,

 9    in his capacity in regulatory the whole time.

10    But prior to Cardinal, my understanding was

11    Steve was a Boston police officer for several

12    years.  I don't remember if he retired from that

13    job or not, but I know he worked at it for many,

14    many years.

15              Q.    So coming in, did you believe that

16    both Mr. Moné and Mr. Reardon were qualified for

17    the positions they held?

18              A.    I felt very comfortable about it

19    and I -- it's another aspect of -- a part that I

20    talked to our CEO about was that I wanted that

21    team in place.

22              Q.    When you were working in

23    anti-diversion, in order to understand what the

24    Controlled Substances Act required, did you
```

```
 1   consider DEA policies and guidance in your work?

 2           A.    Prior to this role?

 3           Q.    No.  When you were working in

 4   anti-diversion, in order to understand what the

 5   Controlled Substances Act required, did you

 6   consider DEA's policies and guidance from DEA?

 7           A.    Yes.

 8           Q.    To your knowledge, did DEA's

 9   policies and guidance change over the course of

10   time?

11           A.    Yes.

12           Q.    Prior to your time in

13   anti-diversion, what's your understanding of

14   what DEA's general requirements were for

15   anti-diversion?

16           A.    Well, again, I'm -- I don't -- I

17   don't have great recollection on this.  I didn't

18   study it closely, but the company was required

19   to submit reports monthly.  They went in at the

20   end of the month.  The headquarters location

21   would aggregate the data for the field

22   locations, to my understanding, and then send it

23   in.

24           Q.    During the time that you were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    running the anti-diversion team, did Cardinal

 2    Health ship orders that it had made a

 3    determination qualified as a suspicious order?

 4            A.    No.

 5            Q.    But in earlier times, your

 6    understanding, was Cardinal Health always

 7    required under the Controlled Substance Act to

 8    stop shipment of orders that it reported to DEA

 9    as suspicious?

10            A.    That's what I was made aware of,

11    was one of the major changes, this not.

12            Q.    So the question of whether

13    Cardinal should or should not ship orders that

14    it had determined were potentially suspicious

15    orders, is the answer to that question dependent

16    on the time period we're talking about?

17            A.    Yes.

18            Q.    Do you know approximately when

19    Cardinal changed its system to ensure that

20    orders were not shipped in addition to having

21    been reported to DEA?

22            A.    That was prior to me stepping into

23    role.

24            Q.    So sometime prior to
```

```
1    December 2007?

2            A.    That's what I understood.

3            Q.    While you were in the

4    anti-diversion role, did DEA ever conduct

5    inspections or site visits of Cardinal Health

6    facilities?

7            A.    Yes.

8            Q.    Were you present during some of

9    those?

10           A.    Yes.

11           Q.    Generally speaking, what were the

12   results of those visits from DEA during your

13   time in anti-diversion?

14           A.    They were rigorous, in-depth

15   inspections, and from them we had already

16   regained our licenses, so we were operating all

17   of our distribution centers.  The inspections

18   then take place.  And from that, we had no

19   actions or issues running our complete supply

20   chain.  So the results of the inspections, in my

21   view, were we passed and did very well.

22           Q.    You've talked today a little bit

23   about different pieces of Cardinal Health's

24   anti-diversion program at the time that you were
```

1    running it, but I don't know that we've kind of

2    put it together.

3             Can you just take me through, in

4    your mind, what the major elements of the

5    anti-diversion system were -- was during your

6    time at Cardinal.

7         A.    I'm not sure I'll get it all,

8    because it was -- we had a lot to do to build

9    out and expand, and the key components were the

10   analytics system.  So a system that we built

11   upon that allowed us to have thresholds across

12   the organization's customers, that had

13   thresholds attached, and then every order that

14   went through for a controlled substance would be

15   monitored against that analytics system to

16   determine if a threshold was hit.

17            And then if a threshold was hit,

18   then the team of professionals I had, they would

19   take a look at that -- they would look for other

20   information that may have caused some reason for

21   that threshold to hit, and then make a

22   determination on that.  Sometimes I was brought

23   into those conversations.  Many times I wasn't,

24   as they made decisions as a professional team

Highly Confidential - Subject to Further Confidentiality Review

1   with what I felt were strong pharmacists in

2   place.

3          Q.    Was there -- were there other

4   elements besides the analytics?

5          A.    And then another big piece was the

6   Know Your Customer, and we designed training to

7   address a much broader Know Your Customer

8   component.  We rolled that out across our system

9   to -- and we rolled it through the -- you know,

10  the sales management staff and then down to our

11  field staff.

12              We rolled it through our

13  distribution centers, certainly our compliance

14  officers that we talked about we had put in

15  place.  It was in each of the distribution

16  centers.  So Know Your Customer became a big

17  element of what we did.

18          Q.    Did you also conduct site visits

19  during your time leading the anti-diversion

20  team?  Not you personally but the team.

21          A.    Yeah, the investigators that we

22  had put in place, along with compliance officers

23  and, of course, the field staff that we had

24  would conduct site visits to determine if -- and

