Highly Confidential - Subject to Further Confidentiality Review

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE:  NATIONAL          :   HON. DAN A.
PRESCRIPTION OPIATE       :   POLSTER
LITIGATION                :
                          :
APPLIES TO ALL CASES      :   NO.
                          :   1:17-MD-2804
                          :


- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

October 25, 2018

- - -

Videotaped deposition of
EDWARD HAZEWSKI, taken pursuant to
notice, was held at the law offices of
Reed Smith, LLP, 1717 Arch Street,
Philadelphia, Pennsylvania, beginning at
9:36 a.m., on the above date, before
Michelle L. Gray, a Registered
Professional Reporter, Certified
Shorthand Reporter, Certified Realtime
Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: MARK P. PIFKO, ESQ.
BY: STERLING CLUFF, ESQ.
Encino Plaza
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
(818) 839-2333
Mpifko@baronbudd.com
- and -
BARON & BUDD, P.C.
BY: WILLIAM G. POWERS, ESQ.
600 New Hampshire Avenue, NW
The Watergate, Suite 10-A
Washington, D.C. 20037
(202) 333-4562
Wpowers@baronbudd.com
- and -
BLASINGAME, BURCH, GARRARD,
ASHLEY, P.C.
BY: ALEXANDRA HUGHES, ESQ.
440 College Avenue, Suite 320
Athens, Georgia 30601
(706) 354-4000
Ahughes@bbga.com
Representing the Plaintiffs

Page 3

APPEARANCES: (Cont'd.)

REED SMITH, LLP
BY: ROBERT A. NICHOLAS, ESQ.
ANNE E. ROLLINS, ESQ.
SAMANTHA L. ROCCHINO, ESQ.
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8226
rnicholas@reedsmith.com
arollins@reedsmith.com
srocchino@reedsmith.com
Representing the Defendant,
AmerisourceBergen Drug Corporation
and the Witness

JONES DAY
BY: SARAH G. CONWAY, ESQ.
555 South Flower Street, 50th Floor
Los Angeles, California 90071
(213) 489-3939
sgconway@jonesday.com
Representing the Defendant, Walmart

PELINI CAMPBELL & WILLIAMS
BY: GIANNA M. CALZOLA-HELMICK, ESQ.
8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio 44720
(330) 305-6400
giannac@pelini-law.com
Representing the Defendant,
Prescription Supply, Inc.

COVINGTON & BURLING, LLP
BY: MEGHAN E. MONAGHAN, ESQ.
850 Tenth Street, NW
Suite 586N
Washington, D.C. 20001
mmonaghan@cov.com
(202) 662-5110
Representing the Defendant, McKesson
Corporation

Page 4

APPEARANCES: (Cont'd.)

WILLIAMS & CONNOLLY, LLP
BY: MIRANDA PETERSEN, ESQ.
725 12th Street, NW
Washington, D.C. 20005
(202) 434-5148
mpetersen@wc.com
Representing the Defendant, Cardinal
Health

TELEPHONIC APPEARANCES:

BLASINGAME, BURCH, GARRARD,
ASHLEY, P.C.
BY: THOMAS HOLLINGSWORTH, III, ESQ.
440 College Avenue, Suite 320
Athens, Georgia 30601
(706) 354-4000
thollingsworth@bbga.com
Representing the Plaintiffs

MARCUS & SHAPIRA, LLP
BY: ELLY HELLER-TOIG, ESQ.
One Oxford Centre, 35th Floor
Pittsburgh, Pennsylvania 15219
(412) 338-4683
Ehtoid@marcus-shapira.com
Representing the Defendant, HBC
Service Company

KIRKLAND & ELLIS, LLP
BY: ZACHARY A. CIULLO, ESQ.
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2595
Zac.ciullo@kirkland.com
Representing the Defendant, Allergan
Pharmaceuticals

Page 5

TELEPHONIC APPEARANCES: (Cont'd.)

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: ERIC SHAPLAND, ESQ.
777 Figueroa Street
Los Angeles, California 90017
(213) 243-4000
Eric.shapland@apks.com
Representing the Defendants, Endo
Health Solutions; Endo
Pharmaceuticals, Inc.; Par
Pharmaceutical Companies, Inc. f/k/a
Par Pharmaceutical Holdings, Inc.

BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
BY: MATTHEW BREWER, ESQ.
Courthouse Place
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
(312) 494-4440
Matthew.brewer@bartlit-beck.com
Representing the Defendant,
Walgreens

REED SMITH, LLP
BY: LOUIS W. SCHACK, ESQ.
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8226
Lschack@reedsmith.com
Representing the Defendant,
AmerisourceBergen Drug Corporation

Page 6

1    APPEARANCES: (Cont'd.)
2
     ALSO PRESENT:
3
4    VIDEOTAPE TECHNICIAN:
5      Dan Lawlor
6
     LITIGATION TECHNICIAN:
7
       Zach Hone
8
9    ALSO PRESENT:
10     Elizabeth Campbell, Esq.
       (AmerisourceBergen)
11
12
13            - - -
14
15
16
17
18
19
20
21
22
23
24

Page 7

1            - - -
2      I N D E X
3            - - -
4
5    Testimony of:      EDWARD HAZEWSKI

6      By Mr. Pifko         14
7
8
9
            - - -
10
11     E X H I B I T S

12            - - -
13   NO.      DESCRIPTION      PAGE
14   ABDC-Hazewski-1  E-mail, 3/16/12  49
                 Subject, Draft
15               Diversion Training
                 ABDCMDL00265457
16
17   ABDC-Hazewski-2  Slide Deck      49
                 Prescription
18               Drug Diversion
                 Recognizing the
19               Red Flags

20   ABDC-Hazewski-3  E-mail Thread   90
                 4/16/12
21               Subject, Draft
                 Diversion Training
22               ABDCMDL00268888
23
24

Page 8

1            - - -
2      E X H I B I T S (Cont'd.)
3            - - -
4
5    NO.      DESCRIPTION      PAGE
6    ABDC-Hazewski-4  Suspicious     94
                 Order Monitoring
7                Slide Deck
                 Partnership Meeting
8                10/22/12
                 ALLERGAN_MDL_00381552
9                -66
10   ABDC-Hazewski-5  E-mail Thread   118
                 1/30/13
11               Subject, Question
                 On OMP
12               ABDCMDL00285348-50
13   ABDC-Hazewski-6  E-mail, 4/8/14  123
                 Subject, Data
14               ABDCMDL00282490
15   ABDC-Hazewski-7  Spreadsheet     123
                 DC, DEA #, Customer
16               Name
                 ABDCMDL00282491
17
18   ABDC-Hazewski-8  E-mail Thread   127
                 3/28/17
19               Subject, Walgreens
                 C2 Playbook
20               ABDCMDL00280818-22
21   ABDC-Hazewski-9  US DOJ of       146
                 Florida Walgreens
22               Agrees to
                 Pay a Record
23               Settlement
24

Page 9

1            - - -
2      E X H I B I T S (Cont'd.)
3            - - -
4
5    NO.      DESCRIPTION      PAGE
6    ABDC-Hazewski-10  E-mail Thread  160
                 3/27/13
7                Subject, C2 Hyper-
                 Accelerated Perrysburg
8                ABDCMDL00278509-13
9    ABDC-Hazewski-11  Letter, 2/11/13  199
                 To Hazewski from
10               Napoli
                 TEVA_MDL_A_01037633-34
11
12   ABDC-Hazewski-12  E-mail Thread  212
                 3/30/11
13               Subject, OMP
                 ABDCMDL00267230-32
14   ABDC-Hazewski-13  E-mail Thread  215
                 12/31/10
15               Subject, OMP Issues
                 ABDCMDL00267013-14
16
17   ABDC-Hazewski-14  E-mail Thread  222
                 6/6/13
18               Subject, OMP Research
                 ABDCMDL00279037-39
19   ABDC-Hazewski-15  E-mail Thread  235
                 11/8/13
20               Subject, Diversion
                 Control Program
21               ABDCMDL00279103
22   ABDC-Hazewski-16  Diversion      235
                 Control Program
23               ABDCMDL00279104-107
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                - - -
 2          E X H I B I T S
 3                - - -
 4
 5  NO.          DESCRIPTION     PAGE
 6  ABDC-Hazewski-17  E-mail Thread   256
                 Subject, Due
 7               Diligence Files
                 ABDCMDL00145881
 8
    ABDC-Hazewski-18  E-mail Thread   261
 9               9/13/12
                 Subject, Order
10               Monitoring
                 Program - Setting The
11               Record Straight
                 ABDCMDL00266845
12
    ABDC-Hazewski-19  Order Monitoring 261
13               Program:  Setting the
                 Record Straight
14               ABDCMDL00266846-59
15  ABDC-Hazewski-20  E-mail Thread   262
                 9/13/12
16               Subject, Meeting
                 Forward Notification
17               ABDCMDL00266860-61
18
19
20
21
22
23
24
```

```
 1                - - -
 2       DEPOSITION SUPPORT INDEX
 3                - - -
 4
 5  Direction to Witness Not to Answer
 6  PAGE   LINE
    None.
 7
 8  Request for Production of Documents
 9  PAGE   LINE
    None.
10
11  Stipulations
12  PAGE   LINE
    None.
13
14  Questions Marked
15  PAGE   LINE
    None.
16
17
18
19
20
21
22
23
24
```

