Highly Confidential - Subject to Further Confidentiality Review

```
  1                  UNITED STATES DISTRICT COURT

  2                   NORTHERN DISTRICT OF OHIO

  3                        EASTERN DIVISION

  4

  5   -------------------------) MDL No. 2804

  6   IN RE:   NATIONAL         )

  7   PRESCRIPTION OPIATE       )

  8   LITIGATION                )

  9   -------------------------) Case No. 17-md-2804

 10   THIS DOCUMENT RELATES TO:)

 11   ALL CASES                 )

 12   -------------------------) Hon. Dan A. Polster

 13

 14                     HIGHLY CONFIDENTIAL

 15        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

 16

 17                  VIDEOTAPED DEPOSITION OF

 18                        RANDY HEISER

 19

 20                     February 19, 2019

 21

 22                   Pittsburgh, Pennsylvania

 23

 24
```

Page 2

The videotaped deposition of RANDY HEISER, called by the Plaintiffs for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before JULIANA F. ZAJICEK, a Registered Professional Reporter and a Certified Shorthand Reporter, at the offices of Marcus & Shapira, LLP, Suite 3500, One Oxford Centre, Pittsburgh, Pennsylvania, on February 19, 2019, at 9:02 a.m.

Page 3

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
  WAGSTAFF & CARTMELL LLP
  4740 Grand Avenue, Suite 300
  Kansas City, Missouri 64112
  816-701-1100
  BY: TYLER W. HUDSON, ESQ.
    thudson@wcllp.com

ON BEHALF OF AMERISOURCEBERGEN CORPORATION and AMERISOURCEBERGEN DRUG CORPORATION:
  JACKSON KELLY PLLC
  500 Lee Street East, Suite 1600
  Charleston, West Virginia 25301-3202
  304-340-1018
  BY: GRETCHEN M. CALLAS, ESQ. (Telephonically)
    gcallas@JacksonKelly.com

ON BEHALF OF CARDINAL HEALTH, INC.:
  PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
  One Oxford Centre
  301 Grant Street, 38th Floor
  Pittsburgh, Pennsylvania 15219
  412-263-4348
  BY: JOHN A. SCHWAB, ESQ.
    jas@pietragallo.com

ON BEHALF OF CVS INDIANA, LLC AND CVS RX SERVICES, INC. AND THE WITNESS IN HIS CAPACITY AS A CURRENT EMPLOYEE OF CVS:
  ZUCKERMAN SPAEDER LLP
  1800 M Street, NW, Suite 1000
  Washington, D.C. 20036
  202-778-1800
  BY: PAUL B. HYNES, JR., ESQ.
    phynes@zuckerman.com

Page 4

APPEARANCES: (Continued)
ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO PHARMACEUTICALS INC., PAR PHARMACEUTICAL, INC. AND PAR PHARMACEUTICAL COMPANIES, INC. (FKA PAR PHARMACEUTICAL HOLDINGS, INC.):
  ARNOLD & PORTER KAYE SCHOLER LLP
  777 South Figueroa Street, 44th Floor
  Los Angeles, California 90017-5844
  213-243-4238
  BY: SEAN A. McCORMICK, ESQ. (Telephonically)
    sean.mccormick@arnoldporter.com

ON BEHALF OF HBC SERVICES AND THE WITNESS:
  MARCUS & SHAPIRA LLP
  One Oxford Centre, 35th Floor
  Pittsburgh, Pennsylvania 15219
  412-471-3490
  BY: JOSHUA A. KOBRIN, ESQ.
    kobrin@marcus-shapira.com

ON BEHALF OF McKESSON CORPORATION:
  COVINGTON & BURLING, LLP
  One City Center
  850 Tenth Street, NW
  Washington, D.C. 20001
  202-662-5531
  BY: RAJ PAUL, ESQ.
    rpaul@cov.com

ON BEHALF OF WALMART INC.:
  JONES DAY
  150 West Jefferson, Suite 2100
  Detroit, Michigan 48226-4438
  313-733-3939
  BY: RICHARD M. BRODSKY, ESQ. (Telephonically)
    rbrodsky@jonesday.com

Page 5

ALSO PRESENT:
  COREY SMITH, Trial Technician
  CHRIS RITONA, Videographer

Page 6

```
                    I N D E X
 1
 2
 3  WITNESS:                          PAGE:
 4  RANDY HEISER
 5      EXAM BY MR. HUDSON...................    8
 6
 7                    *****
 8
 9              E X H I B I T S
10  HBC SERVICES-HEISER EXHIBITS      MARKED FOR ID
11  No. 1    Randy Heiser's LinkedIn Profile    11
12  No. 2    HBC Service Company's Second       34
13          Amended Responses to Plaintiffs'
14          (First) Set of Combined Discovery
15          Requests
16  No. 3    E-mail chain, top one dated        43
17          11/1/2010, Subject: RE: Pain mgt;
18          MCKMDL00512974 - 977
```

Page 7

1 THE VIDEOGRAPHER: We are now on the record. My
2 name is Chris Ritona. I am the videographer for
3 Golkow Litigation Services.
4     Today's date is February 19th, 2019, and
5 the time is approximately 9:02 a.m.
6     This video deposition is being held in
7 Pittsburgh, PA at Marcus & Shapira, LLP, One Oxford
8 Centre, 35th Floor, In the Matter of National
9 Prescription Opiate Litigation, MDL No. 2804, Case
10 No. 17-md-2804, before the United States District
11 Court, Northern District of Ohio, Eastern Division.
12     The deponent today is Randy Heiser.
13     Will all counsel please identify
14 themselves for the record.
15     MR. HUDSON: Ty Hudson of Wagstaff & Cartmell
16 for the Plaintiffs.
17     MR. SCHWAB: John Schwab on behalf of Cardinal
18 Health.
19     MR. PAUL: Raj Paul of Covington on behalf of
20 McKesson.
21     MR. HYNES: Paul Hynes from Zuckerman Spaeder on
22 behalf of CVS and on behalf of the witness in his
23 capacity as a current employee of CVS.
24     MR. KOBRIN: Josh Kobrin of Marcus & Shapira on

Page 8

1 behalf of HBC Service Company and the witness.
2     THE VIDEOGRAPHER: Thank you.
3     The court reporter today is Juliana
4 Zajicek and she will now please swear in the witness.
5     (WHEREUPON, the witness was duly
6      sworn.)
7         RANDY HEISER,
8 called as a witness herein, having been first duly
9 sworn, was examined and testified as follows:
10         EXAMINATION
11 BY MR. HUDSON:
12     Q.   Good morning, sir.
13         Could you state your name, please?
14     A.   Randy Heiser.
15     Q.   And, Mr. Heiser, where do you currently
16 reside?
17     A.   I currently reside at 5620 King School
18 Road in Bethel Park, Pennsylvania.
19     Q.   Have you ever had your deposition taken
20 before?
21     A.   Yes.
22     Q.   How many times?
23     A.   I think it's three prior to this.
24     Q.   Okay. If you could, just briefly describe

Page 9

1 what those cases involved?
2     A.   One was with Rite Aid Corporation. I
3 believe it involved some type of pricing litigation,
4 but it was in the mid to early '90s. And I believe
5 there were two other situations where I was deposed
6 with Giant Eagle. One in a class action suit
7 concerning pricing with branded pharmaceuticals and I
8 think there was another deposition concerning some
9 type of a prescription issue.
10     Q.   And do you recall, again, a ballpark for
11 those last two depositions, when those occurred?
12     A.   I do not. It was sometime in my 15-year
13 career with Giant Eagle, but I don't recall. The --
14 the first one had to do with the class action suit
15 with pricing, I believe it was within the first five
16 years, but I don't know the exact timing.
17     Q.   Okay. Well, it sounds like it has been a
18 while since you've had your deposition taken, right?
19     A.   Correct.
20     Q.   Okay. So before we get going, let's just
21 make sure we are on the same page.
22         You understand that you are under oath
23 just like we would -- you would be if you were in a
24 courtroom in front of a judge or a jury?

