```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                     EASTERN DIVISION

 3

 4   In re:  NATIONAL PRESCRIPTION   )   CASE NO.

     OPIATE LITIGATION               )   1:17-MD-2804

 5                                   )

     APPLIES TO ALL CASES            )   Hon. Dan A. Polster

 6

 7        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

 8

 9              DEPOSITION FOR PLAINTIFF

10

11

12              ***   ***   ***

13   DEPONENT:       SHAUNA HELFRICH

14   DATE:          JANUARY 10, 2019

15              ***   ***   ***

16

17

18

19

20

21

22

23

24

25
```

EXAMINATION INDEX

Examination by Mr. Goetz.......................... 8
Examination by Mr. Delinsky...................... 242
Re-examination by Mr. Goetz...................... 249
Reporter's Certificate........................... 257

EXHIBIT INDEX

CVS-Helfrich-2.................................. 56
IRR, 8-30-13          CVS-MDLT1-10672-757
          Highly Confidential
CVS-Helfrich-3................................. 100
Email chain          CVS-MDLT1-83064
          Confidential
CVS-Helfrich-4................................. 100
SOM Process          CVS-MDLT1-83065
          Confidential
CVS-Helfrich-5................................. 79
Time study          CVS-MDLT1-112702
          Confidential
CVS-Helfrich-6................................. 83
LP Analyst Time Study    CVS-MDLT1-112686
          Confidential
CVS-Helfrich-7................................. 85
LP Analyst Time Study    CVS-MDLT1-112690
          Confidential
CVS-Helfrich-8................................. 90
LP Analyst Time Study    CVS-MDLT1-112698
          Confidential
CVS-Helfrich-9................................. 205
Controlled Drug-DEA SOP Manual   CVS-MDLT1-8506
          Confidential
CVS-Helfrich-10................................ 166
Email chain,          CVS-MDLT1-88516
          Confidential

EXHIBIT INDEX - Continued

CVS-Helfrich-12................................ 172
Email chain,          CVS-MDLT1-31518
          Confidential
CVS-Helfrich-13................................ 109
Order sheets          CVS-MDLT1-10268
          Highly Confidential
CVS-Helfrich-14................................ 130
Chart Title, Series 1    CVS-MDLT1-10235

CVS-Helfrich-18................................ 37
INCB statistics 2012

CVS-Helfrich-19................................ 39
Publication: 2012 Ohio Drug Overdose Deaths

CVS-Helfrich-20................................ 51
NVSS graph, U.S. Rates of Opioid Overdose Deaths,
   Sales and Treatment Admissions, 1999-2010
CVS-Helfrich-21................................ 216
Notice of Inspection of Controlled Premises
CVS-MDLT1-10522          Highly confidential
CVS-Helfrich-23................................ 235
Suspicious Order Monitoring Report update
          confidential
CVS-Helfrich-24................................ 235
Logistics Planning Update, 9-15-14
CVS-MDLT1-19836          Highly Confidential
CVS-Helfrich-25................................ 216
DEA Visit 8/5 - 8/8 2013 - Notes
CVS-MDLT1-61230          Highly Confidential
CVS-Helfrich-26................................ 217
Email chain          CVS-MDLT1-409
          Highly Confidential
CVS-Helfrich-27................................ 232
Email chain          CVS-MDLT1-76135
          Highly Confidential

EXHIBIT INDEX - Continued

CVS-Helfrich-29................................ 233
DEA correspondence          CVS-MDLT1-8014
          Highly Confidential
CVS-Helfrich-30................................ 237
Email chain          CVS-MDLT1-8016
          Highly Confidential
CVS-Helfrich-31................................
Email          CVS-MDLT1-22284
          Highly Confidential
CVS-Helfrich-33................................ 113
Track One CVS Store Information CVS-MDLT1-7362
          Confidential
CVS-Helfrich-34................................ 68
Irregular Order - Logistics Communication
CVS-MDLT1-3346          Highly Confidential
CVS-Helfrich-35................................ 146
Email chain          CVS-MDLT1-8496
Highly Confidential - Protected Health Information
CVS-Helfrich-36................................ 179
List I Chemicals and Control Drug Policy/Procedure
CVS-MDLT1-25018          Confidential
CVS-Helfrich-37................................ 119
Irregular Order - Logistics Communication
CVS-MDLT1-3348          Highly Confidential
CVS-Helfrich-38................................ 120
Email chain          CVS-MDLT1-8483
Highly Confidential - Protected Health Information
CVS-Helfrich-41................................ 254
Email          CVS-MDLT1-118312
          Confidential
CVS-Helfrich-43................................ 254
Fulfillment Check Register

A P P E A R A N C E S

FOR THE PLAINTIFF:    DANIEL GOETZ, Esquire
          BRIAN ROOF, Esquire
          Weisman, Kennedy & Berris Co., L.P.A.
          101 West Prospect Street
          Cleveland, Ohio  44115
          216-781-1111
          dgoetz@weismanlaw.com
          broof@weismanlaw.com

Via speakerphone:    MICHAEL ELSNER, Esquire
          KAITLYN EEKHOFF, Esquire
          AMANDA UNTERREINER, Esquire
          Motley Rice, LLC
          28 Bridgeside Boulevard
          Mount Pleasant South Carolina
              29464
          843-216-9250
          843-216-9210
          843-216-9493
          melsner@motleyrice.com
          keekhoff@motleyrice.com
          aunterreiner@motleyrice.com

FOR THE DEFENDANT:    ERIC DELINSKY, Esquire
CVS entities          Zuckerman Spaeder, LLP
          Suite 1000
          1800 M Street
          Washington, DC  20036
          202-778-1800
          edelinsky@zuckerman.com

FOR THE DEFENDANT:    SARAH HARMON, Esquire
Cardinal Health       Armstrong Teasdale, LLP
          Suite 1800
          7700 Forsyth Boulevard
          St. Louis, Missouri  63105
          314-552-6672
          sharmon@ArmstrongTeasdale.com

| Page 6 | Page 8 |
|---|---|

**Page 6**

1     APPEARANCES - Continued

2

3 FOR THE DEFENDANT:   JAMES PETKUN, Esquire

AmerisourceBergen    Reed Smith, LLP

4 via speakerphone    Three Logan Square

          Suite 3100

5           1717 Arch Street

          Philadelphia, PA  19103

6           215-851-8204

          jpetkun@reedsmith.com

7

8 FOR THE DEFENDANT:   ANGELA VICARI, Esquire

Endo & Par entities   Arnold & Porter Kaye Scholer, LLP

9 via speakerphone    250 West 55th Street

          New York, New York  10019

10          212-836-7408

         angela.vicari@arnoldporter.com

11

12 FOR THE DEFENDANT:   PATRICK DUBOIS, Esquire

Walmart          Jones Day

13 via speakerphone    77 West Wacker Street

          Chicago, Illinois  60601

14          312-269-4251

         pdubois@jonesday.com

15

16 ALSO PRESENT:   Ben Stanson, videographer

          Jon Knowles, technologist

17

18

19

20

21

22

23

24

25

**Page 7**

1     The deposition of SHAUNA HELFRICH taken on

2 discovery, pursuant to Notice heretofore filed, in the

3 Latitude Room, 2nd Floor, of Le Meridien Indianapolis,

4 123 South Illinois Street, Indianapolis, Indiana, on

5 January 10, 2019, at approximately 8:22 a.m.; upon

6 oral examination, and to be used in accordance with

7 the Federal Rules of Civil Procedures.

8

9        *  *  *

10

11     THE VIDEOGRAPHER:  We are now on the record.

12 My name is Ben Stanson. I'm a videographer for Golkow

13 Litigations Services. Today's date is January 10,

14 2018, and the time is 8:22 a.m.

15     This video deposition is being held in

16 Indianapolis, Indiana, in the matter of National

17 Prescription Opioid Litigation, MDL No. 2084 pending

18 in the United States District Court for the eastern

19 district of Ohio.

20     The witness is Shauna Helfrich.

21     Counsel, please identify yourselves for the

22 record?

23     MR. GOETZ:  Dan Goetz on behalf of

24 plaintiffs.

25     MR. ROOF:  Brian Roof on behalf of

**Page 8**

1 plaintiffs.

2     MS. HARMON:  Sarah Harmon for Cardinal

3 Health.

4     MR. DELINSKY:  Eric Delinsky, Zuckerman

5 Spaeder on behalf CVS Indiana, LLC; CVS Rx Services,

6 Inc, and on behalf of Ms. Helfrich as well.

7     THE VIDEOGRAPHER:  The court reporter is Kim

8 Keene.

9     Will you please swear in the witness?

10

11        *  *  *

12     SHAUNA HELFRICH, after having first been duly

13 administered an oath, testified as follows:

14        *  *  *

15

16       EXAMINATION

17 BY MR. GOETZ:

18     Q. And am I pronouncing your name correctly?

19 Helfrich?

20     A. Uh-huh.

21     Q. When did you come to work for CVS?

22     A. I can't recall the exact date. Possibly in

23 October, the end of October, I believe.

24     Q. Of what year?

25     A. Of 2012.

**Page 9**

1     Q. And when you started at the end of October of

2 2012, who was your employer?

3     A. CVS Pharmacy, Indianapolis.

4     Q. Is that the name of the company you worked

5 for?

6     A. Yes.

7     Q. Is that the name of the company you currently

8 work for?

9     A. I believe so, yes.

10     (CVS-Helfrich-43 was marked for

11 identification.)

12     Q. Okay. I'm going to hand you Exhibit 43. We

13 are not actually putting these up on the screen.

14     Throughout the day as we hand you exhibits,

15 if you want to look, the exhibits will actually go up

16 on the screen, but these were not -- that's for the

17 jury to see. These aren't really necessary.

18     A. Okay.

19     Q. Does this refresh your recollection of when

20 you came to work for CVS?

21     A. I can't really recall. It has -- has the

22 date of 11-16, so...

23     Q. That was your first paycheck from CVS --

24     A. Okay.

25     Q. -- correct, according to the records?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    A. Yeah.
2    Q. Okay. And these actually reflect your time
3 records, I believe, and your payment through
4 9-19-2014.
5    A. Yes.
6    Q. Okay. As you look at them, do they seem
7 generally accurate?
8    A. Uh-huh.
9       MR. DELINSKY: Object to form.
10    A. That I -- I cannot say.
11    Q. Do you have any reason to dispute that the
12 hours shown are wrong?
13       MR. DELINSKY: Object to form.
14    A. I can't really -- I -- see -- I really can't
15 say. I don't -- I don't have my records.
16    Q. Well, you can put that aside. We will move
17 on.
18       If we have time, we will come back to that.
19       Who is Frank Helfrich?
20    A. My father.
21    Q. And what does Frank Helfrich do?
22    A. He is logistics ops manager.
23    Q. For -- for whom?
24    A. CVS dis...
25    Q. How long has he been --

Page 11

1       MR. DELINSKY: I'm sorry, Dan. I just want
2 to make sure. Shauna's voice is a little -- is quiet,
3 so -- you said CVS?
4    A. Distribution center.
5    Q. Okay. Is that the same place you work?
6    A. Yes.
7    Q. Okay. That's the same place that you went to
8 work in 2012 and -- is that correct?
9    A. Yes.
10    Q. Is that how you got your job? Through your
11 father?
12    A. No. He informed me that there was an
13 opening, but my application and everything was pulled
14 by their HR department.
15    Q. Okay. What is your educational background?
16    A. I have a high school diploma.
17    Q. When?
18    A. 20 -- 2003.
19    Q. 2003.
20       And after high school, do you have any other
21 college, any training, any other training?
22    A. No.
23    Q. And after high school, graduating high
24 school, where did you go to work?
25    A. Right after -- out of high school, I worked

Page 12

1 at a law firm.
2    Q. For how long?
3    A. I can't -- the exact, I want to say maybe
4 about seven years or so.
5    Q. Till around 2010?
6    A. Yeah. I think so.
7    Q. Okay.
8    A. I'm not sure.
9    Q. What did you do after that?
10    A. I moved to Florida.
11    Q. You moved to Florida?
12    A. Uh-huh.
13    Q. And you did what in Florida?
14    A. I volunteered at a wildlife refuge.
15    Q. How long did do you that?
16    A. Florida? Maybe only a couple of years,
17 maybe. I don't -- I can't recall how long I was -- I
18 know it wasn't for very long I was there.
19    Q. Okay. In between working at a law firm and
20 coming to CVS in either October or November of 2012,
21 did you do anything other than volunteer at a wildlife
22 refuge?
23    A. No.
24    Q. What did you do at the wildlife refuge?
25    A. Fostered and took care of animals.

Page 13

1    Q. And what did you do at the law firm for seven
2 years?
3    A. I was a legal assistant.
4    Q. Meaning what?
5    A. I helped prepare correspondence and emails
6 and other documentation.
7    Q. For what type of practice?
8    A. Corporate.
9    Q. There was no regulatory aspect to your legal
10 assisting, was there?
11       MR. DELINSKY: Object to the form.
12    A. What are you saying?
13    Q. Did you work with the Controlled Substances
14 Act as part of your work at the law firm?
15    A. No.
16    Q. Okay. Did you work with anything related to
17 the DEA as part of your work at the law firm?
18    A. Not that I can recall.
19    Q. When you came to CVS in October or November
20 of 2012, what was your title?
21    A. I was an RX picker.
22    Q. What is that?
23    A. You work in the RX department and you pick
24 the orders.
25    Q. How long were you an RX picker?

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    A. I do not know how long I was classified as an
2  RX picker.
3    Q. So, how long did you pick orders?
4    A. Honestly, I can't -- I don't -- I don't
5  really know and -- the exact dates, possibly 2013. I
6  was continuously picking. I can't exactly remember
7  the exact dates in which I stopped picking and went to
8  SOM.
9        MR. DELINSKY: And you'll hear that a lot.
10  That's S-O-M.
11    Q. And when you had a -- when you went to SOM,
12  can you give me a period? Was it the fall of 2013?
13  The winter of 2013?
14    A. When I went to SOM full-time? Maybe -- maybe
15  fall, I don't -- I honestly, I don't know the exact
16  dates.
17    Q. When you say "maybe fall," are we talking
18  about October of 2013?
19      Do you have any idea?
20    A. I have no idea.
21    Q. When you went to SOM, did you go full-time?
22    A. No. I -- I was help -- I would help out here
23  and there with SOM from when I started, whenever they
24  needed help, I would help.
25    Q. When you went -- you started part-time,

Page 15

1  correct?
2    A. Yes.
3    Q. When you went full-time, were you in SOM or
4  were you a picker?
5    A. When my -- are you asking when my status
6  changed from a part-time associate to a full-time
7  associate?
8    Q. Yes.
9    A. That, I do not know. I don't -- I don't know
10  if I was -- if I went full-time for SOM or if I went
11  full-time before SOM.
12    Q. Well, as a picker, can you tell me what you
13  did?
14    A. We had a -- you would pick up an order, and
15  you would go through the bays and pick the product and
16  put it in the tote.
17    Q. You said the base?
18    A. The bays.
19    Q. The bays?
20    A. There are bays.
21    Q. What were you picking?
22    A. That I'm -- I -- I don't know. I know it
23  wasn't the controlled substances. They were --
24  because it wasn't in the cage. I'm not for sure
25  exactly.

Page 16

1    Q. Did you ever work in the cage?
2    A. No.
3    Q. So you never ever were a picker for
4  controlled substances?
5    A. No.
6    Q. When you were a picker, which we don't know
7  the time period, did you have a chance to visualize
8  the cage?
9        MR. DELINSKY: Object to the form.
10    A. To see the cage?
11    Q. Yeah.
12    A. I was in the RX department.
13    Q. You were in the RX department?
14    A. Yeah. The cage is within the RX
15  department.
16    Q. Okay. And in that period, how big was that
17  cage?
18    A. That I do not re -- I don't -- I don't really
19  know.
20    Q. Can you give me an estimate?
21    A. I really -- I can't.
22    Q. How many bays were in the cage?
23    A. That I -- I don't know. I was not in the
24  cage, so...
25    Q. Do you know who was in the cage --

Page 17

1    A. I do not.
2    Q. -- at that time?
3      You don't remember any names?
4    A. There's -- there is -- first, I don't know
5  last name. I know one that I can possibly recall. I
6  don't know her last name.
7    Q. When you went to SOM, even though you don't
8  know the time period, what was your title?
9        MR. DELINSKY: Object to the form.
10    A. When I went to --
11    Q. Excuse me.
12      Do you know when you went to SOM?
13    A. Full-time, or just in general?
14    Q. Part-time or full-time.
15    A. I started helping Aaron shortly after I was
16  hired on.
17    Q. What does "shortly after" mean?
18    A. I can't recall the exact time frame, but
19  maybe like a few weeks, a couple of weeks.
20    Q. So maybe December of '12? Would that be
21  fair?
22    A. Possibly.
23    Q. And when you were helping Aaron in December
24  of '12, what were you doing?
25        MR. DELINSKY: Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A. I was helping him go through spreadsheets
2 of -- of hydrocodone.
3    Q. What were the spreadsheets called?
4    A. They were spreadsheets that came from
5 MicroStrategy.
6    Q. What were they called?
7    A. That's -- I --
8    Q. What did they -- I'm sorry.
9       Were you done?
10    A. I can't recall if they had an exact name or
11 not. I just know that they came from MicroStrategies.
12 I -- I may have eventually -- I'm not exactly sure how
13 he saved them, how he named them.
14    Q. Okay. Did you do anything else other than
15 look at these spreadsheets?
16    A. I helped him with that for -- for a little
17 while. I can't exactly remember when he started
18 training me on other things.
19    Q. What does "a little while" mean?
20    A. I can't -- I can't -- I don't know the exact
21 dates. I don't know.
22    Q. One month? Two months? Three months?
23    A. It was so long ago, I can't -- I can't
24 remember.
25    Q. The spreadsheets that you looked at, what did

Page 19

1 they look like?
2    A. As I can -- as -- as I remember the
3 spreadsheets had patient -- patient -- the patient ID
4 number, doctors, and PI number.
5       Insurance, how the drug was paid for.
6 Quantity of the drugs, dispense.
7       Could be some other stuff I'm forgetting, but
8 that's most of it.
9    Q. How long every day or every week would you
10 look at those spreadsheets?
11    MR. DELINSKY: Object to form.
12    A. I'm not for sure. Every -- every one was
13 different. I can't say exactly.
14       It was pretty much a case-by-case basis on
15 how long they actually took.
16    Q. Obviously, I wasn't clear. I apologize.
17       How much time per week would you spend
18 assisting Aaron looking at these spreadsheets?
19    A. From what I can remember, I wasn't -- I was
20 maybe up there possibly every day for maybe half --
21 half a day. Possibly at times less than that, or
22 more.
23    Q. You said "possibly less or more"?
24    A. Uh-huh. Depending on...
25    Q. Was it an average of half a day every day?

Page 20

1    MR. DELINSKY: Object to form.
2    THE WITNESS: I would say -- it's so hard to
3 recall. It's long ago.
4       In the beginning, yeah, possibly.
5    Q. And then it changed, obviously, I understand
6 from your answer?
7    A. I went full-time with him.
8    Q. When did you go full-time with him?
9    A. I -- that I am very un -- uncertain on the
10 dates.
11    Q. When you went full-time with Aaron, did your
12 pay change?
13    A. I can -- I'm not for sure when my -- when my
14 pay changed.
15    Q. What else did Aaron train you on other than
16 these spreadsheets?
17    MR. DELINSKY: Object to form.
18    THE WITNESS: From -- from what I can
19 recall, he -- he told me about the other reports and
20 how to -- how to run them and where to find them, what
21 to look for. I'm sure there is other things that I am
22 forgetting.
23    Q. What other reports?
24    A. Besides MicroStrategy, there is the -- there
25 was this Store Metrics report and then Viper.

Page 21

1    Q. What else?
2    MR. DELINSKY: Object to form.
3    THE WITNESS: That's all I can actually
4 recall right now. I don't --
5    Q. The Store Metrics report that you just
6 mentioned, that's -- am I correct that that is the
7 MicroStrategy report, or are those two different
8 reports?
9    A. They're two different reports.
10    Q. Okay. So, what does the Store Metrics report
11 tell you?
12    A. The Store Met -- the Store Metrics report,
13 from what I can recall, has top doctors, top patients,
14 cashier, distance traveled, volume and how it's --
15 it's volume compared to its other stores in its zone.
16       And I was pretty -- I'm -- many other things
17 I cannot recall, but I know I'm missing some.
18    Q. When you reviewed the MicroStrategy report --
19    A. Yes.
20    Q. -- were those in a hard copy?
21    A. When -- no. They were on the computer.
22    Q. Would you ever print them?
23    A. Yes.
24    Q. Under what circumstances would you print
25 them?

Page 22

1    A. We printed -- we printed them with the -- the
2  -- if it was -- if I -- gosh. It's so long ago.
3      If I can recall, it was printed if it is a
4  store that we are going -- were of interest, a store
5  that, you know, we wanted to look into a little bit
6  more.
7    Q. The MicroStrategy reports, that would be used
8  to look at an order or used to look at a store?
9    A. It would be used to look at a store.
10    Q. Okay. So that was a -- when you were doing a
11  general store investigation, you would look at a
12  MicroStrategy report?
13    MR. DELINSKY: Object to form.
14    THE WITNESS: I -- so, sorry. You're -- are
15  you asking -- what was the question again? I'm sorry.
16    Q. You said that you would print the
17  MicroStrategy reports when you were using it to
18  investigate a store, correct?
19    MR. DELINSKY: Object to form.
20    THE WITNESS: When we were using it to look
21  into a store, yes.
22    Q. Look into a store?
23    A. Yeah.
24    Q. Is that the same as investigate?
25    MR. DELINSKY: Object to form.

Page 23

1    THE WITNESS: Investigate sounds a little bit
2  more -- some -- to a certain extent, I would -- I
3  would say, yeah.
4    Q. Is it the same? I'm just -- I want to be
5  fair.
6      Would you agree its the same?
7    MR. DELINSKY: Object to form. Asked and
8  answered.
9    THE WITNESS: I would say yes, to a -- to an
10  extent.
11    Q. So when you qualify it, "to an extent,"
12  what's the difference?
13    A. Well, depending on -- I mean, if --
14  investigate just sounds so much -- I don't know -- I
15  don't know the -- I don't know that -- it just -- it
16  doesn't really come to me like -- like that, I
17  suppose --
18    Q. Investigate?
19    A. -- versus just -- yeah, so --
20    Q. Investigate sounds more serious?
21    A. Not -- not necessarily. It is more just not
22  -- not the words that I would use, I guess.
23    Q. Does investigate sound more formal?
24    MR. DELINSKY: Object to form.
25    THE WITNESS: Depending on circumstances,

Page 24

1  I -- I guess you could use it.
2    Q. Okay. So you would use the MicroStrategy
3  report when you chose to look into a store, correct?
4    MR. DELINSKY: Object to form.
5    THE WITNESS: No. We would use the
6  MicroStrategy -- we would look at the MicroStrategy
7  report. It was just part of -- it was part of the
8  process. You would look at it regardless. It's --
9    Q. Part of what process?
10    A. Part of the daily process.
11    Q. Of what?
12    A. Of SOM. Of the SOM program.
13    Q. Okay. And so as part of that daily process,
14  when you would print the MicroStrategy report, were
15  you evaluating an order or were you evaluating a
16  store?
17    MR. DELINSKY: Object to form.
18    THE WITNESS: It would have to be possibly
19  both because the orders what made me go to the
20  MicroStrategy report to look at the store.
21    Q. You had reports that would print for
22  high-volume stores, correct?
23    MR. DELINSKY: Object to form.
24    THE WITNESS: I'm not exactly sure what --
25  what you're referencing.

Page 25

1    Q. Did you have reports that would print
2  specifically for high-volume stores?
3    A. I'm -- I'm sure volume had something to do
4  with the orders that were flagged.
5    Q. I'm not asking about individual orders. I'm
6  asking about stores.
7      Did you have reports that would print for
8  high-volume stores?
9    MR. DELINSKY: Object to form.
10    THE WITNESS: I can -- I can vaguely
11  recall the -- the Florida IRR, I think, if I -- that
12  might flag stores.
13    Q. Did you have something called "Top Ten
14  Reports"? Have you ever seen those?
15    A. As I can -- I don't -- I can't exactly
16  remember those.
17    Q. Okay. When you would print the MicroStrategy
18  report, do you know what happened to that hard copy?
19    A. We would put it in the file. We would attach
20  the -- everything that -- the Store Metrics report,
21  MicroStrategy and our Viper Reports to it.
22    Q. And when you say you would put that in the
23  file, are you telling me that you would put -- do you
24  know what -- strike that.
25      Do you know what an IRR or an Item Review

Page 26

1  Report is?
2      A.  Yes.
3      Q.  Did you, during this period, review those?
4      A.  Yes.
5      Q.  Okay.  And --
6      MR. DELINSKY:  I didn't have time to object
7  to form.
8      The basis of the objection, Dan, was just
9  this period.
10     MR. GOETZ:  That's fine.
11     MR. DELINSKY:  I think we can --
12 BY MR. GOETZ:
13     Q.  When did you start reviewing Item Review
14 Reports?
15     A.  That, I -- I cannot recall when I first
16 started doing those.  I -- if I was -- it would
17 possibly be in 2013.  Just not for sure of the actual
18 time frame.
19     Q.  Do you think it was early 2013?  Mid?  Just a
20 guess?
21     MR. DELINSKY:  Object to form.
22     THE WITNESS:  Possibly, maybe the -- just
23 with a guess, maybe a little bit more on the mid to --
24 side.
25     Q.  Okay.  You just testified that you would

Page 27

1  print -- when you would -- I asked where you would
2  store it, you said when you printed the MicroStrategy,
3  when you printed the Store Metrics, and when you
4  printed, you think the Viper, you would put them in a
5  file, correct?
6      A.  Uh-huh.  Yes.
7      Q.  Is that file the IRR?
8      A.  No.
9      Q.  Okay.  Where was the file?
10     A.  The IRR?
11     Q.  No.  Where was the file that you put these
12 reports.
13     A.  It was -- we put the reports in -- it was
14 like a box of -- with the -- it was a box.
15     Q.  I'm sorry?
16     A.  It was a box.
17     Q.  A box.  Did that box contain Item Review
18 Reports?
19     A.  From -- I remember the IRR reports.  For --
20 from what I can recall, I would have to -- I would
21 pob -- I would say -- it could have been, because I
22 remember Aaron always talking about -- about them, and
23 I vaguely remember seeing the -- the paper files, the
24 paper.
25     Q.  All right.  I've had a chance to look at some

Page 28

1  boxes of IRRs.
2      A.  Okay.
3      Q.  Okay?
4      Contained within those boxes are also some of
5  these reports we have talked about.
6      My question is:  Were those reports -- was it
7  your practice to stick them in with the boxes with the
8  IRRs, or were they stuck in another box somewhere?
9      MR. DELINSKY:  Object to form.
10     THE WITNESS:  They're not -- that I -- it was
11 so long ago.
12     I only recall the IRR reports.  I recall -- I
13 can -- I know I have seen them in the boxes, I
14 believe.
15     Q.  Are you done?
16     A.  I'm trying to think.  Because I can recall
17 them.  I can recall him getting them, but I'm not sure
18 if of his exact practice.
19     Q.  If it's what?
20     A.  I'm not for sure of his exact practice.
21     Q.  Okay.  When you say "recall getting them,"
22 are you talking about IRRs or these other, the
23 MicroStrategy and the Store Metric Report?  Which are
24 you talking about?
25     A.  The IRR.

Page 29

1      Q.  Maybe it will be clear later.
2      And you also would look at Viper Reports?
3      A.  Yes.
4      Q.  Okay.  How -- what did the Viper Report look
5  like?
6      A.  The Viper Report, as I can remember, gave me
7  the balance on hand for that store for a particular
8  drug, that I can -- probably has other information on
9  it, but I can -- I can recall it having to deal with
10 the balance on hand, I believe.
11     Q.  So you recall using the Viper Report to
12 figure out the inventory a particular pharmacy had,
13 correct?
14     MR. DELINSKY:  Object to form.
15     THE WITNESS:  Yes.
16     Q.  Okay.  Do you recall using Viper for anything
17 else?
18     A.  I can't remember.
19     Q.  You ultimately became the SOM manager, didn't
20 you?
21     A.  No.
22     Q.  No?  Did you replace the SOM manager?
23     A.  No.
24     Q.  No?
25

Page 30

1  (CVS-Helfrich-41 was marked for
2  identification.)
3  I'm going to show you Exhibit 41.
4  MR. DELINSKY: I would like to take a break.
5  Can we do it now? Is that okay?
6  MR. GOETZ: Now is fine.
7  MR. DELINSKY: Thank you.
8  THE VIDEOGRAPHER: We are off the record at
9  9:02 a.m.
10  (There was a brief recess.)
11  THE VIDEOGRAPHER: We are back on the record
12  at 9:10 a.m.
13  BY MR. GOETZ:
14  Q. Ms. Helfrich, when you earlier were saying
15  Aaron, you were speaking of Aaron Burtner; is that
16  correct?
17  A. Yes.
18  Q. Yes?
19  A. Yes.
20  Q. Okay. And there came a point in time when
21  Aaron Burtner left, correct?
22  A. Yes.
23  Q. Do you know when that was?
24  A. I do not recall. I don't -- I don't
25  remember.

Page 31

1  Q. Okay. When Mr. Burtner was working in the
2  SOM at CVS Indiana, you were assisting him, correct?
3  A. Yes.
4  Q. Was there anybody else working in that
5  department at that time?
6  MR. DELINSKY: Object to the form.
7  THE WITNESS: Kelly Baker. I believe, I
8  can't -- he was there. Gary Millikan helped
9  periodically when needed.
10  I can't exactly recall. Let me see. I'm not
11  for certain if pharma compliance came on board at that
12  time or not.
13  Q. Do you know when Kelly Baker left the CVS
14  Indiana distribution center?
15  A. That, I do not remember.
16  Q. Can you give me a guess?
17  A. Guessing? Maybe possibly later in 2013,
18  maybe like the later -- maybe December.
19  Q. And when Mr. Burtner left, they went to
20  pharma compliance for somebody to run the SOM; is that
21  correct?
22  MR. DELINSKY: Object to form.
23  THE WITNESS: I can't -- I can't remember
24  when they came on. I don't know. I can't remember if
25  it was -- it may have been after Aaron left.

