Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL         )    MDL No. 2804
     PRESCRIPTION OPIATE     )
 4   LITIGATION,             )    Case No.
                             )    1:17-MD-2804
 5                           )
     THIS DOCUMENT RELATES TO )    Hon. Dan A.
 6   ALL CASES               )    Polster
                             )
 7
 8                    __ __ __
 9            Wednesday, January 23, 2019
                      __ __ __
10
11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
12                    __ __ __
13
14
15         Videotaped Deposition of SUSANNE
     HILAND, held at 4206 South J.B. Hunt Drive,
16   Rogers, Arkansas, commencing at 8:25 a.m., on
     the above date, before Debra A. Dibble,
17   Certified Court Reporter, Registered
     Diplomate Reporter, Certified Realtime
18   Captioner, Certified Realtime Reporter and
     Notary Public.
19
20                    __ __ __
21
22
            GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | fax 917.591.5672
                 deps@golkow.com
24
25
```

## Page 2

A P P E A R A N C E S:
CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
BY: ZACHARY BOWER, ESQUIRE
zbower@carellabyrne.com
MICHAEL INNES, ESQUIRE
minnes@carellabyrne.com
5 Becker Farm Road
Roseland, New Jersey 07068-1739
(973) 994-1700
Counsel for Plaintiffs

JONES DAY
BY: TINA TABACCHI, ESQUIRE
ttabacchi@jonesday.com
SCOTT ELMER, ESQUIRE
selmer@jonesday.com
JASON ZHOU, ESQUIRE
jzhou@jonesday.com
(Attending telephonically)
77 West Wacker
Chicago, Illinois 60601-1692
312-782-1692
Counsel for Walmart

WRIGHT, LINDSEY & JENNINGS, LLP
BY: CALEY B. VO, ESQUIRE
cvo@wlj.com
3333 Pinnacle Hills Parkway
Suite 510
Rogers, Arkansas 72758-8498
(479) 986-0888
Counsel for McKesson

REED SMITH, LLP
(appearing telephonically)
BY: MARY BALASTER, ESQUIRE
mbalaster@reedsmith.com
811 Main Street
Suite 1700
Houston, Texas 77002-6110
(713) 469-3800
Counsel for AmerisourceBergen

## Page 3

ARNOLD & PORTER KAYE SCHOLER, LLP
(appearing telephonically)
BY: KAREN RIGBERG, ESQUIRE
Karen.Rigberg@arnoldporter.com
777 South Figueroa Street
44th Floor
Los Angeles, California 90017-5844
(213) 243-4000
Counsel for Endo Health Solutions
Inc.; Endo Pharmaceuticals Inc.; Par
Pharmaceuticals, Inc.; Par
Pharmaceutical Companies, Inc.
formerly known as Par Pharmaceutical
Holdings, Inc.

BARBER LAW FIRM
BY: J. CARTER FAIRLEY, ESQUIRE
cfairley@barberlawfirm.com
425 West Capitol Avenue
Suite 3400
Little Rock, Arkansas 72201
(501) 707-6182
Counsel for Cardinal Health, Inc.

ALSO PRESENT:

Jennifer B. Bechet
Senior Associate Counsel
Walmart, Inc.

THE VIDEOGRAPHER:
Chris Ritona
Golkow Litigation Services
— — —

## Page 4

INDEX

APPEARANCES                    2
PROCEEDINGS                    7

EXAMINATION OF SUSANNE HILAND:
    DIRECT EXAMINATION         9
    BY MR. INNES

## Page 5

DEPOSITION EXHIBITS
SUSANNE HILAND
January 23, 2019

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Walmart-Hiland 1 | 12-4-07 email from Jimmie Sherl to Mike Mullin. Subj: DEA Scheduled Visit of DC 6045 120507. WMT_MDL_000054021-54022 | 81 |
| Walmart Hiland 2 | 3-10-10 email chain. Subj: Re: NABP VAWD Mtg. WMT_MDL_000016173-T6174 | 114 |
| Walmart Hiland 3 | 10-4-11 email from Susanne Hiland. Subj: Significant Loss Guidelines - Confidential - Do Not Forward. WMT_MDL_000040775-40779 | 132 |
| Walmart Hiland 4 | 9-27-12 email from George Chapman. Subj: CII utilization review. WMT_MDL_000012194 | 136 |
| Walmart Hiland 5 | August 2014 email chain. Subj: FW: Hydrocodone to CII meeting 8.25.14. WMT_MDL_000047417-47419. | 164 |
| Walmart Hiland 6 | 8-17-12 email from Susanne Hiland. Subj: Prescription Drug Abuse and Diversion - Senator Harkin. WMT_MDL_000049685-49687 | 187 |
| Walmart Hiland 7 | 12-13-16 email from JoAnn Stevens. Subj: H&W Compliance Oversight Meeting Materials - December 14-2016 2:00-4:00pm, Soderquist Hall Conference Room. WMT_MDL_000046442-46513 | 259 |

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1    Walmart     October 2017 email chain.    274
     Hiland 8    Subj: Press Release from
2                McKesson.
                 WMT_MDL_000002203-2205
3
     Walmart     May 2015 email chain.         279
4    Hiland 9    Subj: "4th Thursday" H&W
                 Compliance Focus Areas
5                deck.
                 WMT_MDL_000049545-49566
6
     Walmart     December 2017 email chain.   289
7    Hiland 10   Subj: RE Industry Letter.
                 WMT_MDL_000032595-32599
8
9
10
11              — — — — — —
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1              PROCEEDINGS
2          (January 23, 2019 at 8:25 a.m.)
3          THE VIDEOGRAPHER:  We are now
4    on the record.  My name is Chris
5    Ritona.  I am videographer for Golkow
6    Litigation Services.  Today's date is
7    January 23, 2019.  The time is
8    approximately 8:25 a.m.  This video
9    deposition is being held in Rogers,
10   Arkansas at Mitchell Williams, 4206
11   South JB Hunt Drive, Suite 200, in the
12   matter of National Prescription Opioid
13   Litigation MDL No. 2804, Case
14   No. 17-MD-2804 in the United States
15   District Court Northern District of
16   Ohio, Eastern Division.  The deponent
17   today is Susanne Hiland.  Will all
18   counsel please identify themselves for
19   the record.
20         MR. INNES:  Good morning.
21   Michael Innes of Carella, Byrne for
22   plaintiffs in the MDL.
23         MR. BOWER:  Good morning.  Zach
24   Bower, Carella, Byrne, for the
25   plaintiffs in the MDL.

Page 8

1          MR. FAIRLEY:  Carter Fairley on
2    behalf of Cardinal Health.
3          MR. VO:  Caley Vo, Wright,
4    Lindsey & Jennings on behalf of
5    McKesson.
6          MS. BECHET:  Jennifer Bechet,
7    senior associate counsel, Walmart,
8    Incorporated.
9          MR. ELMER:  Scott Elmer from
10   Jones Day on behalf of Walmart.
11         MS. TABACCHI:  Tina Tabacchi,
12   Jones Day, on behalf of Walmart and
13   the witness.
14         THE VIDEOGRAPHER:  And will the
15   participants on the conference call
16   also please identify themselves.
17         MS. RIGBERG:  Karen Rigberg
18   from Arnold & Porter on behalf of the
19   Endo and Par defendants.
20         MS. BALASTER:  And Mary
21   Balaster with Reed Smith on behalf of
22   AmerisourceBergen Corporation.
23         THE COURT REPORTER:  Anyone
24   else on the phone?
25         THE VIDEOGRAPHER:  The court

Page 9

1    reporter today is Debbie Dibble and
2    she will now please swear in the
3    witness.
4          SUSANNE HILAND,
5    having first been duly sworn, was examined
6    and testified as follows:
7          DIRECT EXAMINATION
8    BY MR. INNES:
9     Q.   Good morning, Ms. Hiland.  My
10   name is Michael Innes.  We met yesterday,
11   where you sat as a corporate designee for
12   Walmart and provided testimony.
13         Some of the questions I'm going
14   to ask you up front might sound redundant as
15   to the questions you were asked yesterday,
16   but I want to have a complete record.  So
17   I'll preface all of my questions with -- with
18   that.
19         You do understand you're under
20   oath today; right?
21    A.   Yes.
22    Q.   And you might have to speak up
23   for the folks to hear on the phone.  I know
24   yesterday there were some complaints after
25   that it was difficult to hear all of us in

Page 10

1  the room. So I'll try to keep my voice up as
2  well.
3          Have you ever testified under
4  oath before?
5      A.   Yes.
6      Q.   And when was that?
7      A.   Yesterday and in depositions --
8  previous depositions related to my employment
9  with Walmart.
10     Q.   Okay. And you understand that
11 even though you're in a law office today,
12 testimony you give under oath has the same
13 force and effect and penalties of perjury as
14 though you are testifying in a court of law?
15     A.   Yes.
16     Q.   If I ask you a question and you
17 provide an answer, I'm going to assume that
18 you understood my question. Is that fair?
19     A.   Yes.
20     Q.   Is there anything that would
21 prevent you from thinking clearly today?
22     A.   No.
23     Q.   Is there anything that would
24 prevent you from testifying truthfully today?
25     A.   No.

Page 11

1      Q.   What did you do today -- or
2  what did you do to prepare for your
3  deposition today?
4      A.   I met with attorneys.
5      Q.   And how many times did you meet
6  with your attorneys?
7      A.   So specific to prepare for this
8  deposition, twice, that I recall.
9      Q.   So you met with your attorneys.
10 And the attorneys -- strike that.
11         Those two meetings were
12 specific to the testimony you were going to
13 give as a fact witness today.
14     A.   They were for this deposition.
15     Q.   Okay. And during those
16 meetings, did -- were they -- did you discuss
17 anything related to your -- strike that.
18         Did those meetings in any way
19 touch upon the testimony that you gave as a
20 corporate designee yesterday?
21     A.   I think with the preparation
22 I've done, it's a little bit difficult for me
23 to separate out some of the preparation. But
24 specific to my individual deposition, the two
25 times that I remember we said okay, well now

Page 12

1  let's talk about the -- your individual
2  deposition. There were two where we
3  separated that information out.
4      Q.   And when did those occur?
5      A.   One was last Thursday
6  afternoon, and the other one was Monday of
7  this week.
8      Q.   The meeting on Thursday
9  afternoon, how long did that last?
10     A.   That was about two hours.
11     Q.   And who was present at that
12 meeting?
13     A.   Walmart counsel and Jones Day.
14     Q.   And by "Walmart counsel," you
15 mean Walmart in-house counsel?
16     A.   Yes.
17     Q.   How many -- how many Walmart
18 in-house counsel were present?
19     A.   Two that I recall.
20     Q.   Okay. And do you recall their
21 names?
22     A.   One was Jennifer, present here.
23 And I don't recall the other attorney that
24 was there.
25     Q.   That's okay.

Page 13

1          Sometimes we're faceless in
2  this profession.
3          The meeting on Monday, how long
4  did that go for?
5      A.   That was about an hour.
6      Q.   Okay. And who was present at
7  that meeting?
8      A.   It was the same as Thursday,
9  that I recall.
10     Q.   And so in those two meetings,
11 no one other than Walmart in-house counsel
12 and the attorneys from Jones Day were
13 present?
14     A.   Correct.
15     Q.   In either of those meetings,
16 did you review documents?
17     A.   Not specifically that I recall
18 for this. Not that I recall specific to this
19 deposition.
20         Some of the documents that I --
21 that I reviewed for the corporate deposition
22 were -- were -- involved me. And so the
23 things that I had personal knowledge of, we
24 didn't review in that preparation.
25     Q.   Okay. Understood.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1      But you did review documents in
2  preparation for your testimony in your
3  personal capacity?
4      MS. TABACCHI:  Object to the
5  form.
6      THE WITNESS:  No.  In the
7  preparation for the corporate
8  deposition, there were documents that
9  I reviewed that were from my personal
10  knowledge and my work history.
11      What I don't recall is pulling
12  out additional documents that weren't
13  part of the overall preparation for my
14  corporate deposition.
15      Q.   (BY MR. INNES) I think I'm
16  getting a better understanding.  You reviewed
17  documents for your 30(b)(6) testimony?
18      A.   Correct.
19      Q.   But there's no documents
20  outside of those documents that you used in
21  preparation for your fact preparation; is
22  that right?
23      A.   Correct.
24      Q.   And by "fact preparation," I
25  mean individual.

Page 15

1      A.   Individually, yes.
2      Q.   In preparation for today's
3  testimony, did you review any deposition
4  transcripts in this case?
5      A.   Not for this individual.  I did
6  review depositions for the corporate
7  deposition that I gave, not in my individual
8  capacity.
9      Q.   Thank you for giving me that
10  precise answer.  I appreciate that.
11      Did you review any court
12  documents in preparation for today?
13      A.   It would be the same answer.
14  For my corporate deposition I did.  Not in
15  the capacity of this individual deposition.
16      Q.   In preparation for today, did
17  you look at any of your own personal files?
18      A.   No.
19      Q.   Did you look at any documents
20  outside the presence of counsel in
21  preparation for today?
22      A.   No.
23      Q.   Prior to today, did you speak
24  with any representative of any other
25  defendant in this litigation?

Page 16

1      MS. TABACCHI:  Object to the
2  form.  That's just kind of a broad
3  question, Mike.
4      MR. INNES:  Yeah.  Sorry.
5      Q.   (BY MR. INNES)  In preparation
6  for today, did you speak with any
7  representative of any defendant in this
8  litigation?
9      A.   No.
10      Q.   Other than the counsel that
11  you've identified in those two meetings, did
12  you speak with anyone else prior to your
13  deposition today regarding the testimony
14  you're about to provide?
15      A.   Not in my individual capacity.
16  There were -- there were other Walmart
17  attorneys that were present for some of the
18  other preparation that I did.  But there
19  was -- there was nothing outside of
20  preparation with counsel.
21      Q.   So no conversations in
22  preparation for today with persons other than
23  counsel?
24      A.   For today, correct.
25      Q.   Okay.

Page 17

1      A.   For today, correct.
2      Q.   So you didn't speak to a
3  colleague about the testimony you're about to
4  give?
5      A.   No.
6      Q.   You didn't speak to a friend?
7      A.   No.
8      Q.   You didn't speak to a former
9  colleague?
10      A.   No.
11      So the reason I'm hesitating is
12  I'm trying to sort out ...
13      I did, for the corporate
14  deposition, interview current and former
15  associates, but that was for the corporate,
16  not for my individual.  And all of those
17  interviews were in the presence of counsel.
18      Q.   Are you familiar with the term
19  "Just Culture"?
20      A.   Yes.
21      Q.   What is your understanding of
22  the term "Just Culture"?
23      A.   Just Culture is an approach
24  that looks at ways to improve processes
25  without punishing someone who might have been

Page 18

1  involved in an erring process or procedure.
2  So it encourages transparency for the purpose
3  of continuous quality improvement.
4      Q.    When did you first become
5  familiar with the Just Culture approach, as
6  you understand it today?
7      A.    I think the first time I heard
8  Just Culture was sometime in the 2010, 2011
9  time period, when I was working in a role
10  that -- I was working collaboratively with
11  another compliance partner on our quality
12  improvement, quality assurance program.
13      Q.    And what was your title at the
14  time -- the time period you just described,
15  the 2010 to 2011 time period?
16      A.    Senior director for regulatory
17  affairs.
18      Q.    Who first brought the -- who
19  introduced you to the term "Just Culture"?
20      A.    Paula Barton was senior
21  director for operations compliance.
22      Q.    Did you see any -- during that
23  time period, did you receive any materials
24  related to this Just Culture approach?
25          MS. TABACCHI:  Object to the

Page 19

1      form.
2          THE WITNESS:  Yes.
3      Q.    (BY MR. INNES)  Can you
4  describe those materials?
5      A.    There's a book by David Marx,
6  who's a Just Culture expert, that was
7  provided to me.
8      Q.    And who provided you with the
9  book by Mr. Marx?
10      A.    Paula Barton.
11      Q.    Did you read that book?
12      A.    Yes.
13      Q.    Did Ms. Barton ask you to read
14  that book?
15      A.    She gave it to me to read.  As
16  we were -- it was an interest that I had, so
17  she provided it and I read it.
18      Q.    And did Ms. Barton provide that
19  to you in her capacity as a Walmart employee?
20  Or as a gift from a friend?
21          MS. TABACCHI:  Object to the
22      form.
23          THE WITNESS:  It was a Walmart
24      interaction.
25      Q.    (BY MR. INNES)  Did other folks

Page 20

1  at Walmart also receive copies of the
2  David Marx book?
3          MS. TABACCHI:  Object to the
4      form.
5      Q.    (BY MR. INNES)  To your
6  knowledge?
7      A.    Yes.  We've used that book over
8  time as a -- as part of our quality
9  improvement program.
10      Q.    Following -- I believe you
11  testified that you actually -- you did read
12  the David Marx book after it was given to you
13  by Ms. Barton; is that right?
14      A.    Yes.
15      Q.    And did you have conversations
16  with Walmart employees regarding Mr. Marx's
17  book after you read it?
18      A.    Yes.
19      Q.    And in what -- what was the
20  nature of those conversations?
21      A.    We were looking at making
22  changes to our then quality assurance program
23  that would incorporate tenets of
24  Just Culture.
25      Q.    And can you expound upon what

Page 21

1  the quality assurance program was at that
2  time?
3      A.    Yes.  Quality assurance at
4  Walmart related to the process by which our
5  pharmacists fill prescriptions to ensure that
6  the prescription is filled accurately.
7      Q.    Is it fair to say quality
8  assurance at that time was limited to
9  accurate dispensing?
10      A.    Yes.
11      Q.    Quality assurance had -- at
12  that period of time had no other meaning to
13  you at Walmart?
14          MS. TABACCHI:  Object --
15      Q.    (BY MR. INNES)  Other than
16  quality, accuracy of dispensing?
17          MS. TABACCHI:  Object to the
18      form.
19          THE WITNESS:  The way that we
20      looked at quality assurance was from
21      an operating procedure for the
22      accurate dispensing of prescriptions.
23      Q.    (BY MR. INNES)  Can you
24  describe to me how Just Culture and
25  Mr. Marx's text were applied to the accurate

Page 22

1 dispensing by Walmart?
2        MS. TABACCHI:  Object to the
3 form.
4        THE WITNESS:  Yes.  The quality
5 assurance program in place for nearly
6 20 years at Walmart was a very
7 punitive program so that as
8 prescription processing issues were
9 raised, our pharmacists were held
10 accountable for those -- for raising
11 their hand and saying that they had
12 had a dispensing error, or they had
13 reported some process issue in
14 their -- in filling prescriptions.
15        And so we were looking at
16 Just Culture alongside a program --
17 Just Culture came out of the Institute
18 of Medicine "To Err is Human" report
19 from the late 1990s.  And we were
20 looking at a way to bring additional
21 transparency to our accuracy program
22 so that -- so that we could improve
23 the processes and have additional
24 visibility, not punish our pharmacist
25 for raising their hand and reporting

Page 23

1 an issue as it related to filling
2 prescriptions.
3        Q.    (BY MR. INNES) Okay.  How
4 would a pharmacist who -- well, strike that.
5        When you say a pharmacist would
6 raise their hand, what do you mean by that?
7        A.    Report -- we had a requirement
8 to report a prescription error.  If they
9 didn't report, they could be terminated.
10 When they did report, we would track that
11 information.  We would retrain them.
12        But raising their hand was
13 filing a report, basically.
14        Q.    And you said it was -- I think
15 you said it was an error report?
16        A.    Yes.
17        Q.    What would be considered an
18 error?
19        A.    A checkout error.  There were a
20 multitude of categories.  It could be a
21 quantity error.  It could be an error by the
22 prescriber.  We didn't hold our pharmacists
23 responsible for that, obviously.
24        It could be the strength on the
25 prescription was not accurate.  It was a

Page 24

1 category of standard operating procedures
2 through the filling process that we would
3 track if the prescription wasn't dispensed
4 exactly as it was intended.
5        Q.    As part of that, would -- I
6 just want to make sure we're talking about
7 the right period of time.  This is pre-2010
8 that we're discussing now; right?
9        MS. TABACCHI:  Object to the
10 form.
11        THE WITNESS:  This is -- this
12 is a period that spanned from about
13 1993 to the changes that were
14 implemented in 2015.
15        Q.    (BY MR. INNES) So would a --
16 would a pharmacist raise their hand, in your
17 terminology, if -- or would it be proper for
18 a Walmart pharmacist to raise their hand, in
19 your terminology, if they're presented with a
20 script that -- for a Schedule II opioid that
21 appeared to have been written for an improper
22 purpose?
23        MS. TABACCHI:  Object to the
24 form.
25        THE WITNESS:  That type of

Page 25

1 communication wasn't part of the
2 quality assurance program that I've
3 been discussing.
4        Q.    (BY MR. INNES) Okay.  So it's
5 my understanding, based on the testimony and
6 documents in the case, that Walmart
7 pharmacists, for a period of time, at least
8 in this '93 to 2015 period were provided
9 training as to how to identify an order -- or
10 a script for a Schedule II narcotic that may
11 not have been written for a medically
12 necessary purpose?
13        MS. TABACCHI:  Object to the
14 form.
15        THE WITNESS:  No.  That's --
16 that wasn't the -- I'm not following,
17 but I don't think that was the -- as
18 you've described, it was the intent or
19 the way that our program worked.
20        Q.    (BY MR. INNES) Which program
21 are you referring to?
22        A.    The quality assurance program?
23        Q.    Okay.  So outside -- so let me
24 break this down.
25        So if, for example, a -- would

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 you agree that a script that was written for
2 a Schedule II narcotic, say, for example,
3 oxycodone, along with another script that was
4 presented by that same patient for
5 benzodiazepine, would that be something that
6 a pharmacist would want to investigate
7 further?
8         MS. TABACCHI:  Object to the
9 form.
10        THE WITNESS:  I think it would
11 depend on the circumstance and the
12 information that that individual
13 pharmacist had available.
14        There would have to be
15 additional information that I would
16 need to be able to assess dose,
17 duration.  I mean, there's a lot of
18 information that goes into how a
19 pharmacist would assess
20 appropriateness of a prescription.
21    Q.    (BY MR. INNES)  And were
22 Walmart pharmacists trained to assess the
23 appropriateness of a prescription?
24        MS. TABACCHI:  Object to the
25 form.

Page 27

1        THE WITNESS:  I think that's
2 inherent in a pharmacist's education.
3    Q.    (BY MR. INNES)  Do you know
4 that to be the case?  That that's inherent in
5 a pharmacist's education?
6        MS. TABACCHI:  Object to the
7 form.
8        THE WITNESS:  I know that in my
9 personal case, that I've been trained
10 to assess the appropriateness of
11 prescriptions and dosing.  That's --
12 as a pharmacist, that's what I would
13 do.
14    Q.    (BY MR. INNES)  And if a -- but
15 assessing the appropriateness of a
16 prescription and dosing falls outside of this
17 raising your hand definition you gave me
18 earlier; is that right?
19        MS. TABACCHI:  Object to the
20 form.
21        THE WITNESS:  So one of -- one
22 of the categories that could be --
23 could be reported would be something
24 that we called drug utilization review
25 if a dose was high.  And it's -- drug

Page 28

1 utilization review encompasses just a
2 wide variety of clinical review that
3 the pharmacist would perform.  Within
4 that program, an example of that, of
5 how a drug utilization review could be
6 reported is if they missed an allergy.
7 If there was an allergy to the drug
8 that was dispensed and the pharmacist
9 somehow missed that allergy with a
10 patient, that would be an example of
11 the quality assurance report that
12 could be made.
13    Q.    (BY MR. INNES)  Can you think
14 of an example that a quality assurance could
15 be made as it involves -- involving a
16 Schedule II narcotic?
17        MS. TABACCHI:  Object to the
18 form.
19        THE WITNESS:  If there was an
20 error in the dispensing of that
21 prescription, that would be
22 reportable.
23    Q.    (BY MR. INNES)  And what would
24 an error in dispensing be in that case?
25    A.    It would be the same as a

Page 29

1 non-controlled prescription.  If they somehow
2 got the strength wrong, the directions were
3 inaccurate, that would be reportable within
4 the quality assurance program.
5    Q.    And I want to circle back to --
6 a couple of times you've used the word
7 "punitive."
8        What was the nature of the
9 punitive -- why do you use the word
10 "punitive" in the context of quality
11 assurance?
12    A.    The reason that I use that word
13 is we had a very extensive training program
14 within our quality assurance program, and
15 what that involved was at a certain point, if
16 a pharmacist had a certain number of reports
17 accumulated, we would bring them to
18 Bentonville for a -- it was a three-day
19 training session around our process and
20 helping them to orient within the quality
21 assurance program.  And that training was
22 seen as very punitive.  People did not want
23 to be pulled out of their pharmacy and come
24 to Bentonville for this extensive training
25 program.

Highly Confidential – Subject to Further Confidentiality Review

Page 30

1  Q.   Were they paid for their time
2  in Bentonville?
3  A.   Yes.
4  Q.   So the punitive nature was the
5  travel to Bentonville and being away from
6  home for three days?
7  A.   I think it would be -- some of
8  them were professionally embarrassed that
9  they would be brought to Bentonville.
10  Q.   Okay.  And then you mentioned
11  that, I believe, that at some point a
12  pharmacist could be fired for failure to
13  adhere to quality assurance; is that right?
14  A.   That is correct.
15  Q.   And as I understand it, this
16  Just Culture approach and concept was to move
17  away from a more punitive system to something
18  kinder and gentler?  Is that fair?
19  MS. TABACCHI:  Object to the
20  form.
21  THE WITNESS:  So the -- what we
22  implemented through the Just Culture
23  was a different type of follow-up on
24  the reports that were being made.
25  Still, if a pharmacist fails to report

Page 31

1  a prescription error, they can be
2  terminated, but the -- what we did is
3  we took the training that was kind of
4  at the end of the process and moved it
5  to the beginning, which is one of the
6  tenets of Just Culture, to say -- we
7  didn't wait for an accumulation of
8  reports.  We retrained our entire
9  staff and continued to work.  At the
10  point of which a report comes in,
11  there's extensive refocus, retraining
12  that occurs at that point instead of
13  waiting for an accumulation and then
14  terminating someone.
15  Q.   (BY MR. INNES)  So as I
16  understood, prior to the Just Culture program
17  being implemented, there would be, after an
18  accumulation of errors, the pharmacist was
19  summoned to Bentonville to undergo training;
20  is that right?
21  A.   It was a retraining.
22  Q.   A retraining.  Okay.  And after
23  the rollout of Just Culture, if there was a
24  single error, that pharmacist was summoned to
25  Bentonville?

Page 32

1  MS. TABACCHI:  Object to the
2  form.
3  THE WITNESS:  No.
4  MR. INNES:  Okay.
5  THE WITNESS:  The -- the
6  directed training -- we don't bring
7  them to Bentonville anymore.
8  Q.   (BY MR. INNES)  All right.
9  Okay.  So the punitive nature of being
10  brought to Bentonville was taken out by
11  Just Culture; right?
12  A.   Yes.
13  Q.   Okay.
14  A.   That process that was at the
15  end of the -- kind of at the end of the
16  process.
17  Q.   And the punitive nature prior
18  to Just Culture was this mark on their -- on
19  their reputation, I suppose?
20  A.   That was one of them.  It was
21  being flagged as needing retraining as a
22  pharmacist in this process.  And then it was
23  also the possibility that they could be
24  terminated if they didn't improve on that
25  performance.

Page 33

1  Q.   So how did either the -- I'm
2  just trying to figure out how either of those
3  were removed when you rolled out
4  Just Culture.
5  Don't both those two -- those
6  two punitive results, as you described them,
7  still exist under the Just Culture?
8  A.   No.  No.  They do not.
9  The idea of -- of waiting until
10  a problem surfaces and then addressing it is
11  not a Just Culture.  So today, what happens
12  is if they report the -- when they report an
13  issue, we -- the -- we immediately look at
14  the circumstances of the report and then
15  provide them with training on that specific
16  piece of the process so that they're
17  reoriented to -- to prevent the possibility
18  on the front side.
19  In the past, we would -- they
20  would develop a plan of action, but that plan
21  of action was their own focus.  We -- the
22  quality improvement team didn't insert
23  themselves into the process for training as
24  early in the process as we do today.
25  Q.   So I want to sort of take this

Page 34

1  from the top.
2        How does a -- how does one go
3  about reporting a prescription error?
4      A.    We have a system -- a reporting
5  system.
6      Q.    And who reports a prescription
7  error?
8        MS. TABACCHI:  Object to the
9  form.
10       THE WITNESS:  The policy is
11  that the discovering pharmacist
12  reports.
13     Q.    (BY MR. INNES)  How does a
14  pharmacist discover an error?
15       MS. TABACCHI:  Object to the
16  form.
17       THE WITNESS:  It could be
18  through their own review of a
19  prescription.  They often report what
20  we call a near miss, something that
21  they caught in their -- in their
22  review of prescriptions.
23       It could be a customer that
24  comes back, raises an issue to them,
25  and those are reported.

Page 35

1        There are a variety of ways
2  that they could be made aware of an
3  error.
4      Q.    (BY MR. INNES)  Okay.  So is it
5  a self-reporting concept?
6      A.    It is self-reporting.
7      Q.    So do other pharmacists have
8  oversight over another pharmacist?  Where
9  they'd be reviewing prescriptions that were
10  filled for error?
11       MS. TABACCHI:  Object to the
12  form.
13       THE WITNESS:  Our standard
14  operating procedure, which is the
15  process by which we fill
16  prescriptions, is -- the easiest way
17  to describe it is it's a, kind of team
18  filling.  And so there are specific
19  reviews that occur throughout the
20  process of filling a prescription to
21  ensure accurate filling.
22     Q.    (BY MR. INNES)  What incentive
23  does a pharmacist have to report his or her
24  own filling error?
25       MS. TABACCHI:  Object to the

Page 36

1  form.
2        THE WITNESS:  It's our policy.
3        It's our policy to report.
4      Q.    (BY MR. INNES)  And it's a
5  self-reporting function; is that right?
6      A.    Yes.
7      Q.    So if a pharmacist doesn't
8  report a filling error on him or herself, how
9  is Walmart aware of the filling error?
10     A.    So at the point at which we
11  become aware of it, that pharmacist could be
12  terminated.  The policy is such that if an
13  error is discovered and it's not reported,
14  the non-reporting pharmacist can be
15  terminated.
16     Q.    All right.  So now maybe we're
17  getting somewhere.
18       So how could an error that was
19  not reported be discovered?
20     A.    It could be other staff members
21  that are aware.  It could be the
22  pharmacist -- it could be that a patient
23  raises it to someone else.
24       That's typically how a
25  non-reported error is surfaced.

Page 37

1      Q.    Okay.  And the responsibility
2  to report a filling error is inherent in the
3  pharmacist's responsibilities; is that right?
4        MS. TABACCHI:  Object to the
5  form.
6        THE WITNESS:  It's in Walmart's
7  policy.
8      Q.    (BY MR. INNES)  Absent
9  Walmart's policies, would a pharmacist have a
10  duty to report a filling error?
11       MS. TABACCHI:  Object to the
12  form.
13       THE WITNESS:  I'm not sure I
14  know, because it -- the reporting
15  requirement is Walmart -- is part of
16  Walmart's quality improvement program.
17       I don't know where they'd
18  report if it wasn't -- if we didn't
19  provide the means by which they could
20  report.
21     Q.    (BY MR. INNES)  Okay.  So an
22  unreported error could be discovered through
23  either a patient coming in and raising the
24  issue.  That's one way; right?
25     A.    Yes.

Page 38

1  Q.   Another way is another staff
2  member, someone other than the pharmacist
3  filling the order could discover the error
4  and report it.
5       MS. TABACCHI:  Object to the
6  form.
7       THE WITNESS:  Yes.
8  Q.   (BY MR. INNES)  And how would
9  another staff member go about determining
10 whether or not there was a filling error by
11 another pharmacist?
12 A.   Just in the course of, you
13 know, working.  There could be a mention by
14 another staff member.  It might be depending
15 on what the -- you know, what the
16 circumstances were.  There might be some
17 inventory adjustment that's made.  It would
18 just be something that occurs in the course
19 of business that raises the incident to the
20 attention of another pharmacist.
21 Q.   So there's a -- other than
22 those two avenues to identify a filling error
23 by a pharmacist, other than by the
24 pharmacist's own person, is there anything
25 else in Walmart's policies where you could

Page 39

1  discover a filling error?