```
 1    I'm pretty certain the term came from the DEA,

 2    the red flags existed that would be reported

 3    back into -- into us.

 4         Q.    So shifting gears a little bit.

 5              Earlier today you were asked some

 6    questions, and you don't need to look at the

 7    exhibit but just to put it in context.

 8    Exhibit 7 discussed a budget battle.

 9              Do you recall that conversation?

10         A.    Yes.  Yes.

11         Q.    And there was a discussion in that

12    e-mail about head count.

13              Do you recall that?

14         A.    Yes.

15         Q.    Okay.  I don't think you were ever

16    asked how that issue resolved or if you know.

17              How did that issue resolve, if you

18    know?

19         A.    Personal exchange with Michael,

20    and he was going through the budget battle for a

21    head count.  He maintained that head count.

22         Q.    It's a little bit corporate speak.

23    Can you explain what you mean by "he maintained

24    that head count."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    It -- well, in the budget fight

 2    of, you know, do you lose a head count and it

 3    goes to somebody else, if you will, he

 4    maintained it.  Exactly what he had and wanted

 5    remained the same, as I understand what the

 6    later e-mails that he had sent that, you know,

 7    he had won the battle.

 8            Q.    You were asked -- also asked about

 9    the potential of the QRA group being moved into

10    a position that it would be part of operations.

11            Do you know whether QRA remained

12    separate from operations after your time at

13    Cardinal?

14            A.    During my time frame, it certainly

15    was, and I believe after I left, it remained

16    separate from the operating divisions reporting

17    to corporate.

18            Q.    Earlier today you were also asked

19    some questions about particular distribution

20    centers, in particular, the Birmingham, Alabama,

21    distribution center and the Lakeland, Florida,

22    distribution center.

23            Do you remember those questions?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And there were some exhibits,

2    Exhibits 14 and 15 that concerned those -- those

3    distribution centers actually before you were in

4    role, I believe.

5             Do you recall that?

6        A.    Yes.

7        Q.    In addition to whatever steps for

8    anti-diversion were being taken at the

9    distribution centers back in 2006 and 2007 when

10   those e-mails were being sent, was there also a

11   corporate anti-diversion system that was

12   monitoring orders?