```
 1                - - -
 2     P R E V I O U S L Y   M A R K E D
 3          E X H I B I T S
 4                - - -
 5
 6  NO.          DESCRIPTION
 7  Zimmerman-9     Regulatory Compliance
                 Update, 8/10/17
 8               Slide Deck
                 ABDCMDL00273425-25
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                - - -
 2          THE VIDEOGRAPHER:  We are
 3  now on the record.  My name is Dan
 4  Lawlor.  I'm a videographer with
 5  Golkow Litigation Services.
 6          Today's date is
 7  October 25th, 2018, and the time
 8  is 9:36 a.m.
 9          This video deposition is
10  being held in Philadelphia,
11  Pennsylvania, in the matter of
12  National Prescription Opiate
13  Litigation, MDL No. 2804.
14          The deponent is Edward
15  Hazewski.
16          Counsel will be noted on the
17  stenographic record.
18          The court reporter is
19  Michelle Gray and will now swear
20  in the witness.
21                - - -
22          ... EDWARD HAZEWSKI, having
23  been first duly sworn, was
24  examined and testified as follows:
```

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1           - - -
2       EXAMINATION
3           - - -
4   BY MR. PIFKO:
5       Q.   Good morning.
6       A.   Good morning.
7       Q.   My name is Mark Pifko, I
8   represent the plaintiffs in the case that
9   we're here for, and I'm going to be
10  asking you some questions today.
11          Let's start by -- can you
12  please state and spell your name for the
13  record.
14      A.   Yes.  First name is Edward.
15  Last name Hazewski, H-A-Z-E-W-S-K-I.
16      Q.   Have you ever had your
17  deposition taken before?
18      A.   I believe I have.
19      Q.   About how long ago?
20      A.   It would have been well over
21  25 years ago.
22      Q.   Okay.  Was that a deposition
23  taken in connection with a professional
24  issue or personal issue?

Page 15

1       A.   Professional.
2       Q.   Okay.  What was the nature
3   of the deposition?
4       A.   I don't recall the
5   specifics, but it was during my law
6   enforcement career.
7       Q.   Okay.  Where were you a
8   law enforcement officer?
9       A.   I was a law enforcement
10  officer in Wilmington, Delaware.  And for
11  the State of Delaware, the Office of the
12  Attorney General.
13      Q.   Okay.  When did you serve in
14  that role?
15      A.   The Attorney General's?
16      Q.   Well, the question --
17      A.   My police career, 1974
18  through 1994.  Then five additional years
19  with the Attorney General's office.
20  Somewhere '96 through 2000.  Roughly.
21      Q.   Okay.  Well, since it's been
22  20, 25 years maybe since you had your
23  deposition taken, let's just go over some
24  of the ground rules.

Page 16

1           I assume that in preparing
2   for this deposition, you did that, but I
3   always want to make sure that we are on
4   the same page here.
5           First, you see that there's
6   a court reporter here, so we need to make
7   sure that we are not talking over each
8   other.  That someone else in the room is
9   talking, that, you know, we are trying
10  not to all speak at the same time.  Okay?
11      A.   Understood.
12      Q.   Another thing is we need to
13  give audible responses.  If you just nod
14  your head or shrug your shoulders, we
15  can't take that down for the record.  So
16  please make sure that you give a
17  verbal -- verbal, audible response to any
18  question.  Understood?
19      A.   Understood.
20      Q.   And then please try to say
21  "yes" or "no" rather than mm-hmm or
22  unh-unh, because when you see it in
23  writing, you can't really tell the
24  difference between a yes and a no, if

Page 17

1   it's mm-hmm or unh-unh.  Okay?
2       A.   Understood.
3       Q.   I'm going to be asking you
4   some questions as I said.  If you don't
5   understand your -- my questions, please
6   let me know and I'll try to rephrase it.
7   Okay?
8       A.   Okay.
9       Q.   From time to time your
10  counsel might assert an objection, but
11  unless he instructs you not to answer,
12  I'm still entitled to a response.  Okay?
13      A.   Okay.
14      Q.   You understand that the
15  court reporter just administered the oath
16  to you.  Yes?
17      A.   Yes.
18      Q.   Okay.  And that means that
19  if you are untruthful or intentionally
20  misleading or dishonest, you can be
21  subject to penalties from the court.  Do
22  you understand that?
23      A.   Understood.
24      Q.   Okay.  Is there any reason

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 why you think this deposition should not
2 proceed today?
3    A.   No.
4    Q.   Are you taking any
5 medications or undergoing any treatment
6 that would impair your ability to tell
7 the truth?
8    A.   No.
9    Q.   Are you -- same thing, are
10 you taking the medications or undergoing
11 the treatment that would impair your
12 memory?
13    A.   No.
14    Q.   Okay.  From time to time,
15 we're going to obviously be talking about
16 things that happened in the past.  I'm
17 entitled to your best recollection of
18 those events.  Okay?
19    A.   Okay.
20    Q.   At the same time, I don't
21 want you to guess.  So if you have a
22 rough estimate or a memory of something,
23 please provide it to the best you're able
24 to do so.  But if -- if you just simply

Page 19

1 don't know, I don't want you to make up
2 an answer.  Okay?
3    A.   Okay.
4    Q.   So you are currently
5 employed by AmerisourceBergen, correct?
6    A.   Correct.
7    Q.   What's your current title?
8    A.   Director diversion control
9 and security.
10    Q.   Who do you report to?
11    A.   David May.
12    Q.   Where are you physically
13 located?  Here in Pennsylvania?
14    A.   Yes.  In Valley Forge,
15 Pennsylvania.
16    Q.   When did you first become
17 employed by AmerisourceBergen?
18    A.   June of 2007.
19    Q.   What was the position that
20 you took when you were first hired?
21    A.   I believe the title was
22 corporate investigator.
23    Q.   How long did you hold that
24 position?

Page 20

1    A.   Roughly a year.
2    Q.   And then what -- what was
3 your next role?
4    A.   My next role was as manager
5 of the diversion control program.
6    Q.   And sorry, when you started
7 at the company as a corporate
8 investigator, who did you report to?
9    A.   My best recollection is
10 Bruce Gundy was my direct report -- or I
11 reported directly to him.
12    Q.   Is Bruce Gundy still with
13 the company?
14    A.   Yes, he is.
15    Q.   What role is he in now?
16    A.   He is director diversion
17 control and security, in charge of
18 investigations.
19    Q.   So you said you are director
20 of diversion control.  What is your area
21 of focus currently?
22    A.   Currently it's special
23 projects as identified by David May.
24    Q.   How long have you been in

Page 21

1 that role?
2    A.   Probably since March of this
3 year.
4    Q.   Okay.  Going back.  So
5 corporate investigator, and then manager
6 of diversion and control.  Who did you
7 report to when you were manager of
8 diversion control?
9    A.   Chris Zimmerman.
10    Q.   How long were you in that
11 position?
12    A.   From 2008 until 2014.  I
13 can't be more specific in terms of --
14    Q.   Okay.  In 2014, what role
15 did you move into?
16    A.   I -- I moved into the role
17 as -- with corporate investigations,
18 working along with Bruce Gundy.
19    Q.   And how long were you in
20 that role?
21    A.   I would say approximately
22 two years.
23    Q.   And then where did you move
24 to?

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    A.   I stayed within the
2  corporate security structure, but I
3  became director of -- in charge of
4  physical security.
5    Q.   How long were you in that
6  role?
7    A.   Until I assumed my current
8  position.
9    Q.   Okay.  Who did you report to
10 when you were director of physical
11 security?
12   A.   David May.
13   Q.   During the period when you
14 were manager of diversion control, you
15 said that you reported to Chris
16 Zimmerman.  Do you recall saying that?
17   A.   Yes.
18   Q.   Was there also a period when
19 you reported to Steve Mays?
20   A.   I worked closely with Steve.
21 I don't recall directly reporting to
22 Steve.
23   Q.   Okay.  When you joined the
24 company in June 2007, did they inform you

Page 23

1  that there was -- that the company had
2  just entered into an agreement with the
3  United States Department of Justice
4  through the drug administration -- Drug
5  Enforcement Administration?
6        MR. NICHOLAS:  Object to the
7     form.  You can answer.
8        THE WITNESS:  I was aware of
9     the company's involvement with --
10    with the government on -- on that
11    issue.
12 BY MR. PIFKO:
13   Q.   What did they tell you about
14 that issue when you joined the company?
15       MR. NICHOLAS:  Object to the
16    form.
17 BY MR. PIFKO:
18   Q.   You can answer unless he --
19 he'll tell you very clearly if he doesn't
20 want you to answer.
21       MR. NICHOLAS:  On this, I
22    will -- the only thing that I'd
23    add is, to the extent that there's
24    any communications in answer to

Page 24

1  this question or any question that
2  involve information that was
3  transmitted to you by an attorney,
4  that's privileged and you don't
5  have to include that in your
6  answer and you shouldn't.  And I
7  would instruct you not to.
8        But go ahead.
9        THE WITNESS:  I don't recall
10   a circumstance where I was -- sat
11   down and someone actually
12   explained to me the -- the issues
13   that were going on with the Drug
14   Enforcement Administration at the
15   time.
16       I'm sure there was
17   conversation between myself, my
18   peers and our lead team, but I
19   don't recall any specifics of what
20   was said.
21 BY MR. PIFKO:
22   Q.   So you just had a general
23 awareness when you joined the company
24 that that -- that enforcement action was

Page 25

1  out there and people were dealing with
2  it, is that correct?
3        MR. NICHOLAS:  Object to the
4     form.
5        THE WITNESS:  That would be
6     correct.
7  BY MR. PIFKO:
8    Q.   So you joined as an
9  investigator.  And you were in the CSRA
10 division, correct?
11   A.   Correct.
12   Q.   What -- what was your job as
13 an investigator at that time?  What were
14 your duties?
15   A.   Well, I would be assigned
16 cases by Bruce Gundy, obviously to
17 investigate.  It ran the gamut.  There
18 was no specific area that -- that I
19 concentrated on.  It was, again, whatever
20 required some sort of investigative work,
21 it would be assigned.
22   Q.   You're -- are you familiar
23 with the order monitoring program that
24 was implemented in 2007?

Page 26

1    A.   Yes.
2    Q.   Are you familiar with the
3  fact that certain orders from a
4  distribution center could be sent to the
5  CSRA for investigation?
6    A.   Yes.
7    Q.   Okay.  Were you involved in
8  reviewing orders that were submitted from
9  the distribution centers?
10    A.   Can you specify what time
11  period you're talking about?
12    Q.   When you first joined the
13  company.
14    A.   I was aware of the process
15  of orders having to be reviewed.  I don't
16  recall specifically reviewing orders
17  myself, but I was aware of the process.
18    Q.   Did you work with anybody
19  whose job it was to review the orders at
20  that time?
21    A.   Yes.
22    Q.   Okay.  Who were those
23  people?
24    A.   That would have been Bruce

Page 27

1  Gundy and Steve Mays.
2    Q.   Anyone else?
3    A.   No one else that I can
4  recall.
5    Q.   So at that time, that first
6  year from June 2007 to approximately
7  June 2008, did you ever review orders
8  that had been identified from the
9  distribution center as needing
10  investigation?
11    A.   I don't recall specifically
12  doing that, but it's likely that I did.
13    Q.   I want to understand the
14  investigation process for doing that.
15  So, okay, you said that you would be
16  tasked by Bruce Gundy with conducting a
17  variety of investigations, correct?
18    A.   Correct.
19    Q.   Did all of those
20  investigations concern potential
21  diversion issues?
22    A.   No.
23    Q.   Okay.  About what percentage
24  of the investigations concerned diversion

Page 28

1  issues?
2    A.   That would be a guess.  I
3  really have no idea what percentage
4  constituted those.
5    Q.   Okay.  Did you work on any
6  investigations that concerned diversion
7  issues at that time when you were an
8  investigator when you first joined the
9  company?
10    A.   I don't recall any
11  investigations that involved potential
12  diversion other than the report, or the
13  order review process.
14    Q.   Okay.  And you did find
15  yourself involved with the order review
16  process during that time?
17    MR. NICHOLAS:  Objection.
18    Asked and answered.
19    THE WITNESS:  Again, it's
20    likely that I reviewed orders
21    during that period of time.  I
22    just have no specific
23    recollection.
24  BY MR. PIFKO:

Page 29

1    Q.   Okay.  Do you have a
2  recollection about the process that one
3  would use to review and investigate an
4  order?
5    A.   Yes.
6    Q.   Okay.  Can you tell me what
7  the process was?
8    A.   Well, it would be a review
9  of the actual order.  The product
10  being -- the product in question
11  constitutes the order, looking at a
12  purchase history of the customer.  Trying
13  to determine if the order is unusual in
14  some fashion that would have caused it to
15  trigger a further investigation.
16    Q.   Okay.  So if -- do you
17  remember the potential outcomes of
18  investigation?
19    So you review an order.
20  You're looking for the things that you
21  just described.  If you -- if you don't
22  see any of that, what happens?
23    A.   Well, without looking at a
24  specific order, I would just have to say

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  that if there are no indicators of
2  potential diversion, then the order would
3  be released.
4      Q.   Okay.  And it would be
5  shipped?
6      A.   Correct.
7      Q.   Okay.  And then if you did
8  find some potential indicators of
9  diversion, then what would you do?
10     A.   The order would be canceled
11  and not shipped.
12     Q.   Okay.  And then you
13  mentioned that there could be further
14  investigation; is that correct?
15     A.   On a specific order?
16     Q.   Yeah.  Or is that it?
17     A.   No.  What I just described
18  constitutes the process.
19     Q.   Okay.  What factors would
20  you look at in the ordering history or
21  any information about the customer to
22  determine if you felt, in your words, the
23  order was unusual?
24     A.   We would look for -- or I

Page 31

1  would look for the quantity being ordered
2  versus their historical usage, whether
3  the order fits a pattern that the
4  customer usually ordered.  Is the order
5  more frequent than normally seen with
6  this particular customer?  If necessary,
7  a call to the customer, meaning usually
8  the pharmacist in charge, to clear up any
9  issues that may have arisen through this
10  review and to get some clarity from the
11  customer as to why we're even looking at
12  this order.
13     Q.   What kind of questions would
14  you ask the pharmacist in charge to
15  figure out answers to those questions?
16         MR. NICHOLAS:  Object to the
17     form.
18         THE WITNESS:  I would need
19     the specifics of the order to be
20     able to frame questions that would
21     be asked.
22  BY MR. PIFKO:
23     Q.   If you saw an order that was
24  unusually large for that customer or

Page 32

1  appeared to be more frequent, what kind
2  of questions would you ask the
3  pharmacist?
4         MR. NICHOLAS:  Object to the
5     form.
6         THE WITNESS:  I would ask
7     why and have them provide an
8     explanation as to the reason for
9     those factors.
10  BY MR. PIFKO:
11     Q.   Can you name some things
12  that, based on your experience, a
13  pharmacist might say that would alleviate
14  any concerns that you would have had?
15         MR. NICHOLAS:  Object to the
16     form.
17         THE WITNESS:  I don't know
18     that they would alleviate any
19     concerns, but I would -- a
20     potential response to a question
21     like that would be -- it could
22     deal with pricing issues.  In
23     other words, they are trying to
24     purchase prior to what they

Page 33

1  anticipate might be a price rise.
2         I know there's other factors
3     that are escaping me at the
4     moment.  But there's any number of
5     potential responses that would
6     either, A, alleviate my concerns,
7     or fail -- fail to do so.
8  BY MR. PIFKO:
9     Q.   From the perspective of
10  looking at the size of the order, how
11  would you judge whether it was an
12  unusually sized order?
13         MR. NICHOLAS:  Object to the
14     form.
15         THE WITNESS:  By comparing
16     it to their historical purchases.
17  BY MR. PIFKO:
18     Q.   What data would you look at?
19  Where would you obtain historical
20  purchasing data?
21     A.   Through our -- through our
22  system that was being used at the time.
23  I can't explain the computer facets of
24  that -- of that review, but we had access

Page 34

1 to the data.
2     Q.   Okay.  So you would pull up
3 something on the computer that would
4 provide you with the customer's
5 purchasing history?
6     A.   Yes.
7     Q.   Okay.  Have you heard of the
8 Star system?
9     A.   I can't say that I have, no.
10     Q.   Have you heard of the SAP
11 system?
12     A.   Yes.
13     Q.   The systems that -- is SAP
14 system a system that AmerisourceBergen
15 used?
16     A.   It was instituted at some
17 point.  But I don't know the time frame
18 of that.
19     Q.   Okay.  It was instituted
20 after you started at the company,
21 correct?
22     A.   Correct.
23     Q.   Okay.  And you don't
24 remember what the name was of the system

Page 35

1 prior to that?
2     A.   No.  All I know is I plugged
3 in what I wanted to find, and it
4 appeared.
5     Q.   How -- when you're looking
6 at a customer's order history, how far
7 back would you look?
8         MR. NICHOLAS:  Object to the
9     form.
10         THE WITNESS:  A year.
11 BY MR. PIFKO:
12     Q.   And when you're looking
13 at -- to see if the size is unusual,
14 how -- how much over the prior years'
15 orders would constitute something that is
16 unusually large?
17         MR. NICHOLAS:  Object to the
18     form.  Very unspecific question.
19     Go ahead.
20         THE WITNESS:  Can you repeat
21     the question?
22 BY MR. PIFKO:
23     Q.   Yeah.  So you're looking to
24 determine if an order is unusually large

Page 36

1 as part of your investigation, correct?
2     A.   Correct.
3     Q.   And you're looking at the
4 customer's order history over the
5 previous year, correct?
6     A.   Correct.
7     Q.   So what would constitute an
8 unusually large order when you're
9 conducting an investigation like that?
10         MR. NICHOLAS:  Object to the
11     form.  Go ahead.
12         THE WITNESS:  There's not a
13     hard and fast rule.  We would just
14     look at the totality of the
15     information generated and make a
16     determination.
17         I can't say that for every
18     order there was a specific
19     percentage or quantity that would
20     satisfy that information.
21 BY MR. PIFKO:
22     Q.   Did you receive training on
23 how to conduct these investigations?
24     A.   Yes.

Page 37

1     Q.   Who provided that training
2 to you?
3     A.   Primarily Bruce Gundy and
4 Steve Mays.
5     Q.   Was that -- was there any
6 written documentation that was provided
7 to you in your training?
8     A.   I don't recall any specific
9 documents.
10     Q.   Was it like a formal
11 training session where you sit in a room,
12 someone gives you a presentation, or was
13 it more like on-the-job, you just kind of
14 start sitting down and they show you what
15 to do?
16     A.   I would say it was a
17 combination of both.
18     Q.   Prior to joining
19 AmerisourceBergen, did you have any
20 familiarity with the Controlled
21 Substances Act?
22     A.   I did not.
23     Q.   Did anyone when you joined
24 the company give you training on the

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 Controlled Substances Act?
2     A.   I don't recall specifically
3 speaking of the Controlled Substance Act.
4     Q.   How about generally?
5     A.   Everything discussed was
6 generally -- generally concerned
7 obviously not only the Controlled
8 Substance Act but diversion issues or
9 potential diversion issues in general.
10     Q.   Did you undertake any
11 efforts on your own to become familiar
12 with the laws and regulations under the
13 Controlled Substances Act when you joined
14 the company?
15     A.   I tried to keep informed on
16 my own, yes.
17     Q.   How did you do that?
18     A.   Reading the statutes.
19 Reading the literature available.
20     Q.   At any point -- and so I had
21 asked you earlier if when you joined the
22 company there was training on the
23 Controlled Substance Act.
24         At any point later when you

Page 39

1 worked for the company, was there any
2 training provided to you concerning
3 the Controlled Substance Act?
4     A.   Well, I was involved with
5 and received training in a lot of
6 different areas concerning controlled
7 substances, potential diversion issues,
8 investigation of those kinds of issues.
9 So, yes.  Again, not specifically called
10 the Controlled Substances Act, but all of
11 the related issues surrounding that --
12 that information.
13     Q.   Do you recall the names of
14 anyone at the company who, after you
15 joined the company, provided training to
16 you concerning the Controlled Substance
17 Act?
18     A.   No, I don't.
19     Q.   Did you ever attend any
20 seminars with other members of the
21 pharmaceutical distribution industry
22 where you were trained or discussed the
23 laws and -- and regulations under the
24 Controlled Substance Act?

Page 40

1     A.   Yes.
2     Q.   Can you recall any specific
3 such instances?
4     A.   Of training?
5     Q.   Yeah, with other members of
6 the industry.
7     A.   Yes, I could remember
8 basic -- it was called basic diversion
9 training sponsored by the National
10 Association of Drug Diversion
11 Investigators.  That was a week-long
12 training session held in -- somewhere in
13 Virginia.  There were other -- the
14 acronym for the organization I just
15 mentioned is NADDI.
16         There were other similar
17 trainings sponsored by NADDI that I
18 attended along with folks from throughout
19 the industry as well as law enforcement.
20 There was -- we did internal training for
21 our associates on diversion-related
22 issues.
23         So to answer your question,
24 yes, I -- those are a sampling of the

Page 41

1 types of training that I participated in.
2     Q.   When was the first time you
3 recall attending basic diversion
4 training?
5     A.   I would say it was probably
6 within my first year of employment.
7     Q.   I want to go back for a
8 second.  We talked about the process of
9 investigating orders that had been
10 identified by the distribution center for
11 you to investigate.
12         When you made a decision
13 about whether an order should be
14 released, as you said, or canceled, did
15 you document that somewhere?
16     A.   Yes.  On the screen of the
17 system that we were utilizing to -- to
18 gather the data.
19         My recollection is there was
20 a note section that would prompt you to
21 enter a synopsis of the issue you're
22 working on.
23     Q.   And did you -- would you
24 describe the decisionmaking process that

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 you used to make your determination in
2 those notes?
3      A.   It's the same process that I
4 alluded to -- to an earlier question,
5 the -- looking at the specific -- the
6 historical data and so forth.
7      Q.   What I'm asking is, would
8 you type in the notes -- let's say you
9 cancel an order.  You say canceled
10 because something you found in your
11 investigation led you to cancel.  Would
12 you write that in the notes?
13          MR. NICHOLAS:  Object to the
14      form.  Go ahead.
15          THE WITNESS:  In all
16      likelihood.  I don't recall any
17      specific instances or can tell you
18      precisely what was entered.  But,
19      yes.
20 BY MR. PIFKO:
21      Q.   Okay.  And then if you
22 released an order, would you type in the
23 basis of your decision to release it in
24 there, like I looked at this, and for

Page 43

1 whatever reason, you weren't concerned
2 and decided to release it?
3      A.   Yes.
4      Q.   And those would all be
5 maintained in the -- that database?
6      A.   Yes.
7      Q.   If someone wanted to look
8 back at those, they could?
9          MR. NICHOLAS:  Object to the
10      form.
11          THE WITNESS:  Yes.
12 BY MR. PIFKO:
13      Q.   Did you ever provide
14 training to anybody else at the company
15 concerning the Controlled Substances Act?
16      A.   I wouldn't call it training
17 on the Controlled Substances Act, but on
18 diversion-related issues or potentially
19 diversion-related issues, yes.
20      Q.   Do you recall specific
21 instances of doing that?
22      A.   I couldn't give you dates
23 and times, but generally the audience I
24 could probably address to some extent.

Page 44

1      Q.   What type of people were the
2 audience in your training sessions that
3 you can recall?
4      A.   Well, our thought when
5 addressing these issues is that everyone,
6 all associates play a role in preventing
7 potential diversion.  So the -- the
8 audience varied.  It included people in
9 our distribution centers who had occasion
10 to -- to handle controlled substances.
11 It included our salespeople who were kind
12 of like the eyes and ears for corporate
13 security when it came to discussing
14 diversion issues with -- with customers.
15 It included the management folks.
16          So generally speaking,
17 everyone within the organization had some
18 exposure to discussions or training that
19 related to potential diversion issues.
20      Q.   When you say that the
21 salespeople were the eyes and the ears, I
22 can't remember exactly how you said it,
23 but they were the eyes and ears, what did
24 you mean by that?

Page 45

1      A.   Well, the -- the thought
2 with giving training to the sales
3 associates is that they were in and out
4 of the customer locations.  So they had
5 the potential to be able to observe
6 behavior in -- in the pharmacy or
7 surrounding the pharmacy that might be
8 cause for concern.  And we stressed to
9 the -- to these associates that it was
10 their responsibility to let someone know
11 if they -- if something occurred that
12 they felt uncomfortable with or that they
13 had suspicions about.
14          So again, we would give them
15 this training to discuss certain
16 indicators with the expectations that if
17 they came across any of these indicators,
18 they would report it to corporate
19 security.
20      Q.   Is it your understanding
21 that at all times while you worked for
22 AmerisourceBergen, salespeople were
23 tasked with making these observations for
24 you?

Page 46

1   A.   I don't recall when
2 specifically the training occurred, but
3 the discussions were during my tenure
4 with the diversion control team.
5   Q.   What I'm trying to get at,
6 was there -- was there a period when
7 there was no expectation that salespeople
8 would be providing these observations and
9 then at some point the company decided
10 you wanted to alert salespeople to be
11 doing this, or was it always the case?
12   A.   No, I -- I don't believe
13 there was a period when there was any
14 thought that they never had a role in --
15 in identifying potential diversion.
16     I think as time went on,
17 that role became more crucial and
18 discussed in greater detail than perhaps
19 when I first started with the company.
20     But then of course I didn't
21 know what I didn't know when I first
22 started with the company.  So that may
23 very well have been taking place.
24   Q.   Did you feel that the

Page 47

1 observations provided by salespeople
2 about what was occurring at your
3 customers' locations was an important
4 part of the diversion control program?
5   A.   It was just one component of
6 the diversion control program.  But yes,
7 important.
8   Q.   And to some degree, if you
9 want to -- as you said, the salespeople
10 are the eyes and ears, so if you want to
11 know what's happening at these customers'
12 sites, the only people who would know are
13 the salespeople who are going there,
14 agree?
15     MR. NICHOLAS:  Object to the
16     form.
17     THE WITNESS:  Well, they
18     would be in the best position to
19     relay that information that they
20     observed.
21 BY MR. PIFKO:
22   Q.   And if they were not told
23 to -- what to look for, they wouldn't be
24 able to report anything back to the

Page 48

1 company, correct?
2     MR. NICHOLAS:  Object to the
3     form.
4     THE WITNESS:  I wouldn't
5     assume they didn't know because
6     that they weren't told.  I think
7     it's -- I think they were aware of
8     the issues, and I think I would
9     give them enough credit to say
10     that they did their own research
11     as well and had an idea of what --
12     what looks wrong and what's
13     potentially wrong.
14       But that's not to say --
15     again, I don't want to make it
16     sound like this was a regular call
17     I received from sales associates,
18     because, you know, we deal with
19     legitimate, licensed entities as
20     far as pharmacies, hospitals and
21     others that, you know, procure the
22     product.
23       So it's not like it was a
24     day in and day out situation.

Page 49

1     (Document marked for
2     identification as Exhibit
3     ABDC-Hazewski-1.)
4     (Document marked for
5     identification as Exhibit
6     ABDC-Hazewski-2.)
7 BY MR. PIFKO:
8   Q.   I'm handing you what are
9 marked as Exhibits 1 and 2.
10     Exhibit 1 is a document
11 Bates-labeled ABDCMDL00265457 and
12 Exhibit 2 is a PowerPoint presentation
13 Bates-labeled ABDCMDL00265458.  I believe
14 that was produced natively.  So it only
15 has one Bates number for the entire
16 document.
17     Take a minute to review
18 these documents and let me know when
19 you're done.
20   A.   Okay.
21   Q.   Exhibit 2 is a presentation.
22 I mean, take as much time as you need.
23 But you don't need to read necessarily
24 every word.  I'll direct you to some

Page 50

1 questions, and if you want to review it
2 while I'm asking you questions, you can
3 do that. But let me know when you're
4 ready.
5      A.   Okay. Okay. I'm ready.
6      Q.   The first document is an
7 e-mail from you to several people
8 attaching the second document.
9           Have you seen this document
10 before?
11      A.   I have no specific
12 recollection, but my name is on it. So I
13 would assume I have at some point.
14      Q.   How about the presentation?
15 Do you remember putting this presentation
16 together, Exhibit 2?
17      A.   Again, not specifically, but
18 it looks like something that I would have
19 done.
20      Q.   It says here on Exhibit 1,
21 "Attached is a draft of the presentation
22 that I'm planning to have put on the
23 learning management system."
24           Do you see that?

Page 51

1      A.   Yes.
2      Q.   "Keep in mind that there
3 will be dialogue associated with each
4 slide. The training is aimed at sales
5 associates, inside sales, and customer
6 service reps in addition to any
7 distribution center associates with an
8 OMP function or those who handle
9 controlled substances."
10           Do you see that?
11      A.   Yes.
12      Q.   Okay. Does that refresh
13 your recollection about who this training
14 was intended to be for?
15      A.   Well, I think it spells it
16 out, yes.
17      Q.   What's the learning
18 management system?
19      A.   My understanding, an online
20 program where an associate can sit down
21 and do the training at their own pace
22 without -- you know, minus a big
23 presentation to a larger group.
24      Q.   This particular training,

Page 52

1 this e-mail is dated April 16th, 2012.
2 Do you see that on the e-mail?
3      A.   Yeah.
4      Q.   Sent date. It says you're
5 still working on the last few slides and
6 you're asking for people's commentary.
7 So maybe it's not in final form yet, but
8 was this the first time that you put
9 together a presentation like this?
10      A.   I don't know the answer to
11 that.
12      Q.   Do you recall ever providing
13 training like this earlier in your tenure
14 at the company?
15      A.   I participated in and
16 presented training fairly regularly. So
17 but to put this into the context of when
18 it occurred versus any other
19 presentation, I don't know the answer to
20 that.
21      Q.   The title of this
22 presentation, the first page, Exhibit 2,
23 says "Prescription Drug Diversion,
24 Recognizing the Red Flags."

Page 53

1           Do you see that?
2      A.   Yes.
3      Q.   Is there anything new about
4 the idea of recognizing red flags that
5 came to light in 2012?
6           MR. NICHOLAS:  Object to the
7      form.
8           THE WITNESS:  I don't know
9      what was new versus what was not
10      new. So I would have to say I
11      don't know the answer to that.
12 BY MR. PIFKO:
13      Q.   Okay. What I'm trying to
14 get at is, is the idea of recognizing a
15 red flag or looking for a red flag of
16 diversion something that, as far as you
17 know, was always part of the idea of
18 preventing diversion?
19      A.   As far as I know.
20      Q.   Yes?
21      A.   Yes.
22      Q.   So it's discussed in here,
23 but I want to ask you. What's your
24 understanding -- and you don't

Page 54

1  necessarily have to read.  I don't want
2  you to read this back to me as your
3  answer.  But what's your understanding of
4  what diversion is?
5      A.    Removing the -- a
6  pharmaceutical product from its intended
7  path for a nonmedical purpose.
8      Q.    And do you understand that,
9  as a distributor, AmerisourceBergen is
10 what they call a registrant under the
11 Controlled Substance Act?
12     A.    Yes.  I know that.
13     Q.    Okay.  And you understand
14 that along with the right to distribute
15 controlled substances, a registrant also
16 has certain obligations that they must
17 follow under the law, correct?
18     A.    Correct.
19     Q.    Okay.  And one of those
20 obligations is to maintain effective
21 controls to prevent diversion; is that
22 correct?
23     A.    Yes.
24     Q.    What does that mean to you,

Page 55

1  to maintain effective controls to prevent
2  diversion?
3          MR. NICHOLAS:  Object to the
4      form.
5          Go ahead.
6          THE WITNESS:  To operate a
7      system that is going to assist in
8      identifying potential diversion.
9  BY MR. PIFKO:
10     Q.    And preventing it as well?
11         MR. NICHOLAS:  Object to the
12     form.
13         THE WITNESS:  I don't know
14     that we can prevent diversion.  We
15     have an obligation to report
16     suspicious orders to the DEA, but
17     in terms of preventing diversion,
18     I think that falls more into the
19     DEA's lap than the wholesale
20     distributor.
21 BY MR. PIFKO:
22     Q.    Do you believe that, in this
23 training, telling -- as you said in your
24 e-mail, telling sales associates, inside

Page 56

1  sales, and customer service reps about
2  indicia of potential diversion, that by
3  telling them what to look for, they are
4  supposed to help stop it from occurring?
5          MR. NICHOLAS:  Object to the
6      form.
7          THE WITNESS:  No.  They're
8      providing information for
9      corporate security that can then
10     be passed along to an authority
11     that is able to deal with those
12     issues.
13 BY MR. PIFKO:
14     Q.    Do you have an understanding
15 about whether, under the company's
16 practices and the law, if an order is
17 identified as suspicious, if you're
18 permitted to ship it to a customer?
19         MR. NICHOLAS:  Object to the
20     form.
21         THE WITNESS:  It's -- it's
22     AmerisourceBergen's policy not to
23     ship suspicious orders.
24 BY MR. PIFKO:

Page 57

1      Q.    And why is that?
2      A.    That's a policy that we've
3  adopted.
4      Q.    Do you have any reason why
5  the company adopted that policy?
6          MR. NICHOLAS:  Objection to
7      the form.  Asked and answered.
8          THE WITNESS:  Well, it
9      satisfies our obligation to report
10     the order.  And we don't want to
11     ship any order that is deemed to
12     be suspicious.
13 BY MR. PIFKO:
14     Q.    Why don't you want to ship
15 an order that is deemed to be suspicious?
16         MR. NICHOLAS:  Object to the
17     form.  Asked and answered twice.
18         Go ahead.
19         THE WITNESS:  Again, it's
20     the company's policy not to do so.
21 BY MR. PIFKO:
22     Q.    One thing is what is.  I'm
23 asking why.  So you said we don't want to
24 ship an order that is deemed suspicious.

Page 58