Page 10

1   A.   Yes, sir.
2   Q.   And do you also -- will you also let me
3 know if I ask an unclear question so I can rephrase
4 it?
5   A.   Sure.
6   Q.   Okay.  And is it fair that if you answer
7 my question that I can assume that you understood it?
8   A.   Yes.
9   Q.   And if you want to take a break at any
10 time, just let me know and we can go off the record.
11 Okay?
12   A.   Okay.
13   Q.   The only thing I would ask is just if
14 there is a question pending that you answer it before
15 we go off the record.
16   A.   Okay.
17   Q.   Is that fair?
18   A.   Yes, sir.
19   Q.   Okay.  Tell me, what did you do to prepare
20 for the deposition today?
21   A.   I spent a couple of hours yesterday with
22 this office talking to -- to attorneys.
23   Q.   Did you do anything else?
24   A.   No, sir.

Page 11

1   Q.   Did you look at any documents that
2 refreshed your recollection about any topics relating
3 to your time at Giant Eagle?
4   A.   Yesterday, yes.
5   Q.   Anything that sticks out that you recall?
6   MR. KOBRIN:  Objection.  We showed him certain
7 documents and I'm going to assert that the collection
8 of those documents is work product privilege.  You can
9 ask him if he remembers anything, but I don't want you
10 to go too far beyond that.
11   MR. HUDSON:  Yeah, that's what I'm asking him,
12 is what --
13 BY MR. HUDSON:
14   Q.   Do you -- did that re --
15   MR. KOBRIN:  Just yes or no.
16 BY MR. HUDSON:
17   Q.   -- refresh your recollection?
18   A.   Yes.
19   Q.   If we could, just shift gears.  I'm going
20 to mark here as Exhibit 1 a print-off off of LinkedIn.
21       (WHEREUPON, a certain document was
22        marked HBC - Heiser Deposition
23        Exhibit No. 1, for identification, as
24        of 02/19/2019.)

Page 12

1 BY MR. HUDSON:
2   Q.   Does this look like your CV or resume?  Or
3 I would -- not sure of the right term to use, but your
4 information from LinkedIn relating to your
5 professional career?
6   A.   It seems to be correct.
7   Q.   Okay.  And there on the second page of
8 Exhibit 1 it lists your education?
9   A.   That is correct.
10   Q.   Okay.  Did you obtain a degree from The
11 Wharton School?
12   A.   I did not.  Those were certificate
13 programs for week-long educational classes.
14   Q.   Okay.  And then how about Shenandoah
15 University?
16   A.   Yes, I have a Doctor of Pharmacy from
17 Shenandoah University.
18   Q.   And then if we go back to the first page,
19 does this accurately describe your professional
20 experience?
21   A.   Yes.
22   Q.   And this indicates that you spent 16 years
23 at Giant Eagle as the VP of Pharmacy?
24   A.   Well, the math doesn't -- the math is not

Page 13

1 correct.  It is 15 years.
2   Q.   Oh.
3   A.   '96 to 2011.
4   Q.   Okay.
5   A.   And the math is not correct with McKesson.
6 That was not two years.  If you can start in '12 and
7 leave in '13, it is not going to be two years.
8   Q.   Right.  No, I understand that.  I -- I --
9 my guess is that's probably something on LinkedIn
10 where they --
11   A.   It could -- could be how they calculate
12 it, but --
13   Q.   -- do the math based on the months or
14 something.  But anyway...
15   A.   -- but these positions are correct.  The
16 timing is not correct.
17   Q.   Yeah, the -- the ballpark?
18   A.   The positions are correct.
19   Q.   Right.  Okay.  15, 16 years at Giant
20 Eagle.
21       At some point did Giant Eagle decide to
22 become a distributor of Schedule III, IV and V
23 controlled substances?
24   A.   Yes.

Page 14

1   Q. Were you involved in that decision-making?
2   A. Yes.
3   Q. Why did Giant Eagle decide to become a
4 distributor of Controlled III, IV and V -- or excuse
5 me -- Schedule III, IV and V controlled substances?
6   A. Part of my responsibility in -- in running
7 the pharmacy business at Giant Eagle is to look for
8 opportunities to streamline how we receive product,
9 look for efficiencies, and look for the most
10 economical way to run the business at --
11   Q. Did -- I'm sorry. Go ahead. I didn't
12 mean to cut you off.
13   A. And, you know, we made a decision based
14 upon some of the practices that we saw in the industry
15 that it would make sense for us to become a self
16 distributor.
17   Q. Did you or others at Giant Eagle run
18 financial models to determine whether or not it would
19 be more profitable for Giant Eagle to become a
20 distributor?
21   MR. KOBRIN: Object to form.
22     You can answer.
23 BY THE WITNESS:
24   A. We ran financial models to look at being a

Page 15

1 self distributor of generic products. It was not
2 solely looking at controlled substances. We were
3 looking at all of the generic lines to become a self
4 distributor.
5 BY MR. HUDSON:
6   Q. And why generics versus brand?
7   A. With the branded product, you only have
8 one company that is making the product. With a
9 generic product, you've got two people that are
10 producing it or more than two people that are
11 producing it and you have the ability to create a
12 better economic position when you've got more than one
13 person making that product.
14   Q. Were you personally involved in trying to
15 determine how much money Giant Eagle can save by
16 becoming a self distributor?
17   MR. KOBRIN: Object to form.
18 BY THE WITNESS:
19   A. I would say I was one of a -- of a large
20 team of people that was doing that analysis, including
21 people in the distribution side, people that were
22 involved in category management, financial folks. It
23 was a -- a team project from a number of individuals
24 within the organization.

Page 16

1 BY MR. HUDSON:
2   Q. Do you have any sense of what the
3 projected savings looked like for -- in terms of the
4 bottom line to Giant Eagle if they self distributed
5 generic pharmaceuticals, including Schedule III, IV
6 and V controlled substances?
7   A. I don't recall what that number was.
8   Q. Do you -- do you have any ballpark sense,
9 in other words, was it tens of millions of dollars,
10 just any -- any idea at all of what the cost savings
11 would look like?
12   A. I -- I -- I don't know.
13   Q. Is it your understanding that in 2009
14 Giant Eagle did obtain a DEA distributor license to
15 distribute controlled -- Schedule III, IV and V
16 controlled substances?
17   A. That date sounds about correct.
18   Q. And that license was put in the name HBC
19 Service Company, is that your recollection?
20   A. It was in the HBC building in Washington,
21 Pennsylvania, but I don't recall the -- the naming of
22 it.
23   Q. Okay. Do you -- and that was going to be
24 my question is I'll represent to you that the name on

Page 17

1 the license is HBC Service Company.
2     Do you have any recollection of -- you
3 know, or involvement in that decision-making that the
4 licensee for that -- or the -- or the -- the name on
5 the license was HBC as opposed to Giant Eagle?
6   MR. KOBRIN: Object to form.
7 BY THE WITNESS:
8   A. I -- I don't recall how that was decided.
9 I'm assuming it was a combination of legal and
10 distribution people making that decision.
11 BY MR. HUDSON:
12   Q. Were -- did you play any role in -- in
13 that decision?
14   A. Not that I recall.
15   Q. And is it your recollection that HBC
16 started acting as a distributor of Schedule III, IV
17 and V controlled substances in around November
18 of 2009?
19     Does that sound about right?
20   A. That sounds about right.
21   Q. Okay. And then you left Giant Eagle at
22 some point in 2011, correct?
23   A. Correct. October of 2011.
24   Q. So -- so Giant -- or HBC acted as a