Page 32

1  Q. When Kelly Baker was at the CVS Indiana, was
2  it your understanding that he was the SOM manager?
3  MR. DELINSKY: Object to form.
4  THE WITNESS: I have -- I have no idea if he
5  was ever given that position. Me, personally, I
6  thought he was still an analyst.
7  Q. Okay. I'm handing you what has been marked
8  as CVS-Helfrich-41. It starts at Bates No. CVS118312.
9  That is an email that I do not believe you
10  were copied on. I could -- I'm sorry. I'm wrong.
11  You are copied on it.
12  Do you know who John Mortelliti is?
13  A. I've heard of the name, but no.
14  Q. John Mortelliti, in the first sentence at the
15  top, do you see that? What he says?
16  MR. DELINSKY: Ms. Helfrich, do you need to
17  read that?
18  THE WITNESS: Yes.
19  BY MR. GOETZ:
20  Q. Ms. Helfrich, you are more than welcome to
21  read the email, but I promise you, to the extent I'm
22  asking you questions, I'll point it out.
23  If you want to read the whole email, that's
24  fine.
25  A. Okay.

Page 33

1  Q. That first sentence, tell me if I'm reading
2  this correctly, it says, "Shauna is replacing our SOM
3  manager and is responsible for DEA compliance."
4  I had earlier asked you if you were the SOM
5  manager ever, and you said, "No."
6  A. Correct.
7  Q. Were you not informed of this?
8  A. I honestly -- to my understanding, I was an
9  analyst. I -- I can't really comment what John
10  Mortelliti was referencing or -- but to my knowledge,
11  I was -- I was a SOM analyst.
12  Q. Okay. Were you ever told you were
13  responsible for DEA compliance?
14  A. No.
15  Q. No?
16  Could you go back to the second page of that
17  document, please?
18  And it says -- there is an email from Pam
19  Hinkle that says, tell me if I'm reading it correctly,
20  "Novistor is Viper that no longer functional and is
21  probably why it was denied."
22  Do you know when Viper became no longer
23  functional?
24  A. I do not.
25  Q. You had been looking for, according to the

Page 34

1  email down below, Viper access for months as of
2  November of '13, correct?
3      MR. DELINSKY: Object to form.
4      THE WITNESS: According to Bill Klenotic,
5  that's what it reads.
6      Q. Do you remember that?
7      A. I -- I can't ever really recall, as far as I
8  remember, needing that access.
9      Q. So you don't recall ever needing to access
10 Viper?
11     MR. DELINSKY: Object to form.
12     THE WITNESS: No. I recall not having that
13 access. It was -- it's been -- I just can't recall
14 not having access to a program that I needed.
15     Q. So am I correct, I just want to make sure
16 that I understand your testimony: You don't have an
17 independent memory of this, but you -- to your
18 knowledge, everything you thought you needed, you had
19 access to?
20     MR. DELINSKY: Object to form.
21     THE WITNESS: Yes, reading this email, I
22 believe I had access to what I needed when I needed
23 it.
24     Q. You were copied on this email, correct, on
25 November 6 of '13?

Page 35

1      A. Yes.
2      Q. And according to this email string, you never
3  responded, correct?
4      A. No.
5      Q. That's correct?
6      A. Yes.
7      Q. So you never responded and said, "I don't
8  need access. I have everything I need," correct?
9      A. I never responded.
10     Q. When you started at CVS, we spoke a little
11 bit about your training.
12     Were you aware of the opioid epidemic?
13     MR. DELINSKY: Object to form.
14     THE WITNESS: I can't exactly recall what I
15 knew back then, but I know that there were drugs that
16 could be abused and diverted.
17     But an epidemic, I don't necessarily think
18 I'm actually qualified to establish whether there was
19 an epidemic or not. But, I mean, I knew there were
20 drugs that were abused.
21     Q. When you went to work in the SOM at CVS, the
22 Suspicious Order Monitoring, were you aware that you
23 were going to be monitoring hydrocodone combination
24 products which are an opioid?
25     MR. DELINSKY: Object to form.

Page 36

1      THE WITNESS: When I worked for SOM, I knew
2  there was going to be, yes, various drugs that I would
3  monitor; hydro being one of them.
4      Q. Okay. And were you aware of an epidemic
5  surrounding hydro or HCPs?
6      MR. DELINSKY: Object to form.
7      THE WITNESS: I knew they could be abused. I
8  don't think I can really comment on epidemic.
9      Q. Did anybody at CVS, when you were at the --
10 in the SOM department, tell you that there was an
11 epidemic of hydrocodone combination products?
12     A. Not that I can remember.
13     Q. Okay. You never got any training surrounding
14 the prevalence of hydrocodone combination products?
15     MR. DELINSKY: Object to form.
16     THE WITNESS: Not that I can remember.
17     Q. Did anybody ever tell you that your role in
18 the Suspicious Order Monitoring Program would be
19 critical as it relates to hydrocodone combination
20 products?
21     MR. DELINSKY: Object to form.
22     THE WITNESS: I don't remember that exactly
23 being said. I mean, I know they voiced how important
24 SOM was.
25     Q. How did they voice it?

Page 37

1      A. Well, I can remember possibly what the SOM --
2  what SOM was for and how important that was.
3      Q. What was SOM for, as you said?
4      A. SOM was for monitoring potentially suspicious
5  orders.
6      Q. Suspicious orders of what?
7      MR. DELINSKY: Object to form.
8      THE WITNESS: Potentially suspicious
9  orders.
10     Q. Of what?
11     A. That were -- that hit our IRR.
12     Q. Okay. I don't fully follow you, but I think
13 we'll figure it out later.
14     (CVS-Helfrich-18 was marked for
15 identification.)
16     Q. I'm showing you Helfrich-18. These are
17 statistics from the United States Drug Enforcement
18 Administration.
19     Do you see the first bullet point?
20     A. Yes.
21     Q. And could you read that, please?
22     MR. DELINSKY: Object to form.
23     THE WITNESS: "The US was the country with
24 the highest consumption of hydrocodone. Approximately
25 45.5 tons or 99 percent of global consumption."

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.  That was the drug you were monitoring as part
2 of SOM, correct?
3         MR. DELINSKY:  Object to form.
4         THE WITNESS:  Yes.
5    Q.  Okay.  And no one ever told you that the US
6 consumed 99 percent of the hydrocodone in the United
7 States, did they?
8    A.  No.
9    Q.  Okay.  Do you think that would have been
10 helpful to know?
11    A.  I don't -- I know my job was to review orders
12 to the best of my ability thorough.  I would presume
13 if this was something that I needed to know, I would
14 have been -- I would have been informed.
15    Q.  Okay.  You have that much faith in CVS?
16    A.  I have that much faith in what I did.
17    Q.  But you said you would have been informed had
18 you needed to know?
19    A.  Uh-huh.
20    Q.  Who would have informed you?
21    A.  That, I do not know.
22    Q.  Somebody at CVS would have informed you?
23    A.  I would presume so.
24    Q.  Somebody at CVS never told you, you were
25 responsible for DEA compliance, did they?

Page 39

1         MR. DELINSKY:  Object to form.
2         THE WITNESS:  From what I can recall, no.
3    Q.  Okay.  So somebody at CVS never told you that
4 you were the SOM manager, did they?
5         MR. DELINSKY:  Object to form.
6         THE WITNESS:  From what I can recall, no.
7         (CVS-Helfrich-19 was marked for
8 identification.)
9    Q.  I'm handing you what has been marked as
10 Exhibit 19.
11         CVS Indiana, your distribution center,
12 delivered HCPs.
13         Do you know what I'm talking about when I say
14 HCPs?
15         MR. DELINSKY:  Object to form.
16         THE WITNESS:  Hydrocodone?
17    Q.  Combination products?
18    A.  Yes.
19    Q.  Okay.  And you are aware that's an opioid?
20    A.  Yeah.
21    Q.  Okay.  CVS Indiana distribution center that
22 you worked at, are you aware that they delivered HCPs
23 to Ohio?
24    A.  During?
25         MR. DELINSKY:  Object to form.

Page 40

1    Q.  While you were there.
2    A.  While I was --
3    Q.  Yeah.
4    A.  -- doing SOM?
5         MR. DELINSKY:  I object to the form of the
6 question.
7         You may answer, Ms. Helfrich.
8         MR. GOETZ:  I'm not sure -- can you tell me
9 why?  I mean, I'm asking her if she is aware if while
10 she was at CVS Indiana, they were directing HCPs to
11 Ohio.
12         MR. DELINSKY:  Okay.  And the form of
13 objection is that CVS -- the distribution center in
14 Indiana, on behalf of CVS, distributed to CVS
15 pharmacies.  It didn't distribute to Ohio at large.
16         That was the basis of my objection.
17 BY MR. GOETZ:
18    Q.  Do you understand what I was asking you?
19         Did you understand that I was asking you if
20 the distribution center you worked at in Indiana,
21 whether -- when I said they distributed to Ohio, that
22 I was speaking about Ohio CVS pharmacies?
23    A.  Yes.
24    Q.  And, in fact, let's be fair, the CVS
25 distribution center in Indiana only distributed to CVS

Page 41

1 pharmacies?
2    A.  I believe so.
3    Q.  Okay.  Now, when you were at the distribution
4 center in Indiana in the Suspicious Order Monitoring
5 Program, they distributed hydrocodone combination
6 products to CVS pharmacies in Ohio.
7         Are you aware of that?
8    A.  At the time doing SOM, I can't exactly recall
9 whether I did or not.
10    Q.  You don't remember that they were
11 distributing to Ohio, as you sit here today?
12         You don't have that memory?
13         MR. DELINSKY:  Object to form.  You can
14 answer, Ms. Helfrich.
15         THE WITNESS:  I don't really know what -- who
16 or where Indiana DC delivers.
17    Q.  Okay.  Are you aware that they were
18 delivering hydrocodone combination products to CVS
19 pharmacies in Cuyahoga and Summit County?
20    A.  I -- I don't remember.
21    Q.  And part of the reason you don't remember
22 might be because when you were reviewing IRRs, you
23 were reviewing IRRs for the entire country, weren't
24 you?
25         MR. DELINSKY:  Object to form.

Page 42

1 THE WITNESS: For all of our DCs, for -- I
2 can't exactly recall.
3 At some point in 2014, they started going
4 over to the new system, so it wasn't the whole time.
5 Q. Before they migrated to the new system in
6 2014, while you were there at CVS Indiana, they were
7 reviewing the Item Review Reports for all 11
8 distribution centers in the United States?
9 MR. DELINSKY: Object to form.
10 THE WITNESS: I believe so, yes.
11 Q. Okay. Are you aware that this first trial
12 involves two of the largest counties in Ohio?
13 A. No.
14 Q. Okay. So you have no knowledge that this
15 first trial involves two of the largest counties in
16 Ohio that have been decimated by the opioid crisis?
17 MR. DELINSKY: Object.
18 BY MR. GOETZ:
19 Q. Are you aware of that?
20 MR. DELINSKY: Object to form.
21 THE WITNESS: I'm not for certain that the --
22 the two counties or -- I'm not familiar with how
23 they're affected.
24 Q. Are you aware how the state was affected by
25 the opioid crisis?

Page 43

1 A. No.
2 Q. Okay. Could you read the first paragraph,
3 please, where it begins, "Drug overdose deaths..."?
4 A. "Unintentional drug overdose" --
5 Q. No, I apologize. First paragraph.
6 A. "Drug overdose deaths continue to be a public
7 health crisis in Ohio with a 366 percent increase in
8 the number of deaths from 2000 to 2012."
9 Q. Were you aware of that when you were doing
10 SOM?
11 MR. DELINSKY: Object to form.
12 THE WITNESS: I don't know, no.
13 Q. Can you read the second bullet point that
14 begins with "In 2012..."?
15 A. "In 2012, five Ohioans died every day from
16 unintentional drug overdose or one every five hours."
17 Q. If those statistics hold today, while we are
18 here today, two Ohioans will die from drug overdose.
19 Were you aware of those statistics when you
20 were doing SOM?
21 MR. DELINSKY: Object to form.
22 THE WITNESS: No.
23 Q. Okay. Could you read the bullet point that
24 begins "Opioids" and then the open paren?
25 A. "Opioids, prescription or heroin, remain the

Page 44

1 driving factor behind the unintentional drug overdose
2 epidemic in Ohio. Approximately two-thirds or 1,272,
3 66.5 percent, of the drug overdoses involved any
4 opioid in 2012 similar to 2011, 1,154 or 65 percent."
5 Q. Were you aware of that statistic?
6 MR. DELINSKY: Object to form.
7 THE WITNESS: No.
8 Q. Okay. Can you read the next bullet point,
9 just the first paragraph -- first sentence?
10 A. "Prescription opioids are involved in most of
11 the unintentional drug overdoses and have largely
12 driven the rise in deaths over the past decade."
13 Q. Were you aware of that statistic?
14 A. No.
15 Q. Okay. When we talk about SOM, Suspicious
16 Order Monitoring, sounds pretty generic, right, pretty
17 benign?
18 MR. DELINSKY: Object to form.
19 THE WITNESS: Meaning to some who don't know
20 what it is?
21 Q. Right.
22 But the whole point of a Suspicious Order
23 Monitoring Program was to monitor diversion, not ship
24 potentially suspicious orders.
25 Do you agree?

Page 45

1 MR. DELINSKY: Object to form.
2 THE WITNESS: To -- yeah, potentially
3 suspicious.
4 Q. Correct.
5 It was -- the whole point of SOM was so that
6 we don't end up with this, correct?
7 MR. DELINSKY: Object to form.
8 THE WITNESS: That, I am -- that, I really I
9 can't comment on. I know SOM was there to help to --
10 one of the -- one tool to prevent diversion.
11 But I know what I did.
12 MR. DELINSKY: Are you done?
13 THE WITNESS: Yes.
14 Q. These statistics are a result of diversion.
15 Do you disagree with that?
16 MR. DELINSKY: Object to form.
17 THE WITNESS: I -- I'm just now seeing this
18 document for the first time. I don't -- I don't know
19 where this came from, who had written it.
20 Their analysis.
21 Q. Do you see the bottom? Sorry for
22 interrupting.
23 A. Yes.
24 Q. Do you see where that came from?
25 A. Yes.

Page 46

1    Q.  Do you dispute the accuracy of this
2  document?
3         MR. DELINSKY:  Object to form.
4         THE WITNESS:  I don't know the background
5  information.  I don't -- I just -- I can't really
6  comment on how they came about their -- their
7  findings.
8    Q.  If true, it is a shocking document, isn't it?
9  I mean, that's what we're grappling with.
10        MR. DELINSKY:  Object to form.
11        THE WITNESS:  I can't really comment.
12   Q.  You don't think it is shocking?
13        MR. DELINSKY:  Object to form.
14        THE WITNESS:  This is my first time seeing
15  it.
16   Q.  Do you think it's shocking?
17        MR. DELINSKY:  Object to the form.
18        Asked and answered.
19        THE WITNESS:  Again, it's the first time
20  seeing this.  I can't really comment on it.
21   Q.  Do you -- I understand.
22        Do you think it is shocking?  That really is
23  a yes or no.  I'm not asking if it is the first time
24  that you saw it.
25        Do you think it is shocking?

Page 47

1         MR. DELINSKY:  Object to form.  The question
2  has been asked and answered.
3         THE WITNESS:  I can't -- I can't comment on
4  it.
5    Q.  You have no opinion?
6         MR. DELINSKY:  Object to form.
7         THE WITNESS:  I have -- I would want -- I
8  would want more information.  I would want to know --
9  I would need more information, more background, more
10  where this came from.  Who --
11   Q.  What information?
12   A.  Seeing it for the first time in this
13  situation, I can't -- I can't think of what the exact
14  things that -- that I would need.
15   Q.  Would you want to know the age of those
16  people that died?
17        MR. DELINSKY:  Object to form.
18   Q.  Would that help you determine if it is
19  shocking?
20        MR. DELINSKY:  Object to form.
21        THE WITNESS:  Still would not be able to
22  comment on it.
23   Q.  What about if they were someone's son or
24  daughter, would that help you determine if it's
25  shocking?

Page 48

1         MR. DELINSKY:  Object to form.
2         THE WITNESS:  Still would not be able to
3  comment on it.
4    Q.  You just can't think of anything that would
5  help you determine if it's shocking?
6    A.  Not without more information.
7         MR. DELINSKY:  I object to the form of the
8  question.
9         Ms. Helfrich, just make sure you pause so I
10  have an opportunity to interpose my objections.
11   Q.  You said that SOM was one part of -- of
12  preventing diversion.
13        Do you remember that?
14        MR. DELINSKY:  Object to form.
15        THE WITNESS:  I believe it was one tool.
16   Q.  One tool?
17   A.  Yeah.
18   Q.  Okay.  So you said SOM is one tool to prevent
19  diversion?
20        MR. DELINSKY:  Object to form.
21        THE WITNESS:  One tool used to prevent
22  diversion.
23   Q.  Okay.  And are you telling me it is one tool
24  used at the Indiana distribution center to prevent
25  diversion?

Page 49

1    A.  It's one tool that -- that I know of with SOM
2  that was used to prevent diversion.
3    Q.  What else prevents diversion?  What else that
4  you know of?
5    A.  For me?  There was -- it was SOM, and that
6  was my main focus.
7    Q.  You said SOM was one tool.  I'm asking what
8  the other tools are to prevent diversion.
9    A.  I know it is -- I -- I know SOM is one tool
10  that prevented diversion.  And that was my main focus.
11  I'm uncertain of the others.
12   Q.  Okay.  Do you think there are others?
13        MR. DELINSKY:  Object to form.
14        THE WITNESS:  I know SOM was my main focus.
15  That was what I did.  That was my -- my purpose.
16   Q.  You're not answering my question.  It is:  Do
17  you think there are other tools to prevent
18  diversion?
19        MR. DELINSKY:  Object to form.
20   Q.  I'm asking for your opinion, what you know.
21        MR. DELINSKY:  Object to form.
22        THE WITNESS:  I know SOM was one tool used,
23  and that is what I focused on.
24   Q.  Tell me the other tools that you know of.
25   A.  I -- I vaguely recall a -- CVS, when I would

Page 50

1 call the -- the doctors -- or not the doctors, the
2 pharmacists, I -- they had their -- their method, but
3 I -- I can't recall because SOM was mine.
4    Q. So you think that the CVS pharmacies, the
5 pharmacists also had tools to prevent diversion, was
6 your understanding?
7      MR. DELINSKY: Object to form.
8      THE WITNESS: I just vaguely recall something
9 in regards to them. What exactly it is...
10    Q. Ms. Helfrich, I'm not trying to trick you.
11 I'm really trying to figure out what was being done at
12 the Indiana distribution center while you were working
13 and while people thought you were the SOM manager and
14 while people thought that you were in charge of DEA
15 compliance. I'm trying to find out what was being
16 done.
17     What I worry about is when you say "it's one
18 tool," that later then you offer testimony, if this
19 goes to trial, that you come up with three other
20 things that were being done at the distribution center
21 to prevent diversion. Okay?
22     Do you know of any other tools, then, at the
23 Indiana distribution center, while you were working
24 there, to help prevent diversion?
25      MR. DELINSKY: Object to form.

Page 51

1      THE WITNESS: At the distribution center?
2 There would be pickers that would notice an irregular
3 order, and I would be shot an email.
4    Q. Okay. So, we have pickers and we have the
5 SOM, which -- the Item Review Report, essentially,
6 correct?
7      MR. DELINSKY: Object to form.
8      THE WITNESS: Yeah.
9    Q. Anything else besides those two that you can
10 think of?
11    A. That I can recall, those are the two that
12 stick out.
13     (CVS-Helfrich-20 was marked for
14 identification.)
15    Q. I'm showing you what has been marked as
16 Exhibit 20, and I apologize for throwing them at you.
17      MR. DELINSKY: Did you say Exhibit 29?
18      MR. GOETZ: This is Exhibit 20.
19    Q. When you started in 2012, were you aware that
20 there was a direct correlation between opioid overdose
21 deaths and opioid sales?
22      MR. DELINSKY: Object to form.
23      THE WITNESS: I did not.
24    Q. You did not know?
25    A. No.

Page 52

1    Q. Okay. Does -- can -- that chart indicates
2 there's a correlation, doesn't it?
3      MR. DELINSKY: Object to form.
4      THE WITNESS: I can't -- I don't know where
5 this -- this information came from, like how it was
6 gathered.
7    Q. I'm not asking you to -- to challenge the
8 validity of the report. We can talk about whether you
9 think the report is valid or not based on your
10 expertise.
11     But this report was put together by the Drug
12 Enforcement Administration. According to them, there
13 is a correlation between opioid sales and opioid
14 deaths as shown in this chart, correct?
15      MR. DELINSKY: Object to form.
16      THE WITNESS: Well, if you're asking what I'm
17 seeing, that's --
18    Q. You see the correlation, correct?
19      MR. DELINSKY: Object to form.
20      THE WITNESS: I see it. I -- I see what's on
21 the chart.
22    Q. And what is on the chart?
23    A. The opioid sales versus deaths versus opioid
24 treatment admissions.
25    Q. And they all run semi-parallel to each other,

Page 53

1 correct?
2      MR. DELINSKY: Object to form.
3      THE WITNESS: I really don't --
4    Q. Let me ask --
5    A. -- feel comfortable commenting on a document
6 I've just seen.
7    Q. Just so you do not see the correlation? You
8 can't acknowledge the correlation?
9      MR. DELINSKY: Object to form.
10      THE WITNESS: I can't -- I can't really
11 comment.
12    Q. Why can't you comment?
13    A. Because I -- it is the first time I'm seeing
14 it. I don't -- I don't know the reasoning behind it,
15 what -- what went into it.
16    Q. What was your understanding of the legal
17 obligations that CVS had to monitor for suspicious
18 orders?
19    A. I know that it's a DEA required -- it's
20 something that DEA requires, but the actual context
21 and -- I'm not familiar with.
22    Q. Are you finished?
23    A. Yes.
24    Q. I don't understand your answer. You know
25 that DEA requires but you're not familiar with the

Page 54

1  actual context.
2      A. Yeah.
3      Q. I don't understand what you said.
4      A. I'm not -- I'm not familiar with the exact --
5  like the language or -- of the requirement that DEA
6  imposes, but I know there is one.
7      Q. Okay. So you don't know the exact language.
8  Is that what you're telling me?
9      A. Yeah.
10     Q. But you know there is a requirement?
11     A. Yes.
12     Q. Okay. What is that requirement? I'm not
13  asking for exact language. I'm asking you to give it
14  to me in your words.
15     A. In general, the DEA requires monitoring of
16  potential suspicious drugs.
17         MR. DELINSKY: Drugs or orders.
18         MR. GOETZ: I'm sorry. What?
19         Did you catch that?
20         What did you say?
21         MR. DELINSKY: I said drugs or orders.
22         MR. GOETZ: I don't --
23         MR. DELINSKY: Drugs or orders.
24         MR. GOETZ: Okay.
25         MR. DELINSKY: Potentially suspicious drugs

Page 55

1  or potentially suspicious orders.
2         MR. GOETZ: Oh, is that what she said?
3         MR. DELINSKY: Yes.
4         MR. GOETZ: Oh, okay. You were just
5  repeating it.
6         MR. DELINSKY: Yes.
7         THE REPORTER: Ma'am, you're going to have to
8  keep your voice up. I didn't know you said that.
9         MR. GOETZ: I didn't hear drugs either.
10        THE REPORTER: So --
11        MR. GOETZ: I thought Mr. Delinsky and I was
12  going to have to swear him in.
13     Q. So your general understanding is that the DEA
14  requires CVS to monitor for potentially suspicious
15  drugs or orders; is that correct?
16     A. Yes.
17     Q. Okay.
18        MR. GOETZ: This is a good time to take a
19  five-minute break.
20        MR. DELINSKY: Okay.
21        THE VIDEOGRAPHER: We are off record at 9:54
22  a.m.
23        (There was a brief recess.)
24        THE VIDEOGRAPHER: We are back on the record
25  at 10:12 a.m.

Page 56

1         (CVS-Helfrich-2 was marked for
2  identification.)
3  BY MR. GOETZ:
4      Q. Ms. Helfrich, I'm handing you what has been
5  marked as Exhibit 2.
6         That document is an IRR or an Item Review
7  Report.
8         Yes?
9      A. Yes.
10     Q. And I don't mean to speak over you, but you
11  need to answer verbally because the court reporter is
12  trying to take everything down.
13     A. Uh-huh.
14     Q. So, yes, that's an item review --
15        MR. DELINSKY: Just to be clear, I didn't
16  understand you to be asking a question.
17        MR. GOETZ: Okay. That's fine.
18     Q. And we talked earlier, when you were in SOM
19  regulatory compliance, you would review IRRs,
20  correct?
21        MR. DELINSKY: Object to form.
22        THE WITNESS: Yes.
23     Q. Yes?
24        Okay. And if you look through here, you will
25  see some pages that are completely blacked out.

Page 57

1         I will tell you, my understanding the reason
2  that those are blacked out is because those were
3  nonopioid orders, okay?
4      A. Okay.
5      Q. So, when you reviewed an IRR, there would be
6  opioid orders and other controlled substances on it,
7  correct?
8      A. Yes.
9         MR. DELINSKY: Object to form. You may
10  answer.
11        THE WITNESS: Yes.
12     Q. Okay. And you -- I just want to make sure,
13  you did not review an IRR with huge black pages on it,
14  correct?
15        So, for example, if we look at 10677, that is
16  a page that has been totally blacked out.
17        You did not review IRRs that looked like
18  that, correct?
19     A. Correct.
20     Q. Okay. This is an IRR that is specific to --
21        MR. DELINSKY: Wait. Can we just pause for
22  one moment?
23        MR. GOETZ: Sure.
24  BY MR. GOETZ:
25     Q. That is an Item Review Report for an IRR for

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  drugs from the Indiana distribution center, correct,
2  as you look through it?
3      MR. DELINSKY: Object to form.
4      THE WITNESS: From the pages that I looked
5  at, it looks like it is from Indy.
6      Q. And if you go to the end of the document, the
7  last few pages, it says, IRR or something similar and
8  then says Item Review Report-PSE, at the end?
9      A. Okay.
10     Q. So, for example, 107 I imagine it is all the
11 way at the end, as well, 10756, second to last page,
12 that says Item Review Report-PSE.
13     A. Yes.
14     Q. And that is that is IRR for
15 pseudoephedrine?
16     A. Yes.
17     Q. And so, in addition to the controlled drugs,
18 on a Item Review Report, there also would be an Item
19 Review Report that includes pseudoephedrine?
20     A. Yes.
21     Q. And you would review that report, as well?
22     A. Yes.
23     Q. So, as you flip through it, as you go toward
24 the end, for example, 10746, if you look at that,
25 that, again, says Item Review Report, controlled drugs

Page 59

1  Indiana.
2      A. Yes.
3      Q. These Item Review Reports wouldn't go from
4  Indiana to La Habra back to Indiana, correct? They
5  would, the distribution centers would all be in order,
6  correct?
7      MR. DELINSKY: Object to form.
8      A. That, I cannot remember.
9      Q. I'm just trying to confirm that this -- that
10 the entirety of this IRR, other than the last few
11 pages, are for controlled drugs ordered for the
12 Indiana distribution center.
13     Do you agree with that?
14     A. Yes.
15     Q. Okay. And this IRR is dated 8-30-13.
16     Do you see the front page?
17     A. Yes.
18     Q. And if you turn to -- a couple of pages in,
19 you will see that it says "Item Review Report" up near
20 the top, "8-29-13."
21     A. Okay.
22     Q. Keep going.
23     A. Oh.
24     Q. 10677.
25     MR. DELINSKY: Oh, I'm sorry. 677. Keep

Page 60

1  turning the pages.
2  BY MR. GOETZ:
3      Q. That first page you were on is fine. It says
4  "Item Review Report" and then "8-29-13," correct?
5      A. Yes.
6      Q. And so the way that this works is, this
7  8-30-13 IRR is all the orders, controlled drug orders,
8  that were identified from 8-29-13, correct?
9      A. Yes.
10     Q. This is a daily report, correct?
11     A. Uh-huh.
12     Q. It captures --
13     MR. DELINSKY: You have to answer.
14     THE WITNESS: I believe so, yes. It's --
15     Q. And other than a -- a Monday report, which
16 would capture the orders from Saturday and Sunday,
17 this captures the orders from the prior day?
18     MR. DELINSKY: Object to form.
19     THE WITNESS: It's been awhile. I won't -- I
20 believe that's correct.
21     Q. Okay. In addition to the Indiana DC, there
22 would be Item Review Reports that were also run for
23 the 10 other distribution centers, correct?
24     A. Yes.
25     MR. DELINSKY: I object to the form of the

Page 61

1  question.
2  BY MR. GOETZ:
3      Q. And when you were in SOM, Suspicious Order
4  Monitoring, in Indiana, the Indiana DC would also
5  review those other IRRs for the other distribution
6  centers.
7      A. Yes.
8      Q. Okay. Was this a typical, this report here,
9  was this a typical Item Review Report? This size?
10     MR. DELINSKY: Object to the form of the
11 question.
12     THE WITNESS: It's been so long ago. I can't
13 exactly recall the sizes of the IRR.
14     A lot of what I did was, got the IRR from our
15 mainframe. So, seeing it in pages, I can't -- I can't
16 really say.
17     Q. The IRR was printed every day.
18     A. I still can't recall the size of them.
19     Q. I'm asking you if it was printed every day.
20     A. I can't -- it was so long ago, remembering
21 the frequency, I can't really remember.
22     Q. Was there an electronic version saved?
23     A. On our mainframe --
24     Q. There was?
25     A. -- there is -- yeah.

Page 62

1    MR. DELINSKY: Finish your answer. You
2 began, "on the mainframe."
3    THE WITNESS: On the mainframe, there's the
4 IRR report.
5    Q. How long was that saved for?
6    A. That, I am uncertain.
7    Q. Was it backed up?
8    A. That is -- I -- I don't know.
9    Q. When you were the SOM manager, did you ever
10 ask to look at old IRRs?
11    MR. DELINSKY: Object to form and misstates
12 the testimony.
13    THE WITNESS: It's so long ago, I can't
14 really recall.
15    Q. You don't have a memory of ever doing it?
16    MR. DELINSKY: Object to form.
17    THE WITNESS: It was so long ago.
18    Q. Do you have a memory of ever reviewing the
19 prior IRRs?
20    MR. DELINSKY: Object to form. Asked and
21 answered.
22    THE WITNESS: It's been so long, I can't -- I
23 can't remember.
24    Q. You can't remember if you have a memory?
25    A. No, I can't remember if -- if I -- if I

Page 63

1 reviewed a previous one.
2    Q. The --
3    MR. DELINSKY: Dan, I would just like to put
4 on the record at this point that the electronic, the
5 IRR data is no longer on the mainframe, that we
6 investigated that thoroughly and know it -- it is no
7 longer available to us.
8    Had it been, we would have produced it to
9 you.
10 BY MR. GOETZ:
11    Q. Were you involved in any investigation to
12 retrieve old Item Review Reports from '12 or '13?
13    MR. DELINSKY: I object to the question to
14 the extent that it calls for attorney-client
15 communications.
16    MR. GOETZ: Are you telling her not to
17 answer?
18    MR. DELINSKY: I also object to form of the
19 question.
20    Ms. Helfrich, if you are able to provide a
21 yes or a no answer to that question, you may answer,
22 but let's take it step by step. Okay?
23    I'm sorry. I -- can we have the question
24 read back or can you repeat the question?
25    MR. GOETZ: Could you read the question back?