2       MS. TABACCHI:  Object to the
3  form.
4       THE WITNESS:  Not that -- not
5  that I'm thinking of.
6       There may be, but not that I'm
7  thinking of at the moment.
8       Those are the ones that come to
9  mind specific to the pharmacy.
10 Q.   (BY MR. INNES)  There's no home
11 office audit of pharmacists' fillings of
12 prescriptions?
13      MS. TABACCHI:  Object to the
14 form.
15      THE WITNESS:  Our pharmacists
16 and the quality improvement program
17 participate and report errors to our
18 patient safety organization.  Those
19 reports are patient safety work
20 product and therefore they are
21 privileged.  So the work of the PSO is
22 protected by privilege.
23 Q.   (BY MR. INNES)  What privilege
24 are you referring to?
25 A.   It's a privilege afforded

Page 40

1  through the Patient Safety and Quality
2  Improvement Act.
3  Q.   Did Walmart do any -- so the
4  Just Culture program -- after the
5  Just Culture program was in effect, did
6  Walmart do any audits or analysis to judge
7  its effectiveness?
8       MS. TABACCHI:  Object to the
9  form.
10      THE WITNESS:  So again,
11 Just Culture was implemented when we
12 established the patient safety
13 organization and began reporting.  So
14 any analysis that was performed would
15 be protected as patient safety work
16 product.
17 Q.   (BY MR. INNES)  Pursuant to the
18 Patient Safety and Quality Improvement Act --
19 A.   Yeah.
20 Q.   -- that's your understanding?
21 A.   Yes.
22 Q.   Any other privileges that would
23 apply to that that you're aware of?
24      MS. TABACCHI:  Object to the
25 form.

Page 41

1       THE WITNESS:  Work that's
2  conducted within the PSO is often
3  attorney-client privilege, but the
4  stand-alone privilege for patient
5  safety work product is afforded by the
6  Act.
7  Q.   (BY MR. INNES)  Okay.
8  A.   And there's a patient safety
9  rule as well.
10 Q.   So is that -- at bottom, is it
11 fair to say that the Just Culture program is
12 aimed at ensuring safe business practices
13 balanced with individual employee
14 accountability?
15      MS. TABACCHI:  Object to the
16 form.
17      THE WITNESS:  I think that's a
18 fair way to summarize.
19 Q.   (BY MR. INNES)  Okay.  Are you
20 aware of any other place of Walmart's
21 business where a Just Culture was applied?
22      MS. TABACCHI:  Object to the
23 form.
24      THE WITNESS:  Not under the
25 kind of term of art of Just Culture.

Page 42

1   I think our overall culture which
2   incorporates beliefs around respect
3   for the individual and understanding
4   circumstances. There's an element of
5   Just Culture that really is embedded
6   in Walmart's overall culture, but it's
7   not to the tenets of Just Culture as
8   described in, for example, the Marx
9   work that I referenced earlier.
10      Q.   (BY MR. INNES) What's your --
11  can you articulate what the tenets of
12  Mr. Marx's understanding of Just Culture are?
13      MS. TABACCHI: Object to the
14  form.
15      THE WITNESS: Yes. So it's,
16  first and foremost, that if you punish
17  people for coming forward, that
18  because people are human, they make
19  choices, and so you have to manage to
20  the choices that people make.
21      It incorporates human factor
22  engineering. It describes specific
23  levels of human behavior that include
24  human error; at-risk behavior, which
25  is where the choice comes in; and then

Page 43

1   what I will describe from the -- from
2   the Just Culture approach, blatant
3   disregard, or -- blatant disregard for
4   harm to others.
5       And so those choices are based
6   on the values of the individual that's
7   involved in the choice that they're
8   making.
9       Q.   (BY MR. INNES) What's human
10  factor engineering?
11      A.   It -- what it describes is, as
12  you're designing systems, that you have to
13  factor into the design that humans are
14  involved in the process, and that they will
15  make choices. So where -- where you can
16  insert a force function that takes out the
17  opportunity to choose, to get a consistent
18  outcome, that's kind of the desire of human
19  factor engineering.
20      It's really related to systems
21  and process development.
22      Q.   Systems and process development
23  that would remove -- or that establish force
24  functions to remove human choice?
25      A.   Where possible.

Page 44

1       Q.   Where possible?
2       A.   Yes.
3       Q.   And why the desire to remove
4   human choice where possible?
5       A.   So it -- what -- again, as
6   you -- as it refers to Just Culture and human
7   choice, some -- there are times when a --
8   I'll -- let me explain it this way.
9       So from a human error
10  perspective, the -- like the easiest example
11  is, I'm driving my car. I'm speeding. I
12  don't realize that the speed limit has
13  changed; and therefore, it's like human -- I
14  didn't -- it's human error. I didn't realize
15  that the speed limit changed, and I had no
16  intent to speed.
17      The next behavior that is --
18  that -- the kind of at-risk behavior is, I'm
19  driving. I know that the speed limit is 70,
20  but I think I can go 72. I don't see the
21  risk in doing that, but I've made that choice
22  and that's the way I'm going to act.
23      The reckless behavior in that
24  scenario would be, I'm going 72 in a school
25  zone. I mean, that's -- I mean, that's a

Page 45

1   reckless behavior. And so that's kind of the
2   everyday analysis of human behavior and how
3   humans make choices. And we all do it every
4   day in everything that we do.
5       Q.   So I think you described three
6   categories there. Right? It's, I don't know
7   the speed limit. I know the speed limit, but
8   I'm -- I can exceed it by some margin, and
9   then the third is, I know the speed limit and
10  I don't have any regard for the consequences.
11  That's the reckless one; is that right?
12      A.   That's the example.
13      Q.   Okay. Those are three distinct
14  examples. Okay.
15      All right. Let's pull back a
16  little bit out of Just Culture. We might get
17  back there at some point today.
18      Can you describe for me your
19  education following high school?
20      Start chronologically up until
21  I think you obtained your MBA relatively
22  recently.
23      So -- and then we're going to
24  cover some ground.
25      But let's start with college.

Page 46

1    A.    My formal education, I attended
2  undergraduate at the University of Nebraska
3  Lincoln for pre-pharmacy.
4           I then attended pharmacy school
5  at the University of Nebraska Medical Center,
6  where I obtained a PharmD in 1986.
7           And then I completed my MBA in
8  2013 through Harding University.
9    Q.    When did you graduate from
10 undergrad?
11   A.    I did two years of undergrad.
12   Q.    Okay.
13   A.    And then entered pharmacy
14 school.
15   Q.    Did you obtain a degree in
16 those two years?
17   A.    No.
18   Q.    And I think you said PharmD.
19 Can you describe for me what the PharmD
20 degree is?
21   A.    It's a doctor of pharmacy
22 degree.
23   Q.    Did you have any particular
24 focus in your doctor of pharmacy studies?
25   A.    Pharmacy.

Page 47

1    Q.    Right.  Within the category of
2  pharmacy, did you have a focus on, say, a
3  particular category of drugs?
4    A.    No.  It was a broad-based
5  education to -- PharmD at that time, Nebraska
6  was one of only eight colleges of pharmacy
7  that was PharmD only.  And so that's why it's
8  my original degree.  It was a more clinically
9  focused degree at that time.  The prior
10 degree was bachelor of pharmacy.
11          So we spent an additional year
12 in clinical rotations, but they were
13 broad-based, including hospital, community,
14 geriatrics, psychi -- we had a psychiatry
15 rotation.  But the PharmD was intended to be
16 more clinically based than the previous
17 degree.  And today PharmD is the degree.
18 It's the only degree.  It's evolved over time
19 that you can't earn a bachelor's degree
20 anymore.  Everyone's PharmD.
21   Q.    Did you ever have a clinical
22 rotation through a practice focused on pain
23 management?
24          MS. TABACCHI:  Object to the
25    form.

Page 48

1           THE WITNESS:  Not specific to
2  pain management.
3           I had rotations that would have
4  involved pain medications, but not
5  specific to pain management.
6    Q.    (BY MR. INNES)  Okay.  During
7  those rotations, did you have opportunity to
8  work with or -- and/or study opioid products?
9           MS. TABACCHI:  Object to the
10   form.
11          THE WITNESS:  I would have
12   studied opioid products as part of the
13   curriculum.
14   Q.    (BY MR. INNES)  Okay.  Did you
15 take a -- was that a specific class part of
16 your curriculum?
17   A.    It would have been part of
18 pharmacology classes that I took, and it
19 likely would have been part of a therapeutics
20 course that was part of the curriculum.
21   Q.    Can you describe why you
22 believe it would have been part of a
23 therapeutics course?
24   A.    We did different disease state
25 modules through the therapeutics course

Page 49

1  which covered all the drugs -- or the
2  majority of the drugs that we would have
3  studied in pharmacology.  Pharmacology was
4  more kind of a basic sciences, and then
5  therapeutics was more of the clinical
6  application.
7    Q.    Okay.
8           In that -- those clinical
9  applications, you mentioned disease states.
10 Were opioids -- during those classes were
11 opioids discussed during a specific disease
12 state?
13   A.    I don't recall.
14   Q.    When you -- you also mentioned
15 that there was -- let's just bifurcate --
16 pharmacology and clinical.
17          In pharmacology, did you study
18 the effects of opioids on the human body?
19   A.    Pharmacology would have been
20 kind of the chemistry behind the compound,
21 how they work, where they work.  So that
22 would have -- it would have been
23 understanding the chemical structure of the
24 drug, and then the process by which they work
25 in the body.

Page 50

1    Q.    And did you come to understand
2  the chemical structure of opioids?
3        MS. TABACCHI:  Object to the
4  form.
5        THE WITNESS:  I believe it
6  would have been part of that course.
7    Q.    (BY MR. INNES)  Okay.  And then
8  in that course, did you also come to
9  understand the process by which opioids work
10 in the body?
11       MS. TABACCHI:  Object to the
12 form.
13       THE WITNESS:  I believe so.
14   Q.    (BY MR. INNES)  Okay.  Did you
15 study the differences between immediate
16 release and extended release tablets?
17   A.    I don't know if in 1980 --
18 well, that probably would have been 1984.  I
19 don't recall what formulations were
20 available.  I don't know if there were
21 extended release at that time.  I don't
22 recall that.
23   Q.    Okay.  Did you study -- strike
24 that.
25       As part of your studies for

Page 51

1  PharmD, did you receive any presentations or
2  courses from drug manufacturers?
3    A.    Not that I recall.  It would
4  have been university professors.
5    Q.    As part of your studies for
6  PharmD, did you take any classes specific to
7  the business of pharmacy?
8    A.    We had a pharmacy
9  administration class.
10   Q.    And what did that pharmacy
11 administration class cover generally?
12   A.    It was general business
13 operations, what -- probably is an equivalent
14 like an economics class but related to
15 pharmacy operation.
16   Q.    And by an "economics class,"
17 what do you mean by equivalent of an
18 economics class?
19   A.    It would be purchases and
20 finance of a pharmacy.  It was focused on
21 pharmacists who might want to open their own
22 business, be their own business owner.
23   Q.    So not macroeconomic theory or
24 something like that?
25   A.    Nothing that detailed.

Page 52

1    Q.    Following the degree you
2  obtained -- the PharmD degree you obtained --
3  strike that.
4        Let's go over the history of
5  your employment now.
6        Did you have a job while you
7  were in college?
8    A.    Yes.
9    Q.    Where was that?
10   A.    So two.  I worked at a local
11 pharmacy in Omaha, Nebraska.  We had a
12 requirement to gain experience hours on our
13 own, so I worked at a -- I was an intern at a
14 pharmacy in Omaha.
15       I also was a member of the
16 Nebraska National Guard.
17   Q.    Did you have any
18 responsibilities regarding -- any pharmacy
19 responsibilities during your service in the
20 Nebraska National Guard?
21   A.    No.
22   Q.    Following your graduation from
23 PharmD, or obtaining your PharmD, where were
24 you employed?
25   A.    I went on active duty in the

Page 53

1  Navy as a pharmacist.
2    Q.    Okay.  And how long were you on
3  active duty in the Navy?
4    A.    Three years.
5    Q.    And what were your
6  responsibilities as an active duty pharmacist
7  in the Navy?
8    A.    I was stationed at Naval
9  Hospital, Jacksonville, Florida.  I was the
10 inpatient pharmacist, so my responsibilities
11 included rounds with physicians.  We had a
12 family practice residency through the Navy,
13 so all Navy doctors that were in family
14 practice went through that residency.
15       So I did rounds with the
16 residents and with the attending.  I sat on
17 the pharmacy and therapeutics committee for
18 the hospital.  I checked carts.  I
19 compounded.  I made TPNs and chemo IVs.
20       And then I supplemented -- we
21 had an outpatient pharmacy that dispensed --
22 was very high-volume, so I also had duties,
23 when my inpatient responsibilities were
24 complete, to go help out in the outpatient
25 pharmacy.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    Q.    Okay.  In that role, did you
2  have occasion to dispense opioid products?
3    A.    Yes.
4    Q.    And do you recall specifically
5  what those conditions were that you were
6  treating with opioids at that time?
7         MS. TABACCHI:  Object to the
8    form.
9         THE WITNESS:  I don't.  We used
10   opioids inpatient for pain management
11   post surgery, and we dispensed
12   outpatient prescriptions that we
13   received.
14   Q.    (BY MR. INNES)  Outside of
15 postsurgical dispensing, did you -- do you
16 recall if you ever dispensed opioids to treat
17 chronic pain?
18        MS. TABACCHI:  Object to the
19   form.
20        THE WITNESS:  Not that I
21   recall.  The inpatient, we didn't --
22   the inpatient stay was limited, and so
23   I don't recall that.
24   Q.    (BY MR. INNES)  Okay.  I
25 believe you also -- maybe I misheard you, but

Page 55

1  I thought you said you had some outpatient
2  responsibilities as well?
3    A.    Yes.
4    Q.    Did those involve treatment of
5  chronic pain through dispensing of opioids?
6         MS. TABACCHI:  Object to the
7    form.
8         THE WITNESS:  We dispensed
9    opioids outpatient.  There were -- I
10   just -- I don't know -- I didn't
11   always know what the diagnosis was
12   that we were dispensing for.
13   Q.    (BY MR. INNES)  When did you
14 leave active duty in the Navy?
15   A.    1989.
16   Q.    And from there, where was your
17 next -- what was your next job?
18   A.    Walmart.
19   Q.    What was the first role you
20 held at Walmart?
21   A.    I was a part-time pharmacist.
22   Q.    And where was that?
23   A.    San Antonio, Texas.
24   Q.    How long were you a part-time
25 pharmacist in San Antonio Texas?

Page 56

1    A.    About six weeks.
2    Q.    Okay.  And following that
3  six-week stint in 1989 as a part-time
4  pharmacist, what was your next role at
5  Walmart?
6    A.    I was full-time.
7    Q.    Full-time.  Okay.  And how long
8  were you full time -- the full-time
9  pharmacist in San Antonio?
10   A.    About nine months.
11   Q.    And then what was your next
12 title?
13   A.    My husband was in the Navy, so
14 we transitioned to a new duty station.  And I
15 came to Florida as a staff pharmacist in the
16 Orlando area.
17   Q.    Also at a Walmart?
18   A.    Yes.  Let me check that.  That
19 is not true.  We went to Pensacola after
20 San Antonio.
21   Q.    Okay.
22   A.    And I was a staff pharmacist in
23 Pensacola.
24   Q.    At a Pensacola, Florida
25 Walmart?

Page 57

1    A.    Yes.
2    Q.    And what was your next job
3  after the Pensacola pharmacy?
4    A.    We were there about a year, and
5  we transferred again to Orlando, and I was a
6  staff pharmacist.
7    Q.    Okay.
8         And after Orlando?
9    A.    I was promoted to pharmacy
10 manager of Mount Dora, Florida Walmart around
11 1993 or '4.
12   Q.    Can you spell Mount Dora for
13 the benefit of the court reporter?
14   A.    M-O-U-N-T, D-O-R-A.
15   Q.    And after the new pharmacy
16 manager position at Mount Dora, what was your
17 next position?
18   A.    I was promoted to district
19 manager, still in Florida.
20   Q.    And what year was that?
21   A.    1998.
22   Q.    And what was your region of
23 coverage as a district manager?
24   A.    My first district was
25 largely -- it was south of -- it was south of

Page 58

1  Orlando, from Haines City to Sebring.
2      Q.    And you mentioned a first
3  district. Was there a second district that
4  you covered?
5      A.    I have had five different
6  districts over two years.
7      Q.    So maybe the best way to do
8  this is let's just go through district by
9  district and you can tell me the time period
10 that you covered it and the region that it
11 entailed. I realize this is 1998, so if you
12 don't recall, you don't recall.
13         So the first is south of
14 Orlando. And what period of time was that?
15     A.    It was 1998, for a short period
16 at a time -- we had a lot of realignments, so
17 my alignments changed. All of these were in
18 Florida, kind of in the Central Florida area.
19     Q.    Okay.
20     A.    The next one I believe I gained
21 responsibility more toward the East Coast, so
22 I had Melbourne, some of kind of the east
23 edge of Orlando area.
24     Q.    And I'm sorry, the first was --
25 was just a brief period of time in '98?

Page 59

1      A.    '98. Probably a little bit
2  into 19 -- early 1999.
3      Q.    And the second was?
4      A.    The second was -- would have
5  largely followed that, Melbourne. I had a --
6  I think I went up to Daytona, but it was east
7  of Orlando instead of south of Orlando. And
8  that would have been maybe six months that I
9  had that alignment.
10     Q.    Okay. And your third?
11     A.    My third was more kind of back
12 in the area that I came from. At one point I
13 supervised. So moving a little bit west. I
14 had Lakeland at one point over to Tampa.
15         I don't recall exactly how
16 these flowed, but just generally there were
17 multiple alignments over that period of time.
18     Q.    Okay. So I think we're on to
19 the fourth.
20     A.    Fourth I had -- I had Orlando.
21 I had areas in Orlando.
22     Q.    Portions of Orlando or all of
23 Orlando?
24     A.    I didn't have all of it. I had
25 kind of the -- again, the east side of

Page 60

1  Orlando, that I recall, east of I-4.
2      Q.    And your fifth region? Or
3  fifth district?
4      A.    I was a Sam's Club district
5  manager, and I had all of the Sam's Clubs in
6  the state of Florida.
7      Q.    And what time period was that?
8      A.    2001 to 2002. For a year.
9      Q.    And was that in addition to --
10 did you have any responsibilities for Walmart
11 stores?
12     A.    Not at that time.
13     Q.    Okay. So in 2001 to 2002, you
14 were responsible for all Sam's Clubs in
15 Walmart -- in Florida.
16     A.    In Florida.
17     Q.    And following your tenure as a
18 district manager for Sam's Clubs which ended
19 in 2002, what was your next position?
20     A.    I was promoted to regional
21 manager.
22     Q.    And what region were you
23 responsible for?
24     A.    I had their region that spanned
25 from East Texas to -- through Mobile. It

Page 61

1  included all of Louisiana and the southern
2  parts of Mississippi and Alabama.
3      Q.    Okay. And what years did you
4  hold that title?
5      A.    I was a regional for three
6  years. I had that single alignment for one
7  year.
8      Q.    Okay. What was the next
9  alignment you had?
10     A.    So I still had that area, but
11 due to some just kind of personnel changes, I
12 was also given responsibility for the region
13 that was South Texas.
14         So I had roughly -- still the
15 East Texas, Houston area that I had, but I
16 added Austin, all the way south into The
17 Valley.
18     Q.    For the benefit of us that
19 don't live in Texas, what is the valley?
20     A.    That's just the -- like what's
21 along the Mexican border is the way that we
22 referred to The Valley.
23     Q.    Did you have any other
24 alignments besides those two in the 2002-
25 2005 time period?

Page 62

1    A.    No.
2    Q.    What was your next position at
3  Walmart?
4    A.    In 2002, I was director of
5  professional services.
6    Q.    So in 2002, you're director of
7  professional services and also regional
8  manager?
9    A.    Oh, I'm sorry, did I say '2?  I
10 meant '5.  2005, I was director of
11 professional services.
12   Q.    What were your duties as
13 director of professional services?
14   A.    I had responsibility for Board
15 of Pharmacy issues, policies, as well as --
16 it was -- it was largely regulatory issues
17 around the practice of pharmacy for the
18 states that I was responsible for.
19   Q.    And what states were those?
20   A.    So through this time period
21 where I was a director, that alignment
22 changed as well.  And over the period of time
23 that I had state-specific responsibility, I
24 probably had every state at some point over
25 that time period.

Page 63

1         There were three of us when I
2  started.  There were -- at one point there
3  were two of us, so I had half the country at
4  any one time.  So it varied.
5    Q.    At any point in time do you
6  recall being the director -- having
7  responsibility for the state of Ohio?
8    A.    I don't remember specifically.
9  But again, because I think I had
10 responsibility at some point in time for
11 every state.  Ohio was never my, kind of,
12 principal area.  Mostly what I had was the
13 west.  But I do think there was a period of
14 time when there were two of us that I picked
15 up Ohio for a short period of time.
16   Q.    And would there be a way for us
17 to figure out what time period you covered
18 Ohio, if ever?
19   A.    I'm not sure how that -- I'm
20 not sure what that would be.
21   Q.    How long were you a director of
22 professional services?
23   A.    Until 2009.
24   Q.    Okay.  And you said you were
25 responsible for the Board of Pharmacy issues

Page 64

1  and policies.
2         What exactly does that entail?
3    A.    So the large part of my -- the
4  day-to-day, if -- if we were looking at a new
5  project, it would be my responsibility to
6  contact the board or, you know, research
7  pharmacy practice acts to see what a
8  requirement might be around the specific
9  project that we were working on so that we
10 could make sure we met the state
11 requirements.
12        I had responsibility for Board
13 of Pharmacy relations, so that if there was
14 an inspection or communication with the
15 board, I supported the pharmacists in my area
16 with those communications or with any
17 follow-up that was needed.
18        And then as it related to
19 anything that might have involved those
20 states or stores with filing a DEA 106.
21 Dispensing issues in those stores, that was
22 my responsibility as well.
23   Q.    Okay.
24        Do you recall any DEA 106
25 dispensing issues related to opioids during

Page 65

1  that time period?
2         MS. TABACCHI:  Object to the
3  form.
4         THE WITNESS:  I know we filed
5  DEA 106 reports of loss of controlled
6  substances during that time period.
7    Q.    (BY MR. INNES)  And do you
8  recall specific to opioids?
9    A.    Opioids would have been
10 reportable -- included in those reports.
11 They would have been included in some of the
12 reports we filed.
13   Q.    Okay.  I'm sorry, they could
14 have been or they would have been?
15   A.    They were.  But not all.
16 Without looking at the records, opioids were
17 reportable, and so they would have been
18 included in reports if there was a loss.
19   Q.    Okay.  And so I understand the
20 requirement of the 106, and your
21 understanding, I think, is correct that a 106
22 report could include an opioid if there was a
23 loss of them.
24        I'm wondering if you recall any
25 such incident that did -- that actually did

Page 66

1  involve an opioid.
2         MS. TABACCHI:  Object to the
3  form.
4         THE WITNESS:  Not specifically.
5  I know they were -- I know
6  there were some, but not specifics as
7  to an individual form that was filed.
8     Q.    (BY MR. INNES)  So you recall
9  there was, but you can't point to the exact
10 point in time when that happened?  Is that
11 fair?
12        MS. TABACCHI:  Object to the
13 form.
14        THE WITNESS:  Yes.
15    Q.    (BY MR. INNES)  Did you
16 represent any pharmacists in front of the
17 boards of pharmacy that you had
18 responsibility for regarding the dispensing
19 of opioids?
20    A.    So can you define "represent"?
21    Q.    Let's see.
22        You say you supported
23 pharmacists in your areas with communications
24 and any follow-up needed related to Board of
25 Pharmacy inspections or communications with

Page 67

1  the board.
2         Can you describe what you meant
3  by the support that you provided for
4  pharmacists?  As it related to opioids.
5         MS. TABACCHI:  Object to the
6  form.
7         THE WITNESS:  So -- so support,
8  in my prior testimony, what I meant by
9  support was -- and not --
10        So I'm not sure that I know a
11 specific time with opioids.  But had
12 there been an instance, what we --
13 what my role would have been to, was
14 to understand what the board was
15 asking for on an inspection.  You
16 know, what type of deficiency might be
17 noted.
18        We would help the pharmacist to
19 draft communication back to the --
20 back to the Board of Pharmacy, and
21 then we would make sure that if there
22 was -- if it was required, any plan of
23 action or any follow-up that they had
24 reported to the board was in place.
25        And so it was a -- it was a way

Page 68

1  to support them and help them in
2  responding to the board.
3     Q.    (BY MR. INNES)  Okay.  And as
4  you sit here today, you don't recall a
5  specific time where that might have involved
6  your support -- that your support was needed
7  related to opioid dispensing?
8         MS. TABACCHI:  Object to the
9  form.
10        THE WITNESS:  I don't
11 specifically recall related to
12 opioids.  I did -- I did appear with a
13 pharmacist, and on behalf of the
14 permit in front of the Texas Board of
15 Pharmacy around a DEA 106 loss.  But
16 my recollection was there was no
17 opioid involved.  There was a
18 controlled substance, but I don't
19 believe it was an opioid.
20    Q.    (BY MR. INNES)  What was the
21 outcome of that appearance?
22    A.    The pharmacy manager was not
23 sanctioned from that appearance.
24    Q.    So I believe we're at 2009.
25 What role did you have after the director of

Page 69

1  professional services?
2     A.    In 2009, I was a senior
3  director, regulatory affairs.  Regulatory
4  affairs was the new name for professional
5  services.
6     Q.    Okay.  Was that a title change?
7  Was there a functional change to your
8  day-to-day work?
9     A.    I was promoted in that 2009
10 title.
11    Q.    And what were your
12 responsibilities as senior director of
13 regulatory affairs at that time?
14    A.    I had responsibility for the
15 directors, the previous role that I had been
16 in.
17    Q.    Okay.
18    A.    As well as the licensing
19 function for our -- any license that a
20 pharmacy or distribution center held.
21    Q.    Okay.  Would that include DEA
22 registrations for distribution?
23    A.    Yes.
24    Q.    Okay.  So that would include
25 the licensing of -- or the registration of

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  the DC 6045?
2      A.    Yes.
3      Q.    How long did you hold that
4  title?
5      A.    In July of 2011, I was moved to
6  a role that was operations.  I was senior
7  director of compliance and quality assurance.
8      Q.    I just want to go back to the
9  prior role.  Do you recall the names of the
10  directors that you oversaw during that time
11  period?
12      A.    Yes.
13      MS. TABACCHI:  Object to the
14  form.
15      Q.    (BY MR. INNES)  During the time
16  period where you were the senior director of
17  regulatory affairs?
18      A.    Yes.
19      Q.    And what were their names?
20      A.    Tim Koch.  George Chapman.
21  Dadrion Gaston, and Debbie Mack.
22          And I also had Jennifer Summer
23  who was responsible for optical.
24      Q.    And you were -- your role
25  immediately prior was -- was the same level

Page 71

1  as Mr. Koch, Chapman, Gaston, and Mack; is
2  that right?
3      MS. TABACCHI:  Object to the
4  form.
5      THE WITNESS:  George wasn't in
6  role in 2009, but I was peers to
7  Debbie, Dadrion, and Tim.
8          And can I correct one thing?
9  Jennifer was not in role.  It was
10  Angie Muldoon at that time in the
11  optical role.
12      Q.    (BY MR. INNES)  What were your
13  responsibilities for the oversight of these
14  directors?
15      MS. TABACCHI:  Object to the
16  form.
17      THE WITNESS:  It was to -- I
18  had a broader role around policy and
19  programs, and then to make sure -- I
20  mean, I oversaw what they were doing.
21  If we -- if we had a project, again,
22  as I described, where I would go look
23  at my individual states, I would take
24  a look at that cumulative work as it
25  related to policy and how we could,

Page 72

1  from an overarching perspective, meet
2  the state requirements when we were
3  establishing overall policy on a
4  program.
5          I looked at reports, trends of
6  how they were interacting with
7  different agencies, boards of
8  pharmacy.  I had general supervisory
9  duties over them.
10      Q.    (BY MR. INNES)  When you say
11  looking at the cumulative work.  Is this --
12  tell me if I'm wrong, but these folks that
13  you were overseeing are in charge of
14  different regions; is that right?
15      A.    They had different alignment --
16  different state responsibilities by -- they
17  were assigned different areas of the country.
18      Q.    Okay.  I'll try to use Walmart
19  language.  So they were aligned with a
20  different -- with a -- each had an alignment
21  with a specific Board of Pharmacy.
22      A.    Yes.
23      MS. TABACCHI:  Object to the
24  form.
25      THE WITNESS:  A specific state.

Page 73

1      Q.    (BY MR. INNES)  A specific
2  state.  Okay.
3          And when you're looking at
4  cumulative work, are you looking at the
5  cumulative work across all states?  Is that
6  what you mean?
7      A.    What I was describing was where
8  my previous role had been, I'm responsible
9  for understanding my state and how -- how a
10  requirement might fit into a program.
11          In my alignment, when I was
12  promoted, I had to take their work
13  cumulatively across their areas of
14  responsibility, and then understand how that
15  worked for the entire organization.
16          So I no longer had individual
17  alignment.  I had to take their work in total
18  and apply it to our policies from an
19  overarching perspective.
20      Q.    So, say, for example, a Texas
21  Board of Pharmacy had a peculiar requirement.
22  You would make sure that that -- that
23  Walmart's overarching national policies could
24  fit that specific Texas policy?
25      MS. TABACCHI:  Object to the

Page 74

1 form.
2 Q. (BY MR. INNES) Is that a fair
3 understanding? Or ...
4 A. To make sure that we knew what
5 Texas requirements were. As we set our
6 overarching policy, did it meet that or did
7 we need to carve Texas out and have a
8 separate policy for Texas.
9 Q. During your tenure as senior
10 director of regulatory affairs, were there
11 any times in which you made adjustments to
12 the licensing of the facilities that were
13 distributing Schedule IIs?
14 MS. TABACCHI: Object to the
15 form.
16 THE WITNESS: Can you define
17 "adjustment"?
18 Q. (BY MR. INNES) Did you go
19 through an application process?
20 MS. TABACCHI: Object to the
21 form.
22 THE WITNESS: My team was
23 responsible for applications and
24 licenses. And so I don't know that we
25 made any new application. We would

Page 75

1 have gone through a relicensing or
2 reregistration process.
3 Q. (BY MR. INNES) And during that
4 time period, you would make sure that the
5 information that was required for those
6 licenses was accurate and up-to-date? Is
7 that fair?
8 MS. TABACCHI: Object to the
9 form.
10 THE WITNESS: I didn't -- I had
11 a team that was responsible for
12 licensing, and so they had a process.
13 If there was -- I didn't look at every
14 license or every application to -- I
15 didn't look at every form that we
16 submitted.
17 Q. (BY MR. INNES) If there was an
18 error on one of those forms, who would be
19 responsible for that error?
20 MS. TABACCHI: Object to the
21 form.
22 THE WITNESS: We had licensing
23 specialists that were responsible for
24 the accuracy of their work. They
25 reported to a licensing manager.

Page 76

1 So -- so accuracy was first at
2 the level of the specialist.
3 I don't know that we ever had a
4 significant -- I don't recall a
5 significant licensing issue, that I
6 can speak to.
7 Q. (BY MR. INNES) Yeah, to be
8 clear, I'm not trying to play gotcha. I'm
9 just trying to figure out what the chain of
10 command is for maintaining the license for --
11 and I'm going to be specific -- for 6045.
12 If a change was made or a form
13 was filled out to maintain that license,
14 whose ultimate responsibility was it for the
15 accuracy of that form?
16 MS. TABACCHI: Object to the
17 form.
18 THE WITNESS: The licensing
19 manager was responsible for the
20 accuracy of her work and the team's
21 work.
22 I guess ultimately they
23 reported to me. I mean, so they
24 reported to me.
25 MR. INNES: Okay. Thank you.

Page 77

1 So July 11th, you take over senior
2 director of compliance and quality
3 assurance. Is that right?
4 THE WITNESS: Yes.
5 Q. (BY MR. INNES) And how long
6 did you hold that title?
7 A. Seven months.
8 Q. And what were your
9 responsibilities --
10 A. Five months.
11 Q. Okay.
12 A. Five months.
13 Q. And what were your
14 responsibilities during that five-month time
15 period?