13       A.    To my knowledge, yes.

14       Q.    And looking at those two

15   distribution centers for a minute, in particular

16   the Birmingham, Alabama, and Lakeland, Florida,

17   distribution center, in your experience at

18   Cardinal Health, did either of those two

19   distribution centers ship medication to northern

20   Ohio?

21       A.    No.

22       Q.    At any time while you were at

23   Cardinal, are you aware of an instance where the

24   sales staff or anyone else blocked the

```
 1    anti-diversion team from taking an action

 2    against a customer that your team wanted to

 3    take?

 4          A.    No.

 5          Q.    Did you personally ever take steps

 6    to increase the number of opioids that would be

 7    prescribed by doctors or used by patients?

 8          A.    No.

 9          Q.    Did you ever speak to a doctor

10    about controlled substances in your role?

11          A.    No.

12          Q.    In your experience at Cardinal

13    Health, did you ever see Cardinal Health ship an

14    order that you believed would be diverted?

15          A.    No.

16                MR. PYSER:  No further questions.

17          We can go off the record.

18                THE VIDEOGRAPHER:  The time is now

19          5:59.  Off the record.

20                (Recess taken.)

21                THE VIDEOGRAPHER:  The time is now

22          6:03.  Back on the record.

23                      - - -

24                RECROSS-EXAMINATION
```

```
 1    BY MR. FULLER:

 2           Q.    Mr. Hartman, you've testified

 3    repeatedly about these limiter reports, right,

 4    that were submitted monthly?

 5           A.    Yes, I've commented on them.

 6           Q.    And you're aware, are you not,

 7    that the limiter reports are only submitted for

 8    those substances and entities that exceed their

 9    limits, correct?

10           A.    I don't recall exactly what these

11    reports were about prior to.  I know what

12    reports were talked about, what the team

13    responded to to the DEA and were required to

14    submit.  And then they did that on a monthly

15    basis, and it was at the end of the month that

16    those reports went in.

17           Q.    And who at the DEA said that was

18    okay; do you know, or are you relying on your

19    people to tell you that?

20           A.    My folks commented on that.

21           Q.    So you have no knowledge of the

22    DEA approving that process, do you?

23           A.    Prior to my time in role, I don't

24    have the conversations with the DEA.  My
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    folks -- the people that worked for me at the
2    time did.
3              Q.    Fair enough.
4                    So, again, I guess my question is,
5    no one at the DEA ever told you that that was
6    acceptable?
7                    MR. PYSER:  Object to form.
8              A.    Correct.
9              Q.    And then -- and I apologize
10   because I missed the first one.
11                   When you first came to Cardinal,
12   what was it that you were doing, you told me
13   Pyser you were doing?
14             A.    I was a regional vice president
15   for the Midwest region.
16             Q.    How many people did you oversee?
17             A.    Probably about 200, somewhere in
18   that range.
19             Q.    And what was your budget?
20             A.    Budget for?
21             Q.    Your entire budget, the money you
22   had control of for the Midwest region.
23             A.    I have -- I don't recall what the
24   budget was.
```

```
1              Q.    So then you moved to senior vice

2    president of operations, right, support all the

3    field, had an engineering team underneath you --

4              A.    Yes.

5              Q.    -- correct?

6                    How many people did you oversee

7    then?

8              A.    There were four or five different

9    components doing different things.

10             Q.    Yes, sir.

11             A.    I'm guessing that 20 to 25.

12             Q.    Do you know what your budget was

13   for -- as a senior VP of operations?

14             A.    I don't recall.

15             Q.    How about the executive vice

16   president of field sales and operations?  You

17   reported to the president at that time, right?

18             A.    Of pharmaceutical, yes.

19             Q.    And then you were overseeing about

20   5,000 employees?

21             A.    Yes.

22             Q.    Generating revenue of over

23   $40 billion in sales?

24             A.    Yes.
```

```
1            Q.    What was your budget for that

2   department?

3            A.    I have -- I have no idea what we

4   had at that point.

5            Q.    And then you took on the executive

6   vice president role for transformation?

7            A.    Yes.

8            Q.    And how many people did you

9   oversee during that time frame?

10           A.    Again, it was -- I -- I'm guessing

11  at somewhere between 10 and 15.

12           Q.    Do you know what your budget was

13  for that department?

14           A.    I have no recollection.

15           Q.    And, again, you would have gone

16  through that budgetary process we saw earlier

17  for all these different departments during those

18  respective years, correct?

19           A.    Oh, yes.  And all the jobs

20  previous to that and every other company.  I

21  went through the annual budget process.  It's

22  a -- it's a fun experience.

23           Q.    And you testified, I think, that

24  the mantra for Cardinal was to deliver meds via
```

```
 1   supply chain to pharmacies and hospitals in a

 2   safe and secure way; is that correct?

 3           A.   Something like that.  I don't know

 4   the exact quote, but --

 5           Q.   We won't hold you to you exactly.

 6           A.   Yeah, so --

 7           Q.   But certainly it was to do it in a

 8   safe and secure manner, right?

 9           A.   Of course.

10           Q.   Do you believe --

11           A.   Yes.

12           Q.   Strike that.

13                Cardinal didn't always do it in a

14   safe and secure manner, did they?

15                MR. PYSER:  Object to form.

16           Q.   They had their license pulled

17   because it wasn't always in a safe and secure

18   manner.

19           A.   Those -- I'm sorry.

20                MR. PYSER:  Object to form.

21                Go ahead.

22           A.   Those were the accusations that

23   the DEA leveled against us.

24           Q.   Then in 2013, they actually agreed
```

1    with the accusations when the Florida license

2    was suspended; are you aware of that?