1 So my question is why you don't want to
2 ship an order that is deemed suspicious.
3       MR. NICHOLAS:  Asked and
4    answered.  Objection.
5       MR. SHAPLAND:  Objection to
6    form as well.  Eric Shapland.
7       THE WITNESS:  I have nothing
8    to add to my answer.  Other than
9    it's our company's policy not to
10   ship a suspicious order.
11 BY MR. PIFKO:
12    Q.   Do you have any
13 understanding about why you wouldn't want
14 to ship a suspicious order?
15       MR. NICHOLAS:  Object to
16    form.  Asked and answered.
17       THE WITNESS:  No, other than
18    it's our policy.
19 BY MR. PIFKO:
20    Q.   Would you agree that by not
21 shipping an order that is suspicious, you
22 can stop it from getting it into illegal
23 hands?
24       MR. NICHOLAS:  Object to the

Page 59

1    form.
2       THE WITNESS:  I -- I
3    personally never saw a correlation
4    between suspicious orders and
5    potential diversion.
6       It's a business decision for
7    the company to make as to whether
8    or not we're going to ship an
9    order that is classified as
10   suspicious.
11       And as stated, it's our
12   policy not to do so.
13 BY MR. PIFKO:
14    Q.   Let's go a few pages into
15 your PowerPoint presentation.
16       There's a page that says red
17 flags.  It's on the screen in front of
18 you to help you find it.
19    A.   I got it.
20    Q.   Okay.  Do you know what a
21 red flag is in the context of this
22 presentation?
23    A.   A red flag is something that
24 could possibly involve closer scrutiny or

Page 60

1 further investigation if identified.
2    Q.   Why would these things lead
3 you to want to conduct closer scrutiny,
4 something that's a red flag?
5       MR. NICHOLAS:  Object to the
6    form.  Go ahead though.
7       THE WITNESS:  Well, it's --
8    it's information that comes to
9    light that prompts more questions.
10       And in order to thoroughly
11    investigate suspicious orders or
12    indicators of potential diversion,
13    it's necessary to identify the
14    flag and -- and try to determine
15    the reasons behind that red flag.
16    Perhaps there's reasonable -- a
17    reasonable explanation for
18    something, perhaps not.
19 BY MR. PIFKO:
20    Q.   Well, let's go through
21 the -- the next -- some of these red
22 flags that you put in your presentation
23 here.
24       The first one is,

Page 61

1 "Dispensing large quantities of Oxycodone
2 prescriptions, (greater than 12 to
3 15 percent) when compared with total
4 number of prescriptions."
5       Do you see that?
6    A.   Yes.
7    Q.   Is this something that you
8 wrote here in your presentation?
9    A.   If I authored it, yes.  But
10 I'm not certain.  I don't recall
11 specifically doing that.
12    Q.   The e-mail says:  "Attached
13 is a draft presentation that I am
14 planning to have put on" -- it appears to
15 be something that you're putting
16 together.  Do you dispute that?
17    A.   No, I do not.
18    Q.   Okay.  Why is dispensing a
19 large quantity, something that's 12 to
20 15 percent more of Oxycodone when --
21 sorry, let me just rephrase that.
22       Why would dispensing a large
23 quantity of Oxycodone in comparison with
24 the total number of prescriptions at a

Page 62

1 pharmacy be a red flag?
2     A.   Well, based on information
3 from the DEA and other industry sources,
4 Oxycodone was a high risk for potential
5 diversion, so that particular product was
6 scrutinized more closely than -- and
7 higher concentrations are cause for
8 concern without a reasonable explanation.
9     Q.   Why is it a concern if a
10 pharmacy has got something 12 to
11 15 percent or more of its total sales are
12 Oxycodone, why is that a concern?
13         MR. NICHOLAS:  Object to the
14     form.
15         THE WITNESS:  It's a concern
16     because, again, Oxycodone is at
17     high risk for potential diversion.
18     And a customer dispensing larger
19     quantities is cause to ask further
20     questions as to why they are
21     following -- you know, following
22     that particular business model.
23         There may be explanations.
24     There may not.

Page 63

1 BY MR. PIFKO:
2     Q.   Did you ever talk with any
3 representatives of pharmacies about their
4 selling quantities of Oxycodone that were
5 12 to 15 percent or greater than -- of
6 their total sales?
7     A.   Through the years I'm sure I
8 have talked to any number of pharmacists
9 in similar circumstances.  I don't recall
10 any specifics.
11     Q.   Do you recall any reasons
12 that any pharmacy might have provided to
13 you for having that ratio of Oxycodone
14 to -- as compared to their total number
15 of prescriptions?
16     A.   Yes.
17     Q.   Can you provide some of the
18 reasons you recall?
19     A.   Well, the -- probably the
20 primary reason is they are servicing a
21 demographic usually classified as pain
22 management that -- I'm not a doctor, but
23 I -- I'm assuming the Oxycodone is
24 generally a regimen that pain doctors

Page 64

1 would prescribe.
2     Q.   Do you recall any reasons
3 provided by pharmacies for having this
4 kind of ratio that you felt were
5 illegitimate?
6         MR. NICHOLAS:  Object to the
7     form.
8         THE WITNESS:  I can't recall
9     any specifics of that, no.
10 BY MR. PIFKO:
11     Q.   Sitting here today, I asked
12 you if you recall a question or a
13 response from a pharmacist.  But just
14 sitting here today, can you give an
15 example of a reason that would be
16 illegitimate to have a ratio like this?
17         MR. NICHOLAS:  Objection.
18     Object to the form.
19         A reason provided by a
20     pharmacist?  Is that what you
21     mean?
22 BY MR. PIFKO:
23     Q.   I'm asking any reason that
24 you can think of.

Page 65

1         MR. NICHOLAS:  I'll object
2     to the form.
3         THE WITNESS:  Okay.  I got
4     turned around in the back and
5     forth, so, can you repeat the
6     question?
7 BY MR. PIFKO:
8     Q.   Yeah.  I'm just asking --
9 forget about any conversations with
10 pharmacists.  Can you -- as someone who
11 is in charge of the diversion control
12 function at Amerisource and who served as
13 an investigator, can you think of an
14 illegitimate reason why a pharmacy would
15 be having a higher quantity of Oxycodone
16 as part of their percentage of their
17 total sales?
18         MR. NICHOLAS:  Object to the
19     form.
20         THE WITNESS:  Well, the --
21     the illegitimate reasons may very
22     well be the same as the legitimate
23     reasons.
24         If -- if a customer tells us

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  they're -- or has told us that
2  they were servicing a physician
3  who works in a pain management
4  clinic, then that may be cause for
5  the person responsible for vetting
6  the physicians or policing the
7  physicians to look closer as to
8  whether or not the pharmacist is
9  doing all they can to vet the
10 doctors and prescriptions that are
11 prompting the increase levels of
12 Oxycodone.
13 BY MR. PIFKO:
14     Q.   So when you say that someone
15 who is in charge of vetting the
16 physicians, who would that be?
17        MR. NICHOLAS:  Object to the
18 form.
19        THE WITNESS:  I would say
20 the responsibility for that lies
21 with the pharmacist.
22 BY MR. PIFKO:
23     Q.   At any time during your
24 tenure at AmerisourceBergen, did the

Page 67

1  company ever examine the legitimacy of
2  physicians as part of its diversion
3  control functions?
4        MR. NICHOLAS:  Object to the
5  form.
6        THE WITNESS:  We would
7  request information from customers
8  concerning their top prescribing
9  physicians and check available
10 public records.  But beyond that,
11 no.
12 BY MR. PIFKO:
13     Q.   When you say check available
14 public records, what do you mean by that?
15     A.   Checking with the authority
16 that polices physicians in a particular
17 state to see if there's been any public
18 records of discipline or sanctions
19 against the medical license.
20     Q.   Was that a standard practice
21 to do that with every customer?
22     A.   It was part of the
23 onboarding process for new customers, to
24 provide that information.

Page 68

1     Q.   Okay.  And when they
2  provided that information, how would they
3  provide that?
4     A.   How would they provide it?
5     Q.   Yeah.
6     A.   Through the due diligence
7  process, there were forms that were used
8  by -- by the distribution centers and the
9  sales associates to gather the
10 information.
11    Q.   And upon receiving that
12 information, was it the company's
13 practice to always conduct this review of
14 publicly available information of the top
15 prescribers at every customer?
16    A.   There was a point in time
17 when -- when that information became
18 standard on the form that we used to
19 onboard customers.  But I couldn't tell
20 you when that particular time was.
21    Q.   Well, after that information
22 started to be provided on the form, did
23 you always then take that information and
24 perform a review of publicly available

Page 69

1  information on those top prescribers?
2     A.   Yes.
3     Q.   Did you document the review
4  anywhere in your files?
5     A.   It was part of the due
6  diligence file, yeah.
7     Q.   So any research that you
8  would have conducted on the top
9  prescribers of any customer would be
10 maintained in the due diligence file for
11 that customer?
12       MR. NICHOLAS:  Object to the
13 form.
14       THE WITNESS:  Yes.
15 BY MR. PIFKO:
16    Q.   Let's go back to Exhibit 2.
17 We've got the slide that I was going to
18 ask you about up in front of you.
19 Another red flag of diversion is
20 dispensing a high percentage of oxycodone
21 30-milligram prescriptions versus all
22 other oxycodone strengths being
23 dispensed.
24       Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    You just had it, right
2 there, with your left hand.  Keep going.
3    A.    Gotcha.
4    Q.    One more.  There you go.
5    A.    Yes, I see it.
6    Q.    Okay.  Why is that a red
7 flag of diversion.
8    A.    For reasons that are unclear
9 to me, that particular strength of
10 oxycodone seemed to be considered to be
11 more highly abused than other -- other
12 strengths of the same product.
13    Q.    What was the basis for that
14 knowledge?
15        MR. NICHOLAS:  Object to the
16        form.
17        THE WITNESS:  Information
18        received from the DEA as well as
19        trade organizations in the
20        industry.
21 BY MR. PIFKO:
22    Q.    And why would it be a
23 concern if a pharmacy was dispensing more
24 of this than other types of oxycodone?

Page 71

1    A.    Well, knowing that it's more
2 prone to abuse, that would become a
3 concern for -- for us.
4    Q.    You see on your copy and on
5 the screen, these pills are blue.
6    Do you see that?
7    A.    Yes.
8    Q.    Have you ever heard of
9 something called the Blue Highway?
10    A.    I've not heard that term.
11    Q.    Okay.  Have you heard of the
12 idea that -- let's look at one of the
13 other slides here.
14    Go a few pages down.
15 There's a page with a bunch of license
16 plates, going towards -- yeah.
17        Have you heard of the idea
18 that people would travel to places like
19 Florida and bring pills back into other
20 areas like West Virginia and Ohio, among
21 other states?
22    A.    I've heard of that.
23    Q.    Where did you hear that?
24    A.    I can't -- I couldn't say

Page 72

1 who specifically I heard it from.  But it
2 was generally discussed information in
3 the industry.
4    Q.    When do you believe was the
5 first time you heard that?
6    A.    My best recollection would
7 have probably been when I took -- became
8 manager of the diversion control team.
9    Q.    When was that?
10    A.    2008.
11    Q.    So looking at this slide --
12 I know we're going out of order, but it
13 was relevant to the area that we were
14 discussing.  Why is dispensing
15 prescriptions to patients or from
16 physicians not from the local area a red
17 flag?
18    A.    Well, it suggests that they
19 can't get the prescriptions they want
20 locally, so they branch out, would be my
21 best guess.
22    Q.    Right.  That the idea that
23 someone who has a legitimate medical need
24 for a prescription probably wouldn't be

Page 73

1 driving out of the area to get their
2 prescription, correct?
3    A.    I would agree with that.
4    Q.    Let's go back to, a few
5 pages earlier, this page with the money
6 and the pills on it.  The other way.  The
7 other way, towards the beginning.
8        So you see another red flag
9 is accepting an unusually large
10 percentage of cash transactions for
11 prescriptions.
12        Do you see that?
13    A.    I do.
14    Q.    Why is that a red flag of
15 diversion?
16    A.    Cash payments were generally
17 looked at as being subject to trying to
18 determine more information on those
19 transactions because of not being able to
20 track that information as you would
21 that's being paid by a third-party payor.
22    Q.    Is it also the idea that
23 again a legitimate prescription, not
24 always but most likely, would have some

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  sort of insurance coverage associated
2  with it?
3         MR. NICHOLAS:  Object to the
4     form.
5         THE WITNESS:  Yes.
6  BY MR. PIFKO:
7     Q.   The next slide says, "Cash
8  transactions average 8 percent or less of
9  all transactions according to the DEA."
10       Do you see that?
11    A.   Yes, I do.
12    Q.   Do you agree with that
13 statement?
14       MR. NICHOLAS:  Object to the
15    form.
16       THE WITNESS:  I have -- no,
17    I have no knowledge of the 8
18    percent reference in that slide.
19    I don't know that I'm
20    qualified to speak to that
21    question.
22 BY MR. PIFKO:
23    Q.   Okay.  This was something
24 that you put together.  Do you think that

Page 75

1  you researched this and found that
2  somewhere to put that on the slide?
3     A.   Yes.
4     Q.   So it was probably accurate
5  at the time that you put it on the slide?
6     A.   Yes.
7     Q.   Next page.  "Purchasing
8  controlled substances from multiple
9  wholesalers."  And then it's got images
10 of the different distribution companies,
11 right there.
12       Why is that a red flag of
13 diversion?
14    A.   Well, as a wholesale
15 distributor, we don't have visibility to
16 other -- other companies that are
17 servicing a particular customer.  So
18 potentially a customer can order from
19 multiple wholesale distributors and fly
20 under the radar in terms of order
21 monitoring programs or just due diligence
22 in general.
23    Q.   Have you ever heard of a
24 utilization report or a usage report?

Page 76

1     A.   Yes.
2     Q.   Can you tell me what that
3  is?
4     A.   Well, from our perspective,
5  it's the historical data of purchasing by
6  a particular customer from
7  AmerisourceBergen.
8     Q.   Is that something that you
9  request from the customer?
10    A.   No, that's information that
11 we would -- we would source from our own
12 internal systems.
13    Q.   Do you recall ever
14 requesting from a customer their purchase
15 history from any other distributors in
16 addition to yourself?
17    A.   I don't recall ever having
18 done that.
19    Q.   Do you recall ever attending
20 presentations put on by manufacturers
21 where they told you some of the highest
22 purchasers of their products from all
23 distributors, which included customers
24 that were yours?

Page 77

1     A.   I have spoken with
2  representatives of manufacturers, not in
3  the -- not in the -- not in a scene of
4  multiple representatives speaking about
5  that publicly.  But I've had
6  conversations with manufacturers
7  concerning customers that they had
8  concerns with because -- and were
9  speaking to me because we service that
10 particular customer.
11    Q.   Do you recall attending a
12 presentation by Actavis where they gave
13 you a list of some of the highest
14 purchasers of certain opioid products,
15 and the discussion included customers
16 that purchased from you and other
17 distributors?
18    A.   No.
19       MR. CIULLO:  Object to form.
20    Zach Ciullo.
21       THE WITNESS:  I don't recall
22    ever attending such a session.
23 BY MR. PIFKO:
24    Q.   Let's go to this slide here.

Page 78

1 You're there. It says, "Dispensing
2 controlled substance cocktails consisting
3 of multiple prescriptions for oxycodone,
4 Xanax and Soma for a single patient."
5          Do you see that?
6     A.   Yes, I do.
7     Q.   Why is that a red flag of
8 diversion?
9     A.   Okay. Not being a
10 pharmacist or a doctor, it's my lay
11 understanding that cocktails similar to
12 what are described in this slide may not
13 conform to the medical -- a legitimate
14 medical purpose.
15    Q.   So if a doctor is writing
16 prescriptions for this combination of
17 products or a pharmacy is filling
18 prescriptions for this combination of
19 products, it's your understanding that
20 that's not a legitimate medical use?
21    A.   No, I wouldn't go that far.
22 It's cause for concern. But again, I'm
23 not a pharmacist or a doctor.
24    Q.   Okay.

Page 79

1     A.   But I do know that there's
2 cause for concern when prescribing those
3 combinations.
4     Q.   You'd be concerned that it's
5 not a legitimate medical use?
6     A.   Well, again it's difficult
7 for us to even have that information.
8 The -- the dispensing data from a
9 particular pharmacy is -- is, you know,
10 is not a routine piece of information
11 that a wholesale distributor would have.
12    Q.   Understood. But again,
13 just -- I'm just clarifying for the
14 record, that the concern though is that
15 this type of combination, whether you
16 know it to be true or not, there's a
17 concern that it's not a legitimate
18 medical use, is that correct?
19          MR. NICHOLAS: Object to the
20     form.
21          THE WITNESS: That's part of
22     the concerns, yes.
23 BY MR. PIFKO:
24    Q.   Have you heard of "The Holy

Page 80

1 Trinity"?
2     A.   I have.
3     Q.   What is that?
4     A.   A combination of an opioid,
5 a benzodiazepine, and a muscle relaxant
6 prescribed together to one patient.
7     Q.   Is that something of
8 potential concern?
9     A.   It is of potential concern,
10 yes.
11    Q.   And why is that?
12    A.   For the same reasons that
13 the other cocktails were a concern.
14 Again, not being a pharmacist or a
15 physician, my understanding is,
16 prescribed in those -- in that
17 combination is potentially a dangerous
18 situation for a patient taking those
19 particular drugs.
20    Q.   Is that a situation that --
21 is potentially someone doing that as
22 abusing the drugs?
23          MR. NICHOLAS: Object to the
24     form.

Page 81

1          THE WITNESS: I don't know
2     that I can say abusing the drugs.
3     If the prescription is written by
4     a licensed medical doctor, I think
5     it's incumbent on the pharmacist
6     to identify and ask the proper
7     questions concerning the use of
8     that combination.
9          MR. NICHOLAS: Mark, if
10    we're close to the end of this
11    document, we can complete it.
12    Otherwise if you're going to be a
13    while we'd like to take a break.
14         MR. PIFKO: No, I think
15    I'm -- I'm close to the end of it.
16    We'll finish it and then we'll
17    take a break.
18 BY MR. PIFKO:
19    Q.   Turn to this page. It says,
20 "Abused Pharmaceuticals Substances."
21 It's towards the end there?
22    A.   Yes.
23    Q.   Can you tell me what this --
24 what this is and why this is included in

Page 82

1 here?
2    A.   Well, as it says on the
3 document itself, it's a handout from the
4 NADDI organization that I referenced
5 earlier.  And I included it for the
6 obvious reasons that it lists potentially
7 high risk controlled substances.
8    Q.   Let's go to the next, the
9 next slide here.  It says, "What is a
10 suspicious order?"
11       Do you see that?
12    A.   Yes.
13    Q.   Can you tell me in your own
14 words what a suspicious order is?
15    A.   An order of unusual
16 quantity, an order that is ordered more
17 frequently as compared to their
18 historical ordering, and one that
19 deviates from a particular pattern.
20    Q.   If something is identified
21 as a suspicious -- well, first of all,
22 does -- do you understand that as a
23 registrant under the Controlled
24 Substances Act, AmerisourceBergen has a

Page 83

1 duty to identify suspicious orders?
2    A.   Yes.
3    Q.   And do you have an
4 understanding as to why they have that
5 duty?
6       MR. NICHOLAS:  Object to the
7 form.
8       THE WITNESS:  It's mandated
9    in the statute.
10 BY MR. PIFKO:
11    Q.   Okay.  Do you have an
12 understanding as to why the statute
13 requires you to do that?
14       MR. NICHOLAS:  Object to the
15 form.
16       THE WITNESS:  My
17    understanding is it's to identify
18    potential diversion.
19 BY MR. PIFKO:
20    Q.   And if you identify
21 something as a suspicious order, what are
22 you supposed to do?
23       MR. NICHOLAS:  Object to the
24 form.

Page 84

1       THE WITNESS:  I know what --
2       MR. NICHOLAS:  Go ahead.
3       THE WITNESS:  I know what we
4    do, which is not ship it.
5       MR. PIFKO:  We can take a
6    break.
7       MR. NICHOLAS:  Thank you.
8       THE VIDEOGRAPHER:  Going off
9    record.  The time is 10:54.
10       (Short break.)
11       THE VIDEOGRAPHER:  We're
12    going back on the record.
13    Beginning Media File Number 2.
14    The time is 11:20.
15 BY MR. PIFKO:
16    Q.   I want to ask you about a
17 comment that you made a little bit before
18 we took a break.
19       I was asking you about
20 suspicious orders and you said -- you
21 said -- I'm quoting, "I personally never
22 saw a correlation between suspicious
23 orders and potential diversion."
24       Do you recall saying that?

Page 85

1    A.   Yes.
2    Q.   Okay.  So is it your view
3 that there's no correlation between
4 suspicious orders and diversion?
5       MR. NICHOLAS:  I'll object
6    to the form.
7       THE WITNESS:  No.  My
8    opinion is that there was -- not
9    in all cases.  But it's not a
10    given that a suspicious order is
11    going to be potentially diverted
12    in some manner.
13 BY MR. PIFKO:
14    Q.   Right.  But you said, "I
15 never saw a correlation between
16 suspicious orders and diversion."
17       So what did you mean by
18 that?
19       MR. NICHOLAS:  Objection.
20    Bickering.
21       THE WITNESS:  I meant what I
22    just explained, that it's not a
23    given that a suspicious order is a
24    product that's necessarily going

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  to be subject to potential
2  diversion.
3  BY MR. PIFKO:
4      Q.   Do you think that
5  identifying, reporting and stopping the
6  shipments of suspicious orders helps
7  prevent diversion?
8          MR. NICHOLAS:  Object to the
9  form.  It's a fact deposition.
10  You're just asking him about
11  nonfactual things now, about his
12  opinion on things.
13         THE WITNESS:  So what's the
14  question?  I'm sorry.
15  BY MR. PIFKO:
16     Q.   Do you think that
17  identifying, reporting, and stopping the
18  shipments of suspicious orders helps
19  prevent diversion?
20         MR. NICHOLAS:  Exact same
21  objection.
22         Go ahead.
23         THE WITNESS:  I think that
24  that question is better suited for

Page 87

1      the DEA to answer, who required
2      the identifying and reporting of
3      suspicious orders.
4          The shipping of orders is
5      the company's decision and policy
6      not to do so.  And that's my
7      answer.
8  BY MR. PIFKO:
9      Q.   Okay.  Well, I'm not asking
10  for the DEA's answer.  You're the one
11  who's being deposed here today.  I'm
12  asking for your answer.  So I would
13  appreciate if you would provide that to
14  me.  I'll ask the question again so that
15  you know.
16         I'm asking if you think that
17  identifying, reporting, and stopping the
18  shipments of suspicious orders helps
19  prevent diversion?
20         MR. NICHOLAS:  Objection to
21  the form of the question.  And
22  he's just answered the question.
23  So it's asked and answered.
24         THE WITNESS:  There may be

Page 88

1  instances where it could assist in
2  identifying diversion.  I stand by
3  my contention that I -- throughout
4  my career I've not necessarily
5  seen suspicious orders -- I've not
6  been presented with information
7  that would suggest that those
8  suspicious orders were subject --
9  I'm sorry, I lost my train of
10  thought.
11         I stand by my statement that
12  I've not seen a correlation
13  between suspicious orders and
14  potential diversion.
15  BY MR. PIFKO:
16     Q.   Other than having a
17  suspicious order monitoring program, and
18  security measures within its warehouses,
19  does AmerisourceBergen implement any
20  other procedures or programs to prevent
21  diversion?
22         MR. NICHOLAS:  Object to the
23  form of the question.
24         THE WITNESS:  No, beyond

Page 89

1  what is required by statute.  We
2  comply with all of the statutes as
3  they concern developing and
4  operating a system to help
5  identify potential diversion.  But
6  beyond what we currently utilize,
7  that's -- that's it.
8  BY MR. PIFKO:
9      Q.   And what you currently
10  utilize is a suspicious order monitoring
11  program and certain security measures
12  within your facilities, is that correct?
13         MR. NICHOLAS:  Object to the
14  form.
15         THE WITNESS:  And a due
16  diligence program which is an
17  ongoing monitoring of customers.
18  BY MR. PIFKO:
19     Q.   So that's yes and a due
20  diligence program, just to be clear?
21     A.   I'm sorry?
22     Q.   Your answer was yes and a
23  due diligence program?
24     A.   Correct.

Page 90

1     MR. NICHOLAS:  Object to the
2     form.
3  BY MR. PIFKO:
4     Q.   Is the due diligence program
5  separate and apart from the suspicious
6  order monitoring program?
7     A.   Well, they are two different
8  functions, but I think they all mesh
9  together at some point to give us a good
10  capsule of the customer we're dealing
11  with.
12     (Document marked for
13     identification as Exhibit
14     ABDC-Hazewski-3.)
15  BY MR. PIFKO:
16     Q.   I'm handing you what's been
17  marked as Exhibit 3.
18     It is a one-page document
19  Bates labeled ABDCMDL00268888.  Take a
20  minute to review and let me know when
21  you're done.
22     MR. CIULLO:  Can you repeat
23     those numbers, please?
24     MR. PIFKO:  Yeah,

Page 91

1     ABDCMDL00268888.
2     THE WITNESS:  I've reviewed.
3  BY MR. PIFKO:
4     Q.   So this is an e-mail that
5  Paul Ross writes in response to your
6  attaching the presentation that we were
7  discussing which is Exhibit 2.  Do you
8  see that?
9     A.   Yes.
10     Q.   Okay.  And who is Paul Ross?
11     A.   Paul Ross is a senior
12  director in the corporate security
13  regulatory affairs department for
14  AmerisourceBergen.
15     Q.   What was his specific role,
16  what was his focus?
17     A.   My understanding is Paul
18  specialized in the specialty companies
19  that are subsidiaries of
20  AmerisourceBergen.
21     Q.   And what did he do for them?
22     A.   Regulatory issues, review
23  compliance with existing statutes.
24     Q.   Was his role similar to

Page 92

1  yours, but for other divisions of the
2  company?
3     MR. NICHOLAS:  Object to the
4     form.
5     THE WITNESS:  No.  Paul's
6     role was above me in terms of --
7     in terms of his scope of
8     authority.
9  BY MR. PIFKO:
10     Q.   So he says here in response
11  to your presentation, "It's amazing how
12  few people recognize the red flags."  Do
13  you see that?
14     A.   I do.
15     Q.   Do you agree with that
16  statement?
17     A.   No.
18     Q.   What makes you disagree with
19  it?
20     A.   Well, just my -- my
21  experience in talking with other
22  associates is that people generally as
23  time went on gained a greater
24  appreciation for why we do the things we

Page 93

1  do in corporate security and regulatory
2  affairs.
3     And some positive feedback
4  that I've gotten from the field in terms
5  of how helpful this particular
6  information has been and will continue to
7  be.
8     Q.   Well, he says here, "I
9  certainly believe this will be a useful
10  thing."  Do you think what he's saying is
11  people don't -- prior to them receiving
12  this training, he's saying people don't
13  recognize it, and he's saying this will
14  help them recognize it?
15     MR. NICHOLAS:  Object to
16     form.
17  BY MR. PIFKO:
18     Q.   Do you -- do you understand
19  him to be saying that?
20     MR. NICHOLAS:  Object to the
21     form.
22     THE WITNESS:  I can't get
23     inside Paul's head, so I really
24     couldn't say what he meant by a

Page 94

1      particular statement.
2  BY MR. PIFKO:
3      Q.   Do you recall at the time
4  having a belief that you needed to have
5  this training session because people
6  weren't recognizing the red flags?
7      A.   No.  I think the thought was
8  that the training sessions are critical
9  across the -- across the company.  And as
10  I've said previous, the -- you know, our
11  opinion is that all of our associates
12  play a role in -- in protecting the
13  company assets and help -- helping to
14  identify potential diversion.
15      (Document marked for
16      identification as Exhibit
17      ABDC-Hazewski-4.)
18  BY MR. PIFKO:
19      Q.   I'm handing you now what's
20  been marked as Exhibit 4.  It is a
21  PowerPoint presentation from Actavis.
22  It's Bates labeled Allergan_MDL_00381552,
23  and the last page is 0381566.
24      Take a minute to review that

Page 95

1  and let me know when you're done.
2      MR. CIULLO:  This is Zach
3  Ciullo.  Have you received a -- is
4  this marked confidential?  I can
5  pull it up really quickly.
6      MR. PIFKO:  It is.  He is
7  authorized under the protective
8  order to review it.
9      MR. CIULLO:  Okay.  Have you
10  reached out to Allergan to get
11  permission to use it?
12      MR. PIFKO:  No, I'm not
13  required to do so.
14      MR. CIULLO:  And I'm sorry,
15  can you repeat the Bates one more
16  time?
17      MR. PIFKO:  Yes.  00381552
18  through 381566.
19      MR. NICHOLAS:  I -- I'm
20  going to just -- I'll confess, I
21  really don't know whether he's --
22  whether you're permitted to use
23  the document.
24      MR. PIFKO:  Well, we're

Page 96

1  going to -- we're going to discuss
2  it with him.
3      MR. NICHOLAS:  Is that --
4  no, no, without getting Allergan's
5  permission.
6      MR. PIFKO:  Yeah, we went
7  through this issue with the
8  Cardinal document yesterday too.
9      There's a provision in the
10  protective order where he's
11  permitted to see it because it was
12  shown to him already.
13      MR. CIULLO:  That was a --
14  that was a Cardinal document.
15  This is an Allergan document.
16      MR. PIFKO:  It doesn't
17  matter --
18      MR. CIULLO:  You have to
19  reach out to Allergan to get
20  permission to use it.
21      MR. PIFKO:  I don't need to
22  get permission, okay?  We're not
23  doing this.
24  BY MR. PIFKO:

Page 97

1      Q.   Sir, tell me when you're
2  done reviewing the document.
3      MR. NICHOLAS:  You're --
4      MR. CIULLO:  I beg your
5  pardon.  I think you do need
6  permission under the --
7      MR. PIFKO:  I don't, okay?
8  You can object to it later, but I
9  don't.  Under 34 --
10      MR. NICHOLAS:  Mark, I think
11  you said because he's seen it
12  before.  But what -- what -- how
13  do we know he's seen it?
14      MR. PIFKO:  His name is on
15  the document, it's his -- I'm
16  trying not to taint the testimony.
17  I'm going to ask him some
18  questions about it.
19      MR. CIULLO:  All right.
20  This is Zach Ciullo.  Docket 441,
21  paragraph 333M.  "No confidential
22  information of one defendant may
23  be shown to any witness who is a
24  current employee of another

Highly Confidential – Subject to Further Confidentiality Review

Page 98

1 defendant who is not otherwise
2 authorized to receive the
3 information under this order."
4      MR. PIFKO: He is otherwise
5 authorized because --
6      MR. CIULLO: I can't see how
7 he is otherwise authorized to
8 receive the information under the
9 agreement.
10      MR. PIFKO: Because he -- he
11 previously reviewed or received
12 the information.
13      MR. NICHOLAS: You don't
14 know -- the issue is -- that I
15 have is, you don't know that --
16 for example, there are other
17 people listed as attendees who did
18 not attend this thing.
19      So I don't know whether he's
20 seen this document.
21      MR. PIFKO: Okay. Well,
22 we're going to ask him, okay?
23      MR. NICHOLAS: You have to
24 start with that before you use the

Page 99

1 document.
2      MR. PIFKO: We're going to
3 ask him.
4      MR. NICHOLAS: I think you
5 have to do that before --
6      MR. PIFKO: I need to -- no,
7 I need to --
8      MR. CIULLO: You have to
9 first establish a foundation.
10      MR. PIFKO: I'm going to do
11 that right now.
12 BY MR. PIFKO:
13      Q.   Please, sir, can you go to
14 page -- okay. See the first page. Do
15 you see a date here?
16      The title of this document
17 is Suspicious Order Monitoring,
18 Partnership Meeting, AmerisourceBergen,
19 Chesterbrook, Pennsylvania, October 22,
20 2012.
21      Do you see that?
22      A.   Yes, I do.
23      Q.   Okay. This is a meeting, a
24 partnership meeting. And you see it has

Page 100

1 meeting participants here?
2      A.   Yes.
3      Q.   Okay. And you are listed
4 among -- you are the first participant
5 listed there. Do you see that?
6      A.   Yeah.
7      Q.   Okay. And it's got Actavis
8 people here listed who participated in
9 this meeting. Nancy Baran, Michael
10 Clarke, and John Duff.
11      Do you see that?
12      A.   Yeah.
13      MR. NICHOLAS: As you go
14 forward, I'm going to -- I'm just
15 going to interpose an objection.
16 I'm going to -- I have to do this
17 to make a record.
18      My objection is I don't
19 believe you can use this document
20 in the deposition, including
21 showing it to him and putting it
22 on the record until you establish
23 that he has seen the document or
24 had involvement. I mean, all he's

Page 101

1 said so far is he --
2      MR. PIFKO: I'm trying to
3 ask him questions. You are
4 interrupting my ability to do that
5 right now.
6      MR. NICHOLAS: You -- you
7 asked him about this before, and
8 he said he had no recollection.
9      MR. PIFKO: He doesn't
10 recall. It doesn't mean -- so --
11      MR. NICHOLAS: All right.
12 Go ahead. I've interposed my
13 objection. Go ahead.
14      MR. PIFKO: This is --
15      MR. CIULLO: I raise the
16 exact same objection.
17      MR. PIFKO: Okay. You --
18 under the rules of the deposition,
19 one person can make the objection
20 for all defendants. So you don't
21 need to say the same objection
22 twice.
23      MR. CIULLO: Okay. Well,
24 this is an Allergan specific

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  document so I'm objecting on
2  behalf of Allergan.  I represent
3  Allergan.
4      MR. PIFKO:  Well, he made
5  the objection for you.  All you're
6  doing is disrupting the
7  deposition.  So if you have
8  something new to say, you're --
9  I'm not going to stop you from
10  saying that.  But if you're just
11  going to say, "I agree with what
12  he said," his objection stands for
13  you.  It's in the documents.  You
14  don't need to say that.
15 BY MR. PIFKO:
16  Q.  Okay, sir.  So I'm trying to
17 ask you questions, sir --
18      MR. SHAPLAND:  Excuse me.
19  This is a message to the court
20  reporter.  We should have folks
21  who are on the phone who are
22  interposing objections identify
23  themselves, because I'm reading a
24  transcript here and the objections

Page 103

1  are not being attributed to
2  whoever is the party.
3      THE COURT REPORTER:  Thank
4  you.
5      I'm trying not to interrupt
6  by asking everybody who they're
7  speaking -- who's speaking.  I'm
8  trying to be less obtrusive.
9 BY MR. PIFKO:
10  Q.  Okay.  Sorry all the lawyer
11 mumbo-jumbo here.  I'm just trying to ask
12 you some questions about this meeting.
13      So you see that this is a
14 meeting that was -- on the first page it
15 took place at AmerisourceBergen offices
16 in Chesterbrook on October 22, 2012.
17 Okay.
18      Then I had you look at the
19 third page, and it's got participants.
20 Okay.  Do you see that?
21  A.  Yes.
22  Q.  Do -- do you know who Nancy
23 Baran is at Actavis?
24      MR. NICHOLAS:  Hold on.  I

Page 104

1  thought you were going to first
2  ask -- you have to establish --
3      MR. PIFKO:  I'm -- I'm
4  working on that, Bob.  You've got
5  to let me -- you've got to let me
6  do that.  You've got to stop
7  interrupting me.
8      MR. NICHOLAS:  Well, I'm
9  just --
10      MR. CIULLO:  Can you please
11  just ask if he attended this
12  presentation?
13      MR. PIFKO:  I'm getting
14  there.  You guys -- you can't ask
15  the questions for me, okay?  Stop.
16  All of you.
17      MR. CIULLO:  Then ask the
18  proper question.
19      MR. PIFKO:  I'm going to
20  mute the phone if you're going to