Page 18

1  distributor of controlled substances for a little less
2  than two years while you were still there?
3     A.   That's -- well, I don't recall when we
4  actually brought the controls in.  I know that we
5  started with generics and then my recollection is at
6  some point we added the controls.  That dating sounds
7  about correct, but I don't recall the exact date.
8     Q.   Sure, sure.
9         And the records will reflect what they
10 were.  And, again, I'll -- I'll represent to you that
11 they show that -- that the -- the controlleds started
12 in -- in about November of 2009 --
13    A.   Okay.
14    Q.   -- so...
15        During that time period, do you have any
16 recollection of whether or not HBC designed a system
17 to identify suspicious orders of controlled
18 substances?
19    A.   We had an integrated system in place to
20 monitor the movement of all controls.  It started as
21 we received product from the warehouse.  It was
22 scanned and electronically recorded.  When it was
23 placed on the shelves, again, it was scanned and
24 electronically recorded.  When it was dispensed or

Page 19

1  when it was -- an order was picked based upon a
2  store's order, it was scanned and electronically
3  recorded.  When the totes were placed in a truck, it
4  was scanned and electronically recorded.  When those
5  delivery vehicles arrived at the Giant Eagle location,
6  the totes were scanned and electronically recorded.
7  When the merchandise was unpacked, it was, again,
8  scanned and electronically recorded.  When we
9  dispensed the product through our dispensing system,
10 the product was scanned and electronically recorded.
11 When we gave the medicine to the patient, it went
12 through our cash register, it was scanned and
13 recorded.
14        We also had corporate oversight of both
15 the stores and the warehouse.  The warehouse had
16 buyers that were monitoring from a human perspective
17 the orders that were placed by the stores and also the
18 orders that were placed to the manufacturers.  The
19 system to monitor the store activity involved our
20 pharmacists who are required to on a monthly basis
21 compare dispensing activity to purchase activity,
22 identify discrepancies, and try to find out what
23 those -- why those discrepancies occurred.
24        Our district managers were responsible to

Page 20

1  verify that that analysis of dispensing activity
2  versus purchasing activity was being conducted
3  properly.  And our vice president of pharmacy
4  operations was responsible to see that our district
5  managers were performing those particular follow-ups.
6        So we had a -- a fully integrated system
7  of controls in place to be sure that we were trying to
8  detect and prevent any type of theft or diversion.
9     Q.   My question was more specific.  My
10 question was:  Did HBC design a system to identify
11 suspicious orders of controlled substances?
12        So my question is what -- to you, what is
13 a suspicious order of a controlled substance?
14    A.   I mean, we -- me -- our integrated system
15 looked for, you know, any -- any types of -- of
16 deviations.  Our focus was on theft and the -- you
17 know, ways to -- to get it -- get it out if anyone was
18 taking it out of the system.
19        The buyers were looking at, you know,
20 orders as they were coming in.  So if someone, you
21 know, was on -- if they saw something that came in and
22 they said they wanted 40 pieces and they have never
23 ordered 40 pieces, they would typically call to see if
24 it was a -- a fat finger situation or if the system,

Page 21

1  you know, somehow made a computer error and set that
2  order up and it should have been four rather than 40.
3  You know, that's, you know, an example of something
4  that, you know, might be considered suspicious.
5     Q.   Do you -- but do you have a definition of
6  a suspicious order?  In other words, during -- and let
7  me be more specific about that.
8        During the time that you were at Giant
9  Eagle and Giant Eagle was considering becoming a
10 distributor of controlled substances, was one of the
11 things that Giant Eagle looked at is trying to design
12 a system specifically focused on suspicious orders?
13    MR. KOBRIN:  Object to form.
14 BY THE WITNESS:
15    A.   Well, I think -- I mean, the integrated
16 system that I described is in place to identify any
17 type of suspicious orders or theft or diversion.
18 BY MR. HUDSON:
19    Q.   Okay.  And so in your mind, what is a
20 suspicious order?
21    MR. KOBRIN:  Object to form, asked and answered.
22    THE WITNESS:  Am I supposed to answer that?
23    MR. KOBRIN:  I'll tell you -- if you are not
24 meant to answer it, I will definitely say stop, hold

Page 22

 1  on a minute.
 2  BY THE WITNESS:
 3     A.  I don't think that I'm in a position to
 4  define what you think a suspicious order is.  I mean,
 5  you tell me what's a suspicious order and I'll tell
 6  you if we had a system in place to identify it, but
 7  I -- I -- I'm -- I'm -- I'm not Webster's dictionary.
 8  I'm not sure what your definition of a suspicious
 9  order is.
10  BY MR. HUDSON:
11     Q.  Sure.  We're not --
12     A.  And I've fully described all of the
13  systems that we had integrated to be sure that product
14  was moving properly and that we had the right controls
15  in place to identify any issues that might occur in
16  that entire supply chain.
17     Q.  Were you -- do you have a recollection
18  that you or others were focused on designing a system
19  that specifically met the requirements of the
20  Controlled Substances Act?
21     MR. KOBRIN:  Object to form, asked and answered,
22  vague.
23  BY THE WITNESS:
24     A.  The system that I described as far as the

Page 23

 1  integration of all of the systems in place, both at
 2  the warehouse and store level, were put in place to
 3  fulfill the requirements that are in the Controlled
 4  Substances Act.
 5  BY MR. HUDSON:
 6     Q.  And were you or others, that -- that you
 7  are aware of, involved in that process?  In other
 8  words, were you part of the group that was trying to
 9  put in place a -- a system that would meet the
10  requirements of the Controlled Substances Act?
11     A.  I think there were a number of people that
12  were involved.  I would say that my direct report Greg
13  Carlson, who is responsible for all of the purchasing
14  of pharmaceuticals within Giant Eagle, had the direct
15  responsibility.  He did have meetings with the DEA who
16  did on-site inspection before we were granted any type
17  of a distributorship license to the DEA.  So we met
18  the requirements.  So that representative was happy
19  with the controls that we had in place and granted us
20  the permit.
21     Q.  Did you personally talk to anyone at the
22  DEA during that process?
23     A.  I do not recall that, no.
24     Q.  Were you personally involved in any

Page 24

 1  meetings where Giant Eagle was taking steps to meet
 2  the requirements of the Controlled Substances Act?
 3     MR. KOBRIN:  Object to form, asked and answered.
 4  BY THE WITNESS:
 5     A.  I -- I don't recall if I was involved in
 6  specific meetings about meeting the requirements, but,
 7  again, it was a -- it was a team approach involving
 8  HBC Services, our loss prevention folks, legal folks
 9  internally, but I don't recall a specific meeting
10  concerning that.
11  BY MR. HUDSON:
12     Q.  Do you know whether or not in 2009, 2010
13  or 2011 where you are at HBC if -- or excuse me --
14  when you were at Giant Eagle if Giant Eagle or HBC
15  used any computer software programs to monitor the
16  orders and shipments of controlled substances?
17     A.  I'm confident that there were.  I couldn't
18  tell you the name of the system, but I know that we
19  did have electronic measuring devices.  We scanned the
20  orders, tracked the orders.  So I'm assuming, again,
21  that we used the existing software that was in place
22  that was used to track the movement of other types of
23  products in that particular warehouse.
24     Q.  But I guess my question is more specific.