Page 64

1    (The previous question was read back by the
2 court reporter as follows:
3    Question: Were you involved in any
4 investigation to retrieve old Item Review Reports from
5 '12 or '13?)
6    MR. DELINSKY: Same objections. Same
7 instruction to, Ms. Helfrich.
8    If you can answer with a yes or no, you can
9 answer. If you cannot, let's discuss, just between
10 you and me.
11    THE WITNESS: Can we discuss it?
12    MR. DELINSKY: What?
13    THE WITNESS: Can we discuss it?
14    MR. DELINSKY: Yes.
15    We are just going to be right outside the
16 room.
17    THE VIDEOGRAPHER: We are off record at 10:26
18 a.m.
19    (There was a brief recess.)
20    THE VIDEOGRAPHER: We are back on the record
21 at 10:29 a.m.
22    MR. DELINSKY: Dan, let's -- I propose we
23 proceed in the following way: I think -- I appreciate
24 what question you're asking. I don't think your
25 question gathers it, but let's try to move in the

Page 65

1 following way where -- and then let me tee it up and
2 then you can ask follow up. And I'm going to
3 carefully monitor the questions for attorney-client
4 confidences.
5    But Ms. Helfrich assisted in gathering
6 documents relevant to this litigation from
7 Indianapolis. So that's the starting point.
8    I imagine you'll have follow up, and you can
9 pursue your follow up.
10 BY MR. GOETZ:
11    Q. Ms. Helfrich, some of those documents that
12 you gathered were Item Review Reports.
13    A. In those boxes, I believe, yes.
14    Q. Yes.
15    And also in those boxes were the Store Metric
16 Reports that we spoke about earlier?
17    A. Yes.
18    Q. And also in those boxes were what you called
19 the MicroStrategy reports we spoke about earlier?
20    A. Uh-huh.
21    Q. Yes?
22    A. Yes.
23    Q. And also in those boxes were the Viper
24 Reports that we spoke about earlier?
25    A. Yes.

Page 66

1    Q.  Okay.  Was there anything else in those
2  boxes?
3        MR. DELINSKY:  To the extent that you looked
4  at them or remember.
5        THE WITNESS:  That I can recall?  I don't
6  believe so.
7    Q.  Okay.  Exhibit 2, again, this is an IRR for
8  one distribution center.  And in Indiana, there would
9  be an IRR additionally for 10 other distribution
10  centers that would be reviewed by SOM in Indiana,
11  correct?
12        MR. DELINSKY:  Object to form.
13        THE WITNESS:  I would review IRRs for other
14  DCs.
15    Q.  Okay.  And you would review IRRs for all of
16  the other DCs?
17    A.  Yeah.
18        MR. DELINSKY:  Some of the DCs don't
19  distribute controlled substances.
20        MR. GOETZ:  I believe you have -- I think the
21  record would show, I thought you had 19 distribution
22  centers with 11 that distributed controlled
23  substances.
24        MR. DELINSKY:  Okay.  All right.
25  BY MR. GOETZ:

Page 67

1    Q.  Am I wrong about that, Ms. Helfrich?
2    A.  That, I'm uncertain.
3    Q.  I believe, and I might be wrong, that it is
4  19 distribution centers with 11 that distribute
5  controlled substances, we will clear that up.
6        But you would review the IRRs for all of the
7  other distribution centers that distributed controlled
8  substances?
9    A.  Yes.
10    Q.  Yes?  Okay.
11        And so that would be all of the controlled
12  substances that were being delivered to the CVS
13  pharmacies in 2012 and 2013 during that period when
14  you were reviewing the IRRs?
15        MR. DELINSKY:  Object to form.  I think that
16  misstates the testimony.
17        THE WITNESS:  I reviewed for the those DCs.
18  Yes.
19    Q.  Do you know how many CVS pharmacies existed
20  in 2013?
21    A.  I cannot recall.
22    Q.  Do you have a guess?
23    A.  No.  I don't know.
24    Q.  Would you disagree if I told you that there
25  were approximately 7,700 CVS pharmacies --

Page 68

1        MR. DELINSKY:  Object to form.
2    Q.  -- in 2013?
3        MR. DELINSKY:  My apologizes, Dan.  I object
4  to form.
5        THE WITNESS:  I do not know.
6        (CVS-Helfrich-34 was marked for
7  identification.)
8    Q.  Okay.  I'm going to show you Exhibit 34.
9  We'll just be really quick on this and then you can
10  put it aside.  That -- you're going to keep Exhibit 2
11  in front of you and we will come back.
12    A.  Okay.
13    Q.  That -- Exhibit 34, that is an irregular
14  order logistics communication?
15    A.  Yes.
16    Q.  And what is this document?
17    A.  If I recall correctly, it is -- you would
18  check each DC next to their name.  If you looked into
19  an order -- if you looked into an order that flagged
20  on the IRR of concern that I looked deeper into.
21    Q.  Let me try to summarize if I can, and you
22  tell me if I'm wrong.
23        You would review the Item Review Report, and
24  if that Item Review Report had an order that was
25  identified on that Item Review Report that you looked

Page 69

1  into or did additional investigation, you would mark
2  that where it says control and then you would notify
3  that distribution center, correct?
4        MR. DELINSKY:  Object to form.
5        THE WITNESS:  I believe that before this was
6  sent out, the distribution center would have
7  previously been contacted, but I believe that's
8  correct.
9    Q.  Does looking at this document refresh your
10  recollection that there were 11 distribution centers
11  that were distributing controlled substances?
12    A.  Yes.
13    Q.  Okay.  So when we had a confusion earlier
14  about the number, we can agree now at least?
15    A.  Yes.
16    Q.  Okay.  And so, there were times that -- we
17  can go back to Exhibit 2.
18        There were times that you would review a
19  document similar to Exhibit 2 for ten other
20  distribution centers, and you were the only person
21  doing that?
22        MR. DELINSKY:  Object to form.
23        THE WITNESS:  In 2013, I can't recall when
24  Aaron left, but I believe there was Kelly and Gary
25  Millikan at the time.

Page 70

1    Q.  Okay.  Kelly Baker left sometime in October
2  or November of '13, early November or mid to late
3  October; is that correct?
4    A.  I'm not for certain on that.  I believe it is
5  -- it was possibly sometime later in 2013.
6    Q.  Okay.  And so after he left, you had Gary
7  Millikan help you review IRRs, Item Review Reports?
8    A.  Yes.  If -- when I needed assistance, he
9  would help me, yes.
10    Q.  Anybody else?
11    A.  Depending on when pharma compliance came on,
12  they would help in a -- they would help me look at it,
13  but Gary could actually help me, you know, get the
14  reviews done.
15    Q.  Okay.  How many hours in late '13 was Gary
16  working?
17    A.  I'm very unforcertain [sic].
18    Q.  There were some weeks it was five, right?
19    A.  I don't -- I don't know.
20    Q.  That doesn't -- you don't recall that?
21    MR. DELINSKY:  Object to form.
22    THE WITNESS:  I don't recall Gary's hours.
23    Q.  Okay.  This -- if you look at page 10747 of
24  Exhibit 2.
25    A.  What did you say?

Page 71

1    Q.  10747, please, of Exhibit 2.
2    Do you see -- do you see that page?  If -- if
3  you turn to the next page, 10748, that is the start of
4  the IRR for the PSE, correct?
5    A.  Yes.
6    Q.  Okay.  And so the -- if you go back to 10747
7  and you look in the top right corner, it is 144
8  pages --
9    A.  Yes.
10    Q.  -- is that correct?  And this Item Review
11  Report would typically have three orders per page?
12    A.  That, I'm unforcertain.
13    Q.  All right.  We can go through it and I'll
14  show you why I believe that.
15    Could you look at 10693, please?
16    That's an order in the middle of the page,
17  and the top is blacked out and the bottom is blacked
18  out.
19    Would that indicate to you that there's only
20  three orders on that page?
21    A.  I can't really say.
22    Q.  You're not sure --
23    A.  I'm not sure.
24    Q.  -- if there is an order up top or order on
25  the bottom, you're not sure if there is other text in

Page 72

1  that IRR?
2    A.  No.
3    Q.  Can you go to 10696, please?
4    So that shows there is an order on the bottom
5  of the page.  So we know that there is orders on the
6  bottom of the page, correct, that that --
7    A.  Yes.
8    Q.  And could you go to 10740, please?  40,
9  10740.
10    And that shows there is an order on the top
11  of the page, correct?
12    A.  Yes.
13    Q.  So we know there are orders on the top,
14  middle and bottom of the pages?
15    A.  Yes.
16    Q.  And unfortunately, the rest is blacked out,
17  but pretty good assumption that is three orders per
18  page?
19    MR. DELINSKY:  Object to form.
20    Q.  Do you agree?
21    A.  Possibly.  Yes.
22    Q.  Possibly?  I'm sure we can find one later
23  that shows all three, but I'm just -- I didn't think
24  that would be an issue.
25    And the controlled drug section of this IRR

Page 73

1  is 144 pages.
2    Can we agree there is approximately 400
3  controlled drug IRR orders that are identified on this
4  8-30-13 IRR?
5    MR. DELINSKY:  Object to form.
6    THE WITNESS:  Possibly.
7    Q.  Possibly?  Probably.  You agree probably?
8    MR. DELINSKY:  Object to form.
9    THE WITNESS:  Possibility.
10    Q.  Well, what are the other possibilities?
11    A.  I don't have the full IRR.  Are some smaller?
12  Some bigger?  Where it is possibility two per page,
13  or --
14    Q.  Maybe that full IRR you're saying is relevant
15  to this case.
16    MR. DELINSKY:  Object to form.  Instruct the
17  witness not to answer.
18    Q.  I'm asking if it is relevant to you to answer
19  my question, if there is approximately 400 controlled
20  drug IRR orders on this page -- on this document, if
21  having the full IRR would be helpful?
22    MR. DELINSKY:  Object to form.
23    THE WITNESS:  I believe I can still possibly
24  answer your questions about it.
25    Q.  Okay.  How many controlled drug IRR orders do

Page 74

1 you think this Exhibit 2 consists of?  I thought it
2 was 400 or 420, but I'm asking you now.
3        How many do you think it is?
4        MR. DELINSKY:  Object to form.
5        THE WITNESS:  I can go through each page
6 and --
7        Q.  When you say you can go through each page,
8 can you tell me what is under the pages that are
9 completely blacked out, if there is two or three
10 order?
11       A.  No.
12       Q.  We kind of -- I thought we established there
13 was an order up top, there's an order in the middle
14 and there's an order in the bottom.
15       But you don't agree there is probably three
16 orders per page, that doesn't refresh your
17 recollection?
18       MR. DELINSKY:  Object to form, misstatements
19 the testimony.
20       THE WITNESS:  It's been so long, I -- I
21 vaguely -- I can't remember how many orders per
22 page.
23       Q.  Okay.  All right.
24       I want you to assume there is three.  But
25 let's cut it in half.  Let's say there is 200

Page 75

1 controlled drug IRR orders shown this 8-30-13 report.
2        Would you agree there is at least 200?
3        MR. DELINSKY:  Object to form.
4        THE WITNESS:  I don't really know.
5        Q.  No idea?
6        You would know if we had this document in
7 full, wouldn't you?
8        MR. DELINSKY:  Object to the form of the
9 question.
10       MR. GOETZ:  How can you object to that?
11       Q.  You looked at IRRs throughout your career.
12       Would you know how many controlled drug
13 orders were on this IRR if you had the complete
14 document?
15       MR. DELINSKY:  Object to form.
16       THE WITNESS:  I was in -- I mean, obviously,
17 if it was complete, I would know, but I can still
18 answer your questions on it.
19       Q.  Here is my question:  How many controlled
20 drug IRRs are -- were identified on 8-30-13 for the
21 Indianapolis distribution center?
22       MR. DELINSKY:  Object to form.
23       THE WITNESS:  Possibly one for the day?  Is
24 that what are you asking?
25       Q.  No.  I'm asking how many controlled drug

Page 76

1 orders were identified on the IRR for the Indianapolis
2 distribution center on 8-30-13?
3        That's the document in front of you as
4 Exhibit 2.  How many were identified?  How many
5 orders?
6        A.  I don't know how many orders.
7        Q.  So when you say -- when I asked you if you
8 had the entire document, would it help you, without
9 all of the blackouts, and you say, no, you can answer
10 anything I want based on this, you can't, can you?  It
11 would help you?
12       MR. DELINSKY:  Object to form.
13       THE WITNESS:  If the exact count was needed,
14 then the full would be helpful.
15       Q.  Ms. Helfrich, I would like to know the exact
16 count, or an estimate.  I thought we could estimate
17 that there was 400.  I then offered to say to you
18 let's assume there is 200 based upon that my estimates
19 are wrong.  And you would not agree to that.
20       What is your estimate as to the number of
21 orders that were identified as potentially suspicious
22 for the Indianapolis distribution center that are
23 shown on up on this report dated August 30, 2013?
24       MR. DELINSKY:  Object to form.
25       THE WITNESS:  I don't know.

Page 77

1        Q.  You can't even estimate?
2        MR. DELINSKY:  I believe Ms. Helfrich was
3 going to say something when you put the question to
4 her.
5        What were you going to say?
6        THE WITNESS:  I don't know, but I could go
7 through and, each page and figure out an estimate, my
8 own.
9        Q.  How would do you that?
10       A.  Just by going through it.
11       MR. GOETZ:  All right.  We are going to go
12 off record and you can go through it.
13       MR. DELINSKY:  We are not doing it off the
14 record.
15       MR. GOETZ:  We are.  And you can -- we can
16 complain, or at least track this time, because -- and
17 we will fight about it later.
18       MR. DELINSKY:  But it is going to be on
19 record.  It is going to be record.  If we are going to
20 do this -- are we on the record?
21       MR. GOETZ:  Yeah.
22       MR. DELINSKY:  If we are going to do this, it
23 is going to be on the record.  And if you hit your
24 limit, then there will be a discussion about whether
25 it calls, but it has to be recorded on the record.

Page 78

1    MR. GOETZ: I want you to track the time.
2    Q. And Ms. Helfrich, I would like to know that
3  you are going to look at page by page versus us
4  agreeing that there is probably three orders per page.
5    I would like to know what are you doing.
6    MR. DELINSKY: And I also would -- are we
7  still on record?
8    THE VIDEOGRAPHER: We're still on.
9    MR. DELINSKY: All right. This is --
10  Mr. Goetz, this is silly. It is wasteful of
11  everyone's time here to ask a witness to go through
12  144 pages and make an estimate. The document speaks
13  for itself. It is just unnecessary.
14    MR. GOETZ: Mr. Delinsky, I totally agree it
15  is unnecessary. If you would like to stipulate that
16  there are three orders per page, as we all know there
17  are, and then the document speaks for itself, that is
18  fine.
19    She cannot agree to it. She won't give me an
20  estimate as to the number of -- of orders. She claims
21  she can if she goes through page by page. I 100
22  percent agree it is silly and a waste of time. That's
23  why I suggested that this is not my time.
24    MR. DELINSKY: We will stipulate that that --
25  that the IRR contains approximately 200 or more

Page 79

1  controlled orders.
2    MR. GOETZ: Thank you.
3    MR. DELINSKY: And by the IRR, to be clear,
4  the particular IRR marked as Exhibit 2.
5    MR. GOETZ: Exactly. Exhibit 2.
6    (CVS-Helfrich-5 was marked for
7  identification.)
8  BY MR. GOETZ:
9    Q. Exhibit 5. Ms. Helfrich, would you look at
10  the third page of this document, which says "LP
11  Analyst Time Study."
12    A. Okay.
13    Q. That's a document dated September 24th, 2012,
14  correct? It is on the top left. Look at the first
15  page, please, Ms. Helfrich. I apologize.
16    No.
17    A. Oh.
18    Q. The first page that says "LP Analyst Time
19  Study."
20    A. Okay.
21    Q. So, do you see that date, September 24,
22  2012?
23    A. Yes.
24    Q. Okay. And that name is Aaron Burtner?
25    A. Yes.

Page 80

1    Q. And that is who you were working for when you
2  started in Suspicious Order Monitoring?
3    A. Yes.
4    Q. You were not at CVS at this time, were you?
5    A. No, I was not.
6    Q. I'm going to ask you some questions just to
7  see if it is consistent with your experience. Okay?
8    This is when he was tracking all of his time.
9  And we don't have his testimony yet, but he was
10  tracking all of his time. And if you look at the
11  fourth entry from the bottom, it says, "Review 9-21-12
12  and 9-23-12 IRRs for stores populated based on max
13  cutoffs."
14    Do you know what that is?
15    A. I can't remember.
16    Q. Okay. There was a time -- this was right
17  about the -- and I'll show it to you later. You don't
18  have to just take my word for it.
19    This was right about when the max fine and
20  max cutoff came into being. And so this was kind of a
21  new project related to that, how much time is it going
22  to take.
23    But here is what really interests me. The
24  third from the bottom, it says, "Review 9-21-12
25  control IRR, 9:20 to 9:35."

Page 81

1    Do you see that?
2    A. Yes.
3    Q. And so, on that day -- or on the 24th, which
4  was a Monday, so, when he reviews the 9-21 control
5  IRR, he's actually reviewing those from Friday,
6  correct? He's reviewing the orders from Friday?
7    A. I'm not for certain of the calendar, but --
8    Q. I will promise you that September 24, 2012
9  was a Monday.
10    A. Okay.
11    Q. So if we count back where September 21st,
12  2012 was a Friday.
13    And so, when he comes in this Monday and it
14  says, "Review 9-21-12 control IRR," we can assume he's
15  reviewing the IRR from the Friday orders, correct?
16    A. Yes.
17    Q. Okay.
18    MR. DELINSKY: I object to form of the
19  question. Just make sure you give me a second.
20    Q. And that took him 15 minutes. Do you see
21  that? Do you see where it says "time start, time
22  finished"?
23    MR. DELINSKY: Object to the form of the
24  question. That's not what the document says.
25    Q. That's okay. Do you see where it says "time

Page 82

1 start, time finished"?
2   A. Yes.
3   Q. And according to this document, he started at
4 9:20 and he ended the 9:35; is that correct --
5   A. Yes.
6   Q. -- according to the document?
7   A. Uh-huh.
8   Q. Do you have any reason to assume that
9 Mr. Burtner would write something down that wasn't
10 true?
11     MR. DELINSKY: Object to form.
12     THE WITNESS: No.
13   Q. Okay. And if you look at bottom entry, it
14 says "Review 9-23-12 control IRR."
15     Do you see that?
16   A. Yes.
17   Q. Okay. And that was 9:40 to 10:30, start time
18 of 9:40 and a finish time of 10:30, correct?
19   A. Yes.
20   Q. And so, if Mr. Burtner wrote this down
21 correctly and he was truthful and honest, it took him
22 50 minutes to review the 9-23 control -- 12 control
23 IRR, correct?
24   A. Yes.
25   Q. Okay. And that 9-23 --

Page 83

1     MR. DELINSKY: I object to the form.
2   Q. That 9-23-12 control IRR actually -- since it
3 was a -- this is as Monday on the 24th, that 9-23-12
4 control IRR captures the orders from Saturday and
5 Sunday, correct?
6     MR. DELINSKY: Object to form.
7     THE WITNESS: I believe so, yes.
8   Q. Yeah. So he's reviewing two day's worth of
9 orders in that one IRR, correct?
10   A. Yes.
11     (CVS-Helfrich-6 was marked for
12 identification.)
13   Q. Okay. Could you look at Exhibit 6 for me?
14 Keep Exhibit 5 next to you, please.
15     I'm going to hand you Exhibit 6.
16     This is a time study. If you go to where it
17 says "LP Analyst Time Study", this is a time study,
18 again, by Mr. Burtner dated 7-13-2012, correct?
19   A. Yes.
20   Q. Okay. And if you look at the fourth item
21 down, it says, "Review 7-12-12 control IRR."
22     Do you see that?
23   A. Yes.
24   Q. And it says, "time start 7:35, time finished
25 8:15"?

Page 84

1   A. Yes.
2   Q. All right. And so, it took him 40 minutes?
3     MR. DELINSKY: Object to form.
4 BY MR. GOETZ:
5   Q. Does this document indicate it took him 40
6 minutes?
7   A. Yes.
8   Q. He flagged one order, YK.
9     What distribution center is that?
10   A. I believe that is our Chemung distribution
11 center.
12   Q. Okay. And on the prior document, Exhibit 5,
13 you don't need to, we will go back to it, but he
14 flagged three orders, LA.
15     Do you know what that is?
16   A. I believe that is La Habra.
17   Q. That's in California, correct?
18   A. Yes.
19   Q. Or is that in -- is that in Florida?
20   A. La Habra is in California.
21   Q. So, again, he's reviewing the IRRs from the
22 entire country out of Indiana?
23     MR. DELINSKY: Object to form.
24     THE WITNESS: For those -- I believe that's
25 what he was doing at that time.

Page 85

1   Q. Yeah.
2   A. I'm unforcertain [sic].
3     MR. DELINSKY: I'm sorry, Shauna. What did
4 you say?
5     THE WITNESS: I believe that might have been
6 what he was doing at the time. I'm unforcertain.
7     MR. DELINSKY: You're uncertain?
8     THE WITNESS: Yeah, what he was doing.
9     MR. DELINSKY: I just didn't understand.
10 "I'm un for certain," did you mean I'm uncertain?
11     THE WITNESS: Yeah.
12     MR. DELINSKY: Uncertain?
13     THE WITNESS: Yeah.
14     MR. GOETZ: Thank you.
15     (CVS-Helfrich-7 was marked for
16 identification.)
17   Q. I'm going to show you Exhibit 7, please.
18     Do you -- can you turn where it says, "LP
19 Analyst Time Study"?
20   A. Yes.
21   Q. And do you see where it says, three lines
22 down, "Review 7-17-12 control IRR, 7:50 to 8:40"?
23   A. Yes.
24   Q. So, on this day, he spent approximately 50
25 minutes to review the control drug IRR?

Page 86

1    A. Yes.
2        MR. DELINSKY: Object to form of that
3    question.
4    BY MR. GOETZ:
5    Q. When you would --
6        MR. DELINSKY: I object to form. Make sure
7    that you leave me time to object before you answer,
8    okay? Thank you.
9    BY MR. GOETZ:
10   Q. When you would review the control drug IRR,
11   you would also review the control PSE IRR for that
12   distribution center, correct?
13   A. Yes.
14   Q. And so if you look down below, he reviewed,
15   on 7-17-12, the PSE IRR, correct?
16   A. Yes.
17   Q. And so, and then it says, "Sent to EN, IN,
18   NJ, UC, and YK to communicate the orders flagged"?
19   A. Yes.
20   Q. So, what is EN?
21   A. I believe EN is Ennis, Texas.
22   Q. What is IN?
23   A. Indy, Indiana.
24   Q. What is NJ?
25   A. I believe that is our Lumberton, New Jersey,

Page 87

1    DC.
2    Q. And what is UC?
3        I'm sorry?
4    A. I can't recall.
5    Q. You don't recall what UC is?
6    A. I don't remember.
7    Q. UC is Patterson.
8        Does that ring a bell?
9    A. Yes.
10   Q. What is UK?
11   A. Chemung.
12       MR. DELINSKY: Excuse me, YK. YK, Dan.
13       MR. GOETZ: Oh, YK. I apologize.
14   Q. YK?
15   A. I believe that is our Chemung DC.
16   Q. Okay. So we know on this day, at least, he
17   reviewed one, two, three, at least five distribution
18   centers, right?
19       MR. DELINSKY: Object to form. We just know
20   what is on the document.
21   BY MR. GOETZ:
22   Q. We know the document indicates that he
23   reviewed five distribution centers, correct?
24       MR. DELINSKY: Object to form.
25   BY MR. GOETZ:

Page 88

1    Q. Is that correct?
2    A. I don't know exactly what he reviewed in
3    whole for that day, but it says those DCs, yes.
4    Q. Okay. It says that he communicated the
5    flagged orders to those DCs, correct?
6    A. Yes.
7    Q. So as long as he was being honest, he had
8    reviewed and then sent -- sent the irregular order
9    like we had talked about earlier, correct?
10       MR. DELINSKY: Object to form.
11       THE WITNESS: Not -- not Aaron -- I can't
12   really comment on his -- his doing.
13   Q. Is it your understanding that in July of
14   2012, Aaron Burtner was the only person reviewing the
15   IRR for controlled drugs for every distribution
16   center?
17   A. I don't know.
18   Q. You don't have an understanding?
19   A. I don't -- I don't know.
20   Q. You have no idea?
21       When you came to -- and you started with him
22   in late '12, was it just you and Aaron reviewing the
23   IRRs?
24   A. Yes.
25   Q. Yes?

Page 89

1        And, in fact, I think you testified earlier
2    you didn't start reviewing IRRs until sometime in '13,
3    correct?
4        MR. DELINSKY: Object to form.
5        THE WITNESS: I believe so.
6    Q. Okay. So -- but when you were there in late
7    '12, we know it was just Aaron Burtner reviewing the
8    entire IRRs for all 11 distribution centers?
9    A. I can't -- I don't know.
10   Q. Do you remember?
11   A. From this --
12   Q. No.
13       I'm asking you: In 2012, when you started
14   working with Aaron Burtner in the Suspicious Order
15   Monitoring Program, who else besides Aaron Burtner was
16   reviewing the IRRs?
17       MR. DELINSKY: Object to form.
18       THE WITNESS: We were the only two in that
19   room. I wasn't really in the SOM. I came in and I
20   did it -- I helped him and I left.
21       If there was any other background or anybody
22   else, I don't know.
23   Q. You don't know of anybody else?
24       And you -- it is your understanding when you
25   were doing it in 2012, that the entirety of the IRR

Page 90

1 review was done out of the Indianapolis distribution
2 center?
3        MR. DELINSKY: Objection.
4        THE WITNESS: I can't recall exactly what I
5 knew. It's so long ago.
6        MR. DELINSKY: Wait. Dan, before we look at
7 this -- I don't want to look at this.
8        Let's take a break. It's been about an
9 hour.
10       MR. GOETZ: I'm going do this one time study.
11 It is the same document. It will take two minutes.
12       MR. DELINSKY: You're very wordy, though,
13 Dan. So really speed it up.
14       (CVS-Helfrich-8 was marked for
15 identification.)
16 BY MR. GOETZ:
17    Q. Ms. Helfrich, I've handed you Exhibit 8.
18       MR. DELINSKY: Just so the record is clear,
19 that was Mr. Goetz and I joking.
20 BY MR. GOETZ:
21    Q. That -- can you turn to the LP Analyst Time
22 Study?
23    A. Yes.
24    Q. Do you see that?
25    A. Yes.

Page 91

1    Q. Same document -- same type of document that
2 we have been looking at, correct?
3    A. Yes.
4    Q. And that's a time study dated September 7,
5 2012?
6    A. Yes.
7    Q. Again, done by Aaron Burtner?
8    A. Yes.
9    Q. Okay. And if you look down in the middle, it
10 says, "Review 9-6-12 control IRR"?
11    A. Yes.
12    Q. It says, "8:20 a.m. to 8:35 a.m.," correct?
13    A. Yes.
14    Q. Again, the rational assumption is that it
15 took him 15 minutes to review the control drug IRRs
16 for that day?
17       MR. DELINSKY: Object to form. It's just
18 what the document says.
19       THE WITNESS: I don't -- I don't know.
20    Q. Let me ask you a question. Strike that.
21       We looked at time studies that appears it
22 takes between 15 minutes and 50 minutes, but the 50
23 was a -- was two days. So, 15 minutes to 50, if it is
24 two days, to review the IRRs.
25       Is that consistent with your practice when

Page 92

1 you were doing it in 2013?
2        MR. DELINSKY: Object to form.
3        THE WITNESS: It was so long ago. I don't --
4 I can't recall how long it took.
5    Q. You have no idea?
6       I did this so you would have an idea of how
7 long -- you have no idea how long it took you?
8    A. For just two DCs, or...
9    Q. No.
10       I mean, he -- it appears to me that he was
11 reviewing all of them.
12    A. Oh.
13    Q. How long in 2013, when you were reviewing
14 IRRs, would it take you per day to review the IRR?
15    A. I don't know. It -- it varied from day to
16 day. It -- I can't --
17    Q. How did it vary?
18    A. I -- depending on, you know, the orders.
19    Q. What was -- how long would it normally take?
20       From -- from here, we see it is anywhere from
21 15 minutes to 25 minutes or 30 minutes, or whatever.
22       How long would it take you? That's not
23 consistent with your experience?
24       MR. DELINSKY: Dan, can I ask you a question?
25       MR. GOETZ: Uh-huh.

Page 93

1        MR. DELINSKY: Because I think this may be
2 confusing Ms. Helfrich, but I don't want to break the
3 rules.
4        MR. GOETZ:  Go ahead and ask. No. No.
5        MR. DELINSKY: Are you talking about the
6 amount of time it took for the overall SOM review --
7        MR. GOETZ: No, sir.
8        MR. DELINSKY: -- or it is just the IRR --
9        MR. GOETZ: Yeah.
10       MR. DELINSKY: -- that piece?
11       Okay. Thank you.
12 BY MR. GOETZ:
13    Q. Ms. Helfrich, let me -- and then we will move
14 off this -- let me make this easier, okay?
15       If you go back to Exhibit 8, all right?
16 If -- this is Exhibit 6, I apologize. Go back to
17 Exhibit 6, please.
18       MR. DELINSKY: Exhibit 6?
19       MR. GOETZ: Yes.
20    Q. Do you see Exhibit 6?
21       Do you have that in front of you?
22    A. Yes, I do.
23    Q. And it says, "Review 7-12-12 control IRR,
24 7:35 to 8:15."
25       So that was 40 minutes. And it says, "One

Page 94

1 store flagged."
2      Correct?
3    A. Yes.
4    Q. Okay. Then down below it says, "Review store
5 1780," which happens to coincide with the store that
6 he flagged, and that is, then, to the right, the due
7 diligence he did to review that store, correct?
8      That's how you read the document?
9    A. Yes.
10    Q. Okay. I'm not asking you about how long it
11 took you to do due diligence.
12      What I'm asking you is: How long did it take
13 you to review this IRR to, then, decide which orders
14 you wanted to do due diligence on, which we'll get
15 into later.
16      But that's what Mr. Burtner's time sheets, he
17 separates reviewing the IRR and then once he decides
18 those orders that he believes need due diligence, he,
19 then, has that time later?
20    MR. DELINSKY: Object to form.
21
22 BY MR. GOETZ:
23    Q. My question is: How long did it take you to
24 review the IRR to, then, decide which orders needed
25 due diligence?