16 A. The role was more around
17 Walmart -- other compliance work, so where we
18 had practice of pharmacy in my regulatory
19 affairs work. This was things like HIPAA
20 compliance, billing compliance.
21 I also had -- that's when I
22 first picked up the quality assurance team.
23 Q. And this is around the time
24 period I think we were discussing
25 Just Culture; is that right?

Page 78

1   A.   Just Culture had been
2 introduced as a concept just prior to this
3 time, so around the 2010 time period.
4   Q.   Okay.
5   A.   Maybe early 2011.
6   Q.   Did you have any
7 responsibilities in this -- in that role at
8 that time regarding the Controlled Substances
9 Act?
10   MS. TABACCHI:  Object to the
11   form.
12   THE WITNESS:  The team
13   conducted -- so we had a -- the role
14   of this team was to ensure that we had
15   an effective compliance program.  And
16   part of that responsibility was
17   monitoring that was conducted.
18   So the team conducted or
19   coordinated audits of a statistical
20   number of pharmacies to ensure that
21   they were following our policies and
22   procedures related to security of the
23   pharmacy.  That I recall, that was the
24   extent of their involvement in
25   something that would touch controlled

Page 79

1 substances.
2   MS. TABACCHI:  Mike, whenever
3   you get to a good point for a break,
4   let me know.  I was trying to let you
5   get through the employment history,
6   but I'm not sure I'm going to make it.
7   So just at a good point for you.
8   MR. INNES:  Maybe we'll just
9   finish this role.
10   MS. TABACCHI:  Okay.  Sure.
11   MR. INNES:  It's a five-month
12   role, so maybe we can fly through it.
13   Q.   (BY MR. INNES)  And the
14 security of the pharmacies, is that -- that
15 involves physical security of the plant.  Is
16 that what you mean?
17   A.   Physical security.
18   They also -- some of the other
19 survey questions would be were they following
20 other policies that might touch on -- when I
21 think about security -- security of
22 controlled substances, that would be
23 included.
24   So as to a policy that related
25 to a controlled substance, they -- they may

Page 80

1 have audited that policy, compliance with
2 that policy.
3   Q.   Okay.  And could these policies
4 be like, for instance, logistics policies
5 related to the picking process and order
6 filling process?
7   MS. TABACCHI:  Object to the
8   form.
9   THE WITNESS:  No.  This was
10   specific to the pharmacy --
11   MR. INNES:  Okay.
12   THE WITNESS:  -- operations.
13   Q.   (BY MR. INNES)  So in that role
14 you had no responsibilities regarding the
15 distribution facilities themselves?
16   MS. TABACCHI:  Object to the
17   form.
18   THE WITNESS:  No.
19   Q.   (BY MR. INNES)  It's a bad
20 question.  These folks were doing -- the
21 folks that these --
22   Well, we can strike that.
23   In your role as senior director
24 of compliance and quality assurance, what
25 responsibilities, if any, did you have over

Page 81

1 DC 6045?
2   A.   None that I can recall.
3   MR. INNES:  Okay.  Let's go off
4   the record.  Take a short break.
5   THE VIDEOGRAPHER:  9:57.  We
6   are off the video record.
7   (Recess taken, 9:57 a.m. to
8   10:09 a.m.)
9   THE VIDEOGRAPHER:  10:09.  We
10   are on video record.
11   (Whereupon, Deposition Exhibit
12   Walmart-Hiland 1, 12-4-07 email from
13   Jimmie Sherl to Mike Mullin.  Subj:
14   DEA Scheduled Visit of DC 6045 120507.
15   WMT_MDL_000054021-54022, was marked
16   for identification.)
17   Q.   (BY MR. INNES)  Okay.
18 Ms. Hiland, we're back.  You've been handed
19 what's been marked as Exhibit 1.  I'll give
20 you a few minutes to review it.
21   When you're ready, let me know
22 but, for the record, let me read in the Bates
23 number.  It's a Walmart document beginning
24 with 54021 and ending in 54022.
25   [Document review.]

Page 82

1    Q.    (BY MR. INNES) All set?
2    A.    Yes.
3    Q.    Okay.  So when we broke, you
4  were talking about your role -- well --
5  between '05 and '09.  And -- I'm sorry, and I
6  don't believe that you said you had any
7  responsibility over DC 6045.  Is that right?
8         Between '05 and '09?
9    A.    Yes.
10   Q.    That's right?
11   A.    Direct responsibility.
12   Q.    Okay.
13        So this email that's marked as
14  Exhibit 1 is from Jimmie Sherl.  It's dated
15  December 4th, 2007.  Sent to Mike Mullin.
16  And you are copied along with Monty Mason.
17        The subject of the email is
18  "DEA scheduled visit of DC 6045, 120507.
19  Which, I think, based on this email, means
20  December 5th, 2007.
21        Why is it that you're getting
22  an email regarding a DEA scheduled visit to
23  DC 6045 in 2007, if you don't have
24  responsibility for DC 6045?
25        MS. TABACCHI:  Object to the

Page 83

1  form.
2         THE WITNESS:  So at this time,
3    to the best of my recollection, my
4    alignment likely included Arkansas.
5    And so where there was a regulatory
6    visit related to Arkansas, that may
7    have been the reason.  The other
8    reason I was -- while I was a peer to
9    the other directors, I was -- I had
10   been there the longest, so I was kind
11   of the de facto lead for the team.
12        We didn't have the senior
13   director role at that point, and so I
14   was the longest tenured director, and
15   so I would take the lead on certain
16   things.
17   Q.    (BY MR. INNES) Okay.  So sort
18  of the first among equals kind of thing?  Is
19  that how you describe that?
20        MS. TABACCHI:  Object to the
21   form.
22        MR. INNES:  I can strike that.
23   Q.    (BY MR. INNES)  In -- there was
24  no formal Walmart hierarchy that placed you
25  in a position to lead those folks.  This was

Page 84

1  more of an informal structure?
2    A.    That's the way that I recall
3  it.
4    Q.    I think we've provided you with
5  what was marked as the 30(b)(6) Exhibit 7.
6         So you'll recognize this from
7  yesterday.  It was the binder that my
8  colleague, Mr. Bower, went through quite a
9  bit.
10        I'm going to ask you to turn
11  to --
12        If you could go to tab 1.  The
13  first tab of the binder.
14        And let's turn all the way to
15  the page with the bullets on it we spent some
16  time on yesterday.
17        Okay.  So just want you to have
18  that as a reference for the next questions.
19        In 2007, there were no written
20  policies regarding the DC facility employees'
21  review of Schedule II orders.  Is that right?
22        MS. TABACCHI:  Object to the
23   form.  Lack of foundation.
24        THE WITNESS:  Not that I'm
25   aware of, no.

Page 85

1    Q.    (BY MR. INNES)  In fact, if you
2  look at 30(b)(6), Exhibit 7, tab 1, which are
3  the responses that were provided to
4  plaintiff's combined discovery requests, the
5  first bullet reads, "From as early as 1994
6  until 2010, employees in Walmart's pharmacy
7  distribution centers reviewed controlled drug
8  stock exception reports, followed up on
9  orders by speaking with pharmacists and
10  escalate issues to market and/or regional
11  leadership as needed to investigate orders
12  and/or resolve concerns."
13        Is that accurate?
14        MS. TABACCHI:  Object to the
15   form.
16        THE WITNESS:  Yes.
17   Q.    (BY MR. INNES)  You understand
18  that during that time period, that's an
19  accurate statement of Walmart's policy;
20  right?
21   A.    Yes.
22   Q.    I'll direct your attention to
23  the last bullet on the page.  "For the entire
24  relevant time period, employees in Walmart's
25  pharmacy distribution centers monitored

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  orders."
2      There's a parenthetical
3  citation after that.
4      So during this time period
5  where the DC associates were reviewing every
6  order that came in -- is that your
7  understanding at the time?
8      MS. TABACCHI: Object to the
9  form. Lack of foundation.
10     THE WITNESS: They were
11 reviewing orders and -- and looking --
12 monitoring orders for anything that
13 was out of the ordinary.
14     Q. (BY MR. INNES) And they were
15 reviewing orders for unusual size at that
16 time?
17     MS. TABACCHI: Same objections.
18     THE WITNESS: To the extent
19 that it was out of the ordinary, they
20 would be monitoring those orders.
21     Q. (BY MR. INNES) Would an order
22 of unusual frequency be out of the ordinary?
23     MS. TABACCHI: Same objections.
24     THE WITNESS: So again,
25 frequency was a little bit different

Page 87

1  in our scenario because of the way
2  that the ordering process occurred for
3  individual stores. They had access --
4  or the frequency issue would alert, in
5  this case, to orders outside of the
6  normal scheduled day of the week that
7  was set for that pharmacy, and they
8  had -- they had view to those.
9      Q. (BY MR. INNES) Okay. Turning
10 back to what's been marked as Exhibit 1,
11 Mr. Sherl writes to you and others saying
12 that, "In reviewing of and in preparation for
13 the upcoming DEA visit scheduled for
14 12-05-2007, I've compiled the following
15 information."
16     The second bullet point under
17 that sentence says, "We have shipped over
18 6,700,000 bottles of Schedule II narcotics in
19 443,000 cases to Walmart pharmacies during
20 the same time period."
21     The time period it's referring
22 to is the one year prior to this visit; is
23 that right?
24     MS. TABACCHI: Object to the
25 form. Lack of foundation.

Page 88

1      Q. (BY MR. INNES) I'm sorry, let
2  me strike that.
3      The first bullet under the
4  first full sentence says, "Since 12-01-2005
5  DC 6045 has filed 37 106s In-Transit Losses,
6  Concealed Vendor shortages, and Unaccounted
7  for shortages @ the DC."
8      Second bullet continues, "We
9  have shipped over 6,700,000 Bottles of
10 Schedule II narcotics in 443,000 cases to
11 Walmart Pharmacies during this same time
12 period."
13     Is it a fair reading that the
14 same time period is the -- since 12-1-2005
15 until on or about the writing of this email?
16     Is that your understanding of
17 the time period?
18     MS. TABACCHI: Object to the
19 form. Lack of foundation.
20     THE WITNESS: Based on the
21 information in this email, it looks
22 like Jimmie is referring to the time
23 period since 12-05.
24     Q. (BY MR. INNES) So in that
25 two-year time period, Walmart employees at

Page 89

1  the DC are reviewing orders for Schedule II
2  narcotics manually; is that right?
3      MS. TABACCHI: Same objections.
4      THE WITNESS: One of the
5  processes in place was for a review of
6  orders as they were being processed
7  through the distribution center. And
8  it was -- it was an observation as
9  they were conducting their work.
10     Q. (BY MR. INNES) And by
11 "observation," you mean an order form comes
12 in and then it is -- the DC associate reads
13 that order form, and that's the inspection?
14     THE WITNESS: That was --
15     MS. TABACCHI: Same objections.
16     THE WITNESS: That was one of
17 the processes, as well as those
18 associates that were in the vault
19 picking orders and their observation
20 through that picking process.
21     Q. (BY MR. INNES) Okay. And
22 their observations of that picking process
23 being they went and selected a bottle, and
24 they would select another bottle and they
25 could make a comparison as to -- from

Page 90

1  knowledge as to what may or may not be an
2  unusual order? Is that what you mean by the
3  picking process?
4       MS. TABACCHI: Same objections.
5       THE WITNESS: Yes. The order
6  filling process.
7       Q.   (BY MR. INNES) Okay. And in
8  that two-year period of time, there's
9  6,700,000 bottles of scheduled narcotics that
10 are shipped; is that right?
11      MS. TABACCHI: Same objections.
12      THE WITNESS: That's the amount
13 reflected in the email.
14      MR. INNES: Totaling 443,000
15 cases.
16      THE WITNESS: That's also in
17 the email.
18      Q.   (BY MR. INNES) So during this
19 time, this two-year time period, the DC
20 associates are tasked with reviewing the
21 orders that -- for Schedule II narcotics
22 of -- they would total 6,700,000 bottles?
23      MS. TABACCHI: Same objections.
24 Is there a question?
25      MR. INNES: Yeah. I think

Page 91

1  there is.
2       MS. TABACCHI: I can tell that
3  she's waiting for you.
4       THE WITNESS: I didn't realize
5  there was a question.
6       Q.   (BY MR. INNES) I can read it
7  back. Sorry about that. Didn't get enough
8  sleep last night.
9       So during this time -- I'm
10 sorry. Let me --
11      So during this time, this
12 two-year period of time, the DC associates
13 were tasked with reviewing orders for
14 Schedule II narcotics totaling
15 6,700,000 bottles. Is that right?
16      MS. TABACCHI: Same objections.
17      THE WITNESS: That's reflected
18 here in this information.
19      Q.   (BY MR. INNES) And they
20 shipped four times per week; is that right?
21      MS. TABACCHI: Same objections.
22      THE WITNESS: Yes, that was
23 the --
24      MR. INNES: Okay.
25      THE WITNESS: There were four

Page 92

1  production shipments. That didn't
2  include every store.
3       Q.   (BY MR. INNES) So they are
4  reviewing orders four days a week? Is that
5  saying the same thing?
6       MS. TABACCHI: Same objections.
7       THE WITNESS: Yes.
8       Q.   (BY MR. INNES) When do -- what
9  time did orders come into the DC basically at
10 that period of time?
11      MS. TABACCHI: Object to the
12 form. Lack of foundation.
13      THE WITNESS: I don't know what
14 their shifts ran. I don't know that
15 information.
16      Q.   (BY MR. INNES) So slightly
17 different question. Not wondering what time
18 the shift of a particular employee ran, but
19 wondering what time an order could come in to
20 a DC.
21      MS. TABACCHI: Same objections.
22      THE WITNESS: Are you asking
23 me -- can you clarify? Time of day?
24      MR. INNES: Yes.
25      THE WITNESS: I don't know

Page 93

1  that -- I don't know that information
2  specifically. It was -- it was early,
3  because it would be like a production
4  run to start the day.
5       Q.   (BY MR. INNES) So was there --
6  I'm sorry, I didn't mean to cut you off.
7       A.   Yeah. I just -- I don't know
8  that information.
9       Q.   Okay. Maybe we can be a little
10 bit more general, then.
11      Was there one order that was --
12 I'm sorry, did the system work that DC
13 associates were to fill the orders that came
14 in in the morning?
15      MS. TABACCHI: Object to the
16 form. Lack of foundation.
17      THE WITNESS: I don't know how
18 their production -- I'm not familiar
19 with like the time schedule within the
20 distribution function.
21      Q.   (BY MR. INNES) Do you have any
22 working knowledge, as you sit here today,
23 regarding how orders were filled by the DC in
24 2007?
25      MS. TABACCHI: Object to the

Page 94

1 form.
2        THE WITNESS: Can you -- can
3 you clarify -- can you try a little
4 clarification.
5        MR. INNES: Absolutely.
6    Q.    (BY MR. INNES) Sitting here
7 today, what's your understanding of how an
8 order was filled at the DC in 2007?
9        MS. TABACCHI: Object to the
10 form.
11        THE WITNESS: So my
12 understanding is based on visits that
13 I made to the DC. Orders came through
14 a system that was generated by our
15 replenishment system. Those orders
16 were then -- DEA 222 forms were
17 completed for those orders. Those
18 paper orders were taken to the vault,
19 and associates would pick based on
20 the -- they would pick based on the
21 information on that DEA 222.
22    Q.    (BY MR. INNES) And the orders
23 that were generated by the replenishment
24 system, would they come in on a rolling basis
25 throughout the course of the day? Or was

Page 95

1 there a single-shot download of the orders?
2        MS. TABACCHI: Object to the
3 form.
4        THE WITNESS: I don't know that
5 specifically.
6    Q.    (BY MR. INNES) Now let's
7 return to your employment history. See if we
8 can't push through that.
9        Okay. So in July of 2011, you
10 were the senior director of compliance and
11 quality assurance. You held that title for
12 about seven months? Is that what you said?
13 Five, seven months?
14    A.    Approximately. It was from
15 July until, in title change, February 1st of
16 2012.
17    Q.    And how did your title change
18 February 1st of '12?
19    A.    This is the one I can't
20 specifically recall, but I think it was
21 senior director of professional relations and
22 clinical quality assurance? Clinical quality
23 improvement?
24    Q.    And were your roles -- what was
25 your role and responsibility under that

Page 96

1 title?
2    A.    I had responsibility for the
3 quality assurance program that evolved to
4 quality improvement program. I had
5 responsibility for professional -- the
6 professional relations function was largely
7 associated with our relationships with our --
8 with optometrists that were leasing space in
9 our Supercenters. And I had responsibility
10 for the health and wellness, so the broad
11 health and wellness training function.
12    Q.    So the professional relations,
13 that was limited to optometry?
14        MS. TABACCHI: Object to the
15 form.
16        THE WITNESS: As in -- in a
17 supervisory role, it was, so from a
18 team makeup it was largely focused on.
19 I individually had some
20 responsibilities as it related to
21 relationships with the American
22 Pharmacists Association, for example.
23    Q.    (BY MR. INNES) So the American
24 Pharmacists Association, that was an
25 example -- sorry, that's an example of one of

Page 97

1 those relationships. Did you have other
2 relationships that you were responsible for?
3    A.    In the -- within the
4 professional relations responsibility, it was
5 focused on professional organizations and
6 what I would refer to as professional
7 support.
8        So I also managed our
9 relationship with some of the education
10 services, Pharmacist's Letter, that provided
11 professional information to our pharmacists
12 and our technicians. That's the other one
13 that -- that kind of comes to mind for me.
14    Q.    The Pharmacist's Letter, that's
15 an education service?
16    A.    They -- they aggregate
17 professional information and produce a
18 monthly newsletter.
19        And then they also provided CE
20 services.
21    Q.    Do you recall at any time in
22 that role, CE -- and this is CE, continuing
23 education?
24    A.    Yes.
25    Q.    Okay. Do you recall any time

Page 98

1 during that role where continuing education
2 programs were sponsored in whole or in part
3 by a drug manufacturer?
4          MS. TABACCHI:  Object to the
5 form.
6          THE WITNESS:  Not -- not that I
7 recall.
8          I don't know that I looked for
9 the sponsorship.
10     Q.    (BY MR. INNES) Do you recall at
11 any time during that role where continuing
12 education programs were paid for by a drug
13 manufacturer?
14          MS. TABACCHI:  Object to the
15 form.
16          THE WITNESS:  Could you
17 clarify?  Specific to Pharmacist's
18 Letter?
19     Q.    (BY MR. INNES)  No, specific to
20 any continuing education provided to
21 pharmacists at Walmart.
22     A.    Not that I recall.
23     Q.    Okay.
24          Does Walmart have a policy
25 against manufacturers providing continuing

Page 99

1 education to -- manufacturers providing
2 continuing education to pharmacists?
3          MS. TABACCHI:  Object to the
4 form.
5          THE WITNESS:  Our practice that
6 I'm familiar with was that a
7 manufacturer supplier could not
8 provide a CE training that was closed.
9 Our -- the example that I can give
10 you, it's not related to opioids.
11          If there was a new device, an
12 inhaler/diabetic device that was
13 coming to market and a supplier wanted
14 to do a training session, a CE
15 session, a dinner session for Walmart
16 pharmacists, we would say no.  Our
17 pharmacists could attend if it was
18 open generally to any pharmacist in
19 the area that wanted to come, but ...
20          So my answer relates to I don't
21 think that ever happened.  It was our
22 practice not to allow that for
23 non-controlled substances.  So I
24 don't -- I'm not aware of a time that
25 it would have applied to anything

Page 100

1 related to opioids.
2     Q.    (BY MR. INNES)  You used the
3 word "practice" a few times here.  Are you
4 referring to a written policy, or is that --
5 strike that.
6          By using the word "practice,"
7 are you referring to a written policy?
8          MS. TABACCHI:  Object to the
9 form.
10          THE WITNESS:  In this case, no.
11     Q.    (BY MR. INNES)  Would you agree
12 that it would be improper for a manufacturer
13 to present continuing education to a pharm --
14 to Walmart pharmacists?
15          MS. TABACCHI:  Object to the
16 form.
17          THE WITNESS:  As a general
18 practice?  I -- I don't think it's
19 totally improper.
20          I know that there are rules
21 about whether -- whether or not
22 product information can be provided if
23 CE is granted.  I'd have to know more
24 about the circumstance, because I know
25 manufacturers do sponsor continuing

Page 101

1 education programs.
2     Q.    (BY MR. INNES) And Walmart
3 pharmacists are permitted to attend those
4 events so long as they're open to all
5 pharmacists, including those that don't work
6 for Walmart?
7          MS. TABACCHI:  Object to the
8 form.
9          THE WITNESS:  That's -- that's
10 my recollection of the practice that
11 we've had in place at Walmart.
12     Q.    (BY MR. INNES)  Okay.  Does
13 Walmart ensure that its pharmacists are
14 up-to-date with continuing education
15 requirements in the various states?
16     A.    What we -- what we track is
17 active licensure.  So active licensure
18 would -- the fact that you've met the
19 requirement and hold the active license is
20 what we verify.
21     Q.    Okay.  And Walmart doesn't go
22 beyond just knowing that there's an active
23 license when reviewing its pharmacists' --
24 strike that.
25          The only information that

Page 102

1 Walmart is concerned with regarding its
2 pharmacists' licensure is that its
3 pharmacists hold an active license; is that
4 correct?
5      MS. TABACCHI:  Object to the
6 form.
7      THE WITNESS:  No.  We have a
8 credentialing function that verifies
9 licensure, looks for -- I'm losing the
10 term, but OIG eligibility.  Excluded
11 provider status.
12      We have a credentialing
13 function that goes beyond just active
14 license.
15      Q.    (BY MR. INNES) Does Walmart
16 maintain -- strike that.
17      Are Walmart pharmacists
18 required to present Walmart with proof of
19 completion for continuing education?
20      A.    Only if it's continuing
21 education that is mandated by Walmart.
22      Q.    Does Walmart have any way of
23 knowing what continuing education
24 presentations its pharmacists have attended?
25      MS. TABACCHI:  Object to the

Page 103

1 form.
2      THE WITNESS:  No.
3      Q.    (BY MR. INNES) So Walmart
4 would have no way of knowing if a Walmart
5 pharmacist attended a CE conducted by a
6 pharmaceutical manufacturer?
7      MS. TABACCHI:  Object to the
8 form.
9      THE WITNESS:  Not that I'm
10 aware.
11      Q.    (BY MR. INNES) Do you think
12 that would be useful information to Walmart?
13      MS. TABACCHI:  Object to the
14 form.
15      THE WITNESS:  I don't know if I
16 have an opinion on how we would use
17 that information.
18      Q.    (BY MR. INNES) Do you include
19 the -- are you familiar with the National
20 Association of Chain Drug Stores?
21      A.    Yes.
22      Q.    In your role as senior director
23 professional relations -- I'm not sure we've
24 nailed that title down, so I'll just say the
25 title you held in 2012, did you have any --

Page 104

1 did that include relationships with NACDS?
2      MS. TABACCHI:  Object to the
3 form.
4      THE WITNESS:  I was a member of
5 the policy council at that time, but
6 that wasn't part of my -- that was an
7 assigned duty.  It wasn't specific to
8 that job description.
9      MR. INNES:  Okay.  Thank you.
10      Q.    (BY MR. INNES) I believe you
11 also said you had responsibilities over
12 health and wellness training in that role?
13      A.    Yes.
14      Q.    And what exactly was that?
15      A.    The training function, as to
16 working within -- in Walmart health and
17 wellness spaces that included optical and
18 pharmacy, the team that I supervised
19 developed training modules that were part of
20 the training plan for the different
21 field-based associates, as well as --
22      And we also provided what we
23 referred to as instructor-led training that
24 was live training for our operations
25 leadership so our market directors.

Page 105

1      And at one point we helped with
2 onboarding of our new regional directors, but
3 that was more individualized than the market
4 director training that we provided.
5      Q.    You used the term "field-based
6 associate."  What is a field-based associate?
7      A.    Those that are working in
8 stores in the field versus the home office.
9      Q.    Are those pharmacists?
10 Pharmacists would be included as a
11 field-based associate?
12      A.    Yes.
13      Q.    Who else would be considered a
14 field-based associate?
15      A.    Our opticians, our associate
16 optometrists.  Cashiers that were assigned to
17 either optical or pharmacy.  Sales associates
18 that worked out on the OTC pad.  Technicians.
19 Are all field-based.
20      Q.    So health and wellness training
21 provided to field-based associates,
22 operations leadership which includes market
23 directors?
24      A.    Yes.
25      Q.    And regional directors?

Page 106

1    A.   Yes.
2    Q.   Any other categories of
3  employees that training was provided to in
4  that role?
5        MS. TABACCHI:  Object to the
6  form.
7        THE WITNESS:  Not at the time
8  that I had responsibility for that
9  team.
10   Q.   (BY MR. INNES) At the time
11 that you had responsibility for that team,
12 did -- I'll try to focus this a little bit --
13 did any of the training -- was any of the
14 training -- strike that.
15       At the time that you had that
16 responsibility for the team, did you provide
17 any training related to Schedule II
18 narcotics?
19       MS. TABACCHI:  Object to the
20 form.
21       THE WITNESS:  We didn't -- so
22 this team was creating training
23 modules.  We didn't create training.
24 What we might have trained on would be
25 Walmart's policy as it related to how

Page 107

1  we dispense controlled substances.
2        So it's -- the example that I
3  would give is, if a policy -- if there
4  was a policy change related to
5  dispensing, there might have been a
6  module that was created or an
7  acknowledgment that was created in our
8  learning management system for the
9  appropriate associate to complete.
10   Q.   (BY MR. INNES) Okay.  So I just
11 want to -- so -- I just want to make sure we
12 have a clear record.
13       That response started with this
14 team -- "We didn't -- so this team was
15 creating modules.  We didn't create
16 training."
17       What's the difference between
18 creating training modules and not create
19 training?
20   A.   Yeah.  So I'm --
21       MS. TABACCHI:  Object to the
22 form.
23       THE WITNESS:  So to clarify, we
24 didn't create content that was
25 specific to an opioid or a controlled

Page 108

1  substance.  What we would create was a
2  module associated with a policy so
3  that we could confirm that the
4  information contained in the policy
5  was -- was viewed, completed by the
6  associate that needed to have that
7  training.
8    Q.   (BY MR. INNES) Okay.
9    A.   I hope that's more clear.
10   Q.   So you're taking the policy.
11 Then from that, you're basing your training
12 module off the policy.  Is that accurate?
13   A.   That's accurate.
14   Q.   That's accurate.  Okay.  And
15 the module was accessible through the
16 learning management system?  Is that right?
17   A.   Yes.
18   Q.   And did the learning management
19 system track who viewed that particular
20 learning module?
21   A.   It would track -- it would
22 track completions based on the training plan
23 that was assigned.
24   Q.   Okay.  And how -- how did --
25 how would it track completions exactly?

Page 109

1    A.   It was a list to say, "Did you
2  complete this module," and what date the
3  module was completed.
4    Q.   And what does a module consist
5  of?  Is it a video or is it a PDF that's
6  downloaded from the system?
7        MS. TABACCHI:  Object to the
8  form.
9    Q.   (BY MR. INNES) What form does
10 the module take?
11   A.   So it was accessible online.
12 So it was viewable within the learning
13 management system.  But the activity could
14 have been a PDF of the policy and then an
15 acknowledgment that you read the policy.
16       It could have been, depending
17 on the subject matter, a video or an animated
18 training.  It depended on the content of the
19 subject matter.
20   Q.   Were associates ever tested for
21 the knowledge that they may or may not have
22 learned based on their viewing of a module?
23   A.   Yes.
24   Q.   And when were they tested?
25   A.   It depends on the module.

Page 110

1　Q.　Okay.

2　A.　It could have been at the end
3　or it could have been knowledge checks.
4　Again, depending on how the module was built.
5　It could have been a knowledge check along
6　the way or it could have been a test at the
7　end.

8　Q.　What do you mean by "a
9　knowledge check along the way"?

10　A.　So as they're completing the
11　information, there may have been a point in
12　time when it said, when -- when you couldn't
13　go any further until you acknowledged what
14　you had learned previously in the module.

15　Q.　Okay.　So at some point in time
16　in the module, a question would pop up.　And
17　would that be a substantive question?　Okay.
18　A true-false, or a yes-no, about the material
19　that was learned?　That was presented prior
20　to that popup?

21　MS. TABACCHI:　Object to the
22　form.

23　THE WITNESS:　It could be --
24　the questions that I remember, it
25　could be true-false.　It could be kind

Page 111

1　of a sequencing of a process if that's
2　what they were learning.

3　It could be a more substantive
4　answer than yes-no.

5　So it depended on the content.

6　Q.　(BY MR. INNES)　Was it
7　something more than click here to continue?

8　A.　Yes, in this case.

9　Q.　Okay.

10　And did Walmart maintain --
11　strike that.

12　If an associate -- if a
13　recipient of the training either failed or
14　did not complete the training, was there a
15　retraining that occurred?

16　MS. TABACCHI:　Object to the
17　form.

18　THE WITNESS:　The modules that
19　were assigned were part of required
20　training plan.　Those were tracked at
21　the individual store level.　There are
22　training coordinators that monitored
23　training completions for an entire
24　store, not just pharmacy.

25　So they would have to take it

Page 112

1　until they registered a successful
2　completion.

3　Q.　(BY MR. INNES)　How many times
4　were folks allowed to take a test to complete
5　it?

6　MS. TABACCHI:　Object to the
7　form.

8　THE WITNESS:　I don't know that
9　there was a set number assigned.　It
10　was --

11　They were expected to take it
12　until they completed it.　I don't know
13　that there was a number assigned to
14　that.

15　Q.　(BY MR. INNES)　And if they
16　didn't complete it, what would happen?

17　A.　The training associate would
18　follow up.

19　Q.　And what would that follow-up
20　entail?

21　A.　Reminder to complete their
22　training.

23　Q.　And if they didn't complete it
24　after that reminder, what would happen?

25　A.　They could be performance

Page 113

1　coached for failing to complete their
2　training plan.

3　Q.　What was the next role you took
4　on after 2012?

5　A.　So from 2012 to present, my
6　role has evolved slightly in title.

7　I pick -- after 20 -- so around
8　the time of 2015, I picked up clinical
9　services.　So I think my title in or around
10　2015 was quality improvement in clinical
11　services, senior director.

12　And at that time, I no longer
13　had the training function or professional --
14　or the optical professional relations
15　function.

16　Q.　But otherwise, your function
17　was the same?

18　A.　From a quality improvement it
19　was the same.　And then I took on
20　responsibility for pharmacy clinical
21　services.

22　Q.　And what did that entail?

23　A.　Developing and executing our
24　immunization program, as well as our
25　medication therapy management program and

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 other clinical practice services that
2 pharmacists provide.
3    Q.   Did any of those involve
4 Schedule II narcotics?
5       MS. TABACCHI:  Object to the
6    form.
7       THE WITNESS:  No.
8    Q.   (BY MR. INNES)  So in that
9 role, did you have any responsibilities
10 regarding the distribution of opioids?
11    A.   I had no direct responsibility
12 at that time.
13    Q.   Did you have any responsibility
14 over the dispensing of opioids?
15       MS. TABACCHI:  Object to the
16    form.
17       THE WITNESS:  I had
18    responsibility for the quality
19    improvement process, which -- which
20    entailed how all prescriptions are
21    dispensed through Walmart's standard
22    operating procedures.
23       (Whereupon, Deposition Exhibit
24    Walmart Hiland 2, 3-10-10 email chain.
25    Subj: Re: NABP VAWD Mtg.

Page 115

1    WMT_MDL_000016173-16174, was marked
2    for identification.)
3    Q.   (BY MR. INNES)  Ms. Hiland,
4 you've been handed what's been marked as
5 Exhibit 2.
6       While you review it, I'll just
7 read into the record this is a Walmart
8 document ending in 1 -- beginning in 16173
9 and ending in 16174.
10       [Document review.]
11    Q.   (BY MR. INNES)  All set?
12    A.   I'm set, yes.
13    Q.   So this is an email chain.  The
14 last email chain that I have is from you,
15 Susanne Hiland, to Tim Harris, sent on
16 March 10th, 2010.  Subject line is "NABP VAWD
17 MTG."
18       I believe "MTG" is an
19 abbreviation for meeting --
20    A.   Yes.
21    Q.   -- is that fair?
22       What is the -- well, what
23 significance, if any, do the abbreviations
24 NABP and VAWD have for you?
25    A.   NABP is the National

Page 116

1 Association of Boards of Pharmacy, and VAWD
2 is Verified Accredited Wholesale Distributor.