3            A.    Not to my knowledge.  It was after

4    my time.

5            Q.    Were you aware that -- well, I

6    understand that.  But when Mr. Pyser was asking

7    you questions, you responded -- and I'm assuming

8    honestly -- to questions after your time and

9    before your time in this role.  So I would

10   expect the same courtesy for my questions.

11           A.    I don't have any knowledge.

12                 MR. PYSER:  Object to form.

13           Q.    Were you aware they paid a

14   $35 million fine for their conduct?

15                 MR. PYSER:  Object to form.

16           A.    Not 35 million.

17           Q.    In 2013, based on the MOA that

18   was --

19           A.    I'm sorry.  You were -- I thought

20   you were -- during my time frame.

21           Q.    That was 13 million.

22           A.    No.  I think it was different than

23   that.

24           Q.    What do you believe it was?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    34 million.

 2            Q.    Fair enough.

 3            MR. FULLER:  That's another time.

 4   BY MR. FULLER:

 5            Q.    You testified to Mr. Pyser that

 6   the DEA policy and guidance changed.  And,

 7   again, that was told to you by your

 8   subordinates, correct?

 9            A.    Yes.

10            Q.    That wasn't conversations you had

11   with the DEA?

12            A.    No.

13            Q.    And then you mentioned something

14   that -- this was the first time I heard it, and

15   maybe I misheard, that the stop shipping

16   requirement was instituted at Cardinal before

17   you came to the department.

18            A.    That's what the team had put in

19   place and they told me.  That was the major

20   change.  I don't know when that took place, but

21   as I got into role, my understanding was they

22   had begun that process, and I don't know when

23   that happened.

24            Q.    Well, they'd begun the process or
```

```
 1    they had fully implemented it?  Because when you

 2    started implementing your Phase I and Phase 2,

 3    it took over a year to fully implement it,

 4    correct?

 5           A.    I think that's accurate.

 6           Q.    So I want to make sure when you

 7    testified to Mr. Pyser and said they had already

 8    implemented the stop shipping, they had not

 9    implemented it across the board, correct?

10           A.    I don't know that.  I only know

11    when I got into role, that was the major -- that

12    was one of the major changes that the DEA had

13    now guided on.  And my understanding is they

14    stepped in the role in December, so mid time

15    period, that somewhere before that, they had

16    begun the stop shipping piece of that guidance.

17           Q.    They had begun it, is your

18    understanding?

19           A.    Yeah.

20           Q.    Did -- had they completed it or do

21    you know?

22           A.    I don't recall.  I don't have a

23    recollection.

24           Q.    So you can't say that they had
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    already stopped shipping all suspicious orders?

 2           A.    I -- I don't know that.

 3           Q.    Fair enough.

 4                 And then when you were talking to

 5    Mr. Pyser about the major elements of this

 6    suspicious order monitoring program that you

 7    were implementing, also at the same time created

 8    was a anti-diversion committee, correct?

 9                 Do you recall an anti-diversion

10    committee?

11           A.    I think we had one in place for

12    some period of time.  I don't -- I don't

13    remember much about it.

14           Q.    Okay.  Do you remember who was on

15    the committee?

16           A.    When I came into role, it was a

17    pretty difficult time.  So I remember there were

18    two meetings taking place each morning, pretty

19    early and then one right after.  I stopped one

20    of the meetings to consolidate and have one

21    meeting so we could get to the work.

22           Q.    Sure.

23           A.    And then there was -- there's some

24    point after that I believe that we -- and I --
```

 1   and I just wanted everybody out of our way.

 2   There were a lot of questions.  You know, as you

 3   can imagine with three suspension orders, there

 4   was an awful lot of meetings people wanted to

 5   have and we needed to get after the work.

 6                 So I believe there was -- I think

 7   there's a committee we put together of senior

 8   members so that I could update them where I --

 9   where we were, what we needed or, you know, if I

10   needed things.  Then that took place for -- I

11   can't remember.  For a few months maybe?

12          Q.    Do you remember who chaired that

13   committee?

14          A.    I remember I think I did all the

15   talking.

16                 MR. FULLER:  Let's pull up 4463.

17          A.    I'm not sure what meeting you're

18   talking about.

19   BY MR. FULLER:

20          Q.    I'm not talking about a meeting.

21   I'm talking about committee.  Who chaired the

22   committee.

23                 And if you look at this

24   Exhibit 4463, which is Plaintiff's Number --

```
 1                 MS. SHIVERS:   31.