21  do that, because you're
22  interrupting the deposition.
23 BY MR. PIFKO:
24  Q.  Okay.  Sir, I'm trying to

Page 105

1 ask --
2      MR. CIULLO:  You're not
3  going to mute the phone.
4 BY MR. PIFKO:
5  Q.  -- do you know who -- do you
6 know who Nancy Baran is?
7  A.  Other than what I'm reading
8 on here --
9      MR. CIULLO:  Objection.
10 BY MR. PIFKO:
11  Q.  Do you know who Michael
12 Clarke is?
13      MR. NICHOLAS:  Objection.
14  Same objection.
15      MR. CIULLO:  Objection.
16      THE WITNESS:  Other than
17  reading what's on the agenda.
18 BY MR. PIFKO:
19  Q.  Do you know who John Duff
20 is?
21      MR. NICHOLAS:  Same
22  objection.
23      MR. CIULLO:  Objection.
24      THE WITNESS:  Other than

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  reading what's on the agenda.
2  BY MR. PIFKO:
3      Q.   Okay.  And you said Steve
4  Mays, was he your boss in 2012 or was
5  he --
6          MR. NICHOLAS:  Same
7  objection.
8          MR. CIULLO:  Objection.
9  BY MR. PIFKO:
10     Q.   -- someone who's equal at
11 your level at that time?
12     A.   I don't know that he was my
13 boss, but he was above me in terms of the
14 hierarchy of the department.
15     Q.   Okay.  And so my question,
16 having reviewed this meeting participant
17 slide and seeing the first page, do you
18 now recall attending this meeting at your
19 offices where Actavis presented to you?
20     A.   I don't recall the meeting,
21 no.
22     Q.   Do you dispute that the
23 meeting occurred?
24         MR. NICHOLAS:  Object to the

Page 107

1  form.
2          MR. CIULLO:  Objection.
3          THE WITNESS:  I can only go
4  on what's in front of me.  So I
5  assume the meeting went forward.
6  BY MR. PIFKO:
7      Q.   Do you remember Actavis
8  presenting certain information to you
9  about customers of Amerisource and
10 volumes of products?
11         MR. NICHOLAS:  Objection.
12         MR. CIULLO:  Objection.
13         MR. NICHOLAS:  I think the
14 question needs to be asked, has he
15 seen the document before, because
16 you're trying to use the document.
17 That's what -- that's what the
18 rule says you have to do if you're
19 going to get around --
20         MR. PIFKO:  It doesn't say
21 that.  It says the information.
22 So you -- again, you guys are
23 tainting the record, because
24 you're -- he's sitting right here

Page 108

1  and you are telling him things.
2          MR. CIULLO:  You're breaking
3  the deposition protocol.
4          MR. PIFKO:  I'm not.
5          MR. NICHOLAS:  We can excuse
6  him if you want to argue about it.
7          MR. PIFKO:  We don't need to
8  argue.  Your objection is clearly
9  noted.  Okay.  And all you're
10 doing is interrupting the
11 witness -- interrupting the
12 questioning, and you're biasing
13 the witness's testimony because
14 you're providing speaking
15 objections and explaining things
16 that, you know, are infecting what
17 he's saying.
18         MR. NICHOLAS:  I disagree
19 with that.  We're just trying to
20 figure out if he's ever seen the
21 document or whether he went to the
22 meeting.  It sounds like the
23 answer to both questions is no,
24 but you should ask.

Page 109

1          MR. CIULLO:  In which case,
2  we need to stop using this
3  document.
4          MR. PIFKO:  That's not what
5  he said.  That's not what he said.
6          MR. CIULLO:  It's a
7  confidential document.  It could
8  have come from Allergan.  You did
9  not get permission from Allergan.
10 BY MR. PIFKO:
11     Q.   You said, "I assume the
12 meeting went forward."  Do you recall
13 saying that?
14     A.   Yes, I do.
15     Q.   Okay.  So you agree you had
16 this meeting, correct?
17         MR. NICHOLAS:  Object to the
18 form.
19         MR. CIULLO:  Objection.
20         MR. PIFKO:  Stop.  That's
21 all you need to say.  You guys,
22 stop, seriously.  You are
23 infecting the testimony.  I just
24 read off the realtime.  He said,

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 "I assume the meeting went
2 forward." I asked him, "Do you
3 agree?" He said, "Yes."
4 BY MR. PIFKO:
5    Q.   Okay, sir. Thank you.
6        MR. NICHOLAS: Then you
7 asked another question. I
8 objected to that because that's an
9 unfair question. That what -- I
10 objected to the second question,
11 Mark, not the first.
12 BY MR. PIFKO:
13    Q.   Okay. So you agree this
14 meeting went forward, correct?
15        MR. NICHOLAS: Objection.
16 Inappropriate question.
17        MR. CIULLO: Objection.
18        THE WITNESS: I believe I
19 said I assume it went forward.
20 BY MR. PIFKO:
21    Q.   Okay. Do you recall having
22 this PowerPoint presentation provided to
23 you in connection with this meeting?
24        MR. CIULLO: Objection.

Page 111

1    Asked and answered.
2        THE WITNESS: I again have
3 no recollection of the meeting
4 itself. So I don't know if I've
5 seen this document before or not.
6 BY MR. PIFKO:
7    Q.   Do you dispute that the
8 information provided in this document was
9 presented to you?
10        MR. NICHOLAS: Object to the
11 form of the question.
12        MR. CIULLO: Objection.
13        THE WITNESS: That would
14 have to assume that I was there.
15 And I just have no recollection of
16 the meeting.
17 BY MR. PIFKO:
18    Q.   Okay. We'll put this
19 document aside for now.
20        MR. PIFKO: I'll note my
21 objection that I think defendants'
22 counsel on both the phone and
23 AmerisourceBergen's counsel here
24 have infected and biased the

Page 112

1 witness's testimony by guiding him
2 on what to say in response to this
3 question. And you can't unring
4 that bell. If we have a dispute
5 about that --
6        MR. CIULLO: That's not true
7 at all. There's a protocol for
8 doing things and we have to follow
9 it.
10        MR. PIFKO: If we have a
11 dispute about this, you guys
12 screwed up the record. And now we
13 won't get a fair assessment of the
14 situation. You should have let me
15 to ask the questions that I needed
16 to ask. Anyway, let's move on.
17        MR. NICHOLAS: We'll
18 disagree with your
19 characterization for the record,
20 because I think it's inaccurate.
21 BY MR. PIFKO:
22    Q.   Have you heard of the idea
23 of a threshold?
24    A.   Yes.

Page 113

1    Q.   What's a threshold?
2    A.   A threshold is an internally
3 generated number that is going to trigger
4 further review of a customer's order.
5    Q.   Did AmerisourceBergen use
6 thresholds as part of its order
7 monitoring program?
8    A.   Yes.
9    Q.   How did AmerisourceBergen
10 use thresholds in its order monitoring
11 program?
12    A.   The -- I have to present it
13 in -- I can't present it in a couple
14 sentences. But all of the products that
15 we sell, all of the controlled substance
16 products that we sell to customers are
17 placed -- or at the time were in drug
18 families.
19        Thresholds were arrived by
20 way of -- thresholds were arrived through
21 analysis of the customer's purchasing
22 volume.
23        Averages were taken of the
24 amount of products and the dollars spent.

Page 114

1 And those averages were then used to help
2 to establish the actual customer
3 threshold for a particular product.
4 Q. And if you exceeded the
5 threshold under AmerisourceBergen's order
6 monitoring program, then what happened?
7 A. The order would be flagged
8 for review.
9 Q. And whose job was it to
10 review the order?
11 A. There were several. The
12 review started at the distribution center
13 for low risk products. High risk
14 products were forwarded to the diversion
15 control team at the corporate
16 headquarters, and those personnel
17 reviewed the order.
18 Q. Was there training provided
19 to the distribution center associates as
20 to what they were supposed to look at
21 when they were evaluating an order that
22 exceeded the threshold?
23 A. Yes.
24 Q. And what was the nature of

Page 115

1 that training?
2 A. Somewhere within these
3 documents is a PowerPoint that I believe
4 was centered on the distribution center
5 personnel.
6 Q. And was that an ongoing
7 training session that you would provide,
8 or how was that provided?
9 A. My -- my recollection is
10 that it was mandated annually, and then
11 obviously for new personnel coming
12 into -- into the position.
13 Q. As far as the definition of
14 a high risk product, was that something
15 that was clearly defined in the training?
16 A. Clearly defined to the
17 extent that the products were named, yes.
18 Q. Okay. And so, if something
19 was a high risk product and it exceeded
20 the threshold, then it would go to the
21 CSRA for further review?
22 A. Correct.
23 Q. And when we are talking
24 about this procedure, what was the time

Page 116

1 frame when this occurred? Was this
2 always a function of the order monitoring
3 program during your tenure?
4 A. Yes, it was.
5 Q. And this operated the same
6 way as long as you were in the diversion
7 control functions?
8 A. There were changes to some
9 of the programs. We talked earlier about
10 SAP and systems of that sort. I believe
11 the SAP component was rolled out at some
12 point during my tenure.
13 Q. Okay. Other than that
14 change, were there any other changes that
15 you were aware of during your tenure?
16 MR. NICHOLAS: Object to the
17 form.
18 THE WITNESS: No. None that
19 I'm aware of.
20 BY MR. PIFKO:
21 Q. Were customers informed of
22 what their thresholds were?
23 A. It was not our policy to
24 tell customers their thresholds.

Page 117

1 Q. Do you know why it was your
2 policy not to tell your customers their
3 thresholds?
4 A. Well, it would give the
5 customer the opportunity to try to
6 manipulate the system to their advantage.
7 Q. And you would not want
8 customers to manipulate the system to
9 their advantage, correct?
10 A. Correct.
11 Q. So by keeping the thresholds
12 within the exclusive knowledge of
13 AmerisourceBergen, you could -- that was
14 one way that you would prevent customers
15 from manipulating the system, is that
16 correct?
17 MR. NICHOLAS: Object to the
18 form.
19 THE WITNESS: One way, yes.
20 BY MR. PIFKO:
21 Q. Do you know if the DEA told
22 AmerisourceBergen not to disclose
23 thresholds to its customers?
24 A. I -- I don't know that they

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 said that.
2     Q.   If I told you that Chris
3 Zimmerman had said that, would you
4 disagree that that was something that the
5 DEA told the company?
6         MR. NICHOLAS:  Object to the
7     form.
8         THE WITNESS:  I don't know
9     the answer to that question.
10 BY MR. PIFKO:
11     Q.   I'll show you a document.  I
12 was trying to streamline the process
13 here.  Give me a second.
14         (Document marked for
15     identification as Exhibit
16     ABDC-Hazewski-5.)
17 BY MR. PIFKO:
18     Q.   I'm handing you what's
19 marked as Exhibit 5.
20         Tell me when you're done.
21     A.   Okay.
22     Q.   For the record, Exhibit 5 is
23 a couple page e-mail Bates labeled
24 ABDCMDL00285348 through 85350.

Page 119

1     A.   I'm done reviewing.
2     Q.   Okay.  Do you recall the
3 discussions reflected here in this
4 e-mail?
5     A.   I recall some discussions
6 about what it's alleged the other
7 wholesale distributor was doing.
8     Q.   Okay.  Well, let's look at
9 the -- the first page here.
10         MR. NICHOLAS:  When you say
11     the first page, do you mean from
12     the back or the front -- you
13     mean --
14         MR. PIFKO:  The front.  The
15     first page, the top of the --
16     285348.
17 BY MR. PIFKO:
18     Q.   Are you there?
19     A.   Yeah.
20     Q.   Okay.  In the middle is an
21 e-mail from Chris Zimmerman to Steve Mays
22 and you are copied.  Do you see that?
23     A.   Yes.
24     Q.   And he says, "All statements

Page 120

1 are correct."
2         He says, "One, it's not
3 illegal to divulge threshold levels.
4 Two, DEA has told us we should not
5 divulge threshold levels."
6         Do you see that?
7     A.   Yes.
8     Q.   Okay.  Do you have any
9 recollection that DEA told
10 AmerisourceBergen not to divulge
11 threshold levels?
12     A.   I had no discussions with
13 them where they said anything of that
14 sort.
15     Q.   Do you recall Mr. Zimmerman
16 communicating this to you?
17     A.   Not specifically other than
18 through this e-mail.
19     Q.   You agree that he did
20 communicate it to you in this e-mail?
21     A.   I'm copied on the e-mail, so
22 yes.
23     Q.   And then he says, "Three,
24 ABC's policy is not to divulge

Page 121

1 thresholds."  Do you see that?
2     A.   Yes.
3     Q.   Okay.  He then says, "Since
4 ABC's position can't get any worse."  Do
5 you see that?
6     A.   Yes.
7     Q.   Do you have any
8 understanding when he said this to you,
9 what he meant by that?
10     A.   I have no idea.
11     Q.   Okay.  He says, "My
12 recommendation would be to send a formal
13 letter to DEA outlining the issue and
14 requesting a formal opinion."
15         Do you see that?
16     A.   Yes.
17     Q.   Do you have any recollection
18 about whether a formal letter was ever
19 sent to the DEA about disclosing
20 threshold levels?
21     A.   I do not.
22     Q.   Okay.  It's your
23 understanding that the policy at ABDC has
24 always been not to divulge threshold

Page 122

1  levels?
2      A.   Yes.
3      Q.   You are not aware of any
4  change after this where they then said
5  you could divulge threshold levels to
6  customers?
7      A.   I am not aware of such a
8  change.
9      Q.   If there was a change, given
10  your role in the company, it's something
11  you would have been aware of, correct?
12         MR. NICHOLAS:  Object to the
13      form.  Go ahead.
14         THE WITNESS:  Yes.
15  BY MR. PIFKO:
16      Q.   Are you aware -- from time
17  to time was it the company's practice to
18  send formal letters to DEA asking for
19  their position on -- on certain issues?
20      A.   I wasn't involved in
21  composing letters of that kind.  I -- I
22  don't know if they communicated.  I'm
23  sure there's been questions asked but
24  beyond that I couldn't say.

Page 123

1      Q.   Okay.  Are you aware, other
2  than the discussion here about doing that
3  in this context, are you aware of any
4  discussion about doing that kind of thing
5  in any other context?
6      A.   No.
7         (Document marked for
8      identification as Exhibit
9      ABDC-Hazewski-6.)
10         (Document marked for
11      identification as Exhibit
12      ABDC-Hazewski-7.)
13  BY MR. PIFKO:
14      Q.   I'm going to hand you two
15  exhibits, what's marked as Exhibit 6 and
16  Exhibit 7.
17         For the record, Exhibit 6 is
18  a one-page e-mail Bates labeled
19  ABDCMDL00282490.
20         And Exhibit 7 is a document
21  that was attached to that, was produced
22  in native, Bates labeled ABDCMDL00282491.
23         Take a minute to review
24  those and let me know when you're done.

Page 124

1      A.   I've reviewed.
2      Q.   Okay.  Do you recall sending
3  e-mails to Walgreens people?
4      A.   Yes.
5      Q.   Okay.  This is an e-mail
6  dated April 8, 2014, from you to a whole
7  host of people at Walgreens.  Do you see
8  that?
9      A.   Yes.
10      Q.   Okay.  And you say, "Team
11  WAG, find attached some data that I
12  believe could be the basis for part of
13  our discussion.  Briefly, the first tab
14  is all Walgreens locations that had
15  Schedule II controlled substance order
16  lines flagged by the order monitoring
17  program, sorted largest (most lines) to
18  smallest.  We can discuss further
19  tomorrow."
20         Do you see that?
21      A.   Yes.
22      Q.   Do you agree that you sent
23  them the attached spreadsheet?
24      A.   Yes.

Page 125

1      Q.   If you look at that
2  spreadsheet, among, in addition to
3  disclosing the information that you
4  discuss in your e-mail.  If you look, one
5  of the columns is the threshold.
6         Do you see that?
7      A.   Yes.
8      Q.   And then it lists the
9  threshold for each location.  Do you see
10  that?
11      A.   Yes.
12      Q.   Is that correct?
13      A.   That's correct.
14      Q.   If it was against the
15  company's policy and the DEA told you not
16  to share thresholds, why were you sending
17  them to Walgreens?
18      A.   Well, the information that
19  was sent, and I believe the basis for
20  this message, was a request received from
21  Walgreens' pharmacy integrity unit, which
22  that unit are the people who are listed
23  on this e-mail.
24         Their pharmacy integrity

Highly Confidential – Subject to Further Confidentiality Review

Page 126

1 group are their version of our diversion
2 control team. So they monitored their
3 internal customer orders. And we worked
4 on a regular basis hand in hand with that
5 group with the -- obviously, the goal
6 jointly to help monitor the customer
7 orders generated by their stores.
8 They had made a request at
9 some point that orders submitted by their
10 stores that breach a threshold just be
11 canceled and not reviewed any further,
12 that they would not like those orders to
13 be filled.
14 So this -- I can't say this
15 for certain. But I believe the sending
16 of this information was in furtherance of
17 their request and our joint efforts to
18 work together to try to, you know,
19 achieve our goals.
20 Q. Was it a regular occurrence
21 for you to send data that included the
22 thresholds and order monitoring program
23 details to Walgreens?
24 A. A regular occurrence, no.

Page 127

1 Q. Did you do it on more than
2 one occasion?
3 A. This is the only one I
4 recall. I can't say for certain that
5 there were other occasions.
6 Q. Do you agree that, looking
7 back at Exhibit 7, it also states the
8 overage percentage for each store for the
9 item being listed?
10 A. Yes, I see that.
11 Q. And it provides the overage
12 in dosage units as well, correct?
13 A. I'm having trouble reading
14 that. But, yes, I see it.
15 Q. It's the column -- it's the
16 second-to-last column.
17 A. Yeah, I see it now.
18 Q. And Walgreens was a customer
19 of AmerisourceBergen's, correct?
20 A. Correct.
21 (Document marked for
22 identification as Exhibit
23 ABDC-Hazewski-8.)
24 BY MR. PIFKO:

Page 128

1 Q. I'm handing you what's
2 marked as Exhibit 8. For the record,
3 it's multiple page e-mail Bates-labeled
4 ABDCMDL00280818 through 822. Take a
5 minute to review that and let me know
6 when you're done.
7 A. Are these one document?
8 Q. You should only have one
9 copy. Maybe I inadvertently gave you
10 counsel's copy.
11 A. I see.
12 MR. BREWER: I'm sorry.
13 Could you please repeat the Bates
14 number?
15 MR. PIFKO: ABDCMDL00280818
16 through 280822.
17 MR. BREWER: Thank you.
18 THE WITNESS: I've reviewed.
19 BY MR. PIFKO:
20 Q. Okay. Do you recall the
21 discussion reflected in these e-mails?
22 A. Some. It seems at the
23 beginning of the e-mail thread, I wasn't
24 copied, but at some point I was.

Page 129

1 So from there forward, yes.
2 Q. You are copied at the top of
3 the e-mail, correct? On the -- on the
4 first page, 818?
5 A. Yes.
6 Q. And therefore, you received
7 all the information below, correct?
8 A. If that is how the e-mail
9 system works, then yes.
10 Q. Okay. What's the Walgreens
11 C2 playbook?
12 A. My understanding --
13 MR. BREWER: This is Matt
14 Brewer. Objection.
15 THE WITNESS: My
16 understanding is a -- a playbook
17 is essentially a listing of tasks
18 and the persons responsible for
19 those tasks when onboarding a
20 large customer similar to
21 Walgreens.
22 BY MR. PIFKO:
23 Q. Among other things, we
24 talked about the Form 590, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    A.   Yes.
2    Q.   That's something that you
3 get for new customers, correct?
4    A.   Correct.
5    Q.   It was your policy to get
6 that for new customers?
7    A.   It was.
8    Q.   As of 2007?
9    A.   I don't know at what point I
10 became aware of what a 590 was.  But I
11 believe there was a similar form in use
12 back then.
13    Q.   It is a long-standing
14 policy?
15    A.   Yes.
16    Q.   If you go to Page 280820.
17 It's those little numbers on the bottom
18 right-hand corner.  I'm asking you to go
19 to 280820.  Tell me when you're there.
20    A.   Yeah, I'm there.
21    Q.   Okay.  There's an e-mail at
22 the bottom from Steve Mays to Chris
23 Zimmerman dated March 28, 2013.  Do you
24 see that?

Page 131

1    A.   Yes.
2    Q.   Steve says:  "I don't think
3 we ever considered getting 590s for every
4 account."
5         Do you see that?
6    A.   Yes.
7    Q.   Do you have an understanding
8 about why he's saying despite the
9 company's policy about 590, he doesn't
10 want 590 --
11         MR. BREWER:  Objection.
12         MR. PIFKO:  I'm not even
13    done with the question.
14 BY MR. PIFKO:
15    Q.   He doesn't want 590s for
16 every account?
17         MR. NICHOLAS:  I'll object
18    to the form of the question.
19    You're reading the first sentence
20    of a much longer e-mail and I
21    believe the question is not --
22         MR. PIFKO:  Okay.  Again,
23    that's a speaking objection --
24    that's a speaking objection.  You

Page 132

1 can say form.  You can say your
2 foundational kind of objection.
3 You don't really need to say that,
4 but you can say that.  But you
5 cannot do what you're doing.
6         MR. NICHOLAS:  Well, I'll
7    object to the form of the question
8    for the reason that I stated.
9         MR. PIFKO:  Okay.
10    Understood.  Form objection is
11    noted for all defendants.  Thank
12    you.
13         THE WITNESS:  So can you
14    repeat your question?
15 BY MR. PIFKO:
16    Q.   Yeah, I know it's hard to
17 answer a question when all these lawyers
18 are speaking and explaining things and
19 making arguments.
20         MR. NICHOLAS:  We just don't
21    want things taken out of context.
22         For the record, I know
23    you're -- you're focused on
24    getting a clean record.  And so am

Page 133

1    I.
2 BY MR. PIFKO:
3    Q.   I'm going to ask you the
4 question again.
5         You see the first sentence
6 here.  Steve says to Chris Zimmerman:  "I
7 don't think we ever considered getting
8 590s for every account."
9         Do you see that?
10    A.   Yes.
11    Q.   Okay.  And so my question
12 is, do you have an understanding as to
13 why Steve is saying that to Chris despite
14 the company's policies concerning
15 obtaining 590s for new customers?
16         MR. NICHOLAS:  Object to the
17    form of the question.
18         MR. BREWER:  I'll join.
19         THE WITNESS:  I don't know
20    why Steve would -- was saying what
21    he said.
22 BY MR. PIFKO:
23    Q.   That seems inconsistent with
24 the company's policy, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    MR. NICHOLAS: Object to the
2 form of the question.
3    THE WITNESS: My
4 recollection is that as it applied
5 to chain customers, that
6 historically 590s were not gotten
7 for every individual store listed
8 in the chain.
9    Usually the pertinent
10 information was applied to someone
11 who was responsible for overseeing
12 that customer's individual chain
13 locations, meaning within that
14 organization.
15    But -- so in the case of
16 Walgreens for example, there were,
17 I believe, 8,000 plus pharmacies.
18    So that perhaps is an
19 explanation for why Steve said
20 what he did.
21 BY MR. PIFKO:
22    Q.   He says instead -- Steve
23 says instead he's going to have -- he
24 says, "I have Ed working on a one-page

Page 135

1 abbreviated 590."
2    Do you see that?
3    A.   Yes.
4    Q.   Do you recall working on
5 that?
6    A.   I do not.
7    Q.   Another thing he says here,
8 a little bit in the middle paragraph
9 here, "One thing we need immediately on
10 or before April 9th, is the de-identified
11 dispensing data for Oxycodone for the 225
12 initial stores."
13    Do you see that?
14    A.   Yes.
15    Q.   If you go to the first page
16 of the e-mail, there's another comment
17 about where Steve is writing to you. And
18 he's again asking to ask Walgreens for
19 the de-identified dispensing data per
20 store.
21    Do you see that?
22    A.   Yes.
23    Q.   Do you know why he's asking
24 for that data?

Page 136

1    MR. NICHOLAS: I'll object
2 to the form of the question and
3 the jumping around in a -- in a
4 lengthy e-mail chain. And picking
5 out a sentence here and there.
6    Go ahead.
7    THE WITNESS: The question
8 is why he would ask for that data?
9 BY MR. PIFKO:
10    Q.   Why did you need that data?
11    MR. NICHOLAS: Object to the
12 form.
13    THE WITNESS: As part of our
14 onboarding due diligence process,
15 we wanted to get an idea of what
16 type of volume particular
17 locations do as compared to other
18 Walgreens stores.
19 BY MR. PIFKO:
20    Q.   Was it your general practice
21 to get dispensing data for Oxycodone from
22 any -- any new customer?
23    MR. NICHOLAS: Object to the
24 form.

Page 137

1    THE WITNESS: We would
2 not -- we would ask the question
3 as to what their usage was. We
4 wouldn't necessarily get
5 dispensing data unless we felt it
6 was necessary to clarify the
7 numbers they are giving us.
8 BY MR. PIFKO:
9    Q.   Okay. So you would ask --
10 it was your general practice to ask for
11 it on occasion if you -- if you needed
12 clarity on dispensing practices from any
13 customer?
14    A.   Correct.
15    Q.   And why was it that you
16 needed it for Walgreens?
17    A.   Why -- I'm sorry, can you
18 repeat?
19    Q.   You needed -- you needed
20 clarity about data from Walgreens?
21    A.   Yeah. Given the number of
22 locations, we wanted to make certain we
23 had a good grasp of who was doing what in
24 terms of volume.

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    Q.   And to your knowledge, was
2  that data provided to you?
3    A.   To my knowledge, it was,
4  yes.
5    Q.   Do you know how far back it
6  went, what was the time period it
7  covered?
8    A.   I do not know.
9    Q.   The next sentence here --
10  we're on Page 280820 -- Steve is saying
11  to Chris:  "I'm trying to think of
12  everything we can do to prevent having a
13  bunch of orders reported to DEA and
14  held."
15       Do you see that?
16    A.   Yes.
17    Q.   Do you know why Steve is
18  trying to implement practices at
19  AmerisourceBergen to avoid reporting
20  Walgreens orders to DEA and holding them?
21       MR. NICHOLAS:  Object to the
22    form of the question.
23       THE WITNESS:  I don't know
24    why he made that statement.

Page 139

1  BY MR. PIFKO:
2    Q.   Do you recall discussing
3  with Steve or Chris upon receiving this
4  e-mail the idea that you wanted to avoid
5  reporting orders from Walgreens to DEA?
6       MR. NICHOLAS:  Object to the
7    form of the question.
8       MR. BREWER:  I'll join.
9       THE WITNESS:  I don't recall
10    any such conversation.
11  BY MR. PIFKO:
12    Q.   Did you ever speak up upon
13  receiving this e-mail and say, why, why
14  are we going to try to avoid reporting
15  orders to DEA for Walgreens?
16       MR. NICHOLAS:  Object to the
17    form.
18       MR. BREWER:  I'll join.
19       THE WITNESS:  Not to my
20    recollection.
21  BY MR. PIFKO:
22    Q.   Do you think it's
23  appropriate to implement policies to
24  prevent having a bunch of orders reported

Page 140

1  to DEA for any customer?
2       MR. NICHOLAS:  Object to the
3    form of the question.
4       THE WITNESS:  We only know
5    the context of what's in the
6    e-mail.  I just don't know what
7    discussions Chris and Steve may
8    have had outside of my presence.
9       I just can't answer that
10    question.
11  BY MR. PIFKO:
12    Q.   I'm not asking about that.
13  That wasn't my question about this --
14  that statement.
15       I asked you if you think
16  it's appropriate to implement policies to
17  prevent having orders reported to DEA for
18  any customer.
19       MR. NICHOLAS:  Object to the
20    form of the question.
21       THE WITNESS:  It -- it's
22    just simply not our policy to do
23    anything that would divulge that
24    kind of information or --

Page 141

1    certainly we have never undertaken
2    any sort of action that would --
3    that was geared towards preventing
4    a customer from hitting the order
5    monitoring program.  It's simply
6    not done.
7  BY MR. PIFKO:
8    Q.   You see here the next
9  sentence on that same page, 280820, it
10  says:  "The more data Walgreens can share
11  with us the better off we will all be."
12    A.   Yes, I see that.
13    Q.   Do you have an understanding
14  about what that's about?
15       MR. NICHOLAS:  Object to the
16    form.
17       MR. BREWER:  I'll join.
18       THE WITNESS:  No, I can only
19    suggest that it -- it's just --
20    obviously onboarding any customer,
21    we want to know as much about --
22    in fact, we're mandated to know
23    your customer through our due
24    diligence program.  And I see this

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  as being part of that.
2  BY MR. PIFKO:
3      Q.   When you talk about being
4  mandated to know your customer, what are
5  you supposed to know about your customer
6  through that mandate?
7      A.   Everything there is to know
8  about a pharmacy customer, including
9  their business model, who they service,
10 obviously their license numbers, their --
11 every -- every facet of what you would
12 expect to know from a business partner,
13 you try to gather through that process.
14     Q.   You'd want to know about all
15 the red flags of diversion that we
16 discussed in your presentation, if those
17 were potentially occurring at any
18 customer, correct?
19          MR. NICHOLAS:  Object to the
20     form.
21          MR. BREWER:  I'll join.
22          THE WITNESS:  If someone
23     reported indications of diversion,
24     we would treat that information

Page 143

1      regardless of who the customer is,
2      the same we would for any
3      customer.
4  BY MR. PIFKO:
5      Q.   And you'd want to know, like
6  we talked about, if there were people
7  using drugs at the facility.  Is that
8  something that you'd want to know?
9          MR. NICHOLAS:  Object to the
10     form.
11          Go ahead.
12          THE WITNESS:  Well, I would
13     want to know it, yes.  And I
14     presume those responsible for
15     monitoring such things would want
16     to know it.
17 BY MR. PIFKO:
18     Q.   How about if the pharmacy is
19 selling pills to people who don't have
20 valid prescriptions?  Is that something
21 that you'd want to know?
22          MR. NICHOLAS:  Object to the
23     form.
24          THE WITNESS:  Yes.  I don't

Page 144

1      know how we would obtain that kind
2      of information, but yeah.
3  BY MR. PIFKO:
4      Q.   And through the
5  know-your-customer mandate, that's the
6  kind of information that you'd want to
7  know through that process, correct?
8          MR. NICHOLAS:  Object to the
9      form.
10          THE WITNESS:  I don't know
11     the intention of that is to get
12     that granular, that is at the
13     point of onboarding, but it's
14     important information, sure.
15 BY MR. PIFKO:
16     Q.   You definitely want to know
17 if that was occurring at a customer's
18 location, if you could though, right?
19     A.   Yes.
20     Q.   And how about if they had
21 unreported theft occurring at their
22 pharmacy?  Would you want to know about
23 that?
24     A.   Yes.  But I have to add that

Page 145

1  everything that you're mentioning are
2  kind of out of the purview of the
3  wholesale distributor.  There are other
4  people in the closed system that are
5  responsible for different areas.  And I
6  think this goes beyond what's required of
7  a wholesale distributor.
8      Q.   Would you want to ask if
9  those kinds of activities are occurring
10 at your customers' locations as part of
11 your due diligence?
12          MR. NICHOLAS:  Object to the
13     form.
14          THE WITNESS:  If there is
15     additional indications that would
16     point in that direction, then the
17     question would need to be asked.
18          MR. NICHOLAS:  Mark, is it a
19     good time for a break?
20          MR. PIFKO:  Yeah, just one
21     more quick thing.
22          MR. NICHOLAS:  We're at the
23     lunch hour.
24          (Document marked for

Highly Confidential – Subject to Further Confidentiality Review

Page 146

1    identification as Exhibit
2    ABDC-Hazewski-9.)
3  BY MR. PIFKO:
4    Q.  Are you aware that Walgreens
5  paid an $80 million fine for violating
6  the Controlled Substances Act?
7    MR. BREWER:  Objection.
8    THE WITNESS:  I'm aware
9    through media reports, yes.
10 BY MR. PIFKO:
11   Q.  Is that something that you
12 discussed when you were doing business
13 with them?
14   MR. NICHOLAS:  Object to the
15   form.
16   MR. BREWER:  I'll join.
17   THE WITNESS:  Those -- I'm
18   sure there were discussions of
19   that sort, but not at my level.
20 BY MR. PIFKO:
21   Q.  I've handed you what's
22 marked as Exhibit 9.  Do you see it's a
23 press release from the United States
24 Attorney's Office for the Southern

Page 147

1  District of Florida announcing Walgreens'
2  payment of an $80 million fine for civil
3  penalties under the Controlled Substance
4  Act?
5    Do you see that?
6    A.  Yes.
7    Q.  It's dated June 11, 2013.
8    Do you see that?
9    A.  Yes.
10   Q.  And do you agree that this
11 announcement is after the e-mails in
12 March of 2013 that we were just
13 discussing in Exhibit 8.  Agree?
14   A.  Yes.
15   MR. BREWER:  Do you have a
16   Bates number for this exhibit?
17   MR. PIFKO:  No.  It's just a
18   press release you can download it
19   from the United States Department
20   of Justice.
21 BY MR. PIFKO:
22   Q.  Were you aware that the
23 activities discussed in Exhibit 9 were
24 occurring at Walgreens facilities?

Page 148

1    MR. NICHOLAS:  I'll object
2  to the form of the question.
3    MR. BREWER:  Objection.
4    MR. NICHOLAS:  He's never
5  seen the document, and he said
6  there were no discussions at his
7  level about these issues.
8    MR. PIFKO:  Again, speaking
9  objections.
10   MR. NICHOLAS:  Well, you
11 can't --
12   MR. PIFKO:  Form,
13 foundation.  Form, foundation.
14   MR. NICHOLAS:  You can't
15 just ask misleading questions.
16 Come on.  I object.
17   MR. BREWER:  I'll also
18 object to the form and foundation.
19   MR. NICHOLAS:  Go ahead.
20   THE WITNESS:  Again, can you
21 could you repeat?
22 BY MR. PIFKO:
23   Q.  Well, let's just -- let's be
24 specific here.  Let's go to Page 2.

Page 149

1  First paragraph, part way through.
2  First, "The Jupiter distribution center
3  failed to comply with the DEA regulations
4  that required it to report to the DEA
5  suspicious prescription drug orders that
6  it received from Walgreens' retail
7  pharmacies."
8    Do you see that?
9    A.  Yes.
10   Q.  Were you aware that the
11 Jupiter distribution center failed to
12 comply with suspicious order
13 requirements?
14   MR. NICHOLAS:  I'll object
15 to the form.  The -- I've never
16 seen this document before, but you
17 can't ask a question that
18 misleading.  It says "Walgreens'
19 alleged failure."  You have to at
20 least be fair in asking --
21   MR. PIFKO:  It does not say
22 that.  The Jupiter -- I read the
23 quote.  "The Jupiter distribution
24 center failed to comply with DEA

Page 150

1  regulations that required it to
2  report to the DEA suspicious
3  prescription drug orders that it
4  received from Walgreens' retail
5  pharmacies."
6      MR. NICHOLAS: Can you read
7  the next --
8      MR. PIFKO: I'm reading that
9  quote.
10     MR. NICHOLAS: Read the
11 first -- read the first four --
12     MR. PIFKO: I'm reading that
13 quote.
14     MR. NICHOLAS: -- five words
15 of the next sentence.
16     MR. PIFKO: Stop. Stop.
17 Stop. Stop. Form, foundation.
18 That's all you are allowed to do
19 here. Okay. Stop.
20     MR. NICHOLAS: You just --
21     MR. PIFKO: Stop. We're
22 going to -- I'm going to bring him
23 back. I'm going to bring all your
24 witnesses back. I'm going to

Page 151

1  bring Mr. Zimmerman and Mr. May
2  back too, because you coached them
3  the whole time. Okay. We're not
4  doing this.
5      MR. NICHOLAS: If you ask
6  questions --
7      MR. PIFKO: You are -- you
8  are biasing the testimony. Stop.
9      MR. NICHOLAS: You're --
10     MR. PIFKO: If you want to
11 redirect, you can direct examine
12 him when it's your turn. Right
13 now, all you can say is form and
14 foundation. And absent that, if
15 you can't do that, you need to
16 stop defending him because you are
17 violating both the local rules and
18 the requirements in this case.
19     So you need to tone it down.
20 And you need to stop this right
21 now. Okay.
22     MR. NICHOLAS: You really
23 can't tell me to stop defending
24 him. It's not your place to do

Page 152

1  that.
2      MR. PIFKO: You're
3  apparently not able to comply with
4  the rules. And we need an
5  attorney who can. Okay. I'm
6  serious. I'm dead serious.
7      MR. NICHOLAS: You can't
8  tell me to stop defending him.
9      MR. PIFKO: Someone else at
10 Reed Smith can sit in here and do
11 it, because you apparently cannot
12 do it and comply with the law.
13 Okay.
14     MR. NICHOLAS: If you ask
15 questions that are
16 inappropriate --
17     MR. PIFKO: You can say
18 form, foundation --
19     MR. NICHOLAS: -- I will
20 continue to object.
21     MR. PIFKO: -- and you can
22 state your objections, but that's