Page 25

 1  Do you have any -- any recollection of a
 2  process that Giant Eagle or HBC used to -- using
 3  computer software to try to identify unusual orders of
 4  controlled substances?
 5     A.  Well, the integrated system that I
 6  described earlier would identify anything that was out
 7  of the ordinary with the scanning that's going to
 8  occur from the time it enters until we actually place
 9  the prescription in the hands of the consumer.
10     Q.  And how would it do that, how would it
11  identify -- for example, how would it identify an
12  order of unusual size?
13     How did the -- how did the computer
14  program work?
15     MR. KOBRIN:  Object to form.
16  BY THE WITNESS:
17     A.  Again, I -- I was not the person that was
18  looking at those particular reports, but I think in my
19  previous definition, I described that there were
20  pharmacy buyers that were looking at the orders that
21  were sent from the stores to the HBC facility and
22  those buyers were also looking at the orders that were
23  sent to the pharmaceutical manufacturers.
24  BY MR. HUDSON:

Page 26

1  Q. Between 2009 and 2011 when you were at
2 Giant Eagle, how many orders or shipments of
3 controlled substances did Giant Eagle or HBC identify
4 as suspicious?
5  A. I don't recall.
6  Q. Between 2009 and 2011 when you were at
7 Giant Eagle, did -- did you have a corporate process
8 for documenting the -- the integrated system, you
9 know, the steps in the integrated system that you've
10 talked about?
11  MR. KOBRIN: Object to form.
12 BY THE WITNESS:
13  A. The -- the -- when the scanning occurs,
14 there is going to be an electronic record of that. I
15 don't know how long that record would exist
16 electronically. I do know that at Giant Eagle we had
17 a document retention policy and certain records were
18 kept for a certain period of time and, you know, then
19 were automatically deleted.
20 BY MR. HUDSON:
21  Q. Do you know whether or not while you were
22 at Giant Eagle they had a computer system with
23 algorithms that would be monitoring the orders of
24 controlled substances?

Page 27

1  A. I'm not aware of that level of detail.
2  Q. Do you know whether or not Giant Eagle or
3 HBC employed the monthly total rule to monitor
4 controlled substances?
5  MR. KOBRIN: Object to form.
6 BY THE WITNESS:
7  A. I'm not aware of that language.
8 BY MR. HUDSON:
9  Q. Do you know whether or not Giant Eagle
10 employed the consecutive order rule to monitor
11 controlled substances?
12  MR. KOBRIN: Object to form.
13 BY THE WITNESS:
14  A. I'm not aware of that term either.
15 BY MR. HUDSON:
16  Q. Okay. Would the same be true for
17 multi-distributor rule?
18  MR. KOBRIN: Object to form.
19 BY THE WITNESS:
20  A. I'm not familiar with that term.
21 BY MR. HUDSON:
22  Q. Okay. How about percentage increase rule?
23  MR. KOBRIN: Object to form.
24 BY THE WITNESS:

Page 28

1  A. I'm not familiar with that term.
2 BY MR. HUDSON:
3  Q. How about pharmacy comparison rule?
4  MR. KOBRIN: Object to form.
5 BY THE WITNESS:
6  A. I'm not familiar with that term.
7 BY MR. HUDSON:
8  Q. Okay. Are you aware of any rules that
9 Giant Eagle or HBC employed to try to identify
10 suspicious orders at the distributor level?
11  A. Yeah, I think I've already described our
12 integrated approach as to how we were monitoring
13 movement from the time that it hit the dock at HBC
14 Services until it was placed in the hands of the
15 ultimate patient.
16  Q. And I guess what I'm trying to -- trying
17 to figure out is, is you -- you've described an
18 integrated system, and I think you've said this, but
19 it was focused largely on tracking the inventory to
20 avoid theft.
21   Is that fair?
22  MR. KOBRIN: Object to form, misrepresents the
23 testimony.
24 BY THE WITNESS:

Page 29

1  A. We were looking at theft and -- and
2 diversion and looking to meet all of the requirements
3 that are in the Controlled Substances Act, and I think
4 our integrated system as described met the
5 requirements that are set forth in -- in that
6 regulation.
7 BY MR. HUDSON:
8  Q. Well, what -- sir, what are the
9 requirements of the Controlled Substances Act as they
10 relate to monitoring suspicious orders?
11  MR. KOBRIN: Object to form.
12   Are you going to show him anything or are
13 you just hoping that he'll recall the requirements of
14 the CSA on his own?
15  MR. HUDSON: He has testified that the company
16 met all of the requirements, so I want to know, what
17 are they?
18  MR. KOBRIN: So you just want him to --
19  MR. HUDSON: Well, if he is testifying that
20 he -- he knows that they met the requirements, then I
21 assume he knows what the requirements are. I think
22 it's a fair question.
23  MR. KOBRIN: Okay. I mean, if he can --
24 BY MR. HUDSON:

Page 30

1 Q. So, sir --
2 MR. KOBRIN: -- if he can give an --
3 BY MS. HUDSON:
4 Q. So --
5 MR. KOBRIN: -- exposition on the law to you
6 right now without any documents in front of him or
7 anything, that's fine. I'm happy to have him do it,
8 but I think that that's an unreasonable question.
9 BY THE WITNESS:
10 A. My recollection is that we met all of the
11 requirements of the Controlled Substances Act as
12 documented by our receipt of a permit from the DEA.
13 BY MR. HUDSON:
14 Q. And -- and is that where -- I guess that's
15 where I'm trying to understand is, is you're saying,
16 as you sit here today, you can testify under oath that
17 from 2009 to 2011 when you were at Giant Eagle you're
18 confident that you met all of the requirements of the
19 Controlled Substances Act, is that because the DEA
20 allowed you, the company, to act as a distributor, or
21 is there something more specific that you can point to
22 to support that assertion?
23 MR. KOBRIN: Object to form. He has gone
24 through a ton of specifics as to what supports that

Page 31

1 assertion.
2 But go ahead if you want to repeat them.
3 BY THE WITNESS:
4 A. We had an integrated system approach to
5 monitor all of the movement of -- of the activity, to
6 monitor any type of -- of theft and diversion once
7 that particular product came in to the Giant Eagle
8 system that I described previously.
9 BY MR. HUDSON:
10 Q. Do you know whether or not under the
11 Controlled Substances Act a registrant shall design
12 and operate a system to disclose to the registrant
13 suspicious orders of controlled substances?
14 MR. KOBRIN: Object to form.
15 BY THE WITNESS:
16 A. I'd have to see the -- I mean, I -- I
17 don't have the Controlled Substances Act embedded in
18 my brain. I'd be happy to review it if you want me
19 to, but, again, it was a number of years ago that we
20 put the systems in place to comply.
21 Our -- our -- our -- our internal legal
22 counsel was on that team as we put together that
23 particular program. The DEA gave us a permit showing
24 that they were confident that we had all of the

Page 32

1 require -- required measurements and processes in
2 place. But I am not sitting here today saying I'm an
3 expert in the Controlled Substances Act.
4 BY MR. HUDSON:
5 Q. And that's all I'm trying to do is, is
6 understand what you do and don't know.
7 Do you know whether or not Giant Eagle or
8 HBC ever notified the DEA field division office about
9 any suspicious orders of controlled substances?
10 MR. KOBRIN: During what time period?
11 BY MR. HUDSON:
12 Q. 2009 to 2011.
13 MR. KOBRIN: Object to form. Asked and
14 answered.
15 BY THE WITNESS:
16 A. I'm not aware of any situations that we
17 had to identify -- that were identified that we had to
18 inform the DEA.
19 BY MR. HUDSON:
20 Q. Are you aware of any time between 2009 and
21 2011 where Giant Eagle or HBC did identify a
22 suspicious order of controlled substances?
23 A. I am not aware of any.
24 MR. KOBRIN: Object to form, asked and answered.