Page 95

1    MR. DELINSKY: Object to form.
2    THE WITNESS: It was so long ago. I -- I
3 don't remember.
4    MR. DELINSKY: Can, can we take a break now?
5    MR. GOETZ: Sure.
6    THE VIDEOGRAPHER: We are off record at 11:14
7 a.m.
8      (There was a brief recess.)
9    THE VIDEOGRAPHER: We are back on the record
10 at 11:25 a.m.
11 BY MR. GOETZ:
12    Q. Ms. Helfrich, in August of 2013, when you
13 were working in the Suspicious Order Monitoring at CVS
14 in Indiana, when was your typical day?
15    MR. DELINSKY: Object to form.
16    THE WITNESS: From what I can recall, I would
17 come in, I would get the IRR, put it in Excel from the
18 mainframe, and then there was -- I remember the Excel
19 spreadsheet did some sorting. And then I go to the
20 Store Metrics report, the MicroStrategy report, and
21 Viper.
22      And if none of those put any concerns I had
23 at rest, after talking to the pharmacist and I'm still
24 con -- concerned, I would elevate -- escalate that up
25 to Dean Vanelli or Pam Hinkle.

Page 96

1    Q. What else?
2    MR. DELINSKY: Object to form.
3    THE WITNESS: After -- I remember emails
4 being sent out to the DCs. I can't remember their
5 exact content. And then from what I can -- that --
6 the IRR communications also went out. That's all I
7 can recall.
8    Q. Is that all you recall doing in a typical
9 day?
10    A. That's all I can really remember.
11    Q. When you said that you would get Store
12 Metrics and MicroStrategy and the Viper, you would --
13 you would not do that on every order that was
14 identified on the IRR, would you?
15    A. The Store Metrics, yes. We would look at the
16 Store Metrics.
17    Q. For every IRR order?
18    A. For every order, that I can recall.
19    Q. How long would it take to you review a Store
20 Metrics report?
21    A. It's been so long, I don't -- I don't know.
22    Q. I mean, that's a detailed report, correct?
23    A. I vaguely remember that report.
24    Q. So, you would look at a Store Metrics report
25 for 200 -- because we know there is at least 200 --

Page 97

1 200 orders for the Indiana distribution center on
2 August 30th?
3    MR. DELINSKY: Object to form.
4    THE WITNESS: I wasn't by my -- I don't
5 believe I was alone at -- on August 30th. And I would
6 have -- I would have help, if necessary. I mean, I
7 believe we established Kelly was still there. And
8 then you bring in Gary Millikan, if necessary.
9    Q. And you would look at a report like this for
10 all 11 DCs, and so for all 11 distribution centers,
11 you would look at a Store Metrics report for every
12 order?
13    A. From what I can -- it's been so long ago.
14      That's what I -- I can -- I can recall using
15 the Store Metrics and the MicroStrategies, and the
16 Viper.
17    Q. So would you do that for every order?
18    MR. DELINSKY: Object to form.
19      Ms. Helfrich, you can answer if you remember,
20 and if you don't remember, you don't remember. Nobody
21 here wants you to guess. Just so if you know it, you
22 know it. If you don't, you don't, you don't remember,
23 and that's fine.
24    THE WITNESS: It's so long ago, I really
25 don't.

Page 98

1  Q. You don't?

2  A. I don't remember.

3  Q. So, you would do additional due diligence on

4  every order identified on the IRR?

5     MR. DELINSKY: Object to form. Asked and

6  answered.

7     MR. GOETZ: I'm --

8     THE WITNESS: I don't -- I don't remember the

9  exact -- exactly.

10  Q. When you would look at those Store Metrics

11  reports, would you print those out?

12  A. I would -- I know they were -- they were

13  printed on stores that I would want to look more into.

14  Q. That's what I don't understand.

15  A. Yeah.

16  Q. You would look at the Item Review Reports and

17  look at everything that was shown on this report,

18  correct?

19     MR. DELINSKY: Object to form.

20  Q. Is that correct?

21     MR. DELINSKY: Object to form.

22     THE WITNESS: All of the information on the

23  IRR that went into the spreadsheet.

24  Q. What spreadsheet?

25  A. Well, my day consisted of getting the IRR

Page 99

1  from the mainframe and putting it in the spreadsheet.

2  Q. I understand. And so what I was trying to

3  figure out is: What orders off of that IRR did you

4  decide, after you reviewed the IRR, to do additional

5  due diligence on?

6     And you said to me you looked at

7  MicroStrategy and Viper and Store Metrics for every

8  order on this IRR.

9     MR. DELINSKY: No. No, no. Object to form.

10  Q. Is that wrong?

11     MR. DELINSKY: Misstates the testimony.

12     THE WITNESS: Yes.

13  Q. Okay. So, when you reviewed the IRR, would

14  you look at anything else to decide if you needed

15  additional due diligence besides this and then you

16  would -- after looking at that, would you go do

17  additional due diligence if you thought it was

18  necessary?

19     MR. DELINSKY: Object to form.

20     THE WITNESS: I can't -- I don't recall the

21  exact process.

22  Q. I appreciate you don't recall the exact

23  process, but then when I show you things like

24  Mr. Burtner's time studies that show that he picks one

25  order out of the IRR for additional due diligence, you

Page 100

1  don't agree with that, do you?

2     Even though you don't recall anything, that

3  is not consistent with your memory, is it?

4     MR. DELINSKY: Object to form.

5     THE WITNESS: I don't know much about his

6  time studies or that he even did a time study.

7  Q. Did you do your job and try to do it

8  consistent with how he did his?

9  A. I did my job consistent to how I was

10  trained.

11  Q. And he trained you, correct?

12  A. Yes.

13     (CVS-Helfrich-4 was marked for

14  identification.)

15  Q. Okay. I'm going to show you Exhibit 4.

16     Have you ever seen that document?

17  A. No.

18  Q. Okay. Do you know when this document is

19  from?

20  A. No.

21     (CVS-Helfrich-3 was marked for

22  identification.)

23  Q. I will show you Exhibit 3, which is the email

24  that this document came with.

25     And if you look at Exhibit 3, it is an email

Page 101

1  from November 29, 2012, and then it appears to attach

2  three different documents.

3     Do you see that?

4  A. Yes.

5  Q. And one says "List of opportunities. My

6  notes from our meeting on 11-27," correct?

7  A. Yes.

8  Q. And that is an email from Craig Schiavo. Who

9  is that?

10  A. I don't know.

11  Q. This -- on page -- if you go to Exhibit 4,

12  paragraph 8, it says, "A hundred plus orders flagged

13  by system. Looked. Past history, algorithm,

14  max/min."

15     Those are the three things that are shown on

16  the IRR, correct? Past history, the algorithm and the

17  max and the minimum?

18     MR. DELINSKY: Object to form.

19  Q. Yes?

20  A. Part of these? Yes.

21  Q. Yes. Those are the three things that are

22  shown on the algorithm on the IRR, correct?

23     MR. DELINSKY: Object to form. It is three

24  things on this page.

25  Q. Are those three things shown on the IRR?

Page 102

1 A. I'm not -- it's been many years. I can't
2 recall.
3 MR. DELINSKY: Let her finish, Dan.
4 Are you done, Ms. Helfrich, with your answer?
5 THE WITNESS: I can't recall exactly.
6 Q. Can you read where it says -- the A? That
7 says, "Two to three were stopped by Aaron for review."
8 Do you see that?
9 A. Yes.
10 Q. And then down below it says, i, ii, and iii,
11 talking background types of review he would do,
12 correct? Deeper dive review, dispensing versus
13 ordering, reach out to store, correct?
14 A. Yes.
15 Q. Okay. According to this document, Aaron
16 would look at the IRR, and from that, pick two to
17 three orders from the hundred or so orders, if there
18 is a hundred, to decide which received a deeper
19 review?
20 Is that consistent with what your procedure
21 was?
22 MR. DELINSKY: Object to form.
23 THE WITNESS: I recall doing those things.
24 It's been so long ago.
25 Q. Are you finished?

Page 103

1 A. Yes.
2 Q. Okay. What percentage of orders from the IRR
3 would you then do a deeper review on or additional due
4 diligence on? That's all I'm trying to find out.
5 MR. DELINSKY: Object to form.
6 THE WITNESS: I don't know. It's been so
7 long ago.
8 Q. You have no idea?
9 MR. DELINSKY: Object to form.
10 THE WITNESS: I don't -- I don't remember.
11 Q. You have no idea? You have no idea?
12 A. I don't remember.
13 Q. You have no idea how long it took you to
14 review the IRRs, correct?
15 MR. DELINSKY: Object to form. Asked and
16 answered.
17 Q. Is that correct?
18 A. I don't remember.
19 Q. Can you go back to Exhibit 5, please?
20 Do you see down below on Exhibit 5 -- this is
21 the 9-24-12 time study. Said, "Review 9-21-12 control
22 IRR." He spent 15 minutes. "No orders flagged."
23 Do you see where it says that?
24 A. Yes.
25 Q. According to this time study, and assuming

Page 104

1 this is right, he did not do any additional due
2 diligence on those orders from 9-21-12 other than what
3 is shown on the IRR, correct?
4 A. I don't know.
5 MR. DELINSKY: Object to form.
6 Q. You don't know?
7 A. I don't know what Aaron did.
8 Q. Do you disagree that that is what that
9 indicates?
10 A. I can't comment on it.
11 Q. Okay. Look at the 9-23-12 entry, the last
12 one. Says, "Review 9-23-12 IRR. Three orders
13 flagged."
14 Do you see that?
15 A. Yes.
16 Q. Okay. And then if you look on the next page,
17 it talks about the due diligence he did for those
18 three orders.
19 A. Yes.
20 Q. Do you see that?
21 A. Yes.
22 Q. Okay. And -- and you -- would you agree that
23 what that form represents, assuming it's true and
24 accurate and Mr. Burtner was being truthful, was that
25 he reviewed the IRR from 9-23-12 and three orders he

Page 105

1 picked for additional due diligence?
2 Would you agree with that?
3 MR. DELINSKY: Object to form.
4 THE WITNESS: I can't say what Aaron did.
5 Q. But you can't tell me what you did.
6 What percentage of orders would you pick for
7 additional due diligence?
8 MR. DELINSKY: Object to form. Misstatements
9 the testimony.
10 THE WITNESS: I don't remember.
11 Q. Okay. But you don't know if -- if -- this
12 doesn't refresh your recollection that Aaron would
13 pick zero to three from a control IRR for additional
14 due diligence?
15 MR. DELINSKY: Object to form, if that is a
16 question.
17 MR. GOETZ: It is a question.
18 THE WITNESS: I don't remember.
19 Q. I just want to be clear: You have no idea at
20 all what percentage of orders from a control IRR you
21 would do additional due diligence on, correct?
22 MR. DELINSKY: Object to form. That
23 misstates the testimony.
24 THE WITNESS: I don't remember.
25 Q. I understand.

Page 106

1    As you sit here today, do you have any idea
2  what percentage of orders that were on the control
3  drug IRR you would do additional due diligence on?
4    MR. DELINSKY: Object to form. Asked and
5  answered.
6    THE WITNESS: It was so long ago, I just do
7  not remember.
8    Q. Okay. Do you have any idea, as you sit here
9  today?
10    MR. DELINSKY: Object to form. Asked and
11  answered.
12    THE WITNESS: I don't. I don't remember.
13    Q. You're not answering my question.
14    My question is: Do you have any idea? I
15  appreciate you saying you don't remember. I'm not
16  asking you for an exact number. I'm asking you if you
17  have any idea.
18    Any idea?
19    MR. DELINSKY: Object to form. Asked and
20  answered.
21    There is a distinction between not knowing
22  and not remembering, and you're trying to conflate the
23  situation.
24    Objection. Asked and answered. Multiple
25  occasions.

Page 107

1    Q. Do you know what percentage of orders you
2  reviewed -- strike that.
3    Do you know what percentage of orders on the
4  control drug IRR you reviewed for additional due
5  diligence?
6    MR. DELINSKY: Same objections. Asked and
7  answered. Objection to form.
8    THE WITNESS: I don't remember.
9    Q. Do you remember how many orders that were on
10  the control drug IRR you reviewed with additional due
11  diligence?
12    MR. DELINSKY: Object to form. Objection.
13  Asked and answered.
14    THE WITNESS: I don't -- I don't remember.
15    Q. Do you have any idea? Can you give us a
16  guess?
17    MR. DELINSKY: Object to form. Asked and
18  answered.
19    THE WITNESS: I don't remember.
20    Q. Can you give -- that's not -- can you give us
21  a guess? That's yes or no.
22    MR. DELINSKY: Object to form.
23    THE WITNESS: I don't remember.
24    Q. I'll take that as a no.
25    MR. DELINSKY: There is no question put to

Page 108

1  you right now, okay?
2    Q. What is an IRR Recap?
3    A. I don't recall.
4    Q. You don't recall?
5    Did you look at any documents to prep?
6    A. No.
7    Q. No? Ms. Helfrich, do you --
8    MR. DELINSKY: Did you look at any documents
9  in preparing for the deposition?
10    It's not a complicated question. Did you
11  look at any documents to prepare for the deposition?
12  In meeting with me, did you look at documents?
13    Dan, let's take a break. Let's take a
14  break.
15    THE VIDEOGRAPHER: We are off the record at
16  11:58.
17    (There was a luncheon recess.)
18    THE VIDEOGRAPHER: We are back on the record
19  at 12:30 p.m.
20  BY MR. GOETZ:
21    Q. Ms. Helfrich, before we took a break, I had
22  asked you a question, if you had reviewed any
23  documents in preparation for today.
24    Did you review any documents in preparation
25  for today?

Page 109

1    A. Yes.
2    Q. Can you tell me what those documents are?
3    MR. DELINSKY: Instruct the witness not to
4  answer on privileged grounds. If you ask a question
5  about a particular document, you can ask that
6  document. But her selection and the selection of
7  documents that she was shown reflects privileged
8  communications and work product.
9  BY MR. GOETZ:
10    Q. Ms. Helfrich, did you review an Item Review
11  Report in preparation for today?
12    A. I want to -- I believe I saw a portion of
13  one.
14    Q. Did you review an IRR Recap Report --
15    A. Recap?
16    Q. -- in preparation for today?
17    A. Not that I can recall, unless I'm confusing
18  it with something.
19    (CVS-Helfrich-13 was marked for
20  identification.)
21    Q. So, I'm going to hand you something that we
22  have marked as Exhibit 13.
23    MR. GOETZ: Do you want a copy?
24    MS. HARMON: No, thank you.
25    MR. GOETZ: I couldn't imagine that you

Page 110

1  would.
2  Q. Ms. Helfrich, would you briefly leaf through
3  those pages and tell me what that document is.
4  A. To me, this looks like what we -- we called
5  the max tracker.
6  Q. What is a max tracker?
7  A. If I'm recalling correctly, it is what we got
8  off that stopped -- what we populated the IRR into.
9  Q. Okay.
10  A. Why he called it the max tracker, I don't --
11  I don't know.
12  Q. So, this would be -- this was not the
13  entirety of the IRR, correct, populated onto this?
14  A. I believe --
15  MR. DELINSKY: Ms. Helfrich, if you need an
16  opportunity to glance at the document, you can.
17  MR. GOETZ: Absolutely.
18  THE WITNESS: I was -- so, it was long ago,
19  but I believe what was -- what we took from the IRR,
20  everything was populated. I -- I believe.
21  Q. Ms. Helfrich, could you look at 10474?
22  MR. DELINSKY: I'm sorry, Dan. 104?
23  MR. GOETZ: 74.
24  Q. And, again, Ms. Helfrich, my understanding is
25  what we received were those hydrocodone orders and no

Page 111

1  other controlled substances, okay?
2  A. Okay.
3  Q. Does that make sense?
4  So they only gave us where the hydrocodone or
5  HCPs showed up, and they didn't give us the other
6  controlled drugs that would populate what you're
7  calling the max tracker.
8  A. Okay.
9  Q. And so if you look at 10474, there is two
10  orders from 11-30-13, correct?
11  A. Yes.
12  Q. And I will represent to you that within this
13  document, if you go before and after the multiple
14  pages that are blanked out, there are no other
15  documents -- no other orders of HCP from 11-30-13.
16  Okay?
17  A. Uh-huh. Okay.
18  Q. You have never seen a controlled drug IRR for
19  a day such as 11-30-13 that only consisted of two
20  entries, have you?
21  MR. DELINSKY: Object to form.
22  THE WITNESS: I don't -- I don't remember
23  if -- I don't remember.
24  Q. We just reviewed over 1,000 IRRs in DC at
25  Mr. Delinsky's office. And there is no IRRs that are

Page 112

1  only two entries, but you don't -- you don't remember
2  that?
3  MR. DELINSKY: Object to form.
4  THE WITNESS: I don't remember.
5  Q. Okay. What -- when I look at this report,
6  what it appears to me is this report appears to be
7  those orders that are populated from the IRR that had
8  additional due diligence done on them, which is what
9  is reflected in that right-hand column.
10  A. From -- from what I can remember, the IRR on
11  the mainframe and we put it in this Excel spreadsheet.
12  But, again, it was long ago.
13  Q. So you think this IRR -- this max tracker
14  report was the entirety of the IRR for whatever date
15  is shown?
16  MR. DELINSKY: Object to form.
17  THE WITNESS: I don't -- I don't remember.
18  I'm not sure when we started to lose stores
19  to the new system, but...
20  Q. Are you asking when you created -- when you
21  migrated to the new system in Indianapolis?
22  A. Yeah. I don't know that.
23  Q. It did not occur -- the earliest migration
24  was March 2 of 2014. Trust me on that.
25  That was the first distribution center that

Page 113

1  was ever migrated, and that was the Indianapolis
2  distribution center.
3  This is an order from December of '13.
4  MR. DELINSKY: I don't think there is a
5  question pending, Dan.
6  MR. GOETZ: Well, she said she wasn't sure if
7  this was part of the new system, so I was just...
8  MR. DELINSKY: I would like to hear what the
9  question is. I'm not sure what it is.
10  MR. GOETZ: I'll withdraw the question.
11  Whatever it was, I don't remember it.
12  Q. Let me ask you a question.
13  (CVS-Helfrich-33 was marked for
14  identification.)
15  MR. GOETZ: Can I have Exhibit 33?
16  Q. If you look at page 2 of this document,
17  10269, you'll see a date on there of 2-7-13.
18  Do you see that?
19  A. Yes.
20  Q. And if you follow this document to the end,
21  you will see that the last date on this document is
22  December 30th of '13, and that is Bates number 10516.
23  Do you see that order where it says "FRR."
24  A. Yes.
25  Q. Okay. And so, this report, am I correct,

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 according to your testimony, should contain every
2 order that was identified by the IRR computer
3 algorithm as potentially suspicious from the beginning
4 date until December 30, 2013.
5 MR. DELINSKY: Object to form.
6 THE WITNESS: I recall -- all I can remember
7 of that was, we took the IRR and put it into a
8 spreadsheet, but it was so long ago.
9 Q. My question is: Does this, according to your
10 memory and your testimony, does this document reflect
11 all of the IRRs orders -- strike that.
12 Does this document, according to your
13 testimony, reflect all of the orders that were
14 identified by the IRR computer algorithm model as
15 potentially suspicious from the first date until
16 December 30th of '13?
17 MR. DELINSKY: Object to form. Objection,
18 misstates the testimony.
19 She testified she doesn't remember what this
20 document contains.
21 THE WITNESS: I don't remember exactly.
22 Q. Are you on any medicine today that impacts
23 your ability to remember anything?
24 A. No.
25 Q. Were you on medication in 2012 that impacted

Page 115

1 your ability?
2 MR. DELINSKY: Object to form.
3 THE WITNESS: Not that I can recall.
4 Q. Okay. Any -- anything between 2012 and today
5 that would impact your ability to remember?
6 A. Not --
7 MR. DELINSKY: Object to form. I would just
8 like to put on the record --
9 MR. GOETZ: I'm just asking.
10 MR. DELINSKY: But I would like to -- Dan,
11 this is bordering on the disrespectful.
12 You are putting questions to the witness
13 regarding documents and events, documents she may or
14 may not have seen, may or may not have ever seen
15 before, that go back four and a half, five and a half,
16 six years and asking her to remember details about
17 them, then suggesting that she must be medicated for
18 not remembering.
19 MR. GOETZ: I --
20 MR. DELINSKY: And that's not fair.
21 Ms. Helfrich is a human being. She has not
22 done SOM review for a very long time.
23 MR. GOETZ: And, Mr. Delinsky, she has known
24 nothing today. She was the SOM person. She was in
25 charge of reviewing the Item Review Report. She does

Page 116

1 not know what this report is.
2 It begs a question if -- if the Item Review
3 Report populates onto this report, why you even have
4 both reports.
5 And we are just trying to find facts. I'm
6 just trying to find out what this report represents.
7 That's it.
8 And the fact that she -- her name is all over
9 it -- if you would like to look at it, she is the
10 predominate person that made the entries -- can't
11 testify as to what it even represents, indicates there
12 is something concerning.
13 All I asked was if there some reason why she
14 couldn't remember something, and I asked it as
15 respectfully as I could.
16 BY MR. GOETZ:
17 Q. Okay. Is there any reason -- has anything
18 occurred between 2012 and 2018 that impacts your
19 memory?
20 MR. DELINSKY: Object to form.
21 THE WITNESS: Not that I can recall.
22 Q. Okay. If this populated from the Item Review
23 Report, all of the orders that you thought that you
24 had suggested, correct, you believe that all of the
25 Item Review Reports were populated onto this Exhibit

Page 117

1 13?
2 MR. DELINSKY: Objection. Asked and
3 answered.
4 THE WITNESS: From what I remember, I believe
5 that was -- that was the steps.
6 Q. Okay. And assuming that this tracks dates
7 from February 7th of '13 through December 30th of '13,
8 okay, would it surprise you that there is one store
9 for Cuyahoga and Summit County that's identified in
10 this report?
11 MR. DELINSKY: Object to form.
12 THE WITNESS: From what date?
13 Q. February 7th, I believe, of '13 to December
14 30th of '13, approximately 11 months.
15 A. That there was only one order flagged?
16 Q. That's my question.
17 There is one store, you can look through
18 there, one store we can find for Cuyahoga and Summit
19 Counties, one store over an 11-month period in that
20 document.
21 Does that surprise you?
22 MR. DELINSKY: Object to form.
23 THE WITNESS: I can't exactly recall what
24 that IRR looked like.
25 Q. You have an IRR in front of you as Exhibit 2.

Page 118

1    A. Not that. I meant this specific -- that
2  specific IRR.
3    Q. You mean for this date?
4    A. Yes.
5    Q. Well, we -- this actually does cover
6  August 30th of '13.
7    Do you see that?
8    It is 10413. Do you see that?
9    A. Yes.
10    Q. Do you see the entries there on 10413?
11    A. Yes.
12    Q. Okay. And if you look to the left column, it
13  says "FRR." And if you look to the column to the
14  right of that, it says "FL," right?
15    A. Yes.
16    Q. And so that we do know, if you looked at that
17  page and the next page, which is all the 8-30 entries
18  and the next page and the next page, every one of them
19  says OR, FRR, correct?
20    A. Yes.
21    Q. Okay. There is no Indianapolis orders
22  reflected on this sheet, are there?
23    A. No.
24    Q. Okay. Does that refresh your recollection
25  that this sheet is not the entirety of the IRRs

Page 119

1  populated because we know -- your counsel stipulated
2  that there were at least 200 IRR orders identified on
3  the 8-30 IRR for Indianapolis.
4    A. But as I remember, we took it and we placed
5  it in an Excel spreadsheet.
6    MR. DELINSKY: Ms. Helfrich, is it possible
7  that the Excel spreadsheet that you are remembering is
8  different from this Excel spreadsheet?
9    THE WITNESS: Possibly.
10  BY MR. GOETZ:
11    Q. Ms. Helfrich, either the 8-30 IRR, 8-30-13
12  IRR, which is Exhibit 2, is completely wrong or this
13  document, Exhibit 13, is completely wrong.
14    Or maybe Exhibit 13 did not populate the
15  entirety of the IRR.
16    MR. DELINSKY: I'm not sure there is a
17  question.
18    MR. GOETZ: I'm asking her if that's
19  possible.
20    MR. DELINSKY: Okay. Object to form.
21    THE WITNESS: I -- I don't remember.
22    (CVS-Helfrich-37 was marked for
23  identification.)
24    Q. Ms. Helfrich, I'm going to show you Exhibit
25  37. We had talked about that earlier.

Page 120

1    Do you remember that? We had talked about a
2  document that looked like that earlier?
3    A. Yes.
4    (CVS-Helfrich-38 was marked for
5  identification.)
6    Q. Okay. And I'm going to now show you Exhibit
7  38 so we can try to do this together. And
8  hopefully...
9    Do you see Exhibit 38? It is an email from
10  you?
11    A. Yes.
12    Q. Okay. And what is the date of that email?
13    A. December 10, 2013.
14    Q. And who were you writing to?
15    A. To Dan Deaton, myself, Gary Lamberth, and
16  Joseph Scholl.
17    Q. And what were you saying in this email?
18    A. That the store and the flagged order has been
19  reviewed and approved.
20    Q. And so you were -- that was an order, tell me
21  if I'm wrong, that you had identified off of the IRR
22  for additional due diligence.
23    A. From what I can remember, yes.
24    Q. And so, Exhibit 37, which is also the
25  irregular order, that is also -- has that front email

Page 121

1  attached, correct?
2    A. Yes.
3    Q. Correct?
4    A. Correct.
5    Q. And so, that is the same order we are talking
6  about, right?
7    MR. DELINSKY: Object to form.
8    THE WITNESS: Yes.
9    Q. Yes?
10    A. Yes.
11    Q. Okay. And that, then, Exhibit 38, if you go
12  to the next page, 8484, that is the due diligence you
13  did on that order before releasing that order?
14    MR. DELINSKY: Object to form.
15    THE WITNESS: It is part of the due
16  diligence, it looks like.
17    Q. And what -- what is this?
18    A. If I recall correctly, it is what -- it shows
19  there the store's balance on hand. So that's what I
20  believe it is.
21    Q. So balance on hand shows their inventory?
22    A. I believe so, yes.
23    Q. Okay. And the next page, 8435, is that also
24  due diligence you did on this order?
25    A. I believe so.

Page 122

1    Q. Okay. Is that the MicroStrategy report that
2  we talked about earlier?
3    A. No. No. That's not the MicroStrategy
4  report.
5    Q. So what is this report?
6    A. It says -- it's SOM daily extract detail
7  report.
8    Q. Which is what?
9    A. I vaguely remember this report.
10    Q. You didn't use it often?
11    MR. DELINSKY: Object to form.
12    THE WITNESS: I just -- I vaguely remember --
13  remember it. It looks familiar, but I -- I can't
14  recall it exactly.
15    Q. Do you have any idea what this shows us?
16    MR. DELINSKY: Object to form.
17    THE WITNESS: Just from reading it,
18  obviously, it will show us -- it shows us that the
19  store, the quantity, the description of what is being
20  ordered.
21    Q. That -- I'm sorry?
22    A. The UPC and NDC of the order, unit of
23  measure.
24    Q. That quantity of 4.73, what is that?
25    A. That, I'm unsure of.

Page 123

1    I kind of remember it possibly being the --
2  maybe like the grams ordered.
3    Q. Is that what you remember?
4    A. Grams.
5    Q. And what about the 8487?
6    Page 8487, what does that -- what is that?
7    A. I believe that's our MicroStrategy report.
8    Q. Oh, 8487? Okay.
9    So -- so that tells me the patient age,
10  correct?
11    A. Yes.
12    Q. Okay. And it tells me how it was paid for?
13    A. Yes.
14    Q. Does it tell me anything other than that?
15    A. I believe the NPI number is the physician. I
16  believe the DCN number is the number associated with
17  the label item, the label name. And then displays the
18  quantity, date, and store.
19    Q. Here is my question: The DCN number tells me
20  the label name, but we already knew that, right?
21  From -- you already knew that from the IRR?
22    A. The -- I needed that number to plug into
23  MicroStrategy.
24    Q. Why?
25    You already -- doesn't that just tell you if

Page 124

1  it is a hydrocodone 5 or hydrocodone 7 and a half?
2    What does that number tell you?
3    A. That number was -- I believe we -- we used it
4  to -- we -- we entered it -- it was one of the
5  criterias to create the report.
6    Q. So, when you did additional due diligence on
7  the order that was identified by the IRR as
8  potentially suspicious, you would do the due
9  diligence, attach it to an email, and then send it
10  off; is that correct?
11    MR. DELINSKY: I'll object to form.
12    Dan, the cover email doesn't indicate any
13  attachments. I think this is from the IRR, from the
14  boxes.
15    MR. GOETZ: Can you check? I think this is
16  all the same. We'll find out. I think this was all
17  part and parcel.
18    MR. DELINSKY: Oh, I agree with you, but I
19  think that this is stapled together and it was --
20    MR. GOETZ: Absolutely.
21    MR. DELINSKY: -- pulled from the IRR.
22    MR. GOETZ: This came is boxes.
23    MR. DELINSKY: Right.
24    But I don't think the email, the email is
25  stapled, but I think the email is a stand-alone

Page 125

1  document. It doesn't say "attachment."
2    Do you see what I'm saying?
3    MR. GOETZ: Fair enough.
4    MR. DELINSKY: When the email was sent.
5  BY MR. GOETZ:
6    Q. So you would -- when you -- an order from the
7  IRR received additional due diligence, you would,
8  then, send an email saying that you cleared the order,
9  correct?
10    A. I believe so, yes.
11    Q. And you would, then, print that email and you
12  would, then, take the due diligence that you did,
13  staple it and put it in the boxes?
14    MR. DELINSKY: Object to form.
15    THE WITNESS: I believe so. I think that was
16  the process.
17    Q. Could you go back to Exhibit 13, please?
18    Do you see that? Could you go to 14082,
19  please?
20    And if you'd look at the last order that is
21  not blocked out, it says, "IRR, Indiana, 4101," the
22  store? Do you see that?
23    A. Yes.
24    Q. That 4101 is a store?
25    A. Yes.