3    Q.   At the time of this email, I
4 think we've established that you were the
5 senior director of regulatory affairs.  Is
6 that right?
7    A.   Yes.
8    Q.   Okay.  And your focus in that
9 role was primarily on the practice of
10 pharmacy?  Is that a fair statement?
11    A.   It was practice of pharmacy.
12 And again, because -- and I have the
13 licensing function as well --
14    Q.   Right.
15    A.   -- I believe, at this time.
16    Q.   And you were overseeing the
17 directors, Mr. Koch, Chapman, and others that
18 you mentioned during that time period?
19    A.   Yes.
20    Q.   Was Mr. Harris one of those
21 folks that you were overseeing?
22    A.   No.
23    Q.   Who was Mr. Harris?
24    A.   He was senior director of
25 pharmacy logistics.

Page 117

1    Q.   Did you report to Mr. Harris?
2    A.   No.
3    Q.   And did Mr. Harris report to
4 you?
5    A.   No.
6    Q.   Mr. Harris was in a different
7 business unit?
8    A.   He was a peer, and he was in
9 logistics.
10    Q.   Okay.  So you'll see in the
11 middle of the page, the email is from Tim to
12 you on March 9th.
13       The last sentence of that email
14 says, "I want to ensure my thinking is in
15 lines with the concerns that you have."
16       You then responded to that
17 email.  You said you didn't have any specific
18 concerns at that time.  Right?
19       I'm curious.  The next line
20 says, "The reapplication process was clearly
21 more detailed than last time, and we've had
22 some issues that others have had that would
23 potentially be problems for us."
24       So were you involved --
25       MS. TABACCHI:  I apologize,

Page 118

1  Mike. You did misread that. Do you
2  want to read that again?
3  Q.  (BY MR. INNES) Okay. The
4  email states, "Tim, since we are just
5  beginning the process again, we don't have
6  any specific concerns yet. The reapplication
7  process was clearly more detailed than last
8  time, and we've heard some issues that others
9  have had that would potentially be problems
10  for us."
11       The email continues, but I want
12  to focus on those first two sentences.
13       What process are you beginning
14  again?
15  A.  The recertification of our
16  distribution center for the VAWD
17  certification.
18  Q.  And what is the -- which
19  distribution center in particular?
20  A.  I believe at this time, this
21  was recertification, so all of them?
22       I -- I'd have to check their
23  certification dates, but all of our
24  distribution centers were VAWD certified. I
25  just don't know what their original

Page 119

1  certification dates were.
2  Q.  Okay. I mean, at this time,
3  can we agree that the 6045 was VAWD
4  certified?
5  A.  Yes.
6  Q.  Were you involved in the prior
7  application process?
8  A.  Yes.
9  Q.  Okay. And you say that the
10  reapplication process, the process you're
11  going through at this point in time, was
12  clearly more detailed than the last time.
13       What was the basis for that
14  statement?
15  A.  We, by this time, would have
16  had the -- there was an application process,
17  or there were documents that were required
18  with the certification, recertification of
19  our distribution centers. And the -- to
20  my -- to my recollection, the information
21  that was asked for in that recertification
22  was more expansive than -- it included new
23  information, new requirements, than were
24  applied to the previous certification
25  process.

Page 120

1  Q.  And that new information and
2  new requirements then were applied to the
3  previous certification. Is it -- was it your
4  understanding at the time that others have
5  had problems that would potentially be
6  problems for Walmart?
7       MS. TABACCHI: Object to the
8  form.
9       THE WITNESS: I see that in the
10  email. And my recollection was that
11  recertification across the industry
12  was -- it was a more stringent
13  process, so it was applying to anyone
14  that was VAWD certified.
15  Q.  (BY MR. INNES) What's your
16  basis for the statement is more stringent?
17  A.  Because of the -- because of
18  the statement that there was more information
19  in the recertification in that application.
20       Stringent, extensive. It was
21  a -- it was a more expansive process.
22  Q.  Why did Walmart seek
23  certification -- seek VAWD certification of
24  its distribution facilities?
25  A.  At the initial certification,

Page 121

1  VAWD generally is related to the operations
2  of the distribution center. And the state of
3  Florida first required a VAWD certification
4  to ship product into the state. Other states
5  followed, and so it was a requirement of
6  ongoing business.
7  Q.  (BY MR. INNES) Do you recall
8  attending this NABP VAWD meeting that's
9  referenced in this email?
10  A.  I don't recall attending.
11  Q.  Your email goes on to state, "I
12  think the goal is to listen and see what we
13  can learn from the other participants and
14  also if there is anything specific about the
15  inspection procedures that we need to know."
16       I guess I'll start with the
17  question. Did you in fact listen or speak
18  with any of the other participants regarding
19  those issues?
20       MS. TABACCHI: Object to the
21  form.
22       THE WITNESS: I don't think I
23  was present.
24  Q.  (BY MR. INNES) Do you know if
25  Mr. Harris was present?

Page 122

1   A.   I don't know specifically, but
2   he's on the attendee list later in the email.
3   Q.   Did you have occasion to speak
4   with Mr. Harris about this meeting after it
5   occurred?
6   A.   I don't recall a specific
7   conversation with him about it.
8   Q.   You said, "Last time it was
9   more of a tour of the facility than an
10  inspection."
11      Who toured the facility?
12  A.   The process of certification
13  was an on-site visit to the facility.  So
14  there was a VAWD inspector working on behalf
15  of NABP that came to the facility.
16  Q.   And that was the first -- the
17  first application we were talking about?
18  A.   Yes.
19  Q.   So it was one attendee by -- of
20  a VAWD inspector?
21      MS. TABACCHI:  Object to the
22  form.
23      THE WITNESS:  Yes.
24  Q.   (BY MR. INNES)  Do you recall
25  if there was a tour of the facility during

Page 123

1   the reapplication process?
2   A.   I don't recall the specifics,
3   but I -- I know we prepared materials, so it
4   would follow that there was an on-site
5   inspection.  I don't recall the specifics of
6   who or how many.
7   Q.   And the facility that was
8   inspected, is that referring to 6045?
9       MS. TABACCHI:  Object to the
10  form.
11      THE WITNESS:  That would be any
12  of the -- any of the distribution
13  centers that went through the
14  reaccreditation process.
15  Q.   (BY MR. INNES)  Okay.  And then
16  your prior testimony is that all of the
17  distribution centers went through the
18  reaccreditation process?
19  A.   Yes.
20  Q.   So is it fair to say that if
21  they all went through them, and there were
22  inspections of all of them, 6045 was in fact
23  inspected?
24  A.   Yes.
25  Q.   Further on in your email you

Page 124

1   said, "I wouldn't necessarily bring this up,
2   but if they discuss anything about continuing
3   education programs for our DRs, I would like
4   to know what they consider acceptable
5   programs."
6       First off, why are you
7   suggesting that Mr. Harris not specifically
8   or necessarily bring that topic up?
9   A.   I don't recall specifically.  I
10  think we had access to some training, but we
11  weren't members of HDMA, so -- so some of the
12  training that might have applied to this
13  certification might not have been available
14  to us.
15      I don't know that it was all
16  that important and not a significant concern.
17      That's what I recall about that
18  continuing education.  I don't recall if
19  there's anything else that I had in mind at
20  that time.
21  Q.   So based on that, is it
22  possible you didn't want to call attention to
23  the fact that Walmart wasn't a member of the
24  HDMA and therefore might not have some of the
25  training that could be applied to the VAWD

Page 125

1   certification?
2       MS. TABACCHI:  Object to the
3   form.
4       THE WITNESS:  No.  I'm -- what
5   I'm saying is I -- I don't know that
6   this was a significant issue for us.
7   There was other training that was
8   available.  And in this setting where
9   there's HDMA participants, I don't
10  know that that topic was applicable to
11  everyone.
12      Is that what I recall about
13  that.
14  Q.   (BY MR. INNES)  Well,
15  Mr. Harris is emailing you about attending a
16  meeting, is wondering what your concerns are,
17  and wants to make sure that you both share
18  the same concerns.  The VAWD accreditation
19  process is a -- is important to Walmart so it
20  can continue do business in states that
21  require it.  Right?
22  A.   Yes.
23  Q.   And you want to make sure that
24  when you go to these -- when you attend a
25  VAWD meeting discussing reapplication, that

Page 126

1 Walmart doesn't set off any flags that it
2 might not be capable of accreditation with
3 VAWD. Is that right?
4       MS. TABACCHI: Object to the
5 form.
6       THE WITNESS: That's not what I
7 mean by that.
8    Q.   (BY MR. INNES) Did you come to
9 learn what VAWD would consider to be
10 acceptable programs?
11    A.   Our pharmacy -- our
12 distribution centers were reaccredited. So
13 we would have met the criteria required by
14 the VAWD certification. At no time in this
15 process were we unaccredited. The point of
16 this was to make sure that we were prepared
17 and had as much information as possible to
18 prepare for that recertification process.
19    Q.   How long did that
20 recertification process take?
21    A.   I think in this case there
22 was -- I think there were some delays as
23 we -- again, because there were additional
24 documentation requirements. I don't remember
25 specifically what those were. I think it was

Page 127

1 a longer recertification process in this time
2 frame.
3    Q.   What do you mean by
4 "documentation requirements"?
5    A.   So documenting practices in --
6 in a policy that could be reflected and
7 inspected by the VAWD inspector.
8    Q.   Okay. So at the time of the
9 reapplication process, did Walmart have its
10 practices documented in a policy that could
11 be reviewed by the VAWD inspector?
12       MS. TABACCHI: Object to the
13 form.
14       THE WITNESS: As I recall,
15 there were -- there were written
16 policies memorialized around practices
17 that we had in place in this time
18 frame as a result -- to meet those
19 recertification -- those new
20 recertification requirements.
21       MS. TABACCHI: Mike, before you
22 get to another document, can we take
23 another quick break?
24       I just don't want to get -- I
25 want to catch you before you start

Page 128

1 another document.
2       MR. INNES: Yeah, we can take a
3 break.
4       THE VIDEOGRAPHER: 11:11 a.m.
5 we are off the video record.
6       (Recess taken, 11:11 a.m. to
7 11:24 a.m.)
8       THE VIDEOGRAPHER: 11:25. We
9 are on the video record.
10    Q.   (BY MR. INNES) Okay.
11 Ms. Hiland, we're back. In response to my
12 last question before the break, you
13 referenced "written policies memorialized
14 around practices we had in place in this time
15 frame."
16       Do you -- can you describe
17 those written policies? What they were
18 exactly?
19    A.   I don't recall exactly. There
20 were -- VAWD is focused on general
21 distributions, so there were -- there were
22 policies that touched on various topics. I
23 don't recall exactly all that was included in
24 the recertification.
25    Q.   You said "VAWD is focused on

Page 129

1 general distributions." What's the basis for
2 that statement?
3    A.   It was established to ensure
4 that there was -- there was no adulterated
5 product entering into the supply chain, or --
6       And so -- so from a general
7 distribution pharmaceuticals, that's what I
8 was referring to.
9    Q.   Okay. Are you referring to any
10 written policies that relate specifically to
11 the distribution of Schedule II narcotics?
12       MS. TABACCHI: Object to the
13 form.
14       THE WITNESS: The -- the
15 recertification, I know that there
16 were policies that reflected
17 distribution of controlled substances.
18 And there were other broader policies
19 around distribution of pharmaceuticals
20 in general.
21    Q.   (BY MR. INNES) Okay. But
22 specific written policies at that time period
23 related to Schedule II narcotics. Are you
24 aware of any? Or were you referring to any?
25       MS. TABACCHI: Object to the

Page 130

1  form.
2      THE WITNESS: The order
3  monitoring policy was part of the --
4  part of the set of logistics policies
5  that we have in place.
6      Q.  (BY MR. INNES) What order
7  monitoring policy are you referring to?
8      A.  I don't know that -- I don't
9  know the number specifically. That may be in
10  an exhibit.
11      That's one -- the order
12  monitoring policy is one of the policies that
13  we submitted with our VAWD application, along
14  with multiple other policies.
15      Q.  So we're in the -- we are in
16  the 2010 time period; right?
17      A.  Yes.
18      Q.  Okay. I notice that you were
19  looking at was Exhibit 7 in your deposition
20  yesterday. Is there anything you want to
21  look at in there that would help refresh your
22  recollection?
23      You can take as much time as
24  you want.
25      A.  I know we have a policy around

Page 131

1  distribution.
2      So tab 2 is the -- is one of
3  the policies as -- that would have been
4  included in the recertification process for
5  our distribution centers.
6      Q.  And it's -- so you're
7  referring, just for the record, Exhibit 7 of
8  the 30(b)(6) deposition, at tab 2, which is
9  Walmart document ending 11106. It's a
10  one-page document.
11      And I just want to be sure I'm
12  clear on the time frame. We're talking about
13  policies that were in place in or around
14  March of 2010?
15      MS. TABACCHI: Object to the
16  form.
17      THE WITNESS: I'm talking about
18  the VAWD recertification process. As
19  we -- as we went through that
20  recertification process, that's what
21  I'm referring to.
22      Q.  (BY MR. INNES) Okay. So
23  the -- are you referring to documents that
24  were ultimately submitted as part of the
25  recert -- or reapplication process?

Page 132

1      A.  Yes.
2      Q.  Okay. And when, to the best of
3  your knowledge, was that submission made?
4      A.  I don't recall that.
5      Q.  But you do recall the policy --
6  or the document ending 11106 being likely
7  included as part of that application?
8      A.  That's the best of my
9  recollection.
10      (Whereupon, Deposition Exhibit
11  Walmart Hiland 3, 10-4-11 email from
12  Susanne Hiland. Subj: Significant
13  Loss Guidelines - Confidential - Do
14  Not Forward. WMT_MDL_000040775-40779,
15  was marked for identification.)
16      Q.  (BY MR. INNES) Okay. While
17  you review that, Ms. Hiland, I'll just read
18  into the record, this is -- what's been
19  marked as Exhibit 3 is a Walmart document
20  ending -- beginning in 40775. It has, I
21  believe, an attachment here that ends in
22  40779.
23      [Document review.]
24      THE WITNESS: Can I consult
25  with --

Page 133

1      MS. TABACCHI: Oh. Is there
2  something --
3      THE WITNESS: I don't know.
4  Can I consult with Tina?
5  I don't know if that applies
6  because of the document.
7      MS. TABACCHI: The only
8  circumstance under which you may speak
9  with me is if you're concerned that
10  the document's privileged or that the
11  question that I guess you don't have
12  yet is privileged. So do you want to
13  wait until Mr. Innes asks a question
14  and then we can take it from there?
15      THE WITNESS: Okay. My -- just
16  based on the way the document is
17  marked. At the bottom of page 2.
18      MS. TABACCHI: Okay.
19      So I didn't realize, Michael,
20  when you read this, but at the bottom
21  of the document, it says "Privileged
22  and confidential: Prepared at the
23  direction of counsel." So do you mind
24  if I talk to the witness about this
25  document?

Page 134

1    MR. INNES:  So for the record,
2  we're on 40776.  And there's, at the
3  bottom, a footer in italics that says
4  "Privileged and confidential:
5  prepared at the direction of counsel."
6    And that's the basis for your
7  question of whether or not you can
8  confer with counsel?
9    THE WITNESS:  Yes.
10   MR. INNES:  Okay.  That's fine.
11   THE VIDEOGRAPHER:  11:33.  We
12  are off the video record.
13   (Recess taken, 11:32 a.m. to
14  11:39 a.m.)
15   THE VIDEOGRAPHER:  11:39.  We
16  are on the video record.
17   Q.   (BY MR. INNES)  Okay,
18  Ms. Hiland, we're back on the record.  We
19  had -- plaintiffs had introduced an exhibit.
20   You asked to confer with your
21  counsel off the record.  We've done that.
22   There's a representation off
23  the record that there needs to be some
24  further investigation as to that particular
25  document.  Plaintiffs have agreed to not ask

Page 135

1  questions about that document pending the
2  outcome of your counsel's further
3  investigation.  So with that, we'll continue
4  on, unless you --
5    MS. TABACCHI:  No, the only
6  thing I would say is that the
7  investigation relates to whether the
8  document is a privileged one that we
9  will serve, privileged claim that was
10  inadvertently produced, and we will
11  advise you at the earliest opportunity
12  today on that issue.  So we appreciate
13  you moving forward until we can
14  address the privilege status of that
15  document.
16   MR. INNES:  Fair enough.
17   Q.   (BY MR. INNES)  So moving ahead
18  in our regularly scheduled programming, we
19  have -- can you tell me what a C-II
20  utilization review is?
21   Are you familiar with that
22  term?
23   A.   I don't recall specifically,
24  without some reminder about what it might
25  have meant.

Page 136

1    Q.   Okay.  Let me see if I can
2  provide you with a -- some kind of reminder.
3    (Whereupon, Deposition Exhibit
4  Walmart Hiland 4, 9-27-12 email from
5  George Chapman.  Subj:  CII
6  utilization review.
7  WMT_MDL_000012194, was marked for
8  identification.)
9    Q.   (BY MR. INNES)  Okay.  While
10  you review, that's just a one-page document.
11  For the record, it is Walmart document Bates
12  No. 12194.
13   [Document review.]
14   THE WITNESS:  I've reviewed it.
15   Q.   (BY MR. INNES)  So this is an
16  email from George Chapman to you and others:
17  Greg Beam, Brandon Worth, and Tim Harris,
18  dated September 27, 2012.  Subject line,
19  "C-II utilization review."
20   Does this maybe orient you
21  regarding what a C-II utilization review is?
22   A.   I see the process that he's
23  outlining.  I don't know that I knew that's
24  what it was called.
25   Q.   At the time of this email, I

Page 137

1  think we've established that you were the
2  senior director, professional relations -- we
3  can't remember the rest of the title.
4    A.   And clinical quality
5  improvement.
6    Q.   And in that role -- how does --
7  how did that role relate to Mr. Chapman's
8  role at the time?
9    A.   At that time George had moved
10  into the role that I had previously that was
11  called senior director of regulatory affairs.
12   And I was what I would consider
13  in a peer role as a senior director in
14  another area of the business.
15   Q.   Okay.  And what was Mr. Beam's
16  role at that time?
17   A.   Greg was in asset protection.
18  Health and wellness asset protection.
19   I don't know his title.
20   Q.   Okay.  And you've established
21  your title.  How about Mr. Worth?
22   A.   Brandon was senior director of
23  operations support.
24   That may not be his correct
25  title, but he was senior director -- that was

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  his function.
2      Q.    Okay.  And Mr. Harris?
3      A.    Tim, I believe, was -- he was,
4  I think, senior director for logistics.  Was
5  his title.
6      Q.    So based on those titles, it
7  looks like we've got folks from several
8  different parts of the business on this one
9  email where we're discussing C-II utilization
10  review.  And I think you testified you might
11  not have known it by that name, but you
12  understand the process.  Is that right?
13      A.    Yes.
14      Q.    And what was the purpose of the
15  process, as you understand it?
16      A.    I believe in this time frame
17  was the process we put in place when we set
18  the threshold limit of 20 bottles of
19  oxycodone for logistics orders.
20      Q.    So at that time, was the
21  process to alert for that particular product
22  over 20 or when it was at 20?
23      MS. TABACCHI:  Object to the
24  form.
25      THE WITNESS:  The process was

Page 139

1  that we -- that the distribution
2  center wouldn't ship more than
3  20 bottles of oxycodone 30.
4      Q.    (BY MR. INNES)  If an order
5  came for exactly 20, would that trigger a
6  review at that point in time?
7      MS. TABACCHI:  Object to the
8  form.
9      THE WITNESS:  I believe -- I'm
10  trying to think how we considered
11  exactly 20.
12      I think the threshold was 20,
13  so I'd think 20 would ship.  No more
14  than 20.
15      Q.    (BY MR. INNES) Okay.  Do you
16  see halfway down the page, approximately --
17  it says, "Plan was as follows:"  And I want
18  to direct you to No. 2.
19      And the last part of that
20  sentence says, "And also supply a list of any
21  stores that ordered more than 20 bottles of
22  any C-II item."
23      Okay.  So on that list would be
24  orders of 21 and greater; right?
25      A.    Yes.

Page 140

1      Q.    According to that process?
2      A.    More than 20.
3      Q.    Okay.  Is it your understanding
4  that this utilization review -- well, strike
5  that.
6      In your mind, the C-II
7  utilization review is the same as the process
8  that's articulated in steps 1 through 4 here?
9      MS. TABACCHI:  Object to the
10  form.
11      THE WITNESS:  I think the way
12  he's articulating it is that the C-II
13  utilization review is a subset of
14  step 3.  The way I'm reading this.
15      Q.    (BY MR. INNES) Okay.  And what
16  particular language are you looking at?
17      A.    That AP would communicate --
18  third line.  "AP would communicate to the
19  market director that a C-II utilization
20  needed to occur."
21      Q.    Okay.  So what is a C-II
22  util -- what is a C-II utilization, then,
23  based on that sentence?
24      A.    I don't recall specifically
25  what was included in the review, but it

Page 141

1  was -- it was information that would be
2  gathered from the market director on that
3  particular location.
4      Q.    Can you recall what information
5  that was?
6      A.    I don't recall specifically.
7      In this process, the idea was
8  understand the need for an order that was
9  over that 20 threshold.
10      Q.    Does the C-II utilization
11  generate a report?
12      MS. TABACCHI:  Object to the
13  form.
14      THE WITNESS:  I don't know.  I
15  don't know what the output of that was
16  specifically.
17      Q.    (BY MR. INNES)  But there was
18  an output?
19      MS. TABACCHI:  Object to the
20  form.
21      THE WITNESS:  I don't know
22  that.  I don't know that I ever saw
23  any output specific to --
24      Q.    (BY MR. INNES)  After a C-II
25  utilization occurred, do you know what would

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  happen next?
2      A.    I --
3          MS. TABACCHI:  Object to the
4  form.
5          THE WITNESS:  There was an
6  asset protection process that
7  occurred, but I don't know what the
8  details were.
9      Q.    (BY MR. INNES)  In the last
10 sentence of the first paragraph, Mr. Chapman
11 says, "I will be reporting to the compliance
12 oversight committee on Friday of our
13 progress."
14         At that point in time, do you
15 recall who sat on the compliance oversight
16 committee?
17     A.    I don't.  Once I left my
18 compliance role in early 2012, I wasn't part
19 of the compliance oversight committee.
20     Q.    But at a certain point in time,
21 you were a member of the compliance oversight
22 committee?
23     A.    As a member of compliance, I
24 was -- I attended those oversight meetings in
25 a prior role.

Page 143

1      Q.    Are there specific members of
2  the oversight committee?
3      A.    As I recall, it was senior
4  members of leadership and legal from
5  compliance and -- senior members of
6  leadership from compliance and the business,
7  as well as legal.
8      Q.    And is there a difference
9  between an attendee of those meetings and a
10 member of the committee?
11         MS. TABACCHI:  Object to the
12 form.
13         THE WITNESS:  That I --
14         MR. INNES:  I'm just trying to
15 clear it up.  You said you had -- my
16 prior question was whether or not you
17 were on the committee, and you said
18 you'd attended meetings.  I'm
19 wondering if there's a distinction
20 between.
21         Can non-members of the
22 committee attend meetings?
23         THE WITNESS:  They would attend
24 if there -- if there was something
25 being reported.  Like where George in

Page 144

1  this case is saying, "I'm reporting."
2  If you were reporting on an activity,
3  you would attend.  But there were --
4  there were -- that I recall, you
5  wouldn't just generally attend -- you
6  had to be invited to attend and
7  present to the committee.
8      Q.    (BY MR. INNES) Okay.  So
9  probably the exact middle of this page, this
10 line says, "By not following the plans set
11 forth, operations asset protection and
12 logistics are accepting risk.
13         "If the plan needs to be
14 changed, then the appropriate business owners
15 need to get together and make those
16 decisions."
17         What risk is Mr. Chapman
18 referring to here?
19         MS. TABACCHI:  Object to the
20 form.
21         THE WITNESS:  I don't know what
22 he's referring to.
23     Q.    (BY MR. INNES)  Did you ask
24 him?
25     A.    No.  I think he's making a

Page 145

1  statement to the other folks on --
2          I mean, he's making a statement
3  to operations, asset protection, and
4  logistics that are included here.
5      Q.    And because you were not in one
6  of those roles, you didn't have reason to
7  know what risk they were accepting?
8          MS. TABACCHI:  Object to the
9  form.
10     Q.    (BY MR. INNES)  At this time?
11     A.    I don't know what risk he's
12 referring to.  Risk of not following a plan
13 that we outlined, as he's represented here.
14 I don't know what he's referring to.
15     Q.    Because the risk could
16 potentially be that these folks are not
17 following a plan that he's going to report to
18 the oversight compliance committee on?
19         MS. TABACCHI:  Object to the
20 form.
21         THE WITNESS:  That's a
22 potential.  I don't know.
23     Q.    (BY MR. INNES)  Well, what was
24 the purpose of this plan that is outlined in
25 this email?

Page 146

1    A.    This was part of the program
2 that we put in place to address, enhance
3 additional monitoring of oxycodone 30, and it
4 included -- that plan included the mandatory
5 checking of prescription monitoring programs
6 when oxycodone 30 prescriptions were filled,
7 as well as a requirement for our pharmacists
8 to gain access to their state prescription
9 monitoring programs, if access was allowed at
10 the state level.
11    Q.    And why, at that time, did
12 Walmart decide that it needed additional
13 monitoring of oxycodone 30s?
14    A.    We had received information
15 from a DEA agent that oxycodone 30 was on
16 their radar to be -- I mean, just to kind of
17 simplify.
18         That they had heightened
19 concerns about oxycodone 30.  During that
20 meeting they indicated that Walmart was not a
21 focus of the concerns that they had, but we
22 wanted to proactively establish additional
23 due diligence to ensure that we didn't become
24 part of the DEA's concern around oxy 30.
25    Q.    And this plan that was outlined

Page 147

1 was meant to make sure that you didn't
2 become -- on Walmart's -- on the DEA's radar
3 regarding oxy 30; is that fair?
4         MS. TABACCHI:  Object to the
5 form.
6         THE WITNESS:  This was meant to
7 provide proactive diligence around our
8 dispensing activities and distribution
9 activities related to oxycodone 30.
10    Q.    (BY MR. INNES)  And at that
11 time, were there any other plans or processes
12 in place to provide proactive diligence
13 around dispensing activities and distribution
14 related to oxycodone 30?
15         MS. TABACCHI:  Object to the
16 form.
17         THE WITNESS:  We had other
18 policies and practices in place.
19    Q.    (BY MR. INNES)  And this one in
20 particular was directed towards oxycodone 30;
21 right?
22    A.    Given the information that we
23 were provided by the DEA agent, yes, it was
24 specific to that conversation and that
25 effort.

Page 148

1    Q.    And if you -- if this plan
2 wasn't followed, you'd be at risk of running
3 afoul of those proactive measures.
4         MS. TABACCHI:  Object to the
5 form.
6         THE WITNESS:  I would say we'd
7 be at risk of not executing the plan
8 that had been laid out.
9    Q.    (BY MR. INNES)  The plan that
10 was directed towards proactive measures to
11 make sure that oxycodone 30s were properly
12 dispensed or otherwise properly distributed?
13         MS. TABACCHI:  Object to the
14 form.
15         THE WITNESS:  That was the
16 intent of the program.
17         MR. INNES:  Why don't we do --
18 why don't we go off the record for a
19 minute.
20         THE VIDEOGRAPHER:  12:00 p.m.
21 We are off the video record.
22         (Recess taken, 12:00 p.m. to
23 12:44 p.m.)
24         THE VIDEOGRAPHER:  12:45.  We
25 are on the video record.

Page 149

1    Q.    (BY MR. INNES)  Welcome back,
2 Ms. Hiland.  You're still under oath.  You
3 understand that to be correct; right?
4    A.    Yes.
5    Q.    I'd like to talk a little bit
6 about the National Association of Chain Drug
7 Stores, the NACDS.
8         Are you familiar with that
9 acronym?
10    A.    Yes.
11    Q.    And what is the NACDS?
12    A.    I would describe it as a trade
13 organization for community retail pharmacies.
14    Q.    Is Walmart a member of the
15 NACDS?
16    A.    Yes.
17    Q.    And why is Walmart a member of
18 the NACDS?
19    A.    We operate multiple pharmacies,
20 so they're -- they're a trade organization
21 that we participate in.
22    Q.    By "multiple pharmacies," you
23 mean more like 4,000 or so pharmacies; right?
24    A.    Yes.
25    Q.    Okay.  Do you hold any

Page 150

1 positions at the NACDS currently?
2     A.   I'm a member of the NACDS
3 Policy Council.
4     Q.   Okay.  And what do you do as a
5 member of the NACDS Policy Council?
6     A.   I participate in phone calls
7 and attend meetings of the policy council
8 where we review a variety of issues that
9 NACDS is bringing forward to its membership.
10    Q.   How long have you been a member
11 of the policy council?
12    A.   Since late 2007.
13    Q.   And so from 2007 -- late 2007
14 until present, you've been a member of the
15 policy council?
16    A.   Yes.
17    Q.   At any point in time did you
18 hold a specific title as a member of the
19 policy council?
20    A.   I served as chair of the policy
21 council in 2012.
22    Q.   During your time on the policy
23 council, did you have occasion to attend
24 meetings or telephone calls where either
25 distribution or dispensing of opioids was

Page 151

1 discussed?
2         MS. TABACCHI:  Object to the
3     form.
4         THE WITNESS:  I don't recall
5     specifically, but generally, yes.
6     Q.   (BY MR. INNES) So you were
7 on -- you have attended meetings or telephone
8 calls as a member of the policy council where
9 opioids were discussed?
10    A.   Yes.
11    Q.   Has the NACDS put forth any
12 public statements regarding policies directed
13 toward the distribution of opioids?
14        MS. TABACCHI:  Object to the
15    form.
16        THE WITNESS:  I don't know -- I
17    don't know if they have made public
18    statements.  I'm aware that there was
19    a brief submitted related to Masters,
20    but I don't -- I don't know the
21    details -- I don't recall the details
22    of that information.
23    Q.   (BY MR. INNES) Was that the --
24 are you referring to possibly the amicus
25 brief that was filed on behalf of the NACDS

Page 152

1 and the HDMA in support of neither party?
2         MS. TABACCHI:  Object to the
3     form.
4         THE WITNESS:  I believe so.
5     All the legal terminology I'm not
6     familiar with, but I believe that's
7     it.
8     Q.   (BY MR. INNES)  And did you
9 review that amicus brief before it was filed?
10    A.   Not that I recall.
11    Q.   Are you aware of any of the
12 arguments put forth in that amicus brief?
13    A.   No.
14    Q.   Did the policy -- well, strike
15 that.
16        Was there a committee or
17 division of the NACDS that was responsible
18 for the filing of that amicus brief?
19        MS. TABACCHI:  Object to the
20    form.
21        THE WITNESS:  There -- there's
22    a legal committee that looks at --
23    that looks at legal issues.  And so I
24    believe that's where it would have
25    been generated from.

Page 153

1     Q.   (BY MR. INNES) Okay.  And do
2 you know who the members of the legal
3 committee are?
4         MS. TABACCHI:  Object to the
5     form.
6         THE WITNESS:  For Walmart, it's
7     our in-house attorneys that have
8     responsibility for health and
9     wellness.
10    Q.   (BY MR. INNES) So Walmart
11 in-house counsel are members of the NACDS
12 legal committee?  Is that right?
13        MS. TABACCHI:  Object to the
14    form.
15        THE WITNESS:  They would
16    participate on issues that were
17    reviewed by the legal committee.
18    Q.   (BY MR. INNES) But they
19 themselves are not members of the -- "They"
20 being the Walmart in-house attorneys are not
21 themselves members of the NACDS?
22        MS. TABACCHI:  Object to the
23    form.
24        THE WITNESS:  No, not in the --
25    not in the sense of membership.  I

Page 154

1  think they -- not in the sense of
2  membership.
3      Q.    (BY MR. INNES)  Let me ask you
4  this way.  Are you a member of the NACDS?
5      A.    By virtue of being an employee
6  of Walmart, Walmart's a member, so therefore
7  I am -- I participate.  I have access to
8  information from NACDS based on Walmart's
9  membership.