 2          Q.    -- 31 for purposes of the

 3    deposition.   This is an e-mail --

 4                 MR. FULLER:   Why does mine look

 5          different?

 6                 (Discussion off the record.)

 7                        - - -

 8          (Cardinal-Hartman Exhibit 31 marked.)

 9                        - - -

10    BY MR. FULLER:

11          Q.    I apologize about that,

12    Mr. Hartman.

13                 4463 is an e-mail from

14    Jeff Henderson; is that right?

15          A.    Yes.

16          Q.    And Jeff Henderson was the CFO

17    during this time frame; is that correct?

18          A.    Yes.

19          Q.    And the subject is what for this?

20          A.    "Anti-Diversion Steering

21    Committee."

22          Q.    Okay.  And Mr. Henderson says,

23    "Effective immediately, we're putting into place

24    an Anti-Diversion Steering Committee (ADSC)
```

```
 1    composed of six of us, facilitated by

 2    Mark Hartman and chaired by me."

 3                  Is that right?

 4         A.    That's what it says.

 5         Q.    "The group's basic objective is to

 6    assume sole leadership for ensuring our

 7    anti-diversion programs are comprehensive, being

 8    implemented effectively, and are meeting our

 9    basic mission of delivering safe supply chain

10    services to our customers."

11                  Right?

12         A.    That's what it says.

13         Q.    And that "We also have the

14    responsibility of making decisions which impact

15    the implementation of our diversion control

16    plan."

17                  And then he attaches a couple

18    documents.  I believe if you go to the page 2 --

19    actually, it's page 3, because page 2 is a

20    little jacked up.  And that's a legal term.

21                  So this page 3 says

22    "Anti-Diversion" --

23         A.    Is it different than my jacked

24    up --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     No.  Probably the same.

 2              A.     Okay.

 3              Q.     So page 3 indicates it's the

 4    anti-diversion steering committee chaired by

 5    Jeff Henderson.  And give us the committee

 6    members.

 7              A.     Committee:  Gary Dolch,

 8    Mike Duffy, Steve Falk, Mark Hartman,

 9    Scott Storrer.  Optional attendees:  Kerry Clark

10    and Ivan Fong.

11              Q.     And who's Scott Storrer?  Didn't

12    we talk about him earlier?

13              A.     No.

14              Q.     Who is it that sent you an e-mail

15    that was outside of the company at the time?

16              A.     Strat Sherman is who you're

17    referring to, I think.

18              Q.     Got it.  I apologize.

19              A.     Yeah.

20              Q.     And additional attendees,

21    Kerry Clark, who is at this time the CEO of,

22    we'll call it, "big Cardinal," over everybody,

23    right?

24              A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And who's Ivan Fong?

2      A.    He was the head legal officer.

3      Q.    So he's a lawyer?

4      A.    Yes.

5      Q.    At least we hope so.

6      A.    Yes.

7      Q.    And the charter, read the charter

8   to us.

9      A.    "Charter:  Oversee progress of

10   diversion control plan.  Establish priorities

11   and align resources.  Coordinate tone at the top

12   and culture of compliance training.  Establish

13   policies as needed.  Establish improvement

14   actions to address outcomes of third-party

15   audits and DEA requests."

16      Q.    As indicated there, just below

17   that, Jeff Henderson is the chair.

18            Mr. Henderson is the chairman of

19   this committee, correct?

20      A.    Yes.

21      Q.    And then it lists the rest of the

22   members and sort of puts, I guess, job

23   descriptions underneath them; is that fair?