23 all you can do. You cannot
24 provide speaking objections.

Page 153

1  Okay. If you can't do that you're
2  not going to be allowed to
3  participate in this case. We're
4  going to put all your deposition
5  transcripts in front of the court,
6  and we're going to show what you
7  did.
8      MR. NICHOLAS: That would be
9  okay.
10     MR. PIFKO: Okay.
11     MR. NICHOLAS: That really
12 would --
13     MR. PIFKO: Because you're
14 biasing the testimony. You've
15 been doing it all day today. And
16 you did it at the last two
17 depositions that you did. Okay.
18     MR. NICHOLAS: I don't think
19 I've been doing it all day --
20     MR. PIFKO: Apparently
21 that's your practice, and I don't
22 appreciate it.
23     MR. NICHOLAS: -- or
24 previously, but I've made my

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1 objection. I stand by my
2 objection. And now we can see if
3 he can answer the question.
4 　　　MR. PIFKO: You're clearly
5 disrupting the --
6 　　　MR. BREWER: I object to
7 form and foundation as well. I'm
8 Adam Brewer.
9 　　　MR. PIFKO: Again, people on
10 the phone, you don't need to join
11 in the objection. The orders in
12 this case are very clear that one
13 objection by any counsel is
14 sufficient for all defendants.
15 Okay. All you're doing when you
16 do that is disrupting the
17 deposition. Clearly that's your
18 intent.
19 BY MR. PIFKO:
20 　　Q.　Okay. I'm reading you
21 again, sir. I'm sorry that everybody is
22 disrupting this process here. But I'm
23 trying to ask you questions, and I'm
24 unable to do so without people trying to

Page 155

1 tell you will what to say and
2 interrupting the flow of the questioning.
3 So I'm going to try again here.
4 　　　Okay. We're on the second
5 page here.
6 　　　It says: "First, the
7 Jupiter distribution center failed to
8 comply with DEA regulations that required
9 it to report to the DEA suspicious
10 prescription drug orders that it received
11 from Walgreens' retail pharmacies."
12 　　　Do you see that?
13 　　A.　Yes, I do.
14 　　　MR. NICHOLAS: Object to the
15 form of the question and
16 suggestion that anyone is trying
17 to tell anyone what to say.
18 　　　Go on.
19 BY MR. PIFKO:
20 　　Q.　Were you aware that the
21 Jupiter distribution center failed to
22 comply with DEA regulations?
23 　　　MR. NICHOLAS: Object to the
24 form and the foundation.

Page 156

1 　　　THE WITNESS: In or around
2 the time this press release was
3 released, I became aware of it.
4 BY MR. PIFKO:
5 　　Q.　How did you become aware of
6 it?
7 　　A.　Through reading similar
8 press releases from various agencies.
9 　　Q.　When you were onboarding
10 Walgreens as a customer, did you
11 undertake any effort to ensure that
12 Walgreens was complying with DEA
13 regulations?
14 　　　MR. NICHOLAS: Object to the
15 form.
16 　　　THE WITNESS: I don't know
17 at that time whether or not there
18 were suspensions of their
19 licenses. I just don't have
20 enough information to be able to
21 say.
22 BY MR. PIFKO:
23 　　Q.　All I'm asking you is if you
24 attempted to obtain information that

Page 157

1 would allow you to know if Walgreens was
2 complying with DEA regulations.
3 　　　MR. NICHOLAS: Object to the
4 form.
5 　　　THE WITNESS: I have no
6 specific recollection of that.
7 BY MR. PIFKO:
8 　　Q.　Let's go to the next
9 paragraph, next full paragraph. It says
10 "second" on there.
11 　　　"Second, the six retail
12 pharmacies in Florida that received the
13 suspicious drug shipments from the
14 Jupiter distribution center in turn
15 filled customer prescriptions that they
16 knew or should have known were not for
17 legitimate medical use."
18 　　　Do you see that?
19 　　A.　Yes.
20 　　Q.　Were you aware that
21 Walgreens was sending prescriptions to
22 pharmacies who were then filling
23 prescriptions that they knew were not for
24 legitimate medical use?

Page 158

1    MR. NICHOLAS: Objection to
2  the form and to the foundation of
3  this question -- of this question
4  and of this line of questions.
5    Go ahead.
6    THE WITNESS: At some point
7  I became aware from reading the
8  press releases concerning this
9  matter.
10 BY MR. PIFKO:
11   Q.  In onboarding Walgreens as a
12 customer, did you make any effort to
13 learn about whether they were -- its
14 pharmacies were filling prescriptions
15 that they knew or should have known were
16 not for legitimate medical use?
17   MR. NICHOLAS: Object to the
18  form and foundation.
19   THE WITNESS: I don't recall
20  any specific conversations
21  concerning that matter with
22  Walgreens.
23 BY MR. PIFKO:
24   Q.  Did you attempt to learn

Page 159

1  that information?
2    MR. NICHOLAS: Object to the
3   form and the foundation.
4    THE WITNESS: Me personally,
5   no.
6  BY MR. PIFKO:
7    Q.  Do you know if anyone else
8  did?
9    MR. NICHOLAS: Object to the
10   form --
11   THE WITNESS: I don't know.
12   MR. NICHOLAS: -- and the
13   foundation.
14   MR. PIFKO: All right.
15  We'll take a break now.
16   THE VIDEOGRAPHER: Going off
17  record. The time is 12:38.
18     - - -
19   (Lunch break.)
20     - - -
21   THE VIDEOGRAPHER: We are
22  going back on the record.
23  Beginning of media file Number 3.
24  The time is 1:19.

Page 160

1  BY MR. PIFKO:
2    Q.  Welcome back.
3    A.  Thank you.
4    (Document marked for
5   identification as Exhibit
6   ABDC-Hazewski-10.)
7  BY MR. PIFKO:
8    Q.  For the record, Exhibit
9  Number 10 is Bates labeled
10 ABDCMDL00278509 through 00278513.
11   It is a series of e-mails.
12 Take a minute to review it and let me
13 know when you're ready.
14   A.  I'm done reviewing.
15   Q.  Okay. If you go to the
16 second to last page. 278512.
17   Sorry to make you jump back
18 and forth from pages, but the top of that
19 e-mail is at the very, very bottom of the
20 prior page, if you just fold it over.
21   You see it's an e-mail from
22 Chris Zimmerman sent Wednesday, March 27,
23 2013, to Steve Mays. And then you go to
24 Page 278512, and you see that you're

Page 161

1  copied there. Do you see that?
2    A.  I do.
3    Q.  Okay. The subject is C2
4  hyper-accelerated Perrysburg. Do you see
5  that?
6    A.  I do.
7    Q.  Okay. At the very bottom of
8  this page it's an e-mail from John
9  Trippe. Do you know who that is?
10   A.  I know John Trippe, yes.
11   Q.  Okay. Who is he?
12   A.  I -- I don't know his
13 position. I just know him as an
14 acquaintance.
15   Q.  Okay. You know him from
16 working at the company or just know him
17 from the community?
18   A.  From working at the company.
19   Q.  So he writes to -- a set of
20 e-mails that's called The Walgreens
21 General Distribution. Do you see that?
22   A.  Yes.
23   Q.  Okay. Do you know if you
24 were among the people who would have

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  received the Walgreens general
2  distribution?
3      A.   I don't believe I was.
4      Q.   Okay.  Well, anyway he
5  writes to that group.  He says, "So what
6  would you call the Schedule II controlled
7  substances accelerated Walgreens
8  Perrysburg plan?  The C2
9  hyper-accelerated Perrysburg plan.  You
10 got it.  Walgreens called late yesterday
11 afternoon and wants us to take on the
12 attached list of 225 Walgreens accounts
13 next week."
14      Do you see that?
15     A.   Yes.
16     Q.   Were you aware that the
17 company was rushing to take on these 225
18 Walgreens accounts?
19     MR. NICHOLAS:  Object to the
20     form of the question.
21     THE WITNESS:  I was not
22     aware of this communication, no.
23 BY MR. PIFKO:
24     Q.   Okay.  Well, you are -- you

Page 163

1  are -- through being copied on the upper
2  e-mail, you did receive this, correct?
3      A.   Yes.
4      Q.   Do you recall discussing the
5  hyper-accelerated Perrysburg plan?
6      A.   I do not.
7      Q.   Go to the next e-mail up.
8  Steve writes to Jim Jackson, and that's
9  where he copies you as well.  Well,
10 actually I can't see who's copied on the
11 next e-mail.  But he's writing to -- it
12 appears to be Jim Jackson, and he's
13 copied on the above e-mail to you.
14      He says, "Jim, can we
15 discuss these accounts when you get an
16 opportunity?"
17      Do you know who Jim Jackson
18 is?
19     A.   I know who he is, yes.
20     Q.   Who is he?
21     A.   He's -- I think he is a vice
22 president.  I honestly don't know
23 specifically what he does, which is not a
24 criticism.  But I know who he is.

Page 164

1      Q.   Okay.  He's not in a CSRA
2  function, is he?
3      A.   He is not.
4      Q.   Okay.  So Steve says, "I'm
5  concerned that these are the high risk
6  accounts that Cardinal Health wants to
7  dump ASAP, so I want to make sure that we
8  have them sized properly and get the
9  correct thresholds set."
10      Do you see that?
11     A.   I do.
12     Q.   And then that's when Chris
13 also chimes in and copies you.
14      "We should also put the
15 sales staff on alert in the area where
16 these stores are in case we have to have
17 them go in and do a 590."
18      Do you see that?
19     A.   Chris wrote that?
20     Q.   Yeah, Chris Zimmerman.
21     A.   I'm sorry.  Can you tell me
22 what page?
23     Q.   It's the part, you're going
24 to look at the bottom of 278511 and it

Page 165

1  continues on the next page.
2      A.   All right.
3      MR. NICHOLAS:  While you are
4      doing this, this has nothing to
5      do -- generally when you read from
6      these -- these e-mails, and this
7      is for the record, so that we have
8      a nice clean record.  You read,
9      "I'm concerned that these are the
10     high risk accounts that CAH," and
11     so forth.
12      I think you need -- you said
13     Cardinal Health.  I think you need
14     to say what it actually says on
15     the paper if you're going to
16     purport to read what's on the
17     paper, so you need to say CAH.
18     MR. PIFKO:  You can make an
19     objection.
20     MR. NICHOLAS:  Well, I'm
21     just -- this isn't -- this is just
22     so we have a cleaner record going
23     forward.
24     MR. PIFKO:  I think it's a

Page 166

1   cleaner record when you say what
2   the actual thing is.
3        MR. NICHOLAS:  Well, no, no,
4   no.  The actual thing is what's
5   written on the piece of paper.  So
6   I think you need to do that.  And
7   that's -- that's what I'll ask you
8   to do going forward.
9        THE WITNESS:  What was the
10  question?
11       MR. PIFKO:  Exactly.  More
12  interruptions that disrupt the
13  deposition.
14       MR. NICHOLAS:  No need for
15  the commentary.  I'm trying to
16  make a clean record.
17       MR. PIFKO:  You're talking
18  about making a clean record.  I'm
19  making a clean record that you're
20  continuing to disrupt the record
21  with unnecessary discussion.
22  BY MR. PIFKO:
23       Q.   Okay.  Do you know what CAH
24  stands for?  Does that stand for Cardinal

Page 167

1   Health?  Is that an abbreviation that's
2   used for Cardinal Health?
3        A.   Yes.
4        Q.   So when I say CAH, you
5   understand that means Cardinal Health,
6   correct?
7        A.   I do.
8        Q.   Okay.  So do you recall
9   there being a discussion about concerns
10  that these were accounts that Cardinal
11  Health didn't want because they were high
12  risk?
13       A.   No discussions that I
14  participated in.
15       Q.   Okay.  You were a recipient
16  of this e-mail, correct?
17       A.   Yes.
18       Q.   You don't recall when you
19  received this e-mail being concerned that
20  the company was putting itself at risk by
21  taking on accounts that maybe Cardinal
22  Health didn't want?
23       MR. NICHOLAS:  Object to the
24  form.

Page 168

1        THE WITNESS:  Again, I was
2   not involved in any discussions of
3   that sort about those accounts.
4   BY MR. PIFKO:
5        Q.   When you received this
6   e-mail, did you do any investigation into
7   these accounts to determine what Steve
8   was talking about, about these being high
9   risk accounts?
10       MR. NICHOLAS:  Object to the
11  form.
12       THE WITNESS:  I did not.
13  BY MR. PIFKO:
14       Q.   If these were high risk
15  accounts that Cardinal Health didn't want
16  to do business with anymore, is that
17  something that you would have liked to
18  have known?
19       MR. NICHOLAS:  Object.
20  BY MR. PIFKO:
21       Q.   As a diversion control
22  officer for the company?
23       MR. NICHOLAS:  Objection.
24  Form and foundation.

Page 169

1        THE WITNESS:  Well, I think
2   Steve said he was concerned that
3   they might be.  I don't know to
4   what extent it was ever determined
5   that was in fact true.
6   BY MR. PIFKO:
7        Q.   Well, if it was true, was it
8   something that you'd want to know?
9        MR. NICHOLAS:  Objection to
10  form, foundation.  Hypothetical.
11       THE WITNESS:  I trusted
12  information that would have been
13  ferreted out through the due
14  diligence process.
15  BY MR. PIFKO:
16       Q.   Okay.  He says, "I'm
17  concerned that these are the" -- "the
18  high risk accounts that Cardinal Health
19  wants to dump."
20       Do you have any idea about
21  why Steve might have known that there
22  were high risk accounts that Cardinal
23  wanted to dump?
24       MR. NICHOLAS:  Objection.

Page 170

1    Form.  Foundation.
2         THE WITNESS:  I do not know.
3  BY MR. PIFKO:
4    Q.   Did you ever communicate
5  with your counterparts at Cardinal
6  Health?
7         MR. NICHOLAS:  Object to the
8    form.  Ever?
9         THE WITNESS:  I've had
10   discussions with people at
11   Cardinal Health.  Not specifically
12   about this.
13  BY MR. PIFKO:
14   Q.   Who are your counterparts at
15  Cardinal Health?
16        MR. NICHOLAS:  Object to the
17   form.
18        THE WITNESS:  Currently I
19   have no counterparts at Cardinal
20   Health.
21  BY MR. PIFKO:
22   Q.   Fair enough.  During the
23  time when you were an executive in the
24  diversion control function for

Page 171

1  AmerisourceBergen, do you know who your
2  counterparts at Cardinal were?
3    A.   Well, number one, I'd like
4  to correct the executive part.  I'm far
5  from an executive.
6         I didn't have a specific
7  person that I communicated with regularly
8  at Cardinal Health.
9    Q.   Have you heard of Steve
10  Reardon?
11   A.   I've heard the name, yes.
12  I've met him.
13   Q.   Okay.  So that's someone
14  you've communicated with on occasion?
15   A.   No.  I've met him.  I can't
16  say that we've communicated on occasion.
17   Q.   Where did you meet him?
18   A.   Industry functions.
19   Q.   Can you think of anyone else
20  in the diversion control function at
21  Cardinal that you met?
22   A.   There's one person whose
23  name escapes me.  But if there was anyone
24  who I would have communicated with, it

Page 172

1  would have been him, but I can't provide
2  a name.
3    Q.   So you never spoke with
4  anyone at Cardinal about high risk
5  Walgreens accounts?
6    A.   I did not.
7    Q.   You don't recall Steve
8  telling you what high risk Walgreens
9  accounts there might be that Cardinal
10  had?
11        MR. NICHOLAS:  Objection.
12   Asked and answered.
13        Go ahead.
14        THE WITNESS:  I do not.
15  BY MR. PIFKO:
16   Q.   If you go to the first page
17  of Exhibit 10, Steve talks about reaching
18  out to Reardon on the bottom.
19        Do you see that?
20   A.   Yes.
21   Q.   Do you remember him ever
22  talking about reaching out to Steve
23  Reardon?
24   A.   No, I don't.

Page 173

1    Q.   He also says, "I'm afraid
2  some higher level Cardinal guys might be
3  looking for work."
4         What -- is that something
5  that you're familiar with?
6    A.   I have no idea what that
7  refers to.
8    Q.   The next e-mail up, Chris
9  tells Steve to ask Mapes.
10        Do you see that?
11   A.   Yes.
12   Q.   Do you know who Mapes is,
13  Mike Mapes?
14   A.   Mike Mapes, yes.
15   Q.   Who was he?
16   A.   He was a former DEA official
17  that did consulting work for
18  AmerisourceBergen.
19   Q.   So at this time, he was a
20  consultant for AmerisourceBergen?
21   A.   I don't know the time span
22  that he served.  But I know he was a
23  consultant for AmerisourceBergen.
24   Q.   Did you ever interact with

Page 174

1  Mr. Mapes when he was a DEA agent?
2      A.   Not when he was with DEA,
3  no.
4      Q.   Are you aware that he had
5  interactions with the company as a DEA
6  agent?
7      A.   Yes, I am aware.
8      Q.   And then he became a paid
9  consultant for AmerisourceBergen?
10     A.   After his career, yes.
11     Q.   Looking at the discussion on
12  the first page, do you have any idea
13  about why they wanted to talk to DEA
14  about this discussion concerning
15  Walgreens?
16     A.   No, I have no idea.
17     Q.   I want to go back to -- and
18  you agree when this says C2, that means a
19  Scheduled II controlled substance,
20  correct?
21     A.   Correct.
22     Q.   That's a common way of
23  using -- of talking about Schedule II
24  controlled substance by just abbreviating

Page 175

1  it C2, correct?
2      A.   Yes.
3      Q.   Let's go back to the Actavis
4  document.  As I'm sure you know, we've
5  since gotten permission to discuss that
6  document.
7          MR. NICHOLAS:  Did you say
8      you just got permission to discuss
9      the document?
10         MR. PIFKO:  Yeah.  Sterling
11     e-mailed with their counsel.
12         MR. NICHOLAS:  Is there
13     someone on the line to confirm it?
14     Zach are you there?
15         MR. CIULLO:  Yeah, this is
16     Zach -- this is Zach Ciullo.  I
17     can confirm.
18         MR. PIFKO:  Thank you Zach.
19  BY MR. PIFKO:
20     Q.   Do you have that in front of
21  you?
22     A.   Yeah.
23     Q.   Which exhibit is that?
24     A.   Four.

Page 176

1      Q.   Looking at Exhibit 4 -- as a
2  general matter, do you recall meeting
3  with any other manufacturers to discuss
4  suspicious order monitoring programs?
5          MR. CIULLO:  Objection to
6      form.
7          THE COURT REPORTER:  If I
8      could ask if they could identify
9      themselves.
10         MR. CIULLO:  Zachary Ciullo.
11         THE COURT REPORTER:  Thank
12     you.
13         MR. STERLING:  Do you want
14     to tell her who you represent,
15     Zach, so can keep you on record
16     for further objection?
17         MR. CIULLO:  Yes, I
18     represent Allergan Finance LLC.
19         THE WITNESS:  Can you
20     refresh my recollection of the
21     question?
22  BY MR. PIFKO:
23     Q.   Yeah, no problem.
24         I said, as a general matter,

Page 177

1  do you recall having meetings with
2  manufacturers of controlled substances
3  concerning suspicious order monitoring
4  programs?
5          MR. CIULLO:  Same objection.
6          THE WITNESS:  Yes.  I recall
7      having interactions with other
8      manufacturers.
9  BY MR. PIFKO:
10     Q.   Can you name any other
11  manufacturers you recall having met with?
12     A.   Mallinckrodt.  Most of the
13  interactions with manufacturers was by
14  way of an annual form that they required
15  be filled out just certifying the
16  existence of an order monitoring program
17  and so forth.  It was general practice
18  for most of the manufacturers to send
19  that sort of form.  Mallinckrodt is the
20  only one I can think of that I met with
21  personally.
22     Q.   They had a form they wanted
23  to fill out for their records to ensure
24  that you told them you had a suspicious

Highly Confidential – Subject to Further Confidentiality Review

Page 178

1 order monitoring program? Is that what
2 you're saying?
3        MR. NICHOLAS: Object to
4    form.
5        THE WITNESS: Yes.
6        MR. CIULLO: Same objection.
7 BY MR. PIFKO:
8    Q.   Do you know if at any time
9 manufacturers conducted audits of
10 AmerisourceBergen's suspicious order
11 monitoring programs?
12    A.   I don't recall any coming
13 into our company to do an on-site audit,
14 no.
15    Q.   How about any kind of audit?
16    A.   No, nothing that came under
17 my responsibility.
18    Q.   Do you ever recall
19 Mallinckrodt having conducted an audit
20 with you?
21    A.   No. I recall meeting with
22 them in person. I don't recall any audit
23 functions being performed.
24    Q.   Where was that meeting?

Page 179

1    A.   At our corporate
2 headquarters in Pennsylvania.
3    Q.   Okay. Do you recall
4 approximate time period?
5    A.   No, I don't.
6    Q.   And what did you discuss
7 during that meeting?
8    A.   We generally discussed
9 customers that they were concerned with
10 who were purchasing their products and
11 that were customers of AmerisourceBergen.
12    Q.   And why -- did they tell why
13 they were concerned about these customers
14 that you were discussing?
15    A.   They had their own --
16        MR. CIULLO: Object to form.
17        THE WITNESS: They had their
18    own internal program which my
19    recollection is these customers
20    were identified through their
21    program as purchasing quantities
22    that they felt were -- bear
23    further investigation.
24 BY MR. PIFKO:

Page 180

1    Q.   And when you talk about
2 customers, these were retail pharmacy
3 customers?
4    A.   Correct.
5    Q.   So Mallinckrodt, based on
6 your discussion with them, Mallinckrodt
7 had some sort of monitoring system of its
8 own that raised flags about certain
9 customers and that they came to you to
10 discuss those customers?
11    A.   They had their own program
12 that identified customers that they
13 wanted to discuss with us, yes.
14    Q.   Going back to this meeting
15 with Actavis. Let's go to the fifth
16 page. Do you see it says System
17 Challenges and Responses?
18    A.   Yes.
19    Q.   It says, "Threshold-based
20 systems are not sufficient." Do you see
21 that?
22    A.   I do.
23    Q.   Do you have any recollection
24 of Actavis telling you why

Page 181

1 threshold-based systems were not
2 sufficient?
3        MR. NICHOLAS: Objection to
4    the form and to the -- and to the
5    foundation of the question.
6        MR. CIULLO: Same.
7        THE WITNESS: I do not
8    recall that.
9 BY MR. PIFKO:
10    Q.   How about, it says, the next
11 bullet point says, "Cutting orders to a
12 volume that puts the order under a
13 threshold is not acceptable."
14        Do you see that?
15    A.   I do.
16    Q.   Do you understand what they
17 are referring to there?
18        MR. NICHOLAS: Objection to
19    the form and to the foundation.
20        MR. CIULLO: Join.
21        THE WITNESS: I -- no, I
22    don't know what they are referring
23    to specifically.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  Q. Have you heard of the idea
2  of someone places an order, let's just
3  say for example it's for a thousand
4  units, but it puts them over their
5  threshold by a hundred units, so then
6  someone modifies the order to make it
7  900 units and then it passes through.
8  Have you heard of that idea?
9  A. I had not.
10  Q. Is that a permissible
11  practice as far as you're concerned under
12  ABDC's policies?
13  MR. NICHOLAS: Object to the
14  form.
15  THE WITNESS: It is not.
16  BY MR. PIFKO:
17  Q. It is not permissible?
18  A. It's not acceptable.
19  Q. And why is that?
20  A. It's altering information
21  that is not intended to be altered.
22  Q. Did AmerisourceBergen have a
23  threshold-based system in 2012?
24  A. Yes.

Page 183

1  Q. If you go to Page 7. Are
2  you there?
3  A. Yes.
4  Q. It's a flowchart. It says,
5  "SOM overall process." I assume that
6  means suspicious order monitoring overall
7  process. Do you see that?
8  A. Yes.
9  Q. Okay. Looking at this
10  process, is this reflective of
11  AmerisourceBergen's process?
12  MR. NICHOLAS: Object to the
13  form. Object to the foundation.
14  If he's going to insist you
15  answer, please read it carefully.
16  THE WITNESS: I don't know
17  who authored the -- the document.
18  I don't know what the intention
19  was, whether they are discussing
20  current practice, whether --
21  whether they are proposing
22  something. I just don't have
23  enough information to know.
24  BY MR. PIFKO:

Page 184

1  Q. Okay. But you're familiar
2  with AmerisourceBergen's suspicious order
3  monitoring process, correct?
4  A. Yes.
5  Q. Does this appear to be
6  consistent with that, or is this not
7  reflective of what AmerisourceBergen's
8  practices is?
9  MR. NICHOLAS: Objection.
10  Total lack of foundation. It's
11  not an SAT question.
12  THE WITNESS: I mean there
13  seems to be components here that
14  are consistent with what we do as
15  far as -- or did at the time for
16  our order monitoring program.
17  BY MR. PIFKO:
18  Q. But there's other components
19  that are not what you did?
20  MR. NICHOLAS: Same
21  objection. If you're going to ask
22  him to take the time and go
23  through component by component,
24  we'll be here a while.

Page 185

1  THE WITNESS: Well, for
2  example, I don't recall us having
3  anything that we termed an SOM
4  steering committee. That's about
5  the only thing that I could
6  identify.
7  BY MR. PIFKO:
8  Q. Okay. I want to go to -- go
9  to Page 11. Are you there?
10  A. Yes.
11  Q. It's the slide, the top of
12  the slide says, "Top 50 Pharmacies Sales
13  of Oxycodone 30, January 1st, 2012, to
14  June 2012."
15  And then it says in
16  parentheses, "not all of June being
17  reported at the time these statistics
18  were reported."
19  Do you see that?
20  A. Yes.
21  Q. It has an NDC code 287911.
22  Do you see that?
23  A. Yes.
24  Q. Do you know what that code

Page 186

1  refers to?
2      MR. NICHOLAS: Object to the
3  form of the question. Object to
4  the foundation.
5      THE WITNESS: I don't know
6  for certain, but I believe it
7  refers to a particular product.
8  BY MR. PIFKO:
9      Q.   Okay. So this chart, it has
10 a rank. A buyer's DEA number. A buyer.
11 City, state, zip code. Number of pills.
12 Bottles. And it has a column of the
13 wholesaler. Do you see that?
14     A.  I do.
15     Q.   Okay. AmerisourceBergen is
16 listed as one or the only wholesaler for
17 all these, correct?
18     Or, sorry, one of the
19 wholesalers on all these, on Page 11,
20 correct?
21     MR. NICHOLAS: Object to the
22 form. Object to the foundation.
23     THE WITNESS: I don't quite
24 understand your question.

Page 187

1  BY MR. PIFKO:
2      Q.   In the wholesaler column.
3      A.   Right.
4      Q.   It says ABC, that refers to
5  AmerisourceBergen Corporation, correct?
6      A.   Correct.
7      Q.   And then it has a name. Is
8  that a distribution center name?
9      A.   It is.
10     Q.   Okay. So let's take
11 Number 1. Food City Pharmacy. Do you
12 know if that was a -- if Food City was a
13 customer of AmerisourceBergen's?
14     MR. NICHOLAS: Object to the
15 form. Object to the foundation.
16     I'll try not to object to
17 everything provided I'm given a
18 continuing objection to this
19 entire line of questioning about a
20 document that he hasn't seen,
21 that's another company's document.
22     Do I have the continuing
23 objection?
24     MR. CIULLO: Join.

Page 188

1      MR. PIFKO: You can make
2  that objection, sure.
3      MR. NICHOLAS: But -- I know
4  I can make it. But do I have to
5  repeat it every time?
6      MR. PIFKO: It depends on
7  the question.
8      MR. NICHOLAS: Okay. I
9  guess I have to repeat it every
10 time.
11     MR. PIFKO: Okay.
12     MR. NICHOLAS: Object to the
13 form. Object to the foundation.
14     MR. PIFKO: My questions are
15 not all about the document.
16     MR. NICHOLAS: Every
17 question is based on the document
18 that you have in front of him. If
19 you want to ask him questions
20 about the document in front of
21 him, I won't have to continue to
22 object.
23     But as long as you ask him
24 to look at the document and ask

Page 189

1  questions about it, I guess I'll
2  have to object every time.
3      Object to the form. Object
4  to the foundation.
5  BY MR. PIFKO:
6      Q.   You probably don't remember
7  my question, do you?
8      A.   I believe you were asking
9  about the first line, the customer in
10 that line.
11     Q.   What did I ask you?
12     MR. NICHOLAS: Object to the
13 form of that question.
14     THE WITNESS: Were they an
15 AmerisourceBergen customer.
16 BY MR. PIFKO:
17     Q.   Correct. Okay. What's the
18 answer to that?
19     MR. NICHOLAS: Objection.
20 Go ahead.
21     THE WITNESS: They were at
22 one time.
23 BY MR. PIFKO:
24     Q.   Okay. It says they are

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  ranked number one -- all the way to the
2  right of the comments section.  Ranked
3  Number 1 for oxy 15-milligram and oxy
4  30-milligram in 2011; Number 1 for
5  30-milligram and Number 29 for
6  15-milligram.
7        Do you see that?
8     A.  I do.
9     Q.   Do you have an understanding
10 of what -- what that means?
11        MR. NICHOLAS:  Objection to
12    the form.  Objection to the
13    foundation.
14        MR. CIULLO:  Join.
15        THE WITNESS:  I'm confused
16    by what ranking they are referring
17    to.
18        Is it their -- their
19    ranking, our ranking?  I just
20    don't have enough information.
21 BY MR. PIFKO:
22    Q.   Okay.  Let's go to Line 6.
23 If you go to the rank on the left.
24 Windsor Pharmacy.

Page 191

1        Are you there?
2     A.   Yes.
3     Q.   Okay.  It says,
4  "Wholesaler," and it says,
5  "AmerisourceBergen, Bethlehem."
6        Do you have a distribution
7  center there?
8     A.   Yes, we do.
9        MR. NICHOLAS:  Objection to
10    form and foundation.
11        Go ahead.
12 BY MR. PIFKO:
13    Q.   And then it says and,
14 "Wholesaler Number 2."
15        Do you see that?
16    A.   I do.
17    Q.   And then it says in the
18 comment section, "Dual sourcing."
19        Do you see that?
20    A.   Yes.
21    Q.   Do you understand that to
22 mean that the numbers being reflected
23 here are from ABC and some other unknown
24 distributor --

Page 192

1        MR. NICHOLAS:  Objection.
2  BY MR. PIFKO:
3     Q.   -- Wholesaler Number 2.
4        MR. NICHOLAS:  Objection to
5    the form.  Objection to the
6    foundation.
7        MR. CIULLO:  Join.
8        THE WITNESS:  That would be
9    my understanding of that line.
10 BY MR. PIFKO:
11    Q.   Then we have the same thing
12 on Line 17 for Hopkins Pharmacy, and Line
13 20 for Humana Pharmacy in West Chester,
14 Ohio.
15        Do you see those?
16    A.   I do.
17    Q.   And in the comments it says,
18 "Dual sourcing," again.
19        Do you see that?
20    A.   Yes.
21    Q.   Same thing for Number 37.
22 Agree?
23        MR. NICHOLAS:  Object to the
24    form.  Object to the foundation.

Page 193

1        THE WITNESS:  Yes.
2        MR. CIULLO:  Join.
3  BY MR. PIFKO:
4     Q.   Let's go to Slide 13.  Do
5  you see what it says at the top of Slide
6  13?
7     A.   Let me make sure I'm -- yes.
8     Q.   Can you read that for me?
9     A.   "Pharmacies purchasing from
10 multiple wholesalers.  Sales of oxycodone
11 15-milligram and 30-milligram, NDC" -- do
12 you want me to read the NDC numbers?
13    Q.   That's okay.  Thank you.
14 And it's for the time period January 1st,
15 2012 to October 15, 2012.
16        Do you see that?
17    A.   Yes.
18    Q.   Okay.  And then it's got a
19 chart, which has a buyer's DEA number,
20 buyer name, some information about where
21 the buyer is located, the wholesaler, and
22 the quantity of oxy 30, 100 count from
23 the 867 data.
24        Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    A.   Yes.
2    Q.   And then it also has another
3 column for the quantity of 15-milligram
4 year-to-date 867 data.
5         Do you see that?
6    A.   Yes.
7    Q.   Do you know what 867 data
8 is?
9         MR. NICHOLAS:  Object to the
10   form.
11        THE WITNESS:  I do not.
12 BY MR. PIFKO:
13   Q.   Are these buyers listed in
14 the buyer column, are those
15 AmerisourceBergen customers at that time?
16        MR. NICHOLAS:  Objection to
17   form and foundation.
18        THE WITNESS:  Most sound
19   familiar.  One I'm not -- I've
20   never heard of.
21 BY MR. PIFKO:
22   Q.   Which one?
23   A.   Apple Discount Drugs.
24   Q.   Okay.  If we wanted to

Page 195

1 confirm that these were AmerisourceBergen
2 customers, where would I look?
3        MR. NICHOLAS:  Object to the
4   form.
5        THE WITNESS:  On one of our
6   internal computer systems.
7 BY MR. PIFKO:
8    Q.   Under the Star system or the
9 SAP system?
10        MR. NICHOLAS:  Objection to
11   the form.
12        THE WITNESS:  I don't know
13   enough about either system to be
14   able to say yes --
15 BY MR. PIFKO:
16   Q.   Okay.
17   A.   -- or no.
18   Q.   But there's -- one could
19 look at AmerisourceBergen's data and find
20 out if these were customers at that time?
21        MR. NICHOLAS:  Objection.
22   Form.
23        THE WITNESS:  We can
24   certainly determine if they were

Page 196

1 customers, yes.
2 BY MR. PIFKO:
3    Q.   Okay.  And you see here, it
4 has -- it says in the wholesaler column,
5 ABDC and it has a distribution center,
6 and it names that there are other
7 wholesalers.
8         Do you see that, for all
9 these?
10   A.   Yes.
11   Q.   Okay.  And then it's got the
12 quantities in the other columns, agreed?
13   A.   Yes.
14   Q.   Do you recall any other
15 manufacturers ever sharing sales data or
16 purchasing volumes concerning
17 AmerisourceBergen's customers with you?
18        MR. NICHOLAS:  Object to the
19   form.
20        MR. CIULLO:  Object to form.
21        THE WITNESS:  The -- the
22   information discussed with
23   Mallinckrodt was similar to the
24   kind of information on this

Page 197

1 document.
2 BY MR. PIFKO:
3    Q.   Okay.  And so in the meeting
4 and the discussion that you had with
5 Mallinckrodt, they also shared with you
6 sales data which may have reflected
7 purchases of a customer from multiple
8 wholesalers?
9         MR. NICHOLAS:  Object to the
10   form.
11        THE WITNESS:  I don't recall
12   the extent of the data.  The only
13   thing that I remember is them
14   providing customer names that they
15   wanted to discuss.
16 BY MR. PIFKO:
17   Q.   On February 11, 2013,
18 Actavis sent you a letter.  I don't have
19 a copy of that letter from
20 AmerisourceBergen's files, but it's got
21 your name on it.
22        MR. PIFKO:  Are we going to
23   have an argument with counsel that
24   the witness received this letter,

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 given that it's a letter that --
2 has got his name at the top here?
3 It says, "It was a pleasure
4 speaking with you," et cetera, and
5 describes a discussion with him?
6 　　　　MR. NICHOLAS:  You know, for
7 someone who doesn't --
8 　　　　MR. CIULLO:  Can you give me
9 the Bates numbers.
10 　　　　MR. PIFKO:  Yeah, it's
11 TEVA_MDL_A_01037633.
12 　　　　MR. CIULLO:  I'm sorry.
13 Repeat the numbers.  You cut out a
14 little bit.
15 　　　　MR. PIFKO:  Okay.  It's
16 TEVA_MDL_A_01037633.
17 　　　　MR. NICHOLAS:  Before I
18 answer your question, what
19 exactly --
20 　　　　MR. PIFKO:  I'm not asking
21 you.  I'm asking counsel on the
22 phone.
23 　　　　MR. CIULLO:  Give me a
24 moment to review the document,

Page 199

1 please.
2 　　　　MR. PIFKO:  No problem.
3 　　　　MR. CIULLO:  Thank you.
4 　　　　This was addressed to him.
5 We don't have any objection to
6 this.
7 　　　　MR. PIFKO:  Thank you.
8 　　　　MR. CIULLO:  For the record,
9 it would be helpful, just to avoid
10 these kind of issues like we've
11 had today, if we reach out to
12 counsel before.  But it's up to
13 you.
14 　　　　MR. PIFKO:  Understood.  I
15 don't think we're going to be
16 using any documents from any other
17 defendant after this.
18 　　　　(Document marked for
19 identification as Exhibit
20 ABDC-Hazewski-11.)
21 BY MR. PIFKO:
22 　　Q.　I'm handing you what's
23 marked as Exhibit 11.
24 　　　　It's a two-page document.

Page 200

1 Bates labeled Teva_MDL_A_01037633 through
2 34.
3 　　　　It is a letter addressed to
4 the witness, dated February 11, 2013.
5 Please take a moment to review it and let
6 me know when you're done.
7 　　A.　I have reviewed.
8 　　Q.　All right.  Do you recall
9 reading this letter from Mr. Napoli?
10 　　A.　I don't recall receiving the
11 letter, but I remember conversations with
12 Tom Napoli.
13 　　Q.　Who is Tom Napoli?
14 　　A.　I don't know his position
15 title, but he was -- well, it says
16 associate director of controlled
17 substance compliance for Actavis.
18 　　Q.　You say you recall speaking
19 with him?
20 　　A.　Yes.
21 　　Q.　On more than one occasion?
22 　　A.　Yeah, he was an acquaintance
23 through industry groups, so I knew him to
24 speak with.

Page 201

1 　　Q.　Okay.  What industry groups
2 did you know him from?
3 　　A.　There was a New Jersey -- I
4 don't recall the specific name of the --
5 of the group.  But there was a New Jersey
6 group of pharmaceutical manufacturers and
7 distributors that met on -- I don't
8 recall how frequently, but we -- we met
9 and discussed issues of concern.
10 　　Q.　When you say issues of
11 concern, what do you mean?
12 　　A.　Suspicious order monitoring.
13 Due diligence.  Other issues that were
14 specific to manufacturers that I really
15 knew nothing about.  Issues of that sort.
16 　　Q.　Do you remember the identity
17 of any other companies who participated
18 in those meetings?
19 　　A.　No, I -- I don't recall any
20 other wholesale distributors
21 participating.  In terms of the
22 manufacturers, there were several, but I
23 couldn't -- I couldn't tell you which