Page 33

1 BY MR. HUDSON:
2 Q. As you sit here today, is it your belief
3 that there -- to the best of your knowledge, that
4 there were no suspicious orders that came through the
5 HBC warehouse between 2009 and 2011?
6 MR. KOBRIN: Object to form, asked and answered.
7 BY THE WITNESS:
8 A. That is my recollection.
9 BY MR. HUDSON:
10 Q. Do you -- do you recall whether or not
11 Giant Eagle or HBC put any written policies or
12 procedures in place between 2009 and 2011 to address
13 steps being taken to identify suspicious orders of
14 controlled substances?
15 A. I'm sure that we have at the warehouse
16 level. The procedures that I've recently described
17 with our integrated program of scanning the
18 merchandise as it comes in and, you know, scanning it
19 as it's placed on the shelves, scanning the totes as
20 it leaves, I'm confident that there was a procedure
21 manual in place that documents those particular steps.
22 Q. As you sit here today, do you have any --
23 any recollection, and I wouldn't be surprised if you
24 don't because it's been years ago, but do you have any

Page 34

1 recollection of what was documented in writing?
2   A.  I don't have any personal recollection.
3       (WHEREUPON, a certain document was
4       marked HBC - Heiser Deposition
5       Exhibit No. 2, for identification, as
6       of 02/19/2019.)
7 BY MR. HUDSON:
8   Q.  Okay.  I'm just going to hand you here,
9 real quick, what I've marked as Exhibit 2, and this is
10 just some responses by HBC to some questions that we
11 had.
12      And if you turn to Page 2 -- oh, excuse
13 me.  If you turn to Page 8.  And if you look there at
14 Question 2, you can see there, we asked:
15      "Please produce each of your suspicious
16 order monitoring system policies and procedures since
17 January 1st, 2006, and identify the Bates range for
18 each.  Please identify the effective date each was in
19 force and effect."
20      Do you see that?
21  A.  Yes, I see it.
22  Q.  Okay.  Now, if we turn back, there is
23 some -- the response then follows that and there is
24 some objections, but then if you look on Pages 9 and

Page 35

1 10, the companies responded, and do you see at the
2 bottom of Page 9, the first written policy identified
3 is there at that Bates range and then it says it's
4 effective from 8/1 of 2014.
5      Do you see -- do you see that at the
6 bottom?
7   A.  I see the sentence:  "Apparent version of
8 HBC policy effective 8/1 of 2014."
9   Q.  Okay.  And then if we look to the next
10 page, I think you'll see that the rest of the written
11 policies identified become later, you know, later in
12 time as opposed to earlier in time.
13      My -- my -- given that the company has
14 identified the first written policy as being
15 August 1st of 2014, my question is simply:  Do you
16 have any recollection of any written policies or
17 procedures relating to suspicious order -- a
18 suspicious order monitoring system that were in effect
19 prior to August 1st of 2014?
20  A.  I mean, I think I've already described
21 these integrated systems that were in place to monitor
22 the movement of all products throughout the Giant
23 Eagle supply chain.
24  Q.  And can you say under oath today whether

Page 36

1 or not that integrated system had components that were
2 specifically designed to identify suspicious orders of
3 controlled substances?
4       MR. KOBRIN:  Object to form.
5 BY THE WITNESS:
6   A.  I think I've already described how the
7 system was in place to -- to monitor the movement and
8 to identify anything that was out of line.
9 BY MR. HUDSON:
10  Q.  Right.  And as part of that, do you know
11 as you sit here today whether or not that involved
12 monitoring and identifying orders of controlled
13 substances of unusual size?
14      MR. KOBRIN:  Object to form, asked and answered.
15 BY THE WITNESS:
16  A.  I -- I think I've already answered the
17 fact that we had people at a corporate level that were
18 monitoring the orders that were sent from the store to
19 the HBC warehouse.  Those buyers were also monitoring
20 the orders that were sent from the warehouse to the
21 manufacturers.
22 BY MR. HUDSON:
23  Q.  So who -- who at corporate was monitoring
24 orders of controlled substances to identify those of

Page 37

1 unusual size?
2       MR. KOBRIN:  Object to form.
3 BY THE WITNESS:
4   A.  I think I already -- I already stated they
5 were -- they were pharmacy buyers that were
6 responsible for monitor -- monitoring those orders.
7 BY MR. HUDSON:
8   Q.  And who were the pharmacy buyers, what
9 were their names?
10  A.  I don't recall.
11  Q.  What did the pharmacy buyers do to monitor
12 the orders to try to identify those of unusual size?
13  A.  They are -- they are looking at the orders
14 that came from the pharmacies before they actually
15 submit their orders into the manufacturers.
16  Q.  How often did they review those orders?
17  A.  I don't recall.
18  Q.  Well, what was the criteria being applied
19 to try to determine whether it was an order of unusual
20 size?
21  A.  I don't recall.
22  Q.  How many orders did the pharmacy buyers
23 identify during the time that you were there that --
24 that were identified as being potentially suspicious

Page 38

1 because they were of unusual size?
2     A.  I'm not aware.
3     Q.  Were the buyers at the corporate level
4  that were looking at orders also attempting to
5  identify orders of unusual frequency?
6     MR. KOBRIN:  Object to form.
7  BY THE WITNESS:
8     A.  I'm -- they were -- they were monitoring
9  all orders that were coming from the stores and then
10 subsequent orders that were being placed by the -- to
11 the manufacturers.
12 BY MR. HUDSON:
13    Q.  Is there any way, as we sit here today, we
14 can figure out in any sort of detail what the -- what
15 the pharmacy buyers were actually doing on a
16 day-to-day basis to monitor those orders?
17    A.  I don't recall that level of detail.
18    Q.  Do you know whether that -- they generated
19 any reports or documented any -- any of their efforts?
20    A.  I'm -- I'm not aware of what their --
21 those types of specific day-to-day activities were.
22    Q.  Do you recall during your two years at
23 Giant Eagle whether or not any reports ever made their
24 way to you documenting activity related to monitoring

Page 39

1  orders of controlled substances?
2     A.  No, I don't recall any of those type of
3  reports.
4     Q.  Did you spend any part of day-to-day --
5  did you spend any time in your role looking at and
6  trying to determine whether or not HBC had -- was
7  operating a system that was identifying suspicious
8  orders of controlled substances?
9     A.  No.
10    Q.  Who -- were there others who you believe
11 were spending time doing that?
12    A.  Greg Carlson.
13    MR. KOBRIN:  Object to form.  Spending time
14 doing what?
15 BY MR. HUDSON:
16    Q.  Did you understand my question?
17    A.  Yeah.  Greg Carlson was my direct report
18 who had oversight over all of pharmaceutical
19 purchasing for Giant Eagle.
20    Q.  Anyone else that would have been involved?
21    A.  He would have the -- he would have direct
22 responsibility.
23    Q.  Do you know whether or not he worked with
24 anyone else under him or would it be better just to

Page 40

1  ask him those questions?
2     A.  He would probably have a better
3  recollection of -- of who those people were.
4     Q.  In your time at Giant Eagle, did there
5  ever -- did there ever come a time where from a -- a
6  corporate standpoint there was a concern about
7  controlled substances or opioids being diverted?
8     MR. KOBRIN:  Object to form.
9  BY THE WITNESS:
10    A.  No, there was never a situation that I'm
11 aware of that caused concern.
12 BY MR. HUDSON:
13    Q.  How about just from a -- a policy or, you
14 know, a potential risk standpoint, was Giant Eagle or
15 HBC concerned about opioids being diverted?
16    MR. KOBRIN:  Object to form.
17 BY THE WITNESS:
18    A.  The -- the integrated system we had in
19 place was such that the -- the risk was -- was very
20 minimal.  So there was not a high level of concern.
21 BY MR. HUDSON:
22    Q.  During your time at Giant Eagle, so
23 between 2009 and 2011, are you aware of any efforts by
24 Giant Eagle to try to determine whether or not its

Page 41

1  integrated system was effective?
2     MR. KOBRIN:  Object to form.
3  BY THE WITNESS:
4     A.  I'm not sure I understand the question.
5  BY MR. HUDSON:
6     Q.  Well, for example, did you ever hire a
7  third-party consultant or do, you know, any review
8  process on the integrated test -- system that you've
9  testified about to try to determine whether or not it
10 was effectively preventing diversion?
11    MR. KOBRIN:  Object to form.
12 BY THE WITNESS:
13    A.  I'm not aware of any outside consulting
14 entity that was brought in to evaluate the system.
15 BY MR. HUDSON:
16    Q.  How about any sort of internal review
17 process?
18    A.  I'm not aware of an internal review after
19 the initial project plan that was put together that
20 went forward with developing it that had input from
21 logistics, distribution, legal, accounting, IT.
22    Q.  And was there -- was there a central file
23 or somewhere where Giant Eagle or HBC kept that
24 initial project plan document or documents?