Page 126

1  Q. And the 12-9-13 is the date?
2  A. Yes.
3  Q. And that is an order for hydrocodone. That
4  actually happens to be the order in the due diligence
5  we were just looking at in Exhibit 37 and 38; correct?
6  MR. DELINSKY: Object to form.
7  THE WITNESS: Exhibit 37 and 38?
8  Q. Those are the same order, correct?
9  A. I -- I believe so.
10  Q. This is the only order identified for a store
11  in a CT-1 jurisdiction. And I'll tell you what a CT-1
12  jurisdiction is. I'll hand you Exhibit 33.
13  Those are the CVS pharmacies that are in
14  Cuyahoga and Summit Counties. Okay?
15  A. Okay.
16  Q. When we talk about CT-1, that's because those
17  are the first -- that's case Track One. That's the
18  first case being tried.
19  In this document that goes from, I believe,
20  2-6 of '13 to 12-30 of '13, this is only order
21  identified for CT-1 jurisdiction.
22  Does that surprise you?
23  MR. DELINSKY: Object to form.
24  THE WITNESS: I don't -- I don't -- I don't
25  recall that far -- that far back to -- to really -- I

Page 127

1  just don't remember.
2  Q. Are you done? Are you done?
3  A. Yes.
4  Q. We looked for due diligence on CT-1 stores
5  for that time period, and this is it, Exhibit 37 and
6  38, which reflect that order.
7  You don't have any reason -- you have no
8  memory -- but you have no reason to disagree that from
9  February 7th of 2013 to December 30th of 2013, CVS
10  investigated one order that went to Cuyahoga and
11  Summit Counties?
12  MR. DELINSKY: Object to form. Misstates
13  the testimony.
14  MR. GOETZ: You objected.
15  THE WITNESS: I just -- I don't know.
16  Q. Do you have any reason to disagree?
17  MR. DELINSKY: Object to form.
18  THE WITNESS: It was so long ago, I just
19  don't remember.
20  Q. This is pretty good due diligence, isn't it,
21  what was shown in 37 and 38 for diversion; right?
22  Pretty good?
23  MR. DELINSKY: Object to form.
24  THE WITNESS: I know what I did, like, I
25  vaguely remember the -- the steps taken, but I do know

Page 128

1  I did my job thoroughly. I -- I was driven. I --
2  I -- I enjoyed my job.
3  Q. Let's get that math right.
4  At least as of August 30th of 2013, we know
5  that at least 200 stores in Indiana were put onto the
6  Item Review Report by the computer algorithm model as
7  potentially suspicious orders; correct?
8  MR. DELINSKY: Object to form.
9  Q. Is that correct?
10  A. I know -- I know I reviewed the flag orders.
11  I reviewed the orders thoroughly, and I went through
12  my due diligence, and any concerns that were raised
13  were elevated.
14  Q. And it shows up one time that you did
15  additional due diligence. That's what the documents
16  indicate.
17  MR. DELINSKY: Object to form.
18  Q. Is that wrong? Are the documents wrong?
19  MR. DELINSKY: Object to form. Misstates the
20  testimony.
21  Q. Are the documents wrong?
22  MR. DELINSKY: Object to form. Misstates the
23  testimony.
24  THE WITNESS: It's been many years since I've
25  dabbled in it. Seeing --

Page 129

1  MR. DELINSKY: Ms. Helfrich, did you -- you
2  said that it's been many years that you dabbled in it.
3  Did you mean dabble or do you mean that you
4  worked in it?
5  THE WITNESS: I worked --
6  MR. GOETZ: Well, stop. Come on.
7  THE WITNESS: That I worked in it.
8  MR. GOETZ: She said dabbled. She dabbled in
9  it.
10  MR. DELINSKY: Did you mean to indicate that
11  you weren't taking it seriously?
12  MR. GOETZ: No. Oh, my God. Stop. You can
13  question her when we are done. Stop.
14  BY MR. GOETZ:
15  Q. Ms. Helfrich, in 2014, there was a new system
16  that was coming into being, right?
17  A. Yes.
18  Q. Okay. And in -- and in 2014, they started
19  hiring additional people, correct?
20  A. I believe so.
21  Q. Yeah. And before that new system came in,
22  you started having actually the opportunity to do
23  additional due diligence on more orders that were
24  identified by the IRR as potentially suspicious,
25  correct?

Page 130

1      MR. DELINSKY: Object to form.
2      THE WITNESS: That, I don't -- I don't
3  remember that being the case.
4      Q. There were more people hired in the beginning
5  of 2014, correct?
6      A. For the new SOM team?
7      Q. Yeah. And to ramp up for the new SOM and at
8  the end of '13 and into '14, they were hiring
9  additional people for the suspicious order monitoring
10  program?
11      MR. DELINSKY: Object to form.
12      THE WITNESS: I believe those were -- that
13  was probably the time frame, but how many people they
14  actually hired I'm uncertain of.
15      Q. And so since they hired additional people,
16  that allowed the opportunity to do additional due
17  diligence in the older system, correct? What -- I'm
18  talking about the system pre-March of '14.
19      MR. DELINSKY: Object to form.
20      THE WITNESS: I don't think -- I don't
21  believe that changed the way I did my -- my job.
22      (CVS-Helfrich-14 was marked for
23  identification.)
24      Q. I'm going to show you what we have marked as
25  Exhibit 14.

Page 131

1      What is that document?
2      A. It looks like the max tracker.
3      Q. It is -- it is the same document as the other
4  one, correct? Same form?
5      A. Yes.
6      Q. Okay. If you see across the top, it will
7  give you the report date; is that correct?
8      A. Yes.
9      Q. And it gives you the report? Do you see
10  that?
11      A. Yes.
12      Q. Okay. And that report under it says FRR?
13      A. Yes.
14      Q. That's a Florida Review Report, correct?
15      A. Yes.
16      Q. That was a specific report because of all of
17  the problems CVS had had in Florida, correct?
18      A. I --
19      MR. DELINSKY: Object to form.
20      THE WITNESS: -- don't -- I don't know the
21  reasoning behind that report.
22      Q. Did you ever ask anybody why there was a
23  separate report for Florida?
24      A. If I did, I don't -- I don't remember.
25      Q. Then it gives you the store number?

Page 132

1      A. Yes.
2      Q. It gives you a report date?
3      A. Yes.
4      Q. The item, which in this case is hydrocodone
5  10, correct?
6      A. Yes.
7      Q. Quantity ordered, and it indicates the IRR is
8  in grams and the FRR is in doses?
9      A. Yes.
10      Q. Do you have any idea why?
11      A. I know that the FRR said it was a 5,000-dose
12  report. I believe that may have put out for stores
13  that ordered 5,000 or more.
14      MR. DELINSKY: Do you want some help here,
15  Dan?
16      MR. GOETZ: Excuse me?
17      MR. DELINSKY: Do you want some help on this?
18      MR. GOETZ: Why?
19      MR. DELINSKY: On the Florida thing?
20      MR. GOETZ: No.
21      MR. DELINSKY: I'm offering you free
22  discovery.
23      MR. GOETZ: Sure.
24      MR. DELINSKY: There is a Florida statute
25  that calls for a 5,000-dose review.

Page 133

1      MR. GOETZ: Thank you.
2      MR. DELINSKY: A regulation.
3  BY MR. GOETZ:
4      Q. There is a -- dispense versus order is the
5  next box, correct?
6      A. Yes.
7      Q. And that -- again, we talked about that
8  earlier, that is kind of an inventory control?
9      A. Yes, I believe so.
10      Q. That tells you if it is being stolen? Do you
11  agree? If they're ordering a lot more than they're
12  dispensing, somewhere it is disappearing, do you agree
13  with that?
14      MR. DELINSKY: Object to form.
15      THE WITNESS: That, I don't know.
16      Q. Okay. Let me ask you: If it says dispense
17  versus order: If they dispensed 20,000 and ordered
18  40,000 as an inventory, I either have 20,000 in
19  inventory or 20,000 somewhere has been stolen?
20      MR. DELINSKY: Object to form.
21      THE WITNESS: I don't know.
22      Q. Okay. How does that help me in suspicious
23  order monitoring?
24      MR. DELINSKY: Object to form.
25      THE WITNESS: Because it helps to know how

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 much they're ordering and how much they have on
2 their -- on their shelf, so to speak. It's their
3 inventory.
4     Q. And if they're ordering significantly more
5 that -- if they're ordering significantly more than
6 they are dispensing, that indicates that there is a
7 problem?
8     MR. DELINSKY: Object to form.
9     THE WITNESS: Could be other underlying
10 factors.
11     Q. Like what?
12     A. After doing the due diligence and talking it
13 over with our, the pharma compliance, could be other
14 reasons.
15     Q. What other reasons?
16     A. I'm -- I'm --
17     Q. You don't know?
18     A. -- unsure. I don't.
19     Q. As long as -- when you were reviewing, as
20 long as the dispense versus ordered were approximately
21 the same size, the numbers were approximately the
22 same, then it didn't raise a flag with you?
23     MR. DELINSKY: Object to form.
24     THE WITNESS: There was the due diligence
25 that was done. And if there is any concerns that were

Page 135

1 raised, that the pharmacist couldn't put at ease or
2 the consultants couldn't -- after looking over
3 everything, couldn't put at ease, then I would
4 escalate it up and it would be their decision.
5     Q. You didn't answer my question.
6     A level of concern with you -- when you
7 review these reports, were you looking for the
8 difference between dispense versus ordering, or were
9 you looking for something else?
10     MR. DELINSKY: Object to form.
11     THE WITNESS: I believe in my process there
12 were many factors that came into play.
13     Q. I'm asking about this entry. This dispense
14 -- I understand there might be other factors that you
15 evaluate.
16     I'm asking you when you evaluated that,
17 dispensed versus ordered, what did you look at? What
18 raised a concern?
19     A. Without doing my due diligence, I -- I -- I
20 can't really comment on this one in particular.
21     Q. So, that number, in and of itself, means
22 nothing to you absent due diligence?
23     MR. DELINSKY: Object to form.
24     Q. Is that a yes?
25     MR. DELINSKY: Object to form.

Page 136

1     MR. GOETZ: She shook her head.
2     THE WITNESS: No, I was kind of just
3 rocking.
4     Q. Okay.
5     A. You see something, but without your due
6 diligence, I really can't -- I really can't say.
7     MR. GOETZ: Can you read back my question?
8 Just listen very closely. It's a yes or no.
9     (Previous question was read back by the court
10 reporter commencing as follows:
11     Question: So, that number, in and of itself,
12 means nothing to you absent due diligence?)
13     MR. DELINSKY: Object to form.
14     THE WITNESS: I would believe, because it's
15 been so long ago, that anything with concern I would
16 have did a deeper dive into.
17     Q. Are you finished?
18     A. Yes.
19     Q. I'm not asking you if did you a deeper dive
20 into this. I'm not asking you if you did an
21 appropriate deeper dive.
22     I'm asking you what that number reflects so
23 that it would raise a concern to do a deeper dive.
24     You had to have some standard when you
25 reviewed it.

Page 137

1     I suggested that maybe the standard was
2 looking for the difference between the two numbers. A
3 large difference between how much they ordered versus
4 how much dispensed, and you said, no.
5     What standard did you use to evaluate that
6 number, or that field?
7     A. I don't remember.
8     Q. Okay.
9     MR. DELINSKY: Dan, I think we have been
10 going for about an hour, so let's take a five-minute
11 break.
12     THE VIDEOGRAPHER: We are off record at
13 1:30 p.m.
14     (There was a brief recess.)
15     THE VIDEOGRAPHER: Back on the record at
16 1:43 p.m.
17 BY MR. GOETZ:
18     Q. Ms. Helfrich, do you see where it says,
19 "Quarter mistake Y/N"?
20     Do you see that box slash?
21     A. Yes.
22     Q. What is that box?
23     A. If I recall correctly, that references
24 whether the same was in aim ordering the error or fat
25 finger ordering error.

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  Q. And a fat finger, just so the jury
2 understands, that's when a pharmacist tries to order
3 ten and it's two extra zeros and hits order 1,000,
4 something like that?
5  A. Or a surrounding digit.
6  Q. Okay.
7  A. Yeah -- oh, I'm sorry.
8  Q. And so, when you kind of look at that order,
9 it is just so large, it just makes no sense.
10  That's kind of what a fat finger is?
11  MR. DELINSKY: Object to form.
12  THE WITNESS: Yeah.
13  Q. And the next says, "Field LP Contacted."
14  A. Yes.
15  Q. That's you?
16  A. Yes.
17  Q. Okay. So that means that -- that you were
18 the one that did this due diligence on this order that
19 was identified by the IRR as potentially suspicious?
20  A. Yes.
21  Q. And it says, "Date File Started, Date File
22 Completed."
23  Is that the date of your investigation?
24  A. I believe so, yes.
25  Q. And it was important to do these

Page 139

1 investigations in one day?
2  A. Yes.
3  Q. And then "Investigation Needed."
4  Is that additional investigation beyond this?
5  A. That I'm unforcertain [sic].
6  Q. You're unsure?
7  A. Yes.
8  Q. The next it says, "File of Case Attached to
9 IRR."
10  Do you remember earlier I had asked you when
11 I said -- when you did your due diligence, you would
12 then print it -- we looked at 37 and 38 -- staple it,
13 and you would put it in a box, correct?
14  MR. DELINSKY: Object to form.
15  THE WITNESS: The due diligence?
16  Q. Yes.
17  A. Yes.
18  Q. Yes.
19  And that indicates that it actually was to be
20 attached to the IRR?
21  A. I don't -- I don't remember.
22  Q. Well, if you look at this, Exhibit 14. I
23 will represent to you that I believe every time you
24 indicated that you attached that file to the IRR.
25  Do you see that? Do you see all of the Ys?

Page 140

1 You can kind of...
2  A. Yes.
3  Q. So throughout this Exhibit 14, every time
4 that it shows you investigated something, you would
5 enter that you attached the file to the IRR.
6  Is that what the document shows? You can
7 look at all of the subsequent pages.
8  A. File of case attached to IRR. That's what
9 it -- that's what it says.
10  But what exactly that meant, it was the full
11 IRR or that particular order on the IRR.
12  Q. When we started today, we talked about
13 Exhibit 2, which was an IRR from August 30, I believe,
14 of 2013, correct?
15  A. Yes.
16  Q. And I had asked you, we had talked about it
17 and said that at the end of day, this was printed and
18 put into a box.
19  Do you remember that?
20  A. I know these were -- I know these were -- I
21 believe these were -- I remember these being printed.
22  Q. And they were put into a box?
23  A. I believe so.
24  Q. Okay. Here, we will just clarify.
25  Do you remember your counsel had said I could

Page 141

1 ask some questions about what you did to help with
2 finding documents.
3  And you helped find Item Review Reports,
4 correct?
5  MR. DELINSKY: Object to form.
6  THE WITNESS: Gather all of the boxes and --
7  Q. And inside of the boxes were Item Review
8 reports?
9  A. I believe so.
10  Q. And so, the way they got there is at the end
11 of the day, they were printed and put into the box?
12  A. I don't -- I don't really -- I remember --
13 yes, because we were talking about Aaron, and I know
14 he got these reports. Oh, sorry, just --
15  I believe they were put into the box.
16  Q. And when this says, "File Case Attached to
17 IRR," if we go back to Exhibit 14, what that is, is,
18 did you attach your due diligence and put it in the
19 same box as the IRR?
20  Isn't that what it is asking?
21  A. I don't know. It's -- I don't remember.
22  Q. You have no idea?
23  MR. DELINSKY: Object to form.
24  THE WITNESS: I don't remember.
25  Q. Do you see the next line where it says,

Page 142

1  "Remarks"?
2       A. Yes.
3       Q. Okay. That is a due diligence you did on
4  this order?
5       A. It looks to be that way.
6       Q. And those are what those columns mean on that
7  chart.
8       So, if you look at the first page of this,
9  this is actually the first -- the date -- the first
10 entry on this is 1-2 of '14, correct?
11      A. Yes.
12      Q. And if you look at, because of the format of
13 this report, 10256. The last entry of this is 2-12 of
14 '14, or 2-11, depending upon review versus start.
15      A. Yes.
16      Q. Yes?
17      So, again, this reflects the orders from the
18 Item Review Report that were identified as potentially
19 suspicious that received additional due diligence --
20      MR. DELINSKY: Object to form.
21 BY MR. GOETZ:
22      Q. -- from 1-2 of '14 to 2-11 of '14?
23      MR. DELINSKY: Object to form.
24      THE WITNESS: I don't remember.
25      Q. You think it might reflect the entirety of

Page 143

1  the Item Review Report, correct, for that time
2  period?
3       MR. DELINSKY: Object to form.
4       MR. GOETZ: You can have a running objection
5  to form. Seriously. Everything.
6       Go ahead.
7       THE WITNESS: I just don't remember.
8       Q. Okay. For this time period I will represent
9  to you -- tell me if you're surprised -- that there is
10 one store flagged that either showed up on the IRR,
11 because you're not sure, or received additional due
12 diligence after it showed up on the IRR as a
13 potentially suspicious order. There is one of those
14 orders for the CT-1 jurisdiction.
15      Does that surprise you?
16      MR. DELINSKY: Object to form.
17      THE WITNESS: I don't -- I don't remember.
18      Q. Does it surprise you that that is how few
19 orders were investigated?
20      MR. DELINSKY: Object to form.
21      THE WITNESS: It's been so many -- so many
22 years. It's -- hard to recall.
23      Q. I appreciate that.
24      Unfortunately, you were the person doing
25 suspicious order monitoring in 2013 and through 2014

Page 144

1  at the CVS Indiana distribution center that was
2  distributing hydrocodone combination products into the
3  CT-1 pharmacies.
4       So you are the person I have to get these
5  answers from.
6       MR. DELINSKY: Object to form.
7  BY MR. GOETZ:
8       Q. Do you know anybody else that would know the
9  answer?
10      MR. DELINSKY: Object to form.
11      THE WITNESS: I mean, I didn't work alone.
12      Q. Okay. Ms. Helfrich, the -- the orders we
13 looked at all bore -- had your name on them.
14      Who else besides you could tell me about
15 them?
16      And I'll point out to you the order on CT-1
17 on Exhibit 14 that's on page 10254.
18      Do you see that?
19      A. Yes.
20      Q. That has your name, correct?
21      A. The --
22      MR. DELINSKY: Which one? There is...
23      MR. GOETZ: Well, it is the same store. It
24 is the same date.
25      MR. DELINSKY: The 3314, store 3314?

Page 145

1       MR. GOETZ: Yes.
2       MR. DELINSKY: At the very bottom?
3       MR. GOETZ: Yeah. It is actually the only
4  one that is a nonFlorida, I believe. I apologize,
5  it's not, but it is the bottom store.
6       THE WITNESS: Yes.
7  BY MR. GOETZ:
8       Q. Who else could tell me that?
9       A. During that time, we had pharma compliance, I
10 believe.
11      Q. Are they going to tell me what you are doing
12 with this order, Ms. Helfrich?
13      MR. DELINSKY: Object to form.
14      THE WITNESS: They probably wouldn't be able
15 to recall. They probably might not be able to
16 remember, just like I'm kind of struggling to
17 remember.
18      Q. You think maybe pharma compliance might be
19 able to tell me something?
20      MR. DELINSKY: Object to form.
21      THE WITNESS: At the time, that -- they may
22 have been the only assistance that I had.
23      Q. At that time?
24      A. Possibly.
25      Q. Who was person from pharma compliance?

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    A.  We had maybe a few different people at
2  different times.  The main one, I can't recall his
3  last name, but it was Steve.
4    MR. DELINSKY:  Excuse me.  Could you put your
5  phone on mute?
6    MR. GOETZ:  You need to mute.
7    (CVS-Helfrich-35 was marked for
8  identification.)
9    Q.  I'm going hand you Exhibit 35.
10    And I -- I've previously showed you Exhibit
11  34.
12    Can you pull that up, please?
13    Thirty-four and 35, those are for the same
14  orders, correct?
15    A.  Yes.
16    Q.  And that actually happens to be the exact
17  same order that is shown in Exhibit 14 down at the
18  bottom, correct?
19    A.  Yes.
20    Q.  And could you go to Exhibit 35, please?
21    A.  Yes.
22    Q.  That shows the due diligence that you did on
23  that order before releasing it?
24    MR. DELINSKY:  Object to form.
25    THE WITNESS:  Yes.

Page 147

1    Q.  Okay.  That's the due diligence that you did
2  before you approved it?
3    A.  Yes.
4    Q.  Pretty substantial due diligence?
5    A.  I believe the due diligence that I did --
6    Q.  Was substantial?
7    A.  Yes.
8    Q.  Okay.  Again, look at 8497.  You looked at
9  the inventory.
10    A.  What was that?
11    Q.  8497, you looked at the inventory?
12    A.  Yes.
13    Q.  On the next page, 8498, that's the daily
14  extract report, correct?
15    A.  Yes.
16    Q.  You don't -- as I recall, you don't really
17  remember what that showed, but it is something that
18  you would do to do due diligence?
19    A.  Yes.
20    Q.  And then the next page is what you thought
21  was the MicroStrategy report, 8499?
22    A.  Yes.
23    Q.  And, again, that is pretty substantial
24  information that you gathered, printed, and attached
25  to this and then put it as part of the IRR, correct?

Page 148

1    MR. DELINSKY:  Object to form.
2    THE WITNESS:  Yes.
3    Q.  Okay.
4    Yes?
5    We have evidence that from -- almost all of
6  2013, February 1st, I think, of 2013 until you
7  instituted the new system March 2nd of '14, you
8  investigated two days of orders for the CT-1 stores,
9  the one we looked at earlier and this one.  That's it.
10    Does that surprise you?
11    MR. DELINSKY:  Object to form.
12    THE WITNESS:  I don't know.  I don't --
13    Q.  You could have the greatest due diligence in
14  the world, but if you only choose to do it once a year
15  or twice a year, it's relatively meaningless.
16    Do you agree?
17    MR. DELINSKY:  Object to form.  Misstates the
18  testimony.
19    THE WITNESS:  I know what -- what I did.  The
20  orders were flagged, I reviewed them thoroughly.  I
21  went through my due diligence.
22    And from there, any concerns, I escalated
23  it.
24    Q.  And we have evidence that you did additional
25  due diligence on two days for over a 14-month period.

Page 149

1    You have no memory of anything else, do
2  you?
3    MR. DELINSKY:  Object to form.
4    THE WITNESS:  Anything else regarding?
5    Q.  Over that 14 months for the CT-1 stores, can
6  you tell me, no, you're wrong, I know I did due
7  diligence on more than just those two days on those
8  two stores?
9    MR. DELINSKY:  Object to form.
10    THE WITNESS:  I reviewed the orders that were
11  flagged.  I reviewed them thoroughly.  Where those
12  stores were located, I don't know.
13    Q.  And when you would review them thoroughly,
14  you would print the due diligence, staple it, and put
15  it in the box, correct?
16    MR. DELINSKY:  Object to form.
17    MR. GOETZ:  Stop.  You can have a running
18  objection.  Seriously.
19    MR. DELINSKY:  But I also have -- I don't
20  want a running objection.  I want to be able to put my
21  objections on the record.
22    Q.  Go ahead.  You can --
23    A.  Yes, that was --
24    Q.  Do you remember the time reports we looked at
25  earlier?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  A. The time studies?
2  Q. The time studies?
3  A. Yes.
4  Q. In there -- we can go through it if you
5  want -- it appears that due diligence, when it's done
6  on an individual order from Mr. Burtner, it would take
7  him 10 to 20 minutes.
8      Was that consistent with your experience?
9      MR. DELINSKY: Object to form.
10     THE WITNESS: I don't remember.
11  Q. Well, how long do you think you took?
12     MR. DELINSKY: Object to form. Asked and
13  answered.
14     THE WITNESS: I don't remember.
15  Q. Was it more than 20 minutes?
16  A. I don't remember.
17  Q. Can you go back to Exhibit 38?
18     How long would that due diligence take you to
19  do?
20  A. I don't remember.
21  Q. You don't remember?
22     How long would it take you to print an
23  inventory inquiry and kind of make some scribbles like
24  you did there?
25     MR. DELINSKY: Object to form.

Page 151

1      THE WITNESS: I don't remember.
2  Q. You have no idea?
3      Did you have a printer next to you?
4  A. I -- I believe so.
5  Q. And -- and where would you have to go to
6  print this inventory inquiry form?
7  A. The -- I believe the Viper system.
8  Q. So you think that -- that this was printed
9  from Viper?
10  A. I -- I think so. I'm not for sure.
11  Q. If you printed it from Viper, how long would
12  that take?
13  A. I don't -- I don't know.
14      I don't remember.
15  Q. The -- the scribbles you have there, 2365,
16  473, what were you calculating?
17     MR. DELINSKY: Object to form.
18     THE WITNESS: It looks like it might be what
19  they have on hand versus what they ordered.
20  Q. Okay. The next page where it says, "The SOM
21  Daily Extract Detail Report."
22     How long would it take you to review that?
23  A. I don't remember.
24  Q. Where would you get the report from?
25  A. This report might be something off our

Page 152

1  mainframe. I think it is what it is called.
2  Q. Was it available to you at this time?
3  A. Was it available?
4  Q. Available to you?
5  A. I believe so.
6  Q. Okay. You don't know what the report shows?
7  We talked about that earlier, correct? You don't
8  remember?
9  A. Right. Correct.
10  Q. In the third page of this set is 8487, and
11  that's the MicroStrategy document, correct?
12  A. Yes.
13  Q. And that is five or six entries of other
14  orders for the same drug to this store, correct?
15     MR. DELINSKY: I object to form.
16     MR. GOETZ: I apologize. That's not what it
17  shows.
18  Q. That is -- that shows five or six entries of
19  people that purchased this drug, and it shows some of
20  their data, correct?
21     MR. DELINSKY: Object to form.
22     THE WITNESS: Yes.
23  Q. Okay. And how long would it take you to
24  review those five or six entries?
25  A. I'm uncertain. I don't know.

Page 153

1  Q. You said you're uncertain?
2  A. Yeah. I don't --
3  Q. Do you have any reason to believe that the
4  amount or the time you spent on due diligence when
5  evaluating an order that the IRR had identified as
6  potentially suspicious as the amount of time that you
7  spent was different than the amount of time that Aaron
8  Burtner spent?
9      MR. DELINSKY: Object to form.
10     THE WITNESS: I don't. I don't know. I
11  don't remember.
12  Q. You don't remember how much time you spent?
13  A. No.
14  Q. And even looking at those three documents
15  doesn't help you?
16  A. No.
17  Q. And when Aaron Burtner in those time studies
18  indicates he generally spends ten to twenty minutes to
19  review an order that has been as potentially
20  suspicious, you don't know if your practice was
21  consistent with that or not?
22  A. Yeah. I don't remember.
23  Q. How many orders per day would you -- would
24  you do due diligence on after it was identified by the
25  IRR as potentially suspicious?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    A. I don't remember.
2    Q. Do you have a guess?
3       MR. DELINSKY: Object to form.
4       THE WITNESS: I don't remember.
5    Q. Well, we do know that you would review
6 thousands of IRR entries a day, correct?
7       MR. DELINSKY: Object to form.
8       THE WITNESS: I don't remember.
9    Q. You don't remember?
10      Do you -- do you remember that we stipulated
11 earlier, because of all of the arguing, that the
12 August 30 IRR -- August 30th of 2013 IRR contained at
13 least over 200 entries?
14   A. Yes, I remember.
15   Q. Okay. Yeah. And do you remember that was
16 for one distribution center?
17   A. Yes.
18   Q. Yes. And at Indianapolis, you were reviewing
19 for 11 distribution centers.
20      Do you remember that?
21   A. Yes.
22   Q. You had indicated earlier just a few minutes
23 ago -- could you go back to Exhibit 41, please?
24   A. You said 41?
25   Q. Forty-one, please.

Page 155

1    A. What does that look like? I'm sorry, but --
2    Q. Do you mind reading it off up there? I know
3 I --
4    A. It should be in here.
5    Q. I know we used it. Do you have it?
6    A. Yeah.
7    Q. Could you go to 118313 of that document,
8 please?
9    A. Yes.
10   Q. You had indicated earlier just a few minutes
11 ago that you believe that that due diligence inventory
12 inquiry came from Viper?
13   A. Yes, I believe.
14   Q. Yes. And that inventory due diligence was
15 from an order, I think dated 11-12 of '13, or
16 something, but it doesn't matter.
17      Here is my question: This email dated
18 November 6, 2013 says "Shauna Helfrich, SOM project,
19 has been looking for this access for months."
20      Correct? Do you see that?
21   A. Yes.
22   Q. Up above, the email response is, "Novistor is
23 Viper that no longer functional and is probably why it
24 was denied."
25      You did not have access to Viper for months,

Page 156

1 we know, before November of 2013, did you?
2       MR. DELINSKY: Object to form.
3       THE WITNESS: I don't ever recall not having
4 access to get the reports that I need.
5    Q. That was not my question.
6       We know if this email was true that you were
7 copied on -- and you never said it wasn't true -- that
8 at least from November of 2013 you had been looking
9 for Viper access for months and that it had been
10 denied.
11      MR. DELINSKY: Object to form.
12      THE WITNESS: This could possibly be related
13 -- be referencing me having my own log-on, but I was
14 still able to run the reports that I needed.
15   Q. When did Viper become -- was no longer
16 functional?
17   A. I don't know. I don't remember.
18   Q. This email indicates as of November of '13
19 that it wasn't functional anymore, was it?
20   A. Yes.
21      MR. DELINSKY: Object to form of the
22 question. It ignores the next sentence.
23      MR. GOETZ: Did you want to take a break? I
24 think we have been going an hour, or no? How long
25 have we been going?

Page 157

1       MR. DELINSKY: Do you need break?
2 We've only gone a half hour.
3 Do you need a break?
4 Huh-huh.
5       MR. GOETZ: That's fine.
6 BY MR. GOETZ:
7    Q. Could you go back to Exhibit 2, please?
8       MR. DELINSKY: It's right here, Shauna.
9       THE WITNESS: Oh, okay.
10   Q. It's the bigger one.
11   A. Okay.
12   Q. Again, that is an Item Review Report,
13 correct?
14   A. Yes.
15   Q. And I just want to make sure we're clear on
16 the record: All orders of controlled substances from
17 a CVS pharmacy to a CVS distribution center would pass
18 through an algorithm computer model, and then those
19 orders that were identified as potentially suspicious
20 were populated onto this Item Review Report?
21   A. I'm not real certain of the exact details. I
22 believe so.
23   Q. This Item Review Report did not contain every
24 controlled substance ordered by a CVS pharmacy -- I'll
25 finish my question -- it only contained those orders

Page 158

1 that were identified by this algorithm as potentially
2 suspicious?
3     A. I believe so.
4     Q. Okay. And you earlier called these -- or you
5 have called these throughout the day, you called the
6 orders on here flagged orders.
7         Do you remember that?
8     A. Yes.
9     Q. You've called them orders of interest?
10     A. Uh-huh.
11     Q. Is that a yes?
12     A. I don't remember. I remember flagged
13 orders.
14     Q. That's fine.
15     A. Okay.
16     Q. What we do know is, on CVS-Helfrich 2, there
17 are at least 200 orders from CVS pharmacies made to
18 the CVS Indiana distribution center that the computer
19 algorithm identified as potentially suspicious for
20 August 30th of 2013.
21     A. Okay.
22     Q. Correct?
23     A. Yes.
24     Q. So we know that on that day the algorithm
25 said at least these 200 orders are potentially

Page 159

1 suspicious?
2         MR. DELINSKY: Object to form.
3         THE WITNESS: Yes.
4     Q. And you don't know if that is a typical
5 number or you don't know if that's high or low?
6     A. Correct.
7     Q. So some days it might be 25, some days it
8 might be a thousand, you just don't know?
9     A. I don't remember.
10     Q. Okay. You would take this report, look at an
11 order and decide whether or not it needed additional
12 due diligence, correct?
13     A. Yes.
14     Q. Okay. And this order, this -- would -- these
15 orders would show up on here for one of three reasons:
16 Either it violated some score, some number; it
17 violated a max cutoff, maximum volume; or it violated
18 a maximum ratio.
19         Do you remember that?
20     A. I don't remember.
21     Q. You don't remember that? Could you go to
22 10693, please, of Exhibit 2?
23     A. Okay.
24     Q. Do you see that? And that is an order for
25 Store 3355?