10     Q.    Okay.  The in-house -- Walmart
11 in-house members -- or in-house counsel that
12 you referred to earlier, do they have a
13 similar relationship with NACDS that you do?
14         MS. TABACCHI:  Object to the
15     form.
16         THE WITNESS:  No.  In my
17     experience, anything that I've seen is
18     just -- it's not -- it's not a -- it's
19     not a standing committee.  It's not
20     a -- something that meets regularly.
21         I, from time to time, have seen
22     notifications come from NACDS's
23     attorney to say that there might be a
24     call specific to a legal issue or
25     something that they're raising.

Page 155

1      Q.    (BY MR. INNES)  Is it your
2  understanding that someone from Walmart
3  reviewed the amicus brief that was filed in
4  the Masters case?
5      A.    No.
6      Q.    And my question is prior -- is
7  prior to its filing.
8          I can re-ask the question.
9      A.    No, I have -- I have no
10 knowledge of anyone's involvement from
11 Walmart in the amicus brief.
12     Q.    If the NACDS were to file a
13 document with a court, would someone from
14 Walmart typically review that document prior
15 to its filing?
16         MS. TABACCHI:  Object to the
17     form.
18         THE WITNESS:  Not necessarily.
19     In my experience, NACDS is not a
20     consensus organization.  Therefore,
21     consent by all members is not required
22     and often not sought.
23     Q.    (BY MR. INNES)  Communications
24 from the -- strike that.
25         Are you aware of anyone at

Page 156

1  Walmart that disagreed with the positions
2  taken in the amicus brief filed in Masters?
3          MS. TABACCHI:  Object to the
4      form.
5          THE WITNESS:  I'm not familiar
6      with the -- what was contained in the
7      brief, so I don't know.
8      Q.    (BY MR. INNES)  Have you ever
9  reviewed the amicus brief?
10     A.    Not that I recall.
11     Q.    Are you aware in 2014 that the
12 NACDS made public statements opposing the
13 reclassification of hydrocodone?
14         MS. TABACCHI:  Object to the
15     form.
16         THE WITNESS:  I don't recall
17     specific comments.  I know that
18     there -- I know there was discussion
19     about the reclassification at the
20     policy council, but I don't recall the
21     specific details.
22     Q.    (BY MR. INNES)  Okay.  And in
23 2014, you were a member of the policy
24 council; is that right?
25     A.    Yes.

Page 157

1      Q.    Were you involved in
2  discussions regarding the reclassification of
3  hydrocodone?
4          MS. TABACCHI:  Object to the
5      form.
6          THE WITNESS:  I participated in
7      the operations committee of -- as well
8      as policy council, but there -- there
9      are other committees.
10         I participated in the
11     operations committee that looked at
12     operational impacts of the
13     reclassification.
14     Q.    (BY MR. INNES)  The operations
15 committee was a committee separate and apart
16 from the policy council?
17     A.    Yes.
18     Q.    Do you recall what operational
19 impacts the reclassification of hydrocodone
20 were discussed at those meetings?
21     A.    There were some challenges
22 around how the -- how current stock was
23 labeled in pharmacies.  So that being in a
24 pharmacy, labeled as a C-III.  And if, at the
25 time of scheduling, it wasn't reclassified,

Page 158

1  we were concerned about, you know, was there
2  any impact to that stock. I think that was
3  clarified by DEA.
4       The other -- some other
5  operational -- or another operational issue
6  was, I think DEA said there were
7  prescriptions at the time of the
8  reclassification that would have had refills,
9  which was allowed when it was scheduled as a
10 C-III.
11      And our system wouldn't allow
12 for the filling -- it was an operational
13 issue around what to do with the refills and
14 once the reclassification occurred.
15  Q.   And as part of your -- part of
16 those conversations, did you articulate
17 Walmart's -- these operational -- strike
18 that.
19      The operational issues that you
20 just described, did you present those to the
21 operations committee?
22      MS. TABACCHI:  Object to the
23 form.
24      THE WITNESS:  I didn't present
25 them. I remember them being discussed

Page 159

1  in a way that was trying to problem
2  solve or understand what the impact
3  would be and how we should prepare our
4  pharmacy teams for that transition.
5  Q.   (BY MR. INNES)  Who were the
6  other members of the operations committee at
7  that time?
8       And I can ask that a different
9  way.
10      What other companies were
11 represented on the operations committee at
12 that time?
13  A.   To my knowledge, it was open to
14 any member. I recall Walgreens, CVS,
15 Rite Aid, HEB, Costco.
16      Those are the ones that I
17 recall. There may have been others.
18  Q.   Why do you recall those in
19 particular?
20      MS. TABACCHI:  Object to the
21 form.
22      THE WITNESS:  I worked with
23 many of their representatives on
24 other -- they were either part of the
25 policy committee. I was just familiar

Page 160

1  with them personally from other work
2  that we had done. So they're easy to
3  recall.
4  Q.   (BY MR. INNES)  Other work you
5  had done with the NACDS or elsewhere?
6       MS. TABACCHI:  Object to the
7  form.
8       THE WITNESS:  With NACDS.
9  Q.   (BY MR. INNES)  Okay. Let's
10 circle back to the policy council.
11      What discussions, if any, did
12 you have regarding the reclassification of
13 hydrocodone on the policy council?
14      MS. TABACCHI:  Object to the
15 form.
16      THE WITNESS:  I don't recall
17 specifically. The conversations that
18 were part of the operations committee
19 would have fed into discussions with
20 the policy council, so I believe that
21 would have been part of the
22 conversation.
23  Q.   (BY MR. INNES)  Do you recall
24 the discussions regarding whether or not the
25 reclassification of hydrocodone would

Page 161

1  restrict patient access?
2       MS. TABACCHI:  Object to the
3  form.
4       THE WITNESS:  I believe that
5  may have been included in some of the
6  conversation.
7  Q.   (BY MR. INNES)  NACDS was
8  opposed to the reclassification because of
9  increased costs. Do you agree with that?
10      MS. TABACCHI:  Object to the
11 form.
12      THE WITNESS:  I don't -- I
13 don't recall the specifics. If there
14 was something to refresh my memory, I
15 could take a look at it and comment.
16  Q.   (BY MR. INNES)  The operational
17 issues that you discussed regarding
18 hydrocodone, did those result in --
19 ultimately result in higher costs to Walmart?
20      MS. TABACCHI:  Object to the
21 form.
22      THE WITNESS:  The specific
23 relabeling and refills, the refill
24 issues that I discussed, those were
25 just how to execute. So not

Page 162

1 specifically.
2 Q. (BY MR. INNES) So it's my
3 understanding that Walmart -- when the
4 rescheduling occurred, Walmart had to
5 increase its vault size at the 6045 location;
6 is that correct?
7 A. That is correct. We moved all
8 of the product from other distribution
9 centers and started operation of --
10 distribution of hydrocodone from that single
11 location.
12 Q. Okay. And when hydrocodone was
13 rescheduled, it's also my understanding that
14 that would -- that increased the amount of
15 Schedule IIs that Walmart was required to
16 review. Isn't that right?
17 MS. TABACCHI: Object to the
18 form.
19 THE WITNESS: Are you referring
20 to the dispensing function? Or
21 distribution function?
22 Q. (BY MR. INNES) Distribution
23 function.
24 MS. TABACCHI: Object to the
25 form.

Page 163

1 THE WITNESS: There were more
2 orders coming through DC '45 after the
3 reclassification.
4 Q. (BY MR. INNES) Did those
5 orders result in the need to hire more
6 personnel --
7 MS. TABACCHI: Object to the
8 form.
9 Q. (BY MR. INNES) -- to review
10 those orders?
11 MS. TABACCHI: Lack of
12 foundation.
13 THE WITNESS: I don't know what
14 the personnel impact was.
15 Q. (BY MR. INNES) Do you agree
16 with the statement that when the -- following
17 the reclassification resulted in a demand
18 value and -- increased demand value and
19 pressure to divert that particular product?
20 MS. TABACCHI: Object to the
21 form.
22 THE WITNESS: I don't know
23 what -- I'm not sure I know what that
24 statement means.
25 Q. (BY MR. INNES) Is it your

Page 164

1 understanding that the reclassification of
2 hydrocodone increased its street value?
3 MS. TABACCHI: Object to the
4 form.
5 THE WITNESS: I don't know
6 that. I don't have that information.
7 (Whereupon, Deposition Exhibit
8 Walmart Hiland 5, August 2014 email
9 chain. Subj: FW: Hydrocodone to CII
10 meeting 8.25.14.
11 WMT_MDL_000047417-47419., was marked
12 for identification.)
13 Q. (BY MR. INNES) Okay. While
14 you review that document, Ms. Hiland, I'm
15 just going to note for the record that that
16 is a Walmart document. It's been marked as
17 Exhibit 5. Bates number is 47417, and it
18 ends in 47419.
19 [Document review.]
20 THE WITNESS: I've reviewed it.
21 Q. (BY MR. INNES) Okay. So
22 again, this is an email from Debbie Mack to
23 Susanne Hiland, sent on August 25th, 2014.
24 The subject line is "FW: Hydrocodone to C-II
25 meeting 8-25-14." There's one attachment.

Page 165

1 There's a Word document that we've attached
2 here as well.
3 Do you recall receiving this
4 email?
5 A. I don't recall it specifically,
6 but I see that it was addressed to me.
7 Q. So you have no reason to
8 believe you didn't receive this email?
9 A. No.
10 Q. Did you attend the 8-25-14
11 meeting?
12 A. I don't know. Since I'm not on
13 the original distribution, and -- I'm not
14 sure I did.
15 Q. Okay.
16 This would appear to be from
17 this email, and tell me if you disagree.
18 Miss -- I may mispronounce the last name --
19 Tustison's? -- notes from that meeting?
20 A. Yes, that's what it appears.
21 Q. And just for the record, it's
22 T-U-S-T-I-S-O-N. I may have added an extra
23 S-.
24 Okay. So if I could turn your
25 attention to the second page of the document.

Page 166

1 About a third of the way down the page it
2 says, "Nick --" Then it says "Nick --" again.
3 Right under that line it says,
4 "Stores are getting products from 5 DCs and
5 will go to 1 DC."
6 Is that a reference to the
7 consolidation of distribution of hydrocodone
8 from multiple DCs to the one DC, 6045?
9 A. Yes.
10 Q. Exactly halfway down the page
11 you'll see the word "Volume." It says
12 "Volume --. Go after capital funds to
13 increase the size of the vault at the -- on
14 the C-II warehouse."
15 Do you see that?
16 A. Yes.
17 Q. Okay.
18 And the C-II warehouse, again,
19 that's 6045?
20 A. Yes.
21 Q. And what's your understanding
22 of the "Go after capital funds to increase
23 the size of the vault"? What does that mean?
24 MS. TABACCHI: Object to the
25 form.

Page 167

1 THE WITNESS: We have a
2 budgeting process at Walmart that's
3 approved annually. Since this was in
4 the middle of our fiscal year,
5 there -- and not preplanned, there
6 would have to be a budget request
7 made.
8 Q. (BY MR. INNES) Okay. So this
9 is essentially out of cycle, and it means
10 that you're going to have to request more
11 dollars to complete this project; is that
12 right?
13 MS. TABACCHI: Object to the
14 form.
15 THE WITNESS: Yes. The capital
16 funds request would be additional
17 funding.
18 Q. (BY MR. INNES) Who is making
19 the capital fund request, do you know?
20 A. I don't know what the process
21 was at that -- for the distribution centers.
22 Q. Okay.
23 At the bottom of the page, it
24 says "Redacted privileged." And just above
25 that it says, "Hydro still the largest drug

Page 168

1 filed on DEA 106s."
2 Do you see that?
3 A. Yes.
4 Q. And "hydro" refers to
5 hydrocodone; is that right?
6 A. I'm assuming so, from this
7 context.
8 Q. And what's a DEA 106, do you
9 know?
10 A. It's an official DEA form to
11 report a loss of controlled substances.
12 Q. So at this time, at least
13 according to this document, hydrocodone was
14 the -- was reported, loss of controlled
15 substances. This was leading the list. This
16 is the top of the list in lost controlled
17 substances; is that right?
18 MS. TABACCHI: Object to the
19 form. Lack of foundation.
20 THE WITNESS: That's what's
21 reflected on the document.
22 Q. (BY MR. INNES) Do you have any
23 basis to disagree with that statement in this
24 document?
25 MS. TABACCHI: Same objections.

Page 169

1 THE WITNESS: I don't have any
2 information to agree or disagree.
3 MR. INNES: Okay.
4 Q. (BY MR. INNES) Now I'll have
5 you turn to the third page of this document.
6 Middle of the way down the page
7 it says, "The price of hydrocodone will go up
8 which will increase the demand, value, and
9 pressure to divert. PC recommends locking up
10 sooner rather than later."
11 Do you know what the letters
12 "PC" stands for?
13 A. That, in this context, would be
14 practice compliance.
15 Q. And who is in charge of
16 practice compliance at -- in 2014?
17 MS. TABACCHI: Object to the
18 form.
19 THE WITNESS: The senior
20 director at that time would be George
21 Chapman.
22 Q. (BY MR. INNES) A third of the
23 way down the page it says, "What will we do
24 for potential increased diversion between now
25 and October 6th?"

Page 170

1    Do you see that?
2    A.    Yes.
3    Q.    Is the implication from that
4  that the rescheduling of hydrocodone will
5  result in the potential for increased
6  diversion?
7         MS. TABACCHI:  Object to the
8    form.  Lack of foundation.
9         THE WITNESS:  I think this was
10   just like brainstorming what we needed
11   to think about with this change
12   coming.
13        I think these were kind of
14   free-form thoughts, brainstorming
15   through this meeting.
16   Q.    (BY MR. INNES)  Well, at that
17 time, do you agree with the statement that
18 "The potential for increased diversion
19 between now and October 6th could occur due
20 to the rescheduling of hydrocodone"?
21        MS. TABACCHI:  Object to the
22   form.
23        THE WITNESS:  That wouldn't
24   be -- that wouldn't be my train of
25   thought in the rescheduling.

Page 171

1    My mind just doesn't go to that
2  potential, as I think about the
3  rescheduling.
4    Q.    (BY MR. INNES)  Well, why not?
5  Why do you disagree with that
6  statement?
7         MS. TABACCHI:  Object to the
8    form.
9         THE WITNESS:  I don't disagree
10   with the statement.  I just don't
11   think about it -- I don't think about
12   it in that way.  That wouldn't be one
13   of the issues that I would think to
14   raise in the context of the
15   rescheduling.
16   Q.    (BY MR. INNES)  But it's
17 possible that the rescheduling could result
18 in the potential for increased diversion?
19   A.    I think --
20        MS. TABACCHI:  Object to the
21   form.
22        THE WITNESS:  I think somebody
23   in this meeting has raised the issue
24   of -- that it's possible that that
25   could occur.

Page 172

1    Q.    (BY MR. INNES)  And, yep, I
2  fully agree that it's documented in these
3  notes from the meeting.  I'm wondering
4  whether or not you agree or disagree with
5  that statement?
6         MS. TABACCHI:  Object to the
7    form.  Asked and answered.
8         THE WITNESS:  That there is
9    potential for increased diversion.
10   Q.    (BY MR. INNES)  Due to the
11 rescheduling.
12   A.    Again, my mind just doesn't
13 think that way.  I don't disagree or agree
14 with it.  I -- that's not something that I
15 had in mind as the rescheduling was -- was
16 occurring.
17   Q.    Okay.  In your role on the
18 policy council for NACDS, did anyone raise
19 the issue that was raised here, that the
20 rescheduling could result in the potential
21 for increased diversion?
22   A.    Not that I recall.
23   Q.    In addition to you, who
24 serves -- or who participates in the NACDS?
25 From Walmart?

Page 173

1    A.    George Chapman is also a member
2  of the policy council.
3    Q.    Okay.  Any other members on the
4  policy council?
5    A.    No.  We only have -- we have
6  two, based on company size.
7    Q.    So the member -- your
8  participation is dictated by company size?
9  Is that right?
10   A.    The seats that we hold on
11 policy council are related to size of the
12 company.
13   Q.    Okay.  What other positions are
14 held by Walmart employees at the NACDS?
15        MS. TABACCHI:  Object to the
16   form.
17        THE WITNESS:  So can you
18   clarify -- are you -- can you clarify
19   what you mean by "positions"?
20   Q.    (BY MR. INNES)  Are you
21 familiar with the board -- the names of the
22 board members of the NACDS?
23        MS. TABACCHI:  Object to the
24   form.
25        THE WITNESS:  No.

Page 174

1    Q.    (BY MR. INNES) Are you -- do
2  you know if George Riedl serves on the board
3  of the NACDS?
4         MS. TABACCHI:  Object to the
5    form.
6         THE WITNESS:  Are you asking
7    for a specific time frame?
8    Q.    (BY MR. INNES)  Has he ever sat
9  on the board?
10         MS. TABACCHI:  Object to the
11    form.
12         THE WITNESS:  I don't know if
13    he was a -- there's -- there's the --
14    there's the board and there's the
15    executive committee, and I'm not
16    sure -- I'm not sure if he was
17    officially on the board.
18         I just -- I don't know if -- I
19    know there are -- I know there were
20    other people that were voted onto the
21    board from Walmart, but I don't
22    remember whether or not George was
23    officially on the board for NACDS.
24    Q.    (BY MR. INNES)  Okay.  All
25  right.  So what board members from Walmart

Page 175

1  are you aware of?  At any point in time.
2    A.    Carmen Bauza was voted to the
3  board of directors at one time.
4         I believe Marybeth Hayes was at
5  one time.
6         Those are the ones that I
7  remember, the vote that occurred.
8         There may have been others.
9  And it's possible there were others, I just
10  don't recall that official participation.
11    Q.    Do you know what committees, if
12  any, Ms. Bauza sat on?
13    A.    At that level, just the board
14  of directors.
15    Q.    Do you know what committees, if
16  any, that Mr. -- is it Rye-dell?
17    A.    Ree-dul.
18    Q.    Ree-dul.  Thank you.
19         -- that Mr. Riedl sat on?
20    A.    Again, if he participated, it
21  would be at the level of board of directors.
22    Q.    And I think you mentioned one
23  other.  Ms. Hayes?  Is that right?
24    A.    Yes.
25    Q.    What committees, if any, did

Page 176

1  she sit on?
2    A.    She also would have -- these
3  were over different time frames.  She would
4  have been board of directors as well.
5    Q.    Okay.  Do you know what time
6  frame Ms. Bauza participated?
7         MS. TABACCHI:  Object to the
8    form.
9         THE WITNESS:  I don't, but I
10    believe in order it would have been
11    Carmen, George, Marybeth, with
12    Marybeth being the most recent that
13    I'm aware of.
14    Q.    (BY MR. INNES)  Am I correct
15  that none of them served at the same time?
16  They served in successive terms?
17         MS. TABACCHI:  Object to the
18    form.
19         THE WITNESS:  That's what I
20    think.  I don't know the workings of
21    NACDS at that level.
22    Q.    (BY MR. INNES)  I'm not trying
23  to play gotcha.  Just trying to get a better
24  picture of NACDS.
25         And Ms. Bauza, Mr. Riedl and

Page 177

1  Ms. Hayes, those were high-level positions at
2  the NACDS?
3         MS. TABACCHI:  Object to the
4    form.
5         THE WITNESS:  I think I'm
6    struggling with the idea of position.
7    We were like participants.  Even --
8    but board of directors is the highest
9    position -- highest membership
10    position that I'm aware of.
11    Q.    (BY MR. INNES)  So Walmart held
12  the highest membership position that you're
13  aware of at NACDS?
14         MS. TABACCHI:  Object to the
15    form.
16         THE WITNESS:  At different
17    times.
18    Q.    (BY MR. INNES)  Do you
19  participate in the RxIMPACT program?
20    A.    I have, yes.
21    Q.    And what is the RxIMPACT
22  program?
23    A.    It is an advocacy program
24  that's sponsored by NACDS.
25    Q.    And what do you mean by

Page 178

1  "advocacy program"?
2      A.   So legislative advocacy.
3  Meeting with legislators at either the state
4  or federal level, to advocate for
5  pharmacy-related issues.
6      Q.   Have you met with legislators,
7  either the state or federal level, to
8  advocate for pharmacy-related issues through
9  your role at the NACDS?
10     A.   Through my participation in
11  RxIMPACT, yes.
12         It's a -- it's an event that
13  occurs.  And then it can -- it can apply to
14  certain specific topics at the state level.
15     Q.   Okay.  And does that -- is it
16  certain specific topics at the federal level
17  as well?
18     A.   There's always a -- kind of an
19  agenda of topics to discuss, when the event
20  is planned.
21     Q.   Does the agenda of topics of
22  events, is it -- at any time in the past has
23  it included opioids?
24         MS. TABACCHI:  Object to the
25  form.

Page 179

1          THE WITNESS:  I don't know if
2  the official agenda included opioids.
3  We, Walmart, in our participation in
4  2018 discussed a national prescription
5  monitoring program.
6          I want to say we -- we would --
7  we would look at the agenda topics and
8  choose how we were going to address
9  the visits that we made.  And I know
10  that on the visits that I participated
11  in, we talked to staff and legislators
12  about a national prescription
13  monitoring program.
14     Q.   (BY MR. INNES)  And that --
15  what was the date of that?  2018?  Is that
16  what you said?
17     A.   That would be March of 2018.
18     Q.   Okay.  Did any of the topics
19  touch upon prescription drug abuse?
20         MS. TABACCHI:  Object to the
21  form.
22         THE WITNESS:  Not that I
23  recall.
24     Q.   (BY MR. INNES)  Did any of the
25  topics touch upon opioid-related deaths?

Page 180

1          MS. TABACCHI:  Object to the
2  form.
3          THE WITNESS:  Not that I
4  recall.
5      Q.   (BY MR. INNES)  Did any of the
6  topics address opioids' effect on national
7  mortality rates?
8          MS. TABACCHI:  Object to the
9  form.
10         THE WITNESS:  Not that I
11  recall.
12     Q.   (BY MR. INNES)  And you
13  participated in the 2018 RxIMPACT day; is
14  that right?
15     A.   Yes.
16     Q.   And during the 2018 RxIMPACT
17  day, did you meet with any legislators?
18     A.   Yes.
19     Q.   Did you meet with any federal
20  legislators?
21     A.   Yes.
22     Q.   And who did you meet with?
23     A.   I don't remember the list.
24  There would be a list, because we would
25  file -- we would file a lobbying report.  But

Page 181

1  I don't know -- without some --
2      Q.   Are you registered as a
3  lobbyist?
4          MS. TABACCHI:  Object to the
5  form.
6          THE WITNESS:  No.
7      Q.   (BY MR. INNES)  Is the NACDS
8  registered as a lobbyist?
9      A.   I don't know.
10     Q.   But it's your understanding
11  that a lobbying report would be filed that
12  would include a list of those folks that you
13  met with on that particular IMPACT day?
14     A.   I believe so.  NACDS tracked
15  all of those meetings.
16     Q.   Did you ever have discussions
17  with folks back at Walmart about who you had
18  met with during the RxIMPACT days?
19     A.   We worked with our DC office,
20  our federal government affairs office on the
21  meetings that we were having.
22     Q.   Prior to those meetings taking
23  place, did you have meetings with -- strike
24  that.
25         Prior to your meetings with

Page 182

1 legislators, did you meet with the federal
2 government affairs office at Walmart?
3        MS. TABACCHI:  Object to the
4 form.
5        THE WITNESS:  We would discuss
6    who was attending, navigating -- how
7    to navigate the Capitol, because it
8    can be very confusing.  So they
9    supported us with that.
10       It was more about kind of the
11   logistics of the day, that I remember.
12   Q.    (BY MR. INNES) By "navigating
13 the Capitol," I assume you mean physically
14 getting around the Capitol; right?
15   A.    Yes.
16   Q.    Are you familiar with the
17 NACDS's congressional testimony where they
18 reference a study that was commissioned by
19 NACDS for best practices for pharmacies
20 related to OxyContin?
21   A.    I don't recall that
22 specifically.  Can you orient me to date?
23   Q.    The testimony was given on
24 February 12, 2002.
25   A.    That was prior to my

Page 183

1 participation.  I was still in the field at
2 that time.
3    Q.    Does the NACDS maintain
4 resources that you can call upon in your role
5 as a member of the policy council?
6        MS. TABACCHI:  Object to the
7    form.
8        THE WITNESS:  There are --
9    there are resources that they have
10   available.
11   Q.    (BY MR. INNES) Would those
12 resources include statements given to
13 Congress?
14       MS. TABACCHI:  Object to the
15   form.
16       THE WITNESS:  Not that I've
17   seen.
18   Q.    (BY MR. INNES) What resources
19 do you know to be available?
20   A.    The resources that I've
21 accessed would be like grids of state law on
22 the specific issues.  Something -- I'm trying
23 to think of what -- state practice allowance
24 for immunizations, for example.
25       I also know at one time they

Page 184

1 had a resource related to fraud, waste, and
2 abuse training for pharmacists.
3        So I -- those are the resources
4 that I can remember accessing on the NACDS
5 site.
6    Q.    Does Walmart participate in
7 updating those resources?
8        MS. TABACCHI:  Object to the
9    form.
10       THE WITNESS:  No.  It's -- in
11   my mind, that resource is a service
12   that NACDS provides.
13       MR. INNES:  Okay.
14   Q.    (BY MR. INNES) You mentioned
15 you met with legislators and staff about a
16 national prescription monitoring program in
17 2018; is that right?
18   A.    That's what I recall.
19   Q.    I just wanted to make sure I
20 had the date right.
21       Did you or Walmart ever raise
22 that idea, or something similar to that idea,
23 prior to 2018 with state legislators or
24 federal legislators?
25       MS. TABACCHI:  Object to the

Page 185

1    form.
2        THE WITNESS:  We talked about
3    the issue, but I don't know -- I don't
4    know to specific legislators if we did
5    have that conversation.
6    Q.    (BY MR. INNES) When is the
7 first time that you talked about that
8 particular program?
9        MS. TABACCHI:  Object to the
10   form.
11       THE WITNESS:  I don't remember
12   what date -- what year it was.  It was
13   sometime --
14       So it was during the previous
15   administration, I participated in a
16   work group through ONDCP, Office of
17   National Drug, OND -- Office of
18   National -- ONDCP, whatever that
19   stands for -- Drug Control Policy, I
20   think.
21       And that was focused on the
22   interoperability of prescription drug
23   monitoring programs and trying to
24   achieve broader access to those -- to
25   those programs.

Page 186

1    Q.    (BY MR. INNES)  And "the prior
2   administration," you're referring to the
3   President Obama's administration?
4    A.    Yes.
5    Q.    And what exactly is your
6   definition of a prescription drug monitoring
7   program?
8           Just so we're all on the same
9   page.
10   A.    States -- generally, because
11  there's not a federal solution -- operate
12  drug monitoring programs where prescription
13  information is provided to the state in an
14  aggregate format so that if they allow
15  access, a physician or a pharmacist, for
16  example, could see not only what was filled
17  in their location or prescribed by them in
18  the case of a physician, but also see -- it's
19  a complete patient profile of the controlled
20  substances that they've received across any
21  prescriber and any pharmacy within that
22  state.
23   Q.    Okay.  And what was Walmart's
24  intent in presenting such programs to
25  legislatures on that -- in 2018?

Page 187

1        MS. TABACCHI:  Object to the
2   form.
3        THE WITNESS:  We were asking
4   for advocacy to establish a national
5   prescription drug monitoring program
6   so that we -- so that there would be
7   clear visibility across all state
8   lines.
9    Q.    (BY MR. INNES)  Okay.  And did
10  you make efforts to do that with the prior
11  administration?
12       MS. TABACCHI:  Object to the
13  form.
14       THE WITNESS:  Other than
15  participating in the ONDCP work group.
16  We had been -- I don't know what the
17  timing is.  We had been working to
18  establish a national solution over a
19  period of time.  That March 2018
20  advocacy was not the start of that
21  conversation.  I just don't know what
22  the time frame was.
23       (Whereupon, Deposition Exhibit
24  Walmart Hiland 6, 8-17-12 email from
25  Susanne Hiland.  Subj: Prescription

Page 188

1   Drug Abuse and Diversion - Senator
2   Harkin.  WMT_MDL_000049685-49687, was
3   marked for identification.)
4    Q.    (BY MR. INNES)  Again,
5   Ms. Hiland, take your time in reviewing this
6   document.
7           For the record, it is a Walmart
8   document Bates stamped 49686 through 49687.
9           [Document review.]
10          THE WITNESS:  I've reviewed.
11   Q.    (BY MR. INNES)  So this is a
12  letter dated August 17th, 2012, sent by you
13  to Senator Tom Harkin, in the Hart Senate
14  Building in Washington, DC.
15          Do you remember sending this
16  letter?
17   A.    I don't specifically.  I did
18  send the letter.
19   Q.    And at the bottom, the last
20  full -- the last paragraph begins, "Policy
21  areas that should be reviewed by this panel
22  include a system for prescription drug
23  monitoring that avoids duplications and
24  process -- and provides access to
25  stakeholders that need the prescription

Page 189

1   monitoring data."
2           Is it fair that that's a PDMP?
3    A.    Yes.
4    Q.    So does this refresh your
5   recollection that at least as early as
6   August 17th, 2012, Walmart was discussing
7   PDMPs with federal legislators?
8    A.    Yes.
9    Q.    Now, based on having -- now
10  having this letter, do you recall if it --
11  happened prior to August 17th, 2012?  Do you
12  recall any communications such as advocating
13  for a PDMP?
14          MS. TABACCHI:  Object to the
15  form.
16          THE WITNESS:  I don't know from
17  an advocacy, but this wouldn't be
18  the -- this would have been the first
19  time this issue was discussed with
20  Walmart, or that we would have
21  discussed it.
22   Q.    (BY MR. INNES)  Okay.
23   A.    This would have been a result
24  of prior discussions that we have -- at least
25  had within Walmart.

Page 190

1    Q.    So this letter opens -- the
2  opening paragraph asks Senator Harkin to
3  fight prescription diversion abuse.  Right?
4    A.    Yes.
5    Q.    Okay.  And you ascribe the
6  matter as urgent; is that right?
7    A.    Yes.
8    Q.    And this is in -- this is in
9  2012?
10   A.    Yes.
11   Q.    Why in 2012 did you feel that
12 the matter was urgent?
13   A.    This was part of efforts that
14 we had ongoing.  This was in the -- kind of
15 in the same time frame that we were hearing
16 about the oxy 30 issues from the DEA.  I know
17 that there were actions taken against some of
18 our competitors around their dispensing
19 habits, and so we were seeing the issues
20 related to opioid use continuing to rise,
21 just coming from an environmental scan.
22   Q.    Did you say opioid use or
23 opioid abuse?
24   A.    I meant abuse, if ...
25   Q.    So the reason why, in August of

Page 191

1  2012, you believe the matter was urgent was
2  because of the conversations you had had with
3  the DEA regarding oxy 30 and the fines and
4  penalties that were leveled against folks who
5  were similarly situated to Walmart in the
6  dispensing and distribution of opioids.
7         MS. TABACCHI:  Object to the
8    form.
9         THE WITNESS:  Really what we
10   were -- what we were seeing as a
11   continuing issue related to the opioid
12   abuse.
13   Q.    (BY MR. INNES)  Okay.  And you
14 mentioned that the DEA told you that they
15 weren't focused on Walmart in particular for
16 oxy 30s at that point in time; right?
17   A.    That is correct.
18   Q.    And these actions that you
19 referenced were brought against companies
20 other than Walmart?  That's right?
21   A.    Correct.
22   Q.    So why would a warning from the
23 DEA that you weren't a concern, that Walmart
24 wasn't a concern and actions against
25 companies other than Walmart create this

Page 192

1  sense of urgency in your mind?
2         MS. TABACCHI:  Object to the
3    form.
4         THE WITNESS:  So I think it was
5    the environment that we were all aware
6    of at that time.
7         We put proactive measures in
8    place related to the oxy 30 because
9    enforcement action was occurring in
10   other areas.  The potential for
11   someone to try to move that
12   prescription or that -- or into a
13   Walmart was something that we had some
14   concerns about.  That's why we put
15   some of those additional measures in
16   place.
17        And so this was just an
18   environment that we saw continuing
19   issues related to opioids, and we were
20   hoping for support of this advisory
21   panel which ultimately was
22   commissioned, I believe.