24            MR. PYSER:  Counsel, we're now

```
 1              well beyond the scope of the examination

 2              that I did, so I'm going to object to

 3              this line of questioning.

 4                   MR. FULLER:  Sure.  Objection well

 5              noted.

 6              Q.   Go ahead.  You can answer.

 7              A.   Your -- your reference to some

 8    sort of call-out of jobs, I would say, is

 9    accurate.

10              Q.   Because under you it has

11    IT systems with Mr. Reardon, diversion control

12    and policies and procedures.

13                   I guess that's Michael Moné; is

14    that right?

15              A.   Yes.

16              Q.   And then QRA organization, you get

17    to boss yourself, right?

18              A.   It appears that way.

19              Q.   And Scott Storrer, sales force

20    alignment, business continuity.

21                   Is -- Mike Duffy, what was his

22    role, do you remember, or position?

23              A.   At that time I believe he was

24    running operations for Cardinal.  Now, I don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   recall if it was pharmaceutical, medical, or

 2   pharmaceutical and medical.

 3            Q.    Fair enough.

 4                  And then Steve Falk.  Who is

 5   Steve Falk?

 6            A.    Steve was a -- was -- I don't know

 7   at this time, but he became general counsel.

 8            Q.    Okay.  Because it says

 9   "Third-Party Audit & DEA Matters," right?

10            A.    Yes.

11            Q.    And Gary Dolch, it really doesn't

12   give him anything.

13                  What was Mr. Dolch's position at

14   this time; do you remember?

15            A.    I reported to him.  I should.  I

16   think it was too long ago.  He was EVP,

17   regulatory affairs, for Cardinal Health.  So,

18   again, like Kerry, the whole big company.

19            Q.    Got it.  Got it.

20                  And then if you turn, I believe,

21   another page.  This is an outline of key actions

22   on anti-diversion.

23                  Do you see that?

24            A.    I do.
```

1          Q.    It was actually generated the day

2    before your announcement that you were coming

3    back.  At least it has December 18th and we know

4    by the announcement that was sent out, it was on

5    the 19th?

6          A.    It looks that way.

7          Q.    Maybe you told them yes the day

8    before they sent the e-mail.

9          A.    Maybe they anticipated it.

10          Q.    That could be, too.

11                So -- and we don't need to go into

12    detail, but this sort of sets out the action, as

13    well as the status of the action, that are going

14    to be taken in relation to this anti-diversion

15    steering committee that Mr. Henderson was

16    heading up, correct?

17          A.    At that time, right.  I think

18    that's right.

19          Q.    And these meetings, if I -- I

20    believe I read somewhere they were -- was it

21    every morning or twice a week in the morning?

22          A.    Not this meeting.

23          Q.    How about these meetings?

24          A.    These meetings.  So as I came on

Highly Confidential - Subject to Further Confidentiality Review

```
1    board, every morning there were two meetings.  I

2    don't remember exactly when they started.  I'm

3    going to say the first one was 7:30 to 8:30, and

4    that was the Gary Dolch meeting.

5           Q.    When you say "Gary Dolch," just

6    give me a brief description of what you mean.

7           A.    Gary Dolch called members together

8    to review where are we at, what are we doing.

9           Q.    Fair enough.

10          A.    And then there was another meeting

11   from 8:30 to 9:30, and it was a lot of the same

12   members, not Gary involved.

13          Q.    Okay.

14          A.    As I recall it.  So to kind of

15   complete this, when I came on board, I think it

16   was that very next week, I told Gary, let's stop

17   your meeting.  It's just using our time up.

18          Q.    Just consolidate into one?

19          A.    We need every hour we've got to

20   get after this.  So we ended that meeting.  I

21   took over the next hour meeting with everybody.

22   We'd review things.  I honestly don't -- I'm

23   sure there's lots of things on here we

24   incorporated into going forward.  I don't
```

Highly Confidential - Subject to Further Confidentiality Review

1   remember using this form again.  I'm sure we

2   added much, much more to it.

3                And at the committee meeting, I

4   think I ran those meetings, and they were

5   updates, and I told the executive team that you

6   can see was on that what I needed and what I

7   needed them to do.  I don't recall any decisions

8   coming out of that meeting different than what I

9   came in and asked for.

10          Q.    And these meetings, how often were

11   these meetings of this anti-diversion committee?

12          A.    Well, as he calls out, I would

13   have to assume they did happen.