24 ones.

Page 202

1    Q.   Did you ever get any notes
2 or documents or e-mails from -- from that
3 group?
4    A.   None that I recall.
5    Q.   How did you know to go to
6 the meetings?
7    A.   Probably through an e-mail
8 request.
9    Q.   Okay.  Who -- someone from
10 the group would have e-mailed you?
11    A.   Correct.
12       MR. NICHOLAS:  Object to the
13    form.
14       MR. CIULLO:  Join.
15 BY MR. PIFKO:
16    Q.   After these meetings
17 occurred, do you remember exchanging
18 discussion with anyone over e-mail?
19    A.   No, I don't.
20    Q.   Okay.  But you knew
21 Mr. Napoli from these meetings?
22    A.   Yes.
23    Q.   You met with him with some
24 regularity?

Page 203

1       MR. NICHOLAS:  Object to
2    form and foundation.
3       MR. CIULLO:  Same objection.
4       THE WITNESS:  I don't know
5    whether I would say with
6    regularity, but when we had
7    occasion to speak, we did.
8 BY MR. PIFKO:
9    Q.   Okay.  So this -- this says,
10 "It was a pleasure speaking with both
11 yourself and Joe Tomkiewicz this
12 afternoon."  Do you remember -- and it
13 goes on to say about "mutual compliance
14 goals relative to Oxycodone, 15 tablets
15 and Oxycodone 30."
16       Do you see that?
17    A.   I do.
18    Q.   Okay.  Do you recall having
19 a discussion with him about that?
20    A.   Other than his synopsis in
21 this letter, I don't have a recollection
22 of specifically talking about it.
23    Q.   The document we previously
24 reviewed also discusses Oxycodone 15s and

Page 204

1 30s, correct?
2    A.   Which other document are
3 you --
4    Q.   The Actavis presentation we
5 just looked at.
6    A.   Yes.
7    Q.   Who is Joe Tomkiewicz?
8    A.   He's a former employee of
9 AmerisourceBergen and worked on the
10 diversion control team.
11    Q.   Did he work for you or just
12 with you or?
13    A.   For me.
14    Q.   Okay.  What was his role?
15    A.   He was -- he reviewed
16 suspicious orders.  He did a lot of our
17 data work in terms of putting together
18 spreadsheets to pass along information
19 internally about the job we were doing.
20    Q.   Do you agree that you had
21 mutual compliance goals with Actavis?
22       MR. NICHOLAS:  Object to the
23    form.  Go ahead.
24       THE WITNESS:  I agree, the

Page 205

1    entire supply chain has mutual
2    goals when it comes to compliance.
3 BY MR. PIFKO:
4    Q.   And how so?
5       MR. NICHOLAS:  Object to the
6    form.
7       THE WITNESS:  I think the --
8    the group as a whole, or the
9    industry as a whole, are
10    responsible corporate citizens and
11    endeavor to do the right thing.
12 BY MR. PIFKO:
13    Q.   In what way do they endeavor
14 to do the right thing?
15    A.   By following the guidelines
16 and statutes that -- that govern the
17 handling of controlled substances.
18    Q.   I believe I've seen in one
19 of your documents that the company should
20 engage in diversion control because it's
21 the right thing to do.  Is that a
22 statement you would agree with?
23       MR. NICHOLAS:  Object to the
24    form.  Go ahead.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1   THE WITNESS:  I think we do
2   do the right thing.
3   BY MR. PIFKO:
4   Q.   But I'm just asking, if --
5   if you agree that the company should
6   engage in diversion control because it's
7   the right thing to do?
8   MR. NICHOLAS:  Object to the
9   form.
10   THE WITNESS:  We -- we
11   should engage in diversion control
12   because it's mandated by the
13   statute.
14   BY MR. PIFKO:
15   Q.   But also because it's the
16   right thing to do?
17   MR. NICHOLAS:  Object to the
18   form.  But go ahead.
19   THE WITNESS:  It is the
20   right thing to do, yes.
21   BY MR. PIFKO:
22   Q.   In this letter at the bottom
23   it talks about AmerisourceBergen's having
24   reevaluated ordering threshold limits,

Page 207

1   and reduce them by 50 percent.  You can
2   read the whole bottom paragraph down
3   there.  It's the second to last sentence
4   that talks about that.
5   A.   This is the letter to me
6   you're referring to, correct?
7   Q.   Yeah.
8   MR. CIULLO:  Sorry, where
9   are you?
10   MR. PIFKO:  Bottom of that
11   letter.
12   THE WITNESS:  Okay.
13   BY MR. PIFKO:
14   Q.   Do -- do you recall that --
15   whether AmerisourceBergen reduced
16   ordering threshold limits by 50 -- 50
17   percent for Oxycodone 15 and 30 from
18   Actavis?
19   MR. NICHOLAS:  Object to the
20   form.
21   THE WITNESS:  I recall that
22   we reduced threshold limits for
23   Oxycodone, not specifically
24   Actavis products, but across the

Page 208

1   board.
2   BY MR. PIFKO:
3   Q.   Okay.  When did you do that?
4   A.   I couldn't tell you.  I
5   don't recall.
6   Q.   Do you remember why you did
7   that?
8   A.   To -- I don't recall
9   specifically the reasoning behind it.
10   But we wanted to lessen our distribution
11   of those particular products, which I've
12   described previous as high-risk products.
13   Q.   If you go to the next page,
14   top paragraph.  I'll read to you.  "Also
15   during our discussion, we indicated that
16   a review of the previous six months'
17   ordering of the Oxycodone HCL 15 and
18   30-milligram products from legacy Actavis
19   indicated no appreciable reduction in
20   order quantities."
21   Do you see that?
22   A.   I do.
23   Q.   Is it your understanding
24   that although the thresholds were

Page 209

1   lowered, it didn't result in a lesser
2   quantity being ordered?
3   MR. NICHOLAS:  Objection to
4   the form, and the foundation.
5   THE WITNESS:  I don't know
6   the time frames in terms of when
7   the reductions took place as to
8   when this data was gathered.  It's
9   just difficult to say.
10   BY MR. PIFKO:
11   Q.   Do you ever recall
12   discussing that even though the company
13   lowered thresholds for those products, it
14   didn't impact the quantities that were
15   sold?
16   A.   I don't recall having such
17   discussions, no.
18   Q.   Would you expect that if you
19   lowered the thresholds, that sales would
20   go down?
21   MR. NICHOLAS:  Object to the
22   form.
23   MR. CIULLO:  Objection,
24   foundation.

Page 210

1    THE WITNESS:  I would have
2  to look at the data more closely.
3  It doesn't -- it seems to -- it
4  seems to me if the thresholds are
5  lowered -- but that doesn't take
6  into account what products are
7  being ordered.  There's -- there's
8  just not enough information here
9  for me to comment.
10 BY MR. PIFKO:
11   Q.   If the thresholds -- sorry,
12 you were still talking?
13   A.   No, I'm sorry.
14   Q.   Okay.  If the thresholds
15 were -- okay.
16    You agree that the
17 methodology used for calculating
18 thresholds at AmerisourceBergen was -- at
19 one point was three times an average for
20 a customer that size and type, correct?
21    MR. NICHOLAS:  Object to the
22  form.
23    THE WITNESS:  Correct.
24 BY MR. PIFKO:

Page 211

1    Q.   So that's 300 percent of
2  what their average orders were for the
3  measured time period, correct?
4    A.   Yes.
5    Q.   So that puts in some buffer
6  room from what the average pace is,
7  correct?
8    MR. NICHOLAS:  Object to the
9   form.
10    THE WITNESS:  Correct.
11 BY MR. PIFKO:
12   Q.   So you could lower the
13 threshold, and it doesn't necessarily
14 mean that the amount ordered goes down
15 because the threshold is above what the
16 average is, correct?
17    MR. NICHOLAS:  Object to the
18  form.
19    THE WITNESS:  Again, I'm
20  just not comfortable with these
21  hypotheticals as to what the
22  result of our actions would be
23  given the volumes of data that
24  need to be assessed.

Page 212

1    (Document marked for
2   identification as Exhibit
3   ABDC-Hazewski-12.)
4  BY MR. PIFKO:
5    Q.   I'm handing you what's
6  marked as Exhibit 12.
7    Exhibit 12 is a three-page
8  e-mail, Bates-labeled ABDCMDL00267230
9  through 267232.
10    Take a minute to review
11 this.  Let me know when you're done.
12    A.   Okay.  Okay.  I'm ready.
13    Q.   All right.  This is a series
14 of e-mails.  The subject is OMP.  The one
15 at the top is dated March 30, 2011, from
16 Chris Zimmerman to Steve Mays, copying
17 you and Bruce Gundy.
18    There are some other e-mails
19 below from Ron Manchester, who is the
20 vice president, it looks like, at the
21 Houston operation.
22    I want to call your
23 attention to the first page.  Chris is
24 writing to Steve and copying you and

Page 213

1  Bruce Gundy.  And he says, halfway
2  through the page, "First, when an order
3  is 'just 3 percent or 6 percent' over
4  threshold referenced below, it is
5  actually 303 percent and 306 percent over
6  the average purchase for that size
7  pharmacy because we billed a 300 percent
8  float into each threshold."
9    Do you see that?
10    A.   I do.
11    Q.   Do you agree that's how the
12 system works?
13    MR. NICHOLAS:  Object to the
14  form.
15    THE WITNESS:  In terms of
16  those numbers you mean?
17 BY MR. PIFKO:
18    Q.   The threshold, when you're 3
19 or 6 percent over threshold, you're
20 actually three times that amount over the
21 average?
22    MR. NICHOLAS:  Object to the
23  form.
24    THE WITNESS:  Yeah.  I agree

Highly Confidential - Subject to Further Confidentiality Review

Page 214

¹ with that.
² BY MR. PIFKO:
³ Q. And for the record,
⁴ Mr. Zimmerman's math is actually wrong on
⁵ that calculation. It's 309 and
⁶ 318 percent if you are 3 and 6 percent
⁷ over.
⁸ MR. NICHOLAS: I'll object
⁹ because I have no idea whether
¹⁰ that's right or wrong.
¹¹ BY MR. PIFKO:
¹² Q. You agree a 300 percent over
¹³ the average is a fair amount of wiggle
¹⁴ room in the thresholds?
¹⁵ MR. NICHOLAS: Object to the
¹⁶ form. Foundation. Mainly form.
¹⁷ THE WITNESS: That's the
¹⁸ manner in which the system was
¹⁹ built. So yes, I agree with that.
²⁰ BY MR. PIFKO:
²¹ Q. Let's go to the next page.
²² The top -- second full paragraph.
²³ Chris comments that -- he
²⁴ says, "It's interesting that the only

Page 215

¹ other two distribution centers on this
² e-mail string are Orlando, who had its
³ DEA registration suspended, and Houston,
⁴ which DEA had scheduled to suspend its
⁵ DEA registration if we had not come to an
⁶ agreement for the DEA-approved OMP."
⁷ Do you see that?
⁸ A. I do.
⁹ Q. Do you recall discussions
¹⁰ about the Houston distribution center
¹¹ nearly having its registration suspended?
¹² A. I do not.
¹³ Q. Maybe that would have been
¹⁴ before your time?
¹⁵ A. Perhaps it was. I don't
¹⁶ know the time span.
¹⁷ Q. Do you have any reason to
¹⁸ dispute what Mr. Zimmerman is saying
¹⁹ there?
²⁰ A. I do not.
²¹ (Document marked for
²² identification as Exhibit
²³ ABDC-Hazewski-13.)
²⁴ BY MR. PIFKO:

Page 216

¹ Q. I'm handing you what's
² marked as Exhibit 13. Take a minute to
³ review that. Let me know when you're
⁴ done.
⁵ For the record, Exhibit 13
⁶ is a two-page e-mail Bates-labeled
⁷ ABDCMDL00267013 and 14.
⁸ MR. NICHOLAS: Mark, after
⁹ this document, could we take a
¹⁰ break?
¹¹ MR. PIFKO: Yes.
¹² MR. NICHOLAS: Are you
¹³ getting close?
¹⁴ MR. PIFKO: I think so.
¹⁵ I'll tell you this. I promise
¹⁶ I'll be before 4:00. I hope a lot
¹⁷ sooner. I can say that with some
¹⁸ certainty.
¹⁹ MR. NICHOLAS: Is this
²⁰ flight related?
²¹ MR. PIFKO: No. Just what
²² we got going on here, unless you
²³ want to start some discussion with
²⁴ me.

Page 217

¹ MS. HELLER-TOIG: Any sense
² how long we're going to go?
³ MR. PIFKO: That's what we
⁴ were just discussing. Probably
⁵ not a lot longer. We'll see.
⁶ I want to clarify for the
⁷ record. Bob hates it when I
⁸ accuse him of stuff.
⁹ Exhibit 11, Sterling just
¹⁰ found that is in Amerisource's
¹¹ production. To the extent that
¹² there was an argument that it
¹³ wasn't produced, we're not making
¹⁴ an argument.
¹⁵ MR. CIULLO: Mark, really
¹⁶ quickly, this is Zach Ciullo
¹⁷ again. Regarding Exhibit 11, I
¹⁸ want to be clear, I don't have
¹⁹ authority to object or not to
²⁰ object for Teva.
²¹ Again, that should have been
²² reached out to regarding -- you
²³ should have reached out to Teva
²⁴ regarding that document. But

Page 218

1 obviously you can ask him because
2 he was on the document. But I
3 don't have authority to object or
4 not to object to Teva. Thank you.
5     MR. PIFKO: Okay.
6     THE WITNESS: I've reviewed.
7 BY MR. PIFKO:
8     Q.   Okay. Do you recall the
9 discussion reflected in these e-mails?
10     A.   I recall the discussions
11 concerning the complaints from the
12 Birmingham distribution center.
13     Q.   What were they complaining
14 about?
15     A.   The time that it was taking
16 to reach decisions on whether an order
17 was suspicious or not.
18     Q.   You write on the first page
19 of this document, in the middle, to Jeff.
20 You say: "During our most recent call
21 (me, you, Erica, and Bobby), I agreed to
22 let your OMP team release orders that
23 were 10 percent or less over."
24     Do you see that?

Page 219

1     A.   I do.
2     Q.   Do you recall making that
3 agreement?
4     A.   To the extent that it's in
5 front of me in writing, I would agree.
6     Q.   Okay. Do you have any
7 reason to dispute that you made that
8 agreement?
9     A.   No.
10     Q.   Steve writes to you: "Let's
11 discuss Monday and then we can set up a
12 call with Jeff, Erica and his team. I'm
13 a little concerned that we are setting up
14 one-off agreements with the Birmingham
15 distribution center over and above the
16 basic order monitoring program
17 requirements."
18     Do you see that?
19     A.   Yes.
20     Q.   Do you recall having that
21 discussion with Steve about that issue?
22     A.   Again, to the extent that
23 it's in the e-mail. I don't have a
24 specific recollection of the

Page 220

1 conversation, no.
2     Q.   Okay. Do you have any
3 reason to dispute that Steve was
4 concerned that by telling the OMP team at
5 Birmingham that they could release orders
6 that were 10 percent or less over, that
7 that would be setting up one-off
8 agreements?
9     MR. NICHOLAS: Object to the
10     form. Go ahead.
11     THE WITNESS: I agree that
12     he had a concern.
13 BY MR. PIFKO:
14     Q.   Do you think that's a
15 concern?
16     MR. NICHOLAS: Object to the
17     form.
18     THE WITNESS: I would have
19     to revisit all of the
20     circumstances involved. The --
21     the type of orders that we are
22     discussing, they're -- whether
23     they are high risk. There's a lot
24     of factors, but that would lead me

Page 221

1 to say I had a concern or not.
2 BY MR. PIFKO:
3     Q.   Do you recall making
4 agreements with other distribution
5 centers about allowing them to release
6 orders that were 10 percent or less over
7 the threshold?
8     A.   No.
9     Q.   Are you certain that you
10 didn't make those agreements or you just
11 don't recall?
12     A.   I'm certain I did not make
13 those agreements.
14     Q.   This is the only one where
15 you made that kind of an agreement?
16     MR. NICHOLAS: Object to the
17     form.
18     THE WITNESS: Yes.
19     MR. PIFKO: All right. We
20     can take a break.
21     THE VIDEOGRAPHER: We are
22     going off record. The time is
23     2:28.
24     (Short break.)

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    THE VIDEOGRAPHER:  We are
2  going back on the record.
3  Beginning Media File Number 4.
4  The time is 2:52.
5    (Document marked for
6  identification as Exhibit
7  ABDC-Hazewski-14.)
8  BY MR. PIFKO:
9    Q.   All right.  I'm handing you
10 what's been marked as Exhibit 14.
11    Take all the time you want
12 to review the e-mail.  But I was just
13 going to ask you a question about one of
14 the paragraphs.
15    For the record, the
16 Exhibit 14 is a series of e-mails
17 Bates-labeled ABDCMDL00279037 through
18 9039.
19    All I really wanted to ask
20 you is, the first page, 279037 refers to
21 AmerisourceBergen being the target of two
22 U.S. Attorney grand jury investigations.
23    I want to ask you some
24 questions about that.  If you want to

Page 223

1  turn your attention to that paragraph on
2  the first page.
3    A.   On the first page, okay.
4    Q.   Yeah.
5    A.   And which paragraph again?
6  I'm sorry.
7    Q.   Well, you can read that
8  whole e-mail from Steve Mays dated
9  June 6th, 2013.  You are on the "to"
10 line.  And it says "Jason."
11    Do you see that part?
12    A.   Yes.
13    Q.   Okay.  Tell me when you're
14 ready.
15    A.   Okay.
16    MR. NICHOLAS:  Before you
17  ask questions about this topic,
18  and just so I don't mess you up
19  more than -- more than necessary,
20  I'm going to just caution the
21  witness, if he's going to answer
22  questions about this, to the
23  extent that he's answering --
24    MR. PIFKO:  I'll carefully

Page 224

1  ask my questions.
2    MR. NICHOLAS:  No, no, no.
3  Just I want to make sure that he
4  doesn't answer anything that would
5  invade the attorney/client
6  communication and privilege thing.
7    MR. PIFKO:  I understand.
8    MR. NICHOLAS:  So and if
9  he's going to ask any questions at
10  all about stuff in this paragraph,
11  Mr. Hazewski, I just want to make
12  sure that you do not divulge any
13  communications with, between,
14  among, you and counsel.  Okay?
15    THE WITNESS:  Understood.
16    MR. CIULLO:  Mark, could you
17  please read the Bates one more
18  time for me, please?
19    MR. PIFKO:  Yeah.  0279037
20  is the first page.  Do you need
21  the rest?
22    MR. CIULLO:  Nope.  That's
23  good.  Thank you.  It's just
24  coming through choppy a little bit

Page 225

1  on the phone.
2    MR. PIFKO:  0279037.
3  BY MR. PIFKO:
4    Q.   I see that you were reading
5  the second page.  You were e-mailing
6  Jason about discussions with a customer
7  account manager and discussions about
8  when the customer can next order the
9  quantity.
10    Do you see that?
11    A.   Yes.
12    Q.   What was that about?
13    A.   I don't recall the
14 discussion specifically.  I remember
15 there being discussions about customer
16 care personnel being able to field
17 questions from the customer as it relates
18 to their ordering, and I believe this was
19 at the outset of the switch from
20 calculating things on a monthly basis to
21 a rolling 30-day.
22    But beyond that, that's the
23 best of my recollection.
24    Q.   Who is Jason?  His signature

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 is on here. Operations director,
2 AmerisourceBergen Corporation?
3      A.   Beyond that description,
4 that's all I know about Jason.
5      Q.   Do you remember
6 communicating with him other than this
7 discussion?
8      A.   I can't say that I can.  No.
9      Q.   Okay.  Then Steve writes
10 back to your e-mail, to everybody, and
11 says he wants to add a little flavor to
12 your response.
13           Do you see that?
14      A.   Yes.
15      Q.   And then he mentions that
16 AmerisourceBergen is the target of at
17 least two U.S. Attorney grand jury
18 investigations and a defendant in
19 multiple state lawsuits related to the
20 order monitoring program.
21           Do you see that?
22      A.   Yes, I see that.
23      Q.   Aside from communications
24 with counsel, did you have an

Page 227

1 understanding about what the U.S.
2 Attorney grand jury investigations were
3 about?
4           MR. NICHOLAS:  Object to the
5      form.  And same cautionary
6      instruction.
7           THE WITNESS:  No, I know
8      nothing beyond those conversations
9      with counsel.
10 BY MR. PIFKO:
11      Q.   Okay.  Did you -- in the
12 context of this, did you discuss the
13 grand jury investigations with Jason?
14      A.   I would have no reason to do
15 so, no.
16      Q.   Okay.  Do you understand
17 this e-mail to be saying that ABC is the
18 target of grand jury investigations
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20           MR. NICHOLAS:  Object to the
21      form and foundation.
22           THE WITNESS:  Again, beyond
23      what I've discussed with counsel
24      on these matters, I have no other

Page 228

1 further information.
2 BY MR. PIFKO:
3      Q.   I'm just asking about what
4 this e-mail says.
5      A.   Okay.  Can you point to the
6 section that you're referring to?
7      Q.   It says ABDC -- sorry, "ABC
8 is currently the target of at least two
9 U.S. Attorney grand jury investigations
10 and a defendant in multiple state
11 lawsuits related to our order monitoring
12 program."
13           Do you see that?
14      A.   Yes.
15      Q.   "The CSRA OMP team must be
16 completely focused on monitoring customer
17 activity and conducting investigations
18 related to OMP activity."
19           Do you see that?
20      A.   Yes.
21      Q.   "The last thing we would
22 want to happen would be for ABDC to have
23 a DEA registration suspended or for the
24 company to have to pay a significant

Page 229

1 civil settlement because our OMP
2 associates were spending their time
3 handling customer inquiries instead of
4 monitoring controlled substance
5 activity."
6           Do you see that?
7      A.   Yes.
8      Q.   Do you remember that being a
9 concern, that OMP associates were
10 spending more time handling customer
11 inquiries rather than monitoring
12 controlled substance activity?
13      A.   Beyond this e-mail, it was
14 never communicated to me that there was a
15 concern.
16      Q.   Okay.  Do you agree that's
17 what he's saying in this e-mail, that
18 that was a concern?
19           MR. NICHOLAS:  Object to the
20      form, as to what he's saying.
21           THE WITNESS:  No, I don't
22      agree that it was a concern.  I
23      believe myself and my team were
24      focused on what our tasks were and

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1   not spending time on issues that
2   were of lesser consequence to us.
3   BY MR. PIFKO:
4       Q.   Did you have any further
5   discussions about the issues reflected
6   here outside of counsel?
7       A.   No, I have not.
8       Q.   Outside of discussions with
9   counsel, do you know what the outcome of
10  these grand jury investigations were?
11      A.   I do not know.
12      Q.   Do you have any reason to
13  dispute the accuracy of what's said in
14  these statements?
15          MR. NICHOLAS:  Well, I'll
16      object to the form of the question
17      and the foundation.  No
18      foundation.  Object to the form.
19          THE WITNESS:  No, I don't.
20  BY MR. PIFKO:
21      Q.   I'm handing you a document
22  that's previously marked as Exhibit 9 to
23  Chris Zimmerman's deposition.  Have you
24  seen this document before?

Page 231

1           MR. NICHOLAS:  Give him a
2       minute.
3           MR. PIFKO:  For the record,
4       it's Bates labeled
5       ABDCMDL00273425.
6           THE WITNESS:  No, it doesn't
7       look familiar to me.
8   BY MR. PIFKO:
9       Q.   It's a lengthy document, and
10  of course you're permitted to look at it
11  as much as you need to.  I just had a
12  quick question on Page 12.
13          There's a mention about Ed
14  and from the context it appears it's you.
15  I apologize if you feel that I'm prying
16  into something personal, but I -- it's
17  your deposition and I need to know what
18  they are discussing here.
19          So if you look in the bottom
20  of the first full paragraph there.  It
21  says in red brackets, "Would note that Ed
22  has moved to a nondiversion control role
23  and who has taken over his job -
24  highlighting that Ed has moved on may

Page 232

1   help take away" -- "take any remaining
2   pressure off of them doing something
3   about Ed."
4           Do you see that?
5       A.   I do.
6       Q.   Were you involved with
7   discussions with leadership at the
8   company over some concerns about your
9   performance?
10      A.   No.
11      Q.   Do you know what this is
12  about?
13      A.   Well, I know it's about me
14  moving from my role in the diversion
15  control unit to another assignment.
16      Q.   Do you know why they moved
17  you out of the diversion control unit?
18      A.   It was at my request.
19      Q.   And why was that?
20      A.   I just felt like I needed a
21  break from the duties I had been doing
22  for a number of years and needed a change
23  of scenery, if you will.
24      Q.   It was a stressful job?

Page 233

1       A.   It had its moments.
2       Q.   You just wanted something
3   that wasn't so much a risk?
4           MR. NICHOLAS:  Object to the
5       form.
6           THE WITNESS:  Again, yeah, I
7       had just had enough of the -- the
8       same tasks and I just felt I
9       needed a change.
10  BY MR. PIFKO:
11      Q.   Do you have any sense about
12  what is being mentioned here when it says
13  pressure and it's talking about doing
14  something about Ed?
15          MR. NICHOLAS:  Object to the
16      form.  Lack of foundation.
17          THE WITNESS:  I don't know
18      what that's referring to, no.
19  BY MR. PIFKO:
20      Q.   Did the company grant your
21  request to -- to change positions?
22      A.   Yes, they did.
23      Q.   Okay.  Did you feel that you
24  had enough resources to do your job

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 before you moved out of the diversion
2 control function?
3     A.   I did feel we had enough
4 resources.
5     Q.   Did you feel that you had
6 adequate support from the management to
7 do your job?
8     A.   Definitely had support of
9 the management, yes.
10     Q.   Did you ever complain to
11 anyone, aside from making a request to
12 move out of that position?
13     A.   Complained to anyone, no.  I
14 had -- it wasn't a matter of complaint.
15 As I said, it was just a matter of change
16 of scenery.
17     Q.   Who did you make that
18 request to?
19     A.   I believe I discussed it
20 with David May who would have been on
21 board at that point.
22     Q.   Did -- did David May
23 essentially take over the role that you
24 had been in?

Page 235

1     A.   In addition to other roles,
2 but yes.
3     Q.   When you say in addition to
4 other roles, you mean he had other roles
5 in addition to what you were doing?
6     A.   Yes.
7         (Document marked for
8     identification as Exhibit
9     ABDC-Hazewski-15.)
10         (Document marked for
11     identification as Exhibit
12     ABDC-Hazewski-16.)
13 BY MR. PIFKO:
14     Q.   I'm handing you what I've
15 marked as Exhibits 15 and 16.
16         For the record, 15 is a
17 one-page e-mail attaching Exhibit 16.
18 It's -- 15 is Bates labeled
19 ABDCMDL00279103, and 16 is
20 ABDCMDL00279104 through 106 -- or through
21 107.
22         Let me know when you're
23 ready to discuss these.
24     A.   I've reviewed the document.

Page 236

1     Q.   Okay.  Do you remember the
2 discussion reflected here?
3     A.   I do not.
4     Q.   Exhibit 15 has an e-mail
5 from you, dated November 8, 2013, to
6 Steve Mays.  It says:  "This is the
7 document I put together this week."
8         Then Steve forwards it to
9 Chris Zimmerman and copies you.  And
10 says, "Chris, here is Ed's other list
11 that you asked for last week."
12         Do you see that?
13     A.   I do.
14     Q.   Okay.  And it attaches a
15 document called Diversion Control
16 Program, a Word document.  Do you see
17 that?
18     A.   Yes.
19     Q.   Okay.  Do you know what this
20 diversion control program document is?
21     A.   It appears to be an
22 explanation of the day-to-day functions
23 of someone assigned to the diversion
24 control team.

Page 237

1     Q.   Do you recall putting this
2 document together?
3     A.   I do not recall putting it
4 together.
5     Q.   The discussion about the
6 diversion control program here, do you
7 believe this is -- accurately describes
8 attributes of the program as of that
9 date?
10     A.   Yes.
11     Q.   It says on the first page of
12 Exhibit 16, "Diversion control" -- at the
13 top -- "control specialists review on
14 average 100 order lines daily each."
15         Do you see that?
16     A.   I do.
17     Q.   "Based on October 2013
18 data."
19         Do you see that?
20     A.   Yes.
21     Q.   Okay.  Is that consistent
22 with your understanding of the volume
23 that a diversion control specialist would
24 review everyday at that time?

Page 238

1 　　　MR. NICHOLAS: Object to the
2 form.
3 　　　THE WITNESS: I would have
4 researched that number prior to
5 putting it on a document. So I
6 would say it's accurate.
7 BY MR. PIFKO:
8 　　Q. Do you have any sense about
9 how many lines, order lines people
10 reviewed in years prior to that?
11 　　A. Not off the top of my head,
12 no.
13 　　Q. Do you remember it going up
14 or down over the years?
15 　　A. In my recollection it was
16 fairly constant.
17 　　Q. Okay. So you would
18 generally agree that it was around that
19 number over the time period when you were
20 in charge of the diversion control
21 function?
22 　　　MR. NICHOLAS: Object to the
23 form, and foundation.
24 　　　THE WITNESS: Yes.

Page 239

1 BY MR. PIFKO:
2 　　Q. The third bullet point says,
3 "Verify that a current (within the last
4 three years) CSRA Form 590 has been
5 completed and is on file."
6 　　　Do you see that?
7 　　A. Yes.
8 　　Q. What does that mean?
9 　　A. Well, it means that we are
10 to verify that within the last three
11 years, a due diligence investigation had
12 been completed or the Form 590 which
13 is -- furthers that investigation on that
14 customer.
15 　　Q. For what -- in what context
16 were you doing this verification?
17 　　　MR. NICHOLAS: Object to the
18 form.
19 　　　THE WITNESS: Well, the
20 reference is that -- the order
21 review process.
22 　　　So during the course of
23 reviewing an order, that's one of
24 the facets that would be

Page 240

1 researched before a final
2 determination -- determination was
3 made on an order.
4 BY MR. PIFKO:
5 　　Q. So it's the company's policy
6 that that was one of the things that they
7 were supposed to do when reviewing an
8 order?
9 　　A. Yes.
10 　　Q. I want to go to Item 6,
11 which is a few pages in on
12 ABDCMDL00279106. "Prescriber big report."
13 　　　Do you see that?
14 　　A. I do.
15 　　Q. Do you know what that is?
16 　　A. My recollection it was a
17 listing of prescribing physicians that
18 may have displayed a disciplinary record
19 during the course of a due diligence
20 investigation.
21 　　Q. Let's go over some elements
22 of it. First of all, you agree that,
23 looking at the document, that these are
24 accurate descriptions of the company's

Page 241

1 process and the prescriber big report?
2 　　　MR. NICHOLAS: Object to the
3 form. Foundation.
4 　　　THE WITNESS: Can I have a
5 minute to review it again?
6 BY MR. PIFKO:
7 　　Q. Yeah, of course.
8 　　A. I've reviewed it.
9 　　Q. Okay. Did you, as a person
10 who is running the diversion control
11 program, did you have involvement in
12 developing the prescriber big report?
13 　　A. I was aware that it was
14 being put together. I wouldn't say I was
15 involved in the making of the report.
16 Joe Tomkiewicz was given that task.
17 　　Q. Did you, on occasion, review
18 the report?
19 　　A. Yes, we routinely reviewed
20 all of the reports that we generated.
21 　　Q. Do you know when it was
22 developed and implemented?
23 　　A. I do not.
24 　　Q. It says -- the third bullet

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 point, "As part of our due diligence
2 process, we routinely request
3 de-identified prescribing data from our
4 pharmacy customers."
5      Do you see that?
6   A.   Yes.
7   Q.   True statement?
8      MR. NICHOLAS:  Object to the
9 form and foundation.
10      THE WITNESS:  I'm sorry.
11 What bullet was that again?
12 BY MR. PIFKO:
13   Q.   Third bullet point.  "As
14 part of our" --
15   A.   Oh, okay.  I don't know that
16 I would have used the word "routinely."
17 But it occurred, yes, that we would
18 request such information.
19   Q.   During your due diligence
20 process?
21   A.   Yes.
22   Q.   That's for the reasons that
23 we previously discussed?
24      MR. NICHOLAS:  Object to the

Page 243

1 form.  It's been a long day.
2      THE WITNESS:  Yes.
3 BY MR. PIFKO:
4   Q.   Do you recall discussing
5 that before?
6      MR. NICHOLAS:  Object to the
7 form.
8      THE WITNESS:  I recall
9 discussing it in the context of
10 when we were looking at controlled
11 substance cocktails, three
12 products dispensed together, other
13 indicators of that sort.
14 BY MR. PIFKO:
15   Q.   Well, let's just clarify.
16 Why would you request de-identified
17 prescribing data from your pharmacy
18 customers in connection with your due
19 diligence process?
20   A.   If their ordering quantities
21 were, you know, significant, we wanted to
22 make certain that the products they were
23 dispensing were being done so in a
24 legitimate manner.

Page 244

1   Q.   Where would you keep that
2 information when you received it?
3   A.   The de-identified data?
4   Q.   Yeah.
5   A.   In the file.
6   Q.   In the due diligence file?
7   A.   Due diligence file.
8   Q.   For the customer?
9   A.   Correct.
10   Q.   Are those maintained -- at
11 that time, were they maintained in
12 hardcopy or electronically?  Do you know?
13   A.   I don't -- no, I don't know.
14   Q.   At any time, do you know how
15 they are maintained?
16      MR. NICHOLAS:  Object to the
17 form.
18      THE WITNESS:  The same forms
19 we're talking about?
20 BY MR. PIFKO:
21   Q.   The due diligence files.
22   A.   There was a time when we
23 switched from paper copies to electronic,
24 but I couldn't tell you the date of when

Page 245

1 that occurred.
2   Q.   Okay.  Was that fairly
3 recently or a long time ago?
4   A.   A long time ago.
5   Q.   A long time ago you switched
6 to electronic?
7   A.   Yes.
8   Q.   Okay.  Two more bullet
9 points down, "The analysis identifies
10 prescribers that are writing
11 prescriptions of a questionable nature,
12 e.g., drug cocktails, IR narcotics minus
13 a long-acting opioid, and a high volume
14 of the same prescription for every
15 patient."
16      Do you see that?
17   A.   Yes, I do.
18   Q.   What does that mean?
19      MR. NICHOLAS:  Object to the
20 form.  Foundation.
21      THE WITNESS:  What it means
22 is the analysis of the
23 de-identified data includes
24 looking for those particular

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    points that you just read off.
2 BY MR. PIFKO:
3    Q.   And why would you look at
4 those?
5         MR. NICHOLAS:  Object to the
6    form.  Object to the foundation.
7         THE WITNESS:  We would look
8    at those, again, triggered by what
9    might perhaps be ordering that
10   causes us concern, or just again,
11   to verify that the products are
12   being dispensed in a legitimate
13   fashion for legitimate medical
14   purpose.
15 BY MR. PIFKO:
16   Q.   "The analysis may also
17 identify unnamed patients that are doctor
18 shopping in addition to patients
19 traveling considerable distance to fill a
20 prescription."
21      Do you see that?
22   A.   Yes.
23   Q.   That's a true statement
24 about the analysis?

Page 247

1         MR. NICHOLAS:  Object to the
2    form.  Object to the foundation.
3         THE WITNESS:  It's a
4    component of the analysis, yes.
5 BY MR. PIFKO:
6    Q.   People who are conducting
7 this analysis were under your management?
8    A.   Yes.
9    Q.   Why would they be conducting
10 that type of analysis?
11   A.   As part of the due diligence
12 process.
13   Q.   Why would they be looking at
14 whether a patient is doctor shopping?
15        MR. NICHOLAS:  Object to the
16   form.  Object to the foundation.
17   Lack of context.
18      Go ahead.
19        THE WITNESS:  We want to
20   make certain the products that
21   we're dispensing -- or
22   distributing to our pharmacy
23   customers, once it leaves our
24   purview, that it's being dispensed

Page 248

1    by the pharmacy in a legitimate
2    manner.
3 BY MR. PIFKO:
4    Q.   Patients traveling
5 considerable distance to fill a
6 prescription, why is that a factor that
7 you would look at?
8         MR. NICHOLAS:  Same
9    objections.  Form, foundation,
10   context.
11        THE WITNESS:  Well as we
12   discussed earlier.  It's -- it's a
13   potential red flag.
14 BY MR. PIFKO:
15   Q.   For diversion?
16   A.   For potential diversion.
17   Q.   Let's look at Item Number 7,
18 projects.  What's the low volume account
19 project?
20   A.   We routinely reviewed, as I
21 said a few minutes ago, reports that
22 would generate.  One was a report which
23 indicated percentage of controls versus
24 noncontrols.  We were trying to isolate

Page 249

1 in the low volume project accounts that
2 were purchasing little -- little product,
3 and the product that they were was high
4 risk controlled substances.  And it was a
5 pattern that we wanted to try to
6 eliminate.
7    Q.   Why did you want to try to
8 eliminate that?
9    A.   We didn't want to be
10 sourcing high risk controls to the
11 exclusion of all of the other maintenance
12 products that go along with it.
13   Q.   And why is that?
14   A.   We're not -- we're in the
15 business of being a primary wholesaler.
16 That business was not capturing what we
17 considered to be data that would indicate
18 them as a primary customer.
19   Q.   When you talk about primary
20 and secondary, you mean that there's the
21 potential for that customer buying other
22 materials from another distributor and
23 then buying controls from you?
24        MR. NICHOLAS:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 250