Page 42

1  MR. KOBRIN: Object to form.
2  BY THE WITNESS:
3  A. I'm not aware of a project plan, but as I
4  stated earlier, there is a document retention policy
5  at Giant Eagle, and, you know, that -- if -- if there
6  was a document that would have been destroyed based
7  upon the normal deletion timeframe that's in that
8  document retention policy.
9  BY MR. HUDSON:
10  Q. Were you involved in trying to identify
11  corporate opportunities to grow the revenue at Giant
12  Eagle or HBC?
13  A. At Giant Eagle pharmacy, yes.
14  Q. Okay. And at some point did Giant Eagle
15  identify pain management clinics as a potential
16  corporate opportunity?
17  A. I was involved in evaluating pharmacies
18  that looked at pain management.
19  Q. And tell me what your involvement was.
20  A. I had meetings with Cleveland Clinic, I
21  had meetings with an entity in the State of Texas, I
22  made a trip to Oregon to meet with a chain, a small
23  chain that I don't recall the name, and, you know,
24  after deliberation we made a decision that that was

Page 43

1  one of many potential pharmacy business building
2  ventures that we were not going to pursue.
3        (WHEREUPON, a certain document was
4         marked HBC - Heiser Deposition
5         Exhibit No. 3, for identification, as
6         of 02/19/2019.)
7  BY MR. HUDSON:
8  Q. Let me hand you what I have marked as
9  Exhibit 3.
10  MR. KOBRIN: Have you talked to McKesson about
11  showing this to our client?
12  MR. HUDSON: Yes. I've sent that to them a
13  number of times in the past and also he is on the
14  document, so...
15  MR. KOBRIN: All right. So he has seen this
16  whole document?
17  MR. HUDSON: Who?
18  MR. KOBRIN: The witness, Mr. Heiser has?
19  MR. HUDSON: Well, he's -- he wrote the e-mail.
20  It is his e-mail on Page 2.
21  MR. KOBRIN: Right. But he is not copied on the
22  above e-mail. I just want to make sure that McKesson
23  is okay with us showing a confidential document to
24  Mr. Heiser, despite the fact that I know that his

Page 44

1  e-mail, he is on Page 2, but I note that there are
2  further e-mails that he has never reviewed above that
3  e-mail.
4  BY MR. HUDSON:
5  Q. Okay. Well, let's just -- yeah. If you
6  could just hand that back to me then.
7        I mean, my question...
8  MR. KOBRIN: I mean, if they've consented,
9  that's fine too.
10  MR. HUDSON: Well, I've sent it to them a number
11  of times, so I know that they're aware of it.
12  BY MR. HUDSON:
13  Q. If you could, just focus on the e-mail
14  there that you wrote on Page 2 there.
15        Do you see there it says:
16        "Jeff, We are currently evaluating 'pain
17  mgt' as a corporate business opportunity. Looking at
18  the Cleveland marketplace to begin (already in
19  conversations with the Cleveland Clinic). Please give
20  me a call this week to discuss."
21        Do you see that?
22  A. Yes, I do see that.
23  Q. Okay. And is that -- is that a reference
24  to what you are talking about is efforts that you made

Page 45

1  to identify pharmacies and potentially form
2  relationships with them?
3  A. This was a potential business venture to
4  open pharmacies that focused on pain management. It's
5  a venture that we decided to not pursue.
6  Q. So when you -- so you would be -- you were
7  looking at actually opening up pharmacies in
8  conjunction with the Cleveland Clinic or other pain
9  management clinics?
10  A. Correct.
11  Q. Okay. Not -- in -- instead I guess what I
12  took that e-mail to mean was that you were looking at
13  forming, like, relationships where you would work with
14  pain management clinics to have the, you know,
15  prescriptions filled through existing Giant Eagle
16  pharmacies?
17  A. No. It was -- it was a potential business
18  venture to actually open up pharmacies that
19  specialized in pain management but were fully owned by
20  Giant Eagle.
21  Q. Do you know at what point that you decided
22  not to pursue those ventures?
23  A. I don't recall.
24  Q. Anything else you can recall about steps

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  that you or others took to look into corporate
2  business opportunities relating to pain management
3  clinics?
4      A.   Pain management was just one of dozens of
5  different opportunities that we looked at every year,
6  including nursing homes, buying independent
7  pharmacies, potentially getting into mail-order
8  business.  We looked at all types of things every year
9  when we created our business plan.  This was just one
10 of the ones that we looked at and one that we -- of
11 many that we decided not to pursue.
12     Q.   Between 2009 and 2011, did you ever pursue
13 any internet pharmacies or mail-order pharmacies?
14     A.   No.  Nope.
15     Q.   Did you -- did you ever have any sort of
16 specialty pharmacies between 2009 and 2011 that Giant
17 Eagle opened?
18     A.   No.  I think that -- that started after I
19 left, specialty pharmacy, but there was no specialty
20 pharmacy while I was there.
21     Q.   Did you -- between 2009 and 2011, did you
22 personally have any role in evaluating any diversion
23 or theft that occurred at any of the Giant Eagle
24 retail pharmacies?

Page 47

1      A.   The systems that we had in place, if there
2  was any major diversion identified, it would have been
3  pushed up to my level, but there was no diversion or
4  theft to the level that got pushed up to my area.
5      Q.   So between 2009 and 2011, to the best of
6  your recollection, there were never any pharmacists
7  who ever stole or diverted controlled substances?
8           MR. KOBRIN:  Object to form.  It misrepresents
9  his testimony.
10 BY THE WITNESS:
11     A.   I -- I didn't state that.
12 BY MR. HUDSON:
13     Q.   You testified that if there were any major
14 diversions identified, they would have made their way
15 up to your level, right?
16          MR. KOBRIN:  Object to form.
17 BY THE WITNESS:
18     A.   If -- if there was a -- a situation that
19 involved theft, it would have come to my level at some
20 point, but it was many, many years ago.
21 BY MR. HUDSON:
22     Q.   Right.  And then you -- but then you --
23 the other part of your answer is you said "there was
24 no diversion or theft to the level that got pushed up

Page 48

1  to my area," right?
2      A.   Well, no, I mean, I know there are
3  pharmacists that had issues with stealing that were
4  caught within our system.
5      Q.   And that's what I'm asking about.  Between
6  2009 and 2011, are you aware of times where
7  pharmacists were caught stealing or diverting
8  controlled substances?
9      A.   There were times from my entire time at
10 Giant Eagle from '96 to 2011 where pharmacists had
11 issues with either abusing drugs or technicians
12 stealing that were caught that I'm aware of, but I --
13 I don't recall the two-year window.  I mean, in that
14 15 years there were situations where that did occur
15 that were brought to my attention.
16     Q.   And how about diversion or theft that
17 occurred at the HBC warehouse, any recollection of
18 that occurring between 2009 and 2011 when HBC acted as
19 a distributor of controlled substances?
20     A.   I'm not aware of any theft or diversion
21 issues that were identified in the warehouse.
22     Q.   Not at all?
23     A.   None that I recall.
24     Q.   Is that something that would make its way

Page 49

1  up to your level or would that be handled by
2  Mr. Doerr, Mr. Rogos or others?
3      A.   It probably would have eventually got to
4  me, but, again, I don't recall any situations of theft
5  or diversion at the distribution center.
6      Q.   And between 2009 and 2011, did Mr. -- was
7  Mr. Doerr the head of the HBC facility?
8      A.   I don't remember.  Some guy named Walt, I
9  think, but I -- I don't recall the gentleman's name.
10 I mean, my -- my interaction or my point of contact
11 was always Greg Carlson and then Greg would have been
12 in contact with the proper distribution center, but I
13 don't -- I don't recall the person's name.
14     Q.   As the VP of Pharmacy, did you oversee the
15 HBC warehouse, in other words, would that fall within,
16 sort of, your chain of command?
17     A.   No.  The only thing that would have fallen
18 in my chain of command were the -- the
19 pharmaceuticals, specifically the generics that were
20 being distributed, but the rest of the merchandise I
21 was not responsible for.
22     Q.   Did -- did Walt or any -- anyone else at
23 HBC report up the chain to Mr. Carlson or to you, do
24 you know?