Page 160

1     A. Yes.
2     Q. It is hydrocodone 5/500.
3         Do you see that?
4     A. Yes.
5     Q. And it says, "Score .85."
6         Okay. Do you see that? Ms. Helfrich?
7     A. I'm not seeing.
8     Q. Okay. Do you see where the score is?
9         MR. DELINSKY: You can look here, too.
10         THE WITNESS: Okay. Yes.
11     Q. And you don't remember what that score
12 meant?
13     A. I do not remember.
14     Q. Okay. Could you go to 10674, please?
15     A. Okay.
16     Q. Do you see that? Could you --
17         MR. DELINSKY: Which one?
18         MR. GOETZ: 10674. I'm going to wait.
19 BY MR. GOETZ:
20     Q. It's about the second page in. I apologize.
21 I didn't mark it for you.
22         It says, "Score," and then it says,
23 "Description." And I'm going to read this to you and
24 you tell me if I read it right.
25         "Score decides if an order is irregular or

Page 161

1 not. If it is greater than a threshold value,
2 currently 0.65, the order is flagged as irregular."
3         Did I read that correctly?
4     A. Yes.
5     Q. Okay. Score -- and then it says "Possible
6 Values." "Score is a combined result of all of the
7 above factors based on their values and weights."
8         Did I read that correctly?
9     A. Yes.
10     Q. And then it says, "The higher the score, the
11 more irregular the order is."
12     A. Yes.
13     Q. So we know that any order -- we go back to
14 10693 -- that is .65 or above, shows up on this
15 algorithm as a potentially suspicious order?
16         MR. DELINSKY: Object to form.
17     Q. Does that refresh your recollection?
18         MR. DELINSKY: Object to form.
19         THE WITNESS: Yes.
20     Q. Okay. I stated wrong. I'm sorry. It's
21 actually if it's greater than .65. I apologize. So
22 .65, I believe, is out.
23         Anything greater than .65, it shows up on
24 this Item Review Report as a potentially suspicious
25 order as identified by the computer algorithm,

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 correct?
2    A. Yes.
3    Q. And then you review these 200 orders and
4 decide which order you are going to do additional due
5 diligence on?
6      MR. DELINSKY: Object to form.
7      THE WITNESS: I don't remember, but I -- I
8 feel there is some more that went into that.
9    Q. There are other reasons it could flag? There
10 are other reasons it could show up on this report?
11    A. I just don't remember.
12    Q. Okay. What we do know is: That the -- what
13 the documents reflect from the recap of the IRR --
14 what I call the recap, what you call the max tracker,
15 is when you did do due diligence, it showed up in the
16 -- it showed up in the files with the IRRs because we
17 looked at those emails with the attachments of the due
18 diligence you did, correct? We know that?
19      MR. DELINSKY: Object to form.
20      THE WITNESS: My due diligence was
21 attached.
22    Q. Thank you. Are you aware -- do you know when
23 this model came into being?
24    A. When the IRR came?
25    Q. Yes.

Page 163

1    A. I do not.
2    Q. Are you aware that it was delivered in early
3 2009?
4      MR. DELINSKY: Object to form.
5      THE WITNESS: I do not know.
6    Q. Are you aware that it was created by experts
7 in this field?
8    A. I did not.
9    Q. Did you know who created this model?
10    A. No, I do not.
11    Q. Are you aware that when this model was
12 created it was actually designed by the experts to
13 flag any order that was over .15?
14    A. I did not.
15    Q. Would that be relevant to you?
16      MR. DELINSKY: Object to form.
17    Q. As the person that was a SOM analyst
18 reviewing the Item Review Report, would it be relevant
19 to you to know that when the Item Review Report
20 computer algorithm was first written, it was designed
21 to flag any orders that were over .15?
22      MR. DELINSKY: Object to form.
23      THE WITNESS: I believe if it was relevant --
24 if it was, I would have been told about it.
25    Q. CVS, you think good corporate citizen, they

Page 164

1 would tell you?
2      MR. DELINSKY: Object to form.
3      MR. GOETZ: I'm asking.
4      THE WITNESS: If it was going to skew my --
5 my review, or was necessary, I would -- I would think
6 that I would -- I would know.
7    Q. Because you had that much faith in CVS?
8      MR. DELINSKY: Object to form.
9      THE WITNESS: I did my job.
10    Q. Are you aware that CVS paid over a $132
11 million in fines related to controlled substances and
12 pseudoephedrine?
13      MR. DELINSKY: Objection.
14    Q. Are you aware of that?
15      MR. DELINSKY: Object to form.
16      THE WITNESS: I don't recall having that
17 information.
18    Q. Okay. As you sit here today, do you know
19 that?
20      MR. DELINSKY: Object to form.
21      THE WITNESS: I vaguely recall something of
22 that nature.
23    Q. You're still at CVS, correct?
24    A. Yes.
25    Q. Yeah. So you have never left, even though

Page 165

1 you left SOM, Suspicious Order Monitoring, you're
2 still there?
3    A. Yes.
4    Q. You're still at the warehouse?
5    A. Yes.
6    Q. Are you aware that they had a show cause
7 order in Florida for how much Oxycodone and OxyContin
8 they were spitting out of their pharmacies? Are you
9 aware of that?
10      MR. DELINSKY: Object to form.
11      THE WITNESS: Not that I can recall, no.
12    Q. Are you aware that when this model was
13 changed from .65 to -- from .15 to .65, that it
14 actually was done internally, the experts were not
15 consulted?
16      MR. DELINSKY: Object to form.
17      That's a false statement.
18      MR. GOETZ: Let me have 10.
19    Q. Are you aware of that?
20    A. No, I did not know that.
21    Q. I might have misspoke, and I believe the
22 experts were told after the fact. And they were
23 surprised at the -- at the departure, but we will see
24 if I'm wrong.
25

Page 166

1    (CVS-Helfrich-10 was marked for
2 identification.)
3    Q. I'm going to hand to you Exhibit 10.
4    Do you see the last page? It is 88518.
5    A. Yes.
6    Q. And if you turn to the page before it, 88517,
7 that's an email from John Mortelitti to Robert
8 Williamson.
9    MR. DELINSKY: Ms. Helfrich, if you have not
10 seen this document before, I would ask that you take a
11 moment to read it, in full.
12    THE WITNESS: Okay.
13    Q. Can you -- did you get a chance to read it
14 all?
15    A. Yes.
16    Q. If you look at the last email, that is
17 actually an email from John Mortelliti to Robert
18 Williamson dated June 30th of 2010.
19    And I will begin by telling you, I apologize
20 saying they weren't consulted. Because this actually
21 indicates that Mortelliti is writing to Robert
22 Williamson, who is a DEA manager consulting for
23 Cegedim Dendrite. I don't know if I'm pronouncing it
24 correctly.
25    And Mortelliti tells him on second page, "I'm

Page 167

1 going to focus on the .15 score," correct?
2    A. Yes.
3    Q. Okay. And he says we are going to test the
4 model and I'm going to look at the .15 score?
5    A. Yes.
6    Q. Correct?
7    This is approximately 18 months after the
8 model was initially delivered to -- to CVS.
9    And I know you don't know that, I'm just
10 telling you it was.
11    And then there are some email traffic and
12 then right -- he -- if you look at the first page,
13 Mortelliti writes to Williamson and says, ".65 is
14 where we are now. .70 looks a bit more realistic, but
15 I still want to view data."
16    Did I read that correctly?
17    A. Yes.
18    Q. And what does Robert Williamson, who is part
19 of the expert team that designed this model, what does
20 he say in response?
21    A. "That's quite a departure from the initial
22 threshold. We should probably have a call once you've
23 completed your initial review as a logical starting
24 point for the retunement. Would that work for you?
25 Bob."

Page 168

1    Q. And reason for needing a retunement once you
2 change the score, that score is dependent upon a whole
3 host of factors, correct?
4    A. I don't know. I can't really comment on this
5 document. It's before my time.
6    Q. I understand.
7    I'm just asking you if you -- if you thought
8 it was important to know it was changed from .15 to
9 .65 and that decision was made internally and then
10 they just informed the consultant.
11    That's how this started.
12    I just asked if you were aware of that?
13    A. I wasn't. I did --
14    MR. DELINSKY: Wait.
15 BY MR. GOETZ:
16    Q. And do you think --
17    MR. DELINSKY: Did you finish your answer?
18    MR. GOETZ: I apologize.
19    THE WITNESS: I wasn't -- I did not know
20 about this document.
21    Q. Okay. Do you know if a retunement was ever
22 done around this?
23    A. I didn't -- I did not know.
24    Q. Can you go to 10696, please?
25    MR. DELINSKY: What exhibit, Dan?

Page 169

1    MR. GOETZ: Actually, I apologize. Stay at
2 10693, please.
3    MR. DELINSKY: In Exhibit 2?
4    MR. GOETZ: Yes.
5    Q. Do you know how that score is calculated?
6    MR. DELINSKY: Object to form.
7 BY MR. GOETZ:
8    Q. Do you know how the score that is -- that is
9 referenced there as score 0.85 is calculated?
10    A. I do not.
11    Q. You do not?
12    Do you know what weight is given to each
13 factor?
14    A. I do not.
15    Q. Can you go to 10696, please?
16    A. Okay.
17    Q. And do you see that bottom report order?
18    It is for store 3975. It's a hydrocodone
19 order.
20    A. Yes.
21    Q. And that actually says it is -- if you look
22 at the bottom left, "Added to report. Maximum cutoff
23 ratio exceeded"?
24    A. Yes.
25    Q. Okay. And so, also if you look at the score

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 of this order, this score was 0.06, correct?

2    A. Correct.

3    Q. Incredibly low, correct?

4    A. Compared to the measurement?

5    Q. Yes.

6    A. Yes.

7    Q. Do you know what it means when it says,

8 "Maximum cutoff ratio exceeded"?

9    A. I do not. I don't remember.

10    Q. You don't remember what that means?

11    A. I do not.

12    Q. Okay. Do you know that this -- did you find

13 this ratio helpful?

14        When you would evaluate the Item Review

15 Report to determine which orders that had been

16 identified as potentially suspicious you wanted to do

17 additional due diligence on, did you find this maximum

18 cutoff ratio helpful?

19    A. I don't remember. It's been so long ago. I

20 just don't remember.

21    Q. I understand it was long ago, but, again, you

22 were the one doing it at this time.

23        Is there anybody else I can ask?

24    A. I don't remember.

25    Q. Is there -- you were also the one reviewing

Page 171

1 the Item Review Report for Indiana.

2        Is there anybody else I can ask to say, can

3 you tell me what Ms. Helfrich, what -- what she was

4 looking at? What was important to her?

5    A. I don't remember.

6    Q. Were you coached to say, "I don't remember"?

7 I'll withdraw it.

8        I think I asked you, are you aware this

9 wasn't added until October 11, 2012?

10    MR. DELINSKY: Object to form.

11 BY MR. GOETZ:

12    Q. Are you aware this maximum cutoff ratio was

13 not added until October 11th of 2012?

14    A. Not that I can recall.

15    Q. Well, you weren't there, correct, at that

16 time?

17    A. In November?

18    Q. Listen very -- were you aware that this

19 maximum cutoff ratio was not added to the Item Review

20 Report until October 11, 2012?

21    MR. DELINSKY: Objection. Asked and

22 answered.

23    THE WITNESS: I didn't -- I don't -- I don't

24 recall.

25    Q. You had earlier said that you don't remember

Page 172

1 what the maximum cutoff ratio was, correct?

2    A. I don't remember, but --

3    Q. I'm going to show you --

4    MR. DELINSKY: Well, before you get there.

5 It has been an hour now. Let's take a break.

6    MR. GOETZ: Fine.

7    THE VIDEOGRAPHER: We are off the record at

8 2:41 p.m.

9    (There was a brief recess.)

10    THE VIDEOGRAPHER: Back on the record at

11 2:51 p.m.

12    (CVS-Helfrich-12 was marked for

13 identification.)

14 BY MR. GOETZ:

15    Q. Ms. Helfrich, I'm handing you Exhibit 12.

16        We were talking about how the maximum cutoff

17 ratio -- Ms. Helfrich, we were talking about how the

18 maximum cutoff ratio was calculated.

19        And you indicated you didn't know how,

20 correct?

21    A. Correct.

22    MR. DELINSKY: Object -- object to form.

23 BY MR. GOETZ:

24    Q. And could you look at page 1520 of that

25 exhibit?

Page 173

1    A. Yes.

2    Q. Okay. And I'm not going to ask you about the

3 math, but that exhibit, if you see, it says, "Ratio

4 equals month-to-date cumulative units divided by AGI

5 supplied total noncontrol value."

6    A. Okay.

7    Q. Does that refresh your recollection as to

8 what that was calculated?

9    A. No.

10    Q. Did you ever know how it was calculated?

11    A. Not that I remember.

12    Q. So all you really knew was that it showed up

13 on the report as a potentially suspicious order?

14    MR. DELINSKY: Object to form.

15

16 BY MR. GOETZ:

17    Q. And then you would look at what else was on

18 the report, correct?

19    MR. DELINSKY: Object to form.

20    THE WITNESS: I feel that the IRR that I -- I

21 downloaded, when I put it into a spreadsheet, it -- it

22 didn't look like this IRR. The way it formatted and

23 had its own formulas running in the background and how

24 it was sorted.

25    Q. Would you resort the IRR before it would be

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 printed?
2     MR. DELINSKY: Object to form.
3     THE WITNESS: I don't remember. I remember
4 when I put this information into a spreadsheet, it did
5 something. Exactly, I can't recall.
6     Q. When you helped counsel --
7     (Speakerphone interruption.)
8     MR. GOETZ: We'll leave him a message.
9     Q. When you helped counsel find documents, did
10 you ever see a document that was in that IRR format
11 that you just testified about?
12     A. This one? Or --
13     Q. No.
14     A. Oh. The one that I was just referencing?
15     Q. Yes.
16     A. I don't recall exactly what was in those
17 boxes.
18     I remember the max cutoff. Let me think.
19     I can't remember exactly what that looked
20 like, the original where I put the IRR into.
21     Q. Could you go to 10718, please?
22     A. Okay.
23     Q. Do you see that, of Exhibit 2?
24     And that, down below, indicates that that
25 order was added on to the IRR as potentially

Page 175

1 suspicious by the computer algorithm model because
2 maximum cutoff volume was exceeded.
3     Do you see that?
4     A. Yes.
5     Q. Do you know how that was calculated?
6     MR. DELINSKY: Object to form. Object.
7 Asked and answered.
8     THE WITNESS: I -- I don't know. I don't
9 know. I don't remember or recall.
10     Q. Do you remember how -- you don't remember how
11 that was calculated?
12     A. I don't recall.
13     Q. Did you ever know?
14     A. I don't recall if I -- if I did or not.
15     Q. Did you ever get documents on how that was
16 calculated?
17     A. I can't recall if I did or not.
18     Q. Do you remember earlier in the deposition we
19 had looked at the MicroStrategy reports, those two
20 that were attached to the due diligence?
21     A. Yes.
22     Q. Yes?
23     And you said that when you would look at
24 those, you would print them out, put them -- attach
25 them to the other due diligence and then file them,

Page 176

1 correct?
2     A. Yes.
3     Q. Okay. And that MicroStrategy report gave you
4 fairly detailed information about the patient
5 population that was purchasing drugs from that
6 pharmacy, that specific drug from that pharmacy,
7 correct?
8     MR. DELINSKY: Object to form.
9     A. Yes. The age and --
10     Q. Age, whether it was cash, those sorts of
11 things, correct?
12     A. Yes.
13     Q. And you had said you're not sure if you were
14 with Mr. Burtner that took 10 or 20 minutes or if it
15 took longer than that; is that fair, to review those
16 reports?
17     A. Yeah.
18     Q. And so that MicroStrategy report might take
19 you 15 minutes, it might have taken you half an hour
20 to review; is that fair?
21     I'm trying to get an idea.
22     A. I just don't remember.
23     (Speakerphone interruption.)
24     A. I just don't remember.
25     Q. I'm trying it get an idea of how much time

Page 177

1 that you would spend reviewing that so that you could
2 understand the data? How long it took you?
3     (Speakerphone interruption.)
4     MR. DELINSKY: We are going to terminate the
5 call as a result of the interruption being caused by
6 this recording.
7 BY MR. GOETZ:
8     Q. I do not remember my question, Ms. Helfrich,
9 do you?
10     A. I don't.
11     Q. I know I'm trying to get handle on how long
12 it took you to review the MicroStrategy reports.
13     And I suggested -- I had asked if it was 10
14 minutes or 20 minutes or 25 to get a handle on the
15 data, and I don't remember your answer.
16     A. I don't remember.
17     Q. You don't remember your answer, or you don't
18 remember how long it took?
19     A. No, I don't remember. I don't remember the
20 time frame it took to review.
21     Q. It was a significant report.
22     Do you agree?
23     MR. DELINSKY: Object to form.
24     THE WITNESS: Depending on the days, the
25 amount flagged could be more or --

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    Q.  No.  I'm talking about that MicroStrategy
2  report we had looked at earlier with the due
3  diligence.
4    A.  Oh, okay.
5    Q.  That was a significant report.
6      It showed, essentially, the patient
7  population that was ordering that drug from a pharmacy
8  that had -- and that drug had flagged as an order,
9  correct?
10   A.  Yes.
11   Q.  Okay.  And that -- that MicroStrategy report,
12  that is what I was trying to get an idea.
13      When you would review that, how long would
14  that take you?
15   A.  Every report was different.  So, I don't
16  really know whether it -- I don't really remember,
17  since every one was different.
18   Q.  Every MicroStrategy report?
19   A.  Was different.
20   Q.  How many entries were normally in a
21  MicroStrategy report?
22      How many entries?
23   A.  It varied.
24   Q.  Since we are talking about the IRR, I'm going
25  to ask you:  After you -- you keep talking about how

Page 179

1  you reviewed it online, but after you reviewed the
2  IRR, CVS rules required you to sign it, correct?
3    A.  That, I don't remember.
4    Q.  You don't remember that?
5      (CVS-Helfrich-36 was marked for
6  identification.)
7    Q.  I'm going to hand you Exhibit 36.
8      Do you know what that is?
9    A.  Policies and procedures for the List 1
10  Chemicals of PSE, EPH and controlled drug.
11   Q.  Do you know -- do you know what that is,
12  though?
13      Ms. Helfrich, if you want to read the whole
14  thing, I don't know that it is necessary, but I
15  just -- do you know what it is?
16   A.  From the -- what I read, it is almost like
17  the policies and procedures for what was done in
18  SOM.
19   Q.  Governing what you were supposed to do,
20  correct?
21      MR. DELINSKY:  Object to form.
22      THE WITNESS:  Looks to be that, policies and
23  procedures.
24   Q.  Okay.  Have you ever seen this before right
25  now?

Page 180

1    A.  If I -- if I did, I don't -- I don't
2  recall.
3    Q.  I'm going to read to you on the second page,
4  it is Bates Number 25019, it says, under IV, Item
5  Review Report, "Each day the logistics LP analyst
6  shall review the daily item review reports."
7      That was you, correct?
8      MR. DELINSKY:  Object to form.
9      THE WITNESS:  I am SOM analyst, yes.
10   Q.  Okay.  And it says, "These reports are an
11  analysis of all control and PSE orders weighted in
12  total gross from the stores within the prior 24
13  hours."
14      Did I read this correctly?
15   A.  Yes.
16   Q.  And then it goes on to talk further about
17  what the report is.  I want to read to you down below
18  where it says, "Start."  It alleges "all control and
19  PSI IRR must be signed by logistics LP analyst and
20  dated the day the report is received."
21      I did read that correctly?
22   A.  Yes.
23   Q.  "And distribution centers MUST" -- and that's
24  in all caps, isn't it?  -- maintain the -- "maintain
25  IRRs, investigation information and documentation

Page 181

1  associated with IRRs on file for three years."
2      Did I read this correctly?
3    A.  Yes.
4    Q.  Okay.  Did you sign the IRRs when you were
5  reviewing them?
6    A.  I can't recall.  IRRs that I dealt with were
7  from the mainframe.  I don't remember.
8    Q.  You don't remember whether or not you
9  followed this regulation and signed them after you
10  reviewed them?
11      MR. DELINSKY:  Object to form.
12      THE WITNESS:  Considering how long ago, I
13  just don't remember.
14   Q.  You did, though, maintain all of the
15  investigations that you did on the IRRs and put them
16  with the files?
17      MR. DELINSKY:  Object to form.
18      THE WITNESS:  As I can remember.
19   Q.  Can you go back to Exhibit 2, please?  10693.
20      Do you see where it says, "SOM key" up in the
21  top left, right to the right of "store"?
22   A.  Yes.
23   Q.  What does that mean?
24   A.  I don't -- I don't remember.
25   Q.  Did you ever know?

Page 182

1    A. I don't recall.
2    Q. Okay. Do you see where it says "Item
3  190528"? What does that mean? And I'm just asking
4  you generically. What is that category of information
5  capturing?
6    A. Possibly the drug itself.
7    Q. So I don't want you tell me possibly, and if
8  you don't know, it is fine just. Just say "I don't
9  know."
10   A. Yeah.
11     MR. DELINSKY: Or you don't remember.
12     THE WITNESS: I don't -- I don't remember.
13   Q. Well, what is the difference between I don't
14  know and I don't remember.
15     MR. DELINSKY: Object to form.
16     THE WITNESS: I don't remember because I -- I
17  believe at one time I possibly -- I -- I -- I may have
18  known what this means.
19   Q. Do you know if you knew?
20     MR. DELINSKY: Object to form. Asked and
21  answered.
22     THE WITNESS: I believe I just -- I don't
23  remember.
24   Q. When it says "Description, Hydrocodone
25  5/500," what does that mean?

Page 183

1    A. That is the drug.
2    Q. And what is a 5/500?
3    A. That, I don't -- I don't know.
4    Q. You don't know?
5    A. I don't remember.
6    Q. And where it says "UPC/NDC," do you know what
7  that means?
8    A. I don't remember.
9    Q. Do you know where it says "invoice number,"
10  do you know what that means?
11   A. I don't remember.
12   Q. That probably means the order? Maybe? You
13  don't know?
14   A. I don't know.
15   Q. "Bill quantity," do you remember that?
16   A. I believe that was the quantity billed.
17   Q. And when it says "order quantity," what does
18  that mean?
19   A. The quantity ordered.
20   Q. And then when it says, "Unit of measure," do
21  you know what that means?
22   A. The amount -- I believe -- I don't
23  remember.
24   Q. All right. And then it says, "Extended
25  quantity."

Page 184

1    A. I don't remember.
2    Q. What about where it says "Binary day"?
3    A. I don't remember.
4    Q. Okay. What about "Trend above month"
5    A. Don't remember.
6    Q. What about where it says "Trend slope"?
7    A. I don't remember.
8    Q. To the next, "Frequency" RD 6 -- or "ORD 6."
9      MR. DELINSKY: Object to form.
10     THE WITNESS: I don't remember.
11   Q. Where it says "FREQORD6," do you know what
12  that means?
13   A. I don't remember.
14   Q. Okay. Do you know what it means
15  "FREQORD12"?
16   A. I don't remember.
17   Q. What about where it says "RAREORD12"?
18   A. I don't remember.
19   Q. Maybe we can make this quicker.
20     Where it says "PZSCORERANGE," and it has 6,
21  12, 12 max, do you remember any of those?
22   A. No, I don't remember.
23   Q. Do you remember where it says
24  "PREDZSCORERANGE," do you remember that?
25   A. I don't remember.

Page 185

1    Q. Do you have any idea what those numbers
2  mean?
3      MR. DELINSKY: Object to form.
4      THE WITNESS: I don't remember.
5    Q. Where it says "MTD" down below, do you know
6  what that means?
7    A. Month-to-day.
8    Q. All right. What about where it says
9  "LAG1"?
10   A. I don't remember.
11   Q. That MTD where you said month-to-date, that's
12  total volume ordered by that store month-to-date; is
13  that correct?
14   A. I believe so.
15   Q. All right. What about LAG2?
16   A. I don't remember.
17   Q. What about LAG3?
18   A. I don't remember.
19   Q. What about LAG4?
20   A. I don't remember.
21   Q. What about LAG5?
22   A. I don't remember.
23   Q. What about LAG6?
24   A. I don't remember.
25   Q. What about the bottom four, 7 through 12

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 again?
2    A. I don't remember.
3    Q. Do you have any idea what those are?
4    MR. DELINSKY: Object to form. Asked and
5 answered.
6    THE WITNESS: I don't remember.
7    Q. If you look at the score where it says,
8 "Score .85," what can that score tell me about this
9 order?
10    A. From when we previously read, I can't recall
11 exactly, it's -- it's -- it's greater than, I think,
12 .65.
13    Q. I understand that the computer algorithm
14 model identifies this order as potentially suspicious
15 because it violated the score of .65.
16    My question is: What can -- the fact that
17 this score is .85, what does that indicate to you as
18 far as this order goes?
19    A. Like I said before, I believe -- from what I
20 can recall, I know the IRR went mechanically to
21 another -- went into a spreadsheet. And it is -- I
22 know what formatted it in a way for review.
23    Q. It still just gave you --
24    MR. DELINSKY: Wait.
25    THE WITNESS: I -- I just -- I can't recall

Page 187

1 this.
2    Q. When it formatted the IRR for review, it
3 still gave you this information, correct, that we are
4 looking at in front of us?
5    A. I want to say it looked differently. So I'm
6 not -- I'm not sure if what I looked at when it said
7 "score" how it -- how it made that in a way back in --
8 I can look at that order and -- and -- and know
9 everything that it's -- it's giving here.
10    Q. You have no idea?
11    A. I just can't remember.
12    Q. You have no idea, do you?
13    MR. DELINSKY: Object to form.
14    THE WITNESS: I can't remember.
15    Q. Okay. You can remember, meaning you have no
16 idea what it actually -- what that screen showed in
17 2013?
18    MR. DELINSKY: Object to form.
19    THE WITNESS: I can't remember.
20    Q. Okay. Unfortunately, as your -- Mr. Delinsky
21 mentioned, all of those computer screens were never
22 maintained.
23    You would maintain documents for a DEA audit,
24 correct?
25    A. I would maintain my -- the SOM documents.

Page 188

1    Q. You would maintain Item Review Reports,
2 right?
3    A. Yes. That's what I put in the Excel
4 spreadsheet.
5    Q. And so you would want to maintain the most
6 complete document you could for a DEA audit,
7 correct?
8    MR. DELINSKY: Object to form.
9    THE WITNESS: I believe so.
10    Q. Right. I'm just trying to figure out: When
11 you say that you looked at this form in a spreadsheet,
12 if there was any other information in it, and it
13 doesn't make sense to me why you would have other
14 information in a spreadsheet that was downloaded from
15 this form and you wouldn't save that for the DEA.
16    MR. DELINSKY: Object to form.
17    THE WITNESS: I don't remember.
18    Q. Can -- can any of this information here shown
19 on this form tell me anything about the percentage of
20 this drug to other drugs ordered?
21    MR. DELINSKY: Object to form.
22    THE WITNESS: I don't -- I don't remember.
23    Q. In fact, the only place that would be found
24 would be if it flagged for maximum cutoff ratio,
25 correct?

Page 189

1    A. I don't remember.
2    Q. Okay. Can anything on this screen tell me
3 about the makeup of people that buy these drugs --
4 that are going to go buy these drugs once they're
5 shipped to CVS pharmacies?
6    MR. DELINSKY: Object to form.
7    THE WITNESS: That's not the MicroStrategy
8 report.
9    Q. I understand. And when you went to the
10 MicroStrategy report, you would print that as part of
11 your due diligence and put it in the Item Review and
12 put it in the files, correct?
13    A. As I can recall, yes.
14    Q. What I'm asking is: Anything on this Item
15 Review Report, this report that we are looking at, is
16 there anything here that can tell me anything about
17 the people that are going to buy these drugs or the
18 people in the past that have bought these drugs from
19 this store?
20    A. I don't -- from looking at it, I -- I -- but
21 not fully recall, like recalling what it is, I don't
22 believe so.
23    Q. Okay. Is there anything shown in this report
24 in that area for Store 3355 that can tell me how many
25 people that are going to buy these drugs are going to

Page 190

1 pay with cash or how many people in the future would
2 pay with cash for any of these drug orders?
3     A. I don't -- I don't think so.
4     Q. Okay. Can it tell me anything about the
5 distance people are going to travel to purchase these
6 drugs or the distance people traveled in the past to
7 purchase these drugs?
8     A. I can't really recall much about this.
9     MR. DELINSKY: Ms. Helfrich, do you need a
10 break?
11     MR. GOETZ: No. We are going to finish this,
12 Mr. Delinsky.
13     MR. DELINSKY: Well, do you need a break or
14 do you not need a break?
15     THE WITNESS: Huh-huh.
16     MR. DELINSKY: You do not?
17     THE WITNESS: Huh-huh.
18     MR. DELINSKY: Okay.
19     THE WITNESS: I don't -- I don't -- I don't
20 know.
21 BY MR. GOETZ:
22     Q. You would agree -- well --
23     Can this tell me anything about whether or
24 not there were common doctors that were going to
25 prescribe these drugs or had prescribed these drugs in

Page 191

1 the past?
2     A. Again, I'm not recalling this versus what I
3 looked-- a document like that, I think of the
4 MicroStrategy report. That's what shows me all of
5 that information.
6     Q. Right.
7     A. And that's not this.
8     Q. Right. And that MicroStrategy report is
9 something that you go to after you look at these
10 orders and you say, "Oh, that needs additional due
11 diligence," correct?
12     MR. DELINSKY: Object to form.
13     THE WITNESS: There is other factors that
14 lead to due diligence. It is not necessarily only
15 MicroStrategy.
16     Q. I'm asking you: When you say that
17 MicroStrategy report -- when you go -- go to -- go
18 look at MicroStrategy, you print it out and put it in
19 the IRR box, correct? That's the due diligence?
20 That's what you're supposed to do, put it in the
21 box?
22     MR. DELINSKY: Object to form.
23     THE WITNESS: As I can remember.
24     Q. Yes?
25     A. Yeah.