23   Q.    (BY MR. INNES)  Does
24 environmental -- the environment that you're
25 in; right?  It's folks other than Walmart

Page 193

1  that are having trouble with the DEA.  In
2  fact, the DEA tells you that they're not
3  focusing on you.  So what's the concern?
4         MS. TABACCHI:  Object to the
5    form.
6         THE WITNESS:  The concern is
7    that there are -- the environment --
8    I'm not talking about the regulatory
9    environment.  The environment that I'm
10   talking about is the environment that
11   our pharmacists are faced with, with
12   people presenting prescriptions, and
13   we had -- we had competitors who were
14   implementing programs that limited
15   some of the ways that they were
16   dispensing.  And so we just -- the
17   environment that we saw from a
18   community pharmacy perspective pointed
19   to an urgency around the issue related
20   to opioids.
21   Q.    (BY MR. INNES)  How does a
22 competitor limiting dispensing of opioids
23 bear at all on Walmart?
24        MS. TABACCHI:  Object to the
25   form.

Page 194

```
1        THE WITNESS:  So one of the red
2   flags that our pharmacists face is
3   pharmacy shopping.
4        So if one pharmacy denies a
5   prescription, that doesn't mean the
6   person is not going to try to go to
7   the next pharmacy and the next
8   pharmacy until they can get their
9   prescription filled.
10       And so those -- those were
11  just -- as we're thinking about issues
12  in the environment, those are the
13  kinds of things that we're thinking.
14       Q.   (BY MR. INNES)  So what
15  particular -- what particular competitors
16  were implementing programs that limited the
17  ways that they were dispensing opioids?
18       MS. TABACCHI:  Object to the
19  form.
20       Q.   (BY MR. INNES)  At this
21  particular time?
22       A.   At this time, I believe
23  Walgreens and CVS both had programs in place.
24       Q.   So if a Walgreens and CVS were
25  limiting their dispensing of opioids, as I
```

Page 195

```
1   understand your testimony, that would
2   potentially lead to those scripts being
3   brought to a Walmart to be filled.
4        A.   I'm just saying that the
5   environment that we were practicing in was
6   different than what we had seen in the past.
7        And that potential existed
8   within the -- within the practice that we
9   were experiencing at the time.
10       Q.   And I'm just trying to get a
11  better understanding about the environment.
12       And one of the factors in that
13  environment that you've described is the --
14  that your competitors were limiting
15  dispensing.
16       And if your competitor is
17  limiting dispensing, I want to know --
18  understand how that impacted Walmart
19  negatively.
20       MS. TABACCHI:  Object to the
21  form.
22       THE WITNESS:  I'm saying it had
23  the potential to do that.
24       Q.   (BY MR. INNES)  And how -- why
25  did it have the potential to do that?
```

Page 196

```
1        A.   Because Walmart wasn't creating
2   the demand.  Our competitors weren't creating
3   the demand.  The prescriptions that were
4   being written didn't cease when -- when a
5   competitor decided to change a program or a
6   policy.  I'm saying the potential existed.
7   That's why we implemented our proactive
8   policies.
9        Q.   When you say "Walmart wasn't
10  creating the demand," what do you mean by
11  that?
12       A.   We didn't write the
13  prescriptions that were coming to us.
14       Q.   And you saw a -- and the
15  demand -- so the demand is, in -- in this
16  scenario, what do you mean by the word
17  "demand"?
18       A.   The prescriptions we were
19  filling -- we do fill today -- come from a
20  physician.  So those prescriptions are not
21  generated through any activity that Walmart
22  directs.  That's what I mean.
23       MS. TABACCHI:  We're ready for
24  a break whenever it's good for you,
25  Mike.
```

Page 197

```
1        MR. INNES:  Okay.
2        Q.   (BY MR. INNES)  So the
3   demands -- I'm just trying to follow your
4   logic on the increased -- or your
5   competitor's limiting dispensing.
6        By limiting dispensing, are you
7   saying that those scripts that were denied
8   by, say, CVS or Walgreens in this scenario
9   were then brought to Walmart to be filled,
10  and that increased the demand at the Walmart
11  pharmacy counter for opioids?
12       MS. TABACCHI:  Object to the
13  form.  Asked and answered.
14       THE WITNESS:  No, what I'm
15  saying was the potential for them to
16  be presented existed.  We -- and so
17  be -- the environment that we found
18  ourselves in was very different
19  over -- over a period of time that we
20  had seen some of the activity.  We had
21  information from the DEA saying
22  oxycodone 30 was a problem.  Walmart
23  was not the problem.
24       The problem that was -- was
25  being focused on was prescriptions for
```

Page 198

1 oxycodone 30 that Walmart was not
2 writing.
3          And so we were trying to be --
4 we found ourselves in a position to
5 say, we have this information. We
6 want to be proactive about it. And
7 the environment that we found
8 ourselves in was, we didn't want to be
9 part of any problem. We want to be
10 proactive in the programs that we were
11 outlining, and we saw activity around
12 us changing.
13          MR. INNES: Okay. I'm going to
14 move to strike the witness's answer to
15 that last question starting at "We."
16          So I'll keep, "No, what I'm
17 saying was about the potential for
18 them to be presented existed," which I
19 think is responsive to my question.
20 And I'll -- I can change my question.
21     Q.    (BY MR. INNES) Are you saying
22 that by Walgreens and CVS limiting their
23 dispensing increased the potential for
24 scripts that were denied by those pharmacies
25 to be brought to Walmart?

Page 199

1          MS. TABACCHI: Object to the
2 form. Asked and answered.
3          THE WITNESS: Yes, we saw that
4 as a potential.
5     Q.    (BY MR. INNES) And why is that
6 a reason for action needed? In that --
7 why -- strike that.
8          If your competitors in the
9 industry are tightening or limiting their
10 dispensing of opioids, it gets passed on to
11 you; right? Potentially. In your scenario.
12 It gets potentially passed on to you. And
13 it's been denied at another facility. Why
14 would -- denied by a competitor. Why would
15 Walmart not just deny that same script?
16          MS. TABACCHI: Object to the
17 form. Mischaracterizes the testimony.
18          THE WITNESS: So we had
19 policies and procedures in place to
20 address and verify prescriptions as
21 they were presented to our
22 pharmacists. And so this was -- my
23 testimony is about the environment
24 that we saw in this period of time.
25          This was different than we had

Page 200

1 seen previously. It's why we
2 implemented policies that were
3 different at this time.
4     Q.    (BY MR. INNES) What was
5 different in 2012 than previously?
6          MS. TABACCHI: Object to the
7 form. Asked and answered.
8          THE WITNESS: We had
9 information from the DEA specific to
10 oxycodone, the 30 milligrams, being an
11 issue that they were seeing.
12          That was different. That was
13 new information to us.
14          We reacted to that information.
15          MS. TABACCHI: Mike, before we
16 keep going, could we take another
17 break, please?
18          MR. INNES: You were done
19 answering that question? I'm sorry.
20          MS. TABACCHI: You were
21 finished; right?
22          THE WITNESS: I was.
23          MR. INNES: Sure, we can take a
24 break.
25          THE VIDEOGRAPHER: 1:54. We

Page 201

1 are off the video record.
2          (Recess taken, 1:54 p.m. to
3 2:12 p.m.)
4          THE VIDEOGRAPHER: 2:12. We
5 are on the video record.
6          MR. INNES: Okay. We're back
7 on the record. There was a -- before
8 we start, Ms. Hiland, I'm just going
9 to make a statement on the record
10 here.
11          And correct me if I'm wrong,
12 Ms. Tabacchi, but there is a
13 discrepancy between what was
14 transcribed and perhaps what the
15 witness said occurring around 1:40, I
16 believe. We've agreed that we will
17 take care of that discrepancy via the
18 errata.
19          MS. TABACCHI: Correct. It's a
20 discrepancy between the word "would"
21 and "wouldn't." So we will -- we have
22 agreed that we will address it in the
23 errata.
24     Q.    (BY MR. INNES) So let's march
25 forward. We'll see if we can't make sure

Page 202

1 everyone makes their flights. Try to quicken
2 the pace a little bit.
3 I'd still like to discuss this
4 August 17th letter that you sent to
5 Senator Harkin. And in the first paragraph
6 you say, "The matter is urgent."
7 The matter you're referring to
8 there is prescription diversion and abuse; is
9 that correct?
10 A. Yes. And as the rest of the
11 sentence reads, "a coordinated national
12 effort to combat the problem." I think it is
13 inclusive of what was urgent about this
14 request.
15 Q. Okay. So the problem that was
16 urgent is the prescription diversion and
17 abuse, and it's urgent that the prescription
18 drug monitoring program be put into effect;
19 is that right?
20 MS. TABACCHI: Object to the
21 form.
22 THE WITNESS: I think the
23 content of the letter is beyond -- is
24 inclusive of prescription drug
25 monitoring program, but there are

Page 203

1 additional asks that are included in
2 the letter.
3 Q. (BY MR. INNES) Okay. How does
4 a competitor's not following the law, the
5 Controlled Substances Act make this matter
6 urgent?
7 MS. TABACCHI: Object to the
8 form.
9 THE WITNESS: Yeah. So I'm not
10 saying that in the letter. I know we
11 discussed that previously.
12 What I'm saying is that the
13 issues around prescription drug
14 diversion and abuse make this -- or
15 this is an urgent matter based on that
16 issue.
17 Q. (BY MR. INNES) And you became
18 aware of -- or formed in your mind this issue
19 was urgent because you had conversations with
20 the DEA regarding oxy 30, and because of
21 competitors paying fines or otherwise being
22 prosecuted by the federal government.
23 MS. TABACCHI: Object to the
24 form.
25 Q. (BY MR. INNES) Is that right?

Page 204

1 A. We were seeing changes in an
2 environment that included some of those
3 things that I mentioned before.
4 Q. Okay. Well, I think your prior
5 testimony was those were the two pieces of
6 information.
7 Is there information you'd like
8 to add to that list now?
9 MS. TABACCHI: Object to the
10 form.
11 THE WITNESS: I would just say
12 it was -- those were -- those were
13 inclusive of -- I can't think of other
14 reasons right now, but they are
15 inclusive of --
16 Q. (BY MR. INNES) So does the --
17 why would a competitor paying fines make this
18 issue urgent?
19 MS. TABACCHI: Object to the
20 form.
21 THE WITNESS: I don't think the
22 fact that they -- I don't think that's
23 what I -- that's not what I meant.
24 What I meant was we were seeing
25 activity in the prescription

Page 205

1 dispensing environment that was
2 different than we had seen before.
3 Q. (BY MR. INNES) And that
4 activity was your competitors weren't
5 following the law and being hit with fines?
6 MS. TABACCHI: Object to the
7 form.
8 THE WITNESS: The issues that
9 we were seeing around prescription
10 diversion and abuse were inclusive of
11 what we were -- what we were
12 experiencing in that time frame of
13 2012. It didn't -- it didn't inform
14 everything that's entailed in this
15 letter. What we were -- what we were
16 seeing was we had undertaken a lot of
17 effort and continued to provide due
18 diligence in the way that we're
19 dispensing prescriptions, but we were
20 seeing efforts across the environment,
21 the industry that -- and it brings it
22 into context where there are multiple
23 people trying to address this issue.
24 And the letter is asking for support
25 so that we can bring solutions forward

Page 206

1  for our pharmacists.  And in this --
2  in this environment, in our effort to
3  provide healthcare services, we are
4  asking for support and tools for our
5  pharmacists.
6      Q.   (BY MR. INNES)  Why do you need
7  support to comply with the Controlled
8  Substances Act?
9      MS. TABACCHI:  Object to the
10  form.
11     THE WITNESS:  We needed -- what
12  we were asking for was support for
13  broader visibility -- I mean, that's
14  what a prescription -- a national
15  prescription monitoring program would
16  do.  We're just asking to try to be
17  part of the solution and for support
18  in developing some of these solutions.
19     Q.   (BY MR. INNES)  How does
20  information that one particular form of
21  opioid is being abused?  How does that create
22  a sense of urgency in your mind, around all
23  opioids?
24     MS. TABACCHI:  Object to the
25  form.

Page 207

1      THE WITNESS:  It's one data
2  point that we reacted proactively to.
3      Q.   (BY MR. INNES)  And if there
4  was a sense of urgency regarding that one
5  product, why not extend your programs to all
6  products?
7      MS. TABACCHI:  Object to the
8  form.
9      THE WITNESS:  We did do that.
10     Q.   (BY MR. INNES)  Your comments
11  focused on the oxy 30s.
12     A.   My comment focused on oxy 30
13  because that's the drug that the DEA
14  mentioned.  We also, then, started to look at
15  all C-IIs that we were dispensing or
16  distributing around the -- we expanded the
17  review that we were doing from -- to all
18  opioid -- all C-II products that were ordered
19  over a quantity of 20.  We increased our due
20  diligence around all products in that same
21  time frame.
22     We were communicating to our
23  pharmacies.  We were providing additional
24  training.  And there were a multitude of
25  things that we were doing -- to improve our

Page 208

1  own programs and provide tools for our
2  pharmacists, we were advocating for
3  additional tools that we felt would be
4  helpful, because there were so many other
5  people also working on issues related to
6  opioids.
7      Q.   And those people were the DEA;
8  correct?
9      A.   They're included in the list of
10  people and agencies that were working on
11  opioid issues.
12     Q.   Right.  And they were doing
13  that by prosecuting folks who were not
14  complying with the CSA; isn't that right?
15     MS. TABACCHI:  Object to the
16  form.
17     THE WITNESS:  In our case, they
18  were communicating with us.  I think
19  there were a variety of ways that the
20  DEA and other agencies were focusing
21  on the opioid issue.
22     Q.   (BY MR. INNES)  And your
23  competitors were focused on the opioid issue
24  by restricting their opioid dispensing
25  practices; is that right?

Page 209

1      MS. TABACCHI:  Object to the
2  form.
3      THE WITNESS:  My experience was
4  that there were changes that were
5  occurring that were new in the
6  environment.  That was my experience.
7      Q.   (BY MR. INNES)  And you pointed
8  specifically to, I think it was Walgreens and
9  CVS.
10     A.   You asked me who I was aware
11  had made some changes, and I knew that there
12  were enforcement actions at that time.
13     Q.   And so they made those
14  changes -- the changes that you were aware of
15  were related to the enforcement actions?
16     MS. TABACCHI:  Object to the
17  form.
18     THE WITNESS:  I don't know the
19  timing of the -- I don't know the
20  exact timing of when any of those
21  changes were made by our competitors.
22     Q.   (BY MR. INNES)  So the urgency,
23  at least in part, is a result of your
24  competitors not following the CSA; is that
25  right?

Page 210

1  MS. TABACCHI: Object to the
2  form.
3  THE WITNESS: No, it was a data
4  point in the environment. And we saw
5  multiple agencies, patient advocacy
6  groups working in this area. So we
7  were asking for support through this
8  letter, and ultimately I believe this
9  advisory committee that we sought
10 support from Senator Harkin on was
11 established.
12 Q. (BY MR. INNES) So your
13 competitors' failure to comply with the CSA
14 and the fines they paid as a result of that
15 was a data point in the environment that
16 resulted in this letter being sent?
17 MS. TABACCHI: Object to the
18 form. Misstates testimony.
19 THE WITNESS: It was not the
20 impetus for the letter being sent. I
21 believe we started to talk about the
22 urgency and what was happening. I
23 described what I remember as the
24 environment. That was a -- that
25 was --

Page 211

1  So when I say "a data point,"
2  it was one of the pieces of
3  information that I had in this time
4  frame.
5  It did not cause -- it was not
6  the cause of the letter being written.
7  Q. (BY MR. INNES) It was one of
8  the data points that you used to form this
9  sense of urgency?
10 MS. TABACCHI: Object to the
11 form.
12 THE WITNESS: It was one of the
13 data points that formed my
14 understanding and frame in this time
15 period.
16 Q. (BY MR. INNES) Which you
17 describe as an urgent -- as an urgent matter?
18 Correct?
19 MS. TABACCHI: Object to the
20 form.
21 THE WITNESS: This letter asked
22 for support for a coordinated national
23 effort to combat prescription
24 diversion and abuse. And I believe
25 that was an urgent issue.

Page 212

1  Q. (BY MR. INNES) Which specific
2  enforcement actions do you recall reviewing?
3  A. I don't know that the actions
4  had taken place. There -- there were audits
5  that -- that were in the raids, closures of
6  pharmacies that occurred in the early 2012
7  time frame.
8  Q. Okay. So we can go through
9  those. But I believe your earlier testimony
10 was that it was enforcement actions that
11 helped frame the matter for you. Earlier.
12 Right? It was discussions with the DEA and
13 enforcement actions against competitors. I'm
14 wondering which enforcement actions against
15 which competitors were you referring to?
16 A. I don't know that -- I don't
17 know the exact time that those occurred. I
18 may need to include the word "pending." I
19 know that it was earlier in 2012 that there
20 were some issues with our competitors that
21 are a piece of information in this time
22 frame.
23 Q. So now it's -- you framed the
24 matter as urgent based on a pending
25 investigation of your competitors.

Page 213

1  MS. TABACCHI: Object to the
2  form. Misstates testimony. Asked and
3  answered.
4  THE WITNESS: Can you restate
5  the question, please?
6  Q. (BY MR. INNES) Sure. So I --
7  the question I thought was simple. I was
8  trying to understand and get a better
9  understanding for why you believed the
10 prescription diversion abuse matter to be
11 urgent at the time you wrote this letter.
12 And your prior testimony was
13 that you had a conversation with the DEA
14 regarding oxy 30s. And also enforcement
15 actions against competitors.
16 So I'm giving you an
17 opportunity to explain, if I'm wrong on that,
18 or if I'm right on that, or if there's
19 anything else that helped frame the matter as
20 urgent for you at the writing -- at the time
21 you wrote this August 17th letter.
22 MS. TABACCHI: Object to the
23 form. Asked and answered.
24 THE WITNESS: Again, the issue
25 of prescription diversion and abuse,

Page 214

1  the environment that I was aware of,
2  and from a timing perspective that I
3  recall was how I have described. We
4  had conversations about the oxycodone
5  30 issue. And in my mind, from an
6  enforcement action, I believe there
7  had been closures of at least one
8  competitor. I thought that it was --
9  I thought that the time frame was
10 appropriate based on DEA activity.
11      I'm not saying that we framed
12 our entire -- that I framed this
13 letter because of a DEA enforcement
14 action. I'm not testifying to that
15 point. If that's what the impression
16 has been, that is not what I'm
17 testifying to.
18      I was talking about the
19 environment.
20      Q.   (BY MR. INNES) And that
21 environment is the environment that caused
22 you to form in your mind the idea that
23 prescription diversion and abuse was an
24 urgent matter in August of 2012.
25      MS. TABACCHI: Object to the

Page 215

1  form. Asked and answered.
2      THE WITNESS: Again, it was
3  a -- it was information that I -- it
4  didn't -- it didn't generate this
5  letter. It wasn't the purpose behind
6  this letter.
7      Q.   (BY MR. INNES) Which I think
8  is a separate question. And I haven't asked
9  you what the purpose is behind this letter.
10 That's not my question right now. My
11 question is -- goes to the words you put in
12 this letter and the frame of mind you were in
13 when you wrote this letter.
14      And you state that this
15 prescription diversion and abuse matter is
16 urgent.
17      And you've said that there were
18 data points in the environment, and there's
19 information in the environment that had
20 caused you to hold that belief at that time.
21      I'm asking for the precise
22 information and data points that you are
23 citing to right now.
24      MS. TABACCHI: Mike, you know,
25 you've asked this question a number of

Page 216

1  times.
2      MR. INNES: And the answer has
3  changed a couple of times.
4      MS. TABACCHI: I think she's
5  done her best to give you the answer,
6  and you just don't like it so you keep
7  asking the same question over and over
8  and over.
9      MR. INNES: I have to keep
10 following up on different pieces of
11 information and data points that she's
12 giving me.
13      And to be clear, I'm not --
14      MS. TABACCHI: You're not
15 trying to harass the witness?
16      MR. INNES: I'm trying not to
17 harass you. And this is part of the
18 stilted nature of such a conversation
19 where I'm addressing your counsel.
20 And I don't mean to be rude.
21      All I'm asking for I want to
22 make sure that the record is clear
23 that I understand what data points
24 specifically you were considering when
25 forming this opinion that the

Page 217

1  prescription diversion and abuse
2  matter was urgent in August of 2012.
3      And you've mentioned a couple
4  of things, and I just want to make
5  sure that you've had an opportunity to
6  give me all of the things.
7      THE WITNESS: I can't recall
8  all of the issues that were forming
9  my -- the way that I thought about
10 this issue, but I know there were
11 multiple issues. I'm giving you --
12 I'm giving you some situations that I
13 remember in this time frame. That's
14 what I'm providing to you.
15      We are asking for support for
16 tools for our pharmacists to help
17 address a situation that we saw was
18 changing. That's the -- that's the
19 extent of what I can tell you that I
20 remember in this time frame.
21      Q.   (BY MR. INNES) Okay. Again,
22 I'm not asking you what this letter is
23 requesting from Senator Harkin. I'm asking
24 for why you believed in 2012, August 2012,
25 why the prescription diversion abuse matter

Page 218

1 was urgent. What specific data points, in
2 your words, did you use to form that opinion?
3    A.    We saw a changing environment.
4    Q.    And what were the changes in
5 that environment?
6        MS. TABACCHI: Object to the
7    form. Asked and answered.
8        THE WITNESS: We saw specific
9    urgency around information that we
10    were getting from DEA.
11    Q.    (BY MR. INNES) What specific
12 urgency around what specific information that
13 you were getting from DEA?
14    A.    In this time frame, there was a
15 conversation around specific concerns that
16 they had with oxycodone 30 milligrams that
17 they saw as high abuse. They were tracking
18 that information. We were working -- we were
19 working not to be part of a problem. We were
20 working to put measures in place to be part
21 of the solution.
22        That's the environment that we
23 were working within.
24        It's -- that's the extent that
25 I remember about this time frame in mid-2012.

Page 219

1    Q.    But there's more. You also
2 mentioned enforcement actions. I just want
3 to make sure that that is -- that that's
4 clear. That you're considered this
5 information regarding oxy 30s, the
6 conversation with DEA, and there's also
7 another thing that you originally testified
8 as to considering. Right?
9    A.    Yes. I included that as a data
10 point that I remember in this time frame.
11    Q.    Right. And I want to know what
12 exactly you remember about that data point.
13        MS. TABACCHI: Object to the
14    form. Asked and answered.
15        THE WITNESS: I may have the
16    dates wrong. My memory is that in or
17    around the May time frame of 2012 --
18    it might have been June of 2012 --
19    that there were -- a couple of
20    pharmacies were closed by the DEA. It
21    was -- to me, it was a connection
22    point of a changing environment.
23        When the DEA says there's a
24    problem with oxycodone 30, we're
25    reacting to that. We see pharmacies

Page 220

1 that are closed. That was my frame of
2 reference in my mind when I testified
3 earlier.
4    Q.    (BY MR. INNES) Was that the
5 earliest point in time that you recall being
6 notified that prescription opioid abuse and
7 diversion was a problem in the United States?
8        MS. TABACCHI: Object to the
9    form.
10        THE WITNESS: No.
11    Q.    (BY MR. INNES) And when was
12 the first time that you learned that
13 information?
14    A.    I don't recall exactly.
15    Q.    Was it in 2002?
16        MS. TABACCHI: Object to the
17    form.
18        THE WITNESS: I can't recall.
19    Q.    (BY MR. INNES) Was it -- it
20 was certainly before August of 2012; right?
21    A.    It would be before that.
22    Q.    Was it your understanding that
23 those pharmacy closures by the DEA were the
24 result of improper dispensing of opioids?
25        MS. TABACCHI: Object to the

Page 221

1 form?
2        THE WITNESS: I read news
3    reports about the closure.
4    Q.    (BY MR. INNES) What do you
5 mean --
6    A.    I don't remember specifically
7 what I read.
8    Q.    Do you recall anything from
9 what you read?
10    A.    I thought I read about it in
11 the May to June time frame of 2012. I don't
12 remember other specifics.
13    Q.    What publication do you think
14 you read about it?
15    A.    I don't know. It was on some
16 publicly available news feed.
17    Q.    Did you draft this letter with
18 anyone else?
19        MS. TABACCHI: Object to the
20    form.
21        THE WITNESS: This format was
22    part of an effort that was coordinated
23    with NACDS.
24    Q.    (BY MR. INNES) What do you
25 mean by "format part of an effort that was

Page 222

1  coordinated by NACDS"?  What do you mean by
2  "format"?
3      A.    The format of the letter.
4      Q.    And the format of the letter,
5  you mean the letterhead and the signature?
6  What do you mean by "format"?
7          MS. TABACCHI:  Object to the
8      form.
9          THE WITNESS:  No, there was
10     suggested language, and it was
11     reviewed by our government affairs
12     team, as I recall.
13     Q.    (BY MR. INNES)  Who on the
14  government affairs team -- well, strike that.
15         And by "our government affairs
16  team," were you referring to Walmart?
17     A.    Yes.
18     Q.    And who on Walmart's government
19  affairs team reviewed this letter?
20     A.    I don't know specifically who.
21  There were a couple of members that I worked
22  with.
23     Q.    Did you -- you received a draft
24  from NACDS initially; is that right?
25         MS. TABACCHI:  Object to the

Page 223

1      form.
2          THE WITNESS:  I believe so.
3      Q.    (BY MR. INNES)  And then did
4  you make your own edits to that draft?
5      A.    I believe it's possible that we
6  would have.
7      Q.    Okay.  And then you forwarded
8  that draft along next to Walmart's government
9  relations team?
10         MS. TABACCHI:  Object to the
11     form.
12         THE WITNESS:  If I would have
13     made any suggested edits, I would have
14     made that before forwarding to the
15     government affairs team.
16     Q.    (BY MR. INNES)  Would you have
17  done that in -- are you familiar with?
18     A.    Yes.
19     Q.    Would you have done that in the
20  redline format?
21     A.    Yes.
22     Q.    Would you have shown it to
23  anyone else prior to forwarding it on to
24  government relations?
25         MS. TABACCHI:  Object to the

Page 224

1      form.
2          THE WITNESS:  I don't recall.
3      I don't know.
4      Q.    (BY MR. INNES)  After it went
5  to government relations, did NACDS review it
6  again?
7          MS. TABACCHI:  Object to the
8      form.
9          THE WITNESS:  No.
10     Q.    (BY MR. INNES)  So it goes from
11  government relations.  Once you get approval
12  from government relations, you sent it
13  directly to Senator Tom Harkin or his staff?
14     A.    Yes.
15     Q.    Other than the government
16  relations team and yourself, did anyone else
17  at Walmart review this letter prior to it
18  being sent to Mr. Harkin -- or
19  Senator Harkin?
20     A.    I don't know.
21     Q.    Is it possible that it could
22  have been?
23         MS. TABACCHI:  Object to the
24     form.
25         THE WITNESS:  I don't know who

Page 225

1  it might have been, so I can't think
2  of anyone that it might have been.
3      Q.    (BY MR. INNES)  Who reported
4  directly to you at this time?  August of
5  2012?
6      A.    In 2012, I believe it would
7  have been Tim Koch, Debbie Mack, Dadrion
8  Gaston, and I'm not sure when George Chapman
9  joined the team.
10     Q.    Do you recall sharing this
11  letter with any of those individuals?
12     A.    I don't.
13     Q.    Who did you report directly to
14  in August of 2012?
15     A.    Sybil Richard.
16     Q.    Did you show this to
17  Ms. Richard?
18     A.    Possibly, but I don't know.
19     Q.    Is there a written protocol in
20  Walmart's files for communications that are
21  done in conjunction with trade groups to
22  federal legislators?
23         MS. TABACCHI:  Object to the
24     form.
25         THE WITNESS:  I'm sorry, can

Page 226

1   you re-ask the question?
2       Q.   (BY MR. INNES)  Is there a
3   protocol in place at Walmart for who reviews
4   a letter prior to it being sent to a federal
5   legislator?
6       A.   The process, as I understood
7   it, was to partner with the government
8   affairs team.
9       Q.   What did you base that
10  understanding on?
11      A.   Just my experience with any
12  issue that dealt with a legislative issue.
13      Q.   Did you send any other letters
14  in conjunction with NACDS regarding opioids
15  to federal or state legislators?
16      A.   It's possible that I did.  I
17  don't recall.
18      Q.   Did you write to
19  President Obama?
20      A.   I don't think so.
21      Q.   Did you write to
22  President Obama only on behalf of Walmart at
23  any point in time?
24      A.   I don't think so.  I don't
25  recall that.

Page 227

1       Q.   Do you recall a letter that you
2   wrote to President -- that was written to
3   President Trump from Walmart regarding
4   opioids?
5           MS. TABACCHI:  Object to the
6   form.
7           THE WITNESS:  I believe there
8       was a letter that went to the Trump
9       Administration.  I don't remember the
10      specifics.  I think it was sent by our
11      senior leadership.
12      Q.   (BY MR. INNES)  Was that letter
13  sent -- strike that.
14          Did that letter include
15  language proposed by the NACDS?
16      A.   I don't think it was led by
17  NACDS.
18      Q.   Was it led by any other
19  organization other than Walmart?
20          MS. TABACCHI:  Object to the
21  form.
22          THE WITNESS:  I don't know how
23      it was generated.  I think there were
24      other members of the NACDS, but I
25      don't know that it was NACDS directed

Page 228

1   or generated.
2           I wasn't -- I wasn't part of
3       any conversation or development around
4       the letter.
5       Q.   (BY MR. INNES)  And again, I'm
6   talking about the letter that you believe was
7   sent to the Trump Administration.  Was that
8   sent -- do you recall any other organizations
9   other than Walmart that participated in the
10  drafting of that letter?
11          MS. TABACCHI:  Object to the
12      form.  Lack of foundation.
13          THE WITNESS:  If I remember
14      correctly, I think CVS Caremark was
15      involved.  Signed on.  I -- but again,
16      I didn't participate in drafting the
17      letter, so I don't know who else might
18      have been involved in that.
19      Q.   (BY MR. INNES)  The first time
20  that Walmart engaged Buzzeo, or received
21  information from Buzzeo related to suspicious
22  order monitoring, that was prior to
23  August 17, 2012.  Isn't that right?
24      A.   I'm sorry, can you -- I think
25  I --

Page 229

1       Q.   I shifted gears a little bit on
2   you.  I'm sorry.
3       A.   I'm sorry, I didn't follow.
4       Q.   So you're familiar with the
5   company Buzzeo?
6       A.   Yes.
7       Q.   When did you first become
8   familiar with the -- or gain knowledge of the
9   company Buzzeo?
10      A.   I think I saw a document
11  yesterday that at least indicated sometime in
12  2010.
13      Q.   And that was -- I think it was
14  a Dendrite?  It was a former name of Buzzeo?
15      A.   Cegedim.
16      Q.   And that was prior to August of
17  2012; isn't that right?
18      A.   Yes.
19      Q.   And then Walmart doesn't
20  actually begin using the Buzzeo platform
21  until sometime in 2017; is that right?
22      A.   That's correct.
23      Q.   And that's about five years
24  after the sending of this letter in August of
25  2012?

Page 230

1    A.    Yes.

2    Q.    This letter also makes several
3 policy suggestions to Senator Harkin.  We've
4 discussed -- we've at least mentioned one.
5 There are others.

6         Does Walmart suggest that other
7 distributors of oxy 30 impose the same limits
8 that Walmart had at this time?

9         MS. TABACCHI:  Object to the
10 form.

11         THE WITNESS:  I'm sorry, I
12 didn't follow -- I don't see that in
13 the letter, so can you clarify?

14    Q.    (BY MR. INNES)  Sure.  So
15 you're making suggestions in this letter to
16 Senator Harkin about particular policies that
17 could be looked at or advanced to fight what
18 you described as the prescription diversion
19 and abuse.  Right?

20    A.    Yes.

21    Q.    Do you suggest in this letter
22 specifically targeting oxy 30?

23    A.    No.  That's not in this letter.

24    Q.    Did you not think that
25 specifically targeting oxy 30 would be a way

Page 231

1 to prevent prescription diversion and abuse?

2         MS. TABACCHI:  Object to the
3 form.

4         THE WITNESS:  I think this was
5 a broader policy request than specific
6 to one item.

7    Q.    (BY MR. INNES)  Why not also
8 include the specific to one item in this
9 letter?