14          Q.    Do you recall them happening?

15          A.    I -- yeah, I've got a recollection

16   of a couple, and I can see myself in conference

17   rooms.  They weren't -- they weren't top

18   priority to me.  I'll be very frank.  I was busy

19   getting after what had to be done, and they were

20   there to support me.  I knew that, and -- but,

21   of course, we needed to report to them what are

22   we doing, where are we going, what things do we

23   need to do strategy-wise, working with the DEA,

24   to putting systems in, to figuring out all the

```
 1    elements of our -- of our improvements.

 2           Q.    And do you know if there were

 3    minutes kept of these meetings?

 4           A.    I don't remember, but I'm -- I --

 5    I'm certain there weren't.

 6           Q.    Okay.  And, again --

 7           A.    Because I probably would have had

 8    to keep them.

 9           Q.    So if you go down on

10    Mr. Henderson's e-mail to the third paragraph.

11    It says, "Initially the intent, this group will

12    meet twice weekly."

13           A.    I'm sorry.  You're on --

14           Q.    The first page.

15           A.    Yeah.  Okay.  I'm sorry.

16           Q.    "From 5:00 to 6:00 on Tuesdays and

17    Thursdays.  This meeting will be added to your

18    calendar.  Please make every effort to attend if

19    you can.  Otherwise you'll get a call-in

20    number."

21           A.    I don't remember that happening.

22    You know, long, with two nights a week.  As I

23    took over, and I think the confidence was pretty

24    high that I had -- was getting my handles on
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    it -- getting my handle on it, and pushing our

2    team to where we needed to go to respond to the

3    DEA guidelines for Cardinal.  So I can't tell

4    you I remember meeting Tuesdays and Thursdays

5    for any extensive period of time.

6            Q.    Now, earlier Mr. Pyser also asked

7    you that there -- whether there was or wasn't a

8    corporate anti-diversion group, right, in '06

9    and '07?

10           A.    Okay.

11           Q.    Do you recall that testimony?

12           A.    I -- you know, I think I do.

13           Q.    Okay.  And we looked at an actual

14   organizational chart that set out there was a

15   corporate group, and there was five members of

16   that corporate group, and Mr. Reardon was at the

17   top of that chain.

18                 Do you remember that?

19           A.    Yes.

20           Q.    So that was the corporate

21   anti-diversion group, correct?

22           A.    I believe that's right.

23           Q.    And they had to oversee all the

24   distribution centers country-wide, five of them,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   one of them being a secretary, correct,

 2   administrative assistant?

 3        A.    Wasn't it -- five in position.

 4        Q.    Correct.  They were seeking more,

 5   but they had not gotten them?

 6        A.    I recall.

 7              (Reporter clarification.)

 8        A.    I said, "I recall."

 9        Q.    Okay.

10              MR. PYSER:  Counsel, by my count,

11          I think we're now at 18 minutes of your,

12          I guess, recross.

13              MR. FULLER:  Okay.  Yeah.  And I

14          still had time on my initial seven.  So

15          I get my time.

16              MR. PYSER:  As I read the

17          deposition protocol, you're done,

18          but ...

19              MR. FULLER:  We can agree to

20          disagree.

21              MR. PYSER:  I'll put the objection

22          on and ...

23              MR. FULLER:  Fair enough.

24
```

```
1    BY MR. FULLER:

2          Q.   Do you recollect before you

3    came -- and you talked about automating the

4    system, the metrics.  Prior to '07 when you came

5    in, anti-diversion was operating under a manual

6    system, correct?

7               MR. PYSER:  Object to form.

8          A.   I'm not sure what system they were

9    operating under.

10         Q.   So you don't have any idea whether

11   it's some sort of automated or whether it was a

12   manual system?

13         A.   I don't recall.

14              MR. FULLER:  Fair enough.  I don't

15         have anything further.

16              MR. PYSER:  Nothing further.

17              THE VIDEOGRAPHER:  It is now 6:27.

18         This concludes the deposition.  We're

19         going off the record.

20              MR. PYSER:  We can stay on the

21         record.  We don't need the video.

22              Just two things real quick.  I

23         want to make a request on the record

24         that any demonstratives or other
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              documents that were shown to the witness

 2              or used today can be put into the

 3              record.  So that's one request.

 4                   Counsel, is that acceptable?

 5                   MR. FULLER:  That's fine.

 6                   MR. PYSER:  And the second is,

 7              when we were doing appearances, I don't