```
1    form.
2        But go ahead.
3        THE WITNESS:  Yes.
4    BY MR. PIFKO:
5        Q.   And that's not a practice
6    that you want to occur?
7        A.   Correct.
8        Q.   Third bullet point, "IMS
9    data pilot."
10        Do you see that?
11        A.   I do.
12        Q.   Do you know what that's
13    about?
14        A.   I have little experience
15    with IMS data.  But it's -- I don't know
16    how it would be explained in terms of how
17    the data is stored.  But it was
18    information that was not available unless
19    you subscribed to purchasing IMS data,
20    and it could provide information that
21    wasn't readily available on other
22    sources.
23        Q.   At some point, did
24    AmerisourceBergen subscribe to purchase
```

Page 251

```
1    IMS data?
2        A.   My recollection is we did a
3    pilot project.  I don't know if we ever
4    purchased the service.
5        Q.   What did you intend to use
6    that data for?  Do you know?
7        MR. NICHOLAS:  Object to the
8    form.
9        THE WITNESS:  Specifically I
10    don't know.
11    BY MR. PIFKO:
12        Q.   Some aspect of monitoring
13    diversion?
14        MR. NICHOLAS:  Object to the
15    form.
16        THE WITNESS:  Some aspect of
17    monitoring information not
18    available through other sources.
19    BY MR. PIFKO:
20        Q.   For purposes of your
21    diversion control function?
22        MR. NICHOLAS:  Object to the
23    form.
24        THE WITNESS:  It would have
```

Page 252