Page 50

1  MR. KOBRIN: Object to form.
2  BY THE WITNESS:
3  A. Mr. Carlson reported to me, but the person
4  that oversaw the distribution center would have
5  reported up to another person on the distribution or
6  logistics side of the business.
7  BY MR. HUDSON:
8  Q. Did HBC, the warehouse, did it have any
9  compliance department or compliance employees that
10 were physically located at the facility?
11 A. I'm -- I'm not aware of any.
12 Q. Do you know whether or not there were any
13 compliance employees or executives that were assigned
14 to oversee the actions at the HBC warehouse?
15 A. I'm not aware of them.
16 Q. Do you -- between 2009 and 2011, did you
17 visit, ever visit the HBC warehouse?
18 A. Yes.
19 Q. And approximately how many times?
20 A. I'd say approximately two, but that's just
21 based on my recollection. I really don't recall. But
22 it was at least once, it may have been twice.
23 Q. Do you know whether or not as part of that
24 integrated system that you've discussed, were there

Page 51

1  employees from corporate who were assigned to the HBC
2  warehouse?
3  MR. KOBRIN: Object to form.
4  BY THE WITNESS:
5  A. I'm not sure I understand the question.
6  You said assigned from corporate to --
7  BY MR. HUDSON:
8  Q. Yeah. I guess I'm trying to get an
9  understanding of -- of just how the -- the integrated
10 system worked in terms of who -- you know, which
11 personnel worked with -- with who and how the system
12 actually operated.
13 MR. KOBRIN: Object to form.
14 BY THE WITNESS:
15 A. Well, the -- the buyers that I mentioned,
16 which would be monitoring, you know, the orders coming
17 from the stores to the warehouse and then the orders
18 from the warehouse to the manufacturers, those
19 pharmacy buyers were probably sitting in Giant Eagle
20 headquarters. I don't think they were sitting in the
21 HBC warehouse.
22 BY MR. HUDSON:
23 Q. And those -- do you know what data, would
24 it be the purchase and -- and shipping data, or what

Page 52

1  data were their look -- were they looking at, if you
2  know?
3  A. They would be looking at the orders, but I
4  don't recall how that data was actually transmitted to
5  them.
6  Q. And -- and I apologize. I think I've
7  asked you this question already, but I just want to
8  make sure the record is clear.
9    Do you know one way or the other whether
10 or not those pharmacy buyers were using any computer
11 programs to assist them in their review of those
12 orders or shipments?
13 A. I'm not aware of the tools that they used
14 to -- to monitor that particular activity.
15 Q. Do you know whether or not Giant Eagle or
16 HBC had any -- anyone assigned to investigate
17 potential suspicious orders?
18 A. I think I've already described the system,
19 that it was in place to identify any -- anything that
20 looked like it was unusual.
21 Q. Right. And so let's assume then that
22 there was an order that was flagged or identified as
23 being unusual.
24    Was there -- was there some investigator

Page 53

1  or person that then was in place to go out and
2  investigate that order to try to figure out whether it
3  was legitimate or at risk for diversion?
4  A. My understanding is the -- the buyer that
5  identified something that might look different, that
6  they would do the investigation. If they were not
7  satisfied, then I'm assuming that they would -- they
8  would talk to Greg Carlson about that issue.
9  Q. And, again, in terms of the pharmacy buyer
10 or buyers, you don't have any recollection of who
11 that -- who that would have been?
12 A. I don't recall who those folks were.
13 Q. Do you know whether or not it was one,
14 two, three, how many people were involved in that
15 process?
16 A. I don't recall.
17 Q. Do you have any sense of how much time
18 the -- those pharmacy buyers spent monitoring orders
19 or shipments?
20 A. No, I do not.
21 Q. To the best of your recollection, you
22 believe that they were physically located, though, at
23 the -- at corporate headquarters?
24 A. That's -- would be my recollection, yes.

Page 54

1  Q. And anything else you can think of related
2 to the pharmacy buyers monitoring orders, anything
3 more specific you can say about that process?
4      MR. KOBRIN: Object to form.
5 BY THE WITNESS:
6   A. I think I've described as best I recall
7 what the system was in place to do that monitoring.
8      MR. HUDSON: We've been going about an hour.
9 Let's take a short break.
10     THE VIDEOGRAPHER: 9:58, we are off the video
11 record.
12     (WHEREUPON, a recess was had
13        from 9:58 to 10:26 a.m.)
14     THE VIDEOGRAPHER: 10:26, we are on the video
15 record.
16 BY MR. HUDSON:
17  Q. Mr. Heiser, I want to switch gears, if I
18 could, and just make sure I understand the
19 organizational structure of Giant Eagle when you were
20 there, and I'm really focused on that time period from
21 November of 2009 until October of 2011.
22  A. Okay.
23  Q. Could you just describe for me, you were
24 obviously the VP of Pharmacy, but if you could just

Page 55

1 describe for me who you reported to and then who
2 reported to you?
3   A. Okay. Who I reported to changed
4 throughout my 15 years at Giant Eagle. So I don't
5 recall between 2009 and 2011 who I reported to. I can
6 give you a history.
7      Initially I reported to John Tedesco who
8 at that time oversaw pharmacy, health and beauty care,
9 non-foods, photo. At some point my reporting changed
10 and I reported to Laura Karet when she was in charge
11 of pharmacy merchandising. At another point I
12 reported to John Lucot, and I think at his capacity he
13 was president of Giant Eagle at the time. And the
14 last person that I reported to was Brett Merrell, and
15 he was senior vice president of health and wellness.
16 But I don't recall 2009 - 2011 who it was, but the
17 last person was Brett Merrell, but I don't recall when
18 I began reporting to him.
19  Q. So it may have been John Lucot as well, in
20 other words, at some point during that?
21  A. Correct. It's -- I don't think it was
22 Laura Karet. It was either Brett Merrell during that
23 time period or John Lucot. I -- I just don't recall.
24  Q. And then during that time period, to the

Page 56

1 best of your recollection, I know it's been a number
2 of years, but can you just describe them going up the
3 chain how the -- you know, how the reporting worked,
4 to your knowledge?
5   A. Under me?
6   Q. No. Up the chain, meaning, sorry, above.
7   A. Above.
8   Q. Yeah. So either Brett Merrell or John
9 Lucot. So John Lucot was the president, you remember?
10  A. Correct.
11  Q. Right. And so then did he --
12  A. Lucot would have reported to David
13 Shapira, the CEO. And during Brett Merrell's time, I
14 think -- I think Brett would have also reported to
15 John Lucot and then Lucot would have reported to the
16 CEO.
17  Q. Okay.
18  A. But -- but -- but I --
19     MR. KOBRIN: Don't speculate. If you remember,
20 it's fine.
21 BY THE WITNESS:
22  A. I -- I don't recall specifically what that
23 reporting structure was.
24 BY MR. HUDSON:

Page 57

1   Q. Sure.
2      And then -- so then how about underneath
3 you? You've talked about Greg Carlson, but if you
4 could, just describe what you recall about the
5 organizational structure underneath you?
6   A. And I'll -- I'll start with 2011 because,
7 again, it changed going back from 2011 to '96, but
8 when I left the Giant Eagle, the people that reported
9 to me were: Greg Carlson, who had responsibility for
10 purchasing; Debbie Kraznow, who had responsibility for
11 managed care, contracting with the different health
12 plans; Joe Meshanski, who was responsible for IT; Sean
13 Raynak, who was responsible for business development
14 and analysis; and Anthony Mollica, who was responsible
15 for pharmacy operations.
16  Q. And if you went back in time to 2010 or
17 2009, do you have any recollection of how that may
18 have changed?
19  A. At some point the position of overseeing
20 pharmacy operations was added. I don't know when that
21 was added. So Anthony would have moved into that
22 position. Prior to that all of the district managers
23 reported directly to me, but at some point Anthony
24 Mollica was inserted so that they reported -- the ten

Page 58

1 reported to him and then he reported to me.
2     The position also of business development
3 and analysis, Sean Raynak, that was one that was
4 recently added, but the ones that were there for --
5 for many years was the purchasing, Greg Carlson; the
6 managed care, Debbie Kraznow; and the IT under Joe
7 Meshanski.
8     Q.   Why did you decide to leave Giant Eagle?
9     A.   At some point in October of 2011, Brett
10 Merrell came to me and said the company has made a
11 decision to move the pharmacy in a new direction and
12 they felt that Brett Merrell was the more appropriate
13 person to move it into that direction and they
14 presented me with a severance package.
15     Q.   What was the direction, to your knowledge,
16 that the pharmacy was going to move in?
17     A.   It was never disclosed to me.
18     Q.   Did anybody ever identify for you, you
19 know, crit -- criticisms or complaints about your role
20 in overseeing the pharmacy?
21     A.   I was never aware of any criticism about
22 my performance.
23     Q.   Anything else you recall from that time
24 period when Mr. Merrell approached you with the

Page 59

1 buyout?
2     A.   Concerning -- what's your specific
3 question?
4     Q.   Well, just anything else you recall about
5 that.  In other words, the -- you know, the
6 conversations or anything more specific about the
7 reasoning for why the decision was made?
8     MR. KOBRIN:  Object to form.
9 BY THE WITNESS:
10     A.   No.  They wanted to move in another
11 direction and here it is.  I was the first of -- of
12 many severance packages that were handed out at Giant
13 Eagle when new management came in at the top.
14 BY MR. HUDSON:
15     Q.   And who was the new management at the top,
16 Brett Merrell?
17     A.   No.  Laura Karet would have been the new
18 CEO.
19     Q.   Do you have any -- looking back now and
20 sitting here today, do you have any knowledge or
21 understanding of how Giant Eagle may have shifted
22 direction or moved in a different, you know, approach
23 with -- under new management?
24     A.   No, I --

Page 60

1     MR. KOBRIN:  Object to form, asked and answered.
2 BY THE WITNESS:
3     A.   -- I have -- I have not seen any specific
4 change in how they are conducting their pharmacy, but
5 I also don't have insight into what's going on.
6 BY MR. HUDSON:
7     Q.   When you were the VP of Pharmacy at Giant
8 Eagle, did you receive incentive compensation?
9     A.   There was a -- a bonus program in addition
10 to the normal weekly compensation.
11     Q.   Was the -- was the bonus program based off
12 of the performance specific to the pharmacy or the
13 entire company?
14     A.   The entire company.
15     Q.   After you left Giant Eagle, you joined
16 McKesson?
17     A.   Correct.
18     Q.   And what was your role there?
19     A.   My role was Director of National Accounts
20 Six Sigma.
21     Q.   And it looks like you stayed in that role
22 a little less than two years?
23     A.   It was less -- it was actually less than a
24 year.

Page 61

1     Q.   Okay.  Less than a year.
2     And then why did you leave McKesson?
3     A.   It just was not a good fit.  My position
4 was to look for cost savings between the national
5 accounts and McKesson and it was very numbers and
6 commodity driven and it was not a good fit for me.  I
7 need to be around people.
8     Q.   And then what did you do after you left
9 McKesson?
10     A.   I started working for CVS as a pharmacist.
11     Q.   And is your job just to be a pharmacist at
12 a specific pharmacy?
13     A.   I'm currently a pharmacy manager at a
14 specific pharmacy south of Pittsburgh in McKeesport,
15 Pennsylvania.
16     Q.   And then prior to that you were in -- out
17 of -- a pharmacist in Masontown, Pennsylvania?
18     A.   Correct.  Masontown, I was a staff
19 pharmacist there.
20     Q.   And what does that mean, staff pharmacist?
21     A.   I wasn't the pharmacy manager.
22     Q.   Okay.  How many pharmacists are there at
23 your current pharmacy in McKeesport?
24     A.   One-and-a-half.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  Q. You being the one?
2  A. Me being the one.
3       MR. HUDSON: Okay. I think that's all I've got.
4  No further questions. Thanks.
5       MR. KOBRIN: Can we just take a quick break.
6  I'm not going to have very much redirect either.
7       THE VIDEOGRAPHER: 10:35, we are off the record.
8          (WHEREUPON, a recess was had
9           from 10:35 to 10:42 a.m.)
10      THE VIDEOGRAPHER: 10:42, we are on the video
11 record.
12      MR. KOBRIN: We have no additional questions.
13      THE VIDEOGRAPHER: 10:42, we are off the video
14 record. This concludes the video deposition.
15          (Time Noted: 10:42 a.m.)
16      FURTHER DEPONENT SAITH NAUGHT.

Page 63

1          REPORTER'S CERTIFICATE
2
3       I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
4  a Certified Shorthand Reporter, do hereby certify:
5       That previous to the commencement of the
6  examination of the witness herein, the witness was
7  duly sworn to testify the whole truth concerning the
8  matters herein;
9       That the foregoing deposition transcript
10 was reported stenographically by me, was thereafter
11 reduced to typewriting under my personal direction and
12 constitutes a true record of the testimony given and
13 the proceedings had;
14      That the said deposition was taken before
15 me at the time and place specified;
16      That I am not a relative or employee or
17 attorney or counsel, nor a relative or employee of
18 such attorney or counsel for any of the parties
19 hereto, nor interested directly or indirectly in the
20 outcome of this action.
21      IN WITNESS WHEREOF, I do hereunto set my
22 hand on this 19th day of February, 2019.
23
24      JULIANA F. ZAJICEK, Certified Reporter

Page 64

1          DEPOSITION ERRATA SHEET
2
3
4  Case Caption: In Re: National Prescription
5          Opiate Litigation
6
7      DECLARATION UNDER PENALTY OF PERJURY
8
9       I declare under penalty of perjury that I
10 have read the entire transcript of my Deposition taken
11 in the captioned matter or the same has been read to
12 me, and the same is true and accurate, save and except
13 for changes and/or corrections, if any, as indicated
14 by me on the DEPOSITION ERRATA SHEET hereof, with the
15 understanding that I offer these changes as if still
16 under oath.
17
18              RANDY HEISER
19
20 SUBSCRIBED AND SWORN TO
21 before me this      day
22 of         , A.D. 20__.
23
24      Notary Public

Page 65

1          DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23 SIGNATURE:_____DATE:_____
24          RANDY HEISER

Page 66

```
 1          DEPOSITION ERRATA SHEET
 2  Page No._____Line No._____Change to:_____
 3  _____
 4  Reason for change:_____
 5  Page No._____Line No._____Change to:_____
 6  _____
 7  Reason for change:_____
 8  Page No._____Line No._____Change to:_____
 9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24           RANDY HEISER
```