Page 192

1     Q. Okay. And so, my question is and what I'm
2 trying to find out: How do we look at this
3 information and determine, "Hey, I need to go do
4 additional due diligence, I should consult
5 MicroStrategy, I should consult the SOM Daily Extract
6 Report, I should consult the Store Metrics report?
7     How I do look at this that has been
8 identified by the computer algorithm model as
9 potentially suspicious, over 200 orders on one day
10 from one distribution center -- you're reviewing for
11 11 distribution centers out of Indianapolis
12 distribution center -- how do I look at this
13 information -- how did you look, because you were
14 doing it, on this sheet and say, "I need to do
15 additional due diligence on that order"?
16     MR. DELINSKY: Objection.
17     Q. That's what I'm trying to find out.
18     MR. DELINSKY: Object to form.
19     THE WITNESS: Again, I ordered that -- I
20 would populate into a spreadsheet. And from what I
21 can recall, this spreadsheet sorted it in a way I
22 can't remember.
23     Q. Are you thinking that the IRR populated this
24 and showed you doctor relationships and that the IRR
25 populated other additional information besides this

Page 193

1 that we are looking at here? Is that what you
2 think?
3     A. I can't recall the exact data. It could have
4 been this data, but once populated, it sorted in a
5 manner that I knew -- that I -- that I would begin
6 doing my review.
7     Q. Ms. Helfrich, are you sure you're not
8 confusing this with the new IRR system which came
9 online March of 2014?
10     A. The new IRR system?
11     Q. There was a new SOM system that came online
12 in March of '14, correct?
13     MR. DELINSKY: The wind socket system,
14 Shauna.
15     THE WITNESS: Oh. Okay. Yes.
16     Q. There was correct?
17     A. Yes.
18     Q. And for a period, that system was going --
19 was also out of the Indianapolis distribution center,
20 correct?
21     A. The new SOM?
22     Q. You never worked on that?
23     A. The new SOM?
24     Q. Yes.
25     A. I've seen it. I don't recall working on

Page 194

1  it.
2      Q.  You don't ever recall working on that?
3      A.  I don't recall.
4      Q.  Did Gary Millikan always work out of the
5  Indiana distribution center in 2014 or did he actually
6  go to Rhode Island?
7      A.  From -- I don't know.  I don't know Gary.
8      MR. DELINSKY:  All right.  Let's take a
9  break.
10     THE VIDEOGRAPHER:  We are off record at 3:31
11  p.m.
12     (There was a brief recess.)
13     THE VIDEOGRAPHER:  We are back on the record
14  at 3:40 p.m.
15  BY MR. GOETZ:
16     Q.  Ms. Helfrich, I think the last thing we were
17  talking about is what that data can and can't show.
18     Can that data up there tell me anything about
19  the doctors that had prescribed that drug in the past
20  of patients that use that pharmacy?
21     A.  Still not familiar with exactly remembering
22  what this -- but possibly, no.
23     Q.  And can that data up there -- strike that.
24     Do you know what the "Trinity" is?
25     A.  I have heard of the Trinity.  I can't exactly

Page 195

1  recall which ones are in it.
2      Q.  You don't remember?
3      A.  I think possibly hydrocodone, maybe
4  oxycodone, and I'm not for sure of the last.
5      Q.  So the Trinity was the hydrocodone,
6  benzodiazepine, and a muscle relaxer.
7      Does that refresh your recollection?
8      A.  Yes.
9      Q.  And benzodiazepine is an anxiety medication,
10  correct?
11     A.  Yes, I believe so.
12     Q.  Okay.  Can -- can that -- and the Trinity was
13  really significant for a SOM program because if you
14  saw those three drugs going out in combination, that
15  was usually an indication of diversion, correct?
16     MR. DELINSKY:  Object to form.
17     THE WITNESS:  I'm not certain of that.  I do
18  remember something in regards to the cocktails that
19  was -- that was of interest if we saw that.
20     Q.  Why was it of interest?
21     A.  For -- I believe, if recall correctly, I --
22  potential abuse when you get those three together.
23     Q.  Can that information up there tell me
24  anything about the Trinity?
25     A.  I don't believe so.

Page 196

1      Q.  Can we talk generically about what due
2  diligence can be done to figure out whether or not a
3  order is suspicious?
4      So you can contact and speak to the
5  pharmacist, correct?
6      A.  Yes.
7      Q.  Okay.  And what would you ask the
8  pharmacist?
9      A.  I can't recall the exact conversations.
10     I know in -- in general, it regarded to --
11  possibly asking them what their balance on hand was,
12  possibly let them know what was ordered, and my due
13  diligence that I did, what I found.
14     And if they had -- if they had any, you know,
15  patients or doctors of -- of interest.  If this was
16  a -- if it was an order that they actually wanted to
17  place.
18     I can't recall what other questions I might
19  have asked.
20     Q.  And that information could be important to
21  you in investigating whether or not an order is a
22  potentially suspicious?
23     MR. DELINSKY:  Object to form.
24     THE WITNESS:  I -- I did not have that -- I
25  did not deem whether an order was suspicious or not.

Page 197

1  That was actually -- if it was an order I was
2  concerned with, it was elevated up.
3      But those questions could help me figure out
4  what happened in the ordering.
5      Q.  How often did you elevate an order?
6      A.  That, I -- I don't remember.
7      Q.  What was the form that you used to elevate an
8  order?
9      A.  I would notify Pam Hinkle and Dean Vanelli of
10  my concerns.
11     Q.  How?
12     A.  Either via phone or email.
13     Q.  And then what would happen to them?
14     A.  Then it was out of my hands.
15     Q.  You would email them your due diligence,
16  correct?
17     A.  Yes.
18     Q.  We have not seen one order that you elevated
19  in our discovery.
20     Does that surprise you?
21     A.  Considering I know there were orders that I
22  elevated.
23     Q.  Would you elevate orders once a week?  Once a
24  day?  Once a month?
25     Approximately how often?

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  A. I don't -- I don't remember.
2  Q. I need some -- you have no idea whether it
3 was once day or once every six months?
4     MR. DELINSKY: Object to form.
5     THE WITNESS: Not -- every day was different.
6 I just don't remember.
7  Q. Could have elevated an order once every six
8 months?
9     MR. DELINSKY: Object to form.
10    THE WITNESS: I don't remember.
11 Q. Once every eight months?
12    MR. DELINSKY: Object to form.
13    THE WITNESS: I don't remember.
14 Q. Once every nine months?
15 A. I don't remember.
16 Q. Did you have a subject line you would put on
17 there when you would elevate an order?
18 A. I believe there is something that I put in
19 the email. I just don't recall what it was exactly.
20 Q. And you would attach and send your due
21 diligence when you sent that email?
22    MR. DELINSKY: Object to form.
23    THE WITNESS: I don't remember if it was
24 attached with that email or -- or later. I -- I
25 believe -- gosh, it's hard to recall.

Page 199

1     I want to say, if I recall correctly, it may
2 have been with the initial email.
3  Q. That information you indicated that you could
4 gather from -- that was part of due diligence, decide
5 whether or not to elevate an order by calling the
6 pharmacist, none of that is reflected in the Item
7 Review Report entries, is it?
8  A. No.
9  Q. No?
10    So if you want that due diligence to evaluate
11 an order, you actually have to do that separate due
12 diligence and contact the pharmacist, correct?
13 A. After the review of the IRR?
14 Q. Yes.
15 A. Yes.
16 Q. Yes.
17    If you want to -- okay.
18    And there was actually a pharmacy contact
19 form?
20 A. That, I don't remember.
21 Q. How often did you contact a pharmacy?
22 A. I would contact pharmacies daily.
23 Q. Daily?
24 A. Yes.
25 Q. Would you fill out a form?

Page 200

1     MR. DELINSKY: Object to form.
2     THE WITNESS: I don't remember.
3  Q. How many times per day do you think that you
4 would contact the pharmacy?
5  A. It varies from day to day, but the calls were
6 frequent.
7     I don't -- I don't remember an actual
8 number.
9  Q. I'm asking you: Was it once a day? Five
10 times a day? Ten times a day?
11 A. I don't remember.
12 Q. Might have been once? It might have been
13 five?
14 A. I don't remember.
15    MR. DELINSKY: Shauna, was there a range that
16 you can recall? It may have been three or something
17 else?
18    THE WITNESS: Oh, man. I know that the calls
19 were -- were frequent, depending on, obviously, the
20 volume.
21 Q. You predominately would call, because we
22 looked at that report earlier that said, was this
23 order a mistake, right?
24    You said fat finger, that was whether or not
25 it was a fat finger, you remember a yes or no?

Page 201

1  A. Yes.
2  Q. And that is predominantly why you would call
3 and say, "Hey, was this a fat finger?"
4     And you would get a no or a yes, and you
5 would enter that in?
6     MR. DELINSKY: Object to form.
7     THE WITNESS: No. That would -- that's
8 usually information that they would have given me. I
9 don't -- that's not something that I asked them.
10 Q. You would say, "Did you order 50,000 hydros?"
11    And they said, "No, we meant to order 5,000."
12    Is that what you are telling me?
13    MR. DELINSKY: Object to form.
14    THE WITNESS: If there is an error in the
15 order, yeah, they would let me know.
16 Q. Other due diligence that you can do is
17 looking at ordering versus dispensing data.
18    And we have talked about that earlier,
19 correct?
20 A. Yes.
21 Q. Okay. You don't know why -- I remember you
22 are not sure what the significance of it was, but is
23 that showing up there on that report?
24    MR. DELINSKY: Object to form.
25    THE WITNESS: I don't know much about what

Page 202

1 that -- what that -- I can't really recall what that
2 is showing.
3    Q.  Are you finished?
4    A.  Yes.
5    Q.  So you don't know?
6    A.  I don't know.
7       MR. DELINSKY:  Object to form.
8       THE WITNESS:  I don't recall.
9    Q.  Another thing you could do would be to
10 determine whether or not doctors make up a
11 disproportionate share of those prescriptions for a
12 pharmacy, correct?
13      MR. DELINSKY:  Object to form.
14      THE WITNESS:  Of like -- like top doctors --
15   Q.  Yes?
16   A.  -- of -- yes.
17   Q.  Yeah.
18      You would want to know, what are the top
19 doctors?  Who are they?  What are their specialties?
20 And how much of this drug are they actually
21 prescribing that -- that is being -- that is being
22 sold at that pharmacy, correct?
23   A.  Yes.
24   Q.  Okay.  And that's additional due diligence
25 you can do, correct?

Page 203

1    A.  I -- I believe that's a Store Metrics
2 report.
3    Q.  Okay.  And that's nowhere on that report, is
4 it?
5    A.  That's not the Store Metrics report.
6       I don't believe -- I don't -- I don't really
7 know what that is -- I can't really recall what that
8 is saying.  I would say not.
9    Q.  All right.  And, again, if I went to the
10 Store Metrics report, if it is something you would
11 say, okay, this is an order I really ought to
12 investigate.
13      You would do that due diligence, look at the
14 store metrics, look at MicroStrategy, print it, put it
15 in the files?
16      MR. DELINSKY:  Object to form.
17      THE WITNESS:  I believe that's what I recall,
18 yes.
19   Q.  Okay.  There is nothing on that report, and I
20 might have asked you this before, as to whether or not
21 that is reflective of the drug cocktail, right?
22   A.  Yes.  You asked -- the Holy Trinity, right,
23 or little Trinity thing?
24   Q.  And there is nothing on that report that
25 reflects that, is there?

Page 204

1    A.  Not that I can see.
2    Q.  Okay.  So, again, that is information that
3 would show up on the Store Metrics report, correct?
4    A.  The --
5       MR. DELINSKY:  Object to form.
6       THE WITNESS:  The cocktail?
7    Q.  Yes.
8    A.  I believe there is something about cocktails
9 on there.
10   Q.  So if I wanted that information, I would say,
11 I've got to do extra due diligence.  I would print the
12 store metrics, print other things, attach it, put in
13 the file because it's not there, it is not on this
14 report?
15   A.  It's not.
16   Q.  This does show me prior ordering data.
17      Do you agree with that?
18      MR. DELINSKY:  Object to form.
19      THE WITNESS:  I see month to date.  That
20 could possibly be something.
21   Q.  I'm handing you Helfrich 9.
22      Helfrich, I apologize.
23      Ms. Helfrich, do you know what this is?
24      MR. DELINSKY:  Take your time.
25      THE WITNESS:  I don't recall this document.

Page 205

1       (CVS-Helfrich-9 was marked for
2 identification.)
3    Q.  Have you ever seen this document before, that
4 you know of?
5    A.  Not that I know of.
6    Q.  Okay.  On the front page this says, "CVS
7 Distribution Center Control Drug DEA Standard
8 Operating Procedures Manual."
9       And then do you see on the right, it has
10 revision dates?
11   A.  Yes.
12   Q.  So, I believe, based upon this being produced
13 by CVS, that this was the operating manual for the
14 controlled drug and distribution center.
15      And it was lasted revised November 8, 2011,
16 which I believe is the last revision date before you
17 started, okay, which is why I pulled this date.
18      Could you go to 8545, please?
19   A.  Okay.
20   Q.  Do you see where it says, "Items Reviewed"?
21   A.  Yes.
22   Q.  And it says, "CVS has established controlled
23 drug order thresholds which will flag on the IRR (Item
24 Review Report), as well as field loss prevention known
25 as Novistor loss prevention software report."

Page 206

1    Do you see that?
2    A.  Yes.
3    Q.  We do know that the Novistor loss prevention
4    software report, at some point, were eliminated,
5    correct?
6         MR. DELINSKY:  Object to form.
7    BY MR. GOETZ:
8    Q.  Do you remember seeing that document?
9    A.  Yes.
10   Q.  Okay.  And the Novistor was the Viper report;
11   is that correct?
12   A.  Yes.
13   Q.  Okay.  And it says, "These thresholds are the
14   primary tool to prevent stores from purchasing
15   excessive or potentially suspicious controlled drug
16   orders."
17        So what they're saying is that IRR was the
18   primary tool.
19        Do you agree with that?
20        MR. DELINSKY:  Object to form.
21        THE WITNESS:  I really -- I mean, seeing this
22   for the first time, I can recall -- I can't really --
23   I can't really comment on it.
24        I don't -- I don't -- it obviously -- I'm not
25   sure where it came from.  Oh, I can't really comment

Page 207

1    on it.
2    Q.  The Item Review Report -- I'm sorry.  Were
3    you finished?
4    A.  Yes.
5    Q.  The Item Review Report identified potentially
6    suspicious orders.  Strike that.  We have gone over
7    that.
8         In your experience, was the Item Review
9    Report the primary tool that you used?
10   A.  It is -- it is where I got my -- the flagged
11   orders from, but I -- I've also received emails from
12   supervisors asking to look into an order because it
13   was deemed, like, an order that they were they
14   concerned about.  I've looked into it.
15   Q.  And was that maybe an order from a picker or
16   a packer?  A picker, is that what your telling me?
17   A.  Yes.
18   Q.  A picker or packer identified an order.
19        So you would get an email there, even though
20   it would not show up on the IRR, they'd say, "Hi,
21   Ms. Helfrich, please also investigate this order
22   today."
23        Is that what you're telling me?
24   A.  Yes.
25   Q.  How often would that occur?

Page 208

1    A.  I don't -- I don't -- I don't really remember
2    how often.
3    Q.  How often do you think?  Can you give me a
4    range?
5    A.  I don't remember.
6    Q.  The pickers and packers would not have the
7    Item Review Report, would they?
8    A.  I don't believe so.
9    Q.  Okay.  So when -- when you would get from
10   them a notification, please look at this order, it
11   oftentimes would overlap with the Item Review Report,
12   wouldn't it?
13   A.  I can vaguely recall times where it -- it
14   didn't.  It wasn't an order that hit the IRR.
15   Q.  How many orders per day would they tell to
16   you look at?  Or per week?  Or per month?
17   A.  I don't remember.
18   Q.  Was it one?  More than one per day?
19   A.  It has been so long ago, I just -- I can't --
20   I just can't -- I can't remember.
21   Q.  More than or less than one per month?
22   A.  I don't remember.
23   Q.  Less than one per every six months?
24   A.  I don't remember.
25   Q.  It could have been one every six months?

Page 209

1    A.  I don't -- I don't remember.
2    Q.  Do you see paragraph 4 of the Item Review
3    Report, and then the last sentence of that says, "The
4    network DC analyst..."
5         Do you see where it says that?
6    A.  Yes.
7    Q.  "has primary responsibility for reviewing the
8    report."  That is the IRR, correct?
9    A.  Yes.
10   Q.  "In investigating all orders that may be
11   excessive or unusual.  In making the determination,
12   the network DC analyst shall review the IRR
13   considering but not limited to the following factors."
14        Do you see that?
15   A.  Yes.
16   Q.  And then they give you those two factors on
17   there, A and B.  I'm going to read to you A.
18        "Known reasons for increased orders, i.e.,
19   shortage of project in the industry, seasonal
20   variations."
21        And B is, "Corporate promotional activities."
22        Did they ever give you any more detailed
23   factors than that?
24   A.  I don't remember.
25   Q.  This is what is in the standard operating

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 procedure, the SOP SOM manual. And those are the two
2 things that they suggest that you should look for.
3          Did you ever look for anything else when you
4 reviewed the IRR?
5          MR. DELINSKY: Object to form. Object to
6 form.
7          THE WITNESS: I don't remember.
8     Q. You don't remember if you looked for anything
9 else? What corporate promotional activities occurred
10 for hydrocodone?
11    A. That, I don't recall.
12    Q. Do you recall any?
13    A. Not that I can remember.
14    Q. Okay. Were there times where there were
15 known reasons for increased orders such as when they
16 were trying to force product into the pharmacies
17 because of the new scheduling? Were you aware of
18 that?
19          MR. DELINSKY: Object to form.
20          THE WITNESS: I vaguely remember something.
21 I don't -- I don't remember, well, what item it was,
22 but I remember something of --
23    Q. And then down below, again it says, "All
24 controlled drug IRRs must be signed by network DC
25 analyst for the network report and locally by the RX

Page 211

1 manager/supervisor and dated the day the report is
2 received.
3          You don't remember ever signing a report, do
4 you?
5          MR. DELINSKY: Object to form.
6 BY MR. GOETZ:
7     Q. Strike that.
8          Do you remember ever signing a report?
9          MR. DELINSKY: Object to form.
10          THE WITNESS: I can't remember.
11    Q. Who was the RX manager/supervisor while you
12 were doing suspicious order monitoring for the
13 Indianapolis DC?
14          MR. DELINSKY: Object to form. And I'm going
15 to interpose an additional objection here.
16          You're asking Ms. Helfrich, who is and has
17 always been in Indiana, about a policy that pertains
18 to IRR review in Knoxville, Tennessee.
19          And this is an unfair line of questions.
20 I've given you a lot of latitude, but it's --
21          MR. GOETZ: Mr. Delinsky, are you suggesting
22 to me that there was a subsequent amendment that
23 applied; or are you suggesting that CVS, as a
24 distribution center, just didn't update the -- update
25 their policies?

Page 212

1          First, I would like to know that because I'm
2 just curious.
3          MR. DELINSKY: The record is clear on this,
4 Mr. Goetz.
5          MR. GOETZ: I would like --
6          MR. DELINSKY: The record is clear.
7          MR. GOETZ: -- to know: Is there a
8 subsequent DC -- is there a subsequent IRR that we are
9 not -- we don't have?
10          MR. DELINSKY: I don't know. That's
11 unintelligible.
12          MR. GOETZ: You're right.
13          MR. DELINSKY: There are subsequent items.
14          MR. GOETZ: You are totally right.
15          MR. DELINSKY: There are subsequent policies
16 pertaining to SOM, one of which you showed
17 Ms. Helfrich today.
18          There are other ones as well, all of which
19 have been produced.
20          The -- the one you are asking her about
21 pertains to a review conducted by a distribution
22 center that she never saw.
23          MR. GOETZ: My question to you is: Are you
24 suggesting that this SOP SOM did not apply to the
25 Indiana DC in 2013?

Page 213

1          MR. DELINSKY: I'm suggesting to you that the
2 policies that have been produced in this case, catalog
3 all of the policies that were applicable at the
4 appropriate time.
5          MR. GOETZ: You're not answering.
6          MR. DELINSKY: And you've already showed
7 Ms. Helfrich an SOM policy that postdates this one,
8 that takes a different form than this one.
9          MR. GOETZ: It takes -- are you telling me,
10 because we have gone at this forever with the
11 30(b)(6), that that policy that postdates it
12 completely supersedes it?
13          That's all I'm asking you.
14          MR. DELINSKY: The --
15          MR. GOETZ: Because otherwise you can't
16 suggest that I did something unfair showing her a
17 policy that -- that we have no idea if it was been
18 superseded. We have asked you that.
19          The Court suggested that you answer to the
20 combined discovery requests, and you did nothing but
21 list Bates number.
22          MR. GOETZ: And I direct you to those.
23          MR. GOETZ: That is one of those.
24          MR. DELINSKY: You can continue with that --
25          MR. GOETZ: That is one of them.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1  MR. DELINSKY: -- as the subsequent one. You
2  can continue with your questions.
3  MR. GOETZ: My question is: Since that is
4  one of those, why were they identified if you are
5  suggesting that I should not have used it?
6  MR. DELINSKY: You can continue with your
7  questions.
8  BY MR. GOETZ:
9  Q. Let me ask a question: Did you ever see any
10  standard operating procedures while you were at CVS
11  doing suspicious order monitoring?
12  A. I -- I believe that there is a possibility
13  that I -- I did see an SOP.
14  Q. That looked like that?
15  A. I don't -- I don't remember what it looked --
16  looked like.
17  Q. How were you given it?
18  A. Oh, that, I can't remember.
19  Q. Were you emailed it?
20  A. I can't remember.
21  Q. Were you given a hard copy?
22  A. I don't remember.
23  Q. Did you save that hard copy?
24  A. I don't remember.
25  Q. Is this when the CVS thought you were acting

Page 215

1  as the SOM manager and they never informed you?
2  MR. DELINSKY: Object to form. Objection,
3  misstates testimony.
4  You have the documents.
5  THE WITNESS: I was -- I just don't
6  remember.
7  Q. Is this -- did you receive the SOM SOP when
8  -- when CVS thought you were responsible for DEA -- DC
9  DEA compliance and they never told you about that,
10  either?
11  A. I -- I don't -- I don't remember.
12  Q. You -- you testified earlier that you did not
13  think that you were responsible for DC DEA compliance,
14  correct?
15  A. Yes.
16  Q. And yet, we saw an email that an executive
17  said, "Shauna Helfrich is doing that," correct?
18  MR. DELINSKY: Object to form. Objection as
19  to misstates the document.
20  Q. Did you answer?
21  A. No.
22  MR. GOETZ: Could you read that back?
23  (Previous question was read back by the court
24  reporter commencing as follows:
25  Question: And yet, we saw an email that an

Page 216

1  executive said, "Shauna Helfrich is doing that,"
2  correct?)
3  THE WITNESS: I don't -- I don't know what he
4  was saying in that email or what was meant by it.
5  BY MR. GOETZ:
6  Q. You were employed at the CVS distribution
7  center doing suspicious order monitoring when they
8  were audited by the DEA, weren't you?
9  A. Yes.
10  (CVS-Helfrich-21 was marked for
11  identification.)
12  Q. I'm handing you what has been marked as
13  Exhibit 21.
14  Have you ever seen that document?
15  A. Not that I can remember.
16  Q. You were doing SOM monitoring at that point,
17  correct?
18  A. 8-5-13, is that the date?
19  Q. August of '13. We looked before at your --
20  A. Yes.
21  Q. Yeah. Did you participate at all in the
22  investigation or the audit?
23  A. No, I did not.
24  (CVS-Helfrich-25 was marked for
25  identification.)

Page 217

1  (CVS-Helfrich-26 was marked for
2  identification.)
3  Q. I'm going to hand what you has been marked as
4  CVS Exhibit 25, Helfrich 25. These are notes from the
5  DEA visit.
6  Have you ever seen these notes?
7  A. Not that I can recall.
8  Q. If you look at -- under the second bullet, it
9  says, on the second page, 61235, it says "SOM."
10  MR. DELINSKY: 61235? So it's the second
11  page?
12  MR. GOETZ: You're right. 61235 is the fifth
13  page.
14  Q. That's the SOM section. And it says in the
15  second bullet, "DEA explained that it is imperative
16  that CVS know its customers."
17  Did you know that the DEA believed that that
18  was imperative?
19  MR. DELINSKY: Object to form.
20  THE WITNESS: No.
21  Q. Do you ever learn that it was imperative to
22  know your customers?
23  A. I've heard that phrase before.
24  Q. When?
25  A. I can't recall when.

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1    Q. You didn't know it was imperative, it is just
2 a phrase that you heard?
3    A. I did not know.
4    Q. Okay. Can you look at the -- bottom
5 bullet where it says, "Director Nicastro provided the
6 DEA with examples of actual irregular store orders and
7 the research completed to validate as legitimate.
8 They were impressed with the research and said this is
9 exactly what we want to see."
10    Do you know what they saw?
11    MR. DELINSKY: Object to form.
12    Q. Do you know? I couldn't hear you.
13    A. I can't -- I can't really, I mean, comment on
14 this. I have never -- that I can recall seeing it. I
15 don't know what Mr. Nicastro is -- is -- is saying.
16    We had earlier looked at 35, if you want to
17 look at that. I believe Exhibit 37 might be, but
18 Exhibit 35 is -- is a sample of the due diligence that
19 you had done. Is that --
20    A. I have that.
21    Q. And other than -- strike that.
22    That Exhibit 35 is probably what the type of
23 documents that were shown to the DEA, correct, same
24 time period, same type of investigation?
25    MR. DELINSKY: Object to form. She testified

Page 219

1 that she had no involvement in communications with the
2 DEA.
3    THE WITNESS: I don't -- I don't know.
4    Q. Other than that investigation that's shown in
5 Exhibit 35, the only two other things that could have
6 been done that we know CVS was doing was calling the
7 pharmacy or running a Store Metrics report, correct?
8    A. From what I can recall, I -- that was my due
9 diligence.
10    Q. Yes. Those three things shown there and then
11 calling a pharmacy, running the Store Metrics report,
12 if you chose to do that, and printing that and putting
13 it in the file, correct?
14    A. Yes.
15    Q. Okay. And so, when they show the DEA the
16 investigation, more than likely they're probably
17 probably showing them those five documents, correct?
18    A. I was not involved in it. I don't -- I don't
19 know.
20    Q. You were doing the investigations around this
21 time period. You were the one doing the
22 investigations. They would have pulled your files for
23 this.
24    A. But I'm not sure exactly what was -- what was
25 given. I don't -- I wasn't -- I wasn't involved.

Page 220

1    Q. It would have been based upon what
2 investigations you were doing at the time, all five or
3 a -- a portion of those five, some combination of
4 those five?
5    MR. DELINSKY: Object to form. Objection,
6 misstates the testimony. Mischaracterizes the time
7 frame.
8    THE WITNESS: I don't -- I don't -- I don't
9 know.
10    Q. We know your due diligence consisted of
11 either all five of those things that we talked about,
12 those three documents, plus the Store Metrics plus
13 maybe calling the pharmacy, it consisted of one or, in
14 some cases, all five of those items, correct?
15    A. Yes.
16    Q. Okay. If they pulled your due diligence, if
17 they pulled one of your files to show the DEA and they
18 said, "Here's a recent file to show the DEA," they
19 would have pulled one of yours, correct?
20    MR. DELINSKY: Objection. Object to form.
21 Objection. Misstates the evidence and testimony.
22    THE WITNESS: I mean, that's my due
23 diligence.
24    Q. Okay. So let's assume that that's -- they
25 showed them those five documents. The DEA was

Page 221

1 impressed with that, weren't they?
2    MR. DELINSKY: Object to form.
3    THE WITNESS: I don't feel comfortable
4 commenting on it since I was not involved.
5    Q. Did anybody ever talk to you about this
6 investigation?
7    A. Not that I can remember.
8    Q. You were working in SOM at Indiana, the SOM
9 system in Indiana is subject to a DEA audit, and no
10 one ever spoke to you about it?
11    MR. DELINSKY: Object to form.
12    THE WITNESS: I was aware one was going on,
13 but I -- I did my -- I continued to do my -- do my job
14 as thoroughly as possible.
15    Q. Do you know if the DEA was ever told, "Look
16 at our great due diligence. By the way, we did this
17 on two stores over a one-year period in Cuyahoga and
18 Summit County"?
19    MR. DELINSKY: Object.
20    Q. Do you know if they were ever told that?
21    MR. DELINSKY: Dan, I'm going to instruct the
22 witness -- start instructing the witness not to
23 answer. You are overtly asking her to speculate on
24 conversations and a series of events that she said she
25 didn't participate in.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    I've given you leash, but this line of
2  questioning has to come to an end.
3    Q. Exhibit 26. Have you ever seen this
4  document?
5    A. I don't recall ever seeing this email.
6    Q. Do you know who Mark Nicastro is?
7    A. Yes. Yes.
8    Q. Who is Mark Nicastro?
9    A. Is the director of the Indianapolis DC.
10    Q. And this appears to be an email from him
11  attaching some files -- some different files and
12  things to Daniel Gillen at the DEA, okay?
13    A. Uh-huh.
14    Q. Can you go to page 410? And if you look at
15  that, page 410 and 411, that is a letter that
16  Mr. Nicastro wrote to Mr. Gillen, it appears.
17    A. Yes.
18    Q. I'm only going to go ask you about one -- one
19  paragraph. It says -- it is at the bottom, the bottom
20  paragraph says, "Any order that is flagged by our SOM
21  model or questioned by our DC team is initially
22  identified as an order of interest and has additional
23  due diligence conducted by the SOM team."
24    Do you see that?
25    A. Yes.

Page 223

1    Q. That SOM model that he's speaking about, that
2  is the Item Review Report that we have talked about
3  today, correct?
4    A. I believe so.
5    Q. All right. I'm just -- I want to make sure
6  there is nothing else that --
7    A. I -- well, I don't exactly know what he is --
8    Q. So --
9    A. -- trying to say here. I am not him. I
10  can't really comment on what he's -- he's saying.
11    Q. You were doing suspicious order monitoring
12  during this period for the CVS Indiana distribution
13  center.
14    And are you aware of any SOM model other than
15  the IRR algorithm we have talked about today?
16    A. I can't remember. I can't remember.
17    Q. Do you think there might have been another
18  SOM model that you just don't remember about?
19    A. I remember the -- the IRR.
20    Q. Okay. And that was a SOM model?
21    MR. DELINSKY: Object to form.
22    THE WITNESS: I don't know what the language
23  he is -- is using.
24    Q. In November of '13, Mr. Baker was gone,
25  correct?