10         MS. TABACCHI:  Object to the
11 form.

12         THE WITNESS:  I think we were
13 looking for broader policy solutions
14 that are listed here.

15    Q.    (BY MR. INNES)  So you made the
16 conscious decision to leave out a limit on
17 oxy 30, because it was targeted at a specific
18 drug?

19         MS. TABACCHI:  Object to the
20 form.

21         THE WITNESS:  We were talking
22 about a broader issue.

23    Q.    (BY MR. INNES)  Why not suggest
24 the limiting of Schedule II narcotics as part
25 of those broader policy concerns?

Page 232

1         MS. TABACCHI:  Object to the
2 form.

3         THE WITNESS:  Again, we're
4 looking for solutions that we thought
5 would be helpful in providing tools
6 and some additional collaboration,
7 not -- we didn't focus on a specific
8 drug in this letter.  It just wasn't
9 part of the intent.

10    Q.    (BY MR. INNES)  Well, Walmart
11 decided to put that particular check in place
12 in its own distribution; right?

13    A.    We did.

14    Q.    So why not suggest that
15 everyone put that check in place?

16         MS. TABACCHI:  Object to the
17 form.

18         THE WITNESS:  We just didn't do
19 that in this letter.

20    Q.    (BY MR. INNES)  Did you believe
21 that that particular check was effective in
22 preventing prescription diversion and abuse?

23         MS. TABACCHI:  Object to the
24 form.

25         THE WITNESS:  I think we put

Page 233

1 the policy in place because we thought
2 that it was the right thing to do.

3    Q.    (BY MR. INNES)  And in this --
4 you -- Walmart, in the spirit of
5 collaboration with its competitors, why not
6 make that suggestion?  Why doesn't everyone
7 put this check in place?

8         MS. TABACCHI:  Object to the
9 form.

10         THE WITNESS:  I think we
11 were -- on that particular activity,
12 we were focused on our own internal
13 policies.

14    Q.    (BY MR. INNES)  Were you
15 focused in this letter on your own internal
16 policies or what NACDS told you to send to
17 Senator Harkin?

18         MS. TABACCHI:  Objection to
19 form.

20         THE WITNESS:  No.  We were
21 looking at broader policies that would
22 be -- that would go beyond our
23 internal programs that we had in
24 place.

25    Q.    (BY MR. INNES)  Walmart was or

Page 234

1 the NACDS was?
2        MS. TABACCHI:  Object to the
3    form.
4        THE WITNESS:  This letter, sent
5    from me, was focused on what we
6    thought would be effective policies.
7    Q.    (BY MR. INNES) So NACDS and
8 Walmart were focused on these broader
9 concerns; is that right?
10       MS. TABACCHI:  Object to the
11   form.
12       THE WITNESS:  This was -- this
13   format and the information that was
14   included here are the items that
15   Walmart agreed would be broader
16   policies to be helpful in this issue.
17       Some of these suggestions came
18   from NACDS.  We agreed -- I agreed
19   with sending the letter in this
20   format.
21   Q.    (BY MR. INNES) Were there any
22 suggestions made by the NACDS that you did
23 not agree with and deleted from their
24 original draft?
25   A.    I don't recall.

Page 235

1    Q.    Did you suggest to the NACDS
2 that perhaps we should include Walmart's
3 policy regarding oxy 30s as a suggestion?
4        MS. TABACCHI:  Object to the
5    form.
6        THE WITNESS:  No.
7    Q.    (BY MR. INNES) Why not?
8        MS. TABACCHI:  Object to the
9    form.  Asked and answered.
10       THE WITNESS:  This letter was
11   intended to look at broader policy,
12   not Walmart's internal policy.
13   Q.    (BY MR. INNES) Do you recall
14 being a part of a DEA working group?
15   A.    Yes.
16   Q.    And what was the DEA working
17 group exactly?
18   A.    It was a subcommittee of the
19 operations work group at NACDS.
20   Q.    And what was its function?
21   A.    We reviewed -- we reviewed
22 enforcement action, and worked to develop
23 training for pharmacists specific to red
24 flags that DEA identified, that could be
25 indicators of diversion.

Page 236

1    Q.    When did you begin working on
2 the DEA work group?
3    A.    I don't remember.
4    Q.    Was it prior to August of 2012?
5    A.    I don't recall.
6    Q.    Is there anything that would
7 help refresh your recollection as to when you
8 may have begun your work on the DEA work
9 group at the NACDS?
10   A.    There may have been.  I don't
11 know.  If there's a document that I could
12 review, I'd be happy to review.  It.
13   Q.    This isn't a game of gotcha.
14 I'm really just trying to figure it out.
15       MS. TABACCHI:  Really?
16       MR. INNES:  Other times it
17   might be.
18       Kidding.
19   Q.    (BY MR. INNES) Do you
20 recall -- you said you reviewed enforcement
21 actions during your time on the DEA work
22 group.  Do you recall any specific
23 enforcement actions that you reviewed?
24   A.    They were the enforcement
25 actions that I mentioned.

Page 237

1        There was an enforcement action
2 with an independent pharmacy that I don't
3 recall.  And then I -- I seem to remember
4 that we would have reviewed the CVS
5 settlement with DEA.
6    Q.    Okay.  Your review of the -- of
7 these enforcement actions, were you also at
8 the same time sitting on the policy council
9 at the NACDS?
10   A.    Yes.
11   Q.    Did your review of the
12 enforcement actions inform your discussions
13 at the policy councils in any way?
14   A.    Not -- I mean, it may have, but
15 it seems like the substantive work was in the
16 subcommittee, the DEA work group.
17   Q.    And the DEA work group was a
18 subgroup of the operations group?
19   A.    Yes.
20   Q.    Which is separate from the
21 policy group?
22   A.    Yes.
23   Q.    Do you recall ever reviewing an
24 enforcement action and then making a policy
25 recommendation based on that review of the

Page 238

¹ enforcement action?

² A. Can you -- whose policy? Can

³ you clarify what type of policy? Are you

⁴ talking NACDS policy or Walmart policy?

⁵ Q. We can take them in chunks.

⁶ How about NACDS first?

⁷ A. What I recall about the work

⁸ with NACDS was that we were working to

⁹ establish kind of guidelines and training for

¹⁰ pharmacists related to red flags, dispensing

¹¹ red flags.

¹² So I don't -- I don't

¹³ specifically recall a policy suggestion. I

¹⁴ don't recall a policy suggestion. I just

¹⁵ don't recall.

¹⁶ Q. Did your work on the policy

¹⁷ council at the NACDS involve advocating for

¹⁸ particular policy changes at the federal or

¹⁹ state level?

²⁰ MS. TABACCHI: Object to the

²¹ form.

²² THE WITNESS: It could.

²³ Sometime -- sometimes we did advocate

²⁴ at the federal or state level.

²⁵ Q. (BY MR. INNES) And that -- the

Page 239

¹ August letter that we've discussed at length,

² that would be an example of such a -- such as

³ that?

⁴ A. Yes.

⁵ Q. We said we were going to take

⁶ it in chunks. We'll do NACDS first.

⁷ How about a Walmart policy? Do

⁸ you recall after reviewing an enforcement

⁹ action making a suggestion to change a

¹⁰ Walmart policy or add a Walmart policy?

¹¹ MS. TABACCHI: Object to the

¹² form.

¹³ THE WITNESS: The -- as we -- I

¹⁴ think it was more again around

¹⁵ training and communication from what

¹⁶ we were able to develop from that

¹⁷ review.

¹⁸ Q. (BY MR. INNES) Okay. So you

¹⁹ did review an enforcement action that led to

²⁰ you making a recommendation to a change at

²¹ Walmart?

²² MS. TABACCHI: Object to the

²³ form.

²⁴ THE WITNESS: We developed a

²⁵ red flags document that we

Page 240

¹ communicated to our pharmacists as a

² result of the operations DEA work

³ group work.

⁴ Q. (BY MR. INNES) And the DEA

⁵ operations work group, that policy change

⁶ came after a review of a particular

⁷ enforcement action?

⁸ MS. TABACCHI: Object to the

⁹ form.

¹⁰ THE WITNESS: It was a review

¹¹ of red flags that were identified by

¹² the DEA in -- within those enforcement

¹³ actions.

¹⁴ Q. (BY MR. INNES) And I really am

¹⁵ not trying to harass you on this, but do you

¹⁶ recall the particular enforcement actions

¹⁷ that you just referenced there?

¹⁸ A. Some of the review was done by

¹⁹ attorneys, so I -- I don't know all of the

²⁰ actions that were reviewed. I specifically

²¹ remember that there was -- I don't remember

²² the name of the independent pharmacy, but

²³ there was a -- there was an action regarding

²⁴ an independent pharmacy that called out

²⁵ several red flags that the DEA identified in

Page 241

¹ that situation.

² Q. Okay. And through your work in

³ that group, you made a suggestion to Walmart,

⁴ and that resulted in the generation of the

⁵ red flag policies for pharmacists?

⁶ MS. TABACCHI: Object to the

⁷ form.

⁸ THE WITNESS: The red flag

⁹ training that we developed.

¹⁰ MR. INNES: The red flag

¹¹ training. Okay.

¹² Q. (BY MR. INNES) And can you

¹³ describe what that red flag training was?

¹⁴ A. Initially, we -- we may have

¹⁵ done a broadcast. I'm not sure. But there

¹⁶ was a -- there was a reference document that

¹⁷ was created that called out specific red

¹⁸ flags as to patient, prescriber, and

¹⁹ prescription, I believe are the three

²⁰ categories.

²¹ Q. Have you heard that reference

²² document described as a checklist at any

²³ point in time?

²⁴ MS. TABACCHI: Object to the

²⁵ form.

Page 242

1    THE WITNESS: Not -- not that I
2 recall. I haven't always been as
3 close to how it was operationalized.
4    Q.    (BY MR. INNES) Okay. And in
5 the -- anything else in addition to this red
6 flag reference document that was generated
7 out of a review of an enforcement action
8 during your time at the NACDS?
9    MS. TABACCHI: Object to the
10 form.
11    THE WITNESS: Not that I
12 specifically recall.
13    Q.    (BY MR. INNES) So we've talked
14 a lot about the NACDS. Is Walmart a member
15 of or affiliated with the National Council
16 For Prescription Drug Programs? You might
17 hear that as NCPDP?
18    A.    We have -- we have associates
19 that participate on NCPDP.
20    Q.    Do you know the names of those
21 associates that participate in NCPDP?
22    A.    The specific one that I know,
23 Darren Townzen, was -- I don't know what the
24 exact title was, but he -- he was the lead of
25 NCPDP. I don't know what the title was.

Page 243

1    Q.    Do you know the purpose for
2 Walmart being a member of the NCPDP?
3    MS. TABACCHI: Object to the
4 form.
5    THE WITNESS: I think it's to
6 understand the NCPDP standard which is
7 part of the pharmacy business.
8    Q.    (BY MR. INNES) Is Walmart a
9 member affiliated in any way with the
10 American Pharmacists Association?
11    A.    We, at the corporate level,
12 we're a -- we're considered a corporate
13 supporter. It's different than a membership
14 status.
15    Q.    Do you remember contributing a
16 paper to the APhA in or about 2016?
17    A.    Was it a resident research
18 poster at their annual meeting?
19    Q.    Do you not recall?
20    A.    I don't recall.
21    Q.    Okay. Have you yourself
22 personally donated to the APhA?
23    A.    I'm a member. I haven't
24 donated.
25    Q.    Okay. So would you be

Page 244

1 surprised if you were found to have been
2 listed as a donor in 2015 of the APhA?
3    A.    I don't recall that, a donor.
4    Q.    So before when I asked you if
5 Walmart was a member of the APhA, you said
6 they're considered a corporate supporter and
7 that's different than membership; is that
8 right?
9    A.    That's my understanding.
10    Q.    Okay. But you yourself are an
11 individual member of the APhA.
12    A.    Yes, I am a member of the APhA.
13    Q.    Does Walmart pay for your
14 membership in the APhA?
15    A.    Yes.
16    Q.    Are there other members of --
17 other Walmart associates that are members of
18 the APhA?
19    MS. TABACCHI: Object to the
20 form.
21    THE WITNESS: There could be.
22 Yes.
23    Q.    (BY MR. INNES) Okay. So I
24 just want to clear that up. Do you know
25 other associates that are members -- other

Page 245

1 Walmart associates that are members of the
2 APhA?
3    A.    Yes.
4    Q.    Do any of those members hold
5 leadership positions in the APhA?
6    MS. TABACCHI: Object to the
7 form.
8    THE WITNESS: The only person
9 that I'm aware of that I can recall is
10 Kevin Barton was a member of the New
11 Practitioner Network. He may have --
12 he may have led the New Practitioner
13 Network. I don't think he leads it
14 today.
15    Q.    (BY MR. INNES) How long have
16 you yourself been a member of the APhA?
17    A.    I mean, I've been a member over
18 my career. It hasn't been continuous.
19    I -- I am sure I have
20 continuously been a member since 2013,
21 because my job duties, I'll say, require that
22 I am a member, based on my responsibility for
23 our residency program.
24    Q.    What's your residency program?
25    MS. TABACCHI: Object to the

Page 246

1    form.
2        THE WITNESS:  We have a -- we
3    have PGY 1, Post Graduate Year 1
4    Community Pharmacy Resident Program,
5    and our residents present at the
6    annual meeting.  It's part of the
7    requirement of their residency.  So as
8    their direct preceptor, I'm a member
9    of the organization.
10       Q.    (BY MR. INNES)  And you
11   received a standing ovation once, I think;
12   correct?  At a meeting?
13       A.    That wasn't at APhA.
14       Q.    Oh, that wasn't at APhA?
15       A.    I don't think so.  I've spoken
16   at APhA before, but I don't think that was
17   the ...
18       Q.    Does the APhA hold regular
19   meetings?
20       A.    They hold an annual meeting.
21   There are -- there are work groups that --
22   that meet from time to time if you're a
23   member of that work group, but my involvement
24   or knowledge of how often they meet is
25   limited.

Page 247

1        Q.    Do you hold any leadership
2    positions at APhA?
3        A.    No.
4        Q.    Have you held any leadership
5    positions in APhA?
6        A.    No.
7        Q.    Are you familiar with APhA's
8    partnership with Walmart regarding opioid
9    training?
10       A.    Yes.
11       Q.    Okay.  Can you describe what
12   that is?
13       A.    We worked with APhA to develop
14   what we referred to as the Pain Management
15   Forum, which was six and a half hours of
16   continuing education for our pharmacist
17   related to opioid-related issues.
18       Q.    Okay.  And when did that Pain
19   Management Forum first begin?
20       A.    We -- it was presented live in
21   June of 2018.  And starting in July of 2018,
22   the recorded session was a requirement for
23   all of our pharmacists to complete.  The
24   deadline was before August 31st of 2018.
25       Q.    Are you aware of any

Page 248

1    pharmaceutical manufacturers that are members
2    of the APhA?
3        A.    I don't know their membership
4    status.
5        Q.    Are you aware -- were you aware
6    of any pharmaceutical manufacturers ever
7    being members of the APhA?
8        A.    I think it's -- I think it's
9    possible.  I know that they -- there are a
10   lot of manufacturers that exhibit at the
11   annual meeting that APhA holds.
12       Q.    In addition to Walmart's
13   partnership with the APhA, the pain forum,
14   does Walmart partner with the APhA in
15   anything else?
16       MS. TABACCHI:  Object to the
17   form.
18       THE WITNESS:  We conducted
19   training.  I can't remember the name.
20       We sponsored leadership
21   development training for students.
22       At -- it was a leadership development
23   series for APhA student members.
24       Q.    (BY MR. INNES)  What sort of
25   development training was that?

Page 249

1        A.    (BY MR. INNES)  So the way that
2    it was delivered, at the annual meeting, a
3    member of Walmart's leadership would do a
4    leadership presentation to students that were
5    in attendance at the annual meeting.  And the
6    students received some type of credit for
7    attending that session.
8        I don't know the whole workings
9    of the program.
10       Q.    That program was or was not
11   related to opioids?
12       A.    No, it was a leadership
13   development topic.
14       And then just to be clear,
15   Walmart leadership has met with APhA at the
16   APhA headquarters on occasion to -- just to
17   talk about industry -- kind of industry
18   trends, practice-related issues.
19       And on one occasion, the
20   leadership of APhA came to Bentonville and
21   met.  It was -- we met with them twice, I
22   think, at their corporate office -- or at
23   their headquarters in DC, and they came to
24   Bentonville for one meeting.
25       MS. TABACCHI:  When we can.

Page 250

1    MR. INNES: Are you done with
2  that answer?
3    THE WITNESS: Yes.
4    MR. INNES: Okay. Let's go off
5  the record and take a quick break.
6    THE VIDEOGRAPHER: 3:11. We
7  are off the video record.
8    (Recess taken, 3:11 p.m. to
9  3:33 p.m.)
10   THE VIDEOGRAPHER: 3:33. We
11  are on the video record.
12   MR. INNES: Okay. Hi,
13  Ms. Hiland. Welcome back.
14   Before we begin again with our
15  conversation, we -- earlier in the
16  day, we identified on the record, we
17  introduced plaintiffs' -- or
18  introduced Exhibit 3. That was
19  identified as a potentially needed for
20  clawback due to attorney-client
21  privilege.
22   We held that exhibit back to
23  allow defense counsel to make the
24  proper inquiries.
25   It's been determined that they

Page 251

1  desire to claw it back. We have not
2  had a discussion about what the
3  particulars are of that privilege, but
4  we have agreed to pull it from the
5  record now.
6    And we will receive a letter,
7  hopefully by Monday, articulating the
8  parameters of that, and we will go
9  from there.
10   But as it stands, Exhibit 3 is
11  no longer a part of this deposition
12  record.
13   We would hold this deposition
14  open to the extent that the privilege
15  is not proper, and we'd like to
16  question Ms. Hiland about the contents
17  of the same.
18   MS. TABACCHI: I don't need to
19  say any more at this point. Thank you
20  for returning the document to us, and
21  we will send you a letter next week.
22   MR. INNES: Okay. Great.
23   Q.   (BY MR. INNES) Ready to
24  continue?
25   A.   Yes.

Page 252

1    Q.   So are you -- are you or
2  Walmart a member of the National Association
3  of Boards of Pharmacy?
4    A.   No.
5    Q.   Okay. So you personally are
6  not a member of -- I'll refer to it as NABP;
7  is that correct?
8    A.   Correct.
9    Q.   Is Walmart a member of the
10  NABP?
11   A.   No.
12   Q.   Does Walmart participate in the
13  activities of the NAPB through any other
14  trade organization? For example, the NACDS?
15   MS. TABACCHI: Object to the
16   form.
17   THE WITNESS: There are times
18   when there will be joint meetings of
19   NAPB and NACDS.
20   Q.   (BY MR. INNES) Do any of those
21  joint meetings that come to mind have
22  anything to do with opioids?
23   A.   I believe there have been
24  meetings in the past between NABP and NACDS
25  related to opioids.

Page 253

1    Q.   In which Walmart participated?
2    A.   I don't believe we
3  participated. I don't believe we were aware
4  of the meeting at the time that I'm thinking
5  of.
6    Q.   And what meeting are you
7  thinking of?
8    A.   I think there was a meeting
9  that predated the work of the operations, the
10  DEA work group committee, that Walmart did
11  not participate in.
12   Q.   And how did you come to know
13  about that particular meeting?
14   A.   If I remember correctly, it
15  would have been through NACDS reporting that
16  the meeting had occurred.
17   Q.   And how would you receive such
18  a report?
19   MS. TABACCHI: Object to the
20   form.
21   THE WITNESS: Either at the
22   policy council or in the work group.
23   Q.   (BY MR. INNES) Did you ever
24  receive summaries by email of such meetings?
25   MS. TABACCHI: Object to the

Page 254

```
 1   form.
 2         THE WITNESS:  Possibly.  I may
 3   have.
 4      Q.    (BY MR. INNES)  Do you think
 5   you may have received one for this particular
 6   meeting?
 7         MS. TABACCHI:  Object to the
 8   form.
 9         THE WITNESS:  It's possible
10   that I did.
11         I'm not sure, but it's possible
12   that I did.
13         I think we inquired about -- we
14   wanted to know what happened in the
15   meeting, so it's possible.
16      Q.    (BY MR. INNES)  "We," Walmart --
17      A.    "We" Walmart.
18      Q.    -- inquired.
19         And if it came by email, would
20   you still have that email, do you believe?
21         MS. TABACCHI:  Object to the
22   form.
23         THE WITNESS:  I believe so.
24      Q.    (BY MR. INNES)  You're not in
25   the regular practice of deleting those kinds
```

Page 255

```
 1   of emails, are you?
 2         MS. TABACCHI:  Object to the
 3   form.
 4         THE WITNESS:  No.
 5      Q.    (BY MR. INNES)  Are you a
 6   member of the National Community Pharmacists
 7   Association, otherwise known as NCPA?
 8      A.    No.
 9      Q.    Is Walmart a member of the
10   National Community Pharmacists Association?
11      A.    No.
12      Q.    Does Walmart participate in any
13   way with the National Community Pharmacists
14   Association through any other group such as
15   the NACDS?
16         MS. TABACCHI:  Object to the
17   form.
18         THE WITNESS:  There have been
19   joint initiatives between NACDS and
20   NCPA.
21      Q.    (BY MR. INNES)  Were those
22   joint initiatives related to the distribution
23   of opioids?
24         MS. TABACCHI:  Object to the
25   form.
```

Page 256

```
 1         THE WITNESS:  Not that I'm
 2   aware.
 3      Q.    (BY MR. INNES)  Were they
 4   related to dispensing of opioids?
 5      A.    Not that I specifically recall.
 6      Q.    Were they related to Schedule
 7   II narcotics in any way?
 8         MS. TABACCHI:  Object to the
 9   form.
10         THE WITNESS:  I just don't
11   recall.
12      Q.    (BY MR. INNES)  Are you aware
13   of any other organizations that Walmart is a
14   member of that would relate to opioids?
15         MS. TABACCHI:  Object to the
16   form.
17         THE WITNESS:  Not that I can
18   think of.
19      Q.    (BY MR. INNES)  If you wanted
20   to determine whether or not Walmart was a
21   member of any other associations that related
22   to opioids, how would you go about finding
23   that out?
24      A.    I think I would know, because
25   the membership dues has come from my budget
```

Page 257

```
 1   generally.
 2         So I'm just not -- I'm just not
 3   recall --
 4         I mean, I don't think there are
 5   others.  The only other membership dues that
 6   I know is the Pharmacy Quality Alliance.  But
 7   I don't think of that as an opioid-related
 8   organization.
 9      Q.    What is the Pharmacy Quality
10   Alliance?
11      A.    It's the organization that has
12   set quality metrics related to Medicare
13   Part D prescription programs.
14      Q.    Okay.  And you said that -- I
15   believe -- let's see -- "Membership dues come
16   from my budget generally."
17         What are you referring to when
18   you say "my budget"?
19      A.    My department has a budget
20   through the budget cycle that I mentioned
21   earlier.  I apply for membership dues, for
22   example, for PQA.  That comes out of my
23   budget.
24      Q.    Okay.  Are there line items
25   within your budget for particular
```

Page 258

memberships?

A. Specifically for PQA, there is.

Q. How about for NACDS?

A. That is not in my budget. That's not in my budget.

Q. Sitting here today, do you recall what memberships are in your budget that would relate to -- or have dealings with opioids or Schedule IIs?

MS. TABACCHI: Object to the form.

THE WITNESS: None that I'm aware of.

Q. (BY MR. INNES) Were you ever asked to keep leadership engaged on issues related to opioid dispensing?

Do you recall that?

MS. TABACCHI: Object to the form.

THE WITNESS: Can you repeat the question?

Q. (BY MR. INNES) Do you know what? I can probably speed this up if I just provide you with a document.

And what I'll tell you is it's

Page 259

a big document. We don't need to go through much of it at all. I'll direct you right to the page.

Feel free to review the entire document if you'd like, but I can -- I'm going to direct you to page 4. I'll give you the Bates when I hand it to you.

This is Exhibit 7.

(Whereupon, Deposition Exhibit Walmart Hiland 7, 12-13-16 email from JoAnn Stevens. Subj: H&W Compliance Oversight Meeting Materials - December 14-2016 2:00-4:00pm, Soderquist Hall Conference Room. WMT_MDL_ 000046442-46513, was marked for identification.)

Q. (BY MR. INNES) So for the record, this is a Walmart document Bates No. 46442, going all the way to 46513.

As promised, Ms. Hiland, I'm going to direct you to 46445, and in particular you'll see in the middle of the page is a bullet in bold italics that says "Opioid dispensing."

And again, feel free to review

Page 260

the document, but this is the only thing I'm going to ask you about.

[Document review.]

THE WITNESS: I've reviewed this page, but I haven't reviewed anything else in the document.

Q. (BY MR. INNES) If we do spill into other pages, I'll give you the opportunity to review that.

So this is an email from JoAnn Stevens to a litany of people. You're included on the list. And it is a "Health and wellness compliance oversight materials December 14th, 2016, 2:00 to 4:00 p.m., Soderquist Hall Conference Room."

Do you recall receiving this email?

A. I don't recall, but since I'm on here, I don't dispute that I received it.

Q. Okay. Did you regularly receive emails in advance of the health and wellness compliance oversight meetings?

MS. TABACCHI: Object to the form.

THE WITNESS: I wasn't a member

Page 261

of --

And so I only received it if I had some topic that pertained to the agenda.

Q. (BY MR. INNES) Okay. So because you received this, it's likely that you had a topic that pertained to the agenda; is that right?

A. That's correct.

Q. So if we move forward to that page I asked you to review, 46445, again, the middle of the page, Opioid dispensing. The final -- the last full sentence of that paragraph says, "Mr. Beahm followed up with a request for Ms. Hiland to continue to keep Walmart and Sam's Club leadership engaged on the decisions being made."

Do you remember that request?

A. I don't specifically remember it.

Q. Did you inform Walmart and Sam's leadership regarding decisions being made related to opioid dispensing?

MS. TABACCHI: Object to the form. If you could, read the whole

Page 262

1     bullet, please, for complete context.
2     I think that would be more accurate.
3         Q.    (BY MR. INNES)  Well, the
4   entire document is in the record, but I can
5   read it.
6         "Mr. Langman requested that
7   Susanne Hiland, Senior Director of Patient
8   Safety and Quality, and Erica Rochelle,
9   Director of Billing Compliance, respectively
10  provide additional context on the topic of
11  standing orders for naloxone and
12  corresponding billing changes.  Mr. Beahm
13  followed up with a request for Ms. Hiland to
14  continue to keep Walmart and Sam's Club
15  leadership engaged on decisions being made."
16        Did you in fact keep leadership
17  engaged on decisions being made with regards
18  to that topic?
19        MS. TABACCHI:  Object to the
20    form.
21        THE WITNESS:  So the topic that
22    I did update leadership on was
23    standing orders for naloxone.
24        Q.    (BY MR. INNES)  And who is
25  leadership?

Page 263

1         A.    Walmart and Sam's Club
2   leadership would be the senior level of
3   leaders on both sides of the organization.
4         So that had responsibility for
5   different pieces of the business.
6         Q.    Okay.  And who exactly are
7   senior level leaders?
8         A.    That would be like the
9   president of health and wellness for Walmart,
10  and the -- I'm not sure what the title --
11  there's vice president of operations on the
12  Sam's Club side.
13        Q.    Okay.  Do you remember the
14  persons that held those titles at that time?
15        A.    Yes.  So some of them are
16  listed here.  Paul Beahm, senior vice
17  president of health and wellness operations,
18  Jill Turner-Mitchell.
19        Q.    I'm sorry, for the record --
20        A.    I'm sorry.  I'm on the second
21  page of the exhibit where it says "from," and
22  then it says "Committee members."
23        Q.    Okay.  And that's --
24        A.    This is the agenda page.
25        Q.    I'm sorry to talk over you.

Page 264

1         Is it -- are you looking at the
2   bottom right-hand page, it says 46443?
3         A.    Yes.
4         Q.    Is there -- okay.
5         I'm sorry, you can continue
6   your answer.
7         A.    So these -- this would be
8   Paul Beahm, as listed here.
9         Jill Turner-Mitchell.
10  David Reitnauer, and George Riedl.
11        Those are the -- those are who
12  I would think of as leader -- Walmart --
13        When they say "Walmart and
14  Sam's Club leadership," that's who I'm
15  thinking of.
16        Q.    Okay.
17        And -- strike that.
18        Were you ever asked to update
19  leadership regarding other topics -- topics
20  other than what's described here, related to
21  opioids?
22        MS. TABACCHI:  Object to the
23    form.
24        THE WITNESS:  I would have
25    provided -- and did provide updates to

Page 265

1     leadership on the progress that we
2     were making with the APhA training,
3     the development of that training and
4     the completion rates by our
5     pharmacists.
6         Q.    (BY MR. INNES)  Okay.  Were you
7   ever asked to update leadership as to any
8   other programs related to opioids?
9         A.    I don't recall any specific
10  requests.
11        Q.    Okay.  Slightly different
12  question.
13        Did you ever update leadership
14  as to any other programs related to opioids?
15        MS. TABACCHI:  Object to the
16    form.
17        THE WITNESS:  As we developed
18    what we refer to as our opioid
19    stewardship program, I had a -- I had
20    responsibility for the development of
21    the patient education brochure, and I
22    provided -- I provided updates and the
23    opportunity for -- for the leadership
24    to review the content format of
25    that -- what we refer to as the opioid

Page 266

1 brochure that we provide to patients.
2 Q. (BY MR. INNES) And I notice
3 the Opioid Stewardship is listed under your
4 LinkedIn profile. I'm curious. Maybe we
5 should just talk about that now. What
6 exactly is the Opioid Stewardship program?
7 A. It's a collective set of
8 initiatives that Walmart has developed to
9 address different focuses around the opioid
10 issue.
11 The naloxone standing order
12 progress by state was one of those
13 initiatives that I participated in. The
14 development of the brochure was another one
15 of those initiatives that I participated in.
16 Q. Okay. You used the term "it
17 was a collective of," and I missed the ...
18 A. Initiatives.
19 Q. Initiatives. Okay.
20 And you've listed one
21 initiative, I believe, the naloxone.
22 What other initiatives are in
23 the Opioid Stewardship collective?
24 A. Walmart instituted dispensing
25 limits for the initial fill of acute opioid

Page 267

1 prescriptions.
2 We instituted counseling
3 specific to -- that included -- that
4 incorporated the patient leaflet.
5 Q. Okay. When was that
6 implemented?
7 A. This was -- the program was
8 officially launched in June of 2018, if I
9 remember correctly.
10 Q. When was the naloxone program
11 launched?
12 A. That occurred over a period of
13 time, depending -- not all states, as -- at
14 the time of this memo in 2016 allowed
15 pharmacists to dispense naloxone. And so the
16 update that Mr. Beahm was asking for was to
17 update leadership as states develop new
18 programs, and we were able to dispense in
19 those states.
20 Q. How did Walmart decide which
21 markets to engage its naloxone program in
22 originally?
23 MS. TABACCHI: Object to the
24 form.
25 THE WITNESS: Originally the

Page 268

1 only -- originally the state of
2 New York, and I think today, to this
3 day, is the only state that requires
4 pharmacists to participate in the
5 naloxone program.
6 And then we just -- we -- we
7 followed with states. We did a
8 prioritization. Some of it had to do
9 with the granting authority from the
10 state.
11 Some programs were easier to
12 implement than others, based on the
13 way the regulation was written.
14 Q. (BY MR. INNES) Was it -- any
15 priority given to communities that were --
16 based on communities' relevant suffering from
17 opioid crisis?
18 MS. TABACCHI: Object to the
19 form.
20 THE WITNESS: I believe I did,
21 from a -- from a -- I believe I did
22 look at some CDC information around
23 opioid usage to try to prioritize
24 where there was -- where states
25 allowed to try to prioritize how those

Page 269

1 programs rolled out.
2 Q. (BY MR. INNES) What -- do you
3 recall what that CDC opioid data was
4 specifically?