 8              think everyone in the room introduced

 9              themselves.  I just wanted to make sure

10              we get a record of everyone who was in

11              the room.

12                   MR. FULLER:  Sure.

13                   MR. PYSER:  If you were here and

14              didn't announce yourself as an

15              attorney --

16                   MR. FULLER:  So everybody who's

17              not an attorney, announce themselves.

18                   MS. SHIVERS:  Karla Shivers for

19              the Plaintiffs, litigation paralegal.

20                   MR. VELDMAN:  Gina Veldman with

21              Golkow Technology.

22                   MR. FULLER:  Twila?

23                   MS. HULETT:  Twila Hulett for the

24              Plaintiff.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. FULLER:  Edna?

 2              MS. JAMISON:  Edna Jamison for the

 3         Plaintiff.

 4              MR. FULLER:  I think that's it.

 5              MR. PYSER:  Thank you.

 6              MR. FULLER:  I'm sorry.  And for

 7         the record, we're also marking --

 8         Plaintiff's 32 was the other

 9         demonstrative drawing.

10                   - - -

11        (Cardinal-Hartman Exhibit 32 marked.)

12                   - - -

13              MS. QUEZON:  And Archie Lamb was

14         here on behalf of the Plaintiffs as

15         well.  He was in and out, and I don't

16         think he was here when we announced

17         ourselves --

18              MR. FULLER:  That's true.

19              MS. QUEZON:  -- for the record.

20         (Signature not waived.)

21                   - - -

22           Thereupon, at 6:28 p.m., on Friday,

23      November 15, 2018, the deposition was concluded.

24                   - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        CERTIFICATE

 2    STATE OF OHIO        :

                                   SS:

 3    COUNTY OF FRANKLIN   :

 4

 5           I, MARK HARTMAN, do hereby certify that I

 6    have read the foregoing transcript of my

 7    cross-examination given on November 15, 2018; that

 8    together with the correction page attached hereto

 9    noting changes in form or substance, if any, it is

10    true and correct.

11                         _____

                               MARK HARTMAN

12

13           I do hereby certify that the foregoing

14    transcript of the cross-examination of MARK HARTMAN

15    was submitted to the witness for reading and signing;

16    that after he had stated to the undersigned Notary

17    Public that he had read and examined his

18    cross-examination, he signed the same in my presence

19    on the _____ day of _____, 2018.

20

21                         _____

                               NOTARY PUBLIC - STATE OF OHIO

22

23    My Commission Expires:

24    _____, _____.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2  STATE OF OHIO      :

                                 SS:
 3  COUNTY OF FRANKLIN  :
 4         I, Carol A. Kirk, a Registered Merit
    Reporter and Notary Public in and for the State of
 5  Ohio, duly commissioned and qualified, do hereby
    certify that the within-named MARK HARTMAN was by me
 6  first duly sworn to testify to the truth, the whole
    truth, and nothing but the truth in the cause
 7  aforesaid; that the deposition then given by him was
    by me reduced to stenotype in the presence of said
 8  witness; that the foregoing is a true and correct
    transcript of the deposition so given by him; that the
 9  deposition was taken at the time and place in the
    caption specified and was completed without
10  adjournment; and that I am in no way related to or
    employed by any attorney or party hereto or
11  financially interested in the action; and I am not,
    nor is the court reporting firm with which I am
12  affiliated, under a contract as defined in Civil Rule
    28(D).
13
           IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my seal of office at Columbus, Ohio
    on this 20th day of November 2018.
15
16
17
18         _____
           CAROL A. KIRK, RMR
19         NOTARY PUBLIC - STATE OF OHIO
20  My Commission Expires:  April 9, 2022.
21              - - -
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2   I, MARK HARTMAN, have read the transcript

     of my deposition taken on the 15th day of November

 3   2018, or the same has been read to me.  I request that

     the following changes be entered upon the record for

 4   the reasons so indicated.  I have signed the signature

     page and authorize you to attach the same to the

 5   original transcript.

 6   Page  Line  Correction or Change and Reason:

 7   ____ _____  _____

 8   ____ _____  _____

 9   ____ _____  _____

10   ____ _____  _____

11   ____ _____  _____

12   ____ _____  _____

13   ____ _____  _____

14   ____ _____  _____

15   ____ _____  _____

16   ____ _____  _____

17   ____ _____  _____

18   ____ _____  _____

19   ____ _____  _____

20   ____ _____  _____

21   ____ _____  _____

22   ____ _____  _____

23   ____ _____  _____

24   Date _____  Signature _____
```