```
1    been a component of our diversion
2    control program.
3    BY MR. PIFKO:
4        Q.   The last bullet point on
5    that Item Number 7, "Participation in
6    industry working group."
7        Do you see that?
8        A.   Yes.
9        Q.   What's that about?
10        A.   I'd have to know what
11    specifically -- what specific industry
12    working group they are referring to.  I
13    mean, we participated in several and took
14    advantage of chances to join other groups
15    as well.
16        Q.   To be clear, when you say
17    they are referring to, this is, according
18    to the document, your -- your document.
19        A.   Okay.  Yes.
20        Q.   Do you agree?
21        A.   That it's a document that I
22    put together?
23        Q.   Yeah.
24        A.   Yes.
```

Page 253

```
1        Q.   Okay.  Are you familiar with
2    a New Jersey anti-diversion group?
3        A.   Yeah.  I believe it's the
4    same group that I referenced earlier in
5    the deposition.
6        Q.   Okay.  And that was with the
7    manufacturers?
8        A.   Yes.  That's the group I was
9    referring to.
10        Q.   How about the Healthcare
11    Distribution Alliance industry working
12    group?
13        A.   I didn't participate in
14    meetings of that group.
15        Q.   Okay.  Did you ever
16    participate in an HDA meeting?
17        A.   HDA meeting?  I believe I
18    attended some seminars sponsored by the
19    HDMA at the time.
20        Q.   Did you ever serve as a
21    committee member on any of their
22    committees?
23        A.   No.
24        Q.   Did you participate in an
```

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 industry working group with Mallinckrodt
2 concerning anti-diversion issues?
3     A.   For a period of time, I did,
4 yes.
5     Q.   What was that group?
6     A.   That was a group organized
7 by Mallinckrodt of other -- well, I don't
8 recall if there were other manufacturers.
9 But representatives of other wholesale
10 distributors, to, again, just discuss
11 issues common to all of the participants,
12 brainstorm ways of trying to effectively
13 communicate with the government on these
14 issues and hopefully get them to
15 participate in helping at the -- that
16 level to work on again issues of mutual
17 concern.
18     Q.   And when you say issues, do
19 you mean diversion control-related
20 issues?
21         MR. NICHOLAS:  Object to the
22     form.
23         THE WITNESS:  I wouldn't
24     limit it to that, no.  But that

Page 255

1     was certainly discussed.
2 BY MR. PIFKO:
3     Q.   What else did it include?
4         MR. NICHOLAS:  Object to the
5     form.
6         THE WITNESS:  I -- I can't
7     think of an example, other than
8     what I've testified to.
9 BY MR. PIFKO:
10     Q.   Okay.  But you know
11 diversion control was among the issues
12 discussed?
13     A.   It was.
14     Q.   Do you remember who else was
15 a member of that group besides
16 Mallinckrodt?  You said other
17 distributors.  How about -- I'll make it
18 easy.  How about Cardinal Health?
19     A.   I believe so, yes.
20     Q.   How about McKesson?
21         MS. MONAGHAN:  Objection to
22     form.
23         THE WITNESS:  I believe so.
24 BY MR. PIFKO:

Page 256

1     Q.   Any other distributors that
2 you can think of?
3     A.   No, I can't.
4         (Document marked for
5     identification as Exhibit
6     ABDC-Hazewski-17.)
7 BY MR. PIFKO:
8     Q.   I've handed you what's
9 marked as Exhibit 17.  For the record,
10 it's a one-page document Bates labeled
11 ABDCMDL00145881.  It's essentially just
12 two e-mails between William Crawford of
13 the United States Department of Justice
14 and Eric Cherveny, Katherine Chaney.  And
15 then it's forwarded from Eric Cherveny to
16 the witness on July 9, 2013.
17         Let me know when you're
18 ready to discuss this.
19     A.   I'm ready.
20     Q.   Do you recall this
21 discussion?
22     A.   Not specifically.  I recall
23 discussions of this sort.
24     Q.   Okay.  When you say

Page 257

1 discussions of this sort, what do you
2 mean?
3     A.   During the course of a DEA
4 audit at one of our distribution centers
5 they would routinely ask the person
6 assisting with the audit to provide due
7 diligence files on certain customers of
8 their choosing.  Those requests were
9 usually passed on to myself or a member
10 of my team to research, copy the files,
11 and return them to the diversion
12 investigator on -- on site at the
13 distribution center.
14     Q.   Do you know who William
15 Crawford is?
16     A.   I do not.
17     Q.   Do you believe he is a DEA
18 agent based on the context?
19         MR. NICHOLAS:  Object to the
20     form.
21         THE WITNESS:  Yes.
22 BY MR. PIFKO:
23     Q.   How about Katherine Chaney?
24     A.   I know the name, because I

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1 believe I've met her before. But beyond
2 that, no.
3      Q.   Okay.  Do you know anything
4 about any of the customers that are
5 listed here? Have you heard of these
6 customers before?
7      A.   Some of the names are
8 familiar.  I can't put them in any
9 context, but I've heard their names
10 before.
11      Q.   All right.  Let's discuss
12 some of the ones in Ohio.
13          Church Square Pharmacy,
14 Cleveland, Ohio.  Do you see that?
15      A.   Yes.
16      Q.   First question.  Are you
17 able to tell, based on this list of
18 customers, that this would concern any
19 specific distribution center?
20          MR. NICHOLAS:  Object to the
21 form.
22          THE WITNESS:  Not from --
23 not from this e-mail, I couldn't,
24 no.

Page 259

1 BY MR. PIFKO:
2      Q.   All right.  Have ever heard
3 of Church Square Pharmacy in Cleveland,
4 Ohio?
5      A.   No, I have not.
6      Q.   Do you have any reason to
7 believe that there would be cause for
8 concern that the Department of Justice
9 would want to examine files about that
10 pharmacy?
11      A.   I have no knowledge of why
12 they would request a file for that
13 customer.
14      Q.   How about Clark Low Cost
15 Pharmacy?
16      A.   I'm not familiar with that
17 customer.
18      Q.   How about Edward's Drugs?
19      A.   Not familiar with that
20 customer.
21      Q.   Family Medical Pharmacy?
22      A.   Not familiar with that
23 customer.
24      Q.   At the top, Eric says, "We

Page 260

1 might consider bringing Joe with us for
2 this."
3          Do you see that?
4      A.   I do see that, yes.
5      Q.   If -- in the context of the
6 audits you're talking about, would there
7 be in-person meetings?
8      A.   There would be in-person
9 meetings with the staff of the
10 distribution center.
11      Q.   Would you participate in
12 those meetings?
13      A.   No, I would not.
14      Q.   Do you have any
15 understanding why -- why Eric is saying
16 to you, "We might consider bringing Joe
17 with us for this," suggesting that you're
18 going to attend some meeting?
19          MR. NICHOLAS:  Object to the
20 form.
21          THE WITNESS:  Now I didn't
22 understand what his -- why the
23 request for Joe.
24 BY MR. PIFKO:

Page 261

1      Q.   Do you believe that you
2 attended a meeting where Mr. Crawford
3 from -- on behalf of the United States
4 Department of Justice was there?
5      A.   I don't recall such a
6 meeting, no.
7          MR. PIFKO:  We'll take a
8 break, and then I think we'll be
9 close to concluding.
10          THE VIDEOGRAPHER:  Going off
11 the record.  The time is 3:35.
12          (Short break.)
13          THE VIDEOGRAPHER:  Going
14 back on the record.  Beginning
15 Media File Number 5.  The time is
16 3:47.
17          (Document marked for
18 identification as Exhibit
19 ABDC-Hazewski-18.)
20          (Document marked for
21 identification as Exhibit
22 ABDC-Hazewski-19.)
23          (Document marked for
24 identification as Exhibit

Page 262

1    ABDC-Hazewski-20.)
2  BY MR. PIFKO:
3    Q.   I'm going to hand you
4  documents that are marked 18, 19, and 20.
5    Let the record reflect the
6  witness is reviewing the documents.
7    For the record, the
8  documents -- Exhibit 18 is a one-page
9  document Bates-labeled ABDCMDL00266845.
10    19 is a document attached to
11  that, Bates-labeled ABDCMDL00266846, and
12  it ends 266859.
13    And then Exhibit 20 is
14  another document that's attached to
15  Exhibit 18, which is ABDCMDL00266860 and
16  61.
17    For the record, Exhibit 18
18  is a meeting request attaching the other
19  two exhibits, dated September 2012 --
20  September 17, 2012.  And it's
21  notification, Upcoming OMP Changes.
22    Do you recall discussing OMP
23  changes in the end of 2012?
24    A.   I was involved in

Page 263

1  discussions concerning changes to OMP,
2  yes.
3    Q.   That was when the company
4  moved to the SAP, SAP system?
5    A.   I believe that's correct.
6    Q.   Exhibit 18 in the middle
7  there, it talks about a proactive plan
8  communicating to the sales team.  Is this
9  talking about communicating the rollout
10  of this new program to the sales team?
11    A.   Correct.
12    Q.   It says, "Based on the
13  concern expressed by Ed H., we will forgo
14  any documentation updates until we have
15  this call.  I have attached the PDF that
16  we developed back in January."
17    Do you see that?
18    A.   I do.
19    Q.   Do you recall what your
20  concerns were that discussed in this
21  meeting?
22    A.   I do not.
23    Q.   Do you recall having
24  concerns about the communications about

Page 264

1  the rollout of the updated OMP?
2    A.   I do not have any
3  recollection of my concerns.
4    Q.   If you go to Exhibit 20.
5  Some additional discussion about the
6  meeting.  Who is Maureen Story?
7    A.   I don't know what her
8  position is, I believe she is a vice
9  president of something.  But she worked
10  with -- I believe in helping to put
11  together customer facing documents and
12  talking points concerning the changes to
13  the OMP.
14    Q.   On the last page of
15  Exhibit 20, Maureen writes to Chris
16  Zimmerman, she says:  "We want to be sure
17  that either you or Steve are there since
18  we will need guidance around what we
19  can/cannot say to the customers."
20    Do you see that?
21    A.   It's on the front page of
22  that document?
23    Q.   On the last page at the top.
24    A.   Oh.  Yes, I see that.

Page 265

1    Q.   Okay.  Does this refresh
2  your recollection about having
3  discussions about what you could or
4  couldn't say about the new program to
5  customers?
6    A.   I think the concern was of
7  Maureen, and not us.
8    Q.   Well, we --
9    A.   She wanted to be -- just be
10  careful in terms of what could be said
11  and not said.
12    Q.   You write at the top of
13  Exhibit 20, "Maureen, need to discuss.  I
14  will be out of the office tomorrow, but
15  back in on Monday."
16    Do you see that?
17    A.   I do.
18    Q.   On September 13, 2012.
19    Do you remember discussing
20  any of this with her?
21    A.   No, I don't.
22    Q.   Do you remember giving her
23  feedback about what could be said to
24  customers?

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    A.   I do not.
2    Q.   If you turn to Exhibit 19,
3  Page 5, which is ABDCMDL 266850.  Let me
4  know when you're there.
5    A.   I'm there.
6    Q.   Okay.  So among other
7  things, Exhibit 19 is talking about
8  attributes of the new program.  And it
9  has frequently asked questions on here.
10  Do you agree?
11    A.   Yes.
12    Q.   Okay.  Item 2 on Page 5 here
13  says that before the SAP system -- well,
14  first of all, okay.
15        Is it correct that in
16  AmerisourceBergen's system, you can have
17  multiple accounts with the same DEA
18  registration number?  If you look at
19  Item 2 here.
20    A.   In the system at the time,
21  you're referring to?
22    Q.   Yeah.
23    A.   You could have multiple
24  accounts that had one DEA registration,

Page 267

1  yes.
2    Q.   And it says, "Under the
3  pre-SAP system, every account would have
4  their own threshold."  Agree?  True
5  statement?
6        MR. NICHOLAS:  Object to the
7    form.  True statement that that's
8    what it says?
9  BY MR. PIFKO:
10    Q.   That's an accurate statement
11  about the pre-SAP system.
12    A.   Each account number had
13  their own threshold, correct.
14    Q.   And after the SAP system was
15  implemented, thresholds were then based
16  on a -- you'd have one threshold for
17  every registration number.  Is that
18  correct?
19    A.   For every DEA registration,
20  correct.
21    Q.   Why was that change made, do
22  you know?
23    A.   I don't know the specific
24  rationale behind it, no.

Page 268

1    Q.   Did you ever discuss that
2  aspect of the change with anyone?
3    A.   I don't recall personally
4  discussing it with anyone, no.
5    Q.   Do you believe there were
6  any concerns about having multiple
7  accounts with the same DEA registration
8  that each had their own threshold?
9        MR. NICHOLAS:  Object to the
10    form.
11        THE WITNESS:  No, I had no
12    concerns.
13  BY MR. PIFKO:
14    Q.   Do you believe that the
15  review process conducted by distribution
16  center associates of an order flagged for
17  review was arbitrary at times?
18        MR. NICHOLAS:  Object to the
19    form.
20        THE WITNESS:  I don't
21    understand what you mean by
22    arbitrary sometimes.
23  BY MR. PIFKO:
24    Q.   That there wasn't a clear

Page 269

1  directive about what distribution center
2  associates were supposed to do when
3  making a decision about whether to fill
4  or reject or send an order up to further
5  review?
6    A.   No.  I believe they had
7  adequate training and performed their
8  tasks as best as possible.
9    Q.   Well, let's go to Page 7,
10  ABDCMDL00266852.
11        Do you see there's a -- top
12  third of the page -- section that says
13  "Bottom Line"?
14    A.   Yes.
15    Q.   It says, "Historically, each
16  distribution center had the ability to
17  review held orders and apply their best
18  judgment in releasing individual orders.
19  Most sales associates have had accounts
20  exceed their thresholds at some point;
21  however, the distribution center had the
22  ability to 'make the call' after
23  conducting their review which led
24  customer" -- "led to customers receiving

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 their orders."
2          Do you see that?
3     A.    Yes.
4     Q.    "As we deploy SAP to our
5 distribution centers, the order
6 monitoring program management process
7 becomes more systemic and less arbitrary.
8 This is by design."
9          Do you see that?
10    A.    Yes.
11    Q.    Do you agree that prior to
12 implementing the SAP system there was a
13 degree of arbitrariness with respect to
14 each distribution center associate's
15 decisionmaking process for releasing an
16 order?
17         MR. NICHOLAS:  Object to the
18    form.
19         THE WITNESS:  No, I don't
20    agree and I don't think that
21    statement is suggesting that the
22    pre-SAP system was in any way
23    inadequate.
24 BY MR. PIFKO:

Page 271

1     Q.    Do you know why they wanted
2 to make that change?
3     A.    No, I do not know.
4     Q.    When it says make the call
5 in the context of that discussion, do you
6 have an understanding about what that
7 means?
8     A.    Whether to approve or
9 disapprove an order, I would take it to
10 mean.
11    Q.    Did distribution center
12 associates have to document their reasons
13 for approving or disapproving an order
14 when they performed that function?
15    A.    In the same manner as anyone
16 else reviewing orders, yes.
17    Q.    How -- what do you mean by
18 that?
19    A.    We discussed previously I
20 believe a notes section within the
21 structure of the computer system where
22 notes would be entered, and that held
23 true with the distribution centers as
24 well.

Page 272

1     Q.    And they were supposed to
2 put notes in when they would make a
3 decision about whether to release an
4 order that was over threshold?
5     A.    They would be -- they were
6 expected to enter notes as to the final
7 disposition of the order.
8     Q.    Where would those notes be
9 maintained?
10         MR. NICHOLAS:  Object to the
11    form.
12         THE WITNESS:  Within the
13    computer system that we're
14    referring to.
15         MR. PIFKO:  All right.  I
16    don't have any further questions,
17    unless your counsel has some
18    direct examination of you.
19         MR. NICHOLAS:  I have no
20    questions.
21         THE VIDEOGRAPHER:  All
22    right.  This concludes today's
23    deposition.  We are going off the
24    record.  The time 4:01.

Page 273

1          (Excused.)
2          (Deposition concluded at
3 approximately 4:01 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1
2      CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6   deposition is a true record of the
testimony given by the witness.
7
           It was requested before
8   completion of the deposition that the
witness, EDWARD HAZEWSKI, have the
9   opportunity to read and sign the
deposition transcript.
10
11
12   _____
MICHELLE L. GRAY,
13   A Registered Professional
Reporter, Certified Shorthand
14   Reporter, Certified Realtime
Reporter and Notary Public
15   Dated:  October 28, 2018
16
17
18          (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

Page 275

1     INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8          After doing so, please sign
9   the errata sheet and date it.
10          You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14          It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 276

1       - - - - - -
        E R R A T A
2       - - - - - -
3
4   PAGE  LINE  CHANGE
5   ____  ____  _____
6     REASON: _____
7   ____  ____  _____
8     REASON: _____
9   ____  ____  _____
10     REASON: _____
11   ____  ____  _____
12     REASON: _____
13   ____  ____  _____
14     REASON: _____
15   ____  ____  _____
16     REASON: _____
17   ____  ____  _____
18     REASON: _____
19   ____  ____  _____
20     REASON: _____
21   ____  ____  _____
22     REASON: _____
23   ____  ____  _____
24     REASON: _____

Page 277

1
2     ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do
5   hereby certify that I have read the
6   foregoing pages, 1 - 278, and that the
7   same is a correct transcription of the
8   answers given by me to the questions
9   therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   EDWARD HAZEWSKI                  DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20_____.
21   My commission expires:_____
22
23   _____
     Notary Public
24

Highly Confidential - Subject to Further Confidentiality Review

Page 278

LAWYER'S NOTES

PAGE   LINE