Page 224

1    A. I believe so.
2    Q. Aaron Burtner was gone, correct?
3    A. Yes.
4    Q. It was you, and you think it might have been
5  Gary Millikan doing SOM?
6    A. With the assistance of pharma compliance.
7    Q. And pharma compliance would provide -- what
8  did you say -- one person?
9    A. Yes.
10    Q. And would they work for you or would you
11  report to them?
12    A. That, I -- I don't exactly remember a
13  reporting tier of any sort.
14    Q. They were there to help shepherd in the new
15  system, gather all of the data for the new system or
16  no? They were there to do separate SOM?
17    MR. DELINSKY: Object to form.
18    THE WITNESS: I'm not for sure of their -- of
19  their reasoning for being there. I know they were
20  there and they watched over and helped me with what I
21  did.
22    Q. Okay. He says in this -- this sentence, "Any
23  order that is flagged by our SOM model" -- I want you
24  to assume that is the IRR. That's only thing that
25  makes sense. -- "or questioned by our DC team is

Page 225

1  initially identified as an order of interest and has
2  additional due diligence conducted by the SOM team."
3    Did I read that correctly?
4    MR. DELINSKY: Object to form.
5    THE WITNESS: Yes.
6    Q. That's not true, is it?
7    MR. DELINSKY: Object to form.
8    THE WITNESS: I know -- I know what I did.
9  What was flagged, I did my due diligence.
10    Q. And when you did your due diligence, you
11  printed it and put it in a file?
12    MR. DELINSKY: Object to form. Misstates the
13  testimony.
14    Q. Go back to Exhibit 2, please.
15    Are you suggesting to me that for these 200
16  orders on this day for this distribution center alone,
17  that for every one of those orders, you either looked
18  at -- you either looked at and printed to put in the
19  file, the Store Metrics report, the MicroStrategy
20  report, the daily extract detail report, called a
21  pharmacy, or -- I apologize, what the fifth one was
22  that you had testified that you could do -- are you
23  telling me that did you that for every one of these
24  orders?
25    MR. DELINSKY: Object to form.

Page 226

BY MR. GOETZ:
Q. You did one of those for every one of those orders?
MR. DELINSKY: Object to form.
THE WITNESS: I believe I did my due diligence.
Q. Did you do one of those five things for every one of these orders?
MR. DELINSKY: Object to form.
THE WITNESS: I know I went through the due diligence.
Q. You're not answering my question.
A. That I can --
I know it has been many years, but I've -- I believe -- I believe that's -- that's what I did.
Q. For hundreds of orders a day, you would do one of those things?
MR. DELINSKY: Object to form.
Dan, you're just misunderstanding the testimony.
THE WITNESS: I believe I did my due diligence for those.
Q. What was that due diligence?
A. The IRR, look at what was flagged, the Store Metrics report, and, you know, the Viper,

Page 227

MicroStrategies.
Q. And you would print those and put them with the IRRs, you've testified to that multiple times?
A. Yes, but I'm doing my due diligence.
Q. So, every IRR that is flagged for a CT-1 store, every IRR -- strike that.
Every order from a CT-1 store that shows up on the Item Review Report, should have corresponding due diligence with it?
A. I know I did due diligence.
Q. My question --
MR. GOETZ: Can you read back my question?
(Previous question was read back by the court reporter commencing as follows:
Question: Every order from a CT-1 store that shows up on the Item Review Report, should have corresponding due diligence with it?)
MR. DELINSKY: Object to form. That assumes that the due diligence extended beyond the IRR review.
MR. GOETZ: She just said it did.
MR. DELINSKY: No.
MR. GOETZ: She absolutely did.
MR. DELINSKY: You misunderstood the testimony.

Page 228

BY MR. GOETZ:
Q. Did the due diligence that you did extend beyond this IRR review or was it this IRR review?
When I ask about due diligence, additional due diligence, I'm asking about if there was anything you saw beyond the four corners of this report?
MR. DELINSKY: Object to form. You're using -- you're using different terms.
You are using due diligence in some instances, and you're using additional due diligence in others.
BY MR. GOETZ:
Q. When you say to me you did your due diligence, okay, are you telling you reviewed the Item Review Report, or are you telling me I looked at the Item Review Report and for every order, I did some additional due diligence?
MR. DELINSKY: Object to form.
THE WITNESS: It was so long ago, but I know I looked at the IRR report once it populated.
And then I would look at the Store Metrics report, MicroStrategy and Viper.
Q. And when you looked at the Store Metrics report and the MicroStrategy report, you would print those?

Page 229

MR. DELINSKY: Object to form.
THE WITNESS: When I looked -- what I did --
Q. You've already testified. So I'll withdraw that.
So every order that is shown up here, you're telling me that you looked at MicroStrategies for every order identified on this 8-30-2013 IRR?
MR. DELINSKY: Object to form. Misstates testimony.
MR. GOETZ: I thought -- you got to stop. I thought we were clear that she didn't and then it became she did.
Q. For every order that is identified on this or on an IRR as a potentially suspicious order, did you look at MicroStrategy?
MR. DELINSKY: I don't believe she testified that she looked at every one.
MR. GOETZ: Stop. You've got to stop.
If you would like to tell me she didn't, if she would like to say, no, I oftentimes just reviewed the report and that was my due diligence, I'll move on.
THE WITNESS: I remember the IRR. So -- so long ago.
Man, I know I remember looking at the IRR.

Page 230

1    Q.  You're not -- this is a very simple question.
2        You would review the Item Review Report,
3    correct?
4        MR. DELINSKY:  Shauna, just listen to the
5    question.
6    BY MR. GOETZ:
7    Q.  You would review the Item Review Report?
8    A.  Yes.
9    Q.  Okay.  The Item Review Report would be
10   populated with orders that had been identified as
11   potentially suspicious.
12   A.  Yes.
13   Q.  Okay.  When you would look at an Item Review
14   Report, would you do -- go outside of what is shown on
15   the document, do what I call additional due diligence,
16   one of those five things we talked about earlier, or
17   in some circumstances, would you just look at what is
18   shown on the IRR and move on to the next order?
19       MR. DELINSKY:  Object to form.
20       THE WITNESS:  I -- I just don't remember.
21   Q.  Because -- are you done?
22   A.  Yes.
23   Q.  Because you did testify that when you would
24   review the store metrics or you would review the
25   MicroStrategy, you would print those.

Page 231

1    To the extent that you did it for CT-1
2    stores, we should have any due diligence if we have
3    the IRR, correct?
4    A.  Yes, if it was an order of concern, yes, I
5    did my due diligence.
6    Q.  Can you tell me why we have due diligence
7    files for two days over a one-year period?
8        MR. DELINSKY:  Object to form.  That
9    misstates the testimony.
10       MR. GOETZ:  You're right.  Over an -- in
11   excess of a one-year period.
12       MR. DELINSKY:  Same objections.
13       THE WITNESS:  I don't -- I don't know.
14   Q.  Those two days also happen to coincide with
15   the IRR recap report, which, again, you don't remember
16   what that -- or you call them the max tracker.
17       You don't remember what that was, either,
18   correct?
19   A.  Vaguely.
20       MR. DELINSKY:  Dan, I just want to let you
21   know that I have five minutes of questions, so if you
22   want reserve.
23       MR. GOETZ:  I'm not sure that's -- that's not
24   rule.  If you go five minute, I get five.
25       MR. DELINSKY:  Okay.  Well, I hope you don't

Page 232

1    make me miss my plane.
2        MR. GOETZ:  I'm doing my best, but --
3    Q.  Are you aware that the DEA believed that the
4    Indianapolis distribution center did not have a SOM
5    system in place?
6        MR. DELINSKY:  Object to form.
7        THE WITNESS:  I was not.
8    Q.  You were not aware of that?
9        Does that surprise you?
10   A.  Considering I was doing SOM.
11   Q.  You would think they would have told you,
12   though, right?
13       That's an email from Mark Nicastro to Dan
14   Gillen.  And it appears to recap a call in the -- the
15   second paragraph says, "Regarding our call today.  I
16   am disappointed to hear that you do not believe we
17   have a suspicious order monitoring program in place,
18   but I can assure you that we do."
19       No one ever told you that that's what the DEA
20   thought?
21   A.  No, not that I recall.
22   Q.  You were doing suspicious order monitoring at
23   this time, right?
24   A.  Yes.
25

Page 233

1    (CVS-Helfrich-27 was marked for
2    identification.)
3    Q.  Are you aware that the DEA had serious
4    concerns with the amount of -- I'm showing you Exhibit
5    27 -- with the amount of hydrocodone that was being
6    shipped by your distribution center?
7        MR. DELINSKY:  Object to form.
8        THE WITNESS:  Not that I can recall.
9    Q.  Excuse me?
10   A.  Not that I can recall.
11   Q.  No one ever told you about that, either?
12   A.  Not that I can recall.
13   Q.  Are you aware that the DEA issued a letter of
14   admonishment related to the SOM program that you were
15   working at for this period, for the Indianapolis
16   distribution center?
17   A.  Not that I can recall.
18       (CVS-Helfrich-29 was marked for
19   identification.)
20   Q.  Okay.  I'm going to show you CVS 29.
21       This relates to the 2013 investigation.
22       Can you read paragraph 1, please?
23   A.  Failure to design and maintain a system to
24   detect suspicious and report suspicious orders for
25   Schedule III through V Controlled Substances as

Page 234

1 required by Title 21, United States Code (USC) 821,
2 Title 21 USC 823(e)(1), and Title 21 Code of Federal
3 Regulations, (CFR) 1301.74 (b) in violation of the
4 Title 21 USC 842(a)(5), in that CVS failed to detect
5 orders that should have been identified as suspicious
6 for retail locations in Vincennes and Kokomo,
7 Indiana.
8     Q. No one ever made you aware of that, that the
9 DEA found that while you were working in the SOM at
10 the Indianapolis distribution center, that it had
11 significant problems?
12     No one ever told you that?
13     MR. DELINSKY: Object to form.
14     THE WITNESS: Not that I can remember.
15     Q. Does that disappoint you?
16     MR. DELINSKY: Object to form.
17     THE WITNESS: I trust if it was something
18 that I needed to know, I would have -- I would --
19     Q. I'm asking if --
20     MR. DELINSKY: Let her finish, Dan.
21     THE WITNESS: -- I would be informed.
22     Q. Does the finding that the DEA issued a letter
23 of admonishment partially related to the period while
24 you were there doing SOM, does that disappoint you?
25     MR. DELINSKY: Object to form.

Page 235

1     THE WITNESS: I've only seen this for the
2 first time. I can't really comment on the document,
3 but I -- I have not seen.
4     Q. You have no opinion?
5     (CVS-Helfrich-23 was marked for
6 identification.)
7     (CVS-Helfrich-24 was marked for
8 identification.)
9     Q. I'm going to show you Exhibit 23 and 24.
10     I'm only going ask you a couple of brief
11 questions.
12     If you look at 23, that is a Suspicious Order
13 Monitoring, it looks like an update. And it indicates
14 that -- it says, "Deployment. Currently
15 mid-deployment with 12 of 19 DCs deployed and live on
16 the new SOM."
17     Do you see that?
18     A. Yes.
19     Q. And it indicates that Indianapolis was the
20 first at March 3, 2014, correct?
21     So when we talk about the new system, this is
22 what we are talking about, right, that new testimony
23 that they were doing?
24     A. Yes.
25     Q. Okay. Could you look at Exhibit 24, please.

Page 236

1     And it says -- the first sentence says,
2 "Store service by 14 of 19 DCs includes Puerto Rico
3 are live on the new SOM," correct?
4     A. Yes.
5     Q. So, what that means is that we know by
6 September 15 -- 14 of the DCs were live?
7     A. Yes.
8     Q. Okay. And that was part of that new system,
9 it was a really upgraded new system, rolled out
10 system?
11     MR. DELINSKY: Object to form.
12     THE WITNESS: I can't really comment on the
13 new system. I remember -- I vaguely remember
14 asking -- being asked to kind of help with the ins and
15 outs of it.
16     I can't -- I can't recall me ever -- ever
17 being in it, that I can remember.
18     Q. There was no new system, new SOM system in
19 the summer of 2013, was there?
20     MR. DELINSKY: Object to form.
21     THE WITNESS: Not that I can recall.
22     Q. There was no new SOM symptom in January of
23 '14, was there?
24     MR. DELINSKY: Object to form.
25 BY MR. GOETZ:

Page 237

1     Q. I mean, this was it. This system we see
2 right there. That's the new system, correct?
3     MR. DELINSKY: Object to form.
4     THE WITNESS: Yeah, this is the --
5     Q. All right. And from the time you started
6 until March 3rd of '14, that going live, there was no
7 new SOM system.
8     When we refer to a new SOM system, there
9 wasn't, was there?
10     A. From which dates?
11     Q. The time that you started until March of, 3
12 of '14?
13     A. Yeah, I believe my SOM was the only SOM.
14     Q. Right. What you had been using, it was --
15     (CVS-Helfrich-30 was marked for
16 identification.)
17     Let me show you Exhibit 30.
18     MR. DELINSKY: Ms. Helfrich, would you like a
19 break or are you okay?
20     MR. GOETZ: We'll do this, and take a break.
21 It will be two minutes.
22     THE WITNESS: Restroom.
23     Q. Do you see 8017?
24     A. Yes.
25     Q. Could you look at the next page, please?

Page 238

1    That's a letter from Elizabeth Ferguson?
2    A.  Yes.
3    Q.  Do you know who that is?
4    A.  Yes, I believe I know her as Betsy.
5    Q.  Okay.  And she is CVS's legal counsel?
6    A.  Yes.
7    Q.  And if you look at the front page of that
8    letter, she is writing a letter to Mr. Gillen,
9    correct?
10   A.  Yes.
11   Q.  And Mr. Gillen is the DEA person that
12   actually audited the Indianapolis distribution center,
13   correct?
14   A.  I'm unsure of --
15   Q.  In any event, this is her letter to him.
16       And I want to read to you the third
17   paragraph.  It says, "As we discussed in the closing
18   interview, in the fall of 2013, CVS had just rolled
19   out a new SOM system and had invested substantial
20   resources to design and implement it."
21       That's not true, is it?
22   A.  I'm not --
23       MR. DELINSKY:  Object to form.
24       THE WITNESS:  I really can't comment on her
25   letter.  I don't know what she is meaning.

Page 239

1    Q.  Is that --
2    A.  The context.
3    Q.  Is that true?
4        Based upon what you know about the CVS SOM
5    system and when it was rolled out, and when it was
6    implemented, and when the new one was in your period
7    there, is that -- is that statement, that in the fall
8    of '13, CVS had just rolled out a new SOM system; is
9    that true?
10   A.  Again, I'm not -- I'm not Betsy.  I don't
11   exactly know what she's -- what she's saying in her
12   wording.
13   Q.  Is it correct?
14       Go back to the rollout page, please?
15       Go back to Exhibit 30, 23 or 24.
16       Go back to Exhibit 23, please.
17   A.  Yes.
18   Q.  That page clearly says the first time this
19   system goes live in any distribution center was March
20   3rd of '14, correct?
21   A.  It looks like --
22   Q.  And --
23   A.  -- an outline.
24   Q.  Look at Exhibit 24.
25       By September 15, 2014, 14 of the 19 DCs are

Page 240

1    on the new system.
2        So even by then, the system is not fully
3    functional in all of the DCs, is it?
4    A.  Seeing this, I can't really comment on it.
5    Q.  You can comment on this:  When she says, "In
6    the fall of 2013, CVS had just rolled out a new SOM
7    system and had invested substantial resources to
8    design and implement it."
9        MR. DELINSKY:  Object to form.
10   BY MR. GOETZ:
11   Q.  Either we don't know about what system she
12   talking about -- she is talking about, or this is a
13   misstatement.
14       MR. DELINSKY:  Object to form.
15       THE WITNESS:  Again, I can't comment on what
16   Betsy is trying -- what she is saying or trying to
17   say.
18   Q.  Based on the facts that you know, is that
19   accurate, that statement?
20       MR. DELINSKY:  Object to form.
21   BY MR. GOETZ:
22   Q.  "As we discussed in the closing interview, in
23   the fall of 2013, CVS had just rolled out a new SOM
24   system and had invested substantial resources to
25   design and implement it."

Page 241

1        MR. DELINSKY:  Object to form.  Asked and
2    answered.
3        THE WITNESS:  I can't comment on what
4    Betsy --
5    Q.  And this letter is dated January 22 of '15.
6        I don't know for sure because we have not
7    gotten the documents, but I do know as of 9-15-2014,
8    four months earlier, it still wasn't operational in
9    five DCs.
10       It might not have even been fully operational
11   when she is writing this letter two years after the
12   fact, correct?
13       MR. DELINSKY:  Object to form.
14       THE WITNESS:  That I can't comment on it.  I
15   don't --
16   Q.  Because you don't want to say that it was not
17   an accurate letter?
18       MR. DELINSKY:  Object to form.
19       This has been asked and answered several
20   times.
21       MR. GOETZ:  I will reserve the rest of my
22   time plus your time when you question.
23       MR. DELINSKY:  Well, no, Dan.  I don't think
24   that's right.
25       MR. GOETZ:  That's how it reads.

Page 242

```
1        MR. DELINSKY:  Let me see it.  I don't
2   believe that is correct.
3        MR. GOETZ:  We can take a break.  We'll show
4   it to you.
5        MR. DELINSKY:  All right.  Five minutes.
6        THE VIDEOGRAPHER:  We are off record at
7   5:00 p.m.
8        (There was a brief recess.)
9        THE VIDEOGRAPHER:  We're back on the record
10  at 5:09 p.m.
11
12            EXAMINATION
13  BY MR. DELINSKY:
14       Q.  Ms. Helfrich, have you ever been deposed
15  before?
16       A.  No.
17       Q.  Have you ever seen a deposition before?
18       A.  No.
19       Q.  Have you ever testified in court before?
20       A.  No.
21       Q.  Also, has this deposition been a brand new
22  experience for you?
23       A.  Yes.
24       Q.  Were you nervous for this deposition?
25       A.  Very, yes.
```

Page 243

```
1        Q.  Have you ever been nervous -- have you stayed
2   nervous throughout the deposition today?
3        A.  Yes.
4        Q.  Do you suffer any physical symptoms of your
5   nervousness?
6        A.  My neck gets real red.
7        Q.  Are you nervous now?
8        A.  Yes.
9        Q.  Mr. Goetz put a lot of questions to you,
10  correct?
11       A.  Yes.
12       Q.  Do you feel that you answered all of the
13  questions that Mr. Goetz put to you perfectly?
14       A.  No.
15       Q.  Was it difficult for you to answer a lot of
16  his questions?
17       A.  Yes.
18       Q.  Was this process of testifying hard for
19  you?
20       A.  Yes.
21       Q.  Is that because you're nervous?
22       A.  Yes.
23       Q.  Is it because this is new for you?
24       A.  Yes.  Yes.
25       Q.  Were many of the questions confusing for you
```

Page 244

```
1   and just hard to answer?
2        A.  Yes.
3        Q.  Did you still do your best to answer
4   Mr. Goetz's questions as best and as honestly as you
5   were capable of doing in the moment?
6        A.  Yes.
7        Q.  You were a SOM analyst for CVS many years
8   ago, correct?
9        A.  Yes.
10       Q.  How many years ago?
11       A.  Like, five or so.
12       Q.  Do you remember all of the details of what
13  you did as a SOM analyst?
14       A.  No.
15       Q.  Is that because it was about five years
16  ago?
17       A.  Yes.
18       Q.  Is it hard to remember -- is it hard for you
19  to remember work that you have not performed for four
20  or five years?
21       A.  Yes.
22       Q.  Do you remember all of the details of the
23  various documents and reports that related to your SOM
24  work?
25       A.  No.
```

Page 245

```
1        Q.  Do you remember the details of how you read
2   the IRR?
3        A.  No.
4        Q.  Do you recall that you understood the IRR at
5   the time you were a SOM analyst?
6        MR. GOETZ:  Objection.
7        Q.  I'll rephrase the question.
8        Ms. Helfrich, do you recall whether at the
9   time you were a SOM analyst you felt you understood
10  the IRR?
11       A.  Yes.
12       Q.  Did you understand the IRR at the time that
13  you were a SOM analyst?
14       A.  I believe so, yes.
15       Q.  Do you have general memory of how you went
16  about your work as a SOM analyst?
17       A.  Yes.
18       Q.  Do you remember whether you reviewed all of
19  the orders that CVS's system flagged?
20       A.  Yes.
21       Q.  When you were a SOM analyst, did you always
22  review all of the orders that the system flagged?
23       A.  Yes.
24       Q.  Ms. Helfrich, do you remember whether you
25  conducted due diligence on flagged orders that you
```

Page 246

1 believed was necessary?
2     A. Yes.
3     MR. GOETZ: Objection.
4     Q. When you were a SOM analyst, did you always
5 conduct the due diligence that you believed was
6 necessary?
7     A. Yes.
8     Q. What was kind of due diligence that you might
9 conduct depending on the circumstances?
10     A. IRR, MicroStrategies, Store Metrics report,
11 pharma -- talking to pharma compliance in the
12 pharmacy, pharmacist.
13     Q. Do you mean call the pharmacist and speaking
14 with the pharmacist?
15     A. Yes.
16     Q. Would you ever call upon the Viper system as
17 well?
18     A. Oh, yes.
19     Q. I believe that you testified that you would
20 review the IRR itself?
21     A. Yes.
22     Q. And did the form of the IRR that you reviewed
23 on the computer look different from the one that you
24 have been asked about today in Exhibit 2?
25     A. Yes.

Page 247

1     Q. Was your review of the IRR itself a form of
2 due diligence?
3     A. Yes.
4     Q. Do you remember whether you worked hard in
5 reviewing the orders that CVS's SOM system flagged?
6     A. Yes.
7     Q. Did you work hard in reviewing the orders
8 that the system flagged?
9     A. Yes, I did.
10     Q. How hard did you work?
11     A. Very hard.
12     Q. Is it fair to say that you spilled blood,
13 sweat and tears on this?
14     MR. GOETZ: Objection.
15     THE WITNESS: And then some.
16     Q. How early in the day would you get to the
17 office to begin your review?
18     A. 3:00 a.m., at times at 4:00 a.m.
19     Q. Did it depend on the day?
20     A. It did, yeah.
21     Q. Were you able to review all of the orders
22 flagged by the SOM system each day?
23     A. Yes.
24     Q. Was there ever a day when you were unable to
25 review all of the flagged orders?

Page 248

1     A. No.
2     Q. When you were a SOM analyst, did you always
3 have access to all of the information that you
4 believed you needed --
5     A. Yes.
6     Q. -- to thoroughly review the orders that the
7 SOM system flagged?
8     A. Yes.
9     Q. Did you ever let an order ship that you were
10 concerned might be suspicious?
11     A. No.
12     Q. Did you ever let an order ship that you
13 believed might be misused?
14     UNIDENTIFIED SPEAKER: Objection.
15     THE WITNESS: No.
16     Q. Did you ever let an order ship that you
17 believed had an illegal purpose?
18     UNIDENTIFIED SPEAKER: Objection.
19     THE WITNESS: No.
20     Q. Did you ever let an order ship that you
21 believed might be diverted?
22     UNIDENTIFIED SPEAKER: Objection.
23     THE WITNESS: No.
24     Q. Did CVS ever let an order ship that you had
25 concerns about?

Page 249

1     A. Not that I can recall.
2     Q. To your knowledge, did you let an order ship
3 that was suspicious in nature?
4     UNIDENTIFIED SPEAKER: Objection.
5     THE WITNESS: Not that I can recall, no.
6     MR. DELINSKY: I have nothing further.
7     RE-EXAMINATION
8 BY MR. GOETZ:
9     Q. Ms. Helfrich --
10     A. Uh-huh.
11     Q. -- I'm going to hand you Exhibit 43. I've
12 already given you this. It is in the record, but you
13 just talked about how hard you worked and you would
14 get there at 3:00 in the morning, correct?
15     A. At times.
16     Q. Okay.
17     A. 3:00 a.m. It varies.
18     Q. We spent a lot of time today looking at an
19 IRR from August 30, 2013, correct?
20     A. Yes.
21     Q. And so for that time period, actually looks
22 like you worked -- the most hours you ever did, you
23 worked 39.98 hours one week and 40 hours the next.
24     Is that what you were talking about your
25 blood, sweat and tears?

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    A. Considering -- yes.
2    Q. And in fact, in August 9th of '13, you worked
3  34 hours one week and 27 the next.
4    That's what you were talking about your
5  blood, sweat and tears?
6    A. When was it?
7    Q. August the 9th, 2013, that pay period.
8    A. I can't recall when I went full time, but,
9  yes, I -- yes.
10    Q. Those were the long hours that you were
11  talking about.
12    Could you go back to exhibit 2, please?
13    It's the large document, probably on the
14  bottom.
15    A. Okay. Yes.
16    Q. And you just -- can you go to 10693, please?
17    And you just testified you conducted due
18  diligence on all SOM system flagged orders that you
19  believed was necessary, correct?
20    MR. DELINSKY: Object to form.
21    THE WITNESS: Yes.
22    Q. Tell me what due diligence would be necessary
23  for this order.
24    A. I don't -- being since it was so long ago and
25  not being in the -- I don't -- I don't remember.

Page 251

1    Q. Tell me -- tell me whether or not extra due
2  diligence would be necessary on this order.
3    MR. DELINSKY: Object to form. Asked and
4  answered.
5    THE WITNESS: I don't -- I don't remember.
6    Q. So tell me, did do you additional due
7  diligence on this order? Looking at it now, can you
8  tell me?
9    A. I don't remember.
10    Q. So when you testified that you did additional
11  due diligence on all orders that were necessary, what
12  was that based on?
13    MR. DELINSKY: Object to form.
14    THE WITNESS: From what I can remember. I
15  would review the IRR. That's considered due
16  diligence.
17    Q. Okay. So, reviewing the IRR is -- is, in
18  your mind, due diligence, correct?
19    A. Yes. Yes.
20    Q. But as you sit here today, you can't tell me
21  what one of those numbers on that IRR mean, can you?
22    MR. DELINSKY: Object to form.
23    THE WITNESS: But the IRR report that I saw
24  and populated into an Excel spreadsheet looked -- it
25  would look different than this.

Page 252

1    Q. Well, what -- what -- what numbers were on
2  the IRR spreadsheet that was populated then? I mean,
3  it's the same -- same data, but tell me what was on
4  there that -- that you knew what it meant.
5    A. I don't remember.
6    Q. Okay. And so, when you say -- I'm just
7  trying to figure out when you say, "I did -- every
8  order that needed additional due diligence, I did it,"
9  but you have no idea -- we have no facts what that is
10  based upon other than you just saying, "I put my
11  blood, sweat and tears into it and I did it"?
12    MR. DELINSKY: Object to form.
13    THE WITNESS: I don't remember.
14    Q. Not only do you not know what those numbers
15  mean, you can't tell me how they're calculated, can
16  you?
17    MR. DELINSKY: Object to form. Asked and
18  answered.
19    THE WITNESS: I don't remember.
20    Q. And so as you sit here today, you can't tell
21  me whether or not that order is an order that I would
22  -- you would do additional due diligence on, or that
23  order is an order that you would say, "I looked at it,
24  that's my due diligence, I don't need to do anything
25  else"?

Page 253

1    You have no idea what you would do with that
2  order, do you?
3    MR. DELINSKY: Object to form. Asked and
4  answered.
5    THE WITNESS: I don't remember.
6    Q. Okay. You have no idea, do you?
7    MR. DELINSKY: Same objection.
8    Q. The only thing you remember is that you did
9  appropriate due diligence, but you don't remember any
10  facts surrounding that?
11    MR. DELINSKY: Object to form.
12    THE WITNESS: It was long ago. I don't
13  remember.
14    Q. I understand it was long ago.
15    You were the last person reviewing suspicious
16  orders in CVS Indiana, correct?
17    MR. DELINSKY: Object to form.
18    Q. Correct?
19    A. Yes.
20    Q. You are it? You are the person we have to
21  come to, to get this information from.
22    MR. DELINSKY: I don't believe there is a
23  question, Dan.
24    Q. There is a question.
25    Is there anybody else that was there in March

Page 254

1  of '14 when this system transferred to Rhode Island,
2  that was full-time reviewing suspicious orders other
3  than you?
4      A. Full-time? Just me.
5      Q. Just you. And so, if you can't give us the
6  information, do you know anybody that can?
7      A. I had help from Gary Millikan.
8      Q. Okay.
9      A. But it was so long ago.
10     Q. And I just want the record to be clear: Over
11 a ten-month period or 11-month period in 2013, we have
12 evidence that CVS did due diligence beyond what is
13 shown on the IRR for one order, for pharmacies in
14 Cuyahoga and Summit County. One order.
15     Do you have any reason to dispute that?
16     MR. DELINSKY: Object to form. Object.
17 Asked and answered.
18     THE WITNESS: I don't remember.
19     Q. Is that a no?
20     Do you have any reason to dispute it? I
21 don't remember of -- you either have facts or you
22 don't have facts.
23     MR. DELINSKY: Same objections.
24     THE WITNESS: I don't remember.
25     Q. I don't understand what that means. I'm

Page 255

1  asking you: Do you have any evidence to dispute it?
2      MR. DELINSKY: Object to form. Objection.
3  Asked and answered.
4      THE WITNESS: I don't remember.
5      Q. As you sit here today, do you have any
6  evidence to dispute that CVS investigated one order
7  for the CT-1 pharmacies outside of the IRR in 2013?
8      MR. DELINSKY: Object to form. Objection.
9  Asked and answered.
10     THE WITNESS: I don't remember.
11     Q. I don't understand what "I don't remember"
12 means when I'm asking you if you have any evidence.
13     You don't remember if you have evidence?
14     MR. DELINSKY: Objection. Object to form.
15     THE WITNESS: Seems like you're asking me to
16 recall.
17     Q. I'm asking you, as you sit here today, do you
18 dispute that? Today, as you sit here, do you dispute
19 it?
20     MR. DELINSKY: Object to form. Objection,
21 asked and answered.
22     THE WITNESS: It's been many years. I just
23 don't remember.
24     MR. GOETZ: Thank you, Ms. Helfrich.
25     THE VIDEOGRAPHER: We are off the record at

Page 256

1  5:26 p.m.

Page 257

CERTIFICATE

5      I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6  deposition is a true record of the
testimony given by the witness.

7      It not was requested before
8  completion of the deposition that the
witness, SHAUNA HELFRICH, have the
9  opportunity to read and sign the
deposition transcript.

12 _____
    Kimberley Ann Keene
    Certified Reporter
13  Notary Public
    Dated: January 17, 2019

17     (The foregoing certification
18 of this transcript does not apply to any
reproduction of the same by any means,
19 unless under the direct control and/or
20 supervision of the certifying reporter.)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 259

- - - - - -

## E R R A T A

- - - - - -

PAGE  LINE  CHANGE

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

Page 260

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

SHAUNA HELFRICH          DATE

Subscribed and sworn
to before me this
_____ day of _____, 20_____.
My commission expires:_____

_____
Notary Public

Page 261

## LAWYER'S NOTES

PAGE  LINE
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____