5 A. I believe it was some
6 population. I don't recall specifically. I
7 know that I -- I know that I remember
8 searching and reviewing some information
9 available from CDC.
10 Q. Okay. And when you reviewed
11 that data, did you create a priority list of
12 communities that were in greater need for
13 naloxone than others?
14 MS. TABACCHI: Object to the
15 form.
16 THE WITNESS: I believe we
17 prioritized states based on -- on the
18 information that I had -- that I had
19 looked at.
20 Q. (BY MR. INNES) Okay. Did
21 you -- did you document that list anywhere?
22 A. I think in conversations to my
23 team as they -- as we were -- I think I did
24 document, "Here's the priority list of states
25 to focus on first."

Page 270

1    Q.   Now, I don't want to turn this
2  into a 50-state social studies example, but
3  can you give me the top five states you think
4  you recall -- or can you give me a list of
5  the states that you recall were in your high
6  priorities?
7    A.   I don't know.  There's probably
8  a --
9         What I remember is --
10        I don't know.  I don't know
11 that I recall.  It's -- I'm sure there's a
12 list --
13   Q.   Right.
14   A.   -- of priorities and
15 communication from the team.
16   Q.   Okay.  I'm sorry, I don't want
17 to seem like I'm harassing you, or --
18        I'd love to present that
19 document to you.  I don't believe we've seen
20 that document.
21   MR. INNES:  But to the extent
22 it does exist, we'd ask for its production.
23 We can send you all a letter on that.
24   Q.   (BY MR. INNES)  Was it the CDC
25 mortality data that you looked at?

Page 271

1    A.   I don't recall specifically
2  what it was.
3         I just don't recall.
4         I know I looked at a lot of
5  information over time related to the CDC
6  dispensing guidelines, and I just --
7         I don't recall exactly what I
8  looked at.
9    Q.   And when you say you "looked at
10 a lot of data over time," is that you looked
11 at a lot of data over time to create your
12 priority list of -- for the naloxone program?
13   MS. TABACCHI:  Object to the
14 form.
15   THE WITNESS:  Yes.
16   Q.   (BY MR. INNES)  Okay.  So over
17 how long a period of time do you think you
18 researched the -- your research entailed for
19 the priority list for the naloxone program?
20   MS. TABACCHI:  Same objection.
21   THE WITNESS:  So I think it at
22 least started sometime in 2016, and I
23 think we had the program with --
24 within a year, I think we had the
25 program stood up.

Page 272

1    Q.   (BY MR. INNES)  Okay.  So in
2  addition to CDC data, what else do you recall
3  looking at to form your priority list?
4    A.   I don't remember if I looked at
5  anything else.
6    Q.   Okay.  So it very well could
7  have just been the CDC data that you looked
8  at?
9         MS. TABACCHI:  Object to the
10 form.  Mischaracterizes testimony.
11        THE WITNESS:  I did also look
12 at states that allowed, because not
13 all states allowed pharmacists to
14 dispense.  So that was the other
15 information that I think that I relied
16 on.
17   Q.   (BY MR. INNES)  That's fair.  I
18 forgot that you had said that.
19        So you looked at where it was
20 viable for the program even to begin, and
21 then you also looked at a priority list of
22 states based on a review of CDC data.
23   A.   Yes.
24        I also recall a request from
25 the New Mexico -- I believe the New Mexico

Page 273

1  Board of Pharmacy.  So we looked at that
2  request to bring that program online.
3    Q.   So the New Mexico Board of
4  Pharmacy got wind of the program and
5  requested that Walmart enter that market?
6         MS. TABACCHI:  Object to the
7  form.
8         THE WITNESS:  They had a
9  program in place --
10        I don't know that they got wind
11 of anything.  They had a program in
12 place, and they were aware that
13 Walmart hadn't implemented it so they
14 reached out and asked us to implement
15 it.
16   Q.   (BY MR. INNES)  So when --
17 aside from the research as to what
18 jurisdictions would allow you to enter, did
19 you -- the other side did the research, the
20 research for prioritization of communities
21 that were affected, did you look at anything
22 other than the CDC data?
23   A.   Not that I recall.
24   Q.   Are there any other programs
25 that you reported on you related to the

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1 distribution of dispensing of opioids to the
2 oversight committee?
3      MS. TABACCHI:  Object to the
4 form.
5      THE WITNESS:  No.
6      (Whereupon, Deposition Exhibit
7 Walmart Hiland 8, October 2017 email
8 chain.  Subj: Press Release from
9 McKesson.  WMT_MDL_000002203-2205, was
10 marked for identification.)
11 Q.   (BY MR. INNES)  Once you've had
12 a chance to review it, let me know and we can
13 begin.
14      For the record, it is a Walmart
15 document beginning 222 -- sorry, excuse me.
16 Walmart Document 2203 ending in 2205.
17      [Document review.]
18      THE WITNESS:  I've reviewed the
19 document.
20 Q.   (BY MR. INNES)  Ms. Hiland, do
21 you remember receiving this email?
22 A.   I vaguely remember it.  I do.
23 Q.   Do you remember this one?
24 A.   I think I do.
25 Q.   Why do you remember seeing this

Page 275

1 one?
2 A.    It was a little more recent.
3 But I remember -- I remember Darren sending
4 this.
5 Q.    Okay.
6      And who's Darren Townzen?
7 A.    Darren is director of health
8 and wellness billing reconciliation and
9 healthcare data.
10 Q.    Darren writes, "This also may
11 have something to do with their sense of
12 urgency."
13      Do you recall, or can you
14 recall, who he's referring to by "their"
15 sense of urgency?  Who is that pronoun for?
16 A.    That seems out of context.  And
17 I don't know who he means by "They" in this
18 sense.
19      I don't know.  I don't recall
20 who "they" would be because I'm not relating
21 sense of urgency.
22 Q.    Mm-hmm.  It's possible he could
23 be talking about McKesson, I guess?
24      MS. TABACCHI:  Object to the
25 form.  Lack of foundation.

Page 276

1      THE WITNESS:  Yeah, I'm not
2 sure.
3 Q.    (BY MR. INNES)  This is
4 October 24th, 2017.  Remind me when Walmart
5 decided to exit the distribution --
6 self-distribution of Schedule II narcotics.
7      MS. TABACCHI:  Object to the
8 form.  Lack of foundation.
9      THE WITNESS:  I don't know when
10 the decision was made.  We exited in
11 April 2018 for C-IIs.
12 Q.    (BY MR. INNES)  Okay.  Was that
13 all C-IIs?
14 A.    Yes.
15 Q.    Okay.  And this -- this email
16 from Darren, or Mr. Townzen, went to you,
17 Bryan -- is it Richard?
18 A.    It is Richard.
19 Q.    -- and Betsy Hall Collins?
20 A.    Yes.
21 Q.    And who is -- is Mr. Richard a
22 Walmart employee?
23 A.    Yes.
24 Q.    And what's his role?
25 A.    He is senior director for

Page 277

1 quality improvement.
2 Q.    Okay.
3      And at this time, is he a peer
4 of yours or did he report to you?
5 A.    He reported to me.
6 Q.    And Betsy Hall Collins, was she
7 a Walmart employee?
8 A.    Yes.
9 Q.    And what was her role at the
10 time of this email?
11 A.    She was in government affairs.
12 Q.    Is it possible that the "their"
13 refers to the Walmart board?
14      MS. TABACCHI:  Object to the
15 form.  Lack of foundation.
16      THE WITNESS:  I don't think so.
17 I would say no.
18 Q.    (BY MR. INNES)  And why do you
19 say no to that?
20 A.    I don't know that the board was
21 involved in this NCPDP white paper.
22      I don't have any connection
23 of -- of this NCPDP project with the board of
24 directors.  I don't have a context for that.
25 Q.    What is the NCPDP white paper?

Page 278

1    A.    It's linked in reference in the
2  document, and it --
3          So basically it was a standard
4  for a national prescription drug monitoring
5  program.
6    Q.    Okay.  At the time of this
7  email, who were the stakeholders that you
8  were aware of with respect to the
9  implementation of such a program?
10         MS. TABACCHI:  Object to the
11   form.
12         THE WITNESS:  Can you clarify
13   Walmart stakeholders?
14   Q.    (BY MR. INNES) Sure, we can
15  start with Walmart.
16   A.    Darren was advocating.  And he
17  came to -- he came to me.  He involved Betsy,
18  because there was some advocacy that he was
19  involved with from his leadership role at
20  NCPDP in trying to establish this database.
21         Bryan was involved because
22  there was -- as I recall, the proposal was to
23  mirror a program that McKesson had
24  established called a patient -- patient
25  safety network.  And so because it was called

Page 279

1  patient safety network, Bryan was involved.
2    Q.    Okay.  Were there stakeholders
3  outside of Walmart?
4          MS. TABACCHI:  Object to the
5    form.
6          THE WITNESS:  So I believe
7    potentially the folks listed here,
8    there were some discussions about a
9    working group.  I don't know that it
10   ever formed, so I don't know exactly
11   who the stakeholders might have been.
12   Q.    (BY MR. INNES) Okay.  Bottom
13  line is you're not sure who the "their"
14  refers to in this sentence?
15   A.    Correct.
16   Q.    Could it have been the members
17  of the controlled substances panel?  Advisory
18  panel?
19         MS. TABACCHI:  Object to the
20   form.  Asked and answered.  Lack of
21   foundation.
22         THE WITNESS:  Yeah, I don't
23   think in this context.
24         (Whereupon, Deposition Exhibit
25   Walmart Hiland 9, May 2015 email

Page 280

1  chain.  Subj: "4th Thursday" H&W
2  Compliance Focus Areas deck.
3  WMT_MDL_000049545-49566, was marked
4  for identification.)
5          MR. INNES:  Ms. Hiland, I'm
6  handing you what's been marked as
7  Plaintiffs' Exhibit 9.  This is
8  another fairly lengthy document.  Feel
9  free to review the whole thing.  I can
10  direct you to the two pages of this
11  document that I'd like to ask you
12  questions on.
13         For the record it's a Walmart
14  document Bates No. 49545 ending in
15  49566.  There are several native
16  attachments that we have produced in
17  native format.
18         I am particularly interested in
19  the middle of the first page and what
20  I believe is a corresponding entry at
21  49564 which is towards the end of the
22  document.
23         THE WITNESS:  Can you repeat,
24  49564?
25         MR. INNES:  That's right.

Page 281

1          THE WITNESS:  Thank you.
2    [Document review.]
3          THE WITNESS:  Okay.
4    Q.    (BY MR. INNES) Okay.  So
5  you'll see in the middle of the page -- well,
6  strike that.
7          This email from Maria Smith to
8  a bunch of folks.
9          You're copied towards the
10  bottom of that "To" line.  It's the subject
11  line "For Thursday H and W compliance focus
12  areas deck."
13         Are you familiar with the
14  fourth Tuesday?  Is that a particular
15  meeting?  What is that?
16         MS. TABACCHI:  Object to the
17   form.
18         THE WITNESS:  4th Thursday was
19   a -- was a meeting that occurred on
20   the fourth Thursday of the month.
21   Q.    (BY MR. INNES) And at that --
22  did you attend all of those meetings?  Is
23  that a --
24   A.    I -- not all of those.
25  Depending on what my schedule would have

Page 282

1 been.
2    Q.    You'll see here in the middle
3 of this cover email, it says, "Board of
4 Directors objectives."
5       Do you see that?
6    A.    Yes.
7    Q.    Okay.  And under that it says
8 "Controlled substances:  Suspicious order
9 monitoring (Miranda Johnson)."
10       Do you see that?
11    A.    Yes.
12    Q.    What does "the board of
13 directors" refer to?
14       MS. TABACCHI:  Object to the
15    form.  Lack of foundation.
16       THE WITNESS:  It would be the
17    Walmart board of directors.
18    Q.    (BY MR. INNES)  And that --
19 were -- okay.  Now let's go to that other
20 page I flagged for you, 49564.
21       And this says, "Board Objective
22 18."
23       It's a little difficult to
24 read.  The font is a little small.
25       But the objective says, "In the

Page 283

1 U.S., implement controlled substance
2 suspicious-order monitoring enhancements
3 (which will include both software and
4 personal changes) in the U.S. distribution
5 centers."
6       Was it common practice for
7 folks to provide updates regarding board of
8 directors objectives at the 4th Thursday
9 meetings?
10       MS. TABACCHI:  Object to the
11    form.
12       THE WITNESS:  I believe if
13    there was a -- if there was a board
14    objective on a project, it would --
15    that was part of that meeting, it
16    would be called out.
17       I don't know that it was common
18    practice.
19    Q.    (BY MR. INNES)  Are you aware
20 of any board of director objectives in
21 addition to -- that that described in the
22 board of objective 18 on 49564 related to
23 opioids?
24       MS. TABACCHI:  Object to the
25    form.

Page 284

1       THE WITNESS:  I -- no.  I don't
2    know.
3    Q.    (BY MR. INNES)  Did you,
4 yourself, or anyone in your department, under
5 your -- strike that.
6       Did you or any of your direct
7 reports carry out board of directors
8 objectives related to Schedule IIs?
9       MS. TABACCHI:  Object to the
10    form.
11       THE WITNESS:  Can you orient me
12    to -- in this time frame?
13       MR. INNES:  Any time frame.
14       THE WITNESS:  So I didn't
15    have -- I was in the compliance
16    department, so the board of directors
17    from a compliance perspective would
18    have been focused on compliance
19    projects.
20       I'm not aware specifically
21    of -- I can't recall a project that we
22    would have worked on.  It might have
23    been collaborative on something, but
24    not specifically.
25    Q.    (BY MR. INNES)  So is it your

Page 285

1 testimony you may have collaborated with --
2 on something with another group in Walmart to
3 execute on a board objective?
4       MS. TABACCHI:  Object to the
5    form.
6       THE WITNESS:  I mean, it's
7    possible, but I can't recall
8    anything -- any specific project.
9    Q.    (BY MR. INNES)  Okay.
10       Can you recall -- but you do
11 recall collaborating with other departments
12 regarding board of director objectives?
13       MS. TABACCHI:  Object to the
14    form.
15       THE WITNESS:  Not specific --
16    not specifically.
17       I don't recall.
18    Q.    (BY MR. INNES)  Is it possible
19 that you collaborated with another group
20 regarding a board of directors objective
21 related to Schedule IIs?
22       MS. TABACCHI:  Object to the
23    form.
24       THE WITNESS:  It's possible.  I
25    wouldn't always know what a board

Highly Confidential - Subject to Further Confidentiality Review

Page 286

```
 1    of -- what was a board of directors
 2    objective.
 3         Q.    (BY MR. INNES) How were board
 4    of director objectives usually communicated
 5    to someone in your position?
 6         MS. TABACCHI:  Object to the
 7    form.
 8         THE WITNESS:  I don't know that
 9    they are.  If I'm in a meeting and
10    it's called out, I would become aware.
11    Otherwise they're not generally
12    communicated with me.  I haven't had
13    occasion for that to come to me.
14         Q.    (BY MR. INNES) But as we've
15    noted on 49545, this would be an example of a
16    communication that you would be aware of, of
17    a -- regarding a board of director objective.
18    Is that right?
19         MS. TABACCHI:  Object to the
20    form.
21         THE WITNESS:  Yes.
22         Q.    (BY MR. INNES) And you said --
23    I believe your testimony was it wasn't
24    necessarily commonplace for the board of
25    directors objectives to be relayed during a
```

Page 287

```
 1    4th Thursday meeting; is that right?
 2         MS. TABACCHI:  Object to the
 3    form.
 4         THE WITNESS:  I think what was
 5    uncommon was that we had --
 6         No.  It wasn't common.
 7         Q.    (BY MR. INNES) So you find it
 8    to be unusual that the board of directors
 9    objective was being communicated in a 4th
10    Thursday meeting?
11         MS. TABACCHI:  Object to the
12    form.
13         THE WITNESS:  I mean, I don't
14    have an opinion about unusual or --
15         I think it was a report that
16    was tied to this project.
17         Q.    (BY MR. INNES) This is a
18    pretty important product; right?  This is a
19    controlled substances Suspicious Order
20    Monitoring Program?
21         MS. TABACCHI:  Object to the
22    form.
23         THE WITNESS:  I believe this is
24    an important project.
25         Q.    (BY MR. INNES) Is it a fair
```

Page 288

```
 1    statement that it would take a fairly
 2    important project such as this one for a
 3    board to inject themselves into a 4th
 4    Thursday meeting?
 5         MS. TABACCHI:  Object to the
 6    form.  Lack of foundation.
 7         THE WITNESS:  I don't know how
 8    board objectives were determined.
 9         Q.    (BY MR. INNES) You don't know
10    how board objectives related to opioids were
11    determined?
12         A.    No.
13         Q.    How would we determine how
14    board objectives related to opioids were
15    determined?
16         MS. TABACCHI:  Object to the
17    form.
18         THE WITNESS:  I don't know,
19    because I don't know who makes those
20    determinations.
21         Q.    (BY MR. INNES) You would
22    presume the board would make those
23    determinations, I suppose; right?
24         MS. TABACCHI:  Object to the
25    form.  Lack of foundation.
```

Page 289

```
 1         THE WITNESS:  Yeah, I'm not
 2    presuming.  I don't know.
 3         (Whereupon, Deposition Exhibit
 4    Walmart Hiland 10, December 2017 email
 5    chain.  Subj: RE Industry Letter.
 6    WMT_MDL_000032595-32599, was marked
 7    for identification.)
 8         Q.    (BY MR. INNES) Ms. Hiland,
 9    you've just been handed what's been marked as
10    Plaintiffs' Exhibit 10.  When you have a
11    chance to review the document, I can ask you
12    some questions.
13         In the meantime for the record
14    I will say that this is a Walmart document
15    beginning 32595 and ending 32599.
16         [Document review.]
17         THE WITNESS:  I've reviewed it.
18         Q.    (BY MR. INNES) Okay.  So
19    you'll see this is an email from Betsy Hall
20    Collins to you, Susanne Hiland on
21    December 19th of 2017.  And it attaches
22    pharmacy industry letter to President Trump
23    11-08-17.PDF.
24         The email chain begins with a
25    request you're making to Ms. Collins.  Let's
```

Page 290

1  just for the record, what's Ms. Collins's
2  title at the time of this email, December of
3  '17?
4      A.   She was director -- she was
5  with government affairs, but I think it was
6  referred to as global public policy, director
7  of global public policy.
8      Q.   And you asked, "Betsy, do you
9  have a copy of the letter Greg signed?"
10      And who is the "Greg" you're
11  referring to there?  Is that Greg Foran?
12      A.   Yes.
13      Q.   And how do you pronounce that
14  name?  I'm sorry.
15      A.   I stumble too.  I think it's
16  Foran.
17      Q.   Okay.
18      And at the time of this letter,
19  Mr. Foran was the president and chief
20  executive officer of Walmart U.S.; is that
21  right?
22      A.   Yes.
23      Q.   Okay.  And then your email
24  continues on.  "Paul wants me to include it
25  in a meeting we have in the morning."

Page 291

1      Who is the "Paul" you're
2  referring to here?
3      A.   That is Paul Beahm.
4      Q.   And what was Mr. Beahm's title
5  at that time?
6      A.   Senior vice president, health
7  and wellness operations, Walmart.
8      Q.   Do you recall the meeting that
9  you had planned in the morning?
10      A.   At -- I don't know specifically
11  what the meeting would have been.
12      I'm trying to orient myself to
13  day of the week, if it was a Thursday
14  meeting.  It doesn't sound like it was a
15  Thursday meeting.
16      Q.   It sounds like it might have
17  been a Wednesday meeting.
18      A.   It sounds like it was a
19  Wednesday meeting.
20      I don't know specifically what
21  the meeting would have been.
22      Q.   Why, out of curiosity, if it
23  was a Thursday would that have jogged your
24  memory?  Was there a particular meeting you
25  had with Mr. Beahm on Thursdays?

Page 292

1      A.   The Thursday compliance
2  meeting.
3      Q.   Okay.  Do you -- did you draft
4  the attached letter to President Trump?
5      A.   No.
6      Q.   Do you know who did draft the
7  attached letter to President Trump?
8      A.   No.
9      Q.   Do you know if the text was
10  provided by NACDS?
11      A.   Not to my knowledge.  I don't
12  remember if they were a party to this or not.
13  I don't think so.
14      Q.   And why don't you think so?
15      A.   Because I don't remember
16  hearing about it from any communication that
17  I was part of with NACDS.  I think it would
18  have eventually come through NACDS if that
19  had been the case.
20      Q.   And in December of 2017, you
21  would have expected to receive such
22  communications from NACDS if it came from
23  NACDS; is that right?
24      MS. TABACCHI:  Object to the
25  form.

Page 293

1      Q.   (BY MR. INNES) You would have
2  been the person at Walmart to receive those
3  types of documents?
4      MS. TABACCHI:  Object to the
5  form.
6      THE WITNESS:  I think in my
7  position as participating in policy
8  council, it would have -- would have
9  been an attachment to a meeting or a
10  call, and I wasn't -- I didn't have it
11  from that --
12      Q.   (BY MR. INNES)  Would it -- do
13  you think --
14      A.   -- source.
15      Q.   Would it have functioned
16  similar to the way it functioned with the
17  letter to Senator Harkin that we discussed
18  earlier today?
19      MS. TABACCHI:  Object to the
20  form.
21      THE WITNESS:  Can you clarify?
22  I'm --
23      Q.   (BY MR. INNES) Sure.  The
24  letter that we discussed earlier to
25  Senator Harkin, you had said that that was

Page 294

1 language that was received from NACDS that
2 you reviewed and forwarded on to government
3 relations.
4 　　Do you believe this is the type
5 of letter that would have -- that NACDS could
6 have provided language for?
7 　　MS. TABACCHI:  Object to the
8 form.
9 　　THE WITNESS:  I just -- I don't
10 have any indication that NACDS was
11 involved.
12 　　Q.　(BY MR. INNES)  Based on the
13 parties that are signatories to this letter,
14 does that give you any sense of who may have
15 drafted this letter?
16 　　MS. TABACCHI:  Object to the
17 form.  Lack of foundation.
18 　　THE WITNESS:  No.
19 　　No.  These are listed to me in
20 alphabetic order, so I don't know if
21 there's -- they're just parties to the
22 letter.  I don't know.
23 　　Q.　(BY MR. INNES) Did you have an
24 opportunity to speak with Mr. Foran prior to
25 this letter being sent?

Page 295

1 　　MS. TABACCHI:  Object to the
2 form.
3 　　THE WITNESS:  No.
4 　　Q.　(BY MR. INNES)  Do you have
5 knowledge as to whether Mr. Foran read this
6 letter prior to it being sent?
7 　　MS. TABACCHI:  Object to the
8 form.
9 　　THE WITNESS:  I don't know
10 that.
11 　　Q.　(BY MR. INNES) Do you know of
12 any letter sent to a prior administration
13 that were similar to this?
14 　　Strike that.
15 　　Do you know of any letters sent
16 to President Obama that were similar in
17 content to this exhibit?
18 　　MS. TABACCHI:  Object to the
19 form.
20 　　THE WITNESS:  No.
21 　　Q.　(BY MR. INNES)  The first
22 paragraph reads -- I can read it in total,
23 "By any measure, opioid abuse in the
24 United States has reached crisis proportions.
25 The number of opioid prescriptions has nearly

Page 296

1 tripled from 76 million in 1991 to
2 approximately 207 million in 2013.
3 　　"The U.S. accounts for
4 80 percent of the world's consumption of
5 opioid painkillers and 99 percent of the
6 hydrocodone.  This remarkable volume is
7 severely harming consumer health, costing the
8 country more than $78 billion annually in
9 associated costs and taking a tragic toll on
10 countless individuals and society as a
11 whole."
12 　　Do you agree with the sum and
13 substance of that paragraph?
14 　　MS. TABACCHI:  Object to the
15 form.
16 　　THE WITNESS:  I don't have any
17 reason to dispute these as being
18 accurate.
19 　　Q.　(BY MR. INNES)  Okay.  What's
20 interesting to me is that this paragraph
21 discusses opioid prescriptions.  It doesn't
22 discuss opioid distribution, does it?
23 　　A.　Not -- no.
24 　　Q.　And at this time, Walmart was
25 in the business of opioid distribution; isn't

Page 297

1 that right?
2 　　MS. TABACCHI:  Object to the
3 form.
4 　　THE WITNESS:  We were
5 distributing opioids in this time
6 period.
7 　　Q.　(BY MR. INNES)  Okay.  It
8 doesn't discuss opioid dispensing, does it?
9 In that first paragraph?
10 　　MS. TABACCHI:  Object to the
11 form.
12 　　THE WITNESS:  It doesn't say
13 the word "dispensing."
14 　　Q.　(BY MR. INNES) It's actually
15 limited to opioid descriptions; isn't that
16 right?
17 　　MS. TABACCHI:  Object to the
18 form.
19 　　THE WITNESS:  As a callout
20 specific to opioids, I see "opioid
21 prescriptions."
22 　　Q.　(BY MR. INNES)  Are you done?
23 　　A.　Yes.
24 　　Q.　So without a prescription,
25 there can be no dispensing; isn't that right?

Page 298

1  A.  Correct.
2  Q.  And without a prescription --
3      And there can be no dispensing
4  without a purchase by a pharmacy of a drug
5  from a manufacturer; isn't that right?
6      MS. TABACCHI:  Object to the
7  form.
8      THE WITNESS:  Can you restate
9  it to make sure I follow?
10  Q.  (BY MR. INNES) An opioid can't
11  be dispensed by a pharmacy unless it makes
12  its way to a pharmacy; isn't that right?
13  A.  Correct.
14  Q.  And the way it's stocked on a
15  shelf at a Walmart pharmacy is because
16  Walmart, through its distribution channels,
17  has placed it on that shelf; isn't that
18  right?
19      MS. TABACCHI:  Object to the
20  form.
21      THE WITNESS:  We
22  self-distributed opioids and also
23  used.
24  Q.  (BY MR. INNES) And Walmart
25  purchased those opioids that it

Page 299

1  self-distributed from manufacturers; isn't
2  that right?
3  A.  Yes.
4  Q.  So if we're articulating the
5  entire problem here, why do you believe that
6  Walmart sent a letter to President Trump
7  where distributors and pharmacists are
8  conspicuously absent?
9      MS. TABACCHI:  Object to the
10  form.  Lack of foundation.
11      THE WITNESS:  I'm sorry, who
12  did you say was absent?
13  Q.  (BY MR. INNES) Distributors.
14  Right?  And pharmacists?
15      MS. TABACCHI:  Object to the
16  form.  Lack of foundation.
17      Are you talking about one
18  paragraph in the letter?
19      THE WITNESS:  The signatories
20  are present.  I don't know how it was
21  decided to send the letter.
22  Q.  (BY MR. INNES) Who is
23  ClarusOne?  Are you familiar with that term?
24  A.  Yes.
25  Q.  Okay.  What is ClarusOne?

Page 300

1  A.  I don't know the specifics, but
2  it's a -- an -- I mean, I have this term in
3  my head, a joint venture between Walmart and
4  McKesson.
5  Q.  And what's your understanding
6  of what that joint venture was?
7  A.  It's for the purpose of
8  purchasing medications.
9  Q.  Purchasing what kinds of
10  medications?
11  A.  I don't know what the -- I
12  don't know the workings of ClarusOne.
13  Q.  Does Walmart purchase drugs
14  from ClarusOne?
15      MS. TABACCHI:  Object to the
16  form.
17      THE WITNESS:  I don't know what
18  the contractual arrangement is.
19  Q.  (BY MR. INNES) That wasn't my
20  question.  My question was, does Walmart
21  purchase drugs from ClarusOne?
22      MS. TABACCHI:  Object to the
23  form.  Lack of foundation.
24      THE WITNESS:  I don't know.
25  Q.  (BY MR. INNES) Does -- do you

Page 301

1  know if Walmart purchases Schedule II
2  narcotics from ClarusOne?
3      MS. TABACCHI:  Object to the
4  form.  Lack of foundation.
5      THE WITNESS:  I don't know.
6      MR. INNES:  Can we go off the
7  record?
8      THE VIDEOGRAPHER:  4:35.  We
9  are off the video record.
10      (Recess taken, 4:35 p.m. to
11  4:44 p.m.)
12      THE VIDEOGRAPHER:  4:45.  We
13  are on the video record.
14  Q.  (BY MR. INNES) Okay,
15  Ms. Hiland, we're back.  We'll make one final
16  push.  I think we can be quick about this.
17      When did you first learn that
18  Walmart decided to exit the distribution of
19  Schedule II narcotics?
20  A.  I don't recall specifically.
21  It was sometime close to the -- it was
22  sometime in early 2018, so close to when we
23  actually stopped.
24  Q.  Okay.  And how was that
25  communicated to you?

Page 302

1    A.   I believe I was in a meeting.
2         I don't know the nature of the
3  meeting, but I believe it was communicated in
4  a meeting that an announcement was made.
5    Q.   Do you recall who communicated
6  it during that meeting?
7    A.   I think it was George Riedl.
8    Q.   Okay.  Following that meeting,
9  were you asked to sign a nondisclosure
10  agreement?
11        MS. TABACCHI:  Object to the
12  form.
13    Q.   (BY MR. INNES)  Regarding the
14  information you learned at that meeting?
15    A.   No.
16    Q.   Have you ever signed a
17  nondisclosure agreement during your tenure at
18  Walmart?
19    A.   Yes.
20    Q.   And what was that in relation
21  to?
22        MS. TABACCHI:  Object to the
23  form.
24        THE WITNESS:  I sign them
25  regularly for new suppliers that we're

Page 303

1  talking to, to understand their
2  capabilities.
3    Q.   (BY MR. INNES)  Do you know who
4  made the decision to exit the Schedule II --
5  the self-distribution of Schedule IIs?
6    A.   I don't know specifically.
7    Q.   Following that meeting where
8  you learned about the intention to exit that
9  business, did you ask any of your colleagues
10  why that decision was made?
11    A.   No.  Not that I recall.
12    Q.   Do you believe that decision
13  was made for a business purpose?
14        MS. TABACCHI:  Object to the
15  form.  Lack of foundation.
16        THE WITNESS:  I believe it
17  impacted the business, so I do -- I
18  think it was a decision made by the
19  business.
20    Q.   (BY MR. INNES)  Is it your
21  belief that the cost of regulatory compliance
22  was too great to self-distribute?
23        MS. TABACCHI:  Object to the
24  form.  Lack of foundation.
25        THE WITNESS:  I don't know.  I

Page 304

1  wasn't part of any of those
2  conversations.
3        MR. INNES:  Okay.  I have no
4  further questions.
5        Do you guys have any questions?
6  Anyone here?
7        MS. TABACCHI:  We have no
8  questions for the witness.
9        MR. INNES:  Okay.  So I know
10  I've already made the record on this,
11  but I'll just seal it off that we
12  pulled back Exhibit 3.  There was a
13  privilege issue.  We'll hold it open
14  for that purpose.
15        We would also like to hold it
16  open because we believe there were
17  certain areas of documents -- and
18  we'll send you a letter on this as
19  well -- that we don't have production
20  of that are -- we believe would be
21  relevant and should have been produced
22  and we'd like to question Ms. Hiland
23  on.  And we can -- we can put that in
24  a letter too as well.
25        MS. TABACCHI:  We can agree to

Page 305

1  disagree as to certain aspects of
2  that.  But I appreciate your statement
3  for the record, and I think we're
4  concluded for today.
5        MR. INNES:  Okay.
6        MS. TABACCHI:  Thank you.
7        MR. INNES:  Thank you.
8        THE VIDEOGRAPHER:  4:48.  We
9  are off the video record.  This
10  concludes the video deposition.
11        (Proceedings recessed at
12  4:48 p.m.)
13             --o0o--
14
15
16
17
18
19
20
21
22
23
24
25

Page 306

CERTIFICATE

I, DEBRA A. DIBBLE, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Realtime Captioner, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, SUSANNE HILAND was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

DEBRA A. DIBBLE, RDR, CRR, CRC
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified Court Reporter

Dated: 23 January 2019

Page 307

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 308

ERRATA

PAGE LINE CHANGE

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

Page 309

ACKNOWLEDGMENT OF DEPONENT

I, SUSANNE HILAND, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
SUSANNE HILAND                    DATE

Subscribed and sworn to before me this
_____ day of _____, 20 _____.
My commission expires: _____

_____
Notary Public

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1          LAWYER'S NOTES
2
3   PAGE  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25